## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | |
| | § | **Chapter 11** |
| **W.R. GRACE & CO., et al** | § | **Jointly Administered** |
| | § | **Case No. 01-1139 (JKF)** |
| Debtors | § | |

## FEE AUDITOR'S FINAL REPORT REGARDING
## INTERIM APPLICATION OF REED SMITH LLP
## FOR THE FIRST, SECOND AND THIRD INTERIM PERIODS

This is the final report of Warren H. Smith & Associates ("Smith"), acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the <u>Interim Application of Reed Smith LLP for the First, Second and Third Interim Periods</u> (the "Application").

### BACKGROUND

1.      Reed Smith LLP ("Reed") was retained as Special Asbestos Product Liability Defense Counsel to the Debtors.  In the Application, Reed seeks approval of fees totaling $884,528.00 and expenses totaling $87,383.96 for its services from April 2, 2001 through December 31, 2001.

2.      In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time entries included in the exhibits to the Application, for compliance with the Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2001, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, Issued January 30, 1996, (the "Guidelines"), as well as for consistency with precedent established in the United States Bankruptcy Court for the District of Delaware, the United States District Court for the District of

Delaware, and the Third Circuit Court of Appeals.  We served on Reed an initial report based on our review, and received a response from Reed, portions of which are quoted herein.

## DISCUSSION

### General Issues

3.      In our initial report we noted that Reed professionals Flatley, Restivo, Cameron, Antezana, and Haines did not consistently provide adequate detail in their time entries.   Thus we asked Reed to please advise these professionals to provide more information in their time entries in the future and Reed stated that it would do so.

4.      In our initial report we noted that Reed professionals Restivo, Flatley, Cameron, Bentz, DelSole, Haines, and Trevelise consistently lumped their time entries.  Thus we asked Reed to please advise these professionals not to lump their time entries in the future and Reed stated that it would do so.

5.      In our initial report we noted that Reed did not segregate its time by project categories.  Thus we asked Reed to please advise whether the retention addresses multiple projects which would necessitate the use of categories.  Reed responded as follows:

> **Project Categories (Inquiry No. 5).**  Beginning with its Fee Application for the Twelfth Monthly Interim Period (June 1, 2002 through June 30, 2002), Reed Smith separated its time and fees for fee application preparation, non-working travel, and asbestos litigation defense.  Beginning with its Fee Application for the Thirteenth Monthly Interim Period (July 1, 2002 through July 31, 2002), and pursuant to the Fee Auditor's directions to use specifically-enumerated categories for fee applications submitted in this case, Reed Smith separated its time and fees for the aforementioned categories, as well as for hearing preparation and attendance, (asbestos) claim analysis, objection and resolution, and employment application preparation.  Reed Smith will continue to separate its time according to the Fee Auditor's designated categories in future fee applications.  Furthermore, it should be noted that beginning in August 2002, pursuant to its representations in its proposed budget for the ZAI Science Trial, Reed Smith will begin to use a separate category for fees and expenses it incurs in preparing the Debtors' defense in the ZAI Science Trial, which has been scheduled by the United States Bankruptcy Court for the Western District of Pennsylvania ("Bankruptcy Court") for the Spring of 2003.  Finally, insofar as Reed

Smith has submitted spreadsheets to the Fee Auditor for all Quarterly Interim Periods in which it has submitted fee applications, in which its hours and fees are separated into the aforementioned categories, it understands that it has fully complied with the Fee Auditor's instructions to categorize.

As a general matter, however, Reed Smith's representation of the Debtors is based wholly upon the Debtors' alleged asbestos-related liabilities. Reed Smith's position as the Debtors' Special Asbestos Product Liability Defense Counsel limits its duties to those relating to cases and claims against the Debtors based on alleged asbestos-related liabilities. Thus, the overwhelming bulk of Reed Smith's work has fallen into the Litigation and Litigation Consulting category and (heretofore) will fall in the ZAI Science Trial category. To the extent that Reed Smith has prepared employment and fee applications, attended hearings, and traveled for purposes of representing the Debtors with respect to those asbestos-related issues, it has used (and will continue to use) categories corresponding to these tasks to explain its requests for compensation.

We appreciate this explanation.

<u>Specific Time and Expense Entries</u>

6.    In our initial report we noted that between July 20, 2001 and December 6, 2001, Reed billed 306.95 hours for a cost to the bankruptcy estate of $87,794.00 in fees for multiple professionals to attend the same meetings, hearings and/or conference calls. Thus we asked Reed to please advise why it was necessary for multiple professionals to attend each of these occasions. *See* Exhibit A. Reed's response is provided in Response Exhibit 1. We appreciate the lengthy and detailed responses regarding multiple professionals at the cited occasions and we believe that, in each instance, our concerns were adequately addressed.

7.    In our initial report we noted that between September 11, 2001 and September 28, 2001, Reed billed 31.3 hours for a cost to the bankruptcy estate of $3,443.00 for tasks which appear to be ministerial in nature as set forth in Exhibit B. The Guidelines Rule II. E. 7., states, "[f]actors relevant to a determination that the expense is proper include the following: . . Whether the expenses appear to be in the nature of nonreimbursable overhead . . . Overhead includes word processing, proofreading, secretarial and other clerical services, . . .". Thus we

asked Reed to please advise why these costs should not be considered ministerial or overhead

and reduced in their entirety.  Reed responded as follows:

> In his initial report, the Fee Auditor noted that between September 11, 2001 and September 28, 2001, Reed Smith billed 31.3 hours (valued at $3,443.00) for tasks which appear to be ministerial in nature.  These tasks, listed at Exhibit B of the Fee Auditor's initial report, were undertaken by Reed Smith paralegal Atkinson as part of her duties relating to the Reed Smith attorney work-product review of the Debtors' documents.
>
> At the beginning of Reed Smith's attorney work-product document review project, paralegal Atkinson was placed in charge of the day-to-day technical and administrative affairs involved in the project, including providing the attorney document reviewers with documents, answering the attorneys' questions about the technical aspects of the project (including instructions on the proper use of the document database), reviewing the work of the attorney document reviewers to ensure compliance with the project's technical guidelines, and reporting on the progress, status, and issues arising from the attorney work-product document review project to senior Reed Smith attorneys working on the Debtors' cases. Paralegal Atkinson was also responsible for remedying problems the attorney document reviewers had in accessing the documents.  All of these tasks were necessary for maximizing the efficiency and effectiveness of the attorney work-product document review project.  Without her technical guidance, the project would have been paralyzed.  Furthermore, insofar as these responsibilities could have been placed on an attorney, the use of an experienced paralegal in this position minimized the expense these necessary tasks generated.

While we believe we understand the role Paralegal Atkinson played in the document review, we

believe that the portion of the time entries pertaining to  "printing documents" refers to a clerical

task.  In fact, Reed refers to the printing of these reports as a secretarial task in its response to

paragraph 11 and 12 of this report,

> "[o]nce the documents were scanned and entered into the database, the CD-ROMS could be accessed by Reed Smith paralegals and/or secretarial staff who would print copies of the imaged documents for the attorney work-product review.  The initial decision to utilize Reed Smith secretarial staff working overtime on weekends to print these documents was made to save costs, as this situation was less costly than retaining an outside printer to do the same task."

Throughout the application period, approximately 149.50 hours was spent by Paralegal Atkinson

on the task of printing documents as set forth in Exhibit C.  Therefore, we recommend a

reduction equal to ½ the fees Paralegal Atkinson charged for "printing documents" for a reduction of $8,222.50 in fees.

       8.     In our initial report we noted that between October 31, 2001 and December 13, 2001, Reed billed $6,593.09 in expenses, which appeared to be for two of its professionals to attend an asbestos seminar.

| | | |
|---|---|---|
| 09/18/01 | General Expense: Vendor: Defense Resea Fee/Restivo | $695.00 |
| 09/18/01 | General Expense: Vendor: Defense Resea Fee/Flatley | $745.00 |
| 10/26/01 | Flatley/Lawrence E. 31 Oct PIT PHX PIT | $1,906.50 |
| 10/30/01 | Restivo/James J 31 Oct PIT PHX PIT | $2,006.50 |
| 11/07/01 | Taxi Expense - Asbestos Medicine Seminar in Phoenix, AZ 10/31-11/02/01 | $24.00 |
| 11/07/01 | Mileage Expense - DRI Asbestos Medicine Seminar in Phoenix, AZ 10/31-11/02/01 Parking, Tolls | $48.00 |
| 11/08/01 | Meal Expense - L.E. Flatley, Phoenix 10/31-11/2/01 | $82.42 |
| 11/08/01 | Lodging - Vendor: L.E. Flatley, Phoenix 10/31-11/02/01 | $487.11 |
| 11/08/01 | Transportation - L.E. Flatley, Phoenix 10/31-11/2/01 | $27.00 |
| 11/26/01 | Meal Expense - Asbestos Seminar Dinner | $93.00 |
| 12/13/01 | Lodging - Vendor: James J. Restivo, Jr. Phoenix 11/2/01 | $463.98 |
| 12/13/01 | Telephone - Outside - James J. Restivo, Jr. Phoenix 11/2/01 | $14.58 |

Thus, we asked Reed to please explain why it was appropriate for the estate to bear this expense.

Reed responded as follows:

> **Asbestos Seminar Expenses (Inquiry No. 8).** In light of the Bankruptcy Court's comments at the August 26, 2002 hearing on fee applications, Reed Smith would agree that the Debtors' estates should not bear the expenses incurred for two Reed Smith attorneys (James J. Restivo, Jr. and Lawrence E. Flatley) to attend an asbestos seminar. However, it should be noted that at that seminar, the Reed Smith attorneys met with the Debtors' in-house counsel and with consultants who were considered for retention in connection with the Debtors' asbestos-related cases, without charging any time to the Debtors.

We therefore recommend a reduction of $6,593.09 in expenses.

9.      In our initial report we note that on June 6, 2001, Reed billed 2.6 hours for a cost to the bankruptcy estate of $676.00 regarding conflicts.

06/06/01        Bentz   2.6      Review potential conflicts and preparation of motion and affidavit
                                 re: products liability defense.

The U.S. Bankruptcy Code §330 (4)(A)(ii)(I) provides that "(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for – . . .(ii) services that were not – (I) reasonably likely to benefit the debtor's estate; . . ."  Reviewing potential conflicts would appear to benefit the Applicant and not the bankruptcy estate.  Thus we asked Reed to please explain how the estate benefitted by this conflict review.  Reed responded as follows:

> **Conflicts Review Work (Inquiry No. 9).**  The Fee Auditor noted in his initial report that on June 6, 2001, Reed Smith billed 2.6 hours (valued at $676.00) for reviewing potential conflicts raised by Reed Smith's representation of the Debtors, which the Fee Auditor stated was an expense not allowed by the Bankruptcy Court.  Upon review of several sources, including the Bankruptcy Court's local rules, the United States Trustee's guidelines, and the Bankruptcy Court's chamber procedures, Reed Smith was unable to find any authority in which the Bankruptcy Court issued a blanket prohibition against all such expenses.  Nevertheless, the work involved in reviewing the existence of conflicts raised by Reed Smith's instant representation of the Debtors was necessary as part of Reed Smith's preparation of its employment application for retention in the Debtors' bankruptcy proceedings -- which, under the list of categories recently issued by the Fee Auditor, is compensable work.  As such, the entry listed in Paragraph 9 of the Fee Auditor's initial report, in which Reed Smith charged for "[r]eview [of] potential conflicts and preparation of motion and affidavit re: products liability defense," is another way to describe work done in preparation of Reed Smith's employment application for these cases, and should be compensable.

While we believe we understand this explanation, we also believe that the entity that benefits from performing these conflict checks is Reed itself, since its employment and hence the fees Reed will likely receive, depend on whether such conflicts exists .  As Reed states above, ". . .the work involved in reviewing the existence of conflicts raised by Reed Smith's preparation of its employment application for retention in the Debtors' bankruptcy proceedings was necessary as

part of Reed Smith's preparation of its employment application for retention . . ."  We therefore

recommend a reduction of $676.00 in fees.

10.    In our initial report we noted that between October 1, 2001 and December 31,

2001, Reed billed $7,590.00 in secretarial overtime.  Thus we asked Reed to please advise why

this expense was necessary.

11.    We also noted in our initial report, that between November 1, 2001 and December

31, 2001, Reed billed $32,782.03 in document scanning services.  Thus we asked Reed to please

provide additional information on the task which necessitated this expense.  Reed responded to

both of these inquiries as follows:

> **Secretarial Overtime and Document Scanning Services (Inquiry Nos.**
> **10 and 11).**  The Fee Auditor noted in his initial report that between October 1,
> 2001 and December 31, 2001, Reed Smith billed $7,590.00 in secretarial
> overtime, and that between November 1, 2001 and December 31, 2001, Reed
> Smith billed $32,782.03 in document scanning services.  Both of these costs are
> related to the Reed Smith attorney work-product review of the Debtors'
> documents.
>
> The Fee Auditor previously raised questions over the secretarial overtime
> expenses and scanning services charged to the Debtors in Reed Smith's Fee
> Application for the Fourth Interim Period.  The Fee Auditor accepted Reed
> Smith's explanation that these expenses were related to its attorney work-product
> document review project and approved compensation of these expenses in full in
> its Final Report for that fee application.  As explained in response to the Fee
> Auditor's inquiries raised with respect to Reed Smith Fee Application for the
> Fourth Interim Period, the scanning charges stemmed from the Debtors' decision,
> for the purpose of discovery in all of their bankruptcy-related cases, to produce
> their documents on CD-ROMS rather than in paper, given the overwhelming
> universe of documents in the Debtors' possession.  Further, the secretarial
> overtime charges were incurred to facilitate, in the most economical manner, the
> printing of these documents for attorney review.
>
> The document review process began with the scanning of the Debtors'
> documents into a CD-ROM database (to save the expense of either moving the
> paper documents to the attorney reviewers, or the travel expenses which otherwise
> would have been incurred during a prolonged document review by Reed Smith's
> Pittsburgh-based attorneys working on the project in Boston).  Once the
> documents were scanned and entered into the database, the CD-ROMS could be
> accessed by Reed Smith paralegals and/or secretarial staff who would print copies
> of the imaged documents for the attorney work-product review.  The initial

decision to utilize Reed Smith secretarial staff working overtime on weekends to print these documents was made to save costs, as this situation was less costly than retaining an outside printer to do the same task.  The attorney work-product document review project would have been severely restricted and delayed if the secretaries who printed these documents would not have worked overtime in order to maintain a steady supply of documents to the attorney reviewers.

We believe these explanations adequately address our concerns.

## CONCLUSION

12.    Thus, we recommend approval of fees totaling $875,629.50 ($884,528.00 minus $8,898.50) and expenses totaling $80,790.87 ($87,383.96 minus $6,593.09) for Reed's services from April 2, 2001 through December 31, 2001.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES**

By:_____
        Warren H. Smith
        State Bar No. 18757050

900 Jackson Street
120 Founders Square
Dallas, Texas  75202
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this ____ day of October, 2002.

_____
Warren H. Smith

**SERVICE LIST**
Notice Parties

**The Applicant**

Richard Keuler, Esq.
Reed Smith LLP
1201 Market Street, Ste. 1500
Wilmington, DE 19801

Douglas Cameron
Reed Smith LLP
P. O. Box 2009
Pittsburgh, PA 15230-2009

**The Debtors**

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones,
P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of
Unsecured Creditors**

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of
Property Damage Claimants**

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price &
Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph,Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of
Personal Injury Claimants**

Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Matthew G. Zaleski, III, Esq.
Campbell & Levine
Chase Manhattan Centre, 15th Floor
1201 Market Street, Suite 1200
Wilmington, DE 19801

**Official Committee of Equity Holders**

Thomas M. Mayer, Esq.

Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022


Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801


**United States Trustee**

Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801

EXHIBIT "A"

_A-1:_

| 07/20/01 | Bentz | 3.30 | Meeting with R. Finke, J. Restivo, L. Flatley and D. Cameron regarding defense of attic fill cases and status of various defense efforts. |
| 07/20/01 | Cameron | 5.80 | Prepare for and attend meeting with R. Finke and Reed Smith team re: strategy for asbestos property damage/attic insulation cases (3.9); lunch meeting with R. Finke and review Grace materials and meet with associates regarding assignment (1.9). |
| 07/20/01 | Flatley | 5.80 | Reviewing documents and preparing an agenda for R. Finke meeting (1.50); meeting to discuss strategy with R. Finke, J. Restivo, D. Cameron and J. Bentz and follow up with R. Finke, et al. (4.30). |
| 07/20/01 | Restivo | 4.20 | Preparation for and strategy planning meeting with R. Finke, et al. |

Total: 17.20/$5,693.50

_A-2:_

| 08/01/01 | Cameron | 6.60 | .......; continue review of bankruptcy materials and prepare for meeting in Chicago (2.6);........ |
| 08/01/01 | Restivo | 4.00 | Prepare for Chicago meeting, including agenda mark-up and case review. |
| 08/02/01 | Cameron | 10.20 | Prepare for and meet with J. Restivo in preparation for meeting with bankruptcy counsel in Chicago (1.4); participate in meeting in Chicago with D. Bernick, et al. (7.5);.... |
| 08/02/01 | Restivo | 10.00 | To Chicago: preparation (on plane) for Chicago meeting (1.0); meeting with Messrs. Bernick, Siegel, et al., re: planning (8.0); to Pittsburgh; notes of meeting (on plane) (1.0) |

Total: 25.50/$9,057.50

_A-3:_

| 08/08/01 | Cameron | 4.00 | Prepare for and participate in conference call with T. Hardy and J. Restivo re: regulatory work (.70);........ |
| 08/08/01 | Restivo | 1.00 | Meeting with D. Cameron; call with T. Hardy re non-testifying consultant |

Total: 1.70/$607.50

*A-4:*

| | | | |
|---|---|---|---|
| 08/17/01 | Flatley | 5.80 | ......; prepare for 8/21 conference call (4.0);...... |
| 08/19/01 | Flatley | 1.80 | Review K&E memoranda in preparation for 8/21 conference call. |
| 08/20/01 | Flatley | 1.20 | ........; review medical expert information for 8/21 conference call (1.1). |
| 08/21/01 | Cameron | 6.30 | Prepare for and meet with L. Flatley and participate in conference call with Grace in-house lawyers and K&E lawyers regarding attic insulation cases (2.3);...... |
| 08/21/01 | Flatley | 3.20 | Preparation for conference call (0.6); conference call with T. Hardy, R. Finke, R. Senftlevben, D. Kuchinsky, et al. (1.8);........ |

Total: 11.50/$3,909.50

*A-5:*

| | | | |
|---|---|---|---|
| 08/22/01 | Cameron | 6.10 | .........; Prepare for and meet with J. Restivo and L. Flatley regarding 8/23 strategy meeting (.8); Prepare for 8/23 meeting with counsel regarding attic insulation cases (2.6);...... |
| 08/22/01 | Restivo | 2.50 | .........; preparation for D.C. strategy meeting (1.0);...... |
| 08/23/01 | Cameron | 8.00 | Prepare for and meet with J. Restivo, R. Finke and Grace lawyers in Washington, D.C. regarding attic insulation case strategy and meet with J. Restivo for post-meeting summary. |
| 08/23/01 | Restivo | 8.00 | Travel to D.C.: preparation (on plane) for D.C. meeting (1.0); strategy meeting with T. Hardy, R. Finke, et al. (7.0). |

Total: 20.40/$7,125.00

*A-6:*

| | | | |
|---|---|---|---|
| 08/24/01 | Haines | 8.00 | Prepare for and attend meeting with R. Murphy. M. Murphy, Chris Sullivan, Andy Trevelise, HRO personnel at Casner re: document review project. |
| 08/24/01 | Trevelise | 7.30 | Attend meeting at Casner & Edwards with R. Finke, C. Sullivan, B. Murphy, M. Murphy, C. Latuda, B. Tracey and S. Haines re: document review and production project and issues. |

Total: 15.30/$3,452.50

*A-7:*

| | | | |
|---|---|---|---|
| 10/04/01 | Haines | 8.00 | Meetings with scanning companies in Boston and conference call with Finke re: results of meeting re: resumption of document review. |

| | | | |
|---|---|---|---|
| 10/04/01 | Trevelise | 7.00 | Meeting at Casner & Edwards with Holme Roberts and Casner & Edwards and document scanning companies for completion of document review project and conference call with Richard Finke re: same (7.0) |

Total: 15.0/$3,355.00

*A-8:*

| | | | |
|---|---|---|---|
| 10/12/01 | Flatley | 4.00 | .......; preparation for Philadelphia trip (.60); with J. Bentz re: Philadelphia trip preparation (.40). |
| 10/14/01 | Flatley | 2.80 | Preparation for J. Bentz meeting and trip to Philadelphia (1.30);....... |
| 10/15/01 | Bentz | 5.00 | Preparation for meeting with former Grace employees regarding various construction products. |
| 10/16/01 | Flatley | 6.40 | ...........; outlining issues and otherwise preparing for Philadelphia meetings (6.30). |
| 10/17/01 | Bentz | 8.00 | Meeting and witness interviews with W. Sparks, L. Flatley; preparation of witnesses. |
| 10/17/01 | Flatley | 8.50 | Preparation for meetings, including with J. Bentz (1.50); with J. Bentz and W. Sparks and others (7.00). |

Total: 3.10/$9,194.00

*A-9:*

| | | | |
|---|---|---|---|
| 11/01/01 | Bentz | 2.00 | Review of documents in preparation for witness interviews. |
| 11/02/01 | Flatley | 4.50 | Review documents in preparation for Boston meetings (3.5); outline for Boston meetings (1.0). |
| 11/03/01 | Bentz | 4.25 | Review of documents in preparation for witness interviews. |
| 11/04/01 | Flatley | 2.60 | Reorganizing from Phoenix trip and preparing for Boston trip. |
| 11/05/01 | Bentz | 5.25 | Review of documents in preparation for witness interview (4.25);............ |
| 11/05/01 | Flatley | 1.10 | With J. Bentz re: preparation for Boston (0.2); conference with W. Sparks and e-mail re: Boston preparation (0.5); organizing for Boston trip (0.4). |
| 11/06/01 | Bentz | 5.90 | .......; review of documents in preparation for witness interviews (3.4);........ |
| 11/06/01 | Flatley | 0.30 | .........; organizing re: Boston trip (.20). |
| 11/07/01 | Bentz | 6.80 | .......; review of documents in preparation for witness interviews (6.0). |
| 11/07/01 | Flatley | 6.70 | Outlining for Boston meetings preparation. |

| | | | |
|---|---|---|---|
| 11/08/01 | Bentz | 2.20 | Preparation for interview of witnesses. |
| 11/08/01 | Flatley | 5.00 | Revising outlines for Boston meetings and organizing documents for same (2.60); with J. Bentz (.10); other preparation for Boston meetings (2.30). |
| 11/09/01 | Bentz | 3.70 | Preparation for witness meetings (3.3);...... |
| 11/09/01 | Flatley | 4.80 | With J. Bentz re: Boston meetings (1.10); preparation for Boston. |
| 11/10/01 | Bentz | 3.25 | Review of documents in preparation for witness interview. |
| 11/11/01 | Flatley | 2.00 | Preparation for meetings in Boston. |
| 11/12/01 | Bentz | 9.00 | Preparation for and attending witness interviews in Boston. |
| 11/12/01 | Flatley | 9.60 | Meetings with W. Sparks, C. Sullivan, J. Bentz, et al. in Boston (8.80); .......... |
| 11/13/01 | Bentz | 10.10 | Preparation for and attending witness interviews in Boston. |
| 11/13/01 | Flatley | 8.80 | Meetings with W. Sparks, C. Sullivan, J. Bentz, B. Murphy and M. Murphy, et al. in Boston (8.40);...... |
| 11/14/01 | Bentz | 8.00 | Preparation for and attending witness interviews in Boston. |
| 11/14/01 | Flatley | 5.80 | Meetings with W. Sparks, C. Sullivan, J. Bentz, et al. in Boston (5.80);...... |

Total: 105.65/$31,461.00


*A-10:*

| | | | |
|---|---|---|---|
| 11/16/01 | Bentz | 5.50 | Preparation for and participation in conference call regarding factual investigation and documents (2.9);........ |
| 11/16/01 | Flatley | 2.40 | Preparation for conference call (1.30); with J. Bentz to prepare for call (.30); conference call with W. Sparks, C. Sullivan, J. Bentz, et al. (.60); follow up on call with J. Bentz (.20). |

Total: 51.1/$1,502.00

*A-11:*

| | | | |
|---|---|---|---|
| 12/01/01 | Flatley | 3.20 | Preparation for Chicago meetings by reviewing deposition transcript and exhibits. |
| 12/03/01 | Flatley | 3.30 | Reviewing outline for Chicago meetings (.80); reviewing documents for Chicago meetings (1.30); other preparation for Chicago meeting (.90); call with W. Sparks re: Chicago (.30). |
| 12/04/01 | Bentz | 8.50 | Preparation for and attending witness interviews in Chicago. |
| 12/04/01 | Flatley | 10.00 | Reviewing outlines and J. Bentz memos on Chicago trip |

| | | | (2.00); meetings in Chicago with R. Finke, W. Sparks, et al. (8.00). |
|---|---|---|---|
| 12/05/01 | Bentz | 8.00 | Preparation for and attending witness interviews in Chicago. |
| 12/05/01 | Flatley | 5.10 | Meeting in Chicago with W. Sparks, C. Sullivan, et al. and short follow up (4.70);........ |

Total: 37.7/$11,498.00

*A-12:*

| | | | |
|---|---|---|---|
| 12/06/01 | Cameron | 1.30 | Prepare for and participate in conference call with R. Finke, T. Hardy, L. Flatley, D. Kurchinsky and other Grace in-house lawyers regarding bankruptcy status and strategy for projects (.9);....... |
| 12/06/01 | Flatley | 2.90 | ........; preparation for conference call (.90); conference call with T. Harty, R. Finke, R. Senftleben, J. Hughes, D. Kuchinsky and D. Cameron (1.00);........ |

Total: 2.8/$938.50

EXHIBIT "B"

| 09/11/01 | Atkinson | 3.80 | Meeting with Litigation Support re: Grace database(2.0); printing sample documents for associates review of summation(1.8). |
|---|---|---|---|
| 09/12/01 | Atkinson | 2.00 | Summation training for associates to review documents from summation. |
| 09/12/01 | Atkinson | 1.50 | Meeting with Litigation Support re: database(.5); printing documents from database(1.0). |
| 09/13/01 | Atkinson | 3.60 | Meeting with associates re: review of documents from databases(1.4); printing and organizing documents for review by associates(2.2). |
| 09/14/01 | Atkinson | .50 | Printing out database documents for associates to review(.3); tele-mail to Ditto re: printing of documents(.2). |
| 09/15/01 | Atkinson | 1.30 | Printing documents from Summation database for associates to review. |
| 09/17/01 | Atkinson | 1.70 | Printing and organizing documents from Summation for associates to review and summarize. |
| 09/18/01 | Atkinson | 1.80 | Printing documents from Summation database for associates to review(1.5); e-mail to re: questions(.3). |
| 09/19/01 | Atkinson | 2.40 | Conference call with A. Trevelise re: options to outsourcing printing of Summation images(.2); with K. Hindman, L. Johnson, K. Dollens and drafting memo to A. Trevelise(1.8); printing images from Summation(.4). |
| 09/20/01 | Atkinson | 3.80 | Reviewing, revising memorandum to A. Trevelise re: review of documents printed from Summation(1.1); organizing, printing documents from Summation(2.7). |
| 09/21/01 | Atkinson | 2.40 | Reviewing Summation database and printing summaries and images for attorney review(2.2); e-mail to new associates(.2). |
| 09/22/01 | Atkinson | 2.20 | Reviewing Summation database and printing summaries and images for attorney review. |
| 09/23/01 | Atkinson | .80 | Review Summation database and summaries and images for attorney review. |
| 09/24/01 | Atkinson | 2.60 | Sample Summary sheets to J. Restivo to review(.3); reviewing Summation database and printing images for attorney review(2.3). |
| 09/25/01 | Atkinson | 3.70 | Meeting with J. Restivo and copy of Summary Sheets from document review to J. Restivo for review(.4); telephone call to A. Trevelise re: Summation coding and printing(.3); reviewing summation database and printing Summation documents for associate review(3.0). |
| 09/26/01 | Atkinson | 2.60 | Arrangements for training to input, print Summation documents(.3); e-mails to/from associates re: document review(.3); reviewing, printing summation imaged documents to review(2.0). |
| 09/27/01 | Atkinson | 2.70 | Meeting with L. Flatley, S. re: individuals' medical records and e-mail re: same(.5);  copies of Summary Sheets collected for J. Restivo to review(.4); printing, reviewing Summary Sheets printed from Summation(1.8). |
| 09/28/01 | Atkinson | 1.80 | J. Restivo meeting with associates to discuss documents review progress/issues(1.1); printing additional documents for associate review(.7). |
| 09/29/01 | Atkinson | 1.20 | Printing Summation documents for associate attorneys to review(.8); locating missing for associates to review(.4). |

Response Exhibit 1

**Multiple Professionals' Attendance at Meetings, Etc. (Inquiry No. 6).**  In his initial report, the Fee Auditor noted that between July 20, 2001 and December 6, 2001, Reed Smith billed 306.95 hours, totaling $87,794.00 in fees, for multiple professionals to attend certain meetings, hearings and/or conference calls.  As a general matter, the necessity of having multiple Reed Smith attorneys attend the same meetings, hearings and conference calls in the early stages of its representation of the Debtors stems from the way in which Reed Smith has structured its representation of the Debtors in their bankruptcy proceedings.  Since 1989, Reed Smith has provided counsel to the Debtors for certain asbestos-related litigation, and several individual Reed Smith attorneys have divided responsibility among themselves for various aspects of those cases.  James J. Restivo, Jr. has been the lead trial attorney on these cases, and Douglas E. Cameron has had general day-to-day and coordinating responsibilities over these cases.  In addition, responsibilities for specific subject areas and segments of the cases have been divided among attorneys Restivo, Cameron, Lawrence E. Flatley and James W. Bentz for dealing with, among other things, responsibility over medical issues and experts, industrial hygiene issues and experts, microscopy issues and experts, regulatory issues and experts, Grace's historical documents and witnesses, case specific/claimant specific facts, and damages.

This division of primary responsibility originally was designed to avoid duplication of effort and to allocate direct responsibility for results.  Following this format, the division of specific primary responsibilities was carried over to Reed Smith's retention as the Debtors' Special Asbestos Products Liability Defense Counsel.  The attendance of multiple Reed Smith professionals at certain meetings, hearings or conference calls, particularly in the early stages of the representation, has often been necessary when the event in question covers topics within the areas of responsibility of more than one Reed Smith professional.  Reed Smith is fully aware of the need to avoid duplication.  There have been many meetings and calls where only one Reed Smith professional has participated.  Reed Smith has only had multiple attorneys participate where it was necessary and more economical than any alternative staffing plan.

The Fee Auditor's initial report noted twelve separate occasions on which multiple Reed Smith professionals were in attendance at the same meeting or conference call.  The following paragraphs explain the reason for the attendance of multiple Reed Smith professionals at each of these meetings or conference calls.

**Exhibit A-1.**  On July 20, 2001, the four Reed Smith attorneys (identified above) with primary responsibilities attended a meeting in Pittsburgh with the Debtors' in-house counsel, Richard Finke, to discuss the status to that date of the Debtors' bankruptcy cases, as well as to plan for Reed Smith's participation in various aspects of the proceedings going forward.  This meeting took place immediately after the retention of Reed Smith by the Debtors as Special Asbestos Product Liability Defense Counsel, and required the presence of all four Reed Smith attorneys because the meeting touched upon all aspects of Reed Smith's representation, including topics over which each of the Reed Smith attorneys had separate areas of responsibility.  Because the meeting involved planning and strategy for all aspects of the cases going forward as well as reports on the status of work, if any, that had been conducted prior to bankruptcy on the particular subject matters, it not only was necessary to the overall litigation strategy for all four responsible Reed Smith attorneys to be present at the meeting, but indeed was more efficient to do so rather than having the details of the meeting passed along by one or two attorneys through

holding what would have amounted to multiple meetings with each attorney individually to discuss their areas of responsibility.

**Exhibit A-2.**  Following the initial meeting with the Debtors' in-house counsel on July 20, 2001, on August 1 and 2, 2001, two of the Reed Smith attorneys prepared for and attended a meeting in Chicago with the Debtors' in-house and bankruptcy counsel.  The two attorneys who attended were James J. Restivo, Jr., lead trial counsel, and Douglas E. Cameron, responsible for the day-to-day coordination and work as special asbestos product liability counsel.  This was the initial meeting Reed Smith attorneys had with the Debtors' bankruptcy counsel, who outlined the Debtors' litigation strategy and discussed the division of responsibilities and tasks that each firm would undertake in representing the Debtors in their bankruptcy-related cases.  Because each of the Reed Smith attorneys in attendance at this meeting had responsibility over different segments of the Debtors' asbestos-related product liability defense work, it was necessary for both to be present in order to craft an effective and efficient task and responsibility outline with the Debtors' bankruptcy counsel.  In fact, it would have been more effective for additional Reed Smith attorneys to be present, but given the fact that the meeting was outside of Pittsburgh, only two attorneys attended, and attorney Cameron was responsible for reporting on the meeting and coordinating the efforts of the other absent Reed Smith attorneys with responsibilities on the case.

**Exhibit A-3.**  On August 8, 2001, two Reed Smith attorneys prepared for and participated in a conference call in which potential consultants and expert witnesses were discussed.  Reed Smith attorneys James J. Restivo, Jr. and Douglas E. Cameron discussed with the Debtors' bankruptcy counsel a potential non-testifying consultant who might provide information on the areas over which attorneys Restivo and Cameron had separate responsibilities; thus, their participation in the same conference call was necessary so a full discussion of all issues in which the consultant was involved could be had, eliminating the necessity of repetitive calls to the same consultant by these attorneys individually.  Moreover, attorney Cameron did not participate in the entire conference call, minimizing the expense his participation generated by not participating when topics unrelated to his area of responsibility were discussed.

**Exhibit A-4.**  From August 17, 2001 to August 21, 2001, Reed Smith attorneys Lawrence E. Flatley and Douglas E. Cameron prepared for and participated in a conference call in which they discussed with the Debtors' in-house and bankruptcy counsel several potential consultants and expert witnesses and how these individuals' testimony could be used in the Debtors' bankruptcy-related cases.  Because these experts addressed separate and some overlapping issues over which each Reed Smith attorney had responsibilities, in order to maximize the value of the call and to eliminate the need for repetitive calls, both Reed Smith attorneys participated in the call.  The majority of the time at issue in this Exhibit was spent by attorney Flatley preparing for the call, as new information was provided to him that related to his area of responsibility but was unrelated to the issues requiring attorney Cameron's participation.  For that reason, attorney Cameron did not also review this new material, but rather reviewed only the material that related to his area of responsibility and then participated in the call.

**Exhibit A-5.**  On August 22 and 23, 2001, attorneys James J. Restivo, Jr. and Douglas E. Cameron prepared for and attended a meeting with the Debtors' in-house counsel in Washington, D.C. to discuss strategy regarding the Debtors' potential attic insulation litigation, particularly as it related to potential expert witnesses.  At this meeting, the Reed Smith attorneys also met with potential consultants who offered information that pertained to areas over which each of the attorneys had separate primary responsibilities in the Debtors' asbestos-related bankruptcy cases.

The presence of both Reed Smith attorneys at this meeting was necessary in order for the information offered by these consultants (which impacted issues within both attorneys' areas of primary responsibility) to be fully evaluated and utilized.

**Exhibits A-6 and A-7.**  On August 24, 2001, two Reed Smith professionals, attorney Andrew J. Trevelise and paralegal M. Susan Haines, attended a meeting with representatives of a document scanning company and with in-house and outside counsel of the Debtor.  This meeting pertained to the extensive document scanning project by which the Debtors' documents were collected for review by other Reed Smith attorneys to prepare the Debtors for litigation in their various asbestos-related cases, as well as to prepare the Debtors for discovery (document productions) in the EPA and Chapter 11-related cases.  Relatedly, on October 4, 2001, both of the aforementioned Reed Smith professionals attended meetings and participated in conference calls that also dealt with the scanning of the Debtors' documents in connection with the Reed Smith attorney work-product document review.

The attendance of both professionals on these occasions was necessary because of the division of responsibilities over the intake portion of the Reed Smith document review project.  Attorney Trevelise had direct responsibility to the Debtors for managing the document scanning and attorney work-product review process and for planning the attorney work-product document review project in conjunction with other parts of the Debtors' bankruptcy proceedings, while paralegal Haines supervised the day-to-day, technical scanning operations and served as liaison between the Debtors (and attorney Trevelise) and the document scanning company.

**Exhibits A-8 through A-11.**  On several occasions between October and December 2001, Reed Smith attorneys Lawrence E. Flatley and James W. Bentz participated in meetings with potential witnesses who are knowledgeable about asbestos issues.  In light of the large number of potential witnesses who might be called to testify, Reed Smith anticipated that there would come a time in the litigation of these cases when no one professional could prepare and defend all of these witnesses' depositions, or prepare and examine all of these witnesses during their testimony at trial.  As such, particularly at the early stages of the project, it was necessary to have two attorneys present at these witness meetings so that each of them could develop a working knowledge of the witness' involvement and potential areas of cross-examination, as well as to establish a working relationship with each witness.

Attorneys Flatley and Bentz, working together with Debtors' in-house counsel William H. Sparks, have been the Reed Smith lawyers primarily responsible for working with Grace witnesses since 1989.  At the meetings in question, several potential witnesses were interviewed in the same day, and having two attorneys present allowed for comprehensive sessions with each witness.  This eliminated the need for multiple days of follow-up meetings and interviews with each witness that otherwise would have been necessary, and which would have entailed further travel or conference call expenses.  It also should be noted that the witness interviews themselves were Reed Smith's most efficient tool for working to develop an understanding of the Debtors' attic insulation operations, which heretofore had never been analyzed in any detail by the Debtors or any of their counsel.  To be meaningful, the interviews required fairly intensive preparation in the form of, among other things, the study of documents of which the witness was anticipated to have knowledge.  Thus, the preparation time, as well as the time spent in attendance at the witness interviews in the above-referenced Exhibits, were all necessary to Reed Smith's representation of the Debtors and to Reed Smith's preparation of the defenses in the Debtors' asbestos-related litigation arising in their bankruptcy proceedings.

- **Exhibit A-8**

On October 17, 2001, attorneys Flatley and Bentz participated in meetings with two potential witnesses in Philadelphia, as part of Reed Smith's preparation of the Debtors' defenses in cases relating to their bankruptcy proceedings. Between October 12-16, 2001, the same two Reed Smith attorneys prepared for portions of these interviews by reviewing various documents of which the witnesses were expected to have knowledge and by reviewing various other materials that related to the witnesses' scope of knowledge.

- **Exhibit A-9**

From November 12-14, 2001, the same two Reed Smith attorneys participated in interviews of six potential witnesses in Boston as part of Reed Smith's continuing preparation of the Debtors' defense in cases relating to their bankruptcy proceedings. In preparation for these interviews, the Reed Smith attorneys spent many hours between November 1 and November 11, 2001 on detailed reviews of documents of which the witnesses were expected to have knowledge, and on composing detailed outlines for the witness interviews. As explained above, it was necessary for the two Reed Smith attorneys to divide responsibility for preparing for and conducting these interviews, given the number of witnesses and the large scope of information that was presented by these interviews.

- **Exhibit A-10**

On November 16, 2001, attorneys Flatley and Bentz participated in a conference call with the Debtors' bankruptcy and in-house counsel to discuss the overall division of responsibility in the historical case defense project. As detailed in Reed Smith's response to the Fee Auditor's Final Report Regarding the Interim Application of Reed Smith, LLP for the Fourth Interim Period, the historical case defense project was a preliminary attempt to research and organize as much information as possible to help counsel in the preparation of a defense of claims involving attic insulation (a product that had not previously been the subject of substantial litigation), which may arise in various aspects of the Debtors' bankruptcy cases. The work included collecting, comparing, and summarizing historical information relating to the production and sale of ZAI and other of the Debtors' vermiculite products over the past fifty years, as well as the preparation of attorney work-product materials intended to help facilitate several tasks required to prepare a defense of claims involving attic insulation. During the conference call of November 11, 2001, the parties on the call engaged in comprehensive planning for the project, and divided responsibility for various parts of the project amongst the participants. The participation of both Reed Smith attorneys on this call was necessary because the historical defense project touched upon issues and potential witnesses over which each of these Reed Smith attorneys traditionally had direct responsibility in Reed Smith's representation of the Debtors before their bankruptcy filings.

- **Exhibit A-11**

From December 1-5, 2001, the same two Reed Smith attorneys prepared for and participated in additional witness meetings held in Chicago. During these meetings (held on December 4 and 5, 2001), the Reed Smith attorneys collectively interviewed four witnesses, and also held meetings with the Debtors' bankruptcy counsel to coordinate planning and strategy for the Debtors' Chapter 11-related cases. Because the preparation for these interviews required extensive work (including the review of a large catalogue of documents over which the witnesses were expected to have knowledge and the drafting of interview outlines based on these documents and other information), and because of the large amount of information offered by each of these witnesses, the presence of both Reed Smith attorneys at these witness interviews was necessary. Furthermore, without the presence of the two Reed Smith attorneys at these

meetings, multiple trips or extended travel periods would have been necessary for all of these witnesses to be thoroughly interviewed and for the meetings among counsel to be completed, which would have increased the amount of expenses incurred and fees charged in connection with these meetings.

**Exhibit A-12.**  On December 6, 2001, two Reed Smith attorneys, Lawrence E. Flatley and Douglas E. Cameron, prepared for and participated in a conference call with the Debtors' in-house counsel regarding the status of the Debtors' bankruptcy proceedings and strategy for upcoming litigation related thereto.  During this call, the Reed Smith attorneys and the Debtors' in-house counsel outlined the responsibilities and tasks each would take in preparing the Debtors for future asbestos-related litigation arising from their bankruptcy proceedings, and discussed the potential retention of several consultants whose knowledge impacted several issues that have arisen in the Debtors' asbestos-related cases.  Because each of the Reed Smith attorneys who participated in this call had responsibility over different segments of the Debtors' asbestos-related product liability defense work, and because the meeting addressed issues within each of these attorneys' individual areas of responsibility, it was necessary for both attorneys to participate in order to effectively and efficiently address the tasks and responsibilities with the Debtors' bankruptcy counsel.  Moreover, attorney Cameron only prepared for and participated in that part of the call addressing those issues within his areas of responsibility.