UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: § | |
| § | Chapter 11 |
| W.R. GRACE & CO., et al § | Jointly Administered |
| § | Case No. 01-1139 (JKF) |
| Debtors § | |

### FEE AUDITOR'S FINAL REPORT REGARDING
### INTERIM APPLICATION OF PITNEY HARDIN LAW FIRM
### FOR THE FIRST, SECOND, AND THIRD INTERIM PERIODS

This is the final report of Warren H. Smith & Associates, P.C. ("Smith"), acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the Interim Application of Pitney Hardin Law Firm for the First, Second, and Third Interim Periods (the "Application").

### BACKGROUND

1.  Pitney Hardin Law Firm ("Pitney") was retained as special counsel to the Debtors. In the Application, Pitney seeks approval of fees totaling $484,829.50 and expenses totaling $99,840.91 for its services from April 2, 2001, through December 31, 2001.

2.  In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time entries included in the exhibits to the Application. We reviewed the Application for compliance with the Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2001, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, Issued January 30, 1996, (the "Guidelines"), as well as for consistency with precedent established in the United States Bankruptcy Court for the District of Delaware,

the United States District Court for the District of Delaware, and the Third Circuit Court of Appeals. We served on Pitney an initial report based on our review and received a response from Pitney, portions of which response are quoted herein.

## DISCUSSION

### General Issues

3. In our initial report, we noted that Pitney professionals A. Marchetta, S. Zuber, W. Hatfield, Montag, and L. Reilly did not consistently provide adequate detail in their time entries. We asked Pitney to advise these professionals to provide more information in their time entries in the future. Pitney replied that it had done so.

4. In our initial report, we noted that Pitney professionals AJM, BEM, DLB, DSF, JPS, KDH, MEW, SAZ and SP consistently lump their time entries. We asked Pitney to advise advise these professionals not to lump their time entries in the future. Pitney responded that it had advised its professionals to be careful to avoid lumping of time entries.

5. In our initial report, we noted that the Application did not contain time entries which correspond with the amount of hours spent and fees sought alleged in the applications. We also note that the applications do not contain a separate fee application category. We asked Pitney to include the fee entry detail in its own category for the fee application process. Pitney responded that it would do so.

6. In our initial report, we noted that although categories are utilized in a summary sheet in the application, categories are not used in the fee entry detail. We asked Pitney to segregate the fee entry detail into categories. Pitney responded that it would do so.

Specific Time and Expense Entries

7. In our initial report, we noted that between April 5, 2001, and May 3, 2001, Pitney billed 79.7 hours for a cost to the bankruptcy estate of $6,376 for "quality control review of the production database". See Exhibit A. We asked Pitney to provide additional information regarding this task. Pitney responded that

> [i]t appears after further review, investigation and analysis that the time entries comprising the subject of your inquiry in this regard were inadvertently billed to Grace. Specifically, in the Intercat matter, Applicant served as counsel to Grace <u>and</u> as special counsel to the Chapter 11 Trustee in connection with an adversary proceeding instituted by the Trustee. The subject time entries should have been billed to the Intercat Trustee, not to Grace. Accordingly, this time will be deleted from Applicant's fee request.

Accordingly, we note that Pitney has agreed to a reduction of $6,376 in fees.

8. In our initial report, we noted that between May 8, 2001, and December 4, 2001, Pitney billed 82.5 hours for a cost to the bankruptcy estate of $26,051 in fees for multiple professionals to participate in the same meeting, hearing, or conference call. See Exhibit B. We asked Pitney to explain why it was necessary for multiple professionals to attend each of these meetings, hearings, and conference calls. Pitney offered the following response:

> These time entries represents the initial conferences with the Appeals Coordinator of the Southern District of New York, and the Second Circuit clerks and case managers in connection with this complex appeal. At that time, Mr. Waller was to be responsible for the day-to-day responsibilities of the briefing and Mr. Moffitt was to be responsible for, among other things, certifying the docket entries, finalizing the record on appeal, preparation of the Joint Appendix, as well as assisting in other procedural matters and motions. Specifically, on the date of these entries, Messrs. Waller and Moffitt obtained the first copy of the docket entries and conducted an initial review of the voluminous documents on file with the court. As a result of that preliminary review it was determined that further review and indexing was required by Mr. Moffitt and a paralegal at a later date. They also conferred with the Appeals Coordinator to discuss the resolution of various issues relating to indexing the voluminous documents filed with the court over the preceding thirteen (13) years, the preferred procedure to supplement the Record on Appeal with documents missing from the docket entries, and necessary procedures to maintain the status of documents submitted under seal with the district court. It was important to fully understand the procedures of both courts in this regard and to establish a rapport with

> the District Court Appeals Coordinator and Second Circuit clerks and case manager that would be handling the appeal. In fact, the rapport established with these court officials greatly assisted in resolving numerous procedural issues that developed while perfecting Grace's appeal.
>
> As previously noted in response to the Fee Auditor's report respecting applicant's Fourth Interim Fee Application, the Intercat bankruptcy case was a large, complex matter in which Grace was the largest unsecured creditor, holding a claim in excess of $23 million. The bankruptcy court appointed a Chapter 11 Trustee, but also left the Debtor partially in possession. Thereafter, the case proceeded on parallel tracks; the Chapter 11 Trustee sought the sell the Debtor's assets pursuant to plan of orderly liquidation, while the Debtor sought to confirm a stand-alone plan of reorganization. Since Grace held the majority of the debt in the class of unsecured creditors, it would have been extremely difficult for either the Trustee or the Debtor to confirm its plan over Grace's objection. Therefore, Grace's decision respecting which plan to support was critical to the outcome of the case.
>
> The meeting in Columbia, MD, which was the subject of your inquiry, was a very important meeting that took place at a crucial time in the Intercat Chapter 11 case. Grace requested the attendance of both Mr. Marchetta, who is, and has been for many years, Grace's general outside counsel on many matters, and Mr. Zuber, who possesses specific bankruptcy expertise and had been intimately involved in the Intercat matter from its inception. Grace directed numerous questions to each of Messrs. Marchetta and Zuber.
>
> The meeting was to review and analyze the competing plans that had been filed and, ultimately, for Grace to determine which plan to support. All of the relevant players were present, including senior executives and in-house counsel of Grace, as well as a number of support personnel from the affected business unit of Grace. The matter required extensive preparation, including review and analysis of the competing plans, financial projections, and numerous legal issues. It was, therefore, in Applicant's view, necessary and appropriate for both Mr. Marchetta and Mr. Zuber to attend the meeting to address the myriad issues on the table and to finalize Grace's strategy in this complex matter. Again, a plan was ultimately confirmed which provided for a 100% dividend, plus interest, to unsecured creditors, including Grace.

We accept this explanation regarding the first three items scheduled on Exhibit B. We note, however, that the explanation did not address the final two items cited in Exhibit B. In a subsequent telephone conversation, Mr. Marchetta of Pitney explained that both his and Mr. Zuber's attendance at the October 29, 2001, and December 4, 2001, meetings was required because the subject of the meetings was the settlement of a litigation matter and the incorporation of the substance of the settlement into a plan of reorganization. Mr. Marchetta, who was

handling the litigation, needed to be present to address the settlement of the litigation while Mr. Zuber, as bankruptcy counsel, needed to be present to ensure that any settlement was adequately addressed in the plan. We accept the explanation and recommend no reduction with respect to these meetings.

9. In our initial report, we noted that between April 2, 2001, and December 31, 2001, Pitney billed $7,543.50 to Doerner & Goldberg and $2,800.00 to Pennoni Associates for unknown services. We asked Pitney to provide additional information regarding these expenses. Pitney explained that each of these vendors is a court-reporting service and that the charges were for the cost of obtaining transcripts. Pitney also provided copies of the relevant invoices. We accept this explanation and recommend no reduction.

10. In our initial report, we noted that during this reporting period, Pitney billed $9,025.95 in "travel and miscellaneous expenses" without explaining what these expenses consisted of. We asked Pitney to provide appropriate documentation. Pitney responded by providing an itemization of the components of the $9,025.95 charge. We have reviewed the charges and recommend no reduction.

11. In our initial report, we noted that during the November 2001 billing cycle, Pitney included time entries for the *Gloucester* matter. We also noted that Pitney separately filed a Special Fee Application for the requested contingency fee of $240,000 representing 30% of the amount awarded to the Debtors in that litigation. We asked Pitney to explain why certain of the time entries were included in the November 2001 billing cycle when they would seem to be included in the $240,000 contingency fee. Pitney responded that

> The W.R. Grace/Gahrs Landfill Litigation matter was under contingency fee (case matter W.R. Grace/Gahrs - PHKS client/matter billing # 082910.070965). The W.R. Grace/Gahrs litigation is separate and distinct from the GNCC/Landfill Closure matter (PHKS client/matter billing # 030423.066958). The Litigation concluded and

**FEE AUDITOR'S FINAL REPORT** - Page 5
wrg FR re Pitney 1-3int 4-12.01.wpd

was settled last year. No fees or time related to the W.R. Grace/Gahrs litigation matter have been billed to the GNCC/Landfill Closure matter.

The GNCC/ Landfill Closure matter (case matter GNCC/ Landfill Closure Issues - PHKS client/matter # 030423.066958) is a separate file that concerns legal advice on environmental regulatory and compliance issues related to the Landfill Closure and the NJDEP's review of same. Although this case concerns the same Landfill site as the W.R. Grace/Gahrs litigation, it is a non-litigation matter concerning regulatory/compliance issues. The GNCC/Landfill Closure matter is an ongoing case and will continue until NJDEP issues its final closure approval for the Landfill.

Note: This landfill regulatory/compliance matter was not subject or part of the contingency fee in the W.R. Grace/Gahrs litigation case. Rather, the GNCC/Landfill Closure Issues file is under a separate retention agreement from the litigation and is billed on an hourly basis under a different case number.

We note that the time entries within the "Landfill Closure Issues" matter relate to non-litigation activities in accordance with the explanation offered by Pitney. We accept Pitney's explanation and recommend no reduction with respect to this item.

12. In our initial report, we noted that during this reporting period, Pitney assigned a minium of eight professionals to and billed over 1,089.2 hours for an appeal in the NY Superfund litigation resulting in a minimum cost to the bankruptcy estate of $239,062.50. Although we are aware of the complexities of superfund litigation and appellate procedure, we noted that only four or five appellate issues had been raised. We thus asked Pitney to explain why it was necessary to staff this matter with so many attorneys.[1] Pitney provided a lengthy response, which is attached hereto as Response Exhibit 1. We reviewed the relevant time entries in light of this response, and the review generally substantiates Pitney's response. We accept the explanation offered by Pitney and recommend no reduction in this regard.

## CONCLUSION

13. Thus, we recommend approval of fees totaling $478,453.50 ($484,829.50 minus

---

[1] Because of the large number of time entries relating to this issue, they have not been aggregated into an exhibit.

$6,376.00) and costs totaling $99,840.91 for Pitney's services from April 2, 2001, through December 31, 2001.

                Respectfully submitted,

                **WARREN H. SMITH & ASSOCIATES, P.C.**

By:  _____
                Warren H. Smith
                Texas State Bar No. 18757050
                Mark W. Steirer
                Texas State Bar No. 19139600

900 Jackson Street
120 Founders Square
Dallas, Texas  75202
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 28th day of October 2002.

_____
Warren H. Smith

## SERVICE LIST

**The Applicant**

Anthony J. Marchetta, Esq.
Scott A. Zuber, Esq.
**Pitney, Hardin, Kipp & Szuch LLP**
P.O. Box 1945
Morristown, NY 07962-1945

**The Debtors**

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones, P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph, Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**

Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Matthew G. Zaleski, III, Esq.
Campbell & Levine
Chase Manhattan Centre, 15th Floor
1201 Market Street, Suite 1200
Wilmington, DE 19801

**Official Committee of Equity Holders**

Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**

Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801

## EXHIBIT "A"

| Date | Name | Hours | Amount | Description |
|---|---|---|---|---|
| 04/05/01 | D.Florence | 8.60 | $688.00 | Work on updating all organizational indexes; Quality control review of the production database. |
| 04/06/01 | D.Florence | 7.10 | $568.00 | Quality control review of the production database. |
| 04/09/01 | D.Florence | 4.30 | $344.00 | Quality control review of the production database. |
| 04/10/01 | D.Florence | 7.00 | $560.00 | Quality control review of the production database. |
| 04/11/01 | D.Florence | 7.00 | $560.00 | Quality control review of the production database. |
| 04/12/01 | D.Florence | 7.50 | $600.00 | Quality control review of the production database. |
| 04/13/01 | D.Florence | 5.40 | $432.00 | Quality control review of the production database. |
| 04/17/01 | D.Florence | 5.20 | $416.00 | Quality control review of the production database. |
| 04/18/01 | D.Florence | 4.90 | $392.00 | Quality control review of the production database. |
| 05/01/01 | D. Florence | 9.00 | $720.00 | Case file management including updating the case file, pleading board and orders binder, quality control review of the production database. |
| 05/02/01 | D. Florence | 7.60 | $608.00 | Quality control review of the production database. |
| 05/03/01 | D. Florence | 6.10 | $488.00 | Quality control review of the production database. |
|  |  | 79.7 | $6,376.00 |  |

**EXHIBIT "B"**

*B-1: May 8, 2001:*

| Date | Timekeeper | Hours | Amount | Description |
|---|---|---|---|---|
| 05/08/01 | B.Moffitt | 5.50 | $1,265.00 | Meetings with clerks at Southern District of New York and Second Circuit Court of appeals; confer with M.Waller re same; confer with court staff re: preparing record of appeal and re: obtaining docket entries; confer with J.Borg re: same. |
| 05/08/01 | M.Waller | 5.50 | $1,457.50 | Conferring with B.Moffitt regarding assembling record on appeal; Discussing preparation of relevant briefs and affidavits for appeal briefs with S.Parker; Second Circuit filing procedures; Working with B.Moffitt to obtain official docket from district court; Meetings with Second Circuit and district court clerks regarding preparing record on appeal, filing transcripts, pre-argument conference, and briefing schedule; Draft memorandum regarding same to A.Marchetta and status of preparing appeal; Reviewing official docket re: key briefs, affidavits, and transcripts. |
| | *Total:* | 11.0 | $2,722.50 | |

*B-2: June 12-13, 2001:*

| Date | Timekeeper | Hours | Amount | Description |
|---|---|---|---|---|
| 06/12/01 | A.Marchetta | 1.40 | 553.00 | Work with M.Waller and K.Helmer re Second circuit appearance; review outline for Second circuit conference and follow up with M.Waller re same. |
| 06/12/01 | M.Waller | 5.60 | 1,484.00 | Meeting with K.Helmer and A.Marchetta. regarding appeal issues and conference with staff counsel on 6/13; Working with B. Moffitt regarding choice of law appeal issues and outline summarizing same; Reviewing and drafting additions to appeal issues outline, including Sect. 46 issues; Draft memo to A.Marchetta regarding same. |
| 06/13/01 | A.Marchetta | 4.50 | 1,777.50 | Prepare for and attend Second circuit court conference and follow up with client re same; review and revise outline of legal issues and calendar of dates for same; settlement issues. |
| 06/13/01 | M.Waller | 4.00 | 1,060.00 | Prepare for pre-argument conference with A.Marchetta at offices of Second Circuit; Confer with CNA counsel re: briefing schedule; Pre-argument conference with counsel for CNA and Second Circuit staff counsel; Follow up with A.Marchetta. |
| | *Total:* | 15.5 | $4,874.50 | |

*B-3: September 18, 2001:*

| Date | Timekeeper | Hours | Amount | Description |
|---|---|---|---|---|
| 09/18/01 | S.Zuber | 1.9 | $503.50 | Continued preparation for meeting with clients in MD. |
| 09/18/01 | A.Marchetta | 1.0 | 395.00 | Forward information to Kirkland & Ellis per client; prepare information re client meeting. |
| 09/19/01 | A.Marchetta | 9.5 | 3,752.50 | Meeting with client re strategy concerning plan issues; complete review of same and work with S. Zuber re same. |

| Date | Timekeeper | Hours | Amount | Description |
|---|---|---|---|---|
| 09/19/01 | S.Zuber | 10.5 | 2,782.50 | Meeting with clients in MD to review status, competing plans, and strategy. |
|  | *Total:* | *22.9* | *$7,433.50* |  |

*B-4: October 23-29, 2001:*

| Date | Timekeeper | Hours | Amount | Description |
|---|---|---|---|---|
| 10/23/01 | S.Zuber | 0.8 | 212.00 | Initial preparation for meeting with Engelhard. |
| 10/23/01 | A.Marchetta | 0.9 | 355.50 | Work with S.Zuber re Englehard meeting and arrangements re same.. |
| 10/25/01 | A.Marchetta | 0.7 | 276.50 | Prepare for meeting with Englehard and follow up re release of Mobil claim. |
| 10/26/01 | A.Marchetta | 0.7 | 276.50 | Prepare re Englehard meeting; conference with A.Zuber re same. |
| 10/29/01 | S.Zuber | 2.1 | 556.50 | Prepare for meeting with client and Engelhard. |
| 10/29/01 | S.Zuber | 2.90 | 768.50 | Meeting with A.Marchetta, J.rRghtmyer, N.Alt and G.Stokes, followed by meeting with same and E.Benton and J.Greenberg of Englehard. |
| 10/29/01 | A.Marchetta | 5.0 | 1,975.00 | Prepare for and attend meeting with clients and Englehard. |
|  | *Total:* | *13.1* | *$4,420.50* |  |

*B-5: December 4, 2001:*

| Date | Timekeeper | Hours | Amount | Description |
|---|---|---|---|---|
| 12/04/01 | AJM | 10.0 | $3,950.00 | ($395 hr) Prepare for and meeting with client and follow up with S. Zuber and adversary regarding plan documents and drafting of proposal |
| 12/04/01 | SAZ | 10.0 | $2,650.00 | ($265 hr) Prepare for meeting with client and Debtor to discuss Debtor's plan and possible consensual plan; attend meeting with client and Debtor; and meet with A. Marchetta after meetings to discuss plan, status and strategy. |
|  | *Total:* | *20.0* | *$6,600.00* |  |

**FEE AUDITOR'S FINAL REPORT** - Page 12
wrg FR re Pitney 1-3int 4-12.01.wpd

Response Exhibit 1

The subject appeal is one of Grace's largest insurance litigation matters, involving the interpretation and application of general liability policies, claims service agreements, and separate settlement agreements between Grace and Continental Casualty Company ("CNA") involving coverage for over 200 environmental contamination claims arising from sites in 40 states. The underlying case was filed in 1988 and, in the ensuing fourteen (14) years, the docket expanded to in excess of three hundred entries. Many of the docketed documents are relevant to the present appeal, as evidenced by the four volume, 2,925 page Joint Appendix submitted by the parties.

Although initially involving only two parties in 1988, the case eventually expanded to include numerous parties and hundreds of sites/claims. Grace eventually filed cross-claims against all of its CGL primary and first level excess carriers that issued policies to Grace from 1962 to June 30, 1984. Grace was ultimately able to settle the matter with all of the carriers except CNA, which refused to settle. These settlements did not result in a simplification of the issues. CNA continued to contest all coverage issues, ultimately forcing Grace to appeal virtually all of the underlying decisions involving insurance policy interpretation and application, which Grace contends were wrongly decided by the District Court.

The several District Court opinions at issue in this appeal address complex points of law involving the interpretation of heavily endorsed, multiple year insurance contracts, each exceeding one-hundred pages, which cover a 12-year period from 1973 through 1984, and their application to multi-state claims. The depth and breadth of the issues, along with the long life of this case, created a situation that required a lengthy principal appellate brief to fully and accurately depict the events that have occurred in this matter since 1988, and present and analyze applicable law.

Specifically, Grace is appealing the Final Judgment, which directly implicates four interlocutory orders entered on June 8, 1992, April 28, 1994, August 23, 1994, and May 17, 2000. Grace has presented three main issues for consideration on appeal, each of which encompasses numerous sub-issues as set forth in Grace's brief:

- Whether the District Court erred in holding that New York Law applied to the insurance policies at issue even though the vast majority of the environmental claims arose outside of New York;

- Whether the District Court erred in holding that during the years 1982 through 1984 Grace was "self-insured" for gradual pollution claims by reason of the retrospective premium and deductible/claim service agreements (the "Charge Back Procedures") and in ignoring the undisputed evidence, including the 1990 Settlement Agreement, that the "cost-caps" or maximum amounts that Grace could be required to pay under the Charge Back Procedures, had in fact been fully paid by Grace; and

- Whether the District Court erred in holding that repealed provisions of Section 46 of the New York Insurance Law, N.Y. Ins. L. § 46 (McKinney Supp. 1976)(repealed 1982 N.Y. Laws ch. 856), renders "illegal" the insuring agreement of CNA insurance policies at issue which provided coverage for gradual, unintentional pollution.

Each of these main issues necessarily raised numerous factual and legal issues that needed to be researched, analyzed, and briefed.

As we argued in support of Grace's successful motion for leave to file a principal brief nearly three times the page length ordinarily allowed by the Second Circuit, a brief devoted exclusively to any one of these issues could justify an appellate brief meeting the Court's page limitations. For example, the complexity of the choice of law issue alone is beyond doubt. One leading commentator has remarked that he "cannot think of any field of law that has in modern times become as hopelessly jumbled as the present New York law of conflicts." H. Korn, *The Choice Of Law Revolution: A Critique*, 83 COLUM. L. REV. 772, 956 (1983).

The self-insurance/charge back procedures issues (i.e. application of retrospective premiums, deductibles, and "cost cap" limitations) are similarly complex and required a lengthy explanation and analysis. The resolution of such issues involves an analysis of the charge back procedures and provisions of the policies and claims service agreements issued by CNA, and the 1990 settlement agreement by which Grace and CNA agreed that the retrospective caps in the CNA policies for all policy years from June 30, 1973 through June 30, 1985 had been met and Grace would have no further retrospective payment or deductible obligations for any remaining coverages in those policy years. Grace contends that the District Court's decisions regarding each of these issues were wrongly decided.

We were also required to address the propriety of the District Court's ruling in light of the New York legislature's repeal of Section 46, which, until repealed in 1982, required that policies contain a "sudden and accidental" pollution exclusion. Grace argues that the District Court erroneously held that Section 46, which the District Court found was a "statutorily mandated exclusion for gradual pollution," rendered the insurance agreements in the CNA policies for unintentional "gradual pollution" unenforceable as "illegal contracts." To demonstrate the Court's error, it was necessary to examine the provisions of Section 46, its legislative history, the case law contemporaneous with the effective dates of that statute, and the legislative history of the law repealing Section 46. We were also required to analyze and apply case law regarding statutory construction. This argument adds an additional layer of analysis to a complicated appeal.

In order to effectively address each of these complex issues in the time allotted to submit Grace's principal brief, responsibility for the various tasks associated with the appeal were divided among several attorneys. Anthony J. Marchetta, a member of the firm, is the attorney primarily responsible for this matter, and was designated as the attorney that would argue the appeal before the Second Circuit on behalf of Grace. Mr. Marchetta charges $395 per hour for services rendered with respect to this matter.

In order to limit the fees incurred by Grace with respect to the appeal, Mr. Marchetta delegated responsibility for day-to-day supervision of the appeal to Michael Waller, a junior member of the firm. Mr. Waller charges $265 per hour for his services relating to this matter, resulting in a cost savings of $130 per hour. In addition to supervising the appeal on a daily basis, Mr. Waller assumed responsibility for briefing the Section 46 issues. Helen Nau, an associate, assisted him with research and writing on this issue. Due to scheduling conflicts regarding a trial in another matter, Ms. Nau was replaced by Meghan Bennett, an associate, who then worked with Mr. Waller with respect to the Section 46 briefing. Mr. Waller also assumed responsibility for preparation of the Statement of Facts and Procedural History portions of the Grace's principal brief.

Briefing of the choice of law issue was assigned to Brian Moffitt, an associate. Mr. Moffitt was also charged with preparing the index to the record on appeal, obtaining certified docket entries and the Clerk's certificate, and preparation of the Joint Appendix. Mr. Moffitt worked with Mr. Waller in this regard, including communications with the District Court's Appeal Coordinator and Second Circuit Staff Counsel regarding the necessity for filing a motion to correct or modify the record on appeal to include crucial documents erroneously omitted by the District Court from the docket entries, and a motion to maintain the sealed status, during the appeal, of certain documents filed under seal in the District Court. Messrs. Waller and Moffitt also communicated with counsel for CNA and the settling insurers with respect to these motions.

In assembling the index to the record on appeal, Mr. Moffitt utilized paralegals Susan Parker and Douglas Florence, both of whom were familiar with the voluminous case file as the result of their work on the file over the past several years. Ms. Parker and Mr. Florence were able to cost-effectively assemble necessary documents given that their billable rate was $80.00 per hour as opposed to $230 per hour for Mr. Moffitt. Utilizing these paralegals resulted in savings to the estate of $150.00 per hour, as compared to Mr. Moffitt's hourly rate.

Briefing of the self-insurance/charge back procedures issues were assigned to Kathy Helmer, Counsel to the firm. Along with Mr. Waller, Ms. Helmer was also responsible for combining the various sections of the brief, and synthesizing them into one, cohesive document.

Rather than divert the attention of attorneys drafting appellate brief points from their assigned tasks, associate Joseph Clark was assigned the discrete task preparing motion papers in support of Grace's applications to correct or modify the record on appeal, to include crucial documents which were erroneously omitted from the docket entries. Mr. Clark was also assigned the discrete task of preparing a motion to maintain the sealed status, during the appeal, of the documents filed under seal in the District Court.

First year associate Denise Buerrosse was assigned discrete legal research tasks relating to the various issues on appeal, performed cite checking, and shepardized case law. By utilizing Ms. Buerrosse to perform these tasks at her hourly rate of $140.00, instead of more senior associates or Counsel, we substantially decreased the amount of fees billed to the estate.