**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| W.R. GRACE & CO., et al., | § | Jointly Administered |
| | § | Case No. 01-01139 (JKF) |
| Debtors. | § | |
| | § | |

**FEE AUDITOR'S FINAL REPORT REGARDING**
**FEE APPLICATION OF REED SMITH LLP**
**FOR THE FIFTH INTERIM PERIOD**

This is the final report of Warren H. Smith & Associates, P.C. ("Smith"), acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the Interim Fee Application of Reed Smith LLP for the Fifth Interim Period.

**BACKGROUND**

1. Reed Smith LLP ("Reed Smith") was retained as special asbestos products liability defense counsel to the Debtors. In the Application, Reed Smith seeks approval of fees totaling $479,395.75 and costs totaling $159,602.71 for its services from April 1, 2002 through June 30, 2002.

2. In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time entries included in the exhibits to the Application, for compliance with 11 U.S.C. § 330, Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2001, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, Issued January 30,

1996, (the "Guidelines"), as well as for consistency with precedent established in the United States Bankruptcy Court for the District of Delaware, the United States District Court for the District of Delaware, and the Third Circuit Court of Appeals. We served on Reed Smith an initial report based on our review, and received a response from Reed Smith, portions of which response are quoted herein.

## DISCUSSION

### General Issues

3.    We noted in our initial report that, within the fee detail of the Application, the individual time entries for April and May were not divided by category. However, this was corrected in the June invoice and time entries for that month were divided into three categories; (1) Special Asbestos Counsel, (2) Travel, and (3) Billing Procedures, Fee Petitions and Interim Compensation. Paragraph II.D.1. of the Guidelines states that "[t]o facilitate effective review of the application, all time and service entries should be arranged by project categories.... A separate project category should be used for administrative matters and, if payment is requested, for fee application preparation." It was also noted that the Application contained a summary by project category. The Amended Administrative Order Under 11 U.S.C. §§ 105 (a) and 331 Establishing Revised Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members (the "Amended Administrative Order") in this case, requires such a summary in order to provide the court with "a spreadsheet showing all fees and expenses paid, by category to each professional and committee member, in each quarterly period....". However, except for Travel, the categories used by Reed Smith were not in keeping with the Court's instruction and, thus, we requested that Reed Smith adjust these categories accordingly. We asked Reed Smith to please

**FEE AUDITOR'S FINAL REPORT** - Page 2
 wrg IR Reed 5int 4-6.02.wpd

refer to the Guidelines, the Delaware Local Rules, and both the fee auditor retention order and the Amended Administrative Order when preparing subsequent fee applications. Reed Smith responded that it would do so.

4.      We noted in our initial report that timekeepers Flatley, Cameron, and Raytik often did not include sufficient detail in their time entries. Rule 2016-2(d) of the Delaware Local Rules states "activity descriptions . . . shall be sufficiently detailed to allow the Court to determine whether all the time, or any portion thereof, is actual, reasonable, and necessary . . ." We observed that this issue had been raised in previous reports and that certain professionals had been advised to provide more detailed time entries in the future. We again asked that Reed Smith continue to advise its professionals regarding this matter and Reed Smith responded that it would do so.

5.      We noted in our initial report that professionals Cameron, Flatley, Butcher, and Hindman often tended to lump their time entries. Local Rule 2016-2(d)(vii) provides that "[a]ctivity descriptions shall not be lumped – each activity shall have a separate description and a time allotment." We asked Reed Smith to please advise these professionals to avoid lumping their time entries in the future and Reed Smith responded that it would do so.

### Specific Time and Expense Entries

6.      We noted in our initial report that in the month of April there was no distinction made between non-working travel time and working travel time in the fee detail. The hours involved totaled 13.8 and fees of $1,696.00. The time entries are provided below.

| Date | Timekeeper | Hours | Description |
|---|---|---|---|
| 04/05/02 | Atkinson | 7.40 | .....; travel from Boston (1.8). |
| 04/05/02 | Jones | 3.00 | Travel from Boston to Philadelphia (W.R. Grace 172573/60026). |
| 04/14/02 | Atkinson | 3.10 | .....; travel to Boston for document review (1.5). |
| 04/18/02 | Atkinson | 4.50 | ......; travel from Boston (1.1). |

| 04/22/02 | Jones | 2.50 | Travel from Philadelphia to Boston. |
| 04/25/02 | Jones | 2.50 | Travel from Boston to Philadelphia. |
| 04/29/02 | Atkinson | 6.60 | Travel to Boston (1.4);........... |

Local Rule 2016-2(d)(viii) provides that "[t]ravel time during which no work is performed shall be separately described and may be billed at no more than 50% of regular hourly rates." Although this oversight appears to have been corrected in the subsequent months of May and June, the April travel time during which no work was performed appears to have been billed at the professional's full hourly rate. We requested Reed Smith explain how these miscalculations would be addressed. Reed Smith responded that:

> . . . although there is no indication of it on the fee detail, the travel time at issue in this Inquiry was in fact charged at 50% of its actual value, in compliance with Local Rule 2016-2(d)(viii). Beginning with its Fee Application for the Thirteenth Monthly Interim Period (July 1, 2002 through July 31, 2002), Reed Smith both has separated its non-working travel time into a distinct category (per the Fee Auditor's instructions) and has included in all entry details a notation that only half of each non-working travel entry was charged to the Debtors.

Thus we have no objection to these fees.

7. We noted in our initial report that on 04/22/02 Cameron ($385) and Flatley ($400) prepared for and attended the same meeting for a total of 6.60 hours and $2,565.00. The time entries are provided below.

| 04/22/02 | Cameron | 5.40 | Prepare for and meet with J. Restivo, D. Siegel, R. Finke and P. Norris (.5); Prepare for and attend hearing (2.2); Meet with R. Finke, D. Siegel, et al. regarding hearing and strategy issues going forward (2.3);........... |
| 04/22/02 | Flatley | 1.90 | Preparation for meeting (0.4); meeting with J. J. Restivo, Jr., D. E. Cameron, R. Finke, W. Sparks and J. W. Bentz (1.2); ......... |

According to Local Rule 2016-2(d)(ix), "[t]he activity descriptions shall individually identify all

meetings and hearings, each participant, the subject(s) of the meeting or hearing, and the participant's role." The matter of multiple professionals, is also addressed in the Guidelines, Paragraph II.D.5.: "[i]f more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees." The fee detail does not provide the reason for multiple professionals at this meeting nor does it explain each professional's role. We asked Reed Smith to please explain the need for multiple professionals at this meeting. Reed Smith responded that:

> Because the meeting touched upon issues that were in the primary areas of responsibility of both attorney Cameron and attorney Flatley, it was necessary for both of these attorneys to be present for at least parts of this meeting, to avoid having details of the meeting passed along by one attorney to another through additional meetings or calls. Notably, attorney Flatley did not attend the entire meeting; he attended only the parts of that meeting in which issues in his area of primary responsibility were discussed.

Thus we have no objection to these fees.

8. Similarly, we noted that on 05/28/02, Restivo ($430) and Bentz($300) jointly participated in a meeting for a total of 4.00 hours and $1,460.00. The time entries are provided below.

| | | | |
|---|---|---|---|
| 05/28/02 | Restivo | 2.00 | Preparation and meeting regarding EPA Action Memo. |
| 05/28/02 | Bentz | 5.20 | .........; attending meeting with various Grace counsel (2.0);..... |

Again, we asked the reason for each professional's attendance and the expertise that each brought to this meeting. Reed Smith's response is attached hereto as Response Exhibit 1. We accept this explanation and thus we have no objection to these fees.

9. We noted in our initial report that on April 17, 2002, professional Cameron had a time entry listed as 8.20 hours for a total of $3,157.00. However, the parentheticals only added up to 5.20

hours for a total of $2,002.00, resulting in an overcharge of $1,155.00.

| 04/17/02 | Cameron | 8.20 | Prepare for and meet with R. Finke, K. Lund, C. Neitzel and consultant (3.8); Meet with K. Lund, R. Finke and C. Neitzel regarding EPA work and open issues (.5); Review materials from consultant meeting (.9). |

We requested Reed Smith to explain this miscalculation. Reed Smith responded that:

> On that date, attorney Cameron was in Denver and participated in several meetings, which he listed separately depending upon the attendees and the subject matter involved. The detail is missing an entry for one of the meetings on that date: attorney Cameron met with K. Lund and R. Finke regarding discovery issues in the EPA cost-recovery action for 3.00 hours, for a total of $1,155.00. That entry, while listed on the Reed Smith internal time records, was inadvertently omitted from the fee detail.

We take this explanation to mean that the 3.0 hours of missing time were included in Reed Smith's internal time records and were thus reflected in the total amount of fees requested. As such, we have no objection to these fees.

10. Similarly, we noted in our initial report that on April 19, 2002, professional Flatley had a time entry listed as 0.60 hours for a total of $240.00 in fees. The parentheticals, however, only added up to 0.40 hours for a total of $160.00, thus, resulting in an overcharge of $80.00.

| 04/19/02 | Flatley | .60 | With J. Bentz re possible witness meeting (0.3); with D. Cameron (0.1). |

We requested Reed Smith to please explain this miscalculation. Reed Smith responded that:

> The overall time worked listing is erroneous in this instance; attorney Flatley's time amounted to .40 hours. Thus, Reed Smith will not contest an $80.00 reduction in its fees, as reflected by this change.

Thus, we recommend a reduction of $80.00 in fees.

11. Likewise, we noted in our initial report that on May 13, 2002, professional Muha had

a time entry for 6.30 hours for a total expense to the bankruptcy estate of $1,165.50. The parentheticals however, only add up to 6.00 hours for a total of $1,110.00, thus, resulting in an overcharge of $55.50.

| | | | |
|---|---|---|---|
| 05/13/02 | Muha | 6.30 | W.R. Grace document review (3.5); meet with J. Butcher and J. Bentz re: historical case defense outline (.3); revise and edit historical case defense outline (2.2). |

Again, we requested Reed Smith to please explain this miscalculation. Reed Smith responded that:

> The fee detail description of attorney Muha's time spent on the "W.R. Grace document review" is erroneous; it should be listed as 3.80 hours (consistent with the Reed Smith internal time records), rather than 3.50 hours, amounting to a difference of $55.00. Thus, aside from the error in attorney Flatley's overall time entry for April 19, 2002, the overall time entries and fees charged to the Debtors in Inquiry No. 9 are correct.

Thus we have no objection to these fees.

12. We noted in our initial report that on April 15, 2002, more than one professional from Reed Smith prepared for and participated in a conference call for a total of 3.7 hours and a total expense to the bankruptcy estate of $1,449.50. The time entries are provided below:

| | | | |
|---|---|---|---|
| 04/15/02 | Cameron | 3.50 | ........; Prepare for and participate in various conference call regarding issues relating to document review and production (1.9). |
| 04/15/02 | Restivo | 2.00 | ........; conference call with client re same (1.0). |
| 04/15/02 | Trevelise | 1.90 | ........; conference call with R. Finke, HRO, Casner & Edwards, Restivo, Cameron re: status of document production (0.8). |

Local Rule 2016-2(d)(ix) provides ". . .The activity descriptions shall individually identify all

meetings and hearings, each participant, the subject(s) of the meeting or hearing, and the participant's role." Also, Paragraph II.D.5. of the Guidelines states that "[i]f more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees." We requested that Reed Smith please explain the need for more than one professional at this conference. Reed Smith responded that:

> Because the document review project touched upon issues that were in the primary areas of responsibility of both attorneys Restivo and Cameron, the participation of both of these attorneys on the call was necessary for matters pertaining to the document review project to be fully addressed. Furthermore, attorney Trevelise, who had direct responsibility to the Debtors for managing the document scanning process and for planning the attorney work-product document review project in conjunction with other parts of the Debtors' bankruptcy proceedings, also was needed on the call so that administrative and logistical issues could be thoroughly reviewed.

We appreciate this response and thus we have no objection to these fees.

13. Similarly, we noted in our initial report that on April 29, 2002 multiple Reed Smith professionals spent a total of 5.6 hours for a total expense to the bankruptcy estate of $1,386.00 participating in the same conference call. The entries are provided below.

| 4/29/02 | Haines | 8.10 | ..........; prepare for and participate in conference call re: document review status and production (3.0) |
|---|---|---|---|
| 04/29/02 | Trevelise | 2.90 | Review materials and charts regarding remaining document review in preparation for conference call (.3); conference call with K. Coggon, B. Tracey, M. Murphy and S. Haines regarding remaining document review and production issues (2.3); |

Again, we asked Reed Smith to please explain why it was necessary for multiple professionals to attend this conference call. Reed Smith responded that:

> On April 29, 2002, at the request of the Debtors' in-house counsel, attorney Trevelise and paralegal M. Susan Haines prepared for and participated in a conference call with other counsel retained by the Debtors in their bankruptcy proceedings. The call pertained to strategy and planning for the Debtors' compliance with a potential May 15, 2002 deadline for production of documents in one of the Debtors' bankruptcy-related cases. During the call, the Reed Smith professionals and the other counsel developed strategy to resolve legal, technical and staffing issues in order to complete a portion of the document coding project over which both attorney Trevelise and paralegal Haines had responsibility.

We accept this response and thus have no objection to these fees.

14.     Similarly we noted in our initial report that on March 27, 2002 multiple professionals spent 2.0 hours for a total expense to the estate of $510.00 on the same conference call. The time entries are provided below.

| 05/06/02 | Haines | 3.10 | ........; conference call with Murphy, Trevelise, Coggon re: status of review and production (1.0);.......... |
|---|---|---|---|
| 05/06/02 | Trevelise | 1.40 | ........; prepare for and participate in conference call with M. Murphy, S. Haines, and K. Coggin re: completion of document review and attorney review of issues (1.0). |

We again requested Reed Smith to please explain the need for more than one professional at this conference call. Reed Smith responded that:

> Relatedly, on May 6, 2002, both Reed Smith professionals participated in a second call with the same parties to discuss the status of the document coding process vis-à-vis the document production deadline. During this call, the participants formulated for the Debtors' in-house counsel recommendations for reviewing documents at locations outside Boston, adding additional document coders, and accelerating the document scanning work (which was the initial step in the document review process, as explained below).
>
>       The attendance of both professionals on these occasions was necessary because of the division of responsibilities over the intake portion of the Reed Smith attorney work-product document review project. Attorney Trevelise had direct responsibility to the Debtors for managing the document scanning, coding and

**FEE AUDITOR'S FINAL REPORT** - Page 9
wrg IR Reed 5int 4-6.02.wpd

> attorney work-product review process and for planning the attorney work-product document review in conjunction with other parts of the Debtors' bankruptcy proceedings, while paralegal Haines supervised the day-to-day, technical scanning operations and served as liaison between the Debtors (and attorney Trevelise) and the document scanning company. This division of responsibility has been carried over to apply also to the document production duties that the Debtors have been charged with in their bankruptcy-related cases.

We accept this response, and thus have no objection to these fees.

15. We noted in our initial report that secretarial overtime was charged in the amount of $2,262.50 during the interim period. The time entries are provided below.

| Date | Description | Amount |
|---|---|---|
| 04/15/02 | Secretarial Overtime PRINT SUMMATION DOCS. | 120.00 |
| 04/18/02 | Secretarial Overtime NUMBER SUMMATION SHEETS | 82.50 |
| 04/21/02 | Secretarial Overtime TAPE REVISIONS | 90.00 |
| 04/30/02 | Secretarial Overtime PRINT CHECK SUMMATION DOCS | 112.50 |
| 04/30/02 | Secretarial Overtime ENTER DOCS INTO SUMMATION | 75.00 |
| 05/06/02 | Secretarial Overtime PRINT CHECK SUMMATION DOCS | 270.00 |
| 05/15/02 | Secretarial Overtime PRINT CHECK TARGET SHEETS | 427.50 |
| 05/18/02 | Secretarial Overtime PRINTING DOC FOR SUMMATION | 195.00 |
| 05/19/02 | Secretarial Overtime PRINTING DOCS. FROM SUMMATION | 390.00 |
| 05/20/02 | Secretarial Overtime PRINT SUMMATION DOCS. FOR REVIEW BY ATTORNEYS | 600.00 |

Paragraph II.E.7. of the Guidelines, discussing nonreimbursable overhead, provides that "[o]verhead includes word processing, proofreading, secretarial and other clerical services...." In the absence of further explanation, it appears that this secretarial overtime constitutes nonreimbursable overhead. We requested that Reed Smith please explain why an exception should be made for these charges. Reed Smith responded that:

> . . . the secretarial overtime charges were incurred to facilitate, in the most economical manner, the printing of those documents necessary for the attorney review. The alternative, the use of an outside vendor, was more expensive.

We accept this response and thus we have no objection to these expenses.

16. We noted in our initial report a general expense charge in all three months of this interim period for document scanning and duplicating totaling $111,756.64.

| | | |
|---|---|---|
| 5/29/02 | General Expense - - VENDOR: ON-SITE SOURCING INC DOCUMENT SCANNING | 23,993.46 |
| 6/28/02 | General Expense - - VENDOR: ON SITE SOURCING INC OUTSIDE COPYING OF DOCUMENTS JUNE 2002 | 69,325.28 |
| 07/30/02 | General Expense - - VENDOR: ON SITE SOURCING INC DOCUMENT SCANNING JUNE 2002 | 12,589.14 |

We noted in the previous interim period that Reed Smith charged $83,039.38 for this same expense. In our final report for the Fourth Interim Period we acknowledged the enormity of the project and stated that the explanation provided by Reed Smith addressed our concerns and therefore we did not object to the charges at that time. However, we are concerned about the ongoing nature of this document scanning and feel a further explanation is warranted. Thus, we requested Reed Smith please provide more information regarding this matter including, but not limited to, the types of documents involved and an estimated timetable for completion of the project. Reed Smith responded:

> The higher scanning charges for the Fifth Interim Quarterly period reflect the acceleration of the document scanning project during that period, which was necessitated by the EPA Cost Recovery Action deadlines and the anticipated implementation of an aggressive discovery schedule for the ZAI Science Trial. Between November 2001 and April 2002, approximately half of the Debtors' documents had been scanned as part of Reed Smith's document scanning and attorney work-product review process. The remainder of the documents were to be scanned at the same pace as those that had been scanned during the November 2001- April 2002 period. Pursuant to the aforementioned discovery schedules and deadlines, however, the scanning of the remaining half of the Debtors' documents was required to be completed by approximately July or August 2002. Subsequently, almost all of the unscanned documents --approximately half of the Debtors' entire catalogue of documents -- were scanned during the Fifth Interim Quarterly period, compressing into three months work that had previously taken six months to complete.
>
> The acceleration in the scanning project did not raise the overall cost of the project,

> however. The total scanning charges incurred over the duration of the scanning project are the same as if the project would have taken several additional months to complete. Rather than spreading the charges over several additional months, the charges were higher for a smaller number of months. As noted above, as of August 2002 the document scanning project reached near conclusion, and it is anticipated that no further scanning charges (or only minimal charges) will be incurred by Reed Smith on behalf of the Debtors in relation to their bankruptcy-related litigation.

We accept this response and thus we have no objection to these expenses.

## CONCLUSION

17.    Thus, we recommend approval of fees totaling $479,315.75 ($479,395.75 minus $80.00) and costs totaling $159,602.71 for Reed Smith's services from April 1, 2002, through June 30, 2002.

        Respectfully submitted,

        **WARREN H. SMITH & ASSOCIATES, P.C.**

By: _/s/ Warren H. Smith_
     Warren H. Smith
     State Bar No. 18757050

900 Jackson Street
120 Founders Square
Dallas, Texas 75202
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 31st day of October, 2002.

_____
Warren H. Smith

## SERVICE LIST

Notice Parties

**The Applicant**

Richard Keuler, Esq.
Reed Smith LLP
1201 Market Street, Ste. 1500
Wilmington, DE 19801

Douglas Cameron
Reed Smith LLP
P. O. Box 2009
Pittsburgh, PA 15230-2009

**The Debtors**

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones, P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph, Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**

Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Marla R. Eskin
Campbell & Levine, LLC
Suite 300
800 N. King Street
Wilmington, DE 19801

**Official Committee of Equity Holders**

Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**

Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801

Douglas Cameron
Reed Smith LLP
P. O. Box 2009
Pittsburgh, PA 15230-2009

RESPONSE EXHIBIT 1

. . . the necessity of having multiple Reed Smith attorneys occasionally attend the same meetings, hearings or conference calls stems from the way in which Reed Smith has structured its representation of the Debtors in their bankruptcy proceedings. Since 1989, Reed Smith has provided counsel to the Debtors for certain asbestos-related litigation, and several individual Reed Smith attorneys have divided responsibility among themselves for various aspects of those cases. Responsibilities for specific subject areas and segments of the cases have been divided among attorneys Cameron, Flatley, Restivo and Bentz for dealing with, among other things, responsibility over medical issues and experts, industrial hygiene issues and experts, microscopy issues and experts, regulatory issues and experts, Grace's historical documents and witnesses, document production and discovery issues, case specific/claimant specific facts, and damages.

      This division of primary responsibility originally was designed to avoid duplication of effort and to allocate direct responsibility for results. The division of specific primary responsibilities was carried over to Reed Smith's retention as the Debtors' Special Asbestos Product Liability Defense Counsel. The attendance of multiple Reed Smith professionals at certain meetings, hearings or conference calls has often been necessary when the event in question covers topics within the areas of primary responsibility of more than one Reed Smith professional. Reed Smith is fully aware of the need to avoid duplication and works very hard to avoid any such duplication, including writing off time prior to the submission of the Fee Application. As the various fee applications reflect, particularly after the early stages of the representation, the overwhelming majority of meetings and calls have involved only one Reed Smith professional. Reed Smith has only had multiple professionals participate where it was necessary and more economical than any alternative staffing plan.