## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | |
| | § | **Chapter 11** |
| **W.R. GRACE & CO., et al** | § | **Jointly Administered** |
| | § | **Case No. 01-1139 (JJF)** |
| Debtors | § | |

## AMENDED FEE AUDITOR'S FINAL REPORT REGARDING
## INTERIM APPLICATION OF KRAMER LEVIN NAFTALIS & FRANKEL, LLP
## FOR THE SECOND AND THIRD INTERIM PERIODS

This is the amended final report of Warren H. Smith & Associates ("Smith"), acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the First Interim Application of Kramer Levin Naftalis & Frankel, LLP (the "Application").

## BACKGROUND

1.      Kramer Levin Naftalis & Frankel, LLP ("Kramer") was retained as Counsel to the Official Committee of Equity Holders.  In the Application, Kramer seeks approval of fees totaling $177,893.50 and expenses totaling $18,539.64 for its services from July 18, 2001 through December 31, 2001.

2.      In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time entries included in the exhibits to the Application, for compliance with the Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2001, and the United States Trustee Guidelines for Reviewing Applications for

Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, Issued January 30, 1996, (the "Guidelines"), as well as for consistency with precedent established in the United States Bankruptcy Court for the District of Delaware, the United States District Court for the District of Delaware, and the Third Circuit Court of Appeals.  We served on Kramer an initial report based on our review, and received a response from Kramer, portions of which response are quoted herein.

## DISCUSSION

### General Issues

3.      In our initial report we noted that Kramer professionals P. Bentley, R. Schmidt, G. Becker, C. Finnerty,  and K. Mangual did not consistently provide adequate detail in their time entries.   Thus, we asked Kramer to please advise these professionals to provide more information in their time entries in the future.  Kramer responded as follows:

> As you are aware, there is a tension between providing time descriptions sufficiently detailed for review and maintaining the sanctity of attorney client communications and attorney work product.  The enumerated professionals have been advised to provide as much detail as possible consonant with our duty to protect our client's interests.

4.      In our initial report we noted that Kramer professionals R. Schmidt, C. Finnerty, and P. Bentley consistently lump their time entries.  Thus we asked Kramer to please advise these professionals not to lump their time entries in the future and Kramer stated that it would.

5.      In our initial report we noted that although Kramer reported its time chronologically and by categories,  the entries were broken down by timekeeper instead of reporting each timekeeper's entry chronologically under the categories.  Kramer responded as follows:

We believe that our reporting of time by timekeeper is consistent with the requirements of the Bankruptcy Code and applicable local rules.

The U.S. Trustee Guidelines Rule II. D.1., states "[t]o facilitate effective review of the application, all time and service entries should be arranged by project categories. ..." We disagree with Kramer's assertion that its failure to arrange by project categories complies with the Guidelines. Thus, we ask Kramer to comply with this section of the Guidelines in future applications.

6.    In our initial report we noted that during the September, 2001 billing cycle, Kramer increased the following professionals' rates: G. Becker from $340.00 to $370.00 per hour, C. Finnerty from $325.00 to $340.00 per hour, and A. Caton from $280.00 to $300.00 per hour. Thus, we asked Kramer to please provide additional information regarding these rate increases. Kramer responded as follows:

> As is common with professional service firms, Kramer Levin adjusts the hourly rates for its professionals on a periodic basis – typically yearly. Changes in hourly rates are due to a host of factors, including market conditions, but the most typical reason for increases in hourly rates is that the billing rates for associates in the firm are raised yearly as they gain experience, as was the case for the associates you enumerated. We are unaware of any prohibition on changing hourly rates, and we believe any such prohibition would be improper in a multi-year case such as this one.

We are also unaware of any prohibition on changing hourly rates. However, according to the Guidelines, Rule II. A. 3., "[t]he following information should be provided in every fee application. . . .explanation of any changes in hourly rates from those previously charged,. . .". Thus, we appreciate Kramer's courtesy in providing this explanation.

7.      In our initial report we noted that Kramer did not segregate its non-working travel time into a separate category. Thus, we asked Kramer to please use a separate category in the future for non-working travel time, and Kramer stated that it would.

<u>Specific Time and Expense Entries</u>

8.      In our initial report, we noted that between July 20, 2001 and July 26, 2001, Kramer billed 9.1 hours for a cost to the bankruptcy estate of $2,889.50 for conflict checks. *See* Exhibit "A". Thus, we asked Kramer to please advise us as to why these fees should be allowed.  Kramer responded as follows:

> In any bankruptcy case, extremely detailed conflict checks are necessary to prepare applications for employment of estate compensated professionals and to prepare the affidavits supporting those applications.  This task is part and parcel of the retention process and we believe these costs are properly charged.

The U.S. Bankruptcy Code §330 (4)(A)(ii)(I) provides that "(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for – . . .(ii) services that were not – (I) reasonably likely to benefit the debtor's estate; . . .".  While we understand the explanation regarding the retention process, we believe that clearing conflicts benefits Kramer rather than the estate, and thus recommend a reduction of $2,889.50 in fees.

9.      In our initial report we noted that between August 3, 2001 and December 5, 2001, Kramer billed 47.6 hours for a cost to the bankruptcy estate of $20,526.50 in fees and a minimum of $4,230.00 in expenses for multiple professionals to attend the same meetings, hearings and/or conference calls.  *See* Exhibit "B".  The Guidelines, Rule, II.D.5. states  ". . .[i]f more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the

need for multiple attendees." Thus we asked Kramer to please advise why it was necessary for multiple professionals to attend each of these meetings, hearings and/or conference calls. Kramer's response is provided in Response Exhibit A. While we believe we understand the explanations for some of these occasions we believe that the explanation does not establish why multiple professionals were reasonable or necessary, and thus we recommend the following corresponding reductions:

August 7, 2001 conference call: We note that Kramer did not provide an explanation, as required by the Guidelines, for why three professionals were necessary on this conference call. It appears that the conference lasted approximately one hour and thus we recommend a reduction based on one hour of time for the lowest hourly billing professional on the call, for a reduction of $280.00 in fees.

October 3, 2001 conference call:  We note that Kramer did not provide an explanation, as required by the Guidelines, for why two professionals were necessary on this conference call. It appears that the conference lasted approximately 11/2 hours and thus we recommend a reduction based on 11/2 hours of time for the lowest hourly billing professional on the call, for a reduction of $637.50 in fees.

10.    In our initial report we noted that between September 4, 2001 and December 31, 2001, A. Caton billed 15.3 hours for a cost to the bankruptcy estate of $4,590.00 for reviewing documents for distribution and filing.

| 10/01/01 | CATON, AMY | review recently filed docs for distribution | 0.40 | 120.00 |
| 10/02/01 | CATON, AMY | reviewing recently filed docs for distribution (.3); reviewing P Bentley memo to client (.3) | 0.60 | 180.00 |
| 10/09/01 | CATON, AMY | reviewing recently filed docs for distribution | 0.30 | 90.00 |
| 10/11/01 | CATON, AMY | reviewing recently filed docs for distribution | 0.30 | 90.00 |
| 10/12/01 | CATON, AMY | reviewing recently filed docs for distribution | 0.20 | 60.00 |

This appeared to be a fairly ministerial task for a $300.00 per hour professional. Thus we asked Kramer to please advise why a lower-rate professional was not assigned to this task. Kramer responded as follows.

> The review of filings performed by Amy Caton was not a ministerial task. Each day, numerous case pleadings are received in our office. It requires a lawyer sufficiently experienced and knowledgeable about the case to briefly read the pleadings, determine if action is required and by whom, and to arrange for the appropriate Kramer Levin team members to receive the documents. We find that this initial screening saves a substantial amount of fees by reducing the need for more senior lawyers to read every pleading that is received. By using this screening practice, important pleadings are flagged for attention and more senior lawyers read only those pleadings. Due to the importance of this function and the level of knowledge needed to perform it, we do not believe it appropriate to have it done by our paralegals or our most junior lawyers.

While the time entries themselves indicate a task usually reserved for lower billing professionals, the additional information provided by Kramer adequately addresses our concerns.

11.    In our initial report we note that between July 18, 2001 and December 31, 2001, Kramer charged $2,221.54 in cabfares and $1,425.00 in manuscript services. Thus we asked Kramer to please provide back-up for these individual charges. Kramer responded as follows:

> Detail regarding the cabfares is provided herewith. The manuscript services represent secretarial overtime. We agree to a reduction of $1425.00 for manuscript services.

We therefore recommend a reduction of $1,425.00 in expenses.

## CONCLUSION

12.    Thus, we recommend approval of fees totaling $176,976.00 ($177,893.50 minus $917.50) and costs totaling $17,114.64 ($18,539.64 minus $1,425.00) for Kramer's services from July 18, 2001 through December 31, 2001.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES**

By:_____

Warren H. Smith
State Bar No. 18757050

900 Jackson Street
120 Founders Square
Dallas, Texas  75202
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 20th day of November, 2002.

_____

Warren H. Smith

## SERVICE LIST
Notice Parties

**The Applicant**

Thomas Moers Mayer
Philip Bentley
**Kramer Levin Naftalis & Frankel, LLP**
919 Third Avenue
New York, New York 10022

**The Debtors**

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones, P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph,Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**

Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Matthew G. Zaleski, III, Esq.
Campbell & Levine
Chase Manhattan Centre, 15th Floor
1201 Market Street, Suite 1200
Wilmington, DE 19801

**Official Committee of Equity Holders**

Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**

Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801

## EXHIBIT "A"

| 07/23/01 | SCHMIDT, ROBERT T. | review draft retention papers; rev contract/conflict lists and checks re same | 0.00 | 0.00 |
|---|---|---|---|---|
| 07/25/01 | SCHMIDT, ROBERT T. | conflict check; oc Finnerty | 0.30 | 127.50 |
| 07/25/01 | FINNERTY, CATHERINE E. | Review conflict report to prepare retention motion and 2014 affidavit | 1.30 | 422.50 |
| 07/26/01 | FINNERTY, CATHERINE E. | Review conflict check to prepare for 2014 affidavit; begin draft 2014 affidavit; send out e-mails and other inquiries to follow up | 5.00 | 1,625.00 |
| 07/24/01 | SCHMIDT, ROBERT T. | attention to case admin/organizational tasks (.2); ocs Caton/Finnerty re status of conflict check etc. (.1); review misc case pleadings (.3) | 0.10 | 42.50 |
| 07/20/01 | CATON, AMY | editing by-laws per B Schmidt comments (1.5); drafting memo, fax to Cmte w/ same (.6); gathering names for conflict check – email to firm re same (1.5) | 1.50 | 420.00 |
| 07/23/01 | CATON, AMY | call to T Currier re: Klett Rooney as local counsel, v/m to B Schmidt re: same (.4); reviewing conflict check results, t/c w/ C Finnerty re: continuation of same (.5) | 0.90 | 252.00 |

## EXHIBIT "B"

### *August 3, 2001:*

| 08/03/01 | SCHMIDT, ROBERT T. | prep for and meet with debtor's counsel in Chicago re all case issues, confs with Mayer and Bentley en route; review proposed CMO and pleadings re Sealed Air and Fresinous (10.5); non working travel on return trip from Chicago (2.0) | 12.50 | 5,312.50 |
|---|---|---|---|---|
| 08/03/01 | BENTLEY, PHILIP | Meeting with debtor's counsel in Chicago, notes for followup, review pleadings and other papers re current litigation issues, and discs. TM, RS and voicemail re same (10.3); non-working travel to and from Chicago (1.2). | 11.50 | 4,887.50 |
| 08/03/01 | MAYER, THOMAS MOERS | Trvl Chicago rvw, among other things, Information Brief filed by debtor (.5) mtrls on asbestos claims filed against other debtors (1.) & Eagle Picher confirmation trnscpt (1.); confs R. Schmidt, P. Bentley re mtg to come w/Kirkland & Ellis lawyers (.5) meet w/J. Sprayregen, D. Bernick of K&E to disc background of asbestos claims and litigation strategy against them (3.); return to NY, rvw balance of Eagle Picher trnscpt (1.), post-mort discs w/Schmidt, Bentley (.5). | 6.50 | 3,412.50 |

### *August 7, 2001:*

| 08/07/01 | SCHMIDT, ROBERT T. | further review of CMO and case docs (.3); prep for and participate on Cmtee conf call (1.0); follow up t/c with Bentley and Ted W re case issues (.3); continued review of Sealed Air and Fresinous issue (.5) | 2.10 | 892.50 |
|---|---|---|---|---|
| 08/07/01 | BENTLEY, PHILIP | Telephonic committee meeting, prepare for same, notes for followup and discs T. Wechsler re same | 3.80 | 1,615.00 |
| 08/07/01 | CATON, AMY | cvr memo & fax to Cmte w/ bylaws revisions (.5); Cmte conference call w/ all members, P Bentley, R Schmidt, C Finnerty and post-t/cre: valuation issues, organization of docs, trading w/ P Bentley, T Weschler, C Finnerty, B Schmidt (2.7) | 3.20 | 896.00 |

### *October 3, 2001:*

| 10/03/01 | BENTLEY, PHILIP | Committee conf. call, and discs. TW, TM, AC and GB re same, and notes for followup. | 2.10 | 892.50 |
|---|---|---|---|---|
| 10/03/01 | MAYER, THOMAS MOERS | Prepare for (.5) and participate in (1.5) hour telephonic committee meeting with S. Atlas, A. Mercer, P. Bentley, G. Becker, A. Caton: agenda focuses on Case Management Order, litigation strategy planned by D. Bernick, equity committee role in fraudulent conveyance litigation, CMO, and pending business review session with Grace. | 1.50 | 787.50 |

### *December 5, 2001:*

| 12/05/01 | BENTLEY, PHILIP | Committee conf. call, and discs. T. Weschler re same. | 1.30 | 552.50 |
|---|---|---|---|---|
| 12/05/01 | MAYER, THOMAS MOERS | Review G. Becker's memo on appointment of Judge Wolin as consolidating judge and attend telephonic committee meeting to discuss developments in case, Becker's report on Wolin's published decisions. | 1.00 | 525.00 |
| 12/05/01 | BECKER, GARY M. | prepare for and conf. call with Equity Committee (1.3); | 1.30 | 481.00 |
| 12/05/01 | FINNERTY, CATHERINE E | Participate on Committee call w/ P. Bentley, T. Mayer, G. Becker | 0.80 | 272.00 |

Response Exhibit A

On August 3, 2001, the three principal Kramer Levin partners assigned to this case traveled to Chicago to meet with the Debtor and its professionals in a conference crucial to our ability to properly represent the Equity Committee. During the conference, we learned about the history of the Debtor's dealings with the asbestos plaintiffs bar, the business conditions under which the Debtor operates and the Debtors' strategy and plans for managing the chapter 11 case. The information provided was detailed and comprehensive. Given the scope and importance of the meeting, as well as the fact that each of the Kramer Levin attorneys was expected to play a distinct role in the case, we believe it was entirely appropriate to have all three lawyers there.

On December 5, 2001, we conducted a conference call with the Equity Committee and the Kramer Levin lawyers involved in the case. At that point, the case had just been assigned to Judge Wolin and there was significant interest in the implications of that reassignment, as well as in the Debtors' ongoing efforts to have the court implement a case management order with respect to asbestos personal injury claims and to resolve Zonolite Attic Insulation claims and property damage claims. Each of the Kramer Levin lawyers played a role in the conference. As the partner principally responsible for the daily administration of the case, Phillip Bentley took the lead role in presenting to the Equity Committee and in organizing and directing the conference. Thomas Moers Mayer was able to provide insights on the issues under discussion that he had gained from his work on some of the other asbestos cases reassigned to Judge Wolin. Gary Becker and Catherine Finnerty had separately conducted research on various legal issues, and they were in attendance to present the results of their research and to address the Equity Committee's questions. Under the circumstances, we believe it was wise to have all of these lawyers available so that questions could be answered immediately and in detail and so that the discussion could be as productive as possible. As you have noted in Paragraph 10, Theresa Currier of the Klett Rooney firm, our local counsel, also participated in the conference to give us a perspective from the Wilmington bankruptcy bar on the reassignment to Judge Wolin.