**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In Re: | § | |
| | § | **Chapter 11** |
| W.R. GRACE & CO., et al | § | **Jointly Administered** |
| | § | **Case No. 01-1139 (JJF)** |
| Debtors | § | |

# AMENDED FEE AUDITOR'S FINAL REPORT REGARDING INTERIM APPLICATION OF STEPTOE & JOHNSON, LLP FOR THE SECOND AND THIRD INTERIM PERIODS

This is the amended final report of Warren H. Smith & Associates ("Smith"), acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the <u>Interim Application of Steptoe & Johnson LLP for the Second and Third Interim Periods</u> (the "Application").

## BACKGROUND

1. Steptoe & Johnson LLP ("Steptoe") was retained as Special Tax Counsel to the Debtor. In the Application, Steptoe seeks approval of fees totaling $201,966.00[1] and expenses totaling $8,076.01 for its services from July 1, 2001 through December 31, 2001.

2. In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time entries included in the exhibits to the Application. We reviewed the Application for compliance with the

---

[1] This figure represents the actual amounts earned based on the hours billed per month. However, Steptoe was originally identified as an Ordinary Course Professional with an agreed upon monthly allowance of $50,000.00. Therefore, the applications only seek payment for fees above the $50,000.00 per month level.

**FEE AUDITOR'S FINAL REPORT** - Page 1
wrg fr re amended Steptoe 2-3int 7-12.01.wpd

Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2001, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, Issued January 30, 1996, (the "Guidelines"), as well as for consistency with precedent established in the United States Bankruptcy Court for the District of Delaware, the United States District Court for the District of Delaware, and the Third Circuit Court of Appeals. We served on Steptoe an initial report based on this review, and Steptoe sent us a response to this initial report, portions of which response are quoted herein.

## DISCUSSION

### General Issues

3.      In our initial report we noted that although the per page rates for copy cost and facsimile transmission were originally greater than that allowed by the Court, Steptoe had agreed to a voluntary reduction for the period July 1, 2001 to September 30, 2001. Thus we asked Steptoe to please confirm the amount voluntarily reduced. Steptoe responded as follows:

> You noted that the per page rates for copy costs and facsimile transmission were originally greater than allowed by the Court. Mr. Perch, the bankruptcy trustee, pointed this out when he reviewed my first applications that were filed March 29, 2002, for July, September, November, and December of 2001. At his suggestion, we reduced the fee request in both our bills to the client and in the certificates of no objection. Therefore, I am confirming that we did voluntarily reduce the copying expenses from $.20 to $.15 per page and the facsimile charges from $1.15 to $1.00 per page for those periods. We charged the correct amount for all other periods.
>
> As a result, we reduced our July, 2001 expenses by $103.10, our September, 2001 expenses by $53.35, and our December, 2001 expenses by $1.05, for a total of $168.60. Of this amount, $164.85 represented excess copying charges and $3.75

represented excess fax charges (September, 2001 only). The October, 2001 expenses were billed later, after we discovered this error. See footnote 3 to the quarterly summaries for the applicable periods.

We appreciate this confirmation of compliance with the Court's order.

4. In our initial report we noted that it did not appear that Steptoe reduced its non-working travel time by the required 50%. Thus, we asked Steptoe to please make appropriate reductions to comply with the 50% rate reduction. Steptoe responded as follows:

> You said that it appeared that Steptoe did not reduce its non-working travel time by 50%. Again, we were asked about that by Mr. Perch after our first filing. I explained that we reported only 50% of the non-working travel time. For these two Interim Periods, we billed 33 hours of travel time, involving one trip to Florida taken by three lawyers in September, 2001. The time to travel to Florida by air and by car to our destination was 6 hours; we charged 3 hours for each attorney (here I conservatively assumed all travel time was non-working). We traveled back from Florida by car on September 13, 2001 (all the airports were closed) which took 16 hours; we charged 8 hours for each attorney (9 + 24 = 33).
>
> Similarly, in January, 2002 (not part of this report), the travel time for Mr. Bailey and Mr. Johnson reflects only one-half of the time traveled. If, in the future, you want us to report ALL of our travel time and show the one-half reduction, we will do so. You will see that the charts I have prepared that list travel time for each quarterly period state that one-half time is billed.

We believe this explanation adequately addresses our concerns.

<u>Specific Time and Expense Entries</u>

5. In our initial report we noted that between July 20, 2001 and December 3, 2001, Steptoe billed 170.9 hours for a cost to the bankruptcy estate of $66,717.00 in fees for multiple professionals to attend the same meetings, hearings and/or conference calls. *See* Exhibit "A". The Guidelines, Rule, II.D.5. states "...[i]f more than one professional from the applicant firm

attends a hearing or conference, the applicant should explain the need for multiple attendees."
Thus we asked Steptoe to please advise us as to why it was necessary for multiple professionals to attend each of these meetings, hearings and/or conference calls. Steptoe's response is provided in Response Exhibit 1. While we believe we understand the explanations for some of these occasions, we believe that the explanation does not establish why multiple professionals were reasonable or necessary, and thus we recommend the following corresponding reductions:

<u>July 23, 24, 2001 meeting</u>: We believe we understand the explanation offered by Steptoe regarding the roles of Mr. Bailey, Mr. Johnson, Ms. Moran, and Ms. Serling. However, the necessity for the attendance of the fifth attorney, Mr. Kaufman, is not clear. Therefore, we recommend the reduction of Mr. Kaufman's fees for attendance at this meeting for a reduction of $2,817.50 in fees.

<u>10/26/01 meeting</u>: While we understand the explanation regarding the fact that "we generally kept it to one or two individuals", we feel that the necessity for three professional's participation is not established, and therefore we recommend a reduction equal to 1/3 of the fees for a reduction of $520.00 in fees.

## CONCLUSION

6.  Thus, we recommend approval of fees totaling $198,590.50 ($201,966.00 minus $3,375.50) and costs totaling $8,076.01 for Steptoe's services from July 1, 2001 through December 21, 2001.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES**

By: _____
      Warren H. Smith
      State Bar No. 18757050

900 Jackson Street
120 Founders Square
Dallas, Texas 75202
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 21st day of November, 2002.

_____
      Warren H. Smith

## SERVICE LIST
Notice Parties

**The Applicant**

Lewis Kruger
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982

Rose Serrette
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982

**The Debtors**

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones,
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph, Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**

Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Matthew G. Zaleski, III, Esq.
Campbell & Levine
Chase Manhattan Centre, 15th Floor
1201 Market Street, Suite 1200
Wilmington, DE 19801

**Official Committee of Equity Holders**

Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**

Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801

Response Exhibit 1

You asked me to explain the multiple attendance of several partners and associates at meetings. I am going to take each specific instance and describe what was needed. However, I think some background is necessary.

    Steptoe was hired by W.R. Grace as special counsel in 1998 to defend a very complex life insurance tax deduction case. The issue involved insurance policies owned by corporations (corporate-owned life insurance or COLI). The amount at stake for Grace was $80 million in interest deductions from 1990-92, and $107 million from 1993-96, as well as the protection of the tax benefits of the insurance policies on a going-forward basis (Grace, as owner, receives tax-free death benefits from these policies). Because the use of these COLI policies is a particular transaction that the IRS has targeted, Steptoe has represented numerous clients in these cases. In fact, Grace receives the benefit of Steptoe's expertise and experience with its other clients. Mr. Bailey and Mr. Johnson, Ms. Serling and Ms. Moran have represented over 15 clients on these cases. The staffing for each case is not always the same, although usually Mr. Bailey and Mr. Johnson are both involved. Mr. Bailey is a nationally recognized insurance expert in this area, and Mr. Johnson is an experienced litigator with 20 years of experience dealing with IRS appeals officers. These cases go through a protest stage (a written protest of the IRS position is filed with the IRS), and an appeals stage at the IRS in which an appeals officer reviews the protest, and then afterwards, if no agreement is reached, suit is filed.

    The Grace case was staffed generally by Mr. Bailey, Mr. Johnson, Ms. Moran and Mr. Kaufman. Ms. Moran originally handled the case, developed the fact record, and began the protest stage with the IRS (i.e., filing a written protest). Ms. Serling helped Ms. Moran originally in the appeals stage and has a number of other COLI clients. We brought in Mr. Bailey and Mr. Johnson for more significant help when it appeared we were likely to litigate. We still sought Ms. Serling's advice occasionally, to determine how the IRS dealt with her clients. Thus, we do not duplicate each others' efforts, but we do communicate with one another about how the IRS is dealing with this issue in other contexts and for other parties. This is extremely helpful to any taxpayer, and Grace often has specifically called to ask how the IRS was dealing with a taxpayer on a particularly procedural or substantive issue.

    As noted above, initially Ms. Moran and Ms. Serling dealt with the IRS administrative appeals procedures (before W.R. Grace bankruptcy). When it was clear that W.R. Grace was not going to reach a reasonable settlement with the IRS, we decided to consider filing a claim for a refund in district court. At this point, a number of steps have to be taken and various questions arose. First, payment of the contested taxes occurs and a refund claim has to be filed with the IRS. When that claim is denied, the taxpayer generally has two years to file suit in federal court for a refund. In some cases, the taxpayer can choose the court in which it files suit. That

decision would be based on precedent, judicial temperament, etc. Another question was what to do with the insurance policies (should any changes be made to them, etc.) while we were in the process of litigating this case. All of these issues came to a head in the summer of 2001. In addition, Grace had just declared bankruptcy, and this imposed some procedural restraints on the actions that Grace management could take.

At that time, Grace suggested a two-day meeting to discuss these issues in detail. Given that a major litigation activity would take place, with various tasks to be assigned to a number of people both at Grace and at Steptoe, we decided that it would be important to meet and discuss the general approach and the general procedures for dealing with this issue. Grace personnel indicated that they wanted to (a) consider how to deal with the COLI policies and tax issues related to the policies while in litigation, (b) review again the whether the decision to litigate was reasonable given certain changes in the court cases, (c) make decisions as to how to file the required amended returns and make claims for refund, (d) discuss a proper venue to file the claims for refund and the various alternatives, (e) discuss what other COLI clients were doing and thinking, and how the IRS was treating them, (f) review all of the facts in the W.R. Grace case to determine the best venue, proper strategy and arguments, including factual and legal issues to be developed, and (g) develop initial strategy and tasks. Grace also wanted to discuss how bankruptcy would affect its dealings with us, and strategies for working with former corporate members of the Grace controlled group of corporations. Some of these former members (Fresenius and Sealed Air) would be liable for taxes due on the disallowed COLI deductions and, under IRS rules and procedures, might in some cases have to agree to certain procedural moves in the COLI tax case. These parties were beginning to demand some role in the Grace COLI litigation.

Grace wanted five of its employees to attend in order to focus on the issues in a concentrated way and to get the most productive use of Steptoe's time. The chief financial officer, chief counsel, tax counsel and two other lawyers from Grace attended. In order to make these two days productive for the five persons from Grace who would attend, we devoted some time to preparing an agenda and dividing tasks for the meeting. We explained to W.R. Grace who would be attending the meeting and for what purpose.

At the meeting, Mr. Bailey and Mr. Johnson, who were in the middle of appealing a COLI case for another client, explained to Grace personnel the various issues that had arisen at trial and expressed their views as to how the appeal was progressing, the arguments that appeared to be successful, differences between Grace's claims and the facts involving the other clients. They also described the role that certain key witnesses, actuaries, corporate officers, and others played. Mr. Johnson also explained many of the procedural issues that our other clients and Grace would have to resolve both before and at trial.

Ms. Moran has known the client and its affairs for the longest period of time, and her role was to generally coordinate the work on behalf of the client and to review/coordinate the factual issue and insurance tax issues. These factual issues involve purchase, use, tax, and accounting treatment of the policies themselves, as well as the way the policies were represented, sold, and used, and finally, the information given to W.R. Grace by advisers and others since 1992. (Ms. Moran has approximately 8 file drawers of W.R. Grace materials in her office alone.) Ms. Serling assisted Ms. Moran in these efforts. Ms. Moran also filed the initial protest and oversaw the filing of the return. At the meeting, Ms. Moran's role was to keep track and explain to Grace, based on her knowledge of the client, how IRS treatment of other clients might differ or be the same as for W.R. Grace. Thus, she was also responsible for making sure that certain of the returns were correct.

Ms. Serling was specifically asked to attend the meeting to describe the activities that she was undertaking on behalf of her clients, and to be available to deal with insurance tax questions. She also had assisted Ms. Moran in the initial protest for W.R. Grace, so was also involved in reporting how W.R. Grace's facts compared with those of some of her other clients. Ms. Serling was also familiar with how other clients were positioning themselves in preparation for litigation. You will note she did not attend the entire session.

When Grace decided that it would likely litigate this matter, Steptoe added Mr. Kaufman, a former Justice Department attorney, to Grace's COLI team. Mr. Kaufman role as an associate was to draft the complaint and other filings for Grace and for the partners. By the time of this meeting, he was familiar with Grace's fact situation in comparison to other COLI clients, but he needed to know the overall strategy in order to capably handle Grace's questions in the future. His bankruptcy experience was also helpful.

Although each lawyer brought a particular expertise to the table, it was not feasible to divide up the time of the lawyers and have them appear at the meeting seriatim. The whole purpose of the meeting was to have a general discussion of strategy (both for trial and with respect to the use of the policies), to answer Grace's questions as they arose, and for the Steptoe lawyers to understand the factual issues involved that were particular to Grace, as well as unique procedural and management issues that Grace needed to consider. In fact, this was all approved by W.R. Grace and, in our judgment, was a more efficient way of preparing for litigation than in numerous separate meetings.

Trip to Florida

You next questioned the visit to Florida by Mr. Bailey, Mr. Johnson, and Ms. Moran to review Grace documents. The facts of that trip were as follows. W.R. Grace was asked by some of its former controlled group members (who would have to be involved in the litigation) to review all of Grace's documents involving the COLI issue. Prior to that, we had developed a joint defense agreement for dealing with those entities, but nonetheless, we wanted to be careful regarding what documents to let the other parties, copy and review. It was determined that this trip could accomplish two things -- it could allow the Steptoe attorneys to review the documents in order to see which ones should be withheld from the other potential COLI parties, and it would allow the attorneys would who would likely be litigating the COLI case to review Grace's files in detail. We sent the three partners who would likely be working on the COLI case down to review the files for two reasons -- we thought it cheaper to do this than to have one partner go down and review all the files for what would take over a week, and then return and give a report and have other partners review the relevant documents after they were compiled, etc., and Grace needed an expedited review because the other controlled group members were coming to Grace's officers on the September 20, the next week.

In fact, it was likely impossible for one person to go down, review all of the files and report back to the other partners, in that short period of time. There were about 20 major sets of files to review (we counted at least 240 file folders, some containing numerous documents), and at the same time we reviewed the files, we catalogued them (each of us took separate files and went through them, stopping to consult with one another on a particular question (e.g., privilege) or to point out a particular piece of paper that might have a very significant item about which the other should be aware. This was likely to be a much more efficient process than having one person go to Florida, review and catalogue all the files and then come back to Steptoe and prepare a written report or have an internal meeting on the issues. We believe it would have taken the one individual at least a week at W.R. Grace, and then perhaps two days more at Steptoe, to accomplish what the three lawyers accomplished in two days.

We also felt that it was more economical to send the three partners who would most closely be involved in the litigation to review the files. All three were very familiar with COLI documents, and were more efficient than a person who had never seen these particular spreadsheets and analyses before. We had seen some of these in other COLI cases and already knew which documents to focus on and which to disregard.

Note too that the expenses of this trip were very low. The hotel rooms totaled $1,370.39 for three people for three nights. The airplane was coach, and cost $361.50 one way for three of us. Since we drove back by car (due to September 11), we spent another $301.74 for a total transportation cost of $663.24 for 3 people.

In sum, we believe that this trip was carefully planned to be as efficient as possible, with the only wrinkle being the fact that it took us 16 hours rather than about 6 to travel back to DC since we had to go by car.

Other Meetings

You also questioned our meetings on 10/26/01, 11/05/01 and 12/03/01 regarding settlement issues. Note that we did not usually have all four lawyers meeting at the time, we generally kept it to one or two individuals, those individuals being either the person Grace was able to contact at Steptoe or the persons who had the most experience in the area. Quite often there were two people at the meeting because we brought different experiences and expertise to the table. For example, as discussed above, Ms. Moran knew Grace personnel and procedure, Mr. Kaufman and Mr. Johnson were experts on IRS procedure, and Mr. Bailey was the overall expert on COLI insurance issues.

Finally, you noted a call with the client on November 15, 2001 regarding strategy on which Mr. Johnson, Mr. Bailey, Mr. Kaufman and Ms. Moran all participated. In that case, you will see that we were talking with an individual named T. Borders who represented one of the former members of the controlled group, and had specifically requested the meeting (which we did by telephone rather than in person, as Mr. Borders wanted to do, in order to save money). He was going to advise Grace's former parent, which is required to cooperate with Grace in wanted a detailed description of the current COLI litigation, and background of why Grace didn't settle earlier, and the situation at appeals. All of the four Steptoe lawyers had different insights to share with Mr. Borders, based on their experiences. Grace wanted to cooperate fully with Mr. Borders and asked all of us to attend this conference.

Summary

In summary, Steptoe has worked very hard to provide efficient, timely and valuable advice to W.R. Grace on this very complicated issue. It is not usually to have several partners working on a major tax litigation -- usually it is cheaper in the long rule to have the partners do the work rather than to employ numerous associates who have to be taught the substance of the issue and the facts of the particular case. This is particularly true in insurance tax litigation, where the subject matter is arcane and complex. All of the partners were experienced in this area, and had a unique role to play in the Grace litigation. In fact, given their expertise, you will find that our rates are lower compared to many other sophisticated practitioners who are advising Grace on tax, securities, merger and other sophisticated issues at this time. In any cases where are large meeting or conference call was scheduled, we specifically asked Grace personnel for permission to have these individuals attend, and in some cases individuals attended at the request of W.R. Grace.