# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JJF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**Objection Deadline: February 7, 2003, at 4:00 p.m.**
**Hearing Date: February 24, 2003, at 12:00 p.m. (only if objections are received)**

## MOTION FOR THE ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO CONTRIBUTE FUNDS INTO THE TRUST FUNDING THE CURTIS BAY PENSION PLAN TO SUPPORT AMENDMENTS TO ENHANCE BENEFITS THEREUNDER

The above-captioned debtors and debtors in possession (collectively, the

"Debtors"), by their undersigned counsel, respectfully move this Court (the "Motion") for the

entry of an order authorizing the Debtors to make a one-time, lump sum contribution to the trust

funding the W. R. Grace & Co. Retirement Plan for Hourly Employees of Curtis Bay (the

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

1

"Union Pension Plan") in an amount not to exceed $10,000,000. The contribution is necessary in order to meet the Debtors' obligations to amend the Union Pension Plan to increase benefits, in accordance with the recently negotiated collective bargaining agreement (the "2002 Union Agreement"), between W. R. Grace & Co.-Conn, Grace Davison, Curtis Bay Site and the International Chemical Workers Union Council of the United Food & Commercial Workers Union Local 976C (the "Union"), dated October 12, 2002. The 2002 Union Agreement covers the hourly bargaining unit employees of the Debtors' Curtis Bay, Maryland, manufacturing facility, located at 5500 Chemical Road, Baltimore, Maryland ("Curtis Bay"). The 2002 Union Agreement is attached hereto, as "Exhibit A."

**Jurisdiction**

1.      This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this motion is proper under 28 U.S.C. § 1408.

2.      The statutory predicates for this Motion are sections 105 and 363(b) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Chapter 11 Background**

3.      On April 2, 2001, the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

2

4.      The Chapter 11 Cases have been consolidated for administrative purposes
only, and pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to
operate their businesses and manage their properties as debtors in possession.

## Curtis Bay and the Union Agreement

5.      The Curtis Bay complex is the Debtors' largest manufacturing facility in
the United States. A wide range of products are manufactured at Curtis Bay for the Debtors'
Davison Chemicals businesses ("Davison"), including fluid cracking catalysts, hydroprocessing
catalysts, polyolefin catalysts and silica gel products, as well as additives, catalyst supports, and
other catalyst and silica products.

6.      At Curtis Bay, the Debtors employ a total of approximately 710 hourly
and salaried employees (which is approximately 40% of Davison's US workforce). The Union
has represented the hourly workforce at Curtis Bay since at least the 1950's. The total number of
hourly employees currently represented by the Union is approximately 400 (the "Union
Employees"), or 56% of the total workforce at Curtis Bay.

7.      The collective bargaining agreement with the Union (which preceded the
2002 Union Agreement) was scheduled to expire on October 12, 2002. Therefore, to avoid the
possibility of a costly work stoppage, a new agreement to replace the prior agreement needed to
be finalized on, or about, that date.

8.      In anticipation of the expiration of the prior collective bargaining
agreement, the Debtors and the Union began formal negotiations on July 25, 2002, and those
negotiations ended with the Debtors making a final offer, which included the Pension

3

Amendments (as defined herein), on October 10, 2002. The final offer became the 2002 Union

Agreement when the Union Employees ratified the final offer on October 11, 2002, by a

relatively close vote.

       9.     The Debtors' objectives regarding the negotiations with the Union were to

enhance managerial flexibility regarding work rules, to provide compensation and benefits to

Union Employees that would be equitable and competitive, to maintain employee morale and

acceptable labor relations with the Union and to avoid a costly work stoppage by the Union

Employees. The Debtors sought to achieve these objectives in the most cost efficient manner

possible while preserving the Debtors' ability in the future to change certain benefit plans and

control costs with respect thereto, as future business circumstances might dictate. The Debtors

believe that the 2002 Union Agreement accomplishes all of these objectives.[2]

       10.    Prior to the commencement of the formal negotiations that ultimately led

to the 2002 Union Agreement, representatives of the Union made it clear to Curtis Bay

management that employee benefits in general, and the benefits under the Union Pension Plan in

particular, would be significant topics of negotiation. In general, the Union took the position

that: (a) the benefits under the Union Pension Plan were not equitable and competitive when

compared to the pension benefits of other Davison unions,[3] (b) the recent significant increase in

---

[2] The negotiations with the Union, and the implementation of the 2002 Union Agreement, constitute conducting business in the ordinary course. Therefore, implementation of provisions of the 2002 Union Agreement (except for the Pension Amendments) would not require Court approval. The sole reason that the Debtors move for Court approval is to secure consent to fund the Union Pension Plan in an amount necessary to implement the Pension Amendments, pursuant to the 2002 Union Agreement and the requirements of Internal Revenue Code section 401(a)(33).

[3] As stated, without the Pension Amendments, the flat dollar monthly pension benefit at Curtis Bay is $38.00, for each year of service; while the hourly employees at the Davison plant in Cincinnati, Ohio will have a flat-dollar monthly pension benefit of $50.00 per month in 2004 (as a result of prior negotiations), for each year of service.

4

retiree medical premiums would have a devastating impact on current, and future, Curtis Bay

retirees for many reasons, including the failure of the Union Pension Plan to provide benefits that

would offset any portion of the increases in retiree medical premiums;[4] (c) the Debtors had not

made any contribution to the Union Pension Plan for many years;[5] and (d) the Union had

significant objections to the Debtors retaining the unilateral right to change or amend certain

benefit plans covering Union Employees, including the retiree medical plan.  For these reasons,

certain Union representatives indicated that the Debtors' failure to make concessions with

respect to employee benefits would likely result in a strike at Curtis Bay.

           11.    During the negotiations, the Debtors rejected the Union's demands for

concessions regarding the cost and design of its retiree medical plan and any limitation affecting

the Debtors' unilateral right to amend certain employee benefit plans covering the Union

Employees.  The Debtors did, however, agree to amend the Union Pension Plan to increase

benefits (the "Pension Amendments") in a manner that is consistent with benefits increases

agreed in accordance with a collective bargaining agreement negotiated prior to the 2002 Union

Agreement, covering a different group of Davison hourly employees, provided that the Debtors

could secure the requisite approval from the Court (and the Internal Revenue Service, if

necessary).[6]

---

In addition, the pension benefits for unionized employees at Davison's other large US manufacturing facility, in
Lake Charles, Louisiana, are currently $44.00 per month, for each year of service.
[4] Effective January 1, 2003, the monthly retiree cost for retiree medical coverage from the Debtors increased by over
100% from the 2002 cost.
[5] The Debtors have not made any contribution to the Union Pension Plan since at least 1991.
[6] As specified in footnote 4 above, the unionized employees at the Davison plant in Cincinnati, Ohio, as a result of
prior negotiations, were granted an increase in the monthly pension benefits to $50.00.

5

### The Union Pension Plan and the Pension Amendments

12.     In general, the basic structure of the Union Pension Plan may be summarized as follows:  the Plan is a defined-benefit pension plan, which satisfies the qualification requirements under Internal Revenue Code (the "Code") section 401(a).  The "plan year" applicable to the Plan is a calendar year.  The Plan is funded with employer contributions, in accordance with Code section 412.  Those contributions, and all related earnings, are in the trust that is tax exempt under Code section 501(a).  The Plan does not require employee contributions.  As of January 1, 2002, the fair market value of the assets held in trust to provide Plan benefits totaled $26,754,474; and the "current liability" thereunder (as defined by Code section 412(l)(7)) totaled $28,245,074.  Due primarily to the significant decline in the stock market during 2002 (as well as making required benefit payments), as of December 31, 2002, the fair market value of those assets totaled $22,419,039. The liability under the Plan will be recalculated as of December 31, 2002, and such calculation will be complete sometime in May 2003.  As a result of the consistently over-funded status of the Union Pension Plan in the last decade, the Debtors have not been required to make, and have not made, any contribution to the Plan since at least 1991.

13.     The Plan is a so-called "flat-dollar unit benefit plan", which provides a specific dollar amount for each year of service thereunder, commencing at age 62, which is paid in the form of an annuity over the life of the retired employee (or in other forms of benefit of the same actuarial value, but lower actual monthly benefit, including an annuity over the joint lives of the retired employee and his or her spouse).  For instance, under the benefit formula that

6

currently applies (without implementation of the Pension Amendments), an eligible employee

would be entitled to a lifetime annuity commencing at age 62 (or later) in the amount of $38.00

for each year of eligible service. Thus, an employee with 30 years of service would be entitled to

such an annuity in the amount of $1,140.00 per month ($38.00 times 30 years).

14.     The most significant aspect of the Pension Amendments is that the

monthly pension benefit for any Union Employee who retires on or after September 28, 2002,

would be increased from $38.00 per year of service to $50.00 per year of service. This means,

for example, for an eligible employee who retires with 30 years of service with the Debtors, such

employee's straight life annuity benefit, payable at age 62 (or thereafter) would be $1,500.00 per

month ($50.00 times 30 years), for life. This would be an increase of 31.6% over the benefit

under the prior formula, which would have generated a lifetime benefit of $1,140.00 per month

($38.00 times 30 years). As explained below, in order to implement the Pension Amendments,

the Debtors are required to make a contribution of approximately $8,600,000 (the "Required

Contribution"), not later than by September 15, 2003, pursuant to Code section 401(a)(33).

15.     Aside from the Pension Amendments, the only other material cost to the

Debtors as a result of the 2002 Union Agreement is a moderate wage increase. The hourly rate

of the Union Employees is scheduled to increase by about 3.5% annually from 2002 to 2005,

under that Agreement.

### Code Section 401(a)(33)

16.     Code section 401(a)(33) generally prohibits the adoption of any

amendment to increase or enhance benefits under a defined benefit pension plan (like the Union

7

Pension Plan) during the period that the employer which sponsors the plan is a "debtor in a case under title 11, United States Code...", unless one of the exceptions provided by that Code section is satisfied. The exception that is most relevant to the circumstances regarding the Union Pension Plan is specified in subpart (B)(i) of Code section 401(a)(33), which provides that such amendments may be adopted where "the plan, were such amendment to take effect, would have a funded current liability percentage (as defined in section 412(l)(8)) of 100 percent or more"[7] (the "Funded Exception").

17.     The Funded Exception would apply to the Pension Amendments under the Union Pension Plan, if the Debtors make the Required Contribution by no later than September 15, 2003. In that case, under Code section 412(c)(10), the Required Contribution would be deemed to have been made on December 31, 2002 (i.e., the last day of the Plan's 2002 plan year) for purposes of calculating the "funded current liability percentage" under the Funded Exception, for the 2002 plan year. The Pension Amendments would be adopted effective on or after January 1, 2003; and, as of such adoption, the Funded Exception would be satisfied.

### The Required Contribution

18.     The exact amount of the Required Contribution will be calculated by the actuary of the Union Pension Plan, as of December 31, 2002. That calculation will be completed in May 2003. The actuary currently estimates that the Required Contribution will be approximately $8,600,000 to $9,000,000.

---

[7] Section 412(l)(8) defines "funded current liability percentage" as "the percentage which--the [the value of plan assets] is of the current liability under the plan."

:ODMA\PCDOCS\DOCS_DE\62676\1
Revised 01/20/03
91100-001\DOCS_DE:62676.1

19.    As stated above, the Required Contribution is a one-time, lump sum contribution, which must be made by no later than September 15, 2003, in order to satisfy the Debtors' obligations with respect to the Pension Amendments, under the 2002 Union Agreement. However, the Debtors will make the Required Contribution as soon as possible after the exact amount has been calculated, in order to demonstrate good faith to the Union, in accordance with the Debtors' objective of continuing acceptable labor relations with the Union.

20.    At this time, the actuary of the Union Pension Plan estimates that, in order to comply with the funding requirements under Code section 412, the Debtors will not be required to make any additional contributions to the Union Pension Plan during 2003 or 2004, if the Required Contribution is made in a timely basis during 2003.

## Relief Requested

21.    By this Motion, the Debtors seek authority to (a) make a one-time, lump sum contribution to the Union Pension Plan in an amount necessary to satisfy the Funded Exception under Code section 401(a)(33) (but in no event more than $10,000,000), as soon as possible after the amount of the Required Contribution has been determined definitively by the Union Pension Plan's actuary, but no later than September 15, 2003, (b) effectuate the Pension Amendments in accordance with the Debtors' obligations under the 2002 Union Agreement; and (c) take such other actions as may be necessary or appropriate to effectuate the intent of the Motion.

9

## Basis for Relief

22.    Section 105(a) of the Bankruptcy Code "permits the court to issue any

order that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C.

§ 105(a). Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee,

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate." A court has the statutory authority to authorize a debtor to use property

of the estate pursuant to section 363(b)(1) of the Bankruptcy Code when such use is an exercise

of the debtor's sound business judgment and when the use of the property is proposed in good

faith. In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Lionel Corp.,

722 F.2d 1063, 1071 (2d Cir. 1983); see also Fulton State Bank v. Schipper, 933 F.2d 513, 515

(7th Cir. 1991) (a debtor's decision must be supported by "some articulated business

justification"); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the

"sound business purpose" standard for sales proposed pursuant to section 363(b)); In re

Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Ernst Home

Center, Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

23.    Under section 363(b) of the Bankruptcy Code, a debtor has the burden to

establish that it has a valid business purpose for using estate property outside the ordinary course

of business. See Lionel Corp., 722 F.2d at 1070-71. Once the debtor has articulated such a valid

business purpose, however, a presumption arises that the debtor's decision was made on an

informed basis, in good faith and in the honest belief that the action was in the debtor's best

interest. See In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). A party in

10

interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." <u>Montgomery Ward</u>, 242 B.R. at 155.

## The Proposed Transaction Is Supported by Sound Business Judgment

24.     The Debtors respectfully submit that the implementation of the increase in pension benefits, in accordance with the Plan Amendments, as agreed with the Union, will contribute significantly to maintaining acceptable labor relations with the Union at the Debtors' Curtis Bay plant, its largest manufacturing facility in the United States, and to maintain the morale of both the employees represented by the Union, as well as other employees.

25.     The Debtors' management has determined in its business judgment that making the Required Contribution in a timely manner and effectuating the related Plan Amendments are in the best interests of the Debtors' estates and creditors. As specified above, clear business reasons exist to justify under section 363(b) of the Bankruptcy Code the Debtors' proposed contribution of the Required Contribution to the Union Pension Plan and the Pension Amendments. The benefits increases under the Pension Amendments were essential in helping to persuade the Union Employees to ratify the 2002 Union Agreement. Without such ratification, there existed a significant possibility of a financially damaging work stoppage at Curtis Bay.

## Notice

26.     Notice of this Motion has been given to: (i) the United States Trustee, (ii) counsel to the DIP Lender, (iii) counsel to The Chase Manhattan Bank as agent for the Debtors' prepetition lenders, (iv) counsel to all official committees appointed by the United

11

States Trustee and (v) all those parties that requested service and notice of papers in accordance with Fed R. Bankr. P. 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

**No Prior Request**

27.     No prior Application for the relief requested herein has been made to this or any other Court.

12

WHEREFORE, the Debtors respectfully request that the Court authorize the

Debtors to (i) make a one-time lump sum contribution of up to $10 Million to the Union Pension

Plan, (ii) to amend the provisions of the Union Pension Plan in accordance with the Pension

Amendments, as negotiated with the Union, and specified in the 2002 Union Agreement, (iii) to

take such other action as may be necessary or appropriate to effect the intent of this Motion, and

(iv) such other and further relief as the Court deems just and proper.

Wilmington, Delaware
Dated: January 20, 2003

Respectfully submitted,

KIRKLAND & ELLIS
James H.M. Sprayregen, P.C.
James W. Kapp, III
Janet S. Baer
Christian J. Lane
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG & JONES PC

*Paula A. Galbraith*

Laura Davis Jones (#2436)
Scotta E. McFarland (#4184)
Paula A. Galbraith (#4258)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession

13