## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | **Chapter 11** |
| | § | |
| **W.R. GRACE & CO., et al.,** | § | **Jointly Administered** |
| | § | **Case No. 01-01139 (JKF)** |
| Debtors. | § | |
| | § | |

### FEE AUDITOR'S FINAL REPORT REGARDING
### FEE APPLICATION OF CAPLIN & DRYSDALE,
### CHARTERED FOR THE SIXTH INTERIM PERIOD

This is the final report of Warren H. Smith & Associates, P.C. ("Smith"), acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the Interim Fee Application of Caplin & Drysdale, Chartered for the Sixth Interim Period (the "Application").

### BACKGROUND

1.      Caplin & Drysdale, Chartered ("Caplin") was retained as national counsel to the Official Committee of Asbestos Personal Injury Claimants.   In the Application, Caplin seeks approval of fees totaling $248,459.25 and costs totaling $83,909.06 for its services from July 1, 2002, through September 30, 2002.

2.      In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time entries included in the exhibits to the Application, for compliance with 11 U.S.C. § 330, Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2001, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, Issued January 30,

1996, (the "Guidelines"), as well as for consistency with precedent established in the United States Bankruptcy Court for the District of Delaware, the United States District Court for the District of Delaware, and the Third Circuit Court of Appeals. We served on Caplin an initial report based on our review, and received a response from Caplin, portions of which response are quoted herein.

## DISCUSSION

### General Issues

3.    In our initial report, we noted that timekeepers PVL, TWS and NDF still failed to include sufficient detail in their time entries. Rule 2016-2(d) of the Delaware Local Rules states "activity descriptions . . . shall be sufficiently detailed to allow the Court to determine whether all the time, or any portion thereof, is actual, reasonable, and necessary . . ." This issue has been raised in several previous reports, and we have advised these professionals to provide more detailed time entries in the future. We asked that Caplin continue to advise its professionals regarding this matter.

4.    In our initial report, we noted that the Application was generally devoid of lumping, and we complimented Caplin for the improvement its timekeepers have made in this area.

5.    In our initial report, we noted that in the three monthly invoices (July, August, September, 2002) we received from the Applicant covering this interim period, Caplin requested $551,216.75 in fees and $83,909.06 in expenses. The Application, however, requested $248,459.25 in fees and $83,909.06 in expenses. In attempting to do a fair and thorough fee audit, we believed this seeming discrepancy raised a number of distinct but related issues.

6.    First, we noted that we did not receive a copy of Caplin's Application. Further, after researching and obtaining the Application via the Court's electronic document retrieval system, it appeared that we were left off the service list for distribution of the Application. In accordance with

the <u>Amended Administrative Order Under 11 U.S.C. §§ 105(a) and 331 Establishing Revised</u> <u>Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official</u> <u>Committee Members</u>, Paragraph F., "Beginning with the three-month period commencing on January 1, 2002 and ending on March 31, 2002, and at three-month intervals thereafter (each, an "Interim Fee Period"), each Professional shall file with the court and serve via hard copy on the Notice Parties within 45 days of the end of such Interim Fee Period a request (a "Quarterly Fee Application") for interim Court approval and allowance, pursuant to section 331 of the Bankruptcy Code, of the compensation and reimbursement of expenses sought in the Monthly Fee Applications filed during such Interim Fee Period..."  Thus, we asked Caplin to be certain that we are included on the service list for distribution of Caplin's Application in the future.

7.      We further noted that in the Application Caplin requested fees of $248,459.25.  As stated earlier, in the three monthly invoices covering the same period, Caplin requested fees totaling $551,216.75. The difference was $302,757.50.  Prior to locating the Application, we reviewed all of the fees and expenses filed by Caplin in their monthly invoices.  The $302,757.50 figure matched exactly the amount Caplin billed to the project category Litigation/Fraudulent Conveyance in July and August 2002.  On July 10, 2002 Judge Wolin entered an order dealing with the Sealed Air fraudulent transfer litigation fees in which he withdrew his reference of that matter from the bankruptcy court requiring District Court approval for all fees involved in said litigation matters. Thus, we asked Caplin why it continued to include Litigation/Fraudulent Conveyance as a project category through the end of August in its monthly invoices. We also asked Caplin to address why there was no explanation of the Litigation/Fraudulent Conveyance billing treatment in the Application. Caplin responded as follows:

You have asked why Caplin & Drysdale included Litigation/Fraudulent Conveyance as a project category through the end of August in its monthly invoices. This occurred due to an error caused by a delay in the routing of the full text of Judge Wolin's order, and was corrected in the interim application. (Initial Report at ¶ 7.) Separate fee applications for the months of July and August were filed with the District Court, as had been directed in Judge Wolin's order of July 10, 2002.

We appreciate Caplin's explanation of the error, although it came after we had reviewed these fees. In keeping with the Court's ruling, we have withheld comment on any fees related to Litigation/Fraudulent Conveyance.

8.      In our initial report, we further noted that Caplin requested reimbursement of $83,909.06 in expenses. After reviewing the monthly invoices for July and August, it appeared that a significant percentage of that expense total was directly attributable to the Litigation/Fraudulent Conveyance category. Thus we asked Caplin to explain why these expenses were included in the Application. Caplin responded as follows:

You further inquire why the amount requested for expense reimbursement remains unchanged in the interim application, despite the fact that fees relating to the fraudulent conveyance matter were removed and filed with Judge Wolin. (Initial Report at ¶¶ 8-9.) Our accounting department informs us that, since expenses are tabulated by case rather than billing code, there was no way of determining with certainty which expenses related to the fraudulent conveyance litigation. Therefore, we were unable to break out those expenses from the total and filed for the full amount in the bankruptcy court.

We appreciate this explanation, and in light of this explanation we have reviewed all of the expenses included in the Application.

<u>Specific Time and Expense Entries</u>

9.      In our initial report, we noted that on two separate occasions multiple professionals from Caplin participated in the same conferences for a total of 4.7 hours and $2,396.50. The conference details are shown below.

On July 16, 2002 AGL and EI spent 2.2 hours and $1209.00 in the same conference.

| 07/16/02 | AGL | 445.00 | 1.20 | Conference w/EI, MCH, KNB, Mark Peterson re Grace estimation brief and needed revisions. |
| 07/16/02 | EI | 675.00 | 1.00 | Reviewed draft green brief and discussed with AGL, MCH, and KNB with respect to issues in both USG and Grace briefs. |

On August 9, 2002 EI, TWS and NDF spent 2.5 hours and $1,187.50 on the same conference call.

| 08/09/02 | EI | 675.00 | .80 | T/cs NDF/TWS/Weitz/Budd to prepare for conference call |
| 08/09/02 | TWS | 425.00 | .70 | Conference call with EI, R. Budd, P. Weitz, NDF |
| 08/09/02 | NDF | 350.00 | 9.50 | ...; t/c EI, TWS, Budd, Weitz re: case analysis and settlement strategy (1.0); |

Local Rule 2016-2(d)(ix) states that "[t]he activity descriptions shall individually identify all meetings and hearings, each participant, the subject(s) of the meeting or hearing, and the participant's role." Paragraph II.D.5. of the Guidelines states that "[i]f more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees." We noted that the fee detail did not provide the reason multiple professionals were needed for these conferences, nor did it explain each professional's role. Thus, we asked Caplin to explain why it was necessary for more than one professional to participate in these conferences. Caplin's response is provided in Response Exhibit 1. We appreciate Caplin's explanations and have no objection to these fees.

10.     In our initial report, we noted that on September 19, 2002, PVL ($560) billed time for travel and attendance at a Mealeys' conference. The total time spent in attendance and travel was .90 hours for $364. The entries are shown below.

| 09/19/02 | PVL | 560.00 | .40 | Provide status report to constituency at Mealeys' conference on case. |
| 09/19/02 | PVL | 280.00 | .50 | Travel to and from Philadelphia for Mealeys' conference. |

We also noted that at the August 26, 2002 hearing, the Court stated, "...There is one thing that I am not going to permit as compensable fees or expenses for any professional in this Estate. And that is attendance at professional seminars of any kind, whether to do with asbestos or not." We asked Caplin why an exception should be made for these expenses. Caplin responded as follows:

> You have asked why Caplin & Drysdale should be compensated for Peter Lockwood's travel and attendance at a Mealey's conference on September 16. (Initial report at ¶ 11.) Mr. Lockwood attended this conference to provide a status report to the wider constituency of asbestos personal injury attorneys regarding developments in this bankruptcy case. Caplin & Drysdale has determined the most economical and reliable method of disseminating necessary information to the many thousands of attorneys representing asbestos claimants nation-wide is by providing status reports at the Mealey's conference and other meetings attended by large numbers of plaintiffs' counsel.

We appreciate Caplin's explanation; however, in light of the Court's clear directive, we do not believe that these charges should be borne by the bankruptcy estate. Thus, we recommend a reduction of $364.00 in fees.

11.    In our initial report, we noted that on September 12-13, 2002, CSR ($345) traveled to and attended a deposition. The total time spent on travel was 9.50 hours for $3,277.50. The entries are shown below.

| 09/12/02 | CSR | 345.00 | 8.20 | ... and travel to deposition (4.5) |
| 09/13/02 | CSR | 345.00 | 12.50 | ..., travel from deposition to office (5.0). |

Local Rule 2016-2(d)(viii) states that, "Travel time during which no work is performed shall be separately described and may be billed at no more than 50% of regular hourly rates." This travel

time did not appear to have been billed at 50% of this professional's regular hourly rate, nor did it

seem to have been included in the working travel category.  We asked Caplin why this apparent non-

working travel time was billed at this professional's regular hourly rate.  Caplin responded as

follows:

> You have asked why Christopher Rizek's non-working travel time on the above dates
> was billed at his full hourly rate, rather than at 50% of that rate as suggested in Rule
> 2016 2(d)(viii) of the Guidelines.  (Initial report at ¶ 12.)  This was a bookkeeping
> error, and Caplin & Drysdale will accept a voluntary reduction in the fees billed, or
> $3,277.50, regarding Mr. Rizek's travel time fees.

 We appreciate Caplin's explanation.  However, by our calculations only one-half of the amount

cited in the entries should be applied towards a reduction.  Thus, we recommend a reduction of

$1,638.75 in fees.

12.    In our initial report, we noted that  BAS ($215) and JPC ($215) performed services

that could be considered more suitable for professionals billing at a lower hourly rate.  The total time

spent in these activities was 1.8 hours for a total of $387.00.  The entries are shown below.

| 07/23/02 | BAS | 215.00 | .30 | Organize records and files (.3). |
| 07/20/02 | JPC | 215.00 | .80 | ...; fax disclosure pleading to NDF for review (.5). |
| 07/22/02 | JPC | 215.00 | 7.50 | ...and fed ex tracking final expert report to expert witness (.3);... |
| 07/26/02 | JPC | 215.00 | 2.20 | ...; research driving directions from Charlotte to Banner Elk, NC (.4);... |
| 07/29/02 | JPC | 215.00 | 1.30 | ...; research geographic directions for deposition travel (.3);... |

The U.S. Trustee Guidelines Paragraph, I.E. states "... [i]n evaluating fees for professional services,

it is relevant to consider various factors including the following: the time spent; the rates charged;

whether the services were necessary to the administration of, or beneficial towards the completion

of, the case at the time they were rendered; whether services were performed within a reasonable

time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;. . ." We asked Caplin to explain why these professionals performed seemingly ministerial tasks at their full hourly rates. Caplin responded as follows:

> You have inquired about services performed by Brian Skretny and John Cunningham between July 20, 2002 and July 29, 2002. (Initial Report at ¶ 13.) Mr. Skretny's services on July 23 were related to the filing of the Proposal, and included analyzing and annotating the various fact documents and legal research materials that had been relied on in drafting that document and would be necessary in preparing a reply brief. Moreover, since Mr. Skretny had assisted in researching and drafting the brief, he was the attorney who was the most familiar with the documents involved and hence who could perform the tasks at hand the most efficiently.
>
> The remaining services cited in the Response, performed by Mr. Cunningham, appear to have been organizational tasks could have been performed by a paralegal. Therefore, Caplin & Drysdale will accept payment for such services at the hourly rate charged by the firm's head paralegal, Robert Spohn, or $145.00, for a total reduction of $826.00 ($2537.00 - $1711.00).

We appreciate Caplin's explanation. However, we are only questioning 1.8 hours and $387.00 for the tasks shown in the fee detail which we believe to have been ministerial in nature. Thus, we recommend a reduction of $387.00 in fees.

13.    In our initial report, we noted that throughout the Application period, EJS ($135), RCS ($145), KAA ($125), SME ($135), SAT ($125) and IEG ($125) performed activities described as "downloading", "duplicating", "scanning", "collating" and "printing" which could be considered nonreimbursable overhead. (See Exhibit A). The total time spent was 27.40 hours for a total of $3,612.00. Paragraph II. E. 7. of the Guidelines states that, "...[f]actors relevant to a determination that the expense is proper include the following: . . Whether the expenses appear to be in the nature of nonreimbursable overhead . . . Overhead includes word processing, proofreading, secretarial and other clerical services, . . ." We asked Caplin to explain why these activities should not be

considered nonreimbursable overhead.  Caplin responded as follows:

> You have asked that we explain activities performed by para-professionals Elyssa Strug, Robert Spohn, Karen Albertelli, Stacie Evans and Indrani Gnarsari.  (Initial Report at ¶ 14.)  While the description of the tasks in the paralegals' time records include verbs such as "downloading," "duplicating," "scanning," "collating," and "printing," the tasks performed included the identifying pleadings, trial exhibits and other documents (*i.e.*, which must be identified before they can be downloaded), including on Pacer and other legal databases and updating Summation and other databases with deposition testimony and other litigation materials.  All such work is performed under an attorney's direction and requires the identification and analysis of legal documents, as well as familiarity with legal databases, and hence is not administrative or clerical.

We believe we understand Caplin's response and agree that some of the tasks cited may not be purely administrative or clerical.   However, we still believe that tasks such as "printing", "duplicating", "reproducing" or "collating" should be considered nonreimbursable overhead.  Thus, for the time spent on those activities we recommend a reduction of $449.50 in fees.

14.    In our initial report, we noted that on July 11, 2002,  there was a petty cash distribution for lunch for Turken and Widom.  We further noted that on July 17, 2002, another such distribution was shown for Rachel Fleishman. The total of the two expenses was $60.44.  The entries are shown below.

| | | | |
|---|---|---|---|
| 1338,660 31.85 | Petty Cash; Lunch for       31.85 Turken and Widom (no C&D attorney attended) on 7/11 From Petty Cash 005317 AUDIT * AP-0072, 526:0031    Date: 07/17/02 | E 22 07/17/02 0999 C&D 8,108.63 | |
| 1341,869 28.59 | Petty Cash; Lunch for       28.59 Rachel Fleishman during McGowane deposition (no C&D | E 22 07/26/02 0999 C&D 23,717.41 | |

atty attended) on 7/17
From Petty Cash
005317 AUDIT *
AP-0072, 683:0023    Date:
07/26/02

The Guidelines Paragraph II.E. states, "...[a]ny expense for which reimbursement is sought must be actual and necessary and supported by documentation as appropriate." The expense entries did not explain the reason for providing these meals since no Caplin attorney attended the lunches. We asked that Caplin provide further information regarding these expenses. Caplin responded as follows:

> You have inquired about petty cash distributions for lunches on July 11 and 17, respectively. (Initial Report at ¶ 15.) These expenses were incurred by Caplin & Drysdale on behalf of attorneys from the law firm of Milberg, Weiss, Caplin & Drysdale's co-counsel in the Grace Sealed Air matter, as the result of depositions that were taken in the Caplin & Drysdale offices in Washington D.C.

We accept this explanation and thus have no objection to these expenses.

15.    In our initial report, we noted that Caplin seeks reimbursement in the amount of $6,546.00 for airfare for several different flights. (See Exhibit B). The Guidelines Paragraph II.E.1., addresses this issue directly when it states, ". . .[f]actors relevant to a determination that the expense is proper include the following: 1. Whether the expense is reasonable and economical. For example, first class and other luxurious travel mode or accommodations will normally be objectionable." The request for reimbursement for airfare is, in and of itself, not objectionable. However, several of the entries showed different amounts, one indicating the price for coach fare and another higher number representing the amount actually paid. This issue was raised in previous interim periods wherein Caplin responded "...We include the amounts paid for first-class air fare in our requests for reimbursement, both to establish that we are absorbing these additional costs, and so that this

information will be on the record, should the Court ever revisit the question of whether requiring that professionals fly only at coach rates is cost-effective." We could find no explanation in the Application or the monthly expense details showing that Caplin was absorbing these costs. We asked that Caplin provide assurances that the cost difference between the first class fares and the coach class fares were being absorbed by Caplin and not passed through to the estate. Caplin responded as follows:

> You have asked about several different air flights for which Caplin & Drysdale seeks a total of $6,546.00 in reimbursement. (Initial Report at ¶ 16.) We agree that these flights were erroneously charged to the estate at first-class rates, and will take a voluntary reduction of $2,637.50 ($6,546.00 - $3,908.50) regarding these expenses.

We appreciate Caplin's response, and thus we recommend a reduction of $2,637.50 in expenses.

16.     We further noted that Caplin seeks reimbursement of $2,090.00 for the following airfare.

1363,363 ADA Travel for NDF on 8/20        E 15 09/20/02 0187 NDF
2,090.00                     2,090.00          14,024.36
        to Miami (no agency fee)
        From ADA Travel, Inc.
        000534 AUDIT *
        AP-0073, 514:0005    Date:
        09/20/02

Without further explanation, this airfare appeared excessive. We asked Caplin to explain why a lower fare could not be obtained. Caplin responded as follows:

> Further, Mr. Finch's airfare of August 20, 2002 (Initial Report at ¶ 17) should also have been charged to the estate at the coach rate. Since the coach fare for this trip would have been $1,414.00, and Caplin & Drysdale will take a voluntary reduction of $676.00 ($2,090.00 - $1,414.00) regarding this expense.

We appreciate Caplin's response, and thus we recommend a reduction of $676.00 in expenses.

17.     In our initial report, we noted that Caplin seeks reimbursement in the amount of

$431.61 for meal expenses incurred on September 18 and September 23, 2002, that may have been

excessive.  The entries in question are listed below.

| | | |
|---|---|---|
| 1364,029 EI expenses in Chicago on | E 21 09/25/02 0120 EI | |
| 311.71                   311.71 | 18,772.94 | |
|      9/18 for dinner conference | | |
|      with Budd, Rich,Cooney, Kelley, | | |
|      Marcis, Rice, Baron and Weitz | | |
|      (1/3 total expenditure of | | |
|      $935.13) | | |
|      From Elihu Inselbuch | | |
|      000120 AUDIT * | | |
|      AP-0073, 572:0002    Date: | | |
|      09/25/02 | | |

| | | |
|---|---|---|
| 1364,030 NDF dinner on 9/23 with | E 22 09/25/02 0187 NDF | |
| 119.90                   119.90 | 18,923.50 | |
|      Mark Peterson and EI | | |
|      (split four ways) | | |
|      From Nathan D. Finch | | |
|      000326 AUDIT * | | |
|      AP-0073,573:0002    Date: | | |
|      09/25/02 | | |

The Guidelines Paragraph I.E. states "...[i]n evaluating fees for professional services, it is relevant

to consider...[w]hether the expense is reasonable and economical."  We asked Caplin to provide any

supporting information to justify the amount of the expenses.  Caplin responded as follows:

## 1.    September 18 Dinner Conference, Chicago

This dinner conference was a Committee meeting, attended by nine people, for which
the Debtor's estate has been charged $34.63 per person.  Caplin & Drysdale does not
believe this amount is excessive.

## 2.    Dinner on September 23

Mr. Finch's dinner conference with Mark Peterson, the Committee's asbestos bodily-
injury expert, and Mr. Inselbuch was held to discuss Mr. Peterson's forthcoming
testimony at the Sealed Air trial.  We do not believe that the charge to the Debtor's
estates of $39.36 per person is excessive.

We believe we understand Caplin's response, but we do not follow its arithmetic. For the September 18 dinner conference, Mr. Inselbuch's expense entry shows a total charge of $935.13 for the dinner, with the $311.71 requested expense representing one-third of that total. Caplin states that nine people attended the dinner conference, so by our calculations the charge amounts to $103.90 per person, not the $34.63 per person amount shown in the response. We believe this to be an excessive per-person charge and thus recommend a total reduction for this expense entry of $206.70. Mr. Finch's expense entry for September 23 indicates that the charge was split four ways, with the request of $119.90 therefore representing one-fourth of the total charge. Whether that split represents four cases or four people, we calculate the charge to be excessive. Thus, we recommend a reduction of $93.65 for this expense entry. For the combined two entries we recommend a total reduction of $300.35 in expenses.

18.    In our initial report, we noted that during the Application period there were three instances of phone calls made from hotel rooms during business trips that lacked sufficient detail. The total for the calls was $412.77, and the entries are provided below.

| | | | |
|---|---|---|---|
| 1341,023 NDF expenses in Boca Raton, | | E 35 07/24/02 0187 NDF | |
| 181.03 | 181.03 | 21,499.24 | |
| FL for depositions on | | | |
| 7/17-19 for long distance | | | |
| phone calls from room | | | |
| From Nathan D. Finch | | | |
| 000326 AUDIT * | | | |
| AP-0072, 646:0005    Date: | | | |
| 07/24/02 | | | |
| | | | |
| 1343,370 NDF expenses to Newark for | | E 35 07/30/02 0187 NDF | |
| 34.38 | 34.38 | 24,958.95 | |
| deposition of Ellberger on | | | |
| 7/24-25 for phone calls | | | |

made from room
From Nathan D. Finch
000326 AUDIT *
AP-0072, 732:0005    Date:
07/30/02

| | | |
|---|---|---|
| 1361,840 CSR expenses to Ft. | | E 35 09/17/02 0083 CSR |
| 197.36                    197.36 | | 9,031.86 |

Lauderdale for deposition
on 9/12-13 for 27 phone
calls made from room
From Christopher S. Rizek
002586 AUDIT *
AP-0073, 489:0005    Date:
09/17/02

The request for reimbursement for business calls is not objectionable; however, there is insufficient

detail in these expense entries to show that the calls were necessary or case related.  As stated in the

Guidelines, Paragraph II.E., "...[a]ny expense for which reimbursement is sought must be actual and

necessary and supported by documentation as appropriate."  We asked Caplin to provide additional

information so that we might properly analyze the entries.  Caplin responded as follows:

> As you have requested (Initial Report at ¶ 19.), we provide the
> following detail regarding long distance telephone calls made during
> business trips:
>
> 1.     Mr. Finch's telephone calls on July 17-19 were made
> to members of the Committee and concerned issues relating to the
> Sealed Air litigation.
>
> 2.     Mr. Finch's telephone calls on July 24-25 included a
> conference call with the Special Master, Brad Friedman and Michelle
> Browdy of Kirkland and Ellis.  These calls also related to the Sealed
> Air litigation.
>
> 3.     Christopher Rizek's phone calls on September 12-13
> were made to other Caplin & Drysdale attorneys and related to the
> Sealed Air litigation.

We accept this explanation and thus have no objection to these expenses.

19.    In our initial report, we noted that on September 26, 2002, five Caplin professionals show identical expense details for a hotel expense.  The entries total $3,343.20 and are provided below.

| 1364,848 668.64 | Hotel room cost for 3 | 668.64 | E 32 09/26/02 0101 RCS 20,465.05 |
| | nights for 4 attorneys and paralegal due to trial postponement for Robert Spohn From Hilton Newark Gateway 003531 AUDIT * AP-0073, 625:0006    Date: 09/26/02 | | |
| 1364,843 668.64 | Hotel room cost for 3 | 668.64 | E 32 09/26/02 0106 TWS 21,133.69 |
| | nights for 4 attorneys and paralegal due to trial postponement for Ted Swett From Hilton Newark Gateway 003531 AUDIT * AP-0073, 625:0006    Date: 09/26/02 | | |
| 1364,842 668.64 | Hotel room cost for 3 | 668.64 | E 32 09/26/02 0120 EI 21,802.33 |
| | nights for 4 attorneys and paralegal due to trial postponement for Elihu Inselbuch From Hilton Newark Gateway 003531 AUDIT * AP-0073, 625:0006    Date: 09/26/02 | | |
| 1364,845 668.64 | Hotel room cost for 3 | 668.64 | E 32 09/26/02 0149 JPC 22,470.97 |

nights for 4 attorneys and
paralegal due to trial
postponement for John
Cunningham
From Hilton Newark Gateway
003531 AUDIT *
AP-0073, 625:0006    Date:
09/26/02

| 1364,841 | Hotel room cost for 3 | E 32 09/26/02 0187 NDF |
| 668.64 | 668.64 | 23,139.61 |

nights for 4 attorneys and
paralegal due to trial
postponement for Nathan
Finch
From Hilton Newark Gateway
003531 AUDIT *
AP-0073, 625:0006    Date:
09/26/02

The entries raised a number of questions.  First, we could find nothing in the September fee detail

that supports or coincides with the nature or timing of this expense.  Secondly, the expense entries

lack sufficient detail to determine whether or not the expenses are necessary or reasonable.  As stated

in the Guidelines, Paragraph II.E., "...[a]ny expense for which reimbursement is sought must be

actual and necessary and supported by documentation as appropriate."  Finally, we asked why it was

necessary for four Caplin attorneys and one paralegal to attend the same trial.  Local Rule 2016-

2(d)(ix) states that "[t]he activity descriptions shall individually identify all meetings and hearings,

each participant, the subject(s) of the meeting or hearing, and the participant's role."  Paragraph

II.D.5. of the Guidelines states that "[i]f more than one professional from the applicant firm attends

a hearing or conference, the applicant should explain the need for multiple attendees."  We asked

Caplin to provide sufficient explanation and documentation to support the reasonableness and

necessity of these expenses.  Caplin responded as follows:

You have inquired about reimbursement requested regarding hotel costs for four attorneys and a paralegal.  (Initial Report at ¶ 20.)  These costs relate to the Sealed Air litigation and represent the nonrefundable amounts charged by the hotel in which Caplin & Drysdale's trial team, Messrs. Inselbuch, Swett, Finch, Cunningham and Spohn were scheduled to stay during the trial of that matter.  (As you are no doubt aware, the Sealed Air dispute was adjourned only days before trial, and later settled.) had the trial gone forward, the services of each of these professionals would have been required, since the Sealed Air litigation involved more than $1 billion in potential estate assets, numerous witnesses, thousands of pages of documents and many complex issues, and the trial could not have been conducted by fewer attorneys than the relatively small number who were scheduled to attend.   Mr. Inselbuch would have served the Committee in his overall capacity as supervisor and chief strategist regarding this bankruptcy case, while Messrs. Swett, Finch and Cunningham would have examined witnesses, introduced documentary evidence into the record, and otherwise assisted Mr. Inselbuch.  Mr. Spohn was in charge of hundreds of potential trial exhibits.

We accept this explanation and thus have no objection to these expenses.

## CONCLUSION

20.    Thus, we recommend approval of fees totaling $245,620.00 ($248,459.25 minus $2,839.25) and costs totaling $80,295.21 ($83,909.06 minus $3,613.85) for Caplin's services from July 1, 2002, through September 30, 2002.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By:_____
          Warren H. Smith
          Texas State Bar No. 18757050

900 Jackson Street
120 Founders Square
Dallas, Texas  75202
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

**CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing document has been served
First Class United States mail to the attached service list on this 24th day of January, 2003.

_____
          Warren H. Smith

# SERVICE LIST

## Notice Parties

### The Applicant

Elihu Inselbuck
Peter Van N. Lockwood
CAPLIN & DRYSDALE, CHARTERED
399 Park Avenue
New York, NY 10022

### The Debtors

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

### Counsel for the Debtors

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones,
P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

### Counsel for the Official Committee of Unsecured Creditors

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

### Counsel to the Official Committee of Property Damage Claimants

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price &
Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph,Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

### Counsel to the Official Committee of Personal Injury Claimants

Marla R. Eskin
Campbell & Levine, LLC
Suite 300
800 N. King Street
Wilmington, DE 19801

### Official Committee of Equity Holders

Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**

Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801

Exhibit A

| 07/10/02 | EJS | 135.00 | .30 | Download/organized various financial received from D. Ralles for EI & M. Peterson |
| 07/10/02 | RCS | 145.00 | 1.10 | ...; Download pleadings from electronic filing system per attorney request (.4). |
| 07/11/02 | RCS | 145.00 | 2.30 | ...; Download Excel spreadsheet and format per attorney instructions (.7); Review court docket regarding debtors motions and download applicable files per attorney instruction (.6). |
| 07/12/02 | RCS | 145.00 | 1.10 | ...; Print out contents of production documents disk per attorney request (.3);... |
| 07/15/02 | RCS | 145.00 | 2.80 | ...; Search electronic docket and download documents from Electronic Court Filing systems requested by attorney (.6);... |
| 07/19/02 | RCS | 145.00 | 1.10 | ...; Download documents from ECF court filing docket by attorney request (.3);... |
| 07/23/02 | RCS | 145.00 | 3.80 | ...; print summation reports of previous documents as exhiits (.3);... |
| 07/24/02 | RCS | 145.00 | 2.40 | ...; Download recently filed pleading from ECF court filing system per attorney request (.3). |
| 07/26/02 | RCS | 145.00 | 2.90 | ...; ..., update summation database to reflect additions and print new reports of potential exhibit documents (1.2). |
| 07/26/02 | KAA | 125.00 | .50 | Duplicated & created binder for voluminous Ct doc per EI. |
| 07/29/02 | RCS | 145.00 | 3.30 | ...; Add additional exhibits to deposition file update summation database and print new reports (.8). |
| 07/30/02 | RCS | 145.00 | 2.40 | ...; Download documents from electronic version to be used as deposition exhibits (.6); ...; Download documents from |

| Date | Initials | Rate | Hours | Description |
|---|---|---|---|---|
| | | | | electronic dockets per attorney request (.3); ... |
| 07/16/02 | SME | 135.00 | .90 | ... Create database for documents. |
| 07/17/02 | SME | 135.00 | .20 | ... Create database for documents. |
| 08/1/02 | RCS | 145.00 | 4.40 | ...; Search electronic database and download documents requested by attorneys (.6) |
| 08/02/02 | RCS | 145.00 | 3.80 | ...; load specified deposition and exhibit files on a laptop computer per attorney instructions for use out of the office (2.6);... |
| 08/16/02 | SAT | 125.00 | .30 | Reproduce NDF selected documents |
| 08/22/02 | IEG | 125.00 | 4.00 | Documents collation per attorney request (2.1); document indexing (1.9). |
| 08/29/02 | RCS | 145.00 | 4.40 | ...; scanning and electronically forwarding selected docs required by local counsel (1.8);... |
| 09/03/02 | SAT | 125.00 | .80 | Download, index, and create file folders for Grace 10-ks. |
| 09/05/02 | KAA | 125.00 | .50 | Archived and indexed Ct. & dep transcripts. |
| 09/17/02 | RCS | 145.00 | 2.60 | ...; print out and format for depo use, spreadsheets for excel files contained on CD rom (2.1) |
| 09/18/02 | RCS | 145.00 | 2.90 | ...; Load and format depo transcripts into summation transcript database (.5); search files for specific expert reports for co-counsel scan and download to CD rom (1.3); search electric files and download material needed for binder re: case management estimation briefs (.6). |
| 09/18/02 | RCS | 145.00 | 4.40 | ...; prepare duplicate sets of CD ROMs provided during depo (.4); download, review, format and print specified spread sheets from data disk provided during depo (1.3); search files for specific documents requested by co-counsel (.6) |
| 09/20/02 | RCS | 145.00 | 5.10 | ...; download electronic versions of depo transcripts, format and load into summation (.7); ...; download |

| 09/23/02 | RCS | 145.00 | 2.80 | additional documents for case management estimation binders (.6) ...; transfer documents to cd rom to be used at trial (.4) |
|----------|-----|--------|------|---|

Exhibit B

1339,471 ADA Travel; NDF travel to          E 15 07/18/02 0187 NDF
446.00                         446.00          11,020.39
    NYC (coach fare $330.00) NO
agency fee charged
From ADA Travel, Inc.
000534 AUDIT *
AP-0072, 551:0018    Date:
07/18/02

1339,478 ADA Travel; NDF travel to          E 15 07/18/02 0187 NDF
1,952.50                       1,952.50          12,972.89
    Ft. Lauderdale on 7/17
(coach fare $933.50)
From ADA Travel, Inc.
000534 AUDIT *
AP-0072, 551:0025    Date:
07/18/02

1339,480 ADA Travel; 7/17 travel for          E 15  07/18/02 0156 SQC
1,407.50                       1,407.50          9,694.89
    Stacy Cline to Ft.
Lauderdale (coach fare
$1047.00)
From ADA Travel, Inc.
000534 AUDIT *
AP-0072, 551:0027    Date:
07/18/02

1347,657 ADA Travel; NDF 7/24 travel          E 15 08/07/02 0187 NDF
446.00                         446.00          2,831.60
    to New York (coach fare
$330.00)
From ADA Travel, Inc.
000534 AUDIT *
AP-0072, 815:0013    Date:
08/07/02

1347,662 ADA Travel; NDF 7/30 travel      E 15 08/07/02 0187 NDF
1,215.50                    1,215.50            4,087.10
    to Charlotte, NC (coach
    fare $915.50) NOTE: No
    agency fee charged
    From ADA Travel, Inc.
    000534 AUDIT *
    AP-0072, 815:0018    Date:
    08/07/02


1347,665 ADA Travel; NDF 7/28 travel      E 15 08/07/02 0187 NDF
1,078.50                    1,078.50            5,165.60
    Las Vegas to Baltimore
    (coach fare $352.50)
    From ADA Travel, Inc.
    000534 AUDIT *
    AP-0072, 815:0021    Date:
    08/07/02

Response Exhibit 1

You have asked why more than one Caplin & Drysdale professional attended a meeting or participated in a conference call in each of the instances discussed below. (Initial Report at ¶ 10.) In requesting such information, you cite Paragraph II.D.5 of the Guidelines, which provides that "[i]f more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees." (Initial Report at ¶10.)

As stated in our previous responses, we make every effort to perform our services as efficiently as possible. We provide below responses in each instance, but point out that the Guidelines are discretionary, not mandatory, and that the Local Rules do not prevent more than one professional from attending a meeting or conference, nor require that an explanation be provided in each and every instance in which such multiple staffing occurs. As you must appreciate, in complex cases such as W.R. Grace, the mere fact that more than one professional from an applicant firm attends a meeting or conference should not of itself require a further time-consuming effort by counsel to explain the various tabled issues in the discussions. We respectfully request that, in the future, the fee auditor exercise his discretion, challenging only those entries as to which he has an independent basis to believe the services were not necessary or the compensation would not be reasonable.   See 11 U.S.C. 330(a)(3).

## A.      July 16, 2002 Conference
### (Elihu Inselbuch and Albert Lauber)

This conference related to the Committee proposed case management order (the "Proposal") which, along with the Debtors' competing proposal, was filed on July 22, 2002 pursuant to the Court's order. The Proposal was 44 pages long and concerned what was arguably the most important issue in the Grace bankruptcy matter – *i.e.,* how to value the approximately 130,000 pending asbestos personal injury claims that had led to Grace's insolvency, as well as all future asbestos claim. Valuation is the first step toward the establishment of a 524(g) trust for present and future claimants and, in the Committee's view, the first step toward a consensual plan of organization.

Issues addressed in the Proposal included: the appropriate statistical method for valuing claims; the relevance of the debtor's history of resolving asbestos personal injury claims in the tort system; the scope of the debtors' procedural rights in claims estimation and proper application of Federal Rule of Evidence 408; the procedure for allowing proofs of claim in bankruptcy; whether "similarly situated" claimants could be grouped together for omnibus treatment, or must be treated individually; whether certain categories of claims are compensable under applicable state law; and whether the U.S. Supreme Court's decision in Daubert permits grouping of thousands of claims for omnibus determinations regarding the admissibility of expert testimony. The Committee also prepared and filed a 16-page reply brief to responses to the Proposal filed by other creditor constituencies and the equity committee.

The conference referenced above, a discussion session among those professionals who were researching and drafting the Proposal, included Mr. Inselbuch, who is the overall supervisor of these bankruptcy matters and addressed the policy issues and strategy questions involved in the Proposal, Mr. Lauber, who supervised the drafting project and Mark Peterson, the Committee's bodily injury expert and statistician.

**B.**    **August 9, 2002 Conference**
          **(Mr. Inselbuch, Trevor Swett and Nathan Finch)**

The August 9 conference was a review of the current state of play regarding both the Proposal, other outstanding issues in the case, and a possible settlement.  Mr. Inselbuch attended the conference in his capacity as the overall supervisor of these bankruptcy matters, while Mr. Swett discussed the current status of the case management motion and Mr. Finch reported on litigation-related settlement issues and the claims data that had been gathered to date by Mark Peterson.