## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | |
| | § | **Chapter 11** |
| **W.R. GRACE & CO., et al** | § | **Jointly Administered** |
| | § | **Case No. 01-1139 (JJF)** |
| **Debtors** | § | |

## FEE AUDITOR'S FINAL REPORT REGARDING
## FEE APPLICATION OF LEGAL ANALYSIS SYSTEMS, INC.
## FOR THE SIXTH INTERIM PERIOD

This is the final report of Warren H. Smith & Associates ("Smith"), acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the Interim Application of Legal Analysis Systems, Inc. for the Sixth Interim Period (the "Application").

## BACKGROUND

1.    Legal Analysis Systems, Inc. ("LAS") was retained as asbestos-related bodily injury consultant to the official committee of asbestos personal injury claimants.  In the Application, LAS seeks approval of fees totaling $447,111.00 and expenses totaling $19,850.07 for its services from July 1, 2002  through September 30, 2002.

2.    In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time entries included in the exhibits to the Application, for compliance with 11 U.S.C. § 330, Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2001, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, Issued January 30, 1996, (the "Guidelines"), as well as for consistency with precedent established in the United States Bankruptcy Court for the District of Delaware, the United States District Court for the District of

Delaware, and the Third Circuit Court of Appeals.  We served on LAS an initial report based on our review, and received a response from LAS, portions of which response are quoted herein.

## DISCUSSION

### General Issues

3.      In our initial report, we noted that professionals Relles and Peterson occasionally failed to provide the requisite detail in their time entries.  Local Rule 2016-2(d) provides "[s]uch motion shall include activity descriptions which shall be sufficiently detailed to allow the Court to determine whether all the time, or any portion thereof, is actual, reasonable, and necessary".  This issue was raised in previous reports and again we asked LAS to advise these professionals to provide more information in this regard.

4.      In our initial report, we noted that professionals Relles and Peterson occasionally lumped their time entries.  Paragraph II.D.5. of the Guidelines states "[s]ervices should be noted in detail and not combined or "lumped" together, with each service showing a separate time entry".  This issue was addressed previously and again we asked that LAS advise these professionals to avoid such lumped time entries in the future.

### Specific Time and Expense Entries

5.      In our initial report, we noted that professionals Peterson and Relles spent 258.60 hours for a total expense to the bankruptcy estate of $112,453.00 preparing a fraudulent transfer report.  The time entries are provided in Exhibit A and attached hereto. The U.S. Trustee Guidelines Rule, I.E. states ". . . [i]n evaluating fees for professional services, it is relevant to consider various factors including the following: the time spent; the rates charged; whether the services were necessary to the administration of, or beneficial towards the completion of, the case at the time they were rendered; whether services were performed within a reasonable time commensurate with the

complexity, importance, and nature of the problem, issue, or task addressed;. . ."   Neither the narrative portion of the fee application nor the individual time entries provide detail sufficient to analyze the reasonableness of the time spent on this project.  We asked LAS to review Exhibit A and explain why this project required so much time and professional effort.  The LAS response is provided  in Response Exhibit 1.  We believe we understand LAS's response and thus have no objection to these fees.

6.       Similarly, in our initial report we noted that  professionals Peterson and Relles spent a total of 114.00 hours for a total expense to the bankruptcy estate of $51,951.00 preparing a "rebuttal report".  The time entries are provided in Exhibit B and attached hereto.  Neither the narrative portion of the fee application nor the individual time entries provide detail sufficient to analyze the reasonableness of the time spent on this project. We asked LAS to review Exhibit B and explain why this project required so much time and professional effort.  LAS's response is provided in Response Exhibit 2.  We believe we understand LAS's response and thus have no objection to these fees.

7.       In our initial report, we noted one fee detail wherein the time in parentheses does not amount to the total amount requested resulting in an apparent overcharge of $66.00.  The time entry is provided below.

```
08/23/02  Relles    / (28) Data Analysis                     11.8   3894.00
#8344     work on report: additional supporting computations  330.00
          and analysis (5.7); review and proofread (3.3);
          telephone Peterson (several 1.6), Finch, and Swett
          (numerous calls, 1.0) re: resolving issues, progress
```

The time in parentheses only adds up to 11.60 hours.  We asked that LAS confirm this calculation, and, if appropriate, explain how this miscalculation will be addressed.  LAS responded as follows:

> LAS agrees that the details for item #8344 total 1.6 hours not the 1.8 requested and agree to reduce its fees for this matter to $3,828, a reduction of $66.00.

We appreciate LAS's response and thus recommend a reduction of $66.00 in fees.

8.    In our initial report, we noted that LAS is seeking reimbursement in the amount of $7,570.63 for a number of expenses wherein the entry indicates the amounts were either split among different cases or randomly reduced.  The entries are provided below.

| | | |
|---|---|---|
| Travel | Thousand Oaks-Washington, September 22-24 (Peterson) | $1,662.49 |
| | (Split with another project) | |
| | Airfare | $1,188.12 |
| | Hotel | 206.10 |
| | Meals | 70.49 |
| | Cab, Dulles roundtrip | 53.50 |
| | Car service, roundtrip LAX | 144.28 |
| | (With 15% gratuity, $20 each way) | |
| Travel | (Peterson) Thousand Oaks-Washington DC May 5-7 | $1,781.65 |
| | Airfare (½ coach ) | 1,252.25 |
| | Hotel | 257.05 |
| | Meals | 91.10 |
| | Cabs, roundtrip Dulles | 50.00 |
| | Car service, roundtrip LAX | 131.25 |
| Travel | (Peterson) Thousand Oaks-New Your May 14-15 | $1,490.29 |
| | Airfare (½ coach ) | 1,128.75 |
| | Hotel (1/2 | 134.07 |
| | Meals | 46.22 |
| | Cabs, roundtrip JFK Airport | 50.00 |
| | Car service, roundtrip LAX | 131.25 |
| Travel | (Peterson) Thousand Oaks-Chicago   June 3-7 | $930.08 |
| | (Split with several projects) | |
| | Airfare | 509.46 |
| | Hotel | 241.62 |
| | Telephone | 86.84 |
| | Airfone | 5.09 |
| | Meals | 36.71 |
| | Cabs, O'Hare roundtrip | 12.86 |
| | Car service, roundtrip LAX | 37.50 |
| Travel | (Peterson) Thousand Oaks-New York July 16- | $1,706.12 |
| | (Split with other project) | |
| | Airfare | 1,212.33 |
| | Hotel | 344.86 |
| | Meals | 31.01 |
| | Cab, from JFK | 30.00 |
| | Car service, LAX roundtrip | 87.50 |

For each of these entries we asked LAS to provide the number of cases they were split among (or

the reason for the reduction), the reason for the trip, the assurance that all airfares were coach or

economy, the number of meals each meal entry represents, as well as the number of nights each hotel

stay entailed. LAS's response is provided in Response Exhibit 3. We believe we understand LAS's

response. However, we still believe that several of these expense items are excessive, and we

recommend the following reductions:

> *May 5-7, 2002* - Regarding the business meal of $143.20 for Inselbuch and Peterson we
> recommend a reduction of $73.20 in expenses.

> *May 14-15, 2002* - Regarding the meal cost reduction volunteered by LAS, we accept that
> figure and recommend a reduction of $23.11 in expenses.

> *June 3-7, 2002* - Regarding the June 7 business-class airfare, there is no indication that any
> schedule changes were attributable to this case. Therefore, we do not believe the bankruptcy
> estate should bear responsibility for the increase in airfare, and thus we recommend a
> reduction of $169.82 in expenses.

> *June 3-7, 2002* - Regarding the meal cost reduction volunteered by LAS, we accept that
> figure and recommend a reduction of $11.48 in expenses.

> *June 3-7, 2002* - Regarding the hotel charge, we compute a daily rate of $422.83
> ($241.62 x 7 ÷ 4). Based on a daily rate of $275.00 as reasonable and customary, we
> recommend a reduction of $84.48 in expenses.

9.      In our initial report, we noted that LAS seeks reimbursement for two airfares for

which the details are unclear as to the amount of the fare. The expense entries are provided below.

| | | | |
|---|---|---|---|
| August 7-8, Thousand Oaks-New York | | | 4,019.74 |
| Airfare | 991.50 | $3,163.00 | |
| August 26-28, Thousand Oaks-New York | | | 3,930.73 |
| Airfare | 991.50 | $2,263.00 | |

For each of the entries listed, we asked LAS to clarify what each monetary figure represents. LAS

responded as follows:

> The air fare for the August 7-8 trip to Dallas and then New York was $3,163.00
> (coach fare for travel to the two cities) and for the August 26-28 trip to New York
> was $2,263 (coach fare roundtrip to New York). The "991.50" was a typo and has
> no relevance.

We accept this explanation and thus have no objection to these expenses.

10.    In our initial report we noted that LAS is seeking reimbursement in the amount of $1,412.18 for the use of a car service.  The entries are provided below.

| August 7-8, | Car service (LAX roundtrip) | 248.50 | (Peterson) |
|---|---|---|---|
| | 138.70 109.80 | | |
| August 26-28 | Car service (JFK) | 144.76 | (Peterson) |
| | Car service (Meeting, LAX) | 184.70 | |
| | Car service (LAX-Thous Oaks) | 158.70 | |
| September 7-9 | Car, JFK roundtrip | 301.00 | (Peterson) |
| | Car service, roundtrip, LAX | 288.50 | |
| | (With 16% gratuity, $20 each way) | | |
| September 22-24 | Car service, roundtrip LAX | 144.28 | (Peterson) |
| | (With 15% gratuity, $20 each way) | | |
| May 5-7 | Car service, roundtrip LAX | 131.25 | (Peterson) |
| May 14-15 | Car service, roundtrip LAX | 131.25 | (Peterson) |

Without further explanation, these amounts seem excessive.  The Guidelines II.E.1., states ". . .[f]actors relevant to a determination that the expense is proper include the following: 1.  Whether the expense is reasonable and economical.  For example, first class and other luxurious travel mode or accommodations will normally be objectionable."   We asked that LAS augment each entry and explain why the estate should be responsible for these seemingly excessive expenses.  LAS's response is provided in Response Exhibit 4.  We believe we understand LAS's response, and we are sensitive to the travel issues raised therein.  However, compared to a large majority of the other applications we review showing similar travel entries, Dr. Peterson's expenses for car travel are one-third to one-half higher.  We do not believe that the bankruptcy estate should shoulder this entire difference for what is ultimately a decision of personal preference in travel, regardless of the hypothetical time savings.  Thus we recommend a reduction of $470.73 for these expenses.

## CONCLUSION

11.    Thus, we recommend approval of fees totaling $477,045.00 ($477,111.00 minus $66.00) and costs totaling $19,017.25 ($19,850.07 minus $832.82) for LAS's services from July

1, 2002, through September 30, 2002.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES**

By: _____

Warren H. Smith
Texas State Bar No. 18757050

900 Jackson Street
120 Founders Square
Dallas, Texas  75202
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 30th day of January 2003.

_____

Warren H. Smith

## SERVICE LIST
Notice Parties

**The Applicant**

Mark A. Peterson
Legal Analysis Systems, Inc.
970 Calle Arroyo
Thousand Oaks, CA 91360

**The Debtors**

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones,
P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of
Unsecured Creditors**

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of
Property Damage Claimants**

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price &
Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph,Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of
Personal Injury Claimants**

Marla R. Eskin
Campbell & Levine, LLC
Suite 300
800 N. King Street
Wilmington, DE 19801

**Official Committee of Equity Holders**

Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**

Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801

## EXHIBIT A

07/01/02  Peterson  / (34) Litigation/Fraudulent Conveyance        2.4
1200.00
  #7271      Work on draft of report                                500.00

07/02/02  Peterson  / (34) Litigation/Fraudulent Conveyance        7.6   3800.00
  #7275      Work on report re: fraudulent transaction              500.00

07/05/02  Peterson  / (34) Litigation/Fraudulent Conveyance        11.0   5500.00
  #7288      Work on draft of report                                500.00

07/06/02  Peterson  / (34) Litigation/Fraudulent Conveyance        8.4   4200.00
  #7290      Draft report                                           500.00

07/06/02  Relles   / (34) Litigation/Fraudulent Conveyance        4.3   1419.00
  #7479      compute and enter statistics into Peterson report      330.00

07/06/02  Relles   / (34) Litigation/Fraudulent Conveyance        2.9    957.00
  #7480      telephone Peterson (several) re: progress in          330.00
             developing report tables, results of projections

07/06/02  Relles   / (34) Litigation/Fraudulent Conveyance        4.8   1584.00
  #7481      rerun projections, summary statistics for report;     330.00
             check results

07/07/02  Peterson  / (34) Litigation/Fraudulent Conveyance        2.0   1000.00
  #7292      Review Relles' draft of section on databases           500.00

07/07/02  Peterson  / (34) Litigation/Fraudulent Conveyance        4.8   2400.00
  #7297      Draft report                                           500.00

07/07/02  Relles   / (34) Litigation/Fraudulent Conveyance        8.3   2739.00
  #7482      work on report;.......                                 

07/07/02  Relles   / (34) Litigation/Fraudulent Conveyance        4.2   1386.00
  #7483      construct parts of report; rerun descriptive          330.00
             computations to add to the report

07/08/02  Peterson  / (34) Litigation/Fraudulent Conveyance        6.9   3450.00
  #7299      Draft report                                           500.00

07/08/02  Relles   / (34) Litigation/Fraudulent Conveyance        14.0   4620.00
  #7484      work on report: compose text and tables, run various  330.00
             programs to compute descriptive statistics, run
             projections, analyze results; telephone Peterson
             (several, 2.0)

07/09/02  Peterson  / (34) Litigation/Fraudulent Conveyance        9.3
4650.00
  #7304      Draft report                                           500.00

07/09/02  Relles   / (34) Litigation/Fraudulent Conveyance        12.0   3960.00
  #7485      work on report, continue derivation of tables,        330.00
             descriptive statistics, projections, and projection
             summaries; telephone Peterson (several, 1.2) re:
             same

07/10/02  Peterson  / (34) Litigation/Fraudulent Conveyance        1.7    850.00

```
#7305       Draft report                                         500.00

07/10/02  Peterson  / (34) Litigation/Fraudulent Conveyance    8.1   4050.00
#7306       Review, revise and continue drafting report         500.00

07/10/02  Relles    / (34) Litigation/Fraudulent Conveyance    2.8    924.00
#7487       read and note required changes to report            330.00

07/11/02  Peterson  / (34) Litigation/Fraudulent Conveyance    10.6
5300.00
#7309       Review, revise and continue drafting report;......  500.00

07/12/02  Peterson  / (34) Litigation/Fraudulent Conveyance    9.7   4850.00
#7310       Review, revise and continue drafting report         500.00

 07/13/02  Peterson  / (34) Litigation/Fraudulent Conveyance    16.2
8100.00
#7313       Review, revise and continue drafting report;......  500.00

07/13/02  Relles    / (34) Litigation/Fraudulent Conveyance    2.8    924.00
#7494       begin update of report based on new computations    330.00

07/13/02  Relles    / (34) Litigation/Fraudulent Conveyance    3.5   1155.00
#7495       finish Section 3 of report;.......                  330.00

07/14/02  Peterson  / (34) Litigation/Fraudulent Conveyance    8.5   4250.00
#7314       Review, revise and continue drafting report;.....   500.00

07/14/02  Peterson  / (34) Litigation/Fraudulent Conveyance    1.2    600.00
#7315       Draft report section on Stallard report             500.00

07/14/02  Relles    / (34) Litigation/Fraudulent Conveyance    3.1
1023.00
 #7497      further revisions and additions to Section 3        330.00

07/14/02  Relles    / (34) Litigation/Fraudulent Conveyance    4.5   1485.00
#7498       work on revisions and additions to Section 2        330.00

07/15/02  Peterson  / (34) Litigation/Fraudulent Conveyance    13.6  6800.00
#7318       Review, revise and continue drafting report;.....   500.00

07/15/02  Relles    / (34) Litigation/Fraudulent Conveyance    6.8   2244.00
#7501       further revisions to report and supporting          330.00
            computations to complete first draft;......

07/15/02  Relles    / (34) Litigation/Fraudulent Conveyance    2.3    759.00
#7502       prepare cash flows for report and accountant        330.00

07/15/02  Relles    / (34) Litigation/Fraudulent Conveyance    3.5   1155.00
#7503       produce final version of report;..........          330.00

07/16/02  Peterson  / (34) Litigation/Fraudulent Conveyance    4.2   2100.00
#7320       Revise report for fraudulent conveyance             500.00

07/16/02  Peterson  / (34) Litigation/Fraudulent Conveyance    1.0    500.00
#7322       Work on report;.......                              500.00

07/16/02  Relles    / (34) Litigation/Fraudulent Conveyance    2.3    759.00
#7506       develop time payment streams for Appendix to report 330.00
            and for accountants; check results of all
            computations to ensure consistency with the report

07/17/02  Peterson  / (34) Litigation/Fraudulent Conveyance    4.5   2250.00
```

```
  #7324      Work on report;.........................       500.00

07/17/02  Relles   / (34) Litigation/Fraudulent Conveyance      3.5   1155.00
  #7507      ..........; construct appendix to report       330.00

07/17/02  Relles   / (34) Litigation/Fraudulent Conveyance      1.2    396.00
  #7509      telephone Peterson (several) re: revisions to report  330.00

07/18/02  Peterson / (34) Litigation/Fraudulent Conveyance      3.8   1900.00
  #7327      Work on report; telephone Relles (many)       500.00

07/18/02  Relles   / (34) Litigation/Fraudulent Conveyance      7.0
2310.00
  #7512      revise report incorporating Peterson's and Finch's   330.00
             comments; build new tables; import into Word;.....

07/19/02  Peterson / (34) Litigation/Fraudulent Conveyance     14.0   7000.00
  #7329      Work on report;...............       500.00

07/19/02  Relles   / (34) Litigation/Fraudulent Conveyance     12.8   4224.00
  #7513      work on report, build appendices, finish documenting  330.00
             cdroms for distribution;.........

07/20/02  Peterson / (34) Litigation/Fraudulent Conveyance      6.4   3200.00
  #7331      Finish and review report;....................       500.00

07/20/02  Relles   / (34) Litigation/Fraudulent Conveyance      6.3   2079.00
  #7514      final revisions to report;..................       330.00

07/22/02  Relles   / (34) Litigation/Fraudulent Conveyance      2.5    825.00
  #7517      read final report, note additions/corrections
```

EXHIBIT B

08/15/02  Peterson  / (28) Data Analysis
2.9   1450.00
#8121    Plan analysis for Rebuttal Report and draft and send  500.00
         memo to Relles on plans

08/15/02  Peterson  / (28) Data Analysis                       3.5   1750.00
#8122    Work on outline of Rebuttal Report                   500.00

08/15/02  Peterson  / (28) Data Analysis                       2.1   1050.00
#8123    Telephone Relles (many) to discuss analysis and      500.00
         planning for Rebuttal Report

08/15/02  Peterson  / (28) Data Analysis                       7.5   3750.00
#8124    Draft Rebuttal Report                                500.00

08/16/02  Peterson  / (28) Data Analysis                       8.1   4050.00
#8127    Draft Rebuttal Report                                500.00

08/16/02  Relles    / (28) Data Analysis
2.7   891.00
#8316    design analytical files for rebuttal report          330.00

08/17/02  Peterson  / (28) Data Analysis                       7.3   3650.00
#8132    Draft Rebuttal Report                                500.00

08/18/02  Peterson  / (28) Data Analysis                       4.7   2350.00
#8139    Draft Rebuttal report                                500.00

08/19/02  Peterson  / (28) Data Analysis                       8.8   4400.00
#8143    Draft Rebuttal report sections responding to Bates'  500.00
         specific criticisms

08/19/02  Peterson  / (28) Data Analysis                       4.6   2300.00
#8144    Work on analyses for rebuttal report                 500.00

08/19/02  Peterson  / (28) Data Analysis                       2.7   1350.00
#8145    Telephone Relles to review analyses for rebuttal     500.00
         report

08/20/02  Peterson  / (28) Data Analysis                       2.9   1450.00
#8148    Draft rebuttal section on reanalysis of liability    500.00
         based on 1998 database

08/21/02  Peterson  / (28) Data Analysis                       5.7   2850.00
 #8151   Review and draft Rebuttal report section on analysis 500.00
         of liability based on 2002 database

08/21/02  Peterson  / (28) Data Analysis                       0.6    300.00
#8154    Draft introduction to Rebuttal report               500.00

08/22/02  Peterson  / (28) Data Analysis                       4.1   2050.00
#8156    Work on analysis of liability based on 1998          500.00
         database; revise rebuttal report sections on
         analysis using 1998 database

08/22/02  Peterson  / (28) Data Analysis                       6.6   3300.00
#8157    ..............; write and revise sections of rebuttal 500.00

report addressing Bates' criticisms (3.8)

| Date | Name | Description | Hours | Amount |
|------|------|-------------|-------|--------|
| 08/22/02 #8158 | Peterson / (28) Data Analysis | Telephone Relles (many) to discuss analyses and drafting of rebuttal report | 2.4 500.00 | 1200.00 |
| 08/22/02 #8341 | Relles / (28) Data Analysis | develop supporting tables for report: projection results, summary tables for Sections 2 and 4 (7.2);....... | 7.5 330.00 | 2475.00 |
| 08/22/02 #8342 | Relles / (28) Data Analysis | work on report: read, revise, and format draft Sections 2 and 4 | 6.5 330.00 | 2145.00 |
| 08/22/02 #8343 | Relles / (28) Data Analysis | telephone Peterson (many) re: discuss analyses and drafting of rebuttal report | 2.1 330.00 | 693.00 |
| 08/23/02 #8159 | Peterson / (28) Data Analysis | Organize and revise sections of rebuttal report | 2.0 500.00 | 1000.00 |
| 08/23/02 #8160 | Peterson / (28) Data Analysis | Telephone Swett, Finch (many) re: rebuttal report | 1.5 500.00 | 750.00 |
| 08/23/02 #8161 | Peterson / (28) Data Analysis | Telephone Relles (many) re: drafting and production of rebuttal report | 1.6 500.00 | 800.00 |
| 08/23/02 #8162 | Peterson / (28) Data Analysis | Complete Rebuttal report | 7.5 500.00 | 3750.00 |
| 08/23/02 #8344 | Relles / (28) Data Analysis | work on report: additional supporting computations and analysis (5.7); review and proofread (3.3);.... | 11.8 330.00 | 3894.00 |
| 08/23/02 #8345 | Relles / (28) Data Analysis | develop and distribute summary table for Section 3 of report | 2.2 330.00 | 726.00 |

Response Exhibit 1

5.      The July 2002  "REPORT ON OPINIONS AND SUPPORT FOR OPINIONS OF
MARK A PETERSON RE: ASBESTOS LIABILITIES OF W.R. GRACE ON MARCH
30, 1998" referenced in this inquiry and the opinions summarized in the report were
central to the fraudulent transaction claims by the official committee of asbestos personal
injury claimants and contributed to the settlement that added almost $1 billion to the
estate.  Because LAS's report had to address many issues that were central to the
fraudulent transaction litigation and in response to the concerns by counsel to the
Committee that the report and Dr. Peterson's testimony would strongly support their
claims, LAS professionals had to spend significant time addressing these litigation issues.
The resulting report was 138 single spaced pages in length plus 65 pages of appendices
and included the following topics that were necessary as evidence to the fraudulent
transaction claims:

   1.     Identification and descriptions of W.R. Grace asbestos containing
          products, their years of distribution and the industries in which exposures
          to each  product occurred.

   2.     Detailed descriptions and analyses of three abstracts of W.R. Grace's
          asbestos claims database representing the database in 1997, 1998 and at
          the time of bankruptcy filing.  These descriptions and analyses provided
          the foundation for the substantive analyses of subsequent sections and also
          the basis for trial exhibits and testimony.

   3.     Step-by-step descriptions of forecasts of Grace's liability on January 1998
          including separate forecasts derived from two abstracts, one from 1997
          and one from January 1998.  The report presented alternative forecasts as a
          form of sensitivity analysis to calculate the effects of several sources of
          uncertainty.

   4.     Step-by-step descriptions of forecasts of Grace's liability on March 31,
          1998 drawn from the Grace 2002 database, including analyses of claims
          that were pending on March 31, 1998 and resolved subsequently and
          forecasts of Grace liabilities for future asbestos claims as of its bankruptcy
          filing date.  Again the report presented alternative forecasts for sensitivity
          analyses.

   5.     An analysis and criticism of forecasts of Grace's asbestos liability made by
          KPMG-Peat Marwick, including comparisons of KPMG's forecasts made
          in 1995 and comparisons of each of the three forecasts with statistical
          analyses of each of the three abstracts of Grace's claims database.
          Elements of KPMG's 1997 report had been presented to the Grace board
          of directors at the time of Grace's decisions that were challenged by the
          fraudulent conveyance litigation and LAS's criticisms showed both why
          the KPMG forecasts were unreliable and identified concurrent Grace

documents showing that Grace knew or should have known that the KPMG report was unreliable.

6.　　An analysis and criticism of a 1997 report prepared by Professor Eric Stallard for Sealed Air that reviewed KPMG's 1997 forecast of Grace's asbestos liability.  LAS's analyses showed both that Prof. Stallard's criticisms of the KPMG report should have caused Sealed Air and Grace to recognize that the KPMG report was unreliable and also that Prof. Stallard's observations about Grace's liability were not meaningful.

7.　　An analysis and criticism of the ARPC forecast of Grace's liability in August 1998, made by the same professionals who authored the 1995 and 1997 KPMG reports for Grace.  LAS's report showed both the unreliability of the KPMG 1998 report and also that this report further demonstrated the unreliability of KPMG's 1997 report.

8.　　An evaluation and criticism of Price Waterhouse's December 1996 analysis of Grace's claims and liability projections.  LAS showed that Price Waterhouse's analyses did not describe Grace's liability.

Each of these topics involved matters at issue in and critical to the Committee's fraudulent transaction claim.  Counsel for the Committee requested and instructed LAS to address each of these topics in its report.  LAS was required to conduct many statistical analyses as part of this work and to develop and support Dr. Peterson's opinions and testimony on these matters.  Counsel to the Committee submitted more than 13 bankers boxes of papers and documents to LAS and instructed Dr. Peterson to review and become familiar with these documents both in preparing the LAS report and as preparation for his testimony, then organize information from these documents and data for his report and then incorporate relevant material and analyses in the report.

LAS conducted this work efficiently and in a minimum of time.  Dr. Peterson wrote the report in an outline format both to reduce its length and the amount of time needed to write the report.  LAS professionals completed all of reviews and analysis and drafted, revised and completed a 138 page report covering each of the above listed items within a total amount of time that was equivalent to less than 33 8-hour person-days.  All of this work was compressed into a three week calendar period because of the schedule of the case.

Response Exhibit 2

6.      In August, LAS was required to prepare a second, rebuttal report for two reasons:
First, immediately after the July 22 deadline upon which LAS was required to
submit its report, Judge Wolen issued an opinion clarifying and changing the basis
for analyzing Grace's asbestos liabilities and solvency as of the March 31, 1998
date of the challenged transaction. The Committee was now allowed to consider
claims resolutions by Grace that occurred after the March 31, 1998 transaction
date. At the Committee's request, LAS analyzed the impact of using this
additional information and then, at the Committee's further request conducted
forecasts using this new information. The rebuttal report contained several new
analyses using this additional information, compared results of these new analyses
with those presented in the July report and included further sensitivity analyses of
alternative forecasts.

Second, Sealed Air submitted a 100 page "Expert Witness Report of Charles E.
Bates, Ph.D. "that contained 27 sections and 210 numbered paragraphs aimed
primarily at criticizing LAS's July report. Additionally, Dr. Bates's report added
appendices and other attending materials. Dr. Bates also provided extensive
electronic data sets and computer programs in support of his report. To
understand and evaluate Dr. Bates's criticism, all of this material had to be
reviewed. This review showed that every one of Dr. Bates's criticisms were in
error and had to be rebutted.

The Committee instructed LAS to prepare its August rebuttal report both to
respond to and rebut Dr. Bates's criticisms and also to present LAS's new
analyses permitted under Judge Wolen's opinion. This report again required
extensive statistical and quantitative analyses both to prepare the new forecasts
and also to demonstrate the impropriety of Dr. Bate's criticisms. Again, the
Committee regarded LAS's submission of its report addressing these matters as
critical to its case and LAS agrees with that assessment.

LAS completed the substantial amount of work required to review Dr. Bates's
dense 100 page report, to review and investigate the overwhelming amount of
electronic data and material submitted by Dr. Bates, to prepare LAS's own
analyses demonstrating the errors and impropriety of Dr. Bates's criticisms, and
then to write, review, edit and complete its own 87 page report (plus 23 additional
pages of appendices) all within the equivalence to 14.25 8-hour person days.
Because of the brief period between the date that Dr. Bates's report was provided
and the deadline for submitting a rebuttal report, all of this work was completed in
9 calendar days. LAS was extraordinarily efficient and parsimonious in
completing this great amount of necessary work.

Response Exhibit 3

Where possible LAS professionals attempt to combine their travel for work on several projects in order to reduce expenses to any one client or bankruptcy estate. We assume that the Auditor does not object to these practices that save the estate here considerable expense.

All of the referenced trips, other than the June 3-7 trip to Chicago were split with a single other project as noted by the parenthetical comments for each. The June 3-7 trip was split with 6 other projects. On this trip Dr. Peterson met with asbestos creditor committees for several other bankruptcies and insurers on another matter. All of these meetings occurred in conjunction with Mealey's Asbestos Litigation Conference, which Dr. Peterson did not attend, and meetings for most matters, including Grace's, occurred over several days. Each project was assessed 1/7 of the total expenses across the 4 day period rather than attempting to allocate the relative amount of time spent for each engagement on each date. Grace estate is being requested for 1/7th of such charges.

All air fares were for coach travel, except for the June 7 flight from Chicago to Los Angeles, which was a business class fare. The air fare for the June 4 Los-Angeles-Chicago flight on the same trip was for economy. For the roundtrip air fare for this trip, LAS requests reimbursement from W.R. Grace for one-seventh of the round trip fare (a four-day trip shared with six other engagements) or $509.64. LAS had to rebook the June 7 Chicago-Los Angeles return flight twice because of changes in meetings on that date and disruptions of airline flight schedules in Chicago from bad weather. LAS originally booked the June 7 flight in economy but could only rebook in business class with these changes in schedules. If Dr. Peterson's ticket had been economy, rather than business, the round trip air fare for W.R. Grace for the June 4-7 trip would have been $339.64 or $169.82 less than LAS requests.

The table below responds to other questions about these charges:

| Trip | Purpose |
| --- | --- |
| May 5-7 | meeting with attorneys re: fraudulent conveyance litigation |
| May 14-15 | meeting with attorneys and consultants re: developments in case; work on fraudulent conveyance case; anticipated meetings on fraudulent conveyance matters did not occur |
| June 3-7 | committee meeting where Dr. Peterson presented results of analyses of liability; meeting with attorneys to discuss case |
| July 16-18 | meeting with attorneys to discuss and work on report for fraudulent conveyance litigation |
| Sept. 22-24 | Peterson deposition by attorneys for Grace and Sealed Air |

| Trip | Nights | Meals |
|------|--------|-------|
| May 5-7 | 2 nights | 2 meals including a business meal of $143.20 for Inselbuch and Peterson |
| May 14-15 | 2 nights | 2 meals.  Note total meal cost was $46.22.  The application requests this full cost, but should be reduced by half.  Reduction of $23.11. |
| June 3-7 | 4 nights | 4 meals.  Note one dinner charge was $160.73.  LAS proposes to reduce this by half to $80.37.  This would reduce Grace's share of meals to $25.23 and reduce reimbursement by $11.48. |
| July 16-18 | 2 nights | 2 meals. |
| Sept. 22-24 | 2 nights | 3 meals, 2 breakfasts and one dinner, but cannot locate receipts. |

Based on LAS's review of the expenses, LAS will agree to reduce its request for reimbursement of expenses by $34.59 representing correction of the May 14-15 meal expense ($23.11) and reduction of the dinner charge for the June 3-7 trip (-$11.48).  LAS will reduce its request for payment of fees by $66.00 reflecting the correct addition for detailed time records for billing item #8344.

Response Exhibit 4

Dr. Peterson's home and office are in Ventura County and are located approximately 50 miles from LAX, the nearest airport with connections to most cities. After researching the matter and trying alternative means of travel to and from LAX and alternative car services, Dr. Peterson now uses a local car service, traveling by sedan, which provides the most cost-effective travel to LAX. Taxi service costs approximately the same as the car service, but is less reliable, requires more travel time and with added travel time would be considerably more expensive. Other car services are more expensive than the service used by Dr. Peterson.

The referenced car services charges for New York (August 26-28) (September 7-9) were for a car service provided by the New York hotel. These charges represent travel to and from JFK airport, which is the closest airport to Manhattan with nonstop air service to Los Angeles (unfortunately none to LaGuardia). JFK airport is all the way across Queens and is expensive to get to. At other times the law firms with whom we work in New York provide for and pay for car service charges so we do not know amounts charged by other services. Dr. Peterson no longer uses cabs to and from JFK for four reasons: (1) usually he arrives late at night and typically there are few cabs so he had to wait for extended periods for cabs with additional travel time that eliminated any savings from lower fares; (2) when "expressway" travel to JFK is crowded, as is always the case for travel to JFK or from JFK at anytime other than late night, car services use surface streets that greatly reduced travel time while cabs never use these streets but instead sit stopped in traffic while their meters run; not only do car services thus reduce travel time and, consequently, expense to the estate, but they also provide the only reliable means to get to JFK from afternoon meetings in Manhattan; (3) cabs frequently are unavailable in Manhattan or refuse to drive to JFK; again the wait for cabs increases travel time and expense to the estate; (4) New York cabs are simply unsafe; Dr. Peterson has repeatedly had dangerous experiences with cabs to and from New York airports and his wife will not accept his travel by cab.