## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | **Chapter 11** |
| | § | |
| **W.R. GRACE & CO., et al.,** | § | **Jointly Administered** |
| | § | **Case No. 01-01139 (JKF)** |
| Debtors. | § | |
| | § | |

### FEE AUDITOR'S FINAL REPORT REGARDING
### FEE APPLICATION OF REED SMITH LLP
### FOR THE SIXTH INTERIM PERIOD

This is the final report of Warren H. Smith & Associates, P.C. ("Smith"), acting in its

capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the Interim Fee

Application of Reed Smith LLP for the Sixth Interim Period.

### BACKGROUND

1.      Reed Smith LLP ("Reed Smith") was retained as special asbestos products liability

defense counsel to the Debtors.  In the Application, Reed Smith seeks approval of fees totaling

$511,055.50 and costs totaling $39,339.33 for its services from July 1, 2002 through September 30,

2002.

2.      In conducting this audit and reaching the conclusions and recommendations contained

herein, we reviewed in detail the Application in its entirety, including each of the time entries

included in the exhibits to the Application, for compliance with 11 U.S.C. § 330, Local Rule 2016-2

of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended

Effective February 1, 2001, and the United States Trustee Guidelines for Reviewing Applications

for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, Issued January 30,

1996, (the "Guidelines"), as well as for consistency with precedent established in the United States Bankruptcy Court for the District of Delaware, the United States District Court for the District of Delaware, and the Third Circuit Court of Appeals.  We served on Reed Smith an initial report based on our review and received a response from Reed Smith, portions of which response are quoted herein.

## DISCUSSION

### General Issues

3.        In our initial report, we noted that timekeepers Flatley, Cameron and Raytik often did not include sufficient detail in their time entries.  Rule 2016-2(d) of the Delaware Local Rules states "activity descriptions . . . shall be sufficiently detailed to allow the Court to determine whether all the time, or any portion thereof, is actual, reasonable, and necessary . . ."  This issue has been raised in previous reports and we have advised certain professionals to provide more detailed time entries in the future.  We again requested that Reed Smith continue to advise its professionals regarding this matter.  Reed Smith responded that it instructed its professionals accordingly and would continue to improve.

4.        We noted that timekeepers Atkinson, Hindman, Raytik and Muha occasionally lumped their time entries.  Local Rule 2016-2(d)(vii) provides that "[a]ctivity descriptions shall not be lumped –  each activity shall have a separate description and a time allotment."  We requested Reed Smith to advise these professionals to avoid lumping their time entries in the future, and Reed Smith stated it had done so.

5.        We noted that timekeepers Cameron, Raytik, Campbell, Rice and Bentz occasionally billed in increments other than tenths of an hour.  Paragraph II.D.5. of the Guidelines requires that

"Time entries should be kept contemporaneously with the services rendered in time periods of tenths of an hour."  This issue was addressed in the previous application, and we again asked Reed Smith to advise all of its timekeepers to comply with this guideline in future applications.  Reed Smith responded as follows:

> Furthermore, Reed Smith acknowledges that on some occasions, some Reed Smith professionals have billed in increments of one-twentieth (.05) of an hour, rather than a full tenth of an hour, where the time worked by those professionals did not amount to a full, rounded amount that could be measured in tenths of an hour.  (For example, if a professional worked for one hour and fifteen minutes on a matter, the time entry would appear as 1.25 hours—a more accurate description of the time worked than either 1.2 hours or 1.3 hours.)  All Reed Smith professionals will be instructed to avoid this practice in the future.

We appreciate Reed Smith's response.

Specific Time and Expense Entries

6.    We noted that on September 23, 2002, Bentz ($300) and Restivo ($430) spent a total of 24.50 hours for a total expense to the bankruptcy estate of $9,105.00 preparing for and participating in the same hearing.   The time entries are provided below.

| Date | Timekeeper | Description | Hours |
|------|------------|-------------|-------|
| 09/19/02 | Restive | Preparation for omnibus hearing on emergency motion to compel. | 1.50 |
| 09/21/02 | Bentz | Preparation for emergency hearing on motion to compel production in fraudulent conveyance case. | 3.00 |
| 09/22/02 | Restivo | Preparation for hearing on emergency motion to compel. | 4.00 |
| 09/23/02 | Bentz | Preparation for and participation (for argument of certain discovery issues within my area of primary responsibility) at omnibus hearing in Delaware. | 8.00 |
| 09/23/02 | Restivo | Preparation for and participation (for argument of certain discovery issues within my area of primary responsibility) at omnibus hearing | 8.00 |

in Delaware.

According to Local Rule 2016-2(d)(ix), "[t]he activity descriptions shall individually identify all meetings and hearings, each participant, the subject(s) of the meeting or hearing, and the participant's role." The matter of multiple professionals, is also addressed in the Guidelines, Paragraph II.D.5.: "[i]f more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees." The fee detail does not provide the reason it was necessary for multiple professionals to attend this hearing. Thus, we asked Reed Smith to explain the need for multiple professionals at this hearing. Reed Smith's response is provided below:

> Both professionals' attendance was required at the September omnibus hearing (held on September 23, 2002) because of the issues raised at that hearing and the division of responsibility Reed Smith traditionally has employed in its representation of the Debtors. As stated previously in response to the Fee Auditor's reports on prior Interim Periods, attorney Restivo has served as the lead attorney in Reed Smith's representation of the Debtors in their bankruptcy proceedings (including the ZAI Science Trial case), and he prepared for and attended the September 23 hearing in order to address the general strategy and planning issues that would be addressed by the court, as well as issues that the Court would address pertaining to the general framework of the ZAI Science Trial case.
>
> Attorney Bentz's preparation for and participation in the September omnibus hearing was directed at a narrower subset of issues. Attorney Bentz has had responsibility for coordinating the Debtors' discovery in the ZAI Science Trial case, for which Reed Smith serves the Debtors as their lead trial counsel. The emergency motion to compel that was filed in that case[1], which was one of the topics scheduled to be addressed and argued at the September omnibus hearing, impacted the matters within attorney Bentz's area of primary responsibility because he was the Reed Smith attorney who had extensive contact with counsel for the ZAI claimants on the discovery issues in question.

We accept Reed Smith's explanation and thus have no objection to these fees.

---

[1] Footnote provided by Reed Smith: "The narrative in attorney Bentz's time entry for September 21, 2002 erroneously states that the emergency motion to compel arose in the fraudulent conveyance case. The emergency motion to compel was filed by the ZAI Claimants in the ZAI Science Trial case."

7.    Similarly, we noted in our initial report that on July 19, 2002, Cameron ($385), Flatley ($400) and Restivo ($430) participated in a conference call for a total of 1.90 hours and a total expense to the bankruptcy estate of $782.50.   The time entries are provided below.

| 07/19/02 | Cameron | .90 | 346.50 | Participated in part of telephone call with R. Finke and J. Restivo re: response to EPA proposed stipulation in cost recovery action (.50);. . . |
| 07/19/02 | Flatley | .60 | 240.00 | . . . ; participate in part of conference call with R. Finke, and J. Restivo relate to same (.40). |
| 07/19/02 | Restivo | 1.00 | 430.00 | Conference and telephone calls with R. Finke re: EPA proposed stipulation. |

Paragraph II.D.5. of the Guidelines states that "[i]f more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees." The fee detail does not provide the reason for multiple professionals at this conference call nor does it explain each professional's role.   We asked Reed Smith to explain the need for multiple professionals at this conference call.  Reed Smith's response is provided as Response Exhibit 1.  We appreciate Reed Smith's response and have no objection to these fees.

8.    We noted that  three separate time entries contained miscalculations.

On August 6, 2002, Keuler ($240) had a time entry listed as 2.80 hours for a total of $672.00. However, the parentheticals only add up to 2.00 hours and $480.00, resulting in an overcharge of $192.00.

| 08/06/02 | Keuler | 2.80 | 672.00 | Reviewed and revised quarterly fee application (1.7).  Telephone and e-messages to D. Cameron and A. Muha regarding changes (0.2).  Reviewed changes that J. Lord made (0.1). |

On August 16, 2002, Haines ($150) had a time entry listed as 3.10 hours for a total of $465.00.  However, the parentheticals only add up to 2.80 hours and $420.00, resulting in an overcharge of $45.00.

| 08/16/02 | Haines 3.10 | 465.00 | Memos re: document production to EPA in cost recovery action and data transfer to HRO (0.4); multi telephone calls to Trevelise re: same (0.8); telephone call to Coggon re: same (0.5); telephone calls to Hindman. ONSS re: same (0.8); conference call re: same (0.3) |
|---|---|---|---|

On August 13, 2002, in the project category "Attic Insulation Science Trial", Raytik ($75) had a time entry listed as 2.60 hours for a total of $195.00. However, the parentheticals only add up to 1.40 hours and $105.00, resulting in an overcharge of $90.00.

| 08/13/02 | Raytik | 2.60 | 195.00 | Updated spreadsheet from Onsite with missing data from Summation search (1.3); e-mails to K. Hindman re: spreadsheet updates (0.1). |
|---|---|---|---|---|

The combined overcharge amounts total $327.00. We asked Reed Smith to advise us as to these miscalculations. Reed Smith's response is provided below:

> In all three situations noted by the Fee Auditor, Reed Smith's review of its internal time and accounting records showed that clerical errors led to these miscalculations. Our review of these records verified that on August 6, 2002, attorney Richard A. Keuler, Jr. worked a total of 2.00 hours, for a fee of $480.00; on August 16, 2002, paralegal M. Susan Haines worked a total of 2.80 hours, for a fee of $420.00; and on August 13, 2002, paralegal Raytik worked a total of 1.40 hours, for a fee of $105.00. To the extent that the overall hours-worked entries did not match the itemized details for each of these entries, the overall entries were incorrect. Reed Smith thus will not contest a reduction in its fees in the amount of $327.00 for these miscalculated entries.

We accept Reed Smith's explanation and thus recommend a reduction of $327.00 in fees.

9.    In our initial report, we noted that during the Application period professionals Atkinson ($120), Hindman ($110), Lord ($145), Keuler ($240) and Raytik ($75) spent a combined total of 13.00 hours for a total expense to the estate of $1,572.00 on tasks that appear to be non-reimbursable overhead. The entries are provided on Exhibit A attached hereto. Paragraph II.E. 7., of the Guidelines, states, "[f]actors relevant to a determination that the expense is proper include the following: . . Whether the expenses appear to be in the nature of nonreimbursable overhead . . .

Overhead includes word processing, proofreading, secretarial and other clerical services, . . ." We asked Reed Smith to review Exhibit A and explain why these tasks should not be categorized as noncompensable activities or nonreimbursable overhead. Reed Smith's response is provided as Response Exhibit 2. We accept Reed Smith's explanation, and thus we recommend a reduction of $559.50 in fees.

10.     We noted that during the Application period, professionals Bentz ($300), Cameron ($385) and Flatley ($400) spent a combined total of 9.56 hours and $3,273.00 on activities which, without further explanation, appear more appropriate for a professional with a lower hourly rate. These fee details are provided on Exhibit B attached hereto. Paragraph I.E., of the Guidelines, states ". . . [i]n evaluating fees for professional services, it is relevant to consider various factors including the following:  the time spent; the rates charged; whether the services were necessary to the administration of, or beneficial towards the completion of, the case at the time they were rendered; whether services were performed within a reasonable time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;. . .". We asked Reed Smith to review Exhibit B and, for each activity listed, to explain why a professional with a lower rate could not have performed these tasks. Reed Smith's response is provided as Response Exhibit 3. We accept Reed Smith's explanation and thus have no objection to these fees.

11.     We noted that during the Application period professionals Bentz ($300), Butcher ($185) and Muha ($185) spent a total of 75.15 hours and $17,728.00 reviewing and revising the Grace historical case defense outline. See Exhibit C. We further noted that in the fourth interim period, Reed Smith billed $29,378.00 in this regard.  The time entries are similar to those provided in the fourth interim period as they lack sufficient detail with regard to the complexity and nature of the task addressed.  Paragraph I.E., of the Guidelines, states ". . . [i]n evaluating fees for professional services, it is relevant to consider various factors including the following:  the time

spent; the rates charged; whether the services were necessary to the administration of, or beneficial towards the completion of, the case at the time they were rendered; whether services were performed within a reasonable time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;. . .".   As this issue appears to be ongoing, we requested that Reed Smith provide additional details concerning this matter, explaining why it required so much additional professional time, and why the associated fees should be considered reasonable.   Reed Smith's response is provided as Response Exhibit 4.  We appreciate the depth of Reed Smith's response and have no objection to these fees.

12.     In our initial report, we noted that Reed Smith seeks reimbursement in the amount of $6,990.00 for secretarial overtime.   Paragraph II.E.7. of the Guidelines, discussing non-reimbursable overhead, provides that     "[o]verhead includes word processing, proofreading, secretarial and other clerical services...."  In the absence of further explanation, it appears that this secretarial overtime constitutes non-reimbursable overhead.  We asked Reed Smith to explain why an exception should be made for these additional charges.  Reed Smith responded as follows:

> ... the secretarial overtime charges at issue here derived from the document review and coding project that Reed Smith has performed on behalf of the Debtors since approximately August 2001.  To briefly review, at the outset of the Debtors' bankruptcy proceeding, it was decided by the Debtors that, rather than producing their voluminous catalogue of documents in paper form to various litigants in its bankruptcy-related cases, they rather would scan these documents into an electronic database and then produce responsive documents via CD-ROM.  Additionally, the Debtors' counsel also wished to use the database to organize these documents for use in preparing the Debtors' defense in the various cases; thus, the documents were reviewed by the Debtors' counsel, and then coded according to the types of information in the documents.  The coded summaries were then required to be inputted into the database, to complete the overall document management scheme.
>
> The secretarial overtime charges at issue instantly were incurred in order to facilitate, in a more timely fashion, the input of these coded summaries into the document database.  Overtime was necessary due to the accelerated discovery schedules and time deadlines imposed in the EPA cost recovery action and the ZAI Science Trial case; in sum, all coded materials needed to be inputted into the database before the reviewed documents could be produced and before the

documents could be used to any useful extent by any of the Debtors' counsel.

We accept Reed Smith's explanation and thus have no objection to these expenses.

13.    We noted that during the month of August 2002, the hourly rate for professional Jayme L. Butcher varied from $170 to $185[2].  The Application, however, neither acknowledged nor explained this rate fluctuation.  Paragraph II.A.3., of the Guidelines, states ". . .[t]he following information should be provided in every fee application: . . .[n]ames and hourly rates of all applicant's professionals and paraprofessionals who billed time, explanation of any changes in hourly rates from those previously charged, . . ."  Thus, we asked Reed Smith to explain this fluctuation in hourly rate.  Reed Smith's response is provided below:

> The fluctuation was due to a technical error in Reed Smith's billing system; the hourly rate for all matters upon which attorney Butcher worked during the Sixth Interim period should have been $185.00, as agreed upon by the Debtor and Reed Smith as of January 1, 2002.

We accept Reed Smith's explanation and thus have no objection to these fees.

14.    We noted that, in the Application, Reed Smith seeks reimbursement in the amount of $9,497.00 for air travel.  The Guidelines II.E.1., states ". . .[f]actors relevant to a determination that the expense is proper include the following: 1.  Whether the expense is reasonable and economical.  For example, first class and other luxurious travel mode or accommodations will normally be objectionable."  Neither the Application's narrative nor the individual expense entries provide the class of fares purchased.  We asked Reed Smith to provide information regarding the class of fare utilized.  Reed Smith responded as follows:

> The air travel included several cross-country flights for witness meetings and depositions.  It is the policy of Reed Smith that, apart from any agreements between the firm and the client to the contrary, attorney business air travel shall always be via coach-class.  This policy has been followed in Reed Smith's instant representation

---

[2]  Time entries located in the project category "Attic Insulation Science Trial" reflect an hourly rate of $170;  time entries located in the category "Special Asbestos Counsel" reflect an hourly rate of $185.

of the Debtors; Reed Smith has purchased only coach-class tickets for its attorneys to travel on behalf of the Debtors. The only time Reed Smith attorneys use first-class or business-class accommodations in their travels on behalf of the Debtors is when the Reed Smith attorneys pay for the upgrades themselves, or when they are upgraded pursuant to a frequent-flyer or other similar promotional program; at no time have the Debtors ever been charged for similar types of upgrades. Reed Smith will continue to follow its aforementioned air travel policy during its representation of the Debtor, and on future Fee Applications, Reed Smith will describe the type of fare purchased in its air travel expense narratives.

We appreciate Reed Smith's response and have no objection to these expenses.

15.     In our initial report, we noted that Reed Smith seeks reimbursement in the amount of $112.32 for one meal expense. The entry is provided below.

| 09/09/02 | 112.32 | Meal Expense - CAPITAL SPICE CO., INC./ Lunch expense for meetings in Washington, DC with WR Grace and consultants in cost recovery action |

The Guidelines II.E.1., states ". . .[f]actors relevant to a determination that the expense is proper include the following: 1. Whether the expense is reasonable and economical. For example, first class and other luxurious travel mode or accommodations will normally be objectionable." Without further explanation this amount seems excessive. Thus, we asked Reed Smith to provide the number of meals this amount encompasses so that we might properly analyze the same. Reed Smith responded as follows:

The expense was incurred in connection with an August 1, 2002 meeting between attorney Cameron, several other of the Debtors' outside counsel, representatives of the Debtor and the Debtor's in-house counsel, and consultants used by the Debtor in its bankruptcy-related proceedings. The meeting started before lunch, proceeded through a working lunch, and concluded after lunch was finished. Lunch for eight people was purchased, consisting of an assortment of sandwiches, potato chips, cookies and soft drinks, for a total expense of $112.32.

We accept Reed Smith's explanation and have no objection to this expense.

16.     Similarly, we noted that Reed Smith seeks reimbursement in the amount of $141.00 for a taxi fare. The expense entry is provided below.

| 09/24/02 | 141.00 | Taxi Expense - J. Bentz TRAVEL TO DELAWARE FOR GRACE hearing 9/23 |

Without further explanation this amount seems excessive. We asked Reed Smith to explain why this taxi fare was so high. Reed Smith's response is provided below:

> The fare was incurred in relation to the attendance of attorneys Restivo and Bentz at the September omnibus hearing, which was held in Wilmington, Delaware. Attorneys Restivo and Bentz flew from Pittsburgh to Philadelphia, Pennsylvania on the morning of the hearing, and then traveled by taxi to the courthouse in Wilmington to attend the hearing; after the hearing, they returned to Philadelphia for their return flight by a second taxi trip. The overall cost of these taxi fares was less than the cost of renting a car to drive from Philadelphia to Wilmington, and therefore the Debtors were spared some expense in the attorneys' travel to the hearing. Additionally, travel by taxi enabled attorneys Restivo and Bentz to travel to the hearing on the day of the hearing, as opposed to incurring the cost of an overnight stay, to ensure their timely arrival for the morning hearing.

We accept Reed Smith's explanation and have no objection to this expense.

## CONCLUSION

17.    Thus we recommend approval of fees totaling $510,169.00 ($511,055.50 minus $886.50) and costs totaling $39,339.33 for Reed Smith's services from July 1, 2002 through September 30, 2002.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By:_____
          Warren H. Smith
          Texas State Bar No. 18757050

900 Jackson Street
120 Founders Square
Dallas, Texas  75202
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 10th day of February, 2003.

_____
          Warren H. Smith

# SERVICE LIST

Notice Parties

## The Applicant

Richard Keuler, Esq.
Reed Smith LLP
1201 Market Street, Ste. 1500
Wilmington, DE 19801

Douglas Cameron
Reed Smith LLP
P. O. Box 2009
Pittsburgh, PA 15230-2009

## The Debtors

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

## Counsel for the Debtors

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones, P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

## Counsel for the Official Committee of Unsecured Creditors

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

## Counsel to the Official Committee of Property Damage Claimants

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph,Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

## Counsel to the Official Committee of Personal Injury Claimants

Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Marla R. Eskin
Campbell & Levine, LLC
Suite 300
800 N. King Street
Wilmington, DE  19801

**Official Committee of Equity Holders**

Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**

Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801

<u>Exhibit A</u>

| 07/01/02 | Atkinson | 3.70 | 444.00 | . . . ; printing materials from Summation for associates' review (.9): . . . |
|---|---|---|---|---|
| 07/02/02 | Raytik | .10 | 7.50 | Profiled and printed out spreadsheets to search for missing data. |
| 07/03/02 | Atkinson | .90 | 108.00 | Printing summary sheets from Summation for associates review (.2);. . . |
| 07/05/02 | Atkinson | 1.90 | 228.00 | Printing summaries for associates' review of documents (1.1);. . . |
| 07/09/02 | Atkinson | 3.20 | 384.00 | . . . ; print documents for associates' review (.3);. . . |
| 07/11/02 | Atkinson | 1.60 | 192.00 | Proofreading, revising, checking documents relating to memo listing Guidelines inadvertently scanned documents and sending final memorandum re: same to A. Trevelise, S. Haines (PHL). |
| 08/01/02 | Atkinson | 3.20 | 384.00 | .....; arrangements for printing of documents for associates' review (.2) and for transcription of coding tapes (.2). |
| 08/02/02 | Atkinson | 4.10 | 492.00 | .....; printing summaries to accompany documents for associates' review (.9). |
| 08/05/02 | Lord | 1.50 | 217.50 | .....;  proofread and edit summary of fee application (.4); ..... |
| 08/06/02 | Lord | 2.40 | 348.00 | Proofread and edit notice of filing (.3);..... |
| 08/25/02 | Atkinson | .80 | 96.00 | Search and print summaries for document review. |
| 08/25/02 | Keuler | .20 | 48.00 | Reviewed agenda letter for hearing and faxed same to D. Cameron. |

| 09/04/02 | K. Hindman | Loaded data and images into litigation data base for attorney document review project. | 1.50 |
| 09/13/02 | K. Hindman | Copied data from CD's received from On-Site Sourcing, loaded data and images into litigation data base and performed maintenance checks and searched for missing data. | 1.00 |
| 09/19/02 | Atkinson | ...; organizing documents reviewed by coding group attorneys for storage and production (1.3);... | 4.90 |
| 09/20/02 | Atkinson | ...; copy of memo for K. Hindman (Lit. Sup.) To send to On-Site (.2). | 3.90 |
| 09/25/02 | Atkinson | ...; organizing boxes of documents reviewed and reviewing coding in connection with production (.9);... | 2.10 |
| 09/26/02 | Atkinson | ...; reviewing and organizing boxes of documents from coding group attorneys, review for storage (.9);... | 4.20 |

Exhibit B

| 07/02/02 | Bentz | 1.00 | 300.00 | Reviewing and summarizing news articles on Grace, Libby and Zonolite insulation. |
|---|---|---|---|---|
| 07/25/02 | Bentz | 2.30 | 690.00 | Reviewing and summarizing news articles regarding Grace, Libby and ZAI (.3);. . . |
| 07/26/02 | Flatley | 1.10 | 440.00 | Organizing materials in preparation for Cambridge witness meeting (.90);. . . |
| 07/30/02 | Bentz | 7.20 | 2160.00 | . . . ; reviewing and summarizing recent news articles regarding Grace, Libby and Attic Insulation (.5). |
| 07/31/02 | Bentz | 5.35 | 1605.00 | . . . ; Reviewing and summarizing recent news articles regarding Grace and Libby (.75). |
| 08/08/02 | Flatley | 2.90 | 1160.00 | Reorganizing after Cambridge trip on cost recovery action (.40);....; make arrangements for Denver trip re: cost recovery action (.10). |
| 08/20/02 | Flatley | 2.10 | 840.00 | Plans re: trip to Denver for cost recovery deposition (.10);..... |
| 08/28/02 | Bentz | 3.90 | 1170.00 | .....; reviewing and summarizing news articles on Grace and Libby (1.0). |
| 08/29/02 | Bentz | 2.90 | 870.00 | .....; Summarizing ATSDR supplemental report on liability and news articles re: Libby vermiculite (2.2). |
| 08/31/02 | Cameron | 1.80 | 693.00 | Organize materials for certain asbestos property damage depositions in fraudulent conveyance action that are within my responsibility. |
| 09/18/02 | Bentz | | Reviewing and summarizing news articles on Grace and Libby developments in cost recovery action. | .85 |

Exhibit C

| 07/10/02 | Bentz | .90 | 270.00 | Work on outline and summaries for historical case defense project. |
| 07/12/02 | Bentz | 1.25 | 375.00 | Revise detailed outline for historical case defense project. |
| 07/15/02 | Bentz | .80 | 240.00 | Preparation of add'l outlines in connection with historical case defense project. |
| 07/16/02 | Bentz | 1.60 | 480.00 | Review and revise outlines relating to historical case defense project. |
| 07/17/02 | Bentz | .50 | 150.00 | Revisions to attorneya' work product and emails relating to historical case defense project. |
| 07/25/02 | Bentz | 2.30 | 690.00 | . . . ; preparation of detailed summaries for historical case defense (1.5);. . . |
| 07/29/02 | Bentz | .80 | 240.00 | Correspondence with L. Flatley regarding preparation of outlines for historical case defense (.4);. . . |
| 07/30/02 | Bentz | 7.20 | 2160.00 | Preparation and work on revisions to outline and summaries relating to historical case defense (6.7);. . . |
| 08/01/02 | Bentz | 3.70 | 1110.00 | Preparation of and revisions to Graces's historical case defense attorney work-product project (3.7). |
| 08/02/02 | Bentz | 4.75 | 1425.00 | Work on historical case defense outline and summary (4.25); revising and supplementing outline and summary for meeting with J. Butcher and A. Muha regarding additional tasks necessary for historical case defense attorney work-product project (.5). |
| 08/02/02 | Butcher | .70 | 119.00 | Meeting with J. Bentz and A. Muha re: additional tasks for Grace historical case defense project. |

| 08/02/02 | Muha | 1.40 | 259.00 | Meet with J. Bentz and . Butcher re: additional tasks for Grace historical case defense project (0.7)...... |
| 08/05/02 | Bentz | 1.60 | 480.00 | Continued revision to historical case defense attorney work-product project (1.60). |
| 08/05/02 | Muha | .70 | 129.50 | Review J. Bentz edits to Grace historical case defense outline (.7). |
| 08/06/02 | Bentz | 5.10 | 1530.00 | Preparation of historical case defense attorney work-product project including review and analysis of EPA's historian expert's report on the alleged history of vermiculite and Grace's processing and sales of it. |
| 08/06/02 | Butcher | 3.00 | 510.00 | .....; Revise and draft new sections of Grace historical case defense outline (1.0). |
| 08/07/02 | Butcher | 7.40 | 1258.00 | Revise and draft new sections of Grace historical case defense outline. |
| 08/07/02 | Muha | 7.20 | 1332.00 | Revise and edit portions of Grace historical case defense project outline. |
| 08/08/02 | Butcher | 4.60 | 782.00 | Revise and draft new sections of Grace historical case defense outline. |
| 08/08/02 | Muha | 5.90 | 1091.50 | Revise Grace historical case defense outline, and review and incorporate documents into same. |
| 08/09/02 | Bentz | 1.00 | 300.00 | Review of revised historical case defense (1.0). |
| 08/09/02 | Butcher | 4.80 | 816.00 | Revise new sections of Grace historical case defense outline (3.30);..... |
| 08/09/02 | Muha | 6.70 | 1239.00 | Revise portions of new sections of Grace historical case defense outline. |
| 08/12/02 | Bentz | 1.10 | 330.00 | Review of summaries and reports of |

|            |         |      |         | interviews regarding Grace historical case defense attorney work-product project. |
|------------|---------|------|---------|-----------------------------------------------|
| 08/14/02   | Bentz   | 4.90 | 1470.00 | Continued revisions to preparation of historical case defense (4.0);..... |
| 08/14/02   | Butcher | 2.00 | 340.00  | .....; revise Grace historical case defense outline (1.0). |
| 08/15/02   | Butcher | .30  | 51.00   | Revise Grace historical defense outline. |
| 08/21/02   | Bentz   | .75  | 225.00  | Review and revised work product on historical case defense attorney work-product project (.75). |

<u>Response Exhibit 1</u>

The July 19 conference call regarded a proposed stipulation relating to ZAI in the Debtors' EPA cost-recovery action, and involved discussions of various planning and strategy matters with the Debtors' in-house counsel.  The discussions during this call touched upon issues that fell within the areas of primary responsibility of each Reed Smith attorney that participated in that call, and therefore required each attorney to participate in parts of the call.  Notably, attorneys Flatley and Cameron did not participate in the entire call; they only participated in the segments of the call during which the items within their primary areas of responsibility were discussed.  Attorney Restivo, the lead Reed Smith attorney in this firm's representation of the Debtor, initiated and moderated the call and therefore was present for its entirety.

By way of further explanation of this Inquiry (and Inquiry No. 6), it should again be noted that the necessity of having multiple Reed Smith attorneys occasionally participate in the same meetings, hearings or conference calls stems from the way Reed Smith has structured its representation of the Debtors in their bankruptcy proceedings.  Since 1989, Reed Smith has provided counsel to the Debtors for certain asbestos-related litigation, and several individual Reed Smith attorneys have divided responsibility among themselves for various aspects of those cases. Responsibilities for specific subject areas and segments of the cases have been divided among attorneys Restivo, Flatley, Cameron and Bentz for dealing with, among other things, responsibility over medical issues and experts, industrial hygiene issues and experts, microscopy issues and experts, regulatory issues and experts, Grace's historical documents and witnesses, document production and discovery issues, case-specific claims and facts, and damages.

This division of primary responsibility originally was designed to avoid, and has avoided,

duplication of effort and to allocate direct responsibility for results.  The division of specific primary responsibilities was carried over to Reed Smith's retention as the Debtors' Special Asbestos Product Liability Defense Counsel.  The attendance of multiple Reed Smith professionals at certain meetings, hearings or conference calls has often been necessary when the event in question covers topics within the areas of primary responsibility of more than one Reed Smith professional.  Reed Smith is fully aware of the need to avoid duplication, and it has made—and will continue to make—concentrated efforts to avoid any such duplication, including writing off time prior to the submission of Fee Applications if there is any unnecessary duplication.  As the various Fee Applications reflect, particularly after the early stages of Reed Smith's representation of the Debtors, the overwhelming majority of meetings, hearings and calls have involved only one Reed Smith professional.  Reed Smith has had multiple professionals participate only where doing so was necessary and/or more economical than any alternative staffing plan, and it will continue to follow this policy in the future.

<u>Response Exhibit 2</u>

Upon further review of entries listed on Exhibit A to the Initial Report, Reed Smith asserts that insufficient explanations of those time entries has made it unclear as to the importance, relevance and propriety of these charges.  The entries made by paralegals Maureen L. Atkinson and Carey E. Raytik and by litigation support technician Karen L. Hindman all pertain to work involved in the administration of the document review and production project that Reed Smith has coordinated on behalf of the Debtors since approximately August of 2001.  This project (whose overwhelming size has been detailed for the Fee Auditor by Reed Smith previously) has required Reed Smith to establish an electronic database of the Debtors' millions of pages of documents that are subject to discovery in their bankruptcy related cases.  The project has also required intensive attorney and paralegal efforts to review and code the documents to make the database a functional litigation tool. The entries on Exhibit A that are attributable to Ms. Hindman were for work she did in administering this database; once the Debtors' documents were scanned onto CD-ROM form, it was Ms. Hindman's responsibility to load these materials onto the database, to test the integrity of the materials being loaded, and to run periodic tests to assure the performance of the document database. Ms. Hindman's work thus was integral to the proper operation of one of the chief litigation tools available to Reed Smith in its representation of the Debtors.

Paralegal Atkinson has been responsible for organizing reviewed and coded documents for their inclusion in Reed Smith's litigation archive for this case, and for preparing the documents for production to the Debtors' claimants and other adverse parties.  Of the entries listed on Exhibit A, paralegal Atkinson spent 4.90 hours ($588.00) performing these types of administrative tasks, which have been integral to Reed Smith's coordination of the Debtors' discovery in the ZAI Science Trial

case and to Reed Smith's own preparation of the Debtors' defense in that case. Paralegal Atkinson also spent 4.6 hours ($552.00) printing document images that had been loaded onto the CD-ROMs for other Reed Smith paraprofessionals to review and code; this work, like that of paraprofessional Raytik (.10 hours, $7.50), was required to keep the document review and coding project on schedule when secretaries who otherwise were used to print documents and coding forms were unavailable. Although Reed Smith asserts that all of this work was necessary to the efficient operation of the overall document management project, it will not contest a reduction in its fees in the amount of $559.50, that portion of time paralegals Atkinson and Raytik spent printing document images and coding forms.

The Fee Auditor also listed entries by attorney Keuler (.20 hours, $48.00) and paralegal Lord (.70 hours, $101.50) in Inquiry No. 9 as being of questionable value. Attorney Keuler, as situate in Reed Smith's Wilmington, Delaware office, is the firm's local contact with the Debtors' bankruptcy proceedings, which are administered in the United States Bankruptcy Court for the District of Delaware, also located in Wilmington. As such, attorney Keuler is often the first to receive correspondence from the Court or other correspondence served on Reed Smith by personal delivery; subsequently, he reviews these materials in order to alert the Reed Smith Pittsburgh-based attorneys to any emergency or otherwise material developments in the case. His entry listed on Exhibit A is of that nature.

The entries of paralegal Lord listed on Exhibit A arise from his responsibility for preparing Reed Smith's Fee Applications for electronic filing and service. To the extent that paralegal Lord proofreads and edits notices, fee applications, or other materials for filing, it is to ensure that these materials comply with all of the requirements set forth for electronic filing and service, per the

Bankruptcy Court's Order in this case.  Rather than depicting a general clerical chore, paralegal Lord's entries at issue here were necessary for Reed Smith's compliance with that Order and for its participation in the Fee Application process.

Response Exhibit 3

First, the time entries at issue that were made by attorneys Flatley and Cameron were for time spent in relation to witness interviews and depositions in which each attorney participated. Each of these instances required attorneys Flatley and Cameron to travel outside Pittsburgh. These trips required the attorneys to arrange and organize a large volume of materials to be used in the depositions and interviews prior to their departure, and to review, revise, and otherwise reorganize notes, documents and other materials used at those meetings upon their return to Pittsburgh, particularly because those materials could be used with respect to other meetings, interviews or depositions in the future. Because these attorneys were most familiar with the materials that required review and organization prior to and following the aforementioned meetings, it was most efficient for these attorneys to perform these tasks.

Second, the Fee Auditor also questions several time entries by attorney Bentz that detail his time spent reviewing and summarizing various media reports on the Debtors' bankruptcy proceedings and their alleged asbestos-related liabilities. Attorney Bentz has worked on legal matters on behalf of the Debtors for several years, and during that time has become familiar with those issues that pose the greatest impact upon the Debtors' in their bankruptcy-related proceedings. He has also become familiar with the traditional division of responsibility that Reed Smith has used in representing the Debtors in their asbestos-related litigation (and which is being used in the instant bankruptcy proceeding as well), and thus is in a better position than any other Reed Smith attorney to review media reports on the Debtor's affairs and to summarize from those reports information that falls within each Reed Smith attorney's area of primary responsibility. The reports attorney Bentz drafts are relied upon by the other Reed Smith attorneys to plan and devise strategy in the Debtors'

bankruptcy-related proceedings.

Notably, attorney Bentz does not charge for the full amount of time he spends reviewing and summarizing these media articles; rather, he only charges for that portion of his time during which he reviews, analyzes and summarizes information that is pertinent to Reed Smith's ongoing representation of the Debtors.  In the instant case, while attorney Bentz spent more than 6.60 hours reviewing and analyzing articles that pertained to the Debtors' business and litigation proceedings, his overall time was reduced to that amount—6.60 hours—which he spent reviewing, analyzing and summarizing articles that related to issues with regard to which Reed Smith has counseled the Debtors.

<u>Response Exhibit 4</u>

By way of background, the overall historical defense outline project was a preliminary attempt to research and organize as much information as possible to help counsel in the preparation of a defense of any claims involving attic insulation (a product that has not been the subject of substantial litigation previously), which may arise in any part of the Debtors' bankruptcy cases.  The work included collecting, comparing, and summarizing historical information relating to the production and sale of ZAI and other of the Debtors' vermiculite products over the past fifty years, as well as the preparation of attorney work-product materials intended to help facilitate several tasks required for, *inter alia*, the proposed ZAI science trial.

The historical defense outline project is a substantial attorney work-product project that is important and necessary to Reed Smith's effective representation of the Debtors in all upcoming discovery, trial preparation and/or trials relating to the Debtors' alleged asbestos-related liabilities.  This project has been instrumental in Reed Smith's review and comprehension of the history of the Debtors' vermiculite products lines, especially ZAI, and will enable Reed Smith to effectively combat issues which may arise concerning any and all aspects of the Debtors' products, including (1) the safety of the products themselves, (2) the state of Grace's knowledge of the safety of the products, and (3) the safety of the processes by which the products were manufactured.  It was the determination of Reed Smith, in conjunction with Debtors' in-house counsel and Debtors' bankruptcy counsel, that the most efficient way to grasp this long and heretofore unorganized history was for Reed Smith to compile extensive work-product materials that detail (with direct reference to Grace documents, witness interviews, and various other materials) the Debtors' vermiculite products business.

The Debtors comprise a large industrial organization that had a long history in the business of manufacturing vermiculite products; this organization also has a vast catalog of documents that potentially detail its vermiculite products business history. The historical defense outline project has taken a large amount of time and fees because, unlike for other products that have been the subject of litigation for almost twenty years, nothing of its nature has ever been done before by or on behalf of the Debtors, because it covers such a long period of time and source materials, and because of its comprehensiveness. Without this work, Reed Smith would be unable to provide a full and adequate defense of the Debtors' alleged asbestos-related injury claims. The project was undertaken to provide not only a guide for any actual asbestos-related issue trials themselves, but also (and perhaps more importantly) an invaluable aid for the various discovery and trial preparation tasks the Debtor's counsel will need to accomplish before these trials begin. It also has been used as a reference source on the Debtors' organizational history by the Debtors' in-house counsel and the other counsel retained by the Debtors' in their bankruptcy-related proceedings.

The charges listed on Exhibit C of the Initial Report were incurred as attorneys Bentz, Butcher and Muha were completing the fact-intensive historical defense outline. Attorneys Butcher and Muha were responsible for reviewing documents, interviews and other materials, and for drafting the actual outline, whereas attorney Bentz supervised these activities and then made the final revisions to the outline before it was shared with the Debtors' in-house and other outside counsel. Substantial time was spent during the Sixth Interim Period reviewing multiple boxes of documents that had recently been discovered to be relevant to the Debtors' historical vermiculite operations; thus, additional time was thereafter required to add information from these documents into the outline. Furthermore, work on this project was accelerated during the Sixth Interim Period due to

developments in the scheduling of the Debtors' fraudulent conveyance trial, as well as on the elevated pace of discovery in the ZAI Science Trial case.  In both cases, the outline was relied upon heavily by counsel as a key litigation and discovery preparation tool.  The outline was completed in August 2002, and barring the discovery of any additional documents that were not reviewed by the Debtors' counsel which could be material to its bankruptcy-related cases, no further significant charges should be incurred by Reed Smith in relation to the historical defense outline project.