# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | **Chapter 11** |
| | § | |
| **W.R. GRACE & CO., et al.,** | § | **Jointly Administered** |
| | § | **Case No. 01-01139 (JKF)** |
| **Debtors.** | § | |
| | § | |

## FEE AUDITOR'S FINAL REPORT REGARDING
## FEE APPLICATION OF BANKRUPTCY MANAGEMENT CORPORATION
## <u>FOR THE SEVENTH INTERIM PERIOD</u>

This is the final report of Warren H. Smith & Associates, P.C. ("Smith"), acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the <u>Interim Fee Application of Bankruptcy Management Corporation for the Seventh Interim Period</u> (the "Application").

## BACKGROUND

1.      Bankruptcy Management Corporation (BMC) was retained as Claims Reconciliation and Solicitation Consultant  to the Debtors.  In the Application, BMC seeks approval of fees totaling $451,915.50 and costs totaling $29,969.83 for its services from April 1, 2002, through December 31, 2002[1].

2.      In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time entries included in the

---

[1]Because BMC did not submit an application in the Fifth Interim (April-June, 2002) or in the Sixth Interim (July-September, 2002), we have reviewed those periods here along with submissions for the Seventh Interim (October-December, 2002), and treated them in toto as a single application.

exhibits to the Application, for compliance with 11 U.S.C. § 330, Local Rule 2016-2 of the Local Rules

of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2001,

and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement

of Expenses Filed Under 11 U.S.C. 330, Issued January 30, 1996, (the "Guidelines"), as well as for

consistency with precedent established in the United States Bankruptcy Court for the District of Delaware,

the United States District Court for the District of Delaware, and the Third Circuit Court of Appeals.  We

served on BMC an initial report based on our review and received a response from BMC, portions of

which response are quoted herein.

## DISCUSSION

### General Issues

3.      In our initial report, we noted that the Application was generally adequately detailed and

devoid of lumping.

### Specific Time and Expense Entries

4.      In our initial report, we noted that from September 3 through September 6, 2002,

Hasenzahl ($275) and Herrschaft ($185) spent a total of 24.3 hours for $5,404.50 preparing for and

attending the same meeting.  The entries are provided below.

| | | | | | |
|---|---|---|---|---|---|
| HASENZAHL | $275.00 | 9/3/2002 | 0.2 | $55.00 | Review J Baer outline of claims reconciliation meeting content |
| HASENZAHL | $275.00 | 9/3/2002 | 0.4 | $110.00 | Prep corresp to J Baer re agenda for client meeting |
| HERRSCHAFT | $185.00 | 9/4/2002 | 3.0 | $555.00 | Further preparation for 9/6 client meeting. |

| HERRSCHAFT | $185.00 | 9/4/2002 | 4.0 | $740.00 | Prepare for 9/6 meeting with client |
|---|---|---|---|---|---|
| HERRSCHAFT | $185.00 | 9/4/2002 | 1.2 | $222.00 | Meet w/Julia re: 9/6 meeting w/Grace & counsel |
| HASENZAHL | $275.00 | 9/5/2002 | 3.0 | $825.00 | Prep for meeting (objection process, rec process, objection types, claim review instructions etc.) |
| HERRSCHAFT | $185.00 | 9/6/2002 | 6.0 | $1,110.00 | Meeting w/Grace officers and counsel, Kirkland & Ellis, J. Hasenzahl in Columbia MD re: claims reconciliation process and claim forms for medical monitoring/property damage claims |
| HASENZAHL | $275.00 | 9/6/2002 | 2.5 | $687.50 | Claims reconciliation meeting (at Columbia Grace Facility) |
| HASENZAHL | $275.00 | 9/6/2002 | 4.0 | $1,100.00 | Claims reconciliation meeting (at Columbia Grace Facility) |

Rule 2016-2(d)(ix) states, "The activity descriptions shall individually identify all meetings and hearings, each participant, the subject(s) of the meeting or hearing, and the participant's role."

Further, Paragraph II.D.5. of the Guidelines states, ". . .[i]f more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees." We asked BMC to explain why it was necessary for both to prepare for and attend this meeting, as well as addressing the specific role of each professional in the meeting. BMC responded as follows:

> The meeting on September 6th involved at least 12 executives at WR Grace and two attorneys from Kirkland & Ellis. The purpose of the meeting was to provide an overview of the claims process (claims receipt, docketing, and claims objection through distribution),

identification of claims teams to support non-asbestos and asbestos reconciliation, review claim and objection types specific to WR Grace, identify client specific claims issues, provide sample liability and claim reporting, review reports and identify WR Grace specific reporting requirements, and meet with claim team leads to review sample claims for each claim type.

_____The scope of this meeting required considerable preparation of explanatory materials, sample reports, review of claims and case specific issues. Due to the voluminous amount of materials required, it necessitated the participation of both Hasenzahl and Herrschaft to prepare for and present the materials at the meeting. Further, because this meeting established the foundation for considerable efforts by both BMC and WR Grace with respect to the claims process as a whole, it required the attendance of the multiple key personnel responsible for the process from the Debtors, counsel and.

We appreciate BMC's response and have no objection to these fees.

5.      In our initial report, we noted that on October 8, 2002, Hasenzahl ($275) billed 2.0 hours for $550.00 for a paralegal training meeting. The entry is shown below.

| HASENZAHL | $275.00 | 10/8/2002 | 2.0 | $550.00 | Meeting at K&E Chicago office to train Paralegals in b-Linx and provide overview of claims processing and review to date |
|-----------|---------|-----------|-----|---------|---------|

We view training as a normal overhead item and therefore not reimbursable. Like recruitment, it is an inherent cost of doing business. We realize that in this instance the waters are a little muddied, since BMC appears to be training K&E personnel in a particular and specialized area. However, while it is arguable which firm should absorb the training cost, BMC or K&E, we are not convinced that the bankruptcy estate should be responsible for this training. We asked BMC to explain why this time should be billable to the estate. BMC's response is provided below.

BMC uses a proprietary database application to manage claims reconciliation. The application allows counsel to review claims data, reconciliation notes, and objection information, providing a cost effective way for individuals (the debtor and counsel) in different locations to collaborate on casework.

_____In the WR Grace case, BMC has performed extensive customization and revision of the application to accommodate WR Grace case specific issues, which customization has been at both the request of the Debtors and counsel. Such customization of the application includes a specific request regarding the data associated with the complex asbestos claims. While BMC and Kirkland & Ellis have worked together using this tool on other engagements, the customization of the system to accommodate WR Grace case specific issues necessitated limited "training" and a review of the additional data being tracked and reporting options. Since the customization of the application was done at the Debtors and counsel's request, BMC believes that the estate should bear the cost of the training associated with the revised application. Further, as set forth in Item 9 below, BMC attempted to minimize costs associated with this trip by combining this trip to Chicago with another, unrelated case, and only requesting reimbursement of the one additional night's stay related to the meeting at K&E. Based thereon, BMC requests the approval of the fees in Item 5 and the associated costs in Item 9.

We appreciate BMC's response, and given that the system's customization was specific to the W.R. Grace case, we are convinced that this "training" was justified. We have no objection to these fees.    6    .

In our initial report, we noted two entries by Herrschaft ($185) dated October 18 and October 22, 2002, dealing with research regarding fraudulent conveyance. The time spent was 2.3 hours for $425.50. The entries are provided below.

| HERRSCHAFT | $185.00 | 10/18/2002 | 1.5 | $277.50 | Research re fraudulent conveyance |
| HERRSCHAFT | $185.00 | 10/22/2002 | 0.8 | $148.00 | Research re fraudulent conveyance/COLIs |

On July 10, 2002, Judge Wolin entered an order dealing with the Sealed Air fraudulent transfer litigation fees in which he withdrew his reference of that matter from the bankruptcy court, requiring District Court

approval for all fees involved in said litigation matters.    We asked BMC to explain why fees for matters regarding fraudulent conveyance would still be billed for consideration in this bankruptcy court more than three months after Judge Wolin's order was entered.  BMC responded as follows:

> BMC was not apprised of the transfer of the fraudulent conveyance actions to the District Court.  However, BMC believes that these entries should be included in the fees approved by the Bankruptcy Court as they relate to claims and potential claims against the estate pursuant to discussions held with the Debtor regarding fraudulent conveyance and COLI issues.  The description provided does not adequately describe the relationship to claims and potential claims researched by BMC.  The research time expended by BMC with respect to fraudulent conveyance and COLI actions was to obtain an understanding of the parties involved and the form a claim may take with respect to the identification and reconciliation of any such claims filed in the cases.  Since the time expended related to specific types of claims filed, which happened to encompass fraudulent conveyance and COLI, and their effect upon the claims process, as opposed to litigation in the fraudulent conveyance actions, BMC believes that its time is correctly reviewable by the Bankruptcy Court.

We accept BMC's response and have no objection to these fees.

       7.      In our initial report, we noted seven (7) entries by Cohen ($100) dated from October 15 through October 18, 2002, for a continuing review that is seemingly clerical in nature and therefore not compensable.  The total time spent was 18.7 hours for $1,870.00.  The entries are provided below.

| COHEN | $100.00 | 10/15/2002 | 3.8 | $380.00 | Review claims list to update those amended or duplicated (15,144 total - job not completed) |
| COHEN | $100.00 | 10/15/2002 | 4.0 | $400.00 | Review claims list to update those amended or duplicated (15,144 total - job not completed) |
| COHEN | $100.00 | 10/16/2002 | 2.7 | $270.00 | Review claims list to update those amended or duplicated |

|  |  |  |  |  | (15,144 total - job not completed) |
|--|--|--|--|--|--|
| COHEN | $100.00 | 10/16/2002 | 3.7 | $370.00 | Review claims list to update those amended or duplicated (15,144 total - job not completed) |
| COHEN | $100.00 | 10/17/2002 | 2.8 | $280.00 | Review claims list to update those amended or duplicated (15,144 total - job not completed) |
| COHEN | $100.00 | 10/17/2002 | 1.3 | $130.00 | Review claims list to update those amended or duplicated (15,144 total - job not completed) |
| COHEN | $100.00 | 10/18/2002 | 0.4 | $ 40.00 | Review claims list to update those amended or duplicated (15,144 total - job not completed) |

Paragraph, II. E. 7. of the Guidelines states, "[f]actors relevant to a determination that the expense is proper include the following: . . Whether the expenses appear to be in the nature of nonreimbursable overhead . . . Overhead includes word processing, proofreading, secretarial and other clerical services, . . ." For the entries cited, we asked BMC to explain the training and expertise required to perform these tasks that would separate them from normal clerical duties. BMC's response is provided below.

> The description of the time associated with this task should have been better described, as it requires the expertise of BMC personnel who are non-clerical in nature, and the task in and of itself is not an overhead expense. The current description does not provide an adequate description of the complexity of the assignment. Essentially, this assignment was comprised of a detailed analysis, in a one week period, of the 15,144 claims submitted in the WR Grace cases, along with all their supporting documentation, to identify duplicate and amended claims, flag claims for other objections, and record comprehensive notes for

further claims review. This analysis is an integral part of the claims process as a whole, and the claims process cannot go forward in an efficient manner unless this review has been completed by personnel with the knowledge and experience to properly analyze the claims and their supporting documentation.

BMC personnel who perform this type of detailed analysis have an intimate knowledge of the accounts payable process, and have been trained and have expertise in the claims submission process, the rules for identifying duplicate and/or amended claims, the types of other claims objections and their definitions, and the application of the objections to the claims submitted. Therefore, BMC requests that the Examiner approve the fees associated with these services, and BMC will make every attempt in the future to more adequately describe tasks of this nature.

We appreciate BMC's response and have no objection to these fees.

8.      We also noted that from December 27 through December 31, 2002, Herrschaft ($185.00) and Cohen ($100) billed 59.5 hours for $9,426.50 for analyzing a potential amendments report. The fee detail reflects essentially the same language for 12 consecutive entries. See Exhibit A. Paragraph, I.E. of the Guidelines states, ". . . [i]n evaluating fees for professional services, it is relevant to consider . . . whether services were performed within a reasonable time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; . . ." We asked BMC to explain how Herrschaft's work differed from Cohen's in the cited entries, and (a) why the lower-billing employee could not have performed all of the tasks, or (b) why the higher-billing employee did not lower her billing rate for performing this work. BMC responded as follows:

Again, the description of the time associated with this task should have been better by BMC. It does not adequately describe this assignment, which involved an extremely complex and time-consuming process for identifying and filing Schedule F amendments. To complete this process, it was necessary to manually compare originally scheduled invoices to WR Grace's current open accounts payable (over 10,000 individual invoices). Analysis of invoices was completed on two different levels. Because of her accounting background, Herrschaft oversaw the creation of the reports used to make the comparison

to assure the required criteria were met. She then supervised and directed Cohen, who performed the one-to-one invoice comparison and verification against the Herrschaft reports. Herrschaft then confirmed the results of this process with WR Grace's controller and reviewed, compiled and oversaw the creation of the Schedule F amendment reports. As a result of their joint effort, over 2800 amended and supplemental Schedule F's were filed as a result of this process. Therefore, since neither Ms. Herrschaft nor Ms. Cohen rendered services duplicative of each other, BMC requests the Examiner approve these fees, and Ms. Herrschaft will provide greater detail in her future descriptions to adequately describe her time so that it cannot be confused with services provided by a lesser billing employee.

We appreciate BMC's response and have no objection to these fees.

9.     In our initial report, we noted a hotel expense of $241.01 for Hasenzahl on October 7, 2002, in connection with the K&E paralegal training detailed in paragraph #5 of this report. The entry is provided below.

| 10/7/02 | Hasenzahl | Lodging | $241.01 | Chicago, hotel - extra day to go to KE for Grace |
|---------|-----------|---------|---------|--------------------------------------------------|

If the fees for this training are not compensable, then it follows that the associative expenses could not be reimbursable. In addressing why the fees should be compensable, we asked BMC also to explain why this expense should be allowed. The response is provided below.

In order to provide the case specific claims application review explained in response to item 5, Hasenzahl met with Kirkland & Ellis in their Chicago office. As part of our ongoing effort to manage expenses, Hasenzahl scheduled the meeting at Kirkland & Ellis while in Chicago on another matter, minimizing the cost by only incurring lodging expenses for an additional night stay, rather than also incurring air travel expenses. Based upon the response provided in item 5, and the minimization of the expenses by combining this trip with another on an unrelated case, BMC requests that the expense be allowed.

We appreciate the response and have no objection to this expense.

10.     We further noted a hotel expense of $294.80 for Herrschaft on November, 14, 2002, which we believe to be excessive.  The entry is provided below.

11/14/02        zzCorpAMEX_SH        Lodging        $294.80        Lodging in Cambridge

Paragraph II.E.1.of the Guidelines states, ". . .[f]actors relevant to a determination that the expense is proper include the following: 1.  Whether the expense is reasonable and economical.  For example, first class and other luxurious travel mode or accommodations will normally be objectionable."  We believe $250.00 per night to be a reasonable ceiling for hotel charges in most cities.  We asked BMC to explain why this hotel charge should not be viewed as excessive.  BMC responded as follows:

> When traveling to a client site, it is customary for BMC personnel to stay at hotels recommended by the client.  In this case, the hotel in question was identified by WR Grace as the recommended area hotel; since BMC had no experience with hotels in this area, BMC used the client recommended hotel.  It appears that WR Grace uses this hotel regularly, as other WR Grace attendees were also lodged at the hotel during the same time as Ms. Herrschaft.  Based upon the recommendation of the hotel in question by the Debtors, BMC requests that the expenses be allowed.

We appreciate BMC's response, and we agree that the position taken in it has merit.  However, we still maintain that $250.00 per night is a reasonable ceiling for hotel expense.  We therefore recommend a reduction of $44.80 in costs.

## CONCLUSION

11.     Thus, we recommend approval of fees totaling $451,915.50 and costs totaling $29,925.03 ($29,969.83 minus $44.80) for BMC's services from April 1, 2002, through December 31, 2002.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By: _____
        Warren H. Smith
        Texas State Bar No. 18757050

Republic Center
325 N. St. Paul, Suite 4080
Dallas, Texas  75201
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 14th day of April, 2003.

_____
        Warren H. Smith

## SERVICE LIST
<u>Notice Parties</u>

**The Applicant**

Sean A. Allen, President
6096 Upland Terrace South
Seattle, Washington 98118

**The Debtors**

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones, P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of
Unsecured Creditors**

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.

Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of
Property Damage Claimants**

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price &
Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph,Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of
Personal Injury Claimants**

Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Marla R. Eskin
Campbell & Levine, LLC
Suite 300
800 N. King Street
Wilmington, DE 19801

**Official Committee of Equity Holders**

Thomas M. Mayer, Esq.                              Wilmington, DE 19801
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022


Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**

Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311

Exhibit A

| | | | | | |
|---|---|---|---|---|---|
| HERRSCHAFT | $185.00 | 12/27/2002 | 11.5 | $2,127.50 | Analyze potential amendments report to identify and investigate mismatched invoices and vendors |
| COHEN | $100.00 | 12/27/2002 | 4.0 | $400.00 | Analyze potential amendments report to identify and investigate mismatched invoices and vendors |
| HERRSCHAFT | $185.00 | 12/28/2002 | 4.5 | $832.50 | Analyze potential amendments report to identify mismatched invoices and vendors |
| HERRSCHAFT | $185.00 | 12/29/2002 | 5.0 | $925.00 | Analyze potential amendments report to identify mismatched invoices and vendors |
| COHEN | $100.00 | 12/30/2002 | 1.6 | $160.00 | Analyze potential amendments report to identify and investigate mismatched invoices and vendors |
| COHEN | $100.00 | 12/30/2002 | 1.5 | $150.00 | Analyze potential amendments report to identify and investigate mismatched invoices and vendors |
| COHEN | $100.00 | 12/30/2002 | 1.5 | $150.00 | Analyze potential amendments report to identify and investigate mismatched invoices |

| | | | | | and vendors |
|---|---|---|---|---|---|
| HERRSCHAFT | $185.00 | 12/30/2002 | 12.2 | $2,257.50 | Analyze potential amendments report to identify various grouping scenarios |
| COHEN | $100.00 | 12/30/2002 | 4.0 | $400.00 | Analyze potential amendments report to identify and investigate mismatched invoices and vendors |
| COHEN | $100.00 | 12/31/2002 | 4.0 | $400.00 | Analyze potential amendments report to identify and investigate mismatched invoices and vendors |
| COHEN | $100.00 | 12/31/2002 | 2.0 | $200.00 | Analyze potential amendments report to identify and investigate mismatched invoices and vendors |
| HERRSCHAFT | $185.00 | 12/28/2002 | 7.7 | $1,424.50 | Analyze potential amendments report to identify mismatched invoices and vendors |