# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[i] | ) | Case No. 01-1139 (JKF) |
| Debtors | ) | (Jointly Administered) |

**AFFIDAVIT OF LARRY D. ISHOL IN SUPPORT OF THE APPLICATION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a) AND FED. R. BANKR. P. 2014(a), 2016 AND 5002 AUTHORIZING THE EMPLOYMENT AND RETENTION OF DELOITTE & TOUCHE LLP AS CUSTOMS SERVICES PROVIDERS, AND TAX AND COMPENSATION ADVISORS TO THE DEBTORS *NUNC PRO TUNC* TO FEBRUARY 4, 2003**

Larry D. Ishol, being duly sworn, deposes and says:

1.      I am a member of the firm of Deloitte & Touche LLP (hereinafter "Deloitte"), which has an office located at 1750 Tysons Boulevard, McLean, Virginia

---

[i]   Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch

22102-4219. I make this affidavit (this "Affidavit") of my personal knowledge based upon inquiries made by myself or on my behalf in support of the Application (the "Application") for Entry of an Order Pursuant to U.S.C. §§ 327(a) and 328(a) and Fed. Bankr. P. 2014(a), 2016 and 5002 Authorizing the Employment and Retention of Deloitte & Touche LLP as Customs Services Providers, and Tax and Compensation Advisors to the Debtors *Nunc Pro Tunc* to February 4, 2002.

2.      On April 2, 2001 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") and such cases have been ordered jointly administered. The Debtors continue to be authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors desire to retain and employ Deloitte to provide certain (a) customs procedures review and compliance services, including without limitation, services pertaining to assisting the Debtors with the upcoming Focused Assessment to be conducted by the United States Customs Service (the "Customs Services"), (b) tax services, including without limitation, services pertaining to assisting the Debtors by consulting on various corporate and sales tax issues, and in reviewing and analyzing the tax implications of various inter-company transactions (the "Tax Services"), and (c) compensation and benefits services, including without limitation, services pertaining to assisting the Debtors in reviewing and analyzing their current employee retention and incentive programs, and in developing new employee retention and incentive programs (the "Compensation Services"), in each case, as the Debtors may from time to time

---

West Coal Company, H-G Coal Company.

request and as agreed to by Deloitte. The foregoing services shall collectively hereinafter be referred to as the "Deloitte Services".

4.     The Debtors and Deloitte have entered into (a) the engagement letter dated April 14, 2003 pertaining to Deloitte's provision of the Customs Services which is attached hereto as Exhibit A and incorporated herein, (b) the engagement letter dated April 8, 2003 pertaining to Deloitte's provision of the Tax Services which is attached hereto as Exhibit B and incorporated herein, and (c) the engagement letter dated March 14, 2003 pertaining to Deloitte's provision of the Compensation Services which is attached as Exhibit C hereto and incorporated herein.

5.     Deloitte had previously been authorized as an ordinary course services provider to the Debtors in these Chapter 11 cases. In this capacity, Deloitte performed certain compensation plan implementation, tax advisory, and SAP environment control services (the "OCP Services"). The Debtors have subsequently requested that Deloitte expand its scope of services. Deloitte believes such expanded scope of services requires approval pursuant to the Application, and that such services are beyond the scope of Deloitte's ordinary course retention in these Chapter 11 cases. The OCP Services where completed on or about January 15, 2003, prior the date for which Deloitte's *nunc pro tunc* retention is sought. Deloitte incurred fees totaling approximately $191,000 in connection with its provision of the OCP Services and is seeking compensation from the Debtors for such fees in accordance with the Court's orders governing the compensation of ordinary course professionals in these Chapter 11 cases.

6.     Certain professionals who were formerly associated with Arthur Andersen, LLP ("Andersen") have joined Deloitte. While at Andersen, certain of these

3

professionals worked on matters pertaining to the Debtors. It is anticipated that certain of these professionals will provide services to the Debtors on behalf of Deloitte in these Chapter 11 cases. However, the services that Deloitte anticipates providing to the Debtors in these Chapter 11 cases (a) will be new engagements pursuant to separate new engagement letters entered into between the Debtors and Deloitte, and (b) will not be a continuation of the Andersen services, but will commence as of the dates authorized by this Court.

QUALIFICATIONS OF DELOITTE

7.      Deloitte is one of the country's leading professional services firms with approximately 100 offices nationwide and has considerable experience in providing clients, both in and out of bankruptcy, with the scope of services it anticipates providing to the Debtors in these Chapter 11 cases. Because of Deloitte's (a) experience and knowledge in providing services of the nature for which Deloitte's retention is sought in these Chapter 11 cases, and (b) familiarity with the Debtors' business and affairs, in part as a result of Deloitte's performance of the OCP Services, Deloitte is uniquely qualified to serve the Debtors in these Chapter 11 cases in an efficient and cost-effective manner.

8.      All services that Deloitte will provide to the Debtors will be at the request of the Debtors and appropriately directed by the Debtors so as to avoid duplicative efforts among other professionals retained in these Chapter 11 cases.

DISINTERESTEDNESS OF DELOITTE

9.      Except as set forth herein or as set forth on Attachment A attached hereto, to my knowledge based on reasonable inquiry, (a) Deloitte, and the partners, principals, and directors of Deloitte that are anticipated to provide the services for which Deloitte is

4

to be retained in these Chapter 11 cases (the "Deloitte Partners/Directors"), and the employees of Deloitte who are anticipated to provide such services, do not hold or represent any interest adverse to any of the Debtors with respect to the matters on which Deloitte is to be retained in these Chapter 11 cases, and (b) Deloitte and the Deloitte Partners/Directors have no relationship to the Debtors, the Debtors' significant creditors, or other parties-in-interest in these Chapter 11 cases, or to the Debtors' attorneys that are known to be assisting the Debtors in these Chapter 11 cases, except as described herein or as set forth on Attachment A.

10. From time to time, Deloitte and its affiliates have provided services, currently provide or may currently provide services, and likely will continue to provide services, to certain creditors of the Debtors and various other parties potentially adverse to the Debtors in matters unrelated to these Chapter 11 cases. As described below, however, Deloitte has undertaken an internal search to determine whether it is or has been employed by or had other relationships with any entities that were listed on schedules provided to Deloitte by the Debtors in connection with these Chapter 11 cases. As noted herein, certain of these creditors, other parties-in-interest, attorneys, or accountants have or may have provided goods or services to, currently provide or may currently provide goods or services to, and may in the future provide goods or services to Deloitte and its affiliates and the Deloitte Partners/Directors in matters unrelated to these Chapter 11 cases.

11. To check upon and disclose possible relationships with parties-in-interest in these Chapter 11 cases, Deloitte researched its internal client databases and performed reasonable due diligence to determine whether it had any relationships with the entities

5

that were listed on schedules provided to Deloitte by the Debtors in connection with these Chapter 11 cases, which included the following:

- The Debtors and their affiliates;
- The Debtors' twenty largest unsecured creditors;
- The Debtors' secured creditors and other lenders, including bank lenders;
- Law firms anticipated to assist the Debtors in the these Chapter 11 cases; and
- The Debtors' key personnel, including its officers and directors.

Despite the efforts described above to identify and disclose Deloitte's connections with the parties-in-interest in these Chapter 11 cases, because Deloitte is a nationwide firm with tens of thousands of employees, and because the Debtors are a large enterprise, Deloitte is unable to state with certainty that every client relationship or other connection has been disclosed. In this regard, if Deloitte discovers additional material information that it determines requires disclosure, it will file a supplemental disclosure promptly with this Court.

12.   From this internal search, Deloitte has determined that certain relationships should be disclosed as follows:

a.   Deloitte provides services in matters unrelated to these Chapter 11 cases to certain of the Debtors' twenty largest unsecured creditors and other affiliated entities listed on Attachment A. Deloitte will not serve the aforementioned entities in these Chapter 11 cases.

b.   Deloitte has provided, may currently provide and may in the future provide services to Kirkland & Ellis, Latham and Watkins, and Stroock & Stroock & Lavan LLP, and each of the foregoing has provided, may currently provide, and may in the future provide legal services to Deloitte or to its affiliated entities, in each case, in matters unrelated to these Chapter 11 cases.

c.   Bank of America, N.A. ("Bank of America"), Barclays Bank PLC, Citigroup, Inc., HSBC Bank, JP Morgan Chase ("JP Morgan"), and Wachovia Corporation or their respective affiliates of the foregoing have been identified by the Debtors as parties-in-interest in these Chapter 11 cases. Bank of America is a significant lender to Deloitte or its affiliates

6

or to their respective members.    The other entities listed in this subparagraph (c) also have lending relationships with Deloitte or its affiliates or their respective members.

d.   JP Morgan or affiliates are significant clients of Deloitte's affiliate Deloitte Consulting L.P. for which Deloitte Consulting L.P. provides a variety of services in matters unrelated to these Chapter 11 cases.

e.   Prior to Deloitte's provision of any services to the Debtors in these Chapter 11 cases, Deloitte was approached by certain parties concerning a potential litigation services engagement in a matter potentially adverse to the Debtors (the "Litigation Services").  Deloitte engaged in preliminary high-level discussions with such parties regarding Deloitte's possible provision of these services.   During the course of these preliminary discussions certain information, including certain information that may not have been publicly available, regarding the Litigation Services was provided to Deloitte.   Deloitte declined the potential engagement to provide the Litigation Services on or about May 25, 2002 and, accordingly, was never retained to provide any such services.  Deloitte thereupon returned all written information provided to it pertaining to Deloitte's potential provision of the Litigation Services.

Further, no member of the engagement teams anticipated to provide services on the engagements for which Deloitte is seeking retention in these Chapter 11 cases was involved in discussions regarding the potential provision of the Litigation Services; and none of the Deloitte personnel involved in discussions regarding the potential provision of the Litigation Services have provided, are currently providing, or are anticipated to provide services to the Debtors as part of the engagement teams on the engagements for which Deloitte is seeking retention in these Chapter 11 cases. Deloitte will maintain its customary ethical wall and confidentiality safeguards with respect to its provision of services to the Debtors in these Chapter 11 cases.

13.   Deloitte provided no services to the Debtors prior to the Petition Date and I am not aware of any pre-petition claims held against the Debtors by Deloitte.  Further, Deloitte has received no retainers from the Debtors in respect of any services it may in the future provide to the Debtors. Except as may be disclosed herein, to the best of my knowledge, Deloitte and the Deloitte Partners/Directors do not hold or represent any interest adverse to the Debtors, and I believe that Deloitte and the Deloitte Partners/Directors are "disinterested persons" as that term is defined in Section 101(14)

of the Bankruptcy Code, as modified by Section 1107(b) of the Bankruptcy Code.

### NUNC PRO TUNC RETENTION OF DELOITTE

14.    Because (a) the Debtors required Deloitte's immediate assistance in connection with the performance of certain of the Deloitte Services, and (b) the Debtors believed that it would have been potentially detrimental to the Debtors' estates and to the creditors if work on such services did not commence prior to this Court's approval of Deloitte's retention to serve the Debtors in these Chapter 11 cases, Deloitte agreed to commence performing such services for the Debtors with the expectation that Deloitte's retention would be granted on a *nunc pro tunc* basis.  Deloitte's provision of the Tax Services commenced on or about February 4, 2003 (the date from which Deloitte's *nunc pro tunc* retention is sought), Deloitte' provision of the Compensation Services commenced on or about March 24, 2003, and Deloitte anticipates commencing the provision of the Customs Services on or about the date of the filing of the Application. Accordingly, subject to this Court's approval, Deloitte intends to seek compensation for its performance of the Deloitte Services, in addition to reimbursement for reasonable expenses incurred in connection therewith, *nunc pro tunc* to February 4, 2003.

### COMPENSATION

15.    Deloitte will charge hourly billing rates in performing services to the Debtors in these Chapter 11 cases.  The range of hourly billing rates are as follows:

| *Staff Classification* | *Hourly Billing Rate* |
|---|---|
| *Partner/Principal/Director* | *$350-$660  per hour* |
| *Senior Manager* | *$250-$550   per hour* |

8

| | | |
|---|---|---|
| *Manager* | *$180-$430* | *per hour* |
| *Senior Accountants/Consultants* | *$135-$340* | *per hour* |
| *Staff Accountants/Consultants* | *$100-$180* | *per hour* |

16.     The range of hourly billing rates reflects, among other things, differences in experience levels within classifications, geographic differentials and differences between types of services being provided.  In the normal course of business, Deloitte revises its regular hourly billing rates to reflect changes in responsibilities, increased experience, and increased costs of doing business.  Accordingly, Deloitte requests that the aforementioned rates be revised to the hourly billing rates that will be in effect from time to time.  Changes in regular hourly billing rates will be noted on the invoices for the first time period in which the revised rates became effective.

17.     Deloitte will seek compensation and reimbursement of expenses in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules and any orders of this Court, including without limitation, the Administrative Order Under 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members, dated May 3, 2001, effective as of April 2, 2001.

18.     Deloitte requests that it be permitted to submit monthly statements for the services rendered to the Debtors in these Chapter 11 cases and expenses incurred in connection therewith. Such statements will contain reasonable detail consistent with any rules, guidelines, and/or administrative orders promulgated by this Court that apply to the compensation of professionals these Chapter 11 cases.  Deloitte requests that theses statements, after appropriate review, be paid in a manner consistent with the payment of

9

other retained professionals in this matter, consistent with any administrative orders, if any, that would apply to interim payments.

20.     All payments rendered in connection with Deloitte's services rendered to the Debtors in these Chapter 11 cases must be approved by this Court and based upon the filing by Deloitte of appropriate monthly fee statements, and interim and final fee applications for allowance of compensation and reimbursement of expenses.

21.     Deloitte has received no promises regarding compensation in these Chapter 11 cases other than in accordance with the Bankruptcy Code and as set forth in this Affidavit. Deloitte has no agreement with any nonaffiliated entity to share any compensation earned in these Chapter 11 cases.

Dated: April *18*, 2003

By: _____

Larry D Ishol
Partner

Sworn to and subscribed before me, a notary public for the State of

*Pennsylvania* County of *Philadelphia* this *18* day of April, 2003.

_____
Notary Public

NOTARIAL SEAL
Maryann E. Chew, Notary Public
City of Phila., Philadelphia County
My commission expires October 9, 2005

11

## Exhibit A

## Customs Engagement Letter

Deloitte & Touche LLP
200 East Randolph Street
Chicago, Illinois 60601-7002

Tel:(312) 946-3000
Fax:(312) 946-2600
www.deloitte.com

**Deloitte**
**&Touche**

April 14, 2003

Ms. Dana Guzzo
Director, Internal Audit
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

Dear Ms. Guzzo:

Deloitte & Touche ("Deloitte" or "D&T") is pleased to offer this proposal to assist W.R. Grace & Co. ("Grace") with its upcoming Focused Assessment ("FA"). Upon your acceptance hereof, this proposal will serve as the engagement letter between Deloitte and Grace with respect to Deloitte's provision of the services described herein.

On April 2, 2002, Grace filed in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As a result, Grace is now operating as Debtor-in-Possession. Grace has requested that Deloitte perform FA services described herein and Deloitte has agreed to perform such services, subject to the terms and conditions of this engagement letter. This engagement letter, and Deloitte's obligations and responsibilities relating to this engagement, shall be effective as of April 14, 2003 subject to obtaining Bankruptcy Court approval in the matter *In re W.R. Grace & Co., et al.* (the "Case"); provided, however, that, in addition to Deloitte's other rights or remedies, Deloitte may, in its sole discretion and without any liability arising therefrom, terminate this engagement in the event that (a) a third party objects or threatens to object, or Deloitte reasonably believes that a third party may object, in the form of an objection or otherwise, to Deloitte's retention by Grace in the Case on the terms and conditions set forth in this engagement letter, or (b) a final order authorizing the employment of Deloitte to provide the FA services described herein for Grace is not issued by the Bankruptcy Court in the Case on or before sixty (60) days from the date hereof on the terms and conditions set forth herein or on such other terms and conditions as are satisfactory to Deloitte, or (c) the application of Grace seeking such order is denied by the Bankruptcy Court in the Case. In such event, Grace hereby agrees to withdraw or amend, promptly upon Deloitte's request, any application filed or to be filed with the Bankruptcy Court to retain Deloitte's services in the Case.

As we discussed earlier this week, a FA uses risk-management principles to focus on key areas of common errors committed by importers.

During the first phase of an FA, known as the "Pre-Assessment Survey" phase, the United States Customs Service (the "Customs Service") reviews the "internal controls" of the importer, whereby the importer's strengths and weaknesses in relation to customs processes are identified through interviews and document review.[1] The Customs Service will seek to determine an importer's weaknesses in the following key areas: ordering and purchasing foreign merchandise, receiving foreign merchandise, recording receipt in

---

[1]  The Customs Services' definition of the term "internal control" is "a process in put in place by managers and others to provide reasonable assurance that: (1) operations are effective and efficient, (2) financial reporting is reliable, and (3) laws and regulations are complied with."

Deloitte
Touche
Tohmatsu

[3] The civil penalty statute, 19 U.S.C. § 1592, provides penalties for fraud, gross negligence, and negligence ranging from two times the "loss of revenue," i.e., duties) up to the domestic value of the shipment.

Page 2

Ms. Dana Guzzo

April 14, 2003

inventory, declaring merchandise to the Customs Service, paying foreign vendors, distribution to customers, and, if applicable, export of merchandise. Should an importer perform well in the initial stage of the FA, the Customs Service will take no further action.

Should the first stage of the FA highlight problems with internal controls, however, the FA will move on to a more intensive second phase called "Assessment Compliance Testing". During this phase of the FA, the Customs Service auditors will spend a great deal of time on-site at the importer's offices reviewing and testing data on an entry-by-entry basis to determine whether accurate declarations have been made to the Customs Service.[2] Performing poorly during this phase of the FA can lead to a referral to the Office of Investigations and possibly the imposition of fines and penalties (which, for example can be far greater than those imposed by the IRS),[3] in addition to any duties that may be owed to the Customs Service.

Therefore, Grace should conduct a Customs Compliance Review. This review will assess the level of Grace's current compliance with the applicable U.S. customs laws and will provide recommendations for improving or enhancing compliance prior to the start of the FA for which your company has been selected. Under the applicable US customs laws, primary legal responsibility for compliance rests with the importer of record, which must exercise "reasonable care" with respect to compliance responsibilities or face potential civil penalties imposed by the Customs Service. The "reasonable care" standard encourages importers to consult with a knowledgeable source as necessary. If an importer fails to exercise such reasonable care and erroneously classifies merchandise or wrongly reports its value, the importer could be subject to penalties for that error in addition to potentially increased import duties. Conversely, an importer who makes an "informed" decision based on consultations and advice from a knowledgeable source is presumed to have exercised "reasonable care" and may avoid penalties.

In addition, we will assist Grace in completing the FA General Questionnaire and the EDP Questionnaire issued by the Office of Strategic Trade of the Customs Service, which will initiate the FA. Properly responding to these questionnaires is a key element in the outcome of the FA.

Deloitte's Customs and International Trade Services group is uniquely qualified to assist Grace with its Customs and International Trade matters. We are comprised of professionals from legal, brokerage, logistics, and industry backgrounds and thus are positioned to provide our clients with an integrated global team with extensive experience in customs, importing, exporting, controversy, security, transportation, and trade. This unique mix of experienced professionals allows us to deliver effective solutions to our clients. Grace will benefit from our extensive knowledge of leading industry practices and automated tools that save analysis time and effort. In addition, Deloitte can utilize its existing knowledge of Grace's operations to address the company's Customs concerns.

---

[2] Unlike the IRS, all information reported to the Customs Service concerning imported merchandise occurs on a transaction-by-transaction basis via the Entry Summary (Customs Form, or "CF," 7501) that is filed for each incoming shipment.

[3] The civil penalty statute, 19 U.S.C. § 1592, provides penalties for fraud, gross negligence, and negligence

Page 3
Ms. Dana Guzzo
April 14, 2003

REVIEW OBJECTIVES

We will review Grace's operating procedures, recordkeeping, and internal controls as they relate to Grace's import program. We will seek to determine if all duty-saving opportunities have been identified, penalty liabilities have been minimized, and government regulations have been followed. If we find that Grace failed to exercise "reasonable care" in attempting to comply with the applicable customs laws during its most recent fiscal year, we will suggest procedural changes for future compliance. In addition, should our review uncover any customs reporting errors, we will make management aware of these errors and suggest strategies for correcting them on a retroactive basis.[4]

SCOPE OF DELOITTE CUSTOMS COMPLIANCE ASSESSMENT

Our review will proceed in two phases, as outlined below.

**Phase 1**

This phase involves a customs compliance assessment, which follows streamlined procedures based on those used by the Customs Service auditors conducting the FAs. Customs Service auditors trace import transactions from transaction documents to accounting records, and from accounting records to transaction documents, to reconcile information reported to the Customs Service with the importer's accounting and payment records. This is intended to determine whether Grace has substantially complied with the Customs Service's requirements and has adequate customs-related procedures for a company of its size and scope of its import activity.

In particular, we will begin the review by interviewing selected key Grace personnel responsible for logistics, importing/exporting, purchasing, accounts payable, and other areas related to the overall customs process. These interviews will be more extensive than might be conducted by the Customs Service in order to assess the adequacy and effectiveness of Grace's customs compliance efforts. The purpose of these interviews is to assess Grace's internal operations in order to analyze whether they have adequate procedures in place to promote coordination among company departments whose activities might impact Grace's compliance with the applicable US customs laws.

Next, we will select a random sampling of representative transactions, as Customs Service auditors would likely do for a FA. The sample would be selected in such a manner that it would include transactions from several areas, including, special duty preference programs, high dollar values, and main countries of supply. The Customs Service typically confines FAs to the most recently completed fiscal year, and moves to earlier periods only if it finds problems that appear to continue from previous years. Therefore, our review will cover the most recent single year. [We will review transactions identified in the sample for adequacy and accuracy of documents, classification or value errors, assist disclosures, compliance with invoice requirements, and reconciliation of the entry documents with the accounting entries. Each invoice will be compared with bank notices of charges against letters of credit, check registers, wire transfers, and other proofs and records of actual payment. Entry information would also be reconciled with inventory records and journal voucher entries. For entries involving preference, restraint or other special programs, we will test for compliance with the requirements of those programs.] We will also review Grace's inventory records to determine that shortages and overages do not differ materially from quantities reported to Customs for duty assessment and statistical reporting purposes.

---

[4] In addition, any fees for preparing Prior Disclosures or other communications with Customs regarding these errors will be priced during Phase 2 of this project.

Page 4
Ms. Dana Guzzo
April 14, 2003

In addition to reviewing the entry documents included in the transaction sample, we will review secondary or indirect documents pertaining to such samples including agreements, purchase orders, cost sheets, correspondence, or other documents relating to such sample transactions to the extent available. Attachment A sets forth books, records, and other types of secondary or indirect documents which are ordinarily included our reviews. The purpose of this review is to identify discrepancies between such secondary or indirect documentation and the sample transaction entry information. Possible discrepancies could include unreported agents' commissions, packing charges or other off-invoice payments, unreported assists and inaccuracies in descriptions of merchandise or its country of origin.

At the conclusion of this review, we will prepare a draft report of our findings and recommendations, and review it closely with Grace personnel and management to verify that it reflects your understanding of the issues raised before finalizing. Post-review recommendations may include changes in practice or procedures and disclosure of discrepancies to the Customs Service.

### Phase 2

This phase will consist of follow-up actions to rectify the errors uncovered in Phase 1, and may include filing of Prior Disclosures[5] or Protests. This phase may also include, as requested by Grace and agreed to by Deloitte, additional services such as drafting a compliance improvement plan and Customs compliance manual, requesting rulings from the Customs Service on valuation or other issues raised in the FA and training Grace personnel on customs compliance procedures. All fees for services in this Phase will be in addition to the fee estimates set forth below and will be priced after the conclusion of Phase 1.

### Professional Fees and Staffing

I will serve as the engagement partner for Grace for the FA services described herein. Helen Cousineau, Senior Manager, will coordinate daily management of the engagement with the assistance of Stephanie A. Goldfischer. All of our biographies are attached as Attachment B. Deloitte will charge hourly billing rates in performing services set forth in this engagement letter. The range of hourly billing rates are as follows:

| Staff Classification | Hourly Billing Rate |
|---|---|
| Principal | $660 per hour |
| Senior Manager | $540 per hour |
| Senior Consultants | $340 per hour |
| Staff Consultants | $230 per hour |

The range of hourly billing rates reflects, among other things, differences in experience levels within classifications, geographic differentials and differences between types of services being provided. In the normal course of business, Deloitte revises its regular hourly billing rates to reflect changes in responsibilities, increased experience, and increased costs of doing business. Accordingly, the aforementioned rates may be revised to the hourly billing rates that will be in effect from time to time. Changes in regular hourly billing rates will be noted on the monthly statements or interim fee applications filed in the Case for the first time-period in which the revised rates became effective. Deloitte's fees for services are calculated from the actual hours expended in providing such services, multiplied by the hourly billing rates for the specific personnel involved.

---

[5] A "Prior Disclosure" is a mechanism whereby the importer can disclose the circumstances of a violation and tender any unpaid duties and fees to Customs Service before they initiate an investigation.

Page 5
Ms. Dana Guzzo
April 14, 2003

We estimate our fee for the compliance review set forth in Phase 1 above to be between $155,000 - $220,000 depending on the scope of the review required, plus reasonable and necessary expenses. However, due to the complexities of providing services to bankrupt entities, our fees may exceed this amount and Deloitte, accordingly, shall charge additional fees as may be required. Expenses will include an allocation of office charges in support of our services, including computer usage, telephone, postage, photo-reproduction, and similar expenses.    Invoices will be sent monthly and payment on such invoices is due consistent with and as allowed per any applicable orders entered with the Bankruptcy Court in connection with the Case.

Pursuant to paragraph G of the General Business Terms, Grace is expressly authorized to disclose work product that Grace receives from Deloitte pursuant to this engagement to the U.S. Customs Service or other Federal agency in connection with the Customs Service's Focused Assessment of Grace's customs compliance policies, provided that such disclosure shall consist of the entire content of such work product including, without limitation, any and all disclaimers included therein.

*        *        *        *        *

This engagement letter together with the General Business Terms attached hereto constitutes the entire agreement between Grace and Deloitte in respect to this engagement and supersedes all other oral and written representations, understandings or agreements relating to this engagement. It may not be amended except by the mutual written agreement of Grace and Deloitte.

Please indicate your acceptance of this agreement by signing in the space provided below and returning a copy of this engagement letter to us. If you have any questions, feel free to call me at (312) 242-9845. We look forward to working with you on this project.

Very truly yours,

By:    Michele E. McGuire
       Partner
       Customs and International Trade Services

Enclosures

cc: Steve Ahern, Esq. (E-Mail & Overnight Mail)
    Larry Isbol (E-Mail)
    Tony Scoles (E-Mail)
    Stephanie A. Goldfischer (E-Mail and Overnight Mail)

AGREED AND ACCEPTED

W.R. Grace & Co.

By: Dana Guzzo
    Name

    Director - Internal Audit
    Title

    April 16, 2004
    Date

# Deloitte & Touche

### DELOITTE & TOUCHE LLP
### GENERAL BUSINESS TERMS

**A.**   *Services.* It is understood and agreed that D&T's services may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, the Company. In connection with its services hereunder, D&T shall be entitled to rely on all decisions and approvals of the Company. D&T, by reason of the Services, are not required to furnish additional work or services, or to give testimony, or to be in attendance in court with reference to analysis performed. D&T will have no responsibility to update any report, analysis or other document relating to its Services for any events or circumstances occurring subsequent to the date of such report, analysis or other document.

**B.**   *Payment of Invoices.*   Invoices will be sent monthly and payment on such invoices is due consistent with and as allowed per any applicable orders entered with the Bankruptcy Court in connection with the Case.

**C.**   *Term.* Unless terminated sooner in accordance with its terms, this engagement shall terminate on the completion of D&T's services hereunder. This engagement may be terminated by either party at any time by giving written notice to the other party not less than thirty (30) calendar days before the effective date of termination. In the event of termination pursuant to this paragraph, D&T shall immediately stop all work under this engagement, except as expressly permitted by the Client or as may be necessary to provide an orderly winding down of such work and/or transition of the work to Client or to a new consultant. Company agrees to compensate D&T under the terms of the engagement letter to which these terms are appended ("engagement letter") for services performed and expenses incurred through the effective date of termination. In the event of such termination, D&T agrees to use commercially reasonable efforts to assist Client, as requested by Client in writing and as agreed to by D&T, in transitioning work to a new consultant hired by Client to complete the Customs compliance work commenced by D&T hereunder, and D&T agrees to provide Client or such new consultant with reasonable access to D&T's unfinished, incomplete or draft work product, provided that Client and such new consultant execute an acknowledgment of non-reliance with respect to such work product and a release of D&T with respect to any liability thereto acceptable in form and substance to D&T. Further, Client acknowledges that it shall not be entitled to rely on, and D&T shall have no liability with respect to, any unfinished, incomplete or draft work product to which Client may be granted access pursuant to the preceding sentence.

**D.**   *Waiver of Jury Trial.* D&T AND THE CLIENT HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER IN CONTRACT, STATUTE, TORT (SUCH AS NEGLIGENCE), OR OTHERWISE) RELATING TO THIS ENGAGEMENT.

Deloitte
Touche

# Deloitte & Touche

## DELOITTE & TOUCHE LLP
## GENERAL BUSINESS TERMS

**A.     Services.** It is understood and agreed that D&T's services may include advice and recommenda-
tions, but all decisions in connection with the implementation of such advice and recommendations shall
be the responsibility of, and made by, the Company. In connection with its services hereunder, D&T
shall be entitled to rely on all decisions and approvals of the Company. D&T, by reason of the Services,
are not required to furnish additional work or services, or to give testimony, or to be in attendance in
court with reference to analysis performed. D&T will have no responsibility to update any report,
analysis or other document relating to its Services for any events or circumstances occurring subsequent
to the date of such report, analysis or other document.

**B.     Payment of Invoices.**    Invoices will be sent monthly and payment on such invoices is due
consistent with and as allowed per any applicable orders entered with the Bankruptcy Court in connection
with the Case.

**C.     Term.** Unless terminated sooner in accordance with its terms, this engagement shall terminate on
the completion of D&T's services hereunder. This engagement may be terminated by either party at any
time by giving written notice to the other party not less than thirty (30) calendar days before the effective
date of termination. In the event of termination pursuant to this paragraph, D&T shall immediately stop all
work under this engagement, except as expressly permitted by the Client or as may be necessary to provide
an orderly winding down of such work and/or transition of the work to Client or to a new consultant.
Company agrees to compensate D&T under the terms of the engagement letter to which these terms are
appended ("engagement letter") for services performed and expenses incurred through the effective date of
termination. In the event of such termination, D&T agrees to use commercially reasonable efforts to assist
Client, as requested by Client in writing and as agreed to by D&T, in transitioning work to a new consultant
hired by Client to complete the Customs compliance work commenced by D&T hereunder, and D&T agrees
to provide Client or such new consultant with reasonable access to D&T's unfinished, incomplete or draft
work product, provided that Client and such new consultant execute an acknowledgment of non-reliance
with respect to such work product and a release of D&T with respect to any liability thereto acceptable in
form and substance to D&T. Further, Client acknowledges that it shall not be entitled to rely on, and D&T
shall have no liability with respect to, any unfinished, incomplete or draft work product to which Client may
be granted access pursuant to the preceding sentence.

**D.     Waiver of Jury Trial.** D&T AND THE CLIENT HEREBY IRREVOCABLY WAIVE, TO THE
FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION,
PROCEEDING OR COUNTERCLAIM (WHETHER IN CONTRACT, STATUTE, TORT (SUCH AS
NEGLIGENCE), OR OTHERWISE) RELATING TO THIS ENGAGEMENT.

Deloitte
Touche

**E.    Information and Data.** D&T shall be entitled to assume, without independent verification, the accuracy of all representations, assumptions, information and data that Company and its representatives provide to D&T. All assumptions, representations, information and data to be supplied by Company and its representatives will be complete and accurate to the best of Company's knowledge. D&T may use information and data furnished by others ; however, D&T shall not be responsible for, and D&T shall provide no assurance regarding, the accuracy of any such information or data. Except as specifically agreed to D&T shall not provide advice regarding the financial accounting treatment of any transaction implemented from these services and will not assume any responsibility for any financial reporting with respect to the services provided hereunder. Company shall be responsible for all financial information, statements and assumptions provided with respect to any services performed hereunder. D&T shall have no responsibility to address any legal matters or questions of law, other than tax law.

**F.    Reports.** Any reports prepared by D&T are valid only when presented in their entirety and only for the purpose stated therein. It is expressly understood that (a) D&T's reports, recommendations, analysis and conclusions, if any, do not, in whole or in part, constitute a fairness or solvency opinion and (b) D&T will not perform any review, audit, or other attestation procedures with respect to financial information as defined by the American Institute of Certified Pubic Accountants and will not issue any opinion, report or other form of assurance with respect to any financial information.

**G.    Third Parties and Internal Use.** D&T hereby acknowledges and agrees that there are no conditions of confidentiality associated with the services or transaction(s) described herein. Neither D&T nor any party known to D&T has or claims to have any proprietary interest in the subject transaction. Except as otherwise agreed, all services hereunder shall be solely for the Company's internal purposes and use, and this engagement does not create privity between D&T and any person or party other than Company ("third party"). This engagement is not intended for the express or implied benefit of any third party. No third party is entitled to rely, in any manner or for any purpose, on the advice, opinions, reports, or other services of D&T. Subject to other provisions of this engagement letter, Company further agrees that the advice, opinions and reports issued by D&T shall not be distributed to any third party without the prior written consent of D&T. D&T agrees that such consent will ordinarily be granted pursuant to a specific request by Company upon execution by such person or entity of an acknowledgement of non-reliance and a release acceptable to D&T. In order to protect D&T from any unauthorized reliance or claims, and from breach of Company's obligation not to distribute D&T's opinion or reports to any third-party without D&T's consent, Company agrees to indemnify and hold harmless D&T, its partners, principals and employees from and against any and all actions, losses, damages, claims, liabilities, costs and expenses resulting from such breach. However, nothing in this paragraph shall be construed as limiting or restricting disclosure of the transaction or any significant tax feature thereof for purposes of §6111(d) of the Internal Revenue Code. This paragraph is intended to ensure that D&T is not in legal privity with any person or entity other than client.

**H.    Indemnification.** The Company shall indemnify and hold harmless D&T and its personnel from all claims, liabilities, and expenses relating to this engagement, except to the extent finally judicially determined to have resulted in substantial part from the gross negligence, bad faith or intentional misconduct of D&T.

**I.    Independent Contractor.** It is understood and agreed that each of the parties hereto is an independent contractor and that neither party is, nor shall be considered to be, an agent, distributor, partner, fiduciary, or representative of the other. Neither party shall act or represent itself, directly or by implication, in any such capacity in respect of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.

J.     **Cooperation.** The Company shall cooperate with D&T in the performance by D&T of its services hereunder, including, without limitation, providing D&T with reasonable facilities and timely access to data, information, and personnel of the Company. The Company shall be responsible for the performance of its personnel and agents and for the accuracy and completeness of all data and information provided to D&T for purposes of the performance by D&T of its services hereunder.

K.     **Confidentiality.** To the extent that, in connection with this engagement, D&T comes into possession of any information of the Company identified as proprietary or confidential, D&T will not disclose such information to any third party or use such information without the Company's consent, except (a) as may be required by law, regulation, judicial or administrative process, in accordance with applicable professional standards, or in connection with litigation pertaining hereto, or (b) to the extent such information (i) shall have otherwise become publicly available (including, without limitation, any information filed with any governmental agency and available to the public) other than as the result of a disclosure by D&T in breach hereof, (ii) is disclosed by the Company to a third party without substantially the same restrictions as set forth herein, (iii) becomes available to D&T on a nonconfidential basis from a source other than the Company which D&T does not believe is prohibited from disclosing such information to D&T by obligation to the Company, (iv) is known by D&T prior to its receipt from the Company without any obligation of confidentiality with respect thereto, or (v) is developed by D&T independently of any disclosures made by the Company to D&T of such information. The Company agrees (a) not to reference D&T's name or any reports, analyses or other documents prepared by D&T, in whole or in part, in any document distributed to third parties, without D&T's prior written consent and (b) that any reports, analyses or other documents prepared by D&T will be used only in compliance with these General Business Terms and applicable laws and regulations. ·D&T will preserve the confidential nature of information received from the Company in accordance with D&T's established policies and practices.

L.     **Complete Agreement.** The Engagement Letter, including these General Business Terms, constitutes the entire agreement between the Company and D&T with respect to the subject matter thereof and hereof, and supersedes all other oral or written representations, understandings and agreements between the Company and D&T relating to the subject matter thereof and hereof. The Engagement Letter, including these General Business Terms, cannot be changed, except by written instrument signed by both the Company and D&T. The Engagement Letter, including these General Business Terms, shall be binding on the Company and D&T, and the Company's and D&T's permitted successors and assigns; however, neither the Company nor D&T may assign the Engagement Letter, including these General Business Terms, without the prior written consent of the other, except that the Company and D&T may assign the Engagement Letter, including these General Business Terms, to any successor to all or substantially all of the business or assets of such party.

M.     **Exclusion on Damages.** In no event shall D&T or it personnel be liable for consequential, special, indirect, incidental, punitive or exemplary loss, damage or expenses relating to this engagement.

N.     **Applicability.** The provisions of Paragraphs H and M shall apply to the fullest extent of the law, whether in contract, statute, tort (such as negligence), or otherwise. In circumstances where all or any portion of the provisions of such Paragraphs are finally judicially determined to be unavailable, D&T's aggregate liability for any claims, liabilities, or expenses relating to this engagement shall not exceed an amount which is proportional to the relative fault that D&T's conduct bears to all other conduct giving rise to such claims, liabilities, or expenses.

# ATTACHMENT A

**Attachment A**

**GENERAL OUTLINE OF BOOKS, RECORDS AND DOCUMENTATION FOR CUSTOMS REVIEW**

## SAMPLE SELECTION

**List of Major Suppliers and Countries** – This list will be used to select a sample of import transactions for review.

**Criteria for Sample Selection** – The criteria for sample selection should be limited to supplier, country of origin, various Harmonized Tariff Schedule numbers, and duty rates.

**Selection of Sample** – A source must be established from the universe of imports for the period to be reviewed. Examples of potential sample documents include: Document Control Log, Letter of Credit Log, Purchase Orders or Contracts, Purchase Journal, and Receiving Records.

**Sample Review** – Once the sample is chosen and the audit trail for the shipments selected is established, the following supporting documents may be reviewed, if available and if deemed necessary:

- Purchase Order
- Price Lists
- Invoices
- Country Of Origin Declarations
- Bills of Lading (review of actual freight charges and terms)
- Receiving Reports (verification of quantifies received)
- Inventory Reports
- Customs Entry Summary (CF 7501)
- Customs Correspondence Records (CF-28's, CF-29's, Liquidated Damages Notices)
- Correspondence, telexes, and facsimile transmissions
- Proof of payment (bank advices, checks, accounts payable documents)
- Liquidation Notices
- Operations Manual (Current and All Revisions)
- Customs Forms (CF 3461)
- Customs Forms (CF 7512) and (7512A)

# ATTACHMENT B



## Michele McGuire
**Partner**
**Chicago, Illinois**

**office phone:** 312-242-9845
**fax:** 312-242-8845
**e-mail:** mimcguire@deloitte.com

**Experience:**

Michele recently joined Deloitte & Touche from Andersen and is the Partner in charge of Deloitte & Touche's National Customs and International Trade Services Group. Michele has extensive experience in advising Fortune 500 companies on numerous customs and international trade issues including; first sale for export planning and implementation; global customs reviews; designing and implementing compliance programs; advising on other government agency requirements such as FTC, FDA and Excise Tax requirements (including ODCs); designing and implementing Foreign Trade Zones and bonded facilities; on site customs training for clients; advising on various international trade agreements; advising on C-TPAT, customs business process reviews and redesign; preparing for and managing US Customs audits and assessments; tariff classification; e-business strategies from an indirect tax perspective and country of origin determinations and marking. Michele advises clients how to design strategies and structure global transactions to minimize customs duty payments and other international trade costs, and maximize duty recoveries while ensuring all legal and regulatory requirements are met in the most cost-effective manner. Before joining Deloitte & Touche Michele was a partner in Andersen's US International Trade and Customs group. Prior to Andersen Michele spent 5 years as an associate attorney at a Chicago-based law firm where she advised clients on numerous customs and international trade related matters. She also worked as a visiting attorney in the international litigation department of a large London law firm. **Education/Professional affiliations:**

Michele has a B.S. from Indiana University, a J.D. from the John Marshall Law School; and a LL.M. in International Transactions from the McGeorge School of Law in Salzburg, Austria and Sacramento. Additionally, Michele is a U.S. licensed Customs Broker.
**Industry Experience:**

Michele has extensive experience in the following industries:

Retail Textile and Apparel
Heavy Equipment Manufacturing
Consumer Products
Electronics
Automotive
High Tech

APR-17-2003  12:37        D&T LLP USA ND LEGAL              212 492 4201    P.15/34



## Helen M. Cousineau

**Senior Manager**
**Chicago, Illinois**
**office phone:** 312-242-9161
**fax:** 312-242-8161
**e-mail:** hcousineau@deloitte.com

### Experience:

Helen joined Deloitte & Touche in May of 2002. She is a Senior Manager in Deloitte & Touche's national Customs and International Trade Services group, and is based in our Chicago office. In addition to advising clients on global trade and customs compliance issues and helping them to ensure that all legal and regulatory requirements are met in the most cost-effective manner, Helen assists global clients with the design and implementation of strategies that minimize customs duty payments and international trade costs while maximizing duty recoveries. In addition, she is part of multidisciplinary team of Deloitte & Touche professionals assisting clients with participation in new US trade security programs, including the Customs-Trade Partnership Against Terrorism.

Helen has several years of experience in the areas of import and export regulatory compliance, tariff classification under the Harmonized Tariff System, valuation of merchandise, valuation planning including First Sale for Export, duty drawback, preferential trade programs, and bonded warehousing. She has assisted US importers with obtaining binding rulings, responding to Customs requests for information and notices of action, and submitting prior disclosures, protests, and petitions for relief. She has also guided clients through matters involving the detention and seizure of merchandise, regulatory audits, Customs investigations, and various fines, penalties, and forfeiture matters. She has conducted internal Customs compliance reviews and training, and has assisted clients in developing internal compliance systems and programs.

Helen joined Deloitte & Touche from Arthur Andersen's International Trade and Customs Services practice, where she was also involved in advising clients on a variety of matters involving global trade and customs issues. Prior to joining Arthur Andersen, she spent over six years practicing law in Washington D.C. and New York. Her primary areas of legal practice included Customs and international trade law, as well as international transportation and suretyship law.

### Education:

Helen earned her Juris Doctor from the Boston University School of Law in 1994, her Master of Arts in International Relations from the Boston University Graduate School in 1994, and her Bachelor of Arts in International Business from California State University Fullerton in 1987. In addition to being a licensed attorney, Helen is a licensed US Customs broker and was among the 3.2 % of test takers in the US who passed the April 2002 US Customs broker examination.

### Professional & Civic Affiliations:

Helen has been an active member of several organizations focused on international trade and customs issues, including the American Association of Exporters and Importers, the Customs and International Trade Bar Association, and the Customs Committee of the American Bar Association.

**Languages:**

Helen is fluent in French.

## Stephanie A. Goldfischer
**Experienced Senior Consultant**
**New York, New York**

**office phone:** 212-436-3610
**fax:** 212-653-5872
**e-mail:** sgoldfischer@deloitte.com

### Experience:

Stephanie joined Deloitte & Touche in December of 2002. She is an experienced senior consultant in Deloitte's national Customs and International Trade Services group, and is based in our New York City office. Stephanie advises clients concerning issues such as tariff classification, appraisement, country of origin marking, and foreign trade zones. In this regard, she has assisted U.S. importers with obtaining binding rulings, responding to Customs requests for information and notices of action, and submitting prior disclosures, protests, and petitions for relief. She has performed compliance assessment reviews for many types of companies including those in the oil industry, drafted Customs compliance manuals and conducted workshops on a variety of Customs matters. She also advises importers on the benefits of duty-saving programs and the regulatory requirements of various government agencies on Customs-related issues. She co-authored an article entitled "U.S. Customs Modifies Compliance Audit Standards," that was published in The Metropolitan Corporate Counsel (October 2000). Stephanie has returned to Deloitte & Touche after spending three years practicing law at a firm devoted exclusively to international trade and Customs matters. Prior to that, Stephanie worked in the European Community, where she was an assistant to members of the European Parliament in Brussels, Belgium.

### Education:

Stephanie is a graduate of the Benjamin N. Cardozo School of Law. She received her B.A., with distinction in Philosophy, from the University of Rochester where she was elected to Phi Beta Kappa and graduated *magna cum laude*.

### Professional & Civic Organizations:

Stephanie is chair of the regulatory audit committee for the National Association of Foreign Trade Zones, and a member of Women in International Trade, and the American, New York State, and Customs and International Trade Bar Associations.

**Exhibit B**

**Tax Engagement Letter**

Suite 500
555 12th Street, N.W.
Washington, DC 20004-1207

Tel: (202) 879 5600
Fax: (202) 879 5309
www.us.deloitte.com

**Deloitte**
**& Touche**

April 8, 2003

Ms. Elyse Napoli Filon
Vice President – Tax, Risk Management &
Strategic Planning
W.R. Grace & Co.
5400 Broken Sound Boulevard, N.W.
Boca Raton, FL 33487

Dear Elyse:

In accordance with our recent conversation, this letter is to confirm that W.R. Grace &
Co. (the "Company" or "Grace" or the "Client") has requested that Deloitte & Touche
LLP ("D&T") consult with the Company on tax issues during your calendar year, ended
December 31, 2003 including certain transactions that may close subsequent to December
31, 2003. Subject to the following paragraph, the tax professionals of D&T will be
available to provide consultation and assistance on federal, foreign, state and local tax
matters ("tax assistance") on as requested by Grace and as agreed to by D&T. Tax
assistance is anticipated to include but not be limited to consultation on issues related to
taxation of corporate income including advising on transactions such as sales,
liquidations, and reorganizations of assets and legal entities as well as general consulting
regarding deductibility of expenses, consolidated income tax returns, IRS procedures and
other corporate tax matters. In addition, tax assistance is anticipated to include but not
limited consulting relating to transactions involving international transactions and
Grace's non-U.S. affiliates including subpart F income, foreign tax taxes and utilization
of foreign tax credits, withholding taxes, transfer pricing and issues associated with
deconsolidation. The purpose of this letter is to establish the terms and conditions that
will apply to all tax assistance that is provided pursuant to this engagement.

On April 2, 2002, Grace filed in the United States Bankruptcy Court for the District of
Delaware (the "Bankruptcy Court") a voluntary petition for relief under Chapter 11 of the
Bankruptcy Code. As a result, Grace is now operating as Debtor-in-Possession. Grace
has requested that D&T perform the tax consulting services described herein and D&T
has agreed to perform such services, subject to the terms and conditions of this
engagement letter.

This engagement letter, and D&T's obligations and responsibilities relating to this
engagement, shall be effective as of February 4, 2003 subject to obtaining Bankruptcy

Deloitte
Touche
Tohmatsu

Ms. Elyse Napoli Filon
April 2, 2003
Page 2 of 8

Court approval in the matter *In re W.R. Grace & Co., et al.* (the "Case"); provided,
however, that, in addition to D&T's other rights or remedies, D&T may, in its sole
discretion and without any liability arising therefrom, terminate this engagement in the
event that (a) a third party objects or threatens to object, or D&T reasonably believes that
a third party may object, in the form of an objection or otherwise, to D&T's retention by
Grace in the Case on the terms and conditions set forth in this engagement letter, or (b) a
final order authorizing the employment of D&T to provide tax consulting services
described herein for Grace is not issued by the Bankruptcy Court in the Case on or before
sixty (60) days from the date hereof on the terms and conditions set forth herein or on
such other terms and conditions as are satisfactory to D&T, or (c) the application of
Grace seeking such order is denied by the Bankruptcy Court in the Case. In such event,
Grace hereby agrees to withdraw or amend, promptly upon D&T's request, any
application filed or to be filed with the Bankruptcy Court to retain Deloitte's services in
the Case.

### Service Terms and Conditions

The Company and D&T agree that the terms of this letter will apply to all tax assistance
provided by D&T to the Company during the pendency of the Case, unless such services
are the subject of a separate written agreement entered into between D&T and the
Company. It is contemplated that all discreet projects will be evidenced by a separate
written agreement or memo that will include an estimated budget. D&T will make
reasonable efforts to adhere to such estimated budgets, however, the Company
acknowledges that, due to added complexity of providing services to entities involved in
bankruptcy proceedings, it may be necessary for D&T revise such budgets. Any
revisions to such budgets will be communicated to you for an agreed-upon resolution.

Either party may terminate this engagement at any time by giving written notice to the
other party not less than thirty (30) calendar days before the effective date of termination.
In the event of termination pursuant to this paragraph, D&T agrees to stop performing
any new tax consulting projects following receipt of notice of termination and will
restrict any future tax consulting work to the completion of existing work to the extent
necessary for an orderly transition of the consulting project to the Company. The
Company agrees to compensate D&T under the terms of this engagement letter for
services performed and expenses incurred through the effective date of termination,
consistent with and as allowed per any applicable order of the Bankruptcy Court in
connection with the Case.

It is contemplated that the tax assistance that D&T will include oral and written opinions,
views, recommendations and other communications rendered in response to specific tax
questions posed by the Company. D&T may be asked to analyze facts and circumstances
relevant to the requested tax assistance. The Company acknowledges and agrees that any
tax assistance provided pursuant to this engagement letter will be based solely upon:

Ms. Elyse Napoli Filon
April 8, 2003
Page 3 of 8

(a) The representations, information, documents and other facts specifically made or submitted to D&T by the Company, its personnel and any representatives thereof;

(b) D&T's assumption (without independent verification) that there will be timely execution, delivery and performance as may be required by any representation or documents submitted by the Company with respect to D&T's tax assistance;

(c) The Company's understanding and agreement that the ultimate responsibility, with respect to the appropriate application and interpretation of any oral or written communications, rests with management of the Company. D&T will not be held liable for any misinterpretations of oral or written communications regarding the application of tax assistance.

(d) The Company's understanding that any tax assistance provided pursuant hereto will be based upon the law, regulations, cases, rulings, and other tax authority in effect at the time specific tax assistance is provided. If there are subsequent changes in or to the foregoing tax authorities (for which D&T shall have no specific responsibility to advise you), the Company acknowledges that such changes may result in that tax assistance being rendered invalid or necessitate (upon the Company's request) a reconsideration of that prior tax assistance;

(e) The Company's understanding and agreement that the results of D&T's tax assistance may be audited and challenged by the IRS and other tax authorities, which may not agree with D&T's positions. In this regard, the Company understands that the result of any tax assistance is not binding on the IRS, or other tax authorities or the courts and should never be considered a representation, warranty, or guarantee that the IRS or the courts will concur with our advice or opinion; and

(f) D&T, as a result of providing such tax assistance, is under no obligation to represent the Company with respect to any such challenge or an administrative or judicial challenge thereof. D&T would generally be available to represent the Company before the appropriate tax authorities, as long as it is proper to do so, for an additional fee that is mutually agreed upon.

The Company and D&T also agree that the advice and opinions provided in accordance with the terms of this letter are not intended to satisfy the "reasonable cause" exception (Code Section 6664(c)) to the imposition of substantial understatement penalties under Code Section 6662. The Company and D&T agree that a separate engagement letter must be executed with respect to any tax opinion letter that the Company intends to rely upon for purposes of Code Section 6664(c) and Section 1.6664-(e)(2) of the regulations there under.

Ms. Elyse Napoli Filon
April 8, 2003
Page 4 of 8

## Billing

The professional fees charged for the tax assistance rendered pursuant to this engagement letter are calculated from the actual hours expended in providing the tax assistance multiplied by the hourly billing rates set forth below for the specific personnel involved. In addition, reasonable expenses, including travel, report production, delivery services and other expenses incurred in providing the tax assistance, will be included in the total amount billed.

## Hourly Rates

D&T will charge hourly billing rates in performing services to the Debtors in these Chapter 11 cases. The ranges of hourly billing rates are as follows:

| Staff Classification | Hourly Billing Rate |
|---|---|
| Partner/Principal/Director | $350-$600 per hour |
| Senior Manager | $250-$550 per hour |
| Manager | $180-$430 per hour |
| Senior Accountants/Consultants | $135-$230 per hour |
| Staff Accountants/Consultants | $100-$180 per hour |

The range of hourly billing rates reflects, among other things, differences in experience levels within classifications, geographic differentials and differences between types of services being provided. In the normal course of business, D&T revises its regular hourly billing rates to reflect changes in responsibilities, increased experience, and increased costs of doing business. Accordingly, the aforementioned rates will be revised to the hourly rates that will be in effect from time to time. Changes in regular hourly rates will be noted on the invoices for the first period in which the revised rates become effective.

Invoices will be sent monthly and payment on such invoices is due consistent with and as allowed per any applicable orders entered with the Bankruptcy Court in connection with the Case.

## Confidential Taxpayer Communications

You should be aware that, pursuant to the *Internal Revenue Restructuring and Reform Act of 1998*, certain information discussed with members of D&T who are Federally authorized tax practitioners or their agents for the purpose of obtaining our advice on tax

Ms. Elyse Napoli Filon
April 8, 2003
Page 5 of 8

matters may be privileged from disclosure in any non-criminal tax matters before the IRS
and in non-criminal proceedings in Federal court that stem from matters before the IRS,
if the United States is a party to the proceedings. The Company agrees that unless
otherwise specified, all work is to be performed in a manner that preserves this privilege
to the extent allowed under Federal and state law.

This engagement letter, together with the General Business Terms attached hereto,
constitutes the entire agreement between the Company and D&T with respect to this
engagement, supersede all other oral and written representations, understandings or
agreements relating to this engagement, and may not be amended except by the mutual
written agreement of the Company and D&T.

Pursuant to paragraph G of the General Business Terms, you are hereby expressly
authorized to discuss and disclose the full content of any advice or opinion you receive
pursuant to this engagement and every aspect of the transaction with any and all persons
without limitations of any kind.

Please indicate your acceptance of this engagement letter by signing in the space
provided below and returning a copy of this engagement letter to us.

Very truly yours,                        AGREED AND ACCEPTED:


Deloitte & Touche LLP                    W.R. Grace & Co

By: _____            By: _____
    T. Timothy Tuerff                        Name: Elyse Napoli Filon
    Partner
                                             Title:  Vice President - Taxes

                                             Date:  4/8/03

Ms. Elyse Napoli Filon
April 8, 2003
Page 6 of 8

## TAX GENERAL BUSINESS TERMS

**A.**     Services. It is understood and agreed that D&T's services may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, the Client. In connection with its services hereunder, D&T shall be entitled to rely on all decisions and approvals of the Client.

**B.**     Payment of Invoices. Invoices will be sent monthly and payment on such invoices is due consistent with and as allowed per any applicable orders entered with the Bankruptcy Court in connection with the Case.

**C.**     Term. Unless terminated sooner in accordance with its terms, this engagement shall terminate on the completion of D&T's services hereunder. This engagement may be terminated by either party at any time by giving written notice to the other party not less than thirty (30) days before the effective date of termination. In the event of termination pursuant to this paragraph, D&T agrees to stop performing any new tax consulting projects following receipt of notice of termination and will restrict any future tax consulting work to the completion of existing work to the extent necessary for an orderly transition of the consulting project to the Company. The Company agrees to compensate D&T under the terms of the engagement letter to which these terms are appended ("engagement letter") for services performed and expenses incurred through the effective date of termination, consistent with and as allowed per any applicable order of the Bankruptcy Court in connection with the Case.

**D.**     Waiver of Jury Trial. D&T AND THE CLIENT HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER IN CONTRACT, STATUTE, TORT (SUCH AS NEGLIGENCE), OR OTHERWISE) RELATING TO THIS ENGAGEMENT.

**E.**     Information and Data. D&T shall be entitled to assume, without independent verification, the accuracy of all representations, assumptions, information and data that Client and its representatives provide to D&T. All assumptions, representations, information and data to be supplied by Client and its representatives will be complete and accurate to the best of Client's knowledge. D&T may use information and data furnished by the company or its representatives; however, D&T shall not be responsible for, and D&T shall provide no assurance regarding, the accuracy of any such information or data. Except as specifically agreed to, D&T shall not provide advice regarding the financial accounting treatment of any transaction implemented from these services and will not assume any responsibility for any financial reporting with respect to the services provided hereunder. Client shall be responsible for all financial information and statements provided with respect to any services performed hereunder. D&T shall have no responsibility to address any legal matters or questions of law, other than tax law.

Apr 08 03 04

Ms. Elyse Napoli Filon
April 8, 2003
Page 7 of 8


**F.**     **Third Parties and Internal Use.** D&T hereby acknowledges and agrees that there are no conditions of confidentiality imposed on Client associated with the tax services or transaction(s) described herein. Neither D&T nor any party known to D&T has or claims to have any proprietary interest in the subject transaction. Nothing in this paragraph shall be construed as limiting or restricting disclosure of the transaction or any significant tax feature thereof for purposes of §6111(d) of the Internal Revenue Code. The Client and its employees, representatives or agents may disclose the structure and tax aspects of a transaction, and any and all materials, opinions or tax analyses of any kind, to any and all persons without limitation of any kind. However, all services in connection with this engagement shall be solely for the Client's informational purposes and internal use, and this engagement does not create privity between D&T and any person or party other than Client ("third party"). This engagement is not intended for the express or implied benefit of any third party. Unless otherwise agreed to in writing by D&T, no third party is entitled to rely, in any manner or for any purpose, on the advice, opinions, reports, or other services of D&T. In the event of any unauthorized reliance not caused by D&T, the Client agrees to indemnify and hold harmless D&T and its personnel from all third-party claims, liabilities, costs and expenses. []


**G.**     **Independent Contractor.** It is understood and agreed that each of the parties hereto is an independent contractor and that neither party is, nor shall be considered to be, an agent, distributor, partner, fiduciary or representative of the other. Neither party shall act or represent itself, directly or by implication, in any such capacity in respect of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.


**H.**     **Survival and Interpretation.** The agreements and undertakings of the Client and D&T contained in the engagement letter, to which these terms are attached, together with the provisions of all Paragraphs hereof, (except for the "term" of the engagement) shall survive the expiration or termination of this engagement. For purposes of these terms, "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; to the extent providing services under the engagement letter to which these terms are attached, Deloitte Touche Tohmatsu, its member firms, and the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu and its member firms; all of their partners, principals, members, owners, directors, staff and agents; and in all cases any successor or assignee.


**I.**     **Governing Law and Severability.** These terms, the engagement letter to which these terms are attached, including exhibits, and all matters relating to this engagement (whether in contract, statute, tort (such as negligence), or otherwise), shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof). If any provision of such terms or engagement letter is found by a court of competent jurisdiction to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

Ms. Elyse Napoli Filon
April 8, 2003
Page 8 of 8

J.    **Indemnification.** The Client shall indemnify and hold harmless D&T and its personnel from all claims, liabilities, and expenses relating to this engagement, except to the extent finally judicially determined to have resulted from the gross negligence, bad faith or intentional misconduct of D&T.

K.    **Confidentiality.** To the extent that, in connection with this engagement, D&T comes into possession of any proprietary or confidential information of the Client, D&T will not disclose such information to any third party or use such information without the Client's consent, except (a) as may be required by law, regulation, judicial or administrative process, or in accordance with applicable professional standards, or in connection with litigation pertaining hereto, or (b) to the extent such information (i) shall have otherwise become publicly available (including, without limitation, any information filed with any governmental agency and available to the public) other than as the result of a disclosure by D&T in breach hereof, (ii) is disclosed by the Client to a third party without substantially the same restrictions as set forth herein, (iii) becomes available to D&T on a nonconfidential basis from a source other than the Client which D&T believes is not prohibited from disclosing such information to D&T by obligation to the Client, (iv) is known by D&T prior to its receipt from the Client without any obligation of confidentiality with respect thereto, or (v) is developed by D&T independently of any disclosures made by the Client to D&T of such information. In addition, the Client acknowledges and agrees that any such information that comes to the attention of D&T in the course of performing this engagement may be considered and used by D&T in the context of responding to its professional obligations as the independent accountants for the Client.

L.    **Assignment.** Except as provided below, neither party may assign, transfer or delegate any of its rights or obligations hereunder (including, without limitation, interests or claims relating to this engagement) without the prior written consent of the other party. D&T may, without the consent of the Client, assign or subcontract its rights and obligations hereunder to (a) any affiliate or related entity or (b) any entity which acquires all or a substantial part of the assets or business of D&T.

M.    **Cooperation.** The Client shall cooperate with D&T in the performance by D&T of its services hereunder, including, without limitation, providing D&T with reasonable facilities and timely access to data, information and personnel of the Client. The Client shall be responsible for the performance of its personnel and agents and for the accuracy and completeness of all data and information provided to D&T for purposes of the performance by D&T of its services hereunder.

O.    **Exclusion on Damages.** In no event shall D&T or its personnel be liable for consequential, special, indirect, incidental, punitive or exemplary loss, damage, or expense relating to this engagement.

P.    **Applicability.** The provisions of Paragraphs J and O shall apply to the fullest extent of the law, whether in contract, statute, tort (such as negligence), or otherwise. In circumstances where all or any portion of the provisions of such Paragraphs are finally judicially determined to be unavailable, D&T's aggregate liability for any claims, liabilities, or expenses relating to this engagement shall not exceed an amount which is proportional to the relative fault that D&T's conduct bears to all other conduct giving rise to such claims, liabilities, or expenses.

## Exhibit C

### Compensation Engagement Letter

14

APR-17-2003  12:40          D&T LLP USA NO LEGAL              212 492 4201    P.26/34

Two Prudential Plaza
180 North Station Avenue
Chicago, Illinois 60601-6779

Tel (312) 946-3000
Fax (312) 946-2600
www.deloitte.com

# Deloitte
# &Touche

March 14, 2003

Mr. John Akers
Chairman of the Compensation Committee
W.R. Grace & Company
1 Stamford Plaza
263 Tresser Boulevard, 9th Floor
Stamford, CT  06901-3264

Re: Compensation Consulting Services

Dear John:

The purpose of this letter is to confirm the retention of Deloitte & Touche LLP (D&T or Deloitte) to assist the W.R. Grace & Company ("Grace") Compensation Committee with compensation and benefits matters on an as needed basis.  The remainder of this letter summarizes the services to be provided, including the specific project scope and approach, project team, timing and associated fees.

On April 2, 2001, Grace filed in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  As a result, Grace is now operating as Debtor-in-Possession.  Grace and the Compensation Committee have requested that D&T perform the services described herein and D&T has agreed to perform such services, subject to the terms and conditions of this engagement letter. This engagement letter, and D&T's obligations and responsibilities relating to this engagement, shall be effective as of March 14, 2003 subject to obtaining Bankruptcy Court approval in the matter *In re W.R. Grace & Co., et al.* (the "Case"); provided, , however that, in addition to D&T's other rights or remedies, D&T may, in its sole discretion and without any liability arising there from, terminate this engagement in the event that (a) a third party objects or threatens to object, or D&T reasonably believes that a third party may object, in the form of an objection or otherwise, to D&T's retention by Grace in the Case on the terms and conditions set forth in this engagement letter, or (b) a final order authorizing the employment of D&T to provide the services described here n for Grace is not issued by the Bankruptcy Court in the Case on or before sixty (60) days from the date hereof or the terms and conditions set forth herein or on such other terms and conditions as are satisfactory to D&T, or (c) the application of Grace seeking such order is denied by the Bankruptcy Court in the Case.  In such event, Grace hereby agrees to withdraw or amend, promptly upon D&T's request, any application filed or to be filed with the Bankruptcy Court to retain Deloitte's services in the Case.

## PROJECT SCOPE & APPROACH
We will assist Grace and the Compensation Committee by providing analysis, data, and guidance regarding various compensation and benefits matters.  We will have a working relationship with both Grace's management as well as the Compensation Committee, but will ultimately be responsible to the Compensation Committee.  We will also be available to attend and participate in Compensation Committee meetings to present our findings and recommendations, as required  Our goal is to assist, inform, and enhance the abilities of both Senior Management and the Compensation Committee to effectively make decisions regarding executive compensation that are aligned with Grace's business strategies and market practices.

Deloitte
Touche
Tohmatsu



Mr. John Akers
March 14, 2003
Page 2

The scope of this particular engagement includes:

- ◇ Assisting in the competitive benchmarking for the top 600 employees.
- ◇ Conducting an Annual Incentive Plan assessment.
- ◇ Designing and implementing a Long-Term Incentive Plan upon emergence from bankruptcy.

To complete this engagement, we have developed an approach consisting of three phases that focus on providing the information and advice the Compensation Committee requires regarding Grace's compensation program.

## PHASE I: COMPENSATION BENCHMARKING

*Step 1: Project Planning* We will conduct a planning meeting by teleconference with the appropriate members of Grace's management ("Working Team"), where we will confirm the survey sources and the methodology used for the benchmarking. We will also determine the appropriate positions to be benchmarked and discuss compensation structure alternatives during the call.

*Step 2: Compensation Philosophy* During this step, we will review and discuss Grace's compensation philosophy. If necessary, we will draft a revised philosophy based on this discussion for the review by the Compensation Committee.

*Step 3: Competitive Assessment ("Benchmarking")* Select job positions will then be matched and competitive data will be collected. Once the data has been compiled, it will be analyzed to determine the competitive market positioning for each benchmarked job. We will then meet with the Working Team to discuss the results of this analysis.

*Step 4: Develop Compensation Structure and Guidelines* Based on the competitive analysis alternative compensation structures will be developed and discussed with the Working Team.

*Step 5: Finalize the Compensation Structure* In the final step, the remaining jobs will be slotted and a cost analysis of the new structure will be conducted. We will also assist in the development of implementation and communication plans

We anticipate that we will be in contact with the Working Team on a day-to-day basis during all steps in this phase. Grace's Human Resources group will complete many of the key activities described in Steps 3 through 5 with assistance from D&T. Under this joint approach, Grace's compensation staff members will gather and array the data as well as slot all the individuals into the appropriate salary grades. We will, in turn, be available to assist in the process by providing worksheet templates, methodologies and technical guidance. We will also be responsible for analyzing the results and developing the key findings in conjunction with Grace's Human Resources group to be presented to the Compensation Committee for review and approval.

## PHASE II: ANNUAL INCENTIVE PLAN ASSESSMENT

*Step 1: Project Planning* We will conduct a planning meeting by teleconference with the Working Team to determine the goals and objectives of the annual incentive plan and insure the incentive compensation philosophy supports these objectives.



Mr. John Akers
March 14, 2003
Page 3

*Step 2: Review of Annual Incentive Plan Design*   During this step, we will review the Company's goal
setting process and historical performance versus actual payouts. We will also review the design
components of the plan including eligibility, bonus opportunities, payouts, etc., to determine the linkage
between Grace's business strategy, goals and competitive practice.

*Step 3: Summary of Annual Incentive Plan Review Findings*   Finally, we will prepare observations
and recommendations regarding the annual incentive plan design and meet with both the Compensation
Committee and Grace's management to discuss our recommendations and next steps.

## PHASE III: LONG-TERM INCENTIVE PLAN ASSESSMENT
*Step 1: Project Planning*   We will conduct a planning meeting by teleconference with the Working
Team, where we will determine the goals and objectives of the long-term incentive plan as well as gain a
clearer understanding of the key business objectives. We will also discuss the current compensation
marketplace, trends, influences and potential implications.

*Step 2: Equity Dilution*   During this step we will assist in developing the business case for the desired
levels of equity dilution. We also assist Grace's advisors in determining and negotiating the appropriate
percentage of equity to be divided among the creditors and Grace's management. We will provide
competitive data on dilution levels of other companies that have emerged from bankruptcy.

*Step 3: Long-Term Incentive Plan Design*   The next step will include identifying the potential long-term
incentive plan types and the pros and cons for each from a compensation, tax, accounting and disclosure
perspective. We will also assist in determining the appropriate long-term incentive mix and in identifying
eligible plan participants. We will review other plan provisions and meet with Grace's management and
the Compensation Committee to decide on the appropriate potential design alternatives to be modeled.

*Step 4: Long-Term Incentive Modeling & Other Quantitative Analyses*   During this step, we will
determine the appropriate long-term incentive opportunity guidelines and decide on how much equity
should be granted upon emergence from bankruptcy. We will also model the potential costs of the
selected long-term incentive alternatives and develop stock ownership and retention guidelines, if
appropriate. We will perform various share usage and cost analyses and meet with the Compensation
Committee to review the analyses and decide on a final plan design.

*Step 5: Implementation and Communication*   The final step will include a review of the plan document
drafted by Grace's counsel and assist in the development of the comprehensive communication plan. We
will also assist in the development of the policies, procedures and communication materials with the
Working Team. We will participate in the Compensation Committee meeting to obtain approval of the
awards under the new long-term incentive plan and, if necessary, assist in conducting training sessions to
roll-out the long-term incentive program.

## PROJECT TEAM
*Nick Bubnovich* will serve as the Engagement Partner and have the responsibility for the delivery of
timely and quality services as well as the Compensation Committee and Senior Management's overall
satisfaction with our work. He will also serve as a senior technical and subject matter expert to the
engagement team.

*Jane Zeis* will serve as the Engagement Manager. Her primary responsibilities are to maintain overall
project direction, ensure project objectives are realized, and provide benchmarking and compensation

Mr. John Akers
March 14, 2003
Page 4



program design expertise. Jane will serve as the Working Team's primary point of contact throughout the project.

*Allison Prybylo and Katie O'Neill* will serve as the Senior Consultants, possessing relevant compensation and benchmarking experience as well as strong analytics. Their primary responsibilities will include data gathering and analysis, as well as the preparation of draft findings and deliverables.

Other consulting staff will be identified as the project begins to efficiently and effectively assist with data collection, analysis and report development.

## PROJECT TIMING & FEES
The estimated professional fees for this engagement are outlined in the table below:

| Engagement | Step | Description | Estimated Fees |
|---|---|---|---|
| Compensation Benchmarking | | | |
| | 1 | Project Planning | $5,000 - $6,000 |
| | 2 | Compensation Philosophy | $2,500 - $3,000 |
| | 3 | Competitive Assessment ("Benchmarking") | $10,000 - $15,000 |
| | 4 | Develop Compensation Structure and Guidelines | $25,000 - $32,000 |
| | 5 | Finalize Compensation Structure | $13,000 - $18,000 |
| | | Total Compensation Benchmarking Fees | $55,500 - $72,000 |
| Annual Incentive Plan Assessment | | | |
| | 1 | Project Planning | $5,000 - $7,500 |
| | 2 | Review of Annual Incentive Plan Design | $10,000 - $15,000 |
| | 3 | Summary of Annual Incentive Plan Review Findings | $7,500 - $10,000 |
| | | Total Annual Incentive Plan Assessment Fees | $22,500 - $32,500 |
| Long-Term Incentive Plan Assessment | | | |
| | 1 | Project Planning | $5,000 - $7,500 |
| | 2 | Equity Dilution | $7,500 - $10,000 |
| | 3 | Long-Term Incentive Plan Design | $18,000 - $24,000 |
| | 4 | Long-Term Incentive Modeling & Other Quantitative Analyses | $30,000 - $37,000 |
| | 5 | Implementation & Communication (does not include actual training sessions) | $22,000 - $27,000 |
| | | Total Long-Term Incentive Plan Assessment Fees | $82,500 - $105,500 |
| | | **TOTAL FEES** | **$159,500 - $210,000** |

In the case of a project scope change, D&T will notify you immediately and outline the changes for the Compensation Committee's review. Any revised fees will be agreed upon by both parties before the commencement of the additional work.

Any out-of-pocket expenses will be charged at cost. D&T will seek reimbursement for fees and expenses incurred in connection with its provision of the services described in this engagement letter consistent with the compensation and reimbursement procedures in effect in the Case.

## ACCEPTANCE AND AGREEMENT
This engagement letter, together with the attached General Business Terms, constitutes the entire agreement with respect to this engagement. Please indicate your agreement to this letter by signing one of the two enclosed copies and returning it to my attention.

Mr. John Akers
March 14, 2003
Page 5

Please be assured that we will work closely with you to meet your objectives and expectations of high quality service. If you have any questions, please do not hesitate to call Jane Zeis at 312-946-3696 or me at 312-946-2260.

Very truly yours,

DELOITTE & TOUCHE LLP

By *N. de Bubnovich*
Nick Bubnovich
Partner

AGREED AND ACCEPTED BY
W.R. Grace and Company

Name: _____

Title: *Chairman Comp Committee, Board of Directors*

Date.  *3 - 28 -03*

Copies to:        Brian McGowan, W.R. Grace & Co.
                  Michael Piergrossi, W.R. Grace & Co.
                  Jane Zeis, Deloitte & Touche LLP



## GENERAL BUSINESS TERMS

**1. Services.** It is understood and agreed that D&T's services may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, the Client. In connection with its services hereunder, D&T shall be entitled to rely on all decisions and approvals of the Client.

**2. Payment of Invoices.** Properly submitted invoices upon which payment is not received within thirty (30) days of the invoice date shall accrue a late charge of the lesser of (i) 1½% per month or (ii) the highest rate allowable by law, in each case compounded monthly to the extent allowable by law. Without limiting its rights or remedies, D&T shall have the right to halt or terminate its services entirely if payment is not received within thirty (30) days of the invoice date.

**3. Term.** Unless terminated sooner in accordance with its terms, this engagement shall terminate on the completion of D&T's services hereunder. This engagement may be terminated by either party at any time by giving written notice to the other party not less than thirty (30) days before the effective date of termination.

**4. Ownership.**

a) <u>D&T Technology.</u> D&T has created, acquired or otherwise has rights in, and may, in connection with the performance of services hereunder, employ, provide, modify, create, acquire or otherwise obtain rights in, various concepts, ideas, methods, methodologies, procedures, processes, know-how, and techniques (including, without limitation, function, process, system and data models); templates; generalized features of the structure, sequence and organization of software, user interfaces and screen designs, general purpose consulting and software tools, utilities and routines; and logic, coherence and methods of operation of systems (collectively, the "D&T Technology").

b) <u>Ownership of Deliverables.</u> Except as provided below, upon full and final payment to D&T hereunder, the tangible items specified as deliverables or work product in the engagement letter to which these terms are attached (the "Deliverables") shall become the property of the Client. To the extent that any D&T Technology is contained in any of the Deliverables, D&T hereby grants the Client, upon full and final payment to D&T hereunder, a royalty-free, fully paid-up, worldwide, non-exclusive license to use such D&T Technology in connection with the Deliverables.

c) <u>Ownership of D&T Property.</u> To the extent that D&T utilizes any of its property (including, without limitation, the D&T Technology or any hardware or software of D&T) in connection with the performance of services hereunder, such property shall remain the property of D&T and, except for the license expressly granted in the preceding paragraph, the Client shall acquire no right or interest in such property. Notwithstanding anything herein to the contrary, the parties acknowledge and agree that (a) D&T shall own all right, title, and interest, including, without limitation, all rights under all copyright, patent and other intellectual property laws, in and to the D&T Technology and (b) D&T may employ, modify, disclose, and otherwise exploit the D&T Technology (including, without limitation, providing services or creating programming or materials for other clients). D&T does not agree to any terms that may be construed as precluding or limiting in any way its right to (a) provide consulting or other services of any kind or nature whatsoever to any person or entity as D&T in its sole discretion deems appropriate or (b) develop for itself, or for others, materials that are competitive with those produced as a result of the services provided hereunder, irrespective of their similarity to the Deliverables.

**5. Limitation on Warranties. THIS IS A SERVICES ENGAGEMENT. D&T WARRANTS THAT IT SHALL PERFORM SERVICES HEREUNDER IN GOOD FAITH. D&T DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

### 6. Limitation on Damages and Indemnification.

a) The Client agrees that D&T and its personnel shall not be liable to the Client for any claims, liabilities, or expenses relating to this engagement for an aggregate amount in excess of the fees paid by the Client to D&T pursuant to this engagement, except to the extent finally judicially determined to have resulted primarily from the bad faith or intentional misconduct of D&T. In no event shall D&T or its personnel be liable for consequential, special, indirect, incidental, punitive or exemplary loss, damage, or expense relating to this engagement.

b) The Client shall indemnify and hold harmless D&T and its personnel from all claims, liabilities, and expenses relating to this engagement, except to the extent finally judicially determined to have resulted primarily from the bad faith or intentional misconduct of D&T.

c) The provisions of this Paragraph and Paragraphs 9 and 11(b) shall apply to the fullest extent of the law, whether in contract, statute, tort (such as negligence), or otherwise. In circumstances where all or any portion of the provisions of this Paragraph or Paragraph 11(b) are finally judicially determined to be unavailable, D&T's aggregate liability for any claims, liabilities, or expenses relating to this engagement shall not exceed an amount which is proportional to the relative fault that D&T's conduct bears to all other conduct giving rise to such claims, liabilities, or expenses.

### 7. Cooperation
The Client shall cooperate with D&T in the performance by D&T of its services hereunder, including, without limitation, providing D&T with reasonable facilities and timely access to data, information and personnel of the Client. The Client shall be responsible for the performance of its personnel and agents and for the accuracy and completeness of all data and information provided to D&T for purposes of the performance by D&T of its services hereunder.

### 8. Force Majeure.
D&T shall not be liable for any delays or non-performance resulting from circumstances or causes beyond its reasonable control, including, without limitation, acts or omissions or the failure to cooperate by the Client (including, without limitation, entities or individuals under its control, or any of their respective officers, directors, employees, other personnel and agents), acts or omissions or the failure to cooperate by any third party, fire or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

### 9. Limitation on Actions
No action, regardless of form, relating to this engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for non-payment may be brought by a party not later than one year following the date of the last payment due to such party hereunder.

### 10. Independent Contractor.
It is understood and agreed that each of the parties hereto is an independent contractor and that neither party is, nor shall be considered to be, an agent, distributor, partner, fiduciary or representative of the other. Neither party shall act or represent itself, directly or by implication, in any such capacity in respect of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.

### 11. Confidentiality and Internal Use.

a) The Client agrees that all services hereunder and Deliverables shall be solely for the Client's informational purposes and internal use, and are not intended to be and should not be used by any person or entity other than the Client. The Client further agrees that such services and Deliverables shall not be circulated, quoted, disclosed, or distributed to, nor shall reference to such services or Deliverables be made to, any person or entity other than the Client.

b) Notwithstanding anything to the contrary in these terms or the engagement letter to which these terms are attached, (i) D&T hereby acknowledges and agrees that there are no conditions of confidentiality associated with the tax services, if any, provided by D&T or its personnel under these terms or such engagement letter, (ii) neither D&T nor any party known to D&T has or claims to have any proprietary interest in the terms or substance of any tax services, if any, provided by D&T or its personnel under these terms or such engagement letter, and (iii) except as otherwise provided in this subparagraph (b), all services

in connection with this engagement shall be solely for the Client's informational purposes and internal use, and this engagement does not create privity between D&T and any third party. This engagement is not intended for the express or implied benefit of any third party. No third party is entitled to rely, in any manner, or for any purpose, on the advice, opinions, reports, or other services or Deliverables of D&T. The Client further agrees that the advice, opinions, reports and Deliverables issued by D&T shall not be distributed to any third party without the prior written consent of D&T. D&T agrees that such consent will ordinarily be granted with respect to tax services-related materials, provided that the Client makes a specific written request of D&T and the third party seeking such tax services-related materials executes an acknowledgment of non-reliance and a release acceptable to D&T. In order to protect D&T from any unauthorized reliance or claims, and from breach of the Client's obligation not to distribute D&T's advice, opinion, reports or Deliverables to any third party without D&T's prior written consent, the Client agrees to indemnify and hold harmless D&T and its personnel from all claims, liabilities, and expenses relating to such a breach. However, nothing in this Paragraph 11 shall be construed as limiting or restricting disclosure of every aspect of D&T's tax services, if any, provided under these terms or the engagement letter to which these terms are attached for purposes of §6111(d) of the Internal Revenue Code. The Client and its employees, representatives or agents may disclose the structure and tax aspects of a transaction to any and all persons without limitation of any kind.

c) To the extent that, in connection with this engagement, D&T comes into possession of any proprietary or confidential information of the Client, D&T will not disclose such information to any third party without the Client's consent, except (a) as may be required by law, regulation, judicial or administrative process, or in accordance with applicable professional standards, or in connection with litigation pertaining hereto, or (b) to the extent such information (i) shall have otherwise become publicly available (including, without limitation, any information filed with any governmental agency and available to the public) other than as the result of a disclosure by D&T in breach hereof, (ii) is disclosed by the Client to a third party without substantially the same restrictions as set forth herein, (iii) becomes available to D&T on a nonconfidential basis from a source other than the Client which D&T believes is not prohibited from disclosing such information to D&T by obligation to the Client, (iv) is known by D&T prior to its receipt from the Client without any obligation of confidentiality with respect thereto, or (v) is developed by D&T independently of any disclosures made by the Client to D&T of such information

**12. Survival and Interpretation.** The agreements and undertakings of the Client contained in the engagement letter to which these terms are attached, together with the provisions of Paragraphs 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16 hereof, shall survive the expiration or termination of this engagement. For purposes of these terms, "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; to the extent providing services under the engagement letter to which these terms are attached, Deloitte Touche Tohmatsu, its member firms, and the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu and its member firms, all of their partners, principals, members, owners, directors, staff and agents; and in all cases any successor or assignee.

**13. Assignment** Except as provided below, neither party may assign, transfer or delegate any of its rights or obligations hereunder (including, without limitation, interests or claims relating to this engagement) without the prior written consent of the other party. D&T may, without the consent of the Client, assign or subcontract its rights and obligations hereunder to (a) any affiliate or related entity or (b) any entity which acquires all or a substantial part of the assets or business of D&T.

**14. Waiver of Jury Trial. D&T AND THE CLIENT HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER IN CONTRACT, STATUTE, TORT (SUCH AS NEGLIGENCE), OR OTHERWISE) RELATING TO THIS ENGAGEMENT.**

**15. Entire Agreement, Amendment and Notices.** These terms, and the engagement letter to which these terms are attached, including exhibits, constitute the entire agreement between D&T and the Client with respect to this engagement, supersede all other oral and written representations, understandings or agreements relating to this engagement, and may not be amended except by written agreement signed by the parties. In the event of any conflict, ambiguity, or inconsistency between these terms and the engagement letter to which these terms are

attached, these terms shall govern and control  All notices hereunder shall be (i) in writing, (ii) delivered to the representatives of the parties at the addresses first set forth above, unless changed by either party by notice to the other party, and (iii) effective upon receipt.

16. **Covering Law and Severability.**  These terms, the engagement letter to which these terms are attached, including exhibits, and all matters relating to this engagement (whether in contract, statute, tort (such as negligence), or otherwise), shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof).  If any provision of such terms or engagement letter is found by a court of competent jurisdiction to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

**ATTACHMENT A**

15

## ATTACHMENT A

**Parties-in-Interest for whom Deloitte & Touche LLP or its affiliates (for this purpose only, "Deloitte") has provided or is currently providing services in matters unrelated to these Chapter 11 cases or with whom Deloitte has other relationships including banking relationships.**

American Casualty Company of Reading, Pennslyvania

Amro Trust Company N.V.

Atlantic 960 Corp.

Atlantic Financial Services, Inc.

Atlantic New Jersey Corp.

Bank of America Corporation

Bank of Nova Scotia

Barclay';s Bank PLC

BASF AG and affiliates

BNY Capital Markets

C N A Financial Corporation

Caplin & Drysdale

Chase & M.D. Sass Partners, L.P.

Citigroup Inc.

CNA Financial Corp and affiliates

Commerzbank AG

Continental Assurance Company

Continental Corporation

Credit Lyonnais

Credit Suisse First Boston Corporation and affiliates

DCP & MSP Trusts

Delta Chemical Cleaning Inc

Depository Trust Company Inc

DLJ Fund Partners

Dresdner Bank Group

Dresdner RCM Global Investors LLC

Dupont Pharmaceuticals Company

DuPont, John

DuPont, Michele

DuPont, Philip A.

Dupont, Richard

DuPont, Thomas L.

E I DuPont De Nemours & Co

Fresenius Medical Care Co.

FTI

Gramercy Leasing Services, Inc.

HSBC Bank and affiliates

Huntsman Corporation

Illinois Tool Works Inc

Ingersoll-Rand Company Inc

Invest. C. of Bank Hapoalim

JP Morgan Chase Bank and affiliates

Kamax

Kirkland & Ellis

Latham & Watkins

Lloyds Acceptance Corp

Lloyds Bank PLC

Los Angeles Unified School District

Murphy, John, Estate of

Northern Trust Corp.

Omega Commercial Mortgage Corp.

Omni Commercial LLC

Perch, Frank, III

Potash Corporation

Radian Group Inc.

RCB International In

Rexene Corporation

Sealed Air Corporation

Siegel, David

Sky Investment Corporation

Standard Funding Corp.

Stroock & Stroock & Lavan LLP

The Bank of New York Co.

Union Carbide Corporation

Valeron Strength Films, LP

Wachovia Corporation and affiliates