IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

**Response Deadline:  May 9, 2003**
**Hearing Date:  May 19, 2003 at 12:00 p.m.**

### DEBTORS' RESPONSE TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO EXTEND TIME WITHIN WHICH AVOIDANCE ACTIONS MAY BE BROUGHT AND STAYING THE LIMITATIONS DEADLINE PENDING A DECISION ON THIS MOTION (DOCKET NO. 3601)

The above-captioned debtors and debtors in possession (collectively, the

"Debtors"), by their undersigned counsel, respectfully submit this response to the Official

Committee of Unsecured Creditors' (the "Committee") Motion to Extend Time Within Which

Avoidance Actions May be Brought and Staying the Limitations Deadline Pending a Decision on

This Motion (the "Motion").  The Debtors respectfully represent as follows:

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## Background

1.      Pursuant to section 546 of title 11 of the United States Code (as amended,
the "Bankruptcy Code"), the Debtors must initiate any avoidance actions under sections 544,
545, 547, 548 or 553 (the "Avoidance Actions") within 2 years after the entry of the order for
relief in their chapter 11 cases, which was entered on April 2, 2001 (the "Petition Date"). Thus,
the statutory deadline for filing any Avoidance Action was April 2, 2003 (the "Filing Deadline").

2.      For a transfer to be avoidable as a preference pursuant to section 547 or a
fraudulent conveyance pursuant to section 548, the transfer must have been made while the
debtor was insolvent. The Debtors in these cases have always maintained and continue to
maintain that they do not believe they were insolvent at any relevant time.

3.      The Committee, in its Motion, correctly indicates that the Debtors made
the determination that no Avoidance Actions should be pursued in these cases. The Committee
briefly discusses the steps undertaken by the Debtors to support their determination in this
regard. However, the Motion understates the extent of the review conducted by the Debtors. In
reviewing the Committee's Motion, the Debtors believe the Court needs to be fully informed of
the extensive review undertaken by the Debtors.

**The Debtors Review Process**

4.      In anticipation of the Filing Deadline, in November 2002, the Debtors
began a comprehensive review of their books and records, including, but not limited to, the
accounts payable records for W. R. Grace & Co.-Conn., Darex Puerto Rico, Inc., Remedium

Group, Inc. and the Davison division of W. R. Grace & Co.-Conn., (the "Books and Records") to determine what Avoidance Actions would otherwise be appropriate.

5.     As was noted in the Motion and as is set forth in detail in the Avoidance Action Memo provided by the Debtors to the Committee, the Debtors' review of the Books and Records showed a significant number of payments made within the ninety days prior to the Petition Date, with over ninety percent of such payments being for relatively nominal amounts. The payments reviewed by the Debtors can be classified under the following categories: (A) payments to vendors made within ninety days prior to the Petition Date and payments to vendors who are insiders of the Debtors made within one year prior to the Petition Date (the "Trade Payments"); (B) payments made to professionals within ninety days prior to the Petition Date (the "Professional Payments"); (C) payments made pursuant to litigation settlement agreements within ninety days prior to the Petition Date (the "Settlement Payments"); (D) payments, other than payments related to ordinary wages, pensions and benefits, made to current employees and any other insider within one year prior to the Petition Date and to former employees within ninety days prior to the Petition Date (the "Employee Payments"); and (E) payments made to foreign subsidiaries (the "Intercompany Payments"). The Debtors also reviewed their records for potential setoff claims, potential tax lien avoidance actions and reviewed their records with respect to various corporate transactions for potential fraudulent transfers.

6.     This review of the Books and Records, in fact, led to the Debtors' discovery of inconsistencies between its schedules of liabilities filed with this Court with respect

to trade payables and the Books and Records. As a result of the inconsistency, the Debtors

undertook an extensive review of all of the filed schedules to confirm their accuracy and, in

January 2003, filed certain amended schedules of liabilities.

   7.  The Debtors review was conducted consistent with their fiduciary duties

and with primary consideration given to the best interests of their estates and their creditors. The

Debtors' determinations with respect to Avoidance Actions were summarized in a memo (the

"Avoidance Action Memo")[2] delivered on or about February 19, 2003, to the three creditors'

committees appointed in these cases (the "Creditors' Committees").

**Results Of The Avoidance Action Review**

   8.  The Debtors' review of their books and records showed approximately

45,000 payments made in the ninety days prior to the Petition Date totaling over $300,000,000.

Over 44,000 of these payments were for less than $50,000, and over 42,000 were for less than

$10,000. The payments reviewed, as outlined above, by the Debtors can be classified under the

following categories: (A) Trade Payments; (B) Professional Payments; (C) Settlement

Payments; (D) Employee Payments; and (E) Intercompany Payments. The Debtors also

reviewed their records for potential fraudulent transfers, potential setoff claims and potential tax

lien avoidance actions.

---

[2] The Debtors will provide a copy of the Avoidance Action Memo and its attached exhibits detailing the reviewed transfers to the Court upon request. However, due to the confidential nature of the contents of the Avoidance Action Memo, it will not be filed on the Court's docket or otherwise made publicly available.

A.    **Trade Payments.**

9.    The Debtors reviewed all Trade Payments made within ninety days prior to the Petition Date and also reviewed their records for any transactions with insiders within one year prior to the Petition Date. The review found no Trade Payments made to insiders of the Debtors within the one year period. The review found in excess of 44,000 Trade Payments made within the ninety day period totaling in excess of $180,000,000. As with the overall group of reviewed payments, the vast majority of these Trade Payments were for amounts less than $50,000 (the "De Minimis Trade Payments").

10.    The Debtors concluded that it was in the best interests of their estates to exclude the De Minimis Trade Payments from the review of the Trade Payments for potential Avoidance Actions. The Debtors reached this conclusion based on (a) the time and expense necessary to review every one of the Trade Payments and the attendant distraction, (b) the Debtors' determination that the vast majority of the De Minimis Trade Payments were highly likely to have been made in the ordinary course of business and according to ordinary business terms and (c) the likelihood that the amounts recovered would not cover the costs associated with prosecuting Avoidance Actions related to the De Minimis Trade Payments.

11.    The Debtors' ordinary course of business for at least several years prior to the Petition Date was to pay their trade creditors between 30 and 90 days after the receipt of an invoice. Frequently, vendors would be paid substantially later as a result of a variety of issues, generally related to the posting of the invoice in the Debtors' accounting system. The variance in the payment timing was not a result of consistent factors and would vary across divisions and

between vendors. For purposes of this review, the Debtors determined that the proper cutoff was 60 days—i.e., that Trade Payments made less than 60 days after the invoice date would be deemed to be in the ordinary course and not subject to a potential Avoidance Action and that Trade Payments made more than 60 days after the invoice date would be subject to further review.

12.    The Debtors' review found a total of twenty-one Trade Payments in excess of $50,000 which were made more than 60 days after the invoice date, with eight of the payments to the same vendor and four more of the payments to another. All but seven of the Trade Payments were made within ninety days after the invoice date, consistent with the Debtors established practice. Of the seven made more than ninety days after the invoice date, one was made 92 days after the invoice date.

13.    The Debtors determined that none of the Trade Payments should be pursued in an Avoidance Action. Each of the vendors receiving a payment in excess of $50,000 which were made more than 60 days after the invoice date either continues to, or may again in the future, provide necessary products or services to the Debtors and the continued relationship is important to the business operations of the Debtors.

**B.    Professional Payments**

14.    The Debtors reviewed all Professional Payments made within ninety days prior to the Petition Date. The review found approximately 350 Professional Payments (covering over 2,300 invoices) totaling in excess of $28,000,000. In reviewing the Professional Payments, the

Debtors utilized the same $50,000 and sixty day after invoice date thresholds as with the Trade Payments.

15.    The Debtors' review found a total of seven Professional Payments in excess of $50,000 which were made more than 60 days after the invoice date. All but three of the Professional Payments were made within ninety days of the invoice date, consistent with the Debtors' established practice. Of the three Professional Payments made more than ninety days after the invoice, one was made 91 days after the invoice date and the other two were made 96 days after the invoice date.

16.    The Debtors determined that none of the Professional Payments should be pursued in an Avoidance Action. Each of the professionals either continues to, or may again in the future, provide key professional services to the Debtors and the continued relationship with these professionals is vital to the business operations and the efficient restructuring of the Debtors.

### C.    Settlement Payments

17.    The Debtors reviewed all Settlement Payments made within ninety days prior to the Petition Date. The review found approximately 160 Settlement Payments made to nearly 12,000 individuals within ninety days totaling in excess of $83,800,000. In reviewing the Settlement Payments, the Debtors utilized the same $50,000 threshold as with the Trade Payments. Each of the Settlement Payments was made pursuant to a contract or contracts resolving asbestos-related litigation.

18.    The Debtors concluded that none of the Settlement Payments should be pursued in an Avoidance Action. To the best of the Debtors' knowledge, from reviewing the payment records, it appears that the majority of the Settlement Payments have been distributed to the individual plaintiffs and thus, even if the Settlement Payments were found to be avoidable, the Debtors would face an almost insurmountable barrier to recovery of the funds.

### D.    Employee Payments

19.    The Debtors reviewed all Employee Payments. The review found approximately 525 Employee Payments made within ninety days prior to the Petition Date for former employees or within one year prior to the Petition Date for current employees totaling approximately $18,700,000. Approximately 90% of this amount ($17,000,000) consists of payments made to employees under established deferred compensation programs that the Debtors had in place for more than ten years prior to the periods under review. The Wage Order entered by the Court shortly after the Petition Date approved the continuation of payments under the established deferred compensation programs after the Petition Date.

20.    In reviewing the Employee Payments, the Debtors determined that none of the Employee Payments should be pursued in an Avoidance Action. The monetary and non-monetary costs of any such Avoidance Action outweigh the potential recovery because given the current status of the Chapter 11 Cases, the Debtors' management believes that it will be unable to maintain employee morale and loyalty if it initiated Avoidance Actions against current or former employees related to payments made under deferred compensation and retirement programs. The employees' morale, continued loyalty to the Debtors and faith in the Debtors'

management would be greatly diminished by such action. Maintaining a dedicated, motivated and loyal workforce is necessary to maximize the Debtors' chances of successfully reorganizing.

### E.    Intercompany Payments

21.    The Debtors also made payments to foreign subsidiaries in the 90 days prior to the Petition Date. All these payments related to goods and services provided to the Debtors. Two of these Intercompany Payments were for an amount in excess of $50,000 and were made more than 60 days after the date of the invoice. The Debtors determined that these Intercompany Payments should not be pursued in an Avoidance Action because any reconciliation of such payments can be more efficiently achieved at the appropriate time, if necessary, without incurring the expense of litigation.

### F.    Fraudulent Conveyance

22.    The Debtors reviewed all transfers of assets outside of the ordinary course of business for the 5 year period prior to the Petition Date. Other than the Sealed Air and Fresenius transactions, all transfers of assets which the Debtors made outside of the ordinary course of business were sales of assets or stock (generally of a business unit or real estate) for cash, and occasionally for securities of the acquiring company or the right to future payments based on sales or earnings of the acquiring company (the "Divestment Sales"). Only four of the Divestment Sales and the 2001 Advanced Refining Technologies ("ART") joint venture with ChevronTexaco were made under the current management team, and only two of the Divestment Sales involved material consideration. All of the Divestment Sales were made to unaffiliated buyers (sometimes including existing management as part of the buying group) in negotiated

transactions that were approved by the Board of Directors. The Debtors' review of the

Divestment Sales under the current management team and the ART joint venture indicates that

each of the transactions was for reasonably equivalent value, and the Debtors are not aware of

any information suggesting that Divestment Sales by previous management were not also made

for fair equivalent value.

G.      **Setoffs**

23.     Section 553 provides that a setoff made within 90 days of the Petition

Date may be recovered through an Avoidance Action. The Debtors reviewed all of their

accounts to determine if any setoff was made in the 90 days prior to the Petition Date. The

Debtors determined that no creditor set off any mutual obligations in the 90 days prior to the

Petition Date.

H.      **Tax Liens**

24.     The Debtors did not uncover any possible Avoidance Actions related to

tax liens because (a) prior to the Petition Date, the Debtors were generally paying taxes which

could give rise to a secured claim and (b) most of the potential tax liens which could occur relate

to state tax obligations for which state law provides that the tax creates a lien automatically and

thus is not subject to avoidance under section 545.

25.     As indicated above, the Avoidance Action Memo containing this analysis

and the exhibits thereto were provided by the Debtors to the three Creditors' Committees on

February 19, 2003. Other than acknowledgements of the receipt of the Avoidance Action

Memo, none of the three Creditors' Committees contacted either the Debtors or the Debtors'

counsel or financial advisors with respect to the contents of the Avoidance Action Memo. The only communication was from the Committee, who contacted the Debtors' counsel on March 27, 2003, to inquire if either of the other Committees had discussed with the Debtors bringing any Avoidance Actions and to confirm that the Debtors did not intend to commence any Avoidance Actions as was clearly stated in the Avoidance Action Memo.

**Argument**

26.    The Debtors respectfully request that the Court deny the Committee's request to extend the time for Avoidance Actions to be brought. The Debtor's believe that the extension of the deadline for bringing such actions is inappropriate for two reasons: (a) the Debtors believe that the commencement of Avoidance Actions will not benefit their estates; and (b) while the Debtors appreciate the uncertainty that the status of the Cybergenics appeal presents with respect to the power of the Creditors' Committees to prosecute any Avoidance Actions, the Debtors believe that the Court simply does not have the authority to extend the Filing Deadline.

**Bringing Avoidance Actions will not Benefit the Debtors Estates**

27.    As was set forth in the Avoidance Action Memo, the Debtors do not believe that there are any Avoidance Actions which should be brought. The Debtors' extensive analysis of the transfers took into consideration several factors in arriving at this conclusion. First, the Debtors believe that all of the subject transfers were made while the Debtors were solvent. The solvency of the Debtors at the time of a transfer provides a defense for virtually all of the defendants in potential Avoidance Actions. Second, the vast majority of the transfers were

for relatively small dollar amounts, which makes the costs for review of the transfers and prosecution of the Avoidance Actions likely to exceed the expected benefit to the Debtors' estates. Third, the value and critical importance of the trade vendors, professionals and employees to the Debtors' successful reorganization outweigh any potential recovery. Fourth, with respect to potential fraudulent conveyances (other than Sealed Air and Fresenius), the Debtors believe that all of the sales of business units, real estate and similar dispositions were negotiated at arms length and the Debtors received reasonably equivalent value for the assets. Finally, with respect to Avoidance Actions other than preferences and fraudulent conveyances including, but not limited to, actions under sections 544, 545 and 553 of the Bankruptcy Code, the Debtors' review found no transactions which could give rise to Avoidance Actions.

28.     Given the Debtors' extensive analysis of the potential Avoidance Actions and their consideration of the costs and uncertainty attendant to the prosecution of Avoidance Actions, the Debtors made the determination that the pursuit of any Avoidance Actions was not in the best interests of the Debtors' estates and their creditors. Therefore, the Debtors believe that the Committee's Motion to extend the Filing Deadline should be denied as there are no Avoidance Actions which should be pursued.

**The Deadline for Commencing Avoidance Actions may not be Extended by the Court**

29.    Section 546(a) of the Bankruptcy Code provides:

An action or proceeding under section 544, 545, 547, 548, or 553

of this title may not be commenced after the earlier of:

(1)  the later of:

(A)  2 years after the entry of the order for relief; or
(B)  1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or

(2)  the time the case is closed or dismissed.

The plain language of the statute prohibits the filing of Avoidance Actions more than two years after the Petition Date.  As this court has noted, while a potential defendant to an Avoidance Action may stipulate with the plaintiff to an extension of the deadline, the court does not have discretion to extend the Filing Deadline.  In re Owens Corning, Case No. 00-3837 (Bankr. D. Del.), September 24, 2002 hearing transcript, page 75 ("If you do not have a tolling agreement in hand by noon on the day before the statute of limitations runs, then I expect to see actions brought the next day to the extent the debtor has agreed to bring them.  Now I know that pushes you.  There's nothing I can do about that.  You're up against the deadline.").  See also In re Harnischfeger Industries, Inc., 288 B.R. 79, 87 (Bankr. D. Del. 2003) (noting that dismissal of a complaint after the expiration of the section 546 statute of limitations "will effectively result in dismissal with prejudice"); In re National Health & Safety Corp., 2001 WL 1677028, fn 19

(Bankr. E.D. Pa.) ("Indeed it is questionable whether the time limits of § 546(a) can be modified, and I would not have done so without the parties supplying persuasive authority.").

30.     The Filing Deadline is not an absolute bar to an action, since the necessary parties to an Avoidance Action may agree to an extension of the deadline.  This alternative to initiation of an adversary proceeding was specifically recognized in the legislative history to section 546(a):  "The time limits are not intended to be jurisdictional and **can be extended by stipulation between the necessary parties to the action** or proceeding."  (emphasis added). H.R. Rep. No. 103-835, at 49-50 (1994).  However, a stipulation to extend the deadline requires the agreement of the potential defendant and cannot be accomplished unilaterally.

31.     Granting an extension of the Filing Deadline defeats the basic purpose of the statute of limitations set forth in Section 546.  As courts have recognized, the purpose of the deadline under Section 546 "is to provide finality for creditors who have received payments from the debtor" and that the "focus of statutes of limitations is therefore to protect defendants."  In re Luria Steel and Trading Corp., 164 B.R. 293 (Bankr. N.D. Ill. 1994) citing United States v. Kubrick, 444 U.S. 111, 117 (1979); In re Korvettes, Inc., 42 B.R. 217, 221 (Bankr. S.D.N.Y. 1984), rev'd on other grounds, 67 B.R. 730 (S.D.N.Y. 1986).  A unilateral extension of the Filing Deadline is contrary to the policy underlying the limitation imposed on Avoidance Actions by Section 546 of the Bankruptcy Code.

32.     Further, notwithstanding any uncertainty about its authority as a result of Cybergenics, if the Committee believed that there were Avoidance Actions that should have been pursued, the appropriate approach would have been either to contact the Debtors and request that

they obtain tolling agreements from the potential Avoidance Action defendants identified by the

Committee, or to approach directly the potential defendants they had identified.  Having done

neither, and in fact only raising the issue by filing the Motion on the last day before the

expiration of the statute of limitations under Section 546, the Committee should not be entitled to

an extension of the Filing Deadline.

## Conclusion

For these reasons, the Motion to extend the time to bring avoidance actions should

be denied.

Dated:  May 2, 2003

KIRKLAND & ELLIS
David M. Bernick, P.C.
Janet S. Baer
James W. Kapp III
Christian J. Lane
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB P.C.

Laura Davis Jones (Bar #2436)
Scotta E. McFarland (Bar #4184)
Paula A. Galbraith (Bar #4258)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession