# EXHIBIT A

493915_7

# KIRKLAND & ELLIS
## MEMORANDUM

TO: Official Committee of Unsecured Creditors
Official Committee of Asbestos Property Damage Claimants
Official Committee of Asbestos Personal Injury Claimants

FROM: Kirkland & Ellis

DATE: February 14, 2003

RE: W. R. Grace & Co. (the "Debtors")--Review of Potential Avoidance Actions

As you know, pursuant to section 546 of the Bankruptcy Code, the Debtors must initiate any avoidance actions under sections 544, 545, 547, 548 or 553 (the "Avoidance Actions") within 2 years after the entry of the order for relief in their chapter 11 cases, which was entered on April 2, 2001 (the "Petition Date"). Thus, the deadline for filing any Avoidance Action is April 2, 2003 (the "Filing Deadline"). As you also are aware, for a transfer to be avoidable as a preference pursuant to section 547, the transfer must have been made while the debtor was insolvent. The Debtors, of course, do not believe they were insolvent at any relevant time. However, in anticipation of the Filing Deadline, the Debtors have conducted a review of their books and records to determine what Avoidance Actions would otherwise be appropriate. The Debtors review was conducted consistent with their fiduciary duties and with primary consideration given to the best interests of their estates and their creditors. The Debtors' determinations with respect to Avoidance Actions are summarized herein and in the attached tables.

The Debtors' review of their books and records showed approximately 45,000 payments made in the ninety days prior to the Petition Date totaling over $300,000,000.[1] Over 44,000 of these payments were for less than $50,000, and over 42,000 were for less than $10,000. The payments reviewed by the Debtors can be classified under the following categories: (A) payments to vendors made within ninety days prior to the Petition Date and payments to vendors who are insiders of the Debtors made within one year prior to the Petition Date (the "Trade Payments"); (B) payments made to professionals within ninety days prior to the Petition Date (the "Professional Payments"); (C) payments made pursuant to litigation settlement agreements within ninety days prior to the Petition Date (the "Settlement Payments"); (D) payments, other than payments related to ordinary wages, pensions and benefits, made to current employees and any other insider within one year prior to the Petition Date and to former employees within ninety days prior to the Petition Date (the "Employee Payments"); and (E) payments made to foreign subsidiaries (the "Intercompany Payments"). The Debtors also reviewed their records for potential fraudulent transfers, potential setoff claims and potential tax lien avoidance actions.

1. **Trade Payments**

The Debtors reviewed all Trade Payments made within ninety days prior to the Petition Date and also reviewed their records for any transactions with insiders within one year prior to the Petition Date. The review found no Trade Payments made to insiders of the Debtors within the one year period. The review found in excess of 44,000 Trade Payments made within ninety days totaling in excess of $180,000,000. As with the overall group of reviewed payments, the

---

[1] Due to the length of the list setting forth a description of each of the 45,000 payments, it is not attached hereto. An electronic version of the complete list will be supplied, upon request.

2

vast majority of these Trade Payments were for amounts less than $50,000 (the "De Minimis Trade Payments").

The Debtors concluded that it was in the best interests of their estates to exclude the De Minimis Trade Payments from the review of the Trade Payments for potential Avoidance Actions. The Debtors reached this conclusion based on (a) the time and expense necessary to review every one of the Trade Payments and the attendant distraction, (b) the Debtors' determination that the vast majority of the De Minimis Trade Payments were highly likely to have been made in the ordinary course of business and according to ordinary business terms and (c) the likelihood that the amounts recovered would not cover the costs associated with prosecuting Avoidance Actions related to the De Minimis Trade Payments.

The Debtors' ordinary course of business for at least several years prior to the Petition Date was to pay their trade creditors between 30 and 90 days after the receipt of an invoice. Frequently, vendors would be paid substantially later as a result of a variety of issues, generally related to the posting of the invoice in the Debtors' accounting system. The variance in the payment timing was not a result of consistent factors and would vary across divisions and between vendors. For purposes of this review, the Debtors determined that the proper cutoff was 60 days—i.e. that Vendor Payments made less than 60 days after the invoice date would be deemed to be in the ordinary course and not subject to a potential Avoidance Action and that Vendor Payments made more than 60 days after the invoice date would be subject to further review.

The attached Exhibit 1 sets forth the Vendor Payments in excess of $50,000 reviewed by Grace. The attached Exhibit 2 sets forth the Vendor Payments in excess of $50,000 which were made more than 60 days after the invoice date. There are only a total of twenty-one Vendor

3

Payments in this category, with eight of the payments to the same vendor (████████ ████████) and four more of the payments to another (████████████ ████████████). All but seven of the Vendor Payments were made within ninety days after the invoice date, consistent with the Debtors established practice. Of the seven made more than ninety days after the invoice date, one was made 92 days after the invoice date.

The Debtors have determined that none of the Vendor Payments should be pursued in an Avoidance Action. Each of the vendors on Exhibit 2 either continues to, or may again in the future, provide necessary products or services to the Debtors and the continued relationship is important to the business operations of the Debtors.

2.  **Professional Payments**

The Debtors reviewed all Professional Payments made within ninety days prior to the Petition Date. The review found approximately 350 Professional Payments (covering over 2,300 invoices) totaling in excess of $28,000,000. In reviewing the Professional Payments, the Debtors utilized the same $50,000 and sixty day after invoice date thresholds as with the Vendor Payments.

The attached Exhibit 3 sets forth the 131 Professional Payments which were paid to the 49 professionals who received Professional Payments of $50,000 or more. The attached Exhibit 4 sets forth all Professional Payments in excess of $50,000 which were made more than 60 days after the invoice date. There are a total of seven Professional Payments in this category. All but three of the Professional Payments were made within ninety days of the invoice date, consistent with the Debtors' established practice. Of the three Professional Payments made more than ninety days after the invoice, one was made 91 days after the invoice date and the other two were made 96 days after the invoice date.

4

The Debtors have determined that none of the Professional Payments should be pursued in an Avoidance Action. Each of the professionals on Exhibit 4 either continues to, or may again in the future, provide key professional services to the Debtors and the continued relationship with these professionals is vital to the business operations and the efficient restructuring of the Debtors.

3. **Settlement Payments**

The Debtors reviewed all Settlement Payments made within ninety days prior to the Petition Date. The review found approximately 160 Settlement Payments made to nearly 12,000 individuals within ninety days totaling in excess of $83,800,000.[2] In reviewing the Settlement Payments, the Debtors utilized the same $50,000 threshold as with the Vendor Payments. A list of the Settlement Payments in excess of $50,000 is set forth on the attached Exhibit 5. Each of the Settlement Payments was made pursuant to a contract or contracts resolving asbestos-related litigation.

The Debtors have concluded that none of the Settlement Payments should be pursued in an Avoidance Action. To the best of the Debtors' knowledge from reviewing the payment records it appears that the majority of the Settlement Payments have been distributed to the individual plaintiffs and thus, even if the Settlement Payments were found to be avoidable, the Debtors would face an almost insurmountable barrier to recovery of the funds. In addition, Judge Fitzgerald previously made clear, at a hearing discussing avoidance actions in Owens Corning, that she was not interested in the debtor pursuing recovery of asbestos settlement payments which had been distributed to the individual plaintiffs.

---

[2] Due to the length of the list setting forth a description of each of the 12,000 plus individual payments, it is not attached hereto. An electronic version of the complete list will be supplied, upon request.

5

4. <u>**Employee Payments**</u>

The Debtors reviewed all Employee Payments. The review found approximately 525 Employee Payments made within ninety days prior to the Petition Date for former employees or within one year prior to the Petition Date for current employees totaling approximately $18,700,000. Approximately 90% of this amount ($17,000,000) consists of payments made to employees under established deferred compensation programs that the Debtors had in place for more than ten years prior to the periods under review. The Wage Order approved the continuation of payments under the established deferred compensation programs after the Petition Date.

In reviewing the Employee Payments, the Debtors determined that none of the Employee Payments should be pursued in an Avoidance Action. The monetary and non-monetary costs of any such Avoidance Action outweigh the potential recovery because given the current status of the Chapter 11 Cases, the Debtors' management believes that it will be unable to maintain employee morale and loyalty if it initiated Avoidance Actions against current or former employees related to payments made under deferred compensation and retirement programs. The employees' morale, continued loyalty to the Debtors and faith in the Debtors' management would be greatly diminished by such action. Maintaining a dedicated, motivated and loyal workforce is necessary to maximize the Debtors' chances of successfully reorganizing.

5. <u>**Intercompany Payments**</u>

The Debtors also made payments to foreign subsidiaries in the 90 days prior to the Petition Date. All these payments related to goods and services provided to the Debtors. Two of these Intercompany Payments, which are set forth on Exhibit 6, were for an amount in excess of $50,000 and were made more than 60 days after the date of the invoice. The Debtors have determined that these Intercompany Payments should not be pursued in an Avoidance Action

6

because any reconciliation of such payments can be more efficiently achieved at the appropriate time, if necessary, without incurring the expense of litigation.

6. **Fraudulent Conveyance**

The Debtors reviewed all transfers of assets outside of the ordinary course of business for the 5 year period prior to the Petition Date, as set forth on Exhibit 7. Other than the ▇▇▇▇▇▇ ▇▇▇▇▇▇ transactions of which you are aware, all transfers of assets which the Debtors made outside of the ordinary course of business were sales of assets or stock (generally of a business unit or real estate) for cash, and occasionally for securities of the acquiring company or the right to future payments based on sales or earnings of the acquiring company (the "Divestment Sales"). Only four of the Divestment Sales and the ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ were made under the current management team, and only two of the Divestment Sales involved material consideration. All of the Divestment Sales were made to unaffiliated buyers (sometimes including existing management as part of the buying group) in negotiated transactions that were approved by the Board of Directors. The Debtors' review of the Divestment Sales under the current management team and the ▇▇▇▇▇▇▇▇ indicates that each of the transactions was for reasonably equivalent value, and the Debtors are not aware of any information suggesting that Divestment Sales by previous management were not also made for fair equivalent value.

7. **Setoffs**

As you are aware, section 553 provides that a setoff made within 90 days of the Petition Date may be recovered through an Avoidance Action. The Debtors reviewed all of their accounts to determine if any setoff was made in the 90 days prior to the Petition Date. The Debtors determined that no creditor set off any mutual obligations in the 90 days prior to the Petition Date.

7

8. <u>**Tax Liens**</u>

Review of tax liens for possible Avoidance Actions is ongoing through a review of filed proofs of claim asserting a secured claim based on tax liability. The Debtors do not expect to uncover any possible Avoidance Actions because (a) prior to the Petition Date, the Debtors were generally paying taxes which could give rise to a secured claim and (b) most of the potential tax liens which could occur relate to state tax obligations for which state law provides that the tax creates a lien automatically and thus is not subject to avoidance under section 545. To date, no tax lien subject to avoidance has been discovered.

We hope that the above memorandum proves helpful to you. Based on the above, the Debtors have no present plan to commence any Avoidance Actions. However, after you have reviewed the above and the attached exhibits, we would be happy to respond to any questions you may have or set a time to meet to discuss matters further.