# EXHIBIT A

JG. 7.1996  18:32AM    BOWE, CARUSO & EPSTEIN, P.C.    NO.992    P.2

# OPTION AND SALE AGREEMENT

## FOR LAND

## BETWEEN

## GLOUCESTER NEW COMMUNITIES COMPANY, INC. (SELLER)

## AND

## SUMMIT VENTURES, LLC (PURCHASER)

### DATED:   AUGUST _7_ 1996

PREPARED BY:    William J. Bowe, Esq.
Bowe, Caruso & Epstein
A Professional Corporation
Executive Plaza
3443 Highway 66
Neptune, New Jersey 07753

AUG. 7.1996  10:32AM    BOWE, CARUSO & EPSTEIN, P.C.                    NO.992    P.3

Table of Contents

| Section   Title | Pages |
|---|---|
| 1. Definitions | 1 |
| 2. Grant of Option | 4 |
| 3. Term of Option | 4 |
|    3.01 Escrow Account | 5 |
|    3.02 Infrastructure Fund | 5 |
| 4. Consideration for Option | 5 |
| 5. Entry Onto the Property | 5 |
| 6. Delivery of Title and Related Documents | 6 |
| 7. Recordation | 6 |
| 8. Project Plan Approval | 6 |
| 9. Default | 6 |
| 10. Risk of Loss | 7 |
| 11. Condemnation | 7 |
| 12. Terms and Provisions of the Agreement of Sale | 7 |
| 13. Transaction Description | 7 |
| 14. Base Purchase Price | 7 |
| 15. Kicker Payment; Payment | 8 |
|    15.01 Termination For Non-Payment | 8 |
| 16. Provisions Governing Sale to Builders | 8 |
| 17. Contingencies and Obligations | 9 |
|    17.1 Contingencies | 9 |
|      17.01 Purchaser's Contingencies | 9 |
|      17.01.1 Initial Preliminary Approval | 9 |
|      17.01.2 Development Approvals | 9 |
|      17.02 Purchaser's Obligation | 9 |
|      17.02.1 Purchaser's Filing Obligation | 9 |
|      17.02.2 Purchaser's Bonding Obligations | 9 |
|      17.03 Sellers Contingencies | 9 |
|      17.03.1 Remedial Investigation | 9 |
|      17.04 Termination For Unsatisfied Contingencies | 10 |
|      17.05 Moratorium | 10 |
| 18. ISRA | 10 |
|    18.01 | 10 |
|    18.02 | 10 |
| 19. Closing Date | 10 |
| 20. Representations | 11 |
|    20.01 Seller's Representations | 11 |
|      20.01.1 Ownership | 11 |
|      20.01.2 Authority | 11 |
|      20.01.3 No Actions Against Property | 11 |
|      20.01.4 No Attachments | 11 |
|      20.01.5 No Litigation or Contracts | 11 |
|      20.01.6 No Assessments | 11 |
|      20.01.7 All Owners Bond | 11 |
|      20.01.8 FIRPTA Not Applicable | 11 |
|      20.01.9 Hazardous Material Not Present | 11 |
|      20.02 Purchaser's Representations | 11 |
|      20.02.1 Authority | 11 |
|      20.02.2 No Attachments | 11 |
| 21. Conveyance of Premises | 12 |

AUG. 7.1996  10:33AM    BOWE, CARUSO & EPSTEIN, P.C.                    NO.992    P.4

22. Title Commitment and Survey                                    12
23. Title Review Period                                            12
24. Title Insurance                                                12
25. Seller's Obligation At Closing                                 13
    25.01 Deed                                  13
    25.02 Possession                            13
    25.03 Affidavit of Title                    13
    25.04 Purchaser's Obligation Contingent on Title    13
    25.05 Other Documents                       13
26. Conditions to Closing                                          13
    26.01                                       13
    26.02                                       13
    26.03                                       13
27. Closing Adjustments                                            13
28. Additional Agreements                                          14
    28.01 Deed Description                      14
    28.02 Physical Condition of Property        14
    28.03                                       14
29. Waiver of Contingencies                                        14
30. Breach of Agreement; Damages                                   14
    30.01 Breach By Seller                      14
    30.02 Breach By Purchaser                   15
31. Termination: Winding Up                                        15
32. Bulk Sale                                                      15
    32.01 Third Party Purchaser                 15
    32.02 Seller's Put Option                   16
33. No Broker                                                      16
34. Notices                                                        17
35. Applicable Law                                                 17
36. Severability                                                   17
37. Interpretation                                                 17
38. Section Headings                                               17
39. No Assignment                                                  17
40. Independent Contractor Status                                  17
40. Entire Agreement                                               18
    Signatures                                  18

## OPTION AND SALE AGREEMENT FOR LAND

OPTION AND SALE AGREEMENT, made as of the ___ day of August, 1996;

BY AND BETWEEN:

> **GLOUCESTER NEW COMMUNITIES COMPANY, INC.,** a corporation of the State of New Jersey, with offices located at Village Center Drive, Swedesboro, New Jersey 08085 (hereinafter referred to as "Optionor" and sometimes as "Seller");

AND

> **SUMMIT VENTURES, LLC,** a limited liability company of the State of New Jersey with offices located at 152 Himmelein Road, Suite 700, Medford, New Jersey 08055 (hereinafter referred to as "Optionee" and sometimes as "Purchaser").

### WITNESSETH:

WHEREAS, Optionor is the owner of certain real property located in the Township of Woolwich, County of Gloucester, and State of New Jersey, which has previously been approved as part of a planned unit development known as "Beckett" ("Beckett PUD"), consisting of sections currently zoned MDR (residential), TC (Town Center) and LI (limited industrial) as hereinafter more particularly described and as further described on Schedule A attached hereto (the "Property"); and

WHEREAS, Optionor desires to grant Optionee an option to purchase the Property in accordance with the terms and conditions hereof; and

WHEREAS, the Parties intend that Optionee will obtain development approvals to permit the Property to be developed consistent with applicable zoning and undertake the construction and installation of required infrastructure to support same; and

WHEREAS, the Parties further intend that Optionee will thereafter sell improved and semi-improved building lots to third party builders for construction and sale;

NOW THEREFORE, in consideration of the premises and mutual covenants herein contained, Optionor and Optionee (the "Parties") agree as follows:

1. **DEFINITIONS.** The following terms, as used herein, have the following meanings:

"Agreement" means, when fully executed by the Parties, this Option and Sale Agreement for land.

"Approved GDP" means the general development plan based upon the Project Plan as approved by the Planning Board pursuant to the general development plan regulations adopted in accordance with N.J.S.A. 40:55D-45.1 thru 45.8.

"Authorized Representative" means that person designated by written notice from one Party to the other as having full authority to act on behalf of that Party in respect of all matters covered by this Agreement.

"Bonding" means the posting by Optionee or Builders of all performance bonds and security required by the Township to guarantee construction and completion of all subdivision improvements in each of the Optioned Sections for which the Option is exercised as provided in Section 17.08 of this Agreement.

"Builder(s)" means a third party building contractor not affiliated with either Party who shall purchase Sections or Building Lots from Optionee for development and sale to third party home buyers.

"Building Lot" means each residential lot or for a multi-family residence each Dwelling unit which has received all Development Approvals for, and is physically and commercially suitable for development as a Dwelling.

"Closing" means the delivery of the deed by Optionor to Optionee, and the payment of the Purchase Price by Optionee to Optionor, on the Closing Date pursuant to this Agreement after exercise of any Option and the fulfillment of the terms of this Agreement.

"Closing Date" means the dates and times specified in Sections 3 and 19 of the Agreement on which Seller shall convey title to properties pursuant to this Agreement.

"Contingencies" means those events specified in Section 17 of this Agreement which must occur or be otherwise satisfied or waived prior to Closing.

"Contract Deposit" means the $250,000 payment made by Optionee into the Escrow Account on account of this Agreement pursuant to Section 3.01.

"Development Approvals" means and includes, in respect of the Project and each of the Optioned Sections, (i) the Preliminary Approval, (ii) final subdivision approval of each of the Optioned Sections pursuant to the Ordinance up to the point that the Final Plan is ready for Filing and Bonding, including any extended protective period under N.J.S.A. 40:55D-52 for each Optioned Section, (iii) Gloucester County Planning Board approval, (iv) all required permits for construction, extension, installation and operation of potable water distribution mains to provide water service to each Building Lot, (v) all required permits for construction, extension, installation and operation of all sanitary sewer mains to provide sewerage service to each Building Lot, (vi) Gloucester County Soil Conservation District approval and permit, and (vii) any other approval, license or permit required to be granted or issued by any state, county or municipal agency having jurisdiction thereover as a prerequisite to the issuance of a building permit for a Building Lot to the point that the Final Plan is ready for Filing and Bonding.

"Dwelling" means either (i) a detached single-family residence constructed on one Building Lot, (ii) an attached single-family residence or (iii) a single family residence located within a multi family building.

"Escrow Account" means the joint checking account described and provided for in Section 3.01 of this Agreement.

"Excluded Property" means that portion of Lot 8, in Block 2, Woolwich Township, Gloucester County, New Jersey, consisting of approximately twelve (12) acres of land that was formerly operated by the Township as a municipal landfill together with any associated buffers from residential development that are required as a result of the Remedial Investigation.

"Exercise Dates" means each of the dates specified in Section 3 of this Agreement for exercise of the Option.

"Filing" means the act of filing each Final Plan in the Gloucester County Clerk's Office for the purpose of perfecting the final subdivision of each Optioned Section.

"Final Plan" means the final subdivision plan for each of the Optioned Sections as finally approved by the Planning Board based upon, and in full conformity with, the Project Plan.

"First Phase" means the initial phase of the Property identified in the Project Plan as the First Phase to be developed in the Project consisting of a minimum of 300 Building Lots.

2

"Moratorium" means any action taken or imposed by a governmental entity or agency which shall have the effect of barring or preventing, directly or indirectly, Optionee from proceeding with the development project.

"Note and Mortgage" means (i) Optionee's promissory note to Optionor in the form annexed hereto as Schedule B evidencing the obligation of Optionee to pay the Kicker Payment (as hereinafter defined), and (ii) Optionee's purchase money mortgage in the form annexed hereto as Schedule C, securing the Note as a first and paramount lien upon the properties sold at each of the Closings, subject only to changes in the amounts of principal and dates for payment pursuant to the applicable provisions of this Agreement.

"Option" means the option to purchase the Property granted by Optionor to Optionee under this Agreement.

"Option Period" means the time period specified in Section 3 in which the Option may be exercised.

"Option Schedule" means the take-down schedule annexed hereto as Schedule D.

"Optioned Section(s)" means each of the Sections of the Project as shown on the Project Plan containing Building Lots or TC and LI land that is subject of a Notice of Exercise (as hereinafter defined).

"Option Year" means any calendar year commencing as of the year in which all Contingencies have been satisfied and in which Optionee is required to purchase Building Lots in accordance with the Option Schedule.

"Option Year Obligation" shall mean the minimum number of Building Lots which Optionee is required to purchase in one Option Year as shown on the Option Schedule.

"Ordinance" means the draft Subdivision and Site Plan Ordinance of the Township, as amended and approved.

"Party" or "Parties" means, individually and collectively, the Optionor and Optionee.

"Planning Board" means the Planning Board of the Township as authorized by and organized under the Ordinance.

"Preliminary Approval" means the resolutions to be adopted by the Planning Board granting preliminary subdivision approval to Sections of the Project pursuant to N.J.S.A. 40:55D-48.

"Project" means the proposed planned development of the Property as shown on the Project Plan.

"Project Engineer" means                    with offices located at                    New Jersey.

"Project Site" means all of the Property as shown on the Project Plan.

"Property" means any or all of the parcels of real estate as more particularly described on Schedule A annexed hereto.

"Remedial Investigation" means the engineering studies and reviews undertaken by Optionor on the Excluded Property and certain other lands owned by Optionor which are adjacent to but not a part of the Excluded Property.

"Section(s)" means a defined portion of the Property intended to be subdivided therefrom and sold to Purchaser hereunder as shown on the map approved by the Planning Board in the Preliminary Approval.

3

"Seller's Attorney" means William J. Bowe, Esq. of Bowe, Caruso & Epstein, P.C., with offices located at Executive Plaza, 3443 Highway 66, Neptune, New Jersey 07753.

"Title Co." means , Fidelity National Title Insurance Company, Congress Title Division, c/o Mark D'Agostino, with offices located at 110 Barclay Pavilion East, Cherry Hill, New Jersey 08034.

"Township" means the Township of Woolwich, in the County of Gloucester, a municipal corporation of the State of New Jersey.

"Zoning Approval" means amendments to the Zoning Ordinance providing for residential development of the Property as may be required in order to develop the Project on the Property.

"Zoning Ordinance" means the Zoning Ordinance of 1992 of the Township of Woolwich, as amended from time to time.

2.    GRANT OF OPTION.  Optionor does hereby grant to Optionee the sole and exclusive option to purchase from Optionor the Property by means of a series of annual rolling options upon the terms and conditions set forth in this Agreement (the "Option").  Optionor represents that as of the date hereof, the Property is owned by the Optionor.  Optionee's rights hereunder shall be limited to the purchase and resale of the property to Builders and third party purchasers.  Under no circumstances shall Optionee or any affiliated party be permitted to act as a Builder for any of the Property.

3.    TERM OF OPTION.  The term of the Option shall commence on the date of this Agreement and shall terminate at midnight on December 31, 2015 unless sooner exercised or terminated.  In order to keep the Option Agreement in effect, Optionee shall meet the minimum takedown requirements described on Schedule D attached.  The first required exercise shall be made within sixty (60) days from the date all Contingencies have been satisfied as described in Section 17 herein, but in no event later than thirty six (36) months from the date of this Agreement as provided in Section 17.01.1 and 17.01.2 to which date the provisions of Section 9 and the grace periods set forth therein shall not apply.  Should all Contingencies not have been satisfied within thirty six (36) months, Optionee may keep this Agreement in effect by agreeing to acquire the minimum number of lots for the first period and immediately paying to Optionor the Base Purchase Price as described in Section 14 for the number of lots to be acquired, which payment shall be nonrefundable.  The conveyance of such lots purchased shall be deferred until final subdivision approval for such lots shall have been procured and, at Optionee's discretion, all Section 17 Contingencies have been satisfied.  Thereafter, Optionee must exercise the Option in each successive calendar year during the term of this Agreement  or immediately pay the Base Purchase Price for the minimum number of lots in each such Option Year in order to keep the Option Agreement in effect, which payment shall also be nonrefundable.  The conveyance of these lots shall be similarly deferred until final subdivision approval has been procured and at Optionee's discretion, all Section 17 Contingencies have been satisfied.  Optionee agrees to pay to Optionor the Kicker Payment in the amount and manner provided for in Section 15 herein with respect to all of such parcels acquired by Optionee.

The Option shall be exercised by Optionee notifying Optionor in writing, certified mail, return receipt requested (the "Notice of Exercise"), which Notice of Exercise shall set forth the location and number of Building Lots or TC and LI acres, if any, being purchased (the "Takedown Lots") and the projected Closing Date which shall be established by Optionee and be not sooner than thirty (30) days from the date of the Notice of Exercise and not later than the latest permitted date of settlement for the Takedown Lots purchased.  The settlement for all Takedown Lots in any Option Year shall occur no later than December 31" in that Option Year.  Each exercise shall be for not less than twenty-five (25%) percent of the applicable annual minimum takedown requirements unless Optionee is seeking to close title on a lesser amount in order to satisfy an Option Year Obligation.  Upon exercise of the Option, this Agreement shall be converted to an Agreement of Sale for each of the Takedown Lots described in the Notice of Exercise.

The Option Year Obligation shall be deemed to be cumulative so that any Takedown Lots closed during an Option Year in excess of the Option Year Obligation shall be carried forward as a credit against the next

4

Option Year Obligation. In the event that any Option Year shall be less than a full calendar year (a "Short Year") then the respective Option Year Obligation for such Short Year be determined by dividing the stated minimum number of lots otherwise to be purchased by twelve (12) to determine a monthly figure and thereafter multiplying the monthly figure by the number of months remaining in the Short Year and the Option Schedule shall be adjusted accordingly. Any partial month in a Short Year shall be credited as a full month.

    **3.01.**   Escrow Account. Upon the execution of this Agreement by both Parties, the Parties shall open a commercial checking account with Woodstown National Bank and Trust Company at its banking offices located at Swedesboro, New Jersey (the "Bank") as a joint checking account, which shall require the signatures of the Authorized Representative of each Party in order to issue checks thereon and make withdrawals therefrom. To open the Escrow Account, Optionee shall deposit the Contract Deposit as the initial deposit therein. Optionee may issue checks below $    , provided that the expenditures have been agreed to in advance and included in the monthly summary accounting described in Section 8.

    It is understood and agreed that the Escrow Account shall be utilized as the operating account for the Project, into which all sales proceeds from sales of Takedown Lots to Builders or third party purchasers shall be deposited, and from which incurred costs for infrastructure improvements by Optionee, all third party engineering costs, real estate taxes, utility reservation fees, legal, permit, bonding and related approval fees and costs incurred securing the Development Approvals and distribution to the Parties as hereinafter provided shall be disbursed. Optionor shall receive copies of all monthly statements from the Bank on the Escrow Account. Optionor shall also have the right, at its expense to have a certified audit of the Escrow Account conducted upon thirty (30) days notice to Optionee. In no event shall Optionor be obligated or required to contribute any funds to the Escrow Account.

    **3.02.**   Infrastructure Fund. The Parties shall additionally open a separate joint commercial checking account at the said Bank (the "Infrastructure Fund") which account shall be used as a funding source for payment of costs associated with road widening, traffic improvements, including traffic signals, major drainage improvements, off-site water and sewer facilities and water and/or sewer plant upgrades. Such account shall require the signatures of the Authorized Representative of each Party in order to issue checks thereon and make withdrawals therefrom, except that Optionee may issue checks below $    , provided that the expenditures have been agreed to in advance and are subsequently included in the monthly summary accounting described in Section 8. Subsequent to each sale by Optionee to a Builder or any other bona fide third-party purchaser, Optionee shall transfer from the Escrow Account to the Infrastructure Fund the sum of Five Thousand ($5,000.00) Dollars for each Building Lot sold and the sum of Twenty Thousand ($20,000.00) Dollars per acre or fifty (50%) per cent of the gross sale price, whichever is less, for each acre of TC or LI parcel sold. Optionee shall provide a monthly accounting to Optionor with respect to receipts and disbursements from the Infrastructure Fund. In the event from time to time that available funding from the Infrastructure Fund shall be less than the amount required to make needed disbursements, Optionee shall have the right, but not the obligation, to advance such monies as shall be required to cover the disbursements and shall have a priority for reimbursement of such monies (with interest, but only to the extent that the Infrastructure Fund is maintained as an interest bearing account,) when the same shall later be available in the Infrastructure Fund. In no event shall Optionor be obligated or required to contribute any funds to the Infrastructure Fund.

    Optionor shall receive copies of all monthly statements from the Bank on the Infrastructure Fund. Optionor shall also have the right at its expense to have a certified audit of the Infrastructure Fund conducted upon thirty (30) days notice to Optionee.

    **4.**    CONSIDERATION FOR OPTION. In consideration for Optionor's granting of the Option, Optionee (i) has paid the Contract Deposit into the Escrow Account as provided in Section 3 of this Agreement and (ii) shall pay the obligations set forth in Sections 14 and 15 of this Agreement (collectively with the Contract Deposit, the "Option Consideration").

    **5.**    ENTRY ONTO THE PROPERTY. During the term of this Agreement, before and after the exercise of the Option, Optionee, its agents and servants shall have the right to enter upon the Property for the

purpose of conducting such engineering tests, studies, surveys, inspections and other procedures as it shall deem necessary. Optionee shall not cause or permit any liens, mechanic's liens or other encumbrances to be filed against the Property as a result of the conduct of the Optionee, its agents and servants in coming onto the Property. Optionee agrees to indemnify and save Optionor harmless from and against any and all claims, demands, charges, liens, mechanic's liens, expenses or judgments with respect to any personal injury, property damage or other liability which Optionor may incur arising out of such entry and activity by Optionee. Optionee shall have no liability for discoveries of contamination on-site, provided such contamination is not caused by Optionee or its agents and servants. Optionee shall maintain a policy of general liability insurance covering any operations or activities conducted on the Property by Optionee, its agents and servants, in an amount of Five Million Dollars. Optionee shall provide Optionor with a certificate evidencing this coverage and naming Optionor as an additional insured. The certificate shall also indicate that the policy can not be canceled without thirty (30) days prior written notice to Optionor. Optionee shall restore the Property to its condition prior to such entry except for those subdivision improvements constructed and installed by Optionee pursuant to the Development Approvals. If Optionee exercises the Option and purchases a part of the Property, it shall have no obligation to restore the lands it has purchased. Optionor shall make available to Optionee for review and copying, within thirty (30) days from the date hereof, all reports, studies, and other materials pertaining to the Property and the Project, including, without limitation, environmental studies and audits, engineers' inspections reports, soil tests and all other sampling and test results obtained from samples and tests taken at or around the Property, and inspection reports with respect to the Property in Optionor's possession. The provisions of this Section shall survive each Closing and the termination of the Agreement.

   6.    DELIVERY OF TITLE AND RELATED DOCUMENTS. Within ten (10) days from the date hereof, Optionor shall make available to Optionee for review and copying, copies of any and all title binders, title policies, surveys, plot plans or similar documents relating to the title, ownership and use of the Property and development of the Project to the extent the foregoing documents exist and are in Optionor's control and/or possession or are readily available to Optionor.

   7.    RECORDATION. The Parties agree that Optionee shall record a memorandum of this Agreement in the form annexed hereto as Schedule E. In addition, Optionee shall execute a discharge of the memorandum which shall be held by Seller's Attorney in escrow, to be recorded in the event that this Agreement is terminated.

   8.    PROJECT PLAN APPROVAL. The parties acknowledge that as of the date of this Agreement there are no provisions within the Township ordinances creating a mechanism for approval of a GDP. Within ninety (90) days after the execution of this Agreement by both Parties, Optionee shall cause a conceptual Project Plan to be prepared by a professional planner which shall depict the overall site layout, housing types, lot sizes and non-residential uses. Optionor shall furnish Optionee with its reasonable comments and requests for revisions within thirty (30) days of receipt. The parties agree to use their best efforts to achieve a satisfactory concept plan. In the event that an acceptable Project Plan has not been approved by the parties within sixty (60) days of submission to the Optionee, then either party shall have the right to terminate the Agreement and all deposit monies shall be returned to Optionee. In the event that the Project Plan is approved by Optionor, then Optionee shall cause the Project Engineer to prepare a general development plan (the "GDP") based upon the approved Project Plan for submission to the Planning Board. Optionee shall be obligated to diligently pursue the Planning Board's approval of the GDP and all other Development Approvals by submitting all required documents, paying from the Escrow Account all necessary fees and all costs associated with the Planning Board submissions and making all required appearances. Optionee shall provide Optionor with a monthly progress report together with a monthly summary accounting of costs related to the Project in the form attached as Schedule __ within fifteen (15) days after the end of each month.

   9.    DEFAULT. In the event of a breach of this Agreement by either Optionor or Optionee, the remedies available to each Party shall (except as otherwise provided) be as expressly stated in Section 30 of this Agreement. Notwithstanding any provision in this Agreement to the contrary, the defaulting Party shall have the right to cure any alleged default or any other alleged nonperformance of any obligation herein, and the defaulting Party must be notified in writing, certified mail, return receipt requested, of any alleged default or other

nonperformance before the other Party may avail itself of any remedy set forth herein or otherwise take the position that this Agreement or any rights extended to the defaulting Party hereunder have terminated. Upon notice of any alleged default or other non-performance, the defaulting Party shall cure the default or non-performance within sixty (60) days of such notice. In the event that the cure cannot be accomplished within sixty (60) days due to its complexity or for reasons beyond the defaulting Party's control, then the defaulting Party's good faith commencement of a cure and diligent pursuit of same thereafter shall constitute compliance with this Section. The foregoing provisions shall not apply to the takedown of the First Phase, to which time shall be of the essence.

10.    RISK OF LOSS. Risk of loss, by reason of fire or other casualty, shall be borne by Optionor. In the event of fire or other casualty of the Property, Optionor shall advise Optionee within five (5) days of the occurrence thereof. Notwithstanding the foregoing, if all or a material part of the Property is destroyed by fire or other casualty, Optionee shall have the right, as its sole remedy, to cancel this Agreement and receive the remainder of the Contract Deposit then on deposit in the Escrow Account. For purposes hereof, a material damage shall be damage (other than by forest fire), the restoration or repair cost of which shall, as estimated by Optionor's insurance company, exceed $100,000.00. In connection with any casualty, Optionor shall not be obligated to make any repairs.

11.    CONDEMNATION. In the event condemnation or eminent domain proceedings shall be threatened or commenced by any governmental or quasi-governmental authority having jurisdiction therefore against all or a material part of the Property, Optionor shall promptly notify Optionee and provide Optionee with all information concerning such proceedings. Optionee may, at its option, by giving written notice to Optionor within thirty (30) days after its receipt of the notice of such proceedings or threatened proceedings, cancel this Agreement and receive the return of the remainder of the Contract Deposit then on deposit in the Escrow Account. In the event Optionee does not elect to cancel this Agreement, then any award in condemnation and/or unpaid claims and rights in connection with such condemnation paid to Optionor shall be credited pro rata against the unpaid balance of the Purchase Price due at Closing for the Property affected and Optionee shall be credited with the minimum takedown requirements for the Takedown Lots. The calculation of units will be based upon the number of lots depicted on the Approved GDP for the property condemned. Any excess proceeds from the condemnation award shall be divided in accordance with the provisions of sale set forth in Sections 13, 14 and 15. If Optionee determines not to terminate this Agreement, Optionor shall not adjust or settle any condemnation awards without the prior written approval of Optionee, which shall not be unreasonably withheld, and shall allow Optionee to participate in all proceedings.

12.    TERMS AND PROVISIONS OF THE AGREEMENT OF SALE. The Parties hereto agree that if and when Optionee exercises the Option as to any Takedown Lots, all of the terms and conditions of this Agreement shall apply (and for purposes of the following provisions in Sections 13 through 26, inclusive, Optionor shall be referred to as "Seller" and Optionee shall be referred to as "Purchaser").

13.    TRANSACTIONAL DESCRIPTION. The Parties intend that the total purchase price to be paid by Purchaser to Seller for all Sections of the Property actually purchased by Purchaser under this Agreement shall be comprised of two (2) components; i.e., the Base Purchase Price (as defined in Section 14, infra) payable in full at Closing and the Kicker Payment (as defined in Section 15, infra). At the Closing of each Takedown Lot, Purchaser shall execute the Note for the unpaid portion of the Kicker Payment, secured by a Mortgage on the Takedown Lot being purchased. The provisions of the Mortgage and Note will allow for the subordination of the rights of the Seller to any third party lender of a Builder or in the alternative, will permit Purchaser to substitute a partial assignment of Purchaser's interest in any mortgage and note from any Builder to Seller to secure Seller's right to its portion of the proceeds of such mortgage and note in an amount equal to the Mortgage and Note, whereupon Seller will release the lien of the Mortgage and Note.

14.    BASE PURCHASE PRICE. The total Base Purchase Price shall be allocated as $4 million for residential land and $1 million for lands zoned TC and LI. Each acre of TC and LI land sold shall be credited as four (4) Building Lots for purposes of meeting the requirements of the Option Schedule. The Base Purchase Price for each residential lot should be the resultant figure after dividing the total number of lots shown on the Project

Plan into $4 million, and the Base Purchase Price for each acre of TC or LI land shall be the resultant figure after dividing the total number of TC and LI acres shown on the Project Plan into $1 million. The Base Purchase Price per lot or per TC or LI acre shall be adjusted based on the number of lots or acres which are contained in the Approved GDP.

15.    KICKER PAYMENT; PAYMENT.  In addition to the Base Purchase Price, which shall be paid by Purchaser for each Takedown Lot at the Closing thereof, Purchaser shall be liable to Seller for an additional payment equal to the percentage of the Net Profit (as hereinafter defined) received by Purchaser from the subsequent sale of such Takedown Lot to a Builder or third party purchaser (the "Kicker Payment"). For the purpose of computing the Kicker Payment, "Net Profit" shall mean the gross sales price received by Purchaser from a Builder or third party purchaser for each Takedown Lot after deduction of the costs of sale (as hereinafter defined), less (i) all out of pocket third party engineering, legal, permit, bonding and related fees incurred by Purchaser in securing the Development Approvals for each Takedown Lot , (ii) actual third party costs of construction and installation of infrastructure improvements to serve each Takedown Lot incurred by Purchaser, including, but not limited to, any governmental inspection and/or escrow fees, (iii) real estate taxes (inclusive of roll-back taxes), sewer and water connection and reservation fees and other actual costs expended (collectively, the "Allowable Costs"), (iv) the required contribution to the Infrastructure Fund and (v) Base Purchase Price payment to Seller. No costs incurred by any affiliated company of either Party shall be included in the Allowable Costs without the prior written consent of the other Party having been first obtained.

The Kicker Payment to be paid by Purchaser to Seller upon closing with a Builder or third party purchaser shall be equal to (i) 50% of the Net Profit until Seller has received an aggregate total purchase price of $5,000,000.00 from Purchaser, and (ii) 33-1/3% of all of the Net Profit received by Purchaser thereafter until the last Section of the Property has been sold and conveyed to, and fully paid for by, a Builder or third party purchaser. Seller shall not be obligated to release the lien of any Mortgage until such time as the per lot Kicker Payments pertaining to each lot encumbered thereby has been fully paid or otherwise secured by substituted security as provided for herein.

The "costs of sale" shall mean ordinary and customary fees paid to third parties that are incurred in the sale, including, but not limited to, legal fees and brokerage commissions. It is expressly understood that neither party will charge its own general and administrative costs or in-house consultants to the Project as costs of sale.

15.01.   Termination for Non-Payment of Kicker Payment.  In the event that Seller has not received payment in full of the Kicker Payment for any Takedown Lots within one (1) year from the closing date with a Builder or other third-party purchaser or five (5) years from the Closing Date of that Optioned Section, whichever is less, Seller shall have the right, upon prior written notice to Purchaser to terminate the Agreement, whereupon the Option shall be deemed to have, and still be treated as though it had, expired pursuant to Section 31 of this Agreement. Seller may simultaneously pursue its remedies under any Note or Mortgage at law or in equity. Notwithstanding anything to the contrary in this Section, Purchaser shall have the right, but not the obligation, to cure the non-payment at any time prior to expiration of the cure period by paying to Seller an estimated Kicker Payment in such amount as shall be equivalent to the average Kicker Payment paid by Purchaser to Seller for the immediately preceding twenty-four (24) months. Until such time has elapsed to allow this estimated Kicker Payment to be calculated from actual sales made by Purchaser, the Parties agree that the Kicker Payment shall be $3,000 per Building Lot. Said estimated payment shall be made within sixty (60) days of Purchaser's notice to Seller that it intends to pay the estimated Kicker Payment. At the time closing finally takes place with Purchaser's Builder or other third-party purchaser, the Parties will calculate the amount of the final Kicker Payment and make appropriate financial adjustments between them.

16. PROVISIONS GOVERNING SALES TO BUILDERS OR OTHER THIRD PARTY PURCHASERS.  Purchaser shall cause all gross sales proceeds received from sales of Takedown Lots to Builders or third party purchasers, less only the costs of sale and Base Purchase Price payment to Seller, to be deposited in the Escrow Account, from which all disbursements of Allowable Costs shall be made. In the event that Purchaser shall accept a purchase money note and mortgage from a Builder or other third party purchaser as

8

full or partial payment of the Kicker Payment of a Takedown Lots said mortgage shall contain "wrap-around" provisions referencing the term of the Note and Mortgage held by Seller and providing for payment to Seller of any unpaid portion of the Kicker Payment as reflected in the Note. The provisions of the Mortgage and Note will allow for the subordination of the rights of the Seller to any third party lender of a Builder or in the alternative, will permit Purchaser to substitute a partial assignment of Purchaser's interest in any mortgage and note from any Builder to Seller to secure Seller's right to its portion of the proceeds of such mortgage and note in an amount equal to the Mortgage and Note, whereupon Seller will release the lien of the Mortgage and Note, In addition, Purchaser hereby covenants that all sales of property to Builders and other third parties shall contain an expressed disclosure of the existence of the former municipal landfill operated by the Township on the Excluded Property and any failure to do shall be deemed a breach of this Agreement by Purchaser,

### 17.   CONTINGENCIES AND OBLIGATIONS.

**17.1**   Contingencies  The Parties hereto agree and acknowledge that the performance of this Agreement by Purchaser and Seller is expressly contingent upon, and subject to the occurrence of, each and every one of the following events to be satisfied by the respective Party indicated at its sole cost and expense on or before the dates indicated below, each being a "Contingency Period".

#### 17.01   Purchaser's Contingencies

**17.01.1 Initial Preliminary Approval.** Purchaser shall obtain Preliminary Approval of the First Phase containing not less than 300 Building Lots within eighteen (18) months following complete execution of this Agreement. In the event that Purchaser shall not have obtained Preliminary Approval as aforesaid due to circumstances or the inactions of governmental entities beyond its reasonable control, but has diligently pursued same, then Purchaser shall be entitled as of right to two (2) extensions of six (6) months each to complete the approval process.

**17.01.2. Development Approvals.** The securing of all Development Approvals for the First Phase by Purchaser with certification from the Township that the Filing may occur upon completion of Bonding, and with no litigation challenging the validity of any Development Approval pending on the Closing Date within six (6) months of the issuance of the Preliminary Approval for the First Phase by the Planning Board. Thereafter, Purchaser shall secure all Development Approvals required for each Closing on or before the Closing Date.

#### 17.02   Purchaser's Obligations.

**17.02.1. Purchaser's Filing Obligation.** The completion of the Filing within the applicable time period before the subject Closing, provided that Purchaser shall have completed the Bonding prior to the Closing Date.

**17.02.2 Purchaser's Bonding Obligation.** Purchaser agrees to be solely responsible for the payment, deposit or posting of (i) all performance bonds and security as may be required as a precondition to issuance of building permits, (ii) all escrows of funds for engineering inspection fees which may be required by the Ordinance and (iii) executed developer's or building agreement pertaining to each Section in which Building Lots are located. Such expenditures shall be made from the Escrow Account. Seller will allow Purchaser to delay posting Bonds until the Building Lots are ready to be conveyed to a Builder, provided, however, Purchaser must immediately pay Seller the Base Purchase Price for the minimum number of lots each year with the requisite Kicker Payment.

#### 17.03   Seller's Contingencies

**17.03.1 Remedial Investigation.** Seller shall be satisfied, in its sole reasonable discretion, with the results of the Remedial Investigation within twelve (12) months of the date of this Agreement. Seller shall notify Purchaser of its decision within sixty (60) days of its receipt of the results of the Remedial

Investigation. In the event Seller elects to terminate this Agreement as a result of the Remedial Investigation, Purchaser shall be granted a thirty six (36) month right of first refusal to purchase the Property from Seller provided, however, Purchaser shall provide written notice of its exercise of such right within thirty (30) days of receipt of Seller's notice of an offer to purchase the Property on the same terms and conditions contained in Seller's notice. Seller shall keep Purchaser informed of the Remedial Investigation results and provide a timetable for both the investigation and any remediation.

17.04. Termination for Unsatisfied Contingencies. Subject to the provisions of Sections 3 and 29, in the event that all of the Contingencies have not been fully satisfied on or before the expiration of the applicable Contingency Period, then this Agreement may be canceled by either party pursuant to Section 31.

17.05. Moratorium. The existence or imposition of any Moratorium at any time shall automatically extend all applicable times for performance set forth in this Agreement by that amount of time equivalent to the duration of the Moratorium, provided however, either party may terminate this Agreement in the event that the cumulative time period created by any such Moratoriums exceeds five (5) years.

18. ISRA.

18.01. If the Project Site is subject to the provisions of the Industrial Site Recovery Act N.J.S.A. 13:1K, et seq. ("ISRA"), or any other environmental legislation or governmental requirement which requires that the Seller take any action to clean up the Project Site, and if the cost estimates obtained by Seller as to the Seller's responsibilities ("Clean-Up Costs") exceed $200,000.00 (the "ISRA Limit"), Seller may terminate this Agreement for that reason, upon giving notice to Purchaser within fifteen (15) days after Seller receives such cost estimates. Provided, however, that in the event that Purchaser elects, within ten (10) days from receipt of Seller's notice pursuant to this Section 18, to pay all Clean-Up costs in excess of the ISRA Limit, this Agreement shall remain in full force and effect. Seller represents that it has no knowledge of any storage of hazardous or toxic materials on the Project Site.

As a condition precedent to Purchaser's obligation to purchase each Section, Seller shall have received from the Bureau of Industrial Site Evaluation of the New Jersey Department of Environmental Protection ("NJDEP"), either (a) a non-applicability letter or (b) an approval of Seller's negative declaration, in either case applying to the Section for which Seller shall promptly apply pursuant to ISRA and the regulations promulgated thereunder and Seller shall provide such affidavit as may be reasonably required for this purpose. If this condition precedent shall not be satisfied, then Purchaser shall have the right to exclude from its purchase obligations only the affected Property and shall receive a credit for the affected Property against the Option Schedule. As soon as Seller has complied with the provisions of this Section 18.01, Purchaser shall pay the Option Consideration and the affected Property shall be conveyed to Purchaser.

18.02 In the event that the Parties dispute the findings of the Remedial Investigation regarding any required buffers from residential development, the Parties will agree on an independent environmental consulting firm to advise and layout any required buffers within the Project related to the Remedial Investigation site or any other property. In the event that Seller does not terminate the Agreement in accordance with Section 18.01, Purchaser shall have the right to exclude from purchasing any property which is contaminated, and which would require clean-up costs in excess of the ISRA Limit, including any buffers, provided, however, Purchaser must use its best efforts to effect the transfer of such properties to the Township as a part of the open space requirements of the GDP.

19. CLOSING DATE. Closing of title shall take place at the offices of the Title Co., between the hours of 9:00 a.m. and 5:00 p.m., no later than thirty (30) days from the date upon which Purchaser gives notice of its exercise of the Option pursuant to Section 3 of this Agreement: provided, however, that Purchaser shall have the right to extend the Closing Date in the event that any Contingency shall remain unsatisfied until fifteen (15) days after all remaining Contingencies have been satisfied, subject to the time limitations set forth in Section 17.

10

AUG. 7.1996  10:39AM   BOWE, CARUSO & EPSTEIN, P.C.                    NO.992   P.15

20.    REPRESENTATIONS. Each Party hereby represents and warrants as follows, which representations and warranties shall be true and correct as of each Closing Date only as to the Takedown Lots to which title is to be conveyed and shall survive each Closing, and the truth of which shall be a condition precedent to the performance by each Party of its obligations contained herein:

20.01   Seller's Representations:

20.01.1   Ownership. Seller is the owner of the Property and Project Site.

20.01.2   Authority. Seller has the full right and authority to execute this Agreement and consummate all of the transactions hereby contemplated.

20.01.3   No Actions Against Property. There are no actions, suits or proceedings pending or threatened against Seller affecting any portion of the Property or the Project Site, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.

20.01.4   No Attachments. There are no attachments, executions, assignments for the benefit of creditors or voluntary or involuntary proceedings in bankruptcy pending, contemplated or threatened against Seller.

20.01.5   No Litigation or Contracts. There are no existing or pending litigation cases, claims, condemnations or sales in lieu thereof, contracts of sale, options to purchase, right of first refusal or leases with respect to the Property, or any part thereof other than existing leases for farming which shall be terminated prior to Closing on any Takedown Lots which may be subject to such a lease, nor have any such actions, suits, proceedings, claims or other such matters been, to the best of Seller's knowledge and belief, threatened or asserted.

20.01.6. No Assessments. Seller has received no notice and has no knowledge of any pending improvements, liens or special assessments to be made against the Property by any governmental authority, that has not been disclosed to Purchaser.

20.01.7. All Owners Bound. All of the persons executing the Agreement as Seller represent all of the persons who have any interest in the Property and the Project Site and whose signatures will be required to be affixed to the deeds of conveyance hereunder in order to close title as contemplated by the Agreement.

20.01.8. FIRPTA Not Applicable. Seller is not a foreign person (as that term is defined in Section 1445 of the Internal Revenue Code as amended by the Foreign Investment In Real Property Tax Act of 1980 ("FIRPTA") and Seller shall provide Purchaser with an affidavit to that effect in compliance with FIRPTA at each Closing.

20.01.9. Hazardous Materials Not Present. Seller has no knowledge of the presence of hazardous or toxic materials on the Project Site.

20.02   Purchaser's Representations:

20.02.1 Authority. Purchaser has the full right and authority to execute this Agreement and consummate all of the transactions hereby contemplated.

20.02.2 No Attachments. There are no attachments, executions, assignments for the benefit of creditors or voluntary or involuntary proceedings in bankruptcy pending, contemplated or threatened against Purchaser.

21.    **CONVEYANCE OF PREMISES.** Seller hereby warrants, represents and covenants that good and marketable title to each Takedown Lot, insurable at regular rates by a reputable New Jersey title insurance company selected by Purchaser, will be conveyed to Purchaser at Closing free and clear of any and all liens, encumbrances, conditions, easements, assessments, and restrictions, except for those resulting from acts or omissions of Purchaser or approved by Purchaser pursuant to its review of the Commitment for title insurance hereinafter described. Seller hereby agrees that any and all liens secured by the Property (except such liens resulting from the acts or omissions of the Purchaser), will be released (both in fact and of record) on or prior to each Closing Date for the Takedown Lots then being closed, and the only lien securing indebtedness to be shown in the Owner's Policy of Title Insurance hereinafter described will be the liens placed upon the Takedown Lots by Purchaser in accordance with its purchase of same, and the liens for current taxes not yet due and payable.

22.    **TITLE COMMITMENT AND SURVEY.** Purchaser shall obtain the following items prior to its exercise of the Option for any Takedown Lots:

(i)    an Owner's Title Insurance Commitment at Purchaser's cost (the "Commitment") covering the Takedown Lots from the Title Co. together with legible copies of all items referred to therein as exceptions, such Commitment to be dated not earlier than this Agreement, showing fee simple title to the Takedown Lots to be in the Seller;

(ii)    the survey of the Takedown Lots, prepared by the Project Engineer at Purchaser's cost; and

(iii) current tax certificates or tax statements for the Takedown Lots from all taxing authorities.

(collectively the "Title Documents").

23.    **TITLE REVIEW PERIOD.** Purchaser shall have thirty (30) days after receipt of each of the Title Documents in which to approve or disapprove each Title Document ("Purchaser's Exceptions"), which disapproval must be reasonable and relate to a material defect in title creating restrictions affecting the Purchaser's ability to complete the Project and limit the sale of Dwellings. Seller has provided notice to Purchaser that on the basis of a previous site plan approval granted on Block ___, Lot ___ in the Township, Seller filed documents submitting the subject property to the Declaration of Protective and Restrictive Covenants of The Beckett Association (the "Beckett Lien"). The existence of the Beckett Lien shall not serve as the basis for Purchaser to exercise its right to terminate this Agreement as provided for in this Section. Seller shall cooperate with Purchaser in securing the release of the Beckett Lien prior to the Closing on the affected Property. If Purchaser shall fail to give notice to Seller of any Purchaser's Exceptions during such thirty (30) day period, Purchaser shall have waived its rights to object to any Title Document. If Purchaser shall make Purchaser's Exception to such Title Document during such thirty (30) day period, Seller may, within ninety (90) days thereafter, cure or correct such Purchaser's Exceptions to Purchaser's reasonable satisfaction. If Seller shall fail or refuse, during such ninety (90) day period, to cure or correct any such Purchaser's Exceptions noted by Purchaser, Purchaser at its sole discretion may (i) elect to grant such reasonable time extensions as shall be required to cure or correct the Purchaser's Exceptions, (ii) waive such Purchaser's Exceptions and close on the Takedown Lots or (iii) terminate this Agreement pursuant to Section 31 and the provisions of Section 26.03 of this Agreement.

24.    **TITLE INSURANCE.** At the Closing, Purchaser shall be able to secure, at Purchaser's expense, an ALTA Form B Owner's Policy of Title Insurance in the full amount of the Base Purchase Price, issued by the Title Co. insuring good and marketable title to the Takedown Lots then being closed in Purchaser and containing no exceptions to title other than the standard printed exceptions (provided that the exception for restricted covenants shall be endorsed "None of Record" or deleted, the exception for taxes shall be limited to the year in which the Closing occurs and endorsed "Not Yet Due and Payable", the exception for those items which a current survey would disclose shall be deleted) and any exceptions contained in the Commitment which have been approved by Purchaser in writing, there being no exceptions permitted for visible and apparent unrecorded

easements or roads and highways, or parties in possession. Seller shall pay all release fees, prepayment penalties, transfer fees or taxes, holders of any liens secured by the Takedown Lots then being closed or assessed by any governmental authority in connection with this transfer of that Takedown Lots (except for those created by Purchaser's acts or omissions to act), and the cost of any curative title work performed in order that Seller may convey the Takedown Lots to Purchaser as described herein.

   **25. SELLER'S OBLIGATIONS AT CLOSING.** At each Closing of any Takedown Lots, subject to the payment of the Purchase Price and performance of Purchaser's obligations hereunder, Seller shall:

   **25.01.** **Deed.** Convey to Purchaser marketable and insurable title to the Takedown Lots pursuant to Section 21 and 24 by Bargain and Sale Deed with Covenants Against Grantor's Acts.

   **25.02.** **Possession.** Deliver to Purchaser actual and exclusive possession of the Takedown Lots.

   **25.03.** **Affidavit of Title.** Execute an Affidavit of Title in such form as may be reasonably required by the Title Co.

   **25.04.** **Purchaser's Obligation Contingent on Title.** The obligation of Purchaser to purchase each Takedown Lot after the exercise of the Option is subject to the fulfillment, prior to or at the Closing, of the conditions that (i) title shall be as set forth in Section 21 and (ii) the Title Co. shall insure title as set forth in Section 24.

   **25.05.** **Other Documents.** At any time at or after Closing, both Parties shall execute and provide such other documents as may be reasonably required in order to carry out the intentions of this Agreement. The provisions of this Section 25.05 shall survive each Closing.

   **26.** **CONDITIONS TO CLOSING.** In the event on or before each or any Closing Date:

   **26.01.** Seller is unable to convey title to the Takedown Lots approved and insured all as set forth more particularly herein; or

   **26.02** Any representation set forth in Section 20 above is incorrect as to the Takedown Lots;

   **26.03.** Then, in any of the foregoing events, Purchaser may either accept the Takedown Lots subject to any of the foregoing, or cancel this Agreement as to the Takedown Lots in question. In the event Purchaser cancels this Agreement by reason of any defect in title or the disclosure of facts that would render title uninsurable, Seller agrees to pay Purchaser the actual costs of the title search incurred by Purchaser promptly after such cancellation, which cost shall in no event exceed ONE THOUSAND ($1,000.00) DOLLARS.

   **27. CLOSING ADJUSTMENTS.** The closing adjustment for real estate taxes shall be taken as of the date of this Agreement for each Takedown Lot purchased hereunder, except that roll-back taxes shall be paid as follows:

   In the event that the Property is subject to additional or increased assessments arising from roll-back taxes pursuant to the Farmland Assessment Act, then such additional or increased assessments shall be paid by Purchaser and treated as an Allowable Cost as provided in Section 16 of this Agreement.

   A closing adjustment shall be taken from the date of this Agreement to the Closing Date for each Takedown Lot purchased hereunder for all sewer capacity reservation charges paid by Seller during this period to the Logan Township Municipal Utilities Authority for all Dwellings proposed to be included in that Takedown Lot ("LTMUA Reservation Fees"). The adjustment for real estate taxes (exclusive of rollback taxes) and LTMUA Reservation Fees shall be payable at each Closing together with the Base Purchase Price. Purchaser agrees to utilize the capacity reservation purchased from Seller first prior to utilizing any remaining reserved capacity.

Adjustments for real estate taxes shall be pro-rated, on the basis that the property being conveyed bears to the tax parcel(s) it is a part of, in all instances where the real estate taxes assessed are not limited to the Takedown Lots. LTMUA Reservation Fees shall be pro-rated on the basis of gallonage capacity remaining and gallonage capacity represented by the Dwellings to be contained in the Takedown Lots.

**28.** **ADDITIONAL AGREEMENTS.** Purchaser and Seller represent and agree as follows:

**28.01.  Deed Description.** Notwithstanding the description of the Property set forth herein, at Purchaser's option and cost, the deeds to be delivered to Purchaser in accordance herewith shall describe each Takedown Lot by metes and bounds in accordance with the survey obtained by Purchaser from the Project Engineer.

**28.02.  Physical Condition of Property.** This Agreement is being entered into after full investigation, neither Party relying upon any statement or representation not embodied in this Agreement made by the other. Purchaser represents to Seller that Purchaser knows, has examined and has investigated to Purchaser's satisfaction the physical nature and condition of the Property including the building and improvements on said Property and the personal property referred to herein. Purchaser acknowledges that neither Seller nor any real estate broker, agent, officer, employee, servant or representative of Seller has made any representations whatsoever regarding the subject matter of this transaction or any fact thereof including, without limitation, representations as to the physical nature or condition of the Property, existing or future expenses, or any other matter or thing affecting or related to the Property or the operation thereof, except as herein specifically set forth, and Purchaser further agrees to take title to the Property "as is" and in its present condition, subject to the express provisions of this Agreement and to reasonable use, wear, tear and natural deterioration between the date hereof and the Closing. The acceptance of the deed by Purchaser shall be deemed to be a full performance and discharge of every Contingency and of every agreement and obligation on the part of Seller hereunder and no representation, warranty or agreement, express or implied, of Seller shall survive the Closing except those, if any, which are herein specifically stated to survive each Closing.

**28.03.** At the Closing for the First Phase, Seller shall assign to Purchaser and Purchaser shall accept without any additional consideration all right, title and interest in and to all permits, franchises, licenses and other approvals obtained for construction and operation of all water and sewer treatment and transmission facilities for the Project in accordance with such documents as may be reasonably required by Seller's Attorney (the "Assignment Documents"). Purchaser shall have entitlement to the use and enjoyment of this assignment for so long as this Agreement shall be in effect. Upon termination of this Agreement prior to the conveyance of all of the Property, the Purchaser shall reassign to Seller such permits, franchises, licenses and other approvals as Seller deems necessary and which Purchaser has authority to assign in accordance with the Assignment Documents.

**29.** **WAIVER OF CONTINGENCIES.** Optionee shall have the right, prior to the expiration of the Contingency Periods as to any Takedown Lots, to unilaterally waive any of the Contingencies specified in this Agreement and to proceed to fully perform this Agreement as though said Contingencies had been fully performed or satisfied. Any waiver of Contingencies shall be in writing. In addition, any extension of any Contingency Period shall be in writing and executed by both Parties.

**30.** **BREACH OF AGREEMENT; DAMAGES.** In the event of a breach of this Agreement after the expiration of the grace periods provided in Section 9 by either of the Parties hereto, the remedies available to each party shall be expressly limited as set forth in the following Subsections 30.01 and 30.02:

**30.01.  Breach by Seller.** In the event of (i) the breach or non-performance of this Agreement by Seller, or (ii) a default in the performance of any of its obligations hereunder by Seller, Purchaser may, at its option, either terminate this Agreement or seek to enforce specific performance of this Agreement. In no event shall Seller be obligated to spend more than Twenty ($20,000.00) Dollars on any legal proceedings or spend more than the Base Purchase Price for the Takedown Lots to cure a default hereunder, provided however, Purchaser may assume the litigation of any matter commenced by Seller that exceeds the limitation set forth herein.

14

Purchaser expressly waives any right to seek or obtain monetary damages to a breach or default by Seller of this Agreement. In addition, Purchaser shall be entitled to receive the remainder of the Contract Deposit then on deposit in the Escrow Account.

       30.02. **Breach by Purchaser.** In the event Purchaser fails to close this transaction, other than due to Seller's default or due to the termination hereof by Purchaser pursuant to the applicable provisions hereof, Seller shall be entitled to receive the remainder of the Contract Deposit then on deposit in the Escrow Account as liquidated damages together with an assignment of all engineering plans, approvals, permits, test reports, audits or other related items related to the Property as Seller's sole and exclusive remedy. Seller expressly waives any right to seek or obtain monetary damages or equitable remedies due to a breach or default by Purchaser of this Agreement, provided, however, the Parties agree that the actual damages which Seller would suffer would be mathematically difficult to calculate and the Parties hereto agree in good faith to estimate the amount of such damages which would reasonably compensate Seller for such a default, which amount is equal to the remaining portion of the Contract Deposit, so that in the event of any default by Purchaser, Seller shall as its sole remedy be entitled to liquidated damages in the sum of the remaining portion of the Contract Deposit.

      31.    **TERMINATION; WINDING UP.** In the event that a termination of the Option shall occur prior to the sale and purchase of all Property hereunder, then the Escrow Account and the Infrastructure Fund shall be utilized as the means of effectuating the termination of this Agreement and winding up the transactions contemplated hereunder as follows:

      (a)    Any outstanding contracts of sale of, Takedown Lots between Purchaser and Builder or any third party purchaser shall be completed and performed in accordance with their terms and the provisions of Sections 15 and 16 of this Agreement.

      (b)    The net profit in any outstanding contracts with Builders or third party purchasers or mortgages held by Purchaser from Builders or third party purchasers shall be assigned for payment in accordance with the Parties' respective percentages of interest of the Net Profit applicable thereto.

      (c)    All monies held in the Escrow Account and the Infrastructure Fund on the termination or deposited into the Escrow Account following the termination by Purchaser to cover any deficits shall be disbursed as follows:

            (i)    to third party contractors, suppliers and vendors for accrued Allowable Costs;

            (ii)    to Seller for all unpaid balances of Base Purchase Price for Takedown Lots purchased by Purchaser;

            (iii)    to Seller for all accrued Kicker Payments;

            (iv)    balance to Purchaser.

    In no event shall Seller be required or obligated to pay any amounts into either the Escrow Account or the Infrastructure Fund to cover any deficits.

      32.    **BULK SALE.**

      32.01    **Third Party Purchaser.** From and after the date of this Agreement, Purchaser shall have the conditional right to enter into an agreement for the Bulk Sale (as hereafter defined) of the Property to a third-party purchaser upon strict compliance with each and every one of the conditions set forth in this Section 32.01. For purposes of this Section 32.01, the term "Bulk Sale" shall mean the sale by Purchaser to a third-party purchaser of the Property in its entirety or, in the event that the Option has previously been exercised for one or more Takedown Lots, all of the remaining portion of the Property, in either event, as a cash-only sale.

Neither party shall be obligated to accept a Bulk Sale that would result in a total price for the entire project of less than $10 million and neither party can trigger the provisions requiring the other party to match any such offer. Furthermore, Seller will not be required to accept any cash offer if it results in cumulative cash proceeds of less than $7 million to Seller.

In the event either party receives a bulk sale offer, that party shall forward that offer to the other party along with its acceptance or rejection within 15 days of receipt. The other party shall have fifteen (15) days from receiving the offer to respond with an acceptance or rejection. In the event either party accepts the offer, the other party shall either accept the offer or match the offer and pay the other party the net proceeds that party would have received if the sale had been consummated to the third party purchaser. Failure to accept the offer within fifteen (15) days and/or to complete the purchase within ninety (90) days shall be deemed an acceptance of the offer.

In the event of an accepted Bulk Sale, the gross sales price shall be allocated at the closing as follows:

| | |
|---|---|
| To Seller: | $5,000,000 less all Base Purchase Price payments previously received by Seller up to a maximum of $5,000,000.00. |
| To Both Parties: | Reimbursement of all accrued incurred allowable costs. |
| To Seller: | 33 1/3 % of remaining balance. |
| To Purchaser: | 66 2/3 % of remaining balance. |

Regarding outstanding contracts of sale to Builders or third party purchasers, outstanding mortgages between Purchasers and Builders or third party purchasers, and the balances in the Escrow Account and the Infrastructure Fund, these will be completed or paid-out to Seller and Purchaser in accordance with Section 31; i.e., Seller will receive all unpaid Kicker Payments.

**32.02    Seller's Put Option.**  From and after the date of this Agreement, Seller shall have the conditional right to put the Property to Purchaser upon strict compliance with the conditions set forth in this Section 32.02. For purposes of this Section 32.02, the term "put the Property" shall mean the right of Seller to require the Purchaser to purchase all of the Property on a cash only sale.

Seller shall be permitted to put the Property to Purchaser for (i) $1,000,000.00 in cash, to close within ninety (90) days after satisfaction of the Contingency set forth in Section 17.03; or (ii) $2,000,000.00 in cash, to close within one hundred (120) days after the GDP and Preliminary Approval for the First Phase have been granted.

**33.    NO BROKER.**  Purchaser and Seller represent to one another that this sale has been effectuated without the aid or assistance of any real estate broker, salesperson or person and that no commission is due by reason of any act on the part of Purchaser or Seller. The Seller is advised that some of the partners or members of Summit Ventures are New Jersey licensed real estate brokers.

**34.**  **NOTICES.**  No notice, request, consent, approval, waiver or other communication under this Agreement shall be effective unless, but any such communication shall be deemed to have been given if, the same is in writing and is (i) served personally or (ii) mailed by registered or certified mail, postage prepaid, addressed to the parties at the addresses noted below:

| | |
|---|---|
| From Optionee to Optionor: | Akos L. Nagy<br>Gloucester New Communities Company, Inc.<br>Village Center Drive<br>Swedesboro, New Jersey 08085 |
| With a copy to attorney: | William J. Bowe, Esquire<br>Bowe, Caruso & Epstein, P. C.<br>Executive Plaza<br>3443 Highway 66<br>Neptune, New Jersey 07753 |
| From Optionor to Optionee: | Daniel Ljoka<br>Summit Ventures<br>152 Himmelein Road<br>Suite 700<br>Medford, New Jersey 08055 |
| With a copy to attorney: | Edward A. Penberthy, Esquire<br>Brandt, Haughey, Penberthy, Lewis & Hyland, P.A.<br>240 Route 38<br>Moorestown, New Jersey 08057 |

**35.**  **APPLICABLE LAW.**  This Agreement and the performance hereof shall be governed, interpreted, construed and regulated by the laws of the State of New Jersey.

**36.**  **SEVERABILITY.**  If any term, condition or provision of this Agreement, or the application thereof to any person or circumstance shall, at any time or to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term, covenant, condition and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

**37.**  **INTERPRETATION.**  Wherever herein the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require. This Agreement may be executed in several counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

**38.**  **SECTION HEADINGS.**  The Section headings in this Agreement are inserted only as a matter of convenience in reference and are not to be given any effect whatsoever in construing any provision of this Agreement.

**39.**  **NO ASSIGNMENT.**  This Agreement may not be assigned by Purchaser.

**40.**  **INDEPENDENT CONTRACTOR STATUS.**  Purchaser and Seller hereby expressly state and agree that they are carrying out their respective duties and obligations under this Agreement as independent parties, and not as shareholders, partners, joint venturers or in any other form of shared responsibility or liability.

17

41.   **ENTIRE AGREEMENT.** This Agreement sets forth all of the promises, agreements, conditions and understandings between the parties hereto relative to the subject matter hereof, and there are no promised, agreements, conditions or understandings, either written or oral, expressed or implied, between the other than as herein set forth. Except as herein otherwise specifically provided, no subsequent alterations, amendments, changes or additions to this Agreement shall be binding upon either party unless agreed to in writing and signed by each party.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

GLOUCESTER NEW COMMUNITIES
COMPANY, INC.
(Optionor/Seller)

BY: _____
    AKOS L. NAGY, President


SUMMIT VENTURES, LLC
(Optionee/Purchaser)
BY: _____

## SCHEDULE D

## OPTION SCHEDULE

| Year | Minimum # of Lots | |
| --- | --- | --- |
| | Annual | Cumulative |
| 1 | 100 | 100 |
| 2 | 100 | 200 |
| 3 | 125 | 325. |
| 4 | 150 | 475 |
| 5 | 175 | 650 |
| 6 | 200 | 850 |
| 7 | 225 | 1075 |
| 8 | 250 | 1325 |
| 9 | 275 | 1600 |
| 10 | 300 | 1900 |
| 11 | 300 | 2200 |
| 12 | 325 | 2525 |
| 13 | 325 | 2850 |
| 14 | 325 | 3175 |
| 15 | 825 | 4000 |

## FIRST AMENDMENT TO THE OPTION AND SALE AGREEMENT

This Amendment dated November 27, 2000

BY AND BETWEEN:

> GLOUCESTER NEW COMMUNITIES COMPANY, INC., a corporation of the State of New Jersey, with offices located at Village Center Drive, Swedesboro, New Jersey 08085
>
> (hereinafter referred to as "Optionor" and sometimes as "Seller");

AND

> SUMMIT VENTURES, LLC, a limited liability company of the State of New Jersey with offices located at 1920 Frontage Road, Landmark II, Suite 107, Cherry Hill, New Jersey 08034
>
> (hereinafter referred to as "Optionee" and sometimes as "Purchaser").

### W I T N E S S E T H:

WHEREAS, the parties have previously executed the Option and Sale Agreement for Land dated August 7, 1996 (the "Option Agreement"); and

WHEREAS, during the performance of their respective obligations and duties under the Option Agreement, the parties have determined it is necessary to amend, modify and restate certain provisions of the Option Agreement as a result of the ongoing operations with respect to securing Developmental Approvals and related to the parties accounting and financial obligations; and

WHEREAS, the parties hereby agree to modify and amend the Option Agreement in accordance with the provision set forth below.

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and

sufficiency of which are hereby acknowledged and agreed to, the parties hereto do hereby agree as follows:

1. The parties hereby amend and restate the Option Agreement to eliminate the defined term "Kicker Payment" and substitute the term "Net Profit" as it shall appear in the following provisions of the Agreement.

(i) in the definition for Note and Mortgage on page 3;

(ii) in the last sentence of first section of paragraph 3, Term of Option;

(iii) in the first and second sentence of Section 13, Transactional Description;

(iv) in the second sentence of Section 16, Provisions Governing Sales to Builders and Other Third Party Purchasers;

(v) in the last sentence of Section 17.02.2, Purchaser's Bonding Obligations;

(vi) in Section 31(c)(iii); and

(vii) in the last sentence of Section 32.01.

2. Section 3.01 of the Agreement is hereby amended and revised to eliminate the requirement that the joint checking account be maintained as an escrow account. The parties will maintain an account at the Woodstown National Bank and Trust Company in the amount of $100,00.00 or such lesser amount as they may agree to in an interest bearing commercial checking account in accordance with the provisions of Section 3.01, but such account shall not be a "escrow account". The parties may maintain operating accounts in other commercial banks in accordance with the provisions of Section 3.01, but such accounts shall not be an "escrow account".

Section 3.01 of the Option Agreement is amended to provide that authorization for checks shall be $5,000.

3.     Section 3.02 of the Agreement is hereby amended and revised to read as follows: "Optionee shall have the right upon prior written notice to Optionor to use funds contained in the Infrastructure Fund for short term loans in order to allow the completion of on-site improvements required to meet contractual deadlines for deliveries of Building Lots in accordance with the provisions of this Agreement. Optionee's right to use the Infrastructure Funds for these purposes shall be coordinated by the Parties in an effort to limit costs associated with other sources of funding and commercial bank loans. The Parties hereby agree that the amount to be deposited in the Infrastructure Fund shall be $3000.00 per lot until such time as the funds in the Infrastructure Fund are sufficient to meet the agreed upon budget.

4.     Section 3.03. Project Accounting. Within sixty (60) days form the date of this Amendment, Optionor and Optionee shall agree upon a form of accounting to track and report on all Project cost, including but not limited to, the Escrow Fund and Infrastructure Fund (the "Project Accounting"). The Project Accounting shall be provided on a quarterly basis within ten (10) days of the end of each calendar quarter. Optionor shall have thirty (30) days after receipt of the Project Accounting to provide written objection, comment or request for additional information on any item contained therein. Optionee shall respond to Optionor in writing within fifteen (15) days with an appropriate response to Optionor's request. In the event that the parties cannot resolve any dispute as to any item contained in the Project Accounting, the amount in dispute shall be placed in escrow and held by Purchaser's Attorney in an interest bearing trust account until such time as the dispute is resolved through agreement or litigation.

5.     Section 15 of the Agreement is hereby amended and revised to read as follows: "In addition to the Base Purchase Price, which shall be paid by Purchaser for each Takedown

Lot at the Closing thereof, Purchaser shall be liable to Seller for an additional payment equal to the percentage of the Net Profit (hereafter defined) received by Purchaser from the subsequent sale of such Takedown Lot to a Builder or third party purchaser (the "Net Profit Payment"). For purposes of computation, "Net Profit" shall mean the gross sale price received by Purchaser from a Builder or third party purchaser for each Takedown Lot after deduction of the cost of sale (as hereinafter defined), less"

 (i)  all out of pocket third party engineering, legal, permit, bonding and related fees, open space fees, impact fees and such similar fees incurred by Purchaser in securing the developmental approvals for each Takedown Lot,

 (ii)  actual third party cost of construction and installation of infrastructure improvements to serve each Takedown Lot incurred by Purchaser, including, but not limited to, any governmental inspection and/or escrow fees,

 (iii)  real estate taxes (inclusive of all rollback taxes), sewer and water connection and reservation fees and other actual costs expended;

 (iv)  all marketing and incidental development costs;

 (v)  Seller's outside legal and engineering costs to prepare documents for Closings (collectively, the "Allowable Costs");

 (vi)  the required contribution to the Infrastructure Fund,

 (vii)  any interest due to or paid by Purchaser on funds loaned to or borrowed by the venture including loans for the construction and installation of infrastructure improvements; and

 (viii)  Base Purchase Price payment to Seller.

4

No costs incurred by any affiliated company of either party shall be included in the Allowable Costs without the prior written consent of the other party having first been obtained. All interest paid to Purchaser shall be calculated at the prime rate as published in the Wall Street Journal on the date that funds are advanced or not paid.

The Net Profit payment to be paid by Purchaser to Seller upon Closing with a Builder or a third party purchaser shall be equal to:

    (a) $1,500 per lot at each Closing as a preferred payment to Seller of Seller's Net Profits;

    (b) 50% of the Net Profit (including the $1,500 per lot payments set forth in (i) above until Seller has received an aggregate total Purchase Price of $5,000,000 from Purchaser,

    (c) 33 1/3rd percent of all Net Profit (including the payments set forth in 3(a) and (b) above) received by Purchaser thereafter until the last section of the Property is sold and conveyed to and fully paid by, a Builder or third party purchaser. Seller shall not be obligated to release the lien of any Mortgage until such time as the Net Profit Payments pertaining to each lot encumbered thereby has been fully paid and otherwise secured or substituted security has been provided for herein.

For each Closing conducted, Purchaser will provide Seller with a full accounting establishing the Net Profits to be realized on account of the Closing.

The parties agree that the following schedule of disbursements for each Closing on Takedown Lots:

    (i) $1.000 Based Purchase Price payment per Takedown Lot to Seller;

(ii) $1,500 preferred Net Profit Payment to Seller;

(iii) payment of all Allowable Costs and repayment of all loans due including loans made by Purchaser;

(iv) funding of the Infrastructure Fund in the amount of $3,000 per Takedown Lot; and

(v) $1,500 Net Profit Payment to Purchaser.

Thirty (30) days after Closing on any Takedown Lots, fifty (50%) percent of the Net Profits shall be distributed to Seller and Purchaser in accordance with this Section 15. In the event that Purchaser has not received the $1,500 Net Profit Payment at Closing, the Net Profit Payment shall be distributed on a preferred basis with interest to Purchaser.

Within six (6) months of each Closing on Takedown Lots, the parties will review the Project cash flow projections of all costs to complete Infrastructure in the next twelve (12) months, and based on adequate cash available, the parties will distribute the remaining Net Profits from such Closing in accordance with this Section.

The "costs of sale" shall mean ordinary and customary fees paid to third parties that are incurred in the sale, including, but not limited to, legal fees and brokerage commissions. It is expressly understood that neither party will charge its own general and administrative costs or in-house consultants to the Project as costs of sale.

6.    15.01 Termination for Non-Payments of Net Profit Payment. In the event that Seller has not received payment in full of the Net Profit Payment for any Takedown Lots within eighteen (18) months from the Closing Date with the Builder or third party purchaser or five (5) years from the Closing Date of that Option Section, whichever is less, Seller shall have the right, upon prior written notice to Purchaser to terminate the Agreement, whereupon the

6

Option shall be deemed to have, and still be treated as though it had expired pursuant to Section 31 of this Agreement. Seller may simultaneously pursue its remedies under any note or mortgage at law or in equity. Notwithstanding anything to the contrary in this Section, Purchaser shall have the right, but not the obligation, to cure the non-payment at any time prior to expiration of the sixty (60) day cure period by paying to Seller such amount as shall have been calculated as the Net Profit Payment due Seller for any closing in question based on the average Net Profit Payment made during the prior two (2) year period.

7.      Section 17.05 shall be amended to include in the event of the inability to provide adequate sewerage treatment capacity, Seller shall have the right to obtain such capacity and charge the reasonable costs thereto to the Project.

8.      Section 31 is hereby amended to include the following new provision 31(c)(iii):Payment of monies to the Township sufficient to cover the unfunded portion of the Escrow Funds and the continuing maintenance payments required pursuant to the Open Space Agreement with Woolwich Township dated November 15, 1999.

9.      Renumber Sections 31(c)(iii) and (iv) to read 31(c)(iv) and 31(c)(v).

10.     The definition of Seller's Attorney shall be revised to read "William J. Bowe, Esq., Foss Bowe San Filippo & Caruso, LLC, with offices located at 225 Broad Street, PO Box 896, Red Bank, New Jersey 07701.

11.     The definition of Moratorium shall be revised to read as follows, "means any action or inaction taken or imposed by a governmental entity or agency, that shall have the effect of barring or preventing, directly or indirectly, Optionee from proceeding with the Project, which shall include the inability or refusal of any governmental agency to provide water or sewer facilities."

7

12.    Except as modified herein all other terms and conditions of the Option

Agreement remain in full force and effect.

In WITNESS WHEREOF, the parties have set their hands and seals this 27th day of

November, 2000.

SUMMIT VENTURES, L.L.C.
A Limited Liability Company

By: COWICH ASSOCIATES, LLC

By:_____
    Kenneth I. Schatz, Authorized Member

By: TWENTY TWENTY, LLC

By:_____
    Andrew G. Long, Authorized Member

GLOUCESTER NEW COMMUNITIES
COMPANY, INC.

By:_____
    Akos L. Nagy, President

8