IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**Objection Deadline: July 11, 2003**
**Hearing Date: July 28, 2003 at noon**

## MOTION FOR THE ENTRY OF AN ORDER AUTHORIZING, BUT NOT REQUIRING, THE DEBTORS TO MAKE CONTRIBUTIONS INTO THE TRUST FUNDING THE DEFINED BENEFIT PLANS COVERING DEBTORS' EMPLOYEES

The above-captioned debtors and debtors in possession (collectively, the

"Debtors"), by their undersigned counsel, respectfully move this Court (the "Motion") for the

entry of an order authorizing, but not requiring, the Debtors to make annual contributions of

approximately $40 Million in both 2003 and 2004 to the trust that funds the defined benefit

retirement plans covering the Debtors' employees (the "Grace Retirement Plans"), in accordance

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

with the funding strategy described herein.[2] In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O). Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief sought herein is section 327(a) of the Bankruptcy Code and Fed. R. Bank. P. 2014(a).

## Background

2.      On April 2, 2001 (the "Petition Date"), each of the Debtors in these chapter 11 cases filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Chapter 11 Cases have been consolidated for administrative purposes only and, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

## Grace Retirement Plans

3.      The Grace Retirement Plans currently consist of nineteen funded, defined benefit pension plans, each of which is qualified under section 401(a) of the Internal Revenue Code (the "Code"). In reviewing the funding requirements for the Grace Retirement Plans, the

---

[2] The funding discussed in this Motion is in addition to, and does not include, the 2003 contribution to the Debtors' Curtis Bay Pension Plan, which was approved by order of this Court dated March 3, 2003 as Docket No. 3445 (the "Curtis Bay Order"). Pursuant to the Curtis Bay Order, the Debtors' 2003 contribution to the Curtis Bay Plan may not exceed $10 Million. The actual contribution of approximately $8.5 Million will be made by the Debtors on July 1, 2003.

Debtors included the following measures of liability: (a) the "actuarial present value of accumulated plan benefits" under Financial Accounting Standard ("FAS") 35 (the "Economic Obligation"); (b) the "accumulated benefit obligation" (the "ABO") under FAS 87 and (c) the "projected benefit obligation" ("PBO") under FAS 87.[3] The most significant Grace Retirement Plan is the W. R. Grace & Co. Retirement Plan for Salaried Employees (the "Grace Salaried Plan"), which comprises approximately 83% of the assets, 85% of the Economic Obligation, 84% of the ABO and 85% of the PBO.

      4.     All of the assets of each Grace Retirement Plan are held in a master trust at The Northern Trust Company ("Northern Trust"). Within that trust, Northern Trust separately accounts for assets allocated to each Grace Retirement Plan.

### Employees Covered by the Grace Retirement Plans

      5.     The Debtors have a long history of providing employees with defined benefit pension plans. For instance, the Grace Salaried Plan has been in existence since at least 1959. Virtually all active employees of the Debtors are currently covered by one of the Grace Retirement Plans and have been accruing benefits under a Grace Retirement Plan for their entire

---

[3] Under FAS 35, the "actuarial present value of accumulated plan benefits" (Economic Obligation) is further explained as follows: "Accumulated plan benefits are those future benefit payments that are attributable under the plan's provisions to employees' service rendered to the benefit information date. Accumulated plan benefits comprise benefits expected to be paid to (a) retired or terminated employees or their beneficiaries, (b) beneficiaries of deceased employees, and (c) present employees and their beneficiaries. ... The actuarial present value of accumulated plan benefits is that amount as of the benefit information date that results from applying actuarial assumptions to the benefit amounts determined pursuant to [the prior sentence and certain other factors]. ..." FAS 35, paragraphs 16 and 19.

Under FAS 87, "projected benefit obligation" (PBO) is defined as "[t]he actuarial present value as of a date of all benefits attributed by the pension benefit formula to employee service rendered prior to that date. The projected benefit obligation is measured using assumptions as to future compensation. ..." FAS 87, paragraph 264, Glossary. The "accumulated benefit obligation" (ABO) is defined as "[t]he actuarial present value of benefits...attributed by the pension benefit formula to employee service rendered before a specific date and based on employee service and compensation...prior to that date. The accumulated benefit obligation differs from the projected benefit obligation in that it includes no assumption about future compensation levels. ...". Id.

The Economic Obligation is calculated in a manner that is similar to the ABO calculation (versus the PBO calculation), except that, in the case of the Grace Retirement Plans, the interest rate assumptions used in derive the present value portion of those calculations differ and, in the case of Plans covering union employees, the ABO calculation takes into consideration future scheduled increases in annual retirement benefits whereas the Economic Obligation does not consider such increases.

period of employment with the Debtors[4] and expect to continue to accrue such benefits throughout their employment with the Debtors. The Grace Salaried Plan alone covers over 2,160 active salaried employees (of a total US workforce of approximately 3,400 employees) or 64% of the Debtors' US workforce.

6.    Many of the Grace Retirement Plans are maintained pursuant to collective bargaining agreements. Unions representing the Debtors' employees consistently for many years have placed a high priority upon the continuation and protection of accruals under the Grace Retirement Plans and the periodic enhancement of benefits under those Plans. Virtually all of the Debtors' employees consider continued benefit accruals under the Grace Retirement Plans and the continued financial viability of those Plans important aspects of their employment relationship with the Debtors and a key component of their financial plan for retirement.

7.    Employers that are considered competitors or peers of the Debtors' businesses with respect to recruitment and retention of employees, generally maintain defined benefit pension plans for their employees. According to Hewitt Associates LLC, a nationally recognized benefits consulting firm, 23 of 26 (or 88%) of the companies identified by the Debtors for purposes of employee benefit comparisons maintained one or more defined benefit plans during 2002. As a result, the Debtors believe that continued coverage under, and the financial viability of, the Grace Retirement Plans are vital components to maintaining competitive retirement benefits, which is key to attracting and retaining high-quality employees for the Debtors' businesses.

---

[4]    Employee eligibility to participate in the Grace Retirement Plans is generally subject to certain age and years of service requirements.

8.      During recent months, as a result of the current underfunded status of certain Grace Retirement Plans including the Grace Salaried Plan, the Debtors' employees have expressed concerns regarding the continued viability of the Grace Retirement Plans. The Debtors' management, therefore, believes that failure to restore the funded status of the Grace Retirement Plans will have a substantial negative impact on the morale of the Debtors' workforce, and thereby the productivity of the Debtors' business.

## Funded Status Of The Grace Retirement Plans.

9.      The decline in the global equity markets over the past three years has had a substantial impact on the funding status of the Grace Retirement Plans. As of January 1, 2003, the Grace Retirement Plans were underfunded, in the aggregate, by over $120 Million. The range of underfunding of the Salaried Retirement Plan alone is over $110 Million.

10.     In order to make up for this significant underfunding consistent with the Debtors' business objectives, the Debtors have developed a strategy for funding the Grace Retirement Plans (the "Overall Funding Strategy"). The Overall Funding Strategy satisfies each of the following objectives: (a) contribute at least the annual required minimum for each Grace Retirement Plan, as calculated under Code section 412; (b) avoid the requirement to provide an Underfunding Notice to Grace Retirement Plan participants; (c) accomplish these objectives through generally level contributions; (d) eliminate the underfunded status of the Grace Retirement Plans by 2007; and (e) allow for reevaluation of all aspects of the funding strategy in early 2005, prior to making any contribution in that year.

11.     The actuary of the Grace Retirement Plans (the "Grace Actuary")[5]
estimates that the Debtors will be required to contribute approximately $0.5 Million in 2003 and
approximately $81.1 Million in 2004 to comply with the minimum funding requirements under
Code section 412[6] (the "Minimum Funding Requirements").

12.     The Grace Actuary has also determined that, even if the Debtors satisfy
the Minimum Funding Requirements of approximately $0.5 Million in 2003, the Debtors will
still be obligated, pursuant to section 4011 of the Employee Retirement Income Security Act of
1974 ("ERISA"), to inform the participants in the Grace Salaried Plan and several other Grace
Retirement Plans in writing that their Plan is underfunded for the 2004 plan year (the
"Underfunding Notice").

13.     In order to avoid the requirement to provide the Underfunding Notice for
the 2004 plan year, the Debtors would need to make a minimum contribution of approximately
$16.0 Million prior to September 15, 2003.  If required, the Underfunding Notice would be sent
to approximately 2,500 (or 75%) of the Debtors active employees.  If the Debtors make such
minimum contribution in 2003, in order to avoid the requirement to provide the Underfunding
Notice for the 2005 plan year, the Debtors would need to make a minimum contribution totaling
approximately $63.4 million during 2004.

---

[5]  Ann Rachel Quesada of AON Consulting has been the "enrolled actuary" of the Grace Retirement Plans since 1990

[6]  The contribution required to meet the Minimum Funding requirement during 2004 would be comprised of approximately $44.4 Million contributed during 2004 but prior to September 15, 2004 (related to the 2003 plan year) and three quarterly contributions during 2004 of approximately $12.2 Million each (related to the 2004 plan year).

## 2003-04 Funding Strategy

14.    In order to implement the Overall Funding Strategy, the Debtors will contribute $40 Million to the Grace Retirement Plans during 2003 (the "2003 Funding") and also anticipate contributing approximately $40 Million in 2004 (the "2004 Funding" and together with the 2003 Funding, the "2003-04 Funding Strategy"). The 2003 Funding will (a) satisfy the Minimum Funding Requirement for 2003, (b) avoid the need to provide the Underfunding Notice for the 2004 plan year and (c) begin to satisfy the Minimum Funding Requirement for 2004. The Debtors currently expect that the 2004 Funding will satisfy the Minimum Funding Requirement for 2004 and avoid the need to provide the Underfunding Notice for the 2005 plan year. The 2003-04 Funding Strategy will permit the Debtors to begin the process of fully funding the Grace Retirement Plans by 2007, until at least the reevaluation of the Overall Funding Strategy in early 2005.

15.    The Debtors have determined that the 2003-04 Funding Strategy is an effective approach to funding the Grace Retirement Plans because the legal funding requirements will be satisfied in a manner that will also address the employee morale and competitiveness issues described above. In particular, the 2003-04 Funding Strategy represents the beginning of a systematic method to eliminate the underfunding of the Grace Retirement Plans within a reasonable period of time, and demonstrates a commitment by the Debtors to fund those Plans by making significant contributions in the current year.

16.    The Debtors have also determined that the 2003-04 Funding Strategy is effective from a cash flow management perspective because it provides for making legally

required contributions to the Grace Retirement Plans and avoiding the Underfunding Notice through level contributions over the period 2003-2004, and providing for flexibility as a result of a scheduled reevaluation of all aspects of the Overall Funding Strategy in early 2005.

17.    The Debtors have determined that merely satisfying the Minimum Funding Requirements each year would not address the concerns of employees because no significant contributions would be made to the Grace Retirement Plans for at least 1 year from the date of this Motion. Moreover, only satisfying the Minimum Funding Requirements would cause the Debtors to incur the obligation to provide the Underfunding Notice to Grace Retirement Plan participants. In addition, Debtors' management has determined that implementing a strategy that would merely satisfy the Minimum Funding Requirements each year is not consistent with Debtors' overall cash management approach because of the potential for substantial variability in required contributions from year to year.

## Relief Requested

18.    By this Motion, the Debtors seek authority to make annual contributions of approximately $40 Million to one or more of the Grace Retirement Plans in 2003 and 2004, in accordance with the 2003-04 Funding Strategy.

## Basis for Relief

19.    Section 105(a) of the Bankruptcy Code "permits the court to issue any order that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate." A court has the statutory authority to authorize a debtor to use property

of the estate pursuant to section 363(b)(1) of the Bankruptcy Code when such use is an exercise

of the debtor's sound business judgment and when the use of the property is proposed in good

faith. In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Lionel Corp.,

722 F.2d 1063, 1071 (2d Cir. 1983); see also Fulton State Bank v. Schipper, 933 F.2d 513, 515

(7th Cir. 1991) (a debtor's decision must be supported by "some articulated business

justification"); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the

"sound business purpose" standard for sales proposed pursuant to section 363(b)); In re

Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Ernst Home

Center, Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

      20.     Under section 363(b) of the Bankruptcy Code, a debtor has the burden to

establish that it has a valid business purpose for using estate property outside the ordinary course

of business. See Lionel Corp., 722 F.2d at 1070-71. Once the debtor has articulated such a valid

business purpose, however, a presumption arises that the debtor's decision was made on an

informed basis, in good faith and in the honest belief that the action was in the debtor's best

interest. See In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). A party in

interest seeking to challenge the debtor's valid business purpose must "produce some evidence

supporting its objections." Montgomery Ward, 242 B.R. at 155.

### The Proposed Transaction Is Supported by Sound Business Judgment

      21.     The Debtors respectfully submit that implementing the 2003-04 Funding

Strategy is the most effective approach to funding the Grace Retirement Plans, including the

Minimum Funding Requirement.  The 2003-04 Funding Strategy allows for the funding of the Grace Retirement Plans in a manner consistent with Debtors' cash management approach, while maintaining or improving the morale and productivity of Debtors' employees throughout the United States, as well as maintaining competitive employee benefits vis-à-vis the Debtors' competitors and peers.  The employees' morale, continued loyalty to the Debtors and faith in the Debtors' management will be greatly enhanced by the implementation of the 2003-04 Funding Strategy.  In the Debtors' business judgment, the implementation of the 2003-04 Funding Strategy is key to maintaining a dedicated, motivated and loyal workforce in the Debtors' business judgment.

22.     In evaluating options with respect to funding the Grace Retirement Plans, the Debtors have determined that:  (a) the morale of the Debtors' employees is adversely affected by the current financial status of the Grace Retirement Plans and not addressing these employee concerns will lead to further erosion of morale and productivity and thereby have a negative impact on the Debtors' ability to successfully reorganize, (b) merely satisfying the Minimum Funding Requirements on an ongoing basis will not alleviate the employees' concerns, and (c) providing the Underfunding Notice to Grace Retirement Plan participants would heighten employees concerns regarding the financial status of the Grace Retirement Plans, as well as the financial situation of the Debtors.

23.     The Debtors have determined that a funding strategy that results in level annual contributions would be a better cash flow management strategy than an approach whereby contributions would vary widely from year to year.  The Debtors have also determined

that a funding strategy should provide the ability to make adjustments in future years through periodic reevaluation.

24.     Additionally, given the current status of the Chapter 11 Cases, the Debtors' management believes that it will be difficult to maintain employee morale and loyalty if it does not continue to meet the Minimum Funding Requirement and avoid sending the Underfunding Notice. The employees' morale, continued loyalty to the Debtors and faith in the Debtors' management will be furthered by implementing the 2003-04 Funding Strategy because it clearly signals the Debtors' commitment to continuing to profitably grow their businesses for the benefit of the Debtors' stakeholders, including their employees.

25.     The Debtors' management have determined in their business judgment that implementing the 2003-04 Funding Strategy in a timely manner is in the best interests of the Debtors' estates and creditors. As specified above, clear business reasons exist to justify, under section 363(b) of the Bankruptcy Code, the Debtors' 2003-04 Funding Strategy. Continuing accruals under the Grace Retirement Plans and addressing the underfunded status of those Plans is vital to maintaining a focused and motivated US workforce.

### Notice

26.     Notice of this Motion has been given to (i) the Office of the United States Trustee, (ii) counsel to the debtor in possession lenders, (iii) counsel to each official committee appointed by the United States Trustee and (iv) those parties that requested papers under Fed. R. Bankr. P. 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

### No Prior Request

27.     No prior Application for the relief requested herein has been made to this

or any other Court.

WHEREFORE, the Debtors respectfully request that the Court authorize the

Debtors to (i) make contributions to the Grace Retirement Plans annually in 2003 and 2004

consistent with the 2003-04 Funding Strategy and the Overall Funding Strategy, and (ii) such

other and further relief as the Court deems just and proper.

Wilmington, Delaware
Dated:  June 23, 2003

Respectfully submitted,

KIRKLAND & ELLIS
James H.M. Sprayregen, P.C.
James W. Kapp III
Janet S. Baer
Christian J. Lane
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB PC

Laura Davis Jones (Bar No. 2436)
Scotta McFarland (Bar No. 4184)
Paula Galbraith (Bar No. 4258)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession