# EXHIBIT 1

# ZONOLITE ATTIC INSULATION REPORT

Prepared by:

Richard Hatfield
Senior Consultant
And
William E. Longo, Ph.D.
President

Materials Analytical Services, Inc.
3945 Lakefield Court
Suwanee, Georgia 30024

*This report was prepared jointly by Dr. William Longo and Richard Hatfield of MAS.*

I, William E. Longo, am an expert in the fields of microscopy, materials science and engineering, and asbestos analysis and evaluation. I have a Master of Science degree in Engineering and a Doctorate of Philosophy degree in Materials Science and Engineering, both from the University of Florida. I am currently the president of Materials Analytical Services, Inc., a company specializing in materials characterization.

Throughout my career, I have analyzed asbestos bulk, air and settled dust samples for both private clients and government agencies. I have also consulted for the EPA on its protocol for asbestos sampling at Superfund sites and the dust analysis protocol. I have assisted NATO in the analysis of materials from school buildings located over seas and the Berlin Wall for the presence of asbestos. I have analyzed asbestos samples for governmental and private entities. I have also analyzed asbestos samples for corporations that formerly manufactured asbestos-containing products, including W.R. Grace.

I have authored and co-authored numerous articles regarding asbestos sampling and testing techniques. I have served on the Peer Review Group Committee for the EPA, a group responsible for guiding EPA's research involving various asbestos issues in occupied buildings. Additionally, I was invited by the EPA along with others, to help develop its protocol for taking and analyzing settled dust samples during some of its research studies. I am also a member of the American Society of Testing Materials (ASTM Subcommittee for asbestos sampling and analysis). My contribution to this particular subcommittee involved such things as being the primary author of the ASTM method D-5755-95 entitled "Micro-Vacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentration".

I am an expert in the field of materials characterization, the use of materials for specific applications, and the ability to determine their physical and chemical properties using recognized testing procedures. I will testify about testing protocols routinely used for materials characterization and analyzing asbestos samples, including sample preparation and fiber counting. A copy of my curriculum vitae is included with this statement and is incorporated by reference. [Attachment A]

I will also discuss the standard and accepted scientific methods and techniques used for identifying and quantifying asbestos in various samples such as air, dust and bulk. I will testify about the different forms of asbestos, including their morphology and mineralogy. I will discuss in particular the morphology and mineralogy of the Libby Amphibole Asbestos found as a contaminant in Grace's Zonolite Attic Insulation (ZAI) product. I will discuss the nature of ZAI and the results of testing of ZAI by my laboratory using standard accepted scientific methods and techniques for analysis. I will discuss the testing of ZAI preformed by Grace and will compare its results with results of testing by my laboratory.

2

My charge for testimony and deposition testimony is $275 an hour. I have provided expert testimony in asbestos property damage cases in both federal and state court. A list of prior testimony will be provided in the future.

I, Richard L. Hatfield, am an expert in the field of asbestos in buildings. I obtained Bachelor of Science degrees in Experimental Statistics and Geology from North Carolina State University, and began my career in asbestos consultation in 1979 as a Technical Field Advisor to EPA's "Asbestos in Schools" Program. I was appointed as an expert advisor to the EPA's negotiated rule making committee to promulgate new regulations for asbestos in schools pursuant to AHERA (Asbestos Hazards Emergency Response Act). After completing the EPA's "Asbestos in Schools" program in 1979, I developed methods for solving asbestos problems in buildings for Law Engineering and Environmental. In 1982 I was recruited by McCrone Environmental Services to develop and manage its Atlanta based company, and served as Director of Services for five years. My work at McCrone involved the management of laboratory microscopy, field testing and field evaluations of asbestos in buildings. During this time, McCrone was recognized as a leader in the specialized fields of light and electron microscopy. While there, I utilized various methods of microscopy and chemical analysis to solve asbestos-related problems. In December 1987, I returned to Law Engineering where I assessed asbestos problems in buildings and worked extensively with the laboratory of Materials Analytical Services. I joined Materials Analytical Services in August 1996, where I apply my knowledge of asbestos-containing materials as Senior Consultant.

During the years I have dealt with asbestos-related problems, I have instructed over fifty (50) courses and seminars on asbestos in buildings. I have developed protocols for the collection and analysis of settled asbestos dust in buildings, and consulted with the EPA and the American Society for Testing and Materials (ASTM) in establishing guidelines for these protocols. These protocols have been accepted by both the scientific and the legal community.

As a consultant, I have advised hundreds of public and private building owners concerning the appropriate action to take regarding the disposition of asbestos in their properties. As part of my consulting services I have acquired extensive experience in the field of identifying products by visual and microscopic examination of the materials and their components, and in the field of collection and analysis of the amount and frequency of asbestos released from asbestos-containing buildings materials. My expert qualifications and training are set forth more fully in the attached curriculum vitae, which is incorporated by reference [Attachment B].

I have provided expert testimony in numerous asbestos property damage cases in both federal and state court. A list of prior testimony will be provided in the future. Additionally, my charge for trial and deposition testimony is $225.00 per hour.

I have participated in demonstrations, reviewed experiments and performed tests

3

involving asbestos-containing materials, in which either the material or its residue was disturbed in a manner similar to that which would occur during routine building operations and maintenance activities. This disturbance resulted in the release of varying significant levels of airborne asbestos-containing dust. I have participated in similar studies involving ZAI. Such tests indicate that persons engaged in cleaning, repairs, renovations, or removals that disturb ZAI or dust and debris from ZAI will be exposed to significantly elevated and potentially dangerous levels of asbestos fibers.

I am an expert in the field of asbestos materials characterization, the use of asbestos materials for specific applications, and the ability to determine their physical and chemical properties using recognized testing procedures. I will testify about testing protocols routinely used for materials characterization and analyzing asbestos samples, including sample preparation and fiber counting.

I will also discuss the standard and accepted scientific methods and techniques used for identifying and quantifying asbestos. I will testify about the different forms of asbestos, including their morphology and mineralogy. I will discuss in particular the morphology and mineralogy of the Libby Amphibole Asbestos found as a contaminant in Grace's Zonolite Attic Insulation (ZAI) product. I will discuss the nature of ZAI and how it relates to testing by my laboratory using standard accepted scientific methods and techniques for analysis.

## STANDARD TYPES OF MICROSCOPIC EQUIPMENT
## USED TO IDENTIFY & QUANTIFY ASBESTOS

In general, asbestos refers to a family of naturally occurring fibrous silicate minerals. As discussed below, Grace's ZAI product was contaminated with varying amounts of asbestos in the tremolite series of minerals. In its fibrous form, asbestos is made up of parallel strands of fibers that will separate into individual respirable sized fibers that are invisible to the naked eye. Depending on the asbestos mineral, individual asbestos can be as small as 0.025 microns in diameter. Because of its size and mineralogy, identification and quantification of asbestos requires the use of sophisticated microscopic equipment operated by highly trained analysts. The types of microscopes used to analyze and identify asbestos fibers fall into two categories, light microscopes and electron microscopes. Light microscopes include the polarized light microscope (PLM) and phase contrast microscope (PCM).

The PLM is mainly used to analyze bulk samples in order to determine the presence and amount of asbestos in materials, such as ZAI. The PLM technique allows the analyst to distinguish between asbestos and other types of fibers through the use of polarizing lenses, rotation of the samples and various other optical techniques. By knowing the optical properties of various types of fibers, the analyst can distinguish between asbestos and non-asbestos fibers, and can identify the type of asbestos. Ordinary PLM allows an analysis to detect asbestos in a bulk sample in amounts at 0.1% by weight and above depending on the type of material that contains the asbestos fibers.

4

The PCM is a light microscope equipped with a special light source that allows the analyst to resolve fibers easier. The PCM is the standard equipment used to analyze airborne fiber levels in an occupational setting for compliance purposes under the Occupational Safety and Health Administration (OSHA) regulation. Because the analysis is performed at a magnification of 400X, only fibers/bundles with a minimum diameter of 0.25 microns and a minimum length of 5.0 microns are counted for regulation purposes in occupational settings. The PCM method does not allow the analyst to distinguish between asbestos and non-asbestos fibers. Because the PCM does not allow the analyst to distinguish between asbestos and non-asbestos fibers, all fibers are presumed to be asbestos under the OSHA regulation.

There are two main types of electron microscopes available for asbestos analysis, the transmission electron microscope (TEM) and the scanning electron microscope (SEM). Because the size of electrons is much smaller than the wavelength of light, both types of electron microscopes have resolution capabilities allowing the analyst to resolve individual asbestos fibers/bundles much smaller than 0.25 microns in diameter. In most instances, electron microscopes allow the analyst to identify the various types of asbestos through their chemical composition. The analytical SEM is fitted with an energy dispersive x-ray analysis (EDXA) system that can provide information about the elemental composition of a particle or fiber. The analytical transmission electron microscope (TEM) is also equipped with an EDXA system for micro-chemical analysis as well as electron diffraction that provides information about a particle's unique crystal structure in the same manner as powdered x-ray diffraction but on a smaller scale. Individual fibers including those of the smallest asbestos fibers (0.02 µm in diameter) can be studied with TEM.

Our experience has shown that the use of a transmission electron microscope is the preferred way to analyze asbestos air and dust samples because it allows the analyst to detect and identify long as well as short fibers that are very thin (less than approximately 0.25 micrometers wide). Because of their limited resolution, light microscopes are unable to detect the long fibers (greater then 5.0 microns) with a diameter less than 0.25 microns.

## ASBESTOS FIBERS DEFINED

From the analyst's point of view, an asbestos fiber is defined by the counting method being used. For airborne fibers counted on filters, EPA under the Asbestos Hazards Emergency Response Act (AHERA) counting rules, defines a fiber as having a length of at least 0.5 µm long, with a 5:1 or greater aspect ratio, and substantially parallel sides. The International Standards Organization (ISO) and ASTM TEM air methods also use the minimum 0.5 µm length with a 5:1 aspect ratio definition in their work. Under section 3.22 of the ISO 10312 counting rules, a fiber (listed as the British spelling 'fibre') is an elongated particle that has parallel or stepped sides.

5

For airborne fibers counted on filters in an occupational setting, OSHA uses a definition of a fiber that is at least 5 µm long with an aspect ratio (length to width) of at least 3:1. This 5 micron length limitation was not related to toxicity. Instead, the lower length limitation of 5 microns in OSHA's counting rule was based on the limitations of the light microscope, which OSHA had approved for use in analyzing air samples in occupational settings. Grace's chief microscopist, Julie Yang recognizes this limitation in a 1980 document:

> As to the lower limit of fiber lengths, it is 5 µm presently because it is close to the optical microscope reliable resolution limit, the equipment (up to 430x magnification) which OSHA and MESA approved for counting. However, it does not mean that fibers of <5 µm in length are not hazardous. If the transmission electron microscope (1,000 -- 50,000x magnification generally) becomes more popular in use and lower in cost, the limit may be lowered to 1µm range since many recent publications indicated that the smaller asbestos fibers are also potent carcinogens.

> February 15, 1980 memo from Yang to Duecker

## METHODS OF ANALYSIS OF ASBESTOS

We personally, and with the aid of our staff, have analyzed tens of thousands of asbestos samples of all types, including bulk samples, micro-vacuum dust samples, air samples, water samples and human lung tissue samples. We will explain the methodology employed in analyzing the various types of samples. As discussed below, the types of testing and the nature of the material dictates the methods used for analysis in any given situation. Where the PCM is used, the NIOSH 7400 method is the standard method used in occupational settings and can be supplemented with TEM analysis using NIOSH 7402, "Asbestos Fibers by Transmission Electron Microscopy (TEM), "NIOSH Pub. 94 - 113 (1994). Currently, there are no PCM methods for non-occupational settings. We used the NIOSH 7400 method to analyze airborne asbestos samples in our investigations of ZAI.

In non-occupational settings, there are a number of accepted methods for the analysis of air samples by TEM, which provides identification of the asbestos fibers, and provides additional information about sizes of the asbestos fibers. The Yamate method is probably the most comprehensive and widely accepted method for analysis of airborne asbestos by TEM. Mr. George Yamate published a method for the TEM analysis of air samples for EPA in 1984, which became one of the cornerstones for all TEM air sample analysis, including the EPA AHERA method and NIOSH 7402 method. The Yamate procedure is the process of taking an air sample that was collected with either a mixed cellulose ester (MCE) or a polycarbonate (PC) filter, and then preparing that filter for examination in the TEM. Asbestos fibers are defined as a fibrous structure with the appropriate chemistry and crystalline makeup that has an aspect ratio (length to width) of at least 3 to 1 and can be any length. A known area of the filter is examined in the TEM and the number of asbestos structures in that known area of the filter is counted and recorded.

6

Since the Yamate method was published, EPA's AHERA regulation has redefined asbestos fibers for TEM analysis to include fibers longer than .05 microns and having an aspect ratio of 5:1. This definition has been accepted and utilized in all of the TEM methods developed since AHERA. This current definition is easily adapted to previous TEM methods, such as the Yamate method. Therefore, we utilize the current EPA definition for the Yamate protocol. This is just a slight variation of original counting rules in the Yamate protocol. Defining the aspect ratio as 5:1 rather than 3:1 and counting only fibers greater then 0.5 microns in length is a more conservative definition for asbestos fibers while remaining consistent with EPA. As stated above, the Yamate TEM method with the current counting rules was one of the protocols used for our ZAI studies in addition to the NIOSH 7400 method (PCM).

## FORMS OF ASBESTOS – SERPENTINE AND AMPHIBOLE

There are two major forms of asbestos, Serpentine and Amphibole. Chrysotile asbestos, in the serpentine family, was the form of asbestos most widely used in commercial products in North America. The morphology of chrysotile is generally found to be wavy and somewhat flexible with a very high tensile strength. It tends to be less persistent in an acid or basic solution and can be dissolved over time.



The vast majority of chrysotile used in commercial products was mined in Quebec, Canada. Because of the extensive use of chrysotile in commercial products, there is a very low background level of chrysotile asbestos in the air in the environment. This background level in the environment has been reported by EPA to be in the range of 0.000001(rural) to 0.00001 (urban) ` asbestos structures per cc. (HEI-AR Asbestos in Public and Commercial Buildings Report 1991 p. 1-4, 5). Amphibole asbestos

7

(amosite/crocidolite) was far less used. As a consequence, it is unusual to find background levels of amphibole in the air.

Amphibole forms of asbestos include the tremolite/actinolite series of asbestos found in ZAI (which will be discussed in more detail below), anthophyllite, crocidolite and amosite. These forms of asbestos are marked by their needle-like appearance and are more persistent, less affected by acid or base solutions and less likely to dissolve over time.



## LIBBY AMPHIBOLE ASBESTOS FOUND IN ZAI

The vermiculite used in Grace's ZAI product was mined at Grace's Vermiculite mine in Libby, Montana. Notably, this mine contains significant amounts of fibrous amphibole asbestos in the tremolite series of asbestos, as well as anthophyllite. Libby ore content varied depending of the area of the deposit being mined.

8

In the case of Libby amphibole asbestos, the mineral was originally called tremolite, soda-tremolite or sodium-rich tremolite by both mineralogists and the mining industry (Western News, 1927; Larsen and Pardee, 1929; Boettcher, 1966b; Bassett, 1959).    In 1963, Deer, et al., described the Libby amphibole as richterite ("soda tremolite"). In the 1980s, it was referred to as tremolite (McDonald et al. 1986, 1988), and tremolite-actinolite (Amandus and Wheeler 1987).

When the Subcommittee on Amphiboles of the International Mineralogical Association finalized the classification parameters, the Libby amphiboles, after careful chemical analysis, were fit into chemically related zones and assigned the minerals winchite, richterite, tremolite, actinolite and possibly edenite. (Leake, et al., 1997). As a part of the tremolite series, actinolite, richterite and winchite are all amphiboles and are very similar to tremolite in shape, size and chemical composition.    The only difference between tremolite and actinolite is the higher presence of iron (Fe) in actinolite.    The only difference between tremolite and winchite is the presence of a small amount of sodium (Na) in richterite.    The only difference between tremolite and richterite is the presence small amounts of sodium (NA) and potassium (K) in winchite.    Interestingly, the change from one mineral to the next within the tremolite series has been observed within a single fiber.    Distinguishing between tremolite, winchite and richterite using a polarized light microscope is difficult because the three minerals have very similar optical properties. Until recently, W.R. Grace always referred to the Libby amphibole asbestos as tremolite (Yang (W.R. Grace), 1976; Wood (W.R. Grace), 1977).    In fact, Julie Yang, Grace's head microscopist, testified that in the thousands of asbestos samples she analyzed, she always referred to the asbestos as tremolite and testified that most of the asbestos from Libby is tremolite. (Deposition of Julie C. Yang Feb. 20, 2003).    While use of electron microscopy may allow one to distinguish between tremolite, actinolite, winchite and richterite, accurate distinction between the four minerals is very difficult since the mineral chemistry can blend together and is generally beyond the capabilities of the standard routine methods in use today.

There is no evidence that OSHA ever intended to exclude the Libby amphibole from the regulations adopted in 1972. At the time the OSHA standard was enacted, Libby was regarded as containing tremolite and actinolite, two of the asbestos types specifically mentioned in the regulation. The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), commonly known as Superfund, does not limit the definition of asbestos to the commercial types. In fact, the Chemical Abstract Service (CAS) specifically includes winchite and richterite within the amphibole asbestos classification. There is general agreement that there is calcium amphibole asbestos in the Libby material, which EPA and other government agencies now generally refer to as Libby Amphibole Asbestos.    As concluded by Ann Wylie (2000), these minerals regardless of their name should be considered asbestos and hazardous.

Notably, the tremolite series of asbestos found at Libby opens the door for linking contamination to Grace's products manufactured with Libby vermiculite. Further, it will help confirm asbestos exposure to Grace's Libby vermiculite products through the analysis of lung tissue. This was recently demonstrated by Dr. Robert S. Wright, et al.,

9

who analyzed the lung tissue of a person who died of asbestosis and whose only known exposure was working two summers at a plant in California that expanded Libby vermiculite.    The lung tissue analysis found tremolite, actinolite, anthophyllite and chrysotile asbestos.  Notably, the investigators found other asbestiform fibers in "the series of sodium-calcium magnesium silicates characteristic of the Libby vermiculite." See R. S. Wright, et al., "Fatal Asbestosis 50 Years after Brief High Intensity Exposure in a Vermiculite Expansion Plant," Am. J. Resp. and Critical Care Med. Vol. 165, at 1147 (2002). See also September 24, 1991 letter/report by Victor L. Rogoli, MD    RE: Harris Jorgensen Lung Tissue Analysis Results Finding Tremolite/Actinolite from Environmental Exposure to Libby Vermiculite.

## *GENERAL CHARACTERISTICS OF ZAI*

### ZAI IS LOOSE AND FREE FLOWING

In order to evaluate ZAI and determine its asbestos content, MAS analyzed bulk samples of ZAI collected from homes and bulk samples collected from the original bags. ZAI is composed of expanded vermiculite, and is extremely dry, loose and free flowing in nature.  The vermiculite granules move freely with gentle contact and readily tend to flow through small openings or gaps.  This is consistent with Grace's advertisements, which touted its free flowing characteristics:

> Because of its free-flowing characteristics, Zonolite Attic Insulation easily fills up gaps around obstructions and existing insulation, thereby effectively sealing costly heat leaks. It is safe and ideal for the do-it-yourselfer to install.

> See ZAI Advertisement June 27, 1978 Insulation Gets and Assist from John Havlicek

### FRIABILITY OF ZAI

The US EPA defines friability as a material's ability to be crushed by hand pressure.  It is our opinion that the expanded vermiculite  granules used for ZAI are highly friable and can be crushed with minimal force.  This has been a consistent characteristic of ZAI since the mine opened, as shown by patent documents from 1928 for Libby expanded vermiculite which compared its friability to the ash end of a cigar.  [US Patent Office Patent #1,693,015].  The following series of photographs demonstrate the ease with at which ZAI vermiculite granules can be crushed and release fibers.

10







## NATURE OF ASBESTOS FOUND IN ZAI

Grace's Libby amphibole asbestos is highly friable and breaks apart with minimal force. This is reflected in Grace's own internal records. In our work, we have analyzed thousand of samples for asbestos and observed the friability of the materials. Having analyzed thousands of samples and observed their friability, it is our opinion that ZAI has one of the highest friability factors of any products containing asbestos.

12

MAS also evaluated the material for dustiness and found it to contain a certain amount of very fine loose asbestos containing dust that coats the vermiculite granules and readily becomes airborne when gently disturbed.   This fine coating of asbestos dust is demonstrated in the following pictures:

  

The ease with which the material releases dust is evidenced by the simulations involving the scooping of ZAI, using the Tyndall beam effect. Moreover, the asbestos containing dust fibers also tend to sift down, which is evidenced by the concentration of the asbestos detected in the fine dust observed at the bottom of the in-place material. Dust sample #4 was collected from the fine dust under a pile of ZAI and resulted in a much higher amphibole asbestos content.

### DUST SAMPLES COLLECTED FROM A HOME IN SILVER SPRINGS, MD

#### *Dust samples (collected prior to cleaning)*

| | Location | Asb. Str./ $ft^2$ | Asb. Str. / $cm^2$ |
|---|---|---|---|
| **Dust 1** | South end of attic from center walk board | 92.2 Million | 99.2 Thousand |
| **Dust 2** | North center of attic from walk board | 31.8 Million | 34.2 Thousand |
| **Dust 3** | Attic center top of access stairs from board | 89.7 Million | 96.6 Thousand |
| **Dust 4** | South end of attic collected from dust under pile of vermiculite on walk boards | 1.8 Billion | 1.9 Million |
| **Dust 5** | Blank | ND* | ND* |
| | * None detected | | |

Using an SEM microscope, MAS analyzed samples of ZAI collected from homes and collected directly from bags of ZAI left over in the homes. The asbestos in ZAI typically appears as respirable sized fibers and bundles greater than five microns in length. Further, The Libby amphibole asbestos fibers coat the vermiculite granules and are

13

associated with the fine dust that is free and loose within the material.    Using increasing magnification, the following photographs show how the Libby amphibole asbestos fibers typically appear as a contaminant in the material.

As seen in the photograph below, the asbestos fibers are also found intertwined between the vermiculite layers.  It is our opinion that these fibers can be released when the vermiculite is crushed or otherwise disturbed.






The appearance of the asbestos in ZAI is markedly different from the asbestos in products with commercially added asbestos, which are subject to strict regulations by EPA under the NESHAP regulations.   Typically, products with commercially added asbestos were mixed with a gypsum, cement or clay base.   For example, Grace manufactured on or before 1973 a product called Monokote MK-3, which contained approximately 12% commercially added chrysotile asbestos and 55 % gypsum. According to Grace, the gypsum acted as a binder to keep the asbestos fibers "locked-in" to the matrix. In contrast, ZAI, has no binder whatsoever to hold the asbestos fibers in place. As seen in the video demonstrations, the most gentle of contact will cause asbestos dust to be released into the air.

## ASBESTOS CONTENT OF ZAI

Testing performed by or on behalf of Grace demonstrates that ZAI from its Libby mine always contained asbestos amphiboles as a contaminant.   Grace's bulk testing, which was mainly performed after efforts were made by Grace at its Libby mine and at its plants to remove the asbestos from its products in the 1970s, shows the asbestos content of ZAI still ranged up to .8%. As confirmed by its chief microscopist, Grace was never able to completely remove the asbestos from its vermiculite products. (Deposition of Julie C. Yang, Feb 20, 2003)

By way of background, Grace's Libby vermiculite deposit contained as much as 40% amphibole asbestos. (Montana Health Department Report) The vermiculite deposits at Grace's Libby mine are mainly located in a mountain 4,200 feet high, called "Zonolite Mountain." As described in the 1962 issue of "Masonry" magazine, Grace used huge power shovels to extract the rocky material from Zonolite Mountain. The material was hauled to a primary plant at the edge of the deposit, where the larger rocks were removed. The smaller material was then transported to the mill, where it was blended and fed into a series of crushers, screens, and water floatation tables to remove rock and other foreign matter.   The milled material was dried in large rotary kilns and screened into six closely graded sizes for various end uses. The grades ranged from 0 to 5, with 0 being the largest and 5 being the smallest in size. Grace used Libby 1, 2 and 3 grade ore for its ZAI product.  W.R. Grace's chief microscopist, Dr. Julie Yang, reported in 1976 that, "From previous research work (report on Libby Ore Evaluation – Ore Impurities, 2/23/76) we have found that Libby #2 vermiculite product has the highest tremolite fiber content in the order of 5% by weight." According to McDonald (1986), "the vermiculite ore as fed to the mill contained 4-6% of amphibole fibre in the tremolite series."

The unexpanded raw vermiculite ore was shipped by rail to the various expanding plants around North America. At the plant, the material was fed into a furnace and heated to 2,000 degrees Fahrenheit.  Some of the dust was separated out from

expanded vermiculite using a system of bag houses that collected the dust. This dust was known as cyclone fines. Notably, it was Grace's practice prior to the late 1970's/early 1980's to reintroduce the fines back into the product. (Deposition of Thomas Hamilton Feb. 25, 2002) This is important because the cyclone fines would have had a high content of free asbestos fibers.

Testing performed by laboratories across the United States demonstrates that the asbestos content of ZAI varies greatly from as low as a fraction of 1% to as much as 3%. This is not unexpected because the raw ore from Libby also varied in asbestos content. Below is a list of results seen by various outside laboratories, all of which are certified under NAVLAP:

### BULK SAMPLE ANALYSIS OF ZAI

| Location | PLM Results | TEM Results |
|----------|-------------|-------------|
| Lebal's Home | 3% | |
| DeBock Home | 2.70% | |
| Cohen Home | Trace | 2.73% |
| Russ Home | 2% | |
| McMurchie Home | 1 to 3% | |
| MAS samples | <1% | |

Based on our evaluation of ZAI, it is our opinion that the material is contaminated with varying concentrations of Libby amphibole asbestos fibers. It is also our opinion that the majority of asbestos fibers appear as free individual fibers, fiber bundles and clusters of fibers longer than 5 μm in length. It is also our opinion that the asbestos fibers can be released from the product with relatively little disturbance. Because of ease with which asbestos fibers can be released from ZAI, it is our opinion that the asbestos content by weight percent does not adequately assess the potential for the product to release airborne asbestos and cause exposure and contamination in areas within the home. Instead, the true indicia of exposure and contamination potential is through: 1) the appearance and number of asbestos fibers in a given amount of ZAI; 2) surface dust testing on surfaces in the vicinity of the ZAI; and 3) air testing during ordinary and foreseeable activities that disturb the material.

## NUMBER OF ASBESTOS FIBERS IN ZAI

Due to the microscopic size of asbestos fibers, ZAI can contain billions of asbestos fibers in a given amount of material and still be barely detectable by weight percent measurements. Grace's corporate counsel recognized this when he recommended against disclosing the amount of asbestos by weight percent in Grace's MSDS documents regarding certain vermiculite products, and stated:

16

I understand that the reason for wanting to indicate the percent by weight of tremolite content is to give the recipient the indication that he is not getting a product containing commercial asbestos and that the tremolite asbestos contaminate content is low. However, I think that this could be construed as an invitation for the recipient to believe that because the percent tremolite asbestos content is low that the amount of tremolite asbestos fiber released in handling the product can be assumed to be less than this prescribed by the asbestos standard. As you know, respirable asbestos fibers are light and countless numbers maybe present ever though the percent by weight is low.

Notes attached to April 7, 1977 memo from R. C. Ericson, regarding 2nd Draft Proposal for MSDS for Vermiculite Concentrate & Finished Product.

Based on the size range of fibers typically found in ZAI, one can calculate the number of asbestos fibers in a given weight of the material and at a given weight percentage of asbestos. These figures, which are set forth below, show that even at a fraction of 1% asbestos, there are a significant number of asbestos fibers present in ZAI. Using the typical dimensions of a Libby amphibole fiber of 5.0 microns long and 0.2 microns wide, that fiber will weigh approximately 0.000471 nanograms (ng). Assuming a bag of ZAI weighs 13 lbs, then the following Table shows the total number of amphibole fibers if the ZAI bag contains 0.001%, 0.01%, 0.1%, 1.0% and 3.0% by weight of the asbestos contaminate.

| | | Weight of Amphibole in Bag | Number of Fibers in Bag |
|---|---|---|---|
| 1) | 0.001 | 0.059 grams | 125,310,000,000 |
| 2) | 0.01% | 0.59 grams | 1,253,100,000,000 |
| 3) | 0.1% | 5.90 grams | 12,531,000,000,000 |
| 4) | 1.0% | 59.0 grams | 125,310,000,000,000 |
| 5) | 3.0% | 177.1 grams | 375,920,000,000,000 |

## ASBESTOS SURFACE DUST CONTAMINATION

Based on our experience, the use of ambient (quiescent) air sampling is an inadequate technique to determine if in-place materials can release asbestos fibers into the air and cause surface/building contamination. As recognized by EPA, air sampling is only a "snap shot" in time and will likely miss a release episode of asbestos structures from the in-place ACM.[1] Instead, the best way to determine the propensity for materials to release asbestos and cause surface/building contamination is through air testing during ordinary and foreseeable activities that can disturb the material. Further, the best way to determine whether asbestos fibers have been released as a result of past disturbance activities and have caused surface/building contamination is by sampling

[1] EPA 20T-2003 (Green Book P. 14); EPA 560/5-85-024 (Purple Book p. 403); EPA OTS C0090 (Orange Book Part I, p. 14).

and analyzing the settled dust.    In general, experts perform asbestos dust testing routinely for private, industry and the government clients.

## ASSESSMENT OF SURFACE CONTAMINATION

Certain surface concentrations of asbestos structures have been deemed contaminated in the opinion of recognized experts and governmental agencies taking into account a background level of chrysotile asbestos in the environment.[2]    Because chrysotile is found in some urban environments, most experts consider up to one thousand structures of chrysotile asbestos per square centimeters to reflect background levels of asbestos deposition that may now be related to from a particular source.    Because there is no background level of tremolite in the general environment, any surface dust (or dust in the air) containing tremolite asbestos would be considered to be contaminated.

As discussed below, the most widely used and accepted method for assessing surface dust for asbestos is the ASTM method D-5755-95 entitled "Micro-Vacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentration".  This method was published by the ASTM in 1996 and has the advantage over ambient air sampling since it can measure the amount of asbestos that has accumulated over time on a surface, and in many instances (such as this case), provide information about the source of the contamination.

## THE ASTM MICROVACUUM METHOD WAS APPROVED
## FOLLOWING A RIGOROUS SCIENTIFIC PEER REVIEW PROCESS

The ASTM microvacuum method is a standardized analytical method that was subjected to a rigorous scientific peer review process involving hundreds of scientists over a period of six years. The procedures of the ASTM committees require a unanimous vote from the entire membership to approve a new method.

## THE STANDARDIZED PROCEDURES UNDER THE
## ASTM MICROVACUUM PROTOCOL

Following the ASTM microvacuum method, loose dust is vacuumed from a given surface area using a modified air sampling cassette with a standard MCE filter air cassette.  The cassettes/filters are sent to the laboratory for preparation and analysis. Following the ASTM microvac method, the filter is rinsed with a specified amount of water/alcohol solution and the mixture is gently sonicated in a beaker to evenly distribute the fibers within the mixture. A specified amount of the mixture is drawn from

---

[2] Millette, J.R. and Hayes, "Settled Asbestos Dust Sampling and Analysis", and Hatfield, R.L. "Settled Dust Sampling and Analysis", (unpublished manuscript).

18

the beaker and re-filtered onto another filter. The filter is then analyzed by TEM and the asbestos concentration is determined.[3]

## USE OF INDIRECT METHOD IS SUPERIOR TO
## THE DIRECT METHOD FOR ANALYZING DUSTY ENVIRONMENTS

Sampling of air and surface dust with significant concentrations of asbestos dust and/or other non-asbestos dust will result in heavily loaded filters.   This is a typical problem with almost all dusty surfaces.    The overloading of dust on filters prevents the microscopist from seeing and identifying the asbestos fibers when the filters are prepared using the direct method. Without diluting and dispersing the asbestos fibers evenly on the filter, it is impossible to quantify the number of asbestos fibers in the dust. Because of the general nature of surface dust, the filters are generally too overloaded with dust to allow the individual asbestos fibers to be seen using a direct preparation method

As stated above, dust samples are too loaded to effectively identify and quantify the asbestos because of the obscuration effect of the dust. This problem was solved by the development of the ASTM D-5755-95 dust testing protocol, which dilutes and disperses the asbestos fibers onto a filter. [3] This method allows heavily loaded samples (such as dust samples), to be analyzed without affecting the integrity of the results.

Notably, Grace itself has recognized the need for using the indirect method. In 1988, Grace submitted to MAS air samples for analysis and requested they be analyzed by the indirect method in the event that any of the samples were overloaded. (See June 2, 1988 letter from David J. Curren to MAS.)

## ASTM MICROVACUUM METHOD MEETS ACCEPTED PRECISION STANDARDS

Precision data for ASTM D5755 has now been developed and presented to Subcommittee D-22.07 for consideration (the "Precision Data").  The Precision Data shows that based on the inter-laboratory rounds with at least 6 independent laboratories (not including the laboratory that made up the samples), the coefficient of variation ("CV") (the standard deviation divided by the mean value) for ASTM D5755 appears to be around 0.6 – 0.8.  The Precision Data is in agreement with the data from an earlier study that we co-authored in which the results of a round robin study of an earlier version of the microvac technique showed a coefficient of variation of 0.73.[4]  It is also similar to the intra-laboratory precision data for microvac technique of 0.77 that was published in the USEPA Report EPA/600/J-93/169.

---

[3] ASTM D-5755-95 (1995).

[4] See Hatfield, Krewer and Longo, A Study of the Reproducibility of the Micro-Vac Technique as a Tool for the Assessment of Surface Contamination in Buildings with Asbestos-Containing Materials, in Advances in Environmental Measurement Methods for Asbestos, ASTM STP 1342, (Michael E. Beard and Harry L. Rook, Eds. 1999).

The Precision Data also falls within the inter-laboratory CV range for the light microscope phase contrast fiber counting method, NIOSH 7400 A rules, which is listed as 0.27 to 0.85. In fact, it is lower (i.e., more precise) than the CV value of 1.5 reported by Yamate[5] for the EPA TEM air measurement of asbestos sample preparation with the direct method.[6]

The Precision Data is also in keeping with a recent study of settled dust analyzed in the Crankshaw Study [8], which found that the intersample variability for the D5755-95 method, including sample collection, was typically less than + or − 15% (CV=. 15). Crankshaw also reported:

> Results from the microvacuum structure count samples indicate that the method adequately tracks the concentration of asbestos in the dust and that the variability is quite low. When the concentration of asbestos was increased ten-fold, as from 0.1% to 1% or from 1% to 10%, the number of structures per area increased proportionately.

## THE ASTM MICROVACUUM METHOD IS GENERALLY ACCEPTED

Notably, other experts in the field use the ASTM Microvacuum method to identify and evaluate asbestos in surface dust.    This method was used by EPA to evaluate asbestos dust in homes in Libby, Montana. This method was also used by EPA to evaluate documents produced by Grace for possible asbestos contamination. The dust sample results demonstrated the documents to be contaminated with asbestos, prompting EPA to instruct that persons who had worked with the documents be notified and appropriate safety precautions be taken to prevent any additional exposures to asbestos.

Based on our experience, training and analytical work, the results obtained from the indirect number count microvacuum method is accepted in the industry for assessing contamination and determining the source of the contamination. Further, the indirect number count microvacuum method is an accurate and precise representation of the loosely associated asbestos present on the surface.[7] Our experience has shown that the indirect sample preparation process does not substantially alter or change the form of the dust particulates that are sampled. That is; the asbestos structures observed in the electron microscope from the dust samples are representative of the type and number of asbestos structures actually released from the surrounding materials containing asbestos and that have settled on otherwise uncontaminated surfaces.

---

[5] See G. Yamate, S.C. Agarval and R.D. Gibbons, Draft Report, Washington, D.C.: Office of Research and Development, USEPA Contract No. 68-02-3255 (1984).

[6] Crankshaw, Perkins and Beard, *An Overview of Settled Dust Analytical Methods and their Relative Effectiveness* (the "Crankshaw Study"), in Advances in Environmental Measurement Methods for Asbestos. ASTM STP 1342 (Michael E. Beard and Harry L. Rook, Eds., 1999).

[7] Crankshaw, Owens, Research Triangle Institute "Quantitative Evaluation of the Relative Effectiveness of Various Methods for the Analysis of Asbestos in Settled Dust" (1995). And MAS unpublished Round Robin dust data.

Other generally accepted analytical methods also use the indirect method.  See, e.g., ISO 13794, method, entitled,    "Ambient Air – Determination of Asbestos Fibres – Indirect-transfer Transmission Electron Microscopy Procedure." International Standards Organization, 1999.  (TEM); "Superfund Method for the Determination of Releasable Asbestos in Soils and Bulk Materials" (Interim Version), Berman, D. W. and Kolk, A., Prepared for US. EPA Region 9, San Francisco, CA, Contract number: 68-w9-0059, July 1995 (TEM).  Also, additional methods requiring indirect preparation methods are currently being developed or used by US EPA and US Geological Survey (USGS), as well as ASTM.

## THE USE OF THE INDIRECT METHOD IS PARTICULARLY APPROPRIATE FOR ZAI ANALYSIS

The use of sonication to homogenize the dust suspension during the preparation of air and dust samples for analysis by TEM has been subjected to criticisms by some in recent years, mainly by experts paid by the asbestos industry.  The concerns have mainly been the claims that sonication breaks up bundles, clusters and matrices composed of particulates of asbestos and non-asbestos materials, such as gypsum or clay. The critics contend that this results in counts of asbestos fibers that would not ordinarily be inhaled.    This criticism is inapplicable regarding asbestos air and dust samples, especially for ZAI, because the majority of the asbestos found in the dust is individual respirable sized fibers and fiber bundles. As discussed below, the asbestos fiber count using the indirect method is designed to be more precise by providing a more homogenous and optimum sample for analysis. The indirectly prepared sample will better reflect the number of individual asbestos fibrous structures in the surface dust or in the air.

Notably, the airborne levels found in two studies involving the similar disturbance of ZAI in the Barbanti and Busch homes resulted in very similar airborne concentrations (the same order of magnitude), despite the fact that one set of air samples was prepared using the indirect method of analysis while the other set was prepared using the direct method.    This demonstrates that the indirect preparation method does not alter the asbestos structures and validates using the indirect method for dust and air samples involving ZAI.

21

# RESULTS OF DUST TESTING IN HOMES WITH ZAI

Dust samples were collected from various homes with ZAI and the results are set forth below:

### DUST SAMPLE RESULTS FROM VARIOUS HOMES

| Sample Locations | Asb. Str./ft$^2$ | Asb. Str/cm$^2$ |
|---|---|---|
| Mason Home (Libby) | | |
| Floor of Atticapartment storage area | 32.7 million | 35.2 thousand |
| From unused rolled sheet metal in attic | 10.2 million | 10.9 thousand |
| | | |
| Spencer Home (Libby) | | |
| light dust from children's bedroom closet | 399.7 thousand | 430.3 hundred |
| medium dust from child's game in closet | 6.4 million | 6.9 thousand |
| heavy dust from shelf support in closet | 17.3 million | 18.6 thousand |
| | | |
| Walker Home | | |
| walk boards in attic | 41.1 million | 44.2 thousand |
| wooden steps of attic access ladder | 22.8 million | 24.6 thousand |
| | | |
| Loehner Home | | |
| dust on attic floor near stair case | 195.6 million | 210.5 thousand |
| dust from attic flooring in attic wing | 13.9 million | 14.9 thousand |
| | | |
| Salibury Home (Moscow, Idaho) | | |
| Daughter's bedroom closet off cabinet glass door | 37.4 million | 40.2 thousand |
| Daughter's bedroom closet off the floor | 6.2 million | 6.7 thousand |
| Dust from carpet in office closet | 5.2 million | 5.6 thousand |
| | | |
| Matthews Home (Spokane, WA) | | |
| Attic Floor (ZAI in perimeter only) | 24.9 million | 26.9 thousand |
| Carpet on attic floor (ZAI in perimeter only) | 2.8 million | 3.0 thousand |
| on wooden storage box in attic (ZAI in perimeter only) | none detected | none detected |
| | | |
| Home Silver Spring, MD | | |
| South end of attic off walk boards | 92.2 million | 99.2 thousand |
| North center from walk boards | 31.8 million | 34.2 thousand |
| Attic center off board at access stairs | 89.7 million | 96.6 thousand |
| South end of attic dust under vermiculite pile on walk boards | 1.8 billion | 1.9 million |

## DUST SAMPLE RESULTS FROM VARIOUS HOMES
### Continued

| Sample Locations | Asb. Str./ft$^2$ | Asb. Str/cm$^2$ |
|---|---|---|
| Barbanti Home (Spokane, WA) | | |
| Dust from under vermiculite | 46.8 million | 50.3 thousand |
| | | |
| Dillion Home | | |
| Attic surfaces after home removal 1 | 943.6 million | 1.0 million |
| Attic surfaces after home removal 2 | 741.7 million | 798.4 thousand |
| Attic surfaces after home removal 3 | 150.7 million | 162.2 thousand |
| Attic surfaces after home removal 4 | 45.4 million | 48.8 thousand |
| Attic surfaces after home removal 5 | 32.4 million | 34.8 thousand |
| Attic surfaces after home removal 6 | 10.3 million | 111.0 thousand |
| | | |
| MacCready Home | | |
| Attic dust under ZAI 1 | 561.2 million | 604.1 thousand |
| Attic dust under ZAI 2 | 845.6 million | 910.2 thousand |
| | | |
| Bush Home | | |
| BD-01 | 47.2 million | 50.8 thousand |
| BD-02 | ND | ND |
| BD-3 | 191.0 million | 205.6 thousand |
| | | |
| Matthews Home | | |
| MD- 1 | 6.3 million | 6.7 thousand |
| MD- 2 | 35.4 million | 38.1 thousand |
| MD- 3 | ND | ND |
| MD- 4 | 18.5 million | 20.0 thousand |
| MD- 5 | ND | ND |
| MD- 6 | ND | ND |
| MD- 7 | ND | ND |
| MD- 8 | ND | ND |
| MD- 9 | ND | ND |
| MD- 10 | ND | ND |
| MD- 11 | 626.3 thousand | 0.7 thousand |
| MD- 12 | 309.1 thousand | 0.3 thousand |
| MD- 13 | | |
| MD- 14 | | |
| | | |
| Price Home | | |
| Garage above stairwell to basement | ND | ND |
| Garage off door mat | ND | ND |
| Kitchen off door mat to garage | ND | ND |
| Garage from intake for fireplace | ND | ND |
| | | |
| Holbrook Home | | |
| Attic off joist | 280.6 million | 302.0 thousand |
| Attic top of chest | ND | ND |
| Attic dust from hand railing around staircase | 821.2 thousand | 0.9 thousand |

ND = None Detected

The field blank samples when analyzed by the microvac method were shown not to contain any detectable asbestos. Dust samples from buildings that do not have asbestos products do not show any tremolite asbestos contamination such as that present in homes with ZAI.[8] In our opinion, the source of the asbestos contamination in the dust samples collected in these homes was the ZAI located in those areas. As discussed below, the actual disturbance of ZAI and dust from ZAI will cause the release of asbestos structures.

## USE OF STUDIES TO ASSESS MATERIALS WITH ASBESTOS & PREDICT AIRBORNE CONCENTRATIONS DURING ORDINARY & FORESEEABLE ACTIVITIES

MAS analyzed airborne asbestos samples collected during simulated disturbance of ZAI in homes.[9] In the Barbanti home, the samples were analyzed by TEM. Because the filters were too overloaded to be analyzed using direct preparation, they were analyzed by TEM using the indirect method. Knowing the overloading problem encountered in the testing performed in the Barbanti home, we adjusted the sampling volumes for the testing performed in the more recent simulations. By minimizing the air volumes, we were able to minimize the overloading. Therefore, we were able to use the direct method to prepare the samples for analysis by both PCM and TEM. The results of our studies are contained in the report summarized in Mr. William Ewing's materials.

Based on our evaluation of ZAI and the results of the simulation testing, it is our opinion that this material will release asbestos fibers into the air when the material is disturbed during ordinary and foreseeable disturbance activities. Additionally, the amounts of asbestos fibers released during upon disturbance of ZAI are significantly higher than over measured background levels. Additionally, in our opinion, the release of asbestos from ZAI causes contamination on surrounding surfaces in homes containing ZAI. The disturbance of ZAI by ordinary activities of homeowners and contractors, including maintenance, repairs, and demolition, will cause the release of airborne asbestos from the material exposing families to significant levels of asbestos.

We have reviewed air testing performed by Grace in connection with the use of ZAI. The testing included actual and simulated installation of ZAI, including the spreading of the material. At times, the samples were analyzed by PCM, using a method of "discriminatory counting" that eliminated from the results objects that would have normally counted as fibers by the standard OSHA/NIOSH method. In our opinion, the airborne concentrations detected and reported by Grace using their discriminatory analysis method may have resulted in under estimates of the true airborne asbestos concentrations. Notably, some of the early testing involved production ZAI from the plant. It is our opinion that Grace's testing using production ZAI demonstrated the propensity of the product to release asbestos into the air during ordinary use, and confirms that disturbance of ZAI results in elevated airborne fibers to significant levels.

---

[8] MAS reports October 14, 1992 (M-9317), February 10, 1992 (M-7883), September, 1992 (M-9132) and April 6, 1992 (M-8168).

[9] MAS May 18, 1991 Kaylo Study.

Notably, many of the airborne fiber levels found during the pouring and spreading of the material were very similar to the levels found in our studies.   Many of Grace's subsequent tests in actual attics during installation involved the use of experimental materials, including so-called "super clean" ZAI. Even with "super clean" in which Grace attempted to remove as much as possible of the asbestos, the material released significant amounts of asbestos fibers into the air when being poured and spread out.

## RECENT CLEANING STUDY

During a recent study involving cleaning of walk and storage boards located in an attic insulated with ZAI, results indicate that persons conducting the cleaning (broom sweeping) are exposed to levels in excess of the current OSHA standards. The chart below illustrates the exposures.

### ZONOLITE ATTIC INSULATION
### CLEANING STUDY – SILVER SPRING, MD

| SAMPLE LOCATION | | PCM | TEM (All) | TEM (>5µm) |
|---|---|---|---|---|
| | *Background* | | | |
| B-1 | Southside (Attic) | | <0.003 | N/A |
| B-2 | Center (Attic) | | <0.004 | N/A |
| B-3 | Northside (Attic) | | <0.005 | N/A |
| B-4 | Entrance to Master Bedroom (1st Floor) | | <0.005 | N/A |
| B-5 | Entrance to Master Bedroom (1st Floor) (During Cleaning) | | <0.005 | N/A |
| | *During Cleaning - Personnel* | | | |
| Worker | | | | |
| W-8-1 | | 2.900 | | |
| W-8-2 | | 2.708 | | |
| W-8-3 | | 3.000 | | |
| W-45-1 | | | 5.069 | 2.535 |
| W-45-2 | | | 4.464 | 2.551 |
| W-45-3 | | | 2.464 | 2.464 |
| Helper | | | | |
| H-8-1 | | <0.539 | <0.673 | N/A |
| H-8-2 | | 0.643 | 0.499 | 0.499 |
| H-8-3 | | 1.050 | 0.657 | 0.657 |
| H-45-1 | | | <0.762 | N/A |
| H-45-2 | | | <0.608 | N/A |
| H-45-3 | | | <0.781 | N/A |

ZONOLITE ATTIC INSULATION
CLEANING STUDY – SILVER SPRING, MD
*CONTINUED*

| SAMPLE LOCATION | PCM | TEM (All) | TEM ($>5\mu m$) |
|---|---|---|---|
| *During Cleaning - Area* | | | |
| 1-1 | | 1.356 | 0.839 |
| 1-2 | | 1.058 | 0.747 |
| 1-3 | | 0.237 | 0.237 |
| 2-1 | | 0.234 | 0.176 |
| 2-2 | | 1.265 | 0.783 |
| 2-3 | | 0.343 | 0.343 |
| 3-1 | | <0.063 | N/A |
| 3-2 | | 0.672 | 0.403 |
| 3-3 | | 0.457 | 0.196 |

Dust samples (collected prior to cleaning)

| Location | | Asb. Str./ sq. ft. | Asb. Str./ sq.cm. |
|---|---|---|---|
| Dust 1 | South end of attic from center walk board | 92.2 Million | 99.2 Thousand |
| Dust 2 | North center of attic from walk board | 31.8 Million | 34.2 Thousand |
| Dust 3 | Attic center top of access stairs from board | 89.7 Million | 96.6 Thousand |
| Dust 4 | South end of attic collected from dust under pile of vermiculite | 1.8 Billion | 1.9 Million |
| Dust 5 | Blank | ND* | ND* |
| | * None detected | | |

In addition to our own research and studies of asbestos, our opinions and testimony are based on the research and studies of other scientists and governmental bodies. A list of reliance materials on which we may rely to form the basis of our opinions is attached and incorporated by reference; however, we may also rely in whole or in part on the publications as well as opinions, data and materials produced in discovery, or contained in the reports of other experts which the plaintiffs or the defendant designates in this action. We also reserve the right to rely on any scientific articles or studies subsequently presented or published. We have prepared this report in accordance with Rule 26(a) (2) of the Federal Rules of Civil Procedure.

_____
Dr. William Longo

_4/4/03_
Date

_____
Richard L. Hatfield

_4/4/03_
Date

# EXHIBIT 2

Expert Report

Addressing Potential Health Concerns Associated

With Inhalation of Zonolite™ Attic Insulation

by

Morton Corn, Ph.D., CSP
Morton Corn & Associates, Inc.
3208 Bennett Point Road
Queenstown, Maryland  21658-1126

April 7, 2003

Morton Corn, Ph.D., CSP

1

# Table of Contents

I.    Background
II.    Qualifications                                                                    p. 3
III.    Case Specific Materials Reviewed                                p. 3
IV.    The Industrial Hygiene Approach to a Potential Health Risk        p. 4
    a.   Recognition                                                          p. 6
    b.   Evaluation                                                           p. 6
    c.   Control                                                              p. 6
V.    Application of the Industrial Hygiene Approach to Attic Insulation   p. 8
       A. Recognition                                                 p. 8
          1.   Asbestos in ZAI                                     p. 8
          2.   Nature of ZAI                                       p. 8
       B. Evaluation                                                  p. 9
          1.   Qualitative Aspects                                 p. 10
          2.   Quantitative Aspects                                p. 10
    a.   Lees and Mlynarek Investigation                             p. 10
    b.   C. Weis Memorandum dated Dec. 20, 2001 (EPA)                p. 11
    c.   Preliminary Draft Report "Asbestos Insulation: Cumulative    p. 11
        Study Covering Research Conducted in 2001 and 2002.
        Versar, Inc. June 28, 2002.
    d.   Pinchin Environmental Study of Building Demolition          p. 12
          3.   Standards and Guidelines                            p. 13
       C. Control                                                     p. 14
VI.    Relevant Lessons Learned From the Asbestos-Containing Materials in   p. 14
Schools and Buildings Experience, 1979-91
VII.    Settled Dust Measurements As A Surrogate For Personal Exposure       p. 14
Measurements
VIII.    Summary and Conclusions                                            p. 16
                                  p. 18

I.      Background.

I have been asked by Richard C. Finke, Senior Litigation Counsel, W.R. Grace & Co. to evaluate the potential exposure and risk to the health of occupants of homes in which there is Zonolite™ Attic Insulation (ZAI). Also, I have been asked to place this exposure, if any, in perspective vis-à-vis past occupational asbestos exposures and exposures of occupants of schools and commercial buildings containing Asbestos –Containing Materials (ACM). I was also asked to evaluate the potential exposures resulting from remodeling of homes with ZAI; exposures of occupants and/or remodelers.

II.     Qualifications.

I am a Professor Emeritus of Environmental Health Engineering in the Bloomberg School of Public Health of the Johns Hopkins University and President, Morton Corn and Associates, Inc., a consulting firm that works out of my home in Queenstown, Maryland. Environmental health engineering is a discipline concerned with the evaluation of air, water, soil and materials in our environment and the interventions to improve them if they are found to be unhealthy or to pose a human health risk. I received a Bachelor's degree in Chemical Engineering from the Cooper Union School of Engineering in 1955, a Master of Science degree in Industrial Hygiene and Sanitary Engineering from Harvard University in 1956, and a Doctor of Philosophy degree in Industrial Hygiene and Sanitary Engineering from Harvard University in 1961. The subject of my doctoral dissertation was the adhesion and re-entrainment of particles from surfaces. This contribution to basic science is relied on today by engineers and scientists who are dealing with indoor air quality concerns.

From October 1975 until January 1977, I served as Assistant Secretary of Labor for Occupational Safety and Health. I have provided consultation services to many private and governmental organizations, including the United States Atomic Energy Commission, the United States Public Health Service, the United States Bureau of Mines, the World Health Organization, the United States Department of Energy, the United States General Services Administration, the United States Environmental Protection Agency, the National Institute of Environmental Health Sciences, Harvard University School of Public Health, the American Petroleum Institute, Pennsylvania State University, and the Brookings Institution. As a consultant to the United States Environmental Protection Agency (EPA), I served on its Science Advisory Board (SAB) from 1977 to 1984. The SAB reviewed the Agency's Health Assessment document for asbestos.

Included in the awards I have received is the Cummings Award, which is given once a year by the American Industrial Hygiene Association for outstanding contributions in the field of industrial hygiene. My Cummings Award Lecture was on Asbestos and Public Health. (Corn, M., "Asbestos and Disease: An Industrial Hygienist's Perspective," Am. Ind. Hyg. Assoc. J., 47(9), 515-23 (1986)). I have published more than one hundred peer-reviewed articles, fifteen or more chapters in books, and edited three books. In 1994, I received the Smyth Award of the American Academy of Industrial Hygiene, an annual award for outstanding contributions to industrial hygiene. In 2000 I was elected a Director on the Board of the American Industrial Hygiene Association and will serve for three years. In

3

June, 2001 at the annual Industrial Hygiene Conference and Exposition I received the Meritorious Achievement Award of the American Conference of Governmental Industrial Hygienists. It is presented once a year for "outstanding, long-term contribution to the field of occupational health and industrial hygiene."

I have measured asbestos-in-air in glass, steel, and insulation manufacturing facilities during the 1950's, 1960's, 1970's, and have designed ventilation systems to capture potentially toxic dusts and gases from processing operations. I taught graduate courses at Johns Hopkins University and the University of Pittsburgh in the subject areas of industrial hygiene, air pollution, industrial ventilation, aerosol technology and risk assessment.

I have conducted extensive research on airborne asbestos concentrations in buildings as it relates to occupants and to workers who work with or near asbestos-containing materials and have published many of these studies. (see e.g., Mlynarek, S., Corn, M., and Blake, C., "Asbestos Exposure of Building Personnel," Reg. Tox. & Pharm. 23(3) 213-224 (1996); Corn, M., et al., "Asbestos Exposures of Building Maintenance Personnel," Appl. Occup. Env. Hyg. 9(11), 845-852 (1994); Corn, M., "Airborne Concentrations of Asbestos in Non-Occupational Environments," Ann. Occup. Hyg. 38(4), 495-502 (1994); M. Corn, et al., "Exposure to Airborne Asbestos in Buildings," Reg. Tox. & Pharm. 16, 93-107 (1992); M. Corn, et al., "Airborne Concentrations of Asbestos in 71 Buildings," Reg. Tox. & Pharm.13, 99-114 (1991); Corn, M., et al., "Asbestos: Scientific Developments and Implications for Public Policy," Science 247, 294-301 (1990); Esmen, N.A. and Corn, M., "Airborne Fiber Concentrations During Splitting Open and Boxing Bags of Asbestos," Tox. and Ind. Hlth. 14(6), 843-856 (1998). I have participated in numerous United States and international scientific, industrial hygiene, and public health conferences. For example, I participated in the Workshop on the Biological Effects of Fibers organized by the International Agency for Research on Cancer held in Lyon, France in June 1977, was an invited speaker and session chairman at the International Conference on Biological Effects of Man-made Mineral Fibers held in Copenhagen, Denmark in 1982, and have been invited by the federal government to comment on regulatory rule-makings concerning asbestos.

My Curriculum Vitae is attached as Exhibit A. My fee for professional consulting services, including expert consultation and testimony in litigation, is $3600 per day or $450 per hour. I have been accepted as an expert in various federal and state courts to testify in asbestos property damage and premises liability cases, and in other litigation.

III.    Case Specific Materials Cited Herein.

- Lees, P.S.J. and Mlynarek, S.P.: Assessment of Potential Asbestos Exposure Resulting from Disturbance of Zonolite™ Vermiculite Attic Insulation, January 9, 2003. Submitted to R.C. Finke, Senior Litigation Counsel, W.R. Grace Co. The videos of these investigations were also reviewed.

- Anderson, E.L.: Review of Current Exposures and Current Health Risks Associated With Asbestos Exposure in Libby, Montana. Science International, Inc. July 29, 2002.

- Anderson, E.L.: Supplemental Report to Address Potential Risks Associated With Vermiculite Attic Insulation in Libby, Montana. Science International, Inc. Sept. 2, 2002.

- Anderson, E.L.: Analysis of the Risk Assessment Information to Support Cleanup Decisions Made by the EPA Region 8 at the Libby, Montana Asbestos Site. Science International, Inc. Aug. 30, 2002. Prepared for W.R. Grace Co., Holme Roberts & Owen LLP.

- Versar, Inc.: Preliminary Draft of Asbestos Exposure Assessment for Vermiculite Attic Insulation (Cumulative Study Covering Research Conducted in 2001 and 2002), June 28, 2002. Prepared for Office of Pollution Prevention and Toxics, USEPA, Wash., D.C.

- Moolgarkar, S.H.: Expert Report on the Relative Toxicity of Libby Amphibole Asbestos Fibers. July 29, 2002. Submitted in the Libby cost recovery litigation.

- Pinchin Environmental: Final Report. Site Assessment Vermiculite Removal Bldg. E-12, C.F.B. Shiloh, Shiloh, Manitoba. April 3, 1997. Prepared for Dept. of National Defense, Base Construction Engineering, Canadian Forces Base Shiloh, Shiloh, Manitoba ROK2AO.

- Agency for Toxic Substances and Disease Registry, U.S. Dept. of Health and Human Services. Atlanta, Georgia 30333. Report titled Preliminary Findings of Medical Testing of Individuals Potentially Exposed to Asbestiform Minerals Associated With Vermiculite in Libby, Montana: An Interim Report for Community Health Planning. February 22, 2001.

- U.S. Environmental Protection Agency. EPA Response to September 11. EPA-OSHA Fact Sheet: Environmental Information from Lower Manhattan for Residents, Area Employees and Local Business Owners. Data through Sept. 30, 2001.

- Ibid. U.S. Environmental Protection Agency Testing Criteria and Limits. Testing Criteria and Limits.

- U.S. Environmental Protection Agency. Memorandum dated April 24, 2002 from Christopher P. Weis to Paul Peronard titled Addendum Supporting and Clarifying the Libby Risk Memo of December 20, 2001 and Associated Libby Risk Memos.

- U.S. Environmental Protection Agency. Memorandum dated December 20, 2001 from Christopher P. Weis to Paul Peronard titled Amphibole Mineral Fibers in Source Materials in Residential and Commercial Areas of Libby Pose an Imminent and Substantial Endangerment to Public Health.

- U.S. Environmental Protection Agency. OPPT Comments on Action Memorandum Amendment Removal Action at the Libby Asbestos Site. February 22, 2002.

- U.S. Environmental Protection Agency. Memorandum dated 11/22/02 from Chris P. Weis to Paul Peronard Re: Revised Screening Risk Estimates.

- Preliminary Findings of Medical Testing of Individuals Potentially Exposed to Asbestiform Minerals Associated with Vermiculite in Libby, Montana: An Interim Report for Community Health Planners. U.S. Dept. HHS, Atlanta, GA. Feb. 22, 2001. Also critique of report by G.M Marsh.

IV.     The Industrial Hygiene Approach to a Potential Health Risk.

A very well known paradigm or model in the occupational and environmental health field is that of the industrial hygienist. This model includes recognition, evaluation and control of the potentially hazardous material. (Corn, M.: "The Role of Control Technologies in Preventing Occupational Disease," Arch. Env. Health 39, 235-240 (1984)).

a.  Recognition

Recognition is associated with confirmation that a material is potentially toxic and that it is, indeed, present. Epidemiological studies have established that workers in mines, mills, shipyards, and other asbestos workplaces of the past who were exposed to high levels of airborne asbestos for prolonged periods of time were at high risk of contracting asbestos-related diseases, and did, indeed, contract disease in significant numbers. What, if any, risk is presented by exposure to asbestos at ambient levels or at the levels permitted by current occupational regulations is not known and can only be estimated statistically because there is no epidemiological experience with lifetime exposures of working populations at current very low permissible exposure concentrations compared to past exposure concentrations. Using very prudent models to estimate risk, it is judged to be low, if it exists at all. The presence or not of asbestos and its relative abundance or concentration is determined by appropriate sampling and analysis in the evaluation phase of the model.

b.  Evaluation

The evaluation portion of this paradigm refers to measurement. It is measurement of the potentially toxic material that differentiates the professional industrial hygiene approach from that which may have been used or is used by others. The professional industrial hygiene approach utilizes a set of guidelines such as those of the American Conference of Governmental Industrial Hygienists (ACGIH) Threshold Limit Values (TLV's), or a set of standards enforceable by law under the Occupational Safety and Health Act as the basis for evaluating the particular environment. These Occupational Safety and Health Standards contain Permissible Exposure Limits (PEL's) for Airborne Agents. Air sampling is used to assess whether exposures are within TLV's or PEL's, and no surrogates are permitted as substitutes for air sampling measurements.

The Occupational Safety and Health Administration (OSHA) PEL's are the dividing line between legally acceptable and non-acceptable conditions. These evaluations are performed by professionals who must make some judgments about the environment. It is clear from both the ACGIH statement of the TLV's, and the manner in which OSHA PEL's are enforced by OSHA's Compliance Health and Safety Officers, that there are judgment factors involved (Threshold Limit Values for Chemical Substances and Physical Agents in the Work Environment with Intended Changes for 2002. American Conference of Governmental Industrial Hygienists. Cinn., Ohio 1996)). The PEL's, or in their absence, guidelines, are the basis for acceptability or non-acceptability of the measured airborne concentrations.

It is important to understand that these standards or guidelines are, as the ACGIH indicates, concentrations at which "nearly all workers can be employed for their entire working lifetime without adverse effect." (TLV's, ACGIH, Cinn., Ohio, 1996). For the OSHA PEL's, the standard applies to 45 years of a working lifetime, 50 weeks a year, 40 hours per week. Using prudent statistical models, the PEL is not deemed to be risk free, but it is deemed to be sufficiently low risk to be acceptable. Also, it is unlikely that very many people will be occupationally exposed for 45 years to asbestos in air. For this reason and others discussed below, it will be seen that utilizing the OSHA PEL for evaluation of building maintenance worker or home remodeler exposure is a very conservative approach.

In approaching the evaluation portion of the model, the professional hygienist or environmental engineer is in a difficult position with respect to occupants or non-employed persons in buildings or homes because there is no federal government standard or guideline. In this case, the clearance concentration for asbestos in air has been used. It is required by the Environmental Protection Agency (EPA) for permitting occupants of buildings to reenter the building after asbestos-containing materials have been abated. This concentration is 0.01 fibers per cubic centimeter of air. The criterion is applied utilizing the methodologies of the electron microscope to identify specific asbestos fibers. (Yamate, G., Aqasual, S.C. and Gibbons, R.D.: Methodology for the Measurement of Airborne Asbestos by Election Microscopy. Contract 68-02-3266. U.S.E.P.A., Wash., D.C., (1984)). An initial risk-based clearance criteria of 0.0009 f/cc was publicized by the EPA after the 9-11-01 attack on the World Trade Center in New York City. (U.S. EPA Response to September 11; Testing Criteria and Limits). However, to the best of my knowledge, this guideline was not implemented; instead, the 0.01 f/cc building asbestos abatement clearance criterion was invoked.

It is also important to note that the OSHA PEL, which is applicable to maintenance persons working in buildings, was adopted mainly for general industry and for employees who are working with raw asbestos or with products containing substantial percentages of asbestos. In contrast to the EPA clearance methodology referred to above, the OSHA methodology to evaluate asbestos fibers in samples of air does not differentiate between asbestos fibers and other fibers*. The method was developed for air in asbestos factories, where the vast

---

*NIOSH, Method for Determination of Asbestos in Air Using Phase Contrast Microscopy. NIOSH Method 7400. Issued 15 February 1974. Revised 15 May 1989. U.S. Dept of Health and Human Services, National Institutes for Occupational Safety and Health. Cinn., Ohio.

majority of fibers were asbestos. When this methodology is utilized to evaluate the exposure of maintenance workers or occupants in buildings or homes, it has a built-in safety factor because there are many non-asbestos fibers present in the environment of buildings, including, but not restricted to other fibers in the ACM product and fibers associated with carpets, curtains, clothing and fibrous glass products in buildings or homes. Thus, when all fibers are measured, quantitated as "concentration of asbestos fibers in air" and compared to the OSHA PEL, any apparently "high" concentration in buildings or homes most likely results from counting non-asbestos fibers, in addition to asbestos.

c. Control.

The third ingredient of the paradigm that the professional industrial hygienist or environmental engineer follows is that of control. How do we control exposures to potentially toxic materials? There is a host of possible approaches to control, numbering in excess of 21 interventions. (Corn, M., "Assessment and Control Environment Exposure," Allergy Clin. Immun. 72, 231–241 (1983); Corn, M.; "The Role of Control Technologies in Preventing Occupational Disease," Arch. Env. Hlth. 39, 235–240 (1984)).

The guideline for application of controls is referred to as the "Hierarchy of Controls." Appropriate levels of control are chosen based on sound professional evaluation of the exposure circumstances to be controlled. In general, there is an effort to utilize engineering controls to deal with potential industrial hazards when the evaluation indicates that the condition is not acceptable. Engineering approaches include: substitution for the product, ventilation controls, isolation and enclosure. In work with asbestos-containing materials in buildings and homes, I have, in my scientific and professional judgment, rejected engineering-type controls because the exposure conditions for all individuals potentially exposed to asbestos-containing materials in buildings and homes are acceptable. Occupants of buildings and homes, and maintenance personnel, as will later be discussed are not at unacceptable risk from inhalation of asbestos in building air. The engineering solution of ACM removal in buildings and homes is often a greater risk to persons involved in the removal and also may create a higher concentration of asbestos in air in the building or home than was originally present before the removal occurred. Furthermore, the acceptable re-occupancy concentration of asbestos-in-air enforced by the EPA, i.e., 0.01 f/cc, is higher than the asbestos-in-air concentrations in buildings and homes with ZAI before removal. Thus, the removal option should be exercised only under certain very specific conditions, which will later be addressed.

V.   Application of the Industrial Hygiene Approach to Vermiculite Attic Insulation.

A.   Recognition.

1. Asbestos in Zonolite™ Attic Insulation (ZAI).

8

Zonolite™ Attic Insulation asbestos content was determined by Versar, Inc. and reported in the Preliminary Draft Report "Asbestos Exposure Assessment for Vermiculite Attic Insulation (June 2, 2002). Samples were obtained from:

- Vermiculite insulation products purchased from stores throughout the U.S.

- Old bags of Zonolite™ insulation obtained by EPA Region 10 from Seattle Public Utilities and homeowners (it is not known if these were manufactured by W.R. Grace before the Libby Mine was closed in 1990).

- Vermiculite attic insulation currently installed in residential houses in Vermont.

The asbestos content of these materials was determined by both Polarized Light Microscopy (PCM) and Transmission Electron Microscopy (TEM). Results of this investigation indicated that:

- Asbestos fibers were not detected in any of the bulk samples obtained from five products purchased from stores.

- Five Zonolite™ products acquired through EPA Region 10 were comprised of three products from Seattle Public Utilities in Penton, Washington and two partially used bags of Zonolite™ from residential homes in Washington State. The asbestos content of these five materials varied from non-detect to 0.13 percent actinolite.

- Bulk samples of ZAI from five occupied houses in Vermont ranged from 1-2% tremolite in 24 samples.

The asbestos content of vermiculite removed from a World War II era building in Shiloh, Manitoba was less than 0.1% asbestos (Final Report: Site Assessment Vermiculite Removal, Building E12, C.F.B. Shiloh, Shiloh, Manitoba by Pinchin Environmental).

These measurements are consistent with the understanding that while Vermiculite ore contains fifteen or more percent asbestos, the exfoliated ZAI contains asbestos at approximately 1% or less by weight. Whether the asbestos content of ZAI is trace quantity, 1% or 2% by weight, this percentage formulation of a potentially toxic substance in a bulk solid is designated by hygienists as "low" content. It is generally assumed that the higher the bulk material content, the higher the potential for the toxic ingredient to become airborne. A point of reference for this issue is that the OSHA Permanent Standard for Asbestos in the Workplace and EPA regulations pertain to products containing 1% or more by weight of asbestos. "Low" content of bulk material results in minimal airborne material.

2.    Nature of ZAI

9

ZAI is loose fill. It is capable of producing dust upon application of energy causing movement of the bulk material, for example during pouring.

B.    Evaluation.

1.    Qualitative Aspects.

Prior to the Hearing in Marco Barbanti, et al., vs. W.R. Grace & Co., et al., I was asked to inspect homes in the Seattle area and in Montana in order to better understand the potential for exposure of occupants to ZAI. My notes on these inspections are in Appendix B. I presented my opinions on the potential for exposure of home occupants to ZAI at the Hearing held on November 30, 2000. In addition to on-site observations, measurements of airborne concentrations of asbestos and asbestos content of the bulk ZAI in the homes were available.

I observed ZAI sealed between attic floor joists and floorboards and visible ZAI between attic joists. I observed ZAI beneath and above add-on fibrous glass batts and blown-in fiber. There were attics never accessed, attics occasionally accessed and, in one case (with ZAI beneath the attic floor) an attic serving as a bedroom. My conclusion was that the duration of any homeowner or occupant exposure to ZAI was brief and intermittent even for those utilizing the attic as a bedroom. In the one case of bedroom usage, the ZAI was essentially enclosed beneath the floor and did not offer dust emissions to attic air, or any exposure opportunity.

In addition to these observations, analyses of the bulk ZAI asbestos content and samples of attic air obtained under non-disturbance conditions were available. The former ranged from trace amounts to one percent asbestos, while the latter were less than the EPA clearance concentration of 0.01 f/cc.

I testified that, in my opinion, the ZAI did not pose a health risk to home occupants. Declaration of a public health emergency, requested by plaintiffs was unwarranted and not defensible based on the evidence.

An issue arising from this Hearing was the potential of home remodelers, who intrude on ZAI, for occupational asbestos exposure. A related issue was the effect on home air and occupant exposure of the remodeling itself. I indicated that data were needed to place these issues in better perspective, but based on the asbestos in buildings concern that had been resolved, I did not anticipate a hazard.

2.    Quantitative Aspects.

Since the Barbanti Hearing additional data on exposure to asbestos from ZAI have become available. In particular, simulations of activities disturbing ZAI have been conducted with associated air sampling to assess exposure. These data will be briefly summarized as part of the evaluation phase of ZAI potential health risk.

10

a.    Lees, P.S. J. and Mlynarek, S.P.: Assessment of Potential Asbestos
Exposure Resulting from Disturbance of Zonolite™ Vermiculite Attic
Insulation. Jan. 9, 2003.

This is the most extensive investigation of home occupant exposure to asbestos in
air from the presence and disturbance of ZAI. The effects of a variety of
household activities, including repair and renovation tasks were studied. Tests
were performed in a home containing ZAI installed in1971 to a depth of four to
five inches between ceiling joists. The attic did not have flooring over the ceiling
joists and materials were not stored in the attic.

The ZAI was sampled at depths designated "top," "bottom" and "middle" at
several locations and samples were analyzed by Polarized Light Microscopy
(PLM) for asbestos content after separating the samples by size (greater and less
than 500 microns (um)). The results of analyses by location, expressed by
combining the three depth samples at a location, varied from 0.5% to 0.95%
asbestos by weight for four samples and 2.59 weight percent for one sample.

Background air samples, in the house and outdoors, were less than 0.005 f/cc
determined by TEM analysis for task time durations. On an 8-hr Time Weighted
Average (TWA) basis, all samples were less than 0.001 f/cc by TEM analysis.

Personal and area air sampling was performed during task activities of moving
boxes in the attic, small area clearance of ZAI and refill, small area clearance of
ZAI and ceiling fan installation, and large area clearance of ZAI and refill and
box removal, cleaning and vacuuming. Tasks and sampling were replicated.
Task times ranged from 21 to 189 minutes. Air samples were analyzed by both
PCM and TEM.

Asbestos in air personal exposure concentrations during task activities varied
from a high of 0.20 f/cc (less than 0.009 TWA) to less than 0.025f/cc (less than
0.009 f/cc TWA) by TEM. Results of personal sample PCM analyses varied from
1.2 f/cc (0.054 TWA) to 0.076 f/cc (0.004 f/cc TWA). These ranges of results
encompass workers and bystanders during task performance. Results vividly
illustrate the difference between PCM, which counts all fibers, and TEM, which
identifies asbestiform fibers and counts only those fibers. The results also
contrast the 8-hr Time Weighted Average exposures and those associated with the
task performance duration.

b.    Environmental Protection Agency, Region VIII. Memorandum
"Addendum Supporting and Clarifying the Libby Risk Memo of
December 20, 2001 and Associated Risk" by C. Weis.

Results of air sampling in residences and at outdoor locations in Libby, Montana
are presented. Asbestos-in-air concentrations are expressed as PCME, or Phase
Contrast Microscopy Equivalents, based on TEM, as well as PCM results. The

methods utilized to obtain these results have been critiqued by R.J. Lee in an Expert Report for the Libby Cost Recovery Case (2000) and by E.L. Anderson in a report "A Review of Current Exposures and Current Health Risks Associated With Asbestos Exposure in Libby, Montana" (July 29, 2002). If these critiques are ignored, the summary data in the Memo (Table 8) indicate one out of 122 personal samples during active cleaning and two out of twenty two during simulated remodeling exceeded the OSHA PEL of 0.1 f/cc longer than five microns 8-hr TWA. For routine activities none of nine personal samples and none of five samples for roto-tilling exceeded this standard. If the critiques are accepted as valid, and I believe they are, there would not be any exceedance of the OSHA 8-hr TWA PEL; i.e. reported exposures would be much lower. Perhaps the most significant criticism of this investigation is that TEM analysis of air samples utilized the indirect sample preparation methodology, which has been demonstrated to degrade asbestos captured on air sample filters and to very significantly increase asbestos fiber counts. However, there are numerous other problems with the data presented, as addressed in the critique by E.L. Anderson.

c.  Preliminary Draft Report "Asbestos Exposure Assessment for Vermiculite Attic Insulation: Cumulative Study Covering Research Conducted in 2001 and 2002." Versar, Inc. 6850 Versar Center. Springfield, VA 22151. Prepared for Office of Pollution Prevention and Toxics. U.S. Environmental Protection Agency. June 28, 2002.

This investigation included airborne asbestos concentration measurements associated with simulated activities with ZAI performed in a containment chamber, as well as measurements during activity simulations in five unoccupied Vermont houses. Simulated activities which disturbed ZAI included removing dry ZAI, cutting a hole in the below attic ceiling from the attic and from the room below the attic. ZAI removal was by a homeowner and by a contractor. Twenty-five of twenty-nine bulk samples indicated less than 1% asbestos content; four samples contained 2% asbestos by weight.

Background and post-simulation area air samples were collected for four homes; personal or area air samples during simulation activities were collected for 30 minutes. It is interesting that exposure results for Phase 1 of this study, those obtained in a simulated attic, were significantly higher than those obtained during Phase 2, measurements of activities in unoccupied Vermont homes, suggesting that there was air infiltration in homes that did not occur in the attic containment. Significant findings of this study were, as could be expected, 30 minute exposure concentrations during ZAI disturbance and hole cutting were elevated during the period of disturbance. Concentrations determined by TEM following indirect sample preparation, were as high as 2.6 f/cc greater than 5 microns in length (one sample). A companion sample to this high result was 0.2 f/cc. In general, in contrast to short term (30 minute) results in the containment zone of ZAI disturbance, simultaneous air sampling throughout the house in which the tests were performed indicated that asbestos-in-air concentrations were not elevated. It

12

should again be noted that the analytical methodology for TEM analyses in these tests was the indirect preparation technique.

A large number of air samples were collected in this study. Rather than attempt to summarize all of the results, a summary paragraph in the Discussion section of the report will be reproduced here in its entirety.

The findings of the study are summarized here as follows:

1. Disturbances of vermiculite insulation by homeowners (e.g. via homeowner repairs or remodeling) can result in asbestos exposure via inhalation of airborne fibers. The risks associated with single or infrequent exposure of this kind are within or below EPA's target risk range of $1x10^{-6}$ to $1x10^{-4}$ based on the limited sampling of vermiculite products tested in this study.

2. Similar exposures can occur among homeowners who remove the insulation themselves.

3. These exposures can be mitigated to a certain extent by wetting the insulation before disturbing it.

4. Vermiculite attic insulation can be removed safely (i.e. without generating airborne asbestos) by a qualified contractor and

5. Blower door tests such as those performed by Vermont Gas can be done without generating airborne fibers.

As will be discussed later in this report (Section VIII), the potential health risk from inhaling airborne asbestos is dependent not only on the concentration of asbestos in the inhaled air, but also on the duration of time the asbestos-in-air is inhaled. The authors of this report clearly recognized that the elevated exposure to asbestos occurred only to those in the immediate vicinity of the ZAI disturbance, and that such disturbances were infrequent.

d. Final Report. Site Assessment Vermiculite Removal Building E-12, C.F.B. Shiloh, Manitoba. Pinchin Environmental. April 3, 1997.

The purpose of this assessment was to determine the safety of removing the ZAI in several buildings with standard demolition procedures, i.e. without taking asbestos precautions in Building E-12, a World War II era one story wood frame building with drywall ceilings and vermiculite loose fill insulation in the attic space. Building demolition is an extremely disruptive procedure creating excessive dust. Results confirmed that standard asbestos removal precautionary procedures are required during demolition of buildings with ZAI in order to avoid exposures of workers and bystanders. However, analytical methodological

13

problems resulted, in my opinion, in airborne asbestos concentrations an order of magnitude higher than results of other, earlier asbestos removal studies.

Expert reports and associated data, as well as videos by W. Longo, R. Hatfield, W. Ewing and Gobbel-Hays were received after completion of this report, too late to address in this report. They will be addressed.

3.    Standards and Guidelines.

Unfortunately, a U.S. Standard for non-occupational exposure to asbestos-in-air does not exist. The closest guideline to a non-occupational standard is the EPA clearance concentration associated with permitting building re-occupancy after bulk asbestos abatement. This guideline is 0.01 f/cc determined by TEM. This clearance standard involves the general public and suggests that a long-term 0.01 f/cc asbestos-in-air concentration is deemed acceptable in the long-term for occupants of public and private buildings.

The occupational asbestos (all forms) Permissible Exposure Limit enforced by OSHA is 0.1 f/cc 8-hr TWA for fibers greater than five microns length by PCM. It applies to healthy adult workers and is permissible 40 hours per week, fifty-two weeks per year for a 45-year working lifetime.

The Threshold Limit Value guideline for all forms of asbestos by the American Conference of Governmental Industrial Hygienists is 0.1 f/cc for fibers greater than five microns length, determined by PCM. This occupational exposure guideline is the same as the OSHA PEL.

C.    Control.

In the absence of ZAI disturbance in homes, controls are not deemed necessary. Asbestos in-place, undisturbed is not a hazard, as EPA found for asbestos in buildings and explicitly stated in the "Green Book" (1990). On those occasions in homes where remodeling occurs, ventilation utilizing windows and fans, as well as respirators should be utilized by remodelers, the same precautions I would recommend in any dusty environment

VI.    Relevant Lessons Learned From the U.S. Asbestos-Containing Materials In Schools and Buildings Experience, 1979-91.

The Environmental Protection Agency, in a series of guidance documents, often Referred to as the "Orange Book" (Asbestos-Containing Materials in School Buildings: A Guidance Document Part 1. U.S. EPA, Office of Toxic Substance, Wash., D.C., March, 1979.), The "Blue Book" (Guidance for Controlling Friable Asbestos-Containing Materials in Buildings. U.S. EPA, Office of Pesticides and Toxic Substances. Wash., D.C. EPA Report No. 56015-83-002. March, 1983), and the "Purple Book" (Guidance for Controlling Friable Asbestos-Containing Materials in Buildings. U.S. EPA, Office of

14

Pesticides and Toxic Substances. Wash., D.C. EPA Report No. 56015-85-002. June, 1985) called attention to and developed programs to address the risk to occupants of schools and buildings created by the presence of ACM in the buildings. Initially, the exposure to occupants (Orange Book) was compared to those experienced by asbestos workers in earlier years, exposures that resulted in asbestos disease. In the Blue and Purple Books, the EPA downgraded their exposure estimates to one-one hundredth and one-one thousandth respectively, those of earlier asbestos workers. In the "Green Book" (Managing Asbestos in Place: A Building Owners Guide to Operations and Maintenance Programs for Asbestos-Containing Materials. EPA Report No. 20T-2003. Wash., D.C. July 1990), the agency indicated that any risk to building occupant health from ACM in buildings is low, if it exists at all. The agency also shifted policy from a strong preference for asbestos abatement, as expressed in the earlier guidance documents, to one of management in place, in most cases. The large sums of money and effort expended on ACM in buildings, has been referred to as "Phantom Risk" (D'Agostino, R. and Wilson, R.: Asbestos: The Hazard, the Risk and Public Policy," in Phantom Risk: Scientific Inference and the Law, Foster, K., et al., Ed. 1993). Justice Breyer of the Supreme Court reached the same conclusion, that is, the minimal level of health risk from this source of asbestos, in a series of lectures presented at Howard University (Breyer, S.: Breaking the Vicious Circle: Toward Effective Risk Regulation. Harvard Univ., 1993, pp. 11-14). Scientists from the U.S., the United Kingdom and France reached the same conclusion Re: the negligible risk, if any, of asbestos in schools (Mossman, et al. "Asbestos: Scientific Developments and Implications for Public Policy." Science 247, 294-301 (1990)).

Concerns for building maintenance personnel, such as plumbers and electricians, have also been addressed (Corn, M., McArthur, B. and Dellarco, M.: "Asbestos Exposures of Building Maintenance Personnel. Appl. Occup. Env. Hyg. 9(11), 845-852 (1994); Mlynarek, S., Corn, M. and Blake, C. "Asbestos Exposure of Building Maintenance Personnel," Reg. Toxicol. Pharmacol. 23(3), 213-224 (1996)). A finding of these studies was that building maintenance workers spend only 2-4% of their work time in proximity to ACM. Another finding was that, using the PCM methodology for air sample evaluation, a methodology that counts all fibers greater than five microns length, in an environment in which other types of fibers (fibrous glass, carpet, clothing) are ubiquitous, 8-hr Time Weighted Average exposures were many times less than the OSHA PEL. Another significant study offering confirmation that work in buildings with ACM does not expose building workers to asbestos-in-air exceeding the OSHA PEL is that undertaken by the Missouri Department of Public Health (Wickman, A., Roberts, D. and Hopper, T. "Exposure of Custodial Employees to Airborne Asbestos." Bureau of Environmental Epidemiology, Missouri Department of Health. Technical Report for U.S. Environmental Protection Agency (1992).

The conclusion from analyzing maintenance exposure data of workers in buildings is that maintenance workers are not exposed to concentrations of asbestos-in-air that exceed the current OSHA PEL if relatively straight forward operation and maintenance procedures are used to reduce any fiber emission, and to protect the employee during the course of their performing work tasks.

The analogy of ACM in schools and buildings to ZAI in homes is a very close one. Occupants of schools and buildings were in building spaces below the ceilings in which ACM was located; occupants of homes live, with few exceptions, in building spaces other than the attic. Disturbance of the ACM in buildings, above the hung ceilings, resulted in somewhat elevated exposure to those causing the disturbance, but elevated asbestos in any concentrations were not detectable below the ceiling throughout the building. Similarly, studies during and after disturbance of ZAI indicated non-detectable or greatly diluted concentrations of asbestos-in-air throughout the home. Four hours after the ZAI disturbance asbestos-in-air concentrations returned to background. Furthermore, in both cases, i.e. ACM in buildings and ZAI in homes, exposures to asbestos-in-air are infrequent and at concentrations orders of magnitude below historical exposure concentrations associated with asbestos disease in workers. Thus, the integrated dosage to the lungs of those possibly exposed to infrequent, short-term elevations of asbestos-in-air in both cases, is inconsequential or non-existent in terms of asbestos health risk. This was the conclusion of the EPA in the Green Book after eleven years of investigating concerns for asbestos in buildings. The concerns for ZAI and any associated asbestos health risk appear to correspond closely to that earlier concern. The exposure measurements of occupants of homes when ZAI is undisturbed and during home remodeling appear to be the direct analogs of building occupants and maintenance personnel in buildings containing ACM, respectively.

VII.    Settled Dust Measurements As a Surrogate For Personal Exposure Measurements.

Measurements of asbestos in settled dust of homes are being invoked as ZAI health concerns. Measurements of asbestos in surface, or settled dust, was a major issue addressed in asbestos in schools and building investigations. Measurements indicated that less than one percent of surface dust by weight is ACM: i.e. surface dust does not include enough asbestos to be a regulated ACM under the EPA and OSHA regulations.* Given the sample preparation techniques necessary for the analysis of settled dust by electron microscopy, this amount of asbestos by weight can be converted to a large number of fibers and the result expressed mathematically as an apparently large number of fibers per area of surface. These extraordinarily large numbers--albeit not agreed upon by different practitioners and analysts making the measurements because of different methodological approaches, initially appear to be very high and threatening. One must understand the difficulty with which settled dust can be made airborne to appreciate the lack of relevance of these measurements to inhalation risk from asbestos in air.

Six years of my professional life were devoted to investigating the adhesion and re-entrainment of particles. (Corn, M., Adhesion of Particles. Ch. XI in Aerosol Science. C.N. Davies, Ed. Academic Press London. (1966); Corn, M., "Re-entrainment of Particles from a Plane Surface," Am. Ind. Hyg. Assoc. J. 26, 325-336 (1965); Corn, M., "Adhesion of Particles to Solid Surfaces I, J. Air Poll. Control Assoc. 11, 523-528 (1961); Corn, M., "Adhesion of Particles to Solid Surfaces II, J. Air Poll. Control Assoc. 11, 566-577 (1961). Corn, M. and Stein, F.: "Mechanisms of Dust Redispersion"

---

*The regulations require that an ACM contain at least 1% by weight asbestos.

Proceedings of the International Symposium on Surface Contamination, Pergamon Press, New York, 1966; Corn, M. and Silverman, L., "Removal of Solid Particles from a Solid Surface by a Turbulent Air Stream," Am. Ind. Hyg. Assoc. J. 22, 337-397 (1961); Corn, M. and Stein, F., Adhesion of Atmospheric Dustfall Particles to a Glass Slide, Nature 211, 60-61 (1966)). It requires extraordinarily high forces applied to particles submerged in a viscous sub layer adjacent to the floor or ceiling tile surface to make them airborne. After they are dislodged, the larger particles are the easier ones to get aloft because their greater mass and size offers greater projected area to the moving air stream to "lift" them, as an airplane is lifted on takeoff. Those particles that are capable of being inhaled and deposited in the human lung are the particles or fibers relevant to promotion of disease, and they are not made airborne without extraordinary effort.

Thus, the citation of large numbers of fibers in settled dust samples is a diversion from the recognition, evaluation and control paradigm of the Industrial Hygiene Field. At least since the 1950's, the industrial hygiene profession has recognized and instructed that to evaluate exposure to airborne particulates or fibers, air sampling is required and that surface dust sampling cannot be used as a surrogate for air sampling. Particle or fiber concentrations in air are measured in the breathing zone. There are no procedures to measure settled dust for assessment of inhalation risk due to insoluble dusts such as asbestos. For insoluble dusts such as asbestos, there is no official or professional assessment method for concluding health risk does or does not exist based on settled dust sampling and sample analysis*

The reason for not using settled dust measurements to arrive at conclusions about inhalation risk is that such measurements do not correlate with the airborne material that may breathed (Chatfield, E.J.: Correlation Measurements of Airborne Asbestos-Containing Particles and Surface Dust. Advances in Environmental Measurement Methods for Asbestos. American Society of Testing Materials, Conshohocken, PA. Jan. 2000, pp. 378-402; Lee, R.J., Van Orden, D.R. and Stewart, I.M.: Dust and Airborne Concentrations-Is there a Correlation? Advances in Environmental Measurement Methods for Asbestos. American Society of Testing Materials, Conshohocken, PA. Jan. 2000, pp. 313-322). There is no way of predicting what may appear in the air from knowledge of what is on the surface. Those suggesting that measurements of asbestos in settled dust are related to "contamination" with associated implications for health risk are counting upon others to visualize the mass release of fibers from the floor to the air, which can then be inhaled. It simply does not happen that way.

---

*Settled dust is, however, evaluated for materials that are soluble, materials that after touching can adhere to the hand. When inserting the hand into the mouth, a soluble toxic material can enter the body via the gastrointestinal tract. This type of assessment is performed for soluble lead, where children may be exposed to inordinate levels of lead dust on floors of lead painted homes; the lead dust is soluble in body fluids. We also use this evaluation method for polychlorinated biphenyl hydrocarbons (PCB's) where absorption can occur through the skin after skin contact with PCB's on a solid surface such as a table. To attempt (or pretend) to apply these methods to assess inhalation risk in the different circumstances of insoluble particulates or fibers, such as asbestos, is unprofessional and intellectually dishonest.

17

The extensive use of settled dust measurements in lawsuits involving recovery of alleged damage from asbestos-containing materials in buildings is a measurement and a procedure created for the courtroom. It is not scientific, and it is not interpretable in terms of risk to health from airborne asbestos.

VIII.    Summary and Conclusions.

Review of available investigations of potential homeowner exposure to ZAI, as well as review of an EPA Region VIII risk assessment, associated critiques of this assessment, and other relevant documents, lead to the following conclusions:

- Zonolite™ Attic Insulation (ZAI) contains approximately 1% or less asbestos by weight. The bulk material can release airborne particles and fibers when poured or otherwise intruded upon with energy.

- A variety of investigations have been undertaken to measure the concentrations of asbestos-in-air when ZAI does release fibers to the air. Measurements have also been performed in homes when disturbance of ZAI did not occur. The measurements are consistent in that they indicate that disturbance duration is brief, if it occurs, and that airborne asbestos concentrations during disturbance are measurable in the breathing zones of those in the immediate vicinity of the disturbance, but are not elevated throughout the entire home. Where concentrations were elevated, they returned to background levels within hours after the disturbance activity.

  In the absence of disturbance, asbestos-in-air concentrations in homes are the same as background concentrations.

- The industrial hygiene model of recognition, evaluation, and control when applied to ZAI, indicates that there is a direct analogy between the nationwide concern for, and resolution of the potential health risks of asbestos-containing materials in buildings, and ZAI in homes. In the former case, after 11 years of data gathering and repeated lowering of estimates of risk to building occupants and maintenance workers, the EPA concluded the risk to be low, if it exists at all. In both cases, the asbestos bulk material remains undisturbed for the vast majority of its usage in-place. When disturbed with some form of energy, exposure is to those in the immediate vicinity of emissions and is for a very limited period time. In both cases, the dosage of inhaled fibers to the lungs is very low when compared to the historical lifetime dosages of asbestos inhaled in the past by asbestos workers, or to dosages permitted to be inhaled during a working lifetime with current occupational standards.

- Settled dust measurements are not a measure of inhalation risk and are not relevant to evaluation of ZAI potential health risk.

- Utilization of risk assessment methodologies to estimate "hypothetical risk" from homeowner exposure to the intermittent, short duration, low concentration exposure to airborne asbestos when it occurs, if it occurs, indicates risks less than those usually regulated by the EPA and not sufficiently high to be regulated by OSHA.

- A survey of resident health in Libby, Montana homes does not provide evidence that ZAI is associated with manifestations of asbestos disease in the population studied; worker exposure variables were associated with occurrence of asbestos disease. This investigation is consistent with evaluation of homeowner exposure to asbestos from ZAI and associated health risk, as presented in this report.

In addition to all of the above, I may also rely on, or in part, or comment on the publications, opinions, data and materials produced in discovery or contained in reports of other experts designated by the claimants or W.R. Grace in this action, and I reserve the right to amend or supplement this report, as necessary.

Appendices

A. Curriculum Vitae of Morton Corn

B. Notes of Inspections of Seattle Area Homes for ZAI (by Morton Corn)

C. Summary of M. Corn Testimony