# EXHIBIT 19

Construction Products Division

GRACE

PERSONAL AND CONFIDENTIAL          03629668

To:    C. E. Brookes                              May 24, 1977
       C. N. Graf

From:  E. S. Wood

Subj:  Tremolite in Vermiculite

       cc:  R. M. Vining
            B. A. Blessington
            H. C. Duecker
            W. R. Hanlon
            W. F. McCord
            L. Rosenblatt
            B. R. Williams
            J. W. Wolter


          The purpose of this memorandum is to discuss in some detail
the nature of the tremolite problem as it impacts our vermiculite business,
and also to outline our plans for dealing with the problem. These plans
are based on extensive product testing, analysis of alternative confi-
gurations of the Zonolite business, and consultation with legal counsel,
including the Corporate Legal Division.

THE PROBLEM

          Tremolite is present as a tramp mineral in our vermiculite
deposits, and while most of it is separated from the vermiculite in the
milling process, small amounts are carried to expanding plants and ul-
timately into finished products. Tremolite is classified as asbestos
and regulated by the Environmental Protection Agency (EPA), the Occupa-
tional Safety and Health Administration (OSHA), the Mining Enforcement and

EXHIBIT

183.12          15101908

03629669

Safety Administration (MESA), the Consumer Product Safety Act (CPSA), and the Toxic Substances Control Act (TSCA) as a carcinogen. Although we have been working since 1971 to reduce tremolite in our product, in our expanding plants, and in our mills, we have felt until now that tremolite was mis-classified by OSHA and others as a form of asbestos. This was based on our understanding of the difference in physical characteristics of tremolite compared to other fibrous forms of commercial asbestos, as well as outside studies such as the animal study sponsored by Johnson & Johnson on a tremolite talc which showed no carcinogenicity.

Two recent developments have changed our views on this subject. First, an in-house study of mortality rates among ex-employees at Libby indicates that their risk of lung cancer is five times the national average. In this connection, we have experienced asbestosis in 41.5% of the workers (with over 10 years' service) in Libby, as well as in 28% of the workers (with over 10 years' service) exposed to Libby ore in the expanding plants. (The experience at Libby is confused because all of the aforementioned workers were exposed to high dust count levels in the old dry mill. The present Libby dust environment with the new mill represents a major change in this respect. Fiber counts have dropped from a level of above 30 f/ml on the average to a level below 5 f/ml. Also, the expanding plant employees mentioned have also been exposed to commercial asbestos in the manufacture of MK for a number of years.) Secondly, with respect to national safety regulations, the prior distinctions between "commercial asbestos" and "non-commercial asbestos" (tramp contaminants) are being erased as the general nature of the hazard of exposure to fibrous materials is more thoroughly studied.

03629670

A great deal of controversy exists over what constitutes a safe
level of exposure to a carcinogen. Most people would agree that safe
levels are very difficult to establish. One view, taken by most regulating
agencies, is that since no safe level can be unequivocally demonstrated,
carcinogens must be eliminated where there are acceptable substitutes. Where
the carcinogen cannot be eliminated by substitution, exposure must be con-
trolled at the lowest level which can be technically achieved and reliably
monitored. The opposing group makes a strong case that no unusual health
risks have been rigorously documented for asbestos exposures below 5 f/ml
(8-hour time weighted average), much less the present standard of 2 f/ml,
or proposed standard of .5 f/ml. In the presence of such controversy it is
difficult to determine what posture is appropriate for us in establishing
limits of exposure for our employees and customers. A more detailed dis-
cussion of the health hazards associated with asbestos exposure is contained
in Appendix I.

The exposure problems that we have seen to date are limited to
the fibrous type of tremolite that occurs in the Libby deposits. The
tremolite associated with our deposits in and around Enoree, South Carolina
is largely non-fibrous. Since we have no evidence of asbestosis or other
excess health risk associated with asbestos exposure among employees
working in South Carolina, we do not believe that the levels of exposure
to our employees or customers utilizing material from South Carolina creates
a health hazard of any kind. In the case of material from Libby, we believe
that lower levels of exposure are required to assure the safety and well-
being of our employees. Moreover, regulations already proposed, when put
into effect, will mandate lower levels.

15101010

C. L. Brooks/C. R. Ula.

03663376

## PROPOSED ACTIONS

### 1. Fiber Control

As a result of the existing and expected regulations, we are moving ahead on a faster than planned schedule with requests for $1,271,000 in fiber control capital spending originally budgeted through the end of 1978 for the Libby mill and various vermiculite expanding plants. We will also request authorization to spend $298,000 over and above that which was budgeted, again principally for fiber control projects. The individual projects are listed in detail in Appendix II.

Insofar as fiber reduction is concerned, our experience to date indicates that removal of tremolite fibers at the mill is a preferred method of reducing employee and customer exposure levels. Immediate temporary steps have been taken to reduce the level of fines which have been recycled into the ore shipped from Libby. It is too early to assess the benefit of these changes, although taken alone they are r - expected to eliminate the need for a fiber reduction program at the expanding plants and a fiber-binding program for consumer products. The cost of permanent equipment to collect and dispose of these fines is included in the overall Libby fiber reduction program discussed below.

The present MESA standard in effect at Libby is 5 f/ml (8-hour TWA). The Federal Metal and Non-Metal Mine Safety Advisory Committee has recommended that MESA lower the present standard to 2 f/ml, although the timing of such a change is uncertain. Our objective is to bring all Libby fiber counts below 2 f/ml by January 1, 1978. To meet this objective we will be proceeding with $713,000 in capital spending over the next few months (budgeted

15076208

C. E. Brookes/C. N. Graf                    -5-                    May 24, 1977

03629671

at $605,000 in the 1977 capital budget). Included in this amount will be $331,000 of spending against RCA 12-2 (budgeted for this year at $204,000) for mill-related fiber and dust segregation, collection and disposal equipment. The remaining $387,000 (budgeted at $401,000 for 1977) will be directed at mine area dust control and vehicular dust control equipment. Authorization for this spending is being requested under separate RCA's and shop orders.

For the long term, research is being carried on at North Carolina State, aimed at improved separation techniques that appear to be effective in clean-up of our finer grades (No. 3 and No. 4). Unfortunately, this approach does not seem to be effective for the coarse grades (No. 1 and No. 2) which are used almost exclusively for Attic Insulation (hence the need for a binder development for Attic Insulation). Laboratory scale results indicate that a reduction of over 90% in the level of fibrous tremolite in fine grades may be achievable. This would appear to be the preferred long-term solution to tighter fiber exposure levels both at our expanding plants and in the customer use environment for the greatest volume of our products ($28.3 million out of a total $35.5 million of expanded vermiculite sales and ore sales to outsiders using Libby ore in 1977).

A series of changes primarily in ore handling facilities will be made at eight expanding plants which do not presently meet the OSHA standard of 2 f/ml (8-hour TWA). These changes will total $943,000 of capital as follows:  Denver ($50,000); Newark ($114,000); Phoenix ($110,000);

15101911

03629672

Dallas ($50,000); Portland ($107,000); Dearborn ($197,000); and Omaha ($315,000). Since the steps taken to reduce fiber counts to 2 f/ml, with proper plant maintenance, can generally bring fiber counts below 1 f/ml with appropriate peripheral equipment, we expect to achieve a level of 1 f/ml at all expanding plants by mid-1978. An additional $93,000 of capital will be required for peripheral equipment to meet 1 f/ml at the following plants: Easthampton ($17,000); St. Louis ($26,000); Little Rock ($50,000). These changes will be handled through a series of individual plant RCA's or shop orders, with the exception of Omaha spending which has already been approved under RCA E76-317 ($247,000 approved by the President on November 26, 1976), and RCA E76-311 ($68,000 approved by the CPD President on September 27, 1976). Excluding Omaha, the expanding plant capital spending totals $721,000 versus budgeted 1977 and 1978 figures totaling $666,000.

In part, these changes are being undertaken now since they represent relatively small capital increments (above what would be required to reach the present mandatory levels) that will yield substantially lower exposure levels to our employees. However, it is clear that the levels which we propose meeting will eventually be embodied in stricter state and federal standards. Moreover, it is clear that the Federal Government policy for the long run will be directed to achieving the lowest level which is technically feasible and which does not have an adverse impact on the economy as a whole.

15101912

## 03629673

Standards as low as .1 f/ml have been proposed by the National
Institute for Safety and Health (NIOSH). While this was a proposal that
has been made without regard for its economic impact or technical feasi-
bility, it is indicative of the general philosophy behind control of
substances defined as carcinogens.

### 2. Product Labeling

Based on the advice of corporate general counsel, we have
decided not to affix asbestos warning labels on any of our expanded
products which, in their normally intended use, do not expose customers
to fiber levels above those permitted by OSHA. Thus, no products made
from South Carolina ore will require labeling. Subject to the results of
additional job-site tests, no present expanded products using Libby ore
will require labeling, with the possible exception of industrial grades
for which we may not be able to identify and test all end uses. This
policy is consistent with the posture of Johns-Manville, the largest
supplier of asbestos products in the U.S. and a leader in the field of
asbestos safety and health precautions. Effective July 1, 1977, all new
packaging purchased will include a general dust warning label printed on
the package.

In the case of consumer products, we are operating under the
presumption that the present controversy over regulation of materials con-
taining asbestos will be resolved by the Consumer Product Safety Commission
(CPSC) in favor of a complete ban on consumer products containing asbestos
fibers unless they can be shown to be "bound". Recent action of the CPSC

03629674

in proposing a ban on drywall joint compounds containing asbestos, artifical fireplace logs using free asbestos fibers, and spackling compounds containing tremolitic talcs tends to support our presumption of an eventual ban on unbound asbestos-containing consumer products.

Equipment is being installed at 14 key plants at a projected cost of $130,000 (average of $9,300 per plant) using individual, locally approved shop orders. This equipment will permit us to apply a binder for our two major consumer products -- Attic Insulation and Horticultural Vermiculite. Simultaneously with the installation of the equipment, we are in the process of choosing an appropriate binder and level of treatment with the objective of reducing the use exposure for these products to a level of 1 f/ml maximum exposure and .2 f/ml on an 8-hour time weighted average basis. These are levels chosen because we think they are technically achievable and are close (within a factor of 2) to the level which NIOSH proclaims to be the lowest level which can be reliably monitored.

It should be emphasized that these steps are being taken to comply with the extremely stringent projected regulations, and not because we feel that the use of these products creates a serious risk for consumers.

Considering the brief and irregular pattern of use, we do not believe that asbestos exposure from our products causes an increased risk of health problems. However, there is a fringe of expert opinion, most prominently and articulately represented by a well-publicized expert from Mt. Sinai (Dr. Selikoff) suggesting that even brief exposures, presumably at high levels, can later produce mesothelioma. Mesothelioma is a rare form

15101914

03629675

of lung cancer linked to asbestos exposure. For this reason, and the ex-
pected stiff regulation of asbestos-containing materials in consumer
products, we feel that it is prudent to develop a treatment for our con-
sumer products, even though it is anticipated this will increase our cost
of manufacture by up to 15%.

Even though we will not be labeling most of our products, we
intend to notify customers who inquire that small amounts of tremolite are
present in our end products with the exception of our mixed products. In
the case of mixed products (MONOKOTE and soil mixes), tremolite is detectable
only through the use of internally developed analytical procedures which
require elaborate techniques not commonly recognized or employed in the
scientific community for detection of asbestos. For this reason, we are
taking the position with all but authorized government authorities that our
mixed products are "non-asbestos" products. Obviously, in responding to
government inquiries we intend to provide specific data, which we have, that
identifies trace levels of tremolite even in mixed products. It is our
belief, for purposes of the law, that the amount of fibrous tremolite present
in our mixed products is de minimis.

Requests for written statements concerning the presence of
asbestos in our products from customers will be answered by indicating that
we have small amounts of tremolite present in the product and by referring
them to the OSHA regulations covering asbestos-containing products.

C. E. Brookes/C. N. Graf                    -10-                    May 24, 1977

**03629676**

ZONOLITE PROFITABILITY IMPACT

Comparative financial analyses have been completed for the
present Zonolite business and several alternative configurations which
could be forced by future regulatory activity and/or our ability to meet
future fiber standards. The base case and alternative case assumptions
and financial comparisons are presented in Appendix III. The following
table summarizes key financial statistics for: 1.) the Zonolite 1977
budget and forecast, prepared in October 1976; 2.) a 1977 re-estimate
completed in January 1977 reflecting adjustments to sales and gross margins
based on the economic outlook at that time (used as the "base case" in
Appendix III); 3.) a "most likely" future case reflecting additional
capital spending for fiber control, additional costs for binder treatment
in certain products, withdrawal of certain consumer products such as Attic
Insulation in the U.S., and labeling of the remaining consumer products
(Case B in Appendix III).

| ($000) | 1977 | | | 1980 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Budget | Base Case | Case B[1] | Budget | Base Case | Case B |
| Net Sales | $65,719 | $63,495 | $57,303 | $92,639 | $92,281 | $80,232 |
| Operating Profit | 5,201 | 4,183 | 3,033 | 8,278 | 8,512 | 6,065 |
| Profit After Tax | 2,779 | 2,556 | 2,018 | 5,305 | 5,373 | 3,758 |
| Total Capital Employed | $31,573 | $30,891 | $29,937 | $37,613 | $37,215 | $34,328 |
| % Return on TCE | 9.0% | 8.5% | 7.0% | 14.3% | 14.6% | 11.2% |

(1) Case B presented in 1977 is for comparative purposes only. The full-year
impact of assumptions in Case B would not actually be experienced in 1977.

15101916

03629677

Our projections indicate that even with the loss of our consumer business (assuming the Canadian Attic Insulation business continues) Zonolite continues to be a viable business albeit at lower than forecasted returns.

More selective internal use of South Carolina ore in place of Libby ore can largely eliminate the 10-50% reduction in sales volume that would result from a requirement to label our products as containing asbestos. The reduction in sales from labeling is primarily the result of our being the first labeled product on a construction job site which would force contractors to comply with impractical OSHA regulations.

## ALTERNATIVE APPROACHES

Considering the large potential liability that results from the sale of products that contain even a small amount of contaminant defined by the government as a carcinogen, it is reasonable to question whether there are alternatives to the proposed action. Our exposure to law suits cannot be ignored. In addition, we are forecasting a continued demand for no return capital to be invested in the business in order to meet increasingly tighter standards for asbestos fiber exposure, independent of whether a proven risk exists or not. Two obvious alternatives would be to seek divestment of the business or to close Libby and retrench to South Carolina where the health issues are minimal (but not eliminated).

Divestment of Zonolite has been considered in the past and been judged impractical. It is felt that no buyer could be found, capable of continuing to operate the business (with adequate capital resources) to give us an acceptable price for the business as compared to other alternatives.

036Z9678

Closing of Libby and retrenching to South Carolina would require a drastic change in the basis on which the business is run. It is likely that we would be operating a regional business in the East, Midwest, and Southeast, rather than the present national business for Zonolite products. This alternative, if required, would be expected to produce a high return but substantially lower after-tax profits. For example, our projection for 1980 for a regional business, without Libby, shows after-tax profit of 2.6 million dollars giving a 15.2% return on the 17.2 million dollar Total Capital Employed. (This case is presented as Case C in Appendix III.) Large asset write-offs and interim operating losses would be incurred to convert to this regional business basis.

We now believe the most likely case for 1980, retaining Libby, but recognizing the possible loss of consumer businesses to be a 3.8 million dollar after-tax profit, generating an 11.2% return on 34.3 million dollars of Grace Capital Employed.

Our forecast indicates that continuing to operate Libby and continuing to conduct a national business is a preferred alternative unless large amounts of capital are required to meet drastically tightened asbestos fiber exposure levels. Our best estimate is that a 1 f/ml standard for Libby would require 3.6 million dollars of additional capital. A tightening of the OSHA regulations covering our expanding plants to a level of .1 f/ml would require 6 million dollars of additional capital. Based on our present assessment of what is technically required, a move to the standards of .1 f/ml in the expanding plants and 1.0 f/ml in Libby would make it uneconomical to continue operating Libby.

15101918

03629679

In the absence of such extreme (and unlikely) tightening of standards, our projections indicate that the best course is continued operation of Zonolite from two mine locations.

## RISKS

There are seven specific risks associated with tremolite in our workplaces and products which we assess as follows:

## 1. Harm to customers.

We do not feel that our products create a hazard for normal end uses. The highest level of exposure is for Attic Insulation and Masonry Insulation. The high concentrations of upwards of 15 f/ml (15 minute maximum) for Attic Insulation and 12 f/ml (15 minute maximum) for Masonry Insulation that were observed in simulated tests early in 1976 have not been confirmed by the results of more recent testing in actual field use. (The present OSHA ceiling limit is 10 f/ml for any 15 minute period.) The maximum concentration in the case of Masonry Insulation observed in recent testing was 3.65 f/ml (15 minute maximum) and in the case of Attic Insulation was 4.28 (15 minute maximum). However, we have observed very large variations in simulated test results such that further improvement in Attic Insulation, in particular, may be necessary to be assured that we reliably fall below 10 f/ml maximum exposure during use. Due to the products' short and irregular periods of use, it seems unlikely that we would exceed the 2 f/ml, 8-hour time weighted average, OSHA standard with Attic Insulation or Masonry Insulation.

C. E. Brookes/C. N. Graf                    -14-                    May 24, 1977

03629680

All other products appear to be well below permitted levels, in most instances by a good margin. (See Appendix IV for representative test results.)

2. Harm to employees.

The present level of exposure for our Libby employees (up to 5 f/ml TWA), while materially better than the harmful exposures before the new wet mill, still represents concern to us. Therefore, we will be undertaking an employee education program as well as further reduction in the fiber levels to 2.0 f/ml, in order to reduce the risk of harm to our Libby employees' health.

The reduction to 1 f/ml in the expanding plants, which we expect to accomplish by mid-1978, should give us a comfortable margin of safety in concluding that there is very low risk to our employees in the expanding plant work environments.

The risk to expanding plant employees using South Carolina ore, as well as to the mine/mill employees in South Carolina, is negligible.

3. Product bans.

There is a high risk that our products will be banned in several significant uses.

We forecast that our vermiculite consumer products, namely Attic Insulation, Horticultural Vermiculite, and Pool Base, will eventually be banned by the Consumer Product Safety Commission, and this has been assumed in the 1980 financial projections (Appendix III). We place our chances at 50:50 of binding the tremolite such that we could effectively argue that no fibers will be released during use.

15101920

C. E. Brookes/C. N. Graf                    -15-                    May 24, 1977

**03629681**

There is also a high risk (30%) during the next 18 months that
MONOKOTE fireproofing will be considered to fall within the ban in
selected states (California, New York, Minnesota, Massachusetts, and
Illinois) of fireproofing products containing asbestos, although it would
appear that this is an unintended ban. Legislators in those states simply
failed to consider trace tramp minerals when wording the prohibition
against a product containing any asbestos for sprayed applications. We
are actively working on a vermiculite free fireproofing material for
introduction in mid-1978.

4. Label requirements.

We believe that a decision to affix asbestos warning labels
to our products would result in substantial sales losses. This view is
shared by Johns-Manville in the case of their labeled construction products.
It is further supported by J-M's experience with their tremolite talcs.

Based upon advice from corporate counsel, our products do not
require labels if the OSHA limits are not exceeded in their intended use.
This is also J-M's position for their own products. We believe that all
of our products fall below the limits established by OSHA and that we will
be able to continue to fall below more stringent standards being projected,
thus avoiding the need to label our products.

Secondly, any change in interpretation which would require a
labeling of selected products, such as Masonry Insulation, can probably
be avoided by redistribution of the cleaner South Carolina ore and with-
drawal from selected isolated territories.

03629682

Continued programs aimed at cleaning up the product should allow us to meet the projected tighter limits that may be imposed by OSHA in 1978 and 1980.

5. Increasingly restrictive standards and higher capital requirements to meet the more stringent future standards.

We believe there is a very high risk that standards will become more restrictive requiring additional capital for continued operation of Libby and of expanding plants using Libby ore. In addition to the 1.9 million dollars which we propose to spend between now and mid-1978 to comply with asbestos fiber safety standards, an additional one million dollars is expected to be needed by 1980 in order to meet a projected OSHA standard of .5 f/ml.

There is a risk, which we place at less than a 20% chance, that additional investment of up to 10 million dollars would be required in order to reach a level of 1 f/ml at Libby ($3.7 MM) and .1 f/ml at expanding plants using Libby ore ($6.3 MM). Such a development would probably result in a decision to close Libby and the retrenchment of our business to a regional basis supplied entirely out of South Carolina. (See Appendix III, Case C for details of the financial impact of a decision to close Libby.)

6. Adverse publicity

There is a risk that Grace will attract adverse publicity from national media concerning the presence of asbestos in vermiculite. This

03629683

information is already being circulated within government agencies, such as OSHA and has been reported on a local basis in connection with the Louisa County dispute over the mining of vermiculite ore. Future steps, such as the development of a case for continued sale of Attic Insulation to the Consumer Product Safety Commission, will increase the risk of widespread adverse publicity.

7. General liability to employees, customers, and the public.

Liability to employees is limited by the Workmen's Compensation Laws. However, we should expect increased Workmen's Compensation rates in Libby as the number of disabilities increase among employees who have been exposed in the past to the high fiber concentrations of the old dry mill. Liability among expanding plant employees and the South Carolina mine/mill employees appears minimal.

The risk of liability to customers is heightened by the decision not to label our products. Under the strict liability criteria, we may be liable to customers who can demonstrate they (1) were exposed to asbestos fibers and (2) sustained personal harm. Based on advice of corporate counsel, this risk is categorized as moderate. Moreover, it seems unlikely that bona fide cases of personal harm could be well documented considering the pattern of use and exposure levels of our customers.

General public liability, stemming from the sale of consumer products, is a low-level risk with very high potential liability if it develops. While we have no evidence of any adverse effect of our products on consumers, neither can we offer convincing evidence that they are ab-

C. E. Brookes/C. N. Graf          -18-                May 24, 1977

03629684

solutely safe. Making such a case is handicapped by the number of
"experts" who claim that there is no safe level with the inference that
any exposure is potentially hazardous. This leaves us open to liability
without a good defense over a broad range of alleged hazards. A decision
to label our consumer products would eliminate the risk of future lia-
bility, while exacerbating the risk of claims (mostly not bona fide) from
past use of the product.

                                        E. S. Wood

ESW/CGR
Attachments

## APPENDIX I

**03629685**

## MEDICAL EVIDENCE ON THE EFFECT OF ASBESTOS EXPOSURE

Exposure to high concentrations of asbestos fibers results in increased risk to health of three different types:

Asbestosis is a scarring of the lungs that is a chronic condition appearing first in chest x-rays, usually after 5 or more years of exposure. It can be reliably diagnosed from x-rays and is specifically identified with exposure to asbestos fibers.

Lung cancer (bronchogenic carcinoma) can develop as a result of exposure to asbestos fibers or to other causes (such as smoking). It is difficult to diagnose due to the long latency period between initial exposure to asbestos and development of symptoms. Furthermore, since there are a number of causes of lung cancer, it is more difficult to establish a cause-effect relationship between exposure to asbestos fibers and lung cancer. Nonetheless, a great deal of work has been done which convincingly indicates a relationship between an excess risk of lung cancer and exposure to high concentrations of asbestos (above 5 f/ml). A combination of exposure to high concentrations of asbestos fibers and smoking is more damaging than either alone. One study among asbestos workers has shown that smokers have eight times the risk of lung cancer than non-smokers have.

Mesothelioma is a rare form of cancer which can occur either in the lungs or in the stomach. It can be specifically diagnosed only by taking a biopsy of the affected organ. It is specifically associated with asbestos exposure. Around 85% of cases diagnosed as mesothelioma occur in patients who have a history of exposure to asbestos.

## 03629686

Although there is disagreement between experts on this point, the determination of an increased risk of asbestosis may also be indicative of an increased risk of lung cancer.

For purposes of assessing the risk to our employees, the only practical indicator is the incidence of confirmed cases of asbestosis. This is due to the extreme difficulty of determining the cause of cancer in any group of people considering the long latency period and general lack of specificity between lung cancer and any single cause. The exception to this would be cases of mesothelioma. However, we have no reports of mesothelioma even at Libby.

As a result of the particular philosophy employed by government agencies to regulate carcinogens, as well as the experimental difficulty of establishing safe levels, very little scientific work is available to help identify the health risk posed by exposure to low levels of asbestos fibers (under 5 f/ml).

There are three sources of information outside CPD which purport to indicate that asbestos fibers cause increased health risks even at low concentrations.

The first is a study among hard rock miners in Idaho (Gillam et al.) which indicates an increased risk of lung cancer in the presence of asbestos fiber exposures of around 0.24 f/ml. However, this study is confounded by the presence of other potentially carcinogenic materials, notably arsenic-containing compounds and radon daughters. A still unpublished study of a larger group of the same miners (McDonald et al.) has indicated no increased

03629687

mortality risk from silicosis. This particular evidence of a hazard associated with low level exposures would seem to be seriously impugned.

A second purported indication of the hazard associated with low exposure levels is an increased risk of lung cancer among relatives of asbestos miners. However, more recent measurements indicate that fiber exposures in home environments of asbestos workers can be high and therefore this probably does not represent a low level exposure environment.

The third collection of evidence is of mesothelioma (not other asbestos-related diseases) in individuals and in animals exposed to high concentrations for brief periods of time (as little as 8 hours). The cases in men are few in number typically involving one or two individuals with unknown but probably very high exposure concentrations. Due to the small number of cases, definite cause-effect relationships cannot be drawn. The cases among animals are at extremely high dosage levels in species which are especially sensitive and, therefore, extrapolation to the effects on man are not well-founded.

In spite of the lack of hard evidence, there is a respected group of professional researchers who express the opinion that exposure to levels as low as 2 f/ml (8-hour TWA) create an increased risk of cancer in man after 30 or more years of exposure.

Results of our own in-house epidemiological studies indicate that conditions which existed in the old dry mill in Libby (34 f/ml TWA) and in unregulated expanding plants using Libby ore (29 f/ml TWA) created a health hazard to our employees. Among present employees with 10 or more

03629688

years of service who would have been exposed to the conditions in the old
Libby dry mill, 41.5% exhibit asbestosis. Moreover, there is a five-fold
increased risk of lung cancer among retired and ex-employees who worked in
the Libby mine (as compared to the general population).

We are encouraged by the absence of any new cases of asbestosis
found at the last annual check-up at Libby.

Among expanding plant employees, the high employee turnover
and variety of past exposures make conclusions difficult. Among 9 employees
with 10 or more years' service in plants which have not used Libby ore, there
is no incidence of asbestosis, even though several of these plants have
previously used commercial asbestos in some products. Among 14 employees
with ten or more years of service in expanding plants which have used Libby
ore, 28% exhibit asbestosis. However, any cause-effect conclusions are
confounded by the fact that all of these plants have used commercial asbestos
in the past.

Chest x-rays for the 77 employees at our Enoree mine/mill give
no indication of adverse health effects from exposure to the lower level
of tremolite fibers (0.8 f/ml) found in South Carolina. While there is
incidence of positive chest x-rays in 12 employees (16% of total), only
one case is consistent with exposure to asbestos. That particular employee
worked for a great number of years exposed to commercial asbestos in another
Zonolite location. Of the 12 positive chest x-rays, 5 stem from previous
cotton spinning mill exposure which produces "brown lung" disease. There
is no indication of excess mortality due to lung cancer among the South

Case 01-01139-AMC    Doc 4007-8    Filed 07/07/03    Page 24 of 67

03629689

Carolina mine employees. Since the South Carolina mine has only operated
for 29 years, there is still the possibility of extremely long latency
periods before excess mortality would be observed.

As very little published medical evidence exists for tremolite
exposures, as opposed to the commercial forms of asbestos, we have
sponsored animal studies on tremolite and a mixture of vermiculite and
tremolite to determine whether tremolite is carcinogenic. The test animals
have concluded 400 days of treatment and are scheduled to terminate after
730 days. While no definite conclusions can be drawn from the results to
date, indications are that our tremolite creates less of a problem than
commercial asbestos. As we have not yet completed the "critical" period
of the animal studies, between 370 and 450 days, the lack of a significant
difference in mortality between the test animals and the control group is
not yet meaningful. Results of this study should be complete and available
by October 1978.

We have sought and obtained advice from several outside profes-
sionals with respect to what tremolite levels create a hazard.

Dr. William E. Smith of Fairleigh Dickinson University has
responded (Appendix V), indicating that notwithstanding the "new evidence"
presented by OSHA and NIOSH there is no convincing evidence of an excess
risk to health from low level asbestos fiber exposures (below 5 f/ml).

Dr. MacMahon, Professor of Epidemiology at Harvard University,
has questioned the conclusions of a leading epidemiologist, Dr. Selikoff
of Mt. Sinai, that exposures to low levels are potentially hazardous. More-

15101929

over, he indicates that an unpublished study of shipyard workers in the
Pearl Harbor Navy Yard who have been tracked since 1943, indicates no
excess risk of cancer mortality contradicting the evidence presented by
Selikoff. He derides Selikoff's statements with respect to low exposure
level hazards as being unprofessional and not well-founded scientifically.

Dr. Enterline of the University of Pittsburgh has proposed a
mathematical model which closely fits the observed relationship between
mortality rate and time of exposure among the group of 17,000 shipyard
workers studied by Selikoff. We are in the process of using this model
to predict the effect of exposure levels of 1 or 2 f/ml. Even assuming
that tremolite fibers are as biologically active as commercial chrysotile
asbestos (an unduly pessimistic assumption), preliminary indications are
that the increased mortality risk from lung cancer as a result of a 50-year
exposure to 2 f/ml is only 10% above those not exposed to asbestos fibers.

Discussions with Johns-Manville revealed that two "modern"
asbestos fabricating plants (one in Texas and one in California), built
in 1956-57, show no cases of asbestos-related disease among their employees.
Exposures at these plants have been consistently below 10 f/ml (8-hour TWA),
probably in the 2-5 f/ml range, with exposures during the 70's consistently
below 2 f/ml. This suggests no excess health risk at concentrations up to
5 f/ml (8-hour TWA).

Amidst such conflicting scientific opinion, any conclusions which
we draw must necessarily contain large elements of personal judgment and at
least some level of uncertainty. Nevertheless, we must establish levels of

03629691

exposure calculated to protect both employees and customers from excess health hazards. Accordingly, we have concluded that in a regulated and monitored environment such as our plants, a reduction in exposure to 1 f/ml creates a worthwhile margin of safety over the present OSHA standard of 2 f/ml for our employees. A level of 1 f/ml is not expected to have an adverse health effect. A level of 2 f/ml, while probably not hazardous, does not have an acceptable margin of safety and will be reduced if economically feasible. No customers or employees will be exposed knowingly to concentrations above a level of 2 f/ml without adequate warning of the potential hazards involved. Johns-Manville also selects 2 f/ml as a limit below which there is "no excess risk of asbestos-related disease" (compared to those who are not exposed to asbestos).

In unmonitored environments, involving daily use of our products, such as construction sites, a typical exposure from our products of .5 f/ml (TWA) is not considered a hazard.

With the exception of mixed horticultural products, exposure levels for users of our product are above background levels. It is not likely that any improvement which we may make will reduce the exposure of users to levels as low as background. However, our long-range objective will be to reduce customer exposure levels to "the lowest limit at which asbestos fiber concentrations can be reliably monitored". According to NIOSH, this level is .1 f/ml on an 8-hour time weighted average basis and .5 f/ml for any 15-minute period.

15101931

## APPENDIX II

### CAPITAL SPENDING SUMMARY
### TREMOLITE FIBER COMPLIANCE
#### ($000)

03629692

| | Capital Amount | Capital Budget 1977 | Capital Budget 1978 |
|---|---|---|---|
| **Expanding Plants - OSHA @ 1.0 f/ml & 5.0 f/ml** | | | |
| Denver - Ore Handling | $  50 | $ | $  85 |
| Newark - Ore Handling | 114 | 80 | |
| Phoenix - Ore Handling | 110 | | 85 |
| Dallas - Dust Cont. on MK and SM | 50 | 35 | |
| Portland - Ore Storage & Handling | 107 | 101 | |
| Dearborn - Ore Storage & Handling | 197 | 192 | |
| Easthampton - Rock Handling | 17 | 18 | |
| St. Louis - Vent System | 26 | 33 | |
| Little Rock - Ore Handling | 50 | 37 | |
| TOTAL EXP. PLANTS - OSHA | 721 | 496 | 170 |
| **Expanding Plants - Product Binder Equipment** | | | |
| 14 Plants @ $9,300 per plant | $  130 | – | – |
| **Libby - To Achieve 2.0 f/ml[a]** | | | |
| Mill | | | |
| RCA #12-2 | 331 | 204 | |
| Mine | 225 | 225 | |
| Hauling & Loading & Screen Plant Trucks | 162 | 176 | |
| TOTAL AT LIBBY | $  718 | $  605 | $ – |
| TOTAL SPENDING | $1,569 | $1,101 | $ 170 |

(a) See page 2 for Libby detail.

RBB/cwr

15101932

**GRACE**

Construction Products Division

**03629693**

PERSONAL and CONFIDENTIAL

March 28, 1977

To:  W. R. Hanlon        H. A. Eschenbach
     B. R. Williams      W. F. McCord
     J. W. Wolter        R. C. Abernathy
     W. R. Wright        R. R. Benanto
     R. E. Schneider     H. C. Duecker
     F. W. Eaton         B. A. Blessington
     R. H. Locke

From: E. S. Wood

Subj: Guidelines for Handling of Tremolite Contamination
      In our Mines, Plants, and Products

      cc:  R. M. Vining
           L. Rosenblatt
           W. M. Bush, Jr.
           O. M. Favorito
           R. L. Oliverio/Libby

        Plans have now been laid for handling a variety of external
developments related to tremolite asbestos in our mines, expanding
plants, products, and customer environments. We must now proceed to
implement some of the work plans which have been developed.

        Please plan to attend a meeting at 8:30 AM in the Directors'
Conference Room on Thursday, March 31st. The purpose of this meeting
will be to discuss what actions we will be taking over the next twelve
months.

        By way of background, you should know our position on several
important legal and business issues. The following are three key points:

            1.  We will not expose our customers and employees to
                environments which have been formally defined as
                hazardous by the U. S. Government without proper
                caution as to the nature of the hazard. We will
                take all reasonable and practical steps to minimize
                or eliminate unreasonable risks which may be
                associated with the manufacture and use of our
                products including, where appropriate, instructions
                for proper use of our products.

Subj:  Guidelines .....

03629694

2.  The tremolite asbestos fiber count limits in
    effect and enumerated in OSHA (or MESA) regulations
    will be the guide to whether a health hazard exists.
    If the product in reasonable use exposes the user
    to counts in excess of OSHA limits, caution labels
    will be affixed to the product.

3.  Customer, user, or government agency inquiries with
    respect to tremolite in our plants, products, or use
    environments will receive straightforward and candid
    responses with respect to the data and measurements
    which we have gathered and which are relevant to their
    respective situations.

As you know, there is a great deal of controversy both in the
medical and governmental communities as to what constitutes a hazard and
what appropriate regulatory steps should be taken. This is particularly
true for products used by consumers. We have reason to believe that this
issue will be clarified by the Consumer Products Safety Commission within
the next several months. By that time we want to have any tremolite
asbestos fibers in our consumer products "bound" and fiber counts in their
intended use below 0.2 f/ml (8 hr TWA) and 1.0 f/ml (15 min. maximum).
You should be aware that this is a rapidly changing situation and that
requirements are still unpredictable.

Attached is an agenda for our meeting of Thursday, March 31st.

E. S. Wood

ESW/CGR
Attachment

15101934

AGENDA

for

Thursday, March 31, 1977                    03629695

1. Legal and Medical Issues

    a. CPA

    b. OSHA/MESA

    c. General Obligations

2. Continuing data gathering requirements and responsibilities

    a. Plants and mines

    b. Users

    c. "No asbestos" case for MONOKOTE vs. Glass Fibers in
       key states

3. Financial and engineering requirements/work plans

    a. Immediate and short-term -- authorized to proceed

        (1) Water treatment for Terra-Lite Vermiculite
            and Attic Fill

        (2) Remove and dispose of "fines" at Libby

        (3) Define cost (capital and operating) and
            effectiveness of binders for AF, TV and MF

        (4) Determine effectiveness of air elutriation by
            pilot trials

        (5) Engineering design for items in b.

    b. Appropriations to be justified and requested:

        (1) Installation of permanent binder addition equip-
            ment in expanding plants

        (2) Get all expanding plants to 2.0 f/ml (8 hr TWA)
            by 1/1/78

**03629696**

(3) Get Libby to 2.0 f/ml (8 hr TWA) by 1/1/78

(4) Get all expanding plants to 1.0 f/ml (8 hr TWA) by 7/1/78.

4. Customer, governmental, and media communications

   a. Grace policy on comments to media -- DON'T DO IT, LET NY HANDLE.-

   b. Responsibility and guidelines for customer and governmental communications-

      (1) Salesmen and plant managers -- verbal communications

      (2) Product and Q.C. managers -- routine written customer and governmental communications covered by guidelines

      (3) General Sales Managers -- unusual governmental and customer communications covered by guidelines

      (4) Exec. VP -- any communication not covered by guidelines.

5. R&D Work Plans

   a. Vermiculite free substitutes

      (1) MONOKOTE

   b. Modifications for commercial use

      (1) MF treatment to 1.0 (TWA); 6.0 (Max.)

      (2) AF treatment to 0.1 (TWA); 2.0 (Max.)

      (3) TV treatment to 0.1 (TWA); 2.0 (Max.)

      (4) Thin ZIC RD design

      (5) Bark ash sources for MM products

      (6) 3300 for high humidity urethane foam fireproofing

      (7) External fireproofing

      (8) Other?

03629697

c. Modifications to have "on the shelf"

(1) Vermiculite free Redi-Earth

(2) High yield (200% on vermiculite) ZIC

(3) Glass free MONOKOTE for decks

(4) Vermiculite free MM.

6. Document Contingency Plans

a. Remaining air and product assay samples .

b. Revised customer and press releases.

(1) MONOKOTE withdrawal

(2) AF withdrawal

(3) AF labeling

c. Financial Impact Cases

(1) Eliminate inconsistencies

(2) Document and issue summaries

(3) Additional years?

ESW/CGR
3-28-77

15101937

03629698

## DETAILS OF LIBBY FIBER REDUCTION SPENDING

|  | Capital Amount | 1977 Capital Budget |
|---|---|---|
| **MILL** | | |
| **RCA #12-2** | | |
| Final Cleaner System 20 x 65 | $100 | $ 90 |
| Modif. of Dryer Cyclone & Disp. System | 40 | |
| Wash & Screen Hammermill Product | 25 | |
| Skip Dust Collection | 55 | 55 |
| Screen Plant Baghouse Disposal | 20 | |
| Dust Disposal at Mud Dam | 10 | |
| Screen Plant Truck Dump Disposal | 12 | 12 |
| Screen Plant Shuttle Truck Dust Collection | 12 | |
| Screen Plant Control Room & Conveyors | 11 | 11 |
| Dust Wall – Transfer Point | 3 | 3 |
| Permanent Dust Disposal from Dryer BH | 10 | |
| Mill Lab Vent | 5 | 5 |
| Rework Dryer Belt BH System | 20 | 20 |
| Seal Between Dryer & Wet Mill | 8 | 8 |
| TOTAL MILL | $331 | $204 |
| **MINE** | | |
| Paving – Garage Area | 50 | 50 |
| Paving – Transfer Point Area | 50 | 50 |
| Revamp Mobile Equip. Air. Cond. | 75 | 75 |
| Dust Control – Drills | 20 | 20 |
| Mine Vacuum Station | 10 | 10 |
| Wash Rack – Garage Area | 20 | 20 |
| TOTAL MINE | $225 | $225 |
| **HAULING, LOADING, MISC. VEHICLES** | | |
| Temporary Dust Truck & Hopper | $ 15 | $ |
| Screen Plant Super Sucker | 10 | |
| Haul Truck Enclosures | 22 | 22 |
| Dust Control – Load Out | 15 | 15 |
| Permanent Dust Disposal Truck | 100 | |
| TOTAL | $162 | $ 37 |
| Unidentified Projects | | 139 |
| TOTAL LIBBY @ 2.0 f/ml | $718 | $605 |

RRB:cgr
5-24-77

15101938

APPENDIX III

Construction Products Division

GRACE

03629699

TO:     E. S. Wood

FROM:   R. R. Benanto

CC:     Distribution List

May 6, 1977

SUBJECT:  Zonolite Study –
          Financial Impact of
          Contingency Plans

        The following pages summarize the assumptions, and financial impacts
of the various case assumptions developed during the Zonolite Contingency planning
study performed in March.  For each case, the impact on the following areas are
presented:

                1.)  Overall case assumptions
                2.)  Market & Product Impacts
                3.)  Impact on Mines & Ore Allocation
                4.)  Expanding & Polystyrene Plant Impact
                5.)  Selling Expenses
                6.)  Capital Spending
                7.)  Summary of Financial Implications

        All cases are compared to the Zonolite "Base Case" in 1977 and 1980.  The
"Base Case" reflects the 1977 Budget & Forecast adjusted for the re-estimate in BPD/
Ag sales and margins made in January, 1977.

Ron

R. R. Benanto

RRB:mhr
Att.

15101939

03629700

-2-

CASE A — Major Labelling Program and Withdrawal of All Consumer Products

I. Overall Case Assumptions

A. Fiber Counts to 1.0 OSHA (12/77) and 2.0 MESA (12/77)
B. Withdraw all Consumer Products
C. Lose Canada
D. Label all Libby Products except ZIC, MK, and Mixed Horticultural.

II. Market & Product Impacts

A. Withdrawal

Withdrawal from the Attic business results in simultaneous withdrawal of all Glass Fiber sales and a significant impact on dealer Plainboard sales (ranging from 20% loss in 1977 to 31% in 1980).

Withdrawal from Horticultural Consumer market results in total loss of consumer Terra-lite and mixed product sales. These consumer sales losses are partially offset by increases (20% in 1977 and 30% in 1980) in horticultural perlite sales to consumer through substitution of perlite.

B. Labelling

Only products produced from Libby ore would be labelled. The estimated impact of labelling products varies from product to product and is summarized as follows:

Masonry Fill — 20% drop in volume in 1977 and continued declines of 10% per year until by 1980 the volume is only 50% of 1977B volume.

Plaster Ag — 50% drop in 1977 and another 50% drop in 1978 so that by 1980 the volume is only 25% of 1977 volume.

Misc. Expanded — An immediate drop of 10% in 1977, but a gradual rebound in volume of 4% per year so that by 1980 Misc. Expanded volume is only 2% off of the Base Case.

Ag Bag & Bulk — Declines from 30% off of Base Case volume in 1977 to 70% below Base Case volumes in 1980.

Terralite (Professional) — Decline of 50% in 1977 and an additional 20% off of 1977 volume by 1980. However, this impact is also partially offset by improved Horticultural Perlite sales to the professional market (20% in 1977 and 30% in 1980) and a 10-15% increase in non-labelled Horticultural Professional mixes (eg. Metro-mix). The latter favorable impact results from additional substitution of vermiculite with perlite and mixed products.

151C--

### C. Ore Sales

Licensees – Demand reflected downward, particularly in coarse sizes, to reflect their withdrawal of Attic Fill. Finer size demand was left unchanged (primarily MK and ZIC) with the exception of a slight overall negative impact due to Masonry Fill.

Independents – Unchanged.

Scott – Due to Scott's desire to avoid labelling Turf-Builder, Scott demand would fall by 30% in 1977 and continue to decline to 20% of Base case levels by 1980. The basic assumption here is that Scott would attempt to maintain their "natural" image and avoid labelling by substituting as much South African or Virginia Vermiculite ore as they could obtain. In addition, Scott has the ability to convert to a polyurethane process as a substitution and already produces such a product with an existing plant.

Gypsum Companies – Labelling impact reflects a 5% reduction in demand from 1977 to 1981.

Canada – Loss of all Canadian ore shipments precipitated by their withdrawal from Attic Fill.

### III. Impact on Mines & Ore Allocation

In order to minimize the impact of lost sales due to labelled products made from Libby ore, the ore allocation plan reflects a maximization of the South Carolina mine output. Virtually all Masonry Fill demand was shifted to be supplied by South Carolina (except for Portland), so that the labelling impact on Masonry Fill in Case A was minimized. However, this required the transfer of approximately 23,000 tons in to S.C. from Libby, in 1977 and over 26,000 tons by 1980. By 1980, the shift in Masonry Fill alone brought Enoree's output to 135,000 tons, or full capacity. Although some Ag Bag & Bulk & Terra-lite could be temporarily transferred from Libby to S.C. until 1978, for consistency, the 1977 volumes reflect only transferring Masonry Fill. Masonry Fill was chosen as the primary beneficiary of the ore allocation switch based on its more favorable margin contribution per ton of ore versus Ag Bag & Bulk, the extent of the impact on Masonry Fill due to labelling, and the amount of Masonry Fill currently being supplied from Libby.

South Carolina mine volume is reflected at 120,000 tons in 1977 (versus 96,000 tons in 1977 Budget) and in 1980 is at full capacity of 135,000 tons. Actually it becomes capacitated in late 1978. Overhead levels have not been adjusted at Enoree and its DMC is assumed to stay at Budget & Forecast levels. The most favorable impact at Enoree is the impact of the additional tonnage on depletion.

Libby volume is dramatically affected under the Case A allocation scheme. From a 1977 Base Case of 229,000 tons, Libby loses the following volumes: 34,500 tons of Canada, 23,000 tons of Masonry Fill shifted, 16,000 tons of Attic Fill, 8,000 tons lost to Scott, and 22,500 tons lost due to labelling. Libby's Case A 1977 volume is 125,000 in 1977 and 128,000 tons in 1980 (volume growth in non-labelled products is offset by continuing impact of volume lost due to labelling).

15101941

03629702

At these low volume levels, it was estimated that Libby's DMC would still be able to remain at the $26.50/ton budgeted level of DMC. However, fixed overhead expense reductions were not sufficient to offset Libby's gross margin loss due to volume and resulted in net-income after-tax losses of approximately $750,000 in 1977 and 1980. However, even with these operating losses, Libby would generate approximately $750,000 to $1,000,000 in cash from operations for these years before any capital expenditures, which would be minimal due to the low volume levels. Libby would not receive any depletion credits in these years under these circumstances.

In order to operate at such low volume levels, Libby would be forced to operate the mill on a 4-day week for 37 weeks of the year and would be shut down for 15 weeks during the year. This analysis did not account for other potential negative affects caused by the resultant high turnover of management and skilled personnel that would likely follow from such an operation.

Overhead Expense Levels would be reduced by $886,000 in 1977 as follows:

| Factory Overhead | — $622,000 | — Reduction in the Overhead Dept. ($366K) depreciation ($47K), non-standard expense ($78K), and mine and mill supervision ($100K). |
| G&A | — $145,000 | — Reductions in engineering and clerical headcount. |
| R&D | — $119,000 | — Reduction in Prospecting & mill process research costs. |

### IV. Expanding & Polystyrene Plant Impact

With the exception of closing the L.A. plant (assumed in all cases, including the Base Case), no expanding or polystyrene plants were assumed to be closed in Case A.

### V. Selling Expenses

Case A selling expense reductions amounted to $1,070,000 in 1977, including $900,000 in BPD and $170,000 in Ag/Hort. These reductions reflect sales headcounts, marketing headcount, and other selling expense reductions (e.g., advertising).

### VI. Capital Spending

#### A. Expanding Plants

The 1977 Capital Budget and Forecast included $1.0 mm in Capital Spending, sufficient to bring seven expanding plants within a 2.0 f/ml OSHA standard. To meet the 1.0 f/ml standard assumed in this case, an additional $200,000 capital over the Base Case Capital Spending has been reflected. However, this was offset by Capital Spending reductions of approximately $600,000 per year over 1977 to 1981 at the expanding plants. These reductions reflect cancellation of the need for most expansion projects (e.g., furnace capacity expansion) and the stretching out of major replacements (e.g., furnace replacements).

–5–

03629703

B. Libby

       The $515,000 capital required to meet a 2.0 f/ml standard for MESA had also already been reflected in the Base Case capital.  In addition, due to the very low volume levels at Libby, major reductions in projected capital spending plans were assumed.  These total $5,000,000 over the 1977-1980 period and include eliminations of mine garage, haul truck capacity increases, mill process improvements and capacity increases (e.g., #5 unit), office expansion, etc.  These reductions also reflect delays in the need for major replacements of mining equipment scheduled over the forecast period.

       The impact of these capital spending reductions at the plants and Libby on Net Fixed Assets amount to $664,000 less than Base Case in 1977 and $6,270,000 less in 1980.

03629704

## VII. Summary of Financial Implications ($000)

| | | Variance Fav/(Unfav) vs. Base Case | | | |
|---|---|---|---|---|---|
| | | 1977 | | 1980 | |
| | | Amount | % | Amount | % |
| A.) | Gross Sales (Impact in 1977) | | | | |
| | BPD (attic $3,638; Glass $623; Poly $544 and Ag Products $932) | $ (6,037) | (12.2)% | $(10,318) | (14.4)% |
| | AG (Terra-Lite $1,542; Mixer $705) | (2,563) | (24.6) | (4,638) | (30.6) |
| | Ore (Scott $300; Canada $1,835) | (2,784) | (44.5) | (5,578) | (61.2) |
| | TOTAL | $(11,384) | (17.2)% | $(20,534) | (21.4)% |
| B.) | Gross Margin on Net | (4,640) | (17.3) | (8,903) | (22.1) |
| C.) | Factory Overhead (primarily Libby reductions) | 622 | 5.5 | 2,281 | 16.8 |
| D.) | Operating Expense (BPD/Ag Selling $1,070 and the remainder at Libby) | 1,334 | 10.1 | 2,513 | 13.8 |
| E.) | Pre-Tax Profit | (2,684) | 67.8 | (4,109) | 48.3 |
| F.) | Taxes | | | | |
| | Before ITC and Depletion | 1,359 | 67.5 | 2,117 | 48.5 |
| | ITC | (23) | (6.2) | (140) | (49.1) |
| | Depletion After-Tax | 82 | 33.7 | (462) | (47.2) |
| | TOTAL TAXES | $ 1,418 | 100.0% | $ 1,515 | 48.9% |
| G.) | Net Income After-Tax | $(1,266) | (49.5)% | (2,594) | (46.0)% |
| H.) | TCE | | | | |
| | Working Capital Due to Lower Sales | 1,349 | | 2,767 | |
| | Net Fixed Assets | 664 | | 5,270 | |
| | TOTAL | $ 2,013 | 6.5% | $ 8,037 | 21.6% |
| I.) | % Return on TCE | (3.8)% Pts. | | (4.8)% Pts. | |

A more detailed comparison is shown following the case discussions in Exhibit 1-3.

CASE B — Selective Consumer Product Withdrawal; Labelling all other Consumer Products.

I.  Overall Case Assumptions .

    A.  OSHA to 1.0 f/ml by 12/77 and 0.5 f/ml by 12/80
       MESA to 2.0 f/ml by 12/77

    B.  Withdraw only Attic, Pool Cushion, Glass Fiber, and Santoquin.

    C.  Label all other consumer products; Ag/Bag if on Libby.

    D.  Avoid labelling by bringing tremolite in products to lower levels, e.g., treatment, use of South Carolina ore, etc.

    E.  Canada stays in Attic business.

II.  Market & Product Impacts

    A.  Withdrawal

        Withdraw from Attic business results in simultaneous withdrawal of Glass Fiber and a significant impact on dealer Plainboard sales (same as CASE A).

        Withdrawal of Pool Cushion and Santoquin have no impact on other Ag sales.

    B.  Labelling

        Only consumer Products and Ag Bag & Bulk from Libby ore would be labelled. Labelling impact is summarized below:

        Ag Bag & Bulk — Same as CASE A.

        Terra-lite Consumer — 15% reduction versus Base Case in 1977 and eventually 50% of Base Case volume by 1980. Offset by 30% increase in Hort. Perlite.

        Soil Mixes — Consumer — 15% reduction versus Base Case in 1977 and down to 25% off Base Case volume by 1980.

    C.  Treated Products

        To avoid labelling, Masonry Fill, Misc. expanded, and Plaster Aggregate are treated with a water or water/oil solution to achieve fiber standards in finished products. This treatment results in 6.0% yield penalty on coarse Libby ore sizes and 3.0% penalty on Libby sizes 3 & 4.

15101945

-8-

03629706

D.  Ore Sales

Licensees, Independents, Gypsum Co. - As in CASE A.

Canada - Base Case levels.

Scott - South Carolina ore more available than in CASE A (see Ore Section
III below), and allows Scott demand to be met totally from South Carolina.  However,
it is assumed that they will continue to use more South African ore and at best
Zonolite retains 22,000 tons (versus 26,000 tons in 1977 Budget) of Scott business
through 1981.

III.  Impact on Mines & Ore Allocation

Since the treatment of Libby ore for Masonry Fill precludes the CASE A
need to shift Masonry Fill to South Carolina ore, the South Carolina mine has capa-
city available to meet all O. M. Scott ore demand. (Without this move, Scott demand
would be only 8,000 tons in 1980 on Libby ore while 1980 demand would be 22,000 tons
if supplied with South Carolina ore).

The South Carolina mine demand will thus, continue to be high with it
reaching 116,000 tons in 1977 and 132,000 tons (or full capacity) by 1980.  DMC
and overhead levels are as assumed in CASE A.  Also, as in CASE A, the additional
volume results in increased tax depletion at Enoree versus the Base Case.

Libby volume is at 177,000 tons in 1977 (versus a Base Case of 229,000
tons) and grows to 208,000 tons in 1980.  The 52,000 ton reduction versus the Base
Case in 1977 results from volume losses in:  Attic Fill 16,000 tons, and Outsiders
(excl. Canada) 10,000 tons.  The reduction also reflects the shift of 26,000 tons of
Scott ore to South Carolina.

At these volume levels, Libby's DMC is estimated to remain at 1977
Budget & Forecast levels.  In 1977, Libby's net income would be a loss of $422,000
but by 1980, Libby would generate a net income of $500,000 with the volume reach-
ing 208,000 tons.  However, the Libby operation would still represent a substantial
cut-back.  In 1977, the mill would operate a 5-day week for 41½ weeks (or a 4-day
week for the full year) and still face a 2½ month shutdown.  Once again, as in CASE A,
there has been no attempt to quantify the potentially negative impact of such a
cut-back operation on turnover of valuable skilled and management people.  By 1979,
or 1980, the volume levels would once again be sufficient to represent just about a
full-scale operation with only a 3-4 week shutdown required.

Overhead expense levels would be reduced by $276,000 in 1977 as follows:

| | | |
|---|---|---|
| Factory Overhead: | - $187,000 - | Reductions in Overhead dept. |
| R&D | - $ 89,000 - | Mill Process Research cut-backs. |

1510104/

## IV. Expanding & Polystyrene Plant Impact

Same as CASE A.

## V. Selling Expenses

Same reduction in 1977 as CASE A, however, due to additional sales growth (Masonry Fill, consumer Ag/Hort) selling expenses have been assumed to increase commensurably with sales.

## VI. Capital Spending

### A. Expanding Plants

To meet a 1.0 f/ml standard by 1978 and a 0.5 by 1980, a total of $1.2 million over the $1.0 mm included in the Base Case has been reflected in capital spending. However, this $1.2 million is offset by an average of $300,000 per year in decreased capital spending at expanding plants over the four-year period due to delays in capacity expansion projects and replacement furnace delays resulting from the lower sales volumes.

### B. Libby

The $515,000 capital required to meet a 2.0 f/ml standard for MESA has already been reflected in the Base Case capital. However, the reduced volumes at Libby would enable significant capital spending decreases over the 1977-1981 period. These reductions are estimated to be $1,500,000 over the four-year period and represent the haul truck capacity increases, No. 5 circuit, mill office expansion and delays in the need to replace mining equipment.

The impact of these capital spending reductions on Net Fixed Assets amount to $180,000 in 1977 and $1,200,000 in 1980.

15101947

03629708

## VII. Summary of Financial Implications ($000)

| | Variance Fav/(Unfav) vs Base Case | | | |
| | 1977 | | 1980 | |
| | Amount | % | Amount | % |
|---|---|---|---|---|
| A.) **Gross Sales** (Impact in 1977) | | | | |
| BPD (Attic $3,638, Glass Fiber $623; Poly $544; and Ag Products $370) | $(5,175) | (10.4)% | $ (9,365) | (13.0)% |
| Ag (Pool Cushion $270, Mixes $129, T.L. - $93, Ag Bag/Bulk $108) | (751) | (7.2) | (1,760) | (11.6) |
| Ore | (563) | (9.0) | (1,355) | (14.9) |
| TOTAL | $(6,489) | (9.8)% | $(12,480) | (13.0)% |
| B.) **Gross Margin on Net** | $(2,466) | (9.2)% | $ (4,681) | (11.6)% |
| C.) **Factory Overhead** (primarily Libby) | 187 | 2.0 | 503 | 3.7 |
| D.) **Operating Expense** | 1,129 | 8.5 | 1,731 | 9.5 |
| E.) **Pre-Tax Profit** | $(1,150) | (29.1)% | $ (2,447) | (28.7)% |
| F.) **Taxes** | | | | |
| Before ITC & Depletion | 569 | 28.3 | 1,261 | 28.9 |
| ITC | (30) | (8.1) | (30) | (10.5) |
| Depletion After-Tax | 73 | 30.0 | (399) | (40.8) |
| TOTAL TAXES | $ 612 | 43.7% | $ 832 | 26.8% |
| G.) **Net Income After-Tax** | $ (538) | (21.0)% | $(1,615) | (30.1)% |
| H.) **TCE** | | | | |
| Net Working Capital due to Lower Sales | $ 774 | | $ 1,687 | |
| Net Fixed Assets | 180 | | 1,200 | |
| TOTAL | $ 954 | 3.1% | $ 2,887 | 7.8% |
| I.) **% Return on TCE** | (1.5)% Pts. | | (3.4)% Pts. | |

A more detailed comparison is shown following the Case discussions in Exhibits 1-3.

03629709

CASE C - Withdrawal of Consumer Products and Most Unfavorable Outside Regulatory Action.

I. Overall Case Assumptions

A. Fiber Counts to 0.1 f/ml (OSHA) by 12/80 and MESA to 1.0 f/ml by 12/80.

B. Withdraw consumer products, and temporarily lose MK before substitution by 7/78 in California.

C. Lose Canada

D. Close Libby and reformulate to husband ore or go to regional "Zonolite as is" strategy around Enoree orh only.

After withdrawal of consumer products, the loss of Canada, and high capital impact needed to meet more stringent OSHA and MESA standards ($10 million) resulting in closings of many expanding plants, the resultant low volumes of Libby ore would no longer make continued operation there feasible. Therefore, by 1980, CASE C resulted in an Enoree only situation. This situation was analyzed under (1) a national strategy and (2) a regional strategy and is presented in the following pages.

-12-

03629710

## CASE C - National Strategy

### I. General Scenario

Zonolite would be limited to vermiculite ore shipped from Enoree and would be capacitated at 130,000 tons. Thus the scarce resources were utilized on producers and plants contributing the most favorable Zonolite margin per ton of concentrate. In addition, it was assumed that certain products would be reformulated with vermiculite substituted or extended (e.g., high yield ZIC) to stretch the limited ore capacity.

### II. Market & Product Impacts

#### A. Reformulation

Concrete Aggregate – Reformulated to contain a high yield ZIC. This reformulation would cover the 1980 Base Case Sales volume with 50% of the ore required. Sales price and margin (except impact of ore freight and cost from Enoree) were left unchanged from Base Case. This may be a somewhat conservative assumption since it implies that a high yield additive would replace vermiculite and cost as much as $0.70 per 4 cu.ft. bag in 1980 dollars.

MONOKOTE – MONOKOTE is dramatically impacted in this case due to the withdrawal from California and the subsequent ripple effect of this into the other regions. In California, MONOKOTE volume would fall by 83% in 1978 but then double by 1980 so that the non-vermiculite product amounted to only 31% of 1980 Base Case volume in California. The Texas, Midwest, Southern, and Florida regions would all be impacted by the California withdrawal in 1978 by about a 30% reduction from Base Case. Growth from there to 1980 would only be about 5% with a substitute product so that in these regions, 1980 volume would be 2/3 of 1980 Base Case. Eastern Region volume impact would be off by 43% from Base Case volumes in 1980. In all Regions, the substitute product was assumed to retain the same price and margins as a vermiculite product.

Soil Mixes – All consumer soil mixes and Professional soil mixes would be reformulated without vermiculite and result in a 10% volume loss versus Base Case in 1980 as a result of the reformulation. Prices and margins would be the same as Base Case. This also may be conservative since it implies that a bark ash substitute for example, would be just as costly as vermiculite. However, there would be long-term supply questions associated with bark ash.

#### B. Withdrawal

Attic, (and its impact in Poly sales), Terra-lite Consumer, Pool Cushion, Santoquin would all be withdrawn.

#### C. Mine Capacity Constraint Impact on Demand

Masonry Fill demand would still be met nationally from plants remaining open (see Section IV). However, ore capacity constraints necessitated using price as a mechanism to reduce demand and thus, the overall gross sales impact on Masonry Fill. (Masonry Fill was chosen due to its price sensitivity and relatively low margin contribution per ton of concentrate). Overall, Masonry Fill sales are off $1,270,000 (14.4%) versus 1980 Base Case, resulting from 4% higher prices ($0.10 per bag) and overall volume being down by 18%. This volume decline was 30% at areas where plants were closed and 6% at open plants due to the higher prices.

15101950

03629711

Ag Bag & Bulk demand would be met at Base Case volumes with the exception of the Pacific and Texas Regions where it would be discontinued.

### D. Outside Ore Sales

No outside ore sales would be continued. The Enoree mine capacity would be applied totally to internal product usage. In addition, the Canadian business is assumed closed in this case.

## III. Impact on Mines

All Zonolite vermiculite needs would be supplied from Enoree. Enoree's DMC per ton, Overhead, and Capital Spending levels were all kept at Base Case for 1980. However, the ore freight impact and favorable DMC of S.C. vs. Libby were reflected in the Zonolite margins.

S. C. volume was assumed to be capacitated in 1980 at 130,000 tons. A subset of CASE C (national strategy) would have been to identify the capital cost and benefits of a S.C. mill expansion, but this was not investigated in this study.

Total 1980 Base Case mine volume shipped to expanding plants would have been 242,000 tons. This amount was reduced to 130,000 tons as follows:

| | |
|---|---:|
| Total 1980 Base Case mine Shipments to Expanding Plants | 242,000 tons |
| Withdrawal of Attic | (19,900) |
| "  of Consumer T.L. and mixes & Other Ag. | (7,300) |
| Impact of High Yield ZIC | (40,300) |
| Substitution for MK & Soil Mixes | (36,600) |
| Ag Bag & Bulk from Texas & Pacific | (6,700) |
| Masonry Fill Lost to Closed Plants | (7,000) |
| Yield Impact | 5,800 |
| | 130,000 |

## IV. Expanding & Polystyrene Plant Impact

The following plants were assumed closed based on their relative margin contribution, overhead levels, and the estimated capital requirement to comply with a 0.1 f/ml OSHA restriction by 1980.

15101951

03629712

|  | Capital Required to get to 0.1 f/ml |
|---|---|
| Tampa | $   83.0 |
| Dearborn | 440.0 |
| Muirkirk | 232.0 |
| Minneapolis | 220.0 |
| Denver | 208.0 |
| Omaha | 459.0 |
| L. A. | 328.0 |
| Newark | 293.0 |
| San Antonio | 275.0 |
|  | $2,538.0 |

Demand at the closed plants was assumed to be met from the nearest operating plant for vermiculite and non-vermiculite substitute products. This inter-plant transfer freight penalty amounts to $800,000 in 1980, or, $0.44/bag (ranging from $.20/bag to serve Tampa to $0.83/bag to serve Denver) on a total of 1.8 million bags. This number is reflected in sales deductions and accounts for the higher level (5.5% vs 4.1% in other cases) of deductions as a % of Net Sales.

Also note that due to the minimal impact on Poly sales (only the dealer effect on Plainboard, approximately 9% of total Poly Sales) no poly plants were assumed to be closed.

V.  Operating Expenses

Selling Expenses

The same cut-back in selling expenses as used in CASE A was used to reflect the withdrawal from consumer products. Although CASE C (national strategy) is $11,025,000 lower in sales versus CASE A, no additional selling expense reductions were assumed since: a) $3.7 million of the reduction is due to Outside Ore Sales and Ag Bag & Bulk which have no directly identifiable selling expense, b) $7.6 million of the loss is due to MONOKOTE and the Base Case selling expense levels have been assumed to reflect the attempt to recapture market position lost due to the California MK withdrawal and substitution.

03629713

G&A

G&A reductions versus Base Case reflects the elimination of Libby in 1980 ($1,256,000) and an additional unidentified $300,000 reduction due to reduced number of plants and sales.

R&D

R&D reductions versus Base Case reflect the elimination of Libby in 1980 ($243,000). Although sales are less and major R&D effort to find vermiculite substitutes occurred before 1980, other R&D expense is left at Base Case levels to reflect: a) ongoing new product development, b) continued R&D expense to monitor substitutions, and c) the fact that most sales decreases are not in areas where heavy R&D expenditures have occurred.

VI. Capital Spending

Libby Capital Spending, of course, has been eliminated due to its closing. Enoree & Poly plant capital spending levels were left at Base Case amounts. The major capital spending impact versus the Base Case occur at the expanding plants.

|  | Fav/(Unfav) | |
|---|---|---|
|  | Total Spending vs. Base Case over 1977-1980 ($000) | 1980 Net Book Value Impact ($000) |
| Capital to achieve 0.1 f/ml at Retained Expanding Plants | $(4,636) | $(3,969) |
| Eliminated Capital Spending at Closed Plants | 2,100 | 1,858 |
| Delays beyond 1980 in Exp. Plant Expansion | 700 | 530 |
| Net Book Value of Closed Plants | — | 350 |
| Total Exp. Plants | $(1,836) | $(1,231) |
| Libby Capital Spending | 6,856 | 10,805 |
| Total Zonolite | $ 5,020 | $ 9,574 |

In addition to the above, closing Tampa and eliminating the national ore hopper car fleet servicing Libby, capitalized leases totalling $933,000 (after-tax cost of interest $39,000) would be discontinued.

15101953

03629714

VII. Summary of Financial Implications ($000)

| | | Variance Fav/(Unfav) vs: Base Case 1980 | |
|---|---|---|---|
| | | Amount | % |
| A.) | Gross Sales (Impact in 1980) | | |
| | BPD (Attic $5,280; MK $7,607; Poly $1,366; Glass Fiber $1,985; MF $1,270, Ag Prod- $1,658) | $(19,166) | (26.7)% |
| | Ag (Consumer $3,221) | (2,380) | (15.7) |
| | Ore Sales | (9,119) | (100.0) |
| | TOTAL | $(30,665) | (31.9)% |
| B.) | Deductions | | |
| | Due to volume | $    802 | 20.6% |
| | Transfer Freight | (800) | — |
| | | $   - 2 | — % |
| C.) | Gross Margin on Net | $(14,484) | (36.0)% |
| D.) | Factory Overhead (Libby $4,590; closed plants ($1,149) | 6,139 | 45.2 |
| E.) | Operating Expenses (BPD/Ag Selling $1,900; Libby G&A $1,256,000; Div. OH $300) | 3,699 | 20.4 |
| F.) | Other Expense | 39 | 100.0 |
| G.) | Pre-Tax Profit | $ (4,607) | (54.1)% |
| H.) | Taxes | | |
| | Before ITC & Depletion | 2,373 | 54.4 |
| | ITC | (112) | (39.3) |
| | Depletion | (477) | (48.7) |
| | TOTAL TAXES | 1,784 | 57.5 |
| I.) | Net Income After-Tax | $ (2,823) | (52.5)% |
| J.) | TCE | | |
| | Working Capital Due to Lower Sales | $  4,181 | |
| | Net Fixed Assets (Section VI) | 10,507 | |
| | Deferred Taxes | (1,087) | |
| | Other Assets | 82 | |
| | | $ 13,683 | 36.8% |
| K.) | % Return on TCE | (3.6)% Pts. | |

15101956·

CASE C − Regional Strategy                                    03629715

I.  General Scenario

Zonolite would be limited to vermiculite ore shipped from Enoree and would be capacitated at 130,000 tons. The limited vermiculite resource was utilized by applying it to existing vermiculite products (no re-formulations or extenders) and utilizing the highest contribution plants and minimizing the capital expenditures required to meet a 0.1 f/ml OSHA standard. The net effect was to localize the Zonolite business to the most profitable expanding plants located closest to the Enoree ore source. Therefore, the regional strategy included the entire Southern and Florida regions and the larger plants extending into the East and Midwest Regions. NO Inventory Transfers were assumed. If a plant was closed, then no attempt was made to ship into the vacated market from nearby plants with the exception of Professional soil mixes, which continued to serve the areas now met from TR, West Chicago, and Jacksonville.

II.  Market & Product Impacts

A.  Consumer Product Withdrawal

Attic (and its impact on Poly & Glass Fiber), Terra-lite consumer, Consumer soil mixes, Pool Cushion, and Santoquin would all be withdrawn. Unlike Case C (National Strategy), consumer soil mixes were not reformulated. Horticultural Perlite to Consumer market increase vs. Base Case by 30% in 1980 to offset loss of vermiculite business.

B.  Impact of Plant Closing on Sales

BPD − Base Case volume and prices were used at all plants remaining open. Demand from closed plants was not filled. Therefore, remaining BPD sales amounted to Base Case levels in the Southern & Florida Regions plus the portion in Midwest and Eastern Regions retained with the remaining plants. Total sales in Texas and Pacific were taken out and all Attic and Glass Fiber sales for BPD, of course, were withdrawn in all regions. The impact of plant closings by product are as follows:

| BPD Vermiculite (ex. Attic) | 1980 ($000) | | % Variance due to plant closings Fav/(Unfav) |
| --- | --- | --- | --- |
| | Base Case | Case C (Reg) | |
| Concrete Aggregate | $13,739 | $8,477 | (38.3)% |
| Masonry Fill | 8,790 | 5,109 | (41.9) |
| MONOKOTE (No re-formulation) | 16,233 | 6,820 | (42.0) |
| Misc. Exp. | 2,410 | 1,023 | (57.6) |
| Dealer Conc. | 553 | 279 | (49.5) |
| Plaster Agg. | 342 | 174 | (49.1) |
| Mine Sealant (all met from New Castle) | 1,589 | 1,589 | − |
| Other BPD Vermiculite | 83 | − | − |
| Ag Products (Texas & Pacific Region Plants closed) | 2,894 | − | (100.0) |
| BPD Vermiculite | $46,633 | $23,554 | (49.5)% |

03629716

BPD Poly

Insulperm sales were retained in the Southern and Florida Regions and reduced in relation to Concrete Aggregate losses in the East and Midwest. No sales in Pacific and Texas. 1980 Reduction of $1,323,000 or 30.2%.

Billets & Other Poly sales were retained in the Southern and Florida Regions and reduced in relation to plant closings in other regions. No sales in Pacific and Texas.

Plainboard sales were reduced due to impact of Attic withdrawal and plant closings in East and Midwest. Sales retained in total in Florida and Southern Regions. Total sales eliminated in Texas and Pacific Regions. 1980 Reduction - $2,590,000 or 33.2%.

Custom molded - All Pacific Region sales eliminated in amount of $750,000.

Ag/Hort

Terra-Lite - Consumer Products withdrawn in total. Professional Terra-lite retained in South and Florida and reduced in relation to plant closings in East and Midwest. 1980 Reduction - $1,785,000 or 45.1%. $1,130,000 of total reduction was due to elimination of consumer products, $655,000 of reduction due to plant closings or 23.2% of Base Case Professional sales.

Soil Mixes - Consumer soil mixes withdrawn in total without substitution and resulted in the only reduction in Soil Mixes of $1,454,000. Professional soil mixes were retained without reformulation at Base Case volumes and would continue to be made from West Chicago, Jacksonville, TR, and New Castle (mixing capacity expansion done in 1979). Therefore, Professional mixes would continue to be sold in all areas as in Base Case even though some areas would no longer have expanding plants and would require a greater degree of direct shipments to customers. Because of this increase in freight cost to customers, no increase in Professional soil mix demand over the Base Case due to decrease in Professional Terra-Lite has been reflected as was done in CASE A.

CPBA & Ag Bag & Bulk were reduced as a result of plant closings. These impacts are reduction of $576,000 (27.8%) in Ag Bag & Bulk and $171,000 (21.4%) in CPBA versus the Base Case.

III.  Impact on Mines

All Zonolite vermiculite needs would be supplied from Enoree. Enoree DMC per ton, overhead, and Capital Spending levels were all kept at Base Case for 1980. However, the ore freight impact and favorable DMC of S.C. vs. Libby, were reflected in the Zonolite margins.

1510106

03629717

S.C. volume was assumed to be capacitated in 1980 at 130,000 tons. A sub-set of CASE C (regional strategy) would have been to identify the capital cost and benefits of a S.C. mill expansion, but this was not investigated in this study.

Total 1980 Base Case mine volume shipped to expanding plants would have been 242,000 tons. This amount was reduced to 130,000 tons as follows:

| | |
|---|---:|
| Total 1980 Base Case Mine Shipments to Expanding Plants | 242,000 tons |
| Withdrawal of Attic | (19,900) |
| " of Consumer T.L. and mixes & Other Ag. | (7,300) |
| " from Pacific Region | (38,800) |
| " from Texas Region | (13,800) |
| Plant Closings in Eastern & Midwest Region | (32,200) |
| | 130,000 |

## IV. Expanding & Polystyrene Plant Impact

The following 19 plants were assumed closed under a regional Zonolite strategy:

| | Capital Required to meet 0.1 f/ml ($000) |
|---|---:|
| Dearborn | $440.0 |
| Weedsport | 125.0 |
| Easthampton | 232.0 |
| Muirkirk | 232.0 |
| Minneapolis | 220.0 |
| Denver | 208.0 |
| Omaha | 459.0 |
| Milwaukee | 158.0 |
| L. A. | 328.0 |
| Newark | 293.0 |
| Portland | 315.0 |
| Phoenix | 313.0 |
| Santa Ana | 213.0 |
| Oklahoma City | 123.0 |
| San Antonio | 275.0 |
| Dallas | 417.0 |
| Houston Poly | − |
| Auburn Poly | − |
| South Gate Poly | − |
| | $4,351.0 |

Elimination of the above plants leaves all expanding & Poly plants in the Southern and Florida Regions along with Trenton, High Point, and New Castle from the East and St. Louis, Wilder, and West Chicago in the Midwest. Also remaining would be the New Castle and Milwaukee Poly plants. The plants remaining total 18 (14 vermiculite and 4 Polystyrene).

03629718

## V.  Operating Expenses

### Selling Expenses

Selling expenses reflect regional selling expenses at CASE C sales levels (10.5% of BPD net sales and 13.0% of Ag/Hort and 11.9% overall).  In addition, divisional selling expenses totalling $1.3 million (versus Base Case of $2.4 million) have been added to reflect continuing divisional marketing and sales management under the modified regional strategy.  This number was not calculated as a percentage of sales but was derived based on input from BPD sales and marketing management.

### G&A

G&A expense includes Enoree at Base Case levels ($425,000) and $1,802,000 reflecting 4.2% of net sales, consistent with Zonolite's Base Case G&A expenses as a percentage of net sales (excluding Libby expenses of $1,256,000).

### R&D

R&D expenses include Enoree and LOU at Base Case levels ($302,000) and $472,000 reflecting 1.1% of Case C net sales, a percentage relationship consistent with Base Case R&D levels relative to BPD and Ag net sales. -

## VI.  Capital Spending

Capital Spending at Libby, closed expanding and poly plant, and delayed expansion projects at remaining plants were all taken away versus Base Case capital levels.  The offset to there decreases includes capital spending to meet a 0.1 f/ml OSHA standard at remaining plants.  Capital Spending and Net Book Value Impact vs. the Base Case follows:

|  | Fav/(Unfav) | |
|---|---|---|
|  | Total Spending vs: Base Case over 1977-1980 | 1980 Net Book Value Impact |
| Capital to Achieve 0.1 f/ml at Retained Expanding Plants | $(3,244) | $(2,617) |
| Eliminated Capital Spending at Closed Plants | 4,481 | 3,254 |
| Delays beyond 1980 in Expansion Projects | 434 | 202 |
| Net Book Value of Closed Plants | — | 1,512 |
| Libby Capital Spending | 6,856 | 10,805 |
| Total Zonolite | $8,527 | $13,156 |

In addition, closing Libby allows elimination of capitalized leases on national ore hopper car fleet and total value of $683,000 ($28,000 after-tax cost of interest).

03629719

VII. Summary of Financial Implications ($000)

| | Variance Fav/(Unfav) vs: Base Case | |
| | 1980 | |
| A.) Gross Sales (Impact in 1980) | Amount | % |
|---|---|---|
| BPD (Consumer withdrawals — $7,870; Plant Closings — $29,480) | $(37,350) | (52.0)% |
| Ag (Consumer — $3,321; closings $1,214) | (4,535) | (29.9) |
| Ore | (9,119) | (100.0) |
| | $(51,004) | (53.0)% |
| B.) Gross Margin on Net | (21,386) | (53.1) |
| C.) Factory Overhead (Libby $4,590 and Plants — $2,651) | 7,841 | 57.7 |
| D.) Operating Expenses (Selling — $5,426; G&A 3,004 & R&D $671) | 9,101 | 50.1 |
| E.) Other Expense | 39 | 100.0 |
| F.) Pre-Tax Profit | (4,405) | (51.8)% |
| G.) Taxes | | |
| Before ITC & Depletion | $ 2,269 | 52.0% |
| ITC | (183) | (64.2) |
| Depletion | (477) | (48.7) |
| | $ 1,609 | 51.9% |
| H.) Net Income After Tax | $(2,796) | (52.0)% |
| I.) TCE | | |
| Working Capital Due to Lower Sales | $ 6,912 | |
| Net Fixed Assets (Section VI) | 13,839 | |
| Deferred Taxes | (800) | |
| Other Assets | 82 | |
| Total | $20,033 | 53.8% |
| J.) % Return on TCE | 0.6 Pts. | |

A more detailed comparison is shown following the Case discussion in Exhibits 1-3.

15101959

## SCHEDULE I

### SUMMARY OF CASE ASSUMPTIONS ON PRODUCTS

03629720

| | CASE A | CASE B | CASE C Regional | CASE C National |
|---|---|---|---|---|
| Attic Insulation | Withdraw | | | |
| Concrete Aggregate | No Impact | → | ↑ | High Yield Conc. |
| Masonry Fill | Label Libby | Treat Libby | Sales Losses due to Plant Closings | Plant Closings |
| MONOKOTE | No Impact | → | | Mkt. Losses & Reformula tions. |
| Misc. Expanded | Label Libby | Treat Libby | | No Impact |
| Dealer Concrete | No Impact | → | | No Impact |
| Plaster Aggregate | Label Libby | Treat Libby | | No Impact |
| Terra-Lite - BPD | Drop Cons. Label Libby | Label Con- sumer | | Drop Con- sumer. |
| Soil Mixes - BPD | Drop Cons. | Label Con- sumer | ↓ | Drop Con- sumer |
| Pool Cushion | Withdraw | | | → |
| Ag Bag/Bulk - BPD | Label Libby | Label Libby | Plant Closings. | Plant Closi |
| Mine Sealant | No Impact | | | → |
| Other BPD Vermiculite | No Impact | | | → |
| Insulperm | No Impact | → | Parallels Concrete | No Impact |
| Plainboard | Impact of Attic Loss | | ↑ | → |
| Billets | No Impact | → | Sales Losses due to Plant Closings Parallels Concrete | No Impact |
| Custom | No Impact | | | No Impact |
| Other Poly | No Impact | | | No Impact |
| Nails | No Impact | → | | No Impact |
| All Other BPD | Drop Glass | | | → |
| Terra-lite | Drop Con- sumer; Label Prof. | Label Consumer | Drop Consumer | Drop Con- sumer. |
| Soil Mixes | Drop Con- sumer; Inc. Prof. | Label Consumer | Drop Consumer | Drop Consum & Reformula |
| CPBA | Label | Label | Plant Closings | Label |
| Pool Cushion | Withdraw | → | | |
| Ag Bag & Bulk | Label Libby | Label Libby | Plant Closings | |
| Verxite | No Impact | | | → |
| Santoquin | Withdraw | | | → |
| Other as Verm. | Drop Cons. | No Impact | Drop Cons. | → |
| Perlite (Hort.) | Increase | Inc. Cons. | Inc. Consumer | No Impact |
| Ore to O.M. Scott | Decrease | Decrease | Discontinued | → |
| " Gypsum Cos. | Decrease | Decrease | Discontinued | → |
| " Canada | Discontinued | Inc. G. S. | Discontinued | → |
| " Other Outsiders | Decrease | Decrease | Discontinued | → |

15101960

03629721

Schedule 2

15131951

## GROSS SALES COMPARISON
### ($000)

| | 1977 | | | | 1980 | | CASE C | |
|---|---|---|---|---|---|---|---|---|
| | BASE CASE | CASE A | CASE B | BASE CASE | CASE A | CASE B | NAT. STRAT. | REG. STRAT. |
| Attic Ins. | $13,638 | $— | $— | $15,230 | $13,736 | $13,736 | $13,239 | $8,477 |
| Concrete Agg. | 8,962 | 8,962 | 8,962 | 13,739 | 8,700 | 8,790 | 7,520 | 5,109 |
| Masonry Fill | 6,374 | 6,318 | 6,374 | 8,790 | 8,700 | 8,790 | 8,828 | 8,820 |
| Monokote | 11,092 | 11,092 | 11,092 | 16,213 | 16,213 | 16,233 | 8,828 | 6,820 |
| Misc. Exp. | 2,004 | 1,810 | 2,004 | 2,410 | 2,384 | 2,410 | 2,410 | 1,023 |
| Dealer Conc. | 476 | 476 | 476 | 553 | 553 | 553 | 553 | 279 |
| Plaster Ag. | 272 | 211 | 272 | 342 | 342 | 342 | 342 | 174 |
| Terralite | 533 | 189 | 508 | 632 | 134 | 540 | 446 | — |
| Soil Mixes | 934 | 660 | 900 | 3,110 | 775 | 1,060 | 790 | — |
| Pool Cushion | 33 | — | — | 40 | — | — | — | — |
| Ag Bag/Built | 916 | 655 | 655 | 1,112 | 560 | 560 | — | — |
| Mine Sealant | 500 | 500 | 500 | 1,589 | 1,589 | 1,589 | 1,589 | 1,589 |
| Other BPD Vermiculite | 63 | 63 | 63 | 63 | 83 | 83 | 83 | 83 |
| Sub-Total BPD Vermiculite | 35,817 | ?,944 | ?1,806 | 51,913 | 44,946 | 45,899 | 35,098 | 23,554 |
| Insulperm | 2,554 | 1,554 | 554 | 4,379 | 4,379 | 4,379 | 4,379 | 3,056 |
| Plainboard | 5,802 | 5,258 | 5,258 | 7,810 | 6,444 | 6,444 | 6,444 | 5,220 |
| Billets | 480 | 480 | 480 | 692 | 692 | 692 | 692 | 116 |
| Custom | 507 | 507 | 507 | 750 | 750 | 750 | 750 | — |
| Other Poly | 943 | 943 | 943 | 1,414 | 1,414 | 1,414 | 1,414 | 744 |
| Sub-Total BPD Poly | 10,285 | 9,742 | 9,742 | 15,045 | 13,679 | 13,679 | 13,679 | 9,136 |
| Nails | 1,198 | 1,198 | 1,198 | 1,793 | 1,793 | 1,793 | 1,793 | 1,260 |
| All Other BPD | 2,330 | 1,210 | 1,210 | 3,145 | 1,160 | 1,160 | 1,160 | 596 |
| Total BPD | 49,631 | 43,594 | 44,456 | 71,896 | 61,578 | 62,531 | 52,730 | 34,546 |
| Terralite | 2,427 | 885 | 2,334 | 3,954 | 890 | 3,391 | 2,824 | 2,169 |
| Soil Mixes | 4,023 | 3,318 | 3,899 | 5,127 | 4,200 | 4,775 | 4,614 | 3,673 |
| C39A | 531 | 425 | 425 | 800 | 660 | 659 | 800 | 629 |
| Pool Cushion | 270 | — | — | 355 | — | — | — | — |
| Ag Bag'& Bulk | 1,485 | 1,339 | 1,339 | 1,933 | 1,484 | 1,484 | 1,284 | 1,357 |
| Versilte | 222 | 222 | 222 | 204 | 284 | 284 | 284 | 284 |
| Santoquin | 50 | — | — | 72 | — | — | — | — |
| Other Ag. Verm. | 57 | 40 | 57 | 380 | 70 | 375 | 70 | 70 |
| Sub-Total Ag. Verm. | 9,064 | 8,229 | 8,276 | 12,905 | 7,580 | 10,968 | 10,525 | 8,182 |
| Perlite | 1,361 | 1,633 | 1,398 | 2,253 | 2,932 | 2,430 | 2,253 | 2,441 |
| All Other Ag. | — | — | — | — | — | — | — | — |
| Total Ag. | 10,425 | 7,852 | 9,674 | 15,158 | 10,520 | 13,398 | 12,278 | 10,623 |
| Ore to O. M. Scott | 1,771 | 874 | 1,061 | 1,708 | 797 | 1,246 | — | — |
| Ore to Gypsum Cos. | 1,193 | 1,133 | 133 | 1,698 | 1,320 | 1,300 | — | — |
| Ore to Canada | 1,835 | — | 966 | 2,892 | — | 2,047 | — | — |
| Ore to other outsiders | 2,051 | 1,459 | 3,637 | 2,821 | 1,914 | 2,141 | — | — |
| Total Ore | 6,260 | 3,776 | 5,697 | 9,119 | 3,541 | 3,764 | — | — |
| Total Zonolite | $65,316 | $54,932 | $59,827 | $96,173 | $75,639 | $83,693 | $65,508 | $75,169 |

LS101962

Schedule 3

03620722

**PROFITABILITY & RETURN ON TCE COMPARISON**

**ZONOLITE**

($000)

| | 1977 | | | 1980 | | | | CASE C | |
|---|---|---|---|---|---|---|---|---|---|
| | BASE CASE | CASE A | CASE B | BASE CASE | CASE A | CASE B | | NAT. STRAT. | REG. STRAT. |
| Gross Sales | $66,316 | $54,932 | $59,827 | $96,172 | $75,639 | $83,693 | | $65,508 | $45,169 |
| Sales Deductions | 2,821 | 2,230 | 2,524 | 3,892 | 3,125 | 3,461 | | 3,890 | 2,258 |
| Net Sales | 63,495 | 52,702 | 57,303 | 92,201 | 72,514 | 80,232 | | 61,618 | 42,911 |
| Direct Mfg. Cost | 36,646 | 30,493 | 32,920 | 52,012 | 41,143 | 44,644 | | 35,833 | 24,028 |
| Gross Margin | 26,849 | 22,209 | 24,383 | 40,269 | 31,366 | 35,588 | | 25,785 | 18,883 |
| G.M. on Gross % | 44.7% | 44.5% | 45.0% | 45.8% | 45.6% | 46.7% | | 45.3% | 46.8% |
| G.M. on Net % | 42.3% | 42.1% | 42.6% | 43.6% | 43.3% | 44.4% | | 41.9% | 44.0% |
| Factory O.H. | 9,397 | 8,772 | 9,210 | 13,581 | 11,300 | 13,078 | | 7,442 | 5,740 |
| Gross Profit | 17,452 | 13,437 | 15,173 | 26,608 | 20,066 | 22,510 | | 18,343 | 13,143 |
| Selling | 8,419 | 7,341 | 7,379 | 11,500 | 9,600 | 10,100 | | 9,600 | 6,074 |
| G & A | 4,101 | 3,951 | 4,101 | 5,231 | 4,724 | 5,000 | | 3,675 | 2,227 |
| R & D | 749 | 639 | 660 | 1,445 | 1,239 | 1,345 | | 1,202 | 774 |
| Operating Expense | 13,269 | 11,933 | 12,140 | 18,176 | 15,663 | 16,445 | | 14,477 | 9,075 |
| Operating Profit | 4,183 | 1,499 | 3,033 | 8,512 | 4,403 | 6,065 | | 3,866 | 4,068 |
| Other Inc./(Exp.) | (227) | (221) | (227) | (39) | (39) | (39) | | - | - |
| Pre-Tax Profit | 3,956 | 1,277 | 2,806 | 8,473 | 4,364 | 6,026 | | 3,866 | 4,068 |
| Taxes on Income (Before ITC & Depletion) | 2,014 | 651 | 1,445 | 4,364 | 2,247 | 3,103 | | 1,991 | 2,095 |
| ITC | 371 | 344 | 341 | 285 | 145 | 255 | | 173 | 102 |
| Depletion Credits | 243 | 325 | 316 | 979 | 517 | 580 | | 502 | 502 |
| Total Taxes | 1,400 | (18) | 788 | 3,100 | 1,585 | 2,268 | | 1,316 | 1,491 |
| Profit After Tax | $ 2,556 | $ 1,290 | $ 2,018 | $ 5,373 | $ 2,779 | $ 3,758 | | $ 2,550 | $ 2,577 |
| Total Capital Employed | $30,891 | $28,872 | $29,937 | $37,215 | $29,178 | $34,320 | | $23,532 | $17,382 |
| % Return on TCE | 8.5% | 4.7% | 7.0% | 14.6% | 9.8% | 11.2% | | 11.0% | 15.2% |

15101963

APPENDIX IV

RESPIRABLE TREMOLITE FIBER EXPOSURE FOR
ZONOLITE FINISHED PRODUCTS IN INTENDED USES

03629723

| Product | Grade of Ore Used | 8 Hour TWA Exposure (f/ml) Using S.C. Ore | 8 Hour TWA Exposure (f/ml) Using Libby Ore | Maximum 15 Minute Exposure (f/ml) Using S.C. Ore | Maximum 15 Minute Exposure (f/ml) Using Libby Ore |
|---|---|---|---|---|---|
| **STANDARDS** | | | | | |
| Present OSHA | | 2.0 | 2.0 | 10.0 | 10.0 |
| Proposed OSHA | | 0.5 | 0.5 | 5.0 | 5.0 |
| Proposed NIOSH | | 0.1 | 0.1 | 0.5 | 0.5 |
| **PURE VERMICULITE** | | | | | |
| ATTIC INSULATION | #1 | - | 0.58 | - | 4.28 |
| | #2 | - | N/A  1.32ᶠ | - | N/A  5.28 ᵒ |
| MASONRY INSULATION | #3 | 0.03 | 0.07 | 0.21 | 3.11 |
| | #3 | 0.02 | 0.19 | 0.61 | 3.65 |
| | | | 0.13 | | 9.42 |
| ZIC - CHARGE3 MAN | #4 | - | 0.55 | - | 1.14 |
| | #4/5 | 0.02 | 0.45 | 0.14 | 1.66 |
| | | 0.02 | - | 0.11 | - |
| **HORTICULTURAL VERMICULITE** | | | | | |
| Professional Use | #2 | - | 1.06 | - | 1.62 |
| | #3 | 0.07 | N/A  1.44ᶠ | 0.16 | N/A  1.43ᶠ |
| Consumer Use | #3 | <0.05 | <0.035 | <0.29 | <0.14 |
| | #2? | | .69 | | .14 |
| **MIXED PRODUCTS** | | | | | |
| MK 4 - NOZZLE | #3 | N/A | - | N/A | - |
| MK 5 - NOZZLE | #3 | ≤0.10 | ≤0.18 | ≤0.25 | ≤0.29 |
| | #3 | | ≤0.31 | | ≤0.52 |
| REDI-EARTH - Professional Use | #3 | 0.02 | 0.04 | 0.07 | 0.07 |
| Consumer Use | #3 | 0.02 | <0.04 | 0.29 | <0.14 |

CSW/CDR
5-12-77

# Fairleigh Dickinson University

**RUTHERFORD    TEANECK    MADISON**

FLORHAM-MADISON CAMPUS
285 Madison Avenue
Madison, New Jersey
Area Code 201
377-4700

31 March 1977

Dr. Heyman C. Duecker
Vice President-Research
Construction Products Division
W.R. Grace & Company
62 Whittemore Avenue
Cambridge, Mass.   02140

03629724

Dear Dr. Duecker:

This responds to your letter of the 18th in which you ask for comment on a NIOSH report of December 1976 that recommends a revision of the asbestos standard to 0.1 fiber > 5μ per cc.

As I read this document, it does not present evidence for hazard from either a 5 fiber or 2 fiber per cc standard. Essentially, it argues that risks from low level exposures to asbestos are indicated by reports of mesotheliomas associated with brief or with non-occupational exposures, such as "household" exposures of persons living in the houses of asbestos workers, but levels of such exposures are not stated. That "household" exposures have been substantial was indicated by Dr. Selikoff at a Conference on Environmental Cancer that I attended in Washington last week.

The NIOSH report mentions mesotheliomas in individuals with history of asbestos exposure for only one day. Such cases could, of course, be unrelated to asbestos, as indicated in the NIOSH statement (Page III-7) that approximately 15 per cent of mesotheliomas are not known to be related to exposure to asbestos.

An earlier NIOSH report (Gillam et al) has been cited as showing tumor response to low levels of asbestos. In referring to this, the 1976 NIOSH report (III-10) states: "In a study of a group of miners exposed to amphibole fibers in the cummingtonite-grunerite ore series, Gillam et al (1976) have demonstrated mortality from malignant respiratory disease three times that of the general population."

Referring to the same study, a 1975 OSHA report said: "Gillam et al (1975), studying the mortality and reviewing the chest x-rays of 439 underground metal miners exposed to an asbestiform mineral, found three times the risk of malignant respiratory disease than expected. The fiber concentrations averaged 0.24 fibers/ml." (Federal Register, Oct. 9, 1975 pages 47652-47665. Refer to page 47656).

03629725

The claim by Gillam et al for an increased incidence of cancer in the cited miners has not been born out by a more extensive study by McDonald et al (copy attached).

You no doubt have a copy of the above cited 1975 OSHA document. On an enclosed copy of it, I have marked paragraphs that attempt to quantitate exposures to asbestos in relation to occurrence of asbestosis and/or cancer. It should be noted that the level of exposure in the cited British factory in the period 1933-1968 was an estimated level and that no evidence is offered that a 2 fiber level had actually been achieved in the period after 1968.

The 1976 NIOSH report (II-7, II-Table 6) cites a study by Wagner on inhalation exposures of rats to various preparations of asbestos and notes that tumors were found after exposures of only one day. A copy of Wagner's paper is attached. It states that the one-day exposure was 7 hours exposure to dusts containing 9.7 to 14.7 mg per cubic meter of the tested preparations of asbestos.

In March 1976, NIEHS held a 3-day Conference on Extrapolation of Data from Animals to Man. A report on that conference by its chairman is enclosed. I attended that conference and enclose copies of 3 papers that seem of particular pertinence.

The first is a paper by Rall (Director, NIEHS) which addresses the question of threshold levels for carcinogens.

The second is a paper by Enterline and Henderson "A Model for Extrapolating to Low Levels of Asbestos Exposure."

The third is by Hardin Jones. He brings out the point that thresholds for carcinogens should be viewed not only in terms of yield of tumors but also latent period, i.e. that safe levels can be achieved by considering exposures with latent periods longer than the life span.

I understand that CONSAD Research Corp., contractor for inflationary impact study on proposed revision to asbestos standard, is also looking at technical feasibility and economic implications of a 0.1 fiber per cc limit.

Trusting that these remarks may be of interest,

Very sincerely,

William E. Smith, M.D.
Director
Health Research Institute

WES/elc

Enclosures

See addendum (page 3)

15101965

Addendum

03629726

. The enclosed papers from the NIEHS Conference on
Extrapolation of Data from Animals to Man are offered
merely to provide detail on some current thinking on
that subject.

Perhaps a "bottom-line" attitude that seems to be
developing in the regulatory agencies was expressed last
week by Eula'Bingham at the conference I covered in
Washington. Dr. Bingham, the new Asst. Secretary of Labor
for Occupational Safety and Health, said, according to my
notes, "We are ignorant as to whether there is a safe level
for carcinogens. The lowest feasible level seems to be the
prudent path."

On this theme, the NIOSH document that you sent me
contains a statement on page VI-2 that the asbestos standard
"should be set at the lowest level detectable by available
analytical techniques, an approach consistent with NIOSH's
most recent recommendations for other carcinogens."

This approach, or enactment of "zero" levels for
carcinogens, would, of course, mean that investment of
time and money to achieve any particular level would be
precarious, since improvements in sensitivity of analytical
techniques could unpredictably change the picture.

Enclosed is an announcement of a seminar in Washington
on 12-13 April on Federal Regulation of Environmental
Carcinogens. The list of speakers may suggest someone that
you could contact for comment or advice. Paul Kotin from
Johns-Manville is scheduled to give the lead-off address.

Would it be agreeable for me to send a copy of this
letter to Dr. Allan Harvey at R.T. Vanderbilt Co. ?

15.10.1972

TABLE 3 - TREMOLITE LEVELS IN BUILDING PRODUCTS CENTERS

## SOUTH CAROLINA

| Product (Use) | | Product Assay % | Fiber Count Date - Location Min. / Max. / TWA |
|---|---|---|---|
| PK 4 (<3) | Mixer, Nozzle, Clean-up | <0.05 % | TO BE SCHEDULED |
| PK 4 (<3) | Mixer, Nozzle, Clean-up | <0.08 | 3/2/77 - Montgomery: Mixer <0.07 / <0.07 / <0.058; Nozzle <0.05 / <0.25 / <0.132 |
| PK 5 (13) | Mixer, Nozzle, Clean-up | | 3/3/77 - Columbus |
| Masonry Fill (<3) | | 0.05 | 0.10 / 0.21 / 0.017 |
| Masonry Fill (<4) | | 2.55 | 3/16/77 - W. Palm Beach: <0.13 / 0.61 / 0.038 |
| ZIC (<4) | Charger, Mixer, Deck | 0.48 | 3/16/77: Charger <0.03 / 0.14 / 0.030; Mixer <0.04 / 0.06 / 0.047; Deck <0.06 / 0.12 / 0.061 |
| ZIC (4/5 blend) | Charger, Mixer, Deck | 2.63 | 3/2/77 - Montgomery: Charger <0.05 / 0.11 / 0.017 |
| ZIC (<5) | Charger, Mixer, Deck | | |
| 2500 (<5) | | | |
| Mine Sealant (<5) | | | |

## LIBBY

| Product Assay % | Fiber Count Date - Location Min. / Max. / TWA |
|---|---|
| <0.10 % | 3/3/77 - Dallas: <0.093 / <0.285 / <0.116; <0.190 / <0.285 / <0.136 |
| <0.11 | 3/11/77 - Burbank: <0.19 / 0.13 / 0.019; 0.16 / 0.38 / 0.196 |
| | 3/9/77 - San Diego: <0.23 / <0.38 / <0.249; 0.29 / 0.52 / <0.311 |
| 0.25 | 3/10/77 - Oklahoma City: <0.19 / 1.11 / 0.071 |
| 0.01 | TO BE SCHEDULED |
| 0.34 | TO BE SCHEDULED |
| | 3/5/77 - Oklahoma City: 0.12 / 1.14 / 0.546; <0.09 / 0.31 / 0.085 |
| | TO BE SCHEDULED |
| <0.03 | TO BE SCHEDULED |

## Fiber Count — Date/Location — Min. / Max. / Frequent

| | Min. / Max. / Frequent |
|---|---|
| 3/11/77 - Fremont | <0.15 / 0.12 / 0.031; <0.16 / <0.30 / <0.018; <0.19 / 2.13 / 0.150 |
| 1/26/77 - Rest-Instlr | <0.05 / 0.19 / 0.065; 0.05 / 0.21 / 0.018; 0.03 / 0.024 |

03629732

= Samples assayed of products actually used on jobsite.
= New filter count technique used to eliminate gypsum fibers.

15101973

TABLE II - TREMOLITE LEVELS IN HORTICULTURAL PRODUCTS AND USES

| Product (Qty) | SOUTH Product Assay-2 | SOUTH Prof. Fiber Count Date-Location | Min. | Max. | TWA | SOUTH Consumer Fiber Count Date-Location | Min. | Max. | TWA | LIBBY Product Assay-2 | LIBBY Prof. Fiber Count Date-Location | Min. | Max. | TWA | LIBBY Consumer Fiber Count Date-Location | Min. | Max. | TWA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hort. Verm. (#2) | | 3/11/77 - Cambridge | | 0.16 | 0.070 | 3/11/77 & 3/16/77-Cambr. | <0.14 | <0.29 | <0.05 | 0.037[^1] | 3/11/77 - Cambridge | 0.61 | 1.62 | 1.063 | 3/10/77 & 3/18/77-Cambridge | | <0.14 | <0.035 |
| Port. Verm. (#3) | 4.32,0.016[^10] <0.16 | 3/12/77 - Cambridge | | 0.07 | 0.018 | 3/11/77 & 3/18/77-Cambr. | <0.14 | 0.25 | 0.015 | 0.039[^1] | TO BE SCHEDULED | | | | 3/10/77 & 3/18/77-Cambridge | <0.14 | <0.14 | <0.035 |
| Redi-Earth (#3) | 0.048* | 3/10/77 - Cambridge | <0.04 | 0.07 | 0.018 | | | | | <0.07* | 3/12/77 - Cambridge | 0.07 | 0.07 | 0.035 | 3/10/77 & 3/18/77-Carbridge | <0.14 | <0.14 | <0.035 |
| Metro-Mix 200 (#3) | 0.398* | | <0.03 | <0.015 | | TO BE SCHEDULED | | | | <0.034* | 3/10/77 - Cambridge | <0.03 | 0.07 | 0.018 | | | | |
| Metro-Mix 300 (#3) | 0.001* | | TO BE SCHEDULED | | | | | | | | | | | | | | | |
| Metro-Mix 350 (#3) | 0.156* | | | | | | | | | | | | | | 03629733 | | | |
| Turf Builder (#4 light) | | | | | | | | | | <0.009* | | | | | | | 0.15 | 0.037 |
| Turf Builder (#4 dark) | | | | | | | | | | <0.009* | | | | | | | 0.17 | 0.043 |
| Verxite (#4 Carrier Grade) | <0.005 | | | | | | | | | | | | | | | | | |

* Samples assayed of products actually used on simulated job site.

** Professional ver—[icu]lite was 4.32%; Consumer v—[icu]lite was ...%.

TABLE III (Continued)          -2-          03629734

D. Masonry Fill (FWE)

From visiting job sites and talking with masonry contractors, 1 hour is generally the maximum time spent pouring MF. Pouring conditions vary from job-to-job and from contractor-to-contractor. A few conditions are as follows:

1. Lay block/brick part way - Pour MF.

2. Lay block and pour MF at scaffold height. Several men pouring so as not to tie up scaffold.

3. Lay all block/wall, fill w/MF and Cap.

The following are jobs sampled:

| Construction | # Bags | # Men | Total Time/ Da. (Min.) | Location |
|---|---|---|---|---|
| Block Core | 28 | 2 | 41 | West Palm Beach |
| Block Core | 33 | 1 | 85 | Columbus, GA. |
| Brick Cavity | 100 | 1 | 34 | Oklahoma City |
| Block Core | 75 | 2 | 71 | Dallas |

$$TwA = \frac{1}{8}$$

FWE:mem
4-4-77

15101974

TABLE IV — GUIDELINES FOR RESPONDING TO REQUESTS REGARDING ASBESTOS IN OUR PRODUCTS

| | SOUTH CAROLINA 03629735 | | LIBBY | |
|---|---|---|---|---|
| | Frequency | Amount | Frequency | Amount |
| MOHOKOTU | Most samples contain no detectable tremolite; Occasionally one may contain tremolite | Negligible | Most samples contain no detectable tremolite; Occasionally one may contain tremolite | Negligible |
| ZIC | Samples contain tremolite; Predominantly non-asbestos form | Small | Samples contain tremolite | Minute" |
| MF | Samples contain tremolite; predominantly non-asbestos form | Small | Samples contain tremolite | Minute ? |
| AF | Samples contain tremolite; Predominantly non-asbestos form | - | Samples contain tremolite | Minute |
| Ind | Samples contain tremolite; Predominantly non-asbestos form | Small | Some samples may contain tremolite | Very small ? |
| TV | Samples contain tremolite; Predominantly non-asbestos form | Small | Samples contain tremolite | Minute |
| RC | Some samples may contain tremolite; Predominantly non-asbestos form | Minute | Most samples contain no detectable tremolite; Occasionally one may contain tremolite | Negligible |
| MW | Some samples may contain tremolite; Predominantly non-asbestos form | Minute | Most samples contain no detectable tremolite; Occasionally one may contain tremolite | Negligible |

TABLE IV.

-2-

DEFINITIONS:

| | |
|---|---|
| Small | 1.0 - 6.0% |
| Very Small | 0.5 - 1.0 |
| Minute | Less than 0.5 |
| Trace | Detectable, but not quantifiable |
| Negligible | Not detected by normal analytical procedures in the sample as manufactured. |

ESW/CGR
1-30-77

03629736

15101976

TABLE V — M K - 4   W / L I B B Y #3   03629737   3/31/77

| DATE (1977) | JOB SITE LOCATION | JOB | FIBER COUNT (f/ml) | | | COMMENTS |
|---|---|---|---|---|---|---|
| | | | Mirl. | MAY | TWA | |
| | | | ≤0.25 | ≤0.29 | ≤0.11 | T. |
| 3/b | HYATT REGENCY DALLAS | MIXED NOZZLE | 0.01 ≤0.120 | 0.055 0.10 ≤0.255 | 0.058 0.118 ≤0.110 | |
| | SO. COUNTY HALL OF JUSTICE FREMONT CALIF | MIXED NOZZLE CLEAN UP | 0.0-<.15 <0.16 0.020m | 0.12 <0.30 2.13 | 0.68 0.180 0.250 | 0.1.1. |
| 3/10 | | | | | | |
| 3/11 | CALIF FEDERAL SAVINGS & LOAN BURBANK CALIF | MIXED NOZZLE | 0.0-<0.9 0.16 | 0.13 0.38 | 0.019 0.196 | |
| 1/26 | WESTMINSTER COURT BLDG WESTMINSTER CA | MIXED NOZZLE CLEAN UP | ≤0.0-<0.05 0.05 | 0.19 0.21 0.03 | 0.069 0.073 0.024 | ✓ |
| | | | | | | |

15101977