# EXHIBIT 24

Page 1

```
 1            IN THE UNITED STATES BANKRUPTCY COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4
 5
       IN RE:                         NO. 01-01139 JKF
 6
            W.R. GRACE & CO., et al.,
 7                           Debtors.        CONDENSED
 8
 9                                           TRANSCRIPT
10    VIDEOTAPE
      DEPOSITION OF:   THOMAS E. HAMILTON
11
      DATE:            February 25, 2003
12
      TIME:            10:35 a.m.
13
      LOCATION:        Richardson, Patrick, Westbrook
14                       & Brickman, LLC
                       1037 Chuck Dawley Boulevard
15                     Building A
                       Mount Pleasant, SC
16
      TAKEN BY:        Counsel for the Claimant
17
      REPORTED BY:     PATRICIA L. THOMPSON,
18                     Registered Professional
                       Reporter
19
20    Computer-Aided Transcription By:
21          A. WILLIAM ROBERTS, JR., & ASSOCIATES
22    Charleston, SC                      Greenville, SC
      (843) 722-8414                      (864) 234-7030
23
      Columbia, SC                        Charlotte, NC
24    (803) 731-5224                      (704) 573-3919
25
```

Page 2

```
 1    APPEARANCES OF COUNSEL:
 2        ATTORNEYS FOR THE CLAIMANT:
 3        RICHARDSON, PATRICK, WESTBROOK
              & BRICKMAN, LLC
 4        BY: EDWARD J. WESTBROOK
              ROBERT M. TURKEWITZ
 5        1037 Chuck Dawley Boulevard, Building A
              Mount Pleasant, SC  29464
 6        (843) 727-6500
 7
          ATTORNEYS FOR THE RESPONDENT:
 8
          REED SMITH, LLP
 9        BY: JAMES J. RESTIVO, JR.
              435 Sixth Avenue
10        Pittsburgh, PA 15219
              (412) 288-3122
11
          ALSO PRESENT:
12
              David Roberts, Videotape Specialist
13
14
15
16
17
18
19
20
21
22
23            (INDEX AT REAR OF TRANSCRIPT).
24
25
```

Page 3

```
 1        (Plaintiff's Exhibits Hamilton 1
 2    through 24 marked for identification.)
 3        THE VIDEOTAPE SPECIALIST:  We're now on
 4    the record.  Today's date is February 2, 2003.  The
 5    time is approximately 10:37 a.m.  This is the
 6    videotape deposition of Thomas Edgar Hamilton being
 7    held at 1037 Chuck Dawley Boulevard, Building A,
 8    Mount Pleasant, South Carolina, at the law offices
 9    of Richardson, Patrick, Westbrook & Brickman.
10        Counsel, please introduce yourselves
11    for the record.
12        MR. TURKEWITZ:  My name is Rob
13    Turkewitz and I'm an attorney with the Richardson,
14    Patrick, Westbrook & Brickman firm and I'm
15    representing the interests of the homeowners in the
16    Zonolite Attic Insulation Science Trial in the
17    W.R. Grace bankruptcy case.
18        MR. WESTBROOK:  Ed Westbrook,
19    Richardson Patrick, also for the homeowners.
20        MR. RESTIVO:  Jim Restivo, Reed Smith.
21    I'm representing W.R. Grace & Company.
22        THOMAS E. HAMILTON
23    being first duly sworn, testified as follows:
24        EXAMINATION
25    BY MR. TURKEWITZ:
```

Page 4

```
 1        Q.  Good morning, sir.
 2            Would you please state your full name
 3    for the record.
 4        A.  My name is Thomas E. Hamilton.
 5        Q.  And where do you live?
 6        A.  I live in Mansfield, Massachusetts.
 7        Q.  And what do you do for a living?
 8        A.  I'm the owner of a consulting health
 9    and safety business.
10        Q.  And did you at one time work for
11    W.R. Grace?
12        A.  Yes, I did.
13        Q.  When did you work for W.R. Grace?
14        A.  I worked for W.R. Grace between August
15    of 1971 until January of 1987.
16        Q.  Let me just ask you a little bit more
17    about your background.
18            Would you please list your educational
19    background.
20        A.  Yes.  I have a degree in metallurgic
21    engineering from Michigan Tech University which I
22    received in 1970 and I attended Northeastern
23    University part time in the M.B.A. program for four
24    years.  I did not complete the degree, but I did --
25    I got about half of it done.
```

Page 5

```
 1        Q.  And do you have any postgraduate
 2    training?
 3        A.  I have postgraduate training through
 4    professional development courses that I've taken at
 5    NIOSH, which is the National Institute of
 6    Occupational Safety and Health at Wayne State
 7    University in toxicology, in industrial hygiene
 8    from Colorado State University, and I took several
 9    professional development courses which were offered
10    through the American Industrial Hygiene Association
11    which pertained to industrial health.
12        Q.  And do you hold any certifications?
13        A.  Yes.  I have a certification from the
14    American Board of Industrial Hygiene as a certified
15    industrial hygienist.
16        Q.  What does that involve?
17        A.  To become a certified industrial
18    hygienist requires experience and training in a
19    scientific field and in more than 50% of your time
20    working for at least five years as an industrial
21    hygienist.  It also requires -- at the time that I
22    became certified it required the completion of a
23    core examination and a comprehensive examination,
24    which totaled 16 hours of exams, and I passed
25    successfully in 1980.
```

2 (Pages 2 to 5)

Thomas Hamilton   February 25, 2003

Page 6

1    Q. And when did you become certified as an
2    industrial hygienist?
3    A. My certification was granted to me in,
4    I believe, December of 1980.
5    Q. And did you become a certified
6    industrial hygienist while at W.R. Grace?
7    A. That is correct.
8    Q. I would like to talk to you a little
9    bit about your employment with W.R. Grace.
10   What was your first position at
11   W.R. Grace?
12   A. In August of 1971 I joined W.R. Grace
13   as a systems engineer working for the Letter Flex
14   Systems in the Polyfibron Division which was
15   located at that time at the research center in
16   Clarksville, Maryland.
17   Q. And were you promoted or reassigned to
18   another position at any time?
19   A. Yes. Within that job I worked for
20   Letter Flex Systems for three years from '71 to
21   '74, and I was promoted to the engineering group in
22   my last year, which would have been in 1974 through
23   -- 1973 - '74 as a manufacturing engineer, and it
24   was in the summer of '74 that I interviewed for a
25   job in the Health and Safety Department in

Page 7

1    Cambridge and was offered that job and I took it.
2    That was a promotion, and I worked in the Health
3    and Safety Department until the end of my career at
4    Grace in 1987.
5    Q. When you first arrived at the Health
6    and Safety Department, what was your position?
7    A. I believe my business card at the time
8    said safety engineer.
9    Q. And who did you report to?
10   A. I reported to Harry Eschenbach.
11   Q. While you were in the Health and Safety
12   Department until you left W.R. Grace did your
13   position change?
14   A. Yes. I believe it was in 1978 after I
15   had passed the comp. exam for certification as a
16   hygienist I was promoted to manager of industrial
17   hygiene.
18   Q. And did you continue as manager of
19   industrial hygiene until you left Grace in 1987?
20   A. Yes.
21   Q. Can you describe W.R. Grace's Health
22   and Safety Department.
23   A. Yes.
24   When I first joined the Health and
25   Safety Department there was -- there were two

Page 8

1    people working there. I was the third person.
2    Harry Eschenbach was essentially doing the
3    industrial hygiene work and was the de facto
4    manager. Peter Kostic was the manager, the safety
5    manager, at the time and he managed the Safety
6    Department side of the Health and Safety.
7    In around 1979 - '80 we brought on a
8    part-time person, Dr. Borgsted, who helped us with
9    our medical issues; helped me set up a medical
10   program and a monitoring program especially within
11   Construction Products Division, but we did work
12   within other divisions with Dr. Borgsted. And in
13   1980 we hired an industrial hygienist, Paul Conner,
14   who worked for me. He reported to me. And in --
15   I believe it was 1982 -- I'm not quite sure of the
16   date, '82 - '83. -- Dr. Borgsted had left and we
17   brought on Dr. Berke as our medical director.
18   So Peter Kostic had left the company,
19   had retired, and we had replaced him with a Robert
20   Marion who was the new safety director. So
21   essentially in 1987 we had five professionals and
22   two-secretary staff.
23   Q. So you started out in 1974 with three
24   individuals in your Health and Safety Department,
25   in Grace's Health and Safety Department, and then

Page 9

1    it went to five when you left.
2    Was that five?
3    A. Yes, although I think we might have
4    hired another safety person. Right at the time I
5    left in '87 they were hiring another safety person
6    to work for Bob Marion. So it might have been six
7    people at the end, but it was right when I was
8    leaving.
9    Q. And what divisions within Grace was the
10   Health and Safety Department responsible for?
11   A. Yes. I think it's important to
12   understand the relationship there.
13   We essentially worked for Industrial
14   Chemicals Group and the Health and Safety
15   Department based in Cambridge serviced four of the
16   divisions of ICG, and those were the four Lexington
17   - Cambridge based divisions.
18   As time went on the role that we had
19   within ICG expanded to include other divisions such
20   as Krivax and Davison Divisions. So near -- by
21   1987 we were servicing most of ICG, at least six of
22   the divisions at ICG that we worked with in terms
23   of health, safety and toxicology and environmental
24   issues also.
25   Q. In 1974 what division were you actually

3 (Pages 6 to 9)

Thomas Hamilton    February 25, 2003

Page 10

1    servicing at that point?
2        A.    Well, there was the Cambridge
3    Construction Products Division and then there was
4    organic chemicals and polyfibron, which were mainly
5    located in Lexington.
6        Q.    And approximately how many people in
7    these various divisions did the Health and Safety
8    Department service?
9        A.    That's a tough answer because the size
10    of the company was changing quite a bit and keeping
11    a census was difficult, but I would say probably by
12    1987 — no. In 1974 there probably were somewhere
13    between 5 and 8 thousand employees in the four
14    divisions, but I may be off on that. I'm not quite
15    sure. It's been too long.
16        Q.    How about in 1987 when you left? You
17    had five individuals in your department.
18        A.    Yes. There were at least five, pushing
19    towards six, although when I left it went back down
20    to five. The six divisions probably had somewhere
21    around 25,000 employees.
22        Q.    Did there come a time when your work at
23    Grace involved asbestos?
24        A.    Yes. When I joined the Health and
25    Safety Department, the very first day I worked

Page 11

1    there my boss, Harry Eschenbach, started talking to
2    me about the asbestos issues within the
3    Construction Products Division.
4        Q.    And did there come a time where you
5    first became aware that asbestos exposure was
6    capable of causing disease?
7            MR. RESTIVO:  Object to the form.
8        A.    I think that our initial discussions
9    talked about the fact that asbestos was capable of
10    causing a lung disease none as asbestosis, which
11    was a restrictive lung disease.
12            I should note that earlier you asked me
13    if I was certified in anything, and one of the
14    certifications that I attained while working at
15    Grace in about 1981 — I believe in that time
16    period — was certification as a pulmonary
17    technologist, and I became certified to actually
18    conduct lung function tests on employees, because
19    we were doing lung function testing in all of the
20    expanding plants in Libby, Montana, at the Libby
21    warehouse, plus South Carolina, the vermiculite
22    operations there. So there was another
23    certification that I had.
24            The awareness that we had of asbestos
25    and the fact that asbestos could cause a

Page 12

1    restrictive lung disease known as asbestosis was
2    something that I became aware of immediately when
3    we began our discussions of the fact that there was
4    asbestos in the Libby operations and that this was
5    a major reason why I was hired, was to help with
6    the monitoring and evaluation of that problem, plus
7    I think the department was looking for an engineer
8    — and that's my background — was to have an
9    engineer on the Health and Safety staff to look at
10    engineering controls and methods for reducing
11    exposures to chemicals, and part of that would be
12    exposures to asbestos in the expanding plants.
13        Q.    And did you become aware that asbestos
14    was capable of causing other diseases as well?
15            MR. RESTIVO:  Object to the form.
16        A.    Yes. As we became more knowledgable
17    and read more — as I became more knowledgeable and
18    was obtaining more information about asbestos,
19    there was a clear relationship that was published
20    in the literature in regard to the synergistic
21    effect of smoking and being exposed to asbestos;
22    that there was a clear relationship that people who
23    were exposed just to asbestos generally did not
24    develop lung cancers at the same rate that people
25    who smoked and were exposed to asbestos got and

Page 13

1    that the rate was about ten times higher of an
2    opportunity to develop a cancer from the
3    synergistic effect of smoking and being exposed.
4            So this information during -- until
5    about 1974 right through the end of my career there
6    we were constantly looking at information, and it
7    became immediately in 1974. Within the very first
8    week of working in the Health and Safety Department
9    it was clear that that was going to be a major
10    focus of my work.
11        Q.    And did you come to learn that exposure
12    to asbestos was capable of causing a disease called
13    mesothelioma?
14            MR. RESTIVO:  Object to the form.
15        A.    Yes.
16            Mesothelioma is a very unique form of
17    cancer, and it really describes a type of cancer
18    which was associated with asbestos exposure.
19            Generally if you develop mesothelioma
20    they look for asbestos exposure in your background,
21    and this was something that we talked about and
22    were very aware of in studying the literature at
23    that time. Throughout the '70s it was very clear
24    that there was a relationship there.
25        Q.    Did you come to learn that the

4 (Pages 10 to 13)

Thomas Hamilton    February 25, 2003

Page 14

1  vermiculite manufactured — or that vermiculite
2  from Libby was contaminated with asbestos?
3          MR. RESTIVO: Object to the form.
4      A. Yes. That was something I learned
5  within the first five days of my employment at the
6  Health and Safety Department, was an explanation of
7  the issues of the Libby vermiculite versus South
8  Carolina vermiculite and the fact that the —
9  I think it was explained to me this way one day at
10  lunch. One of the managers from CPD explained that
11  the vermiculite mined in Libby was actually an
12  asbestos mine that was contaminated with
13  vermiculite, was the way it was described to me;
14  that there was more asbestos there than there was
15  vermiculite, but the concentrating process was to
16  extract the vermiculite out of that.
17      Q. And did you also come to learn that the
18  asbestos at Libby was an amphibole form of
19  asbestos?
20          MR. RESTIVO: Object to the form.
21      A. Yes. And part of my training in terms
22  of the OSHA standard and the awareness that I was
23  required to have with regard to health issues with
24  asbestos, the understanding of the types of
25  asbestos, the forms that it takes, the difference

Page 15

1  between a serpentine and an amphibole was very
2  clear; that we had to understand that, and we
3  understood that in the Health and Safety
4  Department.
5      I was informed of and had training on
6  the fact that the form of asbestos which occurred
7  at the Libby operations was an amphibole, which has
8  the characteristics of a needle shape, and the
9  other types of asbestos that had been used in the
10  Construction Products Division, which was an
11  additive to some of the products like monocote and
12  to dehydratine and some other products within the
13  Construction Products was a serpentine form of
14  asbestos, which is sometimes pronounced Chrysotile
15  or Chrysotile, depending on the tomato/tomato
16  thing. Some people call it Chrysotile. And that's
17  the way it was explained to me. But that is a
18  serpentine, which looks more like a snake or a hair
19  curling, but it's actually not as brittle. It is
20  capable of bending, whereas the amphiboles don't
21  bend very easily. They tend to snap and break.
22      Q. And can you tell us whether or not it
23  was understood at Grace that the Libby expanded
24  vermiculite was friable?
25      A. Yes.

Page 16

1      First you have to understand what the
2  word "friable" means, and that means you're capable
3  of crushing it with hand pressure. And that was
4  explained to me, the fact that not only was the
5  vermiculite friable, but the tremolitic content was
6  also friable.
7      Q. How friable was the tremolite in the
8  material?
9      A. The tremolite that occurred that you
10  could actually pick the shards out of the Libby
11  vermiculite — if you actually picked up a piece of
12  the tremolite, you could crush it in your hand with
13  very little effort. I mean, it wasn't difficult to
14  actually crush that in your hands.
15      Q. Now, when we're referring to
16  "tremolite", we're referring to tremolite asbestos?
17      A. Yes.
18      Q. That's the tremolite amphibole form of
19  asbestos?
20      A. Correct.
21      Q. And when you worked in the Health and
22  Safety Department, was it understood by you and
23  others at Grace that respirable asbestos fibers are
24  microscopic in size?
25      A. Well, the term "respirable" as we used

Page 17

1  that term -- to answer your question directly, yes,
2  we understood that, but it's important to
3  understand what respirable means.
4      For the term "respirable", which we use
5  as an industrial hygienist, we're talking about a
6  fiber or a particulate that is capable of
7  penetrating to the deepest parts of the lung. Some
8  particles are inhaleable, some particles stop with
9  the thoracic area, and some particles can actually
10  penetrate deeply into the lung. Those are
11  respirable particles.
12      Q. Are these respirable particles visible
13  to the naked eye?
14      A. No. They're well below visible range.
15  You're not capable of seeing these with the naked
16  eye.
17      Q. And was it understood by you and others
18  at Grace that because of the microscopic size of
19  the asbestos fibers, you could have very large
20  numbers of asbestos fibers in a product and the
21  asbestos content would barely be detectable by
22  weight?
23          MR. RESTIVO: Object to the form.
24      A. This was well understood by everybody
25  that if you were to look at the expanded

5 (Pages 14 to 17)

Thomas Hamilton   February 25, 2003

Page 18

1  vermiculite under a microscope you would see fibers
2  — at 450X you would be capable of seeing fibers on
3  the product, coating a product, but to the naked
4  eye these were not visible.
5      Q.  Was it understood by you and others at
6  Grace that asbestos fibers could remain airborne
7  for very long periods of time?
8          MR. RESTIVO:  Object to the form of the
9  question.
10     A.  Yes.  I think that was pretty much
11 understood by all of us, that once you had an
12 airborne fiber event, that the fibers will stay
13 suspended in the air for a very long time.  They
14 were not affected by gravity as much as we might
15 have thought.  They did not settle out.  They
16 tended to float in the air following wherever the
17 air was moving.  And the problem was you could have
18 very, very high fiber levels, literally millions of
19 fibers per cubic meter of air, and you would see
20 nothing in the air at all.  It would not be
21 visible.
22     Q.  And do those asbestos fibers eventually
23 settle out?
24     A.  I suspect that if it was in a room and
25 you were to look at some setting velocity on these

Page 19

1  that you could potentially get all of the fibers to
2  settle over some period of time.  I don't have the
3  slightest idea how long that is, but I know it is
4  not measured in hours.  It would be measured more
5  in days.
6      Q.  And talking about asbestos on surfaces,
7  can asbestos on surfaces be reentrained into the
8  air?
9          MR. RESTIVO:  Object to the form of the
10 question.
11     A.  Because a settled particle is so light
12 in weight, it does not require much air movement or
13 scrubbing to reentrain a settled particle.
14         Yes; it would go airborne immediately
15 if it had the opportunity to do that.
16     Q.  And was reentrainment of asbestos a
17 concern for you and others at Grace?
18     A.  It's an interesting question.
19         I think reentrainment was an issue,
20 although it wasn't talked about very much.  I mean,
21 we didn't really talk about reentrainment.  We were
22 more concerned about primary.  Our occupational
23 exposures were primary exposures, not
24 reentrainment.  So I think we were so focused on
25 primary exposure in trying to get the levels of

Page 20

1  exposure within acceptable or government regulatory
2  standards that we didn't really focus on
3  reentrainment, although I will say this:  We knew
4  that reentrainment was a major problem in our
5  expander plants.  That's why we had tremendous
6  programs for cleaning.
7          When there was a plant audit, a fiber
8  audit, an occupational exposure audit, planned for
9  an expanded plant, they were would spend upwards of
10 four to five days cleaning the plant, and a lot of
11 this dealt with settled dust that they wanted to
12 vacuum up and clean because of the reentrainment
13 issue.  Although we never talked about it as
14 reentrainment, that essentially was what it was.
15 I mean, if you have dust on the floor, you've got
16 to vacuum that up before you do your audit or
17 you're going to have a high fiber count.
18     Q.  And why would you have a high fiber
19 count?  Would it be from the dust getting
20 disturbed?
21     A.  Yes.  It would be from dust that had
22 settled and then been redistributed just through
23 activities in the plant.
24     Q.  Well, did W.R. Grace ever implement any
25 precautions to avoid exposure to asbestos from

Page 21

1  asbestos-settled dust?
2      A.  Yes.  I think there were — I think
3  that would be a fair statement to say yes, that we
4  did that.  I can give some examples.
5          For example, we banned the use of
6  brooms in the expander plants, and the reason is
7  that once you have settled dust, you don't want to
8  sweep it with a broom.
9          When brooms were found in plants, that
10 was a big deal.  That would go down in the report
11 that there were brooms there, and we would tell the
12 plant managers and the manufacturing managers about
13 the fact that we're finding brooms again.  That
14 would be an issue of settled dust.  Also, to
15 replace a broom we put in vacuum cleaners and
16 vacuum systems, which were HEPA or high efficiency
17 particulate arresting vacuum cleaners, so that
18 during the vacuuming you wouldn't reentrain the
19 dust you were picking up.
20     Q.  While you were in Grace's Health and
21 Safety Department did you conduct any testing
22 involving products?
23         MR. RESTIVO:  By "you" you mean the
24 witness, or do you mean Grace?
25         MR. TURKEWITZ:  I'm asking the witness.

6 (Pages 18 to 21)

Page 22

1    MR. RESTIVO: Him personally?
2    MR. TURKEWITZ: Yes.
3    BY MR. TURKEWITZ:
4    Q. While you were in the Health and Safety
5    Department did Grace — I'll ask it the other way.
6    While you were in the Health and Safety
7    Department did Grace perform testing on vermiculite
8    products?
9    A. Yes. There was quite an extensive
10   program developed for testing of vermiculite
11   products, and I was involved in that for almost
12   three years.
13   Q. And can you describe generally the
14   types of testing that was performed by the Health
15   and Safety Department during that three-year
16   period.
17   A. Right. I would say that the original
18   work started, I believe, in around 1976, and this
19   was done in that time period with a manager from
20   Construction Products Division named Robert Locke.
21   I'm going to call him Bob.
22   Bob was placed in charge of doing
23   evaluation of product testing, and they needed help
24   with the air-monitoring work that was to be done.
25   At that time they approached our department, Health

Page 23

1    and Safety, because we were doing all the auditing
2    and air monitoring in the Construction Products
3    Division plants. So the request was made to have
4    me work with Bob Locke to develop the
5    air-monitoring program for product testing. The
6    very first product that we tested was zonolite
7    attic insulation or ZAI, and this then went on to
8    other products including monocote and masonry fill
9    and roof deck material.
10   Q. You mentioned zonolite attic
11   insulation, ZAI.
12   What was ZAI?
13   A. ZAI when I first become aware of it as
14   a product was an expanded vermiculite which
15   immediately came from the Libby Montana mine, not
16   from South Carolina, and the reason is that the
17   Libby product had a much larger size.
18   Vermiculite was sized from 1 to 5,
19   5 being the smallest size and 1 being the largest
20   size. There may have been a zero size, too.
21   I'm not sure, although I saw some South African
22   vermiculite that was very big, about the size of a
23   quarter, which was probably a 00 size. But what we
24   got at Libby for zonolite attic insulation was
25   mainly Libby 1 and 2 and occasionally some 3 was

Page 24

1    used, and those products I became very aware of
2    right from the very beginning. It was the first
3    product we tested.
4    Q. And the Libby vermiculite that was
5    used, was that contaminated with asbestos?
6    MR. RESTIVO: Object to the form of the
7    question.
8    A. Well, there was no doubt that the Libby
9    vermiculite contained asbestos as a contaminant.
10   They didn't want it there. That was really the
11   problem, was the material; the major problem.
12   There were other issues with dust, respirable dust
13   and so forth, visible dust from it, but the major
14   issue in terms of health from the standpoint of my
15   department was the issue of tremolite exposures
16   which would occur during not only the manufacture
17   of ZAI but during the application of ZAI and to the
18   end user.
19   Q. Did all of the three grades that you
20   mentioned, Grades 1, 2 and 3, that was used for ZAI
21   — did all three grades contain asbestos?
22   A. Yes.
23   Q. Were you familiar with how ZAI was
24   installed?
25   A. Yes.

Page 25

1    Are you talking about "installed" in
2    like in the end application as an insulating
3    material?
4    Q. Yes, sir.
5    A. It would be installed by carrying bags
6    into an attic area or an area to be insulated.
7    Sometimes it was the wall cavities. The bags would
8    be opened, the material would be poured out, the
9    bags would then be collapsed, and sometimes
10   overpacked one bag — you know, five bags into one
11   other bag, and then those bags — the empty bags
12   were taken out, the material was spread evenly to
13   spread it out in an attic, and sometimes it was
14   done with a broom or a paddle or some kind of
15   device to spread it out even, to rake it
16   essentially.
17   Q. And who generally installed zonolite
18   attic insulation?
19   A. Well, I don't really know, but most of
20   the time when we thought about attic insulation in
21   homes, just in terms of raw numbers of people, it
22   probably was homeowners; but in terms of volume, it
23   was probably contractors because contractors were
24   installing this over and over and over. So you had
25   one crew working on several jobs, whereas just in

Page 26

1  terms of number of people involved would be
2  homeowners.
3      Q. And do you know how long it generally
4  took to install zonolite attic insulation in a
5  home?
6      A. Well, from the work that was done by
7  Fred Eaton, who was an engineer in the Construction
8  Products Division, and in talking to people about
9  that product, people that sold it and so forth, it
10  appeared as though it would take approximately two
11  days to do an attic. If one person was doing it,
12  it would take approximately two days from start to
13  finish to install between 70 and 90 bags.
14      Q. And did you yourself conduct testing on
15  zonolite attic insulation?
16      A. Yes. I believe I was involved with the
17  very first test ever done on ZAI in the Cambridge
18  facility.
19      Q. And what type of testing were you
20  involved in where you were actually directly
21  involved in performing?
22      A. Yes. I didn't set the test up. My job
23  was to work with the technician, Steve Venuti, and
24  first name is Stephen.
25          Stephen Venuti and I worked with Bob

Page 27

1  Locke to conduct a test on the fiber generated —
2  the airborne fiber levels generated during the
3  manipulation of zonolite attic insulation in the
4  Cambridge facility in a test room with dimensions
5  I have written down somewhere in some of the
6  documents, but it was approximately the size of an
7  attic. About the size of this room essentially in
8  terms of cubic feet and volume.
9          The room did not have any ventilation,
10  and we poured the bags on the floor. I think it
11  was eight or ten bags of vermiculite, 3-cubic foot
12  bags, and we then spread it around on the floor for
13  probably eight to ten, maybe 12 - 15 minutes. The
14  air monitor would be able to show this.
15          We collected air samples in the room on
16  Steve Venuti and one in the middle of the room as
17  an engineering control sample and we did a series
18  of tests in the morning of one day and then in the
19  afternoon we did another series of tests after the
20  material had been wetted. So we did a dry test and
21  then we did a wet test.
22      Q. Was that testing referred to as
23  simulated attic testing?
24      A. I think that would be appropriate. We
25  were trying to simulate a closed space and what

Page 28

1  types of fiber levels would be generated in a space
2  during the manipulation of a typical zonolite
3  product manufactured in an expander from --
4  I forget what plant. Maybe it was East Hampton.
5  East Hampton was close by. Occasionally we would
6  get our material from there.
7          We wanted to know for the first time
8  what kind of levels would occur to people who were
9  involved with the installation of this material,
10  what types of fiber levels would be generated in a
11  simulation of pouring this and working with this
12  material in a closed space like an attic.
13      Q. Now, I've seen some other testing.
14  I've seen some testing referred to as drop testing.
15          Were you familiar with drop testing?
16      A. Yes. The equipment for doing the drop
17  testing was actually in the next room over -- we
18  could see it. -- and that was designed to look at
19  what would happen if the material were in a hopper
20  and you open a door and the material then just fell
21  out into a space.
22          It appeared to me as though that was
23  trying to simulate types of jobs where the material
24  would be in bulk form or maybe similiar to what it
25  would look like coming out of the end of a bag as

Page 29

1  you're pouring it out, and the beauty of that was
2  you didn't need people in the room. You could set
3  up sampling equipment and be outside the room. So
4  you could do some really severe testing without
5  exposing people in the room. It could be done
6  remotely essentialy.
7      Q. And then are you familiar with actual
8  attic testing that was performed at W.R. Grace?
9      A. Yes. There were some — there was a
10  simulated attic which was developed and built in
11  one of the plants, one of the expander plants, and
12  one of the engineers that I trained who worked with
13  air monitoring was assigned to doing tests on that
14  attic and then there were tests that were conducted
15  by that same engineer in actual attics in homes
16  throughout 1977. That time period.
17      Q. I want to show you some documents, and
18  let me go ahead and show you what has been marked
19  as Hamilton Deposition Exhibit 1 and ask if you can
20  identify that document for the record.
21      A. Yes. This is dated 1/31/77 and this is
22  a test of the — I believe this was the attic
23  simulation testing which was done, a drop test.
24          I'm sorry. This is a drop test that
25  was conducted in Weedsport. There were 18 samples

Thomas Hamilton   February 25, 2003

Page 30

1    that were taken by Fred Eaton, and in this they're
2    using what appears to be possibly two different
3    types of Libby 2. It's not quite clear from the
4    notes here, but there clearly is a drop test being
5    done here with Libby 2 material.
6        Q.   And the material that was tested, was
7    this material that was production material from the
8    plant to your knowledge?
9        A.   Yes. This looks like one of the
10   standard drop tests, probably one of the first ones
11   done, and I think they were studying the
12   methodology and working out the test methods a
13   little more. This would have been just standard
14   Libby 2 material that was production material.
15       Q.   By the way, on the first page on the
16   upper right corner, is that your name appearing on
17   the document?
18       A.   Yes. I'm the requester of this
19   document, which is the chain of custody for —
20   we call this the chain of custody. This document
21   is the way we submit samples to the laboratory for
22   analysis. We had to have a standardized method for
23   getting samples in for analysis. This was the
24   request for technical services to the laboratory.
25            It was a very organized method for

Page 31

1    getting samples into the lab and following the
2    possession of these samples right through analysis.
3        Q.   And this process went from you;
4    correct?
5        A.   Yes. This was requested through me to
6    the laboratory. Sometimes I would be the
7    requester, sometimes I would be the approver, and
8    sometimes I would just be getting a copy. It
9    depended on the various stages in this process.
10           When this first started Harry
11   Eschenbach was always in charge of sending samples
12   to the lab and occasionally I would be the
13   requester of it. Later I became the approver of
14   it. Later I was just a person in the room.
15       Q.   And turning to the second page, is
16   there a summary of the results?
17       A.   Yes. The summary states that the
18   20 samples received from Weedsport, 18 samples
19   contained more than two fibers per cc, while the
20   other two samples contained less than two fibers
21   per cc.
22       Q.   And turning to the next page, is that
23   an Air Sampling Record Sheet?
24       A.   Yes. This record sheet was designed by
25   me. It was a sheet that was put together to submit

Page 32

1    samples to the laboratory. We needed a sampling
2    sheet system for doing this. One of the things
3    I did after I started there is put together this
4    sheet.
5        Q.   And what was the range of the airborne
6    fiber levels found during this testing?
7        A.   If you ignore the background tests,
8    just look at the drop tests themselves, the highest
9    level appears to be 13.2 and the lowest level
10   appears to be 3.85.
11       Q.   When you say "13.2", is that 13.2
12   fibers per cubic centimeter?
13       A.   Yes.
14       Q.   How many fibers would that be per cubic
15   meter at 13.2 fibers per cubic centimeter?
16       A.   Well, there are one million cubic
17   centimeters in a cubic meter, so you would just
18   multiply this number by one million and you would
19   have the number of fibers that would be contained
20   in the space of one cubic meter, a cubic meter
21   being approximately 38 inches X 38 inches X
22   38 inches.
23       Q.   So that would be 13.2 million asbestos
24   fibers per cubic meter?
25            MR. RESTIVO: Object to the form.

Page 33

1        A.   Yes. This would convert to 13 million
2    fibers per cubic meter.
3        Q.   I would like to talk to you now about
4    the simulation testing that you referred to before.
5            Let me show you what has been marked as
6    Hamilton Deposition Exhibit 2 and ask if you can
7    identify that.
8        A.   Yes. This is a document dated March 3,
9    1976, requested by me to the Construction Products
10   Division laboratory to evaluate samples which were
11   collected in the Cambridge plant.
12           MR. RESTIVO: I'm sorry. I don't mean
13   to interrupt. My copies don't have numbers on them
14   yet. What was the date?
15           THE WITNESS: We'll go to the top
16   number at the very top of the form. 48876.
17           MR. RESTIVO: Give me the date one more
18   time, sir.
19           THE WITNESS: March 3, 1976. 48876 at
20   the very top of the form. This is Hamilton 2.
21           MR. RESTIVO: I'm with you. Thank you,
22   sir.
23   BY MR. TURKEWITZ:
24       Q.   Are you listed as the requester?
25       A.   I am listed as the requester of this

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Page 34

1  document.
2      Q.  And what does this testing show?  What
3  was this testing for?
4      A.  This was the original — what I believe
5  was the first testing ever done on zonolite attic
6  insulation in the test room in Cambridge which was
7  conducted on March 2nd, 1976, by me and Stephen
8  Venuti under the direction of Robert Locke, and we
9  took ten bags of attic insulation, placed it on the
10  floor for the first four samples there, and this
11  was spread by Steve Venuti with — I believe it was
12  a broom he was using to spread it around and move
13  it on the floor.
14      Q.  And was this the testing you referred
15  to earlier that was done in a room next to where
16  the drop testing was done?
17      A.  Correct.
18      Q.  And on Page 2 does it describe the
19  results, summarize the results?
20      A.  Yes.  The summary of the results says
21  seven samples received from the Cambridge plant.
22  Four samples had a count of less than five fibers
23  per cc.  Samples 1, 3 and 4 showed a count of over
24  five fibers per cc, and No. 3 being the highest
25  fiber count.  Samples No. 2 and 7 were counted to

Page 35

1  100 fields and all the others were counted to 50,
2  and the reason for that is when they got to a
3  certain number of fibers they stopped counting at
4  50.
5      Q.  And turning to the next page, does the
6  report set forth the actual airborne levels that
7  resulted?
8      A.  Yes.  The airborne levels are shown in
9  the last column on the right-hand side of the
10  engineering test sample page and the results range
11  from 3.6 to -- well, approximately 16 fibers per cc
12  for the dry vermiculite.  We then redid the tests
13  in the afternoon with wetted vermiculite and the
14  results dropped -- we had three samples in the
15  afternoon.  The end results dropped to about --
16  from .8 to 2.2 fibers per cc of wet vermiculite.
17      Q.  What activity was being tested with the
18  dry vermiculite?
19      A.  The material was poured on the floor,
20  as I recall, and then spread around with a broom.
21  We just pushed it around with a broom trying to
22  level it out, simulating what you would do if you
23  poured it out in an attic and then would fill in
24  the joist area.
25      Q.  Where were the samples analyzed?

Page 36

1      A.  These samples were analyzed in the
2  laboratory in Cambridge which was directed by Julie
3  Yang.
4      Q.  How were the samples analyzed?
5      A.  They were analyzed, I believe, by phase
6  contrast microscopy.
7      Q.  Let me show you what has been marked as
8  Hamilton Deposition Exhibit 3 and ask if you can
9  identify that document for the record.
10      A.  This is Document No. 48876.  Again —
11      Q.  Is that the same as the last document?
12      A.  The same as the previous one.
13      Q.  Is there any difference between this
14  document and the previous document?
15      A.  The difference between these documents
16  is that one of the samples, sample — the third
17  sample marked Sample No. CAM-3 has a change in the
18  result.  On the first document it was 6.0 and on
19  the second document it's 28.88.
20      Q.  28.88 fibers per cubic centimeter?
21      A.  Correct.
22      Q.  Is there any indication on the front
23  page of this document of where this actual copy
24  came from or where it had gone to?
25      A.  Well, the difference between these on

Page 37

1  the front page is that it appears as though the
2  first document, which is Hamilton 2, was sent to
3  Dr. Duecker and the second one was sent to my file.
4  So the file copy had a higher number than
5  Dr. Duecker's copy.
6      Q.  Is there any reason why the file copy
7  would have a different result or higher number?
8      A.  Yes.  I don't really understand exactly
9  why this occurred, but there were times when
10  results were QC.  We had a quality control
11  procedure that Julie Yang had in the laboratory and
12  on occasion -- not very often -- an audit would be
13  done — a QC audit would be done on the results,
14  and on occasion an error was made, and whenever
15  there was an error it would be corrected and that
16  would show on the file copy.
17      So sometimes what would happen is an
18  error would be made, it would be redistributed, and
19  that would mean that the final resulting file copy
20  would be the most accurate because of the QC
21  procedure that had been done, and the reason I say
22  that is because the handwriting appears to be a
23  different person who wrote the 28.8.
24      Q.  Now, with respect to this testing that
25  we see in Exhibits 2 and 3, where did the material

Thomas Hamilton   February 25, 2003

Page 38

1  that was tested come from?
2      A. I'm not exactly sure where this
3  material came from, but most of the time when we
4  were working initially in the Cambridge facility
5  our material would come from East Hampton, Mass.,
6  because that was the closest facility to Cambridge.
7  So the cost of getting it to Cambridge would be the
8  least.
9      Q. It states: Ten bags attic insulation
10  Libby 2.
11      Would that have been production
12  material that was used?
13      MR. RESTIVO: Object to the form of the
14  question.
15      A. I believe that this was production
16  material which was just taken right off the line at
17  East Hampton.
18      Now, it may have been a different
19  plant. It may have come from a different
20  vermiculite expander plant, but in general this
21  material here would have just been straight
22  production material brought into Cambridge and
23  tested, because this was the very first test of the
24  material that I know of was ever done.
25      Q. Was it important to use production

Page 39

1  material in testing?
2      A. I think the answer to that is yes.
3  I mean, it really was important that we didn't bias
4  the results. We wanted to do things to make sure
5  that there were no confounding factors.
6      When we first started testing, we just
7  wanted to get straight production material in. We
8  didn't want to do anything special because
9  otherwise the results would be confounded, they
10  would be biased, and wouldn't be as useful.
11      Q. I would like to show you now what has
12  been marked as Hamilton Exhibit 4 and ask if you
13  can identify this document for the record.
14      A. This is document -- this is actually
15  No. 67527, and this is the evaluation samples that
16  was brought in from Weedsport, and in this case the
17  requester is Fred Eaton and I approved it. My
18  signature is not there. You can see this was
19  signed for me by my secretary, Barbara Par. That's
20  the "D.B.P."
21      Q. And is there a date for this testing?
22      A. The testing was actually conducted on
23  May 17th, 1977.
24      Q. And what material was tested here?
25  Strike that.

Page 40

1      What type of testing was conducted?
2      A. According to the chain of custody, this
3  is a simulated attic test that was conducted in
4  Weedsport, so this would be in the facility that
5  was constructed in Weedsport for doing this type of
6  testing. And they were pouring zonolite attic
7  insulation, and what is interesting about this is
8  this is the first document showing where they had
9  several different types of amending products that
10  were applied to the vermiculite, although they did
11  actually do some controls with no binder, but the
12  first sets of samples here were conducted on
13  zonolite attic insulation which had been treated
14  with a binder material, what I call amending or
15  amending the product.
16      The product had been changed in an
17  attempt to find a binder, and various types of
18  binders had been looked at and developed for
19  testing by Julie Yang at her suggestion, and the
20  binders were applied at a manufacturing plant --
21  I don't know which one. It doesn't say here. --
22  and then those products were shipped to Weedsport
23  or maybe manufactured in Weedsport and then the
24  simulated attic testing was done with these
25  products.

Page 41

1      Q. Now, are you familiar with the OSHA
2  standard?
3      A. Yes. The OSHA standardized test?
4      Q. Yes.
5      A. Yes.
6      Q. And the current OSHA standard, is there
7  an excursion limit to the current OSHA standard?
8      A. I think you're talking about the
9  maximum limit of exposure excursion limit, which is
10  one fiber per cc of air.
11      Q. Why does OSHA have an excursion limit,
12  do you know?
13      A. Well, there is also a limit in there of
14  one -- of 0.1 fibers per cc, which is an allowable
15  average for a worker to have during a workday, an
16  eight-hour day. The excursion is the upper limit
17  that should never been exceeded during the workday,
18  but that's without respiratory protection.
19      The OSHA standard is designed to say
20  you can have exposure with an average .1 for the
21  day, but you should not exceed 1 during the day
22  without adequate respiratory protection.
23      Q. And looking at these results, with a
24  binder -- and Grace used a binder on the material
25  -- what was the range of the results?

11 (Pages 38 to 41)

Thomas Hamilton   February 25, 2003

Page 42

1    A.  Well, the range on the first page goes
2  from 0.37 to 3.15.
3    Q.  And how many samples were collected,
4  total samples collected, with the binder?
5    A.  11.
6    Q.  Of those 11 how many of those samples
7  exceeded the current OSHA excursion limit of one
8  fiber per cc?
9    A.  Eight.
10    Q.  And on the next page was there any
11  testing performed as a control?
12    A.  Yes.  They did two control samples, two
13  control events.  And you have to understand that
14  these are all doubled up because Fred Eaton
15  collected samples on both shoulders of the
16  employees.  It was set up with one sample collected
17  off the right shoulder and one off the left
18  shoulder of the worker doing the work.
19      So there were two control events, and
20  the range on these two went from 1.43 to 5.7, and
21  all four of them exceeded one fiber per cc.
22    Q.  What was the range -- I'm sorry.
23    A.  Yes.  I said that.  It went from 1.43
24  to 5.7.
25    Q.  There is a note at the bottom of that

Page 43

1  page.  It states: Lab analysis should indicate if
2  small amount of fines have any effect on personal
3  exposure.
4      Did I read that right?
5    A.  Yes.  It says: Lab analysis should
6  indicate if a small amount of fines removed have
7  any effect on personal exposure.
8      The reason that's there is because
9  there were two tests done with material that was
10  not bound.  The first test was done with material
11  that had been passed over a 14-mesh screen in the
12  plant, so it was screened material.  The second
13  material was a control which was not screened, and
14  by looking at these results you can see that the
15  screened material came in at levels of
16  approximately one-third of the levels of the
17  nonscreened material in terms of the overall fiber
18  level generated during the testing.
19    Q.  What are fines?
20    A.  When the vermiculite is expanded there
21  is rock asbestos, shards, little tiny pieces of
22  asbestos, pieces of vermiculite that are very
23  small; and when you pass this over a screen, those
24  small pieces fall out, so that what you're getting
25  is a product that has less fine in it.  The

Page 44

1  finished product then comes through over that
2  screen is cleaner in terms of small particles than
3  the nonscreened material.
4    Q.  And here they're referring to the fines
5  being removed from the material being tested; is
6  that correct?
7    A.  That's correct.
8    Q.  To your knowledge did W.R. Grace ever
9  manufacture zonolite attic insulation with the
10  fines returned to the product?
11    A.  Yes; as I understand it, although I
12  wasn't in manufacturing, but it was explained to me
13  by the manufacturing engineers and some of the
14  production managers that there were times when the
15  fines were put back into the product.  There were
16  cyclone fines that were pulled out for dust control
17  which were eventually put back into the product.
18      See, the dust collectors would actually
19  pull product out during the cleaning, and that
20  product had value, so it was put back into the
21  product, although at the time it was collected to
22  control dust in the air and fiber in the air.
23    Q.  And do you know approximately when that
24  practice stopped, if it ever did?
25    A.  I know that there was a letter that was

Page 45

1  written informing them to not do that, but I don't
2  recall the exact date, but I know that -- I believe
3  it was Reed Wright who was one of the manufacturing
4  managers eventually wrote a letter, probably as a
5  result of this work that was done, that said those
6  fines are not going to be recycled into the
7  product.  They're going to be hauled off as waste.
8      Although I don't know the exact date of
9  that, it probably was sometime in the late '70s.
10  Soon after this.
11    Q.  I want to go back to the earlier
12  testing that we were looking at.
13      In looking at Exhibit 1, we were
14  talking about the OSHA excursion limit of one fiber
15  per cc.
16    A.  Yes.
17    Q.  By the way, under the OSHA excursion
18  limit are there certain precautions that are
19  required for workers to take when the levels reach
20  that level?
21    A.  Yes.  A lot of things get triggered
22  when you're at those types of levels.  There would
23  be a trigger for protective equipment to make sure
24  employees are properly protected.  There would be a
25  trigger for medical monitoring, which already is

12 (Pages 42 to 45)

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Page 46

1  there. There would be a trigger for training of
2  the employees. There would be a trigger for a
3  program, policy, within your company to do all of
4  these things. Those are the types of things that
5  we see that are triggered.
6      Q. In looking at the first test, the drop
7  testing in Exhibit 1, how many samples were
8  collected?
9      A. A total of 20 samples were collected.
10 Two of those were background samples.
11     Q. So 18 of those were during the
12 actual activities?
13     A. Yes. Those were actual activities
14 during -- with drops.
15     Q. And of those 18 samples how many of
16 those samples exceeded today's OSHA excursion of
17 one fiber per cc?
18     A. All 18 of them were above one fiber per
19 cc.
20     Q. And turning to Exhibit 2, the same
21 question.
22     A. Exhibit 2, of the seven samples — and
23 this was the original work done by me in Cambridge
24 of dry material versus wet material with Steve
25 Venuti, and of the seven samples all but one of

Page 47

1  them exceeded 1.
2      Q. And the one that did not exceed 1, was
3  that one of the wet samples?
4      A. Yes.
5      Q. I would like to hand you what has been
6  marked as Deposition Exhibit 5 and ask if you can
7  identify this document for the record.
8      A. This is a request for engineering --
9  for technical service dated June 3, 1977. It was
10 requested by Fred Eaton and approved by me, and
11 this is for evaluating attic test samples from
12 Weedsport, and there were six samples which were
13 submitted.
14     Q. And again, this is simulation testing
15 done in a simulated attic at Weedsport?
16     A. Yes. According to the chain of custody
17 it's a simulated attic test, no binder.
18     Q. By the way, the simulated attic, how
19 was that constructed?
20     A. I never really saw it. I never saw it
21 and the pictures of it were always obscure to me
22 and nobody ever told me about it. I wasn't
23 involved in the design or the construction of it,
24 and I never actually saw it that I can recall.
25     Q. Well, are you familiar with the purpose

Page 48

1  of that testing?
2      A. Yes. The purpose of the testing was to
3  -- I believe that we wanted to -- I shouldn't say
4  it that way.
5          I believe the Construction Products
6  Division wanted the simulated attic to be at an
7  expander plant and not to do it in Cambridge,
8  because there really weren't facilities for doing
9  it in Cambridge that were appropriate. Doing it in
10 an expander plant made much more sense. And
11 Weedsport had the room for it, so it was done there
12 and it was close by. It wasn't difficult to get to
13 Weedsport, and I do not believe that anybody in the
14 Health and Safety Department was consulted on the
15 design or the use of that for the drop testing.
16 That was all designed by people from the
17 Construction Products Division, constructed by them
18 and operated by them.
19         Where I was involved was in the
20 collection of the samples and the analysis of --
21 getting these into the laboratory, they had to go
22 across my desk.
23     Q. And what material was tested for this
24 simulated attic test in Exhibit 5?
25     A. This is all Libby 1 material, 4-cubic

Page 49

1  foot bags of Libby 1. I don't see any listing on
2  here of where the material was produced.
3          There were three different tests. One
4  test was product. It wasn't screened. Another was
5  product that was over a 14-mesh screen and a third
6  was product over a 5-mesh screen.
7      Q. And is there a summary of the results?
8      A. The summary states that six samples
9  were received from Weedsport attic test -- six
10 samples were received from Weedsport attic test and
11 were analyzed. All contained more than two fibers
12 per cc.
13     Q. And obviously all of these results
14 would exceed the current OSHA excursion limit;
15 correct?
16         MR. RESTIVO: Object to the form of the
17 question.
18     A. All of these exceed one fiber per cc.
19 That's correct.
20     Q. And what was the range of the results?
21     A. The range was from 3.42 to 5.70.
22         I must say that there was a tendency in
23 reporting these results from the laboratory to use
24 more significant digits than would be allowed. In
25 general there is only two significant digits and

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Page 50

1  they're reporting it out to three, so the third
2  digit is irrelevant.
3       Q.  When you say the "third digit" --
4       A.  The third digit, which is the
5  hundredths column.
6       Q.  And why is that?
7       A.  Well, because when you're working with
8  significant digits and rounding and so forth, you
9  can't create more digits than what you started
10  with.  That's just -- that's a statistical law.
11  You lose all your accuracy once you go past the
12  number of significant digits you started with.
13       Q.  How much variability would there be?
14       A.  That's an interesting question because
15  there is variability in any testing method.
16       The actual sampling method here at the
17  time that this was done between the air and the
18  measurement of the flow rate and the measurement at
19  the time and then the error which is inherent in
20  the counting process, it is supposed to be plus or
21  minus 15%, so you would have a swing of 30%, 15 in
22  either direction.  But when we first started out in
23  this and the way we were measuring the flow rates,
24  it was difficult to get a primary standard into the
25  field.  The best we could do is what we call a

Page 51

1  secondary standard for measuring flow rate, and
2  therefore that would tend to increase the
3  opportunity for error.
4       I would say that these numbers are
5  probably accurate to within plus or minus 30% of
6  the true mean value.
7       Q.  Is there another report also attached
8  to Exhibit 5?
9       A.  Yes.  It's dated June 3rd, 1977, and
10  it's No. 67543.  This is an evaluation of attic
11  test samples, and these are 16 samples from
12  Weedsport, which were engineering test samples.
13       Q.  What does that mean, that they're
14  engineering test samples?
15       A.  Well, in general we stamp things that
16  were engineer test sampled, that these apply to
17  anything that wasn't involving occupational
18  exposure in the plant to production material.
19       If the Health and Safety Department
20  went out to an expanding plant and monitored
21  exposures during normal production, that would be a
22  normal air sampling evaluation of the workplace.
23  That would not be stamped engineering.  But when
24  Fred Eaton went out and did his work, we wanted to
25  make sure that everybody understood that this was a

Page 52

1  simulation; this wasn't -- we weren't actually
2  doing product work here that involved employees of
3  the company who were in production.  This was a
4  special test done for engineering purposes to
5  figure out what types of levels of exposures we
6  were getting.  It had nothing to do with production
7  material.
8       Q.  And what type of test -- what was the
9  testing of what was being tested in this next
10  report?
11       A.  This is called the Second Simulated
12  Attic Test, and apparently this was done with
13  binders that were developed by Julie Yang and the
14  material here -- let me see if it says what size it
15  is.
16       I don't see anything on here that says
17  what size Libby material it is.  Maybe you see it.
18  I don't.  But this was a pouring of attic test
19  material.
20       MR. RESTIVO:  I'm sorry, sir.
21       Are you looking at the page that says
22  "Second Simulated Attic Test - Yang Binder Test" at
23  the top?
24       THE WITNESS:  Yes.
25       MR. RESTIVO:  Does Footnote No. 4 help

Page 53

1  you answer --
2       THE WITNESS:  There it is.  I know it
3  was on here somewhere.  It's Footnote No. 4.  Thank
4  you.  All material of Libby No. 1 where cyclone
5  fines were removed.
6  BY MR. TURKEWITZ:
7       Q.  So this was a test done with a binder
8  and the previous test that we looked at was a
9  simulated attic test without a binder; is that
10  correct?
11       A.  Yes.  The simulated attic test that we
12  talked about previously that are attached to this
13  document dealt with material that had been screened
14  and nonscreened, and this is material on the second
15  simulated test that involved material that had been
16  -- had a binder applied to it.
17       Q.  Now, how do the levels compare between
18  the testing without a binder and the testing with a
19  binder?
20       MR. RESTIVO:  Object to the form of the
21  question.
22       A.  Well, I should also add that there was
23  another note in here that says that materials that
24  have a 12 series in front of them were screened.
25  So not only do we have material with just a binder,

Page 54

1  we also had material that had a binder and
2  screened.
3       When comparing these results all of the
4  results were above one fiber per cc, and it really
5  didn't matter whether it was screened or
6  nonscreened or whether it had binder or didn't have
7  binder.
8       It's hard to make a generalization. It
9  doesn't appear as though using the binders really
10  had that much effect on it. There was some effect
11  from the binder, but it wasn't dramatic enough to
12  really improve the product, to get it below 1.
13       Q. Then at the bottom of the last page,
14  was there testing done during cleanup?
15       A. Yes. There appears to be two samples
16  that were done during cleanup. I'm not really all
17  that familiar with how they did the cleanup, the
18  process that was used. It was never described to
19  me, but there was a note here that "did not include
20  vacuuming". So the cleanup was probably done with
21  shovels. I don't believe they do it with sweeping,
22  but these were -- these samples — there is a note
23  in here that one of the samples was too dusty to
24  count.
25       Q. And the one that was counted, what was

Page 55

1  the level?
2       A. The one that they were able to count
3  was a result of 1.35 fibers per cc.
4       Q. Going on, I would like to show you
5  Hamilton Exhibit 6 and ask if you can identify that
6  for the record.
7       A. This is Document 67573 dated 7/14/77
8  and this was -- by this way, this was approved by
9  me and --
10       MR. RESTIVO: Excuse me, Mr. Hamilton.
11  Would that be Document 67571, not 73?
12       THE WITNESS: Well, mine says 73. Is
13  that a 3?
14       MR. RESTIVO: Look at the second page.
15       THE WITNESS: No. This says 67573.
16       MR. RESTIVO: Give me a minute to find
17  the right document. What is the date?
18       THE WITNESS: 7/14/77.
19       MR. RESTIVO: And this is Exhibit 6?
20       MR. TURKEWITZ: This is Exhibit 6.
21       THE WITNESS: So 67573 is Exhibit 6 and
22  this was, again, four samples from Weedsport,
23  simulated attic test with Libby No. 2.
24  BY MR. TURKEWITZ:
25       Q. The previous test that we looked at,

Page 56

1  that was Libby No. 1; is that correct?
2       A. Yes. This was Libby 1.
3       Q. And this is now Libby 2 being tested?
4       A. Correct.
5       There is no laboratory sheet attached
6  to it, but the results page of the summary says:
7  Evaluation was made of four simulated attic samples
8  from Weedsport. All four exceeded two fibers per
9  cc of air.
10       Q. I would like to show you what has been
11  marked as Hamilton Exhibit 7 and ask if you can
12  identify this document for the record.
13       A. Right. This is No. 67572. This was
14  the evaluatation — by the way, this was approved
15  by me and collected by Fred Eaton. It was
16  submitted 7/14/77. Eight simulated attic samples
17  from Weedsport, and the summary says that all
18  exceeded two fibers per cc of air. This was a
19  simulated attic test of Libby No. 3 which was
20  screened over a 14-mesh screen.
21       Q. How many samples -- in the first test
22  report how many samples were analyzed?
23       A. Let's see. They were eight samples
24  total collected here.
25       Q. What was the range of the results?

Page 57

1       A. The range was from 0.75 to 2.71.
2       Q. Of those results how many of those
3  results exceeded the OSHA excursion limit of one
4  fiber per cc?
5       MR. RESTIVO: Object to the form of the
6  question if you're suggesting that was the OSHA
7  excursion limit on the date of Exhibit 7.
8       MR. TURKEWITZ: We're referring to
9  today's OSHA excursion limit.
10       A. Right. Seven of them exceed one fiber
11  per cc.
12       Q. Is there a second test attached to this
13  report?
14       A. Yes. It's No. 67571 dated 7/14/77.
15  These are the evaluation of attic test samples from
16  Weedsport for Libby No. 2, and there were two
17  samples submitted on this.
18       Q. And was anything — how was the
19  material treated in this testing?
20       A. This appears to be a control test of
21  4-cubic foot — we'll call it the 4-cubic foot bag
22  size. It says the material was dusty during the
23  pour and the results ranged from 4.78 to 5.78, and
24  there were only two samples collected.
25       Q. Was this screened Libby No. 2?

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Page 58

1    A. Yes. This was simulated attic test
2 with screened Libby No. 2 over -- does it say what
3 size screen?
4        I suspect that this was the same screen
5 as the screened material here, which I think was a
6 14 mesh.
7        Yes. It probably was the same material
8 as the previous, and it would be a 14-mesh screen.
9    Q. And again, both of these samples exceed
10 today's OSHA excursion limit?
11        MR. RESTIVO: Object to the form of the
12 question.
13    A. Yes.
14    Q. I would like to show you what has been
15 marked as Hamilton Deposition Exhibit 8 and ask if
16 you can identify that document for the record.
17    A. This is No. 67575.
18    Q. And what was being tested -- what is
19 the date of this test?
20    A. This is dated -- the report date is
21 July 25th, 1977. The collection date I think was
22 July 17th, although that could be the 19th.
23    Q. And what was tested in this report?
24    A. This was the simulation of attic test
25 of Libby No. 3, and it was screened on the 14-mesh

Page 59

1 screen.
2    Q. By the way, I don't see your name on
3 this report.
4        Would this report have come across your
5 desk?
6    A. Yes. Although the cover page for the
7 technical request is not attached to the front of
8 this document, this document would have gone -- at
9 that time period this document would have been
10 requested by me.
11    Q. And looking at the results on Page 3,
12 can you read the results better than you can on
13 Page 2?
14    A. Yes.
15    Q. And at the bottom it states: Test 19AS
16 1 and 2, screened 14-mesh, cyclone fines returned
17 to product.
18    A. Unbound.
19    Q. Unbound.
20    A. And then the Test 19BS 1, 2, 3 and 4
21 were the same, but it was bound. It had a binder
22 on it.
23    Q. Why were they testing the product with
24 the cyclone fines being returned to the product?
25    A. Well, as I stated earlier, the cyclone

Page 60

1 fines were fines that were actually product that
2 were pulled off during the manufacturing because of
3 the bag houses that were there to control dust and
4 so forth would pull product as well as dust, and
5 the cyclone would spin out the heavier product and
6 those would drop out and the lighter fines and so
7 forth would pass through at the bag house.
8        By having the cyclone then you were
9 able to recapture product which has been pulled off
10 during the manufacturing as an emission. You could
11 then reclaim that product, put it back in. It's
12 actually expanded vermiculite and some things that
13 you want to throw back in because it has value,
14 actual value.
15    Q. And what were the results of this
16 testing of Libby No. 3 with no binder?
17    A. Okay. The first -- Samples 1 and 2,
18 which are the first four samples with no binder on
19 them, range from 1.01 to 4.79, I think, or maybe
20 4.99. I can't tell.
21    Q. And how many of those samples would
22 exceed or exceed today's OSHA excursion limit of
23 one fiber per cc?
24    A. All four of them would exceed that
25 limit.

Page 61

1    Q. And what was the range of the testing
2 of the material with a binder?
3    A. That ranged from, it looks like, .49 to
4 2.51 with four of those exceeding one fiber per cc.
5    Q. I would like to show you what has been
6 marked as Hamilton Deposition Exhibit 9 and ask if
7 you can identify that document for the record.
8    A. Yes. This is number -- I can't read
9 that. It's 675 something 82, it looks like. 67582
10 dated August 4th.
11        I'm sorry. These don't appear to be --
12 I see. They were submitted on August 1, but it was
13 reported on August 4th. This is 36 simulated attic
14 test samples that were done in Weedsport by Fred
15 Eaton, and it looks as though this is all Libby 2.
16    Q. In looking at the results, was the
17 first set of test results Libby 2 unscreened with
18 all cyclone fines returned to the product?
19    A. Yes. That's the 20A series. So
20 anything beginning with 20A is Libby 2, which is
21 unscreened, all the cyclone fines returned to the
22 product.
23    Q. And what was the range of the results
24 of this testing?
25    A. Just looking at the 20 series now, the

Page 62

1    range was from 0.47 to 4.56 with 11 of them
2    exceeding one fiber per cc.
3        Q.  And then --
4        A.  That's 11 of 12 samples exceeding one
5    fiber per cc.
6        Q.  Is there another test that was done of
7    Libby 2 with all cyclone fines pulled from the
8    product?
9        A.  Yes.  That's the 21 series, indicating
10   sample beginning with 21 would be Libby 2
11   unscreened with all cyclone fines pulled, and it
12   appears as though there are eight samples with that
13   21 designation, and the range on that is from .21
14   to 2.4.
15       Q.  How would you compare the range of
16   results for the material where the cyclone fines
17   had been pulled to the results with the material
18   where the cyclone fines were returned?
19       MR. RESTIVO:  Object to the form of the
20   question.
21       A.  I think if you were to average these
22   out you would see that the fiber levels are less
23   than one half -- when you don't return the fines to
24   the product, the fiber levels drop by more than
25   50%.

Page 63

1        Q.  So with the fines returned to the
2    product, the levels are twice as high?
3        A.  With the fines returned to the product
4    the resulting fiber level at the attic simulation
5    test was at least -- it was more than twice as
6    high.
7        Q.  And then did the testing repeat itself
8    once again?
9        A.  It appears that they then did on the
10   26th of July, which was earlier -- they did No. 2
11   Libby, which was screened with 14 mesh with all
12   cyclone fines removed, and this is what is known as
13   the 23 series, the sample known as beginning with
14   23, and in this case the sample results ranged from
15   0.46 to 1.37 with only one of those samples
16   above 1.
17       Q.  And that's Libby 2 screened with all
18   cyclone fines removed?
19       A.  And it went over a 14-mesh screen.
20       Q.  Now, looking at the page prior to that,
21   is there another test done on 22 series samples
22   with Libby 2 screened, 14 mesh, with all cyclone
23   fines returned?
24       A.  Yes.  That's the difference between the
25   22 series and the 23.  It's Libby 2, 14-mesh

Page 64

1    screened.  The difference is in the 22 series the
2    fines were returned, whereas in the 23 series the
3    cyclone fines were removed.
4        Q.  And again, what is the difference in
5    the results based on the range of those results --
6    what is the difference between the Libby 2 screened
7    were the fines were removed to the Libby screened
8    where the fines were returned?
9        MR. RESTIVO:  Object to the form of the
10   question.
11       A.  On average it appears as though there
12   was about a 50% reduction in the resulting airborne
13   fiber level when the cyclone fines were removed.
14       Q.  I would like to hand you what has been
15   marked as Hamilton Exhibit 10 and ask if you can
16   identify that for the record.
17       A.  Yes.  This is No. 67583 dated 8/3/77.
18   These are attic test samples from Weedsport and
19   there were eight tests -- eight samples submitted.
20       Q.  And what material was being tested
21   here?
22       A.  This is a simulated — by the way,
23   I'm the requester.  I'm sorry.  I'm the approval on
24   this document.
25       The simulated attic test for

Page 65

1    Libby No. 1 and this is a screened Libby 1,
2    14-mesh, with all cyclone fines removed.
3        Q.  And what was the range of the results
4    there?
5        A.  The results ranged from 0.61 --
6    I'm sorry.  0.55 to 1.83.  Of the 12 here there is
7    -- nine of the 12 exceeded one fiber per cc.
8        Q.  Is that 12 samples?
9        A.  I'm sorry.  There is averages in there.
10       It's eight samples.  There are some
11   averages in there of those samples.  So we have
12   eight samples and six of them exceeded one fiber
13   per cc.
14       Q.  I would like to show you what has been
15   marked as Deposition Exhibit 11 and ask if you can
16   identify that document for the record.
17       A.  This is Document No. 67584 dated
18   8/3/77, and it involves sampling in Weedsport, the
19   attic testing in Weedsport, and there were eight
20   samples submitted.
21       Q.  What material was being tested here for
22   the simulated attic test?
23       A.  Now, this is Libby No. 1.  It's a
24   screened.  I can't read what mesh that is and even
25   Jack Wolter couldn't tell, but it is 14 mesh,

Page 66

1  according to the note on the front of it. So this
2  is a 14 mesh with all cyclone fines returned to the
3  screen.
4      Q.  What does that mean by "all cyclone
5  fines returned to the screen"?
6      A.  Well, as I understand it, there was a
7  screen in what we call the stoner. They put a
8  screen in there and they were trying to get the
9  fines and so forth out of there.
10      In the process there are times when the
11  cyclone will pull product because it's pulling
12  strongly, and you can take those cyclone fines and
13  put them anywhere they want. In this case they
14  returned it right to the screen to try to just get
15  vermiculite product salvaged out of that.
16      Q.  So this is a material that the fines
17  are not going back into the product itself?
18      A.  No. It's not going into the product
19  bag. It's going into what they call the stoner,
20  I believe, which would be the screening area.
21      Q.  Is there a note at the bottom
22  describing the material?
23      A.  Yes. This material was very clean and
24  dust free.
25      Q.  And what was the range of the airborne

Page 67

1  fiber levels that were found during this pouring of
2  material?
3      A.  The low was 0.78 and the high was 1.81.
4  Seven of those exceeded one fiber per cc.
5      Q.  Seven out of eight of those samples
6  exceeded one fiber per cc?
7      A.  That's correct.
8      Q.  I would like to show you what has been
9  marked as Deposition Exhibit 12 and ask if you can
10  identify that for the record, please.
11      A.  This is — I believe it's 67591, and
12  it's four tests from samples from Weedsport and —
13  I'm sorry. It's eight simulated attic test samples
14  from Weedsport, four tests but there are two lines.
15      MR. RESTIVO: Mr. Hamilton, I'm sorry.
16  Can you give me the number again.
17      THE WITNESS: Yes. It's obscured on
18  mine, but it looks like this.
19      MR. RESTIVO: Would you agree
20  Exhibit 12 appears to be, based on the second page,
21  No. 67591?
22      MR. TURKEWITZ: Yes.
23      MR. RESTIVO: Thank you, sir.
24      A.  This was a simulated attic test for
25  Libby No. 3 product. It was screened on 16 mesh

Page 68

1  and it had a binder and all the cyclone fines were
2  pulled.
3      Q.  And are the results summarized on the
4  second page?
5      A.  Yes. The results say that eight
6  simulated attic test samples from Weedsport were
7  received and evaluated. Six samples also exceeded
8  the limit, and that would be the limit of two
9  fibers per cc.
10      Q.  Turning to the second page, what was
11  the range of the levels that were found?
12      A.  The range there was from 1.86 to 2.61.
13      Q.  And this is a material where all the
14  cyclone fines were pulled?
15      A.  Yes.
16      Q.  And of the eight samples how many of
17  those samples exceeded the current OSHA excursion
18  level of one fiber per cc?
19      A.  All eight of them exceeded that.
20      Q.  Sir, I would like to show you what has
21  been marked as Hamilton Exhibit 13 and ask if you
22  can identify that for the record.
23      A.  This also -- in order to read the
24  number you have to go to the second page. It's
25  67590, and this is a simulated attic test from

Page 69

1  Weedsport with eight samples were submitted and
2  this was a simulated attic test of Libby No. 3
3  screened on a 16-mesh screen with all cyclone fines
4  pulled.
5      Q.  So the last test that was done was when
6  a binder was applied; is that correct?
7      A.  Yes. The last test talked about a
8  binder which had been applied, and this test is
9  similiar material with no binder.
10      Q.  And what was the range of the test
11  results for this test which is marked as Exhibit 13
12  dated August 19th, 1977?
13      A.  Right. The range of results on the
14  eight samples was from 0.7 − 0.50 to 1.28, and
15  four of these exceeded one fiber per cc.
16      Q.  Can you explain why the levels of this
17  unbound material are in this situation lower than
18  the levels in the previous testing where the
19  material was bound?
20      MR. RESTIVO: Object to the form of the
21  question. I object on the grounds lack of personal
22  knowledge.
23      A.  Well, you know, it's interesting that
24  those levels would look different to you. I find
25  that most people that look at data like this, they

18 (Pages 66 to 69)

Page 70

1  see a difference between 1.01 and 1.28 and 2.04.
2      To me those are identical. There is no
3  difference between the data, and the reason I say
4  that is because of the margin of error. When you
5  put the error bars on they seem to overlap. If you
6  say: Okay. Take the first set of data and put the
7  error bars on it and take the second set and put
8  the error bars on it, they probably would overlap.
9      This could be a precision error in the
10  reader, the way the reader did them. It could be
11  an error in the way that it was collected; they did
12  something slightly different, but from my view in
13  having looked at thousands of these types of
14  samples, these results don't look that much
15  different to me. Another way of saying it is that
16  in my opinion putting a binder on really didn't
17  change things.
18      Q. Let me show you what has been marked as
19  Hamilton Exhibit 14 and ask if you can identify
20  that document for the record.
21      A. This is No. 67589. This is dated
22  8/18/77 and this was for 32 attic test samples.
23      Q. And is that your name at the top right
24  on the first page?
25      A. Yes. I am the approver on this.

Page 71

1      Q. And what was being tested in this round
2  of testing?
3      A. These are the simulated attic tests for
4  Libby No. 3. It appears all of this was screened
5  and all the cyclone fines were pulled.
6      Q. And are the results summarized on the
7  second page?
8      A. Yes. The summary states 32 attic test
9  samples were received from Weedsport and evaluated.
10  28 samples exceeded the limit, and that limit there
11  would have been the limit of two fibers per cc.
12      Q. And looking at the actual record, the
13  Air Sampling Record Sheet, can you tell us what the
14  range was for the results during this testing?
15      A. Yes. Some of these had binder put on
16  them.
17      If we're looking at the very first test
18  sheet, which was Libby 3 screened, 14 mesh, all
19  cyclone fines pulled with no binder — we have
20  eight samples here. The range was from 1.58 to
21  3.74, and all of these exceeded one fiber per cc.
22      Q. And then the second page, is there —
23      A. The second page is again Libby 3.
24  In this case we have 14-mesh screen, all cyclone
25  fines pulled, and this indicates a binder had been

Page 72

1  applied to the product and the results -- there are
2  eight samples. The range on these was from 1.8 to
3  4.01, and all of these exceeded one fiber per cc.
4      Q. And the third page?
5      A. The third page we have Libby 3 screened
6  over a 20-mesh screen rather than a 14-mesh screen,
7  and this also had the cyclone fines pulled and a
8  binder was applied. There were eight samples
9  collected. They ranged from 2.14 to 3.63, and all
10  of them exceeded one fiber per cc.
11      Q. And then the fourth page?
12      A. The fourth page we have Libby 3
13  screened material with a 20-mesh screen and all
14  cyclone fines were pulled, and the range on the
15  eight results was from 1.66 to 4.04, and all of
16  them exceeded one fiber per cc.
17      Q. Now, during all this testing that was
18  done, were the observations made that there was
19  very little dust visible while pouring?
20      MR. RESTIVO: Object to the form of the
21  question.
22      A. There is a note — on each of these
23  pages at the bottom there are additional comments
24  that said along the lines that the material looked
25  good and there was little to no visible dust while

Page 73

1  pouring. "No dust while pouring." "Little to no
2  dust while pouring." This appeared to be clean
3  material in terms of visible dust.
4      Q. But it still resulted in levels
5  exceeding the then OSHA PEL and certainly today's
6  OSHA excursion level?
7      MR. RESTIVO: Object to the form of the
8  question.
9      A. Well, I'll say it the way I want, the
10  correct way. I'm going to say they all exceeded —
11  for the most part they exceeded one. I don't think
12  any of these were less than one and several of them
13  exceeded two fibers per cc, but the two fiber per
14  cc is an eight-hour TWA, and there were no time
15  weighted averages calculated.
16      So on an instantaneous or a 15- or
17  20-minute -- well, these were -- for the period of
18  time that they sampled it did exceed two for the
19  most part on nearly all of these samples.
20      Q. Let me hand you what has been marked as
21  Hamilton Exhibit 15 and ask if you can identify
22  that document for the record.
23      A. Yes. This is Report No. 67636 and it's
24  dated January 6th, 1978, and I am the person that
25  approved this. This was a simulated attic test

19 (Pages 70 to 73)

Page 74

1   from Weedsport again, and there were ten samples
2   that were submitted.
3          According to the summary the results
4   showed that nine of these samples exceeded the
5   limit of two fibers per cc. This is a simulated
6   attic test with Libby 3 and there are various
7   changes to the Libby 3 that were made.
8          Q. Did the material that was tested come
9   from various sources?
10         A. Yes. That's what made this kind of
11  interesting. The material appeared to be
12  manufactured pretty much the same way in different
13  facilities. The first test set came from Omaha,
14  the second from Trenton, the third from Dallas and
15  the fourth from East Hampton.
16         Q. Was there one additional source?
17         A. I think the "W" is Weedsport. If
18  anything began with a "W" means Weedsport, so you
19  would have five different locations.
20         Q. And what was the range of results for
21  all of this testing?
22         MR. RESTIVO: Object to the form of the
23  question.
24         A. If you look at the range on all these,
25  this is a Libby 3 screened 14 mesh unbound from

Page 75

1   five different locations. The range went from 2.1
2   — I'm sorry. — 1.07 to 8.55, and all of these
3   exceeded one fiber per cc.
4          Q. I would like to show you what has been
5   marked as Hamilton Deposition Exhibit 16 and ask if
6   you can identify that document for the record.
7          A. It's hard to read it on the first page,
8   but on the second page it says 67567 as the number.
9   This is, again, simulated attic test samples from
10  Weedsport and there were ten samples that were
11  collected.
12         The summary says that all ten samples
13  exceeded 4.5 fibers per cc of air. This is —
14  according to the notes here, it's an simulated
15  attic field test with screened Libby No. 3 and it's
16  screened over a 14-mesh screen with all cyclone
17  fines removed.
18         Q. And what was the range of the levels in
19  this testing of Libby 3?
20         MR. RESTIVO: Object to the form.
21         A. The range of the numbers appears to be
22  4.8 at the low end to 12.83 at the far range. So
23  just between 4.81 and 12.83.
24         Q. At the time — by the way, when this
25  testing was done, did OSHA have an excursion limit

Page 76

1   at that time?
2          A. You know, it's been so long since I've
3   looked at this. It might have had one like five,
4   but I don't recall. It's been too long. Sorry.
5          You have to understand I don't do
6   asbestos work now. It's been probably since 1987.
7   I don't do asbestos work anymore and my company
8   does not insure to do asbestos work, so we don't do
9   it. We refer all that work to other companies, so
10  I'm really kind of rusty on what the standards were
11  in 1977. I suppose a little bit of research would
12  refresh my memory on that.
13         Q. I would like to show you what has been
14  marked as Hamilton Deposition Exhibit 17 and ask if
15  you can identify that document for the record.
16         A. This is No. 67691 dated April 6th,
17  1978, and this is an evaluation of samples that
18  were considered to be what is known as super clean
19  simulated attic tests. There were 33 samples that
20  were collected and submitted on this request form,
21  and according to the summary it says three samples
22  had more than two fibers per cc, and this says West
23  Chicago, Libby No. 1.
24         Q. What was super clean zonolite attic
25  insulation?

Page 77

1          A. I'm not real sure exactly what super
2   clean was, but from what people have said to me
3   that I can recall there was some cleaning that was
4   done of this material prior to expansion at Libby.
5   And I may be completely wrong on that, but it seems
6   to me that's what the clean was, and this,
7   I believe, was a development that Julie Yang might
8   have come up with where they were trying to clean
9   the material prior to expansion through a special
10  air-stripping process.
11         Now, that's the way I recall it in my
12  memory from years and years ago. It's been
13  25 years since I've looked at this, but it seems to
14  me that that's what it was, an air-stripping
15  process to clean the vermiculite prior to
16  expansion.
17         Q. To your knowledge was this material
18  that was tested here being marketed and sold?
19         MR. RESTIVO: Object to the form of the
20  question. Also object on the lack of knowledge.
21  BY MR. TURKEWITZ:
22         Q. Let me ask you this: Was this
23  production material that was being tested?
24         MR. RESTIVO: In Exhibit 17?
25         MR. TURKEWITZ: Right.

20 (Pages 74 to 77)

Page 78

1     A.  I don't ever recall super clean
2  material ever going into production as a standard
3  product.
4     Q.  In looking at the test results on
5  Page 3, are there results during cleanup of the
6  material?
7     A.  Here it is, cleaning up.  There are
8  cleanups that occur.
9        For example, on Page 1 it says there
10  was a sample there.  It says:  Cleanup, rebagging,
11  Sample 151SC-3 and 4.  That would be South
12  Carolina.
13     Q.  Super clean?
14     A.  I'm sorry.  Super clean, 3 and 4.
15     Q.  On the first page is it referring to
16  the pouring of the material?
17     A.  Yes.  It says pouring of the material.
18  It's interesting they say:  Material quite dusty
19  and dirty during cleanup and rebagging.
20        Oh, I see.  They rebagged the material
21  apparently and they got some dust generated at that
22  time.  But these first samples are from the first
23  three sets they are pouring and fill.  Samples 7,
24  8, 9 and 10 were cleaning up the material.
25     Q.  What was the range of the results for

Page 79

1  the super clean Libby 1?
2     MR. RESTIVO:  Object to the form of the
3  question.
4     A.  We're looking at Samples 1SC-1 through
5  1SC-10, which would include pouring and cleaning
6  up, and the range was from 0.19 to 1.10.
7     Q.  And the 1.10, what was the activity
8  taking place?
9     A.  That was during cleanup.
10     Q.  And then turning to the next page, is
11  there another set of test results with this report?
12     A.  Yes.  This would be samples that begin
13  with a 2SC-1 through 2SC-12.
14     Q.  And what material was being tested
15  there?
16     A.  This is super clean simulated attic
17  test for Libby No. 2.
18     Q.  And what was the range of the test
19  results for super clean Libby 2?
20     MR. RESTIVO:  Object to the form.
21     A.  It ranged from 0.22 to 1.35.
22     Q.  And how many of those samples — how
23  many samples were analyzed?
24     A.  There were 12 total.
25     Q.  How many of those exceeded the current

Page 80

1  OSHA excursion level?
2     A.  Five of them were above 1.
3     Q.  Is there another report attached?
4     A.  Yes.  There is another report attached.
5  It's 67692 dated April 6th, 1978, and these were
6  samples of super clean Libby No. 1 and Libby No. 2
7  taken in the Weedsport attic test.
8     Q.  What was being tested there during that
9  testing?  How was that testing performed?
10     A.  This was super clean attic test for
11  Libby 2.  The first tests were Libby 1.  I believe
12  this was, I believe, a repeat of the first set of
13  tests just doing super clean Libby 2.  Some samples
14  were collected outside the attic area before the
15  test was taken, before there was any simulation,
16  and then they repeated the pouring and the cleanup.
17     Q.  And what was the range of the results
18  for Libby No. 2 super clean?
19     A.  These ranged from less than 0.06 to a
20  high during cleanup of 1.5 — I'm sorry.  I'll have
21  to check to see what Sample No. 5 is, but the high
22  was 1.58.  So the range was less than 0.06 to 1.58.
23     Q.  Where were the highest levels found?
24     A.  The highest level was 1.58 and it says
25  that this was seen as SCE-2.  1SCE-3 and 4, let's

Page 81

1  see what that is.
2        I think this high level here, it says
3  1SCE-5, the same as SCE-2 taken with personal
4  Sample 1SCE-3 and 4.  This would be pouring fill.
5  And then the next one is 1.35 taken with personal
6  samples 1SC-5 and 6, which again is pouring fill.
7     Q.  Turning your attention to the fourth
8  page of this document, what does it state in the
9  note down below?
10     A.  Is this the page you're on?
11     Q.  The page before that.
12     A.  It would be that page?
13     Q.  Yes, sir.
14        That's super clean simulated attic
15  cleanup L1; is that correct?
16     A.  Correct.
17     Q.  And what does it state in the note down
18  at the bottom?
19     A.  The last sentence or the whole note?
20        It says:  These samples were taken
21  while shoveling up Libby 1 attic fill and putting
22  it into 4-cubic foot plastic bags.  The attic
23  window was open and exhaust fan on during cleanup.
24  Ten shovel per 4-cubic foot bag per minute -
25  15 seconds.  There appeared to be more dust

Page 82

1  generated cleaning up this material than any
2  previous screened L-1, 2 or 3 unbound.
3      Q. And what was the highest level found
4  during the cleanup?
5      A. 1.1 fibers per cc.
6          MR. TURKEWITZ: Why don't we take a
7  break then.
8          THE VIDEOTAPE SPECIALIST: This
9  concludes Tape 1 of the videotape deposition of
10  Thomas Edgar Hamilton. The time is approximately
11  12:35.
12      Off the record.
13      (Lunch recess taken.)
14          THE VIDEOTAPE SPECIALIST: Back on the
15  record. This is Tape No. 2 of the videotape
16  deposition of Thomas Edgar Hamilton. The time is
17  approximately 1:30 p.m.
18  BY MR. TURKEWITZ:
19      Q. Mr. Hamilton, prior to taking our lunch
20  break we were talking about the simulated attic
21  testing that was conducted by Grace in the 1970's,
22  and were any goals established for the simulated
23  attic testing?
24      A. I don't think they did anything at
25  Grace without something like this where they spent

Page 83

1  a lot of money without a goal. I think the work
2  that was being done by Fred Eaton was to first
3  determine what levels of release of fiber release
4  would we see with attic products in actual use, and
5  then his assignment was to see if there were
6  products that could be used to amend the
7  vermiculite to bind the fiber to see if a new
8  product would be developed that would not have any
9  fiber release, so it would have a very low fiber
10  release during the use in an attic at the consumer
11  level.
12      So the answer to your question, I think
13  there were goals, and I think those goals were
14  quite straightforward. It was to figure out what
15  we have and figure out what can be done to make the
16  product better.
17      Q. Were any air standard goals established
18  while you were there?
19      A. During my employment there we did have
20  air standard goals that we looked at, not only for
21  -- asbestos would be one product. There were many
22  other chemicals for which we established at Grace
23  what we call a GIL or Grace Internal Limit.
24      Within Construction Products I was
25  aware of the fact that at the manufacturing level

Page 84

1  they were looking for a goal of the lowest
2  achievable level, but it specifically was looking
3  at levels down around .1. Getting down to .1 and
4  lower was really a goal that amounted to a large
5  investment.
6      I have to say that they were quite
7  successful at it, too. You know, when you look at
8  success stories, that was one of them. I think
9  that the engineering group at CPD had some
10  innovative ideas for lowering fiber levels,
11  exposure levels, in the plant and at Libby, and
12  I've even had people from NIOSH mention to me that
13  they had been to Libby -- NIOSH being the National
14  Institute of Occupational Safety and Health in
15  Morgantown, West Virginia. They mentioned to me
16  how creative and how well the ventilation systems
17  were designed.
18      So the answer to your question is we
19  had goals, and those were important always to
20  establish where do you want to be in terms of fiber
21  levels in the plant, and I think Jack Wolter was
22  probably one of the catalysts. He was of the
23  managers of production that set the goal for the
24  engineering group and for the plant managers, and
25  they did a pretty good job of meeting of that goal

Page 85

1  of getting down towards .1.
2      Q. And that was in the plants?
3      A. That was in the manufacturing plants.
4  Correct.
5      Q. Did you ever run into problems with any
6  occasion of any type of fiber release or fiber
7  release episodes in the plants?
8      A. Yes. I would say that over the years
9  the plant managers and the people from Health and
10  Safety group got very good at identifying what
11  types of events would create a fiber release in the
12  plant that would be unacceptable. Certain things
13  like port pressure on the bag house -- you know, if
14  the pressure got too high across the bags means
15  that you're not getting enough air through and you
16  get a degradation of air capture on the expander
17  unit; the changing of the bags and how often to do
18  it and what levels worked.
19      Another example would be a spill in the
20  plant. You know, if a spill occurred, a bag of
21  vermiculites got ripped or was ruptured, the
22  employees had to clean that up right away. They
23  had to stop what they were doing and clean it up
24  essentially, because if they didn't this could
25  create a source of fiber exposure in the plant.

22 (Pages 82 to 85)

Page 86

1    There were certain techniques that the
2  employees had to do, certain stoner settings. The
3  stoner is how they separated the product from the
4  stone. After it was expanded it went over this
5  thing called a stoner, and it's very important to
6  have that adjusted properly and have all the
7  ventilation working there.
8    So the answer to your question is yes;
9  we had techniques that we used that we all began to
10 understand that if you did it a certain way, you
11 could achieve very good acceptable levels of
12 exposure within the OSHA limits in the plant.
13   Q.  You mentioned the breakage of bags.
14   Did that ever occur with bags of
15 zonolite attic insulation?
16   A.  Yes. I wouldn't say it was a common
17 occurrence, but it did happen.
18   Q.  And what were the results?
19   A.  Well, we knew that if that bag — when
20 that bag burst that there would be a fiber release,
21 and it was very important that the forklift
22 operator or the plant people that were there not
23 drive through this loose vermiculite on the floor;
24 that that bag had to be — that spill had to be
25 cleaned up and the bag had to be repaired.

Page 87

1    Q.  What would happen when that loose
2  material was disturbed?
3    A.  We would begin to see elevated fiber
4  levels in the plant as a result of that. That was
5  pretty well known. I mean, we had duct tape and
6  materials in the plant that were readily available
7  in case of a break, and employees were trained if
8  there is a break in the bag, fix it right away.
9    Q.  Were air standard goals established for
10 end use or products' end use?
11   A.  Not that I'm aware of.
12   Q.  Now I would like to talk to you a
13 little bit about actual attic testing. You
14 referred to it earlier.
15   Are you familiar with the actual attic
16 testing that was performed at W.R. Grace?
17   A.  I'm familiar with it as a result of the
18 request for analytical services that came through
19 my desk, were signed by me or authorized by me, or
20 I was copied on the report of the simulated — of
21 the actual attic test, not the simulated — well,
22 the simulated ones always came to me and then they
23 started doing the actual test, and on occasion --
24 I think most of those came across my desk.
25   Q.  And to your knowledge what was the

Page 88

1  purpose of the actual attic testing?
2    A.  I think that there was an understanding
3  that the simulated tests were okay, but that the
4  simulated tests don't mimic or match exactly what
5  would be seen with various types of attics that
6  might be available to put vermiculite in; that if
7  we didn't — if we didn't do some testing that
8  actually was real testing, then all we would have
9  is simulated testing, and I think that there was
10 some concern that it was important to find some
11 attics and actually go out and test in homes and
12 attics to go beyond what the simulated tests were
13 showing.
14   Q.  I would like to show you what has been
15 marked as Hamilton Deposition Exhibit 18 and ask if
16 you can identify that document for the record.
17   A.  Yes. This is a 67565 dated July 11th,
18 1977.
19   Q.  Is that your name at the top right
20 corner of the —
21   A.  Yes. This is approved by me.
22   Q.  And what type of testing was conducted?
23   A.  This is -- I'm going to read the
24 summary.
25    "Six attic test samples were received

Page 89

1  from Savannah, New York, and evaluated. Sample
2  18AS-PR 2 was extremely dusty and impossible to
3  read with any accuracy. The other five samples all
4  showed fiber counts of greater than 7.5 fibers per
5  cc of air", and this is an actual home attic fill
6  job, Savannah, New York, and it involved the
7  pouring of attic fill. All test materials
8  screened, Libby No. 3, 14 mesh with all cyclone
9  fines removed.
10   Q.  Let me direct you to the third page —
11 the fourth page.
12   A.  The handwritten --
13   Q.  The handwritten notes.
14   A.  Yes.
15   Q.  Does it mention when the bags were
16 taken up to the attic?
17   A.  Yes. It says on Note No. 6 that all
18 24 bags were taken to the attic before conducting
19 testing.
20   Q.  When a homeowner installs this
21 material, would a homeowner be going back and forth
22 with bags to your knowledge and would the whole
23 entire job involve going back and forth bringing
24 bags up and installing it?
25    MR. RESTIVO: Objection to the form of

23 (Pages 86 to 89)

Page 90

1   the question and lack of any personal knowledge as
2   to what a homeowner would do.
3       A.  A homeowner would have to take the bags
4   from whatever vehicle they transported the bags in.
5   Perhaps the bags were delivered to their home.
6   Those bags would have to be moved to their attic.
7   Those bags would have to be placed in the attic and
8   then opened. The material would then be spread out
9   either by pouring it and walking with it or by
10  spreading it with some kind of device, a spreading
11  device.
12      The empty bags would then have to be
13  collapsed and removed from the attic. That
14  procedure is a standard procedure that you would
15  have to do. There is no other way to put it in
16  there. This air monitoring was done only during
17  the time period when the material was poured from
18  the bag.
19      Q.  It did not include the time in which
20  the homeowner is bringing bags up and down and
21  collapsing the bag?
22      A.  As I understand it, no. This is only
23  done during the actual pouring.
24      Q.  Did it include the spreading of the
25  material?

Page 91

1       MR. RESTIVO:  Objection; lack of
2   personal knowledge.
3       A.  According to the Air Sampling Record
4   Sheet, the air monitoring was done during the
5   pouring only.
6       Q.  And let's look at the range of fiber
7   levels that occurred just during the pouring
8   itself.
9       What was the range, can you tell?
10      A.  This is very, very difficult to read.
11  My copy is very obscured.
12      I've attempted to read this, but I just
13  can't quite make this out. I think that the first
14  one, Sample 18AS-PR 1, I believe that was 7.9.
15      Does it appear like 7.9 on your sheet?
16      Q.  I believe that's right as far as I can
17  tell.
18      A.  The second sample I cannot read.
19      Q.  Does that appear to be 11.22?
20      A.  Are you looking at Sample PR-3 or
21  PR-2?
22      Q.  I'm looking at 3.
23      A.  I think PR-2 was too dusty and
24  impossible to read with any accuracy.
25      If you look at the summary, it says

Page 92

1   PR-2 wasn't readable. It was dusty. So the PR-3
2   looks like 11.22. The Sample PR-4 looks to me like
3   9.68. 5 looks like it could be either 8 or 3.27.
4   I can't read it. And PR-6 looks like 8.5.
5       Now, I think that PR-5 was actually
6   8.27 because in the summary it says that all of the
7   samples were greater than 7.5.
8       Q.  And obviously all of these samples
9   would have been greater than the current OSHA
10  excursion limit of one fiber per cc; is that
11  correct?
12      MR. RESTIVO:  Object to the form.
13      A.  That's correct.
14      Q.  And this is in an actual attic; is that
15  correct?
16      A.  Yes. It says this is an actual home
17  attic fill job.
18      Q.  Let me show you what has been marked as
19  Hamilton Exhibit 19 and ask if you can identify
20  that for the record.
21      A.  Yes. This is No. 67706.
22      It's dated May 12th, 1978, and this is
23  a super clean actual home attic fill test from
24  Savannah, New York, and this is of Libby No. 1.
25      Q.  Is that your name in the upper right

Page 93

1   corner? Strike that. I mean on the bottom right.
2       A.  Yes. A copy was sent to me.
3   Mr. Eschenbach approved this and an additional copy
4   was sent to me. And the summary explains that
5   there was heavy loading of dust in the cassettes,
6   and Harry Eschenbach advised that loose dust should
7   be evaluated as total dust, and so that the -- then
8   they just did what we call a gravimetric analysis
9   of the dust where he weighed the dust. And under
10  Data Analysis it says: Samples of residual dust
11  trapped in the filter were counted in the regular
12  manner.
13      Q.  And what was the range of fiber levels
14  in this test?
15      By the way, what type of material was
16  being tested here?
17      A.  This was super clean Libby No. 1.
18      I think it's important to note that
19  what they did was they removed the dust from the
20  cassettes and weighed that, and what was left on
21  the cassette was then counted for fiber, because
22  they had to get the dust off the cassette in order
23  to count the cassette. That might not have been
24  clear when you read this. But the dust on the
25  cassette was too thick. They removed the dust that

Thomas Hamilton   February 25, 2003

Page 94

1  will come off and they weigh that; and the dust
2  that's left, the residual on the filter, is then
3  counted for fiber.
4      Q. So the count that we see on the second
5  — the last two pages, would that be an
6  underestimate of the levels, airborne levels, that
7  was found during the — present during the testing?
8      MR. RESTIVO: Object to the form of the
9  question.
10     A. I would answer that question by saying
11 that because dust was removed from the cassette and
12 no fibers were counted from that dust, that these
13 numbers here would represent an underestimation of
14 the total fiber that was there. They would have to
15 because residual dust was removed from the
16 cassettes prior to doing the counting.
17     Q. And where was this testing performed?
18     A. This was tested in Savannah, New York.
19     Q. And what were the levels — what was
20 the range of the airborne levels that were counted
21 on the dust that was remaining on the filter?
22     MR. RESTIVO: Object to the form of the
23 question.
24     A. There were 12 samples that were
25 collected during the pouring of fill, and the

Page 95

1  results ranged from 0.81 to 3.89.
2      Q. And of the 13 samples, how many of
3  these samples exceeded two fibers per cc?
4      A. There were 12 samples and ten of them
5  exceeded one fiber per cc.
6      Q. And how many exceeded two fibers per
7  cc?
8      A. Six of them exceeded two fibers per cc.
9      Q. Now, in the testing that was performed,
10 how long did it take for them to do this actual
11 installation?
12     A. Well, it says that 50 bags were placed
13 in the attic, and it looks like by three men in
14 45 minutes. So if we want to talk in one-person
15 units here, it would be about 135 minutes for one
16 person to put 51 bags into the attic. The actual
17 pouring was monitored between 1333, which is 1:30,
18 through 3:44, which is 1544. So from 1:30 to 3:30
19 would be two hours. This was a little over two
20 hours of time for the pouring of 51 bags.
21     Q. And does it mention —
22     A. I'm sorry. Poured 49 bags.
23     Q. Does it mention whether they had
24 completed the job?
25     A. No. Note No. 6 states that the tests

Page 96

1  completed at end of 49 bags due to working
2  conditions. We require approximately 60 more bags
3  to complete attic overfill.
4      This attic already had insulation in
5  it, and this was just putting an overfill on top of
6  it.
7      Q. Is this measuring the time of just the
8  time of pouring the material?
9      A. I'm sorry. Could you repeat that.
10     Q. The activities that were being
11 measured, was it the pouring of the material?
12     A. According to the notes here on the
13 sampling record, this only involved the actual
14 pouring of the material, and then on what we call
15 Sample No. 14 and 15 — I'm sorry. 13 and 14. It
16 says they poured five bags and brought down empty
17 bags and lights.
18     Q. If it took three people approximately
19 two hours to do this job, then do you have an
20 opinion as to how long it would take for this job
21 one person to do?
22     MR. RESTIVO: I'm going to object to
23 that. I don't think that's what the witness
24 testified to. I think he testified that it took
25 three men 45 minutes each.

Page 97

1  I would ask you to rephrase your
2  question. I'm not sure whether you're referring to
3  his prior testimony or not.
4  BY MR. TURKEWITZ:
5      Q. You testified it took between 1:33 to
6  install 49 bags — it took them from 1:43 — 1:33
7  to 3:44, and that's a little bit over two hours.
8      A. That's two hours and 11 minutes to
9  install 49 bags.
10     Q. And that's three people doing that?
11     A. That's what it appears to be, yes.
12 Correct.
13     Q. And they were only halfway through with
14 the job?
15     A. He said that it would take 60 more
16 bags, so they were less than halfway through.
17     Q. Do you have an opinion as to how long,
18 based on that, one person to complete this job?
19     MR. RESTIVO: Object to the form of the
20 question. Also object to lack of foundation.
21     A. The problem that they had in this attic
22 was that after the act of pouring 49 bags into the
23 attic resulted in working conditions which were
24 unacceptable to the employee. They had to leave
25 and wait for the attic dust to settle before they

25 (Pages 94 to 97)

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Page 98

1  could go back up and finish the job. That's what
2  this appears to me to say.
3       Now, to answer your question, if in two
4  hours and 11 minutes you create a dust level which
5  is unacceptable for working conditions, then this
6  job would take more than three man days to
7  complete.
8       Q. And if you were to apply the OSHA PEL
9  of two fibers on an eight-hour time weighted
10 average to this job, do you have an opinion as to
11 whether this job exceeded the OSHA PEL two fibers
12 on an eight-hour time weighted average?
13      MR. RESTIVO: Object to the form of the
14 question.
15      A. Well, it just so happens I'm probably
16 the most qualified person in this room -- I'm
17 probably the most qualified person at W.R. Grace to
18 answer that question, and the answer is yes. These
19 people would have been exposed potentially above
20 the OSHA PEL if they attempted to complete this job
21 in an eight-hour day.
22      Q. And did they stop this job so that they
23 would not go over the OSHA eight-hour time weighted
24 average standard?
25      A. No. They stopped this job because they

Page 99

1  couldn't work in the attic anymore. It was too
2  dusty.
3       Q. Sir, I would like to show you what has
4  been marked as Hamilton Deposition Exhibit 20 and
5  ask if you can identify this document for the
6  record.
7       A. This is No. 67707 dated May 12, 1978.
8  It is a super clean actual home attic field test
9  conducted at Savannah, New York. The products
10 involved were Libby 1 and Libby 2.
11      Q. And was this material being tested also
12 super clean attic insulation?
13      A. That's correct. This was a super clean
14 actual home attic field test.
15      Q. And what were the results of those
16 testing?
17      A. These are similiar to the previous ones
18 where the fact is that there was so many dust in
19 the cassettes that they had difficulty reading the
20 cassettes. Harry Eshenbach advised that the loose
21 dust be evaluated as total dust. The fibers were
22 then counted in the remaining cassettes.
23      I would like to point out something in
24 Exhibit 19 that I meant to mention. If you go to
25 the third page of Exhibit 19, which actually it

Page 100

1  says Page 2 at the top, the total dust levels that
2  you see in this column are very high. The
3  allowable level of dust under the OSHA standards at
4  the time for total dust was 15 milligrams per cubic
5  meter. Six of the samples exceeded that PEL.
6       So not only were we exposed above the
7  permissible — I believe if they had stayed in the
8  attic for any longer, maybe the whole day, they
9  would have been exposed not only above the
10 permissible exposure limit for total dust, but they
11 would have been exposed above the allowable level
12 for asbestos at the time.
13      Now, going back to Exhibit 20, we had
14 the same problem with the dust, and on the third
15 page of the exhibit we have the total dust results
16 for these cassettes. This is a very high level.
17      I should also point out that when you
18 approach 15 milligrams per cubic meter the
19 visibility in the air drops to approximately three
20 to five feet. That's all the farther you could see
21 through that dust level. Those samples, the dust
22 was removed and then they were counted for asbestos
23 fiber. This is super clean Libby No. 2 and Libby
24 No. 1.
25      Q. Can you read the results on that, or is

Page 101

1  it hard to read?
2       A. No. I can see the results.
3  I'm looking at Sample SC2-1R through 4R. This was
4  super clean Libby No. 2, a total of 24 bags. The
5  results ranged from 0.88 to 2.37, and three of the
6  samples were above 1.
7       Q. We were talking about the OSHA standard
8  earlier.
9       While you were at Grace do you recall
10 any discussions about whether it would be
11 appropriate to apply the OSHA standard to families
12 working with zonolite attic insulation?
13      A. Yes. The use of OSHA standards is very
14 clear that it is not applicable to the nonwork
15 environment. We do not apply OSHA standards to
16 homeowners, to children, to elderly. They were
17 designed for the healthy worker exposure, a healthy
18 worker. In this case these standards were
19 originally designed for healthy men, and most
20 people that talk about these standards will admit
21 that's what was really in their minds because that
22 was really what we had exposure data available
23 from.
24      The use or the application of an OSHA
25 standard to a child or to an elderly person or to

Thomas Hamilton   February 25, 2003

Page 102

1   the nonworking environment is not an acceptable
2   practice in the world of industrial health or
3   occupational health or public health, and there are
4   reasons for this. Those standards are not designed
5   for children. They're not designed for elderly.
6   They're not designed for people who have a
7   preexisting condition, some preexisting condition
8   such as — say, for example, asthma, which is an
9   obstructive lung disease. You wouldn't want to
10  expose people to high levels of dust if they have a
11  preexisting lung disease. So people with asthma
12  don't work in dusty jobs.
13      Q.  Did you ever speak out about applying
14  OSHA to consumer products that were applied by
15  families?
16      A.  We discussed — within our department
17  we discussed these types of things on occasion,
18  because it was problematic and we knew that.
19  But there were many products that were sold by
20  Grace to consumers, and over the years we had to
21  evaluate whether or not the type of exposure that
22  would occur during any use of those products would
23  present an opportunity for an exposure which could
24  be harmful to the end user.
25      We discussed this throughout the entire

Page 103

1   spectrum of Grace products, not just CPD, but of
2   course there was always that concern in the Health
3   and Safety Department that if you did have levels
4   that were exceeding OSHA standards, you had a
5   problem whether or not you were exposing a
6   contractor who would be an employee of some company
7   versus a homeowner.
8       The types of levels that we were seeing
9   with the attic products represented an exposure
10  profile which was exceeding OSHA standards, and
11  therefore it represented a problem for anybody who
12  used it, not just a healthy worker.
13      Q.  Do you recall discussions while at
14  Grace about NIOSH and its position that there is no
15  known safe level of exposure to asbestos?
16      MR. RESTIVO: Object to the form of the
17  question.
18      A.  Yes. Actually that all started with
19  Dr. Selacon and his position on asbestos, that one
20  fiber could cause disease, which is about as far
21  out on the edge as you can get.
22      The fact is we did discuss the NIOSH
23  document. When that was published we all looked at
24  it, we all read it, and immediately began to
25  formulate a plan for addressing that within the

Page 104

1   context of the tremolite that we were seeing not
2   only in our products but in our plants at CPD.
3       Q.  Do you recall NIOSH proposing .1 or .2
4   as a permissible exposure limit?
5       A.  Yes. They call it a Recommended
6   Exposure Limit or an REL, and that number appeared
7   very low to us at the time it came out, because we
8   were struggling to meet the two fiber per cc limit
9   at the time.
10      Q.  Did W.R. Grace perform air testing in
11  homes after installation?
12      A.  You mean after the installation of
13  zonolite attic insulation, did they do testing in
14  homes?
15      Q.  Yes.
16      A.  I believe they did, yes.
17      Q.  What type of testing did they do?
18      A.  It would be the same type of air
19  monitoring that was used here where it was being
20  evaluated for asbestos content by phase one
21  microscopy.
22      Q.  Was it done during disturbance of the
23  material?
24      A.  No. They would not have disturbed the
25  material and then done testing.

Page 105

1       Q.  Do you recall any discussions about
2   that testing?
3       A.  I do recall discussions about this in
4   that the testing of a home that had attic
5   insulation in it, if you just collect a sample and
6   don't do any disturbance of the material, then you
7   really don't have an understanding of what
8   potential exposures could occur during a
9   disturbance of the material. And a typical
10  disturbance of the material could involve many
11  different actions, such as a homeowner going up and
12  laying a floor in their attic to store things in
13  their attic, a homeowner storing things right on
14  the vermiculite itself. That would be a
15  disturbance of it because then it could be tracked
16  into their home. The installation of a new
17  lighting fixture in the ceiling, the installation
18  of new wiring in the home, the installation of a
19  heating system, the installation of an
20  air-conditioning duct or vent, the installation of
21  a TV antenna.
22      There are so many times when a
23  homeowner may go into their attic and there are so
24  many times when opportunities could occur for
25  disturbance of the material. Also, the material

27 (Pages 102 to 105)

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Page 106

1  was very fine in some cases. If you found a hole
2  in an interstitial wall space, it would just fill
3  the cavity; and if a homeowner were to do any
4  disturbance of that wall, like remodeling of the
5  home where you remove a wall from this position to
6  another, remodeling I think represented
7  the most opportunity for a spill and an exposure of
8  the loose vermiculite from the attic into their
9  home.
10       All of those situations were ones that
11  I thought about and that I did talk about with
12  people in regards to is there going to be any
13  thought given to these types of activities which
14  could occur and what types of exposure may occur at
15  those times.
16       Q.  And what was the response that you got
17  when you gave your thoughts to do home testing?
18       A.  Well, these were just ideas that
19  we were proposing. Sometimes this would be at
20  lunch talking to people from Construction Products
21  Division or within our division, and sometimes these
22  the attorneys. We had lunch with them quite a bit.
23  And the fact is these would just be discussions
24  that we would go around the fringes of and say:
25  Gee, you know, this might represent an issue, but

Page 107

1  it never was formalized in writing. That would
2  have been a problem to put that in writing.
3       Q.  Why would that have been a problem to
4  put that in writing?
5       A.  Well, you know, the corporate culture
6  just didn't tolerate that. Anybody that really
7  spoke out about this issue had to be careful, had
8  to be very cautious how they said it and the way
9  they said it, because if they weren't careful they
10  would be told: We don't write about that or we
11  don't talk about that.
12       Q.  In general what was Grace's attitude
13  towards safety?
14       MR. RESTIVO:  Object to the form of the
15  question.
16       A.  If you don't mind I'm going to expand
17  your question just slightly and I'm going to say:
18  What was Grace's attitude towards health and
19  safety?
20       Q.  Let me rephrase that.
21       What was Grace's attitude towards
22  health and safety?
23       A.  The generalized attitude, the one that
24  I felt was the more prevalent, dealt with making
25  sure that we met the requirements of the OSHA

Page 108

1  standards. That was important. And when we
2  weren't in compliance with OSHA, that then was
3  dealt with, and it was always a very good response
4  from managers when we weren't meeting OSHA.
5       Any time that we tried to go beyond
6  OSHA it was not done. I really can't think of a
7  lot of instances where we said: Gee, the OSHA
8  standard is — I'm just going to pick a number —
9  ten, but at Grace we're going to use five. It just
10  didn't happen.
11       And within some of the divisions -- for
12  example, Polyfibron Division, the engineering
13  manager there was probably — he was just
14  impossible to work with. If it wasn't an OSHA
15  standard, it wasn't going to get done. No money
16  was ever going to be spent unless they were
17  required to spend it, and I didn't see that
18  attitude within the Construction Products Division.
19       Remember, this is a corporate culture
20  and there were many divisions of Grace. Within
21  Construction Products I felt that the attitude
22  about health and safety was taken seriously, and I
23  believe just because of who I dealt with —
24  I believe that Jack Wolter probably was the
25  catalyst for getting a lot of this done. I think

Page 109

1  he really cared about making sure that the
2  employees were not harmed, and when he came in to
3  Grace it was right at the time when — he kind of
4  set the goal for getting the plant and keeping it
5  in compliance, and they did it.
6       So I would say that the corporate
7  culture within Construction Products was pretty
8  good in terms of trying to get the manufacturing
9  plants in line with the OSHA standards, but to
10  expand that to the entire corporation, you probably
11  would have to do it division by division and look
12  at who was there. Some of the divisions did not
13  have big problems. Like Dewey & Almy just didn't
14  have major problems in terms of compliance.
15       But I would say this: From the
16  standpoint of Health and Safety we had a small
17  department and it was hired to keep track of
18  everything that was going on there.
19       THE VIDEOTAPE SPECIALIST:  Off the
20  record. The time is approximately 2:00 p.m.
21       (Discussion off the record.)
22       THE VIDEOTAPE SPECIALIST:  Back on the
23  record. The time is approximately 2:03 p.m.
24  BY MR. TURKEWITZ:
25       Q.  Did you ever do a study comparing

Thomas Hamilton    February 25, 2003

Page 110

1    Grace's health and safety program with other
2    companies in the chemical industry?
3        A.  Yes.  I conducted that study in mid
4    1980's because I felt as though, after talking with
5    my peers, other managers in industrial hygiene and
6    so forth in other companies, that our program was
7    in what I call fire-fighting mode.  We weren't
8    being proactive; we were being reactive, and the
9    reason we were being reactive is because we were
10   understaffed.  And I felt that way for quite
11   awhile, and it was at that time that I started a
12   study of chemical companies.
13       So I selected the top 20 chemical
14   companies in the United States.  I then called my
15   equivalent there, the manager of industrial hygiene
16   at those companies, and I interviewed them to
17   determine how were they staffed, how did they
18   handle equipment, how many managers did they have,
19   how many technicians did they have, what types of
20   programs did they have in place, how did they
21   handle their medical records and all their hygiene
22   records.  Were they computerized?  It was a nice
23   circuit.  I then presented this in a spreadsheet to
24   our management.
25       Q.  And how did W.R. Grace compare to the

Page 111

1    other chemical companies with respect to its health
2    and safety program?
3        A.  Well, pretty much in every category we
4    were at the bottom of the list in terms of the
5    number of people we had, the budget that we had,
6    the amount of equipment we had.
7        We certainly were deadlocked when it
8    came to computerization of records.  We really
9    didn't have any central computerization of records
10   at all, and we also were at the low end in terms of
11   salary.  I actually did a salary survey at the same
12   time.
13       Q.  Now, we talked earlier about the
14   problem of asbestos contaminated dust on surfaces,
15   and I would like to show you a document that has
16   been marked as Hamilton Deposition Exhibit 21 and
17   ask if you can identify that document.
18       A.  This is dated March 20th, 1984,
19   subject: Talc Removal - Cambridge.  This was a
20   talc removal specifications and sketches showing
21   areas to be cleaned within the Cambridge facility.
22   It says here to clean talc dust from Building 29
23   and Building 23.
24       Q.  Let me refer you to — I guess it's the
25   — by the way, are you copied on this document?

Page 112

1        A.  Yes, I am.
2        Q.  And this is dated March 20th, 1984?
3        A.  Correct.
4        Q.  And you were the manager of industrial
5    hygiene at that time?
6        A.  That's correct.
7        Q.  And turning to the fourth page, that
8    page is entitled "Building Interior Cleaning
9    Specifications".
10       A.  Correct.
11       Q.  That's the fifth page.  I'm sorry.
12           And it states under Background
13   Information: Although Building 29 is basically
14   clean, talc remains in some floors area, beams,
15   pipes, light fixtures and equipment.  Before
16   partial demolition of Building 29 can be initiated
17   all remaining talc and other forms of particulates
18   must be removed.  This building interior cleaning
19   requirement is necessary to prevent or reduce to
20   the maximum extent possible fugitive emissions to
21   the atmosphere during demolition.
22           Did I read that correctly?
23       A.  Yes.
24       Q.  What are they referring to?  What is
25   being removed?

Page 113

1        A.  The talc in Building 29 was used to
2    coat latex balloons.  These were weather balloons
3    that were manufactured there in that plant.  After
4    the latex balloon was made they would coat it with
5    talc, and there was a lot of talc there loose on
6    surfaces that had settled and had never been
7    removed.  There were ducts, say, eight-inch ducts,
8    that were half filled.  The entire run of the duct
9    was half filled with talc.
10       Q.  The next paragraph states: The owner
11   has determined that the waste talc remaining in
12   Building 29 contains a contaminant of .05-2%
13   Chrysotile fiber up to 20 micrometers in length.
14           Did I read that correctly?
15       A.  Yes.
16       Q.  Is that accurate?
17       A.  I don't believe it is.  I believe what
18   they meant to say was tremolite instead of
19   Chrysotile.
20       Q.  And why do you believe that?
21       A.  Because the talc doesn't contain
22   Chrysotile asbestos.  It contains tremolite forms
23   of asbestos.
24       Q.  And turning to the next page, under the
25   Scope of Work it has a section on applicable

29 (Pages 110 to 113)

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Page 114

1  regulation; correct?
2      A.  Yes.
3      Q.  And it states: The contractor shall
4  comply with all applicable city, state and federal
5  regulations as they apply to waste talc removal and
6  disposal. Talc waste is not classified as a
7  hazardous weight. This waste is also not regulated
8  by the NESHAPS for asbestos as the waste does not
9  contain commercial asbestos. Owner believes
10  contractor must comply with OSHA asbestos
11  standards, and I left out -- I just put the
12  acronyms for OSHA and NESHAPS.
13          Did I read that correctly?
14      A.  Yes.
15      Q.  And did Grace go on to hire a
16  contractor to remove the asbestos-contaminated talc
17  following certain abatement procedures?
18      A.  Yes. This entire abatement procedure
19  was done -- this entire procedure was done as an
20  asbestos removal project, done just exactly the way
21  that would be done.
22          The entire specification here,
23  isolating with poly sheeting, having entrances and
24  exits just for the contractors; they have to remove
25  protective clothing and change; they have to have a

Page 115

1  change area; they have to have a ventilation to
2  maintain negative pressure in the area; they have
3  to vacuum. They can use a wet method if they want.
4  They have to collect it all, wet it, put it in
5  bags. It's considered clean when there is no dust
6  left and the owner was going to -- the owner will
7  air monitor all areas outside that for asbestos
8  fiber.
9          This was actually done just as you
10  would do an asbestos fiber cleanup, asbestos
11  removal clean-up type job.
12      Q.  And turning toward the end of the
13  document, five and six documents from the end, does
14  it describe the amount of asbestos in the talc and
15  the Grace instructions to the builder?
16      A.  I want to make sure I'm on the same
17  page.
18          The work to be done by Dec-Tam
19  Corporation?
20      Q.  Yes.
21      A.  Yes. On that page --
22      Q.  What is that document, by the way?
23  What is that page?
24      A.  This is a quotation. This is a vendor
25  quotation to W.R. Grace by Dec-Tam Corporation.

Page 116

1  This is a quote only to do the work that was work
2  that was requested in the documents, and they say
3  on here "talc may have minute traces of asbestos.
4  Removal must conform to all EPA and OSHA regs."
5      Q.  And was that work actually performed?
6      A.  Yes, it was.
7      Q.  Let me show you what has been marked as
8  Hamilton Deposition Exhibit 22 and ask if you can
9  identify that document for the record.
10      A.  Yes. This is the letter from
11  Environmental Solutions, Inc., dated August 15th,
12  1984, and they are submitting their bid to do the
13  work for the removal of the talc.
14      Q.  And does it also discuss the cleanup of
15  vermiculite from Building 23?
16          MR. RESTIVO:  I'm going to object to
17  the form of the question. I don't think you've
18  established whether the witness ever saw this
19  document before, so I object to the form of the
20  question.
21      A.  There is a comment in the third
22  paragraph which says: Most of the material present
23  is vermiculite which remained after the demolition
24  of the evidence.
25      Q.  Does it state: Upon completion of the

Page 117

1  work in Building 29, the oven area in Building 23
2  will also be vacuumed cleaned?
3      A.  Yes.
4      Q.  And they're referring to the
5  vermiculite that remained after the demolition of
6  the ovens?
7      A.  Correct.
8      Q.  Why were they vacuum cleaning the
9  vermiculite?
10      A.  Well, this area needed to be cleaned
11  because they were going to demolish it and put in
12  offices in that space. They were going to rebuild
13  it and construct it to put in offices.
14          The fact that there was vermiculite in
15  there which we knew was Libby vermiculite
16  necessitated that this be vacuumed up with HEPA
17  vacuuming, and the removal of the talc -- removal
18  of the talc contained some tremolite forms of
19  asbestos, so it just made sense to combine the
20  cleanup of Building 23 with 29 because the
21  contractor was already there with all the
22  appropriate equipment to do this.
23      Q.  Were you familiar with this work that
24  was done?
25      A.  I was familiar with the fact that it

Thomas Hamilton    February 25, 2003

Page 118

1  was going to happen and I was familiar with the
2  specifications that were written because I was
3  copied in on the specs.
4      Q. And was the vermiculite vacuumed using
5  a HEPA vac?
6      A. Yes, it was. It was done — I believe
7  it was done by Environmental Solutions. I believe
8  they got the contract and they came in and they did
9  it all with HEPA vacuums.
10     Q. I would like to show you what has been
11 marked as Hamilton Deposition Exhibit 23 and ask if
12 you can identify that document.
13     A. This is a letter from me to
14 Mr. Wightman dated 23 August 1984 with carbon —
15 with copies to several of the Grace employees who
16 were involved in this building, Building 5.
17     Q. And what is this memo discussing with
18 respect to Building 5? Is this memo discussing a
19 problem with asbestos dust?
20     A. Yes.
21     What had happened is we had had
22 asbestos lagging removed by a contractor. There
23 had been some piping in Building 5 that asbestos on
24 it, and we had to have it removed.
25     The contractor did not do a good job.

Page 119

1  They had left some asbestos on the floor and on
2  surfaces in Building 5. This was discovered by
3  Larry Maglin, who was a technician in the CPD
4  laboratory working for Julie Yang, and he wrote me
5  a memo saying that he had discovered this. My
6  response to him was to write this memo telling him
7  that it had been inspected, and this was after an
8  intensive cleanup had been done.
9      What happened was once they found this,
10 they called the contractors back in and said hey,
11 you missed. The contractors then did a complete
12 cleaning of the area. We then went in and did an
13 inspection and then I wrote this letter saying we
14 did an inspection and everything was clean.
15     Q. So the asbestos dust was HEPA vacuumed
16 in this area?
17     A. Yes.
18     Q. Mr. Hamilton, in general from the
19 testing that we've reviewed and the testing that
20 you're familiar with with respect to zonolite attic
21 insulation, how would you describe the airborne
22 levels that resulted during the simulated and the
23 actual attic testing?
24     MR. RESTIVO: Objection.
25     Do you intend to call this witness as

Page 120

1  an expert witness? Because I think you're asking
2  for opinion evidence.
3      MR. TURKEWITZ: Let me rephrase that
4  question.
5  BY MR. TURKEWITZ:
6      Q. Mr. Hamilton, based on your knowledge
7  and your experience with regard to the simulated
8  and actual attic testing of zonolite attic
9  insulation how would you describe the airborne
10 asbestos levels that resulted?
11     MR. RESTIVO: I'm going to object
12 because I think you're asking for an opinion
13 evidence, unless you advise us whether or not
14 you're calling Mr. Hamilton as an expert witness.
15 BY MR. TURKEWITZ:
16     Q. You can answer the question, sir.
17     A. The original testing that was done by
18 Steve Venuti and me in Cambridge in the small room
19 that we did the original attic testing, the testing
20 of zonolite attic insulation, showed that there was
21 a real potential for exposure for anyone who was
22 disturbing free, loose Libby vermiculite. Those
23 levels were consistently above one fiber per cc and
24 ranged as high as 28.
25     Testing done by Fred Eaton in the

Page 121

1  simulated attic tests and in the actual home tests
2  showed that in spite of the best efforts to clean
3  the vermiculite, in spite of the best efforts to
4  amend the vermiculite, that we never -- at Grace we
5  never were successful in finding a way of
6  installing zonolite attic insulation without having
7  exposures above one fiber per cc. You can make it
8  super clean and it's still above 1. You can put
9  all the soap you wanted on it and it still wouldn't
10 be below 1.
11     So if you were to sum up all this data,
12 as you asked me to do in my opinion as a certified
13 industrial hygienist who was involved in this on a
14 daily basis and had reviewed and had all these
15 documents on my desk at one time during my
16 employment at Grace, the loose zonolite material
17 from Libby has always — no matter what we did,
18 always represented an opportunity for an exposure
19 that was going to be high. Maybe just for a short
20 period of time, but it would be high, and it would
21 be measured in levels above one fiber per cc, and
22 we never did find a way to reduce that.
23     Q. And based on the results do you have an
24 opinion as to whether zonolite attic insulation can
25 release asbestos fibers and cause contamination in

Thomas Hamilton   February 25, 2003

Page 122

1  a home after insulation?
2      MR. RESTIVO:  Object to the form of the
3  question unless you're going to call this witness
4  as an expert rather than a fact witness.
5      A.  In my opinion any time loose woody
6  vermiculite, whether it's 1, 2, 3, 4, 5 -- it
7  doesn't matter what size it is.  Any time you have
8  loose Libby vermiculite from an expander plant it
9  will have an opportunity to release fibers into a
10  home, although if it's just sitting in the attic
11  and nobody is touching it, it's not going anywhere,
12  but the moment any movement of that is done, any
13  time there is any maintenance done, any time there
14  is any disturbance of that material, whether it's a
15  renovation or a demolition, there are opportunities
16  for asbestos fiber exposures which exceed OSHA
17  standards.
18      And I want to emphasis one more point.
19  I do not believe that the application of OSHA
20  standards to homeowners and to children has any
21  basis in this study of the zonolite attic
22  insulation.  The application of occupational
23  standards to a homeowner is just not allowable.
24      Q.  Based on your testing at Grace did you
25  form an opinion as to whether Grace should have

Page 123

1  continued to sell zonolite attic insulation?
2      MR. RESTIVO:  The same objection.
3      A.  Yes.  After my first testing in 1976
4  with Steve Venuti I felt that zonolite attic
5  insulation was a product that should not be
6  marketed by Grace.  I felt that it was going to
7  create a lot of problems and could certainly expose
8  thousands of people to asbestos needlessly.
9      There certainly were many other
10  products that could be used for insulating a home
11  besides zonolite attic insulation that didn't
12  represent an asbestos exposure profile potential.
13      Q.  Based on your testing at Grace did you
14  form an opinion about the need for an asbestos
15  warning label to go on bags of zonolite attic
16  insulation?
17      MR. RESTIVO:  The same objection.
18      A.  Yes.  I think I would use the word
19  "unconscionable" if I were to describe the fact
20  that there was no label on these bags to warn
21  people that there was asbestos fiber in there.
22      The opportunity for exposure was clear.
23  Zonolite had been marketed for many, many years
24  before we even did the first test on it to actually
25  show this.  This product should have been labeled

Page 124

1  -- there should have been a warning for people to
2  tell them that the use of this improperly would
3  release asbestos fibers.
4      Certainly -- I mean, think about it.
5  They should have at least said to people:  Don't
6  let your children go play with this stuff.
7      Q.  Did Grace ever conduct testing to
8  simulate disturbance of zonolite attic insulation
9  after installation such as during renovations?
10      A.  I don't recall them ever doing that.
11      Q.  And based on your testing at Grace do
12  you have any concerns about zonolite attic
13  insulation in homes across the United States and
14  Canada?
15      MR. RESTIVO:  The same objection.
16  Unless you add this fact witness as an expert,
17  I object to the form of the question.
18      A.  I think it's important that the people
19  that have this material in their attic know that if
20  they disturb this material, they could have an
21  unnecessary exposure to asbestos.  It just isn't
22  necessary for them to do that.
23      If they're warned about this and they
24  know that there is an opportunity for exposure,
25  even above occupational limits, which don't apply

Page 125

1  anyway to this, that there is a duty to inform them
2  and there is at least a very easy quick fix that
3  will not involve them being exposed.
4      This material should be removed from
5  attics appropriately.  This should be done by
6  professionals that know what they're doing.  It
7  could be done in a matter of minutes in most
8  attics.  Vacuuming inside of an attic with a vac
9  truck would take one-hundredth of the time it took
10  to put in, and it could be done safely.  It could
11  be removed in such a way that it would no longer
12  represent an issue except for material that might
13  have fallen down into an interstitial space, but in
14  my opinion people that have this in their homes now
15  should be warned.
16      Q.  And what information should homeowners
17  be told?
18      MR. RESTIVO:  The same objection.
19      A.  I think they should be told the truth;
20  that if they don't disturb it, it won't be a
21  problem.  If they do disturb it, it will be a
22  problem or a potential problem and it could create
23  a high level of exposure over a brief period of
24  time, but that potential is there, and what I call
25  an informed -- an enlightened decision on what to

32 (Pages 122 to 125)

Thomas Hamilton   February 25, 2003

Page 126

1  do with it at least could be made.
2  We have millions of homeowners out
3  there that don't know about this problem.
4  Q. Mr. Hamilton, do you have zonolite
5  attic insulation in your home?
6  A. No, I do not.
7  Q. And based on your testing if you had
8  zonolite attic insulation in your home what action
9  would you take?
10  MR. RESTIVO: Object to the form.
11  A. If I had it in my home, I would have it
12  removed.
13  Q. And why?
14  A. Because it would be very easy to do, it
15  would not cost that much money to do it, and there
16  are other substitutes for it that are just as good
17  that do not present the asbestos hazard that this
18  material does.
19  Q. At any point was your involvement with
20  the Construction Products Division interrupted?
21  A. Yes.
22  Q. What happened?
23  A. I was called to give a deposition in a
24  — specifically there were two events which
25  interrupted my work with Construction Products

Page 127

1  Division.
2  The first involved a deposition that I
3  was giving -- I don't recall the year. It had to
4  be sometime in the early '80s. I would say 1981 -
5  '82 — that era — where I was asked some questions
6  in regard to product monitoring done by me in Grace
7  facilities where I was actually monitoring
8  products, not the manufacture of the product, but
9  the end use of the product. And I answered the
10  question honestly. I said yes. I gave
11  descriptions of when I had done that.
12  The word that came back to my superior,
13  Harry Eschenbach, was that "I had sold W.R. Grace
14  down the tubes".
15  I asked Harry if he thought I had lied,
16  and he said: No, you didn't lie, but you told them
17  more than the truth. And I said — or something
18  along that line, and I said: I never lied. I told
19  the truth. And he said: Well, they think you sold
20  them out, were his words.
21  Q. What kind of monitoring was that that
22  you were doing?
23  A. The monitoring that I had done was some
24  air monitoring in South Carolina operations in one
25  of the maintenance shacks. They had sprayed on

Page 128

1  monocote on the metal coating in the interior and
2  it was falling off, and there was some concern
3  about the monocote that was falling on the
4  equipment, the heavy equipment. And we did some
5  air monitoring in there to see if there was any
6  asbestos fiber as a result of this degradation of
7  the monocote that had been sprayed, and we didn't
8  find any; but when I was asked in deposition did I
9  do that type of monitoring, I said yes to that.
10  There was some people at the
11  Construction Products Division who were very
12  unhappy that I had said that, and the word came
13  down through my boss that I had sold them out, and
14  I felt offended by that. And that was probably one
15  of the first incidences of problems with CPD.
16  The second one was a little bit more
17  catastrophic. I was in a meeting with the
18  president of the division, several other members of
19  the team that were involved with the air monitoring
20  for schools. Lawsuits were coming in at a pretty
21  good rate on a daily basis, and at that time we
22  were trying to set up a program for responding to
23  the lawsuits. I began to question — by the way,
24  Harry Eschenbach was not there in that meeting.
25  I began to question exactly what

Page 129

1  protocols we were going to use and what was the
2  reason for doing this. Because we were going to
3  embark on a program spending literally hundreds of
4  thousands of dollars for air monitoring, and I
5  wanted to make sure that everybody understood what
6  they were going to get for that.
7  After that meeting broke up I went back
8  to my office and the phone rang, and it was the
9  president of the division talking to my boss
10  telling him that I was no longer to be allowed to
11  work on Construction Products Division anymore;
12  that I was to be taken off of that team and that
13  Paul Conner was to be placed on that team. Paul
14  Conner was my — an industrial hygienist who worked
15  under me.
16  I then -- I took that news kind of
17  hard, and I went over to Paul Conner's office and I
18  shut the door and I told Paul that the only way to
19  work for Construction Products Division was to go
20  along. Don't fight it. Don't argue with those
21  people. Don't even question what they're doing.
22  Do whatever they want and it will be okay. Because
23  he was worried about doing that job.
24  Q. What was the position that you were
25  taking that caused the problem?

33 (Pages 126 to 129)

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Thomas Hamilton    February 25, 2003

Page 130

1    A. I'm not quite sure exactly if I can
2  recall all of the positioning that was done.
3       I questioned -- a little along the
4  lines of this: That we were going to go into
5  schools and monitor the schools that had sprayed on
6  product in them, whether it was the acoustical
7  material or the ceiling material, and it might even
8  be monocote. And we were just going to walk into
9  the schools and do monitoring with a team of
10  people. We were going to put five hygienists in
11  there and we were going to monitor the heck out of
12  that building, and my comment along those lines
13  was: What is that going to give us? What does
14  that do for us? Don't you think we ought to do
15  some tests to see whether disturbances of the
16  material would create an exposure possibility?
17       My goodness, if the ceiling is all of
18  our materials and are sprayed on stuff and we just
19  take an air sample in the room, chances are that
20  sample is going to look pretty good; but if we come
21  into the room and do some damage to that and then
22  monitor it, then there is nothing — then we've got
23  a case that this doesn't represent a health threat
24  to the students.
25       My attempts to work in that area and to

Page 131

1  do those types of things were frowned upon, and I
2  was not allowed to work on CPD anymore after that.
3       Q. Mr. Hamilton, was it conceivable to you
4  while working on zonolite attic insulation issues
5  that homeowners could go into the attic and disturb
6  the zonolite attic insulation after installation?
7       MR. RESTIVO: Object to the form.
8       A. I don't think there is anybody that
9  doesn't go into their attic at some time. I think
10  if you ask that question of anybody, it's
11  foreseeable that you're going to go in your attic;
12  you're going to go in your attic. Everybody is
13  going to go in their attic at some time.
14       If all you see when you walk in there
15  is zonolite attic insulation, are you going to
16  disturb that? The answer is yes. Is that going to
17  create an exposure opportunity? The answer is yes.
18  All of our air monitoring showed that. Every
19  sample we did showed that there was an exposure
20  opportunity.
21       You know, one fiber per cc is still one
22  million fibers per cubic meter of air.
23       Q. And was it foreseeable to you that
24  people would disturb zonolite attic insulation
25  during renovations in their home?

Page 132

1       MR. RESTIVO: Object to the form.
2       A. I don't see how you couldn't disturb
3  it. You have to disturb it if you're going to do
4  renovations in your home. The moment you change a
5  wall in your home, the moment you do something --
6  anything that disturbs that material and lets it
7  fall, you have an exposure opportunity. It could
8  be brief, but it's still there. It's still real.
9  And the problem is homeowners don't know how to
10  clean it up.
11       If you do have a spill of the material
12  in your home, what is the procedure that a
13  homeowner should use to clean it up? Should they
14  go get a little spray bottle of water and wet it
15  down before they do anything with it? Well, that
16  might work, but who is telling them to do that?
17  Who is the person that is going to do that? Who is
18  going to step up to the plate? It's probably going
19  to be people like me who say it should be done,
20  because I don't believe W.R. Grace is going to do
21  it.
22       Q. Mr. Hamilton, why did W.R. Grace not
23  test zonolite attic insulation during disturbance
24  after installation?
25       A. You know, that's a good question

Page 133

1  because that very question got me into a lot of
2  trouble.
3       I at one time attempted to call a
4  meeting to do -- actually to discuss with the
5  scientists from Construction Products Division
6  disturbance of material. Now, it wasn't zonolite
7  attic insulation, but it was another Grace product.
8  And the lesson that I learned from that is that
9  this is not an issue to be discussed. You do not
10  discuss these issues. People didn't want to touch
11  it. They didn't even want to go on the record that
12  they were at the meeting. I had one person who
13  called me and said: I'm not attending that
14  meeting. I won't discuss that.
15       I believe I sent out a notice about
16  that meeting.
17       Q. Were you interviewed by a reporter for
18  the St. Louis Post-Dispatch?
19       A. Yes. I should say he called me and ask
20  me a few questions. He didn't really interview me.
21       Q. And did the questioning involve
22  zonolite attic insulation?
23       A. Yes, it did.
24       Q. And what did you tell the reporter
25  about zonolite attic insulation?

34 (Pages 130 to 133)

Page 134

1    A. I think I should explain why that
2 happened.
3        There is a health and safety user group
4 on the internet, on Yahoo. I'm a member of that
5 user group. After the 9/11 World Trade Center
6 event there were some threats that developed. Do
7 you know what threat is in the user group? It's
8 where everybody talks about the same thing. You go
9 online and everybody says the same thing and it's
10 called a threat.
11       There was a threat that developed about
12 the opportunity for tremolite exposure as a result
13 of the use of Libby -- Libby vermiculite and the
14 monocote that was sprayed on the World Trade
15 Centers, and I saw that and it was going way off in
16 the wrong direction.
17       For those of us that are in health and
18 safety the World Trade Center represented an
19 unbelieveable exposure to millions of people of
20 dust that were a nuisance to us and somewhat toxic,
21 and it was important, I felt, at the time that I
22 read that not to get off on a bad track, not to go
23 in the wrong direction, not to spend money on the
24 wrong thing.
25       There was statements that the tremolite

Page 135

1 had been overlooked, that they weren't looking for
2 this form of asbestos in the air and the EPA and
3 OSHA -- it was sort of along the lines that they
4 weren't doing it properly. And I responded to that
5 that I had done monitoring of monocote on many
6 occasions; that I understood how the product was
7 made because I was in the plants where it was
8 manufactured, and that the amount of tremolite that
9 would be released from the World Trade Center would
10 be unmeasurable. I didn't believe that monocote --
11 and I still don't today believe that monocote
12 represents an asbestos or a tremolite exposure
13 opportunity.
14       The MK3 products didn't have chrysotile
15 asbestos added to them, so I'm only talking about
16 the MK4 and 5 products. The fact is that I was
17 trying to say to this person: Look, don't get lost
18 on this tremolite issue because it's not a big
19 deal. There are many other things that are bad.
20 There was a million linear feet of fluorescent
21 lighting, 15 pounds of mercury were released. You
22 know, there were many other compounds that were
23 released in the air that represented a toxic
24 exposure profile, not tremolite. There was nothing
25 wrong with that product. It worked well. In fact,

Page 136

1 I like monocote and I still do to this day.
2        This person responded back sort of
3 along the lines that I didn't know what I was
4 talking about, that there were many other people
5 that felt that this represented a problem, and he
6 quoted several sources.
7        I then responded back to that,
8 continuing the threat by saying that in my opinion
9 the monocote -- those people were not talking about
10 monocote. They were talking about loose
11 vermiculite. They're talking about Libby
12 vermiculite that is loose fill material and that
13 that did represent a problem in my opinion because
14 I was involved in testing of it. I saw all this
15 data. I know what the potential is of that.
16       So I responded back by saying: No,
17 we're both right. You're right. The loose fill,
18 the loose material, does represent an opportunity
19 for exposure, but the monocote product doesn't.
20 It's important to know the difference between the
21 two.
22       I had several people respond to that by
23 thanking me and saying that they finally understood
24 the difference and that they agreed with me. I had
25 several people e-mail back to me and say: Thank

Page 137

1 you for explaining this. You're right and we're
2 glad to at least have somebody who worked at
3 W.R. Grace finally speak up about it.
4        The St. Louis Post-Dispatch was working
5 on an article about vermiculite at the time. They
6 read this. The author of that called me and said:
7 Can I quote you? And I said: Yes. You may quote
8 me as long as you make it very clear that you use
9 my exact words. I want you putting quotes around
10 my words. I don't want you rewriting it. And
11 that's what he did. Because I wanted to be clear
12 that there was a specific event that has to occur
13 here and that it's a short duration, but it's a
14 high level.
15       Q. Let me show you what has been marked as
16 Hamilton Exhibit 24 and ask if you can identify
17 that document.
18       A. Yes. This is the St. Louis
19 Post-Dispatch article about zonolite attic
20 insulation.
21       Q. And is that dated February 24, 2002?
22       A. Well, I don't see a date on it, but
23 maybe that's because the --
24       Q. The upper left side.
25       A. There it is. Yes, it is. It's dated

Thomas Hamilton   February 25, 2003

Page 138

1   Sunday, February 24th, 2002. Sorry.
2      Q.  And let me draw your attention to
3   Page 4.
4      A.  Yes.
5      Q.  And is that your quote in the middle of
6   the page?
7      A.  It says: "Anyone who is involved with
8   Libby vermiculite that is in the loose form should
9   take great care to ensure that they do not expose
10  themselves to the dust from this material. It will
11  release high levels of tremolite on a short-term
12  basis. I have measured this exposure potential on
13  several occasions, and it is real."
14      That is my exact quote.
15      Q.  And were you contacted by someone at
16  Grace following publication of this article?
17      A.  Yes. I was contacted by Attorney
18  Sparks. I believe he's in Delaware.
19      Q.  And what did Mr. Sparks say?
20      A.  I believe the conversation was he asked
21  me if I had said that, was that truly my quote, and
22  I said: Yes, it was me and I said that, and I did
23  give permission to the author of this to quote me,
24  and he then said that the official Grace position
25  was that zonolite attic insulation doesn't

Page 139

1   represent an exposure problem, and I said: Well,
2   I disagree.
3      Then he said that if I wanted to talk
4   about it or I had any questions or if there was any
5   issues that involved W.R. Grace, that I could call
6   him, and he gave me his phone number. It was a
7   very cordial conversation.
8      Q.  Mr. Hamilton, are you here testifying
9   voluntarily?
10     A.  Yes, I am.
11     Q.  And why are you here today?
12     A.  Well, I think that after all the years
13  of working at Grace and working on this product and
14  now knowing that it's out there, I felt very
15  strongly that it was important for somebody to come
16  forward as I have to talk about this issue and to
17  render opinions about what it means.
18     After talking to you about the Science
19  trial that's going on, I clearly am at odds with
20  W.R. Grace about this product.
21     You have to understand there are
22  thousands of products manufactured by W.R. Grace.
23  This is the only one I really took issue with.
24  I feel very strongly that this material represents
25  an unnecessary exposure to people and to children,

Page 140

1   and somebody has got to say that.
2      Now, if it's somebody from -- a former
3   Grace employee and so forth, maybe there will be
4   other Grace employees that feel that way also. But
5   you have to understand that I was in a position in
6   the Health and Safety Department -- I was in a
7   position to study the effects and understand the
8   health effects of asbestos exposure. I was doing
9   lung function tests on people who could barely
10  breathe. You know, after you do 100 lung function
11  tests on people who cannot blow into the machine
12  because they have a lung disease, you say: Wait a
13  minute. This material is a problem.
14     A lot of the people I gave lung
15  function tests to in Libby died prematurely from
16  asbestosis or from cancer, and I was in charge of
17  doing their lung function tests for years. Years
18  and years I went to the plant -- I was a certified
19  pulmonary technician. I met these people. They
20  weren't personal friends, but they were names to me
21  and faces. And I felt as though if the
22  manufacturer of the product can create an exposure
23  potential, that we control bag houses and we're
24  very cautious about what we're doing, and yet this
25  product is then put out on the market and there is

Page 141

1   not even a label on it warning people about it.
2   Somebody has to come forward and say: Enough.
3      Does nobody have a conscience about
4   this? Well, I do, and that's why I'm here today.
5   I'm not being paid to be here except for my
6   expenses, and I felt it was important for me -- at
7   least somebody to come forward and say for the
8   first time: Enough. It's time to let the world
9   know about this material. It's time to let people
10  know that if it's in their attic, for goodness
11  sake, just be careful about it; and if you want to
12  remove it, this is how you do it safely.
13     MR. TURKEWITZ:  Thank you,
14  Mr. Hamilton.
15     EXAMINATION
16  BY MR. RESTIVO:
17     Q.  Mr. Hamilton, it's been quite some time
18  since I introduced myself. Five hours ago.
19  I'm Jim Restivo. I represent W.R. Grace.
20  I'm going to go back to the beginning of your
21  testimony, but let me start at the end first since
22  it's fresh in my mind.
23     Is it your testimony that monocote 4 or
24  monocote 5 was sprayed as fireproofing in the World
25  Trade Center?

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Page 142

1    A. No, I don't think it was. I think it
2 was monocote 3 because this was prior to '71.
3 I don't think 4 or 5 was sprayed there, but I
4 believe there was one building that went up to
5 about the 45th or 49th floor with one form of
6 monocote, and the rest of that building and the
7 other one was sprayed with another type of
8 material. But what I wanted to make sure was that
9 when people were talking about the monocote that
10 was sprayed in that building -- this was prior to
11 '71. I don't think 4 and 5 were invented at that
12 time.
13    It's important to understand that the
14 asbestos issue was not a tremolite asbestos issue
15 with monocote. I don't believe that monocote
16 products represent a tremolite exposure, and that's
17 what I was trying to say to people.
18    Q. Do you remember the deposition you gave
19 you referred to -- towards the end of your direct
20 testimony -- it was in a case called Greenville
21 County School District.
22    A. I knew that it was in South Carolina.
23 I don't recall that it was Greenville. It could
24 be. I just don't recall the name of it. It was
25 quite a long time ago.

Page 143

1    Q. Do you remember your testimony was in
2 December of 1983?
3    A. It could very well have been, yes.
4    Q. Do you remember that one of the
5 difficulties you ran into after your testimony was
6 the fact that you testified that with respect to
7 the testing you had done for Grace, the air
8 sampling method was not specific to asbestos?
9    A. No, I don't recall that.
10    Q. The testing method which you utilized
11 at Grace, was that the NIOSH testing method?
12    A. Are you talking about what -- what
13 testing are you talking about? I tested there for
14 13 years, so you have to be specific.
15    Q. With respect to the 13 years of tests
16 that you did, were those tests evaluated by phase
17 and contrast microscopy, also known as PCM?
18    A. For the most part the samples we
19 collected were collected using phase contrast
20 microscopy. Correct.
21    Q. Isn't it true that at the time of your
22 deposition in 1983 in the Greenville County School
23 District case, December of 1983, at that time you
24 hadn't seen while at Grace any electron microscopy
25 results? Isn't that true?

Page 144

1    A. I had not seen it. That's correct.
2    Q. And am I correct that independent of
3 what you may have said at your deposition that
4 phase contrast microscope or PCM in fact is not
5 specific to asbestos?
6    A. Phase contrast microscopy is specific
7 to fibers.
8    Q. Isn't it correct, sir, that PCM air
9 monitoring is not specific to asbestos?
10    A. Yes.
11    Q. Does that refresh your recollection
12 that you gave that answer at your deposition?
13    A. No.
14    Q. But that's something you knew —
15    A. Do you want me to read that first to
16 refresh my memory? I would be more than happy to.
17 I'll take the time to do it.
18    Q. It's not necessary.
19    You knew that fact during the years you
20 worked at W.R. Grace in the position you discussed?
21    A. Well, everybody knew that the reason
22 that we were doing phase contrast microscopy was to
23 look at tremolite, which was a form of asbestos.
24 We also knew that the method was capable of
25 counting fibers that met the definition of a fiber

Page 145

1 that was not asbestos.
2    Q. Mr. Hamilton --
3    A. To answer your question, I knew that
4 the whole time I was there.
5    Q. Mr. Hamilton, I understand your
6 testimony.
7    Did you understand that when the PCM
8 method counted fibers, it assumed the fibers were
9 asbestos, but PCM did not distinguish between
10 asbestos fibers and other fibers?
11    A. Yes.
12    Q. Now, you indicated why you are
13 testifying today, and I understand your testimony
14 to be you're not receiving any compensation for
15 testifying here.
16    A. No, I am not.
17    Q. All you're receiving is reimbursement
18 of expenses?
19    A. That's correct.
20    Q. And what are those?
21    A. My travel expenses, which includes the
22 hotel, the airline and transportation.
23    Q. I was under the impression,
24 Mr. Hamilton — and I could be wrong — that the
25 reason your deposition was taking place in South

Thomas Hamilton    February 25, 2003

Page 146

1  Carolina is that you are here for some other
2  reason. Maybe I misunderstood.
3      A.  No. It was a matter of convenience for
4  me, and I appreciate your being here today.
5  I remember talking to you saying I really would
6  like to do it today rather than push it into March
7  because it was very easy for me to change my travel
8  plans to come through South Carolina to be here
9  today to give this deposition. So when we first
10 talked about it I said: Gee, I would really like
11 to do it in South Carolina because it's convenient.
12 Otherwise we would have to do it in downtown
13 Boston, which to me is inconvenient.
14     Q.  And what did you do in preparation for
15 your testimony today?
16     A.  In preparation for the testimony I
17 reviewed all of these documents that were shown as
18 exhibits.
19     Q.  Where did you do that and where did you
20 get them?
21     A.  I received them by courier from
22 Mr. Turkewitz last week before I went on vacation,
23 and I reviewed them while in flight. I've been
24 going through the documents refreshing my memory
25 about the work that we had done. I had never seen

Page 147

1  the Post-Dispatch article previously to this, so it
2  was interesting to see that. That's where I
3  received them from.
4      Q.  Did you then meet with either
5  Mr. Turkewitz or Mr. Westbrook to discuss your
6  testimony today?
7      A.  Yes. I met with Mr. Turkewitz to
8  discuss my testimony today.
9      Q.  And when did you do that?
10     A.  Last night and this morning, for about
11 an hour and a half this morning prior to coming in
12 here.
13     Q.  Did you discuss any documents which
14 have not been marked as exhibits today?
15     A.  If we did, I don't recall them.
16 I can't think of any documents that we really
17 discussed. I mean, we did discuss my deposition in
18 the Greenville case briefly. We did discuss a
19 document that isn't in here involving a testing of
20 product, but it wasn't zonolite attic insulation,
21 so therefore it wasn't brought out, but we did
22 discuss it. And another document that I had
23 produced while I was at Grace, but it didn't
24 involve ZAI, so that may be why it's not in this
25 list.

Page 148

1      Q.  Did you discuss any documents in which
2  you wrote about the subject matter of a label ZAI?
3      A.  Yes. We did discuss a document that I
4  wrote to the Canadian operations in response to a
5  request for information about labels.
6      Q.  Was that a document that Mr. Turkewitz
7  had sent you by courier last week?
8      A.  No.                    -
9      Q.  That was a document you saw last night
10 or this morning?
11     A.  That's correct.
12     Q.  Was that document one of the exhibits
13 introduced today?
14     A.  No.
15     Q.  And what did you tell Mr. Turkewitz
16 about that document when he showed it to you?
17     A.  If we're discussing the document that I
18 wrote about the label or that I wrote to the
19 Canadian operations, I discussed with him the
20 context of that document, what was going on, what
21 was the question being asked, and why was I
22 responding the way I did.
23     Q.  And looking at, for example,
24 Exhibit 22 --
25     A.  Yes.

Page 149

1      Q.  Do you remember you told us a little
2  bit on the record about what Exhibit 22 said?
3      A.  Yes.
4      Q.  Do you recall that testimony?
5      A.  Yes, I do.
6      Q.  Prior to receiving this in a package
7  from Mr. Turkewitz do you recall ever seeing
8  Exhibit 22 at or about August 15, 1984?
9      A.  This exhibit was not sent to me by
10 Mr. Turkewitz. I saw this this morning for the
11 first time, and I do not recall seeing this in
12 August of 1984.
13     Q.  Do you recall seeing it between
14 August 15, 1984, and this morning when you saw it?
15     A.  No, I do not.
16     Q.  And so you were reading what it said,
17 but you really have no personal knowledge of having
18 received this document, no personal recollection of
19 having received this document at the time?
20     A.  That's correct.
21     Q.  Now, you also saw some test results
22 that you talked about; correct?
23     A.  In the exhibits here. Correct. Yes.
24     Q.  Have you seen any of them since the
25 time you left Grace and the time Mr. Turkewitz sent

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Thomas Hamilton   February 25, 2003

Page 150

1  them to you?
2      A.  No.
3      Q.  And do you recall if you recently
4  before seeing the documents expressed the view that
5  in your initial test what you poured was a single
6  bag of attic insulation?
7      A.  Yes.  I thought it was a single bag
8  when I originally started thinking about it again,
9  and then I realized that we had done more than
10  that.  There was some moving around of the
11  material.
12      Then when I got these materials from
13  Mr. Turkewitz and started reading it it refreshed
14  my memory, and I remember that it wasn't just one
15  bag, it was more, and that the information that I
16  was trying to remember started coming back to me a
17  little better, and frankly I took some pretty good
18  notes so that I could refresh my memory a little
19  bit better.
20      Originally for some reason I was
21  thinking it was only one bag, but it actually was,
22  as I was thinking about it, ten bags.
23      Q.  And staying on that situation for a
24  moment, I think you testified this morning that
25  your recollection was that the room in which you

Page 151

1  did that test with Mr. Venuti was about this size,
2  I thought you testified.
3      A.  If you would like, we can look at the
4  exact dimensions.
5      Q.  I'm going to do that a moment.  My
6  question is --
7      A.  But I remember it being a closed-in
8  room.  This is probably bigger, but it seems to me
9  that the room and height are similiar; but you
10  know, it's 25 years ago.  Frankly, I didn't put the
11  size of the room on my notes, so whether or not
12  it's exactly the size of this room or not doesn't
13  -- well, frankly, I think having the notes in there
14  really helps to understand the size of the room.
15  It's difficult for me to say:  Well, 25 years later
16  I stood in a room for one day and was -- it was a
17  room that was closed.  This is a closed room.  This
18  looks a little bit longer than what I recall, maybe
19  a little wider and taller, but the room that we
20  actually did the work in, I have the dimensions in
21  here.  So it's pretty easy to refresh my memory on
22  that and say:  Yes.  The room was 8 X 12 with an
23  8-foot ceiling.
24      Q.  The reason I asked you that,
25  Mr. Hamilton, at lunchtime I tried to pace this

Page 152

1  room off because this looked bigger to me than your
2  notes, at least by my pacing, unscientific.
3      A.  Is the size of the room all that
4  important?  We're talking about people's health
5  here and we're talking about the size of this room
6  and whether or not you paced it off?
7      Q.  Would you agree --
8      A.  This is getting off the subject, isn't
9  it?  Can we just stay on the subject?
10      Q.  My question, sir, is what was the size
11  of the room --
12      A.  The room was 8 X 9 X 12.  I wrote it in
13  my notes.
14      Q.  8 X 12 X 8?
15      A.  Okay.  Let's go right to the page.
16      I'm sorry.  It was 8 X 12 X 8.  That's
17  a small room.  That room is a little bit smaller
18  than my recollection of it.
19      Q.  Do you recall any other documents you
20  may have seen other than the two we've identified
21  that were not marked today as exhibits?
22      A.  We did look at a document involving a
23  person who had a rather minor exposure period of --
24  had worked for Grace for, I think, two summers and
25  had died rather suddenly 50 years later of lung

Page 153

1  disease.  I do recall seeing that document.
2      Q.  What was that person's name?
3      A.  I don't think we discussed his name.
4  All I read was the headline.
5      Q.  And what did the headline say?
6      A.  The headline talked about the -- it
7  dealt something along the lines of a death caused
8  by a rather low level or small exposure time period
9  of a person who had died from lung disease.
10      Q.  Would it be correct for me to assume
11  other than seeing that headline you had no personal
12  knowledge or involvement in whatever that situation
13  was?
14      A.  That's correct.
15      Q.  And how long did you meet yesterday
16  with Mr. Turkewitz?
17      A.  Well, we met at approximately 5 o'clock
18  and we completed our business at about a little
19  after 1 o'clock in the morning.
20      Q.  Did he ask you and rehearse with you
21  the questions he asked you today?
22      A.  Yes, he did.
23      Q.  Did you have any discussion with him
24  about transmission electron microscopy or TEM?  Did
25  that come up in your discussions?

39 (Pages 150 to 153)

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Thomas Hamilton    February 25, 2003

Page 154

1    A.  The TEM came up only to the extent that
2  it really wasn't very popular.  It wasn't a method
3  that was done much for asbestos in the mid '70s,
4  but later TEM was used to look at samples on a more
5  frequent basis, and today it's used regularly.
6    That's about it.
7    Q.  As a certified industrial hygienist do
8  you know whether TEM is specific in identifying
9  asbestos fibers in air sampling?
10    A.  Yes; it is specific to asbestos fibers.
11    Q.  You indicated a number of names in your
12  testimony, and I think you made reference to Fred
13  Eaton, did you not?
14    A.  Yes, I did.
15    Q.  What was his job during the period of
16  time you were requesting technical service on
17  various tests?
18    A.  Fred Eaton worked for the Construction
19  Products Division engineering group.  He was
20  involved with projects with the plant construction,
21  and during this time that I began to become
22  familiar with his work he was requested or his job
23  was reassigned to work on product evaluations.
24  Specifically he was on the — his product that he
25  was evaluating was zonolite attic insulation.

Page 155

1    Q.  Isn't it true, Mr. Hamilton, that with
2  respect to that evaluation Mr. Eaton, using
3  whatever resources he had, designed various tests
4  that you talked about today?
5    A.  I don't know whether Fred designed them
6  or not.
7    Q.  You know you didn't design them?
8    A.  I did not design them.
9    Q.  And do you know whether Mr. Eaton had
10  any goals he was trying to accomplish through the
11  use of these tests?
12    A.  I know that he had goals, but I don't
13  know specifically what was outlined and assigned.
14  I don't know specifically the work, but nobody
15  spent money at W.R. Grace without a goal.
16    Q.  Whatever those goals were, those
17  weren't goals that he reached in consultation or
18  with your approval or involvement?
19    A.  That's correct.
20    Q.  Whatever testing and whatever work he
21  was working on, he was doing, but you were involved
22  in that you made the request for technical service
23  and in that you got certain reports and in that you
24  may have commented on certain reports, but you
25  didn't design the programs?

Page 156

1    A.  That's correct.
2    Q.  And you would agree with me that just
3  based upon the exhibits you've talked about today
4  there was an awful lot of things written down about
5  tremolite and about Libby and about the testing of
6  those things; isn't that correct?
7    A.  There is a lot of documentation, yes,
8  here about the testing and the vermiculite and
9  Fred's notes on that, yes.
10    Q.  And with respect to your principle
11  function during the period of time you were
12  employed, you issued and received many, many
13  documents dealing with air tests in the plant
14  environment; isn't that correct?
15    A.  Yes.
16    Q.  Plants all over the country; isn't that
17  correct?
18    A.  Yes.
19    Q.  On a fairly regular basis; isn't that
20  correct?
21    A.  Yes.
22    Q.  And those plants would report with
23  respect to Libby or air quality readings at certain
24  times and during certain functions in certain
25  plants; isn't that correct?

Page 157

1    A.  Yes.
2    Q.  And you would report back to the plants
3  what you found; isn't that correct?
4    A.  Yes.
5    Q.  And all of that was written down on
6  pieces of paper; isn't that correct?
7    A.  There was -- I think what you're
8  referring to is that we had a paper trail for every
9  air sample we collected.  It was written down.
10  There were reports issued for every sample set that
11  we collected, and there was a paper trail on all of
12  that.  Correct.
13    Q.  Now, on some of the reports you
14  testified about there were a number of names that
15  appear, one of which is Mr. Eaton.  You've talked
16  about on occasion Mr. Eschenbach.  I think you
17  mentioned Mr. Duecker.
18    Am I saying that right?
19    A.  Yes.
20    Q.  You mentioned Mr. Wolter.
21    I'm not sure you mentioned and so I'm
22  going to ask you:  What was the involvement of
23  E.S. Wood whose name appears as getting copies of
24  at least some of these reports?
25    A.  I never had any dealings with Chip

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Thomas Hamilton    February 25, 2003

Page 158

1  Wood. Whenever he dealt with anybody in our
2  department, he talked directly to Harry Eschenbach.
3  I had the feeling he didn't know what my name was.
4      Q. Did that upset you?
5      A. No. He was a very busy man. He had a
6  lot on his mind, and I could appreciate the fact
7  that he didn't really have a lot to talk to me
8  about. He was busy managing CPD, and whether he
9  knew me didn't really matter. He was a very busy
10  man and I didn't want to bother him.
11      Q. Did you ever see any results of tests
12  Mr. Wood reported on with respect to testing of the
13  application of ZAI in actual homes?
14      A. I did see Mr. Turkewitz —
15  Mr. Turkewitz did show me a document that I believe
16  was a response by Mr. Wood to — it may have been
17  the EPA or Consumer Products Safety Group, which
18  I'm kind of drawing a blank on that, but I know
19  that it was a document he wrote talking about ZAI
20  and potential exposure to it.
21      Q. Had you seen that document prior to the
22  time Mr. Turkewitz showed it to you?
23      A. No; I had not seen that document. In
24  fact, I didn't read it. I only read little
25  excerpts from it.

Page 159

1      Q. Mr. Hamilton, I want you to think as
2  hard as you can because now we've identified three
3  documents that you saw that were not marked as
4  exhibits.
5          Can you think of any other pieces of
6  paper you were shown in preparation for your
7  deposition other than the three documents we've now
8  identified that were not marked as exhibits?
9      A. You have to understand that all three
10  of those documents were looked at just briefly. We
11  probably spent less than one or two minutes on
12  them. I really can't think of any other document
13  -- a lot of this wasn't germane to what I was going
14  to be reporting on or talking about today. It was
15  more along the lines: Did you know this document
16  existed or did you see this article? They weren't
17  involved with what I was going to be talking about,
18  so I didn't spend a lot of time studying them or
19  thinking about them.
20          I really can't think of any other
21  document that I looked at that had any importance
22  to this case. Mr. Wood's document to me isn't
23  important for today's work.
24      Q. Mr. Hamilton, I'm not trying to —
25      A. So I can't remember, really. There may

Page 160

1  have been another document there. I just don't
2  recall.
3      Q. I don't know whether the documents are
4  important or not important, significant or
5  insignificant. I am entitled to know what
6  documents you might have looked at in preparation
7  for your deposition to the extent you can remember.
8      A. I'm going to answer your question:
9  I did not use those documents that we talked about
10  in preparation for my testimony today.
11      Q. I will now ask you: Do you remember
12  other than the three documents that we've talked
13  about seeing any other pieces of paper other than
14  the exhibits marked so far at your deposition
15  today?
16      A. No; I don't recall any others.
17      Q. Now, you talked on direct a little bit
18  about how asbestos fibers get into the lungs.
19          Can I assume that you don't hold
20  yourself out as a medical doctor; that is simply
21  information you have acquired as part of being a
22  certified industrial hygienist? You're not passing
23  yourself off as an expert on the causation of
24  asbestos fibers in the body?
25      A. I don't know what you mean by the

Page 161

1  "causation of asbestos fibers in the body".
2  I think you're going to have to restate that for
3  me, where you're going with that.
4      Q. You talked about what size asbestos
5  particles in order to get this, in your terms, to
6  the lowest part of the lung, did you not?
7      A. That's correct.
8      Q. How do you know that?
9      A. I read that.
10      Q. You're not an expert in those medical
11  processes? You're not Board certified as a
12  physician, as a thoracic surgeon, or anything like
13  that? You read it somewhere; correct?
14      A. That's correct.
15      Q. Would it be fair to say, Mr. Hamilton,
16  after your review of these documents that what
17  Mr. Eaton was attempting to do in this instance was
18  to test different formulations and different grades
19  to see what results he would get in various types
20  of tests?
21      A. Yes.
22      Q. And would it be fair to say that
23  Mr. Eaton was doing that, given what you know about
24  Grace, for some purpose — we'll call it at least
25  some goal.

41 (Pages 158 to 161)

Page 162

1      A.  Yes.
2      Q.  And that's why sometimes you see in the
3  test Libby No. 1, sometimes Libby No. 2, sometimes
4  Libby No. 3, sometimes with a binder, sometimes
5  without, sometimes screened, sometimes without.
6          He was looking at all various
7  permutations, was he not, in these tests?
8      A.  That's correct.
9      Q.  You mentioned Bob Locke being in charge
10 of product testing.
11     A.  Yes.
12     Q.  Have you talked to Mr. Locke about
13 these subject matters since you left W.R. Grace?
14     A.  No.
15     Q.  Did you contact Mr. Turkewitz or did he
16 contact you in order that you would be available to
17 give testimony for the reasons you've discussed?
18     A.  He contacted me.
19     Q.  And when did that contact occur,
20 approximately?
21     A.  A couple of weeks ago.
22     Q.  In February or in January?  If you
23 know.
24     A.  I think it was in February.
25     Q.  You ordered testing of various air

Page 163

1  sampling done, both in terms of the exhibits before
2  you today and also in terms of environmental plant
3  testing; is that correct?
4      A.  I directed testing of employee exposure
5  in the manufacturing plant.  I also conducted
6  personal testing of end use application of products
7  on several occasions.
8      Q.  My question was:  In connection with
9  that testing you had air sampling done; correct?
10     A.  Yes.
11     Q.  You yourself did not evaluate the air
12 sample equipment, the filters, the counting of the
13 fibers?  That you requested someone else to do?
14     A.  The air sampling pumps belong to my
15 group, Health and Safety, so when Fred Eaton wanted
16 air sampling pumps, he would come to me and borrow
17 my pumps.
18         The rest of your question is yes;
19 I requested other people evaluate air samples.
20     Q.  Turn if you would, Mr. Hamilton, to
21 Deposition Exhibit 1.
22     A.  Yes.
23     Q.  Isn't that a Request for Technical
24 Service?
25     A.  Correct.

Page 164

1      Q.  That's what these documents are called?
2          Yes or no.
3      A.  Yes.
4      Q.  And with respect to this document,
5  you're not requesting that air sampling be done
6  because that has been done.  What you are
7  requesting is that the air samples that have been
8  collected be analyzed.  Isn't that what these
9  documents do?
10     A.  That's correct.
11     Q.  And that analysis wasn't done by you or
12 people reporting to you; that was done by some
13 other department?
14     A.  That's correct.
15     Q.  And do you know how they went about
16 their business of preparing the air samples you had
17 collected for analysis?
18     A.  I think if you're referring to the
19 procedure for the evaluation of the samples —
20     Q.  Yes.
21     A.  Yes.
22     Q.  You have a general understanding of how
23 that works?
24     A.  Oh, yes.
25     Q.  And are you familiar with the term

Page 165

1  "direct preparation" of the sample results?
2      A.  If you mean direct preparation of the
3  sample results and direct preparation of this
4  document —
5      Q.  Yes.
6      A.  I'm familiar with the fact that the
7  document was prepared by Julie Yang, by people in
8  her department.
9      Q.  As a certified industrial hygienist are
10 you familiar with the difference in what is known
11 as direct preparation of air sample results and
12 indirect preparation of air sample results?
13         I'm not suggesting by the question you
14 should be aware, but I want to know if you're
15 aware.
16     A.  I think I understand the concept of
17 direct preparation versus indirect, but I wasn't
18 directly preparing the samples, which is done by
19 others.  So that would be an indirect preparation,
20 if that's what you're driving at.
21     Q.  I think you testified at 11:05 this
22 morning that it was your understanding that
23 zonolite attic insulation in general used the
24 larger sizes, mainly No. 1, sometimes Libby No. 2
25 and occasionally Libby No. 3; is that correct?

42 (Pages 162 to 165)

Thomas Hamilton   February 25, 2003

Page 166

1    A.  It was along that line, that the
2  zonolite attic insulation product could be Libby 1,
3  2 or 3. That's what I saw in the expanding plants,
4  and that's what was being tested here. I think
5  that's what I testified to. That's what I meant.
6  One of those three products could be labeled as
7  zonolite attic insulation.
8    Q.  Mr. Hamilton, do you have any
9  understanding as a result of your years of
10  experience taking tests and looking at tests in the
11  expanding plants whether ZAI was composed mainly of
12  Libby No. 1, sometimes of Libby No. 2, and on
13  occasion Libby No. 3, or are you saying all three
14  grades to your knowledge were used equally?
15    A.  I'm going to say it my way.
16      I know that all three of those grades
17  were tested; that all three grades were called
18  zonolite attic insulation, and they clearly were
19  testing those three grades. That's what I
20  understood would be used for ZAI, and whether or
21  not one was used more than the other, I do not
22  know.
23      MR. TURKEWITZ: Why don't we take a
24  break right now.
25      (Discussion off the record.)

Page 167

1      THE VIDEOTAPE SPECIALIST: Off the
2  record.
3      (Short recess taken.)
4      THE VIDEOTAPE SPECIALIST: Back on the
5  record. The time is approximately 3:34. This is
6  Tape No. 3 of the videotape deposition of Thomas
7  Edgar Hamilton.
8  BY MR. RESTIVO:
9    Q.  Mr. Hamilton, if you would look at
10  Hamilton Deposition Exhibit 1. This is a
11  January 31, 1977, Request for Technical Services
12  dealing with samples from Weedsport; is that
13  correct?
14    A.  Yes.
15    Q.  And Mr. Eaton's name appears as getting
16  copies of the report as well as some other people?
17    A.  That's correct.
18    Q.  And in the summary section in the
19  second page of the exhibit there is a reference to
20  more than two fibers per cc. Do you see that?
21    A.  Yes.
22    Q.  Was that the standard at the time, do
23  you know?
24    A.  Yes.
25    Q.  And was that an OSHA standard or just a

Page 168

1  recommended threshold limit standard or what?
2    A.  I believe that was the OSHA permissible
3  exposure limit at the time.
4    Q.  And was that, if you know -- strike
5  that.
6      Do you know whether that standard was
7  an eight-hour time weighted standard?
8    A.  Yes, it was.
9    Q.  And do you know whether or not in 1977
10  there was also an excursion -- I think you made
11  mention to an excursion limit or excursion
12  standard.
13    A.  I don't recall that.
14    Q.  You don't recall if there was one —
15    A.  I don't recall if there was one. It's
16  been too long. I would have to refresh my memory
17  on that.
18    Q.  There is today, I thought you
19  testified, an excursion limit.
20    A.  One fiber per cc, yes.
21    Q.  And is there any time frame for that
22  limit?
23    A.  I think the minimum sampling time is
24  15 minutes for a sample. So essentially you could
25  apply a 15-minute limit to that, because if you

Page 169

1  have to sample every 15 minutes, you have to
2  measure that level.
3    Q.  Does that mean that the excursion limit
4  is stated in terms of one cannot be exposed above
5  this limit for 15 minutes or more?
6    A.  No. I think the excursion limit is
7  essentially a limit that should not be exceeded.
8    Q.  Even for one minute?
9    A.  Even for one minute. But in order to
10  measure it, you have to measure it over a 15-minute
11  period.
12    Q.  And that's your understanding of the
13  current — what did we call it?
14    A.  OSHA standard on asbestos.
15    Q.  OSHA standard on asbestos.
16      Now, turning, sir, if you would, to the
17  Air Sampling Record Sheet, the second page of that,
18  if you would, there is a reference towards the
19  bottom of the second page to "initial background".
20      Do you see that?
21    A.  Yes.
22    Q.  Can you tell me what that means, what
23  they were doing there.
24    A.  Yes. They collected an air sample
25  before they started the drop test.

Thomas Hamilton    February 25, 2003

Page 170

1    Q. And can you help me by telling me what
2  time, you know, in lay people's time they did the
3  initial -- they started taking the initial
4  background sample.
5    A. It says 1503, which would be a little
6  after 3 o'clock, until 3:33. So it's a 30-minute
7  sample.
8    Q. That would be in the afternoon?
9    A. Correct.
10   Q. And what is the next entry?
11   A. The next entry is the final background,
12  and that's from 6:40 to 6:52, it looks like.
13   Q. And there is an asterisk -- can you
14  tell what that says? "Started" --
15   A. "Started back on sample after cleanup.
16  Running short of time."
17   Q. Now, can you tell looking at the times
18  on the various tests when the last drop test was
19  completed?
20   A. It looks like it was completed at 1824.
21   Q. Which would be 6:24?
22   A. Correct.
23   Q. And it looks like, if I'm reading this
24  right, they do a final background sample at 6:40.
25   A. Correct.

Page 171

1    Q. Finishing it at 6:52.
2    A. That's correct.
3    Q. So they began the last background
4  sample 16 minutes after the end of the last drop
5  test at 6:24?
6    A. Correct.
7    Q. And the report shows what fibers were
8  found in the air during the drop test, does it not?
9    A. Yes.
10   Q. And it also shows what fibers were
11  found when they did a background check after the
12  last drop test; is that correct?
13   A. That's correct.
14   Q. Would you agree with me that the fibers
15  in the air in the final background test are a small
16  percentage of the fibers in the air during the
17  actual drop test?
18   A. That's correct.
19   Q. Namely, 0.21 fibers per cc?
20   A. That's correct.
21   Q. And the final background of this test
22  at least which lists the initial background before
23  they started, 0.71 fibers per cc; is that correct?
24   A. That's correct.
25   Q. And am I correct that whatever these

Page 172

1  numbers represent, it's your understanding they
2  don't represent eight-hour time weighted results?
3    A. That's correct.
4    Q. Now I want to turn to your first
5  involvement and your first test.
6      Was that a test, if you know, set up by
7  Mr. Locke?
8    A. Yes.
9    Q. And you did that along with Steve
10  Venuti?
11   A. Correct.
12   Q. And you used ten bags of Libby No. 12
13  attic insulation; correct?
14   A. That's what I put down here. That's
15  what we used, ten bags.
16   Q. And you spread those bags in an 8 X 12
17  room with an 8-foot ceiling?
18   A. That's correct.
19   Q. And how long did it take you and
20  Mr. Venuti to spread those ten bags?
21   A. 14 minutes.
22   Q. And you're answering me 14 minutes to
23  spread the ten bags because you are adding up eight
24  minutes in CAM 1 sample and 6 minutes in the CAM 3
25  sample; is that correct?

Page 173

1    A. That's correct.
2    Q. I'm talking about the dry material.
3  I should have made that clear to you, but you've
4  answered consistent with my questions.
5      Now, isn't it correct, Mr. Hamilton,
6  that what the report shows is how long the pump was
7  on unnecessarily how long Venuti was spreading
8  vermiculite?
9    A. That's correct.
10   Q. Your knowledge of the test and your
11  involvement allows you to testify that the pump
12  that was on for eight minutes was on for eight
13  minutes of spreading vermiculite because you were
14  there and that's what was done; correct?
15   A. That's correct.
16   Q. The document itself doesn't necessarily
17  spell that out, but if you were there you know
18  that's what happened?
19   A. Correct.
20   Q. All the document tells you is how long
21  the pump was on.
22      And generally in these reports that you
23  got that you weren't involved in, would you read
24  them the same way; that is, would you equate the
25  sampling time with whatever the operation area is

44 (Pages 170 to 173)

Page 174

1  in that part of your form?
2      A.  The sampling time represents the period
3  of time that the pump ran.  The job that is
4  described there, the operation of the area, may or
5  may not have run exactly in conjunction with the
6  time that the pump ran.  There may be some start
7  and stop time in which they weren't pouring or
8  weren't spreading but would be recorded as sampling
9  time.
10     Q.  But for this test which you were
11 present at in Hamilton Deposition Exhibit 2 your
12 recollection is that in fact Venuti was spreading
13 vermiculite for approximately eight minutes and six
14 minutes for a total of 14 minutes?
15     A.  Yes.  As I recall, we didn't delay
16 between his completion of the spreading and
17 shutting off the pump and putting a new filter on
18 and starting up again.  There wasn't a lot of
19 delay.  That eight minutes and that six minutes
20 represents pretty much the time of the spread.
21     Q.  And I think you'll agree with me that
22 these test results are reflected in phase contrast
23 microscopy terms; correct?
24     A.  That's correct.
25     Q.  And so am I correct that over -- when

Page 175

1  you get to lab evaluation and a number of fibers
2  per cc, all fibers are counted as if they are
3  asbestos, but in fact PCM doesn't identify them as
4  asbestos or nonasbestos?
5      A.  I believe you're correct on that.
6  I'm not sure if these were counted using
7  discriminatory counting technique that you would
8  need to put in place.  I don't know exactly when
9  she started that.  But if this was discriminatory
10 counting, then these samples would reflect more
11 closely the fiber that would be associated with
12 tremolite rather than particles that were not
13 tremolite that appeared as fibers.
14         I'm not sure when she started the
15 discriminatory counting technique, so I can't
16 answer your question.
17     Q.  Was it at the front end of your
18 involvement in these sorts of tests or more towards
19 the tail end of your involvement that you believe
20 Julie Yang dealt with discriminatory counting?
21     A.  I think discriminatory counting
22 occurred rather early on this time.  So I'm not
23 quite sure if she had already started doing that or
24 not because I was already -- we were already doing
25 a lot of monitoring in the expander plants, and I

Page 176

1  think she may have started using the discriminatory
2  counting technique prior to this time.  These may
3  be -- these may have been counted using the
4  discriminatory technique, in which case they would
5  more accurately reflect fiber rather than fiber and
6  tremolite -- I mean vermiculite on end.  It appears
7  to be fiber, but it really isn't.
8      Q.  It would be fair to say, Mr. Hamilton,
9  looking at Hamilton Deposition Exhibit 2 you and I
10 can't tell whether the fiber numbers marked under
11 "Lab Evaluation" are tremolite asbestos fibers or
12 not?
13     A.  That's correct.
14     Q.  Would you agree with me that whatever
15 those fibers are, they are not expressed in terms
16 of an 8-hour time weighted average?
17     A.  That is correct.
18     Q.  Would you agree with me that when you
19 reported results back to various plants where air
20 sampling had been taken, you reported those results
21 back on a time weighted average basis?
22     A.  We attempted to do that in nearly every
23 report we could because that was of the appropriate
24 way to report it.  Correct.
25     Q.  Do you recall ever advising plants that

Page 177

1  while there may be isolated instances of exposures
2  above the PEL, when averaged out over an 8-hour
3  time weighted average, they were within standard?
4      A.  Yes.
5      Q.  I think I lost the thread of your
6  testimony on Exhibit 2, this No. 28.88, which on
7  Exhibit 3 then shows up as a different number.
8  I'm not sure I understand why that occurs or why
9  you are testifying you think that occurred.
10     A.  I think the question was along the
11 lines of why would this have happened?  How come
12 the file copy had a different number from the copy
13 that was sent to Mr. Duecker, and I think that I
14 gave a plausible explanation of why that could have
15 occurred.
16         The reason was that sometimes when a
17 sample result set has gone out, a quality control
18 check is done on the data.  It may have been that
19 after they QC checked this data they found the
20 error, and so they corrected it, and what you have
21 is an uncorrected copy as Exhibit 2 and a corrected
22 copy as Exhibit 3.
23         I have no other explanation for that
24 that I can think of why it would have been changed.
25     Q.  Mr. Hamilton, don't take my question in

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO