Page 178

1   the wrong light.
2        Isn't it true that you don't know why
3   there is a different number on Exhibit 3 than there
4   is on Exhibit 2? You were simply trying to give
5   what to you would be the most plausible
6   explanation, but you don't actually know whether
7   that's the answer or not?
8        A. That's correct.
9        Q. And you were not suggesting and it
10  would be wrong for anyone to suggest that someone
11  at Grace on Exhibit 2 took the 28.88 number and
12  artifically and dishonestly simply changed it for
13  the file copy to 6.00 or 6.09? You weren't
14  suggesting that?
15       A. Not at all, no.
16       Q. When you report results back to the
17  plant on a time weighted average, were you the
18  individual that performed whatever arithmetic one
19  had to perform in order to convert the readings to
20  an 8-hour time weighted average?
21       A. On many occasions I would perform that
22  arithmetic. There were times when that arithmetic
23  might have been performed by an industrial
24  hygienist working for me.
25       Q. And assuming you had an operation which

Page 179

1   was monitored for 20 minutes and produced certain
2   fiber level air sample readings and that for that
3   eight-hour period that was the end of the
4   operation, does one take the direct air sample
5   readings and divide by 480 minutes in order to get
6   an 8-hour time weighted average? Is that the math?
7        A. You're very close to the math.
8        You would take the sample result,
9   multiply it by the time of that sample and divide
10  it by 480 and get the eight-hour TWA for that
11  individual sample, assuming that the employee works
12  with no other exposure during that.
13       Q. And was it your understanding back in
14  those good old days that the time weighted average
15  was something applicable to eight hours a day, five
16  days a week, 52 weeks a year for 45 years under
17  OSHA standards?
18       A. Under OSHA standards it would be eight
19  hours a day, 40 hours a week for a working
20  lifetime.
21       Q. Do you know whether that working
22  lifetime is 45 years or 50 years? Do you remember?
23       A. I don't think I've ever been asked that
24  question before.
25       A working career would be in the

Page 180

1   neighborhood of 45 years.
2        Q. Could you, sir, turn to Exhibit 4.
3        These are samples from Weedsport?
4        A. Yes.
5        Q. And you approved another Request for
6   Technical Service?
7        A. That's correct.
8        Q. Fred Eaton was the requester?
9        A. Yes.
10       Q. And he and Mr. Wood, Mr. Wolter and
11  others got copies of the report?
12       A. Yes.
13       Q. And in the summary it talks about six
14  samples exceeding the limit.
15       Do you see that?
16       A. Yes.
17       Q. Does that indicate to you that there
18  must have been an OSHA limit or some limit as of
19  May 19, 1977?
20       A. Yes. I believe that the limit they're
21  referring to is the two fibers per cc, which was in
22  existence at that time.
23       Q. Now, the two fibers per cc limit was an
24  8-hour time weighted average; correct?
25       A. That's correct.

Page 181

1        Q. Are the results reported in this
2   exhibit based upon an 8-hour time weighted average?
3        A. No, they are not.
4        Q. Was the testing of this material from
5   Weedsport simulated attic tests?
6        A. Yes.
7        Q. And I thought you testified that the
8   OSHA standards relating to employee exposures in
9   the workplace should not be used with respect to
10  attics where you might have kids or the elderly or
11  something else.
12       Was that the import of your testimony?
13       A. I think it's very important to
14  understand that when comparing these numbers to a
15  standard, which is an occupational standard, that
16  you are limiting the usefulness of that standard
17  only to people who would be paid by an employer to
18  install this as an employee at somebody's location.
19  Or whoever is being paid, they're an employee of an
20  employer. That is when the OSHA standard applies.
21       OSHA standards do not apply to
22  homeowners or to children or to a nonemployee.
23  They also do not apply to public sector workers,
24  which includes firemen, postal workers, meter
25  maids. It only applies to the general industry at

46 (Pages 178 to 181)

Page 182

1   Section Codes 21 to 29.
2       Q.  Mr. Hamilton, are you suggesting by
3   that answer that all of the simulations and the
4   tests that Mr. Eaton devised and then conducted
5   assumed that you wouldn't have a homeowner
6   installing the product?
7       A.  No.
8       Q.  The test assumed, did they not, you
9   would have a homeowner installing the product?
10      A.  I don't know that.
11      Q.  Who would know that?
12      A.  The person that sells it.
13      Q.  And you know that this material was
14  sold for homeowners to install themselves and also
15  sold for contractors to install it, don't you?
16      A.  That's correct.
17      Q.  And so you know that these tests at
18  least with respect to homeowners would not involve
19  OSHA-covered employees; isn't that correct?
20      A.  If the homeowner installs it, the OSHA
21  standards are irrelevant.
22      Q.  And with respect to Hamilton Deposition
23  Exhibit 4, there is a report that six samples
24  exceeded the limit.
25          Do you see that?

Page 183

1       A.  Correct.
2       Q.  What is the limit, the OSHA standard?
3       A.  I believe that's what they mean.  Two
4   fibers per cc OSHA limit as 8-hour TWA for employee
5   exposure to asbestos.
6       Q.  Mr. Hamilton, I would represent to you
7   that I've attempted to go through our collection of
8   documents which were provided to counsel for the
9   plaintiffs attempting to identify anything with
10  your name on it, to or from, and I will represent
11  to you that I have not found one memorandum or
12  report from you telling the Construction Products
13  Division or Julie Yang or M.M. Hoey or anyone else
14  that it is inappropriate to use the OSHA standard
15  when testing simulated attic material.
16          Do you remember ever writing such a
17  recommendation or making such a criticism in
18  writing?
19      A.  No.
20      Q.  With respect to Hamilton Deposition
21  Exhibit 4, am I correct that this material was
22  tested in this simulated attic test is not what you
23  and Mr. Turkewitz referred to as production
24  material?
25      A.  At the time that this test was done I

Page 184

1   do not believe that the material that was being
2   tested was production material.
3       Q.  This isn't something at the time one
4   could go to a local hardware store and buy with all
5   these various formulations?
6       A.  That's correct.
7       Q.  And can you tell what size attic fill
8   was being used in these formulations?
9       A.  I don't see a reference to size of the
10  material.  It may be on here.  I may be missing it.
11      Q.  It could be, sir.  I would have
12  addressed your attention to it.
13      A.  I just don't see it here.
14      Q.  I don't either.
15      A.  It's very unusual for Fred to do that.
16  He was always thorough with his notes.
17      Q.  Am I correct, sir, that with respect to
18  Hamilton Deposition Exhibit 4, that looking at the
19  exhibit itself one cannot tell whether or not the
20  fibers reported under "Lab Evaluation" are asbestos
21  fibers or nonasbestos fibers?
22      A.  That's correct.
23      Q.  Am I correct that one can tell that
24  whatever is being reported is not being reported on
25  an 8-hour time weighted average?

Page 185

1       A.  That's correct.
2       Q.  Turn, sir, if you would, please, to
3   Exhibit 5, Hamilton Exhibit 5.
4           This is a Request for Technical
5   Assistance dated June 3, 1977, evaluating attic
6   test samples from Weedsport; correct?
7       A.  Yes.
8       Q.  You approved the Request for Technical
9   Assistance; correct?
10      A.  Yes.
11      Q.  Copies of the report go to a number of
12  people including E.S. Wood and others; correct?
13      A.  Correct.
14      Q.  The laboratory on Page 3 is reporting
15  that all samples contain more than two fibers per
16  cc; correct?
17      A.  Correct.
18      Q.  Does that tell you that at least the
19  laboratory is using as a standard the OSHA standard
20  of two fibers per cc?
21      A.  Yes.
22      Q.  However, I think you and I have agreed
23  that standard is really on an 8-hour time weighted
24  basis at that time; correct?
25      A.  That's correct.

47 (Pages 182 to 185)

Thomas Hamilton    February 25, 2003

Page 186

1    Q.  Do you recall when you received your
2  copy of Hamilton Exhibit 5 writing a memorandum
3  telling anyone that it would be inappropriate to
4  use the OSHA standard for simulated attic tests if
5  one assumed homeowners were going to do it
6  themselves?
7    A.  I don't see where you're headed on
8  this, and I'm going to answer your question a
9  little lengthy here, if you just bear with me.
10    I did not set up these tests. I only
11  approved the request for technical assistance to
12  get the samples analyzed. These were not collected
13  by me; therefore, I don't write reports on these.
14    If I had been requested to write a
15  report based on the OSHA standards, I would have
16  said that we had to calculate an 8-hour time
17  weighted average. I would have done that
18  calculation for them and reported that out. I was
19  not requested to write anything with regard to
20  these data. These came across my desk. I reviewed
21  them and they were filed.
22    Now, somewhere within CPD they may have
23  had a goal of getting all of their samples on —
24  whatever sample they collected, below 2. That may
25  have been a goal, and therefore the laboratory was

Page 187

1  reporting out that goal in relation to the results.
2    I have no way of knowing whether
3  somebody had requested me to write a report on any
4  of these samples and compare it to an OSHA
5  standard. Whatever that standard was, I would have
6  been very clear in my calculations.
7    Are we looking at an excursion limit?
8  Are we looking at .1, .2? Are we looking at two
9  fibers per cc? Whatever that standard was, if it
10  was an 8-hour TWA, I would have calculated 8-hour
11  time weighted averages. But since I don't know
12  what the goal of this sampling was — I was not
13  privy to that — I don't know whether comparing it
14  to two was appropriate it or not based on what CPD
15  managers wanted to see.
16    What I do know is that they
17  consistently used that level and they talked about
18  it, and I never saw any document from anybody at
19  CPD saying: Hey, that's an 8-hour time weighted
20  average. Why are we comparing it to two?
21    So I didn't write anything because I
22  wasn't requested to and they didn't write anything
23  because they didn't know any better. I guess
24  that's the answer to the question.
25    Q.  In any event, Mr. Hamilton, there is no

Page 188

1  doubt that you were either the requester or the
2  approver with respect to these requests for
3  technical service?
4    A.  That's correct.
5    Q.  And at that time you were — at that
6  time were you a certified industrial hygienist?
7    A.  No.
8    Q.  What were you at that time?
9    A.  I was an industrial hygienist.
10    Q.  But not certified?
11    A.  Correct.
12    Q.  And there is no doubt that you received
13  copies of the reports for the requests which you
14  had requested or approved?
15    A.  Correct.
16    Q.  And there is no doubt -- you read
17  these?
18    A.  That's correct.
19    Q.  For whatever reason you didn't write
20  any reports along the basis and you have just
21  discussed, but it's not because you didn't get
22  copies of these reports?
23    A.  That's correct.
24    Q.  Turning, sir, if you would to Hamilton
25  Deposition Exhibit 6.

Page 189

1    These are samples from simulated attic
2  tests; is that correct?
3    A.  That's correct.
4    Q.  We don't have on this exhibit, do we,
5  the actual lab reports, the air sampling reports?
6    A.  That's correct.
7    Q.  We do know that there is reference to
8  two fibers per cc of air?
9    A.  That's correct.
10    Q.  We assume -- or you knew at the time
11  that was a reference to the OSHA standard?
12    A.  I believe so.
13    Q.  But that is not a reference to the OSHA
14  time weighted average standard?  Strike that.
15    But at least up to this point we have
16  not seen any air sampling results reported as
17  8-hour time weighted average; isn't that correct?
18    A.  That's correct.
19    Q.  We don't have the results for this, but
20  would your assumption be that whatever the results
21  were that are not attached to this report, they
22  would not be 8-hour time weighted average results
23  based on what you've seen so far?
24    A.  That's correct.
25    Q.  Once again -- and if I asked this,

48 (Pages 186 to 189)

Thomas Hamilton   February 25, 2003

Page 190

1   I apologize. — what was Eaton's job as contrasted
2   with your job and as contrasted with Wood's job?
3       A. Fred worked in the Construction
4   Products Division Engineering Department. He was
5   an engineer working there for Dick Snyder,
6   I believe, and his job was to work on plant
7   projects involving construction. That's what I
8   understood his job to be. He was called in to do
9   this work which involved testing of ZAI, so for a
10  long period of time he was involved in this rather
11  closely.
12          Mr. Wood was the manager. He was the
13  manager of CPD.
14      Q. Did Eaton report to Wood?
15      A. No. I believe Eaton reported to Dick
16  Snyder.
17      Q. Did Dick Snyder report to Wood?
18      A. Yes; he may have.
19      Q. Now, did you have a good working
20  relationship with Eaton?
21      A. Yes. Fred and I got along just fine.
22      Q. Did you have an opportunity to see his
23  work and to see what he was doing and to talk about
24  it?
25      A. Occasionally we did talk about his work

Page 191

1   and his sampling technique and making sure that he
2   was able to get samples which would be readable.
3       Q. Did you consider him a careful,
4   conscientious worker?
5       A. Oh, yes.
6       Q. Was he honest?
7       A. As far as I know, yes.
8       Q. Was he the man primarily responsible in
9   this time frame for testing ZAI?
10      A. Well, he was the only person that was
11  giving us samples for ZAI. So I have to answer
12  yes, as far as I know he was the only person.
13      Q. Turn, if you would, to Exhibit 7.
14          These are eight simulated attic test
15  samples from Weedsport; correct?
16      A. Yes.
17      Q. In addition to you receiving a copy did
18  Eaton and Wood and others receive copies?
19      A. Yes.
20      Q. Again, the report seems to deal with as
21  a standard two fibers per cc of air, does it not?
22      A. Yes.
23      Q. Looking at the Air Sampling Record,
24  would you agree with me -- strike that.
25          Go back to the first page. The first

Page 192

1   page indicates this is Libby No. 3, does it not?
2       A. That's correct.
3       Q. Now go to the Air Sampling Record
4   Sheet.
5           Would you agree with me that whatever
6   material was being tested here is not production
7   material that came out of bags of ZAI from your
8   local hardware store?
9       A. That's most likely the case, yes.
10      Q. This is different formulations of
11  different stuff being tested in this test; correct?
12      A. That's correct.
13      Q. By Mr. Eaton?
14      A. That's correct.
15      Q. Hamilton Deposition No. 8 doesn't
16  appear to have your name on it, but your sense
17  based upon the procedure is it would have crossed
18  your desk.
19      A. That's correct.
20      Q. And these are 12 simulated attic test
21  samples from Weedsport; correct?
22      A. Correct.
23      Q. And the lab analysis appears to be
24  using two fibers per cc of air as the standard?
25      A. That's correct.

Page 193

1       Q. And this appears to be, does it not,
2   Libby No. 3?
3       A. Yes.
4       Q. With fines bound and unbound, returned
5   and unreturned?
6       A. Yes.
7       Q. Would you agree with me that this is
8   not production material one would get out of a bag
9   at your local hardware store?
10      A. I would agree that this — I'm not sure
11  about the first four samples there as being
12  production material or not. It's unbound Libby
13  control material with no binder that could very
14  well have been production material.
15      Q. But you can't tell from this document
16  whether it is or it isn't?
17      A. No, I can't. All I know is that they
18  call it "control", and usually when they're talking
19  about control they're talking about a production
20  material.
21      Q. That control would be No. 3 Libby, not
22  Libby No. 1 or No. 2?
23      A. That's correct.
24      Q. And the second page you know is not
25  something you would buy at your hardware store

49 (Pages 190 to 193)

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Page 194

1  coming out of a bag?
2  A.  I believe in 1977 material that had
3  been screened and had a binder on it was not
4  production material.
5  Q.  Mr. Hamilton, I have looked — and I
6  have samples here maybe I could show you.
7  I have looked at your reports to the
8  various plants based upon environmental surveys.
9  I would represent to you that almost every time you
10  refer in a report back to the plant on ZAI, you
11  identify it as an operation using Libby No. 1 or
12  Libby No. 2. I never found many or any examples
13  where you report back using Libby No. 3 as a ZAI
14  operation.
15  Is that consistent with your
16  recollection as to what you were seeing from the
17  plants as the source material for ZAI, primarily
18  Libby No. 1 and sometimes Libby No. 2 and only
19  occasionally Libby No. 3?
20  A.  I would say it's consistent with what
21  I recall. It's really difficult to remember
22  everything that went on because there were so many
23  plants we went to, but I do notice that the attic
24  testing did involve Libby 3. I thought that most
25  of the ZAI was Libby 1 and 2. Maybe there was some

Page 195

1  3 that was sent out as ZAI. I don't know, but I
2  know that they were testing it as part of this
3  attic test.
4  Q.  Isn't it true, Mr. Hamilton, that when
5  you reviewed recently these various tests
6  Mr. Turkewitz sent you, you were kind of surprised
7  to see so much testing of No. 3 rather than testing
8  of Libby 1 and Libby 2? Didn't that surprise you?
9  A.  Oh, it may have come as a surprise.
10  I guess I never really thought of Libby 3 as being
11  a good product to put into an attic, and there was
12  a lot more testing on 3 in there that I recall.
13  So maybe "surprise" is the right word. I'm not
14  sure.
15  Q.  As an industrial hygienist for Grace
16  you did advise the plants, did you not, that
17  visible dust levels really wouldn't tell the plants
18  anything with respect to fiber counts?
19  A.  Yes. I think we had a pretty good feel
20  that — I mean, I think it was general agreement
21  that the visible dust level wasn't a good indicator
22  of fiber count level. We tried to stay away from
23  that.
24  Q.  Indeed on occasions you reported that
25  even though in certain tests the visible dust

Page 196

1  levels didn't seem to be improved, the fiber counts
2  were drastically reduced.
3  Do you remember giving reports like
4  that?
5  A.  Oh, I may have, yes. That was very
6  possible.
7  Q.  And so that the visible dust levels
8  simply wouldn't tell you as an industrial hygienist
9  what the fiber count in the air would be?
10  A.  It generally wasn't a good indicator,
11  because one day the dust would be high and the
12  fiber would be low and the next day would be the
13  opposite. It really wasn't doing us any good.
14  Q.  If you look at Hamilton Deposition
15  Exhibit 9, these are samples from Weedsport, it
16  appears to me, based upon the comment section that
17  this is Libby No. 2.
18  A.  Yes.
19  Q.  Do you agree with that?
20  A.  Yes.
21  Q.  And then can you tell whether this is
22  production material or engineering sample material?
23  A.  I would suspect that some of this could
24  be production material because they're talking
25  about it's unscreened with the cyclone fines

Page 197

1  returned to the product. I believe that might have
2  been a production material, but I'm not qualified
3  to make that statement.
4  Q.  What I need you to tell me is whether
5  you know whether this is production material or
6  not. I realize it may be and it may not be.
7  A.  No, I don't know.
8  Q.  Do you know whether — strike.
9  You would agree with me that the lab
10  evaluation results are not reported as time
11  weighted averages.
12  A.  That's correct.
13  Q.  And you would agree with me that
14  whatever is being reported there, there is nothing
15  on this exhibit indicating whether what was found
16  was asbestos fibers or not asbestos fibers?
17  A.  That's correct.
18  MR. RESTIVO:  I would like this marked
19  as Hamilton Deposition Exhibit 25.
20  (Defendant's Exhibit Hamilton 25, Memo,
21  1/18/78, to R.E. Ward from T.E. Hamilton, marked
22  for identification.)
23  BY MR. RESTIVO:
24  Q.  Mr. Hamilton, I show you what has been
25  marked Hamilton Deposition Exhibit No. 25, which

Page 198

1  purports to be a memorandum from you to R.E. Ward,
2  West Chicago, dated January 18, 1978, subject: Air
3  Sampling Results; is that correct?
4      A.  That's correct.
5      Q.  Do you recognize on the first page that
6  to be your signature?
7      A.  Yes.
8      Q.  I'll ask you the question:  Do you
9  remember writing this specific report on
10 January 18, 1978?
11     A.  No.
12     Q.  I would represent to you that this is a
13 sample of the sorts of reports that I've seen with
14 your name on it, all of which I'm not going to
15 spend the next week showing you.
16         Would you agree this is the format your
17 reports took?
18     A.  Yes.
19     Q.  Taking a look at your report, are you
20 reporting -- do you remember who R.E. Ward is?
21     A.  He was the plant manager in the West
22 Chicago plant.
23     Q.  And you went to the West Chicago plant
24 and took air sampling of certain operations and
25 then reported back to him the results?

Page 199

1      A.  That's correct.
2      Q.  You did that with a whole bunch of
3  plants; correct?
4      A.  Yes.
5      Q.  And you reported back to him based upon
6  an OSHA limit of two fibers per cc; correct?
7      A.  Correct.
8      Q.  And you send to him lab results --
9  I'm sorry. -- the Air Sampling Record Sheet, do
10 you not?
11     A.  Yes.
12     Q.  And do the Air Sampling Record Sheets
13 report air sampling readings on an 8-hour time
14 weighted average basis?
15     A.  No.
16     Q.  Those are just direct air sampling
17 readings; correct?
18     A.  That's correct.
19     Q.  For whatever period of time the pump is
20 on; correct?
21     A.  That's correct.
22     Q.  You, however, or someone on your staff
23 does a calculation that takes those direct readings
24 and converts them to time weighted averages in your
25 report; is that correct?

Page 200

1      A.  That's correct.
2      Q.  And that was the standard and practice
3  which you used in reporting back to the plants;
4  correct?
5      A.  That's correct.
6      Q.  And this is an example when I talk to
7  you about where you were looking at Employee Soto,
8  No. 2.
9      A.  Yes.
10     Q.  And do you see where it refers to
11 "attic"?
12     A.  Yes.
13     Q.  And there it references Libby No. 2,
14 does it not?
15     A.  Yes.
16     Q.  And what I was stating or representing
17 to you was in most of the reports that I've seen
18 that you sent to the plants, when you refer to
19 "attic," you're almost always referring to Libby 1
20 or Libby 2.
21         Is that consistent with your
22 recollection?
23     A.  Yes.
24     Q.  And did you indicate to the plant
25 manager -- I'm in the paragraph under the names --

Page 201

1  "It appears that some high exposures can occur for
2  short periods of time, but when averaged over the
3  entire workday there is no overexposure"?
4      A.  That's correct.
5      Q.  And that's the purpose and the effect
6  of using the OSHA time weighted average in doing
7  that calculation?
8      A.  Yes.
9      Q.  And there would be any number of
10 reports where you would have expressed that view
11 back to the plant in memorandums like this;
12 correct?
13     A.  This is a fairly standard letter.
14     Q.  Am I correct, Mr. Hamilton, that you
15 personally have never done any testing on in-place
16 attic fill material --
17     A.  That's correct.
18     Q.  -- using either PCM or TEM?
19     A.  That's correct.
20     Q.  Have you seen the results of any such
21 in-place testing?
22     A.  Could you describe for me what type of
23 testing you're talking about.
24     Q.  Where someone might send consultants
25 into an attic, set up air pumps, disturb, or to use

Page 202

1   your term, manipulate the material and try to
2   determine what the results are.
3       A. I've never done that in a home.
4   I don't recall seeing anybody else's results --
5   I never saw a report from anybody where they have
6   done that either.
7       Q. Have you ever talked to anybody about
8   doing that?
9       A. Yes. We talked about that at Grace on
10  occasion because there was -- as I said earlier,
11  there was some concern on my part that just going
12  into a home that had that attic insulation and
13  doing a sample didn't tell you the whole story.
14  There was going to be times when that stuff -- when
15  the attic insulation was disturbed, and we did not
16  know what the potential exposures would be and
17  under what situations that might occur.
18          We had an idea of the types of
19  situations where it could occur and I've described
20  some of them earlier today, but we never did any
21  testing on that that I know of.
22      Q. Sir, since leaving Grace's employ have
23  you heard from anyone about any types of testing
24  done in an attic or attics when material was
25  disturbed or manipulated?

Page 203

1       A. No, I have not.
2       Q. With respect to these conversations you
3   may have had perhaps at lunch about in-place
4   material and disturbing it, did you ever compare
5   the manipulation of a fan repair and the other
6   examples you gave with the initial manipulation
7   involved in installing the material from scratch?
8       A. I've never measured that and I've never
9   seen measurements of it.
10      Q. You didn't have any assumptions that
11  any fan repair would not involve as much
12  disturbance or manipulation of material as pouring
13  an attic from scratch? You have no view on it?
14      A. Oh, I think my view on that would be
15  that pouring the attic would be more disturbance
16  than repairing a fan in the attic, and certainly
17  you would have more opportunity for exposure in
18  terms of duration and level of a fiber during the
19  installation versus a repair to a fan in an attic.
20      Q. You, I thought, stated under oath that
21  individuals told you that it would take two days
22  for one person to insulate that person's attic with
23  attic fill material. I thought that's what you
24  said.
25      A. I didn't say that people told me that.

Page 204

1   I was asked how long did I think it would take, and
2   I said I think it would take approximately two days
3   to put in approximately a hundred bags.
4       Q. Am I correct that no one ever told you
5   that?
6       A. No.
7       Q. No, I'm not correct? Someone did tell
8   you that?
9       A. I'm sorry. Let me say that the right
10  way.
11          No one told me that. I thought about
12  it. I thought about how long it would take to do
13  it. If I were trying to do an attic of a certain
14  -- of a house that took a hundred bags, how long
15  would it take me to get all that done, and thinking
16  about how long it took three guys to move 49 bags
17  in and assuming that those three guys are -- that's
18  their job and they get paid by the hour. They're
19  going to be much more efficient than a homeowner
20  is. He's going to take his time.
21          So a homeowner isn't just going to cut
22  open bags and dump them and cut open bags and dump
23  them. He's going to take his time and he's going
24  to be careful about it. So the period of time in
25  my mind that it would take a homeowner to do a

Page 205

1   hundred bags would be more like two days to get the
2   bags from the truck into the attic, spread it,
3   clean up and get the bags out and finish.
4       Q. Mr. Hamilton, I understand that's your
5   opinion.
6       A. Nobody told me that.
7       Q. I'm trying to find out from whence that
8   opinion comes.
9          It doesn't come from you personally
10  having performed that task in an attic?
11      A. That's correct.
12      Q. It doesn't come from Fred Eaton or
13  anyone at Grace telling you that it would take two
14  days to totally insulate an attic with ZAI?
15      A. That's correct.
16      Q. Where it comes from is your review
17  recently of these documents which in some instances
18  give time frames for some employees and your
19  extrapolation of that to an individual in a home?
20      A. Yes. I think it also comes from my
21  experience of actually applying insulation to an
22  attic. Not ZAI, but fiberglass. I have done that.
23  I insulated an attic in a home, my home in
24  Johnsford, with fiberglass, and I know how long it
25  took. It took two days for us to get all those

52 (Pages 202 to 205)

Page 206

1    rolls up into the attic, roll them out and cut
2    them, place them.
3         So not only is it a personal experience
4    of using fiberglass and walking around in an attic,
5    but then if I had to do bags, I don't think it
6    would be that much different. So I am
7    extrapolating from what I see here. I'm also
8    drawing on my own personal experience from having
9    done my own attic.
10        Q. But you are not basing it on anything
11   Fred Eaton or anyone at Grace told you?
12        A. That's correct.
13        Q. You talked a little bit about these
14   AIHA Web sites, did you not, with Mr. Turkewitz?
15        A. I didn't talk to Mr. Turkewitz about an
16   AIHA web site at all.
17        Q. What was that discussion about the
18   World Trade Center?
19        A. Oh, that was a Yahoo user group. That
20   is not the AIHA web site.
21        Q. For what it's worth, it's listed under
22   Yahoo as AIHA Industrial Hygiene Group; but in any
23   event, you and I are talking about the same Yahoo
24   material?
25        A. Yes.

Page 207

1         Q. And in that material you wrote, did you
2    not, that the amount of tremolite in the expanded
3    vermiculite was always less than 0.1 percent?
4         A. From what I remember, that's pretty
5    much what I recall.
6         Q. The first question is: Did you write
7    that?
8         A. I did write that, yes.
9         Q. The second question is: Do you believe
10   that to be true sitting here today under oath?
11        A. From what I recall from my experience
12   having been there for the most part, that's still
13   true today.
14        Q. No. 3: Did you write that because that
15   under the OSHA rules Grace was not required to list
16   tremolite asbestos as a constituent or a
17   contaminant?
18        A. That's correct. I wrote that.
19        Q. Take a look, sir, at Hamilton
20   Deposition Exhibit 10.
21        These are test samples — are they more
22   test samples from Weedsport?
23        A. Correct.
24        Q. Looking at the Air Sampling Sheet, can
25   you tell whether this is production material or

Page 208

1    test material?
2         A. No, I cannot.
3         Q. You can tell that it was screened?
4         A. Yes.
5         Q. You can tell that all cyclone fines
6    were pulled?
7         A. Yes.
8         Q. You can tell how many bags were poured?
9         A. Yes.
10        Q. How many?
11        A. There are 25 3-cubic foot bags tested
12   except 25AS, which was 24 bags.
13        Q. 24 bags were poured; correct?
14        A. That's what it says.
15        Q. In how much time?
16        A. Well, I guess you would have to add up
17   those times there, 15-1/2 and 17 and 16 and 14.
18        Q. In about an hour?
19        A. Approximately an hour.
20        Q. Turn, sir, if you would to Hamilton
21   Deposition Exhibit 11.
22        More simulated attic tests; is that
23   correct?
24        A. Yes.
25        Q. Can you tell from the Air Sampling

Page 209

1    Records whether that is production material or not?
2         A. No.
3         Q. Can you tell how much was poured?
4         A. I don't see the number of bags written
5    down here.
6         Q. Nor do I.
7         Take a look at Exhibit 12. More attic
8    test samples from Weedsport?
9         A. Yes.
10        Q. Do you agree with me that this appears
11   to be Libby No. 3?
12        A. Yes.
13        Q. Do you agree with me that this appears
14   to be test material, not production material?
15        A. Yes.
16        Q. Do you agree with me that the results
17   are not expressed in 8-hour time weighted average?
18        A. That's correct.
19        Q. Do you agree with me that whatever the
20   results are you can't tell from this exhibit
21   whether whatever was found was asbestos or
22   nonasbestos?
23        A. That's correct.
24        Q. Can you tell how many bags were used in
25   this attic fill test?

Thomas Hamilton   February 25, 2003

Page 210

1     A.  It looks like 99 bags were used.
2     Q.  And can you tell how long it took to
3   use 99 bags of attic fill in this test?
4     A.  Six -- 80 minutes.
5     Q.  Let me show you, sir --
6        MR. RESTIVO:  Let's go off the record.
7        THE VIDEOTAPE SPECIALIST:  Off the
8   record.  The time is approximately 4:39.
9        (Short recess taken.)
10       THE VIDEOTAPE SPECIALIST:  Back on the
11  record.  The time is approximately 4:45 p.m.
12  BY MR. RESTIVO:
13    Q.  Mr. Hamilton, I would address your
14  attention to Hamilton Deposition Exhibit 13.
15       These are more attic test samples from
16  Weedsport?
17    A.  Correct.
18    Q.  It looks like they are testing Libby
19  No. 3 screened.
20    A.  Yes.
21    Q.  Is that production material, do you
22  know?
23    A.  I don't know.
24    Q.  Can you tell me how many bags were
25  poured in this simulated attic?

Page 211

1     A.  Well, it says 25 3-cubic foot bags, and
2   there is a line drawn down among the sample
3   numbers.  I'm not sure if that's 25 total or 25 for
4   each sample.
5     Q.  You can't tell looking at this whether
6   or not the total bags applied here were 25 or a
7   hundred because the line is ambiguous at best?
8     A.  But I would assume that it was a
9   hundred bags.
10    Q.  And the employee, Charlie, poured a
11  hundred bags himself in this test?
12    A.  That's correct.
13    Q.  And how long did it take him to do
14  that, a little more than an hour?
15    A.  34 and 37.  So yes, a little over an
16  hour.  An hour and ten minutes, an hour and 11
17  minutes.
18    Q.  Take a look, sir, at Hamilton No. 14.
19       These are more test samples from
20  Weedsport.
21    A.  Correct.
22    Q.  And again, Eaton and Wood and others
23  get copies of this; correct?
24    A.  Correct.
25    Q.  And Eaton is the requester; correct?

Page 212

1     A.  Yes.
2     Q.  Does this tell you based upon your
3   knowledge of Grace and being employed at the time
4   that this indicates Eaton is continuing to work on
5   various formulations and testing them in simulated
6   attic tests?
7     A.  Yes.
8     Q.  Does this indicate to you that as of _
9   August of 1977 the lab is still treating OSHA as
10  providing a limit?
11    A.  In the summary they don't say what the
12  limit was, but they say that 28 samples exceeded
13  the limit.
14    Q.  And in the first page, which you
15  approved, they make reference to the OSHA asbestos
16  standard under "Significance", do they not?
17    A.  Yes.
18    Q.  And this appears to be Libby No. 3 that
19  they've tested?
20    A.  Yes.
21    Q.  How many bags?
22    A.  101 bags of product per cubic foot,
23  nine and a half 4-cubic screened and 4-cubic foot
24  of cyclone fine.
25    Q.  And this is Libby No. 3 that they did

Page 213

1   certain things with and tested certain
2   formulations?
3     A.  That's correct.
4     Q.  Do you agree with me that the results
5   in this document don't tell you whether what was
6   found was asbestos or nonasbestos?
7     A.  That's correct.
8     Q.  You agree with me that the results are
9   not reported in 8-hour time weighted average?
10    A.  That's correct.
11    Q.  Take a look quickly, sir, at
12  Exhibit 15.
13       You would agree with me, would you not,
14  that those simulated attic tests are dealing with
15  Libby No. 3?
16    A.  Yes.
17    Q.  You would agree with me that it appears
18  to be material from various plants that certain
19  experimental work was done to?  I take that back.
20       Does this appear to be material from
21  three different — on the first page of the Air
22  Sampling Record Sheet, three different plants?
23    A.  Yes.  It's from three different plants.
24    Q.  And can you tell whether or not Eaton
25  did anything to that material?

54 (Pages 210 to 213)

Thomas Hamilton    February 25, 2003

Page 214

1    A.  It says that it's screened through a
2  14-mesh screen and it's unbound.
3    Q.  And on the simulated attic test how
4  many bags of Libby No. 3 were poured in this attic
5  test on the first page of the Air Sampling Record?
6    A.  75 bags.
7    Q.  And how long did it take, less than an
8  hour?
9    A.  Less than an hour.
10    Q.  Hamilton Exhibit 16, sir.
11    More simulated attic test samples from
12  Weedsport?
13    A.  Yes.
14    Q.  Would you agree with me that -- strike
15  that.
16    Can you tell what size this is?
17    A.  It says it's Libby 3.
18    Q.  And where does it say that?
19    A.  At the top of Page — of the Air
20  Sampling Record page.
21    MR. TURKEWITZ:  What number is that?
22    MR. RESTIVO:  16.
23    A.  It says it right here.
24    Q.  And can you tell whether this Libby
25  No. 3 is production material or material that Eaton

Page 215

1  performed some processes on?
2    A.  I don't know.
3    Q.  Hamilton Deposition Exhibit 17,
4  Mr. Hamilton.
5    These are further simulated attic tests
6  from Weedsport and it now involves the document
7  that you have talked about as super clean; correct?
8    A.  That's correct.
9    Q.  Did you testify that to your knowledge
10  super clean was never production material?
11    A.  That's correct.
12    Q.  Would you agree with me that the ores
13  involved appear to be Libby 1 and Libby 2?
14    A.  Yes.
15    Q.  Do you agree with me that one of the
16  things Eaton was doing was shoveling up material?
17    I'm looking at the note on the third
18  page of the Air Sampling Record Sheet.
19    A.  Yes.
20    Q.  Would you agree with me that Exhibit 17
21  reports on an employee by the name of Duke
22  shoveling up L1 attic fill and putting it into
23  plastic bags?  Is that correct?
24    A.  That's correct.
25    Q.  And with respect to that process, the

Page 216

1  lab is reporting fibers per cc in lab evaluation;
2  correct?
3    A.  That's correct.
4    Q.  You would agree with me, would you not,
5  that those results are not being reported on an
6  8-hour time weighted basis?
7    A.  Yes.
8    Q.  You would agree with me that whatever
9  these results are reporting, one can't tell from
10  this exhibit whether the fibers reported are
11  asbestos or not asbestos?
12    A.  That's correct.
13    Q.  In any event, you and I agree that
14  whatever they were testing was not production
15  material?
16    A.  Not that I know of.
17    Q.  Exhibit 18 is a home attic fill job in
18  Savannah, New York; is that correct?
19    A.  Yes.
20    Q.  And they're pouring attic fill?
21    A.  Correct.
22    Q.  The attic fill they're pouring is
23  screened Libby No. 3 with 14-inch mesh with all
24  fines removed; correct?
25    A.  Correct.

Page 217

1    Q.  That was not production material was
2  it, to the best of your knowledge?
3    A.  I don't know.
4    Q.  And in any event, you and I aren't
5  quite sure what the results are because they're
6  hard to read on this exhibit?
7    MR. TURKEWITZ:  Objection.
8    MR. RESTIVO:  Strike that.
9  BY MR. RESTIVO:
10    Q.  Did you read the lab evaluation results
11  for all of the activities tested?
12    A.  I will attempt to do that for you with
13  the idea that we know that all of these are greater
14  than 7.5 because that's what they say in the
15  summary.  The legibility on my document, I believe
16  the first sample PR1 —
17    Q.  I don't want you to read them to me.
18    My question was could you read them,
19  and you saying you're could.
20    A.  I'll do what I can.
21    Q.  My next question is:  Whatever those
22  numbers are, can you read enough to agree with me
23  they are not 8-hour time weighted average?
24    A.  Correct.
25    Q.  Whatever those numbers are that you can

55 (Pages 214 to 217)

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Page 218

1  read, do you agree with me that this document
2  doesn't disclose whether they are asbestos fibers
3  or nonasbestos fibers?
4     A. That's correct.
5     Q. Take a look at Hamilton Exhibit 19.
6        These are home attic fill tests using
7  the super clean sample formulation?
8     A. That is correct.
9     Q. To the best of your knowledge, super
10 clean was not a production product?
11    A. That's correct.
12    Q. What is your Exhibit 22, Mr. Hamilton?
13    A. 22?
14    Q. Yes. Because I have two 22's, and that
15 can't be right.
16    A. 22 is Environmental Solutions.
17    Q. What is your 23?
18    A. My 23 is a letter, Subject: Use of
19 Building 5.
20    Q. And what is your 24?
21    A. 24 is the St. Louis Post-Dispatch.
22    Q. And do you have a 25?
23    A. 25 is the exhibit you produced for the
24 letter to — I think it's Bob Ward of West Chicago.
25    Q. Would you agree, Mr. Hamilton, from

Page 219

1  your perspective that what Fred Eaton was
2  attempting to do was to come up with the best
3  possible product he could after testing?
4     A. Yes.
5     Q. I may have asked you this.
6        Do you know whether or not there is any
7  time limit today under the OSHA excursion? And if
8  I asked you, please answer again because I can't
9  remember.
10    A. We mentioned the fact that it's a level
11 that should not be exceeded at any time, and to
12 measure it requires a collective sample over a
13 period of time of approximately 15 minutes.
14    Q. But it's your understanding it doesn't
15 mean you need to be exposed for that 15 minutes
16 above the excursion level?
17    A. That's correct.
18    Q. It will go quicker if I just ask again.
19       I may have asked you, but where did
20 Jack Wolter fit in? I know I asked you about Eaton
21 and Locke. I can't remember if I asked you about
22 where Wolter fit in in this program.
23    A. I understood that he was the
24 manufacturing manager.
25    Q. Did you have occasion to work with

Page 220

1  Wolter?
2     A. Yes, I did.
3     Q. Did you form an opinion as to his
4  competence and credibility?
5     A. Yes, I did.
6     Q. What was that opinion?
7     A. I felt that he was very credible and
8  very competent, and I enjoyed working with Jack.
9     Q. Would it be fair to say based upon your
10 testimony that there were individuals in an
11 organization as large as Grace that you didn't
12 enjoy working with as much as you did with other
13 individuals?
14    A. Of course.
15    Q. I would represent to you, Mr. Hamilton,
16 that I could not find any document authored by you
17 in the Grace files which we have shared with
18 counsel for plaintiffs in which you recommended at
19 least in writing discontinuance of the ZAI product.
20       Did you in fact make such a
21 recommendation in writing? I seem to not have been
22 able to find the document.
23    A. No, I did not.
24    Q. Other than the document you briefly
25 looked at with Mr. Turkewitz I could not find any

Page 221

1  document in which you recommended any warning
2  labels on ZAI.
3        Did you make any such written
4  recommendations?
5     A. No, I did not.
6     Q. When you had the discussion about
7  potential or possible air monitoring for schools
8  and Grace setting up a program -- do you remember
9  testifying about that?
10    A. Yes.
11    Q. — was there any discussion at that
12 time about having the test evaluated by use of TEM
13 rather than PCM?
14    A. I believe there was discussion about
15 it.
16    Q. Did you make any recommendations in
17 that regard?
18    A. I don't recall making recommendations
19 specifically about using TEM. My discussion in
20 that regard was more along the line of using PCM in
21 the schools — using PCM methods in the schools in
22 my opinion. I was trying to find the value in
23 doing that, and I asked questions along that line.
24    Q. Did you express an opinion about the
25 value of using TEM in the schools?

Page 222

1    A.  I may have. I don't recall.

2    Q.  Did you testify on direct that in your

3  opinion it was outrageous not to put a label on

4  bags with ZAI?

5    A.  I think it was outrageous to sell ZAI

6  to people knowing that the use of that product

7  could result in an exposure to asbestos or fiber

8  without any label on it at all and no intention of

9  putting a label on it.

10    Q.  I would represent to you that in

11  looking through all the Grace documents we have

12  which we've shared with the plaintiffs, were

13  documents containing your name, I could find no

14  recommendation in writing or statement in writing

15  that stated or implied as wrong or outrageous not

16  to put a label on to warn of asbestos.

17        Did you make any such writing?

18    A.  At the time that I was employed at

19  W.R. Grace writing that kind of a letter would have

20  resulted in my unemployment with W.R. Grace.

21        The culture of Construction Products

22  Division was not to put labels on anything, and

23  that label was far from years within PCD. I worked

24  for ICG. I worked for the Industrial Chemicals

25  Group, and nobody from my group that I know of

Page 223

1  other than maybe Peter Kostic would ever put that

2  in there; wouldn't even think of writing a letter

3  like that.

4    Q.  I take it that your answer is no, you

5  never put in a writing that statement.

6    A.  That's correct.

7    Q.  Thank you.

8    A.  That's correct, because it would have

9  been the end of me at Grace.

10    Q.  When did you leave W.R. Grace?

11    A.  In January of 1987.

12    Q.  Why did you leave?

13    A.  I left because I felt my career was

14  finished there and I wanted to find a better

15  opportunity.

16    Q.  You voluntarily resigned, or were you

17  terminated?

18    A.  I voluntarily resigned.

19    Q.  And you did that because your career

20  had plateaued at least in your judgment and you

21  wanted to do something else?

22    A.  That's correct.

23      (Defendant's Exhibit Hamilton 26,

24  letter, 4/1/80, to D. Ray from E.W. Wood, marked

25  for identification.)

Page 224

1  BY MR. RESTIVO:

2    Q.  Mr. Hamilton, I show you what has been

3  marked as Hamilton Deposition Exhibit 26 which

4  purports to be a letter dated April 1, 1980, from

5  E.S. Wood of Grace to Mr. Dale Ray of the Consumer

6  Product Safety Commission with attachments; is that

7  correct?

8    A.  That is correct.

9    Q.  Is Exhibit 26 one of the documents you

10  were shown by Mr. Turkewitz but which was not

11  marked as an exhibit during your direct

12  examination?

13    A.  That is correct.

14    Q.  Is this one of the documents you looked

15  at however briefly in preparation for your

16  deposition?

17    A.  I did not review this to prepare for my

18  deposition. This document was shown to me prior to

19  the deposition, but I didn't use this for the

20  deposition.

21    Q.  Did you read it when it was shown to

22  you?

23    A.  I read maybe two or three paragraphs of

24  this.

25    Q.  Prior to it being shown to you last

Page 225

1  night or this morning had you seen this document

2  before?

3    A.  I do not recall ever seeing this

4  document before, no.

5    Q.  Would you agree with me that in this

6  document Grace is reporting to the Consumer

7  Products Safety Commission on certain tests done on

8  certain products?

9    A.  That's what it appears to be.

10    Q.  As a long time employee of Grace is

11  that the way you would read the letter reflected in

12  Exhibit 26?

13    A.  This letters says that it was done at

14  the request of the Consumer Product Safety

15  Commission to set the details of Grace fiber

16  exposure test methodology and test results and

17  indicates the nature of Grace's fiber reduction

18  efforts.

19    Q.  And does this letter report on a number

20  of products on Page 2 which are consumer products?

21    A.  Yes.

22    Q.  Terra-Lite?

23    A.  Yes.

24    Q.  Redi-Earth?

25    A.  Yes.

Page 226

1    Q. Lightweight fertilizer?
2    A. Yes.
3    Q. Zonolite attic insulation?
4    A. Yes.
5    Q. Were you involved in any of the testing
6  with respect to the first three products?
7    A. I don't do – I don't recall doing
8  testing on those first three products. I may have,
9  but I don't recall it.
10    Q. I think you've talked a lot today about
11  your involvement in the testing of the fourth
12  product; correct?
13    A. Yes.
14    Q. With respect to whether or not fibers
15  were detected, does Grace disclose to the Consumer
16  Products Safety Commission that in installation
17  some fibers are detected during installation?
18    A. Yes.
19    Q. On Page 3 does Grace relate – strike
20  that.
21        Annex A provides the Consumer Products
22  Safety Commission with test data; is that correct?
23        MR. TURKEWITZ: Where are you,
24  Mr. Restivo?
25        MR. RESTIVO: Annex A is the fifth page

Page 227

1  of Exhibit 26.
2    A. Annex A shows test data. Correct.
3    Q. Incidentally, back up one page.
4        E.S. Wood is the Wood that we've talked
5  about so far in this deposition?
6    A. Yes.
7    Q. Chip Wood –
8    A. Correct.
9    Q. – is E.S. Wood; correct?
10    A. That's correct.
11    Q. And F.W. Eaton is Fred Eaton, the Fred
12  Eaton we've already talked about; correct?
13    A. Correct.
14    Q. The next page is then test data, is it
15  not, test protocol and test data.
16    A. Correct.
17    Q. I would like you to go down to –
18  I believe it's Page 5 of test data on results.
19        Do you see the results page?
20    A. Yes.
21    Q. And does this indicate to you that four
22  types of homes were involved in installation of
23  attic insulation?
24    A. That's what it says. Well, there was a
25  Colonial ranch.

Page 228

1    Q. You are correct, sir.
2        Four homes are listed, three types?
3    A. Correct.
4    Q. Two Colonials, one Cape and one ranch;
5  correct?
6    A. Yes.
7    Q. Do you see the number of bags of
8  material utilized in the attics of those homes?
9    A. Yes.
10    Q. Based upon your knowledge and
11  experience do you have any reason to doubt that's
12  how many bags it took to insulate the attics in
13  those three types of homes?
14    A. I had no reason to doubt the data.
15    Q. Does the data indicate air
16  concentrations – I'm sorry. – fiber
17  concentrations before the attic insulation was
18  installed and after it was installed?
19    A. That's correct.
20    Q. And does Footnote 3 indicate the length
21  of time for the after installation air sampling?
22    A. Yes. It does list some time in regard
23  to that.
24    Q. And in one instance it was six hours
25  after installation; correct?

Page 229

1    A. That's correct.
2    Q. And in another it was nine years after
3  installation; correct?
4    A. That's correct.
5    Q. Turn to Page 6, sir.
6        When Mr. Turkewitz showed you what is
7  now Exhibit 26, did you get a chance to look at
8  Page 6?
9    A. I don't recall seeing this chart
10  before. I did not look at this page.
11    Q. Page 6 reports, does it not, both
12  absolute fiber counts and TWA fiber counts, does it
13  not?
14    A. That's correct.
15    Q. And Footnote 5 recognizes, does it not,
16  that some of the direct fiber counts exceed two
17  fibers per cc?
18    A. That's correct.
19    Q. And Footnote 5 discloses that to the
20  Consumer Products Safety Commission, does it not?
21    A. Yes.
22    Q. And then Footnote 5 talks about
23  frequency of exposure and the fact that at least
24  with respect to installation of attic fill, that is
25  not something that would occur more than once or

Thomas Hamilton    February 25, 2003

Page 230

1  twice in a lifetime? Twice in a lifetime.
2  I'm sorry.
3      A. They said twice in a lifetime.
4  Correct.
5      Q. And based upon your knowledge and
6  experience working at Grace would it be your
7  understanding that Fred Eaton, the recipient of
8  that document, would have been the person who
9  conducted the various tests on the various products
10  reported in Exhibit 26?
11      MR. TURKEWITZ: Objection.
12      A. I don't know. I don't know the answer
13  to that. I don't know who did that work.
14      Q. During the period of time you were at
15  Grace who did such work other than Fred Eaton?
16      A. Well, I know that during 1977 when most
17  of this work was done Fred Eaton was doing it.
18  I don't know whether that job was handed over to
19  somebody at a later date because this memo came out
20  in some cases three -- more than three years later.
21      So since they don't say when they did
22  this, I don't have any idea of who did that
23  monitoring. It may have been Fred Eaton. I don't
24  know.
25      Q. My question is, sir: Do you know

Page 231

1  sitting here today whether anyone replaced Fred
2  Eaton in his job of performing procedures on
3  consumer products such as attic fill after 1977?
4      A. No, I don't.
5      Q. After 1978?
6      A. No, I don't.
7      Q. After 1979?
8      A. No, I don't.
9      Q. Mr. Hamilton, you talked about looking
10  at a document in which you communicated with the
11  Canadian operation vis-a-vis labels; correct?
12      A. That's correct.
13      Q. That document was not marked during
14  your direct examination; correct?
15      A. That's correct.
16      Q. You didn't use that document in
17  preparation for your deposition? You simply looked
18  at it when it was shown to you; correct?
19      A. That's correct.
20      Q. You commented on a statement that sales
21  literature and bag labels referring to vermiculite
22  as nonirritating; is that correct?
23      A. I may have.
24      Q. You advised Canada, did you not, that
25  the label is much more accurate and the problems

Page 232

1  with end use of the product is greatly reduced now
2  that the dust is controlled?
3      MR. TURKEWITZ: I'm going to object.
4  Mr. Restivo, if you want to show him
5  the document, I think that's probably the proper
6  way rather than referring to it and asking him
7  questions without him seeing that.
8      MR. RESTIVO: I agree with that.
9  I will show him the document.
10  BY MR. RESTIVO:
11      Q. Do you remember seeing it?
12      I'm going to show you the document, but
13  do you remember based upon your review last night
14  or this morning telling that to Mr. S.M. Gillott on
15  or about December 29, 1982?
16      A. I may have said that. Correct.
17      (Defendant's Exhibit Hamilton 27, memo,
18  9/29/82, to S.M. Gillott from T.E. Hamilton, marked
19  for identification.)
20  BY MR. RESTIVO:
21      Q. I show you, sir, what has been marked
22  Hamilton Deposition Exhibit 27.
23      MR. RESTIVO: Off the record.
24      THE VIDEOTAPE SPECIALIST: Off the
25  record. The time is approximately 5:25.

Page 233

1      (Discussion off the record.)
2      THE VIDEOTAPE SPECIALIST: Back on the
3  record. The time is approximately 5:26.
4  BY MR. RESTIVO:
5      Q. Mr. Hamilton, Hamilton Deposition
6  Exhibit 27 purports to be a confidential
7  communication from you to Mr. S.M. Gillott dated
8  September 29, 1982; is that correct?
9      A. This looks like my letter. Correct.
10      Q. And who or what was Mr. Gillott?
11      A. I believe he was our product manager in
12  the Ajax facility.
13      Q. And where was the Ajax facility?
14      A. It was in Ontario, Canada.
15      Q. And who was Mr. B.D. Pollack?
16      A. Brian Pollack, I believe, was the
17  manufacturing manager for the Canadian operation.
18      Q. Also based in --
19      A. Ajax.
20      Q. Also based in Canada?
21      A. Yes.
22      Q. Is that your signature on Hamilton
23  Deposition Exhibit 27?
24      A. Yes, it is.
25      Q. Mr. Hamilton, have you been asked by

59 (Pages 230 to 233)

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Page 234

1  the plaintiffs' attorney to testify live and in
2  person at any trial or hearing on this matter
3  pending right now in the bankruptcy court?
4      A. They have not asked me to testify
5  there. They have mentioned that there may be a
6  trial and they want me to, but they have not asked
7  me to do it.
8      Q. Have you expressed a view as to whether
9  you would be willing to come live at a trial or
10  whether your preference is for the parties to
11  simply use this recorded videotaped deposition
12  today?
13      A. I have not expressed any opinion in
14  that regard to them or to anybody.
15      Q. Do you have an opinion in that regard?
16      A. Not at the moment.
17      MR. RESTIVO: That's all I have. Thank
18  you, sir.
19          EXAMINATION
20  BY MR. TURKEWITZ:
21      Q. Mr. Hamilton, looking at Exhibit 27,
22  can you tell us what the context for this memo that
23  you wrote was back in 1982.
24      A. I believe the context of this was the
25  fact that there were many different regulations in

Page 235

1  Canada. They were different from us in the States
2  because Canadian regulations tended to be
3  provincial rather than federal, and I had taken it
4  upon myself to become very familiar with the
5  different regulations in the various provinces of
6  Canada and how they impacted the operations. They
7  were entirely different in Winnipeg than they were
8  in Edmonton, and what we had to do for training
9  and medical monitoring and air monitoring were
10  different from province to province. Some things
11  were the same, but the result was that the people
12  in Canada came to rely on me to help them interpret
13  their regulations.
14      I believe probably what happened here
15  was that the manufacturing manager had a question
16  about the labeling that he took to the product
17  manager who then sent a letter to me or -- I don't
18  remember a letter. It may have been a letter; it
19  may have been a phone call, but they -- it could be
20  either way, but they contacted me and asked me to
21  give them an opinion about currently, especially as
22  it referred to the term "nonirritating".
23      So my paragraph about it is used in the
24  sales literature and on our labels. We said that
25  vermiculite was not irritating, and essentially

Page 236

1  that meant on the skin, and that's what it was
2  intended to mean. Because they were looking at
3  sometimes people breathed in the dust and they were
4  irritated to the dust, and I was trying to make it
5  clear to them that it was for comparison to
6  fiberglass, which is irritating.
7      Q. Would it have been misleading to have
8  led someone to believe that it was nonirritating
9  for someone to breathe in?
10      MR. RESTIVO: Objection to the form.
11  Leading.
12      A. I think when you say that something is
13  nonirritating, people have a certain level of
14  expectation. That level of expectation may include
15  nonirritating to the lungs, but we knew that this
16  product created -- even the super clean material
17  created a dust level that could be irritating to
18  some people, and in fact most of the time people
19  wore respirators when they were applying the attic
20  installation.
21      I would be willing to -- I would place
22  a bet that all of the attic simulation tests were
23  done with people wearing respirators. I don't
24  think that they did that without the respirators
25  on, but I would have to talk to Fred Eaton about

Page 237

1  that, and I don't even know where he is.
2      To answer your question, I think to say
3  that it's nonirritating, I think this represented a
4  problem, and this is what the people in Canada were
5  trying to grapple with. Because it says
6  nonirritating on the bag, but it may be irritating
7  if you breathe it in. The label we were using then
8  said nonirritating, so we were trying to
9  distinguish ourselves from fiberglass which is
10  irritating to the skin.
11      And you can see in my third paragraph
12  here I said I don't want to overlook the underlying
13  question there, and that is: Is the label strong
14  enough? And I said that I can't answer that
15  question.
16      This was 1982 and I was not going to
17  get involved at all with how labels should be
18  designed for CPD products. At that time Steve
19  Venuti was there and that was his job. He was
20  writing public safety -- Material Safety Data
21  Sheets and so forth. I believe Venuti had the job
22  then in 1982 or around that time. So there were
23  other people who would be involved with designing
24  the label. That was not my job.
25      Q. Now, when you're referring to this

Page 238

1  middle paragraph, would you read that paragraph.
2      A. It says: However, I don't want to
3  overlook the question you are really asking. Is
4  the label strong enough to warrant a consumer of
5  the proper precautions to use, especially since the
6  product (Attic) is not screened or bound in Canada?
7  And I said only the lawyers are allowed to answer
8  that question. I wouldn't touch that.
9      Q. And you were referring to the asbestos
10  in the material in that paragraph?
11          MR. RESTIVO: Object to the form.
12      A. I was alluding to it just as everybody
13  did who danced around this issue. I didn't say it;
14  I didn't put it in writing, but clearly I was
15  dancing around the issue of precautions to be used.
16      Q. And you were basically putting it off
17  saying only a lawyer was allowed to answer that
18  question?
19      A. That's right. If I tried to answer
20  that question, I would have got my head handed to
21  me on a platter.
22      Q. What would you have said if you were to
23  answer that question honestly in this regard?
24      A. At this time I would have said the
25  label should say that there — for the end user,

Page 239

1  that this material contains fiber and — I would
2  have had to work on that for a while.
3          Clearly we needed to warn the end user
4  that use of this product in the wrong way could
5  result in exposure to fiber, and we did not put
6  that anywhere on our label. Instead what we did
7  was we hid behind the OSHA regulators. "Oh, it
8  won't cause problems with OSHA."
9      Q. You were asked a number of questions
10  about the limitations of PCM, phase contrast
11  microscopy.
12          Were there other types of fibers
13  besides asbestos in the zonolite attic insulation?
14      A. I don't believe we ever identified
15  other fibers. What we had was a problem,
16  I believe, in the counting technique, which if you
17  had a piece of vermiculite on its end would have
18  the characteristics that would meet the requirement
19  of a fiber in the length we were making and so
20  forth, but it wasn't truly a fiber, although it
21  looked like — it met the qualifications for a
22  fiber while looking — the microscopists would look
23  at it and say: Gee, that meets the requirement for
24  counting a fiber, but it really isn't a fiber.
25  I can see it's not a fiber. It's a piece of

Page 240

1  vermiculite on its edge.
2      Q. And that was the purpose for
3  discriminatory testing?
4      A. I believe so, and I was in favor of
5  that. I was strongly in favor of discriminatory
6  counting because I felt from a health standpoint
7  I didn't want them to count vermiculite as fibers.
8  It just didn't make any sense. Why report out --
9  you know, if you're going to do that, why not have
10  two columns, two columns in the report that says:
11  Fiber count according to NIOSH method and strict
12  counting record and another column that says:
13  Discriminatory counting.
14          They didn't put the first one on there.
15  They put the latter one on there.
16      Q. Are you aware of any samples while you
17  were at Grace being sent out for analysis by TEM,
18  any air samples?
19      A. I became aware of that in regards to
20  samples that were collected for the school
21  litigation.
22      Q. And how did those TEM samples compare
23  to the PCM samples that you're aware of?
24      A. I don't know. I never saw any of those
25  results. Those would not go to my desk. As you

Page 241

1  may recall, at that time I was banned from working
2  on CPD product.
3      Q. You and I, we met before this
4  deposition.
5          Did you also talk to Grace's lawyer
6  before the deposition?
7      A. Yes, I did.
8      Q. And were you cooperative with the Grace
9  lawyers as well?
10      A. I tried to to the extent that they --
11  I mean, we did talk. I told them that I had agreed
12  to come down here and the reasons why and I told
13  them I would appreciate if they could make it also
14  today because of timing.
15          We talked a little bit about my
16  testimony, things that I might talk about, what my
17  opinions were. It was about — this was on a
18  holiday, the President's Day holiday. I was in my
19  office working that day and I agreed to take a
20  conference call.
21      Q. And how many Grace lawyers were on that
22  call?
23      A. Well, I believe there were two
24  attorneys on the call, one from Delaware and one
25  from Pittsburgh.

Page 242

1    Q. And in our conversations what have been
2  my instructions to you as far as information and
3  your testimony throughout this whole process?
4    A. I would say that for the most part your
5  instructions to me have been to make sure that my
6  answers are complete, which I would do anyway.
7    I always tell the truth. I would never
8  embellish on anything. I would just tell it like
9  it is. To the best of my ability I do. Sometimes
10  I can't recall everything.
11    However, I think it's important that —
12  let me put it another way. Your conversations with
13  me, we went over the types of questions you were
14  going to ask, the exhibits and the types of
15  information we were going to elicit from these
16  exhibits, and occasionally you would ask me my
17  opinion about what these fiber levels — what they
18  meant and what my experience at Grace was in regard
19  to the flow of information within CPD in regard to
20  fiber issues.
21    Q. And did I indicate to you that this was
22  a process for me for you to educate me on the
23  facts?
24    MR. RESTIVO: Objection; leading.
25    A. Yes. I think it was important for me

Page 243

1  to get this out to make sure that people understood
2  my opinion, where I came from, how I viewed this
3  work; and if that's an education process, then so
4  be it.
5    Q. And you mentioned in your testimony in
6  Mr. Restivo's questioning that you and I reviewed
7  another document.
8    MR. TURKEWITZ: Let me have this marked
9  as the next exhibit.
10    (Plaintiff's Exhibit Hamilton 27, memo,
11  12/21/83, to H.C. Duecker, F. Eaton, R.C. Ericson,
12  L.S. Shu, J.C. Yang, from T.E. Hamilton, marked for
13  identification.)
14    THE VIDEOTAPE SPECIALIST: There
15  concludes Tape No. 3 in the videotape deposition of
16  Thomas Edgar Hamilton. The time is approximately
17  4:40 p.m.
18    Off the record.
19    (Discussion off the record.)
20    THE VIDEOTAPE SPECIALIST: Back on the
21  record. This is Tape No. 4 in the videotape
22  deposition of Thomas Edgar Hamilton. The time is
23  approximately 5:41.
24  BY MR. TURKEWITZ:
25    Q. Mr. Hamilton, I'm handing you what has

Page 244

1  been mark as Hamilton Exhibit 28.
2    Is this one of the documents that you
3  referred to with Mr. Restivo that you and I went
4  over prior to the deposition?
5    A. This is correct.
6    Q. If you could identify that document for
7  the record.
8    A. Yes. This is a document that I
9  produced on the 21st of December 1983, and the
10  title of it is Test Method for Determining the
11  Damagability and Subsequent Fiber Release of
12  Sprayed on Asbestos Containing Products, and this
13  was sent to Duecker, Eaton, Ericson, Shu and Yang
14  with a carbon copy to Bob Walsh.
15    Q. And is this memo referencing one of the
16  meetings that you discussed in your earlier
17  testimony?
18    A. That's correct.
19    Q. And what happened here? What was the
20  situation?
21    A. In the meeting I was concerned that we
22  were going to go into schools and we were going to
23  do air monitoring without any plan for determining
24  fiber release while the material was being
25  disturbed.

Page 245

1    The sprayed on asbestos-containing
2  products were pretty tough. I don't know whether
3  you've ever dealt with them, but they're like
4  plaster of paris, like the same plaster that you
5  would have on a cast. Very tough, and they don't
6  break down very easily.
7    I was concerned that we might want to
8  look at what would occur — what kind of fiber
9  release might we see if we actually damaged the
10  material as a student would or a janitor or
11  somebody doing something, hanging something on the
12  ceiling. Would they actually damage the ceiling
13  and would it have a release of fiber?
14    If we wanted to evaluate, we needed a
15  test method. We needed a standardized method for
16  actually doing that type of work. I felt this was
17  an important idea, and I produced this memo and
18  sent it to these people. And I had actually set up
19  a meeting for them to attend, and the purpose of
20  the meeting was to develop an action plan and
21  preliminary test protocols to damage — can we set
22  up — we were doing test methods in attics. We
23  have a drop test for certain materials. We were
24  testing vermiculite products. I wasn't involved,
25  but I knew that that testing was going on.

Page 246

1    We had tested masonry fill. We had
2    tested the application of zonolite, monocote
3    materials. It just seemed obvious within the
4    school situation how were we going to defend
5    ourselves about asbestos fibers in schools if we
6    didn't go in there and see if it was possible for
7    this material to evenly release fibers?
8    I think the analogy here and an
9    important work was I had done a lot of work on
10    monocote. We tested monocote. We were there when
11    they damaged it and we were there when they sprayed
12    it on, and we really didn't see any fiber release
13    in that material. In my head there really was
14    nothing wrong with the product — I didn't think it
15    was a problem, and that's what we saw in the
16    Greenville schools. I came back from that and I
17    said I think we should look at a method of testing.
18    Now, after I sent out this memo all
19    kinds of crazy things happened. Dr. Duecker walked
20    into the meeting and said: I don't know why I'm
21    here. I don't want to talk about this, and he
22    left. Julie Yang talked about how this was
23    impossible and we couldn't set this up. I don't
24    think she attended.
25    The whole thing fell apart. It never

Page 247

1    went any farther, and this turned out to be a
2    disaster. It never went any farther than this.
3    Q.   And is this the same idea of testing a
4    product after installation, testing zonolite attic
5    insulation after renovation activities or
6    activities that would disturb the material?
7    A.   Of course. I felt the same way about
8    the air monitoring that's discussed in this letter
9    that's written by Chip Wood to the CPD.
10    Q.   Are you referring to Exhibit 26?
11    A.   Yes. In Exhibit 26 there is absolutely
12    nothing in here that discusses what could happen to
13    the zonolite attic material in the event of a
14    renovation or a spill of this material into the
15    home.
16    There is nothing in here that discusses
17    any kind of an exposure limit which we would apply
18    to a child or somebody walking up into that attic
19    and playing with the material. That isn't even
20    discussed here. What is discussed is federal
21    regulations.
22    Q.   Let me refer you to Page 7 of the test
23    results, Footnote 5.
24    A.   Yes.
25    Q.   It states in the second sentence down:

Page 248

1    Results in C-1 indicate no further exposure after
2    installation.
3    Based on your testing and your
4    knowledge do you believe that to be true?
5    A.   Absolutely not. There is no further
6    exposures after installation? That's like somebody
7    going and taking a snapshot of a building and
8    saying the building is still there. I took a
9    picture of it nine years ago.
10    That's crazy to say in here that there
11    is no opportunity for exposure after the
12    installation flies in the face of somebody going up
13    into the attic and doing something there. Somebody
14    doing a renovation, somebody running a phone line
15    through their attic, a cable for their cable TV,
16    putting in an HVAC system.
17    If someone said: That's never going to
18    happen. It's a tomb and nobody is ever going to go
19    in there again and it's never going to be
20    disturbed, does this recognize that fact? I don't
21    think so. I think that this letter in Exhibit 28
22    points out my concern about those types of issues.
23    MR. TURKEWITZ: Mr. Hamilton, I don't
24    have any further questions. Thank you.
25

Page 249

1    EXAMINATION
2    BY MR. RESTIVO:
3    Q.   Mr. Hamilton, let's go back to
4    Deposition Exhibit 27.
5    What was your job position on or about
6    September 29, 1982?
7    A.   I was the manager of industrial hygiene
8    for the Industrial Chemicals Group.
9    Q.   What group if any was Ajax?
10    A.   They were in the Construction Products
11    Division of the Industrial Chemicals Group.
12    Q.   Did you have a part in the Construction
13    Products Division?
14    A.   I don't believe that Steve Venuti was
15    — I don't know what his date for being health and
16    safety manager in the Construction Products
17    Division was, but somewhere around this time.
18    But to directly answer your question,
19    there was no counterpart that had the title Manager
20    of Industrial Hygiene for Construction Products
21    Division.
22    Q.   As I read Hamilton Deposition
23    Exhibit 27, you are not telling Mr. Gillott or
24    Mr. Pollock that you were not the person to whom
25    they should be asking this question; am I correct

Page 250

1   on that?

2   A. You used a double negative in there,

3   and I would like you to rephrase that question.

4   Q. I thought your testimony on redirect

5   was that you weren't the person that was going to

6   answer this question. Maybe I misunderstood you.

7   A. That's correct. I say in there that —

8   in the third paragraph in Exhibit 27 that I am not

9   the person who was going to answer the question

10  that I felt they were really asking.

11  Q. I'm sorry. Then I misunderstood your

12  prior answer.

13      I thought your answer when

14  Mr. Turkewitz was asking you questions was that you

15  didn't have a role at this point in time in

16  Construction Products Division and it wasn't your

17  place to answer this question. That's what I

18  thought you said. Again, maybe I misunderstood

19  you.

20  A. No. What I meant was that that type of

21  question was not the type of question that anybody

22  was going to step up to the plate and answer. We

23  were going to leave that up to the lawyers because

24  it was a legal issue in regard to what the

25  appropriate label should be.

Page 251

1   Q. Now, you do not indicate to Mr. Gillott

2   anything about there may be release of the product

3   into the living area? Didn't you just talk about

4   it with Mr. Turkewitz?

5   A. That's correct.

6   Q. Did you say anything about children

7   being in the attic?

8   A. No, I do not.

9   Q. Did you say anything to him about old

10  people being in the attic?

11  A. No.

12  Q. Did you say anything to him about you

13  ought to put some warning label on it that people

14  know there is fibers in it?

15  A. No.

16  Q. Now, I believe you just told

17  Mr. Turkewitz that you always tell the truth, and I

18  assume that was true back on September 29, 1982.

19  A. That's correct.

20  Q. Was it a true statement that extensive

21  air sampling was conducted by CPD engineering,

22  F. Eaton?

23  A. I think that the first set of exhibits

24  here is proof of that answer; that yes, that's

25  true.

Page 252

1   Q. Was it a true statement when you stated

2   on September 29, 1982: The results of the testing

3   program show that dust exposures are significantly

4   reduced by the screening, binding process, both in

5   the plant during manufacture and in the attic where

6   the product is used?

7   A. That's true.

8   Q. It was true then and it's true now?

9   A. I believe it is.

10  Q. Was it a true statement in September of

11  1982: We feel that the label is much more accurate

12  and the problems with end use of the product are

13  greatly reduced now that the dust is controlled?

14  A. That's true.

15  Q. It was true then?

16  A. Yes.

17  Q. And it's true now?

18  A. We don't make the product anymore, so

19  it's not applicable.

20      MR. RESTIVO: Thank you. That's all I

21  have.

22      EXAMINATION

23  BY MR. TURKEWITZ:

24  Q. Mr. Hamilton, you stated "we feel the

25  label is much more accurate".

Page 253

1       Did you feel that the label was

2   appropriate?

3   A. No.

4       MR. TURKEWITZ: Thank you.

5       EXAMINATION

6   BY MR. RESTIVO:

7   Q. Mr. Hamilton, did you write to

8   Mr. Gillott or to Mr. Pollock that the label was

9   inappropriate?

10  A. No, because if I had done that I would

11  have been fired.

12  Q. Did you tell them to talk to Mr. Venuti

13  or someone else?

14  A. I actually told them in Paragraph 3

15  "only a lawyer is allowed to answer that question".

16  Q. And so your true belief and the truth

17  at the time in your opinion was you needed a label,

18  but you didn't tell them that?

19  A. No. What I said on here is true.

20  I just didn't tell them everything. So I'm not

21  answering your question.

22      What I wrote on here is true, but what

23  I wrote on here is misleading because if I had said

24  what the truth was, I would have been fired. And

25  the proof of that is whenever I talked about doing

Thomas Hamilton    February 25, 2003

Page 254

1   anything involving labeling or work in that
2   company, I had my hat handed to me and told not to
3   work on CPD anymore.
4       Q.  That upset you, didn't it?
5       A.  Well, it upset me.  This is true.
6       Q.  And with respect to in-place testing of
7   monocote material, isn't it true that in fact you
8   did that at Travelers Rest?
9       A.  You know, we may have done some work at
10  Travelers Rest, but what I was thinking about in
11  the deposition was the work that I did at Anaree.
12      Q.  Did you take a mop handle and hit
13  material?
14      A.  That was in regard to the Greenville
15  schools case, and that was not monocote.  That was
16  a sprayed on material.
17      Q.  Acoustical plaster material?
18      A.  Acoustical plaster in a school.
19      Q.  Asbestos-containing acoustical plaster
20  material?
21      A.  Right.  And we did that after
22  consulting with Mark Stoller, the Grace attorney.
23  We said:  Would you like us to do this?  Because I
24  would be a consultant.
25          We said:  Look, we can do this if you

Page 255

1   would like.  We can collect a sample.  We can go in
2   with a mop handle and do some abrasion of the
3   material and collect a sample, but we'll only do it
4   if you approve it, and he said yes.
5          So I did that work with the approval of
6   counsel of Grace.  It was not me out there doing my
7   own thing.
8       Q.  You made a recommendation that counsel
9   for Grace that disturbance, impact of
10  asbestos-containing material in a school should be
11  done; correct?
12      A.  Correct.
13      Q.  Did you get fired when you made that
14  suggestion to the Grace attorney?
15      A.  It was shortly after that that I was
16  told no longer to work on Grace products.
17      Q.  But you didn't get fired at that time?
18      A.  No.  I learned my lesson at that point.
19      Q.  And did the Grace attorney say yes,
20  that is something you should do?
21      A.  Yes.  He said go ahead and do it.
22      Q.  Did he get fired when he said yes, go
23  ahead and do it?
24      A.  No, he did not.
25      Q.  And you went ahead and did it, didn't

Page 256

1   you?
2       A.  Yes.
3       Q.  And you discovered that hitting
4   acoustical plaster with a broom handle did not
5   create any respirable asbestos fibers in the air;
6   isn't that correct?
7       A.  I don't recall the results of the test.
8   To tell you the truth, you may be correct.  I don't
9   know.
10          MR. RESTIVO:  That's all I have.
11          THE VIDEOTAPE SPECIALIST:  This
12  concludes the videotape deposition of Thomas Edgar
13  Hamilton.  The time is 5:56 p.m.
14          Off the record.
15          (Deposition concluded at 5:56 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 257

1           SIGNATURE OF DEPONENT
2
3       I, the undersigned, THOMAS E. HAMILTON,
4   do hereby certify that I have read the foregoing
5   deposition and find it to be a true and accurate
6   transcription of my testimony, with the following
7   corrections, if any:
8
9   PAGE  LINE      CHANGE          REASON
10
11
12
13
14
15
16
17
18
19                              ___
20          THOMAS E. HAMILTON    Date
21
22
23
24
25

Thomas Hamilton    February 25, 2003

Page 258

```
 1          CERTIFICATE OF REPORTER
 2
 3      I, Patricia L. Thompson, Registered
 4  Professional Reporter and Notary Public for the
 5  State of South Carolina at Large, do hereby certify
 6  that the foregoing transcript is a true, accurate,
 7  and complete record.
 8      I further certify that I am neither related
 9  to nor counsel for any party to the cause pending
10  or interested in the events thereof.
11      Witness my hand, I have hereunto affixed my
12  official seal this 12th day of March 2003 at
13  Charleston, Charleston County, South Carolina.
14
15
16
17
                _____
                Patricia L. Thompson
18              Registered Professional
                Reporter
19
20
21
22
23
24
25
```

Page 259

```
 1          I N D E X
                            Page
 2
    EXAMINATION
 3
        By Mr. Turkewitz ........... 3, 234
 4      By Mr. Restivo ............. 141, 249, 252
 5
 6  Signature of Deponent ...........     257
    Certificate of Reporter ..........   258
 7
 8      (No Information Requested.)
 9
10          E X H I B I T S
                            Page
11
    PLAINTIFF'S EXH.
12
    HAMILTON 1  Request for Technical Service
13      1/31/77 .............     3
14  HAMILTON 2  Request for Technical Service
        3/3/76 .............     3
15
    HAMILTON 3  Request for Technical Service
16      3/3/76 .............     3
17  HAMILTON 4  Request for Technical Service
        5/19/77 .............     3
18
    HAMILTON 5  Request for Technical Service
19      6/3/77 .............     3
20  HAMILTON 6  Request for Technical Service
        7/14/77 .............     3
21
    HAMILTON 7  Request for Technical Service
22      7/14/77 .............     3
23  HAMILTON 8  Request for Technical Service
        7/25/77 .............     3
24
    HAMILTON 9  Request for Technical Service
25      8/1/77 .............     3
```

Page 260

```
 1  EXHIBITS (Continued):
 2  HAMILTON 10  Request for Technical Service
        8/3/77 .............     3
 3
    HAMILTON 11  Request for Technical Service
 4      8/3/77 .............     3
 5  HAMILTON 12  Request for Technical Service
        8/19/77 .............     3
 6
    HAMILTON 13  Request for Technical Service
 7      8/19/77 .............     3
 8  HAMILTON 14  Request for Technical Service
        8/18/77 .............     3
 9
    HAMILTON 15  Request for Technical Service
10      1/6/78 .............     3
11  HAMILTON 16  Request for Technical Service
        7/11/77 .............     3
12
    HAMILTON 17  Request for Technical Service
13      4/6/78 .............     3
14  HAMILTON 18  Request for Technical Service
        7/11/77 .............     3
15
    HAMILTON 19  Request for Technical Service
16      5/12/78 .............     3
17  HAMILTON 20  Request for Technical Service
        5/12/78 .............     3
18
    HAMILTON 21  Memo, 3/20/84 to T.H. Pezzullo
19      from R.S. Merrington .     3
20  HAMILTON 22  Letter, 8/15/84, to W.R. Grace
        from J. Duffey .......     3
21
    HAMILTON 23  Memo, 8/23/84, to D.C. Wightman
22      from T.E. Hamilton ...     3
23  HAMILTON 24  Photocopy of St. Louis
        Post-Dispatch article .   3
24
    HAMILTON 25  Letter, 4/1/80, to D. Ray
25      from E.S. Wood ........   197
```

Page 261

```
 1  EXHIBITS (Continued):
 2  HAMILTON 27  Memo, 9/29/82, to S.M. Gillott
        from T.E. Hamilton .....  223
 3
    HAMILTON 28  Memo, 12/21/83, to H.C. Duecker,
 4      F. Eaton, R.C. Ericson, L.S. Shu,
        J.C. Yang from
 5      T.E. Hamilton ..........  243
 6
    DEFENDANT'S EXH.
 7
    HAMILTON 25  Memo, 1/18/78, to R.E. Ward
 8      from T.E. Hamilton .....  197
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

66 (Pages 258 to 261)

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO