Notes of Inspection of 7961 Beach Drive

Port Orchard, Washington

for Vermiculite Attic Insulation

November 2, 2000


by



Morton Corn, Ph.D., C.S.P.

Morton Corn & Associates, Inc.

3208 Bennett Point Road

Queenstown, MD  21658-1126


I

Introduction

It is approximately 10:05 a.m. I am at this residence of Mr. Parks, with Richard Finke, Senior Litigation Counsel for W.R. Grace. Also present is Daryl Scott, Attorney for plaintiffs. The purpose of my visit is to gain insight into the nature of past and present potential vermiculite attic insulation exposure to Mr. Parks in the course of his remodeling his home. The home faces Daniels, a side street, and I have photographed the home from the front, rear and from each side. I initially walked through the home taking photographs, which will accompany these notes. I then rewalked the house, commenting on my observations.

The home has a first level entry facing Daniels and a rear set of external stairs rising to what is a self-contained second floor apartment that Mr. Parks apparently installed during his remodeling. I believe the home had only one level and both the front bedroom dormer and the rear second floor kitchen entry dormer were installed by Mr. Parks. Below the front entry is a two-car garage; the house has a full basement. The siding of the house is a white simulated wood plastic material. The home is in good condition. There are two heating systems, one in the basement, which is a ducted supply and return. That is for the first floor and basement living space. There is a second floor flush wall furnace, as referred to by Mr. Parks, which heats the apartment on the second floor. The second floor heating system is not ducted.

One enters the front door of the house to the kitchen. The kitchen is remodeled. The ceiling is a continuous tile at approximately the 8ft height. There was vermiculate attic insulation above this kitchen, and it is now, according to Mr. Parks, beneath the floorboards of the second floor apartment and the ceiling of this first floor, but not below the dormers, I believe. To the right of the kitchen is a breakfast dining area. It has a plaster type ceiling and a combination fan/lighting unit. The ceiling is in very good condition, with no signs of cracking through to the above ceiling space.

Walking through the breakfast area to the living room I observe another lighting fan fixture on the ceiling of that room. There is also a plaster ceiling in good condition in this room, also at approximately the 8ft height. There is no open connection from this ceiling to the above ceiling space. One can enter a porch from the living room through a two-panel sliding storm door; the porch has been added to the house. There is an outdoor deck attached to the enclosed porch area. The basement heating system supply and return appear to be to the floors with grills visible in the living room, the breakfast nook and the dining room. I'm not sure which of these are returns and which are supplies. From the rear of the kitchen area one enters a hallway. To the left is the first bedroom on this floor. Both the hallway and the bedroom have a paneled synthetic material ceiling. It appears to be 1ft x 1ft tiles. They are in their integrity and in very good condition. I see no holes, damage, etc., which would afford air connection to the above ceiling space. The ceiling is approximately 8ft high. There is a combination fan-lighting unit in the center ceiling of this

3

bedroom. The bathroom adjoins this bedroom and is between the second bedroom and the first bedroom. It has a plastic continuous sheet ceiling with a central fixture and an exhaust fan unit. This ceiling is also in excellent condition, with no air connection to the above ceiling space and the floor of the second story apartment.

The second bedroom in the rear of the first floor has the tiled ceiling in its integrity. It is in excellent condition. There is a light fixture in the center of this ceiling. There are no other fixtures affixed to this ceiling. It should be noted that I am calling attention to all fixtures or damage points in the ceilings of this first floor, since it is alleged that there is vermiculite above the ceiling.

The third bedroom adjoins the rear of the house. The second bedroom is being used as a storeroom. It has the 1ft x 1ft ceiling tiles on the ceiling in their integrity and a light fixture in the center of the ceiling. The closet also has a ceiling in its integrity. All of these ceilings are approximately at the 8ft height. The closet in the first bedroom has a plaster ceiling. The ceiling in the second bedroom has dry wall nailed to the ceiling. This is the area where piping and duct go through the ceiling. The basement is entered from the doorway opposite the rear kitchen exit. I am walking down stairs to a finished basement area used for storage. There is shelving, storage of food, a work area, the heating system and the chimney for the exhaust of the heating system. The water heater is also located here, as are a washer and dryer. They are adjoining the front wall of the basement facing the front of the house. From the basement one can see the structure of the ceiling supporting the first

floor floor.  There are 2 x 6's, and there is fibrous glass batt insulation in selected locations between those joists.  This area is independent of any vermiculite insulation that may be contained above the ceiling of the first floor or above the ceiling of the second floor.  An office type room towards the rear of the basement has a paneled simulation wood ceiling.  It is in its integrity; there are no connections up through the house from this location.

I walked up the external stairs at the rear of the house and I'm entering the self-contained apartment on the second floor of the house.  One enters the kitchen area.  This is a low ceiling apartment.  Relative to the height of the ceiling on the first level, this ceiling is low, perhaps 7 1/2ft.  The ceiling is completely finished in the entry area with a dry wall type of material and in the central living room area that one enters from the kitchen entry, there is a simulated wood paneling on the ceiling and on the walls.  The flush furnace is directly opposite the entry on the far wall of the living room towards the front of the house.  The living room extends practically the entire width of the apartment.  One end of it has the bathroom; it is on the right as you enter and there is an entryway leading to the bedroom on the far side of the living room wall.  The ceiling height of the bedroom is the same as in the living room.  It also has that dry wall type ceiling, and it uses the same material on the wall of the bedroom.  The closet off the bedroom has a sloped ceiling.  There is a light fixture in the center of the kitchen area and two light fixtures in the center of the living room area.  One of these has a fan attached.  The bathroom has a plastic-type material on the ceiling.  It has three light fixtures and a fan associated with the central light fixture.  There are no

5

connections from any of these ceilings through to the attic. There is an access door in the bathroom; it is approximately 2ft x 2ft. I moved the door panel to the side and have access to the attic to view the insulation. The peak of the attic is approximately 3ft above the flat surface of the third floor ceiling. It slopes at approximately a 45° angle so that the attic base is about 10-12ft. For about 10ft from the side that I am on in the bathroom one has fibrous glass batt insulation between the ceiling rafters, which are 2 x 4's. By standing high on a ladder I can look beyond and see the laid-in insulation to a depth of approximately a 1" - 1 1/2" up the side of the 2 x 4's, that is up the 4" side. There are vents on the vertical surfaces at either end of the attic. There is some wiring visible lying on top of the joists. Those are the only items I can see up here in terms of utilities.

The sloping roof meets the ceiling and I cannot see beyond that. There is closure. I think we are then into the dormers that include the kitchen and bathroom additions. I believe they were added to what was a one-floor house, which was then renovated to include this self-contained apartment. There would be no contact with the vermiculite. One cannot climb through this attic; you would break through the ceiling to the floor below. During remodeling there would be some cross-flow of air from the two vents on either end of the attic. These are approximately 1ft sq on one end and what appears to be 2ft sq on the other end. They are louvered. It is 11:20 a.m. This will conclude the visit and inspection of the home of Mr. Parks.

Notes of Inspection of 624 N. Warren Street

Helena, Montana

for Vermiculite Attic Insulation

November 3, 2000

by

Morton Corn, Ph.D., C.S.P.

Morton Corn & Associates, Inc.

3208 Bennett Point Road

Queenstown, MD  21658-1126

Introduction

I am at the Prebil Home at 624 N. Warren Street in Helena, Montana for the purpose

of inspecting the home for the presence of vermiculite attic insulation and its potential for

exposure of residents or remodelers. With me are: Richard Finke, Senior Litigation

Counsel for W.R. Grace & Co., and Alan McGarvey, plaintiff's Attorney. Also present are

Mr. and Mrs. Prebil. I have entered the home through a series of stairs and a front porch

and I'm in the entryway. The ceilings are approximately 10ft high. They are plaster, as are

the walls. The home is in very good condition and is characterized by expensive use of

wood, ceiling molding and decorative beams. I will describe each room as I proceed from

the entryway. On my right is the living room. It has a 10ft high ceiling. All of the ceilings

are the same height on this floor. A fireplace and windows are facing east and north. The

ceiling is plaster and in excellent condition. It has one or more coats of paint and it may

have a thin material over the plaster or it has been painted. There are underlying visible

cracks that have been covered. From the living room one moves towards the rear of the

house and encounters the dining room. It has the simulated beamed ceiling. The heating in

this house is via gas heat, with a hot water heating system. The radiators are below the

windows both in the living and in the dining room. Windows in the dining room are facing

north. At the rear of the dining room is a pantry area with the same covered painted ceiling

in its integrity and one then enters the pantry through a second archway. The kitchen is a

modern kitchen. The plaster ceiling is in its integrity. There are baseboard heaters in the

kitchen. They may operate off the hot water system or not. I am not sure. An archway on the kitchen leads to a foyer from which one can exit the first floor to the rear yard. One can continue through the second archway to a central hallway. I am back at the entry. At the left of the entry is a sitting room with a fan mounted in the center of the ceiling. The ceiling is covered plaster in its integrity. At the rear of the entry foyer is a clothing closet. I have exited the entry foyer and entered a bedroom. This is the second room from the south side of the house. The ceiling appears to be a dry wall subsurface under a cloth material that has been painted. It is in its integrity. There is a light fixture in the center of the ceiling. There are closets in this room and they have plaster ceilings. The ceilings in the closets are in their integrity. At the rear of this bedroom I enter the hallway. There are stairs up to the second floor on my right. On my left is the first floor bathroom with a plaster ceiling and an exhaust fan mounted in the ceiling. Behind the bathroom door at the rear of the house is a bedroom, which houses a computer station. The ceiling has that same cloth covered painted dry wall. It is in excellent condition. At the end of that hallway one then enters the rear foyer of the house which leads to the rear yard.

I descended a flight of stairs to the basement of the house. The basement has three distinct rooms. The first room is a shop area and contains the laundering equipment and a freezer. The first floor rafters and floorboards are visible from the basement and they are supported by 2 x 8's and are not covered. There is extensive piping and wiring visible, which has been photographed. The second room is a bedroom and storeroom. It has a

tiled ceiling and a fluorescent light mounted there. There are no other fixtures on the ceiling. The third room is the furnace room. It is a hot water heating system with a gas burner. The exhaust to the chimney is visible here. There is a hot water heater also exhausting to the chimney. Floor joists are visible, as are the wiring and piping at this location. Note: In answer to a question whether there is vermiculite insulation between the first and second floors, Mr. McGarvey answered yes there is in parts, and Mr. Prebil indicated he went into this in detail, including floor plans, in his deposition. This will be very helpful. At the top of the stairs leading to the attic is a landing and small room. The ceiling is sloped consistent with the dormer construction. It is a dry wall type ceiling and is painted.

At the top of the stairs on the right off the landing is a small room. It has sloped ceilings with complete synthetic 1ft x 1ft tiling. Walking towards the front of the house from the landing at the top of the attic stairs, there is a bathroom on the right. The bathroom has a sloped ceiling. It is a hard board material or plaster. There is a light fixture affixed to the ceiling. The ceiling and the walls are painted. They are in excellent condition. Continuing along the hallway on the second floor, adjoining the bathroom and on the south side is a bedroom. It has sloped ceilings with accommodation to the dormer construction. The hot water heating system extends to here with the convective unit below the windows on the south side. Ceilings on the second floor are approximately 8ft high. The ceiling is in its integrity. One light fixture is affixed to the center of the ceiling. The ceiling is painted and is either plaster or a hard board material. Opposite this bedroom on the south side is another

10

bedroom on the north side  The ceiling has one light fixture affixed to it. There are sloping portions of the ceiling consistent with the dormer construction. A convective heating unit is beneath the windows on the north side. The closets have plaster ceilings in their integrity. The closet in the first bedroom also had a plaster ceiling in its integrity. The front bedroom of the second floor has sloping roof, both north and south, and a flat central ceiling that is either hard board or painted plaster -- all in excellent condition. The access to the attic is at this location. The attic runs east and west with a peak approximately 2 1/2ft above the entry. There is vermiculite between the 2 x 4's.

It is difficult to see from this access due to the size of the access, which is approximately 1ft x 18". I have taken photographs holding the camera above my head. There is a door at the front of this bedroom leading to a small porch on the exterior of the house. The porch is covered by attic, which may also contain insulation.

It is 10:40 a.m. I am on the outside of the Prebil home and I am going to dictate some notes as I try to understand the second floor dormer attic structure. From the front of the house the attic over the front room bedroom where I had access to the vermiculite can be seen to be the flat part of the dormer extending out over the front of the house. I see the porch and the bedroom windows behind it. That entire base of the attic appears to be about 5ft. It is not clear if this second floor attic was an addition or was part of the original house. There is a sloping roof to the second floor from the ceiling of the first floor. The deposition of Mr. Prebil should clarify this. From the 12th Street side of the house I observed the

11

chimney and the dormer for the second floor bedroom on that side of the house. I could not gain access into the attic surrounding this bedroom dormer. From the rear of the house I see the windows associated with the landing that one reaches after climbing the stairs to the second floor. That is also a small dormer off the roof. Mr. McGarvey indicated there is no access to any space immediately above the first floor that may contain insulation. In other words, whatever is in there is sealed and totally inaccessible. There is also no need to access the attic to which I was able to have access, as there is no building space up there. On the north side of the house I can see the dormer of the bedroom on the second floor on this side of the house, and the exhaust for the bathroom fan.

There are three air vents on the attic roof; there is one over the dormer on this side of the house and there are two over the main attic that I observed with the insulation going from east to west above the second floor.

On the north side of the house the foundation and basement windows are visible. There is a basement entry at the rear of the house under the rear porch, but the garages for the house are relatively new compared to the house and I suspect at an earlier time coal was delivered via chute from the rear of the house. The garages, which are unattached to the house, have cinder block foundations and are of more recent vintage.

This will end the inspection of the Prebil home. It is 10:50 p.m.

Notes of Inspection of 328 S. Fifth Street

Missoula, Montana

for Vermiculite Attic Insulation

November 3, 2000

by

Morton Corn, Ph.D., C.S.P.

Morton Corn & Associates, Inc.

3208 Bennett Point Road

Queenstown, MD  21658-1126

Introduction

It is the afternoon of November 3, 2000, 2:25 p.m. I have been at this house since 2:00 p.m. and have completed photographs. I am now going to walk through the premises dictating notes. One enters the front door to a foyer. Ceilings are approximately 10ft high. The ceiling is plaster and there is a small visible crack in the paint covering. The light is from a central ceiling fixture. All the ceilings on this first floor appear to be about 10ft in height. The building stems from 1897. Directly in front of the foyer is the dining room area. It has a tile 1ft x 1ft ceiling that has been affixed to the plaster. It is in its integrity. It is complete. There is a light fixture and a fan combination in the center of the ceiling.

The house is heated by a QUATRA-FIRE gas stove in the dining room. It heats the entire house. There is a duct rising from this stove. It goes through the wall to the chimney to exhaust. Continuing in line with the dining room we entered the kitchen. The kitchen has the same glued-on tile material, only these appear to be about 2 1/2ft x 12" tiles. The ceiling has a light bulb in the center. That is the only fixture on this ceiling. It is in its integrity. On the left of the kitchen is an archway leading into a bathroom. The bathroom has the plaster painted ceiling. There is a light fixture in the center of the ceiling. The ceiling is in its integrity - uncracked, painted. There is also an exhaust fan that operates through the combination light fixture-fan. Directly behind the kitchen is a porch. It has plastic covering. The ceiling of the porch seems to be made of 3" wide wood strips. The

14

legs of the porch are to the back yard. There is a freezer and a washing machine on the porch.

On the left of the entry foyer is the living room. This room has a picture window facing the street, two small side windows adjoining it. The ceiling is of plaster. It is painted and there are some visible minor cracks probably from the ground subsidization. There is a light fixture in the center of the ceiling. There are no other connections through to the attic. This ceiling is in its integrity. Just behind the living room is the first bedroom. It has a stucco plaster ceiling. It has been painted. There are two hooks, a smoke detector and a central light fixture affixed to the ceiling. There are no other penetrations on the ceiling. This ceiling is in good condition. Directly behind the first bedroom and off of the dining room is the second bedroom. This also has a plaster ceiling, with a smoke detector and a central light fixture affixed. There are no other penetrations or fixtures on the ceiling. Directly behind the bedroom is a walk-in closet. The closet has a plaster ceiling, with a light bulb in the center. There is some cracking visible. It is painted. There is no penetration through to the attic from these minor cracks. One can walk through the closet to the rear of the house. The archway takes you to the rear porch, which has been described above.

This house does not have a basement.

It is from this second bedroom that one ascends a steep set of stairs to attic. The attic is composed of two rooms. There is a smaller one towards the front of the house and a larger one towards the rear of the house. I was able to look under the roof and a section of

the larger room on the Chestnut Street side of the house. I could observe the vermiculite between floor joists and covered with fibrous glass. On the opposite side of this room on the attic there is also some edge exposure of vermiculite covered by fiberglass. It is blocked off by batts of fiberglass. I would estimate approximately 75% of this front room is covered by fibrous glass batts beneath the roof. The smaller front room of the attic has floorboards on more than 75% of the floor. It is on the Chestnut Street side that there is exposed vermiculite between the rafters and this vermiculite is covered with fibrous glass. Material is also stored on the floorboards of this smaller room of the attic. The roof of the attic does not have fibrous glass batts between the rafters.

I am on the outside of the house once again and can see the attic and relate it to what I observed from inside. It is clear that there have been no major additions or remodeling that would cut into the ceiling of the first floor and the insulation where it is covered by the floorboards. There is some mention of removal of the bathroom ceiling on the first floor and if that was removed that, of course, would cause some insulation to be made airborne. However, that is the only renovation that I can discern from the exterior of the Holbrook house. The roof shingles on this house are cedar and there is very significant vegetation growth on the roof. The stove that heats the house exhaust rises through what was previously the chimney. There are some metal repairs to the cedar shingling visible on the roof. It is 2:55 p.m. This will end the inspection of the Holbrook home.

16

In summary, the house is built without a basement and does not have a ducted or hot water/hot steam piping system threading its way through the house. There are no intrusions into the first floor ceiling to the attic, and the present occupant would not experience any exposure to any dust from the vermiculite in-place insulation. The material is inaccessible by virtue of the way it has been blocked off in the attic. There is no accessibility from the lower floor through the ceilings, which are intact. In the case of previous renovation, removal of this ceiling would have been a one-time creation of dust and some exposure for that period of time to the dust from the vermiculite attic insulation and any fibrous glass insulation that was dislodged. These exposures would have been for a brief period, i.e. the period of the renovation work.

In Mr. Holbrook's affidavit he speaks of dust blowing down the staircase to the lower floors. I find it highly unlikely that any attic insulation dust would blow down those stairs. There might be dust from all of the materials stored and accumulation of atmospheric dust that blows down, but the reintrainment of the vermiculite and fibrous glass between the floor joists would be, in my opinion, highly unlikely. Note: The very front floor of the attic second room is also exposed, that is, does not have floorboards. That is a distance of approximately 6ft back from the front of the house. It is covered with batts of fibrous glass insulation.

Notes of Inspection of 39095 Montana Hwy. 40 West

Columbia Falls, Montana

for Vermiculite Attic Insulation

November 4, 2000

by

Morton Corn, Ph.D., C.S.P.

Morton Corn & Associates, Inc.

3208 Bennett Point Road

Queenstown, MD  21658-1126

Introduction

It is Saturday, November 4, 2000. It is 9:45 a.m. I am at 3905 Montana Hwy 40 West, Columbia Falls, Montana at the Price home. Richard Finke of W.R. Grace Co. is with me. Mr. and Mrs. Price are at home. Mr. Richard Hatfield, Consultant to Plaintiff, has joined us together with Mr. McGarvey.

I have taken photographs and a walk-through of the house, and I am now at the front door prepared to dictate notes of the house construction. It is a one-story house with a basement. The house is heated with a furnace and has steam circulation and baseboard heaters. In addition, in the living room there is a ceramic log fireplace with a separate chimney through to the roof. As one enters the living room the ceiling is approximately 8ft high. It is a plaster ceiling. There is a light fixture in the center of the ceiling, and there is a hook with a hanging plant affixed to it at the southwest corner of the room. There is a picture window on the south side of the room. There is another hanging fixture in the northeast corner of the room. It is affixed to the ceiling with two hooks that have been put into the plaster ceiling. There are no other intrusions into this ceiling. One walks towards the rear of the house to an archway into a small hallway and the kitchen. There is a window at the rear of the kitchen and that is the rear wall of the house. The ceiling is plaster, with a fluorescent fixture approximately 4ft long affixed to the ceiling. There is a flush mounted fan in the ceiling above the stove. Those are the only intrusions into the ceiling. Ceiling height is the same as in the living room. In the hallway behind the living room one turns right to the

bedrooms and bathrooms. The bathroom is on the left off of the hallway. It has a plaster ceiling in its integrity. There is a light fixture in the center ceiling and one hook with a hanging plant. The hook has been affixed to the ceiling. Directly ahead in the hallway on the eastside rear, that is the northeast corner of the building, is a bedroom. This bedroom has one light fixture on the plaster ceiling. It is in excellent condition. There are no other intrusions into it. The closet in this bedroom has a plaster ceiling in good condition. In the southeast corner of the building is the master bedroom. It has one light fixture in the center of the ceiling and three hooks into the ceiling. A light fixture is hanging from two of these in the southeast corner of the room and in the northeast corner of the room a decorative fixture is hanging; the ceiling is plaster and in excellent condition. The closet ceiling is also plaster. All of these ceilings on this floor of the house are of the same height. There is a closet in the hallway and that ceiling is plaster; it is in its integrity. Thus, in the living portion of the house there is no open-air connection between the ceiling and the attic flooring and insulation.

One leaves the kitchen and enters the garage. The garage has a fiber board ceiling that has been nailed to the rafters. The access to the attic is in on the far westside, center of the garage.

From this access I am looking east in the attic. It runs the entire length of the building. There are two vents in the vertical walls on east and west of the attic. The peak height in the attic is approximately 6ft and the roof slopes to either side of the house. I can see vermiculite and batting above the vermiculite. On the north side of the house adjacent

to where I am accessing there is loose cellulose insulation on top of batting. The vermiculite looks to be a layer of about 2". I cannot access the rest of the attic. It appears there is both batting and vermiculite.

The chimney for the ceramic log fireplace goes through the roof. That is the only evidence of any remodeling that has been performed. I have climbed to the access a second time to dictate the above notes.

From the rear of the garage I entered the basement. On the right is the furnace for the heating system. Directly in front of me is a washer and dryer for laundering. This is a washing, sewing, ironing room. It is off the rear of the basement. Walking to the front of the house an office/living room occupies the southwest corner of the house. It is approximately 60% of the length of the basement. Turn left and for the remainder of the space adjoining that office/living room is a storage room, which was previously a bedroom. The ceilings of these two rooms have a 1ft x 1ft fiber-type paneling affixed to the ceiling. It is in excellent condition. In the northeast corner of the basement there is a water heater shower, countertop and a workshop. In this area the floor joists are visible; the ceiling material has been applied to only a small portion of the above ceiling area adjacent to the shower. The only air connection to the attic from the basement is from the chimney to the heating plant. There is no connection adjacent to the walls of the basement.

In summary, there is vermiculite and other insulation between the rafters in the attic of this home. The attic is unfinished. The only previously remodeling that appears to have

21

taken place was installation of the chimney for the wood stove. The chimney is approximately 12-15" in diameter and appears to be of stainless steel construction. It goes through the ceiling on the first floor into the roof chimney. The ceilings of the first floor living space of the house are plaster and in their integrity. There is no air connection to the vermiculite insulation. The basement also lacks an air connection to the vermiculite insulation. Thus, the exposure of occupants of this house to vermiculite would be extremely minimal, at best, during the period of installation of the stove. There is no current exposure. The material is in place and dormant in the attic.

It is 10:50 a.m. This will end this inspection.

**Morton Corn**
**Expert Witness Testimony Report**
**2003-1997**

| Date | Case | Court/Jurisdiction | Type Testimony |
|---|---|---|---|
| 2/03/03 | Mandell Roy, et al. vs. Able Supply Co. | District Court of Montgomery County, Texas 9th Judicial District | Deposition |
| 1/10/03 | Judy May Arndt as Personal Rep. Of the Estate of Chris Robert Hilsenbeck vs Allied Signal, et al | Case No. 00-2-2974415EA Superior Court, State of Washington, County of King | Deposition |
| 1/8/03 | Andrew A. Patrick, M.D. et al vs. Board of Supervisors of LSO I | Civil Court, Parish of Orleans, LA Case 93-10037 | Deposition |
| 11/22/02 | Consolidated Asbestos Cases | Circuit of Newport News Law No. CL99-2000-00 | Testimony |
| 11/14/02 | Matthew Scott & Judith Scott vs. AC and S, Inc., et al No. 2001-032665 | Superior Court of California County of Alameda | Deposition |
| 10/30/02 & 11/09/02 | E. Flowers & T.C. Flowers vs. AC and S, Inc., et al. | Civil Action 01-vs-014834D State Court, Fulton County, GA | Deposition |
| 10/9/02    11/12-13/02 | A. Laico and C. Laico vs. Chevron Chemical co., et al | Superior Court of California Santa Clara County | Deposition    Testimony |
| 10/3/02 | James Lansford and Leta Lansford vs. Able Supply Co., et al. | Cause No. 26658 in the Judicial Court of Shelby County, Texas | Deposition |
| 9/23/02 | West Virginia Consolidated Asbestos Litigation. Civil Action No. 02-C-9004 | Circuit Court of Kanaha County, West Virginia | Deposition |
| 9/12/2002 | Stewart vs. HNA Holdings, Inc. Formerly Hoechst Celanese, Inc. | State of North Carolina County of Rowan/in the General Court of Justice Superior Court Division 98-CVS-224 | Deposition |
| 6/26/02 | Kelvin Manbodh vs. HOVIC, et al. | In the Territorial Court of the Virgin Islands Division of St. Croix | Deposition |
| 6/21/02 | Barnes et al vs. Givaudan Fragrance Corp., et al | Superior Court of N.J. Passaic County | Deposition |
| 5/29/02 | C.J.Thurston | Norfolk, Va. | Deposition |
| 1/29/02    2/26/02 | DuPont | Asbestos Personal Injury Litigation, No. 01-C-9002 Circuit Court of Kanawha County, West Virginia | Deposition    Testimony |
| 12/5/2001 | Billy James, et al. vs. Kaiser Aluminum and Chemical Corporation, et al. | 34th Judicial district Court for The Parish of St. Bernard State of Louisiana division "E" | Testimony |
| 12/3/2001 | Robinson vs. Narco | Cuyahoga County Courthouse Cleveland, Ohio | Testimony |
| 11/7/2001    4/08-09/02 | Leo S. Appel, et al. vs. Beazer East, Inc., et al. | Circuit Court of Kanawha County West Virginia Civil Action No. 98-C-2847 | Deposition    Testimony |
| 11/19/2001 | 1993 Coker Fire Litigation (Exxon/Mobil) | Master Docket No. 93-MS-2-C-1 United States District Court Middle District of Louisiana | Deposition |
| 11/19/2001 | Billy James, et al. vs. Kaiser Aluminum and Chemical Corporation, et al. | 34th Judicial District Court for The Parish of St. Bernard State of Louisiana Division "E" | Deposition |

| Date | Case | Court/Jurisdiction | Type Testimony |
|---|---|---|---|
| 9/28/2001 | Gwendolyn G. Luce vs. E.I. DuPont De Nemours & Co. | Cause No. 157.109 District Court of Jefferson County, Texas 58th Judicial District | Deposition |
| 8/13-14/2001 | Marcus Peters vs. Avondale | Civil District Court Parish of Orleans State of Louisiana | Deposition |
| 7/13/2001 | Roger J. Bergfeld, Sr., and Denice I. Bergfeld Plaintiffs, vs. Unimin Corporation and Martin Marietta Corporation, N/K/A Lockheed Martin | In the United States District Court for the Northern District of Iowa Eastern Division | Deposition |
| 6/15/2001 | Asbestos Litigation Meth Trial Group – Limited to: Wilson W. Henry (DuPont) | In the Superior Court of the State of Delaware in and for New Castle County | Deposition |
| 5/4/2001<br><br>5/29/2001 | No. 98-621; Donald Gilbreath, et al. vs. The Anchor Packing Company, et al. | 135th Judicial District Court Cooke County, Texas | Deposition<br><br>Testimony |
| 3/28/2001 | Cause No. 96-3062; Bruce D. Davis and James R. Davis, Individually and as Personal Representatives of the Heirs and Estate of Asbestos Personal Injury Litigation, No. 01-C-9002 Circuit Court of Kanawha County, West Virginia Frankie Gene Davis, Deceased, et al. vs. Owens-Corning Fiberglas Corporation, et al. | In the County Court at Law Number 3 El Paso County, Texas | Deposition |

| Date | Case | Court/Jurisdiction | Type Testimony |
|---|---|---|---|
| 2/16/2001 | Dorothy Browder, Individually and as Personal Representative of the Heirs and Estate of James Samuels vs. ARMCO | 55th Judicial District Court Harris County, Texas | Deposition |
| 2/19/2001 | Melvin A. Cavalier, et al. vs. Mobil Oil Corporation and Chalmette Refinery, LLC | Civil District Court for the Parish of Orleans State of Louisiana | Deposition |
| 2/23/2001 | J.P. Cowart, Jr. et ux. vs. Avondale Industries, Inc., et al. | C.A. No. 95-16230 Civil District Court Parish of Orleans State of Louisiana | Deposition |
| 10/17/2000 | Arbitration Hearing AFGE Local 1617 Air Force Base, San Antonio, Texas and San Antonio Air Logistics | | Testimony |
| 10/3-4/2000<br><br>12/6/2000 | Goldberg Group 7 Bill Bays, et al. vs. A. Best Products Co., et al. | Court of Common Pleas Cuyahoga County, Ohio | Deposition<br><br>Testimony |
| 9/15/2000<br><br>11/30/2000 | M. Barbanti vs. W.R. Grace & Company-Conn. | U.S. District Court Eastern District of Washington Federal Court Spokane, WA | Deposition<br><br>Testimony |
| 8/1,2,18/2000 | Port Authority of N.Y. and N.J., et al. vs. Affiliated FM Insurance Co., et al. | U.S. District Court Case No: USDGNJC. A. No. 91-2907 | Deposition |
| 8/8/2000 | Central Wesleyan College vs. W.R. Grace & Co. | U.S.D.C.S.C., CA No. 2:87-1860-8 | Deposition |
| 8/12/2000 | George Morris vs. Kelly Springfield Tire Co., Employee: Travelers Insurance Co, Carrier Defendant | North Carolina Industrial Commission File No: 975686 | Deposition |
| 6/12/2000 | Delaluz vs. Safety Kleen Corp., et al. | Superior Court of California County of Los Angeles | Testimony |
| 4/27/2000 | Delaluz vs. Safety Kleen Corp., et al. | Superior Court of California County of Los Angeles | Deposition |
| 4/25/2000 | Moore vs. Owens-Corning Fiberglas Corp. | 217th Judicial District Angelina County, Texas | Deposition |
| 2/16/2000 | State of Hawaii vs. U.S. Gypsum, et al. | 1st Circuit Court of the State of Hawaii | Deposition |

| Date | Case | Court/Jurisdiction | Type Testimony |
|---|---|---|---|
| 1/20/2000 | Lockheed Litigation Cases Group 6 | Superior Court of the State of California for the County of Los Angeles | Deposition |
| 2/24/1999 | Metropolitan Life Insurance Co. vs. Aetna Casualty & Surety Co., et al. | Civil Action CV-95-0554890-2 | Deposition |
| 3/11/1999 | Melody Ann Nagy, et al. vs. Wyman-Gordon Company, et al. | No. 97-52958 133rd District Court, Harris County, Texas | Deposition |
| 6/18/1999 9/27/1999 | Arnold Meyers vs. Amerida Hess | Docket No. L-3534-96 Superior Court of N.J. Middlesex County | Deposition |
| 7/14/1999 9/16-17/1999 | Rose Watson vs. Appalachian Power Co., et al. | Civil Action No. 95-C-442 Putnam County, West Virginia | Deposition |
| 7/16/1999 | AFGE Local 115 with Laborer's Int'l. Union, Local 1170 (Grievant) and Naval Inventory Control Point and Defense Logistics Agency, Mechanicsburg, PA | FCMS Case No. 98-0224 | Courtroom Testimony |
| 7/20/1999 10/21-22/1999 | S.H. Solow and Solow Development Corp. vs. W.R. Grace Co. | Supreme Court of New York County of New York Index No. 2453/88 IAS Part G | Deposition and Courtroom Testimony |
| 4/1/1998 | Robert Bickham, et al. vs. Metropolitan Life Ins. Co. et al. | 22nd JDC No. 70.760 New Orleans, LA | Deposition |
| 2/4-5/1997 | N.Y. Port Authority vs. W.R. Grace | New York, N.Y. | Deposition |
| 1/15/1997 2/12/1997 | Asarco, Inc. vs. Secretary of Labor, MSHA and ICWU, Intervener | Docket No. SE 94-362-RM Washington, D.C. | Deposition |
| 2/14/1997 | Newmont Mining Co. vs. Secretary of Labor (MSHA) | Washington, D.C. | Courtroom Testimony |
| 5/27-28/1997 | Percy Harris, Plaintiff vs. Chemix Corp., et al., Defendants | Chicago, Illinois | Deposition |
| 7/11/1997 | U.S. Gypsum vs. Pima County, Arizona | Pima County, Arizona | Deposition |
| 12/18-19/1997 | N.Y. Port Authority vs. W.R. Grace | New York, N.Y. | Deposition |

| Date | Case | Court/Jurisdiction | Type Testimony |
|---|---|---|---|
| 2/23/1996 | Maryland Casuality Co. vs. W.R. Grace & Co. et al. | | Deposition |
| 3/19/1996 3/21/1996 | State of N. Dakota vs. W.R. Grace Co. | | Deposition |
| 3/21/1996 | Secretary of Labor (MSHA) | Washington, D.C. | Testimony |
| 10/23-24/1996 | Prudential Life Ins. Co. vs. W.R. Grace Co. | | Deposition |
| 11/4/1996 | Secretary of Labor (MSHA) Vs. Newmont Mining Co. | Washington, D.C. | Deposition |
| 11/15/1996 | State of West Virginia vs. W.R. Grace Co. | | Deposition |

Supplement to Expert Report
by Morton Corn, Ph.D., CSP

Addressing Potential Health Concerns
Associated With Inhalation of Zonolite™
Attic Insulation

by

Morton Corn, Ph.D., CSP
Morton Corn & Associates, Inc.
3208 Bennett Point Road
Queenstown, Maryland   21658-1126

May 23, 2003

_____
Morton Corn, Ph.D., CSP

1

Background

Subsequent to submitting my Expert Report, I reviewed the Expert Reports of plaintiff's experts, William M. Ewing, Richard Hatfield and William Longo and Ronald V. Gobbel and Steven M. Hays. I also read the depositions of Messers. Ewing, Hatfield and Longo. The Zonolite™ Insulation Exposure Studies report by W.M. Ewing, R. Hatfield and S.V. Hays was also reviewed. The purpose of this supplementary report is to address several issues raised in plaintiff's experts reports, depositions and the exposure study.

Issue 1:       The Learning Curve for asbestos in buildings and potential health effects from in-place friable asbestos.

In their expert reports, plaintiff's experts repeat precautionary statements contained in early EPA guidance documents for asbestos in buildings, for examples:

- Ewing report, p.10: "Air monitoring may not be done frequently enough to include such episodic events (repair work or accidental disturbance); this can lead to misleading interpretation of air sampling results." (1985 EPA document)  In reality, episodic events have not been detected as increases in building air asbestos concentrations. (Reference: Lee, R.J., Van Orden, D.R., Corn, M. and Crump, E.S.: Exposure to airborne asbestos in buildings. Reg. Tox. Pharm.16: 93-107 (1992)).

- Ewing report, p. 9: "It (air testing) measures only current conditions and provides no information about fiber release potential and future air levels." (1985 EPA document).  Tens of thousands of airborne asbestos measurements in buildings are available and provide a consistent picture of low concentrations equivalent to outdoor concentrations for fibers longer than five microns.

- Ewing report, p.11: EPA has expressed its concerns about the "resuspension of previously released fibers that have settled onto floors and other surfaces" (1982 EPA document).

- Ewing report, p.11: "Resuspension of asbestos fibers that have settled may result from many different activities, including dusting, sweeping, vacuuming, and even ordinary movement of the settled fibers.  This process of release and resuspension of asbestos fibers results in continued dispersal of asbestos fibers throughout the building." (EPA 1982 document).

- Hays report p. 2; Ewing report p. 11: These experts, as well as Longo and Hatfield, speak to utilization of surface dust sampling to determine if a building is contaminated, as contrasted to air contamination, determined by air sampling.

2

Hays indicates that with surface dust sampling one can determine the "potential exposure risk attendant to surfaces contaminated by settled asbestos structures...". Standards for such surface dust measurements for exposure or health risk assessment do not exist and, as referenced in my report, two peer reviewed published reports of scientific studies indicated that a correlation does not exist between asbestos air concentrations and asbestos concentrations from surface dust measurements.

These same arguments were used by these same plaintiff's experts in the 1980's when the scientific data were insufficient to clearly resolve the issues. However, in 1990 after reviewing all evidence and arguments, including results of air sampling and settled dust sampling, related to the potential health risk of asbestos in buildings, EPA published its final guidance document for asbestos in buildings (Managing Asbestos In Place: A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials. U.S.E.P.A. Pesticides and Toxic Substances, 20T-2003. July, 1990). Often referred to as the "Green Book," it included a foreward that stated five facts relevant to the potential health risk of in-place friable asbestos in buildings. These facts are highly relevant to the concern for VAI, a friable asbestos product in homes. For this reason, they are presented here in their entirety.

Fact One:      Although asbestos is hazardous, the risk of asbestos-related disease depends upon exposure to airborne asbestos fibers.

Fact Two:      Based upon available data, the average airborne asbestos levels in buildings seem to be very low. Accordingly, the health risk to most building occupants also appears to be very low.

Fact Three:    Removal is often not a building owner's best course of action to reduce asbestos exposure. In fact, an improper removal can create a dangerous situation where none previously existed.

Fact Four:     EPA only requires asbestos removal in order to prevent significant public exposure to airborne asbestos fibers during building demolition or renovation activities.

Fact Five:     EPA does recommend a proactive, in-place management program whenever asbestos-containing material is discovered.

EPA articulated these facts after considering thousands of air sampling results, settled dust measurements and options for control of a risk that initially was perceived as very high for occupants in an estimated 750,000 public and commercial buildings. Extraordinary effort to collect data and evaluate its meaning resulted in the resolution embodied in the above five facts. Basically, EPA concluded the risk is low, if it exists, and that instilling awareness of the asbestos presence and attendant minimization of intrusion and simple

3

precautions is the best policy. Demolition and removal exposures are potentially higher and these activities should be undertaken by specialists.

The Learning Curve required time, extraordinary effort and debate over a ten year period. Plaintiff's experts have essentially ignored all this and have turned the clock back to the 1980's, treating VAI as an entirely new issue. VAI in homes concerns are analogous to in-place friable asbestos in buildings concerns, albeit with some variations of secondary or tertiary significance. Lessons hard won are applicable here.

Issue 2: The dose makes the poison.

A central tenet of toxicology is "the dose makes the poison;" this suggests that all chemical agents are harmful: it is a question only of dose (Reference: Ottoboni, M.A.: The Dose makes the Poison: A Plain-Language Guide to Toxicology. Van Nostrand Reinhold, New York, 1991). For an inhaled potentially toxic agent such as asbestos, the dose is the average airborne concentration inhaled multiplied by the time it is inhaled. Thus, the current OSHA Permissible Exposure Limit (PEL) is 0.1 fiber per cubic centimeter (f/cc) 8-hr. Time Weighed Average concentration. This amount can be inhaled for 8 hrs. per day, five days per week, 50 weeks per year for 45 years. The dose permitted is 4.5 f/cc-yrs. The metric f/cc-yr. is used by epidemiologists to construct a dose-response curve for a population exposed to airborne asbestos at different doses.

Epidemiologists, hygienists and toxicologists, do not calculate numbers of fibers inhaled, as Mr. Ewing has done in his report (p. 9), because it is understood that the human respiratory tract very efficiently removes about 98% of deposited fibers or particles after their inhalation. The numbers of inhaled fibers are huge and meaningless for scientific correlation with disease, but they can be scary to those new to the subject. For example, we all inhale background asbestos-in-air every minute of every day. In an urban area the concentration of asbestos fibers greater than 5 microns is about 0.001 f/cc. An adult breathes about 20,000,000 cc of air per day, or 20,000 asbestos fibers! In one year this is 7,950,000 fibers. If one considers asbestos structures less than five microns long, the number would be about 10x greater, or about 79,500,000 structures per year. This is background and the human lung easily deals with it through several clearance mechanisms. The calculation of inhaled structures of VAI by Mr. Ewing is disingenuous, at best.

It should be recognized that there are OSHA PEL's for inhalation of over 700 potentially toxic materials. Also, there are Community Air Pollution Standards for six agents, enforced by EPA. Emergency Response Guidelines for chemicals released to air near chemical plants or tanker trucks or train crashes exist. All recognize a concentration (related to dose) that, if not exceeded, will be protective of "nearly all exposed." The latter phrase is recognition of a few sensitive or susceptible persons in all exposed populations.

4

Health based standards or guidelines do not exist for permissible concentrations of potentially toxic insoluble dusts, such as asbestos.

Issue 3: Use of K factors (Ewing deposition, pp. 182-183).

Early in my experience with asbestos (1977-82) in buildings I assisted IBM to determine which of their buildings contained asbestos and how to address the concern. During 1978 and 1979 I tested the validity of the K factor, the ratio of airborne asbestos concentration to asbestos concentration in dust on a surface. This was an attempt to reduce air sampling costs. The K factor was not a dependable approach to estimating asbestos-in-air concentrations and it was rejected as an option to air sampling. I have not used K factors since that time.

Issue 4: Decrease in airborne concentration of asbestos in an occupied space.

My expert report Summary and Conclusions (p. 18) included the statement, "Where concentrations were elevated, they returned to background levels within hours after the disturbance activity." Mr. Hatfield challenges this statement (Hatfield deposition, p. 156). The reference for my statement is: Moorcraft, J.S. and Duggan, M.J.: Rate of decline of asbestos fiber concentration in room air. Ann. Occup. Hyg. 28(4): 453-457 (1984). The authors experimentally demonstrate that removal of fibers from room air occurs much more rapidly than indicated by calculations based on a model of particles settling in still air. Various forces operating on fibers, in addition to gravity, are offered as causes of the observation.

Issue 5: Plaintiff's Report titled "Zonolite Insulation Exposure Studies." by W.M. Ewing, R Hatfield and S.M. Hays dated 3/15/03.

Major Criticisms of these simulation studies are as follows:

1.      Observation of video tapes of the studies indicated to me that the work was performed more vigorously by the participants than my experience with attic insulation installation indicates. When I, as a homeowner, performed this work I proceeded very slowly and carefully (not to damage the underlying ceiling and the attic). I also wore a mask. In my opinion, fiber concentrations created by the plaintiff's experts simulations would be higher than encountered by a homeowner performing these same tasks.

2.      Results of asbestos-in-air concentrations are reported as Time Weighted Averages (TWA's) for the period of the particular task, not for the customary 8 hours used to calculate occupational exposures, or 24 hours used to calculate community air pollution exposures. Thus, all reported results are very high because task times are 24 minutes, or 31 minutes, or 46 minutes, respectively, for examples. I calculated 8-hr. TWA's for the measured exposures, the customary reporting time

base for occupational exposures.  For examples, the reported 1.54 fibers/cc for cleaning stored items with Zonolite at the top of perimeter wall cavities only becomes 0.11 f/cc.  The reported TEM s/cc > 5 μm of < 0.42 for this task becomes < 0.03.  The reported 5.8 f/cc for cutting hole in ceiling below attic with Zonolite insulation becomes 0.31 f/cc on an 8-hr. TWA basis.  The reported 1.32 s/cc > 5 μm  becomes 0.07 s/cc on an 8-hr TWA basis.  The highest reported area sample of 0.60 s/cc > 5 μm becomes 0.03 on an 8-hr. TWA basis.  Similar, major reductions in reported values can be calculated for each activity/task.  For the reported numbers to be meaningful to one assessing exposure, they must be converted to an 8 hour or a 24 hour base, or one must assume the activity continued for a full 8 or 24 hours.  As reported, the task exposures present an exaggerated picture of the exposures for the tasks undertaken.

3.    It is not clear from the page 4 description of activities performed if clean air was drawn into the containment erected or if the HEPA filter was a safeguard, without air movement through it, to prevent fibers exiting the containment.  If air flow was used, the rate of flow was not presented in the report.  If air flow was not used, the containment in which the work was performed was sealed off from any naturally occurring air flow in the attic space, thus causing unnatural buildup of any fibers released to air by the tasks performed.  This would result in higher airborne asbestos concentrations than anticipated without containment and performance of the same tasks.

6