## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re

W.R. Grace & Co., et al.,

      Debtors.

Chapter 11

Case No. 01-01139 (JKF)
Jointly Administered

**APPENDIX TO
W.R. GRACE & CO.'S MOTION
FOR SUMMARY JUDGMENT
(VOLUME 2 OF 2)**

Counsel of Record for this Party:

REED SMITH LLP

James J. Restivo, Jr.
Lawrence E. Flatley
Douglas E. Cameron
James W. Bentz
    435 Sixth Avenue
    Pittsburgh, PA  15219
    Telephone:  412.288.3131
    Facsimile:  412.288.3063

SPECIAL ASBESTOS COUNSEL FOR
DEBTORS

PACHULSKI, STANG, ZIEHL, YOUNG,
 JONES & WEINTRAUB P.C.

Scotta E. McFarland
Paula A. Galbraith
    919 Market Street
    Suite 1600
    Wilmington, DE  19801
    Telephone:  302.652.4100
    Facsimile:  302.652.4400

CO-COUNSEL FOR DEBTORS

July 7, 2003

## TABLE OF CONTENTS

**EXHIBIT**

**VOLUME 1**

Agency for Toxic Substances and Disease Registry, Year 2000 Medical Testing of Individuals Potentially Exposed to Asbestiform Minerals Associated with Vermiculite in Libby, Montana:  A Report to the Community (August 23, 2001) ...........................................A

Memorandum Opinion in *Barbanti, et al. v. W.R. Grace & Co., et al.,* No. 00-2-01756-6 (Super. Ct. Wash. Dec. 20, 2000) ........................................................B

Excerpts from the May 5, 2003 Deposition of William Ewing .....................................C

Federal Judicial Center, Reference Manual on Scientific Evidence (2d ed. 2000) ..........................................................................................................D

Elizabeth L. Anderson Report.........................................................................................E

Morton Corn Reports ......................................................................................................F

**VOLUME 2**

Richard J. Lee Report .....................................................................................................G

William G. Hughson Report ...........................................................................................H

EPA Headquarters Press Release (May 21, 2003); OPPT Comments On Action Memorandum Amendment Removal Action at the Libby Asbestos Site (February 22, 2002) ......................................................................................................I

EPA and ATSDR, Current Best Practices for Vermiculite Attic Insulation (May 2003)................J

Letters from Christine Todd Whitman, EPA Administrator, to Senator Max Baucus and to Senator Patty Murray, Responses (April 4, 2003 and April 18, 2003)......................................K

Environmental Protection Agency, EPA Response to September 11, Frequently Asked Questions, http://www.epa.gov/wtc/questions/index.html ..........................................................L

Excerpts from the May 7, 2003 Deposition of Steve Hays.............................................M

Excerpts from the May 6, 2003 Deposition of Richard Hatfield .....................................N

*In re Lamar County Asbestos Litigation*, slip opinion (Lamar County, Tex., July 5, 2001) ..........................................................................................................O

Agency for Toxic Substances and Disease Registry, ASTM Method D5755, Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscropy for Asbestos Structure Number Concentrations...................P

Excerpts from the May 8, 2003 Deposition of William Longo ......................................Q

Environmental Protection Agency, Comparison of Airborne Asbestos Levels Determined by Transmission Electron Microscopy (TEM) Using Direct and Indirect Transfer Techniques (March 1990) ...................................................................................... R

E. B. Ilgren Report ...................................................................................................... S

Excerpts from the April 30, 2003 Deposition of Henry A. Anderson, M.D. .................................... T

Agency for Toxic Substances and Disease Registry, Preliminary Findings of Libby, Montana, Asbestos Medical Testing [Combined Testing 2000 and 2001] (September 2002) ................................................................................................................................ U

David L. Faigman, et al., 4 Modern Science Evidence (2d ed. 2002) ............................................ V

# EXHIBIT G

**Opinion of Dr. Richard J. Lee**

**In the matter of**

**In Re:  W. R. Grace & Co., et al**

Prepared for

W. R. Grace & Co.
5400 Broken Sound Blvd
Boca Raton, FL  33487

April 15, 2003
Project No. LSH108674

Prepared by

RJ Lee Group, Inc.
350 Hochberg Road
Monroeville, PA  15146

# Table of Contents

I.      Summary                                                                                              4

II.     Qualifications                                                                                       6

III.    Background                                                                                           9

IV.     Applicable Standards and Testing Protocol                                                            10

        A.      Asbestos and Cleavage Fragments                                                              10

        B.      Cleavage Fragments Should be Excluded from "Asbestos" Counts                                 13

        C.      Bulk Sample Collection Equipment and Analysis                                                16

        D.      Air Sample Collection Equipment and Analysis                                                 17

                1.  Phase Contrast Microscopy                                                                17

                2.  Transmission Electron Microscopy                                                         18

                3.  Direct vs. Indirect Sample Preparation                                                   20

                4.  IRIS Premise and Process                                                                 24

V.      Amphiboles in ZAI                                                                                    24

        A.  Percentage of Fine Amphibole Particles in ZAI                                                    25

        B.  Historical Data                                                                                  26

        C.  Amphiboles in the Coarse Fraction of ZAI                                                         27

VI.     Review and Analysis of Air Samples                                                                   30

A.    Airborne Amphibole Fibers Generated by Disturbing ZAI are
      Largely Non-asbestos Cleavage Fragments                        30

B.    Ambient Air Test                                               33

C.    Simulations                                                    33

      1.  Lees and Mylnarek                                          33

      2.  EPA Phase 2 Data                                           35

      3.  Versar                                                     36

VII.   Critique of ZAI Claimants' Experts' Simulations              36

A.    Claimants' Experts' Simulations                                37

      1.  Conversion to PCME/Impact of Counting Cleavage Fragments   38

      2.  Impact of Containment/No Ventilation on Air Sample Results 39

      3.  TWA Calculations                                           40

B.    Pinchin                                                        40

C.    Grace Historical Testing                                       41

D.    Dust samples                                                   43

      1.  Surface Dust Concentrations are Not Predictors of Past or Future
          Exposures                                                  43

      2.   Particles Found in Dust Samples were Primarily
           Cleavage Fragments                                        44

VIII.   Conclusions                                                  46

## I.   Summary

The purpose of this report is to review the mineralogy, form, and exposure potential of the amphibole particles found in installed Zonolite Attic Insulation (ZAI) manufactured and sold by W. R. Grace & Co. Additionally we have reviewed and offer comments on the testing results reported by Claimants' experts and the opinions expressed by those experts. Based on our review of the literature, our own experience and studies, studies by W. R. Grace, studies by Claimants' experts in this matter and the Barbanti v. W. R. Grace & Co. matter (Barbanti), EPA reports related to Libby, Montana, and the World Trade Center, the history of EPA activity in Minnesota, the findings of OSHA in 1992, the findings of the Consumer Product Safety Commission in 2000[1], and the history of the regulations and methods for analyzing asbestos, it is our opinion within a reasonable degree of scientific certainty that:

1)      Phase Contrast Microscopy (PCM) measurements of airborne fiber concentrations in atmospheres where ZAI is being manipulated, handled, or removed by a homeowner significantly overestimate potential *"asbestos"* fiber concentrations.    In Claimants' experts' airborne *"asbestos"* fiber counts, the average reduction would be more than three-fold, simply by excluding non-mineral fibers such as hair, cotton, and cellulose.

2)      *Asbestos* is a commercial term applied to the occurrence (in sufficient quantity to make their extraction and beneficiation economically viable) of *asbestiform* minerals, which are minerals with physical and thermal properties of

---

[1]    Consumer Product Safety Commission (2000). "CPSC Releases Test Results on Crayons", press release no. 00-123, June 13, 2000.

potential commercial significance in applications requiring flexibility, thermal stability or high tensile strength. *Asbestiform* minerals are naturally formed in a fibrous, flexible form with a high aspect ratio known as fibers.

3)      *Asbestos* minerals have non-asbestos analogs called *cleavage fragments*. When finely divided or crushed, *cleavage fragments* may have a similar appearance to asbestos fibers, but are generally thicker and shorter than asbestos fibers and have other distinguishing characteristics.

4)      Regulatory methods are and have been expressly designed to measure the concentrations of asbestos fibers and explicitly cite the "asbestiform varieties of … [amphibole minerals]" in air, water, or bulk samples, not the concentration of *cleavage fragments*.

5)      Claimants' experts misrepresent the OSHA position by failing to acknowledge that in 1992 OSHA explicitly excluded amphibole *cleavage fragments* from their regulations.

6)      Claimants' experts' TEM analysis is flawed because it included non-asbestiform *cleavage fragments* in their *"asbestos"* count, thereby inflating their *"asbestos"* results.

7)      Contrary to Claimants' experts' assertions, the majority of the amphiboles in ZAI are neither asbestiform nor respirable.

8)    Claimants' estimated concentrations would be reduced by at least ten-fold if the concentration of non-asbestiform *cleavage fragments* in their samples were excluded from their "*asbestos*" count.

9)    Exposure measurements made by RJ Lee Group and two groups of Claimants' experts using PCM methodology and adjusted for the quantities of non-mineral fibers and *cleavage fragments*, indicate airborne asbestos concentrations would have been comparable to or below relevant standards.

10)    Evaluation of Claimants' experts' own surface dust data demonstrates that their use of indirect preparation significantly breaks up the mineral particles in the samples. The surface dust particles are smaller than the airborne particles, thus demonstrating the disaggregating effect of indirect preparation.

11)    Neither the ASTM surface dust method(s) nor the indirect preparation technique is generally accepted as a reliable indicator of past or potential future airborne exposures. Results derived from the analysis of samples prepared using an indirect preparation technique cannot be used for risk evaluation.

12)    There is no reliable scientific evidence that ZAI is unsafe.

## II.    Qualifications

Dr. Richard J. Lee obtained a Bachelor of Science degree in physics from the University of North Dakota in 1966 and a Ph.D. in theoretical solid state physics from Colorado State University in 1970. He then went to Purdue University as an Assistant Professor in physics

where he taught courses on the principles of optical microscopy. He received tenure at Purdue in less than two years.

In 1973, Dr. Lee went to work for United States Steel, first as a research scientist and thereafter, as director of their physics and electron microscopy department in the Technical Center. He remained at the United States Steel Research Center until 1985. While at United States Steel, he analyzed a wide range of materials and was employed by NASA to analyze moon rocks brought back by the Apollo missions.

During his tenure at USS Research, Dr. Lee was responsible for developing the first techniques for quantitatively identifying amphibole asbestos fibers and cleavage fragments by a combination of transmission electron microscopy and energy dispersive X-ray analysis. He participated in the original ASTM committee that developed and evaluated the first TEM methods for preparing samples of air, bulk and water for the determination of asbestos content. Dr. Lee was the first scientist to develop methods for distinguishing asbestos amphiboles from cleavage fragments using transmission and scanning electron microscopy.

Since 1985, Dr. Lee has been President of a company now known as RJ Lee Group, Inc., ("RJ Lee Group") which has its principal office in Monroeville, Pennsylvania, and laboratories in San Leandro, California; and Manassas, Virginia. RJ Lee Group provides research, analytical and consulting services relating to materials characterization. Materials characterization of bulk building materials, also referred to as "constituent analysis", involves analyzing a sample of material using various techniques to identify and quantify the components of that material.

Dr. Lee has a long history of scientific consulting and service for government agencies, including the EPA. RJ Lee Group's laboratory serves as a quality assurance and referee

laboratory on a number of EPA programs. RJ Lee Group's laboratory performed the analyses for the EPA's major study on airborne levels of asbestos in public buildings. Dr. Lee has participated in the development by the EPA of analytical methods and procedures for asbestos analyses. The EPA requested that he personally participate in several projects, including the drafting of the portions of the EPA AHERA regulations governing air sample analysis after abatement.

RJ Lee Group also performs analyses for the United States Navy, the United States Army and the United States General Services Administration. Dr. Lee developed a program to determine the cause of failure in components of the guidance system in the Trident missile for the Department of the Navy.

RJ Lee Group's laboratory has also performed microscopic analyses for the State of California Air Resources Board when that agency performed testing of the air in major cities in the State of California to determine the presence of asbestos.

Dr. Lee is now engaged in and specializes in materials characterization, which is the science that uses a variety of analytical techniques to determine the identity and amount of each component of a material. He has performed materials characterization analyses on many samples of vermiculite produced from different sources for over 15 years. He is familiar with all methods of microscopy that are commonly used in characterizing asbestos or identifying and quantifying asbestos, including optical microscopy, scanning electron microscopy and transmission electron microscopy. He is also familiar with all known methodologies, from air sampling to dust sampling, with respect to asbestos. He has worked extensively with, and is an expert in, analytical techniques, including light and electron microscopy, materials

characterization, asbestos air, bulk, and dust samples, and methods of evaluation. He has also served as an expert witness in litigation involving asbestos in buildings and ZAI and has testified in state and federal courts.

Dr. Lee is familiar with airborne levels of asbestos fibers both in buildings and in outdoor air, the sources of asbestos in the outside or ambient air, scientific knowledge and techniques regarding the measurement of levels of asbestos in the air, the development and use of the technology to measure both airborne levels of fibers and levels in materials samples, and the standards and methods used for air sampling. He has been involved in analyzing and producing bodies of air sampling data for EPA and other governmental and private entities including analysis of samples taken in an ongoing nationwide study of airborne levels in buildings and his analysis of air samples taken in an EPA-sponsored study in Texas.

He is also familiar with the history of standards governing asbestos including the current standards, regulatory positions and philosophies, different types of asbestos fibers, asbestos fiber levels as reported in the literature, as well as his own work concerning buildings with asbestos-containing materials.

Dr. Lee's fee for consulting, depositions, and trial appearances is $350 per hour.

## III.   Background

At issue is the potential risk to homeowners or contractors handling, manipulating, removing, or simply having a product known as Zonolite Attic Insulation (ZAI) in these homes. The product consists of lightweight expanded vermiculite, ordinarily between 2 and 10 mm in diameter and 5 – 15 mm in length. ZAI was manufactured from vermiculite concentrate shipped

from Libby, Montana to expansion plants around the country where it was thermally expanded in furnaces, bagged, and sold through distributors to contractors and homeowners for use as attic insulation.

The product contains sub-calcic, sodic, tremolitic amphiboles[2] that have become known as "Libby Amphiboles". These were present in the mine but were not completely removed in the beneficiation process and comprised generally 0.1–1 percent by weight of the ZAI (see Section V of this Report). Generally these amphiboles are 2-5 mm in size. Minute quantities of these amphiboles are present in the product as a dust (<100 micrometers in length), along with fine vermiculite and other accessory minerals. While a small portion of this material is a fibrous asbestos amphibole; most of the material is a non-asbestos form of amphibole (i.e., *cleavage fragments*). In other words, the dust consists of broken pieces of the processed material. The amount of respirable Libby Amphibole in the dust is minute, varying from 0.0001 to 0.1 per cent by weight of the product.

## IV.    Applicable Standards and Testing Protocols

### A.    Asbestos and Cleavage Fragments

The term "asbestos" is a commercial term that refers to naturally occurring fibrous minerals that are economically exploitable. "Asbestos" is defined in the Code of Federal Regulations (29 CFR 1910.1001, 40 CFR 763.83, 40 CFR 61.141) as chrysotile, amosite, crocidolite and the asbestiform varieties of tremolite, anthophyllite and actinolite, as well as any

---

[2]    A. L. Boettcher (1966). "The Rainy Creek Igneous Complex Near Libby, Montana", PhD Thesis, The Pennsylvania State University, June 1966.

of these minerals that have been chemically treated and/or altered. The terms "tremolite asbestos," "anthophyllite asbestos" and "actinolite asbestos" are also used to refer to asbestiform varieties of these minerals.

Asbestos minerals belong to two mineral families: the serpentines and the amphiboles. Tremolite, anthophyllite, and actinolite are types of amphibole minerals. They differ in their chemical composition, and can grow in either an asbestiform or cleavage (non-asbestiform) manner. The habit of a mineral is the shape or form a crystal or aggregate of crystals take on during crystallization and is dependent on the existing environmental/geological conditions at the time of formation. Asbestiform minerals are formed through unidirectional crystalline growth that produces long thin fibers. The narrow width and long lengths of asbestos provide flexibility and high tensile strength.

Unlike asbestos, cleavage amphibole minerals grow in three dimensions to produce the non-fibrous (massive) form of the same mineral. When non-asbestiform cleavage minerals such as amphiboles are crushed, fragments are cleaved away from the main crystal mass, a process that produces "cleavage fragments". The massive mineral will tend to fracture along sets of systematic planes within the mineral crystal, and some long thin fragments may result, although the majority of the fragments will be short, non-fibrous particles. These cleavage fragments may have a similar microscopic appearance to that of true asbestos fibers, although distinguishing characteristics include size, optical extinction characteristics, and morphology.

Cleavage fragments have more surface defects, a higher susceptibility for acid dissolution, and a different surface charge than do asbestos fibers. Cleavage fragments, compared to asbestos fibers, are weak and are not flexible (more brittle).

Populations of cleavage fragments and populations of asbestos fibers can be distinguished from one another when viewed as a whole, because cleavage fragments are likely to be thicker and shorter than asbestos particles and will therefore have lower aspect ratios. Individual particles may be more difficult to classify. Table 1 lists selected references that discuss the nature of asbestos fibers and cleavage fragments.

Asbestiform fibers have been defined as those exhibiting characteristics of: (a) high aspect ratios (usually 20:1 to 100:1 or higher); (b) curvature; and (c) fiber bundles with splayed ends. Asbestiform fibers can occur in bundles of parallel fibers or in matted masses of fibers and fiber bundles. Typically, individual fibers have width dimensions of less than 0.5μm. Competent microscopists can tell the difference between asbestos and cleavage fragments.

Since the early 1970's, the question of whether to count asbestos and non-asbestos amphiboles in measurements of airborne asbestos concentrations has been the subject of controversy. The issue took root in the early 1970's. Fibers believed to be amphibole asbestos discharged as part of taconite mining tailings were found in samples of Lake Superior water[3]. The amphiboles in question included grunerite and actinolite, closely related to the amphiboles present in ZAI.

---

3   W. Brice and M. Berndt (2003). "Reserve Mining and the Asbestos Case", presentation at International Symposium on the Health Hazard Evaluation of Fibrous Particles Associated with Taconite and the Adjacent Duluth Complex, St. Paul, MN, March 30 – April 1, 2003.

Some thirty years later, a number of epidemiological and animal studies have found no evidence that the non-asbestos amphibole cleavage fragments from the iron region of Minnesota produce mesothelioma or other asbestos disease[4].

Claimants' experts contend that the presence of any amphibole in ZAI renders it unsafe because sufficient airborne dose (exposure to an airborne concentration over a given period of time) of a particular fibrous form of amphibole (known as asbestos) causes disease. Claimants' experts include in the measurement of the airborne concentration any amphibole particle that meets a particular shape and length criteria, regardless of whether it is in fact asbestos. They erroneously contend that there is no mineralogical or regulatory distinction and that applicable regulations intend to regulate all amphiboles if they meet the definition of a fiber.

**B.      Cleavage Fragments Should be Excluded from "Asbestos" Counts**

In 1992, OSHA examined the history and epidemiology of non-asbestos amphiboles (in particular tremolite) and concluded that they should not be regulated and should not be included in "asbestos" counts[5]. In the Preamble to the 1992 Final Rule on Occupational Exposure to Asbestos, Tremolite, Anthophyllite and Actinolite (Intro to 29 CFR Parts 1910 and 1926), OSHA removed cleavage fragment tremolite, anthophyllite and actinolite (ATA) from the scope of asbestos regulations. The Preamble discusses at length the reasoning for this removal of cleavage ATA.

---

4    W. Brunner, A. Williams, A. Bender (2003).  Exposures to Commercial Asbestos in Northeastern Minnesota Iron Miners who Developed Mesothelioma, draft report, Minnesota Department of Health, Chronic Disease and Environmental Epidemiology Section.

5    The      Preamble     to     the     1992     OSHA     ruling     can     be     found     on     the     Internet     at http://www.osha.gov/pls/oshaweb/owasrch.search_form?p_doc_type=PREAMBLES&p_toc_level=1&p_keyval

Continued on following page

OSHA's discussion includes both an analysis of the medical evidence regarding the effects of asbestiform and cleavage ATA as well as the feasibility of analytically distinguishing between the two forms. OSHA stated that asbestos and cleavage ATA appeared to be distinguishable mineral entities on a population basis, and in most instances on a particle basis. The Preamble states that differences in biologic effect between asbestos and its cleavage analogues are likely related to the distinctions that define the two groups as separate mineral entities. To distinguish cleavage ATA from asbestos, OSHA acknowledges and allows the use of differential counting with its current approved methodology. Cleavage fragment ATA can be excluded from asbestos concentrations if sufficient evidence to do so can be shown through the various differential counting techniques.

Table 2 lists relevant citations from regulations and analytical methods showing the intent of all of the regulations to regulate asbestos minerals – not cleavage fragments (the nonasbestos variety of the amphibole minerals). A similar listing has been created by Lowers and Meeker[6].

As stated, amphibole minerals can form in two manners – as fibers or fiber bundles, loosely cemented together, and as crystals bound together by strong, ionic, crystallographic forces[7]. In the first case, the fibers may have commercial value and may readily be separated into respirable asbestos fibers of high aspect ratio – the basis of the asbestos textile and other

_____

Continued from previous page

ue=Asbestos~(1992~-~Original)&p_status=CURRENT&p_search_str=&p_text_version=FALSE. See Chapter IV.

6   H. Lowers and G. Meeker (2003). "Tabulation of Asbestos-Related Terminology", US Geological Survey, Open File Report 02-458, available at: http://pubs.usgs.gov/of/2002/ofr-02-458/.

7   W. Campbell, E. Steel, R. Virta, and M. Eisner (1979). "Relationship of Mineral Habit to Size Characteristics of Tremolite Cleavage Fragments and Fibers", U.S. Department of the Interior, Bureau of Mines, Report of Investigation No. 8367.

asbestos industrial applications. In the second case, the crystals may be broken into fragments which have a similar appearance to asbestos fibers when finely divided, but which have no economic value because they cannot be separated into flexible, high-aspect ratio fibers that can be woven or otherwise manipulated[8].

More recently, the Consumer Product Safety Commission examined the issue of tremolite in color crayons and concluded that cleavage tremolite and anthophyllite presented, at most, an insignificant risk[9].

Beyond the distinction between asbestiform fibers and cleavage fragments, it is widely recognized that the amphibole fibers of toxicological significance to human health are long and thin. In the 1970's, Dr. Merle Stanton studied a large number of mineral fibers and concluded that fibers longer than eight micrometers and less than 0.5 micrometers in diameter were far more potent than shorter or thicker fibers[10]. This was reinforced by numerous studies during the 70's and 80's. Today, the so-called Stanton hypothesis has withstood the test of time. In fact, the latest EPA-sponsored risk assessment[11] finds the medically significant (risk) fibers are those that are longer than 40 micrometers and thinner than 0.3 micrometers, a size and shape rarely found in cleavage fragments.

---

8   R. Virta and E. Mann (1994). "Asbestos", in *Industrial Minerals and Rocks*, 6th ed., D. Carr, editor, Society for Mining, Metallurgy, and Exploration, Inc., p. 97 – 124.

9   Consumer Product Safety Commission (2000). "CPSC Releases Test Results on Crayons", press release no. 00-123, June 13, 2000.

10  M. F. Stanton, M. Layard, A. Tegeris, E. Miller, M. May, E. Morgan, and A. Smith (1981). "Relation of Particle Dimension to Carcinogenicity in Amphibole Asbestos and Other Fibrous Minerals," *Journal of the National Cancer Institute*, **67**, p. 965-975.

11  D. Berman and K. Crump (1999). "Methodology for Conducting Risk Assessments at Asbestos Superfund Sites, Part 2: Technical Background Document", prepared for Kent Kitchingman, U.S. EPA Contract No. 68-W9-0059, Work Assignment No. 59-06-D800, Feb. 15, 1999.

The mineralogical distinction between asbestos and cleavage fragments is well established. The intent of the regulations is "to count those asbestos particles meeting the definition of a fiber, and not non-asbestiform particles such as cleavage fragments."[12]. The epidemiological data demonstrate that non-asbestos amphiboles do not behave as asbestos and that the asbestos particles of significance are generally outside the size range found in cleavage fragments.

Thus, of the airborne amphibole particles that are asbestos and meeting the dimensional aspects of regulated fibers should be included in the *asbestos* count. In this case, this would reduce the Claimants' TEM asbestos counts at least ten-fold.

## C.    Bulk Sample Collection Equipment and Analysis

Bulk samples (1 to 2 grams) may be taken with tube or cork borer sampling devices and are placed in sealed containers for storage or transport to the laboratory. Samples may be prepared by chemical reduction of the matrix, drying, or heating to produce a powder that is sufficiently fine to fit under a glass cover slip for microscopic examination. Forceps may also be used to take samples from several parts of a bulk material. Such samples are placed directly on microscope slides.

Optical microscopy (and polarized light microscopy (PLM), in particular) is a technique used to identify the minerals in a bulk specimen. Originally used for rock and ore examination, optical microscopy is now used for determining the mineral content of numerous materials,

---

12  D. Crane (1988).   'Asbestos in Air", OSHA Analytical Methods Manual, ID-160, available at www.osha.gov/dts/sltc/methods/inorganic/id160/id160.html, July, 1988.

including bulk building materials and soils.. PLM is very subjective for asbestos at low concentrations[13]. To improve the quantitation, EPA now requires that samples with low levels of asbestos (usually less than 10 percent) be point-counted[14].

In 1982, the EPA issued an Interim Method that created a uniform procedure for mineral identification and quantification of asbestos in bulk building materials (currently at Appendix E to Subpart E, 40 CFR Part 763). The original version of the method required the use of "point counting" to quantify the asbestos content of the material. In its current version, the method permits either point counting or a visual estimation technique for quantitation.

Included with the methods and regulations are descriptions of the material being evaluated. As shown in Table 2, EPA and OSHA clearly regulate and analyze for regulated asbestiform minerals; they do not include the non-asbestiform cleavage minerals.

### D.    Air Sample Collection Equipment and Analysis

#### 1.    Phase Contrast Microscopy

In the early 1960's, air filters began to achieve acceptance for the collection of the airborne particulate. These early studies were first conducted in the United Kingdom and later in the United States. Protocols for the method were established by the Public Health Service and NIOSH for the use of PCM. Following studies that showed variability in results due in part to varying qualities of the microscopes, NIOSH published the 7400 method in 1984. This

---

13  R. Perkins, B. Harvey, and M. Beard (1994). "The One Percent Dilemma", *EIA Technical Journal*, 2, p. 5 – 10.
14  Code of Federal Regulations (2002). National Emission Standard For Asbestos, 40 CFR, Part 61.141. Definition for Friable Asbestos.

method[15] specified sample collection procedures, material (filter and microscope), quantities, and counting protocols. PCM, under NIOSH 7400, does not differentiate between asbestos and non-asbestos fibers, but counts all fibers that are longer than 5 μm and have a minimum aspect ratio of 3:1.

PCM is not an appropriate method for estimating exposure in a dusty environment such as an attic where the accumulation of non-mineral fibers (such as cotton, hair, etc.) meeting the PCM counting criteria is known to occur over time. The amount of this overestimate can be evaluated by comparing the TEM and PCM counts in the various studies in this matter. For example, in Claimants' experts' studies, elimination of the non-mineral fibers from the PCM count would result in more than a three-fold reduction in worker task concentrations. In the Lees and Mlynarek study (see section VI of this Report), elimination of the non-mineral fibers resulted in a four-fold reduction in such concentrations.

## 2.    Transmission Electron Microscopy

Beginning with early studies of particulates[16], electron microscopes were used to examine the crystal structure of the asbestos minerals, particularly that of chrysotile. By the mid to late 1960's, transmission electron microscopy (TEM) was being used, notably by Pooley and Henderson in the United Kingdom, for the study of mineral particles in lung tissue[17]. Similar

---

[15]  NIOSH Manual of Analytical Methods, NIOSH 7400, "Fibers". The current version as listed as "Asbestos and Other Fibers by PCM", issue 2, August 15, 1994. available at http://www.cdc.gov/niosh/nmam/pdfs/7400.pdf.

[16]  D. A. Fraser (1953). "Absolute method of sampling and measurement of solid airborne particulates – combined use of the molecular filter membrane and electron microscopy", *Archives of Industrial Hygiene and Occupational Medicine*, 8, p. 412.

[17]  I. M. Stewart (1989). "History of TEM Analysis for Asbestos", personal communication.

work was pursued by Mt. Sinai School of Medicine, in New York City, and by the late 1960's, TEM had been used for the study of environmental samples.

The first recognized EPA TEM procedure for air samples was written by Samudra, et al[18]. That provisional method specified sample collection and preparation procedures, but did not specify counting rules. Recognizing the limitations of the provisional TEM method, IIT Research Institute was contracted by the EPA to draft a revised method. The initial discussion of the draft method was presented at a conference held at the National Bureau of Standards in 1980; the final draft[19] was never officially published by the EPA, but is still widely used. Among the improvements over the provisional method was the specification of counting rules – defining what constitutes a fiber and how it should be counted. This draft method (called Yamate, EPA Level II, or Level II) was used by Claimants' experts in their tests (see Appendix E to the Zonolite Insulation Exposure Studies by Ewing, et. al, listed next to "Analysis Type").

The first fully reviewed air protocol was a TEM method for testing the cleanliness of air in schools following abatement actions. Under the authority of the Asbestos Hazard Emergency Response Act (AHERA), the EPA developed a rapid TEM method[20] for use in clearance testing at abatement sites. The method specified sample collection procedures and required a direct transfer preparation method. To reduce the analysis time, the method did not require recording

---

18  A. V. Samudra, C. F. Harwood, and J. D. Stockham (1977).  "Electron Microscope Measurement of Airborne Asbestos Concentrations:  A Provisional Methodology Manual", US Environmental Protection Agency, Report EPA 600/2-77-178, August 1977.

19  G. Yamate, S. C. Agarwal, R. D. Gibbons (1984).  "Methodology for the Measurement of Airborne Asbestos by Electron Microscopy", IIT Research Institute, Contract No. 68-02-3266, July 1984.  The method is referred to as the "Yamate Method" and also as "EPA Level II".

20  "Interim Transmission Electron Microscopy Analytical Methods – Mandatory and Nonmandatory – And Mandatory Section to Determine Completion of Response", Federal Register, **52**, p. 41857 – 41897, October 30, 1987.

of fiber dimensions, but did require listing the fibers as either greater than 5 µm or less than 5 µm in length. One significant change over the Draft Method was the increase in minimum aspect ratio from 3:1 to 5:1. A minimum length for asbestos fibers (0.5 µm) was specified for the first time to improve the reproducibility of fiber counts. The method is widely used in the United States.

Not all airborne fibers are asbestos and, in 1989, NIOSH issued its first TEM asbestos method, NIOSH 7402, which was designed for use in conjunction with PCM (NIOSH 7400) to allow determination of the proportion of countable fibers present in mixed fiber environments that were actually asbestos. The method[21] used a magnification comparable to the magnification used in the optical microscope, counted only fibers longer than 5 µm, wider than 0.25 µm, and had an aspect ratio of at least 3:1. OSHA permits the use of the NIOSH 7402 method when analyzing air samples for OSHA compliance purposes (when performed in conjunction with PCM)[22].

### 3.    Direct Versus Indirect Sample Preparation

The direct preparation procedure is the only correct analytical technique for any risk assessment. As described in the latest proposed version of the EPA risk method[23], only a directly prepared sample can be used to determine the exposures for risk analyses. Indirect

---

21  NIOSH Manual of Analytical Methods, "Asbestos by TEM", Method 7402, May 15, 1989. Available at http://www.cdc.gov/niosh/nmam/pdfs/7402.pdf.

22  D. Crane (1998). Letter to Jim Johnston, US Department of Labor, Occupational Safety & Health Administration, June 24, 1998.

23  D. Berman and K. Crump (1999). "Methodology for Conducting Risk Assessments at Asbestos Superfund Sites, Part 2: Technical Background Document" prepared for Kent Kitchingman, U.S. EPA Contract No. 68-W9-0059, Work Assignment No. 59-06-D800. The proposed risk method can be found at http://www.epa.gov/oerrpage/superfund/programs/risk/asbestos/method.htm.

preparation takes large, non-respirable particles captured on an air filter and breaks the particles into numerous "respirable" particles.

Current TEM air analytical methods specify the use of a direct preparation procedure. A direct procedure is essentially one where the filter is coated with a layer of evaporated carbon, the filter is dissolved, and the carbon film (containing the trapped particles) is inserted into the microscope. During an indirect preparation procedure, the filter is manipulated in such a way as to produce a suspension of particles in a transfer medium (usually water), which is then filtered onto a new filter. The redeposit filter is then prepared for examination using the direct transfer procedure. The manipulation of the original filter to produce the suspension is usually either ashing followed by sonication of the suspended ash or sonication of the filter in a bath of liquid.

The purpose of the indirect preparation procedure is to remove interfering materials (such as organic matter or acid-soluble minerals such as carbonates or gypsum) from the sample and to disperse the remaining material evenly over a new filter to permit improved visual inspection of the fibers. However, the indirect preparation procedure liberates asbestos from bound matrices, splits fiber-bundles into individual fibers, and fractures the fibers into shorter, more numerous fibers, thus artificially inflating the number of respirable particles that were originally in the sample.

When the analysis is being performed for a mass determination, an increase in the number of counted fibers is not significant provided accurate dimensions of the fibers can be obtained for the mass calculation. However, when the result is to be expressed as a number concentration of airborne fibers, the indirect preparation procedure produces results that are artificially biased high. Early TEM method development work recognized this effect – "The

ultrasonic treatment not only dispersed and deagglomerated the particulate matter, but also broke the asbestos into shorter and finer particles, even approaching formation of individual fibrils of colloidal dimensions." [24]

The EPA has reported that the indirect preparation procedure results in uncontrolled and non-reproducible increases in the observed fiber concentration[25]. Other researchers have reached similar conclusions[26]; The Health Effects Institute-Asbestos Research (HEI-AR)[27] provided a description of the problem. Campbell, et al[28] provide photographic evidence of the type of breakage that will occur when tremolite fractures across the long axis of the crystal.

To illustrate the effect of the indirect preparation, a bundle of asbestiform tremolite (from an eastern U.S. quarry) was subjected to a standard indirect preparation procedure. The procedure involved placing the bundle into 100 ml deionized water (pH 4 adjusted using acetic acid) and sonicating for 3 minutes in a standard laboratory ultrasonic bath (CrestSonic Model

---

24  U.S. Environmental Protection Agency (1977). "Comparison of Ambient Asbestos Levels Determined by Various Laboratories", Environmental Monitoring and Support Laboratory, Office of Research and Development, at p. 10.

25  J. Chesson and J. Hatfield (1990). "Comparison of Airborne Asbestos Levels Determined by Transmission Electron Microscopy (TEM) Using Direct and Indirect Transfer Techniques", U.S. Environmental Protection Agency, EPA Report EPA 560/5-89-004, March 1990.

26  R. J. Lee, D. R. Van Orden, G. R. Dunmyre, and I. M. Stewart (1996). "Interlaboratory Evaluation of the Breakup of Asbestos-Containing Dust Particles by Ultrasonic Agitation", *Environmental Science & Technology*, **30**, pp. 3010 - 3015.
R. J. Lee, T. V. Dagenhart, G. R. Dunmyre, I. M. Stewart, and D. R. Van Orden (1996). "Response to Comment on 'Effect of Indirect Sample Preparation Procedures on the Apparent Concentration of Asbestos in Settled Dusts'", *Environmental Science & Technology*, **30**, pp. 1405 - 1406.
R. J. Lee, T. V. Dagenhart, G. R. Dunmyre, I. M. Stewart, and D. R. Van Orden (1995). "Effect of Indirect Sample Preparation Procedures on the Apparent Concentration of Asbestos in Settled Dusts", *Environmental Science & Technology*, **29**, pp. 17 - 1736.

27  Health Effects Institute – Asbestos Research (1991). Asbestos in Public and Commercial Buildings:  A Literature Review and Synthesis of Current Knowledge, Health Effects Institute – Asbestos Research, Cambridge, MA, pp. 4-24 and 4-26.

28  W. J. Campbell, E. B. Steel, R. L. Virta, and W. H. Eisner (1979). "Relationship of Mineral Habit to Size Characteristics for Tremolite Cleavage Fragments and Fibers", U.S. Department of the Interior, Bureau of Mines, Report of Investigation 8367, Figure 11.

275-D). An aliquot of the resulting suspension was filtered through a standard mixed cellulose ester filter that was subsequently prepared for examination on the TEM. Figure 1a of this Report shows an optical image of the bundle prior to preparation; Figure 1b shows a TEM micrograph of a grid opening in the TEM. The single bundle was reduced to tiny fibers that would be counted using any analytical protocol.

To further document the effect of indirect preparation, a piece of amphibole asbestos ore from Libby Montana was sonicated in an ultrasonic bath (similar to one that would be used by a jeweler to clean rings) for 3 minutes, a time period usually used in indirect preparation. Following sonication, the entire suspension was deposited on a filter and examined in the TEM. The original amphibole bundle was broken into more than 10,000,000 individual particles.

The effect of indirect preparation is explicitly illustrated by the data presented by Claimants' experts. Air filters were collected and analyzed using a direct preparation procedure. Surface dust samples were collected and prepared using an indirect preparation procedure. Because dust represents material that settled onto surfaces, it (by definition) represents structures that are longer and wider than airborne particles. Figures 2 and 3 compare the length and width of the airborne and surface dust particles.

These graphs show the counted dust amphibole fibers are both shorter and thinner than those found in the air. This can only happen as a result of the sonication process used during the indirect preparation procedure.

### 4.    IRIS Premise and Process

EPA risk assessment is performed using the Integrated Risk Information System (IRIS) methodology. IRIS requires the use of PCM as the primary assessment tool for airborne asbestos fiber levels. Because the epidemiology studies upon which IRIS is based are all related directly to commercial asbestos exposures, IRIS calls for the counting of asbestos fibers. The appropriate methods to use under IRIS are the same as prescribed by OSHA: analyze the samples by PCM using NIOSH 7400, and adjust for the percentage of fibers that are asbestos as determined by NIOSH 7402.

## V.    Amphiboles in ZAI

The amphiboles in ZAI occur in two size categories. The dominant portion is in a size range typical of the smaller end of the vermiculite in the expanded product. The remainder is a fine dust. As described below, samples of ZAI were collected from a number of homes to evaluate the relative abundance of the two components.

In addition, the amphiboles in ZAI were compared to standard reference amphibole minerals from Jamestown, California, and Shinness, Scotland. The amphibole in the Jamestown material is an asbestos tremolite that has been shown to be a highly potent carcinogen in cell studies and animal studies. The physical and chemical properties of this material have also been extensively studied, including the size and shape distribution of the asbestos fibers produced from the material. The amphibole in the Shinness material is a non-asbestos, prismatic amphibole that is typically used as a non-asbestos control in cellular and animal studies. The material has no natural fibers, and forms elongated cleavage fragments when crushed.

The percentage of fine amphibole in ZAI is discussed in the following section and compared with Grace historical data. That discussion is followed by a comparison of ZAI with the reference amphibole minerals from Jamestown and Shinness.

### A.    Percentage of Fine Amphibole Particles in ZAI

Several homes were tested to determine the asbestos content of vermiculite attic insulation as part of litigation (Barbanti). The survey team selected random locations in the attic of each home from which to collect the samples. The sampler separated ZAI into three layers of material in the attic (top, middle, and bottom). Separation into three layers was intended to address particle settling due to installation and subsequent vibration or other actions. The two size fractions were chosen because, as both experts in Barbanti agreed, only the asbestos content in particles that can become airborne (< 0.5 mm) is of relevance to disturbances potentially caused by homeowners and contractors.

Upon receipt at the laboratory, each layer was separated using a screen into a coarse, non-respirable fraction (larger than 0.5 mm) and into a finer fraction (smaller than 0.5 mm) that contained the respirable particles in the sample. The fine fraction (< 0.5 mm) was examined in the scanning electron microscope (SEM) using a draft ISO analytical procedure[29] (essentially an SEM version of NIOSH 7402). Table 3 is a summary of the bulk data from these homes.

The size data from all of these samples shows the particles to be primarily coarse non-respirable material (generally more than 96% by weight is coarser – or thicker – than 0.5 mm).

---

[29]  A. Baujon (1989). "Ambient atmosphere – Direct Determination of asbestos fibres and other inorganic particles – Scanning electron microscopy procedure", ISO/TC 146/SC 3/WG1 N26, September 7, 1989. The draft method was recently issued as an official ISO method – ISO 14966:2002(E), First edition 2002 – 11 – 15.

Thus, the fine fraction (< 0.5 mm) which contains any asbestos that could become airborne is a very small portion of the total. In fact, expressed as a portion of the total sample, the overall asbestos content of this fraction was 0.01% or less. Analysis of the layers showed no systematic difference in the asbestos content. Thus there is no evidence of segregation of asbestos by depth in the vermiculite.

### B.    Historical Data

In the 1970's and 80's, W. R. Grace conducted tests to determine the asbestos content of ZAI. Much of this testing was performed using either x-ray powder diffraction (which cannot distinguish asbestos from cleavage fragments) or by PLM (with no exclusion for cleavage fragments). Generally, these results show the attic insulation (Libby grades 1, 2, and 3) to contain less than 1% Libby Amphiboles in the expanded product. These values are generally comparable to the total amphibole content observed in the attic samples by the experts in Barbanti.

### C.    Amphiboles in the Coarse Fraction of ZAI

About 200 pounds of Zonolite Attic Insulation were collected from one attic. The vermiculite was separated from the amphibole and other gangue minerals using a water separation process. About 20 pounds of material were placed in a large container filled with water to a depth of about three feet. The exfoliated vermiculite floated to the surface and the remaining minerals sank to the bottom. The vermiculite was removed from the surface and the water filtered to recover the heavy portion. The filtrate was then processed in a liquid of density 2.9 to separate the amphiboles from the lighter minerals using conventional heavy liquid separation procedures. The sink fraction from the heavy liquid separation was extracted and

dispersed under a stereo optical microscope for examination of the amphiboles. The typical dimensions of the amphiboles extracted were several millimeters in length and width. They occur as either equant or elongated particles (see Figure 4). They are far too large to be respirable particles.

Claimants' experts allege the amphibole particles found in ZAI[30] are highly friable and readily pulverize into respirable fibers, i.e., they are indistinguishable from asbestos. Although Claimants' experts cite W. R. Grace's literature in support of their position, the Grace documents actually were referring to the vermiculite, not the amphibole minerals. In any event, Claimants' experts' assertions were evaluated using a mallet and chisel to break one of the equant particles. As can be seen in Figure 5a, the particle pulverized into a number of pieces, all larger than respirable size, and none with the characteristics of asbestos, namely high aspect ratio, curved fibers and splayed ends.

The large particles from the ZAI were compared to fibers in a bundle of asbestos from Jamestown, California (see Figure 5b) that was teased open with a needle. The comparison illustrates two of the well-known mineralogical differences between asbestos and non-asbestos amphiboles: (1) the asbestos amphiboles are comprised of fine fibers with extraordinarily high aspect ratios; and (2) the asbestos fibers are readily separated. In contrast, the amphiboles in ZAI broke into fragments with low aspect ratios characteristic of cleavage fragments.

As discussed earlier, the three primary distinctions between asbestos and non-asbestos amphiboles are: (1) the diameter of the fundamental structure; (2) the adhesion properties of the

particles – asbestos fibers are loosely cemented together while the non-asbestos amphiboles are bound together by crystallographic forces; and (3) the length-to-diameter ratio of the particles. In addition, the non-asbestos amphiboles have perfect cleavage planes which cause them to preferentially break along certain directions, a property not observed in the separation of asbestos fibrils.  These fractured surfaces are believed to have fundamentally different properties and biological behavior than the surfaces of the asbestos fibrils that were naturally formed.  To achieve a very fine diameter particle (<0.3 to 0.5 micrometer), a cleavage fragment has to be repeatedly broken, which requires far more energy to accomplish than the simple separation that produces very fine asbestos fibrils.

RJ Lee Group undertook a comparison of ZAI amphiboles to tremolite asbestos from Jamestown, California; and the non-asbestos tremolite from Shinness, Scotland.  Pieces of each of these amphiboles, both equant and elongated were mounted in epoxy.  Polished cross-sections of the particles were then made in a direction perpendicular to the c-axis or fiber axis.

As seen in Figure 6a, the asbestos amphibole (Jamestown) has an open structure, comprised of ultrafine diameter crystals, predominantly less than 0.3-0.5 micrometers in diameter. From these micrographs, it is apparent why the bundles can be readily separated into long, flexible fibrils. In contrast, the Shinness sample (Figure 6b) is formed from coarse crystals (>10 micrometers) that are tightly bound to adjacent grains.  Incipient mircrocracking along the 110 cleavage planes is visible. The ZAI amphiboles (Figures 6c, d) have a finer crystal structure than the Shinness amphibole, but are much coarser than the Jamestown material.  The crystals

---

Continued from previous page

30  R. Hatfield and W. Longo (2003).  "Zonolite Attic Insulation Report", Materials Analytical Services, Inc.,
Continued on following page

are generally bound tightly together.   Incipient cracking along the 110 cleavage planes is apparent (Figure 6d).

The vast majority of the amphibole in the ZAI are coarse, non-respirable particles containing prismatic and acicular amphibole grains.   The similarity of the amphiboles in the polished cross sections to the Shinness material— **never shown to have any biological effects –** and their difference from the Jamestown fibers – **a fiber population that has been repeatedly shown to be highly potent** –is obvious.   These particles have survived the extraction from the ore, processing at the mine, thermal expansion at the expansion plant, shipping to the home, installation, removal, and the physical separation processes required to view them.   There is no possibility that any ordinary disturbance will cause them to fracture or release respirable airborne asbestos fibers.

Thus only the fine portion of the amphibole particles in ZAI has even the potential to become airborne.   As reviewed in the following section, several investigators have conducted simulations to evaluate the significance of this potential.

---

Continued from previous page
    March 21, 2003, p 18 – 20.

VI.    **Review and Analysis of Air Samples**

Claimants' experts and Lees and Mlynarek[31] (on behalf of W. R. Grace) have studied the airborne concentrations produced when disturbing ZAI under various scenarios.  The studies all involve simulations of disturbances of ZAI that are postulated to represent something a homeowner or contractor might do.  In all the simulations air samples were collected, and Claimants' experts also collected surface dust samples.  The air samples were analyzed by PCM and TEM, using direct preparation procedures, and the surface dust samples were prepared using the indirect methodology.

Claimants' experts assert that the amphibole particles that become airborne during the disturbance of ZAI are indistinguishable from asbestos fibers.  We disagree.

A.    **Airborne Amphibole Fibers Generated by Disturbing ZAI are Largely Non-asbestos Cleavage Fragments**

Examination of the particle size data clearly demonstrates that when Claimants' experts used the direct preparation technique, the size distribution of the amphibole particles observed was substantially the same as the size distribution observed in the Lees and Mlynarek study.

Similarly, the total amphibole concentrations obtained in the TEM analyses were generally in the same range for the different scenarios, whether performed by Claimants' experts or Lees and Mlynarek.  Thus the central question is whether the amphibole particles meeting the counting criteria were in fact asbestos fibers or cleavage fragments.

---

31    P. Lees and S. Mylnarek (2003).  "Report:  Assessment of Potential Asbestos Exposure Resulting from Disturbance of Zonolite™ Vermiculite Attic Insulation", January 9, 2003

Claimants' experts draw no distinction between the different amphibole forms.  In fact, Hatfield has been quoted in the press saying that any amphibole particle with a 3:1 aspect ratio is asbestos[32].  Longo and Ewing claim simply to be following the "rules" outlined in regulatory methods.  Interestingly, their own data provides support for the distinctions they ignore and that are widely recognized by other experts.

As mentioned earlier, it is well recognized that a distinguishing characteristic of asbestos is that the asbestos fibrils have a very narrow range of diameters while cleavage fragment widths are not so limited[33].  As a result, as fiber length increases, the width of the fibers should remain constant if they are derived from an asbestos population.  As seen in Figure 7 for both MAS and RJ Lee Group data, the length of the fibers found in the air samples increases as the width increases—**indicating they are not from an asbestos population.**

Conversely, if the airborne particle population is derived from a population of cleavage fragments, as the length increases it is expected that the width will increase because the particles must be formed by breaking larger fragments into smaller ones.  This implies that the aspect ratio should be nearly constant as a function of width.  As also can be seen in Figure 7, for both MAS and RJLG data, the aspect ratio is nearly constant -- **indicating the fibers are from a population of cleavage fragments.**

---

32  Warwick Advertiser (2000).  "Quarry quandary:  Residents, expert question laboratory's independence", newspaper article, September 22, 2000.

33  A. Wylie, K. Bailey, J. Kelse, and R. Lee (1993).  "The Importance of Width in Asbestos Fiber Carcinogenicity and Its Implications for Public Policy", American Industrial Hygiene Association Journal, 54, p. 239 – 254.
G. Burdett (1998).  "Final Report for R42:70:  Quantitative measurement of asbestos and other fibres in bulk materials", Health & Safety Laboratory, Report IR/L/MF/98/02, August, 1998.

Thus size and shape characteristics of the airborne fibers define the population as non-asbestos. The proof goes further, however. Comparison of the MAS width distribution (excluding bundles) with the distributions reported by Addison[34] demonstrates that the width distribution of the amphibole particles reported by Claimants' experts is substantially identical to that of the Shinness fibers – **a fiber population never shown to have any biological effects** – and much thicker than Jamestown fibers – **a fiber population that has been repeatedly shown to be highly potent.** See Figure 8.

The difference between the Jamestown fibers and the ZAI amphibole particles is obvious like the difference in the polished cross sections. The similarity between diameter distributions of the Shinness and ZAI fibers is also apparent. Equally important is the observation that less than 10 percent of the ZAI fibers have diameters below 0.3 micrometers, the diameter recognized by the most recent EPA-sponsored risk assessment as the diameter below which long fibers become highly toxic. Moreover, more than 90% of the ZAI particles have a diameter larger than 0.5 micrometers, the upper limit often reported for asbestos fiber diameter.

Thus, the analysis of the mineral populations observed in the simulations conducted by Claimants and by W. R. Grace leads to the inescapable conclusion that 90 percent or more of the mineral particles released when disturbing ZAI are non-asbestos cleavage fragments that should be excluded from the estimates of asbestos fiber concentration.

---

34  J. Davis, J. Addison, C. McIntosh, B. Miller, and K. Niven (1991). "Variations in the carcinogenicity of tremolite dust samples of differing morphology", Proceedings of the Collegium Ramazzini Symposium, New York, 1990. Annals of the New York Academy of Sciences; 643; p. 473 – 490.

**B.**     **Ambient Air Tests**

Air samples were collected in homes that contained vermiculite attic insulation. These air samples were analyzed using EPA's AHERA protocol (40 CFR, Part 763, Appendix A to Subpart E). The data are summarized by residence address in Table 4. In the 12 houses tested, all of the indoor samples, with one exception, were negative for airborne amphibole asbestos. In one sample, a single fiber longer than 5 μm was observed (for a concentration of 0.0022 f/cc). These results indicate the air inside homes with ZAI is not contaminated with asbestos fibers.

**C.**     **Simulations**

Simulations have been conducted by several groups to determine the airborne concentration of asbestos during attic cleaning, vermiculite removal, or other disturbance of the vermiculite attic insulation.

**1.**     **Lees and Mlynarek**

The most extensive and most completely documented simulations were conducted by Lees and Mlynarek. RJ Lee Group assisted with the sample collection and performed the laboratory analysis. A home near Albany, New York contained several inches of ZAI on top of existing batt-type fiberglass insulation. A number of tests were performed at the home, grouped into the following categories: (1) cleaning and storage; (2) small scale removal; (3) large scale removal; and (4) renovations. (Complete details of the tests are reported in the Lees and Mlynarek report[35].)

---

[35] P. Lees and S. Mylnarek (2003). "Report: Assessment of Potential Asbestos Exposure Resulting from Disturbance of Zonolite™ Vermiculite Attic Insulation", January 9, 2003.

Air samples were collected during all simulations. Personal air samples were collected on workers, helpers, and at least two bystanders. Area air samples were collected in the attic during the tests and also inside and outside the house away from the work area. All of the samples were analyzed by both PCM (NIOSH 7400) and TEM (NIOSH 7402). The TEM procedure was slightly modified to fully identify and enumerate the cleavage fragments (non-asbestos). Each test was conducted until the task was completed (approximately 45 minutes for cleaning, 10 – 20 minutes for removal, and 180 minutes for the renovation). In general, these were short duration tasks. The personal data are summarized in Table 5.

The average asbestos concentrations during the four activities (asbestos task concentration) were 0.003 f/cc (cleaning), 0.118 f/cc (small scale removal), 0.195 f/cc (large scale removal) and 0.024 f/cc (fan installation). When reported as a TWA, the asbestos concentrations average 0.002 f/cc, 0.004 f/cc, 0.010 f/cc, and 0.010 f/cc, respectively, all of which are significantly below the OSHA permissible exposure limit.

These data can also be used to show the extent to which PCM overestimates asbestos concentrations in a dusty mixed-fiber environment such as an attic. For workers, PCM concentrations overestimated the amphibole concentrations (PCME cleavage fragments and asbestos fibers) by a factor of 4-fold. When compared to PCME asbestos fiber concentrations, the worker concentrations were overestimated by PCM by a factor of at least 24-fold. Finally, the data shows that including the PCME cleavage fragments in the workers concentrations overestimates the actual concentration by at least 10-fold.

Lees and Mlynarek also collected air samples within the home before each test and during the tests. These locations were in the downstairs living room, the master bedroom, and

the hall closet leading to the attic entrance. None of the living space air samples were found to have any statistically significant concentration of asbestos. Only one of these living space samples (out of 62 analyses) collected during the simulation detected any asbestos fibers (0.006 f/cc).

### 2.    EPA Phase 2 Data

As part of its investigations in Libby, MT, the U.S. Environmental Protection Agency (EPA) performed several simulations in homes containing ZAI as part of its Phase 2 investigation. "Scenario 3" samples were those collected during purported home repair simulations. Samples identified as Scenario 3 samples were evaluated to determine the PCM and TEM concentrations. Because the contract laboratories did not perform NIOSH 7402 analyses, the TEM data were evaluated to determine the PCME (PCM equivalent – 5μm and longer, 0.25 μm and wide, and at least 3:1 aspect ratio) concentrations. In keeping with proper risk analyses procedures, only samples prepared using a direct preparation procedure were evaluated. The TEM fiber data were further evaluated to determine the true asbestos concentration. This additional evaluation was performed by a review of the drawings of the observed fibers and by using a discriminating algorithm similar to that developed by Wylie[36].

The average concentrations for the scenario data are shown in Table 6, listed under "Renovations". All samples were of short duration with an average duration of 60 - 180 minutes. The PCM concentration averaged 0.34 f/cc, while the PCME amphibole concentration averaged

---

36 A. Wylie (1988). 'Discriminating Amphibole Cleavage Fragments from Asbestos: Rationale and Methodology", Proceedings of the VIIth International Pneumoconiosis Conference, Part II. Pittsburgh, PA, August 23 – 26, 1988. NIOSH, U.S. Department of Health and Human Services, DHHS (NIOSH) Publication No. 90-108 Part II, p. 1065 – 1069.

0.128 f/cc, and the PCME asbestos concentration averaged 0.009 f/cc. These concentrations, which are not 8-hour TWA concentrations, but are task concentrations only, are consistent with those reported by Lees and Mlynarek.

### 3. Versar

A third simulation was performed for EPA by Versar[37]. This study, only available as a draft report, discusses airborne concentrations observed during various activities (similar to Lees and Mlynarek) involving expanded vermiculite. The data from these tests are summarized in Table 12 of the Versar report and are included in Table 6 of this report. The raw data from the testing were not available for review; the reported TEM concentrations are assumed to represent a combination of cleavage fragments and asbestos fibers.

During the "Small Scale Removal" (see Table 6), Versar found airborne fiber concentrations by PCM in ranges consistent with those reported by Lees and Mlynarek. Testing by Versar that could be classified as either "Large Scale Removal" or "Renovations" found concentrations consistent with Lees and Mlynarek for both PCM and TEM amphibole fibers.

## VII.    Critique of Claimants' Experts' Simulations

Review of the simulations relied upon by Claimants' experts revealed numerous deficiencies. The work plans and simulations were superficially similar to those of other investigators, but lacked critical elements of quality control, failed to adequately describe or characterize the environments, and used inappropriate methodologies. For example, personal air

---

[37] Versar (2002). "Preliminary Draft: Asbestos Exposure Assessment for Vermiculite Attic Insulation", Versar, Inc. Springfield, VA, June 28, 2002.

samples were collected and analyzed by PCM (item 666) and TEM (EPA Level II, item 664).  RJ Lee Group attempted to independently calculate the concentrations for the samples, but was precluded from doing so due to missing data (such as missing grid opening dimensions for samples W-45-3 and H-45-1).

A more detailed critique of the simulations and measurements are presented in the following sections.

### A.    Claimants' Experts' Simulations

Two simulations have been performed by Claimants' experts – MAS and Ewing, et al. MAS performed a cleaning simulation at a home located in Silver Spring, MD (items 664 – 666) in March, 2003.  No detailed description of the activities is available, so it is unclear what activities actually occurred during the "cleaning".  The test does not describe whether the area was isolated from the rest of the house during the test by plastic barriers or whether airflow through the attic was augmented or reduced artificially.

Because of the missing information (experimental plan, actual operations, and analytical data) and the inclusion of cleavage fragments in the reported TEM concentrations, the studies must be considered as unreliable.

Ewing, et al[38], conducted several simulations in two homes in Spokane, WA in November, 2002.  One cleaning test, one renovation, and three large-scale removal tests were conducted.  Prior to conducting the tests, Ewing, et al artificially isolated the test rooms from the

_____

[38]  W. Ewing, T. Dawson, R. Hatfield, W. Longo, P. Liss, S. Hays, R. Gobbell, and P. Cappell (2003).  Zonolite Insulation Exposure Studies, March 15, 2003.