amount of information from W.R. Grace and other sources in order to identify potential risks related to vermiculite insulation. The Agency has used this data to pursue the cleanup work underway at Libby and 22 contaminated processor sites which used Libby ore.

3.    **Please also discuss EPA's previous experience using a declaration of a public health emergency as a means to garner specific health care resources for a community like Libby, if such a declaration has ever been made. Please discuss the process for requesting that a second declaration be declared In Libby for the separate purpose of gathering health care resources in Montana. Please detail any communications EPA has had with ATSDR regarding the impacts of declaring a public health emergency on the provision of health care resources to the residents of Libby, Montana. Please discuss what EPA's understanding is of the real resources that are available to a community like Libby, if such a declaration could be granted**

**Response:**

In the 23-year history of the provision, EPA has never made a determination that a public health or environmental emergency exists to invoke CERCLA's exception to the general "product" rule, CERCLA Sec. 104 (a)(1)(4). In the part of the statute establishing ATSDR, CERCLA separately provides that ATSDR may, "in cases of public health emergencies...provide medical care and testing to individuals....", CERCLA Sec 104 (i)(1)(D).

EPA has worked closely with ATSDR and other parts of the Department of Health and Human Services (HHS) regarding the health of Libby residents, and has consulted with them on several occasions regarding this particular provision of CERCLA. EPA and ATSDR agree that EPA's decision to invoke the "emergency" provision of 104(a)(1)(4) to support a removal action would not pre-determine the exercise of other CERCLA authorities related to public health emergencies under Section 104(i)(1)(D) and (E). At the time the Action Memorandum Amendment was signed in May 2002, ATSDR advised EPA, for reasons unrelated to any perceived nexus between these two provisions, that the substantial health screening and monitoring services being provided the residents of Libby would not be affected by whether EPA invoked the emergency removal authority. ATSDR already has the necessary authority to conduct medical monitoring and the range of other activities it has been undertaking in Libby.

4.    **I am interested in any information the EPA may have regarding the relationship between the removal of contaminated materials from homes in Libby, and EPA's scientific understanding of the health risks posed by Zonolite insulation, or other vermiculite insulation manufactured from ore mined in Libby, Montana.**

**Response:**

The Agency for Toxic Substances and Disease Registry (ATSDR) identified many different routes of asbestos exposure for the residents of Libby. Insulation was one of the 16 pathways ATSDR considered in its study. The ATSDR report found that four factors were highly associated with the likelihood of having asbestos-related health impacts, including working for the mine/processor, living in the same house with a worker, playing on vermiculite or waste piles, and hiving multiple exposure pathways. The study did not show that insulation by itself, could be linked with the health impacts found in Libby,

5.    **Please discuss EPA's understanding of the differences between tremolite asbestos and chrysotile asbestos in terms of the relative toxicity of each form of asbestos, and in terms of the unique health risks posed by tremolite asbestos as compared to chrysotile asbestos. Please discuss in detail any studies conducted by, or planned by**

**EPA, or by any other federal agency working with EPA. to study tremolite asbestos and/or "Libby fiber."**

**Response:**

EPA has begun an update of its Integrated Risk Information System (IRIS) file for asbestos as a result of the activities occurring in Libby. This includes a complete update of the scientific literature for asbestos, the carcinogenic and non-carcinogenic effects, exposure pathways, and risk assessment methodology. It is normally a three to five-year process to complete this type of review. However, EPA is expediting the process as much as possible. EPA is able to expedite this process, in part, because of ATSDR's work related to Libby and vermiculite processor sites around the country, which has added significantly to our understanding of the unique situation in Libby and has improved our understanding of asbestos exposure and toxicity.

As part of this update and the establishment of differences between tremolite asbestos and chrysotile asbestos, in May 2001, EPA sponsored a Public Forum on asbestos minerals. Expert scientists with years of research experience, discussed the current literature base for asbestos exposure, toxicity, and risk assessment. Additionally EPA hosted a Peer Consultation meeting on February 25-27, 2003, for a panel of experts to discuss a revised risk assessment methodology for distinguishing the risks of exposure to amphibole asbestos fibers (Libby tremolite asbestos) and serpentine asbestos fibers. This methodology uses the differences in fiber sizes and shape to distinguish toxicologic hazards between the fiber types and provides a differential in the slope factor for risk assessment between the fiber types.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON, D.C. 20460**

APR 18 2003

THE ADMINISTRATOR

The Honorable Patty Murray
United States Senate
Washington, DC 20510

Dear Senator Murray:

Thank you for your letter of February 10, 2003, regarding the U.S. Environmental Protection Agency's (EPA) efforts to protect people from exposure to asbestos-containing vermiculite. I share your concerns about the health risks posed by asbestos-containing vermiculite and I appreciate your support of EPA's cleanup efforts in Libby, Montana.

I also appreciate the opportunity to explain EPA's actions with respect to the question of whether to declare a public health emergency in Libby. Many press accounts have mischaracterized EPA's position on this matter, as well as EPA's handling of broader public outreach on vermiculite attic insulation.

As I stated in my letter of January 16, 2003, the Office of Management and Budget did not direct the EPA regarding whether to declare an emergency in Libby. The decision was made solely by EPA. The Comprehensive Emergency Response, Compensation and Liability Act (CERCLA) generally prohibits the removal of a "product" from a residential structure as part of a removal action, but provides an exception where a health emergency exists. EPA chose not to rely upon CERCLA's health emergency provision, in part, to minimize the possibility of removal work in Libby being delayed by possible legal challenges to this untested approach. Instead, EPA determined that it has the authority to remove the insulation in Libby based upon more traditional legal authorities because many of the homes contained insulation that was not inspected, packaged, labeled, warranted, regulated, or sold as a commercial "product".

The Agency's decision not to invoke CERCLA's health emergency provision to remove attic insulation in Libby has no relationship to how EPA communicates the potential exposure risk of asbestos-containing vermiculite attic insulation to the wider American public. EPA has not changed its longstanding guidance to homeowners because we do not have the scientific basis to do so at this time. Until more is known, the best way to safely manage vermiculite attic insulation is to leave it undisturbed or, if necessary, retain the assistance of a professional for removal. To improve communication of EPA's guidance to a broader audience, EPA will make available to the public a consumer pamphlet that will provide information on how to address

vermiculite attic insulation if it is found in the home. Because so much about the risks posed from asbestos-containing vermiculite attic insulation remains unknown, EPA will step up its efforts to research and investigate the potential health effects of asbestos-containing vermiculite products, including a multi-phase study to further evaluate the potential exposure risk from vermiculite attic insulation. Based on the findings, the Agency will issue additional guidance to the public.

Again, thank you for your letter. I appreciate this opportunity to continue our ongoing dialogue on this important effort. If you have any further questions regarding vermiculite insulation or vermiculite processing facilities, please contact me or your staff may contact Betsy Henry at (202) 564-7222.

Sincerely yours,

Christine Todd Whitman

Enclosures

### Enclosure One
### Detailed Responses to Questions in Letter of February 10, 2003

1.    Please provide two copies (or an electronic copy) of each of the following materials:

a.    All written communications exchanged between EPA and OMB during the period from December 20, 2001 to the present, related to proposals to provide the general public information about the risks and proper handling of asbestos-contaminated insulation, anywhere in the country.

Answer:    To the best of the Agency's knowledge, there were no written communications between EPA and OMB between December 20, 2001, and the date of your request.

b.    All written communications exchanged between EPA and W.R. Grace during the period from January 20, 2001 to the present, related to proposals to provide the general public information about the risks and proper handling of asbestos-contaminated vermiculite insulation, anywhere in the country.

Answer:    On April 10, 2002, William Corcoran of W.R. Grace & Co. wrote a letter to EPA Administrator Whitman, stating that he did not believe EPA had any credible evidence of asbestos-related exposure or injury that could be attributed to vermiculite insulation. A copy of the that letter is enclosed (Enclosure 2). EPA did not respond to this letter.

c.    All EPA estimates, in whatever form, of the risks of asbestos-contaminated vermiculite insulation in structures in Libby and elsewhere in the U.S. and any supporting or explanatory materials.

Answer:    EPA has three documents addressing risk of asbestos and asbestos-contaminated vermiculite insulation. These are enclosed and as follows:

1)    The Proposed Asbestos Cancer Risk Assessment Methodology is intended to provide a firm basis for completing a state-of-the-art protocol to assess potential human-health risks associated with exposure to asbestos. This is a large document file of approximately 430 pages. We have enclosed copies of the Introduction, Executive Summary and Overview portions of this document (Enclosure 3). The document, in its entirety, may be found in our website at:
http://www.epa.gov/superfund/programs/risk/asbestos/index.htm

2)    Memorandum from Dr. Christopher P. Weis, a Senior Toxicologist in EPA Region 8, Denver, Colorado, dated December 20, 2001. The subject of the memorandum is "Amphibole Mineral Fibers in Source Materials in Residential and Commercial Areas of Libby Pose an Imminent and Substantial Endangerment to Public Health." (Enclosure 4; and

3)    A "Preliminary Draft on Asbestos Exposure Assessment for Vermiculite

Attic Insulation", June 28, 2002, prepared for the EPA Office of Pollution
Prevention and Toxics (Enclosure 5).

2.      **Please provide the dates, names of participants, and any documents related to each
meeting since January 20, 2001, between EPA political appointees and W.R. Grace
regarding Zonolite.**

Answer:      To the best of the Agency's knowledge, no such meetings have taken place
between W.R. Grace and EPA political appointees regarding Zonolite since
January, 2001 and the date of your request.

3.      **It is not clear to us... how the decision to remove asbestos-contaminated vermiculite
insulation in Libby can be unrelated to the issue of whether asbestos-contaminated
vermiculite insulation poses a risk outside of Libby.**

Answer:      EPA does not have enough information to generalize nationwide about the risks
posed by exposure to asbestos contained in vermiculite attic insulation alone. The
Agency for Toxic Substances and Disease Registry (ATSDR) identified many
different routes of asbestos exposure for the residents of Libby. Insulation was
one of the 16 pathways ATSDR considered in its study. The ATSDR report found
that some of the factors associated with the likelihood of having asbestos-related
health impacts included working for the mine/processor, living in the same house
with a worker, playing on vermiculite or waste piles, and having multiple
exposure pathways. The study did not show that insulation, by itself, could be
linked with the health impacts found in Libby.

a.      **Is EPA removing all vermiculite (including Zonolite and expanded
vermiculite that was not sold as Zonolite) used as insulation from the houses
that EPA is addressing in Libby?**

Answer:      EPA is making its decision to remove attic insulation in Libby on a house-by-
house basis. The decision to remove the insulation depends on the degree of
access to the attic. In most cases, the insulation is being removed. Additionally,
EPA is using similar criteria for making the decision to remove insulation from
walls, examining each case to see if the walls are in poor condition or there are
other unique circumstances such as the homeowner is planning an impending
renovation to their home. EPA expects that the vast majority of walls will not be
disturbed. Through this overall approach, EPA intends to reasonably reduce risk
and the likelihood of on-going releases back into living space for the uniquely
impacted residents of Libby. Recognizing that there is a risk should a property
owner disturb a wall or attic containing vermiculite insulation, EPA will provide
information on the potential risk to each impacted resident in Libby. EPA will
also provide information on the means for future disposal should disposal of the
insulation material become necessary

For other situations in Libby where buildings are constructed with mortar or other
building materials containing vermiculite, EPA will evaluate these situations on a

case by case basis, depending on the friability and condition of the material. EPA's response will vary depending on the specific situation for each building.

b. Is it possible to distinguish, by examining or testing the material itself, between expanded vermiculite sold as Zonolite and expanded vermiculite mined in Libby that was not sold as Zonolite? Is there anything about the finished product sold as Zonolite that is distinct from expanded vermiculite mined in Libby that was not sold as Zonolite? Is there any mineralogical distinction? Is there any toxicological distinction?

Answer:     EPA has not determined what if any differences exist among the various forms of vermiculite found in Libby. EPA's conclusion that there is insulation in Libby that was not inspected, packaged, warranted or sold as a product was based on the way the insulation was distributed, not on mineralogy or toxicology.

c. Our understanding is that EPA characterized asbestos as a known human carcinogen and that EPA considers carcinogens to be non-threshold chemicals, to which no exposure can be presumed to be without some risk of adverse effect. Is this understanding correct?

Answer:     Yes. EPA has characterized asbestos as a known human carcinogen. This is a statement of "hazard." It is also correct that the Agency believes no level of asbestos exposure can be presumed to be without some risk. However, the "presence" of asbestos in vermiculite attic insulation does not necessarily equate with "exposure." Risk or the probability of harm, is a function of both hazard and level of exposure.

4.  Is it possible to calculate the potential level of exposure and risk nationwide without estimating the number of structures that may contain asbestos-contaminated vermiculite? Please explain.

Answer:     The Libby cleanup is being conducted under Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) authorities. EPA does not calculate residential risk on the basis of a population exposure which would require an estimate of the number of structures that may contain asbestos-contaminated vermiculite. Rather, under CERCLA, risk is estimated based on the Reasonable Maximum Exposure level of an individual. Thus, it is possible to calculate residential exposure risk without arriving at an estimate of how many buildings may contain the contaminated vermiculite insulation.

5.  In your letter of January 16, 2003, you further state that EPA "continues to believe that, absent the unique conditions present at Libby, vermiculite insulation poses minimal risk if left undisturbed."

a.  Does EPA believe that some, most, or almost all homeowners across the country currently know that there is a possibility that their homes contain Zonolite insulation? And,

b.  Does EPA believe that some, most, or almost all homeowners across the

3

country currently know that if their homes contain Zonolite insulation it should not be disturbed? And

    c.    What is the basis for EPA's belief in each of these instances?

**Answer:**    EPA does not have specific information about the extent of the public's knowledge about vermiculite attic insulation in their homes. However, EPA has long provided information to the public on how to address attic insulation concerns, and other asbestos related issues through numerous brochures and fact sheets. This information has been distributed over the years by Federal, State and local agencies, among other venues. The information is always available through the Agency's webpage and hotline (Enclosure 6).
http://www.epa.gov/opptintr/asbestos/verm.html

    a.    Have you or EPA staff consulted with any Administration officials outside of EPA regarding warning the public about the risks and proper handling of vermiculite insulation? If so, please indicate the persons and agencies consulted and the positions they expressed regarding whether and how EPA should issue such a warning. Please provide copies of any documents exchanged.

**Answer:**    EPA staff from our various offices have consulted with representatives from the Agency for Toxic Substances and Disease Registry, National Institute for Occupational Safety and Health, Mine Safety and Health Administration, Occupational Safety and Health Administration, and the Consumer Product Safety Commission regarding adequacy of information available to the public about vermiculite attic insulation. Through interagency internal deliberations, all Agencies are working to ensure that consistent guidance is provided to the public regarding proper handling of vermiculite insulation based on the current state of knowledge. The documents exchanged are those provided in response to questions 1(c) above and 6(f) below. As more becomes known, the public guidance may change.

6.    In your letter of January 16, 2003, you discuss "the first phase of a limited study to evaluate the level of asbestos in vermiculite attic insulation in homes."

    a.    When EPA initiated the study in the spring of 2001, what was the planned schedule for completion of the first phase of the study and the full study?

**Answer:**    When the EPA Office of Pollution Prevention and Toxics initiated the study, it was viewed as a scoping or pilot exercise. There was no formal schedule for completion. The Office determined that it would be best to have the first phase peer reviewed to get comments on our progress to that date before continuing with the next phases of the study.

    b.    You state that "others" in addition to EPA's Office of Research and Development are currently reviewing the preliminary study. Who are the "others," and when are they scheduled to complete their review? Have OMB

4

staff received a draft of this study?

Answer:    The peer review was recently completed. Other peer reviewers included: The
Agency for Toxic Substances and Disease Registry, the Occupational Safety and
Health Administration, the National Institute of Occupational Safety and Health,
the Consumer Product Safety Commission, the Mine Safety and Health
Administration, the Vermiculite Association, W.R. Grace, Mt. Sinai School of
Medicine (Philip Landrigan), Research Triangle Institute (Mike Beard), and EPA
Region 8. OMB was not included in the formal peer review.

c.    When will EPA release the results of the first phase of the study?

Answer:    EPA anticipates that the first phase will be released later this Spring.

d.    Please describe the next phase or phases of the study and provide the
schedule for EPA to complete and release the remainder of the study.

Answer:    EPA anticipates that the next phase of the study will provide a more
comprehensive understanding of the issues associated with vermiculite attic
insulation. Until the plan is completed, it is not possible to provide more details
or a schedule for these efforts, but we intend to move as rapidly as possible to
complete the next phase of the study so that we can provide more guidance to the
public.

e.    Will this study evaluate the number of homes, businesses, and other
structures containing Zonolite nationwide? If so, when and how do you plan
to develop this estimate? If not, why not?

Answer:    As previously mentioned, the full scope of the next phase of the study is still
under development. It has not been determined if it is necessary to obtain this
kind of information in order for the Agency to gain a more complete
understanding of the risks the public may face from having asbestos-contaminated
vermiculite attic insulation in their homes.

f.    Please provide us with a draft copy of what is being peer reviewed. If you
cannot, please explain why you can't share it at this time.

Answer:    EPA is providing you with a copy of the draft Assessment for Vermiculite Attic
Insulation, a Cumulative Study Covering Research (The Versar Study) conducted
in 2001 and 2002 (Enclosure 5). We are also enclosing the Introduction Executive
Summary, and Overview section of the EPA Proposed Asbestos Cancer Risk
Assessment Methodology which is a large file of approximately 430 pages
(Enclosure 3). The document in its entirety may be found through our website at:
http://www.epa.gov/superfund/programs/risk/asbestos/index.htm

**EXHIBIT L**



## U.S. Environmental Protection Agency
# EPA Response to September 11

Recent Additions | Contact Us | Print Version    Search: [_____] 
Response to 9-11 > Frequently Asked Questions

**Dust Cleanup**
Request Info
Request Map
Result Info
Result Map
**New!**
Follow Up

**Fact Sheets / Scopes**

**Frequently Asked Questions**

**Ads & Flyers**

**EPA Press Releases**

**Pictures**

**The EPA Experience**

**Monitoring Summaries**
New York City Area
Pentagon

**Monitoring Data**
Asbestos in Air
Asbestos in Bulk Dust
Benzene in Air
Chromium in Air
Dioxin in Air
Drinking Water
Lead in Air
Metals in Air
Particulate Matter 2.5
Particulate Matter 10
PCBs in Air
Polycyclic Aromatic Hydrocarbons
VOCs: Volatile Organic Compounds

**Interactive Maps**

**Other**

# Frequently Asked Questions
# [Preguntas Mas Frecuentes; En Español]

We encourage you to sign up for EPA's WTC Email Notification Service, which will send information and updates by email to all subscribers.

If you have questions not addressed here, please send them to us at wtc.region2@epa.gov.

- General Questions
- Testing & Cleaning Options
- Scheduling Questions
- What EPA Will Clean
- Health & Safety
- Testing
- Businesses
- Contractors

### Acronyms

| | |
|---|---|
| ATSDR | Agency for Toxic Substances and Disease Registry |
| EPA | U. S. Environmental Protection Agency |
| FEMA | Federal Emergency Management Agency |
| HEPA | High Efficiency Particulate Air (a special filter for a vacuum) |
| NYCDEP | New York City Department of Environmental Protection |

## General Questions

- Who is eligible?
- Will EPA clean residences outside of lower Manhattan?
- Will the information I give you be held confidential?
- When will you begin scheduling appointments?
- How can I check on the status of my request?
- I've lost my confirmation number. How can I check the status of my request?
- How long will it take to clean the average apartment?
- How many residences are there in Lower Manhattan and will EPA have enough money to clean them all if asked?
- Why not clean entire buildings instead of individual homes?
- Why test just the air and not test the dust?
- How can I best keep informed about this program?

**Who is eligible?**
All residents of lower Manhattan, living south of Canal, Allen and Pike Streets are eligible on a voluntary basis to have their residences cleaned and/or tested.

**Will EPA clean residences outside of lower Manhattan?**
This program is currently limited to lower Manhattan residences because data collected to date indicates that the significant impacts from debris, dust and fires occurred in this area. We are continuing to analyze data, including that collected through the dust cleanup program, and will reevaluate as necessary.

Monitoring Data
EXIT disclaimer ➤
New York
State DEC
New York City
DEP
New Jersey
DEP
OSHA

General Questions
All Questions

**Will the information I give you be held confidential?**
Individual information collected at the time you make your request as well as test results and any other information will be entered into our Dust Cleanup Database. Any public reporting related to individual residences will be presented in a form which does not divulge the address of the residence or the name of the resident. It will be necessary to provide information collected from this database to our scheduling and cleaning contractors, who are required to protect your confidentiality. Residents may access their individual information through our Web site (https://nyrpub.epa.gov/NYRDUST2/dustcleanup/followup.html) using the discreet confirmation number they receive when they make their requests. To further protect privacy, people will also be asked to provide the last four digits of their social security number to access their individual information.

**When will you begin scheduling appointments?**
Scheduling, cleaning and testing has begun. You should be contacted by a contractor to schedule an initial walk through. You can get the names of the contractors for the quadrant you live in at http://www.epa.gov/wtc/stories/091602.htm. These contractors will be able to provide the confirmation number you received when you registered for assistance. Do not volunteer your confirmation number to anyone, and if a contractor claiming to be working on this program cannot provide your confirmation number, do not let them into your home.

General Questions
All Questions

**How can I check on the status of my request?**
Residents may access their individual information through the Dust Cleanup Database on our Web site (https://nyrpub.epa.gov/NYRDUST2/dustcleanup/followup.html) or by calling our **WTC Message Center (212) 637-3435.** You will be asked for the confirmation number given to you when you make your request. To protect your privacy, you will also be asked to provide the last four digits of your social security number to access your individual information.

**I've lost my confirmation number. How can I check the status of my request?**
Call our **WTC Message Center (212) 637-3435** and give them your last name and the last four digits of your social security number. They will be able to check the status of your request as well as give you your confirmation number.

**How long will it take to clean the average apartment?**
It will vary, depending on the size and content of the residence. Most residences will be cleaned in two days or less. Testing for asbestos in air will take one additional day.

General Questions
All Questions

**How many residences are there in Lower Manhattan and will EPA have enough money to clean them all if asked?**
Based upon census data, New York City estimates there are 20,000 - 30,000 homes in lower Manhattan. Working with FEMA, we believe we will be able to fund cleanups for all, if necessary.

**Why not clean entire buildings instead of individual homes?**
This program is voluntary. It provides services to residents and owners who want cleaning while respecting the rights of those who do not. EPA is reaching out to and

meeting with leaders of tenants associations, community organizations, building owners and realty organizations to facilitate the coordination of a whole-building approach where desired. Building owners and managers, co-op boards and tenant associations who are coordinating cleanup requests can ask EPA to coordinate building cleanup.

**Why test just the air and not test the dust?**
The primary way that people are exposed to asbestos is by breathing in airborne asbestos. Asbestos must be in the air to pose a health problem. There are accepted health-based scientific protocols in place for conducting air tests and evaluating the results. We realize that there may be asbestos in the dust in residential units and that some of this asbestos-containing dust may get disturbed and become airborne. But we don't have broad scientific agreement on the relationship between what is in the dust and what is in the air. Many factors can influence this. For example, how much settled dust can be disturbed and become airborne is affected by the amount of dust, the nature of indoor activity, the air flow rates in different interior spaces and the rate that the dust re-settles. Because of these variables, there is no health-based level that we can use for dust measured through wipe samples. EPA has conducted a background study on apartments not affected by the WTC disaster to provide information on asbestos levels in NYC indoor spaces. As the data becomes available, we will use it to re-evaluate our cleanup activities. In the meantime, we believe that cleaning and eliminating as much dust as possible is the most protective approach.

**How can I best keep informed about this program?**
New information is constantly being added to this Web site (http://www.epa.gov/wtc). We also encourage you to sign up for EPA's WTC Email Notification Service (http://www.epa.gov/wtc/email/index.html), which will send information and updates by email to all subscribers.

General Questions
All Questions

---

# Testing & Cleaning Options

- If I opt for testing without cleaning, can I change my mind later and ask to have my residence cleaned?
- What is a HEPA vac and why would I want one?
- Where can I purchase a HEPA vacuum?
- Are there any other ways to obtain HEPA vacuums and air purifiers?
- Can I use my own asbestos removal contractor and be reimbursed?

**If I opt for testing without cleaning, can I change my mind later and ask to have my residence cleaned?**
It depends on the results of the testing. If our testing finds asbestos-in-air levels in your residence to be above our health standard, we will offer to clean your home. However, if you ask for testing without cleaning, and the test results for asbestos-in-air find the levels to be below our health standard, you may not then ask to have your residence cleaned anyway.

**What is a HEPA vac and why would I want one?**
HEPA stands for High Efficiency Particulate Air and refers to a special filter that is attached to the vacuum cleaner. A vacuum with a HEPA filter captures tiny particles of dust that would pass right through a regular vacuum. Asbestos fibers, which can be very small, are trapped by the HEPA filter so they are not re-suspended in the air.

**Where can I purchase a HEPA vacuum?**
Many well-known vacuum cleaner manufacturers include HEPA filter vacuums in their lines. HEPA vacuums can be purchased at many department stores, appliance stores

and vacuum cleaner specialty shops as well as on the Internet. Prices can run from $100 to over $1,000. Note that the HEPA filters must be replaced, usually annually, and they are more expensive than regular vacuum filters. Consumer Reports Magazine regularly reports on vacuums including HEPA vacs. Reviews and ratings are also available at: http://www.allergybuyersclub.com/compare-vac.html **EXIT disclaimer➤**

**Are there any other ways to obtain HEPA vacuums and air purifiers?**
Assistance for HEPA vacuums is available from the American Red Cross **EXIT disclaimer➤** (Click on "Guide to September 11 Assistance").

Questions About Testing & Cleaning Options
All Questions

**Can I use my own asbestos removal contractor and be reimbursed?**
No. The FEMA funding calls for hiring a number of companies to conduct large-scale cleanups. There is no mechanism for reimbursing third-party cleanup work.

Questions About Testing & Cleaning Options
All Questions

---

# Scheduling Questions

- Will cleaning and testing be done on weekends? In the evening?
- I work nights and sleep during the day. What can I do?

**Will cleaning and testing be done on weekends? In the evening?**
EPA's cleaning and monitoring contractors will work seven days a week, from 8:00 am to 5:00 pm.

**I work nights and sleep during the day. What can I do?**
While our contractors will not be available to clean and test before 8:00am or after 6:00pm, they will be working seven days a week. We will make every effort to work around your work/sleep schedule.

Questions About Scheduling
All Questions

---

# What EPA Will Clean

- Will you clean my exterior balcony or terrace?
- Will you clean my exterior window ledges so dust doesn't blow in when the window is opened?
- Will you clean my clothing?
- What should I do with valuable and/or breakable items?
- What should I do with my pets?
- Will you clean personal belongings, window treatments, carpets or furniture?
- Will you clean my window guards?
- Will you clean my smoke alarms?
- Will you be cleaning the HVAC (central heating and cooling) system?

- Will you clean my air conditioners?
- It's summer and I want to use my air conditioner without waiting until my cleaning is scheduled.
- There is a vacant apartment in my building. Will you clean it?

- There is visible dust and debris on the exterior of an adjacent building. Where can I get help?
- Will you clean common areas?
- What will be done about dust coming from tops of buildings?

**Will you clean my exterior balcony or terrace?**
Yes. While balconies and terraces are on the outsides of buildings, they are considered part of the residence and will be cleaned along with the inside spaces upon the resident's request.

**Will you clean my exterior window ledges so dust doesn't blow in when the window is opened?**
Yes. If we can open the window, we will clean the window ledge outside it.

**Will you clean my clothing?**
Normal laundering and dry cleaning is all that is necessary for clothing. They remain your responsibility.

**What should I do with valuable and/or breakable items?**
Valuable and/or small breakable items should be cleaned and packed up or removed for safe keeping before the cleaning contractors begin work.

Questions About What EPA Will Clean
All Questions

**What should I do with my pets?**
For the safety of both your pets and our workers, pets must be removed from your home while the work is underway. In addition to the noise and presence of strangers, workers cannot be responsible for the possibility of a pet getting loose from your residence. Fish and pets in aquariums or terrariums need not be moved out of the home.

**Will you clean personal belongings, window treatments, carpets or furniture?**
We will clean all hard surfaces including walls, floors and shelves; we will HEPA-filter vacuum rugs, carpets and wall-to-wall carpeting; curtains, drapes and other window treatments, and upholstered furnishings. In dealing with occupied residential spaces that have already been cleaned, we expect that most personal belongings will have already been cleaned.

**Will you clean my window guards?**
Yes. If our contractors can open your windows, they will clean your window guards and the exterior window ledges.

**Will you clean my smoke alarms?**
Yes.

Questions About What EPA Will Clean
All Questions

**Will you be cleaning the HVAC (central heating and cooling) system?**
We will seek the building owner/manager's permission to evaluate the HVAC system. Evaluation will be done by a contractor that specializes in this kind of work. Evaluation will involve examination of maintenance records, filters and accessible portions of the system. If this evaluation determines that there is a potential problem, the HVAC system will be cleaned.

**Will you clean my air conditioners?**
Yes. Individual air conditioner units will be cleaned in place.

**It's summer and I want to use my air conditioner without waiting until my cleaning is scheduled.**
There are two options open to you, depending on the condition of your air conditioner:

- If you air conditioner appears to contain World Trade Center related dust, you should consider replacing it. The New York State Energy Research and Development Agency (NYSERDA) offers a "Keep Cool Bounty," which reimburses you $75.00 when you turn in an old air conditioner and replace it with a new Energy Star air conditioner. For details and a list of participating dealers, visit NYSERDA's "Keep Cool" Web site at http://www.getenergysmart.org/summer_intro.asp EXIT disclaimer▶ or contact the agency toll-free at **1-877-NYSMART (1-877-697-6278)**.
- If your air conditioner contains minimal dust and you do not want to replace it, there are some steps you can take to minimize the intake of dust into your home. Remove the grill and damp wipe all surfaces. Mist the filter with water, remove it, put it in a bag and dispose of it. Damp wipe all visible dust inside the air conditioner. Do not vacuum it unless you have a HEPA filter vacuum. Install a new filter. If accessible, clear the air conditioner housing and the window ledge it sits on of any residual dust. Fasten a damp towel over the front of the air conditioner when turning it on for the first time to capture any dust that may not have been visible. If possible, run the air conditioner on exhaust when you first turn it on.

Questions About What EPA Will Clean
All Questions

**There is a vacant apartment in my building. Will you clean it?**
If a vacant unit is brought to our attention, we will make every effort to contact the lease-holder, if there is one, or the building owner/manager to get permission to clean it. If we can arrange access, we will clean the unit.

**There is visible dust and debris on the exterior of an adjacent building. Where can I get help?**
NYCDEP is removing dust and debris from the rooftops and exteriors of buildings in lower Manhattan. If you see dust or debris on the outside of a building, call **311**.

**Will you clean common areas?**
We will clean common areas if asked by the building owner or manager. If EPA's on-site coordinator or project monitor observes that the common areas need to be cleaned, we will contact the building owner or manager to get permission to do the cleaning. If a resident asks that common areas be cleaned, we will evaluate whether those areas require cleaning. This evaluation will include discussions with building owners/managers and review of maintenance and cleaning procedures and records as well as visual inspection. Residents requesting the cleaning of common areas should be specific about which areas need cleaning and the reason for their concern.

**What will be done about dust coming from tops of buildings?**
NYCDEP has done a visual survey of rooftops and building facades and canopies in lower Manhattan and has begun cleaning them. The city is actively negotiating access agreements with building owners/managers to complete this work before interior cleanup work is done on residential units. If you see dust or debris on the outside of a building, call **311**.

Questions About What EPA Will Clean

All Questions

---

## Health & Safety

- Does the fact that EPA is willing to clean residences mean that you are not confident in the cleaning recommendations made last fall?
- Isn't it too late to offer this cleaning program? Haven't people already been exposed?
- How high is the risk from exposure to asbestos, fiberglass and other hazardous materials in my lower Manhattan home?
- There are men working with masks on my street. Are there precautions that my building should be taking?

**Does the fact that EPA is willing to clean residences mean that you are not confident in the cleaning recommendations (to use wet wipes/mops and HEPA vacuums) made last fall?**
We remain confident that the cleanup methods recommended for residences with minimal dust -- wet wiping, wet mopping and using HEPA filter vacuums -- are effective. We are offering professional testing and cleanup services to provide an added level of assurance that residences have been cleaned properly.

The Agency recommends that all residential spaces that have been cleaned, especially those with significant impacts from dust or debris from the collapse, repeat cleaning using wet mops, wet wipes and HEPA vacuums. Porous surfaces, like carpets and drapes, may still contain some dust that might get released into the air. Exposure occurs when the materials are in the air and inhaled. These followup cleaning methods further reduce the chance of any pollutants that might be present getting into the air.

EPA has conducted two studies that will yield more information in the longer term. A pilot study of various cleaning techniques --wet wiping, wet mopping and using HEPA vacuums -- was conducted in an unoccupied lower Manhattan building to evaluate the effectiveness of these approaches. The Agency also studied the presence of a list of substances associated with the World Trade Center collapse in residences outside of the impacted area to determine pre-existing levels of these materials.

We do have the results of a study done by the Agency for Toxic Substances and Disease Control (ATSDR) and the NYC Department of Health (NYCDOH). This study tested the air inside residences that were cleaned using the recommended methods. None of this air testing found asbestos above the standard used to clear students for re-entry into schools after an asbestos removal. In a number of the residences, dust samples showed that some low levels of asbestos remained. This is why we continue to recommend ongoing cleaning and why EPA is offering this cleanup and testing program.

Questions About Health & Safety
All Questions

**Isn't it too late to offer this cleaning program? Haven't people already been exposed?**
The scientific data about any immediate health risks from indoor air is reassuring and we do not have an emergency health situation in lower Manhattan. For most of the World Trade Center related compounds, exposure must occur at elevated levels over a long period of time to present a long-term health risk. That is true for asbestos, for which health effects most often occur when exposure is to relatively high levels over a long period of time. Even if people have not cleaned using recommended methods, leading medical experts believe that the risk of getting sick from exposure to asbestos from the WTC collapse is very small. According to Dr. Stephen Levin, medical director

of the Mt. Sinai School of Medicine's Center for Occupational Health and Environmental Medicine, "It's not a zero increase in risk, but it's not a magnitude of risk that I think people ought to be terrorized by ..."

The cleanups and testing that EPA and the city are now offering will help reduce any further exposures. In the meantime, EPA will continue to evaluate and confirm the effectiveness of cleanup techniques and determine whether there are compounds other than asbestos that may pose potential risks in the long term.

### How high is the risk from exposure to asbestos, fiberglass and other hazardous materials in my lower Manhattan home?

Independent health experts have characterized the risks from developing asbestos-related diseases as very low. The ATSDR/NYCDOH study did not find asbestos present in the air in any of the residences they tested. However, the presence of asbestos and fibrous glass in the dust in some tested residences raises the possibility that this material could be redistributed in the indoor air. While EPA does not believe that residents are currently facing significant health risks from World Trade Center dust in indoor spaces, we do think that the best way to reduce this risk even further is to remove residual dust from people's homes.

### There are men working with masks on my street. Are there precautions that my building should be taking?

People working with potentially hazardous materials wear protective gear, including respirators, because they are in close contact with these materials, often breathing in the dust that their work creates. They are potentially exposed to hazardous material daily over the course of their work lives. The fact that they are wearing protective gear does not mean that you are at risk.

Questions About Health & Safety
All Questions

---

## Testing

- What will EPA test for?
- Will you test for dioxin and lead and substances other than asbestos?
- How soon after my home is cleaned will EPA test?
- What if the results show that there is still asbestos in my air?
- Were there contaminants in homes before September 11?
- When will I get my testing results? How will I get them?

### What will EPA test for?

EPA will test for asbestos in the indoor air after the cleanups are completed (and in residences where people want testing without cleaning). The Agency will assess the testing results using a health-based benchmark that assumes a thirty year exposure. This means that if a population of 10,000 people is exposed to a level of asbestos above the benchmark for a period of thirty years, there could be one additional case of cancer beyond what that population would normally expect to experience.

### Will you test for dioxin and lead and substances other than asbestos?

We will test for asbestos in air. This is the substance of greatest concern, and air is the pathway of exposure. By cleaning up the dust, many other substances will also be removed. In addition, we are conducting dust-wipe testing in 250 randomly selected homes. These dust wipes will be analyzed for dioxins plus 23 elements, including:

- aluminum (Al)
- antimony (Sb)
- arsenic (As)
- barium (Ba)
- beryllium (Be)
- cadmium (Cd)
- calcium (Ca)
- chromium (Cr)
- cobalt (Co)
- copper (Cu)
- iron (Fe)
- lead (Pb)

- magnesium (Mn)
- manganese (Mg)
- mercury (Hg)
- nickel (Ni)
- potassium (K)
- selenium (Se)
- silver (Ag)
- sodium (Na)
- thallium (Ti)
- vanadium (V) and
- zinc (Zn)

Our scientists will evaluate whether substances other than asbestos might pose a significant risk, and will determine if any refinement to cleanup guidance is needed. Any proposed benchmarks for substances on the list will be peer reviewed by independent scientists.

Questions About Testing
All Questions

**How soon after my home is cleaned will EPA test?**
EPA will test on the following day.

**What if the results show that there is still asbestos in my air?**
The unit will be re-cleaned and the air will be tested again. We would continue this process until the air monitoring meets the 30-year health standard.

**Were there contaminants in homes before September 11?**
Most if not all of the pollutants associated with the collapse of the World Trade Center were present in New York City's environment prior to September 11th. To establish a baseline for the presence of these contaminants in affected residences, EPA will collect and analyze samples to look for some of these pollutants in residences in parts of Manhattan that were not impacted. The Agency will use the data to determine pre-existing or "background" levels of these pollutants in interior spaces in New York City.

**When will I get my testing results? How will I get them?**
You should receive your testing results within 4-6 weeks by U.S. mail.

Questions About Testing
All Questions

---

## Businesses

- Will EPA be cleaning any commercial properties?
- Where can I find a list of certified contractors who can clean my office or business?

**Will the agencies be cleaning any commercial properties?**
For the most part, the voluntary cleaning program recently announced by EPA, does not include businesses. The focus is on people's homes, where they spend the most amount of time. New York City, however, will be cleaning a small number of commercial

spaces in unoccupied, uncleaned buildings and will also be cleaning building roofs and facades to prevent any dust or debris from re-entering interior spaces. The removal of the residual dust from building exteriors makes sense now that the recovery efforts at Ground Zero are officially complete. There is financial assistance available to small businesses through the Small Business Administration.

**Where can I find a list of certified contractors who can clean my office or business?**
NYCDEP maintains a list of certified asbestos removal contractors (http://www.ci.nyc.ny.us/html/dep/html/airfirms.html `EXIT disclaimer▶` ) on its Web site.

Questions About Businesses
All Questions

---

## Contractors

**I am an asbestos abatement contractor. Whom do I contact about work in lower Manhattan?**
Contact the NYCDEP, in writing, at:
NYCDEP
Asbestos Department
59-17 Junction Blvd.
Flushing, NY, 11373

Questions About Contractors
All Questions

---

EPA Home | Privacy and Security Notice | Contact Us

Last updated on Tuesday, June 3rd, 2003
URL: http://www.epa.gov/wtc/questions/index.html

**EXHIBIT M**

1

1   IN THE UNITED STATES BANKRUPTCY COURT

2   FOR THE DISTRICT OF DELAWARE

3

4

5   IN RE:                    )
                              ) CHAPTER 11
6   W.R. GRACE & CO., ET AL., ) CASE NO. 01-01139(JKF)
                              )
7   _____Debtors._____    ) (JOINTLY ADMINISTERED)

8

9

10

11   DEPOSITION OF

12   STEVE M. HAYS, CIH

13

14   May 7, 2003

    9:10 a.m.

15

16   2100 Bank of America Plaza

17   600 Peachtree Street

18   Atlanta, Georgia

19
     Frances Buono, RPR, CCR-B-791
20

21

22

23   B R O W N
     *Reporting* INC.
24

25   1740 Peachtree St, N.W.
     Atlanta, GA 30309
     404-876-8979

1  cases?

2      A.    The first one, which was for the State of

3  Hawaii.  The third listing, Peter G. Angelos Law

4  Offices, those are personal injury cases for

5  asbestos.  The Alkon, Rhea & Hart also personal

6  injury related to asbestos.

7      Crystal Breeze is not asbestos, that is

8  related to mold.  And the last one, the Murden case

9  for Roussel and Roussel is asbestos personal injury.

10     Q.    How about the Smooth Construction?

11     A.    That is related to lead.

12     Q.    Are you familiar with the Daubert

13  standards for acceptance of expert testimony?

14     A.    Generally, yes, sir.

15     Q.    Do you know whether any of your expert

16  opinions or any parts of your expert opinions have

17  been rejected by a court under Daubert or similar

18  legal standards?

19     A.    To my knowledge, they have not.

20     Q.    Did you play any role or have any

21  involvement in the Armstrong bankruptcy proceeding?

22     A.    No, sir.

23     Q.    Are you aware that in that case the

24  Bankruptcy Court precluded the use of dust testing

25  that utilized the indirect preparation method?

A.    I read the opinion, yes, sir.

Q.    So you are aware that it precluded the use of a dust testing?

A.    I am.

Q.    And that dust testing is similar to dust testing that was conducted in this case, is it not?

A.    It is.  At least the method.  The circumstances were quite different.

Q.    Same method was utilized?

A.    It is my understanding.  I didn't participate in taking the samples.

Q.    That is your understanding from review of the opinion?

A.    That is my understanding.

Q.    And Dr. Millette was involved in that proceeding, was he not?

A.    It is my understanding, yes, sir.

Q.    Mr. Hays, as a certified industrial hygienist and engineer, can you tell me what a cleavage fragment is or your understanding of what a cleavage fragment is?

A.    Well, I think we established earlier that I am not a microscopist or a mineralogist.  My understanding is from reading actually other reports and talking to Dr. Longo, the debate seems to be over

1    whether or not cleavage fragments are asbestiform.

2         My understanding is that a true cleavage

3    fragment is not an asbestiform.  And that seems to

4    relate to the surface conditions, geometry,

5    et cetera, but beyond that, I would refer you to the

6    materials people in this case.

7         Q.    That is certainly not your area of

8    expertise?

9         A.    It is not.

10        Q.    If you would look, Mr. Hays, at your

11   report on Page 1, you have listed at the bottom under

12   your qualifications, the last paragraph -- let me ask

13   you first.  Did you prepare this report?

14        A.    Yes, sir.

15        Q.    Did anybody assist in the preparation of

16   Pages 1 through 4 of the Gobbell Hays report?

17        A.    This qualification stuff my secretary

18   pulls stuff out of the file.  I think she assisted in

19   Section 1.  The rest of it I wrote.

20        Q.    At the last paragraph in Section 1, it

21   indicates that you have been asked to give opinions,

22   certain opinions.  Do you see that?

23        A.    Yes, sir.

24        Q.    One of which, the first one listed, is

25   concerning the nature of Zonolite Attic Insulation,

1    Q.    And if the tremolite that you find is not

2 a carcinogen, would the building still be

3 contaminated, in your opinion?

4    A.    If any material on the surface poses no

5 health risk, then I might consider it dirty but not

6 contaminated.

7    Q.    And that health risk is a health risk from

8 the inhalation of that material; is that correct?

9    A.    In the case of asbestos, it is inhalation.

10 Understand I am not convinced tremolite is not a

11 health risk, that is a medical question.

12    Q.    All right.

13    A.    I just want to be sure what we are

14 agreeing and disagreeing on.

15    Q.    And how many homes did you visit for this

16 case?

17    A.    I personally visited the two homes in

18 which we did the studies in Spokane, and I visited

19 them when we were doing the studies.

20    Q.    So you didn't visit them prior to the

21 studies?

22    A.    I did not.

23    Q.    And you did not visit any other homes

24 other than the two in which the studies were

25 performed?

1    discussion begins on the very bottom of Page 2.

2         Q.    Can you tell me what the K-factor is for

3    asbestos in ZAI?

4         A.    K-factor, first of all by definition, is a

5    ratio of the concentration of asbestos in air divided

6    by the concentration of asbestos in surface dust, and

7    for the K-factor to be meaningful, the airborne

8    concentration is measured at the time the surface

9    from which the dust measurement came is disturbed.

10         So a K-factor is a ratio.  It is not

11   something that was invented for asbestos, it has been

12   used by industrial hygienists for decades for various

13   surface contaminants, and it is an empirically

14   developed ratio.

15        Q.    What is the K-factor ratio specific to

16   asbestos in ZAI that you would apply?

17        A.    The K-factor that I would apply to these

18   studies would range from about three times ten to the

19   minus six up to seven or eight times ten to the minus

20   fifth.

21        Q.    And how do you develop that K-factor, can

22   you tell me what the business is for developing that

23   K-factor is?

24        A.    Those K-factors or that range has been

25   developed empirically and those numbers are reported

1    A.    Then the last line of Exhibit 3 says K

2    equals and then I have plugged in the values for air

3    and values for dust into the formula.  Done the math.

4    And the answer is six times ten to the minus sixth.

5    And the unit is centimeter to the minus one, which is

6    the normal unit for the K-factor.

7        Q.    And --

8        A.    This number, I believe, is in the range

9    which I gave you or testified to earlier in this

10   deposition.

11       Q.    Within the range from your book?

12       A.    Yes.

13       Q.    To determine the concentration of the

14   asbestos in the air, you took the -- well, you took

15   the area samples that were analyzed by TEM, is that

16   correct?

17       A.    That is correct.

18       Q.    You didn't take the personal samples; is

19   that correct?

20       A.    No, sir.  The reason I didn't is because

21   these personal samples, since they were so overloaded

22   and had to be changed so many times, had a high limit

23   of detection.

24            I agree with Mr. Ewing's conclusion in the

25   last paragraph on Page 10 that for this particular

72

1   test, the best measurement is that area measurement,

2   it was in the cleaning area, the limit of detection

3   was lower.

4        Q.    And you took this -- you didn't use any

5   information from the Busch home; is that correct?

6        A.    Not for the calculation I just did.

7        Q.    And when did you do this calculation?

8        A.    I did it just a few minutes ago when we

9   were on break.

10       Q.    When did you first do the calculation, you

11  told me you came up with the --

12       A.    In the last few days.

13       Q.    Somebody requested you to do that

14  calculation?

15       A.    No, sir.

16       Q.    Have you discussed it with anyone?

17       A.    No, sir.

18       Q.    Have you submitted it to anybody for

19  review, any peer review?

20       A.    This particular calculation you mean?

21       Q.    Yes.

22       A.    You are the first.

23       Q.    Okay.

24       A.    You get the --

25       Q.    I will say that it is not a very

**EXHIBIT N**

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


IN RE:                        )
                              )  CHAPTER 11
W.R. GRACE & CO., ET AL.,     )  CASE NO. 01-01139(JKF)
                              )
_____Debtors,_____)  (JOINTLY ADMINISTERED)




DEPOSITION OF

RICHARD L. HATFIELD


May 6, 2003

9:45 a.m.


2100 Bank of America Building

600 Peachtree Street

Atlanta, Georgia



Frances Buono, RPR, CCR-B-791


B R O W N
Reporting INC.

1740 Peachtree St, N.W.
Atlanta, GA 30309
404-876-8979

1    Q.    Now, is it still correct that simply

2  looking at settled dust doesn't necessarily give you

3  what is in the air?

4    A.    That is right.  At that particular time.

5  There are two separate items.

6    Q.    Is it still correct that the EPA and OSHA

7  do not have a clearance level or permissible exposure

8  limit for asbestos in dust?

9    A.    As best I know.  Certainly OSHA doesn't

10  have a -- I mean, you wouldn't call it a permissible

11  exposure then when you had it with dust because a

12  surface situation, not necessarily an airborne

13  exposure.  But, no, they don't have anything like

14  that.

15        And EPA, to the best of my knowledge,

16  doesn't have a clearance criteria or something like

17  that based on settled dust, but I am also not sure

18  exactly how they are using some of the settled dust

19  samples they are collecting as it relates to Libby,

20  Montana.

21    Q.    It is your understanding that the EPA in

22  Libby, Montana, is taking some settled dust samples;

23  is that correct?

24    A.    Yes, they have taken many settled dust

25  samples.

24

1    materials contain asbestos, that is bulk sampling?

2        A.    That can be bulk sampling, that can also

3    be dust sampling.

4        Q.    And are there any federal regulations by

5    EPA or OSHA that call for bulk sampling of material

6    to determine whether or not it is asbestos

7    containing?

8        A.    Yes.

9        Q.    Are there any regulations of EPA or OSHA

10   that call for dust sampling to determine whether any

11   material is asbestos containing?

12       A.    Not by regulation that I am aware of.

13       Q.    And with respect to the inhalation of

14   asbestos, and the regulation of asbestos exposures,

15   there would you agree that the focus is not on how

16   much asbestos is present in a room or building, but

17   upon how many respirable asbestos structures are in

18   the air during activity?

19       A.    Yes.

20       Q.    You do agree that it's generally

21   recognized that the direct air sampling method for

22   testing of asbestos is the method required by OSHA

23   and EPA?

24       A.    The methods that are called out in the

25   regulations utilize the direct preparation method.

1    you used the indirect method in Barbanti?

2         A.    We made a conscious decision prior to the

3    studies, because of the concern by some over the

4    indirect preparation, that we would collect the air

5    samples in a manner that hopefully would allow us to

6    read the samples using the direct method rather than

7    having to prepare them using the indirect method.

8         Q.    Was part of that concern the decision by

9    Judge Newcomer in the Armstrong World Industries

10   case?

11        A.    I am sure that that decision played a

12   role.

13        Q.    Do you agree that the number of asbestos

14   structures found through the indirect method of

15   preparation is almost always significantly higher

16   than that found through the direct method of

17   preparation?

18        A.    I would say that is certainly generally

19   true and particularly true when the samples are

20   rather heavily loaded.

21        Q.    And would that be true with respect to

22   what you have seen in your testing with respect to

23   attic fill material?

24        A.    No.

25        Q.    Isn't it true that the results of your

1   simulations in the Matthews home and the Busch home

2   prepared by direct preparation are lower than what

3   you found in Barbanti when prepared by indirect

4   preparation?

5        A.    No.   The studies, the two studies or three

6   studies that would be comparable due to the activity

7   that was done would be the Barbanti and the removal

8   of the vermiculite using the W.R. Grace method and

9   using the homeowner's method, and there you will find

10  that they are somewhat equal at times and maybe even

11  higher when the samples were prepared using the

12  direct method.

13       Q.    When you do dust sampling you follow an

14  ASTM procedure; is that correct?

15       A.    Yes.

16       Q.    When you do air sampling, do you follow

17  NIOSH 7400 and NIOSH 7402?

18       A.    The samples are collected in general

19  accordance with 7400.  If there is phase contrast

20  analysis, yes, then you are continually following

21  7400.  When we analyze the samples by transmission

22  electron microscopy, we are using basically the

23  Yamate Level II analysis utilizing the more current

24  AHERA counting rules.

25       Q.    With respect to the ASTM dust protocol, do

1    you agree that the protocol itself states that the

2    dust sampling method does not described procedures or

3    techniques required to evaluate the safety or

4    habitability of buildings with asbestos-containing

5    materials?

6         A.    That is one of the statements in there.

7         Q.    Do you agree that another statement in

8    there is that there is no single direct relationship

9    between asbestos-containing dust and potential human

10   exposure?

11        A.    That statement is also in there.

12        Q.    Do you agree that one cannot take asbestos

13   dust sampling results and apply a K-factor to them to

14   opine on air quality?

15        A.    You asked me that one cannot, was the

16   question?

17        Q.    Yes.

18        A.    And I would need to know when are you

19   talking about the air quality?

20        Q.    At any time.

21        A.    Okay.

22        Q.    At any time prior to the taking of the

23   sample.

24        A.    Well, I think if we were talking about

25   prior, K-factors generally are not utilized that way,

1    K-factors are generally utilized to predict a

2    concentration in the future.

3            What you can do, as far as past, is you

4    could simply use a K-factor of one and say if it was

5    all in the air at one time, or you could say it

6    slowly but evenly settled down, you know.

7            Probably in most cases the truth is

8    somewhere in-between, it came down some and then a

9    little bit more.  It is kind of like rain, you get a

10   heavy downpour and then light, et cetera.

11           So there is probably not a good K-factor

12   for predicting what was in the air in the past from

13   dust samples, it is better utilized what could be in

14   the air in the future from some disturbance.

15       Q.    Is there a recognized procedure for

16   utilizing K-factors in dust sampling results to

17   predict what will be in the air in a particular place

18   in the future?

19       A.    Yes, there are procedures to do that.

20       Q.    And are those published procedures?

21       A.    Yes.

22       Q.    And are they published by the EPA or OSHA

23   or any regulatory agency?

24       A.    Not that I am aware of.

25       Q.    And are those procedures commonly accepted

1   under the current version of 7402, you don't

2   calculate a concentration of asbestos fibers in the

3   air, but rather calculate a percent of asbestos

4   versus the total fiber structures and then apply that

5   percentage to the previously read phase contrast

6   sample.

7           Q.     Let me try to use my own terms and see if

8   you and I can agree on what you are saying, what you

9   stated very well.

10           What is the dimensional size of the fibers

11   counted under 7400 by PCM?

12           A.     The fiber must be greater than 5 microns

13   in length. You must have a 3-to-1 length/width

14   ratio, and because of the resolving power of the

15   microscope, the diameter or width of the fiber must

16   be or typically is greater than or equal to .25

17   microns.

18           Q.     Greater or equal to .25 microns?

19           A.     Greater or equal to.

20           Q.     Do I take it from your prior answer under

21   NIOSH 7402, one counts fibers with those same

22   dimensions?

23           A.     Absolutely.

24           Q.     Okay. Under the Yamate method, what are

25   the dimensions of the fibers to be counted?

# EXHIBIT O

IN THE 6TH DISTRICT COURT IN AND FOR LAMAR COUNTY TEXAS

IN RE: LAMAR COUNTY ASBESTOS LITIGATION CASES FILED OR TO BE FILED BY WATERS & KRAUS IN
LAMAR COUNTY, TEXAS

### ORDER
Relating to Garlock, Inc. Motion to Suppress Testimony of
Dr. William Longo and Mr. Richard Hatfield
with
Findings of Fact and Conclusions of Law

On June 20, 2001 this matter came on before the court upon a motion filed by Garlock, Inc. to strike Dr. William Longo and Richard Hatfield (Longo-Hatfield) of Materials Analytical Services, Inc. (MAS) from plaintiff's list of expert witnesses. Plaintiffs joined issue and the court on April 23, 2001 issued its Order setting the date for
"... hearing qualifications of William Longo and Richard Hatfield under the *Daubert/Robinson* standards to provide expert testimony involving various products involved in the Lamar County Asbestos Litigation ... all parties affected by the testimony of such witnesses will be bound by the results of the hearings and rulings of the court..."

After announcements of ready the court proceeded with the hearing. The parties waived opening statements, the court received testimony and exhibits from the parties together with final arguments. Plaintiffs tendered the testimony of Dr. Longo for both Dr. Longo and for Mr. Hatfield.

Based upon the testimony, documents and photographs admitted at the hearing and the subsequent review of all the evidence, the court makes the following findings of fact and conclusions of law. Each finding of fact shall also be considered a conclusion of law and each conclusion of law shall also be considered a finding of fact insofar as they are not clearly delineated as one or the other or possibly involve both.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      Government and professional association standards perpetuated by the Occupational Safety and Health Administration (OSHA), the United States Environmental Protection Agency (EPA), National Institute of Occupational Health and Safety (NIOSH) and the American Society of Testing Materials (ASTM) for measuring airborne asbestos fibers for human exposures, are minimum standards that do not provide a defense for compliance. Such standards do, however, provide reliable source evidence for the court in understanding generally accepted scientific methodologies and the judicial reliability standards of *Daubert-Robinson* vis-à-vis Rules 401, 402, 403, 702 and 703 of the Texas Rules of Evidence.

2.      The tests conducted at Materials Analytical Services, Inc (MAS) by Dr. William Longo and Mr. Richard Hatfield (Longo-Hatfield) on removal, scraping, hand wire brushing and electric wire brushing of gaskets, pouring joint compounds, sawing Kaylo products and mixing and sanding Kelly-Moore joint compounds as reflected in PX Longo 5, 6, 13, 14, 15, 34 and 35, are not scientifically reliable and are not admissible.

3.      The MAS tests constitute "junk science."

4.      The MAS tests do not meet the requirements of Rules 401 and 402 Texas Rules of Evidence in that the tests are not sufficiently tied to the facts of any individual case in a manner to aid the finder of fact in resolving a factual dispute.

5.      The MAS tests fail to account for reasonably foreseeable conditions and pathways of exposure that could be experienced with respect to the removal, scraping, hand wire brushing and electric wire brushing of gaskets, pouring joint compounds, sawing Kaylo products and mixing and sanding Kelly-Moore joint compounds so as to render the MAS tests little more than speculation.

6.      If this court has misunderstood the testimony and exhibits admitted during the *Daubert/Robinson* hearing so as to be incorrect in its findings of facts and conclusions of law, the error(s) was caused by the confusing, misleading and prejudicial presentation of the evidence to the finder of fact.

7.      A judge does not have to be trained in science to evaluate the reliability of a scientific theory or technique. Although the details of science may be complex, the characteristics of valid scientific knowledge and the kind of reasoning that produce it are not difficult to grasp. Judges are capable of understanding and evaluating scientific reliability.

8.      The court makes no finding upon the truth or falsity of the opinions expressed in this case by Dr. Longo individually or on behalf of Mr. Hatfield concerning exposures or pathways of injury.

---

[1] The abbreviation *Daubert/Robinson* is used to indicate the following decisions: *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579 (1993) and *E. I. Du Pont de Nemours v. Robinson*, 923 S. W. 549 (Tex. 1995).