9.    These findings of fact and conclusions of law are binding upon all parties affected by the testimony of the witnesses, Longo-Hatfield, concerning the products about which they testified, to wit: scraping and removal of compressed asbestos gaskets by hand and electric wire brushing, pouring joint compounds, sawing Kaylo products and mixing and sanding Kelly-Moore joint compounds.

10.    Exhibit A, attached hereto and made a part hereof for all purposes, contains the factual analysis by the court of the relevant exhibits and testimony.

The Motion by Garlock, Inc. to Suppress the testimony of Dr. William Longo and Mr. Richard Hatfield is granted. This order is binding as to Garlock, Inc. and all other defendants in the Lamar County Asbestos Litigation cases filed by Waters & Kraus using the testimony of Longo-Hatfield and tests by MAS against parties who market or produce gaskets (removing, hand wire brushing, electric wire brushing), insulating cement (pouring), Kaylo products (sawing) and Kelly-Moore joint compound (mixing and sanding.)

Entered this 5 day of July, 2001.

_____
Judge Jim D. Lovett

Exhibit A
**Fact Analysis Of Relevant Exhibits And Testimony**
*(Summaries, paraphrases and comments are italicized)*

## RULE 702 REQUIREMENTS

(1)    The witness must be qualified.
*The court is of the opinion that Dr. William Longo and Mr. Richard Hatfield are qualified by both education and experience in relevant sciences to be allowed to testify.*

(2)    The proposed testimony must be "scientific knowledge."
*The court is of the opinion that the tests conducted by Longo-Hatfield on the products involved in this hearing are scientifically unproven and not accepted by a respectable community within the relevant sciences.*

(3)    The testimony must assist the trier of fact to understand the evidence or to determine a fact in issue.
*The court is of the opinion that the Longo-Hatfield testimony is neither relevant nor reliable, that it is confusing and that it will not assist the trier of fact.*

## RELEVANT EXHIBITS

**DX Garlock 1, Asbestos and Other Fibers by PCM.**
*This is the NIOSH Method 7400 from the Manual of Analytical Methods, Fourth Edition, 8/15/94. The MAS tests claimed to have followed this Method.*

**"APPLICABILITY:** ... The method gives an index of airborne fibers. It is primarily used for estimating asbestos concentrations, though PCM does not differentiate between asbestos and other fibers. Use this method in conjunction with electron microscopy (e.g., Method 7402) for assistance in identification of fibers... "
*Note that PCM is to be used with this method. TEM is to be used only for "identification" of fibers, not for counting the fibers as was improperly done in the MAS tests. Furthermore, MAS misused Method 7400 instead of Method 7402 for assistance in identification of fibers, rendering the results scientifically unreliable.*
"CALIBRATION AND QUALITY CONTROL:
11.    Document the laboratory's precision for each counter for replicate fiber counts.
      a.    Maintain as part of the laboratory quality assurance program a set of reference slides to be used on a daily basis... The Quality Assurance Officer should maintain custody of the reference slides and should supply each counter with a minimum of one reference slide per workday. Change the labels on the reference slides periodically so that the counter does not become familiar with the samples."
*The MAS laboratory was not certified as required and the reference slides were not handled in conformity to requirements of this Method.*
13.    Perform blind recounts by the same counter on 10% of filters counter (slides relabeled by a person other than the counter).
*The MAS tests failed to conform to this recount standard as well as the instructions to disregard samples that exceeded the specified limits.*
*Further, the MAS tests failed to use the calculations, evaluations and reporting methods required by NIOSH Method 7400.*

**PX.LONGO 25, Garlock Industrial Products Catalog**
*The Garlock, Inc. catalog provides an abundance of information about the variable specifications, models, types and conditions that should be considered and then eliminated or otherwise accounted for through application of proper scientific methodologies. The MAS tests failed even to consider the following variables.*
pg 62 - Gasketing Compound No. 101-S. A non-hardening plastic compound used as a surface leveler on flanged joints and for temporary repair of torn or blown gaskets. Joints on which it is used do not "freeze," and are easy to disassemble at any time. Recommended for use at temperatures ranging from below 0° to ~500° F on pipelines or other equipment handling water, steam, air, oil, gasoline, gas, weak acids or alkalies.
pg 21 - *shows eight different "compressed asbestos gaskets" available from Garlock, Inc. in style numbers 900, 7021, 7228, 7705, 8748, 7819, 9057 and 9500. These eight models contain varying characteristics, to wit:*
*-they are made from two types of asbestos, white chrysotile asbestos and blue crocidolite asbestos;*
*-tensile strengths vary with the grain from a low of 5,000 p.s.i. to a high of 9,000 p.s.i. and across grain from a low of 2,000 p.s.i. to a high of 4,600 p.s.i.;*
*-variances in oil resistance after 5 hrs. in: ASTM #3 oil @ 300° F with thickness increases ranging from 3% to 63% and a tensile losses ranging from a low of 10% to a high of 76%;*
*-fuel resistance, after 5 hrs. in: ASTM Ref. Fuel B @ R.T. Thickness increases as low as 5% and as high as 26%;*

*density variations from as low as .85 oz. to as high as 1.0 oz.*

*16 sheet sizes (inches) ranging from 40 x 40 to 150 x·150*

*wide variations in tolerances on thicknesses and specifications;*

*style numbers: 900, 7021, 7228 and 7705 are branded with Garlock name and style number thru 60". Over 60" std. is unbranded unless otherwise specified*

pg 6 *- warns that the basic factors surrounding any application (fluid, temperature, pressure, speed and type of motion) added to the age and condition of equipment make concrete recommendations very difficult based only on type of equipment and fluid involved;*

pg no. (not shown on the exhibit) *- located on the page next to the page entitled "Garlock Materials vs. various media under typical conditions" has the following information in fine print at the top of the page:*

"This chart indicates the general suitability of basic materials commonly used in packings and gaskets against various media and is intended only for the general information of the packing user. Obviously the subject of the interaction of packing materials with the several liquids listed is too complex to be covered adequately in a few words. Although chemical considerations are important in the selection of packings, the mechanical properties of the packing itself usually are of greater importance. Packings rarely are fully exposed to the gas or liquid and, therefore, do not necessarily react in the same degree as indicated for the base material. For these reasons packings or gaskets should not be accepted or rejected for any application solely on the basis of chemical consideration."

*The catalog lists the following materials: graphite yarn, viton and fluorel, phenolic resins, TFE Flurocarbon, white asbestos, blue asbestos, cotton, flax, viscose rayon, paper and leather.*

pg 28 *- Garlock CHEMSEAL jacketed gaskets with 8764 TFE jackets (often called envelopes) are claimed to be ideal for applications where corrosion, contamination or other undesirable effects must be combated. "Good examples" are glass-lined piping and such processing equipment as reactors, kettles, condensers, heat exchangers and columns.*

**PX Longo 5, 6, 34 and 35 MAS Work Practice Studies and videotapes dated April 21, April 25 and June 2000.**

*The MAS studies listed specific and generally accepted methodologies claimed to have been utilized in the three tests. These include Tyndall lighting, NIOSH Method 7400 and the indirect method of sample preparation by the ASTM D5755-95.*

*After the hearing the court read and studied the exhibits. It then became clear that the methodologies claimed in the MAS tests were not followed. Further, the tests were deficient in their failure to account for variable but reasonably foreseeable conditions in the possible pathways of exposure. Dr. Longo's testimony was at least disingenuous.*

*The MAS tests improperly mixed direct and indirect methods of sample preparation, misused and misrepresented TEM analyses and application of Tyndall light. The reports failed to mention that there was no index to convert TEM data to PCM data to enable the use of the index of exposure in the OSHA epidemiological studies. Additionally, Dr. Longo's testimony improperly claimed that the tests covered all pathways of exposure ("one size fits all".)*

*As to the ASTM Method D 5755-95 claimed in the MAS tests, the following deviations by MAS disprove the reliability of the tests:*

1)    *the Method is entitled "Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations"- this method was misused to measure airborne asbestos fibers;*

2)    *test results were reported in structures/cc rather than structures/cm² - this is a misrepresentation of a reportable result.*

*As to NIOSH Method 7400 claimed in the MAS tests, the following deviations by MAS disprove the reliability of the tests:*

1)    *MAS used the indirect sample preparation method instead of the required direct sampling method;*

2)    *MAS failed to report as uncountable the fiber counts above 1300 fibers/mm² as required.*

*The test reports failed to explain the failure of the MAS tests to utilize the direct transfer NIOSH 7402 Method that states, "This method is used to determine asbestos fibers in the optically visible range and is intended to complement the results obtained by phase contrast microscopy (Method 7400)." The court assumes the reason to be the claim of Dr. Longo that the filters were too heavily loaded with fibers to use the direct method of sample preparation required by NIOSH 7402. Additionally, the provenance of the flanges and gaskets used in the tests were inadequately explained in the test reports. The test reports should have explained these matters but failed to do so.*

*Furthermore, the MAS tests cannot be duplicated from the information contained in the reports or in Dr. Longo's testimony. There is no established rate of error, insufficient information was furnished on the angle, concentration and lumens of Tyndall light, the videotaping was deceptively out of focus, misrepresents asbestos exposure levels and fails to compare dust generated from non-asbestos gaskets. Further, the June 2000 report involved invalid air samples due to obstructions in the airflow feed-throughs located in the ECL walls and the April 21 and April 25 tests fail to report decontamination of the ECL chamber prior to testing. Indeed, the three results provide suspiciously wide and unexplained variations considering that they were conducted in identical conditions in the ECL.*

*Such lapses and unverified variances in the test methodologies cast doubt on the efficacy of the MAS tests and specifically reflect on the violation of standards for the lack of Quality Assurance Certification of the MAS laboratory.*

*It is apparent that the MAS tests started with the assumption that persons had been exposed to airborne asbestos fibers from work place activities involving Garlock and other brands of gaskets (removing, hand wire brushing, electric wire brushing), insulating cement (pouring), Kaylo products (sawing) and Kelly-Moore joint compound (mixing and sanding) and then selected methods to achieve the desired results stated in the MAS reports and testimony of Longo-Hatfield. This is not permitted.*

*The limitations of the MAS tests become even more apparent when compared to standards set for and methodologies followed by the Environmental Protection Agency studies currently being conducted in Libby, Montana.* **PX Longo 8, Phase 2 Sampling and Quality Assurance Project Plan, Revision 0 for Libby, Montana, March 2001.**

*An open pit vermiculite mine near Libby, Montana is suspected as a source of on-going asbestos exposure to current and future residents in the Libby area. The United States Environmental Protection Agency is engaged in the first known study by non-litigation scientists to utilize a combination of Phase Contrast Light Microscopy (PCM) and Transmission Electron Microscopy (TEM) as an analytical technique for counting airborne asbestos fibers and dust and converting the counts to the OSHA index of exposure that will connect TEM for the first time to the generally accepted epidemiological studies. Up to this time the scientific community has used and recommended TEM as a method of identifying asbestos fibers, not as a method of counting them. No respectable community of scientists has used TEM for counting asbestos fibers.*

*In Phase 1 of this study EPA gathered samples from multiple indoor and outdoor locations around the community, along with samples of different potential sources of asbestos fibers in air (note by contrast that the MAS samples were from only one site and tested under only one controlled environment).*

*The EPA results indicate that amphibole-type asbestos fibers are present in a number of environments samples, including indoor air, dust, soil, and insulation. The report notes that the human health risk is mediated by inhalation exposure and utilized stationary air monitors located in the principal living areas of various homes to gather samples. TEM has been used to estimate the concentration of these fibers. The report states at pg. 3, "However, there are issues which exist with regard to both the <u>collection technique</u> and the <u>analytical technique (TEM)</u> (note by contrast that MAS fails to recognize this issue.)*

*EPA notes that the collection technique may have acceptably measured "passive" activity in homes but may underestimate exposures of the people directly engaged in activities, which do generate dust containing asbestos fibers. The EPA report continues*

"Therefore, the first objective of this sampling effort (Phase 2 of the environments characterization project plan) is to measure asbestos levels in the breathing zone of individuals engaged in routine and special activities ~~in and about Libby, and to compare those measurements~~ to data collected from co-located stationary air monitors. This information will be helpful in deciding what type of air sampling method is needed to evaluate risks to individuals engaged in both routine and special activities in the home." *(note by contrast that no such considerations were discussed in the MAS tests and all the data comes from only fifteen tests conducted by MAS under only one set of conditions: no comparative tests were conducted in any other location or under any other conditions, although one suspects that the MAS ECL could have been programmed to test a variety of conditions: no satisfactory explanation is offered by MAS or Dr. Longo as to why tests were not conducted under a variety of test conditions.)*

"With regard to the analytical technique, the issue is that air samples have historically been analyzed for asbestos using Phase Contrast Light Microscopy (PCM), and the EPA current slope factor for quantifying lung cancer risk from asbestos in air is expressed in units of risk per PCM fiber per cc of air (USEPA 2000a). Thus, even though it is widely recognized that TEM analyses are more accurate and more powerful than PCM analyses, measurements of asbestos concentration based on TEM are difficult to convert to an equivalent concentration by PCM (this is referred to as PCM equivalents, or PCME). Thus the second objective of this sampling effort is to analyze a series of different air samples by both the TEM and PCM methods in order to derive a site-specific relationship between the two, and to help judge which type of measurement is most appropriate." *(note by contrast that the MAS tests failed to mention the conversion problem and the lack of a reliable method to measure PCME.)*

As noted above, the chief reason for collecting data on asbestos fiber levels in air is to support risk assessment and risk management decision-making. Thus, the third objective of the study is to utilize the data collected to derive preliminary assessments of the potential health risk to people who engage in the types of routine and special activities investigated during the study. Because the study will not span all possible exposure conditions and all exposure locations, the data will be used to help estimate the <u>range</u> of different levels (and hence health risks) that residents of Libby may experience from both routine and special activities." *(note by contrast that the MAS tests fail to recognize and test for reasonably foreseeable conditions of exposure:*

*further, the MAS tests are not reliable even to estimate range of different levels of airborne asbestos generated while wire brushing a gasket.)*

*The EPA developed a seven-step plan Data Quality Objectives (DQO) procedure designed to ensure that sampling and analysis plans are carefully thought out and that results of the effort will be adequate to meet basic objectives of the program. The seven-step plan is applied to each of the three main objectives of the project and is as follows:*

Step 1. State the Problem;
Step 2. Identify the Decision;
Step 3. Identify Inputs to the Decision;
Step 4. Define the Study Boundaries;
Step 5. Develop a Decision Rule;
Step 6. Specify Limits of Decision Errors;
Step 7. Optimize the Design for Obtaining Results.

*The details of the EPA tests contrast sharply with the generalizations and non-specific plans of the MAS tests.*

**PX Longo 17. United States Environmental Protection Agency publication EPA 560/S-89-004, "Comparison of Airborne Asbestos Levels Determined by Transmission Electron Microscopy (TEM) Using Direct and Indirect Transfer Techniques.**

At page 3, II. Conclusion and Recommendations. "The results from the ... (EPA's seven studies - *including one by Dr. Eric John Chatfield, whose affidavit is considered below*) ..., lead to the following conclusions:

- TEM analysis of air samples using indirect transfer methods tends to provide estimates of total airborne asbestos structure concentration that are higher than those obtained using direct transfer methods. This conclusion is consistent with general opinion and implies that airborne asbestos levels estimated by one method are not directly comparable to those estimated by the other.

- Evidence. A review of available data (seven studies) revealed this relationship in every study despite variations in sampling, analytical, and counting protocols.
  There is no single factor that can be applied to convert measurements made using an indirect transfer method to a value that is comparable with measurements made using a direct transfer method. The quantitative relationship between estimates obtained by the two transfer methods is expected to depend on sampling and analytical protocols as well as the nature of the asbestos structures in the air.

**PX Longo 32. 41086 Federal Register/ Vol 59, No. 153. Wed., August 10, 1994**

This federal regulation states as follows:

"(iv)(A) If a gasket is visibly deteriorated and unlikely to be removed intact, removal shall be undertaken within a glovebag as described in paragraph (g)(5)(ii) of this section. (B) The gasket shall be thoroughly wetted with amended water prior to its removal. (C) The wet gasket shall be immediately placed in a disposal container. (D) Any scraping to remove residue must be performed wet."

*This OSHA Federal Regulation provides that "possible" asbestos exposure be avoided but also reasonably implies that moisture in the form of rain, snow, ice, fog, mist and humidity "possibly" affect the manner in which asbestos becomes airborne in the workplace while scraping or brushing a gasket. The MAS tests fail to test or account for such reasonably foreseeable conditions.*

**DX Garlock 2. OSHA §1910.1001 Asbestos**

(a) *Scope and Application.* (1) This section applies to all occupational exposures to asbestos in all industries covered by the Occupational Safety and Health Act, expect as provided in paragraph (a)(2) and (3) of this section.

*The exception in para (a)(2) refers to construction work and para. 3 to shipbuilding and related activities.*

*It is the understanding of the court that OSHA does not regulate potential airborne asbestos exposures relating to gaskets since they contain asbestos binding material.*

**PX Longo 33, letter from Colt Industries relating to handling Garlock products containing asbestos in general and compressed asbestos sheet in particular.**

*Although not required by OSHA asbestos regulation §1910.1001 to place warning labels on its gaskets, Garlock, Inc. nevertheless did so voluntarily and notified its dealers concerning the possible release of excess amounts of asbestos under extreme conditions. The letter says "The user should, therefore, refer to 29CFR 1910.1001 for information on handling asbestos and monitoring the release of asbestos fibers."*

*It appears that even though OSHA did not regulate its gaskets, Garlock voluntarily sent this notice of possible release of excessive airborne asbestos under some extreme conditions. This is not a confession of fault by Garlock, Inc. From the evidence offered and admitted in this hearing it appears to be a reasonable, voluntary action by the manufacturer to warn its dealers and end users.*

**DX Garlock 3, ASTM D 5755-95, Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations[2]**

5.1    This microvacuum sampling and indirect analysis method is used for the general testing of non-airborne dust samples for asbestos. It is used to assist in the evaluation of dust that may be found on surfaces in buildings such as ceiling tiles, shelving, electrical components, duct work, carpet, etc. This test method provides an index of the concentration of asbestos structures in the dust per unit area analyzed as derived from a quantitative TEM analysis.

5.1.1    This test method does not describe procedures or techniques required to evaluate the safety or habitability of buildings with asbestos-containing materials, or compliance with federal, state, or local regulations or statutes. It is the user's responsibility to make these determinations.

5.1.2    At present, a single direct relationship between asbestos-containing dust and potential human exposure does not exist. Accordingly, the user should consider these data in relationship to other available information in their evaluation.

5.2    This test method used the definition, settleable particulate material, found in Test Method D 1739 as the definition of dust. This definition accepts all particles small enough to pass through a 1 mm (No. 18) screen. Thus, a single, large asbestos containing particle(s) (from the large end of the particle size distribution) dispersed during sample preparation may result in anomalously large asbestos concentration results in the TEM analyses of that sample. It is, therefore, recommended that multiple independent samples are secured from the same area, and a minimum of three samples analyzed by the entire procedure.

*The above requirements were violated in the MAS tests as follows:*

1)    *the Method is entitled "Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations" - this method was misused to measure airborne asbestos fibers;*

2)    *the test results were reported in structures/cc rather than structures/cm[2] - this is a misrepresentation of a reportable result;*

3)    *the tests attempt to provide results in a single direct relationship between asbestos-containing dust and potential human exposure, which does not exist;*

4)    *the tests ignored the warning that sample preparation may result in anomalously large asbestos concentration results in the TEM analyses of that sample.*

**PX Longo 19, Exposure to Airborne Asbestos Associated with Simulated Cable Installation Above a Suspended Ceiling, November 1991 American Industrial Hygiene Association Journal.**

**PX Longo 22, Asbestos Exposure During and Following Cable Installation in the Vicinity of Fireproofing, March/April 1993 American Industrial Hygiene Association Journal.**

*These companion studies were sponsored in part by the Plaintiff's Executive Committee of the National Schools' Class Action for Cost Recovery. The eight co-authors included three of the witnesses in this court: Dr. William Longo (and through him, Richard Hatfield) of Materials Analytical Service, Inc. (address in Norcross, Ga.) and Dr. James R. Millette of McCrone Environmental Services, Inc (address in Norcross, Ga.) and Millette, Vander Wood and Associates, Inc. (address in Norcross, Ga.). Also see PX Longo 20, immediately below, that appears to be closely related to PX 19 and 22.*

*The studies properly sounded a warning that workers should wear respirators while performing these work place activities because of the "possibility" of improper exposure to airborne asbestos fibers.*

*In both these articles, however, it is clearly recognized and acknowledged that their purpose was not to compare exposure levels to current or previous OSHA PEL, adding that "...Further research is still necessary to standardize dust and air sampling techniques, including the number of samples necessary to characterize a given surface area, recovery efficiency from various surfaces and the analytical technique employed when heavy concentrations of asbestos and other particles are encountered."*

*Some of the testimony of plaintiffs' witnesses Longo (and through him, Hatfield) and Millette is either at a variance with their opinions expressed in these two articles or involved faulty memories and otherwise evasive answers. Furthermore, plaintiffs failed to cite the court to correctly performed scientific studies or peer reviewed scientific publications to justify any changes of their opinions as expressed in PX Longo 19 and 22. These articles, while peer reviewed, fail to fulfill plaintiffs' burden to cite peer reviewed published articles in support of their current scientific positions.*

---

[2] "This test method is under the jurisdiction of ASTM Committee D-22 on Sampling and Analysis of Atmospheres and is the direct responsibility of Subcommittee D22.07 on Sampling and Analysis of Asbestos."
*Dr. Eric John Chatfield, whose affidavit is considered below, claims he is a member of the D-22 committee and was honored by it in 1997 "... in recognition of outstanding contributions in development of ASTM and International Standard analytical methods for determination of asbestos." Dr. Chatfield further claims that all his analytical standards development activities were, and continue to be, voluntary.*

*In any event these studies would have very limited use when attempting to apply them to the varied indoor, outdoor, internal and external conditions experienced in the work place while scraping and brushing gaskets, pouring joint compound, sawing Kaylo products and mixing and sanding Kelly-Moore joint compounds.*

**PX Longo 20, Baseline Studies of Asbestos Exposure During Operations and Maintenance Activities, November 1994 Appl. Occup. Environ. Hyg. 9(11)**

*This study appears to be closely related to the studies shown in PX Longo 19 and 22, immediately above. Its co-authors include the same three plaintiffs' witness but only two of the other authors, having lost three co-authors without explanation. Further, this study was not sponsored by the Plaintiffs' Committee of the National Schools' Class Action for Cost Recovery. New sponsors included Dies, Dies and Henderson (Orange, Texas) and the West Virginia State Attorney General's Office (Charleston, W.V.).*

*The purpose of the study was to provide evidence of "possible" exposures to dangerous levels of airborne asbestos while performing certain maintenance duties in the work place. This study was designed to provide information to the authors so they could design an O&M (Operations & Maintenance) program "... based upon our extensive experience (estimated at 30 man-years) in designing, implementing, and evaluating O&M programs for buildings with ACM."*

*It was not the purpose of this study to provide information that could be converted to the OSHA index of exposure. It instead states, "Statistical analyses were applied to the logarithm (base 10) of the measured concentrations. The log transformation tends to equalize variances and permit the use of standard statistical tests that would otherwise be inappropriate. Previous studies of air pollution data have demonstrated that air pollution data tend to be lognormally distributed."*

*No other evidence of "lognormal distribution" was submitted to the court, or if it was, is not recalled and not located in the exhibits at this point. Although not specifically mentioned in the Libby, Montana study by EPA being currently conducted (PX Longo 8, see above), the first objective of the EPA Libby study indicates that there is no method of conversion from the TEM-direct analysis methods used in these studies to the PCM index of asbestos exposures. The court assumes that if the lognormal distribution is correctly understood by the court to be the conversion method used in this study (PX Longo 20), that the plaintiffs would have submitted appropriate supporting material. Absent such material the court finds the plaintiffs have failed to discharge their burden of proof and rejects this as a substantiating study in satisfaction Daubert/Robinson standards.*

*In any event this study (PX Longo 20) would have very limited use when attempting to apply it to the varied indoor, outdoor, internal and external conditions experienced in the work place while scraping and brushing gaskets, pouring joint compound, sawing Kaylo products and mixing and sanding Kelly-Moore joint compounds.*

**DX Garlock 4, ASTM D 6281 - 98. Standard Test Method for Airborne Asbestos Concentration in Ambient and Indoor Atmospheres as Determined by Transmission Electron Microscopy Direct Transfer (TEM)**

1.1      This test method[3] is an analytical procedure using transmission electron microscopy (TEM) for the determination of the concentration of asbestos structures in ambient atmospheres and includes measurement of the dimension of structures and of the asbestos fiber found in the structures from which aspect ratios are calculated.

1.2      This test method is suitable for determination of asbestos in both ambient (outdoor) and building atmospheres.

1.4      The direct analytical method cannot be used if the general particulate matter loading of the sample collection filter as analyzed exceeds approximately 10% coverage of the collection filter by particulate matter.

*ASTM 6281-98 is not mentioned in the MAS reports. It appears it was not utilized because of the 10% coverage limitation but, if so, this should have been mentioned in the MAS reports so as to explain its methodologies.*

**Other Exhibits Not Specifically Reviewed**

*Exhibits not reviewed above by the court are deemed either not to relate to the Daubert/Robinson issues of reliability or relevancy or are considered to be unnecessarily duplicative of other cited exhibits.*

## RELEVANT TESTIMONY AND AFFIDAVITS

**William Boelter, transcript of testimony, June 20, 2001.**

*William Boelter is an environmental engineer, a certified industrial hygienist/consultant, 1973 graduate of Purdue University with B.S. degree and a former OSHA compliance officer in Milwaukee and Chicago from 1976 through 1980 supporting various regional offices as well as the national office. He was called to testify for the defendant to wit:*

---

[3] "This test method was adapted from International Standard ISO 10312 "Air quality - Determination of asbestos fibres - Direct transfer transmission electron microscopy method."

*Note that Dr. Eric John Chatfield, whose affidavit is set forth below, is the author of ISO 10312. He is also author of ISO 13794 which is a corresponding indirect-transfer analytical method, both of which were affirmed by international ballot and published as international Standards.*

226/14:

"... I wasn't really sure what *(light)* he *(Dr. Longo)* used *(in the tests)*. There was not really a specific reference made to the type of light and consequently I selected based on what I saw in the video a similar looking theater light and a wattage that I believe was what was being used. But I wasn't really sure what was used."

228/21:

"... Tyndall lighting is not used in the industrial hygiene community. It may have been attempted at various times for various occupations but it is not widely used — I don't know anybody that uses it with the exception of Doctor Longo."

231/3:

"...The EPA historical data is mass based; whereas OSHA's historical data and the epidemiology is based on fiber sizes and inhalation. The EPA data mass base has no relationship to epidemiological data. It is an air quality issue independent of epidemiology."

231/9:

"Q. (by the Court) Let me ask you, would you think it would be safe to work without respirators or special clothing in the atmosphere and in what you saw in the videotape Doctor Longo ran? *(PX Longo 34 and 35)*
A. Yes. As a matter of fact, I do my tests without respiratory protection.
Q. (by the Court) So you would go into that environment as shown in Dr. Longo's videotape without special breathing equipment?
A. Yes sir."

235/10:

Q. You're not an electron microscopist like Doctor Longo, is that correct?
A. I thought he described himself as a material scientist.
Q. And who has more expertise in electron microscopy, you or Dr. Longo?
A. That may be a draw.
Q. Do you work an electron microscope?
A. I used to own a laboratory that we had an electron microscope. We were NAVLAC certified, as well as AIHA.
Q. Did you prepare the samples?
A. I prepared some, yes.

236/8:

Q. You know that some of those PCM levels *(in the MAS tests)* are as high as 20 fibers per cc. Is that correct?
A. I don't believe the numbers"

238/1:

Q. ... If you're in an environment where an activity is producing one fiber per cc, you're supposed to protect yourself. Is that correct?
A. That's not what an excursion limit is.
Q. Why don't you tell us what it is.
A. An excursion limit is where an infrequent activity which cannot be valued on a time-weighted average basis is conducted where the concentration would exceed one fiber per cc on a 30-minute sample.
Q. Fair enough. And those levels reported in the study by MAS would exceed the excursion limit. Correct?
A. They weren't excursion samples. That's not — what I'm trying to explain is industrial hygiene. The samples were not collected in the way to compare against the excursion limit. It wasn't an excursion activity and therefore to compare them against an excursion limit would be improper.

240/25:

Q. So you think Doctor Longo just lied when he got up here and said he opened the flange and that was the way the gasket was?
A. I have known Dr. Longo a long time and I am simply saying that I do not know what the conditions were of those gaskets. But I have been in the industrial environment for a very long time and I have never seen the conditions that are demonstrated in that video.
Q. Are you suggesting to the court that Dr. Longo somewhat doctored those flanges and throws gaskets before performing those tests, that he lied to the court?
A. I did my own tests involving 80 fittings and I have never encountered a gasket of that type.

242/11:

"I have a long history of being around pipe, plumbers, pipe fitters. My father was a plumbing contractor and I have been around the piping trades for my entire life and I have done considerable work in industrial environments, which include pipe fitters."

<u>243/19:</u>

"The results I had in a study *(such as the MAS studies)* which involved ten different types of removals and replacements of gaskets and packing, the highest concentration that I received on an eight hour time-weighted average was .06. Most of the results were in the .02 to .04 ranges."

<u>250/2:</u>

Q. And OSHA has never passed a standard *(relating to airborne asbestos)* with respect to the industry standards? *(as opposed to construction standards relating to airborne asbestos)*

A. That's correct.

*The court finds that William Boelter is qualified as an expert in a relevant science to render the opinions expressed in his testimony set forth above, that such testimony is properly corroborated and is both relevant and reliable in accordance with Daubert/Robinson standards.*

Eric John Chatfield, PhD, affidavit dated January 6, 2001.

*Dr. Chatfield is a Canadian citizen and a world-class scientist with M.A. in Natural Sciences and Ph.D. in Colloid Science from Cambridge University. He has more than 25 years experience in identification and analysis of asbestos fibers and their behavior in air and water through both optical and electron microscopy. He has written and published more than 60 peer-reviewed scientific articles relating to asbestos analysis, has been actively involved in the creation of recognized standards and honored by being chosen as the chairman of various prestigious organizations related to asbestos science.*

*Dr. Chatfield's credibility is an issue since he has testified extensively and exclusively for defendants in asbestos cases. His affidavit states*

<u>pg. 3, para. 11:</u>

"Other than to determine whether fibers found in the air are <u>asbestos</u> fibers, TEM is not generally used to measure occupational exposure to asbestos."

"World-wide, occupational exposure to airborne asbestos is measured by phase contrast optical microscopy *(PCM)*... To my knowledge, no country has used, or is proposing to use, transmission electron microscopy *(TEM)* for routine monitoring of occupational exposure to airborne asbestos..."

"... the *(PCM)* measurement represents an <u>index</u> of exposure to asbestos. This index is directly relatable to past measurements which are associated with the epidemiology."

<u>pg. 4, para. 11:</u>

"In the studies made by Mr. Hatfield and Dr. Longo, NIOSH Method 7402 *(as opposed to NIOSH Method 7400)* should have been used for the analysis of the air samples. This would have yielded data directly comparable with the epidemiological database. Instead, they elected to use an indirect-transfer TEM specimen preparation, and thereby generate data of no value because there are no scientific standards against which these data can be compared."

<u>pg. 4, para. 12:</u>

"The method chosen by Mr. Hatfield and Dr. Longo to analyze the air filters from their studies is stated as ASTM Method D 5755-95...*(this method)* does not include application to the analysis of air samples, and is an improper use of the ASTM standards, given that airborne particulate rather that surface dust was being analyzed. The results of ASTM D 5755-95 are specified to be reported in structures/cm², not structures/cc as used in the studies by Mr. Hatfield and Dr. Longo."

"Indirect-transfer TEM specimen preparation of airborne asbestos or asbestos-containing surface dust *(as done by Longo-Hatfield in the MAS tests)* causes large changes to occur in the fiber size distributions, particularly in the case of chrysotile, and the measure fiber size distribution derived from such a preparation bears little resemblance to that which existed in the original sample..."

<u>pg. 5, para. 12:</u>

"The indirect-transfer TEM measurements made by Mr. Hatfield and Dr. Longo therefore do not provide reliable information about the actual exposures during their experiments."

<u>pg. 6, para. 14:</u>

"Moreover, if the width distributions of the asbestos structures reported in Mr. Hatfield and Dr. Longo's indirect dust measurements were really those that existed in the original airborne material, the results reported would contradict conventional physics."

<u>pg. 7, para. 16:</u>

"Comparison of indirect-transfer and direct-transfer TEM specimen preparations of air samples collected from airborne particulate derived by abrasion of asbestos-containing materials shows that the majority of the asbestos structures reported by the indirect-transfer method *(improperly used in the MAS studies by Longo-Hatfield)* <u>did not exist as separate entities in the original airborne particulate material</u> (Chatfield, 2000).

**pg. 7, para. 17**

"(Tyndall illumination used in the video recordings by Longo-Hatfield in the MAS studies -PX Longo 34, 35)... are misleading for the following reasons: (a) ... the Tyndall effect does not discriminate between asbestos fibers and other types of particle. The contribution of asbestos to the dust depicted in the video recordings, and whether the particles are respirable or non-respirable, are therefore unknown; (b) "... de-focusing creates an extended illumination source from each point source, giving the overall effect of a snow storm. This type of demonstration grossly mis-represents the actual amount and size of the dust particles, and it is therefore misleading."

*Dr. Chatfield's opinions are corroborated by details and annotations to independent, peer-reviewed and generally accepted scientific publications and standards that provide a level of confidence for the court in his credibility. Furthermore, his opinions are fortified by similarly corroborated opinions by other experts who are deemed credible by this court. The court finds that Dr. Chatfield is qualified in a relevant science to render the opinions quoted above and that such opinions are both relevant and reliable in accordance with Daubert/Robinson standards.*

**John W. Spencer affidavit dated June 6, 2000 (attached as Exhibit A to Garlock's Motion to Strike William Longo and Richard Hatfield as Plaintiffs' Experts**

*Mr. Spencer is a certified industrial hygienist whose affidavit states that his CV is attached. The CV was not included with the copy furnished to the court, so the only knowledge of the court on the requirements of being a certified industrial hygienist is contained in the testimony of Mr. Frederick William Boelter, another certified industrial hygienist who testified live before the court. At page 220 line 7 of the court transcript of Boelter's testimony is the following:*

Q.     What are the requirements to become a certified industrial hygienist?
A.     You have to have a degree in the sciences, as well as five years of experience doing industrial hygiene work, and then sit for a two-part examination.
Q.     And you completed all that in 1980?
A.     Yes.
Q.     Does the examination for certified industrial hygienist – does the industrial hygienist exam require that you demonstrate mastery on the collection of analysis of air samples for occupational exposure?
A.     Yes.
Q.     In particular, occupational exposure to asbestos?
A.     Not necessarily in particular. It is a very broad test because it's a comprehensive certification. It encompasses sampling and analytical procedures broadly for the industrial hygiene field.

*For the purpose of these findings and conclusions the court assumes that Mr. Spencer fulfilled these same requirements.*

*The following is a summary and paraphrased version of the Spencer affidavit.*

1.     *The tests conducted at Materials Analytical Services, Inc (MAS) by Dr. William Longo and Mr. Richard Hatfield on gasket removal, scraping, hand wire brushing and electric wire brushing, as reflected in PX Longo 5, 6. 34 and 35 in April and June 2000, failed to use standard or generally recognized test procedures or any combination of such procedures that are recognized by any substantial number of the relevant scientific community or that have been peer reviewed and published.*

2.     *The Spencer opinions are annotated with a wealth of materials that are generally recognized within the relevant scientific community and by peer-reviewed articles that have been published in recognized and generally accepted scientific journals.*

3.     *In Spencer's opinion the tests conducted at Materials Analytical Services, Inc (MAS) by Dr. William Longo and Mr. Richard Hatfield on gasket removal, scraping, hand wire brushing and electric wire brushing, as reflected in PX Longo 5, 6. 34 and 35 in April and June 2000, failed to follow the requirements of the NIOSH 7400 and ASTM D5755-95 tests that are cited for support in the MAS reports. Specifically the MAS tests mixed the direct and indirect methods of sample preparation required by each test. The methods used in the MAS tests are not generally recognized within the relevant scientific community, are not recognized within a respectable portion of the relevant scientific community and are not recognized by peer reviewed articles that have been published in recognized and generally accepted scientific journals.*

4.     *The methods used in the MAS tests are demonstrably incorrect;*

5.     *All laboratories that determine fiber-in-air concentrations are required to have stringent quality control programs to monitor the proficiency of the laboratory against the methods criteria.*

6.     *Although TEM is used in connection with NIOSH 7402, it is only for the purpose of identifying asbestos fibers above 5 microns in length, 0.25 microns in width and less than 3 : 1 length to width aspect ratio, not for counting asbestos fibers as was improperly done in the MAS tests.*

7.     *The use of Tyndall lighting in the MAS tests is not an acceptable industrial hygiene practice and is not relevant or reliable for the quantification of airborne asbestos fibers.*

*The above cited facts and opinions contained in the Spencer affidavit are detailed, cite a wealth of easily verifiable and generally accepted standards and peer-reviewed publications. These along with the testimony of other*

EXHIBIT A

*experts deemed competent by the court corroborate Spencer's opinions. Mr. Spencer is found to be qualified in a relevant science to testify to the opinions shown above and that those opinions are both relevant and reliable under Daubert/Robinson standards.*

**Dr. William Longo testimony at Daubert/Robinson hearing on June 20, 2001.**

*Dr. Longo presented at the hearing with testimonial charisma and convincing demeanor. His educational qualifications and experience were impressive. He claims to have conducted business and testified fairly for both plaintiffs and defendants. Dr. Longo's testimony sounded reasonable and this court accepted it at face value until completing study of all the exhibits, affidavits and testimony.*

*After considerable study by the court, it became clear that the methodologies claimed to be used by MAS in the test reports were not followed. Further, no respectable community of scientists in the relevant professions recognizes the methods used by MAS. And although Dr. Longo claimed that the tests covered the pathways of exposure ("one size fits all") for gaskets (removing, hand wire brushing, electric wire brushing), insulating cement (pouring), Kaylo products (sawing) and Kelly-Moore joint compound (mixing and sanding), the MAS tests were also deficient in their failure to account for variable but reasonably foreseeable conditions in the possible pathways of exposure.*

*Neither the MAS tests nor Dr. Longo offer a satisfactory explanation as to why tests were not conducted under a foreseeable variety of test conditions.*

*Re-reading Dr. Longo's testimony reveals it to be practiced and to employ misdirection and evasiveness. It is at best disingenuous, not credible and unsupported by any respectable community of scientists.*

**James R. Millette, Ph.D., deposition dated June 7, 2001; affidavit dated May 22, 2001.**

*Dr. Millette is an educator and scientist who describes himself as an Environmental Scientist. He has worked and written extensively about asbestos. He gave his videotaped deposition in this case for the plaintiffs on June 7, 2001. He claims that he has testified in the past for other plaintiffs but not for any defendants. His affidavit consists of less than one and one-half pages of opinions with sixteen pages of attached CV.*

*Dr. Millette opines that the use of Tyndall lighting is not misleading and that the MAS tests describe results by both PCM and TEM. He then cites to one of his co-authored articles concerning levels of asbestos fiber release from gaskets "depending on the type of activity to which the gaskets are subjected." He further opines that the results of the MAS tests "...are not very different from the values reported in the scientific literature." He further describes the MAS test results as "... useful in understanding the release of asbestos fibers from gasket material." He concludes that "... TEM asbestos values are not new or novel and are generally accepted by the scientific community."*

The court is disturbed by the lack of proper scientific corroboration, explanations and annotations in support of Dr. Millette's opinions. He fails to reconcile the mixing of procedures under NIOSH 7400 and ASTM D-5557-95 and does not cite any respectable scientific sources in support of such novel procedures. The entire body of work of OSHA, EPA, NIOSH and ASTM are ignored. Neither does he cite any more authority than his anecdotal experience on the use of Tyndall light.

Indeed, the court assumes that if there was proper scientific support shown for the novel procedures utilized by MAS that the plaintiffs would have submitted a copy of the corroboration cited by Dr. Millette to his own article in the EIA technical journal 3(2): 10-15, 1995) relating to air sampling results for gasket activities. The court presumes that Dr. Millette's article was not offered into evidence because it would not have been supportive of plaintiffs' position.

Dr. Millette also presented in his videotaped deposition with testimonial charisma much in the same fashion as Dr. Longo. In the early part of his testimony Dr. Millette could not remember enough about the MAS test details to be credible. Later, when confronted by cross-examination concerning the details of NIOSH 7400, ASTM D 5755-95 and Tyndall lighting, his answers were consistently evasive and disingenuous at best, not unlike the performance of Dr. Longo during the hearing.

In Robinson at page 559 the supporting testimony of plaintiff's expert, Dr. Warde that there was a "... 99% probability that Dr. Whitcomb's conclusion ...was correct" was considered and rejected by the court.

The court likewise rejects the testimony of Dr. Millette as being insufficiently corroborated by peer reviewed publications and lacking in corroboration with any respectable community of scientists who accept the methodologies of the MAS tests. When combined with his faulty memory and evasive answers, his opinions are not credible.

LAMAR COUNTY ASBESTOS LITIGATION          Garlock. Inc. *Daubert* Order              12

**EXHIBIT P**



**Designation: D 5755 – 95**

## Standard Test Method for
## Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations[1]

This standard is issued under the fixed designation D 5755; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

### 1. Scope

1.1 This test method covers a procedure to ( *a* ) identify asbestos in dust and (*b*) provide an estimate of the concentration of asbestos in the sampled dust reported as the number of asbestos structures per unit area of sampled surface.

1.1.1 If an estimate of the asbestos mass is to be determined, the user is referred to Test Method D 5756.

1.2 This test method describes the equipment and procedures necessary for sampling, by a microvacuum technique, non-airborne dust for levels of asbestos structures. The non-airborne sample is collected inside a standard filter membrane cassette from the sampling of a surface area for dust which may contain asbestos.

1.2.1 This procedure uses a microvacuuming sampling technique. The collection efficiency of this technique is unknown and will vary among substrates. Properties influencing collection efficiency include surface texture, adhesiveness, electrostatic properties and other factors.

1.3 Asbestos identified by transmission electron microscopy (TEM) is based on morphology, selected area electron diffraction (SAED), and energy dispersive X-ray analysis (EDXA). Some information about structure size is also determined.

1.4 This test method is generally applicable for an estimate of the concentration of asbestos structures starting from approximately 1000 asbestos structures per square centimetre.

1.4.1 The procedure outlined in this test method employs an indirect sample preparation technique. It is intended to disperse aggregated asbestos into fundamental fibrils, fiber bundles, clusters, or matrices that can be more accurately quantified by transmission electron microscopy. However, as with all indirect sample preparation techniques, the asbestos observed for quantification may not represent the physical form of the asbestos as sampled. More specifically, the procedure described neither creates nor destroys asbestos, but it may alter the physical form of the mineral fibers.

1.5 The values stated in SI units are to be regarded as the standard. The values given in parentheses are for information only.

1.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

### 2. Referenced Documents

2.1 *ASTM Standards:*
D 1193 Specification for Reagent Water[2]
D 1739 Test Method for the Collection and Measurement of Dustfall (Settleable Particulate Matter)[3]
D 3195 Practice for Rotameter Calibration[3]
D 3670 Guide for Determination of Precision and Bias of Methods of Committee D-22[3]
D 5756 Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Mass Concentration[3]

### 3. Terminology

3.1 *Definitions:*

3.1.1 *asbestiform*—a special type of fibrous habit in which the fibers are separable into thinner fibers and ultimately into fibrils. This habit accounts for greater flexibility and higher tensile strength than other habits of the same mineral. For more information on asbestiform mineralogy, see Refs (1),[4] (2) and (3).

3.1.2 *asbestos*—a collective term that describes a group of naturally occurring, inorganic, highly fibrous, silicate dominated minerals, which are easily separated into long, thin, flexible fibers when crushed or processed.

3.1.2.1 *Discussion*—Included in the definition are the asbestiform varieties of: serpentine (chrysotile); riebeckite (crocidolite); grunerite (grunerite asbestos); anthophyllite (anthophyllite asbestos); tremolite (tremolite asbestos); and actinolite (actinolite asbestos). The amphibole mineral compositions are

---

[1] This test method is under the jurisdiction of ASTM Committee D-22 on Sampling and Analysis of Atmospheresand is the direct responsibility of Subcommittee D22.07on Sampling and Analysis of Asbestos.
Current edition approved August 15, 1995. Published October 1995.

[2] *Annual Book of ASTM Standards,* Vol 11.01.
[3] *Annual Book of ASTM Standards,* Vol 11.03.
[4] The boldface numbers in parentheses refer to the list of references at the end of this test method.

---

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

 D 5755

defined according to nomenclature of the International Mineralogical Association (3).

| Asbestos | Chemical Abstract Service No.[5] |
|---|---|
| Chrysotile | 12001-29-5 |
| Crocidolite | 12001-28-4 |
| Grunerite Asbestos | 12172-73-5 |
| Anthophyllite Asbestos | 77536-67-5 |
| Tremolite Asbestos | 77536-68-6 |
| Actinolite Asbestos | 77536-66-4 |

3.1.3 *fibril*—a single fiber that cannot be separated into smaller components without losing its fibrous properties or appearance.

3.2 *Definitions of Terms Specific to This Standard:*

3.2.1 *aspect ratio*—the ratio of the length of a fibrous particle to its average width.

3.2.2 *bundle*—a structure composed of three or more fibers in a parallel arrangement with the fibers closer than one fiber diameter to each other.

3.2.3 *cluster*—a structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group; groupings of fibers must have more than two points touching.

3.2.4 *debris*—materials that are of an amount and size (particles greater than 1 mm in diameter) that can be visually identified as to their source.

3.2.5 *dust*—any material composed of particles in a size range of ≤1 mm and large enough to settle by virtue of their weight from the ambient air (see definition for settleable particulate matter in Test Method D 1739).

3.2.6 *fiber*—a structure having a minimum length of 0.5 μm, an aspect ratio of 5:1 or greater, and substantially parallel sides (4).

3.2.7 *fibrous*—of a mineral composed of parallel, radiating, or interlaced aggregates of fibers, from which the fibers are sometimes separable. That is, the crystalline aggregate may be referred to as fibrous even if it is not composed of separable fibers, but has that distinct appearance. The term fibrous is used in a general mineralogical way to describe aggregates of grains that crystallize in a needle-like habit and appear to be composed of fibers. Fibrous has a much more general meaning than asbestos. While it is correct that all asbestos minerals are fibrous, not all minerals having fibrous habits are asbestos.

3.2.8 *indirect preparation*—a method in which a sample passes through one or more intermediate steps prior to final filtration.

3.2.9 *matrix*—a structure in which one or more fibers, or fiber bundles that are touching, are attached to, or partially concealed by a single particle or connected group of nonfibrous particles. The exposed fiber must meet the fiber definition (see 3.2.6).

3.2.10 *structures*—a term that is used to categorize all the types of asbestos particles which are recorded during the analysis (such as fibers, bundles, clusters, and matrices). Final results of the test are always expressed in asbestos structures per square centimetre.

## 4. Summary of Test Method

4.1 The sample is collected by vacuuming a known surface area with a standard 25 or 37 mm air sampling cassette using a plastic tube that is attached to the inlet orifice which acts as a nozzle. The sample is transferred from inside the cassette to an aqueous solution of known volume. Aliquots of the suspension are then filtered through a membrane. A section of the membrane is prepared and transferred to a TEM grid using the direct transfer method. The asbestiform structures are identified, sized, and counted by TEM, using SAED and EDXA at a magnification of 15 000 to 20 000X.

## 5. Significance and Use

5.1 This microvacuum sampling and indirect analysis method is used for the general testing of non-airborne dust samples for asbestos. It is used to assist in the evaluation of dust that may be found on surfaces in buildings such as ceiling tiles, shelving, electrical components, duct work, carpet, etc. This test method provides an index of the concentration of asbestos structures in the dust per unit area analyzed as derived from a quantitative TEM analysis.

5.1.1 This test method does not describe procedures or techniques required to evaluate the safety or habitability of buildings with asbestos-containing materials, or compliance with federal, state, or local regulations or statutes. It is the user's responsibility to make these determinations.

5.1.2 At present, a single direct relationship between asbestos-containing dust and potential human exposure does not exist. Accordingly, the user should consider these data in relationship to other available information in their evaluation.

5.2 This test method uses the definition, settleable particulate material, found in Test Method D 1739 as the definition of dust. This definition accepts all particles small enough to pass through a 1 mm (No. 18) screen. Thus, a single, large asbestos containing particle(s) (from the large end of the particle size distribution) dispersed during sample preparation may result in anomalously large asbestos concentration results in the TEM analyses of that sample. It is, therefore, recommended that multiple independent samples are secured from the same area, and a minimum of three samples analyzed by the entire procedure.

## 6. Interferences

6.1 The following minerals have properties (that is, chemical or crystalline structure) which are very similar to asbestos minerals and may interfere with the analysis by causing a false positive to be recorded during the test. Therefore, literature references for these materials must be maintained in the laboratory for comparison to asbestos minerals so that they are not misidentified as asbestos minerals.

6.1.1 *Antigorite.*

6.1.2 *Palygorskite (Attapulgite).*

6.1.3 *Halloysite.*

6.1.4 *Pyroxenes.*

6.1.5 *Sepiolite.*

6.1.6 *Vermiculite scrolls.*

6.1.7 *Fibrous talc.*

6.1.8 *Hornblende* and other amphiboles other than those listed in 3.1.2.

---

[5] The non-asbestiform variations of the minerals indicated in 5.1.3 have different Chemical Abstract Service (CAS) numbers.

🌐 **D 5755**

6.2 Collecting any dust particles greater than 1 mm in size in this test method may cause an interference and, therefore, must be avoided.

## 7. Materials and Equipment

7.1 *Purity of Reagents*—Reagent grade chemicals shall be used in all tests. Unless otherwise indicated, it is intended that all reagents conform to the specifications of the Committee on Analytical Reagents of the American Chemical Society, where such specifications are available. Other grades may be used, provided it is first ascertained that the reagent is of sufficiently high purity to permit its use without lessening the accuracy of the determination.[6]

7.2 *Transmission Electron Microscope (TEM)*, an 80 to 120 kV TEM, capable of performing electron diffraction, with a fluorescent screen inscribed with calibrated gradations, is required. The TEM must be equipped with energy dispersive X-ray spectroscopy (EDXA) and it must have a scanning transmission electron microscopy (STEM) attachment or be capable of producing a spot size of less than 250 nm in diameter in crossover.

7.3 *Energy Dispersive X-ray System (EDXA)*.

7.4 *High Vacuum Carbon Evaporator*, with rotating stage.

7.5 *High Efficiency Particulate Air (HEPA)*, filtered negative flow hood.

7.6 *Exhaust or Fume Hood*.

7.7 *Particle-free Water* (ASTM Type II, see Specification D 1193).

7.8 *Glass Beakers*  (50 mL).

7.9 *Glass Sample Containers*, with wide mouth screw cap (200 mL) or equivalent sealable container (height of the glass sample container should be approximately 13 cm high by 6 cm wide).

7.10 *Waterproof Markers*.

7.11 *Forceps* (tweezers).

7.12 *Ultrasonic Bath*, table top model (100 W).

7.13 *Graduated Pipettes* (1, 5, 10 mL sizes), glass or plastic.

7.14 *Filter Funnel*, either 25 mm or 47 mm, glass or disposable. Filter funnel assemblies, either glass or disposable plastic, and using either a 25 mm or 47 mm diameter filter.

7.15 *Side Arm Filter Flask*, 1000 mL.

7.16 *Mixed Cellulose Ester (MCE) Membrane Filters*, 25 or 47 mm diameter, ≤0.22 µm and 5 µm pore size.

7.17 *Polycarbonate (PC) Filters*, 25 or 47 mm diameter, ≤0.2 µm pore size.

7.18 *Storage Containers*, for the 25 or 47 mm filters (for archiving).

7.19 *Glass Slides*, approximately 76 by 25 mm in size.

7.20 *Scalpel Blades*, No. 10, or equivalent.

7.21 *Cabinet-type Desiccator*, or low temperature drying oven.

7.22 *Chloroform*, reagent grade.

7.23 *Acetone*, reagent grade.

7.24 *Dimethylformamide (DMF)*.

7.25 *Glacial Acetic Acid*.

7.26 *1-methyl-2-pyrrolidone*.

7.27 *Plasma Asher*, low temperature.

7.28 *pH Paper*.

7.29 *Air Sampling Pump*, low volume personal-type, capable of achieving a flow rate of 1 to 5 L/min.

7.30 *Rotameter*.

7.31 *Air Sampling Cassettes*, 25 mm or 37 mm, containing 0.8µ m or smaller pore size MCE or PC filters.

7.32 *Cork Borer*, 7 mm.

7.33 *Non-Asbestos Mineral*, references as outlined in 6.1.

7.34 *Asbestos Standards*, as outlined in 3.1.2.

7.35 *Tygon[7] Tubing*, or equivalent.

7.36 *Small Vacuum Pump*, that can maintain a pressure of 92 kPa.

7.37 *Petri Dishes*, large glass, approximately 90 mm in diameter.

7.38 *Jaffe Washer*, stainless steel or aluminum mesh screen, 30 to 40 mesh, and approximately 75 mm by 50 mm in size.

7.39 *Copper TEM Finder Grids*, 200 mesh.

7.40 *Carbon Evaporator Rods*.

7.41 *Lens Tissue*.

7.42 *Ashless Filter Paper Filters*, 90 mm diameter.

7.43 *Gummed Paper Reinforcement Rings*.

7.44 *Wash Bottles*, plastic.

7.45 *Reagent Alcohol*, HPLC Grade (Fisher A995 or equivalent).

7.46 *Opening Mesh Screen*, plastic, 1.0 by 1.0 mm, (Spectra-Mesh #146410 or equivalent).

7.47 *Diffraction Grating Replica*.

## 8. Sampling Procedure for Microvacuum Technique

8.1 For sampling asbestos-containing dust in either indoor or outdoor environments, commercially available cassettes must be used. Air monitoring cassettes containing 25 mm or 37 mm diameter mixed cellulose ester (MCE) or polycarbonate (PC) filter membranes with a pore size less than or equal to 0.8 µm are required (7.31). The number of samples collected depends upon the specific circumstances of the study.

8.2 Maintain a log of all pertinent sampling information and sampling locations.

8.3 Sampling pumps and flow indicators shall be calibrated using a certified standard apparatus or assembly (see Practice D 3195 and 7.29).

8.4 Record all calibration information **(5)**.

8.5 Perform a leak check of the sampling system at each sampling site by activating the pump (7.29) with the closed sampling cassette in line. Any air flow shows that a leak is present that must be eliminated before initiating the sampling operation.

8.6 Attach the sampling cassette to the sampling pump at the outlet side of the cassette with plastic tubing (7.35). The plastic tubing must be long enough in that the sample areas can

---

[6] *Reagent Chemicals, American Chemical Society Specifications*, American Chemical Society, Washington, DC. For suggestions on the testing of reagents not listed by the American Chemical Society, see *Analar Standards for Laboratory Chemicals*, BDH Ltd., Poole, Dorset, U.K., and the *United States Pharmacopeia and National Formulary*, U.S. Pharmaceutical Convention, Inc. (USPC), Rockville, MD.

[7] Tygon is a registered trademark of the DuPont Co.

⏚ **D 5755**

be reached without interference from the sampling pump. Attach a clean, approximately 25.4 mm long piece of plastic tubing (6.35 mm internal diameter) directly to the inlet orifice. Use this piece of tubing as the sampling nozzle. Cut the sampling end of the tubing at a 45° angle as illustrated in Fig. 1. The exact design of the nozzle is not critical as long as some vacuum break is provided to avoid simply pushing the dust around on the surface with the nozzle rather than vacuuming it into the cassette. The internal diameter of the nozzle and flow rate of the pump may vary as long as the air velocity is 100 (±10) cm/s. This air velocity calculation is based on an internal sampling tube diameter of 6.35 mm at a flow rate of 2 L/min.

8.7 Measure and determine the sample area of interest. A sample area of 100 cm$^2$ is vacuumed until there is no visible dust or particulates matter remaining. Perform a minimum of two orthogonal passes on the surface within a minimum of 2 min of sampling time. Avoid scraping or abrading the surface being sampled. (Do not sample any debris or dust particles greater than 1 mm in diameter (see 4.2).) Smaller or larger areas can be sampled, if needed. For example, some surfaces of interest may have a smaller area than 100 cm$^2$. Less dusty surfaces may require vacuuming of larger areas. Unlike air samples, the overloading of the cassettes with dust will not be a problem for this analysis. As defined in 3.2.5, only dust shall be collected for this analysis.

8.8 At the end of sample collection, invert the cassette so that the nozzle inlet faces up before shutting off the power to the pump. The nozzle is then sealed with a cassette end-plug and the cassette/nozzle taped or appropriately packaged to prevent separation of the nozzle and cassette assembly. A second option is the removal of the nozzle from the cassette, then plugging of the cassette and shipment of the nozzle (also plugged at both ends) sealed in a separate closeable plastic bag. A third option is placing the nozzle inside the cassette for shipment. The nozzle is always saved and rinsed because a significant percentage of the dust drawn from a lightly loaded surface may adhere to the inside walls of the tubing.

8.9 Check that all samples are clearly labeled, that all dust sampling information sheets are completed, and that all pertinent information has been enclosed, in accordance with laboratory quality control practices, before transfer of the samples to the laboratory. Include an unused cassette and nozzle as a field blank.

8.10 Wipe off the exterior surface of the cassettes with disposable wet towels (baby wipes) prior to packaging for shipment.

## 9. Sample Shipment

9.1 Ship dust samples to an analytical laboratory in a sealed container, but separate from any bulk or air samples. The cassettes must be tightly sealed and packed in a material free of fibers or dust to minimize the potential for contamination. Plastic "bubble pack" is probably the most appropriate material for this purpose.

## 10. Sample Preparation

10.1 Under a negative flow HEPA hood (7.5), carefully wet-wipe the exterior of the cassettes to remove any possible contamination before taking cassettes into a clean preparation area.

10.2 Perform sample preparation in a clean facility that has a separate work area from both the bulk and air sample preparation areas.

10.3 Initial specimen preparation shall take place in a clean HEPA filtered negative pressure hood to avoid any possible contamination of the laboratory or personnel, or both, by the potentially large number of asbestos structures in an asbestos-containing dust sample. Cleanliness of the preparation area hoods is measured by the cumulative process blank concentrations (see Section 11).

10.4 All sample preparation steps 10.4.1-10.4.6 shall take place in the dust preparation area inside a HEPA hood.

10.4.1 Remove the upper plug from the sample cassette and carefully introduce approximately 10 mL solution of a 50/50 mixture of particle-free water and reagent alcohol into the cassette using a plastic wash bottle (7.44). If the plugged nozzle was left attached to the cassette, then remove the plug and introduce the water/alcohol solution into the cassette through the tubing, and then remove the tubing, if it is visibly clean.

10.4.2 Replace the upper plug or the sample cap and lightly shake the dust suspension by hand for 3 s.

10.4.3 Remove the entire cap of the cassette and pour the suspension through a 1.0 by 1.0 mm opening screen (7.46) into a pre-cleaned 200 mL glass specimen bottle (7.9). All visible traces of the sample contained in the cassette shall be rinsed through the screen into the specimen bottle with a plastic wash bottle containing the 50/50 solution of particle-free water and alcohol. Repeat this procedure two additional times for a total of three washings. Next, rinse the nozzle two or three times through the screen into the specimen bottle with the 50/50 mixture of water and alcohol. Typically, the total amount of the 50/50 mixture used in the rinse is 50 to 75 mL. Discard the 1.0 by 1.0 mm screen and bring the volume of solution in the specimen bottle up to the 100 mL mark on the side of the bottle with particle-free water only.

10.4.4 Adjust the pH of the suspension to 3 to 4 using a 10.0 % solution of acetic acid. Use pH paper for testing. Filter the suspension within 24 h to avoid problems associated with bacterial and fungal growth.

10.4.5 Use either a disposable plastic filtration unit or a glass filtering unit (7.14) for filtration of aliquots of the suspension. The ability of an individual filtration unit to



1" TO 1-1/2"
OR
25 MM TO 37MM

APPROXIMATE 45 DEGREE ANGLE

1/4" DIAMETER TUBING

**FIG. 1 Example of the Tubing Nozzle**

**D 5755**

produce a uniform distribution may be tested by the filtration of a colored particulate suspension such as diluted India ink (suspension of carbon black).

10.4.5.1 If a disposable plastic filtration unit is used, then unwrap a new disposable plastic filter funnel unit (either 25 or 47 mm diameter) and remove the tape around the base of the funnel. Remove the funnel and discard the top filter supplied with the apparatus, retaining the coarse polypropylene support pad in place. Assemble the unit with the adapter and a properly sized neoprene stopper, and attach the funnel to the 1000 mL side-arm vacuum flask (7.15). Place a 5.0 μ m pore size MCE (backing filter) on the support pad. Wet it with a few mL of particle-free water and place an MCE (7.16) or PC filter (≤0.22 μm pore size) (7.17) on top of the backing filter. Apply a vacuum (7.36), ensuring that the filters are centered and pulled flat without air bubbles. Any irregularities on the filter surface requires the discard of that filter. After the filter has been seated properly, replace the funnel and reseal it with the tape. Return the flask to atmospheric pressure.

10.4.5.2 If a glass filtration unit is used, place a 5 μm pore size MCE (backing filter) on the glass frit surface. Wet the filter with particle-free water, and place an MCE or PC filter (≤0.22 μm pore size) on top of the backing filter. Apply a vacuum, ensuring that the filters are centered and pulled flat without air bubbles. Replace the filters if any irregularities are seen on the filter surface. Before filtration of each set of sample aliquots, prepare a blank filter by filtration of 50 mL of particle-free water. If aliquots of the same sample are filtered in order of increasing concentration, the glass filtration unit need not be washed between filtration. After completion of the filtration, do not allow the filtration funnel assembly to dry because contamination is then more difficult to remove. Wash any residual suspension from the filtration assembly by holding it under a flow of water, then rub the surface with a clean paper towel soaked in a detergent solution. Repeat the cleaning operation, and then rinse two times in particle-free water.

10.4.6 With the flask at atmospheric pressure, add 20 mL of particle-free water into the funnel. Cover the filter funnel with its plastic cover if the disposable filtering unit is used.

10.4.7 Briefly hand shake (3 s) the capped bottle with the sample suspension, then place it in a tabletop ultrasonic bath (7.12) and sonicate for 3.0 min. Maintain the water level in the sonicator at the same height as the solution in sample bottle. The ultrasonic bath shall be calibrated as described in 20.5. The ultrasonic bath must be operated at equilibrium temperature. After sonicating, return the sample bottle to the work surface of the HEPA hood. Preparation steps 10.4.8-10.4.14 shall be carried out in this hood.

10.4.8 Shake the suspension lightly by hand for 3 s, then let it rest for 2.0 min to allow large particles to settle to the bottom of the bottle or float to the surface.

10.4.9 Estimate the amount of liquid to be withdrawn to produce an adequate filter preparation. Experience has shown that a light staining of the filter surface will yield a suitable preparation for analysis. Filter at least 1.0 mL, but no more than half the total volume. If after examination in the TEM, the smallest volume measured (1.0 mL) (7.13) yields an over-loaded sample, then perform additional serial dilutions of the

suspension. If it is estimated that less than 1.0 mL of solution has to be filtered because of the density of the suspension, perform a serial dilution.

10.4.9.1 If serial dilutions are required, repeat step 10.4.8 before the serial dilution portion is taken. Do not re-sonicate the original solution or any serial dilutions. The recommended procedure for a serial dilution is to mix 10 mL of the sample solution with 90 mL of particle-free water in a clean sample bottle to obtain a 1:10 serial dilution. Follow good laboratory practices when performing dilutions.

10.4.10 Insert a new disposable pipette halfway into the sample suspension and withdraw a portion. Avoid pipetting any of the large floating or settled particles. Uncover the filter funnel and dispense the mixture from the pipette into the water in the funnel.

10.4.11 Apply vacuum to the flask and draw the mixture through the filter.

10.4.12 Discard the pipette.

10.4.13 Disassemble the filtering unit and carefully remove the sample filter with fine tweezers (7.11). Place the completed sample filter particle side up, into a precleaned, labeled, disposable, plastic petri dish (7.48) or other similar container.

10.4.14 In order to ensure that an optimally-loaded filter is obtained, it is recommended that filters be prepared from several different aliquots of the dust suspension. For this series of filters, it is recommended that the volume of each aliquot of the original suspension be a factor of five higher than the previous one. If the filters are prepared in order of increasing aliquot volume, all of the filters for one sample can be prepared using one plastic disposable filtration unit, or without cleaning of glass filtration equipment between individual filtration. Before withdrawal of each aliquot from the sample, shake the suspension without additional sonification and allow to rest for 2 min.

10.4.15 There are many practical methods for drying MCE filters. The following are two examples that can be used: ( 1) dry MCE filters for at least 12 h (over desiccant) in an airtight cabinet-type desiccator (7.21); (2) to shorten the drying time (if desired), remove a plug of the damp filter and attach it to a glass slide (7.19) as described in 12.1.2 and 12.1.3. Place the slide with a filter plug or filter plugs (up to eight plugs can be attached to one slide) on a bed of desiccant, in the desiccator for 1 h.

10.4.16 PC filters do not require lengthy drying before preparation, but shall be placed in a desiccator for at least 30 min before preparation.

10.5 Prepare TEM specimens from small sections of each dried filter using the appropriate direct transfer preparation method.

## 11. Blanks

11.1 Prepare sample blanks that include both a process blank (50 mL of particle-free water) for each set of samples analyzed and one unused filter from each new box of sample filters (MCE or PC) used in the laboratory. If glass filtering units are used, prepare and analyze a process blank each time the filtering unit is cleaned. Blanks will be considered contaminated, if after analysis, they are shown to contain more

 **D 5755**

than 53 asbestos structures per square millimetre. This generally corresponds to three or four asbestos structures found in ten grid openings. The source of the contamination must be found before any further analysis can be performed. Reject samples that were processed along with the contaminated blanks and prepare new samples after the source of the contamination is found.

11.2 Prepare field blanks which are included with sample sets in the same manner as the samples, to test for contamination during the sampling, shipping, handling, and preparation steps of the method.

## 12. TEM Specimen Preparation of Mixed Cellulose Ester (MCE) Filters

NOTE 1—Use of either the acetone or the diamethylformamide-acetic acid method is acceptable.

12.1 *Acetone Fusing Method*:

12.1.1 Remove a section (a plug) from any quadrant of the sample and blank filters. Sections can be removed from the filters using a 7 mm cork borer (7.32). The cork borer must be wet wiped each time a section is removed.

12.1.2 Place the filter section (particle side up) on a clean microscope slide. Affix the filter section to the slide with a gummed page reinforcement (7.43), or other suitable means. Label the slide with a glass scribing tool or permanent marker (7.10).

12.1.3 Prepare a fusing dish from a glass petri dish (7.37) and a metal screen bridge (7.38) with a pad of five to six ashless paper filters (7.42) and place in the bottom of the petri dish (4). Place the screen bridge on top of the pad and saturate the filter pads with acetone. Place the slide on top of the bridge in the petri dish and cover the dish. Wait approximately 5 min for the sample filter to fuse and clear.

12.2 *Dimethylformamide-Acetic Acid Method*:

12.2.1 Place a drop of clearing solution that consists of 35 % dimethylformamide (DMF), 15 % glacial acetic acid, and 50 % Type II water (v/v) on a clean microscope slide. Gauge the amount used so that the clearing solution just saturates the filter section.

12.2.2 Carefully lay the filter segment, sample surface upward, on top of the solution. Bring the filter and solution together at an angle of about 20° to help exclude air bubbles. Remove any excess clearing solution. Place the slide in an oven or on a hot plate, in a fume hood, at 65 to 70°C for 10 min.

12.3 Plasma etching of the collapsed filter is required.

12.3.1 The microscope slide to which the collapsed filter pieces are attached is placed in a plasma asher (7.27). Because plasma ashers vary greatly in their performance, both from unit to unit and between different positions in the asher chamber, it is difficult to specify the exact conditions that must be used. Insufficient etching will result in a failure to expose embedded fibers, and too much etching may result in the loss of particles from the filter surface. To determine the optimum time for ashing, place an unused 25 mm diameter MCE filter in the center of a glass microscope slide. Position the slide approximately in the center of the asher chamber. Close the chamber and evacuate to a pressure of approximately 40 Pa, while admitting oxygen to the chamber at a rate of 8 to 20 cm³/min.

Adjust the tuning of the system so that the intensity of the plasma is maximized. Determine the time required for complete oxidation of the filter. Adjust the system parameters to achieve complete oxidation of the filter in a period of approximately 15 min. For etching of collapsed filters, use these operating parameters for a period of 8 min. For additional information on calibration, see the *USEPA Asbestos-Containing Materials in Schools* (4) or *NIST/NVLAP Program Handbook for Airborne Asbestos Analysis* (6) documents.

12.3.2 Place the glass slide containing the collapsed filters into the low-temperature plasma asher, and etch the filter.

12.4 Carbon coating of the collapsed and etched filters is required.

12.4.1 Carbon coating must be performed with a high-vacuum coating unit (7.4), capable of less than $10^{-4}$ torr (13 MPa) pressure. Units that are based on evaporation of carbon filaments in a vacuum generated only by an oil rotary pump have not been evaluated for this application and shall not be used. Carbon rods (7.40) used for evaporators shall be sharpened with a carbon rod sharpener to a neck of about 4 mm in length and 1 mm in diameter. The rods are installed in the evaporator in such a manner that the points are approximately 100 to 120 mm from the surface of the microscope slide held in the rotating device.

12.4.2 Place the glass slide holding the filters on the rotation device, and evacuate the evaporator chamber to a vacuum of at least 13 MPa. Perform the evaporation in very short bursts, separated by 3 to 4 s to allow the electrodes to cool. An alternate method of evaporation is by using a slow continuous applied current. An experienced analyst can judge the thickness of the carbon film to be applied. Conduct tests on unused filters first. If the carbon film is too thin, large particles will be lost from the TEM specimen, and there will be few complete and undamaged grid openings on the specimen.

12.4.2.1 If the coating is too thick, it will lead to a TEM image that is lacking in contrast, and the ability to obtain electron diffraction patterns will be compromised. The carbon film shall be as thin as possible and still remain intact on most of the grid openings of the TEM specimen.

12.5 *Preparation of the Jaffe Washer*— The precise design of the Jaffe washer is not considered important, so any one of the published designs may be used (7, 8). One such washer consists of a simple stainless steel bridge contained in a glass petri dish.

12.5.1 Place several pieces of lens tissue (7.41) on the stainless steel bridge. The pieces of lens tissue shall be large enough to completely drape over the bridge and into the solvent. In a fume hood, fill the petri dish with acetone (or DMF) until the height of the solvent is brought up to contact the underside of the metal bridge as illustrated in Fig. 2.

12.6 *Placing the Specimens into the Jaffe Washer*:

12.6.1 Place the TEM grids (7.39) shiny side up on a piece of lens tissue or filter paper so that individual grids can be easily picked up with tweezers.

12.6.2 Prepare three grids from each sample.

12.6.2.1 Using a curved scalpel blade (7.20), excise at least two square (3 mm by 3 mm) pieces of the carbon-coated MCE filter from the glass slide.

🏛 **D 5755**



Glass petri dish (100 mm x 15 mm)
Electron microscope specimens
Stainless steel mesh bridge (50 mesh)
Lens Tissue

**FIG. 2 Example of Design of Solvent Washer (Jaffe Washer)**

12.6.2.2 Place the square filter piece carbon-side up on top of a TEM specimen grid.

12.6.2.3 Place the whole assembly (filter/grid) on the saturated lens tissue in the Jaffe washer.

12.6.2.4 Place the three TEM grid sample filter preparations on the same piece of lens tissue in the Jaffe washer.

12.6.2.5 Place the lid on the Jaffe washer and allow the system to stand for several hours.

12.7 Alternately, place the grids on a low level (petri dish filled to the ⅛ mark) DMF Jaffe washer for 60 min. Add enough solution of equal parts DMF/acetone to fill the washer to the screen level. Remove the grids after 30 min if they have cleared, that is, all filter material has been removed from the carbon film, as determined by inspection in the TEM.

12.8 Carefully remove the grids from the Jaffe washer, allowing the grids to dry before placing them in a clean marked grid box.

## 13. TEM Specimen Preparation of Polycarbonate (PC) Filter

13.1 Cover the surface of a clean microscope slide with two strips of double-sided adhesive tape.

13.2 Cut a strip of filter paper slightly narrower than the width of the slide. Position the filter paper strip on the center of the length of the slide.

13.3 Using a clean, curved scalpel blade, cut a strip of the PC filter approximately 25 by 6 mm. Use a rocking motion of the scalpel blade to avoid tearing the filter. Place the PC strip particle side up on the slide perpendicular to the long axis of the slide. The ends of the PC strip must contact the double sided adhesive tape. Each slide can hold several PC strips. With a glass marker, label each PC strip with the individual sample number.

13.4 Carbon coat the PC filter strips as discussed in 12.4.2. PC filters do not require etching.

NOTE 2—**Caution:** Do not overheat the filter sections while carbon coating.

13.5 Prepare a Jaffe washer as described in 12.5, but fill the washer with chloroform or 1-methyl-2-pyrrolidone to the level of the screen.

13.6 Using a clean curved scalpel blade, excise three, 3-mm square filter pieces from each PC strip. Place the filter squares carbon side up on the shiny side of a TEM grid. Pick up the grid and filter section together and place them on the lens tissue in the Jaffe washer.

13.7 Place the lid on the Jaffe washer and rest the grids in place for at least 4 h. Best results are obtained with longer wicking times, up to 12 h.

13.8 Carefully remove the grids from the Jaffe washer, allowing the grids to dry before placing them in a clean, marked grid box.

## 14. Grid Opening Measurements

14.1 TEM grids must have a known grid opening area. Determine this area as follows:

14.2 Measure at least 20 grid openings in each of 20 random 75 to 100 μm (200-mesh) copper grids for a total of 400 grid openings for every 1000 grids used, by placing the 20 grids on a glass slide and examining them under the optical microscope. Use a calibrated graticule to measure the average length and width of the 20 openings from each of the individual grids. From the accumulated data, calculate the average grid opening area of the 400 openings.

14.3 Grid area measurements can also be made at the TEM at a calibrated screen magnification of between 15 000 and 20 000X. Typically measure one grid opening for each grid examined. Measure grid openings in both the x and y directions and calculate the area.

14.4 Pre-calibrated TEM grids are also acceptable for this test method.

## 15. TEM Method

15.1 Microscope settings: 80 to 120 kV, 15 000 to 20 000X screen magnification for analysis (7.2).

15.2 Analyze two grids for each sample. Analyze one-half of the sample area on one sample grid preparation and the remaining half on a second sample grid preparation.

15.3 *Determination of Specimen Suitability*:

15.3.1 Carefully load the TEM grid, carbon side facing up (in the TEM column) with the grid bars oriented parallel/perpendicular to the length of the specimen holder. Use a hand lens or loupe, if necessary. This procedure will line up the grid with the X and y translation directions of the microscope. Insert the specimen holder into the microscope.

15.3.2 Scan the entire grid at low magnification (250X to 1000X) to determine its suitability for high magnification analysis as specified in 15.3.3.

15.3.3 Grids are acceptable for analysis if the following conditions are met:

15.3.3.1 The fraction of grid openings covered by the replica section is at least 50 %.

15.3.3.2 Relative to that section of the grid covered by the carbon replica, the fraction of intact grid openings is greater than 50 %.

15.3.3.3 The fractional area of undissolved filter is less than 10 %.

15.3.3.4 The fraction of grid openings with overlapping or folded replica film is less than 50 %.

15.3.3.5 At least 20 grid openings, that have no overlapping or folded replica, are less than 5 % covered with holes and have less than 5 % opaque area due to incomplete filter dissolution.

15.4 *Determination of Grid Opening Suitability*:

15.4.1 If the grid meets acceptance criteria, choose a grid opening for analysis from various areas of the grid so that the

D 5755

entire grid is represented. Determine the suitability of each individual grid opening prior to the analysis.

15.4.2 The individual grid opening must have less than 5 % holes over its area.

15.4.3 Grid openings must be less than 25 % covered with particulate matter.

15.4.4 Grid openings must be uniformly loaded.

15.5 Observe and record the orientation of the grid at 80 to 150X, on a grid map record sheet along with the location of the grid openings that are examined for the analysis. If indexed grids are used, a grid map is not required, but the identifying coordinates of the grid square must be recorded.

## 16. Recording Data Rules

16.1 Record on the count sheet any continuous grouping of particles in which an asbestos fiber is detected. Classify asbestos structures as fibers, bundles, clusters, or matrices as defined in 5.2.

16.2 Use the criteria for fiber, bundle, cluster, and matrix identification, as described in the *USEPA Asbestos-Containing Materials in Schools* document **(4)**. Record, for each AHERA structure identified, the length and width measurements.

16.3 Record NSD (No Structures Detected) when no structures are detected in the grid opening.

16.4 Identify structures classified as chrysotile identified by either electron diffraction or X-ray analysis (7.3) and recorded on a count sheet. Verify at least one out of every ten chrysotile structures by X-ray analysis.

16.5 Structures classified as amphiboles by X-ray analysis and electron diffraction are recorded on the count sheet. For more information on identification, see Yamate, et al, **(7)** or Chatfield and Dillon **(8)**.

16.6 Record a typical electron diffraction pattern for each type of asbestos observed for each group of samples (or a minimum of every five samples) analyzed. Record the micrograph number on the count sheet. Record at least one X-ray spectrum for each type of asbestos observed per sample. Attach the print-outs to the back of the count sheet. If the X-ray spectrum is stored, record the file and disk number on the count sheet.

16.7 *Counting Rules:*

16.7.1 At a screen magnification of between 15 000 and 20 000X evaluate the grids for the most concentrated sample loading; reject the sample if it is estimated to contain more than 50 asbestos structures per grid opening. Proceed to the next lower concentrated sample until a set of grids are obtained that have less than 30 asbestos structures per grid opening.

16.8 *Analytical Sensitivity*—An analytical sensitivity of approximately 1000 asbestos structures per square centimetre (calculated for the detection of a single asbestos structure) has been designed for this analysis. This sensitivity can be achieved by increasing the amount of liquid filtered, increasing the number of grid openings analyzed, or decreasing the size of the final filter. Occasionally, due to high particle loadings or high asbestos concentration, this analytical sensitivity cannot be practically achieved and stopping rules apply.

16.9 *Limit of Detection*—The limit of detection for this method is defined as, at a minimum, the counting of four asbestos structures during the TEM analysis. If less than four asbestos structures are counted during the analysis then the analytical result which will be reported will be less than the limit of detection and a "less than" sign (<) will appear before the number. All data shall be provided in the laboratory report.

16.10 *Stopping Rules:*

16.10.1 The analysis is stopped upon the completion of the grid square that achieves an analytical sensitivity of less than 1000 asbestos structures per square centimetre.

16.10.2 If an analytical sensitivity of 1000 asbestos structures per square centimetre cannot be achieved after analyzing ten grid openings then stop on grid opening No. 10 or the grid opening which contains the 100th asbestos structure, whichever comes first. A minimum of four grid squares shall be analyzed for each sample.

16.10.2.1 If the analysis is stopped because of the 100th structure rule, the entire grid square containing the 100th structure must be counted.

16.11 After analysis, remove the grids from the TEM, and replace them in the appropriate grid storage holder.

## 17. Sample Storage

17.1 The washed-out sample cassettes can be discarded after use.

17.2 Sample grids and unused filter sections (7.18) must be stored for a minimum of one year.

## 18. Reporting

18.1 Report the following information for each dust sample analyzed:

18.1.1 Concentration in structures/cm$^2$.

18.1.2 The analytical sensitivity.

18.1.3 Types of asbestos present.

18.1.4 Number of asbestos structures counted.

18.1.5 Effective filtration area.

18.1.6 Average size of the TEM grid openings that were counted.

18.1.7 Number of grid openings examined.

18.1.8 Sample dilution used.

18.1.9 Area of the surface sampled.

18.1.10 Listing of size data for each structure counted.

18.1.11 A copy of the TEM count sheet or a complete listing of the raw data. An example of a typical count sheet is shown in Appendix X1.

18.2 Determine the amount of asbestos in any accepted sample using the following formula:

$$\frac{EFA \times 100 \text{ mL} \times \#STR}{GO \times GOA \times V \times SPL} = \text{asbestos structures/cm}^2 \qquad (1)$$

where:

$\#STR$ = number of asbestos structures counted,
$EFA$ = effective filter area of the final sampling filter, mm$^2$,
$GO$ = number of grid openings counted,
$GOA$ = average grid opening area, mm$^2$,
$SPL$ = surface area sampled, cm$^2$, and
$V$ = volume of sample filtered in step 10.4.9, representing the actual volume taken from the original 100 mL suspension, mL.

**D 5755**

## 19. Quality Control/Quality Assurance

19.1 In general, the laboratory's quality control checks are used to verify that a system is performing according to specifications regarding accuracy and consistency. In an analytical laboratory, spiked or known quantitative samples are normally used. However, due to the difficulties in preparing known quantitative asbestos samples, routine quality control testing focuses on re-analysis of samples (duplicate recounts).

19.1.1 Re-analyze samples at a rate of 1/10 of the sample sets (one out of every ten samples analyzed not including laboratory blanks). The re-analysis shall consist of a second sample preparation obtained from the final filter.

19.2 In addition, quality assurance programs must follow the criteria shown in the *USEPA Asbestos-Containing Materials in Schools* document (4) and in the *NIST/NVLAP Program Handbook for Airborne Asbestos Analysis* document (6). These documents describe sample custody, sample preparation, blank checks for contamination, calibration, sample analysis, analyst qualifications, and technical facilities.

## 20. Calibrations

20.1 Perform calibrations of the instrumentation on a regular basis, and retain these records in the laboratory, in accordance with the laboratory's quality assurance program.

20.2 Record calibrations in a log book along with dates of calibration and the attached backup documentation.

20.3 A calibration list for the instrument is as follows:

20.3.1 *TEM:*

20.3.1.1 Check the alignment and the systems operation. Refer to the TEM manufacturer's operational manual for detailed instructions.

20.3.1.2 Calibrate the camera length of the TEM in electron diffraction (ED) operating mode before ED patterns of unknown samples are observed. Camera length can be measured by using a carbon coated grid on which a thin film of gold has been sputtered or evaporated. A thin film of gold is evaporated on the specimen TEM grid to obtain zone-axis ED patterns superimposed with a ring pattern from the polycrystalline gold film. In practice, it is desirable to optimize the thickness of the gold film so that only one or two sharp rings are obtained on the superimposed ED pattern. Thick gold films will tend to mask weak diffraction spots from the fibrous particles. Since the unknown d-spacings of most interest in asbestos analysis are those which lie closest to the transmitted beam, multiple gold rings from thick films are unnecessary. Alternatively, a gold standard specimen can be used to obtain an average camera constant calculated for that particular instrument and can then be used for ED patterns of unknowns taken during the corresponding period.

20.3.1.3 Perform magnification calibration at the fluorescent screen. This calibration must be performed at the magnification used for structure counting. Calibration is performed with a grating replica (7.47) (for example, one containing at least 2160 lines/mm).

(a) *(a)* Define a field of view on the fluorescent screen. The field of view must be measurable or previously inscribed with a scale or concentric circles (all scales should be metric).

(b) *(b)* Frequency of calibration will depend on the service history of the particular microscope.

(c) *(c)* Check the calibration after any maintenance of the microscope that involves adjustment of the power supply to the lens or the high voltage system or the mechanical disassembly of the electron optical column (apart from filament exchange).

(d) *(d)* The analyst must ensure that the grating replica is placed at the same distance from the objective lens as the specimen.

(e) *(e)* For instruments that incorporate a eucentric tilting specimen stage, all specimens and the grating replica must be placed at the eucentric position.

20.3.1.4 The smallest spot size of the TEM must be checked.

(a) *(a)* At the crossover point, photograph the spot size at a screen magnification of 15 000 to 20 000X. An exposure time of 1 s is usually adequate.

(b) *(b)* The measured spot size must be less than or equal to 250 nm.

20.4 *EDXA:*

20.4.1 The resolution and calibration of the EDXA must be verified.

20.4.1.1 Collect a standard EDXA Cu peak from the Cu grid.

20.4.1.2 Compare the X-ray energy versus channel number for the Cu peak and be certain that readings are within ±10 eV.

20.4.2 Collect a standard EDXA of crocidolite asbestos (NIST SRM 1866).

20.4.2.1 The elemental analysis of the crocidolite must resolve the Na peak.

20.4.3 Collect a standard EDXA of chrysotile asbestos.

20.4.3.1 The elemental analysis of chrysotile must resolve both Si and Mg on a single chrysotile fiber.

20.5 Ultrasonic bath calibration shall be performed as follows:

20.5.1 Fill the bath water to a level equal to the height of suspension in the glass sample container that will be used for the dust analysis. Operate the bath until the water reaches the equilibrium temperature.

20.5.2 Place 100 mL of water (at approximately 20°C) in another 200-mL glass sample container, and record its temperature.

20.5.3 Place the sample container in the water in the ultrasonic bath (with the power turned off). After 60 s, remove the glass container and record its temperature.

20.5.4 Place 100 mL of water (at approximately 20°C) in another 200-mL glass sample container, and record its temperature.

20.5.5 Place the second sample container into the water in the ultrasonic bath (with the power turned on). After 60 s, remove the glass container and record its temperature.

20.5.6 Calculate the rate of energy deposition into the sample container using the following formula:

$$R = 4.185 \times \sigma \times \rho \times \frac{(\theta_2 - \theta_1)}{t} \qquad (2)$$

where:
$4.185$ = Joules/cal,
$R$ = energy deposition, watts/mL,

9

D 5755

$\theta_1$ = temperature rise with the ultrasonic bath not operating, °C,

$\theta_2$ = temperature rise with the ultrasonic bath operating, °C,

$t$ = time in seconds, 60 s (20.5.3 and 20.5.5),

$\sigma$ = specific heat of the liquid in the glass sample container, 1.0 cal/g, and

$\rho$ = density of the liquid in the glass sample container, 1.0 g/cm$^3$.

20.5.7 Adjust the operating conditions of the bath so that the rate of energy deposition is in the range of 0.08 to 0.12 MW/m$_3$, as defined by this procedure.

## 21. Precision and Bias

21.1 *Precision*—The precision of the procedure in this test method is being determined using round robin data from participating laboratories.

21.2 *Bias*—Since there is no accepted reference material suitable for determining the bias of the procedure in this test method, bias has not been determined (see Specification D 3670).

NOTE 3—Round robin data is under development and will be presented as a research report.

## 22. Keywords

22.1 asbestos; microvacuuming; settled dust; TEM

## APPENDIX

### (Nonmandatory Information)

### X1. DUST SAMPLE ANALYSIS

X1.1 See Figs. X1.1 and X1.2 for the dust analysis worksheet and the TEM count sheet.

**D 5755**

## DUST SAMPLE ANALYSIS

Client: _____          Accelerating Voltage: _____

Sample ID: _____       Indicated Mag: _____ KX _____

Job Number: _____      Screen Mag: _____ KX _____

Date Sample Analyzed: _____ - _____ - _____   Microscope:   1   2   3   4   5

Number of Openings/Grids Counted: _____|_____   Filter Type: _____

Grid Accepted, 600X:          Yes    No    Filter Size: _____

Percent Loading: _____ %              Filter Pore Size ($\mu$m): _____

Grid Box #1: _____      Grid Opening:   1) _____ $\mu$m  x _____ $\mu$m

                                                        2) _____ $\mu$m  x _____ $\mu$m

Analyst: _____

Reviewer: _____      Counting Rules:    AHERA      LEVEL II

Calculation Data:

Effective Filter Area in mm$^2$:                (EFA)    _____

Number of Grid Openings Counted:                (GO)     _____

Avderage Grid Opening Area in mm$^2$:           (GOA)    _____

Volume of sample Filtered in ml:                (V)      _____

Surface area Sampled in cm$^2$:                 (SPL)    _____

Number of Asbestos Structures Counted:*         (#STR)   _____

* If the number of asbestos structures counted is less than or equal to 4, enter 4 structures as the limit of detection here.

## FORMULA FOR CALCULATION OF ASBESTOS STRUCTURES "DUST" PER CM$^2$:

$$\frac{EFAX \ X \ 100 \ X \ \#STR}{GO \ X \ GOA \ X \ VX \ SPL} = \text{(Asbestos Structures per cm}^2\text{)}$$

Results for Total Asbestos Structures: _____
                                       (Structures per cm$^2$)

Results for Structures $\geq$ microns: _____
                                       (Structures per cm$^2$)

**FIG. X1.1 Dust Sample Analysis Work Sheet**

⟨ASTM⟩ **D 5755**

Job Number: _____

| Structure # | Grid # Square # | Type | Structure | Length Microns | Width Microns | Confirmation | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Morph. | SAED | EDS |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Note:   Keys to Abbreviations Used in Figure:

| | | **Type:** | | **Structure:** | | | **Others:** | |
|---|---|---|---|---|---|---|---|---|
| C | = | Chrysotile | F = | Fiber | NSD | = | No Structures Detected | |
| AM | = | Amosite | B = | Bundle | Morph | = | Morphology | |
| CR | = | Crocidolite | C = | Cluster | SAED | = | Selected Area Electron Diffraction | |
| AC | = | Actinolite | M = | Matrix | EDS | = | Energy Dispersive X-Ray Spectroscopy | |
| TR | = | Tremolite | | | ER | = | Inter-Row Spacing | |
| AN | = | Anthophyllite | | | NP | = | No Pattern | |
| N | = | Non Asbestos | | | | | | |

**FIG. X1.2 TEM Count Sheet**

12

**D 5755**

## REFERENCES

(1) Steel, E. and Wylie, A., "Mineralogical Characteristics of Asbestos," in *Geology of Asbestos Deposits*, Riordon, P. H., Ed., SME-AIME, 1981, pp. 93–101.

(2) Zussman, J., "The Mineralogy of Asbestos," in *Asbestos: Properties, Applications and Hazards*, John Wiley and Sons, 1979, pp. 45–67.

(3) Leake, B. E., "Nomenclature of Amphiboles," *American Mineralogist*, Vol 63, 1978, pp. 1023–1052.

(4) " *USEPA Asbestos-Containing Materials in Schools: Final Rule and Notice," Federal Register*, 40 CFR Part 763, Appendix A to Sub-part E., Oct. 30, 1987.

(5) OSHA, *OSHA Technical Manual, OSHA Instruction CPL 2-20B*, Directorate of Technical Support, U.S. Department of Labor, Washington, DC 20210, Feb. 5, 1990, pp. 1–8 to 1–11.

(6) *NIST/NVLAP Program Handbook for Airborne Asbestos Analysis*, NISTIR, August 1989, pp. 89–4137.

(7) Yamate, G., Agarwall, S. C., and Gibbons, R. D., "Methodology for the Measurement of Airborne Asbestos by Electron Microscopy," EPA Draft Report, Contract No. 68-02-3266, 1984.

(8) Chatfield, E. J., and Dillon, M. J., "Analytical Method for the Determination of Asbestos in Water," EPA No. 600/4-83-043, 1983.

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).*

**EXHIBIT Q**

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


IN RE:                       )
                             ) CHAPTER 11
W.R. GRACE & CO., ET AL.,    ) CASE NO. 01-01139(JKF)
                             )
_____Debtors.    ) (JOINTLY ADMINISTERED)



DEPOSITION OF

WILLIAM E. LONGO, Ph.D.

May 8, 2003

9:25 a.m.

2100 Bank of America Plaza

600 Peachtree Street

Atlanta, Georgia

Frances Buono, RPR, CCR-B-791


B R O W N
*Reporting* INC.

1740 Peachtree St, N.W.
Atlanta, GA 30309
404-876-8979

1      A.      That is correct.

2      Q.      The beginning part of your statement

3  talked about having less than an aspect ratio of five

4  to one.

5      A.      That is correct.

6      Q.      By that do you mean one does not find

7  cleavage fragments with an aspect ratio greater than

8  five to one?

9      A.      No, you can find them greater than five to

10  one, but they will have definite -- they will not

11  have substantially parallel sides.

12      Q.      Now --

13      A.      When we count fibers, of course we follow

14  the rules, we follow EPA's rules, OSHA's rules.

15  Well, EPA's rules in the counting rules five to one.

16  We won't call anything less than five to one

17  asbestiform.  But you can have longer structures that

18  do not have substantially parallel sides and that is

19  a cleavage fragment.

20      Q.      And were you attempting to anticipate my

21  next question by that answer?

22      A.      No, sir.  I am not smart enough to do

23  that.

24      Q.      In the laboratory, if the analyst sees an

25  item which meets the counting rules and the aspect

1    ratio, does the analyst report that out as an

2    asbestos fiber?

3        A.    If it meets the counting rules, has

4    substantially parallel sides, yes, that is the rules.

5    We follow the rules.

6        Q.    Don't bate me.

7            Would that mean, putting the rules aside

8    and I understand what you have said, would that mean

9    that in following the rules, in your laboratory, you

10   would be counting some items which in fact are

11   cleavage fragments as you have defined them, but

12   which under the counting rules are to be counted as

13   fibers?

14       A.    No, you can't have both, you can't follow

15   the rules and count a cleavage fragment.  Typically

16   cleavage fragments will not have the substantially

17   parallel sides.

18       Q.    I am going to try that again, Dr. Longo.

19   I want you to assume for me on the picture you have

20   drawn -- you are an expert and I can ask you to make

21   assumptions even if you think the assumptions are

22   silly -- that the length of this cleavage fragment

23   you have drawn is 6 microns?

24       A.    Okay.

25       Q.    And that the width of this cleavage

1    fragment is 1 micron?

2        A.    Okay.

3        Q.    Can you make that assumption?

4        A.    Sure.

5        Q.    Would that be counted as an asbestos fiber

6    under the counting rules?

7        A.    Only if it looked like this, not if it

8    looked like this.

9        Q.    And what in the counting rules allows you

10   not to count the cleavage fragment which is longer

11   than 0.5 microns and which has an aspect ratio

12   greater than five to one?

13       A.    It has to have substantially parallel

14   sides, that does not have substantially parallel

15   sides.

16       Q.    And the counting rules spell that out?

17       A.    Yes.

18       Q.    So that if, in your laboratory, the

19   analyst sees something which meets the length

20   requirement and meets the aspect ratio requirement,

21   but does not have parallel sides, that is not counted

22   as a fiber under the counting rules?

23       A.    That is correct.   Substantially parallel

24   sides.

25       Q.    Substantially parallel sides?

25

1    A.    That is correct.

2    Q.    Do you have pictures of some of the type

3 of fibers we are talking about with respect to this

4 project?

5    A.    We are working on that.  We are going to,

6 I think -- you know, as I see it boiling down between

7 the two sides, are they cleavage fragments or not.  I

8 think we will have plenty of examples of the

9 asbestiform fibers we counted and we will look around

10 for some of the stuff we didn't count.  But, we

11 haven't had time to get to it and finish it.

12    Q.    Do you have any pictures?  Have you

13 started it?

14    A.    Yes, we have.

15    Q.    Do you have any pictures?

16    A.    Well not here, no.

17    Q.    No doubt they are not here.  Do you have

18 any pictures?

19    A.    We have some negatives but they are not

20 printed.

21    Q.    Do you have any printed pictures?

22    A.    No.

23    Q.    How long have you had the negatives?

24    A.    I think they were taken yesterday.

25    Q.    And obviously, Dr. Longo, my concern is

26

1   this is my opportunity to determine what you, as an

2   expert, know, and I know you don't want me to be

3   surprised at trial by seeing some pictures that I

4   haven't seen or had a chance to talk to you about?

5        A.    I understand, and certainly it is not my

6   intent to testify by ambush, and certainly any

7   photographs introduced at trial I am sure my client

8   would give you ample opportunity to explore them with

9   me.

10       Q.    I want to ask you about Dr. Ilgren's

11  report.  I am going to ask you whether you agree or

12  disagree or have no opinion because it is not your

13  area?

14       A.    Well, it is kind of my area.  You know, I

15  guess I didn't get much past his qualifications.  He

16  is an MD and has a Ph.D. in zoology.  I am not sure

17  where he became an expert in cleavage fragments.

18            But, I don't disagree with some of the

19  things he says.  I just don't agree that the Libby

20  mine has all these types of cleavage fragments.  It

21  is not something -- so I disagree with his opinion.

22            I don't disagree, of all the papers he

23  cited and all the mineralogy he cited and -- I

24  haven't gone back and looked at each and every

25  reference, I just don't agree that it applies to all

1    mean by an order of magnitude?

2         A.    If you are in the hundreds of millions the

3    first time, you are typically in the hundreds of

4    millions the second time.

5         If you are in the one to 200 millions you

6    may get, you know, 90 million to 150 million.

7         Q.    In this case, in general, there are

8    exceptions, the dust sampling counts were in the tens

9    of thousands, in general?

10        A.    Per centimeter squared, yes.

11        Q.    Has it been your laboratory experience

12   where you have done multiple samples that if you

13   counted what amounted, in your laboratory, to 20,000

14   fibers per square centimeter, that the second sample

15   counted would never be more than 40,000, is that what

16   order of magnitude means?

17        A.    No, it would never be more than -- an

18   order of magnitude is times 10, so 20,000 times 10 is

19   200,000, or 20,000 divided by 10 is 2000.

20        Q.    All right.

21        A.    So you get a bracket of 2000 to 200,000.

22        Q.    With respect to dust sampling where the

23   same sample is analyzed two times, you could get, in

24   that example, a range of 2000 fibers per square

25   centimeter to 200,000 fibers per square centimeter,

1   and in your laboratory, those two results would be

2   viewed as consistent?

3      A.    That is correct.

4      Q.    You would not take issue with the general

5   proposition that in the mining and milling process of

6   Libby ore, cleavage fragments are and were created?

7      A.    No, I wouldn't take issue with that.  I

8   have seen some early, not early Grace documents but

9   Julie Yang recognized that you don't quite get the

10   cleavage fragment concentrations as you do in South

11   Carolina but you do get some.

12      Q.    Am I correct that with respect to any of

13   the simulations reported upon, you personally were

14   not present in any of the attics or homes?

15      A.    You would be correct.

16      Q.    Am I correct that the reason the bulk of

17   the air sampling was analyzed using the direct

18   preparation method rather than the indirect

19   preparation method, was as a result of the decision

20   rendered in the Armstrong Bankruptcy case?

21      A.    That is -- no, I would take issue with

22   that.

23      Q.    Why in Barbanti were the majority of air

24   samples analyzed by indirect whereas here your

25   laboratory analyzed them, the majority, not all of

**EXHIBIT R**

United States Environmental Protection Agency

Office of Toxic Substances
Washington, D.C. 20460

EPA 560/5-89-004
March 1990

Toxic Substances



# ⊕EPA Comparison of Airborne Asbestos Levels Determined by Transmission Electron Microscopy (TEM) Using Direct and Indirect Transfer Techniques

EPA 560/5-89-004
March, 1990

FINAL REPORT


COMPARISON OF AIRBORNE ASBESTOS LEVELS DETERMINED BY
TRANSMISSION ELECTRON MICROSCOPY (TEM)
USING DIRECT AND INDIRECT TRANSFER TECHNIQUES


Prepared by:

Chesson Consulting, Inc.
1717 Massachusetts Avenue, NW
Washington, DC 20036

and

Battelle
Arlington Office
2101 Wilson Boulevard
Arlington, VA 22201

EPA Contract No. 68-02-4294


for the:

Exposure Evaluation Division
Office of Toxic Substances
Office of Pesticides and Toxic Substances
U.S. Environmental Protection Agency
401 M Street, S.W.
Washington, D.C.  20460

#5689

This document has been reviewed and approved for publication by the Office of Toxic Substances, Office of Pesticides and Toxic Substances, U.S. Environmental Protection Agency.  The use of trade names or commercial products does not constitute Agency endorsement or recommendation for use.

## AUTHORS AND CONTRIBUTORS

This report was prepared by Jean Chesson of Chesson Consulting, Inc. under subcontract to Battelle. Jeff Hatfield of Battelle prepared an earlier draft of the Study 1 (EPA 1988) results. The R.J. Lee Group, Inc., Monroeville, PA performed the laboratory analysis of samples from Study 1 as part of the study reported in EPA (1988).

The EPA work assignment manager was Brad Schultz. Substantial contributions were also made by Cindy Stroup, Betsy Dutrow, and Joe Breen of the Exposure Evaluation Division in the EPA Office of Toxic Substances.

## ACKNOWLEDGEMENTS

Al Unger and Barbara Leczynski, the Battelle Task Managers and Project Managers, and Edie Sterrett and Mary Frankenberry, the EPA Project Officers, provided valuable managerial and administrative support. Janice Mesich of JAM Design designed the report cover. The peer reviewers, D. Wayne Berman, Michael Beard, Gary Burdett, Eric Chatfield, Thomas Fishbach, Richard Lee, James Millette, and Roger Wilmoth, provided many valuable suggestions.