1997   International Occupational Respiratory Diseases, 9th Conf. ("Coalinga Chrysotile: Lack of Biological Activity"), Kyoto, Japan.

# PUBLICATIONS

**PUBLICATIONS**

1 . Ilgren, E.B., Tang, C.K. and Thorbjarson, L. (1976). Cystadenocarcinoma of the pancreas. New York State Journal of Medicine 76: 548-550.

2. Ilgren, E.B., Symchyk, P.S. and Redo, S.F. (1977). Pneumoperitoneum without rupture viscus in the neonate: a case report and review of the literature. J. Ped. Surgery, 12: 537-540.

3. Ilgren, E.B. (1980). Polyploidization of extraembryonic tissues during mouse embryogenesis. J. Emb. exp. Morph. 59: 103-111.

4. Ilgren, E.B. (1980). The control of trophoblastic growth in the guinea pig. J. Emb. exp. Morph., 60: 405-418.

5. Ilgren, E.B. (1981). The control of trophoblastic giant-cell transformation in the mouse: homotypic cellular interactions and polyploidy. J. Emb. exp. Morph, 62: 183-202.

6. Ilgren, E.B. and Little field, J.W. (1981). The extra embryonic endodermal differentiation and polyploidization of embryonal carcinoma cells in vitro. Differentiation 19: 115-20.

7. Ilgren, E.B. (1981). The in vitro morphogenesis of the guinea-pig egg cylinder. Anat. Emb., 163: 351-365.

8. Ilgren, E.B. (1981). Placental polyploidy: a comparative study in the mouse and the guinea-pig. Placenta, 2: 333-342.

9. Ilgren, E.B. (1981). The initiation and control of trophoblastic growth in the mouse: binucleation and polyploidy. Placenta, 2: 317-332.

10. Ilgren, E.B., Griner, L., Benirschke, K. and Pang, L.S.C. (1982). A comparative study of pulmonary tumors from the San Diego Zoological Gardens and the Tumour Reference Collection, Imperial Cancer Research Fund, London. Pathology Annual, 17: 331-351.

11. Pearson, J., Ilgren, E.B. and Spriggs, A.J. (1982). Lymphoma cells in cerebrospinal fluid confirmed by chromosome analysis. J. Clin. Path., 35: 1307-1311.

l2. Ilgren, E.B., Brings, M. and Aynesley-Green (1983). Precocious puberty in a 3-year-old girl associated with a parasellar ganglionic hamartomas. Clin. Neuropath., 2: 95-98.

13. Ilgren, E. and Vaux, D. (1983). The comparative pathology of teratomas. Cancer Surveys, 2:209-215.

14. Ilgren, E.B. (1983). Review article: Control of trophoblastic growth. Placenta, 4: 307-328.

15. Ilgren, E.B., Evans, E.P. and Burtenshaw, M.D. (1983). Origin of the multinucleate decidual cell of the mouse. Cytologia, 48: 313-322.

16. Ilgren, E.B. (1983). Cardiomyogenic differentiation and teratocarcinoma formation in EC-derived chimaeric placentae. Placenta, 4: 415-422.

17. Sagar, H., Ilgren, E.B. and Adams, C.B.T. (1983). Nevus of Ota associated with meningeal melanosis and intracranial melanoma. J. Neurosurg., 58: 280-283.

18. Ilgren, E.B. and Hemachudha, S. (1983). Dissecting aneurysm of the pulmonary artery associated with brain abscess: a case report. Clint. Neuropath., 2:179-181.

19. Ilgren, E.B., Stiller, C., Steckel, M., Silverman, P. and Hughes, J.T. (1984). Ependymomas:a clinical and pathological study. Part I. Biological Features. Clin. Neuropath., 3: 113-121.

20. Ilgren, E.B., Stiller, C., Steckel, M., Silberman, P., Hughes, J.T. and Kaye, A. (1984). Ependymomas: a clinical and pathological study. Part II. Survival Features. Clin. Neuropath., 3:122-127.

21. Ilgren, E.B., West Moreland, D. and Adams, C.B.T. (1984). Cerebella mass caused by Candida species. J. Neurosurg., 60: 428- 430.

22. Ilgren, E.B. and West Moreland, D. (1984). Tuberous sclerosis: Unusual associations in four cases. J. Clin. Path., 37: 272-278.

23. Ilgren, E.B. and Teddy, P.J. ( 1984). Chemodectoma of the Cauda Equine: a case report. Clin. Neuropath., 3:148-152.

24. Ilgren, E.B., Teddy, P.J., Vafidis, J., Briggs, M. and Gardiner, N.G. (1984). Clinical and pathological studies of brain injuries in horse riding accidents: a description of cases with a warning to the unhelmeted. Clin. Neuropath., 3: 253-259.

25. Ilgren, E.B., and Jones, W.B. (1984). A method for establishing short-term cultures of human gestational choriocarcinoma in vitro. Cancer Letters, 24: 187-192.

26. Ilgren, E.B., Watt, F.W., Grime, G., Takacs, J. and Vaux, D. (1984). Elemental mapping of human nervous tissue using the scanning proton microprobe. J. Neurosci. Methods, 12: 25-28.

27. Raine, A.G., Ilgren, E.B., Ledingham, J. and Kurt, J. (1984). Cerebral Toxoplasmosis, AIDS, and HIV. Lancet 1: 985.

28. Ilgren, E.B., Saxton, D.G., Jones, A.E. and Duckworth, S. (1985). A potential microneurosurgical method for the manipulation of the developing nervous system of the postimplantation mouse embryo in utero. I. Injection methods. J. Neurosci. Methods, 13:191-197.

29. Ilgren, E.B., Kinnier-Wilson, L.M., and Stiller, C. (1985). Gliomas in neurofibromatosis: a series of 89 cases iwth evidence for enhanced malignancy in associated cerebellar astrocytomas. Pathology Annual, 1: 1-25.

30. Ilgren, E.B. and Stiller, C. (1986). Cerebellar Astrocytomas: Therapeutic management. Acta Neurochir., 81: 11-26.

31. Ilgren, E.B. and Stiller, C. (l987). Cerebellar Astrocytomas: Clinical Characteristics and prognostic indices. J. Neuro-Oncol., 4: 293-308.

32. Ilgren, E.B. and Stiller, C. (1987) Review article: Cerebellar astrocytomas. Part I. Macroscopic and microscopic features. Clin. Neuropath., 6:185-200

33. Ilgren, E.B. and Stiller, C. (1987) Review article: Cerebellar astrocytomas. Part II. Pathologic features indicative of malignancy. Clin. Neuropath., 6: 201-214

34. Ilgren, E.B. (1988). Multi System Atrophy: Possible central aetiology of the laryngeal dysfunction and the role of lymphocytic inflammation. Arch. Suisses Neuro. Psych. 139: 75.

35. Ilgren, E.B. (1989). Mesothelioma Threshold. In: Effects of Mineral Dusts on Cells. (Mossman, B. and Begin, R.), Springer-Verlag, Heidelberg, 1989, vol. H.30, 455-464.

36. Ilgren, E. and Wagner, J. (1989). The value of experimental animals in analyzing the hazards of exposure to mineral fibres. II. Consideration of natural background incidence of mesotheliomas and nonphysiological intraperitoneal technique. Submission to the German MAK Commission on Mineral Fibre Safety. ISBN [0-9516359-0-5].

37. Ilgren, E.B. and Wagner, J.C. (1991). Background incidence of mesothelioma: Animal and human evidence. Reg. Tox. Pharm., 13: 133-149

38. Ilgren, E.B. and Browne, K. (1991). Asbestos-related mesothelioma: Evidence for a threshold in humans and animals. Reg. Tox. Pharm., 13: 116-132

39. Brown, R., Davis, J., Douglas, D., Gruber, U., Hoskins, J., Ilgren, E., Johnson, N., Rossiter, C. and Wagner, J. (1991). Carcinogenicity of the insulation wools: Reassessment of the IARC Evaluation. Reg. Tox. Pharm., 14: 12-23

40. Ilgren, E. and Chatfield, E. (1997) Coalinga fibre - A short, amphibole - free chrysotile. Part 1: Evidence for a lack of fibrogenic activity. Indoor + Built Environment. 6:264-276

41. Ilgren, E. and Chatfield, E. (1998) Coalinga fibre - A short, amphibole - free chrysotile. Part 2: Evidence for lack of tumorigenic activity. Indoor + Built Environment. 7: 18-31

42. Ilgren, E. and Chatfield, E. (1998) Coalinga fibre - A short, amphibole - free chrysotile. Part 3: Evidence for lack of biopersistence. Indoor + Built Environment. 7: 98-109

43. Ilgren, E (2002) Health Risks from Exposures to Asbestos, Inorganic Metals, and Various Chemicals due to Collapse of the World Trade Center: An Environmental Residential Survey with a Commentary related to Ground Zero Workers. Indoor Built Environment. 10: 361-383.

44. Ilgren, E (2002) Coalinga Fibre - A Short, Amphibole - Free Chrysotile. Part 4: Further Evidence for a Lack of Fibrogenic and Tumorigenic Activity . Indoor + Built Environment 11: 171 – 177.

45. Ilgren, E (2002) Coalinga Fibre - A Short, Amphibole - Free Chrysotile. Part 5: Response to the California EPA's Office of Environmental Health Hazard Assessment [OEHHA] Critical Assessment of Ilgren & Chatfield's Studies of Coalinga Chrysotile's Fibrogenicity, Tumorigenicity, and Biopersistence. Indoor + Built Environment [In Press]

46. Ilgren, E (2002) Coalinga Fibre - A Short, Amphibole - Free Chrysotile. Part 6 Lack of Amphibole asbestos contamination – Direct analytical evidence. In Preparation.

47. Ilgren, E (2002) Coalinga Fibre - A Short, Amphibole - Free Chrysotile. Part 7: Lack of Amphibole asbestos contamination – Indirect analytical evidence. In Preparation.

**Books:**

Ilgren, E [1991] Initiation and Promotion in Skin or Liver Neoplasia: A 65 year annotated bibliography of international literature. CRC press. 928 pp. ISBN - 0-8493-4407-7

Ilgren, E [1993] Mesotheliomas of Animals: A comprehensive, tabular compendium of the world's literature. CRC press. 356 pp. ISBN - 0-8493-4308-9

## <u>List of Expert Testimony</u>    <u>(1998 – 2003)</u>

1.    <u>Conwed v. Union Carbide</u>, Minn. Sup. Ct., 9/11/02  (Trial Testimony)

# EXHIBIT T

VERBATIM

REPORTING, LIMITED

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

= = = = = = = = = = = = = = = = = = = = = = = = = =

In re:

W.R. GRACE & CO., et al.,          Chapter 11
                                   Case No. 01-01138(JKF)
        Debtors.

= = = = = = = = = = = = = = = = = = = = = = = = = =

Deposition of:

HENRY A. ANDERSON, M.D.

Madison, Wisconsin
April 30, 2003

Reporter:  Susan Milleville

TWO EAST MIFFLIN STREET • SUITE 102
MADISON, WISCONSIN 53703
MADISON: 608•255•7700 FAX: 608•255•7749 MILWAUKEE: 414•276•3886
1•800•255•7710 e-mail: verbatim@gdinet.com www.verbatim-madison.com

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1    A   I can't give you a firm range, no, because --

2    Q   Can you give me any kind of range, firm or not?

3    A   I've said it is certainly greater.  Depending on

4        what you're comparing it to, it could be hundreds.

5        A lot depends on what study you compare it to.

6                MR. FLATLEY:  Why don't we take a few

7            minutes.

8                (Recess)

9    Q   Turn, if you would, Dr. Anderson, to page 10 of

10       Anderson Exhibit 1, paragraph J.  It says there,

11       "Persons who installed ZAI without the protection

12       of an appropriate respirator, not a hardware store

13       dust mask, were likely exposed to significant

14       levels of airborne tremolite fibers."  In that

15       sentence how do you mean significant?

16   A   I would say of health consequence.

17   Q   At a level where there might be a health

18       consequence?

19   A   Yes.  There would be a risk.  They would be at

20       risk.

21   Q   Are there levels at which there wouldn't be a

22       risk?

23   A   I would say there certainly could be levels where

24       there wouldn't be a significant level of risk.

25   Q   So that a person could be exposed to insignificant

63

1      levels of airborne tremolite fibers?

2   A  Yes.  Sure.  All exposure would carry some risk,

3      but, from a public health perspective, it would

4      not be considered to be of significance.

5   Q  Can you quantify the difference between

6      significant and insignificant in terms of level of

7      exposure?

8   A  I would say in general a good cut point is if you

9      calculate a risk, a cancer risk, of one in a

10      million is generally viewed as diminimus.

11   Q  So a risk of one in a million or less is a

12      diminimus cancer risk?

13   A  Right.  From a regulatory standpoint.  Then from

14      practical individual purposes less than that is

15      certainly not a priority risk.

16   Q  How would one go about quantifying a cancer risk

17      in terms of incidence per million based on a level

18      of exposure to airborne tremolite fibers?  How do

19      you convert?

20   A  Well, you can -- one, tremolite by itself -- I

21      don't think we have calculations on human health

22      risk that are specific to tremolite.  So one could

23      use the general asbestos models that have been

24      used and put in the exposure and calculate what

25      that exposure would be that would generate that

64

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1          during the installation of Zonolite Attic

2          Insulation?

3     A    All I have is the Court's opinion.  I have not

4          reviewed his case other than what is there.  I'm

5          taking what's in that as being the facts of the

6          case.

7     Q    Is reading a court opinion enough for you as a

8          medical doctor to offer an opinion on what caused

9          Mr. Harashe's mesothelioma?

10    A    I would say a legal opinion after reviewing all

11         the materials, if I haven't had all the materials

12         to review, is a very useful piece of information,

13         and I would rely on the conclusions in that.

14    Q    Would you state with a reasonable degree of

15         medical certainty that Mr. Harashe's mesothelioma

16         was caused by exposure to Zonolite Attic

17         Insulation?

18    A    What I'm saying is -- I am assuming or I am --

19    Q    You're assuming that everything in the opinion is

20         correct, the legal opinion is correct?

21    A    I am basing my opinion on this, on the legal

22         opinion and the facts as detailed in that.  If you

23         want to show me the facts are wrong and the Court

24         is wrong, then I would be rethinking it.  But this

25         I saw as a summary of an individual case where

                              71

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1    everything was weighed and that was the

2    determination that was made.  I was not involved

3    with that.  I haven't seen all of those records,

4    so I can't do it as a first case, as it were,

5    individual.

6  Q    You don't really have a medical opinion about what

7    caused Mr. Harashe's mesothelioma, do you, Doctor?

8  A    The opinion I have is what was expressed by the

9    Court.

10  Q    And you can't form a medical opinion based on a

11    legal decision, can you?

12  A    I am basing the conclusions of that case -- I have

13    not been asked to form my own individual opinion.

14    I am reflecting the opinions of others.

15  Q    This is somebody else's opinion, not yours?

16  A    It's like the same as the literature.  I didn't do

17    the study.  I read the study.  I look at it and I

18    say this is what they concluded and I accept that.

19    Does that mean that I did the study or reviewed --

20    what is written is written.  That opinion I would

21    take as a summary of the information that would

22    support that in fact that was the case.

23  Q    You're not equating that legal opinion with

24    something you would read in the published medical

25    literature, are you?

72

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1   A   What I'm equating is I'm treating that opinion and

2       the facts reflected in that opinion to be as

3       accurate as the facts that might well be presented

4       in the paper.

5   Q   What you're saying is that that's not your opinion

6       on the cause of Mr. Harashe's mesothelioma.  It's

7       the Court's opinion on the cause of Mr. Harashe's

8       mesothelioma?

9   A   It's the Court's opinion, and I've reflected the

10      Court's opinion.  It's not my individual opinion

11      because I haven't been involved with the case.  I

12      haven't reviewed it.  Just as I haven't done all

13      of the studies, I point to those studies as

14      evidence.  And this, I would say, also is evidence

15      of an individual case where it went through the

16      system and a conclusion was made.

17  Q   Do medical doctors rely on the opinions of Courts

18      in reaching medical conclusions?

19  A   I think it contributes to them certainly.

20  Q   Do you rely on them?

21  A   Rely on them for what?

22  Q   That's what I'm asking you.  You came here with

23      the report that says that Mr. Harashe's

24      mesothelioma was caused by exposure to Zonolite

25      Attic Insulation, and your only basis for that

73

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1      opinion is what you read that a Court said.  You

2      didn't read one medical record.  You didn't talk

3      to one physician.  You didn't read one medical

4      article about Mr. Harashe's case.  Your entire

5      opinion is based on reviewing a Court decision?

6   A  The summary of the testimony and the Court

7      decision.  As I say here, as one of the pieces of

8      evidence I'm saying that unprotected individuals

9      can be exposed and I say can cause mesothelioma.

10     It doesn't say -- it's evidence to support that.

11     I'm not saying in this case I'm concluding that.

12  Q  You think it's credible medical evidence that

13     Zonolite Attic Insulation can cause mesothelioma

14     because a jury decided that and the Court affirmed

15     it?  Is that your view, Doctor?

16  A  I'm saying that the evidence presented to the

17     Court was found to be credible, and a decision was

18     made both about the exposure, the cause of death

19     and the disease.

20  Q  And based on that you reached the medical

21     conclusion that is reflected here in paragraph J?

22  A  As part of paragraph J.  This is a case that I was

23     not personally involved in.  That's part of that.

24     Then I say, likewise, a case I was involved in --

25  Q  Let's stay first --

74

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1    Q    You don't recall that being in the ATSDR report?

2    A    I don't recall that that group had only that.

3         They also would have lived in the community.

4    Q    Do you disagree, sir, that the ATSDR did not find

5         an association in its Libby studies between

6         Zonolite Attic Insulation as the only pathway and

7         asbestos disease?

8    A    I haven't seen that.  My understanding was the use

9         there was people didn't go out and buy Zonolite.

10        They were given vermiculite, and a lot of the

11        people used vermiculite.  It was not Zonolite ZAI

12        as a product that was sold elsewhere.  I haven't

13        seen that or I don't recall seeing that.

14   Q    You don't recall that they found no association?

15   A    No, I do not.

16   Q    Or, to say it more accurately, that they failed to

17        find an association between ZAI in the attic alone

18        and any disease?

19   A    No.

20   Q    Let's go back and talk some more about

21        Mr. Harashe's case.  Are you aware, Dr. Anderson,

22        that Mr. Harashe worked for a period of more than

23        15 years in a maintenance position with the city

24        of St. Louis school district?

25   A    No.  If it isn't in the report there, I didn't

                              82

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1    have that information.

2  Q  Now, we talked about maintenance people in school

3     districts, and you have indicated that those are

4     people who are at an increased risk of asbestos

5     disease, didn't you?

6  A  They can be.

7  Q  I think you already said that they are, didn't

8     you?

9  A  In our studies we indicated by looking at that as

10     a group of people that if they were in buildings

11     where they were maintaining asbestos or there was

12     asbestos products, they are at risk.

13  Q  And that would be a significant fact with regard

14     to Mr. Harashe's case, wouldn't it, if that were

15     true and he was working for the city of St. Louis

16     school district in a maintenance position for

17     15 years?

18  A  It would depend what he did and what buildings he

19     was in.

20  Q  What if part of what he did was to remove

21     asbestos-containing pipe insulation from pipes

22     within the school district on a regular basis?

23     Would that be a significant fact?

24  A  Could be.

25  Q  Could be or would be if one were trying to

83

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1   determine where his mesothelioma came from?

2   A   If he did that on a regular basis, that could have

3       contributed to it.

4   Q   And it's well known, isn't, it Dr. Anderson, that

5       pipe insulation is widely seen as a cause of

6       mesothelioma?

7   A   Certainly contributes to it, yes.

8   Q   But that's something you didn't know about

9       Mr. Harashe's case?

10  A   No.  If that's true, then he would have had mixed

11      exposures.

12  Q   Well, do you know how much or were you ever able

13      to quantify or did the court opinion quantify the

14      amount of exposure that Mr. Harashe had to

15      Zonolite Attic Insulation?

16  A   I don't recall.  It may be in the court record but

17      not in the report that I read.

18  Q   You don't know that there was any quantification,

19      do you --

20  A   No.

21  Q   -- of what his exposure was to Zonolite Attic

22      Insulation?

23  A   No.

24  Q   You don't know how that compared to say, for

25      example, what Dr. McDonald Dr. Amandus found about

                           84

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1    the exposures to which the people they studied at

2    Libby were exposed?

3    A    Doing work like Mr. Harashe did?

4    Q    No.  Doing the work that they did.

5    A    In a mine?

6    Q    In a mine and mill.

7    A    No.  I don't know how it compared to that or would

8         it be appropriate to compare it.

9    Q    You don't know how it would compare to the one in

10        a million that we talked about earlier, would you?

11   A    No.

12   Q    Now let's talk about Mr. Liebsch's case.  You

13        testified in that case on behalf of or at the

14        request, rather, of the Liebsch family?

15   A    Yes.

16   Q    And is it fair to say, Dr. Anderson, that's the

17        first case you ever dealt with where there was an

18        allegation that asbestos-related disease resulted

19        from exposure to Zonolite Attic Insulation?

20   A    I don't know all of the cases or what they may

21        have been exposed to.  This is the only one where

22        the predominant exposure was Zonolite, so it

23        probably was.

24   Q    The first one that you ever heard about, right?

25   A    That I was involved in, yes.

85

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1    Q    Okay.  That was my question.  It's the first time

2         you were ever involved in a case where there was

3         an alleged exposure to Zonolite Attic Insulation

4         causing disease?

5    A    Causing mesothelioma, yes.

6    Q    And other than that case, the Liebsch case and the

7         Harashe case, you haven't been involved in any

8         others?

9    A    No.

10                    (Exhibit No. 3 marked

11                      for identification)

12   Q    Dr. Anderson, let me show you collection of

13        documents I have had marked for identification

14        purposes as Anderson Deposition Exhibit No. 3.

15        This is a copy, I believe, of what was provided to

16        us as part of your reliance materials that

17        reflects medical records regarding Mr. Liebsch's

18        case.

19   A    Yes.

20   Q    Now, you mentioned earlier that you may have had

21        more medical records than this on Mr. Liebsch's

22        case before.  As you look through here now, is

23        there anything specific that you recall that you

24        had before that you don't see now?

25   A    I think there was a lot more hospitalization

                              86

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1      records and other material.

2   Q   Were there other documents that reflected on

3      Mr. Liebsch's exposure to asbestos?

4   A   There may have been.  I haven't specifically

5      looked through here.  I think there was one

6      medical record that -- there were some conflicting

7      medical records.

8   Q   Conflicting medical records regarding exposure?

9   A   Yes.

10  Q   Well, I'll represent to you that there are a

11     couple of documents here.  If you look at the

12     third page of what I have had marked as Anderson

13     Exhibit 3, which starts Consultant's Report at the

14     top, --

15  A   Yes.

16  Q   Under History of -- page 3, Consultant's Report.

17     Third page of Exhibit 3.  Under History of Present

18     Illness -- I apologize.  That's the best copy I

19     have.  It's a little cut off on the left side.  It

20     says, "This is a 71-year-old male, a smoker, with

21     previous heavy asbestos exposure during cabinet

22     making in his youth."  That's one reference I see

23     to his exposure to asbestos.  Then if you turn

24     back to the seventh page of Exhibit 3, under

25     Social History, it says, "He has been retired

                        87

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1      since 1985 as a former carpenter and cabinet

2      maker."  I thought there was another reference to

3      heavy asbestos exposure, but I apologize, I can't

4      find it right now.  That related to his work as a

5      carpenter and cabinet maker.  My question,

6      Dr. Anderson, is do you recall having seen any

7      records that are conflicting with that; that there

8      was heavy exposure in his work as a carpenter or

9      cabinet maker?

10   A   I would say the depositions of individuals did not

11       confirm that he would have been or was heavily

12       exposed to asbestos as a cabinet maker.  That

13       would not fit with what cabinet makers do.

14   Q   How about a carpenter?

15   A   I would say, as I recall the carpentry work he

16       did, he did not do any commercial carpentry.  He

17       did private home carpentry where there at that

18       time would not have been much asbestos around.  He

19       built stick homes as I recall.

20   Q   Was there anything that you recall from the

21       medical records that conflicted with the

22       information that is contained here on page 3 that

23       he had previous heavy asbestos exposure during

24       cabinet making in his youth?

25   A   I would say most or all the other records make no

88

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1     mention of any asbestos exposure.

2  Q  Okay.

3  A  So that the conflict --

4  Q  So there's nothing conflicting.  That's nothing

5     confirmed?

6  A  Just as this report says he's a current cigarette

7     smoker and the other report says he quit five

8     years ago.  Medical records often have that.  The

9     consultant -- where he got that we don't know.

10  Q  Presumably he got it from the patient, didn't he?

11  A  You don't know.  That isn't necessarily the case.

12  Q  It's not a normal procedure for a doctor to take

13     an employment history or a work history or an

14     exposure history from a mesothelioma patient?

15  A  One would hope they did, but frequently they will

16     review the records and they will quote from some

17     other record they have seen.

18  Q  It would be normal practice to do that, wouldn't

19     it, Doctor?

20  A  You would like it to be that that would be done.

21     If you look in his medical records and in the

22     voluminous records that I did have, typically

23     asbestos was not mentioned, was not asked about.

24  Q  Now how voluminous were the medical records that

25     you reviewed previously when you were working on

VERBATIM REPORTING, LIMITED (608)255-7700

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1      this case?

2    A   I don't remember.  There was a lot of records of

3       his hospitalizations and treatments.

4    Q   A lot more than we have here in Exhibit 3?

5    A   Yes.

6    Q   Now let's talk about the depositions.  The

7       depositions you looked at were the depositions

8       of -- I think you told me it was Joseph Liebsch,

9       the son, and Jennel Kordus, the daughter, of

10     Gerald Liebsch?

11   A   Those are the ones that are part of the record

12     here.

13   Q   Those are the ones you had when you originally

14     opined in this case, aren't they, Doctor?

15   A   Not the only ones.

16   Q   Is it your testimony here today that you had more

17     than two depositions that you had reviewed prior

18     to the time you testified in your deposition in

19     the Kordus case?

20   A   I don't have a listing of all that I had.

21   Q   You only had those two at the time you testified

22     in the Kordus case; isn't that right, Doctor?

23   A   I believe that there were depositions of

24     co-workers.  There was a variety of other

25     individuals whose depositions were there.

90

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1    Q    How about other family members?  You only had

2         those two depositions from the family members at

3         the time you that you testified in the Kordus

4         case; isn't that right?

5    A    I don't know.  I don't remember all that I had.

6         At the time of deposition that may have been.

7    Q    You don't know if you had anything more or not?

8    A    At this point, as it relates to how I rely on this

9         information, I can't tell you all the records that

10        I had at that time.  I do recall there were a

11        variety of other depositions that were related to

12        that.  Whether it was before or after a deposition

13        or before the trial I don't recall.

14   Q    You do know now that you did not have the

15        deposition of Jeanne Fitzgerald, Mr. Liebsch's

16        daughter?

17   A    It's not in the pack that I have now, no.

18   Q    And you do not have the deposition now of Julie

19        O'Neill, another of Mr. Liebsch's daughters,

20        correct?

21   A    If there is one.  No, I don't have it here.

22   Q    And you do not have the deposition of

23        Orville Liebsch, Mr. Liebsch's brother, do you?

24   A    No.

25   Q    And you don't have the deposition of Joanne Lloyd,

                              91

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1    Mr. Liebsch's former wife, do you?

2  A  No.

3  Q  And you never saw, I take it, or you have not seen

4     now in formulating your opinions now the complaint

5     or any interrogatory responses in that case?

6  A  Not as part of this.

7  Q  Part of this case?

8  A  Not as part of this case.  This is not a personal

9     injury case.

10  Q  Now, would you agree --

11  A  That was a personal injury case.

12  Q  Right.  But you are offering opinions here about

13     the cause of Mr. Liebsch's mesothelioma, aren't

14     you, Doctor?

15  A  I am indicating that this is one of the cases I'm

16     familiar with; that after I reviewed it all, my

17     conclusion was that Zonolite Attic Insulation was

18     a substantial contributing cause of his

19     mesothelioma.

20  Q  Were you ever able to quantify Mr. Liebsch's

21     exposure to Zonolite Attic Insulation?

22  A  No.  There were no measurements ever made.

23  Q  So you don't know how that -- you just don't know

24     what his exposure was in terms of quantification?

25  A  No.  Typically the vast majority of cases there is

92

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1       no quantification of any measurements made.

2    Q   Now, you never talked to any of Mr. Liebsch's

3        family members?

4    A   Not as part of my testimony, no.

5    Q   At any time in any of the work you did on that

6        case you never talked to any of them?

7    A   I did at time of trial.

8    Q   At the time of trial?  About the work history?

9    A   No.

10   Q   Just social talk?

11   A   I don't recall what we talked about.

12   Q   And you didn't treat Mr. Liebsch?

13   A   No.

14   Q   And you never looked at any pathology materials in

15       this case?

16   A   No.

17   Q   And you never talked to any of the physicians who

18       treated Mr. Liebsch?

19   A   No.

20   Q   We talked a little bit about the fact that

21       Mr. Liebsch was a carpenter and a cabinet maker.

22   A   Yes.

23   Q   In fact, that information, cabinet maker, I think

24       is on his death certificate?

25   A   Yes.

93

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1    Q   And that's also reflected in his medical records

2        that he was a carpenter and a cabinet maker?

3    A   I don't recall.

4    Q   I think we just looked at one.

5    A   Yes.  It says as a youth.  It doesn't say anything

6        about --

7    Q   Former carpenter and cabinet maker.

8    A   Yes.  Which is this one?

9    Q   I think it's five or six pages in.  Seven pages

10       in.

11   A   Right.  But the first one says nothing about his

12       occupation.

13   Q   No.  I'm looking at seven pages in.

14   A   Pain Management Clinic or which one?  Let me find

15       it.  Here it is in Social History.  Has been

16       retired since 1985 as a former carpenter and

17       cabinet maker.  Yes.  This is part of the pain

18       management clinic report.

19   Q   Okay.  But you'll agree with me that the medical

20       records indicate that he was a carpenter and

21       cabinet maker?

22   A   That's what they said he did, yes.

23   Q   Wouldn't you agree that in fact that's what he

24       was, what he did for a --

25   A   I would.

                                94

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1   Q   -- substantial time?

2   A   As I recall, and, again, I don't have all of the

3       information here.  He did build cabinets I think

4       in his basement and did a variety of cabinet

5       making to install into private homes.  Then he

6       worked in the hospital doing similar things,

7       putting up cabinets.  He would build the cabinets.

8   Q   Let's talk about the hospital work.  He was a

9       maintenance worker at the hospital, wasn't he?

10  A   He was a cabinet maker there.

11  Q   Is it your testimony that all he did was make

12      cabinets at the hospital?

13  A   I don't know what all.  I don't recall all that he

14      did.

15  Q   Didn't he do general carpentry and maintenance

16      work?

17  A   He did general carpentry.  He was a carpenter.  As

18      I recall, in the depositions what he did in that

19      hospital was build cabinets to install them in

20      places.  He would do carpentry.

21  Q   And he did general carpentry.  He was a general

22      maintenance guy in that hospital, wasn't he?

23  A   He did carpentry.  I wouldn't say -- I don't

24      recall anything saying he did general maintenance.

25  Q   Just to go back to something you said before, he

95

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1    wasn't just a carpenter on residential buildings,

2    was he?  He was a carpenter at the hospital.

3  A  In the last work years.

4  Q  He worked for the hospital 15 or 20 years, didn't

5     he?

6  A  On and off, yes.

7  Q  That wasn't his regular job?

8  A  I don't think it was his regular job.  Again, I'm

9     using this as an example.  I'm not using it as a

10    personal injury case.  I don't have the materials.

11    I would have to go back through all the materials

12    to answer all of these questions and review the

13    trial testimony.  I think that would be a good

14    thing to look at to see how all this was

15    described.

16 Q  I'm not sure I understand.  I'm trying to inquire

17    into what you said here in paragraph J.  Are you

18    saying today you're not prepared to give an

19    opinion on whether Zonolite Attic Insulation was

20    the cause of Mr. Liebsch's mesothelioma?

21 A  I'm saying that it is my opinion and it's based on

22    all the information that I had available and it's

23    an example of a case.  It's not a personal injury

24    case here, so I don't have all of the information

25    that went into my opinion.  I'm saying in my

                         96

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1      opinion in that case, as I gave at my deposition

2      and as I gave at trial testimony in that case, my

3      conclusion -- I haven't got any information since

4      then that would change my opinion that I arrived

5      at at that time.

6  Q  Well, Doctor, the opinion you have given in this

7      case that brings us here today says the medical

8      records of Gerald Liebsch and the deposition of

9      Mr. Liebsch's children taken in Kordus versus W.R.

10     Grace further demonstrate that mesothelioma can

11     result from exposure to ZAI.  That's what we're

12     here to talk about.

13  A  That was my conclusion in this case; that it

14     contributes to the mesothelioma and that's an

15     example of it.

16  Q  That's what we're trying to inquire into.

17  A  That's right.

18  Q  Now, let's go back to the work that Mr. Liebsch

19     did at the hospital as a maintenance

20     worker/carpenter.  Didn't you indicate earlier

21     that maintenance workers in buildings like

22     hospitals are at an elevated risk of asbestos

23     disease from that work?

24  A  They can be.

25  Q  And didn't you say they are at that risk, they are

97

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1      at elevated risk as compared to the general

2      population?

3  A  Maintenance workers that did the type of work on

4      boilers and pipes and sweeping of that kind of --

5      that is what we -- Gerald Liebsch -- I did not

6      believe that his exposure of working as a

7      carpenter brought him into any contact with

8      asbestos.

9  Q  At the hospital?

10 A  At the hospital.

11 Q  So you believe that he wouldn't have fit within

12     those studies that you did that you talked about

13     earlier, the Levin study, the various Anderson

14     studies.  You don't think he's one of those people

15     who by virtue of working in a building that had

16     asbestos-containing material in this as a

17     carpenter, as a maintenance person would be at an

18     elevated risk of asbestos-related disease as a

19     result of that work.  You're saying he's not part

20     of that?

21 A  I think in reviewing his case like I reviewed the

22     other cases, I would not classify him as having

23     identified asbestos exposure while working as a

24     maintenance worker.  If you look at our review of

25     the maintenance workers we looked at, we

98

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1      identified specific activities that they did that

2      they described where they came into contact with

3      asbestos.   I didn't see that, and I didn't hear

4      that in the records that I reviewed.

5    Q   Okay.  Are you aware, Dr. Anderson, that family

6      members of Mr. Liebsch testified that he

7      frequently came home from work covered with white

8      dust?

9    A   I don't recall that.

10   Q   Isn't white dust something that typically

11     indicates somebody who's working around

12     asbestos-containing material?

13   A   No.

14   Q   When it's on a regular basis for somebody who

15     works in a building?

16   A   No.

17   Q   You would say that's not true?

18   A   I would say that's not true.   I would say —

19   Q   You wouldn't find a concern with somebody who came

20     home with any kind of dust whether it was white or

21     not?

22   A   I would say white dust from a carpenter is going

23     to be more likely than not related to working with

24     cementation, not — wallboard that he may have

25     been around.  If he was building cabinets, he may

                              99

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1       have been building cabinets out of material that

2       would have plaster or something like that.

3    Q   You think somebody working with wallboard would

4       have no opportunity for exposure to asbestos

5       during the years when he worked at the hospital?

6    A   I'm saying that in the information I had there was

7       no description of an asbestos exposure.  Could

8       somebody who does wallboard work be exposed to

9       asbestos, yes.  But in this particular instance

10      there was no indication of that; that he was

11      predominantly a carpenter.  He built cabinets.

12   Q   You didn't know that he was coming home covered

13      with dust every day?

14   A   I didn't know that.

15   Q   Did you know that he told his wife to wash his

16      clothes separately from the rest of the clothes

17      because of what he was coming into contact with?

18   A   No.

19   Q   You know that his place of work within the

20      hospital was within the boiler room?

21   A   Yes.

22   Q   Isn't the boiler room typically where there are

23      numerous asbestos-containing materials?

24   A   There may be.

25   Q   Isn't it typically the case?

100

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1   A   I don't know this specific hospital.

2   Q   I'm not asking you specifically.

3   A   Typically a boiler room, depending on where it is

4       and what's in the boiler room -- if it's

5       insulated, it could be insulated with asbestos.

6   Q   And normally that would be the case from this time

7       period, wouldn't it, Doctor?

8   A   It's possible.  In this instance there was no

9       description of that.  I have no information.

10   Q   My question is whether it was normal.

11   A   Normal?  I'm talking about a specific case here.

12       Normal could be anything.  Is that a potential

13       source of exposure being in a boiler room, working

14       in a boiler room, repairing boilers, doing

15       something with boilers, yes.

16   Q   You are talking about a specific case.  What are

17       the facts regarding the boiler room at the

18       hospital where Mr. Liebsch worked?

19   A   I have no indication that he worked around

20       asbestos.

21   Q   Do you have any indication that he did not work

22       around asbestos?

23   A   No.  I don't have information either way.  I have

24       to work with the information I have.  That was the

25       information.  In the cases that I have described,

101

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1      I got specific information that they, in fact, did

2      that kind of work and that was the type of

3      insulation that was there.  I didn't have that

4      information here.

5   Q  By the way, in your maintenance worker

6      mesothelioma studies in Wisconsin, you didn't have

7      specific information on those buildings, did you,

8      Dr. Anderson?

9   A  When we interviewed the individuals we did, yes.

10  Q  Are you saying --

11  A  On the schools we had all the inspections that

12     were done.  We knew it was there.

13  Q  How about the other buildings?

14  A  Other buildings we had the information that the

15     interviewing people that we had gave us.

16  Q  Didn't you pretty much assume that there was

17     asbestos-containing material in the boiler rooms

18     of those buildings in doing your Wisconsin

19     mesothelioma studies?

20  A  Depending if they described working on the

21     insulation or repairing the insulation, then we

22     assumed that it may be containing asbestos.

23  Q  But if you didn't know anything else, then you

24     said we don't know whether there's asbestos in

25     that boiler room or not, so we're not going to

                         102

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1   A   We started from job titles and then we

2       interviewed.

3   Q   You didn't have a whole lot more, did you?

4   A   We had all the information that was available, and

5       we got interview information on what the jobs were

6       described.  We had how long the individual worked

7       there and what kind of work they did.

8   Q   Whatever it is, it's there in your report.

9   A   It's summarized in the report.  We had more

10      information.

11  Q   It's summarized in the report?

12  A   Right.

13  Q   Okay.

14  A   We had more information.

15  Q   Are you aware, Dr. Anderson, that Mr. Liebsch was

16      said to have rebuilt old cars as a hobby?

17  A   Yes.

18  Q   His son testified to that, didn't he, Joseph

19      Liebsch?

20  A   He may have.  If you want to show me the

21      statements.  I do recall that he did work on cars

22      and he --

23  Q   He worked on the brakes of those cars?

24  A   Sometimes, yes.

25  Q   And brake linings in that era contained or

104

1      frequently contained asbestos?

2   A   They may have.

3   Q   Would you agree with me that it was frequent

4       during that time period that they contained

5       asbestos?

6   A   I don't know what time period he worked on car

7       brakes.  I don't recall there was any description

8       of -- when you say time period, what time period

9       are you talking about?

10  Q   Well, what's the testimony?

11  A   I don't know.

12  Q   You don't remember?

13  A   You're stating testimony to me that I don't have

14      here.

15  Q   Okay.

16  A   So I'm assuming --

17  Q   Fair enough.

18  A   Everything you have said so far I am assuming that

19      what you're saying is true.  It's not information

20      I had.  It's testimony I wasn't present at, and I

21      don't know -- I'm assuming when you're saying

22      that, you're stating it as fact.  I do not know it

23      as fact.  I do recall that he worked on cars.

24      When he worked on cars, if you can give me the

25      years, I would be very interested.

105

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1  Q  That's a fair comment.

2  A  Or what kind of cars.  I want to be very clear

3     here that all the information that you have given

4     you have not provided me with any documentation.

5     I'm assuming that what you're saying is true.

6  Q  Doctor, I'm asking you questions about your

7     opinion.  I'm inquiring into the bases for your

8     opinion.  If you don't remember what the testimony

9     is, that's fine.  You just have to say that, I

10     don't remember, and we can move on.  I will assure

11     you I have not deliberately or to my knowledge in

12     any way misrepresented anything that I know from

13     that record.  That's not the way I operate.  If I

14     tell you are you aware of that, if you don't know

15     it, that's fine.  You just have to say so.  If I'm

16     saying are you aware of that, I'm believing that

17     to be the case I assure you.

18          Now, let's go back to working on brakes.  Is

19     it also true that brake pads contain asbestos?

20  A  They can.

21  Q  Do you have a view on whether the brake pads and

22     brake linings Mr. Liebsch worked on contained

23     asbestos?

24  A  I don't know.

25  Q  You don't know either way?

106

VERBATIM REPORTING, LIMITED (608)255-7700

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1    A    I don't know.  I don't know how many he worked on.

2         I don't know whether he ground them down like they

3         would in a shop or whether he just installed them

4         or what he did at all.

5    Q    Let's talk about carpentry work more generally,

6         not Mr. Liebsch's carpentry work but carpenter

7         work in general and specifically carpentry work in

8         buildings.  Isn't that work that in and of itself

9         can involve significant exposure to asbestos,

10        Dr. Anderson?

11   A    Anything is possible.

12   Q    Well, I'm not asking you in that sense.  Let me

13        ask this question:  Aren't there a number of

14        articles in the medical literature that reflect

15        significant asbestos exposure among carpenters?

16   A    I'm not aware that there's any study that -- I

17        don't know what that means.  I am aware that there

18        have been studies of construction workers that

19        include carpenters, and such individuals have

20        developed pleural plaque and chest x-ray changes,

21        some of them.  As a class of people I couldn't

22        tell you specifically.

23   Q    Aren't there a number of articles in the medical

24        literature that reflect an increased incidence of

25        asbestos disease among carpenters?

107

Deposition of HENRY A. ANDERSON, M.D., 4/30/03

1        same union.

2    Q   Okay.

3    A   You combine it.  In this study they had an

4        increased risk.

5    Q   Dr. Anderson, let's go back to the Liebsch case

6        facts.  Do you know whether there was testimony in

7        the depositions that you did not look at for

8        preparing your report here today that contradicts

9        some of the information that was in the

10       depositions that you did read?

11   A   I would say there was disagreement by various

12       individuals on a number of different issues.

13   Q   Within the two depositions that you read?

14   A   Within the various depositions.  Some people —

15       one remembers one thing, and some remembered other

16       things.  I would say in general the level of

17       information was fairly sketchy.

18   Q   Even the information you had that you relied on

19       was sketchy?

20   A   I relied on all of the information that was

21       available, but, as with the medical records on the

22       cigarette smoking, there's always some

23       discrepancy.  Some people remembered one thing,

24       and other people remembered another thing.

25   Q   In fact, the two depositions that you relied on

                        117



**EXHIBIT U**