1      SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         FOR THE COUNTY OF LOS ANGELES

3 DEPARTMENT NO. 324     HON. ERNEST M. HIROSHIGE, JUDGE

4

5 BUNKER HILL TOWERS CONDOMINIUM )
   ASSOCIATION, ETC., ET AL.,    )

6             PLAINTIFFS, )

7        VS.          )   NO. C 638 821

8 THE PRUDENTIAL INSURANCE   )
   COMPANY OF AMERICA, ET AL.,  )

9                  )

               DEFENDANTS. )

10

11         REPORTER'S DAILY TRANSCRIPT
         APRIL 2, 1992 - A.M. SESSION

12
             VOLUME 24

13       PAGES 2805 TO 2930, INCL.

14 APPEARANCES:

15 FOR THE PLAINTIFFS:     GILBERT L. PURCELL, ESQ.
                    ERIC J. SCHINDLER, ESQ.

16                    MORENO, PURCELL & SCHINDLER
                   227 BROADWAY, SUITE 200

17                    SANTA MONICA, CALIFORNIA 90401
                   (310) 395-9299

18                       - AND -
                   RAYMOND P. BOUCHER, ESQ.

19                    520 BROADWAY, SUITE 670
                   SANTA MONICA, CALIFORNIA 90401

20                    (310) 395-6336

21 FOR THE DEFENDANT      GEORGE A. MANFREDI, ESQ.
   W.R. GRACE & COMPANY:   DAVID T. BIDERMAN, ESQ.

22                    PERKINS COIE
                   NINTH FLOOR

23                    1999 AVENUE OF THE STARS
                   LOS ANGELES, CALIFORNIA 90067

24                    (310) 788-3230
                     - AND -

25                    THOMAS R. JONES, ESQ.
                   CAHILL GORDON & REINDEL

26                    80 PINE STREET
                   NEW YORK, NEW YORK 10005

27       COPY

28                    DAVID E. ROBERSON, CSR #2488
                   OFFICIAL REPORTER

1    LOS ANGELES, CALIFORNIA    *    MONDAY, APRIL 6, 1992

2    DEPARTMENT NO. 324    HON. ERNEST M. HIROSHIGE, JUDGE

                          10 A.M.

4                    (THE FOLLOWING PROCEEDINGS WERE HELD IN

5                    OPEN COURT OUT OF THE PRESENCE OF THE

6                    JURY:)

7        THE COURT:  ALL RIGHT.  WE'RE READY TO COMMENCE

8    OUTSIDE THE PRESENCE OF THE JURY.  THERE WERE TWO POINTS

9    AND AUTHORITIES SUBMITTED REGARDING THIS WITNESS.  HOW

10   SOON ARE WE GOING TO GET TO THIS ISSUE?

11       MR. BOUCHER:  WE'RE ACTUALLY IN THE THICK OF IT

12   NOW, YOUR HONOR.

13       THE COURT:  WELL, WEREN'T YOU GOING THROUGH SLIDES?

14       MR. BOUCHER:  THAT'S CORRECT.

         THE COURT:  ARE YOU THROUGH WITH THE SLIDES?

16       MR. BOUCHER:  WE HAVE GOT SOME ADDITIONAL SLIDES,

17   SOME OF WHICH IN PART GO DIRECTLY TO THIS POINT.  I ASKED

18   SOME GENERAL QUESTIONS DURING THE SLIDE PRESENTATION, AS

19   THE COURT MAY RECALL, AND MR. MANFREDI OBJECTED ON

20   HEARSAY GROUNDS TO JUST GENERAL BACKGROUND QUESTIONS.

21   AND THE COURT ASKED THAT I GO ON TO ANOTHER TOPIC, WHICH

22   I DID, AND I STOPPED THE SLIDES AT A POINT WHERE THERE

23   ARE A COUPLE OF MORE I THINK THAT WE CAN GO THROUGH.

24                    BUT CERTAINLY SOME OF THESE, SOME OF THE

25   REMAINING SLIDES GO DIRECTLY TO AT LEAST PART OF THIS

26   POINT OR AT LEAST THE BREADTH OF THE POINT IN TERMS OF

27   THE WAY THE DEFENSE, AS I UNDERSTAND IT, IS ARGUING.

         THE COURT:  WELL, WEREN'T YOU TRYING TO GO INTO THE

1   ISSUE OF IDENTIFYING MONOKOTE-3, HIS PAST EXPERIENCES

2   WHERE HE'S TAKEN DUST SAMPLES AND IT HAS BEEN ANALYZED IN

    OTHER CASES?

4        MR. BOUCHER:  THAT'S CORRECT.

5        THE COURT:  AND IT'S PROVED TO BE MONOKOTE-3?

6        MR. BOUCHER:  THAT'S CORRECT.

7        THE COURT:  I THINK THAT IS A DISTINCT ISSUE FROM

8   THE OTHER ISSUE HERE, THE ISSUE THAT WE HAVE AS TO

9   WHETHER OR NOT THE LAB RESULTS IN THIS CASE COME IN FOR

10  THE TRUTH OF THE MATTER, WHICH IS MY RECOLLECTION OF WHAT

11  THE ISSUE WAS, I THINK, ON THE ISSUE OF HIS BEING ABLE TO

12  BE FAMILIAR WITH MONOKOTE-3 AND BEING ABLE TO IDENTIFY IT

13  AND ITS PROPERTIES.

14        THE FACT THAT IT IS ANALYZED IN OTHER CASES

15  AND HE'S FAMILIAR WITH THE PROPERTIES, WHAT IT LOOKS

16  LIKE, WHAT IT FEELS LIKE, AND IT WAS LATER IDENTIFIED,

17  THAT COULD BE RELEVANT TO HIS EXPERTISE ABOUT RECOGNIZING

18  CERTAIN CHARACTERISTICS OF MONOKOTE-3.  BUT IN THIS CASE

19  ITSELF THERE IS A DIFFERENT ISSUE AS TO WHETHER OR NOT WE

20  GET THE LAB RESULTS IN FOR THE TRUTH OF THE MATTER THAT

21  IT IS MONOKOTE-3 OR THAT A PERCENTAGE OF ASBESTOS IS X.

22  THAT SEEMS TO BE THE DIFFERENT ISSUE, TO ME.

23        MR. BOUCHER:  WELL, I WOULD AGREE WITH THE COURT

24  ESSENTIALLY.  HOWEVER, YOUR HONOR, I THINK THAT THERE ARE

25  TWO ISSUES IN TERMS OF THE QUESTIONING HERE -- ONE OF

26  WHICH WE BELIEVE IS VERY CLEAR AND THE SECOND OF WHICH

27  THE COURT HAS JUST IDENTIFIED -- THE FIRST BEING, CAN

    THIS EXPERT, MR. HATFIELD, WHO TOOK THE DUST SAMPLES,

1    RELY UPON THE MILLETTE REPORT IN RENDERING HIS OPINION

2    THAT THERE IS IN FACT CONTAMINATION, NOT ONLY BASED UPON

     THE REPORT ITSELF BUT ON HIS PRIOR EXPERIENCE AND

4    ANALYSIS THAT HAS BEEN PERFORMED IN OTHER CASES THAT HE'S

5    BEEN INVOLVED IN?

6              THAT IS ONE QUESTION THAT WE BELIEVE

7    CLEARLY HE'S PERMITTED TO GO THAT FAR.  THE EVIDENCE CODE

8    INDICATES THAT AN EXPERT CAN RELY UPON EVIDENCE, WHETHER

9    OR NOT IT IS ADMISSIBLE, IN RENDERING THEIR OPINIONS.  SO

10   IN TERMS OF HIM BEING ABLE TO TESTIFY THAT HE TOOK SOME

11   TESTS, DID SOME DUST SAMPLING, HAD THAT ANALYZED, AND

12   BASED UPON THAT ANALYSIS, AS WELL AS HIS BACKGROUND AND

13   EXPERIENCE, HE FEELS THAT THIS PLACE IS CONTAMINATED, WE

14   DON'T THINK THERE IS ANY QUESTION THAT HE CAN GO THAT

     FAR.

16             THE NEXT QUESTION BECOMES, DO THE RESULTS

17   FROM THE MILLETTE LAB COME INTO EVIDENCE FOR THE TRUTH OF

18   THE MATTER, THAT IS, WHAT THE ACTUAL RESULTS SHOW, AS

19   OPPOSED TO JUST COMING IN AS THE BASIS FOR SOME OF HIS

20   OPINIONS RELATING TO CONTAMINATION?  AND THAT IS I THINK

21   WHAT IS ADDRESSED BY THE BRIEFS THAT WE PUT FORTH.

22             OUR UNDERSTANDING OF -- AND OBVIOUSLY MR.

23   MANFREDI CAN SPEAK TO IT BETTER THAN I -- BUT OUR

24   UNDERSTANDING OF THE DEFENSE OBJECTION IS THAT THEY DON'T

25   FEEL THEY HAVE AN OBJECTION TO ANY TESTIMONY BY MR.

26   HATFIELD ABOUT THE CONTAMINATION OR EVEN THE FACT THAT HE

27   HAD THESE RESULTS ANALYZED, AND THAT HE BASED HIS

     OPINIONS IN PART UPON THESE RESULTS.

1           AND SO I THINK THAT THERE ARE TWO SPECIFIC

2   ISSUES BEFORE THE COURT.

         THE COURT:  WELL, ON THE ISSUE OF WHETHER OR NOT

4   HIS PREVIOUS EXPERIENCE WITH MONOKOTE-3 INVOLVED HIS

5   OBSERVATIONS OF THE PRODUCT UNDER VARIOUS CONDITIONS

6   PHYSICALLY, AND OBSERVING ITS PROPERTIES, PHYSICAL

7   PROPERTIES, PLUS THE LAB RESULTS, IF THEY CONFIRM THAT IT

8   IS MONOKOTE-3 AND THERE IS ASBESTOS, WHAT ARE YOU

9   UTILIZING THAT FOR?  IS THAT FOR THE ISSUE OF HIS OPINION

10  THAT THERE IS HAZARD?

11       MR. BOUCHER:  THAT THERE IS CONTAMINATION, CORRECT.

12       THE COURT:  SO HIS OPINION THEN, HIS OPINION THAT

13  THERE IS HAZARD WOULD HAVE TO BE IN THE FORM OF SOMEWHAT

14  OF A HYPOTHETICAL QUESTION.  HE'D HAVE TO ASSUME CERTAIN

    THINGS, HIS OBSERVATIONS, HIS PAST EXPERIENCE.  WOULD HE

16  HAVE TO ASSUME THE TRUTH OF THE LAB RESULTS?

17       MR. BOUCHER:  HE'D HAVE TO RENDER HIS OPINION BASED

18  IN PART UPON THE LABORATORY RESULTS WHICH HE'S --

19       THE COURT:  ALL RIGHT.  SO WHAT DO YOU PROVIDE ME

20  IN YOUR POINTS AND AUTHORITIES THAT TELLS ME THAT THE LAB

21  RESULTS COME IN FOR THE TRUTH OF THE MATTER?

22       MR. BOUCHER:  THOSE ARE TWO DIFFERENT THINGS, YOUR

23  HONOR.

24           UNDER THE EVIDENCE CODE, I BELIEVE IT IS

25  SECTION 801, MR. HATFIELD CAN TESTIFY THAT HE TOOK SOME

26  DUST SAMPLES.  HE SENT THEM OFF FOR LABORATORY ANALYSIS;

27  THAT THE LABORATORY ACTUALLY DID THE FIBER COUNTING.  AND

    HE HAS REVIEWED THOSE RESULTS AND, BASED UPON THOSE

1    RESULTS, IT IS HIS OPINION, AS WELL AS HIS BACKGROUND AND

2    EXPERIENCE, IT IS HIS OPINION THAT THERE IS CONTAMINATION

     IN THE BUILDING.

4                    HE CAN GO THAT FAR UNDER THE EVIDENCE CODE

5    REGARDLESS OF WHETHER RESULTS COME IN FOR THE THE TRUTH

6    OF THE MATTER ASSERTED.  AND THE EVIDENCE CODE SAYS

7    CLEARLY THAT AN EXPERT CAN RELY UPON SUCH RESULTS,

8    WHETHER OR NOT THEY ARE THEMSELVES ADMISSIBLE.

9                    AND WE'VE CITED A COUPLE OF CASES, ONE OF

10   WHICH WE BELIEVE IS DIRECTLY ON POINT.  AND THAT IS THE

11   WILLIAMS VS. VOLKSWAGEN CASE, WHERE THE COURT FOUND THAT

12   AN EXPERT WHO, RIGHT BEFORE TRIAL AND AFTER HIS

13   DEPOSITION WAS TAKEN, IN FACT HAD A LABORATORY PERFORM A

14   STRESS TEST ON A PART OF THE VOLKSWAGEN, AND THEN

15   RENDERED HIS OPINION BASED UPON THE LABORATORY ANALYSIS

     AND CHEMICAL ANALYSIS FROM THAT STRESS TEST.  THE COURT

17   ALLOWED NOT ONLY HIS OPINIONS BASED UPON THOSE TESTS, BUT

18   ALLOWED THE TEST RESULTS THEMSELVES IN.

19                   THE CASE CITED BY THE DEFENDANTS, WHICH IS

20   CONTINENTAL AIRLINES, IS DISTINGUISHABLE.  BUT FROM THE

21   STANDPOINT OF THE VERY FIRST ISSUE, AND THAT IS THAT MR.

22   HATFIELD CAN TESTIFY THAT HE HAS REVIEWED THE RESULTS OF

23   THE TESTS AND BASES HIS OPINIONS IN PART UPON THOSE TEST

24   RESULTS, IN CONTINENTAL AIRLINES THE COURT SPECIFICALLY

25   SAID THAT AN EXPERT, EVEN THOUGH TWO OTHER INDIVIDUALS

26   PERFORMED THE ACTUAL ANALYSIS, MAY RELY UPON THOSE

27   FIGURES SUBMITTED TO HIM IN FORMING HIS EXPERT OPINIONS

     AND TO TESTIFY THAT HE RELIED UPON THEM.

1           NOW, THE IN THE CONTINENTAL CASE --

2       THE COURT:  WELL, IN WILLIAMS VS. VOLKSWAGEN THERE

    WAS A STRESS TEST ON A PORTION OF THE VEHICLE?

4       MR. BOUCHER:  THAT'S CORRECT.

5       THE COURT:  WAS THAT LATER ADMITTED INDEPENDENTLY

6   THROUGH THE PERSON WHO PERFORMED THE STRESS TEST --

7       MR. BOUCHER:  NO.

8       THE COURT:  -- IN THE CASE?

9       MR. BOUCHER:  NO.  THEY WERE PERMITTED THROUGH THE

10  EXPERT WHO HAD THE STRESS TEST PERFORMED.

11              NOW, THE COURT --

12      THE COURT:  WELL, I MEAN LOOKING AT 801, YOU HAVE

13  JUST IN PLAIN LANGUAGE OF THE SECTION, YOU HAVE CERTAINLY

14  AN ARGUMENT THAT SAYS IT MAY BE PERCEIVED BY OR BE

    PERSONALLY KNOWN TO THE WITNESS OR MADE KNOWN TO HIM AT

16  OR BEFORE THE HEARING, WHETHER OR NOT ADMISSIBLE.  IT IS

17  OF A TYPE THAT REASONABLY MAY BE RELIED UPON BY AN

18  EXPERT.

19              SO CERTAINLY ON ITS FACE IF HE'S AN EXPERT

20  IN THIS AREA OF CONTAMINATION, THEN HE COULD REASONABLY

21  RELY ON LAB RESULTS FROM A REPUTABLE LAB AS FAR AS HE WAS

22  CONCERNED, EVEN IF THE LAB RESULTS DON'T COME IN, I MEAN

23  JUST LOOKING AT THE FACE OF THE STATUTE.

24      MR. BIDERMAN:  YOUR HONOR, THE STATUTE HAS BEEN

25  INTERPRETED AND I REFER THE COURT TO -- IT IS ACTUALLY

26  THE POCKET PART OF THE JEFFERSON BENCHBOOK AND THE CASES

27  THAT WE'VE CITED.  THE CONTINENTAL CASE IS ONLY ONE.

    THERE IS MOSESIAN, M-O-S-E-S-I-A-N, VS. PENWALT AND

1    COLEMAN, AND AGAIN IT IS 384 OF THE -- DISCUSSED AT PAGE

2    384 OF THE POCKET PART, I BELIEVE, OF THE JEFFERSON

     BENCHBOOK, SECTION 29.4.

4                    JEFFERSON STATES THAT WHILE AN EXPERT CAN

5    RELY ON OTHER THINGS, AN EXPERT CANNOT SET FORTH THE

6    OPINIONS OF ANOTHER EXPERT IN PROVIDING HIS TESTIMONY

7    BECAUSE THERE IS THE RISK, OF COURSE, THAT THOSE

8    OPINIONS, WHICH ARE NEVER ADMITTED INTO EVIDENCE, WILL BE

9    DEEMED BY A JURY TO BE OFFERED FOR THEIR ACTUAL TRUTH,

10   WHEN THEY CAN'T BE ADMITTED FOR THE TRUTH UNLESS THERE IS

11   SOME INDEPENDENT BASIS FOR THEIR ADMISSION.

12                   I'M SPECIFICALLY READING FROM JEFFERSON ON

13   DIRECT EXAMINATION: AN EXPERT MAY NOT SET FORTH THE

14   OPINIONS OF OTHER EXPERTS TO BOLSTER THE WITNESS'S

15   OPINION, SINCE OTHER OPINIONS ARE BEING OFFERED FOR THE

16   TRUTH AND CONSTITUTE INADMISSIBLE HEARSAY.  AND THAT IS

17   PRECISELY WHAT PLAINTIFFS WOULD HAVE MR. HATFIELD DO IN

18   THIS CASE.

19                   ALL MR. HATFIELD HAS DONE IS DO THE

20   VACUUMING.  AND THEN IF PLAINTIFFS THEN ARE PERMITTED TO

21   ACTUALLY HOLD UP THIS CHART AND RECITE THE VARIOUS COUNTS

22   AND ANALYSES THAT WERE PREPARED BY MR. MILLETTE, ANOTHER

23   EXPERT WHO IS NOT AVAILABLE, THAT IS ESSENTIALLY THE

24   INTRODUCTION OF INADMISSIBLE HEARSAY THROUGH MR.

25   HATFIELD.

26                   THAT IS PRECISELY WHAT JEFFERSON SAID IS

27   NOT PERMITTED IN CIRCUMSTANCES SUCH AS THIS, PARTICULARLY

     WHETHER THERE WILL NEVER BE A BASIS FOR BRINGING IN THE

1    UNDERLYING CASES.  AGAIN I REFER THE COURT TO THE

2    JEFFERSON BENCHBOOK.  IT REALLY DISCUSSES THAT QUITE

     THOROUGHLY AND QUITE EMPHATICALLY, THAT ONE EXPERT CANNOT

4    TESTIFY IN DETAIL ABOUT ANOTHER EXPERT'S OPINIONS.  WE

5    CITED TO THE COURT ALSO THE GRIMSHAW CASE FOR THAT

6    PROPOSITION.

7              SO, ONE, YOUR HONOR WE DISAGREE WITH THE

8    PLAINTIFF'S CONTENTION THAT MR. HATFIELD CAN RELY UPON

9    INADMISSIBLE HEARSAY OF DR. MILLETTE IN GIVING HIS

10   OPINIONS, BECAUSE THAT IS, AS THE COURT STATED ON FRIDAY,

11   ESSENTIALLY A ONE TO ONE RELATIONSHIP.  ALL MR. HATFIELD

12   HAS DONE IS DO THE VACUUMING.  HE WOULD THEN TESTIFY

13   ABOUT CONTAMINATION BASED NOT UPON HIS VACUUMING, BUT

14   BASED UPON AN ANALYSIS DONE BY ANOTHER EXPERT.

               SO AGAIN, ONE, WE DON'T THINK THERE SHOULD

16   BE ANY RELIANCE ON THESE INADMISSIBLE OPINIONS OF DR.

17   MILLETTE.  NUMBER TWO, YOUR HONOR, THAT THE OPINIONS

18   THEMSELVES DO NOT COME INTO EVIDENCE IF RELIED UPON.

19   EVEN THE CASE THAT PLAINTIFFS CITE, THE WILLIAMS CASE,

20   DOES NOT HOLD THAT SIMPLY BECAUSE AN EXPERT RELIES ON

21   SOMETHING, IT THEN COMES IN FOR AFFIRMATIVE EVIDENCE.

22             AND I ALSO NOTE, YOUR HONOR, THAT IN THE

23   WILLIAMS CASE IT WAS A METALLURGICAL EXPERT WHO RELIED

24   UPON A STRESS TEST.  THIS METALLURGICAL EXPERT HAD DONE

25   HIS OWN ANALYSIS OF THE PART, AND THAT STRESS TEST WAS

26   DEEMED TO BE A NON-CONTROVERSIAL COMPUTATION, WHICH IS

27   EXACTLY THE OPPOSITE OF WHAT WAS DONE HERE BY DR.

     MILLETTE, WHICH AS THE COURT KNOWS FROM THE

1   CROSS-EXAMINATION OF DR. LONGO, IT IS EXTREMELY

2   CONTROVERSIAL, THE ENTIRE DUST SAMPLING PROTOCOL.

        THE FACT THAT IT HAS NOT BEEN APPROVED BY

4   EITHER THE E.P.A. OR ANY STANDARDIZED TESTING

5   ORGANIZATION, PRECISELY WHAT GOES INTO DOING THE DUST

6   SAMPLING, WHETHER THERE IS HYDROCHLORIC ACID ADDED TO THE

7   LIQUID THAT IS APPLIED TO THE DUST, WHETHER THERE IS ANY

8   SEDIMENT OBSERVED IN THE TEST TUBE, THE INTENSITY OF THE

9   SONICATION, HOW THE ALIQUOT SAMPLE IS TAKEN OUT, ALL OF

10  THAT IS NOT DESCRIBED IN THE DOCUMENT THAT PLAINTIFFS

11  ATTEMPT TO RELY UPON.

12          AND WE HAVE NO OPPORTUNITY TO CROSS EXAMINE

13  THE WITNESS ABOUT THAT, AND IT IS A FUNDAMENTAL PART OF

14  THE ANALYSIS.  IT IS NOT A NONCONTROVERSIAL COMPUTATION,

    SUCH AS THE CASE IN THE WILLIAMS COURT.

16          THE COURT:  DO THE PLAINTIFFS INTEND TO SEEK THE

17  LAB RESULTS INDEPENDENTLY OF MR. HATFIELD IN THIS CASE?

18          MR. BOUCHER:  NO, YOUR HONOR, ALTHOUGH WE DO HAVE

19  THE CUSTODIAN OF RECORDS FROM THE LABORATORY HERE TO LAY

20  A FOUNDATION, IF NECESSARY.  BUT NO, DR. LONGO TESTIFIED

21  ABOUT SONICATION.  MR. HATFIELD IN HIS DEPOSITION WAS

22  EXTENSIVELY EXAMINED ABOUT THE VERY ISSUES THAT MR.

23  BIDERMAN JUST RAISED WITH THE COURT.

24          THE COURT:  WHAT WOULD THE CUSTODIAN OF RECORDS BE

25  ABLE TO TELL FROM THE DOCUMENT?  WOULD YOU BE ABLE TO

26  TELL WHAT METHOD WAS UTILIZED TO ANALYZE?

27          MR. BOUCHER:  YES.  THE CUSTODIAN OF RECORDS FROM

    THE LABORATORY ACTUALLY PERFORMED QUALITY CONTROL ON THE

1   SAMPLES AS WELL FROM THE LABORATORY, AND HE WILL BE ABLE

2   TO TESTIFY ABOUT THE METHOD THAT WAS USED AND WHAT THE

    RESULTS, JUST SIMPLY HOW THE RESULTS WERE OBTAINED.

4            BUT AGAIN, WE DON'T THINK IT NEEDS TO GO

5   THAT FAR.  MR. HATFIELD, AS IN WILLIAMS, CAN TESTIFY

6   ABOUT THESE -- THEIR OBJECTIVE FACTS.  ALL A MICROSCOPIST

7   DOES IS LOOK UNDER A MICROSCOPE AND COUNT.  THAT'S ALL

8   MILLETTE DOES.  THEY LOOK UNDER A MICROSCOPE AND THEY

9   COUNT STRUCTURES.  IN FACT, MR. HATFIELD HAS VERIFIED.

10  WE HAD HIM THIS WEEKEND ACTUALLY GO TO THE MILLETTE LAB

11  AND LOOK AT THE ASBESTOS FIBERS AND COUNT FOR HIMSELF AND

12  LOOK AT THE VERMICULITE HIMSELF, WHICH HE'S QUALIFIED TO

13  DO AND IN FACT DID.

14           ALL THE MICROSCOPIST DOES IS THE SAME THING

    THAT WAS PERFORMED IN WILLIAMS, AND THAT IS CALCULATIONS.

16  THEY ARE OBJECTIVE FACTS.  THEY ARE NOT OPINIONS.  AND

17  THE CASES THAT HAVE HELD OPINIONS CAN'T COME IN GO

18  SOMETHING LIKE THIS, YOUR HONOR.  YOU HAVE A DOCTOR ON

19  THE STAND WHO HAS X-RAYS ANALYZED.  AND HE TESTIFIES

20  ABOUT HIS OPINIONS ABOUT THE X-RAYS, HE THEN HAS THE

21  ENTIRE STAFF AT STANFORD LOOK AT THE X-RAYS.

22           AND HE TELLS THE JURY: I HAD THE ENTIRE

23  STAFF AT STANFORD LOOK AT THE X-RAYS AND THEY SAID THEY

24  COULD NOT FIND ANYTHING IN THESE X-RAYS EITHER.  WELL,

25  THERE YOU'RE GETTING IN THE OPINIONS OF OTHER EXPERTS

26  ABOUT HOW THEY INTERPRETED THE X-RAYS THEMSELVES, AS

27  OPPOSED TO SIMPLE LABORATORY SCIENTIFIC ANALYSIS.  DR.

    MILLETTE DOES NOT IN HIS REPORT GIVE AN OPINION ABOUT

1   CONTAMINATION.   HE DOES NOT RENDER AN OPINION ABOUT THE

2   SIGNIFICANCE OF THE THE RESULTS.

    ALL HE DOES IS COUNT THE STRUCTURES AND

4   PROVIDE THE LABORATORY STRUCTURE COUNTS.   IT IS THEN MR.

5   HATFIELD WHO CAN REVIEW THE STRUCTURE COUNTS AND RENDER

6   OPINIONS ABOUT CONTAMINATION AND RENDER OPINIONS ABOUT

7   THE SIGNIFICANCE OF CONTAMINATION BASED ON WHAT HE SAW

8   AND BASED UPON THAT ANALYSIS, AND IT IS JUST A SCIENTIFIC

9   CALCULATION.

10          AND UNDER SECTION 801, WHETHER OR NOT THE

11  COURT FINDS THAT THE ACTUAL COUNTS THEMSELVES ARE

12  ADMISSIBLE, CERTAINLY HIS RELIANCE UPON THE FACT THAT HE

13  HAD THEM ANALYZED IS ADMISSIBLE.   MOREOVER, IT IS

14  PERMISSIBLE TO SHOW THE COUNTS TO THE JURY.   AND IF THE

    COURT FINDS THAT THERE IS NOT A SUFFICIENT BASIS FOR THE

16  COUNTS THEMSELVES TO COME IN AS SCIENTIFIC EVIDENCE, THEN

17  A LIMITING INSTRUCTION IS APPROPRIATE.   AND THE APPELLATE

18  COURTS HAVE CLEARLY GONE THAT SUCH IS AN APPROPRIATE

19  VEHICLE FOR DEALING WITH THAT PROBLEM.

20          SO THE BOTTOM LINE IS, YOUR HONOR, THAT

21  ONE, WE BELIEVE THAT AS A MICROSCOPIST SIMPLY COUNTING

22  THE STRUCTURES THEMSELVES AND LISTING THE AMOUNT OF

23  STRUCTURES SEEN UNDER THE MICROSCOPE, IT IS NO DIFFERENT

24  THAN WILLIAMS, AND THOSE RESULTS CAN ACTUALLY COME IN.

25          IF THE COURT FINDS THAT THE RESULTS

26  THEMSELVES DON'T COME IN BASED UPON THAT, THEN CERTAINLY

27  UNDER SECTION 801 OF THE EVIDENCE CODE MR. HATFIELD CAN

    RENDER HIS OPINIONS ABOUT WHAT HE REVIEWED AND THE FACT

1   THAT THEY ARE BASED UPON THIS ANALYSIS THAT HE HAS

2   PERFORMED.

            FINALLY, IF NECESSARY WE CAN LAY THE

4   FOUNDATION THROUGH MR. HATFIELD, BASED ON THE FACT THAT

5   WE HAD HIM THIS WEEKEND GO BACK TO THE LABORATORY ITSELF

6   AND ACTUALLY LOOK AT THE RESULTS HIMSELF TO MAKE THE

7   COUNTS AND TO VERIFY THE COUNTS; AND THAT FINALLY, WE

8   HAVE THE CUSTODIAN OF RECORDS HERE IF THAT IS NECESSARY.

9       THE COURT:  SO HE'S CAPABLE OF GIVING TESTIMONY AS

10  TO COUNTS HIMSELF?

11      MR. BOUCHER:  THAT'S CORRECT.  WHAT HAPPENS, YOUR

12  HONOR, IS UNDER THE T.E.M. ANALYSIS THE MICROSCOPIST

13  LOOKS UNDER THE MICROSCOPE AND IDENTIFIES THE STRUCTURES.

14  AND THEN AS THE COURT HEARD FROM PREVIOUS EXPERTS, THAT

    IS, A DEFRACTION EX-RAY DISPERSON ANALYSIS IS PERFORMED

16  WHICH SHOWS THAT THERE IS AN ASBESTOS FIBER, THE TYPE OF

17  FIBER, AND THAT IT IS VERMICULITE; AND THAT MR. HATFIELD,

18  SPECIFICALLY TO DEAL WITH THIS, WENT TO THE LABS, SAW THE

19  ASBESTOS STRUCTURES THEMSELVES.

20      MR. BIDERMAN:  A NUMBER OF POINTS HAVE BEEN RAISED,

21  YOUR HONOR.  I'M JUST GOING TO TRY TO ADDRESS THEM IN

22  SERIES.

            THE FIRST IS -- AND THE CASES ARE SO

24  UNEQUIVOCAL ON THIS, YOUR HONOR, THAT I AGAIN REQUEST

25  THAT THE COURT LOOK AT THEM, THE EVIDENCE BENCHBOOK AND

26  CASES WE'VE CITED.  GRIMSHAW, ONE CANNOT USE AN EXPERT AS

27  A VEHICLE FOR BRINGING IN ANOTHER EXPERT'S OPINION, WHICH

    IS EXACTLY WHAT IS DONE HERE.

1           MR. MILLETTE REACHED AN OPINION THAT THERE

2    WERE X NUMBER OF FIBERS IN THESE VARIOUS SAMPLES THAT

     WERE TAKEN.  YOU CANNOT USE THAT INADMISSIBLE HEARSAY,

4    PRESENT THAT TO THE JURY IN ANY DETAIL WHEN THERE IS NO

5    FOUNDATIONAL BASIS FOR HAVING THAT EVIDENCE ADMITTED IN

6    AND OF ITSELF.  AGAIN, THE GRIMSHAW VS. FORD MOTOR

7    COMPANY, AN EXPERT MAY NOT TESTIFY AS TO THE DETAILS OF

8    MATTERS WHICH ARE OTHERWISE INADMISSIBLE.

9           HE MAY NOT UNDER THE GUISE OF REASONS BRING

10   BEFORE THE JURY INCOMPETENT HEARSAY EVIDENCE.  THAT IS

11   SPECIFICALLY PRECLUDED, PEOPLE VS. YOUNG.  THE RULE WHICH

12   ALLOWS THE EXPERT TO STATE THE REASONS UPON WHICH OPINION

13   IS BASED MAY NOT BE USED AS A VEHICLE TO BRING BEFORE THE

14   JURY INCOMPETENT EVIDENCE.

            EXPERTS MAY NOT RELATE AN OUT OF COURT

16   OPINION BY ANOTHER EXPERT AS INDEPENDENT PROOF.  THEY

17   CANNOT REVEAL THE CONTENTS OF THAT OTHER OPINION.

18          THAT IS CLEARLY WHAT MR. HATFIELD WOULD BE

19   DOING IF HE TALKED ABOUT THE COUNTS THAT WERE MADE.  HE

20   WOULD BE PRODUCING AN OPINION DONE BY SOMEBODY ELSE.

21   INTRODUCING IT BEFORE THE JURY.  AND THE STATEMENT THAT

22   MR. BOUCHER SAYS, WELL, GEE, THAT MAY NEVER COME IN AS

23   EVIDENCE, THAT IS PRECISELY WHY MR. HATFIELD SHOULD NOT

24   BE ALLOWED TO USE THAT KIND OF INFORMATION, BECAUSE IT IS

25   NOT EVIDENCE.

26          IT WILL NEVER BE EVIDENCE.  AND FOR HIM TO

27   SAY THAT HE HAS RELIED UPON THIS AND RECITE THAT

     INFORMATION IN DETAIL BEFORE THE JURY CREATES EXACTLY THE

1   CONTRARY CONCLUSION AND CANNOT BE CURED BY A LIMITING

2   INSTRUCTION, AS THE GRIMSHAW CASE, THE MOSESIAN CASE

    CITE, AND AGAIN AS JEFFERSON HIMSELF CITES.

4            SO NUMBER ONE, MR. HATFIELD SHOULD NOT BE

5   PERMITTED TO RELY UPON THIS HEARSAY EVIDENCE THAT IS NOT

6   OTHERWISE ADMISSIBLE.   NUMBER TWO --

7        THE COURT:   WELL, JUST FROM YOUR ARGUMENT YOU HAVE

8   NOT PRECLUDED A RELIANCE UPON IT.   YOU HAVE PRECLUDED THE

9   RECITATION OF DETAILS BY YOUR OWN ARGUMENT.

10           SO ARE YOU SAYING THAT HATFIELD CAN SAY

11   THAT HE SENT THE SAMPLES TO A CERTAIN LAB, HE GOT THE

12   RESULTS, AND WITHOUT PULLING OUT THE CHART, AND

13   INDICATING EXACTLY WHAT WAS FOUND, IF HE COULD SAY TO HIS

14   SATISFACTION THAT THERE WAS A SHOWING THAT THERE WAS

     ASBESTOS AT A CERTAIN LEVEL AND THAT THERE WAS

16   MONOKOTE-3, AND HE RELIED ON THAT, THOSE GENERALITIES, IN

17   COMING TO HIS OPINION, WITHOUT HAVING TO YOU PULL OUT A

18   CHART AS TO WHAT THINKS, DO YOU THINK HE COULD DO THAT?

19        MR. BIDERMAN:   YOUR HONOR, NO, WE DO NOT BELIEVE

20   SO, IF IT IS NOT OTHERWISE GOING TO BE ADMISSIBLE, IF THE

21   INFORMATION WILL NOT OTHERWISE BE ADMISSIBLE.   IT IS

22   DETAILED HEARSAY EVIDENCE.

23        THE COURT:   IT'S NOT COMING OUT AS DETAILED

24   HEARSAY.   IT IS COMING OUT IN CONCLUSIONARY FASHION.

25        MR. BIDERMAN:   THAT THERE WERE JUST SOME COUNTS

26   MADE?

27        THE COURT:   THERE WERE COUNTS MADE.   HE MIGHT SAY

     TO A GENERALITY OF AT LEAST THIS AMOUNT AND THAT WAS GOOD

1   ENOUGH FOR ME TO RELY UPON.  I MEAN AS AN EXPERT, HE HAS

2   TO KNOW, HE HAS TO RELY ON A CERTAIN AMOUNT OF ASBESTOS,

3   I SUPPOSE, TO COME TO AN OPINION THAT THERE IS

4   CONTAMINATION.

5       MR. BIDERMAN:  YOUR HONOR, THE PROBLEM IN THIS CASE

6   IS EXACTLY WHAT THE COURT POINTED OUT ON FRIDAY.

7   ESSENTIALLY, IT IS A ONE TO ONE ANALYSIS.

8          HE DOES NOT BRING ANYTHING TO BEAR OTHER

9   THAN THE FACT THAT HE'S DONE THESE DUST SAMPLES, SENDS

10  THEM BACK, AND THEN GETS THE RESULT.  ESSENTIALLY HE'S

11  BEING USED AS A SUBSTITUTE FOR MR. MILLETTE, BECAUSE HIS

12  OPINION ON CONTAMINATION IS BASED ENTIRELY ON THESE

13  RESULTS.  SO THERE IS A ONE TO ONE CORRESPONDENCE

14  BETWEEN --

15       THE COURT:  LET ME ASK YOU, WHAT IS YOUR OBJECTION

16  TO THE BUSINESS RECORDS EXCEPTION?

17       MR. BIDERMAN:  THE OBJECTION TO THE BUSINESS

18  RECORDS EXCEPTION IS, YOUR HONOR, THAT IT IS NOT A

19  BUSINESS RECORD.  THE CASES HAVE HELD, WE HAVE CITED TWO

20  FEDERAL CASES FOR THE COURT --

21       THE COURT:  IN YOUR PAPERS.

22       MR. DEFENSE:  YES.

23       MR. BIDERMAN:  THEY ARE, YOUR HONOR, THAT, AND

24  UNDER THE CALIFORNIA LAW THERE HAS TO BE AN INDEPENDENT

25  BASIS FOR THE TRUSTWORTHINESS OF THE COUNTS.  IT IS

26  PREPARED IN CONNECTION WITH LITIGATION, FOR USE IN

27  LITIGATION.  IT DOES NOT CONSTITUTE A BUSINESS RECORD.

     IT IS AN INVOICE, A BILL OF LADING, THAT TYPE OF BUSINESS

1    RECORD DOCUMENT.

2            THE CUSTODIAN, YOUR HONOR, WAS NOT

     DESIGNATED ON THEIR WITNESS LIST.  IT WAS NOT DESIGNATED

4    AS AN EXPERT.  AND ESSENTIALLY BY PERMITTING THE RESULTS

5    TO COME IN AS A BUSINESS RECORD WOULD BE TO CIRCUMVENT

6    ALL THE RULES GOVERNING THE DISCOVERY OF EXPERT

7    WITNESSES.  WE THEN HAVE NO OPPORTUNITY TO HAVE ANY

8    CROSS-EXAMINATION ABOUT HOW THE COUNTS WERE PREPARED, HOW

9    THE SAMPLES WERE PREPARED, HOW THE SONICATION WAS DONE.

10            THERE IS NO OPPORTUNITY WHATSOEVER BECAUSE

11   THE RECORD COMES IN WITHOUT ANY INDEPENDENT ANALYSIS OR

12   REVIEW.  THE PURPOSE FOR HAVING AN EXPERT DESIGNATION,

13   FOR HAVING EXPERT DEPOSITIONS IS SO THAT ONE CAN TEST THE

14   EXPERT'S OPINIONS.  TO PERMIT THOSE IN AS A BUSINESS

     RECORD WOULD ENTIRELY CIRCUMVENT THAT RULE.

16            YOUR HONOR, THE ANALYST IS NOT HERE.  THE

17   PERSON WHO HAS ACTUALLY DONE THE ANALYSIS IS STILL NOT

18   HERE.  IT IS SIMPLY SOMEBODY WHO WILL TALK ABOUT WHAT THE

19   RECORDS SAY.  WE STILL HAVE NO OPPORTUNITY TO FIND OUT

20   HOW THOSE SAMPLES WERE PREPARED, HOW THE COUNTS WERE

21   MADE.

22       THE COURT:  WELL, IT DOES NOT SOUND LIKE THAT IS

23   WHAT THEY HAVE.

24            DO YOU HAVE A CUSTODIAN OF THE RECORDS WHO

25   CAN TESTIFY AS TO THE METHOD BY WHICH THE ANALYSIS WAS

26   DONE IN GENERAL TERMS?

27       MR. BOUCHER:  THAT'S CORRECT, AS WELL AS --

         THE COURT:  IN OTHER WORDS, IF THEIR LAB SAYS IT

1    WAS DONE UNDER X METHOD, THEN THIS PERSON IS FAMILIAR

2    WITH WHAT THAT METHOD IS AS FAR AS PROCEDURAL --

          MR. BOUCHER:  YES.  AS WELL AS THE FACT THAT HE

4    HIMSELF PERFORMED QUALITY CONTROL ON THESE SAMPLES.

5          MR. BIDERMAN:  AGAIN, YOUR HONOR, HE'S NOT ON THE

6    WITNESS LIST.  IT IS -- BECAUSE DR. MILLETTE WAS REQUIRED

7    TO BE MADE AVAILABLE, A DATE WAS SET FOR HIS DEPOSITION.

8    HE DID NOT ATTEND HIS DEPOSITION.  HE WAS NOT MADE

9    AVAILABLE ON THAT DATE.  ESSENTIALLY, PLAINTIFFS ARE

10   BRINGING IN ANOTHER EXPERT WHO WAS UNDESIGNATED,

11   UNDEPOSED, AND IN CONTRAVENTION OF THE RULES THAT JUDGE

12   COOPERMAN SET UP FOR PRETRIAL DISCOVERY.

13         THE COURT:  WELL, THERE ARE TWO THINGS THAT WE CAN

14   DO.  I'M TRYING TO FIGURE OUT A SCHEDULE AT THIS POINT.

15   OBVIOUSLY, I WANT TO READ WHAT WE HAVE HERE, AND THAT'S

16   GOING TO DELAY THINGS.  BUT EITHER I COULD READ THE

17   PORTION ABOUT THE BUSINESS RECORDS AND MAKE A DECISION ON

18   THAT, AND THAT WITNESS COULD BE TAKEN OUT OF ORDER IF I

19   DECIDE THAT THAT WAS PERMISSIBLE, OR WE COULD GO TO -- DO

20   YOU HAVE ANY OTHER DIRECT THAT YOU CAN HANDLE WITHOUT

21   GETTING INTO ANY PREVIOUS ANALYSIS ON OTHER CASES AS WELL

22   AS THIS CASE AT THIS POINT WITH MR. HATFIELD?

23         MR. BOUCHER:  UMM --

24         THE COURT:  HAS HE ESTABLISHED THAT, THE TAKING OF

25   THE SAMPLES?

26         MR. BOUCHER:  NO.  THAT'S THE NEXT PART OF THE

27   SLIDES.  AND HE'S BROUGHT A CASSETTE TO SHOW THE JURY AND

     DEMONSTRATE WHAT HE DOES.

1         THE COURT:  I THINK UP TO TAKING THE SAMPLES, I

2    THINK WE COULD GO THAT FAR.  WHAT WE COULD DO IS, I COULD

)    ORDER THAT WE BIFURCATE THE TESTIMONY AND ORDER CROSS UP

4    TO THAT POINT.  AND THEN I COULD KEEP READING AND CROSS

5    COULD BE DONE ANYWAY ON WHAT HAS BEEN DONE SO FAR.

6         MR. MANFREDI:  I'M JUST THINKING, AS YOU WERE

7    SAYING THAT, IT WOULD BE VERY DIFFICULT TO CROSS ON WHAT

8    HAS BEEN DONE BECAUSE THOSE PHOTOGRAPHS ARE TIED INTO THE

9    PLACES WHERE HE TOOK THE DUST SAMPLES AND SO FORTH, AND I

10   DON'T WANT TO BE IN A POSITION OF BEING ACCUSED OF

11   OPENING THE DOOR OF BY VIRTUE OF WHAT I HAVE ASKED ON

12   CROSS-EXAMINATION BECAUSE THE THINGS ARE RELATED, AND IT

13   IS GOING TO BE A DIFFICULT PROBLEM.

14            I WOULD URGE THE COURT TO PERHAPS TAKE THE

     TIME TO READ THESE BRIEFS EVEN THOUGH WE HAVE A JURY

16   WAITING.

17        THE COURT:  WELL, WHAT WE COULD DO IS, I'LL LOOK AT

.18  THE COUPLE OF CASES.  HOW LONG WOULD IT TAKE TO GO

19   THROUGH THE SAMPLING IF HE GOES THROUGH HIS TESTIMONY

20   ABOUT THE SAMPLES?

21        MR. BOUCHER:  I THINK THERE IS A HALF HOUR, 45

22   MINUTES MAYBE OF DIRECT EXAMINATION, BECAUSE I'LL ALSO

23   ASK HIM ABOUT HIS WORK ON THE A.S.D.M. COMMITTEE, ABOUT

24   SONICATION AND CERTAIN ISSUES RELATED TO THAT AS IT

25   RELATES TO HIS TESTIMONY.  YOU KNOW, HALF HOUR, 45

26   MINUTES PROBABLY WITHOUT ANY PROBLEM.

27        MR. MANFREDI:  YOUR HONOR, ON THE OTHER HAND, WHAT

     IS THE RELEVANCE OF ANY OF THIS IF YOU CONCLUDE THAT

1    THOSE SAMPLES MAY NOT BE USED, CANNOT COME INTO EVIDENCE?

2    I MEAN WE ARE GETTING FURTHER AND FURTHER DOWN THE ROAD

3    ON SOMETHING WE BELIEVE, VERY VERY STRONGLY BELIEVE IS

4    NOT ADMISSIBLE.

5              THE OTHER POINT THAT I WOULD MAKE IS THAT

6    WITH RESPECT TO THIS 45 MINUTES OR WHATEVER, I CERTAINLY

7    HOPE THAT THERE IS GOING TO BE NO TESTIMONY ABOUT WHAT

8    THIS WITNESS DID OVER THE WEEKEND.  WE DID TAKE HIS

9    DEPOSITION, YOUR HONOR, CAREFULLY.  HE TESTIFIED AMONG

10   OTHER THINGS AT THAT DEPOSITION THAT WHILE HE IS A LIGHT

11   MICROSCOPIST, HE IS NOT A TRANSMISSION ELECTRON

12   MICROSCOPIST.

13             FOR HIM NOW TO COME IN HERE, AND AFTER

14   GOING BACK TO CAROLINA THIS WEEKEND, AND CLAIM TO HAVE

     LOOKED THROUGH THE MICROSCOPE AND DONE THESE COUNTS

15   HIMSELF, SOMETHING WHICH HE HAD NOT DONE WHEN WE HAD

17   DISCOVERY FOR HIM ON THE LAST DAY OF DISCOVERY --

18        THE COURT:  DO YOU HAVE TO BE CERTIFIED OR DO YOU

19   HAVE TO HAVE A CERTAIN BACKGROUND TO DO THAT?

20        MR. BOUCHER:  NOT TO DO THE COUNTS ON THE -- YOU

21   HAVE TO HAVE CERTIFICATION AND EXPERT BACKGROUND IN ORDER

22   TO OPERATE THE ELECTRON MICROSCOPE.  BUT THE ELECTRON

23   MICROSCOPE ACTUALLY TAKES A PICTURE ON THE X-RAY

24   DISPERSION THAT SHOWS THE FIBER ITSELF THAT YOU DON'T

25   HAVE TO HAVE THE T.E.M. BACKGROUND IN ORDER TO ANALYZE

26   AND UNDERSTAND.

27        THE COURT:  SO THERE ARE PHOTOS OF WHAT DR.

     MILLETTE WOULD HAVE EVALUATED THAT EXIST?

1          MR. BOUCHER:  YES, YOUR HONOR, ESSENTIALLY.

2          MR. MANFREDI:  NOT THAT HAVE BEEN PRODUCED TO US.

   THERE ARE NOT.

4                THERE ARE COUNT SHEETS IN WHICH A

5    MICROSCOPIST SITS AT THE ELECTRON MICROSCOPE, COUNTS THE

6    ASBESTOS STRUCTURES, MARKS THEM DOWN, MARKS DOWN THEIR

7    LENGTH AND THEIR WIDTH, AND THERE IS AN ANALYST THAT DOES

8    THAT, DID THAT, FAXED IT TO MR. HATFIELD.

9                WE EXAMINED HIM ABOUT IT AT HIS DEPOSITION,

10   FOUND OUT HE HAD NOT DONE ANY OF THE WORK, HAD NOT BEEN

11   IN FRONT OF THE MICROSCOPE.  IT HAD BEEN FAXED TO HIM,

12   DONE BY SOMEONE ELSE NOT THERE.  NOW HE GOES BACK TO

13   CAROLINA DURING HIS TRIAL, DURING HIS EXAMINATION, AND

14   SITS IN FRONT OF THE MICROSCOPE AND DOES THIS WORK.

                 HOW DOES THAT COMPLY WITH THE EXPERT

16   DISCOVERY RULES?  HOW DOES THAT FAIRLY PROTECT OUR RIGHTS

17   TO CROSS EXAMINE AND TO DO DISCOVERY?  YOUR HONOR, THEY

18   HAVE HAD THE MICROSCOPY AVAILABLE SINCE THIS WORK WAS

19   DONE.  FOR REASONS UNKNOWN TO US, THEY RESIST BRINGING

20   THE PERSON WHO COULD LAY FOUNDATION FOR THIS WORK.  THEY

21   BRING LONGO OUT HERE.  THEY BRING HATFIELD OUT HERE.

22         THE COURT:  WELL, I KNOW WHY MR. MILLETTE IS NOT

23   HERE, BECAUSE THEY DID NOT APPARENTLY PRODUCE HIM IN TIME

24   AND YOU TACTICALLY DO NOT WANT HIM IN HERE.  THAT'S

25   UNDERSTANDABLE.

26         MR. MANFREDI:  THEY HAD TWO MICROSCOPISTS UNTIL THE

27   DAY OR TWO BEFORE THEIR DEPOSITIONS.  THEY SAID WE DO NOT

     KNOW WHO TO CALL, MILLETTE OR HOPEN.  THE DISCOVERY CUT

1   OFF CAME AND WENT, AND THEY PRODUCED NEITHER OF THEM.

2   AND NOW WE DON'T HAVE THE PERSON WHO DID THE WORK, AND

    THIS IS COMING IN THE BACK DOOR.

4           BUT IT ADDS INSULT TO INJURY TO ALLOW THIS

5   MAN, WHO TESTIFIED HIMSELF AT HIS DEPOSITION THAT HE IS

6   NOT A ELECTRON MICROSCOPIST, TO GO BACK THERE IN THE

7   MIDDLE OF HIS TESTIMONY, DO ADDITIONAL WORK AND COME BACK

8   HERE AND TESTIFY.

9           THE COURT:  WELL, I WOULD SAY ON ITS FACE IT LOOKS

10  LIKE MR. HATFIELD COULD NOT TESTIFY TO GOING BACK THERE

11  DURING THE TRIAL AND MAKING COUNTS, BECAUSE THAT WAS

12  TOTALLY UNANTICIPATED.  I THINK IT WAS A WHOLE DIFFERENT

13  AREA OF EXPERTISE THAT HE WOULD SEEM TO BE INVOLVED IN.

14  SO ON ITS FACE I WOULD SAY HE'S NOT GOING TO TESTIFY, I

15  WOULD PRECLUDE IT AT THIS POINT, ANY TESTIMONY OF ACTUAL

16  COUNTS BY HIMSELF OF ANY OF THE EVIDENCE IN THIS CASE.

17          MR. BOUCHER:  BASED ON WHAT GROUNDS, YOUR HONOR?

18  BECAUSE THE ONLY THING HE DID IS HE WENT BACK, AND JUST

19  FOR THE PURPOSES OF LAYING THE FOUNDATION FOR THE ACTUAL

20  TEST TO COME IN, WHICH IS BEYOND WHAT WE FEEL IS

21  NECESSARY AND BEYOND WHAT IS PERMITTED UNDER SECTION 801.

22          I MEAN THERE ARE TWO VERY SEPARATE ISSUES

23  AND, AS THE DEFENDANTS AMPLY LAY OUT IN THEIR BRIEF, AND

24  AS THEIR CASES INCLUDING GRIMSHAW AND SO FORTH INDICATE,

25  AN EXPERT CAN RELY UPON INADMISSIBLE HEARSAY AND INDICATE

26  TO THE JURY THAT HE'S RELYING UPON INADMISSIBLE HEARSAY

27  AND RELATE IN GENERAL TERMS WHAT THAT IS.

            BUT TO LAY THE FOUNDATION, MR. HATFIELD

1   WENT OUT AND LOOKED AT THE ACTUAL ANALYSIS ITSELF, WHICH

2   IS WHAT I'M SHOWING THE COURT.   IT'S AN EXAMPLE OF

    SOMETHING THAT IS ALREADY IN EVIDENCE THROUGH DR. COHEN,

4   BUT THAT IS AN X-RAY DISPERSION OF WHAT HAPPENS WHEN THE

5   MICROSCOPE FOCUSES ON IT.   IT COMES UP ON AN X-RAY

6   SCREEN, AND THIS TYPE OF PATTERN COMES UP.

7                AND MR. HATFIELD IS IN FACT QUALIFIED TO

8   TESTIFY ABOUT IT.   AND WHAT IT SHOWS -- AND IN FACT, MR.

9   MILLETTE WORKED UNDER THE DIRECTION OF MR. HATFIELD AT MC

10  CRONE LABORATORIES PRIOR TO MR. HATFIELD THEN MOVING ON

11  TO LAW ENGINEERING OR LAW ASSOCIATES.   SO THE ONLY THING

12  HE DID THIS WEEKEND WAS SATISFY HIMSELF FROM THE

13  FOUNDATIONAL POINT OF VIEW OF THE ACTUAL COUNTS.   BUT

14  THAT GOES ON --

          THE COURT:   YOU'RE SAYING THAT HE CAN TESTIFY TO

16  THAT IN FRONT OF THE JURY?

17        MR. BOUCHER:   HE'S QUALIFIED TO NOW.

18        THE COURT:   WHAT IS HIS CERTIFICATION AGAIN?   WHAT

19  IS HIS PROFESSIONAL TITLE?

20        MR. BOUCHER:   MR. HATFIELD IS VICE PRESIDENT-

21  CONSULTANT AT LAW ASSOCIATES.   AND HE'S GOT A BACKGROUND

22  IN POLARIZED LIGHT MICROSCOPY, BUT ADDITIONALLY HE, AS I

23  THINK THERE HAS ALREADY BEEN TESTIMONY ABOUT, HE IS ON

24  THE A.S.D.M. COMMITTEE AND THE E.P.A. COMMITTEE BY

25  APPOINTMENT DECIDING THIS EXACT PROTOCOL, AND IS MAKING A

26  DETERMINATION OF EXACTLY HOW THIS PROCESS IS UTILIZED AND

27  SO FORTH.   AND HE'S TAUGHT THIS AT UNIVERSITIES AROUND

    THE COUNTRY.

1        THE COURT:  NO, BUT THE POINT IS IN DISCOVERY IF

2   YOU DID NOT DESIGNATE HIM AS A PERSON WHO IS GOING TO

    TESTIFY TO THE ACTUAL COUNTS AND TO THE MISCROSCOPY WORK,

4   THEN THERE WOULD HAVE BEEN NO DISCOVERY ABOUT THAT AND

5   THERE WOULD BE NO PRIOR ABILITY TO CROSS EXAMINE IN THAT

6   AREA.

7        MR. BOUCHER:  YOUR HONOR, AT THE DEPOSITION THEY

8   DID EXACTLY QUESTION HIM ABOUT SONICATION.  THEY

9   QUESTIONED HIM ABOUT THESE COUNTS.  THEY TOOK HIM THROUGH

10  THE COUNT SHEETS AND HAD HIM DISCUSS AND ANALYZE THE

11  COUNTS SHEETS.  THEY ASKED HIM HIS OPINIONS ABOUT THE

12  NUMBER OF ASBESTOS FIBERS.  THEY WENT IN DEPTH WITH HIM

13  ON HIS DEPOSITION ABOUT THESE EXACT POINTS.

14       THE COURT:  NOT ABOUT VIEWING IT, HIM PERSONALLY

    PHYSICALLY VIEWING IT UNDER A MICROSCOPE AND VERIFYING

15  THE COUNTS.

17            I CAN UNDERSTAND THEM GOING THROUGH ANY

18  COUNTS THAT WERE THE BASIS OF HIS OPINION.  THAT WOULD BE

19  NORMAL.  BUT IT'S RATHER A SURPRISE FOR THEM TO COME HERE

20  AND FIND OUT THAT OVER THE WEEKEND THEY HAVE ANOTHER AREA

21  TO CROSS EXAMINE HIM ABOUT THAT THEY WERE NOT AWARE TO BE

22  PREPARED ON AND HE OBVIOUSLY WAS NOT PREPARED UNTIL THIS

23  WEEKEND.

24       MR. BOUCHER:  AGAIN, YOUR HONOR, THE ONLY THING HE

25  DID WAS GO THROUGH, VIEW THE COUNTS FOR FOUNDATIONAL

26  PURPOSES.  AND WE AGAIN BELIEVE THAT IS BEYOND WHAT IS

27  NECESSARY, BUT WE JUST DID IT OUT OF AN ABUNDANCE OF

    CAUTION.  HE WAS DESIGNATED AS A PERSON WHO WOULD TESTIFY

1  ABOUT SAMPLE ANALYSIS AND ANALYTICAL PROCEDURES.

2       THE COURT:  I WOULD THINK HE'D HAVE TO KNOW

   SOMETHING ABOUT THE ANALYTICAL PROCEDURES TO RELY UPON

4  THE RESULTS AS AN EXPERT ON THE ISSUE OF CONTAMINATION.

5  HE'D HAVE TO UNDERSTAND THE RESULTS.

6            IN OTHER WORDS, IF HE GETS IT FROM THE LAB,

7  HE'D HAVE TO KNOW WHAT TECHNIQUE THEY USED.  IS IT A

8  REPUTABLE TECHNIQUE?  IS IT SOMETHING HE SHOULD RELY ON

9  AS AN EXPERT?  THAT'S ALL WELL AND GOOD.  BUT I'M WILLING

10  TO GO WITH THE SAMPLING PORTION OF THE TESTIMONY.

11            I'LL HEAR FROM MR. MANFREDI.

12  MR. MANFREDI:  YES.  MR. BOUCHER HELD UP SOME

13  THINGS, OF COURSE, THAT WE'RE NOT PRIVY TO SINCE THEY

14  WERE NEVER PRODUCED TO US, ALLEGEDLY WORK THAT THE

   WITNESS DID OVER THE WEEKEND.

16            THESE ARE WHAT THEY CALL COUNT SHEETS.

17  THESE WERE PRODUCED AT THE WITNESS'S DEPOSITION.  AS YOU

18  WILL SEE, THE ANALYST IS A.T.C. OR R.K.W. WHO WAS LOOKING

19  THROUGH THE ELECTRON MICROSCOPE, GIVES THE GRADE, GIVES

20  THE OVERALL STRUCTURE, LENGTH AND WIDTH, GIVES WHAT TYPE

21  OF ASBESTOS IT IS, AND SO FORTH, AND THEN TELLS YOU

22  WHETHER IT IS A MATRIX FIBER OR BUNDLE OR WHATEVER.

23  THESE WERE PRODUCED AT THE DEPOSITION, AND OF COURSE WE

24  ASCERTAINED AT THE DEPOSITION MR. HATFIELD DID NONE OF

25  THIS.

26            NOW, WHAT THEY HELD UP HERE WAS SOMETHING

27  VERY DIFFERENT.  THAT IS AN ELEMENTAL READOUT DONE ON AN

   ELECTRON MICROSCOPE AS X-RAY DEFRACTION.  THAT IS NOT A

1    COUNT OF FIBERS.  NOW, I DON'T KNOW WHAT HE DID OVER THE

2    WEEKEND, BUT WHAT THEY ARE TALKING ABOUT THERE AND WHAT

3    -- MR. BOUCHER VERY CAREFULLY SEVERAL TIMES USED THE WORD

4    VERMICULITE -- I ASSUME WHAT THEY DID THERE WAS TO

5    ANALYZE A PIECE OF THE SUBSTANCE IN ORDER TO ASCERTAIN

6    WHAT WAS IN THERE AS A MATTER OF CONTENT.

7              THAT IS SOMETHING, OF COURSE, WE HAVE NEVER

8    HEARD ANYTHING ABOUT FROM THE WITNESS.  AND ALL I'M

9    SAYING IS THAT WHAT IS BEING SHOWN THERE IS NOT THE COUNT

10   SHEETS.  THAT IS A TOTALLY DIFFERENT SCIENTIFIC TEST,

11   X-RAY DEFRACTION ANALYSIS, THAN SIMPLY LOOKING AT A

12   PORTION OF ONE OF THESE GRIDS THAT HAS BEEN PREPARED AND

13   COUNTING THE NUMBER OF ASBESTOS STRUCTURES ON THE GRADE.

14             I JUST WANT TO MAKE SURE THAT THE WITNESS

15   DOES NOT, WHATEVER WE DO, THE WITNESS DOES NOT GO INTO

16   THAT WORK BECAUSE IT IS SOMETHING ON WHICH WE HAVE NO

17   DISCOVERY.

18        THE COURT:  WELL, I WOULD TEND TO AGREE THAT ANY

19   EVALUATION OVER AND ABOVE WHAT WAS DISCLOSED AT THE

20   DEPOSITION THAT WAS DONE OVER THE WEEKEND BY MR.

21   HATFIELD, ESPECIALLY AS TO CONTENTS OF THE PRODUCT OR

22   SAMPLES THAT WAS NOT PREVIOUSLY DISCLOSED, WOULD NOT

23   APPEAR TO BE IN COMPLIANCE WITH THE DISCOVERY STATUTES

24   THAT GO INTO THAT MEMO.

25        MR. BOUCHER:  WELL, JUST FOR THE RECORD, AGAIN,

26   YOUR HONOR, WE WEREN'T ATTEMPTING TO GET BEYOND ANY

27   DISCOVERY STATUTES.

               AND THE COURT ASKED ME A SPECIFIC QUESTION,

1   AND THAT IS WHETHER OR NOT MR. HATFIELD WAS QUALIFIED TO

2   ANALYZE UNDER THE T.E.M. ANALYSIS.  AND THE EXAMPLE THAT

3   I SHOWED THE COURT WAS AN X-RAY DISPERSAL ANALYSIS THAT

4   HE IS QUALIFIED TO ANALYZE.  THAT'S THE ONLY REASON FOR

5   HOLDING THAT UP.  AGAIN, THIS IS SIMPLY FOUNDATION.  IT

6   IS NOT ANYTHING OTHER THAN FOUNDATION.  BUT WE HAD HIM DO

7   THAT SIMPLY AS A PRECAUTIONARY MEASURE.

8        THE COURT:  WELL, I'M INCLINED TO ALLOW THE

9   TESTIMONY AT THIS POINT OF THE SAMPLING AND THE SHOWING

10  OF THE SLIDES REGARDING WHERE THE SAMPLING WAS TAKEN AND

11  VERIFICATION OF WHATEVER REPORTS HE HAS AS TO HIS

12  NOTATIONS, AS TO SAMPLE ONE WAS TAKEN FROM X OR WHATEVER

13  AND PRESERVED IN A CERTAIN WAY, WITHOUT GETTING INTO

14  WHETHER OR NOT HE SENT IT ANYWHERE, BECAUSE I'M SURE IN

15  ONE FELL SWOOP HE CAN TESTIFY LATER THAT I TOOK ALL THE

16  SAMPLES AND BOXED THEM OR WHATEVER I'M SUPPOSED TO DO TO

17  SECURE THEM AND I SENT THEM TO THE LABORATORY AND I GOT

18  THE RESULTS BACK.

19             SO WE CAN GO THROUGH THE PHYSICAL SAMPLING

20  ONLY.  I WILL PRECLUDE ANY REFERENCE TO ANY WEEKEND

21  FURTHER ACTIVITIES BY MR. HATFIELD REGARDING MICROSCOPIC

22  ANALYSIS OR COUNTS, VERIFICATION OF COUNTS BY HIM

23  PERSONALLY AT THE LAB.  AND I WILL, ONCE WE FINISH THAT

24  PORTION OF THE TESTIMONY, THEN I'LL BREAK FOR LUNCH AND

25  I'LL READ THROUGH THE BRIEFS AND HOPEFULLY AT 1:30 MAKE

26  THE DECISION.

27        MR. BOUCHER:  THE OTHER THING I CAN DO, YOUR HONOR,

    IS ASK HIM HOW THESE TYPES OF SAMPLES ARE TYPICALLY