
COPY

# MINITRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION
CIVIL NO. CV-01-72-M-DWM

DEPOSITION OF HARRY ESCHENBACH
EXAMINATION DATE: SEPTEMBER 26, 2002

UNITED STATES OF AMERICA,

Plaintiff,

v.

W.R. GRACE & COMPANY, W.R. GRACE &
CO.-CONN, and KOOTENAI DEVELOPMENT
CORPORATION,

Defendants.

### APPEARANCES

KATHY BRADFORF, ESQ.
CHARLOTTE L. NEITZEL, ESQ.
WILLIAM J.A. SPARKS, ESQ.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION
CIVIL NO. CV-01-72-M-DWM

---

DEPOSITION OF HARRY ESCHENBACH
EXAMINATION DATE:  September 26, 2002

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

W.R. GRACE & COMPANY, W.R. GRACE & CO.-CONN, and
KOOTENAI DEVELOPMENT CORPORATION,

Defendants.

---

     PURSUANT TO NOTICE, the deposition of HARRY ESCHENBACH was taken at 9:02 a.m. on September 26, 2002, at 999 Broadway, 10th Floor, Denver, Colorado, before Margaret Melander, Registered Professional Reporter and Notary Public in and for the State of Colorado, said deposition being taken pursuant to the Federal Rules of Civil Procedure.


                  Margaret Melander
        Registered Professional Reporter

### Page 70

1 and did all this counting. So we had this
2 discussion, and we used discriminatory counting.
3     Later, in the mid '70s or so, NIOSH
4 started having a course, a training course, and we
5 would send our people there to learn how to count
6 asbestos fibers. Well, they'd come back and say,
7 We've got to count everything. And then we'd have
8 the discussion of, Yes, you have to count every
9 asbestos fiber, but if it's not asbestos, then you
10 don't count it.
11     NIOSH never addressed that in their
12 discussions because they were working on counting
13 asbestos. We had a unique circumstance, and that's
14 what came about.
15     Now, from time to time, and in my
16 previous memo that you discussed this morning, when
17 I was talking about "mutant behavior," every time
18 we would send somebody to NIOSH, they came back,
19 and we would have to go back through the same
20 retraining, rediscussion. In this period of time,
21 by the way, we learned that the -- when MSHA, are
22 you familiar with that term?
23     Q  Yes, I am.
24     A  Yeah. MSHA came in and sampled at
25 Libby. They would take their samples and evaluate

### Page 71

1 them with PCM, phase contrast microscopy. If a
2 sample appeared to exceed the PEL, they would redo
3 it with TEM. And we never had a citation, because
4 when they did it with TEM, they found that it was
5 well below the limit.
6     But they didn't train their people to
7 count PCM discriminatorily because that was a
8 burden, so, consequently, we usually used
9 discriminatory counting. We always used it.
10     Now, in some of the other -- when they
11 were doing comparison testing, you know, when we
12 discussed drop testing, I don't know, really, what
13 they did, you know, but those samples were usually
14 pretty heavy with fiber. And since it was a
15 comparison thing, I don't know precisely what they
16 did. But with respect to people exposures, we did
17 discriminatory counting always. Now --
18     Q  So for --
19     A  One more thing if I could. Julie
20 Yang, after this, finally wrote down the
21 procedure --
22     Q  Right.
23     A  -- sometime subsequent to these
24 documents, after many years of sort of passing it
25 on by word of mouth rather than documenting it.

### Page 72

1     Q  Let's see if I get this. So for
2 all the employee testing and sampling and analysis,
3 you used the discriminatory method from 1972 when
4 you brought it to the lab internal to Grace; and
5 for the user testing or the binder tests and the
6 attic tests and the drop tests and all those
7 things, you don't know what was done?
8     A  That's not quite true. For the
9 user tests, if we were comparing this to -- if we
10 were doing it to compare to the OSHA standard, we
11 would use discriminatory counting, because we were
12 looking for people exposures. We weren't looking
13 for a lab test type thing.
14     Q  Okay.
15     A  Okay? So when we were talking
16 about, What is a person's actual exposure and not
17 doing material evaluations or anything else, we
18 used counting that we believed and subsequently
19 were shown to give us accurate information.
20     Q  Then, why is it that you weren't
21 doing discriminatory counting when you were doing
22 the binder testing and things like that, also?
23     A  As I said, they may or they may not
24 have.
25     Q  Oh, I see.

### Page 73

1     A  I wasn't involved in that. That
2 was a different project.
3     Q  Okay.
4     A  All right? I think, by the way, in
5 the paragraph -- the last paragraph, the second
6 No. 3 on this document, the second paragraph, they,
7 Arthur Little, in fact, sent out some of these
8 samples at one point and had them examined by
9 electron microscopy to confirm what we were doing,
10 in addition to the confirmation we had from the
11 Bureau of Mines.
12     Q  Right. Isn't that the sample that
13 came back 50 to 72 percent of the actual tremolite
14 respirable fiber?
15     A  I don't recall offhand.
16     Q  Okay.
17     A  I don't have that document, and it
18 may or may not have been, but I don't recall.
19     Q  Okay. Seal that last exhibit.
20     (Deposition Exhibit No. 344 was marked.)
21     Q  (BY MS. BRADFORD) You've been
22 handed what's been identified as Exhibit 344. Have
23 you had an opportunity to look at that document?
24     A  Yes, I have.
25     Q  I'm asking you about this document,