# Asbestos Strategies
**Lessons Learned About Management and Use of Asbestos**



# Report of Findings and Recommendations On the Use and Management of Asbestos

### April 21, 2003

**Global Environment & Technology Foundation**
7010 Little River Turnpike, Suite 460, Annandale, Virginia 22003

**DRAFT REPORT OF FINDINGS AND RECOMMENDATIONS
ON THE USE AND MANAGEMENT OF ASBESTOS**

**April 21, 2003**

1.0   SUMMARY OF LEADING RECOMMENDATIONS ..................................................... 1

2.0   INTRODUCTION ......................................................................................................... 6

  2.1   Project Purpose ...................................................................................................... 6
  2.2   Overview of the Process ......................................................................................... 6

3.0   ISSUES IDENTIFIED .................................................................................................. 7

  3.1   Asbestos in Buildings ............................................................................................. 7
  3.2   Asbestos in Products ............................................................................................. 11
  3.3   Naturally Occurring Asbestos as a Product Contaminant .................................... 16
  3.4   Regulations and Enforcement ............................................................................... 18
  3.5   Medical/Health Issues .......................................................................................... 20
  3.6   Risk Assessment and Analysis.............................................................................. 23
  3.7   Analytical Issues .................................................................................................. 24

4.0   IMPLEMENTATION OF RECOMMENDED SOLUTIONS ......................................... 26

5.0 APPENDICES ............................................................................................................... 27

  Appendix A: The Asbestos Strategies Process ......................................................... 27
  Appendix B: Background on Asbestos Issues ........................................................... 33
  Appendix C: Research Priorities by Issue Area......................................................... 40
  Appendix D: All Recommendations........................................................................... 43
  Appendix E: Asbestos Strategies Stakeholder Interview Findings Outline .............. 47
  Appendix F: Meeting Summary – October 10, 2002, Washington, DC..................... 51
  Appendix G: Nations with Existing or Pending Bans on Asbestos............................ 61
  Appendix H: Glossary ............................................................................................... 62
  Appendix I: Additional Opinions and Views ............................................................ 68
  Appendix J: Asbestos Survey Notification Record ................................................... 79

# DRAFT REPORT OF FINDINGS AND RECOMMENDATIONS ON THE USE AND MANAGEMENT OF ASBESTOS

## April 21, 2003

## 1.0 SUMMARY OF LEADING RECOMMENDATIONS

The U.S. Geological Survey (USGS) calls asbestos "a commercial designation for any mineral products composed of strong and flexible fibers, resistant to heat, corrosion, abrasion, and that can be woven." Despite all of these remarkable properties, known since the time of Aristotle, controversy has followed asbestos due to numerous and well-documented adverse health effects. Various federal and state agencies and private sector organizations grapple with continuing public health concerns, such as the legacy of the Libby, Montana vermiculite mine, possible asbestos risks from the World Trade Center collapse and other related issues. They also continue to address current developments regarding the safety and efficacy of substitutes.

Many Americans are under the impression that asbestos has been banned for years. However, even though consumption has dropped dramatically over the past three decades, the USGS estimates that more than 26 million pounds of asbestos was used in product manufacturing in the U.S. during 2001.[1] The U.S. Environmental Protection Agency (EPA) has estimated that more than 700,000 commercial and public buildings contain friable asbestos. Countless more homes, schools, and factories contain friable and non-friable asbestos. Enough asbestos cement pipe has been used in the U.S. since 1930 to circle the earth eight times.[2] Asbestos-containing products continue to be imported into the U.S. Although imports have declined, strict controls and accurate numbers regarding these imports are seen to be lacking. While not all applications of asbestos present significant risk in normal use when best practices are followed, these continuing uses are sources of concern to many stakeholders in this process.

Ultimately, the aggregate cost to remove asbestos from buildings may range from $50 to $150 billion, according to one widely quoted estimate from the journal *Science*.[3] Over the past 30 years, billions of dollars have been invested in controlling exposure to asbestos. Regulatory actions, improved work practices, testing of bulk materials and air samples, and management or removal of asbestos have reduced asbestos exposure in the U.S. Development of alternatives has often enabled manufacturers to transition to effective substitutes. At the same time, massive litigation has provided some compensation to workers affected by asbestos exposure and has driven into bankruptcy dozens of companies that mined, manufactured, or used asbestos. Concerns continue about the presence and use of asbestos and potential remaining risks in management.

These issues and many like them are impacting public and business policy throughout the nation. Some of these concerns and the economic and social costs cited above are associated with a lack

---

[1] Virta, R., *USGS 2003 Mineral Commodity Summary: Asbestos*, online at http://minerals.er.usgs.gov/minerals/pubs/commodity/asbestos/070303.pdf. This does not include manufactured products imported into the U.S.

[2] Alleman, J., and Mossman, B., "Asbestos Revisited," *Scientific American*, July 1997, pp. 70-75.

[3] Mossman, B., et al., "Asbestos: Scientific Developments and Implications for Public Policy," *Science*, Vol. 247, Jan. 19, 1990, pp. 294-301.

of consistent, usable information and an inability to deliver such information adequately. For example, asbestos removal costs have come down since the mid-1980s. Many businesses are under the misconception that products they purchase no longer contain asbestos, incurring future liability when workers or others are exposed. Such quality information can reduce the costs associated with asbestos.

It is crucial for regulatory and advisory agencies to have the best available information in order to make the most effective use of limited resources. Agency budgets for oversight, outreach, and education are relatively small compared to the sums involved in control and abatement. However, a modest investment in effective oversight, outreach and education can have a strong potential to reduce exposure and avoid needless expenses later.

Therefore, the Global Environment & Technology Foundation (GETF) engaged more than 100 technical and policy experts and other key stakeholders from government, academia and the private sector to take stock of the recent experiences with potential solutions and options regarding the use and management of asbestos. This process – entitled *Asbestos Strategies* – was not intended to build consensus, but to focus on how oversight, outreach, and education will help promote innovative approaches and best management practices to effectively address and best manage costs and exposure risks associated with asbestos issues. GETF is a 501(c) (3) not-for-profit organization with expertise in stakeholder facilitation. A complete description of the process is contained in Appendix A.

This report reflects a fresh look at the current situation through a review of recent research and by seeking and assessing the views of stakeholders with significant experience. Due to a limited budget and scope, it does not attempt to review the science of asbestos nor is it a comprehensive evaluation of the risk and risk mitigation issues associated with asbestos. It does, however, identify significant concerns and uncertainties – many of which can be addressed by clearly stating what is known and not known. The recommendations here can serve agencies and interested institutions as a basis for action or for targeted further inquiry. Public concerns about remaining risk can be mitigated by clarification of information and enhanced coordination among key federal and state agencies. With clearer information and rules, experts may determine that some questions require further research or regulatory action.

Summarized below are the leading ten recommendations for policy makers suggested by key stakeholders to address issues surrounding asbestos. These recommendations primarily focus on the use of oversight, outreach, and education to achieve results. The recommendations are not ranked and are intended to be implemented concurrently, if possible. They are divided into short term recommendations to be implemented rapidly, and longer term recommendations that will require additional time and resources to implement. A number of scientific issues, including analytical methods, medical studies, mineralogical definitions, and risk assessment, remain to be addressed. A brief history of the science is described in Appendix B, "Background," and areas needing further research are highlighted in Appendix C, grouped and prioritized by topic area.

The full report summarizes the process used to identify asbestos issues today. It should be noted that asbestos has likely been studied more than any other hazardous material over the past 100 years. Scientific and medical literature contains thousands of articles addressing hundreds of

issues surrounding asbestos. Major scientific conferences have been held on every continent but Antarctica. Yet with all the studies there remains disagreement on many fundamental issues regarding asbestos. It is unlikely these disagreements will be resolved in the immediate future. While disagreements do exist, there were issues identified by the *Asbestos Strategies* stakeholders where policy makers can have a positive impact.

The issues themselves are grouped into categories with a brief background discussion, the remaining issues identified, areas of future research needed, and recommendations to address many of the issues. The document provided a total of 20 recommendations that largely employ oversight, outreach, and education to address specific issues. Ten leading recommendations are included in the following tables, and the complete list of recommendations is contained in Appendix D.

## Ten Leading Recommendations from *Asbestos Strategies* Process (not ranked)

### Table 1.1: Leading Short Term Recommendations

| Action 1: | Update Existing Asbestos-in-Buildings Guidance | | |
|---|---|---|---|
| Description: | The EPA should update the "purple book" guidance document to make it the premier technical resource for managing asbestos in buildings and facilities, including industrial settings. The revised resource should include updated "green book" (operations and maintenance) information, and should be consistent with current federal regulations and good practices that have evolved since its release in 1985. The resulting resource, in a form such as an online integrated database of all relevant documents, will facilitate compliance with existing regulations, reducing asbestos exposure among contractors working in buildings. | | |
| Lead Agency: | EPA | Supporting Agency: | OSHA |

| Action 2: | Encourage Compliance with Existing Regulations | | |
|---|---|---|---|
| Description: | Regulatory agencies should encourage compliance with existing regulations and good practices for managing asbestos in buildings and conducting response actions. This may be accomplished through a series of asbestos awareness seminars directed at the regulated community (building owners, contractors and consultants). The seminars should be sponsored by EPA and OSHA, and hosted by the resident state asbestos authority. Joint sponsorship would be extremely valuable. Such seminars should be held in conjunction with national or regional meetings of professional/trade associations such as the Environmental Information Association (EIA) to encourage participation by the target audience. Regulatory compliance will increase worker and building occupant safety, reduce asbestos exposure, and decrease costs associated with liability. This action should be undertaken in the context of a long-term effort.to enforce existing regulations and improve consistency among agencies, as noted in Action 7 in Table 1.2. | | |
| Lead Agency: | EPA | Supporting Groups: | OSHA, EIA & State Regulators |

| Action 3: | Clarify the Asbestos Definition to Address Asbestos Contamination in Vermiculite and Other Minerals | | |
|---|---|---|---|
| Description: | The Libby vermiculite situation should be considered an important lesson, but not be treated as a typical case. A federal process should be undertaken promptly to clarify the definition of "asbestos." Many parties recommended that the definition should include all asbestiform amphiboles, in addition to currently regulated amphiboles and chrysotile. An evaluation by EPA, OSHA and MSHA will be needed to determine procedurally how this should be accomplished, and what consequences such a clarification might have, if any, on other industries. This definition, if adopted, would enable federal agencies to address the risk of exposure from minerals such as winchite and richterite. USGS, trade associations, and other organizations can serve as resources for clarifying and understanding the science associated with creating a new definition. | | |
| Lead Agency: | EPA | Supporting Agencies: | MSHA, OSHA, USGS |

| Action 4: | Advance a Federal Legislative Ban on Asbestos | | |
|---|---|---|---|
| Description: | A clearly defined legislative ban on the production, manufacture, distribution and importation of products with commercially-added asbestos is the most direct means to address concerns about remaining health risk and reduce future costs for facility owners and managers. Such a ban should be proposed by the Congress, promptly debated, and conclusively resolved. Enabling legislation would eliminate remaining products by a specified date, and installation of those products by a later date. Jurisdictional issues could be addressed in congressional legislation that might not be achievable by individual agency rule-makings. Exceptions may be necessary for a small number of applications for which substitutes may not be available, and for research purposes. Implementing regulations, and perhaps the enabling legislation itself, could be challenged in the courts. | | |
| Lead Agency: | Congress | Supporting Agencies: | EPA, OSHA, Dept. of Commerce |

| Action 5: | Develop A National Mesothelioma Registry | | |
|---|---|---|---|
| Description: | A national mesothelioma registry is necessary to facilitate epidemiology studies to evaluate the effects of asbestos exposure. Many countries and some states have established mesothelioma registries. The establishment of such a registry would likely be performed by agencies within the Centers for Disease Control (CDC), including the National Center for Health Statistics, National Institute for Occupational Safety and Health, and the National Center for Environmental Health, in conjunction with ATSDR and state public health departments. An accompanying effort to connect interested parties with the best experts and data would improve research and treatment of asbestos-related disease. | | |
| Lead Agency: | CDC | Supporting Agencies: | State Public Health Departments, ATSDR |

## Table 1.2: Leading Long Term Recommendations

| Action 6: | Update Asbestos Model Training Curricula | | |
|---|---|---|---|
| Description: | The EPA should update the model training curricula to ensure that all relevant agencies' priorities are reflected. Updating the training will make the curricula consistent with existing regulations and increase worker safety. The updated versions should cover the revised OSHA asbestos standards, revised EPA asbestos NESHAP standards, EPA Worker Protection Rule, new respirator designations/regulations, and other topics. The training providers should also be permitted to vary the course content in refresher courses. | | |
| Lead Agency: | EPA | Supporting Agencies: | State Regulators and OSHA |

| Action 7: | Enforce Existing Asbestos Regulations | | |
|---|---|---|---|
| Description: | The EPA, OSHA, CPSC, and state regulators should focus on more stringent, predictable, and consistent enforcement of existing regulations, which may offer greater benefit than committing scarce resources to new rule-making efforts. This recommendation can be implemented immediately; however, such an effort must continue into the long-term. Consistent interpretations and streamlining across agencies will lead to increased compliance and potential reduced liability for businesses. Any step that EPA and OSHA can take to encourage the enforcement of existing regulations at the local level will likely prove most effective. To this end, consideration should be given to the use of a form such as the one created by EIA to assure compliance with existing regulations at the time applications are made for building, renovation, or demolition permits. This action ties into Action 2 in Table 1.1. | | |
| Lead Agency: | EPA | Supporting Agencies: | OSHA, CPSC and State Regulators |

| Action 8: | Reduce Unintended Asbestos in Products | | |
|---|---|---|---|
| Description: | Reduction of naturally occurring asbestos in products could be achieved by a program set up by a consortium of mining concerns to develop a sampling and analytical protocol to analyze bulk materials at the mining stage for chrysotile and all asbestiform amphibole forms of asbestos. Oversight of such a program may be provided by EPA and MSHA, with technical assistance by NIOSH and NIST. This program would assist the mining and quarrying industry in avoiding unwanted asbestos in their product. The program would provide a degree of assurance to users of these raw materials that they are not contaminated with asbestos. | | |
| Lead Agency: | EPA | Supporting Groups: | Mining Industry, MSHA, NIOSH, NIST, USGS |

| Action 9: | Address Asbestos-Containing Products in Commerce | | |
|---|---|---|---|
| Description: | A coordinated effort to educate consumers, employers and building owners about products with commercially-added asbestos is necessary. Such a program would assist the target audience in making an informed decision about which products are legally available with commercially added asbestos. This education and outreach effort would be performed by EPA, OSHA and CPSC. These agencies would need to perform research into which products actually have commercially added asbestos, which do not, and which are to be phased out voluntarily by manufacturers. Congress should consider amending the Asbestos Information Act of 1988 requiring manufacturers and importers to update information on their asbestos-containing products to EPA. | | |
| Lead Agency: | EPA | Supporting Agencies: | CPSC, OSHA, Congress, Bureau of Customs and Border Protection |

| Action 10: | Partner with State Agencies in Support of Asbestos Training | | |
|---|---|---|---|
| Description: | Training providers under the EPA model accreditation plan (MAP) and corresponding state plans should be audited with sufficient frequency to assure the training is provided, tests are conducted, records maintained, and certificates issued. This action, conducted in concert with Action 6, will increase worker safety and the effectiveness of abatement efforts. Reducing the incidence of training fraud will provide greater security to building occupants and owners. Partnering with state agencies will provide better coordination. | | |
| Lead Agency: | EPA | Support Groups: | State Regulators, Training Providers, OSHA |

## 2.0 INTRODUCTION

### 2.1 Project Purpose

The purpose of the *Asbestos Strategies* project was to take stock of the recent experience with potential solutions and options regarding the use and management of asbestos. The first major objective was to offer recommendations and options on effective asbestos oversight, outreach and education approaches. The second major objective was to provide an opportunity for key stakeholders to share their knowledge on barriers, incentives, lessons learned, and best practices as they relate to asbestos use and management.

### 2.2 Overview of the Process

Throughout 2002, GETF engaged more than 100 technical and policy experts and other key stakeholders from government, academia and the private sector with knowledge and interest in the use and management of asbestos.

A cross-sector focus group was convened on October 10, 2002 with fifty-three (53) stakeholders representing federal and state government agencies, industry representatives, organized labor, technical experts and key private sector organizations. Research and interviews were held prior to the meeting to identify key areas of concern, develop background on key asbestos issues, and identify other stakeholders and experts to invite. Additional interviews and meetings were held subsequent to the focus group meeting with key technical and policy experts to further clarify issues and gather opinions. GETF emphasized that the goal of the meeting and interviews was to understand views and identify priorities today, not to reach consensus on all issues or to evaluate asbestos issues exhaustively. A more detailed description of the process with a complete listing of invited and participating stakeholder groups is contained in Appendix A.

## 3.0 ISSUES IDENTIFIED

Several major categories of issues were identified in interviews prior to the stakeholder focus group meeting (see Appendix E for a summary of interview findings); others were identified during the focus group meeting (see Appendix F for a meeting summary). These categories then provided the framework for dialogue. The following discussion of issues, best practices, solutions, recommendations, and needs for additional research is based upon the views received. These views come from three major sources: the stakeholder focus group meeting and subsequent dialogue with participants and other technical and policy experts, prior and subsequent interviews, and research. There are certainly many additional issues concerning asbestos, however, which were not raised as priorities during this process.

For each major category, a brief background is provided, and the significant issues identified. Where additional research is needed to further define or address an issue, it is listed. (A compilation of research needs is contained in Appendix C.) Specific recommendations for actions are provided for many of the issues identified. These recommendations appear consistent with views expressed across a wide range of sectors and appear consistent with agency and marketplace experience. Thus, the recommendations focus primarily on the value of reliable information, consistently delivered, and generally do not attempt to resolve contentious technical issues. In each section where recommendations are listed, they are listed in order of priority. Those having the highest priority are those identified by stakeholders as having the greatest impact for the resources expended, although no formal cost-benefit analysis was performed.

### 3.1 Asbestos in Buildings

**Background:** The 1984 EPA national survey of asbestos in buildings estimated 733,000 buildings with friable Asbestos Containing Materials (ACM). This study also estimated there is 2.7 billion square feet of exposed asbestos-containing floor tile in 1.526 million buildings.[4] These estimates did not include schools, industrial facilities, and residences with fewer than 10 dwelling units.[5] Most non-residential buildings are subject to the Occupational Safety and Health Administration (OSHA) asbestos standards, the EPA National Emissions Standards for Hazardous Air Pollutants (NESHAP) standard for asbestos, and various state regulations.

The OSHA asbestos standard requires building owners to presume that Thermal System Insulation (TSI) and surfacing ACM found in buildings constructed before 1981, and floor tile installed in buildings through 1981, are asbestos containing, unless demonstrated to be 1% or less asbestos through sampling.[6] The rule does not permit an assumption to be made that a material does not contain asbestos in buildings constructed after 1980. This has led to some confusion among building owners regarding the need for labeling, training and inspections.

---

[4] USEPA, *Asbestos in Buildings Technical Bulletin: Use of Asbestos-Containing Friable Materials and Vinyl-Asbestos Floor Tiles in Public and Commercial Buildings* (1984)

[5] USEPA, *Asbestos in Buildings: A National Survey of Asbestos-Containing Friable Materials*, EPA Publication No. 560/5-84-006 (October 1984) p. ix-x.

[6] 29 CFR 1926.1101 (OSHA Asbestos Standard for the Construction Industry)

The EPA asbestos NESHAP standard categorizes asbestos-containing material according to its friability.[7]  Materials greater than 1% asbestos are Regulated Asbestos-Containing Materials (RACM) if they are (1) friable asbestos material; (2) category I non-friable ACM that has become friable; (3) category I non-friable ACM that will be or has been subjected to sanding, grinding, cutting, or abrading; or, (4) category II non-friable ACM that has a high probability of becoming or has become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition or renovation operations.[8]

Almost all states have regulations addressing asbestos.  Many states have been approved by EPA to enforce the asbestos NESHAP in their states.  In some states, the regulations are enforced at a local level.  For example, California has separate air quality control districts, Florida has multiple districts, Allegany County, Pennsylvania enforces the regulations in the Pittsburgh area, and the cities of New York and Chicago have their own rules.[9]

Elementary and secondary schools are covered by the EPA Asbestos Hazard Emergency Response Act (AHERA) regulations, asbestos NESHAP regulations, OSHA asbestos standards, the EPA Worker Protection Rule (some jurisdictions), and state asbestos regulations.  These regulations provide a framework for the management of asbestos in school buildings.  The AHERA regulations apply to commercial, industrial, and other public buildings for accreditation and training in all Model Accreditation Plan disciplines except management planner.[10]  Even though the rules do not apply to these buildings for inspection, abatement and other aspects, many building owners and consultants look to AHERA as a guide when addressing asbestos in non-school buildings.  This appears to have been largely successful for sophisticated office building owners, knowledgeable consultants, and some government entities.[11]  Industrial facilities, such as power plants and oil refineries, may find much of AHERA to be difficult to implement, even when looked at as a guideline.[12]  Since the AHERA regulations were designed for schools many of the procedures, such as the clearance protocol, does not work well in industrial settings.

The primary motivations for building owners to effectively manage asbestos in buildings are health, regulatory compliance, liability concerns, and financial considerations.  The need to limit exposures and prevent future asbestos-related disease focuses on these considerations.  The many regulations provide direction if understood and a "stick" if enforced.  The financial considerations can either detract from or promote proper management of asbestos in buildings.  The cost of asbestos inspections, management programs, and response actions, with little

---

[7] 40 CFR 61, Subpart M (EPA Asbestos NESHAP)

[8] 40 CFR 61.141.

[9] For information regarding specific state or local regulations contact each regulatory agency. Summaries are available, but dated in: Bureau of National Affairs, *Asbestos Abatement: Risks and Responsibilities*, Rockville, MD (1987); and, National Conference of State Legislators, *State Asbestos Programs Related to The Asbestos Hazard Emergency Response Act*, NCSL, 1050 17th Street, Suite 2100, Denver, CO 80265 (November 1987, and updates).

[10] ASHARA – Asbestos School Hazard Abatement Reauthorization Act of 1990.

[11] Opinions based on interviews with Environmental Information Association (EIA) members and focus group discussion of October 10, 2002.

[12] Opinion based on interviews with asbestos consultants, EIA members, and focus group discussion of October 10, 2002.

tangible rewards is an incentive to consistently take the least costly approach. Negative publicity, tenant complaints, and insurance issues may promote effective asbestos management.

**Issues Remaining:** Many issues were raised through the interviews and meetings about asbestos in buildings. Some issues are addressed in other sections of this report. The list of issues below is not exhaustive but appeared to be significant based upon the views of several stakeholders.

1. The quality of work performed by people conducting response actions and managing asbestos in buildings may have declined during the past decade. This may not be universal across the country, or consistent by the types of facilities involved. Reasons expressed have included less frequent enforcement of existing regulations; quality of training for asbestos workers, consultants and regulatory personnel; misunderstanding of existing regulations; lack of independent oversight of projects in some states; and, conflicts among federal regulations and state regulations.

2. The EPA and OSHA regulations are quite lengthy and attempt to address most asbestos issues in buildings. The agencies have issued dozens of letters interpreting various requirements. This approach is seen by some as confusing and inconsistent and may serve as a barrier to employing innovative approaches to managing asbestos and developing new technical solutions. The EPA AHERA regulations (for schools) and numerous state regulations make asbestos management options even less flexible in schools.

3. The high cost of liability insurance and the quality of coverage provided to building owners, contractors and consultants influence asbestos management decisions. Financing acquisitions of commercial and industrial facilities also influence asbestos management decisions. These influences need to be better understood to determine whether government policy clarification is warranted.

4. The last comprehensive EPA guidance document for asbestos in buildings, the "purple book," was issued in 1985. This pre-dates the EPA AHERA regulations for schools, and the latest revisions to the OSHA and EPA asbestos NESHAP standards. The 1990 EPA guidance document for asbestos operations and maintenance (O&M) programs (green book) is not entirely consistent with existing regulations.

5. Attitudes about asbestos in buildings are wide-ranging and often inconsistent. The heightened concern about asbestos in the 1980s may have led to some premature asbestos removal projects. The perceived complacency about asbestos in the 1990s may have resulted in less effective asbestos management programs. According to a number of stakeholders, mixed messages in the media from regulatory agencies may have also affected how asbestos in buildings has been managed during the past decade.

6. There is a misconception that asbestos products are no longer permitted to be sold in the U.S. A number of products may continue to be produced with commercially-added asbestos, although most domestic manufacturers have substituted non-asbestos alternatives. For example, building products, roofing cements, gaskets and packings with asbestos are available in the U.S. This issue is further discussed in section 3.2.

7. The application of risk assessment techniques to the management of asbestos in buildings was raised as a remaining issue. One subpart to this issue appears to be perceived risks versus actual risks from in-place ACM. Another appears to be potential risks or exposures from in-place ACM versus current risks or exposures.

**Recommended Solutions:** For each issue raised there could be many solutions. The solutions recommended below are those that could be implemented in the near term. These ideas have emerged from stakeholder input; they are also recommendations that may best employ education, outreach and/or oversight to achieve results.

1. The EPA should update the "purple book" guidance document[13] to make it the premier technical resource for managing asbestos in buildings and facilities, including industrial settings. The revised resource should include updated "green book" information[14], and should be consistent with current federal regulations and good practices that have evolved since its release in 1985. The resulting resource, in a form such as an online integrated database of all relevant documents, will facilitate compliance with existing regulations, reducing asbestos exposure among contractors working in buildings.

2. Regulatory agencies should encourage compliance with existing regulations and good practices for managing asbestos in buildings and conducting response actions. This may be accomplished through a series of asbestos awareness seminars directed at the regulated community (building owners, contractors and consultants). The seminars should be sponsored by EPA and OSHA, and hosted by the resident state asbestos authority. Joint sponsorship would be extremely valuable. Such seminars should be held in conjunction with national or regional meetings of professional/trade associations such as the Environmental Information Association (EIA) to encourage participation by the target audience. Regulatory compliance will increase worker and building occupant safety, reduce asbestos exposure, and decrease costs associated with liability. This action should be undertaken in the context of a long-term effort to enforce existing regulations and improve consistency among agencies

3. The EPA in conjunction with the Consumer Product Safety Commission (CPSC) should revise and update the Asbestos in Homes guidance document. This would help address the gap that currently exists in regulations affecting residential buildings.

4. Federal and state agencies should provide additional training to their personnel responsible for asbestos. These personnel would be better equipped to provide guidance and assistance to the regulated community. These agencies should use such personnel to increase enforcement of existing regulations. Federal agencies could be tasked to ensure that this training is supported by consistent messages from those agencies.

---

[13] The "purple book" is the 1985 EPA publication no. 560/5-85-024, *Guidance for Controlling Asbestos-Containing Materials in Buildings.*
[14] The "green book" is the 1990 EPA publication no. 20T-2003, *Managing Asbestos in Place: A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials.*

5. Federal and state agencies should communicate among themselves before issuing communiqués to the public. This may reduce confusion among building owners and others attempting to comply with regulations. A web-based electronic distribution mechanism for such information should be established to assure rapid communication. Some of the regional consortiums currently in EPA regions 1-5 may serve as a model for this recommendation.

### 3.2 Asbestos in Products

Asbestos was commercially added to more than 3,000 products historically. In the U.S., asbestos has been removed or substituted for in all but a small number of products today. In 2001, the U.S. Geological Survey (USGS) stated approximately 13,100 metric tons of asbestos was used in the United States. Most of the asbestos was imported from Canada. The last asbestos mine in the U.S. ceased operation in 2002. The USGS estimated the major asbestos-consuming uses in the U.S. are roofing products (asphaltic roofing and shingles) (9,250 tons), gaskets (2,300 tons), and friction products, (brake linings and clutch facings) (608 tons).[15] These are shown in Figure 3.1, left. In the case of domestic manufacturing, asbestos-containing products are confined to the U.S. What about materials that are imported with products? Nationally-added asbestos has not been systematically investigated. Some imported asbestos-containing products are clearly



Uses of Asbestos in 2001 (tons)

labeled as such. The Department of Commerce maintains some information on broad product categories, but import data often fail to distinguish between asbestos-containing products and products that use substitutes for asbestos and can lead to confusion as to whether or not imported products contain asbestos.[16] For example, over 44,000 tons of products of "asbestos-cement, cellulose fiber-cement, or the like" were imported in 2002.[17] A majority of these products are imported from Canada and Mexico, two countries where asbestos is still in use. While the imports from these countries are no longer asbestos-containing,[18] the International Trade Administration classifications do not make this distinction. Some U.S. companies have

---

[15] Estimates from USGS at http://minerals.usgs.gov/minerals/pubs/commodity/asbestos/070401.pdf.
[16] The International Trade Administration web site at http://www.ita.doc.gov/td/industry/otea/Trade-Detail/Latest-Month/Imports/68/index.html provides a list of categories.
[17] Based on data compiled by Bob Virta, USGS, from the U.S. International Trade Commission.
[18] Conversation with the Asbestos Information Association of North America. Mexican manufacturers do export asbestos-cement pipe to Canada through the U.S.

promised to phase out the use of asbestos in brakes,[19] but brake pads, linings, and shoes continue to be imported from countries that use large amounts of asbestos.[20] Imports in 2002 also included well over 100 tons of asbestos yarn, string, cord, thread, fabric, and fabricated fibers, predominately from developing countries.

Substitutes for asbestos in products are available for almost all uses. The health risks for some substitutes are controversial. Many private entities and government agencies have established policies that prohibit the purchase or use of products with commercially added asbestos. However, such policies can only be implemented if the products are clearly labeled. A.A. Hodgson's book, *Alternative to Asbestos - the Pros and Cons* (1989) and other similar publications provide listings of some available alternatives. None of these sources appears to be exhaustive.

On July 12, 1989 the EPA promulgated the Asbestos Ban and Phase Out Rule under authority of the Toxic Substances Control Act (TSCA). Under this rule certain asbestos-containing products were scheduled to be banned at staged intervals over a seven-year period. The U.S. Circuit Court of Appeals vacated most of the rule and remanded it to the EPA in October 1991.[21] The court left intact the portion of the rule that regulates products that were not being manufactured, produced, or imported when the rule was published on July 12, 1989.

The six asbestos-containing product categories still subject to the rule are corrugated paper, rollboard, commercial paper, specialty paper, flooring felt, and any other new uses of asbestos. Actions by the EPA in the 1970s had previously eliminated the application of friable spray-applied fireproofing and surface treatments, as well as friable thermal system insulations, such as pipe and boiler insulation. In the 1970's, the CPSC issued rules prohibiting the sale of consumer patching compounds and fireplace emberizing agents containing respirable free form asbestos. In the 1980s, CPSC issued an enforcement policy under the Federal Hazardous Substances Act (FHSA) concerning labeling of certain asbestos-containing household products that, under reasonably foreseeable conditions of handling and use, are likely to release asbestos fibers[22]. The U.S. Food and Drug Administration (FDA) has prohibited asbestos from use in some drugs, cosmetics and foodstuffs.[23]

The following commercial product categories are no longer subject to the EPA rule and it appears permissible that they be manufactured, imported and sold in the U.S.:

---

[19] Schneider, A., *Nation's Mechanics at Risk from Asbestos*, Seattle Post-Intelligencer, November 16, 2000. Article quotes an executive of Brake Products, Inc., which makes Raybestos brakes, as promising to eliminate asbestos from their brakes by the end of 2001. Raybestos currently sells some products which are clearly marked as asbestos-free and some which are not.

[20] U.S. International Trade Commission data indicate that a majority of imported brake pads (by dollar value), both mounted and unmounted, originate in Canada, Japan, and Brazil, and Mexico.

[21] *Federal Register*, Vol. 59, No. 123, USEPA, 40 CFR 763, Technical Amendment in Response to Court Decision on Asbestos; Manufacture, Importation, Processing and Distribution Prohibitions, (June 28, 1994), p. 33208.

[22] *Federal Register*, Vol. 51, No. 185, CPSC, Labeling of Asbestos-Containing Household Products; Enforcement Policy, (September 24, 1986), p. 33910.

[23] U.S. EPA, *Asbestos Fact Book* (February 1985), p.10.

**TABLE 3.1: Asbestos-Containing Products Allowed in the U.S.[24],[25]**

| | |
|---|---|
| asbestos cement corrugated sheet | clutch facings |
| asbestos cement flat sheet | friction materials |
| asbestos clothing | disk brake pads |
| pipeline wrap | drum brake lining |
| roofing felt | brake blocks |
| vinyl asbestos floor tile | gaskets |
| asbestos cement shingle | non-roofing coatings |
| millboard | roof coatings |
| asbestos cement pipe | automatic transmission components |

The following products were never a part of the EPA's ban and phase-out rule; however, some may require labeling under the CPSC's FHSA:

- acetylene cylinders
- arc chutes
- asbestos diaphragms
- battery separators
- high-grade electrical paper
- missile liners
- packings (valves, seals, and other uses)
- reinforced plastic
- sealant tape
- specialty industrial gaskets
- textile products

Over thirty countries have issued bans on all forms of asbestos (see Appendix G). The European Commission banned the five forms of amphibole asbestos from the European Union in 1991. Chrysotile asbestos was banned from fourteen categories of product at that time. On July 27, 1999 Annex I of Directive 76/769/EEC extended the ban on chrysotile in asbestos cement products, friction products seals, gaskets, and various specialty uses.

The Directive requires member states to implement the ban by January 1, 2005. An exception is made for using chrysotile asbestos in diaphragms used in chlorine plants for electrolysis, for which no substitute is available. This use is permitted until at least 2008. The European Commission directive does not apply to substances used for research or analysis, and special military uses. The ban does not apply to asbestos that is not intentionally added to products. The ban does not require in-place asbestos-containing products to be removed until the end of their service life.

In 2002, Senator Patty Murray of Washington introduced legislation titled, The Ban Asbestos in America Act of 2002. This bill, S. 2641, would require the EPA to issue regulations prohibiting the manufacture, processing, importation and distribution of asbestos-containing products. The bill also contained provisions for a public education campaign, research on asbestos diseases, a

---

[24] U.S. EPA, *Asbestos Materials Ban: Clarification* (May 1999), online at www.epa.gov/asbestos/asb-bans2.pdf.
[25] Some of these products may require labeling under the CPSC's FHSA.

national mesothelioma registry, evaluation of products unintentionally contaminated with asbestos, and the establishment of a blue ribbon panel on asbestos and non-regulated fibers. No action was taken on this legislation during 2002. The bill would need to be re-introduced in the current (or future) Senate session to be considered.

The current OSHA asbestos standard requires products used in the workplace to be labeled if greater than 1% asbestos, and likely to result in exposures above the permissible exposure limits during their foreseeable use. The OSHA Hazard Communications standard requires materials used in the workplace having greater than 0.1% of any known human carcinogen to be labeled. Material Safety Data Sheets (MSDS) are required to be made available to employers from manufacturers upon request. This information must be accessible to employees, or their representatives.

**Issues Remaining:** A number of issues were raised through interviews and meetings about asbestos in new products. The list of issues below is not exhaustive but appeared to represent the major issues discussed by the group.

1. The extent to which products currently on the market contain commercially-added asbestos is not clearly defined. Which products contain asbestos and which do not is often not clearly disclosed on the product labels. It is also unclear the degree of hazard, or risk, posed by some products on the market with commercially-added asbestos. Put another way, the presence of asbestos in products needs to be understood, but it may be that the asbestos fibers present no meaningful risk during normal use of certain products. In other products, asbestos presents a very significant risk. Generally, the risk of asbestos exposure is most critically affected by how the product is handled during and after manufacture and during and after installation.

2. The definition of an asbestos-containing material under the EPA regulations is a material having greater than 1 percent asbestos.[26] When this definition was established by EPA, it was rare that manufacturers would add less than this amount to a product. The analytical methods did not permit a reliable measurement of less than 1 percent asbestos. An issue remains whether 1 percent is an appropriate definition of an asbestos material with commercially-added asbestos. A related issue is the percentage of naturally occurring asbestos not intentionally added to the product. Products with less than 1 percent asbestos can also be dangerous if, in handling the product, there is significant fiber release.

3. Interviews, meetings, and field visits to workplaces and home improvement stores found products with asbestos as an ingredient. The word "asbestos" was not used on the label. Rather, the terms "Canadian Mineral Fiber" or "Chrysotile" were used. The issue is whether such labeling practices are misleading to consumers or employers wishing not to purchase products with commercially-added asbestos.

---

[26] OSHA uses 1% in their definition for the asbestos standards affecting general industry, construction and shipbuilding, but 0.1% for any carcinogen in the hazard communication standard.

4. Which federal agencies have jurisdiction over the monitoring of asbestos in products is unclear. Each of the following federal agencies has some jurisdiction:

**TABLE 3.2: Agencies Responsible for Monitoring and Controlling Asbestos**

| Agency | Area of Responsibility |
|---|---|
| U.S. Environmental Protection Agency | products (TSCA), emissions, buildings |
| Occupational Safety and Health Administration | workplace products |
| U.S. Department of Transportation | shipping |
| Food and Drug Administration | asbestos in foods, drugs and cosmetics |
| Mine Safety and Health Administration | asbestos (during mining) |
| U.S. Consumer Product Safety Commission | asbestos in consumer products |
| U.S. Department of Commerce | import/export, with EPA |
| Bureau of Customs and Border Protection | importation of products, with CPSC |

The many federal agencies with sometimes overlapping jurisdictions may have resulted in a piecemeal or overly compartmentalized approach to regulating asbestos in products.

5. The EPA asbestos NESHAP regulations require building owners or operators to inspect buildings for asbestos prior to certain renovations and all demolitions. If asbestos products were no longer available for use in buildings the EPA could establish a firm date after which building owners could assume asbestos products are not present. Economically, building owners would not need to hire accredited building inspectors to sample and analyze building materials in newly constructed buildings and facilities. Under current regulations, with no outright asbestos ban, NESHAP inspections of buildings must continue even in buildings being built today.

**Recommended Solutions:** Several recommended solutions to issues raised about commercially-added asbestos in new products are described below.

1. A clearly defined legislative ban on the production, manufacture, distribution and importation of products with commercially-added asbestos is the most direct means to address concerns about remaining health risk and reduce future costs for facility owners and managers. Such a ban should be proposed by the Congress, promptly debated, and conclusively resolved. Enabling legislation would eliminate remaining products by a specified date, and installation of those products by a later date. Jurisdictional issues could be addressed in congressional legislation that might not be achievable by individual agency rule-makings. Exceptions may be necessary for a small number of applications for which substitutes may not be available, and for research purposes. Implementing regulations, and perhaps the enabling legislation itself, could be challenged in the courts.

2. A uniform labeling requirement for all products with commercially-added asbestos should be established through rule making. Labels should include the word asbestos and should be a specified minimum size, and should be consistent with the labeling requirements of the CPSC's FHSA. The Bureau of Customs and Border Protection would ensure that imported asbestos-containing products are properly labeled in accordance with this requirement. The EPA would likely be the lead agency for such a

rule making, but would need to coordinate its efforts with other agencies having jurisdiction over products with commercially-added asbestos. This option would need to be implemented with the following recommendation as well.

3.  A coordinated effort to educate consumers, employers and building owners about products with commercially-added asbestos may be successful. Such a program would assist the target audience to make an informed decision about which products are legally available with commercially-added asbestos. This education and outreach effort would be performed by EPA, OSHA and CPSC, as resources permit. These agencies would need to perform research into which products actually have commercially-added asbestos, which do not, and which are to be phased out voluntarily by manufacturers. Congress should consider amending the Asbestos Information Act of 1988 requiring manufacturers and importers to update information on their asbestos-containing products to EPA. Non-governmental organizations such as EIA are able to assist with the education and dissemination of information.

### 3.3 Naturally Occurring Asbestos as a Product Contaminant

**Background:** Naturally-occurring minerals known collectively as "asbestos" are occasionally found as an unintended contaminant in some products.[27] Depending on the nature and use of the products, asbestos exposures to workers, consumers and others can occur.[28] The amphibole forms of asbestos known as tremolite and actinolite are perhaps the most common asbestos contaminants. Asbestos contamination may be often found in metamorphic rock with high magnesium content.[29]

The issue of asbestos contamination in products has surfaced repeatedly during the past 25 years. Incidences of asbestos contamination in talc, vermiculite, play sand, crayons, and art supplies have arisen. Educational efforts by the EPA and CPSC, along with voluntary efforts by some manufacturers have traditionally been relied upon to address each incident. Manufacturers have generally employed alternate materials whenever concerns arose regarding the safety of a product. The perception of risk among consumers, rather than regulatory action, was the major motivator in many of these cases.

In recent years, much attention has focused on the vermiculite-mining district near Libby, Montana.[30] Concern has also been expressed about exposures to users of products consisting of vermiculite from this location.[31] The Libby vermiculite deposits have been reported to be significantly contaminated with asbestiform amphiboles including some closely resembling fibrous tremolite and actinolite.[32]

---

[27] Schreier, H., *Asbestos in the Natural Environment*, Elsevier Publishers, New York (1989).

[28] National Research Council, *Asbestiform Fibers: Nonoccupational Health Risks*, National Academy Press, Washington, DC (1984).

[29] Information based on telephone interview with Dr. Ann Wylie, Professor of Geology, University of Maryland.

[30] Lybarger, J.A., et al., "The Community Environmental Health Project in Libby, Montana," *Hazardous Substances & Public Health*, Vol. 12, No. 1 (Spring 2002), pp. 1-2.

[31] Walker, T., "Asbestos-Contaminated Vermiculite: A National Issue," *Hazardous Substances & Public Health*, Vol. 12, No. 1 (Spring 2002), pp. 4-5

[32] Fibrous tremolite and actinolite forms of asbestos are also present at this location

The mineral names for these Libby minerals are winchite and richterite, which are not listed by regulatory agencies as forms of asbestos. The differences between these mineral forms and the listed tremolite and actinolite forms appear to be minor.[33] Some workers who mined and milled the Libby vermiculite appear to have developed the same asbestos-related diseases as workers exposed to the listed forms of asbestos.

The EPA, USGS, and the Agency for Toxic Substances and Disease Registry (ATSDR) are conducting studies to determine exposures from Libby vermiculite products, and the resultant health effects. The Libby vermiculite deposit was originally developed as an asbestos deposit. In this sense, the Libby vermiculite deposit is unique, and not likely to be representative of vermiculite deposits in the U.S., or elsewhere.[34]

The issue of asbestos contamination in mining and quarrying operations is not limited to just vermiculite and talc. The Mine Safety and Health Administration (MSHA) is currently revising their asbestos standard. The current MSHA standard of 2 f/cc is expected to be reduced. The dusty nature of mining operations and the non-specific nature of the air sampling method currently used to measure worker exposures has prompted MSHA to consider transmission electron microscopy (TEM) as the analytical method of choice.

Interviews with some representatives of the mining and quarrying industries indicate efforts are being made to avoid mining deposits and seams likely to have substantial quantities of asbestos. Knowledge of the geology of the area, visual inspections of the working face, and sample analyses are used to avoid encountering significant asbestos deposits.

**Issues Remaining:** The following issues related to naturally occurring asbestos as a contaminant were identified during the asbestos strategy process. The list below is not exhaustive.

1. How should mining concerns, product manufacturers, distributors, and users respond to the issue of natural asbestos in ore and products as unintentional contaminants? As a closely related issue, how should regulators respond to the same concern?

2. Current producers of vermiculite and vermiculite products expressed concern that all vermiculite has been tainted due to the publicity surrounding the Libby vermiculite. It is noted that vermiculite from the Libby deposit has not been mined for approximately 10 years. Since these current mining deposits appear not to be equally risky, an effective way of communicating on this topic appears essential.

3. What information should be provided to homeowners who may have Libby vermiculite (Zonolite) as insulation in their homes?

---

[33] For a detailed description of this topic see, Meeker, G.P., et al., *The Chemical Composition and Physical Properties of Amphibole from Libby, Montana: A Progress Report*, U.S. Geological Survey, Presented at the USEPA Health Effects of Asbestos Conference, Oakland, CA (May 24-25, 2001)

[34] Perry, E.S., *Talc, Graphite, Vermiculite and Asbestos Deposits in Montana* (Memoir No. 27), State of Montana, Bureau of Mines and Geology, Montana School of Mines, Butte, MT (1948), pp. 23-44.

4. Do the existing polarized light microscopy (PLM) analytical method for measuring asbestos in bulk materials and the commercial laboratories performing these analyses provide reliable results for measuring asbestos as a natural contaminant at the 1 percent level or below?

**Recommended Solutions:** The following possible initial solutions were considered as means to address some of the issues raised.

1. Reduction of naturally occurring asbestos in products could be achieved by a program set up by a consortium of mining concerns to develop a sampling and analytical protocol to analyze bulk materials at the mining stage for chrysotile and all asbestiform amphibole forms of asbestos. Oversight of such a program may be provided by EPA and MSHA, with technical assistance by the National Institute of Occupational Safety and Health (NIOSH), the National Institute of Standards and Technology (NIST), and USGS. This program would assist the mining and quarrying industry in avoiding unwanted asbestos in their product. The program would provide a degree of assurance to users of these raw materials that they are not contaminated with asbestos.

2. The Libby vermiculite situation should be considered an important lesson, but not be treated as a typical case. A federal process should be undertaken promptly to clarify the definition of "asbestos." Many parties recommended that the definition should include all asbestiform amphiboles, in addition to currently regulated amphiboles and chrysotile. An evaluation by EPA, OSHA and MSHA will be needed to determine procedurally how this should be accomplished, and what consequences such a clarification might have, if any, on other industries. This definition, if adopted, would enable federal agencies to address the risk of exposure from minerals such as winchite and richterite. USGS, trade associations, and other organizations can serve as resources for clarifying and understanding the science associated with creating a new definition.

3. A labeling provision should be considered for products having naturally occurring asbestos as a contaminant. Some products may currently be subject to the labeling requirements of the CPSC's FHSA if, under reasonably foreseeable conditions of handling and use, they are likely to release asbestos fibers. Existing regulations may be sufficient for products found to contain more than 1 percent asbestos. A label may be appropriate for products containing greater than 0.1 percent asbestos by volume, if feasible. The evidence on this issue should at least be reviewed. Products consistently found to contain asbestos at a level below 0.1 percent through a testing program may be exempt from labeling, or have a label with different wording.

### 3.4 Regulations and Enforcement

**Background:** There are over 20 different asbestos rules and regulations at the federal level. At least 40 states have asbestos regulations mostly affecting asbestos in buildings and the qualifications of contractors and others who perform asbestos surveys and response actions. Additionally, many local government agencies (county and city) have promulgated rules affecting asbestos in buildings.

The major regulations affecting asbestos in buildings, the workplace, and products have been summarized elsewhere in this document and highlighted in Table B.1 of Appendix B. Many of the issues concerning regulations were described in sections 3.1, 3.2 and 3.3.

Interview and focus group participants made reference to various innovative approaches at the state and local level to support enforcement of asbestos regulations. Most of the approaches described focused on existing asbestos in buildings, response action practices, and contractor licensing or certification. Michigan supports asbestos enforcement activities, including the state Occupational Safety and Health Administration, Asbestos Licensing Program, and the Asbestos Accreditation Program, with a surcharge of 1% on most asbestos removal fees. Texas has a new law that requires an asbestos survey in order to get a building permit.[35] Wisconsin reported an increase in NESHAP notification compliance through an outreach program to fire departments. Maine has developed a "one-stop shop" for asbestos issues within its Department of Environmental Protection. Georgia has demonstrated increased compliance with its asbestos regulations through its STAR program, working cooperatively with the regulated community. Several states in the Southwest employ a simple form developed and distributed by the Environmental Information Association (see Appendix J) that must be completed and submitted along with an application for a building, demolition, or renovation permit. This information alerts the building inspectors and the building owner of the need to survey their buildings for asbestos before they begin a renovation or demolition project. Current federal regulations require an inspection for asbestos before demolition or renovation, and this form encourages such compliance.

**Issues Remaining:**

1. Building owners, contractors, consultants, and others often are not knowledgeable of the applicable federal, state and local regulations governing asbestos in buildings, response actions, and disposal.

2. Existing federal, state and local regulations are often not regularly enforced. Possible reasons include insufficient staffing, funding, and training among the existing staff.

3. Some regulations may benefit by clarifications and revisions. Many stakeholders appear wary of re-opening rule-makings that might allow special interests to weaken some provisions.

**Recommended Solutions:** Most proposed solutions affecting asbestos regulations are addressed in sections 3.1 – 3.3. Several additional proposed solutions are offered below.

1. The EPA, OSHA, CPSC, and state regulators should focus on more stringent, predictable, and consistent enforcement of existing regulations, which may offer greater benefit than committing scarce resources to new rule-making efforts. This recommendation can be implemented immediately; however, such an effort must continue into the long-term. Consistent interpretations and streamlining across agencies will lead to increased

---

[35] Texas Senate Bill 509, passed September 1, 2001. Details are online at http://www.tdh.state.tx.us/beh/asbestos/FAQ.doc.

compliance and potential reduced liability for businesses. Any step that EPA and OSHA can take to encourage the enforcement of existing regulations at the local level will likely prove most effective. To this end, consideration should be given to the use of a form such as the one created by EIA to assure compliance with existing regulations at the time applications are made for building, renovation, or demolition permits.

2. The EPA should update the model training curricula to ensure that all relevant agencies' priorities are reflected. Updating the training will make the curricula consistent with existing regulations and increase worker safety. The updated versions should cover the revised OSHA asbestos standards, revised EPA asbestos NESHAP standards, EPA Worker Protection Rule, new respirator designations/regulations, and other topics. The training providers should also be permitted to vary the course content in refresher courses.

3. Training providers under the EPA model accreditation plan (MAP) and corresponding state plans should be audited with sufficient frequency to assure the training is provided, tests are conducted, records maintained, and certificates issued. This action, conducted in concert with the updating of training requirements, will increase worker safety and the effectiveness of abatement efforts. Reducing the incidence of training fraud will provide greater security to building occupants and owners. Partnering with state agencies will provide better coordination.

4. A summary document of federal asbestos regulations should be prepared. This would be a valuable resource for the regulated community and the regulators. The document would be prepared by EPA and OSHA with input from the other federal agencies with asbestos regulations.

5. A companion summary document of state asbestos regulation summaries would also be a valuable education tool. This document could be developed by the National Conference of State Legislatures (NCSL). The NCSL has developed such documents in past years, but these are now no longer accurate. The new document should include a list of web sites where the state (and local) regulations may be found.

6. The EPA should partner with one or more local organizations such as the Environmental Information Association (EIA), state agencies, local building code inspectors, fire departments, and other groups to inform stakeholders and to encourage voluntary compliance with both federal and local regulations. Similar efforts with these groups have been successful recently.

### 3.5 Medical/Health Issues

**Background:** The early evolution of the health effects related to exposure is summarized in Appendix B. There continue to be inconsistent perceptions among the public about the health effects associated with asbestos. Frequently references are made in the lay press to "asbestos disease," rather than the recognition of several different health effects associated with asbestos exposure. While it is beyond the scope of this study to address technical risk assessment issues,

comments from participants stressed that more precision and clarity of information is needed with risk assessment issues.

Depending on the specific disease, a threshold may exist below which symptoms would not be expected. Some diseases exhibit a classic linear dose-response relationship, while others do not. The potency of one form of asbestos may be greater for one disease than another form. The issue of fiber dimensions, surface characteristics, and other physical properties continue to be studied and debated today. Individual susceptibility is also an issue when considering asbestos related diseases. It appears unlikely that many of the health issues will be resolved in the near term.

The risk of developing an asbestos-related disease is also controversial in the scientific and medical communities. The risk is also inconsistently perceived by the public. At one extreme, some of the public perceive one asbestos fiber is sufficient to cause a fatal disease. While theoretically this appears possible, in reality such a risk is de minimus. At the other extreme are some who believe only massive long-term industrial exposures may result in disease.

In the U.S., regulatory agencies have always treated all the forms of asbestos (chrysotile and the amphiboles) the same. The American Conference of Governmental Industrial Hygienists (ACGIH) initially treated them the same for over 20 years, then issued more restrictive threshold limit values (TLVs) for the amphiboles, but reverted back to one TLV for all forms of asbestos in the 1990s.[36] Most European countries treated all asbestos forms the same, then issued more restrictive requirements for the amphiboles, and now returned to treating them equally for regulatory purposes.[37]

The background of medical and health issues would not be complete without mention of the effect litigation may have had on the scientific and medical literature. Recognition of this fact was evident in the Health Effects Institute Asbestos Research (HEI-AR) where that panel of experts felt it necessary to describe data as "litigation" and "non-litigation" data.[38] On the positive side, litigation has provided financial support for many studies that otherwise may have not been performed. On the negative side, the financial support creates at a minimum the perception of bias by researchers, or may have prevented distribution of results not in the best interest of the research sponsor. Today, most reputable scientific and medical journals require disclosure of affiliations and funding prior to publication.

The relationship between fiber size and disease is being considered by ATSDR. This agency convened a panel of experts on October 29-30, 2002 to consider the health effects of asbestos and synthetic vitreous fibers: the influence of fiber length. The results of this investigation were unavailable during the drafting of this report. EPA's Office of Solid Waste and Emergency Response (OSWER) sponsored a workshop from February 25-27, 2003 in San Francisco to

---

[36] ACGIH, *Documentation of TLVs and BEIs*, Asbestos.

[37] Health and Safety Executive, *HSE Launches Guidance on New Legislation on Managing Asbestos*, HSE Press Release E239:02 (December 16, 2002).

[38] HEI-AR, *Asbestos in Public and Commercial Buildings: Supplementary Analyses of Selected Data Previously Considered by the Literature Review Panel*, Health Effects Institute-Asbestos Research, Cambridge, MA (1992), p. 3-1.

discuss a proposed "Protocol to Assess Asbestos-Related Risk." A Mechanism of Asbestos Toxicity conference is scheduled for mid-May.

**Issues Remaining:** This *Asbestos Strategies* process was not designed to identify or evaluate the many issues relating to health effects, diagnosis and treatment of disease, and the epidemiology of asbestos-related diseases. However, several issues were raised that are described below.

1. The need for early recognition and diagnosis of asbestos related diseases was raised as an issue. This issue is not as simple as it may appear. There is controversy over the use of various tests to diagnose disease, such as using Computerized Axial Tomography (CAT) scans. The use of repeated chest x-rays for people with little asbestos exposure is controversial. The question of which branch of the medical profession is best equipped to recognize the asbestos-related diseases is not resolved.

2. The need for epidemiology studies of populations with "low-level" exposures to asbestos was raised as an issue. This would include additional studies of workers in the vicinity of others who worked with asbestos, family members of asbestos exposed workers, and persons with short-term high-dose exposures.

3. The need for a national mesothelioma registry was raised as necessary. Closely related was the issue of clarifying malignant mesothelioma in the International Classification of Diseases (ICD).

4. The obvious issue of compensation for persons with asbestos-related diseases remains today, as it did 50 years ago. The mechanism of compensation, responsible parties, and the definition of fair compensation are all significant issues that are beyond the scope of this analysis and have been wrestled with in the courts and legislative bodies in the U.S. and worldwide.

**Recommended Solutions:** The following proposed solutions address only a fraction of the possible medical/health issues surrounding asbestos-related diseases.

1. A national mesothelioma registry is necessary to facilitate epidemiology studies to evaluate the effects of asbestos exposure. Many countries and some states have established mesothelioma registries. The establishment of such a registry would likely be performed by agencies within the Centers for Disease Control (CDC), including the National Center for Health Statistics, National Institute for Occupational Safety and Health, and the National Center for Environmental Health, in conjunction with ATSDR and state public health departments. An accompanying effort to connect interested parties with the best experts and data would improve research and treatment of asbestos-related disease.

2. There is a need for an inventory of significant health-related research to ensure that interested parties can access experts wherever they are located. The CDC should lead this effort. In conjunction with the mesothelioma registry, this would improve research and treatment of asbestos-related disease.

### *3.6 Risk Assessment and Analysis*

**Background:** Risk assessments have been performed by the National Academy of Sciences (NAS), OSHA, CPSC, EPA and ATSDR over the years in support of regulatory activities or research. The risk assessment area is controversial. Much of the controversy may stem from uncertainties in the source data the assessments are based on. The long latency period between exposure and onset of disease makes linking exposure concentrations, frequency and duration to disease difficult.

Much of the risk assessment exposure data were generated during asbestos mining, milling and product manufacturing. Most of this exposure data during the 1930s through the 1960s were generated using the impinger technique or the thermal precipitator. These methods expressed exposures in millions of particles per cubic foot of air (mppcf).[39] In the late 1960s the method of choice changed to measuring fibers visible by the optical microscope with concentrations expressed as fibers per cubic centimeter (f/cc).[40] These early exposure measurement techniques assumed all particles, or all fibers were asbestos. In some workplaces most were likely asbestos, in other workplaces, most were likely not asbestos.

Since the onset of disease among asbestos exposed populations often occurs 30 years to 40 years later it is difficult to estimate the exposure(s) responsible for the disease. Since there are multiple diseases associated with asbestos exposure, and for lung cancer a recognized positive synergistic effect with cigarette smoking exists, the uncertainties are compounded.

The degree of risk posed by a substance is always a controversial subject. With substances such as asbestos, factual variables such as the specific form of the material and exposure pathways can vary widely, and oversimplification of risk characterization can be problematic. For example, if it is assumed that any increase in exposure represents some increase in risk, should all exposures be eliminated? Since there is some low exposure in the outside air, should only additional exposure be eliminated? Is there some increased exposure, and corresponding increase in disease that is considered "acceptable?"

The term "risk assessment" has been used when discussing the management of asbestos in buildings and in considering asbestos in products. Often it is used, perhaps erroneously, interchangeably with "exposure assessment" or "hazard assessment." Exposure assessments are performed to measure airborne concentrations of asbestos. Hazard assessments look at current exposures and the potential for future exposures. Building owners use this information to develop asbestos management plans to reduce or minimize actual exposures, and hence to reduce or minimize actual risk.

The foregoing is a brief synopsis that only begins to suggest the range of risk assessment issues relevant to asbestos. Studies of this subject are on-going worldwide and will likely continue for decades to come. Areas of research were listed in section 3.1 and 3.5 that are necessary to further define the risks associated with exposure to asbestos, particularly low-level exposures.

---

[39] Asbestos Hygienic Standard, *Industrial Hygiene Journal* (April 1958), pp. 161-162.
[40] The membrane filter technique was first used in the U.K., and later was adopted in the U.S. and became the optical method of choice published by NIOSH as method P&CAM 239. This method was later revised to the optical method today of NIOSH method 7400.

The EPA is currently reviewing the need to revise its risk assessment methodology for asbestos. The agency convened a panel of experts to consider whether this methodology can be used to support decisions about asbestos contaminated sites. This panel met February 25-27, 2003 in San Francisco, California. The results of this investigation were unavailable during the drafting of the *Asbestos Strategies* report.

**Issues Remaining:** There are numerous issues surrounding risk assessments for asbestos. One identified during this process was the public's perception of exposure and risk. Another concern is that it may often be important to assess the risk in terms of the potential for exposure, not simply measured air levels.

**Recommended Solutions:**

1. The EPA and OSHA should consult with each other and leading scientists to obtain the best sense of the science and then employ education and outreach to provide reliable risk communication to the regulated community and the public. Commentors indicate that following the World Trade Center attacks federal agencies may have underestimated the risks out of concern to control the public's perceived risk. A backlash followed inside and outside some agencies, which may have overstated the risks.

### 3.7 Analytical Issues

**Background:** For at least 75 years there have been issues relating to how best to measure asbestos in bulk materials, soils, dust, water and air. The methods of analysis have evolved and many have become regulatory requirements.

Polarized light microscopy (PLM) is commonly used to measure asbestos in bulk materials. It is inexpensive (about $10 per analysis in commercial laboratories) and a quality assurance program administered by NIST is in place. The method can identify asbestos in many bulk materials down to 1 percent reliably. False negative results (i.e., not finding the asbestos) are common in some bulk materials when the asbestos is very small or concealed in a matrix, such as floor tile or roofing tar. Transmission electron microscopy (TEM) has gained wider acceptance to confirm or deny the presence of asbestos in bulk materials at a cost of about $50-75 per sample, but getting reliable quantitative data from this technique has been questioned.

Air samples are generally collected on a filter and analyzed by phase contrast microscopy (PCM) or TEM. The PCM method is inexpensive (about $15.00 per analysis) but does not distinguish asbestos from other fibers. PCM also only looks at bundles of fibers longer than 5 micrometers in length since the optical microscope cannot resolve, or "see," individual fibrils of chrysotile asbestos for example. TEM only counts asbestos fibers and has the ability to detect all sizes of fibers. TEM remains more expensive than PCM, but its cost has come down markedly over the past 15 years from about $500 per sample to $100 per sample today.

A large number of dust samples were taken after the World Trade Center collapse and the results were quoted extensively. There are no regulatory standards for dust samples, and the recognized method for dust sampling (ASTM D5755) does not include criteria for interpreting the results. Nonetheless, decisions were made regarding levels of asbestos contamination and the

effectiveness of clean-up on the basis of dust sampling results. In the event of large-scale fiber release episodes from deliberate or accidental causes in the future, building owners and local regulatory officials are likely to look to EPA for guidance in using dust sampling and interpreting the results.

**Recommended Solutions:** Many of the technical issues surrounding sampling and analytical issues are addressed as they arise by professional associations such as the American Society for Testing and Materials (ASTM) and the American Industrial Hygiene Association (AIHA); and federal agencies such as EPA, NIOSH, OSHA (Salt Lake City, Utah laboratory), and NIST (NVLAP program).

1. Federal agencies should continue to actively participate and support the efforts of professional associations in the development, revision, and quality assurance practices relating to sampling and analytical methods for asbestos.

## 4.0 IMPLEMENTATION OF RECOMMENDED SOLUTIONS

The recommended solutions identified during this process are listed and described in section 3.0. In discussing each recommendation the primary involved parties are identified. For consistency and follow-through it is appropriate one agency take the lead in implementing the recommendations. The EPA is the logical choice in many cases since their role involves most, if not all, of the issues identified.

For the recommended solutions the EPA should establish working groups composed of representatives from government agencies and other stakeholders identified as critical to the success of the project. EPA should call upon a range of organizations to support to this effort. Many of these organizations may be willing to conduct awareness seminars and to assemble panels of experts as necessary to implement the recommendations provided. Listed below are some of the key groups that may be valuable participants:

- Federal government agencies – EPA, OSHA, MSHA, CPSC, NIOSH, NIST, National Institutes of Health (NIH), CDC, ATSDR
- State government agencies involved with asbestos
- Local government agencies involved with asbestos
- Professional associations – EIA, ASTM, AIHA, National Institute of Building Science (NIBS), Building Owners and Managers Association (BOMA), NCSL
- Current asbestos product manufacturers – Asbestos Information Association/North America (AIA/NA)
- Mining and mineral processing companies and/or associations
- Representatives of organized labor
- Other groups or individuals having special expertise in the specific recommended proposed solution

This *Asbestos Strategies* process was an effective mechanism to take stock of the issues surrounding asbestos today. The information gained will be valuable to provide direction for policy makers in the years to come. The direction provided herein recognizes and makes efficient use of limited resources. The emphasis on oversight, outreach, and education as the means to implement the recommendations assures that all concerned persons will have a common base of information, and that the issues identified will be addressed transparently and expeditiously. Even though acknowledged uncertainties and difference of view remain, the findings illustrate that the experts in government and non-government institutions can productively address many concerns with information, education and coordinated oversight and thus allow all to focus on those issues which remain concerns of substance.

## 5.0 APPENDICES

### Appendix A: The *Asbestos Strategies* Process

The key elements of the *Asbestos Strategies* process are shown in Table A.1.  The *Asbestos Strategies* process began with a survey of the asbestos industry.  The GETF team researched the issues and identified affected companies, communities, and organizations.  The team then worked to develop a list of contacts that would be able to provide information on the state of asbestos oversight, outreach, and education, as well as other concerns.  These contacts represented a range of sectors and perspectives.  While the timing and scope of this process could not permit reaching 100% of interested persons, the GETF team was able to directly involve more than 100 industry participants and experts, as seen in Table A.2.

### TABLE A.1: *Asbestos Strategies* Timeline

| | |
|---|---|
| Early May, 2002 | Research begins – GETF develops background information, identifies contacts |
| Mid June, 2002 | Contacts identified |
| Late June, 2002 | Interviews begin |
| Mid July, 2002 | Draft research document on asbestos developed |
| Early September, 2002 | Interviews conclude |
| Early September, 2002 | List of invitees established |
| Early September, 2002 | Invitations to meeting sent out |
| Mid October, 2002 | Meeting held in Washington, D.C. |
| Late October, 2002 | Meeting notes distributed |
| Mid November, 2002 | GETF meets with EIA |
| Mid November, 2002 | List of eight expert stakeholders developed |
| Early December, 2002 | Revised meeting notes distributed |
| Late December, 2002 | First draft of report developed |
| January, 2003 | Report revised |
| Early February, 2003 | Draft report circulated to stakeholder group |
| Late February, 2003 | Comments received from stakeholder group |
| Early March, 2003 | Comments incorporated into report |
| Late March, 2003 | Final review by experts |
| April, 2003 | Final Report Issued |

The GETF team conducted interviews with almost 50 key stakeholders and experts over a period of two months prior to the focus group. These interviews were designed to provide the team with information on the current needs in asbestos policy, to identify important issues to address in the focus groups, to identify areas for further research, and to direct the team to additional contacts. GETF employed an interview template, tailored to the expertise of the interview subject. This provided consistency in answers and highlighted important points. This methodology is provided in Appendix E.

The team leaders followed the interviews with invitations to participate in the dialogue process. Invitees represented a cross-section of the groups dealing with asbestos, as seen below in Figure A.1. For those that could not participate at the meeting in Washington D.C., GETF welcomed participation through the web site (http://www.getf.org/asbestosstrategies).



**Figure A.1: Invitees to October 10 Meeting**

The *Asbestos Strategies* focus group meeting was held on October 10, 2002, in Washington, D.C. Fifty-three attendees discussed a range of topics, starting with the issue categories that had been identified in the interviews. The purpose of the meeting was not to develop consensus on all issues. On areas where consensus existed, this was noted. On more contentious areas, the GETF team sought to identify the common ground and the differing views among the various sectors and groups (See Appendix I).

A summary of this meeting was then compiled and distributed to participants (See Appendix F). Additional interviews and research were conducted after the meeting to clarify points of discussion and gain additional perspectives. The Executive Board of the Environmental Information Association was engaged in person in November 2002.

This report has been developed based on the comments from the meeting, the interviews and on extensive secondary and expert research. The following table represents all of the organizations who were contacted prior to the stakeholder meeting in October 2002. The table indicates the extent of each organization's involvement with the process. In some cases, the team was not able to schedule an interview with a representative from an organization, or the organization elected not to participate.

**TABLE A.1:** *Asbestos Strategies* **Contacts**

| Established contact? | Interviewed or commented? | Attended meeting? | Agency/Company |
|---|---|---|---|
| Yes | Yes | No | Aeolus, Inc. |
| Yes | No | No | AFL-CIO |
| Yes | No | No | Agency for Toxic Substances & Disease Registry |
| Yes | Yes | No | Alliance of Automobile Manufacturers |
| Yes | Yes | No | American Association of School Administrators |
| Yes | No | No | American Cancer Society |
| Yes | Yes | No | American Chemistry Council |
| Yes | Yes | Yes | American Federation of State, County and Municipal Employees |
| Yes | No | No | American Federation of Teachers |
| Yes | Yes | Yes | American Industrial Hygiene Association |
| Yes | No | No | American Lung Association |
| Yes | Yes | Yes | American Petroleum Institute |
| Yes | No | No | Armstrong World Industries |
| Yes | Yes | Yes | Asbestos Information Association |
| Yes | Yes | No | Association of International Automobile Manufacturers |
| Yes | Yes | Yes | Automotive Aftermarket Industry Association |
| Yes | Yes | No | Automotive Parts Rebuilders Association |
| Yes | No | No | Babcock & Wilcox |
| No | No | No | Building Owners and Managers Association |
| Yes | No | No | California Air Resource Board, Stationary Source Division |
| Yes | Yes | No | California Environmental Protection Agency |
| Yes | Yes | No | Center for Environmental Health Sciences, University of Montana |
| Yes | No | No | Center to Protect Workers' Rights |
| Yes | No | No | Chatfield Technical Consulting, Ltd. |
| Yes | No | No | Communication Workers of America |
| Yes | Yes | Yes | Compass Environmental, Inc. |
| Yes | No | No | Consumers Union |
| Yes | Yes | Yes | DeLisle Associates, Ltd. |
| Yes | Yes | No | Dow Chemical Company |
| Yes | No | No | Environmental Defense Fund |
| Yes | Yes | Yes | Environmental Information Association |
| No | No | No | Federal-Mogul Corporation |
| Yes | No | No | GAF Materials Corporation |
| Yes | Yes | Yes | Georgia NESHAP Waste Reduction and Abatement Program |
| Yes | Yes | No | Georgia-Pacific Corporation |
| N/A | N/A | Yes | Global Environment & Technology Foundation |
| Yes | Yes | No | Gobbell Hayes Partners, Inc. |
| Yes | No | No | Hedman Resources, Limited |
| Yes | Yes | Yes | Herron Enterprises USA, Inc. |

Appendix A: The *Asbestos Strategies* Process

| Established contact? | Interviewed or commented? | Attended meeting? | Agency/Company |
|---|---|---|---|
| Yes | No | No | Institute of Applied Sciences, Brooklyn College of the City University of New York |
| Yes | No | No | Johns Hopkins School of Public Health |
| Yes | No | No | Johns Manville |
| Yes | No | No | KCAC, Inc. |
| Yes | Yes | Yes | Laborers Health and Safety Fund |
| Yes | Yes | No | Maine Department of Environmental Protection |
| Yes | No | No | Michigan Dept. of Consumer & Industry Services |
| Yes | Yes | Yes | Mine Safety and Health Administration, Metal and Nonmetal Mine Safety and Health |
| Yes | No | No | Mt. Sinai – Irving J. Selikoff Center for Occupational & Environmental Medicine |
| Yes | Yes | Yes | National Conference of State Legislatures |
| No | No | No | National Gypsum |
| Yes | No | No | National Institute for Environmental Health Science |
| Yes | No | No | National Institute of Building Science |
| Yes | Yes | Yes | National Institute of Occupational Safety and Health |
| Yes | Yes | Yes | National Institute of Standards and Technology |
| Yes | No | No | National Mining Association |
| Yes | Yes | No | National PTA |
| Yes | Yes | No | National Roofing Contractors Association |
| Yes | No | Yes | National Stone, Sand, & Gravel Association |
| Yes | Yes | No | New Hampshire Department of Health and Human Servies, Office of Community and Public Health |
| Yes | No | No | New Jersey Department of Health and Senior Services |
| Yes | No | No | New York State Department of Health |
| Yes | Yes | Yes | North American Insulation Manufacturers Association |
| Yes | No | No | Northwestern University |
| Yes | Yes | No | Occupational Safety and Health Administration |
| Yes | No | No | Pittsburgh Corning |
| Yes | Yes | No | PSI, Inc |
| Yes | Yes | No | R.T. Vanderbilt |
| Yes | No | No | Raybestos Products Company |
| Yes | No | No | Raytech Corporation |
| Yes | No | No | Refractory Ceramic Fiber Coalition |
| Yes | Yes | No | Research Triangle Institute, Center for Environmental Measurements and Quality Assurance |
| N/A | N/A | Yes | RESOLVE, Inc. |
| Yes | Yes | No | RFM, Inc. |
| Yes | No | Yes | RJ Lee Group Inc. |
| Yes | Yes | No | Sciences International, Inc. |

30

Appendix A: The *Asbestos Strategies* Process

| Established contact? | Interviewed or commented? | Attended meeting? | Agency/Company |
|---|---|---|---|
| Yes | Yes | Yes | The Asbestos Institute, Inc. |
| Yes | Yes | Yes | The Environmental Consultancy |
| Yes | Yes | No | The Scotts Company |
| Yes | No | Yes | U.S. Agency for Toxic Substances & Disease Registry |
| Yes | No | Yes | U.S. Army Assistant Chief of Staff for Installation Management |
| Yes | Yes | Yes | U.S. Army Center for Health Promotion and Preventive Medicine |
| Yes | Yes | Yes | U.S. Consumer Product Safety Commission |
| Yes | Yes | Yes | U.S. Environmental Protection Agency Office of Pollution Prevention and Toxics |
| Yes | No | Yes | U.S. Environmental Protection Agency Office of Solid Waste and Emergency Response |
| Yes | Yes | No | U.S. Environmental Protection Agency, National Enforcement Investigations Center |
| Yes | No | No | U.S. Environmental Protection Agency, New England |
| Yes | No | No | U.S. Environmental Protection Agency, Office of Research and Development |
| Yes | Yes | Yes | U.S. Environmental Protection Agency, Region 5 |
| Yes | No | Yes | U.S. Environmental Protection Agency, Region 6 |
| Yes | No | Yes | U.S. General Accounting Office |
| Yes | Yes | Yes | U.S. Geological Survey |
| Yes | No | No | U.S. Geological Survey Denver Research Center |
| Yes | Yes | Yes | U.S. Senate, Office of Senator Patty Murray |
| No | No | No | United Auto Workers |
| No | No | No | United Mine Workers of America |
| No | No | No | United Steelworkers of America |
| Yes | No | No | University of California, San Francisco |
| Yes | Yes | No | University of Cincinnati College of Medicine |
| Yes | Yes | Yes | University of Maryland |
| Yes | Yes | No | University of West Virginia, Morgantown |
| Yes | Yes | Yes | Vermiculite Association |
| Yes | Yes | Yes | Virginia Vermiculite |
| Yes | Yes | Yes | Wisconsin Department of Natural Resources |

Appendix A: The *Asbestos Strategies* Process

After the stakeholder meeting, other contacts were identified and contacted:

| Agency/Company |
| --- |
| American Thoracic Society |
| EPA Ombudsman's Office |
| Mesothelioma Applied Research Foundation |
| Mineral Policy Center |
| Natural Resources Defense Council |
| Occupational Health Initiatives, Inc. |
| RFM, Inc. |
| Sierra Club |

A draft report was completed in December 2002. The draft was revised according to discussions with EPA and the group of eight expert stakeholders. The revised draft report was then circulated to the full stakeholder group for comments in February 2002. These comments were incorporated into the final report.

The report bases its recommendations on the opinions and comments of the stakeholder group, and other experts. The goal was not to achieve full consensus, but rather to develop recommendations that appear consistent with views expressed across a wide range of sectors and appear consistent with agency and marketplace experience. Thus, the recommendations focus primarily on the value of reliable information, consistently delivered, and generally do not attempt to resolve contentious technical issues. Specific recommendations suggested by individual stakeholders that did not have broad support among the group of stakeholders were included in Appendix I. These views include those that disagree with more widely expressed views of stakeholders or are simply not reflected in the leading recommendations. The inclusion of specific comments or recommendations in this category does not necessarily imply that the team rejected or disagreed with them; in many cases, there was simply not enough strong support to actively endorse the recommendation.

- The recommendations here do not reflect the unanimous consent of all stakeholders. There are a number of serious issues to be addressed on which the various stakeholders do not agree. In some cases, further scientific study will enable government agencies to make more informed decisions. In many instances, some precautionary action is warranted while further information is developed, even if this action is opposed by some of the stakeholders consulted for this report. This report highlights areas of concern identified by the participants. It proposes potential solutions that enjoy the support of a broad range of the sectors engaged in asbestos issues, and seeks to find balance between different approaches. It includes a range of differing views, some expressed by only one participant, some by a few, and some by many. It is hoped that, taken together, these conclusions identify useful steps, both to clarify and inform and to create an environment in which the more contentious remaining issues can be better and more swiftly resolved.

## Appendix B: Background on Asbestos Issues

Asbestos is a term used to describe a group of naturally occurring silicate minerals. Traditionally, regulated asbestos has included a group of five amphibole minerals and one serpentine mineral. The common mineral names for the amphiboles are crocidolite, tremolite, actinolite, amosite, and anthophyllite. The single serpentine variety is chrysotile.[41] Asbestos has several properties that have made it commercially valuable. Its fibrous nature made it a good thermal and acoustic insulator, and able to be twisted and woven into cloth. Since asbestos is an inorganic mineral, it does not burn. When mixed with other materials it often adds strength, or imparts other desirable qualities.

Asbestos has been exploited sparingly throughout history, but its use became widespread during the later half of the 19th century.[42] Initially its use was primarily in making insulation for steam engines, locomotives and pipes. The raw fiber was mixed with plasters and cements, or woven into cloth used to reduce heat loss. Its uses were initially developed in Great Britain, but became widely used in the United States (U.S.) and other industrialized nations.

The locations of major deposits of asbestos mined commercially have been South Africa, Russia, and Canada.[43] The vast majority of the asbestos used in the US originated in the chrysotile mines of Quebec. The mining and milling of asbestos was historically a dusty process.

Asbestos regulations and legislation were enacted throughout the 20th Century, as seen in Table B.1. By the early 1900s, asbestos was recognized as a cause of occupational disease.[44] The early association between asbestos exposure and asbestosis in the British asbestos textile factories lead to the first regulations. In 1931 Parliament passed legislation requiring dust control in asbestos textile factories and making asbestosis a compensable disease. The disease initially associated with asbestos was asbestosis. This is a scarring of the lung tissue that initially results in shortness of breath and can be fatal in advanced cases.[45]

During the 1930s and 1940s the connection between asbestos exposure and lung cancer emerged. Case reports of mesothelioma among asbestos workers increased in the 1950s. By 1960 the connection between mesothelioma and asbestos exposure was established.[46] Malignant mesothelioma is a cancer of the mesothelium, a thin lining covering the major organs of the body. If it originates in the chest cavity, it is called pleural malignant mesothelioma. In the abdominal cavity it is known as peritoneal malignant mesothelioma. The decade of the 1960s saw considerable interest and research on the asbestos related diseases. The work of Dr. Irving J. Selikoff and his colleagues described the incidence of disease among insulation workers in the

---

[41] Michaels, L. and S.S. Chissick, *Asbestos: Properties, Applications and Hazards* (Vol. 1), John Wiley & Sons, Ltd., Chichester, U.K. (1979), pp. 45-46.

[42] Sinclair, W.E., *Asbestos: Its Origin, Production and Utilization*, Mining Publications, Ltd., London (1955), pp. 258-261.

[43] Michaels and Chissick (1979), p. 73.

[44] Selikoff, I.J. and D.H.K. Lee, *Asbestos and Disease*, Academic Press, New York (1978), pp. 20-25.

[45] Brodeur, P., *The Asbestos Hazard*, New York Academy of Sciences, New York (1980), p. 9.

[46] Selikoff and Lee (1978), pp. 28-29.

building trades in 1964.[47] This work was the focus of the international conference, "Biological Effects of Asbestos Exposure," held that year at the New York Academy of Science.

A common characteristic among the asbestos-related diseases is the long latency period between the initial exposure and the onset of disease. Asbestosis, lung cancer, malignant mesothelioma, and other asbestos-related maladies rarely occur in less than 10 years since first exposure. Neoplasms associated with asbestos often do not manifest themselves for 30 years or longer.

In spite of the recognized adverse health effects associated with asbestos exposure, its use in the U.S. accelerated throughout much of the 20th century. In 1972, 770,000 short tons of chrysotile asbestos were used in the U.S., and much smaller quantities of other asbestos forms. This asbestos was used in construction (pipe and boiler insulation, asbestos cement pipe and boards, fireproofing, acoustical plaster, and other uses); floor tile; friction materials (brake and clutch linings); asbestos paper; felts; packing and gaskets; textiles; and other uses.

Prior to the enactment of the Occupational Safety and Health Act (OSHA) in 1970 the American Conference of Governmental Industrial Hygienists (ACGIH) had established an exposure limit for asbestos in occupational settings. The value was initially set as a maximum acceptable concentration (MAC) in 1946 of 5 million particles per cubic foot (mppcf). In 1948 the 5 mppcf MAC was changed to a threshold limit value (TLV) of an average concentration over an 8-hour day, referred to as an 8-hour, time-weighted average. The ACGIH retained this TLV of 5 mppcf until 1974 when it was reduced to 5 fibers per cubic centimeter (f/cc) expressed as an 8-hour, TWA. Since that time the TLV has been reduced repeatedly to 0.1 f/cc today. From 1972 onward the ACGIH has listed asbestos as a human carcinogen.[48]

Many states adopted the ACGIH TLVs for the regulation of occupational exposures in the workplace during the 1950s and 1960s. State asbestos regulations were effectively replaced by federal OSHA regulations in June 1972 with the first permanent OSHA asbestos standard.[49]

The first regulatory action of the new U.S. Environmental Protection Agency (EPA) under authority of the Clean Air Act was listing asbestos as a hazardous air pollutant. This occurred in March 1971. In April 1973 the EPA issued the National Emission Standard for Hazardous Air Pollutants (NESHAP) for asbestos. This standard required "no visible emissions" for milling and manufacturing asbestos products, and during demolition of buildings. The asbestos NESHAP had the effect of eliminating the spray application of friable asbestos-containing fireproofing in July 1973. Subsequent revisions to this regulation in 1975 and 1978 effectively eliminated the use of friable pre-molded pipe, boiler, turbine, and duct insulation; and the spray application of friable asbestos-containing materials for all uses in buildings.[50]

---

[47] Selikoff, I.J., Churg, J. and E.C. Hammond, "Asbestos Exposure and Neoplasia," *JAMA* 148:1 (1964), pp. 142-146.

[48] American Conference of Governmental Industrial Hygienists, *Documentation of Threshold Limit Values and Biological Exposure Indices*, 6th Edition, Vol.1 (Asbestos Documentation, p. 1)

[49] *Federal Register*, Vol. 37, No. 110, Title 29 – Labor, Part 1910 – Occupational Safety And Health Standards, Standard for Exposure to Asbestos Dust (June 7, 1972, p. 11318.)

[50] USEPA, *Asbestos Fact Book*, Washington, DC (February 1985), p. 10.

The original EPA NESHAP definition of an asbestos material was "asbestos or any material containing asbestos".[51] The 1975 asbestos NESHAP regulation redefined a friable asbestos-containing material to mean "any material that contains more than 1 percent asbestos by weight that can be crumbled, pulverized, or reduced to powder, when dry, by hand pressure.[52] This definition remained largely unchanged until the 1990 asbestos NESHAP revision.

In buildings, the EPA asbestos NESHAP addressed friable asbestos-containing materials (ACM) in buildings undergoing renovation or demolition operations. Non-friable materials were essentially exempt, as were buildings with four or fewer dwelling units. Renovation projects involving less than 160 linear feet or 260 square feet of friable ACM were exempt from the EPA Asbestos NESHAP regulations. Additional revisions to the asbestos NESHAP regulation attempted to clarify some regulatory language. The current revised 1990 version is discussed briefly in section 3.2.

The federal OSHA asbestos standard of 1972 has been revised on several occasions. In 1976, the planned reduction of the 8-hour permissible exposure limit (PEL) from 5 f/cc to 2 f/cc became effective.[53] In 1986 separate standards for general industry, construction industry, and shipyards became effective with an 8-hour PEL of 0.2 f/cc and an excursion limit of 1 f/cc for 30 minutes.[54] The 8-hour PEL was again reduced to 0.1 f/cc in 1994.[55] The current OSHA standards for asbestos are discussed briefly in section 3.2.

The concern over the presence of asbestos in buildings began with friable ACM in elementary and secondary schools. In 1979 the EPA initiated a technical assistance program to help schools identify and control friable ACM.[56] Under this program a guidance document was produced to assist schools.[57] Congress passed the Asbestos School Hazard Detection and Control Act of 1980 giving the US Department of Education authority to implement a grant and loan program for schools.[58] Funds for this program were never appropriated.

In 1977, the CPSC issued rules prohibiting the sale of consumer patching compounds[59] and fireplace emberizing agents[60] containing respirable free form asbestos, and in 1986, issued an enforcement policy under the Federal Hazardous Substances Act (FHSA) concerning labeling of certain asbestos-containing household products that, under reasonably foreseeable conditions of

---

[51] 40 CFR 61.21 (1973).

[52] FR 40:199, Oct. 14, 1975, p. 48299.

[53] 29 CFR 1910.1001 (1976)

[54] *Federal Register*, Vol. 51, No. 119, Department of Labor (OSHA), Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite – Final Rules (June 20, 1986), p. 22612.

[55] *Federal Register*, Vol. 59, No. 153, Department of Labor (OSHA), Occupational Exposure to Asbestos – Final Rule (August 10, 1994), p. 40964.

[56] USEPA, *Asbestos Fact Book* (1985), p. 4.

[57] USEPA, *Asbestos-Containing Materials in School Buildings: A Guidance Document* (Parts 1 and 2), Washington, DC (March 1979)

[58] Ewing, W.M., "History, Implementation and Evaluation of the Asbestos School Hazard Detection and Control Act of 1980," *National Asbestos Council Journal*, Vol. 4, No. 2 (1986).

[59] *Federal Register*, Vol. 42, CPSC, 16 CFR Part 1304, Ban of Consumer Patching Compounds Containing Respirable Free-Form Asbestos (December 15, 1977), p. 63362.

[60] *Federal Register*, Vol. 42, CPSC, 16 CFR Part 1305, Ban of Artificial Emberizing Materials (Ash and Embers) Containing Respirable Free-Form Asbestos (December 15, 1977), p. 63364.

Appendix B: Background on Asbestos Issues

handling and use, are likely to release asbestos fibers[61]. Public awareness, as well as regulatory action, proved effective in addressing potential risks to public safety. When it was discovered that hair dryers containing asbestos released these fibers into the air, manufacturers promptly took action to remove the material from their products.

In 1982 the EPA promulgated the "Asbestos-in-Schools Rule" requiring schools to identify friable ACM in school buildings and provide notification to parents, teachers, and school employees.[62] The Asbestos School Hazard Abatement Act (ASHAA) of 1984 set up a loan and grant program to assist schools in eliminating asbestos hazards.[63] This program was administered by the EPA and reauthorized under the Asbestos School Hazard Abatement Reauthorization Act (ASHARA) of 1990.[64] In 1983, the EPA revised its primary asbestos guidance document (the "orange books") to address friable ACM in buildings beyond schools.[65] This guidance document (the "blue book") was revised two years later in 1985.[66] This revision is known as the "purple book" and it remains today the primary EPA guidance document for controlling friable and non-friable asbestos in schools, public and commercial buildings.

President Reagan signed the Asbestos Hazard Emergency Response Act (AHERA) in 1986.[67] The EPA issued the AHERA regulations in 1987 requiring schools to inspect, assess, and manage asbestos in their buildings.[68] Each school was to produce an asbestos inspection report and a management plan describing how the asbestos would be managed. These regulations did not require asbestos be removed beyond what was already required in the EPA asbestos NESHAP regulations during demolition and renovation projects.[69]

Other provisions of AHERA required the EPA to investigate what actions should be taken, if any, regarding asbestos in public and commercial buildings. The agency responded in several ways. It evaluated how well the AHERA regulations were implemented by schools.[70] It co-sponsored the work by the Health Effects Institute – Asbestos Research on Asbestos in Public and Commercial Buildings culminating in a major published review and synthesis of the literature in 1991.[71]

---

[61] *Federal Register*, Vol. 51, No. 185, CPSC, Labeling of Asbestos-Containing Household Products; Enforcement Policy, (September 24, 1986), p. 33910.

[62] *Federal Register*, Vol. 47, No. 103, USEPA, Part 763, Subpart F – Friable Asbestos-Containing Materials in Schools (May 27, 1982), p. 23369

[63] Title V – Asbestos School Hazard Abatement Act of 1984 (Congressional Act).

[64] Letter from Esther M. Tepper of the USEPA to William M. Ewing dated Nov. 24, 1992 Re: ASHARA.

[65] USEPA, *Guidance for Controlling Friable Asbestos-Containing Materials in Buildings*, EPA Publication No. 560/5-83-002 (March 1983).

[66] USEPA, *Guidance for Controlling Friable Asbestos-Containing Materials in Buildings*, EPA Publication No. 560/5-85-024 (June 1985).

[67] *Congressional Record-House*, October 1, 1986, H 8812, "Asbestos Hazard Emergency Response Act of 1986."

[68] *Federal Register*, Vol. 52, No. 210, EPA, 40 CFR 763, Asbestos-Containing Materials in Schools – Final Rule (October 30, 1987), p. 41826.

[69] The EPA report, *Asbestos in Schools: Evaluation of the Asbestos Hazard Emergency Response Act (AHERA)* released in June 1991 found removal of some ACM was the recommended response action for only 10% of the recommendations issued in the school asbestos management plans.

[70] USEPA, *Asbestos in Schools: Evaluation of the Asbestos Hazard Emergency Response Act (AHERA): A Summary Report*, EPA Publication No. 560/4-91-012 (June 1991).

[71] Health Effects Institute – Asbestos Research, *Asbestos in Public and Commercial Buildings: A Literature Review and Synthesis of Current Knowledge*, Cambridge, MA (1991).

Appendix B: Background on Asbestos Issues

AHERA required the agency to study ACM in public and commercial buildings and report back to Congress its recommendations. The February 1988 EPA report to Congress recommended a series of studies and specifically called for delaying a regulatory response.[72] The purpose for delaying a regulatory response was the concern that the available pool of trained personnel and laboratories might be overwhelmed due to the concurrent work in schools. The research was not conducted.

The agency did host a policy dialogue with stakeholders (1990) to consider actions relating to asbestos in public and commercial buildings. The agency subsequently issued the "green book" guidance document on the design and implementation of operations and maintenance (O&M) programs for the management of in-place ACM.[73]

In 1989 the EPA issued regulations to ban some asbestos-containing products and phase out most others over a multi-year period.[74] The "Ban and Phase-Down" rule was challenged in court and the regulation remanded to the agency. As a result, any asbestos-containing products then "in commerce" would not be banned. Those not in commerce would be banned. Those materials "banned" could not be sold. It did not affect such materials already installed, or in use.

AHERA also established the asbestos laboratory accreditation program under the National Institute of Standards and Technology (NIST). This program accredits laboratories that perform bulk sample analyses by polarized light microscopy (PLM) and air sample analyses by transmission electron microscopy (TEM).

The AHERA regulations established the requirements for accreditation of individuals who (1) inspect for ACM, (2) develop management plans, (2) supervise response actions and (4) design response actions. There were also requirements for the training and certification of workers who perform asbestos response actions. The accreditation and certification requirements initially only applied to work in schools. These requirements, with the exception of the management planners, were extended to all buildings by ASHARA, effective November 28, 1992.

The EPA promulgated the Asbestos Worker Protection Rule in 1987.[75] This rule was designed to extend coverage found in the OSHA asbestos standards to state and local employees not covered by OSHA. It applies to employees performing construction work, custodial work, and automotive brake and clutch work. The Asbestos Worker Protection Rule was revised in November 15, 2000, adopting the OSHA asbestos standards (29 CFR 1926.1101 and 29 CFR 1910.1001) and subsequent revisions to these standards.

---

[72] USEPA, *EPA Study of Asbestos-Containing Materials in Public Buildings: A Report to Congress*, USEPA, Washington, DC (February 1988), at p. 36, letter from Mr. Lee M. Thomas of EPA to Congress dated February 26, 1988.

[73] USEPA, *Managing Asbestos in Place: A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials*, EPA Publication No. 20T-2003 (July 1990).

[74] *Federal Register*, Vol. 54, No. 132, EPA, 40 CFR Part 763, Asbestos; Manufacture, Importation, Processing, and Distribution in Commerce Prohibitions – Final Rule (July 12, 1989), p. 29460.

[75] *Federal Register*, Vol. 65, No. 221, EPA, 40 CFR 763, Asbestos Worker Protection – Final Rule (November 15, 2000), p. 69210.

Appendix B: Background on Asbestos Issues

**TABLE B.1: Timeline of Asbestos Regulatory and Legislative Activities**

| | |
|---|---|
| 1900 | Asbestos recognized as a cause of occupational disease (asbestosis) in Charing Cross Hospital, London. A presumptive connection is established. |
| 1918 | Insurance companies, including Prudential, refuse to sell insurance to asbestos workers. |
| 1922 | U.S. Navy lists asbestos work as hazardous and recommends the use of respirators. |
| 1924 | Asbestos is established as a definitive cause of death from lung scarring. |
| 1927 | The name "asbestosis" is applied to lung scarring caused by asbestos. Massachusetts awards disability payments to individuals affected by occupational lung disease. Over the next 40 years, other states come to recognize asbestosis as a compensable disease. |
| 1929 | Workers begin suing Johns Manville for damages from disability caused by asbestos exposure. |
| 1931 | In the UK, Parliament requires dust control measures in asbestos textile factories and allows workers to receive compensation for asbestosis. "Safe" level is established as conditions such that no more than one in three workers will get asbestosis after 15-19 years work exposure. |
| 1946 | The American Conference of Governmental Industrial Hygienists (ACGIH) establishes a maximum acceptable concentration (MAC) in 1946 of 5 million particles per cubic foot (mppcf) for occupational exposure. |
| 1948 | The 5 mppcf MAC was changed to a threshold limit value (TLV) of an average concentration over an 8-hour day, referred to as an 8-hour, time-weighted average. |
| 1955 | Richard Doll publishes paper linking asbestos to lung cancer. |
| 1960 | Chris Wagner publishes paper linking asbestos to mesothelioma. |
| 1964 | Johns Manville first places warning labels on some asbestos products. Irving J. Selikoff describes the incidence of asbestos-related disease among insulation workers. |
| 1969 | First product-liability lawsuit is brought against asbestos manufacturers. Federal contracts over $10,000 must adhere to a workplace standard of 12 fibers per cubic centimeter of air (f/cc). |
| 1970 | OSHA establishes the first federal guidelines for workplace asbestos exposure. These take effect the following year. |
| 1971 | OSHA regulations take effect. EPA lists asbestos as a hazardous air pollutant. |
| 1972 | ACGIH lists asbestos as a human carcinogen. First permanent asbestos regulations instituted by OSHA. Permissible exposure limit (PEL) is 5 f/cc. |
| 1973 | First NESHAP rule enacted. Eliminates spray application of fireproofing containing asbestos. Asbestos consumption in U.S. hits all-time high of over 800,000 tons. |
| 1975 | NESHAP revision bans the use of asbestos in many thermal insulation products. EPA defines "friable" asbestos. |
| 1976 | OSHA PEL reduced to 2 f/cc. |

| 1977 | CPSC issues rules prohibiting the sale of consumer patching compounds and fireplace emberizing agents containing respirable free form asbestos |
|------|--------------------------------------------------------------------------------------------------------------------------------------|
| 1978 | NESHAP revision. |
| 1979 | EPA begins providing technical assistance to help schools identify and control friable ACM. The primary documents are the "orange books." |
| 1982 | EPA promulgates "Asbestos in Schools" rule. |
| 1983 | EPA "orange book" is revised to provide guidance to manage friable asbestos in non-school buildings. The new document is the "blue book." |
| 1984 | EPA national survey estimates that there are 733,000 buildings with friable ACM. Asbestos School Hazard Abatement Act passed. |
| 1985 | The last comprehensive EPA guidance document for asbestos in buildings is issued. This is *Guidance for Controlling Asbestos-Containing Materials in Buildings*, also known as the "purple book." |
| 1986 | OSHA reduces PEL to .2 f/cc, with an "excursion limit" of 1 f/cc for up to 30 minutes. Asbestos Hazard Emergency Response Act (AHERA) is passed. |
| 1986 | CPSC issues an enforcement policy under the Federal Hazardous Substances Act (FHSA) concerning labeling of certain asbestos-containing household products |
| 1987 | EPA issues AHERA regulations. EPA promulgates Asbestos Worker Protection Rule, applying OSHA standards to employees of state and local governments. |
| 1989 | EPA promulgates Asbestos Ban and Phase-Out Rule. |
| 1990 | NESHAP revision. Asbestos School Hazard Abatement Reauthorization Act passed. EPA holds policy dialogue with stakeholders regarding asbestos in public and commercial buildings. The "green book" is issued, a guidance document on operations and maintenance programs for the management of in-place ACM. |
| 1991 | Much of the Ban and Phase-Out Rule is vacated by the U.S. Circuit Court of Appeals. The portion prohibiting new uses for asbestos remains intact. Health Effects Institute compiles *Asbestos Research on Asbestos in Public and Commercial Buildings*, a review and synthesis of the literature. |
| 1991 | EU bans amphibole asbestos. Chrysotile is banned for some applications. Chief Justice Rehnquist of the U.S. Supreme Court appoints an ad hoc committee regarding the thousands of court-filed asbestos illness claims. |
| 1992 | EPA attempts to work with auto industry to voluntarily phase out asbestos in brakes. Threatened anti-trust action by asbestos industry ends this effort. |
| 1994 | OSHA PEL reduced to .1 f/cc. Under this OSHA standard, Thermal System Insulation (TSI) and surfacing materials installed before 1981, and floor tile installed through 1981, are presumed to be asbestos-containing unless demonstrated otherwise through sampling. |
| 1999 | EU extends ban on chrysotile to nearly all applications. Member states must enact bans by 2005. |
| 2000 | Asbestos Worker Protection Rule revised. |
| 2002 | Ban Asbestos in America Act is introduced by Senator Patty Murray. |

Appendix B: Background on Asbestos Issues

**Appendix C:** Research Priorities by Issue Area

The focus of this report has been on asbestos issues and problems where oversight, outreach, and education can quickly have a positive impact. The process clearly indicated many issues requiring further research. The research priorities raised in this process are grouped by issue area below. They are not prioritized and should not be considered exhaustive by any means.

· **Asbestos in Buildings:**

1. Complete the studies indicated in the 1988 EPA Report to Congress, "EPA Study of Asbestos-Containing Materials in Public Buildings." This report described nine studies designed to fill information gaps about asbestos in buildings.[76] To date, only the first of these nine studies, listed below, has been completed.

    a. Evaluation of the Implementation of AHERA Schools Rule
    b. Operations and Maintenance Procedures Efficacy
    c. Long-term Efficacy of Asbestos Control
    d. Problem Characterization Studies
       da. Study 1: "Peak" Exposure Levels
       db. Study 2: The Incidence of "Peak" Exposure Levels and Their Impact on Average Building Levels
    e. Management Activities
       ea. Private Sector Asbestos Management Activities and State and Local Government Programs
       eb. Evaluate Impact of Private Sector/State and Local Asbestos Management Programs
    f. Exposure-Risk Interpretation
    g. Levels of Exposure
       ga. Prevalent Levels of Airborne Asbestos Fibers in Public and Commercial Buildings
       gb. Service Workers' Exposure to Airborne Asbestos in Public and Commercial Buildings
       gc. Residential Apartment Buildings Exposures
       gd. Survey of Federally Subsidized Public Housing Units for Asbestos Extent and Air Levels
       ge. Prevalent Levels of Airborne Asbestos Fibers in Schools
    h. Population Studies
       ha. Characterization of Populations Exposed to Airborne Asbestos in Public and Commercial Buildings
       hb. Survey of Populations Exposed to Airborne Asbestos in Public and Commercial Buildings
    i. Development of a Decision Tool for Determining Whether a Response Action is Warranted for a Particular Building

---

[76] USEPA *Report to Congress* (February 1988), Appendix 7.

2. Determine the reliability of measuring asbestos in various types of bulk materials at concentrations less than 1 percent by volume.

3. Evaluate the effectiveness of training provided to asbestos response action workers and building service workers, including those who do not speak English.

4. Evaluate the effectiveness of asbestos management programs in industrial settings. Based on this evaluation, prepare a guidance document for managing asbestos in industrial facilities.

**Asbestos in Products:**

1. A study should be conducted to determine the extent that asbestos-containing products are actually being manufactured, imported, exported, and distributed in the U.S. The study should identify who are the end users of the products, and the disposition of those products after use. The study should address the extent to which these products are available to consumers and local education agencies (schools). This study should be performed by the EPA, in conjunction with the CPSC, OSHA and the Department of Commerce. Following this, necessary risk-related analysis could be conducted.

2. A study should be conducted to determine the extent to which substitutes exist for asbestos known to exist in certain product categories. The study should consider the findings from the European Commission's Scientific Committee on Toxicology, Ecotoxicity and the Environment on the health risks of chrysotile asbestos and its substitutes. This study would be an adjunct to the one listed above.

**Naturally Occurring Asbestos:**

1. The extent of exposure and resulting health effects from mining, milling, manufacturing, distribution, and use of materials and products with less than 1 percent asbestos should be investigated. This study should also include workers performing road cuts and some road building operations. The study may include other durable naturally occurring fibrous minerals or work that produces cleavage fragments of respirable size and similar composition and shape as asbestos minerals. This study would be conducted by the National Institute for Occupational Safety and Health (NIOSH), in conjunction with EPA, MSHA, OSHA and CPSC. A panel of experts could be engaged to provide peer review on this topic.

2. A study is necessary to develop an analytical protocol that will reliably measure naturally occurring asbestos in bulk materials at concentrations below 1 percent. Polarized light microscopy (PLM) has traditionally been used but is generally limited to providing reliable results at 1 percent or greater. This study would likely be conducted by NIST, in conjunction with EPA, USGS and MSHA.

3. A study led by the USGS in conjunction with mining interests could map likely locations of asbestos deposits. Much of the necessary research for this effort has been

accomplished by various federal and state geological surveys. The information would be useful to the mining and quarrying industries, and road planning and construction.

**Medical and Health Issues:** There are many areas of additional research related to the health effects of asbestos. Many research studies are in progress worldwide. The listing of additional research needs here is far beyond the scope of this project, but may be the appropriate focus of a neutral scientific review of the state of analysis in this area.

**Analytical Methods:**

1.  The application of PLM and/or TEM microscopy for determining asbestos in bulk materials at 1 percent or less. This research should include building materials, products, and asbestos as a contaminant. This research should be directed by EPA in conjunction with NIST and laboratories knowledgeable of such applications.

2.  The use of TEM for exposure measurements as a supplement, or in place of PCM should be evaluated. Obtaining reliable measurements of low fiber concentrations in dusty atmospheres should be included. MSHA is considering TEM in their asbestos standard revision. The Health Effects Institute – Asbestos Research (HEI-AR) recommended OSHA consider TEM in the early 1990s. The research effort should be lead by EPA and NIOSH, in conjunction with NIST.

3.  Improve the accuracy and precision of methods using light microscopy.

**Appendix D: All Recommendations**

The *Asbestos Strategies* process led to the development of a list of recommendations. These are not necessarily consensus opinions, but rather a collection of ideas gathered from the range of stakeholders and selected by GETF and industry experts. Many of these action items enjoy considerable support across the range of stakeholders. Some – such as revisiting a ban on asbestos – would be opposed by some stakeholders.

These recommendations are primarily for short-term action items. They are grouped by the issue that they address, and ranked by priority within each category. Undertaking the research items in Appendix C can highlight areas that require more focused action.

### Develop and Provide Updated Information that is Consistent within and Among Agencies

1. The EPA should update the "purple book" guidance document to make it the premier technical resource for managing asbestos in buildings and facilities, including industrial settings. The revised resource should include updated "green book" (operations and maintenance) information, and should be consistent with current federal regulations and good practices that have evolved since its release in 1985. The resulting resource, in a form such as an online integrated database of all relevant documents, will facilitate compliance with existing regulations, reducing asbestos exposure among contractors working in buildings. [Leading Action #1]

2. The EPA should update the model training curricula to ensure that all relevant agencies' priorities are reflected. Updating the training will make the curricula consistent with existing regulations and increase worker safety. The updated versions should cover the revised OSHA asbestos standards, revised EPA asbestos NESHAP standards, EPA Worker Protection Rule, new respirator designations/regulations, and other topics. The training providers should also be permitted to vary the course content in refresher courses. [Leading Action #6]

3. Training providers under the EPA model accreditation plan (MAP) and corresponding state plans should be audited with sufficient frequency to assure the training is provided, tests are conducted, records maintained, and certificates issued. This action, conducted in concert with the updating of training requirements, will increase worker safety and the effectiveness of abatement efforts. Reducing the incidence of training fraud will provide greater security to building occupants and owners. Partnering with state agencies will provide better coordination. [Leading Action #10]

4. Federal agencies should continue to actively participate and support the efforts of professional associations in the development, revision, and quality assurance practices relating to sampling and analytical methods for asbestos. The EPA, NIST and NIOSH should work together to accomplish this goal.

5. The EPA, in conjunction with the Consumer Product Safety Commission (CPSC), should revise and update the Asbestos in Homes guidance document. This would help address the gap that currently exists in regulations affecting residential buildings.

6. A summary document of federal asbestos regulations should be prepared. This would be a valuable resource for the regulated community and the regulators. The document would be prepared by EPA and OSHA with input from the other federal agencies with asbestos regulations.

7. A companion summary document of state asbestos regulation summaries would also be a valuable education tool. This document should be developed by the National Conference of State Legislatures (NCSL). The NCSL has developed such documents in past years, but are no longer reflective of current state requirements.

8. The EPA and OSHA should consult with each other and leading scientists to obtain the best sense of the science and then employ education and outreach to provide reliable risk communication to the regulated community and the public. Commentors indicate that following the World Trade Center attacks federal agencies may have underestimated the risks out of concern to control the public's perceived risk. A backlash followed inside and outside some agencies, which may have overstated the risks.

**Support State Enforcement and Encourage Voluntary Compliance**

1. Regulatory agencies should encourage voluntary compliance with existing regulations and good practices for managing asbestos in buildings and conducting response actions. This may be accomplished through a series of asbestos awareness seminars directed at the regulated community (building owners, contractors and consultants). The seminars should be sponsored by EPA and OSHA, and hosted by the resident state asbestos authority. Joint sponsorship would be extremely valuable. Such seminars should be held in conjunction with national or regional meetings of professional/trade associations such as the Environmental Information Association (EIA) to encourage participation by the target audience. Voluntary compliance will increase worker and building occupant safety, reduce asbestos exposure, and decrease costs associated with liability. [Leading Action #2]

2. The EPA should partner with one or more local organizations to inform stakeholders and to encourage voluntary compliance with both federal and local regulations. Similar efforts appear to have been successful with groups such as the EIA, individual state agencies, local building code inspectors, fire departments, and other groups. This recommendation would be implemented in concert with the above recommendation.

3. The EPA and OSHA should focus on more stringent, predictable, and consistent enforcement of existing regulations, which may be more beneficial than committing scarce resources to new rule-making efforts. Consistent interpretations across agencies will lead to increased compliance and reduced liability for businesses. [Leading Action #7]

4. Federal and state agencies should provide additional training to their personnel responsible for asbestos. These personnel would be better equipped to provide guidance and assistance to the regulated community. These agencies should use these personnel to increase enforcement of existing regulations. Federal agencies could be tasked to ensure that this training is supported by consistent messages from those agencies.

5. Federal and state agencies should communicate among themselves before issuing communiqués to the public. This may reduce confusion among building owners and others attempting to comply with regulations. A web-based electronic distribution mechanism for such information should be established to assure rapid communication.

## Address Products in Commerce with Commercially Added Asbestos

1. A clearly defined legislative ban on the production, manufacture, distribution and importation of products with commercially-added asbestos is the most direct means to address concerns about remaining health risk and reduce future costs for facility owners and managers. Such a ban should be proposed by the Congress, promptly debated, and conclusively resolved. Enabling legislation would eliminate remaining products by a specified date, and installation of those products by a later date. Jurisdictional issues could be addressed in congressional legislation that might not be achievable by individual agency rule-makings. Exceptions may be necessary for a small number of applications for which substitutes may not be available, and for research purposes. Implementing regulations, and perhaps the enabling legislation itself, could be challenged in the courts. [Leading Action #4]

2. A uniform labeling requirement for all products with commercially-added asbestos should be established through rule making. Labels should include the word "asbestos" and should be a specified minimum size, and should be consistent with the labeling requirements of the CPSC's FHSA. The EPA would likely be the lead agency for such a rule making, but would need to coordinate their efforts with other agencies having jurisdiction over products with commercially-added asbestos. This option would need to be implemented with the following recommendation.

3. A coordinated effort to educate consumers, employers and building owners about products with commercially-added asbestos is necessary. Such a program would assist the target audience in making an informed decision about which products are legally available with commercially added asbestos. This education and outreach effort would be performed by EPA, OSHA and CPSC, as resources permit. These agencies would need to perform research into which products actually have commercially added asbestos, which do not, and which are to be phased out voluntarily by manufacturers. [Leading Action #9]

## Address Naturally Occurring Asbestos in Products

1. Reduction of naturally occurring asbestos in products could be achieved by a program set up by a consortium of mining concerns to develop a sampling and analytical protocol to analyze bulk materials at the mining stage for chrysotile and all asbestiform amphibole forms of asbestos. Oversight of such a program may be provided by EPA and MSHA, with technical assistance by NIOSH, NIST, and USGS. This program would assist the mining and quarrying industry in avoiding unwanted asbestos from entering their product. The program would provide a degree of assurance to users of these raw materials that they are not contaminated with asbestos. [Leading Action #8]

2. The Libby vermiculite situation should be considered an important lesson, but not be treated as a typical case. A federal process should be undertaken promptly to clarify the definition

45

of "asbestos." Many parties recommended that the definition should include all asbestiform amphiboles, in addition to currently regulated amphiboles and chrysotile. An evaluation by EPA, OSHA and MSHA will be needed to determine procedurally how this should be accomplished, and what consequences such a clarification might have, if any, on other industries. This definition, if adopted, would enable federal agencies to address the risk of exposure from minerals such as winchite and richterite. USGS, trade associations, and other organizations can serve as resources for clarifying and understanding the science associated with creating a new definition. [Leading Action #3]

3. A labeling provision should be considered for products having naturally occurring asbestos as a contaminant. Some products may currently be subject to the labeling requirements of the CPSC's FHSA if, under reasonably foreseeable conditions of handling and use, they are likely to release asbestos fibers. Existing regulations may be sufficient for products found to contain more than 1 percent asbestos. A label may be appropriate for products containing greater than 0.1 percent asbestos by volume, if feasible. The evidence on this should at least be reviewed. Products consistently found to contain asbestos at a level below 0.1 percent through a testing program may be exempt from labeling, or have a label with different wording.

**Support the Medical Community**

1. A national mesothelioma registry is necessary to facilitate epidemiology studies to evaluate the effects of asbestos exposure. Many countries and some states have established mesothelioma registries. The establishment of such a registry would likely be performed by agencies within the Centers for Disease Control (CDC), including the National Center for Health Statistics, National Institute for Occupational Safety and Health, and the National Center for Environmental Health, in conjunction with state public health departments. An accompanying effort to connect interested parties with the best experts and data would improve research and treatment of asbestos-related disease. [Leading Action #5]

2. There is a need for an inventory of significant health-related research to ensure that interested parties can access experts wherever they are located. The CDC should lead this effort. In conjunction with the mesothelioma registry, this would improve research and treatment of asbestos-related disease.

For the recommended options, the EPA should establish working groups composed of representatives from government agencies and other stakeholders identified as critical to the success of the project. These key groups, among others, may be valuable participants:

- Federal government agencies (EPA, OSHA, MSHA, CPSC, NIOSH, NIST, NIH, CDC, ATSDR, USGS)
- State and local government agencies involved with asbestos
- Professional associations (EIA, ASTM, AIHA, NIBS, BOMA, NCSL)
- Current asbestos product manufacturers (AIA)
- Mining and mineral processing companies and/or associations
- Representatives of organized labor
- Other groups or individuals having special expertise in the specific recommended proposed solution

**Appendix E:** *Asbestos Strategies* **Stakeholder Interview Findings Outline**

**Purpose**
The purpose of this document is to summarize as fairly as possible the primary comments emerging from a series of one-on-one discussions with key public and private stakeholders with an interest and expertise in asbestos policy and related issues. These findings provided data points to guide the development of the agenda for the *Asbestos Strategies* focus group meeting.

**Summary of Findings**
In general, the findings are as follows:
- Regulatory approaches across agencies need to be more consistent.
- Communication and cooperation will be important:
    1. Within federal agencies;
    2. Among different federal agencies;
    3. Between federal and state agencies; and,
    4. Between the public and private sectors.
- Setting guidelines, definitions, and standards is most appropriately done at the federal level; enforcement and cleanup may be done at the federal or state level; education and outreach can be a joint project of federal, state, and NGO's. Respondents had different opinions as to precisely how these tasks would be broken down.
- Education is a critical need. The federal government is seen as the best source for information on health risks. Uninformed actions in response to a perceived risk (e.g., ripping out in-place asbestos) may have a greater health risk as well as an economic cost; education can prevent this.
- Risk assessment and cost-benefit analysis are important components of a federal strategy. Health risks from asbestos need to be considered at the population level and in the context of other health risks. The risk of alternatives needs to be considered and the potential benefits from using asbestos, if any, need to be weighed.
- Formally approved analytical methods for asbestos are important and will provide a sound scientific basis for further action.
- Some respondents suggested that different forms of asbestos have varying levels of health risks. Others suggested that minerals and materials not classified as asbestos may have similar risks. It may or may not be useful to develop different standards for different materials, but this is an issue worth considering. The definition of asbestos may need some adjustment.
- Voluntary programs may or may not be effective. The NAIMA/OSHA agreement is seen by some as a good example of such a program.
- Among the scientific community, there is a need for better cross-discipline communication.

**Background**
Asbestos is a major issue in environmental policy, as various federal and state agencies and private sector organizations grapple with continuing public health concerns, such as the legacy of the Libby, Montana vermiculite mine, possible asbestos risks from the World Trade Center collapse and other related issues. Under the Clean Air Act and Toxics Substance Control Act,

the U.S. Environmental Protection Agency (EPA) has certain oversight responsibilities over the manufacture, management and use of asbestos to address such public health concerns. The Occupational Safety and Health Administration (OSHA) also has oversight authority relating to the estimated 1.3 million employees in construction and general industry who face significant asbestos exposure on the job.

The Global Environment & Technology Foundation (GETF) – a 501(c)(3) not-for-profit organization with a proven track record in stakeholder facilitation – is engaging interested parties to compile innovative approaches, best management practices, and lessons learned relevant to the use and management asbestos. This process will facilitate a coordinated approach among federal agencies, other policy leaders and private sector organizations based on input from key stakeholders. The GETF team will develop a series of initial recommendations and options provided by the focus groups and other stakeholder input.

**Objectives**
This process is designed to take stock of the recent experience with potential solutions and options regarding the continued and future use of asbestos. Therefore, the objectives are to:
- Offer recommendations and options on effective asbestos oversight, outreach and education approaches; and,
- Provide an opportunity for key stakeholders to share their knowledge on barriers, incentives, lessons learned, and best practices as they relate to asbestos use and management.

In achieving these objectives, GETF will:
- Bring diverse stakeholders together around a common environmental objective;
- Showcase solutions; and,
- Facilitate a dialogue to discuss policy and regulatory issues and the need to communicate about stakeholder responsibilities and what roles solutions play in improving the current policy environment.

**The Interview Process**
GETF conducted interviews with key stakeholders and experts over a period of two months. These interviews were designed to provide GETF with information on the current needs in asbestos policy, to identify important issues to address in the focus groups, to identify areas for further research, and to direct GETF to additional contacts.

GETF followed the interviews with invitations to participate in the dialogue process. For those that could not participate at the meeting in Washington DC, GETF welcomed participation through the web site.

## Methodology

GETF employed an interview template, tailored to the expertise of the interview subject. This provided consistency in answers and highlighted important points. The questions were:

1. What is the history of your or organization's involvement with asbestos?
2. Have you been involved with asbestos oversight, outreach and education? If yes, who provided the oversight, outreach and education?
3. What role do you think federal and state agencies and private sector organizations ought to play with oversight, outreach and education?
    a. Do you think the federal government should develop a targeted strategy for asbestos oversight, outreach and education?
    b. What should the elements of the strategy include (e.g., policy, legislation, voluntary programs, alternatives to asbestos use, partnerships, incentives, new regulation, new or improved opportunities for information exchange on asbestos issues)?
    c. Of these ideas, if given limited resources, where should federal and state agencies and private organizations invest their resources in oversight, outreach and education? Why?
    d. What obstacles do you think federal and state agencies or private sector organizations would find in implementing these suggestions?
    e. Are there issues we should be aware of regarding the current or potential actions for oversight, outreach and education?
4. Do you have any examples of successful asbestos approaches, technologies, management, lessons learned, substitutes, oversight, outreach and education efforts or programs?
5. Who else should be interviewed? Who is a resource?
6. Who ought to be at the focus group meetings for direct dialogue and discussion on asbestos use, policies, education and outreach?
    a. Who should be invited to the *cross-sector issues meeting* that will convene a senior level advisory group from all the identified sectors (e.g., manufacturers, associations, users, federal, state and local government, etc.)? The purpose of this group is to help identify who ought to be invited to subsequent meetings and to promote the outcome of the process.
    b. Who should be invited to the meeting on *products in commerce* (e.g., representatives of asbestos products manufacturing, distribution and importation communities such as roofing and insulation manufacturers, brake manufacturers, etc.)?
    c. Who should be invited to the meeting on *products in use,* including stakeholders who currently use asbestos-containing products (e.g., truck manufacturers, nurseries) and those with a legacy of asbestos use (e.g., schools, construction and commercial building community and others)?
7. What suggestions do you have to make this process a success?

**Findings from the Interviews**

*Industry*
Individual businesses were generally reluctant to participate. In many cases, their lawyers advised them not to participate in interviews or meetings due to ongoing litigation. Trade associations were more likely to participate in interviews and some were willing to participate in meetings. Some businesses were willing to recommend academic experts for us to contact; in some cases, the research work of these experts may be financially supported by a business or trade association. Industry frequently cited a need for consistency of regulations, risk assessment, cost-benefit analysis, and a consistent mineralogical definition of asbestos. Developing and communicating accurate scientific information was seen as a key federal role.

Businesses are, of course, concerned with asbestos liability. One concern expressed was the extent to which asbestos liability rested with the retailers of asbestos-containing products and how much with the manufacturers. Conflicting accounts dispute the use of asbestos in brakes (whether new or remanufactured) and the health impacts on mechanics.

*Academic, medical, and research*
Academic experts were very willing to contribute to this process and some were able to attend the meeting. These experts have specific areas of focus on which they are extremely well-informed. Some suggested developing a more specific mineralogical definition of asbestos, while others suggested expanding the focus to include all fibers with similar properties. Some suggested developing different exposure standards for different forms of asbestos, and some believed that is not important. Some of these experts focused on risk assessment and considered that to be a priority area. Some experts focused on naturally occurring asbestos and considered this to be a priority area. Epidemiologists, toxicologists, geologists, and microscopists were all seen as important categories of academic experts to contact.

One academic expert did not consider there to be a significant health risk from asbestos anymore; in this expert's opinion, asbestos was no longer used in products (so replacements were not a need), naturally occurring asbestos would be avoided by miners, and adequate regulatory mechanisms were already in place.

*Federal and state agencies*
Representatives from federal and state agencies were willing to contribute to the process, but in many cases were not be able to attend the meeting due to lack of funding. These contacts expressed a range of views on past and current EPA activities regarding asbestos. Most agreed on the need for a consistent federal policy and that EPA needs to be a partner with the states during implementation. Each state had very different approaches to addressing the asbestos issue and cited a range of possible best practices, including Maine's "One-Stop" system or Wisconsin's outreach to the fire department and building industries. Education/outreach and monitoring were seen as key needs, in particular with regard to appropriately managing in place. Funding is a major barrier to further state action.

**Appendix F:** Meeting Summary – October 10, 2002, Washington, DC

**Purpose and Direction of This Process**
The Global Environment & Technology Foundation (GETF) convened a cross-sector focus group to discuss innovative approaches, technologies, best management practices, lessons learned and substitutes associated with the use of asbestos. The focus group brought together interested parties from federal and state regulatory agencies, industry, trade associations, unions and other key private sector organizations.

The meeting opened with a review of the background, purpose, and direction of this dialogue process. GETF emphasized that the goal of this meeting was to understand views and identify priorities today, not reach consensus or make definitive recommendations. GETF conveyed a desire to ensure that all views are heard. Additional interviews with key stakeholders, small meetings of key stakeholders or additional focus groups (of this group or a subset of this group) were identified as possible next steps.

GETF will be collecting and working with various stakeholders to develop the draft findings/recommendations document. When complete, this document will take stock of the recent experience with potential solutions and options regarding the continued and future use of asbestos. The report will develop a sense of issues potentially warranting further analysis and will be based primarily on stakeholder input. Specifically, the report will:
- Offer recommendations and options on effective asbestos oversight, outreach and education approaches;
- Provide an overview on barriers, lessons learned, incentives, and best practices as they relate to asbestos use and management;
- Develop for policymakers views regarding information gaps to help them determine where further analysis would add value; and,
- Offer examples of innovative approaches, best management practices, and lessons learned for asbestos-containing products currently sold and existing products in use that contain asbestos.

The report will be drafted by the end of February, and all stakeholders who participated in this process will have an opportunity to review the report. All issues brought forward by stakeholders through the *Asbestos Strategies* process will be noted and included as part of the final report.

*Comments on the Dialogue Process*

Concern was expressed that the dialogue on asbestos is often affected by an emotional perception of asbestos risk and by gaps in accessible and reliable information. A number of participants suggested that regulation be based on quantified risk.

Participants noted that, while it is generally good to foster discussion and get more information, such processes are often used to prevent moving forward. Some participants expressed concern over revisiting and undermining issues that have been settled.

Many participants expressed interest in hearing about the innovative approaches used by other agencies, whether federal or state.

**Discussion of the Issues**
Based upon a number of interviews and other research, the team identified categories of current issues relevant to asbestos management. Set forth below are the categories and issues addressed by the focus group.

*Abatement, Management, and Response Actions*

The following were the key issues discussed during the focus group related to asbestos response alternatives:

- Participants discussed several options for the title of this category. "Abatement" was seen to be often interpreted as meaning "removal" in exclusion of other options. "Hazard control" includes both removal and also management in place, and "response alternatives" is also an inclusive term.
- Participants expressed the opinion that, although management in place is often seen as the safer and cheaper alternative, this is not necessarily true due to the costs of operations and maintenance over a building's lifetime including demolition and the hazards presented by demolition. It was suggested that, in some situations, management in place may be the more costly alternative. Participants suggested that in each case facility owners should have information regarding the economics of a good oversight and management program.
- It was noted that the Asbestos Hazard Emergency Response Act (AHERA) spells out the required actions for schools, but that more flexibility exists when managing asbestos in other buildings. Building owners have flexibility in how they choose to manage asbestos in non-school buildings as long as they comply with the National Emissions Standards for Hazardous Air Pollutants (NESHAP), the regulations of the Occupational Safety and Health Administration (OSHA), state and/or local regulations, and the accreditation provisions of the Asbestos School Hazard Abatement Reauthorization Act (ASHARA). Participants explained that since no agency has the money to treat every building as a school, they focus on the hazards. Participants also suggested that the management approach embodied by AHERA is inadequate for many facilities such as industrial plants. For non-school buildings, it is important and possible to employ risk assessment that is more cost-effective than AHERA, focusing on hazards. There was some disagreement on this, since AHERA only requires sampling to determine that a material is *not* asbestos.
- It was noted that, in a prior lawsuit, regulations were sought to extend the inspection requirement to public and commercial workplaces, and a series of cross-sector policy dialogue meetings took place. Participants noted that a settlement was reached, and new regulations enacted, but that enforcing these regulations remains an area of concern. [Clarification: the policy dialogue meetings did not produce an agreement. The settlement between the plaintiffs and EPA was addressed through OSHA rulemaking. The new rule promulgated was that, although inspections would not be required for every workplace, there would be a presumption that certain categories of surfacing material, thermal insulation and flooring material are presumed to contain

asbestos and must be handled as such, unless the employer conducts a bulk sample to determine that the material does not contain asbestos. This was included in the 1994 updates to the OSHA construction and general industry standards. Some time later, the same provision was extended to public-sector workplaces by inclusion in the EPA Worker Protection rule.]

- It was suggested that, to prevent the disturbing of asbestos in place, the U.S. Environmental Protection Agency (EPA) and OSHA should require labeling every instance of in-place asbestos. Participants asked if this was already an OSHA requirement. Others suggest that in part, it is, but is not enforced. [Clarification: OSHA currently requires all asbestos-containing materials, or certain materials presumed to contain asbestos to be labeled, if feasible; in some applications, labeling is not considered to be feasible.]
- Participants expressed concern that public agencies are constrained by the legal obligation to accept low bids and even commercial owners find it difficult to justify placing quality above cost.

*Asbestos in Products*

The following were the key issues discussed during the focus group related to asbestos in products:

- Participants expressed concern that EPA and OSHA do not provide sufficiently clear and accessible information about what kinds of building materials and other products may contain asbestos. Some participants noted that a significant number of products in the marketplace still contain asbestos and may not adequately disclose that fact. Other participants disagreed with this statement. The question was raised whether any agency has reliable information on where asbestos exists in commerce and how one could define which products are hazards. In response to this, participants noted that there had been some work at EPA in tracking the usage of asbestos-containing materials (ACM), but that this effort had been largely abandoned as its findings were not replicated elsewhere.
- Questions were raised about what is an appropriate threshold for "asbestos-containing material" and what that threshold means in terms of corresponding risk. Several participants asked if the 1% limit was reasonable. It was noted that products that contain less than 1% asbestos can still create a significant airborne exposure hazard.
- Some participants disputed the statement that asbestos is no longer used in consumer products. It was claimed that asbestos is still used in products, which may be mislabeled or misleading. A need for more information was identified, and it was suggested that the information should be made public regarding which products contain asbestos.
- Participants asked whether any federal agency had direct jurisdiction over the monitoring of asbestos in products, and if asbestos-containing materials are being imported.
- It was suggested that workers and members of the public are unknowingly buying products that contain asbestos. The question was raised, how can workers safely deal with the product if they don't know it contains asbestos? There was some discussion about whether a threshold level of asbestos content can or should be set.

- Several participants suggested that the North American Free Trade Agreement (NAFTA) is part of the reason that asbestos-containing products are coming back into the United States, due to the provisions by which industries can file suit against environmental regulations and laws that they feel are unreasonable restrictions on free trade. Other participants suggested that products are not being reintroduced, but simply never were removed from the U.S. market in the first place.
- The use of "chrysotile" on labels was identified as an example of misleading or inadequate labeling, since most consumers don't know that chrysotile is a form of asbestos. There seemed to be broad support for more clarity on labels.
- The U.S. Consumer Product Safety Commission (CPSC) was identified as having responsibility for enforcement of labeling requirements for certain asbestos-containing products. It was noted that CPSC has a list of banned products and works with the U.S. Customs Service [now the Bureau of Customs and Border Protection] to control imports of hazardous products.
- It was noted that some uses of asbestos have been banned and that others have not. Statistics cited indicate that even the legal uses are declining, down to 9000 tons (down from 800,000 tons). Of that, 90% is roof coatings, brakes (for another 2 years), and gaskets (primarily for petrochemical industry).
- Some participants suggested that the "unintentional" products (those to which asbestos has not been added by design) should be considered a separate class from the "intentional" products and that to lump those products in with traditional asbestos-containing materials is probably not appropriate.
- Some participants questioned if, given the decline in the use of asbestos in domestically-manufactured products, EPA should revisit the ban. This would have a tremendous positive economic impact since the NESHAP rule could be changed: if asbestos were banned, it was said, agencies and private building owners could be more certain that new buildings would not have ACM, and could save money on inspections for asbestos.

*Education, Outreach, and Oversight*

The following were the key issues discussed during the focus group related to education, outreach, and oversight:

- Many participants agreed that one goal of this process should be to provide immediate advice for EPA on how to use their limited resources regarding education, outreach, and oversight.
- It was noted that workers who renovate, repair or demolish buildings are not given proper training, and that owners, contractors and workers need education. Several participants also noted that some of these workers are immigrants, and education/outreach is needed to inform the workers of their rights. Participants stressed the need for this education as well as product labels to be available in the native languages of immigrant workers.
- Comments indicated that the Environmental Information Association (EIA) has conducted a cooperative effort among the agencies, educators, and regulated community over the past seven years. This process, including ongoing seminars, has kept a lot of owners out of trouble and regulators in compliance. It was suggested

that EPA can support efforts like this – not necessarily through funding, as the abatement contractors benefit enough that they are willing to support it – but through participation. EIA has employed this process through local partners in Florida, New Mexico, Utah and Arizona.

- Participants observed that training fraud is an issue, especially worker training fraud. Solutions suggested included more prosecutions and more training record audits.
- Insurance companies and lending agencies were identified as key stakeholders able to influence the behavior of building owners. Compliance with existing regulations could be encouraged through a cooperative agreement with insurers and lenders.
- Most participants agreed that the existing guidance material needs to be updated by EPA, since the most recent guidance material is now over 12 years old.

*Enforcement and State Actions*

The following were the key issues discussed during the focus group related to needed state actions:

- It was stressed that every state has NESHAP-designated agencies. Participants suggested that U.S. EPA ought to support those agencies in oversight and enforcement of AHERA and the Model Accreditation Plan (MAP). [Clarification: States can apply for authority over AHERA and MAP, and if they do not, these programs are enforced by federal agencies. So far, 39 states have MAP authority and 9 have AHERA authority. Authority over these programs is not usually vested in the NESHAP-designated agency. The comment was directed at including AHERA and MAP authority under the NESHAP agency and not under a separate agency.]
- It was noted that NESHAP neither establishes a numerical risk threshold nor sets a specific air standard. NESHAP deals with work practices and how abatement is actually done. Participants identified the need for inspections, enforcement, outreach, and communication, as well as for adequate workers doing an adequate job. [Clarification: NESHAP does require "no visible emissions" during building demolition and renovation operations. A risk assessment was performed before the standard was promulgated, and during the various revisions. Since the standard is promulgated under the authority of the Clean Air Act and the Toxic Substances Control Act there must be a showing of significant risk, and the agency is permitted to regulate both the outside air (no visible emissions) and work practices (wet methods, etc.).]
- It was suggested that owners have to take more responsibility over who they hire, and that owners need incentive to support oversight. It was suggested that EPA and/or the states should start taking NESHAP enforcement actions against building owners, to encourage building owners to be more involved in the demolition and renovation process. To date, it has been EPA's policy to take action only against contractors.
- Some participants expressed the view that NESHAP rules are relatively well-designed and effective, but they are not enforced at a federal or state level. The EIA effort described above is aimed at encouraging compliance with NESHAP, and aiding enforcement. Participants noted that some areas of the NESHAP rules still need modification. Rules regarding demolition were seen as one example of an area for improvement.

- Inadequate or questionable enforcement of existing training rules was identified as an area of concern, with increased enforcement as a possible solution.
- Participants discussed innovative approaches in various states and regions:
  - o It was noted that, in the Southwest, the Environmental Information Association has served as a platform that is independent of the regulating community and regulated community. In this 7-year cooperative effort among the agencies, educators, and the regulated community, ongoing seminars and education efforts have worked to keep facility owners, contractors, and state regulators in compliance with federal requirements. This effort is funded by local asbestos abatement contractors.
  - o Participants spoke positively of the NESHAP program in Michigan. This program provides outreach, oversight, and education, and is entirely funded by a 1% surcharge on asbestos removal fees.
  - o Participants also cited the NESHAP program in Wisconsin as a positive case. It was noted that, in the last five years, fire departments were not complying with the requirements regarding asbestos. The NESHAP agency explained the rule to them and held statewide meetings on asbestos, bringing in the contractors, building inspectors, fire departments, and others. The result has been an increase in notifications of asbestos hazards.

*Federal Actions*

The following were the key issues discussed during the focus group related to needed federal actions:

- Aggressive enforcement of existing laws and regulations was seen as important. This was highlighted as one of the most important issues for worker protection.
- Voluntary consensus standards were seen as an effective complement to regulation.
- Some participants advocated filling definitional and other gaps in existing regulations. This would involve clarifying the definition sections of NESHAP, AHERA, OSHA, according to already published letters of intent. Others cautioned against "clarifying" the regulations in such a way as to weaken them.
- Concern was expressed over the fact that OSHA was not present at the meeting. It was clarified that OSHA had participated in earlier interviews. Their absence was still noted as significant, and there was strong support for federal initiatives to visibly demonstrate coordination across all relevant agencies.
- The question was raised as to whether or not the various federal agencies should employ different standards since they regulate different environments (i.e., mines, workplaces, schools).
- It was also noted that resources are very limited and must be focused on activities offering the greatest public benefit.
- Education and outreach is seen by most participants as lacking, although most believe this is where federal agencies can get the most "bang for the buck."

*Forms of Asbestos and Definitional Issues*

The following were the key issues discussed during the focus group related to the forms of asbestos:

- Participants discussed whether or not it was appropriate to treat the various forms of asbestos differently due to the varying levels of health risks posed. Some suggested that the best solution may be to do nothing – creating several sets of standards might not be worth the cost and complication. Others recommended further research into the toxicity of different forms and of different fiber shapes within each mineral type.
- It was asked if there should be a more inclusive definition of hazardous durable fibers. Concerns were again raised about whether change would exacerbate rather than reduce confusion. This was countered by the comment that the durable fibers involved in the Libby situation were arguably not covered by existing official definitions of asbestos.

*Medical Issues*

The following were the key discussion points during the focus group related to medical issues:

- Participants supported the idea that early recognition of illness is a problem that must continue to be addressed. A need was seen to be able to assess the disease both in individuals and in populations.
- It was noted that the medical community does not always know if they can achieve early detection of mesothelioma or asbestosis with Computerized Axial Tomography (CAT) scans. Needs were identified for determining if early detections can be achieved, if there are effective medical options such that early detection can benefit the workers, and if early detection leads to workplace interventions. Needs were also seen for conducting more epidemiological studies, and developing a better medical monitoring program, including clarification of mesothelioma in International Classification of Diseases (ICD) codes. A clearinghouse for medical information was suggested, possibly a mesothelioma registry as exists in other countries.
- It was recommended that OSHA should require a licensed physician certified in occupational disability medicine to sign off on the workers' physicals.

*Naturally Occurring and Contaminant Asbestos*

The following were the key issues discussed during the focus group related to naturally occurring and contaminant asbestos:

- Participants generally agreed that current regulations do not sufficiently address most of the asbestos present in Libby, Montana. This was seen as a matter of definitions or semantics – comments indicated that the minerals present in Libby are closely related to regulated forms of asbestos (tremolite).
- It was stated that a range of unresolved issues exist with naturally occurring asbestos or asbestos as a contaminant in other mineral products. For example, it is not possible to manage 20% of the state of California because it has naturally occurring asbestos – another approach is needed. The question was raised if there were examples of the issue being successfully addressed. Some said that there is no

mechanism to handle naturally occurring asbestos in large geographic areas; others noted that California has in fact addressed this, but some did not feel the solution in that case was a good model to replicate. The California approach needs further evaluation.

- Many participants agreed that asbestos in building materials should not be the sole focus of this process.
- It was noted that mineral industries such as the vermiculite industry often include many small companies. These companies are affected by the perception that their output contains asbestos, and are in the difficult and costly position of trying to prove a negative. Further, it was noted that the vermiculite industry would look for some level of certainty as to how agencies or legislation will ultimately require assessment and control of the presence of fibrous structures. Participants noted that there are six types of federally-regulated asbestos; beyond these, they noted, many other substances can be present in a mineral ore, and the level of risk from those other structures is not quantified. A need for more data on this was recognized, as the unknowns have a profound economic effect on the whole minerals industry.
- Participants asked if it would be possible and reasonable to expand the list of materials that are assumed to be non-asbestos-containing. A question exists regarding the cost of obtaining the evidence to support such an expansion and whether the reported problems created by the status quo justify those costs.
- It was stated that existing methods were developed for commercial asbestos products, and that agencies do not really have adequate methods to analyze naturally occurring asbestos. Naturally occurring asbestos was cited as being harder to manage, as it is in soils or large-scale areas. More information was seen as necessary to understand the hazards and what kind of response is indicated.
- Participants noted that secondary exposure (e.g., clothing taken home) and dust from uncontrolled demolitions remain other possible pathways for asbestos exposure.
- Participants were interested in the assertion that asbestos as a contaminant is not a problem because mining companies will avoid asbestos deposits. This was seen as positive if it signals a willingness to consciously and diligently avoid asbestos deposits.

### Risk Assessment and Analysis

The following were the key issues discussed during the focus group related to risk assessment:

- Participants suggested that risk is a factor not only of fiber type (whether it is classified as one of the six or another mineral) but also of fiber shape, size, and solubility.
- Some commented that the presence of asbestos cannot be eliminated and that it is necessary to identify some level of acceptable risk. Other participants questioned the feasibility of doing this.
- Other participants expressed the view that the risk of asbestos can be entirely eliminated, by substitution of new materials or completing the ban on asbestos.
- There was considerable discussion as to whether we should consider the actual exposure (based upon fiber count in the air) or the potential risk (based on the

condition of the material and asbestos content of the material). This appears to be a fundamental question to be addressed.

- Participants suggested that if there is a potential for exposure, it is important to deal with this issue before it becomes an airborne measurable amount and presents an actual risk, but others noted that asbestos content within a material does not necessarily correspond to asbestos exposure.
- Participants noted that risk assessment presupposes that we have good data, and questioned if this is a valid assumption. To aid in the discussion, GETF asked if there are important uncertainties that should still be addressed.
- It was noted that background levels of asbestos exist, and Japanese studies were cited for more information. Therefore, there has to be an unreasonable risk level established in order for us to take action. It was noted that we cannot have an "everything is asbestos" definition, nor can we have a "one particle is too many" standard.
- Participants explained that risk assessment can be conducted in terms of health risk; or rate of exposure; or hazard assessment; or the rate of disease among exposed individuals.
- Some saw the public as generally unable to judge risk accurately, and advocated increased education about what the risk is in cases where there is potential asbestos exposure.
- The question was raised as to what should be said regarding risk when scientific certainty is lacking. In particular, the obligation of federal agencies was questioned. Participants noted that resolving this question should be considered a long-term goal, but that thinking about it should shape our decisions.
- Participants questioned the need for determining precise risk relationships. The opinion was expressed that if we had more accurate data and could determine exactly what level of exposure was associated with what risk, better decisions could be made related to risk management. Several participants, however, cautioned that given that people are still being exposed to asbestos, it is irrelevant to try to figure out exactly what the safe level is.
- One question raised that may require some discussion is "What mineralogical characteristics are associated with risk?"
- Some indicated that there may be merit in convening a neutral panel of scientific experts simply to review the state of the science on asbestos risk and identify priority issues for further analysis.

*Techniques for Fiber Counting and Identification*

The following were the key issues discussed during the focus group related to various analytical techniques:

- There was considerable discussion over the proper analytical techniques to use – Phase Contrast Microscopy (PCM) and Transmission Electron Microscopy (TEM) will give different results in fiber counts. [Clarification: With the Proficiency Analytical Testing Program and the Asbestos Analysts' Registry this source of variation can be estimated for PCM; and the NIST National Voluntary Laboratory

Accreditation Program (NVLAP) provides information regarding inter-laboratory variability as well.]

- Participants generally accepted that the quality of the analysis varies considerably from lab to lab, according to the skills of the analyst.
- It was noted that different methods may be applied for examination of bulk materials versus examination of air samples.
- Participants noted that different federal agencies employ different fiber counting criteria.
- Participants suggested that agencies may want to require PLM point counting in some circumstances. Participants recommended examining where point counting is required and where it might be used. [Clarification: The EPA NESHAP regulations require point counting for materials where asbestos is detected at a level of less than ten percent. In practice, point counting is done for materials where asbestos is detected, but less than one percent. For most materials where asbestos is detected at greater than one percent, but less than ten percent, building owners accept the material as ACM and treat it accordingly.]

**Appendix G: Nations with Existing or Pending Bans on Asbestos**[77]

1. Argentina (2001)
2. Australia (2003)
3. Austria (1990)
4. Belgium (1998)
5. Chile (2001)
6. Croatia (2005)
7. Czech Republic (prior to 2001)
8. Denmark (1986)
9. European Union (Amphiboles banned; limited exceptions for chrysotile, but these do not include mastics, sealants, joint compounds, or mortars. Member states must implement this ban by 2005.)
10. Finland (1993)
11. France (1996)
12. Germany (1993)
13. Greece (2005)
14. Hungary (2005)
15. Iceland (1983)
16. Ireland (2000)
17. Italy (1992)
18. Latvia (2001)
19. Luxembourg (2002)
20. Netherlands (1991)
21. New Zealand (timeframe unknown)
22. Norway (1984)
23. Poland (1997)
24. Portugal (2005)
25. Saudi Arabia (1998)
26. Slovak Republic (2002)
27. Slovenia (prior to 2001)
28. Spain (2002)
29. Sweden (1986)
30. Switzerland (1989)
31. United Kingdom (1999)

Most of the above nations outlined exemptions for specific uses (such as defense-related applications). Some applied sunset provisions to these exemptions. Some countries have had earlier bans on amphiboles, and are now expanding the bans to include chrysotile. All European Union countries will ban asbestos by 2005.

---

[77] Most data from Laurie Kazan-Allen, International Ban Asbestos Secretariat page at http://www.ibas.btinternet.co.uk/Frames/f_asbestos_ban_list.htm.

**Appendix H: Glossary**[78]

**ACGIH** – American Conference of Governmental Industrial Hygienists. ACGIH is a not-for-profit organization of industrial hygienists that publishes Threshold Limit Values for asbestos and other chemical and physical agents.

**ACM** – asbestos-containing materials.

**Actinolite** – one of five forms of amphibole asbestos specifically named and regulated by the EPA and OSHA.

**AHERA** – Asbestos Hazard Emergency Response Act of 1986. The stipulations and impact of this Act are discussed in Appendix B.

**AIA** – Asbestos Information Association. This group was founded in 1970 to represent the interests of the chrysotile asbestos industry in the U.S.

**AIHA** – American Industrial Hygiene Association. AIHA is the trade association of industrial hygienists. Members work to reduce exposure to hazards in workplaces.

**Amosite** – one of five forms of amphibole asbestos specifically names and regulated by the EPA and OSHA. It occurs in certain mining districts of southern Africa as the asbestiform variety of cummingtonite-grunerite.

**Amphibole** (asbestos) – one of the two categories of asbestos that includes the EPA and OSHA regulated forms of asbestos known as actinolite, amosite, anthophyllite, crocidolite, and tremolite. The other category of asbestos is the serpentine variety, known as chrysotile.

**Anthophyllite** – one of five forms of amphibole asbestos specifically named and regulated by the EPA and OSHA. Major deposits of anthophyllite are located in Finland. It was once commercially exploited from mines in northern Georgia in the United States.

**Arc chute** – a device used in some electrical switches to protect the switch from damage from electric arcs.

**Asbestos** – mineralogical definition[79]: Asbestos is defined as a group of highly fibrous silicate minerals that readily separate into long, thin, strong fibers that have sufficient flexibility to be woven, are heat resistant and chemically inert, are electrical insulators, and therefore are suitable for uses where incombustible, non-conducting, or chemically resistant material is required.

---

[78] The U.S. Geological Survey has compiled an extensive list of definitions of asbestos-related terms from a variety of sources: Lowers, H., and Meeker, G., *Tabulation of Asbestos-Related Terminology*, Open-File Report 02-458, online at http://pubs.usgs.gov/of/2002/ofr-02-458/OFR-02-458-508.pdf.

[79] Veblen, D.R. and Wylie, A.G., 1993, *Mineralogy of amphiboles and 1:1 layer silicates* in Guthrie Jr., G.D. and Mossman, B.T., eds., *Health effects of mineral dusts: Reviews in Mineralogy*, v. 28, p. 61-137. Cited by Lowers and Meeker in *Tabulation of Asbestos-Related Terminology*, op. cit.

**Asbestos** – regulatory definition[80]: Asbestos means the asbestiform varieties of: Chrysotile (serpentine); crocidolite (riebeckite); amosite (cummingtonite-grunerite); anthophyllite; tremolite; and actinolite.

**Asbestiform** – a term used to describe certain minerals that have grown in a fibrous habit.

**Asbestos abatement** – procedures to control fiber release from asbestos-containing materials or to remove it entirely. These procedures may involve removal, encapsulation, enclosure, encasement, repair, and operations and maintenance programs.

**Asbestos-containing material** (ACM) – any material that contains more than one percent asbestos.

**Asbestos diaphragm** – a device containing asbestos used in chlorine manufacturing to separate chloride from sodium in salt water to produce chlorine.

**ASHAA** – Asbestos School Hazard Abatement Act of 1984.

**ASHARA** – Asbestos School Hazard Abatement Reauthorization Act of 1990.

**ASTM** – American Society of Testing and Materials. Founded in 1898, ASTM International is a not-for-profit organization that provides a global forum for the development and publication of voluntary consensus standards for materials, products, systems, and services.

**Asbestosis** – A disease caused by inhalation exposure to asbestos resulting in scarring of the lung tissue.

**ATSDR** – Agency for Toxic Substances and Disease Registry, part of the Centers for Disease Control within the U.S. Department of Health and Human Services.

**Blue Book** – a guidance document issued by the EPA in 1983 titled, *Guidance for Controlling Friable Asbestos-Containing Materials in Buildings*, EPA publication no. 560/5-83-002, having a blue cover.

**BOMA** – Building Owners and Managers Association. BOMA represents the owners and managers of nine billion square feet of North American office space.

**CDC** – Centers for Disease Control and Prevention, part of the U.S. Department of Health and Human Services.

**Chrysotile** – the serpentine form of asbestos.

**CPSC** – U.S. Consumer Product Safety Commission, an independent federal agency.

---

[80] Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools (7-1-01 Edition). Cited by Lowers and Meeker in Tabulation of Asbestos-Related Terminology, op. cit.

**Crocidolite** – one of five forms of amphibole asbestos specifically named and regulated by the EPA and OSHA.

**DOT** – U.S. Department of Transportation.

**EIA** – Environmental Information Association. EIA is a non-profit group specializing in the dissemination of information about the abatement of asbestos and lead-based paint, indoor air quality, safety and health issues, analytical issues, and environmental site assessments.

**EPA** – U.S. Environmental Protection Agency. Established in 1970, this federal agency has a mandate to protect human health and to safeguard the natural environment.

**FDA** – Food and Drug Administration, a division of the U.S. Department of Health and Human Services.

**FHSA** – the Federal Hazardous Substances Act. This Act requires the labeling of certain hazardous household products, and gives the Consumer Product Safety Commission the authority to ban hazardous substances in instances where labeling alone is not sufficient to protect the public health.

**Focus group** – research involving organized discussion with a selected group of individuals, having a common interest, to gain information about their views and experiences of a topic, such as asbestos.

**Friable** – a material which when dry may be crumbled, pulverized, or reduced to powder by hand pressure.

**Friction products** – a group of products that use friction to increase or decrease the speed of a moving part. Common friction products are brakes and clutches.

**Gasket** – a material used to form a seal between two immovable parts. Sheet gaskets are commonly used on pipe flanges. Rope gaskets are commonly used on oven doors.

**GETF** – Global Environment and Technology Foundation. GETF is a 503(c) (3) not-for-profit organization that brings together industry, government and communities to address environmental challenges with innovative solutions.

**Green Book** – a guidance document issued by the EPA in 1990 titled, *Managing Asbestos in Place: A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials*, EPA publication no. 20T-2003, having a green cover.

**HEI-AR** – Health Effects Institute – Asbestos Research. HEI-AR was an independent, nonprofit organization formed in 1990 to compile and disseminate reliable and objective information pertaining to the health effects of asbestos. The group completed its research in 1994.

**ICD** – International Classification of Diseases. The International Classification of Diseases is the classification used to code and classify mortality data from death certificates.

**MAC** – maximum acceptable concentration.

**MAP** – Model Accreditation Plan; training and testing requirements for persons that inspect, develop management plans, conduct, supervise, and design asbestos response actions found at Appendix C to the EPA AHERA regulations.

**Mesothelioma** (malignant) – a cancer of the mesothelium, a thin lining covering the major organs of the body. If it originates in the chest cavity, it is called pleural malignant mesothelioma. In the abdominal cavity it is known as peritoneal malignant mesothelioma.

**MSDS** – Material Safety Data Sheet. These documents provide information on the properties, storage, and handling requirements of chemicals. MSDS also detail the human health effects of hazardous chemicals.

**MSHA** – Mine Safety and Health Administration. An agency within the U.S. Department of Labor, MSHA oversees workplace safety and health within the mining industry.

**NAS** – National Academy of Sciences. Established in 1863, the National Academy of Science is a private non-profit institution that advises Congress on scientific issues.

**NCSL** – National Conference of State Legislatures.

**NESHAP** – National Emission Standard for Hazardous Air Pollutants; the EPA asbestos NESHAP is found at 40 CFR, Subpart M. The stipulations and impact of NESHAP requirements are discussed briefly in Appendix B.

**NIBS** – National Institute of Building Sciences. Established in 1974, NIBS is a non-profit, non-governmental organization. It focuses on bringing together the public and private sectors to address issues related to the development of safe, affordable buildings.

**NIOSH** – National Institute for Occupational Safety and Health. NIOSH is a division of the Centers for Disease Control, within the U.S. Department of Health and Human Services.

**NIST** – National Institute for Standards and Technology. NIST is an agency of the Technology Administration within the U.S. Department of Commerce.

**Nonfriable** – a material which when dry may not be crumbled, pulverized, or reduced to powder by hand pressure.

**O&M program** – operations and maintenance program. An O&M program is a set of procedures designed to reduce asbestos exposure to building workers and occupants in buildings with asbestos-containing materials.

**Orange Book** – a guidance document issued by the EPA in two parts in 1979 titled, *Asbestos-Containing Materials in School Buildings: A Guidance Document,* having an orange cover.

**OSHA** – Occupational Safety and Health Administration. Established in 1970 as a division of the U.S. Department of Labor, OSHA has a mandate to ensure workplace safety for over 100 million American workers.

**PACM** – presumed asbestos-containing material; in the OSHA asbestos standards it means thermal system insulation and surfacing material found in buildings constructed not later than 1980

**PCM** – phase-contrast microscopy; a type of microscopy that uses special illumination to enhance the ability to see fibers. It is a common method to count fibers collected on filter from the air.

**Peak exposures** – high intensity exposures to a substance, such as asbestos, that occur for brief periods.

**PEL** – permissible exposure limit.

**PLM** – polarized light microscopy; a type of microscopy often used to identify asbestos in a material.

**Prevalent level** – the typical concentration of a substance found in the air, water, soil, or other medium, although the concentration may be higher or lower than this level for brief periods of time.

**Purple book** – a guidance document issued by the EPA in 1985 titled, *Guidance for Controlling Asbestos-Containing Materials in Buildings*, EPA publication no. 560/5-85-024, having a purple cover.

**RACM** – regulated asbestos-containing material.

**Response action** – a method, including removal, encapsulation, enclosure, encasement, repair, and operations and maintenance activities that are designed to reduce asbestos exposure to building workers and occupants.

**Richterite** – a mineral having an asbestiform variety not listed specifically by EPA or OSHA as "asbestos."

**SEM** – scanning electron microscopy.

**Serpentine** – One of the two categories of asbestos. Chrysotile is the only recognized form of serpentine asbestos. The other category is amphibole asbestos.

**Stakeholder** – an individual or organization having a specific interest in a topic or issue.

**TEM** – transmission electron microscopy.

**Thermal system insulation** – material applied to pipes, fittings, boilers, breeching, tanks, ducts, or other facility components to prevent heat loss or gain, or water condensation, or for other purposes.

**TLV** – Threshold Limit Value.

**TSCA** – Toxic Substances Control Act. Enacted in 1976, this Act gives EPA the ability to track the 75,000 industrial chemicals currently produced or imported into the United States, including asbestos.

**TSI** – thermal system insulation.

**USGS** – United States Geological Survey. A bureau of the U.S. Department of the Interior, USGS provides geological information to the government and the public. USGS compiles statistics on the use of minerals, including asbestos, in commerce and industry.

**Vermiculite** – a magnesium silicate mineral (mica) occurring naturally in sheets that has been heated or chemically treated to expand to many times its original size.

**Appendix I:** Additional Opinions and Views

Numerous participants in the *Asbestos Strategies* process expressed views differing from the conclusions and recommendations reached by this process and presented in the report. These views are included here, as are a number of comments and recommendations supplemental to the recommendations in the report.

In order to foster dialogue, participants in the *Asbestos Strategies* process were informed that their comments would not be attributed. For this reason, the comments below are not attributed to individual participants or to the sectors they represent. Comments listed here reflect responses to the content of the report or otherwise correlate with the focus of the *Asbestos Strategies* process. Recommendations on issues such as litigation and tort reform are not included.

The *Asbestos Strategies* process offered every stakeholder an opportunity to provide comments regarding the content of the report. It was not possible to offer every stakeholder the opportunity to reply to the comments of other participants; doing so would have required allowing the original commenter the opportunity to defend his or her statement, etc. This Appendix, to the extent possible, limits comments to those addressing the body of the report itself.

## Action 1: Update the Existing Asbestos-in-Buildings Guidance Documents

- *Recommendation:* The U.S. Environmental Protection Agency (EPA) should update the "purple book" guidance document to make it the premier technical resource for managing asbestos in buildings and facilities, including industrial settings. The revised resource should include updated "green book" information, and should be consistent with current federal regulations and good practices that have evolved since its release in 1985. The resulting resource, in a form such as an online integrated database of all relevant documents, will facilitate compliance with existing regulations, reducing asbestos exposure among contractors working in buildings.
- *Comment:* Participants did not agree with the recommendation to update the guidance documents in the absence of identification of specific areas where the guidance documents are inadequate.
- *Comment:* Participants suggested that the needed areas of improvement are known, and that a project committee formed by the National Institute of Building Sciences (NIBS) could address this issue very well. Such a committee, it was suggested, should include members of the Environmental Information Association (EIA).
- *Comment:* While recognizing the need to balance the opinions from a wide range of affected constituents, participants expressed concern that revisions to the "Purple Book" could open the revised document up to current pressures to soften the requirements. Participants emphasized that the revised document must not allow the dilution of the expressed message to detect and control asbestos containing materials.

## Action 2: Encourage Compliance with Existing Regulations

- *Recommendation:* Regulatory agencies should encourage compliance with existing regulations and good practices for managing asbestos in buildings and conducting

response actions. This may be accomplished through a series of asbestos awareness seminars directed at the regulated community (building owners, contractors and consultants). The seminars should be sponsored by EPA and the Occupational Safety and Health Administration (OSHA), and hosted by the resident state asbestos authority. Joint sponsorship would be extremely valuable. Such seminars should be held in conjunction with national or regional meetings of professional/trade associations such as EIA to encourage participation by the target audience. Regulatory compliance will increase worker and building occupant safety, reduce asbestos exposure, and decrease costs associated with liability. This action should be undertaken in the context of a long-term effort to enforce existing regulations and improve consistency among agencies.

- **Comment:** Participants suggested that education, outreach, and voluntary compliance are not as useful as enforcement. These participants suggested that "voluntary" programs need consequences in order to be effective, and that more resources and emphasis be devoted to enforcement at the state and Federal level.
- **Comment:** Participants noted that to be effective, rather than just punitive, enhanced enforcement will still require education and outreach.
- **Comment:** Participants suggested that industry associations such as the International Facility Managers Association, Building Owners Management Association, and American Institute of Architects would be good partners for hosting or sponsoring outreach forums. Participants suggested that these forums would provide better results than forums sponsored and organized by Federal agencies.
- **Comment:** Participants suggested that the National Institute of Building Science (NIBS) would be the best organization to convene a forum. Participants noted that NIBS has excellent connections to the Building Owners and Managers Association (BOMA), American Institute of Architects (AIA), National Society of Professional Engineers (NSPE), and many other organizations related to the built environment, and also has an excellent staff skilled in such tasks.
- **Comment:** Participants expressed the opinion that a critical factor in encouraging compliance is to explain to the regulated community *why* the regulations are important.
- **Comment:** Participants noted that one successful approach involves designing seminars around the belief that regulated constituents could and would not comply with asbestos rules unless they knew the basic requirements and the reasons behind them.
- **Comment:** Participants suggested guidelines for seminars, including the following:
  - The seminar content and presentations must include state/local requirements and violation findings.
  - The seminar content and presentations must be balanced and convincing, but not radical.
  - The presenters must be effective lecturers. Many state and local regulators are not effective lecturers.
  - It can be effective to include seminar attendance, including multiple attendees per regulated constituent, as a part of enforcement settlements.
  - There must be benefits of attending, including the receiving of a useful training certificate.
  - The seminars must be short enough to be affordable in terms of total costs, but long enough to present the "what and why" content.

o There should be a small registration fee. Free is often perceived as having no or little value. Too high a fee is often perceived as being presented for the financial benefit of the involved organization.
o Requiring advanced registration is an impediment to attendance.
o Other regulated issues can be introduced at these seminars, such as Lead-Based Paint requirements.

## Action 3: Clarify the Asbestos Definition to Address Asbestos Contamination in Vermiculite and Other Minerals

- *Recommendation:* The Libby vermiculite situation should be considered an important lesson, but not be treated as a typical case. A federal process should be undertaken promptly to clarify the definition of "asbestos." Many parties recommend that the definition should include all asbestiform amphiboles, in addition to currently regulated amphiboles and chrysotile. An evaluation by EPA, OSHA and the Mine Safety and Health Administration (MSHA) will be needed to determine procedurally how this should be accomplished, and what consequences such a clarification might have, if any, on other industries. This definition, if adopted, would enable federal agencies to address the risk of exposure from minerals such as winchite and richterite. The U.S. Geological Survey (USGS), trade associations, and other organizations will be able to serve as resources for clarifying and understanding the science associated with creating a new definition.
- *Comment:* Participants suggested expanding the definition of asbestos, not only to include winchite and richterite (the forms found at Libby) but also asbestiform incidences of minerals such as talc, mica, and taconite.
- *Comment:* Participants suggested that a more effective solution would be to regulate all amphibole asbestos and leave out the specific mineral names.
- *Comment:* Participants suggested that the definition of asbestos should be expanded to include more minerals, focusing on those that form longer and thinner fibers. Others suggested focusing on the range of hazardous durable fibers.
- *Comment:* Participants suggested that the definition of asbestos should be based on chemical properties and *not* expand to all fibers based on shape.
- *Comment:* Participants felt that the current definition is inaccurate, too broad and is not useful or protective of public health. These participants felt that a consistent mineralogical definition was needed.
- *Comment:* Participants suggested that, if the range of minerals addressed by asbestos regulations is to be expanded, refractory ceramic fibers (RCF) should be made a regulated material under similar regulations. This is connected to asbestos in that the hazards appear to be similar and RCF is often used as a substitute for asbestos (for example, in high-temperature insulation). Participants noted that this would require a literature review of RCF health effects data.
- *Comment:* Participants emphasized that lack of research should not be construed to suggest that a material is potentially safe.
- *Comment:* Participants expressed the opinion that it is not appropriate to use the term "asbestos free" or zero asbestos level. Because asbestos is ubiquitous in the air at low levels, it is a natural part of the background environment.

- *Comment:* Participants expressed concern that any regulation of asbestiform amphiboles take care to exclude non-asbestiform shapes such as cleavage fragments, scrolls, shards, and other forms.

## Action 4: Advance a Federal Legislative Ban on Asbestos

- *Recommendation:* A clearly defined legislative ban on the production, manufacture, distribution and importation of products with commercially-added asbestos is the most direct means to address concerns about remaining health risk and reduce future costs for facility owners and managers. Such a ban should be proposed by the Congress, promptly debated, and conclusively resolved. Enabling legislation would eliminate remaining products by a specified date, and installation of those products by a later date. Jurisdictional issues could be addressed in congressional legislation that might not be achievable by individual agency rule-makings. Exceptions may be necessary for a small number of applications for which substitutes may not be available, and for research purposes. Implementing regulations, and perhaps the enabling legislation itself, could be challenged in the courts.

  *Opposing a Ban*

- *Comment:* The original recommendation called for Congress to "consider a ban on asbestos." Participants expressed concern that this recommendation was not warranted and should be removed. These participants expressed similar concern over the revised recommendation, highlighting the negligible risk from asbestos in roofing compounds and suggesting that no asbestos-containing products are currently installed in buildings.
- *Comment:* Participants noted that, while some applications should be banned, an absolute ban would prohibit some applications for which the benefits outweigh the risks and for which there are no good substitutes. In such cases, a ban would not be protective of public health. Participants expressed concern that this recommendation was not based on a risk/benefit analysis for each remaining application and its substitutes.

  *Supporting the Proposal of a Ban*

- *Comment:* Participants noted that this recommendation should focus on a process that involves considering the evidence for and against a ban. While an overwhelming majority of participants supported a ban, and while a ban appeared to be feasible and to provide specific benefits, the *Asbestos Strategies* process did not conduct a thorough investigation of all the issues associated with enacting a ban.
- *Comment:* A large number of participants from a wide range of sectors expressed support for the final wording of the recommendation. Most of these participants support a ban on asbestos, but recognize the need for a deliberative process.

  *Supporting the Enactment of a Ban*

- *Comment:* Many participants expressed concern that the original recommendation to consider a ban on asbestos was too weak and that a recommendation to enact a ban was necessary and appropriate. Some of these supported the revision, while others felt that the final wording of the recommendation should have specifically advised the Congress to "conclusively resolve" the process by enacting a ban.

- **Comment:** Participants saw a ban on asbestos as feasible due to the dramatic decline of asbestos use in products and the success of asbestos bans in many other countries. It was seen as desirable due in part to the assurance it would provide to building owners and facility managers that new asbestos-containing materials would no longer be installed.
- **Comment:** Some participants suggested that this report be used to support the reintroduction of the Ban Asbestos in America Act.

### Declining to Support or Oppose

- **Comment:** Some stakeholders took no position on this recommendation, on the grounds that it is not their role to tell anyone they may or may not manufacture, sell or use a product.

### Asbestos in Place

- **Comment:** Of those advocating a ban, none suggested that such a ban should require the removal of all in-place asbestos.
- **Comment:** Some recommended that a ban *not* require the removal of in-place asbestos-containing materials beyond the removal requirements already in current rules and regulations. The purpose of this is to ensure that the ban focuses on production, manufacture, distribution and importation of asbestos; while future removal requirements are possible, such regulations should be made explicitly for that purpose.

### Practicality of Implementation

- **Comment:** Participants noted that a ban would probably take many years (possibly 10-15) to draft, debate, finalize, and implement, and that it is likely to be tied up with litigation at the federal and international levels. These participants suggested that such a caution does not mean that a ban is not worthy of trying again, but rather that it is important to anticipate the nature and extent of problems that will likely be encountered. Other participants expressed the opinion that a ban could take effect much sooner, suggesting that two years was a more accurate timeframe.
- **Comment:** Participants suggested that, if authorized through an Act of Congress, a ban would not likely be challenged in the courts since the only recourse would be to argue that it was unconstitutional. It was suggested that, using lessons learned from previous efforts such as the ban on polychlorinated biphenyls, a legislative ban could be drafted that would narrow the grounds for challenging EPA's implementing regulations.

### Addition of a Labeling Requirement

- **Comment:** Participants suggested that the recommendation for a ban should include a recommendation for a specific and enforced labeling requirement for all products containing one percent or more asbestos. The labeling requirement would rapidly lead to asbestos being taken out of most of the remaining materials which contain greater than one percent asbestos, even before the ban went into effect.
- **Comment:** Participants noted that labeling requirements for asbestos-containing materials already exist. The requirements referred to were: 1) any product that contains greater than 1% commercially-added asbestos is required to be labeled (with additional hazard warnings) that the product is an Asbestos Containing Material; and 2) if the product contains greater than 0.1% asbestos then it must be disclosed within the

Material Safety Data Sheet for the product that asbestos at this level exists or may exist.

*Naturally Occurring Asbestos versus Commercially-Added Asbestos*

- *Report:* The report provided separate recommendations to address asbestos as a contaminant in products. These focus on labeling requirements, clarification of the definition of asbestos, enforcement of existing regulations, and other processes to safeguard the public health against naturally-occurring asbestos in mineral products. A ban on commercially-added asbestos is suggested as one tool among many to address the inclusion of asbestos in the manufacture of products.

- *Comment:* Participants expressed the concern that prohibiting only commercially-added asbestos could allow the unintentional addition of enough asbestos fibers to yield a product containing more than one percent asbestos. There was concern that such a ban would allow the future occurrence of disasters such as Libby.

- *Comment:* Many participants suggested that the ban apply to products with naturally occurring asbestos, specifying a non-zero allowable maximum (that is, a level above which the ban takes effect and below which a product is considered to be asbestos-free). Specified levels suggested included .1%, .05%, and .01%. A wide range of alternative language was proposed.

- *Comment:* Participants noted that a blanket prohibition on "commercially-added asbestos" could be interpreted as a ban on the addition of any mineral products which contain a single fiber of asbestos.

- *Comment:* Participants suggested that "Commercially-added asbestos" should be clearly defined as asbestos intentionally added to a product – not asbestos unintentionally added to commercial products as a contaminant.

- *Comment:* Participants referred to the *Consultative Document for the Proposal to Amend the Asbestos (Prohibition) Regulations (1992),* issued by the United Kingdom Health and Safety Executive, as a document that addresses many of the issues surrounding a ban on intentionally-added asbestos.

- *Comment:* Participants noted that, even in countries which have banned asbestos, a non-zero allowable maximum level has been established (such as .01% in Denmark).

*Health-Based Standards*

- *Comment:* Participants advocated the use of health-based standards for a ban. Participants expressed concerns that: a ban based upon the current definition of asbestos-containing products will reduce exposure, but not eliminate harmful asbestos products from commerce; that it is not possible to effectively ban asbestos products until it is known which products that contain asbestos are truly harmful; that only health-based asbestos hazard standards can determine which products are truly harmful; and, that a legislative ban based on current standards would be beneficial, but it should allow for adjustments based upon future standards development, including the development of health-based standards.

*Asbestos Fireproofing*

- *Report:* Neither the *Asbestos Strategies* meeting nor the report discussed the risks and benefits of asbestos fireproofing, or its effectiveness as compared to alternatives. The

report noted that the spray form of fireproofing is prohibited by regulation. A ban on asbestos would naturally preclude the further use of asbestos fireproofing.

- *Comment:* Participants suggested that fireproofing for buildings may be one instance where the benefits of asbestos use may outweigh the risks.
- *Comment:* The application of asbestos for fireproofing was widely seen as one of the most dangerous uses of asbestos by a number of participants. Participants vehemently disagreed with the assertion that the benefits outweighed the risks.

## Action 5: Develop a National Mesothelioma Registry

- *Recommendation:* A national mesothelioma registry is necessary to facilitate epidemiology studies to evaluate the effects of asbestos exposure. Many countries and some states have established mesothelioma registries. The establishment of such a registry would likely be performed by agencies within the Centers for Disease Control (CDC), including the National Center for Health Statistics, National Institute for Occupational Safety and Health (NIOSH), and the National Center for Environmental Health, in conjunction with the Agency for Toxic Substances and Disease Registry and state public health departments. An accompanying effort to connect interested parties with the best experts and data would improve research and treatment of asbestos-related disease.
- *Comment:* Participants felt that a mesothelioma registry would not facilitate epidemiology studies to evaluate the effects of asbestos exposure, because it would include a large percentage of cases with causal pathways, which do not include asbestos exposure. It was suggested instead to establish exposure registries of asbestos workers and persons living in communities with high asbestos exposure.
- *Comment:* Participants suggested that an international registry would gather more cases for study versus a national registry. Such a registry supposedly already exists.
- *Comment:* Participants noted that a national registry was proposed in the Ban Asbestos in America Act (S 2641). It was suggested that additional epidemiology studies focus on exposure to durable synthetic fibers such as Refractory Ceramic Fiber.
- *Comment:* Participants suggested a medical surveillance program for at-risk individuals.
- *Comment:* Participants advised that concerns regarding patient confidentiality must be addressed, and that this could be accomplished by limiting access to the registry to medical researchers.

## Actions 6: Update Asbestos Model Training Criteria

- *Recommendation:* The EPA should update the model training curricula to ensure that all relevant agencies' priorities are reflected. Updating the training will make the curricula consistent with existing regulations and increase worker safety. The updated versions should cover the revised OSHA asbestos standards, revised EPA asbestos National Emission Standard for Hazardous Air Pollutants (NESHAP) standards, EPA Worker Protection Rule, new respirator designations/regulations, and other topics. The training providers should also be permitted to vary the course content in refresher courses.

- *Comment:* Participants advised that, in states with asbestos licensing, the course content is specified in the state regulations, which would have to be changed to conform to a revised Model Accreditation Plan.
- *Comment:* Participants noted that the training curricula met the needs of the Asbestos Hazard Emergency Response Act (AHERA) laws back in 1986, but that it is barely adequate in 2003 and is extremely inadequate when it comes to industrial situations.
- *Comment:* Participants noted that it is also important to evaluate what is a necessary frequency for asbestos refresher training among professionals with different levels of experience with asbestos in their work.

## Action 7: Enforce Existing Asbestos Regulations

- *Recommendation:* The EPA, OSHA, and Consumer Product Safety Commission (CPSC) should focus on more stringent, predictable, and consistent enforcement of existing regulations, which may offer greater benefit than committing scarce resources to new rule-making efforts. This recommendation can be implemented immediately; however, such an effort must continue into the long-term. Consistent interpretations and streamlining across agencies will lead to increased compliance and potential reduced liability for businesses.
- *Comment:* Participants expressed the view that voluntary compliance and outreach and education were not sufficient by themselves to address the risks from asbestos. Many participants suggested increasing enforcement activities.
- *Comment:* Participants advocated specific enforcement actions. These include:
  - o Increase audits of training records and increase prosecutions for training fraud.
  - o Improve pre-inspection of facilities before beginning a renovation or demolition project.
  - o Allocate more resources to enforcement at the state level.
  - o Focus on occupational exposure.

## Action 8: Reduce Unintended Asbestos in Products

- *Recommendation:* Reduction of naturally occurring asbestos in products could be achieved by a program set up by a consortium of mining concerns to develop a sampling and analytical protocol to analyze bulk materials at the mining stage for chrysotile and all asbestiform amphibole forms of asbestos. Oversight of such a program may be provided by EPA and MSHA, with technical assistance by NIOSH and the National Institute of Standards and Technology (NIST). This program would assist the mining and quarrying industry in avoiding unwanted asbestos in their product. The program would provide a degree of assurance to users of these raw materials that they are not contaminated with asbestos.
- *Comment:* Participants suggested establishing a maximum allowable level for asbestos content, above zero, noting that no mined product can ever be assumed to be entirely free of asbestos. Participants noted that it was unfair to ask a mineral industry to prove the absence of asbestos in its products.
- *Comment:* Participants suggested that methods developed for the analysis of commercial asbestos products are in fact adequate for naturally occurring materials.

## Action 9: Address Asbestos-Containing Products in Commerce

- *Recommendation:* A coordinated effort to educate consumers, employers and building owners about products with commercially-added asbestos is necessary. Such a program would assist the target audience in making an informed decision about which products are legally available with commercially added asbestos. This education and outreach effort would be performed by EPA, OSHA and CPSC. These agencies would need to perform research into which products actually have commercially added asbestos, which do not, and which are to be phased out voluntarily by manufacturers.
- *Comment:* Participants suggested that OSHA discard the existing Presumed Asbestos-Containing Materials (PACM) rule. It was recommended that the 1% definition be eliminated and replaced with a stricter standard.
- *Comment:* Participants noted that, although some products present a nearly non-existent risk in use, health hazards may still be associated with mining and milling the fiber, manufacturing the product, installing the product, deterioration during use and abusing the product during maintenance and repair. Other participants noted that these actions do constitute "use" and it is not accurate to say that such products present a nearly non-existent risk in use.
- *Comment:* Participants suggested that International Trade Commission statistics should differentiate between asbestos-containing products and similar non-asbestos-containing products (such as asbestos-containing cement and cellulose-containing cement).
- *Comment:* Participants disagreed with the assertion that asbestos is used in new products that are not labeled as asbestos-containing.
- *Comment:* Participants noted that there is no control over the manufacture and sales of products in other countries that contain asbestos and are sold in the United States.

## Action 10: Partner with State Agencies in Support of Asbestos Training

- *Recommendation:* Training providers under the EPA model accreditation plan (MAP) and corresponding state plans should be audited with sufficient frequency to assure the training is provided, tests are conducted, records maintained, and certificates issued. This action, conducted in concert with Action 6 (Update Asbestos Model Training Criteria), will increase worker safety and the effectiveness of abatement efforts. Reducing the incidence of training fraud will provide greater security to building occupants and owners. Such partnerships will provide better coordination among federal and state agencies.
- *Comment:* Participants expressed the opinion that enforcing current training course regulations (as in this recommendation) is more important than improving asbestos training courses (as in Action 6).

Participants also commented on several additional topics which were not the subject of leading recommendations.

## Topic: Risk Assessment and Communication

- *Report:* Risk assessment is incorporated as a component of many other recommendations. The report acknowledges the frequent misperceptions of risk among the public and notes that "public concerns about remaining risk can be

mitigated by clarification of information, and coordination among key federal and state agencies." It also noted that "while it is beyond the scope of this study to address technical risk assessment issues, comments from participants stressed that more precision and clarity of information is needed with risk assessment issues." The only recommendations were: 1) support existing efforts evaluating the adequacy of current risk assessment methodology; and 2) have EPA and OSHA employ education and outreach to provide reliable risk communication to the regulated community and the public.

- *Comment:* Participants noted that risk may not be accurately quantified by measured air levels. In some instances, risk is assessed by occupant accessibility levels and potential for exposure.
- *Comment:* Participants expressed the opinion that risk assessment should be based on air levels, reflecting actual exposure rather than potential exposure or asbestos content in a material.
- *Comment:* Participants suggested that, since resources for public health are limited, it is important to educate the public about the relative magnitude of health risks from asbestos compared to other hazards.
- *Comment:* One participant noted that risks must guide the regulatory process if changes in the definitions of asbestos are contemplated. This participant suggested that risks must be based on properly conducted animal studies of inhalation and developed cancers of the proposed regulated materials.

## Topic: Considering the Effect of Fiber Shape, Type, and Size

- *Report:* The report recommended studying the health effects of other durable naturally occurring fibrous minerals or work that produces cleavage fragments of respirable size and similar composition and shape as asbestos minerals. It recommended support of efforts such as the Agency for Toxic Substances and Disease Registry (ATSDR) panel evaluating the health effects of asbestos and synthetic vitreous fibers and the influence of fiber length. It did not make a recommendation either for or against the establishment of varying exposure levels based on fiber shape, type, or size.
- *Comment:* Participants thought that investigations of the relationship of fiber size (or fiber type) to disease were not necessary since these issues had been settled in previous rounds of policymaking. The European example was highlighted. In Europe, standards were at one time based on fiber type, but this approach has since been discarded. Participants questioned the value of creating several different classes of toxicity.
- *Comment:* Participants felt that it is appropriate to establish varying safe exposure levels according to the type and size of fiber.
- *Comment:* Participants emphasized that distinctions based on fiber type (i.e. mineral name) are insufficient, since shape and size are more important in determining health risks. Participants expressed the view that EPA over-states the toxicity of some forms of asbestos and under-state the toxicity of others.

## Topic: Regulatory Policy Changes

- *Report:* The report identified a number of areas where regulatory policy could be strengthened to better protect public health.

- *Comment:* Participants suggested that a committee could be formed to identify the most pervasive regulatory issues that vary across states and make recommendations to eliminate these inconsistencies – perhaps focusing on the ten most common inconsistencies.
- *Comment:* Participants suggested mandating asbestos surveys in all public and commercial buildings.

## Topic: Analytical Methods

- *Report:* The report discussed the various methods of testing air samples and bulk materials for asbestos. It noted that the National Institute of Standards and Testing administers the National Voluntary Laboratory Accreditation Program.
- *Comment:* Participants expressed the opinion that current testing laboratories have a very high level of false positives at or near current standards, especially when testing minerals such as vermiculite, talc, taconite, marble, and dolomite. Participants suggested that a more vigorous testing/training and certification program needs to be established, administered and monitored by NIST, for contract laboratories to prevent mis-identification of asbestos fibers.
- *Comment:* Participants expressed the opinion that polarized light microscopy (for bulk materials) and phase contrast microscopy (for air analysis) may not be effective at distinguishing potentially hazardous fibers from those that are benign.
- *Comment:* Participants suggested that transmission electron microscopy analysis is extremely reliable if sample preparation is performed correctly.
- *Comment:* Participants expressed the concern that the current regulations regarding analytical methods are sometimes inconsistent, excessively costly, and are not always protective of public health.
- *Comment:* Participants suggested that there is no direct relationship between mass estimates of asbestos concentrations and risk, and that fiber counts are a more useful metric. Therefore, analytical methods that report asbestos concentrations in terms of mass percent should be de-emphasized in favor of other methods that report fiber number concentrations. Moreover, methods that are capable of determining the complete range of sizes of potentially hazardous fibers should be emphasized over methods that are incapable of characterizing the entire range.

## Topic: Dust Sampling

- *Report:* The report noted that there are no regulatory standards for dust samples, and the recognized method for dust sampling (ASTM D5755) does not include criteria for interpreting the results.
- *Comment:* Participants expressed the opinion that the topic of dust sampling was not discussed in sufficient detail.

**Appendix J:** Asbestos Survey Notification Record

#    001189

# ASBESTOS SURVEY NOTIFICATION RECORD
## Verification of Inspection

| | |
|---|---|
| 1a. Work Site Name, Address, City, County, State | 1b. Owner's Name and Mailing Address<br><br><br>Telephone No. (     ) |
| 2. Name & Mailing Address of Company or Individual Conducting Asbestos Survey<br><br><br>Telephone No. (     ) | 3. Analytical Laboratory Name and Address<br><br><br>Telephone No. (     ) |
| 4a. Asbestos NESHAP Regulatory Agency Name & Address for Work Site<br><br><br>Telephone No. (     ) | 4b. OSHA Regulatory Agency Name and Address for Work Site<br><br><br>Telephone No. (     ) |

(Left side vertical label: AHERA CERTIFIED BUILDING INSPECTOR)

| 5. APPROXIMATE AMOUNT OF ASBESTOS, INCLUDING: | Amount of RACM to be Removed or Generated | Amount of Nonfriable ACM | | | |
|---|---|---|---|---|---|
| | | To Be Removed | | Not To Be Removed | |
| | | CAT I | CAT II | CAT I | CAT II |
| On Facility Components: Pipes (Linear Feet) | | | | | |
| On Facility Components: Surface Area (Sq. Ft.) | | | | | |
| Off Facility Components: Volume (Cubic Feet) | | | | | |

| | |
|---|---|
| 6. AHERA Building Inspector Certificate No. & Expiration Date | |
| 7. Training Provider Name & Phone No. | |
| 8a. Number of samples analyzed & date of analysis | |
| 8b. □ TSI □ Ceiling Texture □ Duct/Seam Tape □ A/C Pipe □ A/C Siding/Shingles □ VAT/Mastic □ Asphaltic Roofing □ Add-on Surfacing Texture on wall systems □ Other please specify: | |

9. INSPECTOR'S CERTIFICATION: I hereby declare that the contents of this Asbestos Survey Notification are fully and accurately described above, are classified in all respects to applicable regulations found in title 40, EPA Code of Federal Regulations, Part 61, Subpart M, Asbestos NESHAP, Sec. 61.145(a).

NOTE: The AHERA Building Inspector must retain a copy of this form.

| Printed / Typed Name & Title | Signature | MO  DAY  YR |
|---|---|---|

(Left side vertical label: ASBESTOS ABATEMENT AND DEMOLITION CONTRACTORS)

| | | |
|---|---|---|
| 10. Asbestos Removal Contractor / Operator acknowledges receipt of this form.<br><br><br>Printed / Typed Name, Title, Address & Telephone No. | Signature | MO  DAY  YR |
| 11. Demolition Contractor / Operator acknowledges receipt of this form.<br><br><br>Printed / Typed Name, Title, Address & Telephone No. | Signature | MO  DAY  YR |

(Left side vertical label: BUILDING PERMIT AGENCY)

| | | |
|---|---|---|
| 12. Renovation/Demolition Permit Number, date of issuance | Parcel Number | |
| 13. Building Permit Agency acknowledges receipt of this form.<br><br>Printed / Typed Name & Title | Signature | MO  DAY  YR |

Copyright 1999 by Jon D. Maring - All Rights Reserved

OWNER

**Additional copies of this form are distributed to:**
- Asbestos Abatement Contractor/Operator
- Demolition Contractor/Operator
- Building Permit Agency
- General Contractor/Subcontractors
- AHERA Building Inspectors/Asbestos Survey Records

79

Appendix J: Asbestos Survey Notification Record