**ADMINISTRATIVE RECORD**

SDMS Document ID

2002165

# EPA's Response to Comments Received On The Second Supplement to The Export/Screening Plant Administrative Record

This document provides EPA's response to comments received on EPA's second supplement to the administrative record for the Export/Screening Plant. The only comments received by EPA on the this second supplement were from W.R. Grace on July 31, 2002. These comments not only address the basis for the cleanup actions at the Libby Asbestos Site documented in the Action Memorandum Amendment dated May 9, 2002, but also include comments on previous cleanup actions at the Libby Asbestos Site. Despite the fact that W.R. Grace has already provided comments on these response actions during comment periods which have long ago expired, EPA has considered all the comments generally. W.R. Grace has also included reports from its expert witnesses in litigation captioned <u>United States of America v. W.R. Grace et al.</u>, Civ. No. CV-01-72-M-DWM, and comments on EPA's proposed listing of the Libby Asbestos Site on the National Priorities List. EPA has considered the comments to the degree that they are relevant to the cleanup actions being performed pursuant to the May 9, 2002 Action Memorandum. Finally, W.R. Grace has submitted many of the same comments it has previously made in response to the administrative record and its first supplement. EPA responds to these comments as appropriate below, but incorporates by reference its two prior responses to W.R. Grace. EPA has fully considered the totality of the documents and determined that the response actions taken or to be taken are appropriate.

EPA's response actions at the Libby Asbestos Site are directed by the requirements of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 <u>et seq.</u>, and on the regulations promulgated therefrom at 40 C.F.R. § 300, also known as the National Contingency Plan (NCP). In particular, in determining the necessity of the removal actions at the Libby Asbestos Site, EPA has followed the criteria in 40 C.F.R. § 300.415(b), which indicate that it is appropriate for EPA to "abate, prevent, minimize, stabilize, mitigate, or eliminate" any release or threat of release of hazardous substances or pollutants and contaminants where such release results in a "threat to public health or welfare of the United States or the environment." The NCP criteria for determining if such a threat exists are as follows:

(i)     Actual or potential exposure to nearby populations, animals, or the food chain from hazardous substances or pollutants and contaminants;

(ii)    Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii)   Hazardous substances or pollutants and contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv)    High levels of hazardous substances or pollutants or contaminants in soils at or near the surface, that may migrate;

(v)     Weather conditions that may cause hazardous substances or pollutants and contaminants to migrate or be released;

(vi)    Threat of fire or explosion;

(vii)   The availability of other appropriate federal or state response mechanisms to respond to the release; and

(viii)  Other situations or factors that may pose threats to public health or welfare of the United States or the environment.

All of EPA's removal actions in Libby to date have been, after consideration of all of the criteria, based upon the presence of one or more of those criterion. In addition to meeting these NCP requirements, EPA and other federal agencies, such as the U.S. Public Health Service and the Agency for Toxic Substances and Disease Registry (ATSDR) proceeded to perform scientific and medical investigations and analyses to further evaluate the threat posed to public health. It is these additional investigations and analyses that W.R. Grace criticizes.

Contrary to W.R. Grace comments, threats to the health of Libby residents caused by the release or threat of release of asbestos from W.R. Grace operations posed a threat to Libby residents upon EPA's arrival in 1999. These threats continue today. EPA found vermiculite contaminated with amphibole asbestos ("Libby vermiculite") in many areas of Libby and at former W.R. Grace facilities in the Libby valley which were accessible to the public. EPA has not found significant ambient air concentrations of amphibole asbestos across Libby and has notified the community that the ambient air in Libby does not present a threat. However, EPA has an

abundance of evidence that normal human activities that disturb Libby vermiculite raise enough respirable amphibole asbestos fibers into the air to pose a threat **to those involved in the activities**. As stated in EPA's prior responses to W.R. Grace's comments, EPA has developed information that indicates that the suspension of amphibole asbestos fibers occurs whether the activity is with soil, dust, vermiculite ore, mining waste, concentrate or insulation. This is consistent with W.R. Grace's own findings resulting from drop tests, barrel transfer tests, attic simulation tests, and experience in handling and processing Libby vermiculite..

ATSDR in partnership with other government agencies, local physicians, and the community conducted a mortality study, a case series investigation, and a large-scale community health screening to determine, among other things, the effect of amphibole asbestos on the community. ATSDR found that community members experienced exposure to amphibole asbestos through multiple pathways and that there was a positive correlation between the number of pathways and occurrence of asbestos-related lung abnormalities. Given the natural latency of asbestos-related disease, EPA understands that the presence of the diseases seen in the ATSDR studies was not likely caused by exposures during or after 1999. However, the data clearly indicate that amphibole asbestos from Libby vermiculite causes disease. EPA's review of other studies (including studies by W.R. Grace) involving workers that handled or processed vermiculite, whether in Libby or at other sites (e.g., Marysville, Ohio) validates this finding. It is therefore inherently logical to conclude that exposure to Libby amphibole today may result in disease in the future.

Despite having conclusive evidence that the documented release and threat of release of amphibole asbestos in Libby presents a threat to the health of the community, EPA also performed hazard assessments and screening level risk evaluations to further define the effect of actual and potential exposures to the amphibole asbestos. These assessments and evaluations indicated that certain normal day-to-day activities involving Libby vermiculite can result in exposures to amphibole asbestos. Such exposures may result in abnormally high rates of asbestos-related pulmonary disease.

W.R. Grace argues that fibers are different in Libby today than they were prior to cessation of mining and milling operations in 1991. W.R. Grace and their associates argue that

3

due to these differences, the Libby amphibole has been rendered non-toxic. In making this argument, and despite copious data to the contrary, W.R. Grace experts argue that fibers in Libby have changed shape. In the following pages, EPA provides data collected by W.R. Grace, independent academic researchers, and EPA sampling teams demonstrating that fiber size distribution have changed little since they were first measured nearly 30 years ago. The overwhelming weight of public health and environmental evidence indicates that fibers present in Libby today have the same toxic characteristics as they did when mining operations commenced at the turn of the century.

W.R. Grace agues that the material found in Libby today is made up of 'cleavage fragments' and as indicated by Dr. Anderson, these fragments are non-toxic. Even W.R. Grace has long referred to the friable mineral fibers found in Libby as "asbestos". In the following pages EPA demonstrates both the fibrous nature of the Libby amphibole and its propensity to cause human suffering and death. The fact that the fibers found today are the same as those that existed back when those now ill were first exposed indicates that many of Grace's arguments are superfluous.

W.R. Grace devotes page upon page attacking EPA sampling and analytical procedures. EPA disagrees with almost every one of these criticisms. It is also important to understand that EPA did not effect any cleanup decisions based upon single data points. Rather, following the collection of 30,000 samples in Libby including over 14,000 air samples (most collected in human breathing zones) EPA's environmental data base is robust. Human health screening effected by ATSDR confirms the hazard associated with the Libby amphibole asbestos. Taken together, this exhaustive data collection effort paints a picture of complete and continuing human exposure pathways in Libby.

Based on all these facts, EPA determined it appropriate to take response actions to remove amphibole asbestos in order to diminish the threat to public health that existed in 1999 and will continue to exist until all exposure pathways are eliminated.

Since W.R. Grace has based its comments on multiple expert reports and thousands of pages of supplemental material, EPA has categorized W.R. Grace's comments in order to provide a manageable response. *W.R. Grace's comments are "paraphrased" in italics.*

4

I.     W.R. Grace argues that amphibole asbestos concentrations in Libby are too low to create
       exposures of significance. W.R. Grace bases this statement on what it purports to be
       poor scientific method by EPA and upon the findings of its expert witness, RJ Lee. Issues
       raised by W.R. Grace are described below, followed by EPA's response.

       A.     W.R. Grace asserts that EPA's Quality Assurance Project Plan (QAPP) for the
              collection and analysis of samples for the Libby Asbestos Site is inadequate, while
              at the same time indicating that, if followed, it " provided scientifically credible
              information which could be evaluated and reviewed within the scientific or legal
              community."

       EPA has produced two primary QAPPs, the first (Phase I) is designed to help delineate
the nature and extent of amphibole asbestos contamination in air, water, dust and soil and the
second (Phase II) to determine what levels of airborne asbestos will be generated during certain
human exposure scenarios. The QAPPs described the methods and standard operating
procedures by which samples would be collected and analyzed, including collection technique,
chain of custody, sample preparation, analysis method and documentation of sample results. The
QAPPs also included procedures to ensure that the data collected and analyzed would be of
adequate quantity and quality. For instance, the QAPPs call for the use of sample chain of
custody requirements, blanks, replicates, instrument calibration, sample collection and analysis
methods, and validation and verification requirements. EPA's QAPPs were formulated upon
appropriate data quality objectives, a well-reasoned and clear site conceptual model, detailed
decision criteria for the sample collection and analysis process and detailed standard operating
procedures. As will be further discussed below, the QAPPs also provided the flexibility for
deviations from field, lab and documentation requirements necessary to meet real world
conditions. In its evaluation of the QAPP, W.R. Grace makes a serious error in assessing the
purpose of the document. The QAPP is designed to provide a reasoned rationale for sample and
data collection. It is not, however, a decision document, nor does it provide the basis or decision
criteria for undertaking a Removal Action. While obviously the QAPP must discuss some of the

5

anticipated criteria (such as what level of detection is needed for quantitative risk calculations) it does not, and cannot replace the Removal Action criteria found at 40 CFR 300.415(b)(2) of the NCP.

Dr. Lee derides the QAPPs because he alleges that: 1) "EPA failed to adequately describe the population to be sampled; and 2) EPA failed to provide adequate instructions for sampling soil." Dr. Lee clearly did not understand the objectives of EPA's sampling. With respect to Dr. Lee's first point, EPA did do some general environmental monitoring, such as the ambient air sampling across town and at specific locations near former facilities. EPA also targeted homes for solid media, dust and air sampling designed to give a cross-section of homes in Libby, including the homes of former miners. These were designed to give an indication of the distribution of fibers in and around Libby. EPA has never relied on a single sample from a location to make a cleanup decision. However, EPA found that exposure is highly dependent upon the nature of the activities in those areas. Thus, EPA's goal was to identify, in addition to the Phase I nature and extent sampling, actual exposures, which required the use of exposure based monitoring described in the Phase II QAPP. Thus, EPA has both described the population to be sampled, as well as performed the exposure based sampling necessary to identify the actual risk to people in Libby. Dr. Lee's concern about the lack of clear directions for "required intervals" or "sub-sampling points" also fails to recognize the objective of exposure based sampling. There is no bias in identifying the actual sources of amphibole asbestos that may threaten the health of Libby residents.

It is particularly interesting to note that despite these criticisms, Dr. Lee obviously feels that the QAPPs were adequate. On page 5 of his expert report, Dr. Lee states that had the QAPPs been followed, it " would have provided scientifically credible information which could be evaluated and reviewed within the scientific or legal community - and for which scientists could debate the interpretation and implications of the data set." EPA agrees that the QAPPs provide for data which is scientifically credible.

B.    *EPA did not follow its QAPPs.*

Dr. Lee asserts that EPA did not follow its QAPPs by: 1) failing to follow stopping rules; 2) counting non-asbestos amphibole: 3) violating the NIOSH 7400 method; 4) violating the ISO 10312 Method; 5) violating the basic premise and process of IRIS; 6) failing to perform good laboratory practices; and 7) failing to provide evidence of verified counts.

It is difficult for EPA to respond to many of these general allegations, as Dr. Lee provides few, if any, examples for each of these criticisms. Where Dr. Lee attempts to provide examples they do not support his allegations. For example, on page 56 of his report, Dr. Lee contends that the laboratory count sheets do not contain actual fiber dimensions and sketches. However, looking at the examples provided by Dr. Lee on pages 59-60, figures 4 and 5 of his report, one can see that both sketches and fiber dimensions are provided. EPA and its contractors have followed the QAPPs in good faith and have only deviated from them where real-world conditions or new information warranted deviations from those plans. Every attempt was made to document such deviations when they occurred. These deviations reflect continual efforts to improve the scientific process of identifying the exposure to Libby residents. In fact, EPA views most of the deviations to be improvements in the scientific validity of the methods used.

Dr. Lee's criticism on failure to follow stopping rules is difficult to respond to, since Dr. Lee provides not a single example of what he is concerned about. EPA has taken over 14,000 air samples. EPA does not know at what point in time Dr. Lee performed his data review. However, it is possible that Dr. Lee reviewed data sheets which had not been fully completed at that time. In some cases, analysts were instructed to initially count 10 grids for screening level quantification and to expand the grid count at a later date as required to attain the level of sensitivity required by the QAPPs (i.e., 10E-4).

The allegations of W.R. Grace and Dr. Lee concerning the *"erroneous counting [of] non-asbestos amphibole"* are inaccurate. As will be described later in this response under Section I.C., while EPA obtained all the information that it could about the nature of the respirable fibers that could be adversely affecting public health in Libby, it only used those asbestiform fibers which met the stated counting rules in its hazard assessment.

7

W.R. Grace and Dr. Lee indicate that EPA has failed to follow NIOSH 7400, one of the air analysis methods found in EPA's QAPPs. EPA used NIOSH 7400, along with more sensitive techniques, to comply with OSHA worker requirements. EPA followed NIOSH 7400 as indicated in the QAPPs. NIOSH 7400 was used to determine opaqueness for choice of direct or indirect methods. EPA did not use the indirect preparation as part of NIOSH 7400, nor did EPA employ the results of NIOSH 7400 for any quantitative risk evaluation at the site.

Dr. Lee's criticism about the use of the indirect method is also flawed. Indirect preparations were not conducted as part of the worker protection program, but were implemented as outlined in the QAPPs. It was necessary to use this technique due to high concentrations of dust encountered by the sampling teams. W.R. Grace and Dr. Lee assert that EPA is biasing the air sampling results by performing the indirect preparation method on air filters.

The use of the indirect preparation method is appropriate for air samples given the nature of Libby's amphibole asbestos. Dr. Lee indicates that the indirect preparation method biases the results by over-counting fibers, because the use of sonication to disperse the fibers in the liquid medium breaks up clusters that would, in the environment, remain intact. EPA disagrees with Dr. Lee's assertion and interpretation of the literature on direct vs. indirect preparation methods. Dr. Lee cites a report (footnote 50 in Dr. Lee's report) by the Health Effects Institute which actually indicates that "direct and indirect sample preparation procedures have been shown to produce nearly equivalent results when used to measure fibers longer than 5 μm in laboratory comparisons." In addition, Dr. Eric Chatfield has found that, in dusty environments such as those in Libby, the direct method may obscure airborne fibers, thus biasing the result. He suggests that the use of the indirect method in these cases may more accurately reflect exposure.[1]

The indirect preparation method is also appropriate for dust samples in light of the friable nature of the amphibole asbestos found in Libby. As evidenced in Dr. Quivik's report, which is incorporated by reference into this response, many mineralogists through history have found that the amphibole material present in this vermiculite deposit was fibrous where weathered. As

---

[1]Chatfield, EJ. 1985b. Asbestos measurements in workplaces and ambient atmospheres. In: Electron Microscopy in Forensic, Occupational, and Environmental Health Sciences (Basu S, Millette J, eds) pp. 149-186. Plenum Publishing Corp., New York, NY. (Attachment 1)

previously reflected in EPA's administrative record for this site, W.R. Grace's own scientist, Dr. Julie Yang, found that the amphibole asbestos in the vermiculite concentrate (which is now found around Libby) was very friable. Mr. Meeker, a senior mineralogist at the United States Geological Survey has carefully studied samples from the Vermiculite Mountain deposit and comes to the same conclusion. (Mr. Meeker's report is incorporated by reference into this response.) In fact, Mr. Meeker has reviewed Dr. Lee's report and believes that figures 1 and 2 in Dr. Lee's report are a good example of what can happen to a cluster of fibers in the Libby environment just due to weathering or normal human activity (e.g. car or foot traffic over contaminated driveways, play areas, roads, and pathways).

Dr. Lee complains that "*ISO 10312 method was systematically and flagrantly violated.*" Dr. Lee fails to provide a coherent assessment of such violations. Scattered throughout his report, Dr. Lee makes unsupported claims of errors related to the use of ISO 10312 and other methods and procedures. (None of these assertions, even if true, indicate "systematic" or "flagrant" violations.) As previously discussed herein, EPA established and followed a set of general objectives as clearly outlined in the QAPPs. Where appropriate, EPA and its contractors have deviated from specific procedures to provide more reliable data. These deviations have been documented. As discussed below, an independent audit of EPA's sampling and analysis procedures failed to find any significant errors.

EPA did not violate the "premise and process" of the Integrated Risk Information System (IRIS) as Dr. Lee asserts. EPA employed standard procedures for identification and enumeration of asbestiform fibers throughout the course of the Libby site investigation. While IRIS acknowledges the uncertainty in fiber counting by PCM, it still suggests fiber enumeration by PCM because of the manner in which IRIS's foundational data was collected. The IRIS file was based on epidemiological studies involving groups of workers where PCM was used to roughly estimate worker's airborne asbestos dose. The file acknowledges the importance of measuring site-specific exposures in such a manner as to only include fibers that may have been counted in these original epidemiological studies, i.e. those fibers meeting counting rules of PCM. However, W.R. Grace was aware as early as mid-1970s, that fibers found in the air around the Libby processing operations were (and still are) not visible by PCM. Because it is quite possible that

9

these fibers are contributing to the asbestos-related disease seen in Libby, EPA made a conscious decision to identify and measure the broadest spectrum of amphibole fibers in Libby using high resolution microscopy (i.e., Transmission Electron Microscopy or TEM) and the most complete counting procedures (i.e., ISO 10312). TEM allows for the flexibility to evaluate all of the factors that may be contributing to asbestos-related disease in Libby. Nonetheless, for the purpose of the IRIS based risk calculations, EPA's specific objective, and practice, for risk evaluation at the site was to count only those fibers with widths equal to or greater than 0.25 $\mu$m, equal to or longer than 5.0$\mu$m, and having an aspect ratio equal to or greater than 3 to 1[2].

Dr. Lee's assertion that the only *"appropriate"* method to use to determine PCM equivalents value is a comparison of data obtained through methods 7400 and 7402, and as adjusted by rules prescribed by the Occupational Safety and Health Administration (OSHA), is not supported by IRIS. IRIS clearly states that "no generally applicable conversion factor exists for these two measurements", i.e., measurements obtained through PCM and those resulting from TEM. There is no requirement or discussion in the context of the IRIS file either requiring or recommending the use of OSHA guidelines for estimation of fiber concentrations. As W.R. Grace is aware, it is common practice to estimate asbestos fiber exposure using PCME. In doing so, EPA has not overestimated risks as the TEM measurement techniques employed discern the difference between mineral and non-mineral fiber in the samples; which is not distinguished by PCM. Only those fibers conforming to PCME definitions were used. Dr. Lee's concern about fibers being ignored under TEM which would be counted under PCM seems misplaced since Dr. Lee seems to be arguing that EPA overestimated the risk of exposure. If Dr. Lee was correct, EPA would have undercounted asbestos fibers and therefore underestimated the risk. Similar internal inconsistencies can be found throughout Dr. Lee's report.

---

[2]As indicated in table 4 of the 12/20/01 Weis memorandum, for the Phase 1 data, PCME fibers are estimated by summing the number of fibers in size bins that overlap the definition of PCM fibers, while for Phase 2, the number of PCM equivalent fibers were calculated directly. The overall effect of this approach is likely to have underestimated fiber counts. As will be discussed separately, EPA has made slight revisions in the exposure assessments as a result of W.R. Grace comments.

Dr. Lee criticizes EPA's general laboratory procedures, raising issues about documentation, instrument calibration and data validation, among others.   While Dr. Lee may choose to "cherry-pick" occasional "errors" from EPA's extensive data set, to suggest that such "errors" diminish the validity of EPA's findings is simply incorrect.   EPA's database comprises the results of analyses of over 30,000 samples.   Each sample has multiple components of information. While Dr. Lee may identify some small number of records where a piece of information is missing, the overall affect on data validity is minuscule for several reasons.   First, EPA's sampling and analysis efforts were subjected to comprehensive quality assurance quality control programs.   As mentioned previously, these programs included extensive planning and documentation followed by the use of sample chain of custody requirements, blanks, replicates, instrument calibration, sample collection and analysis methods, and validation and verification requirements.   In addition, independent audits were conducted on sampling and analysis to ensure the reliability of EPA's data.   These audits indicated that with minor exceptions, the sampling teams and laboratories were correctly following procedures.   In all cases where minor exceptions occurred, the parties involved took specific steps for correction.   The audit successfully identified one laboratory which was not performing to EPA's standards.   Fortunately, this laboratory had only performed analyses on a few samples.   This laboratory has not participated in EPA's efforts at Libby since the audit. Lastly, all of the laboratories which participated in EPA analysis at Libby were certified by the National Voluntary Laboratory Accreditation Program (NVLAP).   As Dr. Lee observed, the analysts from these labs *"must routinely perform round robin testing, duplicate and replicate analyses, and also verified analyses."*   Dr. Lee concluded that the practices followed by these labs *"minimize systematic bias among the analysts."*

Dr. Lee's statement concerning verified counts is also inaccurate.   Once again, EPA used NVLAP certified laboratories (as discussed above) which resolves much of the issue raised by Dr. Lee.   EPA also has been performing recounts and duplicate analyses to ensure data quality.   Dr. Lee provides no basis for his comments on the lack and/or quality of sketches of fibers.   There are in fact sketches of fibers in EPA's laboratory documentation, as shown in the EPA lab count sheets used as examples by Dr. Lee in figures 4 and 5 of his report.   W.R. Grace has received EPA's laboratory count sheets and other documentation, including the full database of all

11

sampling and analysis information. Dr. Millette, an independent expert retained by the U.S. Department of Justice, has reviewed the examples of sketches that Dr. Lee identified and finds them appropriate. The sketches showed the general shape and habit of identified fibers and, coupled with the EDS and/or SAED data, provide unequivocal identification of the asbestiform nature of the material counted.

In addition to these other criticisms, on page 64 of his Report, Dr. Lee raises the question that the EMSL mobile laboratory analyzed an "excessive" number of samples in a single day. He uses the example of September 23, 2001, when over 90 samples were analyzed by the AHERA TEM method. Dr. Lee goes on to make some calculations to suggest that a single analyst simply could not have processed and adequately viewd that number of samples in an eight hour day. These points raised by Dr. Lee have nothing to do with what happened in the mobile laboratory in Libby. Because of the high volume of samples generated during the course of the removal actions during the Summer of 2001, the EPA had EMSL run double shifts (i.e. 16 hour days) and had two additional technitians help to prepare samples for analysis. Therefore, the microscopist spent none of his time preparing samples, as opposed to the 51/4 hours assumed by Dr. Lee. Allowing for four, one-hour breaks, that would allow the microspist 12 hours to analyze the 90 samples. This would allow the microscopist eight minutes per sample for counting fibers. This was not that difficult a task, since 82 of the 90 samples were non-detect for asbestos. In fact, the microscopist was able to spend more time on the sample filters where fibers were observed, and spent a little less time on the samples where no fibers were seen. As Dr. Lee observed, the eight samples on which fibers were viewed, were confirmed by EDS. The rest of Dr. Lee's assertions are simply wrong. The EDS spectra were done correctly, and the appropriate information was recorded on the laboratory count sheets. Once again Dr. Lee seems to have formed an opinion without a firm grasp of the facts.

C.   W.R. Grace and Dr. Lee argue that EPA biased exposure estimates by; 1)
     including cleavage fragments in its analysis, 2) including inappropriate
     amphibole minerals, such as richterite and winchite, 3) misidentified gypsum and
     vermiculite, among other things, as amphibole structures.

Dr. Lee's statements about the inappropriate counting of cleavage fragments do not have
merit. EPA has counted asbestiform fibers and structures pursuant to the counting criteria of the
methods being implemented. The counting criteria dictate discerning fibers by length, width,
aspect ratio and specific physical characteristics. Following these rules, the EPA laboratories
have consistently reported to EPA that the fibers found in air samples collected are populated
almost exclusively with Libby amphibole fiber. (See Reservoirs and EMSL memorandums on this
issue in the Administrative Record.) EPA, USGS and several other researchers (including
researchers for W.R. Grace) have evaluated the nature of the mineral habit of the Libby amphibole
asbestos in the Libby vermiculite. With the exception of Dr. Lee, these researchers have all
concluded that the amphibole asbestos population is fibrous in nature. They all also agree that the
amphibole asbestos in Libby vermiculite is quite friable, giving off airborne fibers when disturbed.
Such research has been performed by Dr. Julie Yang of W.R. Grace, Greg Meeker of USGS,
Arthur Langer, Drs. McDonald and Sebastien at McGill University, Dr. Amandus at NIOSH, Dr.
Wake of the State of Montana, and others. Also, EPA has found that the size and shape of fibers
seen today, whatever their make-up, are similar to those to which workers were exposed to in
Libby in the past (see discussion in Section D below). These fibers clearly have been associated
with asbestos-related disease in Libby and there is no basis for excluding them from exposure
estimates. In fact, Dr. Lee's assertion that EPA has included a large number of cleavage
fragments in its exposure estimates is without any factual foundation. While Dr. Lee discusses a
few studies on the toxicological effects of fibers of different length and width, he offers no
concrete criteria on how he defined a cleavage fragment. His determination is contrary to the
information which has been presented to EPA and to the regulatory and methodological
frameworks established for asbestos assessment. All this discussion aside, Grace grossly
overstates the evidence that cleavage fragments in ans of themselves are benign. There is

13

considerable evidence in the literature that any difference in toxicity between cleavage fragments and fibers is explained by their native difference in morphology. That is that cleavage fragments appear to be less toxic because they tend to be shorter, thicker, and possibly less respirable than fibers. However, it is quite possible that individual, long thin cleavage fragments are as toxic as similarly sized fibers. This position was recently espoused in Senate testimony given by Gregory Wagner of NIOSH on June 20, 2002. A discussion of such issues can be found in a memo by Bill Brattin dated May 31, 2002. (see AR document 495629).

W.R. Grace and Dr. Lee indicate that EPA should not be counting winchite or richterite fibers as asbestos. W.R. Grace's and Dr. Lee's opinion, if followed, would turn the regulatory process on its head, by allowing a non-governmental international committee to change the applicability of regulations after they are established. (For example, if this was in fact the case, one could foresee the dry cleaning industry changing the name of perchloroethylene to "four chlorine atoms on an ethene group" to avoid hazardous waste disposal regulations.) At the time that many of the asbestos regulations that W.R. Grace cites were promulgated, the boundaries of chemical substitution for winchite and richterite were not formally defined in the mineralogic community. Thus, it would have been difficult, at best, for the regulatory agencies to exclude the winchite or richterite from the solid solution series that the agencies believed had a toxicological effect. As W.R. Grace's own experts now readily admit, there is no question that the Libby amphibole (including winchite and richterite) have caused increased rates of asbestos-related disease and mortality in Libby (see Hughson, Anderson, Moolgavkar, 2002). Nothing changed about the asbestiform nature of the Libby amphibole when the new nomenclature was delineated. Indeed, at that time it was common to refer to all of these minerals as tremolite or soda tremolite. (See Mr. Meeker's expert report, which is incorporated by reference, as well as the expert report of Fred Quivik, which is incorporated by reference.) It is interesting to note that all of W.R. Grace's documents, even through the 1980s, refer to the fibrous amphibole asbestos at Libby as tremolite. Finally, the definition of asbestos as a hazardous substance under CERCLA is broader than, and not confined by, the definitions of asbestos promulgated pursuant to OSHA regulations or national emission standards promulgated by EPA.

14

Lastly, on the topic of exposure estimates W.R. Grace argues that EPA *"misidentified gypsum, and vermiculite, among other things, as amphibole asbestos."* This argument is belied by the facts. On every sample where EPA laboratories identified a fibrous structure, additional analyses by EDS and/or SAED were used to verify the mineralogical identity of the fiber. To help in the use of these techniques, standardized spectra and diffraction patterns were developed. These standards were based on the various Libby source materials, containing different ratios of the asbestiform minerals in the Libby amphibole solution series. Analysts and lab technicians were specifically trained on these standards. Although an analyst might see such effects as an increase in the sulfur peak on an EDS due to the colocation of gypsum, this did not preclude the positive identification of an amphibole fiber. In fact, when the spectra specifically used as an example of this supposed problem by Dr Lee (figure 6, p.62) was shown to the Agency's experts, Greg Meeker and Dr. Jim Millette, they could find no support to Dr. Lee's conclusion that the sample showed a mixture of gypsum and amosite. Likewise, W.R. Grace provides no actual support or examples where it alleges that the EPA included "...vermiculite, among other things, with amphibole asbestos."

D.    *The fibers found in EPA's sampling have a different fiber dimension than the fibers that caused disease in miners.*

EPA has carefully evaluated the size distribution of the amphibole asbestos fibers found in the air associated with disturbed Libby vermiculite. Our observations, contrary to the assertion proffered by W.R. Grace, via Dr. Lee's report, is that the fiber size distribution seen today is comparable to that seen in the past. The Agency has already provided to W.R. Grace, and placed in the administrative record, a comparative analyses of the fiber dimensions seen in air samples at various locations around Libby today, versus those reported by Dr. Julie Yang in April 1976. The comparison showed that the reported mean widths, lengths, and aspect ratios, as well as the cumulative distributions, were generally similar. Likewise, the EPA has reviewed a similar analysis performed by Dr. Patrick Sebastien on behalf of W.R. Grace in 1983, which also shows a similar size distribution as that seen today (Attachment 2). In fact, Dr Yang commented on the

report in a memorandum dated July 6, 1983: "It is an eye opener for me to have size distribution profiles of the tremolite fibers present on air filters, and it gives me very valuable information on the **counts and the sizes of those short, thin fibers** which we cannot see with the light microscope." (emphasis added). As early as the late 1950's, Dr Benjamin Wake, State of Montana, estimated that "over 60% of the fibers are < 5microns in length, and over 75% are <10 microns in length." (see Quivik Report, p29)  This description fits well with the Agency's characterization of the fiber size distribution as well. Similar evaluations where reported by Langer (1974) (See Attachment 3). Again Dr. Lee appears to be the outlier. In his evaluation he cites a report by Amandus (1987) as evidence that the fibers seen in Libby historically were longer than those seen today. Amazingly, Dr. Lee fails to mention that Amandus used Phase Contrast Microscopy (PCM) and simply did not include fibers shorter than 4.98 microns in length in his data analysis. It is not surprising then that Dr. Amandus would find a longer mean fiber length than those researchers who did include the shorter fibers. As W.R. Grace is well aware, there are also implications of comparing data reported by PCM, with those results generated by electron microscopy. On numerous occasions W.R. Grace has noted that PCM counted many non-asbestiform objects, such as the edge of vermiculite plates, as asbestos. In fact, W.R. Grace spent a considerable effort to develop PCM counting procedures that differed widely from those use by NIOSH (Dr. Amandus' employer) based on this notion. To now argue the NIOSH method should be used as the gold standard for defining the fiber size distribution in and around the Libby vermiculite operations is inconsistent.

The EPA has summarized the reported size distribution among the various researchers (Yang, Langer, Sebastien, and Amandus) and compared them to the current EPA data sets. (See attached Figures 1-3). The tables listed as "truncated" are the Amandus data set compared to a truncated version of EPA's data, including only those fibers >4.98 microns in length, and >0.44 microns in width. As can be seen, the data sets comparing electron microscopy results (Yang, Langer, Sebastien, and EPA) are quite consistent. There is some slight variation, but this is to be expected, given that the operations and conditions at the mine varied over time. Each of the earlier data sets consisted of sets of samples collected on a single day. Hence, they are most logically viewed as "snapshots" of the airborne amphibole asbestos fibers in Libby. The EPA does

16

not consider it of much consequence that our data set tends to have a slightly longer mean fiber lengths than those reported by Yang and Langer, nor that Sebastien's data overlaps EPA's AHERA data, but is slightly longer than EPA's ISO-10-312 data. All these data sets merely reflect the consistency of the fiber size distribution. Given the above perspective, and then adding the fact that Dr. Amandus used a different microscopic method, using the NIOSH PCM (as W.R. Grace would term it "non-discriminatory") counting methodology, the slight difference in fiber size distribution can hardly be deemed significant. Had Dr. Lee reviewed the references cited by Amandus (e.g. Langer, et.al.) or perhaps reviewed the W.R. Grace files (Yang 1976, Yang/Sebastien 1983) he would have avoided this error.

E.     *W.R. Grace and Dr. Lee argue that there is no correlation between measurements of asbestos in soil or dust and measured airborne concentrations.*

Once again, W.R. Grace and Dr. Lee are seemingly trying to impose on EPA decision criteria not required by the NCP. EPA has clearly established that disturbing soil or dust contaminated with amphibole asbestos will generate airborne amphibole fibers. Dr. Lee argues that you can not "correlate" the presence of asbestos fibers in air by virtue of their presence in soil or dust. This defies logic. To suggest that undertaking an activity such as sweeping in a dusty room will not generate some airborne dust is absurd. If this dust is contaminated with amphibole asbestos, the air will include some asbestos fibers. In fact, as shown by EPA's data, sweeping in the dusty environment of the Screening or Export Plants may result in levels  40 times higher than the occupational exposure limit and more than 10,000 times higher than the long-term residential exposure limit for asbestos. Likewise, vacuuming in a residence with amphibole levels of less than 5,000 $f/cm^2$ in dust can result in airborne fiber levels of greater than 1f/cc by PCM and .01 f/cc PCME by TEM. The fact of the matter is that disturbing materials containing amphibole fibers will result in some of those fibers becoming airborne.

F.     *W.R. Grace and Dr. Lee suggest that EPA must recalculate all of Dr. Weis'*
       *calculations using the data developed by Dr. Lee in accordance with his methods*
       *of identifying and counting fibers.*

The opinions expressed by Dr. Lee in his report indicate that his practice is to exclude asbestos fibers from consideration wherever possible. Rather than use instrumentation that can identify fibers that are very thin, Dr. Lee would choose to use PCM which cannot identify fibers less than .25μm in width, even though both he and W.R. Grace support the theory that longer, thinner fibers have the greatest toxicological significance. Dr. Lee would reduce the number of fibers to be counted by throwing out any sample that was sufficiently loaded with fibers and other materials as to require the use of the widely used and accepted indirect method, despite the fact that the real world conditions in Libby would sometimes result in such samples (indicating the presence of high levels of dust in the air that people are breathing). Dr. Lee would use counting methods that exclude all fibers but one from bundles of fibers or structures containing numerous fibers, despite the fact that W.R. Grace and mineralogists have found the Libby amphibole asbestos to be extremely friable, i.e., bundles and structures readily release individual fibers. Dr. Lee would further exclude many fibers as "cleavage fragments", despite the fact that he is unable to even express the criteria by which he would make such distinctions, nor to identify any accepted method for doing so. Finally, Dr. Lee would incredibly remove from consideration all fibers of winchite or richterite amphibole asbestos, which comprise a substantial portion of the amphibole asbestos in Libby, despite the fact that these amphibole asbestos fibers are hazardous substances and, as explained below, contribute to risk to the same degree as tremolite amphibole asbestos. Asbestos analyses, as performed by Dr. Lee, are clearly biased low. Dr. Lee's methodology is intended not to protect the health of the people of Libby, but rather the interests of his client.

W.R. Grace and Dr. Lee suggest that the recalculation of Dr. Weis' risk formulas be performed with data analyzed at Dr. Lee's laboratory. In the light of Dr. Lee's concern about quality control issues at the laboratories employed by EPA for the Libby investigation and cleanup, EPA has reviewed the independent audit performed by IT Corporation at Dr. Lee's laboratory

18

during April, 2001 (Attachment 4). That review indicated deficiencies in on-site quality control, compliance with laboratory SOPs and methodology, sample handling, record keeping, and incomplete documentation of analytical results. Unlike the audits described for the laboratories employed by EPA for the Libby project, IT Corporation did **not** indicate that these deficiencies in Dr. Lee's laboratory were minor in nature.[3] It is clear that it would not be appropriate to use Dr. Lee's data, as its reliability seems suspect.

Finally, W.R. Grace believes it appropriate for Dr. Lee to perform risk calculations, despite that fact that none of his education nor experience indicate expertise in such work. Once again, EPA does not believe that it would be protective of public health to allow those without expertise in risk calculations to perform hazard assessments for Libby.

---

[3] The conclusion of the audit states:

The overall evaluation of the laboratory revealed procedural weaknesses with regard to a lack of an on-site QA/QC program, compliance with laboratory SOPs and methodology, sample handling, record keeping, and incomplete documentation of analytical results.

The most significant observations from evaluation of the laboratory are as follows:

. The use of a different refractive index solutions for identification and point counting may be a contributing factor in the discrepancies in sample results from RJ Lee Group Inc. versus those from another laboratory. The method is unclear as to whether or not this is an acceptable practice and only states that the samples be mounted "with the appropriate refractive index liquid" for the point counting procedure. Note that this observation has not yet been verified through analysis from a third source.

. Significant evidentiary concerns included failure to sign COC records upon receipt, lack of internal COC documentation, and lack of procedures for assigning internal laboratory sample identification numbers to individual sample containers.

. Significant technical findings include failure to record key observations during stereomicroscopic and PLM analyses, failure to perform duplicate analysis at the prescribed frequency, failure to routinely utilize reference slides, and failure to perform several procedures to minimize potential cross-contamination.

. Significant QA/QC and reporting concerns include the lack of an on-site Quality Assurance Officer, and incomplete documentation of analytical results.

The majority of the staff were very cooperative, and readily answered all questions posed by the on-site audit team. The management of the laboratory was responsive to the identified observations and appeared to be dedicated to correcting all of the audit observations.

II.     *W.R. Grace and Dr. Anderson argue that EPA has not elevated risk assessment high enough in its decision criteria for action at Libby, has not performed risk calculations appropriately, has not distinguished past exposures from current exposures and has not excluded "cleavage fragments" from its risk calculations.*

        A.    *W.R. Grace and Dr. Anderson argue that time critical removal action in Libby should have been motivated by current exposures (i.e., those present in November, 1999 or afterwards). They believe that the most relevant analysis to determine the need for action in response to such exposures are the Weis screening level risk assessments. However, EPA's use of numerous analyses and studies that relate to historical exposures lead W.R. Grace and Dr. Anderson to believe that EPA is inappropriately relying on much "higher" historical exposures in making its cleanup decisions.*

                1.    *Dr. Anderson indicates that risk assessment is the scientifically accepted method for assessing the potential health effects associated with current exposure.*

As previously discussed, the determination to perform time critical removal actions is based on the criteria in Section 104 of CERCLA and in the NCP, Section 300.415(b). No risk assessment is indicated or required under the emergency response provisions of the law. Despite this, EPA and ATSDR undertook a program to fully evaluate the effect of past exposures on current health and on mortality within the community (to understand the impact of amphibole asbestos on health). In addition, EPA and PHS attempted to identify and rank (in order of severity) of ongoing pathways of human exposure, to quantify exposures in chosen pathways by exposure-based human monitoring and to use this information, among other reasons, for the screening level risk assessment. While the information developed through this comprehensive analysis results in a fuller understanding of the threat posed by current exposure to amphibole asbestos, it does not supplant the basic decisional criteria described in 300.415(b) of the NCP.

20

2.   *W. R. Grace and Dr. Anderson continue to argue that EPA is inappropriately using past high level exposures as the main reason for taking the current removal actions. Since there is a long latency period for asbestos-related diseases, illnesses observed today are likely the result of high-level exposures that occurred before the mining and related operations were closed. Therefore, earlier, high level exposures do not justify the current time-critical removal.*

As stated on multiple occasions, EPA does not and has not taken the position that the disease seen today is caused by current exposures, although such exposures may further exacerbate such illness. Rather, as discussed later in this response, EPA believes that evaluation of the disease caused by past exposures is instructive in understanding the potential effects of current exposures to the amphibole asbestos that is present in Libby today. There is a plethora of information indicating the potential for this amphibole asbestos to cause human disease and death. Death and disease are caused in a dose-dependent manner for both occupational and non-occupational settings (i.e. at various levels, durations, and frequencies of exposure and dose). Information indicating the potential for such exposure-related disease has been collected, analyzed, peer reviewed, and reported by McGill University, the National Institutes for Occupational Safety and Health (NIOSH), the University of Cincinnati, and the Centers for Disease Control's Agency for Toxic Substances and Disease Registry (ATSDR). W.R. Grace has also performed its own evaluations suggesting such a relationship.

It is recognized by the scientific community that present evidence of disease is related to past exposures. It is also well documented that exposures to Libby Amphibole continue today in both occupational and non-occupational settings. Such exposures have a potential to cause disease. In stark contrast to EPA's efforts to record and quantify evidence of ongoing human exposure in Libby, W.R. Grace has failed to provide **any** empirical evidence that exposures have ceased since 1999 or that the present disease is related only to exposures occurring prior to 1999.

21

Dr. Anderson has past involvement with risk assessment policy development. Therefore, she should know that, as outlined by the National Academy of Sciences in 1983, risk assessments are usually composed of four principle parts; a) a hazard assessment, b) an exposure assessment, c) a toxicity assessment and d) a risk characterization.   The first stage in any risk evaluation requires a full review of the data in order to evaluate the **hazard** posed by the contaminant of concern. Present and historical evidence of human exposure and disease is essential for completion of the **Hazard Assessment** and is a requirement of any risk assessment.  The epidemiological data used in Dr. Weis's sequential risk evaluations clearly indicates the **hazards** associated with exposure to Libby amphibole asbestos.

Once again, it is incorrect that EPA believes death and disease which have occurred in Libby since EPA's arrival there in November of 1999 are a result of exposures that occurred concurrently.  Rather, EPA's concern (as clearly demonstrated by collection and analysis of breathing zone air) is that exposures occurring today can be as high in their intensity and toxicologically important as exposures that have occurred historically.  It is clear that the outcome of such historical exposures have lead to increased morbidity and mortality occurring in Libby today.

> 3.   *W.R. Grace and Dr. Anderson argue that past exposures which harmed people no longer exist.  They indicate that mining operations ceased in 1990, which removed the primary source of asbestos and reduced occupational and residential exposures.  In addition, other changes at the mining operations prior to 1990 reduced exposures compared to prior periods.  Thus, Dr. Anderson concludes that the relevant delineation should not be occupational versus non-occupational, but rather should regard the level, duration, and frequency of exposure.*

EPA does not disagree with Dr. Anderson's acknowledgment of the importance of exposure "level, duration, and frequency".  Estimation or measurement of dose through determination of exposure intensity, duration, and frequency is fundamental to the risk assessment

22

process and was clearly addressed in Dr. Weis' screening level risk estimations (Weis, 12/20/01 p. 13).

Dr. Anderson indicates that "prior to closure of the mine, there was a potential for high exposures due to the quantities of materials being processed a the mining and milling sites". She goes on to list several areas where exposures were historically "significant". These areas included 1) the mine and mill on Rainy Creek Road on top of Zonolite Mountain, 2) the screening plant and railroad loading station at the intersection of Rainy Creek road and Highway 37, 3) the expansion/export plant located off of Highway 37, and 4) the expansion plant in the town of Libby. Dr. Anderson indicates that it is her "understanding" that most vermiculite piles had been removed after closure of the mine. Unfortunately, in many respects, Dr. Anderson has been misinformed about the presence of vermiculite and amphibole asbestos in the Libby community. Complete exposure pathways existed at all these areas when EPA arrived in Libby in November, 1999.

Prior to EPA involvement in 1999, unprotected workers had excavated fill from the mine site to obtain rip-rap material for reinforcing the banks of a creek in a residential area of Libby. Additionally, logging was actively continuing in the vicinity of the mine site in 1999 and young adults had been having parties at the mine site. Each of these activities represent exposure pathways of potential concern. In addition, students at the Plummer Elementary School and at the Libby High School track were exposed to tailings with high levels of amphibole asbestos. As demonstrated by studies conducted by W.R. Grace on the running tracks at the high school, even foot traffic over areas contaminated with friable Libby amphibole asbestos can cause high intensity exposures.

Upon arrival at the site in 1999, EPA response team members discovered intensive ongoing exposure pathways at the Screening Plant. The area had been converted to a home business with both residents and workers exposed on a regular basis. EPA team members witnessed young children handling and breaking up waste materials including stones that were later discovered to be nearly pure Libby amphibole asbestos. Workers and residents at the converted Screening Plant regularly entered enclosed spaces containing hundreds of pounds of ore, ore concentrate, and finished vermiculite product. These workers swept and conducted other activities in these enclosed spaces on a daily basis. Thus, complete human exposure pathways existed at the

23

Screening Plant upon the arrival of the EPA response team in November of 1999. In addition, family members of the Parkers, who owned the Screening Plant, such as their grandchildren, joined them in enclosed spaces where EPA documented high asbestos fiber concentrations. See Photo 1.

Furthermore, EPA documented large piles of ore concentrate with percent levels of asbestos in the orchard next to the former Screening Plant. See Photos 2 and 3. There was evidence of recent efforts to load this material onto vehicles, presumably for transport and use elsewhere in the vicinity of Libby. Thus, in November of 1999, there was observable evidence of complete human exposure pathways resulting in high intensity exposures at the Screening Plant.

At the expansion/export plant off Highway 37, EPA identified large piles of raw ore, ore concentrate, and finished vermiculite product laying on the open ground. Some of the readily accessible material was demonstrated to have asbestos concentrations higher than 50%. This material was exposed to foot traffic and vehicle traffic where it could be disturbed and rendered airborne. As evidenced by studies done by EPA and W.R. Grace, only minimal disturbance is required to render asbestos fibers airborne. Thus, complete exposure pathways existed at the expansion/export plant off Highway 37 when the EPA response team arrived in Libby in November of 1999.

The only area mentioned by Dr. Anderson where clear evidence of ongoing human exposure was not obvious was the former expanding plant adjacent to Fifth Street. However, even at this location (now used by the Stimson Lumber Mill as a parking lot, some individuals expressed concern about the possibility of ongoing exposure, indicating to EPA officials that flakes of vermiculite were evident on the surface of the parking area. EPA is continuing to evaluate the presence of amphibole asbestos at this location.

4.     *Dr. Anderson believes that in presenting the basis for the time-critical removal action at Libby, EPA has included a variety of studies and analyses which are not relevant because the documents do not address current exposures.*

Dr. Anderson lists several studies presented by EPA indicating that they are "irrelevant". Among them she lists three epidemiological investigations and the Whitehouse case histories investigation.  EPA's Risk Assessment Guidance for Superfund (RAGS), Part A (a document that Dr. Anderson purportedly helped to develop during her tenure at EPA) addresses the importance of human epidemiological studies stating that:

"**Well-conducted, epidemiologic studies that show a positive association between an agent and a disease are accepted as the most convincing evidence about human risk.**" (RAGS Part A)

Despite Dr. Anderson's present statements to the contrary, the beneficial use of epidemiological information for determination of potential hazard, causality, and for the estimation of dose-response criteria for risk assessment is clear.  Dr. Weis' screening level risk evaluations for the site recognize the benefit of these epidemiological investigations, as well as the differential exposure occurring in Libby today versus in the past.

B.     *W.R. Grace and Dr. Anderson assert that the Weis risk assessments and the EPA action memoranda present a variety of analyses of asbestos related health effects in Libby, but do not distinguish prior exposure and risk from current exposure and risk, which is clearly lower.  It is not scientifically supportable to use these earlier historical studies to describe current exposure and risk.  The available health effects data in Libby are consistent with occupational exposures and likely non-occupational exposures prior to the closure of the mine and prior remedial activities in Libby.  It is misleading and scientifically indefensible to attribute these risks to current conditions in Libby.*

25

This is not the first time, when confronted with disease of Libby residents, that W.R. Grace has said that people are sick from exposure in the past and that the "conditions causing such disease no longer exist." In the early 1980s W.R. Grace responded to an information request under TSCA Section 8(e) concerning exposure to tremolite resulting from W.R. Grace's vermiculite operations in Libby, Montana. At that time, W.R. Grace indicated to EPA that "all of the employees who show signs of asbestos-related disease were employed prior to 1976 when fiber levels were significantly higher than they are today." W.R. Grace noted in contrast that its "preliminary data [show that] none of the current employees hired since 1975 have asbestos-related disease." Thus, W.R. Grace concluded, as it does in this case, that such exposures "do not exist in today's ... environment." Putting aside the absurd notion that someone exposed in 1974 would exhibit asbestos-related disease in the early 1980's, ATSDR's health screening study shows that there may have been significant exposures after 1975 and that those exposures were not limited to those employed by W.R. Grace. "Of the 897 participants 18 to 35 years old, 16 were observed to have pleural abnormality. Of these sixteen participants, one was age 20, four were 25-29 years old, and the remaining 11 were 35 years old." (See Year 2000 Medical Testing of Individuals Potentially Exposed to Asbestoform (sic) Minerals Associated with Vermiculite in Libby, Montana, August 23, 2001, p. 14) Thus, five of the sixteen having abnormalities were too young to have received any considerable exposure prior to 1975.

This is also the same argument again used by W.R. Grace to limit regulation of their active facilities in the early 1980s. Due to latency in the symptomology of asbestos-related disease, medical evidence of exposure is delayed by years and even decades. Unfortunately, the flaws in this redundant argument are evidenced in the human tragedy documented by EPA, USPHS and ATSDR in Libby during the medical screening program in Libby (2000-2001). EPA has clearly demonstrated on-going exposures by measuring fibers in the breathing zones of workers and residents in Libby. For the past two years EPA has regularly recorded fiber concentrations far greater than even occupational exposure limits in workers conducting activities similar to those of Libby residents (e.g. driving on Rainy Creek Road, see note from McCaig to all Libby employees expressing concern about "exposure to tremolite contaminated dust from the roadbed." AR Doc. #

486644). Apparently W.R. Grace would have cleanup actions delayed once again until another round of disease is expressed in Libby.

EPA cites the studies of Lockey et al. (1984), Amandus et al. (1987b) and McDonald et al. (1986) to demonstrate causality and **hazard** associated with exposure to Libby Amphibole. Such information is important to risk evaluation as identified in the Risk Assessment guidance for Superfund; Part A, (RAGS) a document developed under oversight by Dr. Anderson. The RAGS specifically states that "**epidemiologic studies.....are accepted as the most convincing evidence about human risk.**" EPA agrees that, in general, exposure intensities recorded in these epidemiological investigations were higher than exposures seen in Libby today. EPA's recognition of this is clearly documented in the quantitative risk evaluations conducted by Dr. Weis. However, empirical exposure concentrations recorded by EPA in human breathing zones of present-day Libby residents and/or workers overlap in their intensity exposures recorded historically by the epidemiology studies discussed above. The value of analyzing consequences of these past exposures is that they demonstrate the logical outcome of exposures known to be occurring today.

> *1.*     *Dr. Anderson notes that the ATSDR mortality study showed that there were 11 cases of asbestosis in Libby, which ATSDR states is between 40-60 times the national average incidence. However, Dr. Anderson believes that EPA's use of this study as evidence that its removal action is necessary is inappropriate, as it is not relevant to current exposures.*

Dr. Anderson's redundant argument misses the point. First, W.R. Grace has argued for years that they should not be held responsible in the present for health effects and deaths as a result of past exposures and that present day exposures are below levels of concern. According to this circular logic, W.R. Grace can avoid responsibility for their actions in perpetuity. As discussed above, this argument was employed by W.R. Grace in the early 1980s in a effort to avoid civil responsibilities under the Toxic Substances Control Act (TSCA). Secondly, Dr Anderson's argument misses the purpose for the ATSDR mortality study. The study was undertaken to determine if there was a definable hazard associated with exposure to Libby amphibole asbestos.

The ATSDR study clearly determined that such a hazard did exist and that, indeed, exposure to Libby amphibole could result in increased mortality. Investigation of all available human data relevant to site-specific exposure is required by RAGS. RAGS indicates that epidemiological investigations such as the ATSDR mortality study "**require careful interpretation....[and]....are given first priority in the dose-response assessment**" (RAGS, page 7-3).

> 2.    *Dr. Anderson states that while the ATSDR medical screening study correlates a variety of exposure scenarios with pleural plaques, none of the exposure scenarios that exist today were correlated with pleural plaques. In effect, Dr. Anderson is once again saying there were no exposure pathways upon EPA's arrival in Libby in November, 1999.*

As indicated earlier, Dr. Anderson has made an assumption that is incorrect. It is clear that Dr. Anderson has not been provided with accurate information regarding the status of the site at the time the EPA emergency response team arrived in Libby in November of 1999. EPA has previously provided in this response information on current exposure pathways. In addition, as clearly documented by the EPA response team and independently verified by Dr. Fred Quivik (7/29/02), **W.R. Grace "distributed waste products throughout the community by allowing members of the community to load waste at the screening plant.....and to haul it away for use in yards, gardens, [etc]."** There were piles of vermiculite that were left "free for the taking" in areas near the screening plant. The former mine site was made available for the extraction of gravel and rip-rap. Large areas of raw vermiculite ore which contained large amounts of asbestos were found in children's play areas at the elementary and high schools. In fact many of the exposure pathways listed by Dr. Anderson on page 8 of her report were still in existence when the EPA emergency response team arrived in Libby in November of 1999. Pathways that were directly observed and measured by the EPA response team included: 1) exposure to raw vermiculite ore at the schools and in specific residential areas in by children who were playing 2) exposure to fibers remaining in the homes of former W.R. Grace workers, 3) exposure resulting from individuals continuing to "pop" vermiculite by heating it on the stove or with blow torches.

Therefore, the assumption that historically significant exposure pathways are no longer relevant to ongoing exposure and risk in Libby is incorrect. Libby is not the only case where lingering workplace contaminants have resulted in disease[4]. Furthermore, existing pathways such as installing vermiculite insulation in homes[5], handling vermiculite insulation[6], and recreational activities involving exposure to vermiculite insulation, raw ore or ore concentrate all existed in November of 1999. All are associated with asbestos-related abnormalities and/or disease either in Libby or elsewhere.

　　　3.　　*W.R. Grace and Dr. Anderson claim that EPA erroneously equates exposures observed in the Marysville, Ohio epidemiology study to potential exposures at the screening and export plants. They indicate that a careful review shows that EPA's analysis is incorrect for several reasons.*

EPA's comparison of particular exposures taking place in Libby to those that were taking place at O.M. Scott's Marysville, Ohio, processing plant are indeed appropriate. First, all of the amphibole asbestos exposures (and the resulting asbestos-related disease documented) discussed by Dr. Lockey at the Marysville plant came as a result of their employees handling Libby vermiculite ore concentrate. This is the same material EPA has found in great abundance at the Screening Plant, KDC Bluffs and Flyway, and nearly forty percent of the properties the EPA has surveyed in and around Libby to date. Likewise, EPA has observed airborne asbestos exposures associated with certain activities that were seen after our arrival in Libby in November 1999. In our last response to comments by W.R. Grace we offered the simple example of sweeping in the former long shed and tunnels at the former W.R. Grace Screening Plant. By way of background,

---

[4]Anderson H.A., and Selikoff, I.J. (1979) Asbestos-associated changes among household contacts of amosite asbestos workers, In: *Induced Disease: Drug, Irradiation, Occupation* L. Preger ed. Grune and Stratton Pub. NY (Attachment 5)

[5]Flintkote Case, 849 S.W. 2d 506 (1993), Barbanti

[6]Lockey et al., (1984) Pulmonary changes after exposure to vermiculite contaminated with fibrous tremolite *Am Rev. Respir. Dis. 129:952-958.*

W.R. Grace should recall that the family which purchased the Screening Plant Property used the former tunnels underneath the long-shed building to grow mushrooms. In fact, the Parkers scraped up enough vermiculite ore concentrate in the tunnels alone to fill over 5000 three gallon buckets with vermiculite (with stockpiled material to spare), which they used as a growth media for their mushrooms. The Parkers swept, bagged vermiculite, and/or entered these tunnels on a daily basis. When EPA conducted personnel sampling during the sweeping of these tunnels and the bagging of the vermiculite in the tunnels, it observed fiber levels >4.0f/cc TEM-PCME. For purposes of comparing this single exposure (ignoring all of the other exposures that the Parkers faced on their property on a daily basis) to those at Marysville, EPA assumed that this occurred for only thirty minutes, and that the Parker's did this as a daily part of their work week. Calculating a cumulative fiber exposure for the seven years the Parkers owned the property:

$$(4.0 \text{ f/cc}) \times (0.5\text{hr/8hr-day}) = 0.25 \text{ f/cc TWA for an 8 hr workday}$$

$$(0.25\text{f/cc}) \times 7 \text{ years} = 1.75 \text{ f/cc years}$$

The medium exposure group in Marysville was reported to have a range for daily TWA exposures of 0.031 to 0.415 f/cc by PCM. Thus, the Parkers clearly had exposures within the range of exposures experienced by those working at Marysville. Further, using only this one scenario, in the seven years they owned the property, the Parker's cumulative amphibole asbestos exposures were as high as Marysville workers found to have asbestos-related abnormalities. Given that the Parkers had exposures associated with a myriad of activities, it is likely that this is a very conservative estimate. It has already been pointed out that there were many more exposures on the Screening Plant property than this sweeping activity. Also, the data collected in Marysville was analyzed by PCM, not the TEM the EPA employed in Libby. Thus, as W.R. Grace has pointed out on numerous occasions it is likely that many non-asbestiform particles were counted as asbestos by PCM in the Marysville data set. Thus the relative exposure at the former Screening Plant would be even higher.

Dr. Anderson's confusion arises from mixing data from different exposure scenarios in making the calculations for this specific exposure at one location at the Screening Plant. Dr. Anderson picked the mean exposure value for all sweeping scenarios at the Screening Plant and the Export Plant, which was reported by Dr. Weis as 0.685f/cc. This explains the six-fold difference in numerical values reported by Dr. Anderson. However, if as Dr. Anderson suggests the mean value should be used, it should at a minimum be segregated by location (Export Plant vs. Screening Plant). Secondly, the period of exposure should be amended to reflect the additive duration of the exposures. For example, if the Parkers swept, bagged in the tunnels for 30 minutes daily, then that exposure must be added to the exposure found during other activities, such as sweeping upstairs in the long shed, planting trees in the vermiculite concentrate left about the property, and vacuuming in the interior of their home on the property, to name a few, must be added. Thus, while the average exposure may be lower, the duration of the exposure must be increased when calculating a TWA exposure. Remember, EPA's example calculations about the Parker's cumulative exposure was based on this single activity (which the Parkers did in fact do on a daily basis) with no other contributions from ather asbestos sources. It is entirely inappropriate, as Dr. Anderson has done, to take values from lower dose exposures, average them in, and then apply the resulting average only to a single activity rather than the Parker's normal day.

C.    *W.R. Grace and Dr. Anderson argue that EPA's risk assessment is not transparent nor reproduceable, and contains numerous apparent errors and inconsistencies. Dr. Anderson states that the transparency of the risk assessment does not meet EPA's own guidance on risk assessment or minimum scientific standards. Dr. Anderson believes that a complete review of the scientific validity of the risk assessment is impossible. Therefore, she suggests EPA's assessments cannot be relied upon, and cannot be supported scientifically.*

1.    *Dr. Anderson indicates that EPA has developed guidelines on the transparency of risk assessments, but the Weis risk assessments did not follow the EPA guidelines for the Libby risk assessments.*

31

Dr. Anderson addresses Agency policy on transparency, reviewing the development of the policy from Administrator Browner's memo on Risk Characterization (4/21/95) through development of the Agency's guidance on risk assessment as outlined in the Risk Assessment Guidance for Superfund (Part D). A review of the Science Policy Council Handbook on Risk Characterization (EPA 100-B-00-002 p.15) identifies ten areas of disclosure to achieve transparency in risk assessment. The screening level risk evaluation conducted by Dr. Weis complies with these recommendations.

2.    *Dr. Anderson indicates that Dr. Weis did not present calculations, exposure point concentrations, [or] numerical risk estimates.*

Risk calculations for asbestos exposure are straight forward and clearly presented in the context of the screening-level risk assessment. A complete explanation and presentation of the mathematical algorithm used to calculate risk is presented on page 13 of 23 in Dr. Weis' December 20, 2001 memorandum. The exposure assumptions used are presented in Table 10 on the same page. Numerical estimates of risk are presented in figure 3 of the risk memo along with a discussion of uncertainties (p. 14). These risk estimates have been slightly revised (see attachments and discussion below) using the same mathematical algorithm presented by Dr. Weis in the December 20, 2001 risk memorandum.

3.    *Dr. Anderson complains that she cannot duplicate many of EPA's calculations.*

Dr. Anderson correctly identifies a quantitative error in the representation of the database in Dr. Weis' December 20, 2001 risk memo. Following inspection of the database and the methods used to upload this information in the risk memo, an error was confirmed. This error appeared to be a function of the way in which Microsoft Access handles certain data queries. While the error was non-trivial for the scenario 1 risk estimates, it had only minor effects on overall risk calculations for scenarios 2 and 3. Risk calculations for the scenarios have been revised to correct this error.

These revisions are reflected in the attachments (6 through 9) indicated in the following paragraph. The revised risk calculations do not impact any of EPA's removal action determinations at the Libby Asbestos Site.

During review of the sample upload in response to Dr. Anderson's comments, it became clear that selection criteria for data used to develop exposure point concentrations also required revision. Consistent with guidance on screening level risk evaluation and in the interest of public health, EPA has revised the selection criteria such that, in cases where both direct and indirect analyses were conducted on a sample, the higher of the two values was chosen and employed in the quantitative risk assessment. To assist W.R. Grace in the review of these changes, EPA has attached to this response; 1) a side-by-side comparison of old and revised tables from Dr. Weis' December 2001 risk memo (Attachment 6), 2) a table of fiber concentration by analysis (Attachment 7), and 3) a table comparing the results of the revised selection criteria (Attachment 8). Additionally, EPA has included a table which clearly demonstrates the types of information collected during the Phase 2 investigation that were not selected for use in the risk assessment (Attachment 9). Most of the samples excluded (with the exception of the quality assurance samples) would have served to increase the estimated exposures and resulting risk estimates. However, most of these samples were collected for the purpose of EPA occupational monitoring and were not deemed completely relevant to residential exposures experienced in Libby.

4.    *Dr. Anderson states that EPA based its risk estimates on an index of fiber counts referred to as Phase Contrast Microscopy Equivalents (PCME) and that she cannot determine from the available documentation how EPA estimated the PCME Concentrations, which is critical to her understanding the risk calculations.*

The approach used to estimate PCME from the Libby database is presented as a footnote to Table 4 in Dr. Weis's risk memorandum (12/20/02). Additionally, the PCME estimates used along with the appropriate sample numbers have been provided to W.R. Grace in the form of a memo written by Dr. Weis on April 16, 2002. As mentioned previously, reevaluation of fiber concentrations are included as an attachment to these comments.

D.     *Dr. Anderson states that EPA developed a complicated database to catalog the asbestos measurement data in Libby, but provided only very limited documentation or training on how to use the database.*

EPA developed the Libby database using standard computer hardware and commercially available (i.e. publically accessible) software. A schematic outline of the database including a list of all available fields has been provided to W.R. Grace along with the opportunity to view the database and discuss its operation with EPA data managers and staff. Throughout the removal actions at Libby, EPA has made all environmental data available to W.R. Grace or its representatives. W.R. Grace representatives were provided opportunities to review and comment on EPA sampling plans. EPA has regularly been available to discuss technical and scientific issues about data collection, analysis, and recording. Estimates of PCME concentrations provided in the risk memo developed by Dr. Weis were derived according to procedures outlined in the footnote to table 4 in the risk memorandum.

EPA acknowledges that the Libby database is large. EPA has never maintained that this (or any) database is flawless, only that it is of the highest possible quality and is sufficient for risk assessment and risk management decision-making. EPA does not agree that the database is lacking in clarity or unnecessarily complex. The complexity of the database is necessary due to the comprehensive sampling program required to fully characterize human exposures at the site.

E.     *Dr. Anderson argues that the asbestos measurement data used in the risk assessments contain numerous apparent errors, inconsistencies, and areas of confusion, which render the risk assessment unreliable.*

As discussed earlier in this response, EPA's sampling and analysis process for the Phase 1 and Phase 2 programs were independently audited by the Analytical Operations/Data Quality Center in Washington, DC (AOC). Both field and laboratory on-site audits were included. Any improvements in the sampling and analysis program requested by the AOC were immediately implemented. EPA previously acknowledged a discrepancy in the transfer of data from the

34

database to the risk memorandum as identified by Dr. Anderson. EPA has implemented revisions to the risk tables and has included them as attachments to these comments.

Dr. Anderson indicates that the binning of fibers according to ISO 10312 protocols does not correlate with PCM size requirements. As explained in the footnote to Table 4 in Dr. Weis's memorandum (12/2/02), fiber data from the Phase 1 investigation were included in the PCM counts if bin characteristics overlapped with the PCME size characteristics. As indicated in the footnote, this technique is likely to have resulted in a slight underestimate of fiber concentrations (i.e. a slight underestimate of exposure and risk) since fibers with aspect ratios less than 5 to 1 are NOT included in the ISO counting rules whereas fibers with 3 to 1 (or greater) aspect ratios are included as PCME fibers.

Dr. Anderson indicates that the number of soil and bulk material samples listed by Weis for both the Screening Plant and the Export Plant do not correspond to those found in the database. Without more specific information, it is not possible to verify the claims made by Dr. Anderson. However, it should be noted that during the Spring of 2000, EPA collected hundreds of environmental samples in an effort to identify plausible human exposure pathways at the site. As a result, the database was changing daily as new information was added. EPA cannot discern from the information provided by Dr. Anderson the date that she reviewed the database and, thus, cannot specifically respond to the comment. However, since soil and bulk material characteristics were not used in the quantitative risk evaluation it is not possible that the alleged small discrepancies in the number of samples in the database would have altered EPA's overall conclusions about human exposure and risk at the site.

F.    *Dr. Anderson addresses several issues concerning the analysis of soils and bulk material including: 1) the exclusion of several categories of samples from the summary risk analysis, 2) the assignment of subsurface vs. surface designations for some samples, and 3) the treatment of duplicate samples for the purpose of the summary analysis.*

The use of soil and bulk samples in the screening level risk evaluation is limited to qualitative presentation only and did not affect the quantitative aspects of the risk assessment in any way. Therefore, there is no possibility that minor discrepancies (if such discrepancies exist) would have affected EPA's final decision-making about the presence of direct human exposure pathways or risk at the site.

G.    *Dr. Anderson alleges that the Weis risk assessments and associated EPA Action Memoranda include unrealistic assumptions and a misunderstanding of key data and studies, which significantly impact the results. According to Dr. Anderson, these assumptions and misunderstandings tend to overestimate risks.*

1.    *According to Dr. Anderson the RJ Lee Group found that EPA inappropriately included cleavage fragments, non-asbestos material, and indirect sample preparations in its fiber counts, which resulted in substantial over counts of fibers.*

EPA has responded to Dr. Lee's allegations earlier in this response.

2.    *According to Dr. Anderson, EPA states that the fibers in Libby are of a type and habit that are more toxic than other asbestos fibers. However, Dr. Anderson believes that analysis of health effects to workers exposed to fibers in the Libby mining operations does not support this claim.*

EPA did not conduct quantitative risk assessments based upon differential toxicity of asbestiform minerals. In conducting the screening level risk assessments for the site, EPA followed standard risk assessment procedure for asbestos derived from the IRIS database. The IRIS slope factor for asbestos is, in turn, derived primarily from occupational studies involving exposure to serpentine asbestiform particles. First, the asbestiform materials found in Libby are at least as poisonous as other forms of asbestos. Second, there is significant evidence in the peer reviewed

literature indicating that amphiboles, particularly tremolite, may have greater toxicity than chrysotile (the predominant form of asbestos used to establish the EPA cancer slope factor). Van Oss et al[7]. state that "some asbestos species, such as the amphiboles, crocidolite, amosite, and tremolite, are pathogenic after only a short (e.g. less than one year) exposure; serpentine asbestos (e.g. chrysolite) and other mineral particles are only pathogenic after long-term (many years) exposure." Thus, EPA's IRIS model, and the screening level risk assessments performed at the site would underestimate risk based on this finding. In light of such evidence, EPA was fully justified in taking appropriate precautions to minimize further exposure to the residential population of Libby.

> 3.      *Dr. Anderson indicates that EPA states that fibers found in the Libby*
>         *community (i.e. environmental fibers) are as toxic or more toxic than fibers*
>         *to which Libby workers were exposed (occupational fibers). She believes*
>         *that a comparison of environmental and occupational fibers suggests the*
>         *opposite.*

The existing data regarding fiber dimension length, width, and aspect ratio of Libby amphibole asbestos fibers supports the finding that the fibers found in Libby today are indistinguishable from fibers to which miners and residents were exposed to in the past. EPA provided detailed fiber characterizations in the screening level risk assessments for the site. EPA is aware of at least three studies conducted by W.R. Grace and others to characterize fiber dimensions from historical occupational sources in Libby[8,9,10]. All of these studies indicate that fiber dimensions

---

[7]Van Oss, CJ, Niam, JO, Costanzo, PM, et al., Impact of defferent asbestos species and other mineral particles on pulmonary pathogenesis.

[8]Langer, AM, Mackler, AD, and Pooley, FD, Electron Microscopical investigation of asbestos fibers. *Env. Health Persp.* 9: pp63-80 (1974)

[9]Sebastien, P. Analysis by analytical transmission electron microscopy of fibrous particles in Libby's air samples (1983) (101Z00113)

[10]Studies to characterize dose material for hamster bioassays run by Dr. Smith

37

are the same in the residential area of Libby today as they were during full operation of the mining and milling processes in Libby. R.J. Lee uses the Amandus (1987) inappropriately in his effort to contend that fiber dimensions have changed since the 1980s. Amandus truncated his presentation of fiber size data collected in Libby by limiting his presentation to only those fibers greater than approximately 5 microns in length. Amandus also references the Langer (1974) work that more fully characterizes asbestos fiber size distributions from the Libby ore. A review of the Langer investigation indicates that the mean length and width determined by Langer in 1974 is indistinguishable from data collected by EPA over the past 2 years.

> 4.    *EPA alleges that its risk assessment is conservative because it did not consider non-cancer endpoints, such as asbestosis. Dr. Anderson believes that asbestosis is generally associated with higher exposures than are currently occurring in Libby.*

ATSDR, EPA and the USPHS completed a radiological screening of nearly 6500 people exposed to the Libby vermiculite. Almost 18% of those screened demonstrated non-cancerous lung abnormalities as a result of the exposures they suffered. EPA agrees that exposures and asbestosis risks were likely to be higher for former workers during active mining operations, yet, only 370 individuals who participated in the screening program were former WR Grace employees. Many of the exposure pathways reported by participants in the screening study (such as playing in vermiculite piles, renovating homes with vermiculite insulation, and tilling gardens with vermiculite amendments) are still in existence today. **Indeed, nearly half the homes sampled during the summer of 2002 have visible vermiculite contamination in their yards.**

As previously indicated in this response, since 1999, EPA has reported findings of ongoing exposure pathways in Libby such as; 1) children playing at the Plummer elementary school on highly contaminated mine waste (waste that contained large chunks of pure amphibole asbestos), 2) high concentrations of asbestos at the highschool track (including under the bleachers and inside the concession stand), 3) piles of vermiculite found scattered throughout residential settings on the site

38

as ornamental and horticultural amendments, 4) and workers reporting regular contact with contaminated vermiculite insulation as a normal part of their job functions.

In light of these findings, it does not seem unreasonable for EPA to conclude that; 1) there were clearly observable human pathways of exposure to high concentrations of asbestos in Libby, 2) that these exposures might result in the inhalation of high concentrations of amphibole fiber (in fact EPA, W.R. Grace, and others have measured this phenomenon) by children and adults living in Libby, 3) that exposures to Libby amphibole have resulted in non-cancerous lung lesions in the past, and 4) that such cause-and-effect might plausibly occur in the future.

> 5.      *Dr. Anderson asserts that EPA states that Libby residents are a "sensitive" subpopulation due to prior exposure implying, without evidence, that multiplicative effects will occur with added exposures; rather than a linear, additive effect proportional to the exposure. She believes that this statement is inconsistent with EPA's assumptions in its risk assessment.*

EPA indicated that the Libby population was sensitive for two primary reasons. First, due to findings of complete exposure pathways for children, the probability of contracting mesothelioma is inordinately high. It is well known, as clearly indicated in references supplied to EPA by Dr. Anderson, that the probability of contracting the fatal pleural disease, mesothelioma, while independent of age at which exposure first occurs, is highly correlated with the time since first exposure. As a consequence, children exposed to even low concentrations of asbestos have a much greater risk of suffering from fatal mesothelioma. Thus, children were considered a sensitive population in Libby. Second, due to historical exposure to Libby amphibole, many Libby residents are carrying a body burden of amphibole fiber. This is evidenced by the high rates of lung abnormalities among the Libby population as recorded in the medical screening study. As pointed out by Dr. Anderson, risk is very dependent upon the "level, duration, and frequency of exposure." The Libby population is sensitive to future exposures due to historical elevations in the level, duration, and frequency of past exposure.

EPA neither discussed nor quantitatively considered multiplicative effects in its risk assessment or risk management for the Libby site. Indeed, as she seems to indicate in the above comment, Dr. Anderson is well aware that EPA employed a **linear model** for risk evaluation as outlined in standard EPA policy and practice to estimate risks for exposure to asbestos.

> H.    *Dr. Anderson, in relying on Dr. Lee, asserts that a substantal portion of the fiber counts from current data collected in Libby were cleavage fragments, not asbestiform fibers. Thus, Dr. Anderson believes that EPA counted the cleavage fragments as having the same toxicity as asbestiform fibers. However, she believes that the prevailing scientific opinion is that cleavage fragments are not carcinogenic or toxic. By including cleavage fragments in its fiber counts, Dr. Anderson alleges that EPA substantially overestimated exposures.*

Dr. Anderson is simply wrong. First, EPA counted only those mineral fragments identified as asbestiform by the IRIS file and by the Starndard Operating Procedures identified in the QAPP. These criteria are clear and straightforward and are intended to allow comparison with fiber counting in the original epidemiology studies that form the basis for the IRIS file. Each fiber identified by EPA as fitting these standard criteria was carefully measured by the analyst involved. These records are available for review by Dr. Anderson at any time. Consequently, EPA does not believe that cleavage fragments, as defined by the counting method, were included in the screening level risk assessment. Second, Dr. Anderson obfuscates the studies that she uses to defend her untenable position. In fact, as indicated by the authors that Dr. Anderson cites, these studies were not even conducted on asbestiform fibers. EPA thought it might be instructive to provide the text of the Steenland and Brown reference cited by Dr. Anderson to highlight her misinterpretation of the author's findings.

> ***Mortality of Reserve Mining Company employees in relation to taconite dust exposure.***
>
> *Higgins IT, Glassman JH, Oh MS, Cornell RG.*

"We have updated a study of 3,328 gold miners who worked underground for at least 1 year between 1940-1965 in South Dakota, extending the follow-up from 1977 to 1990. **The exposures of concern were silica and nonasbestiform amphibole minerals.** The lung cancer standardized mortality ratio (SMR) was 1.13 (95% confidence interval [CI] 0.94-1.36, 115 observed) when the U.S. population was used as the referent group, increasing to 1.25 (95% CI 1.03-1.51) when the county was used as the referent, and to 1.27 (1.02-1.55) for person-time with more than 30 years potential latency. However, lung cancer mortality did not show a positive exposure-response trend with estimated cumulative dust exposure. Data on smoking habits suggested that the miners smoked slightly more than the U.S. population in a 1960 cross-sectional survey. **In contrast to lung cancer, other diseases known to be associated with silica exposure (tuberculosis and silicosis) were significantly increased (SMR = 3.44 and 2.61) and exhibited clear exposure-response trends.** Nonmalignant renal disease, also associated with silica exposure, was elevated for those hired in early years and showed a significant positive exposure-response trend. Multiple-cause analysis revealed significant excesses of arthritis, musculoskeletal diseases (including systemic lupus and sclerosis), and skin conditions (including scleroderma and lupus), diseases of autoimmune origin which have been associated with silica exposure in other studies. Multiple cause analysis also showed a significant excess of diseases of the blood and blood-forming organs". **(Steenland and Brown, Am J Ind Med 1995 Feb;27(2):217-29, emphasis added)**

As indicated by the authors, this study was on taconite dust. The authors clearly state that the participants were not exposed to asbestiform fibers. Note also that the authors of this study recorded significant non-cancer toxicity among their study population. Apparently, these authors do not share the "*prevailing scientific opinion that cleavage fragments are not toxic*" as indicated by Dr. Anderson.

**Mortality of Reserve Mining Company employees in relation to taconite dust exposure.**

Higgins IT, Glassman JH, Oh MS, Cornell RG.

"Analysis of mortality among men who were employed by Reserve Mining Company from 1952 to 1976 has been carried out. Follow-up was conducted with standard methods, including searches by the Social Security Administration. **Occupational exposures to dust** were based on personal samples taken over the past five years by the industrial hygiene department of the company. Smoking habits were obtained by mailed questionnaires or telephone interviews. A modified life table method was used to compare death rates of the employees with those expected for white males in the state of Minnesota. Comparisons were also made with US rates for white males. The results showed that the death rates for all causes were significantly below expectation. Deaths from malignant diseases were marginally below those expected for the state. **Exposures to total dust, to silica dust, or to fiber were low.** There was no relationship between mortality and estimated lifetime dust exposures, nor was there any suggestion that deaths from malignant neoplasms were increased after 15 to 20 years latency. In contrast, there was a strong relationship between smoking habits and mortality from all causes, from cardiovascular diseases, and from cancer. This study does not suggest any increase in cancer mortality from taconite exposure." (Am J Epidemiol 1983 Nov;118(5):710-9; emphasis added)

Note, again, that Dr. Anderson misrepresents the findings of the authors of this study which she cites in her comment to EPA. These authors are not even studying cleavage fragments as implied by Dr. Anderson. Contrary to Dr. Anderson's comments, the authors' abstract clearly indicates that the exposures of the study population are to "occupational dust", an exposure substance with absolutely no relevance to the Libby situation.

None of the studies cited by Dr. Anderson address exposures to mineral fragments meeting the definitions applied in the EPA screening level risk assessment (i.e. fibers $\geq 0.25$ microns wide; $\geq 5$ microns long; having an aspect ratio $\geq 3:1$). Dr. Anderson states that these studies are *"in stark*

contrast to the high incidence of lung cancer and mesothelioma widely observed in studies where asbestos and asbestiform fibers have been the source of exposure." Apparently, Dr. Anderson is unaware of the elevated morbidity and mortality incidence in Libby. Overall, when compared to Montana and U.S. mortality, there was a 20 to 40 percent increase in malignant and nonmalignant respiratory deaths in this small Montana community from 1979 to 1998. Furthermore, the finding of approximately one in three thousand deaths from mesothelioma in this community far exceeds the approximately one in one million cases which occur in the general population each year. Clearly, the studies Dr. Anderson uses to support her contention that Libby materials are non-pathogenic are inconsistent with the findings in Libby.

Dr. Anderson similarly misses the point with respect to animal studies that she uses to argue that Libby asbestiform fibers are non-toxic. The studies presented tested dusts and blocky mineral substances which have little or no relevance to the fibrous characteristics of Libby amphibole used in the EPA risk evaluations.

Perhaps Dr. Anderson is unaware that W.R. Grace conducted an animal study to determine the toxicity of the Libby amphibole. W.R. Grace completed a set of animal dosing studies using a hamster model to determine the toxicity of Libby asbestos fibers. The dosing material was collected from the mine and carefully prepared by W.R. Grace scientists (Dr. J. Yang) to represent material to which miners were exposed. Interestingly, the fiber size characteristics of the material used to dose these hamsters was nearly identical, albeit a bit shorter overall, to fiber size characteristics determined recently by EPA to exist in the Libby community and presented in Dr. Weis' April 16, 2002 addendum to the preliminary risk assessments. Hamsters dosed by with Libby amphibole asbestos suffered increased rates of fibrotic lung disease and mesothelioma. This further demonstrates the extremely potent toxicological characteristics of the Libby amphibole asbestos.

In closing, Dr. Anderson argues that the "weight-of-evidence" indicates that "exposure to nonasbestiform cleavage fragments does not appear to be associated with respiratory cancers or mesothelioma." However, the empirical evidence available from Libby belies this conclusion for at least three reasons. First, EPA counted only asbestiform fibers in support of its screening level risk assessment. Fiber definitions used by EPA are presented in peer reviewed Standard Operating

43

Procedures and are widely employed throughout the industry for fiber characterization. Second, for decades W.R. Grace has found the Libby amphibole to be "asbestiform" in nature. This W.R.Grace conclusion was reached following hundreds of detailed analyses conducted by professional-level scientists and was recently reaffirmed by Dr. Yang during her deposition in California. W.R. Grace took the further steps of testing the toxicity of the Libby amphibole fibers in animals determining extreme toxicity under the conditions of the experiment. Third, ATSDR, EPA, and the USPHS have demonstrated the toxicological <u>hazard</u> of the Libby fibers, whether they be primarily asbestiform or primarily cleavage fragments, through the conduct of an extensive medical monitoring study, coupled with a formal mortality study in the Lincoln County area which demonstrates that Lincoln County residents suffer an asbestosis death rate at 40-80 times the national average and a mesothelioma rate so high as to be unquantifiable. In light of this empirical information, Dr. Anderson's conclusion that the Libby fiber *"does not appear to be associated with respiratory cancers or mesothelioma"* and *"is not carcinogenic or toxic"* is simply wrong.

I.      *Dr. Anderson and W.R. Grace allege that the quantitative risk estimates provided by Weis contain a number of scientific deficiencies and rely on fiber counts that are inaccurate. They believe that after correction, the estimated risks do not justify a time-critical removal action according to the criteria established by EPA at the beginning of the process.*

1.      *W.R. Grace and Dr. Anderson argue that EPA did not follow the Region VIII protocol for determination of time-critical removal as outlined in the Phase 1 Quality Assurance Project Plan:*

EPA Quality Assurance Project Plans (QAPPs) are designed to assure the collection of usable environmental data according the the Data Quality Objectives process, not to establish risk management limits as implied by W.R. Grace and Dr. Anderson. The phase 1 QAPP was developed, consistent with Agency guidance, for this purpose. Efforts were made to assure that the level of

44

analytical sensitivity could achieve the range of risk management levels being considered for the site (10E-4 - 10E-3) during the initial phase of the response action. Note that EPA analytical sensitivity for the site was set commensurate with a risk level of one excess theoretical cancer incidence in one thousand Libby residents. This is a level far less protective than most response actions implemented by the Agency due to the complexity of asbestos measurement.

As pointed out by Dr. Anderson, EPA states in the Phase 1 QAPP that if levels do not exceed the one in one thousand target risk then EPA would determine "if risks might exceed an acceptable chronic risk level (e.g., 1E-04)" of one in ten thousand excess theoretical cancers. Note that the section of the QAPP provided in the text of Dr. Anderson's comments to EPA does not indicate the criteria that the risk management team would use to determine the need for time critical removal. Indeed, risk managment criteria are clearly outlined in CERCLA and the NCP. Nonetheless, the qualitative aspects of the risk assessment are highlighted and clearly stated in the context of Dr. Weis' risk memorandum. The existence of readily observable contaminant releases and ongoing pathways of human exposure were more than sufficient to meet risk management criteria outlined in the CERCLA and the NCP.

III.   *W.R. Grace argues that the ATSDR Mortality Study, Health Screening Study, Case Study, and the Whitehouse Study are flawed and do not reveal health effects from asbestos exposure in Libby and even if these studies do show health effects, the question is whether exposures were occurring in 1999 in Libby that were similar to those that occurred during the historical time period that caused these health effects. The issues raised by W.R. Grace are described below, followed by EPA's response.*

*A.*    **Mortality Study**

1.    *W.R. Grace asserts that the findings from the Mortality Study are based on historical exposures and EPA has not substantiated that similar levels of exposure were occurring in 1999.*

In direct contradiction to W.R. Grace's argument, EPA has never stated nor relied on findings of observed health effects reported in ATSDR documents or by treating clinicians, such as Dr. Whitehouse, as an indication of current exposures in Libby. EPA is well aware that observed health effects being reported today are likely the result of cumulative asbestos exposures which began many years ago in Libby. This has been clearly indicated to W.R. Grace on many occasions. For example, EPA has stated that "ATSDR's study of mortality results shows that there is an unequivocal association between **historic exposure** to Libby amphibole asbestos and death from asbestos-related disease".

It is clear that some individual's exposures started when they began living and working in Libby and included a myriad of exposure pathways (i.e., ambient air, playing in piles, working at vermiculite processing facilities, running on contaminated school tracks, gardening with contaminated soils, sweeping contaminated floors etc.). While it is true that some pathways of exposure were curtailed upon closure of the mine in 1990 (i.e, ambient air, working at vermiculite processing facilities at the mine site), numerous pathways of exposure remained and were present when EPA began its emergency response in November, 1999. For instance, contaminated piles of vermiculite were still present, vermiculite was still present around the school track and playgrounds, etc. Additionally, while direct mining related occupational exposures had ended various other direct and ancillary occupational exposures to contaminated vermiculite remain. For example, direct exposures include custodial staff at the schools tending to the tracks and playgrounds, electricians working in attics filled with vermiculite contaminated insulation. Ongoing ancillary exposures in a work setting include workers at the former export plant, turned lumber mill, that

performed various activities in this highly contaminated facility. Also, a family lived and worked at the contaminated property that formerly housed the screening plant.

2.    *W.R. Grace argues that the ATSDR update information was not supplied to W.R. Grace.*

ATSDR copied W.R. Grace on the updated information in July 2002.

3.    *W.R. Grace claims that the Mortality Study does not address whether exposures are occupational or not.*

In the updated mortality study, ATSDR found that a large percentage of the asbestosis cases (92%) and mesothelioma cases (67%) included in the study had occurred among former employees of the mine. While workers have been included in the determination of asbestos-related mortality in Libby, they are also included, as a matter of practice for comparison purposes, in determining standardized mortality rates for other communities throughout the nation. To put the Libby experience in perspective, age-adjusted mortality rates for asbestosis from 1988-1997, by county, reveal that Lincoln County, Montana had the highest asbestosis rate in the United States (compiled by NIOSH from the National Center for Health Statistics multiple-cause-of-death public use data files). Asbestosis mortality in Lincoln County was the worst in the nation even when compared to other counties that contain large workforces also exposed to asbestos (i.e., shipbuilding, former asbestos product manufacturing facilities etc.).

Further, while increased mortality rates among workers can in part be attributed to the fact that workers have the highest asbestos exposures. It is also well recognized that workers with known exposure also have an increased likelihood of having an asbestos related disease identified on their death certificates compared to workers without known asbestos exposures or nonworkers. In a prospective follow-up of workers in an asbestos products factory, Newhouse et al. reported that

47

mesothelioma was misdiagnosed on 40% of death certificates [ATSDR Health Consult 12/12/2000]. Accurate reporting of the diagnosis of mesothelioma on death certificates is even worse for the general public, ranging from 20% to 29% [ATSDR Health Consult 12/12/2000]. As previously stated in EPA's prior response to W.R. Grace (June 02) "the mortality study clearly illustrates that the hazardous substance in question in Libby causes disease and death."

4.     *W. R. Grace states that it is surprising that lung cancer is not elevated and does not indicate an increase due to synergistic effect of smoking.*

This mortality study performed by ATSDR has just been formally updated for the same 20 year period (1979-1998) and now reports that the mortality in Libby resulting from asbestosis is actually 40 to 80 times higher than expected and lung cancer mortality was also elevated, with a 20 to 30 percent excess over this time period. Overall, when compared to Montana and U.S. mortality, there was a 20 to 40 percent increase in malignant and nonmalignant respiratory deaths in this small Montana community from 1979 to 1998. W.R. Grace experts were surprised that lung cancer mortality was not elevated in the earlier ATSDR mortality study report, this follow-up report clearly shows that lung cancer is indeed elevated. Furthermore, the finding of approximately one in three thousand deaths from mesothelioma in this community far exceeds the approximately one in one million cases which occur in the general population each year. Dr. Moolgavkar points out in his report that "*since the background rate of mesothelioma is close to zero, this number points to a significant elevation of risk in the Libby area*". ATSDR also identified eight additional mesothelioma deaths during the review of mortality data. The decedents were prior residents of Lincoln County and the majority, but not all, (88%, 7/8) previously worked at the mine and milling facility. However, these eight decedents did not live in the extended Libby community at the time of their death and were therefore not eligible to be included in the analysis.

5.    *W.R. Grace alleges that, based on the findings that most identified deaths were in former workers, there is little evidence that environmental exposure to asbestos contributed to the deaths from respiratory cancer, mesothelioma, and asbestosis in the Libby area.*

EPA disagrees with this statement. While it is true that a large percentage of the deaths identified during the mortality study occurred in former workers there are several findings which support the contribution of non-occupational exposures to the deaths of Libby residents. One of the 3 (33%) mesothelioma cases identified by ATSDR for inclusion in the study did not occur among former mine workers. This individual is known to have never worked at the mine nor lived in a household with a former worker. W.R. Grace alleges that this individual's exposures were associated with visiting the homes of relatives that were non-household contacts, playing on Zonolite property, playing in piles, and popping vermiculite; all clearly non-occupational exposures. Furthermore, several of these exposures still remained in Libby in November 1999. Also, several other mesothelioma cases have recently been identified, several of which were not included in the ATSDR study, as discussed above.

While not a study of mortality, the ATSDR case-series identified 7 individuals with asbestos-related radiographic abnormalities that could not be attributed to any known occupational exposure pathways. This finding in combination with findings of non-occupationally related mesothelioma cases further underscores the fact that historical environmental exposures alone have contributed to death and morbidity in the community.

B.    Health Screening Study

1.    *W.R. Grace's expert, Dr. Hughson, states that the low percentage of those with parenchymal fibrosis is "quite reassuring, and does not suggest a risk*

49

*of interstitial fibrosis in people with low-level ambient or activity-related exposure"*

As Dr. Hughson indicates, the medical screening did not find high percentages of parenchymal fibrosis in either former workers or other members of the community. However, the findings of numerous cases of mesothelioma (occupationally-related or not), elevated risk of lung cancer, and evidence of asbestos-related pleural disease in 19% of those evaluated is quite alarming, and indicates that medical surveillance and health care will be needed in Libby for years to come.

2).     *W. R. Grace noted the following Study Limitations:*

    *-volunteer group*

    *-Screening suffers from lack of control group*

    *-Reader variability and bias not accounted for by removal of names from x-rays, should have used control x-rays*

    *-Obesity in the population results in subpleural fat which is overread*

    *-Oblique films*

a.     *Use of Volunteer Study*

W.R. Grace implies that voluntary participation in the ATSDR study biases the findings. W.R. Grace fails to convey that: 1) 61% of the population is a very significant participation rate; 2) approximately 1,700 more people have undergone testing, thus raising the percentage even more; 3) 994 people with lung abnormalities in such a small population is extremely significant; and 4) even if the remaining population participated and had no abnormalities, abnormalities would still appear in 11% of the population, a finding of great public health consequence. It is worth noting that ATSDR has combined medical screening results from the summer of 2000 and the summer of 2001

to arrive at a new combined data set. The new population of those tested is 7304, which is 72% of the Libby division of Lincoln County. Many of those not tested were children or did not meet the testing qualification criteria (i.e., did not live or work in Libby prior to 1990, which given the latency period, is a necessary criterion). Information from this additional screening is currently being evaluated.

W.R. Grace also spends much time mis-characterizing statements of individuals and organizations concerning the meaning of the ATSDR studies, for instance the letter of Pat Cohan. Statements to individuals indicating that they should seek medical advice before being fearful of medical disease have nothing to do with the meaning of the ATSDR study. Statements of the Agency concerning the lack of asbestos in Libby ambient air are not indicative of other exposure pathways currently present in Libby.

### b.    Lack of Control Group

W.R. Grace's concerns about the lack of a control group are misplaced. As ATSDR indicated in its published report:

> "The program was not designed as an analytic epidemiologic study with comparison groups and random sampling of exposed and comparison groups. Nevertheless, the data collected provide important information about the prevalence and degree of asbestos-related abnormalities among a large number of current and former Libby residents, and about the possible relationships between these abnormalities and a number of exposure pathways reported by community members."

### c.    Reader Variability and Bias

W.R. Grace implies that the B-readers were biased. There is no reason to believe this to be true. The three B-readers are respected experts in their field and distinguished members of academic

51

institutions. The readers were blinded to the identities of individuals who were screened. They have no incentive to misread the x-rays. In commenting on "reader variability and bias", W.R. Grace has failed to acknowledge the information in ATSDR's report about limitations on observer bias (see p.26). Even though no external control group was available, internal comparisons within the study population are entirely consistent with expected exposure-response relationships. For example, only 5% of those with no apparent exposures had pleural abnormalities as compared to 11% for those with one to three exposure pathways, 15% for those with four to five exposure pathways, and 24% for those with six or more pathways. Furthermore, with respect to individual exposure pathways which individuals graded between never, sometimes, and frequently, the odds ratios increased with increasing frequency of the activity for five out of six pathways evaluated (handled vermiculite insulation, recreational activities along Rainy Creek, played at ballfields near expansion plant, played in vermiculite piles, and popped vermiculite).

Furthermore W.R. Grace asserts that reader variability and bias was not accounted for by removal of names from x-rays, and ATSDR should have used control x-rays. The study design employed by ATSDR is consistent with that performed by other major research organizations in evaluation of asbestos-related radiographic abnormalities. For example, except for the additional use of oblique x-rays in Libby, researchers at the National Institute of Environmental Health Sciences in their evaluation of the prevalence of asbestos associated pleural thickening in the US population have employed a similar study design including: no control films, three B-readers with positive results determined by agreement by 2 of the 3 readers, readers knew that the purpose of the study was to estimate the prevalence of pleural thickening but nothing else about the study subject (Rogan 2000).

### d.    Significance of Obesity and Use of Oblique Films

W.R. Grace also implies that the study is invalid because of the extra views used to observe lung abnormalities and because of the prevalence of obesity in the community. These implications are unfounded. Even if ATSDR had limited its views to those traditionally used in epidemiological

studies of asbestos exposure (posterior and anterior chest view only), there would still be a finding of 14% lung abnormalities. In addition, oblique views are widely used for observation of asbestos-related abnormalities in clinical practice for evaluation and were recommended for this study by a panel of medical experts. Beyond the ATSDR study, such recommendations persist. For example, a recent medical study recommends the use of obliques for surveillance studies where both parenchymal and pleural changes are anticipated. ("Reliability and Validity of Chest Radiograph Surveillance Programs", Chest, Volume 120, pages 64-68,). Further, in this response Grace cites Harber 1987 (WR P 27 footnote 55) as evidence that pleural plaques are not associated with mesothelioma. It is interesting to note that W.R. Grace provides this study for EPA's consideration, which utilized chest x-ray views including Right and Left Obliques to more accurately identify pleural plaques, while W.R. Grace criticizes ATSDR for using the same chest x-ray views to identify pleural disease among Libby residents.

While Body Mass Index (BMI) may be a potential confounder for evaluations of pleural disease, very few epidemiologic studies have even considered the effect of BMI on their findings. The steps taken by ATSDR to include and account for BMI in their study design show that every effort was made to be more thorough, thoughtful, and conservative in their approach towards medical screening of the Libby population. The fact that BMI was not considered in the evaluation of other comparative populations suggests that actual percentage of true asbestos-related pleural abnormalities would be proportionally less in these populations, as well. Further, the ATSDR multivariate analysis was specifically adjusted for BMI and still found numerous statistically significant associations between vermiculite exposure pathways and asbestos-related pleural disease. Evaluation of the data set from 2000 medical screening period reveals that even if all participants with a BMI over 30 that were found to have asbestos related pleural abnormalities were entirely excluded from consideration, there would still be over 500 participants remaining with asbestos-related pleural abnormalities identified by at least 2 B-readers. W.R. Grace contends that the B-readers were biased and were over-reading x-rays secondary to BMI or fat. All B-readers were blinded to the identity of x-rays they were reading. Thus, if x-rays readings were biased or systematically being overread, then it is unlikely that consistent internal exposure-response relationships would be observed. Again the internal comparisons found by ATSDR within the study

population are entirely consistent with expected exposure-response relationships. As discussed above, only 5% of those with no apparent exposures had pleural abnormalities as compared to 11% for those with one to three exposure pathways, 15% for those with four to five exposure pathways, and 24% for those with six or more pathways. Furthermore, with respect to individual exposure pathways which individuals graded between never, sometimes, and frequently, the odds ratios increased with increasing frequency of the activity for five out of six pathways evaluated (handled vermiculite insulation, recreational activities along Rainy Creek, played at ballfields near expansion plant, played in vermiculite piles, and popped vermiculite).

3.      *W.R. Grace believes that the comparison of Libby population to other studies of non-workers is unfair because the Libby study includes workers.*

The findings (i.e., rates of pleural abnormalities) of the ATSDR preliminary report [Preliminary Findings of Medical Testing of Individuals Potentially Exposed To Asbestiform Minerals Associated with Vermiculite in Libby, Montana: An Interim Report for Community Health Planning, February 22, 2001] correlate very closely with the findings shown in the ATSDR Medical Testing Report released August 23, 2001. An analysis in this report showed that among those participants that reported only recreational contact with vermiculite (never occupationally exposed to vermiculite nor having a household contact with a WR Grace worker) 10% (45/435) had pleural abnormalities on PA view chest x-ray identified by at least two B-readers. Thus, even with all workers and household contacts excluded at least 10% of the medical screening participants still had pleural abnormalities, which is substantially higher than observed in comparison populations. [Studies of differing groups within the United States believed to have no substantive work-related asbestos exposures have found the prevalence of pleural abnormalities ranging from 0.2% among blue-collar workers in North Carolina (Castellan 1985), to 0.9% among loggers in Washington and Oregon (Stilbolt 1991) , to 1.8% among New Jersey residents (Anderson 1979), and 2.3% among patients at Veterans Administration hospitals in New Jersey (Miller JA 1996). A cross-sectional study of the US population in the age group 35-74, which did not exclude workers with asbestos

54

exposure, still only found that 3.9% of those evaluated had pleural abnormalities on a PA view identified by at least two of three B-readers (Rogan 2000) ] Further, the 10% identified in this group is probably conservative since; 1) it only included those who reported recreational contact with vermiculite, excluding those with other non-occupational exposures in the community, and 2) household contacts of workers were not excluded from the other study populations used for our comparisons.

4.    *W.R. Grace's comments that ATSDR's screening was not diagnostic of asbestos-related disease.*

The medical screening program was designed to identify pulmonary pathology both radiographically and functionally that is related to asbestos exposure. As mentioned in EPA's June response, certain radiographic abnormalities such as pleural plaques are highly specific for asbestos exposure ["Pleural plaques are the most common manifestation of asbestos exposure and only rarely do they occur in persons who have no history or evidence of asbestos exposure" (Cotran RS, Kumar V, Collins T. Robbins pathologic basis of disease, 6th ed. Philadelphia: WB Saunders Company, 1999:, 732-4.)], however final attribution or diagnosis of the cause of such findings rests with each screening participants individual treating physician and not the screening program.

5.    *W.R. Grace states that without the results of the CT study currently being undertaken by ATSDR, it cannot comment on the statement by EPA that the 18% identified in the screening study may be a conservative number.*

While the percentage of under-reading remains to be determined by the pending results of the ATSDR CT Study, it is well established in the medical community that chest x-rays are fairly insensitive in picking up many asbestos-related abnormalities, entirely missing all abnormalities in large percentages of individuals found to have asbestos-related abnormalities on CT scans,

especially High Resolution CT scans, and histopathological evaluation. In one study, chest x-rays entirely missed interstitial abnormalities in 18% of those with histological evidence of asbestosis. The authors concluded that negative chest radiographs do not exclude interstitial fibrosis in a substantial percentage of workers with previous asbestos exposure (Kipen,HM, Lilis R, Suzuki Y, et. al. Pulmonary fibrosis in asbestos insulation workers with lung cancer: a radiological and histopathological evaluation. Br J Ind Med. 1987;44:96-100). In another study of shipyard workers chest x-rays missed pleural plaques in 49% and interstitial fibrosis in 27% of those evaluated, compared to high resolution CT scan (Neri S et al Asbestos-related lesions detected by high-resolution CT scanning in asymptomatic workers. Specificity, relation to the duration of exposure and cigarette smoking. Clin Ter. 1994;145:97-106).

C.     Case-series.


The recent ATSDR case series clearly validates Dr. Whitehouse's reports of non-occupational asbestos-related disease (i.e., individuals without any history of occupational asbestos exposures, household contact with former workers, or other confounders, such as past medical problems, which could cause mischaracterization of radiographic findings) occurring among his patients. The results of this separate study is consistent with the findings of non-occupational disease identified during the community medical testing (ATSDR Medical Testing report August 2001).


1.     *W.R. Grace asserts that the case series does not support the finding that 69% of those with lung abnormalities had no occupational exposure.*


W.R. Grace asserts that the case-series does not support the findings of large numbers of individuals with non-occupational asbestos-related abnormalities identified during the community medical testing (ATSDR August 2001). As Dr. Hughson has clearly pointed out, Dr. Whitehouse's patient population is not necessarily representative of the general Libby community. While Dr. Whitehouse has seen a large number of patients from the Libby community, most of his patients until

56

the last few years had occupational exposures. Also, given the expense and distance for an evaluation by Dr. Whitehouse, his patients would obviously tend to be those individuals with more significant exposures and disease. A free large scale community testing program such as that conducted by ATSDR, will have much greater general participation from those with lessor non-occupational exposures, hence the increased findings of disease in this population.

2. *W.R. Grace asserts that one case with the most exposures was not confirmed.*

While reported number of exposure pathways appears to correlate with increasing cumulative exposure in the epidemiologic evaluation of this population and thus the risk of pleural abnormalities, it does not necessarily predict the outcome of pleural disease for any particular individual. The occurrence of disease in an individual is dependent on their cumulative exposure (dose x duration), latency (time period between initial exposure and observable clinical changes (i.e., x-ray abnormalities) which varies between individuals, and an individuals idiosyncratic reaction to the fibers (felt to be genetically determined). Thus, the fact that an individual reports numerous exposure pathways increases the risk that they will develop disease similar to a smoker that has increased risk for lung cancer. Of course we know that not all smokers get lung cancer.

3. *W.R. Grace asserts that the case-series did not quantify exposure.*

It is virtually impossible to quantify historical environmental exposures. Even with occupational exposures that have typically been measured more frequently, realistic and valid quantification of exposure is rarely performed nor accomplished and would entail representative monitoring of all exposures and activities throughout each individuals day. In fact, virtually all of the occupational epidemiologic studies concerning asbestos disease involve estimations of worker exposure through dose-reconstruction exercises and are typically at best ballpark estimations of workers exposures. Given the myriad of pathways in which Libby residents historically and currently

57

were exposed to, and the variability in activities which generate these exposures, such quantification of exposures is not possible.

> 4. Dr. Anderson states: "workers in the mining operations in Libby clearly had elevated levels of asbestos-related diseases. It is also possible that elevated, historical non-occupational exposures may have caused some asbestos-related disease, and could have resulted in the elevated incidence of pleural plaques among Libby residents. EPA provides some evidence to support this relationship, but this evidence is poorly documented and does not meet the minimum requirements for scientific rigor."

Both the medical testing results of over 6000 individuals from the community and the case-series is rigorous scientific evidence that historical exposure have resulted in non-occupational asbestos-related disease. The findings (i.e., rates of pleural abnormalities) of the ATSDR preliminary report [Preliminary Findings of Medical Testing of Individuals Potentially Exposed To Asbestoform Minerals Associated with Vermiculite in Libby, Montana: An Interim Report for Community Health Planning, February 22, 2001] correlate very closely with the findings shown in the ATSDR Medical Testing Report released August 23, 2001. An analysis in this report showed that among those participants that reported only recreational contact with vermiculite (never occupationally exposed to vermiculite nor having a household contact with a WR Grace worker) 10% (45/435) had pleural abnormalities on PA view chest x-ray identified by at least two B-readers. Thus, even with all workers and household contacts excluded at least 10% of the medical screening participants still had pleural abnormalities, which is substantially higher than observed in comparison populations. For example, an NHANES cross-sectional study of the US population in the age group 35-74. , which did not exclude workers with asbestos exposure, still only found that 3.9% of those evaluated had pleural abnormalities on a PA view identified by at least two of three B-readers (Rogan 2000) ] Further, the 10% identified in this group is probably conservative since; 1) it only included those who reported recreational contact with vermiculite excluding those with other non-occupational exposures

in the community, and 2) household contacts of workers were not excluded from the other study populations used for our comparisons.

D.      Whitehouse Study

1.      *W.R. Grace criticizes the Whitehouse study on a number of basis including:*
        *-Study is based on historic exposures.*
        *-Failure to distinguish occupational from non Occupational exposures.*
        *-Observed decline could be due to few outliers.*
        *-Decline not correlated to quantitative exposure evaluation.*
        *-Change in PFT machines*
        *-Paper not peer-reviewed.*

a.      *Study is based on historic exposures.*

EPA acknowledges that all medical findings observed in these patients are associated with historic exposures that were derived from exposure pathways that varied in severity and duration. Certain exposure pathways (i.e. jobs associated with mine operations, ambient air) directly associated with the mining operations ended upon closure of the mine, while other pathways of exposure both occupational (i.e. construction workers, school groundskeepers, electricians and cable workers) and non-occupational (i.e., piles of vermiculite, contaminated former W.R. Grace properties, contaminated home insulation, contaminated school play areas and tracks etc.) continued to exist and serve as persistent reservoirs of exposure after the mine closure.

b.    *The Whitehouse Study fails to distinguish occupational from non-occupational exposures.*

It is true that this study did not distinguish occupational from non-occupational exposures. However, this issue is irrelevant in regards to this study and its inclusion in the Administrative Record. This study was included in the Administrative Record to demonstrate the progressive nature of loss of pulmonary function in patients exposed to Libby tremolite asbestos and their progressive loss of pulmonary function.

c.    *Dr. Moolgavkar notes that Dr. Whitehouse reported the decline in pulmonary function in averages and that this means that a few outliers could skew the data, "with the majority of individuals showing little or no decline in function except that attributable to aging."*

Dr. Moolgavkar does not appear to be familiar with the draft study. First, it is true that the study did report results in averages and that the averages showed a statistically significant decline in pulmonary function on average. However, the Whitehouse study reported the individual results. The study reported that 94 of the 123 study patients, over 76%, showed a statistically significant decline in pulmonary function. Contrary to Dr. Moolgavkar's speculations, the average results are a consequence of a majority of the study subjects showing a decline in pulmonary function. Dr. Moolgavkar also speculates that this decline is a result of aging. The study specifically states that the patient values were all age corrected with the same predicted values used throughout, changes in the percentage of predicted values reflected progression or changes in pulmonary function. This means that any change in pulmonary function due to changes in age were accounted for so that changes as a result of other factors, i.e., asbestos related disease could be accounted for.

d.    *Dr. Moolgavkar criticizes the Whitehouse study because it does not answer the question of whether the decline in pulmonary function is associated with asbestos exposure in a dose dependent way.*

The Whitehouse study was not an epidemiological study, so Dr. Whitehouse never looked at dose response and had no reason to look at dose response. The Whitehouse study rose from observations Dr. Whitehouse had made over the 14 year period in which he has treated and observed patients from Libby that he determined to have asbestos-related disease under the ATS criteria. Dr. Whitehouse's observations had been that there was a progressive decline in pulmonary function in these patients. He therefore determined to conduct a study to test this hypothesis statistically. That is all the study is about and Dr. Moolgavkar's criticisms that this isn't a proper epidemiological study are simply irrelevant.

e.    *Dr. Moolgavkar and Dr. Hughson are concerned that the pulmonary function data was acquired with two different machines.*

As is standard practice with pulmonary function testing machines, the machines are calibrated at least twice per day using standard samples. Therefore, the change in machines is of no consequence. Dr. Whitehouse also stated that the majority of the test pairs were done on one machine or the other. Finally, often one of the greatest variables in tests such as these is the technician operating the machine. In this case, the same technician was operating the machines throughout the time these patients were tested.

f.    *W.R. Grace comments that Dr Whitehouse's information concerning his specific experience and findings regarding patients with asbestos-related disease from Libby should not be included in the Administrative Record by EPA because it is not peer-reviewed.*

61

W.R. Grace comments that Dr Whitehouse's information concerning his specific experience and findings regarding patients with asbestos-related disease from Libby should not be included in the AR by EPA because it is not peer-reviewed....citing that EPA chose not to respond to a lengthy non-peer reviewed paper by Dr Gaensler involving his personal review of other researchers studies involving asbestos disease.  This is clearly not an analogous situation, as Dr Whitehouse is the treating physician for over 400 Libby patients with asbestos-related disease.  His observations about these patient's is very relevant to EPA's assessment of disease and exposure at this site.

IV.    *W.R. Grace downplays the significance of the markedly increased risk of mesothelioma observed in Libby stating that all the mesothelioma cases were associated with either "heavy" historical occupational or non-occupational exposures which no longer exist.*

In addition to the 3 cases of mesothelioma that ATSDR identified for inclusion in the mortality study, eight other mesothelioma cases were identified that were not eligible to be included in the analysis because the decedents did not live in the extended Libby community at the time of their death (updated ATSDR mortality study August 2002).  Two of these eleven cases (18%) were not identified as having occupational exposure. The Libby Center for Asbestos Related Disease is currently treating over 800 patients for varying degrees of asbestos-related lung impairment and over the past three years has identified as many as twenty cases of mesothelioma among current or former Libby residents, the names of 19 of these cases were provided to W.R. Grace in EPA's June, 2002 response.  Among the 19 cases identified by EPA, several cases were clearly non-occupationally associated and may be related to various environmental pathways.  For example, Toni Riley is known to have never worked at the mine nor lived in a household with a former worker.  W.R. Grace alleges that this individual's exposures were associated with visiting the homes of relatives that were non-household contacts, playing on Zonolite property, playing in piles, and popping vermiculite; all clearly non-occupational exposures.  As previously discussed, most of these types of exposures were present upon EPA's arrival in Libby in 1999.

It is unclear what W.R. Grace means by "heavy" exposure. On the one hand, W.R. Grace indicates that current disease in Libby results from historical occupational exposures. But, on the other hand, W.R. Grace now indicates a new group of exposures, which it calls "heavy" exposures, may be causing asbestos-related disease in this population. Dr. Anderson, however, gives no indication of what intensity of exposure would constitute occupational or "heavy", or what would constitute an exposure that is not "heavy."

The medical community may classify a "heavy" exposure as one which is equivalent to the intensity of a direct workplace exposure. It is clear that a number of non-occupational cases of asbestos-related disease in Libby (clearly demonstrated by several cases of mesothelioma and the ATSDR case-series) are not associated with these "heavy" exposures. In their attack of EPA's discussion of exposures at the Screening Plant involving ½ hour of daily sweeping of vermiculite laden dust, W.R. Grace contends that such exposures pose no substantive health risk. On the other hand, in discounting apparent non-occupational cases of mesothelioma, W.R. Grace contends that playing in a pile of vermiculite, or visiting the homes of relatives that were non-household contacts, or playing on a Zonolite property, or popping vermiculite on a stove were "heavy exposures" that thankfully no longer exist. Perhaps, Dr. Anderson and the other experts assumed that the children performed these types of activities for several hours each and every day in order to be able to achieve the "heavy" exposures necessary to cause the asbestos disease we are seeing in Libby today. If this is the case, then why would an obviously analogous situation involving a family working and living continuously at the screening plant (a former zonolite property), encountering piles of vermiculite (still on the property), tilling soil contaminated with asbestos, and even working below ground in enclosed tunnels (e.g., enclosed-space atmosphere) filled with vermiculite not be similarly classified as a "heavy" exposure posing a substantive risk for future disease.

Furthermore, in her report Dr. Anderson alludes to a few ambient air results indicating that historically high concentrations of ambient asbestos exposure may in large part be responsible for observed asbestos-disease among non-occupationally exposed individuals. If this is the case, then W.R. Grace must surely concede that the 5% of medical screening participants with "no apparent exposure pathways" (i.e., those with ambient air exposures), identified during the ATSDR medical testing, represents a true elevation over comparison populations and that the testing techniques and

interpretations of test results must be accurate. While historical ambient exposures may have contributed to the risk of disease in the community, it is clear from the ATSDR medical testing results that the addition of other exposure pathways is strongly associated with increasing risk. The magnitude of observed pleural abnormalities increased from 5% "with no apparent exposures" to 11% with 1-3 reported exposure pathways to 15% with 4-5 exposure pathways, to 24% with greater than 6 reported exposure pathways. This finding suggests that while historic ambient air conditions may have contributed to exposure, that contribution was not very substantial compared to the other reported exposure pathways, especially those involving direct contact with vermiculite. Restated, with respect to non-occupational exposures, it does not appear that historic ambient air exposures alone played a large role in those "heavy" exposures that W.R. Grace alleges to have stopped when the mine closed in 1990.

It is clear from the thrust of this latest W.R. Grace response, that they now recognize that historic exposures in Libby have resulted in asbestos-related disease, but W.R. Grace then argues that all current exposures are not those historic "heavy" exposures and are thus inconsequential. Unfortunately, for those living in Libby and others exposed to asbestos contaminated vermiculite elsewhere, this is not the case, especially with respect to risk for mesothelioma. It is well documented in the medical literature that while the risk for mesothelioma increases with increasing exposure, the risk is very real and palpable even at very low exposure levels[11], levels that W.R. Grace apparently alleges are inconsequential or at least acceptable risks.

Beyond published case-series, epidemiologic studies have found that non-occupational or environmental asbestos exposures increase the risk for mesotheliomas. A recent case-control study found significantly increased risks from environmental asbestos exposure among residents living near

[11]An excerpt from "Asbestos and Disease" Selikoff and Lee; Academic Press 1978 (p. 265-6) (See Attachment 10.)"The uncertainty about the role played by asbestos in the initiation of mesothelioma was accentuated by the small quantity of the dose that, in many persons at least, is sufficient. The sufficient dose, moreover, need not come from direct occupational exposure. As Wagner et al pointed out in their initial paper, one-third of their cases had merely lived in the vicinity of asbestos mines and mills. One case, 21 years of age, had been exposed briefly to cobbing as an infant. Elmes found that in one third of his cases that the exposure was virtually trivial. Harries found that 53 of 55 cases in the Royal Navy shipyards occurred in those only peripherally exposed, while Planteydt found that none of the cases seen from Dutch shipyards were directly exposed to asbestos. Demy and Adler drew attention to one case in which exposure was only six months, while one of Newhouses's cases had been exposed for only two months."

an asbestos cement factory in Italy (Magnani 2001). A multicentric study performed by researchers in Spain, Italy, and Switzerland found that low-dose exposures to asbestos at home or in the environment carries a significant risk of mesothelioma (Magnani 2000). Significantly elevated mesothelioma rates were also found among residents living in Manville, Somerset County, New Jersey, the location of the largest asbestos manufacturing plant in North America (Berry 1996) (Administrative Record #338256, EPA June response).

Another, particularly relevant, study found significantly increased rates of mesothelioma from environmental asbestos exposure among residents living near a crocidolite mine in Australia (Hansen 1993) (Administrative Record #371372, EPA June response). This study involved exposure to crocidolite among residents of the township of Wittenoon in Western Australia. Similar to Libby former mine workers were found to have excess mortality from asbestosis, malignant mesothelioma, and respiratory cancers. Also, similar to Libby the residents of this township that were not employed in the crocidolite industry were exposed to general environmental contamination "from the milling operations and from the use of tailings from the mill for the paving of roads, driveways, car-parks, school playgrounds, in the yards of houses to suppress dust and muddiness, on the race-course, and from household contact with the workers themselves or their clothes." Among the 24 individuals identified with mesotheliomas associated only with environmental exposures, their residence in Wittenoon ranged from 6 weeks to 11 years, five individuals lived in the township for no more than one year. A follow-up study of this cohort found that at least one case of mesothelioma arose in an individual who did not even move to Wittenoon until after all mining operations had ceased. The authors found that the rate of non-occupational mesothelioma cases increased significantly with time from first exposure, duration of exposure, and cumulative exposure. "Cases of mesothelioma in this cohort of Wittenoom residents have arisen in subjects with durations of crocidolite exposure as short as 2 months and estimated cumulative exposure as low as 0.53 f/ml" (Hansen J, de Klerk NH, Musk AW, Hobbs MST. Environmental exposure to crocidolite and mesothelioma: exposure-response relationships. Am J Resp Crit Care Med 1998;157:69-75.) (Attachment 11)

V.   *W.R. Grace asserts that the high percentage of pleural disease identified during medical testing of Libby residents is inconsequential to these individuals with respect to functional impairment, progression, or risk for cancer. Furthermore, W.R. Grace argues that even if some of these individuals have clinically relevant pleural disease, it stems from historic exposures that no longer exist in current day Libby.*

As previously noted in the EPA's June response to W.R. Grace comments, the pleural abnormalities identified among those that participated in the medical screening program in Libby range from discrete or circumscribed pleural plaques to diffuse pleural disease. Additionally, parenchymal abnormalities while not commonly identified during the medical testing program, were found during the case-series in at least one individual with non-occupational exposures. In particular, EPA stated that:

"...the pleural manifestations associated with exposure to various forms of asbestos range from effusions, circumscribed disease, and diffuse disease with variance depending on latency, idiosyncratic reactions and nature of exposure (dose & duration). "Pleural plaques are the most common manifestation of asbestos exposure and only rarely do they occur in persons who have no history or evidence of asbestos exposure" (Cotran RS, Kumar V, Collins T. Robbins pathologic basis of disease, 6th ed. Philadelphia: WB Saunders Company, 1999:, 732-4.) While pleural abnormalities may have been historically viewed as non-symptomatic markers of asbestos exposure, there is now a large body of scientific literature collected over the last 20 years that demonstrates that asbestos-related radiographic findings of circumscribed and diffuse pleural thickening represent observable evidence of disease processes associated with functional lung impairment and clinical symptoms. Furthermore, the presence of these radiographic findings appears to be associated with increased risk of mesothelioma. While an increased risk of lung cancer is clearly associated with asbestos exposure and radiographic findings of asbestos-related parenchymal abnormalities, this association is inconclusive with respect to asbestos-related pleural abnormalities."

66

A.    *W.R. Grace asserts that the medical literature cited by EPA "does not exhibit anything close to the absolute certainty alleged by Region 8" concerning the relationship between asbestos-related radiographic abnormalities of pleural disease and functional impairment and that studies of occupational groups are not supportive of this association because these were not low exposures. W.R. Grace also commented that the papers cited by EPA were not really recent, the papers relate to occupational cohorts and not low dose exposures, the McGavin and Hillerdahl papers do not support EPA's position, and some of the papers sometime attribute pulmonary function loss to interstitial fibrosis.*

W.R. Grace misrepresents EPA's comments regarding the association between findings of observed asbestos-related radiographic pleural abnormalities and impairment of pulmonary function. Just to be clear, EPA stated the following in the June, 2002, comments to W.R. Grace: "While a few studies have not detected any associations between circumscribed pleural disease and functional impairment, by and large, **the majority of peer reviewed epidemiologic studies, especially those performed more recently, have shown that circumscribed pleural disease is associated with increased symptoms and functional impairment.** Also, the findings of a number of these studies should be given greater consideration as they involved populations large enough to detect statistical associations, had external controls, and accounted for potential confounders such as age, latency, cigarette smoking, and interstitial profusion".

In the June response, EPA also responded to a few articles cited by W.R. Grace and several misrepresentations of the research used to support W.R. Grace's position that pleural disease is not associated with functional impairment. Further, EPA provided W.R. Grace with 15 medical studies that have found epidemiologic associations between pleural plaques with functional impairment and symptoms, and 16 medical studies that have found epidemiologic associations between diffuse pleural disease with functional impairment and symptoms. In the June response EPA stated the following: "the consistency of findings in numerous studies over the last 20 years contradict assertions that plaques do not cause loss of function or symptoms. Some of the more notable studies that have

67

found associations between pleural plaques and functional impairment and symptoms of breathlessness include the following:

* Bourbeau J, Ernst P, Chrome J, Armstrong B, Becklake MR  The relationship between respiratory impairment and asbestos-related pleural abnormality in an active work force. Am Rev Respir Dis. 1990 Oct;142(4):837-42.

* Hilt B, Lien JT, Lund-Larson PG. Lung function and respiratory symptoms in subjects with asbestos-related disorders: a cross sectional study. Am J Ind. Med 1987; 11:517-528.

* Hillerdal G, Malmberg P, Hemmingsson A.  Asbestos-related lesions of the pleura: parietal plaques compared to diffuse thickening studied with chest roentgenography, computed tomography, lung function, and gas exchange. Am J Ind Med. 1990;18(6):627-39.

* Schwartz DA, Fuortes LJ, Galvin JR, Burmeister LF, Schmidt LE, Leistikow BN, LaMarte FP, Merchant JA. Asbestos-induced pleural fibrosis and impaired lung function. Am Rev Respir Dis. 1990 Feb;141(2):321-6.

* Kouris SP, Parker DL, Bender AP, Williams AN. Effects of asbestos-related pleural disease on pulmonary function. Scand J Work Environ Health. 1991 Jun;17(3):179-83.

* Britton MG. Asbestos pleural disease. Br J Dis Chest. 1982;76:1-10.

* Kilburn KH, Warshaw R. Pulmonary functional impairment associated with pleural asbestos disease. Circumscribed and diffuse thickening. Chest. 1990 Oct;98(4):965-72.

* Jarvholm B, Sanden A. Pleural plaques and respiratory function. Am J Ind Med. 1986;10(4):419-26.

* Lilis R, Miller A, Godbold J, Chan E, Benkert S, Selikoff IJ. The effect of asbestos-induced pleural fibrosis on pulmonary function: quantitative evaluation. Ann N Y Acad Sci. 1991 Dec 31;643:162-8.

* Schwartz DA. The clinical relevance of asbestos induced pleural fibrosis. Ann N Y Acad Sci. 1991 Dec 31;643:169-77.

* Ernst P, Bourbeau J, Becklake MR.Pleural abnormality as a cause of impairment and disability. Ann N Y Acad Sci. 1991 Dec 31;643:157-61.

* Hedenstierna G, Alexandersson R, Kolmodin-Hedman B, Szamosi A, Tollqvist J.Pleural plaques and lung function in construction workers exposed to asbestos. Eur J Respir Dis. 1981;62(2):111-22.

* Oliver LC, Eisen EA, Greene R, Sprince NL. Asbestos-related pleural plaques and lung function. Am J Ind Med. 1988;14(6):649-56.

* Miller A, Lilis R, Godbold J, Chan E, Selikoff IJ. Relationship of pulmonary function to radiographic interstitial fibrosis in 2611 long-term asbestos insulators.  Am Rev Resp Dis 1992; 145:263-270.

\* Hillerdal G, Malmberg P, Hemmingsson A.  Asbestos-related lesions of the pleura: parietal plaques compared to diffuse thickening studied with chest roentgenography, computed tomography, lung function, and gas exchange. Am J Ind Med. 1990;18(6):627-39.

In general, diffuse pleural disease has been associated with more severe functional impairment and symptoms than circumscribed pleural disease.  Studies that have found associations between diffuse pleural disease and functional impairment and symptoms of breathlessness or dyspnea, where evaluated, include the following:

\* Bourbeau J, Ernst P, Chrome J, Armstrong B, Becklake MR  The relationship between respiratory impairment and asbestos-related pleural abnormality in an active work force. Am Rev Respir Dis. 1990 Oct;142(4):837-42.

\* Hillerdal G, Malmberg P, Hemmingsson A.  Asbestos-related lesions of the pleura: parietal plaques compared to diffuse thickening studied with chest roentgenography, computed tomography, lung function, and gas exchange. Am J Ind Med. 1990;18(6):627-39.

\* Schwartz DA, Fuortes LJ, Galvin JR, Burmeister LF, Schmidt LE, Leistikow BN, LaMarte FP, Merchant JA. Asbestos-induced pleural fibrosis and impaired lung function. Am Rev Respir Dis. 1990 Feb;141(2):321-6.

\* Kouris SP, Parker DL, Bender AP, Williams AN. Effects of asbestos-related pleural disease on pulmonary function. Scand J Work Environ Health. 1991 Jun;17(3):179-83.

\* Britton MG. Asbestos pleural disease. Br J Dis Chest. 1982;76:1-10.

\* Kilburn KH, Warshaw R. Pulmonary functional impairment associated with pleural asbestos disease. Circumscribed and diffuse thickening. Chest. 1990 Oct;98(4):965-72.

\* Schwartz DA. The clinical relevance of asbestos induced pleural fibrosis. Ann N Y Acad Sci. 1991 Dec 31;643:169-77.

\* Ernst P, Bourbeau J, Becklake MR.Pleural abnormality as a cause of impairment and disability. Ann N Y Acad Sci. 1991 Dec 31;643:157-61.

\* Miller A, Lilis R, Godbold J, Chan E, Selikoff IJ. Relationship of pulmonary function to radiographic interstitial fibrosis in 2611 long-term asbestos insulators.  Am Rev Resp Dis 1992; 145:263-270.

\* Hillerdal G, Malmberg P, Hemmingsson A.  Asbestos-related lesions of the pleura: parietal plaques compared to diffuse thickening studied with chest roentgenography, computed tomography, lung function, and gas exchange. Am J Ind Med. 1990;18(6):627-39.

* Rosenstock L, Barnhart S, Heyer NJ, Pierson DJ, Hudson LD. The relation among pulmonary function, chest roentgenographic abnormalities, and smoking status in an asbestos-exposed cohort. Am Rev Respir Dis. 1988 Aug;138(2):272-7.

* Rosenstock L. Roentgenographic manifestations and pulmonary function effects of asbestos-induced pleural thickening. Toxicol Ind Health. 1991 Jan-Mar;7(1-2):81-7.

* Kee SL, Blanc P. Causes of pulmonary impairment in asbestos-exposed individuals with diffuse pleural thickening. Am J Resp Crit Care Med. 1996;154:789-93.

* Lilis R, Miller A, Godbold J, Selikoff IJ. Radiographic abnormalities in asbestos insulators: effects of duration from onset of exposure and smoking. Relationship of dyspnea with parenchymal and pleural fibrosis. Am J Ind Med. 1991; 20:1-15.

* Miller A, Teirstein AS, Selikoff IJ. Ventilatory failure due to asbestos pleurisy. Am J Med. 1983 Dec;75(6):911-9.

* McGavin CR, Sheers G. Diffuse pleural thickening in asbestos workers: disability and lung function abnormalities. Thorax. 1984 Aug;39(8):604-7.

In their current comments, W.R. Grace does not provide any contradictory medical or epidemiologic evidence that would indicate that pleural plaques and diffuse pleural fibrosis are not independently associated with pulmonary function impairment and clinical symptoms. Instead, W.R. Grace references a number of the studies cited in the EPA June response, typically taking singular quotes out of context, as evidence that there is not a well-documented epidemiological relationship between radiographic findings of asbestos-related pleural disease (both pleural plaques and diffuse pleural fibrosis) with functional impairment and symptoms. Since W.R. Grace has not accurately addressed nor represented the findings of the studies cited by EPA in their comments, the full unedited abstracts, where available, for each of the studies referred to by W.R. Grace are provided below.

* Bourbeau J, Ernst P, Chrome J, Armstrong B, Becklake MR. The relationship between respiratory impairment and asbestos-related pleural abnormality in an active work force. Am Rev Respir Dis 1990 Oct;142(4):837-42

With the general improvement in environmental controls in workplaces where asbestos is used, an increasing number of workers are seen who exhibit isolated pleural plaques. The question as to whether these are associated with respiratory impairment independently of parenchymal disease remains unresolved. The question was reinvestigated using quantitative gallium-67 lung scanning to take into account early parenchymal change not evident on the chest radiograph. We carried out a cross-sectional study of 110 construction insulators all currently at work. Overall, 58.2% had pleural abnormality, 52.5% pleural plaques only, and 5.5% diffuse pleural thickening as assessed from the PA chest radiograph. Compared with those without, those with any pleural abnormality had a decrease in FEV1 and FVC on average of 222 and 402 ml (p less than 0.05), and those with isolated pleural plaques, a decrease on average of 200 and 350 ml (p less than 0.05), after taking into account age, height, smoking status, and the presence of parenchymal abnormality as assessed by chest radiography and gallium uptake. The complaint of dyspnea with strenuous activities was also significantly related to the width and extent of chest wall pleural thickening (p less than 0.05), independently of parenchymal disease. This study suggests that the most common radiographic findings in asbestos-exposed, isolated pleural plaques are associated with a significant reduction in FEV1 and FVC, which cannot be attributed to the presence of radiographic and subradiographic pulmonary fibrosis.

It is clear that the findings of this study do not support the assertion by W.R. Grace "*that pleural plaques are little more than a sign of asbestos exposure*". Not only did the study participants with pleural plaques show clear evidence of significantly reduced lung function, but they also demonstrated increasing dyspnea with major activities such as walking up a steep hill. Also, the dyspnea experienced by individuals was significantly related to the extent of their pleural thickening.

*    Hilt B, Lien JT, Lund-Larsen PG. Lung function and respiratory symptoms in subjects with asbestos-related disorders: a cross-sectional study. Am J Ind Med 1987;11(5):517-28.

The prevalence of respiratory symptoms and lung function impairment was studied in a sample of men from a population screening of asbestos-related disorders. When the rates were adjusted for age and smoking habits, 83 subjects with lung fibrosis had an increased prevalence of respiratory symptoms, in particular, phlegm when coughing and breathlessness grades 1-3. Among 200 subjects under 70 years

71

of age who had pleural plaques only, a statistically significant increase was observed in the prevalence of breathlessness grade 1 compared to an external reference population. Among 98 asbestos-exposed subjects who had normal chest X-rays, there was an increase in the prevalence of breathlessness grade 2, cough during the day, and phlegm when coughing. There was a higher proportion of subjects with lung fibrosis who were below 80% of the predicted values for forced vital capacity (FVC) and forced expiratory volume in 1 second (FEV1) than in the other groups. There was also a higher proportion of subjects with pleural plaques only who were below 90% of the predicted value for FVC than in a group of 90 subjects without asbestos exposure. In accordance with previous studies, these results indicate that pleural plaques in asbestos workers may be of greater importance as a clinical feature than has been recognized in the past.

W.R. Grace does not address the findings of the study, rather W.R. Grace cites a sentence out of context in the discussion portion of the article to suggest that the study findings are not significant *"as the methods applied were crude and the observed differences small, the study does not give conclusive evidence about the prevalence or the degree of lung function disturbances in subjects with different types of asbestos-related disorders"*. The remainder of the paragraph that W.R. Grace chose not to include, reads: "However, the results" [of the study] "provide evidence that subjects with lung fibrosis have more respiratory symptoms and lung function impairment than others. In accordance with the results from other studies [Artz, 1980; Britton, 1982; Hilt, 1984; Lilis, 1984; Sanden, 1984], the present results might also indicate that pleural plaques in asbestos workers are more important as a clinical feature than has generally been recognized in the past."

*    Kouris SP, Parker DL, Bender AP, Williams AN. Effects of asbestos-related pleural disease on pulmonary function. Scand J Work Environ Health 1991 Jun;17(3):179-83

The relationship between loss of pulmonary function and the presence of asbestos-related pleural disease was evaluated for 913 Minnesota asbestos workers. Asbestos-related pleural disease was categorized as circumscribed plaques or diffuse thickening. Compared with workers with normal pleura, workers with plaques had a decreased mean percentage for predicted forced vital capacity (FVC) and predicted forced expiratory volume in 1 s (FEV1.0). Diffuse thickening was associated with

more profound decreases in FVC and FEV1.0. No relationship was seen between FEV % [(100 x FEV1.0)/FVC)] and either type of pleural disease. Dyspnea was associated with diffuse thickening more so than plaques. These results remained after control for pack-years of smoking, extent of parenchymal disease, and the presence of pulmonary disease history. Pleural plaques and diffuse pleural thickening were considered independent risk factors for the loss of lung function.

The finding of this study shows that pleural plaques are significantly associated with decreases in FEV and FEV1 even after accounting for smoking history, coexisting interstitial disease, and other medical conditions. A similar but more substantial effect was demonstrated among the workers who had diffuse pleural disease. The preservation of FEV% was consistent with restrictive lung disease. W.R. Grace suggests that the findings from this study are less compelling since the authors mention other research which did not demonstrate similar findings. The work of other researchers is not relevant to this studies findings. Furthermore, W.R. Grace's comment suggesting this work is *"contradicted by Cotes and, with a much larger study (N=386), by Gaensler, each of whom concluded that plaques had no detrimental effect on lung function."* is not correct as the study population for this work (N=913) is clearly larger than 386 cited by W.R. Grace.

\*     Lilis R, Miller A, Godbold J, Chan E, Benkert S, Selikoff IJ. The effect of asbestos-induced pleural fibrosis on pulmonary function: quantitative evaluation. Ann N Y Acad Sci 1991 Dec 31;643:162-8

A summary abstract is not available for this study. However, the study conclusions clearly support EPA's comments and are as follows: "Multiple regression analysis showed that pleural fibrosis was a significant variable negatively affecting forced vital capacity. This effect was demonstrated in the subgroup with pleural changes only and was also found in those with parenchymal changes associated with pleural changes; the effect of pleural fibrosis on forced vital capacity was independent from that of the profusion of small opacities. In the subgroup with circumscribed pleural fibrosis, the pleural index was found to have statistically significant negative effect on forced vital capacity." W.R. Grace's comments concerning the possible wide range of extent

and width of circumscribed pleural fibrosis does not detract from this studies findings, however, it does support the general findings, by this and other studies, that as the extent of circumscribed pleural disease increases so does the degree of impairment. Thus given that pleural abnormalities ranged from circumscribed pleural plaques to diffuse pleural fibrosis among those evaluated in Libby, we would expect to see variable degrees of associated impairment as well.

\*      Schwartz DA. The clinical relevance of asbestos-induced pleural fibrosis. Ann N Y Acad Sci 1991 Dec 31;643:169-77

Asbestos-induced pleural fibrosis is the most common radiographic abnormality among asbestos-exposed persons. Circumscribed pleural plaques and diffuse pleural thickening account for more than 90% of the asbestos-induced chest wall abnormalities, and their prevalence is expected to increase for the next 15 to 20 years. Several investigators have recently found that pleural plaques and diffuse pleural thickening independently contribute to the development of restrictive lung function. The work presented in this paper indicates that asbestos-induced pleural fibrosis is also associated with evidence of interstitial lung abnormalities, even among those with normal parenchyma on chest X-ray film. These parenchymal abnormalities include an increased percentage of lymphocytes on bronchoalveolar lavage and an increase in the interstitial changes observed on high-resolution chest computerized tomography (HRCT) scan. However, neither a lymphocytic alveolitis nor an interstitial parenchymal fibrosis influenced the relationship between pleural fibrosis and restrictive lung function. We conclude that asbestos-induced pleural disease contributes to the development of restrictive lung function and identify a group of exposed individuals who are at excess risk of asbestosis.

Here another study finds that asbestos-induced pleural disease, especially those with diffuse disease, contributes to lung impairment and lymphocytic alveolitis. While the specific association between pleural plaques and impairment did not reach the level of statistical significance, the author notes that workers with circumscribed pleural plaques had a higher percentage of lymphocytes in the lavage fluid and also an increased prevalence of interstitial changes detected on high-resolution CT scan, that fell between those persons with normal pleura and those with diffuse pleural thickening.

\*    Hedenstierna G, Alexandersson R, Kolmodin-Hedman B, Szamosi A, Tollqvist J. Pleural plaques and lung function in construction workers exposed to asbestos. Eur J Respir Dis 1981;62(2):111-22

Respiratory symptoms and pulmonary function have been evaluated in construction workers exposed to asbestos and in control subjects. Group I displayed pleural plaques but not lung tissue involvement on X-ray, group II had the same history of asbestos exposure as the previous group but had no pleural plaques, nor any lung tissue involvement, and group III constituted non-exposed control subjects. Chronic bronchitis and productive cough were 4-5 times more frequent in group I compared to group III, while non-productive cough was rare. Conventional spirometry gave no significant differences between exposed and non-exposed subjects, while expiratory flow rates during the latter half of the expiration (MEF50, MEF25) were reduced in group I. Closing volume (CV) was markedly increased in group I and the transfer factor of the lung for CO was slightly reduced. The static transpulmonary pressure - lung volume curve was much the same for all three groups. The difference in CV, MEF50, and MEF25 was greater between exposed and non-exposed non-smokers than between exposed and non-exposed smokers. No significant differences were noticed between those in group II and the control group III. The findings indicate that asbestos exposure which elicits pleural plaques, may cause pulmonary dysfunction, representing a disease of the small airways.

This study shows "that subjects exposed to asbestos with no parenchymal changes but with pleural plaques on chest x-ray, suffered more from chronic bronchitis and other kinds of productive cough, and displayed various changes in pulmonary function compared with non-exposed control subjects. Interestingly, those with a rather similar history of exposure to asbestos but without pleural or parenchymal changes on chest x-ray complained considerably less of subjective symptoms and displayed no significant changes in pulmonary function compared with control subjects. W.R. Grace's comments concerning smokers, a subgroup of the study population does not detract from the study results noted above.

\*    Oliver LC, Eisen EA, Greene R, Sprince NL. Asbestos-related pleural plaques and lung function. Am J Ind Med 1988;14(6):649-56

The present study examines the association between asbestos-related pleural plaques and lung function in a group of workers with occupational exposure to asbestos. Exposure, smoking, and respiratory histories, chest radiographs, flow-volume loops, and single breath DLCOs were obtained on 383 railroad workers. A score based on the ILO-1980 classification system was used to quantify the extent of plaquelike thickening. In order to eliminate potential confounders, we excluded from final analysis subjects with diffuse pleural thickening (n = 10) or small irregular opacities classified as profusion 0/1 or greater (n = 6) on chest radiograph. Definite pleural plaques were observed in 22.6%. The single breath DLCO was similar in the groups with and without plaques (p = 0.0550). Decrement in FVC and the occurrence of pulmonary restriction were associated with the presence of definite plaques (p = 0.0306 and 0.0431, respectively) and with quantitative pleural score (p = 0.0135 and 0.0126), controlling for duration of asbestos exposure and smoking. A test for trend revealed an association between level of diagnostic certainty (none, suspect, definite) for pleural plaques and these measures of lung function (p less than 0.02). Our findings reveal an association between asbestos-related pleural plaques and decrement in lung function as measured by FVC and criteria for pulmonary restriction.

This study once again shows a clear relationship between pleural plaques and pulmonary function impairment when controlling for the effects of potential confounders such as smoking and exposure. Furthermore, the prevalence of dyspnea was significantly higher in the group with plaques. As W.R. Grace comments, the authors did not exclude with absolute certainty subjects with interstitial fibrosis, however, they did very reasonably and conservatively exclude all subjects with small opacities classified as profusion 0/1 or greater by the ILO criteria. It should be noted that individuals with pleural plaques were associated with a loss of 4.3 percentage points in FVC. This study is also consistent with Dr. Whitehouse's observations, cited in his expert report, concerning pleural disease and decreased pulmonary function among his patients from Libby.

W.R. Grace references Jarvholm, 1986, (WR p 27, footnote 49) as evidence that relationship between pleural plaques and functional impairment only occurs in highly exposed groups. The abstract for the study by Jarvholm B, Sanden A. Pleural plaques and respiratory function. Am J Ind Med 1986;10(4):419-26; actually states:

> This cross-sectional study was comprised of 202 nonsmoking shipyard workers with varying exposures to asbestos. Their chest X-rays were normal or contained no abnormality other than pleural plaques. They participated in a health examination of workers exposed to asbestos, which comprised a total of 3,904 persons. One hundred and fifteen of the 202 workers had no deviations from normal X-rays, and 87 had pleural plaques but no other finding on their X-rays. Three out of the 115 workers with normal X-rays and 13 of the 87 with pleural plaques had FVCs below the reference limits (p less than 0.005). The workers with plaques had an average of 6.9% lower FVC. Even after stratification for asbestos exposure, men with plaques were found to have lower FVCs than men without plaques. This difference was largest for those with heavy exposure to asbestos.

It is clear from the findings in this study and in the above study by Oliver, 1988, that even after accounting for asbestos exposure, pleural plaques were still independently associated with functional impairment. Conjecture by the authors or W.R. Grace about the findings of another study mentioned in the discussion section of the paper does not detract from the results of this study. Furthermore, the study by Hedenstierna, 1981, shows that among groups of workers with a similar history of asbestos exposure, those with pleural changes on chest x-ray complained considerably more of subjective symptoms and displayed significant changes in pulmonary function compared with control subjects. This study by Jarvholm is also consistent with Dr. Whitehouse's observations, cited in his expert report, concerning pleural disease and decreased pulmonary function among his patients from Libby.

W.R. Grace states that McGavin, 1984 and Hillerdal, 1990 are *"not entirely supportive of Region 8's position"*. The unedited abstract for the McGavin study [McGavin CR, Sheers G. Diffuse pleural thickening in asbestos workers: disability and lung function abnormalities. Thorax 1984 Aug;39(8):604-7] states:

Data from 37 asbestos workers with diffuse pleural fibrosis have been analyzed. None had radiological evidence of asbestosis or physiological evidence of airflow obstruction. Forty per cent had breathlessness of MRC grade 3 or higher. Vital capacity was significantly lower in the subjects in the higher grades of breathlessness and in those with greater radiographic pleural abnormality. No relationship was demonstrated between dust exposure and either radiographic abnormality or grade of breathlessness. Diffuse pleural thickening, particularly when extensive and bilateral, causes functional impairment and disability.

This study was only cited by EPA as evidence that diffuse pleural disease is associated with symptoms and functional impairment. EPA disagrees with W.R. Grace's comment that this study is not entirely supportive of Region 8's position on this point. With respect to W.R. Grace's comment concerning author statements regarding pleural plaques and the separate issue of medical disability, EPA has not taken a position on this point.

The unedited abstract for the Hillerdal study [Hillerdal G, Malmberg P, Hemmingsson A. Asbestos-related lesions of the pleura: parietal plaques compared to diffuse thickening studied with chest roentgenography, computed tomography, lung function, and gas exchange. Am J Ind Med 1990;18(6):627-39] states:

Lung function tests, tests of working capacity with gas exchange, and computed tomography (CT) with density measurements with the patient supine and prone were performed in 23 males with asbestos-related bilateral pleural lesions. Two had pulmonary asbestosis grade 1/0 or more; all the others had normal lung parenchyma. On x-ray, the pleural lesions were divided into plaques involving only the parietal pleura and diffuse pleural fibrosis of various degrees involving the visceral pleura. There was a good correlation between the findings at plain chest roentgenography and CT, but more lesions were seen on the CT scan. However, a few pleural plaques seen on conventional films were not observed at CT. Individuals with plaques had slightly lowered lung function compared to reference subjects. Bilateral diffuse pleural fibrosis was associated with a marked decrease in pulmonary function. The two patients with radiologically evident pulmonary asbestosis were found in this group. Decreased lung

function was also observed in subjects with pleural fibrosis of only grade 1 (involving less than one fourth of the hemithorax) and a normal exercise capacity. The study shows the importance of differentiation between various asbestos-related pleural lesions.

EPA disagrees with W.R. Grace's comment that the Hillerdal study is not entirely supportive of Region 8's position that pleural plaques and diffuse pleural disease are associated with symptoms and functional impairment.

W.R. Grace comments that the authors of the Schwartz study [Schwartz DA, Fuortes LJ, Galvin JR, Burmeister LF, Schmidt LE, Leistikow BN, LaMarte FP, Merchant JA. Asbestos-induced pleural fibrosis and impaired lung function. Am Rev Respir Dis 1990 Feb;141(2):321-6] speculated that subclinical alveolitis or interstitial fibrosis not detected by routine chest x-rays may be responsible for the observed functional impairment. The actual of abstract of this study states:

To assess the clinical significance of asbestos-induced pleural fibrosis, we evaluated the relationship between radiographic evidence of pleural fibrosis and spirometric values in 1,211 sheet metal workers. Of those with pleural fibrosis (n = 334), 78% had circumscribed plaques and 22% had diffuse pleural thickening involving the costophrenic angle. Factors that were found to be associated with the presence and type of pleural fibrosis included increased age (p less than 0.001), more years in the trade (p less than 0.0001), more years since first exposure to asbestos (p less than 0.0001), more pack-years of cigarette smoking (p less than 0.01), and the presence and degree of interstitial fibrosis (p less than 0.0001). After controlling for these potential confounders (age, years in the trade, latency, pack-years of smoking, and ILO profusion category), linear multivariate regression models demonstrated that both circumscribed plaques (p = 0.007) and diffuse pleural thickening (p = 0.008) were independently associated with decrements in FVC but not with decrements in the FEV1/FVC ratio. Furthermore, our data indicate that the effect of diffuse pleural thickening on decrements in FVC is approximately twice as great as that seen with circumscribed pleural plaques. We conclude that the presence and type of pleural fibrosis among asbestos-exposed workers is independently associated with a pattern of spirometry that is suggestive of an underlying restrictive defect in lung function.

While the authors may have speculated about the presence of unobservable interstitial disease, they very reasonably controlled for interstitial fibrosis as represented by ILO profusion categories and found that both circumscribed plaques (p = 0.007) and diffuse pleural thickening (p = 0.008) were still independently associated with decrements in pulmonary function.

B.    *W.R. Grace asserts that pleural disease does not progress, and even if it did, the present population in Libby did not have exposures as large as the occupational studies which have shown progression.*

In their December 21, 2001 comments, W.R. Grace asserted that the articles cited by Dr. Weis do not support the "theory" of progression. The articles cited by Dr. Weis were; Miller, 1983; Cookson, 1986; Rosenstock, 1991; Erlich, 1992; Hillerdal, 1997, and were cited in support of the statement "asbestos-associated radiologic abnormalities, similar to those observed among medical testing participants in Libby, have been shown in other populations to be associated with significant progression of disease, morbidity, and mortality. In EPA's response to W.R. Grace's December 2001 comments concerning this issue, EPA stated:

"All the articles cited by Dr. Weis reported that various asbestos-related abnormalities, whether pleural or interstitial, continued to progress over time regardless of the type of asbestos workers were exposed to. Again the study by Erlich (1992), which found that an average of 37% of workers with less than 1 month of exposure to amosite (another amphibole) had progression of pleural and interstitial disease which was still detectable greater than 20 years after the end of their exposure, clearly illustrates this point. Erlich also found that no cumulative exposure threshold (i.e. a safe level of exposure) for pleural and interstitial disease could be detected. Specifically, with respect to exposure to Libby asbestiform minerals, the recently reported case by Wright, et al (Wright RS, Abraham JL, Harber P, Burnett BR, Morris P, West P. Fatal Asbestosis 50 Years after brief high intensity exposure in a vermiculite expansion plant. Am J Respir Crit Care Med. 2002;165(8):1145-9) clearly documents progressive and fatal asbestos disease in a man 50 years after only a 2 month

exposure to Libby vermiculite when he was 17 years old."

In addition to these epidemiologic studies showing progression of asbestos-related pleural disease, EPA's response cited that a draft evaluation being prepared for publication by Dr. Alan Whitehouse found statistically significant progressive loss of lung function among 67 patients from Libby with only asbestos-related pleural abnormalities identified on either chest x-ray or CT scan. This study was brought to EPA's attention by the US Public Health Service in April, 2002. While EPA clearly has not relied on this incomplete study with respect to actions in Libby, it is consistent with the aforementioned epidemiologic studies and reflects the unique clinical observations and experience of a pulmonary specialist who has been following several hundred patients from Libby for many years.

The EPA response also cited a recent case-report by Wright, 2002, which reported progressive and fatal asbestos disease in a 50 year old man after only a 2 month exposure to Libby vermiculite when he was 17 years old. In response, W.R. Grace has provided information to EPA that the individual cited in the case-report may have had substantial asbestos exposure for several years while in the Navy. While this does not diminish the finding of progressive fatal disease, it does suggest that this individuals asbestos exposures may have been greater than reported and included sources of asbestos exposure other than Libby vermiculite. However, it is interesting to note that the histopathology results reported by Wright et. al. of this individuals lungs showed that 88% of the asbestos fibers were Libby amphibole and not the commercial asbestos typically used in Naval shipyards, suggesting that even if this individual had other asbestos exposures it appears that the Libby amphibole was the most significant fiber present in his lungs during his progressive and fatal demise.

In the May 2, 2002, Action Memorandum, EPA stated "several studies have demonstrated the relationship between the findings of asbestos-related pleural and interstitial abnormalities, and serious progression of chronic asbestos-related diseases citing studies by Erlich, 1992; Shepard, 1997; Cookson, 1986; and Viallat, 1983. W.R. Grace incorrectly asserts that the studies by Shepard 1997 and Viallat, 1983, were not in the Administrative Record. Further, W.R. Grace inappropriately

discusses two other studies [1) Rey F, Boutin C, Steinbauer J, Viallat JR, Alessandroni P, Jutisz P, Di Giambattista D, Billon-Galland MA, Hereng P, Dumortier P, et al. Environmental pleural plaques in an asbestos exposed population of northeast Corsica. Eur Respir J 1993 Jul;6(7):978-82 and 2) Viallat JR, Boutin C, Steinbauer J, Gaudichet A, Dufour G. Pleural effects of environmental asbestos pollution in Corsica. Ann N Y Acad Sci 1991 Dec 31;643:438-43], not cited by EPA but present in the administrative record, as not supportive of the relationship between asbestos-related pleural and interstitial abnormalities and progression of disease. These studies were not cited by EPA with regard to disease progression because they did not evaluate disease progression. Rather these studies evaluated the association of low level environmental asbestos exposures and findings of pleural disease among residents of towns in Northeast Corsica. The unedited abstract by Rey et. al. reported:

> The purpose of this study was to determine whether the inhabitants of villages environmentally exposed to asbestos, in northeast Corsica, had a higher incidence of pleural plaques. X-rays were obtained from subjects aged over 50 yrs, with no occupational exposure to asbestos or history of pleural disease, in one village exposed to asbestos, Murato, and a nonexposed, control village, Vezzani. In addition, the mineral content of the air and parietal pleura of animals in the exposed zone was studied, using transmission electron microscopy. The incidence of bilateral pleural plaques in the exposed population was 41%, as compared to 7.5% in the nonexposed population (p < 0.00001). The levels of airborne tremolite were higher in Murato (6-72 ng.m-3) than in Vezzani (< 1 ng.m-3), but chrysotile levels were similar. Significant numbers of chrysotile and tremolite fibres were identified in the parietal pleura of animals from the exposed village. This study confirms the well-known correlation between bilateral pleural plaques and environmental exposure to low levels of asbestos.

W.R. Grace does not address the findings of the study, rather W.R. Grace cites a sentence out of context in the discussion portion of the article to suggest that the study findings do not show progression of disease and that pleural plaques are not precancerous lesions or a risk for pleural mesothelioma. These health endpoints were not evaluated in these studies, however, EPA has cited a

number of studies which in fact have shown significant relationships between environmental asbestos exposure, pleural disease, and increased risk for pleural mesothelioma [Magnani, 2001; Magnani, 2000; Berry, 1996; Hansen, 1993; Hansen, 1998, Hillerdal, 1994; Luce, 2000].

Further, with respect to progression of disease specifically among those in Libby with asbestos-related abnormalities, Dr. Lockey in his July 30, 2002, expert report (which is attached and incorporated by reference) commented that "with time these pulmonary changes will most likely increase in intensity particularly with continued environmental exposure to asbestiform minerals. Even without additional exposure, the marked durability of tremolite-actinolite asbestiform fibers in pleural tissue will result in chronic inflammation and fibrosis. As pleural changes become more extensive, pulmonary impairment will occur which in some circumstances, such as with fibrosing pleuritis can be associated with increased mortality. A similar process may also occur in the lung parenchyma."

As noted above, the study by Dr. Whitehouse provides EPA with additional information concerning the potential severity and progression of asbestos-related disease among his patients from Libby. W.R. Grace and their experts, incorrectly assert that EPA relies on this study to support a position that Libby amphibole is more toxic than other forms of asbestos and thus necessitating special consideration for remediation. This is clearly not the case, as this evaluation is not intended to be a formal epidemiologic study but merely reflects the unique clinical observations and experience of a pulmonary specialist who has been following several hundred patients from Libby for many years.

C.     *Pleural Disease and Cancer - W.R. Grace states asbestosis is necessary to have an increased risk of lung cancer and that EPA failed to include articles which support this conclusion.*

In EPAs June response EPA clearly stated "the data is inconclusive with respect to the association between radiographic findings of circumscribed pleural disease and lung cancer, unlike that for asbestos exposure in general. The risk for lung cancer associated with parenchymal fibrosis is

83

well documented in the medical literature". The need to add additional articles concerning a point of relative agreement seems superfluous.

However, unlike lung cancer, pleural plaques have been shown to increase the risk for mesothelioma, even in populations with environmental exposures. In their response, W.R. Grace cites two new articles to support that pleural plaques are not associated with mesothelioma. Harber 1987 (WR P 27 footnote 55) used a case-control design involving 726 cases with plaques compared to controls without plaques. This study did not find an association between pleural plaques and lung cancer, as already recognized by EPA. However, given the small sample size and short duration of evaluation this study had no ability to evaluate the association between pleural plaques and mesothelioma (a rare event), nor did the author assert anything about their findings and risk of mesothelioma. It is interesting to note that W.R. Grace provides this study for EPA's consideration, which utilized chest x-ray views including Right and Left Obliques to more accurately identify pleural plaques, while W.R. Grace criticizes ATSDR for using the same chest x-ray views to identify pleural disease among Libby residents.

As the other article supporting the lack of association between pleural plaques and mesothelioma, W.R. Grace cites Pampalon 1982 which found no excess asbestos related mortality among women residing in asbestos mining towns in Quebec. This is consistent with findings by another Canadian researcher (Andrew Churg) that W.R. Grace referenced in their December 2001 response. It is interesting to note that W.R. Grace once again cites specific Canadian research to support their argument that pleural disease is not associated with an increased risk of malignant mesothelioma. The Canadian researchers have focused on groups of workers and residents living around chrysotile mines in Quebec, Canada, which do not appear to have the highly increased mesothelioma rates observed in other asbestos-exposed populations, especially those exposed to amphiboles. Further, a number of studies by Dr. Churg and others have concluded that observed variation in risks of mesothelioma, and other asbestos-related diseases, among chrysotile miners in Quebec appear to be due to exposure to tremolite asbestos present in certain ore products or at certain mine sites (Churg A. Chrysotile, tremolite, and malignant mesothelioma in man.Chest. 1988;93:621-28., and Churg A, Wright JL, Vedal S. Fiber burden and pattern of asbestos-related disease in chrysotile miners and millers. Am Rev Res Dis. 1993; 148:25-31). In another study,

increased rates of pleural calcifications and mesotheliomas among certain groups of Quebec chrysotile miners and millers were thought to be due to exposure to fibrous tremolite present only in specific mining areas (McDonald AD, Case BW, Churg A, et. al. Mesothelioma in Quebec Chrysotile miners and millers: epidemiology and aetiology. Am Occup Hyg. 1997;41:707-19). Studies of mesothelioma rates by Canadian researchers among Quebec chrysotile miners and millers and Libby vermiculite miners and millers (Stayner L, Dankovic DA, Lemon R. Occupational exposure to chrysotile asbestos and cancer risk: A review of the amphibole hypothesis. Am. J. Pub. Hlth. 1996;86:107-114) provide direct epidemiologic evidence indicating that Libby amphiboles are more potent than chrysotile in inducing mesothelioma. These studies found that the percentage of deaths due to mesothelioma among Libby vermiculite miners and millers was 2.4%, approximately six times higher than the percentage (0.4%) reported in a study of Quebec chyrsotile miners and millers. Thus, not only is pleural disease associated with malignant mesotheliomas, but tremolite asbestos exposure in particular appears to be more potent or toxic than other forms of asbestos in causing this deadly disease. Further, a recent mortality study update by JC McDonald (referred to by Dr. Moolgavkar in his expert report) (See Attachment 12) of his Libby vermiculite miners from his previous publication in 1986 found:

> "This small cohort of vermiculite miners, exposed to amphibole fibers in the tremolite series, has suffered severely from both malignant and non-malignant respiratory disease. The overall proportionate mortality from mesothelioma is similar to that for crocidolite miners in South Africa and Australia, but ten times higher than that observed in Quebec chrysotile miners. In the Quebec mining region, the risk of mesothelioma death was some three times greater in Thetford Mines than in the town of Asbestos, where proportions of tremolite in airborne fibers are believed to have been in approximately the same ratio. Within Thetford Mines the risks of both mesothelioma and lung cancer were also related to the estimated levels of tremolite in mines where the men had worked. This suggests the possibility that the relatively low risks of lung cancer and mesothelioma in most workers exposed to commercial chrysotile are attributable in whole or part to contaminating tremolite."

Evidence that pleural plaques are associated with mesothelioma is as follows (taken from EPA June, 2002 comments):

Hillerdal (1994 Pleural Plaques and Risk for Bronchial Carcinoma and mesothelioma; Chest 1994;105:144-50) reported in a 1994 study of 1588 Swedish men with 84% having only occasional low intensity asbestos exposure, found that pleural plaques alone on CXR indicate a significant exposure to asbestos, with a statistically significant increased risk for mesothelioma (1/1700 per year) and possibly also for bronchial carcinoma. The risk for mesothelioma observed by Hillerdal 1994 was smaller than that estimated by Edge (Edge JR. Asbestos-related disease in Barrow-Furness. Env. Res. 1976;11:244-7) in 1976 who found that plaque carriers had a risk of developing mesothelioma which was 1/377 per year. The difference may be due to the Edge cohort having been exposed to amphiboles and having potentially higher exposures. Of note, the expected occrrence of mesotheliomas in the United States is approximately 1 case per 1 million people per year.

In addition to the association between pleural plaques and mesothelioma, non-occupational or environmental asbestos exposures, similar to Libby, have clearly been shown to increase the risk for mesotheliomas. A review of cases of mesothelioma occurring in individuals younger than 40 years old found that the median age of initial exposure was 10 years of age and a median duration of exposure was 120 months. The median latency between initial asbestos exposure and diagnosis of mesothelioma was 19 years (Kane 1990). A recent case-control study found significantly increased risks from environmental asbestos exposure among residents living near an asbestos cement factory in Italy (Magnani 2001). A multicentric study performed by researchers in Spain, Italy, and Switzerland found that low-dose exposures to asbestos at home or in the environment carries a significant risk of mesothelioma (Magnani 2000). Significantly elevated mesothelioma rates were also found among residents living in Manville, Somerset County, New Jersey, the location of the largest asbestos manufacturing plant in North America (Berry 1996) (Administrative Record #338256). Another, particularly relevant, study found significantly increased rates of mesothelioma from environmental asbestos exposure among residents living near a crocidolite mine in Australia (Hansen 1993) (Administrative Record #371372, EPA June response). This study involved exposure to crocidolite among residents of the township of Wittenoon in Western Australia. Similar to Libby, former mine workers were found to have excess mortality from asbestosis,

malignant mesothelioma, and respiratory cancers. Also, similar to Libby, the residents of this township that were not employed in the crocidolite industry were exposed to general environmental contamination "from the milling operations and from the use of tailings from the mill for the paving of roads, driveways, car-parks, school playgrounds, in the yards of houses to suppress dust and muddiness, on the race-course, and from household contact with the workers themselves or their clothes." Among the 24 individuals identified with mesotheliomas associated only with environmental exposures, their residence in Wittenoon ranged from 6 weeks to 11 years, five individuals lived in the township for no more than one year.

Not only have environmental asbestos exposures in general been associated with an increased risk of mesotheliomas, but exposure to tremolite asbestos, in particular, has been associated with increased risk of mesotheliomas in a nonoccupationally exposed population (Luce D, Bugel I, Goldberg P, Goldberg M, Salomon et. al. Environmental exposure to tremolite and respiratory cancer in New Caledonia: a case-control study. Am J Epidemiol 2000 Feb 1;151(3):259-65).

VI.    *W.R. Grace and its experts assert that the basis for EPA's action is the alleged increased potency of Libby Amphibole and the existence of a sensitized population in Libby.*

W.R. Grace and their experts (Drs. Hughson, Moolgavkar, Anderson) incorrectly assume that the justification for EPA's remedial actions in Libby are based on; 1) the presumption that asbestos exposures in Libby are more toxic than exposures to other forms of asbestos, thus requiring special attention, and 2) the existence of a "sensitized population" in Libby. Further, Dr. Hughson (p4 Hughson expert report) incorrectly surmises that EPA's position concerning the potency of the Libby amphibole is based on draft medical results reported by Dr. Whitehouse in April, 2002.

A.    *Dr. Moolgavkar and Dr. Hughson argue that the potency of amphibole asbestos is less than serpentine asbestos and that EPA inappropriately relied on a theory that the*

87

> *potency of amphibole asbestos was higher than serpentine asbestos in making cleanup decisions.*

EPA has not based any of its actions in Libby on the premise that the Libby amphibole is more toxic or potent than other forms of asbestos. Rather EPA's discussion of potency of the Libby amphibole is in direct response to W.R. Grace's December, 2001 comments and most recent comments citing two new studies (Harber, 1987 and Pampalon, 1982) to support their position that environmental exposures and asbestos-related pleural disease are not associated with mesotheliomas.. This has been discussed above in V.C.

With respect to the EPA's risk assessment of Libby, EPA did not conduct quantitative risk assessments based upon differential toxicity of asbestiform minerals. In conducting the screening level risk assessments for the site, EPA followed standard risk assessment procedures for asbestos using the peer-reviewed IRIS model and published potencies from the IRIS database. However, it should be noted that the IRIS slope factor for asbestos is, in turn derived primarily from occupational studies involving exposure to serpentine asbestiform particles. Dr. Moolgavkar in his expert report presents an interesting mathematical exercise, which arrives at the conclusion that the potency of Libby amphibole, may in fact be less potent than the standard risk factor utilized in EPA's risk-assessment model. Dr. Moolgavkar in this exercise does not follow any peer-reviewed or approved method that EPA is aware of. Indeed, Dr. Moolgavkar's hypothetical exercise is directly contrary to many of the comments provided by W.R. Grace in its first two sets of comments on the Administrative Record and its subsequent Supplement. The comments by Dr. Anderson and Dr. Moolgavkar about the linear slope factor found in IRIS are also subject to the same criticism.

Despite the fact that EPA has not based any of its actions in Libby on the premise that the Libby amphibole is more toxic or potent than other forms of asbestos, there is some reasonable evidence to support that Libby amphibole may in fact be more potent. There is significant evidence in the peer reviewed literature indicating that amphiboles, particularly tremolite, may have greater toxicity than chrysotile (the predominant form of asbestos used to establish the EPA cancer slope factor). Van Oss et. al. (Van Oss, CJ, Niam, JO, Costanzo, PM, et al., Impact of different asbestos

species and other mineral particles on pulmonary pathogenesis) state that "some asbestos species, such as the amphiboles, crocidolite, amosite, and tremolite, are pathogenic after only a short (e.g. less than one year) exposure; serpentine asbestos (e.g. chrysolite) and other mineral particles are only pathogenic after long-term (many years) exposure." Further, in a review of several studies, NIOSH (Stayner L, Dankovic DA, Lemon R. 1996. "Occupational exposure to chrysotile asbestos and cancer risk: A review of the amphibole hypothesis" Am. J. Pub. Hlth. 86:107-114) found that the tremolite exposures associated with mining in Libby may be among the most potent exposures related to asbestos risks for mesothelioma. Studies by McDonald et. al. comparing Libby miners to chrysotile miners in Canada, found that the percentage of deaths due to mesothelioma among Libby vermiculite miners and millers was 2.4%, approximately six times higher than the percentage (0.4%) reported in a study of Quebec chyrsotile miners and millers. A recent mortality study update by Dr. McDonald of his Libby vermiculite miners from his previous publication in 1986 found:

> "This small cohort of vermiculite miners, exposed to amphibole fibers in the tremolite series, has suffered severely from both malignant and non-malignant respiratory disease. The overall proportionate mortality from mesothelioma is similar to that for crocidolite miners in South Africa and Australia, but ten times higher than that observed in Quebec chrysotile miners. In the Quebec mining region, the risk of mesothelioma death was some three times greater in Thetford Mines than in the town of Asbestos, where proportions of tremolite in airborne fibers are believed to have been in approximately the same ratio. Within Thetford Mines the risks of both mesothelioma and lung cancer were also related to the estimated levels of tremolite in mines where the men had worked. This suggests the possibility that the relatively low risks of lung cancer and mesothelioma in most workers exposed to commercial chrysotile are attributable in whole or part to contaminating tremolite."

Lastly, the empirical identification of 19 cases of mesothelioma associated with the Libby community, clearly demonstrates the reality of the situation. In light of such evidence, EPA managers were fully justified in taking aggressive precautions to minimize further exposure to the residential population of Libby.

2.    *Dr. Hughson asserts that EPA's use of the term "sensitized" population is inaccurate.*

First, it is important to note that EPA has not indicated that the Libby population is a "sensitized" population. That term, which concerns an immunological response such as an allergy to a bee sting, was never intentionally used by EPA. Rather, EPA used the words "sensitive population", which means an entirely different thing. In this context, a sensitive population, among other things, suggests the effect a cumulative dose may have when compounded by continuing exposures.

W.R. Grace and their experts fail to address the central issue that the past cumulative asbestos exposures of individuals living in Libby places them at greater risk for asbestos-related disease compared to unexposed populations (i.e., healthy populations), and the fact that additional asbestos exposure will continue to increase their risk for asbestos-related disease compared to an unexposed population. It is clear from the medical literature that as time from first asbestos exposure and cumulative exposure increases so do the risks for asbestos-related disease. ATSDR in their 12/12/2000 Libby Health Consult states "asbestosis is a dose-dependent response to asbestos · exposure. Therefore, increased exposure increases the risk for potential disease. There is no scientific consensus on whether lung cancer and mesothelioma are dose-dependent diseases or instead require only a single, significant exposure. Regardless, it is clear that as opportunities for asbestos exposure increase, the likelihood of a person developing lung cancer or mesothelioma also increases." Even Dr. Hughson in his expert report states that there is "general agreement in the medical and scientific literature that the risk of developing an asbestos-related disease is related to the amount of asbestos exposure". "Furthermore, the severity of disease and the risk of its progression is also dose-related." Dr. Hughson also states that "agencies of the U.S. government, including USEPA, OSHA, etc. have consistently endorsed the linear no-threshold model for health risks due to asbestos exposure. Using that model, any exposure would cause an increase in risk compared with no exposure, and the risk of developing an asbestos-related disease increases in a linear manner in proportion to the dose." Thus, individuals with prior exposure to asbestos are less able to tolerate

future exposure before disease will occur compared to unexposed individuals. This is especially important for exposures which occur early in life, since the earlier in life you are exposed to asbestos, regardless of dose, the more likely you are to experience asbestos-related morbidity and mortality. Also, mesotheliomas are well known to occur secondary to small non-occupational asbestos exposures (see discussion of mesothelioma, above).

Expert Reports

Finally, as discussed throughout this response, EPA's expert witnesses in the cost recovery case have addressed many of the issues raised by W.R. Grace in their expert reports. EPA attaches and incorporates those reports into this response. (See Attachment 13.)