UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| W.R. GRACE & CO., et al., | § | Jointly Administered |
| | § | Case No. 01-01139 (JKF) |
| Debtors. | § | |
| | § | |

FEE AUDITOR'S FINAL REPORT REGARDING
FEE APPLICATION OF REED SMITH LLP
FOR THE EIGHTH INTERIM PERIOD

This is the final report of Warren H. Smith & Associates, P.C. ("Smith"), acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the Interim Fee Application of Reed Smith LLP for the Eighth Interim Period.

BACKGROUND

1.      Reed Smith LLP ("Reed Smith") was retained as special asbestos products liability defense counsel to the Debtors.  In the Application, Reed Smith seeks approval of fees totaling $482,101.50 and costs totaling $55,392.16 for its services from January 1, 2003, through March 31, 2003.

2.      In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time entries included in the exhibits to the Application, for compliance with 11 U.S.C. § 330, Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2001, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, Issued January 30,

1996, (the "Guidelines"), as well as for consistency with precedent established in the United States Bankruptcy Court for the District of Delaware, the United States District Court for the District of Delaware, and the Third Circuit Court of Appeals.  We served on Reed Smith an initial report based on our review, and received a response from Reed Smith, portions of which response are quoted herein.

## DISCUSSION

### General Issues

3.      In our initial report, we noted that the time entries were generally devoid of lumping and provided adequate detail, with only occasional lumping by Cameron and inadequate detail by Cameron and Flatley.  Local Rule 2016-2(d)(vii) provides that "[a]ctivity descriptions shall not be lumped –  each activity shall have a separate description and a time allotment."  Furthermore, Local Rule 2016-2(d) directs fee applicants to "include activity descriptions which shall be sufficiently detailed to allow the Court to determine whether all the time, or any portion thereof, is actual, reasonable, and necessary".  We asked Reed Smith to advise these professionals to avoid lumping and to provide adequate detail in their future time entries.  Reed Smith replied as follows:

> All Reed Smith timekeepers have been instructed on several occasions not to lump their time entries.  Reed Smith recognizes that the Fee Auditor has raised these issues in the past.  Reed Smith will continue to improve its efforts at providing clear and properly segmented time entries on all future fee applications.

We appreciate the response.

4.      We further noted that the Application seeks reimbursement for mileage expense for which the calculations are not provided.  With regard to expenses, paragraph II. E. 3. of the Guidelines  states "[f]actors relevant to a determination that the expense is proper include the

following: . . .3. [w]hether applicant has provided a detailed itemization of all expenses including

the date incurred, description of expense (e.g., type of travel, type of fare, rate, destination), method

of computation, and where relevant, name of the person incurring the expense and purpose of the

expense. . ." We asked Reed Smith to provide the firm's policy on the reimbursement of mileage

for this application and in future applications. Reed Smith did provide a copy of the firm's use of

personal vehicles policy. We are satisfied with the specifications of that policy and therefore have

not reprinted those here. The remainder of Reed Smith's response is provided below.

> As a primary matter, the mileage expenses listed on Reed Smith fee applications
> generally are from Reed Smith professionals' travel to and from the Pittsburgh
> International Airport for flights to various places as required by the representation of
> the Debtors in their bankruptcy proceedings. Included within the "mileage" category
> in the fee application are mileage reimbursements (which the firm authorizes at a rate
> of $0.36 per mile) plus actual parking fees incurred at the airport's parking lot during
> these trips.

We appreciate the response.

<u>Specific Time and Expense Entries</u>

5.    In our initial report, we noted that throughout the Application period, multiple Reed

Smith professionals  prepared for and participated in conference calls. See Exhibit A. The total time

spent was 14.80 hours for a cost of $5,918.50. Rule 2016-2(d)(ix) states, "The activity descriptions

shall individually identify all meetings and hearings, each participant, the subject(s) of the meeting

or hearing, and the participant's role." Further, Paragraph II.D.5. of the Guidelines states, ". . .[i]f

more than one professional from the applicant firm attends a hearing or conference, the applicant

should explain the need for multiple attendees." We asked Reed Smith to explain why it was

necessary for more than one professional to prepare for and participate in each cited conference call,

as well as address the specific role and area of expertise of each. Reed Smith's explanation is

provided as Response Exhibit 1. We appreciate the explanation and offer no objection to these fees.

6.    In our initial report, we noted two time entries where the total hours ascribed to the entry do not match the total of the subparts. The difference is $368.50. The time entries are provided below:

On March 10, 2003, JWB ($335) has a time entry listed as 1.20 hours for a total fee of $402.00. The points only total to 1.10 hours for a total fee of $368.50. Fee difference is $33.50.

| 03/10/03 | JWB | 1.20 | Conference with W. Sparks regarding discovery issue raised by claimants' counsel (.5); review of document in preparing response to claimants' inquiry regarding discovery (.6). |

On March 19, 2003, JWB ($335) has a time entry listed as 4.80 hours for a total fee of $1,608.00. The points only total to 3.80 hours for a total fee of $1,273.00. Fee difference is $335.00

| 03/19/03 | JWB | 4.80 | Conference with W. Sparks regarding research issue (.5); conference with J. Butcher and review of drafts regarding Daubert research (.1); review materials regarding prior personal injury case (2.5); corresponding with claimants' counsel regarding expert reports (.7). |

We asked Reed Smith to explain the discrepancy in each of these time entries. Reed Smith responded as follows:

> In his Initial Report, the Fee Auditor noted two time entries where the total hours ascribed to the entry do not match the total of the subparts. The first instance is on March 10, 2003, where attorney Jayme L. Butcher has a time entry listed as 1.20 hours for a total fee of $402.00, but the points only total to 1.10 hours for a total fee of $368.50. The correct entry should be 1.10 hours, for a total fee of $368.50, or a reduction of $33.50. The second instance is on March 19, 2003, in which attorney Bentz has a time entry listed as 4.80 hours for a total fee of $1,608.00, but the points only total to 3.80 hours for a total fee of $1,273.00. The entry should list attorney Bentz's time, in relevant part, as follows: "conference with J. Butcher (.1) and review of drafts regarding Daubert research (1.0)." As such, the correct total entry is 4.80 hours for a total fee of $1,608.00. Reed Smith will not contest a reduction in its fees of $33.50.

We appreciate the explanation, and thus we recommend a reduction of $33.50 in fees.

7.      We noted that between March 6 and March 31, 2003, Condo and Butcher spent a total of 44.50 hours for a total of $10,731.50 researching the statute of limitations applicability to traditional asbestos property damage claims.  See Exhibit B.  Local Rule 2016-2(d) requires that fee applications shall "include activity descriptions which shall be sufficiently detailed to allow the Court to determine whether all the time, or any portion thereof, is actual, reasonable, and necessary." Paragraph I.E. of the Guidelines provides that "[i]n evaluating fees for professional services, it is relevant to consider ... whether the services were necessary to the administration of, or beneficial towards the completion of, the case at the time they were rendered" and " whether services were performed within a reasonable time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed."  We asked Reed Smith to explain the nature of this issue, why it required so much attorney time, and why the associated fees should be considered reasonable and necessary in view of the cited guidelines.  Reed Smith's explanation is provided as Response Exhibit 2.  We accept this explanation and offer no objection to these fees.

8.      In our initial report, we noted that during the Application period, professionals Muha ($200) and Restivo ($475) spent a combined total of 3.00 hours and $792.50 on activities which, without further explanation, appear more appropriate for a professional with a lower hourly rate, or a nonprofessional.  The time entries are provided below:

| 02/20/03 | Muha | 1.20 | 240.00 | Attend to logistics/trip planning issues for Cohen and Worden depositions (1.0); . . . |
| 02/21/03 | Muha | 1.20 | 240.00 | Attend to travel plan issues for homeowner depositions (0.7); . . . |
| 02/28/03 | Restivo | 3.00 | 1,425.00 | . . .; and update trial planning schedule (0.7). |
| 03/06/03 | Muha | 0.60 | 120.00 | Attend to logistics for Salibury/Hatch depositions in Moscow, ID and Spokane, WA (respectively). |

Paragraph I.E., of the Guidelines, states ". . . [i]n evaluating fees for professional services, it is relevant to consider various factors including the following:  the time spent; the rates charged; whether the services were necessary to the administration of, or beneficial towards the completion of, the case at the time they were rendered; whether services were performed within a reasonable time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;. . .".  We asked Reed Smith to explain why a professional with a lower rate, or a nonprofessional, could not have performed these tasks.  Reed Smith's explanation is provided as Response Exhibit 3.  We accept the explanation and have no objection to these fees.

9.      We further noted a number of meal expenses that, without greater explanation, appear excessive or appear could have been duplicated.  The total is $622.64 for the expenses in question.  The entries are provided below.

*Meal Expenses appearing to relate to 2/5-2/7/03 trip:*

| | | |
|---|---|---|
| 02/12/03 | Meal Expense - VENDOR: DOUGLAS E. CAMERON LUNCH FOR MEETING WITH R. FINKE, WITNESS AND GRACE LAWYERS FOR DEPOSITION PREPARATION | 24.12 |
| 02/12/03 | Meal Expense - VENDOR: DOUGLAS E. CAMERON LUNCH FOR MEETING WITH WITNESS, COURT REPORTER, VIDEOGRAPHER, COUNSEL FOR GRACE AND COUNSEL FOR ZAI CLAIMANTS (8 lunches purchased). | 71.82 |
| 02/13/03 | Meal Expense - - VENDOR: DOUGLAS E. CAMERON DEPOSITION OF F. EATON (NAPLES FL) 2/5-2/6/03 | 55.00 |
| 02/13/03 | Meal Expense - - VENDOR: DOUGLAS E. CAMERON DEPOSITION OF F. EATON (NAPLES FL) 2/5-2/7/03 (multiple meals) | 140.55 |

*Meal expenses appearing to relate to 2/24-2/26/03 trip:*

| | | |
|---|---|---|
| 02/28/03 | Meal Expense - - VENDOR: DOUGLAS E. CAMERON HOTEL EXPENSES FOR TRIP TO SAN FRANCISCO FOR MEETINGS WITH R. FINKE AND EXPERTS 2/24-2/26/03 -DINNER VIA ROOM SERVICE (FOR WORKING MEAL). | 40.33 |
| 02/28/03 | Meal Expense - - VENDOR: DOUGLAS E. CAMERON MEETING IN SAN FRANCISCO WITH R. FINKE AND | 85.42 |

|            | EXPERTS AND DEPOSITION OF R. BUSCH IN<br>SPOKANE (multiple dinners)                                    |        |
|------------|------------------------------------------------------------------------------------------------------|--------|
| 02/28/03   | Meal Expense - - VENDOR: DOUGLAS E. CAMERON<br>DINNER IN SAN FRANCISCO WITH RICHARD FINKE AND<br>EXPERTS 2/25/03 (multiple dinners). | 205.40 |

With regard to expenses, paragraph II. E. 3. of the Guidelines states "[f]actors relevant to a determination that the expense is proper include the following: . . .3. [w]hether applicant has provided a detailed itemization of all expenses including the date incurred, description of expense (e.g., type of travel, type of fare, rate, destination), method of computation, and where relevant, name of the person incurring the expense and purpose of the expense. . ."  In addition, paragraph II.E.1.of the Guidelines states, ". . .[f]actors relevant to a determination that the expense is proper include the following: 1.  Whether the expense is reasonable and economical..."  In keeping with that guideline, we have suggested $15 per person for breakfast, $25 per person for lunch and $35 per person for dinner as reasonable ceilings for meal expenses charged to the bankruptcy estate.  For the expenses in question, we asked Reed Smith to provide sufficient documentation so that we might assess the reasonableness of the reimbursement requests.  We asked that the response include the type of meal (i.e. breakfast, lunch or dinner), the number of meals and the number of diners at each meal.  Reed Smith's response is provided as Response Exhibit 4.  We appreciate the explanation.  For the February 13, 2003, meal expense of $140.55, we recommend a reduction of $35.55.  For the February 28, 2003, meal expense of $205.40, we recommend a reduction of $30.40.  Thus, for meal expenses, we recommend a total reduction of $65.95 in expenses.

    10.    In our initial report, we noted two airfare expenses totaling $3,132.50 which appear excessive.  The entries are provided below.

| 01/24/03   | FLATLEY/LAWRENCE-first class ticket purchased       | 1184.00 |

(Pit to Naples, FL) because no other arrangements available

| 02/28/03 | STEWART/GEORGE L 02MAR PIT SEA PIT-REFUNDABLE COACH-CLASS AIRFARE FOR DEPOSITION IN TACOMA, WA | 1948.50 |

Paragraph II.E.1.of the Guidelines states, ". . .[f]actors relevant to a determination that the expense is proper include the following: 1.  Whether the expense is reasonable and economical.  For example, first class and other luxurious travel mode or accommodations will normally be objectionable."  We asked Reed Smith to provide appropriate detail for these expenses so that we might assess their reasonableness, including more information on why the first class ticket was the only option on the January 24th trip.  Reed Smith's explanation is provided as Response Exhibit 5.  We accept the explanation and thus have no objection to these expenses.

11.    In our initial report, we noted a travel expense totaling $44.77 which lacks sufficient detail to properly review.  The expense entry is provided below:

| 02/12/03 | Air Travel Expense - - VENDOR: DOUGLAS E. CAMERON ADDITIONAL CHARGES ON TRIP TO NAPLES FL FOR DEPOSITION OF F. EATON 2/6/03 | 44.77 |

We asked Reed Smith to explain the nature of this charge so that we might assess its reasonableness.

Reed Smith's explanation is provided below.

> In his Initial Report, the Fee Auditor indicated that insufficient detail was given for a $44.77 travel expense that, without further explanation, appeared unreasonable. This expense was incurred by attorney Cameron in relation to his trip to Naples, Florida for the deposition of Fred Eaton, a former employee of the Debtors.  Due to an unforeseen change in his trip itinerary (necessitated by the need for additional time to meet with the witness and the Debtors' in-house counsel), attorney Cameron was forced to change flight reservations, and was charged $44.77 for that change in his itinerary.

We accept this explanation and thus have no objection to this expense.

12.    We noted that Reed Smith seeks reimbursement in the amount of $27.00 for binding

expenses.  The expense entries are provided below:

| | | |
|---|---|---|
| 01/03/03 | Binding Charge | 15.00 |
| 01/09/03 | Document Binding Charge | 3.00 |
| 02/18/03 | Binding Charge | 6.00 |
| 02/26/03 | Binding Charge | 3.00 |

Paragraph II.E.7. of the Guidelines states that "[o]verhead includes word processing, proofreading,

secretarial and other clerical services, rent, utilities, office equipment and furnishings, insurance,

taxes, local telephone and monthly car phone charges, lighting, heating and cooling, and library and

publications charges."   In the absence of further explanation, it appears that these binding charges

constitute non-reimbursable overhead.  We asked Reed Smith to explain why an exception should

be made for these charges.  Reed Smith's response is provided below.

> In his Initial Report, the Fee Auditor noted that Reed Smith sought reimbursement
> in the amount of $27.00 for binding expenses.  These expenses were incurred as part
> of the preparation of materials to be provided for the expert witnesses retained by the
> Debtors to analyze the issues in the ZAI Science Trial case.  Among the materials
> provided to these experts were voluminous sets of information from prior cases in
> which the Debtors had litigated asbestos-related issues, and in order to keep these
> materials together in an orderly fashion, the material were bound before being sent
> to the experts.  Binding these materials thus reduced the chance that any materials
> would be lost or damaged before reaching the experts, and were a reasonable and
> efficient way to provide important information to the Debtors' expert witnesses.

We accept this explanation and have no objection to these expenses.

## CONCLUSION

13.    Thus, we recommend approval of fees totaling $482,068.00 ($482,101.50 minus

$33.50) and costs totaling $55,326.21 ($55,392.16 minus $65.95) for Reed Smith's services from

January 1, 2003, through March 31, 2003.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By:_____
        Warren H. Smith
        Texas State Bar No. 18757050

Republic Center
325 N. St. Paul, Suite 4080
Dallas, Texas  75201
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**


**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 10th day of July, 2003.

_____
                Warren H. Smith

# SERVICE LIST
Notice Parties

**The Applicant**

Richard Keuler, Esq.
Reed Smith LLP
1201 Market Street, Ste. 1500
Wilmington, DE 19801

Douglas Cameron
Reed Smith LLP
P. O. Box 2009
Pittsburgh, PA 15230-2009

**The Debtors**

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones, P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph,Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**

Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Marla R. Eskin
Campbell & Levine, LLC
Suite 300
800 N. King Street
Wilmington, DE  19801

**Official Committee of Equity Holders**

Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**

Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801

Exhibit A

1.    On January 11, 2003, Flatley ($440), Bentz ($335) and Restivo ($475) participated in a conference call.  The total time spent, including preparation time, was 5.40 hours for a total of $2,295.50.

| | | | |
|---|---|---|---|
| 01/11/03 | Flatley | Review transcripts and various correspondence in preparation for 1/13 conference call regarding ZAI science trial. | 2.20 |
| 01/13/03 | Bentz | .......; conference call regarding responsibilities for fact discovery in Science Trial matter (1.1);............. | 4.80 |
| 01/13/03 | Flatley | Preparation for call (.20); participation in part of conference call with D. Siegel, W. Sparks, R. Finke, et al. re: ZAI Science Trial issues (.90). | 1.10 |
| 01/13/03 | Restivo | Conference call re: discovery (1.0);.......... | 2.00 |

2.    On February 10, 2003, Bentz ($335), Cameron ($430) and Restivo ($475) participated in a conference call.  The total time spent was 3.00 hours for a total of $1,239.00.

| | | | |
|---|---|---|---|
| 02/10/03 | JWB | 3.20 | ..........; meeting with R. Finke, J. Restivo and D. Cameron re: deposition schedule (1.2);.......... |
| 02/10/03 | DEC | 3.50 | .........; conference call with R. Finke, J. Restivo and J. Bentz regarding outstanding discovery issues (.4). |
| 02/10/03 | JJR | 2.00 | Analysis and discussion re: proposed deposition schedule (1.4);......... |

3.    On February 13, 2003, Bentz ($335), Cameron ($430) and Flatley ($440) participated in a conference call.  The total time spent was including preparation time was 6.40[1] hours for a total of $2,384.00.

---

[1]The exact time and fees cannot be determined due to lumping with one of the time entries.

| | | | |
|---|---|---|---|
| 02/13/03 | JWB | 8.60 | ............; meetings to determine fact discovery necessary in Science Trial (4.0);.............. |
| 02/13/03 | DEC | 5.60 | Prepare for and participate in conference call with R. Finke and Science Trial experts regarding open issues and projects (1.2); ......... |
| 02/13/03 | LEF | 3.40 | ..........; conference call with R. Finke. W. Sparks, J. Restivo and D. Cameron and J. Bentz re: ZAI Science Trial discovery issues (1.20);........ |

Exhibit B

| 03/06/03 | KKC | 0.60 | Extensive research for statute of repose and statute of limitation applicability to traditional asbestos property damage claims. |
| 03/07/03 | JLB | 0.40 | Review research collected from various sources re: statutes of limitations for 50 state survey. |
| 03/07/03 | KKC | 1.90 | Extensive research for statute of repose and statute of limitation applicability to traditional asbestos property damage claims. |
| 03/10/03 | JLB | 1.10 | Extensive research for statutes of limitations applicability to traditional asbestos property damage claims (0.9);........ |
| 03/10/03 | KKC | 0.20 | Extensive research for statute of repose and statute of limitation applicability to traditional asbestos property damage claims. |
| 03/10/03 | KKC | 0.20 | Extensive research for statute of repose and statute of limitation applicability to traditional asbestos property damage claims. |
| 03/11/03 | JLB | 0.30 | Extensive research of statutes of limitations applicability to traditional asbestos property damage claims. |
| 03/12/03 | JLB | 2.80 | Extensive research of statutes of repose applicability to traditional asbestos property damage claims |
| 03/13/03 | JLB | 5.30 | Extensive research of statutes of repose applicability to traditional asbestos property damage claims |
| 03/13/03 | KKC | 0.20 | Extensive research for statute of repose and statute of limitation applicability to traditional asbestos property damage claims. |
| 03/14/03 | JLB | 0.50 | Extensive research of statutes of repose applicability to traditional asbestos property damage claims |
| 03/17/03 | JLB | 7.30 | Extensive research of statutes of repose and statutes of limitations applicability to traditional asbestos property damage claims. |
| 03/17/03 | KKC | 1.00 | Extensive research for statute of repose and statute of limitation applicability to traditional asbestos property damage claims. |
| 03/18/03 | JLB | 6.80 | Extensive research of statutes of repose and statutes of limitations applicability to traditional asbestos property damage claims. |

| 03/18/03 | KKC | 5.30 | Extensive research for statute of repose and statute of limitation applicability to traditional asbestos property damage claims. |
| 03/19/03 | JLB | 3.40 | Extensive research of statutes of limitations applicability to traditional asbestos property damage claims |
| 03/20/03 | JLB | 6.70 | Extensive research of statutes of limitations applicability to traditional asbestos property damage claims |
| 03/21/03 | JLB | 0.20 | Extensive research re: statutes of limitations applicability to traditional asbestos property damage claims. |
| 03/31/03 | KKC | 0.50 | Extensive research for statute of repose and statute of limitation applicability to traditional asbestos property damage claims. |

Response Exhibit 1

In his Initial Report, the Fee Auditor noted that from January 11-13, 2003, three Reed Smith professionals (James J. Restivo, Jr., Lawrence E. Flatley, and James W. Bentz) prepared for and/or participated in the same conference call, for a total of 5.40 hours and $2,295.50.  This call also involved several of the Debtors' in-house counsel, including Richard Finke, David Siegel, and Will Sparks, and was convened primarily at the request of the Debtor's in-house counsel to resolve coverage and strategy issues relating to potential depositions of over 30 fact witnesses identified by ZAI Claimants.  The call also covered a variety of issues within the general topic of the ZAI Science Trial, each of which fell into primary areas of responsibility allotted to attorneys Restivo, Flatley and Bentz.  It was necessary for each of these attorneys to participate in the call so as to review and plan for various issues arising within these attorneys' primary areas of responsibility in the ZAI Science Trial case:  attorney Restivo serves as the lead Reed Smith attorney on the case and has primary responsibility for regulatory compliance issues, attorney Flatley has primary responsibility for medical and epidemiological issues, and attorney Bentz has primary responsibility for fact witnesses and overall coordination of the Debtors' discovery efforts.

The Fee Auditor also identified two other conference calls in which multiple Reed Smith professionals participated:  on February 10, 2003, attorneys Restivo, Bentz and Douglas E. Cameron spent a total of 3 hours and $1,239.00 on a conference call with Richard Finke, and on February 13, attorneys Flatley, Cameron and Bentz spent 6.40 hours (of which attorney Cameron participated in only a small portion) and $2,384.00 on preparing for and participating in a conference call with Richard Finke and Will Sparks.  Both of these calls pertained to the potential ongoing strategy issues concerning scheduling of fact witness depositions and other issues relating to fact discovery that was in progress in the ZAI Science Trial at the time.

All of the conference calls identified by the Fee Auditor were made in the two-month period during which the ZAI Claimants offered approximately 30 witnesses for the Debtors to depose.  A great deal of coordination was needed among Reed Smith, the Debtor and the Debtor's other outside counsel to ensure that all of these depositions would be covered so that the Debtors could maximize their discovery efforts against the ZAI Claimants in the most cost efficient manner possible.  In order to manage the information being offered by the ZAI Claimants in the most efficient manner, the Debtors and Reed Smith both sought to communicate with each other constantly to clarify the course of action that would be taken.  Only those Reed Smith attorneys who had primary responsibility for the subject matter at issue in these depositions participated in these discussions.

By way of further explanation of this Inquiry, it should again be noted that the necessity of having multiple Reed Smith attorneys occasionally participate in the same meetings, hearings or conference calls stems from the way Reed Smith has structured its representation of the Debtors in their bankruptcy proceedings.  Since 1989, Reed Smith has provided counsel to the Debtors for certain asbestos-related litigation, and several individual Reed Smith attorneys have divided responsibility among themselves for various aspects of those cases.  Responsibilities for specific subject areas and segments of the cases have been divided among attorneys Restivo, Cameron, Bentz, and Flatley for dealing with, among other things, responsibility over medical issues and experts, industrial hygiene issues and experts, microscopy issues and experts, regulatory issues and experts, Grace's historical documents and witnesses, document production and discovery issues,

case-specific claims and facts, and damages.

This division of primary responsibility originally was designed to avoid, and has avoided, duplication of effort and to allocate direct responsibility for results. The division of specific primary responsibilities was carried over to Reed Smith's retention as the Debtors' Special Asbestos Product Liability Defense Counsel. The attendance of multiple Reed Smith professionals at certain meetings, hearings or conference calls has often been necessary when the event in question covers topics within the areas of primary responsibility of more than one Reed Smith professional. Reed Smith is fully aware of the need to avoid duplication, and it has made -- and will continue to make -- concentrated efforts to avoid any such duplication, including writing off time prior to the submission of Fee Applications if there is any unnecessary duplication.

As the various Fee Applications reflect, particularly after the early stages of Reed Smith's representation of the Debtors, the overwhelming majority of meetings, hearings and calls have involved only one Reed Smith professional. Reed Smith has had multiple professionals participate only where doing so was necessary and/or more economical than any alternative staffing plan, and it will continue to follow this policy in the future.

Response Exhibit 2

In his Initial Report, the Fee Auditor noted that between March 6 and March 31, 2003, attorneys Butcher and Kathy K. Condo spent a total of 44.50 hours for a total of $10,731.50 researching the applicability of statutes of limitations to traditional asbestos property damage claims.  This project was in response to an express request made by the Debtors' in-house counsel that Reed Smith undertake an exhaustive state-by-state analysis of the statutes of limitation and repose enacted in all fifty states to determine their applicability to traditional asbestos property damage claims.  The Debtors indicated that this project would greatly assist in-house counsel in evaluating strategic positions and planning ideas for the manner in which they would ultimately resolve the thousands of new asbestos property damage claims that had been asserted against them.  Although the project was large and somewhat unwieldy, Reed Smith was able to minimize the number of professionals on the project to one partner and two associates; furthermore, both professionals kept the Debtors' financial constraints in mind and, given the scope of the project, were able to perform the task as requested by the Debtors in an efficient and expedient manner.

Response Exhibit 3

In his Initial Report, the Fee Auditor noted that attorneys Restivo and Andrew J. Muha spent a combined 3.00 hours and $792.50 on activities that, without further explanation, appear more appropriate for a professional with a lower hourly rate or a nonprofessional.  Attorney Restivo's time at issue, described as "updat[ing] trial planning schedule," actually referred to time attorney Restivo spent forming strategic plans as to assignments to be carried out in litigating the ZAI Science Trial. As the lead attorney on Reed Smith's ZAI Science Trial team, attorney Restivo is responsible for formulating "big picture" strategic items and issuing assignments to other professionals on the case, in order to maintain a unified effort among all Reed Smith professionals on the case.  The "trial planning schedule" at issue refers to the master list of tasks that need to be completed in the litigation of the ZAI Science Trial.  That schedule was constantly being reviewed and revised during this time period.

Attorney Muha's time at issue, relating to logistics involved in deposing several fact witnesses offered by the ZAI Claimants, was necessitated by the abbreviated period during which multiple depositions were required to be taken by the Debtors.  Attorney Muha[1] was scheduled for four depositions, two on each side of the continental United States, in a three week period, and tended to the logistics of these trips (including mapping out where the depositions could be taken, at the convenience of the witness, as well as verifying areas in which support for the depositions would be available) in order to minimize any confusion or inconvenience any participant in the depositions might otherwise experience.  Tending to these items also allowed attorney Muha to be sure of his own travel and business plans while on these trips, allowing for increased efficiency in his travel and his work for the Debtors while away from the office.

---

[1]    Attorney Muha's time is charged at the lowest rate of any Reed Smith attorney involved in the Debtors' bankruptcy proceedings.

Response Exhibit 4

In his Initial Report, the Fee Auditor noted that attorney Cameron incurred $622.64 for meal expenses that were insufficiently described. The following information should resolve the remaining issues about those expenses:

- The $24.12 charge entered on February 12, 2003 was from a deposition preparation session held on February 5, 2003 that involved attorney Cameron, Richard Finke and Fred Eaton, a former employee of Debtors who was scheduled to be deposed the next day. Lunch for three was ordered in, to be eaten while the deposition preparation work continued.

- The $71.82 charge entered on February 12, 2003 was from the deposition of Fred Eaton, taken on February 6, 2003. In order to allow for an early end to the deposition so that counsel could make scheduled flights, a lunch platter was ordered in for the witness, attorney Cameron, Richard Finke, the ZAI Claimants' Counsel taking the deposition, the court reporter and the videographer.

- The $55.00 charge entered on February 13, 2003 included two breakfasts (February 5 and 6, 2003) and one dinner (February 6, 2003) purchased by attorney Cameron during his trip to Florida for the Eaton deposition.

- The $140.55 charge entered on February 13, 2003 included three dinners (for the Debtors' witness, Richard Finke and attorney Cameron) on the evening of February 5, 2003.

- The $40.33 charge entered on February 28, 2003 included one lunch purchased for attorney Cameron ($12.99) and one work-related fax charge incurred by attorney Cameron at the hotel (for papers relating to his meetings in California with witnesses for the Debtors), in the amount of $27.34. These charges were incurred by attorney Cameron on February 24, 2003.

- The $85.42 charge entered on February 28, 2003 included the following meals in connection with attorney Cameron's meetings with the Debtors' expert witnesses in California and attorney Cameron's trip from California to Spokane, Washington for a deposition of one of the ZAI Claimants' fact witnesses on the following days: February 25, 2003 – one breakfast; February 26, 2003 – one lunch and one dinner; February 27, 2003 – one breakfast, one lunch, and one dinner.

The $205.40 charge entered on February 28, 2003 included dinners for Richard Finke, attorney Cameron, and three of the Debtors' consulting expert witnesses on the evening of February 25, 2003.

Response Exhibit 5

In his Initial Report, the Fee Auditor noted that two airfare expenses appeared excessive, without further explanation as to why the expenses were reasonable. The first expense, charged on January 24, 2003 for attorney Flatley's trip to Naples, Florida to meet with a potential witness for the Debtors in the ZAI Science Trial, was in the amount of $1,184.00 for first-class airfare. Although attorney Flatley attempted to make a coach-class reservation for this flight in advance of his trip, upon reaching the airport on the day of the trip the airline instructed him that his reservation inadvertently had been cancelled (ostensibly due to an airline error). In order to reach Naples in time for the meetings the next day (which were an important part of preparing the witness for his upcoming deposition), attorney Flatley was forced to purchase one of the only tickets that were still available for that flight, for first-class accommodations. No coach-class tickets were available by that time.

The second expense questioned by the Fee Auditor was a $1,948.50 charge incurred by attorney George L. Stewart for his travel to Tacoma, Washington to take the depositions of two ZAI Claimant fact witnesses for the ZAI Science Trial. This charge was for round-trip tickets to Seattle, Washington, the nearest major airport to the site of the depositions. Because of the fluctuating fact discovery schedule in the ZAI Science Trial, with some 30 depositions being offered by the ZAI Claimants over a two-month span, attorney Stewart's tickets could not be purchased until shortly before his trip. Furthermore, a preexisting medical condition necessitated attorney Stewart's purchase of first-class tickets for the cross-country trip; although the first-class tickets cost nearly $3,000, Reed Smith charged the Debtors for less than the price of refundable coach-class tickets ($2,048.50), which attorney Stewart otherwise would have purchased. The balance of the cost was incurred by Reed Smith.

By way of further information, it should be noted that the Pittsburgh International Airport is a "hub" airport for USAirways; some 90% of the flights out of Pittsburgh International Airport are flown by USAirways. While this provides customers (including Reed Smith professionals) with the ability to make direct flights to a large number of cities, there are few flights from competing airlines to choose from. As a result of that fact, coupled with USAirways' recent cutback on the number of flights originating out of Pittsburgh, the fares charged by USAirways for flights from Pittsburgh are often higher than fares charged by other airlines for flights of comparable lengths originating from other cities. Reed Smith has made and will continued to make every attempt to minimize its air travel expenses and, as noted before, does not charge clients for first-class air travel as a general rule. However, first-class accommodations are charged to the client when no other travel arrangements can be made by a Reed Smith professional.