# EXHIBIT A

RECEIVED

MAR 23 1998

PERKINS COIE

FILED

MAR 20 1998

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, ex rel.
ROBERT COSTA and RONALD THORNBURG
and STATE OF CALIFORNIA, ex rel.
ROBERT COSTA and RONALD
THORNBURG,

           Plaintiffs,

      v.

BAKER & TAYLOR, INC d/b/a BAKER &
TAYLOR BOOKS and W.R. GRACE & CO
-CONNECTICUT,

          Defendants.

C-95-1825-VRW
ORDER.

    Baker & Taylor is a book wholesaler and distributor.
W.R. Grace & Co owned Baker & Taylor from 1970 to 1992.  Robert
Costa, the former City Librarian of Richmond, Virginia, and Richard
Thornburg, a Virginia resident, brought this qui tam action against
Baker & Taylor and W.R. Grace & Co to recoup monies purportedly
obtained through a fraudulent billing scheme.  Plaintiffs United
States of America and State of California (all plaintiffs
hereinafter referred to as "governments" or "plaintiffs") have
intervened in this action and are now the real parties in interest.

    Baker & Taylor entered into contracts with various
libraries and educational institutions in which Baker & Taylor

COPIES MAILED TO
PARTIES OF RECORD

United States District Court
For the Northern District of California

1    agreed to sell books at various discounts.  The levels of discount

2    were keyed to the discounts which prevail for certain kinds of

3    books.  In general, publishers sell distributors "trade books" at a

4    so-called "deep discount" of 46 percent or more.  Textbooks and

5    other non-trade publications sell at "short discounts" or no

6    discount ("net").

7         According to the third amended complaint, Baker & Taylor

8    deliberately overcharged "for trade books that it believed its

9    library and educational institution customers could be deceived

10    into believing were non-trade publications and by otherwise

11    manipulating discount levels in ways inconsistent with Baker &

12    Taylor's representations and contractual obligations."  3d Am Compl

13    at 7.  Baker & Taylor allegedly carried out this scheme by

14    reprogramming its computers to deprive plaintiffs of discounts

15    promised them in their contracts with Baker & Taylor.  Defendants

16    purportedly did this by changing their system of "price key" codes

17    for three categories of trade books and manipulating the discounts

18    associated with them.

19         Prior to 1980, all trade books were assigned to the "T"

20    Key.  Thereafter, defendants began assigning certain trade books to

21    the "K", "A" and "R" Keys.  They defined these keys as

22    "institutional trade books", "hardcover university press books" and

23    "reinforced trade juvenile books" and gave these books only short

24    discounts.  Id at 8-12.

25         Baker & Taylor also assigned books for which it received

26    no discount from the publisher to the "Y" Key.  Defendants then

27    allegedly instructed their employees to add improper hidden charges

28    to these books when they were sold to the libraries and educational

United States District Court
For the Northern District of California

2

1    institutions.  Retailers supposedly received their agreed upon

2    contractual discounts.  Plaintiffs claim this discrepancy violates

3    their "most favored customer" clause which provided that defendants

4    would charge the libraries and educational institutions no more for

5    a book than the lowest price other customers were charged.

6           Whenever a library or educational institution discovered

7    instances in which it received a smaller discount than had been

8    contracted for, defendants' employees allegedly represented that

9    these were isolated mistakes.  Then, defendants would adjust their

10   computers to avoid overcharging the complaining library or

11   educational institution in the future.  In this way, defendants

12   prevented plaintiffs from discovering the alleged fraud being

13   perpetrated upon them.  Id at 16-17.

14          Thornburg worked for Baker & Taylor for seventeen years.

15   In 1989, Baker & Taylor discharged him.  In both the original and

16   first-amended complaints at ¶ 6, plaintiffs allege that during his

17   employment Thornburg became "aware of Baker and Taylor's fraud."

18   In March 1992, W.R. Grace & Co sold Baker & Taylor to the Carlyle

19   Group.  Id at 3.  According to plaintiffs, W.R. Grace & Co was

20   notified of Baker & Taylor's fraud and worked in concert with them

21   to conceal it even after Baker & Taylor was sold.  Id at 19.

22          On June 1, 1995, Costa and Thornburg filed this action

23   alleging multiple violations of the federal and California False

24   Claims Act, see 31 USC § 3729 and Cal Govt Code § 12650, or in the

25   alternative, seeking payment under the equitable doctrines of

26   unjust enrichment and payment by mistake.  Until January 16, 1997,

27   the complaint remained sealed as plaintiffs conducted further

28   discovery.  On January 31, 1997, plaintiffs served defendants.

United States District Court
For the Northern District of California

1  Plaintiffs filed a second-amended complaint on April 30, 1997, and

2  a third-amended complaint on August 22, 1997.

3         Baker and Taylor, whom W.R. Grace & Co joins, moves that

4  the court dismiss plaintiffs' third-amended complaint pursuant to

5  FRCP 12(b)(6) and (b)(1).  W. R. Grace & Co, whom Baker & Taylor

6  joins, requests that the court dismiss (1) claims barred by the

7  False Claims Acts' statutes of limitations; (2) counts III and IV

8  for failure to state a claim for conspiracy; and (3) claims based

9  on sales of books to Baker & Taylor's library customers.

10                                 I

11         A FRCP 12(b)(6) motion to dismiss tests the legal

12  sufficiency of the claim or claims stated in the complaint.  The

13  complaint must be construed in the light most favorable to

14  plaintiff.  Russell v Landrieu, 621 F2d 1037, 1039 (9th Cir 1980).

15  The court must accept as true all material allegations in the

16  complaint, as well as all reasonable inferences to be drawn from

17  these facts.  NL Indus. Inc v Kaplan, 792 F2d 896, 898 (9th Cir

18  1986).  Material allegations must be accepted as true no matter how

19  improbable they may seem and without regard to any potential

20  difficulties in proof.  Allison v California Adult Authority, 419

21  F2d 822, 823 (9th 1969).  The court need not, however, accept as

22  true allegations that contradict matters properly subject to

23  judicial notice, Mullis v United States Bankruptcy Court, 828 F2d

24  1385, 1388 (9th Cir 1987), cert denied, 486 US 1040 (1988), that

25  are conclusory or mere legal conclusions, that are unwarranted

26  deductions of fact or unreasonable inferences, Clegg v Cult

27  Awareness Network, 18 F3d 752, 754-55 (9th Cir 1994); Western

28  Mining Council v Watt, 643 F2d 618, 624 (9th Cir 1981), cert

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  denied, 454 US 1031 (1981), or that are contradicted by exhibits to

2  the complaint, Durning v First Boston Corp, 815 F2d 1265, 1267 (9th

3  Cir 1987), cert denied, 484 US 944 (1987).  Even so, the  motion

4  may not be granted "unless it appears beyond doubt that the

5  plaintiff can prove no set of facts in support of his claim which

6  would entitle him to relief."  Conley v Gibson, 355 US 41, 45-46

7  (1957); Moore v City of Costa Mesa, 886 F2d 260, 262 (9th Cir

8  1989), cert denied, 496 US 906 (1990).

9                              II

10         Defendants urge that the court find that the statutes of

11  limitations for the federal and California False Claims Acts

12  continued to run in this action until they were served with the

13  complaint on January 31, 1997.  Plaintiffs respond that the court

14  must follow the express language of FRCP 3 and Cal Govt Code §

15  12654 and conclude that the statutes of limitations were tolled on

16  June 1, 1995.

17         Under FRCP 3, the filing of a complaint commences an

18  action and tolls the applicable statute of limitations.

19  "Limitation is superseded by the filing of suit because the suit

20  warns the defendant[s] to collect and preserve evidence relating to

21  it."  Barthel v Stamm 145 F2d 487, 491 (5th Cir 1944), cert denied,

22  324 US 878 (1945).  Amendments to pleadings "relate back" to the

23  date the original complaint was filed unless the original complaint

24  gives no indication of the facts on which the claim for relief is

25  based.  See Baldwin County Welcome Center v Brown, 466 US 147, 149-

26  50 (1994); FRCP 15(c)(2); see also Hutnick v US Fidelity and

27  Guaranty Co, 47 Cal 3d 456, 462 (1988)("Once an action has been

28  timely commenced by the filing of a complaint, the filing of a

                              5

1  supplemental or amended complaint which does not introduce a new

2  cause of action is not subject to the statute of limitations.")

3          Defendants submit that the court should devise a new rule

4  which would permit tolling and relation back only when a complaint

5  is unsealed.  Defendants offer no support for this suggestion, save

6  some policy arguments regarding the purpose of statutes of

7  limitations.  Such policy arguments cannot prevail.  Congress and

8  the California legislature obviously knew when they provided for

9  sealed complaints that defendants named in such complaints would

10 not have notice of the instigation of an action.  Still, neither

11 Congress nor the Legislature differentiated between sealed and

12 unsealed complaints.  The court cannot substitute its judgment for

13 that of these legislative bodies, no matter how reasonable or

14 attractive are the arguments which defendants mount for their

15 proposed rules.

16          Title 31 USC § 3731, the statute of limitations for the

17 federal False Claims Act, speaks in terms of when an action is

18 "brought."  It gives plaintiffs six years from the time a violation

19 occurs to bring suit.  If the fraud is concealed, plaintiffs may

20 bring an action within three years after the facts material to the

21 action become known to the official charged with acting on the

22 violation, subject to a ten-year statute of repose.  Id at (2).

23          Similarly, Cal Govt Code § 12654(a) states that a claim

24 under the California False Claims Act may not be filed more than

25 three years after the date of discovery of the fraud by the

26 official charged with acting upon it.  This statute also provides

27 for a ten-year statute of repose.  Id.

28          The present case was brought and filed on June 1, 1995.

United States District Court
For the Northern District of California

6

1 On that date, the statutes of limitations were tolled.   Defendants

2 do not allege that the amended complaints contain causes of action

3 which the first complaint did not reference.   Unless the plaintiffs

4 knew of the fraud underlying the allegations for more than three

5 years before the filing of the complaint, plaintiffs may sue on all

6 violations after June 1, 1985.

7                                     2

8        Defendants contend that because the original and first-

9 amended complaints alleged that Thornburg knew of Baker & Taylor's

10 alleged fraud upon his termination in 1989, all of plaintiffs'

11 claims after 1992 must be dismissed.   Plaintiffs maintain that (1)

12 merely knowing of fraud does not mean one knows all facts material

13 to a cause of action for fraud and (2) a qui tam plaintiff's

14 knowledge does not bind the governmental bodies on whose behalf the

15 action is brought.

16        Defendants find support for their contentions that the

17 post-1992 claims are barred in United States ex rel Hyatt v

18 Northrop Corp, 91 F3d 1211 (9th Cir 1996).   Hyatt, 91 F3d at 1216-

19 17, found that a qui tam plaintiff was "an official of the United

20 States charged to act in the circumstances," and was hence entitled

21 to the three year extension of the statute of limitations available

22 under § 3731(b)(2).   "Thus, as to the qui tam plaintiff, the three

23 year extension of the statute of limitations begins once the qui

24 tam plaintiff knows or reasonably should have known the facts

25 material to his right of action."   Id.

26        Hyatt has only limited application to the case at bar.

27 Hyatt 91 F3d at 1217, focused on the qui tam plaintiff and noted

28 that "his duty to act must be triggered by his own knowledge not by

                                      7

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  the knowledge of others." Cases applying Hyatt emphasize that its

2  findings apply to the qui tam plaintiff and the knowledge he

3  himself possesses of the fraud. See United States ex rel Saaf v

4  Lehman Brothers, 123 F3d 1307, 1308 (9th Cir 1997). Defendants do

5  not allege that Costa had knowledge of Baker & Taylor's alleged

6  fraud for more than three years prior to the date he filed this

7  action. Nothing in Hyatt prevents Costa from proceeding as a qui

8  tam plaintiff and the governments from intervening in his timely

9  action.

10         Moreover, in the instant case, the governments have

11  chosen to intervene. In light of this intervention it is only

12  logical that they are "the officials charged to act" under the

13  circumstances" pursuant to § 3731(b). To find otherwise would mean

14  hinging the governments' right to protect their fiscs on the whims

15  of a qui tam plaintiff. The Hyatt court gives no indication that

16  it sought to work such a fundamental change in the law. Without

17  more, the court will not read Hyatt as stating the law beyond its

18  facts.

19         In light of Hyatt, however, whether Thornburg should

20  remain a plaintiff in this action seems doubtful. There is no

21  question that Thornburg admitted that he knew of Baker & Taylor's

22  fraud in 1989. See Compl and 1st Amended Compl at ¶ 6. The six

23  year general statute of limitations applicable to violations of §

24  3729 has expired and this suit was filed more than three years

25  after Thornburg knew of the alleged wrong. Because the action was

26  filed more than three years after Thornburg discovered the

27  violations, it also runs afoul of § 12654(a).

28         The governments suggest that the court should not dismiss

8

United States District Court
For the Northern District of California

1  Thornburg because it does not know exactly what Thornburg knew in
2  1989.  This argument misses the point.  Although a plaintiff must
3  plead fraud with particularity pursuant to FRCP 9(b), Thornburg had
4  three years to find the further facts necessary to state a claim.
5  He chose to wait six and one-half years, making his claims
6  untimely.  Thornburg is, therefore, dismissed from this action;
7  this case may proceed with Costa and the governments as
8  intervenors.  Costa and the governments may use any information
9  they received from Thornburg regarding defendants' violations after
10  June 1, 1985, to prosecute this action.

11                                  III

12          Defendants argue that claims III and IV of the third
13  amended complaint fail to state a claim because a parent
14  corporation cannot conspire with its own corporate division.
15  Plaintiffs concede that no conspiracy could exist prior to March
16  1992.  Plaintiffs contend, however, that they have alleged a
17  conspiracy based on conduct after that date; namely, that W.R.
18  Grace & Co and Baker & Taylor worked together to conceal prior
19  misconduct from federal authorities.

20          In Copperweld Corp v Independence Tube Corp, 467 US 752,
21  770 (1984), the United States Supreme Court stated that "the
22  operations of a corporate enterprise must be judged as the conduct
23  of a single corporation."  California courts also find that "a
24  corporation cannot conspire with itself anymore than an individual
25  can, and it is the general rule that the acts of the agent are the
26  acts of the corporation." Black v Bank of Am, 30 Cal App 4th 1, 6
27  (1894).

28          W.R. Grace & Co and Baker & Taylor were essentially one

1 and the same corporation prior to the sale to the Carlyle Group in

2 March 1992.   Thus, the two defendants could not have conspired with

3 each other prior to that date.

4          To state a claim for conspiracy under the federal False

5 Claims Act, plaintiffs must show that: (1) defendants conspired

6 with one or more persons to induce the United States to allow or

7 pay a false claim; (2) one or more of the conspirators performed

8 any act to effect the object of the conspiracy and (3) the United

9 States suffered damages as a result of the false or fraudulent

10 claim.   United States ex rel Stinson, Lyons, Gerlin & Bustamante v

11 Provident Life & Accident Ins Co, 721 F Supp 1247, 1258 (SD Fla

12 1989).   The court found no cases analyzing the elements needed to

13 state a claim for conspiracy under § 12651 of the California False

14 Claims Act, but will assume it requires similar elements.   See

15 Biljac Associates v First Interstate Bank, 218 Cal App 3d 1410,

16 1420 (1990)("[c]omparative sparsity in state-court precedent often

17 means that [California courts] rely heavily on federal cases for

18 guidance.")

19          The conspiracy allegations at bar center around conduct

20 occurring in the wake of certain letters received from a

21 disgruntled former Baker & Taylor employee in 1992.   The employee,

22 Joseph DeMarco, wrote W.R. Grace & Co's general counsel alleging

23 that Baker & Taylor had "systematically bilked and defrauded its

24 library customers out of millions of dollars as a result of its

25 pricing practices."   3d Am Compl, Exh H.   DeMarco followed up with

26 a letter to Baker & Taylor and the United States Attorney in

27 Charlotte, North Carolina.   Id at Exhs I & J.   W.R. Grace and Baker

28 & Taylor jointly hired the Latham & Watkins law firm which wrote a

United States District Court
For the Northern District of California

10

1 letter to the United States Attorney stating that an investigation
2 had proved DeMarco's allegations groundless. Id at Exh K.

3    From these facts, plaintiffs allege that "[a]lthough
4 Baker & Taylor knew, and ultimately acknowledged that its pricing
5 practices with respect to the "K" Key were not valid, Baker &
6 Taylor conspired with W.R. Grace & Co to mislead the government
7 into abandoning a 1992 inquiry on the subject." Essentially,
8 plaintiffs assert that W.R. Grace & Co and Baker & Taylor
9 represented to the governments that their law firm had conducted an
10 inquiry into the pricing practices and found them not to violate
11 state or federal law. Id at ¶39.

12    The complaint does not allege that Latham & Watkins was a
13 co-conspirator, so it may be read as alleging that W.R. Grace & Co
14 and Baker & Taylor, by September 1992 separate entities, lulled
15 their law firm into making false representations to a federal
16 prosecutor. As evidence, the DeMarco and Latham & Watkins letters
17 are extremely thin for such serious charges. Furthermore, the
18 court is troubled that the governments would construe an attorney's
19 denial of wrongdoing on his clients' part as evidence of a
20 conspiracy and a double barreled one at that: a conspiracy to
21 mislead Latham & Watkins so that it in turn, would mislead the
22 United States Attorney.

23    No matter how implausible and troubling, such allegations
24 suffice to state a claim for conspiracy under the False Claims
25 Acts. Plaintiffs allege that defendants conspired to conceal their
26 wrongdoing so that the governments would continue to pay inflated
27 prices. They maintain that defendants misled Latham & Watkins
28 unwittingly to attempt to induce the governments to halt their

11

1  investigation. Plaintiffs claim that the resulting failure to

2  discover these overpayments caused them damage in an amount yet to

3  be determined.

4       Defendants insist that the Latham & Watkins letter cannot

5  be used as evidence of a conspiracy because it invited the

6  governments to refer the allegations to the Federal Bureau of

7  Investigations for review.  Also, the letter stated that Baker &

8  Taylor stood ready to cooperate in any investigation.

9       Whether the letter evidences a conspiracy is a matter

10 that cannot be decided on a pleadings motion.  Plaintiffs do not

11 contend that the letter was uncooperative but that the letter

12 itself, written by a reputable law firm, was meant to mislead the

13 governments.

14      United States ex rel Prawer & Co v Verrill & Dana, 982 F

15 Supp 206 (D Me 1997), is not to the contrary.  In Prawer, 982 F

16 Supp at 208, the court dismissed a claim of conspiracy because the

17 now repealed Maine Bulk Sales Act did not create an existing legal

18 obligation to give rise to reverse false claim liability.

19 Prawer's analysis focused on the requirement in § 3729(a)(7) that

20 the defendants have "an obligation to pay or transmit money or

21 property to the Government."  In particular, the Prawer court found

22 that the attorneys' alleged cover-up did not create such an

23 obligation to pay or transmit money but were at most "possible

24 contingent future * * * liabilities." Id at 208.  Because the

25 present case concerns § 3729(a)(2) which does not require that

26 defendants have an obligation of any sort, Prawer is inapposite.

27      All § 3729(a)(2) requires is that defendants "knowingly

28 made or used a false record or statement to get a false or

United States District Court
For the Northern District of California

1    fraudulent claim paid or approved by the Government."  Plaintiffs
2    allege exactly that scenario; defendants purportedly used
3    misleading statements of their counsel to overcharge the
4    governments.

5          The conspiracy allegations at bar raise far more
6    questions than they answer.  Not least among these is how the
7    plaintiffs intend to prove a conspiracy between W.R. Grace & Co and
8    Baker & Taylor that involves communications with a law firm which
9    presumably are privileged.  Still, these questions do not suffice
10   to prevent plaintiffs from proceeding with their conspiracy claim
11   at this stage.  The gravity of plaintiffs' allegations, implicating
12   possible criminal activity, appears to call for some extraordinary
13   steps to get to the bottom of those charges.

14         To accomplish that objective, the court is considering a
15   stay of proceedings on all claims except the conspiracy
16   allegations.  Discovery would proceed promptly on the conspiracy
17   claims and be concluded to allow the parties to make whatever
18   motions they deem appropriate.  In proposing to so focus the
19   litigation, the court notes that Latham & Watkins is presently
20   serving as counsel for Baker & Taylor.  If the conspiracy
21   allegations survive summary judgment, Latham & Watkins would hardly
22   seem in a position to continue its representation of Baker &
23   Taylor.  These circumstances lead the court to believe that it is
24   imperative to deal first with the conspiracy claims before all
25   others.  Nevertheless, in the interest of disposing of the present
26   motions, the court turns to the motions dealing with defendants'
27   alleged direct violations of the False Claims Acts.
28

United States District Court
For the Northern District of California

13

**IV**

Defendants next claim that the United States may not recover under the federal False Claims Act for any alleged overcharging of libraries.  They assert that these library customers do not have claims under the Acts because: (1) their claims did not cause the federal government to disburse funds; (2) the United States did not exercise control, discretion or supervision over the expenditure of federal funds and (3) plaintiffs fail to allege that Baker & Taylor's statements were material to the expenditure of federal funds.  Plaintiffs maintain that these claims: (1) fall within the plain meaning of 31 USC § 3729(c); (2) the United States exercises significant control over grants made under Title I of the Library Act, 20 USC § 351 et seq; and (3) there is no separate materiality requirement in the federal False Claims Act, but Baker & Taylor's statements were material.

**A**

For purposes of the federal False Claims Act, 31 USC § 3929 (c), a "claim" includes:

> any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the property requested or demanded.

Notwithstanding this broad definition, defendants urge the court to find that the system of funding under the Library Act fails to demonstrate the required nexus between the fraud and federal funding.  They assert that the court ought to read §

14

1  3729(c) as simply overruling <u>United States v Azzarelli Construction</u>

2  <u>Co</u>, 647 F2d 757 (7th Cir 1981).  In <u>Azzarelli</u>, 647 F2d at 762, the

3  Seventh Circuit refused to allow the United States to proceed under

4  the federal False Claims Act because the grants it had given

5  Illinois were fixed and hence the alleged overcharging did not

6  cause it to disburse federal funds.

7        It is true that Congress passed § 3729(c) in part to

8  overturn <u>Azzarelli</u>, see 1986 USCCAN at 5287, but the language

9  Congress used was far-reaching.  Courts engaged in statutory

10  interpretation should presume that "if the language of a statute is

11  clear and there is no ambiguity, then there is no need to

12  'interpret' the statute by resorting to legislative history."

13  <u>Church of Scientology v US Dept of Justice</u>, 612 F2d 417, 421 (9th

14  Cir 1979).  The reasoning behind this so-called "plain meaning

15  rule" is that "in the vast majority of its legislation Congress

16  means what it says and thus the statutory language is normally the

17  best evidence of congressional intent."  Id.

18        Given that the plain meaning of the statute allows the

19  United States to recoup monies it granted to states which were then

20  subject to fraudulent overcharging, the court will not exempt the

21  Library Act from the federal False Claims Act.  Defendants' policy

22  arguments regarding the potentially limitless reach of the False

23  Claims Act under this reading of § 3729(c) should be addressed to

24  Congress, not the court.

25                              B

26        Defendants insist that Congress intended that the False

27  Claims Act applies only to programs and grants over which the

28  United States exercised substantial control and cites <u>Wilkins v</u>

15

United States District Court
For the Northern District of California

1   Ohio, 885 F Supp 1055 (SD Ohio 1995), to support this contention.

2   Wilkins, 885 F Supp at 1063, explicitly noted, however, that the

3   definition of a claim in § 3729(c) "was broad enough to include any

4   funds provided directly or indirectly by the United States,

5   regardless [] whether the grant was a fixed amount or open-ended."

6   It mentioned that the government exercised "significant control"

7   over the program at issue in order to distinguish Azzarelli, not to

8   graft a requirement onto the statute.   Defendants also cite United

9   States ex rel Davis v Long's Drugs, Inc, 411 F Supp 1144, 1146 (SD

10  Cal 1976) as imposing a "substantial contacts" requirement.   Given

11  that this case was decided prior to the adoption of § 3729(c), it

12  cannot be deemed the current law.

13          Moreover, a brief review of the requirements a state must

14  meet to obtain and maintain a grant under the Library Act

15  demonstrates that the United States exercises significant control

16  over these funds.   In order to receive such a grant, a state must:

17  (1) establish a state-advisory council on libraries; (2) establish

18  a state plan and (3) have the Secretary of Education approve all

19  parts of the plan.   See 34 CFR § 770.20.   A necessary component of

20  a state plan is keeping records for the Secretary to check that the

21  funds are being used only for the purpose for which they were

22  appropriated.   See 34 CFR 770.22.   The state must also give

23  priority to certain federally mandated objectives.   See id at

24  (b)(3).

25          It is not necessary to list the multitude of other

26  conditions a state must meet to conclude as the court does that the

27  federal government does not relinquish control over its library

28  grants when it gives them to the states.   Indeed, courts have long

16

United States District Court
For the Northern District of California

1   found that federal grant money remains the property of the United

2   States until it is actually expended.  See e.g., In re Joliet-Will

3   County Comm Action Agency, 847 F2d 430 (9th Cir 1988)(stating that

4   federal monies deposited in a fund for state uses remain the

5   property of the federal government until expended by the state).

6                                   c

7           Defendants maintain that the United States has failed to

8   plead that W.R. Grace & Co and Baker & Taylor's allegedly

9   fraudulent statements were material.  Plaintiffs deny that any

10  explicit allegation of materiality is required by the federal False

11  Claims Act, but argue that their proffered statements are material

12  in any event.

13          In United States ex rel Berge v Bd of Trustees, 104 F3d

14  1453, 1459 (4th Cir), cert denied, 118 SCt 301 (1997), the Fourth

15  Circuit decided that the False Claims Act imposes a materiality

16  requirement.  The Ninth Circuit has not yet addressed the

17  materiality issue.

18          Assuming without deciding that the Ninth Circuit would

19  require materiality, the court finds plaintiffs' allegations to be

20  material.  Under Berge, 104 F3d at 1460, a statement is material if

21  it has a natural tendency to influence government action or is

22  capable of influencing agency action.  Materiality is a question

23  for the court.  Id.  Plaintiffs allege that Baker & Taylor devised

24  a false billing scheme and routinely misled libraries into

25  accepting discounts that breached their contracts.

26          Defendants' contention that there was no agency action is

27  nothing more than a regurgitation of their argument that there is

28  no causal link between federal funds and these purchases.  When a

                                  17

state uses a federal library grant, it acts on behalf of the
federal government.   Thus, any statements which caused the state to
use grant monies to overpay for books are indisputably material.

Defendants point out that plaintiffs have alleged that
only a majority of the libraries used federal funds to buy books.
The court understands defendants' argument to be that if a library
or educational institution did not expend federal funds to purchase
its books, there can be no violation of the federal False Claim
Act.   The determination of which libraries and institutions spent
federal funds need only come into play when and if damages need be
awarded and, therefore, do not prevent the United States from
establishing liability.

V

A

Defendants next contend that plaintiffs fail to state a
claim under either the California or federal False Claims Act
because all the pricing information was disclosed on the invoices.
Specifically, defendants maintain that because they disclosed the
list price for purchased books, the discount applied and the prices
ultimately charged for the books, plaintiffs cannot prove
defendants possessed the intent to deceive.   Plaintiffs respond
that the claims are premised on the idea that the information on
the invoices were false because defendants classified trade books
as non-trade publications.

In <u>United States ex rel Butler v Hughes Helicopters, Inc</u>,
71 F3d 321, 327 (9th Cir 1995), the court noted that its prior
decisions in <u>Wang v FMC Corp</u>, 975 F2d 1412 (9th Cir 1992), and
<u>United States ex rel Hagood v Sonoma County Water Agency</u>, 929 F2d

18

1416 (9th Cir 1991), established that if the government knows all
the facts underlying an alleged fraud, intent to deceive may not be
established.   Butler, 71 F2d at 327, notes, however, that a
determination of the governments' knowledge cannot be made from the
face of the complaint; "[o]nly at the stage of trial or summary
judgement will it be possible for a court to say [what the
government knew.]"   Defendants' argument is therefore premature.

Even if defendants' contention were timely, cases such as
Wang address factual situations not present here.   Wang and its
progeny address situations in which the government possesses the
information which it then claims is the subject of a false claim.
In the present case, plaintiffs claim that defendants submitted
false invoices.   Put otherwise, the governments challenge the
veracity of the very information disclosed to them.   Assuming that
the defendants did assign non-trade keys to trade books as the
court must on a motion to dismiss, the governments could not have
discovered defendants' fraud from a review of the invoices.

B

Defendants assert that the court should find as a matter
of law that because  "juvenile reinforced books" were priced as a
separate category, it is reasonable to assume that these discounts
were not fraudulent.   Plaintiffs contend that they have alleged a
fraudulent scheme which does not require an intent to deceive.

At the onset, the court notes that because the
defendants' argument is based upon contracts or receipts for books
which the governments claim are false, it is doubtful that the
court could use them to determine whether defendants were truthful
as a matter of law.   Assuming arguendo that the separate pricing

United States District Court
For the Northern District of California

19

might lead the court to conclude that defendants believed they were acting truthfully, the court still could not dismiss the governments' claims.  Although United States v Race, 632 F2d 1114, 1120 (4th Cir 1980), did state that "one cannot be found guilty of a false statement beyond a reasonable doubt when his statement is within a reasonable construction of the contract," its reasoning has no application to the present case.  Race 632 F2d at 1120, involved a prosecution for making a false statement under 18 USC § 1001; it spoke to the government's burden in a criminal case in which the result turns on the knowing falsity of the statements.

Courts state that defendants may be found civilly liable under the False Claims Acts if they submitted either false or fraudulent claims to the government.  See United States v TDC Management Corp, 24 F3d 292 297 (DC Cir 1994).  Intent to deceive is only required if the government asserts that defendants submitted false claims, not fraudulent ones.  Id.  Moreover, in Wang, 975 F2d at 1420, the court noted that "what constitutes an offense is not intent to deceive but the knowing presentation of a claim that is either 'fraudulent' or simply 'false'." (quoting Hagood, 929 F2d at 1421).

In the third amended complaint at ¶17, plaintiffs allege that Baker & Taylor devised a scheme to submit false bills to the libraries and educational institutions funded by the governments. This allegation falls squarely within the definition contemplated by Wang.  Determining whether defendants believed their records conformed to the terms of the contract is a factual question, not a question of contract interpretation.

**c**

Defendants request that the court dismiss any claims based on Baker & Taylor's promise to give "short discounts" commensurate with the discounts it received from the customers. Defendants maintain that because short discounted books had ranges in which that could fall, e.g., five to ten percent, Baker & Taylor's discounts were not false nor fraudulent. Moreover, defendants argue that the allegedly fraudulent scheme applies only to trade books, not short discounted ones.

Paragraph 32 of the third amended complaint alleges that the "commensurate with" provisions of Baker & Taylor's contracts were false because Baker & Taylor received full trade discounts on some books but offered the governments only "short" discounts on those books. Due to this discrepancy books given short discounts were not "commensurate with" Baker & Taylor's discounts from the publisher since Baker & Taylor received a full trade discount on them but allegedly did not pass the full discount on to its library and educational institution customers. This pricing practice, if true, is part of the overall fraudulent pricing scheme alleged elsewhere in the complaint and, hence, states a claim under the California and federal False Claims Acts. The range of discounts available for short discounted books under the contract is also irrelevant because plaintiffs allege that the books were misclassified. The discount for short discounted books is simply not in issue.

Defendants' contention that such claims must fail because the allegedly false discounts were included in only some of the contracts at issue speaks to damages, not liability. The time for

21

distinguishing among the millions of contracts will come if damages
are awarded and need not be done now.

D

Defendants ask the court to dismiss all claims for breach
of the FedLink contract.  Specifically, defendants contend that
FedLink's "most favored customer" clause was not breached because
Baker & Taylor's pricing practices were consistent with a specific
qualification to that clause in the contract.  Plaintiffs respond
that the qualification to which defendants refer does not cover
books.  They also argue that their claims under the FedLink
contract are not limited to the "most favored customer" clause but
extend to the broader false pricing scheme.

Under the heading "Certification of Commercial Pricing
For Parts or Components" in the FedLink Contract, section 1.4 at I-
6, the following language appears:

> Please Note: Baker & Taylor Books has terms and
> conditions of sale that offer prices lower than
> those offered in this proposal, but only where
> specific dollar amounts are guaranteed.
> [FedLink] does not commit to any specific
> dollar amount, and as such receives an offer
> not less than any made under similar
> conditions.

Directly above that language, the contract states that
the term

> Part or component as used in this clause [of
> the contract] means any individual part
> component, subassembly, assembly, or subsystem
> integral to a major system and other property
> that may be replaced during the life of the
> system but does not include packaging or
> labeling associated with shipment or
> identification of a part or component.  See 1.4
> (a)(3) at I-5.

United States District Court
For the Northern District of California

22

1    Twenty-four pages from the end of section 1.4 is the

2 "most favored customer" clause.  This clause has its own heading,

3 section k.27, and provides:

4    The Offeror warrants and agrees that the prices
    charged FEDLINK users under this agreement will
5    not exceed prices charged by the vendor to its
    most favored customer for the same services in
6    like or comparable quantities, and further
    agrees, that any payments received for charges
7    made in excess of prices by such most favored
    customers will be returned to the Government.

8

9    Since contract interpretation is a matter of law, see

10 <u>United States v Sacramento Municipal Utility District</u>, 652 F2d

11 1341, 1343-44 (9th Cir 1981), it is for the court to determine what

12 these provisions mean.  The court finds that a logical reading of

13 the contract taken as a whole supports the conclusion that the

14 qualification Baker & Taylor included in section 1.4 refers only to

15 the parts and components covered in that section.  Accordingly, the

16 qualification does not cover what the contract refers to as

17 "publications."  Given that plaintiffs' complaint covers the

18 fraudulent pricing of publications, the pricing of parts and

19 components is irrelevant.

20    The court realizes that the contract may have an

21 ambiguity because the qualification in section 1.4 does not

22 expressly exclude publications from the definition of components or

23 parts.  The rule of contra proferentum, adopted as part of federal

24 common law, see <u>Everson v Blue Cross & Blue Shield</u>, 898 F Supp 532,

25 538 (ND Ohio 1994), provides that if an author of a contract

26 creates an ambiguity it must be construed against him.  Defendants

27 assert that they should not be considered the authors of the

28 FedLink contract because the contract is based on model federal

United States District Court

For the Northern District of California

1  contracts.

2  Even if defendants used language the federal government
3  wrote in the provisions of the FedLink contract, they cannot argue
4  that the United States drafted the qualification that creates the
5  ambiguity.  Baker & Taylor separately typed in the qualification on
6  component pricing; they are its authors and, therefore, the
7  qualification must be construed as not covering books.

8  Plaintiffs argue that the FedLink contract was subject to
9  the same misclassification scheme for "A," "R" and "Y" Key books.
10  This claim is contradicted by the complaint itself.  At ¶ 21 the
11  third-amended complaint says that the allegations of "K" Key fraud
12  apply to all contracts "other than the United States Government
13  'FedLink' contract."  In addition at ¶ 29, plaintiffs allege that
14  the representations vis-a-vis the "K," "A," and "R" Keys do not
15  apply to the FedLink contract.

16  If as plaintiffs contend, the exclusions of the FedLink
17  contract from the allegations of "A" and "R" Key fraud are merely
18  the result of sloppy draftsmanship, the remedy is to amend the
19  complaint.  The court will not, however, take it upon itself to do
20  that.

21  E

22  1

23  Defendants maintain that plaintiffs cannot include claims
24  based on unjust enrichment or payment by mistake because plaintiffs
25  concede that a valid contract exists.  Plaintiffs contend that they
26  have pled the common law claims only as an alternative.

27  It is well established that if a valid as opposed to a
28  supposed or nonexistent contract exists, the common law theories of

24

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  unjust enrichment and payment by mistake are not available.    See

2  Pracor Finance v General Electric Capital Corp, 96 F2d 1151 (9th

3  Cir 1996)(unjust enrichment); United States v Systron-Donner Corp,

4  486 F2d 249, 252 (9th Cir 1973)(payment by mistake).

5          In the present case, plaintiffs believe that their

6  contracts with defendants are valid.    In the unlikely event that

7  the court should find these contracts invalid, however, plaintiffs

8  have included claims for unjust enrichment and payment by mistake.

9  This pleading practice serves judicial economy and hence will not

10  be discouraged by the court.    Of course, the common law claims will

11  not come into play as long as the court deems the contract valid.

12  Defendants cannot seriously argue that should the court disregard

13  the contracts, plaintiffs could not state a claim under common law.

14  Indeed, under that scenario, no valid contract would bind the

15  parties.    To require plaintiffs to wait until contracts are

16  disregarded to bring quasi-contract claims would only prolong this

17  litigation.

18                                    2

19          Defendants contend that the Contract Disputes Act, 41 USC

20  § 605, deprives the court of subject matter jurisdiction over

21  plaintiffs' common law claims.    Plaintiffs contend that the anti-

22  fraud provision of the Act applies because the common law claims

23  are based entirely on the fraud which supports their claims under

24  the federal False Claims Act.

25                                    a

26          In considering a motion concerning subject matter

27  jurisdiction, a court will ordinarily address the jurisdictional

28  issues prior to considering other claims.    Thornhill Publishing Co.

United States District Court
For the Northern District of California

1  Inc v General Telephone & Electronics Corp, 594 F2d 730, 733-34

2  (9th Cir 1979).  The party asserting subject matter jurisdiction in

3  federal court bears the burden of establishing that jurisdiction.

4  Kokkonen v Guardian Life Ins Co of America, 114 S Ct 1673, 1675

5  (1994).  There are two types of motions to dismiss under FRCP

6  12(b)(1), so-called "facial attacks," which assert the inadequacy

7  of the jurisdictional allegations in the complaint, and "factual

8  attacks," which seek to introduce extrinsic evidence to prove a

9  lack of subject matter jurisdiction.  See Meliezer v Resolution

10  Trust Co, 952 F2d 879, 881 (5th Cir 1992).  In a facial attack,

11  such as the one presented in this case, the court will accept as

12  true the allegations in the complaint for the purpose of deciding

13  the  FRCP 12(b)(1) motion.  Mortensen v First Fed Sav & Loan Ass'n,

14  549 F2d 884, 891 (3d Cir 1977).

15                                      b

16           Under the Contract Disputes Act, 41 USC § 605(a), "all

17  claims by the government against a contractor relating to a

18  contract shall be the subject of a decision by the contracting

19  officer.  The Act does not authorize any agency head to settle,

20  compromise, pay or otherwise adjust any claim involving fraud."

21  Id.

22           In United State ex rel O'Keefe v McDonnell Douglas Corp,

23  918 F Supp 1338, 1343-44 (ED Mo 1996), the court faced a situation

24  in which the government brought claims for unjust enrichment and

25  payment by mistake contemporaneously with a claim under the federal

26  False Claims Act.  The court found that the common law claims came

27  within the purview of the anti-fraud exception because fraud was

28  "an integral part of" these common law claims which were merely

                                    26

1  alternative theories for recovery.  Id at 1344.  Moreover, in

2  Martin J. Simko Construction, Inc v United States, 882 F2d 540, 546

3  (Fed Cir 1988), the Federal Circuit noted that Congress intended

4  that contract claims associated with fraud be heard by the courts.

5  See also Joseph Morton Co, Inc v United States, 757 F2d 1273, 1281

6  (Fed Cir 1985)("Those claims which are not inextricably linked with

7  liability for fraud must first be the 'subject of a decision by the

8  contracting officer.'")

9        In support of their contention that the court should

10 disregard the reasoning of the aforementioned courts, defendants

11 direct the court's attention to United States v Hughes Aircraft Co,

12 1991 US Dist Lexis 21639.  In Hughes at 1, the court found that

13 common law claims for unjust enrichment and payment by mistake were

14 not subject to the fraud exception.  The court expressly stated,

15 however, that its decision was compelled by prior holdings in the

16 case; it noted that the government had previously requested a

17 strict construction of § 605(a).  No such considerations apply in

18 the instant case and the court, therefore, declines to follow

19 Hughes.

20        There is no question that plaintiffs' common law claims

21 are bound up in their claims under the False Claims Acts.  As noted

22 above, the common law claims serve as alternate theories of

23 recovery for the alleged fraudulent pricing scheme engaged in by

24 defendants.  Since these claims involve fraud, the anti-fraud

25 exception applies and the court has jurisdiction to hear these

26 claims.

27                              VI

28        Pursuant to the foregoing, the court ORDERS as follows:

United States District Court
For the Northern District of California

1    (1) defendants' motion to dismiss claims barred by the

2  statute of limitations (Doc # 103, pt 1) is GRANTED IN PART and

3  DENIED IN PART.   Thornburg is dismissed as a plaintiff in the

4  action;

5    (2) defendants' motion to dismiss counts III and IV for

6  failure to state a claim for conspiracy (Doc # 96, pt 1) is GRANTED

7  to the extent it relies on acts occurring prior to March 1992 and

8  DENIED as to acts allegedly occurring thereafter.

9    (3) defendants' motion to dismiss claims based on Baker

10  and Taylor's sales to library customers (Doc # 99, pt 1) is DENIED;

11    (4) defendants' motion to dismiss plaintiffs' third

12  amended complaint (Doc # 108, pt 1) is GRANTED IN PART and DENIED

13  IN PART.   Claims related to the FedLink contract are confined to

14  breach of the "most favored customer" clause.   Plaintiffs may amend

15  their complaint to include the FedLink contract in their

16  allegations of "A" and "R" Key fraud no later than April 17, 1998,

17  and

18    (5) The court schedules a case management conference for

19  April 17, 1998 at 10:30 am.   At that conference, the parties should

20  be prepared to discuss the following issues:

21    (a) Whether the court should stay all proceedings except

22  as to claims III and IV of the third-amended complaint;

23    (b) If such a stay is adopted by the court, the length of

24  time the parties will need for discovery on the conspiracy

25  allegations; and

26    (c) If such a stay is adopted by the court, when the

27

28

28

1 | parties would be ready to serve and file motions directed to the

2 | conspiracy allegations.

3 |         IT IS SO ORDERED.

4

5

              VAUGHN R. WALKER

6 |               United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29