IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

Objection Deadline: August 8, 2003
Hearing Date: August 25, 2003 at 12:00 p.m.

## MOTION OF THE DEBTORS FOR THE ENTRY OF AN ORDER APPROVING THE EXECUTION OF AND PERFORMANCE UNDER AN ADMINISTRATIVE ORDER WITH THE EPA

W. R. Grace & Co. - Conn.("Grace") and Kootenai Development Corporation ("KDC"), debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"), by and through their undersigned counsel, respectfully move this Court (the "Motion") for the entry of an Order approving the Debtors' execution of and performance under an Administrative Order on Consent for Removal Action (the "Administrative Order") entered into with the Environmental Protection Agency ("EPA") pursuant to section 363 of title 11 of the

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

United States Code (as amended, the "Bankruptcy Code") and Fed. R. Bankr. P. 9019, and in support thereof, state the following:

**Jurisdiction**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this motion is proper under 28 U.S.C. § 1408.

2. The statutory predicates for this Motion are sections 105 and 363 of the Bankruptcy Code and Rule 9019 the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

3. On April 2, 2001 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). These Chapter 11 Cases have been consolidated for administrative purposes only, and, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

4. Prior to the filing of these Chapter 11 Cases and from the years 1963 through 1990, Grace mined, milled and processed vermiculite from a mine ten miles north of Libby, Montana (the "Libby Mine"). Grace purchased the Libby Mine and related assets from the Zonolite Company in 1963. Vermiculite is a mineral that expands into popcorn-like, low density pieces when heated. This expanded vermiculite is light-weight, fire-resistant and serves as a good insulator. Vermiculite is itself an inert mineral that is non-asbestos and has no known toxic properties. When mined, the vermiculite ore in the Libby Mine deposit, however, contained a

secondary mineral--fibrous asbestiform tremolite.[2] Grace mined the ore and then milled it into a concentrate through a crushing, screening, washing, and flotation separation process.

5.   In the course of processing the vermiculite concentrate, there were occasional spills, processing errors, or lack of demand for certain size grades of vermiculite concentrate. At various times between 1963 and 1990, the vermiculite concentrate that had spilled, that was affected by processing errors, or that was of a grade for which there was no immediate demand was placed in various outdoor locations on the grounds where it was open to the environment.

6.   In 1990, Grace ceased vermiculite mining and processing operations in Libby. In the mid-1990s, Grace sold several of the properties associated with its former vermiculite operations in and near Libby. In 1994 Grace sold to KDC an approximately 20-acre parcel known as the Flyway. Varying amounts of vermiculite concentrate remain on the surface and subsurface at the Flyway. KDC was aware of the presence of the vermiculite concentrate at the time it purchased that property in the mid-1990s. KDC moved vermiculite concentrate material from outdoor, uncovered spills that remained on the Flyway property to other locations on the Flyway property. In 2000 Grace purchased a controlling interest in KDC.

7.   Prior to EPA's involvement at the site, the Flyway was totally accessible to the public. The EPA has taken the position that human activities which disturb soils contaminated with amphibole asbestos result in exposures to airborne asbestos fibers. Thus, the EPA believes that people who have been, or may be in the future, involved in activities on the Flyway may be potential receptors for asbestos through inhalation.

---

[2] Fibrous asbestiform tremolite impurities in vermiculite are atypical and not characteristic of most vermiculite deposits.
(Continued...)

8.  The State of Montana requested EPA to list the Libby Asbestos Site on the National Priorities List as Montana's top priority site pursuant to 42 U.S.C. §9605(a)(8)(B) and 40 C.F.R. §300.425(c)(2). See 67 Fed. Reg. 8836, 8839 (Feb. 26, 2002). On October 24, 2002 EPA listed the Libby Asbestos Site on the National Priorities List. See 67 Fed. Reg. 65,315 (Oct. 24, 2002). EPA alleges that its test results indicated elevated levels of asbestos contamination at the Site. See Action Memoranda 5-23-00 and 8-17-01.

9.  Throughout the course of the past several years, the Debtors have been working with various State and Federal Agencies throughout the Country with respect to environmental remediation. Generally, the Debtors have found that if they perform the remediation rather than await the EPA's performance, the remediation work can be done in a more time efficient and cost efficient manner.

### The Administrative Order

10. As a result of good-faith, arms-length negotiations among the Debtors and the EPA, the parties have recently agreed to enter into the Administrative Order. The Administrative Order provides for the Debtors to complete remediation work on the Flyway property. The chart below summarizes the terms and conditions contemplated by the Administrative Order.[3]

| **Key Administrative Order Provisions** | |
|---|---|
| The Terms of the Administrative Order | • The Debtors agree to retain and pay one or more contractors to develop a work plan; remove soils containing amiphibole asbestos from areas within the Flyway; dispose of such contaminated materials; and collect and analyze samples as set forth in the Administrative Order (the "Remediation Work"). |

---

Most vermiculite deposits do not contain impurities.

[3] The chart herein is only a summary of the terms of the Administrative Order. The final Administrative Order will be filed with this Court upon finalization of its specific terms with the EPA.

> - The Debtors shall provide to the EPA weekly reports for the duration of the Remediation Work and a final report within 30 days after the completion of the Remediation Work.
>
> - The Debtors will pay for the EPA's costs associated with the Remediation Work (the "Response Costs") through the funding of a special account (the "Response Cost Account"). The Debtors will initially deposit $40,000 into the Response Cost Account. In the event that the balance falls below $10,000, the Debtors are required to deposit an additional $10,000 into the Account. The Debtors obligations to fund the Response Cost Account are capped at $60,000. However, the EPA reserves its right to seek payment of Response Costs in excess of $60,000 and to file an administrative expense claim for such excess amounts in the Debtors' chapter 11 cases.
>
> - If the Debtors fail to meet their compliance milestones or fail to submit timely or adequate reports, the Debtors will incur penalties of $50 or $500 per day for the first 14 days of non-compliance, $100 or $1000 per day for the next 15-30 days and $27,500 per day for noncompliance from the 31st day and beyond.
>
> - If the Debtors fail to complete or adequately pursue completion of the Remediation Work, the EPA has the right to takeover the Remediation Work. If the EPA exercises this right, the Debtors shall be liable for a stipulated penalty of $250,000.

11.   The Debtors expect that the cost to the Debtors of the Remediation Work will be approximately $175,000, plus the EPA Response Costs. The Debtors estimate the cost of the Remediation Work if performed by the EPA to be between $350,000 and $400,000. The Debtors believe that the Remediation Work will take approximately 6 to 8 weeks to complete. The total funding of the Response Cost Account is not expected to exceed the initial funding of $40,000.

### Relief Requested

12.   By this Motion, the Debtors seek the entry of an order (i) approving the Debtors' execution of the Administrative Order, and (ii) granting the Debtors the authority to perform its

obligations under the Administrative Order, including the Remediation Work on the Flyway and the reimbursement to the EPA of certain Response Costs incurred in conjunction with the Remediation Work.

### Statutory Authority

13. This Court has statutory authority to authorize and approve the Debtors' entry into the Administrative Order pursuant to sections 105 and 363(b)(1) of the Bankruptcy Code. A settlement of claims and causes of action by a debtor in possession constitutes a use of property of the estate. See Northview Motors, Inc. v. Chrysler Motors Corp., No. 98-3387, 1999 U.S. App. LEXIS 13403, at *11 (3d Cir. 1999). If a settlement is outside of the ordinary course of business of the debtor, it requires approval of the bankruptcy court pursuant to section 363(b) of the Bankruptcy Code. Id.

14. Bankruptcy Rule 9019 provides that, after notice and a hearing, a court may approve a proposed settlement or compromise. The decision whether to accept or reject a compromise lies within the sound discretion of the court. In re Resorts Int'l, Inc., 145 B.R. 412, 451 (Bankr. D. N.J. 1990); In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (Bankr. E.D. Pa. 1986).

15. In reviewing this Motion for approval of the Administrative Order, the Court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." In re Martin, 91 F.3d 389, 393 (3d Cir. 1996). This requires court consideration of the following criteria: "(1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved,

and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Id.

16. Approval of the Administrative Order is in the best interests of the Debtors and their estates and serves a public interest. First, the EPA has the right to proceed with the remediation of the Flyway and seek to collect its costs for doing so notwithstanding the Debtors' chapter 11 cases. Approval of the Debtors' entry into the Administrative Order will allow the Debtors to satisfy the EPA's demand for remediation without forcing protracted and expensive litigation with respect to the Remediation Work or the EPA's claim for reimbursement. Second, compliance with the Administrative Order will eliminate a potential administrative expense to the Debtors' estates, which could exceed $400,000, for a cost of only approximately half that amount. Resolving this matter through the execution of the Administrative Order will serve as a reasonable settlement between the Debtors and the EPA with respect to the Flyway and is in the best interests of the Debtors and their estates.

17. Additionally, remediating the Flyway now versus paying the EPA's substantially larger claim later is clearly in the public interest. Allowing the Debtors to undertake the remediation, reduces the total costs of the project and likely achieves the completion of the remediation more quickly. Clearly, this serves the public interest.

**Conclusion**

18. The proposed Administrative Order is fair and equitable and is in the paramount interests of the Debtors, their estates and their creditors. The consummation of the Remediation Work provided for in the Administrative Order is also in the public interest. In addition, the Debtors reasonably believe that the relief requested in this Motion will aid in the expeditious

resolution of these Chapter 11 Cases. Accordingly, the Debtors have demonstrated a sound business justification and public interest for the execution and consummation of the Administrative Order and this Motion should be granted.

### Notice

19. Notice of this Motion has been given to (i) the Office of the United States Trustee, (ii) the Environmental Protection Agency; (iii) counsel to the debtor in possession lenders, (iv) counsel to each official committee appointed by the United States Trustee and (v) those parties that requested papers under Fed. R. Bankr. P. 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

### No Prior Request

20. No prior Application for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order (i) authorizing the Debtors to enter into the Administrative Order; (ii) authorizing the Debtors to undertake the Remediation Work outlined in the Administrative Order and perform all of their other obligations under the Administrative Order; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: July 21, 2003

> KIRKLAND & ELLIS
> David M. Bernick, P.C.
> Janet S. Baer
> James W. Kapp III
> Christian J. Lane
> 200 East Randolph Drive
> Chicago, Illinois 60601
> (312) 861-2000
>
> and
>
> PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
>
> _____
> Laura Davis Jones (Bar #2436)
> Scotta McFarland (Bar #4184)
> Paula Galbraith (Bar #4258)
> 919 North Market Street, 16th Floor
> P.O. Box 8705
> Wilmington, Delaware 19899-8705 (Courier 19801)
> (302) 652-4100
>
> Co-Counsel for the Debtors and Debtors in Possession