# EXHIBIT A

Page 1

1        VOLUME: I
2        PAGES: 1-111
3        EXHIBITS: 1

COPY

5   IN THE UNITED STATES BANKRUPTCY COURT
6   FOR THE DISTRICT OF DELAWARE
7   - - - - - - - - - - - - - - - - - x
8   IN RE:                              Bankruptcy No. 01-1139
9   W.R. GRACE & COMPANY, et al.,       Chapter 11
10            Debtors
11  - - - - - - - - - - - - - - - - - x
12
13        DEPOSITION of ELWOOD S. WOOD
14              February 5, 2003
15                 9:24 a.m.
16            W.R. Grace & Company
17           62 Whittenmore Avenue
18          Cambridge, Massachusetts
19
20
21
22
23    Reporter: Michael D. O'Connor, RPR
24

```
 1   APPEARANCES:
 2
 3        RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC
 4        By Robert M. Turkewitz, Esq. and
 5        James L. Ward, Jr., Esq.
 6        1037 Chuck Dawley Boulevard, Building A
 7        Mt. Pleasant, South Carolina 29464
 8        (843)727-6672
 9        For the Claimants.
10
11        REED SMITH LLP
12        By Lawrence E. Flatley, Esq.
13        435 Sixth Avenue
14        Pittsburgh, Pennsylvania 15219
15        (412)288-3063
16             - and -
17        W.R. GRACE & COMPANY
18        By William J.A. Sparks, Esq.
19        919 North Market Street
20        Wilmington, Delaware 19801
21        (302)652-5340
22        For W.R. Grace & Company.
23
24
```

Page 3

```
 1                    I N D E X
 2   Deposition of:                   Direct   Cross
 3   ELWOOD S. WOOD
 4       By Mr. Turkewitz               5
 5
 6
 7                  E X H I B I T S
 8   No.                                        Page
 9   1   Memo to F.W. Eaton, H.C. Duecker,
10       E.S. Wood and H.A. Eschenbach from
11       O.M. Favorito, dated 5/23/80            80
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1     A.    To avoid inhaling asbestos-laden area.

2     Q.    Now, with respect to housekeeping and
3  education, was that done regardless of the levels of
4  asbestos in the plant?

5     A.    I'm really trying to think about what we
6  may have done in plants which were using South
7  Carolina concentrate in order to answer your
8  question.  It was certainly done in all plants which
9  handled the Libby concentrate.  It certainly was
10 done with much greater detail in Libby itself where
11 we had a very serious problem.

12    Q.    At some point grace was able to get the
13 levels at Libby and the levels in the plant to be
14 within the OSHA standard; is that correct?

15    A.    Yes.

16    Q.    But Grace continued to educate its
17 employees even after that, did it not?

18    A.    Yes, I think so.  I can speak only for my
19 watch.

20    Q.    And Grace continued with the housekeeping
21 measures that we talked about as well?

22    A.    Yes.

23    Q.    Now, when you first started as general
24 manager of the Zonolite business, do you recall

1   testing being conducted to determine the airborne
2   levels of asbestos that could result during
3   installation of Zonolite attic insulation?
4       A.   Yes, I know we made some tests.
5       Q.   And were you responsible for that decision
6   to test?
7       A.   Yes.
8       Q.   Why did you want to conduct that testing?
9       A.   It was mandated that we test all of our
10  products.  The occupational safety and health
11  authorities promulgated regulations, and among those
12  regulations were requirements that all products be
13  tested in their end use.  So we were complying with
14  those requirements.
15      Q.   Do you recall the results that you received
16  early on?
17      A.   On what?
18      Q.   With regard to the airborne levels during
19  installation of the Zonolite attic insulation.
20      A.   I don't specifically recall individual
21  results.  The testing went through phases in trying
22  to refine representative protocols for how the
23  product was used.  Initially there were crude tests
24  that didn't measure any particular use, but rather,

1  measured the amount of fiber that could be
2  liberated, so-called prop tests.
3       That was helpful indiscriminate go higher
4  contamination from lower contamination, but didn't
5  really give much information on how the product
6  would actually behalf in its end use.
7       With respect to attic insulation, there
8  were tests performed in a mock attic, and that was
9  followed by tests in actual homes where, you know,
10 you went and did what you expected the homeowner
11 would do.
12     Q.   Early on when you first received the
13 initial results of testing, do you recall discussing
14 contingency relating to Zonolite attic insulation in
15 1977?
16     A.   Yes.
17     Q.   Do you recall that one of the contingencies
18 included withdrawal of Zonolite attic insulation
19 from the market?
20     A.   Yes.
21     Q.   Why was this option addressed?
22     A.   At the time of my arrival, the Consumer
23 Products Safety Commission was considering
24 regulations banning the use of asbestos in consumer

1   products, and therefore, with the pending, but still
2   unresolved issue of whether or not a material such
3   as ours, with small amounts of contaminant, would be
4   included in their ban, we felt it necessary to make
5   plans in case the Consumer Products Safety
6   Commission required us to withdraw the product.
7        Q.   Do you recall the Consumer Products Safety
8   Commission indicating at that time that they
9   considered any exposure to asbestos to be dangerous?
10       A.   I guess that was a very conservative
11  operating practice.  I don't recall that they said
12  any exposure, because, in fact, they were busily
13  identifying the risk factors associated with various
14  uses.
15       Q.   Do you also recall at that time discussions
16  about putting asbestos warnings on bags of Zonolite
17  attic insulation?
18       A.   Yes.
19       Q.   Who made that proposal?
20       A.   It was a part of the contingency plan --
21            MR. FLATLEY:  Object to the form of the
22  question.  Go ahead.
23       A.   It was a part of the contingency plan.  It
24  was never proposed to do it.  There was never a

1  decision to do it.  It was an exercise that we went
2  through in case we were required to do it.
3      Q.  And the warning language specifically
4  identified asbestos; is that correct?
5          MR. FLATLEY:  Do you mean the warning
6  language that was being considered as part of the
7  contingency plan?
8          MR. TURKEWITZ:  Yes.
9      A.  I would think so.  I would have to refresh
10 my memory on that point.
11     Q.  Why was asbestos specifically identified in
12 the language?
13     A.  Because that was the issue to be addressed
14 by the Consumer Products Safety Commission.
15     Q.  And was it felt it would be important to
16 actually identify asbestos in the warning?
17     A.  If the Consumer Products Safety Commission
18 required you to do so, yes.
19     Q.  Do you recall discussions about the impact
20 of placing an asbestos warning label on bags of
21 Zonolite attic insulation?
22     A.  Yes.
23     Q.  What do you recall about those discussions?
24     A.  That it would have a depressant effect on

1  sales.

2      Q.   Why is that?

3      A.   Just people's fear of the unknown.

4      Q.   Was a decision made to not place asbestos

5  warning labels on bags of Zonolite attic insulation?

6      A.   Yes.

7      Q.   And who made that decision?

8      A.   I think it was a collective decision.

9  Certainly I being responsible for the business had a

10 lot to say about that.

11     Q.   Who else was involved in making that

12 decision?

13     A.   We met with our attorneys, we met with our

14 health and safety people, we met with outside

15 experts on the effect of exposure to asbestos, we

16 participated in hearings of the OSHA regulatory

17 authorities, we counseled at one point with the

18 Consumer Products Safety Commission.

19          It was a long process.  It wasn't a quick

20 nor easy decision

21     Q.   You mentioned that you counseled with your

22 health and safety people.  Are you talking about at

23 W.R. Grace?

24     A.   Yes.