UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: ) | Chapter 11 |
| ) | |
| W.R. GRACE & CO., et al., ) | Bankruptcy No. 01-01139 (JKF) |
| ) | Jointly Administered |
| Debtors. ) | |

## RESPONSE OF ZAI CLAIMANTS TO DEBTORS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF ANY ALLEGED DAMAGES FROM THE ZAI SCIENCE TRIAL

Darrell W. Scott
Burke D. Jackowich
Lukins & Annis, P.S.
717 W. Sprague, Suite 1600
Spokane, WA  99201

Telephone:  (509) 455-9555
Facsimile:  (509) 747-2323

William D. Sullivan
Elzufon Austin Reardon Tarlov & Mondell
300 Delaware Avenue
Suite 1700
P.O. Box 1630
Wilmington, DE  19899-1630

Telephone:  (302) 428-3181
Facsimile:  (302) 428-3180

Edward J. Westbrook
Robert M. Turkewitz
Richardson Patrick Westbrook & Brickman LLC
1037 Chuck Dawley Blvd., Bldg. A
Mt. Pleasant, SC  29464

Telephone:  (843) 727-6500
Facsimile:  (843) 727-6688

# TABLE OF CONTENTS

I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS.......1

II.   SUMMARY OF ARGUMENTS..............................................................................1

III.  STATEMENT OF FACTS ..................................................................................2

IV.   ARGUMENT.....................................................................................................5

     A.    Introduction................................................................................................5

     B.    The Court's Order Appropriately Focused Discovery on the General
             Causation Question of Whether ZAI Poses an Unreasonable Risk of
             Harm; The Order Did Not Ill Advisedly Limit Discovery to ZAI's
             Capacity to Cause Disease. ..........................................................................6

     C.    Dr. Kilpatrick's Expert Testimony Speaks to Causation, Not
             Damages; His Testimony, Therefore, is Directly Relevant..........................7

     D.    The Fact that ZAI Causes Real Property Damage Due to Marketplace
             Aversion to Asbestos is Neither "Secondary," nor "Premature," nor
             Legally Dependent on Proof of Disease.....................................................11

V.    CONCLUSION................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

*Everett v. Paschall*, 61 Wash. 47, 111 P. 879 (1910) ..................................................................... 13

*Ferry v. Seattle*, 116 Wash. 648, 203 P. 40 (1922) ......................................................................... 13

**OTHER AUTHORITIES**

22 Am. Jur. 2d. *Damages* § 399 (1988) .......................................................................................... 7

22 Am. Jur. 2d. *Damages* § 400 (1988) .......................................................................................... 7

22 Am. Jur. 2d. *Damages* § 401 (1988) .......................................................................................... 7

51 C.F.R. at 22615-*22648* (1986) ................................................................................................. 11

Black's Law *Dictionary*, (5th ed.,1979), s.v. "Harm." ....................................................................... 6

J. I. Rodale, The Synonym Finder (1978), s.v. "Science." ................................................................. 6

*Restatement* (Second) of Torts § 927(1)(a) (1979) ........................................................................... 7

*When Does the Clock Start Ticking? Applying the Statute of Limitations in Asbestos Property Damage Actions,* 80 Cornell L. Rev., n. 69 (1995) ...................................................................... 2

## I. **STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS**

Marco Barbanti (Washington), Ralph Busch (Washington), Paul Price (Montana), John Prebil (Montana), John Szufnarowski (Massachusetts), Edward Lindholm (Massachusetts), James & Doris McMurchie (Minnesota), Stephen Walsh (Minnesota), and William Harris (California) ("ZAI claimants") are each creditors who allege that asbestos-contaminated ZAI manufactured by W.R. Grace has caused harm to their real property, including diminution in property value.

To bring into focus Grace's potential ZAI liability, this Court on October 21, 2002, entered an Order providing for discovery on the limited general causation question of "whether ZAI poses an unreasonable risk of harm." The Court did not attempt to predetermine the issues for trial.[1]

Claimants' expert, Dr. John Kilpatrick, is prepared to offer expert testimony grounded on principles of real estate economics that demonstrate and explain a direct causal relationship between asbestos-contaminated ZAI and injury to property. Dr. Kilpatrick's ultimate opinion is that ZAI poses an unreasonable risk of harming real property values. Grace now moves to exclude Dr. Kilpatrick's testimony as "irrelevant."

## II. **SUMMARY OF ARGUMENTS**

1.      This Court's Discovery Order carefully avoided predetermining the scope of the ZAI trial issues. The Order, prudently, did not legally derail trial by erroneously constricting "risk of harm" to "risk of disease."

---

[1] August 26, 2002, hearing transcript at 62-63 [Attachment A].

2.    Dr. Kilpatrick's expert testimony directly speaks to causation between asbestos-contaminated ZAI and harm to property value. His testimony, therefore, is directly relevant to the question of whether ZAI poses a risk of harm.

3.    Whether ZAI causes property damages due to marketplace aversion to asbestos is neither "secondary," nor "premature," nor dependent on proof of disease.

### III.  STATEMENT OF FACTS

ZAI claimants are fee simple owners of real property in which ZAI has been installed. Each is a class representative of or proposed class representative of other real property owners whose properties contain asbestos-contaminated ZAI.

ZAI claimants allege that ZAI has caused real property damage and that Grace is liable for that damage under various legal theories, including fraudulent concealment, consumer protection, negligence, and strict product liability.[2]  ZAI claimants do not base their claims on whether they have suffered disease, nor do legal theories advanced each require proof of disease. *See* Corrected Zonolite Attic Insulation Claimants' Memorandum in Support of Motion for Partial Summary Judgment Re: W.R. Grace's Consumer Protection Liability.

---

[2]While ZAI claims share with some traditional asbestos property damage cases various common factual and legal questions, it is important to observe that ZAI claims are also unique in fundamental respects affecting available legal theories, compensable harms, liability, and public policy considerations. ZAI claims, unlike traditional asbestos property damages claims, arise from contamination of a building product with asbestos, not the commercial use of asbestos in a building product. Traditional asbestos property damage cases involved purchase of a commercial asbestos product, typically for use in a commercial building. ZAI claims, by contrast, involve consumer purchase of a product unknown to consumers, but known to Grace, to be contaminated with asbestos. In this regard, traditional property damages cases, all of which involved commercial asbestos products installed prior to 1973, largely predate statutory consumer protection liability. *See, When Does the Clock Start Ticking? Applying the Statute of Limitations in Asbestos Property Damage Actions,* 80 Cornell L. Rev., n. 69 (1995). ZAI claims which involve concealment of asbestos contamination in a consumer product until as late as 1984 directly implicate the corpus of state consumer protection laws which afford recovery for damage to property, including economic loss.

On October 21, 2002, this Court entered a Discovery Order concerning a science trial as to present ZAI claimant's property damage claims, focusing on the general causation question of whether ZAI poses an unreasonable risk of harm. ("...the scope of discovery will be limited to what science demonstrates with regard to whether ZAI creates an unreasonable risk of harm.")[3] [Attachment B]. This general causation question regarding ZAI's capacity to cause legally cognizable harm, segregated out for later determination if necessary, raises important issues such as whether ZAI claimants have, in fact, suffered harm as a result of Grace's business misconduct, and the measure of those damages.[4]

The Court established these proceedings because an informed judgment as to whether ZAI has a capacity to cause cognizable harm, and what those harms may be, advanced this Court's reorganizational goals by bringing into focus Grace's potential ZAI liability, its scope and scale, and ultimately the advisability of collective management and disposition of ZAI claims within bankruptcy.

Grace, of course, in this context has taken the position that, absent proof that ZAI causes substantial risk of disease, Plaintiffs cannot show that ZAI causes harm. Plaintiffs deny that this is either legally or factually the case. The legal issues are now being

---

[3]"[M]ost liability trials like this bifurcate the concept of liability from damage, and it seems to me we're looking at, in phase one, liability. But we're looking at only a subset of liability, which is whether the experts are going to be able to demonstrate that under any theory there is the possibility that Zonolite caused an unreasonable risk of harm. If the determination is yes, then I think the claimants have to prove under what theory the particular claimant suffers some harm, and then show damages. But don't we have to get to the issues first of whether there is an unreasonable risk of harm? I am looking for a narrow, focused trial on that subject matter." Excerpt from July 22, 2002, Motions Hearing before the Honorable Judith K. Fitzgerald, pg. 83 [Attachment C].

[4]"I don't think we want to go to the question of how much does it cost to clean it up, yet. I think what we want to go to is, is it necessary or even advisable to clean it up, and possibly, what are alternative methods, because that may also affect damages." Excerpt from July 22, 2002, Motions Hearing before the Honorable Judith K. Fitzgerald, pp. 90-91 [Attachment C].

briefed and will allow the Court to make a ruling to determine the proper burden of proof in a property damage case.

Testing by ZAI claimants' and Grace's experts have now reaffirmed the findings of the Environmental Protection Agency ("EPA") and the Agency for Toxic Substances and Disease Registry ("ATSDR"): ZAI is contaminated with asbestos. ZAI releases asbestos into the air when disturbed during ordinary homeowner activities.

ZAI claimants retained Dr. John Kilpatrick to assess whether asbestos-contaminated ZAI posed an unreasonable risk of harm to real property values. Dr. Kilpatrick is a real estate economist and valuation expert, holding a Ph.D. in real estate finance from the University of South Carolina. He is the managing partner of Mundy Associates, LLC, which specializes in complex real estate valuation problems. He has authored four books on real estate and published numerous journal articles.

Dr. Kilpatrick was presented with the general causation question of whether asbestos-contaminated ZAI poses an unreasonable risk of causing harm to real property values.[5] The explanatory force of Dr. Kilpatrick's testimony arises from the theoretic underpinning, derived from real estate economics, that predict and explain the causal relationship between asbestos-contaminated ZAI and harm to property value. Dr. Kilpatrick's ultimate opinion is that asbestos-contaminated ZAI, in fact, poses an unreasonable risk to property value.

---

[5]Q. What's the subject matter of your expert testimony in this case?
A. Does the presence of zonolite create an unreasonable risk of harm to the value of a residence in which it's contained. Kilpatrick Deposition, p. 10 [Attachment D].
Q. What was your understanding of your assignment in preparing your expert report in this matter?
A. To research the impact that zonolite may have on the value of residences containing zonolite within a reasonable degree of valuation certainty from the perspective of a real estate valuation expert. Kilpatrick Deposition p. 6 [Attachment D].

Grace now seeks to exclude Dr. Kilpatrick's testimony, claiming that it is "irrelevant."

## IV. ARGUMENT

### A.    Introduction.

Grace's motion is grounded on "relevancy." *See* Fed. R. Evid. 402. Grace does not challenge the substantive truth of Dr. Kilpatrick's testimony, that ZAI can be expected to cause damage to property value, nor does Grace question the admissibility of Dr. Kilpatrick's expert testimony under *Daubert* standards.

Relevancy involves two components: materiality and probative value. "Materiality concerns the fit between the evidence and the case. It looks to the relation between the propositions that the evidence is offered to prove and the issues in the case." 1 McCormick on Evidence § 185 (John William Strong ed., 5th ed. 1999). If the evidence is offered to help prove a proposition that is not a matter in issue, the evidence is immaterial and, therefore, irrelevant. Probative value, on the other hand, concerns the tendency of the evidence to establish the proposition that it is offered to prove. Grace's challenge is clearly centered on the first component, materiality.

Grace's claim that Dr. Kilpatrick's testimony is immaterial is perched on three erroneous premises: (1) Grace erroneously characterizes this Court's Order as prohibiting testimony other than as to risk of disease; (2) Grace mischaracterizes Dr. Kilpatrick's testimony as addressing damages, rather than addressing causation; and (3) Grace erroneously asserts that ZAI's capacity to cause property damages due to marketplace aversion to asbestos is "secondary" or "premature" absent proof of disease. These erroneous premises may be treated and disposed of in turn.

-5-

**B.    The Court's Order Appropriately Focused Discovery on the General Causation Question of Whether ZAI Poses an Unreasonable Risk of Harm; The Order Did Not Ill Advisedly Limit Discovery to ZAI's Capacity to Cause Disease.**

Grace complains that Dr. Kilpatrick is not a medical doctor and offers no testimony as to ZAI's capacity to cause disease.  Grace concludes that Dr. Kilpatrick's testimony is irrelevant because, Grace says, the Court's Order limited trial to ZAI's capacity to cause disease.

The Order entered by the Court, in fact, befittingly set the parameters of discovery as "what science demonstrates with regard to whether ZAI <u>creates an unreasonable risk of harm</u>."[6] (emphasis added) [Attachment B].  The Court's Order contrasts sharply with multiple proposed orders crafted by Grace, which sought to inappropriately, and without regard for the actual legal elements of ZAI claimants' claims, confine trial to ZAI's capacity to cause disease.[7]

Grace's revisionist effort to supplant in the Court's Order "risk of harm" with "risk of disease" is betrayed by the frequency with which Grace is compelled to erroneously paraphrase the Order, rather than actually cite the Court's language.

The Court, moreover, was prudent in entering an Order that embraced, in the present real property damage context, the question of ZAI's capacity to cause cognizable harm, giving rise to a bankruptcy claim, and not merely ZAI's capacity to cause disease.

---

[6]"Harm" is the existence of loss or detriment in fact of any kind to a person resulting from any cause.  Black's Law Dictionary, (5th ed.,1979), s.v. "Harm."  The harm ZAI claimants allege is property damage.  "Science," means a body of knowledge, body of facts or information, body of laws or principles.  Examples of fields of science include the physical sciences, geography, the social sciences, and economics.  J. I. Rodale, The Synonym Finder (1978), s.v. "Science."  Dr. Kilpatrick's field may be described as real estate economics.

[7]April 29, 2002, Grace <u>Proposed</u> Order: "Fact discovery shall be limited to the issue of whether ZAI presently poses an unreasonable risk of harm to the occupants of the home" [Attachment E].  July 22, 2002, Grace <u>Proposed</u> Order: "Fact discovery shall be limited to the issue of what science demonstrates regarding the health risks of exposure to ZAI" [Attachment F].

-6-

Grace faces, as illustration, substantial potential ZAI liability under applicable consumer

protection statutes, involving millions of ZAI claimants. These claims directly pose the

causation question of ZAI's capacity to cause injury to real property interests.[8]

C.      **Dr. Kilpatrick's Expert Testimony Speaks to Causation, Not Damages; His
        Testimony, Therefore, is Directly Relevant.**

        Grace dismisses Dr. Kilpatrick's testimony as damages testimony and on this

ground seeks to have it excluded. Grace mischaracterizes Dr. Kilpatrick's testimony.

        Dr. Kilpatrick's testimony is directed at the theoretic underpinning, derived from

real estate economics, that predict and explain the causal relationship between asbestos-

contaminated ZAI and harm to property value.[9] *See* Declaration of John A. Kilpatrick,

Ph.D., filed in support of this Response to Debtor's Motion in Limine. As illustration,

Dr. Kilpatrick applies basic principles of real estate value as they apply to home

ownership, focusing on how the qualitative aspects of homeownership ultimately translate

into the quantitative aspects of valuation. Kilpatrick Report, p. 3. Interference with use

or right of transfer, in this regard, is a predictor of negative impact on property values.

Kilpatrick Report, p. 3 [Attachment G]. Causation between asbestos-contaminated ZAI

---

[8]Damages for the depreciation in value of real property and for interference with its unfettered use
are venerable species of harm supporting a claim for property damage. 22 Am. Jur. 2d. *Damages*
§ 401 (1988). Harm to real property includes the impairment of any legally protected interest in
land and a landowner may recover the value of the subject matter or of his interest in it. *See*
Restatement (Second) of Torts § 927(1)(a) (1979), *see also* 22 Am. Jur. 2d. *Damages* § 399
(1988). Harm to real property includes not only injury to the property itself, such as manifested in
diminished property value resulting from detriments on the land, but injuries to personal rights
attendant with ownership of real property. Thus, "A property owner is generally entitled to
recover compensation for discomfort, annoyance, and personal inconvenience caused by
interference with his property rights, and for any other consequential damages which necessarily
arise from a wrongful act and which are the proximate result of it." 22 Am. Jur. 2d. *Damages*
§ 400 (1988).

[9]Q. So when you say "what science demonstrates," you're talking about the science of real estate
valuation?
A. That's correct. (Kilpatrick Deposition, p. 16) [Attachment D].

and harm to property value is found in ZAI's infringement on these rights. As

Dr. Kilpatrick explained, "It is noteworthy to stress that the voluntary acceptance of

private restrictions is always in trade for some economic compensation. Impairment

places a restriction on the right of use without some economic compensation. This is

illustrated in potential restrictions which may be placed on the use of real estate due to a

physical impairment and which can thus limit the property to something less than its

highest and best use." Kilpatrick Report, p. 4. This principle of real estate economics has

practical implications in the marketplace. "Real estate economics—and appraisal

practice—uniformly recognize that a physical impairment has a negative impact on

property values. Indeed, appraisers are required by the Uniform Standards of Professional

Appraisal Practice to consider the impacts of such contamination in the value estimation

process." Kilpatrick Report, p. 4 [Attachment G].

        In view of standing EPA advisories regarding ZAI, it would be foolhardy for a

property inspector or appraiser to disregard ZAI. The strong recommendations of the

EPA and the ATSDR to ZAI homeowners, in this connection, serve as a benchmark

"community standard" of property impairment from ZAI.[10]

_____

[10]EPA/ATSDR Current Best Practices (issued May 2003):
"DO NOT DISTURB IT. Any disturbance has the potential to release asbestos fibers into the air."
"EPA and ATSDR strongly recommend that homeowners make every effort not to disturb
vermiculite insulation in their attics" [Attachment H]. *See also* Wisconsin Department of Health,
Human Health Hazards: Vermiculite Insulation ... "signs should be posted inside the attic saying,
'Cancer Hazard: Insulation Contains Asbestos, Do Not Disturb or Create Dust.'" [Attachment I];
Washington State Department of Health, "Washington State Department of Health shares the
concern of federal agencies with citizens regarding potential exposures to insulation containing
asbestos by workers and residents. Asbestos has long been recognized as a human health hazard,
and inhalation of the asbestos fibers should be avoided." [Attachment J]; Minnesota Department of
Health: Vermiculite Insulation ... "If the insulation is exposed or spilling into living areas,
immediate steps should be taken to remove the hazard ... The Minnesota Department strongly
recommends using a Minnesota-licensed asbestos contractor for the protection of your family's
health." [Attachment K]; EPA Fact Sheet: Asbestos in Attic Insulation "Why is it a problem? If
disturbed, the asbestos fibers in vermiculite attic insulation may get into the air. These fibers can
be inhaled and become trapped in the lungs and may cause diseases such as asbestosis, lung
cancer, and mesothelioma." [Attachment L].

Dr. Kilpatrick also testifies to the important principle of intuitive toxicology as an explanatory principle underlying the causal link between asbestos and property damage. Market reactions to impairments, such as contamination, he explains, "are not monotonically tuned to the degree of contamination, the specific contaminant, or subtle differences in toxicological impacts. Rather, market reactions tend to be generated simply by contamination with a toxic substance, irrespective of the degree of toxicity." Kilpatrick Report, pp. 5-6 [Attachment G].[11] The principle of "intuitive toxicology" is especially salient where families, as here, are confronted with a toxic substance whose harm is the product of cumulative exposures from multiple sources during family members' lifetimes, rendering every exposure a thing to be avoided. EPA Libby Brochure: "to protect your health and property value: ...Asbestos is harmful to human health if inhaled, and you should minimize exposures whenever possible" (emphasis added) [Attachment M]; Washington State Department of Health, Resources on Asbestos in Vermiculite Insulation: "Washington State Department of Health shares the concern of federal agencies with citizens regarding potential exposure to insulation containing

---

[11]Q. Thank you. If you could turn to Page 5 of Exhibit 1, the last sentence on the bottom of the page, and it's a paragraph entitled Intuitive Toxicology. And the sentence says: "As a result, market reactions to impairments, such as contamination, are not monotonically tuned to the degree of contamination, the specific contaminant, or subtle differences in toxicological impacts. Rather, market reactions tend to be generated simply by contamination with a toxic substance, irrespective of the degree of toxicity."
Do you see where I read that?
A. Yes.
Q. When you used the term "not monotonically tuned," what does that mean?
A. The simplest way to think of that is like a dimmer switch on a light. You turn it one way, the light goes up; you turn it back the other way, the light goes down. And the degree of illumination is a function of how far you turn the switch, one way or the other. A volume knob on a radio monotonically controls the decibel level. Intuitive toxicology, as it's been studied not by toxicologists but by people in the social sciences, finds that perceptions of risk and thus perceptions of unreasonable risk of harm are more like off/on switches: Either something is there or it's not there. You hear that something is present, and you turn your back and walk away from it.
Q. And just so I'm clear as to what you're saying, you're saying that it's the perception that can affect the value, not necessarily the health risk?

asbestos by workers and residents. Asbestos has long been recognized as a human health

hazard, and inhalation of the asbestos fibers should be avoided." (emphasis added)

[Attachment J]; Puget Sound Clean Air Agency-Homeowners-Information, Asbestos and

demolition: "...[T]here's no known safe level of asbestos exposure. That's why medical,

environmental health and regulatory organizations stress the need to protect health by

minimizing exposure to airborne asbestos fibers" [Attachment N]. The economic

principles discussed by Dr. Kilpatrick, unfortunately now reflect human faces, as asbestos

contamination of ZAI becomes known.[12]

Because Dr. Kilpatrick's testimony is directed at ZAI's capacity to cause harm to

the real property interest of homeowners, not at the qualification of damages, his

testimony is immediately relevant to the question posed by the Court.

D.     The Fact that ZAI Causes Real Property Damage Due to Marketplace
       Aversion to Asbestos is Neither "Secondary," nor "Premature," nor Legally
       Dependent on Proof of Disease.

Grace asserts, as its final argument, that if ZAI does not double the risk of disease,

then marketplace forces are based on "erroneous perceptions." This, Grace declares,

---

A. Yes. That's a good generalization. (Kilpatrick Deposition, pp. 35-36) [Attachment D].
[12]Deposition of Shawn Dillon (taken 3/3/03): I probably wouldn't have bought the house if I had
known that it had asbestos in it, to be honest with you. I more than likely would not have because
why have the headache? Pg. 17/18-21 [Attachment O]; Clarke Russ (taken 2/24/03): Q. Okay.
Do you know anyone who has sold his or her home that had similar issues that you have about
vermiculite? A. No, but I can tell you right now, if I knew it was in a house I was going to buy, I'd
never buy the house. Pg. 87/16-27 [Attachment P]; Gladwin Worden (taken 2/27/03): Q. Would
you buy another home if you knew it had Zonolite attic insulation in it? A. ...No. If I had known
that it had Zonolite Attic Insulation, knowing what I know now, I would make sure that it was
totally removed before I purchased the house, and it may even come to the fact that I would leave
the house. I wouldn't even think twice about buying the house. Q. Would your recommend to
your family or friends that they should not buy a house that had Zonolite Attic Insulation in it?
A. Yes. I would tell everyone I could to stay away from it. Pg. 131-133 [Attachment Q]. *See also*
Affidavit of Paul Price [Attachment R]. Declaration of Dan Wiens [Attachment S]; Deposition
excerpts of Ralph Busch [Attachment T].

would absolve Grace of liability and, thus, Dr. Kilpatrick's testimony is, Grace declares, "irrelevant," or "secondary," or "premature."

It is sufficient, for purposes of denying Grace's present motion, to observe that Grace's argument does not assay the relevancy of Dr. Kilpatrick's causation testimony, but is a mere rejoinder which attempts to interpose a superceding or intervening cause. Grace's assertion, therefore, supplies no basis for excluding Dr. Kilpatrick's testimony, even were one to erroneously assume that Grace's position was meritorious.

Nor does Grace's assertion supply reason for characterizing Dr. Kilpatrick's testimony as "secondary" or "premature." That asbestos is toxic[13] and that the toxicological effects of asbestos are cumulative,[14] are now beyond question. Avoidance

---

13

- "Evaluation of all available human data provides no evidence for a threshold or for a "safe" level of asbestos exposure." NIOSH *Revised Recommended Asbestos Standard* [Attachment U].
- "EPA and the scientific community believe that any exposure to asbestos involves some health risk. No safe level of exposure (or threshold exposure level) has been established." EPA Asbestos-Containing Material in School Buildings at 1 (1979) [Attachment V].
- "OSHA is aware of no instance in which exposure to a toxic substance has more clearly demonstrated detrimental health effects on humans than has asbestos exposure...a significant risk of asbestos-related disease would exist even under a standard having a permissible exposure limit of .1 f/cc." 51 C.F.R. at 22615-22648 (1986) [Attachment W].
- "[I]t cannot be assumed that any exposure, no matter how small, to asbestos is safe...the dangers posed to human health by asbestos are notorious and have been so for many years." United States Third Party Submission re: Measures Affecting Asbestos and Products Containing Asbestos at 5, 21 (1999) [Attachment X].
- "All forms of asbestos are hazardous, and all can cause cancer." ATSDR [Attachment Y].
- "If disturbed, the asbestos fibers in vermiculite attic insulation may get into the air. These fibers can be inhaled and become trapped in the lungs where they may cause diseases such as asbestosis, lung cancer, and mesothelioma. These diseases can develop many years after exposure to asbestos." EPA Fact Sheet [Attachment L].
- "Disturbed vermiculite attic insulation can create a potential asbestos exposure risk to consumers." EPA Pilot Study [Attachment Z].
- "Asbestos has long been recognized as a human health hazard." Washington State Department of Health [Attachment J].

14

- "The risk of lung cancer and mesothelioma increases with the number of fibers inhaled." EPA – Asbestos in Your Home [Attachment AA].
- "Each time you breathe asbestos fibers into your lungs you increase the chance of developing health problems." EPA Region 10. [Attachment BB]

of airborne asbestos, whenever possible, is a bedrock normative standard espoused by

every public and private health agency that has had occasion to issue advice on the

subject.[15]

The recent launching by the EPA and ATSDR of a "National Consumer

Awareness Campaign" regarding asbestos-contaminated ZAI and those agencies'

"strong" recommendations impacting homeowners' use of their properties [Attachment

H] dispel all pretense that ZAI claimants' property damages can be dismissively ignored

as fanciful.

Nor, in the end, would Grace's argument absolve Grace of liability were one to

embrace the fiction that public concern for avoiding asbestos is baseless. Grace's legal

position, it is noteworthy, is proffered without aid of any legal authority from any

jurisdiction that a defendant may evade liability for real property damage it has caused by

critiquing marketplace factors driving those damages. Whether marketplace aversion to

---

- "Continued exposure increases the amount of fibers that remain in the lung." "Limiting the number of trips you make to your attic and shortening the length of those trips can help limit your potential exposure." EPA/ATSDR Current Best Practices [Attachment H].
- "[T]he more you are exposed to asbestos and the more fibers that enter your body, the more likely you are to develop asbestos related problems. While there is no "safe level" of asbestos exposure, people who are exposed more frequently over a long period of time are more at risk." University of Mississippi Website. [Attachment CC].
- "[T]he more you are exposed to asbestos and the more fibers that enter your body, the more likely you are to develop asbestos related problems. While there is no "safe level" of asbestos exposure, people who are exposed more frequently over a long period of time are more at risk." Oklahoma State University Website. [Attachment DD].
[15]
- "DO NOT DISTURB IT. Any disturbance has the potential to release asbestos fibers into the air." EPA/ATSDR – Current Best Practices. [Attachment H].
- "The most important way that families can lower their exposures to asbestos is to be aware of the sources of asbestos in their homes and avoid exposure to these sources." ATSDR – Public Health Statement: Asbestos. [Attachment Y].
- "Asbestos is harmful to human health if inhaled, and you should minimize exposures whenever possible." EPA – Libby Asbestos Superfund Site. [Attachment M].
- "[I]nhalation of the asbestos fibers should be avoided." Washington State Dept. of Health. [Attachment J]

-12-

airborne asbestos is well founded, or for that matter a point of pure preference, is legally and factually immaterial both to causation and to Grace's culpability. Where shared community perceptions impact real property values, a defendant whose actions brings those community perceptions to bear is not at liberty to conditionally challenge community perceptions.[16] Moreover, Grace's own heath risk assessment, when modestly corrected for only a few of its many deficiencies, produces results that would fuel marketplace aversion to ZAI, rather than show that aversion to be "erroneous perceptions." *See* Response of ZAI Claimants to Grace's Motion for Summary Judgment.

Particularly here, where Grace was fully mindful of marketplace aversion to asbestos-contaminated building products,[17] predicted that disclosure of asbestos

---

- "Substances such as radon, asbestos, and solvents also can be harmful if inhaled. Women should be aware of these agents and their effects and try to reduce or minimize exposure to them." American Medical Women's Association website. [Attachment EE]

[16]In the landmark opinion *Everett v. Paschall*, 61 Wash. 47, 50-51, 111 P. 879, 880 (1910), the Court wrote with respect to property value damage resulting from community perceptions regarding a tuberculosis sanitarium: "Waiving for the present the substantial pecuniary damage which the court found to exist, and addressing ourselves to the principle underlying the lower court's decree—that is, that the danger being only in the apprehension of it, a fear unfounded and unsustained by science, a demon of the imagination—the courts will take no account of it. If dread of the disease and fear induced by the proximity of the sanitarium, in fact, disturb the comfortable enjoyment of the property of the appellants, we question our right to say that the fear is unfounded or unreasonable, when it is shared by the whole public to such an extent that property values are diminished. The question is, not whether the fear is founded in science, but whether it exists; not whether it is imaginary, but whether it is real, in that it affect the movements and conduct of men." *See also Ferry v. Seattle*, 116 Wash. 648, 203 P. 40 (1922). In the situation of ZAI, of course, the Court is not confronted with a marketplace driven by erroneous and ill-informed fears, but a situation where the nation's highest public health agencies have, following extensive scientific investigation, felt compelled to weigh in by implementing a nationwide campaign to communicate strong recommendations to the public regarding exposure to ZAI.

[17]*See* Corrected Zonolite Attic Insulation Claimants' Memorandum in Support of Motion for Partial Summary Judgment re: Grace's Consumer Protection Liability: "While we have no evidence of any adverse effects of our [vermiculite] products on consumers, neither can we offer convincing evidence that they are absolute safe ... This leaves us open to liability without a good defense over a broad range of alleged hazards." *Wood to Brookes, et al.*, May 24, 1977 Memo at 17-18 [Attachment FF].

-13-

contamination of ZAI would kill ZAI sales,[18] chose to conceal asbestos contamination of ZAI[19], and went so far as to predict that ZAI would ultimately be "banned,"[20] Grace cannot feign surprise at resulting harm or colorably disclaim responsibility for resulting contamination and injury to the property interests of homeowners. *See also* Statement of Facts Section of *Corrected Zonolite Attic Insulation Claimants' Memorandum in Support of Motion for Partial Summary Judgment re: Grace's Consumer Protection Liability.*

## V. **CONCLUSION**

Grace's motion to disallow Dr. Kilpatrick's testimony is grounded on multiple erroneous premises: an erroneous rewording of the Court's discovery order; an erroneous characterization of Dr. Kilpatrick's important causation testimony as merely addressing damages; and the erroneous legal position that a profligate corporation can knowingly sell an asbestos-contaminated product, without disclosing that contamination, and then avoid liability for foreseeable property damages by criticizing the marketplace.

Grace's motion should be denied. Grace's failure to timely bring its motion at the earliest possible moment defeats any excuse that Grace should at this late date be permitted to now begin preparing countervailing expert testimony.

---

[18] "It is believed that product labeling would have a serious, adverse, and irreversible effect upon consumer acceptance of our products." May 17, 1976, *R.H. Locke "Binder Development Program,"* at 1 [Attachment GG].

[19] "[I] have doubts as to whether the caution labels are very helpful to our case ... The caution label used on attic insulation does not specifically identify asbestos and, accordingly, could be viewed by the CPSC as being inadequate warning of the risk which may be associated with use of this product." March 27, 1980, *Memo from O.M. Favorito to E.S. Wood*, at 1 [Attachment HH].

[20] "We forecast that our vermiculite consumer products, namely Attic Insulation...will eventually be banned by the Consumer Product Safety Commission." *Wood to Brookes, et al.*, May 24, 1977, p. 14. [Attachment FF]

Dated: August 7th, 2003.

Respectfully submitted,

By: _____
    Darrell W. Scott
    Burke D. Jackowich

LUKINS & ANNIS, P.S.
717 W. Sprague, Suite 1600
Spokane, WA  99201
Telephone:  (509) 455-9555
Facsimile:  (509) 747-2323

Edward J. Westbrook
Robert M. Turkewitz
RICHARDSON PATRICK
WESTBROOK & BRICKMAN LLC
1037 Chuck Dawley Blvd., Bldg. A
Mt. Pleasant, SC  29464
Telephone:  (843) 727-6500
Facsimile:  (843) 727-6688

Special Counsel for ZAI Claimants

William D. Sullivan
ELZUFON AUSTIN REARDON
TARLOV & MONDELL
300 Delaware Avenue
Suite 1700
P.O. Box 1630
Wilmington, DE  19899-1630
Telephone:  (302) 428-3181
Facsimile:  (302) 428-3180