UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: ) | Chapter 11 |
| ) | |
| W.R. GRACE & CO., et al., ) | Bankruptcy No. 01-01139 (JKF) |
| ) | Jointly Administered |
| Debtors. ) | |

**DECLARATION OF JOHN A. KILPATRICK, Ph.D. IN SUPPORT OF ZAI CLAIMANTS' RESPONSE TO DEBTORS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF ANY ALLEGED DAMAGES FROM THE ZAI SCIENCE TRIAL**

John A. Kilpatrick, Ph.D., makes the following declaration:

1. I am over the age of 18, competent to testify, and provide the following information of my own personal knowledge.

2. As cited in my original affidavit, Gamble and Downing (1982)[1] were among the first to examine the impact of contamination on residential real estate, analyzing the effects of the March, 1979, nuclear accident at Three Mile Island on nearby home values. They compared 583 residences within 25 miles of the plant with homes in a control neighborhood 75 miles away, both before and after the accident occurred using a hedonic model to isolate the pricing impacts of the event.[2] Notably, their research was not predicated by any particular incidence of disease, nor was the result (that there was a realized harm to value) contingent on the actual amount of harm--only that harm did measurably occur.

---

[1] Gamble, H.B., and R.H. Downing, "Effects of Nuclear Power Plants on Residential Property Values," Journal of Regional Science, 1982, 457-478.

[2] A hedonic model is a multiple regression equation used for disaggregating the price paid for multi-dimensional commodities into their component parts.

-1-

3.  The appraisal profession in the United States began recognizing the negative impact of environmental contamination on property value shortly thereafter, and soon thereafter the literature was replete with guidance to aid appraisers tasked with examining the harm caused by such contamination.[3]

4.  For example, the American Institute of Real Estate Appraisers, in a 1988 official guidance to appraisers, noted that "...leaking underground storage tanks (LUSTS) and spills and overfills from tank systems can cause severe contamination of subject properties and surrounding parcels and seriously affect the value of those properties."[4] Again, neither the degree of harm nor the incidence of disease is a fundamental issue. Patchin (1988), noted that leaking underground storage tanks have a negative effect on real estate and that even "...mildly contaminated [sites] can be expected to suffer reduced marketability."[5] A subsequent study conducted by Gamble and Downing (1984), revealed evidence that the prices of building lots were lower near landfills and that the values for residential properties located on the main access road serving the landfills were lower than other properties in the area.[6]

---

[3] Kinnard, William N. and Elaine M. Worzala, "How North American Appraisers Value Contaminated Property and Associated Stigma," The Appraisal Journal, July 1999, 269-279.

[4] American Institute of Real Estate Appraisers; Research Department, Underground Storage Tanks: Basic Information For Appraisers (Illinois: National Association of Realtors, 1988), 3.

[5] Patchin, Peter J., "Valuation of Contaminated Properties," The Appraisal Journal (January 1988), 10.

[6] Hays B. Gamble, Hayes, B. and Roger H. Downing, Effects of Sanitary Landfills on Property Values and Residential Development (University Park, PA: Institute for Research on Land and Water Resources 1984), 7.

5. Since that time, appraisal methodology has evolved rapidly, and by the late 1980's, American appraisers universally recognized several truths about contaminated property:[7]

1. A property may be affected by either on-site contamination or proximate (that is, nearby) contamination.
2. The methodology which had evolved for Eminent Domain appraisal analysis proved to be the most useful for evaluating contaminated properties.
3. The cost of remediation is not, by itself, a sufficient proxy for the diminution in market value, since at equilibrium contaminated properties sell for less than the difference between unimpaired value and the cost of remediation. This difference is called "stigma."
4. The market explicitly recognizes that remediation is often not a full cure, and hence post-remediation properties continue to suffer from a degree of stigma.

6. Subsequent advances in appraisal standards and methodology have helped give definition to these axioms and in 2003, the Appraisal Standards Board incorporated this into Advisory Opinion 9 of the Uniform Standards of Professional Appraisal Practice.

7. Patchin (1991) was also the first to show that the decline in value is often greater than the cost-to-cure suggests.[8] Mundy (1992a) identifies this phenomenon as "stigma," a term which has continued in the lexicon to this day.[9] In his definition, Mundy (1992a) was also the first in the valuation literature to list specific criteria for stigma,[10] which are:

---

[7]Kilpatrick, John A., and Bill Mundy, "Appraisal of Contaminated Property in the United States," Journal of the Japan Real Estate Institute, forthcoming.
[8]Patchin, P.J., "Contaminated Properties-Stigma Revisited," The Appraisal Journal, 1991, 167-172.
[9]Mundy, Bill, "Stigma and Value," The Appraisal Journal, 1992a, 7-13.
[10]While Mundy (1992a) was the first in the valuation literature to present these, he correctly cites the authorship of this from the sociology literature: Edelstein, Michael, Contaminated Communities: The Social and Psychological Impacts of Residential Toxic Exposure (Boulder, Colorado: Westview Press, 1988), 6.

- Disruption
- Concealability
- Aesthetic Effect
- Responsibility
- Prognosis
- Degree of Peril
- Level of Fear

8. These seven criteria, collectively, represent the necessary and sufficient conditions for stigma.[11]

9. Mundy (1992b) later showed that the diminution in market value can be attributed to two different factors: a *marketability effect* and an *income effect*, neither of which require a linkage to actual risk of disease nor is the causation predicated on an actual determination of diminution in value. He attributed the former to the increased marketing period for the asset; even in the absence of a decrease in selling price, value is diminished due to the increased time necessary to realize liquidity as well as an increase in the discount rate to account for higher risks of holding a relatively illiquid asset.[12] Notably, this proves an unreasonable risk of harm to value -the present value of the asset - even without a diminished price of the asset.

10. In summary, Grace has either misunderstood or misconstrued the science with respect to valuation. Cause and effect are frequently determined together, but not necessarily so. Appraisers can, and in fact frequently do, measure effect without attributing a specific cause. Of more direct impact on this case, however, appraisal methodology as practiced today - the "science" of valuation - provides sufficient theoretical and empirical support to allow us to causal links before attempting to measure empirical results.

---

[11]Kilpatrick and Mundy, op. cit.
[12]Mundy, Bill, "The Impact of Hazardous Materials on Property Value," The Appraisal Journal, 1992b, 155-162.

11. As for the supposition that an unreasonable risk of harm to real estate values be predicated on a proof of disease, this flies totally in the face of over twenty years of valuation literature. Appraisers are empirical economists, and as such are focused on observable valuation data. The valuation literature is replete with well developed, well documented, and well defended empirical studies proving that an environmental impairment such as ZAI causes harm to real estate values without any establishment of a proof of disease. Thus, a determination that the presence of ZAI causes an unreasonable risk of harm to the value of real estate requires neither the measurement of the actual harm itself nor is it dependent on the proof of disease.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 7, 2003.

*[signature]*
JOHN A. KILPATRICK, Ph.D.