UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Bankruptcy No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |

## APPENDIX TO RESPONSE OF ZAI CLAIMANTS TO DEBTORS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF ANY ALLEGED DAMAGES FROM THE ZAI SCIENCE TRIAL

Darrell W. Scott
Burke D. Jackowich
LUKINS & ANNIS, P.S.
717 W. Sprague, Suite 1600
Spokane, WA 99201

Telephone: (509) 455-9555
Facsimile: (509) 747-2323

William D. Sullivan
ELZUFON AUSTIN REARDON TARLOV &
MONDELL
300 Delaware Avenue
Suite 1700
P.O. Box 1630
Wilmington, DE 19899-1630

Telephone: (302) 428-3181
Facsimile: (302) 428-3180

Edward J. Westbrook
Robert M. Turkewitz
RICHARDSON PATRICK WESTBROOK &
BRICKMAN LLC
1037 Chuck Dawley Blvd., Bldg. A
Mt. Pleasant, SC 29464

Telephone: (843) 727-6500
Facsimile: (843) 727-6688

# TABLE OF CONTENTS

## EXHIBIT

Excerpts from Transcript of August 26, 2002, Motions Hearing Before The
Honorable Judith K. Fitzgerald ........................................................................................... A

October 21, 2002, Order ....................................................................................................... B

Excerpts from Transcript of July 22, 2002, Motions Hearing Before The Honorable
Judith K. Fitzgerald ............................................................................................................. C

Excerpts from May 6, 2003, Deposition of John A. Kilpatrick ........................................... D

Grace Proposed Order Setting Initial Schedule For Litigation Concerning Alleged
Zonolite Attic Insulation Product Risk (dated April 29, 2002) ........................................... E

Grace Proposed Order Setting Initial Schedule For Litigation Concerning Zonolite
Attic Insulation Science Issues (dated July 22, 2002) ......................................................... F

John A. Kilpatrick Expert Report (dated March 14, 2003) ................................................. G

EPA/ATSDR *Current Best Practices for Vermiculite Attic Insulation* (May, 2003) ........ H

Wisconsin Department of Health, Human Health Hazards: *Vermiculite Insulation* .......... I

Washington State Department of Health: Resources *on Asbestos in Vermiculite
Insulation* ............................................................................................................................. J

Minnesota Department of Health: Vermiculite *Insulation* ................................................. K

EPA Environmental Fact Sheet: *Asbestos in Attic Insulation* ........................................... L

EPA Libby Asbestos Superfund Site: Community *Information and Involvement
for Libby Residents* ............................................................................................................. M

Puget Sound Clean Air Agency: *Asbestos and Demolition* ............................................... N

Excerpts from March 3, 2003, Deposition of Shawn Dillon ............................................... O

Excerpts from February 24, 2003, Deposition of Clarke Russ ........................................... P

Excerpts from February 27, 2003, Deposition of Gladwin Worden .................................... Q

Affidavit of Paul Price (April 30, 2003) ............................................................................. R

Declaration of Dan Wiens in Support of ZAI Claimants' Response to Debtors' Motion In Limine to Exclude Evidence of Any Alleged Damages from the ZAI Science Trial (August 8, 2003) .................................................................................... S

Excerpts from February 27, 2003, Deposition of Ralph Busch ........................................ T

NIOSH, *Revised Recommended Asbestos Standard* ............................................................ U

EPA: *Asbestos-Containing Materials in School Buildings: A Guidance Document* (March 1979) ..................................................................................................................... V

Federal Register: *Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite; Final Rules,* June 20, 1986 (OSHA, 51 C.F.R. at 22615-22648) ............. W

Third Party Written Submission of the United States: *European Communities – Measures Affecting Asbestos and Products Containing Asbestos* (May 28, 1999) ........... X

ATSDR: Public Health Statement for Asbestos (September 2001)..................................... Y

*EPA's Pilot Study to Estimate Asbestos* Exposure *from Vermiculite Attic Insulation* (May 21, 2003) .................................................................................................. Z

EPA: *Asbestos in Your Home* ......................................................................................... AA

EPA Region 10: *Vermiculite* Homepage ........................................................................ BB

The University of Mississippi Website: *When is Asbestos Dangerous?* ......................... CC

The Oklahoma State University Website: *Asbestos Awareness* ...................................... DD

American Medical Women's Association Website: *Keeping the Respiratory System Healthy* ................................................................................................................. EE

Confidential Memorandum from E.S. Wood to C.E. Brookes, et al., regarding Tremolite in Vermiculite (May 24, 1977)....................................................................... FF

*Binder Development Program*, from R.H. Locke (May 17, 1976) ................................... GG

Confidential Legal Memorandum from O.M. Favorito to E.S. Wood regarding Asbestos in Consumer Products (March 27, 1980) .......................................................... HH

# ATTACHMENT A

FILED

2002 SEP -9 AM 11: 20

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

1

2

3

4    IN RE:                          .        Chapter 11

5    W.R. Grace & Co., et al.,       .

6         Debtor(s).                 .        Bankruptcy #01-01139 (JKF)

7    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

8                              Wilmington, DE
                              August 26, 2002
9                               10:00 a.m.

10                   TRANSCRIPT OF MOTIONS HEARING
              BEFORE THE HONORABLE JUDITH K. FITZGERALD
11                UNITED STATES BANKRUPTCY JUDGE

12   APPEARANCES:

13   For Debtor:                     David Bernick, Esq.
                                     Kirkland & Ellis
14                                   200 E. Randolph Drive
                                     Chicago, IL 60601
15
                                     Janet S. Baer, Esq.
16                                   Kirkland & Ellis
                                     200 E. Randolph Drive
17                                   Chicago, IL 60601

18                                   David W. Carickhoff, Jr., Esq.
                                     Pachulski, Stang, Ziehl,
19                                   Young & Jones
                                     919 North Market Street
20                                   Wilmington, DE 19801

21                                   Paula A. Galbraith, Esq.
                                     Pachulski, Stang, Ziehl,
22                                   Young & Jones
                                     919 North Market Street
23                                   Wilmington, DE 19801

24

25

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*



1  claim that would want to.  They really ought to be here if

2  their buildings gonna get litigated.

3        THE COURT:  Yeah, that's what I think.  If they want

4  in, then I'm happy to put them in.  But it has to be done in a

5  fashion that permits everybody to get involved in the

6  discovery on those same buildings.

7        MR. WESTBROOK:  And just for instance, Your Honor,

8  there may be buildings that Grace has done some testing in

9  which are not buildings of these 10 Claimants.  But we may

10  discover something in discovery about that testing that we'd

11  like to bring before the Court.

12        THE COURT:  You may.

13        MR. WESTBROOK:  Okay.

14        THE COURT:  And as I said, with respect to relevancy

15  I can't issue rulings on relevancy until I hear the context in

16  which the evidence is brought.  So I simply can't address that

17  now.

18        MR. WESTBROOK:  Thank you, Your Honor.  May I confer

19  with Mr. Bernick for a minute?

20        THE COURT:  Yes.

21     (Pause in proceedings)

22        MR. BERNICK:  Your Honor, all the other entries on

23  the agenda pertain to quarterly fee applications.  And I don't

24  know what the Court's pleasure is with respect to them.

25        THE COURT:  Why don't we take a minute and get caught

1  up --

2       MR. BERNICK:  Sure.

3       THE COURT:  -- with this issue first, Mr. Bernick?

4  All right.  I'm going to get from Mr. Baena a copy of the

5  Order that I entered.  And then compare it to the other two

6  Orders, I guess, that have been presented.  And I will modify

7  it to add the ability of the Property Damage to file their

8  motions if they choose.  I don't think I need to do anything

9  with respect to the Claimants if it's an evidentiary

10 principle.  Is that everything, Mr. Westbrook?

11      MR. WESTBROOK:  From memory, Your Honor, the only

12 other differences following the hearing when we submitted our

13 Order, we've framed the issue as it says in the context of a

14 property damage case, whether ZAI presents an unreasonable

15 risk, we tried to track the language from the transcript.  And

16 the Court will see that when it compares our Order with

17 Grace's Order.

18      MR. BERNICK:  That is a sore subject, because we've

19 been over that like nine times, and argued that very issue

20 very specifically, and then negotiated it out.

21      THE COURT:  Well, hopefully I did it myself within

22 the context of the hearing.  If I didn't, then I'll take a

23 look at that.  I was trying very hard not to set the parameter

24 for what the issues would be until the discovery is done.  I

25 think the appropriate place to look at that is at the pre-

1  trial conference.

2      MR. BERNICK:  We can live with that.

3      THE COURT:  Okay.  Because I think after discovery we

4  may be able to frame the issue a little bit better than we can

5  now anyway.  Okay.  All right, fee applications.

6      MR. BERNICK:  Fee applications.  I've not done this

7  with the Court before, and I don't know what your preferred

8  procedure is.  There are quite a number of them.  And --

9      THE COURT:  Well, with respect to -- first of all, my

10  preferred procedure is to get from somebody -- I don't know if

11  this is gonna be Mr. Smith or you, Mr. Bernick, but one Order

12  that will address all the fees in an Omnibus Order so that I

13  can get them addressed by period.  So you or Mr. Smith can

14  work out how that will be proffered.  But I would like to get

15  one Order after I get through the allowance process.  For

16  today's purposes I have not had any objections to Mr. Smith's

17  report with respect to #10 -- these are agenda items -- #10,

18  #12 through 18, #20 through 31, I believe.  I think I need

19  hearings on 11 -- I'm sorry, I thought -- 16 I believe I did

20  get a response in.  I'm sorry.  I have a different issue with

21  16.  I literally cannot read it.  The print is too small.  And

22  I literally cannot read Mr. Smith's final report because he

23  incorporates some responses that he got from whomever's

24  application that is.  And the way they're put into the report,

25  the print is too small.  I can't read it.  As a result, I have

# ATTACHMENT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR DISTRICT OF DELAWARE

IN RE:                              (
                                    (
W.R. Grace & Co. *et al.*           ( Bankruptcy No. 01-1139
                                    (
                                    (
        Debtor(s)                   ( Chapter 11
                                    ( Related to Dkt. #2193, 2375
                                    ( Related to July 22, 2002, Agenda No. 13
                                    (

### ORDER

AND NOW, this __21__ day of __October__, 2002,

WHEREAS this Court held several hearings, including one on July 22, 2002, on the above captioned Agenda No. 13 and entered a scheduling order which modified the order Debtors' counsel presented in the hearing binder;

WHEREAS a modified scheduling order entered at the July 22, 2002, hearing on Agenda No. 13 was not docketed and cannot be located by the Court or the parties;

WHEREAS the Court has reviewed the transcripts concerning Agenda No. 13, and the proposed orders submitted by various parties,

NOW, THEREFORE, IT IS ORDERED that the scope of discovery will be limited to what science demonstrates with regard to whether ZAI creates an unreasonable risk of harm. Any discovery disputes shall be handled in accordance with the Federal Rules of Bankruptcy Procedure, the Local Rules for the Bankruptcy Court for the District of Delaware, the procedures of this Court and any orders entered by this Court.

It is FURTHER ORDERED that the discovery schedule is as follows:

1

AO 72A
(Rev.8/82)

(1)     Fact discovery ends December 31, 2002;

(2)     ZAI claimants' expert report is due January 15, 2003;

(3)     Debtors' expert report is due January 31, 2003;

(4)     Depositions of ZAI claimants' experts are to be conducted from February 3, 2003, to
        February 28, 2003;

(5)     Depositions of Debtors' experts are to be conducted from March 3, 2003, to March 31,
        2003;

(6)     Debtors shall file and ZAI claimants may file a Rule 42 consolidation motion together
        with related Daubert/summary judgment motions by April 30, 2003;

(7)     Responses are due May 26, 2003;

(8)     Replies are due June 6, 2003. Replies are limited to 10 pages;

(9)     Argument will be in Pittsburgh, Pennsylvania, Courtroom A, 5490 US Steel Tower,
        600 Grant Street, on June 30, 2003, and July 1, 2003, at 9:00 a.m.at which time the
        Court will address further pretrial matters.

        **IT IS FURTHER ORDERED** that consideration of matters relating to class

certification is postponed until further Order.

Judith K. Fitzgerald
United States Bankruptcy Judge

2

# ATTACHMENT C

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .        Chapter 11
                                .
W.R. Grace & Co., et al.,       .
                                .
        Debtor(s).              .        Bankruptcy #01-01139
(JKF)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. .

Wilmington, DE
July 22, 2002
9:56 a.m.

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtor:                     David W. Carickhoff, Jr.,
Esq.

                                Pachulski, Stang, Ziehl,
                                Young & Jones
                                919 North Market Street
                                Wilmington, DE 19801

                                James W. Knapp, Esq.
                                Kirkland & Ellis
                                200 E. Randolph Drive
                                Chicago, IL 60601

                                David Bernick, Esq.
                                Kirkland & Ellis
                                200 E. Randolph Drive
                                Chicago, IL 60601

                                Janet S. Baer, Esq.

83

issues --

MR. BERNICK: Right.

THE COURT: -- now. Unless you can't prove the
unreasonable risk without also showing the damage. I --
most liability trials like this bifurcate the concept of
liability from damage, and it seems to me we're looking at,
in phase one, liability. But we're looking at only a
subset of liability, which is whether the experts are going
to be able to demonstrate that under any theory there is
the possibility that Zonolite caused an unreasonable risk
of harm. If the determination is yes, then I think the
claimants have to prove under what theory the particular
claimant suffers some harm, and then show damages. But
don't we have to get to the issue first of whether there is
an unreasonable risk of harm? I am looking for a narrow,
focused trial on that subject matter. That's what I was
attempting to get to.

Now, I don't know --

MR. BERNICK: Yeah. Our --

THE COURT: -- where the Debtor stands, I don't
know where other Committee stands. That's what I thought
would make a logical litigation strategy.

MR. BERNICK: That's where we've been ever since
you suggested it in March. That's why we came up with the
idea of having the claimants come before the Court to

90

scientific evidence that asbestos fibers in Zonolite

products do pose an unreasonable risk of harm.   But I

really want to limit this trial to that issue.   That's

number one.

        Number two, the budget that I'm keeping your feet

to the fire on probably isn't going to support much more

than that anyway.   So, I think maybe it would be a good

idea to limit the scope to that issue.

        MR. WESTBROOK:   Yes.   Your Honor, the language is

not necessarily the problem, as long as we have an

understanding that from out standpoint at least, what we're

focusing on is the building and contamination of the

building and whether if asbestos in a building is not from

ZAI, is not innocuous, whether there's a cost to clean that

up now or down the road.   That's what we're concerned

about, the contamination and whether something has to be

done about it.

        MR. BERNICK:   That's the problem is that of course

if you said about the -- what's it take to clean it up,

it's always gonna cost something to clean it up.   The

question is whether it's necessary to clean it up.   That's

the question of liability and question of damages is a

clean-up question, that's for later on.

        THE COURT:   All right.   That I agree with.   I don't

think we want to go to the question of how much does it

cost to clean it up, yet. I think what we want to go to

is, is it necessary or even advisable to clean it up, and

possibly, what are alternative methods, because that may

also affect damages. But, for example, the Debtor may say

that it can be encapsulated and your position may be no,

the building has to be torn down. Somewhere in between may

be a reasonable scope. I don't know. I don't know

anything about this yet. I'm hoping you're going to inform

me about it as we go on. So, these comments are not

judging anything. I'm just hypothesizing that there could

be a lot of things that come out at this trial, and I don't

think it's necessary to get to the aspect of damages yet.

MR. WESTBROOK: Okay. That's fine, Your Honor. I·

think the language with that understanding, the language

doesn't bother us, as long as it doesn't come back at some

hearing in some limitation on what we're trying to

discover.

THE COURT: Well, if it does, and you disagree with

it, you'll file some motion and it'll get heard.

MR. WESTBROOK: Thank you, Your Honor.

THE COURT: All right. Can you live with the

schedule that the Debtor has proposed now? This is -- fact

discovery ends December 2, expert disclosure is January 2

by the ZAI claimants and by Grace January 31, depositions

of ZAI experts from February 3 to February 28, and of

# ATTACHMENT D

# CONDENSED TRANSCRIPT

IN THE UNITED STATES BANKRUPTCY COURT
FOR DISTRICT OF DELAWARE

IN RE:

W.R. Grace & Co., et al.          Bankruptcy No. 01-1139

        Debtor.          Chapter 11

Related to Dkt. #2193, 2375
Related to July 22, 2002,
Agenda No. 13

---

DEPOSITION OF JOHN A. KILPATRICK
Taken on behalf of the Debtor
May 6, 2003

- - -

BE IT REMEMBERED THAT, pursuant to the Washington
Rules of Civil Procedure, the deposition of John A.
Kilpatrick was taken before Judith Cederblom, a Certified
Court Reporter and a Notary Public for the State of
Washington, on May 6, 2003, commencing at the hour of
9:05 a.m., the proceedings being reported at 1601 Fifth
Avenue, Suite 2100, Seattle, Washington.

## NAEGELI REPORTING CORPORATION

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000

Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

National: (800) 528-3335

www.naegelireporting.com

Fax: (503) 227-7123

Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

```
 1   substantive support.
 2        Q.   And what -- you said Mr. Spiess is an analyst.
 3   What is his educational background?
 4        A.   He has a master's in business administration from
 5   the University of Washington, dated 2002.
 6                   And an undergraduate degree in one of
 7   the liberal arts, I'm not sure exactly what from, about
 8   eight years ago.   I can't remember his undergraduate
 9   institution.
10        Q.   And at some point did you become aware of what
11   your -- strike that.
12                   What was your understanding of your
13   assignment in preparing your expert report in this matter?
14        A.   To research the impact that zonolite may have on
15   the value of residences containing zonolite within a
16   reasonable degree of valuation certainty from the perspective
17   of a real estate valuation expert.
18                   (Whereupon, two documents were marked
19   Exhibits-land2 for identification.   Exhibit 1: a 17-page
20   letter and report to Darrell Scott from John Kilpatrick,
21   03/14/03.   Exhibit 2: a 4-page document entitled Reliance
22   Materials, Zonolite Science Trial.)
23        BY MR. TALARICO:
24        Q.   Dr. Kilpatrick, I've had the court reporter mark
25   as Kilpatrick 1 a 17-page document on the letterhead of
```

## NAEGELI REPORTING CORPORATION

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

· Phone: (800) 528-3335   www.naegelireporting.com   Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

1      Q.    What's the subject matter of your expert testimony

2  in this case?

3      A.    Does the presence of zonolite create an

4  unreasonable risk of harm to the value of a residence in

5  which it's contained.

6      Q.    And what particular areas of expertise that you

7  have are germane to answering that question?

8      A.    Well, several.  Of course I'm considered an expert

9  in real estate value and the things which contribute to real

10  estate value and have testified on those matters in state

11  and federal courts of this country.  And so I have a broad

12  general expertise in those issues which contribute to or

13  detract from the value of single family residences.

14              I have very specific expertise in issues

15  which cause impairment of value, different kinds of

16  impairment, such as -- just to name a few, construction

17  defects or defective materials or environmental contamination

18  or external hazards -- and have testified on specific issues

19  as they relate to those.

20              I have a very specific expertise in

21  residential dwellings, the construction thereof.  I'm the

22  author of Understanding Home Construction, which is the

23  authoritative guide on the subject published by the National

24  Home Builders Association, as well as other books, articles,

25  and lectures on the home building process and how houses go

**NAEGELI REPORTING CORPORATION**

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

1      together.  And have testified as to construction and

2      construction defects matters in various courts and tribunals.

3                         And I think all of that combined, plus

4      my broad academic experience, my understanding of what

5      establishes necessary and sufficient conditions within this

6      field of science, real estate valuation, would give me the

7      expertise to opine with respect to these matters.

8          Q.    So the area of science we're talking about is

9      real estate valuation?

10         A.    Yes.

11         Q.    Now, for example, you're not a medical doctor?

12         A.    No.

13         Q.    You're not an industrial hygienist?

14         A.    No.

15         Q.    You're not a microscopist?

16         A.    No.

17         Q.    You're not an engineer?

18         A.    No.

19         Q.    You're not an architect?

20         A.    No.

21         Q.    And you say you've written a definitive book on

22      constructing homes.  Was there someone who wrote it with

23      you, or you wrote it by yourself?

24         A.    Sole author.

25         Q.    And I note that that book isn't referenced in

**NAEGELI REPORTING CORPORATION**

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-3163

Phone: (800) 528-3335      www.naegelireporting.com  ·      Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

1    limited to value questions.

2         Q.    And in other words, you're not going to testify

3    as to whether, in fact, there are any releases of fiber

4    from the ZAI?

5         A.    No.    I'm not testifying to that.

6         Q.    Reading further in Exhibit 1, if you would, you

7    -- I'll just read this one sentence.

8                        It says:    "Note that our research has

9    been conducted within the limits of 'what science

10   demonstrates' as per the methods applicable to our field of

11   expertise, real estate economics and valuation, pursuant to

12   the Amended Order issued by the Court on November 25th,

13   2002."

14                        Did I read that correctly?

15        A.    Yes.

16        Q.    What specifically are you referring to when you

17   state "within the limits of what science demonstrates"?

18        A.    Well, I'm certainly limiting myself to those

19   hypotheses which have been well examined and well

20   demonstrated within the salient literature.    Things which

21   have met the test of peer review, things which have met the

22   test sufficient for either presentation at academic

23   conferences or publication in the sorts of literature upon

24   which real estate valuation experts rely.

25                        I have not attempted to make speculative

## NAEGELI REPORTING CORPORATION

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335      www.naegelireporting.com      Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

1    arguments or to present untested hypotheses.  So that's what

2    I've attempted to do within the bounds of that phrase.

3          Q.   So when you say "what science demonstrates,"

4    you're talking about the science of real estate valuation?

5          A.   That's correct.

6          Q.   And it's fair to say, isn't it, that none of the

7    documents you reference discuss in any way Zonolite Attic

8    Insulation?

9                    MR. SCOTT:   Object to the form.

10         A.   I can't recall if any of them name zonolite by

11   name.

12         BY MR. TALARICO:

13         Q.   Well, do any of the articles included in your

14   reliance material reference attic insulation?

15         A.   I can't recall if attic insulation is a specific

16   form of asbestos or asbestos-containing material referred to

17   in any of these articles.

18         Q.   And none of the articles you've referenced as your

19   reliance materials discuss asbestos in residential

20   properties?

21         A.   I can't recall whether the real estate referenced

22   in these articles is specific to residential asbestos or

23   commercial building asbestos.

24         Q.   Well, if they referenced either attic insulation

25   or residential -- strike that.

NAEGELI REPORTING CORPORATION

Portland, OR                    Seattle, WA
(503) 227-1544                                      (206) 622-3376

Spokane, WA                                  Coeur d'Alene, ID
(509) 838-6000                                  (208) 667-1163

Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

1    No. 1364, whereas Exhibit 2 went to reference No. 1346; is

2    that right?

3        A.    That's correct.  And I still don't see the Slovic

4    article listed in here.  And I know it's in my office and

5    I can certainly recall sending it forward to you folks.

6                    MR. SCOTT:    Off the record.

7                    MR. TALARICO:    Okay.

8                    (Discussion off the record.)

9        BY MR. TALARICO:

10       Q.    Let's see if we can just short circuit this

11   stuff, Dr. Kilpatrick.

12                   Your use of the word "contamination" is

13   just meant to infer the presence of material?

14       A.    That's correct.

15       Q.    You're not using contamination in an industrial

16   hygiene sense?

17       A.    No.  I'm not attempting to -- I'm not attempting

18   to express an opinion outside of my field of expertise.

19       Q.    Thank you.  If you could turn to Page 5 of

20   Exhibit 1, the last sentence on the bottom of the page, and

21   it's a paragraph entitled Intuitive Toxicology.

22                   And the sentence says:  "As a result,

23   market reactions to impairments, such as contamination, are

24   not monotonically tuned to the degree of contamination, the

25   specific contaminant, or subtle differences in toxicological

NAEGELI REPORTING CORPORATION

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335     www.naegelireporting.com     Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

1    impacts.   Rather, market reactions tend to be generated

2    simply by contamination with a toxic substance, irrespective

3    of the degree of toxicity."

4                    Do you see where I read that?

5         A.    Yes.

6         Q.    When you used the term "not monotonically tuned,"

7    what does that mean?

8         A.    The simplest way to think of that is like a

9    dimmer switch on a light.   You turn it one way, the light

10   goes up; you turn it back the other way, the light goes

11   down.   And the degree of illumination is a function of how

12   far you turn the switch, one way or the other.   A volume

13   knob on a radio monotonically controls the decibel level.

14                   Intuitive toxicology, as it's been

15   studied not by toxicologists but by people in the social

16   sciences, finds that perceptions of risk and thus

17   perceptions of unreasonable risk of harm are more like

18   off/on switches: Either something is there or it's not

19   there.

20                   You hear that something is present, and

21   you turn your back and walk away from it.

22        Q.    And just so I'm clear as to what you're saying,

23   you're saying that it's the perception that can affect the

24   value, not necessarily the health risk?

25        A.    Yes.   That's a good generalization.

**NAEGELI REPORTING CORPORATION**

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335      www.naegelireporting.com      Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

1       Q.   Like, for example, if one assumes that ZAI

2  presents no health risk; however, there's publicity

3  concerning that it is a health risk, the value may still be

4  -- the value of a residence may still be affected based

5  upon a perception?

6       A.   Oh, the literature is replete with examples of

7  that.

8       Q.   But it would be true in this case if one assumes

9  that; right?

10                MR. SCOTT:  Object to the form.

11  BY MR. TALARICO:

12       Q.   Did you understand my question, Dr. Kilpatrick?

13       A.   I understand the question.  If one assumes that

14  hypothetical condition.

15       Q.   Yes.  Yeah, it's a hypothetical.

16       A.   Yeah.

17       Q.   That I asked you to assume that ZAI presents no

18  health risk.

19       A.   If the public interprets it negatively to a

20  sufficient degree, then it could still pose an unreasonable

21  risk of harm to the value of residences.

22                Even if the stuff tastes like chocolate

23  candy and kids ought to eat it every day, nonetheless if

24  parents determine that it's risky or if people have a

25  negative view of it, then it could pose an unreasonable risk

## NAEGELI REPORTING CORPORATION

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000

Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163



Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204



# ATTACHMENT E

RECEIVED
APR 2 9 2002
LUKINS & ANNIS, P.S.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                          )    Chapter 11
                                                )
W. R. GRACE & CO., et al.,[1]                   )    Case No. 01-01139 (JKF)
                                                )
                                                )    (Jointly Administered)
              Debtors.                          )

## ORDER SETTING INITIAL SCHEDULE FOR LITIGATION
## CONCERNING ALLEGED ZONOLITE ATTIC INSULATION PRODUCT RISK

The Court having heard argument from counsel for the Debtors, the Property Damage

Committee and certain counsel representing Zonolite Attic Insulation ("ZAI") claimants as to the

scheduling and management of claims concerning the Debtors' ZAI product during the regularly

scheduled omnibus hearings on March 18, 2002, April 22, 2002, and May 20, 2002, and having

given counsel of record for those individuals who filed ZAI claims prior to the petition date of

April 2, 2001 the opportunity to appear and be heard at the May 20, 2002 hearing, hereby orders

that:

1.        Claims litigation concerning the Debtors' ZAI product shall be limited initially to

the 10 individual claims filed by the Debtors on April 12, 2002 on behalf of the following

individual claimants, all of whom filed ZAI product liability claims against the Debtors prior to

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc., Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

the petition date: Marco Barbanti, Ralph Busch, William Pat Harris, Jan Hunter, Edward M.

Lindholm, James and Doris McMurchie, John and Margery Prebil, Paul Price, John Sufnarowski,

and Stephen B. Walsh. These 10 individual claimants shall hereinafter be referred to as the "ZAI

Claimants."

2.    The Court hereby sets the following schedule to litigate the issue of whether ZAI

poses an unreasonable risk of harm to the ZAI Claimants:

A.    Fact discovery shall be limited to the issue of whether ZAI presently poses an

unreasonable risk of harm to the occupants of the home, and will be conducted from the date of

this Order through September 30, 2002. Unless the discovery cutoff is extended by the Court for

good cause, no fact discovery with a response date after September 30, 2002 shall be allowed.

Motions to the Court for extensions of the time provided by the Federal Rules of Civil Procedure

for responses to document requests, interrogatories, and inspections and testing of property shall

be granted only for good cause shown. Unless good cause is shown for an extension, fact

depositions shall be limited to eight hours of questioning per side, not including questioning time

in depositions taken prior to the bankruptcy filing;

B.    The ZAI Claimants shall serve their FRCP 26(a)(2) expert disclosures on or

before October 1, 2002. Grace shall serve its expert disclosures on or before November 1, 2002.

Depositions of the ZAI Claimants' expert(s) shall be conducted from November 4, 2002 -

November 29, 2002. Depositions of Grace's expert(s) shall be conducted from December 2,

2002 -December 20, 2002;

2

C.    Debtors shall file on or before January 20, 2003, a Rule 42 consolidation motion and related *Daubert*/summary judgment motions, based upon the absence of a reliable scientific basis for the alleged risk of harm to the individual claimants from ZAI. The ZAI Claimants' response is due on or before February 15, 2003; and Debtors' reply is due on or before February 22, 2003. A hearing on these motions would be scheduled for _____, 2003;

D.    In the event that the Court finds any material disputed facts, an FRCP 42 common issue bench trial would be conducted as soon as the Court's schedule allows to decide the unresolved issues. The Court shall, if necessary, set the date for the final pretrial conference at the conclusion of the hearing on the *Daubert*/summary judgment motions;

E.    The Court hereby postpones further consideration of matters relating to class certification until the conclusion of the proceedings outlined above.


_____, 2002
Wilmington, Delaware

                                        _____
                                        The Honorable Judith K. Fitzgerald
                                        United States Bankruptcy Court Judge


3

# ATTACHMENT F

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                      )    Chapter 11
                                            )
W. R. GRACE & CO., et al.,[1]               )    Case No.: 01-01139 (JKF)
                                            )    (Jointly Administered)
       Debtors.                      )
                                            )    Re: Docket No. 1981

## ORDER SETTING INITIAL SCHEDULE FOR LITIGATION CONCERNING ZONOLITE ATTIC INSULATION SCIENCE ISSUES

The Court having heard argument from counsel for the Debtors, the Property Damage

Committee and certain counsel representing Zonolite Attic Insulation ("ZAI") claimants as to the

scheduling and management of claims concerning the Debtors' ZAI product during the regularly

scheduled omnibus hearings on March 18, 2002, April 22, 2002, May 20, 2002, June 18, 2002

and July 22, 2002 and having given counsel of record for those individuals who filed ZAI claims

prior to the petition date of April 2, 2001 the opportunity to appear and be heard at the May 20,

2002 hearing and thereafter, hereby orders that:

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

1.      Claims litigation concerning the Debtors' ZAI product shall be limited initially to the 10 individual claims filed by the Debtors on April 12, 2002 as amended by certain claimants on May 30, 2002 and objected to on June 10, 2002 on behalf of the following individuals claimants, all of whom filed ZAI product liability claims against the Debtors prior to the petition date: Marco Barbanti, Ralph Busch, William Pat Harris, Jan Hunter, Edward M. Lindholm, James and Doris McMurchie, John and Margery Prebil, Paul Price, John Sufnarowski, and Stephen B. Walsh. These 10 individual claimants shall hereinafter be referred to as the "ZAI Claimants."

2.      The Court hereby sets the following schedule to litigate the ZAI science issue:

A.      Fact discovery shall be limited to the issue of what science demonstrates regarding the health risks of exposure to ZAI and will be conducted from the date of this Order through December 31, 2002. Unless the discovery cutoff is extended by the Court for good cause, no fact discovery with a response date after December 31, 2002 shall be allowed. Motions to the Court for extensions of the time provided by the Federal Rules of Civil Procedure for responses to document requests, interrogatories, and inspections and testing of property shall be granted only for good cause shown. Unless good cause is shown for an extension, fact depositions shall be limited to eight hours of questioning per side, not including questioning time in depositions taken prior to the bankruptcy filing;

B.      The ZAI Claimants shall serve their FRCP 26(a)(2) expert disclosures on or before January 15, 2003. Grace shall serve its expert disclosures on or before January 31, 2003. Depositions of the ZAI Claimants' expert(s) shall be conducted from February 3, 2003 - February 28, 2003. Depositions of Grace's expert(s) shall be conducted from March 3, 2003 - March 31, 2003;

-2-

C.    Debtors shall file on or before April 30, 2003, a Rule 42 consolidation motion and related *Daubert*/summary judgment motions, based upon the absence of a reliable scientific basis for the alleged actionable risk of harm to the individual claimants from ZAI. The ZAI Claimants' response is due on or before May 26, 2003, and Debtors' reply is due on or before June 6, 2003. A hearing on these motions would be scheduled for June 30 and July 1, 2003 in Pittsburgh, PA;

D.    In the event that the Court finds any material disputed facts, an FRCP 42 common issue bench trial would be conducted as soon as the Court's schedule allows to decide the unresolved issues. The Court shall, if necessary, set the date for the final pretrial conference at the conclusion of the hearing on the *Daubert*/summary judgment motions;

E.    The Court hereby postpones further consideration of matters relating to class certification until the conclusion of the proceedings outlined above.

_____, 2002
Wilmington, Delaware

                                        _____
                                        The Honorable Judith K. Fitzgerald
                                        United States Bankruptcy Court Judge

-3-

# ATTACHMENT G

# MUNDY ASSOCIATES LLC

ECONOMIC, MARKET, AND VALUATION ANALYSTS
1825 QUEEN ANNE AVENUE NORTH
SEATTLE, WASHINGTON 98109
PHONE 206-623-2935   FAX 206-623-2985
HTTP://WWW.MUNDYASSOC.COM

JOHN A. KILPATRICK, Ph.D.
John@mundyassoc.com

March 14, 2003

Darrell W. Scott, Attorney at Law
Lukins & Annis, PS
1600 Washington Trust Financial Center
717 W. Sprague Avenue
Spokane, Washington 99201-0466

Dear Mr. Scott:

Pursuant to your request, we have examined the economic impact of Zonolite Attic Insulation (ZAI) on the property values of residential dwellings. We have specifically addressed the question, does ZAI create an "unreasonable risk of harm" to the value of these dwellings? Note that our research has been conducted within the limits of "…what science demonstrates…" as per the methods applicable to our field of expertise, real estate economics and valuation, pursuant to the Amended Order issued by the Court on November 25, 2002.

It is our opinion that the unreasonable risk of harm to the value of properties in question is well demonstrated by the salient evidence, including academic research (peer-reviewed literature) and empirical data. We have summarized our research and our qualifications to testify in this matter in the following report.

Thank you for the opportunity to assist you, your colleagues, and your clients.

Sincerely,

MUNDY ASSOCIATES LLC

John A. Kilpatrick, Ph.D.

## Background and Purpose

This report has been prepared in connection with the matter of W.R. Grace & Co., et. Al., (US Bankruptcy Court for the District of Delaware, Case No. 01-01139), and specific ally in response to the Amended Order dated November 25, 2002:

> *"...the scope of discovery will be limited to what science demonstrates with regard to whether ZAI creates an unreasonable risk of harm."*

As real estate economists and valuation experts, our focus will be limited to the methodologies of our field as outlined under *Daubert* and as extended to our field under *Kumho Tire*.[1] Specifically, and for the purposes of this report:

Asbestos is used generically to refer to the asbestos in ZAI (Zonolite Attic Insulation) and all equivalent substances. The real estate valuation profession does not attempt to parse differential valuation impacts among the various trade names of insulating materials which have been shown by other experts to be potentially toxic. WE have made no specific assumptions regarding the material composition of ZAI, but rather have relied on other experts whom we have deemed reliable.

Science refers to the generally accepted methods, techniques, and approaches to valuation which constitute the body of knowledge of our profession and as are currently accepted in the peer-reviewed literature of our profession.

Unreasonable risk of harm refers to an expectation of an economically significant loss in value to real estate as a result of contamination with asbestos (and specifically ZAI) to a reasonable degree of certainty as would constitute acceptable standards of valuation in the real estate and appraisal profession.

## Competency

I am Dr. John A. Kilpatrick, the Managing Partner of Mundy Associates LLC, headquartered in Seattle, Washington. I hold a doctorate in real estate finance from the University of South Carolina and am a Certified General Real Estate Appraiser in several states. I have been qualified as an expert witness in real estate issues in the Federal Courts and other jurisdictions. I am the author of four books on real estate and numerous journal articles and invited talks. My firm has been in business for over a quarter of a century, and our focus is on complex real estate

---

[1] For a thorough explanation of the valuation paradigm under *Daubert* and *Kumho* as it applied to real estate experts in the Federal Courts, see McLean, David, John Kilpatrick, and Bill Mundy, Summation of Evidentiary Rules for Real Estate Experts, Real Estate Issues 24-3, Fall, 1999, 24-33.

valuation problems.  A complete copy of my current Professional Qualifications and prior trial testimony is attached. I am being compensated at a rate of $185 per hour in this case.

## Organization of this Report

The remainder of this report is contained in three main sections.  The first of these subsequent sections establishes the basic principles of real estate value as they apply to home ownership, with a focus on how the qualitative aspects of home ownership translate into the quantitative aspects of valuation. This section will particularly emphasize how the qualitative aspects of home ownership can be negatively impacted by contamination, to set the stage for how such a contamination is a sufficient condition for an unreasonable risk of harm to the value of the home ownership.

The final section presents specific empirical market evidence, generated from academic studies in the peer reviewed literature on the valuation impact of asbestos, and draws conclusions regarding ZAI.  The conclusion of this paper is that ZAI is sufficient for there to be an unreasonable risk of harm of the diminution of value of the real estate.  We also show that even post-remediation, properties which had previously contained ZAI will, to a reasonable degree of certainty with in the rubrics of the valuation profession, suffer an unreasonable risk of harm to market value as a result of post-remediation stigma.

## Value – An Overview Of The Literature

From an real estate economics and valuation perspective, the rights enjoyed by a fee-simple owner fall into three categories:

1.  Right of use
2.  Right of exclusion, and
3.  Right of transfer[2]

Economists are careful to note that property itself is not "owned," but rather the rights of the property are owned.[3] The ability to delineate these rights, and the ability of owners to transfer some or all of these rights voluntarily is a necessary condition for property valuation.

The first of these rights, that of use, is generally interpreted to mean that the owner may determine how property will be used, or if it is to be used at all. The right of use is traditionally

---

[2] While delineated in one fashion or another in many texts, this specific wording derives from Jaffee, Austin J. and Demetrios Louziotis, Jr., "Property Rights and Economic Efficiency", Journal of Real Estate Literature 4, July, 1996, 137-162.

[3] Alchian, Armen A. and Harold Demsetz, "The Property Rights Paradigm", Journal of Economic History 53, March 1973, 16-27. Also, see Demsetz, Harold, "Toward a Theory of Property Rights", American Economic Review 57, May, 1967, 347-373.

limited in western culture by both public restrictions (e.g. -- eminent domain, police power) and private restrictions (e.g. -- liens, mortgages). Private restrictions are generally voluntary, and property owners willingly submit to the disutility of such restrictions in trade for some other economic benefit. For example, a property owner will issue a mortgage to a lender in trade for leverage in the purchase. Also, a homeowner will purchase in a subdivision with covenants and restrictions in trade for the assurance of uniform property use within the neighborhood. It is noteworthy to stress that the voluntary acceptance of private restrictions is always in trade for some economic compensation. Impairment places a restriction on the right of use without some economic compensation. This is illustrated in potential restrictions which may be placed on the use of real estate due to a physical impairment and which can thus limit the property to something less than its highest and best use.

The right of exclusion -- often called the right of exclusive use or right of exclusive enjoyment -- provides that those who have no claim on property should not gain economic benefit from enjoyment of the property. In other words, the right of use is exclusive to the property owner, and any violation of the right of exclusive use typically carries either payment of compensation to the rightful owner or assessment of a penalty. For example, if "A" trespasses on land owned by "B," then "A" will be guilty of a crime and a possible criminal penalty may be in order, as well as civil damages. Physical impairment by a third party is, in effect, a trespass on property rights, violating the right of exclusion.

Society places a high value on the right of exclusion, for justifiable reasons. Exclusion provides that both the current benefits of ownership as well as future benefits accrue only to the rightful owner, and his/her successors and assigns. In the absence of exclusion, the right of use is under constant threat of nullification without just compensation. In an economy without the right of exclusion, property owners would adopt short-term strategies for use, rather than long-term strategies. In an economic sense, this would lead to widespread inefficiency in the allocation of resources. Hence, the right of exclusion carries with it a significant societal 'good'[4], and thus a significant societally recognized value.[5]

Finally, the right of transfer provides the owner with the ability to swap one resource for another. An impairment restricts the right of transfer, and may in fact destroy the right of transfer altogether.

### *Effects of Contamination on Property Values – Economic Theory*

Real estate economics – and appraisal practice – uniformly recognizes that a physical impairment has a negative impact on property values. Indeed, appraisers are required by the Uniform Standards of Professional Appraisal Practice to consider the impacts of such contamination in the value estimation process.[6] Much of the literature on impaired property

---

[4] See, for example, Snare, Frank, "The Concept of Property", <u>American Philosophical Quarterly</u> 9, April 1992.

[5] Stigler, George, "Law or Economics?" <u>Journal of Law and Economics</u> 35, October 1992, 455-469.

[6] This is specifically covered under USPAP Rule 1-2(c). This is one of the rules from which departure is specifically not permitted. In other words, an appraiser may not fail to take physical disutility into account EVEN IF s/he

stems from the many environmentally contaminated property cases studied in academia over the past thirty years.

Fitchen (1989)[7] was one of the first to look at the value of the rights of a property owner in the face of impairment – in this specific case, toxic chemical pollution. As an anthropologist and a Professor of Anthropology at Ithaca College, she looks principally at residential values, not only at the real aspects of "violation of the home" by contamination (e.g. – carcinogenic effects of polluting chemicals) but also about the symbolic interference on what she calls "...a threat to the assumptions people have about themselves and the way life is supposed to be."[8] She continues, "Toxic contamination also attacks the valued institution of homeownership, violating many of the rights that are assumed to flow from the ownership of ones home, including the assumed right to control entry to it...chemical contamination may affect homeowners more seriously than renters, not only in terms of potential financial loss, but also in terms of devaluation of the achieved status of homeowners."

Edelstein (1986) also deals with this "home" theme, and calls impairment to or near a residence an"...inversion of home..." when "...the previous locus of family security and identity becomes instead a place of danger and defilement."[9] He builds on previous works, such as Perin (1977)[10] and Altman and Chemers (1980),[11] who show the very special place the home has in American society, culture, and economics. To quote Perin (1977): "Not being a nation of shopkeepers, America is one of homeowners, busily investing in plant maintenance and expansion with both money and time, keeping the product attractive for both use and sale."[12]

### Intuitive Toxicology

Toxicologists have identified cause and effect relationships between various substances and illness or disease. These linkages are well founded based on science. Human behavior, such as market interactions which result in a market pricing equilibrium, makes a more intuitive interpretation of the underlying science. As a result, market reactions to impairments, such as contamination, are not monotonically tuned to the degree of contamination, the specific

---

discloses such departure from the rules. A thorough discussion of the appraiser's responsibility is also contained in Eaton, J.D., <u>Real Estate Valuation in Litigation</u> (Chicago: The Appraisal Institute, 1995). For specific references, see pages 128, 129, 149-54, and 235-37. It is clear that an appraisal of a residence, which fails to account for a physical deficiency such as soil contamination, would violate the Uniform Standards. As of this writing, all 50 states have adopted these standards as a matter of law. In addition, adherence to these standards is mandatory for all federally-insured mortgage transactions.

[7] Fitchen, Janet M., "When Toxic Chemicals Pollute Residential Environments: The Cultural Meanings of Home and Homeownership," <u>Human Organization</u> 48, Winter, 1989, 313-324.

[8] Roddewig, Richard, "Stigma, Environmental Risk, and Property Values: 10 Critical Inquiries", <u>The Appraisal Journal</u>, 1996, 375-387

[9] Edelstein, Michael R., "Toxic Exposure and the Inversion of the Home", <u>Journal of Architecture Planning and Research</u> 3, 1986, 237-251.

[10] Perin, Constance, <u>Everything in its Place: Social Order and Land Use in America</u> (Princeton: Princeton University Press, 1977)

[11] Altman, I, and M. Chemers, <u>Culture and Environment</u> (Monterey: Brooks/Cole Publishing, 1980)

[12] Perin, op, cit., 120.

contaminant, or subtle differences in toxicological impacts. Rather, market reactions tend to be generated simply by contamination with a toxic substance, irrespective of the degree of toxicity.

As noted by Roddewig (1996), perceptions can have a substantial effect on real estate market behavior, and therefore, price and value. For example:

> *Frazer and Mauss described a belief, widespread in many cultures, that things that have been in contact with each other may influence each other through transfer of some of their properties via an "essence." Thus "once in contact, always in contact," even if that contact (exposure) is brief. Rozin, et al., show that this belief system, which they refer to as a "law of contagion" is common in our present culture. The implication of this work is that even a minute amount of a toxic substance in one's food will be seen as imparting toxicity to the food; any amount of a carcinogenic substance will impart carcinogenicity, etc. The "essence of harm" that is contagious is typically referred to a contamination. Being contaminated clearly has an all-or-none quality to it ~ like being alive, or pregnant. When a young child drops a sucker on the floor, the brief contact with "dirt" may be seen as contaminating the candy, causing the parent to throw it away rather than washing it off and returning it to the child's mouth. This all-or-none quality irrespective of the degree of exposure is evident in the observation by Erikson that "to be exposed to radiation or other toxins...is to be contaminated in some deep and lasting way, to feel dirtied, tainted, corrupted." A contagion or contamination model is obviously very different from the scientist's model of how contact with a chemical induces carcinogenesis or other adverse effects.*[13]

The "law of contagion" helps explain how a home can become significantly stigmatized with the risk of harm to value a contaminant even though property owners may not fully understand or appreciate the subtle nuances of the toxicological effects of the contamination itself.

### *Effects of Contamination on Property Values – Appraisal Literature*

Patchin (1991)[14] was one of the first to note that the decline in market value of a contaminated property may exceed the cost to cure, even when that cost to cure is well defined. Mundy (1992a)[15] builds on this theme and is one of the first to outline the value paradigm for contaminated property damages: the value "before", or "clean", minus the value "after", or "dirty", is the appropriate measure. He goes on to note that, from a mathematical perspective, this difference should represent the cost to cure. However, he notes that in practice properties frequently sell for less than this cost to cure difference. He ascribes this difference as the stigma effect. In Mundy's (1992a) framework, stigma is directly related to the level of uncertainty or risk associated with the contamination.

---

[13] Kraus, Nancy, Torbjorn Malmfors, and Paul Slovic. "Intuitive Toxicology: Expert and Lay Judgments of Chemical Risks," *Risk Analysis*, 12:2 (1992).

[14] Patchin, Peter J., "Contaminated Properties – Stigma Revisited, The Appraisal Journal, 1991, 167-172.

[15] Mundy, B., "Stigma and Value", The Appraisal Journal, 1992a, 7-13.

Mundy (1992b)[16] follows this theme by outlining what is now a widely recognized valuation approach with two components: an income effect and a marketability effect. The income effect measures the lost enjoyment (or income, in the case of non-residential properties) resulting from the contamination. The marketability effect accounts for the losses stemming from additional time-on-the-market, either to rent or to sell. Kilpatrick (1998)[17] builds on this marketability theme and shows that opportunity costs resulting from increased time on the market may in fact exceed cost to cure and income-effect stigma. Mundy (1992c) continues this theme, exploring the quantification of stigma as it impacts the cost of capital and, for non-residential properties, the indicated discount rate on equity[18]. In this study, he notes that adequate transactions data frequently may not be available, and recommends the use of survey research to estimate stigma losses.

Neustein (1992)[19] echoes Mundy (1992b) in observing that the diminution in value resulting from contamination results from both reduced net income and a risk premium adjustment. He applies his risk premium to the capitalization rate and does not distinguish between debt and equity, showing that the cost of both are affected by the increased risk.

Both Patchin (1992) and Mundy (1992a,b.c) suggest that stigma may not be constant over the holding period. Chalmers and Roehr (1993) build on this theme and show that using a differential discount rate over time can accommodate temporal differences in risk[20].

Wilson (1994) stresses other intangibles in the estimation of value diminution, such as demand factors, public confidence in the remediation cost estimates, stability of regulatory decisions, availability of financing, and third-party liability[21]. Wilson (1996)[22] proposes a slightly different framework from Mundy (1992a) in separating additional financing costs out as a separate factor from his stigma calculation. However, Chalmers and Jackson (1996)[23] show that Mundy (1992a) is the preferred framework, and that stigma indeed increases the risk premium and hence debt costs. Chalmers and Jackson (1996) also build on Mundy (1992b) who differentiated between real and perceived risks. Chalmers and Jackson (1996) demonstrate, as Mundy (1992b) had

---

[16] Mundy, B., "The Impact of Hazardous and Toxic Materials on Property Values", The Appraisal Journal, 1992b, 155-162.

[17] Kilpatrick, John A., "Appraisal of Contaminated Properties", Career News (Published by the University of South Carolina), 1998, 3-4

[18] Mundy, B., ".The Impact of Hazardous and Toxic Materials on Property Values – Revisited" The Appraisal Journal, 1992c, 463-471

[19] Neustein, R.A., "Estimating Value Diminution by the Income Approach", The Appraisal Journal, 1992, 283-285.

[20] Chalmers, James and Scott Roehr, "Issues in the Valuation of Contaminated Property", The Appraisal Journal, 1993, 28-40.

[21] Wilson, Albert, "The Environmental Opinion: Basis for an Impaired Value Opinion", The Appraisal Journal 1994, 410-423

[22] Wilson, Albert, "Emerging Approaches to Impaired Property Valuation", The Appraisal Journal, 1996, 155-170.

[23] Chalmers, James, and Thomas Jackson, "Risk Factors in the Appraisal of Contaminated Property", The Appraisal Journal, 1996, 44-58.

inferred, that the perception of risk on the part of lenders, rather than the actual risk, was the determinant of the increased financing costs.

Numerous authors have called into question the use of comparable sales as a method for valuing contaminated real estate, including Patchin (1988)[24], Wilson (1994, 1996), Roddewig (1996)[25], and Weber (1997)[26]. Weber (1997) is one of the first to recommend an alternative methodology, suggesting instead that a monte carlo simulation is an applicable tool in such situations. Lentz and Tse (1995) had also suggested the use of an alternative methodology, in their case options pricing as an alternative to the discounted cash flow model[27]. Jackson (1998) returns to a somewhat more traditional approach, showing that a mortgage-equity type model can be useful in quantifying the effects of stigma[28]. In the face of a broad array of methodologies used by appraisers to assess the stigma damages stemming from contamination, Kinnard and Worzola (1999) surveyed and summarized the key methodologies currently in use[29]. While their study focused primarily on income producing property, they noted that the somewhat more traditional methods most widely used by practitioners were at odds with the more advanced techniques recommended in the academic and practitioner literature.

### *Effects of Contamination on Property Values – Empirical Evidence*

Gamble and Downing (1982)[30] were among the first to examine the impact of contamination on residential real estate, analyzing the effects of the March, 1979, nuclear accident at Three Mile Island on nearby home values. They compared 583 residences within 25 miles of the plant with homes in a control neighborhood 75 miles away, both before and after the accident occurred using a hedonic model (multiple regression) to isolate the pricing impacts of the event. Consistent with later theory developed by Mundy (1992c) they find that the primary value impact results from increased marketing time.

Edelstein (1986) specifically stresses the investment diminution aspect of the inversion of home principle. In citing case studies of experiences following neighborhood-wide impairment in the Legler section of Jackson Township in southern New Jersey, he shows that residents could not separate the psychological pride in home ownership from the question of economic value. Surveys of the population found uniformity of opinion that property values had diminished as a result of the problem. Previous studies had focused on the opportunity costs stemming from the

---

[24] Patchin, Peter, "Valuation of Contaminated Properties", The Appraisal Journal, 1988, 7-16.

[25] Roddewig, Richard, "Stigma, Environmental Risk, and Property Values: 10 Critical Inquiries", The Appraisal Journal, 1996, 375-387

[26] Weber, B.R., "The Valuation of Contaminated Land", Journal of Real Estate Research, 1997, 379-398.

[27] Lentz, George, and K.S.M. Tse, "An Options Pricing Approach to the Valuation of Real Estate Contaminated by Hazardous Materials", Journal of Real Estate Finance and Economics, 1995, 121-144.

[28] Jackson, Thomas, "Mortgage Equity Analysis in Contaminated Property Valuation", The Appraisal Journal, 1998, 46-55.

[29] Kinnard, William, and Elaine Worzala, "How North American Appraisers Value Contaminated Property and Associated Stigma", The Appraisal Journal, 1999, 269-278.

[30] Gamble, H.B., and R.H. Downing, "Effects of Nuclear Power Plants on Residential Property Values", Journal of Regional Science, 1982, 457-478.

inability to move. In short, homeowners were stuck holding unsellable property with stagnant prices, while property in other neighborhoods was soaring in value. Thus, the owners were harmed not only by the diminution of value in the existing residences, but by the opportunity costs inherent in lost gains from alternative home investments.[31]

Kohlhase (1991)[32] studies thirteen Superfund sites near Houston with a hedonic (multiple regression) model and finds significant price impacts at or near sites, with distance to the point-source as an important determining variable. Thayer, Albers, and Rahmatian (1992) also opted for a hedonic model to examine the effect of hazardous waste sites near Baltimore[33]. They found that homeowners are willing to pay more for improved environmental quality. Theirs was one of the first studies which did not focus on an "event", but rather on an ongoing contamination problem, and they found that value diminution effects continued over time. Richert, Small, and Mohanty (1992) found similar results studying house prices near landfills in Cleveland[34] as did Ketkar (1992) in a hedonic regression model of house prices near landfills in New Jersey[35] and Nelson, Genereux and Genereux (1992) analyzing house prices near landfills in Minnesota[36].

Abdalla, Roach, and Epp (1992) examine data on the averting expenditures which homeowners must incur when dealing with a groundwater contamination incident involving TCE. The economic costs to households to deal with the contamination of their groundwater ranged from $61,313 to $131,344 during an 88-week contamination period. The authors also found that the decision to incur averting expenditures was based on the knowledge of the contamination, the degree of risk perceived, and the presence of children in the household.[37]

Kiel (1995) examines the effects on housing values in Woburn, MA, a community with two Superfund Sites, one a source of TCE groundwater contamination. Both sites were identified as Superfund Sites in the early 1980s, and the clean-up process had begun by 1995. She reviewed selling prices of over 2,000 houses over the period 1975 to 1992, utilizing regression techniques with specified time periods: pre-announcement phase, discovery phase, announcement phase, and clean-up-identified phase. She also analyzed impacts of distance from the sites and discounted values of future rents, which would be earned on the residences. Information sources included the EPA as well as local community groups such as the local citizen group "For a Cleaner Environment" (FACE) whose efforts gained both national newspaper as well as national network television coverage of the Woburn situation. The results of her study indicated that

---

[31] Edelstein, op. cit.

[32] Kohlhase, J.E., "The Impact of Toxic Waste Sites on Housing Values", Journal of Urban Economics, 1991, 1-26.

[33] Thayer, M., H. Albers, and M. Rahmatian, "The Benefits of Reducing Exposures to Waste Disposal Sites: A Hedonic Housing Value Approach", Journal of Real Estate Research, 1992, 379-398.

[34] Reichert, A.K., M Small, and S. Mohanty, "The Impact of Landfills on Residential Property Values", Journal of Real Estate Research, 1992, 297-314.

[35] Ketkar, Katherine, "Hazardous Waste Sites and Property Values in the State of New Jersey", Applied Economics, 1992, 647-659.

[36] Nelson, A.C., J. Genereux, and M. Genereux, "Effects of Landfills on House Values", Land Econonomics, 1992, 359-365.

[37] Abdalla, C.W., B. Roach, and D. Epp, "Valuing Environmental Quality Changes Using Averting Expenditures: An Application to Groundwater Contamination," Land Economics, 68, May, 1992, 163-9.

information made available to the public on the toxicity of sites does indeed have an affect on real estate prices, and that official announcements that sites will be cleaned up are not necessarily believed by the public.[38]

One of the earliest studies of air quality on property values was Ridker and Henning (1967). Using a hedonic model and data from St. Louis, Missouri, they found a linkage between air quality declines and property value diminution which was both statistically and economically significant[39]. However, Wieand (1973)[40] uses that same data to structure a hedonic model which examined rent rather than prices. He finds that rents are not directly affected by pollution, which would be consistent with Mundy (1992b) and others who argue that stigma is manifested in an increase in risk premium. Thus, Wieand's (1973) constant rent measure would be capitalized by a higher risk-adjusted cap rate to result in Ridker and Henning's (1967) lower values.

Deyak and Smith (1974)[41] use broad data from across the United States and find a statistically significant relationship between air pollution and house value diminution, as did Harrison and Rubinfeld (1978)[42] in their more detailed examination of house values in Boston. Nelson (1978) attempts to differentiate among pollutants, specifically particulates and oxidants, using data from Washington, D.C., and finds statistically significant diminution in house values from both causes[43]. Palmquist (1983), in an unpublished study, used data from fourteen cities, and found similar results[44].

Follow-up studies typically controlled for other variables, such as neighborhood quality, income, demographic characteristics, homeowner occupation, and crime rates. Murdoch and Thayer (1988)[45], Graves, Murdoch, Thayer and Waldman (1988)[46], and Zabel and Kiel (2000)[47] all find consistent relationships between air contamination and property value diminution.

---

[38] Kiel, Katherine A., "Measuring the Impact of the Discovery and Cleaning of Identified Hazardous Waste Sites on Housing Values", <u>Land Economics</u> 71-4, Nov., 1995, 428-435.

[39] Ridker, R.G., and J.A. Henning, "The Determinants of Residential Property Values with Special Reference to Air Pollution", <u>Review of Economics and Statistics</u>, 1967, 246-257.

[40] Wieand, K.F., "Air Pollution and Property Values: A Study of the St. Louis Area", <u>Journal of Regional Science</u>, 1973, 91-95.

[41] Deyak, T.A., and V. K. Smith, "Residential Property Values and Air Pollution: Some New Evidence", <u>Quarterly Review of Economics and Business</u>, 1974, 93-100.

[42] Harrison, D, and D.L. Rubinfeld, "Hedonic Housing Prices and the Demand for Clean Air", <u>Journal of Environmental Economics and Management</u>, 1978, 81-102.

[43] Nelson, J.P., Residential Choice, Hedonic Prices, and the Demand for Urban Air Quality" <u>Journal of Urban Economics</u>, 1978, 357-369

[44] Palmquist, R.B., "Estimating the Demand for Air Quality from Property Value Studies: Further Results", N.C. State University Unpublished Working Paper, 1983.

[45] Murdoch, J.C., and M.A. Thayer, "Hedonic Price Estimation of Variable Urban Air Quality", <u>Journal of Urban Economics</u>, 357-369.

[46] Graves, P.J., J.C. Murdoch, M.A. Thayer, and D. Waldman, "The Robustness of Hedonic Price Estimation: Urban Air Quality", <u>Land Economics</u>, 1988, 220-233.

[47] Zabel, J.E., and K. A. Kiel, "Estimating the Demand for Air Quality in Four U.S. Cities", <u>Land Economics</u>, 2000, 174-194.

The "state of the art" in valuation of properties impaired with soil or subsurface born contamination was reviewed most recently by Simon (2002) in his study of homes impacted by PCB contaminants in Anniston, Alabama[48]. His study was a review of a well documented impaired property case in which properties inside a neighborhood impacted with PCB's from an adjacent manufacturing plant were diminished in value by 60% to as much as 90%. He also found that properties outside the immediate neighborhood but within an area impacted by the PCB contamination were diminished in value by as much as 45%.

Simon (2002) focuses primarily on the methodology necessary to accomplish a large scale study of contaminated properties. He suggests that in an ideal world, a hedonic model (multiple regression) would be the preferred method. However, such is not usually available in these cases, and so he outlines methods which work well with the best available data, including market trend analysis, sale/resale analysis, transaction rate analysis, and sale/list-price analysis. However, he notes that these are all "revealed preferences" methods, and as such fail to account for transactions which did not occur as a result of the impairment[49]. As such, statistical characterizations using revealed preference data will probably not capture the full impact of the contamination on the market at equilibrium. He notes that survey research (in this case, contingent value analysis) is a preferred method for arriving at an unbiased analysis.

Other studies have been conducted into real estate value impacts of other negative events, externalities, and risk assessments. While the problems analyzed in these studies are not specifically consistent with the case at hand, these studies do demonstrate the broad consistency in methodology and the generalization of diminution impacts and specifically stigma across a wide range of negative value influences.

For example, Brookshire, Thayer, Tschirhart, and Schulze (1985) were among the first to look at property value impairment and geotechnical issues.[50] Specifically, they examined property value changes in areas known to have earthquake risks – Los Angeles and San Francisco. They find that when the market is informed of geotechnical risks, the market adequately prices that risk even before a geotechnical event occurs.

Bernknoff, Brookshire, and Thayer (1990)[51] follow the Brookshire, et al (1985) study with an examination of property value changes surrounding a pre-existing warning, such as an earthquake zone. They find that the property value diminution – stigma, in other words – occurs when the hazard notice is issued.

---

[48] Simon, Robert, "Estimating Proximate Property Damage from PCB Contamination in a Rural Market: A Multiple Technique Approach", The Appraisal Journal, 2002, 388-400.

[49] Financial economists often refer to this as a "survivor bias" problem, and results in a bias of the data.

[50] Brookshire, et. Al, 1985, "A Test of the Expected Utility Model: Evidence from Earthquake Risks", Journal of Political Economy 93, 369-389.

[51] Bernknopf, R., D. Brookshire, and M. Thayer, 1990, "Earthquake and Volcano Alerts: An Economic Evaluation of Risk Perception Changes", Journal of Environmental Economics and Management 18, 35-49.

Also leveraging off of the methodology in the Brookshire et al (1985) study, Murdoch, Singh, and Thayer (1992) examine the impact of the Loma Prieta earthquake on property values[52]. The authors find that once a predecessor event occurs, the expectation (and hence the stigma) associated with subsequent events is maximized.

Sanders (1996) is consistent with the hypothesis that stigma is not just the result of the natural event itself, but can and will arise once the potential for the event is known.[53] Thus, stigma losses actually precede the geotechnical event. Sanders (1996) uses a traditional sales adjustment grid approach, using actual home sales from a neighborhood in California, and estimates post-remediation stigma at 19.7% to 26.2% (based on the value of the house and lot as a unit).

Other studies into similarly impaired property include one by Bell (2001)[54] in which he looks at the impact of airport noise on residential property values. Note that in this case, there is no actual physical impact to the dwellings – the impact is strictly from the intermittent high decibel noise. However, Bell (2001) finds that the degrees of property impacts are actually increasing with increasing unimpaired values. For example, for "low quality" homes, the impact is from 4.5% to 10.3% of value, when compared with homes that do not have noise impacts. However, for high quality homes, the impact can range from 16.4% to as high as 29%. Bell (2001) also cites a Federal Aviation Administration 1999 study that looks at moderate priced homes and finds a 19% loss in value as a result of airport noise. Frankel (1991) independently examined the question using survey techniques (as well as one hedonic model) for neighborhoods surrounding Chicago's O'Hare Airport and found value losses ranging from a low of 10.2% (the hedonic model) to a high of 21.6% (a survey of realtors). Frankel (1991) did not try to distinguish between home qualities.[55] Bell's (2001) findings for higher quality homes is consistent with Sander's (1996) geotechnical loss findings.[56]

In that same vein, it is also useful to look at the valuation methodology used by the FAA and others in the acquisition of aviation easements.[57] Higler (1999) shows that an aviation easement

---

[52] Murdoch, J.C., H. Singh, and M. Thayer, 1992, The Loma Prieta Earthquake: An Event Study of Changes in Risk Perception and House Prices, study funded by the National Science Foundation and published by San Diego State University.

[53] Sanders, Micheal, "Post-Repair Diminution in Value from Geotechnical Problems", Appraisal Journal, January 1996.

[54] Bell, Randall, "The Impact of Airport Noise on Residential Real Estate", Appraisal Journal, 2001, 312-321

[55] Frankel, Marvin, "Aircraft Noise and Residential Property Values: Results of a Survey Study", Appraisal Journal 1991, 96-110.

[56] Bell's findings are consistent with other prior studies of noise, including Mieszkowski, P. and A.M. Saper, "An Estimate of the Effect of Airport Noise on Property Values", Journal of Urban Economics 5, 1978, 425-440; Nelson, J.P., "Airport Noise, Location Rent, and the Market for Residential Amenities", Journal of Environmental Economics and Management 6, 1979, 320-331; and O'Byrne, P.H., J.P. Nelson, and J.J.Seneca, "Housing Values, Census Estimates, Disequilibrium, and the Environmental Cost of Airport Noise: A Case Study in Atlanta", Journal of Environmental Economics and Management 1985, 363-72.

[57] The use of an easement valuation calculation in this study does not presuppose any particular theory of law or doctrine in the estimation of damages. This example is offered for it's illustrative contribution to the valuation equation only.

for an airport runway with an expected useful life of 5 years and no anticipated residual inconvenience to the residential property owners afterwards amounts to 11% of the value of the home. His calculations also point to a 25% value diminution if the effects are perpetual or at least long-lived.[58]

One of the key issues in impaired property valuation is the consideration of the impact of remediation. Does remediation by itself – or in the case of a contaminant, the issuance of a "no further action letter" – cure stigma? Theory and empirical results point in opposite directions. Many theoretical studies suggest that post-remediation, stigma should subside. The theoretical debate has surrounded the timing of that subsiding. However, recently there have been a number of empirical studies, which suggest that stigma is persistent even after remediation. For example, Sementelli and Simons (1997) studied commercial property impacted by leaky underground storage tanks and found that the issuance of a no further action letter did not improve marketability.[59],[60]

Kilpatrick (1999, 2001) published a series of interim studies on residences impacted by synthetic stucco within the broad context of construction defects. His analysis demonstrates that stigma remains even after defects are remediated to local building code standards.[61]

Mundy Associates LLC has conducted numerous case studies on construction defects issues, both for condominiums and single family residences, in various parts of Washington State (both King and Pierce Counties) as well as in other locales (primarily the east coast of the U.S.). In summary, water intrusion results from some construction defect, such as the use of synthetic stucco or workmanship defects, and even after the physical defect is cured, stigma remains as a result of numerous unknowns (and risks associated with those unknowns). Additionally, stigma in these cases has a very real physical component, in that some incurable physical damage was done to the structure itself which remediation could not address (such as structural stress, residual moisture damage, etc.) In these cases, we have consistently found a residual stigma ranging from 10% to 20% of the otherwise unimpaired value of the structures. We have also found that at the upper end of the economic scale, such as with the subject property, the higher damages are evidenced.

Simons, Bowen, and Sementalli (1997) study the impact of identified, remediated leaking underground storage tanks (LUST) on neighboring dwellings, using a regression analysis

---

[58] Higler, Charles, "The Infamous Avigation Easement", Appraisal Journal 1999, 354-358

[59] Sementelli, A.J., and R.A. Simons, "Regulations of Leaking Underground Storage Tanks: Policy Enforcement and Unintended Consequences", Economic Development Quarterly 11, 1997, 236-48.

[60] Part of this stems from well-publicized events in California and New York in which those states' environmental agencies have begun random re-inspections of previously remediated LUST sites for which "no further action" letters had previously been issued. In many cases, the states have found additional problems and required further costly remediation despite the no-further-action letter. In other words, a "no further action" letter actually means "no further action unless we change our minds."

[61] Kilpatrick, John A., Ron Rogers, and Doug Brown, "Appraisal Implications of EIFS", Appraisal Journal, 1999; Kilpatrck, John A., "Valuation Implications of EIFS", Construction Defects, 2001.

involving 16,990 sales and 2,513 LUSTs. They find statistically significant stigma impacts of 17.5%[62], post-remediation.

Leggett and Bockstael (2000) study precisely the issue of sewerage contamination. While they do not estimate a damage coefficient, they do confirm that the presence of sewerage has a statistically significant impact on property value, even after controlling for obvious manifestations such as odor and health risks[63].

Mundy Associates LLC has conducted numerous surveys across the U.S. regarding impaired property. Recent (2001) surveys conducted in King County, Washington, surveyed potential potential buyers of condominiums on their attitudes toward the purchase of properties which had been the subject of water intrusion (as a result of construction defects) but none-the-less remediated. We found that typical buyers, who *would* buy a remediated dwelling, demanded discounts typically in the range of 25%. Note that our surveys indicated that as many as 40% of surveyed buyers would not buy such a dwelling at all, even if physically remediated.

Mundy Associates LLC has conducted extensive research into the impact of airborne lead contamination, which was summarized in a 2000 journal article. We found that, post-remediation, homes suffered at least 15% diminution from stigma[64].

### *Summary of the Value Impacts of Contamination*

In summary, the published literature, case studies, and market research (market surveys) are consistent in finding that an environmental impairment imposes an unreasonable risk of harm to the value of real estate. In an "impaired" state, this diminution is a function of the cost to cure the impairment plus negative stigma impacts, which capture the increased risks and uncertainties as well as other factors. In a "post-remediation" state, market values of real estate continue to suffer unreasonable risk of harm as a result of continued stigma impacts.

## Property Values and Specific Asbestos Impacts

Thusfar, this study has shown substantial evidence that an environmental impairment constitutes an unreasonable risk of harm to the value of real estate. The final question remains, asbestos, specifically ZAI, constitute such an environmental impairment?

---

[62] Simons, R.A., W.M. Bowen and A.J. Smentelli, 1997, "The Effects of Underground Storage Tanks on Residential Property Values in Cuyahoga County, Ohio", Journal of Real Estate Research 14, 29-42.
[63] Leggett, C.G., and N.E., Bockstael, 2000, "Evidence of the Effects of Water Quality on Residential Land Prices", Journal of Environmental Economics and Management 39, 121-44.
[64] Kilpatrick, John A., 2000, "Property Values and Lead Contamination", Real Estate and Environmental Liability News

*Academic Studies*

Relatively few academic studies had addressed the question, and many of those focused on commercial properties. In the 1980s, in a seminal study on the subject, Dewees (1986) established a framework for investigating the impacts on income producing properties, and was considered the leading study of its time[65]. Wilson (1989) developed a discounted cash flow model which incorporated reductions in cash flow, but failed to generalize his model to include stigma impacts[66]. Fisher, Lentz, and Tse (1992) developed a generalized model which incorporated both reductions in expected cash flow as well as the stigma impacts on increased discount rate[67]. While their work continued in the commercial property vein, their model included stigma causality which would be generalizable to non-income producing property (e.g. - - residential property) such as adverse market reactions.

Fisher, Lentz, and Tse (1993) also survey real estate appraisers to determine their observations of market impacts resulting from asbestos-containing material (ACM).[68] They find that appraisers report that potential purchasers sometimes "…simply refuse to purchase any property containing asbestos."[69] Potential buyers usually require that the seller pay for both a preliminary environmental audit as well as a comprehensive engineering survey. Those buyers who are willing to buy may sometimes require that asbestos be removed, or purchase at a discount. Discounts reported range from a lower limit of the cost of removal and upwards to account for stigma.

In the Fisher, et. Al, study, owners of properties containing ACMs which are financed sometimes suffer lower loan-to-value (LTV) ratios or are charged higher interest rates and are usually required to provide indemnification. Some ("seldom") owners report that lenders outright refuse to make loans even with the lower LTV or with indemnification.

Appraisers in the Fisher, et. Al. survey "usually" report the following direct impacts on value:

- Increase in the discount rate
- Increase in the capitalization rate
- Direct reduction in property value to account for removal costs
- Direct reduction in property value to account for indirect costs

[65] Dewees, D.N. Controlling Asbestos in Buildings: An Economic Investigation (Washington, DC: Resources for the Future, 1986)

[66] Wilson, A.R., Probable Financial Effect of Asbestos Removal on Real Estate, Appraisal Journal 57-1, 1989, 378-91.

[67] Fisher, J.D., G.H. Lentz, and K.S.M. Tse, Valuation of the Effects of Asbestos on Commercial Real Estate, Journal of Real Estate Research 7-3, 1992, 331-350

[68] Fisher, J.D., G.H. Lentz, and K.S.M. Tse, Effects of Asbestos on Commercial Real Estate: A Survey of MAI Appraisers, Appraisal Journal, October, 1993, 587-598

[69] Note: "sometimes" is the modal, or most common, response on a normative scale which includes "never", "seldom", "sometimes", "usually", and "always". Subsequent reference to the Fisher, et. Al, survey will use this terminology and will refer to the modal response.

- Increase in insurance costs
- Increase in repair, maintenance, and monitoring costs

Other costs reported by appraisers, although to lesser frequency, include decreased rental rates, increased vacancy rates, increased rental concessions, increased build-out allowances, and increased legal expenses. While the Fisher, et. Al, survey focused on commercial property impacts, it is clear that many, if not most of these impacts strongly imply an unreasonable risk of harm to the value of residential properties, as well.

*Property Tax Studies*

Additional studies have noted that asbestos is a sufficient cause for a claim for reduction property value assessment in property tax cases. As early as 1992, the Appraisal Journal reported, as an unauthored note, that the New York Appeals court had granted a $23 million property tax refund to the former owners One New York Plaza due to devaluation resulting from asbestos. Asbestos was also cited in Commerce HoMing Corp. v. Assessor of Babylon, in which the New York State Court of Appeals, by unanimous decision, required New York state tax assessors to acknowledge the impact of environmental impairment on property value[70]. Considerations for appraisers when evaluating property value impairment cited by the court included:

- The type and extent of the contamination
- The current and past uses of the property
- Financing impacts
- Continuing stigma after remediation.

Only limited residential asbestos studies have been conducted to date, and those have focused on property tax issues and post-demolition issues. However, the implication of both of these threads of literature is consistent and compelling: that asbestos does, in fact, pose an unreasonable risk of harm to residential real estate values. In the current case, where simulations of usual homeowner activities such as remodeling and maintenance around ZAI have prompted releases of asbestos fibers, there is no question that properties with ZAI will suffer such harm to their values[71].

New Jersey tax assessors have specifically identified asbestos as a sufficient condition for a property tax reduction since 1994, when the City of Hackensack settled with Fairleigh Dickenson University over the value of One University Plaza[72].

---

[70] Fromewick, Richard G., Property Contamination Can Affect Local Tax Assessment, Court Rules, Real Estate Weekly, 9/9/1998

[71] Among the materials we have reviewed are illustrative photographs and ZAI homeowner reports.

[72] New Jersey Issues First Tax Refund for Asbestos Contamination, Real Estate Weekly, 2/9/1994

### Residual Land Values

Studies have also shown that the negative value impacts of asbestos can even impact the land after demolition of the dwelling. Simons (1994), in a study analyzing the rehabilitation of former inner city brownfields into residential sites, found that asbestos on the property increased the development costs by as much as one-third[73]. Buzea (1998), writing on the costs of demolition of a building, shows that asbestos increases building demolition costs in a similar manner to PCB's (from leaky transformers), lead paint, or other hazardous materials[74].

### Summary of the Value Impacts of Asbestos

Much like other on-site environmental contaminants, there is clear and compelling evidence from the academic studies and from empirical market evidence that an asbestos product such as ZAI that can release asbestos fibers in a dwelling is sufficient for there to be an unreasonable risk of harm to the value of the real estate. Prior to remediation, the value is diminished by the estimated cost of remediation plus stigma. Post-remediation, stigma apparently continues, plus there is substantial evidence that even demolition of the dwelling and re-use of the vacant land carries costs over and above that which would be expected with unimpaired properties.

---

[73] Simons, Robert, How Clean is Clean?, <u>Appraisal Journal</u>, July, 1994.

[74] Buzea, Dan, Building Demolition Requires Extensive Environmental Review, <u>Real Estate Weekly</u>, 7/15/1998.

# ATTACHMENT H



# U.S. Environmental Protection Agency

## Asbestos

Recent Additions | Contact Us |   Search: [          ] GO

EPA Home > Prevention, Pesticides & Toxic Substances > Pollution, Prevention Toxics > Asbestos > Vermiculite > Vermiculite Insulation

## Current Best Practices for Vermiculite Attic Insulation - May 2003

The U.S. Environmental Protection Agency (EPA) offices have received a large number of phone calls from citizens concerned about vermiculite insulation in their home that might be contaminated with asbestos. EPA is gathering more information about vermiculite insulation and other products containing vermiculite. If you suspect vermiculite insulation is in your home, the safest thing is to leave the material alone. If you decide to remove or must otherwise disturb the material due to a renovation project, consult with an experienced asbestos contractor. The following information provides a common-sense approach to help you find out what kind of insulation is in your home and decide what to do if you have vermiculite insulation.

What is vermiculite insulation?
Do I have vermiculite insulation?
Photo - Different Grades of Vermiculite
Photo - Close Up of Vermiculite Insulation in an Attic
Photo - Attic Containing Vermiculite Insulation
Is vermiculite insulation a problem?
How does asbestos cause health problems?
What should I do if I have vermiculite attic insulation?
What if I occasionally have to go into my attic?
What are the next steps?
Is my health at risk from previous exposures to the asbestos in the insulation?
What if I have work-related exposure to vermiculite?
Where can I get more information?

---

**What is vermiculite insulation?**
Vermiculite is a naturally occurring mineral that has the unusual property of expanding into worm-like accordion shaped pieces when heated. The expanded vermiculite is a light-weight, fire-resistant, absorbent, and odorless material. These properties allow vermiculite to be used to make numerous products, including attic insulation.

**Do I have vermiculite insulation?**
Vermiculite can be purchased in various forms for various uses. Sizes of vermiculite products range from very fine particles to large (coarse) pieces nearly an inch long. Vermiculite attic insulation is a pebble-like, pour-in product and is usually light-brown or gold in color. The pictures below show several samples of vermiculite attic insulation.

**Photo - Different Grades of Vermiculite -**



**Photo - Close Up of Vermiculite Insulation in an Attic -**



**Photo - Attic Containing Vermiculite Insulation -**



**Is vermiculite insulation a problem?**
Prior to its close in 1990, much of the world's supply of vermiculite came from a mine near Libby, Montana. This mine had a natural deposit of asbestos which resulted in the vermiculite being contaminated with asbestos. Attic insulation produced using vermiculite ore, particularly ore that originated from the Libby mine, may contain asbestos fibers. Today, vermiculite is mined at three U.S. facilities and in other countries which have low levels of contamination in the finished material.

**How does asbestos cause health problems?**

Asbestos can cause health problems when inhaled into the lungs. If products containing asbestos are disturbed, thin, lightweight asbestos fibers are released into the air. Persons breathing the air may breathe in asbestos fibers. Continued exposure increases the amount of fibers that remain in the lung. Fibers embedded in lung tissue over time may result in lung diseases such as asbestosis, lung cancer, or mesothelioma. Smoking increases your risk of developing illness from asbestos exposure.

**What should I do if I have vermiculite attic insulation?**
**DO NOT DISTURB IT.** Any disturbance has the potential to release asbestos fibers into the air. Limiting the number of trips you make to your attic and shortening the length of those trips can help limit your potential exposure. EPA and ATSDR strongly recommend that:

> • Vermiculite insulation be left undisturbed in your attic. Due to the uncertainties with existing testing techniques, it is best to assume that the material may contain asbestos.
>
> • You should not store boxes or other items in your attic if retrieving the material will disturb the insulation.
>
> • Children should not be allowed to play in an attic with open areas of vermiculite insulation.
>
> • If you plan to remodel or conduct renovations that would disturb the vermiculite, hire professionals trained and certified to handle asbestos to safely remove the material.
>
> • You should never attempt to remove the insulation yourself. Hire professionals trained and certified to safely remove the material.

**What if I occasionally have to go into my attic?**
EPA and ATSDR strongly recommend that homeowners make every effort not to disturb vermiculite insulation in their attics. If you occasionally have to go into your attic, current best practices state you should:

> 1. Make every effort to stay on the floored part of your attic and to not disturb the insulation.
>
> 2. If you must perform activities that may disturb the attic insulation such as moving boxes (or other materials), do so as gently as possible to minimize the disturbance.
>
> 3. Leave the attic immediately after the disturbance.
>
> 4. If you need work done in your attic such as the installation of cable or utility lines, hire trained and certified professionals who can safely do the work.
>
> 5. It is possible that vermiculite attic insulation can sift through cracks in the ceiling, around light fixtures, or around ceiling fans. You can prevent this by sealing the cracks and holes that insulation could pass through.
>
> 6. Common dust masks are not effective against asbestos fibers. For information on the requirements for wearing a respirator mask, visit the following OSHA website: http://www.osha-slc.gov/SLTC/respiratoryprotection/index.html

**What are the next steps?**
The guidance provided in this brochure reflects the current testing technology and knowledge of precautions one may take regarding vermiculite attic insulation. EPA is initiating further studies on vermiculite attic insulation and pursuing other asbestos related issues. Additional information will be provided to the public via the EPA and ATSDR web sites and through additional outreach materials as it becomes available.

## Is my health at risk from previous exposures to the asbestos in the insulation?

If you removed or disturbed the insulation, it is possible that you inhaled some asbestos fibers. Also the disturbance may have resulted in the fibers being deposited into other areas of the home. Exposure to asbestos increases your risk of developing lung disease. That risk is made worse by smoking. In general, the greater the exposure to asbestos, the greater the chance of developing harmful health effects. Disease symptoms may take several years to develop following exposure. If you are concerned about possible exposure, consult a physician who specializes in lung diseases (pulmonologist). Where can I get information on testing or removal of the insulation? EPA and ATSDR strongly recommend using a trained and certified professional to conduct removal work. Removing the insulation yourself could potentially spread asbestos fibers throughout your home, putting you and your family at risk of inhaling these fibers. For certified asbestos removal professionals in your area, refer to your local Yellow Pages. Your State Environmental Agency can confirm that the company's credentials are current. You can find your State Agency at: http://www.epa.gov/epahome/whereyoulive.htm. Currently, there are specific technical issues involving vermiculite sampling that can complicate testing for the presence of asbestos fibers and interpreting the risk from exposure. EPA and ATSDR are not recommending at this time that homeowners have vermiculite attic insulation tested for asbestos. As testing techniques are refined, EPA and ATSDR provide information to the public on the benefits of testing that produce more definitive and accurate test results.

## What if I have work-related exposure to vermiculite?

Workers who have had significant past exposure, or have significant ongoing exposure to asbestos, to vermiculite from Libby, or to other asbestos contaminated materials should consider getting a medical exam from a physician who knows about diseases caused by asbestos. For more information and to obtain a fact sheet concerning occupational exposure to vermiculite, contact the National Institute for Safety and Health (NIOSH) at: 1-800-35-NIOSH, or http://www.cdc.gov/niosh/homepage.html.

## Where can I get more information?

Information on the Agency's guidance on asbestos and vermiculite, including insulation and horticultural products, has previously been available on EPA's website. Additional information on vermiculite and asbestos is available from the following sources:

| | |
|---|---|
| **General Information** | EPA's Toxic Substances Control Act (TSCA) Assistance Information Service: Asbestos Line: 1-800-471-7127 |
| | EPA Asbestos Ombudsman: 1-800-368-5888 |
| | EPA's Asbestos Home Page: http://www.epa.gov/asbestos/ |
| **Health Information** | Agency for Toxic Substances and Disease Registry (ATSDR): http://www.atsdr.cdc.gov |
| **Worker Safety** | Occupational Safety and Health Administration (OSHA: ) http://www.osha.gov |
| | National Institute for Occupational Safety and Health (NIOSH): http://www.cdc.gov/niosh/homepage.html |
| **Consumer Products** | Consumer Product Safety Commission (CPSC): http://www.cpsc.gov |
| **Mineralogy** | United States Geological Survey (USGS): http://minerals.usgs.gov/minerals/ |

Prepared by the United States Environmental Protection Agency, National Institute for Occupational Safety and the Agency for Toxic Substances and Disease Registry, May 2003. EPA publication 747-F-03-001

 

EPA Home | Privacy and Security Notice | Contact Us

This page was generated on Wednesday, August 6, 2003

View the graphical version of this page at:  http://www.epa.gov/asbestos/insulation.html