# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **W.R. Grace & Co., et al.,** | ) | **Case No. 01-01139 (JKF)** |
| | ) | **(Jointly Administered)** |
| | ) | |
| **Debtors.** | ) | |

### Claimants' Response to W.R. Grace's  Motion for Summary Judgment

Darrell W. Scott, Esq.
Burke D. Jackowich, Esq.
Lukins & Annis, PS
717 W. Sprague Ave., Suite 1600
Spokane, WA  99201
Telephone:  (509) 455-9555
Facsimile:  (509) 747-2323
ADDITIONAL SPECIAL COUNSEL

Edward J. Westbrook, Esq.
Robert M. Turkewitz, Esq.
James L. Ward, Esq.
Robert S. Wood, Esq.
Richardson, Patrick, Westbrook & Brickman
1037 Chuck Dawley Blvd., Building A
Mount Pleasant, SC  29464
Telephone:  (843) 727-6513
Facsimile:  (843) 727-6688
ZAI CLAIMANTS' SPECIAL COUNSEL

William D. Sullivan, Esq.
Charles Brown, Esq.
Eluzufon Auston Reardon Tarlov & Mondell
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE  19899
Telephone: (302) 428-3181
Facsimile: (302) 777-7244
COUNSEL FOR THE ZONOLITE CLAIMANTS,
BARBANTI, BUSCH, PREBIL, AND PRICE

Dated:  August 8, 2003

TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 1

 I. Grace's Motion Impermissibly Seeks to Impose a Personal Injury Burden of Proof in the Science Trial ................................................................. 1

 II. Grace's Case is Built Upon the Faulty and Scientifically Unreliable Premise That ZAI Predominantly Contains Non-Asbestiform "Cleavage Fragments" Rather Than Asbestiform Fibers ....................................... 4

  A. The Questionable Practices of Dr. Lee's Laboratory Have Resulted in its Placement on EPA's "Watch List" .................... 5

  B. Dr. Lee's Opinions are Contrary to Virtually all Prior Opinions Regarding Libby Amphiboles, Including Those Within Grace .................................................. 6

 III. Claimants Have Presented Scientifically Reliable and Admissible Evidence to Support Their Claims ....................................................... 8

  A. Surface Dust Testing is Scientifically Valid, Reliable, and Relevant to the Issues in This Case ................................... 8

   1. ASTM D5755 is Scientifically Valid and Reliable........ 9

    a. Settled Dust Testing Consists of a Testable Hypothesis........................................................... 9

    b. ASTM D5755 Has Been Subject to Peer Review ............................................................... 10

    c. ASTM D5755 Has an Acceptable Potential Rate of Error............................................................... 10

    d. There Are Standards That Control the Technique's Operation ........................................................... 11

    e. ASTM D5755 is Generally Accepted in the Courts and the Scientific Community .......................... 11

     i. Courts Have Regularly Admitted Expert Dust Testimony ..................................... 11

|  |  | ii. | Cases Excluding Dust Testing Are Distinguishable ...................................... | 11 |

|  |  | iii. | ASTM D5755 Has Achieved General Acceptance in the Scientific Community ........................................... | 13 |

|  | f. | | ASTM D5755 is Superior to Other Methods Found to be Reliable ...................................................... | 14 |

|  | g. | | Claimants' Experts Are Well-Qualified to Testify Based on the Methodology ............................... | 16 |

|  | h. | | ASTM D5755 is Routinely Used in Non-Judicial Contexts ............................................................. | 16 |

| 2. | | | ASTM D5755 is Properly Applied to the Facts of This Case ............................................................................. | 16 |

| 3. | | | Grace's Argument That the K-Factor Does Not Make Dust Samples Scientifically Acceptable to Show Airborne Asbestos Exposures is Misplaced .................................. | 17 |

B. Case Reports are Relevant and Admissible Under Federal Rules of Evidence 401 and 402 .................................................. 17

C. Grace's Criticism of Claimants' Lack of Epidemiological Evidence Should be Rejected ..................................................... 19

D. Grace's Risk Assessment is Unnecessary to Prove Building Contamination and is Fatally Flawed ....................................... 21

1. Many Assumptions in Grace's Risk Assessment Are Baseless ................................................................. 22

2. Recalculation of the Risk Estimates Shows a High Risk From Exposure to ZAI .................................................. 26

CONCLUSION ............................................................................................ 28

## TABLE OF AUTHORITIES

### CASES

1.  Adams-Arapahoe Sch. Dist. No. 28-J v. GAF Corp.,
    959 F.2d 868 (10th Cir. 1992) ............................................................... 3

2.  Ball v. Consolidated Rail Corp.,
    756 N.E.2d 1280 (Ohio Ct. App. 2001) ............................................. 13

3.  Bell v. Dresser Indus.,
    No. A-920.961-SC(19), slip op. (128th Jud. Dist., Orange Co., Tex.
    Sept. 4, 2001) ........................................................................................ 13

4.  Bonner v. ISP Tech., Inc.,
    259 F.3d 924 (8th Cir. 2001) ............................................................... 20

5.  Bower v. Westinghouse Elec. Corp.,
    522 S.E.2d (W. Va. 1999) ..................................................................... 2

6.  Brock v. Merrell Dow Pharm., Inc.,
    874 F.2d 307 (5th Cir. 1989) ............................................................... 20

7.  Caffey v. Foster Wheeler Energy Corp.,
    No. 01-C-753, slip op. (Dist. Ct., Cass County, Tex., June 19, 2003) .............. 13

8.  City of Greenville v. W.R. Grace & Co.,
    827 F.2d 975 (4th Cir. 1987) ............................................................... 4,19,20

9.  City of Wichita, Kan. v. U.S. Gypsum Co.,
    72 F.3d 1491 (10th Cir. 1996) ............................................................. 3

10. Commonwealth v. United States Mineral Prods. Co.,
    809 A.2d 1000 (Pa. Commw. Ct. 2002) ............................................. 4

11. Daubert v. Merrell Dow Pharm., Inc.,
    509 U.S. 579 (1993) .............................................................................. 9,16

12. Ferebee v. Chevron Chem. Co.,
    736 F.2d 1529 (D.C. Cir. 1984) .......................................................... 20

13. G.J. Leasing Co. v. Union Elec. Co.,
    54 F.3d 379 (7th Cir. 1995) ................................................................. 22

14. Harashe v. Flintkote Co.,
    848 S.W.2d 506 (Mo. Ct. App. 1993) ................................................. 2,18

15. In re Armstrong World Indus.,
    285 B.R. 864 (Bankr. D. Del. 2002) .................................................................. 12

16. In re Armstrong World Indus.,
    No. 00-04471 (RJN) (Bankr. D. Del. Nov. 1, 2002)........................................... 12

17. In re Celotex Corp.,
    No. 90-10016-8G1, slip op. (Bankr. M.D. Fla. July 17, 2003) ......................... 3

18. In re Celotex Corp.,
    196 B.R. 973 (Bankr. M.D. Fla. 1996) .............................................................. 4

19. In re Lamar County Asbestos Litigation,
    slip op. (6th Dist. Ct., Lamar Co., Tex. July 5, 2001) ....................................... 12, 13

20. In re Paoli R.R. Yard PCB Litig.,
    35 F.3d 717 (3rd Cir. 1994) ............................................................................... 2, 9

21. Kansas City v. W.R. Grace & Co.,
    778 S.W.2d 264 (Mo. Ct. App. 1989) ................................................................ 3

22. Norfolk & Western Ry. Co. v. Ayers,
    123 S.Ct. 1210 (2003)........................................................................................ 2

23. Perlmutter v. U.S. Gypsum Co.,
    4 F.3d 864 (10th Cir. 1993) ............................................................................... 2,3

24. School Dist. of Independence, Mo., No. 30 v. U.S. Gypsum Co.,
    750 S.W.2d 442 (Mo. Ct. App. 1988) ................................................................ 2,4,19

25. State Farm Mut. Auto. Ins. Co. v. W.R. Grace & Co.,
    No. 89-3022, slip op.  (C.D. Ill. Feb. 11, 1993) ................................................ 19

26. U.S. Gypsum Co. v. Mayor of Baltimore,
    647 A.2d 405 (Md. Ct. App. 1994) .................................................................... 19

## STATUTES

1. 40 C.F.R. § 300.430 .......................................................................................... 22

2. 55 Fed. Reg. 8666 (Mar. 8, 1990)...................................................................... 22

**OTHER AUTHORITIES**

1.    ASTM Method D5755, <u>Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations</u> (1995) .......................................................... 9

2.    Anderson, Henry, et al., <u>Mesothelioma Among Employees with Likely Contact with In-Place Asbestos-Containing Bldg. Materials</u>, Ann. N.Y. Acad. Sci. 43:550-72 (1991) ............................................................................................ 18

3.    ATSDR, <u>Year 2000 Med. Testing of Individuals Potentially Exposed to Asbestiform Minerals Associated with Vermiculite in Libby, MT</u> (Aug. 23, 2001) ............ 20

4.    Bresnitz, E.A., et al., <u>Asbestos-Related Radiographic Abnormalities in Elevator Construction Workers</u>, Am. Rev. Respir. Dis. 47:1341-44 (1992) ................... 18

5.    Crankshaw, Owen S., et al., <u>Overview of Settled Dust Analytical Methods and Their Relative Effectiveness</u>, Advances in Envtl. Measurement Methods for Asbestos, ASTM STP 1342 (Michael E. Beard & Harry L. Rook eds., 2000)................... 11

6.    Crankshaw, Owen S., <u>Quantitative Evaluation of the Relative Effectiveness of Various Methods for the Analysis of Asbestos in Settled Dust</u>, Research Triangle Inst. (1996) ....................................................................................................... 11

7.    <u>EPA Fact Sheet:  Asbestos Sampling in Libby, MT</u> (May 2000) ..................... 13

8.    EPA, <u>Comparison of Airborne Asbestos Levels Determined by Transmission Electron Microscopy (TEM) Using Direct and Indirect Transfer Techniques</u> (March 1990) ................................................................................................... 15

9.    EPA, <u>Measuring Airborne Asbestos Following an Abatement Action</u>, No. 600/4-85-049 (Nov. 1985) .......................................................................... 10

10.   Gordon, Greg, <u>Magnitude of Asbestos Scare Grows</u>, Modesto Bee (Jan. 21, 2003)..................................................................................................... 26

11.   Hatfield, Richard, et al., <u>Study of the Reproducibility of the Micro-Vac Technique as a Tool for the Assessment of Surface Contamination in Bldgs. with Asbestos-Containing Materials</u>, Advances in Envtl. Measurement Methods for Asbestos, ASTM STP 1342 (Michael E. Beard & Harry L. Rook eds., 2000) ................. 10

12.   Health Effects Institute Asbestos Research, <u>Asbestos in Pub. & Commercial Bldgs.</u> (Sept. 1991) ........................................................................................ 14

13.    Hines, William, Third Wave of Asbestos Disease: Asbestos in Place
       (1990) ................................................................................................ 18

14.    Keyes, D.L., et al., Exposure to Airborne Asbestos Associated with Simulated
       Cable Installation Above a Suspended Ceiling, Am. Ind. Hyg. Assoc. J.
       52(11):479-84 (1991) ........................................................................ 10

15.    Lilienfeld, David, Asbestos-Associated Pleural Mesothelioma in School Teachers:
       A Discussion of Four Cases, Ann. N.Y. Acad. Sci. 454-58 (1991) ................. 18

16.    Lilis, Ruth, et al., Asbestos Disease in Maintenance Workers of the Chem. Indus.,
       Ann. N.Y. Acad. Sci. 127-35 (1979) ................................................... 18

17.    Longo, William, et al., Fiber Release During the Removal of Asbestos-Containing
       Gaskets, Appl. Occup. & Envtl. Hyg. J. 17(1):55-62 (2002) ........................... 12

18     McDonald, J.C., et al., Cohort Study of Mortality of Vermiculite Miners Exposed to
       Tremolite, British J. of Indus. Med. 43:436-44 (1986) ..................................... 20

19.    McLaughlin, Kathleen, W.R. Grace Urging EPA to Quit Emergency Plan for
       Libby, Mont. Forum, (Apr. 14, 2002)................................................................ 26

20.    Millette, James R., et al., Applications of the ASTM Asbestos in Dust Method
       D5755, Advances in Envtl. Measurement Methods for Asbestos, ASTM STP
       1342 (Michael E. Beard & Harry L. Rook eds., 2000) ..................................... 14

21.    Millette, James R., et al., Settled Dust Analysis Used in Assessment of Bldgs.
       Containing Asbestos, Microscope 215-20 (1990) ............................................. 10

22.    Moss, Michael, et al., Protecting the Product: A Special Rep.; Company's
       Silence Countered Safety Fears About Asbestos, N.Y. Times, A1
       (July 9, 2001) ...................................................................................... 20

23.    National Inst. for Occup. Safety & Health (NIOSH) Method 7400, Issue 2,
       NIOSH Manual of Analytical Methods (Aug. 15, 1994) .................................. 10

24.    National Research Council, Science and Judgment in Risk Assessment
       (1994) ................................................................................................ 20

25.    Oliver, L. Christine, et al., Asbestos-Related Disease In Pub. Sch. Custodians,
       Am. J. of Indus. Med. 19:303-16 (1991) ......................................................... 18

26.    Pardee, J.T., et al., Deposits of Vermiculite and Other Minerals in the Rainey Creek
       Dist., Near Libby, Mont., Contributions to Econ. Geology, U.S. Geological Survey
       Bulletin 805 (1929) ............................................................................. 6

27.   Romano, Jay, <u>Lesser Known Form of Asbestos Lurks in Many Homes</u>, San
      Francisco Chronicle, WB-7 (July 14, 2001) ....................................................... 26

28.   <u>Science and Judgment in Risk Assessment</u>, Nat'l Research Council
      (1994) .............................................................................................................. 20

29.   Warren, Susan, <u>EPA Plans Asbestos Removal From Homes in Libby, Mont.</u>,
      Wall St. J., B2 (May 13, 2002) ........................................................................ 26

30.   Williams, Marion G., Jr., et al., <u>Asbestos Release During Removal of Resilient
      Floor Covering Materials by Recommended Work Practices of the Resilient
      Floor Covering Institute</u>, Appl. Occup. & Envtl. Hyg. 18(6):466-78 (2003).... 10

31.   World Trade Ctr. Envtl. Assessment Working Group, <u>Final Rep. of the Pub.
      Health Investigation to Assess Potential Exposures to Airborne and Settled
      Surface Dust in Residential Areas of Lower Manhattan</u> (Sept. 2002) .............. 13

## INTRODUCTION

Grace's motion suffers from three fatal defects. First, it impermissibly seeks to change Claimants' burden of proof by invoking a personal injury standard. Second, it relies on the scientifically flawed opinions of Dr. R. J. Lee who has recently been placed on EPA's "watch list". Third, it uses ZAI risk estimates based on groundless assumptions and misapplications of risk assessment principles.

## ARGUMENT

### I.    Grace's Motion Impermissibly Seeks to Impose a Personal Injury Burden of Proof in the Science Trial.

Grace has suggested that there is no ZAI property damage claim unless the Claimants show that ZAI "doubles the risk of an asbestos-related disease" in a home.[1] The cases Grace cites are all personal injury cases where an admittedly injured plaintiff sought to prove the injury was caused by a defendant's toxic substance. The "doubling risk" standard was used to determine <u>causation,</u> not <u>injury.</u> Here, there is no question about causation. Everyone agrees that the tremolite asbestos contaminating ZAI homes comes from ZAI. The issue is whether Claimants have suffered a compensable "injury". Grace has improperly taken personal injury cases addressing proximate <u>cause</u> and cited them as if relevant to a property damage case in determining <u>injury.</u> The disconnect between Grace's authority and its attempted application here is apparent.

Even if Grace's cases addressed injury, which they do not, they would still be off-base. Grace ignores the different elements of four types of claims that can arise from asbestos exposure:

---

[1]  Brief of W.R. Grace & Co. in Supp. of Mot. for Summ. J. at 2 (July 7, 2003) ("Grace Summ. J. Br.") [Attach. 1].

- A personal injury claim requires proof of disease caused by defendant.[2]

- A fear of cancer claim requires underlying personal injury and genuine apprehension of a more severe disease, but that disease need not be more likely than not to develop.[3]

- A medical monitoring claim requires evidence of an increased risk of disease sufficient to warrant a physician prescribing monitoring, but not personal injury.[4]

- A property contamination claim requires contamination (exposure above background) of property by defendant's toxic substance, but not imminent or certain personal injury.[5]

As a claim shifts from personal injury to property damage, the burden of proof and required evidence shift as well. Simply stated, the claim you make defines the burden of proof you take. Grace misses this important point.

At an early stage in these proceedings, Claimants sought carefully to distinguish between property damage and personal injury claims. In particular, Claimants urged that this Court not pre-determine the issues to be litigated in the science trial. The Court agreed:

> I was trying very hard not to set the parameter for what the issues would be until the discovery is done. I think the appropriate place to look at that is at the pre-trial conference.[6]

At a later hearing, the Court assured Claimants, "[Y]ou're not foreclosed from trying to prove your claim however you want to prove your claim."[7] Accordingly, the Court entered a discovery order without predetermining admissibility or burden of proof for trial: "the scope

---

[2] Harashe v. Flintkote Co., 848 S.W.2d 506 (Mo. Ct. App. 1993).

[3] Norfolk & Western Ry. Co. v. Ayers, 123 S.Ct. 1210, 1219-23 (2003).

[4] See, e.g., In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 787-88 (3rd Cir. 1994); Bower v. Westinghouse Elec. Corp., 522 S.E.2d 424 (W. Va. 1999).

[5] See, e.g., Perlmutter v. U.S. Gypsum Co., 4 F.3d 864, 867-68 (10th Cir. 1993); School Dist. of Independence, Mo., No. 30 v. U.S. Gypsum Co., 750 S.W.2d 442, 455 (Mo. Ct. App. 1988).

[6] Tr. Aug. 26, 2002 Hearing at 62-63 [Attach. 2].

[7] Tr. Sept. 23, 2002 Hearing at 83-84 [Attach. 3].

of <u>discovery</u> will be limited to what science demonstrates with regard to whether ZAI creates an unreasonable risk of harm."[8]

Ignoring the distinction between property damage and personal injury, Grace argues that ZAI homeowners have no claim unless they meet an inapplicable personal injury standard. Whatever the merit of this "doubling risk" standard when plaintiff is trying to prove her sickness is caused by defendant's toxin, it has no application to a property damage claim. Grace has cited no case that has ever imposed such a standard in a property damage context.

Last month, the <u>Celotex</u> bankruptcy court recognized the distinction, finding that an asbestos property damage claimant can defeat summary judgment and has a "legally viable cause of action and/or compensable injury" when the claimant submits "documentation of studies showing that asbestos fibers can be released from [the asbestos-containing product] during the normal life of the product".[9] The <u>Celotex</u> court is correct. Indeed, as Claimants have shown in their summary judgment motion and discuss briefly below, a legion of courts have correctly focused on property contamination as the key to an asbestos property damage claim.

Claimants have proved contamination by presenting irrefutable evidence that asbestos fibers have been and will continue to be released during disturbances of ZAI, and that these fibers settle on surfaces throughout attics. <u>See</u> <u>Perlmutter</u>, 4 F.3d at 867-68 (contamination established by showing significant amounts of asbestos fibers on building surfaces).[10]

---

[8] Amended Order at 1 (Nov. 25, 2002) (emphasis added) [Attach. 4].

[9] <u>In re Celotex Corp.</u>, Case No. 90-10016-8G1, slip op. at 32 (Bankr. M.D. Fla. July 17, 2003) [Attach. 5].

[10] <u>See also</u> <u>City of Wichita, Kan. v. U.S. Gypsum Co.</u>, 72 F.3d 1491, 1498 (10th Cir. 1996); <u>Adams-Arapahoe Sch. Dist. No. 28-J v. GAF Corp.</u>, 959 F.2d 868, 872 (10th Cir. 1992); <u>Kansas City v. W.R. Grace & Co.</u>, 778 S.W.2d 264, 268 (Mo. Ct. App. 1989); <u>School Dist. of Independence</u>, 750 S.W.2d at 456-57. Numerous other cases recognizing that contamination is the key to property damage claims are collected in Attachment 6.

Claimants need not prove that imminent or certain personal injuries will result from the contamination.[11] The substantial increase in asbestos levels when ZAI is disturbed is sufficient to demonstrate an unreasonable risk of harm. See In re Celotex Corp., 196 B.R. 973, 1008 (Bankr. M.D. Fla. 1996) (when interior asbestos levels exceed background levels, there is a potential health hazard, and physical injury to tangible property is established); City of Greenville v. W.R. Grace & Co., 827 F.2d 975, 979 (4th Cir. 1987) (when asbestos is unnecessary in a product, even a small risk can be "unreasonable").

Claimants have established as a matter of law that the asbestos-contaminated ZAI in their homes results in property damage. The air and settled dust testing establish that asbestos fibers have been released from ZAI and will continue to be released upon subsequent disturbances. These asbestos fibers create an increased risk of harm to ZAI homeowners and contractors. Accordingly, Claimants are entitled to summary judgment. At a minimum, the evidence creates issues of fact as to whether Claimants have suffered property damage, and Grace's motion should be denied.

## II. Grace's Case is Built Upon the Faulty and Scientifically Unreliable Premise That ZAI Predominantly Contains Non-Asbestiform "Cleavage Fragments" Rather Than Asbestiform Fibers.

Grace's case is a house of cards precariously perched on Dr. Lee's rogue opinion that the particles released from ZAI are harmless, non-asbestiform cleavage fragments rather than asbestiform fibers. No other Grace expert holds that opinion. They merely accept Dr. Lee's assertion in formulating their opinions.[12] If Dr. Lee's opinion falls, Grace's other expert

---

[11] See, e.g., Commonwealth v. United States Mineral Prods. Co., 809 A.2d 1000, 1020 (Pa. Commw. Ct. 2002) (rejecting defendants' contention that a property damage plaintiff must present a statistical or epidemiological analysis of the risk associated with a toxic substance); School Dist. of Independence, 750 S.W.2d at 455 (rejecting defendant's contention that external standards of increased risk should be imposed on the fact finder, and allowing plaintiffs' claim even though none of the building occupants had developed disease).

[12] See Deposition of Edward Ilgren at 128-29 (May 22, 2003) ("Ilgren Dep.") [Attach. 7]; Deposition of William Hughson at 168-70 (June 6, 2003) ("Hughson Dep.") [Attach. 8]; Deposition of Elizabeth Anderson at 31 (June 5, 2003) ("Anderson Dep.") [Attach. 9]; see also Deposition of Steven Mlynarek at 141-42 (June 19,

4

opinions topple with it.[13]  As set forth in Claimants' Motion to Exclude Dr. R.J. Lee's

Opinion on Cleavage Fragments ("Lee Brief"), his opinion is scientifically unreliable and

contrary to decades of research on the Libby amphiboles in ZAI.  Everyone but Dr. Lee

agrees that Libby vermiculite is contaminated with asbestiform tremolite.  Indeed, in a July

21, 2003 filing in this Court, Grace recently contradicted Dr. Lee's position by admitting that

Libby tremolite is asbestiform:

> When mined, the vermiculite ore in the Libby Mine deposit, however,
> contained a secondary mineral – <u>fibrous asbestiform tremolite</u>.[14]

Grace's admission says it all.

### A.    The Questionable Practices of Dr. Lee's Laboratory Have Resulted in its Placement on EPA's "Watch List".

In desperate need for an inventive defense, Grace was forced to rely on an expert

whose laboratory recently failed an EPA investigative audit.  In April 2001, EPA audited Dr.

Lee's California laboratory and concluded:

> The overall evaluation of the laboratory revealed procedural weaknesses with
> regard to a lack of on-site QA/QC program, compliance with laboratory SOPs
> and methodology, sample handling, record keeping, and incomplete
> documentation of analytical results.[15]

Obviously, the failure to follow standard operating procedures and lack of internal quality

controls are serious deficiencies, and EPA agrees.  It recently issued a special notice to its

regional offices urging caution when making decisions about asbestos contaminated sites

---

2003) ("Mlynarek Dep.") [Attach. 10]; Deposition of Peter Lees at 20, 94-95 (June 20, 2003) ("Lees Dep.") [Attach. 11].

[13] <u>See</u>, <u>e.g.</u>, Anderson Dep. at 188 (conceding that her estimated risks would increase if Dr. Lee's fiber counts underestimated the asbestiform fiber concentrations) [Attach. 9].

[14] Motion of the Debtors for the Entry of an Order Approving the Execution of and Performance Under an Administrative Order With the EPA at 2-3 (July 21, 2003) (emphasis added) [Attach. 12].

[15] U.S. EPA Office of Emergency & Remedial Response, <u>Summ. On-Site Audit Rep. R. J. Lee Group, Inc.</u> at 8 (May 1, 2001) [Attach. 13].

where Dr. Lee's lab did the analysis.[16]  Citing concern over the laboratory's "questionable

practices," EPA recommended that:

> Regions review data for all RJ Lee Group testing facilities that may have been
> involved in testing of asbestos samples, including samples of vermiculite
> products or raw ore which may have come from Libby, Montana, and may be
> contaminated with asbestos.[17]

A prime example of such "questionable practices" is Dr. Lee's manipulation of

scientific techniques to characterize asbestiform fibers as cleavage fragments.  After Grace's

July 21, 2003 admission to this Court that Libby tremolite is asbestiform, it is apparent that

not even Grace relies on him.  Nor should this Court.

### B.    Dr. Lee's Opinions are Contrary to Virtually all Prior Opinions Regarding Libby Amphiboles, Including Those Within Grace.

Dr. Lee's opinions are contrary to the consensus in the published, peer-reviewed

scientific literature, as well as Grace's historical conclusions.  As more thoroughly discussed

in the Lee Brief, virtually all researchers have concluded that Libby vermiculite is

contaminated with fibrous amphibole asbestos fibers whose disturbance results in the release

of airborne asbestos.  In its seminal analysis of the Libby ore deposit in 1928, the U.S.

Geological Survey reported finding "amphibole of a fibrous habit that is known

commercially as amphibole asbestos".[18]  After seventy-five years of scientific agreement, Dr.

Lee has conjured up a theory that 90% of the Libby particles that everyone else measures as

asbestos fibers, are really harmless cleavage fragments.[19]

---

[16] U.S. EPA Office of Emergency & Remedial Response, Mem. to Superfund Regional Managers (June 19, 2003) [Attach. 14].

[17] Id. at 2 [Attach. 14].

[18] J.T. Pardee, et al., Deposits of Vermiculite and Other Minerals in the Rainey Creek Dist., Near Libby, Mont., Contributions to Econ. Geology, U.S. Geological Survey Bulletin 805 at 17 (1929) (emphasis added) [Attach. 15].

[19] Significantly, Grace paid Dr. Ilgren over $100,000 in the early 1990s to conduct research on the health effects of tremolite contained in the Libby amphibole.  Ilgren Dep. at 49 [Attach.7].  Until Dr. Lee conjured up the

In a remarkable about-face in support of Dr. Lee, Grace now attacks its own historical testing of ZAI fiber release in the 1970s and 1980s.[20] Grace's testing showed that despite its efforts to remove asbestos from the product, ZAI continued to release asbestos at concentrations above the current OSHA excursion limit of 1 f/cc.[21] Grace now claims its testing does not really show the asbestos fiber release its microscopists reported. Grace condemns its testing by arguing that: (1) the results are unreliable because "[t]he samples were analyzed by Phased [sic] Contrast Microscopy (PCM), a method that does not distinguish asbestos from non-asbestos fibers"; and (2) "[n]o attempt was made to perform a differential count to exclude the non-asbestos fibers."[22] Grace's assertions defy its clear historical record.

Claimants have uncovered irrefutable evidence that Grace used an asbestos fiber counting method called "discriminatory counting" when analyzing ZAI.[23] This discriminatory counting method was designed to exclude non-asbestos particles, including cleavage fragments, even if the criteria for a "fiber" were met.[24] In 1982, Grace's chief

---

issue, Grace never asked him about cleavage fragment health effects. According to Dr. Ilgren, "It wasn't an issue that ever appeared on the radar screen at all." Id. at 55.

[20] Grace Summ. J. Br. at 12 n.6 [Attach. 1].

[21] Deposition of Thomas Hamilton at 41-42, 46-47, 49, 56-61, 68-75, 78-80, 91-92 (Feb. 25, 2003) [Attach. 87].

[22] Grace Summ. J. Br. at 12 n.6 [Attach. 1].

[23] Deposition of Harry Eschenbach in United States v. W.R. Grace & Co. at 72 (Sept. 26, 2002) (stating that Grace used discriminatory counting for ZAI user exposure tests) ("Eschenbach EPA Dep.") [Attach. 16].

[24] Memo from J. Yang to H. Brown, et al., at 5 (Jan. 28, 1976) ("do not count as fibers crystals or slivers of material") [Attach. 17]; Memo from J. Yang to H. Duecker at 2 (Dec. 9, 1976) ("It is very difficult to decide (1) whether the fiber being counted is a true fiber even though the aspect ratio is greater than 3 to 1 . . . . [S]livers of vermiculite or plates standing on edge should be avoided . . . .") [Attach. 18]. Dr. Yang's December 1976 memo referenced a directive from OSHA that "[i]n order to be considered asbestiform or fibrous . . . [p]articles must appear to be fibrous rather than as crystals or slivers." OSHA Field Info. Mem. No. 74-92, at 1 (Nov. 21, 1974) [Attach. 19].

safety officer, Harry Eschenbach, reiterated Grace's practice of excluding non-asbestos particles in its testing:

> When counting asbestos fibers, those particles . . . which are obviously not asbestos but some other material are <u>not</u> to be counted as fibers. Even if the aspect ratio and other criteria for fibers are met, non-fibrous materials are not asbestos and therefore must be excluded."[25]

Amazingly, Grace now claims that only 1.5 to 6% of the fibers it counted by PCM were actually asbestos fibers.[26] Grace forgets that twenty years ago it hired an independent laboratory to compare its PCM counts with corresponding TEM counts to determine the percentage of fibers counted that were actually asbestos. That study concluded that 50-75% of the fibers Grace counted using its PCM discriminatory counting method were indeed asbestos.[27]

In light of this evidence, Grace's representation that it made no attempt to exclude non-asbestos fibers from its PCM counts (and thus they are overstated) is clearly incorrect. Grace's historical testing results are further evidence that ZAI releases asbestos fibers and creates an increased risk of harm to Claimants. Grace's attempt to salvage Dr. Lee by savaging its own laboratory is a dismal failure.

### III.     Claimants Have Presented Scientifically Reliable and Admissible Evidence to Support Their Claims.

#### A.     Surface Dust Testing is Scientifically Valid, Reliable, and Relevant to the Issues in This Case.

Grace contends that Claimants' dust sampling evidence is inadmissible under <u>Daubert</u> and must be excluded. On the contrary, settled dust test results are scientifically valid and highly probative in an asbestos property damage case. Claimants' experts confirmed

---

[25] Memo from H. Eschenbach to J. Yang (June 14, 1982) (emphasis in original) [Attach. 20].

[26] Grace Summ. J. Br. at 12 n.6 [Attach. 1].

[27] Letter from E. Peters, A.D. Little, Inc., to J. Yang at 2 (Sept. 19, 1983) [Attach. 21].

asbestos contamination in ZAI homes by collecting and analyzing settled dust from surfaces near ZAI pursuant to the peer-reviewed protocol of the American Society for Testing and Materials (ASTM), Method D5755.[28] This evidence should be admitted as numerous courts have found.

### 1.   ASTM D5755 is Scientifically Valid and Reliable.

Expert testimony is admissible under Fed. R. Evid. 702 if "the reasoning or methodology underlying the testimony is scientifically valid and . . . properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993). The Supreme Court set forth a non-exclusive list of four factors to guide the first part of this inquiry, and the Third Circuit expanded the list to eight.[29] As discussed below, Claimants' settled dust testing evidence satisfies all of the factors set forth in Daubert and In re Paoli.

### a.   Settled Dust Testing Consists of a Testable Hypothesis.

ASTM D5755 provides an index of asbestos in the sampled dust, reported as the number of asbestos structures per unit area of sampled surface. Because ZAI contains tremolite asbestos for which there is no background level in the general environment, a finding of tremolite asbestos in surface dust proves the hypothesis that ZAI has released asbestos into the environment.[30]

---

[28] See ASTM Method D5755, Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations (1995) [Attach. 22].

[29] These factors are: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. Daubert, 509 U.S. at 593-94; In re Paoli, 35 F.3d 717, 742 n.8 (3rd Cir. 1994).

[30] Richard Hatfield & William Longo, Zonolite Attic Insulation Rep. at 18 (Apr. 4, 2003) [Attach. 23]; Deposition of Richard Lee at 244-45 (June 6, 2003) ("Lee Dep.") [Attach. 24].

###### b.    ASTM D5755 Has Been Subject to Peer Review.

The methodology used by Claimants' experts has been subjected to peer review and

publication.[31]  Likewise, published scientific experiments have relied on the indirect method

for measuring asbestos in dust.[32]

###### c.    ASTM D5755 Has An Acceptable Potential Rate of Error.

The dust sampling method has a scientifically acceptable potential rate of error that

has been demonstrated in various studies and subjected to peer review.  Precision data for

ASTM D5755, based on inter-laboratory rounds, shows that its coefficient of variation (CV)

falls within the inter-laboratory CV range for the NIOSH 7400A PCM air test method.[33]  Its

CV is also lower (thus more precise) than the CV for the EPA TEM measurement of asbestos

air samples.[34]  The inter-sample variability for ASTM D5755, including sample collection,

---

[31] See James R. Millette, et al., Settled Dust Analysis Used in Assessment of Bldgs. Containing Asbestos, Microscope at 215-20 (1990) [Attach. 25] ; Richard Hatfield, et al., Study of the Reproducibility of the Micro-Vac Technique as a Tool for the Assessment of Surface Contamination in Bldgs. with Asbestos-Containing Materials, Advances in Envtl. Measurement Methods for Asbestos, ASTM STP 1342, at 301-12 (Michael E. Beard & Harry L. Rook eds., 2000) [Attach. 26].

[32] See, e.g., D.L. Keyes, et al., Exposure to Airborne Asbestos Associated with Simulated Cable Installation Above a Suspended Ceiling, Am. Indus. Hyg. Assoc. J. 52(11):479-84 (1991) [Attach. 27]; Marion G. Williams, Jr., et al., Asbestos Release During Removal of Resilient Floor Covering Materials by Recommended Work Practices of the Resilient Floor Covering Institute, Appl. Occup. & Envtl. Hyg. 18(6):466-78 (2003) [Attach. 89].

[33] Compare Hatfield, supra note 30, at 304 (D5755 CV of 0.71), with National Inst. for Occup. Safety & Health (NIOSH) Method 7400, Issue 2, NIOSH Manual of Analytical Methods at 9 (Aug. 15, 1994) (CV of 0.27 – 0.85) [Attach. 28].

[34] See EPA, Measuring Airborne Asbestos Following an Abatement Action, No. 600/4-85-049, at 5-3 (Nov. 1985) [Attach. 88].

has been found to be less than +/– 15%, which is very low.[35]  The dust test technique has

been independently verified as scientifically effective and reproducible.[36]

### d.    There Are Standards That Control the Technique's Operation.

ASTM D5755 sets forth a standardized method for taking and measuring asbestos in

settled dust that satisfies this requirement.

### e.    ASTM D5755 is Generally Accepted in the Courts and the Scientific Community.

#### i.    Courts Have Regularly Admitted Expert Dust Testimony.

Courts throughout the country have recognized that dust testing is relevant and often

necessary to establish that an asbestos-containing product has caused contamination.  Settled

dust test results have been admitted in numerous trials against Grace and other asbestos

defendants.[37]  Claimants' experts have repeatedly been allowed to testify about dust testing

results.[38]

#### ii.    Cases Excluding Dust Testing Are Distinguishable.

Against the wealth of cases admitting dust testing evidence, Grace has found just

three contrary opinions.  On examination, they are clearly distinguishable.  In re Armstrong

World Industries, 285 B.R. 864 (Bankr. D. Del. 2002), dealt with a non-friable product (floor

tile) that the court found presented "a minimal risk of asbestos release in buildings."  Id. at

---

[35] Owen S. Crankshaw, et al., Overview of Settled Dust Analytical Methods and Their Relative Effectiveness, Advances in Envtl. Measurement Methods for Asbestos, ASTM STP 1342, at 361 (Michael E. Beard & Harry L. Rook eds., 2000) [Attach. 30].

[36] Owen S. Crankshaw, Quantitative Evaluation of the Relative Effectiveness of Various Methods for the Analysis of Asbestos in Settled Dust, Research Triangle Inst. (1996) [Attach. 31].

[37] A representative listing of these orders is attached hereto [Attach. 32].

[38] A representative listing of these orders is attached hereto [Attach. 40].

867. ZAI, in contrast, is a highly friable asbestos product that releases asbestos even when it is minimally disturbed.[39]  Importantly, the Armstrong court found that dust testing was "a useful tool for determining whether there is any asbestos on the surface of a room or building."  Id. at 871 (emphasis in original).  But the Armstrong court excluded dust testing to predict the amount of asbestos that would become airborne from floor tile (in the absence of any actual air tests confirming the relationship).  Id. at 869.  Unlike Armstrong, the ZAI Claimants are not trying to use settled dust testing to predict airborne asbestos levels.  They already have actual air test results confirming that asbestos in ZAI dust will readily become airborne on disturbance.  Ironically, the Armstrong court noted that air levels like the ZAI simulation readings exceed OSHA levels would "establish[ ] your case per se".[40]  In the final analysis, Armstrong is of no help to Grace.

Grace next cites In re Lamar County Asbestos Litigation, slip op. (6th Dist. Ct., Lamar Co., Tex. July 5, 2001).  A review of the trial court's order shows that the judge misconstrued significant elements of the science behind Dr. Longo's fiber release tests, as well as the purpose and nature of his testimony.  For example, contrary to Dr. Longo's testimony, the court incorrectly found that he attempted to compare TEM sample results to OSHA standards that were promulgated using PCM results.[41]  The decision in Lamar County

---

[39] See, e.g., William M. Ewing, Zonolite Attic Insulation Rep. at 6-7 (Mar. 19, 2003) [Attach. 47]; Lee Dep. at 242-43 [Attach. 24]; Deposition of Morton Corn at 127 (May 29, 2003) ("Corn Dep.") (ZAI is "highly friable") [Attach. 48].

[40] In re Armstrong World Indus., et al., No. 00-04471 (RJN), Tr. at 18 (Bankr. D. Del. Nov. 1, 2002) [Attach. 29].

[41] The judge stated that if he "misunderstood the testimony and exhibits . . . so as to be incorrect in [his] findings of fact and conclusions of law, the error(s) was caused by the confusing, misleading and prejudicial presentation of the evidence . . . ."  Lamar County at 1 [Attach. 49].  Perhaps the best evidence that the Texas county judge was misinformed about the scientific value of the evidence is that the tests he excluded were peer reviewed and published after his ruling.  See William Longo, et al., Fiber Release During the Removal of Asbestos-Containing Gaskets, Appl. Occup. & Envtl. Hyg. 17(1):55-62 (2002) [Attach. 50].

is an anomaly that should not be given any precedential value. It has not even been followed in Texas.[42]

Finally, Grace relies on <u>Ball v. Consolidated Rail Corporation</u>, 756 N.E.2d 1280 (Ohio Ct. App. 2001) (a personal injury case). In <u>Ball</u>, the defendant attempted to exclude Dr. Longo's testimony because it was not a full re-enactment of the exact conditions experienced by the plaintiffs at the time of their exposure to asbestos. <u>Id.</u> at 1287. The court rejected the defendant's argument and <u>admitted</u> Dr. Longo's testimony because the experiment was limited to "determination of whether asbestos fibers could be released if some conditions [plaintiffs] had described had occurred." <u>Id.</u> The only evidence excluded was testimony as to amounts of asbestos released during the experiment, since the experiment was designed to show only the fact, not the level, of exposure. <u>Id.</u> at 1288. Because the ZAI simulation experiments were designed to show the levels of asbestos release, <u>Ball</u> is inapplicable.

### iii.    ASTM D5755 Has Achieved General Acceptance in the Scientific Community.

Grace's argument that dust testing analysis is not generally accepted in the scientific community is without merit. The TEM indirect method of sample preparation is an accepted methodology that has been approved by the ASTM, the American National Standards Institute and authorized by public and private agencies, such as EPA.[43] Further, by 1997

---

[42] <u>See, e.g.</u>, <u>Caffey v. Foster Wheeler Energy Corp.</u>, No. 01-C-753, slip op. (Dist. Ct., Cass County, Tex., June 19, 2003) (admitting dust testing evidence after <u>Lamar County</u>) [Attach. 44]; <u>Bell v. Dresser Indus.</u>, No. A-920.961- SC(19), slip op. (128th Jud. Dist., Orange Co., Tex. Sept. 4, 2001) (same) [Attach. 45].

[43] For example, EPA used indirect preparation dust sampling as part of its analysis of asbestos contamination in Libby, Montana. <u>See</u> EPA Fact Sheet: Asbestos Sampling in Libby, MT (May 2000) [Attach. 51]. Dust sampling was also used to assess asbestos and other hazardous dust in Manhattan following the World Trade Center disaster. <u>See</u> World Trade Ctr. Envtl. Assessment Working Group, <u>Final Rep. of the Pub. Health Investigation to Assess Potential Exposures to Airborne and Settled Surface Dust in Residential Areas of Lower Manhattan</u> (Sept. 2002) [Attach. 52].

over 72% of TEM laboratories surveyed were utilizing ASTM D5755, and approximately

85% of those laboratories were doing so for assessment of asbestos in buildings.[44]

Ironically, outside the courtroom, Dr. Lee has undermined Grace's attack on the

indirect method.  Dr. Lee was a member of the Health Effects Institute Asbestos Research

Panel, which concluded that "surface dust evaluation provides information that can be useful

in determining the priority for and type of remediation required, and in helping to determine

if settled dust should be subject to remediation."[45]

The overwhelming weight of authority supports the general acceptance of dust

sampling evidence.

> **f.      ASTM D5755 is Superior to Other Methods Found to be
> Reliable.**

Because of the extreme sensitivity of an electron microscope, it can only be used to

look at a tiny portion of the total filter.  The "indirect" method of analysis avoids several

shortfalls of the "direct" method, so-called because it looks at materials as they are directly

deposited on a filter.  The two main shortcomings of the direct method are:  (1) materials are

not necessarily deposited on the filter uniformly (so results can vary significantly depending

on what "fields" the microscopist looks at on the filter); and (2) other particles deposited on

the filter may land on top of and obscure material deposited earlier (resulting in fibers being

missed).  The indirect method addresses the first problem by suspending the deposited

particles in a solution and then uniformly redepositing those particles so that each field

---

[44] James R. Millette & Michael D. Blount, Applications of the ASTM Asbestos in Dust Method D5755, Advances in Environmental Measurement Methods for Asbestos, ASTM STP 1342, at 367 (Michael E. Beard & Harry L. Rook eds., 2000) [Attach. 53].

[45] Health Effects Inst. Asbestos Research, Asbestos in Pub. & Commercial Bldgs. at 5-3 (Sept. 1991) [Attach. 54].

examined will have a similar count. It addresses the second problem by the same

resuspension process that dissolves organic particles that would otherwise obscure inorganic

particles such as asbestos fibers. In this way, the indirect method gives the analyst a more

sensitive measure of the total asbestos structure count, not necessarily as the structures

landed on the filter, but as they actually exist in the sample.

Scientific studies have concluded that the indirect method of sample analysis has

better analytical sensitivity than the direct method.[46] It permits the microscopist to see fibers

that would otherwise be obscured by other particles. It uniformly disperses fibers on a filter

so the microscopist will see a more uniform fiber arrangement wherever she looks. Although

Grace contends that the indirect method breaks up asbestos structures and, therefore, results

in artificially high asbestos fiber counts, this view is not supported by any scientific

consensus. The indirect method does not break single fibers into multiple fibers. Although it

may separate some clusters of fibers, and perhaps some fiber matrices, into their

components,[47] this, may in fact, give a more accurate measure of the actual number of

asbestos fibers likely to be in the lung over time. In fact, Dr. Lee has admitted that he co-

authored an article saying that the lung disaggregates asbestos structures just like the indirect

method.[48]

---

[46] Id. at 4-25 [Attach. 54].

[47] This conclusion is based on fiber analysis showing that use of the indirect method results in higher counts in all size categories. See EPA, Comparison of Airborne Asbestos Levels Determined by Transmission Electron Microscopy (TEM) Using Direct and Indirect Transfer Techniques at 4 (Mar. 1990) [Attach. 55]. This increase may result from the indirect method's greater sensitivity over the direct method. If the method were breaking structures into smaller fibers, as Grace contends, there would be an increase only in the smaller sizes, which does not happen. EPA's position is that the indirect method "is scientifically valid and provides useful, accurate information." See United States v. W.R. Grace & Co., No. 01-72-M-DWM, U.S. Reply to Defs.' Resp. to U.S.'s Mot. for Partial Summ. J. on Defs.' Third Affirmative Defense at 10 (D. Mont. Nov. 12, 2002) [Attach. 56].

[48] Testimony of Dr. Lee in State Farm Mut. Auto. Ins. Co. v. W.R. Grace & Co., Tr. at 6086-91 (Apr. 29, 1993) [Attach. 57].

g.     **Claimants' Experts Are Well-Qualified to Testify Based on the Methodology.**

Claimants' experts are qualified to provide expert testimony on asbestos in buildings issues by virtue of their education, training, and professional experience in the field. They are regularly involved in consulting for industries and government agencies in asbestos-related matters, have authored a substantial number of publications, have lectured at universities and conferences, and have been personally involved in the development of methods and standards for asbestos testing in buildings.[49]

h.     **ASTM D5755 is Routinely Used in Non-Judicial Contexts.**

As set forth above, ASTM D5755 is routinely used for assessment of asbestos in buildings by laboratories around the country.[50] One of the scientists Grace retained to supervise its ZAI simulation study had done settled dust testing for asbestos in the vicinity of the World Trade Center collapse.[51] Even Dr. Lee admitted he has done hundreds of dust test analyses for non-litigation clients.[52]

2.     **ASTM D5755 is Properly Applied to the Facts of This Case.**

The second part of the Daubert inquiry is whether the methodology can be applied to the facts to logically advance a material aspect of the proposing party's case. 509 U.S. at 591-92. The dust testing results logically advance a central aspect of Claimants' case by demonstrating that ZAI has released asbestos into Claimants' homes, resulting in physical

---

[49] See curriculum vitae for William Ewing [Attach. 58], Richard Hatfield [Attach. 59], and William Longo [Attach. 60].

[50] See Millette, supra note 42, at 367 [Attach. 53].

[51] Mlynarek Dep. at 14-16 [Attach. 10].

[52] Lee Dep. at 281 [Attach. 24].

contamination.  Accordingly, they are highly probative on the issue of contamination.

Grace's objections to the use of settled dust testing go to the weight, not the admissibility, of

this evidence.

3. **Grace's Argument That the K-Factor Does Not Make Dust Samples Scientifically Acceptable to Show Airborne Asbestos Exposures is Misplaced.**

Grace relies on <u>Armstrong</u> for its contention that the K-factor cannot be used to

predict airborne concentrations upon disturbance of ZAI dust and should be excluded.[53]

Unlike <u>Armstrong</u>, where claimants attempted to use the K-factor to predict airborne asbestos

levels, Claimants here have performed air testing during disturbances of ZAI and have

determined the actual airborne asbestos concentrations during ordinary and foreseeable

activities by homeowners and contractors.  Because Claimants are not seeking to use the K-

factor to predict airborne concentrations, Grace's argument regarding the K-factor is

misplaced.

B. **Case Reports are Relevant and Admissible Under Federal Rules of Evidence 401 and 402.**

Grace contends that individual case reports are not reliable evidence of a causal

relationship between a substance and a given disease.  Evidence is relevant and, thus,

admissible if it tends to make the existence of any material fact more or less probable.  Fed.

R. Evid. 401 and 402.  Applying this standard, case reports are admissible to show the

---

[53] The K-factor simply confirms that asbestos dust can be resuspended, and that a relationship exists between disturbance of asbestos surface dust and airborne asbestos concentrations.  Grace's experts agree that asbestos surface dust can be resuspended.  <u>See,</u> Hughson Dep. at 186-87 [Attach. 8]; Deposition of Richard Lee in <u>United States v. W.R. Grace & Co.</u> at 149-51 (Sept. 28, 2002) ("Lee <u>EPA</u> Dep.") [Attach. 61]; <u>see also</u> Mlynarek Dep. at 107 [Attach. 10].

growing occurrences of asbestos-related disease among individuals exposed to asbestos in buildings.[54]

Claimants' expert witnesses will testify about increased incidence of building-related asbestos disease based on their own investigations, investigations by other reputable researchers, case histories, and recent studies of individuals with asbestos disease whose only known exposure was to asbestos in buildings. This testimony will be supported by studies in the medical literature[55] and published case reports.[56] In fact, asbestos-related disease from exposure in buildings has been referred to as the "third wave of asbestos disease."[57] Significantly, the building-related asbestos disease already reported in the medical literature has largely resulted from exposures to material much less friable than ZAI (e.g., spray-on materials and thermal insulation).[58] The absence of case studies relating asbestos disease to ZAI is homes is not surprising since, as Claimants discuss below, Grace concealed that asbestos content of ZAI for decades.

---

[54] In any event, this Court can take judicial notice of the fact that ZAI causes asbestos-related disease. Despite Grace's incredulous proclamation that no one has ever contracted an asbestos-related disease from exposure to ZAI, at least one appellate court has reached the opposite conclusion. In Harashe v. Flintkote Co., 848 S.W.2d 506 (Mo. Ct. App. 1993), the court affirmed a jury verdict against W.R. Grace in favor of a man who contracted and died from mesothelioma following brief exposure to ZAI during installation in his attic. [Attach. ]. Grace's proclamation also ignores the fact that it has already settled between twenty-five and one hundred additional ZAI bodily injury claims. Debtors' Objections and Resps. to ZAI Claimants' Second Set of Reqs. to Admit to Debtors. [Attach. 62].

[55] See, e.g., Henry Anderson, et al., Mesothelioma Among Employees with Likely Contact with In-Place Asbestos-Containing Bldg. Materials, Ann. N.Y. Acad. Sci. 643:550-72 (1991) [Attach. 63]; L. Christine Oliver, et al., Asbestos-Related Disease in Pub. Sch. Custodians, Am. J. of Indus. Med. 19:303-16 (1991) [Attach. 64]; E.A. Bresnitz, et al., Asbestos-Related Radiographic Abnormalities in Elevator Constr. Workers, Am. Rev. Respir. Dis. 47:1341-44 (1992) [Attach. 65]; Ruth Lilis, et al., Asbestos Disease in Maintenance Workers of the Chem. Indus., Ann. N.Y. Acad. Sci. 127-35 (1979) [Attach. 66].

[56] See, e.g., David Lilienfeld, Asbestos-Associated Pleural Mesothelioma in School Teachers: A Discussion of Four Cases, Ann. N.Y. Acad. Sci. 454-58 (1991) [Attach. 67].

[57] William Hines, Third Wave of Asbestos Disease: Asbestos in Place (1990) [Attach. 68]. The first wave was exposure from asbestos mining and manufacturing, and the second wave was from installation of asbestos products.

[58] Id. [Attach. 68].

Grace fails to acknowledge that numerous courts have rejected its arguments and held that evidence of case studies is relevant and admissible.[59] Grace's argument is really an attack on the weight, not the admissibility, of this evidence.

### C.    Grace's Criticism of Claimants' Lack of Epidemiological Evidence Should be Rejected.

Grace faults Claimants for not having epidemiological studies demonstrating that ZAI causes asbestos disease, even though Claimants are not required to make this showing to prove their property damage claims. As an initial matter, Grace should be estopped from making this argument. For decades it concealed the asbestos content of ZAI from the unsuspecting public.[60] So successful was Grace's concealment that its industrial hygiene expert, Dr. Corn, who has studied asbestos for fifty years, did not know until recently that ZAI contains asbestos.[61] Since it can take years to do an epidemiological study, Grace can be certain that nobody can complete such a study on ZAI during these proceedings. And even if funding were available, the exposed population is so large that it would be very difficult to study.

The case law makes it clear that epidemiological data is not required to prove a product is defective, especially when such data is unavailable as a practical matter. For example, the Fourth Circuit rejected Grace's identical argument:

> [W]e do not believe that Grace should be allowed to escape liability simply because no occupant of the city hall has yet developed an asbestos-related

---

[59] See, e.g., City of Greenville, 827 F.2d at 980 n.2; State Farm Mut. Auto. Ins. Co. v. W.R. Grace & Co., No. 89-3022, slip op. (C.D. Ill. Feb. 11, 1993) [Attach. 69]; U.S. Gypsum Co. v. Mayor of Baltimore, 647 A.2d 405, 420-21 (Md. Ct. App. 1994); School Dist. of Independence, 750 S.W.2d at 448-50.

[60] Grace repeatedly advertised ZAI as "100% vermiculite", "absolutely harmless", "perfectly safe" and containing "no harmful substance". [Attach. 86].

[61] Corn Dep. at 9-10 [Attach. 48]; see also Hughson Dep. at 133-34 (the public's discovery that ZAI contains asbestos "is a reasonably recent event") [Attach. 8].

disease, or because there are, as yet, no epidemiological studies concerning
the health risks associated with asbestos contamination of office buildings.

City of Greenville, 827 F.2d at 980 n.2.[62]  The absence of a ZAI epidemiological study is

likewise not a viable defense for Grace.

The fact that exposure to Libby amphibole asbestos is capable of causing disease is

undeniable.  An epidemiological study of Libby mine workers showed significant asbestos

disease.[63]  An animal study[64] commissioned by Grace concluded that Libby amphibole

asbestos is capable of causing disease.[65]  Even the Libby ATSDR Report on which Grace so

heavily relies concluded that the odds ratios for those who "handled vermiculite insulation"

showed a "statistically significant elevation" of disease risk.[66]  The Libby ATSDR report

---

[62] See Ferebee v. Chevron Chem. Co., 736 F.2d 1529, 1535-36 (D.C. Cir. 1984) (recovery not precluded until a "'statistically significant' number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies"); Bonner v. ISP Tech., Inc., 259 F.3d 924, 929 (8th Cir. 2001) ("there is no requirement that published epidemiological studies supporting an expert's opinion exist in order for the opinion to be admissible").

[63] J.C. McDonald, et al., Cohort Study of Mortality of Vermiculite Miners Exposed to Tremolite, British J. of Indus. Med. 43:436-44 (1986) [Attach. 70].

[64] Because of the limitations of epidemiology, animal testing presents an accepted alternative to determining the potential for a substance to cause disease in humans.  See Science and Judgment in Risk Assessment, Nat'l Research Council at 2 (1994) [Attach. 71].

[65] William E. Smith, Final Report on Biologic Tests of Samples 22260p5 and 22263p2, Health Research Inst., Fairleigh Dickinson Univ. (Dec. 20, 1979) [Attach. 72].  Grace rejected Dr. Smith's suggestion to inject animals with smaller amounts of asbestos to test Grace's assertion that a safe level could be found.  Dr. Smith stated: "I guess they felt they had the answer . . . . The material was carcinogenic."  Michael Moss & Adriane Appel, Protecting the Product:  A Special Rep.; Company's Silence Countered Safety Fears About Asbestos, N.Y. Times, July 9, 2001, at A1 [Attach. 73].

[66] ATSDR, Year 2000 Med. Testing of Individuals Potentially Exposed to Asbestiform Minerals Associated with Vermiculite in Libby, MT at 23 (Aug. 23, 2001) [Attach. 74].  The study concluded that 20.9% of those who "sometimes" handled vermiculite insulation showed pleural abnormality, and 26.6% of those who "frequently" handled vermiculite insulation showed pleural abnormality.  Id. at 11.  Those who "sometimes" handled vermiculite insulation were 1.8 times more likely, and those who "frequently" handled vermiculite insulation were 2.4 times more likely, to have pleural abnormality than someone who never handled vermiculite insulation.  Id. at 12. However, because 40% of those tested reported six or more asbestos exposure pathways, including heavy exposures such as working in the Libby mine or mill, handling vermiculite insulation was not shown to be a factor "most strongly" related to pleural abnormality.  Id. at 17, 23.

does not exonerate ZAI from disease causation.  Rather, the numerous other exposures at
Libby made it impossible to isolate and study ZAI exposure with any precision.

> ### D.    Grace's Risk Assessment is Unnecessary to Prove Building
> ### Contamination and is Fatally Flawed.

Grace relies on a risk assessment by Dr. Elizabeth Anderson to persuade this Court
that its asbestos-contaminated ZAI is safe.  However, Claimants have already shown in
Section I that no risk assessment or "doubling risk" is necessary to prove property
contamination.  Moreover, while Dr. Anderson is a qualified risk assessor, her calculations
are totally dependent on the data supplied by Grace.  This data is infected with unwarranted
assumptions and totters on the three-legged stool of Dr. Lee's "creative" microscopy.  The
old adage "Garbage in, Garbage out", is amply proven here.  Indeed, Dr. Anderson's
equations condemn Grace's position when more realistic exposure scenarios are modeled.

Dr. Anderson produced a series of estimated risks to homeowners and contractors
engaging in activities that disturb ZAI.  The first significant problem with the risk assessment
is its reliance on Dr. Lee's analysis.  Without Dr. Lee's artificially low results, Grace's
estimated risks would skyrocket.  Even assuming that Dr. Lee's fiber counts were correct, Dr.
Anderson's risk assessment still hurts Grace's case more than it helps.  Her estimated risks
are as high as 240 excess deaths per million.[67]  Grace deems this risk acceptable for others.
Claimants do not, both because it is higher than EPA's level of concern (one in a million),
and because it severely underestimates the real risk when accurate numbers are used.

To justify its position, Grace advocates using the most severe end of the EPA risk
range for CERCLA sites.  That range is a cancer risk of 1 in 10,000 to 1 in 1,000,000.  40

---

[67] Elizabeth L. Anderson, Assessment of the Potential Risks to Homeowners and Residential Contractors From
Asbestos Exposure Associated With Vermiculite Attic Insulation at 43, Table V-8 (Apr. 14, 2003) ("Anderson
Rep.") [Attach. 75].

C.F.R. § 300.430(e)(2)(i)(A)(2). CERCLA risk assessments, however, are primarily used by

EPA as a policy tool to prioritize contaminated sites, not as an indicator of tort liability for

property contamination. Cf. G.J. Leasing Co. v. Union Elec. Co., 54 F.3d 379, 385 (7th Cir.

1995) ("[T]he release of asbestos inside a building ... is not governed by CERCLA."). Thus,

the CERCLA risk numbers are not applicable to a home environment where even Grace's

expert agreed there should be an especially high degree of safety.[68]

     In addition, Grace has seriously misapplied the CERCLA risk ranges. Grace claims

that the most severe end of the range (1 in 10,000 excess deaths) is the standard Claimants

must meet to show an unreasonable risk of harm. In contrast:

> EPA's preference, all things being equal, is to select remedies that are at the
> more protective end of the risk range. Therefore, when developing its
> preliminary remediation goals, EPA uses [1 in 1,000,000] as a point of
> departure.
>
> ...
>
> This means that a cumulative risk level of [1 in 1,000,000] is used as the
> starting point (or initial 'protectiveness' goal) for determining the most
> appropriate risk level that alternatives should be designed to attain.

55 Fed. Reg. 8666, 8716-18 (Mar. 8, 1990) (emphasis added).

     Dr. Anderson's report is littered with estimated risks greater than this 1 in 1,000,000

appropriate risk level.[69]

### 1.    Many Assumptions in Grace's Risk Assessment Are Baseless.

     According to Dr. Anderson, "The risk assessment is the presentation of the known

scientific information organized to a paradigm that's intended to inform."[70] But, since she

---

[68] Corn Dep. at 165 [Attach. 48].

[69] Anderson Rep. at 41-43 (Tables V-6, V-7, V-8).

[70] Anderson Dep. at 68 (emphasis added) [Attach. 9].

had no experience in building issues, Dr. Anderson used much <u>unknown</u> data from Grace

sources for her risk assessment. Dr. Anderson admitted, for instance, that the data she used

for the critical factor of time needed to do certain jobs around ZAI was unscientifically

gathered "in passing". To get this data, Dr. Anderson talked with Dr. Corn, and: "Certainly

with my staff, and I believe that's pretty much it. In general, I've asked everybody I know

questions of—in passing, I'll ask how long it takes you to do certain activities in a home.

<u>That's hardly a scientific study</u>."[71] Claimants agree.

    Dr. Anderson's risk assessment is fraught with many other assumptions, guesses, and

inaccurate data, including the prevalence of ZAI in homes, the types of activities occurring in

those homes, and the duration of those activities. Dr. Anderson readily acknowledged that

"risk assessments are necessarily uncertain."[72] That uncertainty was magnified beyond

scientific bounds by the seriously flawed data Grace fed to Dr. Anderson. For example,

when Dr. Anderson guessed that three percent of homes located in colder climates contained

ZAI, she admitted that she simply multiplied her earlier guess at the percentage of ZAI

homes nationwide (one percent) by three.[73] She admitted that she did not use any survey

data, but claimed that Dr. Corn (who had done no such survey either), assisted in her guess.[74]

    Dr. Anderson also guessed that home repair contractors would come into contact with

ZAI during ten percent of their work. She did not consult any national or regional contractor

---

[71] <u>Id.</u> at 30-31 (emphasis added) [Attach. 9].

[72] <u>Id.</u> at 66 [Attach. 9].

[73] <u>Id.</u> at 136 [Attach. 9].

[74] <u>Id.</u> at 126-27, 135-36 [Attach. 9].

organizations to verify her guess.[75]  Rather, the ten percent figure was also based on

discussions with her co-workers and Dr. Corn.[76]  But, Dr. Corn admitted in his deposition

that ZAI was an entirely new issue to him as of two years ago.[77]  Thus he obviously has no

expertise about the frequency of contact with it.  He further admitted that he is a "do it

yourselfer" who has limited contact with home remodeling contractors.[78]  When Dr.

Anderson was asked whether she was aware of contractors whose specialties require regular

work in ceilings, attics, and wall spaces, she admitted, "I can't imagine why they would do

that, but if there are people like that, I don't know them."[79]  Dr. Anderson has apparently

never heard of cable TV, HVAC and other contractors who frequently have to go into attics

or cut through walls.  Clearly, Dr. Anderson's ten percent "assumption" was another

uninformed guess.

     Other assumptions by Dr. Anderson also ignore the real world.  When asked, for

instance, whether older homes containing ZAI would typically have different renovation

needs than newer homes, Dr. Anderson responded, "I have no idea."[80]  Thus, she assumed

that ZAI homes, which are 20 to 60 years old, would be renovated at the same rate as new

homes.  The scientific data shows, not surprisingly, that older homes do indeed demand more

renovation attention.  In fact, one of Grace's ZAI simulation witnesses agreed with a

---

[75] Id. at 138 [Attach. 9].

[76] Id. at 137 [Attach. 9].

[77] Corn Dep. at 9-10 [Attach. 48].

[78] Deposition of Morton Corn in Barbanti v. W.R. Grace & Co.—Conn. at 122-23 (Sept. 15, 2000) ("Corn Barbanti Dep.") [Attach. 76].

[79] Anderson Dep. at 142 [Attach. 9].

[80] Id. at 143 [Attach. 9].

published report that homes older than twenty years "represent the biggest market for remodeling".[81]

Likewise, Dr. Anderson's basis for her assumption on the duration of renovations is equally shallow. In addition to relying on discussions with Dr. Corn (who gave no such opinions in his report) and reviewing the simulations, she relied on "our own internal sense of how long it really takes to do this kind of thing in our own homes."[82] Dr. Anderson did not read any deposition transcripts of the homeowners or contractors to learn about the actual renovations they performed and described.[83] In several instances, Dr. Anderson abandoned any pretense of reliance on facts, stating that her assumptions were based on her "internal sense" or "professional judgment" rather than on verifiable sources of information.[84]

Dr. Anderson's scant reliance on the actual facts stands in stark contrast to the testimony of two of Grace's other witnesses. For instance, Dr. Hughson, Grace's medical expert, admitted that he would be "very concerned" about a home contractor exposed to the levels detected in the Claimants' ZAI simulation (16 f/cc greater than 5 microns) if the contractor was involved in such work as a regular activity. Dr. Hughson said that repeated exposure at such a level would be "plenty to cause an asbestos-related problem".[85] Likewise, Dr. Mlynarek, the industrial hygienist who supervised Grace's ZAI simulation study, testified that if a homeowner spent sixteen hours removing ZAI (as Claimant Jerry Dillon testified),

---

[81] Deposition of Don Van Cura at 56-57 (May 30, 2003) ("Van Cura Dep.") [Attach. 77] (quoting Boom Benefits Remodel Firms, Crain's Chicago Bus. 25:49 (Dec. 9, 2002) [Attach. 78]).

[82] Anderson Dep. at 197 [Attach. 9].

[83] Id. at 203-04 [Attach. 9].

[84] Id. at 197, 214-17 [Attach. 9].

[85] Hughson Dep. at 175-80.

he would be concerned at the exposure level for such work (16 f/cc) reflected in the

Claimants' ZAI simulation.[86]

In Dr. Anderson's own words, "the confidence in the risk assessment outcome

reflects the quality and quantity of the information that you have to use in order to do the

assessment."[87]  In light of the many assumption-filled holes in Dr. Anderson's risk

assessment, its confidence level is quite low.

> **2.      Recalculation of the Risk Estimates Shows a High Risk From
> Exposure to ZAI.**

To illustrate how malleable Dr. Anderson's risk assessments are, Claimants have

recalculated her estimated risks with a slight correction.  Despite their reservations about

many of Dr. Anderson's assumptions, Claimants have adopted all but one of them.  The

single changed assumption is increasing the total number of homes containing ZAI from

940,000 to 3,000,000.  Dr. Anderson's lower number came from a 1982 report that:  (1)

erroneously assumed ZAI had been sold for only the preceding ten years (when it was

actually being sold for at least forty years); and (2) failed to include any post-1980 sales.

Published estimates put the number of homes with ZAI at 3-30 million.[88]  Claimants are

using the low end of the range (three million) for illustration.  Dr. Anderson suggested that if

Claimants corrected her ZAI installations figure, they should also update the total number of

---

[86] Mlynarek Dep. at 152-6.

[87] Anderson Dep. at 65.

[88] See Susan Warren, EPA Plans Asbestos Removal From Homes in Libby, Mont., Wall St. J., May 13, 2002, at B2 [Attach. 79]; Kathleen McLaughlin, W.R. Grace Urging EPA to Quit Emergency Plan for Libby, Mont. Forum, Apr. 14, 2002 [Attach. 80]; Greg Gordon, Magnitude of Asbestos Scare Grows, Modesto Bee, Jan. 21, 2003 [Attach. 81]; Jay Romano, Lesser-Known Form of Asbestos Lurks in Many Homes, San Francisco Chronicle, July 14, 2001, at WB-7 [Attach. 82].

homes in the United States to correct for her use of an outdated number. Claimants have also done this.[89]

After making these adjustments, Claimants recalculated Dr. Anderson's risk assessment using her formula and all her other Grace-favorable assumptions, including Dr. Lee's faulty fiber counts. Not surprisingly, the risks were significantly higher. The single changed assumption increased the aggregate risk of a contractor from approximately 3 in 10,000 to nearly 1 in 1000.[90] This is one thousand times EPA's preferred one in a million risk. Using Dr. Anderson's own risk assessment formula, Claimants have demonstrated risks that even Grace cannot belittle.

Claimants also performed a calculation that Dr. Anderson failed to include -- the risk to residents and contractors associated with the inevitable ZAI removal. Dr. Anderson admitted that if a person were using the method employed in the ZAI simulations, the risk could be estimated by simply changing the "time weighting factor" data in her formula.[91] The results explain why Grace did not have these calculations performed. Again, even when Dr. Lee's faulty fiber counts are used, the results for homeowners and contractors range from approximately 2 in 1,000,000 excess deaths to 4800 in 1,000,000 excess deaths.[92] These risk estimates are far greater than EPA's preferred one in a million risk and further support the unreasonable risk of harm posed by ZAI.

---

[89] In Dr. Anderson's risk assessment, the total number of homes (81,094,000) was derived from the 1993 Census for the following categories: "single family detached", "single family attached", and "2 to 4 units". Anderson Rep. at 35 [Attach. 75]. Claimants have substituted data from the 2001 Census in the same categories [Attach. 83].

[90] Charts showing the adjustments and the results of these calculations are attached as Attachment 84. See specifically Revised Table V-6.

[91] Anderson Dep. at 205 [Attach. 9].

[92] Charts showing the results of these calculations are attached as Attachment 85.

As Claimants have pointed out, no personal injury risk assessment is necessary to prove property contamination. Certainly, a risk assessment peppered with guesses should carry no weight in any type of case. Even if Dr. Anderson's risk assessment were admissible, Claimants have demonstrated that it supports an unreasonable risk of harm if more realistic data is used.

## CONCLUSION

Claimants have established as a matter of law that ZAI contaminates homes by releasing significant amounts of asbestos fibers into them and will continue to do so upon subsequent disturbances. Claimants have also established as a matter of law that the asbestos released from ZAI poses an unreasonable risk of harm. Accordingly, under either approach, Claimants have proven their property damage claims and are entitled to summary judgment. At a minimum, Claimants have presented numerous issues of material fact as to whether ZAI causes property damage to support a bankruptcy claim.

For the foregoing reasons, Claimants request an Order denying Grace's Motion for Summary Judgment and granting Claimants' Motion for Summary Judgment.

RESPECTFULLY SUBMITTED,

Edward J. Westbrook, Esq.
Robert M. Turkewitz, Esq.
James L. Ward, Jr., Esq.
Robert S. Wood, Esq.
Richardson, Patrick, Westbrook & Brickman
1037 Chuck Dawley Blvd, Building A
Mount Pleasant, SC  29464
Tel. (843) 727-6513
ZAI CLAIMANTS' SPECIAL COUNSEL

-and-

Darrell W. Scott, Esq.
Burke D. Jackowich, Esq.
Lukins & Annis PS
717 W. Sprague Ave. Suite 1600
Spokane WA 99201
Telephone:  (509) 455-9555
ADDITIONAL SPECIAL COUNSEL

-and-

William D. Sullivan, Esq.
Elzufon Auston Reardon Tarlov & Mondell
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE  19899
Telephone:  (302) 428-3181
COUNSEL FOR THE ZONOLITE
CLAIMANTS, BARBANTI, BUSCH,
PREBIL, AND PRICE

Dated: August 8, 2003