IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## OPPOSITION OF W. R. GRACE & CO. TO CLAIMANTS' MOTION FOR SUMMARY JUDGMENT

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................1

II. ARGUMENT ......................................................................................................3

    A.    Claimants' Motion Must Be Denied Because Claimants Cannot Meet Their
    Burden of Showing That It Is Undisputed That Science Demonstrates That
    ZAI Creates an Unreasonable Risk of Harm. .........................................................3

        1.    Claimants offer no epidemiologic evidence showing that
        homeowners with ZAI in their attics have an increased incidence
        of disease........................................................................................................3

        2.    Claimants have not offered applicable lifetime exposure data
        showing an increased risk of asbestos-related disease from ZAI in
        an attic...........................................................................................................5

        3.    Because Claimants cannot demonstrate either an increased
        incidence or an increased risk of disease from ZAI in an attic, they
        make the scientifically and legally invalid argument that there is an
        unreasonable risk of harm because disturbance of ZAI can release
        some asbestos fibers......................................................................................10

    B.    Claimants' Attempt To Use Substitutes For Scientifically Reliable Proof
    Of Unreasonable Risk Of Harm Is Unavailing. .....................................................12

        1.    The evidence pointed to by Claimants concerning the history of
        ZAI is both a mischaracterization and irrelevant......................................12

            (a)    In the 1970's, Grace concluded ZAI created no increased
            risks. .........................................................................................13

            (b)    In the 1980's, The Consumer Products Safety Commission
            examined ZAI and allowed Grace to continue selling it................14

            (c)    Grace correctly concluded warning labels on ZAI were not
            necessary. ..................................................................................15

            (d)    Claimants' recitation of other "facts" is hotly disputed..................16

        2.    The EPA has not made any finding that ZAI in an attic creates an
        unreasonable risk of harm. ..........................................................................18

        3.    Claimants cannot meet their burden by claiming that if ZAI is
        eventually to be removed from a home, special precautions may be
        advisable. ....................................................................................................20

i

C.  ZAI Claimants' "Solution" Relates To Alleged Damages And Is Not Part Of The Science Trial, But, In Any Event, Is An Unreasonable "Solution" To A Problem That Does Not Exist. ...................................................................... 23

III.  CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

### Cases

*Adams-Arapahoe Sch. Dist. No. 28-J v. GAF Corp.*, 959 F.2d 868 (10th Cir. 1992) ................... 6

*Allison v. McGhan Med. Corp.*, 184 F.3d 1300 (11th Cir. 1999) ................................................. 9

*City of Greenville v. W. R. Grace & Co.*, 827 F.2d 975 (4th Cir. 1987) ....................................... 6

*City of Wichita, Kansas v. United States Gypsum Co.*, 72 F.3d 1491 (10th Cir. 1996) .................6

*Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311 (9th Cir.),

    *cert. denied,* 516 U.S. 869 (1995) .............................................................................................. 9

*Dole Fresh Fruit Co. v. Del. Cold Storage, Inc.*, 961 F. Supp. 676

    (D. Del. 1997). ....................................................................................................................... 14

*Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387 (D. Or. 1996)........................................... 10

*Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107 (3d Cir. 1996) .......................... 14

*Harashe v. Flintkote Co.*, 848 S.W. 2d 506 (Mo. Ct. App. 1993)................................................ 12

*In re"Agent Orange" Product Liability Litigation*, 597 F.Supp. 740 (E.D.N.Y. 1984), *aff'd*, 818

    F.2d 145 (2d Cir. 1987)........................................................................................................... 20

*In re Breast Implant Litig.*, 11 F.Supp. 2d 1217 (D. Colo. 1998).................................................. 9

*Marder v. G.D. Searle & Co.*, 630 F. Supp. 1087 (D. Md. 1986),

    *aff'd*, 814 F.2d 655 (4th Cir. 1987) ........................................................................................ 10

*Nat'l Bank of Commerce v. Associated Milk Producers, Inc.*, 191 F.3d 858 (8th Cir. 1999)....... 11

*Perlmutter v. United States Gypsum Co.*, 4 F.3d 864 (10th Cir. 1993) ......................................... 6

*Renaud v. Martin Marietta Corp.*, 749 F. Supp. 1545 (D. Colo. 1990),

    *aff'd,* 972 F.2d 304 (10th Cir. 1992) ......................................................................... 4

*Sanderson v. Int'l Flavors and Fragrances, Inc.*, 950 F. Supp. 981 (D. Cal. 1996) ...................... 9

*Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp.2d 1347 (N.D. Ga. 2001),

    *aff'd,* 295 F.3d 1194 (11th Cir. 2002) ..................................................................... 9

*Sutera v. Perrier Group of Am., Inc.*, 986 F. Supp. 655 (D. Mass. 1997) .................................... 11

*Wright v. Willamette Indus. Inc.*, 91 F.3d 1105 (8th Cir. 1996) ...................................................... 5

## Rules and Regulations

29 C.F.R. § 1910.1001 (2003) ...................................................................................... 9

40 C.F.R. § 300.430(e)(2)(i)(A)(2) (2003) ................................................................... 5

Fed. R. Civ. P. 56.................................................................................................1, 2

Fed. R. Evid. 408 ...............................................................................................12 n.6

## Other Authorities

Federal Judicial Center, Reference Manual on Scientific Evidence (2d ed. 2000) ...... 5, 10, 20, 23

David L. Faigman, et al., 4 Modern Scientific Evidence (2d ed. 2002) ....................................... 10

## I.    INTRODUCTION

This Court should deny ZAI Claimants' Motion for Summary Judgment because: (1) it does not address the issue that the Court set for the Science Trial -- whether science establishes that ZAI poses an unreasonable risk of harm; and (2) Claimants have failed to meet their Rule 56 burden of establishing "that there is no genuine issue as to any material fact." In order to prevail on summary judgment in the ZAI Science Trial, Claimants would have to establish that there is no genuine issue of material fact that ZAI poses an unreasonable risk of harm to human health. Claimants cannot and, in fact, do not even try to meet that burden. Claimants' Motion for Summary Judgment, therefore, should be denied.

Claimants' Motion purports to be filed in accordance with the Court's November 25, 2002 Order for the Science Trial, yet it never addresses the issue that Order sets forth: "What science demonstrates with regard to whether ZAI poses an unreasonable risk of harm." Rather, Claimants' Motion begs the question the Court has posed by assuming that *any* asbestos exposure -- without regard to dose or duration -- carries with it an unreasonable risk of harm. No credible science exists to support such a proposition.

As set forth more fully in the Brief of W. R. Grace & Co. in Support of Motion for Summary Judgment ("Grace's Summary Judgment Brief"), Claimants' untenable premise has been repeatedly rejected by the courts. The question, as aptly set forth by this Court, is what science demonstrates with regard to whether ZAI poses an unreasonable risk of harm to human health. This question involves analysis of how much asbestos exposure, if any, a homeowner is

likely to experience, and whether that exposure presents an unreasonable risk of harm to human health when evaluated under the credible science available today.

Claimants' Motion is not premised upon undisputed issues of fact. Rather it appears to be an attempt to dodge the Court's threshold question by laying out the Claimants' general liability case that, Grace submits, this Court need not reach. Moreover, while not relevant to the Science Trial, Claimants' alleged "facts" regarding what Grace knew about ZAI are incorrect and, at the very least, hotly disputed.

That Claimants cannot prevail on summary judgment is implicit in their Motion which fails to state the Rule 56 standard. Perhaps this is so because stating the Rule 56 standard applicable to Claimants' Motion illustrates the futility of Claimants' task: Claimants must establish that it is undisputed that science demonstrates that ZAI poses an unreasonable risk of harm.

For the reasons set forth herein, and in Grace's Summary Judgment Brief, this Court should deny Claimants' Motion for Summary Judgment.

II.    **ARGUMENT**

    A.    **Claimants' Motion Must Be Denied Because Claimants Cannot Meet Their Burden of Showing That It Is Undisputed That Science Demonstrates That ZAI Creates an Unreasonable Risk of Harm.**

        Claimants proffer no scientific evidence that ZAI creates an unreasonable risk of harm to homeowners. Despite this fact, in their Motion Claimants incredibly claim to be entitled to summary judgment and contend that their evidence is *undisputed*. As more fully discussed in Grace's Summary Judgment Brief, to meet their ultimate burden, Claimants will have to establish that the presence of ZAI in an attic doubles the homeowner's risk of asbestos-related disease.

        Based on scientific principles that have been adopted by the courts, this burden must be met either through epidemiological studies that show a double incidence of asbestos-related disease among ZAI homeowners, or through scientifically valid exposure data that demonstrates a double increased risk of asbestos-related disease from an expected lifetime exposure to asbestos as a result of a homeowner's anticipated disturbance of ZAI in an attic. *See* Grace's Summary Judgment Brief at 31-35. Claimants offer neither.

        1.    **Claimants offer no epidemiologic evidence showing that homeowners with ZAI in their attics have an increased incidence of disease.**

        Claimants offer no epidemiologic evidence showing that homeowners with ZAI in their attics have an increased incidence of disease. Despite the reported existence of a large number of individuals with ZAI in their attics, making an epidemiological study possible, Claimants point to no study showing that these individuals have an increased incidence of

asbestos-related disease.[2]  *See Renaud v. Martin Marietta Corp.*, 749 F. Supp. 1545, 1553-1555

(D. Colo. 1990), *aff'd*, 972 F. 2d 304 (10th Cir. 1992); Grace's Summary Judgment Brief at 31-

35.

        In fact, as discussed in Grace's Summary Judgment Brief, the only medical testing

that included a study of ZAI does not show excess risk. *See* Grace's Summary Judgment Brief at

31-32.  That study, by the United States Agency for Toxic Substances and Disease Registry

("ATSDR"), found no association between asbestos disease and living in a home with ZAI or

having "handled" ZAI. ATSDR Year 2000 Medical Testing of Individuals Potentially Exposed

to Asbestiform Minerals Associated with Vermiculite in Libby, Montana:  A Report to the

Community, (August 23, 2001) ("ATSDR Medical Testing"), Appendix to Grace's Summary

Judgment Brief, Exh. A; ATSDR Preliminary Findings of Libby, Montana, Asbestos Medical

Testing [Combined Testing, 2000 and 2001], (September, 2002) ("ATSDR Preliminary

Findings"), Appendix to Grace's Summary Judgment Brief, Exh. U. *See also* Whitman Letters,

Appendix to Grace's Summary Judgment Brief, Exh. K, Responses at 2; Elizabeth Anderson

Report, Appendix to Grace's Summary Judgment Brief, Exh. E at 50-51.

---

[2] In their Summary Judgment Brief, Claimants allege that ZAI was installed in attics as early as the 1940's and yet "except for a small percentage already inhaled or set loose in the atmosphere," the ZAI remains in a million or more homes. Memorandum in Support of ZAI Claimants' Motion for Summary Judgment ("Claimants' Summary Judgment Brief") at 1.

2.    **Claimants have not offered applicable lifetime exposure data showing
an increased risk of asbestos-related disease from ZAI in an attic.**

Claimants have not proffered any lifetime exposure data showing an increased

risk of asbestos-related disease from ZAI in an attic.  Nor have they even attempted to conduct a

"risk assessment."[3]  As the Eighth Circuit Court recognized, for a plaintiff to meet his burden, at

a minimum, there must be evidence that plaintiff was exposed to levels of the alleged toxic agent

that are known to cause the kind of harm that the plaintiff claims to have.  *Wright v. Willamette

Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996).

Claimants apparently attempt to satisfy their burden to show exposure levels with

dust sampling data which they allege show "contamination," and with air sample data which they

allege show that ZAI releases levels of asbestos that are 3,000 times above background, well

over current OSHA excursion levels and thousands of times higher than outside ambient asbestos

levels.  Claimants' Summary Judgment Brief at 31-32.  Neither data set provides any

scientifically valid measurement of a homeowner's expected lifetime asbestos exposure.

---

[3] Risk assessment, which is frequently used by federal, state and local governmental organizations and international organizations, is a conservative methodology that establishes a theoretical acceptable risk range that is considerably higher than real risk.  In the risk assessment process, the estimated exposure of an individual takes into account the concentration, frequency and duration of exposures to a particular substance.  The resulting exposure assessment for carcinogens includes a time-weighted average for a lifetime exposure and is compared with health effects data relating to the potential effects associated with a given exposure.  From this comparison, the risk of individuals for adverse health effects is estimated on a theoretical basis.  Elizabeth Anderson Report, Appendix to Grace's Summary Judgment Brief, Exh. E at 3.  *See also* Reference Manual on Scientific Evidence (2d ed. 2000), Appendix to Grace's Summary Judgment Brief, Exh. D at 412.  EPA has established an acceptable risk range of one cancer in 10,000 persons ($10^{-4}$) to one cancer in 1,000,000 persons ($10^{-6}$).  *See* 40 C.F.R. § 300.430(e) (2) (i) (A) (2) (2003).  While the EPA's methodology establishes a very conservative or theoretically acceptable risk range that is considerably higher than the real risk, Claimants cannot and do not even attempt to satisfy even this conservative standard.

As discussed in Grace's Summary Judgment Brief, Claimants' reliance on dust sampling is misplaced because: (1) Claimants' dust sampling evidence, which is based on the "settled dust" method and indirect preparation, is not scientific and has been rejected by the Bankruptcy Court for the District of Delaware; and (2) dust sampling is not a predictor of a homeowner's past or future exposures to respirable asbestos. *See* Grace's Summary Judgment Brief at 16-22. Claimants contend that the dust sampling data prove "contamination" of the homes. This term, however, has no scientific or legal significance.[4] As this Court properly recognized in defining the issue for this Science Trial, Claimants must show that ZAI creates an unreasonable risk of harm. *See City of Wichita, Kansas v. United States Gypsum Co.*, 72 F.3d 1491 (10th Cir.1996).

Likewise, Claimants' reliance on their experts' air sample data is flawed because: (1) Claimants count as asbestiform fibers, particles which are non-fibrous rock cleavage fragments; and (2) even assuming Claimants properly counted only potential disease-producing asbestos fibers -- which Grace disputes -- their data are misleading in that they only address one aspect of a homeowner's potential exposure, that is, the concentration of asbestos in the air.

---

[4] In their discussion of "contamination," Claimants cite cases involving the requisite elements a plaintiff must prove to recover economic loss in tort actions. Claimants' Summary Judgment Brief at 21-22. In these cases, the courts have pointed to evidence of "contamination" of a property by asbestos dust as providing the necessary element of "physical injury" to allow a plaintiff to seek recovery in tort, rather than in contract. *See Perlmutter v. United States Gypsum Co.*, 4 F.3d 864 (10th Cir. 1993); *Adams-Arapahoe Sch. Dist. No. 28-J v. GAF Corp.*, 959 F.2d 868 (10th Cir. 1992); *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975 (4th Cir. 1987). These cases do not, however, hold that a plaintiff may recover damages without proof that the product creates an unreasonable risk of harm. *See City of Greenville*, 827 F.2d at 978 (product must threaten a substantial and unreasonable risk of harm).

Claimants' alleged air sampling data are faulty because of a bias created by counting as asbestiform fibers, particles which are non-fibrous rock cleavage fragments. The work by Claimants' own experts and Claimants' own concessions demonstrate that the vast majority of particles denominated as airborne "fibers" by Claimants are, in fact, cleavage fragments.

Claimants argue that cleavage fragments are particles with diameters larger than one micron. Memorandum in Support of the Claimants' Motion to Exclude Dr. R.J. Lee's Opinion on Cleavage Fragments at 17. As discussed below, this statement is inconsistent with Claimants' own experts' testimony. But in any event, Claimants concede that between 8% and 20% of the "fibers" they counted had diameters of one micron or greater and thus are cleavage fragments. *See id.* at 17-18.

Claimants' expert, Richard Hatfield, testified that the standard width of tremolite asbestos fibers is less than .3 microns:

> Q:   And is there normally a standard width or diameter you see in the laboratory for tremolite asbestos fibers? And by tremolite, I mean the type involved here in this case, and I don't want to list all of the possibilities.
>
> A:   You are fin[e] if you just want to use the term "tremolite" or many have fallen back to Libby amphiboles or whatever.
>
> But I think you will probably find that single fibers of asbestos amphiboles are going to be in the neighborhood of .1 microns. I could probably look over some of the data and see. They can be larger than that, certainly they can be probably smaller than that too. But, --

Q:     And I am assuming, given the generality of my
       question when you say .1, you mean .1, .2 kind of in
       that range?

A:     There you go.

Hatfield Dep. at 53-54, Exhibit to Affidavit of Dr. R. J. Lee ("Lee Affidavit") filed in support of

Opposition of W. R. Grace & Co. to Claimants' Motion to Exclude Dr. R. J. Lee's Opinion on

Cleavage Fragments.

        The air samples taken during Claimants' simulations and analyzed by Claimants'

experts record approximately 665 structures as single "fibers." Of these, approximately 208 are

less than five microns long and should not be counted at all under normal counting rules. Of the

remaining 457 structures counted as individual "fibers," approximately 394 were *greater than .3*

*microns in width* (and 45 of these were greater than one micron in width). Lee Affidavit.

Accordingly, approximately 86% of the structures longer than five microns in length had widths

greater than .3 microns and thus had widths greater than the "standard width or diameter you see

in the laboratory for tremolite asbestos fibers." In short, these are cleavage fragments, not fibers,

and should not be counted as such in air samples.

        Claimants' air sampling data are also misleading because they only address one

aspect of a homeowner's potential exposure, that is, the concentration of asbestos in the air. As

set forth in Grace's Summary Judgment Brief, the toxicological rule of dose response, a

fundamental tenet of industrial hygiene and public health, provides that the potential health risk

posed by inhaling airborne asbestos is a function not only of the concentration of asbestos in the

inhaled air, but also a function of the frequency and duration of such exposures to asbestos over a

person's lifetime. *See* Grace's Summary Judgment Brief at 35-38.

Claimants, however, conveniently focus entirely on isolated airborne concentrations over short time periods and completely ignore the fundamental concepts of frequency, duration and lifetime exposures. For example, none of the alleged airborne concentrations relied upon by Claimants has been calculated by them on an 8-hour time-weighted average.[5]  Moreover, Claimants make no attempt to demonstrate that the anticipated frequency or duration of such exposure would present any increased risk of disease, let alone an unreasonable risk, to a homeowner. Claimants simply cannot ignore fundamental concepts of industrial hygiene and public health and rely upon isolated short term exposure concentrations to establish an unreasonable risk of harm.

Not only do Claimants fail to provide legitimate exposure data, they fail to provide any analysis of the increased risk of disease as a result of the expected exposure. Claimants make no attempt to show that even the release of asbestos fibers *they* claim can occur when ZAI is disturbed leads to an increased risk of disease, let alone the required showing of a doubling of the risk. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 n.16 (11th Cir. 1999); *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1320-21 (9th Cir.), *cert. denied*, 516 U.S. 869 (1995); *Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp.2d 1347, 1358 (N.D. Ga. 2001), *aff'd*, 295 F.3d 1194 (11th Cir. 2002); *In re Breast Implant Litig.*, 11 F. Supp.2d 1217, 1227-1228 (D. Colo. 1998); *Sanderson v. Int'l Flavors and Fragrances, Inc.*, 950 F. Supp. 981, 998

---

[5] Under OSHA, the Permissible Exposure Level is calculated and reported as a time- weighted average over eight hours, with an assumption that this exposure level, every day over a 45-year working life, is acceptable. *See* 29 C.F.R. § 1910.1001 (2003).

(D.Cal. 1996); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1403 (D. Or. 1996); *Marder v. G. D. Searle & Co.*, 630 F. Supp. 1087, 1092 (D. Md. 1986), *aff'd*, 814 F. 2d 655 (4th Cir.1987); Reference Manual on Scientific Evidence, Appendix to Grace's Summary Judgment Brief, Exh. D at 384. *See also* David L. Faigman et al., 4 Modern Scientific Evidence (2d ed. 2002), Appendix to Grace's Summary Judgment Brief, Exh. V at § 35-1.4.1 at 155-56; and Grace's Summary Judgment Brief at 33-35.

Not only do Claimants fail to proffer *undisputed* scientific evidence that a homeowner's lifetime exposure to ZAI creates an unreasonable risk of disease, they fail to offer any such evidence whatsoever.

      3.    **Because Claimants cannot demonstrate either an increased incidence or an increased risk of disease from ZAI in an attic, they make the scientifically and legally invalid argument that there is an unreasonable risk of harm because disturbance of ZAI can release some asbestos fibers.**

Lacking any epidemiologic evidence that homeowners with ZAI in their attics have an increased incidence of disease or a risk assessment estimating an increased risk of disease, Claimants argue that because ZAI has asbestos fibers in it and disturbing ZAI may release asbestos fibers, it must logically follow that ZAI creates an unreasonable risk of harm. This is scientifically and legally wrong because it erroneously assumes that any release of asbestos fibers causes disease, and that it is enough for Claimants to prove an unreasonable risk of harm by showing a theoretical possibility of disease.

Claimants have no evidence, let alone undisputed evidence, that *any* release of asbestos fibers causes disease. Claimants' own medical expert, Dr. Henry Anderson, admits that

there are levels of exposure to asbestos in ZAI that are not medically significant. <u>Henry</u>

<u>Anderson Dep.</u>, Appendix to Grace's Summary Judgment Brief, Exh. T at 63-74. *See also*

Grace's Summary Judgment Brief at 37-38.

      Courts have required plaintiffs to show the level of an alleged toxic exposure and

the resultant increased risk of disease. In doing so, courts have consistently rejected "no

threshold" arguments such as Claimants make here. As the Eighth Circuit Court observed,

establishing that the risk of causation "is not zero" falls woefully short of the degree of proof

required by *Daubert* and its progeny. *Nat'l Bank of Commerce v. Associated Milk Producers,*

*Inc.*, 191 F.3d 858, 860-861 (8th Cir. 1999). *See also* Grace's Summary Judgment Brief at 35-

38.

      Courts have likewise rejected arguments that the use of a conservative "no

threshold" approach by regulatory agencies allows for its application in civil suits. In rejecting

this argument, courts have recognized that the regulatory goal is to set a conservative and

precautionary "action level," not to impose liability, and therefore a regulatory standard is

reasonably lower than the tort law standard. *See Sutera v. Perrier Group of Am., Inc.*, 986

F.Supp. 655, 665 (D.Mass. 1997); and Grace's Summary Judgment Brief at 35-38.

      In sum, Claimants offer no scientific evidence, let alone undisputed evidence, that

the exposures of homeowners from having ZAI in their attics increase, let alone double, their risk

of asbestos-related disease. As a result, Claimants have not met their burden to show that ZAI

creates an unreasonable risk of harm to homeowners.

**B.    Claimants' Attempt To Use Substitutes For Scientifically
Reliable Proof Of Unreasonable Risk Of Harm Is Unavailing.**

In an attempt to compensate for their lack of scientific evidence of unreasonable

risk of harm, Claimants recite:  (1) a twisted and irrelevant history of ZAI; (2) statements made

by the EPA about ZAI; and (3) a theory that special precautions may be needed to remove ZAI in

the event of a demolition or major renovation.[6]  None of these is an adequate substitute for the

necessary scientific evidence of a significant increased risk of disease.

**1.    The evidence pointed to by Claimants concerning the
history of ZAI is both a mischaracterization and irrelevant.**

What Grace knew about ZAI during the decades prior to the 1984 discontinuance

of ZAI sales raises many disputed issues of fact, none of which is relevant to the Science Trial

issue.  If the science available today establishes that ZAI does not pose an unreasonable risk of

harm, what Grace representatives may have said, done, written or thought about ZAI decades

ago is irrelevant.  This Court recognized as much in ordering the Science Trial, one not intended

to involve particularly time-consuming fact issues about what Grace knew and when it knew it.

---

[6] Claimants also point to a jury verdict in *Harashe v. Flintkote Co.*, 848 S.W.2d 506 (Mo. Ct. App. 1993), and to Grace's settlement of bodily injury claims allegedly involving ZAI, as evidence that ZAI "has already killed and will likely kill again."  Claimants' Summary Judgment Brief at 2.  The disconnect between this "evidence" and Claimants' allegation is obvious.  As more fully discussed in Grace's Summary Judgment Brief, evidence regarding Mr. Harashe is at best an unreliable case report, which is even more suspect due to the admissions of Claimants' medical expert that Mr. Harashe had asbestos exposures other than to ZAI.  *See* Grace's Summary Judgment Brief at 26-30. Claimants' inappropriate attempt to use Grace's settlement of bodily injury cases allegedly involving ZAI to prove ZAI is unreasonably dangerous violates Federal Rule of Evidence 408; settlements are irrelevant and inadmissible.

Claimants' experts lack the hard science necessary to demonstrate an unreasonable risk of harm under *Daubert* standards. *See* Grace's Summary Judgment Brief at 16-38. Claimants cannot overcome that legal deficiency by alleging, or even proving, that one or more Grace representatives once believed that which Claimants assert, but which today's science does not support.

Nevertheless, mindful that Claimants have mischaracterized Grace's history of making and selling ZAI, Grace submits that if this case were to proceed beyond the Science Trial to a general liability trial, Grace would prove that it never believed that ZAI was unsafe to homeowners.[7]

### a.   In the 1970's, Grace concluded ZAI created no increased risks.

The Court need not go any further than the Grace historical documents attached to Claimants' various motions to find proof that Grace carefully studied ZAI and found it to be safe to homeowners. Claimants, for example, include as an exhibit in support of their Motion for Partial Summary Judgment, a May 24, 1977 Memorandum by E.S. Wood, then Grace's Executive Vice President in charge of the division that made and sold ZAI. This voluminous document reflects months of study by Grace of the asbestos in vermiculite issue. In it, Mr. Wood plainly states:

---

[7] To the extent these proceedings ever reach a general liability trial, Grace will present the testimony of former employees of Grace who studied and sold ZAI as well as a more complete presentation of relevant documents (from the thousands of historical documents produced in this case) in their proper context. To do so now would be both premature and not in keeping with the Court's directive for the Science Trial.

> We do not feel that our products create a hazard for normal end
> uses. . . . Due to the products' short and irregular periods of use, it
> seems unlikely that we would exceed the 2 f/ml, 8-hour time
> weighted average, OSHA standard with Attic Insulation . . .

Exh. 19 to Declaration of Darrell W. Scott, submitted by Claimants in Support of Motion for

Partial Summary Judgment Re: W. R. Grace's Consumer Protection Liability ("Scott Dec.") at

13.

After explaining steps taken to bind ZAI to fulfill an anticipated regulatory

requirement (which never came to be), Mr. Wood notes that:

> It should be emphasized that these steps are being taken to comply
> with the extremely stringent projected regulations, and not because
> we feel that the use of these products creates a serious risk for
> consumers.

> Considering the brief and irregular pattern of use, we do not
> believe that asbestos exposure from our products causes an
> increased risk of health problems.

> *Id.* at 8.

There is, therefore, another side of the story regarding what Grace believed about

ZAI, a circumstance that in itself precludes Claimants' Motion for Summary Judgment on

liability. *See Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 112 (3d Cir. 1996)

(summary judgment inappropriate where non-moving party demonstrates a dispute over facts

that might affect the outcome of the suit); *Dole Fresh Fruit Co. v. Del. Cold Storage, Inc.*, 961 F.

Supp. 676, 680 (D. Del. 1997) (citing *Hampton*).

> **b.      In the 1980's, The Consumer Product Safety Commission
> examined ZAI and allowed Grace to continue selling it.**

When concerns about the presence of asbestos in commonly used consumer

products arose in the 1970's, Grace investigated and tested ZAI and assured itself that ZAI was

safe.  <u>Wood Dep.</u>, Appendix, Exh. 1 at 24-29; Exh. 19 to <u>Scott Dec</u>.  Grace even went so far as to

voluntarily go to the United States Consumer Product Safety Commission ("CPSC") to discuss

ZAI, presenting to the CPSC the results of air sampling tests that Grace conducted during the

installation of ZAI in homes.  Exh. 25 to Claimants' Summary Judgment Brief.

      In an April 1, 1980 letter to the CPSC, Grace's E. S. Wood submitted such air

sample results to the CPSC.  Exh. 25 to Claimants' Summary Judgment Brief.  Armed with that

information, the CPSC, which had banned a number of asbestos-containing products during the

1970's, did not ban ZAI, thus allowing Grace to continue to sell it.  Nor did the CPSC ever

require Grace to include additional warnings or cautionary language on bags of ZAI.

      c.     **Grace correctly concluded warning
labels on ZAI were not necessary**.

      At various times during the 1970's, Grace considered whether warning labels should

should be placed on ZAI.  *See, e.g.*, Exh. 53 to Claimants' Summary Judgment Brief; Exhs. 19

and 21 to <u>Scott Dec</u>.  Grace concluded that warning labels were unnecessary because, when used

as intended, ZAI did not create asbestos exposures exceeding then applicable governmental

exposure limits.  <u>Wood Dep.</u>, Appendix, Exh. 1 at 28-29; Exh. 19 to <u>Scott Dec.</u>

      In a March 28, 1977 Memorandum regarding "Guidelines for Handling of

Tremolite Contamination In our Mines, Plants and Products," Mr. Wood memorialized Grace's

policy regarding warnings:

> •   We will not expose our customers and employees to
> environments which have been formally defined as
> hazardous by the U.S. Government without proper caution
> as to the nature of the hazard.  We will take all reasonable
> steps and practical steps to minimize or eliminate
> unreasonable risks which may be associated with the

manufacture and use of our products including, where
appropriate, instructions for proper use of our products.

- The tremolite asbestos fiber count limits in effect and
enumerated in OSHA (or MESA) regulations will be the
guide to whether a health hazard exists. If the product in
reasonable use exposes the user to counts in excess of
OSHA limits, caution labels will be affixed to the product.

Exh. 19 to <u>Scott Dec</u>.

Grace followed this policy with respect to ZAI. Because ZAI in its intended use

did not create fiber levels exceeding government thresholds, no specific warning was deemed

necessary. *Id.* Nor was any requested by the CPSC or required by any existing law.

### d.     Claimants' recitation of other "facts" is hotly disputed.

What Claimants portray as undisputed facts simply are not. They are, to say the

least, hotly disputed. Claimants improperly mix apples and oranges in order to craft a story

suggesting that Grace believed ZAI to be unsafe. Without wasting the Court's time at this stage

of the proceedings by specifically addressing each and every purported error in Claimants'

version of Grace's history of selling ZAI, Grace notes, by way of example, a few of the

deceptions Claimants employ:

- Claimants improperly take statements regarding potential concerns for
workers exposed eight hours per day, five days per week, to in-process
material and use them to imply that Grace believed finished ZAI was
unsafe for homeowners. Claimants, for example, quote language in a
June 15, 1983 internal memorandum entitled "Plant Fiber
Communication." Exh. 72 to Claimants' Summary Judgment Brief. As
one might expect from the title, and can easily confirm by reading the
document, the expressed concern was for workers making ZAI and other
vermiculite-based products eight hours per day, five days per week in
Grace's expanding plants. *Id.*

- As set forth in Grace's Summary Judgment Brief, the Grace historical
testing of ZAI that Claimants argue alerted Grace to "ZAI's significant

fiber release," does not show ZAI is unsafe today or was considered unsafe decades ago. The test results Claimants cite did not accurately reflect: a typical consumer's likely exposure several times in a lifetime; a typical consumer's likely exposure to finished ZAI as opposed to experimental products; calculation of actual asbestos fibers as opposed to all fibers identified per the limitations of the Phase Contrast Microscopy method used; and/or time-weighted averages of exposures necessary to assess risk. *See* Grace's Summary Judgment Brief at 12 n.6 and 24-25.

- Claimants argue that dust testing, rather than air testing, should be used to assess whether ZAI poses a hazard, citing three occasions on which Grace removed asbestos-containing materials from its plants in the 1980's even though air tests had shown safe levels of asbestos exposure. A reading of the Grace documents cited shows that the products removed were *not* ZAI but, instead, were insulating and/or fireproofing materials containing commercially-added asbestos. In one case, the material contained 15-25% asbestos, and in the other two the material was removed because it was "peeling" off the ceiling and "flaking in most locations." Exhs. 81 and 84 to Claimants' Summary Judgment Brief. In any event, Grace's rationale for removal of these products 15 to 20 years ago does not bear on what science tells us today about whether ZAI poses an unreasonable risk of harm.

There is no question that Grace looked carefully at ZAI, at the asbestos content of ZAI, at removing as much asbestos from ZAI as possible, at the extent to which the product would release asbestos into the air during installation, at the dose and duration of potential exposure for homeowners who installed the product, at what the government said through regulations and otherwise that would be helpful to the analysis and, ultimately, whether ZAI poses an unreasonable risk of harm to homeowners.

What Grace concluded decades ago – that ZAI does not pose an unreasonable risk of harm – is fully consistent with what today's science shows, a point spelled out in detail in Grace's Summary Judgment Brief. At best, Claimants' mischaracterization of Grace's history of making and selling ZAI merely highlights disputed issues of fact that are irrelevant to the

Science Trial but which would easily preclude summary judgment against Grace on liability

should these proceedings extend beyond the Science Trial.

> ## 2.    The EPA has not made any finding that
> ##        ZAI in an attic creates an unreasonable risk of harm.

Claimants place reliance upon certain statements in an EPA advisory issued in

connection with a "National Consumer Awareness Program" on ZAI.  Claimants' reliance on that

consumer awareness program to suggest that ZAI creates an unreasonable risk of harm is

misplaced for several reasons.

First, Claimants cannot cite to any EPA statement that ZAI creates an

unreasonable risk of harm.  Nowhere in its pronouncements does EPA state that ZAI creates an

unreasonable risk of harm or that ZAI should be removed from any house.  *See* Grace's Summary

Judgment Brief at 11-12.

Second, EPA has affirmatively stated that the scientific evidence does not support

such a conclusion.  For example:

- When requested to declare a public health emergency in Libby, Montana due to an alleged hazard presented by ZAI in homes, the EPA refused.  <u>OPPT Comments on Action Memorandum Amendment Removal Action at the Libby Asbestos Site</u>, (Feb. 22, 2002), Appendix to Grace's Summary Judgment Brief, Exh. I at 2.

- EPA's Office of Pollution Prevention and Toxics ("OPPT") concluded: "we do not think a supportable argument has been made to declare Libby a Public Health Emergency based on the questionable added exposure burdens from ZAI." *Id.*

- EPA Administrator Whitman confirmed that "EPA has not changed its long standing guidance to homeowners [about ZAI] because we do not have the scientific basis to do so at this time . . . [S]o much about the risks posed from asbestos-containing vermiculite attic insulation remains unknown. . ." <u>Whitman Letters</u>, Appendix to Grace's Summary Judgment Brief, Exh. K at 1.

- EPA Administrator Whitman also confirmed that "The [ATSDR Libby Medical Screening] study did not show that [ZAI] by itself, could be linked with the health impacts found in Libby." *Id.,* Responses at 2.

Third, the program documents themselves make clear that EPA has *not* concluded that an increased risk of disease exists. EPA initiated the awareness program out of an overabundance of caution while additional research is being considered. In the EPA's press release announcing the consumer awareness program, EPA's Assistant Administrator for OPPT, advised: "People who have homes with vermiculite attic insulation should become informed, not alarmed. . . . Well informed consumers can reduce the possibility for exposure to asbestos from vermiculite attic insulation and minimize potential risks." Appendix to Grace's Summary Judgment Brief, Exh. I at 2.

Moreover, as part of the consumer awareness program, the EPA also released the final draft of its "Pilot Study to Estimate Asbestos Exposure from Vermiculite Attic Insulation" (the "Versar Report"). In EPA's release describing the general conclusions of the Versar Report, the absence of a finding of unreasonable risk of harm could not have been more clear: "Additional studies are needed to better understand *any potential risks* from asbestos contaminated vermiculite attic insulation. . . ." Appendix, Exh. 2.

Fourth, even if the EPA had concluded that ZAI creates an unreasonable risk of harm or that ZAI should be removed from attics -- which it has not -- it is a well-known legal precept that the issuance of a regulatory precaution does not make a product unreasonably dangerous or defective.

> The distinction between avoidance of risk through regulation and compensation for injuries after the fact is a fundamental one. In the former, risk assessments may lead to control of a toxic

substance even though the probability of harm to any individual is
small and the studies necessary to assess the risk are incomplete;
society as a whole is willing to pay the price as a matter of policy.
In the latter, a far higher probability (greater than 50%) is required
since the law believes it unfair to require an individual to pay for
another's tragedy unless it is shown that it is more likely than not
that he caused it.

*In re "Agent Orange" Product Liability Litig.*, 597 F. Supp. 740, 781 (E.D.N.Y.

1984), *aff'd*, 818 F. 2d 145 (2d Cir. 1987). *See also* Reference Manual on Scientific Evidence,

Appendix to Grace's Summary Judgment Brief, Exh. D at 413; and Grace's Summary Judgment

Brief at 7 n.2 and 35-38. The EPA advisory is just such a regulatory precaution, not a standard

by which to determine liability.

EPA's failure to find an unreasonable risk of harm from ZAI is well founded. The

scientifically and legally acceptable evidence shows that the risks, if any, from occasionally

disturbing attic insulation containing trace amounts of asbestos fibers are well within the risks

deemed acceptable and permissible by the EPA, other regulatory agencies and health and risk

professionals.

> **3.    Claimants cannot meet their burden by claiming**
> **that if ZAI is eventually to be removed from a home,**
> **special precautions may be advisable.**

Lacking scientific evidence of unreasonable risk of harm, Claimants attempt to

argue that they can prove unreasonable risk of harm by pointing to testimony of Grace's expert,

Dr. Corn, that ZAI removal requires safety precautions prior to major remodeling or before

demolition.

The false syllogism governing this argument, as well as all of Claimants'

arguments is as follows:

- ZAI is contaminated with asbestos.

- Disturbance of ZAI can release asbestos into the air.

- ZAI will necessarily be disturbed in any major home renovation or demolition.

- Therefore, ZAI will have to be professionally removed in a million or more homes over the next several decades.

As indicated in Grace's Summary Judgment Brief and herein, whether the release of asbestos fibers poses an unreasonable risk of harm is dependent not only on the amount of asbestos fibers in the respirable air, but also on the frequency and duration of exposure over a person's lifetime. All of the legitimate scientific testing and analysis demonstrate that the typical disturbances of ZAI in a person's attic release only small quantities of asbestos fibers in concentrations that are orders of magnitude lower than what would conceivably create *any* risk of harm, much less an unreasonable risk of harm. By the same token, any theoretical risks created are well within regulatory and scientifically acceptable risks and well below the exposure limits established by regulatory agencies. Accordingly, ZAI does not pose an unreasonable risk of harm.

Claimants argue that "Grace's experts agree that ZAI presents a hazard sufficient to require specially trained individuals to remove it with stringent precautions." Claimants' Summary Judgment Brief at 1. More specifically, they contend that "Grace's principal industrial hygiene expert [Dr. Morton Corn] agreed at his deposition that ZAI must be removed with stringent safety precautions by trained professionals prior to major remodeling or before demolition." *Id.* at 3. This characterization of Dr. Corn's testimony is both incorrect and incomplete.

Dr. Corn testified that while removal by specialists may be recommended, he does

*not* believe removal by a homeowner creates a hazard:

> Well, I'm really not concerned about the removal, even if the
> homeowner does it with ZAI.
>
> I'd recommend the homeowner get specialists' help, but this is
> really a once in a lifetime occurrence for a homeowner that
> removes it. And I think that's the dominating factor here, that
> exposure is not only a function of concentration but duration of
> exposure.
>
> So I think it's appropriate we recommend the specialists but let us
> say the homeowner goes ahead on their own, they would get some
> exposure during that removal, but I don't think the integrated dose
> of that exposure would concern me.

Corn Dep., Appendix, Exh. 3 at 26-27.

Dr. Corn elaborated further when asked if he would be concerned about a

homeowner who removed ZAI without taking precautions:

> Q.   So you wouldn't be concerned if a homeowner went up
>       there and vacuumed the material out himself or herself
>       without a respirator at all?
>
> A.   That's correct, for once – for that kind of frequency of
>       occurrence.
>
>                          *     *     *
>
> A.   I think that's the difference between the tenure of plaintiffs'
>       experts in this litigation versus the position I'm taking, and
>       plaintiffs have shifted in their experts.
>
>       They're tuned now to avoidance of all exposure. Any
>       exposure is hazardous, and I've addressed that issue in the
>       supplement of my report.
>
>       I am not taking the position that any exposure is hazardous,
>       I don't believe it is. And I believe that the risk, which I
>       term [a] hypothetical risk, from a once in a lifetime
>       removal is very low, if it exists at all.

*Id.* at 29.

      The crux of Dr. Corn's opinion, as more fully set forth in his expert report, is that ZAI does *not* pose an unreasonable risk to homeowners even in the context of a major renovation or demolition.[8]  Thus, Claimants' reliance on Dr. Corn's testimony in an attempt to support an assertion of an unreasonable risk of harm from ZAI is totally misplaced.

### C.    ZAI Claimants' "Solution" Relates To Alleged Damages And Is Not Part Of The Science Trial, But, In Any Event, Is An Unreasonable "Solution" To A Problem That Does Not Exist.

      While Claimants inappropriately raise for purposes of the Science Trial their damages "solution," such proposed "solution" is for a problem that does not exist.  Because ZAI does not present an unreasonable risk of harm, it does not need to be professionally removed and there does not need to be a claims fund to address alleged "abatement costs."

      Moreover, even assuming Claimants were able to prevail at a Science Trial -- which Grace contends they are unable to do -- their alleged "solution" still makes no sense. Claimants' "solution" would require this Court to speculate on the number of homes which have ZAI, on the number of such homes which are likely to be "demolished," and on the alleged "professional ZAI removal" costs that might be incurred.  Claimants' alleged "solution" suggests broad negotiation dealing with the receipt over time of "ZAI claims."

---

[8] That Dr. Corn once recommended the removal of ZAI together with other asbestos-containing materials in several large and poorly maintained naval facilities is not contrary to this opinion. *See* Corn Dep., Appendix, Exh. 3 at 93-97. Nor is Dr. Corn's general agreement that the EPA has appropriately made certain general recommendations to the public at large inconsistent with his assessment that ZAI is not unreasonably dangerous.  The EPA's charge is to be overly cautious. Reference Manual on Scientific Evidence, Appendix to Grace's Summary Judgment Brief, Exh. D at 413.

This "solution" is not consistent with the bankruptcy process and makes no sense whatsoever. If it is determined that under certain circumstances ZAI may pose an unreasonable risk of harm -- which Grace denies -- then the next step would be for the Court to set a bar date for any alleged Claimants to submit these claims. Any such bar date should require Claimants to submit relevant information with respect to their alleged claims in order for the Court and the parties to determine the number of Claimants and the scope of any proposed "solution" with respect to such claims.

Upon receipt and analysis of the claims, the Court and the parties would have an exact number of the ZAI claims. No guesswork would be involved. No "conservative estimates of [whatever the number of] homes" would be needed. No estimates of the number of homes demolished in America each year would be necessary. The precise number of homes involved in any claims would be known and, at that point, if some "solution" were needed, the Court and the parties would understand the exact size and scope of the problem for which a "solution" would be sought.

Claimants' suggestion for the creation of a so-called abatement fund has absolutely nothing to do with the issue currently before the Court -- whether science establishes that ZAI is unreasonably dangerous. In any event, consideration of a damages "solution" would have to be preceded by a bar notice and the filing of claims.

## III.    CONCLUSION

This Court should deny Claimants' Motion for Summary Judgment because: (1) it does not address the issue that the Court set for the Science Trial -- whether science establishes that ZAI poses an unreasonable risk of harm; and (2) Claimants fail to meet their Rule 56 burden of establishing "that there is no genuine issue as to any material fact." In order to prevail on summary judgment in the Science Trial, Claimants would have to establish that there is no genuine issue of material fact that ZAI poses an unreasonable risk of harm to human health. Claimants cannot and, in fact, do not even try to do so. Accordingly, Claimants' Motion for Summary Judgment should be denied.

Date: August 8, 2003                PACHULSKI, STANG, ZIEHL, YOUNG,
                                    JONES & WEINTRAUB P.C.


                                    *Paula A Galbraith*
                                    _____
                                    Laura Davis Jones (Bar No. 2436)
                                    Scotta E. McFarland (Bar No. 5488)
                                    Paula A. Galbraith (Bar No. 4258)
                                    919 Market Street
                                    Suite 1600
                                    Wilmington, DE 19801
                                    Telephone: 302.652.4100
                                    Facsimile: 302.652.4400
                                    Co-Counsel For Debtors

                                    REED SMITH, LLP
                                    James J. Restivo, Jr.
                                    Lawrence E. Flatley
                                    Douglas E. Cameron
                                    James W. Bentz
                                    435 Sixth Avenue
                                    Pittsburgh, PA 15219
                                    Special Asbestos Counsel For Debtors