## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## APPENDIX TO OPPOSITION OF W.R. GRACE & CO.
## TO CLAIMANTS' MOTION FOR SUMMARY JUDGMENT

Counsel of Record for this Party:

REED SMITH, LLP
James J. Restivo, Jr.
Lawrence E. Flatley
Douglas E. Cameron
James W. Bentz
435 Sixth Avenue
Pittsburgh, PA 15219
Telephone: 412.288.3131
Facsimile: 412.288.3063

SPECIAL ASBESTOS COUNSEL FOR
DEBTORS

PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB P.C.
Laura Davis Jones (Bar No. 2436)
David W. Carickhoff (Bar No. 3715)
Scotta E. McFarland (Bar No. 5488)
Paula A. Galbraith (Bar No. 4258)
919 Market Street, 16th Floor
Wilmington, DE 19801
Telephone: 302.652.4100
Facsimile: 302.652.4400

CO-COUNSEL FOR DEBTORS

August 8, 2003

## TABLE OF CONTENTS

**EXHIBIT**

Excerpts from the February 5, 2003 Deposition of E.S.Wood ..........................................................1

May 21, 2003 EPA Background Document:  EPA's Pilot Study to Estimate Asbestos
Exposure from Vermiculite Attic Insulation  (Versar Study)............................................................2

Excerpts from the May 29, 2003 Deposition of Dr. Morton Corn ....................................................3

# EXHIBIT 1

Page 1

1                                    VOLUME: I

2                                    PAGES: 1-111

3                                    EXHIBITS: 1

4                    COPY

5          IN THE UNITED STATES BANKRUPTCY COURT

6              FOR THE DISTRICT OF DELAWARE

7      - - - - - - - - - - - - - - - - - x

8      IN RE:                    Bankruptcy No. 01-1139

9      W.R. GRACE & COMPANY, et al.,        Chapter 11

10                  Debtors

11     - - - - - - - - - - - - - - - - - x

12

13          DEPOSITION of ELWOOD S. WOOD

14                February 5, 2003

15                   9:24 a.m.

16              W.R. Grace & Company

17              62 Whittenmore Avenue

18            Cambridge, Massachusetts

19

20

21

22

23        Reporter: Michael D. O'Connor, RPR

24

Wood Elwood  -  February 5, 2003

Page 2

```
1    APPEARANCES:

2

3        RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC

4        By Robert M. Turkewitz, Esq. and

5        James L. Ward, Jr., Esq.

6        1037 Chuck Dawley Boulevard, Building A

7        Mt. Pleasant, South Carolina 29464

8        (843)727-6672

9        For the Claimants.

10

11       REED SMITH LLP

12       By Lawrence E. Flatley, Esq.

13       435 Sixth Avenue

14       Pittsburgh, Pennsylvania 15219

15       (412)288-3063

16           - and -

17       W.R. GRACE & COMPANY

18       By William J.A. Sparks, Esq.

19       919 North Market Street

20       Wilmington, Delaware 19801

21       (302)652-5340

22       For W.R. Grace & Company.

23

24
```

Page 3

1                    I N D E X

2    Deposition of:                    Direct   Cross

3    ELWOOD S. WOOD

4        By Mr. Turkewitz                    5

5

6

7                  E X H I B I T S

8    No.                                         Page

9    1    Memo to F.W. Eaton, H.C. Duecker,

10        E.S. Wood and H.A. Eschenbach from

11        O.M. Favorito, dated 5/23/80          80

12

13

14

15

16

17

18

19

20

21

22

23

24

Wood Elwood  -  February 5, 2003

Page 8

1  your deposition was taken in 1988.  Do you recall

2  that?

3      A.   I don't recall the details, but I do recall

4  being deposed.

5      Q.   Okay.  On how many occasions have you been

6  deposed?

7      A.   To my recollection, that was the only

8  occasion.

9      Q.   Have you ever consulted for W.R. Grace with

10  regard to asbestos-related cases besides this case

11  here?

12      A.   No.

13      Q.   Sir, you were general manager of Grace's

14  Zonolite business from approximately 1977 until

15  1982; is that correct?

16      A.   I don't have a mind for dates, so I'll have

17  to go by whatever the record may indicate, but

18  that's approximately correct.

19      Q.   1981, 1982, in that time frame?

20      A.   Something like that.

21      Q.   Who served as general manager of the

22  Zonolite business prior to 1977?

23      A.   Mr. Brown.

24      Q.   Who served as general manager of the

Wood Elwood   -   February 5, 2003

1      A.    To avoid inhaling asbestos-laden area.

2      Q.    Now, with respect to housekeeping and

3   education, was that done regardless of the levels of

4   asbestos in the plant?

5      A.    I'm really trying to think about what we

6   may have done in plants which were using South

7   Carolina concentrate in order to answer your

8   question.  It was certainly done in all plants which

9   handled the Libby concentrate.  It certainly was

10  done with much greater detail in Libby itself where

11  we had a very serious problem.

12     Q.    At some point grace was able to get the

13  levels at Libby and the levels in the plant to be

14  within the OSHA standard; is that correct?

15     A.    Yes.

16     Q.    But Grace continued to educate its

17  employees even after that, did it not?

18     A.    Yes, I think so.  I can speak only for my

19  watch.

20     Q.    And Grace continued with the housekeeping

21  measures that we talked about as well?

22     A.    Yes.

23     Q.    Now, when you first started as general

24  manager of the Zonolite business, do you recall

Wood Elwood  -  February 5, 2003

1   testing being conducted to determine the airborne

2   levels of asbestos that could result during

3   installation of Zonolite attic insulation?

4       A.    Yes, I know we made some tests.

5       Q.    And were you responsible for that decision

6   to test?

7       A.    Yes.

8       Q.    Why did you want to conduct that testing?

9       A.    It was mandated that we test all of our

10  products.  The occupational safety and health

11  authorities promulgated regulations, and among those

12  regulations were requirements that all products be

13  tested in their end use.  So we were complying with

14  those requirements.

15      Q.    Do you recall the results that you received

16  early on?

17      A.    On what?

18      Q.    With regard to the airborne levels during

19  installation of the Zonolite attic insulation.

20      A.    I don't specifically recall individual

21  results.  The testing went through phases in trying

22  to refine representative protocols for how the

23  product was used.  Initially there were crude tests

24  that didn't measure any particular use, but rather,

A. WILLIAM ROBERTS, JR., & ASSOCIATES (800) 743-DEPO

Wood Elwood  -  February 5, 2003

1    measured the amount of fiber that could be

2    liberated, so-called prop tests.

3         That was helpful indiscriminate go higher

4    contamination from lower contamination, but didn't

5    really give much information on how the product

6    would actually behalf in its end use.

7         With respect to attic insulation, there

8    were tests performed in a mock attic, and that was

9    followed by tests in actual homes where, you know,

10   you went and did what you expected the homeowner

11   would do.

12        Q.   Early on when you first received the

13   initial results of testing, do you recall discussing

14   contingency relating to Zonolite attic insulation in

15   1977?

16        A.   Yes.

17        Q.   Do you recall that one of the contingencies

18   included withdrawal of Zonolite attic insulation

19   from the market?

20        A.   Yes.

21        Q.   Why was this option addressed?

22        A.   At the time of my arrival, the Consumer

23   Products Safety Commission was considering

24   regulations banning the use of asbestos in consumer

1    products, and therefore, with the pending, but still

2    unresolved issue of whether or not a material such

3    as ours, with small amounts of contaminant, would be

4    included in their ban, we felt it necessary to make

5    plans in case the Consumer Products Safety

6    Commission required us to withdraw the product.

7        Q.   Do you recall the Consumer Products Safety

8    Commission indicating at that time that they

9    considered any exposure to asbestos to be dangerous?

10       A.   I guess that was a very conservative

11   operating practice.  I don't recall that they said

12   any exposure, because, in fact, they were busily

13   identifying the risk factors associated with various

14   uses.

15       Q.   Do you also recall at that time discussions

16   about putting asbestos warnings on bags of Zonolite

17   attic insulation?

18       A.   Yes.

19       Q.   Who made that proposal?

20       A.   It was a part of the contingency plan --

21            MR. FLATLEY:  Object to the form of the

22   question.  Go ahead.

23       A.   It was a part of the contingency plan.  It

24   was never proposed to do it.  There was never a

Wood Elwood  -  February 5, 2003

1    decision to do it.  It was an exercise that we went

2    through in case we were required to do it.

3        Q.   And the warning language specifically

4    identified asbestos; is that correct?

5            MR. FLATLEY:  Do you mean the warning

6    language that was being considered as part of the

7    contingency plan?

8            MR. TURKEWITZ:  Yes.

9        A.   I would think so.  I would have to refresh

10   my memory on that point.

11       Q.   Why was asbestos specifically identified in

12   the language?

13       A.   Because that was the issue to be addressed

14   by the Consumer Products Safety Commission.

15       Q.   And was it felt it would be important to

16   actually identify asbestos in the warning?

17       A.   If the Consumer Products Safety Commission

18   required you to do so, yes.

19       Q.   Do you recall discussions about the impact

20   of placing an asbestos warning label on bags of

21   Zonolite attic insulation?

22       A.   Yes.

23       Q.   What do you recall about those discussions?

24       A.   That it would have a depressant effect on

1   sales.

2        Q.    Why is that?

3        A.    Just people's fear of the unknown.

4        Q.    Was a decision made to not place asbestos

5   warning labels on bags of Zonolite attic insulation?

6        A.    Yes.

7        Q.    And who made that decision?

8        A.    I think it was a collective decision.

9   Certainly I being responsible for the business had a

10   lot to say about that.

11        Q.    Who else was involved in making that

12   decision?

13        A.    We met with our attorneys, we met with our

14   health and safety people, we met with outside

15   experts on the effect of exposure to asbestos, we

16   participated in hearings of the OSHA regulatory

17   authorities, we counseled at one point with the

18   Consumer Products Safety Commission.

19              It was a long process.  It wasn't a quick

20   nor easy decision

21        Q.    You mentioned that you counseled with your

22   health and safety people.  Are you talking about at

23   W.R. Grace?

24        A.    Yes.

# EXHIBIT 2

 United States Environmental Protection Agency

# BACKGROUND

May 21, 2003

## EPA's Pilot Study to Estimate Asbestos Exposure from Vermiculite Attic Insulation

### Background

Due to a variety of questions regarding vermiculite attic insulation, in the Spring of 2001, EPA began a small scale study to better understand the possible levels of asbestos in vermiculite attic insulation (VAI) and whether homeowners are potentially exposed to low levels of asbestos from vermiculite attic insulation. This preliminary, first phase study was designed to: (1) obtain a rough estimate of the amount of asbestos in attics with vermiculite attic insulation; and (2) obtain a rough estimate of a person's potential exposure to asbestos while performing common household activities. The results of this preliminary study do not indicate a need to change the Agency's longstanding and current guidance on managing asbestos, which is that homeowners should not disturb asbestos-contaminated material or, if disturbance is necessary, to hire professionals for removal. The Agency will use the results of this preliminary study to initiate further studies on vermiculite attic insulation and other asbestos related issues.

### Study of Six Vermont Houses

The contractor hired by EPA, Versar Inc., has conducted 20 active simulations in six homes in Vermont and in a containment unit designed to simulate an attic environment in order to examine exposure to VAI. The pilot study examines the potential exposure associated with a number of activities, including:

- Installing and removing VAI;
- Performing wiring/small renovations in an attic that contains VAI;
- Using an attic that contains vermiculite insulation as a storage space;
- Living in a house where such VAI disturbances occur; and
- Background exposure associated with living in a house with VAI.

The study looked at six homes in Vermont with VAI – five were temporarily unoccupied and one was abandoned. Bulk samples of the VAI were collected and tested for asbestos contamination, as were ambient air samples from the attic, the living space, and outside the houses. Five of the houses were temporarily unoccupied at the time of the study and the insulation was not disturbed to avoid potential future exposure to the returning residents. Disturbances were conducted in the sixth abandoned house.

In these five houses, the asbestos content of the vermiculite was as high as 2% in bulk samples of the vermiculite attic insulation, yet asbestos was not detected in the air or dust samples. In the abandoned house, no detectable amount of asbestos was found in the bulk vermiculite sample. Yet, when the insulation was disturbed by performing six attic-use simulations (wiring, hanging a ceiling fan, etc.), small amounts of asbestos were detected in the air during the disturbance.

### *Study of Vermiculite Containing Products and Simulated Use*

The study also sampled 10 vermiculite attic insulation products and simulated their use in the containment unit meant to represent an attic. The study analyzed five products from four different stores, as well as vermiculite from 3 different lots the Seattle Public Utility storage area, and two partially used bags of VAI from two residents of the State of Washington. The study analyzed 13 bulk samples of these 10 different vermiculite insulation products. Air monitoring was conducted during simulated consumer use of 6 of the products in the containment unit.

The results of these simulations showed that the disturbance of vermiculite attic insulation resulted in the release of asbestos fibers – the more aggressive the disturbance, the more fibers detected. These simulations also found that the absence of asbestos in the bulk VAI does not necessarily mean an absence of asbestos in the air after a disturbance.

### *General Conclusions of the Pilot Study*

This small scale study provided the following key findings and identified areas for additional evaluation which EPA is seeking to address through its Asbestos Action Plan and research agenda currently under development:

- Disturbed vermiculite attic insulation can create a potential asbestos exposure risk to consumers.

- Bulk samples of vermiculite attic insulation that tested negative for asbestos contamination are not reliable for determining whether there are asbestos fibers elsewhere in the attic or whether a disturbance of the VAI would result in the release of asbestos fibers.

- Additional studies are needed to better understand any potential risks from asbestos contaminated vermiculite attic insulation and to develop more accurate analytical testing procedures.

# EXHIBIT 3

Morton Corn, Ph.D.   -   May 29, 2003

Page 1

1              IN THE UNITED STATES BANKRUPTCY COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4      ----------------------------x
                                    *
5      In re:                       *   Chapter 11
                                    *
6      W. R. GRACE & CO., et al.,   *   Case No. 01-01139(JKF)
                                    *
7                 Debtors.          *   (Jointly Administered)
                                    *
8      ----------------------------x

9

10

11

12         Deposition of MORTON CORN, Ph.D., B.Ch.E., CSP

13                    Linthicum, Maryland

14                  Thursday, May 29, 2003

15                       9:08 a.m.

16

17

18

19

20

21

22

23     Job No.:  1-17366

24     Pages:  1 - 203

25     Reported by:  Marianne R. Hewitt

Morton Corn, Ph.D.   -   May 29, 2003

Page 2

1            Deposition of MORTON CORN, Ph.D., B.Ch.E.,

2      CSP, held at:

3

4

5

6            MARRIOTT AT THE BWI AIRPORT

7            1743 West Nursery Road

8            Board Room Number One

9            Linthicum, Maryland 21090-2906

10           (410) 859-8300

11

12

13

14            Pursuant to agreement, before Marianne R.

15      Hewitt, Reporter and Notary Public in and for the

16      State of Maryland.

17

18

19

20

21

22

23

24

25

Morton Corn, Ph.D.   -   May 29, 2003

Page 3

```
 1                    A P P E A R A N C E S

 2

 3      ON BEHALF OF THE CREDITORS:

 4           EDWARD J. WESTBROOK, ESQUIRE

 5           RICHARDSON, PATRICK, WESTBROOK & BRICKMAN

 6           1037 Chuck Dawley Boulevard

 7           Building A

 8           Mount Pleasant, South Carolina 29464

 9           (843) 727-6500

10

11

12      ON BEHALF OF THE DEBTOR, W. R. GRACE:

13           DOUGLAS E. CAMERON, ESQUIRE

14           REED SMITH, LLP

15           435 Sixth Avenue

16           Pittsburgh, Pennsylvania 15219

17           (412) 288-4104

18

19

20      ON BEHALF OF THE DEBTOR, W. R. GRACE:

21           RICHARD C. FINKE, SENIOR LITIGATION COUNSEL

22           W. R. GRACE & COMPANY

23           One Town Center Road

24           Boca Raton, Florida 33486-1010

25           (561) 362-1533
```



1  here today that ZAI could be removed safely by

2  qualified contractors?

3      A.    I haven't seen nor heard of a -- the type of

4  removal that concerned me in the early and mid '80s for

5  years.  My conclusion has been those fly-by-night

6  companies are opportunistic companies and no longer in

7  the business, and the ones that are are doing good work

8  today.

9      Q.    And I remember one of your concerns about

10 removal in a traditional ACM in buildings was you had

11 to tear the fabric of the building apart to get to it.

12     A.    That's right.

13     Q.    With respect to ZAI it appears at least that

14 it may be a much easier removal with a vacuum truck, I

15 guess.

16     A.    That's correct.

17     Q.    Okay.  So that would certainly seem to make

18 it feasible without endangering people the way you were

19 concerned about in the traditional buildings.

20     A.    Well, I'm really not concerned about the

21 removal, even if the homeowner does it with ZAI.

22          I'd recommend the homeowner get specialists'

23 help, but this is really a once in a lifetime

24 occurrence for a homeowner that removes it.  And I

25 think that's the dominating factor here, that exposure

1   is not only a function of concentration but duration of

2   exposure.

3        So I think it's appropriate we recommend the

4   specialists but let us say the homeowner goes ahead on

5   their own, they would get some exposure during that

6   removal, but I don't think the integrated dose of that

7   exposure would concern me.

8        Q.   Have you seen any studies indicating the

9   fiber levels that a homeowner would get while removing

10  an entire attic of ZAI?

11       A.   No, I haven't, but I would -- I think that

12  is -- can be modeled and calculated on the base of the

13  data we have in hand for simulations and an assumption

14  as to the duration of removal, and we have exposures

15  during that type of removal by a homeowner scooping it

16  or getting it out.

17       So I think we could come up with a pretty

18  good estimate of what that once-in-a-lifetime exposure

19  or twice in a lifetime, if it's two homes, would be.

20       In terms of an integrated fiber per cc. years

21  dosage, it would be very low.

22       Q.   All right.  Would you recommend that a

23  homeowner wear a respirator?

24       A.   Yes, I always -- I think you may recall, I've

25  always recommended respiratory protection, and I've

1   always recommended to employers that if employees

2   request it, they use a respirator.

3           And I used a respirator when I installed

4   fibrous glass in my attic in Pittsburgh.  I mean I just

5   think it's a good idea.

6       Q.   You're not talking about the Sears dust mask,

7   the white masks that people use for painting, are you?

8       A.   I think for this job they would help, they're

9   about 90 percent effective.  If the homeowner has a

10  better cartridge respirator, that's the appropriate

11  respirator.  But in dealing with the large spectrum of

12  homeowners, I suspect it would be the dust mask that

13  would probably be used.

14      Q.   And by dust mask, so we're talking about the

15  same thing, we talked about the ones that come five in

16  a package, the white ones with the little clip --

17      A.   Yes.

18      Q.   -- that you stick around your face.

19      A.   Well, I think realistically that's probably

20  what most homeowners would utilize and not get a

21  cartridge respirator.

22      Q.   Right.

23      A.   So this would offer a degree of protection

24  over and above no protection, and I already stated I

25  would not be concerned with a lifetime -- once in a



Page 29

1    lifetime exposure without protection.

2         Q.    Okay.  So you wouldn't be concerned if a

3    homeowner went up there and vacuumed the material out

4    himself or herself without a respirator at all.

5         A.    That's correct, for once -- for that kind of

6    frequency of occurrence.

7         Q.    Okay.

8         A.    I think that's the difference between the

9    tenure of plaintiffs' experts in this litigation versus

10   the position I'm taking, and plaintiffs have shifted in

11   their experts.

12            They're tuned now to avoidance of all

13   exposure.  Any exposure is hazardous, and I've

14   addressed that issue in the supplement of my report.

15            I am not taking the position that any

16   exposure is hazardous, I don't believe it is.  And I

17   believe that the risk, which I term hypothetical risk,

18   from a once in a lifetime removal is very low, if it

19   exists at all.

20        Q.    I saw a calculation you did in your report

21   about how much air somebody breathes at what fiber

22   level, et cetera.

23            Without getting into, you know, specific

24   numbers, would it be ballpark correct that a person up

25   there removing ZAI in his or her attic with no

Page 93

1    it was virtually everybody involved in litigation, but

2    I never did serve on that.  I just did not think it was

3    appropriate.

4         Q.    Have you been asked by any other government

5    agency to advise on the issue of ZAI?

6         A.    No.

7         Q.    Have you been asked by any homeowners to

8    consult on ZAI in their home?

9         A.    No.

10        Q.    Okay.  Have you been asked by anyone other

11   than W. R. Grace to do anything in connection with ZAI?

12        A.    I've run into ZAI and been asked in a sense,

13   but I'm assisting the Navy in environmental hazard

14   litigation where they close a facility or reduce it and

15   there's a suit filed for back pay.  So I inspect the

16   buildings involved.

17             These are nonoccupational environment and

18   they're like the buildings issues we dealt with.  And

19   in doing that in Pearl Harbor I encountered attic

20   insulation.

21        Q.    In --

22        A.    So I had to address -- similar to my

23   inspections of buildings I addressed the form of the

24   asbestos, the concern for the asbestos and so on.

25             But I did encounter attic insulation in some

Morton Corn, Ph.D.   -   May 29, 2003

Page 94

1    of the very old buildings on the Pearl Harbor Naval

2    Shipyard Base.

3        Q.    Did you write a report that included the ZAI

4    buildings?

5        A.    No, just notes of what I saw, inspection

6    notes.

7        Q.    Have the facilities been closed that had the

8    ZAI?

9        A.    Yeah, the whole building was closed for

10   either remodeling or tearing down.   If they could get

11   the money to remodel they would remodel, if they

12   couldn't they were going to demolish.

13       Q.    When was this that you were involved with ZAI

14   at Pearl Harbor?

15       A.    I did my inspections two years ago.

16       Q.    Do you know what's happened to those

17   buildings?

18       A.    No, but I'll be going back so I will find

19   out.

20       Q.    Okay.   Did you make any recommendations on

21   what they should do about the ZAI if they tore the

22   building down?

23       A.    Just that it should be appropriate removal.

24   I assumed it had some asbestos and I -- and they do

25   have appropriate removal.

A. WILLIAM ROBERTS, JR., & ASSOCIATES (800) 743-DEPO



Page 95

1          They have standard operating procedures for

2    professional removers.  And so it was really iterating

3    in that sense what they already knew.

4          There were different forms of asbestos

5    materials in the buildings I inspected from thermal to

6    pipe insulation, boiler insulation.  I was encountering

7    a lot of different ACM in the older buildings.

8          Q.    And did you make any calculations of what the

9    cost would be for the asbestos removal for that aspect

10   of the building?

11         A.    No, I didn't get into any of that.

12         Q.    Did you have any discussions with them of the

13   removal technique for ZAI?  We talked earlier about a

14   vacuum truck or scooping it up or --

15         A.    No, we -- again, we didn't get into that.  It

16   was mainly visual qualitative observation of the

17   potential sources of asbestos that were the basis for

18   the claim for 25 years back pay of 8 percent of people

19   who worked in these buildings.

20         Q.    What's happened with the litigation, do you

21   know?

22         A.    There will be a hearing.  The two I was

23   involved with, I assisted the Navy in Mechanicsburg and

24   the Navy was successful.

25         And I assisted the Air Force at Kelly Air

Morton Corn, Ph.D.   -   May 29, 2003

1    Force Base.  The Navy recommended me to Kelly.  These

2    are the JAG attorneys I worked with, and my role is

3    really to educate them to asbestos and to tutor them in

4    the issues.  And we prevailed in Kelly and now it's

5    Pearl Harbor.

6         Q.    Good work leads to more assignments, and

7    Pearl Harbor is not a bad one.

8         A.    Yeah.  Yeah.

9         Q.    With the small percentage of asbestos, we've

10   seen up to two percent of asbestos in the ZAI, out at

11   Pearl Harbor why wouldn't you just recommend they knock

12   it down, it's only going to be a day or two?

13        A.    Well, the ZAI is a minor part of these

14   buildings, the consideration.  These are enormous

15   buildings dating from the -- they may date -- I have

16   those, I think it was the '20s or the '30s.

17             In terrible state of repair, the roofs were

18   in bad shape, there were pigeon droppings, there

19   were -- I mean the -- we have -- despite the enormous

20   defense budget, I learned that very little goes into

21   maintenance of facilities.

22             So these buildings are sealed, they're really

23   sealed off to any entry.  And I was trying to

24   reconstruct what was there when people worked in them,

25   and the degree of hazard.

Morton Corn, Ph.D.   -   May 29, 2003



1      Q.   Well, how did that get you into a

2  recommendation that if the buildings were going to be

3  remodeled or demolished that the ZAI be removed?

4      A.   It was just an add on to my report just

5  saying you're aware that -- just reminding them, which

6  is gratuitous because they knew.

7           But in my notes I would say it should be

8  remembered that this asbestos should be removed by

9  professional removal specialists.

10     Q.   Okay.

11     A.   That's all it was, a footnote at most.

12     Q.   Okay.  All right.  And I want to be sure we

13  covered this to save some time of a lot of questions.

14          Are you doing anything else related to ZAI or

15  run into it, talked about it, bumped into it, consulted

16  with anybody?

17     A.   No.

18     Q.   Okay.  How much time would you estimate

19  you've spent since that first faithful call from Mr.

20  Finke in June of 2000 giving you and me this new avenue

21  of exploration?

22     A.   I've forgotten how much time I spent in

23  Barbanti, I'm guessing it was a week to ten days or

24  so.

25          I had to make two trips, I remember we