IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## OPPOSITION OF W.R. GRACE & CO. TO CLAIMANTS' MOTION TO EXCLUDE DR. R. J. LEE'S OPINION ON CLEAVAGE FRAGMENTS

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................ 1

II.  ARGUMENT ............................................................................................... 3

    A.   Claimants' Motion Must Be Denied Because Dr. Lee Utilized Well-Established and Widely Recognized Protocols and Procedures in Distinguishing Cleavage Fragments From Asbestos Fibers. ................... 3

        1.   Dr. Lee Followed Standard Protocols Widely Accepted In The Scientific Community. .............................................................................. 4

        2.   Single Particle Differentiation Between Asbestos Fibers And Cleavage Fragments Is Scientifically Accepted. ...................................... 7

        3.   In Any Event, Dr. Lee Utilized Other Scientifically Accepted Methods, Including The Method Suggested By Claimants, To Differentiate Cleavage Fragments From Asbestos Fibers And Found Consistent Results. ......................................................................... 8

    B.   Scientific Consensus Is Consistent With Dr. Lee's Conclusion That The Particles That Become Airborne When ZAI Is Disturbed Are Predominantly  Cleavage Fragments. ................................................. 10

    C.   Dr. Lee's Conclusions Are Entirely Consistent With Non-Asbestiform Tremolite Cleavage Fragments. ........................................................... 12

        1.   Dr. Lee's Conclusions With Regard To The Amount Of Cleavage Fragments Found In Air Samples When ZAI Is Disturbed Are Not Inconsistent With His Bulk Sample Analysis Of ZAI.. ........................... 12

        2.   Dr. Lee's Conclusions Are Not Inconsistent With The Propensity Of Cleavage Fragments To Become Airborne. ........................................ 13

        3.   Dr. Lee's Conclusions Are Consistent With The Data And Concessions Of Claimants' Experts. ........................................................ 14

    D.   Dr. Lee's Conclusions Concerning Whether The Particles Released Into The Air From ZAI When It Is Disturbed Are Cleavage Fragments Have Not Been Rejected By Any Court Or Government Agency. ............................... 15

    E.   EPA Has Not Found Dr. Lee's Analysis To Be Unreliable. ................ 17

III. CONCLUSION ........................................................................................ 18

## I.    **INTRODUCTION**

The issue before the Court in the Science Trial is whether science demonstrates that ZAI presents an unreasonable risk of harm.  Since it is undisputed that undisturbed ZAI presents no risk, a central issue in the Science Trial is whether homeowners who disturb ZAI are exposed over their lifetime to levels of airborne asbestos fibers that create an unreasonable risk of harm.  It is important, therefore, to determine whether the particles released from ZAI when it is disturbed are asbestos fibers or non-asbestiform "cleavage fragments."  Claimants' experts fail to make that distinction.

Faced with significant flaws in their experts' sample analysis, Claimants attack Dr. Richard Lee, a world-renowned expert in asbestos analysis in general and asbestos identification in particular, and his expertise concerning the state-of-the-art in differentiating between asbestos fibers and cleavage fragments.  Specifically, Claimants seek to exclude Dr. Lee's expert opinion that the vast majority of the particles that become airborne when ZAI is disturbed are harmless cleavage fragments and not asbestos fibers.

As set forth in his affidavit, beginning as early as 1978, Dr. Lee presented scientific papers on the subject of amphibole asbestos identification.[2]  Since that time, he has been invited to present papers at national and international symposiums on this subject, has served on EPA committees to write standards for asbestos analysis, has published peer-reviewed papers on asbestos identification and cleavage fragment analysis, and is serving as an expert for the state and federal government (EPA) in an investigation involving air sample analysis to

---

[2]  Asbestos minerals belong to two mineral families which have different chemical compositions, the serpentines and amphiboles. Tremolite is in the amphibole family. Lee Affidavit, ¶ 14. In support of its opposition, Grace is filing contemporaneously herewith the Affidavit of Richard J. Lee, Ph.D. with supporting documentation attached thereto.

determine whether the emissions from a New Jersey rock quarry ("Southdown") are asbestos fibers or non-asbestiform cleavage fragments.  Lee Affidavit, ¶¶ 14 - 15.

In addition, Dr. Lee's testimony was cited by OSHA in its 1992 rulemaking that excluded amphibole cleavage fragments -- including tremolite cleavage fragments of the types found in the Libby vermiculate ore -- from the OSHA asbestos standard.  *Id.,* ¶ 16, Exh. 1.  And, unlike Claimants' experts Richard Hatfield and William Longo, Dr. Lee's scientific work has never been rejected by a court under *Daubert* or similar state analogs.  *Id.,* ¶ 17.

The method employed by Dr. Lee in this case – as well as in his other work for EPA – is scientifically valid and reliable under the *Daubert* standard in that:

- The method has a testable hypothesis, namely that physical properties of amphibole asbestos fibers can be reliably distinguished from cleavage fragments by Transmission Electron Microscopy ("TEM"), using definitions and methods developed by EPA, OSHA and other investigators more than 20 years. *Id.,* ¶ 30 - 40.

- The method has been peer-reviewed in that:  the actual flow chart utilized by Dr. Lee was reviewed and approved for use by EPA in the Southdown investigation; the distinguishing properties or characteristics by which asbestos fibers are identified have been directly incorporated into approved methods and have been subject to review; other investigators, both in the United States and internationally, have published on all aspects of the method; and the method was reviewed and accepted by OSHA in their recent investigations of tremolite asbestos in Crayola crayons. *Id.,* ¶¶ 28 - 40.

- The potential error rate is determinable because a record is made by the laboratory of the location on the sample of each particle identified, thus permitting a quality assurance re-analysis. *Id.,* ¶ 44.

- The physical properties used by Dr. Lee to differentiate between asbestos fibers and cleavage fragments (i.e. curvature, splayed ends, fiber aspect ratio, terminations and internal twinning/defects) are generally accepted and are cited in EPA's Polarized Light Microscopy (PLM) Method, by OSHA, by international agencies and by investigators from the United States Geological Survey.  Dr. Lee simply organized these generally accepted properties and characteristics into a flowchart for the ease of analysis. *Id.,* ¶¶ 28 - 40.

- The method used by Dr. Lee is based on the identical properties in the published analytical methods used and recognized by EPA to identify asbestos in bulk materials, including tremolite in samples of ZAI. *Id.,* ¶ 25.

- The TEM method and its optical analog are used throughout Europe, by OSHA and by RJ Lee Group to distinguish asbestos fibers from cleavage fragments in samples of ore and other products outside of litigation. *Id.*, ¶¶ 25, 29, 31, 42.

- Dr. Lee's qualifications concerning asbestos identification are unparalleled. *Id.*, ¶¶ 2 - 18.

The fact that Claimants do not agree with -- or more precisely, do not like -- Dr. Lee's conclusions does not justify their personal attack on Dr. Lee.  Moreover, the thrust of Claimants' attack is directed to the weight this Court should give to Dr. Lee's conclusions, and not to whether he is qualified under *Daubert* to render those opinions.  For these reasons,  and for the additional reasons set forth below, Claimants' attempt to exclude Dr. Lee's opinions concerning cleavage fragments should be denied.

## II.   ARGUMENT

### A.   Claimants' Motion Must Be Denied Because Dr. Lee Utilized Well-Established and Widely Recognized Protocols and Procedures in Distinguishing Cleavage Fragments From Asbestos Fibers.

In an overzealous attempt to discredit Dr. Lee, Claimants contend that the analytical protocols and methods Dr. Lee utilized to distinguish asbestiform fibers from cleavage fragments in the air sample data were "conjured up" by Dr. Lee.[3]  To the contrary,  Dr. Lee followed generally accepted protocols and analytical methods for the analysis of air samples.

There are two general types of air sample collection methods and analysis, Phase Contrast Microscopy ("PCM") and Transmission Electron Microscopy ("TEM").  The standard and generally accepted method for PCM analysis is the National Institute of Safety and Health ("NIOSH") 7400 method.  NIOSH published the 7400 Method in 1984 and its use is required by OSHA for purposes of compliance with asbestos worker regulations.  Lee Affidavit, ¶ 20, Exh. 3.

---

[3]  Memorandum in Support of the Claimants' Motion to Exclude Dr. R.J. Lee's Opinion on Cleavage Fragments ("Claimants' Lee Memorandum") at 2.

Under NIOSH 7400, PCM does not differentiate between asbestos and non-asbestos fibers. It counts as asbestos all particles that are longer than five microns and have a minimum length to width aspect ratio of 3:1. *Id.*

TEM, on the other hand, is much more powerful and can distinguish between asbestos fibers and non-asbestos particles. While there are several generally accepted TEM methods, in 1989 NIOSH published its TEM asbestos method, NIOSH 7402. *Id.,* ¶ 21, Exh. 4. NIOSH 7402 was designed for use in conjunction with NIOSH 7400 to enable an analyst to determine the proportion of countable particles present in a mixed particle environment that are actually asbestos fibers. OSHA explicitly permits the use of the NIOSH 7402 method when analyzing air samples for OSHA compliance purposes when performed in conjunction with PCM analysis. *Id.,* ¶ 22, Exh. 5.

Claimants do not dispute that NIOSH 7400 and 7402 are generally accepted methods.

### 1.    Dr. Lee Followed Standard Protocols Widely Accepted In The Scientific Community.

Dr. Lee followed, without modification, NIOSH 7400 and 7402 in conducting his air sample analysis. Within those methods, Dr. Lee simply took additional steps to determine whether individual particles were non-asbestos or cleavage fragments. This is precisely as is permitted -- and in fact suggested -- by OSHA.

In 1992, OSHA examined the history and epidemiology of non-asbestos amphiboles, including tremolite. OSHA concluded that such non-asbestos tremolite cleavage fragments should not be regulated and should be excluded from a laboratory's "asbestos" counts. Lee Affidavit, ¶ 24. Although Claimants devote 28 pages attacking Dr. Lee for distinguishing

between asbestiform fibers and non-asbestos cleavage fragments, Claimants completely ignore the 1992 OSHA decision to remove cleavage fragment tremolite from the OSHA regulations.[4]

Claimants also conveniently overlook that OSHA expressly acknowledges and allows the use of differential counting in its approved methodology so that cleavage fragments can be excluded from asbestos concentrations. *See* OSHA, Polarized Light Microscopy of Asbestos, Method ID-191 (1992); OSHA, Asbestos in Air, Method ID-160 (1988); Lee Affidavit, ¶ 25, Exh. 7 at 2, Exh. 6 at 2. In effect, Claimants attack Dr. Lee for doing scientifically precisely what OSHA said in 1992 should be done scientifically.

Claimants also are simply wrong to suggest that the method utilized by Dr. Lee is neither "peer-reviewed" nor accepted by "the responsible regulatory authorities."[5] As noted above, OSHA expressly allows the kind of differential counting utilized by Dr. Lee. In addition, in performing this analysis, Dr. Lee examined the air data against the standard physical or morphological properties that have been recognized as being characteristic of asbestos fibers in methods published by OSHA, EPA and many others. Lee Affidavit, ¶ 26.

Also, Claimants mistakenly point to a flowchart utilized by Dr. Lee as evidence that he devised new procedures for use in this case. Dr. Lee has simply organized the standard physical characteristics into a flowchart for the ease of analysis. *See id.,* ¶ 28, Exh. 8. Each and

---

[4] Moreover, rather than offer a scientifically valid method for differentiating between asbestos fibers and cleavage fragments, Claimants essentially suggest that the Court ignore this important distinction. Under Claimants' approach, if a particle meets the counting criteria, it should be presumed to be asbestos and, therefore, counted as asbestos, regardless of whether it has been determined to be asbestos. As shown below, this approach flies in the face of the regulatory and scientific standards, including OSHA, that permit or direct that the analyst look at all relevant physical characteristics of the particle to determine whether it is asbestos.

[5] Claimants' Lee Memorandum at 4.

every analytical step reflected in the flowchart is based on published documents that have been incorporated for years into scientifically accepted analytical methods.[6]  *Id., ¶¶* 30 - 40.

The identical method and flowchart utilized by Dr. Lee here has been approved by EPA Region 2.  In the Southdown investigation, a project conducted by the Environmental and Occupational Health Sciences  Institute and funded by the New Jersey Department of Environmental Protection,  RJ Lee Group was retained to perform the laboratory analysis of air samples taken at the Southdown rock quarry, which was alleged to contain asbestiform tremolite.  *See id., ¶* 31.  The protocol for the Southdown project requires that RJ Lee Group identify and enumerate both asbestos fibers and cleavage fragments.  *Id., ¶* 15.

The method utilized by RJ Lee Group to differentiate between tremolite asbestos fibers and cleavage fragments in the Southdown project is the same method he utilized here.  This method (i.e., flowchart) was reviewed and expressly approved by several governmental agencies, including EPA, Region 2.  *See id., ¶* 31, Exh. 12.[7]

In addition, these same physical characteristics utilized in Dr. Lee's analysis were used by several scientists to analyze play sand to determine whether the tremolite in the sand was asbestos or cleavage fragments.  Their results, published in a peer reviewed book, showed that the tremolite was cleavage tremolite and not asbestiform tremolite.  Lee Affidavit, ¶ 27, Exh. 8.  These results were submitted to the Consumer Product Safety Commission (CPSC).  *Id.*

·

---

[6]  The flowchart has been annotated by Dr. Lee to identify the published documents and generally accepted analytical methods utilized at each step in his analysis.  *See* Lee Affidavit, ¶ 30, Exh. 11.

[7]  The flowchart also was published almost two years ago as part of a conference proceeding of the National Stone Association's Environmental Safety and Health Forum on September 24, 2001. Lee Affidavit, ¶ 29, Exh. 10.

Case 01-01139-AMC    Doc 4206    Filed 08/08/03    Page 9 of 21

Accordingly, Claimants' suggestion that the protocol used by Dr. Lee in this case has not been "peer reviewed" or "accepted by the responsible regulatory agencies" is simply wrong.

### 2.    Single Particle Differentiation Between Asbestos Fibers And Cleavage Fragments Is Scientifically Accepted.

Claimants suggest that certain regulations and analytical methods prohibit the type of discriminatory analysis utilized by Dr. Lee. Contrary to Claimants' suggestion, the OSHA regulations do not prohibit or discourage the single particle differentiation utilized by Dr. Lee. In attempting to support their position, Claimants mistakenly rely on OSHA's discussion concerning the difficulty of identifying single particles using light microscopy. However, the method used by Dr. Lee to identify single particles, the much more powerful TEM method has improved resolution and higher magnification that permits accurate identification of individual particles. Lee Affidavit, ¶ 41.

In fact, OSHA encourages the use of TEM if there are any questions whether the particles are cleavage fragments or asbestos. Lee Affidavit, ¶ 41, Exh. 7 at 9. OSHA's own laboratory consistently and repeatedly uses the same type of single particle TEM analysis to differentiate between asbestos and cleavage fragments. Lee Affidavit, ¶ 42, Exh. 18, 19.

Claimants' reliance upon the International Organization for Standardization ("ISO") TEM method is similarly misplaced.[8] The ISO method expressly provides that a laboratory may modify the method to distinguish asbestos fibers from cleavage fragments. The ISO method simply requires that any such modification be noted and reported. *See* Lee Affidavit, ¶ 33, Exh. 14 at 19. This is precisely what Dr. Lee did.

---

[8]  Claimants' Lee Memorandum at 6-7.

DOCS_DE:76767.1                                    -7-

3.    **In Any Event, Dr. Lee Utilized Other Scientifically Accepted
      Methods, Including The Method Suggested By Claimants, To
      Differentiate Cleavage Fragments From Asbestos Fibers And
      Found Consistent Results.**

Claimants mask the fact that Dr. Lee did not rely on any one method to form his

conclusions.  Rather, he utilized several scientifically accepted methods and found that,

regardless of the analytical method utilized, the conclusion was the same:  the vast majority of

particles released from ZAI when disturbed are non-asbestiform cleavage fragments, not asbestos

fiber.  Lee Affidavit, ¶ 45.

Both Dr. Lee and Claimants' experts analyzed air samples from simulations

involving the disturbance of ZAI.  Dr. Lee's single particle differentiation analysis -- which

consisted of recording the identity of each and every particle counted such that the analysis could

be reproduced -- was based on examining the physical properties of particles that have been

recognized by numerous regulatory agencies and scientists in generally accepted published

methods as being characteristic of asbestos.  *Id.,* ¶ 26

Since the samples from Claimants' simulations were not available to Grace, Dr.

Lee evaluated the shape characteristics reported by Claimants' experts using a mathematical

algorithm.  *Id.,* ¶ 46.  That mathematical algorithm was developed by Dr. Ann Wylie of the

University of Maryland and published in a peer-reviewed journal.[9]  That same algorithm has been

used by investigators from the European community and incorporated into their methods for

distinguishing asbestos fibers from cleavage fragments.  *See* G. Burdett (1998), "Final Report for

---

[9] Claimants' suggestion that Dr. Lee's opinion was based solely on this algorithm is incorrect.  Rather, this was but
one of the tools utilized in forming Dr. Lee's conclusions.  Moreover, contrary to Claimants' assertion, this
algorithm has been peer reviewed and accepted by regulatory agencies.  *See* A.G. Wylie, R. L. Virta and E. Russek
(1985), "Characterizing and Discriminating Airborne Cleavage Fragments and Amosite Fibers:  Implications for the
NIOSH Method," Amer. Ind. Hyg. Assoc. J. 46(4):  197-201; Lee Affidavit, ¶ 47, Exh. 20.

R42:70:  Quantitative measurement of asbestos and other fibers in bulk materials,"

IR/L/MF/98/02, Health and Safety Laboratory; <u>Lee Affidavit</u>, ¶ 48, Exh. 21.

When the differential algorithm was applied to the data generated in Claimants'

simulations, 88% of the particles longer than 5 microns were identified as cleavage fragments.

This is entirely consistent with the conclusions reached by Dr. Lee in his single particle

differentiation analysis.

Dr. Lee also analyzed the Claimants' air sample data on the basis of size and

shape distributions, including the aspect ratio and length-width distributions cited by Claimants

as the recognized methods for distinguishing asbestos fibers from cleavage fragments.  As set

forth in Dr. Lee's expert report (See, Attachment 2 to Claimants' Motion to Exclude at 31-32)

this analysis further confirmed that the data reported by Dr. Lee and by Claimants' experts

matched those expected of a non-asbestos population.  *Id.*, ¶ 50.

Thus, regardless of the method utilized -- be it single particle differential analysis,

mathematical discriminate analysis, or dimensional or population distribution analysis -- the data

consistently demonstrate that the vast majority of amphiboles released from ZAI are not

asbestos.

**B.    Scientific Consensus Is Consistent With Dr. Lee's Conclusion That
The Particles That Become Airborne When ZAI Is Disturbed Are
Predominantly Cleavage Fragments.**

While Claimants apparently disagree with Dr. Lee's conclusions that the vast

majority of particles that become airborne are cleavage fragments, they cannot -- and apparently

do not -- dispute that the Libby vermiculite contains both asbestiform tremolite and non-

asbestiform (cleavage fragment) tremolite. This has been recognized by those who have studied

the Libby ore deposits. Lee Affidavit, ¶ 54, Exh. 22. Indeed, many of the documents appended

to Claimants' Motion to Exclude report the presence of both forms of tremolite at Libby.

The vermiculite ore from the Libby mine contained a natural deposit of amphibole

minerals, including tremolite. Prior to being sold as ZAI, the vermiculite ore was subjected to

various production processes designed to remove impurities, including the naturally occurring

tremolite. These processes involved, among other things, screening and flotation devices at the

Libby mine and in the milling process that produced vermiculite concentrate. Following the

mining and milling, the vermiculite was referred to as concentrate and was shipped to expansion

plants where the vermiculite concentrate was further screened and thermally expanded in

furnaces. During this exfoliation or beneficiation process, more tremolite was removed.

Following expansion, certain sizes of the exfoliated vermiculite was bagged for sale as ZAI.

Thus, the expanded vermiculite that constituted ZAI contained significantly smaller amounts of

tremolite than was present in the Libby ore or the vermiculite concentrate. Id., ¶ 55.

Claimants repeatedly refer to historical tests performed in the mine or with "in

process" vermiculite concentrate and argue that based on this data, there is a "consensus in the

scientific community" that Libby amphiboles are fibrous and asbestiform in nature.[10] From this,

----

[10]  Claimants also suggest that Dr. Lee's conclusion that the finished product ZAI releases mostly cleavage
fragments, rather than asbestos fibers, is erroneous because occupants of Libby who worked at Grace's mine or mill
have suffered asbestos-related diseases. While there is no dispute that high dose exposures to asbestos fibers for
prolonged periods of time at Grace's Libby, Montana mine and mill has caused asbestos-related disease, that
Continued on following page

Claimants attempt to make the quantum leap to the conclusion that when disturbed, the particles released from the finished product, ZAI, are predominantly asbestiform. This argument is flawed for several reasons.

First, the testing upon which Claimants rely to support this argument does not relate to ZAI. Rather, the testing relates to the amphibole content of air tests at the Libby mine or of bulk analysis of the vermiculite ore or concentrate.[11] While Dr. Lee has acknowledged the presence of asbestos fibers in the Libby ore deposit, that issue is not before the Court. The issue is whether the finished product, ZAI, after processing and exfoliation, presents an unreasonable risk of harm if disturbed.

Dr. Lee's opinions and conclusions are based on the analysis of air samples taken in connection with the disturbance of ZAI, not vermiculite ore and not unprocessed vermiculite concentrate. With respect to ZAI, the scientific data demonstrates that the vast majority of structures released are cleavage fragments, not asbestos fibers. Historical testing and any alleged "scientific consensus" concerning the asbestos content of Libby ore or "in-process" material, is simply not relevant.

Second, even if the situations were analogous, this historical testing relied upon by Claimants was conducted by Grace and others many years before the OSHA 1992

---

Continued from previous page

exposure to the raw material as first dug from the ground and to the in-process materials at various stages of the exfoliation process is far different from the exposure, if any, of homeowners to particles released from the finished product, ZAI.

[11]  In support of their argument that the "scientific consensus" is that Libby amphiboles are fibrous and asbestiform in nature, Claimants cite to several documents and testimony that have nothing to do with ZAI, including an epidemiological study of Grace Libby mine workers and historical Grace documents and testimony of a former Grace employee that relate to the asbestos content of the vermiculite ore or concentrate.   Claimants' Lee Memorandum at 9-12.

Rulemaking.  Lee Affidavit, ¶ 57.  It does not appear that any efforts were undertaken prior to that time to differentiate between asbestos fibers and cleavage fragments.  *Id.*

Moreover, the scientific techniques available at the time to evaluate airborne fiber distributions were inadequate to distinguish asbestos fibers from cleavage fragments.  *Id.*  Thus, the historical test data cited by Claimants do not reflect actual asbestos-only concentrations.

**C.      Dr. Lee's Conclusions Are Entirely Consistent With Non-Asbestiform Tremolite Cleavage Fragments.**

Claimants also argue that Dr. Lee's conclusions are inconsistent with the conclusions or results of other laboratories or conclusions of his own laboratory.  Claimants' Lee Memorandum at 13-23.  Although those arguments go to the weight the Court should give to Dr. Lee's conclusions, not whether the methods he has utilized to differentiate between asbestos fibers and cleavage fragments are scientifically valid and reliable under *Daubert*, Claimants' arguments miss the mark.[12]

**1.      Dr. Lee's Conclusions With Regard To The Amount Of Cleavage Fragments Found In Air Samples When ZAI Is Disturbed Are Not Inconsistent With His Bulk Sample Analysis Of ZAI.**

Claimants argue that Dr. Lee's bulk sample analysis is inconsistent with his air sample analysis because the bulk samples contain more asbestos fibers than cleavage fragments.  This is an apples to oranges comparison.  Dr. Lee's opinion with respect to cleavage fragments relates to an analysis of whether the particles that are released into the air when ZAI is disturbed are asbestos fibers or cleavage fragments.

---

[12]  Claimants also suggest Dr. Lee's conclusions are inconsistent with prior positions he has taken in articles or other publications.  However, Claimants use selective quotes without placing the entire publication in context.  A reading of each articles in its entirety demonstrations Dr. Lee's conclusions are entirely consistent with his prior positions.

Dr. Lee's air sample and bulk sample analysis are entirely consistent because most of the asbestos in ZAI does not become airborne. The asbestos fibers observed in the bulk samples were in large, coarse bundles that are 0.5 to 1.0 **centimeter** in diameter, thousands of times larger than respirable fibers. Lee Affidavit, ¶ 58. Due to the relatively large sizes of the majority of asbestiform tremolite particles contained in the bulk samples, those particles will not be released into the air under any foreseeable circumstance. *Id.*

Thus, Dr. Lee's finding that approximately 90% of what becomes airborne from ZAI is non-asbestiform cleavage fragments is not inconsistent with the fact that bulk ZAI samples contained a higher percentage of asbestos fibers and bundles than cleavage fragments.

### 2. Dr. Lee's Conclusions Are Not Inconsistent With The Propensity Of Cleavage Fragments To Become Airborne.

Moreover, Dr. Lee's conclusion that the vast majority of particles that become airborne are cleavage fragments is consistent with the fact that cleavage fragments have a higher tendency to be released from surfaces than asbestos particle of similar length. The difference in the tendency to become airborne is a function of the electrostatic properties of the particles as related to surface area. For particles of similar sized length, asbestos fibers will have higher surface areas than cleavage fragments. In fact, cleavage fragments generally have less than half of the relative surface area of asbestos fibers. Lee Affidavit, ¶ 59, Exh. 24.

Since the electrostatic force is directly proportional to total charge (and therefore surface area, assuming a uniform distribution of charge), the larger the relative surface area, the greater the attraction (and therefore increased difficulty in particle removal from a surface). Thus, for a given force, cleavage fragments -- which have less surface area -- will have a higher tendency to release from surfaces than similarly sized asbestos particles. *Id.*, ¶ 60, Exh. 25.

3.    **Dr. Lee's Conclusions Are Consistent With The Data And
Concessions Of Claimants' Experts.**

The analysis of Claimants' own experts and Claimants' own concessions
demonstrate that the vast majority of particles from Claimants' simulations that were counted as
airborne "fibers" by Claimants' experts are, in fact, cleavage fragments.

Claimants state that cleavage fragments are particles with diameters larger than
one micron.[13]  As discussed below, this statement is inconsistent with Claimants' own expert's
testimony.  But in any event, Claimants concede that between 8% and 20% of the "fibers" they
counted had diameters of one micron or greater[14] and thus are cleavage fragments.  Lee
Affidavit, ¶ 51.

In fact, Claimants' expert, Richard Hatfield, testified that the standard width of
tremolite asbestos fibers is less than 0.3 microns:

>   Q:    And is there normally a standard width or diameter that you see in
>          the laboratory for tremolite asbestos fibers?  And by tremolite, I
>          mean the type involved here in this case, and I don't want to list all
>          of the possibilities.
>
>   A:    You are fine if you just want to use the term "tremolite" or many
>          have fallen back to Libby amphiboles or whatever.
>
>          But I think you will probably find that single fibers of asbestos
>          amphiboles are going to be in the neighborhood of .1 microns.  I
>          could probably look over some data and see.  They can be larger
>          than that, certainly they can probably be smaller than that to.
>          But, --
>
>   Q:    And I am assuming giving the generality of my question when you
>          say .1, you mean .1, .2 kind of in that range?
>
>   A:    There you go.[15]

---

13  Claimants' Lee Memorandum, at 17.

14  *Id.* at 17-18.

15  Lee Affidavit, ¶ 52, Exh. 22 at 53-54.

The air samples taken during Claimants' simulations and analyzed by their experts report approximately 665 structures as single "fibers." Of these, approximately 208 are less than five microns long and should not be counted at all under normal counting rules. Of the remaining 457 structures counted as individual "fibers," approximately 393 were greater than 0.3 microns in width (and 45 of these were greater than one micron in width).[16] Accordingly, approximately 86% of the structures longer than five microns in length had widths greater than 0.3 microns and thus had widths greater than the "standard width or diameter you see in the laboratory for tremolite asbestos fibers." *Id.,* ¶ 52, Exh. 22 at 53-54. In short, these are cleavage fragments, not fibers, and should not be counted as such in air samples.

A simple comparison of the widths of the particles longer than 5 microns as reported by RJ Lee Group and by Claimants' experts demonstrates that only a very small portion of either data set meets Claimants' own expert's opinion as to the standard width of a single tremolite asbestos fiber. *Id.,* ¶ 53.

D.    **Dr. Lee's Conclusions Concerning Whether The Particles Released Into The Air From ZAI When It Is Disturbed Are Cleavage Fragments Have Not Been Rejected By Any Court Or Government Agency.**

Claimants state that the EPA has rejected Dr. Lee's opinions regarding cleavage fragments and imply that in the EPA Libby Superfund litigation, Judge Malloy did the same.[17] These assertions are incorrect.

With respect to the decision of Judge Malloy in the Libby Superfund case, (Attachment 31 to Claimants' Motion to Exclude) there is not a single reference in the opinion to Dr. Lee, his opinions or cleavage fragments. Nor does the opinion deal with the finished product

---

[16]  *Id.,* ¶ 52.

[17]  Claimants' Lee Memorandum at 23-25.

ZAI. Simply stated, there is nothing in the opinion in which Judge Malloy "rejected" any work by Dr. Lee.

With respect to the EPA itself, in the Libby Superfund litigation, the EPA clearly was stung by Dr. Lee's criticisms of its alleged scientific methods. The EPA's reaction to this criticism is set forth as Attachment 30 to Claimants' Motion to Exclude.

Among the many scientific errors noted by Dr. Lee in his review of the EPA's work in Libby was Dr. Lee's conclusion that the EPA was counting as asbestiform fibers what, in fact, were cleavage fragments. The EPA characterized this scientific criticism as an argument "that fibers are different in Libby today than they were prior to cessation of mining and milling operations in 1991." Attachment 30, at 3. Obviously, neither Grace nor Dr. Lee was taking the position that over time "fibers in Libby have changed shape." *Id.* at 4.

Simply stated, Dr. Lee concluded -- with abundant scientific evidence -- that much of what the EPA insisted on calling airborne asbestos fibers were, in fact, non-toxic, non-dangerous cleavage fragments.

A careful reading of the EPA's response reveals that the EPA did not really attempt to disagree with Dr. Lee's conclusion. Instead, the EPA argued that what it counted as "fibers" is dictated by the counting criteria and the length, width, aspect ratio and specific physical characteristics of the particles viewed under a microscope. *Id.* at 13. "Following these rules," the EPA stated that its laboratories counted the particles as amphibole fibers. *Id.* Simply stated, it was the position of the EPA in the Libby Superfund case that if a structure met a certain length, width and aspect ratio, it was to be counted as a fiber, whether or not in fact it was an asbestiform fiber or a cleavage fragment of rock.

Dr. Lee's scientific opinion, amply supported by the scientific authorities cited in his expert report and his Affidavit, is that regulatory and scientific standards permit or dictate

that the microscopist look at all relevant physical characteristics of structures seen under the microscope, even if they meet the appropriate width and length and aspect ratio requirements, to determine whether or not those structures are fibers or pieces of cleavage rock. A careful review of the EPA's response reveals that the EPA never says what was counted were not pieces of rock -- the EPA simply argues that "the counting criteria dictate discerning fibers . . ." *Id.* at 13.

The EPA did not "reject" Dr. Lee's opinion that cleavage fragments, in fact, were included in its fiber counts. To the contrary, the EPA's position was that if a particle met the counting criteria, it was to be conclusively presumed to be fibrous and therefore counted. Thus, the EPA stated that it "does not believe that cleavage fragments, <u>as defined by the counting method</u>, were included in the screening level risk assessment." *Id.* at 40.

### E.   <u>EPA Has Not Found Dr. Lee's Analysis To Be Unreliable.</u>

Claimants' final attack of Dr. Lee is based on an issue raised during an audit of one of RJ Lee Group's California laboratory. This audit had nothing to do with the RJ Lee Group's Pittsburgh, Pennsylvania laboratory where the analyses in this matter were performed.

In April 2001, EPA performed an audit of the California laboratory. The audit was conducted because there was a discrepancy between the polarized light microscopy (PLM) results reported by the two laboratories -- RJ Lee Group and Forensics -- that analyzed the asbestos content of bulk samples. RJ Lee Group's California laboratory performed a PLM-only analysis and reported low to no asbestos in the samples. Forensics analyzed the samples by both PLM and TEM. While Forensics' TEM findings were consistent with the PLM findings of RJ Lee Group, Forensics' PLM findings differed from their own TEM data as well as the PLM data from RJ Lee Group. As a result of this discrepancy, EPA's contractor for the project conducted an on-site inspection of the RJ Lee Group laboratory. <u>Lee Affidavit,</u> ¶ 61.

While the laboratory was fully cooperative and demonstrated their procedures to the inspectors, several alleged deficiencies were noted and reported to the California laboratory in a report dated May 1, 2001. *Id,* ¶ 62. RJ Lee Group immediately corrected those deficiencies and responded in a timely manner with a detailed letter to EPA. *Id.,* ¶ 63, Exh. 26. EPA has <u>never</u> questioned RJ Lee Group's response and he's <u>never</u> requested additional information. *Id.,* ¶ 64.

At no time since the audit in April 2001 has anyone at EPA expressed a concern with RJ Lee Group or its asbestos analysis capabilities. *Id.,* ¶ 64. In fact, RJ Lee Group first learned of the EPA's alleged concern when it saw the June 19, 2003 internal EPA memorandum appended to Claimants' Motion to Exclude more than two years after the audit. *Id.*

This is particularly surprising because since that 2001 audit, RJ Lee Group has continued to have a productive working relationship with EPA as evidenced by the following:

- Multiple analyses performed pursuant to contracts between EPA and RJ Lee Group. *Id.,* ¶ 66.

- The ongoing Cooperative Research and Development Agreement (CRADA), pursuant to which RJ Lee Group provides consulting and training to EPA in the use and operation of Scanning Electron Microscopy (SEM). *Id.,* ¶¶ 67 – 70.

- RJ Lee Group's role as the primary laboratory in the Southdown rock quarry project, pursuant to which RJ Lee Group has analyzed hundreds of samples using TEM and has been responsible for distinguishing asbestos form tremolite from cleavage fragment tremolite. *Id.,* ¶¶ 15, 72.

- RJ Lee Group has co-authored articles with EPA and has been invited by EPA to present papers at EPA meetings and/or faculties. *Id.,* ¶¶ 73 – 74.

## III.    CONCLUSION

The Claimants' Motion to Exclude Dr. R.J. Lee's Opinion on Cleavage Fragments must be denied, as it is a veiled attempt to deflect the problems Claimants face in proving that ZAI presents an unreasonable risk of harm. Claimants' experts have failed to make the

important distinction between asbestos fibers and non-asbestiform "cleavage fragments" of rock. Having failed to make the distinction and realizing this failure, Claimants attack a world renowned expert in asbestos analysis and essentially suggest that the Court ignore the regulatory and scientific standards that acknowledge this important distinction. As demonstrated above, Dr. Lee's testing methods are scientifically valid and reliable under the *Daubert* standard and should not be excluded from the Science Trial. Claimants' motion should therefore be denied.

Date: August 8, 2003

REED SMITH, LLP
James J. Restivo, Jr.
Lawrence E. Flatley
Douglas E. Cameron
James W. Bentz
435 Sixth Avenue
Pittsburgh, PA 15219

Special Asbestos Counsel For Debtors


PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB P.C.

*Paula A. Galbraith*

Laura Davis Jones (Bar No. 2436)
Scotta E. McFarland (Bar No. 5488)
Paula A. Galbraith (Bar No. 4258)
919 Market Street
Suite 1600
Wilmington, DE 19801
Telephone: 302.652.4100
Facsimile: 302.652.4400
Co-Counsel For Debtors