## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                           )
                                                 )   In Proceeding For A
W. R. GRACE & CO. et al.,                        )   Reorganization Under Chapter 11
                                                 )
          Debtor.                                )   Case No. 01-01139 (JFK)
                                                 )   Jointly Administered


COMMONWEALTH OF PENNSYLVANIA        )
                                    )   ss:
COUNTY OF ALLEGHENY                 )


## AFFIDAVIT OF RICHARD J. LEE, Ph.D.

RICHARD J. LEE, Ph.D., being duly sworn, deposes and says:

1.    Except as indicated, I have personal knowledge of the facts stated in this affidavit and, if called as a witness, could and would testify competently, thereto.

### QUALIFICATIONS

2.    I obtained a Bachelor of Science degree in physics from the University of North Dakota in 1966 and my Ph.D. in theoretical solid state physics from Colorado State University in 1970. I then went to Purdue University as an Assistant Professor in physics where I taught courses on the principles of optical microscopy. I received tenure at Purdue in less than two years.

3.    In 1973, I went to work for the United States Steel Company, first as a research scientist and, thereafter, as director of their physics and electron microscopy department in the Technical Center. I remained at the United States Steel Company until 1985. While at United

States Steel, I analyzed a wide range of materials. I was employed by the United States space program to analyze moon rocks brought back by the Apollo missions.

4.    Since 1985, I have been President of a company now known as RJ Lee Group, Inc., ("RJ Lee Group") which has its principal office in Monroeville, Pennsylvania, and laboratories in San Leandro, California and Manassas, Virginia. RJ Lee Group provides research, analytical and consulting services relating to materials characterization.

5.    Materials characterization of materials, also referred to as "constituent analysis," involves analyzing a sample of material using various techniques to identify and quantify the components of that material. RJ Lee Group also performs air sample analysis and analysis of settled dust samples. I have analyzed air samples using both Phase Contrast Microscopy ("PCM") and Transmission Electron Microscopy ("TEM").

6.    I have a long history of scientific consulting and service for government agencies, including the United States Environmental Protection Agency ("EPA"). RJ Lee Group's laboratory serves as a quality assurance and referee laboratory on a number of EPA programs. RJ Lee Group's laboratory performed the analyses for the EPA's major study on airborne levels of asbestos in public buildings.

7.    RJ Lee Group also performs analyses for NASA, the United States Navy, the United States Air Force, the United States Army, the United States General Services Administration and the Federal Bureau of Investigation.

8.    I have participated in the development by the EPA of analytical methods and procedures for asbestos analyses. The EPA requested that I personally participate in several

projects, including the drafting of the portions of the EPA Asbestos Hazard Emergency Response Act (" AHERA") regulations governing air analysis after abatement.

9.    My laboratory has also performed microscopic analyses for the State of California Air Resources Board when that state agency performed testing of the air in major cities in the State of California to determine the presence of asbestos.

10.    I developed a program to determine the cause of failure in components of the guidance system in the Trident missile for the Department of Navy.

11.    I am now engaged and specialize in materials characterization, which is the analytical science whereby a material is "taken apart" using a variety of analytical techniques to determine the identity and amount of each component of the material.

12.    I am familiar with all methods of microscopy that are commonly used in characterizing asbestos or identifying and quantifying asbestos, including optical microscopy, scanning electron microscopy and transmission electron microscopy.  I am also familiar with all methodologies known, from air sampling to dust sampling, with respect to asbestos.

13.    I have worked extensively with, and I am an expert in, analytical techniques, including light and electron microscopy, materials characterization, asbestos air and dust samples and methods of evaluation.  I have also served as an expert witness in litigation involving asbestos in buildings, including litigation involving ZAI, and have testified in state and federal courts.

14.    Beginning as early as 1978, I presented scientific papers on the subject of amphibole asbestos identification.  Asbestos minerals belong to two mineral families which have

different chemical compositions, the serpentines and the amphiboles. Tremolite (asbestos) is in the amphibole family. Since that time, I have been invited to present papers at national and international symposiums on this subject, have served on EPA committees to write standards for asbestos analysis (including amphibole asbestos) and have published peer-reviewed papers on asbestos identification and cleavage fragment analysis.

15.    I am currently retained as an expert for the state and federal government (EPA) in an investigation to determine whether the emissions from a New Jersey rock quarry ("Southdown") are amphibole asbestos or non-asbestiform cleavage fragments. RJ Lee Group is the primary laboratory in the Southdown project and has analyzed hundreds of air, dust and rock samples. We have been asked to identify and enumerate both asbestos fibers and cleavage fragments.

16.    My testimony was cited by OSHA in its 1992 rulemaking that excluded tremolite cleavage fragments from the OSHA asbestos standard. 1992 OSHA Asbestos Standard, Preamble to Final Rules, Part IV (Mineralogical Considerations) at 6 of 10, attached hereto as Exhibit 1.

17.    My scientific work has never been rejected by a Court under *Daubert* or similar state law analogs.

18.    A true and correct copy of my Curriculum Vitae and List of Publications is attached hereto as Exhibit 2.

<u>**ANALYTICAL METHODS**</u>

19.    There are two general types of air sample methods and analysis, Phase Contrast

Microscopy ("PCM") and Transmission Electron Microscopy ("TEM").

20.    The standard and generally accepted method for PCM analysis is the NIOSH

7400 method.  NIOSH published the 7400 Method in 1984 and its use is required by OSHA for

purposes of compliance with asbestos worker regulations.  PCM, under NIOSH 7400, does not

differentiate between asbestos and non-asbestos fibers.  It counts all particles that are longer than

five microns and that have a minimum aspect length to width ratio of 3:1.  A true and correct

copy of NIOSH 7400 is attached hereto as Exhibit 3.

21.    TEM, on the other hand, can distinguish between asbestos and non-asbestos

fibers.  While there are several generally accepted TEM methods, in 1989 NIOSH published its

TEM asbestos method, NIOSH 7402.  NIOSH 7402 was designed for use in conjunction with

NIOSH 7400 to enable an analyst to determine the proportion of countable particles present in a

mixed particle environment that were actually asbestos fibers.  A true and correct copy of

NIOSH 7402 is attached hereto as Exhibit 4.

22.    OSHA permits the use of the NIOSH 7402 method when analyzing air samples

for OSHA compliance purposes when performed in conjunction with PCM.  A copy of the

June 24, 1998 letter from Dan Crane, OSHA Salt Lake City Technical Center, to Jim Johnston is

attached hereto as Exhibit 5.

23.    In my analysis of air samples in this case, I followed, without modification,

NIOSH 7400 and 7402.  I also performed single particle differential counting, which involves

taking additional steps within those methods to further identify particles as non-asbestos or cleavage fragments, as is permitted by OSHA.

24.    In 1992, OSHA examined the history and epidemiology of non-asbestos amphiboles (including tremolite cleavage fragments) and concluded that such non-asbestos amphiboles should not be regulated, which means, they are not to be counted in air samples as asbestos fibers.

25.    OSHA expressly acknowledges and allows the use of differential counting in current approved methodology so that cleavage fragments can be excluded from asbestos concentrations. *See* OSHA, Asbestos in Air, Method ID-160 (1988), a copy of which is attached hereto as Exhibit 6; OSHA, Polarized Light Microscopy of Asbestos, Method ID-191 (1992), a copy of which is attached hereto as Exhibit 7.

26.    In performing my analysis to determine whether the particles released from ZAI were asbestiform tremolite or non-asbestiform cleavage fragments, I examined the air data against the standard physical or morphological properties that have been recognized by OSHA, EPA and many others in published methods as being characteristic of asbestos fibers.

27.    The same physical characteristics of asbestos were also used by scientists to analyze play sand to determine whether the tremolite in the sand was asbestiform or cleavage fragments. Their results were published in a peer reviewed book and submitted to the Consumer Product Safety Commission. *See* A.M. Langer, R.P. Nolan, and J. Addison (1991), "Distinguishing Between Amphibole Asbestos Fibers And Elongate Cleavage Fragments on Their Non-Asbestos Analogs," *Mechanisms in Fibre Carcinogenesis*, R.C. Brown, et al., eds., Plenum Press, NY, p. 253-267, attached hereto as Exhibit 8.

28.    To assist in the differential counting, I organized the standard physical characteristics of asbestos into a flowchart.   A true and correct copy of the flowchart is attached hereto as  Exhibit 9.

29.    The flowchart has been published as part of a conference proceeding:  *See*, R. J. Lee, D. R. Van Orden, W. H. Powers, K. A. Allison (2001) "Implications of Analytical Techniques for Asbestos Identification," presented at the National Stone Association's Environmental, Safety and Health Forum, September 24, 2001, attached hereto as Exhibit 10.

30.    Each and every step of the analysis reflected in the flowchart is based on published, peer-reviewed documents that have been incorporated for years into scientifically accepted analytical methods.   Attached hereto as Exhibit 11 is a copy of the flowchart that I have annotated to reflect those published documents and methods.

31.    The method and flowchart that I utilized in my analysis have been reviewed by the EPA, Region 2, and approved for use in the Southdown project, an EPA funded study of possible tremolite fiber exposure resulting from quarry operations at the Southdown Quarry in Sussex County, New Jersey.  This method and flowchart were used to separate cleavage fragments of tremolite from asbestos tremolite fibers identified during the analyses of air, dust and bulk samples taken in and around the quarry.  *See* Quality Assurance Project Plan dated January 24, 2001, Appendix B5, attached hereto as Exhibit 12.

32.    The flowchart consists of two versions.  The first version (page 1 of Exhibit 9) identifies the physical characteristics of asbestos particles and contains five steps.  The first step is to determine whether the particle is a single mineral crystal or a bundle.  If it is a bundle, the particle is identified as asbestos and there is no further analysis.

33.    The second step is to determine the length to width aspect ratio of the crystal. Various analytical methods have specified a minimum aspect ratio. OSHA (3:1), Exhibits 6 and 7 hereto; NIOSH (3:1), Exhibit 3 hereto; EPA (3:1 or 5:1), Code of Federal Regulations (AHERA), "Interim Transmission Electron Microscopy Analytical Methods – Mandatory and Nonmandatory – and Mandatory Section to Determine Completion of Response Actions," 40 CFR, Part 763, Appendix A to Subpart E., at 1, attached hereto as Exhibit 13; and ISO (5:1), International Organization for Standardization ("ISO"), ISO 10312, "Ambient Air - Determination of asbestos fibres - direct-transfer transmission electron microscopy method," May 1, 1995, at 3, attached hereto as Exhibit 14. If the aspect ratio is less than 5:1, then it is a non-countable particle.

34.    The third step is to determine whether the particle has parallel sides. Beginning with Yamate (G. Yamate, S. G. Agarwal, and R. D. Gibbons (Yamate), Methodology for the Measurement of Airborne Asbestos by Electron Microscopy, Contract No. 68-02-3266, July 1984, at 17, attached hereto as Exhibit 15), and continuing through AHERA (Exhibit 13 hereto, at 2), single asbestos fibers are described as having parallel sides. Particles that are stepped or angular, with no indication of being polyfilamentous, are cleavage fragments.

35.    For particles with parallel sides, the fourth step is to determine whether the particle shows curvature. For amphiboles, generally only the very long fibers will show curvature. *See* R. L. Perkins and B. W. Harvey, EPA/600/R-93/116, "Method for the Determination of Asbestos in Bulk Building Materials," July 1993, at A-1, attached hereto as Exhibit 16; Health & Safety Executive, MDHS 77, "Asbestos in Bulk Materials: Sampling and Identification by Polarised Light Microscopy (PLM)," June 1994, at 11, attached hereto as

Exhibit 17. Curvature is indicative of tensile strength. A curved particle with parallel sides and large aspect ratio greater than 5:1 is indicative of an asbestos fiber.

36.     If the particle is not curved, but is straight, the fifth step is to determine whether the ends of the particle are perpendicular or in some tapered/irregular termination. Tapered and irregular termination is indicative of cleavage fragments. OSHA ID-191, at 13, attached hereto as Exhibit 7.

37.     The second version (page 2 of Exhibit 9) includes an expanded description of the two additional steps that are applied after the physical morphology or properties of the particle have been examined.

38.     The first additional step is to examine the straight fibers to see if there are internal diffraction contours. These contours appear as somewhat darker shadowing or bands within the fiber. True asbestos fibers contain chain-width errors. A. M. Langer, R. P. Nolan and J. Addison (1991), attached hereto as Exhibit 12, at 262. The chain width errors, referred to as "Wadsley defects," are continuous and are staggered along the *a*-axis (generally the short axis) of the fiber and cause internal diffraction to occur.

39.     The final step is to examine the particle for twinning, which occurs in true asbestos fibers, but not in cleavage fragments. *Id.* at 260. Twinning can be observed in a particle by observing the selected area diffraction pattern and looking for additional reflections and possible streaking patterns.

40.    The steps outlined in the flowcharts are found in the published literature and represent a standardization of scientifically accepted materials followed by all competent microscopists during the evaluation of a sample for asbestos fibers.

41.    The OSHA regulations do not prohibit or discourage the type of single particle differentiation that I utilized.  While OSHA discusses the difficulty in identifying single particles, that discussion is in connection with using light microscopy.  The method I used to identify single particles was TEM, an analysis with improved resolution and higher magnification.  OSHA encourages the use of TEM if there are any questions whether the particles are cleavage fragments or asbestos.  OHSA, ID-191, Exhibit 7 at 9.

42.    OSHA's own laboratory has consistently and repeatedly used the same type of single particle TEM analysis to discriminate between asbestos and cleavage fragments.  *See*, OSHA "Report of Analysis of Crayons for the Presence of Asbestos," June 12, 2000, attached hereto as Exhibit 18; OSHA "Background Information Regarding the Analysis of Industrial Talcs," June 12, 2000, attached hereto as Exhibit 19.

43.    The ISO TEM method expressly provides that a laboratory may modify the method to distinguish asbestos fibers from cleavage fragments.  The ISO method simply requires that any such modification be noted and reported, which is what I did.  *See* Exhibit 14 hereto, at 19.

44.    The single particle differentiation analysis I utilized was based on examining the physical properties of particles that have been recognized by numerous regulatory agencies and scientists in generally accepted published methods as being characteristic of asbestos.  As part of

that analysis, the identity of each and every particle counted was recorded such that the analysis could be reproduced.

45.    However, my conclusions are not based only on a single particle differentiation analysis. I utilized several scientifically accepted methods and found that regardless of the analytical method utilized, the conclusion is the same: the vast majority of tremolite particles released from ZAI when disturbed are non-asbestiform cleavage fragments.

46.    Both laboratories analyzed air samples from simulations involving disturbance of ZAI. RJ Lee Group analyzed the physical properties of the particles in the samples that were collected as part of Grace's simulations. Since the samples from Claimants' simulations were not available to Grace, RJ Lee Group evaluated the shape characteristics of the fibers reported by Claimants' experts (MAS) using a mathematical algorithm.

47.    The mathematical algorithm was developed by Dr. Ann Wylie of the University of Maryland and published in a peer-reviewed journal. *See* A.G. Wylie, R. L. Virta and E. Russek (1985), "Characterizing and Discriminating Airborne Amphibole Cleavage Fragments and Amosite Fibers: Implications for the NIOSH Method," Amer. Ind. Hyg. Assoc. J. 46(4): 197-201, attached hereto as Exhibit 20. The algorithm was designed specifically to discriminate on the basis of shape characteristics (width and length to width aspect ratios) between asbestos fibers and cleavage fragments.

48.    That same algorithm has been used by investigators from the European community and incorporated into their methods for distinguishing asbestos fibers from cleavage fragments. *See* G. Burdett (1998), "Final Report for R42:70: Quantitative Measurement of

Asbestos and Other Fibers in Bulk Materials," IR/L/MF/98/02, Health and Safety Laboratory, attached hereto as Exhibit 21.

49.     When the differential algorithm was applied to the data generated in Claimants' simulations, 88% of the particles longer than 5 microns were identified as cleavage fragments.

50.     I also analyzed the Claimants' air sample data on the basis of size and shape distributions. As set forth in my expert report (at 31-32), this analysis further confirmed that the data reported by me and by Claimants' experts matched those expected of a non-asbestos population.

51.     Claimants argue in their motion papers that cleavage fragments are particles with diameters larger than one micron. While this statement is inconsistent with their experts' testimony, at the very least, between 8% and 20% of the "fibers" claimants counted had diameters of one micron or greater and thus are cleavage fragments.

52.     Claimants' expert, Richard Hatfield, testified that the standard width of tremolite asbestos fibers is less than 0.3 microns. Hatfield Dep., 53-54, attached hereto as Exhibit 22 hereto. This is consistent with my conclusions. The air samples taken during Claimants' simulations and analyzed by Claimants' experts report approximately 665 structures as single "fibers." Of these, approximately 208 are less than five microns long and should not have been counted at all under applicable counting rules. Of the remaining 457 structures counted as individual "fibers" approximately 394 were greater than 0.3 microns in width (and 45 of these were greater than one micron in width). Accordingly, approximately 86% of the structures longer than five microns in length had widths greater than 0.3 microns and thus, had widths

greater than the "standard width or diameter you see in the laboratory for tremolite asbestos fibers."

53.     The following simple comparison of the widths of the particles longer than 5 microns as reported by RJ Lee Group and by Claimants' experts (MAS) demonstrates that only a very small portion of either data set meets Claimants' own expert's testimony as to the standard width of a single tremolite asbestos fiber.

| Width | RJ Lee Group | MAS |
|-------|--------------|-----|
| $\leq 0.3$ | 5% | 14% |
| $\leq 0.5$ | 40% | 47% |
| $\leq 1.0$ | 70% | 90% |

## DISTINCTION BETWEEN LIBBY ORE AND ZAI

54.     There appears to be no dispute that the Libby vermiculite contains both asbestiform tremolite and non-asbestiform (cleavage fragment) tremolite.  This has been recognized by those who have studied the Libby ore deposits.  *See,* e.g., 1992 OSHA Asbestos Standard, Preambles to Final Rules, Section V (Health Effects) at 2, attached hereto as Exhibit 23.

55.     The vermiculite ore from the Libby mine contained a natural deposit of amphibole minerals, including tremolite.  Prior to being sold as ZAI, the vermiculite ore was subjected to various production processes designed to remove impurities, including the naturally occurring tremolite.  These processes involved, among other things, extensive use of screening and flotation devices at the Libby mine and in the milling process that produced vermiculite

concentrate.  Following the mining and milling, the vermiculite was referred to as concentrate and was shipped to expansion plants where the vermiculite concentrate was screened and thermally expanded in furnaces.  During this exfoliation or beneficiation process, more tremolite was removed.  Following expansion, certain sizes of the exfoliated vermiculite was bagged for sale as ZAI.  Thus, the expanded vermiculite that constituted ZAI contained significantly smaller amounts of tremolite than was present in the Libby ore or the vermiculite concentrate.

56.     While I have acknowledged the presence of amphiboles in the Libby ore deposit, my opinions and conclusions are based on the analysis of air samples taken in connection with the disturbance of ZAI, not vermiculite ore and not unprocessed vermiculite concentrate.

57.     The historical testing conducted by W. R. Grace and others took place well prior to the OSHA 1992 Rulemaking.  Based on my review of documents, it does not appear that any efforts were undertaken prior to that time to differentiate between asbestiform tremolite and cleavage fragments.  Moreover, the techniques available at the time to evaluate airborne fiber distributions were inadequate to distinguish asbestiform fibers from cleavage fragments.  Thus, the historical testing data cited by Claimants do not reflect actual asbestos-only concentrations.

58.     My air sample and bulk sample analysis are consistent because most of the asbestiform tremolite does not become airborne.  The asbestos fibers observed in the bulk samples were in large, coarse bundles that are 0.5 to 1.0 **centimeters** in diameter, thousands of times larger than respirable fibers.  Due to the relatively large sizes of the majority of asbestiform tremolite particles contained in the bulk samples, those particles will not be released into the air under any foreseeable circumstance.

- 14 -

59.    My conclusion that the vast majority of particles of ZAI that become airborne are cleavage fragments is consistent with the fact that cleavage fragments have a higher tendency to be released from surfaces than asbestos particles of similar length.  The difference in the tendency to become airborne is a function of the electrostatic properties of the particles as related to surface area.  For particles of similar length, asbestos fibers will have higher relative surface areas than cleavage fragments. Cleavage fragments generally have less than half of the relative surface area of asbestos fibers.  *See* L.D. Palekan, C.M. Spooner, and D.L. Coffin (1979). "Influence of Crystallization Habit of Minerals on *In Vitro* Cytotoxicity," Annals of The New York Academy of Sciences, Vol. 330, at 673-86, attached hereto as Exhibit 24.

60.    Since the electrostatic force is directly proportional to total charge (and therefore surface area, assuming a uniform distribution of charge), the larger the relative surface area, the greater the attraction (and therefore increased difficulty in particle removal from a surface).  Thus, for a given force, cleavage fragments -- which have less surface area -- will have a higher tendency to release from surfaces than similarly sized asbestiform particles.  N.A. Esmen (1996) "Adhesion and Aerodynamic Resuspension of Fibrous Particles," Journal of Environmental Engineering, Vol. 122, at 379-83, attached hereto as Exhibit 25.

**APRIL 2001 AUDIT AND CONTINUED WORK FOR EPA**

61.    In April 2001, EPA performed an audit of RJ Lee Group's California laboratory. The audit was conducted because of a discrepancy between the polarized light microscopy (PLM) results reported by the two laboratories -- RJ Lee Group and Forensics -- that analyzed the asbestos content of bulk samples.  RJ Lee Group's California laboratory performed a PLM-only analysis and reported low to no asbestos in the samples.  Forensics analyzed the samples by

both PLM and TEM. While Forensics' TEM findings were consistent with the PLM findings of RJ Lee Group, Forensics' PLM findings differed from their own TEM data as well as the PLM data from RJ Lee Group. As a result of this discrepancy, EPA's contractor for the project conducted an on-site inspection of the RJ Lee Group laboratory.

62.     While the laboratory was fully cooperative and demonstrated their procedures to the inspectors, several alleged deficiencies were noted and reported to the California laboratory in a report dated May 1, 2001.

63.     RJ Lee Group immediately corrected those alleged deficiencies and responded in a timely manner with a detailed letter to EPA. *See* October 25, 2001 Letter from D.R. Van Orden (RJ Lee Group) to Terry Smith, attached hereto as Exhibit 26. EPA has never questioned this response or asked for additional information. In fact, RJ Lee Group has never heard from the EPA again with respect to the audit.

64.     At no time since the audit in April 2001 has EPA expressed a concern with RJ Lee Group or its asbestos analysis capabilities. In fact, RJ Lee Group first learned of the EPA's alleged concern when it saw the June 19, 2003 internal EPA memorandum appended to Claimants' Motion to Exclude more than two years after the audit.

65.     Since April 2001, RJ Lee Group had a continuing working relationship with EPA, including several contracts for research and/or analysis and several joint publications in the field of environmental analyses.

66.    The following table lists several of the contracts between RJ Lee Group and EPA:

| Contract No./Call Order | Sample Type | Analytical Protocol | Completion Date |
|---|---|---|---|
| #44 | Lung tissue | Scanning Electron Microscopy (SEM) | 8/23/01 |
| #45 | Lung tissue | SEM | 8/23/01 |
| #46 | Lung tissue | SEM | 8/23/01 |
| #47 | Lung tissue | SEM | 8/23/01 |
| #48 | Lung tissue | SEM | 8/23/01 |
| P0094998-1 | Air Filters | TEM Asbestos | 12/12/01 |
| P0094998-2 | Dust samples | TEM Asbestos | 2/18/02 |
| | Air Filters | TEM Asbestos | 11/4/02 |
| P0094998-3 | Core Samples | TEM Asbestos | 4/9/03 |
| #1 | Lung tissue ash | ICP | 6/17/03 |
| #2 | Lung tissue ash | ICP | 6/17/03 |
| RC1468 | Air Filters | TEM Asbestos | 7/21/03 |
| CRADA 0207-01 | | Research and development | On-going |
| #4 | Lung tissue ash | ICP | On-going |
| #5 | Air Filters | SEM | On-going |

67.    The Cooperative Research and Development Agreement (CRADA) between EPA and RJ Lee Group is related to "Evaluating Microscopy-Based Particle Characterization Techniques". The goal of the CRADA is "to advance the state-of-the-science of scanning electron microscopy with energy-dispersive x-ray analysis (SEM/EDS) and computer controlled scanning electron microscopy (CCSEM) techniques for the chemical and physical characterization of particles found in outdoor and indoor air".

68.    As part of the CRADA, RJ Lee Group provides consulting and training to the EPA in the use and operation of scanning electron microscopy (SEM). The EPA purchased a

SEM from RJ Lee Instruments; as part of the CRADA, the EPA receives updates to the operating system for the microscope.

69.    The CRADA also requires a continuing interlaboratory comparison of analyses between the EPA and RJ Lee Group.  The purpose of an interlaboratory exchange is to determine the precision and accuracy of an analytical technique and to determine bias that may exist from one laboratory to another.  This work is on-going.

70.    Several training sessions have been conducted by RJ Lee Group personnel for EPA personnel, both at RJ Lee Group and at the EPA laboratory in Research Triangle Park, NC. Both basic and advanced SEM techniques were presented during these courses.

71.    In addition to the CRADA, RJ Lee Group has been providing analytical support in relation to the trace metal content in human lung tissue.  The goal of this research is to determine if there is a relationship between metal in fine particulates found in lung tissue and the development of pneumoconiosis.  This work is on-going.

72.    RJ Lee Group is the primary laboratory in the Southdown project, a project overseen by the New Jersey Department of Health and EPA Region 2.

73.    RJ Lee Group has co-authored a number of documents with the EPA, including but not limited to:

- J. Gallagher, J. Inmon, S. Schlaegle, A. Levine, T. Rogers, J. Scott, F. Green, M. Schenker, K. Pinkerton (2001).  "Tissue Remodeling in the Human Lung in Relation to Particle Concentration and Metal Content."

Poster Presentation, Society of Toxicology Meeting in Nashville, Tennessee, 2001.

- J. Gallagher, J. Inmon, S. Schlaegle, A. Levine, J. Scott, F. Green, M. Schenker, K. Pinkerton (2003). "Health Effects Indicators in Human Lung in Relation to Particle Concentration and Metal Content." Poster Presented in Pittsburgh, Pennsylvania for Particulate Matter: Atmospheric Sciences, Exposure and the Fourth Colloquium on PM and Human Health, March 31-April 4, 2003.

- Jane E. Gallagher, Alan Levine, Klaus Wittmaack, Jeff Inmon, Norbert Menzel, Kent Pinkerton (2003). "Indicators of health effects related to particle and metal burden in human lung: Elemental composition by combined PIXE and ICP-AES analysis", part of GSF – US EPA collaboration.

74.    In addition to joint publications, the EPA has requested RJ Lee Group to present invited papers at EPA meetings and/or facilities, including the following most recent papers:

- G. S. Casuccio (2002). "Characterization of PM using Electron Microscopy Techniques", presented to the US EPA and the Washington Department of Ecology, Manchester Laboratory (Port Orchard, Washington), March 21, 2002.

- G. S. Casuccio and T. Lersch (2003). "Scanning Electron Microscopy Analysis and Source Apportionment Using the CMB8 Receptor Model", presented to the US EPA, Research Triangle Park, NC, July 9, 2003.

Further Affiant sayeth not.

Richard J. Lee, Ph.D.

Sworn to before me this 8th day of August, 2003.

Notary Public

My Commission Expires: 2-11-06

Notarial Seal
Sandra L. Vogel, Notary Public
Hampton Twp., Allegheny County
My Commission Expires Feb. 11, 2006
Member, Pennsylvania Association Of Notaries