# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

In re:                                        Case No. 90-10016-8G1

THE CELOTEX CORPORATION,

_____ Debtor.          Chapter 11

**ORDER ON (1) CITY OF NEW YORK'S MOTION FOR AN ORDER DIRECTING THE ASBESTOS SETTLEMENT TRUST TO PAY ALL CLAIMS APPROVED BY THE PROPERTY DAMAGE CLAIMS ADMINISTRATOR; (2) CITY OF NEW YORK'S MOTION FOR SUMMARY JUDGMENT FOR AN ORDER DIRECTING THE ASBESTOS SETTLEMENT TRUST TO PAY ALL CLAIMS APPROVED BY THE PROPERTY DAMAGE CLAIMS ADMINISTRATOR; AND (3) CITY OF NEW YORK'S MOTION FOR RULINGS ON ITS SUMMARY JUDGMENT MOTION**

**THIS CASE** came before the Court for hearing to consider the (1) City of New York's Motion for an Order Directing the Asbestos Settlement Trust to Pay All Claims Approved by the Property Damage Claims Administrator; the (2) City of New York's Motion for Summary Judgment for an Order Directing the Asbestos Settlement Trust to Pay All Claims Approved by the Property Damage Claims Administrator; and the (3) City of New York's Motion for Rulings on its Summary Judgment Motion.

In the Motions, the City of New York (NYC) asserts that it submitted approximately 740 Asbestos Property Damage Claims to the Property Damage Facility on or before January 29, 1999. NYC further asserts that the Property Damage Claims Administrator allowed approximately 478 of the Claims, but that the Asbestos Settlement Trust has denied payment of "most" of the Allowed Claims. (Doc. 13069, pp. 1-2). Consequently, NYC requests that the Court enter an Order directing the Asbestos Settlement Trust to promptly pay all of NYC's Property Damage Claims that have been Allowed by the Property Damage Claims Administrator. (Doc. 13069, p. 27).

1

13218

In response, the Asbestos Settlement Trust contends that it properly denied payment of NYC's Claims because the Trustees of the Trust are under a fiduciary duty to pay only valid asbestos Claims. According to the Trust, NYC's Claims are not valid Claims that are entitled to payment, because they do not satisfy the legal prerequisites for payment as provided in the Plan documents.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| Background | ........................................................................................ | 3 |
| A. | The Plan documents .......................................................................... | 3 |
| B. | NYC's Property Damage Claims ........................................................ | 6 |
| Discussion | .......................................................................................... | 8 |
| A. | Issues previously resolved.................................................................. | 8 |
| 1. | The July 24, 2002, Order............................................................... | 8 |
| 2. | Application of the July 24, 2002, Order........................................ | 9 |
| 3. | Illustrative Claim No. 6................................................................ | 11 |
| B. | Provisions for the allowance of specific claims ................................ | 12 |
| 1. | The Trust Agreement and the APDCRP specifically delegate the power to determine and allow Claims to the PDCA ................... | 12 |
| 2. | The Plan documents do not contain any procedures to resolve disputes involving Claims that have been allowed by the PDCA ..... | 15 |
| 3. | The absence of a procedure for the Trust's review of allowed Claims is consistent with the "low transaction cost" method of resolving claims that was fully negotiated prior to confirmation..................... | 17 |
| 4. | Conclusion ................................................................................... | 20 |
| C. | Review by the Trust of determinations by the PDCA ....................... | 20 |
| 1. | Prior rulings.................................................................................. | 21 |
| 2. | The Plan documents ...................................................................... | 23 |
| 3. | Conclusion ..................................................................................... | 25 |
| D. | The PDCA did not abuse his discretion in finding that NYC produced "Reasonable Evidence" to support its Claims .................................. | 25 |
| 1. | The "abuse of discretion" standard................................................ | 25 |
| 2. | "Reasonable Evidence" ................................................................. | 26 |
| 3. | Application...................................................................................... | 27 |
| a. | Illustrative Claim No. 1 ...................................................... | 27 |
| b. | Illustrative Claim Nos. 2, 3 and 4 ...................................... | 30 |
| E. | The Trustees as fiduciaries ................................................................ | 35 |
| Conclusion | .......................................................................................... | 38 |

2

## Background

### A. The Plan documents

The Celotex Corporation (Celotex) was engaged in the business of manufacturing, marketing, and distributing building materials.  Carey Canada Inc. (Carey Canada) was engaged in the business of asbestos mining until it ceased operations in 1986.  204 B.R. at 590.

Celotex and Carey Canada filed petitions under chapter 11 of the Bankruptcy Code on October 12, 1990.

At the time that the petitions were filed, Celotex and Carey Canada had been named as defendants in thousands of lawsuits filed by Asbestos Personal Injury Claimants, and in hundreds of lawsuits filed by Asbestos Property Damage Claimants.  204 B.R. at 604-05.

On December 6, 1996, the Court entered an Order Confirming the Modified Joint Plan of Reorganization for Celotex and Carey Canada. 204 B.R. 586.

A principal feature of the confirmed Plan is the creation of a Trust.  "The Plan establishes a Trust to address, liquidate, resolve, and disallow or allow and pay Asbestos Claims, which will operate in accordance with the Asbestos Claims Resolution Procedures." 204 B.R. at 602.

The Trust Agreement was attached as Exhibit 1 to the Modified Joint Plan of Reorganization.

The purpose of the Trust, according to the Trust Agreement, is to:

> assume the liabilities of the Debtors, their successors in interest and their affiliates, arising from or relating to Asbestos Claims and to use the Trust's assets and income to pay holders of Allowed Asbestos Claims in accordance with the Trust Agreement and in such a way that all holders of similar Asbestos Personal Injury Claims are each treated in a substantially equivalent manner and all holders of PD Claims are each to be paid in substantially the same manner as Allowed Asbestos Personal Injury Claims; and to otherwise comply in all respects with the requirements of a trust set forth in Section 524(g)(2)(B)(i) of the Bankruptcy Code.

3

(Second Amended and Restated Asbestos Settlement Trust Agreement, ¶ 2.2).

Pursuant to the Trust Agreement, therefore, the holders of both Allowed Personal Injury Claims and Allowed Property Damage Claims are to be paid from the Trust Assets. The "Trustees shall promptly pay both Asbestos Personal Injury Claims and PD Claims under the terms of both the APICRP [Asbestos Personal Injury Claims Resolution Procedures] and the APDCRP [Asbestos Property Damage Claims Resolution Procedures], as applicable, and shall not give preference in timing nor advance or delay payments to either Asbestos Personal Injury Claim holders or PD Claim holders relative to each other." (Trust, ¶ 3.3(a)).

Even though Asbestos Personal Injury Claimants and Asbestos Property Damage Claimants are both paid from the Trust, however, the processing and allowance of the separate types of Claims are administered by different entities.

The Second Amended and Restated Asbestos Settlement Trust Agreement, for example, provides that the "Trustees shall administer the processing and payment of Asbestos Personal Injury Claims in accordance with the APICRP, as the same may be amended from time to time, in accordance with the provisions hereof and thereof." (Trust, ¶3.3(b)(iii)). The Trust Agreement further states that the Trustees "shall have the power" to "administer, amend, supplement or modify the APICRP." (Trust, ¶ 3.1(c)(viii)).

With respect to Asbestos Property Damage Claims, however, the Second Amended and Restated Asbestos Settlement Trust Agreement provides that a Property Damage Claims Administrator (PDCA) "shall be the officer responsible for implementation of the Third Amended and Restated Asbestos Property Damage Claims Resolution Procedures." (Trust, ¶ 1.2). "The Allowance of PD Claims shall be administered by the PDCA exclusively in accordance with the APDCRP."    (Trust, ¶

4

3.3(c))(Emphasis supplied).  "Payment of PD Claims shall be made by the Trustees in the amount determined by the PDCA pursuant to the APDCRP." (Trust, ¶ 3.3(c))(Emphasis supplied).

The APICRP was attached to the Trust Agreement as Annex B, and the APDCRP was attached to the Trust Agreement as Annex C.

The Third Amended and Restated Asbestos Property Damage Claims Resolution Procedures provide that they "establish the exclusive procedures for evaluating, liquidating, paying and disposing of Asbestos Property Damage Claims." (APDCRP, ¶ I)(Emphasis supplied).  The APDCRP further provides that the PDCA "is responsible for implementing these APDCRP, and shall use his best efforts to complete the processing of all Claims within two years of the Effective Date." (APDCRP, ¶ I).

The APDCRP is divided into the following sections dealing with the administration of Property Damage Claims:

> 1. "Allowance of Asbestos Property Damage Claims," including subsections entitled "Legal Prerequisites," "Categories of Asbestos Property Damage Claims," "Allowed Asbestos Property Damage Claims," and "Disallowed Asbestos Property Damage Claims" (¶ IV.B);
>
> 2. "Payment of Asbestos Property Damage Claims" (¶ IV.C);
>
> 3. "Documentation" (¶ IV.D); and
>
> 4. "Processing and Review of Asbestos Property Damage Claims," including subsections entitled "Submission of Asbestos Property Damage Claims," "Review of Asbestos Property Damage Claims," "Reconsideration of Asbestos Property Damage Claim," and "Binding Dispute Resolution." (¶ IV.E).

Paragraph IV.E of the APDCRP, which relates to the processing of Property Damage Claims, provides that the review and determination of a Claim will be conducted by the "Property Damage Facility," defined as "the mechanism or system established by the PDCA for the disposition and payment of Claims pursuant to these APDCRP." (¶ IV.E.2; ¶ IV.A.35).

According to the APDCRP, an "Allowed Claim" is a claim "allowed for payment under the terms

of these APDCRP. An Allowed Claim shall be, and be deemed to be, a judgment against the Trust ...

in the Allowed Amount of such Claim . . . .(APDCRP ¶ IV.A.5). A "Disallowed Claim" is a claim

"that has been determined by the PDCA to not qualify for payment under these APDCRP." (APDCRP

¶ IV.A.21).

## B. NYC's Property Damage Claims

NYC contends that it filed approximately 740 Property Damage Claims with the Property

Damage Facility, that approximately 478 of the submitted Claims were allowed by the PDCA, and that

the Trust has refused to pay "most" of the Claims. (Doc. 13069, pp. 1-2). Consequently, a dispute

arose between NYC and the Trust regarding whether the Trust was permitted to decline payment of

Allowed Claims.

As one component of the parties' efforts to resolve their dispute, on November 28, 2000, the Court

entered an Agreed Order Resolving Motion of City of New York. (Doc. 12728). Generally, the

Agreed Order provided for the Trust's review of NYC's allowed but unpaid Claims, and set forth a

procedure for the Trust to notify NYC of the issues regarding the Claims. Finally, the Order provided

that both "the Trust and NYC further reserve their right to present any issues, including claim disputes,

to this Court on a group basis in the interests of efficiency and judicial economy." (Doc. 12728, p. 3).

In accordance with the Agreed Order, the Trust subsequently filed a document entitled

"Identification by Asbestos Settlement Trust of Illustrative Claims Relating to the Dispute with the

City of New York." (Doc. 12816A). In the document, the Trust "identifies the asbestos property

damage claims ("PD Claims") of the City of New York ("NYC") that (a) have been submitted to the

Trust for payment by the Property Damage Claims Administrator ("PDCA"), (b) have not been paid or

6

otherwise resolved, and (c) will be used as illustrative claims ("Illustrative Claims") by the Trust at the

evidentiary hearings to be scheduled by this Court to demonstrate the issues" asserted by the Trust.

The Illustrative Claims include:

1. <u>Illustrative Claim No. 1</u>. This Claim is based on thermal system insulation (TSI) located in the Manhattan Criminal Court building. The TSI was manufactured by a third party using a patent held by the Philip Carey Manufacturing Company (Philip Carey).

The Trust contends that Illustrative Claim No. 1 does not satisfy the legal prerequisites for payment because (a) Philip Carey, as a mere patent licensor, is not liable for the TSI manufactured by the third party; (b) the Trust would prevail on the "bulk supplier/sophisticated user" defense; (c) NYC failed to show that it did not release or waive its Claim against the Trust in connection with its settlement with the third party manufacturer; and (d) NYC did not timely file a Proof of Claim, since the Manhattan Criminal Court building was not included in the Proof of Claim filed by NYC in 1993.

2. <u>Illustrative Claim Nos. 2, 3, and 4</u>. These Claims are based on vinyl asbestos floor tile (VAT) installed in the Lincoln Hospital, Public School 29K, and the Woodhull Medical building, respectively.

NYC asserts that the VAT contains asbestos fibers supplied by Carey Canada.

The Trust contends that Illustrative Claims 2, 3, and 4 do not satisfy the legal prerequisites for payment because (a) the Plan documents do not provide for payment of claims based on "non-friable floor tiles or roofing materials;" (b) NYC did not show that any asbestos fibers were released that resulted in damage to the buildings; (c) the Trust would prevail on the "bulk supplier/sophisticated user" defense; (d) NYC failed to show that it did not release or waive its claim against the Trust in connection with its settlement with third party manufacturers; (e) NYC did not show that it abated the VAT in the buildings; (f) Claims 2, 3, and 4 were not timely filed, since the specific buildings were not included in the Proofs of Claim filed by NYC in 1993; and (g) NYC did not show that the asbestos fiber in the buildings was a product of Carey Canada.

3. <u>Illustrative Claim No. 6</u>. This Claim is based on a roofing product that was installed in a building known as "I.S. 75R" in 1985.

The Claim was submitted to the Trust for payment following a Notice of Final Determination After Binding Dispute Resolution.

In addition to many of the alleged deficiencies cited for the other Claims, the Trust contends that Illustrative Claim No. 6 does not satisfy the legal prerequisites for payment because NYC assumed the full risk of installing the asbestos-containing material (ACM).

The Trust also identified an additional claim described as Illustrative Claim No. 5. Illustrative Claim No. 5 is a Claim based on the installation of TSI in a public building. The Trust filed a Motion for Summary Judgment with respect to its Determination not to Pay Illustrative Claim No. 5, and a Pretrial Hearing was scheduled on the Motion for February 28, 2003, at the same time as the hearing on NYC's Motions that are presently under consideration. Since the hearing related to the Trust's Motion was continued to a later date, however, the Court will not specifically consider Illustrative Claim No. 5 in this Order.

### Discussion

**A. Issues previously resolved**

#### 1. The July 24, 2002, Order

On July 24, 2002, the Court entered an Order Denying the Trust's Motion for Summary Judgment with respect to (A) all the Time Barred Claims Submitted by the City of New York, (B) the Right to Challenge Determinations after Binding Dispute Resolution, and (C) the Trust's Determination to Not Pay Illustrative Claim No. 6 and Response in Opposition to Motion for Summary Judgment with respect to these Issues. (Doc. 13031).

In the Order, the Court made the following specific determination concerning the Trust's authority to challenge the allowance of a Claim following Binding Dispute Resolution:

> [T]he Trust can examine a determination by an arbitrator to allow a claim previously disallowed by the PDCF on a limited basis. As a matter of law, the Trust's ability to examine this type of an award is limited to establishing by clear and convincing evidence that the actions of the arbitrator were fraudulent or collusive. This is the only basis upon which the Trust has standing to challenge the arbitrator's award. The Court found no genuine issue of material fact remains with regard to the claims allowed as the subject of binding arbitration.

8

(Doc. 13031, pp. 2-3). The Court found that "no genuine issue of material fact" was present, but denied the Trust's Motion as to its right to challenge determinations after Binding Dispute Resolution.

In the July 24, 2002, Order, the Court also made the following specific determination concerning the Trust's ability to deny payment of NYC's allowed claims on the basis that they are time-barred:

> With regard to the Trust's ability to challenge as time barred claims which do not
> identify buildings with specificity, the Court found buildings do not have to be
> specifically set forth in the proof of claim. The Court further found specific buildings
> must be identified in a manner acceptable to the PDCF on or before November 30,
> 1998, or in accordance with any other deadline determined appropriate and acceptable
> by the PDCF. The Court found no genuine issue of material fact remains with regard
> to the alleged time barred claims.

(Doc. 13031, p. 3). Again, the Court found "no genuine issue of material fact," but denied the Trust's Motion as to its right to challenge NYC's claims as time-barred.

On August 14, 2002, the Court entered an Order denying the Trust's Motion for Clarification and/or Reconsideration of Order Regarding Arbitration Related Issues. (Doc. 13052).

## 2. Application of the July 24, 2002, Order

Based on the findings in the Order dated July 24, 2002, the Court determines that the Trust cannot deny payment of NYC's Claims for the reason that specific buildings were not included in its original Proof of Claim, and also cannot deny payment of NYC's Claims to the extent that the Claims were allowed following Binding Dispute Resolution. NYC's Motions should be granted with respect to these issues.

The Order expressly found that no factual questions existed as to these issues, and that the Trust's contentions could be resolved as a matter of law. The Court also found that an arbitrator's determination can be disturbed only upon a showing by clear and convincing evidence that the decision was the product of fraud or collusion. Since the Trust's Motion for Summary Judgment was

9

denied, and since there are no issues of fact, it must be concluded from the Court's decision that the

Trust failed to satisfy the required burden of proving fraud or collusion on the part of the arbitrator.

Consequently, the allowance of NYC's Claims following Binding Dispute Resolution cannot be

challenged, and the Trust cannot refuse payment of those claims that were submitted after arbitration.

The July 24, 2002, written Order incorporates an oral ruling delivered by the Court on June 11,

2002, as the official record of the Court's opinion. The oral ruling supports this Court's determination

that NYC's Motion should be granted with respect to the arbitration issue:

> Where a claim has been disallowed by the facility, but has been subsequently
> allowed by an arbitrator through the binding arbitration procedures, the Trust's ability
> to examine the arbitration award is limited to establishing by clear and convincing
> evidence that the actions of the arbitrator was [sic] fraudulent or collusive. Otherwise,
> the Trust has no other standing to challenge the arbitrator's award.
>
> . . .
>
> Ergo, the Trust is bound by the arbitration awards except as provided herein. It is quite
> clear from the confirmation hearing and the appropriate documents thereto that the
> binding arbitration of property damage claims was a very limited adjudication process.
> It in no way envisions judicial review; otherwise, me, on the merits like other plans
> such as found in A. J. Robbins [sic].

(Doc. 13026, Transcript of June 11, 2002, hearing, pp. 67-69). The Trust may not refuse to pay NYC's

Claims that were allowed following Binding Dispute Resolution. NYC's Motions should be granted

with respect to the arbitration issue.

At the hearing on June 11, 2002, the Court also made the following oral ruling regarding the

Trust's authority to deny payment of NYC's claims on the basis that they were not timely filed:

> As we all know in April of 1993 there was a claims bar date as regards asbestos
> property damage. Of course, the plan or the effective date of the plan did not rise until
> four plus years later. Part and parcel of the property damage claims process was that a
> claims form would be devised. And that there were various periods that were
> established for those claim forms to be filed. . . .

In those documents it's quite clear that the parties, that being the Trust, the facility, the claimants, and just about anybody else who walked within 20 feet of them, had a great problem with the amount of information that could be supplied or was being supplied. And with that there was with the Trust's approval an extension of a date to November 30, 1998, upon which the claimants could file their claim forms.

. . .

Most specifically the Court finds that because of the intent established with the filing—with the creation of the asbestos property damage facility, the concept associated with the limitation of transactional costs, and the concept of the utilization of the claims form, that buildings did not have to be specifically set forth in the proof of claim, but would have had to have been provided to the asbestos claims facility in a form acceptable by them by November 30, 1998.

. . . [A]s to any particular claim if the facility had given the permission for it to file that information in a form unknown to me or at a time unknown to me from the documents I had, I will go with the position that the facility took.

(Doc. 13026, Transcript of June 11, 2002, hearing, pp. 69-72)(Emphasis supplied). Based on this prior

determination, the Court finds that the Trust may not deny payment of an allowed Claim on the basis

that NYC did not identify the specific building in its Proofs of Claim filed in 1993. NYC's Motions

should be granted with respect to the time-barred issue.

### 3. Illustrative Claim No. 6

Illustrative Claim No. 6 is based on a roofing product that was installed in a building known as

"I.S. 75R."   The Claim was submitted to the Trust for payment following a Notice of Final

Determination After Binding Dispute Resolution.   Consequently, the Court's determination in the

Order dated July 24, 2002, pertaining to binding arbitration is directly applicable to Illustrative Claim

No. 6.

The Trust did not establish by clear and convincing evidence that the actions of the arbitrator were fraudulent or collusive.  Consequently, the Trust is not permitted to challenge the arbitrator's allowance of Claim No. 6, and NYC's Motions should be granted to the extent that they pertain to this Claim.

**B. Provisions for the allowance of specific claims**

The central issue underlying all of NYC's Motions is whether the Trust can deny payment of NYC's Property Damage Claims after the Claims were allowed by the PDCA and submitted to the Trust for payment.  The Court determines that the Trust cannot deny payment of the Illustrative Claims submitted by NYC.

**1.  The Trust Agreement and the APDCRP specifically delegate the power to determine and allow Claims to the PDCA**

The power to determine and allow claims is specifically delegated to the PDCA by the Trust Agreement and the APDCRP.

Several provisions contained in the Trust Agreement and the APDCRP are particularly persuasive in connection with the express delegation of power to the PDCA.  These provisions state as follows:

> 1. Paragraph 1.2 of the Trust Agreement states that the PDCA "shall be the officer responsible for implementation" of the APDCRP "and the day-to-day processing of Asbestos Property Damage Claims."

> 2. Paragraph 3.3(c) of the Trust Agreement states that the "Allowance of PD Claims shall be administered by the PDCA exclusively in accordance with the APDCRP," and further states that the "Trustees shall not interfere with the actions and decisions of the PDCA that are consistent with the APDCRP" or with the "independence of the PDCA in administering the APDCRP." Further, "[p]ayment of PD Claims shall be made by the Trustees in the amount determined by the PDCA pursuant to the APDCRP."

> 3. Paragraph I of the APDCRP states that it establishes "the exclusive procedures for evaluating, liquidating, paying and disposing of Asbestos Property Damage Claims," and that the PDCA "is responsible for implementing these APDCRP, and shall use his best efforts to complete the processing of all Claims within two years of the Effective Date."

4.  Paragraph IV.E.2 of the APDCRP states that the Property Damage Facility, which is defined as "the system established by the PDCA," will "determine whether the Claim will be Allowed" after it has received all of the necessary documentation related to the Claim, and that the decision "will be final and binding on both parties and may not be reopened."

5.  Paragraphs IV.A.5 and 21 of the APDCRP state that an Allowed Claim is "any Claim allowed for payment under the terms of these APDCRP" and shall be deemed to be "a judgment against the Trust . . . in the Allowed Amount of such Claim."  A Disallowed Claim is "any Claim that has been determined by the PDCA to not qualify for payment under these APDCRP."

These provisions reflect that the PDCA was granted virtually exclusive authority with respect to the processing and allowance or disallowance of Property Damage Claims.  The Trust Agreement and the APDCRP provide the PDCA with broad decision-making powers with respect to the disposition of Property Damage Claims.  The Trust Agreement and the APDCRP do not provide for the Trustees to be involved in the factual analysis underlying the allowance or disallowance of particular Claims.

This conclusion is supported by comparing the Agreement's provisions regarding the resolution of Personal Injury Claims with the provisions regarding the resolution of Property Damage Claims.  As set forth above, for example, the Trust Agreement expressly states that the "Trustees shall administer the processing and payment of Asbestos Personal Injury Claims," and that the Trustees "have the power" to "administer, amend, supplement or modify" the procedures formulated to process the Personal Injury Claims.  In other words, the drafters of the Trust Agreement were aware of the Trustees as potential decision-makers or fact-finders in the resolution of Asbestos Claims, and expressly empowered them to administer and process Personal Injury Claims.

In contrast to this conscious provision of power to the Trustees to administer Personal Injury Claims, however, the Trust Agreement is clear in its creation of a separate and distinct position, known

13

as the PDCA, to administer Property Damage Claims. The PDCA "shall be the officer responsible for implementation" of the APDCRP. (Trust Agreement, ¶ 1.2). "Allowance of PD Claims shall be administered by the PDCA exclusively in accordance with the APDCRP." (Trust Agreement, ¶ 3.3(c)). The APDCRP establishes "the exclusive procedures for evaluating, liquidating, paying and disposing of Asbestos Property Damage Claims pursuant to the Modified Plan of Reorganization . . . ." (APDCRP ¶I). The Property Damage Facility is "the system established by the PDCA for the disposition and payment of claims pursuant to [the] APDCRP" and it "may negotiate and compromise Claims" in the best interests of certain categories of Claims. (APDCRP ¶¶IV.A.35, IV.E.1). "If a claimant accepts the determination of the Property Damage Facility as to the amount of such Claimant's Allowed claim, that decision will be final and binding on both parties and may not be reopened." (APDCRP ¶IV.E.2). A claim allowed under the terms of the APDCRP "shall be, and be deemed to be, a judgment against the Trust . . . ." (APDCRP ¶IV.A.5). "Payment of PD Claims shall be made by the trustees in the amount determined by the PDCA pursuant to the APDCRP." (Trust Agreement, ¶3.3(c)).

Consequently, the Plan documents clearly authorize the Trustees to administer and process Personal Injury Claims. The administration of Property Damage Claims, however, is expressly delegated to the PDCA. The Court is satisfied that the Plan documents assign virtually exclusive management authority to the PDCA to allow or disallow Property Damage Claims.

14

**2. The Plan documents do not contain any procedures to resolve disputes involving Claims that have been allowed by the PDCA**

As shown above, the Plan documents provide for the PDCA, and not the Trustees, to process and allow Property Damage Claims. Further, it is significant that the documents do not contain any provision for the Trust's review of the PDCA's determinations allowing Claims.

Neither the Trust Agreement nor the APDCRP includes any specific procedures regarding the handling of a Claim after its allowance by the PDCA. Paragraph IV.E.2 of the APDCRP states:

> Once all of the necessary documentation pertinent to a Claim is received, the Property Damage Facility will determine whether the Claim will be Allowed. . . .
>
> . . .
>
> . . . If the Claimant accepts the determination of the Property Damage Facility as to the amount of such Claimant's Allowed Claim, that decision will be final and binding on both parties and may not be reopened.

(APDCRP, ¶ IV.E.2)(Emphasis supplied).   This language clearly indicates the termination of the Claims resolution process after a Claim has been allowed by the PDCA and accepted by the Claimant.

The termination of the Claims resolution process at the time that a claim is allowed and accepted is further evidenced by the terms of the "Notice of Final Determination" issued by the Property Damage Claims Facility. The Notice states in part:

> Subject to Attachment I, attached hereto and made a part of this Notice of Final Determination, by the signature of the Claimant or the Claimant's authorized representative (the "Claimant Representative") below, or by the failure to seek reconsideration within 60 days pursuant to Section IV.E.3. of the APDCRP, the Claimant agrees to accept payment pursuant to the Total Allowed Costs set forth above and the applicable Payment Percentage in full and final settlement of any and all claims with respect to Claim Number [472-2078-001] against the Celotex Asbestos Settlement Trust and all its predecessors (the "Trust"), and releases the Trust from liability for any and all such claims.

15

(Doc. 12823, Declaration of Alan H. Kleinman, Exhibit F)(Emphasis supplied).  A Claimant's signature on the Notice, therefore, represents its agreement to accept the payment offered by the Property Damage Facility in "full and final settlement" of the Claim.

Paragraph 3.3(c) of the Trust Agreement states that "[p]ayment of PD Claims shall be made by the Trustees in the amount determined by the PDCA pursuant to the APDCRP."

The APDCRP and the Trust Agreement do not set forth any additional procedures for the processing or review of Claims after they have been allowed by the PDCA.

The APDCRP does include detailed provisions establishing a multi-tier procedure for the review of Claims if they have been disallowed by the PDCA.  See, for example, paragraph IV.E.3 of the APDCRP, regarding the review of disallowed Claims by a "reconsideration panel," and paragraph IV.E.4 of the APDCRP, regarding a "final determination upon reconsideration" pursuant to "Binding Dispute Resolution."  The Procedures clearly address the circumstances under which a determination of the PDCA is reviewable, and provide for review only where a Claim has been disallowed.

In other words, although the APDCRP provides a review process if the Claimant is aggrieved by the PDCA's determination, no further proceedings are provided if the Claimant accepts the PDCA's determination.

The authority of the PDCA in the claims allowance process is confirmed by limitations relating to the interactions between the Trustees and the PDCA.  "[W]ithout limiting or abridging Article 3.3(c), [the Trustees shall consult with] the PDCA and the PD Advisory Committee on the implementation and administration of the APDCRP."  (Trust, ¶ 3.2(e))(Emphasis supplied).  Paragraph 3.3(c) of the Trust Agreement, to which the proscription applies, provides:

> The allowance of PD Claims shall be administered by the PDCA in accordance with the APDCRP.  The Trustees shall not interfere with the actions and decisions of the PDCA

16

that are consistent with the APDCRP nor shall the Trustees interfere with the independence of the PDCA in administering the APDCRP. The Trustees shall not amend the APDCRP without the consent of the PD advisory committee. Payment of PD Claims shall be made by the Trustees in the amount determined by the PDCA pursuant to the APDCRP.

Discretion is provided to the Trustees "to determine the timing and appropriate method for making payments" but that discretion is "subject to the requirements of the CRP with respect to the processing and ordering of claims for payment." (Trust, ¶ 3.4(c)).

In the situation under consideration, NYC asserts that the PDCA properly allowed its Claims. An issue arises, however, because the Trust (and not the Claimant) disputes the PDCA's determination. The Plan documents do not include any procedures for the review of allowed Claims by the Trust, or any procedures to resolve disputes involving Claims that have been allowed by the PDCA.

If proceedings for the review of an allowed Claim had been contemplated, either at the initiative of the Trust or any other party, the APDCRP could have included a mechanism for reconsideration comparable to that provided for the review of disallowed Claims. Absent such a provision for the review of Allowed Claims, the Court will not interpret the Trust Agreement and APDCRP as authorizing the Trust to "reopen" the PDCA's "final and binding" decision allowing a Claim.

**3. The absence of a procedure for the Trust's review of allowed Claims is consistent with the "low transaction cost" method of resolving claims that was fully negotiated prior to confirmation.**

As shown above, the Court determines that the Plan documents do not contain any source for the Trust's alleged authority to review Claims that have been allowed by the PDCA. Two factors, in addition to those discussed in subsections 1 and 2 above, are critical to this determination.

First, the Plan documents constitute the product of extensive arms-length negotiation among representatives of the various interests involved in the case, including the Debtors and the Trust.

Second, the entire procedural structure was developed with the stated purpose of providing a low transaction cost method of resolving Claims.

These two intertwined factors are embedded in this case. In the Findings of Fact and Conclusions of Law Regarding the Modified Joint Plan of Reorganization, for example, the Court stated:

> 68. The totality of the circumstances surrounding the formulation and proposal of the Plan, including, but not limited to, the evidence presented at the Confirmation Hearing that <u>the Plan is the result of extensive arms' length negotiations between and among the Plan Proponents and others and that the Plan is designed and intended, among other things, to</u> (i) preserve and protect the viable businesses of the Debtors, (ii) <u>provide a simple, economical procedure for obtaining and encouraging the prompt, efficient and equitable resolution of all Asbestos Claims,</u> (iii) provide fair and equitable compensation to holders of non-asbestos Claims, and (iv) resolve disputed issues in a complete and fair manner, demonstrates that the Plan was proposed in good faith and not by any means forbidden by law.

204 B.R. at 597-98. (Emphasis supplied). Earlier in its findings, the Court had recounted the "development of the Plan," including the announcement to the Court of an agreement between the Property Damage Claimants Committee and the Plan Proponents that facilitated the Order of Confirmation. 204 B.R. at 591-92.

The Trust Agreement was attached as Exhibit 1 to the Modified Joint Plan.

The Trust Agreement refers to the Plan that was filed by the Debtors, the Legal Representatives for Unknown Claimants, the Asbestos Health Claimants' Committee, and the Trade Creditors' Committee, and that was consented to by the Asbestos Property Damage Claimants' Committee. The Trust Agreement was signed by the Trustees, by a representative of Celotex, by the Legal Representative, and by the individual members of the Trust Advisory Committee. The Trustees' signatures evidence their agreement to the terms contained in the Trust Agreement.

18

The Asbestos Property Damage Claims Resolution Procedures were attached as "Annex C" to the Trust Agreement.

The APDCRP expressly states in its Overview that "[t]hese APDCRP are designed to provide a low transaction cost method of effectuating the resolution of Claims." (APDCRP, ¶ III). Finally, as indicated above, in its oral ruling on June 11, 2002, the Court stressed the "concept associated with the limitation of transaction costs" as a significant consideration in the creation of the Property Damage Facility. (Doc. 13026, Transcript of June 11, 2002, hearing, p. 71).

Two other provisions contained in the Plan documents are also relevant to this underlying purpose of the Property Damage Facility. Paragraph 8.6 of the Trust Agreement sets forth the compensation to be paid to the PDCA. That section provides, among other terms, that the PDCA shall receive "an Incentive Bonus if the PDCA Facility successfully reviews, evaluates and makes final determinations of Allowed Costs for less than the expense target of 1.5% of the Total Allowed Costs; on a sharing of the savings basis, 20% of the savings would be paid to the PDCA." (Trust, ¶ 8.6(a)). This provision promotes the economic processing of Claims.

Additionally, paragraph IV.D.1.(d) of the APDCRP describes the documentation that a Claimant must furnish as "Reasonable Evidence supporting a Claim for Abatement Costs." Significantly, the procedures do not necessarily require a Claimant to submit copies of "receipted bills, or vouchers or other proof of all Abatement Costs." (APDCRP, ¶ IV.D.1.(d)(ii)). Instead, it appears that such historical documentation is only one method of proof that may be submitted. Alternatively, Claimants may furnish "a copy of a report from a Qualified Person or Asbestos Coordinator describing the type, location, and quantity of ACM, and type and scope of Abatement which was performed." Further, as to "Future Abatement Costs," Claimants may furnish "a copy of the report of a Qualified Person or an

·19

Asbestos Coordinator detailing information sufficient for the PDCA to apply the Cost Model based on the type, location and quantity of Celotex or ACM and type and scope of Abatement to be performed." (APDCRP, ¶ IV.D.1.(e)). "Cost Model" is defined as "an appropriate model or formula developed by the PDCA with the advice and concurrence of the PD Advisory Committee for the purpose of estimating Past and Future Abatement Costs." (APDCRP, ¶ IV.A.18). Any interpretation of the APDCRP by the PDCA "shall be consistent with the purpose set forth herein, including providing payment in a cost-effective, reasonable method." (APDCRP, ¶ III). These provisions, which again appear in the agreed documents, reflect the Plan's underlying intention to process Claims efficiently.

The parties fully and extensively negotiated a "low transaction cost" structure for resolving property damage claims, and are bound by the agreement that they reached.

### 4. Conclusion

The plan documents contain no provisions for review by the Trust of the PDCA's allowance of specific Claims: (1) the Trust Agreement and the APDCRP specifically delegate the power to determine and allow Claims to the PDCA; (2) the Plan documents do not contain any procedures to resolve disputes involving Claims that have been allowed by the PDCA; and (3) the absence of a procedure for the Trust's review of allowed Claims is consistent with the "low transaction cost" method of resolving Claims that was fully negotiated prior to confirmation.

### C. Review by the Trust of determinations by the PDCA

Neither the Trust Agreement nor the APDCRP provides for the adjustment and allowance of Claims by the Trust, and neither provides for review by the Trust of the PDCA's final allowance of a Claim. To the extent that the Trust may review the PDCA's allowance of a claim, such review is

20

limited to a review of whether the PDCA has followed the required procedures for the allowance of

Claims, or whether he has abused the discretion provided to him in applying those procedures.

The term "abuse of discretion" does not appear in either the Trust Agreement or the APDCRP.

Nevertheless, less specific language in the Plan documents, as well as prior rulings of the Court,

indicate that a review of the PDCA's determinations is appropriate only under this limited standard.

**1. Prior rulings**

First, the Court has previously suggested that the Trust may object to the payment of Claims

that have been allowed by the PDCA under limited circumstances.

On April 11, 2002, for example, the Court made an oral ruling that serves as the official record

of an Order entered on July 24, 2002. (Doc. 13030). In the oral ruling, the Court stated as follows:

> Then if we came to an ultimate dispute, <u>the real question was going to be one which</u>
> <u>revolves around the abuse of discretion by the facilities or i.e., if you wish, the idea</u>
> <u>that procedures were not followed.</u>
>
> . . . <u>There's no doubt that the Trust does not have a right to a de novo review of</u>
> <u>these particular decisions made by the facility.</u>
>
> As I said before, the first requirement, . . . that the Trust has to advise
> specifically to the facility <u>what procedures were not being followed.</u>
>
>         . . .
>
> The real question is whether or not the Court is supposed to set up standards for
> the facility to make decisions or whether or not the Court is to give carte blanche as
> some have suggested to the facilities to make those decisions. Well, I think I've
> already answered the question by saying <u>the issue revolves around abuse of</u>
> <u>discretion</u> . . . .

(Doc. 12953, Transcript of April 11, 2002, hearing, pp. 125-30)(Emphasis supplied). At the

hearing, the Court concluded that the Trust had not shown that the PDCA abused his discretion by

21

allowing a claim, because the scientific evidence in the record did not show that the PDCA's decision was unreasonable. (Doc. 12953, Transcript of April 11, 2002, hearing, pp. 132-134).

Subsequently, on June 11, 2002, the Court made a second oral ruling, which serves as the official record for a separate Order denying a Motion for Summary Judgment that had been filed by the Trust. The second Order was also entered on July 24, 2002. (Doc. 13031). In the oral ruling issued on June 11, 2002, the Court stated:

> Where a claim has been allowed by the facility, the Trust does have an interest in insuring that the facility has followed those approved asbestos property damage claim procedures.

(Doc. 13026, Transcript of June 11, 2002, hearing, p. 67)(Emphasis supplied).

The rulings on April 11, 2002, and June 11, 2002, reflect a position of the Court that has been constant throughout this dispute. "One of the things is that if 3.3 is correct, that the facility has the sole exclusive administration of it and that they have got to comply with the procedures, then the question is whether the procedures were complied with. And that's why--but the burden would be upon the trust to show that the procedures were not complied with." (Doc. 12709, Transcript of hearing conducted on October 30, 2000, pp. 22-23)(Emphasis supplied). "But the nature of the game is that the trust with an allowance of an audit is only going to be able to dig so deep within the procedures." (Doc. 12749, Transcript of hearing conducted on November 30, 2000, p. 67)(Emphasis supplied). "I'm not moving off the mark that I said before is, number one is, the trust is going to have the burden to show that the property damage claims facility whatever they are, made a mistake under the rules. . . . In allowing a claim. And if you can establish that, I think that there is a fiduciary duty--has always had a fiduciary duty not to pay claims that have not been

properly, should I say, adjudicated with a small 'a.'" (Doc. 13003, Transcript of hearing conducted on May 3, 2001, pp. 19-20)(Emphasis supplied).

Consequently, the prior rulings and remarks of the Court indicate that the Trust may exercise a limited review of the PDCA's decisions. The focus of the review, however, has always been restricted to the question of whether the PDCA complied with the procedural requirements of the APDCRP, or whether the PDAC has abused the discretion provided to him by the procedures.

**2. The Plan documents**

This conclusion regarding the Trust's limited power of review is supported by several provisions of the Plan documents.

First, paragraph 3.3(c) of the Trust Agreement provides that the "Trustees shall not interfere with the actions and decisions of the PDCA that are consistent with the APDCRP nor shall the Trustees interfere with the independence of the PDCA in administering the APDCRP." (Trust, ¶ 3.3(c))(Emphasis supplied). Consequently, the Trust may review decisions of the PDCA to determine if they are "consistent with the APDCRP." To determine whether or not a decision is "consistent with the APDCRP," of course, one must necessarily look to the terms of the APDCRP itself.

The second provision supporting the conclusion, therefore, is contained in paragraph IV of the APDCRP. Paragraph IV.B.1 of the APDCRP provides that "for a Claim to be Allowed, the Claimant must provide Reasonable Evidence" that the Claim is based on Celotex ACM, that the Claimant suffered a compensable injury and damages, and that the Claim is based on a legally viable cause of action. (APDCRP, ¶ IV.B.1)(Emphasis supplied). "Reasonable Evidence" is

23

defined as "evidence sufficient to present a jury issue under the tort system of one of the Applicable Jurisdictions." (APDCRP, ¶ IV.A.37).

Construed together, the two provisions allow limited review by the Trust to ascertain if there are instances where the PDCA has allowed a Claim that is not based on "reasonable evidence," since such an allowance would not be "consistent with the APDCRP."

The third provision supporting the conclusion that the Trust may review the PDCA's decisions for "abuse of discretion" is found in paragraph 3.4(d) of the Trust Agreement. That paragraph, contained in the section of the Trust addressing "Claims Payment" (Trust, §3.4), provides that the "Trustees shall conduct random or other audits to verify information submitted in connection with the CRP in a manner consistent with the CRP." (Trust, ¶ 3.4(d))(Emphasis supplied). This audit power, granted specifically to enable the Trust to "verify information," is not otherwise explained in the Plan documents. Of course, one of the purposes of the audit power is to assist the Trust in the performance of its duty to periodically determine the "Percentage Payment," pursuant to paragraph 3.4(a) of the Trust Agreement, and to determine the timing and appropriate method for making payments, pursuant to paragraph 3.4(c) of the Trust Agreement.

Despite the absence of a clear statement of the purpose of the Trust's audit power under paragraph 3.4(d), the provision nevertheless constitutes further support for the Trust's authority to conduct a review of the procedures employed by the PDCA to verify that information in connection with the CRP (which includes the APDCRP, see Trust ¶2.4(b)) is "consistent with the CRP." The "trust with an allowance of an audit" may be permitted to assess the procedures used by the PDCA, at least to a limited extent. (Doc. 12749, Transcript of hearing conducted on November 30, 2000, p. 67).

24

### 3. Conclusion

Review by the Trust of determinations by the PDCA is limited to evaluating whether the PDCA has complied with the procedural requirements of the APDCRP, or whether he has abused the discretion provided to him by those procedures.  This conclusion is consistent with the overall structure of the Trust Agreement and the Claims Resolution Procedures, which expressly delegate the fact-finding function and responsibility for the analysis of claims to the PDCA.  The conclusion is also based on prior decisions of the Court, as well as provisions of the Plan documents that confer limited oversight functions on the Trust.

### D.  The PDCA did not abuse his discretion in finding that NYC produced "Reasonable Evidence" to support its Claims.

### 1.  The "abuse of discretion" standard

Generally, a fact-finder's decision is overturned as an "abuse of discretion" if he "fails to apply the proper legal standard or to follow proper procedure in making the determination, or bases an award upon findings of fact that are clearly erroneous."  A finding of fact is "clearly erroneous" if it leaves the reviewing entity with "a definite and firm conviction that a mistake has been committed."  If the evidence is susceptible to two different interpretations, however, the fact-finder's selection of one of the interpretations cannot be clearly erroneous.  In re The Celotex Corporation, 232 B.R. 488, 491 (M.D. Fla. 1998); In re The Celotex Corporation, 232 B.R. 484, 486 (M.D. Fla. 1998).

> Under the abuse of discretion standard, the decision under review must stand if any reasonable person could agree with it. . . . The reviewing court may not reverse the decision merely because it disagrees or would have arrived at a different outcome. . . . Under the abuse of discretion standard, a decision-maker abuses its discretion when it bases its decision on an erroneous conclusion of law, where the record contains no evidence to support the decision, or where the facts are clearly erroneous as found.

In re Mercury Finance Company, 249 B.R. 490, 498 (Bankr. N.D. Ill. 2000). The "abuse of discretion" standard is a stringent one, and is likely to be found only in exceptional cases.

### 2. "Reasonable Evidence"

Paragraph IV.B.1 of the APDCRP states that a Claimant must provide Reasonable Evidence of three prerequisites for its Claim to be allowed. Specifically, Claimants must submit (1) Reasonable Evidence that the ACM for which the Claim is submitted is Celotex ACM; (2) Reasonable Evidence of a compensable injury and damages; and (3) Reasonable Evidence of a legally viable cause of action.

The term "Reasonable Evidence" is defined as "evidence sufficient to present a jury issue under the tort system of one of the Applicable Jurisdictions." (APDCRP, ¶ IV.A.37).

The Trust Agreement provides that it shall be governed by the laws of the State of Florida, without regard to Florida conflict of laws principles. (Trust, ¶ 9.11).

Under Florida law, a party has produced sufficient evidence to create a jury issue if "conflicting reasonable inferences may be drawn from the evidence presented," so that a question of fact is created for the jury to decide. A party has not produced a jury issue if the party "could not recover under any reasonable view of the evidence." Whitten v. State Farm Fire and Casualty Company, 430 So.2d 528, 529-30 (Fla. 4th DCA 1983).

> If the evidence is conflicting or will permit of different reasonable inferences, or if there is evidence tending to prove the issues, it should be submitted to a jury as a question of fact to be determined by it, and not taken from the jury and passed upon by the Court as a question of law.

Tillery v. Standard Sand and Silica Company, 226 So.2d 842, 845 (Fla. 2d DCA 1969)(quoting Bryan v. Loftin, 51 So.2d 724 (Fla. 1951)). See also Domenech v. General Motors Corporation, 402

So.2d 437 (Fla. 3d DCA 1981)(dissenting opinion).  An issue should not be removed from the jury "unless it is clear that there is no evidence whatever adduced that could in law support a verdict" for the nonmoving party.  Tillery v. Standard Sand and Silica Company, 226 So.2d at 845.

In other words, to present an issue for the jury, Claimants are not required to show that they would ultimately prevail on their Claims in another forum.  On the contrary, Claimants are only required to present evidence that tends to prove their Claims, even if conflicting inferences may also be drawn from the same evidence.  It is noteworthy that the standard appears to be consistent with the "low transaction cost method" of resolving Claims.  (APDCRP, ¶ III).  In any event, if the Claimants satisfy this relatively low threshold of proof, the PDCA is in compliance with the APDCRP if he allows their Claims.

### 3. Application

In reviewing the PDCA's allowance of specific Claims under the "abuse of discretion" standard, the issue for the Trust is whether the PDCA abused his discretion in determining that NYC presented "Reasonable Evidence" of its Claims within the meaning of the APDCRP.  The Court concludes that the PDCA did not abuse his discretion when he allowed NYC's Claims.

#### a. Illustrative Claim No. 1

Illustrative Claim No. 1 is based on TSI manufactured by a third party using a patent held by Philip Carey (the "Patent issue").

The Trust contends that the PDCA should not have allowed Illustrative Claim No. 1, in large part because:

> NYC has not presented Reasonable Evidence of a legally viable cause of action that could be asserted against the Debtors.  The Debtors, as mere patent licensors, cannot be held liable for defects in the TSI under any recognized legal doctrine.  The Debtors are not liable pursuant to a strict products liability theory because the patents

27

are not products, nor are the Debtors "ones who distribute" products, and the Debtors had no control over how the patented process would be used and what items it would produce.  The Debtors are not liable pursuant to a negligence theory because the Debtors had no duty to provide a safe, effective or reliable patented process. Furthermore, public policy supports a finding of non-liability.  Lastly, even if the Debtors were somehow liable, the Debtors as the bulk supplier of the patented process only had a duty to warn the immediate distributor or manufacturer and had no duty to NYC, the ultimate consumer of the product.

(Doc. 12843, Motion for Summary Judgment with Respect to the Trust's Determination Not to Pay

Illustrative Claim No. 1 and All Similar Claims Based Solely on the Use of a Philip Carey Patent, p.

10)(Emphasis supplied).

In response, NYC contends that the PDCA's allowance of Illustrative Claim No. 1 was proper

under the Plan documents because paragraph IV.A.14 of the APDCRP defines "Celotex ACM" as

ACM "designed, manufactured, sold or distributed by Celotex or Carey Canada."  (APDCRP, ¶

IV.A.14)(Emphasis supplied).  According to NYC, the defective design of a product can be the basis

for liability under New York law, as long as the claimant shows that the designer exercised

"significant involvement in distribution or is capable of exercising control over quality."  NYC

further contends:

> The patent gave Carey control over who could use the patented process to make an asbestos-containing material. Moreover, Carey itself was a manufacturer of 85% Magnesia.  Disclosure Statement, Exh. D, Product Identification Information.  As this bankruptcy attests, Carey was, or should have been, an expert on the hazards of asbestos.  As an asbestos manufacturer, and as the sole holder of the patent on the product at issue for Illustrative Claim No. 1, allowed by the PDCA, Carey had the ability to control the risks and may be held liable under products liability.

(Doc. 12822, Memorandum of Law in Support of the Motion for Summary Judgment by Creditor

City of New York, pp. 25-27).

The Trust does not appear to contest the fact that Philip Carey held the patent used to manufacture thermal insulation. "In 1928, the inventor, Harold W. Greider, assigned his right to the process to Philip Carey. On November 30, 1930, the United States Patent Office issued Patent No. 1,782,383." (Doc. 12843, Trust's Motion for Summary Judgment with respect to Illustrative Claim No. 1, p. 17).

The issues involved in determining the liability of a patentor under a strict products liability theory include (1) whether the Patent was a "product," (2) whether the patentor was "one who sells or distributes" a product, (3) whether the patentor could "control the implementation of the patented process or the products created using the patented process," and (4) whether the patentor was "significantly involved in or can exercise significant control over the creation or distribution of the product." (Doc. 12843, Trust's Motion for Summary Judgment with respect to Illustrative Claim No. 1, pp. 18-20). See, for example, Harrison v. ITT Corp., 198 A.D.2d 50, 603 N.Y.S.2d 826 (1st Dept. 1993).

The Court finds that these issues, particularly the issue involving the degree of control exercised by the Debtor, are questions of fact that are suitable for determination by a jury. Since the Debtor held the patent used in the manufacture of TSI, and since the definition of "Celotex ACM" specifically includes asbestos-containing material "designed" by Carey, the Court cannot conclude that NYC submitted "no evidence whatever" that could support a jury verdict in its favor. Tillery, 226 So.2d at 845. Consequently, the PDCA did not abuse his discretion in concluding that NYC submitted "evidence sufficient to present a jury issue," or "Reasonable Evidence," to support the allowance of Illustrative Claim No. 1, and the PDCA did not abuse his discretion in allowing the Claim.

### b. Illustrative Claim Nos. 2, 3, and 4

Illustrative Claim Nos. 2, 3, and 4 are based on vinyl asbestos floor tile ("VAT") installed in the Lincoln Hospital, Public School 29K, and the Woodhull Medical building, respectively. The VAT was not manufactured by Celotex, but "allegedly contains asbestos fibers supplied by Carey Canada." (Doc. 12842, p. 10).

The Trust contends that the PDCA should not have allowed the VAT Claims because "no Reasonable Evidence has been presented by NYC that (a) Carey Fiber was actually contained in the ACM installed in the building, (b) release of asbestos fibers exist sufficient to satisfy the requirement of a legally viable cause of action and/or a compensable injury and damage, and (c) Carey Canada, as the supplier of raw asbestos fiber to GAF, Kentile and Armstrong, the sophisticated manufacturers of the actual ACM, is liable for the installed products." (Doc. 12842, Trust's Motion for Summary Judgment with respect to the Trust's Determination Not to Pay Illustrative Claim Nos. 2, 3, and 4, pp. 10-11).

        i. As to the first objection, the identification of Carey fiber, NYC submitted documents to the PDCA showing "sales of specific grades of Carey fiber to the relevant plants of the manufacturers that made the specific products in the specific years that they were installed in NYC buildings." (Doc. 13115, NYC's Supplemental Memorandum, p. 17). In other words, NYC presented sales records showing that the manufacturers of the VAT purchased asbestos fiber from Carey at the time that they were manufacturing the floor tile that was installed in NYC's buildings. (Doc. 13115, pp. 18-25).

The Trust does not appear to dispute that NYC presented documentation to the PDCA evidencing Carey's sale of asbestos fibers to the VAT manufacturers. (Doc. 13090, Trust's

Supplemental Memorandum, pp. 36-43). The Trust contends, however, that the manufacturers also purchased fibers from other sources, with the result that NYC did not establish that the fiber that was installed in a particular building was actually Carey fiber, as opposed to another supplier's fiber. In other words, the Trust asserts that NYC did not "establish conclusively that Carey Canada could be identified as the sole or exclusive fiber supplier to manufacturers of these products." (Doc. 12845, Affidavit of Stephen A. Madva, p. 2).

As discussed above, the applicable standard is whether NYC submitted "evidence sufficient to present a jury issue," not whether NYC "conclusively established" the identity of specific fiber in a specific building. NYC submitted documentation showing fiber sales by Carey to the manufacturers during the relevant time periods. The Court finds that such documentation "tends to prove" the presence of the fibers in the VAT at issue, even if contrary inferences may also be drawn. Consequently, the PDCA did not abuse his discretion in concluding that NYC presented "Reasonable Evidence" of "product identification," and the PDCA did not abuse his discretion in allowing the Claims.

ii. The Trust's second objection, that NYC did not present Reasonable Evidence of a legally viable cause of action and/or compensable injury, centers on whether asbestos fibers are released from VAT, a "non-friable" material.

The Trust contends that "VAT, although an ACM, is nonfriable and not dangerous because the asbestos is locked in a cement matrix." (Doc. 13090, p. 60). The Trust asserts that the mere presence of asbestos in a material is insufficient to state a legally viable cause of action, absent evidence that the fibers were released or became airborne. (Doc. 13090, pp. 55-64).

31

NYC submitted documentation of studies showing that asbestos fibers can be released from VAT during the normal life of the product. Ordinary maintenance activities performed over a period of time, for example, can result in a breach of the product that results in the release of fibers. (Doc. 13115, pp. 42-43). NYC also submitted evidence that the VAT installed in the buildings at issue had been damaged or had significantly deteriorated. Surveys conducted at the Woodhull Medical building, at Lincoln Hospital, and at Public School 29K, for example, revealed that floor tile in specified areas of each of the buildings was damaged. (Doc. 13115, pp. 43-44).

The issue is whether the presence of initially nonfriable, but damaged, VAT in a building gives rise to a legally viable cause of action. Stated another way, the issue is whether NYC submitted Reasonable Evidence of a legally viable cause of action even though it "did not submit evidence specific to the buildings of fiber release in addition to the overall evidence that VAT releases fibers and that the VAT at issue had deteriorated dangerously." (Doc. 13115, p. 45).

The Court finds that NYC's documentation that normal wear and tear can result in the release of fibers from otherwise nonfriable VAT, combined with its documentation that floor tiles were damaged in the specific buildings at issue, is sufficient to present an issue to a jury regarding whether NYC asserted a "legally viable cause of action and/or compensable injury." The Court cannot conclude that NYC would not recover under any reasonable view of the evidence. The PDCA did not abuse his discretion in concluding that NYC presented Reasonable Evidence of a legally viable cause of action, and the PDCA did not abuse his discretion in allowing the Claims.

iii. The Trust's third objection relates to whether the PDCA properly considered the "bulk supplier/sophisticated user" defense. According to the Trust, this defense provides that "a bulk supplier of asbestos fiber to a building product manufacturer has no liability under product

32

liability law to the end user of the building product <u>where the bulk supplier has warned the immediate distributor or manufacturer that originally purchases the fibers, of any dangers or hazards associated with the asbestos.</u>" (Doc. 13090, p. 67)(Emphasis supplied).

The Trust contends that the Debtors were bulk suppliers, and the manufacturers of the products at issue were sophisticated users who "were aware of" the dangers of asbestos, so that the Debtors were entitled to assert the defense. The Trust further contends that the PDCA was advised of the existence of the defense, but failed to properly apply it. (Doc. 13090, pp. 67-68).

In response, NYC asserts that under New York law the defense is available under only very narrow circumstances, such as where <u>the bulk supplier</u> provided adequate warnings to the intermediate manufacturer that the product may be hazardous. (Doc. 12822, pp. 29-30). NYC contends that the Debtor never issued warnings to the manufacturers involved in its Claims, and that the Trust is therefore not entitled to invoke the defense.

In paragraph 15 of this Affidavit, Stephen A. Madva states:

> I did not find any documentation in any of the New York City fiber claims files which evidences that the PDCA considered any legal defenses, other than statute of limitations. Had the PDCA considered the legal defense of sophisticated user/bulk supplier for the New York City fiber claims, the claims would not have been submitted to the Trust for payment under the relevant case law.

Doc. 12845, ¶ 15). Madva does not specifically assert that the Debtors warned the manufacturers of potential hazards associated with the product, as required to prevail on the bulk supplier defense. He states only that he did not discover files showing that the defense had been considered.

The Court cannot conclude on the record that the PDCA abused his discretion by allowing Illustrative Claim Nos. 2, 3, and 4. No documentation appears in the record which clearly shows that the Debtors satisfied all of the legal requirements of the bulk supplier defense. Consequently,

the Court will not find that the PDCA abused his discretion by allowing the Claims, based on the

absence of documentation in his files regarding a defense that may not even be applicable.

        iv.  Further, the Trust asserts that NYC did not show that it abated the VAT in

the buildings at issue.  In response to this assertion, Alan H. Kleinman (Kleinman), counsel for

NYC, states in an affidavit:

> Proof of past abatement is not required under the APDCRP. To keep transaction
> costs down, NYC submitted, as its right, many claims in which it relied on its earliest
> comprehensive survey and the Cost Model to calculate damages.  This avoided the
> painstaking, laborious, and costly work of collecting the documentation of
> abatements.  In huge buildings such as the Manhattan Criminal Court, there are
> typically multiple abatements, often stored at multiple locations and difficult to
> access.  In assembling the claim for this building (or for the litigation against the
> debtors prior to the Petition Date), this office collected boxes of documentation
> showing multiple abatements.  Documentation of but one of these abatements is
> attached as Exh. G. It shows that abatement work planned in 1990 for a fraction of
> the asbestos in the building cost more than $500,000.

(Doc. 12823, Affidavit of Alan H. Kleinman, p. 8).  The document attached to the Affidavit as

Exhibit G consists of a letter dated December 5, 1990, from Hygienetics, Inc. regarding "Revised

Abatement Cost Estimate - Criminal Court House."

    The Court finds that the PDCA did not abuse his discretion when he concluded that NYC

presented "Reasonable Evidence," or evidence sufficient to create a jury issue, of its abatement costs

and "compensable damages" within the meaning of the Plan documents.

        v.  Finally, the Trust asserts that NYC did not show that it did not release or

waive its Claim against the Trust in connection with its settlement with third party manufacturers.

In response to this assertion, Kleinman states in his affidavit:

> I have been in charge of NYC's asbestos recovery efforts in both State court and
> bankruptcies since 1990.  I have personally handled all settlements and all releases.
> To my recollection, no defendant or debtor ever even asked NYC to release its claims
> against other defendants, including specifically Celotex or Carey.  If any request had

34

been made, I would have rejected it as contrary to the clear interests of my client to obtain as much reimbursement of its huge asbestos abatement costs as possible. In short, NYC did not release NYC claims against the debtors. A copy of the waiver required by the Manville Property Damage Settlement Trust is Exh. H. Reacted [sic] copies of confidential releases for W.R. Grace & Co., GAF Corp., and Armstrong Worldwide Industries have been provided to counsel for the Trust.

(Doc. 12823, Affidavit of Kleinman, p. 9). A copy of a "Claim Resolution Notification" and an "Allowance Notification" from the Manville Property Damage Settlement Trust is attached to the Affidavit as Exhibit H. The exhibit does not refer to Celotex or Carey Canada.

The PDCA did not abuse his discretion in allowing NYC's Claims, since it is reasonable to conclude that NYC did not release its Claims against Celotex in conjunction with its settlements with other defendants.

NYC submitted "evidence sufficient to present a jury issue," or "Reasonable Evidence," to support the allowance of Illustrative Claim Nos. 2, 3, and 4. The PDCA did not abuse his discretion in allowing the Claims.

**E. The Trustees as fiduciaries**

Throughout this dispute, the Trust has emphasized that the Trustees serve in a fiduciary capacity, and that they owe fiduciary duties equally to the Personal Injury Claimants and the Property Damage Claimants. (Doc. 13090, p. 21). Accordingly, the Trust concludes that "the language of the Trust Agreement, applicable trust law and these unique circumstances required any reasonably prudent trustee, charged as they were with the fiduciary duties to all claimants and the specific responsibility to oversee payment to PD Claims, to gain some assurance of compliance with the PD Claims Procedures before paying out hundreds of millions of dollars of Trust funds." (Doc. 13090, pp. 24-25).

It is clear, of course, that the Trustees serve as fiduciaries pursuant to the Plan documents. "The Trustees are and shall act as fiduciaries to the Trust in accordance with the provisions of this Trust Agreement and the Plan." (Trust, ¶ 3.1(a)).

It is also clear that the powers and duties of the Trustees are governed by the terms of the Trust Agreement.

> The duties, powers and liabilities of executors and trustees are ordinarily fixed by the terms of the will and trust agreement. . . . For instance, the trust itself, whatever it be, constitutes the charter of the trustee's power and duties. From the trust, the trustee derives the rule of his conduct, the extent and limit of his authority, the measure of his obligation.

Jones v. First National Bank in Fort Lauderdale, 226 So.2d 834, 835 (Fla. 4th DCA 1969).

Consequently, the Court looks to the following provisions of the Trust Agreement for guidance in determining the powers and duties of the Trustees with respect to Claims submitted to them for payment by the PDCA:

> 1.  "The purpose of the Trust is to assume the liabilities of the Debtors, their successors in interest and their affiliates, arising from or relating to Asbestos Claims and to use the Trust's assets and income to pay holders of Allowed Asbestos Claims in accordance with the Trust Agreement and in such a way that all holders of similar Asbestos Personal Injury Claims are each treated in a substantially equivalent manner and all holders of PD Claims are each to be paid in substantially the same manner as Allowed Personal Injury Claims; and to otherwise comply in all respects with the requirements of a trust set forth in Section 524(g)(2)(B)(i) of the Bankruptcy Code." (Trust Agreement, ¶ 2.2)(Emphasis supplied).

> 2.  "However, the Trustees shall promptly pay both Asbestos Personal Injury Claims and PD Claims under the terms of both the APICRP and the APDCRP, as applicable, and shall not give preference in timing nor advance or delay payments to either Asbestos Personal Injury Claim holders or PD Claim holders relative to each other." (Trust Agreement, ¶ 3.3(a))(Emphasis supplied).

> 3.  "The Allowance of PD Claims shall be administered by the PDCA exclusively in accordance with the APDCRP. The Trustees shall not interfere with the actions and decisions of the PDCA that are consistent with the APDCRP nor shall the Trustees interfere with the independence of the PDCA in administering the

APDCRP. The Trustees shall not amend the APDCRP without the consent of the PD Advisory Committee. Payment of PD Claims shall be made by the Trustees in the amount determined by the PDCA pursuant to the APDCRP." (Trust Agreement, ¶ 3.3(c))(Emphasis supplied).

4.  "Consistent with the provisions hereof, the Trustees and the PDCA shall proceed as quickly as possible to liquidate claims, and the Trustees shall make payments to holders of Allowed Asbestos Claims promptly as funds become available, while maintaining sufficient resources to pay future Allowed Asbestos Claims in substantially the same manner." (Trust Agreement, ¶ 3.4(e)(iii))(Emphasis supplied).

The general powers of the Trustees are set forth in paragraph 3.1 of the Trust Agreement.

Based upon these provisions, the Plan documents specifically delegate the power to allow or disallow Property Damage claims to the PDCA, and the Trustees are required by the Trust Agreement to pay Property Damage Claims that have been allowed by the PDCA in accordance with the APDCRP.

The Trustees contend, of course, that NYC's Claims should not be paid because the PDCA did not allow the claims "in accordance with the APDCRP." The Trustees assert that they should not pay Property Damage claims that are not valid on their merits, since such payment directly impacts the funds available to pay allowed Personal Injury Claims.

The Trustees' effort to ensure that only valid claims are paid is easily justifiable in view of the clear fiduciary duty of the Trustees to both Personal Injury Claimants and Property Damage Claimants, and the substantial number and amount of claims and potential claims. Given the PDCA's express authority to determine and allow claims, however, and also given the provisions of the Trust Agreement that provide for payment by the Trust of allowed claims, the Trust cannot deny payment of claims that have been allowed, accepted by the Claimant, and submitted by the PDCA

37

for payment, where the PDCA has followed the procedures set out in the APDCRP and has not abused the discretion provided to him in the claims allowance process.

### Conclusion

In conclusion, the Court finds that NYC's Motions should be granted, and that the Trust should be directed to pay Illustrative Claim Nos. 1, 2, 3, 4, and 6, and all similar Claims filed by NYC that were approved by the PDCA and submitted to the Trust for payment.

First, the Trust may not deny the payment of Claims on the basis that specific buildings were not included in the original proof of claim filed by NYC in 1993. Further, the Trust may not deny the payment of Claims that were allowed following Binding Dispute Resolution. These issues were previously determined in accordance with the Court's Order dated July 24, 2002.

Second, the Court finds that the documents do not provide authority for the Trust to review the PDCA's allowance of specific Claims. This conclusion is based on the findings that (1) the Trust Agreement and the APDCRP specifically delegate to the PDCA the power to determine and allow Claims; (2) the Plan documents do not contain any procedures to resolve disputes involving Claims that have been allowed by the PDCA; and (3) the absence of a procedure for the Trust's review of allowed Claims is consistent with the "low transaction cost" method of resolving Claims that was fully negotiated prior to confirmation.

Review by the Trust of determinations by the PDCA is limited to evaluating whether the PDCA abused his discretion. This conclusion is consistent with the overall structure of the Trust Agreement and the APDCRP, which expressly delegate the fact-finding function and responsibility for the analysis of Property Damage Claims to the PDCA. The conclusion is also based on prior

decisions of the Court, as well as certain provisions of the Plan documents that confer limited oversight functions on the Trust.

Finally, the Court concludes that the PDCA did not abuse his discretion in finding that NYC produced "Reasonable Evidence" to support Illustrative Claim Nos. 1, 2, 3, and 4.

Accordingly:

**IT IS ORDERED** that:

1. The City of New York's Motion for an Order Directing the Asbestos Settlement Trust to Pay All Claims Approved by the Property Damage Claims Administrator, the City of New York's Motion for Summary Judgment for an Order Directing the Asbestos Settlement Trust to Pay All Claims Approved by the Property Damage Claims Administrator, and the City of New York's Motion for Rulings on its Summary Judgment Motion are granted as set forth in this Order.

2. The Asbestos Settlement Trust is directed to pay Illustrative Claim Nos. 1, 2, 3, 4, and 6 and all similar Claims filed by the City of New York that were approved by the Property Damage Claims Administrator and submitted to the Trust for payment.

3. A separate Final Summary Judgment will be entered consistent with this Order.

**DATED** this __17__ day of ____July____, 2003.

**BY THE COURT**

PAUL M. GLENN
Chief Bankruptcy Judge

39