Page 1

1          IN THE UNITED STATES BANKRUPTCY COURT FOR THE
                        DISTRICT OF DELAWARE

2
                              - - - -

3
4    IN RE:
5
     W.R. GRACE, et al.,                    Chapter 11
6                                           01-01139(JKF)
7          Debtors.
8
9                              - - - - COPY
10
            DEPOSITION OF:  ELIZABETH L. ANDERSON, Ph.D
11
                              - - - -
12     .
13
14                   DATE:    June 5, 2003
                              Thursday, 9:22 a.m.
15
16
17               LOCATION:    REED SMITH, LLP
                              435 Sixth Avenue
18                            Pittsburgh, PA  15219
                              412-288-3131
19
20
21               TAKEN BY:    Claimants
22
23
                 REPORTED BY:  G. Donavich, RPR, CRR
24                             Notary Public
                               AKF Reference No. Gd75794
25

Elizabeth Anderson, Ph. D.   June 5, 2003

**Page 30**

1  Q.   Okay.

2  A.   I believe that's it.  I don't believe I talked

3        to any other experts in this case concerning

4        this case.

5  Q.   Did you speak to Dr. Lee or someone with his

6        group?

7  A.   I spoke to some people in his group.  I don't

8        believe I've spoken to him directly about the

9        case.  I did speak to Dr. Ilgren, as I recall.

10 Q.   Let's start at the top.  What did you and

11       Dr. Corn discuss about your deposition today?

12 A.   I was interested in his views.  I have known

13       him since he was a very prominant peer reviewer

14       at the EPA and head of OSHA, and I knew he was

15       intimately aware of contractor activities, and

16       I wanted to know specifically what his views

17       would be of contractor activities with respect

18       to attic insulation.

19 Q.   Did you speak to anyone else about contractor

20       activities in attic insulation?

21 A.   Certainly with my staff, and I believe that's

22       pretty much it.  In general, I've asked

23       everybody I know questions of -- in passing,

24       I'll ask how long it takes you to do certain

25       activities in a home.  That's hardly a

**Elizabeth Anderson, Ph. D.   June 5, 2003**

 1       scientific study.

 2   Q.   What sort of issues did you talk to Dr. Lee

 3        about?

 4   A.   Dr. Lee has provided the underlying analysis

 5        for the fiber concentration data for the work;

 6        and from time to time, I've had clarification

 7        issues to discuss.

 8   Q.   So do you rely on Dr. Lee for his fiber counts

 9        that were done in this case?

10   A.   Yes, sir.  I think we've made that very clear

11        in the report, that we have relied on his fiber

12        counts.

13   Q.   Okay.  And with Dr. Ilgren, what did you

14        discuss with him?

15   A.   I spoke very briefly to Dr. Ilgren about his

16        expert report concerning the toxicity of

17        cleavage fragments, and I read his report.

18   Q.   You haven't done any independent work on

19        cleavage fragments, have you?

20   A.   You mean conducting studies in the laboratory?

21   Q.   Any research or studies independently.

22   A.   I have not conducted laboratory studies on

23        cleavage fragments.

24   Q.   The statements you make in your report about

25        cleavage fragments, you cite to Dr. Ilgren when

**Elizabeth Anderson, Ph. D.   June 5, 2003**

**Page 65**

```
 1            assessment, the strengths, weaknesses, and
 2            that's very consistent with what I said.
 3    BY MR. WOOD:
 4    Q.      This model that you've had a chance to briefly
 5            review, is that the same model you used in your
 6            risk assessment?
 7    A.      It's the same paradigm that I used.
 8    Q.      Would you agree that risk assessment is only as
 9            reliable as the information that's used to
10            create it?
11    A.      I wouldn't state it that way.
12    Q.      How would you state it differently?
13    A.      I think the confidence in the risk assessment
14            outcome reflects the quality and quantity of
15            the information that you have to use in order
16            to do the assessment.
17    Q.      So the confidence that you would have in a risk
18            assessment outcome reflects the quality and
19            quantity of the information that you used to
20            create it?  Did I state that correctly or --
21    A.      I think your question is a misstatement in a
22            sense, so let me try to get at what I think
23            you're asking here.
24    Q.      Sure.
25    A.      You're asking if you can have confidence in a
```

**Elizabeth Anderson, Ph. D.   June 5, 2003**

**Page 66**

1          risk assessment depending on some threshold of

2          quality and quantity of data is, I believe,

3          what you're trying to ask me, and I would like

4          to answer that a little differently, and that

5          is risk assessments are necessarily uncertain.

6          If we knew all the answers, we would not be

7          doing a risk assessment.

8                    The concept of doing a risk

9          assessment is to organize the scientific

10         evidence and present it, and the uncertainty

11         should be expressed.

12                   Now, I don't like the use of the word

13         "competence."  I like the use of the word

14         "certainties" and characterization of those

15         certainties, because I think that is a part of

16         the risk assessment process, part of the

17         paradigm, so I think those should be expressed

18         clearly, as best you can express them.

19    Q.   Can you tell me what is untrue about this

20         statement so that I can sort of understand what

21         you're saying.  When I say risk assessment is

22         only as reliable as the information used to

23         create it, what about that statement do you

24         disagree with?

25    A.   The word "reliable."  Decisions must be made.

**Elizabeth Anderson, Ph. D.   June 5, 2003**

```
 1                    THE WITNESS:  The risk assessment is
 2           the presentation of the known scientific
 3           information organized according to a paradigm
 4           that's intended to inform.
 5                    From my long-time experience at EPA,
 6           the use of risk assessment was not something
 7           that someone could decide was reliable or not,
 8           because if decisions need to be made, they need
 9           to be made based on the evidence that's
10           available, so you don't present a risk
11           assessment and say there's scientific
12           uncertainty, therefore I did a risk assessment,
13           this is what I know, don't rely upon it.
14                    You present it and present the
15           uncertainties, you try to characterize what's
16           known and not known as fairly as possible, and
17           that becomes the evidence that is available for
18           that particular decision.
19      BY MR. WOOD:
20      Q.   If there are numerous uncertainties and many
21           assumptions made in a risk assessment and all
22           of those are described in the risk
23           characterization compared to another risk
24           assessment where at the risk characterization
25           they say all of this evidence is
```

**Elizabeth Anderson, Ph. D.   June 5, 2003**

**Page 75**

```
 1          to be made, that's what you rely on if a
 2          decision must be made.  That's the evidence as
 3          it is.
 4                    The idea of the risk assessment
 5          process is to fairly present that evidence.
 6          The weight of evidence is a very important
 7          concept.
 8                    The more information and the better
 9          the quality of information to address the
10          particular issues at hand, the louder and
11          clearer the signal is, the weight of evidence
12          then becomes sometimes loud and clear and
13          sometimes quite weak, but you present the
14          evidence as it is, and using the paradigm,
15          present what you know.  You don't present it
16          and say don't dare make a decision is what I'm
17          trying to say to you, so that's why I don't
18          know how you're using this word "reliable."
19                    I'm using a set of terms under this
20          risk characterization that I feel is a fair way
21          to present the evidence you have, and it's to
22          present the uncertainties and to try to
23          characterize the nature of those uncertainties.
24     Q.   When a risk assessment is being peer-reviewed,
25          is it fair to challenge the amount of
```

**Elizabeth Anderson, Ph. D.   June 5, 2003**

**Page 124**

```
 1                    I don't recall whether I did or not.
 2          I believe if Grace had had information on the
 3          exact number of houses nationwide that had
 4          attic insulation, I probably would have been
 5          give than data.
 6                         - - - -
 7          (There was a discussion off the record.)
 8                         - - - -
 9     BY MR. WOOD:
10     Q.   A second ago you said that you didn't think
11          Grace would have records going back to the
12          1930s.
13                    Do you have any factual basis for
14          that?
15     A.   I have no factual basis to describe what
16          W.R. Grace has in their records and what they
17          don't have in their records.
18                    I know that they only acquired the
19          facility in, I believe, 1964, so I would assume
20          that they probably don't have detailed records
21          of the prior owner's activities, but I don't
22          know that, and I wouldn't regard necessarily
23          getting corporate records as any means that I
24          could use to getting how many total homes have
25          attic insulation.  This is an approximation, as
```

**Elizabeth Anderson, Ph. D.   June 5, 2003**

**Page 125**

1       is the denominator.  It's the best

2       approximation I could make.

3   Q.  Did you note in your risk characterization that

4       your estimate of homes with ZAI was based on

5       such a limited window of sales?

6   A.  I don't recall.  We can look at it, but I think

7       the point is the denominator is probably also

8       low, so that if the numerator is low, then my

9       percentages are probably adjusted in some way,

10      and these are the best data.  You can only deal

11      with the best data you have at the time you're

12      doing an assessment and identify its source.

13              If, in fact, there are twice as many

14      homes, if the percentage is two percent instead

15      of one percent or if it's three percent, it's

16      not going to change the risk outcomes in this

17      risk assessment.

18  Q.  So by changing the numbers that you plug into

19      your formula, you're saying that the end

20      result, the risk assessment, will not be

21      affected?

22  A.  I did not say it would not be affected.  I said

23      in a very minor way.  If the risks go up by

24      twofold or threefold, it's not going to change

25      the overall conclusion; plus, I already told

**Elizabeth Anderson, Ph. D.   June 5, 2003**

1      you these are plausible upper-bound estimates,

2      and the second thing I've told you is I have

3      overestimated risks in a number of ways.

4            The third thing I've done is

5      aggregated all the risks assuming the same

6      person does all of these functions, which

7      artificially multiplies the numbers three- and

8      fourfold anyway.

9  Q.  We'll get to all those things soon.

10           In the same paragraph on Page 35 of

11      your report where you have your estimate of the

12      number of homes, your estimate of the total

13      number of homes in the United States, you state

14      that the frequency of homes may be higher in

15      colder climates.

16  A.  Yes.

17  Q.  I don't disagree with that, but I wanted to

18      know what your factual basis was for that.  Did

19      you look at any regional sales records for

20      Grace?

21  A.  No.  What I did is I, first of all, had thought

22      a twofold increase would be ample, and then I

23      spoke to Dr. Corn, who had some knowledge, and

24      he thought that threefold would be so amply

25      overstating it, that it would certainly be

**Elizabeth Anderson, Ph. D.   June 5, 2003**

**Page 127**

```
 1              acceptable.
 2                    So he and I had a discussion about
 3              the frequency of VAI homes, and that's what I
 4              settled on as an upper-bound estimate of the
 5              number of homes that today have VAI.
 6    Q.   Okay.
 7    A.   Now, in order to improve this number, you can't
 8              get the number of homes that have VAI from
 9              sales records, because many homes have been
10              taken down, they've been demolished, they've
11              been renovated, they've been changed.  They no
12              longer represent sales records, and so if you
13              want a very precise figure, I suppose you'd
14              have to send a survey to everybody in the
15              country.
16    Q.   I guess the question you raised about sales
17              figures would apply just as well to the Versar
18              numbers you came out with, because that was
19              based on the distribution of VAI.
20    A.   But I think my report was -- this was a report
21              commissioned under contract to EPA; it's a
22              lengthy consideration of the issue.
23                    I did not have the time to do the
24              kind of consideration these people did.  They
25              did it, they reported their results; I have
```

**Elizabeth Anderson, Ph. D.   June 5, 2003**

**Page 135**

1          of asbestos, we don't have precise information

2          on many things, and, yet, we have methods that

3          allow us to make some reasonable estimates.

4                    Now, if someone wants to give me

5          additional information that allows me to

6          improve on these estimates, I will be very

7          happy to take it and review it.

8     Q.   Did Grace give you any additional information

9          to improve the estimates that you included in

10         the report?

11    A.   Don't you think if I had it I would have used

12         it?

13    Q.   I'll take that as a no.

14                   We got sidetracked there.  We started

15         to float back into the homes with VAI and the

16         total homes, but you said that the scientific

17         basis for choosing three percent was a

18         discussion you had with Dr. Corn and --

19    A.   That is not correct.

20    Q.   Okay.  What --

21    A.   I said that was a factor in my considerations.

22    Q.   What other factors did you use?

23    A.   I considered the literature.

24    Q.   What literature?

25    A.   I have cited the literature I ended up using.

Elizabeth Anderson, Ph. D.   June 5, 2003

Page 136

1   Q.   Could you point that out in your report too?

2   A.   You and I have just been discussing it.

3   Q.   I'm talking specifically about the three

4        percent number.

5   A.   I said there are no survey numbers available.

6        If, in fact, the rate of the VAI-containing

7        homes is roughly one percent nationwide, that

8        is an approximation from the literature we

9        have.  Three times that number for a colder

10       climate we regarded as an ample upper bound.

11  Q.   What's the basis for your decision that that is

12       an ample upper bound?

13  A.   It's three times the national average.

14  Q.   And it's as simple as that?

15  A.   Three times national average seems a very

16       reasonable estimate.

17  Q.   Staying on this same page, what was the

18       scientific basis for assuming that contractors

19       would come into contact with ZAI on ten percent

20       of their jobs?

21  A.   It's an estimate based on the activities that

22       we perceive to be contractor activities.  When

23       they come into a home, they do many different

24       things, and if they go to an attic, they may

25       not even contact VAI, so we consider ten

**Elizabeth Anderson, Ph. D.   June 5, 2003**

Page 137

```
 1        percent, and we said it's assumed to be an
 2        upper-bound estimate of the probability they
 3        would contact VAI.
 4   Q.   And when you're saying --
 5               You said "we" think.  Who --
 6   A.   We presumed.
 7   Q.   My question was about the "we."  Who is it that
 8        helped you make the decision that ten percent
 9        was a good assumption?
10   A.   We talked amongst ourselves, we --
11   Q.   Who were the --
12   A.   Within my organization.
13   Q.   Okay.
14   A.   I also discussed this assumption with Dr. Corn,
15        who has been involved for a long period of time
16        in industrial hygiene, and we made the
17        assumption that ten percent of the time that
18        they're in a home, when you think of what
19        contractors do in homes, they come and they do
20        many, many things.  They go to attics and do
21        many things.
22               Only ten percent of the time actually
23        contacting VAI in the home seemed a very ample
24        estimate of the time they would actually
25        contact VAI.
```

**A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO**

**Elizabeth Anderson, Ph. D.   June 5, 2003**

**Page 138**

 1   Q.   Is that ten percent number on jobs in the attic
 2        or ten percent of all jobs that a contractor
 3        would --
 4   A.   Ten percent of all jobs.
 5   Q.   Have you taken into consideration in your risk
 6        assessment that ZAI has also been used in walls
 7        as insulation, and that contractors, and in
 8        this case also homeowners, would come into
 9        contact with ZAI not only in their attic but
10        also in form work and walls?
11   A.   I don't know the distribution of VAI in walls,
12        as well as attics, but we thought ten percent
13        of the time was such a large number to actually
14        be contacting VAI among all the activities they
15        do in a home, we thought it was a very ample
16        estimate.
17   Q.   Did you contact any national or regional
18        contractor organizations or do any type of
19        polling or anything to come up with that
20        number, or was that just a number that you
21        decided was reasonable?
22   A.   This was the best information I could use at
23        the time.
24   Q.   Again --
25   A.   By the way, this is very clear.   It says

**Elizabeth Anderson, Ph. D.   June 5, 2003**

```
 1              contact VAI, and the result of all those

 2              calculations are presented here.

 3    Q.        And the results of all that is .29, which is

 4              the days per year they contact VAI.

 5    A.        On the average for each activity.

 6    Q.        So once every three years --

 7    A.        For each activity.

 8    Q.        Okay.

 9    A.        On average.

10    Q.        Okay.

11    A.        And .75 at the high end.

12    Q.        Do you know if there were contractors who

13              specialize in areas that would consistently

14              cause them to work in ceilings, attics, or in

15              wall spaces?

16    A.        I don't know that there are contractors who

17              just do nothing but work in attics.  I can't

18              imagine why they would do that, but if there

19              are people like that, I don't know them.

20    Q.        Would you agree that most homes with ZAI are at

21              least 15 to 20 years old based on the fact that

22              Grace started selling VAI in 1984?

23    A.        Most homes, if they have VAI left and have not

24              been previously renovated or rebuilt or razed,

25              would be at least that old or older, I would
```

Elizabeth Anderson, Ph. D.   June 5, 2003

Page 143

1          guess.

2     Q.   Do you know whether homes that are at least

3          that old or older typically have different

4          types of renovations done to them than newer

5          homes?

6     A.   I have no idea.  I'm not a billing expert.

7     Q.   Can we go back to Page 11.

8                    - - - -

9          (There was a recess in the proceedings.)

10                   - - - -

11    BY MR. WOOD:

12    Q.   I think the last thing I said was go to

13         Page 11, hazard identification.  That's the

14         first step of the risk assessment paradigm.

15         Right?

16    A.   Yes.

17    Q.   Steps 2 and 3, the dose-response and the

18         exposure, do they weigh into the decision of

19         whether the substance is a carcinogen?

20    A.   The information about the nature and type of

21         disease that can occur is part of the weight of

22         evidence, as is the nature and type of exposure

23         as it relates to the pharmacokenetics, so they

24         can be answers, yes, they can weigh in.

25    Q.   Has EPA classified asbestos as a Class A

**Elizabeth Anderson, Ph. D.   June 5, 2003**

**Page 188**

1          objection.  If you can answer it, please do.

2                    THE WITNESS:  I think that answer is

3          threefold.  First of all, if I can't separate

4          out the cleavage fragments, I can't do a risk

5          assessment, because I can't use the EPA metric,

6          the IRIS dose-response metric, to do any work,

7          so, one, it's necessary to separate them.

8     BY MR. WOOD:

9     Q.   You misunderstood my question, and I'll maybe

10         save you some time.

11                   What I said is if he was wrong and

12         there weren't cleavage fragments that needed to

13         be separated, if claimants' expert's fiber

14         counts were correct and there were not cleavage

15         fragments included in those, would that change

16         your risk assessment?

17    A.   You mean if the fiber concentrations changed

18         regardless of whose fiber concentration, if the

19         PCME metric that's appropriate to the EPA

20         metric for the use of the IRIS file, if the

21         concentrations go up, will risk go up, and the

22         answer is yes.

23    Q.   What's your understanding of the work that was

24         done during the Pinchin study?

25    A.   My understanding is there was a demolition

Elizabeth Anderson, Ph. D.   June 5, 2003

Page 197

```
 1           clearance done for Lee's, who else did you
 2           receive input from or what other sources of
 3           information did you have?
 4    A.     I told you we also reviewed the Ewing work, and
 5           he did it -- we called it a small area of
 6           clearance.  The observations of his work he did
 7           in removing insulation from the tops, I believe
 8           he described it -- the very tops of walls.
 9           I've forgotten his exact description, but he
10           used a shop vacuum, and again, his times, I
11           believe, were around 45 minutes for that
12           activity, and it was a larger area than just
13           wiring, as I recall.
14    Q.     So your assumption that it would take half an
15           hour and typically an hour and a half on the
16           high end is based on the simulations that were
17           done by Grace's experts and by claimants'
18           experts?
19    A.     Plus, in all these cases, our own internal
20           sense of how long it really takes to do this
21           kind of thing in our own homes, and we also
22           reviewed all of these assumptions with Dr. Corn
23           and asked for his input from his experience
24           with buildings and homes.
25                        - - - -
```

**Elizabeth Anderson, Ph. D.   June 5, 2003**

**Page 203**

```
 1                clearance, and I just extrapolated that to a
 2                large area of clearance in a large home the
 3                size of the Busch attic.
 4      Q.        That was mathematically you took the 16 square
 5                feet in the Lee study for the large area and
 6                multiplied that so it was big enough to do the
 7                whole attic?
 8      A.        Uh-huh, and the same thing for the Ewing study.
 9      Q.        Are the typical exposures intended to represent
10                the average resident or contractor exposure?
11      A.        Well, to represent in a conservative way, yes.
12      Q.        In your risk assessment, did you take into
13                consideration whether homeowners were smokers?
14      A.        No, I did not.  I was not assessing risk for
15                particular individuals but rather generically
16                for people who performed these tasks, so I did
17                not, nor does EPA's dose-response curve, take
18                into account smokers, and since that factor and
19                those responses to curves is derived from the
20                occupational setting, I'm sure there were
21                smokers in those cohorts.
22      Q.        Did you take into consideration when you made
23                your exposure durations for removal of ZAI or
24                any of these other activities the deposition of
25                claimants and claimants' witnesses?
```

**Elizabeth Anderson, Ph. D.   June 5, 2003**

**Page 204**

1  A.   I had not read those depositions.

2  Q.   So you did not take any of those into account?

3  A.   No.

4  Q.   In the simulation that Ewing did on moving

5       aside ZAI, homeowner method, that was what you

6       treated as a large removal --

7  A.   Right.

8  Q.    -- do you recall the technique they used to

9       remove the ZAI?

10 A.   I believe they scooped it out, but I can't

11      recall exactly.

12 Q.   I'm not trying to trick you.  They scooped it

13      out with a dustpan and then cleaned up with a

14      whisk broom and a dustpan, and all of this was

15      bagged in trash bags.

16 A.   (Witness nods head.)

17 Q.   Is that the same removal method that would be

18      used in your Scenario No. 5, removal of ZAI,

19      which is scooping, bagging, and sweeping

20      activities?

21 A.   It could be, or it could be a more efficient

22      system.

23 Q.   Was a more efficient system used in any of the

24      simulations to remove ZAI, whether it was from

25      a small area or a large area?

Elizabeth Anderson, Ph. D.   June 5, 2003

Page 205

1    A.    I would think that the vacuuming that was used

2          in the total removal at the Busch house might

3          be more efficient, but I beg to establish

4          quickly for the record that I am not a removal

5          expert.

6    Q.    The exposure levels that were arrived at -- and

7          when I say "exposure levels" -- scratch that.

8          The fiber levels that were arrived at in the

9          claimants' studies for the large removal using

10         the homeowner method as they describe it, could

11         those fiber levels be plugged into your

12         exposures for removal of ZAI?

13   A.    Once they are correctly adjusted to collect

14         PCME, they can be used in the methodology with

15         the IRIS database, and also corrected for the

16         frequency and duration and the level of

17         exposure.

18   Q.    Okay.

19   A.    The time-weighting factors.

20   Q.    Page 33 -- I'll try to move this along

21         quickly -- you have the average tenure for a

22         home is nine years.

23   A.    That's right.

24   Q.    And where did that number come from?

25   A.    From the EPA exposure factors handbook.

**Elizabeth Anderson, Ph. D.   June 5, 2003**

**Page 214**

```
 1              predominantly ones and you, other than for
 2              moving boxes, have all ones, also --
 3    A.        I considered all of these.  I didn't use them
 4              directly.  In fact, we went beyond them and
 5              considered in many cases where we thought it
 6              was justified higher number of total hours per
 7              year, so I didn't directly translate what they
 8              did to what I did, because the scenarios
 9              weren't exactly the same, but we did consider
10              their estimates of exposure, frequent
11              circumstance and duration, and in no case did
12              we estimate anything lower that would end up
13              with a total lower hours per lifetime in the
14              scenario.
15    Q.        I'm just focusing on the exposure frequency.
16              Did you look to the Versar study to decide that
17              many of these activities that were similar to
18              what you have listed here would only occur once
19            a year?
20    A.        I said I used the Versar study, together with
21              any of the other information I had, or in
22              discussions with Dr. Corn and in our internal
23              discussions we have a long track record in
24              frequency and duration of exposures and used
25              our professional judgment.
```

**A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO**

Elizabeth Anderson, Ph. D.   June 5, 2003

Page 215

1    Q.    You have referred to speaking to people in your
2          office about this.
3                      How many people do you have in your
4          office you talked to about this?
5    A.    I have no idea what number of people discussed
6          this.  Somewhere probably between three and a
7          dozen.
8    Q.    Just depending on who was around for the
9          discussion?
10   A.    This company is ten years old.  We have a long
11         track record, and before this company many of
12         the individuals involved have been involved in
13         these kinds of activities for long careers, and
14         we are very familiar with how frequencies and
15         durations are obtained.  We use that
16         professional judgment.
17                      I think someone coming in who has
18         never looked at these issues before would be
19         less capable.  We use the professional
20         judgment, the duration of the studies, and also
21         discussed it with Dr. Corn, who is very, very
22         knowledgeable about these matters.
23   Q.    Do you remember what specifically in the
24         studies or where in the studies or which
25         studies had exposure frequencies in them?

**Elizabeth Anderson, Ph. D.   June 5, 2003**

1   A.   My recollection is Versar was the only one that

2        had exposure frequencies.  I don't recall if

3        there's any discussion in the other studies at

4        this point in time.  If there was, we

5        considered it, but obviously Versar and EPA did

6        consider particularly exposure frequency and

7        duration and exposure times in their tasks,

8        because they did perform a risk assessment.

9                       - - - -

10       (There was a discussion off the record.)

11                      - - - -

12  BY MR. WOOD:

13  Q.   What sort of research or studies do you have in

14       your office?  You said we've done these sorts

15       of things before.  What other sort of similar

16       studies and research have you done that's

17       related to attic activities?

18  A.   You don't have to relate everything to an attic

19       activity to have some feel and professional

20       judgment about the duration of particular kinds

21       of activities and the exposure frequency.

22                  How often they are likely to occur,

23       there is a very long track record.

24                  In any particular office, we have

25       performed literally hundreds and hundreds of

**Elizabeth Anderson, Ph. D.   June 5, 2003**

**Page 217**

1       risk assessment where these considerations are

2       part of those studies.  We are fully familiar

3       with the EPA guidance and we certainly have

4       applied --

5  Q.   So I can get a feel for this, what similar sort

6       of activities has your office looked at before

7       that you could relate to removing Zonolite

8       attic insulation with a dustpan and a broom

9       from the attic?

10 A.   I said it's professional judgment.

11 Q.   Okay.  The next column, exposure duration, nine

12      and thirty, I know where those came from.

13      That's the length of time someone -- the

14      average time someone lives in the house and the

15      90th percentile.

16            What are you looking at?

17 A.   This next column, exposure duration.

18 Q.   All right.  I know where the nine years comes

19      from and where the thirty years comes from.

20      The rest of that column, where did all of those

21      numbers come from?

22 A.   The same --

23            All of these, if you want to discuss

24      each one individually --

25 Q.   If it's the same source --