Vol. 7

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

MDU Resources Group, Inc., d/b/a   )
Montana-Dakota Utilities Co.,      )
                                   )
                Plaintiff,         )
                                   )
     -vs-                          )   Civil No. A1-90-122
                                   )
W. R. Grace & Co. and              )
W. R. Grace & Co.-Conn.,           )
                                   )
                Defendants.        )

TRANSCRIPT OF TRIAL

Taken at
United States Courthouse
Bismarck, North Dakota
May 26, 1992

BEFORE THE HONORABLE BRUCE M. VAN SICKLE - SENIOR JUDGE
-- AND A JURY --

EMINETH & ASSOCIATES
Court Reporters
BISMARCK, NORTH DAKOTA
255-3513



COPY

1  A.   Yes, he did.

2  Q.   Does the report reflect the methods that he used to
3  analyze these dust samples?

4  A.   Well, at the time these were done there was only one
5  method available to analyze TEM dust samples, but he --

6           MR. CHILDS: I'm going to object, Your Honor, and
7  move to strike as nonresponsive to the question.

8           THE COURT: I overrule that. Finish your answer,
9  please.

10          THE WITNESS: In his report, he gives the specifics
11 of who analyzed them and who reviewed the analysis data and
12 the specifics regarding the magnification used, the area
13 examined, the number of grid openings that were looked at; it
14 could only have been the standard EPA draft protocol.

15          MR. CHILDS: Your Honor, we would again assert our
16 motion -- our objection for lack of foundation. Mr. Longo
17 has been listed as one of their experts and we think that
18 that testimony is best served coming through him.

19          MR. SPEIGHTS: I wasn't through yet with my
20 questions, Your Honor.

21          THE COURT: Please proceed with your examination.
22 Q.   (MR. SPEIGHTS CONTINUING) Have you worked on various
23 projects with Dr. Longo?

24 A.   Yes.

25 Q.   Have you worked on various experiments with Dr. Longo in

1  which you have taken dust and air samples?

2  A.  Yes.

3  Q.  And have you worked closely with Dr. Longo in these

4  projects which have resulted in analysis of settled dust in

5  buildings?

6  A.  Yes.

7  Q.  Is Dr. Longo somebody that you rely on in your field on

8  a regular basis in the analysis of dust samples?

9  A.  Yes.

10       MR. SPEIGHTS:  That's my foundation, Your Honor.  I

11  do intend to call Dr. Longo to the stand, but I think that

12  Mr. Ewing can testify about -- excuse me -- can testify about

13  the results in the MDU building, so he can explain his

14  evaluation of the building in light of the information which

15  was forwarded to him.

16       MR. CHILDS:  Your Honor, our position that is we

17  have no ability to cross this individual as to the method

18  used, which cuts to the heart of our *Frye* motion, and Dr.

19  Longo is the one who applied this indirect-method sonication

20  and he's the one we'd like to cross-examine on that method

21  before the results are made public to this jury, because this

22  Court may find the *Frye* motion is appropriate in this case.

23       THE COURT:  I overrule, and the reason being that

24  it has been shown that this was a -- the -- there was a

25  standard method and, therefore, that this -- and it also has

1  been shown that this witness has more than the average
2  layman's ability to evaluate the product. I overrule and
3  receive the evidence.
4  　　　　Would you please proceed.
5  　　　　MR. CHILDS: Excuse me, Your Honor. In light of
6  the Court's ruling, may we voir dire this witness on
7  sonication for the basis of our Frye motion?
8  　　　　THE COURT: Certainly.
9  　　　　MR. CHILDS: Thank you, Your Honor.
10 **EXAMINATION BY MR. CHILDS:**
11 Q.　Mr. Ewing, the method used to test this dust is called
12 the indirect method; isn't that true?
13 A.　I think you're referring to the indirect/direct method
14 of analysis of air samples. That's where the indirect is
15 normally referred to.
16 Q.　The dust was prepared by a process called sonication;
17 isn't that correct?
18 A.　That is part of the preparation method, yes.
19 Q.　Okay. As an industrial hygienist, do you rely on the
20 EPA Government publication the Green Book for guidance?
21 A.　Yes, to some extent.
22 Q.　The Green Book says "Because the results of this testing
23 are difficult to interpret and evaluate at this time,
24 building owners should carefully consider the appropriateness
25 of this testing to their situation."

1    Isn't that the Green Book's statement with respect
2 to dust testing in buildings?
3 A.  Well, I think that's part of the statement. I think you
4 skipped over the first part, and the EPA has put out a
5 guidance document on specifically the direct versus indirect
6 preparation methods.
7 Q.  And isn't that guidance document, sir, what is called
8 the EPA's draft protocol?
9 A.  No, not -- the published -- you know, the Blue Book says
10 ID, ID across it.
11 Q.  Are you aware of the EPA's draft protocol regarding dust
12 preparation?
13 A.  Yes; they've -- they've turned over everything to the
14 ASTM committee at this point.
15 Q.  Isn't it true that the EPA draft protocol when it -- it
16 addresses dust testing and sonication says the following:
17      "As this method involved the use of sonication to
18      disperse the fibers in the dust sample prior to dilution
19      and filtration, it will increase the number of small
20      fibers counted in relation to what may have actually
21      been found on the surface. At present, no firm
22      conclusions can be drawn regarding potential exposure
23      hazards from asbestos-contaminated surface dust and no
24      limits have been set to define a level requiring
25      abatement or cleaning of the area."

1     Doesn't this draft protocol say, sir, that with
2 respect to testing of dust, that there are no limits, that
3 there is no set protocol, and that's because it increases the
4 number of small fibers?
5 A. Well, I've read the draft protocol many times. I think
6 what you're reading from is from a forward that was suggested
7 by some people on the committee, and I don't think the -- I
8 don't think the forward has ever been incorporated yet into
9 the protocol itself. There are portions of that that you
10 read that I would agree with, other portions I might disagree
11 with.
12 Q. Isn't it true that the Environmental Protection Agency,
13 both in the Green Book and also in this draft protocol, which
14 addresses dust, do not accept the dust testing as a way of
15 assessing the condition of buildings because sonication,
16 which is the process you used, increases the number of small
17 fibers in the count, and that's misleading? Would you agree
18 with that, sir?
19 A. No, I wouldn't. The EPA -- if you recall the PEI study
20 on carpet cleaning, for example, was done using that exact
21 method. The EPA uses the method in their own -- their own
22 work.
23     I would agree that I think you will find some
24 increase in small fibers due to dispersion of clusters and
25 bundles at the ends of the bundles; but with regards to dust



1  sampling, honestly, I've never heard anyone really argue that
2  some other type of method should be used for analysis because
3  there -- for dust sampling, there is no other way to do it
4  other than to redeposit it.
5  Q.    In addition to your relying as part of your work in this
6  field on the EPA -- EPA draft protocol, don't you also rely
7  on a recent publication called the "Health Effects Institute
8  Report" that came out as a mandate from Congress?  Are you
9  familiar with that report?
10 A.    Which one are you talking about?
11 Q.    The "Health Effects Institute Report" that came out
12 several years ago.  Are you familiar with that report?
13 A.    Yes.  There's been three reports.
14 Q.    Okay.  The one I'm referring about is "Asbestos in
15 Public and Commercial Buildings, a Literature Review and
16 Synthesis of Current Knowledge."
17 A.    Yes.
18 Q.    Okay. And isn't it true, sir, that what they say about
19 dust is that sampling surface dust is a particular problem as
20 there is no expectation of uniform dispersion and many
21 samples must be taken and either separately analyzed or
22 combined into a single sample -- into a single analysis.  The
23 latter may give misleading results.
24        So don't we have now three sources that you rely on
25 in your field, the EPA Green Book, the EPA draft protocol and

1 now the Health Effects Institute, that say dust sampling is
2 misleading?
3 A. Well, I think I would agree with what HEI said on that,
4 but -- and am working with HEI at the present time on two
5 research studies, one of which involves the settled dust
6 testing in public and commercial buildings. So I wouldn't
7 say that they just abandoned the method. I would agree that
8 you can't take a surface dust sample and then say this is
9 what someone is breathing. That would be inappropriate to do
10 that, and I'm not trying to do that at all. What it does is
11 gives you an approximation of what is present on a surface to
12 help you prevent exposure in the future, because you know
13 this is here, and that's the main purpose for doing it.
14        MR. CHILDS: Your Honor, based on the Green Book
15 and the EPA protocol and the HEI report, the statements I've
16 just read, again we would renew our motion that the Court has
17 discussed with us, the Frye motion.
18        THE COURT: I overrule the renewed motion. And
19 again we have a break.
20        Members of the jury, please remember the admonition
21 I've previously given you. At this time we will recess until
22 3:20 -- 3:20.
23        (Recessed at 3:05 p.m., Tuesday, May 26, 1992.)
24
25

*Fry Motion* — Vol. 9
*Library*

IN THE UNITED STATE
FOR THE DISTRICT
SOUTHWESTERN

MDU Resources Group, Inc., d/b/a )
Montana-Dakota Utilities Co.,    )
                                 )
            Plaintiff,           )
                                 )
       -vs-                      )   Civil No. <u>A1-90-122</u>
                                 )
W. R. Grace & Co. and            )
W. R. Grace & Co.-Conn.,         )
                                 )
            Defendants.          )

<u>TRANSCRIPT OF TRIAL</u>

Taken at
United States Courthouse
Bismarck, North Dakota
May 28, 1992

BEFORE THE HONORABLE BRUCE M. VAN SICKLE - SENIOR JUDGE
-- AND A JURY --



EMINETH & ASSOCIATES
Court Reporters
BISMARCK, NORTH DAKOTA
255-3513



RPR
Registered
Professional



COPY



1   decision. It is not reliable science and it is not something
2   that is relied on by experts in the field, and the
3   foundation, I think, as Your Honor knows, has come up; so we
4   would just make that objection for the record.
5        THE COURT: I think the question is whether or not
6   you can get him to say -- or get somebody to say before he
7   starts to testify -- that his scientific method is not
8   scientific or at least not recognized as scientific. I doubt
9   that -- I guess you're right there. I doubt that he'll say
10  it, but maybe somebody else will. I don't know. But I've
11  got to have -- as it stands, you know. But nevertheless,
12  yes, by all means, your motion is in order. I deny it, to
13  keep the record clean, and until something develops, if you
14  can bring it up, why it won't bother me at all to direct the
15  jury to disregard the testimony.
16       MR. CHILDS: Thank you, Your Honor.
17       THE COURT: All right. Let's give the jury a
18  chance -- I want to talk to them a second.
19       (Recessed at 1:33 p.m. until 1:36 p.m., the same day, at
20  which time the following proceedings were continued in open
21  court, in the presence of the jury:)
22       THE COURT: Mr. Speights.
23  Q.   (MR. SPEIGHTS CONTINUING) Dr. Longo, Mr. Ewing has
24  already testified that the results of the dust samples in
25  this building were an average of 78 billion 600 million. Was