UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Bankruptcy No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

## TABLE OF CONTENTS OF APPENDICES TO

## ZONOLITE ATTIC INSULATION CLAIMANTS' REPLY TO GRACE'S MEMORANDUM IN OPPOSITION TO ZAI CLAIMANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE W.R. GRACE'S CONSUMER PROTECTION LIABILITY [RE: DOCKET NO. 4007]

**Appendix No.**  **Description**

A    Photographic Exemplars re: Attic Use

B    Photographic Exemplars re: ZAI in Fixtures

C    Photographic Exemplars re: ZAI Sifting

D    Report of ZAI Disturbance by Category

E    Photograph of ZAI Product Packaging

F    Expert Report of John Kilpatrick, Ph.D.

G    Declaration of John Kilpatrick, Ph.D.

H    Expert Report of William Ewing, CIH

I    Excerpts from Depositions of Homeowner Ralph Busch

J    Excerpts from Deposition of Homeowner Brendon King

K    Excerpts from Deposition of Homeowner Jerri Dillon

L    Excerpts from Deposition of Homeowner Shawn Dillon

M    Excerpts from Depositions of Homeowner Rand Hatch

N    Excerpts from Deposition of Homeowner Clarke Russ

O    Excerpts from Deposition of Homeowner Leon Cohen

P    Excerpts from Deposition of Homeowner Robert Parks

**Appendix No.**    **Description**

Q       Excerpts from Deposition of Homeowner Gladwin Worden

R       Excerpts from Deposition of Homeowner Kurt Salisbury

# ATTACHMENT A

# PHOTOGRAPHIC EXEMPLARS – ATTIC USE



**MICHIGAN HOME (Koski):**

Attic with ZAI used for storage.

**WASHINGTON HOME (Matthews):**

Attic with ZAI used for storage.

# ATTACHMENT B

# PHOTOGRAPHIC EXEMPLARS – ZAI IN FIXTURES



**WASHINGTON HOME (Whitmore):**

ZAI coming through ceiling vent..





**MICHIGAN HOME (Koski):**

Wiring running through ZAI.

ZAI Fixture Exemplars: Page 1



**MARYLAND HOME
(Worden):**

ZAI comes through ceiling vents – view from below.



**MARYLAND HOME
(Worden):**

ZAI coming through ceiling vents – view from on top.

.

.

# ATTACHMENT C

# PHOTOGRAPHIC EXEMPLARS – ZAI SIFTING



**NEW YORK HOME (Kwas):**

Basement floor, ZAI migrating from wall.

**MARYLAND HOME (Worden):**

ZAI migrating into laundry room.



**MARYLAND HOME (Worden):**

Basement flooring, ZAI migrating from walls.

ZAI Sifting Exemplars: Page 1



**IDAHO HOME
(Salisbury):**

Children's bedroom flooring, ZAI migrating from attic ceiling.



**IDAHO HOME
(Salisbury):**

Children's closet, ZAI migrating from ceiling.



# ATTACHMENT D

# ZAI Disturbance by Category

| Disturbance Type | Disturbance Summary |
|---|---|

**Chronic Intrusion**

The attic extends over an outdoor small porch and there is constantly air circulating up into the attic, resulting in dust on everything. Concerned about air circulating through ventilation system into home.

The ZAI trickles down into the home through seams in the ceiling, which homeowner has tried to seal with duct tape.

The ceiling in the home is coming apart and ZAI can be found in the living spaces.

ZAI seeps through the lights in the ceiling.

Family did major remodel of home. Tore out all of the inside walls and ZAI was in the stud cavities. This was a "family project" and the children helped scoop up and bag the fallen ZAI. The remodel project took months. The home was like a construction site during this time and there was dust everywhere. They also put a lot out of the ZAI in their garden and gave it away to friends to put in their gardens because they had heard how good it was to use vermiculite in gardens to absorb water.

Furnace returns have ZAI falling into them; some of the ZAI trickles down into the walls and homeowner has to vacuum it up if it falls out into home; ZAI trickles out of outlets/light fixtures.

When a bathroom was gutted, ZAI fell out and when homeowner used the Shop Vac to vacuum it up, dust was spread all over. When ceiling fans were installed, ZAI fell down during the installation. Also, whenever they turned on one of the fans, ZAI fell down (it still does, but they no longer turn the fan on).

The ZAI falls down into his house.

Water damage caused roof and vermiculite to come down in the bedroom some time ago.

The furnace is located in the attic, which has ZAI.

Insulation is falling down through cracks where the wood meets the ceiling, especially in bedroom. A piece of Zonolite fell into her eye and the doctor had to remove it.

Zonolite comes down through vent in bathroom. She has simply been cleaning it up over the 30+ years she has lived there.

ZAI comes down when the homeowner cleans the bathroom vents; has a fan in the attic to draw hot air out in the summer, which is needed because she has no air conditioning; during a kitchen remodel, ZAI fell down into the home.

| Disturbance Type | Disturbance Summary |
|---|---|
| | ZAI is falling from light fixtures in the living room, dining room, and bedroom whenever light fixtures are changed. |
| | The ZAI filters into his home. The bathroom vents out into attic and he is worried about dust contamination. |
| | ZAI is sifting down into son's bedroom that is located beneath the portion of the attic with ZAI. |
| | The Zonolite is in the attic and walls where it is sifting through (he can see it). |
| | Has 3 kitchen windows that slide up into wall and when he slides them up, ZAI comes down. Has three lights in the ceiling where ZAI comes down if the door slams. |
| | ZAI has been sifting down through the plywood into the family room for years. |
| | She remodeled her bathroom approx. 2 years ago and remembered the insulation falling out. She indicated she was exposed to the material over the course of about three weeks as her bathroom was going through this major remodeling. |
| | Pieces of ZAI are sifting down into living area all the time. |
| | The crawl space is in the pantry and they have ZAI falling into the pantry. |
| | ZAI sifts down into home from ceiling, which is knotty pine plank. |
| | ZAI comes down through the rafters. ZAI leaks through into the closets; ZAI is leaking into the children's rooms. |
| | The ZAI still leaks down through the ceiling wherever there are holes for lighting, etc. |
| | ZAI leaks from the attic through the light fixtures, cabinets where they meet the wall/ceiling in kitchen, stove fan, all-house fan every time it is turned on or off, fireplace (main floor), along the entire perimeter of walls in the basement, in the basement near the washer where the drainage hose/pipe enters the wall, and in the basement where the water pipes (with valves) enter the wall. Every time the stove fan is turned on, pieces of ZAI fall out. Even time homeowners turn on or off the all-house fan, a handful of ZAI falls from the fan. Every time a door or window is opened or closed, ZAI is knocked loose. "All-house" fan is a 2' x 3' fan in ceiling which opens into the attic and sucks air from the house into the attic. |
| | During a kitchen remodeling project, homeowner and her two-year-old daughter were exposed for 6 months. |
| | Homeowner has an attic vent to move air and is now afraid to use it. |
| | In the basement, there is a hole in the wall near the cellar door where ZAI is leaking out onto the floor. Currently about a 1 lb. coffe can full has accumulated on the floor underneath the hole. |

| Disturbance Type | Disturbance Summary |
|---|---|

He has forced hot air heat and us concerned as to weather that moves the fibers, since it draws air through the house and, presumably, through every crack it can find.   Wonders if furnace filter will take the asbestos particles out of the air.

In the basement, under the dining room, ZAI leaks out through knot hole (approx. 1 coffee can per year).   The removal of a kitchen wall caused approximately a cubic yard of ZAI to spill out.

ZAI is falling out of garage walls.

Homeowner has dust filtering down from attic into bathroom.

Has cleaned up 3 or 4 ZAI basement spills since owning home.  There is leaking into the basement from the wall where a 2" steel sewer pipe goes into the wall.  The hole that it leaks from is the size of a quarter.  Has cleaned up the pile that accumulates about 4 times.  Last time was 2 months ago where a gallon pail full was found.

The attic doubles as storage and son's bedroom.  There is a floor (covered by carpet), but there is a 8" gap between the wall and the floor around the perimeter of the attic.

Both upstairs bathroom exhaust fans exhaust through the attic.  Homeowner discovered that the exhaust tubing had come loose and was lying on top of the ZAI.

ZAI drifts down into the living space between the living room and the kitchen during extremely windy days, about 4 to 5 times a year.  The pile that accumulates on any one event was described as being enough to be noticeable.  Up until learning of dangers, when ZAI would sift through the ceiling into the living room/kitchen area, they would vacuum it up.  Now they use a wet cloth.

The furnace is in the attic and homeowner is concerned about whether contaminated dust was possibly blowing air down into the home.

ZAI trickles down into living areas of the home.

ZAI is still in the attic and occasionally falls through duct work into the basement and other areas.

Attic has been used as a living space and office space since they moved in about 17 years ago.  The floorboards are pretty old and have lots of gaps.  It is an old home.  Concerned about health.

Has ZAI above bedroom and family room.  Sometimes the little particles leak through the light fixtures and some of the paneling.  They have had it about twenty years.

| Disturbance Type | Disturbance Summary |
|---|---|

Homeowner is greatly concerned about his family and their being around the dust from items in the attic.   When remodeling to build staircase into attic from family room, ZAI fell into home and contaminated carpets. He feels that he should replace the duct work because he is worried about the dust flowing through the air vents.  He also feels that he needs to throw away many if not all of the items in the attic.  He is planning to throw away carpet and put new carpet down.

They did lots of remodeling projects in which the Zonolite poured into the house.  Put in a window (in the kitchen) and the Zonolite just filled into the room.  It is still coming through the outlets.

When they pull down the attic stairs, ZAI falls down into living area.  Items used in home are stored in attic.

ZAI apparently leaks into home because some is piled in a corner in the utility room.  They have not disturbed it.

Has ZAI, at least in the bathroom.  It seems to come out by the pipes.  They have had it for years and never knew what it was.

A complaint the homeowners have had since they moved into the house (12 years ago) is that they have never had such a dust problem in a house before.  It's an old, drafty house that could be blowing this stuff everywhere.

Homeowner states they have something in their basement that looks like ZAI.  It is falling into the basement in a steady trickle and homeowner has handled the stuff and vacuumed it up.

Adult daughter has a bedroom in the attic next to an area where there is exposed ZAI.  They use the area with exposed ZAI for storage and the daughter's computer is right next to this storage area.

Had a second story put on the house 19 years ago and she has found these pellets all over the house.  She has 2 suspended ceilings on the first floor and when she changes the florescent bulbs, these pellets fall out onto the floor and in her face.

Family was exposed when homeowner did a rehab project on the plumbing where the wall had to be torn out.  He handled lots and lots of the ZAI.  The wall stayed open about 2 weeks before the job was finished.  Also have disturbed the ZAI in the attic.  The kids played hide and seek there.

ZAI seeps through into the home and the children have been around it.

There are vents in the attic and homeowner is concerned about whether dust is getting into the rest of the house.  The insulation also falls down through the dryer vent.

*Page 4 of 24*

| Disturbance Type | Disturbance Summary |
| --- | --- |

Homeowner finds several pieces of this material on a regular basis on the floor of the Family Room. Also shelves in their "storage" are coated with this material. In the past homeowner would just sweep it up off the floor and scoop it off the shelves into the garbage. Their two year old toddler spends much of his day in the family room.

ZAI leaks from the attic through the light fixtures, cabinets where they meet the wall/ceiling in kitchen, stove fan, all-house fan every time it is turned on or off, fireplace (main floor), along the entire perimeter of walls in the basement, in the basement near the washer where the drainage hose/pipe enters the wall, and in the basement where the water pipes (with valves) enter the wall. Every time the stove fan is turned on, pieces of ZAI fall out. Every time homeowners turn on or off the all-house fan, a handful of ZAI falls from the fan. Every time a door or window is opened or closed, ZAI is knocked loose. "All-house" fan is a 2' x 3' fan in ceiling which opens into the attic and sucks air from the house into the attic.

Has cleaned up 3 or 4 ZAI basement spills since owning home. There is leaking into the basement from the wall where a 2" steel sewer pipe goes into the wall. The hole that it leaks from is the size of a quarter. Has cleaned up the pile that accumulates about 4 times. Last time was 2 months ago where a gallon pail full was found.

The attic doubles as storage and son's bedroom. There is a floor (covered by carpet), but there is a 8" gap between the wall and the floor around the perimeter of the attic.

Both upstairs bathroom exhaust fans exhaust through the attic. Homeowner discovered that the exhaust tubing had come loose and was lying on top of the ZAI.

ZAI drifts down into the living space between the living room and the kitchen during extremely windy days, about 4 to 5 times a year. The pile that accumulates on any one event was described as being enough to be noticeable. Up until learning of dangers, when ZAI would sift through the ceiling into the living room/kitchen area, they would vacuum it up. Now they use a wet cloth.

## Future Renovations

Has a great deal of remodeling work that needs to be done, but now he can't do it (new roof, kitchen remodel, replacement of old wiring).

Homeowner bought this house with plans to open up the attic. A contractor that homeowner hired to do remodeling work refused to do further work upon discovery of the ZAI in the attic. Now she cannot renovate.

Homeowner, who is in the middle of remodeling, has a lot of additional work to do, but this will disturb the ZAI. All projects are now on hold.

Homeowner wants to add insulation on top of ZAI but can't - he also has not done renovations that he wants to do because of ZAI.

Owner wants to install a vent, but can't without disturbing ZAI.

| Disturbance Type | Disturbance Summary |
|---|---|

He is planning on replacing the roof which will cause additional asbestos exposure.

Was interested in rehabilitating the home (small house used for storage), but is now considering demolition due to the ZAI.

Homeowners had wanted to do renovations, although no immediate plans.

He has an exhaust fan he wants to install, but can't because of the Zonolite.

Home is in need of significant renovations, which would include work in the insulated area.

Homeowner had other remodeling projects that are on hold because he now knows not to disturb the ZAI. He is looking into refinancing to have the ZAI removed, duct work replaced, and carpet that is contaminated replaced.

Has been considering remodeling their 1950's rancher. Does not want to incur extensive removal costs if he does remodel.

Homeowners have future plans to put attic to use as a work area.

She has been considering adding a heating/ventilating fan to the bathroom, which would involve going into the attic and disturbing the insulation.

She needs a new roof this year and doesn't know what to do. Is worried about whether she can sell house if needed (she is elderly).

Home is in need of significant renovations, which would include work in the insulated area.

**Installation**

As a child, he spent a day in the attic watching his father and others install the ZAI.

Homeowner installed ZAI himself. When he installed the Zonolite, he drilled holes where the rafters are through 2x4's. He drilled one hole every 16" and there is 50 feet on each side of the attic. He then poured the Zonolite from the bag into piles between the rafters and used his hand to push the Zonolite into the holes. On the ends of the rafters, he could pour directly from the bag into the attic rafters. The insulation project took him two days to complete, including the drilling. He would drill and then fill the holes as he went along.

He spread and installed this throughout his attic in 1967 or 1968. He wore no facial protection - no danger warnings on bag. He opened bags of Zonolite and spread crushed asbestos in ceiling and then burned the empty bags in his fireplace.

| Disturbance Type | Disturbance Summary |
|---|---|

Homeowner had a new roof placed on his current residence in 1972. He personally installed the ZAI at that time. The roof was off the house while he was placing the first 30-40 bags, but plywood was put in place while he continued with the next approx. 100 bags. He installed the ZAI by cutting the bag open and pouring it out. He then used a garden rake to level it out and spread it around. He remembers seeing the fine dust. He also poured ZAI into walls that had an access hole.

Homeowner (former Grace worker) discussed the time it takes to install Zonolite Attic Insulation—usually a day, although Grace advertised that it took less than a day. He had installed 50 bags in his own home (which took approx. a day). He also recalls that it was very dusty.

Home had existing ZAI when purchased in 1962. Homeowner purchased 55 more bags in the late 60's to early 70's which he installed himself. He actually fell through the ceiling a couple of times while installing it and into the ZAI. It was very, very dusty and in the heat of the summer.

Bought home in 1956 and insulated it with Zonolite. It was a small house, and he spent about a week putting it in off and on. He was also putting sheetrock up (Celotex) in the living room and would alternate this with installing the Zonolite.

Homeowner installed ZAI in October or November 1965. He covered a 1240 square foot attic and poured it 4 1/2 inches thick. He believes it was over 100 bags. It took him two days to install the ZAI. He would haul up about 5 bags at a time, then pour the contents of the bags and go down for more. He burned the empty bags. It was very dusty and there was no ventilation in the attic.

When he installed the ZAI, he created a lot of dust. He used a normal white 3M mask (not asbestos rated). In the house after the installation, dust covered everything because it had come through the all-house fan, fan on stove, light fixtures, and any cracks in walls. Everyday he sees ZAI pieces and dust because it falls from attic anytime he shuts a door or window, turns on the stove fan or all-house fan, or walks down/up stairs to basement. There is a lot of ZAI dust that settles on the stove (from fan), underneath the all-house fan, and around the washer/dryer.

Upon purchasing home in 1994, homeowner found two full bags of ZAI in attic that were still unopened. He opened them and spread them around.

Homeowner poured approx. 30 bags of Zonolite into his attic himself in 1973. It took him 2 weeks to complete the insulation project - he would pour a few bags at a time. It was very dusty and he wore no mask. There was a light layer of the pink insulation in the attic and he poured the Zonolite on top of it. He put it throughout the attic.

In the early 1980's, he purchased and installed the Zonolite Attic Insulation himself. He purchased approximately 28-30 bags from either Central Hardware or B&B Supply (both are now out of business). He is certain the salesman (whom he knew) had no idea that there was any danger with this product. He thinks it took only 1 day to install.

| Disturbance Type | Disturbance Summary |
|---|---|

Installed the ZAI in the late 1970's. Took approximately 8 hours.

Homeowner and daughter found several open bags of ZAI in the attic of a home they purchased in approximately 1996. They opened and spilled the ZAI. Is not sure of extent of ZAI as there is rolled insulation showing in most of the attic.

Homeowner was exposed during installation, which took approximately 10 to 12 hours.

Husband installed the insulation in the early 1970's for a total of 8 to 10 hours over the course of a few days. Wife put ZAI into her garden.

Homeowner installed ZAI in home attic in 1959 or 1960. He believes it was more than 20 bags and was installed at least 5 inches deep. He didn't know the square footage. He has been diagnosied with bilateral pleural plaque.

Homeowner states that he installed about 200 bags in attic and it is about a foot thick.

When he installed the ZAI, he created a lot of dust. He used a normal white 3M mask (not asbestos rated). In the house after the installation, dust covered everything because it had come through the all-house fan, fan on stove, light fixtures, and any cracks in walls. Everyday he sees ZAI pieces and dust because it falls from attic anytime he shuts a door or window, turns on the stove fan or all-house fan, or walks down/up stairs to basement. There is a lot of ZAI dust that settles on the stove (from fan), underneath the all-house fan, and around the washer/dryer.

## Planned Renovations

Homeowners insulated the ceiling of the attic with fiberglass insulation; project took a few days, so homeowner was in attic (where exposed ZAI is located) for an extended time.

When homeowner removed ceiling tiles during a renovation, Zonolite fell down everywhere.

Homeowner was performing a major remodel of his home. Was tearing out the ceiling. His plan was to remove the entire ceiling, but every time he pulled walls off the side, ZAI was falling out everywhere. He was trying to remove the Zonolite and was about one and one-half weeks into the project when he read in newspaper about asbestos in Zonolite.

Major remodeling of home disturbing ZAI, including: repair of inadequate roof bracing in the attic; removal of wall paneling, exposing cracks from which ZAI would seep; opening up of a stairway wall; and remodeling of the kitchen which required demolition of walls and ceiling causing disturbance of the ZAI located in the ceiling and walls.

| Disturbance Type | Disturbance Summary |
|---|---|

Homeowner was in the middle of a major all-encompassing remodel when he read news article about ZAI. They started everywhere at once, started pulling every board off, cabinets, tearing out ceiling and walls. Every time he broke into the ceiling ZAI came pouring out. Zonolite was also in the cinder block walls, which homeowner was also removing. Homeowner took out all inside walls of the home except for one wall. Homeowner redid all of the electrical in the house with new 200 amp service and all new electrical. Homeowner redid all the plumbing, water supplies, vents, drains.

Homeowner took out a three foot section of the wall to enlarge the ceiling, which caused ZAI to come out.

Homeowner disturbed ZAI when installing heating ducts in his home.

Homeowner installed fiberglass insulation over the ZAI; during the project, ZAI was disturbed and homeowner took some of the ZAI out.

Replaced a door, which caused ZAI to pour out of the walls.

The entire family was significantly exposed to ZAI about 10 years ago when they did a major remodel of their home. They literally tore down every inside wall of the house during this time. When they broke a hole in the stud cavity (which extends up a long way because it is an older house), vermiculite came pouring out onto them. She and her husband would do the heavy work (pulling down the lath and plaster) and their children were given the job of scooping up the vermiculite that fell out with dust pans and shovels and putting it in plastic bags. She said they must have bagged dozens and dozens of bags. They would fill many garbage bags out of EACH stud. Sometimes they used snow shovels and scoop shovels because there was so much.

They also installed a furnace in the attic and hired this work out. The workers were exposed to the ZAI when installing the furnace and they also bagged a great deal of it before laying other insulation on top of whatever remained.

Homeowner assisted in remodeling the bathroom. It was completely gutted (they tore down all the walls and ceiling). The ZAI fell out and he vacuumed it up with a Shop Vac, which spread dust all over.

Home improvement activities include cutting ventilation holes in the ceiling; installing a ceiling exhaust fan.

Homeowner sheetrocked and installed additional insulation in attic; also had 1/2 of the attic remodeled to put a master bedroom with a walk-in closet up there.

Homeowner did some remodeling in the kitchen and vermiculite was falling down all over the place. Has had wiring done and also had someone go into the attic to repair a vent and those activities disturbed the ZAI and exposed the workers.

Homeowner disturbed ZAI while doing work in the attic re-insulating it. The local energy company did the work, and the homeowner was up in the attic with them. There was very heavy dust. The project took 2-3 days.

| Disturbance Type | Disturbance Summary |
|---|---|
| | When they had an alarm system installed, one of the employees accessed the attic to install the system and was exposed. |
| | Discovered the existence of the ZAI after they disturbed it in a kitchen remodeling project the winter of 2000. |
| | When ceiling was taken out of the bathroom, ZAI came raining down. |
| | Homeowners installed a floor over the ZAI in approximately 1999 to convert the attic into living space, and had a lot of exposure during project. The second story is used as a bedroom. |
| | Owner installated other insulation on top of the ZAI. |
| | Remodeled a room by expanding the roof upward; removed the ZAI by hand. |
| | Homeowner has spent time in attic installing another type of insulation over the top of the existing ZAI. |
| | Homeowner has disturbed ZAI when removing waxed plaster from ceiling. |
| | Homeowner has cut into the ceiling to make storage area in attic, which has disturbed ZAI. |
| | She remodeled her bathroom approx. 2 years ago and remembered the insulation falling out. She indicated she was exposed to the material over the course of about three weeks as her bathroom was going through this major remodeling. |
| | When homeowner installed cupboards on back porch, insulation began sifting down. |
| | Homeowner installed another insulation over the top of the ZAI and disturbed ZAI during this project. |
| | He has done major renovations on the home. He said he basically has remodeled the whole thing. He has done re-wiring that has exposed him to ZAI. He said he probably spent days up in the attic. He knows he has ZAI because he found a bag. Have been remodeling home off and on since purchased 15 years ago; house gutted and new walls installed (Zonolite sifted down). |
| | Homeowners have done major remodeling to the home. They are constantly adding to this house that started out as a shack. ZAI was added by homeowner each time they added on until about 1960 (built in early 1950s). |
| | Husband and father were up in attic installing furnace piping, when all sorts of stuff started sifting down into the house during the drilling (husband 2 full days and dad for 1 full day). |
| | Drywall work caused ZAI to fall down on them and into home. |
| | Homeowner has been remodeling home; ZAI pours down on him. |

| Disturbance Type | Disturbance Summary |
|---|---|

ZAI in home that homeowner has been renovating off and on since purchase in 1978. His first exposure was when he discovered the ceiling to exist of 1/4" plywood and started ripping down a 3'x7' piece bringing down all the asbestos up above. He swept up the mess, put it into bags, and "dumped" it into yard. He thinks the entire area covered by Zonolite is about 20'x30'. He also put new trusses on the roof and removed a 13'x13' portion of the Zonolite. He then drywalled over the rest of the plywood ceiling rather than removing it. He is still working on it and worried about being able to sell. There is an access hole where the hot water heater is located, but attic is otherwise not used unless he needs to go up for remodeling/wiring purposes.

Homeowners are in the middle of a complete renovation of the home; including finishing off the attic into a bedroom.

When took down wood paneling in living room, 2 to 3 coffe cans volume of ZAI fell from wall. A lot of dust was kicked up when this ZAI fell through.

ZAI has been disturbed while checking a support mount of a ceiling fan and tracking down wiring in the attic.

Homeowner has done renovations that have disturbed ZAI. Saw news story and has stayed out of attic. Feels like he has "a tiger sleeping in the attic."

In 1990, homeowner remodeled the parlor and moved the ZAI above the parlor to other areas of the home (wore a regular white dust mask). In doing so, he used a shovel to manually move the ZAI to other areas of the attic (primarily to above the living room and dining room).

They had air conditioning installed and also had their roof replaced - the contractors were in the attic during these renovations and would have been exposed to the Zonolite.

Put in whirlpool bathtub. Some ZAI fell through the wall (about a coffee can full). Put a plug for TV in the master bedroom, and ZAI fell through (about 2 shot glasses full).

Homeowner cut 7 vents into the roof of the house about 8" x 8". When the pieces fell through, they fell on top of the ZAI in the attic and stirred it up. Tore out a tub in the bathroom and a couple of cabinets. When he did this, he noticed ZAI had descended.

10 years ago, took out window "headers" to replace two old windows with new windows, and about 8 square feet at 3 1/2" deep spilled out.

Went into attic with daughter in March of 2002 to run cable for a satellite dish. They were up there for 15 to 30 minutes. He remembers a lot of dust was kicked up while they were up there. He has been up there approximately 9 other times for about 15 min. each time to do general maintenance such as leak reparirs and sealing up vents.

| Disturbance Type | Disturbance Summary |
|---|---|
| | Homeowner has been doing quite a bit of remodeling the past month which has disturbed the ZAI. First, he re-routed a bathroom vent that used to go through the attic so that it would vent directly outside (1 month ago). Then, he moved one wall while remodeling their bathroom about one month ago. This disturbed the ZAI and knocked about 1/2 cup loose, which they cleaned up with a shop vac which they had vent directly outside. He sealed the area where the ZAI leaked with caulk and put up sheet rock. |
| | Homeowner has spent some time in the attic for various renovation projects: running phone line and re-roofing the house, which left the attic completely exposed during the time he was doing that work. |
| | Repairs to ceiling in daughter's bedroom and repairs to roof involved disturbance. Have been working in the attic for several hours a day over the last few days. |
| | Had ZAI in the walls and ceiling of a cold room. This was discovered when the walls started deteriorating. They began tearing out the wall and ZAI began pouring out. |
| | Shortly after he bought the house, he moved walls, took down walls, and put in new flooring on second floor. Doesn't specifically remember ZAI being disturbed, but believes that the extent of the renovations would have necessarily disturbed the ZAI. |
| | They built a two bedroom addition on top of house. Doesn't remember specific instances of disturbance, but thinks it had to have been disturbed. |
| | Homeowner put another layer of conventional fiberglass insulation over the Zonolite several years ago - potentially exposing himself. |
| | Around 1979, homeowner started a remodeling project (shortly after purchasing the home). The home had a pull-down staircase and 1/2 bedroom in the attic. He decided to change this and make a full bedroom (for the kids) in this space. There was a partial floor in the attic with planks. The ZAI was poured in throughout the attic. He scraped the ZAI to the center of the room, smoothed it out, and then laid down fiberglass insulation over it. He then laid down particle board. He also put in a spiral staircase in place of the pull-down stairs and relocated the furnace into the attic. He was up in the attic for several days working on these projects. |
| | Homeowner discovered the ZAI in early 2002 when they did a remodeling project on the bathroom. His son and a friend of his son's did the work. When they took the drywall down, ZAI came pouring out. The son was wondering if it could be a problem because it was so dusty, so they went out and bought dust masks. They simply dumped the ZAI that fell out. |
| | Homeowner built a bedroom in the attic in 1970's, significantly exposing himself to ZAI. |
| | There was an old flue in the house. Homeowners went into attic and removed it, crawling through ZAI and knocking bricks down. |

| Disturbance Type | Disturbance Summary |
|---|---|

Homeowner has done extensive remodeling projects, including: installation of hot water system; running wires in the attic; installing TV cable wires; making part of the attic into a bedroom, etc. He has spent the equivalent of a few days up in a "fog of dust." The attic is not high, so you have to crawl and at times are crawling on your belly.

Renovations to kitchen caused ZAI to spill out from between the walls, with a considerable amount of dust.

Homeowners have also just completed many home improvements: kitchen, porch (w/ attic above), play room.

He did remodel once, where he took out a 3 foot section of the ceiling and about a garbage sack full of Zonolite poured out. He had the room cleaned.

Homeowner installed vents in the attic and was in the attic when a new power system was installed.

Homeowners have done extensive renovations to their home that was built in the 1940's and is full of Zonolite. Not aware of the dangers, they never wore anything more than a dust mask while shoveling and sometimes using a shop vac to get rid of the ZAI in the walls.

Homeowner has done a lot of remodeling in the house and worked in the attic a lot. There is ZAI in the attic.

Homeowner did a remodel to the home that disturbed the ZAI: he cut a hole in the ceiling of the family room to build a staircase into the attic for easier access. They use the attic for storage (basically everything a person who typically store such as Christmas items, hunting gear, winter/summer clothing, etc.) This project lasted 3 weeks. Before cutting the section out of the ceiling, he was in the attic removing and scooping aside as much of the ZAI as he could. However, even after doing that, when he cut the hole, the Zonolite filtered down everywhere and there was a great deal of dust. He vacuumed this up.

Just one month ago, homeowner did another major project in the attic. He put up supports in the attic and also pulled out and replaced old wiring in a portion of the house that he hadn't previously done. He said that for some of this, he literally had to lay down in the stuff to drill the holes into the 2x4's. He used a shop vac to try to clear it out and the dust blew everywhere.

They did lots of remodeling projects in which the Zonolite poured into the house. Put in a window (in the kitchen) and the Zonolite just filled into the room.

Homeowner recently did some remodeling and disturbed some insulation.

Homeowner recently did remodeling and ZAI was all over his home.

| Disturbance Type | Disturbance Summary |
|---|---|
| | Homeowner is concerned about the consequences since he did do some remodeling and was exposed to the fibers and dust. |
| | In early January, 2003, homeowner was remodeling his second floor. He pulled a ceiling down and a pile of ZAI fell down onto the floor about the size of three 55 gallon drums. He spent all day cleaning up the mess. |
| | Homeowner is presently remodeling their old house and the attic has been torn off. There is insulation that looks like the pictures of ZAI. Homeowner will confirm, but doesn't know what to do since remodeling is in progress. |
| | Has ZAI falling out of walls of the home into the basement. They began updating the home (built in 1951) when they purchased it August of 2000. Upon removing the ceiling tiles in the basement, ZAI, which was used to insulate the exterior walls, would spill out in spots. |
| | Homeowner had one exposure in particular that was for quite awhile. He was remodeling and made a hole in the ceiling and ZAI just came pouring out for about 15 minutes. It was quite a lot - about 3 large garbage bags full. |
| | Homeowner did significant remodeling when they moved into a home with ZAI about a year ago. This remodeling disturbed the ZAI. |
| | About a year ago, homeowner put in an attic ladder and was working with the insulation and stirred it up quite a bit. |
| | Home was built in 1950. They are in the midst of remodeling the kitchen and found vermiculite between the floor and subfloor. |
| | Has 2 homes (both built during the 1950's) with ZAI. He has had numerous occurrences of exposure to the product when doing home renovation projects. On several occasions, he had the dust in his mouth, nose, and clothing. |
| | ZAI is in attic and walls. Family was exposed when homeowner did a rehab project on the plumbing where the wall had to be torn out. He handled lots and lots of the ZAI. The wall stayed open about 2 weeks before the job was finished. |
| | Placed pink insulation on top of the ZAI. |
| | Husband has had to access attic with ZAI for renovation work. He has done work with the ventilation system and has done wiring work in the attic. |
| | He has ZAI in the attic and in the walls. He has done remodeling and has disturbed the ZAI that is in the walls (cutting holes). |
| | Homeowner has ZAI in the ceiling of a flat room home. During a bathroom remodel, ZAI fell down on him. It is between the rafters. Now he cannot finish his remodel. |
| | ZAI in the attic. Husband has done some ceiling work that resulted in ZAI falling down on him. |

| Disturbance Type | Disturbance Summary |
|---|---|
| | Homeowner states he has tons of this stuff lining his attic and has come in contact with it several times during home improvements. He is in the middle of one now in the bathroom. Does not know whether to leave it alone or finish the job. |
| | About 3-4 years ago, they remodeled the kitchen. When they redid the ceiling, ZAI came pouring out. They simply shoveled it up and put it in sacks. |
| | Homeowner is in the middle of a remodeling project where they are putting in a vaulted ceiling. ZAI has been falling around them. |
| | When took down wood paneling in living room, 2 to 3 coffee cans volume of ZAI fell from wall. A lot of dust was kicked up when this ZAI fell though. |
| | 10 years ago, took out window "headers" to replace two old windows with new windows, and about 8 square feet at 3 1/2" deep spilled out. |
| | Homeowner has been doing quite a bit of remodeling the past month which has disturbed the ZAI. First, he re-routed a bathroom vent that used to go through the attic so that it would vent directly outside (1 month ago). Then, he moved one wall while remodeling their bathroom about one month ago. This disturbed the ZAI and knocked about 1/2 cup loose, which they cleaned up with a shop vac which they had vent directly outside. He sealed the area where the ZAI leaked with caulk and put up sheet rock. |
| | Homeowner has spent some time in attic for varous renovation projects; running phone line and re-roofing the house, which left the attic completely exposed during the time he was doing that work. |
| | Had ZAI in the walls and ceiling of a cold room. This was discovered when the walls started deteriorating. They began tearing out the wall and ZAI began pouring out. |
| | Shortly after he bought the house, he moved walls, took down walls, and put in new flooring on second floor. Doesn't specifically remember ZAI being disturbed, but believes that the extent of the renovations would have necessarily disturbed the ZAI. |
| | Repairs to ceiling in daughter's bedroom and repairs to roof involved disturbance. Have been working in the attic for several hours a day over the last few days. |

**Planned Renovations: Ceiling/Wall Fixture**

Removed exhaust pipe to stove, and at least a small coffee can full of ZAI fell out onto the ground.

Put a fan into a second floor bathroom and cut into ceiling. Some ZAI fell from the ceiling.

**Planned Renovations: Electrical Wiring**

| Disturbance Type | Disturbance Summary |
|---|---|

Homeowner ran electric wire from the basement up to the attic, then back down through the walls to supply additional outlets in the bathroom and one bedroom (happened about 1 month ago and a couple of days ago respectively). While doing this, he said some dust in mild amounts was kicked up.

**Planned Renovations: Ceiling/Wall Fixtures**

Changing light fixtures causes ZAI to come down.

Homeowner installed a ceiling fan, which disturbed the ZAI and caused it to leak down into home.

Homeowner installed an exhaust fan in the kitchen and also had to replace a kitchen light which disturbed the ZAI.

Homeowner assisted with the installation of two ceiling fans. The ZAI fell down during the installation. Also, whenever they turned on one of the fans, ZAI fell down (it still does, but they no longer turn the fan on).

Homeowner installed an exhaust fan in the bathroom, which disturbed ZAI.

They did install a vent in one area of the house a few years ago. At that time, a hole was made and he had to clear everything out of the room below because of the dust and ZAI falling. That vent work is complete now and he hopes it is sealed up well.

A vent installed by his brother disturbed the ZAI in the attic.

Homeowner installed an electric exhaust fan, which disturbed the ZAI.

Installed a light fixture that disturbed the buried ZAI.

Installation of a bathroom fan caused a bunch of ZAI to come pouring out all over the place.

Son cut a hole in the ceiling in 1993 to install an exhaust fan.

ZAI discovered when homeowner was getting ready to repaint a bedroom and in removing the fixtures, ZAI started sifting down.

Removed exhaust pipe to stove, and at least a small coffee can full of ZAI fell out onto the ground.

Put a fan into a second floor bathroom and cut into ceiling. Some ZAI fell from the ceiling.

Homeowner had to spend time in the attic when installed a new bathroom fan. He had to scoop away the ZAI. It was very dusty.

Homeowner and his father had to access attic to run a wire down for a bathroom fixture.

| Disturbance Type | Disturbance Summary |
|---|---|
| | When they cut a hole in the wall to put in a phone line, ZAI fell out of the wall. They simply vacuumed it up. |
| | Homeowner has done some minor remodeling (installing ceiling fans, vent fans, etc.) which has exposed him to some amounts of the airborne dust. |
| | When homeowner went to replace a wall recepticle, ZAI came pouring out through the hole. |
| | Homeowners did some remodeling and plumbing work requiring that they break open the wall of their condominium. When the wall was opened this pellet-like insulation fell out. They vacuumed it up with a shop vac & threw it away. |
| | He fixed a broken pipe in the attic, again pushing around the insulation. |

**Planned Renovations: Electrical/Wiring**

| | |
|---|---|
| | Homeowner redid all the electrical in the house with new 200 amp service and all new electrical. All of the wiring goes through the attic, which has ZAI. |
| | Wiring is in the attic; homeowner has disturbed ZAI doing re-wiring project. |
| | ZAI was disturbed when homeowner had to have electrical work done. |
| | Wiring is in the attic and homeowner has disturbed the ZAI doing re-wiring work. |
| | Homeowner has done re-wiring and electrical work in attic, which has caused disturbance. He estimates he has been disturbing for up to 1/2 hour or more at a time and several times. |
| | Attic was accessed when running cables through it for an alarm system. |
| | Homeowner has done extensive electrical work involving working in the attic. |
| | Owner has hired an electrician who has spent a great deal of time in attic. |
| | Homeowner has worked around ZAI in attic for a few hours at a time while doing wiring project, installation of a Radon removal system, and installation of a central vac. |
| | Extensive wiring project in the attic area disturbed the ZAI. |
| | Homeowner has done most of the wiring in the home, disturbing the ZAI in the attic |
| | Homeowner as been in attic and disturbed ZAI when rewiring speakers in the ceiling. |
| | Zonolite Insulation in home, he and his brother disturbed insulation while working on wiring in attic. |
| | Homeowners have frequently added wiring to accommodate numerous additions to home, and have disturbed ZAI in attic each time. |

| Disturbance Type | Disturbance Summary |
|---|---|

They have disturbed ZAI from time to time by going into attic to do electrical work.

He has been up there to do electrical work about 4 times since owning the home. Would be up there about an hour to two hours on each occasion. Used a vacuum cleaner to clean up little amount of ZAI that would fall from access hole when cover removed to access the attic.

Homeowner ran electric wire from the basement up to the attic, then back down through the walls to supply additional outlets in the bathroom and one bedroom (happened about 1 month ago and a couple of days ago respectively). While doing this, he said some dust in mild amounts was kicked up.

Remodeling projects by homeowner include running wires in the attic and installing TV cable wires.

Homeowner has had to access attic to do wiring work and also to run new power (new power system was installed).

Homeowner re-wired a major portion of the house after purchasing it (purchase date is 1996). He had to replace the old existing wire and replace it with new wire. To do this, he had to move the ZAI from around the joists to pull out the old wire and run the new wire/drill holes, etc. He was in the attic for one week, approximately 2-3 hours per day. Note: Tests came back showing tremolite at 2%.

Homeowner did a lot of rewiring and moved the insulation around quite a bit, breathing in a lot of dust.

Has spent a fair amount of time in the attic running new wiring.

He has done electrical work in the attic in which he has had to push the insulation around creating dust.

Homeowner removed floorboards in the attic to install new wiring and a bath fan and disturbed much of this product, including use of a shop vac to vacuum up extra debris.

Homeowners remodeled their attic 1998 to 1999. They have been in contact with the Zonolite Attic Insulation. They moved it around to work on electrical and install new floor joists.

Homeowner has done some re-wiring in which he has had to dig through the ZAI with his hands. He would spend about an hour at a time in the attic doing rewiring and other projects where he had to disturb the ZAI.

**Removal/Clean-up**

Homeowner was tearing out ceiling and walls remodeling home. He decided to remove the ZAI, so it would not fall down on them. He started to clean up the attic using a vacuum, but couldn't contain the dust, so he started scooping it into bags with a short-handled shovel and hauled it to the dump. After reading about danger of ZAI (half-way through project), he paid to have ZAI professionally removed.

| Disturbance Type | Disturbance Summary |
|---|---|
| | Homeowners would use a broom, shop vac, or vacuum cleaner to collected the ZAI and discard it in the garbage, or place it in their gardens, household compost, and yard. |
| | Homeowner was forced to have ZAI professionally removed in order to finish the renovation project. Had to lift roof to remove it all. Extremely expensive. |
| | Wife would sweep the attic floor over to the edges where ZAI is exposed. (Note: ZAI has now been professionally removed). |
| | Homeowner has dug through and scooped up the Zonolite to mix with soil in his garden. |
| | Homeowner used a shop vac to clean up vermiculite when it poured out of his walls when he replaced a door. He shoveled up all the ZAI in attic into black plastic bags and hauled it either to the dump or disbursed it in his garden or neighbor's garden. |
| | ZAI was cleaned with a vacuum and a broom when it poured out of the ceiling into the living room during ceiling repair work. |
| | During a major remodel of an older home, when the ZAI fell out of the wall studs, their children had the job of scooping it up with dust pans and shovels and putting it into garbage bags. Sometimes they used snow shovels and scoop shovels because there was so much. Many bags of ZAI were filled from EACH stud cavity. They filled dozens and dozens of bags. |
| | Homeowner used a Shop Vac to vacuum up ZAI that fell out during bathroom remodel, which spread dust all over. |
| | During attic remodel, they swept up the insulation, bagged it and disposed of it. |
| | Homeowner has just been vacuuming ZAI up that falls into home through light fixtures. |
| | Homeowner was sweeping up ZAI that came raining down into bathroom when ceiling was taken out. |
| | During room remodel, homeowner shoveled the ZAI out of the remodeled room on her hands and knees and disbursed the ZAI in the yard. |
| | In 1957, their house (with ZAI in attic) was in snowslide and demolished. He had to tear the house down and remove the Zonolite. Was entangled in this project for probably a month. At that time, he burned all the lumber that he couldn't salvage. Everything else was taken to the landfill. It was wet and slick from the Zonolite getting so wet. |
| | Homeowners who had ZAI sifting into home during remodel have been sweeping it up. |
| | Homeowner has used shop vac to clean up ZAI. |

| Disturbance Type | Disturbance Summary |
|---|---|

Took a 3'x7' section of ceiling off and swept all the falling ZAI up into bags and distributed over yard area.

Homeowner doing major remodel to home. As part of project, they were attempting to remove the ZAI from the attic themselves. Homeowner was up there for 2-3 days cleaning it out for at least 8 hours per day. She and two teenage children used a whiskbroom and dustpan, and also a vacuum, to clean it up, bag it and take it to the dump.

Homeowner uses a dust pan to clean up ZAI usually. Used a vacuum cleaner to clean up ZAI during kitchen remodel. Used a shovel when moving ZAI from above parlor to other areas of the attic during a 1990 remodel. In 1995, they remodeled the kitchen and when they removed a kitchen wall, approximately a cubic yard of ZAI spilled out.

Has used a dust pan and broom to clean up ZAI that leaks into basement

While moving a bathroom wall, about 1/2 cup of ZAI was knocked loose. Homeowner cleaned it up with a shop vac and had it venting to outside the house.

Homeowners with ZAI pouring out of walls during renovation of cold room in basement, simply used a shop vac to get it out and dispose of it. They filled 3 garbage bags full. They kept a sample and had it tested and it came back 2.7% tremolite. The lab told them this was not good.

On one occasion when homeowner accessed the attic, some ZAI fell to the floor below the access door (a few cups full). He cleaned it up with a vacuum cleaner.

Have used vacuum cleaner to clean up ZAI when it has fallen through the ceiling. Now use a wet cloth to clean up the ZAI.

During ceiling work in late January, 2003, some of the ZAI was scooped up and put into garbage bags. Homeowner swept it up and bagged it. Tried vacuuming with a shop vac. Does not know what to do now with garbage bags. (Saw a news program prior to getting rid of the bags).

During a bathroom remodel, homeowner had to remove some of the ZAI that fell down. He just swept it up and says he probably just buried it somewhere on their property.

Used shovel and sometimes a shop vac to get rid of ZAI in the walls.

During wiring projects, homeowner used a shop vac to try to clear it out and the dust blew everywhere. During renovation project, he scooped ZAI away from hole he needed to cut and vacuumed the ZAI that still fell down into home.

When ZAI fell out of wall, they vacuumed it up with a shop vac and threw it away.

| Disturbance Type | Disturbance Summary |
|---|---|
| | As a teenager and then into his twenties on their Farm, he removed/disturbed very large volumes of vermiculite from the farm sheds (large chicken houses, barns, storage sheds) by hand shoveling, as they converted these buildings for other uses. He does remember stirring up quite a bit of dust. |
| | During renovations in attic, homeowner has bagged up some of the ZAI and thrown it away. |
| | Homeowners have removed ZAI from a hall and part of the kitchen. |
| | Homeowner also had a section of her hallway ceiling removed to check plumbing pipes, and a very large amount of ZAI fell down into her hallway.  She swept it up. |
| | When ZAI came pouring out of ceiling during kitchen remodel, they simply shoveled the ZAI up and put it in sacks. |
| | Homeowner has vacuumed the ZAI and also has swept it around. |
| | Homeowners have been vacuuming up ZAI that has been falling down during remodeling project. |
| | Has used a dust pan and broom to clean up ZAI that leaks into basement |
| | While moving a bathroom wall, about 1/2 cup of ZAI was knocked loose.  Homeowner cleaned it up with a shop vac and had it venting to outside the house. |
| | Homeowners with ZAI pouring out of walls during renovation of cold room in basement, simply used a shop vac to get it out and dispose of it.  They filled 3 garbage bags full.  They kept a sample and had it tested and it came back 2.7% tremolite.  The lab told them this was not good. |
| | On one occasion when homeowner accessed the attic, some ZAI fell to the floor below the access door (a few cups full).  He cleaned it up with a vacuum cleaner. |
| | Have used vacuum cleaner to clean up ZAI when it has fallen through the ceiling. Now use a wet cloth to clean up the ZAI. |

**Repairs**

| | |
|---|---|
| | He needs to tear out the ceiling of his house because of water damage from a broken pipe. Will disturb ZAI to do so. |
| | Homeowners discovered ZAI when having repair work done to the ceiling; ZAI poured out of the ceiling into the living room. |
| | Homeowner had to do repair work to his chimney, which required him to go into attic and disturb ZAI. |

| Disturbance Type | Disturbance Summary |
| --- | --- |

A ceiling joist broke and pulled many tiles off the ceiling, dumping a large amount of Zonolite into a bedroom. Another accident, the same day dumped more Zonolite into the same bedroom. Homeowner had to replace ceiling sections for strength to hold the insulation; he then sheetrocked in the existing walls to contain the ZAI.

Had a leak next to chimney and went into attic to fix it.

Contractor cut hole in 2nd floor (directly underneath attic) to repair water damage and "a lot" of ZAI poured out of the ceiling. Removed exhaust pipe to stove, and at least a small coffee can full of ZAI fell out onto the ground.

Homeowner emailed stating he has had numerous exposures to Zonolite in his home. His ceiling collapsed and the house was filled with dust. He doesn't know what to do and needs help.

In late January, 2003, son of homeowner dropped the whole ceiling out of 1/4 of the attic due to water damage. He gutted it and then put up a new ceiling. This work created a great deal of dust. He estimates he was up there 3 days and approximately 24 hours.

Has been in his attic and has disturbed the ZAI, particularly right after he bought the home doing some water damage repair work.

Fireplace repair work required homeowner to be in the attic.

Contractor cut hole in 2nd floor (directly underneath attic) to repair water damage and "a lot" of ZAI poured out of the ceiling. Removed exhaust pipe to stove, and at least a small coffee can full of ZAI fell out onto the ground.

**Storage**

The attic is used for storage of seasonal items, furniture and toys.

Attic has floorboards in middle of attic; used to store items (trunks, old carpets/rugs, boxes, etc.)

Has used attic for storage.

Attic is used as storage: out-of-season items (e.g. rakes); old toys; boxes; possibly some lumber.

An area of the attic is used for storage. The ZAI is still accessible from this area (coverted the other part of attic into living space). It is very dusty.

They used to store things in the attic and would access it a couple of times a year. They also would clean the attic and stir dust up. They have now built a storage area above their garage and store things there.

Attic used for storage - the storage covers about 1/3 of the attic space.

| Disturbance Type | Disturbance Summary |
|---|---|
| | Homeowner uses the attic for storage and his 2 brothers and sister also use it for storage. Also, he uses the attic as a workspace and spends considerable time up there. |
| | Homeowner used the entire attic space (with ZAI) for storage. |
| | Attic has been used significantly as a storage area and frequently accessed. |
| | They store a lot of belongings in the attic.  They access the attic 4-6 times per year. |
| | Homeowners use attic for storage.  Approximately 25% of the attic space is used for storage and they enter approximately 6 times per year to add/remove items. |
| | Attic used for storage and is about 50% full. |
| | Half of the attic with ZAI is used for storage; other half had a bedroom built in the 1970's.  Storage part not accessed real frequently. |
| | Use attic for storage of items such as baby clothes, holiday decorations, etc., and utilize it on a regular basis.  Their 2 and a half year old son likes to go up with his daddy and hold the light. |
| | Homeowners uses the attic for storage (basically everything a person typically stores, such as Christmas items, hunting gear, winter/summer clothing, etc.) |
| | Homeowner stores Christmas decorations, clothes, etc. in attic and accesses attic to retrieve items. |
| | Stores clothes, suitcases, games, etc. in the attic.  Is wondering if clothes are contaminated. |
| | Uses attic to store off-season equipment.  Attic has ZAI. |
| | Stores Christmas decorations and other items around the entrance of the attic. |
| | Attic with floorboards, but exposed areas on the sides, has been used extensively for storage for past 42 years.  Cothes are stored in attic (summer and winter) and husband put a pole up to hang them on.  Boxes and file cabinets are in attic along with numerous other items.  Homeowner regularly access the attic.  Tests came back at 3% tremolite. |
| | Has exposed ZAI in the garage, where they have been storing things.  Also stores items in attic which also has ZAI.  It is accessed 15-20 times a year. |
| | Homeowner with ZAI in attic stored things in the attic last fall because they were remodeling the basement.  Now they are afraid to go up and get the things they have stored in the attic. |
| | Homeowners store items in attic.  Have spent days in the attic moving things around. |

| Disturbance Type | Disturbance Summary |
| --- | --- |
| | Attic is used for storage and both he and his wife are in and out of the attic moving things around. |
| | Attic is used for storage as they have no basement. Homeowner has simply put plywood down over it as a subfloor. ZAI tested at 1.5% asbestos. |
| | Homeowner uses the attic for storage and his 2 brothers and sister also use it for storage. Also, he uses the attic as a workspace and spends considerable time up there. |
| | They store a lot of belongings in the attic. They access the attic 4-6 times per year. |
| | Attic has been used significantly as a storage area and frequently accessed. |

# ATTACHMENT E



.

# ATTACHMENT F

# MUNDY ASSOCIATES LLC
### ECONOMIC, MARKET, AND VALUATION ANALYSTS
1825 QUEEN ANNE AVENUE NORTH
SEATTLE, WASHINGTON 98109
PHONE 206-623-2935  FAX 206-623-2985
HTTP://WWW.MUNDYASSOC.COM

JOHN A. KILPATRICK, Ph.D.
John@mundyassoc.com

March 14, 2003

Darrell W. Scott, Attorney at Law
Lukins & Annis, PS
1600 Washington Trust Financial Center
717 W. Sprague Avenue
Spokane, Washington  99201-0466

Dear Mr. Scott:

Pursuant to your request, we have examined the economic impact of Zonolite Attic Insulation (ZAI) on the property values of residential dwellings.  We have specifically addressed the question, does ZAI create an "unreasonable risk of harm" to the value of these dwellings?  Note that our research has been conducted within the limits of "…what science demonstrates…" as per the methods applicable to our field of expertise, real estate economics and valuation, pursuant to the Amended Order issued by the Court on November 25, 2002.

It is our opinion that the unreasonable risk of harm to the value of properties in question is well demonstrated by the salient evidence, including academic research (peer-reviewed literature) and empirical data.  We have summarized our research and our qualifications to testify in this matter in the following report.

Thank you for the opportunity to assist you, your colleagues, and your clients.

Sincerely,

**MUNDY ASSOCIATES LLC**

John A. Kilpatrick, Ph.D.

## Background and Purpose

This report has been prepared in connection with the matter of W.R. Grace & Co., et. Al., (US Bankruptcy Court for the District of Delaware, Case No. 01-01139), and specific ally in response to the Amended Order dated November 25, 2002:

> *"...the scope of discovery will be limited to what science demonstrates with regard to whether ZAI creates an unreasonable risk of harm."*

As real estate economists and valuation experts, our focus will be limited to the methodologies of our field as outlined under *Daubert* and as extended to our field under *Kumho Tire*.[1] Specifically, and for the purposes of this report:

Asbestos is used generically to refer to the asbestos in ZAI (Zonolite Attic Insulation) and all equivalent substances. The real estate valuation profession does not attempt to parse differential valuation impacts among the various trade names of insulating materials which have been shown by other experts to be potentially toxic. WE have made no specific assumptions regarding the material composition of ZAI, but rather have relied on other experts whom we have deemed reliable.

Science refers to the generally accepted methods, techniques, and approaches to valuation which constitute the body of knowledge of our profession and as are currently accepted in the peer-reviewed literature of our profession.

Unreasonable risk of harm refers to an expectation of an economically significant loss in value to real estate as a result of contamination with asbestos (and specifically ZAI) to a reasonable degree of certainty as would constitute acceptable standards of valuation in the real estate and appraisal profession.

## Competency

I am Dr. John A. Kilpatrick, the Managing Partner of Mundy Associates LLC, headquartered in Seattle, Washington. I hold a doctorate in real estate finance from the University of South Carolina and am a Certified General Real Estate Appraiser in several states. I have been qualified as an expert witness in real estate issues in the Federal Courts and other jurisdictions. I am the author of four books on real estate and numerous journal articles and invited talks. My firm has been in business for over a quarter of a century, and our focus is on complex real estate

---

[1] For a thorough explanation of the valuation paradigm under *Daubert* and *Kumho* as it applied to real estate experts in the Federal Courts, see McLean, David, John Kilpatrick, and Bill Mundy, Summation of Evidentiary Rules for Real Estate Experts, Real Estate Issues 24-3, Fall, 1999, 24-33.

valuation problems. A complete copy of my current Professional Qualifications and prior trial testimony is attached. I am being compensated at a rate of $185 per hour in this case.

## Organization of this Report

The remainder of this report is contained in three main sections. The first of these subsequent sections establishes the basic principles of real estate value as they apply to home ownership, with a focus on how the qualitative aspects of home ownership translate into the quantitative aspects of valuation. This section will particularly emphasize how the qualitative aspects of home ownership can be negatively impacted by contamination, to set the stage for how such a contamination is a sufficient condition for an unreasonable risk of harm to the value of the home ownership.

The final section presents specific empirical market evidence, generated from academic studies in the peer reviewed literature on the valuation impact of asbestos, and draws conclusions regarding ZAI. The conclusion of this paper is that ZAI is sufficient for there to be an unreasonable risk of harm of the diminution of value of the real estate. We also show that even post-remediation, properties which had previously contained ZAI will, to a reasonable degree of certainty with in the rubrics of the valuation profession, suffer an unreasonable risk of harm to market value as a result of post-remediation stigma.

## Value – An Overview Of The Literature

From an real estate economics and valuation perspective, the rights enjoyed by a fee-simple owner fall into three categories:

1. Right of use
2. Right of exclusion, and
3. Right of transfer[2]

Economists are careful to note that property itself is not "owned," but rather the rights of the property are owned.[3] The ability to delineate these rights, and the ability of owners to transfer some or all of these rights voluntarily is a necessary condition for property valuation.

The first of these rights, that of use, is generally interpreted to mean that the owner may determine how property will be used, or if it is to be used at all. The right of use is traditionally

---

[2] While delineated in one fashion or another in many texts, this specific wording derives from Jaffee, Austin J. and Demetrios Louziotis, Jr., "Property Rights and Economic Efficiency", Journal of Real Estate Literature 4, July, 1996, 137-162.

[3] Alchian, Armen A. and Harold Demsetz, "The Property Rights Paradigm", Journal of Economic History 53, March 1973, 16-27. Also, see Demsetz, Harold, "Toward a Theory of Property Rights", American Economic Review 57, May, 1967, 347-373.

limited in western culture by both public restrictions (e.g. -- eminent domain, police power) and private restrictions (e.g. -- liens, mortgages). Private restrictions are generally voluntary, and property owners willingly submit to the disutility of such restrictions in trade for some other economic benefit. For example, a property owner will issue a mortgage to a lender in trade for leverage in the purchase. Also, a homeowner will purchase in a subdivision with covenants and restrictions in trade for the assurance of uniform property use within the neighborhood. It is noteworthy to stress that the voluntary acceptance of private restrictions is always in trade for some economic compensation. Impairment places a restriction on the right of use without some economic compensation. This is illustrated in potential restrictions which may be placed on the use of real estate due to a physical impairment and which can thus limit the property to something less than its highest and best use.

The right of exclusion -- often called the right of exclusive use or right of exclusive enjoyment -- provides that those who have no claim on property should not gain economic benefit from enjoyment of the property. In other words, the right of use is exclusive to the property owner, and any violation of the right of exclusive use typically carries either payment of compensation to the rightful owner or assessment of a penalty. For example, if "A" trespasses on land owned by "B," then "A" will be guilty of a crime and a possible criminal penalty may be in order, as well as civil damages. Physical impairment by a third party is, in effect, a trespass on property rights, violating the right of exclusion.

Society places a high value on the right of exclusion, for justifiable reasons. Exclusion provides that both the current benefits of ownership as well as future benefits accrue only to the rightful owner, and his/her successors and assigns. In the absence of exclusion, the right of use is under constant threat of nullification without just compensation. In an economy without the right of exclusion, property owners would adopt short-term strategies for use, rather than long-term strategies. In an economic sense, this would lead to widespread inefficiency in the allocation of resources. Hence, the right of exclusion carries with it a significant societal good[4], and thus a significant societally recognized value.[5]

Finally, the right of transfer provides the owner with the ability to swap one resource for another. An impairment restricts the right of transfer, and may in fact destroy the right of transfer altogether.

### Effects of Contamination on Property Values – Economic Theory

Real estate economics – and appraisal practice – uniformly recognizes that a physical impairment has a negative impact on property values. Indeed, appraisers are required by the Uniform Standards of Professional Appraisal Practice to consider the impacts of such contamination in the value estimation process.[6] Much of the literature on impaired property

---

[4] See, for example, Snare, Frank, "The Concept of Property", American Philosophical Quarterly 9, April 1992.

[5] Stigler, George, "Law or Economics?" Journal of Law and Economics 35, October 1992, 455-469.

[6] This is specifically covered under USPAP Rule 1-2(e). This is one of the rules from which departure is specifically not permitted. In other words, an appraiser may not fail to take physical disutility into account EVEN IF s/he

*Darrell Scott, Lukins & Annis*
*W.R. Grace Litigation*
*March 14, 2003*
*Page 5*

stems from the many environmentally contaminated property cases studied in academia over the past thirty years.

Fitchen (1989)[7] was one of the first to look at the value of the rights of a property owner in the face of impairment – in this specific case, toxic chemical pollution. As an anthropologist and a Professor of Anthropology at Ithaca College, she looks principally at residential values, not only at the real aspects of "violation of the home" by contamination (e.g. – carcinogenic effects of polluting chemicals) but also about the symbolic interference on what she calls "…a threat to the assumptions people have about themselves and the way life is supposed to be."[8] She continues, "Toxic contamination also attacks the valued institution of homeownership, violating many of the rights that are assumed to flow from the ownership of ones home, including the assumed right to control entry to it…chemical contamination may affect homeowners more seriously than renters, not only in terms of potential financial loss, but also in terms of devaluation of the achieved status of homeowners."

Edelstein (1986) also deals with this "home" theme, and calls impairment to or near a residence an"…inversion of home…" when "…the previous locus of family security and identity becomes instead a place of danger and defilement."[9] He builds on previous works, such as Perin (1977)[10] and Altman and Chemers (1980),[11] who show the very special place the home has in American society, culture, and economics. To quote Perin (1977): "Not being a nation of shopkeepers, America is one of homeowners, busily investing in plant maintenance and expansion with both money and time, keeping the product attractive for both use and sale."[12]

*Intuitive Toxicology*

Toxicologists have identified cause and effect relationships between various substances and illness or disease. These linkages are well founded based on science. Human behavior, such as market interactions which result in a market pricing equilibrium, makes a more intuitive interpretation of the underlying science. As a result, market reactions to impairments, such as contamination, are not monotonically tuned to the degree of contamination, the specific

discloses such departure from the rules. A thorough discussion of the appraiser's responsibility is also contained in Eaton, J.D., <u>Real Estate Valuation in Litigation</u> (Chicago: The Appraisal Institute, 1995). For specific references, see pages 128, 129, 149-54, and 235-37. It is clear that an appraisal of a residence, which fails to account for a physical deficiency such as soil contamination, would violate the Uniform Standards. As of this writing, all 50 states have adopted these standards as a matter of law. In addition, adherence to these standards is mandatory for all federally-insured mortgage transactions.

[7] Fitchen, Janet M., "When Toxic Chemicals Pollute Residential Environments: The Cultural Meanings of Home and Homeownership," <u>Human Organization</u> 48, Winter, 1989, 313-324.
[8] Roddcwig, Richard, "Stigma, Environmental Risk, and Property Values: 10 Critical Inquiries", <u>The Appraisal Journal</u>, 1996, 375-387
[9] Edelstein, Michael R., "Toxic Exposure and the Inversion of the Home", <u>Journal of Architecture Planning and Research</u> 3, 1986, 237-251.
[10] Perin, Constance, <u>Everything in its Place: Social Order and Land Use in America</u> (Princeton: Princeton University Press, 1977)
[11] Altman, I, and M. Chemers, <u>Culture and Environment</u> (Monterey: Brooks/Cole Publishing, 1980)
[12] Perin, op, cit., 120.

*Darrell Scott, Lukins & Annis*
*W.R. Grace Litigation*
*March 14, 2003*
*Page 6*

contaminant, or subtle differences in toxicological impacts. Rather, market reactions tend to be generated simply by contamination with a toxic substance, irrespective of the degree of toxicity.

As noted by Roddewig (1996), perceptions can have a substantial effect on real estate market behavior, and therefore, price and value. For example:

> *Frazer and Mauss described a belief, widespread in many cultures, that things that have been in contact with each other may influence each other through transfer of some of their properties via an "essence." Thus "once in contact, always in contact," even if that contact (exposure) is brief. Rozin, et al., show that this belief system, which they refer to as a "law of contagion," is common in our present culture. The implication of this work is that even a minute amount of a toxic substance in one's food will be seen as imparting toxicity to the food; any amount of a carcinogenic substance will impart carcinogenicity, etc. The "essence of harm" that is contagious is typically referred to a contamination. Being contaminated clearly has an all-or-none quality to it ~ like being alive, or pregnant. When a young child drops a sucker on the floor, the brief contact with "dirt" may be seen as contaminating the candy, causing the parent to throw it away rather than washing it off and returning it to the child's mouth. This all-or-none quality irrespective of the degree of exposure is evident in the observation by Erikson that "to be exposed to radiation or other toxins...is to be contaminated in some deep and lasting way, to feel dirtied, tainted, corrupted." A contagion or contamination model is obviously very different from the scientist's model of how contact with a chemical induces carcinogenesis or other adverse effects.*[13]

The "law of contagion" helps explain how a home can become significantly stigmatized with the risk of harm to value a contaminant even though property owners may not fully understand or appreciate the subtle nuances of the toxicological effects of the contamination itself.

### *Effects of Contamination on Property Values – Appraisal Literature*

Patchin (1991)[14] was one of the first to note that the decline in market value of a contaminated property may exceed the cost to cure, even when that cost to cure is well defined. Mundy (1992a)[15] builds on this theme and is one of the first to outline the value paradigm for contaminated property damages: the value "before", or "clean", minus the value "after", or "dirty", is the appropriate measure. He goes on to note that, from a mathematical perspective, this difference should represent the cost to cure. However, he notes that in practice properties frequently sell for less than this cost to cure difference. He ascribes this difference as the stigma effect. In Mundy's (1992a) framework, stigma is directly related to the level of uncertainty or risk associated with the contamination.

---

[13] Kraus, Nancy, Torbjorn Malmfors, and Paul Slovic. "Intuitive Toxicology: Expert and Lay Judgments of Chemical Risks," *Risk Analysis*, 12:2 (1992).

[14] Patchin, Peter J., "Contaminated Properties – Stigma Revisited, *The Appraisal Journal*, 1991, 167-172.

[15] Mundy, B., "Stigma and Value", *The Appraisal Journal*, 1992a, 7-13.





Mundy (1992b)[16] follows this theme by outlining what is now a widely recognized valuation approach with two components: an income effect and a marketability effect. The income effect measures the lost enjoyment (or income, in the case of non-residential properties) resulting from the contamination. The marketability effect accounts for the losses stemming from additional time-on-the-market, either to rent or to sell. Kilpatrick (1998)[17] builds on this marketability theme and shows that opportunity costs resulting from increased time on the market may in fact exceed cost to cure and income-effect stigma. Mundy (1992c) continues this theme, exploring the quantification of stigma as it impacts the cost of capital and, for non-residential properties, the indicated discount rate on equity[18]. In this study, he notes that adequate transactions data frequently may not be available, and recommends the use of survey research to estimate stigma losses.

Neustein (1992)[19] echoes Mundy (1992b) in observing that the diminution in value resulting from contamination results from both reduced net income and a risk premium adjustment. He applies his risk premium to the capitalization rate and does not distinguish between debt and equity, showing that the cost of both are affected by the increased risk.

Both Patchin (1992) and Mundy (1992a,b,c) suggest that stigma may not be constant over the holding period. Chalmers and Roehr (1993) build on this theme and show that using a differential discount rate over time can accommodate temporal differences in risk[20].

Wilson (1994) stresses other intangibles in the estimation of value diminution, such as demand factors, public confidence in the remediation cost estimates, stability of regulatory decisions, availability of financing, and third-party liability[21]. Wilson (1996)[22] proposes a slightly different framework from Mundy (1992a) in separating additional financing costs out as a separate factor from his stigma calculation. However, Chalmers and Jackson (1996)[23] show that Mundy (1992a) is the preferred framework, and that stigma indeed increases the risk premium and hence debt costs. Chalmers and Jackson (1996) also build on Mundy (1992b) who differentiated between real and perceived risks. Chalmers and Jackson (1996) demonstrate, as Mundy (1992b) had

---

[16] Mundy, B., "The Impact of Hazardous and Toxic Materials on Property Values", The Appraisal Journal, 1992b, 155-162.

[17] Kilpatrick, John A., "Appraisal of Contaminated Properties", Career News (Published by the University of South Carolina), 1998, 3-4

[18] Mundy, B., "The Impact of Hazardous and Toxic Materials on Property Values – Revisited" The Appraisal Journal, 1992c, 463-471

[19] Neustein, R.A., "Estimating Value Diminution by the Income Approach", The Appraisal Journal, 1992, 283-285.

[20] Chalmers, James and Scott Roehr, "Issues in the Valuation of Contaminated Property", The Appraisal Journal, 1993, 28-40.

[21] Wilson, Albert, "The Environmental Opinion: Basis for an Impaired Value Opinion", The Appraisal Journal 1994, 410-423

[22] Wilson, Albert, "Emerging Approaches to Impaired Property Valuation", The Appraisal Journal, 1996, 155-170.

[23] Chalmers, James, and Thomas Jackson, "Risk Factors in the Appraisal of Contaminated Property", The Appraisal Journal, 1996, 44-58.

inferred, that the perception of risk on the part of lenders, rather than the actual risk, was the determinant of the increased financing costs.

Numerous authors have called into question the use of comparable sales as a method for valuing contaminated real estate, including Patchin (1988)[24], Wilson (1994, 1996), Roddewig (1996)[25], and Weber (1997)[26]. Weber (1997) is one of the first to recommend an alternative methodology, suggesting instead that a monte carlo simulation is an applicable tool in such situations. Lentz and Tse (1995) had also suggested the use of an alternative methodology, in their case options pricing as an alternative to the discounted cash flow model[27]. Jackson (1998) returns to a somewhat more traditional approach, showing that a mortgage-equity type model can be useful in quantifying the effects of stigma[28]. In the face of a broad array of methodologies used by appraisers to assess the stigma damages stemming from contamination, Kinnard and Worzola (1999) surveyed and summarized the key methodologies currently in use[29]. While their study focused primarily on income producing property, they noted that the somewhat more traditional methods most widely used by practitioners were at odds with the more advanced techniques recommended in the academic and practitioner literature.

### Effects of Contamination on Property Values – Empirical Evidence

Gamble and Downing (1982)[30] were among the first to examine the impact of contamination on residential real estate, analyzing the effects of the March, 1979, nuclear accident at Three Mile Island on nearby home values. They compared 583 residences within 25 miles of the plant with homes in a control neighborhood 75 miles away, both before and after the accident occurred using a hedonic model (multiple regression) to isolate the pricing impacts of the event. Consistent with later theory developed by Mundy (1992c) they find that the primary value impact results from increased marketing time.

Edelstein (1986) specifically stresses the investment diminution aspect of the inversion of home principle. In citing case studies of experiences following neighborhood-wide impairment in the Legler section of Jackson Township in southern New Jersey, he shows that residents could not separate the psychological pride in home ownership from the question of economic value. Surveys of the population found uniformity of opinion that property values had diminished as a result of the problem. Previous studies had focused on the opportunity costs stemming from the

[24] Patchin, Peter, "Valuation of Contaminated Properties", The Appraisal Journal, 1988, 7-16.
[25] Roddewig, Richard, "Stigma, Environmental Risk, and Property Values: 10 Critical Inquiries", The Appraisal Journal, 1996, 375-387
[26] Weber, B.R., "The Valuation of Contaminated Land", Journal of Real Estate Research, 1997, 379-398.
[27] Lentz, George, and K.S.M. Tse, "An Options Pricing Approach to the Valuation of Real Estate Contaminated by Hazardous Materials", Journal of Real Estate Finance and Economics, 1995, 121-144.
[28] Jackson, Thomas, "Mortgage Equity Analysis in Contaminated Property Valuation", The Appraisal Journal, 1998, 46-55.
[29] Kinnard, William, and Elaine Worzala, "How North American Appraisers Value Contaminated Property and Associated Stigma", The Appraisal Journal, 1999, 269-278.
[30] Gamble, H.B., and R.H. Downing, "Effects of Nuclear Power Plants on Residential Property Values", Journal of Regional Science, 1982, 457-478.

inability to move. In short, homeowners were stuck holding unsellable property with stagnant prices, while property in other neighborhoods was soaring in value. Thus, the owners were harmed not only by the diminution of value in the existing residences, but by the opportunity costs inherent in lost gains from alternative home investments.[31]

Kohlhase (1991)[32] studies thirteen Superfund sites near Houston with a hedonic (multiple regression) model and finds significant price impacts at or near sites, with distance to the point-source as an important determining variable. Thayer, Albers, and Rahmatian (1992) also opted for a hedonic model to examine the effect of hazardous waste sites near Baltimore[33]. They found that homeowners are willing to pay more for improved environmental quality. Theirs was one of the first studies which did not focus on an "event", but rather on an ongoing contamination problem, and they found that value diminution effects continued over time. Richert, Small, and Mohanty (1992) found similar results studying house prices near landfills in Cleveland[34] as did Ketkar (1992) in a hedonic regression model of house prices near landfills in New Jersey[35] and Nelson, Genereux and Genereux (1992) analyzing house prices near landfills in Minnesota[36].

Abdalla, Roach, and Epp (1992) examine data on the averting expenditures which homeowners must incur when dealing with a groundwater contamination incident involving TCE. The economic costs to households to deal with the contamination of their groundwater ranged from $61,313 to $131,344 during an 88-week contamination period. The authors also found that the decision to incur averting expenditures was based on the knowledge of the contamination, the degree of risk perceived, and the presence of children in the household.[37]

Kiel (1995) examines the effects on housing values in Woburn, MA, a community with two Superfund Sites, one a source of TCE groundwater contamination. Both sites were identified as Superfund Sites in the early 1980s, and the clean-up process had begun by 1995. She reviewed selling prices of over 2,000 houses over the period 1975 to 1992, utilizing regression techniques with specified time periods: pre-announcement phase, discovery phase, announcement phase, and clean-up-identified phase. She also analyzed impacts of distance from the sites and discounted values of future rents, which would be earned on the residences. Information sources included the EPA as well as local community groups such as the local citizen group "For a Cleaner Environment" (FACE) whose efforts gained both national newspaper as well as national network television coverage of the Woburn situation. The results of her study indicated that

[31] Edelstein, op. cit.

[32] Kohlhase, J.E., "The Impact of Toxic Waste Sites on Housing Values", Journal of Urban Economics, 1991, 1-26.

[33] Thayer, M., H. Albers, and M. Rahmatian, "The Benefits of Reducing Exposures to Waste Disposal Sites: A Hedonic Housing Value Approach", Journal of Real Estate Research, 1992, 379-398.

[34] Reichert, A.K., M Small, and S. Mohanty, "The Impact of Landfills on Residential Property Values", Journal of Real Estate Research, 1992, 297-314.

[35] Ketkar, Katherine, "Hazardous Waste Sites and Property Values in the State of New Jersey", Applied Economics, 1992, 647-659.

[36] Nelson, A.C., J. Genereux, and M. Genereux, "Effects of Landfills on House Values", Land Econonomics, 1992, 359-365.

[37] Abdalla, C.W., B. Roach, and D. Epp, "Valuing Environmental Quality Changes Using Averting Expenditures: An Application to Groundwater Contamination," Land Economics, 68, May, 1992, 163-9.

information made available to the public on the toxicity of sites does indeed have an affect on real estate prices, and that official announcements that sites will be cleaned up are not necessarily believed by the public.[38]

One of the earliest studies of air quality on property values was Ridker and Henning (1967). Using a hedonic model and data from St. Louis, Missouri, they found a linkage between air quality declines and property value diminution which was both statistically and economically significant[39]. However, Wieand (1973)[40] uses that same data to structure a hedonic model which examined rent rather than prices. He finds that rents are not directly affected by pollution, which would be consistent with Mundy (1992b) and others who argue that stigma is manifested in an increase in risk premium. Thus, Wieand's (1973) constant rent measure would be capitalized by a higher risk-adjusted cap rate to result in Ridker and Henning's (1967) lower values.

Deyak and Smith (1974)[41] use broad data from across the United States and find a statistically significant relationship between air pollution and house value diminution, as did Harrison and Rubinfeld (1978)[42] in their more detailed examination of house values in Boston. Nelson (1978) attempts to differentiate among pollutants, specifically particulates and oxidants, using data from Washington, D.C., and finds statistically significant diminution in house values from both causes[43]. Palmquist (1983), in an unpublished study, used data from fourteen cities, and found similar results[44].

Follow-up studies typically controlled for other variables, such as neighborhood quality, income, demographic characteristics, homeowner occupation, and crime rates. Murdoch and Thayer (1988)[45], Graves, Murdoch, Thayer and Waldman (1988)[46], and Zabel and Kiel (2000)[47] all find consistent relationships between air contamination and property value diminution.

---

[38] Kiel, Katherine A., "Measuring the Impact of the Discovery and Cleaning of Identified Hazardous Waste Sites on Housing Values", Land Economics 71-4, Nov., 1995, 428-435.

[39] Ridker, R.G., and J.A. Henning, "The Determinants of Residential Property Values with Special Reference to Air Pollution", Review of Economics and Statistics, 1967, 246-257.

[40] Wieand, K.F., "Air Pollution and Property Values: A Study of the St. Louis Area", Journal of Regional Science, 1973, 91-95.

[41] Deyak, T.A., and V. K. Smith, "Residential Property Values and Air Pollution: Some New Evidence", Quarterly Review of Economics and Business, 1974, 93-100.

[42] Harrison, D, and D.L. Rubinfeld, "Hedonic Housing Prices and the Demand for Clean Air", Journal of Environmental Economics and Management, 1978, 81-102.

[43] Nelson, J.P., Residential Choice, Hedonic Prices, and the Demand for Urban Air Quality" Journal of Urban Economics, 1978, 357-369

[44] Palmquist, R.B., "Estimating the Demand for Air Quality from Property Value Studies: Further Results", N.C. State University Unpublished Working Paper, 1983.

[45] Murdoch, J.C., and M.A. Thayer, "Hedonic Price Estimation of Variable Urban Air Quality", Journal of Urban Economics, 357-369.

[46] Graves, P.J., J.C. Murdoch, M.A. Thayer, and D. Waldman, "The Robustness of Hedonic Price Estimation: Urban Air Quality", Land Economics, 1988, 220-233.

[47] Zabel, J.E., and K. A. Kiel, "Estimating the Demand for Air Quality in Four U.S. Cities", Land Economics, 2000, 174-194.

The "state of the art" in valuation of properties impaired with soil or subsurface born contamination was reviewed most recently by Simon (2002) in his study of homes impacted by PCB contaminants in Anniston, Alabama[48]. His study was a review of a well documented impaired property case in which properties inside a neighborhood impacted with PCB's from an adjacent manufacturing plant were diminished in value by 60% to as much as 90%. He also found that properties outside the immediate neighborhood but within an area impacted by the PCB contamination were diminished in value by as much as 45%.

Simon (2002) focuses primarily on the methodology necessary to accomplish a large scale study of contaminated properties. He suggests that in an ideal world, a hedonic model (multiple regression) would be the preferred method. However, such is not usually available in these cases, and so he outlines methods which work well with the best available data, including market trend analysis, sale/resale analysis, transaction rate analysis, and sale/list-price analysis. However, he notes that these are all "revealed preferences" methods, and as such fail to account for transactions which did not occur as a result of the impairment[49]. As such, statistical characterizations using revealed preference data will probably not capture the full impact of the contamination on the market at equilibrium. He notes that survey research (in this case, contingent value analysis) is a preferred method for arriving at an unbiased analysis.

Other studies have been conducted into real estate value impacts of other negative events, externalities, and risk assessments. While the problems analyzed in these studies are not specifically consistent with the case at hand, these studies do demonstrate the broad consistency in methodology and the generalization of diminution impacts and specifically stigma across a wide range of negative value influences.

For example, Brookshire, Thayer, Tschirhart, and Schulze (1985) were among the first to look at property value impairment and geotechnical issues.[50] Specifically, they examined property value changes in areas known to have earthquake risks – Los Angeles and San Francisco. They find that when the market is informed of geotechnical risks, the market adequately prices that risk even before a geotechnical event occurs.

Bernknoff, Brookshire, and Thayer (1990)[51] follow the Brookshire, et al (1985) study with an examination of property value changes surrounding a pre-existing warning, such as an earthquake zone. They find that the property value diminution – stigma, in other words – occurs when the hazard notice is issued.

---

[48] Simon, Robert, "Estimating Proximate Property Damage from PCB Contamination in a Rural Market: A Multiple Technique Approach", The Appraisal Journal, 2002, 388-400.

[49] Financial economists often refer to this as a "survivor bias" problem, and results in a bias of the data.

[50] Brookshire, et. Al, 1985,"A Test of the Expected Utility Model: Evidence from Earthquake Risks", Journal of Political Economy 93, 369-389.

[51] Bernknopf, R., D. Brookshire, and M. Thayer, 1990, "Earthquake and Volcano Alerts: An Economic Evaluation of Risk Perception Changes", Journal of Environmental Economics and Management 18, 35-49.

Also leveraging off of the methodology in the Brookshire et al (1985) study, Murdoch, Singh, and Thayer (1992) examine the impact of the Loma Prieta earthquake on property values[52]. The authors find that once a predecessor event occurs, the expectation (and hence the stigma) associated with subsequent events is maximized.

Sanders (1996) is consistent with the hypothesis that stigma is not just the result of the natural event itself, but can and will arise once the potential for the event is known.[53] Thus, stigma losses actually precede the geotechnical event. Sanders (1996) uses a traditional sales adjustment grid approach, using actual home sales from a neighborhood in California, and estimates post-remediation stigma at 19.7% to 26.2% (based on the value of the house and lot as a unit).

Other studies into similarly impaired property include one by Bell (2001)[54] in which he looks at the impact of airport noise on residential property values. Note that in this case, there is no actual physical impact to the dwellings – the impact is strictly from the intermittent high decibel noise. However, Bell (2001) finds that the degrees of property impacts are actually increasing with increasing unimpaired values. For example, for "low quality" homes, the impact is from 4.5% to 10.3% of value, when compared with homes that do not have noise impacts. However, for high quality homes, the impact can range from 16.4% to as high as 29%. Bell (2001) also cites a Federal Aviation Administration 1999 study that looks at moderate priced homes and finds a 19% loss in value as a result of airport noise. Frankel (1991) independently examined the question using survey techniques (as well as one hedonic model) for neighborhoods surrounding Chicago's O'Hare Airport and found value losses ranging from a low of 10.2% (the hedonic model) to a high of 21.6% (a survey of realtors). Frankel (1991) did not try to distinguish between home qualities.[55] Bell's (2001) findings for higher quality homes is consistent with Sander's (1996) geotechnical loss findings.[56]

In that same vein, it is also useful to look at the valuation methodology used by the FAA and others in the acquisition of aviation easements.[57] Higler (1999) shows that an aviation easement

[52] Murdoch, J.C., H. Singh, and M. Thayer, 1992, The Loma Prieta Earthquake: An Event Study of Changes in Risk Perception and House Prices, study funded by the National Science Foundation and published by San Diego State University.

[53] Sanders, Micheal, "Post-Repair Diminution in Value from Geotechnical Problems", Appraisal Journal, January 1996.

[54] Bell, Randall, "The Impact of Airport Noise on Residential Real Estate", Appraisal Journal, 2001, 312-321

[55] Frankel, Marvin, "Aircraft Noise and Residential Property Values: Results of a Survey Study", Appraisal Journal 1991, 96-110.

[56] Bell's findings are consistent with other prior studies of noise, including Mieszkowski, P. and A.M. Saper, "An Estimate of the Effect of Airport Noise on Property Values", Journal of Urban Economics 5, 1978, 425-440; Nelson, J.P., "Airport Noise, Location Rent, and the Market for Residential Amenities", Journal of Environmental Economics and Management 6, 1979, 320-331; and O'Byrne, P.H., J.P. Nelson, and J.J.Seneca, "Housing Values, Census Estimates, Disequilibrium, and the Environmental Cost of Airport Noise: A Case Study in Atlanta", Journal of Environmental Economics and Management 1985, 363-72.

[57] The use of an easement valuation calculation in this study does not presuppose any particular theory of law or doctrine in the estimation of damages. This example is offered for it's illustrative contribution to the valuation equation only.

for an airport runway with an expected useful life of 5 years and no anticipated residual inconvenience to the residential property owners afterwards amounts to 11% of the value of the home. His calculations also point to a 25% value diminution if the effects are perpetual or at least long-lived.[58]

One of the key issues in impaired property valuation is the consideration of the impact of remediation. Does remediation by itself – or in the case of a contaminant, the issuance of a "no further action letter" – cure stigma? Theory and empirical results point in opposite directions. Many theoretical studies suggest that post-remediation, stigma should subside. The theoretical debate has surrounded the timing of that subsiding. However, recently there have been a number of empirical studies, which suggest that stigma is persistent even after remediation. For example, Sementelli and Simons (1997) studied commercial property impacted by leaky underground storage tanks and found that the issuance of a no further action letter did not improve marketability.[59,60]

Kilpatrick (1999, 2001) published a series of interim studies on residences impacted by synthetic stucco within the broad context of construction defects. His analysis demonstrates that stigma remains even after defects are remediated to local building code standards.[61]

Mundy Associates LLC has conducted numerous case studies on construction defects issues, both for condominiums and single family residences, in various parts of Washington State (both King and Pierce Counties) as well as in other locales (primarily the east coast of the U.S.). In summary, water intrusion results from some construction defect, such as the use of synthetic stucco or workmanship defects, and even after the physical defect is cured, stigma remains as a result of numerous unknowns (and risks associated with those unknowns). Additionally, stigma in these cases has a very real physical component, in that some incurable physical damage was done to the structure itself which remediation could not address (such as structural stress, residual moisture damage, etc.) In these cases, we have consistently found a residual stigma ranging from 10% to 20% of the otherwise unimpaired value of the structures. We have also found that at the upper end of the economic scale, such as with the subject property, the higher damages are evidenced.

Simons, Bowen, and Sementalli (1997) study the impact of identified, remediated leaking underground storage tanks (LUST) on neighboring dwellings, using a regression analysis

---

[58] Higler, Charles, "The Infamous Avigation Easement", Appraisal Journal 1999, 354-358

[59] Sementilli, A.J., and R.A. Simons, "Regulations of Leaking Underground Storage Tanks: Policy Enforcement and Unintended Consequences", Economic Development Quarterly 11, 1997, 236-48.

[60] Part of this stems from well-publicized events in California and New York in which those states' environmental agencies have begun random re-inspections of previously remediated LUST sites for which "no further action" letters had previously been issued. In many cases, the states have found additional problems and required further costly remediation despite the no-further-action letter. In other words, a "no further action" letter actually means "no further action unless we change our minds."

[61] Kilpatrick, John A., Ron Rogers, and Doug Brown, "Appraisal Implications of EIFS", Appraisal Journal, 1999; Kilpatrck, John A., "Valuation Implications of EIFS", Construction Defects, 2001.

involving 16,990 sales and 2,513 LUSTs. They find statistically significant stigma impacts of 17.5%[62], post-remediation.

Leggett and Bockstael (2000) study precisely the issue of sewerage contamination. While they do not estimate a damage coefficient, they do confirm that the presence of sewerage has a statistically significant impact on property value, even after controlling for obvious manifestations such as odor and health risks[63].

Mundy Associates LLC has conducted numerous surveys across the U.S. regarding impaired property. Recent (2001) surveys conducted in King County, Washington, surveyed potential potential buyers of condominiums on their attitudes toward the purchase of properties which had been the subject of water intrusion (as a result of construction defects) but none-the-less remediated. We found that typical buyers, who *would* buy a remediated dwelling, demanded discounts typically in the range of 25%. Note that our surveys indicated that as many as 40% of surveyed buyers would not buy such a dwelling at all, even if physically remediated.

Mundy Associates LLC has conducted extensive research into the impact of airborne lead contamination, which was summarized in a 2000 journal article. We found that, post-remediation, homes suffered at least 15% diminution from stigma[64].

## *Summary of the Value Impacts of Contamination*

In summary, the published literature, case studies, and market research (market surveys) are consistent in finding that an environmental impairment imposes an unreasonable risk of harm to the value of real estate. In an "impaired" state, this diminution is a function of the cost to cure the impairment plus negative stigma impacts, which capture the increased risks and uncertainties as well as other factors. In a "post-remediation" state, market values of real estate continue to suffer unreasonable risk of harm as a result of continued stigma impacts.

## Property Values and Specific Asbestos Impacts

Thusfar, this study has shown substantial evidence that an environmental impairment constitutes an unreasonable risk of harm to the value of real estate. The final question remains, asbestos, specifically ZAI, constitute such an environmental impairment?

---

[62] Simons, R.A., W.M. Bowen, and A.J. Smentelli, 1997, "The Effects of Underground Storage Tanks on Residential Property Values in Cuyahoga County, Ohio", Journal of Real Estate Research 14, 29-42.
[63] Leggett, C.G., and N.E., Bockstael, 2000, "Evidence of the Effects of Water Quality on Residential Land Prices", Journal of Environmental Economics and Management 39, 121-44.
[64] Kilpatrick, John A., 2000, "Property Values and Lead Contamination", Real Estate and Environmental Liability News

*Darrell Scott, Lukins & Annis*
*W.R. Grace Litigation*
*March 14, 2003*
*Page 15*

*Academic Studies*

Relatively few academic studies had addressed the question, and many of those focused on commercial properties. In the 1980s, in a seminal study on the subject, Dewees (1986) established a framework for investigating the impacts on income producing properties, and was considered the leading study of its time[65]. Wilson (1989) developed a discounted cash flow model which incorporated reductions in cash flow, but failed to generalize his model to include stigma impacts[66]. Fisher, Lentz, and Tse (1992) developed a generalized model which incorporated both reductions in expected cash flow as well as the stigma impacts on increased discount rate[67]. While their work continued in the commercial property vein, their model included stigma causality which would be generalizable to non-income producing property (e.g. -- residential property) such as adverse market reactions.

Fisher, Lentz, and Tse (1993) also survey real estate appraisers to determine their observations of market impacts resulting from asbestos-containing material (ACM).[68] They find that appraisers report that potential purchasers sometimes "...simply refuse to purchase any property containing asbestos."[69] Potential buyers usually require that the seller pay for both a preliminary environmental audit as well as a comprehensive engineering survey. Those buyers who are willing to buy may sometimes require that asbestos be removed, or purchase at a discount. Discounts reported range from a lower limit of the cost of removal and upwards to account for stigma.

In the Fisher, et. Al, study, owners of properties containing ACMs which are financed sometimes suffer lower loan-to-value (LTV) ratios or are charged higher interest rates and are usually required to provide indemnification. Some ("seldom") owners report that lenders outright refuse to make loans even with the lower LTV or with indemnification.

Appraisers in the Fisher, et. Al. survey "usually" report the following direct impacts on value:

- Increase in the discount rate
- Increase in the capitalization rate
- Direct reduction in property value to account for removal costs
- Direct reduction in property value to account for indirect costs

---

[65] Dewees, D.N. Controlling Asbestos in Buildings: An Economic Investigation (Washington, DC: Resources for the Future, 1986)
[66] Wilson, A.R., Probable Financial Effect of Asbestos Removal on Real Estate, Appraisal Journal 57-1, 1989, 378-91.
[67] Fisher, J.D., G.H. Lentz, and K.S.M. Tse, Valuation of the Effects of Asbestos on Commercial Real Estate, Journal of Real Estate Research 7-3, 1992, 331-350
[68] Fisher, J.D., G.H. Lentz, and K.S.M. Tse, Effects of Asbestos on Commercial Real Estate: A Survey of MAI Appraisers, Appraisal Journal, October, 1993, 587-598
[69] Note: "sometimes" is the modal, or most common, response on a normative scale which includes "never", "seldom", "sometimes", "usually", and "always". Subsequent reference to the Fisher, et. Al, survey will use this terminology and will refer to the modal response.

- Increase in insurance costs
- Increase in repair, maintenance, and monitoring costs

Other costs reported by appraisers, although to lesser frequency, include decreased rental rates, increased vacancy rates, increased rental concessions, increased build-out allowances, and increased legal expenses. While the Fisher, et. Al, survey focused on commercial property impacts, it is clear that many, if not most of these impacts strongly imply an unreasonable risk of harm to the value of residential properties, as well.

### Property Tax Studies

Additional studies have noted that asbestos is a sufficient cause for a claim for reduction property value assessment in property tax cases. As early as 1992, the Appraisal Journal reported, as an unauthored note, that the New York Appeals court had granted a $23 million property tax refund to the former owners One New York Plaza due to devaluation resulting from asbestos. Asbestos was also cited in Commerce HoMing Corp. v. Assessor of Babylon, in which the New York State Court of Appeals, by unanimous decision, required New York state tax assessors to acknowledge the impact of environmental impairment on property value[70]. Considerations for appraisers when evaluating property value impairment cited by the court included:

- The type and extent of the contamination
- The current and past uses of the property
- Financing impacts
- Continuing stigma after remediation.

Only limited residential asbestos studies have been conducted to date, and those have focused on property tax issues and post-demolition issues. However, the implication of both of these threads of literature is consistent and compelling: that asbestos does, in fact, pose an unreasonable risk of harm to residential real estate values. In the current case, where simulations of usual homeowner activities such as remodeling and maintenance around ZAI have prompted releases of asbestos fibers, there is no question that properties with ZAI will suffer such harm to their values[71].

New Jersey tax assessors have specifically identified asbestos as a sufficient condition for a property tax reduction since 1994, when the City of Hackensack settled with Fairleigh Dickenson University over the value of One University Plaza[72].

---

[70] Fromewick, Richard G., Property Contamination Can Affect Local Tax Assessment, Court Rules, Real Estate Weekly, 9/9/1998

[71] Among the materials we have reviewed are illustrative photographs and ZAI homeowner reports.

[72] New Jersey Issues First Tax Refund for Asbestos Contamination, Real Estate Weekly, 2/9/1994

### Residual Land Values

Studies have also shown that the negative value impacts of asbestos can even impact the land after demolition of the dwelling. Simons (1994), in a study analyzing the rehabilitation of former inner city brownfields into residential sites, found that asbestos on the property increased the development costs by as much as one-third[73]. Buzea (1998), writing on the costs of demolition of a building, shows that asbestos increases building demolition costs in a similar manner to PCB's (from leaky transformers), lead paint, or other hazardous materials[74].

### Summary of the Value Impacts of Asbestos

Much like other on-site environmental contaminants, there is clear and compelling evidence from the academic studies and from empirical market evidence that an asbestos product such as ZAI that can release asbestos fibers in a dwelling is sufficient for there to be an unreasonable risk of harm to the value of the real estate. Prior to remediation, the value is diminished by the estimated cost of remediation plus stigma. Post-remediation, stigma apparently continues, plus there is substantial evidence that even demolition of the dwelling and re-use of the vacant land carries costs over and above that which would be expected with unimpaired properties.

---

[73] Simons, Robert, How Clean is Clean?, <u>Appraisal Journal</u>, July, 1994.

[74] Buzea, Dan, Building Demolition Requires Extensive Environmental Review, <u>Real Estate Weekly</u>, 7/15/1998.

# ATTACHMENT G

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Bankruptcy No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

### DECLARATION OF JOHN A. KILPATRICK, Ph.D. IN SUPPORT OF ZAI CLAIMANTS' RESPONSE TO DEBTORS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF ANY ALLEGED DAMAGES FROM THE ZAI SCIENCE TRIAL

John A. Kilpatrick, Ph.D., makes the following declaration:

1.  I am over the age of 18, competent to testify, and provide the following information of my own personal knowledge.

2.  As cited in my original affidavit, Gamble and Downing (1982)[1] were among the first to examine the impact of contamination on residential real estate, analyzing the effects of the March, 1979, nuclear accident at Three Mile Island on nearby home values. They compared 583 residences within 25 miles of the plant with homes in a control neighborhood 75 miles away, both before and after the accident occurred using a hedonic model to isolate the pricing impacts of the event.[2] Notably, their research was not predicated by any particular incidence of disease, nor was the result (that there was a realized harm to value) contingent on the actual amount of harm—only that harm did measurably occur.

---

[1] Gamble, H.B., and R.H. Downing, "Effects of Nuclear Power Plants on Residential Property Values," Journal of Regional Science, 1982, 457-478.
[2] A hedonic model is a multiple regression equation used for disaggregating the price paid for multi-dimensional commodities into their component parts.

3.    The appraisal profession in the United States began recognizing the negative

impact of environmental contamination on property value shortly thereafter, and soon

thereafter the literature was replete with guidance to aid appraisers tasked with examining

the harm caused by such contamination.[3]

4.    For example, the American Institute of Real Estate Appraisers, in a 1988

official guidance to appraisers, noted that "...leaking underground storage tanks (LUSTS)

and spills and overfills from tank systems can cause severe contamination of subject

properties and surrounding parcels and seriously affect the value of those properties."[4]

Again, neither the degree of harm nor the incidence of disease is a fundamental issue.

Patchin (1988), noted that leaking underground storage tanks have a negative effect on

real estate and that even "...mildly contaminated [sites] can be expected to suffer reduced

marketability."[5]  A subsequent study conducted by Gamble and Downing (1984), revealed

evidence that the prices of building lots were lower near landfills and that the values for

residential properties located on the main access road serving the landfills were lower than

other properties in the area.[6]

---

[3]Kinnard, William N. and Elaine M. Worzala, "How North American Appraisers Value Contaminated Property and Associated Stigma," The Appraisal Journal, July 1999, 269-279.

[4]American Institute of Real Estate Appraisers; Research Department, Underground Storage Tanks: Basic Information For Appraisers (Illinois:  National Association of Realtors, 1988), 3.

[5]Patchin, Peter J., "Valuation of Contaminated Properties," The Appraisal Journal (January 1988), 10.

[6]Hays B. Gamble, Hayes, B. and Roger H. Downing, Effects of Sanitary Landfills on Property Values and Residential Development (University Park, PA:  Institute for Research on Land and Water Resources 1984), 7.

5.    Since that time, appraisal methodology has evolved rapidly, and by the late

1980's, American appraisers universally recognized several truths about contaminated

property:[7]

> 1.    A property may be affected by either on-site contamination or
>        proximate (that is, nearby) contamination.
>
> 2.    The methodology which had evolved for Eminent Domain appraisal
>        analysis proved to be the most useful for evaluating contaminated
>        properties.
>
> 3.    The cost of remediation is not, by itself, a sufficient proxy for the
>        diminution in market value, since at equilibrium contaminated
>        properties sell for less than the difference between unimpaired value
>        and the cost of remediation. This difference is called "stigma."
>
> 4.    The market explicitly recognizes that remediation is often not a full
>        cure, and hence post-remediation properties continue to suffer from
>        a degree of stigma.

6.    Subsequent advances in appraisal standards and methodology have helped

give definition to these axioms and in 2003, the Appraisal Standards Board incorporated

this into Advisory Opinion 9 of the Uniform Standards of Professional Appraisal Practice.

7.    Patchin (1991) was also the first to show that the decline in value is often

greater than the cost-to-cure suggests.[8]  Mundy (1992a) identifies this phenomenon as

"stigma," a term which has continued in the lexicon to this day.[9]  In his definition, Mundy

(1992a) was also the first in the valuation literature to list specific criteria for stigma,[10]

which are:

---

[7]Kilpatrick, John A., and Bill Mundy, "Appraisal of Contaminated Property in the United States,"
Journal of the Japan Real Estate Institute, forthcoming.

[8]Patchin, P.J., "Contaminated Properties-Stigma Revisited," The Appraisal Journal, 1991, 167-172.

[9]Mundy, Bill, "Stigma and Value," The Appraisal Journal, 1992a, 7-13.

[10]While Mundy (1992a) was the first in the valuation literature to present these, he correctly cites the
authorship of this from the sociology literature: Edelstein, Michael, Contaminated Communities:
The Social and Psychological Impacts of Residential Toxic Exposure (Boulder, Colorado: Westview
Press, 1988), 6.

- Disruption
- Concealability
- Aesthetic Effect
- Responsibility

- Prognosis
- Degree of Peril
- Level of Fear

8.   These seven criteria, collectively, represent the necessary and sufficient con-
ditions for stigma.[11]

9.   Mundy (1992b) later showed that the diminution in market value can be
attributed to two different factors: a *marketability effect* and an *income effect*, neither of
which require a linkage to actual risk of disease nor is the causation predicated on an
actual determination of diminution in value. He attributed the former to the increased
marketing period for the asset; even in the absence of a decrease in selling price, value is
diminished due to the increased time necessary to realize liquidity as well as an increase in
the discount rate to account for higher risks of holding a relatively illiquid asset.[12]
Notably, this proves an unreasonable risk of harm to value -the present value of the asset -
even without a diminished price of the asset.

10.   In summary, Grace has either misunderstood or misconstrued the science with
respect to valuation. Cause and effect are frequently determined together, but not
necessarily so. Appraisers can, and in fact frequently do, measure effect without attribut-
ing a specific cause. Of more direct impact on this case, however, appraisal methodology
as practiced today - the "science" of valuation - provides sufficient theoretical and
empirical support to allow us to causal links before attempting to measure empirical
results.

---

[11]Kilpatrick and Mundy, op. cit.
[12]Mundy, Bill, "The Impact of Hazardous Materials on Property Value," The Appraisal Journal,
1992b, 155-162.

11. As for the supposition that an unreasonable risk of harm to real estate values be predicated on a proof of disease, this flies totally in the face of over twenty years of valuation literature. Appraisers are empirical economists, and as such are focused on observable valuation data. The valuation literature is replete with well developed, well documented, and well defended empirical studies proving that an environmental impairment such as ZAI causes harm to real estate values without any establishment of a proof of disease. Thus, a determination that the presence of ZAI causes an unreasonable risk of harm to the value of real estate requires neither the measurement of the actual harm itself nor is it dependent on the proof of disease.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August __7__, 2003.

JOHN A. KILPATRICK, Ph.D.