# ATTACHMENT H

# ZONOLITE ATTIC INSULATION REPORT

**William M. Ewing, CIH**
**Technical Director**
**Compass Environmental, Inc.**
**1751 McCollum Parkway**
**Kennesaw, Georgia 30144**

**March 19, 2003**

## ZONOLITE ATTIC INSULATION

## I.    INTRODUCTION AND BACKGROUND

William M. Ewing, CIH of Compass Environmental, Inc., 1751 McCollum Parkway, Kennesaw, Georgia 30144, was requested to evaluate Zonolite Attic Insulation (ZAI) and to give opinions on its friability, fiber release potential, and its ability to contaminate buildings.   He was also asked to opine on federal and state regulations governing asbestos, evaluation of ZAI in homes and appropriate response actions in buildings where ZAI has released asbestos fibers.   Mr. Ewing is an expert on asbestos in building issues. He is qualified as an expert in this area as a result of his education, training and professional consultation in the field.   In forming his opinion, he has performed certain work discussed below and reviewed government publications, scientific articles, and documents and testimony produced in this matter.   He has also relied on his education, training and experience.

Mr. Ewing received a Bachelor of Science in Biology from Washington and Lee University.   In 1978, Mr. Ewing began work at Clayton Environmental Consultants, Inc. in the field of industrial hygiene.   In 1981, he joined the Georgia Tech Research Institute and started its industrial hygiene laboratory, instituted the hazardous waste program for small businesses in Georgia, was director of the EPA-sponsored Asbestos Information Center, and served as an industrial hygienist under the 7(c)(1) program, sponsored by the Occupational Safety and Health Administration (OSHA).   In 1983, Mr. Ewing became board certified in the comprehensive practice of industrial hygiene.   In 1987, he left the Georgia Tech Research Institute to take the position of Executive Vice President at the

1

Environmental Management Group, Inc. In 1990, Diagnostic Engineering, Inc. acquired Environmental Management Group, Inc. and employed Mr. Ewing as Regional Technical Director until 1993 when he joined the consulting firm, Compass Environmental, Inc., where he is currently the Technical Director.

During his career, Mr. Ewing has conducted numerous industrial hygiene, asbestos management and environmental studies. He has authored several publications and served on many committees, including governmental and industrial committees, to study the following: identifying asbestos in buildings, disposal of asbestos-containing materials, evaluation of asbestos-containing materials, and procedures for the abatement or containment of asbestos-containing materials in buildings. Mr. Ewing has also conducted asbestos surveys for asbestos management and control in commercial and government facilities, including commercial office buildings, schools, hospitals, ships, industrial plants and government buildings. In addition, Mr. Ewing has frequently directed or lectured in training courses sponsored by universities, government agencies and private interests on topics including respiratory protection, asbestos identification, evaluation, management and control and industrial hygiene. Mr. Ewing has provided asbestos-related consulting services to property managers and building owners throughout the nation.

Mr. Ewing has over 24 years experience evaluating asbestos in buildings in 42 states. He has conducted over 2,500 building inspections and designed asbestos abatement projects for over 100 buildings. He is accredited as an Asbestos Inspector, Asbestos Management

2

Planner, Asbestos Abatement Project Supervisor, and an Asbestos Abatement Project Designer pursuant to the Environmental Protection Agency (EPA) regulations.[1]

Mr. Ewing was formerly Director of the EPA-sponsored Asbestos Information Center at the Georgia Tech Research Institute. The primary mission of the center was to conduct training, research and provide technical assistance regarding asbestos in buildings. During the 1980s the Center trained over 10,000 people across the United States, Canada, and Europe on the methods of asbestos management. He served as Chairman of the Governor's Conference on asbestos in 1984 and 1985.

Mr. Ewing was invited to testify before OSHA regarding proposed changes to its asbestos regulations in 1984. He was invited by the EPA's Asbestos Action Program to serve as a technical advisor to the Regulatory Negotiation Committee for writing the Asbestos Hazard Emergency Response Act regulations in 1986-1987. He was invited to participate in the Congressionally mandated evaluation of asbestos in schools in the early 1990s.

Mr. Ewing has served on numerous advisory panels and peer review committees addressing asbestos-related topics. These panels and committees were sponsored by the EPA, the National Institute for Occupational Safety and Health (NIOSH), Navy (Shore Facilities Command), Army Corps of Engineers, General Services Administration, City of New York, Health Effects Institute, and the National Institute of Building Sciences.

---

[1] 40 CFR 763, Subpart E, Appendix C

Mr. Ewing served as an invited external peer reviewer for the EPA asbestos NESHAP revision.[2]

Mr. Ewing has published 19 articles on topics related to asbestos evaluation and control in buildings, and given over 50 presentations or papers on the subject at conferences or symposia. In recognition of his professional contributions he was designated a Fellow by the American Industrial Hygiene Association in 1995.

During the past 20 years Mr. Ewing has performed consulting, research and training relating to asbestos contaminated vermiculite in buildings. In 1987 he organized a technical session for the National Asbestos Council on the subject. More recently, in July 2002 he was invited to give a presentation at an ASTM conference on the subject of vermiculite mining in Libby, Montana.[3]

As a result of Mr. Ewing's work experience and asbestos training, he is qualified to offer opinions related to asbestos in building issues including the following: the nature and condition of ZAI in homes; air, dust and bulk sampling techniques; the contamination in a home resulting from ZAI; fiber release from ZAI under foreseeable uses of a home; the necessity to remove under strict industrial hygiene controls ZAI that may be impacted during a renovation or upon the demolition of the building. He is also qualified to offer opinions on guidelines and regulations issued by the EPA, OSHA and the Consumer

---

[2] NESHAP – National Emission Standard for Hazardous Air Pollutants (40 CFR Part 61, Subpart M)
[3] Ewing, William M., "Libby…A Historical Perspective," presented at the ASTM conference *A Review of Asbestos Monitoring Methods and Results for the New York World Trade Center, Libby Vermiculite, and Fibrous Talc*, Johnson State College, Johnson, VT (July 21-25, 2002)

Product Safety Commission (CPSC) relating to asbestos. Mr. Ewing's qualifications and training are set forth more fully in his Curriculum Vitae. (Attachment 1). Mr. Ewing charges $165.00 per hour for his time plus reasonable and necessary expenses.

Mr. Ewing has testified as an expert on asbestos in building issues on several occasions in both federal and state court. Included in Attachment 1 is a list of Mr. Ewing's asbestos expert deposition and trial testimony over the last five years.

## II.    NATURE OF ZONOLITE ATTIC INSULATION

The term Zonolite Attic Insulation (ZAI) refers to expanded vermiculite from the W.R. Grace (formerly Zonolite) Libby, Montana vermiculite mine. Vermiculite is a weathered form of mica that expands to at least 10 times its volume when heated. The term vermiculite has its Latin roots in the term *vermiculari* meaning to breed worms. This vermiculite, which is contaminated with fibrous tremolite and related forms of asbestos (winchite asbestos, richterite asbestos and fibrous actinolite), was shipped from the mine to an on-site mill where the vermiculite was separated from the other rock in the deposit. The vermiculite was then shipped to expanding plants around the country where it was poured into furnaces which utilized its internal moisture to "pop" it, much like popcorn.[4] Unlike most asbestos-containing products (spray fireproofing, acoustical plaster, floor tile, etc.), the asbestos-contaminated vermiculite used for ZAI was not mixed with any binding material (gypsum, cement, etc.) but was poured directly into bags for sale to consumers. Thus, unlike Grace's spray fireproofing product ("Monokote"), for instance,

which had a gypsum binder that Grace contended "locked in" the asbestos fibers, ZAI had no such binder, at least until the late 1970s. Although ZAI had been sold since at least the 1920s[5], according to Grace records, it was not until the late 1970s that Grace attempted to spray any kind of binder on the vermiculite being poured into the bags. Grace documents reveal that this belated binding effort was sporadic and often ineffective. The majority of ZAI in homes today is likely to be unbound.

The nature of the ZAI preparation process, which subjected the vermiculite to hammermilling at the mill and thermal expansion in the furnaces, resulted in some of the amphibole asbestos being liberated as individual fibers. Grace's internal documents report its microscopic analysis that tremolite could be seen lying on the surface of the vermiculite. As would be expected from such unbound asbestos, any disturbance of the material in handling would liberate additional asbestos fibers lying on the vermiculite pieces. Grace documents reflect that ZAI was known to release asbestos from handling. Other disturbance, such as blowing air over the vermiculite, was also found to liberate asbestos fibers. In the rebuttal to the U.S. Patent Office's denial of the initial patent application for a Zonolite-based product, it is stated, "Applicants' mass is friable, loose and flaky, and so lacking in physical strength as to be broken up at the touch. It has about the same strength as the ashes left on the end of a cigar."[6] From the review of Grace

---

[4] The expanded vermiculite has a golden color when expanded in an oxidizing environment, and a silver color when expanded in a reducing environment. Zonolite was reported available in both colors; See the Zonolite Company, Libby, MT, *Zonolite "Montana's Mineral Marvel*," (circa 1928).

[5] The Zonolite Company, Libby, MT, *Zonolite, As A Heat Loss Insulator in Buildings: Warmer in Winter – Cooler in Summer* (sales pamphlet), (Circa 1928).

[6] From the U.S. Patent Office file for Patent No. 1,693,015 awarded to Joseph A. Babor and William L. Estabrooke, November 27, 1928. Quotation from Brief for Babor and Estabrooke before the hon. Commissioner of Patents, New York, September 20, 1928.

6

documents, as well as my own work discussed herein, I conclude that ZAI is a highly friable asbestos product.

## III.    ASBESTOS WEIGHT VERSUS ASBESTOS FIBER COUNT

I understand that Grace contends that because ZAI often had less than 1% asbestos by weight, it should not pose a building contamination or potential health concern. The data I have reviewed indicates that ZAI in some homes has tested at more than 1% asbestos.[7] This would not be surprising since the asbestos content of the Libby vermiculite deposit varied significantly.[8] It would be expected that vermiculite ore with varying asbestos percentages entering the Libby mill would result in an expanded vermiculite that also had varying asbestos percentages leaving the expanding plant.

However, more important, than whether ZAI had more or less than 1% is the fact that the asbestos in ZAI, at least through approximately 1980 (four years before ZAI was discontinued), was totally unbound, highly friable and subject to release from normal handling. Grace officials conceded that even "bound" ZAI released asbestos fiber upon disturbance. In any event, it is not asbestos weight, but fiber release that is important. An asbestos product with a significant percentage of asbestos may pose little or no hazard in normal use, such as a solid asbestos-containing laboratory table. However, a product with a small percentage of asbestos by weight or volume can pose a significant hazard if the fibers are unbound and can be released from the product to become airborne. Once airborne, the fibers pose an immediate exposure hazard to persons in the area. These

---

[7] Shelborne Laboratories, Progressive Builder Vermiculite Sample #2, April 21, 1987 reported as 5% tremolite asbestos; See Fisette, Paul, *Progressive Builder*, pp. 35-36 (July 1987).

7

fibers eventually settle onto building surfaces where they may be suspended into the air again, thereby creating a repeated exposure potential. The ZAI studies described in this report confirm that disturbance of ZAI, as would be undertaken during foreseeable homeowner activities, can release significant amounts of Libby amphiboles (i.e., fibrous tremolite, actinolite, and related amphiboles). After being released in the air, the asbestos will settle on surfaces in the home, primarily the attic and any area to which Libby vermiculite has migrated. As shown by our home inspections, Libby vermiculite has an affinity for seeping through cracks and crevices and entering living space.

The importance of the propensity for asbestos to be released, rather than its weight in a product, was known to W.R. Grace. Internal Grace documents reflect concern that asbestos fiber release from ZAI (not weight) was the critical issue, and that ZAI being sold in the 1970s could not meet the then-current occupational standards, which were more lenient than today. ZAI would certainly not meet the current, more stringent OSHA standards, based on the Grace test results.

Likewise, it is helpful to focus on the fiber level readings from the studies conducted and attached to this report (Attachments 2 and 3). The tests in the Busch residence, for example, indicated that when ZAI was disturbed by moving it aside using the Grace method, as would be done to install a pull-down stairway in an attic, the activity generated 6.29 structures per cc. There are 1000 cubic centimeters in a liter. Thus, 6.29 structures per cc equals 6,290 structures per liter. An adult breathes approximately 10

---

[8] Note: Zonolite mountain was formerly exploited by the Vermiculite and Asbestos Co. for both vermiculite and asbestos before its merger with The Zonolite Company in 1939.

liters of air per minute. Thus an adult exposed in an attic to 6.29 structures per cc of asbestos, as generated in the simulation, would inhale about 1,887,000 fibers of asbestos during 30 minutes in the attic.

## IV.    AIR TESTING VERSUS DUST TESTING

In order to determine whether asbestos could be released into the air from ZAI during foreseeable disturbance, a series of studies were conducted. It is important to realize, however, that while the studies demonstrate the ability of ZAI asbestos dust to become airborne, airborne asbestos readings are not recommended by EPA to be the primary tool to assess asbestos contamination in a building. Airborne fiber levels are transient, depend on the activity in the area, vary with sampling locations and present only "snapshots" of the air during the time the samples are collected. This issue has been addressed by EPA on a number of occasions. In an EPA publication of June, 1985 *Guidance for Controlling Asbestos-Containing Materials in Buildings*, the agency stated, "It (air testing) measures only current conditions and provides no information about fiber release potential and future air levels."[9] EPA again addressed the issue in its 1987 Asbestos Hazard Emergency Response Action Regulations:

> Several commentors, primarily from industry, encouraged the establishment of air monitoring standards as the primary basis for hazard assessment.
>
> ...
>
> EPA continues to discourage the use of air monitoring as the primary technique for assessing asbestos hazards, since that method only measures current conditions and provides no information about potential and future levels of fiber release.
>
> ...

---

[9] USEPA, *Guidance for Controlling Asbestos-Containing Materials in Buildings*, Publication N. EPA 560/5-85-024, P. 4-3, (June 1985)

9

> Several industry commentors proposed that EPA adopt air monitoring standards for damaged and significantly damaged ACM [asbestos-containing material].
>
> ...
>
> The agency believes that such standards used for purposes of assessing asbestos hazards could not ensure protection of human health and the environment as intended by TSCA Title II.[10]

EPA has also recognized that reliance solely on air monitoring can miss episodic events in a building, as would occur in the studies when ZAI was disturbed in an attic. EPA has noted that air monitoring may underestimate exposures because, "Air monitoring may not be done frequently enough to include such episodic events [repair work or accidental disturbance]; this can lead to a misleading interpretation of air sampling results."[11] Grace air tests, which show little or no asbestos in a ZAI-insulated attic when no activity is occurring, are examples of missing episodic events, as shown by our studies of foreseeable activities in attics which generated elevated asbestos levels.

Rather than relying primarily on air testing, EPA has recognized that trained and accredited asbestos inspectors are qualified to determine from visual inspections of debris if friable asbestos-containing materials pose a building contamination problem. In the case of ZAI, this is not a difficult determination because ZAI by its nature resembles the asbestos-containing debris that building inspectors often look for in buildings with other types of asbestos-containing materials. In the case of ZAI, surface dust analysis is particularly useful to determine if a building area is contaminated. Since the Libby amphiboles do not appear naturally in the rest of the country, except in Libby, MT and

---

[10] Federal Register, Vol. 52, No. 210, p. 41838 (October 30, 1987)

perhaps in the vicinity of some expansion plants, there is no "background level" of Libby amphibole asbestos in settled dust. However, chrysotile asbestos, the type used in many industrial products, has been found in background urban air and many settled dust samples. Thus, a finding of any Libby amphiboles in settled dust in homes with ZAI indicates that the Libby amphiboles have escaped from the ZAI and contaminated the building surfaces. Air testing simply confirms that those fibers can become airborne to be breathed by building occupants, including contractors who may work in the homes rewiring electricity, fixing plumbing leaks, installing attic fans, stringing cable TV lines, installing telephone wiring, etc.

In contrast to air testing, surface dust testing indicates whether the *building* itself is contaminated, versus the *air* contamination data given by air testing. Dust testing has been conducted for asbestos since at least 1935 when a Harvard professor examined settled dust from rafters and published photomicrographs of the results.[12] In 1972, Dr. Selikoff conducted settled dust testing in homes where asbestos workers had lived previously.[13] EPA has expressed its concern about the "resuspension of previously released fibers that have settled onto floors and other surfaces".[14] The agency has noted that:

> Resuspension of asbestos fibers that have settled may result from many different activities, including dusting, sweeping, vacuuming, and even ordinary movement in the vicinity of the settled fibers. This process of release and resuspension of asbestos fibers results in continued dispersal of asbestos fibers throughout the building.[14]

---

[11] USEPA, *Managing Asbestos in Place, A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials*, Publication No. 20T-2003, p. 15, (July 1990)

[12] Hurlbut, C., "The Mineralogy of Asbestos Dust", Journal of Industrial Hygiene 17:289-293 (1935)

[13] Selikoff, I.J. et al, "Asbestos Air Pollution", Archives of Environmental Health 25:1-13 (1972)

[14] Federal Register, Vol. 47, no. 103, p. 23361. (May 27, 1982).

11

More recently EPA has noted that "[d]ry sweeping or dusting can result in asbestos fibers being re-suspended into the building's air and therefore should not be used".[15]   Quite recently, EPA has used dust sampling as part of its analysis efforts for asbestos contamination in the homes in Libby, Montana. As EPA informed the public in its EPA Fact Sheet:

> "Asbestos fibers in <u>dust</u> are measured using (TEM) after an indirect preparation step.   The indirect preparation involves dissolving the filter and removing everything but asbestos fibers."[16]

The effectiveness and reproducibility of the microvac technique for settled dust, as utilized in the ZAI evaluations discussed herein, has been confirmed by independent analysis.[17]

Asbestos in settled dust has been not only a concern to the industrial hygiene community generally, but also to W.R. Grace. In October 1988, W.R. Grace commissioned an asbestos survey of one of its plants which included testing for "residual surface contamination". The consultant reported "visual surface contamination present in several areas of the battery separator warehouse and boiler room". The consultant recommended that workers not conduct any dry sweeping or vacuuming and that the contamination be cleaned up.[18] The Montana Board of Health had reported its concern to W.R. Grace after an inspection at Libby that "the rafters were heavily loaded with dust. Much of the high dust concentrations noted were due to this dust falling off the rafters and other places of

---

[15] EPA, *Managing Asbestos in Place*, p. 19. (1990).

[16] EPA Fact Sheet: Asbestos Sampling in Libby, MT (May 2000).

[17] Crankshaw, O., "Quantitative Evaluation of the Relative Effectiveness of Various Methods for the Analysis of Asbestos in Settled Dust", Research Triangle Institute.

[18] Asbestos Survey W.R. Grace – Acton facility (October 1988).

12

deposit."[19]   The Montana State Board of Health industrial hygiene report of 1956 conducted at the Libby plant relied on the dust sampling data performed by Zonolite Corporation at an earlier date. Zonolite Corporation had found 8 to 21% asbestos in the dust.[20] In June, 1969, W.R. Grace's Safety Director reported that his' visit to a Grace facility revealed "dust accumulations ... all horizontal surfaces was extremely heavy ... Building vibration dislodged ledge accumulations creating a vicious cycle."[21]

In 1983, while Grace was still selling ZAI, Grace personnel recognized the dangers of asbestos in vermiculite dust:

> I feel the employees do not comprehend the relationship between a pile of spilled vermiculite and a health hazard. Fibers are basically an invisible villain. WE must reeducate ourselves and our employees to treat vermiculite as a "hazardous" product.[22] (emphasis in original)

W.R. Grace has recognized that building contamination, as evidenced by surface dust, requires remediation without consideration of air sampling. When Grace was planning to renovate part of its Cambridge, Massachusetts' facility, it discovered asbestos-contaminated talc dust on floors, beams, pipes and other horizontal surfaces. Grace concluded that talc waste was not covered by the NESHAPs regulations, "as the waste does not contain commercial asbestos".[23]  Nevertheless, Grace's specifications for the clean-up of this talc, (which contained no more than 2% asbestos), required isolation of the work area, protective clothing and special cleaning methods.[24]  In 1984, a Grace industrial hygienist noted a "problem with asbestos dust contamination on the surfaces of

[19] May 11, 1964 Letter from Benjamin F. Wake to R.A. Bleich.
[20] Wake, Benjamin F., Montana State Board of Health, A Report on an Industrial Hygiene Study of the Zonolite Company of Libby, MT, August 8-9, 1956, p.3
[21] June 20, 1969 Memo Peter Kostic to G.C. Cunningham.
[22] June 15, 1983 Memo from Winkel to Wright.

13

materials stored in (a Grace building)". Grace ordered an "intensive clean-up" by the contractors who had been working in the building disturbing asbestos.[25] Grace noted in 1985 that asbestos-contaminated dust could settle on people, as well as surfaces:

> Clothing picks up and traps tremolite fibers and, if not periodically cleaned, continuously releases them into the workmen's breathing zone at an increasing rate.[26]

A Canadian researcher hired by Grace to study its Libby operation took 21 dust samples at a Grace facility and reported the number of fibers per milligram of dust.[27]

The dust sampling method used for settled dust sampling and analysis in the ZAI home evaluations was ASTM method 5755.[28] This method reports asbestos structures per unit of area sampled.

## V.    ZAI STUDIES AND GRACE'S ZAI TESTING

As part of our investigation of Zonolite insulation, we undertook a series of tests to evaluate exposures from reasonably foreseeable activities in homes containing Zonolite insulation. These activities included the following:

- Cleaning of stored items in an attic with Zonolite at perimeter only
- Cleaning of an attic completely insulated with Zonolite
- Cutting a hole in a ceiling of a living space below Zonolite attic insulation (ZAI)
- Moving aside Zonolite attic insulation using the Grace method
- Moving aside Zonolite attic insulation using a homeowner method
- Removal of Zonolite insulation from the top of wall cavities with a shop vacuum

---

[23] March 21, 1984, Building Interior, Cleaning Specification.

[24] Building Interior, Cleaning Specification (1984).

[25] T.E. Hamilton August 23, 1984 Memo to D.C. Wightman.

[26] March 26, 1985 Memo from McCaig to Stowell.

[27] McDonald, J.C., et al, "Health of Vermiculite Miners Exposed to Trace Amounts of Fibrous Tremolite", British Journal of Industrial Medicine, 1988, 45:630-634.

These activities were undertaken to simulate the types of normal activities and renovations that would be expected in homes.

In addition to conducting these tests, W.R. Grace testing of ZAI was reviewed. From the test reports provided, there was no evidence that Grace had tested ZAI under many of the foreseeable conditions of disturbance that could occur in a home after ZAI was installed. The Grace ZAI tests are primarily simulation studies (including "drop" tests), or actual installation tests. Some post-installation air samples taken in attics with no apparent activity were also reviewed. Although Grace (Zonolite) has been selling attic insulation since the 1920s, the earliest ZAI testing provided to us began in the mid-1970s. These earliest tests, conducted on what Grace described as its "production material," showed extremely high fiber counts, some in excess of even the higher OSHA permissible exposure limits of that time. Since these tests were run on the production material, it can be reasonably be concluded that inexperienced homeowners installing ZAI would have been exposed to at least these levels, if not higher. Some of the tests were performed in a "drop test" room or "simulated attic." According to the deposition testimony of Ms. Julie Yang, Grace did not always follow the standard microscopic counting rules described by the NIOSH. Rather, Grace undercounted the fibers by eliminating those that Grace microscopists judged were not tremolite.[29] All fibers should have been counted and, if in the opinion of the microscopist, there was additional information to disregard some fibers this should have been clearly stated and a second count provided with an explanation. As someone who did work on the concept of discriminatory counting from 1979-1983, I feel

---

[28] ASTM method 5755, *Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations* (2003)

15

certain that using only a light microscope it would have been very difficult to validly eliminate such fibers as cellulose, and many thin fibers. Accordingly, it must be assumed that many of the analyses performed by the Grace laboratory in Cambridge undercounted the true fiber content of the sample.

The OSHA standards were not intended in the mid-1970s to be "safe" levels of asbestos exposure. OSHA continues to reiterate this fact regarding today's standard as well. Both OSHA and NIOSH has explained on numerous occasions that there is still a significant risk for asbestos-related disease at the "permissible exposure level" (PEL) it has set. The PEL is a regulatory trade off, which takes into account technical and economic feasibility considerations. The OSHA standards do not apply to homeowners or children.

Review of the Grace installation testing also reflects that Grace often reduced the fiber levels measured by 75% because Grace contended that a homeowner would install an entire attic of ZAI in two hours (out of an eight-hour day) and would have no further exposure to ZAI thereafter. The testimony of homeowners in this proceeding refutes this. Homeowners often took several days to install ZAI and had additional exposure through work in the attic thereafter. Grace's claim that homeowners would conclude an attic job in two hours is contrary to Grace advertising that the job would take four hours or more. Grace also often sampled only during the actual pouring, thus missing any continuing exposure during clean up. Fiber levels are likely to stay elevated for some time after ZAI disturbance. With respect to the issue of hazard posed by ZAI, the Grace installation testing in the late 1970s reflects fiber counts that exceed the OSHA 1976 ceiling

---

[29] Deposition of Julie Chi-Sun Yang taken February 20, 2003, p.98

concentrations, which is a level that is not to be exceeded at any time. These excess levels were recorded, apparently using Grace's "discriminatory counting" (which lowered the numbers recorded).

It was foreseeable that ZAI installed in a home could cause additional fiber exposure upon disturbance. There was nothing in the nature of ZAI that would cause the fibers in ZAI to bind or disappear after installation. Unlike other asbestos-containing products, ZAI did not set, harden, cure, or in any way chemically react to confine the asbestos fibers within the product. Rather, the fibers that were loose when ZAI was installed remained available to be reentrained upon disturbance of the ZAI. Renovation of structures is clearly foreseeable over their lifetime.

As noted above, to determine levels of ZAI fiber release during foreseeable home activities, we undertook a series of simulations that are detailed in Attachments 2 and 3. These studies clearly demonstrate that significant exposures occur when ZAI is directly disturbed. They also demonstrate that exposures can occur through routine cleaning activities in attics where Zonolite dust is present. Our studies did not look at activities such as major home renovations or demolition activities that would be expected to result in higher airborne levels of asbestos.

One study, conducted by the Canadian Department of National Defense in 1997 did look at exposures to asbestos from contaminated vermiculite attic insulation in base buildings

17

during demolition practices.[30] In this study workers demolished a ceiling, let the attic insulation drop to the floor, shoveled the waste into the back of a truck, and unloaded the waste at a landfill. The TEM results (NIOSH method 7402) found 4.4–174 f/ml (greater than 5 micrometers) during ceiling demolition and clean up for the personnel doing the work, and 64.5-152 f/ml (greater than 5 micrometers) for the workers unloading the waste at the landfill. Bulk samples of the tremolite-actinolite contaminated vermiculite indicated it contained only a "trace" of the amphibole contamination (less than 0.1%). These data further support and clearly confirm that seemingly very small amounts of asbestos as a contaminant in a product such as ZAI can result in very excessive exposures.

---

[30] Pinchon Environmental, Site Assessment, Vermiculite Removal, Building E-12, C.F.B. Shilo, Shilo, Manitoba, Department of National Defense, Base Construction Engineering, April 3, 1997

# ATTACHMENT I

COPY

1          SUPERIOR COURT, STATE OF WASHINGTON
                    COUNTY OF SPOKANE
2

3    MARCO BARBANTI, individually
     and on behalf of a class of
4    all others similarly situated,
               Plaintiffs,
5

6    vs.                              NO. 00-2-01756-6

7

8    W.R. Grace & COMPANY-CONN, a
     Connecticut corporation; W.R. Grace
     & COMPANY, a Delaware corporation;
9    W.R. Grace & CO., a/k/a Grace, an
     association of business entities;
10   SEALED AIR CORPORATION, a Delaware
     corporation; and WILLIAM V. CULVER,
11   resident of the State of Washington,
               Defendants.
12

13

14

15              DEPOSITION OF RALPH E. BUSCH

16   Deposition upon oral examination of RALPH E. BUSCH,

17   taken at the request of the Defendants, before David

18   Storey, a Notary Public, CSR No. STORED*566QO, at the

19   law offices of Lukins & Annis, 717 W. Sprague Avenue,

20   1600 Washington Trust Financial Center, Spokane,

21   Washington, commencing at or about 2:00 p.m., on

22   August 22, 2000, pursuant to the Washington Rules of

23   Civil Procedure.

24

25

                                                              1

1    the attic in your home?

2    A.    To the best of my recollection, I did all that I

3    did up there during the course of the spring of '98.

4    Q.    How high is the roof above the attic?

5    A.    It is actually quite a large space up there, I even

6    thought of the possibility of breaking through it and

7    making a higher ceiling in the master bedroom.   But it

8    is, you can stand up.   It is quite a high peak.

9    Q.    How far off the center of the house can you walk

10   without stooping?

11   A.    Oh, there is probably maybe five feet either way

12   from the center.

13   Q.    Could you describe for us what working repairs or

14   renovations you've done to your home that have

15   disturbed the vermiculite insulation?

16   A.    Yes.   Well, as I mentioned, I redid all of the

17   bracing on all four sides of the attic from the floor

18   joist to the ceiling joist, you know, because the,

19   there was nothing there, so I--and what I did is I used

20   2x4's and I basically I framed it out on all four

21   sides, and because of the size limitations and the lack

22   of light up there, each time I would go all the way

23   down to the backyard to cut the lumber so I was in and

24   out of that space a number of times, and in pounding

25   even, you know, on the floor, so and I had some work

67

SALAZAR/BUSCH

1    lights up there and there was considerable dust that

2    you could see in the light. So it was a very dusty and

3    dirty process.

4              And I spent, and as I mentioned, too, around

5    that same time I took the additional insulation up

6    there and I spent several weekends during the spring,

7    you know, really concentrated weekends working on that

8    project.

9    Q.   And that work was done in the spring of 1998?

10   A.   Yes.

11   Q.   Did you finish the bracing work that you needed to

12   do in the attic?

13   A.   What I felt that was necessary, Donna would have

14   had me put one more in. And then the other was it all

15   started when I bought a washer and dryer, because the

16   house didn't come with one, for the--and started to

17   install it off of the kitchen on the first floor.

18             And then one thing led to another and I

19   realized that the ceiling was dropped quite a bit and I

20   could visualize that there was a lot of space up there.

21   And thought I would lift the ceiling height. And so I

22   started doing some demolition and I, and there were

23   several layers, there was a--there was a framed out 2x4

24   ceiling with sheetrock on it, and then when I got up

25   into that, above that, took that out, there was

68

1    actually the old material from the original porch that

2    was there that was 2x6's with shiplap tongue in groove

3    and then on top of that there was a layer of tar paper

4    with roofing nails going into the back side of the

5    shiplap, and then above that is the floor above was

6    framed out with 2x6's and it is in those spaces where,

7    when I, when I cut through the shiplap and the tar

8    paper, the vermiculite was filled in that, between the

9    2x6's and came pouring down.

10              I worked on that--I started, actually I

11   worked on that last summer, primarily last summer.  And

12   I think I started in April or May and I worked pretty

13   much through the summer on that and got to October, I

14   quit.

15              By working through the summer, I mean I had

16   a full-time job so this was a weekend project.  And

17   most of my weekends I would spend at least one day

18   working on it and then some days after work.

19   Q.   All of the demolition of the ceiling was done in

20   the addition part of your house?

21   A.   Correct.

22   Q.   What did you do with the vermiculite that came down

23   when you were demolishing the ceiling?

24   A.   I would just sweep it up at the end of the work

25   session and I got it, I got a little more savvy, as I

69

1    went on, as far as processwise.  I would use my 10

2    gallon shop vac and kind of carry up and set it up on

3    top of the ladder, and try to suck out all of the

4    vermiculite without, minimizing the amount that would

5    actually fall from the ceiling and hit the floor that I

6    would have to clean up.  So I tried to minimize it in

7    that way, because there was a lot of it.  I think I

8    probably filled eight or 10 of those canisters with,

9    and then of course, I took most of that out and put it

10   in the flower beds around the house.  I feel terrible

11   about that.

12   Q.  Can you estimate the size of the space that--the

13   size of the area of the ceiling that you were removing?

14   A.  Yeah, it is, yes, it is, let's see I think it is 7

15   by 14.  Doesn't sound big but I must have taken five or

16   six truckloads of debris to the dump from it.

17   Q.  What was the project that you were doing, what was

18   the goal of the demolition that you were--

19   A.  I am creating, I'm enlarging the kitchen and

20   remodeling the kitchen.  I'm putting in a powder room

21   and a laundry mud room at the back entrance of the

22   house, is what was my goal.

23   Q.  Where is that project today?

24   A.  It is on hold.

25   Q.  And do you believe that you have gotten all of the

70

SALAZAR/BUSCH

1   vermiculite you could see out of the ceiling area in
2   the addition?

3   A.   I hadn't totally completed the demolition so there
4   is still a little bit more ceiling that has to come
5   down.   I would say probably 85, 90 percent of it is
6   gone but there is still some there.

7            Plus when I removed the walls, the footer
8   for the walls would, was kind of in--was below the
9   floor level, they had actually installed an underlay in
10  the vinyl after they had built the wall, and so when I
11  took, when I took those walls out, and I tore that
12  portion of it that was set into the floor out, it
13  exposed kind of an interior of the underlying floor in
14  that, in that addition where I have vermiculite
15  insulation migrating into these holes.   I can vacuum
16  them repeatedly and this vermiculite still migrates
17  into these holes.   So I know I've got it in the floor
18  as well.

19           So, and it was my intention to remove the
20  underlay material, expose the floor joists and redo, I
21  mean, in other words, a total gut, you know, right to
22  the floor joists and so--but I'm certain I have it in
23  the floor there as well.

24  Q.   What did you observe when the vermiculite was being
25  disturbed in the addition?

71.

1   A.   That it is very dusty.  That it has a very, a
2   very--sure, it has got the lumps, you know, as far as
3   the popcorn type lumpiness that is easy to vacuum or
4   sweep up, but there is a, there is this real fine fine
5   dust kind of property to it.  That just is, gets, is
6   hard to control and gets all over everything.  It is--I
7   tried to--at one point I put visqueen up, segregating
8   the work area from the rest of the house.  And I would
9   wear a paper dust mask as much as I possibly could,
10  because I'm kind of sensitive to dust and dirt and
11  things like that.  So--
12  Q.   Did the screen that you put up help to control the
13  dust and the remainder of your house?
14  A.   I have to think that it was some help, but Donna
15  was concerned on a number of occasions that, you know,
16  I was getting other parts of the house dirty, and she
17  was--it was a requirement that I clean up as well as
18  possible after each day's work on the project, you
19  know, so--
20  Q.   Would you be able to make any--I'm sorry, let me go
21  back.
22           Are there any other repair or renovation
23  projects that you've done other than the bracing in the
24  attic and the work that you did on the addition that
25  disturbed vermiculite in your home?

72

SALAZAR/BUSCH

1    A.   No.

2    Q.   Would you be able to estimate about how many hours

3    you spent disturbing the vermiculite in your addition?

4    A.   I estimate that between the attic bracing and the

5    back porch that I'm close to 200 hours.

6                      (Ex. No. 11, Floor plans of remodeling

7    activity, marked.)

8    Q.   (BY MS. SALAZAR)  Mr. Busch, can you identify

9    Exhibit Busch 11 for us?

10   A.   Yes, these are, as I had mentioned earlier, my wife

11   is an architect, and I'm, I'm an artist, and we've,

12   these are drawings, progressive drawings of our

13   remodeling activity as I describe it on the first floor

14   rear of the house.  It includes the kitchen, powder

15   room, laundry, mud back entry area.  So what you see on

16   the first page 0179 is kind of a more initial kind of,

17   well, actually it is an as-built, it is the

18   measurements of the space is what that is.

19                  And then the second page is the design.  It

20   is a scaled CAD drawing of what we decided to do there

21   with that space.

22   Q.   So the first page is what the space to be remodeled

23   looked like before you did any demolition, is that

24   right?

25   A.   No, it is actually taking into account the

73

1          IN THE UNITED STATES BANKRUPTCY COURT

2

3              FOR THE DISTRICT OF DELAWARE

4

5

6    In re:                    )

7                              )    Chapter 11

8    W.R. GRACE & CO.          )  NO. 01-01139 (JKF)

9                              )

10          Debtors.           )    (Jointly Administered)

11    _____

12

13               DEPOSITION OF RALPH BUSCH

14                     Pages 1 to 77

15    _____

16

17                         .

18

19          BE IT REMEMBERED that on the 27th day of

20    February 2003 at the hour of 1:00 p.m., the deposition

21    was taken of RALPH BUSCH before Joan M. Snover, Notary

22    Public and Registered Merit Reporter, CSR No.

23    SN-OV-EJ-M387NA, at LUKINS & ANNIS, 818 W. Sprague

24    Avenue, Suite 1600, Spokane, Washington, pursuant to

25    Washington Civil Rules of Procedure.

1   that would be '99, beginning in the spring of '99
2   throughout the entire summer and into October I would
3   say.

4       Q.   So the kitchen renovation project was delayed
5   or stopped several months before you learned about the
6   ZAI; is that correct?

7       A.   That's correct.

8       Q.   What was the reason for stopping that
9   project?  Just time?

10      A.   Yes.  Because I had a full-time job and again
11  life circumstances.  And the winter months aren't a
12  preferable work time.

13      Q.   Where were you working at the time?

14      A.   Well, and that's part of the life
15  circumstances on this timeline is that we both changed
16  employment.  And there was a period there where I was
17  laid off.  I had been a marketing director for an
18  architectural firm.  It's hard for me to say exactly
19  whether I was or wasn't working the particular time
20  that you're referring to.

21      Q.   Did a job change and being laid off, was that
22  one of the circumstances that contributed to the
23  decision not to make the mortgage payments?

24      A.   Not at all.

25      Q.   You had an estimate -- you have an estimate

BUSCH / Cameron

1    in this letter of about 200 hours spent in direct

2    exposure time to the vermiculite insulation material.

3    Do you see that?

4        A.   Yes.

5        Q.   How did you come up with that estimate?

6        A.   In having made that estimate, being closer to

7    actually having done the work, it's a reliable

8    estimate.  And by direct exposure, that means me

9    directly working in the midst of the material.  That

10   doesn't refer to -- that doesn't mean the indirect

11   exposure of living in a contaminated home.  That would

12   be in addition to the 200 hours.

13       Q.   The 200 hours that you're referring to is the

14   time spent on these various projects, the two projects

15   that we've just gone over?

16            MR. SCOTT:  Object to the form of the

17   question.

18   BY MR. CAMERON:

19       Q.   Is that correct?

20       A.   That's my most reliable estimate, yes.

21       Q.   You didn't document -- you don't have

22   documents that show the amount of time that you spent

23   on any of these projects, do you?

24       A.   Not that still exist, but I kept a fairly

25   good Daytimer at the time.

BUSCH / Cameron



1     Q.    Is the 200 hours, is that the total number of
2     hours that you estimate you spent on these projects?
3               MR. SCOTT:  Object to the form.
4     A.    No, because there was -- that is specifically
5     exposure to the dust, to the ZAI material, hands-on
6     exposure.  In estimating 200 hours of that direct
7     exposure, I'm not including taking truck loads of
8     demolished material to the dump or putting the ZAI in
9     the flower beds or peripheral-type of activity.  I mean
10    direct exposure.
11    Q.    Can you explain for me what the work was that
12    was direct exposure?
13    A.    Certainly.  Well, that includes the first
14    major project in the attic to reinforce the bracing
15    which included -- you have to understand that the
16    access to the attic is a small hatch in the bedroom
17    closet of the master bedroom.  So it involved removing
18    all the clothing from the closet and the shelving and
19    putting a ladder in there.  It's a very tight space.
20    And I couldn't cut the lumber for the braces up there
21    at all.  So I'd have to go up and down a number of
22    times to the back yard to do that.
23    Q.    Right.  I'm sorry.  Maybe my question wasn't
24    clear.  What I'm trying to do is focus on -- you've
25    referred to 200 hours of direct exposure.  I'm trying

SNOVER REALTIME REPORTING          36
(509) 599-2606 / (509) 599-1478

1    to figure out what parts of the project you were

2    referring to as your "direct exposure"?

3                    MR. SCOTT:  And he's answering that

4    question.

5    BY MR. CAMERON:

6        Q.   So you are including when you go outside to

7    cut the lumber as part of that 200 hours?

8                    MR. SCOTT:  No.  Object to the form of

9    the question.

10   BY MR. CAMERON:

11       Q.   That's my question.  I would like to know the

12   parts of the project that you are referring to as part

13   of the 200 hours of direct exposure.

14                   MR. SCOTT:  That's the question he's

15   trying to answer, but you cut him off before he

16   completed it.

17   BY MR. CAMERON:

18       Q.   Okay.  Fair enough.

19       A.   When I was up in the attic, that included

20   hammering lumber to the joists up there and framing out

21   the wall which -- sort of just a frame of bracing

22   supports on each side of the attic.  That included

23   taking a couple of planks up there, because you

24   couldn't just walk anywhere.  Your foot might go

25   through the ceiling, see, so I'd have to put some

BUSCH / Cameron

1    planks up there.  And that included moving the planks
2    around to the various parts of the attic that I was
3    working in.  And that included needing to physically
4    brush the ZAI off of the joists because its depth
5    varied from 6 to 8 inches.  So in some places it would
6    go up over the joists.  In order so that the planks
7    would set flush, I would need to brush it away as I was
8    moving the planks around.  And that included, as I
9    mentioned, going back and forth to cut lumber.  It
10    included taking the fiberglass insulation material that
11    I referred to up there.  And then the second major
12    project --

13        Q.    Is there anything else with the first project
14    that you include within the 200 hours of direct
15    exposure time?

16             MR. SCOTT:  Object to the form of the
17    question.

18        A.    You know, my awareness was nil at the time.
19    So I think that estimate is actually very conservative.
20    At this point I would include the cleanup because I
21    used a shop vac and sweeping, and I wasn't aware that
22    the material by nature would suspend in the air for as
23    much as a couple of days.  But I would say that would
24    be the attic.

25        Q.    The attic project?

BUSCH / Cameron

1     A.    The attic project.

2          Q.    So can you tell me what aspects of the
3     kitchen project you include within the 200 hours of
4     direct exposure time?

5                MR. SCOTT:   I object to the form.

6          A.    That would be specifically encountering the
7     ZAI in the ceiling and removing it and being beneath it
8     on a ladder and having it fall on me, having it fall on
9     the floor.  And then again there was the cleanup aspect
10    that I really probably didn't consider as being direct
11    contact as I would now.  But that was fairly
12    substantial, the amount of ZAI that I encountered in
13    that ceiling.

14    BY MR. CAMERON:

15         Q.    Any other aspects of that project that you
16    include in that time estimate for direct exposure?

17         A.    Just the direct contact with the material
18    that I've referred to.  I haven't included trips to the
19    dump or cleanup, a lot of the cleanup and disposal of
20    the material.

21         Q.    I'm just looking for anything that you have
22    not yet identified that you include within that 200
23    hours.

24         A.    I'm trying to be very specific of when I mean
25    direct contact.  I mean it's me there with the ZAI,

1    house?  Why would I do that?  Would you?

2         Q.    What were the remediation costs?

3         A.    32,000 dollars.

4         Q.    Not 60,000?

5         A.    That's my estimate adding the demolition and

6    reconstruction cost because you've got plaster and

7    lathe walls in that house and that asbestos has

8    migrated into the spaces between the floors and in the

9    walls.  The reason why I say that is we talked about

10   two projects specifically that I did, but there were

11   other projects.

12          I opened up a wall in the stairway to find a

13   utility shaft from the basement to the attic.  Okay?

14   Well, we had ZAI migrating out of that opening and

15   getting all over the house.  We were vacuuming that

16   stuff up on an ongoing basis.

17          I took paneling off in a second floor bedroom

18   which exposed a crack to the attic, and that

19   vermiculite was sifting down through that crack

20   continuously.  It was all over the place.  32,000

21   dollars was just an estimate.  That wasn't even a --

22   that didn't even come with a guaranty that it was

23   entirely removed.

24         Q.    Did you try to get a loan to remove the

25   insulation?

# ATTACHMENT J

Deposition of

Brendan J. King

August 18, 2000

BARBANTI V W.R. GRACE

CONDENSED TRANSCRIPT AND CONCORDANCE

PREPARED BY

STOREY & MILLER COURT REPORTERS

601 W. Riverside Avenue
Suite 1030
Spokane WA 99201-0910
Phone: (509) 456-0122
Fax: (509) 456-0169

**Page 21**

1  contained asbestos?
2  A. I didn't, I just guessed that it was, and I said I
   didn't want to deal with it.
4  Q. What was the basis for your guessing that certain
5  pipes you saw had asbestos insulation?
6  A. I had just heard that asbestos had been used to
7  insulate pipes so if I was in a very old building and
8  it looked like it was possible that it could be
9  asbestos I asked them to have it removed themselves
10 before I would work on it.
11 Q. Where did you hear that certain pipe insulation may
12 contain asbestos?
13 A. Oh, probably on the news or from other plumbers or
14 just--
15 Q. Do you remember how long ago you first heard that
16 pipe insulation could contain asbestos?
17 A. Not specifically. I would guess within the last 10
18 years, 15 years.
19 Q. Do you believe that you have known that pipe
20 insulation can contain asbestos for the entire eight
21 years that you have been a plumber?
22 A. Yes.
23 Q. Why did you refuse to work on pipes if you
24 suspected that the insulation contained asbestos?
25 A. I do mostly residential service work, it is not

**Page 22**

   very often that I would come across it. So on a few
2  occasions that I came across it, I just felt it was
3  something I didn't want to be involved with, didn't
4  need to be involved with, didn't want the
5  responsibility.
6  Q. What about asbestos pipe insulation concerned you
7  that made you not want to work on it?
8  A. I didn't want the liability for my business or if I
9  might be contaminating somebody's home or disposing of
10 it wrong, bringing also any hazard to myself.
11 Q. As far as you know, are you healthy, Mr. King?
12 A. Yes.
13 Q. Have you ever been diagnosed with cancer?
14 A. No.
15 Q. Do you have a family history of cancer in your
16 family?
17 A. No.
18 Q. Have you he have been diagnosed with any
19 respiratory problems?
20 A. Slight allergies.
21 Q. Anything else?
22 A. No.
23 Q. Are you now or have you ever been a smoker?
24 A. No.
   Q. How did you first learn that your home contained

**Page 23**

1  Vermiculite Attic Insulation?
2  A. We bought the home knowing that we were going to do
3  remodel on it. And so as soon as we bought it, we
4  started ripping into walls and going up in the attic
5  and it, as soon as we drilled a hole in the ceiling or
6  opened up a wall, vermiculite came pouring out.
7  Q. Were you ever in the attic in your home prior to
8  purchasing it?
9  A. No.
10 Q. Did you have an engineer or a contractor or some
11 other professional inspect the home prior to your
12 purchase?
13 A. No.
14         (Ex. No. 2, Photograph of residence,
15 marked.)
16 Q. (BY MS. SALAZAR) I've put in front of you an
17 exhibit labeled King 2 and ask you if you can identify
18 it?
19 A. That is my home.
20 Q. At 9909 East Garland?
21 A. Right.
22 Q. Is the picture at King 2 how your home appears
23 today?
24 A. Yes.
25 Q. Have you occupied your home on East Garland since

**Page 24**

1  you purchased it?
2  A. No, when we first purchased it we gutted the inside
3  of the house all the way to the outside walls and then
4  have been putting it back together ever since and we
5  had to repour the slab floor inside of it, so we didn't
6  actually move into the home until at least we had the
7  floor down and some of the walls up, which wasn't too
8  long. I would say that we probably moved inside the
9  dwelling approximately six months after we purchased
10 it.
11 Q. When you first began gutting the interior of your
12 home, is that when you discovered that you had
13 vermiculite insulation?
14 A. Yes.
15 Q. What activity did you first engage in in renovating
16 your home that led you to learn that you had
17 vermiculite insulation?
18 A. It was pretty all-encompassing, like I say, we
19 didn't--we started everywhere at once, just started
20 pulling every board off, cabinets, probably the kitchen
21 cabinets were the first things that came down and as
22 soon as I took a cabinet down it opened up holes in the
23 ceiling and the vermiculite came down.
24 Q. Would that removal of the kitchen cabinets have
25 occurred in the first six months that you owned the

1  property?
2  A. Yes, the first couple of weeks.
3  Q. So the first time you broke into the ceiling of
4  your home, vermiculite came pouring down?
5  A. Right.
6  Q. And so from that point on, you knew every time you
7  broke into the ceiling that vermiculite would come
8  pouring down?
9  A. Yes, or opened a wall or, yes.
10 Q. Did you ever, in the course of your renovation,
11 take some activity or do something to prevent
12 vermiculite from pouring down every time you opened the
13 ceiling?
14 A. Not really.
15 Q. Can you describe for us what the vermiculite looked
16 like that came out of your ceiling?
17 A. Like vermiculite, I guess. I know, I know what
18 vermiculite looks like, it is a pellet looking
19 material, kind of popcornish. It had been up there a
20 long time. A lot of dust would come down with it,
21 grayish material.
22 Q. You mentioned in paragraph 5 of your affidavit that
23 vermiculite also came pouring down when you removed
24 part of a cinder block wall?
25 A. Right.
                                                    25

1  vermiculite from your home, including the cinder block
2  walls?
3  A. I don't know.
4  Q. Can you describe for us, give us a little narrative
5  of the remodeling work that you have completed to date
6  in your home?
7  A. Took out all inside walls of the home except for
8  one bearing cinder block wall on the inside of the
9  home. Jack-hammered out the old, it is on a slab, the
10 old slab was cracked. Jack-hammered out the old slab,
11 redid all the rough-in plumbing underneath the slab,
12 poured a new slab, roughed in all the inside walls
13 with, except for the one bearing cinder block wall with
14 lumber. Redid all the electrical in the house with new
15 200 amp service and all new electrical. Redid all the
16 plumbing, water supplies, vents, drains, everything.
17 In the process of insulating the inside :
18 walls, put new drywall on the ceiling, installed new
19 plumbing fixtures, new cabinets, done a little bit of
20 drywall on the inside walls. I've done some tile, hung
21 a couple doors, that's about it, new furnace, new hot
22 water tank, new appliances. That's about it.
23 Q. Which of the remodeling projects that you have
24 described for us resulted in any disturbance of the
25 Vermiculite Attic Insulation or vermiculite wall
                                                    2

1  Q. Can you tell me when you first would have removed
2  part of a cinder block wall, when that happened, when
3  vermiculite came out?
4  A. I would say that wall probably came down in the
5  first maybe two months into the project.
6  Q. Did you investigate where that vermiculite in the
7  cinder block wall was coming from?
8  A. It was in the cinder blocks.
9  Q. Can you describe what the vermiculite in the cinder
10 block wall looked like?
11 A. Just like the stuff that is in the attic. Little
12 pellets, they are kind of puffed up, light-colored.
13 Q. Did the vermiculite in the cinder block wall look
14 any different from the vermiculite that was in the
15 attic?
16 A. No.
17 Q. If this litigation brought by Mr. Barbanti is
18 certified as a class action, is it your understanding
19 that the insulation in your cinder block walls is
20 included in the relief sought in the case?
21 A. That's not my understanding. My hope, the reason I
22 am involved in this at all is to have it removed from
23 my entire house, including the cinder block walls.
24 Q. Is it your understanding that the class litigation
25 is pursuing for you the removal of all of the
                                                    26

1  insulation?
2  A. The walls or the attic.
3  Q. Either or both.
4  A. Well, there is no--other than just a couple of
5  pipes that run underneath the cement foundation, drain
6  pipes, all of the water supply had to run through the
7  attic, through the insulation, and all the electrical,
8  all the wiring had, a lot of the wiring had to run
9  through the attic insulation.
10 When I would take a wall out, that would
11 leave gaps in the ceiling where the two by fours were
12 connected, you know, up to the rafters so insulation
13 would pour out then. When I tried to put walls back up
14 I was disturbing the rafters and stuff so more
15 insulation would pour out then.
16 I haven't completely sealed up the ceilings
17 and the walls where the walls connect and so as I'm
18 hanging a door at the present time, using a hammer or
19 something, vermiculite comes down. I'm still drilling
20 holes, still finishing up electrical and cable. When I
21 drill a hole, still now vermiculite comes down.
22 Q. Can you tell me which of the projects that you have
23 done that you believe have disturbed the vermiculite or
24 caused it to come down were done after you read the
25 article about possible hazards of vermiculite in the