IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., [1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Re: Docket Nos. 4009 & 4204** |

**REPLY OF W. R. GRACE & CO. TO ZAI CLAIMANTS' RESPONSE TO
GRACE'S MOTION FOR SUMMARY JUDGMENT**

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

# TABLE OF CONTENTS

I.      The Same Scientific Principles Apply To Determining Unreasonable Risk Of
        Harm In Property Damage Cases As In Personal Injury Cases ...................................1

II.     Claimants' Proffered Evidence Does Not Meet Their Burden Of Proof To
        Show That ZAI In An Attic Causes An Unreasonable Risk Of Harm. .......................3

        A.      There Is No Epidemiologic Evidence To Support The Allegation That ZAI
                In An Attic Creates An Unreasonable Risk Of Harm. ..............................................3

        B.      Claimants Have Not Rebutted Grace's Position That Evidence Concerning
                Mr. Harashe And Mr. Liebsch Is Irrelevant And Inadmissible. ............................5

        C.      Surface Dust Testing Is Scientifically Inadmissible Under *Daubert* And
                *Armstrong World Industries.* .................................................................................5

        D.      Claimants Continue To Ignore The Important Distinction Between
                Asbestos Fibers And Airborne Cleavage Fragments ............................................7

        E.      Claimants' Attack On Grace's Risk Assessment Does Not Rebut Grace's
                Showing That Claimants Have Failed To Satisfy Their Burden. ...........................8

## TABLE OF AUTHORITIES

**Cases**

*Adams-Arapahoe Sch. Dist. No. 28-J v. GAF Corp.*, 959 F.2d 868 (10th Cir. 1992) .................... 1

*In re Armstrong World Industries*, 285 B.R. 864 (Bankr. D. Del. 2002) ................................. 5,6,7

*Bonner v. ISP Technologies, Inc.*, 259 F.3d 924 (8th Cir. 2001)................................................... 5

*In re Celotex Corp.*, No. 90-10016-8G1, slip.op. (Bankr. M.D. Fla. July 17, 2003).......................2

*Cheshire Medical Center v. W.R. Grace & Co.*, Civ. No. 88-516-M (D.N.H. July 26, 1993).....6,7

*City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975 (4th Cir. 1987) .......................................1,2

*City of Wichita, Kansas v. United States Gypsum Co.*, 72 F.3d 1491 (10th Cir. 1996) .................1

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)......................................................... 6

*Farm Credit Bank of Louisville v. United States Mineral Products Co.*, 864 F.Supp. 643 (W.D. Ky. 1994) ...................................................................................................................... 2

*Harashe v. Flintkote Co.*, 848 S.W. 2d 506 (Mo. Ct. App. 1993)................................................. 5

*Kansas City v. W.R. Grace & Co.*, 778 S.W.2d 264 (Mo. Ct. App. 1989)....................................1

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ..................................................... 6

*Perlmutter v. United States Gypsum Co.*, 4 F.3d 864 (10th Cir. 1993) ......................................... 1

*U.S. v. Stephens*, 185 F. Supp. 2d 116 (E.D. Cal. 2001)................................................................ 5

*United States Gypsum Co. v. Mayor and City Council of Baltimore,* 647 A.2 405 (Md. Ct. App. 1994) .................................................................................................................................... 2

**Rules and Regulations**

Fed. R. Evid. 408 ..........................................................................................................................5

**Other Authorities**

Federal Judicial Center, Reference Manual on Scientific Evidence (2d ed. 2000)........................2

**I.    The Same Scientific Principles Apply To Determining Unreasonable Risk Of Harm In Property Damage Cases As In Personal Injury Cases.**

Claimants argue that different scientific and legal principles apply to their ZAI product liability claims because they seek to recover for property damage, not for personal injury. Claimants' Response at 1-4. They are wrong.

In making this argument, Claimants again attempt to restate the Science Trial issue in a way already rejected by this Court. In a hearing prior to the entry of the Court's Science Trial Order, Claimants' counsel complained that Grace was trying to push the case "to a quasi personal injury claim." Sept. 23, 2002 Hearing Transcript at 84. The Court responded that:

> Number one, yes, you're going to have to show me that there is some hazardous contamination. Now, what makes it hazardous? The fact is that it's going to either be hazardous to the environment or to the people who live in the home or something. There has to be a hazard. If there is no hazard, there is no claim.

*Id.* Thus, Claimants again ignore that they must prove that ZAI in an attic causes an unreasonable risk of harm, the standard this Court established for the Science Trial. *See* November 25, 2002 Order.

Moreover, the very cases that Claimants cite make it clear that property damage claimants must show unreasonable risk of harm. In the cases cited by Claimants, the courts have pointed to evidence of "contamination" only as providing the necessary element of "physical injury" to allow a plaintiff to seek recovery in tort, rather than in contract. *See City of Wichita, Kansas v. United States Gypsum Co.*, 72 F.3d 1491 (10th Cir. 1996); *Perlmutter v. United States Gypsum Co.*, 4 F.3d 864 (10th Cir. 1993); *Adams-Arapahoe Sch. Dist. No. 28-J v. GAF Corp.*, 959 F.2d 868 (10th Cir. 1992); *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975 (4th Cir. 1987); *Kansas City v. W.R. Grace & Co.*, 778 S.W.2d 264 (Mo. Ct. App. 1989).

These cases, however, also hold that in order to recover property damages, a plaintiff must also prove that the alleged "contamination" from the product creates an unreasonable risk of harm. Thus, in *Farm Credit Bank of Louisville v. United States Mineral Products Co.*, 864 F. Supp. 643, 650 (W.D. Ky. 1994), the court recognized: "'Contamination' is defined as the release of toxic asbestos fibers into the environment coupled with an ability to ascertain a substantial and unreasonable risk of harm from that release." Likewise, in *United States Gypsum Co. v. Mayor and City Council of Baltimore*, 647 A.2d 405, 410 (Md. Ct. App. 1994), the court held that a property damage plaintiff may recover in tort only "if the defect creates a substantial and unreasonable risk of death or personal injury." *See also City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975 (4th Cir. 1987).[2]

Finally, the epidemiologic principles which are adopted in the <u>Reference Manual on Scientific Evidence</u> require that to show that disease is "more likely than not" caused by an agent, those exposed to the agent must be twice as likely to get a disease as those not exposed. *See* Brief of W. R. Grace & Co. In Support Of Motion For Summary Judgment ("Grace's Summary Judgment Brief") at 31-35. In order to show with the requisite scientific probability that ZAI in an attic causes disease, and therefore creates an unreasonable risk of harm, Claimants must meet this scientific threshold. Good science is good science, irrespective of the type of case involved.

---

[2] Claimants' reference to *In re Celotex Corp.*, No. 90-10016-8G1, slip op. (Bankr. M.D. Fla. July 17, 2003), is also unavailing. The court in *In re Celotex Corp.* was addressing whether, under the terms of the Celotex Trust Agreement, the Property Damage Claims Administrator abused its discretion in allowing a property damage claim by the City of New York.

II.    **Claimants' Proffered Evidence Does Not Meet Their Burden Of Proof To Show That ZAI In An Attic Causes An Unreasonable Risk of Harm.**

    A.    **There Is No Epidemiologic Evidence To Support The Allegation that ZAI In An Attic Creates An Unreasonable Risk of Harm.**

In recognition that they have none, Claimants argue that an epidemiologic study is not the only way to meet their burden of proof. Claimants' Response at 19. Grace has never contended that an epidemiologic study is the only way for Claimants to meet their burden of proving that ZAI creates an unreasonable risk of harm. Grace *has* pointed out the lack of any such epidemiologic evidence in arguing that Claimants have not met their burden. *See* Grace's Summary Judgment Brief at 31-35. As set forth below, Claimants' excuses for the absence of such evidence are unavailing.

Claimants ask this Court to "reject" Grace's criticism of Claimants' lack of epidemiologic evidence, arguing that Grace is estopped because for decades Grace allegedly concealed the asbestos content of ZAI. Claimants' Response at 19. Claimants' position is premised on their mischaracterization of the history of ZAI, a subject addressed in Grace's opposition papers.[3] Notably, Claimants' concealment argument ignores the fact that in 1980 Grace voluntarily presented to the Consumer Product Safety Commission ("CPSC") the results of asbestos air sampling tests Grace had conducted during ZAI installation. *See* Attachment 25 to Claimants' Response. In that time period, Grace also disclosed information regarding asbestos in ZAI to the EPA and to customers.[4] Obviously, there was no concealment.

---

[3] *See* Opposition of W.R. Grace & Co. To Claimants' Motion For Summary Judgment at 11-16 and Grace's Memorandum In Opposition To ZAI Claimants' Motion For Partial Summary Judgment Regarding Consumer Protection Act Claims at 8-12.

[4] By letter dated February 14, 1980, Grace gave the EPA a detailed description of the tremolite-in-vermiculite situations as to all of Grace's vermiculite products, including ZAI. Letter of February 14, 1980, Appendix, Exh. A. In the late 1970's, Grace began distributing Material Safety Data Sheets ("MSDS") on certain vermiculite products used in industrial settings. Those MSDS Sheets disclosed the possible presence of

Continued on following page

Claimants also erroneously contend that the issue in this Science Trial is whether Libby amphibole asbestos is capable of causing disease. Claimants' Response at 20. This flies in the face of this Court's prior pronouncement:

> So, to the extent that there are documents that sho[w] some medical history of disease in Libby, Montana that's simply a result of the vermiculite mining operation, I don't consider that to be relevant. I don't see how at this stage of the trial that's going to advance anything.
>
> What we need to do is get the information to your expert that they're going to want in order to determine whether Z.A.I. poses some unreasonable risk of harm and that's what I'm trying to get to.
>
> $*$  $*$  $*$
>
> It's not the product it goes into. It is the finished product that's in question. It doesn't matter what that vermiculite -- what danger level the vermiculite has in its nature state or in some work in process state. It matters about the finish[ed] product, doesn't it? That's what I'm trying.

Transcript of Omnibus Hearing Before Hon. Judith K. Fitzgerald, Sept. 23, 2002, at 52, 62.

Finally, Claimants contend that the Libby ATSDR Report concluded that persons who handled vermiculite insulation are at a "statistically significant elevation" of disease risk. Claimants' Response at 20-21. This contention is false. Claimants rely here on what the ATSDR calls a "crude analysis" of x-ray results, an analysis that does "not account for the possible influence of confounding variables or multiple exposures, and so cannot be used to establish a causal relationship." ATSDR Report, Appendix to Grace's Summary Judgment Brief, Exh. A at 10-12.

In fact, the ATSDR Report did not find that ZAI was linked to adverse health effects. See Whitman Letters, Appendix to Grace's Summary Judgment Brief, Exh. K, Responses at 2

---

Continued from previous page

tremolite in Libby vermiculite and were freely provided to Grace customers. See, e.g., letters of March 29, June 1, and July 11, 1979, Appendix, Exh. B.

("The [ATSDR Libby medical testing] study did not show that insulation [ZAI] by itself, could be linked with the health impacts found in Libby.").

### B.   Claimants Have Not Rebutted Grace's Position That Evidence Concerning Mr. Harashe And Mr. Liebsch Is Irrelevant And Inadmissible.

Claimants make no effort to rebut Grace's position that evidence concerning Mr. Harashe and Mr. Liebsch is irrelevant and inadmissible.[5]  Instead, Claimants argue that "case reports are admissible to show the growing occurrences of asbestos-related disease among individuals exposed to asbestos in buildings."[6]  Claimants' Response at 17-18.  The issue here, however, is not whether other asbestos-containing products in buildings have caused disease.  The issue is whether *ZAI* in an attic causes disease and the anecdotal cases upon which Claimants rely establish nothing.

### C.   Surface Dust Testing Is Scientifically Inadmissible Under *Daubert* And *Armstrong World Industries*.

Claimants argue that dust sampling results, obtained through the indirect method, are relevant to whether ZAI poses an unreasonable risk of disease because:  (1) these are property damage claims; (2) *Armstrong World Industries* is distinguishable because ZAI is friable; and (3) some courts have permitted such testimony.  Claimants' arguments are not persuasive.

Initially, the fact that this is a property damage case does not make otherwise non-scientific evidence probative.  *In re:  Armstrong World Industries*, 285 B.R. 864 (Bankr. D. Del. 2002), was a case dealing with some 600 property damage claims.  Judge Newsome held that

---

[5]  Claimants ask this Court to take "judicial notice of the fact that ZAI causes asbestos-related disease, "based on *Harashe v. Flintkote Co.*, 848 S.W. 2d 506 (Mo. Ct. App. 1993), and on Grace's settlement of personal injury cases allegedly involving ZAI. In so arguing, Claimants incredibly ask this Court to take "judicial notice" of settlements which are irrelevant and inadmissible, Fed. R. Evid. 408, and to take "judicial notice" of a jury verdict, upon which they cannot rely. *See U.S. v. Stephens*, 185 F. Supp. 2d 116 n.3 (E.D. Cal. 2001).

[6]  In fact, a case cited by Claimants themselves recognizes that even where the case reports *deal* with the agent at issue, they are generally unreliable. *Bonner v. ISP Technologies*, Inc., 259 F.3d 924, 931 (8th Cir. 2001).

dust sampling and the indirect method were "not scientifically valid method[s] of *quantifying* the

level of asbestos contamination in a room or building." He also held that it is **airborne** dust that

poses the risk of harm and "the indirect method has no valid scientific connection to the pertinent

inquiry." *Id.* at 865.

This ruling was in no way dependent upon the friability of the asbestos-containing

product, and *Armstrong* is not, as Claimants argue, distinguishable on its facts. Nor do

Claimants offer any scientific evidence showing that the indirect method acts differently on

materials based on their friability. Based on the foregoing, *Armstrong* is controlling authority for

Grace's motion to exclude dust testing.

Moreover, *Armstrong* was decided pursuant to the federal standards laid down in the

Supreme Court's 1993 decision in *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993),

and the Third Circuit's 1994 decision *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717. Claimants

argue that a "representative list" of nineteen opinions admitting dust testing in effect "trumps"

*Daubert* and *Armstrong. See* Attachments 32-39 to Claimants' Response.

However, ten of these opinions pre-dated *Daubert* and many were state court cases. The

only federal case decided after *Daubert* that dealt with the admissibility of dust sampling was

*Cheshire Medical Center v. W.R. Grace & Co.,*[7] and that case simply put off until trial a decision

on admissibility of dust testing. [8]

---

[7] Civ. No. 88-516-M (D.N.H. July 26, 1993), Attachment 33 to Claimants' Response ("At trial, the Court will ensure that prior to admitting Cheshire's evidence relating to the levels of contaminated dust, Cheshire first establishes that its 'expert's' testimony both rests on a reliable foundation and is relevant to the task at hand.") (citing *Daubert*).

[8] The other post-*Daubert* federal cases simply mentioned the taking of dust samples by plaintiffs' experts, but were not deciding the admissibility of such evidence.

Similarly, ZAI Claimants' "representative list" of cases permitting Claimants' experts to

testify (*see* Attachments 40-46) consists of one pre-*Daubert* federal case and five state court

cases. Simply stated, state court cases and pre-*Daubert* federal court cases do not "trump" the

*Armstrong World Industries'* opinion holding that dust sampling is inadmissible to prove hazard

in a property damage case.

### D.    Claimants Continue To Ignore The Important Distinction Between Asbestos Fibers And Airborne Cleavage Fragments.

As discussed in Grace's Opposition to Claimants' Motion to Exclude Dr. R.J. Lee's

Opinion on Cleavage Fragments ("Lee Opposition Brief"), the OSHA regulations and the

scientific community recognize that there is a difference between tremolite asbestos fibers and

cleavage fragments. Claimants continue to suggest that the Court ignore this important

distinction.

Claimants cite Grace's statement -- made in another matter relating to ***vermiculite ore*** and

having nothing to do with ZAI -- that vermiculite ore contains "fibrous asbestiform tremolite"

and illogically equate it with the false inference that Dr. Lee and Grace believe that ZAI does not

contain non-asbestiform cleavage fragments. *See* Claimants' Response at 5. Their inference is

wrong. As recognized by this Court, the issue is not whether the vermiculite ore presents a

hazard, but rather whether ZAI presents an unreasonable risk of harm. *See infra* at 4.

At no time has Grace ever taken the position that the only impurity that the vermiculite

ore contains is asbestiform tremolite. [9]  In fact, it has been universally recognized that the ore

---

[9]  Claimants also contend that, because at some point in time Grace began utilizing a "discriminatory counting" technique, Grace's historical test results show only asbestos fibers. Claimants, however, ignore that this discriminatory counting technique was not utilized until the 1980's and was not a standard written procedure until 1983. Yang Dep., Appendix, Exh. C at 80-88. In contrast, the vast majority of the historical testing on which Claimants rely occurred before 1980, and thus pre-date the use of the technique. Moreover, there is no indication that this technique -- which was used in connection with Grace tests analyzed using the PCM analytical method, not the more powerful TEM utilized by Dr. Lee here -- was intended to, or even could, distinguish between asbestos fibers and cleavage fragments. *See* Lee Opposition Brief at 11-12.

contains both asbestiform tremolite and non-asbestiform cleavage fragments. Because only airborne asbestos fibers present a potential health risk, it is crucial to determine whether the particles that become airborne when ZAI is disturbed are asbestos fibers or cleavage fragments.

Rather than attempt to scientifically make that distinction, Claimants attack the only expert in this case who has analyzed the data and distinguished the two. This attack is unavailing for several reasons:

- Regulatory and scientific standards acknowledge the important distinction between asbestos fibers and cleavage fragments. Lee Opposition Brief at 4-5.

- Dr. Lee's method is based on generally accepted protocols and standard methods and has been approved by EPA for use by Dr. Lee in an EPA-funded investigation of tremolite. Lee Opposition Brief at 5-6.

- The suggestion that the EPA has called into question the reliability of Dr. Lee's analysis is belied by, among other things, his continued working relationship with EPA. Lee Opposition Brief at 17-18.

### E.    Claimants' Attack On Grace's Risk Assessment Does Not Rebut Grace's Showing That Claimants Have Failed To Satisfy Their Burden.

Claimants concede that ZAI presents no hazard if it is undisturbed. Thus, the issue is whether ZAI, when disturbed, presents an unreasonable risk of harm. On this issue, the scientifically reliable data demonstrate that the alleged asbestos exposure levels created during a homeowner's sporadic and infrequent disturbances of ZAI do not begin to approach the lifetime exposure necessary to present even a theoretical risk of disease. Apparently recognizing the absence of a real risk to homeowners, Claimants attack the risk assessment performed by Dr. Elizabeth Anderson on the basis that Dr. Anderson has underestimated the amount of time a hypothetical group of unidentified remodeling contractors might spend disturbing ZAI.[10]

---

[10] In essence, Claimants suggest that there exists a significantly large group of contractors who routinely or extensively work in remodeling activities that disturb ZAI. Although they question Dr. Anderson's contractor exposure assumptions, Claimants offer no evidence that demonstrates such a group of contractors exists. A series of events would have to occur for a contractor to be exposed to ZAI, including: (a) the contractor must do work in a home built before 1984; (b) the home must have ZAI, as opposed to several other types of attic insulation; and (c)
Continued on following page

Even if this group of contractors were claimants in this proceeding -- which they are not -
- Claimants' attack on Dr. Anderson's risk assessment is flawed for several reasons. First,
Claimants suggest that there is no range of acceptable risk, but rather any risk greater than 1 in
1,000,000 is unacceptable. This simply is not the case. To the contrary, EPA -- not Grace -- has
adopted an acceptable risk range of 1 in 10,000 ($10^{-4}$) to 1 in 1,000,000 ($10^{-6}$). The EPA's
presumptively safe risk level of 1 in 10,000 ($10^{-4}$) becomes "presumptively less acceptable" only
as it increases above $10^{-4}$. *See* Elizabeth Anderson Report, Appendix to Grace's Summary
Judgment Brief, Exh. E at 17-18.

Second, even the EPA's acceptable risk range is very conservative or theoretical and
considerably higher than any real risk. In fact, the EPA's approach likely overstates the risk and
the real risk could be considerably lower, even approaching zero. *See* Grace's Summary
Judgment Brief at 7. For example, at its current PEL -- the regulatory agency's recognition of an
acceptable exposure level every day for a person's 45-year working life -- OSHA estimates a risk
outside EPA's acceptable risk range. *Id.* at 9.

Finally, Claimants mischaracterize the scope of Dr. Anderson's risk assessment. Dr.
Anderson did *not* rely entirely on Dr. Lee's analysis that differentiated between asbestos fibers
and cleavage fragments. Rather, Dr. Anderson performed multiple risk assessments, ***including
risk assessments based on exposure data that included both asbestos fibers and cleavage
fragments***. Even including cleavage fragments, all but one scenario in Dr. Anderson's risk
assessments fall within the EPA's acceptable risk range. Not surprisingly, Claimants have

---

Continued from previous page

the contractor must engage in an activity that actually disturbs the ZAI (as opposed to the many contracting activities that take place in other parts
of the house).

focused upon this one scenario, a scenario that only slightly exceeds the acceptable risk range and relates to hypothetical contractors who may work in attics that contain ZAI.

To the extent any theoretical risk could be argued to exist for some unidentified group of contractors who work extensively around ZAI, those contractors are likely to have substantial knowledge and training concerning the proper handling of ZAI.  Van Cura Dep., Appendix, Exh. D at 87-89, 91-96.  Proper work practices dictate that they be cautious and use respiratory protection while working in any dusty environment.  Id. at 52-53, 97-98.

In fact, both EPA and NIOSH -- the regulatory agency responsible for conducting research and making recommendations for prevention of work-related disease -- have issued precautionary notices to contractors on their websites and through comprehensive awareness documents issued in May 2003 concerning the possible presence of trace amounts of asbestos in ZAI.  Appendix to Grace's Summary Judgment Brief, Exhs. I and J; Appendix, Exh. E.  Thus, even assuming it could be argued that a theoretical risk slightly above the EPA risk range could exist for some group of hypothetical contractors who work extensively around ZAI, those contractors are adequately protected and not at any real risk.

Date:  August 18, 2003

REED SMITH LLP
James J. Restivo, Jr.
Lawrence E. Flatley
Douglas Cameron
James W. Bentz
435 Sixth Avenue
Pittsburgh, PA  15219
Telephone: 412.288.3131
Facsimile: 412.288.3063

Special Asbestos Counsel for Debtor

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
Scotta E. McFarland (Bar No. 5488)
Paula A. Galbraith (Bar No. 4258)
919 Market Street
Suite 1600
Wilmington, DE  19801
Telephone: 302.652.4100
Facsimile: 302.652.4400

Co-Counsel for Debtors