# ATTACHMENT 6

## ASSESSMENT OF THE POTENTIAL RISKS TO HOMEOWNERS AND RESIDENTIAL CONTRACTORS FROM ASBESTOS EXPOSURE ASSOCIATED WITH VERMICULITE ATTIC INSULATION

### REPORT BY:
### ELIZABETH L. ANDERSON, Ph.D., A.T.S Fellow

### DATE:
### April 14, 2003

### QUALIFICATIONS

1. I am the President and Chief Executive Officer of Sciences International, Inc., a company of scientists dedicated to health and environmental assessment.

2. I have a Ph.D. in organic chemistry and am a Fellow of the Academy of Toxicological Sciences. Formerly, I spent 14 years at the U.S. Environmental Protection Agency (EPA), from October 1971 to December 1985, where I directed EPA's central risk assessment programs for the last 10 years of my tenure. Specifically, in 1975, I became the Executive Director of an intra-Agency committee that was commissioned to write an Agency cancer policy. This committee developed the Agency's first risk assessment guidelines for assessing risk associated with exposure to suspected carcinogens in the environment. Subsequently, in 1976, I established EPA's first Carcinogen Assessment Group (CAG) which formed the core for the enlarged office, the Office of Health and Environmental Assessment (OHEA), now called the National Center for Environmental Assessment, which was established in 1978. As the director of the first CAG and then OHEA, I had responsibility for the central risk assessment activities of EPA for 10 years before I left the Agency. The primary functions of this office were to conduct assessments and establish the toxicity of a wide variety of toxic agents, provide leadership to establish EPA-wide guidelines for toxicity and risk assessments, and oversee EPA's health assessment programs. Of particular relevance to the issues herein addressed, my office was responsible for the risk assessment of toxic air pollutants and for writing the National Ambient Air Quality Criteria Documents. During my tenure as the director of OHEA, I was

*Sciences International, Inc.*

responsible for the draft document, Airborne Asbestos Health Assessment Update (EPA, 1986), which was published in June 1986, shortly after my departure.

3. Since leaving EPA, I have continued active participation in the sciences of health and environmental risk assessment. For example, I am past-President of the Society for Risk Analysis; and am currently Editor-in-Chief of the journal, *Risk Analysis: An International Journal*, which is the leading peer-reviewed international journal on topics of risk assessment. I regularly serve on expert peer review and advisory committees on risk assessment topics for the EPA and other organizations including current appointments to the Department of Energy's Los Alamos National Laboratory Expert Advisory Committee, a recent expert committee for the National Academy of Sciences, and an EPA expert committee that is exploring ways to improve EPA's repository of toxicological and risk information called the Integrated Risk Information System (IRIS). My curricula vita, including a list of my publications for the last ten years, is provided in Appendix A. A list of recent depositions and trial testimony is provided in Appendix B. My compensation is provided in Appendix C.

4. I am submitting this report at the request of WR Grace to address issues associated with vermiculite attic insulation. If new information becomes available that is relevant to the issues discussed in this report, I reserve the right to supplement the report.

*Sciences International, Inc.*                    2

## EXECUTIVE SUMMARY

I have reviewed the available scientific data and studies related to asbestos exposures and risks associated with vermiculite attic insulation (VAI), and I have reviewed the relevant documentation and data provided by the claimants. I have also conducted a risk assessment to estimate the potential risks associated with VAI for residents and contractors. From this review and analysis, I have reached the following conclusions.

*Conclusion 1:  Health risk assessment is the scientifically appropriate and accepted methodology for assessing the potential cancer risk associated with VAI.*

Risk assessment is the scientifically accepted process for assessing whether exposure to an environmental substance has a significant potential to cause adverse health effects. Risk assessment is routinely applied by Federal, state and local U.S. governmental organizations and international organizations, and is well accepted in the scientific community. In the risk assessment process, the estimated exposure of an individual takes into account the concentration, frequency and duration of exposures to a particular substance. The resulting exposure assessment for carcinogens includes a time-weighted average for a lifetime exposure and is compared with health effects data relating to the potential effects associated with a given exposure. From this comparison, the risk of individuals for adverse health effects is estimated.

*Conclusion 2: I have evaluated the available exposure data from VAI disturbance activities and conducted a risk assessment according to accepted methodology with the useful data. The risks for residents are very low, and not of significant concern. The risks for contractors are higher than for residents, but are still below risk levels routinely accepted in the regulatory community or experienced in daily activities, and not of significant concern.*

Seven modern studies were identified that provide personal exposure measurements for individuals engaging in activities that could lead to potential VAI exposure. Of these studies, three were found to be useful for risk assessment, and one other was found to be useful, but with caution. There are not specific studies available to estimate the amount of time residents and contractors may come into contact with VAI. Therefore, conservative assumptions were made about typical and high-end exposure durations for a variety of activities that may involve disturbance of VAI. These exposure frequency and duration estimates were combined with the personal exposure data to estimate typical and high-end lifetime average exposures to asbestos. The exposure estimates were compared

with a cancer potency value developed by the U.S. Environmental Protection Agency (EPA) to estimate the lifetime risk of cancer associated with VAI exposures. In general, the risk assessment employed conservative assumptions (i.e., assumptions that would tend towards overestimating risk), which must be accounted for in interpreting the results.

The estimated risks for residents were very low, and not a significant concern compared to the range of risks considered acceptable by the EPA and were lower than many other environmental risks and other common risks routinely accepted by people in their everyday lives. For contractors, the risks were higher than residents because the assumed exposure frequency and durations were higher. However, when making reasonable assumptions, the estimated risks were within ranges considered acceptable by EPA and below risk levels that are routinely accepted by the Occupational Safety and Health Administration (OSHA) for worker protection, and lower than many other occupational risks.

*Conclusion 3: The EPA, with its contractor Versar, has also conducted a risk assessment for residents that engage in activities that disturb VAI, and found that the risks were within ranges considered acceptable.*

In addition to the risk assessment presented in this report, the EPA recently conducted its own assessment for residents exposed to VAI. The study was conducted by Versar, an EPA contractor, and I have reviewed a draft of the study. This assessment showed that the risks to residences are low. There were some flaws with the risk estimates in that study that are discussed in this report, and the fiber counts were likely overestimated because cleavage fragments may have been counted and indirect preparation techniques may been used, both factors that artificially increase the risk estimates. These factors suggest that, despite the low risk estimates, the risks found in the EPA study are overestimates. This study may be regarded as a useful screening study (i.e., with a conservative, health protective approach, low risks were found). These findings are consistent with the results of my assessment.

*Conclusion 4: The Agency for Toxic Substances and Disease Registry (ATSDR) recently conducted a medical monitoring study of residents of Libby, Montana. This epidemiologic investigation found that there was not an association between potential health impacts with residents having VAI in their homes or engaging in activities that disturbed the VAI.*

In this medical monitoring study, ATSDR conducted chest radiographs and spirometry testing on a subpopulation of Libby residents that included 6,149 current or former

*Sciences International, Inc.*                    4

residents of Libby and the surrounding area. The study also included a questionnaire about potential exposure pathways for each resident. ATSDR conducted a correlation analysis of the medical and questionnaire to determine which exposure pathways were associated with evidence of asbestos exposure in the lung or decrements in lung function. Neither having VAI in a home nor handling VAI was associated with any effects. This provides more evidence that the risks to residents associated with VAI are not significant.

*Conclusion 5: The findings from my risk assessment, the EPA/Versar risk assessment, and the ATSDR medical monitoring study are all consistent. The risks associated with VAI exposures are low, and are of a magnitude that is lower or similar to risks that are routinely experienced by individuals for environmental causes and other common activities, and accepted by regulatory agencies in setting standards.*

The findings of my risk assessment, the EPA/Versar risk assessment, and the ATSDR medical monitoring study all show that the risks to residents associated with VAI are not significant. The consistency between these three studies provides a strong weight-of-the-evidence in support of this conclusion.

Additionally, the low risks that were estimated for residents and contractors are similar to or less than risks that are commonly experienced and accepted by individuals and regulatory agencies, both as the results of environmental causes or other common activities. In addition, the resulting risks are within the acceptable target range of risk, $10^{-4}$ to $10^{-6}$, commonly accepted by EPA and far below risk levels associated with OSHA standards for worker protection.

*Conclusion 6: The claimants have not conducted a risk assessment. Therefore, the claimants have not provided a scientific basis for showing that there are risks associated with VAI.*

The claimants have not assessed the risk associated with VAI. For the most part, the claimants have presented some personal exposure data, without providing any context for how the data should be interpreted. There is a common saying in the medical literature: "the dose makes the poison," which dates back to the Enlightenment. This reference essentially means that the potential for disease from any type of exposure is a function of the frequency, duration, and magnitude of the exposure. In one case, the claimants compared some old measurement data to an OSHA standard that applies to workers. However, this OSHA standard is intended to protect workers routinely exposed to asbestos, as opposed to the infrequent exposures associated with VAI, and it is inappropriate to imply anything about risk from this comparison as time-weighted

*Sciences International, Inc.*                    5

averages for lifetime exposure (total dose averaged over a lifetime) have not been considered. Otherwise, the claimants have not attempted to show that the exposures that they measured may result in any adverse effects. Therefore, the claimants have not provided any scientific evaluation to show that exposures to VAI are harmful.

I. **Vermiculite was commonly used as attic insulation. Some vermiculite attic insulation (VAI) that was sold by Grace contained small amounts of asbestos, and there is a potential for exposure to this asbestos. This report presents an assessment of the potential human health risks associated with VAI.**

Vermiculite is a naturally occurring mineral that has been used in construction, insulation, and gardening products. When expanded, it has a shiny appearance and looks like small pieces of popcorn. Its light weight and structure make it a good insulation product, but also make it possible for some vermiculite to become airborne during a disturbance. Until 1984, Grace sold expanded vermiculite as attic insulation under the product name Zonolite.

The vermiculite used in Zonolite came from a mine in Libby, Montana. The ore from this mine contained a natural deposit of amphibole[1] minerals. Prior to being included in VAI, vermiculite was subjected to various production processes designed to remove naturally occurring impurities, including tremolite (2/5/03 Wood Dep. at 14-15). These processes involved, among other things, extensive use of screening and floatation devices at the Libby mine and mill as well as further screening at expansion plants and removal of fibers, including tremolite, during the expansion process itself. (2/26/03 Wolter Dep. at 28-30; 2/03 Yang Dep. at 26-28). Small amounts of asbestos may still be present in VAI that originated from the Libby mine. When left undisturbed, there is little, if any, chance for asbestos exposure. However, when disturbed through various activities in the attic, there is a potential for exposure to airborne asbestos fibers, but the levels of exposure are likely to be very low.

Asbestos is found in a variety of other materials that have been used in buildings, such as fireproofing materials, pipe insulation, air supply duct wrap, boiler insulation, and others (CPSC, 1979). Some of these materials contain up to 90% asbestos, and have been the historical motivation for the concern about asbestos exposures in buildings. Nonetheless, EPA generally recommends that these products not be removed from buildings, as long as the products are stable, because removal could ultimately lead to higher exposures (EPA, 1990). On the other hand, VAI generally contains less than 1% asbestos. By EPA regulations, products with less than 1% asbestos are not considered asbestos products for regulatory purposes (EPA, 1984; EPA, 1990a).

---

[1] Amphibole refers to a particular type of mineral that contains asbestos.

This report addresses the risks associated with the VAI exposure pathway by applying commonly accepted methods for estimating and characterizing health risks. Risks to homeowners with VAI in their residences and risks to contractors that perform tasks in homes with VAI are considered.

II. **Risk assessment is the accepted scientific method for evaluating the plausibility of an environmental exposure causing a disease, and can be specifically applied to estimate the potential for health impacts during disturbances of VAI. Risk assessment is a scientific, rigorous methodology that is widely accepted in the scientific community and by state, Federal, and international organizations. However, the claimants' experts have not conducted risk assessment. Therefore, the claimants have not provided an analysis that meets minimum scientific standards for demonstrating that exposures associated with VAI are harmful.**

A. *Risk assessment is the scientifically appropriate method for assessing the likelihood that environmental exposures are associated with disease, and can be applied to investigate the plausibility that disturbance of VAI will lead to adverse health effects.*

A health risk assessment can establish if an exposure is at least plausibly linked to adverse health effects. In a risk assessment, the estimated exposures are compared to health benchmarks to determine the likelihood that the exposure could result in an adverse health effect. Risk assessment is a scientifically accepted methodology that is widely used by U.S. Federal, state, and local agencies, and international organizations to address issues of potential health effects.

The claimants' experts in this case have not conducted a health risk assessment to determine the plausibility of health effects associated with VAI exposure. Therefore, they have failed to provide any scientific basis for showing the plausibility of adverse health effects associated with VAI exposure.

B. *The National Research Council of the National Academy of Sciences established a paradigm for conducting risk assessments, which is widely accepted by the scientific community and applied by governmental organizations in the U.S. and internationally.*

In 1983, the National Research Council (NRC) published a document entitled *Risk Assessment in the Federal Government: Managing the Process* (NRC, 1983).

At the time, I was the Director of the Office of Health and Environment Assessment at the EPA, and I served as an advisor to the committee and a reviewer for this document. The document established health risk assessment as the acceptable approach for assessing risk associated with exposure to environmental substances. It is now considered an essential text for health risk assessment. The document outlined a four-step process for risk assessment:

1) *Hazard identification*: the identification of a compound as a potential hazard based on animal toxicity studies or human epidemiologic studies.
2) *Dose-response assessment*: the assessment of the dose required to cause particular health effects.
3) *Exposure assessment*: an estimation of the exposure of the compound from the particular activity in question.
4) *Risk characterization*: characterization of the evidence that an agent might be a human carcinogen (or cause other noncancer effects) together with a comparison of the exposure and dose-response to estimate the potential risk, accounting for uncertainties.

This four-step process is now often referred to as the "risk paradigm," and is widely accepted and applied by governmental authorities throughout the world and by the scientific community.

C. *The claimants in this case did not conduct a risk assessment, and have not provided any rigorous analysis that demonstrates the plausibility that exposures from VAI disturbances will lead to adverse health impacts. The only attempt by the claimants to associate VAI exposure with such adverse health effects was to compare airborne measurement data with the Permissible Exposure Limit (PEL) from the Occupational Health and Safety Administration (OSHA) and make inappropriate implications from this comparison.*

Claimants' expert Mr. Ewing compared exposure measurements during VAI installation simulations conducted by WR Grace in the 1970s to the OSHA PEL at the time (see Ewing expert report, pages 15-17) and drew inappropriate conclusions from this comparison. Further, Mr. Ewing notes that the current OSHA PEL is lower (i.e., more restrictive).

However, as Mr. Ewing states, the OSHA standards do not apply to homeowners. The PEL is set to protect workers, and is currently set at 0.1 fiber/cc over an 8-hour average period (i.e., a workday). As a regulatory standard, the PEL is based

*Sciences International, Inc.*                   9

on a concentration averaged over a workday. However, the cancer risk associated
with asbestos exposure is not determined by looking at the exposure in a single
day. Instead, the risk is determined as a function of the frequency, magnitude,
and duration of exposure over a lifetime. OSHA recognized this in setting the
current PEL. In developing the PEL, OSHA developed a dose-response model to
assess the risk (or the individual probability of mortality from cancer) as a
function of asbestos exposure. In its 1984 rulemaking, OSHA presented risks for
workers exposed for 1, 20, and 45 years of full-time employment in a workplace
with potential asbestos exposure (U.S. Department of Labor, 1994). Thus, the
PEL is designed to reduce the risks of workers that are continuously exposed to
asbestos over a long period of time. For infrequent exposures, it is inappropriate
to imply that exceeding the PEL will result in any adverse health effects. The use
of a dose-response model that is based on lifetime exposure is the most
scientifically accurate way to assess the risks associated with infrequent
exposures.

The exposure durations considered by OSHA for workers in a job that will result
in routine exposure to asbestos are appropriate. However, it is unlikely for
residents with VAI in their homes to be routinely exposed to asbestos at a
frequency and duration of a person in a workplace with asbestos. Instead, most
homeowners are likely to be exposed just a few times a year when they go into
their attic and perform tasks, such as moving boxes that may result in a
disturbance of the VAI. For homeowners involved in renovation activities, these
tasks may be performed more frequently than for the typical homeowner, but the
frequency and duration of exposure would still not present a significant risk.
Additionally, for some of the tasks that may result in the highest exposures such
as clearing or removing the VAI, the homeowner exposure frequencies are even
lower. With respect to the removal of VAI, it is likely that a resident would only
remove VAI, if at all, once or twice in their lifetime.

For a contractor that performs work in homes that have VAI, the exposure
frequencies will likely be higher than most residents. However, most homes do
not have VAI. The EPA estimates that about 1 million homes in the United States
contain VAI (Versar, 1982). As Zonolite was not sold after 1984, this EPA
estimate is likely a reasonable value for homes with VAI that contain any Libby
amphiboles. Furthermore, most contracting activities do not take the contractor
into the attic to perform a task that may result in disturbances of VAI. There are a
series of events that must happen for a contractor to be exposed to VAI:

1) The contractor must go to a job at an older home, as homes built after 1984 would not have VAI.

2) The older home must have VAI. There are several other types of insulation that have been or currently are used. Only about 1% of homes in the U.S. have VAI.

3) The contractor must engage in an activity that disturbs the VAI. Many contracting activities do not take place anywhere near the attic, such as renovations in the living area or work on the exterior of the home. To disturb the VAI, the contractor must either engage in an activity in the attic (and spend a significant amount of time there for any significant exposure) or engage in some other activity that disturbs the insulation, such as drilling a hole in the ceiling below the attic.

All of these events must occur together for there to be an exposure to VAI.

## III. The risk assessment paradigm is the only accepted methodology that can be used to address risk associated with exposure to VAI.

A. _Hazard Identification:_ _The weight-of-evidence that asbestos causes cancer in humans is based on a series of epidemiologic studies in which workers have been exposed to asbestos at high concentrations, with frequent exposures over a considerable period of time or for individuals that were similarly exposed. The observed health effects associated with asbestos exposure include lung cancer and mesothelioma, and noncancer effects such as asbestosis._

It is widely known and accepted that repeated exposures to high levels of asbestos over a long period of time may result in lung cancer and mesothelioma, which is a cancer of the pleural lining of the lung. The EPA classifies asbestos as a Class A carcinogen, or a known human carcinogen based on epidemiologic data gathered from exposures in the workplace[2]. Additionally, repeated exposure to high levels of asbestos is associated with asbestosis, a chronic inflammation of the lung.

The health effects associated with asbestos exposure are known as the result of numerous epidemiologic studies on workers in the asbestos industry, who were exposed to very high levels of asbestos over long periods of time. Additionally, some of these epidemiologic studies were done on miners or other workers exposed specifically to Libby amphiboles (McDonald et al., 1986; Amandus et

---

[2] http://www.epa.gov/iris/subst/0371.htm

Case 01-01139-AMC    Doc 4306-7    Filed 08/26/03    Page 13 of 31

al., 1987), providing evidence that Libby amphiboles are a health risk at high
exposures that are sustained over a long period of time.

B. _Dose-response assessment:_ _The EPA has published a review of asbestos health_
_effect studies and has developed a recommended potency value for estimating the_
_theoretical risk associated with a given asbestos exposure. Use of the EPA_
_cancer potency value provides a conservative, upper-bound estimate of the risk._

Simply stating that asbestos is associated with adverse health impacts is not
sufficient to conclude that there will be adverse health effects associated with
exposure from disturbing VAI. The manifestation of adverse health impacts
depends upon the frequency, duration, and magnitude of exposure, or sometimes
commonly said as "the dose makes the poison." The asbestos exposure associated
with VAI is substantially lower than the exposures of the asbestos workers that
were found to have elevated levels of disease. Therefore, it is necessary to
estimate the likelihood of adverse health effects as a function of the actual
exposure to asbestos from VAI.

EPA evaluates the available health effects data for environmental contaminants,
and develops potency values that can be used for risk assessment. These reviews
are cataloged into EPA's Integrated Risk Information System (IRIS). IRIS is
widely used by EPA for internal risk assessments used in the regulatory decision-
making process. IRIS is also frequently used by other governmental agencies and
by members of the scientific community.

EPA has an IRIS file for asbestos which reviews the available human
epidemiologic and animal toxicology data and recommends a cancer risk value of
0.23 per fiber/ml, based on the human epidemiologic data and using an exposure
metric called PCM-equivalent (discussed in the exposure assessment section that
follows). The value represents a probability of developing cancer for a lifetime
average exposure of 1 fiber/ml. It is important to note that the risk factor is
conservative and only to be compared with the _average_ exposure over a lifetime.
Therefore, periods where there is no exposure to asbestos must be accounted for
when developing this average value. The occurrence of cancer from
environmental exposures is generally the result of prolonged, elevated exposures.
Thus, the total exposure over a lifetime must be taken into account.

The EPA cancer risk potency represents a theoretical risk that is likely higher than
the actual risk, particularly for the low exposures associated with VAI. For

example, in the EPA model, the cancer risk is assumed to be linear with exposure; thus, for example, if the exposure is decreased by 6-fold, the risk is also assumed to decrease 6-fold. This approach was adopted by the EPA in 1976 to place a plausible upper-bound on the risk, meaning that the real risk could be considerably lower, even approaching zero. In fact, at doses lower than those in the epidemiologic studies used to estimate the IRIS potency factor, the risk is unknown and could be considerably lower even approaching zero. The linear assumption is conservative, and is made to be precautionary and public health protective as prescribed by environmental statutes. As an example, for a person with a lifetime average exposure to asbestos of $4.3 \times 10^{-6}$ fibers/ml, the theoretical cancer risk would be 1 in a million as follows:

$$4.3 \times 10^{-6} \frac{fibers}{ml} [exposure] * 0.23 \frac{ml}{fiber} [risk\ factor] = 10^{-6} [risk\ estimate]$$

However, it is possible that the risk is lower or approaching zero at this low level of exposure. Currently, there is no other available methodology for assessing the risks of low-level asbestos exposures. However, if a method is developed, I may reserve the right to update this analysis.

The level of exposure that causes asbestosis is generally considered higher than the level that causes cancer. Therefore, a risk assessment based on cancer potency should also be protective for asbestosis (Berman and Crump, 2001).

The same methods that were used to develop the EPA cancer potency value in IRIS were applied to the epidemiologic studies specific to the Libby amphiboles in VAI (Moolgavkar, 2002). The estimated potency values were similar or lower than the IRIS value, which suggests that Libby amphiboles are of similar or lower potency than the types of asbestos used to develop the EPA potency factor.

C. _Exposure assessment_: There are several studies that have been conducted that have measured exposures during disturbance of VAI. However, the nature of the sample collection and asbestos measurement methodology is important for assessing the appropriateness of any measurement data for use in a scientifically reliable risk assessment.

The available measurement studies of exposure during VAI disturbances are reviewed in the next section. This section provides some of the criteria for the use of asbestos exposure data in a scientifically reliable risk assessment.

_Sciences International, Inc._                    13

Case 01-01139-AMC   Doc 4300-7   Filed 08/20/03   Page 15 of 31

1. The appropriate measurement of exposure is the concentration of airborne fibers. Little information about risk can be obtained from dust measurements or measurements of the asbestos content of VAI.

The EPA cancer risk factor is based on the inhalation exposure to airborne asbestos or asbestiform fibers, as is the OSHA PEL. Therefore, airborne asbestos fiber exposure is the appropriate measure for exposure assessment. Sometimes dust measurements, including a percentage or quantification of the dust that is asbestos, are reported. Dust measurements may be useful for determining the presence of asbestos, but are not relevant for quantitative risk assessment. Additionally, measurements of the asbestos content of VAI may also be made. These measurements are useful for determining the presence of asbestos, but are not useful for estimating risks. Also, the presence of certain minerals (e.g., tremolite) in VAI does not necessarily mean that asbestos is available to become airborne. The VAI must be disturbed before any asbestos becomes airborne. Even during disturbance of VAI, not all asbestos will become airborne. Only those particles of respirable size dimensions are relevant to a proper risk assessment.

2. For a proper comparison with the EPA cancer risk factor, exposure measurements must be collected using Transmission Electron Microscopy (TEM) and converted to an equivalent value for Phase Contrast Microscopy (PCM), or a PCM-equivalent (PCME).

There are two microscopic techniques that are commonly used for measuring asbestos fibers that are collected in air. TEM is the most sensitive measurement technology; it can detect the widest size range of fibers and can differentiate between asbestos and non-asbestos fibers. The older and less sensitive technique is PCM. The PCM method cannot distinguish between asbestos and non-asbestos fibers, and cannot detect as small a size of fibers compared to TEM.

Historically, most exposure measurements from the epidemiologic studies that formed the basis of the EPA cancer risk factor were done using PCM. Therefore, the EPA risk factor is based on asbestos fiber counts using PCM, which may be smaller than TEM counts as a result of the lower sensitivity. For this reason, fiber counts from TEM measurements cannot be compared with the EPA risk factor without an adjustment. On the other hand, the PCM

measurements in the epidemiologic studies were made in environments with large amounts of asbestos; thus, the inability to differentiate asbestos and non-asbestos fibers did not significantly affect these fiber counts. By contrast, PCM measurements in non-occupational environments, such as a home, where other types of structures other than asbestos are present (e.g., in the airborne dust during a disturbance of vermiculite) may result in overestimates of fiber counts. Therefore, the appropriate exposure measure is with fiber counts from TEM, and converted to a PCME (or PCM-equivalent) by excluding fibers in the size range that could not be measured by PCM and with appropriate determination of which fibers are asbestos. Specifically, only TEM fibers greater than 0.4 microns ($\mu$m) in diameter and greater than 5 $\mu$m in length should be included in the PCME fiber counts.

This concept is outlined in EPA's IRIS file on asbestos, which states: "The unit risk is based on fiber counts made by phase contrast microscopy (PCM) and should not be applied <u>directly</u> to measurements made by other analytical techniques" (emphasis ours). Further, the IRIS file states: "It should be understood that while TEM can be specific for asbestos, PCM is a nonspecific technique and will measure any fibrous material. Measurements by PCM which are made in conditions where other types of fibers may be present may not be reliable." These statements have been interpreted to develop the PCME concept, and the EPA has routinely applied it in risk assessments.

3. The asbestos concentration can be overestimated if the indirect filter preparation technique is used. The direct preparation technique should be used for the most accurate results.

Sometimes filters collected in dusty environments can be overloaded if an improper sampling volume is collected. In these situations, some microscopists manipulate the filter, such as through sonication, to produce a suspension of particles in a transfer medium, which is then filtered onto a new filter for analysis. According to the expert report of Dr. Richard Lee, the indirect preparation of the filter can breakup asbestos bundles and clusters that were single structures in the air into numerous individual fibers (Lee, 2003). This manipulation results in an overestimate of the actual asbestos concentration in the air. In addition to their own analysis, Dr. Lee cites an EPA report which also found that the indirect transfer technique leads to higher fiber counts than the direct transfer technique (EPA, 1990b).

4.  Many samples taken in an environment with asbestos may contain cleavage
    fragments. Cleavage fragments are not asbestiform material and are, at the
    least, not as toxic or carcinogenic as asbestiform fibers. Therefore, cleavage
    fragments must be considered separately in fiber counts for appropriate risk
    assessment.

    While certain amounts and sizes of asbestiform fibers are known to be
    carcinogenic, the same is not true of tremolite cleavage fragments, which also
    may appear in microscopic analyses of amphibole asbestos. As Dr. Ilgren has
    certified in his expert report, there are fundamental differences in the
    properties of cleavage fragments and asbestiform fibers that explain the
    observed differences in carcinogenic potential (Ilgren, 2003). Asbestos fibers
    generally exist as bundles of very long, thin fibers that display extreme
    strength, flexibility, durability, and acid resistance. Cleavage fragments do
    not have these properties. Cleavage fragments are formed when
    nonasbestiform amphibole is crushed and slivers of mineral randomly break
    off (or "cleave") from the parent material so that they may look like fibers.
    However, cleavage fragmentation does not yield significant quantities of long,
    thin fibers of the dimensions that contribute substantially to carcinogenic risk.
    Instead, cleavage fragments are brittle and weak, and lack strength, durability,
    and acid resistance. In stark contrast to asbestos fibers, cleavage fragments
    are not strongly biopersistent in the human body, which significantly limits
    the toxicological potential.

    Dr. Ilgren provides a review of the available animal toxicology and human
    epidemiologic data on cleavage fragments, and concludes that cleavage
    fragments are not carcinogenic. To the best of my knowledge, the claimants
    make no mention whatsoever of cleavage fragments in their reports and have
    failed to separate cleavage fragments from asbestiform fibers in their fiber
    counts. The lack of any consideration of cleavage fragments by the claimants
    represents a serious scientific deficiency in their reports.

    It is important to note that EPA has advised that cleavage fragments should
    not be included in fiber counts for comparison with its IRIS cancer risk factor
    (Lioy et al., 2002).

D.  *Risk characterization: EPA and other regulatory authorities have established
    criteria for assessing the acceptability of risks, which can be applied to
    characterize the magnitude of the risk associated with VAI.*

*Sciences International, Inc.*                16

After developing quantitative estimates of risk, or the probability of an individual getting a disease from an exposure, it is necessary to establish what risk is acceptable. It must be understood that we accept small risks in our everyday lives, from driving to work, to what we eat, or how we spend our recreational time. Regulatory authorities are concerned with risks that are considered unacceptable to citizens. The definition of an acceptable risk is a value judgment that takes into account many factors, including the uncertainty in the assessment, the costs of remedial action, and the magnitude of risks that are generally found to be acceptable to individuals. This report relies on ranges of acceptable risk established by the EPA, and used in EPA regulatory actions.

For carcinogens, EPA has set forth and supports an acceptable risk range of individual risk from cancer of $10^{-6}$ (one in a million) to $10^{-4}$ (one in ten thousand). For example, the National Contingency Plan (NCP) sets forth the procedures that must be followed by EPA and private parties in selecting and conducting Superfund response actions. The NCP defines the acceptable risk range as follows:

> "For known or suspected carcinogens, acceptable exposure levels are generally concentration levels that represent an excess upper bound lifetime cancer risk to an individual of between $10^{-4}$ and $10^{-6}$ using information on the relationship between dose and response."

EPA expanded on its definition of the acceptable risk range in 1991 in its document "The role of baseline risk assessment in Superfund remedy selection decisions" (EPA, 1991):

> "For sites where cumulative site risk to an individual based on reasonable maximum exposure for both current and future land use is less than $10^{-4}$, action is generally not warranted, but may be warranted if a chemical specific standard that defines acceptable risk is violated or unless there are noncarcinogenic effects or an adverse environmental impact that warrants action."

The acceptable risk range has also been adopted by other programs within EPA, including the drinking water (Cotruvo and Vogt, 1990) and air (NRDC v. EPA, 1987) programs.

In the decision established through the NRDC v. EPA case, often referred to as the Benzene Decision, EPA adopted a presumptively safe risk level of $10^{-4}$. Furthermore, in setting this risk level, EPA noted that as risk increases incrementally above the benchmark of $10^{-4}$, it becomes "presumptively less acceptable." In establishing this level, EPA stated that the $10^{-4}$ risk level is not a "rigid line for acceptability," but that the "Agency intends to weight it with a series of other health measures and factors" when making a decision (54 Federal Register 38044).

IV. There are several studies that have measured asbestos exposures during disturbances of VAI. Those studies are of varying quality and utility for risk assessment.

A. *We have identified seven modern studies that have measured asbestos exposures during disturbances of VAI.*

The following studies were identified that have measured exposures to asbestos during VAI disturbance:

- *Barbanti*: This study was conducted by plaintiffs as part of the *Marco Barbanti vs. WR Grace & Company et al.* litigation (*Barbanti*). At a residence containing VAI in Washington State, exposures were measured during simulated remodeling and renovation activities.

- *Lees and Mlynarek*: This study was sponsored by WR Grace and the principal investigators were industrial hygiene professors at The Johns Hopkins School of Public Health and the University of South Florida. Exposure measurements were made in a VAI-containing home during simulated homeowner maintenance and renovation activities (Lees and Mlynarek, 2003).

- *Libby, Montana/EPA*: This study was conducted by the U.S. Environmental Protection Agency in Region 8, as part of its evaluation of risks to residences in Libby, Montana. Exposure measurements were made in several homes both without any disturbance activities and during disturbance activities. In addition to the exposure measurements, EPA developed risk estimates associated with potential VAI disturbances in Libby (Weis, 2001). After correction of numerous flaws in EPA's

database and the addition of measurements not included in the EPA report, there are a total of 44 TEM personal air samples with direct preparation. Only 4 of the 44 measurements (9.1%) have asbestiform fibers, and only 17 measurements (38.6%) have either asbestiform fibers or cleavage fragments. Any estimates of risk from VAI exposures in Libby must account for these additional measurements.

In addition to the measurement data, the Agency for Toxic Substances and Disease Registry (ATSDR) conducted a medical monitoring study in Libby. ATSDR conducted chest radiographs and spirometry testing (i.e., a measurement of lung function) on a subpopulation of 6,149 current or former residents of Libby and the surrounding area. A questionnaire was administered to gather information on the potential pathways of exposure for each study subject. A statistical analysis of the questionnaire and the medical monitoring data failed to find any association between lung abnormalities and either having vermiculite in the home or handling vermiculite insulation. The ATSDR study shows that VAI exposures anticipated to be far lower than levels found to be associated with cancer and asbestosis in epidemiologic studies were not associated with lung abnormalities. This result provides significant evidence that exposures associated with VAI do not cause a cancer risk. This study is also discussed in the risk characterization section of this report.

- *Claimants, Silver Spring:* The claimants in this case made exposure measurements during cleaning activities in a home with VAI in Silver Spring, Maryland (Hatfield et al., 2003).

- *Claimants, Washington State:* The claimants in this case made exposure measurements during disturbances of VAI in several homes in the state of Washington (Ewing et al., 2003).

- *Pinchin Environmental:* This study measured exposures during the demolition of a building containing VAI in Canada (Pinchin Environmental, 1992).

- *Versar/EPA:* The study was conducted by the consulting firm Versar, and sponsored by the U.S. EPA. During several activities to disturb VAI, exposure measurements were made in five homes in Vermont and in an experimental chamber (Versar, 2002). I was a peer reviewer of this

*Sciences International, Inc.*          19

document, and submitted comments to EPA (Anderson, 2002). Versar also conducted a risk assessment with this data, and found that the risks were generally minimal. The results of the Versar/EPA risk assessment will be discussed in more detail in the next section.

The next section provides an evaluation of each of these studies for quality and utility for risk assessment.

B. *The criteria described in Section III were used to evaluate each of the exposure studies for scientific quality and appropriateness of use in assessing risks.*

There are several criteria that were applied to assess the scientific quality of the studies and their usefulness for risk assessment:

1) *Appropriate exposure scenarios and adequate descriptions*: The study must have exposure scenarios that are appropriate and typical for residential and/or contractor renovation activities in an attic. These exposure scenarios must be described in sufficient detail to clearly understand the activity.

2) *PCME fiber counts*: PCME data is the exposure metric that must be available to make appropriate comparisons with the EPA IRIS potency factor. Without PCME data, it is not possible to conduct a scientifically defensible risk assessment.

3) *Use of direct sample preparation*: The use of indirect preparation of samples has the potential to cause overestimates in fiber counts. Therefore, studies that use indirect preparation are not appropriate for risk assessment.

4) *Separation of cleavage fragments*: Dr. Ilgren has certified that cleavage fragments are not carcinogenic (Ilgren, 2003). Therefore, it is appropriate to separate cleavage fragments from asbestiform fibers in summarizing the fiber counts. Further, EPA has advised that cleavage fragments should not be included when assessing risk using the EPA IRIS potency factor (Lioy et al., 2002).

*Sciences International, Inc.*                    20

5) *Other issues*: Other issues relevant to using the data for risk assessment, such as sample collection, measurement issues other than those mentioned above, and whether the study contains sufficient documentation.

C. *The studies are of varying quality when evaluated with the criteria for use in risk assessment.*

For each of the seven studies, Table IV-1 reviews the results of the analysis of the first three criteria. Table IV-2 reviews the fourth and fifth criteria and provides an overall summary of the review for each study.

The Versar/EPA study represents the most extensive measurement data of potential VAI exposures. Data were collected in five homes, and an experimental chamber was built for the study. The Versar/EPA risk assessment generally found that there were no significant risks associated with any of the scenarios. However, in the next section, risk estimates are provided based on refined exposure duration assumptions. While the Versar/EPA study was well conducted with respect to developing plausible exposure scenarios for VAI disturbances, there are some issues associated with the measurement data. The potential problems with the measurements include the lack of PCME fiber counts, the apparent use of indirect preparation, and the lack of any discussion of cleavage fragments. However, all of these issues will result in overestimates of fiber counts. Therefore, the Versar/EPA study provides a useful bounding estimate[3] of the risk associated with VAI, and can be useful as a screening study[4].

The Lees and Mlynarek study contains the most accurate fiber count data. This study provided PCME concentrations, used direct preparation of samples, included a count of the cleavage fragments, and provided detailed descriptions of disturbance scenarios that are appropriate. The report is of a scientific quality that would warrant consideration for publication in a peer-reviewed journal. Although this study was not as extensive as the EPA/Versar study with respect to the number of testing locations, the fiber counts from the scenarios that were included were collected in the correct manner for accurate risk assessment.

---

[3] A bounding estimate is an estimate that places a limit on the risk, but the actual risk is likely lower.
[4] Screening-level estimates are typically used for screening out those risks which may require further study from risks that are low even using high-end conservative data and assumptions, where no further study is necessary.

In addition, the claimants' data collected in the state of Washington mostly provide the necessary components for risk assessment, following a reanalysis of the fiber counts by Dr. Richard Lee (Lee, 2003). The claimants did not separate the cleavage fragments from the asbestiform fibers, and did not include PCME fiber counts. However, from an analysis of the fiber count sheets provided by the claimants, Dr. Lee was able to separate the cleavage fragments from the asbestiform fibers. Therefore, the claimants' data from the state of Washington can be used for risk assessment with the caveat that there is some uncertainty in the fiber counts.

The Libby/EPA data are extensive, including 44 separate personal exposure measurements during VAI disturbances (including only direct preparation samples). Dr. Lee has provided a reanalysis of the EPA data with PCME fiber counts, with and without cleavage fragments. However, there are a number of other measurement problems associated with these data (Lee, 2002). Additionally, the investigators provided very little description of the disturbance activities, which limit the usefulness of these data for risk assessment. Given these issues, I have concluded that the Libby data can only be used for a bounding assessment (with Dr Lee's reanalyzed fiber counts) with appropriate caution because of the uncertainties in what activities were performed.

There were several studies which do not provide any data that can be used for a scientifically reliable risk assessment. The Pinchin Environmental study includes data that were collected during a building demolition. A demolition is not relevant to a risk assessment for residents, and is not a typical scenario for contractors. It is expected that workers would wear respiratory protection during a demolition, which would reduce exposure. In addition, there were several measurements problems with this study, including the use of indirect sample preparation.

The claimants' data from the Silver Spring study is not useful for risk assessment because there is no description of the measurement methods, and there is only a brief description of the study. For this study, the claimants also did not provide PCME concentrations or a separation of cleavage fragments. For the *Barbanti* data, there are also serious measurement problems according to Dr. Lee that make the data inappropriate for risk assessment, including the use of indirect preparation of sample filters.

Table IV-3 provides a characterization of the usefulness of each VAI exposure study in risk assessment. The next section of this report presents a risk assessment based on the best available data.

## Table IV-3.  Summary of the Usefulness of Each VAI Exposure Study for Risk Assessment

| Useful for Risk Assessment | Useful for a Bounding Assessment with Caution | Not Useful for Risk Assessment |
|---|---|---|
| Lees and Mlynarek<br>Claimants, Washington State[a]<br>Versar (EPA)[b] | Libby, Montana | Pinchin Enviromental<br>Claimants, Silver Spring<br>*Barbanti* |

[a] This study only meets the required criteria after the reanalysis of the fiber counts by Dr. Richard Lee, and there is still some uncertainty in the reanalyzed fiber counts, since Dr. Lee did not do the original microscopic analysis.

[b] Because of issues associated with the measurements, the fiber counts are considered bounding estimates, and the study is useful as a screening study (i.e., despite factors that would overestimate risk, low risks were found).

Table IV-1.  Review of Criteria 1 through 3 for the VAI Disturbance Exposure Studies

| Study | Appropriate Exposure Scenarios and Adequate Descriptions | PCME Fiber Counts | Use of Direct Preparation Method |
|---|---|---|---|
| Barfanti | Measurements were made during residential maintenance and remodeling scenarios. A description and videotape of the activities were provided. | Both PCM and TEM measurements were made, but PCME results were not reported. | Both direct and indirect preparation methods were used. |
| Pinchin Environmental | Exposure measurements were made during the demolition of a building, which is far more disturbance than for typical residential or contractor activities. This activity would typically be accompanied by respiratory protection. The study report adequately describes the activities. | PCM and TEM measurements were collected. TEM results are reported as fibers > 5μm, but the diameter criterion was not used. Therefore, PCME results are not provided. | The report does not make clear which preparation method was used, but the count sheets suggest that an indirect preparation was used. |
| Lees and Mlynarek | Measurements were made during typical residential maintenance and remodeling scenarios. The activities are described in detail in a technical report. | Both PCM and TEM measurements were made, and PCME results were reported. | Only direct preparation methods were used. |

24

| Study | Appropriate Exposure Scenarios and Adequate Descriptions | PCME Fiber Counts | Use of Direct Preparation Method |
|---|---|---|---|
| Libby, Montana | For most samples, it is not clear what activities were performed. There is no study report summarizing the activities or data. The data are stored in a database that has numerous flaws, errors, and inconsistencies (Anderson, 2002). There are only very brief descriptions of activities, and only for some samples. | Both PCM and TEM measurements were made, and PCME results were developed by Dr. Lee from the count sheets. However, some risk calculations were done with PCM, which is inappropriate under EPA standards. | Both direct and indirect preparation methods were used. Cleavage fragments were included in the fiber counts, although, in some cases, the count sheets are available to estimate the prevalence of cleavage fragments. |
| Claimants, Silver Spring | Exposure measurements while clearing an attic area for storage. A sample log of the activities is provided, and some photographs are included. | There is no description of the methodology used to estimate the fiber counts. The only note is that the counts include fibers > 5μm, but the PCME definition also includes a diameter requirement. Therefore, PCME results are not provided. | There is no description of the measurements methods provided. |

25

| Study | Appropriate Exposure Scenarios and Adequate Descriptions | PCME Fiber Counts | Use of Direct Preparation Method |
|---|---|---|---|
| Claimants, Washington State | Measurements were made during residential maintenance and remodeling scenarios. A detailed description of the activities is provided. | PCM and TEM measurements were collected. TEM results are reported as fibers > 5μm, but the diameter criterion was not used. Therefore, PCME results are not provided. However, Dr. Lee was able to develop PCME estimates by reviewing the count sheets. | It appears that the direct method was used for the measurements. |
| Versar (EPA) | Measurements were made during a variety of typical residential maintenance and remodeling scenarios. The report provides detailed descriptions of all of the disturbance activities. This study represents the most extensive measurement effort for exposures associated with VAI. The study provides the most disturbance scenarios, and the most number of separate homes, including an experimental chamber. | PCM and TEM measurements were collected. TEM results are reported as fibers > 5μm, but the diameter criterion was not used. Therefore, PCME results are not provided. | It appears that indirect preparation methods may have been used for some samples (Chatfield, 2002). |

26

*Sciences International, Inc.*

Table IV-2. Review of Criteria 4 and 5 for the VAI Disturbance Exposure Studies
and a Summary of the Review

| Study | Separation of Cleavage Fragments | Other Issues | Summary Comments |
|-------|----------------------------------|--------------|------------------|
| Barbanti | There is no mention in the report of cleavage fragments, and it's unclear whether these fragments are included in the counts. | Dr. Lee testified that the claimants collected an insufficient air volume for their samples. | Because of numerous issues with the measurements, these data are not useful for risk assessment. |
| Pinchin Environmental | There is no mention in the report of cleavage fragments, and it's unclear whether these fragments are included in the counts. | | These data were collected during a demolition, which is not a typical activity and would likely be accompanied by respiratory protection. Additionally, indirect sample preparation was used, PCME fiber counts were not collected, and there is no mention of cleavage fragments. |
| Lees and Mlynarek | The PCME data are reported for asbestiform fibers only, but the appendices include the data for cleavage fragments. | | This study provides all of the necessary components for use in risk assessment. |

*Sciences International, Inc.*

| Study | Separation of Cleavage Fragments | Other Issues | Summary Comments |
|---|---|---|---|
| Libby, Montana | There are reports that describe the measurement methods generally, and some of the count sheets are available, but there is not a central report describing the data. A database is available summarizing the results, but there are significant flaws and inaccuracies in the database (Anderson, 2002; Lee, 2002). | There are additional data in Libby that EPA failed to report in its Libby assessments. Also, a medical monitoring study by ATSDR found that the VAI was not associated with health effects. The ATSDR study may provide more reliable information about risks than the risk assessment. | Due to numerous problems with the measurement data, data summaries, and the scant descriptions of the disturbance activities, these data can only be used for a bounding assessment of risk and with caution given the uncertainties. |
| Claimants, Silver Spring | There is no mention in the report of cleavage fragments, and it's unclear whether these fragments are included in the counts. | There is only a page and half description of the entire study. | Because there is no description of the measurement methods, PCME data are not provided, no mention of cleavage fragments, no mention of sample preparation technique, the study is inadequate for risk assessment. |
| Claimants, Washington State | There is no mention in the report of cleavage fragments, but Dr. Lee was able to separate the cleavage fragments from the asbestiform fibers, albeit with some uncertainty that would not have occured if Dr. Lee did the original microscopic analysis. | | As provided in the study reports, the data are only useful for a bounding assessment because PCME data are not provided, and cleavage fragments are not considered. However, with Dr. Lee's reanalysis, these data can be used, albeit with some uncertainty. |

*Sciences International, Inc.*

| Study | Separation of Cleavage Fragments | Other Issues | Summary Comments |
|-------|----------------------------------|--------------|------------------|
| Versar (EPA) | There is no mention in the report of cleavage fragments, and it's unclear whether these fragments are included in the counts. | Chatfield (2002) and van Orden (2002) found that there were several flaws in the measurement methods, which would tend to result in overestimates of fiber counts. | This study provides the most extensive VAI exposure measurements available. However, there are some issues associated with the measurements that cause the fiber counts to be overestimated. Therefore, this study is useful for bounding estimates of risk, and as a screening level assessment. |

29

**V. A risk assessment can be conducted with the useable personal exposure data identified in the last section. These risks can be put into context given the uncertainties in the assessment. Additionally, there is other information available to characterize these risks.**

*A. To estimate exposures for residents and contractors, reasonable durations for activities with contact with VAI must be established.*

1. Introduction

As discussed throughout this report, the cancer risk associated with asbestos is dependent on lifetime exposure. The risk associated with a particular activity can be estimated as follows:

$$Cancer\ Risk = Cancer\ Risk\ Factor * Exposure * TWF \qquad (V\text{-}1)$$

where the *Cancer Risk Factor* is the EPA/IRIS value 0.23 per fiber/ml, the *Exposure* is the average exposure over the time period of the activity, and the time-weighting factor (TWF). The TWF represents the fraction of time over a lifetime that an individual engages in a particular activity. Under EPA guidance, a 70-year lifetime is typically assumed, which equals 25,550 days or 613,200 hours. Therefore, the TWF can be estimated as follows:

$$TWF = \frac{Hours\ Engaged\ in\ Activity}{613,200\ hours\,/\,lifetime} \qquad (V\text{-}2)$$

There has not been a specific study on the hours that a resident or contractor might be engaged in activities that would result in a disturbance of VAI. Therefore, conservative exposure durations were developed based on available information. It is recognized that individual behavior or work patterns will differ. Therefore, to account for variation in exposure and to facilitate calculation of central tendency and upper bound risks, "typical" and "high-end" exposure factors have been derived for both residents and contractors. This section provides the basis for the derivation of the activity specific TWFs used in the risk assessment.

If additional data becomes available to better characterize exposure durations, I reserve the right to update this assessment.

*Sciences International, Inc.*                     30