# **ATTACHMENT 12**

```
            UNITED STATES BANKRUPTCY COURT
             FOR THE DISTRICT OF DELAWARE


IN RE: W.R. GRACE & CO., ET AL,

        Debtors.
- - - - - - - - - - - - - - - - -/
                              Case No: 01-1139JKF
```

**CONDENSED TRANSCRIPT**

| | |
|---|---|
| DEPOSITION OF: | STEVEN P. MLYNAREK, Ph.D., CIH |
| TAKEN: | Pursuant to Notice by Counsel for Claimants |
| PLACE: | Johnson, Blakeley, Pope, Ruppel & Burns<br>100 N. Tampa Street, Suite 1800<br>Tampa, Florida |
| DATE: | June 19, 2003 |
| TIME: | Began: 9:05 a.m.<br>Ended: 1:30 p.m. |
| REPORTED BY: | HELEN BENNETT, Ph.D.<br>Registered Professional Reporter<br>Notary Public - State of Florida at Large |

149

1  Q  I want to make sure the record is clear.
2  In the Barbanti case, which is the case that was
3  pending in Washington state, there was some testing
4  done in that case, in Barbanti.
5  A  Okay.
6  Q  Subsequent to Barbanti, the claimants'
7  experts in this case have performed simulation --
8  disturbance simulation testing in additional homes?
9  A  That is what I'm thinking about, the
10 additional simulations that they performed, but I'm
11 not familiar with any of the studies in Barbanti.
12 But the simulations that were provided that are on
13 the video, that is what I was referring to.
14  Q  Okay. So the ones that were performed
15 within the past several months, you have reviewed
16 the videos?
17  A  Correct.
18  Q  Have you reviewed the actual reports from
19 those experts?
20  A  I would have to see if they are in here.
21 They conceivably would be.
22  Q  Okay. I'll represent to you something
23 other than what is contained in this notebook.
24  A  Okay. It is possible that I saw a summary
25 of the results from that. I don't recall,

150

1  specifically.
2  Q  But you -- it is accurate to say that you
3  have not read the full reports?
4  A  I don't recall reading the full reports.
5  Q  Can we go off the record here for a
6  second?
7      (Off the record)
8  Q  Let's go back on. Doctor, we took a brief
9  break to try and clarify something. Let me just try
10 and do that on the record. You have a notebook that
11 you have brought with you today that contains a
12 number of reports and affidavits from the Barbanti
13 case, and those affidavits and those documents
14 reflect testing that was done for purposes of the
15 Barbanti case.
16     And my question is -- let me go one
17 step further and tell you after the Barbanti case
18 that the experts that were retained by the claimants
19 in this case have performed ZAI disturbance testing
20 in homes and have rendered reports of that testing.
21 And my question is: Have you seen the results of
22 the testing performed by the claimants' experts in
23 this case? And when I say "this case," I'm not
24 talking about the Barbanti case.
25  A  Okay. All I have seen are the two videos

151

1  that were provided along with this --
2  Q  Okay.
3  A  -- and I may have seen a summary of what
4  they did -- you know, a hard copy of what they did.
5  I'm not sure, and I don't have it, if I did see it.
6  Q  Okay. Okay. We have referred to the
7  recent testing that the claimants have -- have
8  performed, and you may have seen this in the Korn
9  deposition as the Ewing report. I want to make sure
10 I'm clear. You do not have a copy nor have you seen
11 a full Ewing report of the claimants experts' ZAI
12 disturbance testing that was done in the last
13 several months?
14  A  No. No.
15  Q  Okay. Have you done any work on this
16 project since this report was submitted in 2003 --
17 in January of 2003?
18  A  No.
19  Q  Other than, obviously, prepare whatever
20 preparation you did for this deposition?
21  A  Right.
22  Q  Your invoice reflects that your last work
23 that you billed, I guess, on this project was July
24 of 2002. Is that consistent with your recollection
25 that you didn't do anything from July of 2002, until

152

1  this report was issued in January of 2003?
2  A  If we could look at the invoice, that
3  would make it easier.
4  Q  Yeah. I think it is towards the back.
5  A  Yeah. The last thing that I billed for
6  was 7/22/2002: Review and comments to draft report.
7  And I haven't done anything -- I might have had a
8  phone conversation with Peter Lees or something, but
9  nothing substantial.
10  Q  You mentioned that you may have seen a
11 summary, and I don't want to get back into this
12 confusion about what you have seen and what you
13 haven't seen, but you mentioned that you may have
14 seen a summary of the test results from the ZAI
15 disturbance testing done by the claimants experts.
16     Are you aware that the claimants
17 experts during their own disturbance testing had
18 readings as high as 16 fibers per cc greater than 5
19 microns in length when performing a large removal of
20 ZAI?
21  A  I can't recall the exact numbers, but it
22 sounds reasonable.
23  Q  Have you read the depositions of any of
24 the claimants experts in this case?
25  A  If they are not in here or there

**153**

1   (indicating).
2   Q   You got Korn and Van Cura. I think we
3   established those.
4   A   Yeah.
5   Q   Those are the only depositions you have
6   read?
7   A   Yeah.
8   Q   Have you seen any documents -- let me back
9   up and tell you that there -- I may have told you
10  earlier there have been a number of homeowners whose
11  attics contain ZAI that have been deposed in this
12  case. I can't tell you how many there were, but
13  more than a half a dozen. Have you seen any summary
14  documents that compile, in any way, the testimony of
15  those homeowners?
16  A   No.
17  Q   Do you have any understanding of the types
18  of ZAI exposures that those homeowners have
19  experienced?
20  A   I haven't seen any documentation of it,
21  relating to these homeowners.
22  Q   Have you had any conversations in which
23  somebody said, you know, Homeowner X had spent some
24  number of hours doing some particular project in
25  their attic?

A. WILLIAM ROBERTS, JR., & ASSOCIATES

**154**

1   A   No.
2   Q   This would be a little bit easier if you
3   had read the deposition, but let me represent
4   something to you and tell you that there is a
5   homeowner -- I'm going to give you an example --
6   Jerri Dillon, who has been deposed in this case.
7   Jerri Dillon testified that she spent 16 hours in
8   her attic removing -- doing a large removal of ZAI.
9         And I told you a second ago that the
10  claimants experts got a reading of 16 fibers per cc
11  greater than 5 microns in length during a large
12  removal of ZAI. And my question is this: From an
13  industrial hygienist's point of view, are 16 fibers
14  per cc greater than 5 microns in length for 16 hours
15  exposure something that would get your attention as
16  an industrial hygienist?
17        MR. BENTZ:  Object to the form of the
18  question.
19  A   I'm -- I'm a little confused because you
20  set up the question with a couple of statements, and
21  then you didn't seem to link the question to your --
22  your build-up, so I don't know if you are asking me
23  about this woman's exposure or if you are asking me
24  a general question about industrial hygiene.
25  Q   Well, I'm putting two pieces together. We

A. WILLIAM ROBERTS, JR., & ASSOCIATES

**155**

1   got testimony that a homeowner spent 16 hours
2   removing ZAI from her attic.
3   A   Okay.
4   Q   That is the first piece. You have got an
5   expert report in which the reading for a large
6   removal of ZAI was 16 fibers per cc greater than 5
7   microns in length.
8   A   Okay.
9   Q   Putting those two together, my question
10  is: Is exposure of 16 fibers per cc greater than
11  5 microns in length for a period of 16 hours
12  something that would cause you some concern as an
13  industrial hygienist, as an exposure -- from an
14  exposure standpoint?
15  A   I'm not trying to be difficult. If you
16  want to ask me that question, just ask me that
17  question without reference to the other because that
18  is not relevant to the specific question that you
19  asked. If you -- the way you are asking it --
20  Q   Well, let me ask you -- just forget about
21  that -- that would be easier for you -- the same
22  question without the back-up. I was just trying to
23  give you some foundation, but I'll just ask you the
24  question.
25  A   Yes.

A. WILLIAM ROBERTS, JR., & ASSOCIATES

**156**

1   Q   Doctor --
2   A   Yes.
3   Q   -- as an industrial hygienist, is exposure
4   to 16 fibers of asbestos per cc greater than
5   5 microns in length for an exposure period of 16
6   hours something that would cause you any concern --
7   A   Yes.
8   Q   -- in your profession?
9   A   Yes. Can we take a three minute break to
10  go to the restroom?
11  Q   Yeah.
12        (Off the record)
13  Q   Doctor, do you agree with the general
14  proposition that certain precautions should be taken
15  when dealing with asbestos containing materials?
16  A   Yes.
17  Q   I believe you mentioned a number of those
18  when we were talking about setting up the protocol,
19  in terms of what a contractor would do versus what a
20  typical homeowner would do, and I think that
21  included wetting and some other precautions to avoid
22  the generation of dust.
23  A   Right.
24  Q   Based on your work in this project, what
25  do you suggest that homeowners do -- how do you

A. WILLIAM ROBERTS, JR., & ASSOCIATES