IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

Objection Deadline: October 31, 2003
Hearing Date: November 17, 2003 at noon

**MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO AN EMPLOYMENT AGREEMENT WITH THE PROSPECTIVE PRESIDENT AND CHIEF OPERATING OFFICER OF THE DEBTORS**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby move (the "Motion") this Court for entry of an order authorizing the Debtors to enter into an employment agreement with the prospective President and Chief Operating Officer (the "COO") of the Debtors. In support of this Motion, the Debtors respectfully state as follows:

**Jurisdiction**

1. This Court has jurisdiction over this Motion under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

2.     The statutory bases for the relief requested herein are sections 105(a) and 363(b) of chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").

**Background**

3.     On April 2, 2001 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"), which have been consolidated for administrative purposes only. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors-in-possession.

4.     Currently, the Debtors' day-to-day business management structure does not include a Chief Operating Officer. The Debtors' management is headed by Paul J. Norris, who holds the positions of Chief Executive Officer and President.[2] Reporting directly to Mr. Norris are three senior officers, each responsible for managing one of the Debtors' three "product lines", Davison Catalysts, Davison Silicas and Grace Performance Chemicals (collectively, the "Product Line Officers"). Also reporting directly to Mr. Norris are four other senior officers who are responsible for corporate-wide functions, including the Debtors' chapter 11 cases, finance, treasury, legal, human resources, information technology, environmental, health and safety, and other functions (collectively, the "Administrative Officers").

5.     Over the past several months, Mr. Norris discussed with the Board of Directors of the Debtors his current intention to remain with the Debtors until their emergence from these chapter 11 cases, depending on the timing of such emergence, and the need to address succession planning for the CEO position. (Norris Aff. at ¶ 2).[3]

---

[2] Mr. Norris also holds the position of Chairman of the Board of the Debtors. Upon the election of the COO, Mr. Norris will relinquish his position as President, but will retain the positions of Chairman and Chief Executive Officer.

[3] The Affidavit of Paul J. Norris, President and Chief Executive Officer of the Debtors, is attached hereto as Exhibit B.

6. In light of Mr. Norris' intentions, the Debtors determined that the best alternative regarding the management structure of the Debtors would be the creation of the COO position, whereby the Product Line Officers would report to the COO, who would in turn report to Mr. Norris as CEO. The Administrative Officers would continue to report to Mr. Norris as CEO. (Norris Aff. at ¶¶ 3 & 4).

7. The Debtors also concluded that revising the management structure of the Debtors to include a COO would have several other significant benefits, in addition to providing the Debtors with an additional "in-house" candidate to succeed Mr. Norris as CEO. Those benefits include, but are not limited to: (i) adding a high-level executive who would be focused primarily on managing the overall operations of the Debtors' businesses, in an effort to improve the current financial performance of those businesses and (ii) permitting Mr. Norris to dedicate a greater portion of his time to manage corporate-wide issues, such as the Debtors' Chapter 11 Cases. (Norris Aff. at ¶ 5).

### The COO Candidate

8. At the time the Board concluded that the Debtors should retain a COO, and after various discussions regarding candidates, Mr. Norris identified a specific individual as his preferred candidate for the COO position (the "Candidate")[4]. (Norris Aff. at ¶ 6). The Candidate then met with each member of the Debtors' Board. (Norris Aff. at ¶ 6). Thereafter, the Debtors commenced discussions and negotiations with the Candidate.

---

[4] The name of the Candidate is not included herein, in order to preserve confidentiality until such time as he is actually elected COO. Nevertheless, the representatives of each of the Creditors' Committees and the Equity Committee, have been, or will be, advised of the Candidate's name subject to their confidentiality obligations.

9. The Debtors concluded that the Candidate would bring specific and unique management and leadership strengths to the Debtors' businesses, which would make him particularly well-suited to assume the position of COO for the Debtors. (Norris Aff. at ¶ 7).

10. The Candidate has significant operational experience within the chemicals industry and senior financial management experience within general industry. (Norris Aff. at ¶ 8). He served as a vice president and general manager of a business unit of a major U.S. chemical manufacturer, where he also served as vice president of finance and business development for a major business unit. (Norris Aff. at ¶ 8). He also has experience regarding uses of technologies in ways that are relatively new to the Debtors businesses, and has had responsibility for analyzing manufacturing and other businesses in order to determine the value of the businesses. (Norris Aff. at ¶ 8). Mr. Norris strongly believes that the Candidate possesses the leadership, experience, drive, vision and other personal characteristics, which will allow the Candidate to assume an important role in improving the operations of the Debtors' businesses. (Norris Aff. at ¶ 9). In addition, the Debtors believe that the Candidate possesses the experience and personal characteristics to become a successful CEO of the Debtors upon Mr. Norris' departure from the Debtors. (Norris Aff. at ¶ 10).

## The COO Agreement

11. After identifying the Candidate as their choice for the position of COO, the Debtors and their representatives developed a competitive compensation package to present to the Candidate. Thereafter, the Debtors and the Candidate and their respective counsel negotiated and finalized the terms under which the Candidate would assume the position of COO. Those terms comprise the proposed written agreement that is attached hereto as Exhibit A (the "COO Agreement"). The Candidate has verbally accepted the COO Agreement and it is expected that

the Board will approve the COO Agreement at its next scheduled meeting on November 6, 2003. (Norris Aff. at ¶ 11).

12.     The initial term of the COO Agreement is three years, commencing on the Candidate's first day as COO of the Debtors. The COO Agreement includes competitive compensation arrangements that are consistent with such arrangements provided to others in similar positions with corporations similar to the Debtors. (Bubnovich Aff. at ¶ 10).[5] Specifically, the COO Agreement provides for an initial base salary of $550,000 and participation in the Debtors' existing annual incentive compensation program, at a targeted award equal to 75% of base salary, which will be paid only to the extent that specific financial targets under the program are achieved for the applicable year. The Candidate's award under the program is targeted at 100% of base salary for each of 2003 and 2004, but his award for 2003 would be pro-rated to reflect the portion of that year he was actually employed by the Debtors.

13.     The COO Agreement also provides the Candidate with a severance benefit equal to one and one-half times 175% of his base salary at the time of termination, in the event he is terminated by the Company without "cause" or he terminates his employment with the Company as a result of "constructive discharge" (as those terms are defined in the Agreement), during the initial term of the COO Agreement. The Candidate would also be entitled to such severance benefit, if he terminates his employment as a result of not being offered the position of CEO following the departure of Mr. Norris.

14.     In all other respects, the COO Agreement provides that the Candidate will be provided with compensation, benefits and incentive opportunities that are available to other senior officers of the Debtors, which have previously been approved by the Court.

---

[5] The Affidavit of Nick Bubnovich the Debtors' compensation consultant, is attached hereto as Exhibit C.

**Relief Requested**

15.     The Debtors request that the Court authorize and approve the Debtors entry into the COO Agreement with the Candidate pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

**Basis For Relief**

16.     Section 105(a) of the Bankruptcy Code "permits the court to issue any order that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a). Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." A court has the statutory authority to authorize a debtor to use property of the estate pursuant to section 363(b)(1) of the Bankruptcy Code when such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith. In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); see also Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by "some articulated business justification"); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b)); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Ernst Home Center, Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

17.     Under section 363(b) of the Bankruptcy Code, a debtor has the burden to establish that it has a valid business purpose for using estate property outside the ordinary course of business. See Lionel Corp., 722 F.2d at 1070-71 (2d Cir. 1983). Once the debtor has articulated such a valid business purpose, however, a presumption arises that the debtor's decision was

made on an informed basis, in good faith and in the honest belief that the action was in the debtor's best interest. See In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). A party in interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." Montgomery Ward, 242 B.R. at 155.

18. Generally, courts authorize debtors to use assets of the estate to employ and compensate executives, including provision for bonus and severance packages. See Montgomery Ward, 242 B.R. at 155 (approving retention bonuses as within Debtor's sound business judgment); In re America West Airlines, Inc., 171 BR. 674, 678 (Bankr. D. Ariz. 1994) (approving success bonuses to certain officers and employees as within Debtor's sound business judgment); In re Interco Inc., 128 BR. 229, 234 (Bankr. E.D. Mo. 1991) (authorizing the debtor to assume prepetition severance contracts and approving performance based retention program to ensure critical employees remained with the debtor).

19. The Debtors exercised sound business judgment in deciding to enter into the COO Agreement with the Candidate because, as stated above, the COO Agreement will benefit the Debtors' estates by: (i) addressing the Debtors' need for CEO succession planning, (ii) allowing the Debtors to obtain the services of the Candidate as COO to help the Debtors' business operations, and (iii) allowing Mr. Norris to concentrate more fully on corporate-wide issues.

20. The Candidate will fill a need in the Debtors' management structure by providing a talented and experienced executive to oversee the Debtors' businesses, from the perspective of the overall benefit to the Debtors and their estates. (Norris Aff. at ¶ 12). In this regard, the Candidate will have the opportunity to, among other things, promote cost savings and business enhancement opportunities across the product lines. (Norris Aff. at ¶ 12).

21. Retaining the Candidate will also address the Debtors' need for CEO succession planning because, upon Mr. Norris' departure, the Debtors will have the choice of promoting an individual to CEO who has gained familiarity with all of the Debtors' businesses as COO. (Norris Aff. at ¶ 12).

22. The Debtors will benefit from the retention of the Candidate because Mr. Norris will then be able to dedicate a greater portion of his efforts to the management of other corporate-wide issues, like the Debtors' Chapter 11 Cases. (Norris Aff. at ¶ 13).

23. Finally, the terms of the Candidate's compensation are reasonable for the position. The Debtors' compensation consultant performed two different analyses to determine if the Candidate's Total Direct Compensation under the COO Agreement is within the range of competitive practice. (Bubnovich Aff. at ¶ 4). As indicated in the Bubnovich Affidavit, the compensation provided for in the COO Agreement is reasonable when compared to two different sets of comparable companies and is within the range of competitive practice. (Bubnovich Aff. at ¶¶ 6-10). Mr. Bubnovich also analyzed the severance component of the COO Agreement and determined that it is within the range of competitive practice both with respect to amount and triggering events. (Bubnovich Aff. at ¶¶ 11-12).

24. In conclusion, the COO Agreement will provide a significant benefit to the Debtors' estates by obtaining the services of the Candidate to perform the duties of the COO. The Debtors in their business judgment believe the COO Agreement is reasonable in light of the circumstances surrounding the Debtors' Chapter 11 Cases. The Debtors, in their reasonable business judgment, believe that, for all the reasons discussed herein, the COO Agreement is in the best interests of the Debtors' estates and their creditors and should be approved.

## **Notice**

25.     Notice of this Motion has been given to: (i) the United States Trustee, (ii) counsel to the DIP Lender, (iii) counsel to The Chase Manhattan Bank as agent for the Debtors' pre-petition lenders, (iv) counsel to the Committees and (v) all those parties that requested service and notice of papers in accordance with Fed.R.Bankr.P. 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

## **No Prior Request**

26.     No prior motion for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Debtors request entry of an order (a) authorizing the Debtors to enter into an employment agreement with the Candidate, as President and Chief Operating Officer of the Debtors and (b) granting such other and further relief as is just and proper.

Dated: October 13, 2002

    KIRKLAND & ELLIS
    David M. Bernick, P.C.
    James W. Kapp III
    Janet S. Baer
    Christian J. Lane
    200 East Randolph Drive
    Chicago, Illinois 60601
    (312) 861-2000

    and

    PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.

    */s/ [signature]*
    Laura Davis Jones (Bar No. 2436)
    Scotta E. McFarland (Bar No. 4184)
    David W. Carickhoff, Jr. (Bar No. 3715)
    919 North Market Street, 16th Floor
    P.O. Box 8705
    Wilmington, DE 19899-8705 (Courier 19801)
    Telephone: (302) 652-4100
    Facsimile: (302) 652-4400

    Co-Counsel for the Debtors and Debtors in Possession