## EXHIBIT C

## <u>AFFIDAVIT OF NICK BUBNOVICH</u>

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |

**AFFIDAVIT OF NICK BUBNOVICH IN SUPPORT OF THE MOTION
OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS
TO ENTER INTO AN EMPLOYMENT AGREEMENT WITH THE PROSPECTIVE
PRESIDENT AND CHIEF OPERATING OFFICER OF THE DEBTORS**

Nick Bubnovich, being duly sworn, deposes and says:

1.      I am a partner in Deloitte & Touche's ("Deloitte") Human Capital Advisory Services ("Human Capital") consulting practice. I offer this affidavit in support of the Motion of the Debtors for an Order Authorizing the Debtors to Enter into an Employment Agreement with the Prospective President and Chief Operating Officer of the Debtors.

2.      I have over 20 years of experience in the field of compensation and benefits consulting, but I primarily focus on executive compensation. While I have special expertise with compensation programs for companies that have commenced Chapter 11 cases or are otherwise financially distressed, I also assist both Chapter 11 and non Chapter 11 client companies in the design and evaluation of short and long-term incentive programs, as well as employment contracts and severance contracts and programs.

3.      The salient features of the Candidate's proposed compensation are as follows: (i) base salary of $550,000 per annum, (ii) target annual bonus opportunity of 75% of base salary (except that for 2003 and 2004 the opportunity shall be 100% of base salary), (iii) the annual bonus for 2003 is guaranteed but prorated based on the number of days worked, and

(iv) an annual long-term incentive opportunity of 125% of base salary in the Debtors' current Long Term Incentive Program. Upon the Debtors' emergence from Chapter 11, the Candidate will be eligible to receive competitive long-term incentive awards, as then determined by the Board, under the Debtors' new Long Term Incentive Plan.

4.      I performed two different analyses to determine if the Candidate's Total Direct Compensation ("TDC") (i.e., the sum of base salary, annual incentive opportunity, and long-term incentive opportunity) under the COO Agreement is within the range of competitive practice.

5.      My analysis focused on the total compensation opportunity rather than any specific compensation component because the compensation mix can vary from company to company. My view, as well as that of most other compensation consultants, is that TDC (rather than each element comprising TDC) is the most appropriate measure.

6.      The first analysis compared the Candidate's TDC to that of Chief Operating Officers at the Industry Peer Group companies. A list of the six companies from the Industry Peer Group is set forth on Exhibit 1. The Industry Peer Group is appropriate because these companies are in the same industry as Grace and in some cases, direct competitors of Grace. Performance in the specialty chemical industry is sensitive to general economic conditions and, therefore, economic factors which may affect the Industry Peer Group will also affect Grace.

7.      TDC for Chief Operating Officers at the companies in the Industry Peer Group consists of: (i) base salary, (ii) actual annual incentive, (iii) three-year average of the Black-Scholes value of stock options, (iv) the value of any long-term incentive payout, and (v) restricted stock awards valued without regard to any restriction. In this analysis, assuming

2

the implementation of the COO Agreement, the Candidate's TDC is approximately 8% below the median TDC of all Chief Operating Officers in the Industry Peer Group.

8.      The second analysis compared the Candidate's TDC to that of Chief Operating Officers at a broad group of chemical and manufacturing companies, as reported in survey data (the "Survey Group") from three national compensation surveys. The Survey Group consists of both chemical and manufacturing companies which participate in executive compensation surveys. The Survey Group was used to validate and otherwise double-check the Industry Peer Group analysis.

9.      Chief Operating Officers' TDC for the companies in the Survey Group consists of: (i) base salary, (ii) target annual incentive opportunity and (iii) long-term incentive opportunity. In this analysis, assuming implementation of the COO Agreement, the Candidate's TDC is modestly below (less than 4%) the median TDC of all Chief Operating Officers in the Survey Group.

10.     Based on my experience, as well as that, I believe, of other compensation consultants, most companies target compensation for senior executive positions in a range from the median to the 75th percentile, depending upon such factors as a particular executive's tenure, experience, and performance, as well as the company's particular circumstances. The Candidate's TDC, assuming implementation of the COO Agreement, is within that range, essentially at the median. Actual compensation earned, however, is dependent upon company financial performance. I note that two elements of the Candidate's TDC under the COO Agreement (annual incentive opportunity and long-term incentive opportunity) are contingent upon company performance. Thus, if the Debtors' performance is poor and does not trigger the

3

payment of the annual incentive and long-term incentive opportunities to the Candidate, the Candidate's TDC would be well below the median of Chief Operating Officers in both the Industry Peer Group and the Survey Group. Accordingly, I conclude that the Candidate's TDC under the proposed COO Agreement is within the range of competitive practice.

11.    The proposed COO Agreement also provides for a severance benefit equal to 1.5 times the sum of base salary and target annual incentive opportunity (75%). This severance benefit is payable if the Candidate's employment is terminated without cause or if at the time the CEO position is open, he is not offered such position. In the latter case, he may elect to voluntarily terminate his employment and receive his severance benefit.

12.    Competitive practice for severance benefits for top executives (other than the CEO) range from 1 times salary to 2 times the sum of salary and target bonus opportunity. Often, too, outside candidates for the Chief Operating Officers position (or number two position in a company) will negotiate a special severance payment if they are not eventually named CEO. Accordingly, I conclude that the Candidate's severance benefits are within the range of competitive practice.

AFFIANT FURTHER SAYETH NOT

Dated this _10_ day of October, 2003.

_Nick Bubnovich_
Nick Bubnovich

SUBSCRIBED AND SWORN TO BEFORE ME

this _10_ day of October, 2003.

_Notary Public_
My Commission Expires: 8/11/05

"OFFICIAL SEAL"
DARLA JEAN YAGER
COMMISSION EXPIRES 08/11/05

4

## EXHIBIT 1

### INDUSTRY PEER GROUP

Albemarle Corporation

Dow Chemical Company

E.I. DuPont De Nemours

Ecolab, Inc.

PPG Industries

Rohm & Haas Company