## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## MOTION OF D.K. ACQUISITION PARTNERS, L.P., FERNWOOD ASSOCIATES, L.P. AND DEUTSCHE BANK TRUST COMPANY AMERICAS TO DISQUALIFY THE HONORABLE ALFRED M. WOLIN, UNITED STATES DISTRICT JUDGE, FROM FURTHER PARTICIPATION IN THESE JOINTLY ADMINISTERED CASES

D.K. Acquisition Partners, L.P., Fernwood Associates, L.P. and Deutsche Bank Trust Company Americas (collectively, "Movants")[1], hereby respectfully move this Court for an order, pursuant to 28 U.S.C. § 455(a) and the Code of Conduct for United States Judges, disqualifying the Honorable Alfred M. Wolin, United States District Judge, from further participation in these jointly administered chapter 11 cases.

### PRELIMINARY STATEMENT

1.     As the Court is aware, issues of extreme significance to Movants and all other parties to this case and the other asbestos-related cases pending in this Court have been the subject of recent recusal proceedings initiated in In re Owens Corning, et al., Case No. 00-03837 (the "Owens Corning Case"). Indeed, so significant are these issues that the Third Circuit Court of Appeals currently is entertaining a petition for mandamus filed in that case, and the District Court has agreed to stay all proceedings before it related to these cases until these issues are sorted out.

---

[1] Movants, together with Bear, Stearns & Co. Inc. ("Bear Stearns"), are members of an Unofficial Committee in this case. Bear Stearns has not joined in this motion, and it is not being made on its behalf.

DEL1 54426-1

2.    The issue that has been brought into sharp focus in recent weeks is that

Messrs. David R. Gross and C. Judson Hamlin, two of the District Court-appointed

"Consultants" who have participated materially in the District Court's administration of these

cases, purportedly as neutrals, are anything but impartial advisers to the District Court. Instead,

during the last two years, at the very same time that Messrs. Hamlin and Gross, and their

respective law firms, have been advising the District Court on critical issues and proceedings in

these cases, mostly on an *ex parte* basis, they have been acting as partisan advocates for the

interests of asbestos claimholders in another major and highly-contested (and related) asbestos

bankruptcy case pending in this Circuit -- that of G-I Holdings Inc., f/k/a GAF Corporation, and

its affiliates (collectively, "G-I").

3.    Movants believe that there is, at the very least, a substantial perception

that the District Court in this matter has surrounded itself with, and has been taking *ex parte*

advice from, Consultants who have an agenda distinctly partisan and at odds with their purported

role in this case as neutrals, and who have leveraged their consulting relationship with the Court

in their advocacy roles in other cases. What is more, one of these District Court-appointed

Consultants, Mr. Hamlin, has affirmatively sought to be appointed the representative of future

asbestos claimants in this case in circumstances that can only call into question the fairness and

transparency of these proceedings.

4.    Movants are aware of the significance of this Motion and take this action

most reluctantly. Nonetheless, these recent developments compel Movants to request that, for

the reasons discussed more fully below, Judge Wolin disqualify himself from further

participation in these jointly administered chapter 11 cases, or, alternatively, refer this matter

immediately to the Court of Appeals for the Third Circuit for disposition in conjunction with the recusal motion initiated in the Owens Corning Case.[2]

## JURISDICTION

5.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of Debtors' chapter 11 cases and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief sought herein is Title 28, section 455(a) and the Judicial Conduct Code.

## RELIEF REQUESTED

6.    Movants request that this Court disqualify Judge Wolin from further participation in any proceedings in connection with Debtors' chapter 11 cases.  The relief requested in this Motion is based upon the arguments and authorities set forth herein, and upon the Affidavit of Joanne Wills in Support of Motion To Disqualify The Honorable Alfred M. Wolin, United States District Judge, From Further Participation In These Jointly Administered Cases (the "Wills Aff."), and the exhibits submitted therewith, and upon such other evidence and argument as may be presented to the Court.[3]

---

[2]    In this regard, Movants are prepared to file a Petition for a Writ of Mandamus to facilitate the Third Circuit's consideration of this Motion.

[3]    While Movants believe that the current record compels immediate recusal, to the extent additional evidence may be necessary, Movants reserve their right to seek discovery in connection with this matter, and to supplement their motion with any information obtained through discovery.

## BACKGROUND

7.     On April 2, 2001, W.R. Grace & Co., and 61 of its predecessors,

subsidiaries, and other related entities (collectively, "Debtors"), filed for reorganization under

Chapter 11 of the United States Bankruptcy Code.

8.     Each Movant is a creditor in these chapter 11 cases, holding claims against

Debtors arising under:  (i) a certain $250 million credit facility, entered into as of May 14, 1998;

and/or (ii) a certain $250 million revolving credit facility dated as of May 5, 1999 (collectively,

the "Credit Facilities").  As of August 2003, the fixed, liquidated aggregate claim of the

members of the Unofficial Committee  (of which Movants are members) against Debtors,

exclusive of accrued and accruing post-petition date interest, was estimated to be not less than

$150 million.  This estimate includes outstanding principal as well as estimated prepetition

interest and facility fees.  As holders of claims against Debtors arising under the Credit Facilities,

Movants, along with Bear Stearns, decided to form the Unofficial Committee to represent the

interests of its members in this case.

9.     On January 5, 2001, G-I filed for chapter 11, and its case currently is

pending before the Honorable Rosemary Gambardella in the United States Bankruptcy Court for

the District of New Jersey (the "G-I Court").

10.     On October 11, 2001, the G-I Court appointed Mr. Hamlin to serve as the

"Legal Representative of Present and Future Holders of Asbestos-Related Demands."  (See

Order Appointing Legal Representative of Present and Future Holders of Asbestos-Related

Demands in G-I's Chapter 11 Case, Wills Aff. Ex. A.)  Mr. Hamlin, in turn, hired Mr. Gross and

the firm with which he then was a partner to represent the interests of the asbestos claimants in

that case.

11.    On November 27, 2001, then-Chief Judge Becker of the Third Circuit

Court of Appeals ordered that Debtors' cases, and four other asbestos-related chapter 11 cases

pending in the District of Delaware[4] (together, the "Five Asbestos Cases"), be transferred from

the Bankruptcy Court and assigned to the Honorable Alfred M. Wolin of the United States

District Court for the District of New Jersey, who temporarily was assigned to the District of

Delaware.  (See Designation of a District Judge for Service in Another District Within the

Circuit (the "Designation Order"), Wills Aff. Ex. B.)  Judge Becker directed that "these

bankruptcy cases, which carry with them tens of thousands of asbestos claims, need to be

consolidated before a single judge so that a coordinated plan for management can be developed

and implemented."  Id. ¶ 2.

12.    On December 28, 2001, at a time when Hamlin and Gross were already

acting as partisan advocates for asbestos claimants in the G-I case (many of whom also are likely

within the classes of asbestos claimants in these cases), the District Court appointed Messrs.

Hamlin and Gross, and three other individuals, as Court Appointed Consultants (the

"Consultants") in the Five Asbestos Cases.  (See Order Designating Court Appointed

Consultants and Special Masters (the "Appointment Order"), Wills Aff. Ex. C.)[5]

13.    On or about October 10, 2003, Kensington International Limited and

Springfield Associates, LLC, ("Kensington and Springfield"), creditors of Owens Corning, filed

a motion to recuse the Honorable Alfred M. Wolin from further participation in the Owens

---

[4]    The four other cases are:  In re Armstrong World Indus., Inc., et al., Case Nos. 00-4471, 00-4469,00-4470; In re Owens Corning, et al., Case No. 00-03837; In re Federal Mogul Global, Inc., T&N Ltd., et al., Case No. 01-10578; and In re USG Corp., et al., Case Nos. 01-2094 through 01-2104.

[5]    The three other Consultants are William A. Drier, Esq., John E. Keefe, Esq., and Professor Francis E. McGovern.  (See Appointment Order, Wills Aff. Ex. C.)

Corning bankruptcy proceedings (the "Recusal Motion"). That Recusal Motion highlighted the circumstances surrounding the dual and conflicting capacities within which Messrs. Hamlin and Gross have been acting in their roles as Consultants to the District Court in these cases and as representatives of pending and future asbestos claimants in the G-I bankruptcy proceedings. Kensington and Springfield sought discovery of Hamlin and Gross, as well as of their law firms, and of W.R. Grace in connection with the Recusal Motion.

14.     On October 13, 2003, the Debtors in this case filed an Application pursuant to 11 U.S.C. §§ 105, 327 and 524(g)(4)(B), for the appointment of C. Judson Hamlin as legal representative for future claimants in the W.R. Grace proceedings (the "Hamlin Application").

15.     On October 23, 2003, the District Court sua sponte suspended all briefing and discovery in connection with the Recusal Motion.

16.     The next day, Kensington and Springfield filed an emergency petition for writ of mandamus directing Judge Wolin either to recuse himself from further participation in the Owens Corning proceedings or to expedite consideration of (including discovery on) the Recusal Motion (the "Petition for Mandamus" or "Petition").

17.     On October 28, 2003, the District Court entered an order entitled "Case Management Order and Order to Show Cause" concerning the Recusal Motion, which, among other things, ordered the Consultants to submit affidavits to the District Court setting forth certain information relating to their activities as Consultants and in the G-I case (the "October 28 Order").

18.     On October 29, 2003, the Unofficial Committee filed its Objection to the Hamlin Application.

19.     Then, on October 30, 2003, the Court of Appeals for the Third Circuit issued an order which (a) stayed all proceedings "affected by [the Petition for Mandamus], and in particular all substantive proceedings before the relevant Bankruptcy Court and the District Court pertaining to [the Owens Corning proceedings]"; (b) exempted from the stay any actions to be taken or information to be furnished to the District Court concerning the Recusal Motion as required by the District Court's October 28 Order; (c) ordered respondents affected by the Petition for Mandamus to file Answers with the Third Circuit no later than noon on November 6, 2003; and (d) invited the District Court to address and respond to the Petition.  (Order, dated October 30, 2003, Wills Aff. Ex. D.)

20.     The next day, October 31, 2003, Owens Corning filed a motion for clarification of the Third Circuit's order.  The motion requested that the Court limit its stay to the proceedings before the District Court so that the proceedings before the Bankruptcy Court could proceed.

21.     On November 3, 2003, Judge Wolin filed a Response to the Petition for Mandamus, stating that the District Court "will judge the Motion to Recuse on the law and facts presented after all of the parties have been heard in full" and that it recognizes "the need to resolve the motion as quickly as possible, regardless of jurisdictional issues, to minimize the inevitable harm that will impact the progress of the several asbestos-related bankruptcies under its supervision."

22.     Contemporaneously with the filing of Judge Wolin's Response on November 3, 2003, the Third Circuit Court of Appeals, over the objections of of Kensington and Springfield, issued an order clarifying that only the proceedings pending before Judge Wolin were stayed, and that proceedings before the Honorable Judith A. Fitzgerald, not involving Judge

- 7 -

Wolin, could proceed. The Third Circuit also modified the briefing schedule to extend the date for responses to the Petition to November 21, 2003.

      23.     On November 3, 2003, over the objections of Kensington and Springfield, the Court of Appeals for the Third Circuit issued an order clarifying that only the proceedings pending before Judge Wolin were stayed, and that proceedings before the Honorable Judith A. Fitzgerald, not involving Judge Wolin, could proceed. The Third Circuit also modified the briefing schedule to extend the date for responses to the Petition to November 21, 2003.

      24.     On November 5, 2003, Judge Wolin ordered a stay of all matters relating to the Five Asbestos cases before him in the District Court. The order exempted matters in the Bankruptcy Court from the stay.

## ARGUMENT

### A.    Standards for Considering Disqualification Under 28 U.S.C. § 455(a).

      25.     As the Third Circuit has noted, "public confidence in the judicial system mandates, at a minimum, the appearance of neutrality and impartiality in the administration of justice." Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 157 (3d Cir. 1993). Indeed, "impartiality and the appearance of impartiality in a judicial officer are the sine qua non of the American legal system." Id. These qualities are important in all judicial proceedings, and none more so than bankruptcy proceedings. See In re Ira Haupt & Co., 361 F.2d 164, 168 (2d Cir. 1966) ("The conduct of bankruptcy proceedings not only should be right but must seem right.").

      26.     Congress has recognized the need "to promote confidence in the integrity of the judicial process." Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 859 (1988); see also In re School Asbestos Litig., 977 F.2d 764, 777 (3d Cir. 1992) (noting "Congress's great concern for the public's confidence in the judiciary"). That concern resulted

in the enactment of 28 U.S.C. section 455(a), which provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a) (emphasis added); see also Judicial Conduct Code Canon 3C ("Disqualification (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned . . . .").

27.    As observed by the Third Circuit, "Congress enacted subsection 455(a) precisely because 'people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges. In high profile cases . . . , the outcome of which will in some way affect millions of people, such suspicions are especially likely and untoward.'" In re School Asbestos Litig., 977 F.2d at 782 (citations omitted).

28.    Because of the extremely important concerns underlying the enactment of section 455, the standards applied to its enforcement are exacting, and leave little room for doubt. "Whenever a judge's impartiality 'might reasonably be questioned' in a proceeding, 28 U.S.C. § 455(a) commands the judge to disqualify himself sua sponte in that proceeding." Alexander, 10 F.3d at 162 (emphasis added) (citations omitted). "[W]hether the district court judge actually harbors any bias against a party" is irrelevant -- what matters is that the court maintain its appearance of impartiality. Id.

29.    Further, it is not relevant whether the judge "actually harbors any illegitimate pro-plaintiff bias." In re School Asbestos Litig., 977 F.2d at 782. Nor does it even matter "whether or not the judge actually knew of the facts creating an appearance of impropriety. . . ." Liljeberg, 486 U.S. at 860. Rather, all that matters is whether, "regardless of [the judge's] actual impartiality, a reasonable person might perceive bias to exist, and this cannot

- 9 -

be permitted." Id.; see also United States v. Nobel, 696 F.2d 231, 235 (3d Cir. 1982) (the focus of the disqualification inquiry "is on the objective appearance of bias, rather than bias-in-fact").

       30.    With these standards in mind, we turn to the currently known facts of this matter.

**B.**      **Section 455(a) Mandates Disqualification Under The Circumstances Present Here.**

    **1.**      **Messrs. Hamlin's and Gross's Roles as Close Advisors**
           **To the District Court for the Past Twenty-Two Months.**

       31.    As noted above (see ¶ 12), the District Court appointed Hamlin and Gross as Consultants in the Five Asbestos Cases, which includes this case, on December 28, 2001. The grant of authority provided to them, as well as the other Consultants, was extremely broad. As the District Court stated, the purpose of the "Consultants is to advise the Court and to undertake [certain] responsibilities, including by way of example and not limitation, mediation of disputes, holding case management conferences, and consultation with counsel . . . ." (See Appointment Order, ¶ 3, Wills Aff. Ex. C.)

       32.    Pursuant to the Appointment Order, Hamlin and Gross, as well as the other Consultants, also were delegated "certain authority to hear matters and to advise the District Court on issues that may arise in these five large Chapter 11 cases." Id. ¶ 1. For example, the Appointment Order provided that the District Court could, "without further notice, appoint any of the Court Appointed Consultants to act as a Special Master to hear any disputed matter and to make a report and recommendation to the Court on the disposition of such matter." Id. ¶ 4.

       33.    The significance of the Consultants' role in this and the other Five Asbestos Cases cannot be overstated. Indeed, the District Court itself has described the Consultants, including Hamlin and Gross, as "necessary for the efficient administration of these

- 10 -

very large mass-tort chapter 11 cases," and as "occupying a unique position in the [asbestos] cases not shared by other persons employed in these cases." (See Fee Allowance Order, ¶ 1, Wills Aff. Ex. E.)[6] Furthermore, the District Court has described the Consultants as "functioning in a manner in all respects similar to examiners as provided for in the Bankruptcy Code." Id.

34.    In his role as a Consultant, Mr. Hamlin has, consistent with the grant of authority he received, participated materially in these cases as an advisor to the District Court. Mr. Hamlin's time records show that, over the course of the past twenty-two months, he has been involved in, among other things, several meetings with the District Court and the other Consultants, and the drafting of a memorandum relating to the propriety of certain motions filed by parties to these bankruptcy cases. (See Wills Aff. Exs. F-H.)

35.    Mr. Gross has had even more involvement in this matter and even more contact with the District Court. Indeed, Mr. Gross and his law firms have devoted hundreds of hours to these cases, and, through the spring of 2003, have billed the debtors in the Five Asbestos Cases nearly $600,000. (See Wills Aff. Exs. I-L.) Mr. Gross's time records show that he and his associates participated in numerous meetings with the District Court, its staff, and the other Consultants, many of which were *ex parte*. (Id.)

36.    In short, it cannot reasonably be disputed that Messrs. Hamlin and Gross have had unparalleled access to the District Court, and have had, and continue to have, influence with the District Court and the District Court's decision-making process not shared by Movants. Clearly, then, because of this role, Messrs. Hamlin and Gross were duty bound to remain neutral, and avoid anything that would raise the specter of partiality or bias.

---

[6]    The "Fee Allowance Order" refers to the Order 1) Partially Withdrawing the Reference and 2) Governing Applications for the Allowance of Fees and Expenses to Court Appointed Advisors.

2.    **Messrs. Hamlin's and Gross's Roles as Partisan Advocates
for Asbestos Claimants in the Related G-I Bankruptcy Case.**

37.    Nevertheless, as the Recusal Motion revealed, during the time that Hamlin

and Gross have been acting as close advisors to the District Court in this case, and have had

significant *ex parte* contact with the District Court, they have also been actively involved as

partisan advocates for asbestos claimants in the G-I bankruptcy case.  Specifically, as noted

above (see ¶ 10), on October 11, 2001, the G-I Court appointed Mr. Hamlin to serve as the

"Legal Representative of Present and Future Holders of Asbestos-Related Demands."  (Wills

Aff. Ex. A.)  Mr. Hamlin hired Mr. Gross and the firm with which he then was a partner to

represent the interests of the asbestos claimants in that case.  (Wills Aff. Ex. M.)  In those roles,

both Mr. Hamlin and Mr. Gross are duty bound to see that the asbestos claimants whom they

represent in that related case receive the greatest consideration possible, even if such

consideration comes at the expense of other creditor classes or subjects the debtors to onerous

obligations.

38.    The close relationship between the Debtors' case and the G-I case is not

mere speculation.  For example, both Debtors and G-I were leading manufacturers of asbestos-

containing building products and were the subject of thousands of asbestos-related claims that

eventually forced them into bankruptcy.  Because asbestos claimants frequently claim to have

been exposed to asbestos-containing products produced by more than one manufacturer, or are

unsure of the identity of the manufacturer who produced the product that allegedly caused their

injuries, it is not uncommon for asbestos claimants to assert claims against different

manufacturers of similar products.  Thus, it is likely that a significant number of the asbestos

claimants in the G-I bankruptcy case also are claimants in these cases as well.

- 12 -

39.     Further, as representatives of a class of creditors that, by definition, has no currently identified limit to its members, Messrs. Hamlin and Gross stand to be important power brokers in the G-I case.  They undoubtedly have been involved or will be involved in the consideration of significant legal and factual issues bearing on the interests of future asbestos claimants and other constituent parties in the G-I case, issues which overlap with issues that have surfaced or will surface in these cases.  Indeed, it is likely that a viable plan of reorganization will not be confirmed in the G-I case without the active participation and approval by Messrs. Hamlin and Gross.

3.     **Messrs. Hamlin's and Gross's Dual Roles for the Past Twenty-Two Months in These Cases and in the G-I Case Has Created Potential And Actual Conflicts of Interest and, at Least, the Appearance of Impropriety or Bias.**

40.     By virtue of the unique--indeed, unprecedented--positions they hold in this and the other asbestos cases in which they are Consultants, Mr. Hamlin and Mr. Gross have the ability to play a material role in the manner in which these cases are administered.  More importantly, they have the power to shape or influence precedent and decision-making.  By performing legal research concerning, and advising the Court on, issues that come before Judge Wolin, as well as attending hearings in their roles as Consultants, Messrs. Hamlin and Gross unquestionably have -- or, just as importantly, appear to have significant influence on the District Court.

41.     The Court's order appointing them as consultants established high standards for the Consultants.  Regrettably, the unfolding record demonstrates that at the same time that they have been advising the District Court, Hamlin and Gross have been acting as advocates on behalf of asbestos claimants in the G-I case, and have relied on their relationship with Judge Wolin in the Five Asbestos Cases to their clients' advantage in that case.  And, as

- 13 -

advocates, they have been meeting with other futures representatives and counsel in order to

develop a coordinated strategy in all of the asbestos-related bankruptcy cases in which they and

their colleagues are employed as futures representatives or legal counsel for such claimants.

(See Wills Aff. Exs. F-L.)

42.     These dual roles have given Messrs. Hamlin and Gross the ability to

influence the decision-making process in these cases in a way that could positively affect the

fortunes of their constituents in the G-I bankruptcy case.  Indeed, it certainly would appear to any

objective observer that Messrs. Hamlin and Gross are in a position to influence the District

Court, on an *ex parte* basis, on issues that directly affect their constituents' rights in the G-I case,

or in any other asbestos-related case in which they might become involved.  This dual role

creates the appearance that the District Court's advisors in this case, who are supposed to be

neutral advisors to the District Court, are anything but neutral and impartial.

43.     It matters not whether in fact the District Court's impartiality actually has

been affected in this case.  Rather, what matters is, as a result of Mr. Hamlin's and Mr. Gross's

dual and conflicting roles, a reasonable person might perceive partiality or bias to exist.  This

cannot be rationally disputed, nor can it be permitted.  See Liljeberg, 486 U.S. at 860.  Thus,

because the District Court's "impartiality 'might reasonably be questioned'" in this proceeding,

"28 U.S.C. § 455(a) commands" the Court to disqualify Judge Wolin.  See Alexander, 10 F.3d at

162 (emphasis added) (citations omitted).

44.     The mere fact of their incompatible positions in their dual roles creates an

"appearance" of impropriety.  However, Messrs. Hamlin and Gross have not attempted to

downplay their special status with Judge Wolin in their advocacy before Judge Gamberdella.

Rather, they have repeatedly and explicitly highlighted their relationship with Judge Wolin in

- 14 -

their advocacy before Judge Gamberdella in the G-I case.  While some examples of this

impropriety has been disclosed by and discussed more fully in the Recusal Motion filed in the

Owens Corning case,[7] there are other examples of Messrs. Hamlin and Gross's using, or being

perceived as using, their closeness to Judge Wolin to advance their litigation strategy in the G-I

case.

45.    On December 13, 2002, in a motion to appoint a Chapter 11 trustee, Mr.

Gross, appearing on behalf of Mr. Hamlin, directly acknowledged his dual role when he prefaced

his argument by stating:

> As your Honor knows, I represent the legal representative in this
> situation; and although I have not been before your court on many
> occasions with respect to the bankruptcy world, I've had
> substantial experience in that world <u>as a result of my appointment
> in another court in this building with respect to some of the
> bankruptcies before Judge Wolin.</u>

(Excerpted Transcript of December 13, 2002 hearing at 57-58, Wills Aff., Ex. U) (emphasis

added).  Gross continued to emphasize his role in the case before Judge Wolin throughout this

hearing.  At one point he offered to "share with this court as to what has gone on in other

bankruptcy proceedings which involved large corporations similarly situated as to the debtor

here." <u>Id.</u> at 60.  He further represented that he could "go into some greater detail--with what has

happen[ed] in other bankruptcies" and suggested that the court "look at the other bankruptcies

---

[7]    For example, the Recusal Motion in Owens Corning notes that Hamlin and Gross invoked the District
Court's precedent in opposing G-I's application for an order establishing a method to liquidate claims and
to fix a final bar date.  They argued that the District Court's decisions in this case did not stand for the
proposition that future asbestos claims were "claims" that could be discharged in bankruptcy.  Hamlin and
Gross argued that this issue was not before the District Court in these cases.  Further, suggesting an insight
into the District Court's thinking that they could have obtained only through their roles as close advisors to
the District Court, Hamlin and Gross added that, "if this issue had been before him, it is certain that Judge
Wolin would not have held that future claimants hold dischargeable bankruptcy claims under the
Bankruptcy Code based upon the significant authorities . . . ." (<u>See</u> the Recusal Motion, at 30, (quoting G-I
Claims Liquidation Sur-Reply at 7), Wills Aff. Ex. N).)

and the way they have been handled." Id. at 62. Gross again referred to his experience in Judge

Wolin's court in his criticism of the debtor, noting that "[t]hese circumstances do not seem to be

present in the other cases that I've had some history with, if you will." Id. at 66. Not even a few

minutes later, Gross was compelled to "stress again the timing of these other bankruptcies" and

to recommend to the court that "once again you have to look to some extent to the past, if you

will, and what's going on presently in these other bankruptcies." Id. at 67.

46.    Mr. Gross did not restrict himself merely to reminding the court that he

was familiar with the proceedings in Judge Wolin's court. He went one step further by

intimating that he had special insight to Judge Wolin's thought processes: "I think that the

reliance perhaps that counsel for the debtor has placed on the opinion by Judge Wolin in the

Sealed Air case is perhaps overstated, and there is no point in going further than that. . . ." Id. at

69.  Having earlier reminded the court of his unique role in the Five Asbestos Cases before Judge

Wolin (see id. at 57-58), there really was no reason in going further -- the reasonable inference to

be drawn from that colloquy was that Mr. Gross, perhaps better than any one else in the

courtroom, knew what Judge Wolin intended in the Sealed Air case.

47.    More recently, Messrs. Hamlin and Gross have again emphasized their

connection to Judge Wolin. On September 30, 2003, both Hamlin and Gross appeared before the

G-I court in a hearing regarding a proposed abbreviated proof of claim form in connection with

an estimation procedure for asbestos claimants.  The transcript from that hearing reveals that, as

noted by counsel, earlier in the day "Judge Wolin. . . had a session on the estimation process in

the U.S.G. case. . ." (Excepted Transcript of September 30, 2003 hearing,  at 13,  Wills Aff. T)

Trevor Swett, counsel for the Asbestos Creditors Committee, noted that at that session Judge

Wolin adopted the type of abbreviated proof of claim form being advocated by the Asbestos

Creditors Committee in the G-I case, as opposed to a more lengthy claim form advocated by the

debtor. Id. The session with Judge Wolin referred to in the G-I transcript appears to have been

off the record, as it does not appear on the USG docket. However, the G-I transcript makes clear

that Mr. Gross, and possibly Mr. Hamlin, as well, attended the proceeding with Judge Wolin in

some capacity. See id. During the G-I hearing, held on the same day as the Judge Wolin

session, Mr. Hamlin's attorney, Kevin Irwin, encouraged the G-I court to adopt Judge Wolin's

ruling, stating "[w]e note Judge Wolin's proceedings with interest," and reminding the court that

"[w]e've cited to you in the past when Judge Wolin announced this route. . . ." Id. at 19. Mr.

Irwin went on to paraphrase Judge Wolin's reasoning and noted that the Futures Representative,

Mr. Hamlin, would welcome a similar ruling in the G-I case.

    48.    The role of Hamlin and Gross as partisan advocates for the interests of

asbestos claimants in the G-I case creates a direct conflict of interest with their role as

purportedly impartial and neutral advisors to the District Court in this case. Clearly, the

possibility exists that whatever advice and consultation they have provided to the District Court

has been colored, wittingly or not, by their role and participation in the G-I case as advocates for

asbestos claimants. And, whether or not that actually is the case is immaterial; the mere

appearance of such a conflict alone is grounds for disqualification.

    49.    The similarities between this situation and the situation presented in Edgar

v. K.L., 93 F.3d 256 (7th Cir. 1996) are undeniable. The trial judge in K.L. appointed a panel of

experts to advise him. Two of the appointed experts later took on partisan roles outside of the

case. The Seventh Circuit criticized the partisan advocacy of the experts, noting that "[e]xperts

appointed and supervised by a court carry special weight because of their presumed neutrality."

Id. at 262.

- 17 -

50. In its determination that disqualification was mandatory under those circumstances, the Seventh Circuit was equally critical of the fact that the trial judge had held *ex parte* meetings with the panel. The court held that knowledge acquired in the judge's chambers and not "enter[ed] into the record . . . or tested by the tools of the adversary process" was personal knowledge, not gained in a judicial capacity. Id. at 259. In disqualifying the trial judge, the Seventh Circuit confirmed that the *ex parte* meetings were no less egregious than if the judge had himself undertaken a personal investigation of the facts involved. Id. at 259-60.

51. Here, most, if not all, of the Consultants' work for the District Court in these cases has occurred *ex parte* and, therefore, beyond the scrutiny of the parties, a fact which only compounds the problem.[8] In fact, a review of Messrs. Gross's and Hamlin's fee applications discloses that, during the very same period that they were acting as partisan advocates for asbestos claimants in the G-I bankruptcy case, they have individually or each separately met with the District Court on an *ex parte* basis more than 40 times. (See Wills Aff. Exs. F-L.)

---

[8] It may be suggested that Movants should not be heard to complain about there having been *ex parte* communications between the District Court and the Consultants and other parties to this case as that has been the procedure followed by the District Court from the outset. It may well be the case that some parties have been on notice, or at least may have heard or understood, that there would be *ex parte* communications. But that does not obviate the serious concerns that such communications by their very nature raise. As one court observed, "it is rarely possible to prove to the satisfaction of the party excluded from the communication that nothing prejudicial occurred. The protestation of the participants that the communications were entirely innocent may be true, but they have no way of showing it except by their own self-serving declaration. This is why the prohibition is not against 'prejudicial' *ex parte* communications, but against *ex parte* communications." Burgess v. Stern, 311 S.C. 326, 330-331 (Sup. Ct. 1993).

It is equally true that the Consultants submit fee applications with time records to the District Court. However, that does not provide a sufficient remedy to the concerns that *ex parte* communications raise. The time records are themselves not very descriptive of the activities undertaken by the Consultants, and, in some cases, such as with Mr. Gross's time records, the names of persons with whom he has consulted or discussed matters relating to his role as an advisor to the District Court are redacted even when such meetings included Judge Wolin. And, the actual contents of their *ex parte* communications with the District Court are not revealed.

- 18 -

52.     More troubling, however, is what is disclosed by a side-by-side comparison of (i) Hamlin's and Gross's bills in these cases, (ii) Hamlin's and Gross's bills in the G-I case, and (iii) Futures Representative James J. McGonagle's bills in the Owens Corning case. For example, there are numerous meetings at which Hamlin and Gross, as partisan advocates for asbestos claimants in G-I, had *ex parte* meetings with Mr. McGonagle and others to discuss "common futures issues." (See Wills Aff. Ex. R (showing that such meetings were billed to G-I).) That is, at the same time that they had the "ear" of the District Court in the Five Asbestos cases as Court-appointed neutrals, Messrs. Hamlin and Gross were meeting with the Futures Representative in one of those Five Asbestos Cases discussing "common issues" between future asbestos cases in G-I and Owens Corning. (Interestingly, though Mr. McGonagle disclosed the details of this meeting in his time sheets, in his time sheets for the same meeting, Mr. Hamlin did not include the names of the participants, including Mr. McGonagle. (See Wills Aff. Exs. O, R)

53.     A review of Mr. Hamlin's bills in the G-I case reveals further troubling information about his frequent contact with Future Representatives during his tenure as a supposedly neutral advisor to Judge Wolin. He has recorded at least ten communications with other Future Representatives since his appointment in the G-I case. There are indications that some of these meetings may have included representatives from the Five Asbestos Cases. For example, on August 2, 2002, Hamlin met with Future Representatives of "5 other Chapter XI asbestosis bankruptcies re: common issues and alternatives." Indeed, as stated above, it is clear the Mr. McMonagle was present for at least some of the meetings. Mr. Hamlin, thus, has been in a position to advise Judge Wolin in the USG case and then able to turn around and bill G-I for a "[r]eview of Judge Wolin's decision in USG as it may effect estimation issues pending in G-I."

- 19 -

The conflicts are inherent. These time entries indicate that, in his role as a partisan advocate on behalf of asbestos claimants in the G-I Case, Mr. Hamlin may be working with other such advocates to formulate common strategies to advance their and their clients' collective interests in all of the asbestos-related bankruptcy cases. It is simply not credible to think that, when he is advising the District Court in this or any of the other Five Asbestos Cases, Mr. Hamlin can shed his partisan instincts and provide the District Court with wholly neutral and unbiased advice on many of the same issues that can or will affect his clients in G-I or those of his colleagues in the other cases.

54.    The same comparison of Mr. Gross's bills also reveals troubling details that raise concerns about whether Mr. Gross is using or at least, is able to use, his relationship with Judge Wolin to his advantage in his advocacy outside of the courtroom as well. For example, on March 21, 2003, Mr. Gross had an *ex parte* conference call with the District Court to discuss the "Overall Asbestos Program." (See Wills Aff. Ex. L.) Just a few days after that call with the District Court, on March 25, 2003, Mr. Gross met with Mr. Hamlin and "all other Futures Reps" in New York City to discuss matters relating to the handling of claims by future asbestos claimants. (See Wills Aff. Ex. P.) Then just two days later, Mr. Gross again had a conference call with the District Court. (See Wills Aff. Ex. L.)

55.    The timing of Mr. Gross's *ex parte* communications with the District Court (which he billed as a Consultant) and his meetings with partisan advocates for asbestos claimants (which he billed to G-I) would lead any casual observer to have grave concerns that Mr. Gross has been intermingling his role as a Court-appointed consultant, and the *ex parte* access to the District Court it allows, with his role as a partisan advocate to asbestos claimants -- the group of individuals who, by far, seek the largest distribution of assets in these bankruptcies.

- 20 -

Horrible imaginings?  Perhaps, but when pieced together, that these time logs create the
appearance of an unfair and potentially biased judicial process is undeniable.

56.    Because of the conflicting roles occupied by Messrs. Hamlin and Gross in
these related bankruptcy matters, section 455(a) mandates the disqualification of the District
Court from any further involvement with Debtors' cases.

### 3.    Mr. Hamlin's Application to Be Appointed as the Futures Representative in the W.R. Grace Bankruptcy Proceedings Underscores the Conflict of Interests and Appearance of Partiality or Bias Present in the Cases Before Judge Wolin.

57.    A more recent development in these cases, highlights even more the
troubling perceptions that Messrs. Hamlin's and Gross's participation in these cases has created,
especially at a time when "people . . . are often all too willing to indulge suspicions and doubts
concerning the integrity of judges."  In re School Asbestos Litig., 977 F.2d at 782 (citations
omitted).

58.    At the very same time that Mr. Hamlin continues to serve as a Consultant
in the Five Asbestos Cases, and partisan advocate for asbestos claimholders in G-I, he is now a
candidate for appointment as Futures Representative for asbestos claimants in the W.R. Grace
bankruptcy proceedings.  (See Wills Aff. Ex. S, Application Of Debtors Pursuant To 11 U.S.C.
§§ 105, 327 And 524(g)(4)(B), For The Appointment Of C. Judson Hamlin As Legal
Representative For Future Claimants, the "Application").)  Whatever pretense of neutrality that
Mr. Hamlin may have retained despite his role as representative of asbestos claimants in the G-I
case certainly has been destroyed by Debtors' recently filed Application (which they have now,

not surprisingly, asked be held in abeyance) that seeks to have Mr. Hamlin fill the same role here

he has been fulfilling in G-I as a partisan advocate for asbestos claimants. (Id.)[9]

59. Irrespective of whether the District Court was involved in or aware of

Debtors selection of Mr. Hamlin, the mere fact that Debtors, Mr. Hamlin and perhaps others

chose to ignore the patent conflicts of interest presented by the Application in light of Mr.

Hamlin's role here as a Consultant and his role in the G-I case (which was disclosed before

Debtors filed the Application) raises serious questions about the fairness and transparency of

these proceedings.  It is indeed unfortunate that these facts raise an appearance of impropriety,

but it is the fact that they do, and this is just the sort of situation that section 455(a) was enacted

to remedy.

60. In sum, it is not reasonable to believe that every time Messrs. Hamlin and

Gross have counseled and advised the District Court on matters relating to the administration of

this case they have set aside their partisan leanings as advocates for their constituents in the G -I

case.  It is, on the other hand, reasonable to believe that Messrs. Hamlin and Gross are no more

capable of compartmentalizing their conflicts than any one else would be in similar

circumstances.  In fact, it appears that they may not have even attempted to compartmentalize

their conflicts.  Any outside observer who is not privy to the *ex parte* discussions between the

Consultants and the District Court would reasonably question the impartiality of the District

Court and perceive the real potential for partiality or bias to exist.  As such, regardless of

whether the District Court's impartiality actually has been affected in this case, section 455(a)

mandates that Judge Wolin disqualify himself.  Public confidence in the judicial system, and the

---

[9]     The Unofficial Committee, as well as the Official Committee of Unsecured Creditors and the United States
Trustee, have filed objections to the Application.

- 22 -

appearance of neutrality and impartiality in the administration of these large chapter 11 cases,

permits nothing less.

## CONCLUSION

For all the foregoing reasons, Movants respectfully submit that their request for an

order, pursuant to 28 U.S.C. § 455(a) and the Code of Conduct for United States Judges,

disqualifying the Honorable Alfred M. Wolin, United States District Judge, from further

participation in these jointly administered chapter 11 cases should be granted.

Dated: November 14, 2003

**KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP**

By:    _____/s/ Joanne B. Wills_____
       Joanne B. Wills (#2357)
       919 Market Street, Suite 1000
       Wilmington, DE  19809-3062
       (302) 426-1189

**WILLKIE FARR & GALLAGHER LLP**
Richard Mancino
Marc Abrams
Christopher J. St. Jeanos
Nisha Menon
787 Seventh Avenue
New York, NY  10019
(212) 728-8000

Counsel for D.K. Acquisition Partners, L.P.,
Fernwood Associates, L.P. and Deutsche Bank Trust
Company Americas

DEL1 54426-1