Exhibit N

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | CHAPTER 11 |
| | ) | |
| OWENS CORNING, et al., | ) | |
| | ) | |
| Debtors. | ) | Case No. 00-03837 (JKF) |
| | ) | |
| | ) | Jointly Administered |
| | ) | |

## MOTION TO RECUSE THE HONORABLE ALFRED M. WOLIN, UNITED STATES DISTRICT JUDGE, FROM FURTHER PARTICIPATION IN THESE JOINTLY ADMINISTERED CASES

Kensington International Limited and Springfield Associates, LLC (together, the "Creditors"), holders of more than $275 million in aggregate principal amount of indebtedness under the 1997 Credit Agreement[1] of the above-captioned debtors and debtors in possession ("Debtors"), hereby respectfully move this Court for an order, pursuant to 28 U.S.C. § 455(a) & (b)(1) and the Code of Conduct for United States Judges, recusing the Honorable Alfred M. Wolin, United States District Judge, from further participation in these jointly administered chapter 11 cases.

### INTRODUCTION

1.      The Creditors are aware of the significance of this Motion, and they do not make it lightly. The Creditors recently have obtained information, however, which raises reasonable, and material, questions about the impartiality of this Court. This information, which was never disclosed in these cases, casts serious doubts over the fairness of these proceedings and the treatment of creditors in these cases.

---

[1]    As defined in the "Second Amended Joint Plan of Reorganization for Owens Corning and its Affiliated Debtors and Debtors-in-Possession" [Docket No. 8460].

349578v4

1

2.      The Creditors have learned that Messrs. David R. Gross and C. Judson Hamlin (the "Conflicted Advisors"), two of the Court-appointed "Consultants" who have participated materially in this Court's administration of these cases, are not disinterested. The Conflicted Advisors and their respective law firms have spent hundreds of hours during the last twenty-two months advising this Court as to critical issues and proceedings in these cases.  During this *entire* time, however, the Conflicted Advisors and their law firms also have been actively representing, and continue to represent, the interests of future asbestos claimholders in another major and highly-contested asbestos bankruptcy case pending in this Circuit – that of G-I Holdings Inc., f/k/a GAF Corporation, and its affiliates (collectively "G-I").  The Conflicted Advisors are not "neutral advisors" of this Court – they are partisan advocates who have a material interest in the outcome of these cases.

3.      *Many of the ongoing disputes in the G-I bankruptcy case involve the same legal and factual issues that are presented in the Debtors' cases*, including the establishment of a bar date for future claimants, the manner in which future claims are estimated for plan confirmation purposes, the applicability of the discharge to future claims, successor liability, substantive consolidation, and the role of the future claims representative. Because of the numerous similarities between these cases, the Conflicted Advisors have been able to advocate positions in G-I based upon this Court's decisions – decisions that were issued while the Conflicted Advisors were assisting this Court in carrying out its judicial functions.  The Conflicted Advisors have even gone so far as to tell the court in the G-I case how this Court *will* rule on issues in the future, and to use that yet-to-be-issued decision as precedent for how the G-I court should rule.   The

2

Conflicted Advisors have advocated positions in G-I with regard to the qualifications and testimony of a key expert witness employed by the Official Unsecured Creditors' Committee in this case. Finally, and perhaps most troubling, many of the future claimants whom the Conflicted Advisors represent in G-I are also future claimants in these cases, since G-I and the Debtors engaged in similar businesses and manufactured similar asbestos-containing products. Thus, the Conflicted Advisors and their G-I clients have a personal, and material, interest in the outcome of these cases in terms of (i) the legal precedents this Court has established and will continue to establish in the future, (ii) the testimony of expert witnesses and the development of the factual record, and (iii) the relief that this Court may award future tort claimants.

4.      Judicial Code section 455(a), 28 U.S.C. § 455(a), and Canon 3C of the Code of Conduct for United States Judges (the "Judicial Conduct Code") make clear that a judge *"shall disqualify himself"*, not only if the judge is in fact not impartial, but also *"if the judge's impartiality might reasonably be questioned."* It is well established that a judge's impartiality comes into question when an advisor or assistant to the judge has an interest in the outcome of the litigation. Judicial Code section 455(b)(1) and the Judicial Conduct Code additionally require a judge to disqualify himself whenever he has obtained extra-judicial knowledge of disputed evidentiary facts concerning the proceeding, whether directly or through his advisors.

5.      It cannot be disputed that the Conflicted Advisors have actively and materially participated in these cases and in the four other asbestos cases in which they are advising this Court, including devoting hundreds of hours to consulting privately with the Court, performing legal and factual research for the Court, attending hearings and

3

assisting the Court in preparing for hearings, meeting with representatives of plaintiffs, defendants, and insurers, and engaging in other tasks that may have a material impact on the manner in which these cases are administered and the results that will be achieved. In all, the Conflicted Advisors had been paid more than $620,000 for their services in this Court through the spring of 2003 (the last date that time records are available).

6.      Nor can it be disputed that the Conflicted Advisors, as the appointed future claimants representative and his counsel in the G-I cases, have a material interest in how the future claimants are treated in the five jointly-administered asbestos cases for which they are advising this Court. The Conflicted Advisors have been actively litigating their positions in the G-I cases, and by doing so have presented evidence and advocated positions that are highly relevant to, and hotly disputed in, the Debtors' cases.

7.      The Conflicted Advisors, quite literally, are in a position to "take the law into their own hands" by advising this Court on issues which can directly affect their constituents' rights. These materially conflicting interests were never disclosed to the Creditors, who only discovered them during the last couple of weeks.

8.      "[P]ublic confidence in the judicial system mandates, at a minimum, the appearance of neutrality and impartiality in the administration of justice." Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 157 (3rd Cir. 1993). "Whenever a judge's impartiality 'might reasonably be questioned' in a proceeding, 28 U.S.C. § 455(a) commands the judge to disqualify himself sua sponte in that proceeding." Id. at 162. "[W]hether the district court judge actually harbors any bias against a party" is irrelevant – what matters is that the Court maintain its appearance of impartiality. Id. Moreover, under 28 U.S.C. § 455(b)(1), the judge and his advisors are duty-bound "to avoid any

4

349578v4

contacts outside the record that might affect the outcome of the litigation," <u>Price Bros.</u> <u>Co. v. Philadelphia Gear Corp.</u>, 629 F.2d 444, 446 (6th Cir. 1980) (quotations omitted), and a judge must disqualify himself in the face of such contacts.

9.     The Creditors respectfully submit that, under these circumstances, this Court is required to recuse itself pursuant to Judicial Code section 455 and the Judicial Conduct Code.   Because the Conflicted Advisors have participated actively and materially in these cases for nearly twenty-two months, there is no way to return the appearance of impartiality to this Court.  Under the plain terms of section 455 and the Judicial Conduct Code, full and immediate recusal is required.

10.     Finally, the Creditors firmly believe that the record, as it now stands, compels immediate recusal.   However, to the extent additional evidence may be necessary, the Creditors reserve their right to seek discovery in connection with this matter.  <u>See</u> <u>Edgar v. K.L.</u>, 93 F.3d 256, 257 (7th Cir. 1996) (criticizing trial court's assertion of "judicial privilege" as basis for blocking discovery of a court-appointed panel of expert advisors); <u>see also</u> Bankruptcy Rule 9014(c) (incorporating nearly all of the Federal Rules of Civil Procedure's rules governing discovery into contested bankruptcy matters).

<b><u>JURISDICTION</u></b>

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of the Debtors' chapter 11 cases and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief sought herein is Judicial Code section 455(a) & (b)(1) and the Judicial Conduct Code.

**RELIEF REQUESTED**

12.    The Creditors request that this Court immediately and fully recuse itself from participation in any proceedings in connection with the Debtors' chapter 11 cases. The relief requested in this Motion is based upon the arguments and authorities set forth herein, and upon the "Affidavit of Gina M. Najolia in Support of Motion to Recuse the Honorable Alfred M. Wolin, United States District Judge, from Further Participation in These Jointly Administered Cases" (the "Najolia Affidavit") and the "Request for Judicial Notice in Connection with Motion to Recuse the Honorable Alfred M. Wolin, United States District Judge, from Further Participation in These Jointly Administered Cases" (the "Judicial Notice Request") filed concurrently herewith, and upon such other evidence and argument as may be presented to the Court.

**BACKGROUND**

A.    **The Debtors And Their Chapter 11 Cases.**

13.    The Debtors are leading producers of glass fiber materials and building products.    Prior to 1972, the Debtors manufactured asbestos-containing products, including insulation products.    The Debtors have since been named as defendants in many thousands of personal injury claims allegedly caused by asbestos exposure.

14.    The Debtors commenced their chapter 11 cases on October 5, 2000.    The Debtors continue to operate and manage their affairs as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

15.    On October 20, 2000, the United States Trustee appointed a general unsecured creditors' committee and an asbestos claimants' committee.    James J.

6

349578v4

McMonagle was appointed as the future asbestos claimants' representative on September 28, 2001.

      16.    On November 27, 2001, then-Chief Judge Becker of the Third Circuit Court of Appeals ordered that the Debtors' cases and four other asbestos-related chapter 11 cases pending in the District of Delaware (together, the "Five Asbestos Cases")[2] be transferred from the Bankruptcy Court and assigned to the Honorable Alfred M. Wolin of the United States District Court for the District of New Jersey.[3]  Judge Becker directed that "these bankruptcy cases, which carry with them tens of thousands of asbestos claims, need to be consolidated before a single judge so that a coordinated plan for management can be developed and implemented."  This Court then re-referred portions of this case back to the Bankruptcy Court, but expressly retained jurisdiction "with respect to asbestos-related claims and issues."[4]  This Court subsequently withdrew the reference with respect to a number of issues, including substantive consolidation and an adversary

---

[2]   In addition to the Debtors' jointly administered cases, the Five Asbestos Cases are In re Armstrong World Industries, Inc., et al., Case Nos. 00-4471, 00-4469, 00-4470; In re W.R. Grace & Co., et al., Case Nos. 01-1139 through 01-1200; In re Federal-Mogul Global, Inc., T&N Limited, et al., Case Nos. 01-10578, et al.; and In re USG Corporation, et al., Case Nos. 01-2094 through 01-2104.

[3]   See "Designation of a District Judge for Services in Another District Within the Circuit" (the "Designation Order") dated November 27, 2001 [Docket No. 3638], a copy of which is attached to the Najolia Affidavit as Exhibit "A".  As set forth in the Judicial Notice Request, the Creditors request that this Court take judicial notice of the pleadings and other court documents that are attached to the Najolia Affidavit.

[4]   See "Order (1) Referring Certain Cases to the Bankruptcy Court and (2) Allocating Responsibilities Between the District Court and the Bankruptcy Court" entered December 10, 2001 [Docket No. 3737], a copy of which is attached to the Najolia Affidavit as Exhibit "B".

proceeding brought by the Debtors to determine the validity of the guarantees held by the Creditors and other parties.[5]

**B.    The Conflicted Advisors' Appointment And Roles In The Debtors' Cases.**

17.    This Court appointed the Conflicted Advisors and three other "Consultants" in the Five Asbestos Cases on December 28, 2001.  The grant of authority was sweeping indeed.  As stated by this Court, the purpose of the "Court Appointed Consultants [was] to advise the Court and to undertake such responsibilities, including by way of example and not limitation, mediation of disputes, holding case management conferences, and consultation with counsel, as the Court may delegate to them individually . . . ."  "Order Designating Court Appointed Consultants and Special Masters" [Docket No. 3893] (the "Appointment Order") at 2.[6]  The Consultants also would be delegated "certain authority to hear matters and to advise the Court on issues that may arise in these five large Chapter 11 cases."  Id.  The Appointment Order provided that the Court could, "without further notice, appoint any of the Court-Appointed Consultants to act as a Special Master to hear any disputed matter and to make a report and recommendation to the Court on this disposition of such matter."  Id.

---

[5]    See, e.g., "Case Management Order Re: 1) Partial Withdrawal of the Reference; 2) Filing of a Plan of Reorganization; and 3) Disposition of the 'Bank Guarantee' and 'Substantive Consolidation' Litigation" entered December 23, 2002 [Docket No. 6553] (the "Case Management Order"), a copy of which is attached to the Najolia Affidavit as Exhibit "H".

[6]    A copy of the Appointment Order is attached as Exhibit "C" to the Najolia Affidavit.

349578v4

Finally, the Appointment Order provided that the Consultants would be compensated at the expense of the Debtors' bankruptcy estates. Id. at 3.[7]

18.    During the nearly twenty-two months since the entry of the Appointment Order, the Consultants have actively participated in the judicial administration of the Five Asbestos Cases. Mr. Gross and his law firms[8] alone have devoted hundreds of hours to these cases, and had billed the debtors in the Five Asbestos Cases nearly $600,000 through the spring of 2003.[9]   Although it is not possible based upon Mr. Gross's time

---

[7]    While the facts set forth in this Motion compel immediate recusal on their own, the Creditors have become aware of additional facts, which will require further consideration in the absence of immediate recusal. In addition to the decidedly pro-plaintiff interests held by Messrs. Gross and Hamlin, as evidenced by their role as party advocates in G-I, at least two of the other three Consultants appear to be active partisans for pro-plaintiff views.

Consultant John Keefe's law firm advertises on its web site its "renowned and extensive plaintiff practice in . . . mass torts [and] asbestos related injuries including mesothelioma." Consultant Francis McGovern was loudly criticized in the Celotex bankruptcy by asbestos property damage victims for siding with the personal injury claimants in administering the plan trust fund. Professor McGovern's term as plan administrator was not renewed following his losing a bid to block his deposition relating to this dispute. Questions have also been raised about Professor McGovern's role in the Combustion Engineering bankruptcy and, in particular, his role in approving a $20 million fee for a prominent plaintiffs' attorney, who also happens to be a member of the Official Committee of Asbestos Claimants in the Debtors' cases.

The Creditors reserve the right to supplement this Motion if they obtain additional information about these or other issues which may reflect upon the partiality of the Court, whether through discovery or otherwise.

[8]    When the Appointment Order was entered, Mr. Gross was a partner of the firm Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, P.C.. Mr. Gross apparently left this firm in the summer of 2002 and practiced in the firm of D.R. Gross & Associates, LLC, before finally joining the firm of Saiber Schlesinger Satz & Goldstein, L.L.C. in November, 2002.

[9]    This includes $300,000 awarded to Mr. Gross and his law firms for mediation work performed in the W.R. Grace chapter 11 cases, as well as nearly $300,000 for his other consulting work for Owens Corning and the other asbestos debtors. Since the Creditors do not have any time records for Mr. Gross after spring 2003, his and his firm's total fees now likely far exceed this amount.

9

records to determine the exact amount of his services that relate specifically to the Debtors' cases, it is clear that his involvement has been and continues to be substantial.

19.    Mr. Gross's time records show that he and his associates participated in numerous, often lengthy meetings with the Court, its staff, and the other Consultants.[10] A number of these meetings have preceded status conferences and major hearings in the Debtors' cases, after which Mr. Gross personally attended the proceedings in open Court. Mr. Gross and his colleagues also participated in numerous teleconferences and in-person meetings throughout the country with representatives of the asbestos plaintiffs, defendants, and third party insurers including Hartford, Travelers, and Liberty Mutual. Mr. Gross attended at least one apparently very significant meeting with the insurers' Chief Executive Officers.   And, Mr. Gross met on at least a dozen occasions with undisclosed persons, his time records identifying the meeting participants only as "Name[s] Withheld."[11]

20.    Mr. Gross's services also have included legal research and the preparation of memoranda for the Court.  Although it is not possible for the Creditors to know the substance of this work at this time, since it is not disclosed in the time records, it appears that Mr. Gross and his associates have assisted the Court in analyzing various legal issues before it.  Thus, while the Creditors do not at this time know the full extent of Mr. Gross's role in the judicial administration of these cases, it is clear that his role is substantial.

---

[10]   Copies of the time records filed by Mr. Gross and his law firms are attached as Exhibits "E", "F", "I", and "J" to the Najolia Affidavit.

[11]   Mr. Gross and his law firms appear to have intentionally concealed the full extent of their services to this Court.   Various of their time entries refer to revising and redacting the time records themselves.  See, e.g., Exhibit "J" (at pages 19-21) to the Najolia Affidavit.

10

21.    Although Mr. Hamlin's role has not been as extensive as Mr. Gross's, he too has participated materially in these cases as an advisor to the Court.[12]  Through the spring of 2003 (the last date for which records are available), Mr. Hamlin had billed in excess of $30,000 in fees for meetings and research in the Five Asbestos Cases.  Mr. Hamlin's time records show that he has advised the Court on substantive legal issues relating to, among other things, (i) W.R. Grace's filing of proofs of claims on behalf of various asbestos claimants without their consent, (ii) the establishing of a bar date in the USG cases, and (iii) the appointment of an examiner in these cases.

22.    Mr. Gross and Mr. Hamlin thus have been actively involved in the Debtors' cases for nearly twenty-two months, during which they have materially assisted the Court in performing its judicial functions.  This Court has described the Conflicted Advisors as "necessary for the efficient administration of these very large mass-tort chapter 11 cases," and as "occupying a unique position in the [asbestos] cases not shared by other persons employed in these cases."  "Order 1) Partially Withdrawing the Reference and 2) Governing Applications for the Allowance of Fees and Expenses to Court Appointed Advisors" dated March 19, 2002 (the "Fee Allowance Order") at 2.[13]  This Court also has described the Conflicted Advisors and other Consultants as "functioning in a manner in all respects similar to examiners as provided for in the Bankruptcy Code."  Fee Allowance Order at 2.  Clearly, the Conflicted Advisors and

---

[12]   Copies of the time records filed by Mr. Hamlin and his law firms are attached as Exhibits "E", "G", and "K" to the Najolia Affidavit.

[13]   A copy of the Fee Allowance Order is attached to the Najolia Affidavit as Exhibit "D."

349578v4

other Consultants have been, and continue to be, central to this Court's decision-making process and to the administration of these cases.

### C.    The Conflicted Advisors' Role In The G-I Bankruptcy Cases.

23.    During the *entire* time that the Conflicted Advisors have been actively involved in the judicial administration of these cases, they have also been actively involved as advocates of the future asbestos claimants in the G-I bankruptcy cases.

24.    Like the Debtors, G-I was a leading manufacturer of asbestos building products. G-I is also the subject of thousands of asbestos-related claims based upon exposure to those products. Because similar asbestos-containing products have been produced by multiple manufacturers, claimants often are not sure of the identity of the manufacturer who produced the product that caused the claimants' injuries. It is thus not uncommon for asbestos claimants to assert multiple claims against different manufacturers of similar products. Indeed, G-I has been named as a co-defendant with the Debtors in various proceedings. Therefore, a significant number of the future asbestos claimants in the G-I cases are, in all likelihood, future claimants in these cases as well.

25.    G-I filed for chapter 11 on January 5, 2001, and its case is currently pending before Judge Gambardella in the United States Bankruptcy Court for the District of New Jersey (the "G-I Court"). On October 11, 2001, the G-I Court appointed Mr. Hamlin to serve as the "Legal Representative of Present and Future Holders of Asbestos-Related Demands." Mr. Hamlin promptly hired Mr. Gross and the firm with which he was then a partner to represent the interests of the asbestos claimants in that case. In addition to Mr. Gross, a number of other professionals who have been actively assisting

12

Mr. Gross in his role as a Consultant to this Court also actively represented (and continue to represent) the interests of the asbestos claimants in the G-I Court. When Mr. Gross changed firms twice in 2002, he brought both the representation of the G-I asbestos claimants and the continued advisory role for this Court with him. He also brought a number of the same professionals who continue in the dual role of assisting this Court in performing its judicial functions while advocating the interests of the asbestos claimants in the G-I Court.

26.    Although Messrs. Hamlin and Gross were already serving in their capacities as advocates for asbestos claimants in the G-I case at the time they were appointed by this Court, to the best of the Creditors' knowledge this fact was never disclosed to creditors in any of the Five Asbestos Cases. Messrs. Hamlin and Gross, however, did make clear to the G-I Court their special role in the Debtors' cases.[14]

27.    The close relationships between the Debtors' cases and the G-I cases are far more than conjectural. The G-I and Debtors' cases are among the largest and most contentious asbestos-related chapter 11 cases in the United States. They both involve thousands of present and future asbestos claimants whose claims arise from exposure to asbestos-based products. Because G-I and the Debtors made similar products, they undoubtedly share many of the same asbestos claimants. In fact, G-I and the Debtors have been named as co-defendants in many actions against manufacturers of asbestos building products.

---

[14] See "Affidavit and Disclosure Statement of David R. Gross in Support of the Application of the Legal Representative of Present and Future Holders of Asbestos-Related Demands for an Order Authorizing the Substitution of D.R. Gross & Associates, LLC as Local Counsel and the Withdrawal of Budd Larner Rosenbaum Greenberg & Sade, P.C." (the "D.R. Gross G-I Employment Affidavit") filed in the G-I case (Docket No. 1469), a copy of which is attached to the Najolia Affidavit as Exhibit "N" (following the firm's employment application).

13

28.    The overlapping factual and legal issues between the Debtors' cases and the G-I cases are too numerous to list. Indeed, Mr. Gross himself described the G-I cases and the Debtors' cases as "similar asbestos-related bankruptcies."[15] At a minimum, these similarities include issues regarding (i) the manner in which asbestos claims are estimated, (ii) whether and to what extent future asbestos claims constitute "claims" for purposes of bankruptcy, including with respect to notice, establishing a bar date, application of the discharge, and application of the Bankruptcy Code section 524(g) injunction, (iii) the effect of bankruptcy on third-party insurance coverage, and the proper role of the insurers in the bankruptcy case, (iv) whether substantive consolidation of related entities is appropriate, (v) successor liability, and (vi) the proper role of the future claims representative. This Court has recognized that certain of these issues "may lie at the heart of *all* asbestos bankruptcies." In re USG Corp., 290 B.R. 223, 224 (D. Del. 2003) (emphasis added). That certainly is true with respect to both G-I and Owens Corning.

29.    The Conflicted Advisors already have taken advantage of the factual and legal relationships between the G-I case and the Five Asbestos Cases in which they have advised this Court in order to advocate their positions in G-I. For example, on July 28, 2003, Mr. Gross filed on behalf of Mr. Hamlin an opposition to the extension of exclusivity in G-I (the "G-I Exclusivity Opposition").[16] The G-I Exclusivity Opposition relies extensively upon this Court's decision in In re USG Corp., 290 B.R. 223 (D. Del.

---

[15]    See D.R. Gross G-I Employment Affidavit at 4.

[16]    See "Opposition of the Official Committee of Asbestos Claimants and the Legal Representative of Present and Future Persons Holding Asbestos-Related Demands to G-I's Fourth Application for Order Extending Exclusivity" (docket # 2678 filed July 28, 2003 in the G-I case), a copy of which is attached to the Najolia Affidavit as Exhibit "Q".

14

2003), which decision was rendered more than a year after the Conflicted Advisors began assisting this Court. Among other things, the Conflicted Advisors advocated on behalf of the future claimants in G-I that Judge Gambardella "follow the precedent that Judge Wolin has set in the USG bankruptcy" with respect to valuing present and future claims, G-I Exclusivity Opposition at 15, contending that "Judge Wolin's reasoning applies with equal force here," id. at 16.

30.    The Conflicted Advisors similarly invoked this Court's precedent in opposing G-I's application for an order establishing a method to liquidate claims and to fix a final bar date (the "G-I Claims Liquidation Sur-Reply").[17] The Conflicted Advisors there argued that this Court's decision in another case in which they are advising this Court, Official Committee of Asbestos Personal Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.), 281 B.R. 852 (D. Del. 2002), did not stand for the proposition that future asbestos claims were "claims" that could be discharged in bankruptcy. To the contrary, the Conflicted Advisors argued that this issue was not before the Court in that case. Capitalizing on their relationship with this Court (of which Judge Gambardella was fully aware), the Conflicted Advisors added that "if this issue had been before him, it is certain that Judge Wolin would not have held that future claimants hold dischargeable bankruptcy claims under the Bankruptcy Code based upon the significant authorities . . . ." G-I Claims Liquidation Sur-Reply at 7.

---

[17]    See "Legal Representative's Sur-Reply Relating to Debtor's Application for Order Pursuant to 11 U.S.C. § 502(c) Establishing Method to Liquidate Claims and for an Order Fixing Final Date for Filing Proofs of Claim" (docket # 1967 filed on January 17, 2003 in the G-I case), a copy of which is attached to the Najolia Affidavit as Exhibit "P".

31.    The Conflicted Advisors also have taken positions in the G-I case with respect to at least one key expert who will likely testify in the Owens Corning case. Among other things, the Conflicted Advisors challenged the testimony, qualifications, methodology, and conclusions of Dr. Leticia Chambers, G-I's expert on valuing asbestos claims. G-I Claims Liquidation Sur-Reply at 25-28. The Conflicted Advisors described Dr. Chambers' testimony as "without logic or expertise to support her," id. at 25, and they dismissed her views as, among other things, "unfounded," "unpersuasive," "confusing," "def[ying] logic," "based on an inappropriate analysis," and "entirely inadequate." Id. at 25-27.

32.    The problem is that Dr. Chambers is also playing a critical role in the Debtors' cases as the claims expert and consultant to the Official Committee of Unsecured Creditors. The Conflicted Advisors already have come to the conclusion in G-I that Dr. Chambers' testimony was without merit. Moreover, it appears that the Conflicted Advisors already have advised this Court extensively on issues that have related, or will relate, to Dr. Chambers' testimony. At the same time, the Conflicted Advisors have been working with their own experts in G-I, and in so doing have been advocating factual positions and expert opinions that are highly relevant to, and hotly contested in, the Debtors' cases.

33.    The Conflicted Advisors are partisan advocates in the G-I case of the same issues and evidence that the Conflicted Advisors are helping this Court to evaluate in the Debtors' cases, in large measure for the same universe of future claimants. There is no pretense that the Conflicted Advisors are "neutrals" in the G-I cases, and yet they have been entrusted in the Debtors' cases with "a unique position in the [asbestos] cases not

16

shared by other persons employed in these cases," Fee Allowance Order at 2 – the

position of assisting this Court in the judicial decision-making process.   Thus, the

appearance (if not the reality) is that this Court and its advisors have already pre-judged

the evidence and legal issues in this case based upon the Conflicted Advisors' extra-

judicial activities in the G-I case.

34.   Finally, it appears that the Conflicted Advisors may have billed the

Debtors for some of their advocacy in the G-I case.   For example, Mr. Gross's time

records show that on June 20, 2002 he billed the Debtors and the other Five Asbestos

Debtors 5.2 hours to, among other things, "[p]repare for and appear at Bankruptcy Court

before Judge Gambardella."   It is not clear what benefit, if any, the Debtors got out of this

appearance.  Perhaps Mr. Gross was simply confused by the fact that he is addressing the

same legal and factual issues as an advocate in G-I, as he is as an advisor to this Court in

the Five Asbestos Cases.  In any event, it is clear that there is substantial overlap between

what Mr. Gross and his associates are doing in G-I, and what they are doing in this Court.

## ARGUMENT

A.   **Judicial Code Section 455 And The Judicial Conduct Code Require
That A Judge Recuse Himself In Any Proceeding In Which His
Impartiality Might Be Reasonably Questioned, Or In Which A Judge
Has Been Exposed To Evidence And Opinions Outside Of The
Record.**

35.   Both Congress and the courts recognize the critical need "to promote

confidence in the integrity of the judicial process."   Liljeberg v. Health Services

Acquisition Corp., 486 U.S. 847, 859, 108 S. Ct. 2194, 2202 (1988); see also In re School

Asbestos Litigation, 977 F.2d 764, 777 (3rd Cir. 1992) (noting "Congress's great concern

for the public's confidence in the judiciary"); Alexander v. Primerica Holdings, Inc., 10

F.3d 155, 167 (3rd Cir. 1993) (holding that "impartiality and the appearance of

17

impartiality in a judicial officer are the sine quo non of the American legal system") (quotations omitted). "[T]he adjudication of a case by a judge with an actual or apparent bias is an abuse of judicial power," and "a threat to the integrity of the judicial system." School Asbestos Litigation, 977 F.2d at 778 (internal citations and quotations omitted).

36.     The importance of an impartial judiciary has resulted in the rule that *a judge must disqualify himself in the face of even the mere appearance of bias.*  It is not relevant whether the judge "actually harbors any illegitimate pro-plaintiff bias." School Asbestos Litigation, 977 F.2d at 782. Nor does it even matter "whether or not the judge actually knew of the facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew." Liljeberg, 486 U.S. at 860, 108 S. Ct. at 2202-03. Rather, all that matters is whether, "regardless of [the judge's] actual impartiality, a reasonable person might perceive bias to exist, and this cannot be permitted." Id.; see also United States v. Nobel, 696 F.2d 231, 235 (3rd Cir. 1982) (the focus of the disqualification inquiry "is on the objective appearance of bias, rather than bias-in-fact").

37.     Congress codified this broad, prophylactic recusal rule in Judicial Code section 455(a), which provides that:

> ***Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might be reasonably questioned.***

28 U.S.C. § 455(a) (emphasis added); see also Judicial Conduct Code Canon 3C ("Disqualification. (1) A judge shall disqualify himself or herself in a proceeding in

18

which the judge's impartiality might reasonably be questioned . . . .").[18] By its terms, section 455 *requires* disqualification (*"shall"*) whenever a court's impartiality *"might"* be reasonably questioned. Thus, even the *prospect* of a reasonable question triggers the mandatory duties of section 455.

      38.    "Congress designed this general standard 'to promote public confidence in the impartiality of the judicial process by saying, in effect, if there is a reasonable factual basis for doubting the judge's impartiality, he should disqualify himself and let another judge preside over the case.'" United States v. Nobel, 696 F.2d at 235 (quoting H.R. Rep. No. 1453, 93d Cong., 2d Sess. at 5 (1974)). Thus, "section 455 addresses not only fairness to the litigants but also the public's confidence in the judiciary, which may be irreparably harmed if a case is allowed to proceed before a judge who appears to be tainted." School Asbestos Litigation, 977 F.2d at 776.

> The goal of . . . the disqualification statute is to exact the appearance of impartiality. It focuses on what is revealed to the parties and the public, as opposed to the existence in fact of any bias or prejudice. A judge should exercise his discretion in favor of disqualification if he has any question about the propriety of his sitting in a particular case.
>
> The statute requires the judge to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality. But knowledge of all the facts implies only knowledge of those that are objectively ascertainable. The term cannot, as suggested by counsel, extend to what happens in the judge's chambers or to his actual virtue because, were that so, the test would be not the appearance of impartiality but the absence of actual prejudice.

Hall v. Small Business Admin., 695 F.2d 175, 178-79 (5th Cir. 1983) (citations omitted); see also Judicial Conduct Code Canon 2A ("A judge . . . should act at all times in a manner that promotes public confidence in the integrity and impartiality of the

---

[18] The Third Circuit has held that "appearances of partiality are likely if conduct is inconsistent with the related canons of judicial ethics . . . ." School Asbestos Litigation, 977 F.2d at 783.

19

349578v4

judiciary."); id. Canon 2A, Official Commentary ("A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny.").

39.     In addition to the broad disqualification rule under Judicial Code section 455(a), Congress enacted Judicial Code section 455(b)(1), which provides that a judge "shall disqualify himself" when, among other things, "he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). This disqualification rule is **not** another required element of disqualification for appearance of partiality under section 455(a), but rather a separate and independent mandatory basis for disqualification. A "finder of fact must be 'free from external causes tending to disturb the exercise of deliberate and unbiased judgment.'" Price Bros., 629 F.2d at 446 (quoting Mattox v. United States, 146 U.S. 140, 149, 13 S. Ct. 50, 53 (1892)).

**B.     The Requirement That The Court Avoid Any Appearance Of Impropriety Fully Applies To Those Who Assist The Court In Fulfilling Its Judicial Functions.**

40.     The requirements that a judge "command impeccable appearance" in his ethics extend to those who assist the judge in carrying out his judicial functions:

> Judicial ethics reinforced by statute exact more than virtuous behavior; they command impeccable appearance. Purity of heart is not enough. Judges' robes must be as spotless as their actual conduct. *These expectations extend to those who make up the contemporary judicial family, the judge's law clerks and secretaries.*

Hall, 695 F.2d at 176 (emphasis added). Accordingly, the Judicial Conduct Code makes clear that the same rules of impartiality that apply to federal judges also apply to their staff and close advisors. Canon 3B(2) provides that *"[a] judge should require court*

20

*officials, staff, and others subject to the judge's direction and control, to observe the same standards of fidelity and diligence applicable to the judge"* (emphasis added).

41.    In order to ensure the appearance of impartiality, it is incumbent upon judges to ensure that their advisors' "fairness and expertise in the field cannot reasonably be questioned." Federal Judicial Center, <u>Manual for Complex Litigation</u>, at 111 (1995). Although judges may "obtain the advice of a ***disinterested*** expert on the law," Judicial Conduct Code at Canon 3A(4)(emphasis added), the expert must be a *"neutral third party."* <u>Techsearch L.L.C. v. Intel Corp.</u>, 286 F.3d 1360, 1380 (Fed. Cir. 2002) (emphasis added); <u>see also</u> <u>Biogen, Inc. v. Amgen, Inc.</u>, 1996 U.S. Dist. LEXIS 22617 at *2 (D. Mass. 1996) (court appointed "neutral third party" technical advisor who "has no ideological, financial, or professional interest in the outcome of the litigation"). Otherwise, the Judicial Conduct Code makes clear that *"[t]he proscription against communications concerning a proceeding includes communications from lawyers, law teachers, and other persons who are not participants in the proceeding, except to the limited extent permitted."* Judicial Conduct Code, Canon 3, Official Commentary (emphasis added).

42.    Similarly, the Judicial Conference's rules governing the conduct of court employees require that all who assist in the administration of the courts maintain the appearance of the court's impartiality:

> A judicial employee should not engage in any activities that would put into question the propriety of the judicial employee's conduct in carrying out the duties of the office. A judicial employee should not allow family, social, or other relationships to influence official conduct or judgment. A judicial employee should not lend the prestige of the office to advance or to appear to advance the private interests of others. A judicial employee should not use public office for private gain.

Code of Conduct for Judicial Employees ("Judicial Employees Code") at Canon 2; see also id. at Canon 3F(1) (every "judicial employee should avoid conflicts of interest in the performance of official duties").

43.    The courts have long recognized that, as stringent as the ethical rules must be for all employees of the judiciary, they must be even more so for judges and their closest advisors. Judicial Employees Code at Canon 3F(2) ("[c]ertain judicial employees [including staff attorneys and law clerks], because of their relationship to a judge or the nature of their duties, are subject to . . . additional restrictions.") As the Fifth Circuit has held:

> Law clerks are not merely the judge's errand runners. They are sounding boards for tentative opinions and legal researches who seek the authorities that affect decision. Clerks are privy to the judge's thoughts in a way that neither parties to the lawsuit nor his most intimate family members may be.

Hall, 695 F.2d at 179; see also In re Asbestos School Litigation, 1989 U.S. Dist. LEXIS 2521 at *22 (E.D. Pa. 1989). For this reason, law clerks are "forbidden to do all that is prohibited to the judge." Hall, 695 F.2d at 179; see also Price Bros., 629 F.2d at 447. "It is the duty of the law clerk 'as much as that of the trial judge to avoid any contacts outside the record that might affect the outcome of the litigation.'" Hall, 695 F.2d at 179 (quoting Kennedy v. Great Atlantic & Pacific Tea Co., 551 F.2d 593, 596 (5th Cir. 1977)); see also First Interstate Bank v. Murphy, Weir & Butler, 210 F.3d 983, 985 (9th Cir. 2000) ("judges and law clerks are required to preserve the court's impartiality and the appearance of impartiality"). In accordance with this rule, the Judicial Employees Code bars the Court's staff attorneys and law clerks from practicing law except in very limited circumstances, and *never* for profit or with respect to issues that may be before the Court. See Judicial Employees Code Canons 3F(2)(a) and 4D.

22

349578v4

44.     The Judicial Employees Code makes clear that "[e]mployees who occupy positions with functions and responsibilities similar to those for a particular position identified in this code should be guided by the standards applicable to that position, even if the position title differs." Judicial Employees Code, fn. 2. Although the Conflicted Advisors in these cases may not be called "law clerks" or "staff attorneys" in name, they clearly are performing similar functions for this Court. This Court's order appointing the Conflicted Advisors provides that their role is "to advise the Court and to undertake such responsibilities, including by way of example and not limitation, mediation of disputes, holding case management conferences, and consultation with counsel, as the Court may delegate to them individually," and that they have "certain authority to hear matters and to advise the Court on issues that may arise in these five large Chapter 11 cases." Appointment Order at 2. Thus, as with law clerks, the Conflicted Advisors "are not merely the judge's errand runners," Hall, 695 F.2d at 179, but rather "are sounding boards for tentative opinions and legal researches who seek the authorities that affect decision," id. And as with law clerks, the Conflicted Advisors "are privy to the judge's thoughts in a way that neither parties to the lawsuit nor his most intimate family members may be." Id.

45.     The Conflicted Advisors' time records show that they have, among other things, conducted legal research, prepared memoranda, and advised the Court in connection with hearings and pending motions. Based upon these activities, which are at the heart of the judicial decision-making process, this Court has described the Conflicted Advisors as "necessary for the efficient administration of these very large mass-tort chapter 11 cases," and as "occupying a unique position in the [asbestos] cases not shared

23

by other persons employed in these cases." Fee Allowance Order at 2. The Conflicted Advisors thus must be subject to the same requirements of impartiality (and the *appearance* of impartiality) as this Court.

### C. The Conflicted Advisors Cannot Be Considered As "Disinterested" Or As "Neutral Third Parties" In Light Of Their Active Involvement As Advocates In the G-I Cases.

46.    The Conflicted Advisors cannot objectively advise this Court while acting as advocates for the future asbestos claimants in the G-I cases. In G-I the Conflicted Advisors are duty bound to see that the future asbestos claimants whom they represent receive the greatest consideration possible, even if such consideration comes at the expense of other creditor classes. Thus, on issues such as the discharge, the setting of bar dates, the estimation of future claims, substantive consolidation, and successor liability, the Conflicted Advisors undoubtedly will – as they must – forcefully advocate the interests of future claimants.

47.    It is not, however, reasonable to believe that the Conflicted Advisors' desire to assist their constituents in G-I can be "turned off" like a light switch every time they turn to this Court's work. Numerous of the critical legal issues and disputed facts in G-I are virtually identical to those in the Debtors' cases, including issues and evidence that "may lie at the heart of all asbestos bankruptcies." USG, 290 B.R. at 224. Indeed, Chief Judge Becker recognized the extensive overlapping of issues in large asbestos cases when he assigned the Five Asbestos Cases to this Court, directing that the cases "need to be consolidated before a single judge so that a coordinated plan for management can be

24

developed and implemented,"[19] and Mr. Gross himself described the G-I and Owens Corning cases as "similar asbestos-related bankruptcies."[20]

48.    Already, the Conflicted Advisors have cited to the G-I Court published decisions of this Court that were issued while they were advising this Court. Based upon the Conflicted Advisors' extensive assistance to this Court, the appearance (if not the reality) is that the Conflicted Advisors have influenced both the outcome of the Court's decisions to date, and the Court's decisions to forbear even from addressing some issues put before it by the Unsecured Creditors' Committee. The Conflicted Advisors' statement to the G-I Court that "*it is certain that* Judge Wolin would not have held" a particular way might ordinarily be regarded as an advocate's bravado. See G-I Claims Liquidation Sur-Reply at 7 (emphasis added). However, given the Conflicted Advisors' role in this Court, the statement gives the appearance that the Conflicted Advisors have special access to this Court (which, in fact, they do) and can speak authoritatively about what this Court has done and will do.[21] Indeed, while Messrs. Gross and Hamlin failed to disclose their adverse interests to the Creditors in this case, they made clear to the G-I Court that they were advising this Court.[22] Thus, their statements as to how this Court would rule on future matters had the appearance, if not the reality, that partisan advocates have the authority to affect this Court's decisions and to speak on its behalf.

49.    In seeking to continue his employment in G-I, Mr. Gross also asserted that "in light of my appointment as a Court Appointed Advisor to Judge Wolin in similar

---

[19]    See Designation Order, a copy of which is attached to the Najolia Affidavit as Exhibit "A".

[20]    D.R. Gross G-I Employment Affidavit at 4, a copy of which is attached to the Najolia Affidavit as Exhibit "N".

[22]    See D.R. Gross G-I Employment Affidavit.

349578v4

asbestos-related bankruptcies, my past and present representations [of parties who might hold adverse interests] will not impair the representation of the Legal Representative [of the future asbestos claimants] in this Chapter 11 case."[23]  While it is not entirely clear what this statement means, it is clear that Mr. Gross was touting his role in this Court as a reason why he should be employed in the G-I cases.

50.    In essence, through their dual roles of advising this Court and advocating for future claimants in G-I, the Conflicted Advisors have found a unique way to take the law into their own hands:  They assist this Court in establishing precedents that they then cite as authority to another federal judge in the same courthouse.  They even go so far as to predict *with certainty* what decisions this Court will create in the future, long before the Debtors' creditors have even had their opportunity to be heard on the issue.

51.    Moreover, the Conflicted Advisors have already reached extra-judicial conclusions about the expertise and testimony of one of the key experts for the commercial creditors in the Debtors' cases – Dr. Chambers.  The Conflicted Advisors have dismissed her in G-I as unqualified, and her testimony as flawed.  Meanwhile, the Conflicted Advisors have embraced the testimony of experts who are favorable to the future asbestos claimants' positions.  Under these circumstances, it does not seem possible that the Conflicted Advisors could objectively assist this Court in evaluating the evidence and issues that have been and will be presented to it.  In any event, the appearance of impartiality is not only subject to reasonable doubt – it is totally absent.

---

[23]    D.R. Gross G-I Employment Affidavit at 3-4.

26

**D.    This Court Must Recuse Itself In Light Of The Conflicted Advisors Extensive Involvement To Date In These Cases.**

52.    When the impartiality of a close advisor of the court is questioned at the commencement of a case, the advisor sometimes may be screened off from the proceeding. See, e.g., First Interstate Bank, 210 F.3d at 985. However, once the advisor has materially participated in the proceedings, the questions about the advisor's impartiality necessarily affect the Court as well. Id. ("fail[ure] to screen off the law clerk completely . . . would amount to an appearance of impropriety such as to require recusal"). Thus, the proper remedy in such situations (as is the case with the Conflicted Advisors here) is the immediate disqualification of the judge and reassignment of the case to another jurist. See Hall, 695 F.2d at 179; Miller Indus. v. Caterpillar Tractor Co., 516 F. Supp. 84, 89 (S.D. Ala. 1980); In re Asbestos School Litigation, 1989 U.S. Dist. LEXIS 2521 (E.D. Pa. 1989).

53.    It does not matter that the advisor may have had little or no impact on the court's decision – let alone any impact that would constitute any actual impropriety. "Whether or not the law clerk actually affected the magistrate's decision, her continuing participation with the magistrate in a case in which her future employers were counsel gave rise to an appearance of partiality." Hall, 695 F.2d at 179; see also Miller Indus. v. Caterpillar Tractor, 516 F. Supp. at 89 (holding that recusal was mandated although "there is not even suggestion by the parties, or the record, of any actual impropriety by the law clerk, the judge, or the parties").

54.    In the present case, it is clear that the Conflicted Advisors have not been screened off from any issues that might affect their conflicting interests in the G-I cases. Rather, the Conflicted Advisors are intimately involved with this Court's administration

of these cases and its resolution of issues that will affect, and may already have affected, the Conflicted Advisors' own constituents in G-I. This Court has acknowledged that the Conflicted Advisors are "occupying a unique position in the [asbestos] cases not shared by other persons employed in these cases." Fee Allowance Order at 2. Clearly, this Court would not permit the Conflicted Advisors to be advocates for parties in any of the Five Asbestos Cases pending before it. It is no more proper for the Conflicted Advisors to be material, partisan participants in another large asbestos case pending in this Circuit.

55. Moreover, it is clear that the Conflicted Advisors have had substantial exposure to facts and testimony in the G-I cases that will be highly relevant and hotly contested in the Debtors' cases. In addition to criticizing the testimony, opinions, and qualifications of the Creditors' Committees' expert, the Conflicted Advisors have been advocating their own presentation of the facts.

56. It is the "duty (of the law clerk) as much as that of the trial judge to avoid any contacts outside the record that might affect the outcome of litigation." Price Bros., 629 F.2d at 446 (quoting Kennedy v. Great Atlantic Pacific Tea, 551 F.2d at 596). "[A] judge may not direct his law clerk to do that which is prohibited to the judge." Id. at 447. The Third Circuit has made clear that a judge cannot gather facts outside of the record. School Asbestos Litigation, 977 F.2d at 784-85. Nor may the judge's advisors do so, particularly when, as here, the judge's advisors are in a position to communicate their extra-judicial knowledge and opinions of the facts to the Court ex parte.

57. The situation presented here is very similar to that the Seventh Circuit faced in Edgar v. K.L., 93 F.3d 256 (7th Cir. 1996), in which that court ordered the disqualification of a trial judge under Judicial Code section 455. There, the trial judge

28

had appointed a panel of three "experts" to advise him in connection with litigation regarding the quality of the state's mental health system. The panel was authorized to meet with patients and state employees in connection with preparing a report for the court. Subsequently, two of the panel's members began acting as "partisans" outside of the court, "denouncing" the states' mental health system. 93 F.3d at 260. In addition, it became clear that the panel was meeting privately with the judge to discuss its view of the facts, and that the panel had significant influence over the court's views.

58.   In ordering that the trial judge be disqualified, the Seventh Circuit held that the information the judge received ex parte from the panel was "'personal' knowledge no less than if the judge had decided to take an undercover tour of mental institutions" himself. 93 F.3d at 259. "Instead of going himself, this judge appointed agents, who made a private report of how they investigated and what they had learned. Mandatory disqualification under § 455(b)(1) follows." Id.   The fact that the judge continued his private meetings after two of the panel members had become "partisan" advocates of the plaintiffs' side further demonstrated that "a reasonable observer [would] be seriously concerned about the court's ability to conduct the trial impartially." Id. at 260.

59.   The Third Circuit has made clear that, when grounds for disqualification exist, only immediate disqualification itself is the proper remedy. "Section 455 . . . clearly requires that judges shall disqualify themselves where such a taint appears, rather than attempt creative, alternative remedies such as disqualification of witnesses." Asbestos Litigation, 977 F.2d at 783.

29

60.    The fact that this Court has been presiding over these cases for two years does not alter this rule.  In the <u>Asbestos Litigation</u> case, the district judge had been presiding over this litigation for more than <u>six</u> years before he attended a plaintiffs'-oriented conference on diseases caused by inhaling asbestos.  977 F.2d at 778-80.  Nonetheless, the Third Circuit made clear that recusal, however unfortunate, was the <u>only</u> option:

> We suspect that [the district judge] chose not to disqualify himself because he felt duty-bound to shepherd this extraordinarily complicated and protracted litigation to its conclusion and out of concern about creating additional delay.  These are both laudable sentiments, and we must acknowledge that the newly assigned district judge will face a gargantuan task in becoming familiar with the case.  We also recognize that the delay may disadvantage the plaintiffs, although that result is, to some degree, of their own doing.  Nevertheless, a district judge has no "duty to sit," and under 28 U.S.C. § 455 he or she may not sit where his or her partiality may reasonably be questioned and the parties refuse to waive that objection.  See H.R. Rep. No. 93-1453, 1974 U.S.C.C.A.N. at 6335 (expressing intent to abolish the "duty to sit" gloss on the prior statute).  Indeed, we believe that this episode is precisely the kind that Congress contemplated in broadening section 455.  If [the district judge] were to continue presiding, the outcome of this massive, important, and widely followed case would be shrouded with suspicion.  Accordingly, we are compelled to order [the district judge] to disqualify himself.

<u>School Asbestos Litigation</u>, 977 F.2d at 784-85; <u>see also</u> <u>Alexander v. Primerica Holdings</u>, 10 F.3d at 166 (Third Circuit holds that judge must be disqualified after presiding over case for more than four years).

61.    Nor does the fact that this case may be large or complex alter the mandatory recusal rule.  "Large, multidistrict class actions, for example, often present judges with unique difficulties in monitoring any potential interest they may have in the litigation." <u>Liljeberg</u>, 486 U.S. at 862, 108 S. Ct. at 2203.  However, "notwithstanding the size and complexity of litigation, judges remain under a duty" to comply with Judicial Code section 455.  <u>Id.</u>

30

## CONCLUSION

62.     The issue before this Court is not whether this Court is biased, or even whether the Conflicted Advisors are biased.   The issue is whether the Conflicted Advisors' material participation in the administration of these cases creates the appearance of impropriety in light of their material involvement in the G-I case as advocates on behalf of future asbestos claimants. The Creditors respectfully submit that it does.

63.     The American judicial system is based upon the premise that "justice must satisfy the appearance of justice."   Offutt v. United States, 348 U.S. 11, 14, 75 S. Ct. 11, 13 (1954).  In light of the Conflicted Advisors' conflicting roles in the G-I cases and the Five Asbestos Cases, the only way to satisfy the appearance of justice is for this Court to

349578v4

recuse itself from hearing any further proceedings or rendering any further decisions in the Debtors' cases.

Dated:    October 10, 2003
          Wilmington, Delaware

                        RESPECTFULLY SUBMITTED,

                        /s/ David L. Finger
                        David L. Finger (DE Bar ID #2556)
                        FINGER & SLANINA, P.A.
                        One Commerce Center
                        1201 Orange Street, Suite 725
                        Wilmington, Delaware 19801-1155
                        Telephone: (302) 884-6766
                        Email: dfinger@delawgroup.com

                        ISAAC M. PACHULSKI
                        K. JOHN SHAFFER
                        STUTMAN, TREISTER & GLATT
                        1901 Avenue of the Stars, 12th Floor
                        Los Angeles, California 90067
                        Telephone: (310) 228-5600
                        Facsimile: (310) 228-5788

                        LAWRENCE S. ROBBINS
                        ROY T. ENGLERT, JR.
                        ROBBINS, RUSSELL, ENGLERT, ORSECK &
                        UNTEREINER LLP
                        1801 K Street, N.W., Suite 411
                        Washington, D.C. 20006
                        Telephone: (202) 775-4500
                        Facsimile: (202) 775-4510

                        ATTORNEYS FOR KENSINGTON
                        INTERNATIONAL LIMITED AND
                        SPRINGFIELD ASSOCIATES LLC

349578v4