UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                    .    Case No. 01-01139 (JKF)
                                          .
W. R. GRACE & CO., <u>et al</u>.,           .    Chapter 11
                                          .    Jointly Administered
          Debtors.                        .
                                          .    Nov. 17, 2003 (12:20 p.m.)
                                          .    Wilmington

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.



1       THE COURT:  This is the matter of W.R. Grace, 01-

2   1139.  I will place the call while people come into the

3   podium.  Hello, this is Judge Fitzgerald.

4       MS. DANZEISEN (TELEPHONIC):  Hello, Judge

5   Fitzgerald.  This is Allyn Danzeisen, and I represent the

6   asbestos property damage claims.

7       THE COURT:  Will you spell your last name, please?

8       MS. DANZEISEN (TELEPHONIC):  Sure, it's D-a-n-z-e-

9   i-s-e-n.

10      THE COURT:  Thank you.

11      MS. DANZEISEN (TELEPHONIC):  Thank you.

12      THE COURT:  Is anyone else on the phone?

13      MS. DANZEISEN (TELEPHONIC):  Just me.

14      THE COURT:  Okay.  I have some information that Ms.

15  Magner (phonetical) may have attempted to call in.  Has she

16  been given the number too?

17      MS. BAER:  Your Honor, we had two parties.

18      THE COURT:  Yes, Elizabeth Magner and Ms.

19  Danzeisen, as far as I know.

20      UNIDENTIFIED SPEAKER:  Your Honor, we circulated

21  the call information last week, and to my knowledge Ms.

22  Magner has it as well as --

23      THE COURT:  Okay.  So anyone can call in who

24  chooses to; is that correct?

25      UNIDENTIFIED SPEAKER:  That's correct.

1      THE COURT:  Okay.  Good afternoon.

2      MS. BAER:  Good afternoon, Your Honor.  Janet Baer

3  on behalf of the debtor.

4      THE COURT:  Ms. Baer.

5      MS. BAER:  Your Honor, turning to the agenda,

6  matter number 1 has been continued to the December 15th

7  hearing.

8      THE COURT:  Excuse me while I get my notes, I'm

9  sorry.

10      MS. BAER:  Okay.

11      THE COURT:  Okay, I apologize.

12      MS. BAER:  No problem.

13      THE COURT:  All right, yes, number one is

14  continued.

15      MS. BAER:  Number 2, Your Honor, you entered an

16  order I believe on Thursday or Friday on the chief operating

17  officer matter.

18      THE COURT:  Yes, I did.

19      MS. BAER:  That takes us to number 3.  Your Honor,

20  number 3 is the continued application of the debtor to employ

21  State Street Bank, an investment company, as the investment

22  manager and fiduciary for the Grace stock and the Grace

23  savings plan.  If you recall, Your Honor, this is a situation

24  where Grace's current officers who manage this duty as well

25  as the Board of Directors have a conflict between what they

1    need to do as representatives of the Chapter 11 estate in

2    terms of putting together a Chapter 11 plan and their duties

3    under ERISA.  Under these circumstances, Your Honor, the

4    debtors made a search, interviewed numbers of candidates, and

5    ultimately determined that State Street Bank was the

6    appropriate party.  Your Honor, in their sound business

7    judgment they felt that State Street was the appropriate

8    party.  They have the expertise.  Their fees are actually at

9    the low end of the market for this kind of business, and

10   they're willing to take on the key fiduciary role under ERISA

11   and have the financial wherewithal and insurance to back up

12   their fiduciary responsibilities.  Your Honor, we received

13   two objections.  The first objection was from the Unsecured

14   Creditors Committee who challenged whether it was appropriate

15   for the company versus the actual employees in the plan to

16   pay State Street's fees.  The second objection was from the

17   Equity Committee who did not like State Street, and I think

18   at the last hearing voiced the thought as, Is there somebody

19   else who can do this.  Your Honor, with respect to the first

20   issue as we indicated in the affidavits from Brian McGowan

21   from State Street and from Paul Norris we believe that in our

22   sound business judgment the employees should not be paying

23   for these services.  This is really a fiduciary

24   responsibility that the company had been taking on.  It had

25   never been charged to the employees, and State Street is

1   taking over this fiduciary responsibility given the nuance to
2   Chapter 11 and the conflict that it puts the company in.
3   Your Honor, the marketplace is indicated by State Street's
4   affidavit.  It is clear that this is normally the sort of
5   responsibility financially that is taken on by the company.
6   In addition, Your Honor, these employees are our rank and
7   file.   The effect on their morale, the effect on general
8   fairness to charge them for taking on this kind of a duty is
9   simply inappropriate, and Grace in its fiduciary duties or
10  Grace in its responsibilities determined that with sound
11  business judgment this was not an appropriate charge to pass
12  onto the employees.  With respect to the Equity Committee's
13  objection, Your Honor, I believe you continued this matter
14  for today so that the Equity Committee could continue to
15  explore the possibility of others.  Your Honor, we submitted
16  an affidavit and supplemental filing from Paul Norris, the
17  president of Grace, indicating that Grace did in fact
18  consider whether there were other employees of the company or
19  ex-employees who could take on the responsibility.  As
20  outlined in the affidavit, Grace determined that there were a
21  number of qualifications, if you will, that someone would
22  need.   Number one, a knowledge of the marketplace and the
23  ability to tap into the support necessary in order to make
24  decisions about this kind of stock and the appropriateness of
25  trading it, selling it, or holding it in a Chapter 11

context.   Number two, someone who is knowledgeable on ERISA
matters and the fiduciary responsibilities that go with
ERISA.   Number three, frankly someone who is not involved in
decision-making with respect to the potential Chapter 11 plan
hearing that very well could have a substantial impact on the
holdings of the stock, whether to hold them, whether to sell
them; and number four, someone who is willing to take on the
fiduciary responsibilities and had insurance or the financial
backing to support those responsibilities.   In Grace's
conclusions from looking into this, they concluded there were
no management employees that they felt would be appropriate
and met the qualifications necessary to take on the
responsibility.   With respect to former employees, Grace
considered various scenarios there and again found nobody
that had both the qualifications to take on the
responsibilities and the financial wherewithal or really
agreement to take on the risk involved with the fiduciary
responsibilities.   Not only is there a risk that can be
insured, but there's personal risk that is very difficult to
have someone take on.   And also, Your Honor, having an
employee take on the responsibilities would still raise
implications about the Board and its fiduciary duty and the
conflict that it is in.   Under those circumstances, Your
Honor, Grace concluded that it was not appropriate to give
this responsibility to a former employee or a current

employee and in its sound business judgment concluded that
State Street was still the very best alternative to go
forward and take on this responsibility.  Your Honor, I think
it's very clear under the Montgomery Court's case and other
cases that this is a matter that is something within the
sound business judgment of the company and absent opponents
raising -- absent opponents frankly bringing evidence that
would suggest that it is an inappropriate exercise of sound
business judgment, the matter should be -- the deference
should be given to the business judgment of the company.  The
Equity Committee has not filed anything that we're aware of
or supplied any evidence whatsoever that would suggest that
this is not within our sound business judgment and an
appropriate exercise of sound business judgment.  We again
have supplied now three affidavits:  One from State Street,
one from Brian McGowan the senior executive VP of the
company, and one from Paul Norris our president.  Under those
circumstances, Your Honor, we believe that it is appropriate
to employ State Street in this position.  It's appropriate to
have the company pay State Street's fees, and we do ask that
the order be entered.

        THE COURT:  All right.  Who wants to be heard from
the objecting parties?  Good afternoon.

        MR. SASSON:  Good afternoon, Your Honor.  Moshe
Sasson from Strouck & Strouck & Levin on behalf of the

1  Creditors Committee.  Your Honor, the Creditors Committee
2  continues to object to the debtors' application on the
3  grounds that it takes the burden the debtors' estate and its
4  creditors with the fees and expenses that only benefit a
5  certain block of the equity holders.  At the last hearing,
6  Your Honor granted a continuance to give the parties an
7  opportunity to see whether a less expensive alternative to
8  State Street was available and also directed the parties to
9  negotiate how the fees of State Street or some alternative
10  investment manager should be paid.  As the Equity Committee
11  will likely address in further detail we have learned that
12  there were less expensive alternatives to State Street.  For
13  example, the debtors interviewed Aeon FC (phonetical), the
14  investment fiduciary retained by Federal Mogul and United
15  Airlines, and we understand that the terms of the Aeon
16  proposal in this case were significantly cheaper than State
17  Street to the tune of about $150,000 a year.  We understand
18  the debtors chose State Street over Aeon based solely on the
19  fact that State Street provided more fiduciary liability
20  insurance to protect the plan participants in the event that
21  the investment manager fails to perform the requisite duties
22  in an appropriate manner.  Given the existence of a less
23  expensive alternative to State Street and mindful of the
24  Court's intent to minimize the costs to the plan
25  participants, the Creditors Committee along with the Equity

1 Committee proposed a compromise whereby a small portion of

2 State Street's anticipated fees and expenses would be born by

3 the participants with the remainder of such fees and expenses

4 to be born born by the estate.  Specifically, the Creditors

5 Committee and the Equities Committee proposed that the plan

6 participants pay a one percent annual management fee, a

7 reasonable benchmark in the manage investment industry with

8 the remainder of the reasonable fees and expenses born by the

9 estate.   Under this proposal the estate would bear up to

10 about seventy percent of the anticipated fees and expenses

11 with the average plan participant incurring approximately $20

12 per quarter in management fees and expenses.  In this regard,

13 I think it's important for the Court to know that the plan

14 participants currently pay management fees and expenses in

15 connection with other investment options under the plan while

16 those investments in Grace stock receive preferential

17 treatment under the plan.  It may have made business sense

18 outside of bankruptcy but there's no reasoned basis for the

19 estates to continue to bear the costs of continuing to prefer

20 investments in Grace stock held by the plan, especially where

21 cheaper alternatives were available and the plan participants

22 are benefitting from the extra fiduciary --

23 　　　　　THE COURT:  What does the plan say if anything

24 about where those costs go?  Because I don't think I have the

25 ability if the current plan allocates those fees and says

1  that the employees will not bear any portion of that

2  investment advisory cost for investing in Grace stock.  I

3  think without something more, I can't just willy-nilly change

4  an ERISA plan; can I?

5  MR. SASSON:  I don't know if the plan prohibits

6  that, but I think the Court has the inherent authority to

7  charge these expenses to the --

8  THE COURT:  Absolutely I don't.  If the ERISA plan,

9  I think, was very clear that whatever the plan and the plan

10  documents are that have gone out to those retirees, I think

11  the Court has an obligation to continue those in effect until

12  the debtor or some other party moves to have some change;

13  don't I?  Now, there may be a difference if the plan

14  documents themselves say that the debtor has the right to

15  change that component, but without looking at the documents

16  and seeing what they say, I don't think I can impose a charge

17  on an ERISA-qualified plan that isn't therein the plan

18  without --

19  MR. SASSON:  Well, perhaps the debtors can address

20  that, but it's my understanding that the plan does allow the

21  charging of fees and expenses to the participants.

22  THE COURT:  To other -- yeah, investments and other

23  than Grace stock.

24  MR. SASSON:  Correct.  Well, Your Honor, that

25  proposal was rejected by the debtors, and we believe that

1 it's more than fair and respectfully request that the Court

2 enter that order if it has the ability to do so.  And lastly,

3 Your Honor, at the last hearing the Court indicated that to

4 the extent the Court was inclined to grant the debtors'

5 application it would require that the fees of any

6 professionals retained by State Street be subject to the same

7 audit and review procedures as the professionals in this

8 case.

9      THE COURT:  Yes, I did say that, yes, thank you.

10 Thank you.

11      MR. SASSON:  Thank you.

12      THE COURT:  Good afternoon.

13      MR. BECKER:  Good afternoon, Your Honor.  Gary

14 Becker from Kramer Llevin Naffalis & Frankel for the Equity

15 Committee.  Your Honor, I believe there is a slight

16 misimpression about our objection.  It's no particular

17 antipathy to State Street.  We were concerned about the

18 expense and whether it was necessary at all.  As counsel for

19 the Creditors Committee mentioned to you we talked to them,

20 we talked to the debtor about alternatives to State Street,

21 and I have no reason to believe that their business judgment

22 is not accurate and that State Street is qualified and

23 capable of doing this work.  I do understand that there was

24 an alternative that was less expensive by $150,000, and one

25 of our suggestions, which we also discussed with the debtor,

1   was that they either get a former employee or one of their

2   credit employees and segregate the function so that they

3   wouldn't have that problem of inside information which would

4   lead to potential liability, and I believe they've explained

5   in their supplemental affidavit of why they didn't think that

6   was appropriate.  We also agree with the debtor that it is

7   not, you know, practical or appropriate to change their

8   officer's compensation in any way with respect to this issue.

9   The one issue that I do want to make sure that the Court is

10  aware of is what is it that the debtor is buying for between

11  530,000 and a million dollars a year?  The issue is when the

12  current officers who run the investments in this plan and

13  manage the stock and have some information, inside

14  information that affects the cost of the stock, and they

15  don't trade on that information.  Now let's take the worst

16  case.  The stock right now there's about ten million in

17  shares in the investment plan.  The stock is trading in

18  around the mid-$3 level.  I believe last week 3.31.  Worst

19  case, they have knowledge of us.  They have a plan of

20  reorganization that would result in the equity recovering

21  saying, say nothing.  We hope that will never come to pass

22  but say nothing.  The maximum damages you would ever have is

23  $33 million.  But there's more to it than that, Your Honor,

24  because under ERISA there are limits on what the plan can

25  sell.  They can sell either one percent of the -- in a

1  quarter, either one percent of the outstanding float or they

2  average a weekly volume of shares that trade.  Last week I

3  believe the weekly volume was 1.57 million.  So say roughly

4  up to two million shares, say $3 a share, 3.50 a share,

5  you're between six and seven million dollars damages if they

6  had inside information that would totally wipe out the stock

7  and they didn't sell.  And for that they're paying maybe a

8  million dollars a year.  Now, yes, the debtor's business

9  judgment must be respected, but it's not a free ride, and we

10  believe that paying a million dollars a year to guard against

11  the potential liability of that maximum, six to seven million

12  dollars, is too expensive, and that's the basis of our

13  objection, Your Honor.  Thank you.

14          MS. BAER:  Your Honor, a couple of matters.  First

15  of all, Your Honor, again is the debtor's sound business

16  judgment.

17          THE COURT:  But that's an awfully expensive

18  insurance policy, a million dollars a year potentially,

19  500,000 to a million dollars a year for maximum damages of

20  six to seven million.

21          MS. BAER:  Well, Your Honor, it depends a lot on

22  what is going to happen here, what the timing is, and what

23  the stock is going to be trading at.  You have to realize,

24  Your Honor --

25          THE COURT:  That's true.

1    MS. BAER:  -- the Equity Committee is in a conflict

2  position, and the Equity Committee wants us to remain in a

3  conflict position.  The Equity Committee here does not want

4  Grace to, if you will, give away their interests.  They like

5  us being in conflict because then we've got to think of both

6  things at the same time, which is precisely why we shouldn't

7  be in that position.  It absolutely makes no sense to have

8  somebody at Grace involved.

9    THE COURT:  Well, I don't disagree that at this

10  point in time there should be somebody -- I'll say neutral as

11  opposed to independent, but neutral taking a look at this

12  issue and deciding when it's advisable to sell or not to sell

13  stock.  I don't disagree, but it does seem to me that the

14  cost is very high.  Now, I don't know if it's going to cost a

15  million dollars a year of $150,000 savings by so many other

16  entities is really that significant on ten million shares

17  allocated over that time.  It's not a very expensive addition

18  to use the investment banker that the debtor chooses.  So,

19  I'm not sure about that, but I am questioning, I guess, what

20  the ERISA documents show.  I mean, if -- I appreciate why

21  Grace does not want the employees to bear this burden of this

22  cost, however, if the ERISA documents already provide that

23  they're bearing the cost of investments in other than Grace

24  stock, then why can't they bear some proportion of the

25  investment in Grace stock?

1    MS. BAER:  Your Honor, I'm not an expert on the

2  ERISA documents, but it's my understanding that the only fee

3  that they're paying now is some minimal administrative fee,

4  and so we're not talking really about apples and apples here,

5  we're talking about apples and oranges.

6    THE COURT:  So it's not an investment fee in other

7  stock, it's simply a flat administrative fee.

8    MR. McGOWAN:  Your Honor, the participants pay a

9  flat fee of $6 per quarter for just the overall investment in

10  the 401K plan, it's an administrative fee.  So it's flat, it

11  has nothing to do with what investment you're in.  It's $6

12  per quarter.

13    UNIDENTIFIED SPEAKER:  (Microphone not recording.)

14    MR. McGOWAN:  Oh, I'm sorry.  Brian McGowan with --

15    MS. BAER:  Your Honor, again under those

16  circumstances we're really talking apples and oranges here.

17  We realize this is very expensive, but we're in a very

18  different situation than we were prior to bankruptcy, and

19  it's a very serious situation.  Frankly, we chose State

20  Street over Aeon because State Street is more financially

21  capable of backing up their fiduciary responsibility here.

22  They have better insurance.  They have better financial

23  wherewithal, and we wanted to make sure that every protection

24  that was necessary would be taken, that's why we chose them.

25    THE COURT:  Well, I -- In most cases I'd say

1    $150,000 a year is -- may mean the difference.  In this case,

2    with ten million shares having to be traded I think that

3    you're talking pennies on a share.  It doesn't make much

4    sense to worry about that additional cost.  If that's the

5    issue, I don't think that's the concern.  And I do agree that

6    the debtor needs somebody independent looking at this right

7    now because you're going to have to put a plan together and

8    one way or another it's going to have to address the stock.

9    Is there some way to limit the time frame within which the

10   investment advisor decides whether these shares should be

11   traded or not and sets a time frame within which they're

12   either done or they're not done.

13            MS. BAER:  Your Honor, I'm not sure how we could do

14   that.  This is an ongoing process.

15            THE COURT:  Because at a certain point in time, if

16   Grace reorganizes, is there's still going to be the prospect

17   of employees investing in new Grace stock?

18            MS. BAER:  At this point, not having a plan on file

19   and knowing what it would say, who knows?  I mean it's

20   certainly a circumstance where if we retained State Street,

21   if it's not appropriate at some point in time to continue to

22   retain them, that's an issue that can be taken up in review

23   when appropriate.

24            THE COURT:  Well, it seems to me that that may be

25   the issue.  I mean if it's advisable to trade in Grace stock

then the advisor should do that and should make the trade and that, I guess, ought to be the end of it except that I don't know if employees are still investing in Grace stock; are they?

MS. BAER:  No, they're not, Your Honor.

THE COURT:  Okay.

MS. BAER:  At this point in time we're talking simply about whether it should be sold.

THE COURT:  Okay.  So why don't we just put a finite time limit within which they can decide whether or not to sell.

MS. BAER:  Well, Your Honor, it seems to me that that would be rather difficult because the circumstances today versus the circumstances six months from now when a Chapter 11 plan are on file it could be very different.

THE COURT:  Yes, they could, and that's the risk either up or down, and I think the investment banker could notify everybody who holds Grace stock that this company is still in the throes of Chapter 11, at this point doesn't have a plan on file, and, you know, they take a risk.  They could end up losing their investment because the stock could be worthless.  They could end up making a fortune because it might be worth a whole lot of money, or they can sell right now for X-dollars and give them that choice.

MS. BAER:  I'm not sure that that would fulfill

1  their fiduciary responsibilities.

2  THE COURT:  Why not?  That's what investment
3  bankers do all the time.

4  MS. BAER:  It is, but they've got to look at the
5  timing and what the circumstances are here --

6  THE COURT:  Sure, that's what I'm saying.

7  MS. BAER:  -- versus then.

8  THE COURT:  Exactly.  That's what I'm saying.
9  Let's put a finite time period within which this can be done,
10  and then you don't run the risk of millions of dollars year
11  after year.

12  MS. BAER:  Your Honor, with State Street not being
13  here, I certainly can't question as to whether or not they'd
14  be uncomfortable or comfortable with that.  May I perhaps
15  suggest that why don't we put the retention on a certain time
16  frame, and we can review it with this Court again in several
17  months?

18  THE COURT:  All right.  Maybe that's fair enough.
19  Maybe that's a good way to do it because I'm concerned that
20  this is just going to go on and on and on and at a certain
21  point in time I think it's too expensive for this estate
22  because it does benefit a very select -- I mean, when I say
23  "select" I mean small group of employees or retirees, I'm not
24  sure which, maybe both.

25  MS. BAER:  Actually, Your Honor, it benefits almost

FORM FED-25   PENGAD • 1-800-631-6988

1  everyone.  We have tremendous participation in the plan, so

2  this is the rank and file of Grace's hundreds of employees.

3          THE COURT:  But you're only talking --

4          MS. BAER:  But the dollars are maybe not that

5  significant in terms of the huge group.

6          THE COURT:  But State Street's only there to look

7  at the investment in Grace; correct?  Not the overall

8  investments.  So, it's --

9          MS. BAER:  Right.

10          THE COURT:  I mean, I don't know whether every

11  employee is invested in Grace, maybe they are, but regardless

12  of that fact, it seems to me that there should be some

13  limitation on this time limit.  Gentlemen, what about that as

14  a solution, limit their retention to a certain period of

15  time, and then decide whether it should be continued or not?

16          MR. SASSON:  I think that sounds reasonable.

17          MR. BECKER:  So do I, Your Honor.

18          THE COURT:  Okay, then the question is, how long?

19          MS. BAER:  Your Honor, our suggestion would be a

20  year.  It seems --

21          THE COURT:  Probably reasonable.

22          MS. BAER:  -- that's reasonable.

23          THE COURT:  I don't want to create a false market,

24  and I also don't want to depress the stock by creating this

25  market.  It seems to me that a year is a reasonable period.

FORM FED-25  ®  PENGAD • 1-800-631-6989

1    Gentlemen?

2             MR. BECKER:   That's fine, Your Honor.

3             THE COURT:   All right.   I'll take a revised order

4    that will appoint State Street for a year subject to a

5    renewal on for cause or termination earlier for cause.

6             MS. BAER:   And, Your Honor, we'll also provide in

7    the order that State Street will be subject to the Court's

8    fee application procedure.

9             THE COURT:   Yes, please.

10            MS. BAER:   We're fine with that.   Thank you, Your

11   Honor.

12            THE COURT:   That's their professionals that is.

13            MS. BAER:   Yes, Your Honor.

14            THE COURT:   Okay.

15            MS. BAER:   Your Honor, turning to matter number 4,

16   the motion of Oldcastle for relief from the automatic stay.

17   Oldcastle has agreed to continue that matter until December.

18   We are trying to work through that with them.

19            THE COURT:   Good afternoon.

20            MR. SULLIVAN:   Your Honor, I don't . . .

21   (microphone not recording).

22            THE COURT:   You have to use a microphone.   I can't

23   hear you.

24            MR. SULLIVAN:   Bill Sullivan on behalf of

25   Oldcastle.   We have exchanged some materials, and we do agree

1  to continue till December.

2  THE COURT:  Okay, thank you.

3  MS. BAER:  Your Honor, the next matter on your

4  calendar is the debtor's application to employ Protiviti as

5  its Sarbanes-Oxley compliance advisor.  Your Honor, we

6  received one objection on this matter.  It was from the

7  United States Trustee's Office.  His only objection related

8  to the nunc pro tunc nature of the application.

9  THE COURT:  Has that been filed.  I didn't check in

10  the last couple of days, I was out of the office, but I

11  haven't yet seen it.

12  MR. PERCH:  Good afternoon, Your Honor, Frank Perch

13  for the United States Trustee.  Your Honor, unfortunately I

14  was reminded in discussing this matter with counsel earlier

15  today of what the problem had been.  There had been several

16  attempts to docket that application either on an evening or

17  over a weekend during which the electronic case filing system

18  was not working properly, and it got bounced apparently and

19  did not get docketed.  I am fully responsible for the fact

20  that it was not picked up at some point after that because

21  that was awhile ago, and it did not get docketed.  If the

22  Court does not have it, and the Court does not want to

23  consider it, I understand the Court's previous statements to

24  that effect.

25  THE COURT:  Okay.  As of November 4th, which is the

1  last time I believe that the docket was checked, I hadn't

2  seen it.  So I still don't know what it says, although I

3  appreciate from the last hearing that it was going to be

4  something to do with the nunc pro tunc nature of it.

5        MR. PERCH:  It's solely related to the nunc pro

6  tunc, and we -- I've attempted -- I've been in discussions

7  with Protiviti's counsel, and I have attempted to come to

8  some resolution of that, and unfortunately we just haven't

9  quite been able to find a meeting point on it.

10        THE COURT:  All right.  Get it docketed today, Mr.

11  Perch, and go forward with it now.

12        MR. PERCH:  Okay.

13        THE COURT:  I want it docketed and in the future

14  I'm not going to hear them if they're not docketed.

15        MR. PERCH:  I understand that, Your Honor, and as I

16  said, I would understand if the Court didn't want to hear it

17  at all.  The application was filed on September 22nd, Your

18  Honor, seeking to retain Protiviti as the Sarbanes-Oxley

19  compliance consultant nunc pro tunc to June 30th, 2003, and

20  the statements in the application as to why that delay of

21  almost three months took place in filing the application were

22  that there was a need to complete a conflict search and

23  certain issues regarding who was representing Protiviti.  In

24  conjunction with having discussed this with Protiviti's

25  counsel, he provided me two proposed supplemental affidavits,

1  which I think themselves have not been docketed either, that

2  indicate that the conflict check was completed on or about

3  August 4th, and it's my understanding that if Protiviti's

4  witness, Ms. Henderson (phonetical), would testify that's

5  what she would say, and I'm not going to dispute that.  I'm

6  not sure why it is that a conflict check would take almost a

7  month, but let's assume that it did.  The two observations I

8  have about the situation are that I'm not seeing in any of

9  the papers here some specific requirement as opposed to a

10  desire that the work commence before the conflict check be

11  completed such that, for example, was there an SEC deadline

12  or something that had to be met, a quarterly SEC filing that

13  had to be made that had to contain some certification under

14  Sarbanes or something of that sort.  If that fact had been

15  true, I would have hoped somebody would have explained that

16  to me, and I would have been able to consider that.

17  Typically when one looks at the case law with respect to nunc

18  pro tunc retentions, one sees that there are really two

19  elements that are required.  One is that there be some

20  explanation of an appropriate nature and the Third Circuit

21  has used the words "extraordinary circumstances" provided for

22  the delay.  The second is that the party seeking retention in

23  fact be eligible to be retained as of the date for which they

24  seek retention to which I would propose that in reality, they

25  weren't in a position to certify that they were eligible to

1    be retained until they had completed their conflict check and
2    certified that they were not disinterested -- or that they
3    were disinterested, I'm sorry.  And so since what I've been
4    advised is that Protiviti's witness would testify that their
5    conflict check was completed on or about August 4th, it would
6    seem that at a minimum, Your Honor, that there isn't a basis
7    to approve the retention prior to that date.

8         THE COURT:  Well, I don't know if you have to have
9    a conflicts check finished by that time, I mean, it seems to
10   me that in many instances we appoint people on an interim
11   basis because the conflicts checks take a very long time.
12   Now, I don't know in this specific case why it would take so
13   long, but with major counsel that have national and
14   international offices, we frequently enter those retention
15   applications and then they're subject to continuous
16   disclosures, and at some point in time, a conflict may
17   develop, but that doesn't mean that they weren't eligible as
18   of the date that they started the conflicts check.

19        MR. PERCH:  Well, they're subject to continuous
20   disclosures, but typically, with respect to -- and once
21   again, I don't -- I have not engaged -- this is not the type
22   of thing that would lead me to engage in extensive discovery
23   regarding Protiviti's conflict check procedures, but I'm
24   familiar enough with how law firms do it from having looked
25   at this with a number of law firms and most law firms are

1  able to take some kind of a preliminary read --

2           THE COURT:  Yes.

3           MR. PERCH:  -- of their conflict system virtually

4  instantaneously because they're called by clients and they

5  may need to work right away and they don't want to do

6  something until they've at least done a preliminary check

7  with their conflicts.  I'm not sure that that happened here.

8           THE COURT:  Okay.  Do I understand correctly that

9  -- let's see, RHI is Protiviti's parent?

10          MR. PERCH:  Yes.

11          THE COURT:  But RHI is not related to the debtor in

12 this case?

13          MR. PERCH:  That's the representation, yes.

14          THE COURT:  Okay.  Is this the same RHI that is the

15 parent of either Narco or Jit (phonetical) in one of my

16 Pittsburgh asbestos cases?  Is it the same RHI?

17          MR. PERCH:  I couldn't speak to that.

18          MR. LAWLAR:  Your Honor, I'm sorry, James Lawlar.

19 I'm counsel for Protiviti.  Robert Half International, which

20 is an employment agency.

21          THE COURT:  No, okay, thank you.

22          MR. PERCH:  Okay.

23          THE COURT:  All right.  Okay.  So it's only the

24 nunc pro tunc nature that you object to.

25          MR. PERCH:  That's correct.

1    THE COURT:  Okay.

2    MR. PERCH:  I have no other objection.

3    THE COURT:  All right.  Ms. Baer?

4    MS. BAER:  Your Honor, counsel for Protiviti is

5    here, and I believe it would be more appropriate if he

6    addressed the Court directly on that issue.

7    THE COURT:  All right.  Good afternoon.

8    MR. LAWLAR:  Good afternoon, Your Honor.  James

9    Lawlar, Wollmoth Maher & Deutsch on behalf of Protiviti.  I

10   just wanted to update, Your Honor.  We did send supplemental

11   affidavits to Mr. Perch last week.  We know that there's a

12   freeze on filing things so they didn't get filed.

13   Essentially what happened, and I'll give you a quick rundown,

14   Protiviti is owned by RHI.  RHI is a huge employment person.

15   If you needed a temporary employee they provide that service.

16   They provide it to thousands of companies across this

17   country.  They have a huge accounts payable system.  They ran

18   the check.  That was the longest period of time to get that

19   information back.  Of course, Bank of America, again,

20   everybody's on that list.  You have to determine whether or

21   not there's really anything there.  They knew initially there

22   was no conflict with Grace and Grace's entities, but the

23   issue was whether on the 18th page conflict checklist there

24   was anybody else that may have been in conflict.  They came

25   up clean.  There's no impairment on disinterestedness,

1   impairment on any conflict basis to prevent Protiviti's

2   retention.  What happened was the affidavit was submitted to

3   Kirkland & Ellis.  The debtor decided it wanted it changed,

4   the retention basis, it changed the format of how it wanted

5   to retain Protiviti.  That did not get communicated back to

6   me until the end of August.  So the affidavit was submitted

7   early August, the end of August they wanted us to change it.

8   That's the real reason for the delay.  It was that

9   miscommunication period.  We revised the affidavit, submitted

10  it early September, didn't get it submitted until the end of

11  September.  I don't know the reason why counsel took so long.

12  They may have been just making sure it was correct.  I'm not

13  sure.  The problem is it was out of Protiviti's control.

14  Protiviti did everything he could.  He got the affidavit, did

15  a proper conflicts check, made sure that there is not basis

16  to have it -- this will have and submit it to the debtor.

17  The debtor wanted to change it.  It went along with the

18  change.  All this time it's providing the services which are

19  Sarbanes-Oxley and everybody knows that Sarbanes-Oxley

20  nowadays means you'd better get somebody in there and make

21  sure your books are clean, and that's what this whole process

22  is, is cleaning up the books of Grace to make sure they are

23  Sarbanes-Oxley compliant.  They asked Protiviti to begin

24  right away.  Protiviti agreed to do that thinking they had

25  done everything they needed to do.  There was substantial

28

work done in July and in August.  So with any type of <u>nunc</u>
<u>pro tunc</u> pretention that doesn't go back that far is going to
severely hurt Protiviti for services it provided that
apparently the debtor thinks they're fine.  So the issue
really was -- was not in the control of Protiviti.  They
tried diligently.  I made many phone calls, and we worked
through it, and we got it filed.  Protiviti did what it was
supposed to do with respect to proper retention procedures
and made sure it was clean and disinterested, you know.  The
work that was done was important work that Grace said had to
be done, and Protiviti has no basis other than to rely on the
debtor on that one, Your Honor.  So I think under the factors
of Arkansas, we fit within the factor.  The question is, it
was a long period of time, you know, it's a significant
period of time, and we recognize that, but -- so it doesn't
make sense to penalize Protiviti when it's not really
Protiviti's fault and frankly what you're doing is you're
giving the estate a windfall for work that it's provided to
the estate that it needs.  Thank you, Your Honor.

THE COURT:  Ms. Baer, what happened?

MS. BAER:  Your Honor, my understanding was there
was a mixup in communication because Protiviti had one
counsel and then had another counsel and apparently messages
were not communicated to the right people.  The nature of the
retention was in fact changed, and that took some time to get

1   the affidavits changed.  The delay after the affidavits were
2   finally changed I think actually had to do with the timing
3   for filing before the next court hearing and the fact that
4   one had been missed, and then it was held off until the next
5   one because one had just been missed.  But, Your Honor, it's
6   certainly not appropriate to penalize Protiviti here.  They
7   did come in, and they did start the work right away.  It
8   would have been -- our second quarter's financial statements
9   would have been due and Sarbanes-Oxley obviously is a very
10  significant issue that the debtor did need advice on
11  immediately, and Protiviti did agree to render that advice
12  and work immediately.

13          THE COURT:  Okay.  Well, those deadlines are not
14  maximum deadlines.  They're minimum -- I mean those are
15  maximum deadlines, not minimum.  That doesn't make any sense
16  to hold up a retention application simply to get it onto the
17  next omnibus.  If you miss the deadline for one the hearing's
18  going to come up later, but at least your affidavit's of
19  record.  I don't understand that.

20          MS. BAER:  Your Honor, it may not have been the
21  correct thing to do but unfortunately, I think that is what
22  happened.

23          THE COURT:  Well, I think Kirkland maybe better get
24  whoever's doing its filing to appreciate the fact that when
25  there's a retention application it better get it of record a

little sooner than this when it's holding the information, because it could very well end up penalizing somebody and in fact the next time it probably will.  So -- Mr. Perch, I think under these circumstances, it appears that it's not the fault of Protiviti, and I understand the case law that indicates that it's up to the professionals to make sure that the steps are taken, but frankly I'm not sure what else when you're involved in a case and you've got Kirkland & Ellis doing the filing for you, you're supposed to do except rely on the reputation of that firm to get it done.  So, I think under these circumstances, this is enough of an excusable neglect that I'll award -- I will approve the application process nunc pro tunc but it's coupled with a severe warning to Kirkland not to do this again, not to delay like this again.  All right.

MR. PERCH:  I understand . . . (microphone not recording), Your Honor.

THE COURT:  All right, so, do you have an order, Ms. Baer, or would you like to submit one?

MS. BAER:  We do, Your Honor, have an order.

THE COURT:  I'll take it then if you have it. Thank you.  Okay, that order is entered, thank you.

MS. BAER:  Thank you, Your Honor.

THE COURT:  All right.  I received on -- with respect to item number 6, that's the debtor's request to

retain Mr. Hamlin as the Futures Rep., a request to postpone this, but frankly, I think we should go forward with this matter because I'm very concerned about the application, and under the circumstances, I don't think Mr. Hamlin can represent the Futures.  I don't think he ever will be able to represent the Futures in this case, and I don't see any point to delay that decision.  We need a Futures Rep.  So I asked to keep this on although I saw the request to postpone it, I simply don't see a basis to postpone it because I don't see a basis to grant the application.

MS. BAER:  Your Honor, frankly, this all came up very quickly all at one time and --

THE COURT:  Yes.

MS. BAER:  -- that's why we filed it.  Your Honor, I think under the circumstances, that it would simply make sense for us to withdraw the application.

THE COURT:  Okay, if that's the way you want to do it, that's fine.  I'll accept an order that permits the debtor to withdraw or that indicates that the debtor has withdrawn the application.

MS. BAER:  Thank you, Your Honor, we will submit that.

THE COURT:  All right.  Okay, 7?

MS. BAER:  Your Honor, matter number 7, motion to compel filed by Wesconn, we are working through this matter

1    MS. BAER:  It does, Your Honor.

2    THE COURT:  Fine.  Anything else?

3    MS. BAER:  That's all we have, Your Honor.

4    THE COURT:  Anyone on the phone?

5    UNIDENTIFIED SPEAKER:  No.

6    THE COURT:  Okay, thank you.

7    MS. BAER:  Thank you.

8    THE COURT:  We're adjourned.

9    (Whereupon at 1:00 p.m. the hearing in this matter

10   was concluded for this date.)

16   I, Elaine M. Ryan, approved transcriber for the

17   United States Courts, certify that the foregoing is a correct

18   transcript from the electronic sound recording of the

19   proceedings in the above-entitled matter.

21   _Elaine M. Ryan_                          11-21-03

     Elaine M. Ryan
22   2801 Faulkland Road
     Wilmington, DE 19808
23   (302) 683-0221