## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 01-01139 (JKF) |
| W. R. GRACE & CO., et al.,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Re:  Docket No. 4667 |

## DEBTORS' OBJECTION TO ROYAL INDEMNITY COMPANY'S MOTION FOR LEAVE TO FILE A LATE PROOF OF CLAIM

By and through their undersigned counsel, the above-captioned debtors and

debtors in possession hereby object to the Motion For Leave to File a Late Proof of Claim (the

"Motion for Leave") filed by Royal Indemnity Company ("Royal").  In support of this objection,

the Debtors state as follows:

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food >N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## **PRELIMINARY STATEMENT**

This Court should deny the Motion For Leave . The Debtors implemented unprecedented procedural safeguards and invested tremendous resources to insure that Royal, and all other parties affected by the Bar Date, were notified of the Bar Date and provided with ample time to file a claim.  Royal and its counsel received the Court approved Notice Package (the "Notice Package") 9 months before the Bar Date, and Royal reviewed the Notice Package.  See Huston Aff. ¶12, at 4.  Royal simply disregarded the clear language of the Notice Package, which specifically provides that failure to timely file a Proof of Claim for claims, in the nature of Royal's claim (the "Royal Claim"), will result in forfeiture of any such claims.  Royal's contention that the Notice Package was too voluminous or confusing is completely without merit.  This Court, the Official Committee of Unsecured Creditors (the "Unsecured Committee"), and the Official Committee of Asbestos Property Damage Claimants (the "PD Committee") actively participated in the development of the Notice Package.  Further, this Court's Bar Date Order holds that the Debtors' Bar Date Notice was legally sufficient.

While the Court has the *authority* to accept late claims in *certain instances,* the present situation does not fall within Bankruptcy Rule 9006(b)(1)'s exception for tardy claims upon a showing of "excusable neglect."  Further, accepting the Royal Claim would set a detrimental precedent in these cases as it would:  (a) reward Royal's carelessness, (b) severely discount the value of the resources invested by the Debtors, this Court, the Unsecured Committee and the PD Committee in developing the Notice Package and Program, and (c) open the floodgates for more prospective, late claims due to "excuseable neglect."

91100-001\DOCS_DE:84160.1

## BACKGROUND

1.      Royal issued several comprehensive general liability insurance policies (the "Policies") to Zonolite Company ("Zonolite"), covering ten consecutive one-year periods from March 31, 1953 through April 1, 1963.  Pursuant to the Agreement and Plan of Reorganization, dated January 17, 1963, between W.R. Grace & Co. and Zonolite Company (the "Asset Purchase Agreement"), W.R. Grace & Co. ("Grace") purchased *substantially all of the assets* of Zonolite in exchange for a part of the common stock of Grace.  See Asset Purchase Agreement ¶1 and ¶2, at 1.  Grace did not assume any of Zonolite's pre-existing liabilities.  See id.

2.      Various disputes arose between Grace, Royal and certain other primary insurers concerning the scope of coverage afforded under various insurance policies for Asbestos-Related Claims.  In January 1995, Grace and Royal entered into a Settlement Agreement (the "Royal Settlement Agreement").  Pursuant to the Royal Settlement Agreement, Royal paid Grace a confidential sum of money.  In return, Grace agreed to "cancel all insurance coverage for Products Claims under the [Royal] Primary Policies".  See id. at ¶3.0, 6.  Grace also agreed to indemnify Royal for certain payments made for Products Claims under the Royal Primary Policies.  Paragraph 9.0 of the Royal Settlement Agreement states:

> In the event that any Other Insured or any Person (except any Other Insurer including, without limitation, Maryland, CNA and General Insurance Company of America) makes Products Claims under the Primary Policies (including without limitation claims pursuant to a direct-action statute, garnishment proceeding, third-party suit, or otherwise) against Royal, Grace will indemnify and hold harmless Royal from any and all liability imposed upon, or costs or expenses incurred by, Royal in connection with such claims, provided, however, that if such claimant is not an Other Insured, such total aggregate indemnification for any liability imposed for all such claims will be limited to $6,000,000.

3.      Following the sale of substantially all of its assets to Grace in 1963, Zonolite changed its name to Montana Vermiculite Company (" MVC").  MVC was subsequently

3

dissolved on September 18, 1964.  In July 1999, the Libby Claimants filed complaints against,

among others, Montana Vermiculite Company ("MVC") for various alleged asbestos-related

bodily injuries caused by Zonolite Company amongst others (the "MVC Litigation").  The Libby

Claimants seek recovery from MVC for pre-1963 claims, which they believe are covered under

the Royal Primary Policies.  See Opposition of Carol Gerard, et al., to Debtors' Motion to

Expand the Preliminary Injunction to Include Actions Against Montana Vermiculite Company,

at 4 ("Upon obtaining judgments in any existing and future Montana Vermiculite Litigation, the

Libby [Claimants] intend to collect from Royal under the Pre-Sales Policies to the extent of

available coverage.").  The Libby Claimants contend that if such injuries are covered under the

Royal Primary Policies, then Royal, as Zonolite's insurer during the relevant period, would have

an obligation to pay any awarded damages.

      4.      If the claims in the MVC Litigation are Products Claims covered under the Royal

Primary Policies, then Grace may have a limited obligation under the Indemnity Provision to

indemnify Royal for such claims.  Royal has not been named as a defendant in the MVC

Litigation, but Royal has known about the MVC Litigation since at least March of 2002, when

the Libby Claimants attempted to have Royal appointed as trustee for MVC.  Accordingly, while

Royal has not been named in the MVC Litigation, it has been aware for some time that the Libby

Claimants have "painted a target" on its back, and may seek recovery from Royal under the

Royal Primary Policies.

      5.      On June 27, 2001, the Debtors filed their Motion for Entry of Case Management

Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of the

Notice Program (the "Bar Date Motion").  During the course of the following ten months, the

Debtors coordinated with *every* creditors' committee, as well as this Court, to craft a Bar Date

4

Notice, Bar Date Package and a comprehensive system of publication of the Bar Date Notice (collectively, the "Bar Date Notice Program") that would ensure (with a high degree of probability) that every affected party was aware of the existence of the Bar Date, the scope of the Bar Date, and the process for filing a Proof of Claim.

6.    The Bar Date Order was the product of nearly 10 months of exhaustive and diligent efforts by the Debtors, this Court, and the Unsecured Committee. The Debtors filed several versions of the Bar Date Motion during the course of this lengthy process. In addition, this Court received multiple responses from all of the Committees in this case. Each version of the Bar Date Motion and related Bar Date Package reflected a conscious intent by the Debtors to incorporate concerns expressed by this Court and members of the various Committees. The Notice Program and Bar Date Package were also discussed at several omnibus hearings. For example, during the course of the April 22, 2002 hearing, the parties discussed whether the Debtors needed to disseminate the Bar Date Notice via television advertisements. Ultimately, this Court determined that the increase in coverage (from 83.8% of American households to 95% of American households) was not worth the additional $2.5 million in costs. See Transcript from April 22, 2002 Omnibus Hearing before the Honorable Judith K. Fitzgerald United States Bankruptcy Judge, 94 (attached as Exhibit A). This Court stated, "I truly don't see, given the reach of the newspapers, the consumer magazines, the business magazines, *The Wall Street Journal*, *The Parade Magazine*, the debtor's website, the other places, the opportunity for people to call in to the debtor's establishment to get information concerning a proof of claim, I don't see the need for a television ad." Id at 95. Once the Bar Date Order was issued, the Debtors spent over $4 million to publish the Bar Date Notice. The Debtors also spent substantial funds to

compile and mail copies of the Notice Package to all known, affected parties. In this regard, the

Debtors mailed out at least 201,116 Bar Date Packages.

7.      The Debtors mailed a copy of the Notice Package to *both* Royal and to its

counsel, Wilson, Elser, Moskowitz, Edelman & Dicker ("Wilson, Elser) (at two separate

addresses), on June 22, 2002. See Declaration of Service (attached hereto as Exhibit B). Royal

apparently received its copy of the Bar Notice Package on June 28, 2002. See Huston Aff. ¶12,

4.

## ARGUMENT

### Royal Possessed a "Claim" well Before it Received the Notice Package

8.      Royal suggests that the Libby Claimants' failure to name Royal as a defendant in

the MVC Litigation is legally relevant to Royal's failure to timely file a Proof of Claim.

Specifically, the Motion for Leave states, "Significantly, however, the Montana Claimants have

yet to commence any actions directly against Royal." Motion for Leave ¶11, 5. Failure to name

Royal is irrelevant to whether Royal has a claim in these chapter 11 cases.

9.      Section 101(5)(A) of the Bankruptcy Code defines "claim" as, "a right to

payment *whether or not* such right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

11 U.S.C. § 101(5)(A) (emphasis added). Congress intentionally defined "claim" in the broadest

way possible. See Historical and Statutory Notes to 11 U.S.C. § 101 ("By this broadest possible

definition (of claim) and by the use of the term throughout the title 11, especially in subchapter I

of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote

or contingent, will be able to be dealt with in the bankruptcy case.").

6

10.    The Libby Claimants initiated the MVC Litigation in 1999. Royal has been aware of the litigation since at least March of 2002, when the Libby Claimants attempted to have Royal appointed as designated trustee for MVC. On March 15, 2002, the Libby Claimants filed a Petition for Appointment of and Request for Hearing (the "Petition for Appointment of Trustee"), which sought appointment of Royal as the designated trustee of MVC for the receipt of service of process. See Petition for Appointment of Trustee ¶ 8-9 (attached as Exhibit C). Counsel for Royal was involved in the subsequent discussions concerning the appointment of a trustee, and appeared on behalf of Royal during a March 22, 2002 telephone hearing in the MVC Litigation to discuss the matter. See March 25, 2002 Letter from John F. Lacey to Nadine Pival, Clerk of Court for the Montana Nineteenth Judicial District Court, Lincoln County (attached as Exhibit D). The Declaration of Service pertaining to the Petition for Appointment of Trustee lists Royal as receiving service of the Petition for Appointment of Trustee. Accordingly, Royal had notice of the Libby Claimant's intent to pursue recovery from Royal of any award in the MVC Litigation at least a month before this Court entered the Bar Date Order and 12 months prior to the actual Bar Date. Therefore, Royal knew it had a "claim" against Grace related to the MVC Litigation.

### The Bar Date Explicitly Covers Royal's Claim

11.    Royal seeks relief from the Bar Date to file a claim for, "any unliquidated and contingent indemnification claims of Royal arising out of the Settlement Agreement, including any claim based upon the obligations of Grace to indemnify Royal for the claims asserted by the Libby Claimants against Montana Vermiculite…" Motion for Leave ¶14, 6.

12.    The Bar Date Notice states on page 2, in its own separate paragraph, under the heading "**WHO MUST FILE A PROOF OF CLAIM**," the following:

7

The Bar Date does apply to derivative asbestos claims and asbestos-related claims for contribution, indemnity, reimbursement or subrogation. The Bar Date applies to personal injury and/or wrongful death claims which are not asbestos-related. Bar Date Notice at 2.

13.    The Motion for Leave seeks allowance of an unliquidated and contingent claim for indemnification under Section 9.0 of the Royal Settlement Agreement for certain, potential asbestos-related payments stemming from the MVC Litigation. Accordingly, Royal's claim is an "asbestos" or "asbestos-related" claim for "indemnity," which falls squarely within the explicit language of the Bar Date Notice.

14.    The language informing Royal that the Bar Date applies to Royal's specific type of claim is not hidden or buried within the Bar Date Notice. The language appears in its <u>own</u> paragraph, on *page 2* of the Bar Date Notice, which is *page 3* of the Bar Notice Package, under a heading in bold font and all capital letters, which states: **"WHO MUST FILE A PROOF OF CLAIM."** Given its fundamental importance in determining the applicability of the remaining materials, a prudent reader should have isolated this passage and read it in detail. Further, the Debtors implemented additional measures to increase the likelihood that every recipient would carefully examine this section. Debtors placed this section at the beginning of the Notice Package and formatted the heading in a visually stunning manner. If Royal had engaged in even a cursory review of the Bar Date Notice, it would have seen this paragraph.

## This Court May Accept Late Filings of Claims only if there is "Excusable Neglect"

15.    Bankruptcy Rule 9006(b)(1) grants courts the authority to accept late filings where the movant's failure to comply with the Bar Date "was the result of excusable neglect." Thus, this Court has the power, but not the obligation, to grant the Motion for Leave if it finds that Royal's failure to file a timely claim was the result of "excusable neglect." The Supreme

8

Court has held that under this rule, courts are *permitted, where appropriate*, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control. See Pioneer Inv. Services Co. v. Brunswick Ass'n Ltd. Partnership, 113 S.Ct. 1489, 1491 (1993). The determination of whether such neglect should be excused is determined by the following factors: (1) the danger of the prejudice to the debtor; (2) the length of delay and it potential impact on judicial proceedings; (3) the reason for delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith. See id.

16.     The Third Circuit has interpreted Pioneer to require a "totality of circumstances" test to determine whether a movant's failure to file a timely claim was the product of "excusable neglect". See Manus Corp. v. NRG Energy, Inc., (In re O'Brien Environmental Energy, Inc.), 188 F.3d 116, 125 (3d. Cir. 1999). The Third Circuit has recognized that this analysis is fact-intensive and requires subjective judgment on the part of the court. See Chemetron Corp. v. Jones, 72 F.3d 341, 350 (3d Cir. 1995). Accordingly, it has "imposed a duty of explanation on District Courts when they conduct 'excusable neglect' analysis." Id. Further, the burden of proving excusable neglect lies with the movant. See Jones v. Chemetron Corp., 212 F.3d 199, 204 (3d. Cir. 2000). Moreover, "[i]gnorance of one's own claim does not constitute excusable neglect." In re Best Prods. Co., Inc., 140 B.R. 353, 359 (Bankr. S.D.N.Y. 1992), cited with approval in In re Trans World Airlines, Inc., 96 F.3d 687, 690 (3d. Cir. 1996).

17.     Royal's failure to file a timely claim does not constitute "excusable neglect." In fact, Royal's failure to file a Proof of Claim before the Bar Date rises to a level beyond mere neglect. In Pioneer, the Supreme Court defined "neglect," for purposes of Rule 9006(b)(1), as, "simple, faultless omissions to act and, more commonly, omissions caused by carelessness." See

Pioneer Inv. Services Co. v. Brunswick Ass'n Ltd. Partnership, 113 S.Ct. 1489, 1494 (1993).

Royal's failure to timely file a claim was the culmination of a series of events that, both

individually and collectively, rise to the level of recklessness. Recklessness is defined as,

"Indifferent to or disregardful of consequence." THE AMERICAN HERITAGE DICTIONARY

1162 (4TH Ed. 2002). Royal was indifferent to, and disregarded, the explicit consequences of its

failure to file a timely Proof of Claim.

18.    Royal has incorrectly isolated Ms. Huston's cursory review of the Notice Package

as the only error leading to Royal's failure to timely file a Proof of Claim. The mistakes that led

to Royal's failure to file a timely Proof of Claim go far beyond Ms. Huston's cursory review of

the Notice Package. First, it was reckless for Royal to entrust Ms. Huston alone as "the Manager

of the Major Case Unit responsible for Grace matters." Huston Aff. ¶13, 4. Over one year had

elapsed between the Petition Date and the date Ms. Huston received the Notice Package.

Accordingly, Royal clearly knew that Grace was operating under chapter 11. Royal should have

assigned a person with bankruptcy experience to Grace matters or trained Ms. Huston in basic

bankruptcy issues. Instead, Royal apparently gave Ms. Huston, an individual with "only limited

experience in handling bankruptcy-related matters," sole authority for Grace matters. Huston

Aff. ¶13, 4.

19.    Royal also received several other forms of notice of the Bar Date. Debtors served

Royal's counsel, Wilson, Elser, at two separate addresses, with copies of the Notice Package.

See Declaration of Service. Also, the Debtors spent over $4 million publishing the Bar Date

Notice in a myriad of periodicals, with the specific purpose of reaching members of every

demographic group. Royal's management, internal legal staff, and outside counsel are all part of

the public at-large. Accordingly, they received constructive notice through this media blitz.

10

20.     Royal received notice of the Bar Date on at least three separate occasions, and consciously chose to disregard this Court's message on each occasion.  Each of these Bar Date Notices stated, under the **"EFFECT OF NOT FILING A CLAIM"** section, that any person that fails to timely file a Proof of Claim, **"SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED** FROM ASSERTING ANY SUCH CLAIMS (OR FILING A PROOF OF CLAIM WITH RESPECT TO SUCH CLAIMS) AGAINST ANY OF THE DEBTORS, THEIR PROPERTY, OR THEIR ESTATES."  Bar Date Notice ¶9, 7.  Royal also had more than adequate notice of the MVC Litigation and, thus, knew that it may have claims against Grace arising from such litigation.  Therefore, Royal's failure to file a timely Proof of Claim was not excuseable neglect.


### Debtors Would be Severely Prejudiced if this Court Grants the Motion For Leave

21.     Royal is correct that the Debtors have neither submitted a reorganization plan nor made any payments in satisfaction of claims filed pursuant to the Bar Date Order.  However, Royal's understanding of the purpose of the Bar Date is far too limited.  Before the Debtors can develop a comprehensive, viable plan of reorganization, they need complete and accurate information regarding the nature, amount and status of all claims that will be asserted in these chapter 11 cases.  Accordingly, the Debtors requested (and this Court granted) March 31, 2003 as the deadline for the filing of certain proofs of claim or interest against the Debtors' estates. The Debtors are diligently proceeding with claim objections, and it would thwart the purpose of the Bar Date Notice to allow Royal to file a late claim at this stage in the process.

22.    Permitting Royal to assert its claim could have a significant affect on Grace's reorganization efforts.  Royal is attempting to assert a claim for $6,000,000.  This is not an insignificant amount.

23.    Further, the current exclusive period during which Grace has to file a Plan expires on February 1, 2004.  In order to progress towards a Plan and confirmation, Grace needs a certain degree of certainty with respect to the potential Proof of Claims that will be satisfied by the Plan.  This is exactly why Grace sought a Bar Date.  Granting the Motion for Leave could send a dangerous signal to other parties that the Court will be lenient on parties who disregarded the Bar Date Notice.  At that point, the "flood gates" could open, and this Court could be inundated with waves of similar, tardy claims.  Accordingly, granting the Motion for Leave would encourage uncertainty and deprive the Debtors of any assurance of the scope of their liabilities, which was the fundamental purpose behind a Bar Date.

## Royal's Delay has been Substantial

24.    Royal knew about the MVC Litigation and the Libby Claimants desire to seek recovery from Royal on at least *March 15, 2002*.  This Court entered the Bar Date Order on April 22, 2002, which established March 31, 2003 as the Bar Date.  Royals admits that it received the Notice Package, which contained a copy of the Bar Date Notice, on *June 28, 2002*. See Huston Aff. ¶12, 4.  The Motion for Leave was filed on *November 6, 2003*.  Accordingly, some: (a) 563 days elapsed between the date this Court issued the Bar Date Order and the date Royal filed its Motion for Leave; (b) 496 days elapsed between the date Royal admits it received the Notice Package and the date that Royal filed its Motion for Leave; and (c) 220 days elapsed

between the Bar Date and the date Royal filed its Motion for Leave. Each of these time periods is substantial in the scope of Grace's reorganization efforts.

25.     Grace is currently attempting to wade through claims and move towards a chapter 11 Plan. Grace can not do so unless it has some assurance that creditors will be held to the Court's Bar Date Order. This is not an instance where a creditor forgot to put proper postage on its claim or accidentally sent its proof of claim to the wrong address. Such instances, which typically result in missing a bar date by a few days, likely constitute "excusable neglect". Allowing such claims serves the dual purpose of allowing the debtors to work towards a reorganization plan and not penalizing creditors for small blunders. However, Royal failed to act for at least 220 days before filing the Motion for Leave. This is not a reasonable delay.

### The Reason for Royal's Delay was Solely within the Control of Royal

26.     In the typical case, the first two Pioneer factors will favor the moving party: "[D]elay always will be minimal in actual if not relative terms, and the prejudice to the non-movant will often be negligible..." Lowry v. McDonnell Douglas Corp., 211 F.3d 457, 463 (8th Cir.), cert denied, 532 U.S. 929 (2000). Rarely is the absence of good faith at issue. See id. Because these three factors typically weigh heavily in favor of the movant, several circuits place the most emphasis on the reason for the delay, including whether it was within the reasonable control of the movant." Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 366 (2d Cir. 2003). In this instance, Royal was solely responsible for the delay. Royal had (a) notice through its counsel as early as March 15, 2002 that the Libby Claimants intended to pursue pre-acquisition claims, which the Libby Claimants apparently believe are covered by the Royal Primary Policies; (b) received a copy of the Notice Package directly and also through counsel; and (c) received

13

publication of the Bar Date via Debtors' media blitz. Debtors took every reasonable step to

insure that Royal knew the existence, timing and scope of the Bar Date. Debtors should not be

penalized for Royal's disregard of these Notices.

### The Bar Date was the Product of a Lengthy, Thorough and Expensive Process, Which Would be Largely Wasted if this Court Grants the Motion for Leave

27.    The Debtors invested tremendous resources in the development of a

Notice Program that would insure adequate notice of the Bar Date to all affected parties.

This lengthy and expensive process - during which the Debtors received extensive input

from this Court and the Committees concerning the substance of the documents, the

scope of the parties that received the Notice, and the publications in which to provide

notice - culminated when this Court issued the Bar Date Order. The Bar Date Order

states that delivery of the Notice Package via first class mail constitutes "good, adequate

and sufficient notice". The Debtors mailed a copy of the Notice Package to Royal and its

counsel on June 22, 2002. See Declaration of Service. Accordingly, Royal received

legally sufficient notice of the Bar Date and the application of the Bar Date to its

respective claim. This Court should not excuse Royal's conscious disregard of the plain

terms of the Bar Date Order.

28.    The Motion for Leave implies that the Debtors' Notice Package was not legally

sufficient with regard to claims stemming from indemnification and similar types of claims.

Royal bases this contention on the placement within the Bar Date Notice of the explicit language

covering such claims. The Motion for Leave states, "*Buried within* the Notice Package *on page*

*2* of the Bar Date Notice in the fourth paragraph of Section 1 is the following statement: 'The

Bar Date does apply to derivative asbestos claims and asbestos-related claims for contribution,

14

indemnity, reimbursement or subrogation.'" See Motion for Leave ¶17, 7 (emphasis added). Royal's statements are hyperbole. The Bar Date Notice is the first substantive portion of the Notice Package, preceded only by a table of contents. The key passage relating to Royal appears on the second page of the Bar Date Notice, which is the *third* page of the Bar Date Package. It is contained within a section headed in bold font, titled **"Who Must File a Claim."** Even those readers that "briefly reviewed" the document could not miss this section. Similarly, the key passage is displayed in its <u>own</u> <u>paragraph,</u> to insure that anyone who gave this document even a cursory review would know the exact scope of the Bar Date. Similarly situated parties with contingent indemnity claims read this passage and filed timely Proofs of Claim.

29.     While Royal apparently believes the Notice Package was too voluminous, such a package was necessary to provide users with the Bar Date Notice as well as the relevant materials to provide context for the Bar Date Notice. Debtors spent almost a full year working with this Court and representatives of every Committee to develop a Notice Package that would provide recipients with adequate information to ascertain whether their claims fell within the scope of the Bar Date. This process resulted in the Notice Package, which is 26 pages long. Given the breadth of affected parties and the carefully delineated scope of the Bar Date, the Notice Package is actually quite succinct. It would be ironic if Royal was allowed to use the length of the Notice Package, which addresses several diverse interests and efficiently covers a wide spectrum of claims, to argue that the passage which explicitly governs its claim was "buried" within the document.

30.     The Notice Package makes it abundantly clear that the failure to file a Claim will result in a forfeiture of any such claims against the estates of any of the Debtors. The Bar Date Notice states in Section 9, **"EFFECT OF NOT FILING A CLAIM"**:

15

ANY HOLDER OF A NON-ASBESTOS CLAIM, ASBESTOS PROPERTY DAMAGE CLAIM OR MEDICAL MONITORING CLAIM WHO IS REQUIRED TO FILE A PROOF OF CLAIM AND USE A COURT APPROVED PROOF OF CLAIM FORM AND WHO FAILS TO FILE A PROOF OF CLAIM ON OR BEFORE THE BAR DATE FOR ANY CLAIMS SUCH CLAIMANT HOLDS AGAINST ANY OF THE DEBTORS OR THEIR PREDECESSORS-IN-INTEREST, INSURANCE CARRIERS OR THE DEBTORS' PROPERTY, **SHALL BE FOREVER BARRED, ESTOPPED AND ENJOINED** FROM ASSERTING ANY SUCH CLAIMS (OR FILING A PROOF OF CLAIM WITH RESPECT TO SUCH CLAIMS) AGAINST ANY OF THE DEBTORS, THEIR PROPERTY OR THEIR ESTATES. IF ANY SUCH CLAIMS ARE SO BARRED, EACH OF THE DEBTORS AND ITS PROPERTY SHALL BE FOREVER DISCHARGED FROM ALL INDEBTEDNESS AND LIABILITIES WITH RESPECT TO SUCH CLAIMS AND THE HOLDERS OF SUCH CLAIMS SHALL NOT BE PERMITTED TO VOTE ON ANY PLAN OR PLANS OF REORGANIZATION ON ACCOUNT OF SUCH CLAIMS, OR TO RECEIVE FURTHER NOTICES REGARDING SUCH CLAIMS OR REGARDING THESE CHAPTER 11 CASES.

Bar Date Notice ¶9, 7.

31.    A prudent recipient of the Notice Package would have read the entire document, lest they risked forfeiture of important rights. The Debtors invested extensive resources to develop a Notice Package that was "user friendly" and tailored to individuals that were not experienced with bankruptcy matters. The Debtors contemplated the possibility that careless recipients of the Notice Package might not have diligently read the entire document. To mitigate this risk, Debtors implemented procedures to highlight the most important sections of the document. The use of capital letters and bold font in the **"EFFECT OF NOT FILING A CLAIM"** section were two such measures. These measures were intended to capture the attention of even those who "briefly reviewed" the Notice Package, as Miss Huston claims to have done. See Huston Aff. ¶13. Given that the preceding paragraph is the only paragraph on its respective page to incorporate text effects that capture the casual reader's attention, Ms. Huston should have read this passage. The preceding paragraph makes it abundantly clear that the failure to file a

16

timely claim would result in a complete forfeiture of such claim.  Even if Ms. Huston was

not experienced with bankruptcy matters, the possibility of clear, negative consequences

should have led Ms. Huston to seek the assistance of more experienced individuals.  Ms.

Huston did neither.  <u>See</u> Huston Aff. ¶13 ("I did not send the Notice Package to Royal's

outside counsel, nor did I discuss it with anyone within Royal.").

32.     The Debtors provided additional notice to Royal of the Bar Date.  The

Debtors sent a copy of the Notice Package to Royal's counsel.  <u>See</u> Declaration of

Service.  Accordingly, the Debtors complied with the specific language of the Bar Date

Order, which calls for a copy of the Notice Package to be sent to counsel for appropriate

parties.

33.     The Debtors incorporated an extensive system of publication notice within

the Notice Program.  The Debtors engaged a specialist to study the demographic

readership of various publications and to assemble a stable of publications that would

ensure maximum coverage.  The Debtors also spent over $4 million dollars to publish the

Bar Date Notice in a range of publications that spanned from *People Magazine* to *The

Wall Street Journal.*  The purpose underlying this expensive and prolonged process was

to insure that Grace created a "virtual bulletin board," where members of any

demographic group would encounter a copy of the Bar Date Notice.  Even if Wilson,

Elser and Ms. Huston disregarded the Debtors' clear message, other Royal agents

received ample constructive notice of the Bar Date.  It is amazing that Royal would now

suggest that Grace's notice was somehow inadequate.

17

WHEREFORE, the Debtors respectfully object to the Motion for Leave and request that this Court deny the Motion for Leave.

Dated: November 25, 2003

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
James W. Kapp III
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG JONES &
WEINTRAUB P.C.

Laura Davis Jones (DE Bar No. 2436)
Scotta E. McFarland (DE Bar No. 4184)
David W. Carickhoff, Jr. (DE Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:   (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

91100-001\DOCS_DE:84160.1