1 simply write to the lawyers or counsel.  Is there any problem

2 with that that you guys have?

3          MR. BAENA:  I'm sure there's a problem with that,

4 Judge.  They haven't filed appearances in this court, but I do

5 represent all of them, Judge.

6          MR. BERNICK:  Okay.  Well, then we won't --

7          THE COURT:  Well, gentlemen, either you have to give

8 him names and addresses or you have to make service on your

9 own.  If you want to give them the names and addresses, do it

10 tomorrow.  If you want to serve them on your own, do it.

11 That's it.  That's my ruling.  It's not subject to

12 reconsideration.  Either give them the names and addresses or

13 serve them on your own and direct it to counsel and put that

14 right in the order, Mr. Bernick, they have a choice.  They can

15 give you the names and addresses within a day after service and

16 you will effect service or they can certify to you that they've

17 served on their own.

18          MR. BAENA:  That's fair.  That's fair.  Thank you.

19          MR. BERNICK:  Okay.  Item eight --

20          THE COURT:  Mr. Scott indicated --

21          MR. BERNICK:  Sorry.

22          THE COURT:  -- that he had no problem with that

23 process.

24          MR. SCOTT:  -- can serve me with any case that I am

25 counsel on, I'd be happy to accept it as fact.

1    MR. BERNICK:  Number eight is a motion to annul the

2  automatic stay filed by Edythe Kellogg.  And I seem to recall

3  that Ms. Kellogg's counsel was on the telephone.

4    THE COURT:  Yes, he is.

5    MR. BERNICK:  And just very briefly.  I'm not even

6  sure that this was actually down to be heard.  Last time we

7  talked about having it submitted on paper, but essentially

8  after the last hearing Your Honor directed us to provide more

9  information on the nature of the deductible.  It turns out the

10  deductible is payable by the insurance company, but it's

11  secured by two letters of credit, one at Chase Manhattan Bank

12  and the other is Bank of America on a dollar one basis.  So

13  that if, in fact, the insurance company decides to defend the

14  case or pay the case, they can choose to draw down on either

15  one of those letters of credit.  One of the letters of credit

16  is secured with our cash so our cash immediately goes to court.

17  The other is not secured with cash, it would creat a new

18  unsecured claim presumably by the Bank of America against the

19  debtor in the amount of the letter of credit.

20    So that is where that presently stands.  It does not

21  change our position with regard to this issue.  This is a

22  procedure that is lifting the stay for the Kelloggs.  It would

23  put that particular claimant into a position that's superior to

24  every other claimant and so would our expense, that is with our

25  cash or by creating a new claim, as to which we don't really

1  have a defense.  We don't have a defense against Bank of

2  America.  And under those circumstances, we don't think an

3  exception should be made for Ms. Kellogg.  There are other

4  people who have similar claims and there's no reason from our

5  point of view that hers should get priority, particularly in

6  light of the impact on the estate.

7        THE COURT:  All right.  I somehow at the last hearing

8  lost sight of the fact that the lawsuit was commenced post-

9  petition without relief from stay.

10       MR. BERNICK:  Right.

11       THE COURT:  Doesn't that mean it's void at the

12 outset?  Why do I even have this motion?

13       MR. BERNICK:  Well, they then moved to list the stay.

14 We did not -- and Your Honor -- I believe Your Honor is correct

15 about that.  Yeah, in part part of the reason for that was it

16 was commenced and the insurance company I guess started to pick

17 up with it.  Our cooperation was not really being solicited in

18 the process.  So that's how that unfolded.

19       THE COURT:  Mr. Scanlon?

20       MR. SCANLON:  Yes, Your Honor.  The lawsuit was filed

21 in violation of the stay.  It is void.  It was filed because

22 Ms. Kellogg was not listed as far as, I believe, as a creditor

23 and received no notice of the filing of the bankruptcy.  The

24 relief from -- the motion for relief is to proceed against the

25 insurance policy.  There is an insurance policy that's adequate

1  to pay this entire claim.  The insurance company is not a --

2  will not get a secured claim that's secured by property of the

3  debtor.  What they will have is a right to draw down on one of

4  two letters of credit.  Seventy-five percent of the letter of

5  credit are unsecured by the bank issuing it.  One, the Chase

6  matter is secured by assets of the debtor but this doesn't make

7  Edythe Kellogg a secured creditor.  Chase Manhattan was a

8  secured creditor before the bankruptcy was filed with regard to

9  this and at most Chase is now -- was paying the 250 deductible,

10 assuming that Ms. Kellogg prevails.  That the $250,000 would be

11 liquidating an unliquidated secured claim that already existed

12 prior to the bankruptcy.

13         THE COURT:  Well, I don't know that I can see exactly

14 how it's a secured claim pre-petition when the liability for it

15 hasn't even been determined yet.  At best it seems to me that

16 everybody here has a contingent claim.

17         MR. SCANLON:  Well, that's -- it is contingent and it

18 is unliquidated.

19         THE COURT:  Yes, it's clearly unliquidated.

20         MR. SCANLON:  And both of those things have to be

21 resolved before the bankruptcy is over.  There's no reason to

22 relieve the insurance company of their obligation to pay what

23 plaintiff's counsel estimate to be a $2.5 million claim simply

24 because it's -- I'm not sure what benefit at all would come to

25 the bankruptcy estate.  Chase Manhattan is secured to the

1  extent of their liability.  The insurance company has to
2  eventually pay the claim.  The debtor isn't free to use the
3  property that's subject to Chase's security until the amount of
4  that claim has been determined.  This process will help to
5  liquidate that claim and there really isn't any detriment to
6  the debtor.

7          THE COURT:  What is the detriment to the debtor if a
8  bond is posted or if a letter of credit is posted for the
9  benefit of getting past that original deductible?

10         MR. BERNICK:  Because right now the claim does not
11  have value.  There's no claim.  There's no liability that's
12  been determined.  It's a claim that's out there.  Right now
13  we've got the cash in the account that secures the Chase -- the
14  Chase letter of credit.  And as to the Bank of America, we have
15  no liability.  There's no liability there because there's been
16  no draw down on the letter of credit.

17         THE COURT:  I see.  If Chase draws down, the debtor
18  is out-of-pocket $250,000 on that letter of credit.

19         MR. BERNICK:  Right.  On the Bank of America there's
20  a draw down and we now have a new unsecured claim by Bank of
21  America and a liquidated amount as to which we have no defense
22  as to the Bank of America.  So either way there's an impact on
23  us.

24         THE COURT:  I'm not sure why, Mr. Scanlon, this just
25  isn't a regular pre-petition unsecured claim based on an auto

1 accident that can be filed and liquidated here.  Typically

2 where there are insurance proceeds available and the debtor's

3 estate is not impacted in any way, I've permitted that

4 liquidation to go forward, but that doesn't seem to be the case

5 here.  The debtor will have to be out-of-pocket $250,000

6 pursuant to some reimbursement plan.  And although Chase may be

7 secured in cash, I'll assume for purposes of this discussion

8 that it is, that although Chase may be secured in the cash,

9 your client isn't.  So your client holds an unsecured claim

10 that essentially converts an unsecured claim into something in

11 the nature of a setoff and therefore a secured claim in the

12 event that you're successful in the state court litigation and

13 the judgment that you get is $250,000 or more.

14         So I'm not sure why it's not just appropriate to have

15 it filed here and litigated in the ordinary course.

16         MR. SCANLON:  Well, Your Honor, first, one of two

17 things.  One, it is really reducing or making unavailable to

18 the debtor -- the response doesn't -- indicates that the claim

19 is secured but doesn't say what it's secured by, only that the

20 value of the security if 105 percent of the Chase letter of

21 credit which is in the neighborhood of 790,000.

22         That security, to the extent it is secured by that

23 letter of credit, should not be available to the debtor if the

24 debtor is using collateral of Chase Manhattan.  I submit that

25 it shouldn't be.  So there's no adverse effect on the debtor's

1 estate for that.

2       With regard to the rest of it, this is just an

3 automobile accident in which we're only seeking permission to

4 proceed against the insurance policy.

5       THE COURT:  Well, the problem is though in proceeding

6 against the insurance policy, you're also proceeding against

7 the debtor.  Because to the extent that the debtor has to

8 refund 250,000, if it doesn't participate in the litigation, it

9 loses its rights.  And so I don't see that it has much choice

10 but to defend an action when 250,000 of its cash collateral is

11 at stake.

12       With respect to the debtor using cash collateral that

13 is shouldn't be using, I think there are financing orders and

14 various agreements in place that must permit the debtor to make

15 use of the funds in its cash account just so that cash account

16 doesn't drop below the level that's necessary to make sure that

17 it meets that 105 percent.  Am I incorrect, Mr. Bernick?

18       MR. BERNICK:  I believe that's correct.

19       THE COURT:  So I don't see, Mr. Scanlon, why this

20 action isn't void at the outset as against the debtor.  And

21 with respect to the insurance company, because of the fact that

22 the debtor has to reimburse the insurance company, this really

23 is a suit against the debtor for the first $250,000 of

24 proceeds.  Is there anything in this insurance policy whereby

25 if Mrs. Kellogg chose to waive her first $250,000 worth of

1  distribution the debtor would not be responsible for paying it?

2       MR. BERNICK:  That the rest of the policy drops down

3  to cover dollar one?

4       THE COURT:  Yes.  Because if that's the case, I don't

5  have any problem with her litigating the rest, but I do have a

6  problem if she has to litigate and go through the first 250

7  before this goes further.

8       MR. BERNICK:  An expert here tells me that the policy

9  does not speak to that, so I don't think if there's an express

10  provision that's something that we'd be willing to take the

11  risk of.

12       MR. SCANLON:  Your Honor, if we could get permission

13  to proceed just against the insurance company and just file a

14  proof of claim for the 250, if the liability turns out to

15  exceed that, that would solve the problem.

16       MR. BERNICK:  I don't think that it works that way.

17       THE COURT:  I think you two are going to have to take

18  a look at this insurance policy, Mr. Scanlon, and see.  I have

19  my doubts that it would work that way to the extent that Chase

20  has a right to go against cash collateral.  I don't think that

21  your client filing a proof of claim for the first 250,000 would

22  solve that issue.

23       What I'll do, Mr. Scanlon, I think this would make

24  most sense.  I would deny this motion without prejudice and

25  also require that that lawsuit be terminated against the debtor

1 because it is void as in violation of the automatic stay.  But

2 I will also ask Mr. Bernick to make a copy of the insurance

3 policy available to you.  If it turns out after your review

4 that there is some way that this suit could go forward with the

5 debtor filing a proof of claim, I'll certainly reconsider that.

6 But I have a feeling that this policy is not likely to read

7 that way since it in essence provides Chase with a remedy

8 against the debtor's cash.

9         MR. SCANLON:  Your Honor, the policy has been

10 provided.  The answer to that question is not apparent from it.

11 The policy provided was about four inches thick so I can't

12 absolutely assure the Court that the answer isn't in there, but

13 it didn't seem to be and plaintiff's -- or debtor's counsel

14 didn't direct us to anything that pertained to that issue.

15 In fact, the whole issue of whether or not the right of

16 reimbursement was primary or only after the insurance paid was

17 not particularly clear from the policy.

18         THE COURT:  Okay.  Well, I'm not sure in that

19 circumstance that that helps advance the issue because in all

20 probability the insurance company will deny coverage until the

21 debtor does make whatever reimbursement is necessary and we're

22 right back into collateral litigation anyway, which is what I'm

23 trying to avoid,

24         If there's some basis that you have to seek

25 reconsideration, Mr. Scanlon, in looking at the policy or

84

1  talking to the insurers or whatever is appropriate, I will

2  reconsider.  But I think for today, for the reasons I've just

3  expressed, this is an action that is directed to at least

4  $250,000 of the debtor's assets.  That I do not believe is

5  appropriate.  The debtor would be required to defend and I

6  don't see at this point that the debtor should be required to

7  defend that action to protect the 250,000 based on the record

8  that's before me today.

9       But as I said, I'll deny this for those reasons

10  without prejudice, subject to your ability to file a motion for

11  reconsideration within ten days in the event that I'm not aware

12  of all of the facts that you believe I should be aware of.  And

13  also direct that the lawsuit be terminated, but that doesn't

14  have to happen until at least your ten-day period for

15  reconsideration is over, Mr. Scanlon.  I don't want you to

16  terminate the lawsuit and then find out that I'm going to grant

17  your relief from stay to go forward with it.

18       So if you do file a motion for reconsideration, the

19  lawsuit does not have to be terminated until I can determine

20  that motion.

21       MR. SCANLON:  Thank you, Your Honor.

22       THE COURT:  Okay.

23       MR. BERNICK:  Your Honor, item nine is the last item.

24  It relates to the traditional -- what it comes down to is the

25  traditional property damage claims and we have another issue of

1  delay here.  Let me just recite briefly the history surrounding

2  this matter.

3         As the Court is aware...

4         THE COURT:  Go ahead.

5         MR. BERNICK:  As the Court is aware, we filed and

6  requested a bar date with regard to so-called traditional

7  property damage claims, July of last year.  It's been pending

8  ever since that time, and our notice program in connection with

9  that motion, our proposed notice program has been open for

10  scrutiny during the entire intervening period of time.  The

11  Property Damage Committee has retained an expert by the name of

12  Tom Hilsay.  And Mr. Hilsay had kind of gone through what I

13  think would be fairly characterized as an evolution in his

14  views.  At first he decided to come out with a report and he

15  gave a deposition where he said, "I'm only going to provide

16  criticisms with regard to this program, but I have no

17  alternative program of my own."  And at the time that this

18  matter originally came up for hearing before Judge Farnham in

19  November, counsel had -- counsel for the Committee was prepared

20  to represent that notwithstanding the fact that Mr. Hilsay

21  didn't have an alternative notice program, they were still

22  willing to proceed with a hearing on our bar date motion.  As

23  you know, that hearing never took place.  On the eve of the

24  hearing, the case was reassigned.

25         Step two was the process before Your Honor.  Once

1  this matter was noticed up for hearing, that is again the bar

2  date, apparently Mr. Hilsay had a change of heart.  And on the

3  eve of the last hearing, that is the hearing in March, he

4  submitted a whole new affidavit, a supplemental affidavit, yea

5  thick.  And in this affidavit he does, in fact, play out a

6  proposed notice program.  Now, we objected to that process as

7  being very untimely, but remember at the last hearing the ZAI

8  portion of the equation got stripped up.  So you only have a

9  notice program that would relate to medical monitoring and the

10 property damage.

11      And with the benefit of all of Mr. Hilsay's

12 considerable learning, and with the benefit of that change in

13 circumstance, Mr. Baena for the Committee said as follows,

14 because I was concerned about well, when are we finally going

15 to get the notice program done and out the door?  Mr. Baena

16 said, "Here's the issue on notification, Judge.  With what just

17 transpired in respect to Zonolite, I think that eliminates a

18 lot of the concerns we have with the program.  We want more

19 publications here and some more frequency there and that's

20 something I think once the experts put their own private

21 authorship aside, we'll be able to resolve.

22      "Mr. Bernick's colleague, who is heading up this

23 matter," that's Ms. Baer who is known to the Court, "suggested

24 that by the end of the week they can prepare and present to us

25 revised notices excising that which is no longer going out and

1 we can meet the following week subject to her availability

2 because of other plans and we're prepared to do that.  I don't

3 know how we could be any more reasonable."  Is what Mr. Baena

4 said at that time.

5 Well, that's the way it was.  We agreed that we would

6 turn over our proposal for how to implement Your Honor's

7 rulings with regard to the claim forms and the like and after

8 considering Mr. Hilsay's latest submission, we agreed to turn

9 over our package for their review the following Friday and they

10 in turn submitted their response to that package in the form of

11 a letter.  And the letter that was submitted was written by Mr.

12 Baena's firm and it systematically went through the proof of

13 claim form, the notice program, the claim bar date notice and

14 then the order that Your Honor would be asked to sign.  All

15 very systematically.

16 All of the matters that were raised in the context of

17 this letter were then addressed by Ms. Baer working with Mr.

18 Sakalo from Mr. Baena's firm, and they all resolved and they

19 were all ready to go with one exception, which is what the bar

20 date itself should be.  We wanted a November, was it 1? bar

21 date and they wanted to have a later bar date.  And that's

22 where we were and that's under good news situation because

23 we're making progress when it gets down to a detail level.

24 The bad news is that last week on the 17th we got a

25 letter from Mr. Sakalo that says this:  "Although the Property

1  Damage Committee maintains that adequate notification cannot be
2  accomplished in any instance," well, if it can't be
3  accomplished, then why are we even here?  I thought well, he's
4  saying all that but maybe he'll say he agrees.  It goes on to
5  say:  "Upon reflection of the contents of the program, the
6  Property Damage Committee is concerned that the program does
7  not accomplish the best possible notice to residential
8  homeowners with non-ZAI insulation claims against the debtors."
9  So he's now saying that notice cannot be adequately done under
10  any set of circumstances, but in any event, what we're
11  proposing is a notice program is not the best notice program
12  that there can be.
13          THE COURT:  Well, wait.  What kind of claims are we
14  looking to as to homeowners that are non-ZAI claims?
15          MR. BERNICK:  That is a good question, but the simple
16  answer is that whatever the kind of claims they are, the issue
17  here that they're raising is maybe what we should do is, it
18  says, "Possibly reinstate the television and earned media
19  program originally planned."
20          THE COURT:  The television and what?
21          MR. BERNICK:  And earned media program originally
22  planned.  Well, but Mr. Hilsay's own supplemental affidavit
23  that he submitted on the eve of the March 18 hearing itself did
24  not have with respect to property damage claims any television
25  program.   The television program was with respect to the ZAI

1  and personal injury claims.  And that's why Mr. Baena, I

2  presume, at the end of the last hearing said, "Well gee, now

3  that ZAI is stripped out and PI is going to stip out, we don't

4  have to worry about this dispute over the television program.

5  So what they appear to now be saying is that notwithstanding

6  everything that's in their letter and their sign-off on

7  everything that's happened, they now want more time to consider

8  the possible need for a television notification program, even

9  though it's different from their own plan.

10  THE COURT:  Is there some challenge to the numbers

11  that have been put in Ms. Casella's affidavit, which I don't

12  have specifically in front of me?  But they say something like

13  there are 70 million chances that any particular person is

14  going to see this at at least once and the numbers are all

15  broken out.  There are huge opportunities based on the

16  publication for everybody to see the fact that the debtor has

17  filed bankruptcy and is soliciting claims.  I mean is there

18  some challenge to the statistics?

19  MR. BERNICK:  I think with the challenge that's being

20  made, it's not even a challenge at this point, they're saying

21  we want to explore with Mr. Hilsay whether there is a problem

22  effectively with the absence of a television notification

23  program.  And that's the problem is that television went out

24  when ZAI went out.  Television was for purposes of ZAI.  Their

25  own supplemental affidavit from Mr. Hilsay does not call for

1 television on the property damage, the traditional property

2 damage claims and now apparently -- and now apparently what

3 they're saying is well, gee, maybe we ought to have one.  The

4 Court should --

5          THE COURT:  I don't know why I need a television for

6 property damage claims.  I think I need a television program

7 for asbestos personal injury claims.  I'm not ruling on that,

8 but if I were ruling on it I'd see why I'd need one.  But a

9 property damage claim is what Bankruptcy Courts deal with all

10 the time.

11          MR. BAENA:  If I may?

12          THE COURT:  Sure.

13          MR. BAENA:  Mr. Barnick has got some of it right, not

14 all of it, of course.  But let me just recount the chronology a

15 little bit differently.

16          When Mr. Hilsay said I'm not submitting a program,

17 early, early on when we were still in front of Judge Farnham is

18 because we had a combined program for Zonolite and traditional

19 property damage.

20          Mr. Hilsay was concerned about the very same thing

21 that you're concerned about and it's causing this new procedure

22 that we're entering into in respect to Zonolite and that is how

23 do you give a notice to somebody who's unwary?  And he didn't

24 blood on his hands and he said I can't do it.

25          And so it's a bit of a misstatement to say that -- to

91

1 recount Mr. Hilsay's position just as Mr. Bernick did.

2        When Zonolite was taken off the table because of the

3 new process that we're embarking upon, there was, indeed, a

4 severance from the notification program of several aspects of

5 it.  But you have to understand that Catherine Casella

6 identified that there were the same 135 million people I

7 believe it was that had to be approached -- for Zonolite, had

8 to be approached in respect of traditional property damage

9 claims.  There was an overlapping universe of people.  And,

10 indeed, when we left the hearing, when Zonolite was out, to her

11 credit Ms. Baer said to me, "You understand, Scott, that by

12 separating the two programs we're taking TV out.  Are you sure

13 you want to do that?  I'm not a notice expert, Judge.  I didn't

14 know.  I assume if we take out the Zonolite we'd be okay.  But

15 there was this overlap.  Now, why is that important?  Because

16 the nature of W.R. Grace's products was such that it was used

17 in homes too.  They had texture products that were used by

18 homeowners in their homes.  And so that's not a Zonolite

19 product.  It does require notice to them to put forward their

20 claim.

21        Judge, this is an enormous problem and, you know, we

22 go through these cases with sort of the suggestion that

23 property damage claimants are sort of like the tail wagging the

24 dog.

25        THE COURT:  Oh, I don't know that that's the case.

1  I'm not saying that.

2      MR. BAENA:  It certainly isn't the case.  It

3  certainly isn't the case when their own expert on sizing of

4  these claims recognized back in 1998 that the property damage

5  claims going forward were in the magnitude of $4 billion.  It's

6  not an insubstantial -- and that doesn't even include Zonolite.

7      So we have now these residential homeowners that

8  through my ignorance of notification and my ignorance of the

9  application of W.R. Grace's products, I assumed it wasn't a

10  problem taking TV out.  So we went back on the 17th.  Now, the

11  first that we've heard about how terrible we're conducting

12  ourselves is today.  Nobody responded since August 17 to our

13  suggestion that we take a look again at television and earned

14  media.  This isn't a delay.  We're trying to accomplish

15  something that's very fundamental.  They belittle property

16  damage claims by suggesting nobody sues.  That's a far

17  different issue than whether people will take the time to file

18  a proof of claim.  And they will, but we've got to give them

19  notice.

20      And so we have asked that we put back in the

21  television advertising that they formally proposed over the

22  same reach for the same nucleus of people that they were

23  formally going to expose their -- this notification to for the

24  purpose of getting these texture claimants notice of the bar

25  date and we don't think that that is -- a terrific imposition

1  at this point in time, especially since it is the case that

2  we've resolved every other issue amongst ourselves since the

3  last hearing.

4         THE COURT:  What's the cost?  I want a cost benefit

5  analysis.  What happens if we put the TV and the earned media

6  back in?

7         MR. BAENA:  Well, Judge, if we're going to have cost

8  benefit analyses --

9         THE COURT:  Because we may have to do it again.  So I

10  want to know --

11         MR. BAENA:  If we're going to have that, then I'm not

12  going to -- I'm going to put Mr. Bernick on the stand if he's

13  going to testify to it.  I want to take testimony on that.

14         THE COURT:  I want to know what the cost is.

15         MR. BAENA:  I don't know.

16         THE COURT:  Okay.

17         MR. BAENA:  The program as it stands now is estimated

18  to cost approximately $2.9 million.

19         THE COURT:  No, I meant with the TV in, because there

20  were estimates earlier.

21         MR. BAENA:  Well, the -- but the other estimate

22  included additional notices in addition to television, for

23  Zonolite.

24         THE COURT:  Oh, well, yes.

25         MR. BAENA:  So it's not like we're right back to

94

1 where we started from, it's just the television component of
2 the former program.
3          THE COURT:  Well, we're pretty much back where we
4 started if the same market is attempting to be solicited.
5          MR. BAENA:  No, they were going to publish different
6 sorts of ads and they had to show product for the Zonolite.  It
7 was a different program, Judge.
8          MR. BERNICK:  Your Honor, in specific response to
9 your question, the cost of the TV is $2.5 million.  And that's
10 set forth in our original revised bar date notice program filed
11 in November.  That's the television, not the part of the
12 program now.
13          Non-TV, without the TV reaches 83.8 percent of
14 households already.  If you put the TV in, you go from 83 to 95
15 percent.  So you're producing a spread from 83 to 95 at a cost
16 of two and a half million dollars.  So significant is that,
17 that Mr. Hilsay in his own affidavit filed in March of this
18 year in this case specifically said that U.S. television would
19 be for ZAI and PI, not for property damage.  That was his own
20 judgment at the time.  So it's not a question of what we'll
21 represent to the Court, it's already a matter of record from
22 their own expert.  So what's essentially happening is although
23 Mr. Hilsay hasn't actually submitted something to say it, is
24 that first he didn't want to say anything about property
25 damage, nothing.  Then he said, oh, yes, property damage can

1  have a program, does not involve television.   Then we eliminate
2  everything else and now he says well, maybe we want to have
3  television.

4          THE COURT:   I truly don't see, given the reach of the
5  newspapers, the consumer magazines, the business magazines, the
6  *Wall Street Journal*, the *Parade* magazine, the debtor's website,
7  the other places, the opportunity for people to call in to the
8  debtor's establishment and get information concerning a proof
9  of claim, I don't see the need for a television ad.

10         MR. BAENA:   Well, Judge, I don't know that anything
11 you've heard or seen so far permits you to come to that
12 conclusion, respectfully.

13         THE COURT:   I have several affidavits, all of which
14 I've read, are you going to challenge the credibility of those
15 witnesses?

16         MR. BAENA:   No, I'm --

17         THE COURT:   Do I need an evidentiary hearing?

18         MR. BAENA:   Those affidavits do not parse out the
19 program we're talking about now.

20         THE COURT:   Which is what?

21         MR. BAENA:   Which is a program for traditional
22 property damage claimants consisting of both commercial and
23 residential as well as state and other government claimants.
24 And I would add, Judge, that if you look back on Celetex where
25 we had in addition to commercial residential claimants, you

1 know, the product could be used in homes, there was a

2 television component that was ordered in respect to that

3 program.

4        THE COURT:  Well, I don't know enough about Celetex

5 to know specifically what all the claims were that were being

6 addressed in any TV ad.  It seems to me that we ought to start

7 with the publication media that are here.  If it turns out

8 after getting these proofs of claims in, have to address

9 Zonolite, and Judge Woolen has to address personal injury

10 anyway.  And I'm willing to bet that as to personal injury

11 there will probably be a TV component.  I'm not sure that it

12 might not be appropriate is to revisit the issue of whether

13 that TV ad at that point should add a sentence or two about

14 additional property damage claims if it's necessary.

15        Mr. Baena, I can't imagine that there's a state or

16 federal government or a commercial vendor out there who doesn't

17 already know that Grace is in bankruptcy and that an

18 opportunity to file a proof of claim exists.

19        MR. BAENA:  Judge, you just heard a lawyer, Mr.

20 Scanlon, on the phone telling you that he filed a lawsuit

21 against W.R. Grace because he didn't know this bankruptcy was

22 filed.

23        THE COURT:  Exactly.  What I said is a commercial, a

24 governmental vendor.  I agree, there are probably people out

25 there who don't understand the implication, but it seems to me

97

1 that this program is going to get to the vast majority of
2 people who understand what Grace is, what products it uses and
3 the need to file.

4          MR. BAENA:  Respectfully, Judge, you're making my
5 point.  This is aimed at residential homeowners.  This is not
6 the commercial state or other governmental entities that --

7          THE COURT:  That's right.  This is aimed at
8 residential.

9          MR. BAENA:  That's correct.  And what I'm saying is
10 the more forms of notice we can give them, the better you can
11 assure yourself of the fact that you've done everything within
12 the requirements of due process to give people an opportunity
13 to file a claim.

14          THE COURT:  I'm not sure that even this notice
15 program is necessary, Mr. Baena, but based on the fact that Ms.
16 Casella and Mr. Hilsay both seem to think that it is, I'm
17 certainly not going to stand in the way of doing all this.
18 This is a very wide, very broad-based media program.  I'm just
19 hard-pressed to see how yet one more ad or two more ads,
20 whatever it would be in the TV program, is going to get that
21 many more people than this will get.  It seems to me that this
22 is designed to cover the universe of plaintiffs who could be
23 out there with property damage.

24          MR. BAENA:  Your Honor, you heard counsel's statement
25 about the difference in the reach.  It went from I think he

98

1  said --

2       THE COURT:  Twelve percent, yes.

3       MR. BAENA:  -- eight -- 12 percent.  Twelve percent

4  of all the homes in the United States.

5       MR. BERNICK:  Well, in fairness, we said that because

6  that was the issue that you all had raised.  But in point of

7  fact, this company has never received a residential non-ZAI

8  claim ever.  So what we're talking about is now reaching out to

9  people who have never been claimants.  And all that's required

10  is reasonable notice.  Notably also, I'm now told that in the

11  Armstrong case there was no TV notice program for the property

12  claims.

13       THE COURT:  I have difficulty seeing why that's

14  necessary.  I think if we get to ZAI or if some supplemental

15  claim period may be appropriate at some point in connection

16  with the PI claim, maybe.  But I don't see the need for a

17  separate television claim process just for this.

18       If you folks really believe that it's that necessary

19  and you want to get your professional fee budget amended so

20  that we include this notice program, if you're that strongly

21  intent on believing that this is that important, then I'll take

22  a look at redoing the entire budget that is going to be payable

23  for fees and advertising.  I'll do that if you're that strongly

24  intent on it.  But I want to know that you're that strongly

25  intent because I can't see it, Mr. Baena.

1          MR. BAENA:  Okay.

2          THE COURT:  I really can't see it.

3          MR. BAENA:  I will abide by the Court's ruling, of

4   course, Your Honor.  I do want to address what Counsel just

5   said.

6          THE COURT:  All right.

7          MR. BAENA:  Because that is a false start again.  The

8   fact that nobody sued them, you know, they keep using the word

9   "claim" to indicate the lawsuit.  What we're dealing with here

10  is a very different sort of a process that engenders claims.

11  The fact that nobody sued them because they had texture

12  materials containing asbestos in their homes is not -- is not

13  by any means the mechanism to determine whether, firstly, those

14  persons would be interested in filing a proof of claim in a

15  bankruptcy proceeding, or whether we are obligated as a matter

16  of law in a particular due process to give that person an

17  opportunity to do something.

18         THE COURT:  But it is a very good indication that to

19  date with this company having been around since the 1920s, that

20  there are very few people out there who absent some

21  solicitation by the debtor, come sue me, have done it.

22         MR. BAENA:  Judge, do you know who made the texture

23  on the ceilings in your home?

24         THE COURT:  As a matter of fact I don't nor do I want

25  to.  Thank you very much.

1          (Laughter)

2          MR. BAENA:  You may not care.  You may not care to.

3          THE COURT:  I may care, that's the problem.

4          MR. BAENA:  Therein lies the problem, Judge.  Until

5  somebody knows that the texture on their ceilings may have

6  asbestos in it and it may be harmful, how are they to know

7  whether or not to file a lawsuit, let alone a proof of claim?

8          THE COURT:  Mr. Baena, if they don't know and they

9  haven't been ill and they don't care, the fact that it's on TV

10  isn't going to get them any more to solicit claims than any

11  other group or print media will.

12          MR. BAENA:  Respectfully, Your Honor, I have to

13  respectfully say you're wrong.  You're wrong because in prior

14  cases that was exactly the mechanism that caused people to file

15  claims when there were no lawsuits pending prior to the

16  bankruptcy.

17          THE COURT:  Then give me some evidence, Mr. Baena,

18  that that's the case.  That the TV ads in whatever, Celetex,

19  caused people with ceiling or whatever, texture paint on their

20  walls or whatever the issue, comparable issue would be in

21  Celetex, to file claims as opposed to the print media.  Give me

22  the evidence and then I'll reconsider.  But for now, I don't

23  see the need for a TV ad.

24          MR. BAENA:  Very well, Your Honor.

25          THE COURT:  But if you give me some evidence, I'll

1  look at it.

2          MR. BAENA:  Very well, Your Honor.  Thank you.  We

3  will.

4          MR. BERNICK:  Your Honor, we would ask that the Court

5  enter the order.  It is Docket 1925.  It's a little "i" on the

6  last item of the agenda.  That is our revised proposed order as

7  to all the non-asbestos claims.  The only thing that's left

8  blank there which remained at issue following the dialogue that

9  took place between the debtor and the Property Damage Committee

10  was the date of the bar date.  We're asking for November 1.

11  All of the activities that are part of the bar date notice

12  program be concluded by what is it, the end of July?

13          UNIDENTIFIED SPEAKER:  Yes.

14          MR. BERNICK:  So if everything goes forward, all

15  done, done, done, end of July.  You then have August, September

16  and October, 90 days, even beyond that, and we think that

17  that's plenty of time for people to get their claims in.  We

18  would ask that the Court authorized that and fill it in as

19  November 1.

20          THE COURT:  And who is objecting to that period?  I'm

21  sorry.

22          MR. BERNICK:  I think it was --

23          THE COURT:  Okay.  Mr. Baena?

24          MR. BAENA:  Judge, just by way of background, I think

25  you should understand that when the debtor first proposed its

1  -- how it would proceed on issues like bar date, the very first

2  instance of a program engendered a notification program that

3  ran from August to November and then an April 1 bar date.  This

4  was August to November of last year with an April 1 bar date.

5  Some eight months was intended to be accomplished in terms of

6  the end of the program for notice and the date that the bar --

7  the bar date would occur.

8           When they revised their program, they adjusted the

9  dates because of the delays we were having and their new

10  program was from December to March.  And it had an August 1 bar

11  date.  Again, an extensive period between the end of the

12  program and the bar date.

13           Now, we're in a rush.  We're in a rush despite the

14  fact that Zonolite is not even on the radar screen with a bar

15  date.  We're in a rush because of personal injury claims.

16  Judge Woolen wrote to Mr. Bernick just a week or so ago and

17  told him I'm not getting into case management until I'm

18  finished with fraudulent transfer, and that's not going to be

19  heard until September.  We're in a rush though to get it done

20  for property damage.  We're in such a rush that we're only

21  going to have two months from the end of the program to the bar

22  date.  And, indeed, the program according to the flow chart

23  they provided to us runs out until the end of August giving us

24  two months.

25           THE COURT:  How much time do you think is

1  appropriate?

2         MR. BAENA:  The eight months was appropriate.

3         THE COURT:  That's an awfully long time, Mr. Baena.

4         MR. BAENA:  Well, Judge, if I can finish.

5         THE COURT:  People will forget.

6         MR. BAENA:  If I can finish and explain to you why.

7         THE COURT:  How about four?

8         MR. BAENA:  Can I explain why, Judge?  Please.

9         Firstly, you've got to look at this from the end of

10 the program forward.

11        THE COURT:  Yes, I agree.

12        MR. BAENA:  Okay.  This is the first case that

13 implicates substantial property damage where the form being

14 used is firstly a building-by-building form and exceeds by a

15 significant amount the provision of information that was

16 otherwise required by a Form 10.  The form that you have now by

17 agreement, because there was no choice but to agree candidly,

18 the form that you have now is far more extensive than anything

19 we have ever had before.  It actually moves towards the claim

20 forms that were used in the property damage facilities that

21 evolved out of confirmed plans in prior cases.  And there is no

22 way to dispute the fact that the information required is the

23 same sort of information that was required in National Gypsum

24 and the same sort of information that was required in Celetex.

25 In National Gypsum they had 18 months to fill out that form.

1  And in Celetex they had two years to fill out that form.  I'm
2  not prepared to ask for that kind of an indulgence here,
3  although I still wonder why we have this urgent need to put an
4  end to property damage when no other constituency seems to be
5  confronted with a bar date or will be confronted with a bar
6  date by the date that they're proposing.

7           THE COURT:  Okay.  It seems to me that if you want
8  more than two months or three, however the debtor calculates
9  it, that's okay.  There is no magic to figuring this out but,
10  Mr. Baena, people will put these things in their drawers and
11  they'll forget about them --

12           MR. BAENA:  Judge --

13           THE COURT:  -- and there is no point to having such a
14  long bar date that that happens.  Pick something reasonable.

15           MR. BAENA:  Judge, if that is your view of what
16  people will do, then I request you give me an evidentiary
17  hearing to prove that that's not what people do.  To prove to
18  you what goes into filling out this form --

19           THE COURT:  Mr. Baena, give me a reasonable date.  I
20  don't need an evidentiary hearing.

21           MR. BAENA:  Eight months is what the debtor
22  originally proposed.

23           THE COURT:  Fine.  Make it eight months.  It will
24  have no --

25           MR. BERNICK:  Eight months --

105

1    THE COURT:  Mr. -- it will have no bearing on the
2  outcome of this case.  Make it eight months.  By the time Judge
3  Woolen gets around to the personal injury issue and I get
4  around to the Zonolite issue, eight months will be gone.

5    MR. BERNICK:  Eight months from the commencement of
6  the notice program?

7    MR. BAENA:  No, end.

8    THE COURT:  From July -- I'm going to count the eight
9  months.  As I understand it, the notice program is to be
10 finished in July.  So August counts as the first of the eight
11 months.  August, September, October, November, December,
12 January, February, March.  It's to end March 31st if that's a
13 weekday.  Let me see.  March 31st is the end of the notice
14 program.

15    In exchange, Mr. Baena, I expect that all these
16 people are going to have the documents.  Not fill out something
17 saying I'm still trying to get them.  That's the difference in
18 what Celetex and Gypsum required and what I required in this
19 case.  So if they come in without a lot of documents, you can
20 expect that there will be some --

21    MR. BAENA:  Judge --

22    THE COURT:  -- unhappiness on behalf of the Court.

23    MR. BAENA:  -- in Celetex -- in Celetex, which is the
24 most recent of the two, the property damage claims
25 administrator was invested with the authority to continuously

1  extend the period of time for providing that documentation.

2  And he did --

3        THE COURT:  And that may be the case in the event

4  that we have a confirmed plan.  But we're trying to do is get

5  there, Mr. Baena.  So don't ask for an extension for now

6  because I think this is perfectly feasible for the information

7  that's requested in the form.  If it turns out not to be

8  because you need additional notice, as I've already said three

9  times, I will reconsider it then, not now.

10       MR. BAENA:  Judge, the flow chart they provided shows

11 that their program goes through August for Canada --

12       THE COURT:  Then it's seven months.

13       MR. BAENA:  For Canada.

14       THE COURT:  Seven months is still reasonable if

15 that's the case.  I've counted from August.  I've already

16 written it in in two places.  March 31st is long enough, Mr.

17 Baena.  I can't imagine how people cannot fill out this proof

18 of claim form after seven months from the time that the notice

19 program ends.

20       MR. BAENA:  Because they're required to give product

21 identification, Judge.

22       THE COURT:  Yes, and they will.  I'm convinced that

23 they will.

24       MR. BAENA:  And that requires constituent analysis

25 and it's going to be very difficult, Your Honor.

107

1          THE COURT:  If they need an extension on an
2    individual basis, I'm sure they'll ask for it.  The form
3    already gives them the opportunity to do that.  I want to see
4    the documents.  This is long enough, Mr. Baena.
5          MR. BAENA:  Thank you, Your Honor.
6          THE COURT:  Everybody has the opportunity to ask for
7    bar dates to be extended.  They typically do.  We'll see.
8    Let's see what happens by March 31st.  For now, that's the bar
9    date.
10          I see it three times.  How many other times is it
11   here?
12                    (Pause)
13          All I have here is the order.  So if it's blank in
14   the notice, I don't have the notice date.  Okay.
15                    (Pause)
16          Well, are you going to be typing these to send them
17   out anyway, the notice issues?  Because if you are, there's no
18   sense in my taking the time to write this date in 500 times.
19          MS. BAER:  Ultimately I believe the printer will do
20   something with them, but I would think that they would take a
21   picture of yours and make the print and make it look --
22          THE COURT:  Okay.
23          MS. BAER:  So I'm not sure.
24                    (Pause)
25          THE COURT:  Okay.  Well, I filled in today's date on

1  the claims' bar dates and the date notice on the first line.   I

2  found March 31st, 2003 on Page 2 at the top of the page under

3  the words "Under the bar date, order of the Court established

4  the following bar date."   I see it again in Paragraph 5 on Page

5  5 where it says, "For all claims return the completed proof of

6  claim form to the claims processing agent no later than March

7  31st, 2003."   That's the only place in the notice that I see

8  the date.   Did I miss any?

9           MS. BAER:   I believe that's correct, Your Honor.

10          THE COURT:   All right.   Then in the order there is a

11 blank space on Page 2 about two-thirds of the way down the page

12 where Paragraph D says, "A bar date of March 31, 2003."

13          There is a blank space on Page 3 in the first ordered

14 paragraph after the words "Bankruptcy Rule 3003(c)(3)."

15          There is another in the fourth ordered paragraph

16 under "B," the March 31, 2003 bar date.

17          Those are the only ones I see in the order.

18          MS. BAER:   I also believe that's correct, Your Honor.

19          THE COURT:   Okay.   I'm entering this order.   This

20 record stands for the fact that if there is some evidence that

21 television is going to be such a much better method, I stand to

22 reconsider this order.   If, in fact, there is evidence that not

23 all people -- not all, we'll never get all people, not a

24 reasonable number of people who may be subject to filing claims

25 against the debtor's estate have been reached, I will at that

1  point later in this process consider an extension if that is

2  necessary.

3          I think the record is clear.  I'm not going to put it

4  in here, I don't want to confuse the people who are going to

5  get this notice.  But this is the record.  It is part of my

6  order.

7          MR. BERNICK:  The last leftover item --

8          THE COURT:  Yes.

9          MR. BERNICK:  -- was the medical monitoring complaint

10 which there's agreement we dismiss without prejudice now that

11 Your Honor has gone ahead and approved and signed the program

12 for the notice of bar date with respect to those claims.

13         THE COURT:  Yes.  This is with respect to item number

14 six.

15         MR. BERNICK:  Right.

16         THE COURT:  Okay.  That order is signed so that

17 adversary action is dismissed without prejudice.

18         MR. BERNICK:  That's it.

19         THE COURT:  Okay.  Any housekeeping matters?

20         All right.  Anything else that we need to address

21 back to the whatever issue has been left unstated on this

22 record?

23         Okay.  See you in May.  Thank you.

24                      *  *  *  *  *

25

110

## CERTIFICATION

I, PATRICIA A. KONTURA, certify that the foregoing is a correct transcript to the best of my ability, from the electronic sound recording of the proceedings in the above-entitled matter.

*Patricia A. Kontura*                          Date:  April 25, 2002

PATRICIA A. KONTURA
J&J COURT TRANSCRIBERS, INC.

J&J COURT TRANSCRIBERS, INC.