1    actually implicate other matters for other clients that are not

2    even here.

3        Just as one example, I've got a request here that says

4    most of the requests were made of my firm, I note that there were

5    12 requests made of my firm and only two of my client, so, they

6    obviously are going for the lawyers here, which is fine, we can

7    all play that game, but in two other requests it says -- get this

8    -- with respect to --

9        THE COURT:  That is a key word.  You just used an

10   operative word.

11       MR. BERNICK:  What was that?

12       THE COURT:  Game.

13       MR. BERNICK:  That is your Honor's observation.  I will --

14       THE COURT:  It's your word.

15       MR. BERNICK:  Okay.  Well, that's true.  That's true.

16   Paragraph five of the request to my firm says with respect to the

17   five asbestos cases in G-1 Holdings -- I understand that -- any

18   and all documents concerning communications with or between or

19   among you -- that's me -- or Kirkland and any party, counsel or

20   representative of any party involved in any one of the five

21   asbestos cases or G-1 Holdings.

22       Well, that's just all of my files for the last three

23   years, any one of those cases, and then I got requests that are

24   not even confined, says any and all documents concerning any

25   communications with or between or among you, Kirkland, and Judge

1    Wolin.  Well, that's interesting.  I've not really inquired of my

2    partners, who have had other matters before your Honor, either

3    currently or in years past, and the interests of those clients,

4    whatever those clients might be, so, that's why I say fundamental

5    proposition number one is that we have got a real difficulty here

6    because, A, all the discovery has not been shared and, B, the

7    interested parties here haven't really been identified given the

8    scope of this problem, and I can make objections on behalf of

9    Grace but I don't know that I can make objections on behalf of

10    other parties that might be interested and implicated here,

11    number two.

12        So, the first step seems to be all the pleadings have got

13    to get circulated so at least people know what has been requested

14    on its face.

15        Number two, it seems to me in order to address the issue

16    of relevance, while I understand that your Honor is basically

17    saying that issues about the discovery requests are going to be

18    resolved by another judge, and I understand and appreciate that,

19    nonetheless, I think that there is a fundamental problem if your

20    Honor wants to set a schedule here that's going to be binding on

21    the parties, that there be some process built into this schedule

22    such that the process of resolving objections before the other

23    judge is rational and follows the flow of what the Third Circuit

24    has directed us to do.

25        THE COURT:  I agree with you.  It's a two-fold process.

1    I'm going to have to draw the line as to what will be permitted

2    in terms of discovery.  If there's then a dispute about a

3    particular document, somebody says it's work product, somebody

4    says it's privilege, somebody says it's not relevant, whatever,

5    that judge will then decide that issue.

6         MR. BERNICK:  Very well.

7         THE COURT:  Obviously, from what I've heard this morning,

8    this Court is going to have to draw the hard line and trim the

9    herd.  I understand.

10         MR. BERNICK:  And what I would propose, what I would

11    propose is a way of sequencing that might aid in that, and I

12    don't know whether it does or not but at least I'll just put it

13    out there, is that the fundamental issue that's raised certainly

14    by the motions that have been filed in the Grace case and in the

15    Owens Corning case is whether these advisers, in fact, were

16    conflicted or reasonably could be construed as being conflicted,

17    and as we pointed out in connection with our papers before the

18    Court of Appeals, that fundamentally is going to come down to the

19    question of what these advisers actually did, what they were

20    asked to do.

21         It is true that your Honor, in providing notice to the

22    parties in all five cases, specifically laid out a very broad

23    potential palette of things that they might be asked to take on,

24    but at the end of the day the question is, well, what did they

25    actually do, and the reason that Grace took the position that it

1    did is that based upon what Grace knew, it did not appear that

2    either Hamlin or Gross had been asked to do things that

3    implicated the interests of future claimants, which is what

4    allegedly gave raise to the potential conflict.  So, there's this

5    fundamental issue of a conflict.

6        All this focus on ex parte communications was acknowledged

7    both by counsel for Owens Corning, counsel for the movants of

8    Owens Corning and counsel for the movants in the Grace case as

9    being really ancillary to the question of whether there was a

10    conflict to begin with, because they recognized that the ex parte

11    procedure was adopted.

12        THE COURT:  There's probably no one sitting in this room

13    who represents a constituency in any of the five jointly

14    administered cases that did not avail itself of a request to meet

15    with the Court in an ex parte conference such as on September 24,

16    Mr. Neal was present with Mr. Devereaux, with Mr. Foot, with your

17    general counsel to advise the Court of your perspective of the

18    case, and this Court has said in documents to the Circuit Court

19    of Appeals, Mr. Neal takes me to task on the use of the word

20    innumerable, but if you take five jointly administered cases and

21    you have five debtors and you have five groups of creditors and

22    you have five personal injury claimants, you're up to 15

23    conferences.

24        Almost everyone in this room who represents a major

25    constituency has seen this Court on an ex parte basis and many of

1    the people who are seated in this room are representatives of

2    petitioners in these cases.

3         MR. BERNICK:  Your Honor, I would propose the following.

4    Thinking of what the Court of Appeals has said and thinking of

5    the posture of current motions that are before the Court and the

6    proposals that have been made, it seems to me that the very first

7    and most important task is to take discovery of Messrs. Gross and

8    Hamlin.  They're the two advisers who are alleged to have a

9    conflict of interest that gives rise to the recusal motions in

10   the Grace case and in the Owens Corning case, and that ought to

11   be absolutely the top priority, that the sequencing ought to

12   begin there.

13        It further seems to me that those depositions and that

14   discovery --

15        THE COURT:  Can I add to that?  Gross, Hamlin and any

16   documents that they possess that would be relevant to the

17   conflict that Mr. Orseck alleges on behalf of Kensington.

18        MR. BERNICK:  Okay.  Very well.  Secondly, and that's a

19   top priority, at the same time --

20        THE COURT:  And by the way, if I can interrupt you again,

21   more than likely a lot of that is already in the public domain

22   based upon the filings of Gross and Hamlin in terms of the fee

23   applications, they attached affidavits and all of that, so, I

24   don't know what they have, but one would think that much of it is

25   in the public domain.  As it is what this Court has issued in the

1   190 orders, case management orders that are all on the web site,

2   much of it is there.

3        MR. BERNICK:  I would think that at the same time as that

4   discovery is going forward, discovery can take place with respect

5   to the issue of what the movants knew about the matters that have

6   now been raised in their recusal motions, and the reason I say

7   that could be taken up simultaneously, it doesn't really depend

8   upon the outcome of the depositions of Gross and Hamlin.  It is

9   simply a question of what the clients knew, so, to the extent Mr.

10  Monk has proposed there be some discovery with respect to what it

11  is that the movants knew in the Owens Corning case and to the

12  extent we would seek the same information from the movants in

13  the --

14       THE COURT:  That raises a concern and the concern that is

15  raised is Mr. Englert may say, I represent Kensington, I want to

16  take Grace's deposition, and at the same time somebody wants to

17  take Brodsky's deposition and Englert says, hey, he's my primary

18  client, I got to be there.  I don't know if that's a problem.  I

19  don't know how deep Mr. Englert's firm is.  I don't know if Mr.

20  Orseck is prepared to sit in one and take the other.  I just

21  don't know the answers to that at this time.

22       MR. BERNICK:  They are the movants and they come from -- I

23  mean, this is the argument that I always hear.  I'm sitting over

24  there and there's a concern about the burden on my client.  These

25  are significant firms and they are the movants.  They're the one

1   who have raised this issue.  I know they're very focused.

2          THE COURT:  I know nothing about Mr. Englert's firm.  I do

3   not know how deep it is.  Mr. Orseck, how large is your firm?

4          MR. ORSECK:  Your Honor, we have 11 lawyers in our firm

5   but we are fully prepared to take the discovery that's necessary

6   over the next two weeks.

7          THE COURT:  So, I shouldn't be concerned whether you or

8   Mr. Englert are present at any given deposition?

9          MR. ORSECK:  We will cover all the depositions that will

10  be taken --

11         THE COURT:  Okay.

12         MR. ORSECK:  -- over the next several weeks.

13         THE COURT:  Okay.  Fine.  I appreciate your comment.

14         MR. BERNICK:  It would seem to me that beyond that

15  discovery, when it comes to the central issue of whether there is

16  a conflict or an appearance of impartiality that arises from the

17  appointment of Hamlin and Gross, that Hamlin's deposition,

18  Gross's deposition, the documents that you've indicated, and then

19  finding out what the movants knew really comprise the core

20  discovery that really is relevant to the matters that are before

21  the Court in the Owens Corning and in the Grace case.

22         Now, in the Grace case there's also the issue of the

23  application for the appointment of Mr. Hamlin.  It seems to me

24  that that is a derivative and irrelevant matter unless there's a

25  conflict to begin with.  If there's no conflict, then I don't

1  know what the basis is for seeking discovery about how the

2  application came to be.  That application has been withdrawn.

3  The application itself no longer supports discovery, but we would

4  abide by whatever your Honor would determine as being the

5  appropriate discovery with respect to that issue with one caveat

6  which I haven't gotten to yet and that is privilege.  Privilege

7  is a big issue.  Grace is not waiving any privileges that it

8  might have at this point in time and no showing of particularized

9  need for discovery of lawyers and discovery of privileged

10  information has been made at any point in time, and we're not

11  waiving privileges, so, I would think again you'd begin with the

12  core discovery and then, based upon that core discovery, if your

13  Honor is satisfied or the Chief Judge is satisfied that there is

14  a legitimate issue concerning conflict, then they can talk about

15  the Hamlin application.  I don't think they're going to get very

16  much there that's useful, but let me just finish up one further

17  point in the procedural proposal.

18      With respect to USG, USG raises ex parte communications as

19  being a broader issue.  I'm not going to speak to that because I

20  don't know that any of the discovery that USG has sought relates

21  to my client at all, so, I'm not going to sit there and take on

22  what USG is saying, it would not be appropriate, but it does seem

23  to me that there might be a need for some discovery that is

24  designed to deal with the USG motion that goes beyond what it is

25  that I've proposed here.

1              The procedural proposal is this.  If we begin with Gross,

2      Hamlin, the documents and then --

3              THE COURT:  Why do you leave Brodsky out?

4              MR. BERNICK:  -- and discovery of what the movants knew --

5              THE COURT:  From the Court's point of view, that when you

6      read the Circuit Court of Appeals' opinion, they're talking about

7      what did Kensington know, when, where, affidavits, you know, and

8      so, it seems from my reading it, they would be interested in this

9      record on what Hamlin had to say, what Gross had to say, what

10     Brodsky had to say, and the documents that accompanied them,

11     subject to privilege.

12             MR. BERNICK:  Right, subject to privilege.  Then the

13     question becomes not whether at that point I think it would be

14     premature to say there's no more discovery.  I think candidly,

15     you've got these long lists, these different kinds of proposals,

16     but at that point with that core discovery in place, I would

17     think that under the Court of Appeals' directions, and

18     particularly in light of the statements that were made by counsel

19     to the Court of Appeals on this very issue, that the burden then

20     becomes an extraordinarily high burden for any further discovery

21     whatsoever.

22             THE COURT:  Mr. Bernick, I know what Mr. Englert replied

23     on page 65.  I don't recall, and perhaps you can remind me, did

24     anyone else in their argument before the Circuit Court of Appeals

25     address discovery?  I don't think Mr. Neal did but I don't want

1    to speak for him.

2         MR. BERNICK:   I'm not aware that anybody else addressed

3    discovery.   I'm not aware that anybody else -- there were a lot

4    of questions that were asked I believe of other counsel about the

5    need for proceeding promptly.   Nobody else stood to their feet to

6    say I disagree with Mr. Englert and there's a need for much more

7    discovery and, therefore, it can't be a -- not that he actually

8    said it, this could all be done in two or three weeks, and nobody

9    stood to say that that was not going to be achievable.

10        Again, I want to emphasize, your Honor, Grace has taken

11    the position that we believe that this matter should be explored.

12    If they're moving for recusal, they should have the burden of

13    coming forward with the facts that show that there's an actual or

14    perceived conflict here.   It is their burden and they hadn't

15    borne it by the time they went to the Court of Appeals.

16        It is Grace's position that if they conduct discovery of

17    Gross and Hamlin and it turns out Gross and Hamlin were doing all

18    kinds of other things in connection with the Grace case that we

19    weren't aware of, we're not saying that they could never meet

20    their burden, but the point is that they ought to focus on what

21    they, themselves, said was the key issue, which is the

22    appointment of these advisers, and establish that their original

23    petition to the Court of Appeals which was based upon those

24    advisers was well-founded before we start to go off and take

25    discovery of every law firm in New York City with respect to

1  matters that may not even be confined to these cases.

2       So, our proposal is to begin with the core material and

3  then adopt a very, very high threshold, no other discovery until

4  they make a particularized showing of need based upon a theory of

5  relevance that's encompassed by the Court of Appeals' papers.

6       THE COURT:  All right.  Thank you, Mr. Bernick.  I'm going

7  to finish on that side and then I'm going to come to your side.

8  Mr. Inselbuch.

9       MR. INSELBUCH:  This has never happened before but I

10  believe I agree entirely with Mr. Bernick.

11       THE COURT:  If you remember, in the Federal-Mogul argument

12  in Delaware, I directed you to give Mr. Bernick your telephone

13  number so he could call you.

14       MR. INSELBUCH:  Yes, sir.

15       THE COURT:  Okay.

16       MR. INSELBUCH:  I will make one further point for the

17  reasons why I think Mr. Bernick is correct.  The fundamental

18  issue that was raised by the Kensington petitioners had to do

19  with the appointment of Mr. Hamlin and Mr. Gross.  It didn't have

20  to do with Mr. Keefe, it didn't have to do with Mr. Dreier, it

21  didn't have to do with Mr. McGovern.  There's been no reference

22  to the activity of those three advisers at any point in any of

23  these papers, and I think Mr. Bernick is quite correct that now

24  that you have ordered all of your five advisers to file in open

25  court a litany of their activities --

1       THE COURT:  Under oath.  Not necessarily in open court,

2   under oath.

3       MR. INSELBUCH:  Yes, your Honor.

4       THE COURT:  But I think we did put them on the web site

5   and I know that Mr. Pernick distributed them to everybody.

6       MR. INSELBUCH:  I think counsel should be free now to take

7   the depositions to the extent they want to have Mr. Hamlin and

8   Mr. Gross, see what, if anything, they want to find out in

9   addition to that material, find out if there are any documents

10  that Mr. Hamlin and Mr. Gross generated that are relevant to

11  these issues.

12       Mr. Neal, in his papers, creates a whole 'nother issue.

13  He states that there's something about the fact of these ex parte

14  communications which, of course, this Court announced would take

15  place on the very first day this Court convened all five of these

16  bankruptcies in this building I think over two years ago.  It is

17  a matter of public record, as your Honor has said, that every

18  member, every constituency in this case has had access to the

19  Court on that basis at one time or another.

20       I think it is impossible within the time frame we're

21  talking about to examine into each and every such occasion,

22  particularly if we're going to seek document discovery on what

23  might have been written about what might have been said on those

24  occasions.  We will involve all kinds of issues of privilege and

25  work product as well, and at the end of the day, at the end of

1   the day we will have nothing more than a detailed list of what

2   those meetings were.

3        There's no dispute that they took place, there's no

4   dispute really about the order of magnitude of those meetings,

5   and I see no point in having that discovery.  The Court of

6   Appeals, in its suggestions for what the discovery should deal

7   with, said nothing at all about that.  It talked about the

8   activities of Mr. Gross and Mr. Hamlin.  It talked about the

9   timeliness of the petitions, and those, as Mr. Bernick said,

10  should be the focus of discovery if we're ever to get to an

11  evidentiary hearing on the schedule that the Court of Appeals has

12  set.

13        THE COURT:  Thank you.  Mr. Crames.

14        MR. CRAMES:  Your Honor, there's already an over-burdened

15  record.  I will try not to burden too much more.

16        THE COURT:  No.  You do whatever you have to do, and that

17  applies to everyone.

18        MR. CRAMES:  I would just add one or two points, your

19  Honor.  There's an old expression which this discovery request

20  scenario suggests to me; namely, it's become absurdly too gross

21  to be insisted upon, and I use "gross" in a different context.

22        Your Honor, it is nothing short of absurd because it

23  totally diffuses what focus I think this accelerated process has

24  to have, and I think Mr. Bernick and Mr. Inselbuch put their

25  finger on it.

1          The issue of the advisers boils down to two of the

2     advisers, not all five.  It is a narrowly focused area which I

3     submit to your Honor the time records that have been submitted by

4     all parties, including them, deals with those issues.  I don't

5     know what more can be added to it.

6          I'm not objecting, don't misunderstand me, to discovery of

7     Mr. Gross and Mr. Hamlin, but their time records as well as that

8     which is very much a matter of public record in this case and in

9     G-1 speak volumes, it seems to me.

10         As far as the ex parte communications are concerned,

11    there, too, the time records of all parties, including all of the

12    law firms that represent the parties in these cases, reference

13    such conferences as took place with everybody involved.

14         THE COURT:  I think the original petition filed by

15    Kensington on October 15 had an appendix attached to it with time

16    records, Gross, Hamlin, G-1, this case.

17         MR. CRAMES:  It did indeed, your Honor.

18         THE COURT:  So, I think that information is out there.

19         MR. CRAMES:  Of course it is, as are all the fee

20    applications that are filed by our firm, Mr. Inselbuch's firm and

21    every other firm that is involved in each of these five cases, as

22    the bankruptcy rules and U.S. Trustee guidelines dictate, and

23    they reference the many status conferences that we had before

24    your Honor as well as the conferences, most of which took place

25    with multiple parties in chambers and I, myself, Mr. Inselbuch,

1    Mr. Neal and Mr. Devereaux participated in many of those directly

2    with your Honor in the USG case, and all of our time records,

3    which I frankly have not perused and I don't intend to, but they

4    are there for all of those law firms.  They reflect what

5    transpired.

6         So, when we see a list of 28 or however many parties are

7    to be deposed, most of whom are lawyers and their law firms, it

8    is nothing short of ridiculous.  It is irrelevant.  It diffuses

9    the focus and, in my humble opinion, it is directly antithetical

10   to what the Third Circuit directed all of us and this Court to do

11   in an extraordinarily short time frame.  So, I subscribe to what

12   has been suggested by Messrs. Bernick and Inselbuch.

13        THE COURT:  All right, Mr. Crames.  Thank you very kindly.

14   Mr. Monk.

15        MR. MONK:  Your Honor, I think Mr. Bernick has made a good

16   suggestion in terms of priority.  I would point out, and I think

17   it was based upon the Court's questioning also, the Court's view

18   that we need to proceed at the same time that any depositions of

19   Mr. Hamlin or Mr. Gross are taking place with first document

20   discovery with respect to the notice issue and then, obviously,

21   we would want to look at those before we tried to take

22   depositions of Mr. Brodsky or anyone --

23        THE COURT:  If the Court is going to be consistent in its

24   ruling in light of all the demands, you may be severely limited

25   in the discovery that you've requested.  You've got subpoenas

1    duces tecum out there.  Unless it's limited to the issue of

2    notice --

3         MR. MONK:  Your Honor, we believe our subpoenas are

4    limited to the issue of notice.

5         THE COURT:  Well, I don't know what they say.  I haven't

6    seen them, but if I'm going to circumscribe certainly the

7    petitioners, I'm certainly going to circumscribe you as well and

8    I'm going to try and comply with the mandate of the Circuit Court

9    of Appeals.

10        MR. MONK:  I understand, your Honor.  We would point out

11   that Kramer Levin's time records, unlike the other parties in the

12   Owens Corning case that all filed fee applications and,

13   therefore, our time records are incorporated in connection with

14   the fee application, Kramer Levin, as counsel to the bank group,

15   pursuant to agreement reached resolving our original lawsuit

16   against the bank group, simply provides to the debtor its bill

17   and the debtor pays that bill.  They don't make a --

18        THE COURT:  Don't you have that?

19        MR. MONK:  We do.  Those time records are not at the same

20   level, we do not believe, as time records would be for fee

21   applications.

22        I would also like to point out to the Court that Kramer

23   Levin's affidavit, Mr. Eckstein's affidavit was filed in the

24   Third Circuit in connection with the petition and, therefore, the

25   petitions here, Kensington and Springfield, have waived the

1  attorney-client privilege to the extent that they have called

2  upon the testimony of their lawyer, so, I think it puts them in a

3  very different category than those of us who have not waived the

4  attorney-client privilege and are now being told that they must

5  respond.

6         THE COURT:  Let's take Mr. Eckstein as an example.  If I

7  were to permit his deposition, how long do you want to depose

8  him?  It's basically a question of what did he know, when did he

9  know it, and was it communicated.

10         MR. MONK:  Yes, correct.

11         THE COURT:  How long should that deposition take?

12         MR. MONK:  I would think it's a morning.

13         THE COURT:  A full morning?

14         MR. MONK:  Well, I haven't seen the documents, the

15  underlying documents from Kramer Levin.  There are really two

16  sources of records that are going to be relevant from Kramer

17  Levin, the time records in the Owens Corning case and in the G-1

18  case, and also the files in the G-1 case.

19         I believe that we will find a copy in Kramer Levin's file

20  of the appointment order from the G-1 case for Mr. Hamlin and Mr.

21  Gross because they were monitoring that case on behalf of their

22  client, Bear Stearns.

23         THE COURT:  What if Kramer Levin subscribes to the Daily

24  Deal and one or two other bankruptcy organs and it comes to the

25  firm, is that notice?

1      MR. MONK:  Well, that's certainly access to public

2  information, your Honor.  I believe that if my office receives a

3  pleading in a case in which I've entered my appearance, that I am

4  charged with notice as a consequence, and as a matter of law, I'm

5  charged with notice as a consequence of the receipt of that

6  pleading.

7      I did not see in Mr. Eckstein's affidavit where he said he

8  did not receive a copy of those pleadings, and I do know his law

9  firm's appearance was entered during that period of time.  I'd

10  like to see those documents.

11      THE COURT:  Other than what may have been filed in that

12  document that accompanied the petition on October 15, and I don't

13  know if I looked at every document in there, it's my

14  understanding that the orders of Judge Gambardella appointing

15  both Hamlin and Gross were filed in the ordinary course of

16  business and were not sealed, were unsealed for the world to

17  know.

18      MR. MONK:  That's correct, your Honor.

19      THE COURT:  It's out there.

20      MR. MONK:  That is correct.  And the question, I actually

21  had this colloquy with Judge Fuentes and Judge Garth during the

22  argument and I made the argument that the Martin case, which is a

23  case that says even if you didn't have actual knowledge, you

24  could have constructive knowledge from the public record, was

25  sufficient.  They still suggested that we conduct discovery on

1    this subject, so, that suggests to me that I need to, to the

2    extent I possibly can, nail down what the actual information

3    available to Kramer Levin -- actually what Kramer Levin's role

4    was with respect to Mr. Brodsky.

5        THE COURT:  Does anybody know, because I don't know, who

6    represented -- I'm not talking about in this matter, Mr.

7    Englert -- who represented Mr. Brodsky back in late 2002, as we

8    started to get ready to try the Owens Corning matter?  I don't

9    know who represents Mr. Brodsky.  I don't know if it's Eckstein,

10   Kramer Levin.  I don't know if it's Davis Polk or some third

11   party.  I just don't know.

12       MR. MONK:  I can tell you what the state of the record is.

13       THE COURT:  Okay.  Tell me the state of the record.

14       MR. MONK:  The state of the record is that there was a

15   stipulation filed in the Bankruptcy Court in connection with the

16   inter-creditor project which was the lead-up, if you will, to the

17   substantive consolidation trial in which Kramer Levin stipulated

18   that it was counsel to CSFB and the bank group, and the members

19   of the bank group is actually the words of the stipulation, and

20   then that was reduced to a form of order signed by Judge

21   Fitzgerald.

22       We also know that Mr. Brodsky is a member of the bank

23   group's steering committee.  We don't know this from any public

24   record source but because he's told us that and we've been

25   dealing with them, as the Court is aware, in trying to resolve

1   this case over a period of time.  The bank steering committee

2   directs the bank agent under the bank credit agreement as to what

3   conduct it must take, so --

4       THE COURT:  So, the bank agent being CSFB and Kramer

5   Levin.

6       MR. MONK:  Correct.

7       THE COURT:  Okay.

8       MR. MONK:  And we also know from looking at the time

9   records we have seen from Kramer Levin of a number of

10  communications between Mr. Eckstein and Mr. Brodsky.  Now,

11  those -- if Mr. Brodsky is not his client, and when I say Mr.

12  Brodsky, I mean Springfield and Kensington, because Mr. Brodsky

13  is a principal of Elliott --

14      THE COURT:  I'm asking this question because I want to

15  know how far-reaching the discovery must be.  You know, for

16  example, you named Mr. Case, Davis Polk.

17      MR. MONK:  Yes, your Honor.

18      THE COURT:  If Mr. Eckstein assumes all these roles, then

19  potentially you don't need Mr. Case's deposition.

20      MR. MONK:  Correct.  We would approach it beginning with

21  Kramer Levin and then working back towards the committee, I

22  think, if we were to take a deposition.

23      The question with respect to the Official Committee turns

24  upon the legal question of what the relationship is between CSFB

25  as agent for the bank group, Springfield and Kensington as large

1    owners of the bank debt, and members of the bank group steering

2    committee, Mr. McDonough, as co-chairman of the Official

3    Committee and a member of the bank steering group, Mr. Kofol from

4    CSFB, a member of the Official Committee in his capacity as

5    CSFB's actor, and the communications that the Official

6    Committee's counsel, Mr. Case, had with his Official Committee

7    members about the status of the G-1 case.  We know that they

8    charged the debtor's estate, that Owens Corning, in fact, paid

9    for active weekly monitoring of the G-1 case as well as all the

10   other asbestos-related --

11        THE COURT:  Who paid?  I'm sorry.

12        MR. MONK:  Owens Corning, your Honor.  They filed a fee

13   application from Davis Polk in which they entered time to

14   monitoring of the G-1 case.  They spent 5. -- we have 5.4 hours

15   of what we assume is paralegal time charged by Davis Polk in

16   reviewing your Order appointing the five advisers in December of

17   2001.

18        THE COURT:  Davis Polk, as I understand it, though,

19   represented the Creditors Committee which was made up of both the

20   banks and the bonds.

21        MR. MONK:  Correct, your Honor.  We believe if we were to

22   obtain discovery, that we would learn that Davis Polk reported

23   what it learned in monitoring the G-1 case to the members of its

24   committee, including CSFB and J.P. Morgan Chase.

25        THE COURT:  So, as to the notice issue, and that's what

1    I'm concentrating on --

2         MR. MONK:  Right.

3         THE COURT:  -- the notice issue, you would need the

4    testimony of Eckstein and Case.

5         MR. MONK:  And well, and obviously, Mr. Brodsky as well.

6         THE COURT:  Well, leaving Brodsky aside.

7         MR. MONK:  Yes.  But from the lawyers' perspective, we

8    would want to know the details of the report regarding the G-1

9    case.  We know that they were billing time records to it.  We

10   know that they were maintaining a log because we can read that in

11   Davis Polk's time records.  We believe that there were regular

12   reports at the Creditors Committee meeting.  We'd like to know

13   what those reports were.

14        THE COURT:  Okay.  I understand.

15        MR. MONK:  Thank you, your Honor.

16        THE COURT:  All right.  I think we're over the

17   petitioners' side.  Mr. Orseck.

18        MR. ORSECK:  Your Honor, I think we agree that the notice

19   issue is the area and I suggest the only legitimate area for

20   discovery by the other side.  That's what the Third Circuit

21   listed and they are entitled to discover the question whether

22   there was actual knowledge of the appointment in the G-1 case.

23        Beyond that, I think I probably disagree with virtually

24   everything that Mr. Bernick said, and let me start with a point

25   at which he finished and that was, there's been some discussion

1    about our position and my partner, Roy Englert's, position in the

2    Third Circuit as to what discovery would be necessary if

3    discovery were to happen.

4        Our position in the recusal motion and in the Mandamus

5    petition was that there was a structural conflict for Messrs.

6    Gross and Hamlin; that is, they served as neutral advisers here

7    and they served as partisans representing potentially overlapping

8    clients in another case.  So, what Mr. Englert argued to the

9    Third Circuit was that it need not go any further.  We asked for

10   a Writ of Mandamus to recuse the District Court on that basis.

11       The Third Circuit, however, has decided at least for

12   purposes of this remand to do --

13       THE COURT:  And by the way, I didn't argue with you.

14       MR. ORSECK:  I understand that.

15       THE COURT:  I wanted the Third Circuit to decide it.

16       MR. ORSECK:  And I recall that you did, your Honor.  The

17   Third Circuit said, without resolving I think particularly the

18   legal issue that was before it, it said that with respect to

19   Section 455(a), the question is would a reasonable person in

20   possession of all the relevant facts deem there to be an

21   appearance of impropriety.

22       THE COURT:  By the way, 455(a) doesn't really read that

23   way.  Adding in "knowing all the facts" is judicial gloss that

24   has been put on 455(a).

25       MR. ORSECK:  I am paraphrasing and I don't have it in

1    front of me.  My point is, however, that we did not argue to the

2    Third Circuit that the only relevant discovery is discovery of

3    Gross, Hamlin and Grace.  Certainly those are relevant but it is

4    certainly -- it is transparently relevant whether either of those

5    two advisers had discussions with the other three advisers and

6    had discussions with the Court as to whether there is the

7    conflict.  Now, the conflict I'm talking about now --

8         THE COURT:  Your premise doesn't change regardless of how

9    much discovery you take.  Your premise is there's a structural

10   conflict and, so --

11        MR. ORSECK:  That's true.

12        THE COURT:  It doesn't matter what Gross said or Hamlin

13   said or didn't say.  Right?

14        MR. ORSECK:  That is our position.

15        THE COURT:  Extensive discovery isn't going to change

16   that.

17        MR. ORSECK:  That's correct.

18        THE COURT:  That's your argument.

19        MR. ORSECK:  That's our argument.  But the Third Circuit

20   in its remand said, among other things, discovery will illuminate

21   the following four points, but it did say, the Third Circuit,

22   that it would like to address this issue, and that issue being

23   whether structural conflict is enough or whether actual advice

24   that is tainted by conflict is required.  It wanted to evaluate

25   that question with a full record before it.

1          Now, what I hear Mr. Bernick suggesting is that we have to

2     meet a threshold showing before we are entitled to the discovery

3     that the Third Circuit said would be appropriate on the remand.

4     So, he says we ought to start with Gross and Hamlin, we ought to

5     take all of the discovery that the other side is entitled to as

6     to the timeliness issue, and then let us come back in what

7     amounts to a couple-of-weeks-long period, let us come back then

8     and tell the Court why we need deposition "X" or deposition "Y".

9     That puts the cart before the horse.  That is not at all what the

10    Third Circuit suggested we do.

11         Now, I am not for a minute standing here and suggesting

12    that we intend to run wild with discovery and take unnecessarily

13    long depositions and have duplicative questions.  I think there

14    are a lot of good lawyers here who can focus on what the

15    important issues are, who can agree on what the depositions ought

16    to be, who can resolve privilege issues and take them up with the

17    judge, as you've suggested, if and when they arise.

18         I think it is not appropriate to curtail the discovery in

19    a manner going forward at this hearing without having any

20    particular issue before the Court.

21         THE COURT:  Okay.

22         MR. ORSECK:  So, I would disagree with that.

23         THE COURT:  I understand your argument.

24         MR. ORSECK:  I also, I will leave to Mr. Neal discussion

25    about the discovery on the ex parte issue and I will only repeat

1    what Mr. Englert said in the Third Circuit, that the question

2    whether there were ex parte communications on one side as well as

3    the other is not determinative as to whether there is a problem

4    under Section 455(b).

5         So, your Honor, just to wrap up, we have submitted a

6    discovery schedule that is not in significant respects different

7    from what the other side has suggested.  We have suggested

8    documents exchanged by January 2nd, which we think will be

9    difficult for all involved but doable.  We will then have two

10   weeks for depositions under the Court's supervision.  There will

11   then be a simultaneous exchange of briefs and to the extent the

12   Court wanted to hear argument or evidence, there will be a week

13   or more left to accomplish that.  That's our position.

14        THE COURT:  All right.  Mr. Neal.

15        MR. NEAL:  Your Honor, at the Third Circuit argument, I

16   was not asked the question about what discovery we would need in

17   support of our motion and Mr. Englert was asked that question

18   during his rebuttal, so, the question was never put to me.

19        THE COURT:  You've never been shy, Mr. Neal.

20        MR. NEAL:  Well, the Third Circuit had a big bright red

21   light that went on when I was talking but, in any event, your

22   Honor, the first item on page 26 of the remand suggests that

23   there can be discovery into the full extent of the five advisers'

24   activities.  That discovery, if it indeed is permitted to be full

25   discovery, will, in fact, pick up the information we need with

1    respect to the advisers' participation and ex parte

2    communications either with the Court or with the parties, but if

3    we're going to go forward on our 455(b) motion, we sought first

4    by going directly to the Court discovery of ex parte

5    communications between the parties and the Court, your Honor has

6    denied the request that we put directly to the Court suggesting

7    this morning that we can get it through discovery, other means,

8    that is, the parties themselves, and that's --

9        THE COURT:  If it's relevant.

10       MR. NEAL:  -- and that's the discovery we need.

11       THE COURT:  If it's relevant, I'll add that to the Court's

12   ruling.

13       MR. NEAL:  I accept that.  But clearly in our view,

14   discovery of the extent and substance of ex parte communications

15   between the parties and the Court is highly relevant to the

16   455(b) motion and we want that discovery.

17       THE COURT:  You know, Mr. Neal, in your argument to the

18   Third Circuit Court of Appeals, you spoke about my use of the

19   phrase "innumerable ex parte conferences", and as I told you here

20   today that I met with every constituency in every case, there

21   would be at least four constituencies in every case, maybe more,

22   property damage, personal injury claimants, debtor, whatever, you

23   got that, you got my statement to that effect.  It's in the

24   record.

25       MR. NEAL:  All we have, your Honor, is the statement with

1    respect to innumerable.  What we don't have is what the substance

2    of those conversations was, your Honor, and if those

3    conversations conveyed to the Court extra-judicial information

4    about the substance of these cases that is prohibited under

5    455(b) --

6         THE COURT:  You know very well your client gave me extra-

7    judicial substantive information which I will not reveal.

8         MR. NEAL:  Your Honor, as I said earlier, I am perfectly

9    prepared to have discovery taken as to what our client's

10   communications were with the Court.

11        THE COURT:  What I'm saying is what occurred with you and

12   your client is the same thing that occurred with other --

13        MR. NEAL:  How do I know that?  How do I get to test that

14   as an evidentiary matter?

15        THE COURT:  See, that's why I read to you from Judge

16   Robreno where it says the presiding judge may contradict the

17   movant's factual allegations with facts derived from the judge's

18   knowledge and the record.  I'm prepared to speak to that.  I've

19   already told you it's happened innumerable times.

20        MR. NEAL:  But is your Honor -- because it may be that we,

21   in fact, can resolve this without extensive discovery, is your

22   Honor prepared to confirm that there were, in fact, ex parte

23   communications in which your Honor received argument and other

24   information concerning the merits of the cases before the Court?

25        THE COURT:  No, not argument.  Information, information.

1   Your client said to me I want to keep "X" part of my company, I'm

2   prepared to give up "X" part of my company.  That's telling me

3   about the issues in your case.  When your client tells me what

4   his business plan is, when your client told me about the hundred

5   years of history of USG, that's things that help me just gather

6   background information as to each constituency.  Nobody told me

7   how to decide the merits of any particular case, no constituency.

8   I've already said to you there were innumerable of those

9   conferences.  Now, is innumerable five, ten, 20?

10          MR. NEAL:  That's what we would like to know, how many

11   there were, who they were with, and we would like to know what

12   the substance of the conversations was, your Honor.

13          THE COURT:  You know, Mr. Neal, you and I probably had

14   four or five telephone conferences.  You probably have telephone

15   records of it, I don't, you know, about procedure,

16   administrative, you're going to come here.

17          We don't keep track of that when we're administering five

18   jointly administered cases.  We're trying to bring these cases to

19   conclusion.

20          As you and I had a discussion when you argued for two

21   hours before this Court, this isn't the tort system.  This is

22   bankruptcy.  We're trying to bring matters to a conclusion.  You

23   speak to a lot of people but you're not talking about the merits

24   or the substantive legal issues, and I've already said to you

25   there are innumerable ex parte conferences with constituencies.

1    You've already got that.

2         The Third Circuit is either going to say, okay, well, he

3    said there's innumerable ex parte conferences, under 455(b)(1),

4    let's recuse him.  If they say that, the Court will accept it.

5         MR. NEAL:  But your Honor, the question is whether the

6    Court, when it says we need to develop a discovery record, is

7    saying we should have more detailed information about what those

8    communications were.

9         THE COURT:  But this Court has to balance your request in

10   terms of what they said and the time that they allotted for it,

11   and that's what I'm going to have to do.  And you gave me a list

12   of, I thought it was 25, somebody said 28, demands for production

13   of documents and it doesn't really go to the core issues that

14   they are --

15        MR. NEAL:  It goes to the issues that we have raised, our

16   455(b) motion and, your Honor, as I said earlier, I am fully

17   prepared to have the full light of day exposed to the

18   conversations that we've had with the Court because the

19   conversations that I've had with your Honor do indeed fall in

20   what I would call the procedural category, directing us, for

21   example, to prepare a claims form and circulate it to counsel,

22   which we did.

23        THE COURT:  Except for the first one on September 24, when

24   you appeared with the CEO.

25        MR. NEAL:  I think it was February 24.

1          THE COURT:  No.  It was January 24.

2          MR. NEAL:  It was after the initial conference and that

3     conference, your Honor, in my view was a settlement conference,

4     because that was a conference in which your Honor specifically

5     questioned our CEO about what he would and would not give up in

6     order to resolve the pending matter.

7          Settlement negotiations, settlement conferences are

8     permissible.  They do not constitute a 455(b) violation.  There's

9     nothing in the record that suggests that the full extent of the

10    ex parte communications that this Court has had or this Court's

11    advisers have had with the parties fall in either the ministerial

12    category or in settlement category, and if the Court and the

13    Court's advisers are prepared to say that there were ex parte

14    communications, numerous ex parte communications that fell beyond

15    the scope of either the settlement category or the ministerial

16    category, then we might, in fact, be able to take that kind of a

17    stipulated record back to the Court of Appeals, but that's what

18    we need to know.

19         THE COURT:  All right.  I understand your argument.

20    Anything else?  Okay.  Yes, Mr. Mancino.

21         MR. MANCINO:  I won't belabor the Court or the record with

22    much comment except to say that I join the counsel for the other

23    petitioners and movants here as to their views on how discovery

24    should proceed and, just simply put, I think that we should have

25    the ability to take discovery on the four issues that the Third

1  Circuit identified without the kind of restrictions, artificial

2  restrictions and heightened burdens that Mr. Bernick and the

3  other counsel would impose on us and, in fact, listening to them,

4  I got the impression that what they were telling this Court was

5  we should be satisfied with the kind of factual record that's

6  already been developed, that is, the time records and documents

7  that are available on the Court's web site or in the Court's

8  files, and we should be satisfied with that.

9       THE COURT:  This Court has also filed three supplementals

10  in the Circuit Court of Appeals in the nature --

11       MR. MANCINO:  That's correct, your Honor.

12       THE COURT:  -- in the nature of what Judge Robreno said,

13  that the judge may complete the record with facts derived from

14  the judge's knowledge and the records.

15       MR. MANCINO:  I understand that, your Honor, and the Third

16  Circuit had your Honor's submissions in front of it and had our

17  arguments as well in which I urged the Third Circuit to decide

18  the motion on the record that was currently developed.  The Third

19  Circuit disagreed with me and said go back, we want a fuller

20  record developed, and that's what we would like to do.

21       On the other points that have been raised about scope of

22  discovery and attorney-client privilege, those are the things

23  that the lawyers can discuss.  They can attempt to narrow the

24  scope and, as far as privilege issues are concerned, those are

25  precisely the kinds of issues that get fleshed out once we see a

1    privilege log that lists documents and we could take that, we can

2    discuss them among counsel on an expedited basis, take it to the

3    District Court for resolution, and I would propose that's the

4    sort of procedure that should be put in place.  Thank you.

5         THE COURT:  Thank you.  Yes, sir.  Please identify

6    yourself.

7         MR. TRACHTMAN:  Yes.  Thank you, your Honor.  Jeff

8    Trachtman, Kramer Levin, for the bank.  I just want to clarify a

9    couple of points.

10        First of all, our client, we have one client.  Our client

11   is Credit Suisse First Boston, which acts as agent for the bank

12   group.  The bank group obviously has a lot of banks, lot of

13   people have discussions, but we take direction from CSFB and CSFB

14   is our client --

15        THE COURT:  Okay.

16        MR. TRACHTMAN:  -- not Mr. Brodsky or his entities.

17   Second of all, I agree strongly that the privilege issue can be

18   taken up eventually by the other judge but I just want to say

19   since there was some argument about this, the two affidavits that

20   were put in were responding to specific factual allegations about

21   knowledge and they responded to those allegations.  They did not

22   disclose privilege discussions, advice that was given, anything

23   of that sort.  We don't -- and we also didn't put those issues at

24   issue.

25        We're responding to issues injected into the case by the

other side, so, just for the record, there has been no waiver and

they are entitled to discovery of facts about when people may

have known certain --

THE COURT:  What they knew or didn't know or when.

MR. TRACHTMAN:  Right.  Without prejudice to our argument

that that wouldn't even be dispositive or relevant, but the Third

Circuit asked for that information, but there's been no wholesale

waiver.

And finally, just to underscore, it is, we think,

important even if your Honor is going to make some kind of a

threshold cutoff or initial round of discovery, we have five

advisers here.  There were five affidavits.  The advisers worked

together.  The affidavits themselves established there were at

least four meetings with all the advisers together with the Court

and we believe any definition of the core discovery has to start

with at least those five advisers, their law firms and related

people who work with them, the documents about them and

depositions from them.  That's the smallest universe that would

constitute the core.

We also think it's important that there be at least some

discovery about the Grace matter because we believe that the

attempt to have one of the advisers appointed as a futures

representative in that case implicates exactly the same kind of

structural conflict and reflects on the Court's involvement and

the parties' involvement, and we think that's extremely

1    important, too.  That's not to say the other discovery isn't

2    important as well, but we understand there's going to be some

3    prioritization, and we just want to make clear those matters are

4    key.

5         THE COURT:  Okay.  Thank you.  Mr. Inselbuch.

6         MR. INSELBUCH:  May I make one more point, your Honor.

7         THE COURT:  Yes, you may.

8         MR. INSELBUCH:  When we talk about issues of privilege and

9    privilege logs, we don't have a 180-day discovery period to do

10   things here.  I would just note for the record, I asked my office

11   to tell me the answer to this question and the answer to the

12   question is we have 72 linear feet of correspondence files and if

13   counsel are suggesting that any sensible search can be done of

14   those files, privilege logs created and whatever else between now

15   and January 2nd, I can tell you, Judge, we simply can't do that.

16        MR. BERNICK:  Your Honor --

17        THE COURT:  How many feet, Mr. Bernick?

18        MR. BERNICK:  I don't know.  I haven't been able to elicit

19   that information.  We're not nearly as organized as Caplin &

20   Drysdale, obviously.

21        I think that there's at least a little bit of a disconnect

22   here, if not a major disconnect.  We hear all of these statements

23   about how things could work out and we're all professionals,

24   we're going to operate smoothly, and I think we all understand

25   that.

But the real question is what is the objective of the movants here in terms of this discovery. Is their objective to get what they actually need in the same fashion that I think Mr. Englert responded candidly to the Court of Appeals? He took that question as it was posed. The Court was saying we have very little time, tell me not what you want, what you think you might want to look into, what do you need, and he responded to that question with absolute clarity, and everybody sitting in that courtroom knew exactly what the Court was doing and he knew what the Court was doing, what is it that you need, and there's a dramatic contrast between the candor of his answers there and what we now see is unfolding with the license that they apparently believe that they were given by the Court of Appeals.

The dramatic contrast is what we need versus the record that we would like to make so that we can later argue to the Court of Appeals that we were stymied, we were cut off and, the culprit is Judge Wolin himself. He's trying to protect himself. And it's transparent from these discovery requests.

These discovery requests are outrageous. They pretend there's no difference between the lawyers and the parties. They pretend there's no difference between these cases. They don't even confine themselves to the five cases that are before your Honor and before the Court of Appeals, and when Mr. Mancino says, gee, you know what, we're really happy to work things out, when I talked to his partner yesterday, who gave me the courtesy I would

1    say of telling me that the subpoena was being issued to my firm,

2    I said, hey, what is it you want?  What is it you want?

3         Well, you know, it's kind of a lot of different things.

4         Well, what is it that you actually want?

5         Well, I'm not really going to take that up, and I said

6    well, it's real easy.  I can take the position, I intend to take

7    the position you're not entitled to anything and I can go ahead

8    and do that or you can tell me something that's actually

9    intelligent, that is germane to the issues before the Court of

10   Appeals, and instead of there being this profession of interest

11   in talking about how we're going to be all professional and

12   resolve things all so quickly in the time frame that is set up by

13   the Court, the answer is I don't really want to take that up.  I

14   don't really want to take that up.

15        And today your Honor gave them another opportunity to say

16   what it is that that need and they still don't want to say what

17   they need because what is their objective, is to make their

18   record.

19        MR. MANCINO:  Your Honor, if I may, Richard Mancino.  I

20   wasn't on that phone call but I do know that my colleague said to

21   Mr. Bernick we will get you the document request and you'll see

22   what we've requested.  He did not foreclose a discussion.  We

23   were inviting the discussion at any time and I think we made it

24   very clear, your Honor, we want discovery into the activities of

25   the consultants in all five of the asbestos cases, including the

1   Grace case.  We want discovery into the circumstances surrounding

2   Grace's, to us, extraordinary decision to put forward Mr. Hamlin

3   as a candidate for futures representative in the Grace case.

4   That, by itself, raises in our minds and we believe in the record

5   an appearance of impropriety and we are entitled to probe that

6   and we would like to probe that through Mr. Bernick's firm and

7   through Grace, and we would also like discovery into the ex parte

8   communications that have taken place among the Court's advisers

9   and the Court and with other parties in the five asbestos cases

10   that bear on issues that we believe overlap with the Grace case,

11   and I will say, because it has been raised by your Honor and

12   others, as far as I know, your Honor, my firm, on behalf of the

13   movants in the Grace case, has not participated in ex parte

14   communications with the Court and, as best we know, neither have

15   our clients.

16        THE COURT:  Well, your clients haven't but the Creditors

17   Committee in Grace has on numerous occasions.  Ask Mr. Kruger and

18   Mr. Katchen.

19        MR. ORSECK:  Your Honor, if I may just have a minute, I

20   want to be clear.  We are not demanding production of privileged

21   materials.  There are broad discovery requests that have been

22   circulated by both sides.  We understand that privileged material

23   is privileged material.  That's not a reason that some requests

24   might encompass some materials that might be privileged.  To say

25   we've got 70 linear feet, we can't possibly do it, we're not

1    going to look at it, the Third Circuit issued a decision that

2    there needs to be a record that can be reviewed by this Court

3    and, if necessary, by that Court.

4         It is simply not what they've asked to limit in the way

5    that Mr. Bernick suggests.  What he's suggesting is, in effect, a

6    modification of the Third Circuit's ruling and that would not be

7    appropriate.

8         THE COURT:  Okay.  I understand.  Have we heard from

9    everybody?  It's about 17 after 12.  We're going to go into

10   recess until 2:00.  We're going to think about all of your

11   requests and we'd like to decide the issue today if we can as to

12   the length and breadth of the requested discovery so that we can

13   hopefully guide you in terms of what we think the District Court

14   thinks is the appropriate discovery in light of the mandate from

15   the Third Circuit.  All right.  We'll see you at 2:00.

16        (A recess is taken.)

17        THE COURT:  First of all, I'd like to apologize for the

18   delay but the issues involved are complex and the Court needed

19   time to process them and to render an opinion.

20        Secondly, I'd like to thank everyone who argued here today

21   for the professionalism that was displayed, although I don't

22   agree with all of you about everything that you argued, but you

23   certainly placed a lot of matters in context.

24        I have two announcements that I'd like to make before I

25   issue an opinion.  The first is that the reporter inquired of me

1   as to the date that I was in California, was it December or

2   October, and I told her it was October.   Is there anyone who has

3   any objection to a correction of the record as to that?

4   Anybody?   Thank you.

5          I told you that I had made application to Judge Bissell

6   for a district judge to resolve discovery disputes.   Judge

7   Bissell conferred with the Chief Judge of the Circuit, Judge

8   Scirica.   Because the fact that I am a District Judge of the

9   state of New Jersey or the District of New Jersey and temporarily

10  assigned to Delaware, if there were to be a district judge to

11  handle the discovery disputes, that district judge, too, would

12  have to be appointed as a district judge in Delaware for the

13  purpose of resolving discovery disputes.

14         It is Judge Scirica's considered opinion after -- and by

15  the way, I did not speak to Judge Scirica, I spoke to Judge

16  Bissell, but it is Judge Scirica's considered opinion, after

17  reading Judge Garth's opinion more than once, that this District

18  Court must resolve the discovery disputes, so, notwithstanding I

19  told you that I made application to Judge Bissell, my application

20  has been denied.   I will have to resolve discovery disputes.

21         This matter has been opened before the Court upon the

22  Order of the United States Court of Appeals of December 18, 2003,

23  and the several motions to recuse the Court as further set forth

24  in the Court's prior orders.

25         When the Court took the bench this morning, it had every

1    intention of setting a very short discovery schedule.  The Court

2    intended to leave it to counsel to serve their requests and, if

3    necessary, to object as necessary.  The Court's long experience

4    with the attorneys in these cases engendered confidence that

5    their professionalism and their respect for the mandate of the

6    Court of Appeals would lead them to seek discovery in an orderly

7    and focused fashion to permit, with perhaps some nudging by the

8    District Court, the parties to complete the process and permit a

9    decision by January 31st of 2004.

10        What the Court has learned today shows that its confidence

11   was misplaced.  The movants here report that they have served

12   document subpoenas on some 26 entities and persons, most of whom

13   are law firms and many of whom represent asbestos claimants.

14   Well over a dozen depositions are sought.  None of these demands

15   were served upon counsel opposing this Court's recusal in time

16   for today's hearing.

17        It is now apparent, and the Court so finds, that the

18   parties before it seek to divert this discovery process to

19   different purposes that are at odds with their own

20   representations to the Court of Appeals, the order of that Court

21   to assemble a record with all possible speed, or in the interest

22   of arriving at true facts that will guide this Court or the Court

23   of Appeals.

24        At best, the discovery requests are fishing expeditions.

25   Counsel for USG was unable even to accurately identify what role

the persons or entities played in the cases before the Court, much less articulate any specific relevance of the information they might possess.  Doubtless counsel would appreciate the opportunity to rummage through the files of these law firms. Many have been adverse to them for years in hard fought personal injury litigation.  That is not what the Court of Appeals intended to permit.

Moreover, simply litigating the objections and motions to quash that would result from these requests would make compliance with the Order of the Court of Appeals impossible.  Counsel for W.R. Grace read from a document request he received from the movants.  If it is representative of the other document requests served, and no one contradicted that it was, issues of privilege alone would dominate any real attempt to discover any relevant facts.

More seriously, the obviously absurd breadth of the discovery demands raises an inference as to the movants' true aims.  The Court will speak plainly.  The movants here intend that this Court deny their discovery.  They intend to raise this denial before the Court of Appeals in support of their inevitable renewed petition for a writ of mandamus.  The Court has earned its knowledge of how the asbestos bankruptcy world works through hard and, it believes, honorable experience.  It need not pretend to itself, nor to the world, that counsel conduct themselves with the decorum of a church social, and it is clear that they have

1     not.

2          Before the Court of Appeals counsel for the petitioners

3     represented that they needed two depositions and some minor

4     document discovery.   Counsel now argues that they only made this

5     representation with respect to their structural conflict issue.

6     Of course, this argument makes no sense because their structural

7     conflict argument was complete on the record already before the

8     Court of Appeals.

9          In any event, this Court has read the transcript and the

10    opinion of the Court of Appeals and finds that counsel has not

11    accurately reported what happened there.

12         It is perfectly clear that discovery cannot go forward

13    without the Court's active involvement and supervision.   It is

14    the Order of this Court that counsel may not propound any

15    discovery request without this Court's specific approval.   All

16    the discovery requests propounded to date in this matter are

17    hereby quashed, subject to the exceptions that will be set forth

18    on the record here.   It is not this Court's wish to proceed in

19    this manner.   As previously stated, it was not this Court's

20    intention to do so as late as this morning.   Having attempted to

21    convert the discovery to their own parochial interests, counsel

22    cannot be further trusted to guide these proceedings.

23         Requests for additional discovery beyond what the Court

24    will set forth on the record shortly should be guided by the

25    spirit and the letter of the Court of Appeals' Order.   Counsel

1    have justified their document requests with the rationale that

2    they discover the content and number of ex parte conferences the

3    parties had with this Court, yet counsel stated to the Court of

4    Appeals that any more than a de minimus number of such

5    conferences would require the recusal of the Court.

6         Moreover, counsel well know the content of the conferences

7    because they were present.  Counsel for USG has volunteered that

8    its discovery needs might be substantially reduced if the Court

9    were to state on the record that it received extra-judicial

10   information at these conferences.  The Court states now, as it

11   has stated before, and as it stated would occur at the first

12   conference it held in December of 2001, that it did receive

13   extra-judicial information.

14        Counsel for USG will remember that the president of USG

15   said at one of those conferences that he considered it his duty

16   as a patriotic American to save his company from the asbestos

17   claimants.  This, and the balance of that conference, as well as

18   the balance of the many others held with the Court, surely

19   contained extra-judicial information.

20        Counsel represents now that he believed this conference,

21   the first conference, was a settlement conference.  The Court

22   finds this characterization and counsel's statement are

23   inaccurate.  One may well argue that all Chapter 11 proceedings

24   are in the nature of a settlement negotiation, but only by this

25   broad definition could the meeting with USG and the Court be

1  considered a settlement conference.

2       The Court will permit the following discovery to occur on

3  the dates indicated:

4       It is ordered that the following depositions shall be

5  granted and shall be conducted on January 5th and 6th, 2004, in

6  accordance with the following schedule:

7       On January 5th, 2004, Mr. Keefe, Mr. Dreier, Mr. Hamlin

8  and Mr. Gross shall be deposed.  On January 6, 2004, Mr.

9  McGovern, Mr. Brodsky, Mr. Eckstein and Mr. Case shall be

10  deposed.

11       The depositions shall be conducted on each day in the

12  order from first to last set forth above on each day.  No other

13  deposition shall be granted at this time.

14       It is further ordered that counsel for all interested

15  parties shall appear before this Court on January 8, 2004 to

16  determine at such time if additional depositions are required;

17  and it is further ordered that in the event the Court shall grant

18  further depositions, such depositions shall be completed by

19  January 12, 2004; and it is further ordered that all parties who

20  choose to do so shall submit simultaneous briefs to the Court by

21  January 15, 2004; and it is further ordered that simultaneously

22  with the filing of their briefs, the parties shall submit, under

23  cover of authenticating affidavits, deposition transcripts and

24  documents obtained through discovery that they wish to become

25  part of the record of these proceedings; and it is further

1    ordered that the Court shall hear oral argument if requested only

2    in this matter on January 16, 2004.

3         The Court will give counsel one further opportunity to

4    specify what document discovery they may need.  Counsel are

5    warned that any further excessive demands for document discovery

6    may result in no document discovery being allowed at all.

7         Counsel will serve on each other and the Court a revised

8    list of document discovery they seek by 10:00 a.m. tomorrow.

9    Counsel will convene a telephone conference call with the Court

10    at 11:00 a.m. tomorrow to state their objections, if any, to the

11    document demands.

12         The Court will enter an additional order immediately

13    thereafter.  That is the Opinion of the Court.

14         All right.  My clerk calls to my attention that what must

15    be here by 10:00 tomorrow may be faxed.  Thereafter, there will

16    be no faxes to the Court, hard copy only.  That completes the

17    Opinion of the Court.  Court will be in recess.

18         MR. ORSECK:  Your Honor, may I?  I'd like to make a record

19    on the Court's Opinion, if I may, before we adjourn for the day.

20         THE COURT:  Sure.

21         MR. ORSECK:  Your Honor, the Third Circuit ordered this

22    remand because there was a lack of a developed evidentiary

23    record.  It said on page 25 of its slip opinion that it is

24    important that we, quote, know all the circumstances in order

25    that it be able to, this Court and the Court of Appeals, be able

to adjudicate the matter.

Your Honor, it is our position that the procedure just set forth by the Court will inevitably result in the prevention of a developed evidentiary record rather than the evidentiary record that the Third Circuit requested.  Even if the issue is framed as limited to what Messrs. Gross and Hamlin actually did and the service that they provided to the Court while simultaneously serving as futures representatives, even then discovery from other parties is necessary to determine what they did in that capacity.

By way of example, Mr. McMonagle, who is serving as futures rep in the Owens Corning matter, has attended futures rep meetings with Messrs. Gross and Hamlin, which we know about.

THE COURT:  And he filed an affidavit.

MR. ORSECK:  I understand.  And at the same time, Messrs. Gross and Hamlin have turned around and served as purportedly neutral advisers to this Court.

It is inconceivable that we can develop the evidence necessary and advised by the Third Circuit without the deposition of Mr. McMonagle.

Similarly, your Honor's procedure has not set -- has not allowed for the deposition of W.R. Grace.  It is obvious that the nomination of Mr. Hamlin and any discussions about the nomination of Mr. Gross as futures reps in those cases are relevant to the issue that is before the Court.  So, we object to the procedure

1    that the Court has set forth.  We will, however, submit what the

2    Court has requested by ten a.m. tomorrow morning.

3          THE COURT:  Okay.  Anybody else wish to be heard?  Mr.

4    Neal.

5          MR. NEAL:  Your Honor, two very brief comments.  Your

6    Honor indicated that we hadn't or USG had not been able to

7    specify the relevance of that which we were seeking and I just

8    want to make sure, I think I understood you to say you don't

9    think the theory that I advanced establishes the relevance.

10         Just so there's no confusion, the documents that we are

11    seeking are documents that would be sufficient to identify when

12    ex parte communications occurred between the Court or the Court's

13    advisers and the parties and, secondly, the nature of those ex

14    parte communications.  That is the purpose of the discovery.

15         I understand your Honor saying that that's not relevant

16    but that's the purpose of the discovery.

17         One other request I would make of the Court.  Your Honor

18    has already ruled on USG's request to get information from the

19    Court and I'm not seeking any reconsideration of that, but in the

20    Court's November 20 filing with the Third Circuit, the Court at

21    page two and three of its Opinion indicated that, and I'm

22    quoting, that a record of these meetings, that is, the ex parte

23    meetings, referred to in the November 20 statement is contained

24    in the proceeding minutes of the Court's deputy clerk and, your

25    Honor, I would ask if we may have produced to us a copy of the

1    proceeding minutes of the deputy clerk which reflect those ex

2    parte communications.

3          THE COURT:  Okay.  Your application is denied.

4          MR. MANCINO:  Your Honor, Richard Mancino.

5          THE COURT:  Yes, Mr. Mancino.

6          MR. MANCINO:  I'll be very brief.  I'm just standing up to

7    join in the comments of my colleagues on the movant side.

8          THE COURT:  I thought, Mr. Mancino, when you made your

9    argument before, you didn't really want a deposition, you wanted

10   document production.  Am I right?

11         MR. MANCINO:  I'm sorry.  The argument this morning?

12         THE COURT:  Yes.  I thought you wanted document

13   production.

14         MR. MANCINO:  We did, and we also served a subpoena on Mr.

15   Bernick and there was --

16         THE COURT:  For his deposition?

17         MR. MANCINO:  For his deposition.  And we also sought

18   document discovery, your Honor.

19         THE COURT:  All right.  I've quashed everything but it

20   doesn't stop you from renewing your document discovery request.

21         MR. MANCINO:  Okay.  Thank you, your Honor.

22         THE COURT:  Hopefully it will be tailored and, Mr. Neal,

23   you didn't quite say what I said.  I said I used the term

24   specific relevance.  Okay?  I didn't say lacked relevance.  I

25   said you did not articulate specific relevance, but whatever you

1    said and I said, it's in the record and we'll let somebody else

2    determine what was said.

3         MR. NEAL:  Fair enough, your Honor.

4         THE COURT:  Mr. Bernick.

5         MR. BERNICK:  Two housekeeping matters.  First, with

6    respect to the depositions that are to take place on the 5th and

7    on the 6th, if we have issues that arise during those depositions

8    concerning the scope of the depositions or privileged matters and

9    the like, how will those be resolved?

10        THE COURT:  I guess I have to respond orally.  Mr.

11   Bernick, I tried to have it decided by others but I was

12   overruled.

13        MR. BERNICK:  I understand.  Secondly, the document

14   requests that are to be served tomorrow morning by ten a.m. --

15        THE COURT:  Yes.

16        MR. BERNICK:  -- I don't believe that your Honor addressed

17   how those were to be served on counsel.

18        THE COURT:  No, no.  What I meant was I want you to

19   prepare the language for the document request, what you're

20   requesting, and I can then rule on the language, not that the

21   document request has to physically go out tomorrow.

22        MR. BERNICK:  I understand.  Whatever it is that people

23   send around, I think it would be important to get it sent, first

24   of all, it would be advantageous to get it sent before 10:00 on

25   the button tomorrow morning if counsel is supposed to provide

1    objections by 11:00 tomorrow morning.

2         And secondly, I believe it would be useful to serve both

3    by e-mail and by fax.

4         THE COURT:  Would it help if I said to counsel exchanged

5    by 9:00, conference with the Court, what did I say, 10:00?

6         MR. BERNICK:  You said 10:00 and the conference would be

7    at 11, yes, something to that effect.

8         THE COURT:  Move it up an hour.  That's fine.  We'll still

9    have our court conference at 11:00.  That should give everybody

10    two hours to look at what the language is and what people are

11    requesting.

12         The Court didn't feel comfortable in circumscribing what

13    the scope of document production should be without first giving

14    the parties the opportunity to determine it for themselves.

15         MR. BERNICK:  And this time can we make sure that all

16    people who are propounding discovery serve that discovery not

17    only -- or language not only upon the people who are going to

18    have to respond but upon all parties at least that are present

19    here so that any party present here has the opportunity to

20    provide comment?

21         THE COURT:  You're preaching to the choir.  Speak to the

22    people at counsel table.

23         MR. BERNICK:  I understand that.  I guess I really was but

24    I thought it appropriate to address my remarks to the Court.

25         THE COURT:  Right.  Mr. Neal.

1          MR. NEAL:  May I ask just one clarification, because I

2     don't want to belabor the Court with requests or repetitious

3     requests.

4          THE COURT:  Sure.

5          MR. NEAL:  And if we were to file a paper tomorrow, all we

6     would ask for would be documents sufficient to indicate whether

7     ex parte communications occurred, when they occurred, what the

8     substance of them was, whether they were telephonic or in person.

9          Do I understand from the rulings today though that those

10    kinds of document requests are being overruled so we don't have

11    to engage in another cycle of requests?

12         THE COURT:  I don't want to circumscribe what your

13    document requests should or should not be.  I believe that you

14    were guilty of extreme over-breadth today in what you  requested.

15         MR. NEAL:  The only comment I'll make on that is other

16    than the request that was directed to the Court, which you ruled

17    on and we're not re-raising, I don't think the Court has seen any

18    of the document requests that we served on anybody, so, I don't

19    know how the Court today can make a determination that they were

20    overly broad because they haven't even been put before the Court

21    but --

22         THE COURT:  Okay.

23         MR. NEAL:  So, if we want documents sufficient to show --

24         THE COURT:  I'm not going to give you an advisory opinion.

25    We'll rule at 11:00 tomorrow.  You submit whatever you think you

1    have to submit.  All right.

2         Yes, Mr. Waxman.

3         MR. WAXMAN:  Good afternoon, your Honor.  At the risk of

4    beating a dead horse, your Honor, on behalf of the Armstrong

5    Committee, we would like permission to attend the conference

6    tomorrow morning.

7         THE COURT:  There is no conference.

8         MR. WAXMAN:  The call.  Excuse me, your Honor.

9         THE COURT:  Speak to the lawyers.

10        MR. WAXMAN:  Thank you. Yes, your Honor.  Thank you.

11        THE COURT:  Anything else?

12        MR. MONK:  Your Honor, would you like us to send around to

13   everyone the dial information for the call tomorrow morning?

14        THE COURT:  Thank you, Mr. Monk.

15        MR. MONK:  And I assume at the call tomorrow morning you

16   will tell us when, after you've had a chance to look at the

17   document discovery, you'll tell us when everybody is to turn the

18   documents over so we'll have the documents in advance of the

19   depositions?

20        THE COURT:  Yes, if we didn't do that.

21        MR. MONK:  It might be helpful if the Court saw the scope

22   of the discovery that you're going to approve and then we'll have

23   an answer.

24        THE COURT:  Once again, I'll leave it to the parties as to

25   whether it's going to be December 31st or January 2nd.  Can we

1   agree on that, counsel?

2        MR. ORSECK:  We can.  I hope we can.

3        THE COURT:  I'll leave it to the parties.  Tomorrow you

4   tell me.

5        MR. ORSECK:  That's fine, your Honor.

6        THE COURT:  All right.  Is there anything else for the

7   Court today?  All right.  Court will be in recess.  Thank you,

8   everyone.

9        (Whereupon the proceedings are adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25