1

```
 1          UNITED STATES BANKRUPTCY COURT
             FOR THE DISTRICT OF DELAWARE
 2

 3
      IN RE:  OWENS CORNING,         CHAPTER 11
 4      et al.,              Case Nos. 00-3837 through
                                       00-3854
 5         Debtors.
      --------------------------
 6     IN RE:  W.R. GRACE & CO.,      CHAPTER 11
        et al.,              Case Nos. 01-1139 through
 7                                     01-1200
           Debtors.
 8     --------------------------
      IN RE:  USG CORPORATION,        CHAPTER 11
 9     a Delaware Corporation,     Case Nos. 01-2094 through
       et al.,                        01-2104
10
           Debtors.
11     --------------------------
                      Telephone Conference Call
12                     December 29, 2003
                        Newark, New Jersey
13

14   B E F O R E:  ALFRED M. WOLIN, USDJ

15

16

17    Pursuant to Section 753 Title 28 United States Code, the
      following transcript is certified to be an accurate record as
18    taken stenographically in the above-entitled proceedings.

19
      JACQUELINE KASHMER
20     Official Court Reporter

21

22

23          JACQUELINE KASHMER, C.S.R., C.R.R.
                OFFICIAL COURT REPORTER
24                  P. O. Box 12
               Pittstown, NJ 08867
25                 (609) 656-2595
```

2

1
A P P E A R A N C E S:

2

3

4      ROBBINS, RUSSELL, ENGLERT, ORSECK & UNTEREINER, LLP
       1801 K Street, N.W. - Suite 411
       Washington, D.C. 20006
5      BY:  GARY A. ORSECK, ESQ.,
          LAWRENCE ROBBINS, ESQ.,
6      For Kensington and Springfield

7

8      COOLEY GODWARD, LLP
       Five Palo Alto Square
9      3000 El Camino Real
       Palo Alto, CA 94306-2155
10     BY:  SCOTT DEVEREAUX, ESQ.,
       For USG

11

12

13     WILLKIE, FARR & GALLAGHER
       787 Seventh Avenue
       New York, NY 10019
14     BY:  RICHARD MANCINO, ESQ.,
          CHRISTOPHER ST. JEANOS, ESQ.,
15     For D.K. Acquisition Partners, Fernwood Associates, and
       Deutsche Bank Trust Company America

16

17

18     KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP
       919 Third Avenue
       New York, NY 10022
19     BY:  JEFFREY S. TRACHTMAN, ESQ.,
          ELLEN NADLER, ESQ.,
20     For Credit Suisse First Boston

21

22     SAUL EWING, LLIP
       100 South Charles Street
23     Baltimore, MD 21201-2773
       BY:  CHARLES O. MONK, II, ESQ.,
24     For Owens Corning Debtors

25

3

1
A P P E A R A N C E S:
2

3
    KIRKLAND & ELLIS, LLP
4     200 East Randolph Drive
    Chicago, IL 60601
5    BY:  DAVID M. BERNICK, P.C.,
    For W.R. Grace
6

7
ALSO PRESENT:
8

9    SHARON KATZ, Davis Polk & Wardwell
    GORDON HARRISS, Davis Polk & Wardwell
10    JEFFREY LORELL, Saiber, Schlesinger, Satz & Goldstein
    JENNIFER L. SCOLIARD, Klehr, Harrison, Harvey, Branzburg &
11       Ellers
    JOANNE WILLS
12    NANCY WASHINGTON, Saiber, Schlesinger, Satz & Goldstein
    JUDGE WILLIAM DREIER
13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          THE COURT:  All right.  I'd like to do an appearances

2     again.  Mr. Mancino, is Mr. Mancino there?  Mr. Monk?

3          MR. MONK:  Yes, your Honor, I'm here, along with Mr.

4     Pernick.

5          THE COURT:  All right.  Let me list Mr. Pernick.  Is Mr.

6     Robbins there?

7          MR. ROBBINS:  I am, your Honor, along with --

8          THE COURT:  Is Mr. Orseck here?

9          MR. ORSECK:  Yes, your Honor.  I'm here.

10         THE COURT:  Mr. Bernick?

11         MR. BERNICK:  Yes.

12         THE COURT:  Mr. Devereaux?

13         MR. DEVEREAUX:  Yes.

14         THE COURT:  Mr. Shire?

15         MR. SHIRE:  Yes, your Honor, with Jennifer Morales.

16         THE COURT:  And Mr. Trachtman?

17         MR. TRACHTMAN:  Yes, with Ellen Nadler.

18         THE COURT:  Next is Ellen Nadler.

19         MS. NADLER:  Yes, your Honor.

20         THE COURT:  Mr. Lorell?  Mr. Goldstein?  All right.

21     Anybody else under participants?  I will get to roll call later.

22         MR. LORELL:  Your Honor, I'm sorry.  I had spoken but I

23     didn't realize my phone was on mute.  I am here and Nancy

24     Washington is with me.

25         THE COURT:  All right.  Anybody else under participants?

5

1      JUDGE DREIER:  Judge, Bill Dreier.  I don't know where you

2    would classify me.

3      THE COURT:  Well, if you intend to speak or to listen --

4      JUDGE DREIER:  If you allow screaming, it would be fine,

5    but I may be listening.

6      THE COURT:  We're going to put you under roll call.  Is

7    somebody by the name of Chase from Davis Polk?

8      MS. KATZ:  It's Katz, your Honor, Sharon Katz, K-a-t-z.

9      THE COURT:  I'm sorry.  Mr. Harriss?

10      MR. HARRISS:  Yes, your Honor.

11      THE COURT:  Mr. Parker?  Ms. Wills?  Scoliard, is it?

12    Scoliard or St.Jeanos?  Pasquale?

13      MR. PASQUALE:  Yes, sir.

14      THE COURT:  All right.  Bayer?

15      MR. BAYER:  Yes, your Honor.

16      THE COURT:  Morales?  Anybody else listening who's not

17    participating?  All right.  Is Mr. Bernick there?

18      MR. BERNICK:  Yes, sir.

19      THE COURT:  All right.  Mr. Bernick, I believe that when

20    we parted at or about 10:15, there was going to be another

21    conference and you were going to advise the Court where you were.

22      MR. BERNICK:  Yeah.  I think in our other conference we

23    basically confirmed the schedule for the two tracks.  We also

24    undertook to reach out once again to Professor McGovern, which I

25    have since done, and I notified him that he is slotted for the

6

1   first track on the second day after Mr. Eckstein, so, I think

2   when it comes to the schedule, we are in agreement that the

3   schedule will be as follows:

4          Track one would be on January the 5th, Mr. Gross.  Track

5   two on January the 5th would be Mr. Brodsky, Judge Dreier and

6   then Mr. Case.  Track one on the 6th would be Mr. Eckstein

7   followed by Professor McGovern, and track two would be Judge

8   Hamlin and then the last witness would be Mr. Keefe.

9          We had no further discussion regarding the duration of any

10  one of these depositions.  We don't purport to reflect any

11  agreement as to how long any one deposition will last.  We are

12  cognizant of your Honor's prior determination that the time limit

13  for any deposition is one day under the federal rules.

14         We also understand your Honor's determination from our

15  prior call to be that the depositions will be conducted in the

16  court house in New Jersey with your Honor being available to rule

17  on objections there.

18         We understand your Honor further has made arrangements for

19  one court reporter and the parties I guess are to make

20  arrangements for a second court reporter, and I think that pretty

21  much those are the parameters, the logistical parameters that I

22  think everybody has agreed to in connection with the depositions

23  on the 5th and on the 6th.

24         There have been further discussions regarding other

25  matters but maybe I'll just take a pause here and determine

7

1    whether I've reflected the interplay correctly.

2        MR. PARKER:  Your Honor, as a housekeeping matter, I just

3    want to apologize.  It's David Parker and I'm a listener.  I

4    didn't get the proper password.

5        MS. WILLS: Also Joanne Wills, Jennifer Scoliard, we're

6    listeners, but I think we're waiting for our co-counsel, Chris

7    St. Jeanos, on behalf of D. K. Acquisitions that will be a

8    participant.

9        MR. ST. JEANOS:  I'm on the line now.

10       MS. WILLS:  Okay.  We didn't get the number, either.

11       JUDGE DREIER:  Again, Judge Dreier here.  The scheduling

12   that I've just heard for the first time, and I hear of tracks,

13   does this mean that Mr. Gross is going to be deposed first,

14   then --

15       MR. BERNICK:  I'm sorry.  I apologize for not being clear,

16   Judge Dreier.  We're going to have two tracks, which means we're

17   going to have two sequences of depositions, two different

18   locations both within the court house.

19       THE COURT:  And by the way, they'll be in adjoining jury

20   rooms.  We're going to use Judge Lifland's jury room and my jury

21   room.

22       MR. BERNICK:  With respect to your deposition, Judge

23   Dreier, you're preceded by Mr. Brodsky.  You would then go and

24   then Mr. Case will follow.  Mr. Gross is being examined in a

25   separate room with the expectation that he'll last the day.

8

1        JUDGE DREIER:  I also spoke to Judge Keefe and we both

2    understood that we were going to be on the 5th.  Has anyone

3    contacted him?  I believe he thought he was going to be on the

4    morning of the 5th, not on the 6th.

5        MR. BERNICK:  Well, he has been set down for the 6th.  We

6    didn't get -- we didn't have any indication --

7        JUDGE DREIER:  Did you call?  I mean, I had no call saying

8    as to my preferences, although I told a couple of people, and I'm

9    glad I am on the 5th, but perhaps someone should contact him.  I

10   know he's in a mediation now at his office.  You can break in.

11       THE COURT:  Judge Dreier, would you clarify, when you said

12   you told a couple of people, that you did not discuss it with the

13   Court.

14       JUDGE DREIER:  I have not spoken to you, Judge Wolin.

15   This was when I called to find out what kind of boxes and where

16   I, you know, who wants what when.  I have not spoken to you or

17   anyone at your direction.

18       MR. BERNICK:  I think, Charlie, you were going to reach

19   out to these other folks.  Did you try to give Keefe a call?

20       MR. MONK:  Yes, we did.  We were told that he was

21   available either day, David.

22       JUDGE DREIER:  I spoke to him this morning just to ask

23   what is he doing, how is he sending his materials in to New York

24   and such, and I assume you'll talk about that later.  I think he

25   expects to be there on the 5th but someone might just touch base

9

1    with him.  I don't believe people have.

2          MR. MONK:  We will circulate this list and the approximate

3    times and the final version to everyone and we'll specifically

4    reach out for Judge Keefe and make sure that he knows that we're

5    looking for him.

6          JUDGE DREIER:  Thank you.  I'm sorry for interrupting.

7          MR. BERNICK:  I also contacted Professor McGovern, who is

8    in the dark literally and figuratively on the West Coast, they

9    apparently lost electricity because of the storms out there, and

10    I told him that he's been scheduled for the 6th, and I didn't

11    solicit an agreement to that but he didn't voice any opposition

12    to that.

13          THE COURT:  Mr. Bernick, would you do me a favor again

14    please.  On the 5th, will you tell me who's on track one first?

15          MR. BERNICK:  Yes.  On the 5th, track one is Mr. Gross.

16          THE COURT:  Okay.

17          MR. BERNICK:  Track two is Brodsky, Dreier and Case.

18          THE COURT:  Brodsky, Dreier and Case.  Okay.

19          MR. BERNICK:  On the 6th, track one is Eckstein and

20    McGovern.

21          THE COURT:  Eckstein and McGovern.

22          MR. BERNICK:  Track two is Hamlin, Keefe and then

23    obviously we have to confirm that with Judge Keefe.

24          THE COURT:  All right.

25          MR. BERNICK:  Now, I put it out and I guess I'll put it

10

1    out again.  If anyone disagrees with my recitation of where we've

2    come out --

3        THE COURT:  Anybody object?  Let the record indicate no

4    one objected to the way it was stated by Mr. Bernick.

5        MR. BERNICK:  That leaves some logistics and some issues

6    with respect to document production, and it may be what we should

7    do --

8        THE COURT:  Can we finish depositions first.

9        MR. BERNICK:  Yes.

10       MR. ROBBINS:  Your Honor, this is Larry Robbins.  I have

11    one small logistical question to raise which did come up last

12    Friday.  As the Court may recall, I am in the Court of Appeals

13    for the federal circuit on the morning of the 6th.  In order to

14    fulfill that obligation, which is long standing, if we could

15    begin Mr. Gross's deposition perhaps an hour earlier than the

16    ordinary time of 10:00, at 9:00.

17        It has been represented, I believe, by his counsel last

18    Friday that 9:00 would be feasible for Mr. Gross.  I don't know

19    whether it is, however, physical for the court house or for the

20    court reporter, but if it were, it would enable me to finish Mr.

21    Gross's deposition and then return by Metroliner to Washington so

22    that I can be available in the Court of Appeals in the morning.

23        THE COURT:  Mr. Robbins, we'll start all depositions at

24    9:00.

25        MR. ROBBINS:  Thank you very much, your Honor.

1        THE COURT:  And that will be for both days, both the 5th

2    and the 6th.

3        MR. ROBBINS:  Thank you very much, your Honor.

4        THE COURT:  You're welcome.

5        MR. BERNICK:  With respect to document production, there

6    were two major things that have been discussed, and maybe so that

7    we can get one out of the way quickly, we should begin with it

8    and, that is, just logistics of the production of materials that

9    are being discovered.

10        We understand that the deadline for production of

11    documents to be January the 2nd.  There has been some discussion

12    of how those documents would actually be produced, that is, where

13    documents would become available, and I have to tell you that my

14    eyes glazed over at this point in our conference call at this

15    point, so, maybe somebody else could recite what we had discussed

16    in terms of where the documents would be produced.

17        MR. MONK:  Judge, this is Charlie Monk.  We agreed that we

18    would actually have three sets to the respondents.  One set would

19    come to my office in Baltimore, another set would go to New York,

20    and a third set would go to Mr. Bernick in Chicago.  The set to

21    New York should go to Jane Parver's office.

22        MR. ORSECK:  That's right.  This is Gary Orseck, and we

23    received and agreed to that request and the movants, in turn,

24    have requested of the advisers and we'd like to request of all

25    parties who are responding to our document requests that three

12

1    sets of the responsive materials be sent to Mr. Trachtman's

2    office at Kramer Levin in New York.

3        THE COURT:  All three?

4        MR. ORSECK:  Yes, sir.

5        THE COURT:  Okay.

6        MR. BERNICK:  That's fine from the point of view of Grace

7    respondents.  I would only urge that somebody reach out to

8    Professor McGovern.  I think he's going to have a difficult time

9    with delivering three sets by Friday because he does not have the

10   staff to help in his -- I don't know what kind of documents he

11   has and how many he has, but I do know that he doesn't have

12   counsel, he hasn't told me he got counsel, and I know that

13   academically he probably doesn't have a staff of people to make

14   documents, so, all I guess I'm saying is that I don't know that

15   Professor McGovern is going to be able to deliver three sets, and

16   it might be worthwhile if you guys would agree that Professor

17   McGovern can deliver one set to Mr. Trachtman and maybe he can

18   make two copies.

19       MR. ORSECK:  This is Gary Orseck again.  We're happy to

20   discuss this with Mr. McGovern.  None of us, I believe, on the

21   movants' side has been in contact with him at all and not even

22   sure how we would get a hold of him, but I'd be happy to have the

23   conversation with him.

24       MR. BERNICK:  I'll give you two numbers.  202-744-6750,

25   that's his cell phone, and then his office phone at Duke is

13

1    911-137095 (inaudible).  You might have better luck just leaving

2    a voice mail there.  I don't want to be a go-between on his

3    document production obligation.

4        MR. ORSECK:  I will call him directly.

5        MR. BERNICK:  If there's nothing else there, then I think

6    the last thing that we talked about, your Honor --

7        THE COURT:  Excuse me.  One last matter.  I don't know if

8    four sets is enough.  If you're sitting down taking a deposition,

9    you've got counsel, each wants a copy of the document, you're

10    going to have to give one to the witness, the reporter may need a

11    copy of the document to follow.  Have you given any thought to

12    that?

13        MR. BERNICK:  I think what we've been talking about is

14    what gets produced.  Anybody that shows up in a deposition and

15    wants to use documents as an exhibit, we'll have them cross that

16    bridge, that pretty -- it's the obligation of the attorney taking

17    the examination to carry the burden of making copies of documents

18    that they want to use as exhibits.

19        THE COURT:  I just want to alert you in advance because

20    the Court will not have the facility to make documents as they

21    may be needed.

22        MR. DEVEREAUX:  David, if I could interrupt, and following

23    on the Court's point on copies, I don't know if we reached

24    agreement on this the other day, maybe my eyes glazed over the

25    other day,  I would have thought that given all the parties here,

14

1    that the most sensible way to do this would be to produce it to

2    some outfit probably centrally located in New York that was

3    charged with and given a list of e-mail addresses, was charged

4    then with circulating on that day the second PDS, because I for

5    one sitting out on the West Coast is worried about when I am

6    going to see a hard copy.

7        MR. BERNICK:  Here's what I would suggest, Scott.  It

8    seems to me that if we make that kind of arrangement, it just

9    takes more time.  We then are subject to business of how the

10    delivery takes place.  Why don't you simply make arrangements

11    with Mr. Trachtman, who I know from long experience beyond the

12    competence in such matters to get an expedited version of the

13    documents to you so that you've got everything that's been

14    produced as promptly as you can get it, and it may be that the

15    best way to do that is just through a courier service that puts

16    it on an airplane.

17        MR.  ORSECK:  I can do that and, obviously will do that

18    with my client.  With all the other parties who are sort of

19    interested here, I wonder if that's going to be ultimately

20    efficient but unless they want to raise concerns, I'll do it that

21    way.

22        MR. SHIRE: Mike Shire for Judge Hamlin.  We're sitting out

23    here in Cincinnati and I do have a concern about whether we're

24    going to get our hands on documents and, likewise, it's unclear

25    to me who would be producing documents.

15

1      MR. BERNICK:  I think the whole idea is that's all you'd

2  have to produce --

3      MR. ORSECK:  That's correct.  The idea that I proposed is

4  that all documents produced by the advisers would be sent

5  straight to Mr. Trachtman and I had requested in an e-mail

6  yesterday copying an address list circulated by Mr. Abrams asking

7  that the production be made by overnight delivery with the

8  earliest possible delivery option so that we would receive the

9  documents on the morning of the 3rd.

10      MR. BERNICK:  Mr. Trachtman would be then responsible for

11  making distributions to the entire list of people participating

12  in these proceedings.  Is that right?

13      MS. NADLER:  No.

14      MR. BERNICK:  Well, then what would it be?  If Trachtman

15  is supposed to be a focal point for distribution, it strikes me

16  as being a reasonable thing to do, not being Mr. Trachtman

17  myself, but we want to be most efficient about it, it does seem

18  to me then that the people who have got the most active interest

19  in the documents, because they're going to be conducting

20  depositions, have got to make special arrangements, but if

21  everybody is to have a record of what was produced, it does seem

22  to be the copies got to go out to a service at some point to get

23  distributed to everybody on the list.

24      MR. ORSECK:  This is Gary Orseck again.  If I spoke out of

25  turn on behalf of all the movants, I apologize.  If there are

16

1    parties who wish to have production of documents from the

2    respondents made directly to them, then they should speak up.  I

3    had agreed to Mr. Monk's request that we would produce documents

4    to the three locations he requested and I, in turn, asked for

5    production to be made in New York to Kramer Levin, but if

6    somebody else wants a set sent somewhere else, that's fine with

7    me.

8        MR. BERNICK:  I guess, your Honor, maybe we have a bone of

9    contention here but under the rule, I don't know that there is

10   any obligation to serve multiple copies all over the country by

11   courier.  The obligation is to make documents available, so,

12   there's already an accommodation by people sending copies to

13   different parts of the country and it seems to me that at some

14   point if everybody wants a copy, that can be undertaken on a

15   voluntary basis, but I certainly don't have an interest on behalf

16   of my clients in having multiple sets of copies delivered all

17   over the country.  It just doesn't make any sense at all.

18       MR. ORSECK:  I'm sorry, David.

19       MR. BERNICK:  It seems to be sensible that there ought to

20   be -- the three sets being delivered ought to -- I mean, that's a

21   good compromise.  If people want to make further requests of the

22   documents from people that have gotten one of those three sets,

23   that's appropriate.  If people want to make further requests of

24   documents from the people from the so-called track set, that's

25   appropriate, but the obligation that's being undertaken here on a

1    voluntary basis is confined to production of Mr. Trachtman on the

2    one hand and on the other to the three locations around the

3    country.

4         MR. DEVEREAUX:  Well, if Mr. Trachtman doesn't want to  --

5         THE COURT:  Excuse me.  You have to identify yourself for

6    the record.

7         MR. DEVEREAUX:  I'm sorry.  I thought I did.  Scott

8    Devereaux.

9         THE COURT:  All right, Mr. Devereaux.  You have to keep

10    doing it because we don't know who you are.

11         MR. DEVEREAUX:  If Mr. Trachtman doesn't want to take on

12    that obligation to be a clearing house or one of the other three

13    groups that are receiving documents from the movants don't want

14    to be the clearing house for everyone, then it does seem to be,

15    while it maybe right on the rule, David, then what we need to do

16    is maybe come to a compromise that sends documents, a set of

17    documents to some service that is paid for and tasked with

18    distributing to everyone.

19         MR. BERNICK:  Well --

20         MR. SHIRE:  This is Mike Shire.  May I inquire the three

21    locations around the country where documents are being produced?

22         MR. BERNICK:  It was Chicago and my firm was one.  Then I

23    think there was another in New York, and then the third -- what

24    was the third one?

25         MR. MONK:  Jane Parver's firm is Kaye Scholer, and the

18

1    third one is Saul Ewing in Baltimore.

2         MR. BERNICK:  Thank you.

3         JUDGE DREIER:  Sorry to interrupt again.  Judge Dreier.  I

4    have a letter from Gary Orseck to deliver documents to Jeffrey

5    Trachtman.  I hear now they want three sets.

6         Also, when I spoke to Mr. Trachtman earlier, he said he

7    thought that there could be some limited production.  I spent the

8    better part of last weekend going through everything and

9    assembling four boxes of documents, most of which related to

10   deciding individual motions on W.R. Grace.

11        MR. BERNICK:  Which we're going to -- that's the second

12   topic that we're going to take up here, which is our agreement,

13   to the extent we can reach one, on reducing the scope of

14   production by eliminating categories of documents, and I think we

15   are in agreement already that, Judge Dreier, that discovery with

16   respect to your activities as the special master on discovery

17   issues is not necessary.

18        JUDGE DREIER:  That takes all but one box.  On the box

19   relating to the investors -- asbestos advisory committee, most of

20   that box is billing records which were filed with the Court which

21   I understand you don't want because it's already been -- you

22   already have them; and ,secondly, articles or cases that were

23   circulated, published articles, published cases.

24        In addition, I think I have about a dozen pages of my

25   notes of those meetings.  Do you really want me to send three

19

1    copies of published cases and articles to everybody or to even

2    just to file with Mr. Trachtman?

3        MR. ORSECK:  Judge Dreier, this is Gary Orseck, and one

4    set of your responsive documents will be sufficient and I'll

5    speak for Mr. Trachtman and say that we will make whatever copies

6    in New York we need.

7        JUDGE DREIER:  When you say responsive, the first document

8    request was all documents that reflect, refer to or relate to

9    anything done with the five asbestos cases, and then later it

10    says or adviser to Judge Wolin.  Well, you know, read broadly, it

11    includes every piece of paper in this last file, most of which I

12    am reasonably sure none of you want.

13        I can understand you wanting my notes, but to go and copy,

14    you know, published cases that most of you probably have appeared

15    in, much less have been familiar with, and articles that were in

16    either Trial magazine or from other things that may just come up

17    and might have just been discussed, those are all interesting to

18    any of you.

19        MR. ORSECK:  I think we will get to the question next of

20    the substance of the production.

21        THE COURT:  Who's speaking please?

22        MR. ORSECK:  And any agreements as to carve out of

23    materials that need not be produced, but I think we should just

24    group on the logistics of the productions themselves and what I

25    said, that at least on behalf of Kensington and Springfield, one

1    set of materials will be sufficient.  By the way --

2    THE COURT:  Excuse me once again.  Whenever you speak, you

3    have to identify yourself for the record.  I thought that was Mr.

4    Orseck.  Is that correct?

5    MR. ORSECK:  Yes, it was, your Honor.  I apologize.  I

6    forgot.

7    MR. BERNICK:  This is David Bernick.  Let me make a

8    proposal with respect to the production to Mr. Trachtman.  Why

9    don't we have an arrangement whereby anybody who wants a copy of

10    the documents produced to Mr. Trachtman will simply notify him

11    and maybe, Jeff, if you could then send them out to a vendor with

12    forwarding instructions per the requests that are made of you, so

13    that effectively the document flow would be the documents that

14    are being produced in response to requests made by the

15    respondents to the motions for recusal.

16    Three copies will be sent to Mr. Trachtman so far with the

17    exception of Judge Dreier.  Mr. Trachtman will then have those

18    sets of documents and anybody who wants a copy of those documents

19    will notify Mr. Trachtman by, let's say, noon on the 2nd, and

20    then Mr. Trachtman will take that list of people who want a copy

21    and will make arrangements for a local vendor to copy the

22    documents and forward them on by the fastest possible means to

23    the people that made the request.

24    MS. NADLER:  This is Ellen Nadler.  I believe that's an

25    unreasonable burden to put on us and I don't understand what good

1    it's going to do anybody else when they'll wind up getting their

2    sets on Monday when the deposition starts.

3        I think within the movants' constituency we'll make our

4    own arrangements and if there is a concern that the respondent

5    constituencies want the documents, then there should be an

6    arrangement whereby one set gets delivered to Saul Ewing or one

7    of the other firms on the other side and they undertake this

8    responsibility.

9        MR. BERNICK:  I didn't realize it was so incredibly

10   burdensome for Mr. Trachtman's office to make these arrangements.

11   I didn't hear Mr. Trachtman make an objection.

12       MR. TRACHTMAN:  It's one office, David, and the issue is

13   just doing it in the time frame for people get them in time.

14   You're just adding another layer of production.  We ought to be

15   responsible for getting things out to people on our side and

16   having served them on you, you ought to circulate documents

17   served on you to your side.

18       MR. BERNICK:  It's not quite that way because the

19   documents, you're getting one set of all the documents that are

20   being produced on location.  You're the only one that's getting

21   them.

22       MS. NADLER:  But there's nothing written in stone about

23   that.  If you need one set on your side, then people should send

24   a set to Saul Ewing.

25       MR. BERNICK:  That's fine.  We can then have the

22

1    arrangement and that three copies from each of these advisers

2    make their way to Mr. Trachtman.  We can tell all the advisers

3    that three copies should then be sent to Mr. Monk, which then

4    poses a greater burden on the advisers.  I was seeking to

5    alleviate the burden on the advisers.

6        MR. MONK:  Your Honor, this is Charles Monk.  May I make a

7    proposal?

8        THE COURT:  Sure.

9        MR. MONK:  We will undertake to locate a copy service that

10    could receive directly from everyone a set of everything that's

11    being produced and turn around, image those documents, send them

12    by e-mail to everyone and send a hard copy by the best possible

13    means.

14        What I would propose to do is locate that copy service and

15    e-mail everyone on this distribution list with that information.

16    You can then -- individual parties can then decide whether they

17    want to purchase copies of those materials based upon their level

18    of interest.

19        MR. BERNICK:  Well, it does make -- it does centralize

20    everything but it them takes more time.

21        MR. MONK:  I still believe that we have to have the three

22    copies.

23        THE COURT:  Who's speaking now?

24        MR. MONK:  I'm sorry, your Honor.  Charles Monk again.

25    Just to continue my proposal, I think there really are two sets

1    of needs here.  One level of need is for people who are going to

2    be taking the depositions, we will need the documents on the 2nd

3    with no exceptions because we'll need the weekend to prepare for

4    the depositions.

5        There's another set of people who have a great deal of

6    interest in these matters and will want an archival set of all

7    the records so they'll have an opportunity to review them and

8    understand what's developed in the depositions, and I would

9    propose to accommodate those two needs by having the sets sent as

10   we had originally described, the three sets, one in New York, one

11   to Baltimore, one to Chicago on the respondents' side and as Mr.

12   Orseck suggested earlier, the three sets then to Mr. Trachtman on

13   the proponents' side and a copy, one additional copy sent to the

14   copy service so that everybody has a copy of everything available

15   to them.

16       MR. DEVEREAUX:  Charlie, in response to that, if we're

17   going to meet that objective to make sure the parties who are

18   going to be actively participating in these depositions, I have

19   asked two sets be sent to Mr. Trachtman and one set be sent to me

20   on the West Coast.

21       MR. MONK:  That's fine with me.  It's Mr. Monk.  Sorry.

22       THE COURT:  Anybody else want to be heard?

23       MR. ORSECK:  That's fine with me.  This is Mr. Orseck.

24       MR. BERNICK:  I would still prefer to have Mr. Trachtman

25   send out a set to a local vendor for purposes of distribution so

24

1    that we don't impose the burden on the advisers of coordinating.

2    All they have to worry about is getting a set in Mr. Trachtman's

3    hands and all he has to do is pick up the telephone and call a

4    vendor and have them make these arrangements.  Otherwise, you're

5    going to have all of the five advisers and anybody else who's

6    producing documents in response to movants' request all sending

7    an additional set to some predetermined vendor and I think that

8    increases the chances that there will be problems.

9        MR. ORSECK:  This is Mr. Orseck.  We've taken up a lot of

10    time with this but we have agreed to send sets to three different

11    locations at the respondents' convenience and I think Mr.

12    Devereaux is simply requesting that one set be sent to the West

13    Coast because if he needs to get it through Mr. Trachtman's

14    office, it will take an additional day to do that and he will not

15    have sufficient time to prepare for the depositions.

16        MR. BERNICK:  I'm not speaking to that at all.  That's

17    your arrangement, that's fine.  I'm talking about what happens

18    with the documents that are being produced to Mr. Trachtman and

19    where other people want copy sets of those documents because

20    there are more -- there are many people who are party to this

21    process right now, and all I'm saying is that I think it's very

22    simple for one of the sets that's being sent to Mr. Trachtman to

23    be copied and sent out to a copying service and they then take

24    charge of getting distributed around the country rather than

25    having the advisers have to deal with that copy service.  Mr.

1    Trachtman, do you have a problem with that?

2        MR. ORSECK:  I think Mr. Monk has already proposed a more

3    centralized way and it makes more sense to the debtor and you

4    know --

5        MR. BERNICK:  I think the idea that this is a burden on

6    you is I don't think credible but --

7        MR. TRACHTMAN:  It's a burden and delay.  I'm not sure.

8        MR. BERNICK:  It's not a delay that affects you at all.

9    All you've got to do is put them in the copy center and you wash

10    your hands of it.

11        MR. TRACHTMAN:  I really think we can work this out

12    without taking up any more of the Court's time.  I think we can

13    just think about this and speak in a smaller group and we'll work

14    out the logistics.

15        MR. BERNICK:  The problem is, Jeff, the real problem is

16    getting word to the advisers on what they're supposed to do.  I

17    don't have a problem trying to work it out among ourselves but

18    we've got counsel for one of the advisers, we've got another

19    adviser on the telephone.  We've got to get clear direction to

20    them about what they're supposed to do.

21        MR. DEVEREAUX:  Scott Devereaux again.  Mr. Monk said he

22    would circulate an e-mail to all parties, including advisers or

23    proposed people who produce documents, letting them know exactly

24    along the line of this proposal where and when to produce

25    documents, and it seems to me all this discussion at this point

26

1    is whether or not one additional set of documents goes direct to

2    a copy service, Mr. Monk's proposal, or whether one less copy set

3    goes to -- all just going to Mr. Trachtman or to me and Mr.

4    Trachtman forwards them on, and I don't think it's frankly worth

5    the time to argue about it and we'll make it much quicker, might

6    make it as much as a day quicker to have the advisers send them

7    directly to the copy service.

8          THE COURT:  I'm sitting and listening.  Is there a

9    proposal that anybody wants the Court to rule on because there

10   have been many proposals discussed?

11         MR. BERNICK:  My proposal I think is straightforward,

12   which is that all of the movants produce their documents, the

13   documents being requested of the movants, those documents be

14   circulated, as I think we've already agreed, to those three

15   locations, and then the respondents will get additional copies by

16   making requests of one of those three recipients.

17         With respect to the documents that are being produced by

18   the respondents, including and/or the advisers, that those

19   documents be delivered to Mr. Trachtman, three sets of those

20   documents be delivered to Mr. Trachtman, and if Mr. Trachtman

21   makes arrangements with a local vendor to circulate them further

22   to anybody who wants them and that will discharge his obligation,

23   he's only got to give one set to the local vendor rather than

24   imposing the burden on the advisers or separately communicating

25   with them.  That's my proposal.

1        THE COURT:  Is there an objection to that?

2        MR. DEVEREAUX:  Your Honor, I would object to that in that

3    it ensures that I will not get those documents on the 2nd.  I'd

4    get them as early, depending on the copy service's response, I

5    get them as earliest on the 3rd, and then instead I would propose

6    what Mr. Monk had proposed and, that is, that the production by

7    the movants be made to the three centers around the country as

8    Mr. Bernick had outlined and that an additional production be

9    made to a centralized copy service at the same time.

10        Consequently, in addition, that the documents be produced

11    by the respondents, two sets to Mr. Trachtman, one set to me at

12    Palo Alto and one set to the same copy service and that all

13    additional parties who want or need a copy of the documents get

14    them from that copy service.

15        THE COURT:  So, then you're saying that respondents have

16    to produce four copies, one copy --

17        MR. DEVEREAUX:  Yes.  It would in effect have an

18    additional one copy, my proposal would, your Honor.

19        MR. BERNICK:  Just to be clear, Scott, I thought you were

20    agreeable to making arrangements with Mr. Trachtman to get your

21    set directly from him.

22        MR. DEVEREAUX:  No.  I think this discussion has been a

23    lot of different places but I think where it most sensibly and

24    last was, I was going to have a copy of the three sets going to

25    Mr. Trachtman, instead two would go to Mr. Trachtman and one

28

1    would come to me.

2         MR. BERNICK:  So, you're taken care of.

3         THE COURT:  Well, let me ask this question.

4         MR. DEVEREAUX:  Not under your proposal, David.

5         THE COURT:  Let me ask this question.  I don't know if it

6    helps.  Whatever you agree on, that will be fine by me.  What if

7    everybody who was going to produce documents sent those documents

8    to the centralized services to produce as many copies as

9    requested?

10        MR. BERNICK:  We could do that.  It's just that I think

11   there's a desire on the part of people who are going to have to

12   take depositions on Monday to get the very first set that's being

13   produced so they don't have to wait for the copy service to turn

14   around to process all these documents and turn around and send

15   them off.  That's why I think that Scott was focused on getting

16   as early a set as he could so that he could use the documents

17   that are being produced, but I think the same thing applied with

18   respect to the documents that are being produced by the movants.

19   I know that Mr. Monk wants to get one of the very first sets so

20   that he can prepare for the deposition on Monday.   Assume you're

21   working with a copy service, it's going to take a little more

22   time and I think the distinction that was made originally was we

23   want to get the first set of documents in the hands of people

24   that really need them in order to take depositions on Monday, and

25   the problem that we are wrestling with under these proposals is

1    how do other interested parties get a copy of the documents as

2    well, and under one proposal, the way they can get copies of the

3    documents is that the people who are producing them, produce them

4    direct to the outside vendor.

5        Under the other proposal, which is my proposal, they get

6    -- all those documents get produced to Mr. Trachtman and all that

7    Mr. Trachtman does is to take one copy set and give them to the

8    outside vendor.

9        THE COURT:  How does that accommodate Mr. Devereaux?

10       MR. BERNICK:  Mr. Devereaux is going to -- I mean, Mr.

11   Devereaux, under my proposal, would simply get his one of the

12   three copies that was going out.  Two would go to Trachtman and

13   one go to Devereaux, so, he's going to get them in the first

14   instance anyhow.

15       THE COURT:  I don't know if overnight delivery to the

16   coast means overnight.

17       MR. BERNICK:  It does.

18       THE COURT:  Mr. Devereaux, you can speak to that more than

19   I can.

20       MR. DEVEREAUX:  There are courier services who will put it

21   on the next airplane out.  The answer, your Honor, is if David's

22   proposal does encompass at the same time two sets or whatever it

23   is goes to Trachtman, a set comes out to me, then I think that

24   I've got what I need on behalf of my client.

25       What's the most efficient way for distributing as David

1    describes it, getting the documents to the other interested

2    parties, I said more than I need to say probably on that.

3         THE COURT:  All right.  Anybody else want to be heard?

4    The Court will order that the production of the movants be sent

5    to the three locations that there seems to be no argument about,

6    that would be Baltimore, New York and Chicago, and the movants or

7    the respondents -- excuse me -- will send two to Mr. Trachtman

8    and one to Mr. Devereaux in Palo Alto, and as far as other

9    persons who may be interested, I'm going to leave it to counsel

10    to work that out for those individuals.  I'm not going to order

11    it.

12         MR. ORSECK:  Your Honor, this is Gary Orseck.  The

13    remaining issue that we had discussed among ourselves and reached

14    some modest agreement on and some disagreement on some other

15    issues relates to the production and logging of privileged

16    documents, and I think I can summarize where we are on that

17    issue, if your Honor wishes to hear that next.

18         THE COURT:  Sure.  Go ahead, Mr. Orseck.

19         MR. ORSECK:  Thank you.  We had in our call on Friday

20    proposed a means to address, among other things, the respondents'

21    concern that the privilege log process was going to be unduly

22    onerous for them and what we had proposed was that both sides

23    would be absolved of logging privileged materials that are, in

24    essence, documents in connection with the litigation of the

25    recusal motion, such as drafts of briefs and work product that

1    has gone into the production of briefs and preparation for

2    argument and so on.

3         For our part, we had asked specifically that the

4    respondents would nonetheless be required to log any materials as

5    to which they claim privilege that constitute communications with

6    the advisers or with the Court, and that other than those

7    categories of materials which the respondents would have to

8    provide a log, they wouldn't have to log the materials that I

9    thought I understood Mr. Inselbuch and Mr. Bernick claiming would

10   be most voluminous, and for our part we would not provide

11   privilege logs at all for the same materials but would certainly

12   for the period after September 24th and through the cutoff date

13   identified by the Court would either produce or put in a -- put

14   log materials that discuss knowledge by the respondents -- I'm

15   sorry -- by the movants of the alleged conflict prior to

16   September 24th.

17        So, with those carve-outs, what we had proposed I think is

18   a great reduction in the amount of privilege logging that would

19   have to go on.   There were various, your Honor, objections and

20   exceptions requested by several other parties during the call and

21   since the call as to additional materials that they would like to

22   have logged or materials that they don't wish to produce or don't

23   wish to log, and what I think I can fairly say is the movants'

24   position at this point is that we are amenable, if no further

25   agreement can be reached, to putting all privileged materials in

32

1    a privilege log.  I believe I speak for all the movants in that

2    regard, and we think that should be done in parallel so that the

3    respondents would have the same obligation.

4         We think that to the extent there's disagreement, this

5    proposal will result in the greatest transparency, the greatest

6    amount of information which will be put on the record, which we

7    think is consistent with what the Third Circuit has in mind.

8         THE COURT:  Mr. Orseck, has anybody estimated how many

9    privileged documents we're talking about, let's say, on the

10    movants' side?

11        MR. ORSECK:  Your Honor, as far as Elliott, Kensington and

12    Springfield are concerned, although I don't have my hands on the

13    document, I understand it to be a manageable number that can be

14    logged within the remaining time.

15        MR. BERNICK:  But that's not really -- the movants also

16    include, by movants, we're really talking about documents that

17    are being sought of the movants or of people who are witnesses

18    that are related to the movants.

19        For example, the discovery of Mr. Case, Mr. Eckstein, I

20    think we'd have to, you'd have to outline what the volume of

21    those is as well.

22        MR. ORSECK:  Well -- this is Gary Orseck again.  They can

23    speak for themselves, but I've not heard an objection by any of

24    those parties to creating complete privilege logs.

25        MS. NADLER:  Your Honor, this is Miss Nadler.  The number

1    of documents that we would have to put on a privilege log from

2    the Kramer Levin production, while we don't have an exact figure

3    yet, is also manageable and will not pose a problem.

4         MS. KATZ:  Sharon Katz, your Honor.  This is Sharon Katz.

5    We have the same -- I don't know the exact number but I am

6    confident it will be manageable.

7         MR. BERNICK:  Your Honor, this is David Bernick.  It is

8    very difficult to listen to this in the first instance because I

9    think that Mr. Orseck obviously stated accurately what his

10    position is and perhaps the position of others who are on the

11    movants' side, but there are a number of moving parts that I

12    think are encompassed by his statements that may not be totally

13    clear to the Court, and let me try to break them out a little bit

14    so that you can see what the landscape is maybe a little bit more

15    clear.  Maybge it's not a problem.  Maybe I'm over-estimating it.

16         What is the first thing that we took up was the outright

17    exclusion of certain categories of documents from discovery.  For

18    example, Judge Dreier's service as special master on discovery

19    issues in connection with the Sealed Air litigation, the Grace

20    case, I think we've all agreed that those are not really relevant

21    to the matters that are now before the Court and don't have to be

22    produced.

23         MR. MONK:  David, Charles Monk, and that would include the

24    limited assignment that Judge Dreier had in the Owens Corning

25    case.

34

1        JUDGE DREIER:  It was a single matter, single motion made.

2        MR. MONK:  That's correct.

3        MR. BERNICK:  I think we're all in agreement and if we're

4    not in agreement on that, then we ought to hear the objection.  I

5    don't hear objections, so, that was the first proposal that was

6    made, and that obviously starts to reduce the logging burden

7    significantly.

8        Mr. Dreier then -- or Judge Dreier then made a further

9    proposal saying what do you really want these documents for that

10   have already been filed of record with the court, and I don't

11   take it that anybody believes that anybody's got to produce

12   documents that are already filed of record with the court.  Is

13   there any disagreement with that?

14       MR. ORSECK:  This is Gary Orseck.  I believe excluded from

15   the definition of responsive documents are pleadings that are

16   filed with the court and distributed to the parties.

17       MR. BERNICK:  I just don't want to get involved where a

18   pleading is not a pleading but something that was filed of record

19   with the court.  I don't think we've got a problem with that.

20   That helps Judge Dreier.

21       THE COURT:  Mr. Bernick, before you move on, Judge Dreier

22   indicated that he had sent potentially to others, maybe even

23   including the Court, case digests, articles.  Those would not be

24   documents filed of record.

25       MR. BERNICK:  I was going to get to those.  I think that's

1    right, that's a separate category, and as I heard Mr. Orseck's

2    reaction to that, it was, well, just give us one copy of those.

3    Again, you know, that's his business, Judge Dreier's business.  I

4    can't imagine why those are at all responsive.  I don't know that

5    that problem also affects the other advisers.

6         JUDGE DREIER:  Judge Dreier here.  They probably have

7    copies of these and if it affects them, I just -- for example, I

8    found this article here from the New York Times, the business

9    section, Surge in Asbestos Suits by Healthy Plaintiffs.  The next

10    is American Thoracic Society article on respiratory diseases.  I

11    mean, those are, you know, they're not -- they were not filed, I

12    assume, but they were circulated, but they're articles that

13    you're well familiar with, I'm sure all of you.

14         MR. BERNICK:  Does anybody really want that stuff?

15         MR. ORSECK:  Yes, we do.  This is Gary Orseck, and it may

16    be that some people are familiar with certain items, other people

17    are not familiar with those items and I don't see that there's

18    any way that we can define a category of otherwise responsive

19    materials without seeing them or in a vacuum and simply say that

20    there are categories that needn't be produced.

21         MR. BERNICK:  It's very simple.  Published articles or

22    cases.   What's the magic about it?

23         MR. DEVEREAUX:  Scott Devereaux, and I do think it is

24    germane and relevant to know what it is that the advisers are

25    sitting and learning in their research rather than trying to get

1    into this definitional issue that it just be produced.

2        MR. BERNICK:  That's the issue then, your Honor.  It seems

3    to be that actually cuts exactly the other way because everybody

4    knows that there are extra-judicial matters that everybody has

5    contact with because they read the newspapers.  Asbestos is

6    highly controversial.  That's a separate category.  I don't have

7    a view on it because it doesn't affect me.

8        JUDGE DREIER:  Judge Dreier.  May I suggest the title and

9    the source of the article or, look, I'll start our copying

10    department working on these.  Do you want these all Bate stamped

11    in addition?  I mean, this is just -- gentlemen, the only one I

12    very, very briefly spoke to is Judge Keefe to say how is he

13    sending these boxes.  I've spoken with nobody else, but this is

14    oppressive but, of course, I will comply with any court order

15    that's there, but do you want these to be Bate stamped, these

16    articles, and just -- I'll box them.

17        MR. ROBBINS:  Larry Robbins.  Judge, this is Larry

18    Robbins.  Look, it may very well be sufficient if you're finding

19    that it is oppressive and that your facilities are simply too

20    burdensome, it may be entirely sufficient, assuming that they are

21    simply copies of publicly available cases and articles, contain

22    no other interlineations, for example, to just provide, you know,

23    a list of what they are in a way that would allow us to obtain

24    sources, if it truly is overwhelming and, obviously, you know

25    better, they're sitting in front of you.

1       JUDGE DREIER:  It's all in one box.  I will be happy to

2   bring the box to the deposition and I'll give you the titles in

3   advance if you want.  I just -- it's the copying logistics of

4   copying them and sending.

5       MR. ROBBINS:  Judge, that sounds just fine to me if you

6   give us the list in advance and bring the boxes with you.  I

7   mean, obviously, I can only speak for the folks in the room with

8   me now, but for Kensington's purposes, I am comfortable with that

9   arrangement and do not think you need to do more than that.

10      If someone else has a different view, they should speak up

11  now.  Otherwise, I'm comfortable with what you just said.

12      MR. TRACHTMAN:  This is Mr. Trachtman.  I have one small

13  amendment which is if you could also copy any transmittal letters

14  or other correspondence that suggests as to whom this material

15  came from or was circulated to.

16      JUDGE DREIER:  If I have them, I will.  Some of them may

17  have been passed out at meetings.  People might have brought a

18  few copies and given it to one or two people there.  This is all

19  years ago, but I will look through my correspondence file after

20  pulling the W.R. Grace stuff out of there and there probably are

21  a few transmittal letters, you're welcome to those and you're

22  welcome, of course, to my notes of the meetings.

23      MR. BERNICK:  Than can we try to capture this as a

24  proposition which is that the advisers can bring to their

25  depositions published articles and published studies that are in

1    their files without providing advance copies.

2         MR. DEVEREAUX:  Scott Devereaux.  With the two amendments

3    that, one, they provide a list of what those were on the 2nd,

4    and, two, if there's any transmittal letters or interlineated

5    documents, that those would be provided separately.  That's

6    agreeable to me.

7         MR. MANCINO:  Your Honor, this is Rich Mancino and I

8    wasn't present at the beginning of the phone call which I

9    apologize but I'm here now.  I think doing it that way is just

10    going to be even more burdensome and I would propose that these

11    documents be sent to a copy service where they could be copied

12    and Bates numbered and produced.

13         MR. BERNICK:  I guess you have it there, Judge Wolin, with

14    respect to this category.

15         THE COURT:  I'm prepared to rule.  Anybody else want to be

16    heard?  All right.  All persons who, I guess it's mainly

17    advisers, who have a list of -- who have cases or articles may

18    list them and bring the box with them to the deposition without

19    having to reproduce them at this time, so, Mr. Mancino, I reject

20    your suggestions.  You may move on.

21         MR. DEVEREAUX:  Your Honor, Scott Devereaux.  Can I ask

22    for one clarification.  When you say list them, do you mean

23    provide a list to the parties as part of discovery?

24         THE COURT:  That's correct, as well as the transmittal

25    letters that you asked for.

1       MR. DEVEREAUX:  Thank you, your Honor.

2       THE COURT:  You're welcome.

3       MR. BERNICK:  We then got to a somewhat broader

4    proposition and there were two kinds of -- two additional

5    propositions that were advanced.  One was the proposition that

6    Mr. Orseck described and the essence of it I think was proposed

7    in good faith and it was designed to reduce the logging burden

8    and that was to establish kind of a cutoff beyond which you

9    didn't have to log documents.

10       In thinking, the concept behind the proposal was

11    straightforward, which was as of the time that the recusal

12    motions were filed, obviously, there would be a tremendous amount

13    of documentation that was both privileged and not highly relevant

14    because it was lawyers reacting to the recusal motions, but I

15    think how to respond, so, I think the concept was that the date

16    on which the motions were filed would constitute a cutoff for

17    logging purposes, the exception being, and it was differently

18    stated I think in all candor than the way it has been stated now,

19    is that the logging requirement would still apply to

20    communications with the advisers and to communications with the

21    Court, ex parte communications with the Court, and the difficulty

22    with that was that the discovery that's being proposed by the

23    respondents of Mr. Eckstein, they don't believe that they should

24    be subjected to a cutoff for what appears at least to be for, my

25    client, being for good reason, which is that Mr. Eckstein decided

40

1  to submit an affidavit and in the affidavit he recited activities

2  that he had undertaken in response to the recusal motion, so that

3  Mr. Eckstein has placed at issue his own post motion activities

4  and to the extent that he's done that, there now has to be the

5  opportunity to conduct discovery with regard to that affidavit

6  and that inevitably is going to be discovered as focused after

7  this cutoff of these recusal motions.

8      MR. TRACHTMAN:  David, if I can interrupt you, we're

9  saying we're going to do a privilege log without a date cutoff.

10  I don't know why you're revisiting this.

11     MR. BERNICK:  If you're going to do a privilege log

12  without a date cutoff, what is the essence of the proposal with

13  respect to the cutoff?

14     MS. NADLER:  I think Mr. Orseck said on reconsideration

15  and in light of the fact that the privilege logs were not going

16  to involve that many documents.

17     MR. BERNICK:  That wasn't clear, because Mr. Orseck

18  started by saying that they had made a proposal and I never heard

19  him saying they're withdrawing the proposal.  If the proposal is

20  withdrawn, it's withdrawn.

21     MR. ORSECK:  This is Gary Orseck.  If I wasn't clear, let

22  me be clear.  I had attempted to give his Honor some background

23  as to the back-and-forth about attempting to limit the creation

24  of privilege logs for two reasons; number one, that we ran into

25  significant objections by various parties on the other side and,

1    second, because as events have played out, it doesn't appear that

2    the burden of creating privilege logs will be all that onerous in

3    the first place, and there are -- I think our proposal is that we

4    avoid a lengthy argument about what gets carved out and what

5    doesn't and simply agree to provide privilege logs to one another

6    that capture materials that are being withheld on those grounds.

7         THE COURT:  Mr. Orseck, let me interrupt for a moment.  In

8    one of my filings with the Circuit Court of Appeals, I waived any

9    judicial privilege as to any communications with my advisers.  I

10   don't know if that helps you or not.

11        MR. BERNICK:  I think that this is really designed to

12   alleviate potential burden that the law firms have who are

13   responding to this --

14        THE COURT:  Okay.

15        MR. BERNICK:  -- where the law firms would have to log

16   significant documents that were prepared in connection with the

17   recusal motion, so, and that would be -- that would not be

18   affected by your Honor's waiver.  That really implicates the

19   privileges that apply to the law firms and their clients.

20        THE COURT:  Okay.  I understand.

21        MR. BERNICK:  I don't know to what extent at this point, I

22   don't know at least with respect to my law firm that there are

23   responsive documents that post date the filing of the motion for

24   recusal other than those, the original motion for recusal.  I

25   really can't say that there's a particular burden for my firm

42

1    associated with having to log documents that are after the motion

2    to recuse.

3        MR. ORSECK:  This is Gary Orseck, and excuse me for

4    interrupting if I did.  I think we have agreement on this issue

5    and we can put the matter to rest.  If Mr. Bernick has no

6    objection, I haven't heard any other objections to the creation

7    of privileged logs without a cutoff date.

8        MR. BERNICK:  No, I lodged a more general -- let's just go

9    back.  You proposed the cutoff for purposes of reducing the

10   burden that's associated with logging and, as you remember from

11   that discussion, I was fairly neutral on that.  I thought it was

12   a good idea, but if it didn't really -- I didn't really voice an

13   independent view with respect to that.

14        I have a more general problem which is the problem of

15   producing a log to begin with and the reason why I have that

16   objection is the potential volume of documents that we're talking

17   about in the little time that we have, that burden is affected by

18   what the scope of the production is much more than it is by your

19   proposed cutoff, and that's why it was very important to me to

20   have you undertake what you were interested in Judge Dreier's

21   materials or his activities in connection with the discovery of

22   special masters because that affects the scope of the burden,

23   so --

24        MR. ORSECK:  I believe we have agreement on that as well.

25        MR. BERNICK:  That's correct.  All I'm saying is the

1    cutoff doesn't really affect the broader proposition, so, far as

2    I'm concerned.  What does affect the logging beyond what we've

3    already discussed is the second issue that we haven't discussed

4    at all, which is whether this production ought to include

5    materials relating to the activities of the advisers when they

6    have been engaged as mediators, and that does very much affect

7    the burden of this process so far as my client, my firm is

8    concerned, I should say more precisely so far as my firm is

9    concerned, and the issue there, Judge Wolin, is very

10    straightforward.

11        We know that both Professor McGovern and Mr. Gross had

12    acted as mediators.  They've acted as mediators in connection

13    with the Sealed Air litigation and apparently they've also acted

14    as mediators in connection with the kind of resolve issues as

15    between the banks and the tort claimants in the Owens Corning

16    cases and --

17        THE COURT:  I don't think that's accurate.  It was

18    McGovern and the bankruptcy judge.  Gross was not appointed to

19    mediate in Owens Corning.

20        MR. BERNICK:  In the Grace case it is true.

21        THE COURT:  It's Judge Fitzgerald and McGovern.  She was

22    the settlement judge and McGovern was the mediator.  Gross had no

23    official role.

24        MR. BERNICK:  Then with respect to the Grace case,

25    McGovern and I think also Gross, although I'm not positive, were

44

1    engaged in discussions that were not only the obligation of Grace

2    to conduct as the debtor but also were directed by Judge

3    Fitzgerald, discussions about how to resolve the entirety of the

4    case, and it is my -- it is my and my client's position that

5    discussions of settlement, that is, discussions that took place

6    expressly and for the purpose of settlement, are not discoverable

7    and we are not waiving any privilege that applies to that.  And

8    it seems to me that given the shortness of time that we have to

9    get all this discovery done, for us to have to go through files,

10    search for discussions of that nature and deal with that, I don't

11    think is appropriate and that does affect our logging issue.

12         You know, it seems to me that the activities that these

13    folks engaged in as mediators or settlement facilitators to be

14    off limits.  That is the significant part of this discovery

15    process.  We are not able to reach agreement on this subject.

16         THE COURT:  Well, you know, the other day there was a

17    demand for document production of Sealed Air and Combustion

18    Engineering and I ruled then that there would be no document

19    production pertaining to those cases.

20         MR. ST. JEANOS:  Your Honor, Chris St. Jeanos from

21    Willkie, Farr.  If I recall correctly, it was there was to be no

22    discovery related to Combustion Engineering and that was it.

23         THE COURT:  No.  Mr. Trachtman wanted a lot of documents

24    pertaining to Sealed Air and I denied his request.

25         MR. MANCINO:  Your Honor, Rich Mancino.  Our understanding

1    with that was still within the scope of discovery.

2        THE COURT:  That's my recollection.

3        MR. MANCINO:  And indeed, it's been an issue of contention

4    as between the movants on my side and W.R. Grace opposing the

5    motion that was originally filed and before the Third Circuit as

6    to the significance of Mr. Gross's role in Sealed Air, and we

7    think that that should be a topic of disclosure here.

8        MR. BERNICK:  I don't believe there was ever any such

9    request.

10        MR. ST. JEANOS:  We're looking at what Mr. Gross and Mr.

11    Hamlin did and what their roles are.

12        MR. BERNICK:  There's never been any allegation of

13    improper contacts or improper discussion with respect to Gross or

14    Hamlin in connection with Sealed Air.  No one has ever made that

15    allegation.

16        MR. MANCINO:  I made the argument last week that in our

17    view at least and Mr. Bernick is free to argue the merits of this

18    on the 16th, that Mr. Gross's role in connection with the Sealed

19    Air settlement does bear on issues that we have or in our motion

20    to the extent that that settlement may impact and have an effect

21    on future asbestos claimants or current asbestos claimants.

22        MR. LORELL:  Your Honor, if I may, it's Jeff Lorell

23    speaking for Mr. Gross.  I think that the analysis should make a

24    distinction between inquiring what Gross or any other individual

25    did generally speaking as a mediator, who they met with, on what

1    days they met with and so forth, how many hours they spent on the

2    one hand, with what was disclosed to them in confidence as part

3    of a mediation or settlement process, because in that process we

4    have, as your Honor well knows both under our local rules and the

5    rules in Delaware and the rules in Pennsylvania, very strong and

6    judicially recognized mediation privilege which makes the caucus

7    -- the confidential information to a mediator and caucus entirely

8    confident, and that confidentiality was the expectation of the

9    parties when they were disclosing whatever they disclosed to Mr.

10   McGovern, to Mr. Gross, whoever was acting as a settlement

11   facilitator.  And I think it would be, as Mr. Bernick said,

12   highly inappropriate to allow discovery of the details of

13   whatever may have been given in confidence to these individuals

14   as mediators as opposed to inquiring about what their mediation

15   efforts were, who they met with, when they met, how many hours

16   they spent.

17       MR. MANCINO:  Your Honor, it's Rich Mancino.  What we're

18   talking about at this juncture is simply whether the documents on

19   which a privilege is claimed need to be logged and we will

20   suggest, your Honor, that to the extent that the communications

21   that went back and forth between Mr. Gross and W.R. Grace or

22   other constituencies which are claimed to be privileged be

23   logged.  That doesn't mean that, and we're not asking your Honor

24   to rule on this phone call without the benefit of briefing, that

25    any privilege that might be asserted is waived.

1      MR. DEVEREAUX:  Scott Devereaux.  If I could just add to

2    that, it seems to me inconceivable in their roles as mediators in

3    these limited cases where Judge Wolin appointed some of these

4    individuals as --

5      THE COURT:  By the way, Mr. Devereaux, I don't think

6    you'll find an order that I appointed either McGovern or Gross in

7    Sealed Air to mediate.  My recollection is that the parties hired

8    them to mediate and paid them without the Court's intervention.

9    Now, I may have ultimately approved the fees that were submitted,

10    but I didn't appoint them.

11      MR. DEVEREAUX:  That's a helpful clarification, your

12    Honor.  I didn't mean to be unduly narrow, but in instances --

13      THE COURT:  Well, you know what, you know what, maybe I'm

14    defensive when you guys use the term "court appointee".  I'm

15    willing to take the heat for what I do but I'm not willing to

16    take the heat for what I didn't do.

17      MR. DEVEREAUX:  That seems fair, your Honor.   Let me

18    finish my point.  It's Scott Devereaux still.  The notices where

19    either the Court appointed a mediator or where the parties agreed

20    and asked one of these advisers to mediate their dispute,

21    regardless, the situation in total there cannot be a large volume

22    of written submissions that they now have that make it unduly

23    burdensome to just list them on a log, so, I don't think that the

24    burdensome notion -- whether or not that privilege ultimately is

25    or is not upheld by the Court is a whole different issue but from

48

1    the burdensome issue.  I don't see anybody making a burdensome --

2        MR. BERNICK:  I have to respond to that.  Again, it is

3    burdensome to look for these materials to begin with, for our

4    firm to do and, so, that is specific.  It is burdensome for us to

5    go rifting through files looking for these types of contacts and

6    information.

7        Number two, when you talk about the advisers themselves,

8    it's really the advisers themselves that bear the major burden of

9    this, that is, Gross and McGovern specifically, and Mr. McGovern

10    is not present on this call, Mr. Gross has counsel, but given the

11    scope of the activities that they engaged in as mediators, it

12    might be a very significant undertaking and really serves no real

13    purpose because at the end of the day we all know settlement

14    discussions are not going to be the subject of inquiry.

15        If they were, then, basically this discovery process would

16    have the effect of allowing adverse parties to discover the most

17    important work product, strategic objectives that opposing

18    counsel and opposing parties have and that would be intolerable.

19        But from what I just heard, I kind of wonder why we're

20    going down this road at all.  If Judge Wolin did not specifically

21    appoint McGovern and Gross to be mediators, if they were engaged

22    as mediators with the consent of the parties, and that was true I

23    know in Sealed Air, I know it is also true in connection with the

24    activities that Professor McGovern has been involved in and

25    perhaps Mr. Gross in the Grace case, when it comes to overall

49

1    case resolution discussions, and if it is also true that there

2    was not a specific appointment with respect -- specific

3    appointment by Judge Wolin in the Owens Corning case, was that

4    again by agreement of the parties?

5        THE COURT:  No.  Owens Corning, there's an order that

6    appointed McGovern as a mediator and Judge Fitzgerald as a

7    settlement judge.

8        MR. BERNICK:  Okay.  And McGovern doesn't have any

9    conflicting G-1 Holdings appointment, so, the so-called

10   structural issue which is that there was an underlying conflict

11   that affected one of the advisers who had been appointed as

12   advisers when they had a simultaneous engagement in G-1 has no

13   application to these mediations, none, zero.

14       If the parties were prepared to accept whatever conflict

15   might be there, then this is a non-issue, so, why are we pursuing

16   it?

17       MR. ROBBINS:  Let me explain why we're pursuing it.  This

18   is Larry Robbins speaking in Washington.  It may be that in some

19   discrete situation the parties, not the Court, elected a mediator

20   and that may indeed be a separate case, but the fundamental

21   question that I think has been presented on remand, there are

22   others but the most fundamental one is what precisely is the

23   scope that have been delegated or may be delegated to the

24   advisers such that a reasonable person observing that delegation

25   would regard that as in conflict with the set of duties that

50

1    would fall to someone serving as a lawyer for futures

2    representatives.

3        If you're theorizing that that is the governing standard,

4    it is highly material to know how the five advisers, all five,

5    have been deployed in the past because however they've been

6    deployed in the past is evidence, bears on the scope of the

7    initial delegation and that is the question presented.

8        It is not the case, as was suggested by Mr. Bernick in the

9    telephone conference the other day, that the only thing that

10   matters is how the advisers have in fact been deployed in the

11   past.  That's not the question.  That is, that they bear on the

12   ultimate issue but the ultimate issue remains what is the scope

13   of the delegation of the five advisers, and it is highly material

14   on that question to know how each of them has served in the past,

15   even if he is not himself someone simultaneously representing one

16   of the futures, serving as a futures representative or as counsel

17   for a futures representative.  I haven't finished.

18       MR. BERNICK:  Go ahead.

19       MR. ROBBINS:  So, in short, that is, I think, the reason

20   why it is reasonable to ask even of an adviser who is not

21   simultaneously a futures lawyer or futures rep what is it that

22   he's done.  Now, that is not to say that if there is indeed a

23   privilege applicable to the settlement process, I understand that

24   argument, it may very well be that there are particulars that we

25   may be forbidden on objection to go into, and that is a

51

1    reasonable concern and one that I would trust everyone on both

2    sides would be mindful of and deal with appropriately, but now is

3    simply one of logging so that we know the subject matter of the

4    relationship, the subject matter of the mediations, the subject

5    matter of the meetings.  That may itself be enough to formulate

6    the type of argument that the movants need to make concerning

7    scope of the delegation.  That is why it is material.

8        MR. BERNICK:  I'm sorry.  Are you done?

9        MR. ROBBINS:  I am done now.

10       MR. BERNICK:  That's interesting and important, all the

11   rest, but I have to say right now, your Honor, I would lodge a

12   further objection to all discovery conducted with respect to any

13   mediation where the mediation was undertaken by the parties on

14   their own as being irrelevant, totally irrelevant -- I'm sorry --

15   not likely to relate to the discovery of relevant evidence, even

16   on Mr. Robbins' theory of what is relevant, because if the

17   parties -- if the parties decided to ask Professor McGovern to do

18   something or decided to ask Mr. Gross to do something, and none

19   of them are complaining about what was given to these folks to

20   do, then it seems to me that even under Mr. Robbins' recitation

21   of the standard, it is irrelevant to the delegation because it

22   didn't emanate from the delegation.  It emanated from the

23   parties' desire to elicit these people's expertise for a

24   particular purpose.

25       MR. ROBBINS:  You pushing on an open door.  I already

52

1    agreed to that.  In Owens Corning, as his Honor, Judge Wolin,

2    pointed out moments ago, the mediation was in fact pursuant to

3    Court order as to Mr. McGovern.

4        MR. BERNICK:  I understand that.

5        MR. ROBBINS:  I don't have a dog in that fight.

6        MR. BERNICK:  That's fine.  That's not true in the Grace

7    case.

8        MR. MANCINO:  Your Honor, this is Rich Mancino.  If I can

9    just speak to that briefly, I don't know about pushing on an open

10    door or whether my door is closed, but I believe that the

11    services provided by Mr. Gross in connection with the Grace case,

12    even if it's in the capacity as a mediator on the Sealed Air

13    case, is relevant and I'll just point to, among other things --

14        THE COURT:  Why can't you handle that in his deposition?

15        MR. MANCINO:  I can and I will, your Honor, but --

16        THE COURT:  Excuse me.  Please go ahead.

17        MR. MANCINO:  There are documents that relate to that

18    which are deemed to be privileged.

19        THE COURT:  Well, you've asked Gross for those documents.

20        MR. MANCINO:  That's right.  And you know the Third

21    Circuit said that discovery in this case may shed light on such

22    matters as, quote, "the full extent of the consultants'

23    activities in the five asbestos cases", close quote, and W.R.

24    Grace is one of those five and we should be allowed to explore

25    that, and if there is a privilege and if the privilege attaches,

53

1    I'm not asking for an advisory opinion that that privilege is

2    waived or that it otherwise attaches.

3        All I'm asking is if the parties responding to the

4    discovery requests claim that documents fall within that

5    privilege, that they log them.

6        MR. BERNICK: Your Honor, I think this is a matter that's

7    ripe for your determination.  Let me state before you rule on

8    this, though, that we would move to strike and we would object to

9    any discovery that is conducted with respect to the activities of

10    either Professor McGovern or Mr. Gross or any other kind of

11    discovery whatsoever concerning two subjects in the Grace case;

12    one is the mediation or settlement efforts with respect to the

13    Sealed Air-Frazenius, and the second is any kind of settlement

14    discussions or mediations with respect to the case as a whole.

15        They have no relevance either to the structural issues

16    that have been posed here because they didn't take place, those

17    activities did not take place pursuant to the Court's order and

18    did not take place pursuant to the order that was issued by the

19    Court with respect to the advisers on the outset of the case,

20    they have no relevance because they don't, and they have no

21    relevance with respect to ex parte communications because there's

22    never been an articulation of improbable ex parte communications

23    with respect to any of those matters.

24        The only ex parte communications that Mr. Mancino and his

25    client have alleged and have raised in connection with this

54

1    matter at all in the Grace case is their suspicions are improper

2    ex parte context with respect to the application for Mr. Hamlin

3    to be a futures representative and this, obviously, has nothing

4    whatever to do with that, so, we would object to all discovery,

5    not just the logging issue, we would object to all discovery with

6    respect to those mediation settlement efforts.

7        MR. DEVEREAUX:  Your Honor, Scott Devereaux.  If I may be

8    heard briefly before this is submitted or the Court hears some

9    others  two things.  One, under the language that Mr. Mancino

10   read, clearly the activities of these advisers in total was

11   contemplated as the proper subject of discovery, so, I think it

12   is beyond dispute that the discovery -- that this would be

13   relevant to complete the evidentiary record.

14       The second, the fact that parties in Grace may have agreed

15   to use any of these advisers in any capacity without the Court's

16   blessing or request is a potential point for them to argue down

17   the line, but as far as what these individuals have learned in

18   their -- in whatever capacity --

19       THE COURT:  By the way, by the way, I have to interrupt

20   you.  You're inaccurate again.  Grace didn't use them.  Sealed

21   Air used them and Frazenius used them, so, I just don't want your

22   statements to go unchallenged to create an inappropriate record.

23       MR. DEVEREAUX:  That's fine, your Honor.  In the Sealed

24   Air matter, if these advisers had a role that was the product of

25   the parties' agreement rather than the Court's appointment, that

55

1       may provide the respondents here an argument to make about

2       conflicts or not, those individuals being conflicted or not being

3       conflicted, but as far as whether those individuals should

4       appropriately serve as advisers to the Court in the USG matter

5       where, of course, no party in USG was asked for their consent to

6       whatever role they played in Sealed Air or Frazenius matters,

7       that really does not serve -- answer the question from our

8       perspective, in fact, not at all.

9            The information they deemed in that capacity could well be

10      the kind of information that may make their service in USG

11      questionable or in fact conflicted.

12           MR. BERNICK:  It's never been raised by USG to date.

13           THE COURT:  Anybody else want to be heard?  I'm prepared

14      to rule.

15           MR. MONK:  Your Honor, Charles Monk.  I've been silent on

16      this debate but I would like to be heard briefly.  I have only a

17      concern here that the issue is whether the advisers, McGovern in

18      the case of Owens Corning case was involved in mediation and time

19      spent in mediation.  That's the subject that the parties brought

20      to his attention during the mediation.  The position expressed by

21      any party who expected Mr. McGovern to keep that information

22      confidential in connection with the mediations I believe must

23      stay confidential.

24           The fact that he was available and spoke with the parties

25      about the mediation and facilitated the mediation I think is a

56

1    subject that's fair game and I would object to any discovery that

2    went into the merits of the parties' position as opposed to their

3    involvement in the mediation.

4         THE COURT:  All right.

5         MR. MANCINO:  Your Honor, Rich Mancino.  Just one last

6    point.  I object to Mr. Bernick's motion here.  I think what he's

7    trying to do is to carve out of the Third Circuit's mandate a

8    relevant area of discovery and what he -- if there is a concern

9    about the confidentiality of the substantive discussions that may

10   have taken place which may in fact be privileged, to the extent

11   that questions attempt to probe those, objections to such

12   questions can be lodged and if the objection is perceived to be

13   without basis, we could bring it to the Court's attention and ask

14   for a ruling.

15        At this stage, in effect he's looking, one, for an

16   advisory opinion on this issue and, two, he's trying to put a

17   broad category of activity that consultants played in one of the

18   five asbestos cases, and what Mr. Bernick wants to do is to put

19   that beyond examination into any extent, and we would object to

20   that.

21        THE COURT:  All right.  Anybody else want to be heard?

22   Okay.  Nobody else wanting to be heard, I'm going to put you on

23   hold for two minutes.  I'll be back.

24        (There is a discussion off the record.)

25        THE COURT:  Everybody back?

1       MR. BERNICK:  Yes, sir.  This is David Bernick.  Judge

2   Dreier indicated that he thought that the remaining matters that

3   were being discussed really didn't relate to him.  He wanted to

4   make sure that we told your Honor that he was leaving the call.

5       THE COURT:  All right.  The Court's had an opportunity to

6   listen to the argument of all people, all participants.  I'm

7   satisfied that while I believe that anything that occurred in the

8   mediation is more than likely privileged, other than the fact

9   that there was a mediation, who hired him, were they paid, I'm

10   still going to require you, Mr. Bernick, to produce the log.

11   I'll then be prepared to rule on it.

12       MR. BERNICK:  Okay.

13       THE COURT:  You know, as I read the Third Circuit, and I

14   have their Opinion at page 22 here, when they said the full

15   extent of the consultants' activities, while I'm satisfied, and I

16   say this very candidly, that the parties are taking an extreme

17   position of what the Third Circuit really meant and what they

18   wanted, I'm going to permit it, so, let's move on.  What's the

19   next issue?

20       MR. BERNICK:  I don't have any further issues.

21       MR. ORSECK:  The movants don't have any other issues, your

22   Honor, either.  This is Gary Orseck.

23       THE COURT:  All right.  I want to tell you one last thing.

24   Everybody should read the case of Hall vs. Clifton Precision,

25   found in 150 Federal Rules of Decision 525 written by Judge

58

1    Gawthrop, and as far as I understand is still the law in the

2    Third Circuit and which I will follow.

3        MS. NADLER:  Your Honor, could you repeat the name please?

4        THE COURT:  Sure.  It's Hall vs. Clifton Precision,

5    Division of Litton Know systems, Inc., 150 Federal Rules of

6    Decision 525.  Everybody should be familiar with it when they

7    come here on the fifth.  Does this complete our telephone call?

8        MR. BERNICK:  I believe it does.

9        THE COURT:  All right.  Court will be in recess.

10        MR. ORSECK:  Thank you, your Honor.

11        (Whereupon, the telephone conference is adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25