# EXHIBIT P

1

```
 1                    UNITED STATES BANKRUPTCY COURT
                       FOR THE DISTRICT OF DELAWARE
 2

 3

     IN RE:  OWENS CORNING,              CHAPTER 11
 4   et al.,                             Case Nos. 00-3837 through
                                                    00-3854
 5          Debtors.
     ---------------------------
 6   IN RE:  W.R. GRACE & CO.,           CHAPTER 11
     et al.,                             Case Nos. 01-1139 through
 7                                                  01-1200
            Debtors.
 8   ---------------------------
     IN RE:  USG CORPORATION,            CHAPTER 11
 9   a Delaware Corporation,             Case Nos. 01-2094 through
     et al.,                                        01-2104
10
            Debtors.
11   ---------------------------
                                    Telephone Conference Call
12                                  December 24, 2003
                                    Newark, New Jersey
13

14   B E F O R E:   ALFRED M. WOLIN, USDJ

15

16

17   Pursuant to Section 753 Title 28 United States Code, the
     following transcript is certified to be an accurate record as
18   taken stenographically in the above-entitled proceedings.

19   _____
     JACQUELINE KASHMER
20   Official Court Reporter

21

22

23              JACQUELINE KASHMER, C.S.R., C.R.R.
                     OFFICIAL COURT REPORTER
24                        P. O. Box 12
                     Pittstown, NJ 08867
25                       (609) 656-2595
```

2

A P P E A R A N C E S:


        ROBBINS, RUSSELL, ENGLERT, ORSECK & UNTEREINER, LLP
        1801 K Street, N.W. - Suite 411
        Washington, D.C. 20006
        BY:  GARY A. ORSECK, ESQ.,
        For Kensington and Springfield


        COOLEY GODWARD, LLP
        Five Palo Alto Square
        3000 El Camino Real
        Palo Alto, CA 94306-2155
        BY:  STEPHEN C. NEAL, ESQ.,
        For USG


        WILLKIE, FARR & GALLAGHER
        787 Seventh Avenue
        New York, NY 10019
        BY:  RICHARD MANCINO, ESQ.,
        For D.K. Acquisition Partners, Fernwood Associates, and
        Deutsche Bank Trust Company America


        KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP
        919 Third Avenue
        New York, NY 10022
        BY:  JEFFREY S. TRACHTMAN, ESQ.,
        For Credit Suisse First Boston


        SAUL EWING, LLlP
        100 South Charles Street
        Baltimore, MD 21201-2773
        BY:  CHARLES O. MONK, II, ESQ.,
        For Owens Corning Debtors

1          MR. WOHLFORTH:  Ladies and gentlemen, this is Evans

2     Wohlforth, Judge Wolin's law clerk.  I'm going to put you on the

3     speaker and here in chambers is Judge Wolin, Gail Hansen, the

4     court deputy clerk, the court reporter and my two colleagues.

5     Can you hear us.  Can you hear us?  Very well.

6          THE COURT:  This is Judge Wolin.  All right.  Good

7     morning.  The first thing I'd like to do is take appearances of

8     all persons that are participating in this phone call as opposed

9     to persons who are just listening and then I will ask for them to

10    identify themselves in what I will term a roll call, but I want

11    to take appearances for participants first.

12         MR. MONK:  Your Honor, this is Charles Monk on behalf of

13    the Owens Corning debtors.

14         THE COURT:  All right.

15         MR. INSELBUCH:  Elihu Inselbuch on behalf of the Asbestos

16    Creditors Committees in Owens Corning, United States Gypsum, W.

17    R. Grace and Armstrong.

18         MR. CRAMES:  Michael Crames, your Honor, and Jane Parver

19    of Kaye Scholer on behalf of James McMonagle, the Futures rep in

20    Owens Corning, Dean Trafelet, the Futures rep in USG and

21    Armstrong.

22         THE COURT:  Next.

23         MR. ORSECK:  Gary Orseck, your Honor, on behalf of movants

24    Kensington and Springfield.

25         THE COURT:  All right.  Next please.

1          MR. NEAL:  Stephen Neal and Scott Devereaux on behalf of

2     USG.

3          THE COURT:  All right.  Thank you.

4          MR. MANCINO:  Judge, good morning, your Honor.  It's

5     Richard Mancino, Willkie, Farr & Gallagher, on behalf of D.K.

6     Acquisition Partners and the other two movants in the W. R. Grace

7     matter, and I'm joined by Chris Sangenos.

8          THE COURT:  All right.  Good morning, Mr. Mancino.

9          MR. TRACHTMAN:  This is Jeffrey Trachtman from Kramer

10     Levin on behalf of CSFB as agent for the bank group.  Good

11     morning, your Honor.

12          THE COURT:  Good morning, Mr. Trachtman.

13          MR. PARKER:  David Parker from Kleinberg, Kaplan, Wolff &

14     Cohen, also here on behalf of Kensington and Springfield.

15          THE COURT:  Okay.  Thank you. Next.

16          MR. GIBBONS:  John Gibbons.

17          THE COURT:  I'm sorry?

18          MR. GIBBONS:  John Gibbons, Gibbons, Del Deo, also on

19     behalf of Kensington and Springfield.

20          THE COURT:  Mr. Gibbons, are you a participant or are you

21     just a roll call?

22          MR. GIBBONS:  Roll call.

23          THE COURT:  Well, I'm not to roll call yet, so, I'm

24     working on participants.

25          MR. GIBBONS:  All right.

```
 1          THE COURT:  Thank you.  Any other participants?  And by
 2   the way, Mr. Parker, I don't know whether you're a participant or
 3   a roll call.
 4          MR. PARKER:  Your Honor, I'm not a hundred percent sure
 5   myself.  I'm hoping to be deferring to Mr. Orseck.
 6          MR. BERNICK:  This is David Bernick and I will be
 7   participating on behalf of W.R. Grace.
 8          THE COURT:  All right.  Next please, participants only.
 9   Have we completed all the participants?  Anybody who's a
10   participant who has not recorded their appearance?  I guess none.
11   Good.  We'll go to roll call.
12          MR. PERNICK:  Your Honor, Norm Pernick on behalf of the
13   debtor, Owens Corning.
14          THE COURT:  Okay.
15          MS. KATZ:  Karen Katz from Davis, Polk & Wardwell on
16   behalf of the creditors.
17          THE COURT:  Would you please spell your name.
18          MS. KATZ:  K-a-t-z.
19          THE COURT:  K-a-t-z?
20          MR. HARRISS:  And Gordon Harriss from Davis Polk.
21          MR. CASE:  And Stephen Case from Davis Polk.
22          MR. JAMES:  James McClammy, M-c-C-l-a-m-m-y, Davis Polk.
23          MR. DANZEISEN:  And Allyn Danzeisen on behalf of the
24   Asbestos Property Damage Claims Committee in USG and W.R. Grace.
25          THE COURT:  Would you please spell your name.
```

1    MR. DANZEISEN:  A-l-l-y-n, and my last name is

2 D-a-n-z-e-i-s-e-n.

3    THE COURT:  Okay.  Thank you.

4    MR. KRUGER:  Your Honor, Lewis Kruger and Ken Pasquale

5 from Stroock for the Official Committee of Unsecured Creditors in

6 both the Grace and USG cases.

7    THE COURT:  All right.  Thank you.

8    MR. FINCH:  Your Honor, David Finch from Caplin & Drysdale

9 on behalf of the Asbestos Personal Injury Claimants Committee in

10 USG, Owens Corning, Armstrong and Grace.

11    THE COURT:  All right.  Thank you.

12    MR. TOBIN:  Peter Tobin from Caplin & Drysdale is also

13 sitting in.

14    THE COURT:  Tobin?

15    MR. TOBIN:  Tobin, T-o-b-i-n.

16    MR. KATCHEN:  William Katchen, Duane Morris, USG Official

17 Committee of Unsecured Creditors.

18    THE COURT:  Next.

19    MR. BERRINGER:  John Berringer from Anderson Kill on

20 behalf of the Designated Members of the Unsecured Creditors

21 Committee of Owens Corning.

22    THE COURT:  Okay.  Next.

23    MR. ENGLERT:  Good morning, your Honor.  Roy Englert on

24 behalf of Kensington and Springfield.

25    THE COURT:  Good morning, Mr. Englert.

1          MR. PARKER:  David Parker.  I have with me Mark Brodsky

2     and Nidad Manham from Kensington and Springfield.

3          THE COURT:  All right.  Thank you.

4          MR. MANCINO:  Your Honor, this is Rich Mancino again.  My

5     partner, Mark Abrams, may be coming, listening in on part of the

6     call.  He's not in the room right now.

7          THE COURT:  All right.  I'll list him as roll call.

8          MR. CRAMES:  Your Honor, Michael Crames.  My partner,

9     Aaron Stiefel, S-t-i-e-f-e-l, will also be listening.

10          THE COURT:  All right.  Thank you.

11          MR. ABRAMS:  Your Honor, Henry Abrams from Saul Ewing on

12     behalf of Owens Corning.

13          THE COURT:  All right.  Thank you.

14          MR. DOBSON:  Matthew Dobson, also from Saul Ewing on

15     behalf of Owens Corning.

16          THE COURT:  I'm sorry.  I didn't get the last name.

17          MR. DOBSON:  D-o-b-s-o-n, your Honor.

18          THE COURT:  All right.  Thank you.

19          MR. GOLDSTEIN:  Judge, this Bruce Goldstein on behalf of

20     David Gross.

21          THE COURT:  All right.  Thank you, Mr. Goldstein.

22          MR. LORELL:  And, Judge, Jeffrey Lorell, also on behalf of

23     David Gross.

24          THE COURT:  All right, Mr. Lorell.  Thank you.  Anybody

25     else?  I'm sorry.  Would you please repeat your name.

1          MR. DiFILIPPO:  Paul DiFilippo.

2          THE COURT:  Yes, Mr. DiFilippo.  And anybody else?  I'll

3     go back to Mr. Gibbons.

4          MR. GIBBONS:  Yes.

5          THE COURT:  Okay.  I'll list you now.

6          MR. GIBBONS:  Fine.

7          THE COURT:  Anybody else for the roll call?  Okay.  I now

8     want to move to what I'm going to term process and procedure for

9     this call.  Because of the fact that by my listing there are nine

10    participants, not everybody can speak at once, so, here's the

11    procedure I'd like to follow.  Whoever speaks shall speak as to

12    all of their objections that they raise in their entirety when

13    they are given their opportunity to speak.

14         The Court will provide each speaker a brief opportunity to

15    reply after all participants have had an opportunity to speak.

16    Now, I don't really care who goes first and the reason that I'm

17    giving a reply is that I anticipate that someone may say, well,

18    if I go first, you know, then everybody else has an opportunity

19    to feed off me; therefore, I'll give you the opportunity to

20    reply.

21         As to the request as of yesterday, the Court will make

22    available to parties for inspection, we're not going to produce

23    them but for inspection, the court's official minutes that were

24    filed for calendar year 2001, 2002, and 2003, and you'll have to

25    contact Gail Hansen, who is my deputy court clerk, who will make

1    those minutes available to you.  Does anybody have any question

2    about that?

3         MR. BERNICK:  Yes, I do, your Honor.

4         THE COURT:  Yes, Mr. Bernick.

5         MR. BERNICK:  Those minutes, do they relate -- which of

6    the cases do they relate to and do they relate to cases other

7    than the five cases?

8         THE COURT:  They only relate to the five cases that are

9    under consideration here.  Okay.  And after I have had the

10   opportunity to hear from everyone, I am prepared to rule today on

11   the discovery requests and, thereafter, the rulings will be

12   contained in a Court Order to be issued by the Court today.

13        I would ask that Saul Ewing take it upon themselves to

14   distribute the Case Management Order that will be issued by the

15   Court.  Can we do that, Mr. Monk?

16        MR. MONK:  Your Honor, we'll be happy to do that.

17        THE COURT:  All right.  I would like to start with the

18   movants' submission of requests for documents and then I will go

19   to the requests for submission of documents by Saul Ewing,

20   because that is the way that they were received by the Court.

21        Now, the pages that came through on the fax have numbers

22   beyond one, two, three and four, you know.  I think I received

23   from the movants' submissions 29 pages, some 29 pages, but as you

24   go through them, they don't work that way, so, I don't know if

25   you have them listed one through 29 or you have them one, two,

1    three, four in each category.  I will try to identify the pages

2    in both manners so that you can follow.  Everybody understand?

3         SPEAKERS:  Yes.

4         THE COURT:  Okay.  I want to go to the first page of the

5    movants' submission for request of documents.  Everybody ready?

6         SPEAKERS:  Yeah.

7         THE COURT:  Okay.  Going over to page two -- I'm sorry.

8    If there was a delay, it was that we delayed it and put you on

9    hold for a moment.  I want to go over to page three and I guess I

10   want to start with the bottom of page two, wherein I believe that

11   there is a concern about the deposition schedule that was

12   announced by the Court and contained in its Case Management

13   Order.

14        There was no rhyme or reason as to the dates that were

15   picked and the Court relied upon the statement of Mr. Orseck

16   wherein he indicated that the Court need not be concerned about

17   multiple tracks, that it could be covered, and we relied upon

18   that in ordering these depositions.

19        Now, at the time that we ordered these depositions on

20   particular dates, we had not spoken to any of the individuals to

21   be deposed.  For example, I do not know where Keefe, Dreier,

22   Hamlin and Gross are on January 5th, or McGovern.  I was

23   surprised to learn today that McGovern is out of the country and

24   would not have known that but for the submissions saying that

25   he'll be out of the country until January 9, but I am satisfied

1    that if we keep to a deposition schedule on the fifth and sixth,

2    and if McGovern is one of those people that would be deposed on

3    the fifth and the sixth, he will just have to return from

4    wherever he is out of the country.  In other words, there are no

5    sacred cows in the taking of these depositions.

6        Now, you've said that it's a lot to take Keefe, Dreier,

7    Hamlin and Gross on January 5th.  I'm willing to alter that.  I

8    put Hamlin and Gross down with Keefe and Dreier because I

9    anticipate that you're not going to spend a lot of time with

10   Keefe and Dreier in particular and far more time with Hamlin and

11   Gross.

12       Now, if I'm wrong in my assumption, then we'll reschedule

13   them.  You want to put Hamlin on one day and Gross on another

14   day, you want to move Brodsky up or Eckstein and Case with Keefe

15   and Dreier, that's fine by me.  I'm willing to adjust that

16   deposition schedule within reason.  But I did rely upon the

17   statement made that everybody has the manpower to handle this.

18   And the reason that I put depositions on the fifth and the sixth,

19   so that necessarily if we could avoid multi-tracking depositions,

20   that would be preferable.  If we can't, then we'll multi-track.

21       So, I guess, Mr. Orseck, I'm addressing you first on that

22   issue because you're the one that raised it.

23       MR. ORSECK:  Yes.  Thank you, your Honor.  I did say that

24   we will cover the depositions whenever scheduled.  Of course,

25   when I made that representation, it was not proposed by either

1    side that all of the depositions would be taken in a two-day

2    period, allowing probably no more than two hours for each one.

3    We thought that the depositions, and I think the other side did

4    as well, would take at least a half a day or more each.

5           Having said that, your Honor, I would like to be able to

6    reserve on the question, on this call of moving Mr. Gross or Mr.

7    Hamlin because, as you pointed out, your Honor, none of us knows

8    when either one or when anyone else who's been listed here is

9    available and, therefore, I think it probably makes more sense

10   for us to contact those individuals and find out when each one

11   can be deposed.

12          But I would repeat that without the need for any double

13   tracking or triple tracking, we could certainly spread these out

14   over a somewhat longer period which would allow all the parties

15   the safety valve of some additional time and will also build in

16   some time for the depositions to allow the Court to rule

17   contemporaneously on any objections that are raised, because

18   under the current schedule, as soon as that occurs, we are likely

19   to eat into substantial time that has been allotted for these

20   depositions.

21          So, I guess our response, your Honor, is that while, of

22   course, we will cover any depositions at any time, our lead

23   counsel is absolutely unavailable either of those days and in

24   order to accommodeate that schedule, while allowing for a bit

25   more time if necessary for each deposition, we would propose

1        setting forth some additional days for them and in either event,

2        your Honor, we will take it upon ourselves to contact the people

3        whose depositions we are seeking and we can, I suppose, agree

4        with the other side to move particular deponents from one day to

5        another if that works out to everyone's convenience.

6            MR. BERNICK:  Your Honor, this is David Bernick for Grace.

7        I would strenuously object to that.  It seems to me, number one,

8        that when it comes to finding out the schedules for the advisers,

9        that that ought to be done in a conference call that can be very

10       simply set up with the advisers where all counsel can participate

11       rather than having this thing take place through several filters,

12       and the simple question is their availability during the days on

13       the fifth and sixth and if they have an excuse for why they can't

14       be available, they could take that up with the Court.

15            This schedule is inconvenient for absolutely everybody but

16       all the inconvenience that's really of relevance here is the

17       convenience of the Court of Appeals.  Your Honor very carefully

18       set a schedule yesterday which contemplates the discovery gets

19       done within a certain period of time so that there can be a

20       hearing and the Court can rule, and what's now being requested of

21       you is that you basically extend the discovery schedule,

22       deposition schedule in particular, and that will clearly

23       jeopardize the overall flow that you established yesterday.

24            It seems to me that what the Court has proposed is

25       definitely reasonable, which is that everybody has got to show up

1    and the only question is whether you want -- whether folks want

2    to shift the order of witnesses either to accommodate their own

3    concerns or to accommodate the witness, but if this is an effort

4    to revisit the overall schedule, I think that that should be

5    rejected because we don't have time to revisit the overall

6    schedule.

7         With respect to the convenience of Mr. Robbins, Mr.

8    Robbins, to my knowledge, hasn't participated in anything to

9    date.  He didn't participate in the Court of Appeals argument, he

10   didn't participate in the hearing that took place yesterday.  I

11   don't here him chiming in on the phone today.  Maybe he's there,

12   but Mr. Robbins is one person and Mr. Englert has handled things,

13   Mr. Orseck has handled things, and there could be nothing more

14   explicit yesterday than the representation that they would do

15   whatever was necessary.  They can get counsel.  They can act.

16   They're big boys.  And it doesn't seem to me that we ought to be

17   accommodating Mr. Robbins' schedule.

18        MR. ORSECK:  Your Honor, this is Gary Orseck again.  If I

19   may respond for one moment.

20        THE COURT:  Mr. Orseck, let's see if any other participant

21   wants to respond.  Then I'll give you an opportunity to reply.

22        MR. ORSECK:  Thank you.

23        THE COURT:  Does any other participant want to be heard on

24   the issue that I raised?

25        MR. INSELBUCH:  I agree with what Mr. Bernick just said.

1          THE COURT:  All right.  Anybody else before Mr. Orseck?

2          MS. PARVER: Your Honor, it's Jane Parver for the futures

3     rep.  We agree as well with what Mr. Bernick said.

4          THE COURT:  All right.  Anybody else before Mr. Orseck?

5     All right, Mr. Orseck, and before you respond, Mr. Orseck, I want

6     to add one thing, too.  If you look at the paragraph that

7     followed the designations of depositions, the Court listened to

8     you yesterday when you said, well, you know, how do we know what

9     may come out of the depositions, so, therefore, I left the

10    seventh for people to reflect and on the eighth to convene a

11    conference before the Court to listen to counsel in the event

12    they were to be able to point to something that arose out of the

13    depositions on the fifth and sixth in order to consider

14    additional depositions if necessary.

15          If we're to change the fifth and the sixth, then that date

16    on the eighth may no longer be available or further depositions,

17    if ordered, may be in a greater compressed time period.  So,

18    there was an overall time period for getting this accomplished

19    with it ultimately being accomplished by January 16, so the Court

20    could then reflect on all of the discovery, all the depositions,

21    and be able to render an opinion as directed by the Court of

22    Appeals.  Now I'll hear you, Mr. Orseck.

23          MR. ORSECK:  Yes.  Thank you, your Honor.  The two dates

24    that you've mentioned are January 8th, at which time the Court is

25    to consider whether additional depositions are required, and then

1    oral argument on January 16.

2         THE COURT:  That's correct.

3         MR. ORSECK:  I think without any need to threaten our

4    ability to meet and the Court's ability to meet the January 31st

5    deadline, an accommodation of moving these dates back by perhaps

6    two days each should not threaten the ability to get all of this

7    accomplished by the end of the month.

8         It is not the case that I am raising the convenience of a

9    particular individual.  It's Christmas and it's New Year's for

10   everyone and we all understand that.  What I am saying is that

11   Mr. Robbins, who was hired by the movant Kensington and

12   Springfield, as lead counsel and who is expected to defend Mr.

13   Brodsky's deposition, has an oral argument in the Court of

14   Appeals in Washington on the sixth.  It is literally impossible

15   for him to do both of those things at once.

16        THE COURT:  Well, maybe he should consider adjourning the

17   argument before the Court of Appeals just like I'm considering

18   adjourning some trials that I have in January so that I can

19   concentrate on this.

20        MR. ORSECK:  I have not raised with the Court of Appeals

21   or with Mr. Robbins, who happens to be out of the country at the

22   moment, whether that oral argument can be moved, but I certainly

23   tend to doubt it.  But my only point here is without threatening

24   the schedule and the intervals in between the times and the dates

25   that the Court had set, Mr. Robbins' schedule could be

1    accommodated, number one, and number two, these depositions could

2    certainly be spread out among -- over a greater period of time as

3    both the movants and the respondents have proposed, which would

4    allow for, number one, the discovery I think the Court of Appeals

5    envisioned the parties to be entitled to and, number two, to

6    allow the Court contemporaneously on objections.  That's my

7    response to Mr. Bernick.

8         THE COURT:  All right.  Anybody else wish to be heard?

9         MR. NEAL:  Your Honor, Stephen Neal.  I don't have

10   anything I want to say with respect to the scheduling of the

11   depositions.  I am concerned that if the Court's intention is

12   that these, in fact, be restricted to effectively a couple of

13   hours per deponent, that that may turn out to be insufficient

14   time, and I know your Honor suggested that it may be that we use

15   less than two hours for a couple.

16        THE COURT:  Mr. Neal, you never heard me restrict anybody

17   to any period of deposition.  We'll go by the federal rule.  It's

18   a maximum of seven hours for any deponent.  All I said was I

19   doubt that you'd want to depose some people beyond two hours.

20   Gross and Hamlin you may want to depose for seven hours.  I don't

21   know.

22        So, Mr. Neal, your objection, if it's an objection, is not

23   well-taken.

24        MR. NEAL:  It's not an objection, your Honor.  That

25   clarification is very helpful.

1      THE COURT:  Okay.  I always want to help.  I am very

2   disinclined to move the schedule that the Court set out.  It's

3   part of an overall scheme that lends itself to all the other

4   matters that the Court designed for the disposition of this

5   matter.

6      Secondly, I think it's in keeping with the spirit and the

7   letter of the Court of Appeals and I'm not so sure that all the

8   document production that everybody seeks here, everybody all

9   inclusive, is within the letter and spirit of the Circuit Court

10  of Appeals, but we'll cope with that later.

11     I have no objection to revisiting between the parties on a

12  voluntary basis who shall be deposed on January 5th or January

13  6th.  This Court will not limit the discovery on those days to

14  the court day of eight hours.  If you want to say here till 10:00

15  at night and depose someone, that's fine with the Court.  The

16  Court will be here.

17     Also, it is not my purpose to argue with some Court of

18  Appeals somewhere as to someone's argument.  That's between that

19  individual and that Court of Appeals.  I don't know when --

20  obviously, this person who you mentioned before who has such an

21  important argument with the Court of Appeals seems to be out of

22  the country, when potentially they could be preparing for their

23  argument before the Court of Appeals.

24     My schedule as to January 5th and January 6th for the

25  taking of depositions shall remain.  If parties want to

 1    interchange who will go on the fifth and who will go on the

 2    sixth, I'm certainly amenable to that and I'm going to give you

 3    until Monday, the 29th, to advise the Court at 10:00 whether the

 4    schedule is changed on a voluntary basis.  If not, then the

 5    schedule shall remain.

 6         MR. ORSECK:  Your Honor, this is Gary Orseck again.  I'm

 7    afraid that we, on our own, are unable at this point to contact

 8    Mr. McGovern or to force him to return here, and this may be more

 9    of a housekeeping matter than anything else, but if the Court is

10    to issue an order at the conclusion of this call, I wonder if it

11    might be appropriate to make some provision for directing Mr.

12    McGovern's presence for his deposition.

13         MR. BERNICK:  This is David Bernick.  I'm relatively

14    confident, based upon not only mine but other people's dealings

15    with Professor McGovern in the context of these cases, that it

16    will not be difficult to communicate to him the importance of his

17    showing up and I don't know that we have to have court orders to

18    accomplish what I think will be accomplishable readily without

19    the need for court orders.

20         THE COURT:  Mr. Orseck, who do you want to contact Mr.

21    McGovern?  Do you want the Court's clerk to reach out for him,

22    you want to reach out for him, you want Mr. Bernick to reach out

23    for him?  I don't want to engage in anything that you're going to

24    say is, by the way, ex parte if I reach out for McGovern.

25         MR. ORSECK:  Your Honor, I frankly wouldn't even know how

1    to reach out for Professor McGovern.  Certainly if -- I think Mr.

2    Bernick can contact him, if he'd be willing to do so, and talk

3    about whether his deposition should be on the fifth or the sixth.

4         MR. BERNICK:  A proposal maybe in the spirit of trying to

5    get this done on a cooperative basis among the parties, it really

6    does seem to me that the most effective way in which to

7    coordinate these deposition schedules so that we don't have to

8    come back to Judge Wolin is for the movants to caucus among

9    themselves about who it is that they want to take and for what

10   periods of time, and the same thing for the respondents, and that

11   we schedule a conference call with the advisers prepared to talk

12   about their schedules at some point in the next few days, and

13   that each side be prepared to make a proposal on how long they

14   want to go with each witness and on which day, see if we can work

15   it out.

16        I think if we don't have that call, we're all going to

17   waste a tremendous amount of time getting the logistics of this

18   thing straight and all that's going to happen is we're going to

19   get back to the Court with what will be a very frustrating

20   unproductive call.  I think it would be a waste of time when we

21   could have resolved these logistical matters amongst ourselves.

22        MR. ORSECK:  This is Gary Orseck and that sounds fine to

23   me.

24        THE COURT:  All right.  And when is that call to take

25   place, Mr. Bernick?

1          MR. BERNICK:  Well, I guess it's -- we will undertake -- I

2     mean, it seems to me that the first thing is people have to make

3     up their minds how much time they need and in light of the press

4     of time and people's schedules, we will undertake to set up a

5     conference call on Friday of this week in the afternoon, and or

6     if the Saul Ewing people can do it because they've got

7     everybody's telephone number, that would be even better, but

8     Friday afternoon seems to be reasonable, and in the meantime, it

9     also seems to me that somebody's got to reach out to each one of

10    the advisers to let them know that they really ought to

11    participate in that call if they care about their schedules, and

12    I can contact Mr. McGovern, I think I've got his telephone

13    numbers where he might be, and if somebody else will reach out to

14    the others, we can get it done.

15         MR. MONK:  Your Honor, this is Charles Monk.  I believe

16    Mr. Gross's counsel is on the line.  Is that correct?

17         MR. GOLDSTEIN:  That's correct.

18         MR. MONK:  So, presumably we've communicated with him by

19    virtue of this call.  We will set up a conference call for 3:00

20    on Friday, the 26th, among all parties, to discuss the scheduling

21    of the advisers' depositions.

22         THE COURT:  And I take it that on Monday, the 29th, at

23    10:00, a conference call will be made to the Court or you may

24    designate someone to call the Court and to give the Court the

25    schedule.

1           MR. MONK:  Yes, your Honor, if that's how you'd like us to

2      do it.

3           MR. BERNICK:  Can I ask counsel for Mr. Gross also to

4      contact the other advisers excepting Francis, whom I'll contact

5      to let him know about the call.

6           MR. GOLDSTEIN:  I'm not sure that we can communicate with

7      them and I don't frankly think that is something we should be

8      undertaking.  There are counsel and we suggest whoever you want

9      to depose apart from Mr. Gross, that you communicate with them

10     directly.

11          MR. BERNICK:  I don't want to depose anybody but --

12          MR. GOLDSTEIN:  Whoever the parties want to depose.

13          MR. BERNICK:  Does somebody else want to call?  I don't

14     want to sit there and call everybody.  Does somebody else want to

15     volunteer to call some of the others?

16          MR. MONK:  Your Honor, this is Charles Monk.  We will

17     contact the other advisers.

18          THE COURT:  Keefe and Dreier and Hamlin are in the Lawyers

19     Diary.  They shouldn't be difficult to find.

20          MR. MONK:  Thank you, your Honor.

21          THE COURT:  You're welcome.  All right.  Let's move on to

22     the next matter; that is, that I would like to hear parties'

23     statements or objections as to the demand for production of

24     documents that have been filed and if nobody is a volunteer, then

25     I will --

1          MR. BERNICK:  I'll volunteer, your Honor, and I do so

2     because I think that one of the difficulties in going through

3     this is that we're going to be revisiting a lot of the same

4     issues again and again because they crop up again and again, and

5     I think that there's some basic parameters that would constitute

6     core objections to be made that apply pretty much across the

7     board, and I've tried to think of it that way as well as focusing

8     on the particular requests that are directed at my client and at

9     my firm and myself.

10          It seems to me that they basically fall into three major

11    categories.  There are, first of all, objections that are based

12    upon the fact that as currently styled, these requests will

13    potentially affect the rights of people who are not even before

14    the Court and, therefore, pose basic constitutional problems of

15    due process when compliance with the rules.

16          To the extent that these requests go beyond the five cases

17    that are before the Court, they most certainly do affect the

18    rights of people who are not before the Court.  There's obviously

19    been a concerted effort here to use the excuse of this motion for

20    recusal to reach out to specific -- and the excuse of posing

21    discovery to counsel to reach out and potentially affect the

22    rights of people who are involved in the Combustion Engineering

23    case, people who are involved in the T-1 Holdings case.  None of

24    those people are before the Court.

25          In the case of Combustion Engineering, I'm very familiar

1    with that because, as you know, I'm counsel to some of the plan

2    proponents of that case.  That's a case where there's actually

3    already a confirmed plan and, in light of that, you would have

4    to, if you wanted to effect anything to do with that case, the

5    Court -- which is now on appeal before the Third Circuit, there

6    would be enormous problems, they have jurisdiction; B, of giving

7    notice to each of tens of thousands of claimants who now have a

8    direct stake in the outcome of that case, and that the effort to

9    reach out to that case, and likewise G-1 Holdings, is clearly

10   improper and violates basic precepts of notice of due process,

11   and it seems to me that requests that relate to those cases ought

12   to be rejected out of hand.

13       The second category are problems of relevance.  It seems

14   to me that in dealing with relevance, we have to come back to the

15   discussion that took place yesterday, which seems to me to be

16   wholly -- has been wholly ignored by the people who put together

17   these discovery requests.  Nothing could have been clearer

18   yesterday from the Court that we have a limited period of time,

19   that the focus should be not simply irrelevant information but

20   specifically highly relevant information, yet, in casting these

21   discovery requests, the proponents have -- the movants have

22   clearly retreated back to the same approach that we saw

23   yesterday, which is to make a record at the expense of trying to

24   figure out an answer to what the Court of Appeals has now

25   required, which is to actually find the relevant evidence.  This

1    is just more of the same.  There's no improvement.

2          And what's more, therefore, in order to try to cut through

3    the paperwork and come up with a reasonable proposal about how to

4    get this job done, it's important to articulate what the Court of

5    Appeals has focused on.  It seems to me that there are two

6    principal areas where there could be relevant evidence.

7          Area one is the roles that were actually played by the

8    advisers, because the roles that were actually played by the

9    advisers is germane to the issue of whether there is a conflict

10   to begin with.

11         Again, if there is no conflict and these people have not

12   been given work to do that gives rise to a conflict with their

13   other engagements in G-1, the whole predicate for the motion

14   that's been filed by Owens Corning -- or in the Owens Corning

15   case and the Grace case disappears and, therefore, discovery that

16   relates to what the advisers actually did is relevant discovery,

17   but more particularly, your Honor, it ought to be discovery

18   relating to what Gross and Hamlin did because they are the ones

19   that are alleged to have the conflict. There's been no allegation

20   of conflict that pertains to any of the other advisers.

21         So, the discovery regarding roles played should relate to

22   Hamlin and Gross and, in particular, should focus on whether they

23   have engaged in activities that pertain to the interests of

24   future claimants because those are the folks where the conflicts

25   is alleged to have arisen.

1        If they engaged in other activities, such as mediating

2    issues in one of the cases or advising the Court with respect to

3    fraudulent conveyance principles, that is of absolutely no

4    relevance at all to the key issue of whether there's a conflict.

5    We've heard a lot of argument about how the roles played have

6    been very broad given the broad ambit of the notice that your

7    Honor provided.  We've seen no evidence that's actually been

8    produced regarding the roles that were actually played.  That was

9    the reason why Grace suggested that they engage the record -- the

10   movants engage the record on that subject, and that now is their

11   opportunity.  They have the opportunity to develop a factual

12   record on whether the G-1 engagement was really relevant and

13   created a conflict of interest.

14       The second area of discovery is ex parte contacts and,

15   again, with respect to the Owens Corning movants and the Grace

16   movants, nothing could be clearer in their papers but that they

17   were not taking on the ex parte process itself but simply saying

18   that by virtue of the ex parte process, the conflict that they

19   were focusing on and was the predicate of their motion, that that

20   conflict ended up having particular impact.

21       USG is in a different situation and USG apparently is

22   willing to waive whatever rights they might have with respect to

23   ex parte contacts.  I'm not going to address USG's situation in

24   their particular case but what I would say is when it comes to ex

25   parte contacts affecting all of the other cases, that the focus

1    again should be on ex parte contacts that are germane to the

2    alleged conflict of interest and, therefore, the focus should be

3    not on ex parte contacts between other parties and the Court.

4        Those were, as the Court has indicated, innumerable and

5    pertain to many, many different features of this case.  Those ex

6    parte contacts are protectable because they involve work product

7    that could have been shared with the Court, they involve

8    confidential information that could have been shared with the

9    Court, they involved settlement matters that could have been

10   shared with the Court.  There are all kinds of privilege issues

11   associated with that and none of that is relevant.  Lots of

12   different people had ex parte contacts with the Court.

13       The real issue with respect to ex parte contacts is

14   whether Messrs. Gross and Hamlin had ex parte contacts with the

15   Court pertaining to future claimants, because it is that subject

16   matter again which gives rise to the claim that there's a

17   conflict of interest.  So, when we go to ex parte contacts, the

18   only relevant ex parte contacts are contacts between the advisers

19   and the Court with respect to matters that are alleged to be

20   affected by conflict.

21       The third major source that my client, my firm would

22   object to all discovery requests that either implicate parties of

23   interest and parties that are of interest in these matters that

24   are not before the Court.  We would also object on relevance

25   grounds because it seems to us, and we can demonstrate this in

1    detail in connection with requests that are made of Grace and of

2    Kirkland & Ellis, that these requests are grossly overbroad and

3    do not pertain to the relevant subject matters that are keyed up

4    by the issues before the Third Circuit.

5        And then the third source of objections which we will also

6    make is that most of these requests seek privileged information.

7    We have privileges that apply, including work product privileges,

8    attorney-client privileges.  There's been no showing that

9    specified need to waive to override those privileges and,

10   therefore, we would object to their press on grounds of

11   privilege, those privileges in particular, and that another part

12   of the privilege issue is that these discussions, these documents

13   also relate to the settlement process, and the Third Circuit has

14   reasonably held that settlement discussions are not only

15   inadmissible under the rules but they're also nondiscoverable.

16   We would invoke precisely that principle and object to any

17   request that elicits information that pertains to settlement in

18   any way, shape or form.

19       So those are our three sources of objections with respect

20   to the discovery that has been propounded and, again, I'm

21   prepared to go through the Grace requests in particular if the

22   Court believes that would be appropriate.

23       THE COURT:  All right.  Maybe what we should do is rotate

24   between movants and respondents so that all the respondents don't

25   go first and all the movants go first, so, maybe, Mr. Orseck, we

1     should hear from you next.

2          MR. ORSECK:  Thank you, your Honor.  I will respond to

3     those sections.

4          THE COURT:  And by the way, Mr. Inselbuch, you're on deck.

5          MR. INSELBUCH:  Thank you.

6          THE COURT:  Go ahead, Mr. Orseck.

7          MR. ORSECK:  To begin with, your Honor, we have vastly

8     narrowed down the document requests from the ones that were

9     circulated on Monday.  The ones that remain we think are targeted

10    as specifically as can possibly be done with the materials that

11    are most --

12         THE COURT:  Can I make an inquiry of you?

13         MR. ORSECK:  Yes, sir.

14         THE COURT:  In this document is reference to Combustion

15    Engineering.  My review of the Circuit Court of Appeals' argument

16    indicates that when I believe Mr. Englert raised Combustion

17    Engineering, the Circuit Court of Appeals shut it down

18    immediately.

19         MR. ORSECK:  I don't believe that's correct, your Honor.

20         THE COURT:  What's incorrect about it?

21         MR. ENGLERT:  Your Honor, this is Roy Englert, if I may.

22    When I raised Combustion Engineering, Mr. Bernick took the

23    extraordinarily unusual step in the Court of Appeals in standing

24    up to object and Judge Fuentes' response was we're not going to

25    have that, I believe was we were not going to have objections

1    during counsel's argument to a Court of Appeals, not we're not

2    going to have discussion of Combustion Engineering --

3        THE COURT:  Well, I'm not sure.

4        MR. ENGLERT:  -- though tempering my remarks after Mr.

5    Bernick's objection, and there was nothing said by the judges of

6    the Court of Appeals to suggest that I should not be discussing

7    that.

8        MR. BERNICK:  Your Honor, also, the transcript was not

9    well transcribed and my own observation would be that actually

10   the extraordinary thing about that whole process was that Mr.

11   Englert would seek to argue to the Third Circuit, which now has

12   the Combustion Engineering case on appeal, anything relating to

13   that case, even though that case was not noticed up for anything

14   in connection with the pending matter, that the different

15   proponents and interested parties in the Combustion Engineering

16   case were not before the very same court that is hearing that

17   case absolutely outrageous, and their attempt here is no less

18   outrageous.  It's the same outrage, and what happened was that I

19   had no choice but to stand and object because they're talking to

20   the same Court.

21       Judge Garth did say we will have no more of that.  I don't

22   know whether he was referring to my objection or to Mr. Englert's

23   argument, but what was very clear is that Mr. Englert thought he

24   was referring to his own argument because he then hastened to go

25   through it, and if you take a look at the language he used, he's

1     recognizing he doesn't want to spend very much time on it because

2     he knows he's not supposed to be doing it.

3          MR. ENGLERT:  Your Honor, I just simply register for the

4     record my strong disagreement with Mr. Bernick.  I won't

5     elaborate.  Thank you.

6          THE COURT:  Fine.  Mr. Orseck, let's continue on.

7          MR. ORSECK:  Yeah.  The first objection that was raised by

8     Mr. Bernick I think attempts to eliminate Rule 45 from the

9     federal rules.  Mr. Bernick suggests that it is inappropriate, in

10    fact, unconstitutional to seek discovery from parties who are not

11    before the Court, but I think, more particularly, he's suggesting

12    that we ought not to be able to take discovery with respect to

13    matters that are not before the Court.

14         We are not going after the thousands of claimants in other

15    cases.  This case puts directly at issue the dual roles of the

16    advisers in one case and their service as futures representatives

17    in another case.  There is simply no way to get at that issue

18    without seeking documents and asking questions in a deposition

19    that refer at least to that other matter.  That's number one.

20         MR. BERNICK:  Your Honor, if I may, just because I don't

21    think Mr. Inselbuch, maybe he can address that, but just to be

22    clear, if you're following the rules for the issuance of, for

23    taking discovery, you have to provide notice, and what's not --

24    the notice that's not been given here is the notice to all the

25    other people that are involved in the case.

1            It's not a question of whether you can't or you're

2     precluded from conducting discovery.  It's the process that you

3     have to follow, and they are most certainly attempting to affect

4     the rights of thousands of claimants because those claimants

5     voted in favor of the plan that's now before the Court of

6     Appeals.  You know, in the bankruptcy world, you've got to give

7     notice to the people who are claimants because they have an

8     interest in the matter.

9            The Combustion Engineering case was not subject to the

10    system of advisers that have been supplied in these cases.  As

11    your Honor well knows, that case came to your Honor outside of

12    the confines of the five consolidated cases.  It came on for

13    confirmation after Judge Fitzgerald heard all the evidence and

14    held the confirmation hearing and that case is definitely not at

15    issue with any of the motions that have been filed before the

16    Court of Appeals and there's nothing about the Court of Appeals'

17    Opinion that implicates it, so, I am most certainly raising a due

18    process argument because no effort has been undertaken to notify

19    the interested parties either in Combustion Engineering or in G-1

20    Holdings.

21            THE COURT:  All right.  Excuse me.  Mr. Bernick, now

22    you're violating the process.

23            MR. BERNICK:  I'm sorry, your Honor.

24            THE COURT:  And I'm going to give all participants an

25    opportunity to reply.  If we keep having this type of colloquy,

1    we may not finish before midnight.  So, I'd like to let Mr.

2    Orseck continue uninterrupted.  Let him say or argue whatever he

3    chooses and then we'll keep moving down the line and then I'll

4    come back and give the participants a brief opportunity to reply.

5         Mr. Orseck, you may continue.

6         MR. ORSECK:  Thank you, your Honor.  Just to follow up on

7    that single point, we are seeking facts with these document

8    requests.  There is no attempt and there is no conceivable way in

9    which our attempts to take discovery affects the rights of

10   parties who are not before the Court.  That is simply a red

11   herring.  We are simply taking discovery.

12        Mr. Bernick's objections on the grounds of the

13   constitution or relevance or civil procedure are completely --

14   are completely unfounded.

15        The second objection he made was, Mr. Bernick attempted to

16   post the relevant subject matter here to the activities of

17   Messrs. Gross and Hamlin.  For purposes of his objection, I'm

18   going to assume that he's right, that that is the only relevant

19   subject matter before the Court.  Of course, we disagree with

20   that but the fact of the matter is there is no rule that I'm

21   aware of that restricts a party's ability in discovery with

22   respect to one issue that a party must be prohibited from taking

23   discovery from other parties to determine what parties A and B

24   did.  We are certainly able to take discovery from other parties

25   for that purpose.  That's precisely where our document requests

1     are directed.

2           Number two, the premise is wrong.  We have raised in this

3     proceeding, in fact, we have raised in the recusal motion that

4     was originally presented to the Court footnote seven on page nine

5     raises the conflict problems surrounding Professor McGovern and

6     Mr. Keefe as well.  Those matters are before the Court.  We have

7     raised them and we are entitled to discovery from those

8     individuals with respect to their conflicts and also with respect

9     to the conflict by Messrs. Gross and Hamlin.  So, there is simply

10    no basis for any attempt to restrict discovery from the start to

11    only the two advisers.

12          I am going to, your Honor, ask Mr. Neal to address the

13    objections regarding the discovery requests for ex parte

14    information but before I pass that along, I want to assure the

15    Court of this.  We are not demanding the production of privileged

16    information.  We are confident that the respondents of this

17    motion are not going to produce to us privileged information.

18          We are seeking relevant non-privileged information as the

19    Third Circuit has directed.  In fact, your Honor, we had a call

20    earlier this morning to try to work out some issues between the

21    parties and the one specific objection that was raised by the

22    other side to a particular document request resulted in our side

23    quickly caucusing and agreeing that that request could be

24    dropped, which we have done and which I have informed the other

25    side about.  So, the notion that our requests, number one, are

1    grossly overbroad, that they are unconstitutional and that this

2    is an attempt, as Mr. Bernick suggests, to use a discovery

3    process as an excuse to go after other materials that are not

4    relevant is absolutely, absolutely baseless.

5          THE COURT:  All right.  Mr. Orseck, only one modification

6    to that.  This Court, in relation to its court-appointed

7    advisers, has waived its judicial privilege as to confidence.

8          MR. ORSECK:  I understand.

9          THE COURT:  And the record should so reflect that.

10         MR. ORSECK:  Thank you, your Honor.

11         THE COURT:  Okay.  Mr. Neal.  Or Mr. Neal, if you want to

12   reserve until Mr. Inselbuch so we can do my rotation.

13         MR. NEAL:  Your Honor, which ever way you proceed, that's

14   fine with me, because I don't think Mr. Bernick actually sort of

15   addressed the USG-related issues and if Mr. Inselbuch intends to

16   do that, then I think your procedure probably is the more

17   sensible way to go, but I'll do whatever you want.

18         THE COURT:  I'll hear from Mr. Inselbuch, then I'll hear

19   from Mr. Neal on deck.

20         MR. INSELBUCH: Thank you, your Honor.   Elihu Inselbuch.

21   I have very little to add to what was said yesterday in court or

22   to what David Bernick added today because when I took a look at

23   what was served out this morning and compared it with what was

24   served out yesterday, although I hadn't seen it when I was in

25   court yesterday, it's identical.  The material that you quashed

1    yesterday has been put up once again, and for all the reasons we

2    argued yesterday, it is so far beyond the scope of what anyone

3    could have envisioned would be done here in the limited time

4    frame as to be so objectionable as to not even be worth arguing

5    about.

6         For example, I told you yesterday that we have 72 linear

7    feet of file materials and that most of those file materials, in

8    fact, almost everything in there will be subject to either

9    attorney-client or work product or both privileges.

10         Now, their first request for production yesterday read all

11   documents that constitute, reflect or refer to communications

12   between you and Judge Wolin, and they went on to say yesterday

13   any pleadings served on all parties in the applicable case may be

14   excluded.

15         Now, they dropped that sentence in today's request, so,

16   presumably we would have to go through the file and find any

17   piece of paper that referred to anything that had to do with

18   anything that went on that in any way touched the Court, and we

19   would then have to go through all of those materials and see and

20   make privilege logs out of 72 feet of material to see whether or

21   not there was anything in there unprivileged to produce, and what

22   would be learned from any of that?  What would advance the ball

23   if you look at what the Court of Appeals wanted to know by way of

24   discovery?

25         The Court of Appeals said they wanted discovery to shed

1     light on the full extent of the consultants' activities in the

2     five asbestos cases.  The five consultants have filed their time

3     records, they filed their statements and your Honor has said they

4     should be available to be deposed.  Well, let them be deposed and

5     if, within the context, within the context of the time period

6     that we have available to us, the full extent of their activities

7     certainly can include day-by-day document-by-document examination

8     of everything that they did but, rather, a broad description

9     adviser-by-adviser case-by-case of the activities they were

10    involved in, what their relationships with the parties in those

11    cases were, what their relationships with the Court were.

12         The next document request, identical to what you quashed

13    yesterday, reads all documents that reflect, refer to or concern

14    any meetings, including without limitation, any conferences

15    between you and Judge Wolin.  This isn't even restricted to

16    attempt to see whether or not counsel or any of these other

17    individual counsel were alone with Judge Wolin or alone with his

18    advisers.  In theory, this would call for any document reporting

19    on any conference that had to do with Judge Wolin whether in open

20    court or in chambers with many people present, in your Honor's

21    jury room where we often meet with all the parties and, again,

22    the same burdensome search to come up again with no information

23    other than what your Honor said yesterday, there was ample notice

24    given that there would be ex parte conferences.  Your Honor has

25    stated the nature of what those things are and I can't understand

1      why any -- why this kind of approach to the world needs to be

2      taken.

3            Third, they say all documents that constitute, reflect or

4      refer to communications between you and any advisers.  This again

5      would require a 72-foot search to see whether there are reports

6      made or notes made, and I can assure the Court that if anything

7      of consequence occurs, it would be reflected in a report I make

8      to my clients which would include my impressions of what the

9      conversations were and, thus, inevitably be subject to the

10     attorney-client privilege.

11           The fourth item, all documents which constitute, reflect,

12     refer to, relate to any draft opinions or memorandum of law for

13     Judge Wolin or any adviser.  I can tell you now we didn't draft

14     any.  I can tell the Court, as the Court I'm sure is aware, we

15     didn't draft anything for the Court or any of its advisers.

16           And finally, item five, again, identical to what they

17     served yesterday and to what the Court quashed yesterday, all

18     documents that report, tabulate, reflect or refer to the number

19     of hours that we participate or prepare for communications as

20     described here, and other than our time records, well, I don't

21     know what we have other than our time records.

22           But, your Honor, this is exactly the same material that

23     they served on us,that they sand-bagged on us yesterday that they

24     wanted to talk about with your Honor in court yesterday, that you

25     had seen but we never saw, and they just served it all up today

1    without any refinement, without any explanation of what they hope

2    to accomplish with this and in an obvious attempt to defy the

3    Court and to defy the Third Circuit, and I think that

4    over-breadth is clear.

5         The privilege issues are enormous.  The inability to

6    accomplish any of this within the time frame that's available is

7    plainly obvious and we would ask that this all be stricken.

8         THE COURT:  All right.  Thank you, Mr. Inselbuch.  Mr.

9    Neal.

10        MR. NEAL:  Thank you, your Honor.  What I address will be

11   the five items that Mr. Inselbuch just ran through, which he did

12   summarize accurately.  We have served a proposal that we asked

13   five, but only five, law firms for the five categories of

14   information that Mr. Inselbuch describes, so, it's to be served

15   on five firms for five categories of information.

16        Mr. Inselbuch says that the requests now have been

17   broadened to impose on the responding parties the burden of

18   turning over pleadings.  That's not accurate.  The definition of

19   documents that are on the preceding page explicitly provide that

20   we are not looking for any pleadings, briefs or other documents

21   that have been filed in the court.

22        Mr. Inselbuch makes a point directly that, literally read,

23   the requests would seem to include documents concerning

24   conferences at which all parties were present before the Court,

25   and we would agree to exclude from the requests documents

1    relating to any such occasions, that is, relating to occasions

2    when all parties were present before the Court.

3        The remainder of these, however, go directly to the

4    question of the nature, extent and substance of ex parte

5    communications either with the Court or the Court's advisers,

6    which is obviously directly and specifically relevant to our

7    455(b) arguments.

8        Both Mr. Bernick and Mr. Inselbuch have said it will call

9    for -- might call for privilege documents.  We agree there may be

10   privilege documents that shouldn't be produced but we do want

11   those scheduled on a log so that we have a fair opportunity to

12   address whether they are indeed subject to privileges and should

13   not be produced as a result of that.

14       But the information is directly relevant to the 455(b)

15   issue and has been greatly narrowed as far as the number of

16   parties that we are asking to provide this information to us, and

17   as I say, we're prepared to narrow it further consistent with Mr.

18   Inselbuch's suggestion.

19       THE COURT:  Well, Mr. Neal, in response to that, when we

20   started this call today, I indicated that perhaps the first line

21   of consideration should be the minutes of the Court that are

22   possessed by the deputy clerk, but we'll pass on.

23       MR. NEAL:  And we heard that.  Obviously, we would like to

24   take the opportunity to do that but we are working on a tight

25   time frame and, therefore, in the event those minutes don't

1       illuminate all of the things that may be appropriate and relevant

2       to the 455(b) issue, this is the only way that seems available to

3       us to try and get that illumination.

4              THE COURT:  All right.  I understand.

5              MR. BERNICK:  Can I ask a question, your Honor, in the way

6       of clarification --

7              THE COURT:  Sure.

8              MR. BERNICK:  -- with respect to what Mr. Neal has said.

9              THE COURT:  If it's not a reply, it's a clarification,

10      I'll permit it.

11             MR. BERNICK:  Question.  I'm not going to reply to it, at

12      least at this point.

13             THE COURT:  Okay, fine.

14             MR. BERNICK:  I look at the definitions in the requests

15      that are directed to Cooney & Conaway, Motley Rice, Caplin &

16      Drysdale, Weitz & Luxenberg and the list I take it to be the ones

17      that you're referring to, it has, when it comes to the requests

18      for production, the definitions, there's the definition of the

19      five asbestos cases.  When it comes to the requests for

20      production, though, I don't see anything that limits the requests

21      for production to the five asbestos cases.

22             Is the intent of these requests the five asbestos cases or

23      is the intent to go beyond them?

24             MR. NEAL:  No, David.  If you look at paragraph five,

25      paragraph five makes it clear that we want communications in the

1    five cases but also any communications in any other case pending

2    before Judge Wolin involving claims arising from exposure to

3    asbestos.  So that if, for example, there were communications, ex

4    parte communications concerning Combustion Engineering, our

5    requests are intended to pick those up or at least to elicit a

6    privilege log listing of them and an explanation as to why they

7    aren't being produced.

8         MR. BERNICK:  Also pertaining to the advisers?

9         MR. NEAL:  Correct.

10        THE COURT:  All, right fine.  Mr. Tractman, why don't we

11   hear from you.

12        MR. TRACHTMAN:  Thank you, your Honor.  I did want to

13   address one specific point made by Mr. Bernick earlier that I

14   don't think has really been joined.  I think Mr. Bernick, in his

15   arguments yesterday and today, is really inappropriately trying

16   to impose upon discovery his ultimate arguments about the

17   relevant scope of really about the merits of the ultimate motion.

18   What types of activities would constitute an appearance of

19   impropriety or an appearance of possible bias is not necessarily

20   as narrow as he's defining it.

21        He is suggesting that only, for example, only activities

22   directly relevant to the treatment of future claimants could

23   possibly give rise to an appearance of impropriety.  That is his

24   argument.  We all have arguments both ways about the proper scope

25   of the 455(a) and (b) motions and the ultimate merits and what

1    constitutes grounds for recusal.  Discovery is not the place to

2    impose those limitations.

3         There's a wide range of activity in which the advisers

4    that we know they've engaged or we could discover that they

5    engaged that could strengthen the already significant record

6    about appearance of impropriety.  One example, Mr. Bernick

7    mentioned fraudulent conveyance and suggested that that was

8    inherently irrelevant, and I -- did I lose your Honor?  Your

9    Honor, are you there?

10        THE COURT:  I'm here.

11        MR. TRACHTMAN:  I'm hearing an echo.  I'm sorry.  I think

12   he's referring perhaps to the Sealed Air matter, which we're all

13   familiar with that.  That is extremely relevant to the interest

14   of future claimants and all tort claimants.  Almost anything of

15   any consequence that happened in these cases is of vast

16   importance to asbestos claimants and are matters on which the

17   asbestos claimants and other creditors have dramatically

18   divergent positions.  And so, anything in which, of any

19   significance, in which these advisers participated in our view

20   gives rise to an appearance of a conflict of an impropriety

21   because they are advocates at the same time they're being

22   neutral.  It doesn't matter whether the specific issue at stake

23   is a treatment of future claimants.  So, it's a global comment. I

24   think it's inappropriate to try to limit the inquiry within the

25   five days by narrowly saying that only certain subject matters

1    and activities could be relevant.

2          THE COURT:  All right.  Anything else?  All right.  I'd

3    like to hear from Mr. Crames next please.

4          MR. CRAMES:  Miss Parver will respond, your Honor.

5          THE COURT:  All right.  And Mr. Parker, if you're going to

6    reply, you're on deck.

7          MR. MANCINO:  Your Honor, Rich Mancino.  Will I have an

8    opportunity to respond very briefly --

9          THE COURT:  Absolutely, you're going to be heard from.

10         MR. MANCINO:  -- Mr. Bernick's comments?

11         THE COURT:  Mr. Mancino, I'm going to give you an

12    opportunity to speak but it's not now.

13         MR. MANCINO:  I just didn't want to be overlooked.

14         THE COURT:  Mr. Mancino, it would be very difficult to

15    overlook you.

16         MS. PARVER:  Your Honor, this is Jane Parver.  Good

17    afternoon.

18         THE COURT:  Good afternoon.

19         MS. PARVER:  Your Honor, both Mr. Orseck and Mr. Neal have

20    represented to the Court that the requests that were delivered

21    today were much narrower than the requests that we did not see

22    yesterday and that they really go to communications with the

23    advisers, what the advisers' role were, were communications with

24    the Court.

25          I can tell you, your Honor, that their representations are

1    really belied by the requests to the futures reps and to Kaye

2    Scholer in this case that we received this morning.  There are 11

3    requests, your Honor, and most of them have nothing to do by

4    their express terms with anything to do with any communications

5    with the advisers or with the Court.

6         For example, your Honor, number five with respect to the

7    five asbestos claims cases, Combustion Engineering and G-1

8    Holdings, all documents that reflect, refer to or relate to the

9    establishment of a bar date for filing claims or demands for

10   present or future asbestos-related injuries against the debtor,

11   the estimation or other calculation, quantification or

12   liquidation of claims or demands for asbestos-related injuries or

13   the substantive consolidation of any debtor or any debtor's

14   estate with any other entity or entity's estate.

15        There's no term there tell us about communications with

16   advisers concerning this.  Your Honor, we've been at this for

17   several years.  For example, with claims estimations, there are

18   just tons and tons of documents between us and our clients that

19   deal with future claims estimations.  It has nothing to do with

20   the issues in this case and this is -- I mean, it would take

21   years to put together this stuff to produce, that's an

22   exaggeration, certainly months, to comb the files, and it's got

23   nothing to do with the issues that Mr. Neal and Mr. Orseck have

24   said were what they were trying to discover.

25        So, I really think, your Honor, these requests on the

1 future reps are so overbroad and so irrelevant that they should

2 just be stricken.

3   MR. ORSECK:  At the risk of violating the Court's

4 interruption rule, this is Gary Orseck, and I can quickly address

5 that.  Your Honor, when I mentioned that there had been an

6 objection this morning to --

7   THE COURT:  No, Mr. Orseck.  Mr. Orseck, I'm going to give

8 you a reply.  I'm going to give you a reply.  Let's see if we can

9 keep to the procedure.

10   MR. ORSECK:  I just wanted to mention, your Honor, that

11 that's no longer a request from us.

12   THE COURT:  Okay.

13   MS. PARVER:  I kind of find it interesting, your Honor,

14 because certainly Mr. Orseck didn't bother to notify the futures

15 rep or the future rep's counsel about that.

16   MR. CRAMES:  Jane, let me interrupt you.  This is Michael

17 Crames, if I may.  By e-mail, Mr. Orseck's request number five

18 was being withdrawn.  However, the e-mail continues that it's

19 being withdrawn with the understanding that those communications

20 are subsumed in request number three.

21   MS. PARVER:  So, they really -- I mean.

22   MR. CRAMES:  I mean, to the extent that they would expect

23 a response on five, they still expect a response but in the

24 context of three, so --

25   THE COURT:  Okay.  Thank you.

1          MR. CRAMES:  I really don't think that the issue has gone

2     away, and I don't want to interrupt Jane further, but when she's

3     finished, I will have one or two very, very brief comments.

4          THE COURT:  Are you finished, Miss Parver?

5          MS. PARVER:  Just one other example.  You know, when

6     asking for documents that refer to statements concerning any

7     decision that you might or might not make in future proceedings,

8     I mean, under Mr. Trachtman broad definition of what they're

9     allowed to look for, this is ridiculous.  Practically everything

10    they're asking for is going to be privileged.  It's irrelevant.

11         We're going to spend months doing privilege logs.  This is

12    not the narrow rifle shot that they represented they were going

13    to do, your Honor.

14         THE COURT:  Okay.  Thank you.  Mr. Crames, I'll hear you

15    briefly.

16         MR. CRAMES:  The only two points I'll make, your Honor,

17    that further reflect the breadth and the scope of these requests,

18    I would just call the Court's attention to number eight, which is

19    another extraordinarily broad request for documents.  Frankly, I

20    wouldn't know where we would begin to pull those altogether in

21    any meaningful response.

22         I would also suggest to your Honor that items six, seven,

23    nine and ten and, amusingly, all my resumes since I first applied

24    for a job are called for by item 11, are totally irrelevant in

25    our view.

```
 1              THE COURT:  All right.  Thank you.  Mr. Parker.

 2              MR. PARKER:  Your Honor, I have nothing to add to what Mr.

 3    Orseck was saying before.

 4              THE COURT:  Okay.  Mr. Mancino, you're up.

 5              MR. MANCINO:  Thank you, your Honor.  And I will start by

 6    saying that I concur with the comments that Mr. Tractman made

 7    concerning the restrictions that Mr. Bernick -- the substantive

 8    restrictions that Mr. Bernick would seek to impose on discovery,

 9    because those go to the ultimate question that your Honor will

10    need to address with respect to the motions to disqualify, and we

11    don't, on behalf of our clients, we don't believe that the issues

12    that we've raised in our motions, our motion are as limited as

13    Mr. Bernick suggests.

14              We've raised two issues and one relates to the involvement

15    of the advisers in the case as giving rise to an appearance of

16    impropriety, and that is not limited simply to whether or not

17    they have worked on the Grace case or have worked on directly

18    issues related to future asbestos claimants in the Grace case.

19    There the appearance of impropriety that we believe has been

20    created relates to their overall role in the five asbestos cases,

21    not simply in Grace.

22              Secondly, it's clear to me at least that neither Mr.

23    Bernick, nor Mr. Inselbuch, want to produce any documents

24    relating to ex parte communications that they have had with the

25    Court or with the advisers.  But there, too, those source of
```

1    documents and communications are directly relevant not just to

2    the -- we have raised in our motion but also in the issues that

3    were put before the Third Circuit and on which the Third Circuit

4    is seeking a more developed record, so, I would argue, your

5    Honor, that those are acutely relevant and go to the heart of

6    what should be discovered in these matters.

7           With respect to privilege concerns, I think Mr. Neal made

8    the point which I will adopt that we are not seeking to blow

9    appropriately based privileged claims.  However, not every

10   communication between Mr. Bernick or his client and the Court or

11   the advisers or between Mr. Inselbuch and the Court and the

12   advisers is privileged.

13          I believe your Honor made that point yesterday, that these

14   bankruptcies are not in their entirety one big settlement

15   discussion, which is what I heard Mr. Bernick suggest might be

16   the case.

17          With respect to work product, if Mr. Bernick or Mr.

18   Inselbuch had shared work product with the Court in an ex parte

19   context, it seems to me they've waived any protections that the

20   work product might otherwise have, but those issues can be

21   addressed once we see what sorts of documents they assert

22   privilege and work product protection on.

23          Finally, with respect to the Combustion Engineering point,

24   I really don't have a dog in the fight on that one, but I do note

25   that in the document request that I believe was submitted by --

1    on behalf of at least some of the respondents, the definition

2    of -- they have a definition of six asbestos bankruptcy cases

3    that does include In Re Combustion Engineering.

4         THE COURT:  Mr. Mancino, you can rest assured that

5    whatever the ruling is for the petitioners will be the same for

6    the respondents.

7         MR. MANCINO:  Okay.  So, your Honor, with that, I will

8    subside and, if appropriate, if a further reply is appropriate,

9    I'd appreciate the opportunity, but if it's not, I'll just keep

10   quiet.  Thank you.

11        THE COURT:  All right.  Thank you.  I think the only one

12   that's left that's a participant that hasn't been heard from is

13   Mr. Monk.

14        MR. MONK:  Correct, your Honor, last but hopefully not

15   least.

16        THE COURT:  I'll hear from you.

17        MR. MONK:  Your Honor, I join in most of the comments that

18   were made by the persons on my side of the virtual courtroom

19   here.  I do have some specific points that I would like to make

20   drawing your attention, I think to some specifics that might be

21   of assistance.

22        One is the way that movants have defined documents is

23   really their attempt, it seems to me, to narrow the scope of the

24   discovery here to those matters that were pleadings that were

25   filed or other documents filed with the clerk of the bankruptcy

```
 1        court.  I would suggest that that should be broadened to include
 2        anything that was circulated, correspondence or e-mails that were
 3        circulated to counsel so that what they're really seeking is
 4        non-public communications to the advisers or the Court, things
 5        that were -- because we operate so much by e-mail these days, it
 6        seems to me that they have overly included a lot of information
 7        they already have in their possession and shortness of time
 8        involved here, the waste of everybody's resources to be producing
 9        e-mails that were sent to them.
10             As a for instance, even if that wasn't something that was
11        a pleading or a brief or something that was filed with the
12        clerk --
13             MR. NEAL:  Your Honor, Steve Neal.  I don't mean to
14        interrupt but I agree with that completely.  I'm in complete
15        agreement with that.
16             MR. INSELBUCH:  Your Honor, Elihu Inselbuch.  Can I make a
17        brief point about the document requests that have been noticed
18        for the advisers?
19             THE COURT:  Why can't you save that for your reply.
20             MR. INSELBUCH:  Very well, sir.
21             THE COURT:  Thank you.
22             MR. MONK:  Your Honor, with respect to the time frame
23        involved, we did have a discussion about the time frame among
24        counsel this morning.  I think the best definition of a relevant
25        time frame would be from the period when Owens Corning, which I
```

 1      believe is the first in the cases that was filed, which would be

 2      October 4th of 2000, until October 10th, which was the date that

 3      the movants first filed a motion to seek recusal, and anything

 4      that -- and that should be the relevant scope of discovery here.

 5          I don't believe that any communications that took place

 6      after their filing among respondents would certainly be anything

 7      other than privilege or really irrelevant, because the subject,

 8      as I understand it, is their knowledge and any communications

 9      that anybody had prior to the filing of the petitions with the

10      advisers.

11          I guess one further clarification, to the extent that --

12          THE COURT:  By the way, let me ask you a question, Mr.

13      Monk, about those dates.  Why shouldn't the beginning date be

14      November 27 of 2001, which I believe is the date Judge Becker

15      appointed me to these cases?

16          MR. MONK:  Your Honor, my understanding is that Mr.

17      Hamlin, Mr. Hamlin's appointment in the G-1 case was nominated on

18      May the 1st of 2001, and I'm sure, because I know how hard it is

19      to find futures representatives, that the parties were discussing

20      Mr. Hamlin as a prospective futures rep well before then, so, and

21      the point would be that if that was in the press or discussed or

22      communicated with others prior to that point in time, it would

23      have been within their knowledge no matter when this Court was

24      appointed.

25          THE COURT:  Okay, fine.  You've clarified for the Court

1   because I would have no information on that.

2           MR. MONK:  In our effort to coordinate on behalf of the

3   Owens Corning debtors and Mr. Inselbuch's and Mr. Crame's

4   clients, we have included the Combustion Engineering case.  We

5   have really, to the extent that that's in our papers, we really

6   have no interest in the Combustion Engineering case.  We don't

7   feel as though that forms a part of this record.  We understand I

8   think Mr. Bernick's concerns and would be, unless I hear from my

9   colleagues to the contrary, willing to narrow our request to

10  eliminate the Combustion Engineering case from the discussion.

11          THE COURT:  All right.

12          MR. MONK:  Those are my only comments.

13          THE COURT:  All right.  Thank you.  I'll now go to

14  replies.  Mr. Bernick, you were the first one to speak.  I'll

15  give you the first reply.

16          MR. BERNICK:  Thank you, your Honor.  Everybody always

17  says they don't have much to say and always says a little bit

18  more.  I don't have anything further to say with respect to the

19  notice and participation point.  I think that, obviously, it

20  implicates Combustion Engineering and G-1.  I think that the

21  record, I mean the argument on that has been fairly

22  straightforward and clear.

23          I'll only note that as I pace through some of these other

24  requests, and maybe that counsel don't simply realize what the

25  implications of some of these requests are, that you've just got

1    massive problems in that area.

2        For example, when you ask of all communications between

3    you, that is referring to Elizabeth Magner, Motley Rice, John

4    Cooney, Caplin & Drysdale, Weit & Luxenberg, between you and any

5    adviser, well, Francis McGovern acted as a mediator in connection

6    with the Combustion Engineering case.  He's an adviser in this

7    case, these cases, but there he was a mediator.  All of those

8    firms had massive communications with Professor McGovern in

9    connection with the extensive and continuing efforts of Mr.

10   McGovern to act as a mediator in that case and that, obviously,

11   does implicate the interests of all of their clients, all those

12   many thousands claimants in that case.  Just an illustration of

13   as soon as you did tip your toe into the water outside the five

14   case, how problematic this list becomes.

15       With respect to relevance, it's interesting because the

16   arguments that are being made about relevance here are being made

17   as if there were no record and there were no pleadings and there

18   was no Court of Appeals' decision remanding this case.  Those

19   are, and if the motion to recuse is kind of like bringing a

20   lawsuit, it's notice pleading, and after that you can kind of

21   conduct a fishing expedition to find out what it is that supports

22   your claims.

23       A motion to recuse is not notice of pleading and it's not

24   the initiation of a lawsuit and it's certainly not the initiation

25   of the lawsuit here.  Motion to recuse is an extraordinary

1       request and requires a focused and well-founded claim to begin

2       with.  You don't just make a motion to recuse and try to find out

3       what's out there.

4           In this particular case they're not writing on a clean

5       slate.  They filed motions to recuse that argued specific points.

6       We know what they were.  We know they were based upon conflicts

7       of interest involving Hamlin and Gross and they submitted those

8       theories before the Court of Appeals, and they've never retreated

9       from those, and the Court of Appeals has adopted those theories

10      in connection with the remand, but even USG, which has raised a

11      somewhat different kind of tact in their motion focuses on

12      particular circumstances involving the claim forms where they

13      feel that there were improper contacts with the Court.

14          That record, those allegations are not only required to be

15      specific because of the nature of the remedy sought, but at this

16      point they're locked in stone.  We're not going back and

17      reinventing through discovery what the real scope of this inquiry

18      is, to say nothing of engaging in a fishing expedition to find

19      out what else is there because the current theory they have is

20      probably not a very good theory.  So, all these arguments are

21      being made, well, this might -- these are all ignore the nature

22      of the remedy that's being sought in the proceedings that have

23      taken place to date.

24          Also on the lines of relevance, Mr. Trachtman says, well,

25      you know, fraudulent conveyance, that doesn't relate to the

1   futures or that relates to the futures, like they can't figure

2   out what relates to the futures.  That's another completely

3   far-fetched position.  Mr. Trachtman knows better because he's

4   dealt with mass tort bankruptcies before.  People know in the

5   case that not everything relates to the futures.  In the case of

6   fraudulent conveyance, there is only one issue which is bring

7   more assets into the estate, and in fact, the time that we

8   litigated the fraudulent conveyance claim in the Grace case there

9   was no futures representative because it wasn't necessary to have

10  the futures representative.  It's never been necessary to have a

11  futures representative in the Grace case.

12       Further argument with respect to relevance is that, well,

13  gee, it's not proper to just restrict discovery to Grace, and

14  it's true that discovery can be conducted with respect to issues

15  that are involved in the activities in the other cases that may

16  be relevant to Grace.  That's not the point.  The point is what

17  is the issue, and the issue is conflict with an engagement on

18  behalf of the futures representative.

19       We have never taken the position that they can't conduct

20  discovery into work that's being done by the advisers in

21  connection with other cases that implicate the interests of the

22  futures, but we are taking the position that when you ask Grace

23  or when you ask Kirkland & Ellis for their documents or their

24  information relating to the activities of the advisers relating

25  to the futures, it ought to be confined to the Grace case, and to

1    the extent that my client or I had information about futures

2    representative activity in connection with other cases, that is

3    going to be work product.  It's going to be information obtained

4    by the general counsel or by me as a result of the inquires that

5    we have made that are still protectable.

6          So, when you get to who responds to the discovery, you

7    then have to pay attention to the case in which the discovery is

8    being conducted.

9          Then turning to privilege and settlement, again, no one

10    really addressed the problem of settlement, how settlement is

11    achieved.

12          With respect to privilege, two points.  First, the

13    argument has been made that, well, see, all the privilege was

14    waived to the extent it was shared with the Court as part of this

15    ex parte process.  That's false.  It wasn't waived at all because

16    the communications with the Court were, it took place with the

17    expectation of confidentiality so that there would be no waiver

18    and, obviously, when you're showing up to the Court and you're

19    talking about your theory of the case, of course, it's work

20    product and of course it's privileged information and it's not

21    waived at all.  And your Honor may decide that the Court is not

22    going to invoke confidentiality, is not going to insist upon

23    confidentiality, but certainly the Court's determination to go in

24    that direction doesn't constitute a client's waiver of

25    confidentiality.

1          There has been no waiver with respect to any privilege

2     here and the same thing applies to the settlement privilege and

3     the protections that adhere to settlement discussions.  They've

4     taken place with the Court under an expectation of

5     confidentiality.  There's been no waiver of that expectation,

6     there's been no waiver of those rights.  And my final point with

7     respect to this general argument is that there's been kind of a

8     blase reference to the fact that, well, we're not asking for any

9     privileged information but, by the way, you got to log it all.

10         We will never get done with that process.  We'll never get

11    done with the arguments that will then take place of the logging

12    process in our lifetime given the scope of these requests.

13         The last thing I'll say is that I have not responded to

14    the particular document requests made of my client or my firm and

15    I've not responded to the document requests that have been made

16    of others that implicate the interests of my client and I want to

17    reserve our right and, depending upon what the Court decides is

18    the appropriate process here, to go through each and every one of

19    these requests that talk about how they're poorly phrased, poorly

20    worded and grossly objectionable, not only on the grounds that

21    I've listed but on other grounds as well.

22         THE COURT:  All right.  Thank you very kindly.  Mr.

23    Orseck, your reply.

24         MR. ORSECK:  Well, your Honor, I think I've said what I've

25    had to say about the relevance and the appropriateness of all of

1    our discovery.  I think privileged material does not need to be

2    produced.  I believe the privileged material that is relevant and

3    responsive can be logged.

4        I want to -- I want to respond to something that Mr. Monk

5    mentioned about the time frame of these document requests.  We

6    agree with your Honor that the documents requested by either side

7    become relevant only after this Court's appointment to the five

8    cases.  We also believe that documents that were created after

9    the filing of the recusal motion are not relevant except to the

10   extent that there are non-privileged documents created by one

11   party or another that will pertain particularly to the recusal

12   motion itself, so that, for example, if a document is created

13   that will constitutes an ex parte contact after the recusal

14   motion was filed, that could be relevant.  But none of these

15   remaining materials that have been sought I think are relevant

16   after that date, and I think I'd like to have Mr. Trachtman, if

17   he cares to, reply to Mr. Bernick on the fraudulent conveyance

18   issue.

19       THE COURT:  Mr. Trachtman was next on my reply list.  Have

20   you finished, Mr. Orseck?

21       .   MR. ORSECK:  I have.  I'd just like to bring to the

22   Court's attention one other matter.  I just want to get to it

23   before we forget.  This document -- the two document requests the

24   state different dates by which the production is to be made and I

25   want to bring to the Court's attention that I think we have an

1    agreement reached among counsel this morning that with the

2    exception of some narrow categories of materials that both sides

3    will attempt to produce by December 31st, that the remaining --

4    the deadline for remaining materials will be January 2nd.

5            THE COURT:  That was my understanding.

6            MR. ORSECK:  Right.

7            THE COURT:  Okay.  Thank you.  Mr. Trachtman.

8            MR. TRACHTMAN:  Thank you, your Honor.  I just want to

9    respond to a couple of specific points.  One is Mr. Bernick's

10   reply.  There's nothing in the Third Circuit opinion, to my

11   knowledge, that narrows the relevant issues to the extent that

12   Mr. Bernick attempted to in his remarks at the outset and, in

13   particular, with respect to Sealed Air, as Mr. Bernick knows,

14   really as I believe everybody on this call knows, there are

15   issues in that decision, in particular, the methodology used to

16   determine solvency, that are of intense interst to tort

17   claimants.  The issues have been argued and briefed in a number

18   of different cases that Mr. Bernick has participated in and, in

19   fact, as your Honor will remember, there were letter briefs by

20   parties in this case arguing the significance or lack of

21   significance of Sealed Air.

22           So, to try to circumscribe as narrowly as he has tried the

23   issues that implicate the issues of tort claimants is misleading

24   and not supported by the Third Circuit's remand.

25           I wanted to just address briefly a couple of points made

1    by Mr. Crames and Miss Parver with respect to the document

2    requests to their firm and to the futures representatives.  One

3    is with respect to the narrowing, I think it's important to note

4    that we did drop number five.  Dropping number five, in fact,

5    substantially narrows -- they're trying to dismiss that as if it

6    was not a good faith attempt to trim it back.  All we said was

7    number three, number three has to do with communications between

8    them and the advisers, clearly core relevant issues. All we

9    simply said is to the extent among the subject matters that may

10   be embraced by number three are the matters referenced in five.

11       To the extent Miss Parver complained about the millions

12   and millions of documents that those general subject matters

13   might invoke, withdrawing number one dramatically reduces the

14   amount of materials, so, it's misleading to suggest that we

15   haven't made an effort there.

16       I also would like to elaborate, I'm really amazed, Mr.

17   Crames, I believe, listed number eight as being completely

18   irrelevant and, forgive me, it's a difficult context here if I

19   got that wrong, but I thought Mr. Crames recited number eight as

20   being totally irrelevant.

21       What number eight gets to is the fact that two of the

22   advisers, the neutral advisers in this case, participated in a

23   series of meetings and conversations with the other futures

24   representatives and the fact is that Mr. McMonagle and Mr. Crames

25   have participated with Messrs. Gross and Hamlin and different

combinations of people over the two years employing the common

strategy as they reasonably should as advocates for tort

claimants.  Those conversations are incredibly relevant and the

fact that they didn't turn around and have to deal with each

other, with Mr. McMonagle and Mr. Crames still being advocates

and Messrs. Gross and Hamlin being purportedly neutrals in this

case gives rise to a significant appearance of impropriety and

it's correct that we believe that that appearance of impropriety

is complete on the existing record, but the Third Circuit has

said we want to know all the facts, go back and fill out the

facts.  And this couldn't be more relevant to what the Third

Circuit wants to know about and what's relevant for this motion.

          MR. CRAMES:  Your Honor, this is Michael Crames.

          THE COURT:  No, Mr. Crames.  You're going to have to wait.

Mr. Trachtman, have you finished?

          MR. TRACHTMAN:  Yes, your Honor.

          THE COURT:  All right.  Mr. Crames, you may have your

reply.

          MR. CRAMES:  My point which has just been referenced as to

the rule that might apply, I simply quote from the e-mail I

received which I almost did earlier, but I'll make it complete,

that number five is withdrawn, quote, with the understanding that

communications regarding the subject matters described in that

request are subsumed in request number three, end of quote.  I

don't know how to read that other than saying whatever might have

been provided in terms of number five we now provide in the
context of three.  Otherwise, I'd be happy to be corrected.

Now, as far as number eight is concerned, I don't believe
I used the term irrelevant.  I used the term, or at least I meant
to, that that entails an awful lot of documentation and other
communications and aside from the fact that there are privilege
issues involved in what may have been imparted to Messrs.
McMonagle and Trafelet and the consequences of those meetings, I
would just remind the parties, and I'm sure the Court is aware of
it, that time records are filed by Mr. McMonagle in Owens
Corning, by Dean Trafelet in Armstrong and USG, as well as by my
firm, which reflect those meetings, who was there in many
instances as set forth in papers filed with the Third Circuit in
referencing Mr. McMonagle's time records.

And final points, your Honor, they are going to be
deposing Messrs. Hamlin and Gross and their participation in
those meetings I am sure will be the subject of their
examination, so, it seems to me that the subject is indeed going
to be covered and indeed has been by virtue of the publicly filed
time records.  That's all I have to add, your Honor.

MS. PARVER:  Your, this is Jane Parver.  If I could just
add two brief things to my partner, Mike Crames.  One, on the
issue of what date is the relevant date for starting, I would
suggest to your Honor, propose to your Honor that in most
instances the relevant date would be, and certainly with respect

1   to anything on the futures rep, the relevant date would be the

2   date of the Court's appointment by Judge Becker.

3       I think the one exception on the issue of notice and what

4   everyone knew about G-1 Holdings and Mr. Hamlin's appointment

5   would be -- that would be the one exception which we propose

6   would start earlier.

7       The only other thing I would say, particularly with

8   respect to the arguments just made by Mr. Trachtman, number eight

9   doesn't just talk about communications with Mr. Hamlin or Mr.

10  Gross and any future rep meetings which are a matter of record.

11  They talk about or any of the other advisers appointed by Judge

12  Wolin.

13      It is a matter of record, your Honor, that Messrs.

14  McGovern and I believe Mr. Gross were appointed from time to time

15  as settlement masters, as mediators in the Owens Corning case and

16  Mr. Trachtman and certainly his partner, Ken Eckstein,

17  participated in a lot of these meetings, and to now talk about

18  any document that refers to any communications, I mean, again,

19  we're going to -- most of these are going to be settlement

20  discussions, as Mr. Trachtman and Mr. Eckstein well know.  These

21  were attempts to mediate term sheets.  These were attempts to

22  mediate the intercreditor project.  They were right there and,

23  yet, we're going to be spending weeks and weeks trying to

24  construct privilege logs and going through files and they can't

25  point to any relevance.

1          Certainly Mr. Trachtman didn't try to defend that last
2     portion of number eight, which talks about or any of the other
3     advisers.
4          THE COURT:  Okay.  Mr. Neal, anything that you'd like to
5     add in reply?
6          MR. NEAL:  Briefly, your Honor.  Mr. Bernick's comments on
7     relevance were a little ambiguous as they related to USG.  He
8     suggested that people are changing their theories.  As I think
9     everybody knows, we have moved under both 455(a) and 455(b), and
10    under 455(b), the issue of ex parte communications are obviously
11    directly relevant.  Nobody disputes that, and I gave everybody --
12    nobody made a secret -- there's no secret that ex parte
13    communications apparently occurred.  I mean, nobody is denying
14    that.
15         The opponents to our motion, though, cannot sit
16    simultaneously and say that the evidence that we have brought
17    forth with respect to ex parte communications isn't sufficient to
18    bring about recusal under 455(b) and then say we're not entitled
19    to get any additional evidence.  It is squarely an issue.  The
20    requests that I addressed this morning, the last five items on
21    the materials that were faxed around, particularly as modified by
22    the comments from Mr. Inselbuch and Mr. Monk, with which I
23    agreed, are designed precisely to get at the issue of ex parte
24    communications and they're designed to get at nothing more,
25    nothing less than that, and they are, therefore, relevant.

1     THE COURT:  All right.  Thank you very kindly.  Mr.

2 Mancino.

3     MR. MANCINO:  Thank you, your Honor.  With respect to Mr.

4 Bernick's comments, I think his efforts to cabin the relevancy of

5 the discovery here really does fly in the face of the Third

6 Circuit's directive.  They did not put the limitations on

7 discovery that he would ask this Court to put on them.

8     Specifically with respect to the fraudulent conveyance

9 case and the settlement in the Sealed Air matter, that does bear

10 relavance to the personal injury asbestos claimants and the

11 future asbestos claimants, and as Mr. Trachtman has pointed out,

12 but I also note that at least as I've read the papers that have

13 been filed in connection with seeking approval of the settlement

14 agreement in that case, the various committees that participated

15 in that settlement and have filed their motion have asked that --

16 have said that the settlement agreement provides for them to use

17 their best efforts to require that any plan provide that, at

18 best, all and at a minimum a maximized amount of the settlement

19 amount contributed by the Sealed Air defendants be funneled

20 directly to the 52(g) Trust to be created for asbestos claims.  I

21 mean, that is a direct tie-in to the interests of asbestos

22 claimants, future asbestos claimants, and to argue that it is

23 not, I think, just is really an attempt to foreclose discovery

24 into a highly relevant area.

25     The other point about time limitations on discovery, I

1    agree that there should be reasonable limitations on how far back

2    you go and how far forward you go and with respect to the

3    requests that we have made relating to our motion or have

4    subscribed to relating to our motion, your Honor, the time

5    limitation should go a little bit beyond the filing of the

6    recusal motion so as to capture any ex parte communications with

7    Mr. Hamlin or Mr. Gross or with your Honor that may have taken

8    place with respect to the appointment of a futures representative

9    in the W.R. Grace case.

10         And then finally, you know, I think Mr. Bernick has had

11   ample opportunity to address the Court about his objections, and

12   while I enjoy listening to him, I think that he's had his

13   opportunity to voice his objections with respect to the document

14   requests that have been propounded and that, your Honor, we all

15   need to move forward and get moving on discovery and just simply

16   engaging in further elaborate discussion because Mr. Bernick

17   failed to get his all his objections in in his other

18   opportunities to speak is I think counterproductive.

19         THE COURT:  Okay.  Thank you.  Let's see.  How about --

20         MR. MONK:  Charles Monk.  I think I'm the only one that

21   hasn't replied.

22         MR. INSELBUCH:  Elihu Inselbuch, too.

23         THE COURT:  No, No.  Mr. Monk is going first and then you

24   are going to wind up, Mr. Inselbuch, because you're probably

25   senior in age.

1           MR. INSELBUCH:  Thank you.

2           MR. MONK:  Your Honor, I just would like to make the point

3      that, and this I think in part goes to what Mr. Bernick said, we

4      heard the other side arguing how they had narrowed the discovery

5      requests.  I would draw your attention to page ten of the fax,

6      the third request that was addressed to us which asks for all

7      documents and, as I understand it, I think there seems to be some

8      sense of the concept of limiting the definition of documents to

9      those things that are essentially non-public communications, if I

10     can describe it that way, being not something that was filed with

11     the court or circulated to counsel, that reflect, refer to or

12     relate to, which are very broad verbs, and then the subject that

13     they, of those verbs, the object of those verbs is this recusal

14     motion, and the petitions for writ, which essentially means

15     anything at all.  It seems to be a completely overbroad request.

16     So, even though they've only addressed three requests to us,

17     they've essentially asked for any document that might have

18     anything to do with everything before the Court that hasn't

19     already been turned over to them in some way, and I don't think

20     that anywhere comes close to narrowing anything as the Court had

21     requested.  That's my only additional comment, your Honor.

22           THE COURT:  Okay.  Mr. Inselbuch.

23           MR. INSELBUCH:  Your Honor, I would like to go back to

24     first principles for a moment.  Discovery is made available under

25     the Federal Rules under Rule 26.  It is not without limitation.

1    There are general limitations to discovery.  It's not just

2    anything that anybody can argue is relevant, but a court, ruling

3    on discovery, has to always balance the burden or the expanse of

4    the proposed discovery and whether or not weighs the likely

5    benefit taking into account the needs of the case, etc.  I'm

6    reading from Rule 26(b)(2).

7         With that that mind, the Court, and at least the District

8    Court here, has to take into consideration its own understanding

9    of what the issues are in front of it, its own understanding of

10   the history of the case, and, most importantly, the timetable

11   that has been imposed by the Third Circuit.  The Third Circuit

12   has said get this all done, this discovery, get it all done

13   basically in two weeks.

14        Now, that can't mean that we pretend here that discovery

15   is as if it were beginning in some huge anti-trust case that

16   would have seven or eight years before it would come to trial, if

17   ever.  The court is obligated to tool discovery here, weighing in

18   mind the burdens and the benefits of any potential discovery and,

19   in particular, the ability to get it done sensibly within the

20   time frame that's permitted.

21        Now, some of the advocates have argued about what limits,

22   if any, or unlimits, limits not set by the Third Circuit.  The

23   Third Circuit provided four potential areas where it suggested

24   discovery might shed light.  That's at page 26 of their Opinion,

25   and I would suggest to the Court that most of what has been

1    talked about today doesn't fall into any of these categories

2    unless you would say everything that anybody did in this case

3    falls into the first category, which would be the full extent of

4    the consultants' activities, because the second category, Messrs.

5    Gross and Hamlin's activities in G-1 Holdings, doesn't call for

6    discovery from any of the other parties in these other

7    bankruptcies.

8         The time limits of the petitions for Mandamus, the third

9    category, that has to do with our discovery, not their discovery;

10   and the fourth, the extent to which recusal, if warranted in one,

11   must be held to extend to the others, I don't see how any of this

12   discovery seeks information on the point.

13        Finally, there's nothing in this Opinion that talks about

14   Mr. Neal and his demands to have access to any and all records,

15   however difficult it might be to find them, however difficult it

16   might be to prove the privileged from the unprivileged that have

17   to do with ex parte conversations; that there is no number five

18   that says ex parte conversations with the Court, and I would

19   suggest to the Court in this context that the Court has an

20   obligation to tailor these discovery demands in a way that will

21   make them meaningful and that will get produced for the Court the

22   discovery record that will be relevant to the Court, this Court,

23   in deciding these motions in the first instance, and that's what

24   this Court, I submit with great respect, should be trying to

25   craft here.

```
 1              THE COURT:  All right.  Thank you, Mr. Inselbuch.

 2              MR. INSELBUCH:  May I make one comment about the discovery

 3      directed to the advisers, simply because no one has been heard to

 4      speak about that, and I would implore the Court to pay particular

 5      attention there, to read one example of the demand number 22

 6      calls for all documents that constitute, reflect or refer to

 7      communications between you and any party.

 8              Now, I can't imagine how that wouldn't just mean they

 9      should deliver their file cabinets and I would ask the Court to

10      -- I don't speak to the advisers -- I would ask the Court to pay

11      careful attention to the demands that have been made on the

12      advisers given the time frame within which they have to produce

13      documents as well.

14              THE COURT:  All right.  Thank you, Mr. Inselbuch.  I think

15      I've afforded everybody an opportunity to be heard, everybody an

16      opportunity to reply.  My court reporter is starting to

17      demonstrate fatigue because we've been at this now for

18      approximately two hours.

19              What I'm going to do is I'm going to conclude this

20      telephone call at this time and we will be in recess until

21      quarter to two.  Excuse me one second.

22              Okay.  I'm sorry to have gone off the record.  We were

23      trying to consider procedural matters.  Everybody still there?

24      All right.  We'd gone off the record to try to consider

25      procedural matters as to not wanting to lose everybody who is on
```

1     this telephone call.

2          What we suggest is that the Court is going to disengage

3     this telephone call only for the Court until quarter to two,

4     because I have to give my reporter an opportunity to rest and

5     reload.  At quarter to two, the Court will dial back in and we'll

6     then review the discovery and order what discovery shall be

7     granted and what shall be denied.

8          Because of the time that this call has taken and by the

9     time that the Court finishes, I don't think we're going to have

10    time to get our Case Management Order out today that reflects the

11    views of the Court but the views of the Court that are given

12    today are in fact the Order of the Court and the Case Management

13    Order that will be put out on Friday is only reflective of what

14    we ordered here today, so, nobody should be sitting on their

15    hands saying, oh, we didn't get the written order.  This Order

16    that will be given orally is the Order of the Court.

17         Also, I want you to understand that the approval of any

18    requests for discovery today is without prejudice to any

19    objection to a particular request based upon privilege.  Also,

20    the Court will use the date for production of documents November

21    27, 2001 through the argument in the Circuit Court of Appeals on

22    December 12, other than Hamlin's participation in G-1, you may

23    use an earlier date.

24         We're now going to hang up and we'll be back in about --

25         MR. BERNICK:  Your Honor, before you hang up, this is

1    David Bernick and I just had one housekeeping matter to point out

2    for the record before your Honor rules, that is, that the

3    movants' requests for discovery that was filed by Owens Corning,

4    Grace would join in that request except that I noted that

5    although they include D.K. Acquisition in the request, they don't

6    include counsel for D.K. Acquisition and Grace would seek that

7    same discovery or the same scope of discovery with respect to the

8    Willkie, Farr firm which apparently represented D.K. Acquisition.

9         THE COURT:  I'll be prepared to deal with that at quarter

10   to two.  All right.  Court will be in recess until quarter to

11   two.

12        (A recess is taken.)

13        THE COURT:  Is everybody present that was a participant

14   earlier?

15        MR. ORSECK:  Yes, your Honor.

16        MR. BERNICK:  Yes, your Honor.

17        MR. MONK:  Your Honor, this is Charles Monk.  I wanted to

18   inform you that we were able to locate Judge Dreier, who has

19   joined into the call so he could hear the Court's advice

20   regarding the scope of discovery.  We have not been able to

21   locate, although we have left messages for, former judges Keefe

22   and Hamlin.

23        MR. SIEGEL:  Your Honor, this is Arnold Siegel at the

24   Robbins, Russell firm.  I just got a call from a lawyer

25   representing Judge Hamlin and left him the call-in number and the

1     code so he could dial in.

2          THE COURT:  Okay, fine.  The Court has for the past two

3     hours patiently listened to arguments as to the proposed document

4     production and given each participant the opportunity to speak

5     affirmatively as well as to reply.

6          It is the Opinion of the Court that the demands for

7     production of documents far exceed the spirit and the letter of

8     the Opinion issued by the Court of Appeals on December 18.  The

9     focus of that Opinion was the role of the advisers and the

10    structural conflict that was argued before them.  Their decision

11    to amplify the evidentiary record was in regard to that

12    structural conflict, as well as the ex parte communications that

13    occurred with the District Court.

14         The arguments I have heard today are far beyond the scope

15    of what was intended by the Court of Appeals and particularly

16    with regard to the time frame allotted by the Court of Appeals.

17    Indeed, this Court is sure that the Court of Appeals would be

18    amazed at the submissions before the Court today.

19         The distance between the positions of counsel and the

20    opinion of the Court of Appeals requires this Court to strike a

21    necessary balance between those two positions.  The Court will

22    not respond to the particular arguments as to whether they

23    possess merit or demerit, as the case may be.  The primary issue

24    for the Court is the alleged conflict in regard to the engagement

25    of the advisers as it relates to the interest of future

1    claimants.

2          I agree with those parties that the requested demand for

3    production is overly broad and that, as Mr. Inselbuch said, the

4    burdens of discovery far outweigh the benefits to be received if

5    all of the discovery requested were to be granted.  However,

6    notwithstanding the arguments of the opponents with regard to the

7    requested discovery, the Court is strongly inclined to grant as

8    much access to evidence as it can in good conscience while

9    remaining consistent with the tenor of the mandate of the Court

10    of Appeals and adhering to the extremely abbreviated time period

11    dictated by the Order of that Court.

12          That being said, the Ruling of the Court will be as

13    follows:

14          The first document request was addressed to Owens Corning

15    and to Saul Ewing, LLP.  That request is denied in toto.

16          The next document request was addressed to W.R. Grace and

17    Kirkland & Ellis.  Now, turning over to page four of that

18    document request, question number one, it says all documents that

19    reflect, refer to or relate to any communication concerning, and

20    I'm granting it only as to III, any of the five asbestos cases

21    between or among you and any of the following individuals:  Judge

22    Alfred Wolin, David Gross, C. Judson Hamlin, William Dreier, John

23    E. Keefe, Sr., and Francis McGovern.  It is denied as to G-1

24    Holdings and Combustion Engineering.

25          Number two, I am granting that request except for G-1

1   Holdings.  So, the initial "I" is denied.

2           Question number three, I'm going to grant that request as

3   follows, all documents that reflect, refer to or relate to any

4   draft opinions or memoranda of law transmitted by you to any of

5   the following individuals:  Judge Alfred Wolin, David R. Gross,

6   C. Judson Hamlin, William A. Dreier, John E. Keefe, Sr., and

7   Francis McGovern, in regard to the five jointly administered

8   cases only.

9           Number four is denied.

10          Number five I'm going to grant in this regard:  With

11  respect to the five asbestos cases, eliminating G-1 Holdings, any

12  documents that reflect, refer to or relate to any ex parte

13  communication, and then I'm going to add after that "with the

14  District Court concerning the subjects that are set forth in A, B

15  and C".

16          Number six is denied.

17          Moving on is the document request to David Gross, C.

18  Judson Hamlin, William Dreier, John E. Keefe, Sr., and Francis

19  McGovern.  I am now turning over to page five.  Number one is

20  granted except for Combustion Engineering.  I'm denying that

21  request as to Combustion Engineering.

22          Number two is granted.

23          Number three shall read as follows:  "All complete

24  unredacted time and billing records in connection with activities

25  performed by you in any of the five asbestos cases other than

1    that which has already been filed by the Court."

2         Excuse me one second.  I'm putting you on hold.  Hello.

3    Everybody back? I forgot to eliminate Combustion Engineering

4    there.  I'm eliminating Combustion Engineering.

5         Number four, I'm granting that but I'm eliminating

6    Combustion Engineering.

7         Number five I am granting in its entirety.

8         Number six is denied.

9         Number seven is the denied.

10        Number eight is denied.

11        Number nine -- excuse me one second.  I've got to put you

12   on hold.

13        Everybody back?  I changed my ruling on six.  Six shall

14   read that refers to Leticia Chambers and experts.  It will read

15   as follows, I am granting it as to all documents that reflect,

16   refer to or relate to the engagement of Dr. Leticia Chambers in

17   regard to the five jointly administered asbestos cases.

18        Number seven is denied.

19        Number eight is denied.

20        Number nine is granted.

21        Number ten is granted except for Combustion Engineering.

22        Number 11 is granted.

23        Number 12 is granted.

24        Number 13 is denied.

25        Number 14 is granted.

1          Number 15  --

2          MR. BERNICK:  I'm sorry.  With respect to 14, is that any

3     bankruptcy case?  It's not just the five?

4          THE COURT:  No.  You're correct.  It's the five

5     administered cases.  It's limited to those, the five jointly

6     administered cases.  Thank you.

7          Number 15 is granted.

8          Number 16 is granted except for Combustion Engineering.

9          Number 17 is denied.

10         Number 18 is denied.

11         Number 19 is denied.

12         Number 20 is denied.

13         Number 21 is denied.

14         Number 22 is denied.

15         Number 23 is granted.

16         I'm now moving on to the document requests addressed to

17    McMonagle, Trafelet and Kaye Scholer.  They are all denied.

18         The requests for production of documents to Cooney &

19    Conaway, Motley Rice, Caplin & Drysdale, Weitz & Luxenberg and

20    Elizabeth Magner are denied in their totality.

21         I'm now moving to the Saul Ewing requests for document

22    production, and I'm moving to page two where it indicates the

23    movant entities that Owens Corning seeks document production

24    from.

25         It is granted as to Kensington International, Limited,

1    Springfield Associates, LLC, Elliott Management Corporation,

2    Elliott Associates, LP, Elliott International, LP, and Mark

3    Brodsky.

4         It is denied as to D.K. Acquisition Partners, Fernwood

5    Associates, denied as to Deutsche Bank Trust Company Americas and

6    denied as to USG Corp.

7         It is further denied as to the Official Committee for

8    Unsecured Creditors in the Owens Corning bankruptcy proceeding.

9         It is denied as to the Official Committee for Unsecured

10   Creditors in the W.R. Grace bankruptcy proceeding.

11        It is also denied as to the Official Committee of

12   Unsecured Creditors in the USG Corporate bankruptcy proceeding In

13   Re Armstrong World Industries, Inc.

14        It is granted as to certain creditors in the Owens Corning

15   bankruptcy proceeding.

16        It is granted as to Credit Suisse First Boston as agent

17   for the bank group.

18        It is granted as to J.P. Morgan Chase.

19        It is granted as to Kramer, Levin, Naftalis & Frankel.

20        It is granted as to Davis Polk & Wardwell.

21        And it is granted as to Strook, Stroock & Lavan.

22        Now, going on to documents requested.  Number one.

23        MR. BERNICK:  Excuse me, your Honor.  I hate to interrupt.

24   I just wanted to point out --

25        THE COURT:  Yes.  Go ahead please.

1          MR. BERNICK:  -- we wanted to supplement this to include

2     Mr. Mancino's firm or his client because, otherwise, we have no

3     way of getting the notice issued with respect to the motion of

4     Grace.

5          MR. MANCINO:  I understood your Honor had just denied

6     discovery.

7          MR. BERNICK:  It may very well have been that he did but

8     because that was not set out in writing here but, rather, it was

9     set out by me orally before we broke.

10         THE COURT:  But I did deny it as to D.K. Acquisition

11    Partners, Fernwood Associates, Deutsche Bank Trust Company

12    Americas.  Aren't those Mr. Mancino's clients?

13         MR. BERNICK:  Yes.

14         MR. MANCINO:  Yes, they are, your Honor.

15         MR. BERNICK:  But that just underscores the importance of

16    our request then for discovery from Mr. Mancino's firm.

17         THE COURT:  Well, you haven't convinced me at this point.

18    I'll give you the opportunity at some time to communicate with

19    the Court on notice to all counsel, but as of now the answer is

20    no.

21         All right.  As to the documents requested, number one is

22    granted.

23         Number two is granted.  Number three is granted. Number

24    four is granted. Number five is granted.  Number six is granted.

25         Number seven is granted.  Number eight is granted. Number

nine is granted. Number 10 is granted.

Number 11 is granted.  Number 12 is granted.  Number 13 is granted.

Number 14 is denied. Number 15 is granted. Number 16 is denied.

I believe I've taken care of all of the demands for production of documents.

We're going to cease the phone call at this time.  This is the order of the Court.  It will be reduced further to a writing to be issued by the Court on Friday next.

MR. BERNICK:  Your Honor, just for point of clarification, I don't believe that your Honor has addressed any of the instruction, that is, that there were representations this morning that no privileged documents were called for and, yet, I believe that there were further representations that there's the expectation that they'll all be logged.

The logging requirement and the request for privileged documents is of tremendous consequence given the time frame here. The same would apply to materials reflecting the conflict of settlement discussions which we would argue are privileged.

What is your Honor's determination with regard to privileged and settlement documents information?

THE COURT:  I would call upon the parties to hold a discussion between themselves out of the presence of the Court wherein perhaps they could in a seriotim list list the number of

1    documents without the production of the document that someone

2    could review to see if it's really relevant to what the discovery

3    necessary is to fulfill the mandate to the Court of Appeals.

4         MR. BERNICK:  Are you suggesting that we should kind of

5    work this out informally?

6         THE COURT:  That's correct.

7         MR. BERNICK:  I think we should try to do that on the

8    Friday call.

9         THE COURT:  Okay.

10        THE COURT:  Steve Neal, your Honor.  Just for

11   clarification, I do persist in saying that if we're not able to

12   work it out, the parties should log any documents that are being

13   withheld on privilege grounds so that --

14        THE COURT:  Well, you know, Mr. Neal, I tried to send a

15   message to everybody and the message was, as Mr. Inselbuch said,

16   you have to balance the burden of discovery against the benefit

17   and all privileges are going to be preserved.

18        JUDGE DREIER:  Before you hang up, this is Judge Dreier.

19   There were references to 23 paragraphs, certain items granted,

20   certain items denied.  I don't know, can't speak for the other

21   members of the committee, but I don't have copies of the amended

22   requests that relate to these so these paragraphs will mean

23   anything and I have today and tomorrow basically to go through --

24        THE COURT:  I'll handle that, Judge Dreier.  Mr. Monk,

25   will you fax that to him forthwith?

1          MR. GOLDSTEIN:  And to Saiber, Schlesinger.

2          THE COURT:  Okay, fine.

3          MR. MONK:  Thank you.  We'll be happy to do so.  Let me

4     just give my telephone number to the people that I am to fax it

5     to and if you'll call me after this call is over, I'll be happy

6     to arrange that.

7          THE COURT: What was the number?

8          MR. MONK:  410-332-8668.

9          JUDGE DREIER:  Who am I speaking to?

10          MR. MONK:  Charles Monk, counsel for Owens Corning .

11          THE COURT:  All right.

12          MR. BERNICK:  Your Honor --

13          THE COURT:  Who is this?

14          MR. BERNICK:  This is David Bernick and I'm sorry to be --

15     I was reading off the -- I'm sorry.  Never mind.

16          THE COURT:  All right.  I want to wish everybody a happy

17     holiday, whatever your persuasion.  I thank you for your

18     participation in this telephone call and we'll look to the

19     resolution of these matters.

20          THE COURT:  Thank you.  The demands for admissions

21     submitted by the parties are hereby made part of the record.

22          (Whereupon the telephone conference call is adjourned.)

23

24

25