# EXHIBIT Q

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
---------------------------
IN RE: OWENS CORNING,    :    Chapter 11
et al.,                  :    Case Nos. 00-3837 through
                         :              00 3854
        Debtors.         :
---------------------------
---------------------------
IN RE: W.R. GRACE & CO., :    Chapter 11
et al.,                  :    Case Nos. 01-1139 through
                         :              01-1200
        Debtors.         :
---------------------------
---------------------------
IN RE: USG CORPORATION,  :    Chapter 11
a Delaware Corporation,  :    Case Nos. 01-2094 through
et al.,                  :              01-2104
                         :
        Debtors.         :
---------------------------
```

This matter having been opened before the Court upon the
motions of Kensington International Limited and Springfield
Associates, L.P. in the chapter 11 case In re Owens Corning, and
the motion of D.K. Acquisition Partners, L.P., Fernwood
Associates L.P. and Deutsche Bank Trust Co. America in the
chapter 11 case In re W.R. Grace for the Court to recuse itself
from further proceedings in the above-captioned, administratively
consolidated chapter 11 cases (the "Motions"); and the United
States Court of Appeals for the Third Circuit having issued an
Order on December 10, 2003, to this Court to cause discovery to
be expedited and an Opinion to issue from this Court on the

1

Motions on or before January 31, 2004; and this Court having held
two conferences on the record in which it heard the arguments of
counsel and considered the discovery requests they intended or
had already propounded; and for the reasons set forth in bench
Opinions of this Court placed on the record on December 23, 2003,
and December 24, 2003 and in accordance with the Orders of the
Court made at that time; and good cause appearing

IT IS this $\overset{TH}{26}$ day of December, 2003

ORDERED that, for the convenient reference of the parties
and the avoidance of confusion, the documents titled Movants'
Submission of Request for Documents and Owens Corning's Requests
for Production of Documents Relating to Motion to Recuse District
Judge delivered by facsimile transmission to the Court on
December 24, 2003 and attached to this Order, shall be the
requests to which this Order makes reference and that a grant,
denial or modification of any request for the production of
documents in this Order shall not require the entire request to
be restated herein, and it is further

ORDERED that the phrase "the Five Asbestos Cases" used in
this Order shall mean the chapter eleven cases titled In re
Federal Mogul, Inc., No. 01-10578, In re USG Corporation, No.
01-2094, In re Owens Corning, 00-3837, and In re Armstrong World
Industries, Inc., 00-4471, In re W.R. Grace & Co., No. 01-1139,
and the related cases administratively consolidated thereto, and

2

it is further

**THE MOVANTS' REQUESTS**

ORDERED that the requests for the production of documents to Owens Corning and Saul Ewing LLP are denied in their entirety, and it is further

ORDERED that the requests for the production of documents to W.R. Grace & Co. and Kirkland & Ellis are granted, denied or modified as follows:

1.  Request number one is granted except that the phrase "(i) G-I Holdings; or (ii) Combustion Engineering" is deleted.

2.  Request number two is granted except that the phrase "(i) G-I Holdings" is deleted.

3.  Request number three is granted.

4.  Request number four is denied.

5.  Request number five is granted except that the phrase "and G-I Holdings" is deleted and the phrase "with the District Court is inserted between the words "communication" and "concerning." Request number five shall now begin with the phrase "with respect to the Five Asbestos Cases any documents that reflect, refer to, or relate to any ex parte communication with the District Court concerning . . . ."

6.  Request number six is denied.

3

and it is further

ORDERED that the requests for the production of documents to David R. Gross, C. Judson Hamlin, William A. Dreier, John E. Keefe, Sr., and Francis McGovern are granted, denied or modified as follows:

1.   Request number one is granted except that the phrase "or (ii) Combustion Engineering" is deleted.

2.   Request number two is granted.

3.   Request number three is granted, except that the phrase "or Combustion Engineering" is deleted.

4.   Request number four is granted, except that the phrase "or Combustion Engineering" is deleted.

5.   Request number 5 is granted.

6.   Request number six is granted in part and denied in part and shall be modified to read "All documents that reflect, refer to, or relate to the engagement of Dr. Letitia Chambers as an expert witness in any of the Five Asbestos Cases by (i) any of the Debtors, (ii) any Futures Representative, or (iii) any of the official Creditors Committees." As modified, request number six is granted.

7.   Request number seven is denied.

8.   Request number eight is denied.

9.   Request number nine is granted.

4

10. Request number ten is granted, except that the phrase "or Combustion Engineering" is deleted.

11. Request number eleven is granted.

12. Request number twelve is granted.

13. Request number thirteen is denied.

14. Request number fourteen is granted except that the phrase "any bankruptcy case" is deleted and replaced with the phrase "the Five Asbestos Cases."

15. Request number fifteen is granted.

16. Request number sixteen is granted, except that the phrase "or Combustion Engineering" is deleted.

17. Request number seventeen is denied.

18. Request number eighteen is denied.

19. Request number nineteen is denied.

20. Request number twenty is denied.

21. Request number twenty-one is denied.

22. Request number twenty-two is denied.

23. Request number twenty-three is granted.

and it is further

ORDERED that the requests for production of documents to James J. McMonagle, Dean M. Trafelet and Kaye Scholer LLP are denied in their entirety, and it is further

ORDERED that the requests for production of documents to Cooney & Conway, Motley Rice, Caplin & Drysdale, Weitz &

5

Luxembourg and Elizabeth Magner, are denied in their entirety,
and it is further

**OWENS CORNING'S REQUESTS**

ORDERED that, subject to the terms of the document requests
propounded by Owens Corning as further granted, denied or
modified by this Order, the requests for documents are granted or
denied with respect to the following parties:

  (i)      Kensington International Limited - Granted.

  (ii)     Springfield Associates, LLC - Granted.

  (iii)    Elliott Management Corporation - Granted.

  (iv)     Elliot Associates, L.P. - Granted.

  (v)      Elliott International L.P. - Granted.

  (vi)     Mark Brodsky - Granted.

  (vii)    DK Acquisition Partners - Denied.

  (viii)   Fernwood Associates, L.P. - Denied.

  (ix)     Deutsche Bank Trust Co. Americas - Denied.

  (x)      USG Corporation - Denied.

  (xi - xiii)     The Official Committees for Unsecured
       Creditors in In re Owens Corning, 00-3837, In re
       Armstrong World Industries, Inc., 00-4471, In re USG
       Corporation, No. 01-2094, and In re W.R. Grace & Co.,
       No. 01-1139, and the related, administratively
       consolidated cases - Denied.

  (xiv)    Credit Suisse First Boston - Granted.

6

(xv)      JP Morgan/Chase - Granted.

(xvi)     Kramer Levin Naftalis & Frankel LLP - Granted.

(xvii)    Davis Polk & Wardwell - Granted.

(xviii)   Strook Strook & Lavan - Granted.

and it is further

ORDERED that Owens Corning's document requests one through thirteen and document request fifteen are granted subject to the modification set forth in the paragraph immediately following this paragraph, and it is further

ORDERED that every reference in the Owens Corning document requests to the defined term "Six Asbestos Bankruptcy Cases" is modified to read "Five Asbestos Bankruptcy Cases," Definition G of the phrase "Six Asbestos Bankruptcy Cases" is modified and shall read "Five Asbestos Bankruptcy Cases," and the phrase "and In re Combustion Engineering, Inc., No. 03-10495" is deleted from Definition G, and it is further

ORDERED that Owens Corning's document requests fourteen and sixteen are denied.

ALFRED M. WOLIN, U.S.D.J.

7

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re* Owens Corning, *et al.*, | ) |
|  | ) |
| Debtors. | )    Nos. 00-3837 to 00-3854 (JKF) |
|  | ) |
|  | ) |
|  | |
| *In re* W.R. Grace & Co., *et al.*, | ) |
|  | ) |
| Debtors. | )    Nos.  01-1139 to 01-1200 (JKF) |
|  | ) |
|  | ) |
|  | |
| *In re* USG Corp., *et al.*, | ) |
|  | ) |
| Debtors. | )    Nos. 01-2094 to 01-2104 (JKF) |
|  | ) |
|  | ) |

### MOVANTS' SUBMISSION OF REQUESTS FOR DOCUMENTS

Attached are movants' document requests as ordered by the Court at the status conference of December 23, 2003. Movants believe that the discovery requests they propounded on December 22, 2003 are consistent with both the letter and spirit of the Third Circuit's opinion. However, pursuant to this Court's direction, movants have eliminated a significant number of document requests that they had served on December 22, 2003, all of which were quashed by the Court at the December 23 conference on the ground of their "absurd overbreadth" (Tr. 5) despite never having been seen by the Court. To the extent possible, and in light of the Court's warning that "excessive demands for document discovery may result in no document discovery being allowed at all" (12/23/03 Tr. 8), movants have attempted to limit the attached document requests to the issues that the Third

Circuit identified "among others" as those that bear most directly on the pending motion –

(i) "the *full* extent of the Consultants' activities in the Five Asbestos Cases"; and (ii)

"Messrs. Gross and Hamlin's activities in *G-I Holdings*." Slip op. at 26 (emphasis added).

The attached document requests are directed to the following parties:

1.    Owens Corning and its counsel, Saul Ewing;

2.    W.R. Grace and its counsel, Kirkland & Ellis;

3.    The five advisors appointed by the Court in the five jointly-administered

cases and their law firms;

4.    Futures Representatives James McMonagle, Dean Trafelet, and their counsel,

Kaye Scholer;

5.    Cooney & Conway, Motley Rice, Caplin & Drysdale, Weitz & Luxembourg,

and Elizabeth Magner, all of whom represent asbestos claimants.

As stated by movants at the December 23 conference, the severe restrictions that the

Court imposed on the discovery process, including prior review and limitation of document

requests, and allowing movants only five depositions chosen by the Court, undermines the

Third Circuit's call for a "developed evidentiary record." Dec. 18, 2003 slip op. at 25.[1]

Movants wish to advise the Court, in addition, that its order that all eight depositions

the Court has allowed take place seriatim on January 5 and 6, 2004, was entered without any

---

[1] In advocating that remand for further factual development was *unnecessary*, counsel for movants Kensington and Springfield emphasized the extremely limited nature of the discovery those movants *had previously* propounded. Counsel did not say that if the Third Circuit *disagreed* and remanded for further factual development, the only necessary discovery would be the discovery earlier propounded. It is the Third Circuit's view that the record should be developed – not counsel's contrary position that the Third Circuit should resolve the matter in movants' favor *without* a more-developed record – that should control the proceedings on remand.

prior discussion of availability of counsel or witnesses on those dates. In fact, at least one deponent – Francis E. McGovern – is out of the country until January 9, 2004. In addition, Lawrence S. Robbins, lead counsel for movants Kensington and Springfield, is scheduled to present oral argument to a federal court of appeals in another jurisdiction on January 6, 2004, and thus is entirely unavailable on either of the two days specified by the Court for depositions. Even more troublesome is the Court's scheduling of four of the five advisor depositions (including *both* Messrs. Hamlin and Gross) on the same day (January 5). Movants cannot reasonably be expected to complete the necessary deposition discovery of these important witnesses in what amounts to no more than two hours each. Although movants acknowledge their need to make adjustments to meet the exigencies of the Third Circuit's deadline, it is entirely possible – indeed, likely – that a schedule only slightly different could have accommodated the needs of counsel and witnesses without in any way prejudicing the Court's ability to meet the January 31 deadline. Movants therefore wish to register their formal objection to the schedule imposed by the Court.

Movants ask that the Court direct respondents to provide the requested materials on or before January 2, 2004. Movants should, of course, be held to the same deadline with respect to any valid document requests propounded by respondents.

3

Dated: December 24, 2003                    Respectfully submitted,

ISAAC M. PACHULSKI
K. JOHN SHAFFER
STUTMAN, TREISTER & GLATT P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
(310) 228-5600

LAWRENCE S. ROBBINS
ROY T. ENGLERT, JR.
GARY A. ORSECK
ARNON D. SIEGEL
ROBBINS, RUSSELL, ENGLERT,
ORSECK & UNTEREINER LLP
1801 K Street, N.W., Suite 411
Washington, D.C. 20006
(202) 775-4500

RICHARD MANCINO
CHRISTOPHER J. ST. JEANOS
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

STEPHEN C. NEAL
SCOTT D. DEVEREAUX
JAMES C. MAROULIS
COOLEY GODWARD LLP
5 Palo Alto Square
3000 El Camino Real
Palo Alto, California 94306
(650) 843-5000

4

## CERTIFICATE OF SERVICE

I hereby certify that at 8:55am on Wednesday, December 24, 2003, I served by email a PDF copy of the foregoing Movants' Submission of Requests for Documents on all counsel required to be served.

5

**Document Requests to:**

Owens Corning
One Owens Corning Parkway
Toledo, Ohio 43604

    *and*

Saul Ewing LLP
222 Delaware Avenue
Suite 1200
Wilmington, Delaware 19801

### Definitions

1.    All definitions and rules of construction set forth in the Local Rules of the United

States Bankruptcy Court for the District of Delaware and the Federal Rules of Civil Procedure shall

apply to each command for production of the documents designated below.

2.    "All" and "or" shall be construed either disjunctively or conjunctively as necessary

to bring within the scope of the discovery request all responses that might otherwise be construed

to be outside its scope.

3.    *"Combustion Engineering"* refers to *In re Combustion Engineering, Inc.*, No. 03-

10495 (JKF) (Bankr. D. Del.).

4.    "Debtors" refers to debtors and debtors in possession.

5.    "Document" (in all its forms) means all written, reported, recorded, pictorial, or

graphic matter, however produced or reproduced, that are in your possession, custody or control,

including, but not limited to, all letters, telegrams, telexes, cables, word processing files, telephone

records and notations, invoices, ledgers, journals and other formal and informal books of record and

account, minutes, bulletins, instructions, financial statements, photographs, reports, memoranda,

notes, notebooks, electronic mail, voice mail, drafts, worksheets, contracts, agreements, computer

data, tape recordings, videotapes, transcriptions, intra-company drafts of the foregoing items, and copies or reproductions of the foregoing upon which notations in writing have been made which do not appear on the originals. A document is deemed to be in your possession, custody or control if you have the right to secure the document or a copy thereof from another person or public or private entity having actual physical possession thereof. For purposes of these Document Requests, the documents sought are those created between November 21, 2001 and the present. Any pleadings, briefs or other documents filed with the Clerk of the Bankruptcy Court in the Five Asbestos Cases or served on all parties entitled to be served with such pleadings, brief or other documents in any of the Five Asbestos Cases shall not constitute a document for purposes of this request.

6.    "Five Asbestos Cases" refers to the following cases pending in the United States Bankruptcy Court for the District of Delaware: *In re Armstrong World Industries, Inc. et al.*, Nos. 00-4471, 00-4469, 00-4470; *In re W.R. Grace & Co. et al.*, Nos. 01-1139 through 01-1200; *In re Federal-Mogul Global, Inc., T&N Limited, et al.*, Nos. 01-10578 *et al.*; *In re USG Corp. et al.*, Nos. 01-2094 through 01-2104; *In re Owens Corning, et al.*, Nos. 00-03837, *et al.*

7.    "Futures Representative" refers to the legal representative appointed pursuant to section 524(g) of the Bankruptcy Code to represent the interests of present or future asbestos-related demands.

8.    *"G-I Holdings"* refers to *In re G-I Holdings Inc.*, No. 01-30135 (RG) (Bankr. D.N.J.).

9.    "Judge Wolin" refers to the Hon. Alfred Wolin, U.S. District Judge for the District of New Jersey, and to members of his staff, including law clerks, courtroom deputies, secretaries, and interns.

2

10.    "Person" and "you" (in all their forms) mean the entities listed at the top of this request, as well as any of your partners, employees, officers, or directors, and any person or any business, legal, or governmental entity or association that acts or has acted at your direction or control, including but not limited to Michael Thaman and Maura Smith.

11.    The use of the singular form of any word includes the plural and vice versa.

3

<u>Documents Requested</u>

1.      All documents that reflect, refer to, or relate to, any communication concerning (i)
*G-I Holdings* or (ii) any of the Five Asbestos Cases, between you and any of the following
individuals: Judge Alfred Wolin; David R. Gross; C. Judson Hamlin; William A. Dreier; John E.
Keefe, Sr.; and Francis E. McGovern.

2.      Any and all documents relating to the application of debtors for the appointment of
a Futures Representative or counsel for a Futures Representative in *In re W.R. Grace & Co.*, No. 01-
01139 (JKF) (Bankr. D. Del.).

3.      All documents that reflect, refer to, or relate to, (i) the present motions for recusal of
Judge Wolin or (ii) the Petitions for Writs of Mandamus that were filed in the present proceedings.

4

## Document Requests to:

W.R. Grace & Co.
7500 Grace Drive
Columbia, Maryland 21044

**and**

Kirkland & Ellis
Aon Center
200 East Randolph Drive
Chicago, Illinois 60601

### Definitions

1.      All definitions and rules of construction set forth in the Local Rules of the United States Bankruptcy Court for the District of Delaware and the Federal Rules of Civil Procedure shall apply to each command for production of the documents designated below.

2.      "All" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

3.      *"Combustion Engineering"* refers to *In re Combustion Engineering, Inc.*, No. 03-10495 (JKF) (Bankr. D. Del.).

4.      "Debtors" refers to debtors and debtors in possession.

5.      "Document" (in all its forms) means all written, reported, recorded, pictorial, or graphic matter, however produced or reproduced, that are in your possession, custody or control, including, but not limited to, all letters, telegrams, telexes, cables, word processing files, telephone records and notations, invoices, ledgers, journals and other formal and informal books of record and account, minutes, bulletins, instructions, financial statements, photographs, reports, memoranda, notes, notebooks, electronic mail, voice mail, drafts, worksheets, contracts, agreements, computer

data, tape recordings, videotapes, transcriptions, intra-company drafts of the foregoing items, and copies or reproductions of the foregoing upon which notations in writing have been made which do not appear on the originals. A document is deemed to be in your possession, custody or control if you have the right to secure the document or a copy thereof from another person or public or private entity having actual physical possession thereof. For purposes of these Document Requests, the documents sought are those created between November 21, 2001 and the present. Any pleadings, briefs or other documents filed with the Clerk of the Bankruptcy Court in the Five Asbestos Cases or served on all parties entitled to be served with such pleadings, brief or other documents in any of the Five Asbestos Cases shall not constitute a document for purposes of this request.

6.    "Five Asbestos Cases" refers to the following cases pending in the United States Bankruptcy Court for the District of Delaware: *In re Armstrong World Industries, Inc. et al.*, Nos. 00-4471, 00-4469, 00-4470; *In re W.R. Grace & Co. et al.*, Nos. 01-1139 through 01-1200; *In re Federal-Mogul Global, Inc., T&N Limited, et al.*, Nos. 01-10578 *et al.*; *In re USG Corp. et al.*, Nos. 01-2094 through 01-2104; *In re Owens Corning, et al*, Nos. 00-03837 *et al*

7.    "Futures Representative" refers to the legal representative appointed pursuant to section 524(g) of the Bankruptcy Code to represent the interests of present or future asbestos-related demands.

8.    *"G-I Holdings"* refers to *In re G-I Holdings Inc.*, No. 01-30135 (RG) (Bankr. D.N.J.).

9.    "Judge Wolin" refers to the Hon. Alfred Wolin, U.S. District Judge for the District of New Jersey, and to members of his staff, including law clerks, courtroom deputies, secretaries, and interns.

2

10.     "Person" and "you" (in all their forms) mean the entities listed at the top of this request, as well as any of your partners, employees, officers, or directors, and any person or any business, legal, or governmental entity or association that acts or has acted at your direction or control.

11.     The use of the singular form of any word includes the plural and vice versa.

3

Documents Requested

1.      All documents that reflect, refer to, or relate to, any communication concerning (i)
*G-I Holdings;* or (ii) *Combustion Engineerng*; or (iii) any of the Five Asbestos Cases, between or
among you and any of the following individuals: Judge Alfred Wolin; David R. Gross; C. Judson
Hamlin; William A. Dreier; John E. Keefe, Sr.; and Francis E. McGovern.

2.      All documents that reflect, refer to, or relate to, the appointment of a Futures
Representative, or counsel for a Futures Representative, in (i) *G-I Holdings* or (ii) any of the Five
Asbestos Cases.

3.      All documents that reflect, refer to, or relate to, any draft opinions or memoranda of
law transmitted by you to any of the following individuals: Judge Alfred Wolin; David R. Gross;
C. Judson Hamlin; William A. Dreier; John E. Keefe, Sr.; and Francis E. McGovern.

4.      All documents that record, tabulate, reflect, refer to, or relate to, the hours in which
you participated in or prepared for communications as described in item 1 above.

5.      With respect to the Five Asbestos Cases and G-I Holdings, any documents that
reflect, refer to, or relate to, any *ex parte* communication concerning the following subjects: (a) the
establishment of a bar date for filing claims or demands for present or future asbestos-related injuries
or property damage claims or demands against Grace; (b) the estimation or other calculation,
quantification, or liquidation of claims or demands for asbestos-related injuries; and (c) the
substantive consolidation of any Debtor or any Debtor's estate with any other entity or entity's estate.

6.      All documents that reflect, refer to, or relate to, (i) the present motions for recusal of
Judge Wolin or (ii) the Petitions for Writs of Mandamus that were filed in the present proceeding.

4

**Document Requests to:**

1.  David R. Gross *and*
    Saiber Schlesinger Satz & Goldstein
    One Gateway Center, 13th Floor
    Newark, New Jersey 07102

2.  C. Judson Hamlin *and*
    Purcell Ries Shannon Mulcahy & O'Neill
    One Pluckemin Way
    Bedminster, New Jersey 07921

3.  William A. Dreier *and*
    Norris McLaughlin & Marcus, P.A.
    721 Route 202-206
    Bridgewater, New Jersey 08807

4.  John E. Keefe, Sr. *and*
    Lynch Martin
    1368 How Lane
    North Brunswick, New Jersey 08902

5.  Francis McGovern
    Room 4019
    Duke Law School
    Science Drive and Towerview Road
    Durham, North Carolina 27708

Definitions

1.      All definitions and rules of construction set forth in the Local Rules of the United States Bankruptcy Court for the District of Delaware and the Federal Rules of Civil Procedure shall apply to each command for production of the documents designated below.

2.      "All" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

3.      *"Combustion Engineering"* refers to *In re Combustion Engineering, Inc.*, No. 03-10495 (JKF) (Bankr. D. Del.).

4.      "Debtors" refers to debtors and debtors in possession.

5.      "Document" (in all its forms) means all written, reported, recorded, pictorial, or graphic matter, however produced or reproduced, that are in your possession, custody or control, including, but not limited to, all letters, telegrams, telexes, cables, word processing files, telephone records and notations, invoices, ledgers, journals and other formal and informal books of record and account, minutes, bulletins, instructions, financial statements, photographs, reports, memoranda, notes, notebooks, electronic mail, voice mail, drafts, worksheets, contracts, agreements, computer data, tape recordings, videotapes, transcriptions, intra-company drafts of the foregoing items, and copies or reproductions of the foregoing upon which notations in writing have been made which do not appear on the originals. A document is deemed to be in your possession, custody or control if you have the right to secure the document or a copy thereof from another person or public or private entity having actual physical possession thereof. For purposes of these Document Requests, the documents sought are those created between November 21, 2001 and the present. Any pleadings,

2

briefs or other documents filed with the Clerk of the Bankruptcy Court in the Five Asbestos Cases or served on all parties entitled to be served with such pleadings, brief or other documents in any of the Five Asbestos Cases shall not constitute a document for purposes of this request.

6.      "Five Asbestos Cases" refers to the following cases pending in the United States Bankruptcy Court for the District of Delaware: *In re Armstrong World Industries, Inc. et al.*, Nos. 00-4471, 00-4469, 00-4470; *In re W.R. Grace & Co. et al.*, Nos. 01-1139 through 01-1200; *In re Federal-Mogul Global, Inc., T&N Limited, et al.*, Nos. 01-10578 *et al.*; *In re USG Corp. et al.*, Nos. 01-2094 through 01-2104; *In re Owens Corning, et al.*, Nos. 00-03837 *et al.*

7.      "Futures Representative" refers to the legal representative appointed pursuant to section 524(g) of the Bankruptcy Code to represent the interests of present or future asbestos-related demands.

8.      "*G-I Holdings*" refers to *In re G-I Holdings Inc.*, No. 01-30135 (RG) (Bankr. D.N.J.).

9.      "Judge Wolin" refers to the Hon. Alfred Wolin, U.S. District Judge for the District of New Jersey, and to members of his staff, including law clerks, courtroom deputies, secretaries, and interns.

10.     "Party" means any past or present officers, directors, partners, employees, parents or predecessor corporations, attorneys, consultants or agents of any interest party in any of the Five Asbestos Cases or of any committee in any of the Five Asbestos Cases.

11.     "Person" and "you" (in all their forms) mean the individuals and entities listed at the top of this request, as well as any of your partners, employees, officers, or directors, and any person or any business, legal, or governmental entity or association that acts or has acted at your direction or control.

3

12.   The use of the singular form of any word includes the plural and vice versa.

4

## Documents Requested

1.      All documents that reflect, refer to, or relate to, any services or activities performed by you in connection with the Five Asbestos Cases, *G-I Holdings*, or *Combustion Engineering*.

2.      All documents that reflect, refer to, or relate to, your selection as an advisor to Judge Wolin in the Five Asbestos Cases.

3.      All complete, unredacted time and billing records in connection with activities performed by you in any of the Five Asbestos Cases or *Combustion Engineering*.

4.      All documents that reflect, refer to, or relate to, the potential or actual appointment of any individual as Futures Representative, or as counsel for any Futures Representative, in any of the Five Asbestos Cases or *Combustion Engineering*.

5.      All documents that reflect, refer to, or relate to, any communication concerning (i) *G-I Holdings* or (ii) any of the Five Asbestos Cases, between or among you and any of the following individuals: David R. Gross; C. Judson Hamlin; William A. Dreier; John E. Keefe, Sr.; Francis E. McGovern; and Judge Alfred Wolin.

6.      All documents that reflect, refer to, or relate to, any expert engaged in any of the Five Asbestos Cases, including but not limited to Dr. Letitia Chambers, by (i) any of the Debtors; (ii) any Futures Representative; or (iii) any of the official Creditors Committees.

7.      All documents that reflect, refer to, or relate to, any services or activities performed by you in connection with *Combustion Engineering* and related transactions, including but not limited to the negotiation and agreement of a $20 million fee paid to Joseph Rice or his law firm.

8.      For the period January 1, 1993 to the present, all documents that reflect, refer to, or relate to, any service performed by you as counsel to (i) tort plaintiffs in asbestos cases; (ii) Futures

5

Representatives; or (iii) any official or unofficial committee representing the interests of tort plaintiffs in asbestos cases.

9.    With respect to *G-I Holdings*, all documents that reflect, refer to, or relate to, (i) the establishment of a bar date for filing claims or demands for present or future asbestos-related injuries against the Debtor; (ii) the estimation or other calculation, quantification, or liquidation of claims or demands for asbestos-related injuries; or (iii) the substantive consolidation of any Debtor or any Debtor's estate with any other entity or entity's estate.

10.    With respect to the Five Asbestos Cases and *Combustion Engineering*, all documents that reflect, refer to, or relate to, (i) the establishment of a bar date for filing claims or demands for present or future asbestos-related injuries against the Debtor; (ii) the estimation or other calculation, quantification, or liquidation of claims or demands for asbestos-related injuries; or (iii) the substantive consolidation of any Debtor or any Debtor's estate with any other entity or entity's estate.

11.    All documents that reflect, refer to, or relate to, any representation, assertion, or statement concerning any decision that Judge Wolin might or might not make in future proceedings in the Five Asbestos Cases.

12.    All documents that reflect, refer to, or relate to, any individuals who are both (i) holders or potential holders of present or future asbestos claims or demands in the Five Asbestos Cases; and (ii) holders or potential holders of present or future asbestos claims or demands in *G-I Holdings*.

13.    All documents that reflect, refer to, or relate to, advocacy by you in favor of, or against, asbestos-related legislation.

6

14. All documents that reflect, refer to, or relate to, communications or meetings with Futures Representatives in any bankruptcy case.

15. All documents that reflect, refer to, or relate to, the use of an abbreviated proof-of-claim form in *G-I Holdings* or any of the Five Asbestos Cases.

16. Any and all documents that reflect, refer to, or relate to, your potential retention as Futures Representative, or as counsel for a Futures Representative, in any of the Five Asbestos Cases or in *Combustion Engineering*.

17. All documents that reflect, refer to, or relate to, communications regarding the subject of Judge Wolin's potential future employment at Saiber Schlesinger Satz & Goldstein.

18. All documents that reflect, refer to, or relate to, (i) the present motions for recusal of Judge Wolin or (ii) the Petitions for Writs of Mandamus that were filed in the present proceedings.

19. All resumes, CVs, or bios for you.

20. Any articles, presentations, or other documents for public circulation that you have authored relating to asbestos or mass torts.

21. **[Request Directed to Francis McGovern Only]** All documents that reflect, refer to, or relate to, communications between you and Joseph Rice, Perry Weitz, John Cooney, Fred Baron, or David Bernick, or their law firms, that pertain to the subject matter of asbestos litigation.

22. All documents that constitute, reflect, or refer to communications between you and any Party.

23. Documents sufficient to identify all individuals or entities that you are, or have, since the commencement of the Five Asbestos Cases, represented in connection with claims or demands

that such individuals or entities assert or have asserted against the Debtor in any of the Five Asbestos

Cases.

**Document Requests to:**

1.   James J. McMonagle
     24 Walnut Street
     Chagrin Falls, Ohio 44022

2.   Dean M. Trafelet
     9130 Wild Lane
     Baileys Harbor, Wisconsin 54202

3.   Kaye Scholer LLP
     425 Park Avenue
     New York, New York 10022

<u>Definitions</u>

1.   All definitions and rules of construction set forth in the Local Rules of the United States Bankruptcy Court for the District of Delaware and the Federal Rules of Civil Procedure shall apply to each command for production of the documents designated below.

2.   "All" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

3.   "*Combustion Engineering*" refers to *In re Combustion Engineering, Inc.*, No. 03-10495 (JKF) (Bankr. D. Del.).

4.   "Debtors" refers to debtors and debtors in possession.

5.   "Document" (in all its forms) means all written, reported, recorded, pictorial, or graphic matter, however produced or reproduced, that are in your possession, custody or control, including, but not limited to, all letters, telegrams, telexes, cables, word processing files, telephone records and notations, invoices, ledgers, journals and other formal and informal books of record and account, minutes, bulletins, instructions, financial statements, photographs, reports, memoranda, notes, notebooks, electronic mail, voice mail, drafts, worksheets, contracts, agreements, computer

data, tape recordings, videotapes, transcriptions, intra-company drafts of the foregoing items, and copies or reproductions of the foregoing upon which notations in writing have been made which do not appear on the originals. A document is deemed to be in your possession, custody or control if you have the right to secure the document or a copy thereof from another person or public or private entity having actual physical possession thereof. For purposes of these Document Requests, the documents sought are those created between November 21, 2001 and the present. Any pleadings, briefs or other documents filed with the Clerk of the Bankruptcy Court in the Five Asbestos Cases or served on all parties entitled to be served with such pleadings, brief or other documents in any of the Five Asbestos Cases shall not constitute a document for purposes of this request.

6.      "Five Asbestos Cases" refers to the following cases pending in the United States Bankruptcy Court for the District of Delaware: *In re Armstrong World Industries, Inc. et al.*, Nos. 00-4471, 00-4469, 00-4470; *In re W.R. Grace & Co. et al.*, Nos. 01-1139 through 01-1200; *In re Federal-Mogul Global, Inc., T&N Limited, et al.*, Nos. 01-10578 *et al.*; *In re USG Corp. et al.*, Nos. 01-2094 through 01-2104; *In re Owens Corning, et al.*, Nos. 00-03837 *et al.*

7.      "Futures Representative" refers to the legal representative appointed pursuant to section 524(g) of the Bankruptcy Code to represent the interests of present or future asbestos-related demands.

8.      "*G-I Holdings*" refers to *In re G-I Holdings Inc.*, No. 01-30135 (RG) (Bankr. D.N.J.).

9.      "Judge Wolin" refers to the Hon. Alfred Wolin, U.S. District Judge for the District of New Jersey, and to members of his staff, including law clerks, courtroom deputies, secretaries, and interns.

2

10.    "Person" and "you" (in all their forms) mean the individuals and entity listed at the top of this request, as well as any of your partners, employees, officers, or director, and any person or any business, legal, or governmental entity or association that acts or has acted at your direction or control.

11.    The use of the singular form of any word includes the plural and vice versa.

Documents Requested

1.    All documents that reflect, refer to, or relate to, the selection of David R. Gross, C. Judson Hamlin, William A. Dreier, John E. Keefe, Sr., and Francis E. McGovern, as advisors to Judge Wolin in the Five Asbestos Cases.

2.    All documents that reflect, refer to, or relate to, the potential or actual appointment of any individual as a Futures Representative, or as counsel for a Futures Representative, in any of the Five Asbestos Cases or *Combustion Engineering*.

3.    All documents that reflect, refer to, or relate to, any communication concerning (i) *G-I Holdings* or (ii) any of the Five Asbestos Cases, between you and any of the following individuals: David R. Gross; C. Judson Hamlin; Judge Alfred Wolin; William A. Dreier; John E. Keefe, Sr.; and Francis E. McGovern.

4.    All documents that reflect, refer to, or relate to, *Combustion Engineering* and related transactions, including but not limited to the negotiation and agreement of a $20 million fee paid to Joseph Rice or his law firm.

5.    With respect to the Five Asbestos Cases, *Combustion Engineering*, and *G-I Holdings*, all documents that reflect, refer to, or relate to, (i) the establishment of a bar date for filing claims or demands for present or future asbestos-related injuries against the Debtor; (ii) the estimation or

3

other calculation, quantification, or liquidation of claims or demands for asbestos-related injuries; or (iii) the substantive consolidation of any Debtor or any Debtor's estate with any other entity or entity's estate.

6.      All documents that reflect, refer to, or relate to, any representation, assertion, or statement concerning any decision that Judge Wolin might or might not make in future proceedings in the Five Asbestos Cases.

7.      All documents that reflect, refer to, or relate to, any individuals who are both (i) holders or potential holders of present or future asbestos claims or demands in the Five Asbestos Cases; and (ii) holders or potential holders of present or future asbestos claims or demands in *G-I Holdings*.

8.      All documents that reflect, refer to, or relate to, meetings or other communications between or among (i) any Futures Representatives in the Five Asbestos Cases; and (ii) Hamlin, any of Hamlin's counsel or other advisors or representatives in *G-I Holdings*, or any of the other advisors appointed by Judge Wolin in the Five Asbestos Cases.

9.      All documents that reflect, refer to, or relate to, the use of an abbreviated proof-of-claim form in *G-I Holdings* or any of the Five Bankruptcy Cases.

10.     All documents that reflect, refer to, or relate to (i) the present motions for recusal of Judge Wolin or (ii) the Petitions for Writs of Mandamus that were filed in the present proceeding.

11.     All resumes, CVs, or bios for you.

4

Requests for Production to Cooney & Conway, Motley Rice, Caplin & Drysdale, Weitz & Luxembourg, and Elizabeth Magner

## Definitions

1.  "You" or "Your" mean the entity or person that is the subject of the attached subpoena, and any past or present officers, directors, partners, employees, parent or predecessor corporations, attorneys, consultants or agents of that entity or person.

2.  "Five Asbestos Cases" means the following cases pending in the United States Bankruptcy Court for the District of Delaware: *In re Armstrong World Industries, Inc., et al.*, Nos. 00-4469, *et al.*; *In re W.R. Grace & Co., et al.*, Nos. 01-1139, *et al.*; *In re Federal-Mogul Global, Inc., T&N Limited, et al.*, Nos. 01-10578, *et al.*; *In re USG Corp., et al.*, Nos. 01-2094, *et al.*; and *In re Owens Corning, et al.*, No 00-3837, *et al.*

3.  "Judge Wolin" means the Honorable Alfred M. Wolin, U.S. District Judge for the District of New Jersey, and anyone working on his behalf, including, without limitation, law clerks, courtroom deputies, secretaries, interns, and other members of his staff.

4.  "Advisor" means any of the following: C. Judson Hamlin, David R. Gross, William A. Dreier, Francis E. McGovern, or John E. Keefe, or anyone working on their behalf.

5.  "Party" means any past or present officers, directors, partners, employees, parent or predecessor corporations, attorneys, consultants or agents of any interested party in any of the Five Asbestos Cases or of any committee in any of the Five Asbestos Cases.

6.  "Non-Party" means any person or entity that does not meet the definition for a Party, an Advisor, or Judge Wolin.

869478 v1/SF
3MW6011.DOC

7.   "Document" means any document as defined by Federal Rule of Civil Procedure 34. A Document may be any written, printed, typed, recorded, magnetic, punched, copied, graphic or other tangible thing in, upon, or from which information may be embodied, translated, conveyed, or stored (including, without limitation, correspondence, memoranda, notes, records, books, papers, telegrams, telexes, facsimile transmissions, dictation or other audio tapes, video tapes, computer tapes, computer discs, computer printouts, electronic mail, microfilm, microfiche, worksheets, diaries, calendars, photographs, charts, drawings, sketches and all other writings or drafts thereof). For purposes of these Document Requests, the documents sought are those created between November 27, 2001 and the present. **Any pleadings, briefs or other Documents filed with the Clerk of the Bankruptcy Court in the Five Asbestos Cases or served on all Parties entitled to be served with such pleadings, brief or other Documents in any of the Five Asbestos Cases shall not constitute a Document for purposes of this Request.**

8.   "Communications" means any transmission of information from one person or entity to another, including, without limitation, by personal meeting, telephone, letter, facsimile, electronic mail, teleconference, radio, telegraph, etc., **that relate to the Five Asbestos Cases or to any other case pending under Chapter 11 of the Bankruptcy Code involving claims arising from exposure to asbestos and over which Judge Wolin has exercised any jurisdiction.**

9.   The use of the singular form of any word includes the plural and vice versa.

10.   "Any" and "all" will also be read to include "each" and "every."

1.    "Or" will be read either disjunctively or conjunctively as necessary to bring within the
      scope of the discovery request all responses that might otherwise be construed to be
      outside its scope.

### Requests For Production

1.    All Documents that constitute, reflect, or refer to Communications between You and
      Judge Wolin.

2.    All Documents that reflect, refer to or concern any meetings (including, without
      limitation, any conferences) between you and Judge Wolin.

3.    All Documents that constitute, reflect, or refer to Communications between You and any
      Advisor.

4.    All Documents that constitute, reflect, refer to, or relate to any draft opinions or
      memoranda of law for Judge Wolin or any Advisor.

5.    All Documents that record, tabulate, reflect, or refer to the number of hours in which You
      participated in or prepared for Communications as described in items 1 through 3 above.
      Fee applications that have been publicly filed in the official record of any of the Five
      Asbestos Cases may be excluded.

# UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>OWENS CORNING, et al.,<br><br>    Debtors. | Case Nos. 00-3837 through 3854<br><br>(Alfred M. Wolin, U.S.D.J., specially designated)<br><br>Hearing Date: January 16, 2004 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| In re:<br><br>W.R. Grace & Co., et al.<br><br>    Debtors. | Case Nos. 01-1139 through 0-1200<br><br>(Alfred M. Wolin, U.S.D.J., specially designated)<br><br>Hearing Date: January 16, 2004 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| In re:<br><br>USG Corp., et al.<br><br>    Debtors. | Case Nos. 01-2094 through 01-2104<br><br>(Alfred M. Wolin, U.S.D.J., specially designated)<br><br>Hearing Date: January 16, 2004 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OWENS CORNING'S REQUESTS FOR PRODUCTION OF DOCUMENTS RELATING TO MOTION TO RECUSE DISTRICT JUDGE

Owens Corning and its related debtors-in-possession in the above-referenced bankruptcy proceedings, by its counsel, and as coordinating counsel for the Asbestos Creditors Committees and the Representatives of Future Asbestos Claimants in the *Owens Corning*, *W.R. Grace*, and

*USG Corp.* bankruptcy proceedings, respectfully request that the Court permit the following request for production of documents to the following persons and counsel in these proceedings:

Movant Entities

(i)      Kensington International Limited;

(ii)     Springfield Associates, LLC;

(iii)    Elliott Management Corporation;

(iv)    Elliott Associates, L.P.;

(v)     Elliott International, L.P.;

(vi)    Mark Brodsky;

(vii)   DK Acquisition Partners, L.P.;

(viii)  Fernwood Associates, L.P.;

(ix)    Deutsche Bank Trust Company Americas; and

(x)     USG Corp.

Official Committees of Unsecured Creditors Entities

(xi)    The Official Committee for Unsecured Creditors in the *Owens Corning*

bankruptcy proceeding, *In re Owens Corning, et al,* Case No. 00-03837;

(xii)   The Official Committee for Unsecured Creditors in the *W.R. Grace* bankruptcy

proceeding, *In re W.R. Grace & Co., et al.,* Case Nos. 01-1139 through 01-1200; and

(xiii)  The Official Committee for Unsecured Creditors in the *USG Corp.* bankruptcy

proceeding, *In re Armstrong World Industries, Inc., et al.,* Case Nos. 00-4471, 00-4469-4470.

Certain Creditors in the *Owens Corning* Bankruptcy Proceeding

(xiv)   Credit Suisse First Boston, as agent for the Bank Group; and

(xv)    JP Morgan/Chase.

Counsel

    (xvi)   Kramer Levin Naftalis & Frankel LLP (counsel to CSFB and the Bank Group);

    (xvii)  Davis Polk & Wardwell (counsel to OCUC in the *Owens Corning* bankruptcy

proceeding); and

    (xviii) Stroock, Stroock & Lavan (counsel to OCUC in the *USG Corp.* bankruptcy

proceeding).

Unless otherwise agreed by counsel or by Order of Court, each of your responses and the

requested documents shall be produced on or before December 31, 2003, 10:00 a.m. at the

offices of Saul Ewing LLP, 100 South Charles Street, Baltimore, Maryland 21201.

## DOCUMENTS REQUESTED

1.     All documents relating to any background investigation, biographical research or records checks conducted or obtained by you concerning Messrs. Hamlin and Gross and such documents as will show the dates of any such work.

2.     Such documents as will show whether you subscribe to *Mealey's Litigation Report: Asbestos, Mealey's Asbestos Bankruptcy Reporter, Mealey's Asbestos Reporter, Andrews Publications' Asbestos Litigation Reporter, The Daily Deal,* any publication by Bear Stearns & Co., Inc. concerning distressed securities, debtors, or bankruptcy proceedings, any publication by Lehman Brothers concerning distressed securities, debtors, or bankruptcy proceedings, and any other publication that as part of its stated business routinely reports on distressed securities, debtors or bankruptcy proceedings, and the dates of such subscriptions; or, in lieu thereof, an affidavit or certification providing such information.

3.     All of your distribution lists concerning each of the publications described in Request No. 2, above.

4.     All pleadings, notices and other filings received by you relating to the appointments, re-appointments, activities or roles of Messrs. Hamlin and Gross in the *G-I* bankruptcy proceedings.

5.     Such documents as will identify each of your persons who worked on, monitored or participated in the *G-I* bankruptcy proceedings and the dates thereof, or, in lieu thereof, an affidavit or certification providing such information.

6.  All dockets, logs and other similar documents which were prepared, maintained or distributed by Davis Polk, which are the same as or similar to the docket or log described by R.L. Jones in the billing record found on page 291 of Owens Corning's Appendix filed in the Third Circuit, pertaining to the *G-I* bankruptcy proceeding.

7.  Such documents as will show, as to each such docket, log or similar document identified pursuant to Request No. 6, above, the identity of all distributees and recipients, or, in lieu thereof, an affidavit or certification providing such information.

8.  All reports prepared, received or distributed by Davis Polk which concern the appointments, re-appointments, activities or roles of Messrs. Hamlin and Gross in the *G-I* bankruptcy proceeding.

9.  Such documents as will identify each of the members of the Bank Group and of the Steering Committee, their representatives and their separate dates of service or membership; or, in lieu thereof, an affidavit or certification providing such information.

10. Such documents as will show who represented Kensington and Springfield in the Owens Corning bankruptcy proceedings, and for what periods.

11. Any documents prepared, received or distributed by Kramer Levin which reflect the appointments, re-appointments, activities or roles of Messrs. Hamlin and Gross in connection with the *G-I* bankruptcy proceeding.

12. All of Kramer Levin's actual time sheets and billing records prepared in connection with or issued to any of its clients in the *G-I* bankruptcy proceeding or in any of the six Asbestos Bankruptcy Cases which refer or relate to the appointments, re-appointments, activities or roles of Messrs. Hamlin and Gross in the *G-I* bankruptcy proceeding.

13. All of Davis Polk's actual time sheets and billing records prepared in connection with or issued to any of its clients in the *G-I* bankruptcy proceeding or any of the six Asbestos Bankruptcy Cases which refer or relate to the appointments, re-appointments, activities or roles of Messrs. Hamlin and Gross in the *G-I* bankruptcy proceeding.

14. For each moving party that has purchased a claim or portion of a claim in any of the above-captioned proceedings, such documents as will show when and from whom you acquired such claim or portion of a claim or, in lieu thereof, an affidavit or certification providing such information.

15. Such documents as will show who attended the conference with the Honorable Alfred M. Wolin held December 20, 2001.

16. Such documents as will disclose the date of your first consideration of the possible recusal of the Honorable Alfred M. Wolin in any of the six Asbestos Bankruptcy Cases.

## DEFINITIONS AND INSTRUCTIONS

A.   "CSFB" means Credit Suisse First Boston.

B.   The "Bank Group" means those financial institutions and lenders participating in or owning portions of the debt issued pursuant to the $2,000,000,000 Credit Agreement dated as of June 26, 1997 among Owens Corning, as Borrower and Guarantor, the Other Borrowers and Guarantors, the Banks listed on Annex A hereto and Credit Suisse First Boston, as that group has changed from time to time.

C.   "Engage" or "Engaged" means, with respect to services or personnel, the retention of such services or personnel, without regard to which person is to pay for such services or personnel.

D.   The "*Owens Corning* bankruptcy proceedings" means *In re Owens Corning, et al,* Case No. 00-03837 (D. Del.).

E.   The "Steering Committee" means the steering committee established in connection with the *Owens Corning* bankruptcy proceedings, comprised of certain of the financial institutions and lenders participating in or owning portions of the debt issued pursuant to the $2,000,000,000 Credit Agreement dated as of June 26, 1997 among Owens Corning, as Borrower and Guarantor, the other Borrowers and Guarantors, the Banks listed on Annex A hereto and Credit Suisse First Boston (the "June 26, 1997 Credit Agreement"), and which acts as one of the representatives of the interests of the Bank Group.

F.   The "*G-I* bankruptcy proceedings" means *In re G-I Holdings, Inc., et al,* Case No. 01-30135 (D.N.J.).

G.   The "Six Asbestos Bankruptcy Cases" refers to the following cases pending in the United States District Court for the District of Delaware: *In re Armstrong World Industries, Inc.,et al.,* Case Nos. 00-4471, 00-4469-4470; *In re W.R. Grace & Co., et al.,* Case Nos. 01-1139 through 01-1200; *In re Federal Mogul Global, Inc., et al.,* Case Nos. 01-10578, et al.; *In re USG Corp., et al.,* Case Nos. 01-2094 through 01-2104; *In re Owens Corning, et al.,* 00-3837 through 3854; and *In re Combustion Engineering, Inc.,* No. 03-10495.

H.   "You" means the individuals or entities to which these Requests for Production of Documents are directed, either individually or collectively and their partners, associates, paralegals, attorneys, directors, officers, employees, agents, representatives, successors and others acting on their behalf.

I.   "Communication" means any oral, written or recorded statement (via whatever medium) transmitted by one person to another.

J.   "Document" means any written, recorded, electronic or graphic matter (including any business record in any form), however produced, reproduced or stored (including any digital, electronic, analog or physical medium), including all non-identical copies

containing notations not contained on the original thereof, and including without limitation correspondence, memoranda, notes, calendar entries, diary entries, time and billing records, and electronic mail ("e-mail"), disks, diskettes, compact disks, tapes or other media used in data and/or word processing together with the programming instructions and other materials necessary to understand such media.

K.   "Person" means any natural person, corporate entity, partnership, association, or sole proprietorship.

L.   Reference to any person shall include the person's partners, associates, paralegals, attorneys, directors, officers, employees, agents, representatives, successors and others acting on the person's behalf.

M.   The terms "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this Request for Production of Documents any information which might otherwise be construed to be outside its scope.

N.   The term "concern," "concerning," "relate" or "relating to" means constituting, comprising, containing, setting forth, showing, disclosing, describing, explaining, summarizing, concerning, or referring to, directly or indirectly.

O.   "Including" means including but not limited to.

P.   All documents that are withheld under a claim of privilege, under a claim that such documents form a part of the attorney's work product, or under a claim that such documents were prepared in anticipation of litigation, shall be identified in sufficient detail (including an identification of the document's date, the document's author and all recipients, and a general description of the subject matter of the document) to permit a request for in camera inspection of each such document in the event any such claim is disputed.

Q.   Whenever appropriate herein, the singular form of a word shall also be interpreted as its plural.

R.   To the extent that no single document exists or is in your possession, custody or control which contains all the information sought in any particular Request herein, you are to provide such other documents in your possession, custody or control which are sufficient to show, compute, compile or explain all the information requested in such Requests or as much thereof as is available.

S.   If any documents sought by this Request for Production of Documents have been destroyed or are no longer in your possession, identify the documents no longer in your possession, the date(s) on which such documents were destroyed, and describe in detail your regular policy regarding the maintenance, retention and destruction of records that have at one time been in your possession, as well as the identity of the person or persons responsible for the maintenance, retention, and destruction of such records.

T.    Unless otherwise stated in a particular Request each Request for Production of Documents refers to the time period between October 4, 2000 and December 31, 2003.

U.    This Request for Production of Documents is continuing in nature, requiring a supplemental response and production when new, different or clarifying information comes into the possession of the party whom this Request is addressed or the possession of said party's counsel.

Respectfully submitted,

By: _____

Norman L. Pernick
J. Kate Stickles
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE  19801
(302) 421-6800

and

Charles O. Monk, II
Matthew G. Dobson
SAUL EWING LLP
100 South Charles Street
Baltimore, MD  21201
(410) 332-8600
Counsel to Owens Corning *et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of December, 2003, I sent copies of this

Request for Production via e-mail to all counsel of record and, via telecopy to Evans Wohlforth,

Esquire, United States District Court for the District of New Jersey.

_____
Henry R. Abrams

-7-

✳✳ TOTAL PAGE.08 ✳✳

# EXHIBIT R

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: ARMSTRONG WORLD INDUSTRIES, INC., et al., | : | Chapter 11 Case Nos. 00-4471, 00-4469, 00-4470 |
| Debtors. | : | |
| IN RE: W.R. GRACE & CO., et al., | : | Chapter 11 Case Nos. 01-1139 through 0-1200 |
| Debtors. | : | |
| IN RE: FEDERAL-MOGUL GLOBAL, INC., T&N LIMITED, et al., | : | Chapter 11 Case Nos. 01-10578, et al.[1] |
| Debtors. | : | |
| IN RE: USG CORPORATION, a Delaware Corporation, et al., | : | Chapter 11 Case Nos. 01-2094 through 01-2104 |
| Debtors. | : | |
| IN RE: OWENS CORNING, et al., | : | Chapter 11 Case Nos. 00-3837 through 00-3854 |
| Debtors. | : | |

**ORDER DESIGNATING COURT APPOINTED CONSULTANTS
AND SPECIAL MASTERS**

This matter having been opened by the Court upon its own

motion in each of the above-captioned Chapter 11 cases; and the

interested parties having been put on notice by the Court at the

joint case management conference held on December 20, 2001, that

the Court anticipated appointing special masters and/or case

_____

[1]See attached list.

management consultants to whom the Court may from time to time
delegate certain authority to hear matters and to advise the
Court on issues that may arise in these five large Chapter 11
cases; and for good cause shown

It is this 28th day of December, 2001

ORDERED that the following Order applies to the lead cases
identified in the caption of this Order and to all cases filed as
related cases thereto, and it is further

ORDERED that William A. Drier, Esq., David R. Gross, Esq.,
C. Judson Hamlin, Esq., John E. Keefe, Esq., and Professor
Francis E. McGovern are hereby designated as Court Appointed
Consultants to advise the Court and to undertake such
responsibilities, including by way of example and not limitation,
mediation of disputes, holding case management conferences, and
consultation with counsel, as the Court may delegate to them
individually, and it is further

ORDERED that the parties are on notice that the Court may,
without further notice, appoint any of the Court-Appointed
Consultants to act as a Special Master to hear any disputed
matter and to make a report and recommendation to the Court on
the disposition of such matter, and it is further

ORDERED that William A. Drier, Esq., is hereby appointed
Special Master in the matter of In re W.R. Grace & Co.,
Bankruptcy No. 01 1139 through 01-1200, to hear all disputed
matters in that Chapter 11 case for which the Court's Order of

Reference may be withdrawn from the Honorable Judith K.

Fitzgerald, United States Bankruptcy Judge, and it is further

ORDERED that the fees of the Court Appointed Consultants and

Special Master(s) shall be borne by the debtors in such manner

and apportionment as this Court or the Bankruptcy Courts may

hereinafter direct.

ALFRED M. WOLIN, U.S.D.J.

EXHIBIT S

1

```
 1              UNITED STATES BANKRUPTCY COURT
             FOR THE DISTRICT OF DELAWARE
 2
     IN RE: OWENS CORNING, et al.,
 3                                    Chapter 11
             Debtors        Case Nos. 00-3837/00-3854
 4   ---------------------------------
     IN RE:  W.R. GRACE & CO., et al., Chapter 11
 5                          Case Nos. 01-1139/01-1200
             Debtors
 6   ---------------------------------
     IN RE:  USG CORPORATION,
 7           a Delaware Corporation,   Chapter 11
             et al.,         Case Nos. 01-2094/01-2104
 8           Debtors
     ------------------------------ DEPOSITION UPON
 9                                  ORAL EXAMINATION
                                         OF
10                                  C. JUDSON HAMLIN
11   ---------------------------------
```

## COPY

```
13          TRANSCRIPT of the deposition of the

14   witness, before CATHERINE GOLEMBESKI, a Notary

15   Public and Certified Shorthand Reporter of the

16   State of New Jersey and Registered Professional

17   Reporter, taken at the UNITED STATES DISTRICT

18   COURTHOUSE, 50 Walnut Street, Newark, New Jersey,

19   on Tuesday, January 6, 2004, commencing at 9:00

20   a.m., pursuant to Notice.

21

22

23

24

25
```

3 (Pages 6 to 9)

C. Judson Hamlin - direct

6

1    Q.    Does Mr. Scheier represent you in your
2  capacity as an adviser to Judge Wolin in the five
3  cases?
4    A.    No, he represents me in my capacity as
5  a Futures rep of G-I.
6    Q.    And that's the context in which Mr.
7  Scheier's here today?
8    A.    Yes.
9    Q.    Without revealing any conversations
10  or the substance of discussions with
11  counsel, can you tell me what you did to prepare
12  for today's deposition?
13    MR. SCHEIER:  I'll raise an objection
14  to preserve my record, that that question may
15  elicit information that's protected by the
16  attorney-client privilege.
17    And I caution you in that regard Jud
18  not to testify as Mr. Orseck has also cautioned
19  you with regard to discussions that you and I had
20  in that regard.  I instruct you not, in fact, to
21  not reveal those discussions.
22    Q.    Let me be more specific.  Have you, yes
23  or no, met with your counsel, Mr. Scheier, to
24  prepare for today's deposition?
25    A.    Yes, this morning.

7

1    Q.    Have you had conversations with anyone
2  other than Mr. Scheier?
3    A.    No.
4    Q.    And to prepare for the deposition?
5    A.    No.
6    Q.    Have you spoken to Mr. Gross since his
7  deposition yesterday?
8    A.    No.
9    MR. SCHEIER:  It would be easier if
·10  you let Mr. Orseck finish the questions, mostly
11  for the court reporter.
12    A.    The worst client that you can have are
13  lawyers and judges.  We also make the worst
14  witnesses.
15    Go ahead, I apologize.
16    Q.    Judge Hamlin, you are currently
17  serving as an adviser to Judge Wolin in the five
18  cases.  Is that right?
19    A.    I have not had an assignment since
20  March or April of this year, but yeah.
21    Q.    When did you first -
22    MS. PARVER:  Objection for the record,
23  sake of the record.  Gary, when the Judge
24  referred to this year, I assume he means '03 as
25  opposed to '04.

8

1    A.    '03.  My apologies.
2    Q.    You have not had an assignment since
3  when?
4    A.    March or April.
5    Q.    But, to your knowledge, your
6  appointment as an adviser which came sometime
7  before March or April of 2003 has not been
8  terminated or revoked or ended in some way.  Is
9  that right?
10    A.    Recollect there's been no formal
11  termination.
12    Q.    When did you first learn that Judge
13  Wolin was considering appointing you as an
14  adviser in the five cases?
15    A.    It would have been sometime after his
16  designation by Judge Becker to manage those
17  cases.
18    Q.    And did you have a phone conversation
19  with Judge Wolin?  Did you meet with him?  Tell
20  me how you learned of that idea?
21    A.    My best recollection was that he had
22  called me, indicated that I had received the
23  assignment, and that he wanted to put together a
24  team of people that he thought had some
25  experience in a number of areas, and asked me if

9

1  i would be willing to serve on it.
2    Q.    And that was in a phone conversation?
3    A.    I believe it was.
4    Q.    Did you give Judge Wolin and answer
5  during that same conversation?
6    A.    My first question was, was I was not
7  aware, I don't think I was.  I wasn't aware that
8  Becker had appointed him.  And I didn't know what
9  cases he had.  And I told him if G-I was one of
10  them, I couldn't do it.  He told me that, no, the
11  only cases he had gotten were out of Delaware.
12    Q.    Why did you say that if G-I was one of
13  the cases then you couldn't serve as an adviser
14  in the five cases?
15    A.    I already was a Futures rep in G-I,
16  that was one of his cases I had choose, better
17  one of the others.
18    Q.    Why is that?
19    A.    Because I couldn't very well advocate
20  for G-I while he was handling the case.
21    Q.    You wouldn't advocate as Futures rep
22  in G-I and serve as an adviser with respect to
23  G-I at the same time.  Is that right?
24    A.    That is correct.
25    Q.    Did you considers that that

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ  07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

5 (Pages 14 to 17)

C. Judson Hamlin - direct

14

1 discussions, but since the answer is no, it's
2 mute to this point.
3    A.    That's the answer to your question.
4    Q.    Judge Hamlin, why don't we do this. If
5 at any time a question that I put to you relating
6 to a conversation between you and Mr. Gross would
7 elicit a response that relates to a discussion
8 between the two of you that you had in your
9 lawyer/client context in the G-I case, would you
10 just state that on the record, and then I won't
11 pursue it any further?
12    A.    Okay.
13        MR. SCHEIER:    You're not asking me not
14 to --
15        MR. ORSECK:    Go ahead.
16        MR. SCHEIER:    -- instruct the witness.
17        MR. ORSECK:    You can object as you see
18 fit.
19    Q.    So you didn't have any conversations
20 subject to Mr. Scheier's instruction with any of
21 the advisors between the first meeting with Judge
22 Wolin, the first conversation with Judge Wolin
23 and the meeting with the law clerk that you
24 described?
25    A.    That is correct, I did not.

15

1    Q.    What was discussed at this first
2 meeting with the five advisors and Mr. Wohlforth?
3    A.    If recollection serves me correctly,
4 it was a general discussion about the myriad of
5 problems that were confronting asbestos
6 litigation generally, and that is all the things
7 that had caused asbestos claims not to be
8 resolved in the tort system. ^ Once ^ Ones
9 Georgin and Amchem came down, we pretty much new
10 class actions were not going to be the answer.
11 The various asbestos manufacturers resorted to
12 the asbestos courts as the next possible way of
13 putting a box around their possible liability.
14 And the view was that nobody had been successful,
15 really, to get their hands around time resolution
16 of the issues. And so we talked about common
17 threads of challenges that existed to resolution
18 of the tort system and in the asbestos system,
19 and see if we could come up with some kind of or
20 if Judge Wolin eventually, with our individual
21 input, could come up with some kind of innovative
22 resolution to get those cases done.
23        MS. PARVER:    Could I hear that answer
24 again, please.
25        (Whereupon the requested testimony was

16

1 read back.)
2    Q.    Judge Hamlin, you mentioned two
3 phrases in your answer, and I wanted to try not
4 to forget these two points, so I'm going to ask
5 you a two part question now, and take them one at
6 a time.
7        You said that at this meeting the
8 group discussed a myriad of problems that, now
9 I'm paraphrasing, had prevented resolution
10 of asbestos matters in the tort system.
11        And the second thing you mentioned was
12 that there was some discussion about seeking
13 innovative resolution or resolutions to one or
14 more of those problems. My question is, can you
15 try, as best as you can, to tell us what were,
16 among the myriad of problems that were discussed
17 at the meeting. And then I'm going to ask you
18 next, tell us whether any potential innovative
19 resolutions were discussed.
20        MR. SCHEIER:    Objection to form.
21    A.    I mean, the problems in dealing with
22 tort liability for asbestos claims were huge, and
23 everybody at this table knows what they are.
24        First of all, the number of claims is
25 overwhelming the system. One of the continuing

17

1 issues that is on the table, what do you do with
2 depending on where you come from, whether you
3 want to have all of them, asymptomatics or not
4 impaired or unimpaired. That has always been a
5 difficult issue.
6        In fact, Judge Keefe had addressed
7 that early on from the bench when he was handling
8 asbestos cases. How you manage the claims. There
9 was always the concern about the role of
10 insurance coverage in the context of asbestos
11 litigation, whether or not there was exhaustion
12 of coverage to the degree to which insurance
13 companies could control defenses.
14        I'm just trying to think off the top
15 of my head. We went through the whole package.
16 Once you got into the bankruptcy system, you had
17 unliquidated tort claims competing with secured
18 and unsecured contractors. Property damage
19 people, all of whom had their own constituency
20 and their own interest. In fact, if you were
21 going to reach a resolution, you had to deal with
22 the super majority approval. And how you did that
23 and whether or not 524 G rep, what ability or
24 standing did they have in the context of dealing
25 with -- but we only discussed these in terms of

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ  07039
973-992-7850
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

C. Judson Hamlin - direct

22

1 Early on there was no delineation as
2 to what, other than to be a resource for him,
3 what responsibilities we would be given or to
4 deal with.
5     Q.   Did you say during that first
6 conversation with Judge Wolin or at any
7 subsequent time, my ability to serve as an
8 adviser is dependent upon what the scope of my
9 duties will be in the five cases because I serve
10 in this other role in the G-I case?
11    A.   Certainly not in that degree of
12 detail, no.
13    Q.   What is the first time you recall
14 considering this issue, in your mind, that the
15 possibility of a conflict or no conflict might
16 depend to some degree upon the scope of your
17 duties in the five cases?
18    MR. SCHEIER:  Just take an objection
19 to form in terms of the continued use of
20 "conflict" and "conflict of interest".
21    To the extent you understand what he
22 means by those terms, Jud, go ahead and answer
23 the question.
24    A.   I don't think there was a conflict
25 because it would depend upon what I was asked to

23

1 do. Obviously, I would not undertake anything
2 that would, in my mind, constitute a conflict. It
3 would depend on what he was looking for us to do.
4    And frankly, early on, I don't think
5 -- you're right, I'll stop.
6    Q.   What types of responsibilities --
7    MR. BERNICK:  I can't hear you.
8    MR. ORSECK:  I'll start again.
9    Q.   When you thought about this issue, did
10 you have in mind any particular types of
11 responsibilities that you might be asked to
12 perform in the five cases that might present you
13 with a problem given your simultaneous role in
14 the G-I case?
15    A.   At the initial meeting?
16    Q.   At any time.
17    A.   Certainly in the beginning, no, I
18 didn't think it -- think that through. Let me
19 backup and explain something.
20    For those of us who are familiar with
21 practice in New Jersey, the individuals that
22 Judge Wolin selected had different areas of
23 acknowledged expertise in New Jersey.
24    Judge Dreier was probably the
25 acknowledged leader or expert in products

24

1 liability. He wrote part of the restatement on
2 product liability and had several published
3 opinions which were regarded as precedential in
4 New Jersey product liability law.
5    Judge Keefe had a long career on the
6 appellate division, but had been the first judge
7 handling asbestos litigation in New Jersey. In
8 fact, probably wrote all the seminal opinions
9 initially.  And he actually managed the asbestos
10 calendar, prior to my assumption of that
11 responsibility. He brought that expertise.  He
12 was the full historian on the asbestos law in New
13 Jersey.
14    McGovern was the academic who had a
15 broad, published 8,000 articles, or at least
16 something like that on mass torts and that sort
17 of thing.
18    Gross was, I think, the initial
19 participant on behalf of Johns-Manville and
20 ground breaking litigation.  And he had a
21 reputation as someone who could find pragmatic
22 solutions to difficult problems and bring people
23 together.
24    I was the manager of all complex
25 litigation in New Jersey, probably for the last

25

1 seven, eight years on the bench, by assignment
2 then of Chief Justice Wilitz. I handled the
3 breast implant litigation, any number of things,
4 which is the HIV contaminated blood cases,
5 several cases dealing with environmental damage.
6    So each of us had a kind of different
7 expertise. My anticipation was that I would
8 probably be called upon to deal more with
9 management issues, that was my anticipation of
10 what he would be talking about, what he would be
11 looking for me. So did he say that? No, that was
12 my anticipation from looking at the makeup of the
13 group.
14    Q.   I'm trying to understand your answer
15 to my question. Am I understanding correctly that
16 because your initial understanding was that you
17 would be -- the focus of your responsibilities
18 would be case management or procedural matters
19 that, therefore, the G-I Holdings role for you
20 did not present a conflict problem?
21    A.   Initially, yeah.
22    Q.   Conversely, did you think, at that
23 time, that if you had substantive advisory
24 responsibilities to Judge Wolin, that that might
25 present a conflict with respect to your G-I

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

8 (Pages 26 to 29)

C. Judson Hamlin - direct

26

1 Holdings role?
2    A.    Were he to present me with any issue
3 or request any advice to deal with any of the
4 issues that I would deal with in G-I, I would
5 have declined to participate.
6    Q.    Do you recall, at some point, advising
7 your fellow advisors that you were serving as a
8 Futures rep in the G-I case?
9    A.    Do I formally notify them? No, but I
10 was -- thought it was a matter of fairly common
11 knowledge. It was public pleading. I think
12 things probably appeared in the legal press.
13    Q.    Do you know of any specific place in
14 the legal press where your appointment in G-I
15 appeared?
16    A.    In the legal press? I have no --
17 there was something, I think there was something
18 in the Wall Street Journal. I once got a call
19 from, it was some paper in New York called the
20 Daily Deal shortly after my appointment to G-I.
21 Could be someone from the Daily Deal called me.
22 To say whether it got in the paper or not, I
23 don't know.
24    Q.    Did you yourself --
25        MR. SCHEIER: Were you done answering?

27

1        THE WITNESS: Yes.
2    Q.    Did you have, you yourself, ever read
3 a story or a notification about your appointment
4 in the G-I case in the legal press?
5    A.    I don't recall specifically by name. I
6 do know the Wall Street Journal ran a couple of
7 articles on G-I and that may have even had some
8 currency.
9    Q.    Do you know if that article or
10 articles in the Wall Street Journal mentioned you
11 by name as a Futures rep?
12    A.    I don't recall whether they did or
13 didn't. If they were with -- certainly weren't
14 the focus of it.
15    Q.    Did Judge Wolin, to your knowledge,
16 ever advise any of the parties in the five cases
17 that you were serving as the Futures rep in the
18 G-I Holdings case?
19    A.    I have no such recollection.
20    Q.    Did you, at any time, consider whether
21 that was something that Judge Wolin ought to do?
22    A.    No, I didn't because I was --
23 everybody kind of knew it. I don't know how to
24 explain it. Did anybody say, boy you are? My
25 relationship with Gross as local counsel in G-I

28

1 was known. I know Jack, excuse me, Judge Keefe
2 was aware of it. I don't know whether or not
3 Judge Dreier. I mean Judge Keefe, at some point,
4 said something to me about something that was
5 going on in G-I. And I don't recall what it was,
6 but I know he was aware of it. There was not a
7 formal announcement. I did not request it. But I
8 was pretty sure that everybody had, that it
9 was common knowledge.
10    Q.    All right. You mentioned few minutes
11 ago, Judge Hamlin, that you've known Judge Wolin
12 for some time. Is that right?
13    A.    Yes.
14    Q.    When did you first meet him?
15    A.    He sat in an adjoining county from
16 mine as a judge. And I probably met him at some
17 judicial function when we were both Superior
18 Court judges, but I have no specific recollection
19 of it. I certainly had no intimate or regular
20 contact with him.
21    Q.    Do you remember when you first met him
22 personally?
23    A.    No, I don't.
24    Q.    Rough time frame?
25        MR. SCHEIER: Don't feel like you need

29

1 to be specific. If you have a specific
2 recollection.
3    Q.    I'm not looking for a guess. Would it
4 have been in the 1980s?
5    A.    The answer is probably yes. We used to
6 have a judicial conference every year in
7 November, in which all the State court judges
8 were required to attend. I probably ran into him
9 sometime there. But other than to know there was
10 a guy called Wolin who was a judge in Union
11 County, who I may or may not have met during that
12 period of time. I knew there was a Judge Wolin by
13 the name, but that was about it.
14    Q.    Did there come some point before your
15 appointment as adviser in the five cases where
16 you got to know Judge Wolin better than that?
17    A.    Not really.
18    Q.    Okay. Had he ever appointed you to
19 any official position prior to the appointment in
20 the five cases?
21    A.    No.
22    Q.    Had you ever appointed him to any
23 position? Have you ever, at any time, appointed
24 him to any position?
25    A.    No.

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

C. Judson Hamlin - direct

42

1  as to discuss with some of their fellow judges
2  their evaluations of their performance, and if
3  possible, to actually sit in on some of their
4  proceedings to determine their general fitness
5  and appropriateness for reappointment, that's
6  what I do.
7     Q.   Okay.
8        MR. ORSECK:  If we can go off the
9  record.
10       (Whereupon a brief recess was taken.)
11       MR. ORSECK:  Back on the record
12  please.
13    Q.   Judge Hamlin, paragraph six on page
14  two is headed, "Appointment in G-I Holdings, Inc.
15  Bankruptcy case."  Do you see that?
16    A.   Yes, I do.
17    Q.   It says, "On October 10, 2001, United
18  States Bankruptcy Judge Rosemary Gambardella
19  appointed me the legal representative of present
20  and future holders of asbestos-related demands in
21  the G-I Holdings, Inc. bankruptcy case pending in
22  the U.S. Bankruptcy Court in New Jersey."  Do you
23  see that?
24    A.   Yes.
25    Q.   Is that statement true, to the best of

43

1  your knowledge?
2     A.   I was going to be the Futures rep.
3     Q.   Okay.  What is your understanding of
4  your responsibilities as Futures rep in the G-I
5  Holdings case?
6     A.   I had fiduciary duties of Futures rep
7  to represent their instance to the best of my
8  ability.
9     Q.   Does that fiduciary duty include
10  seeking through your participation in the case to
11  obtain the greatest potential recovery for the
12  constituency that you represent?
13       MR. BERNICK:  Objection, leading.
14    A.   I think it first required that I
15  examine the law and make sure all the assets that
16  belong in the estate were properly in the estate
17  in the first instance.
18       And in the second instance, to make
19  sure that the present claim holders didn't steel
20  all the money off the table and leave the futures
21  with very little.
22    Q.   Did you understand it to be part of
23  your responsibility to attempt, to the best of
24  your ability, to maximize the recovery for the
25  future demand holders?

44

1        MS. PARVER:  Objection, asked and
2  answered.
3     A.   Within the limits of the law, yes.
4     Q.   Paragraph seven says, "In December
5  2001, I selected Kevin Irwin the firm of
6  Keating, Muething and Klekamp of Cincinnati, Ohio
7  to be my principal bankruptcy counsel."  Do you
8  see that?
9     A.   I do.
10    Q.   Keating Muething is Mr. Scheier's firm
11  as well?
12    A.   It is.
13    Q.   Your selection of Mr. Irwin's firm to
14  represent you as futures rep in the G-I case was
15  ultimately approved by the bankruptcy court,
16  correct?
17    A.   It was.
18    Q.   As was your application to retain Mr.
19  Gross as counsel to you in the G-I Holdings case,
20  correct?
21    A.   It was.
22    Q.   I want to talk with you or ask you
23  questions about your service as an adviser in the
24  five cases.
25    A.   Can I put this away?

45

1     Q.   Put it aside for a moment.  We're
2  going to come back to it.
3     A.   All right.  I'll leave it here then.
4        (Exhibit Hamlin-4, Fee Application was
5  marked for Identification.)
6        (Exhibit Hamlin-5, Fee Application was
7  marked for Identification.)
8        (Exhibit Hamlin-6, Fee Application was
9  marked for Identification.)
10       MR. ORSECK:  Hamlin Exhibits 4, 5, and
11  6 are three notices of filing of fee
12  applications.
13       Hamlin-4 is the first fee application.
14  Hamlin-5 is the second fee application.  And
15  Hamlin-6 is the third fee application.
16       (Exhibit Hamlin-7, Affidavit of Judge
17  Dreier was marked for Identification.)
18       MR. ORSECK:  I've marked as Hamlin
19  Exhibit 7, the affidavit of Judge Dreier which
20  was yesterday marked as Dreier Exhibit 3, but
21  today it's Hamlin Exhibit 7.
22    Q.   Judge Hamlin, I want to first direct
23  your attention to Hamlin-7 the affidavit.  I
24  think you have it in front of you.  And on the
25  third page, in particular, there's a little

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ  07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

C. Judson Hamlin - direct

50

1  Q.   That's your second fee application,
2  right?
3  A.   Uh-huh.
4  Q.   Second to last page, let's count down,
5  one, two, three, four, five entries down there's
6  a May 17, 2002 entry.  Do you see that?
7  A.   Yes.
8  Q.   Would you read that description?
9  A.   Meeting and conference at U.S.
10 District Courthouse, Newark, New Jersey with J
11 Wolin, D. Gross, Judge Keefe, Judge Dreier,
12 Professor McGovern, three hours.
13 Q.   With respect to that meeting, do you
14 recall any of those people coming late or leaving
15 early?
16 A.   No, I do not have any recollection.
17 Q.   All right.  Thank you, you can put
18 that aside.
19     I'm going to ask you to turn back
20 please to Judge Dreier's affidavit which is
21 Hamlin Exhibit 7.  And back to that same page
22 three, with the little Roman numeral I at the
23 top, okay?
24 A.   Go ahead.
25 Q.   At the end of that first paragraph

52

1  clearly that was a concern, how do we address the
2  system in some kind of time or manner, yeah.
3  Q.   Was Judge Dreier correct with respect
4  to you when he says, "We were all concerned about
5  this subject." Were you, yourself, Judge Hamlin,
6  concerned about this issue?
7  A.   Everybody who has been involved on the
8  asbestos, on both sides, part of the issue that
9  the debtors were frequently saying is that by
10 virtue of claims of unimpaired or asymptomatics,
11 they are essentially taken out of the same pot
12 that severely injured people are and legitimately
13 concerned, and everybody knows about it.  We're
14 not discovering a new world here.
15 Q.   Did you, you yourself, express any of
16 those, any of the concerns you've just
17 identified?
18 A.   I'm sorry?
19 Q.   Let me start again.
20 A.   Sure.
21 Q.   At any of the four meetings that we've
22 identified, do you recall that you, yourself,
23 expressed any views on the topic identified in
24 Roman II?
25 A.   I do not have a specific recollection

51

1  Judge Dreier writes, that his records show the
2  four meetings we've just identified to discuss
3  the salient issues.  Then it has a semicolon
4  after that.  Do you see that?
5  A.   I do.
6  Q.   Then he says: "First, we were all
7  concerned as was Judge Wolin that the severely
8  injured plaintiffs, i.e., those suffering from
9  mesothelioma or asbestos-related cancers, severe
10 asbestosis or the like could have their cases
11 heard in a timely manner so that the victim
12 themselves and not just their families might
13 retrieve some benefit from the eventual verdicts
14 or anticipated settlement." Do you see that?
15 A.   I do.
16 Q.   Do you recall the subject described in
17 this paragraph that I've just read being
18 discussed at one or more of the four meetings
19 listed in the paragraph above?
20 A.   Yeah.  We were always generally
21 concerned with what was happening in asbestos
22 litigation.  Without getting into great detail,
23 people with meso were dying without getting
24 compensated.  They weren't able to get into the
25 courthouse to get their problems resolved.  And

53

1  of statements I may have made, but they certainly
2  were consistent with issues that all of us have
3  dealt with.
4  Q.   So you don't recall one way or the
5  other whether you made statements on this topic?
6  A.   No, I don't.
7  Q.   Do you recall whether Mr. Gross made
8  any statements at any of the four meetings on
9  this topic?
10 A.   I do not recall any specific
11 statements by any particular individual.
12 Q.   Okay.  Would you read the next
13 paragraph to yourself please, little Roman III
14 that begins with "Second, we were concerned."
15 I'm referring to Exhibit 7.
16 A.   Uh-huh.  Okay.  I've read it.
17 Q.   Do you recall whether or not the topic
18 of how to divide presently unimpaired plaintiffs
19 into classes -- strike that.
20     Do you recall whether the subject of
21 presently unimpaired plaintiffs and how to divide
22 them into classes was a subject of discussion at
23 any of the four meetings?
24     MS. PARVER:  Object to form.
25 A.   My recollection was that we discussed

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0866

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

C. Judson Hamlin - direct

54

1  -- we knew asymptomatics or unimpaired presented
2  a very significant problem that had to be dealt
3  with. My recollection is that we never got into
4  the degree of detail that Judge Dreier seems to
5  think we did. I don't recall ever discussing
6  dividing into particular classes, either as a
7  proposition or as a decision.
8     Q.    Would you look at the next paragraph
9  on Exhibit 7, which is page four. And it has
10 little Roman IV, and that paragraph begins with
11 the words "property damage claimants". Do you
12 see that?
13    A.    Right.
14    Q.    Do you recall the subject of how to
15 divide property damage claimants into classes
16 being the subject of discussion at any of the
17 four meetings?
18    A.    Again, we knew that we had a deal, I
19 say "we", any solution of the asbestos bankruptcy
20 problem had to deal equitably with the property
21 damage claimants. And we recognized that as a
22 problem to be solved. I don't recall anyone
23 saying that degree of detail that Judge Dreier
24 seems to recall here.
25    Q.    Do you recall that topic being

55

1  generally discussed in any of the four meetings?
2     MR. SCHEIER: Just objection to form.
3  Topic being just property damage claims in
4  general?
5     Q.    And the subject as identified in this
6  affidavit of their division into classes?
7     A.    No, I don't recall discussing division
8  in the classes at all, other than recognizing it
9  was a problem that was going to have to be dealt
10 with in some equitable manner, if there was going
11 to be any resolution.
12    Q.    Did someone express the sentiment or
13 the concern that you've just identified at one of
14 the four meetings?
15    A.    Yeah, we all recognized that it was an
16 issue that had to be dealt with. If anybody was
17 going to resolve the asbestos liability, you
18 can't freeze them up. We're at the table.
19    Q.    Having in mind the dates of these four
20 meetings that you attended as reflected in your
21 notes; January 7 and 18, February 27, and May 17
22 of 2002, can you place on the calendar the
23 initial meeting that you discussed earlier today
24 at which you and the other advisors, I believe,
25 met with Mr. Wohlforth?

56

1     MS. PARVER: Object to form. And
2  Gary, just clarification, I think you misspoke
3  when, in the question you said the four meetings
4  you identified from your notes. And the witness
5  identified four meetings from his time fee
6  applications, which are Hamlin Exhibits 4 and 5.
7     MR. ORSECK: Thank you for the
8  clarification.
9     A.    I did not participate in any joint
10 meeting with Mr. Wohlforth or all the other
11 people.
12    Q.    Do you recall any other meetings with
13 the advisors and Judge Wolin that you attended,
14 aside from the four meetings that are identified
15 on page three of Judge Dreier's affidavit?
16    A.    All of my activity is recorded in my
17 time sheets. If it's not on my time sheet, it
18 didn't happen.
19    Q.    Okay. We talked about a meeting
20 earlier today at which you said that there was
21 some recognition of a myriad of problems with
22 asbestos cases.
23    A.    That was the first meeting.
24    Q.    That was the January 7th meeting?
25    A.    Well, it's not like you discussed it

57

1  and blocked it off and never went back to it.
2  These are reoccurring issues we probably talked
3  about them at all of the joint meetings.
4     Q.    You said that among the problems that
5  you had in mind when you used the phrase "myriad
6  of problems" were problems with asymptomatics and
7  unimpaired claimants. Is that right?
8     MR. SCHEIER: Objection to form.
9     A.    That's a problem.
10    Q.    All right. Can you try as best you can
11 to recall what was said at any of the four
12 meetings about that particular problem?
13    A.    The best I can tell you is we
14 recognized that there were radically different
15 views in the asbestos bar. By the asbestos bar I
16 mean both claimants and debtors, as to
17 appropriateness or entitlement of unimpaired to
18 receive any compensation, if so, how it would be,
19 without delving into what any possible resolution
20 or solution that would be recognized. Those were
21 strongly held points of view on both sides which,
22 obviously, was going to effect any resolution.
23       And yes, we're going to have to, if
24 you're going to reach a resolution, you had to
25 reach a consensual resolution which dealt with

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

C. Judson Hamlin - direct

86

1 record would ultimately show.
2      MR. ORSECK: Fine.
3    Q. So did you commence service as the
4 Futures rep in G-I sometime after October 10?
5    A. After the appointment, yeah.
6    Q. What did you do -- what was the next
7 thing you did after you received the appointment
8 in the G-I case?
9    A. I think I gathered some background
10 information and pleadings, and then I set about
11 the wonderful safari of trying to find counsel.
12    Q. Okay. And you ultimately retained Mr.
13 Irwin and Mr. Gross both for that job, correct?
14    A. I did.
15    Q. Did you identify any particular
16 substantive issues in the G-I Holdings case that
17 were of particular interest to you in your
18 capacity as the Futures rep?
19      MS. PARVER: Could we have a time
20 frame?
21      MR. SCHEIER: Objection to form, time
22 frame.
23      MR. ATKINSON: During the review.
24    Q. Let me backup. You hired counsel,
25 correct?

87

1    A. After some period of time, yes.
2    Q. All right. And some point after your
3 appointment, I take it, you made some efforts to
4 get up to speed on what was going on in the case,
5 right?
6    A. I did.
7    Q. In the course of that process, did you
8 identify any particular issues in the G-I
9 Holdings case that you thought required your
10 attention?
11    A. Particular issues, no. I mean, all
12 these standard issues that you see in asbestos
13 litigation was there. If there was any flip it
14 was that G-I had now gone private, had previously
15 been GAF. And that I found out that there was a
16 very intense and contentious position between the
17 debtors and the claimants committee, which by
18 itself is kind of to be expected. But there was a
19 number of other issues that seemed to be, that
20 there had been some previous application seeking
21 to include a subsidiary BMCA into the bankruptcy
22 action which Gambardella denied. That was a
23 companion action alleging fraudulent conveyance
24 pending in the Southern District of New York. And
25 just for some added seasoning, there were

88

1 individual actions filed by Heyman against three
2 well-known plaintiffs asbestos law firms alleging
3 RECO violations which gave it sort of an
4 interesting patina.
5    Q. Did the resolution of the fraudulent
6 conveyance issue have a bearing on the demand
7 holders that you were representing?
8      MR. SCHEIER: Object to form. If
9 you're -- if implied in your question is that the
10 further conveyance issue was revolved, tell me
11 what more, what you're looking for.
12    Q. Yes. Would the ultimate resolution of
13 the fraudulent conveyance issue one way or
14 another have a bearing on the class of demand
15 holders that you represented in the G-I Holdings
16 case?
17    A. Well, to the extent that you're trying
18 to maximize the resources that were available to
19 go into any resolution, if the allegations were
20 correct and approved, it would bring in almost a
21 billion dollars into the estimate. If they
22 weren't, that was going to be money not in the
23 pot, and it's not an insignificant amount.
24    Q. Forgive me if I'm paraphrasing in an
25 inexact way, but I think you said something to

89

1 the effect that in the G-I case, a number of the
2 usual issues or typical issues that one would
3 face in asbestos bankruptcy were present. Did I
4 fairly characterized it?
5    A. Yeah.
6    Q. For the record, can you identify what
7 those issues are?
8    A. The impairs, the unimpaireds' right to
9 a jury trial, in a context of the bankruptcy
10 proceeding to determine tort liability,
11 applicability of state law, right to trial by
12 jury in the context of a bankruptcy matter. I'm
13 drawing a blank. There were others.
14    Q. Was there a question in that case as
15 to whether there ought to be a 706 panel of
16 experts?
17    A. No, I don't recall that being raised
18 in the case.
19    Q. Was there -- do you recall a question
20 being raised in that case about whether and when
21 a bar date should be set?
22      MR. SCHEIER: I'll just interpose an
23 objection that the question might be reaching
24 into attorney/client privilege relations.
25      And I would just caution you in that

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

24 (Pages 90 to 93)

C. Judson Hamlin - direct

90

1  regard. Just to exclude from your response any
2  information that you gleaned or was discussed
3  among you and your attorneys in this case.
4  Excluding that material, you can go ahead and
5  answer that question.
6     A.   We're approaching that decision. There
7  is something before Judge Gambardella, in the
8  near future, whether or not a bar date could be
9  set. We're approaching that decision. That would
10 be followed -- I'm talking now about pleadings
11 that are already on file, regarding the -- we're
12 asking her to make some rulings as to whether or
13 not there should be a bar date whether or not,
14 how we're to pursue either estimation or form of
15 matrix liquidation which the debtors are
16 asserting.
17    Q.   Is there also an issue in the G-I case
18 regarding -- is there an issue present in the G-I
19 case regarding the proof of claim form?
20    MR. SCHEIER: Objection to form.
21    A.   I don't think it's been brought to a
22 head, but clearly that probably would become an
23 issue based upon the diverse position or the
24 present claimants and the debtor.
25    Q.   All right. And is there an issue to

91

1  be resolved in the G-I Holdings case regarding
2  substantive consolidation?
3     MR. SCHEIER: Objection, form.
4     A.   I'm not quite sure how to answer that.
5  There was the ongoing issue as to whether or not
6  BMCA should have been included in the estate, but
7  Gambardella denied that a long time ago.
8     Q.   Okay. So that was an issue at one
9  point. Is that right?
10    A.   Yeah, that was before my entry into
11 the case.
12    Q.   In the course of carrying out your
13 responsibilities as Futures rep in G-I Holdings,
14 did you, through counsel, urge Judge Gambardella
15 to adopt certain positions that had been taken by
16 Judge Wolin in any of the five cases?
17    MR. SCHEIER: I'll object to form in
18 terms of what you mean by the position taken by
19 Judge Wolin.
20    MR. ORSECK: You're absolutely right
21 about that. Let me reask it.
22    Q.   As Futures rep in the G-I Holdings
23 case, did you urge Judge Gambardella that any
24 rulings or orders by Judge Wolin were persuasive
25 precedent and ought to be followed by Judge

92

1  Gambardella in the G-I case?
2     A.   My arguments, Counsel, are on the
3  record and are self-explanatory.
4     Q.   Did you, without telling me any of the
5  subject matter, did you, as a general matter,
6  review and authorize arguments to be made by your
7  counsel in the G-I case on behalf of the futures?
8     A.   Yes -- no.
9     THE WITNESS: Did I jump too quick on
10 you, I'm sorry.
11    MR. SCHEIER: You did.
12    Q.   Did your counsel, either Mr. Irwin or
13 Mr. Gross, ever take a position in the G-I case
14 on your behalf that was contrary to your
15 instructions?
16    A.   Everything that has been argued on the
17 record on my behalf accurately sets forth my
18 position in the matter.
19    Q.   Okay.
20    MR. ORSECK: Let's mark this as
21 Hamlin-16.
22    (Exhibit Hamlin-16, a Two-Page
23 Document was marked for Identification.)
24    THE WITNESS: Okay.
25    Q.   We've marked as Exhibit 16, a two-page

93

1  document that's Bates stamped KM 429 to 430.
2  Judge Hamlin, could you please identify that
3  exhibit?
4     A.   It apparently is a letter from Judge
5  Gross to Judge Bassler arguing a particular
6  position.
7     MR. SCHEIER: You mean David Gross.
8     THE WITNESS: Yeah. What did I say?
9     MR. SCHEIER: Judge.
10    THE WITNESS: David couldn't afford to
11 be a judge.
12    I'm sorry. Go ahead.
13    Q.   Judge Hamlin, based on the reply on
14 the first page in the second entry that says,
15 "Legal rep in G-I Holdings." Am I correct in
16 understanding that Mr. Gross was writing this
17 letter in his capacity as your counsel as Futures
18 rep in G-I?
19    MR. SCHEIER: Objection to form.
20    A.   I so understand it.
21    Q.   Thank you. In connection with your
22 role as the Futures rep in G-I, did you attend
23 one or more meetings of futures representatives
24 in other asbestos bankruptcies?
25    A.   Yeah, there were a series of meetings

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

C. Judson Hamlin - direct

98

1  circumstances what you're dealing with work
2  product objection, for that matter, when you're
3  dealing with the scope of the court's rulings,
4  you would have to establish even if the line of
5  --even if the question you were asking were a
6  relevant question, there's other ways to obtain
7  the same information. And you, by no means,
8  exhausted alternative ways of obtaining the same
9  information.
10      MR. ORSECK: I'm sure Mr. Scheier will
11  take that under advisement.
12      MR. BERNICK: Also relevant question
13  from the -- with complying with the court's
14  order.
15      Q.   My question several questions ago was,
16  did you attend one or more Futures rep meetings?
17      A.   The answer to that is yes.
18      Q.   All right. What was the purpose of
19  those meetings?
20      A.   The purpose of those meetings were
21  primarily to consider the effect of the proposed
22  legislation, whether or not futures reps as a
23  body would oppose or support legislative
24  proposal. And thirdly, whether or not the terms
25  of the proposal itself, the nitty-gritty

99

1  specifics would be able to deal competently with
2  the problem.
3      Q.   Can you recall the names of any other
4  futures reps besides yourself who attended one or
5  more of the meetings that you just described?
6      A.   Aserman, McGonagle, Fitzpatrick, Eric
7  Green, the Futures rep club is a fairly -- I'm an
8  outsider to the Futures rep club. But it's -- you
9  see the same names pretty regularly. They're all
10  a matter of record.
11      Q.   Are you aware that Mr. McGonagle was
12  serving as Futures rep in the Owens Corning case?
13      A.   I think I was.
14      Q.   You were aware at the time of the
15  meetings you attended with him?
16      A.   I knew he was a Futures rep. I
17  thought it was -- it was Owens, it could be.
18      Q.   At any of those meetings?
19      MR. SCHEIER: I'll just ask you don't
20  guess, if you don't know the answer.
21      A.   I don't know specifically.
22      MR. SCHEIER: Feel free to let me know
23  that you don't recall.
24      A.   I know he was a Futures rep.
25      Q.   At any one of those meetings, did you

100

1  express to the other Futures reps or any other
2  Futures rep your view as to whether the proposed
3  legislation favored or disfavored the contingency
4  that you represented?
5      A.   That's the same question we were at
6  before, but I'll give you -- I'm going to give
7  you an answer that's a matter of public record
8  which was no privilege. Eric Green was -
9      MS. PARVER: No, no, excuse me.
10      A.   Okay.
11      MS. PARVER: There's a very specific
12  ruling, Judge, so I'd like to have everyone abide
13  by it. Which is, he, the judge, can talk about
14  whether, if he expressed. And I would object, by
15  the way, on your leading question there Gary, but
16  the proponents are allowed to -- allowed to ask
17  you if you expressed views at these meetings
18  about the legislation, and if so, what did you
19  say.
20      MR. ORSECK: I thought that was the
21  question.
22      MS. PARVER: No I think the question
23  is quite a bit different.
24      MR. BERNICK: I thought that was the
25  question. And I thought that, frankly, it was a

101

1  way for counsel to explore the other question as
2  well, because if you did express your beliefs we
3  now know what your beliefs were. My concern is,
4  at least from my client's point of view, is there
5  is no preclusion. We're not imposing any
6  restriction on Judge Hamlin's ability to talk
7  about the view that he expressed. In other
8  words, the witness began to talk about public
9  statements. And at least from my client's point
10  of view, there's no reason why the answer should
11  be limited to public statements. Judge Wolin did
12  not limit his ruling to publish statements.
13      MS. PARVER: Then the witness -- then
14  my objection was that his statement was not being
15  responsive.
16      MR. BERNICK: Right. I hear you. I
17  don't think that Judge Hamlin understood that
18  point.
19      THE WITNESS: Okay.
20      MR. SCHEIER: Let's hear the question.
21      MR. ORSECK: Could you find my
22  question? Let me do it question by question.
23      A.   Sure.
24      Q.   At any of the meetings where you and
25  other futures representatives were present, did

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME J. ROSE, CSR

30 (Pages 114 to 117)

C. Judson Hamlin - direct

114

1    JUDGE WOLIN: I'm just walking. Just
2  keeping tabs on what's going on.
3    MR. ORSECK: Back on the record.
4    Q.   Let me ask my question again. What
5  were the common issues and alternatives that were
6  addressed at the August 2 meeting?
7    A.   I do not have a specific recollection
8  other than to talk about the general issues that
9  we've already raised having to deal with what was
10  happening in 1125 and those kinds of issues, that
11  was it.
12    Q.   Were there common issues, that is to
13  say, issues common to the futures reps that were
14  discussed at this or other Futures rep meetings
15  that you attended other than the subject of
16  pending legislation?
17    MR. SCHEIER: Objection to form.
18    A.   Not that I have any specific
19  recollection of.
20    Q.   Were there, for example, discussions
21  of estimation procedures, or setting of a bar
22  date that is to say issues other than legislation
23  that you recall being discussed at any of these
24  meetings?
25    MS. PARVER: Object to form.

115

1    A.   Not that I have any specific
2  recollection, no.
3    Q.   In your recollection it was
4  discussions were limited to the subject of the
5  pending legislation?
6    MS. PARVER: Objection,
7  mischaracterizes testimony.
8    A.   The answer is, sometimes they would go
9  around the table to indicate how far along
10  different cases were, how close they were to
11  resolution or not resolution, which frankly was
12  of little interest to me in G-I, we weren't even
13  out of the starting blocks.
14    Q.   I'm intending this to be a yes or no
15  question.
16    A.   Okay.
17    Q.   Do you recall Mr. McGonagle addressing
18  the group of futures reps at any of these future
19  reps meetings?
20    A.   I'm sure I may have spoken. I have no
21  recollection, specific recollection, of what he
22  would have said or when.
23    Q.   Okay. Judge Hamlin, I'd like to
24  direct your attention to a March 25, 2003 entry
25  in your time sheets that is substantially further

116

1  along in this document.
2    A.   March what?
3    Q.   March 25, 2003.
4    A.   Okay.
5    Q.   It is page three of a an April 3rd,
6  2003 bill.
7    A.   Got it.
8    Q.   On page three, one, two, three, four,
9  five, the fifth entry says: "Meeting in NYC with
10  all other futures reps. Re: Status of TDPs and
11  ongoing discussions with various ACCs." Do you
12  see that?
13    A.   I do.
14    Q.   Can you tell me what the references
15  here is to the status of TDPs?
16    A.   The other futures reps gave us an
17  update where they were you, how close they were
18  to resolution.
19    Q.   When you say "resolution", can you
20  help me with what you mean?
21    A.   Yeah. Trying to afford a plan that
22  they thought they could submit for confirmation.
23    Q.   All right. Do you recall speaking to
24  that issue?
25    A.   No, I was particularly silent. We

117

1  were nowheres near that situation.
2    Q.   Okay. Then it says that there were
3  ongoing discussions with various ACCs. Do you
4  see that?
5    A.   I do.
6    Q.   What is an ACC?
7    A.   The asbestos claimants committee is
8  the present claimants.
9    Q.   What discussions do you recall in that
10  regard?
11    A.   The futures reps were probably,
12  although I don't have specific recommendation as
13  to what each one of them said, were discussing
14  the nitty-gritty, elbowing, kneeing and gouging
15  when you get into close to TDP, how much elbowing
16  kneeing and gouging that goes on between futures
17  reps and present claimants committee to make sure
18  that they leave some food on the table for us.
19    Q.   Did different futures reps relate to
20  the group how that process was going in their
21  particular cases?
22    A.   I'm sure they did.
23    Q.   Okay. And I take it you did not?
24    A.   No, I did not because we weren't at
25  that part of the proceeding.

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

C. Judson Hamlin - direct

**122**

1  Q.   And the phrase and possible effect on
2  G-I, that's in there, did you mean by that to
3  indicate that this issue had some possible effect
4  on G-I?
5  A.   Oh, sure. I mean if 1125 went
6  through, that was going to -- we were going to
7  have to decide what we were going to do, if
8  anything. We just fold? Would we join other
9  people opposing the legislation? What would we
10  do.
11  Q.   Okay. Resolution of TDP?
12  MR. SCHEIER: For fear that you're
13  going to berate me for testifying, this is at the
14  end of the day in context of a bill that's being
15  submitted to the United States Trustees office to
16  opposing parties in the G-I bankruptcy court. So
17  many references to G-I are there, so that it
18  obviously tethers what Mr. Hamlin was doing to
19  the case, and to the people who he's billing his
20  time to.
21  MR. ORSECK: Okay.
22  Q.   There's an entry -- there's a phrase
23  in the 8/27 entry, Judge Hamlin, that says:
24  "Resolution of TDP in other pending asbestos
25  bankruptcies." Do you see that?

**123**

1  A.   Yup.
2  Q.   It's in the same entry on the last
3  page?
4  MR. SCHEIER: Okay. I'm sorry.
5  Q.   My question is, do you recall yourself
6  or anybody else in particular discussing
7  resolution of TDP in their particular asbestos
8  bankruptcy?
9  A.   Yeah. I think generally some of the
10  people who were there, who thought they were
11  close to resolution talked about what some of the
12  terms they thought they were negotiating. I
13  don't remember what those terms were
14  specifically. My interest was that once, since
15  just as you have a lot of the same law firms
16  representing multiple debtors, so to do you have
17  many of the same claimants' counsel appearing in
18  different cases, and some cases multiple futures
19  reps. It doesn't take a scientist to figure out
20  that if a particular formula started getting
21  agreed upon in two or three other cases you could
22  pretty much guess that the present claimants in
23  another case would probably stand fast on those
24  kind of terms when you got the negotiating of
25  TDP. So to the extent, although we weren't close

**124**

1  to it, trying to keep an ear out on what was
2  going on in the other cases would give me some
3  idea of what flexibility we might or might not
4  have going down the road. That's what I meant by
5  it.
6  Q.   Okay. There is one more I'd like to
7  ask you about. It's the May 12, '03 entry that
8  appears.
9  MR. SHAFFER: 17, Application of C. J.
10  Hamlin, date?
11  Q.   May 12, '03 entry. It's the third
12  page of the application in Exhibit 17.
13  A.   Okay.
14  Q.   Do you see that entry for May 12?
15  A.   One that says telephone conference?
16  Q.   Right.
17  A.   Yeah.
18  Q.   Do you recall this telephone
19  conference?
20  A.   All I know, I think this is the one
21  that was in Washington. I couldn't attend. I
22  participated by phone for an hour-and-a-half. I
23  got off before the meeting was over because I had
24  some personal business that I had to attend to. I
25  did not speak at that meeting over the telephone.

**125**

1  Q.   Okay. It indicates here that matters
2  regarding settlement structures were among the
3  topics discussed. Is that correct?
4  A.   Yes.
5  Q.   What do you recall concerning that
6  subject that was discussed?
7  A.   Nothing with particularity.
8  Q.   What then do you refer to by the
9  phrase "possible settlement structures"?
10  A.   The other futures reps were talking
11  about the progress of resolving their claims and
12  submitting a plan for confirmation which I don't
13  remember who spoke. I don't remember the
14  specifics of what they suggested.
15  (Exhibit Hamlin-18, a Two-Page
16  Document was marked for Identification.)
17  Q.   Judge Hamlin, I've marked as Exhibit
18  18 a two-page document Bates stamped HA107 and
19  108. Do you have that in front of you?
20  A.   I do.
21  Q.   Can you identify that document?
22  A.   That's my handwriting. I took some
23  notes at the A2 meeting.
24  Q.   It says: "G-I notes" in the upper
25  right-hand corner. Is that right?

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666
RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS
STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

43 (Pages 166 to 169)

C. Judson Hamlin - cross

166

1  privilege has plainly been waived and I would
2  prefer not to take the matter up now with Judge
3  Wolin, as long as others at the deposition are
4  willing not to mention or address the substance
5  of the document, according to Mr. Scheier's
6  instruction. I'd like to just continue with the
7  deposition would be my proposal.
8      MR. BERNICK: To have the deposition
9  continue with another examination.
10     MR. SCHEIER: Let's go.
11 CROSS EXAMINATION BY MR. ST. JEANOS:
12     Q.   We met before off the record. I'm
13 going to do my best not to repeat things that
14 were discussed previously. I'll do my best not to
15 repeat. I'll try to get some more information
16 regarding things you testified about and maybe a
17 few or a couple new areas.
18         Am I correct Mr. Scheier represents
19 you here today?
20     A.   Yes, he does.
21     Q.   Represents you in the capacity as a
22 Futures representative in G-I?
23     A.   Correct.
24     Q.   Does he represent you in any other
25 capacity?

167

1      A.   No.
2      Q.   Does Mr. Irwin from his firm represent
3  you in any other capacity?
4      A.   No.
5      Q.   Has Mr. Gross ever represented you in
6  any other capacity other than Futures
7  representatives?
8      A.   No.
9      Q.   Have you consulted or obtained any
10 counsel in connection with your role as an
11 adviser in the five asbestos cases?
12     A.   No.
13     Q.   Before you submitted your affidavit in
14 this case, other than counsel, did anybody review
15 it?
16     A.   No.
17     Q.   Did you discuss the contents of the
18 affidavit with anybody other than counsel?
19     A.   No.
20     Q.   I'd like to go back when you were
21 appointed in G-I as Futures representative. Am I
22 correct at the time you were appointed, you had
23 not yet been retained as an adviser in the five
24 cases?
25     A.   That is correct.

168

1      Q.   Okay. Had you discussed with Judge
2  Wolin yet, at that point, the possible retention?
3      A.   Not at all.
4          MS. PARVER: Objection, asked and
5  answered.
6      A.   Not at all.
7      Q.   So am I correct the disclosures you
8  made prior to becoming a Futures rep in G-I did
9  not include any disclosures relating to your
10 future role as an adviser in these five cases?
11     A.   That's correct.
12     Q.   Once you became an adviser in these
13 cases, did you make any further disclosure in G-I
14 about that role?
15     A.   Did I make an affirmative independent
16 disclosure? Where?
17     Q.   In the G-I case?
18     A.   No.
19     Q.   You didn't file any supplemental
20 affidavit?
21     A.   No, it was common knowledge.
22         MR. SCHEIER: I'll object. Lack of
23 foundation.
24     A.   It was common knowledge and within,
25 certainly, everybody in the asbestos community in

169

1  this area knew that.
2      Q.   And was the reason you didn't file or
3  make any sort of formal disclosure because you
4  believed it was common knowledge?
5      A.   Yeah.
6      Q.   Now --
7      A.   Matter of public record.
8      Q.   If it was not a matter of common
9  knowledge or public record, do you believe it was
10 something that should have been disclosed?
11         MS. PARVER: Objection.
12         MR. BERNICK: Which case?
13     A.   The answer is no.
14     Q.   Let me make sure what's on the record
15 is clear. If it was not the case that it was
16 common knowledge that you were now serving as an
17 adviser in the five asbestos cases, is that
18 something you would have disclosed in G-I?
19         MR. SCHEIER: Objection to form.
20     A.   I'm not quite sure I understand your
21 question.
22     Q.   Well, you testified that you believed
23 there was knowledge, public knowledge when you
24 where appointed an adviser in these five cases,
25 correct?

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666
RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS
STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

44 (Pages 170 to 173)

C. Judson Hamlin - cross

170

1　A.　Yes.
2　Q.　Had that not be been public knowledge,
3　would you want to disclose that in G-I?
4　　　MR. SCHEIER: Objection to form.
5　A.　I'm not -- you're asking me a
6　hypothetical. I'm not quite sure I know how to
7　answer it.
8　Q.　Why didn't you disclose in any formal
9　manner the fact that you had been appointed
10　adviser in these five cases in the G-I case?
11　　　MR. SCHEIER: Objection to form. That
12　it lacks a foundation, if there's any obligation
13　or final in G-I.
14　A.　Answer is I saw no particular reason
15　to do so.
16　Q.　Why is that?
17　A.　I'm not quite sure I understand your
18　question.
19　Q.　Was the reason you saw no particular
20　reason to do so because you thought it was common
21　knowledge?
22　A.　I said even if it wasn't "common
23　knowledge", you know, these cases, one thing took
24　place on the fourth floor, the other took place
25　on the second floor in the same building, within

171

1　the same community of lawyers. If you look at
2　the distribution list of people who got served
3　with copies of all of this stuff, nobody was
4　hiding this under a bushel basket.
5　Q.　Is that the reason why you believed it
6　wasn't necessary to disclose it?
7　A.　I don't think I had.
8　　　MS. PARVER: Objection, lacks
9　foundation.
10　　　MR. SCHEIER: This is the fourth or
11　fifth time you asked him the same question,
12　Chris. I ask you to move on.
13　　　MR. ST. JEANOS: He hasn't given me the
14　reason for explaining that it was common
15　knowledge.
16　A.　I didn't have a conscious knowledge to
17　form a reason.
18　Q.　Okay. What do you understand your
19　role in G-I to be?
20　A.　To be a fiduciary to the future
21　claimants.
22　Q.　Future asbestos claimants?
23　A.　Is there another kind of claim in this
24　case?
25　　　MS. PARVER: I object because this was

172

1　gone into by Mr. Orseck on his examination this
2　morning, and they're almost verbatim questions.
3　　　MR. SCHEIER: I'll go one better. I
4　think that's verbatim repetitive of what the
5　morning examination was.
6　　　MR. ST. JEANOS: I don't remember that
7　verbatim question being asked. I apologize if I
8　did. I'll move on quickly with them. But just
9　let me get through it. It's been a long day and I
10　took a lot of notes. I'll get through them
11　quick.
12　Q.　In your role as fiduciary, do you have
13　to advocate positions on behalf of the new
14　futures representatives that is taken by other
15　parties in the G-I case?
16　　　MS. PARVER: Objection to form. And
17　objection, lacks foundation. I think you
18　misspoke, Chris.
19　A.　I advocate their position consistent
20　with the law.
21　Q.　Do you have in front of you the
22　exhibit, I think it's 17. Take it out. It's the
23　collection of bills relating to G-I.
24　A.　I got 17. What are we looking at here?
25　Q.　It's going to be a little hard to page

173

1　through the pages.
2　　　First, let me ask you a general
3　question. You testified before that in 2003 at
4　least you were involved in a number of meetings
5　in your capacity as Futures rep in G-I with
6　Futures representatives from other cases?
7　A.　Yes.
8　Q.　I think you testified that the primary
9　purpose of those meetings was to discuss pending
10　legislation?
11　A.　Yes.
12　Q.　I'm correct, sir, additional topics
13　were discussed at each of those meetings?
14　A.　Yes.
15　Q.　And there was also meetings you
16　attended in 2002 as a Futures rep with other
17　future reps?
18　A.　If it's reflected in the billings, I
19　did. If it's not reflected in billings, I did
20　not.
21　Q.　Were you aware in any of those
22　meetings that future reps from the five asbestos
23　cases?
24　A.　Yeah.
25　Q.　Okay. Why? What was your

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

45 (Pages 174 to 177)

C. Judson Hamlin - cross

174

1  understanding as to why you as Futures rep in G-I
2  were meeting with Futures reps in the five cases?
3     A.   I, apparently, Eric Green who was
4  chairing the group extended an invitation to all
5  the future reps.
6     Q.   Why did you decide to attend?
7     A.   Because I was a Futures rep.
8         MS. PARVER:  May I have the answer to
9  the question, not the last answer, but the answer
10 right before.
11    Q.   Other than being invited, was there
12 any other reason you attended?
13    A.   No.
14    Q.   Did you hope to get any information
15 from those meetings?
16    A.   The more you know the better off you
17 always are.
18    Q.   Did you believe that information could
19 be gained from futures reps from the five cases
20 was relevant to your role as Futures rep in G-I?
21        MS. PARVER:  Objection.
22        MR. BERNICK:  You're leading the
23 witness.  You've not established he's a hostile
24 witness.  I think it's impermissible.
25        MS. PARVER:  Also mischaracterizes the

175

1  prior testimony as to a variety of Futures reps
2  who attended those meetings.
3        MR. DOBSON:  I'll join in with Mr.
4  Bernick.  He hasn't established he's a hostile
5  witness.
6     A.   The answer is I did not form any
7  conscious thought of any particular purpose other
8  than to gather as much information as I could and
9  I certainly had no motive by which to, by
10 subterfuge or otherwise, update any advantage, if
11 that's your innuendo.
12    Q.   There's no innuendo in the question.
13 If there was, I apologize.
14    A.   Counsel, I've practiced law for 40
15 years.  I used to be a cross examiner.  Let's
16 proceed.
17    Q.   This one you're the witness.  I was
18 not trying to put anything in, any innuendo.
19    A.   Very good.
20    Q.   Do you recall any of those future
21 representatives meetings you attended anything
22 said by any futures representatives in any one of
23 the five cases other than relating to
24 legislation?
25        MS. PARVER:  Objection, asked and

176

1  answered this morning.
2     A.   Yeah.  I previously indicated that in
3  some of those meetings there were updates on
4  their TDP or negotiations or whether or not they
5  were coming close to reaching some conclusion.
6     Q.   You did.  And I'd like to know if any
7  of those comments were from specifically any
8  Futures representatives in the five cases?
9     A.   Yeah, I'm sure there was.
10        MS. PARVER:  Objection.  Move to
11 strike as speculation.
12        MR. SCHEIER:  I'll ask you again to
13 listen to the question.  Answer it based on your
14 personal knowledge.  If you don't recall or don't
15 remember, that's a perfectly acceptable answer.
16    A.   I don't recall.
17    Q.   If you look at it's probably 15 pages
18 from the back of Exhibit 17, it's Purcell Ries
19 time sheet in G-I Holdings.  The first time entry
20 is for August 1st, '02.
21    A.   August 1st, '02.
22    Q.   Yes?
23    A.   Okay.
24    Q.   Do you have it?
25    A.   Yeah.

177

1     Q.   Well, the fourth entry down for August
2  2, '02 which discusses a meeting of Paul Weiss
3  among Futures representative?
4     A.   Yes.
5     Q.   Of five other Chapter 11 asbestosis
6  bankruptcies?
7     A.   Asbestos.
8     Q.   Who are you referring to there?  What
9  cases?
10    A.   I don't now recall.
11    Q.   Was it the five cases that we're here
12 about day?  What's defined as the five asbestos
13 cases?
14        MR. SCHEIER:  Objection.  He said he
15 doesn't recall.
16    A.   I don't recall.
17    Q.   You testified, I think, that the
18 common issues that were referenced here were the
19 same common issues you've testified to today
20 about asbestos litigation?
21    A.   Yes.
22    Q.   Were there any common issues discussed
23 that related specifically to asbestos driven
24 bankruptcies?
25    A.   That's what all of these pieces of

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ  07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

46 (Pages 178 to 181)

C. Judson Hamlin - cross

178

1  litigation were.
2      Q.   Understood. But when you testified
3  previously the common issues you discussed were
4  issues I think common to asbestos litigation
5  generally?
6      A.   But they obviously arose in the
7  context of the bankruptcy, which we were all
8  involved.
9      Q.   Okay. So the common issues as you
10 recall it that were discussed at that meeting
11 related to common issues in asbestos
12 bankruptcies?
13         MR. SCHEIER: Object, mischaracterizes
14 the testimony. What you're doing is mixing up
15 testimony that he gave earlier in the morning
16 about initial meetings with the advisors, and
17 now you're transposing that on the use of the
18 term common issues here, to which Mr. Hamlin
19 testified later in the afternoon about something
20 else. My understanding, by the way among the
21 movements was you guys were going to get together
22 decide who's going to cross examine the witness,
23 what topics. Mr. Hamlin's got a personal matter,
24 a personal issue today. Just in general he
25 prefers to not spend his time here. To now be

179

1  asking the same questions on the same matters, I
2  find to be an abuse of process.
3         MR. ST. JEANOS: I don't think I'm
4  asking the same questions.
5         MR. SCHEIER: Same exact questions he
6  answered. Now you're mischaracterizing his
7  testimony as far as what that particular term
8  meant.
9         MR. ST. JEANOS: I'll certainly take
10 your comments to heart. I'll do my best. I
11 disagree with you. I've been sitting here all day
12 too. I disagree.
13     Q.   Just so I understand. I didn't think
14 there was a difference. Can you tell me what
15 common issues were discussed?
16         MR. SCHEIER: Objection.
17     Q.   Are the common issues referred to on
18 the 8/2/03 entry the same common asbestos
19 litigation issues you testified about earlier
20 today?
21     A.   Without a specific recollection, yes.
22     Q.   Did those common issues relate to
23 bankruptcy asbestos-related issues?
24     A.   I answered that before. Yes, they do.
25     Q.   You see there it also says common

180

1  issues and alternatives?
2      A.   Yes.
3      Q.   What alternatives were discussed?
4         MR. SCHEIER: Objection, asked and
5  answered.
6      A.   I don't recall.
7      Q.   You testified earlier to have an
8  initial meeting with Judge Wolin and the other
9  advisers at which common issues relating to
10 asbestos were discussed. Do you recall that?
11     A.   Yes.
12     Q.   At least I understood your testimony
13 to be they were discussed in a general way just
14 to bring them up as issues without any particular
15 resolutions being discussed to those issues. Is
16 that correct?
17     A.   That is correct.
18     Q.   In the meeting that you had with the
19 futures reps, that you can recall, were
20 resolutions to the common asbestos issues
21 discussed?
22     A.   Not really.
23     Q.   Were the comments that you recall
24 relating to the common asbestos issues given in
25 the context of what future representatives hoped

181

1  to achieve for the constituents?
2      A.   No.
3      Q.   So again it was just a general
4  discussion of the issues?
5      A.   Yes.
6      Q.   At any of those meetings with the
7  futures representatives, were there discussions
8  about how to achieve a more positive result for
9  the constituents you represented?
10     A.   No.
11     Q.   At any of the meetings you had with
12 the management or the advisory committee and the
13 judge, did you ever discuss the content of any of
14 the meetings that you had with other futures
15 representatives?
16     A.   No.
17     Q.   And by the way, I've seen different
18 references in the materials we've received to the
19 A Team, the management committee and the
20 advisers. Is that, to your understanding, all
21 the same thing or do you have an understanding?
22         MR. SCHEIER: References in Mr.
23 Hamlin's documents?
24         MR. St. JEANOS: I don't know if its
25 his documents or not.

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

C. Judson Hamlin - cross

182

1    A.    All I know is I was one of the group
2  that would assist Judge Wolin trying to figure
3  out some workable solution to a fairly unworkable
4  problem.
5    Q.    Did you ever hear that group referred
6  to as the management committee?
7    A.    Have I heard of it?  Yeah, I supposed
8  so.
9    Q.    Have you ever heard of that group
10  referred to as the A team?
11    A.    That one I didn't hear.  I certainly
12  wasn't going to be Mr. T, was I?
13    Q.    When you testified, when you were
14  first approached by -- when Judge Wolin first
15  told you about possibly becoming an adviser in
16  this case?
17    A.    Yes.
18    Q.    You told him about your role as
19  futures representative in G-I, correct?
20    A.    I asked him if G-I was one of the
21  cases that was involved.
22    Q.    And I think you testified that if it
23  was you didn't feel you could serve as an
24  adviser?
25    A.    In the five cases?  I'm sorry? If G-I

183

1  was in the case, I did not think I could be there
2  or should be there.
3    Q.    Could you explain to me why that is
4  sir?
5    MS. PARVER:  Objection, asked and
6  answered.
7    MR. SCHEIER:  Again, that specific
8  question was asked this morning by Mr. Orseck
9  that took the examination.  I'm not trying to
10  impede you, necessarily, but I thought you were
11  suppposed to coordinate the topics you're cross
12  examining someone on.  To be Frank, what you're
13  doing is a transparent cross examination
14  technique in an effort to possibly trip up the
15  witness.  And I don't appreciate it.
16    Mr. ST. JEANOS:  If it's transparent
17  to you, but not to me.
18    MR. SCHEIER:  Try not to repeat the
19  same subject matters.
20    MR. St. JEANOS:  I'm trying to get him
21  back to a point where he testified so I could
22  follow-up on something I didn't understand that's
23  all I'm trying to do.
24    THE WITNESS:  Could we move on.
25    Q.    I think the reason you gave, in a

184

1  general way, was because you couldn't advocate in
2  G-I advice to Judge Wolin if he was presiding
3  over that case?
4    A.    That's correct.
5    Q.    Could you tell me why you believe
6  that's the case?
7    A.    There had been a potentiality for, on
8  one hand, being his adviser on issues that I
9  would otherwise be dealing with as a fiduciary.
10    Q.    You're a fiduciary to the asbestos
11  claims, future asbestos claims?
12    A.    Correct.
13    Q.    You mentioned that.  Are you still an
14  adviser today to Judge Wolin, although you
15  haven't billed anything?
16    A.    No formal termination.  I have had no
17  assignments.  He's not asking me for any
18  assistance.  I haven't done anything with him
19  since March, April.
20    Q.    No informal terminations to your
21  knowledge either?
22    A.    No.
23    Q.    You were aware, sir, that you were
24  proposed as futures representatives in the Grace
25  case?

185

1    A.    I am?
2    Q.    Did the same potential conflict that
3  you were concerned with, with respect to your
4  appointment as adviser in your role in G-I,
5  concern you when you were posed as a Futures
6  representative in Grace?
7    A.    I think clearly if I was to be a
8  Futures rep in Grace, I would have to -- haven't
9  already been formally terminated, I would have to
10  formally terminate any connection with Judge
11  Wolin as one of his advisers.
12    Q.    Your understanding is that's what
13  would happen if you were appointed?
14    A.    Absolutely.
15    Q.    Certainly your intention then is to
16  resign from the adviser panel?
17    A.    Yeah, if I was still participating.
18    Q.    Did you feel anything you may have
19  learned in your capacity as an adviser would have
20  rendered a conflict to accept a role as Futures
21  representatives in the five -- in the Grace case?
22    A.    No.
23    Q.    The discussions that you've testified
24  to with Judge Wolin and the committee relating to
25  common issues, were issues common to asbestos

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

48 (Pages 186 to 189)

C. Judson Hamlin - cross

186

1  litigation. Am I correct, that those also would
2  apply to the Grace case?
3      MS. PARVER: Objection to form.
4      MR. BERNICK: I don't understand the
5  question.
6      Q.   Let me try it again.
7      You testified to common issues,
8  correct?
9      A.   I did.
10     Q.   I'm assuming by common you mean are
11 there issues that come up in all asbestos cases?
12     A.   Absolutely.
13     Q.   Okay. You believe those issues would
14 also come up or had come up in the Grace case?
15     MR. BERNICK: Wait, wait .Those are
16 two different questions and it's leading.
17 Objection to form.
18     Q.   All right. I'll try again. I don't
19 want to get these questions wrong.
20     MR. BERNICK: Or had, and it was
21 leading.
22     Q.   Do you believe those common issues
23 would also arise in Grace?
24     A.   The issues that exist in any asbestos
25 bankruptcy case that I'm aware of today have

187

1  analogues in all the other cases.
2      Q.   Okay. So the discussions that you
3  testified to with Judge Wolin -- well, let me ask
4  it this way. Do you believe the discussions you
5  had about issues, common issues with Judge Wolin
6  also had applicability to the Grace case?
7      MR. SCHEIER: Objection to form.
8      A.   Did it have applicability? Yeah, but
9  I don't think anything we ever said is anything
10 that everybody else has been involved in this
11 kind of litigation haven't talked about. There
12 are no atomic secrets here.
13     Q.   Were the common issues that were
14 discussed with Judge Wolin the same types of
15 issues you had to face as a Futures
16 representative in G-I?
17     A.   Yeah, the same issues involved. G-I
18 had a few extra flourishes to it, that's for
19 sure.
20     MR. BERNICK: When you say you in that
21 question, is that "you" in kind of a group or
22 "you" specifically to Judge Hamlin?
23     Mr. ST. JEANOS: I'm not sure which
24 part of you --
25     Q.   The issue I was talking about were the

188

1  issues discussed among the group of advisers and
2  Judge Wolin at the meetings?
3      MR. BERNICK: At this point we've got
4  no particular issue. We've got a series. We're
5  not asking about any particular issues, we've got
6  four meetings. He attended all four meetings.
7  He said or he didn't say something that's about
8  those particular issues. So I don't think the
9  question is specific enough to be meaningful. Do
10 you want to ask a question about what one of
11 those issues he discussed? I think that's
12 already been asked, but I can't tell you not to
13 ask it again. So I'm not sure what it is you're
14 now asking him that's new.
15     MR. ST. JEANOS: Be that as it may.
16 You may be absolutely right. I don't think so.
17 Just if you can object, just object. And I'll
18 ask questions in my own hand.
19     MS. DAVIS: I'd like to make an
20 objection that is in the beginning of Judge
21 Hamlin's testimony he discussed meetings he had
22 with the other advisers with Judge Wolin where
23 they discussed issues that were involving
24 asbestos litigation at that point in time which
25 could have been early 2001. My understanding of

189

1  these meetings with the Futures reps which
2  occurred one to two years later involved issues
3  that were common to the bankruptcies. Once they
4  had all been filed.
5      MR. BERNICK: I have that. That's also
6  true. And another defect that's already been
7  pointed out as the common issues have been
8  so-called common issues have been discussed
9  probably three times; one in connection with this
10 historical asbestos litigation, secondly in
11 connection with bankruptcies, and third in
12 connection with futures meetings. And I can't.
13     MS. DAVIS: Not necessarily common
14 across the board.
15     MR. BERNICK: I can't think of it.
16     MR. DOBSON: There's combinations that
17 may occur at a different point in time.
18     MR. ST. JEANOS: If I ask that
19 question, I get objection, asked and answered.
20     Q.   With those objections in mind.
21     A.   I have absolutely no idea where your
22 question is any more.
23     Q.   I haven't asked the question.
24     A.   Good. Ask one.
25     MR. ATKINSON: I think we taught to

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

56 (Pages 218 to 221)

C. Judson Hamlin - cross

218

1  he?
2      Q.   I don't know if he's Navagant or not.
3      A.   He was at one time, I think.
4      Q.   He was at one time .
5          MS. DAVIS: Objection. I think that's
6  speculation. We won't get to accuracy.
7      Q.   Do you recall reviewing Peterson's
8  estimation analysis with respect to cancer only
9  claims in or about July of 2003?
10     A.   No, I do not. I didn't even see it,
11 didn't even know he submitted one.
12         MR. SCHEIER: He filed one in G-I.
13         MR. BERNICK: Let's just --
14         THE WITNESS: Go ahead.
15     Q.   My understanding is that in your
16 billing statements one of the matters that you
17 billed for in G-I was reviewing Peterson
18 estimation analysis for cancer only claims.
19     A.   That would have been Latisha
20 Chambers's work, wouldn't it?
21     Q.   I don't know.
22         MR. BERNICK: He just testified he
23 doesn't recall.
24     A.   I don't recall.
25         MS. DAVIS: We don't have the bill in

219

1  front of us.
2          MR. ATKINSON: I was trying to speed
3  this up by not going back through the documents.
4          THE WITNESS: Okay. Go ahead.
5      Q.   Is it correct that you've taken a
6  position in the G-I matter also to whether plural
7  claims should be compensable?
8      A.   I have not taken a position on that
9  issue yet.
10     Q.   Do you have a position on that issue?
11         MR. SCHEIER: Objection.
12         MR. BERNICK: Objection, relevance.
13 It's up to counsel to deal with work product
14 issues. But of what conceivable relevance is
15 that in this case?
16         MR. ATKINSON: There's a question
17 pending. I'm not going to respond to that.
18     A.   I have not formulated an opinion on
19 that.
20     Q.   Is that a topic that was discussed --
21 strike that.
22         It's correct, isn't it, that was a
23 topic that was discussed with Judge Wolin and
24 with the other advisers in the five asbestos
25 cases?

220

1      A.   As I indicated, we knew the hot issue
2  was what are you going to do with the unimpaireds
3  or the asymptomatics.
4      Q.   Do you recall what your statements
5  were with respect to what should be done with the
6  unimpaireds or asymptomatics?
7          MR. BERNICK: Objection. Assumes
8  facts not in evidence.
9      A.   I don't think I made a statement about
10 it.
11     Q.   What is your understanding as to the
12 ground rules in the five asbestos cases with
13 respect to ex parte communications between Judge
14 Wolin and counsel for any of the parties in this
15 case?
16         MR. SCHEIER: Objection to form.
17         MS. PARVER: Objection to form.
18 Objection, lacks foundation.
19     A.   Nobody asked me about it. I don't
20 have any problems of it, other than what was --
21 knowing what was in the order originally
22 promulgated with the judge had in the very
23 beginning of the case. I can't tell you anything
24 about it.
25     Q.   What is your understanding as to what

221

1  the ground rules are?
2          MR. SCHEIER: Objection to form.
3      A.   I don't think I thought about it, why
4  is it. I have nothing to do with it.
5      Q.   I'm just asking whether you have an
6  understanding as to what the ground rules are?
7      A.   No, I don't.
8      Q.   Have you had any conversations with
9  Judge Wolin with respect to any of his ex parte
10 communications with counsel either in the five
11 asbestos cases or other counsel as they pertain
12 to these cases?
13     A.   No, I don't.
14     Q.   Have you met with Judge Wolin and with
15 any counsel for these cases on an ex parte basis?
16     A.   No.
17     Q.   Have you met with Judge Wolin and any
18 counsel not associated with these cases, but who
19 are generally members of the asbestos bar?
20     A.   No.
21     Q.   Okay. On an ex parte basis?
22     A.   No.
23         MR. ATKINSON: I maybe finished. I have
24 to beat my estimate. I'm finished.
25         (Whereupon a brief recess was taken.)

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR