# EXHIBIT T

SG010504.ASC

1

1                  UNITED STATES BANKRUPTCY COURT
                    FOR THE DISTRICT OF DELAWARE
2
     IN RE:  OWENS CORNING, et al.,
3                                    Chapter 11
            Debtors        Case Nos. 00-3837/00-3854
4    --------------------------------
     IN RE:  W.R. GRACE & CO., et al., Chapter 11
5                             Case Nos. 01-1139/01-1200
            Debtors
6    --------------------------------
     IN RE:  USG CORPORATION,
7            a Delaware Corporation,   Chapter 11
             et al.,        Case Nos. 01-2094/01-2104
8
             Debtors
9    --------------------------------   DEPOSITION UPON
                                        ORAL EXAMINATION
10                                           OF
                                        DAVID R. GROSS
11

12
     --------------------------------
13

14        T R A N S C R I P T  of the stenographic

15   notes of SUSAN E. GIOFFRE, a Notary Public and

16   Certified Shorthand Reporter of the State of New

17   Jersey, taken at the UNITED STATES DISTRICT

18   COURTHOUSE, 50 Walnut Street, Newark, New Jersey

19   on Monday, January 5, 2004, commencing at 9:00 a.m.

20

21

22

23

24

25



                                                         2

1    A P P E A R A N C E S:

2    ROBBINS, RUSSELL, ENGLERT,
     ORSECK & UNTEREINER, LLP
3    1801 K Street NW - Suite 411
     BY:  LAWRENCE ROBBINS, ESQ.

SG010504.ASC

```
 4        GARY ORSECK, ESQ.
       Counsel for Kensington and Springfield
 5
       SAIBER, SCHLESINGER, SATZ & GOLDSTEIN, LLC
 6     Gateway One
       Newark, New Jersey 07102
 7     BY:  BRUCE GOLDSTEIN, ESQ.
            JEFFREY W. LORELL, ESQ.
 8     Counsel for the witness, David R. Gross

 9     KAYE SCHOLER, LLP
       424 Park Avenue
10     New York, New York 10022-3598
       BY:  JANE W. PARVER, ESQ.
11     Counsel for James McGonagle, Owens Corning Futures
       Representative and Dean Trafelet, USG and Armstrong
12     Futures Representative

13     COOLEY GODWARD, LLP
       5 Palo Alto Square
14     3000 El Camino Real
       Palo Alto, California 94306-2155
15     BY:  SCOTT D. DEVEREAUX, ESQ.
       Counsel for USG
16
       CAPLIN & DRYSDALE
17     399 Park Avenue
       New York, New York 10022-4514
18     BY:  TREVOR SWETT, ESQ.
       Counsel for Asbestos Claimants Committee in Owens
19     Corning, USG, W.R. Grace and Armstrong

20     KIRKLAND & ELLIS, LLP
       200 East Randolph Drive
21     Chicago, Illinois 60601
       BY:  DAVID M. BERNICK, ESQ.
22     Counsel for W.R. Grace

23     KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP
       919 Third Avenue
24     New York, New York 10022
       BY:  JEFFREY S. TRACHTMAN, ESQ.
25     Counsel for Credit Suisse First Boston
```



3

```
 1     A P P E A R A N C E S:

 2     STROOCK & STROOCK & LAVAN, LLP
       180 Maiden Lane
 3     New York, New York 10038-4982
       BY:   KENNETH PASQUALE, ESQ.
 4     Counsel for the Official Committee of
       Unsecured Creditors of USG
 5
       WILLKIE, FARR & GALLAGHER
 6     787 Seventh Avenue
       New York, New York 10019
 7     BY:  RICHARD MANCINO, ESQ.
            CHRISTOPHER J. ST JEANOS, ESQ.
 8     Counsel for D.K. Acquisition Partner, LP,
       et al, Movants in the W.R Grace cases
```

SG010504.ASC

9

10   SAUL EWING, LLP
     100 South Charles Street
     Baltimore, Maryland 21201-2773
11   BY:   JOSEPH FAIRBANKS, ESQ.
     Counsel for Owens Corning Debtors

12
     KEATING, MUETHING & KLEKAMP, PLL
13   1400 Provident Tower
     One East Fourth Street
14   Cincinnati, Ohio 45202-3752
     BY:   MICHAEL L. SCHEIER, ESQ.
15   Counsel for C. Judson Hamlin, Legal Representative
     of Future Claimants of GI Holdings, Inc.

16
     ALSO PRESENT:
17
     THE HONORABLE ALFRED M. WOLIN, USDJ
18

19

20

21

22

23

24

25

☐

                                                         4

1                       I N D E X

2
    WITNESS                                  PAGE NO.
3

4   DAVID R. GROSS

5
         Direct Examination by Mr. Robbins      16, 255
6
         Cross-Examination by Mr. Devereaux    193, 260
7
         Cross-Examination by Mr. Mancino          342
8
         Cross-Examination by Mr. Bernick          364
9
         Cross-Examination by Mr. Swett            385
10
         Cross-Examination by Ms. Parver           389
11

12

13                    E X H I B I T S

SG010504.ASC

25      Q        You'll see on page 3 in the run-over

                            Gross-Direct                    26

 1      part of the paragraph you write, "Mr. Hamlin

 2      retained Budd Larner on or about December 18, 2001."

 3               Do you see that?

 4      A        I do.

 5      Q        Do you recall, sir, whether that date

 6      of December 18, 2001 was before you were contacted

 7      by Judge Wolin to serve as his advisor in the five

 8      asbestos cases?

 9      A        I think it was after, but I'm not sure.

10      Q        In all events, they were close in time.

11               Am I correct?

12      A        Yes, that's correct.

13      Q        And did there come a time, sir, when

14      you advised Judge Wolin that you were serving as the

15      counsel to Judge Hamlin as the Futures rep in G-I?

9:34A  16      A        I have no specific recollection of so

17      advising Judge Wolin, but I know that he was aware

18      of that appointment.

19               How he became aware of it is what I'm

20      not sure.

21      Q        If I could just follow-up on your

22      answer briefly, you cannot -- can you recall a

23      conversation that you had with Judge Wolin in which

24      the fact of your service as the lawyer to Judge

25      Hamlin was discussed?

                            Gross-Direct                    27

 1      A        No.

 2      Q        How do you know he knew about it?

                            Page 22

SG010504.ASC

3 A I'm not sure, frankly.  I believe he

4 knew about it, but I don't have specific

5 recollection of my saying to Judge Wolin whenever it

6 was that I was engaged by Judge Hamlin that I was so

7 engaged.

9:35A 8 Q Would you look at paragraph eight on

9 page 4 of your affidavit?

10 A Yes.

11 Q In the first sentence you say, "At all

12 relevant times, Judge Wolin was aware of my

13 representation of Mr. Hamlin in G-I Holdings."

14 Is that still your best belief?

15 A That is correct.

16 Q And when you say "at all relevant

17 times," what did you mean in that sentence?

18 A I assume I meant at times which in some

19 way might impact on the appointment by Judge Wolin,

20 but other than that, I don't know.

21 Q At all times relevant to the matter in

22 which you were submitting your affidavit?

23 A Yes.

24 MS. PARVER:  Objection.

25 Q Before you accepted the position as an

Gross-Direct  28

1 advisor to Judge Wolin, did you notify any of the

2 judges, either the bankruptcy judge or Judge Bassler

3 in the G-I case, that you were considering taking

4 that appointment?

5 A Judge Bassler, to go from him, his name

6 on, was not involved, to my knowledge, in the G-I

7 case at that time, so there would have been no

Page 23

SG010504.ASC

 8   notification to him.

 9              I did not specifically, to my

10   recollection, notify Judge Gambardella, but I

11   believe, and I have not yet -- I have not reviewed

12   this, that in my submission to Judge Gambardella

13   that it was mentioned.

14              I also have the same belief that I

15   believe that Judge Gambardella was aware of it, but

16   I have no specific recollection of doing so.

9:36A 17   Q     Now, sir, let me ask you, the other

18   advisors include Judge Dreier?

19        A     Yes.

20        Q     Judge Keefe?

21        A     Correct.

22        Q     Professor McGovern?

23        A     Yes.

24        Q     Did you disclose your service, your

25   role in G-I, to any of them at any time?

                    Gross-Direct              29

 1        A     They were aware of it, I believe, but I

 2   don't have any recollection of telling them, yes, I

 3   am so appointed in G-I.

 4        Q     How do you know they were aware?

 5        A     I don't know.  I believe they were.

 6        Q     Did you ever disclose your role in G-I

 7   to any of the parties in Owens Corning?

 8        A     Mr. Robbins, I do not recall as I sit

 9   here, whom the parties are in Owens Corning.

10              There are many, many parties and many,

11   many lawyers and I did participate to some extent in

12   some meetings with them.  I don't remember

                    Page 24

SG010504.ASC
```
      13   disclosing anything specific to them.

      14        Q     All right.  Now, broadening the

      15   question a little bit, can you recall disclosing

      16   your role in G-I to any of the parties in any of the

      17   five asbestos cases?

9:37A 18        A     I have no specific recollection of any

      19   such disclosure.  I believe, based on the public

      20   information of the appointment, that people in all

      21   of these cases read all of that public information

      22   and would be so advised, but other than that, I

      23   don't know.

      24              I have no specific recollection of

      25   saying to any of the parties that I am a special
```

                           Gross-Direct                  30

```
       1   advisor to or I am representing the Futures

       2   representative in G-I.

       3        Q     I'll come back to the public

       4   disclosures in a little while.

       5        A     Okay.

       6        Q     Let me just ask, did you ever -- can

       7   you recall whether you ever considered personally

       8   disclosing to any of the parties in the five

       9   asbestos cases the role you were serving in the G-I

      10   case?

      11        A     I don't have any such recollection.

      12              MR. BERNICK:  Mr. Robbins, when you say

      13   "parties" are you including counsel?

      14              MR. ROBBINS:  Yes.  I appreciate that

      15   qualification.

9:39A 16        Q     With Mr. Bernick's qualification in

      17   mind, does that change your answer?
```

                              Page 25

SG010504.ASC

18      A      Some of the lawyers, I believe --

19   strike that.  I'm not sure.

20              The answer to that is -- the answer is

21   I have no specific recollection of saying to any of

22   the lawyers or their parties that I was, in fact, so

23   retained in G-I.

24      Q      To your knowledge, sir, did Judge Wolin

25   ever disclose to any of the parties or their lawyers

                        Gross-Direct                    31

1    in the five asbestos cases the role that you or

2    Judge Hamlin had in the G-I case?

3       A      I don't know.

4       Q      Let me ask you to turn -- look at your

5    affidavit again, Exhibit 1.

6       A      Exhibit 1?

7       Q      Yes.  That's Gross Exhibit 1 for today.

8       A      Yes.

9       Q      Look, if you wouldn't mind, at

10   paragraph six.  There's a sentence at the bottom of

11   the page that I'm going to just ask you to read to

12   yourself and then I've got a question or two about

13   it.

14              Do you see the sentence that begins

15   "Neither in our initial discussions"?

9:40A  16      A      Yes.

17      Q      Would you read that and just finish

18   that sentence and then I'll have a question.

19              (Witness reviewing exhibit.)

20      A      Yes.

21      Q      Did Judge Wolin ever tell you that he

22   would not be seeking the type of advice reports or

                        Page 26

                        SG010504.ASC
23   evaluations that you referred to in this sentence?

24        A     By inference I believe that's what --

25   that is certainly what I understood my role to be,

                      Gross-Direct                    32

1    not to give him legal advice or anything such as

2    that mentioned here.

3              Did he ever specifically say to me "I

4    will not ask you for legal advice."

5              I have no such recollection.

6         Q    Tell me what it is he did say that

7    caused you to draw that inference, if anything?

8         A    My role, as I understood it as we went

9    on in this process, was to assist Judge Wolin with

10   the help of the other advisors in becoming more

11   conversant with the details of the asbestos

12   litigation and after that was done to assist, as I

13   hope I have done, in the mediation and settlement of

14   the five bankruptcy cases.

9:41A   15         MR. BERNICK:   I'm sorry, could I have

16   that answer read back, please?

17              (Answer read back.)

18        Q    Let me ask you, sir, just to follow up

19   for a minute, to become more -- you say more

20   conversant with the details of the asbestos

21   litigation, give me a flavor of what you're

22   referring to.

23        A    The asbestos litigation, as I assume you

24   know, has gone on for many, many years.

25              I assumed one of the reasons that I had

                      Gross-Direct                    33

1    been asked by Judge Wolin to participate in this
                         Page 27

SG010504.ASC

```
 4              Do you believe that your role in the
 5   G-I case puts you in conflict with your role as an
 6   advisor in the five asbestos cases?
 7        A     No.
 8        Q     Tell me why.
 9        A     Because I believe in G-I I am a lawyer
10   representing -- local counsel representing the
11   Futures representative and in that capacity I can
12   advance and should assist the client, Judge Hamlin,
13   in advancing the best interests of himself on behalf
14   of the Futures representatives in the G-I case.
15              I don't believe that that in any way
16   has affected my appearing -- my involvement in the
17   five bankruptcies by way of indicating any prejudice
18   towards any party in the five bankruptcies.
19              I was not -- I did not consider myself
20   nor was I a lawyer, an advocate, if you will, in the
21   five bankruptcies.
22              I was assisting the Court, as I told
23   you initially, in the first phrases of the
24   appointment and then acted as mediator/settlement
25   negotiator in the latter phases of that appointment.
```
𝇈
```
                        Gross-Direct                47
10:00A  1        Q     If I could just follow up and make sure
        2   I understand your answer, Mr. Gross.
        3        A     Sure.
        4        Q     I believe you used the phrase "local
        5   counsel" to describe your position in G-I?
        6        A     Yes.
        7        Q     Is the fact of your service as local
        8   counsel material to whether you believe you were --
```

SG010504.ASC

```
 9   you have a conflict?

10        A     No.

11               MS. PARVER:  Objection.

12        Q     So your answer would be the same even

13   if you were lead counsel?

14        A     Yes.

15        Q     Is the Futures rep in G-I a fiduciary

16   of the demand claims.

17               MR. BERNICK:  In which case?

18               MR. ROBBINS:  In G-I.

19        A     I would assume so.

20        Q     And does that fiduciary responsibility

21   extend to you as his lawyer?

22        A     I think not.  I think that that -- my

23   acting as his lawyer is as I have explained it to

24   you or as the legal representatives lawyer, doing

25   what I can to further the interests of the client I
```

                        Gross-Direct                48

```
 1   serve within the bounds of proper ethics.

 2        Q     And the client you serve in G-I is
10:01A
 3   himself a fiduciary for his clients?

 4        A     I would believe so.

 5        Q     And do you believe you have served that

 6   client vigorously in G-I?

 7        A     As well as I'm capable of, yes.

 8        Q     Now, just one second.

 9               Let me ask you, after you were

10   appointed, Mr. Gross, I take it there were one or

11   more meetings of the advisors with Judge Wolin as a

12   group?

13        A     Yes.  After I was appointed in the
```
                            Page 40

SG010504.ASC

        14    advisory capacity, yes.

10:02A 15        Q        Was there some particular way in which

        16    those meetings were generally convened or did it.

        17    depend on the particular meeting?

        18              MS. PARVER:  Objection.

        19        A        I think it depended on the particular

        20    meeting.  There was no set rules or procedures

        21    followed in convening a meeting.

        22              I think that's correct.

        23              MS. PARVER:  Again, Mr. Gross, if you

        24    can...

        25        A        I think that's correct.  There was no

                              Gross-Direct                    49

         1    set or particular procedure.

         2        Q        From time to time when there were

         3    meetings, did Judge Wolin send out materials for the

         4    advisors to read in preparation for the meeting?

         5        A        I have no recollection of that.

         6        Q        What I'd like to show you -- I'm going

         7    to be showing you in the course of the deposition a

         8    series of fee applications.

         9              You're familiar with those?

10:03A 10        A        Yes.

        11        Q        You have filed them on behalf of you

        12    and your different law firms.

        13              Am I correct?

        14        A        Yes.

        15        Q        I'd like to show you the first of

        16    these.  This is the first fee application in the

        17    five asbestos cases.

10:04A 18                    (Notice of Filing of First Fee
                                    Page 41

SG010504.ASC

Gross-Direct                                    83

1    relating to your representation with Mr. Hamlin in

2    G-I.

3              To the extent it does, I object to the

4    use of this document, although I have it and I can

5    take a look for myself, but I do caution you in that

6    regard.

10:56A  7         A      Is there a question?

8         Q      Yes.  The question is whether you

9    recognize this document?

10        A      Yes.

11        Q      What do you recognize it to be?

12        A      That I produced it in response to the

13   order of Judge Wolin and that it is a memo to myself

14   from Whitney Chelnik, an associate in my office at

15   that time and presently.

16        Q      And it purports to be a memo of the

17   meeting of January 18th that we've been talking

18   about?

19        A      It does.

20        Q      I just want to point to a couple of

21   items in it and just ask whether it refreshes your

22   recollection concerning subject matters that may

23   have been discussed at that January 18th meeting.

24              MR. BERNICK:  I will interpose an

25   objection here to the use of at least a certain

                    Gross-Direct                   84

1    portion of this document which appears on page 2,

2    quote, "David Bernick's four issues."

3              I believe that's derived from work

4    product that was received and has been produced in

SG010504.ASC

```
         5   this case and my acquiescence in the continuation of
         6   this interrogation with respect to this document
         7   should not be construed as a waiver of that work
         8   product objection and I have a privileged objection
         9   to any questions regarding that portion of the
        10   document.
10:57A  11       Q      Look, if you would -- if you wouldn't
        12   mind, at Roman four that makes a reference to --
        13   that states "If he were to follow the American
        14   Thoracic Society ATS Guidelines, would the cost
        15   alone drive out low-end screeners."
        16              Do you see that sentence?
        17              This is in Roman four on page 2.
        18       A      Yes, I'm sorry, I do.  I didn't see
        19   the --
        20       Q      Do you recall that subject being
        21   discussed at the meeting of January 18th that we've
        22   been talking about?
        23       A      I do not recall that subject being
        24   discussed at that meeting, but I do recall that that
        25   subject was generally discussed at some meetings.
```

 
```
                            Gross-Direct                  85
         1       Q      And without pinning you down to a
         2   particular meeting, what can you tell me about the
         3   nature of those discussions?
         4              MR. BERNICK:  You're not asking about
         5   any meeting?
         6              MR. ROBBINS:  Correct.
10:58A   7       A      My recollection is refreshed that at
         8   one or more of these meetings Judge Wolin was
         9   advised of what the American Thoracic Society
```

SG010504.ASC

```
 3              MR. GOLDSTEIN:  No, no.  Do you want
 4   him to finish the answer?
 5              MR. ROBBINS:  I would like him to.
 6              I apologize for interrupting,
 7   Mr. Gross.
 8        A     I was looking at the notes that were
 9   above that line and I see there is a name, Mike
10   Thornton, who is a plaintiff's lawyer in Boston and
11   I guess someone else whose name I cannot decipher
12   about -- I'm relating Judge Zobel, who I know is
13   there, and these people who are Massachusetts
14   lawyers, in fact, there was some discussion about
15   those cases, but I don't remember exactly what the
16   cases were.  It may have been just general asbestos
17   cases.
```

11:07A 18        Q     Do you recall, sir, that on --

```
19              MR. GOLDSTEIN:  Are you through?
20              THE WITNESS:  Yes.
21              MR. GOLDSTEIN:  There's a bunch of
22   notes there.
23        A     I was just talking about things above
24   the line.  If you want me to go on each one, I will.
25        Q     Please.
```

                         Gross-Direct                    91

```
 1        A     Okay.  There is a name Peter Barrett
 2   who is obviously or appears to be a radiologist in
 3   Massachusetts.
 4        Q     Do you remember what, if anything, was
 5   discussed about him?
 6        A     Obviously, he had some thought about
 7   pleural plaques, which is some part of the medical
```

Page 76

                                    SG010504.ASC
      8   involvement in these cases.

      9              The term below that under 2,

     10   chrysotile, which is a form of asbestos, as to there

     11   was some discussion as to whether it can cause

     12   mesothelioma, which is a disease that comes from

     13   this -- allegedly comes from these exposures.

     14              There is the name Vicent Rogli,

     15   R-o-g-l-i, who apparently said chrysotile does not

     16   cause some form of the -- some disease.

11:08A 17       Q      And that was part of the discussion?

     18       A      I guess so.  I made notes about it.

     19       Q      Please continue.

     20              MS. PARVER:  I have an objection and I

     21   move to strike the last answer.

     22              The question is that part of the

     23   discussion, then the answer "I guess so, they're

     24   part of the notes," there is no foundation and it's

     25   speculation.

u

                          Gross-Direct                    92

      1              MR. MANCINO:  I'll just note an

      2   objection to the interruption of the witness' answer

      3   because I don't believe he had completed his answer

      4   to the question

      5       A      What I was doing, Mr. Robbins, was

      6   trying to decipher my notes with the assumption that

      7   they would be reflective of what was discussed.

      8              Whether it was discussed or not, I

      9   don't know.

     10       Q      Let me try and lay a foundation because

     11   I think Ms. Parver may have a valid concern.

     12              Is it your practice when you take notes

                          Page 77

SG010504.ASC

     9  Corning.

    10         I know there was a trial held by Judge

    11  Wolin which dealt with substantive consolidation in

    12  one of the bankruptcies.

    13         I believe it was not Owens Corning, but

    14  that's what I know about it.  I didn't attend it nor

    15  was I involved in it.

11:34A 16     Q    Do you remember being present at a

    17  meeting of advisors in which the subject of

    18  substantive consolidation was taken up?

    19     A    I remember being present at some

    20  meeting of the advisors when the term, which was one

    21  that I wasn't particularly familiar with,

    22  substantive consolidation, came up.

    23         As to how and what it was, I don't

    24  remember.

    25     Q    Do you recall being present at any

                  Gross-Direct        111

     1  meeting with Judge Wolin and the other advisors in

     2  which the merits of the debtor's plan in Owens

     3  Corning were discussed?

     4         MS. PARVER:  Objection to form

     5         MR. SCHEIER:  Objection to form.

     6         One thing I did want to mention, you

     7  asked a series of questions and you referred

     8  generically to the advisors.

     9         It's unclear to me whether you're

    10  asking Mr. Gross about meetings where all the

    11  advisors were present or a portion of the advisors

    12  were present and I'd appreciate if you could clarify

    13  that.

SG010504.ASC

11:35A 14               MS. PARVER:  I think you referred to a

15     plan in Owens.  I think there has been more than one

16     filing of a plan.

17               MR. ROBBINS:  Indeed, so let me ask and

18     let me take into account both objections because

19     they are both well founded.

20          Q    At any time where one or more advisors

21     to Judge Wolin were present with the judge, was the

22     subject matter of any plan proposed by the debtor in

23     Owens Corning discussed?

24          A    I have no recollection of that,

25     Mr. Robbins.

                        Gross-Direct                  112

1          Q    I would like to show you the -- I think

2     it's the fourth gross fee application, but

3     unfortunately, it doesn't bear that name.

4               It's actually the first fee application

5     for D. R. Gross & Associates.

11:36A  6          A    A short-lived institution.

7          Q    How long did it live?

8          A    Two months and eleven days.

9               (First Application of D.R. Gross &

10               Associates, LLC for Compensation is received

11               and marked as Gross Exhibit 12 for

12               Identification.)

13               (Witness reviewing exhibit.)

14          Q    I owe you an apology.

15               What I need is the first Saiber

16     Schlesinger fee application and we will mark

17     that 13.

11:37A 18               MR. BERNICK:  This past round is not --
                             Page 94

                              SG010504.ASC
    11      A      Eight?

    12      Q      I'm sorry, page 4, paragraph eight.

    13      A      Yes.

    14      Q      Do you see the last sentence of

    15   paragraph eight that reads, "Moreover, the cases

    16   before Judge Wolin in the G-I Holdings bankruptcy

    17   have all been subjects of ongoing media interest

    18   particularly in national publications serving the

    19   asbestos litigation community."

    20             Do you see that?

    21      A      Yes, I do.

    22      Q      Can you identify the national

    23   publications that you were referring to in that

    24   sentence?

12:19P 25      A      Yes.


                              Gross-Direct                143

     1      Q      Please do.

     2      A      The two asbestos reporters, Mealey's

     3   and Andrews, The Wall Street Journal, the New York

     4   Times, and I think there is something called The

     5   Deal.

     6      Q      The Daily Deal?

     7      A      Yes.   In other words, those are the

     8   publications that come to mind.

     9      Q      At or about the time -- now this

    10   sentence talks about the cases before Judge Wolin in

    11   the G-I bankruptcy have all been subjects.

    12             Now I want to narrow this a little bit.

    13             Your -- let me strike that.

    14             Judge Hamlin's appointment as the

    15   Futures rep in G-I, in what national publications,

                              Page 120

SG010504.ASC

```
          16    if any, was that reported?
12:20P    17         A      I don't know.  I would assume Mealey's
          18    and Andrews, but I don't know other than that.
          19         Q      You don't recall actually having seen
          20    those?
          21         A      I do not.
          22         Q      So you didn't read about his
          23    appointment in there?
          24         A      I knew about his appointment.
          25         Q      But you didn't read it in any of those
```

                                Gross-Direct                    144

```
           1    publications?
           2         A      I don't recall.  I read them on
           3    occasion.  I do not read them religiously.
           4         Q      How often do they come out?
           5         A      Once a week.
           6         Q      How often do you read them?
           7         A      Once every couple of weeks or so when
           8    it comes across my desk.
           9         Q      What's the last one you can recall
          10    reading?
          11         A      The last one?
          12         Q      Yes.  How long ago?
          13         A      Before the Christmas vacation.
          14         Q      Can you recall any of the articles in
          15    that issue?
          16         A      No.  We get a -- the answer is no.
          17         Q      When you were retained as the counsel
          18    to the Futures representative, was that, to your
          19    knowledge, published in any national publications?
12:21P    20         A      My assumption is yes.  I don't recall
```

                                Page 121

SG010504.ASC

21  anything specific.

22      Q     You didn't see any?

23      A     Not that I can recall to you now.

24      Q     I want to show you a few documents that

25  were issued or filed in the early stages of the G-I

                     Gross-Direct                    145

 1  after Judge Hamlin's appointment starting with an

 2  October 10, 2001 appointment of Judge Hamlin.

 3              MR. SCHEIER:  Larry, are you going to

 4  go through a series of publicly-filed documents?

 5              MR. ROBBINS:  Yes.

 6              (Order Appointing Legal Reprsentative

 7          of Present and Future Holders of Asbestos

 8          Related Demands in G-I's Chapter 11 Case

 9          is received and marked as Gross Exhibit 14 for

10          Identification.)

12:23P 11              MR. ROBBINS:  Actually, why don't I

12  mark all of these at one time so I have them before

13  us.

14              I'm going to be marking as exhibits the

15  order appointing the legal representative

16  October 10, 2001, then a letter from Judge Hamlin to

17  Chief Judge Rosemary Gambardella dated October 26,

18  2001.  Mark that as 15.

19              The first one was 14, the second one is

20  15.

21              Then an application of the legal

22  representative of present and future holders which

23  is January 8th.

24              This is to authorize the employment of

25  Budd Larner.  We will mark that as 16.

SG010504.ASC

```
        10        A      Yes.

        11        Q      In what case?

        12        A      At least three or four of them.

        13        Q      I'm sorry?

        14        A      At least three or four cases.

        15        Q      Can you identify any of those?

        16        A      Not as we sit here, no.  I'm confused

        17   as to which ones he attended -- he was the Futures

        18   rep in.

        19        Q      How about Mr. McMonagle?

        20        A      In one case.

        21        Q      Do you know which case he's the Futures

        22   rep in?

12:55P  23        A      I think Owens Corning, but I'm not

        24   sure.

        25        Q      How about Mr. Trafelet?
```

                              Gross-Direct                 168

```
         1        A      In one case.

         2        Q      Can you identify it?

         3        A      No.

         4        Q      Is Professor McGovern a Futures rep in

         5   any case?

         6        A      Not to my knowledge.

         7        Q      In what capacity was he attending these

         8   meetings?

         9        A      As a mediator for Judge Wolin.  I would

        10   say for Judge Wolin.  I'm not sure.  I'm not sure

        11   what capacity officially he had, if any, in these

        12   cases.

        13              Professor McGovern was involved in the

        14   attempt to settle many of these cases and his
```

                              Page 141

SG010504.ASC

15  capacity in attending the meetings I really don't --

16  I just don't know.

17      Q      Are you able to recall the discussions

18  of any particular meeting?

12:56P 19              MR. BERNICK:  You're now talking about

20  these Futures rep meetings?

21              MR. ROBBINS:  Yes.

22      A      I can tell you generally what the

23  discussions were and how they were presented and

24  also can tell you that the main purpose of them, as

25  I understood it, was to deal with the pending

⬜

                          Gross-Direct                  169

1   legislation which I am advised is not to be

2   discussed here today, but that was as I understood

3   it the main purpose of it and whether, in fact, the

4   Futures rep should take -- the Futures

5   representatives as a group should take any position

6   on the pending legislation.

7              And before the meetings began -- I'm

8   sorry, before that subject was addressed, that being

9   the legislation that was pending, there was often a

10  report by the Futures rep as to the progress of the

11  individual bankruptcies by way of where it was, was

12  there a plan presented, were there settlement

13  negotiations, those kinds of things.

14              And also, I recall that at one of the

15  meetings, and I don't know which one, but we did

16  produce copies of my notes of that meeting, there

17  was -- there were presentations made by various

18  entities as to how they would deal with the

19  presentation of claims to the various trusts.

                          Page 142

                              SG010504.ASC
        25   trusts and these trusts to be of dealing with the
                                Gross-Direct                    171
         1   claims presentation that they had.
         2               They were people who had done this
         3   before and people who were in the process of
         4   desiring to do it now.
         5               That was at one of the meetings.
12:59P   6      Q       Can you recall any contributions to any
         7   of the meetings that you personally made?
         8      A       Other than with respect to the
         9   legislation and things such as that which we are not
        10   supposed to discuss or which I am not -- I am going
        11   under the assumption is not to be discussed.
        12      Q       Well, let's put that to one side for a
        13   moment.
        14      A       Okay.  I participated in discussions
        15   certainly, I can tell you that.  With what
        16   specificity?  No.
        17               I also didn't attend all of the
        18   meetings.  I think one meeting I attended by phone
        19   partially.
        20      Q       I'm sorry?
        21      A       I did not attend personally all of the
        22   meetings.  I think one of them I participated in by
        23   telephone partially and then had to break off.
1:00P   24      Q       Do you recall at any of the meetings
        25   with other -- with Futures reps there were
                                Gross-Direct                    172
         1   discussions of trust distribution procedures?
         2      A       Yes.
         3      Q       What can you recall about that?
                                Page 144

SG010504.ASC

```
      4        A        What I just told you about the fact

      5   that there were these people who were trying to

      6   secure the appointment to facilitate the

      7   presentation of claims to trust.

      8                  Each of the individual -- "each" is

      9   probably too strong a term.

     10                  As I understood it and as I understand

     11   it now, the individual trusts have their own

     12   particular procedures built in and some -- and I

     13   believe they are different with respect to what the

     14   requirements of the procedures are.

     15                  MR. ROBBINS:  Are you all taking the

     16   position that I can ask no questions concerning the

     17   discussions about taking a position on pending

     18   legislation?

1:01P  19                  MR. BERNICK:  My recollection is the

     20   same as Mr. Gross', but in light of the breadth of

     21   your question to us and in light of the fact that we

     22   are going to be breaking in a couple of minutes, why

     23   don't you let us talk about that amongst ourselves

     24   before we say yes to so broad a question?

     25                  MR. ROBBINS:  For what it is worth, it
```

                              Gross-Direct                    173

```
      1   is the only subject on this area that I'd like to

      2   ask him about and then I'm prepared to move and you

      3   can take that under advisement.

      4                  (Luncheon recess taken.)

      5

      6

      7

      8
```
                              Page 145

SG010504.ASC

1    thought and had told you that he thought you could

2    be of assistance in helping the Court and the

3    parties overcome procedural and operational

4    complexities?

5         A    Correct.

6         Q    Did you have any further understanding

7    of what particular procedural or operational

8    complexities Judge Wolin had in mind at the time he

9    asked you to become an advisor?

2:53P  10         A    No, I don't know what was in his mind

11    except as I've indicated here.

12         Q    In retrospect, outside of your efforts

13    in mediating, putting that aside, do you believe

14    that the work you've done as advisor has, in fact,

15    avoided or overcome any procedural or operational

16    complexities in these asbestos bankruptcies?

17         A    I'm unaware of anything other than what

18    I've told you I've done, which is the mediation

19    effort, the settlement effort, and the initial

20    bringing of the Court -- making the Court aware of

21    what's gone on in the asbestos litigation.

22         Q    Do you believe on that last point, the

23    educational efforts that you made to try and get the

24    Court up to speed, do you believe that any of that

25    has aided in avoiding any procedural or operational



                         Gross-Cross                    204

1    complexities?

2         A    I don't know what Judge Wolin used or

3    didn't use with respect to what we put before him to

4    rule as he did.  I was not involved in his rulings

5    as you understand my position ever.

                         Page 171

SG010504.ASC

      6    Q    At the time Judge Wolin first asked you

      7  to participate as an advisor, did he set out any

      8  guidelines or restrictions for you to govern your

      9  conduct as an advisor?

2:54P  10    A    No.

     11    Q    So he didn't instruct you, for example,

     12  not to discuss anything ex parte with the parties in

     13  the five bankruptcies?

     14          Is that right?

     15    A    Ex parte?

     16    Q    Yes.

     17    A    What do you mean?

     18    Q    Did Judge Wolin instruct you that while

     19  as an advisor working under his direction he didn't

     20  want you off having contacts or discussions with

     21  parties that he wasn't there to supervise?

     22    A    No.  Part of my role was to do exactly

     23  that.

     24    Q    Did he specifically ask you to do that?

     25    A    You asked me that before.  I don't

                         Gross-Cross           205

      1  remember any specific direction by the Court "You

      2  will do this."

      3          That's what my role -- what my role

      4  particularly, others differed, evolved in.

      5    Q    Did he -- I gather he also didn't ask

      6  you not to have any conversations outside of his

      7  presence with counsel for the various parties in the

      8  five bankruptcies?

      9    A    He did not.

     10    Q    Did he ask you not to have any

SG010504.ASC
```
 1  recall that were discussed in those meetings today,
 2  at least the list that I have of the meetings were
 3  the 706 panel, we talked about that?
 4       A     Yes.
 5       Q     And the ATS guidelines, correct, it was
 6  another subject --
 7             MS. PARVER:  I object.
 8       Q     -- that we discussed this morning?
 9       A     Those were two of the many things
10  discussed.
11       Q     There was 5-24G?
12       A     Yes.
13       Q     Are there other topics without --
14             MS. PARVER:  And I object to that.
15             MR. DEVEREAUX:  Can I finish my
16  question, counsel?
17             MS. PARVER:  I object to the colloquy
18  by counsel.  I object to your speaking statements.
19  Just put your question, but it's an improper and
20  mischaracterization of the testimony of this
21  morning.
22       Q     Can you think, as you sit here today,
23  sir, of other topics regardless of in what meetings
24  with Judge Wolin or the other advisors that may have
25  come up, other topics that were discussed?
```

                        Gross-Cross                    267
```
 1             MR. GOLDSTEIN:  Objection to the form
 2  of the question.
 3             MS. PARVER:  Objection; form,
 4  speculation.
 5       A     Can I answer?
```
                        Page 224

SG010504.ASC

6              There were discussions about the types

7    of these disease processes that evolved from

8    asbestos exposure.

9              There were discussions about the types

10   of asbestos fiber.

11             There were discussions about all of

12   the -- many of the things that would come up and had

13   come up and I said this morning the MDL, I recall

14   saying the MDL applications and things such as that.

15             For me to try and iterate everything

16   that was discussed in these meetings that took place

17   for a reasonable -- a long period of time, this is

18   not possible except as I've indicated to some extent

19   in the notes which you have.

4:18P  20   Q     Do you have a recollection as to

21   whether or not there was a discussion at any of

22   these discussions with Judge Wolin or the other

23   advisors as to what types of claims by asbestos

24   personal injury claims would be compensable?

25        A    Yes.

                    Gross-Cross              268

1              MR. BERNICK:  I object to form.

2    Compensable where?

3              MR. ROBBINS:  The objection is noted.

4         Q    What was the discussion, if you recall,

5    sir, about whether or not certain types of claims by

6    personal injury claims would be compensable?

7         A    That the judge was bound by the laws of

8    the individual states that set up the compensability

9    of the claims.

10        Q    Outside of the issues as to whether or

                    Page 225

SG010504.ASC
11  not state substantive tort law would govern, is

12  there any other context in which you discussed

13  whether particular types of asbestos claims might be

14  compensable?

15              MR. SCHEIER:  Objection to form.

16      A    Not that I was involved in.

17      Q    Do you recall any discussions about the

18  merits of any defenses that any of the debtors or

19  other parties were raising to any personal injury

20  asbestos claims in the context of your discussions

21  with Judge Wolin or the other advisors?

4:19P  22      A    There were discussions about the types

23  of defenses that were offered such as fiber defense

24  and the like as far.

25              As the merits of those defenses, no, I

                    Gross-Cross                    269

1   have no recollection of any discussion at any time

2   about whether they were good or bad or valid or

3   invalid defenses.

4       Q    In terms of the fiber defense, would

5   you include what is known as the chrysotile defense?

6       A    Yes.

7       Q    Do you recall during the course of the

8   meetings that you participated in with Judge Wolin

9   and other court advisors, anyone making statements

10  about whether or not that was a valid -- in their

11  view a valid or invalid defense?

12      A    I do not.

13      Q    Do you recall discussions with Judge

14  Wolin and the other advisors about the value of any

15  claims for personal injury?

                    Page 226

SG010504.ASC

25        Q       Correct.

                              Gross-Cross                    278

1                MR. GOLDSTEIN:   The bottom of the
2        page?
4:28P  3         Q       The bottom of page 1, right, your
4        entry.
5        A       Okay.  Yes.
6        Q       That entry reads, quote, "Telephone
7        calls to F. McGovern, Judge Wolin and experts Re:
8        Statistics," close quote.
9                Do you see that, sir?
10       A       I do.
11       Q       Do you recall who the experts were that
12       you referenced in this time entry?
13       A       No.
14               MR. SCHEIER:   I'm looking at the time
15       entries for that date and --
16               THE WITNESS:  It's a different one.
17       It's the one at the bottom.  There is one at the
18       top.
19               MR. SCHEIER:  Can we get some sort of
20       identifying number?
21               MR. DEVEREAUX:  Page 1 from Exhibit C,
22       time entries?
23       A       Was I looking at the right one?
24       Q       Yes, you go it.
25       A       Okay.

                              Gross-Cross                    279
1                MR. DEVEREAUX:  Everybody there?
2                MS. PARVER:  Yes.

                            SG010504.ASC
     3      Q      You don't recall, sir?

     4      A      I do not.

     5      Q      Do you recall what discussions you had

     6   as an advisor to Judge Wolin regarding statistics?

4:29P  7              MS. PARVER:  Object to form.

     8      A      I recall discussions with -- in the

     9   early stages of the meetings with Judge Wolin which

    10   dealt with the use of statistics in the prediction

    11   of potential claims that there were such

    12   methodologies.

    13      Q      As a way to predict the incidents and

    14   claims in the future that would arise?

    15      A      Yes.

    16      Q      I know you don't recall who the experts

    17   were who you met with on March 6th or talked with on

    18   March 6, '02.

    19              Do you recall any experts that you met

    20   with during the course of advising Judge Wolin as

    21   part of your duties as an advisor?

    22      A      Other than those who were experts or

    23   parties?

    24      Q      No, no.  I'm including experts or

    25   parties.

                            Gross-Cross                280

     1      A      I don't think I'm supposed to tell you

     2   that.  I'm not even sure that I met with them,

     3   frankly.

     4              I know I met with people.  I know that

     5   there were certain folks who were experts for

     6   parties, but I don't recall -- at this stage,

     7   Mr. Devereaux, I don't recall meeting with any

SG010504.ASC

25              MR. DEVEREAUX:  I have no copies.  This

                          Gross-Cross           341

 1   is the time records distributed at the break.

 2      A     Okay, that's fine.

 3      Q     And these are records where -- have

 4   you, sir, or someone on your behalf interlineated

 5   who the redacted names are to indicate who it was

 6   you were meeting with?

 7      A     Someone on my behalf did that,

 8   Mr. Devereaux.  I did not do it.  It was only done

 9   at the last day.  I don't know when it was done.

5:36P  10      Q     And to the best of your knowledge,

 11   this is the extent of the information that you

 12   have available to show who it was, who those

 13   names withheld from certain billing statements

 14   recite?

 15      A     That is correct.

 16             MR. DEVEREAUX:  That's it

 17             MR. BERNICK:  Are you done, Scott?

 18             MR. DEVEREAUX:  Um-hum.

 19             MR. BERNICK:  I'm sorry, you have to

 20   say it orally for the court reporter.

 21             MR. DEVEREAUX:  It's not up to the

 22   court reporter, it's up to you.

 23             MR. BERNICK:  I understand that.

 24             MR. DEVEREAUX:  Yes.

 25             MR. BERNICK:  Thank you.

                          Gross-Cross           342

 1   CROSS-EXAMINATION BY MR. MANCINO:

 2

SG010504.ASC
```
  3    Q    Mr. Gross, thank you for your patience.
  4         Look at Gross Exhibits 8 and 10,
  5   please.
  6    A    If someone will give them to me, I will
  7   certainly look at them.
  8         MR. MANCINO:  How much time do we have
  9   that Mr. Devereaux took?
 10         MS. PARVER:  About fourteen minutes
 11         MR. DEVEREAUX:  And so I gave my six
 12   minutes to Mr. Mancino.
```
5:37P  13

```
 14   BY MR. MANCINO:
 15    Q    Do you have Gross Exhibits 8 and 10?
 16    A    I've got 10 only.
 17    Q    Okay, 10 is regarding the meeting with
 18   Judge Wolin on February 27, 2002?
 19    A    That is correct.
 20    Q    And I will represent to you that Gross
 21   Exhibit 8 is whitney Chelnik's notes of a meeting on
 22   January 23, 2002.
 23    A    Okay.
 24    Q    And the meeting is on January 8, 2002.
 25    A    I don't have it in front of me, but I
```

                          Gross-Cross                    343
```
  1   accept your representation.
  2    Q    In these preliminary meetings of the
  3   advisors with Judge Wolin, did you discuss topics
  4   that were relevant in general to the five asbestos
  5   cases?
  6    A    Yes.
  7    Q    What topics were those?
```
                          Page 288

SG010504.ASC

8      A      I have already answered them on more

9  than one occasion that I can recall.

10             They were the topics of the status of

11  the litigation, the issues that were involved in the

12  litigation, who were the people who might be helpful

13  to the Court in bringing the Court more knowledge

14  about the litigation, the 706 panel and whether it

15  was efficacious in this situation.

16             I, personally, did not discuss much

17  about the bankruptcy -- I mean, I shouldn't --

18  you're are asking me what I discussed or the group

19  discussed?

5:39P  20      Q      The group discussed.

21      A      There was discussion about past and

22  ongoing asbestos bankruptcies.  That's the kind of

23  thing that was discussed.

24      Q      Okay.  With respect to Gross Exhibit 8

25  on the first page, DRG3696 under Roman 2, "706

                    Gross-Cross                    344

1  Panel," and then there are the main issues to be

2  addressed by the 706 panel.

3             Do you see that, sir?

4      A      I do.

5      Q      And the four issues that are listed

6  there?

7      A      Yes.

8      Q      Okay.  Was the discussion of that -- of

9  those issues to be addressed by the 706 panel a

10  discussion that related generally to all five of the

11  asbestos cases?

12      A      I believe so.

                    Page 289

SG010504.ASC
18   testify in response to Mr. Mancino's questions.

19        A        Those are the things I remember as

20   we're sitting here, Mr. Mancino.

21        Q        Respect to the discussions with Judge

22   Wolin concerning the positions taken by the parties

23   in the Grace case, what positions taken by the

24   parties in the Grace case did you discuss with Judge

25   Wolin?

                          Gross-Cross                 346

 1        A        Their settlement positions.

 2        Q        As to the case in its entirety?

5:42P  3   A        Yes.

 4        Q        Did you have discussions with Judge

 5   Wolin concerning issues relating to W. R. Grace's

 6   position as to how the its bankruptcy should believe

 7   managed?

 8        A        I was more interested, I think, in --

 9   more involved in the settlement discussions rather

10   than the management of the bankruptcy.

11        Q        Okay.  But those were --

12        A        I don't remember.  I'm sure there -- I

13   don't remember.

14        Q        But in terms of the broad topics, there

15   were settlement discussions concerning the

16   disposition of the entire Grace bankruptcy?

17        A        Yes.

18        Q        And all issues involved in it?

19        A        I would think so.

20        Q        But that was your understanding?

21        A        Yes.

22        Q        Looking at Gross Exhibit 8 on page 3,

                          Page 291

SG010504.ASC

23    it's the January 23, '02 memorandum, you will see

24    under Roman six there is -- Roman six right near the

25    middle of the page, it says "W. R. Grace will be

                         Gross-Cross                    347

1    divided into four parts."

2              Was that a topic of discussion at your

3    meeting on January 18, 2002 with the advisors and

4    Judge Wolin?

5:43P    5    A    I do not have a specific recollection

6    of these things, but I am assuming since they were

7    recorded here, yes.

8    Q    And you had that expectation that Ms.

9    Chelnik would record accurately, at least to the

10   best of her ability, the topics discussed at the

11   meeting.  Right?

12             MR. GOLDSTEIN:  Objection to form.

13   A    I told Ms. Chelnik to attend the

14   meeting and to make notes of the meeting.

15   Q    Now, with respect to again Exhibit 8 at

16   Roman six, you will see the paragraph that I will

17   read into the record.

18             "The consensus at the meeting was that

19   Judge Wolin must take care of a fraudulent transfer

20   issue first before proceeding on with the general

21   asbestos/bankruptcy matters.  Therefore, it must be

22   determined whether Judge Wolin can take the case or

23   if it will be handled by a bankruptcy judge.  Also,

24   is a jury required?  In Judge Wolin's opinion, he

25   could have the fraudulent transfer claims tried by

                         Gross-Cross                    348

1    the summer, possibly schedule a trial for July or
                            Page 292

SG010504.ASC

        2   August."

5:44P   3           A     Yes.

        4           Q     I read that correctly?

        5           A     Yes, you did.

        6           Q     Do you recall that discussion?

        7           A     I know there was a discussion about the

        8   fraudulent transfer case, yes, and I know -- yes, I

        9   do.

       10           Q     And then it -- Ms. Chelnik's memo says

       11   "The consensus at the meeting was that Judge Wolin

       12   must take care of the fraudulent transfer issue

       13   first."

       14               What was discussed along those lines?

       15           A     I don't know but -- I don't know, but

       16   that's what -- again, I don't know what was

       17   discussed first and I don't have a recollection of

       18   the discussion except as it's set forth here.

       19           Q     So your best recollection of the

       20   discussion is as what is set forth on page 3 in

       21   Gross Exhibit 8?

       22           A     It's not really a recollection.  I'm

       23   sorry, I'm not trying to quibble with you,

       24   Mr. Mancino.

       25               It's just that the notes say what they

                              Gross-Cross              349

        1   say, quite obviously, and if Ms. Chelnik properly

        2   recorded them, then these are some of the things

        3   that were discussed.

        4           Q     Okay.  Under point four, "Personal

        5   Injury" again on page 3 of Gross Exhibit 8.

5:46P   6           A     Point four?

                              Page 293

# EXHIBIT U

1

```
 1                     UNITED STATES BANKRUPTCY COURT
                       FOR THE DISTRICT OF DELAWARE
 2

 3   IN RE: ARMSTRONG WORLD    : Chapter 11
     INDUSTRIES, INC., et al., : Case Nos. 00471,
 4                             : 00-4469, 00-4470
             Debtors.         :
 5   --------------------------
     IN RE:  W.R. GRACE & CO., : Chapter 11
 6   et al.,                   : Case Nos. 01-1139
                               : through 01-1200
 7           Debtors.         :
     --------------------------
 8   IN RE:  FEDERAL MOGUL,    : Chapter 11
     GLOBAL, INC., T & N,      : Case Nos. 01-10578,
 9   LIMITED, et al.,          : et al.
                               :
10           Debtors.         :
     --------------------------
11   IN RE:  USG CORPORATION,  : Chapter 11
     a Delaware Corporation,   : Case Nos. 01-2094
12   et al.,                   : through 01-2104
                               :
13           Debtors.         :
     --------------------------
14   IN RE:  OWENS-CORNING,    : Chapter 11
     et al.,                   : Delaware Bankruptcy
15                             : Case Nos. 00-3837
             Debtors.         : through 00-3854
16   --------------------------

17                     DEPOSITION UPON
                       ORAL EXAMINATION
18                          OF
                       JOHN E. KEEFE, SR.
19

20        T R A N S C R I P T  of the deposition of
     JOHN E. KEEFE, SR., before AUDREY ZABAWA, a
21   Certified Shorthand Reporter and Notary Public of
     the State of New Jersey, at the MARTIN LUTHER KING
22   JR. FEDERAL BUILDING, 50 Walnut Street, Newark, New
     Jersey, on Tuesday, January 6, 2004, commencing at
23   4:50 p.m., pursuant to Notice.

24

25
```

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ  07039
973-992-7650
FAX 973-992-0666

**RIZMAN, RAPPAPORT, DILLON & ROSE**
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR

Keefe - Direct/Orseck

6 (Pages 18 to 21)

18

1  Q    Did Judge Wolin ever, formally or
2  informally, at some subsequent time subsequent to
3  the issuance of Exhibit 1 advise you that the scope
4  of your responsibilities or authority were to be
5  restricted or curtailed in any respect?
6      A    Not that I can recall.
7      Q    So is it your understanding that you
8  continue to act as a member of the Asbestos
9  Management Committee in the capacity that is
10  described in Exhibit 1?
11      MR. BRODWY: Objection to the form of
12  the question.
13      A    Yes.
14      Q    I didn't hear the answer.
15      MR. FAIRBANKS: Could we have the same
16  arrangement as we had in the other deposition that
17  if one of the persons on this side of the table
18  makes an objection it goes for all of us?
19      MR. ORSECK: Fine with me.
20      Q    Let me show you now what we've marked
21  as Hamlin Exhibit 2, which is a March 19, 2002 order
22  from Judge Wolin in the Five Cases.
23      A    Okay.
24      Q    I am just going to lean over here. Do
25  you see the language that says that to that point at

19

1  least, I think the quote is, "it appearing that the
2  advisors are functioning in a manner in all respects
3  similar to examiners as provided for in the
4  Bankruptcy Code," and then it lists portions of
5  Chapter 11. Do you see that?
6      A    Yes, I do.
7      Q    Do you have an understanding of what
8  that meant, that is to say that you were functioning
9  in all respects similar to examiners under the
10  Bankruptcy Code?
11      A    I don't think I recall contemplating
12  that at all, no.
13      Q    As you sit here today, does that seem
14  to you to be an accurate representation of the
15  capacity in which you were serving at least up
16  through March 19th of 2002?
17      MR. FAIRBANKS: Objection to the form
18  of the question. I don't think there's any basis
19  for that question. He said he didn't understand
20  what that meant; didn't he?
21      A    No. I said I didn't contemplate at the
22  time that the order came in that I was operating in
23  that capacity or not. I just don't know.
24      MR. FAIRBANKS: I don't know if the
25  record shows that he has an understanding of what

20

1  that means under the bankruptcy.
2      A    That's right.
3      Q    Did you at the time of this order in
4  March after there had been one or more meetings
5  among the advisors, did you have a different or
6  expanded -- well, leave it at different, did you
7  have a different understanding as to the scope of
8  your responsibilities or authority than you did back
9  in December of 2001?
10      A    I don't think so.
11      Q    Rather than my fishing around, why
12  don't you as best you can describe it, as of
13  December or March, what is your best understanding
14  of your responsibilities as an advisor?
15      A    Let me put it this way. My
16  recollection of my activities on this advisory
17  committee in the sense of giving any advice in terms
18  of opinions were limited to basically two areas.
19  The first area was a question of whether the
20  committee felt based upon upon our examination of
21  certain briefs and the law whether a removal by Ford
22  Motor Company of several cases to the district court
23  should be remanded to the state courts. The second
24  activity I was involved in in any depth was an
25  inquiry into whether a 706 panel should be formed;

21

1  and, if so, for what reasons and what were the
2  criteria under which we thought the panel could
3  operation and effectively decide issues, and I truly
4  do not remember any other advice that I was asked to
5  give.
6      Q    Is it your understanding that as a
7  member of the Asbestos Management Committee you were
8  required to be neutral with respect to the various
9  parties in the Five Cases?
10      A    Absolutely.
11      Q    Why is that?
12      A    Because we were advisors to the Court,
13  and the Court was to be neutral, so obviously the
14  advice had to be neutral as well. Just like a law
15  clerk or a magistrate.
16      MR. ORSECK: All right. Let's mark
17  Keefe Exhibit 1, please.
18      (Keefe-1, John E. Keefe, Sr. affidavit,
19  was received and marked for identification.)
20      Q    Judge Keefe, can you identify for the
21  record what's been marked as Keefe Exhibit 1?
22      A    It's my affidavit filed --
23      MR. STIEFEL: Is this 3 or 1?
24      MR. ORSECK: No, it's Keefe-1. If I
25  can just make it clear for the record, we have so

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR

Keefe - Direct/Orseck

42

1  you be so kind to explain what these handwritten
2  notes reflect? Are though notes from a particular
3  meeting or --
4       MR. ORSECK: Judge Dreier testified
5  that these are notes from the four meetings, and
6  perhaps, although it wasn't exactly clear to me,
7  from a fifth meeting that may have preceded the four
8  meetings, but at least I know they are so dated that
9  there are notes here from the four meetings.
10      MR. FAIRBANKS: There are not dates
11  that show all four meetings.
12      MR. ORSECK: That's true. There are
13  only dates with respect to the January 18th,
14  February 27th, May 17th meeting, and then there are
15  notes of a November 19th meeting at the end, which I
16  don't believe Judge Keefe to have attended, and I
17  will not ask him about those.
18      Q    Okay. On the first page, WAD 001,
19  there is an entry that I believe, I will represent
20  that Judge Dreier has said, "Says use 502C
21  estimates, not specific bar dates."
22      Do you know what 502C is?
23      A    Yes, in general, but I am not a
24  bankruptcy expert so --
25      Q    My question is does this in any way

43

1  spark a recollection in any way of the issue of 502C
2  estimates being discussed at one or more of the four
3  meetings?
4       A    No, I don't.
5       Q    Okay. Let me ask you to turn to the
6  second page, and about two-thirds of the way down --
7       MS. BROWDY: Let me interrupt you,
8  counsel. I believe that Judge Dreier testified
9  yesterday that as to pages two and three, he
10  believed that those involved the context of
11  potential mediation, and I believe those to be off
12  limits.
13      MR. ORSECK: Okay. I will confess
14  that I just can't remember at this point, but I am
15  going to just take your word for it at this point.
16  Okay. So you are saying that that's with respect
17  to page three as well?
18      MR. TACCONELLI: You'd moved onto page
19  four during his deposition yesterday. You bypassed
20  pages two and three.
21      Q    All right. Let me ask you. I think at
22  this point I remember there are certain marginalia
23  that Judge Dreier said were appropriate. On page
24  five, all the way on the left above the doodle, it
25  says, according to Judge Dreier, "Section 524G

44

1  treatment." Does that spark any recollection of a
2  substantive discussion at one of the four meetings?
3       A    No.
4       Q    Let me turn to page seven -- let me
5  back up for a moment. Page six at the top says,
6  2/27/02, so I understand that page and page seven to
7  relate to the February 27 meeting.
8       A    Okay.
9       Q    At the top, there is a name that
10  appears to say Dr. Victor Rogalic or Rosalie. Do
11  you see that?
12      A    I do.
13      Q    Do you know why his name might be in
14  Judge Dreier's notes?
15      A    I think this is the meeting I referred
16  to before when we had plaintiffs' counsel and
17  defense counsel come and talk to us about the
18  so-called hot issues in asbestos litigation, in all
19  categories of asbestos injury, and I think they were
20  mentioning the names of doctors that were prominent
21  at least from their point of view, whether it be
22  defense or plaintiffs, and I do remember the name
23  Rogalie. Don't ask me if he's defense or plaintiff.
24      Q    Do you see over on the left, I believe
25  that says, "Al Parnell"?

45

1       A    Yes.
2       Q    "D attorney"?
3       A    Right.
4       Q    Do you know why that notation is there?
5       A    Sure. Mr. Parnell was at the meeting,
6  for part of the meeting. He wasn't there for the
7  entire meeting.
8       Q    Do you know why he was invited to the
9  meeting?
10      A    Yes.
11      Q    Why was that?
12      A    My understanding was he was going to
13  discuss these issues from a defense perspective.
14      Q    And did somebody also come to discuss
15  these issues from the plaintiffs' perspective?
16      A    Yes.
17      Q    Did you have any discussions at any of
18  the four meetings as to the purpose of inviting
19  lawyers to provide a plaintiffs' perspective and a
20  defendants' perspective?
21      A    I think it was in the context of
22  allowing Judge Wolin at some point in time to decide
23  whether a 706 panel could feasibly be put together;
24  and, if so, what issues could they possibly resolve
25  in the context of what has happened over the last 20

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR

Keefe - Direct/Orseck

46

1  some years in asbestos litigation.
2      Q    Did the plaintiffs' and the defendants'
3  side attorneys express views as to the usefulness of
4  a 706 panel?
5      A    They did not. Not to my recollection.
6      Q    I perhaps misunderstood. What were
7  they providing information on, if anything?
8      A    They were providing information on what
9  doctors were being permitted to testify to in
10 certain jurisdictions with respect to pleural
11 plaques, whether in certain jurisdictions that was
12 considered to be a disease without symptoms,
13 compensable. With respect to asbestosis, they were
14 discussing whether some jurisdictions adhered to the
15 American Thoracic Society requirements for testimony
16 with respect to readings of x-rays; whether they
17 required B readers, whether 1/0 was acceptable in
18 some jurisdictions and not in others; whether some
19 jurisdictions with respect to asbestosis required
20 abnormal PFTs, or could the diagnosis of asbestosis
21 be made basically on x-ray. With respect to cancer
22 cases, I remember discussion with respect to what,
23 if any, defenses could be offered for that, and, of
24 course, the chrysotile fiber defenses were
25 mentioned, and I recall some discussion -- there was

47

1  a doctor from Boston who believed that you had to
2  have pleural plaques in order to diagnose
3  mesothelioma. We went through every kind of cancer
4  cases, what are the issues, what are jurisdictions
5  allowing in terms of admissibility of evidence
6  because we knew that the Erie Doctrine was going to
7  obviously have play, but the question was whether
8  the 706 Daubert type setting, the federal court
9  could narrow the field, narrow the scope.
10     Q    Did any of the advisors or Judge Wolin
11 put questions to either of the two sets of
12 attorneys?
13     A    I think we all did.
14     Q    How long did each, I am going to call
15 it presentation, last by the defense side and the
16 plaintiffs' side?
17     MR. DOBSON: Object to the form.
18     A    I don't know. It was pretty lengthy,
19 and as I recollect, they came in separately. They
20 weren't in the same room together.
21     Q    Do you know if any of the parties to
22 the Five Cases were advised or notified beforehand
23 that these presentations were occurring?
24     A    I have no idea.
25     Q    You didn't do so; is that correct?

48

1      A    No, I didn't.
2      MS. BROWDY: Off the record for a
3  second.
4      (Discussion off the record.)
5      Q    Judge Keefe, do you recall any
6  discussion at any of the four meetings that related
7  to the question of whether an estimation hearing
8  ought to be held in advance of plan confirmation or
9  at the same time as plan confirmation?
10     A    I really can't recall that.
11     MR. ORSECK:  Okay. All right. Which
12 Keefe exhibit are we up to?
13     THE COURT REPORTER: Keefe-5.
14     (Keefe-5, two pages of handwritten
15 notes, was received and marked for identification.)
16     Q    Judge Keefe, can you identify what's
17 been marked as Exhibit 5?
18     A    That's my handwriting of a proposed
19 agenda for the January 18th meeting concerning
20 discussions on 706 panels.
21     Q    Did you share this with anyone?
22     A    I don't think I did.
23     Q    Do you recall whether you made these
24 notes or drafted this agenda in advance of the
25 meeting?

49

1      A    Oh, I did, yeah, I definitely did.
2      Q    There is a paren after the agenda that
3  says, "not addressed"?
4      A    Right.
5      Q    What does that mean?
6      A    It means that -- can I go back just a
7  second? I thought I was going to actually chair the
8  meeting, because it became obvious to me after the
9  first meeting that Judge Wolin was going to
10 basically focus my services on the asbestos-related
11 disease part of the case and insurance coverage
12 stuff. I did not hold myself out to be a bankruptcy
13 expert, and I thought he had suggested that I create
14 an agenda for the meeting and simply go through it.
15 I wasn't supposed to disseminate it, but just kind
16 of outline the issues that I thought might want to
17 be addressed. As it turned out, I didn't run the
18 meeting, Judge Wolin did, and although we discussed,
19 you know, the various issues within this agenda, the
20 agenda itself was not followed.
21     Q    I see. The first numbered point says,
22 as I read it, "Is this going to be a 706 panel a la
23 Pointer or a 104 panel a la Baxter (Judy Jones)."
24 Have I read that correctly?
25     A    You have.

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7850
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR

Keefe - Direct/Orseck

54

1  Q    All right. Back to the first page of
2  Keefe-5, you were on number four I think?
3  A    No, I think we did number four by
4  referring to the next page.
5  Q    Okay. Well, I think it says under
6  number four, "Establish a conflict questionnaire
7  after initial screening?" Have I read that
8  correctly?
9  A    That's correct.
10 Q    Did you discuss with the group the idea
11 of creating a conflict questionnaire?
12 A    No, we never even talked about who
13 would screen them.
14 Q    Okay. What about number five?
15 A    "Identify what committee members will
16 conduct a search and who will be contacted."
17 Q    Was that discussed at all?
18 A    No.
19 Q    Number six?
20 A    "Once we have ID'd an expert, how do we
21 handle issue of compensation?"
22 Q    Was that discussed among the group?
23 A    No.
24 Q    And I can't quite read the bottom of
25 number seven. Can you?

55

1  A    I think it says, "Will experts be
2  afforded assistance of counsel, and who will pay for
3  counsel?"
4  Q    I take it that probably wasn't
5  discussed either; right?
6  A    No, right.
7  Q    You are aware, I imagine, that a
8  recusal motion has been filed in this matter;
9  correct?
10 A    Yes, I am aware of it.
11 Q    Have you discussed the merits of the
12 recusal motion with any person?
13 A    No.
14 Q    Have you spoken with Judge Wolin at all
15 regarding the --
16 A    Just out in the hall.
17     MR. FAIRBANKS: Objection. You have
18 asked that, and you got the answer.
19     MR. ORSECK: Okay. I need to check my
20 notes, but to me this is a good time for a
21 five-minute break if that's okay, and I may be about
22 through.
23     (Break taken.)
24 Q    Judge Keefe, I am about through. Were
25 you aware that at the time you were serving as an

56

1  advisor, the Lynch Martin firm represented a number
2  of claimants in cases that were removed from state
3  court to federal court and assigned to Judge Wolin?
4  A    I didn't.
5  Q    Did you know that those cases were then
6  remanded back to state court by Judge Wolin?
7  A    I didn't.
8  Q    You are not aware of that?
9  A    No, I'm not.
10     MR. ORSECK: I thank you for your time.
11 I don't have any more questions.
12 CROSS-EXAMINATION BY MR. ST. JEANOS:
13 Q    Judge, Chris St. Jeanos from Willkie
14 Farr. I just have a few. In your affidavit which
15 was marked as Exhibit 1, you state that regarding
16 the four meetings that you had with the Asbestos
17 Management Committee, as I recall, "The discussions
18 involved issues of concern to the Court with respect
19 to the management of complex issues presented by the
20 bankruptcy matters and how the advisors could be
21 assistance to the Court in that regard." You have
22 testified to a number of the things you recall being
23 discussed at the four meetings?
24 A    Right.
25 Q    Is there anything that you recall being

57

1  discussed at those meetings that we haven't yet
2  covered yet as you can recall?
3  A    Substantive issues or procedural
4  issues?
5  Q    Let's start with substantive issues?
6  A    I don't recall any other substantive
7  issues.
8  Q    Other than the issues we have discussed
9  so far today?
10 A    Right.
11 Q    There were procedural issues discussed
12 though?
13 A    I think there was some discussion as to
14 what matters he thought he would want to decide
15 first, and I think it was the W.R. Grace matter,
16 and, yeah.
17 Q    Go ahead. I didn't want to cut you
18 off.
19 A    And I recall him telling me that he
20 would like to have some insurance issues addressed
21 shortly thereafter.
22 Q    Did the judge say why he wanted to
23 decide the Grace case first?
24 A    No.
25 Q    With respect to the Grace case, did he

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR

Keefe - Cross/St. Jeanos

16 (Pages 58 to 61)

58

1  say what it was that he wanted to decide in that
2  case?
3      A    I got the understanding that he was
4  going to decide the -- was it Sealed Air, yes,
5  Sealed Air.  There was a fraudulent conveyance
6  issue.
7      Q    He wasn't referring to, as you
8  understood it, getting the plan approved or
9  anything, completing the case?
10     A    Oh, no, no.
11     Q    Other than the four meetings, have you
12 attended any meetings with any one or more of the
13 other advisors relating to the Five Cases?
14     A    No.
15     Q    You mentioned before, I think, that you
16 wished you had taken notes at these meetings?
17     A    Yes.
18     Q    Can you tell me why?
19     A    I would have a better recollection of
20 what was said in more detail.  I don't think I'm
21 being very helpful here.  I am doing the best I can.
22     Q    Do you agree that that's one of the
23 problems with having ex parte off-the-record
24 meetings?
25     A    No.

59

1      MR. FAIRBANKS:  Objection.
2      MR. DOSSON:  Objection.
3      Q    Sorry.  It's late.
4      A    Good try.
5      Q    I may have missed this because I
6  stepped out in the beginning for a moment, but when
7  you were asked to serve as a consultant in these
8  cases, did you conduct a conflict check?
9      A    Yes.
10     Q    Did that conflict check include your
11 prior representation -- did it relate to parties in
12 cases other than parties who were specifically
13 parties in the Five Cases?
14     A    No.
15     Q    So in other words, did you look to
16 check to see whether a party not currently a party
17 in this case nevertheless had an interest in the
18 case that might create a conflict?
19     A    No, because I was satisfied that I knew
20 nothing about the asbestos litigation in our office
21 and didn't intend to and had no financial interest
22 in.
23     Q    Did you conduct any sort of formal
24 conflict check through your computer system at the
25 firm?

60

1      A    No, I really didn't.
2      Q    We've discussed or you have testified
3  to the document you received from Mr. Gross relating
4  to the G-I decision?
5      A    Yes.
6      Q    Do you know why you asked to review
7  that?
8      A    Do I know why?
9      Q    Yes.
10     A    I don't know why.  I mean I don't know
11 what was in Mr. Gross's mind when he sent me the
12 case.  He thought it would be of interest for our
13 discussions.
14     Q    Was it discussed at all in any of the
15 discussions that you had in the four meetings?
16     A    I don't recall it being specifically
17 discussed at all.
18     MR. ORSECK:  I want to mark one of the
19 lists, both of the lists that you provided with your
20 documents.
21     (Keefe-6, bates JK0000003 through
22 JK0000006, was received and marked for
23 identification.)
24     Q    I do apologize.  I have one copy.
25     MS. BROWDY:  Can you give us bates

61

1  numbers?
2      MR. St. JEANOS:  Sure.  It's JK6 --
3  well, it's 4, 3 and 6, JK4, 3 and 6, which is a
4  collection of documents that relate to files, I
5  believe, on Judge Keefe's computer system.  I will
6  let him clarify that.
7      A    That's right.
8      Q    Can you tell us what this list
9  represents?
10     A    They represent whatever information I
11 either put into the system or copied into the
12 system.
13     Q    And the system is the system at your
14 offices?
15     A    Yes.
16     Q    The computer system?
17     A    Right.
18     Q    And are these documents that were also
19 produced, or you just produced the list?
20     A    No, I just produced the list.
21     Q    Do the documents that are listed here
22 relate to your work in the Five Cases?
23     A    Yes.
24     Q    And I see that some of them at least
25 relate to or appear to relate to your work as a

66 W. MT. PLEASANT AVE.
LIVINGSTON, NJ 07039
973-992-7650
FAX 973-992-0666

**RIZMAN, RAPPAPORT, DILLON & ROSE, LLC**
CERTIFIED COURT REPORTERS

STANLEY B. RIZMAN, CSR
HOWARD A. RAPPAPORT, CSR
MICHAEL DILLON, CSR
JEROME L. ROSE, CSR

# EXHIBIT V

MCGOVERN.V1

1

```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF DELAWARE
 2

 3
        IN RE:  ARMSTRONG WORLD          CHAPTER 11
 4      INDUSTRIES, INC., et al.,        Case Nos. 00-4471
                                                   00-4469
 5           Debtors.                              00-4470
        ---------------------------
 6      IN RE:  W.R. GRACE & CO.,        CHAPTER 11
        et al.,                          Case No. 01-1139
 7                                       through 01-1200
             Debtors.
 8      ---------------------------
        IN RE:  FEDERAL-MOGUL            CHAPTER 11
 9      GLOBAL, INC., T & N              Case Nos. 01-10578,
        LIMITED, et al.,                           et al
10
             Debtors.
11      ---------------------------
        IN RE:  USG CORPORATION,         CHAPTER 11
12      a Delaware Corporation,          Case Nos. 01-2094
        et al.,                          through  01-2104
13
             Debtors.
14      ---------------------------
        IN RE:  OWENS CORNING,           CHAPTER 11
15      et al.,                          Case Nos. 00-3837
                                         through 00-3854
16           Debtors.
        ---------------------------
17

18              TRANSCRIPT of the deposition testimony
        of FRANCIS MC GOVERN, taken by and before
19      JACQUELINE KASHMER, a Certified Shorthand
        Reporter and Notary Public of the State of New
20      Jersey, at the Martin Luther King, Jr., Federal
        Building and U.S. Courthouse, 50 Walnut Street,
21      Newark, New Jersey, on Tuesday, January 6, 2004,
        commencing at 2:10 p.m.
22

23
                JACQUELINE KASHMER, C.S.R., C.R.R.
24                       P. O. Box 12
                   Pittstown, New Jersey 08867
25                       (908) 996-6800
```

2

MCGOVERN.V1

17    A.    I really feel very uncomfortable.  I felt

18    so uncomfortable that I haven't billed for that

19    time.

20         Q.    That's pretty uncomfortable.  Do

21    you recall meeting with -- you know Elizabeth

22    Magner?

23    A.    Yes.

24         Q.    Do you recall meeting with Miss

25    Magner in relation to her representation of the

43

McGovern - Direct - Devereaux

1    SAC in these five asbestos cases in meetings that

2    were not related to mediation efforts that you

3    were conducting?

4    A.    I don't remember any specific instances.

5    All the instances that I can think of were

6    generated by a mediation effort, but it certainly

7    is possible we talked about non-mediation issues

8    but, I don't remember anything specific as to

9    that that comes to mind.

10         Q.    How about, now Mr. Inselbuch is

11    counsel for the ACC, Miss Magner is counsel for

12    the SAC.  Have you met with individual

13    plaintiffs' lawyers who may have clients who are

14    part of the SAC or the ACC and discussed with

15    them issues related to these five asbestos cases,

16    again, that weren't mediation driven?

17    A.    Judge Wolin wanted to meet with all of the

18    principal players and I helped to arrange a

MCGOVERN.V1

15    tell me about those discussions?

16    A.    I don't remember any specific

17    conversations outside of the mediation.   I'm

18    sure I met with them.   I just don't remember

19    anything specific.

20         Q.    Can't recall any details?  Do you

21    have -- can you make any estimates as to how much

22    or how often you have met with them, even if you

23    can't recall any of the particulars?

24    A.    No, not really.  That was part of my

25    problem was dividing up what I was doing with the

☐

42

McGovern - Direct - Devereaux

1    vast bulk of it was related to mediation.

2         Q.    Okay.  Are there any records that

3    you know of that you could go back and find out

4    when or how often you met with Mr. Inselbuch or

5    his colleagues related to the five cases but not

6    related to the mediations?

7    A.    No, other than the fact that I would have

8    to make a guess when I met with Mr. Inselbuch.  I

9    would know that I met with Mr. Inselbuch, I could

10    do that, and then I'd have to make some type of

11    judgment call as to what percentage of the time

12    was related to the mediation and what percentage

13    of the time was related to the court adviser, and

14    that was the difficulty I was having.

15         Q.    And you don't feel comfortable

16    trying to make that estimate here?

MCGOVERN.V1

20    A.    I didn't do any investigations.

21            Q.    Okay.  Do you recall whether he

22    asked you to refrain from talking with any

23    potential witnesses who may come before the Court

24    as part of the five asbestos cases as part of

25    your role as an adviser?

 

13

McGovern - Direct - Devereaux

1    A.    No.

2            Q.    Were there any limitations at all

3    that you can recall Judge Wolin at any time

4    imposing on what you should do as an adviser in

5    the five cases?

6    A.    I think there was an understanding that we

7    had as to what the role would be and I've been

8    trying to think of how to explain it.  It's

9    analogous to a role that I've served in many

10   circumstances as a reporter or an adviser or a

11   consultant to a committee of judges or a

12   commission where one acts as a person who is

13   available to answer questions about issues,

14   arguments, history, procedures, but not as

15   someone who is there to express an opinion

16   concerning those.

17            In other words, when you serve as

18   an adviser to these types of committees, judges

19   typically aren't interested in what your opinion

20   is.  They're more interested in making sure

21   they're aware of what the issues are and what the

MCGOVERN.V1
22   arguments are for and against and, so, my

23   understanding of what he was asking me to do was

24   to be available to him to answer questions that

25   he had that typically would not be answerable

 

14
McGovern - Direct - Devereaux

1   from the published literature, having more to do

2   with custom or practice or what was done in a

3   particular case in the past or who certain people

4   would be in order to get him up the learning

5   curve as to the nature of the asbestos

6   litigation, mass torts in general, and then

7   specifically the asbestos bankruptcies.

8            Q.    I think I understand.  Let me ask a

9   few questions, see if we can draw that out.

10                 In particular here and based on

11   some of the testimony that's been given already,

12   would it be fair to say that part of that was to

13   understand generally what went on in the tort

14   system in asbestos litigation?

15   A.    That would be part of it, yes.

16            Q.    And part of that would be what

17   types of defenses gets raised?

18   A.    Yes.

19            Q.    And what types of arguments made by

20   the plaintiffs about exposures?

21   A.    Yes.

22            Q.    What sort of value the plaintiffs

23   recover in cases either at settlement or trials?

MCGOVERN.V1
9   kinds of conversations that take place?

10  A.      The reason I was having a problem with

11  strengths and weaknesses, that sort of suggests

12  some type of normative judgment and the way I get

13  around that as a mediator or as a neutral is by

14  saying, okay, these people would argue this and

15  these people would argue that rather than

16  interjecting what I think is a strength or

17  weakness.

18          Q.      So, picking up that theme, so, on

19  these issues that were otherwise talked about

20  that were discussed, including 502C estimation,

21  including 706 panel, including some of other

22  issues, what you would do is explain here's what

23  the proponents would say the strengths of this

24  approach is, here's what the detractors would

25  say, here's what the negatives were, and that's

□

39
McGovern - Direct - Devereaux

1   what would provide information and discussion, if

2   you will?

3   A.      I would do as complete a job as I could of

4   what the arguments were on both sides,

5   absolutely.

6           Q.      Okay.  And that's in the context of

7   these adviser meetings and helping Judge Wolin?

8   A.      I don't know how much depth we went in at

9   any one of those meetings.  I just don't

10  remember.  There were very few of them and I

Page 36

MCGOVERN.V1

15   advisers and the Judge for handling these
16   bankruptcies?
17   A.    Could you repeat that question?
18              (The last question is read back.)
19   A.    No.
20        Q.    On page two in the second full
21   paragraph Judge Dreier lays out in his view,
22   starts, the first sentence anyway, talking about
23   the benefit of the three-part grouping that he's
24   described above.  Do you see that, sir?
25   A.    Yes.



⬜

                                                         89
              McGovern - Direct - Devereaux

1         Q.    Do you recall other advisers like
2    Judge Dreier giving to Judge Wolin their view of
3    the benefits or detriments of certain ways
4    proceeding in these bankruptcy, such as Judge
5    Dreier seems to do here?
6    A.    No.
7         Q.    In September of last year Judge
8    Wolin issued an order wherein he asked you and
9    Mr. Gross to lead up, if you will, the creation
10   of what he called working committees.  Are you
11   familiar with that generally?
12   A.    I don't remember the time but I know there
13   was a discussion about committees of parties,
14   yes.
15        Q.    Do you recall Judge Wolin's order
16   on that issue?
                    Page 83

MCGOVERN.V1

12      was, but I remember there was an issue raised

13      about the amount of money that the futures

14      representative was spending and there was a

15      discussion as to techniques that the futures

16      representative could use to make sure that the

17      funds that they were expending were completely

18      justifiable.

19              Q.      Okay.  Can you recall any other

20      instances in which people complained how they

21      handled the particular issue?

22      A.      There was some discussion of the

23      appointment.  There was some discussion about the

24      selection of trustees for subsequent trusts or

25      board members, and the methodology by which that

 

119

McGovern - Cross - Robbins

1       would be conducted, and the characteristics and

2       background that would be worthwhile for people

3       who were serving as directors, if appropriate.

4                       Some of the bankruptcies didn't

5       have directors and used their trusts so there

6       would be trustees, how many there would be, that

7       type of thing and, so, there would be a

8       discussion where someone would say, well, I'm in

9       the process of trying to decide whether or not

10      it's three or five.

11              Q.      I'm going to list a few subjects, I

12      don't mean to suggest they were ever discussed.

13      In fact, that's going to be my question.

Page 111