IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | Case Nos. 00-3837 through 00-3854 |
| OWENS CORNING, et al., | * | |
| | * | |
| Debtors. | * | |
| * * * * * * * * * * | * | * * * * * * * * * * |
| | * | |
| IN RE: | * | Chapter 11 |
| | * | Case Nos. 01-1139 through 01-1200 |
| W.R. GRACE & CO., et al. | * | |
| | * | |
| Debtors. | * | |
| * * * * * * * * * * | * | * * * * * * * * * * |
| | * | |
| IN RE: | * | Chapter 11 |
| | * | Case Nos. 01-2094 through 01-2104 |
| USG CORPORATION, et al. | * | |
| | * | |
| Debtors. | * | |
| | * | |
| * * * * * * * * * * * | * | * * * * * * * * * * |

**MEMORANDUM OF LAW OF THE OWENS CORNING DEBTORS, THE ASBESTOS CLAIMANTS' COMMITTEES IN THE *OWENS CORNING*, *W.R. GRACE* AND *USG* BANKRUPTCY PROCEEDINGS AND THE FUTURE CLAIMANTS' REPRESENTATIVES IN THE *OWENS CORNING* AND *USG* BANKRUPTCY PROCEEDINGS IN OPPOSITION TO THE MOTIONS TO RECUSE JUDGE WOLIN**

SAUL EWING LLP
Norman L. Pernick (I.D. # 2290)
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE 18999-1266
(302) 421-6800

Charles O. Monk, II
Matthew G. Dobson
100 South Charles Street
Baltimore, MD 21201-2773
(410) 332-8600
Attorneys for the Owens Corning
Debtors and Debtors-in-
Possession

CAPLIN & DRYSDALE,
CHARTERED
Elihu Inselbuch
Peter Van N. Lockwood
Nathan D. Finch
399 Park Avenue
New York, NY 10022
(212) 319-7125

CAMPBELL & LEVINE
Marla Eskin (I.D. # 2989)
Chase Manhattan Center
15th Floor
1201 Market Street
Wilmington, DE 19899
(302) 426-1900
Attorneys for the Official
Committees of Asbestos
Claimants

KAYE SCHOLER LLP
Michael J. Crames
Jane W. Parver
Aaron Stiefel
Edmund M. Emrich
425 Park Avenue
New York, NY 10022
(212) 836-8000

YOUNG, CONAWAY,
STARGATT & TAYLOR LLP
James L. Patton, Jr. (I.D. # 2202)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
Attorneys for James J.
McMonagle and Dean M.
Trafelet,
Legal Representatives for Future
Claimants in the Owens Corning
and USG Chapter 11 Cases

Dated: January 15, 2004

**TABLE OF CONTENTS**

I.   INTRODUCTION .................................................................................................1

II.  FACTUAL BACKGROUND.............................................................................3

    A.   The Court's Advisors......................................................................................3

        1.   C. Judson Hamlin..................................................................................4

        2.   David R. Gross.......................................................................................7

        3.   John E. Keefe, Sr. .................................................................................8

        4.   William A. Dreier ...............................................................................10

        5.   Professor Francis McGovern .............................................................12

    B.   The Roles of Hamlin and Gross in the G-I Bankruptcy Proceedings....................14

    C.   The Participants In The Five Cases Were Well Aware (or Should Have
        Known) About Hamlin's and Gross' Dual Roles.  Furthermore, the
        Movants Were Aware of the Court's Plan to Administer these Five Cases
        Through *Ex Parte* Conferences and Did Not Object ............................................17

        1.   The Owens Corning Bankruptcy Proceedings...........................................17

            a.   Background ...............................................................................17

            b.   The Relationship Among CSFB, Kramer Levin, the Bank
                Steering Group Members and the Bank Group..............................20

            c.   Members of the OC Creditors Committee and the Bank
                Group Steering Committee, as well as their Counsel, Knew
                About Hamlin's and Gross' Appointments in *G-I* Prior to
                September 24, 2003 ....................................................................21

                i.   Davis Polk's Knowledge...................................................21

                ii.   Kramer Levin's Knowledge..............................................24

                iii.   Mark Brodsky's Access to Knowledge about
                     Hamlin and Gross ............................................................26

|  |  | d. | Simple Monitoring of the Publicly Filed Time Records in the *Owens Corning* Case Would Have Revealed Hamlin's and Gross' Involvement in *G-I* .........29 |
|  |  | e. | Kensington and Springfield Participated In and Consented to the *Ex Parte* Consultations Conducted by this Court ...............30 |
|  | 2. | | The W.R. Grace & Company Bankruptcy Proceedings ...........................31 |
|  |  | a. | Grace Case Background .................................................................31 |
|  | 3. | | The Grace Creditors Committee's Early Knowledge of Judge Hamlin's Role in *G-I* ..................................................................................33 |
|  |  | a. | The Grace Creditors Committee's and the Grace Equity Committee Agreed with Grace's Proposal To Nominate David Gross as the Futures Representative in the Grace Proceedings .......................................................................................34 |
|  | 4. | | The USG Bankruptcy Proceedings ..........................................................35 |
|  |  | a. | USG Background ...........................................................................35 |
|  |  | b. | USG's Early Knowledge of Judge Hamlin's Role in *G-I* .............36 |
|  |  | c. | USG's Ex Parte Contacts ..............................................................37 |
| A. | | | Movants Have Failed to Show That Disqualification Is Warranted Under 28 U.S.C. § 455(a) ....................................................................................................37 |
|  | 1. | | The Court's Contacts With The Members Of The Advisory Panel Are Not Grounds For Disqualification ......................................................39 |
|  | 2. | | The Court's *Ex Parte* Contacts With The Parties Are Not Grounds For Disqualification ..................................................................................47 |
| B. | | | The Movants Have Not Shown That Disqualification Is Warranted Under 28 U.S.C. 455(b)(1) .............................................................................................47 |
|  | 1. | | *Ex Parte* Communication With The Court And/Or The Advisors Was Proper Given Movants' Consent And Willing Participation ............48 |
|  | 2. | | Movants' Section 455(b)(1) Argument Fails Because The *Ex Parte* Communications Here Do Not Satisfy The Extrajudicial Source Requirement ...............................................................................................50 |

|       | 3. | Movants' § 455(b)(1) Argument Also Fails Because There Is No Evidence That The Court Was Provided With Improper *Ex Parte* Information Of Disputed Evidentiary Facts Concerning The Proceeding | 52 |

    C.    The Recusal Motions Are Untimely Or Are Barred By Laches ............................ 54

        1.    Movants Had Actual Knowledge of the Dual Roles of Hamlin and Gross ....................................................................................................

        2.    In Considering The Timeliness of A Party's Motion to Recuse, That Party Is Charged With The Knowledge Of Its Counsel .................... 57

        3.    The Movants Are Also Charged With Knowledge of Facts Readily Available In The Public Record .................................................................. 59

        4.    Kensington And Springfield Are Bound By The Failure Of Either The OC Creditors Committee Or CSFB, As Agent, To Object ................ 61

        5.    Movants Are Barred From Relying On *Ex Parte* Communications As The Basis For A Motion Under 28 U.S.C. Section 455(b)(1) Because They Knew And Participated In Such Communications For Two Years ........................................................................................ 64

    D.    Any Assertion That The Court Should be Disqualified Because It Has Prejudged The Motion Is Factually Incorrect And Contrary To Law ............................................................................................................ 65

IV.    CONCLUSION ................................................................................................................. 67

# TABLE OF AUTHORITIES

## FEDERAL CASES

895 F.2d at 969 .................................................................................................................................... 42

America, 525 U.S. 1114 (1999) ............................................................................................................ 36

Apple v. Jewish Hosp. & Med. Ctr., 829 F.2d 326 (2d Cir. 1987) ................................................. 48

Bilello v. Abbott Laboratories, 825 F. Supp. 475 (S.D.N.Y. 1993) ........................................ 46, 47

Blanche Road Corp. v. Bensalem Township, 57 F.3d 253 (3d Cir. 1995) .................................... 52

United States v. Bonds, 18 F.3d 1327 (6th Cir. 1994) ..................................................................... 37

Casco Bay Lines, Inc., 17 B.R. 946 (1st Cir. 1982) ......................................................................... 47

Cobell v. Norton, 237 F. Supp. 2d 71 (D.D.C. 2003) ............................................................... 36, 47

United States v. Daley, 564 F.2d 645 (2d Cir. 1977), cert. denied, 435 U.S. 933
(1978) ...................................................................................................................................................... 48

E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280 (9th Cir. 1992) .................................... 48

Edgar v. K.L., 93 F.3d 256 (7th Cir. 1996) ....................................................................................... 41

First Interstate Bank v. Murphy, Weir & Butler, 210 F.3d 983 (9th Cir. 2000) ............................ 41

Hall v. Small Business Admin., 695 F.2d 175 (5th Cir. 1983) ................................................... 41, 43

Hirschkop v. Virginia State Bar Ass'n, 406 F. Supp. 721 (E.D. Va. 1975) .................................... 48

Hook v. McDade, 89 F.3d 350 (7th Cir. 1996) ................................................................................. 53

In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 204 (2d Cir. 1987) ............................................. 7

In re Allied-Signal, Inc., 891 F.2d 967 (1st Cir. 1989) ............................................................. 39, 42

In re Beard, 811 F.2d 818 (4th Cir. 1987) ................................................................................. 45, 46

In re Big Rivers Elec. Corp., 213 B.R. 962 (Bankr. W.D. Ky. 1997) ........................................ 45, 51

In re G-I Holding, Inc., 295 B.R. 211 (D. N. J. 2003) ......................................... 2, 3, 8, 16, 17, 18,
22, 23, 24, 25, 26,
27, 28, 29, 31, 32,
33, 34, 35, 37, 38,
39, 40, 41, 44, 49

In re Kansas Pub. Employees Sys., 85 F.3d 1353 (8th Cir. 1996) .................................................. 48

In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions, 278 F.3d
175, 182 N.J. (3d Cir. 2002)..................................................................................................... 45

In re Prudential Ins. Co. of America Sales Practices Litig., 148 F.3d 283 (3d Cir.
1998), *cert. denied sub nom., Krell v. Prudential Ins. Co. of*.................................................. 36

In re Sch. Asbestos Litig., 977 F.2d 764 (3d Cir. 1992)......................................................... 36, 41

In re Wyoming Tight Sands Antitrust Cases, 726 F. Supp. 288 (D. Kan. 1989)..................... 46, 51

United States v. Int'l Bus. Machines (In re Int'l Bus. Machines), 618 F.2d 923 (2d
Cir. 1980) ..................................................................................................................................... 48

Jenkins v. Starlacci, 849 F.2d 627 (D.C. Cir. 1988)............................................................... 37, 51

Johnson v. Trueblood, 629 F.2d 287 (3d Cir. 1980)...................................................................... 52

United States v. Jordan, 49 F.3d 152 (5th Cir. 1995) ............................................................. 36, 40

Lazorsky v. Sommerset Bus. Co., 389 F. Supp. 1041 (E.D.N.Y. 1975)......................................... 45

Liteky v. United States, 510 U.S. 540 (1994)............................................................................ 46, 52

Martin v. Monumental Life Ins. Co., 240 F.3d 223 (3d Cir. 2001) .................................... 36, 48, 50

NAACP v. AcuSport, Inc., 271 F. Supp. 2d 435 (S.D.N.Y. 2003).................................................... 7

N.Y. State Nat'l Org. of Women v. Terry, 732 F. Supp. 388 (S.D.N.Y. 1990) ............................. 46

Norfolk & Western Ry. Co. v. Freemanayers, 538 U.S. 135 (2003) ............................................. 37

Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman, 2003
U.S. Dist. LEXIS 21164 (S.D.N.Y. Dec. 1, 2003) .................................................................. 17

Reilly v. United States, 863 F.2d 149 (1st Cir. 1988).................................................................... 48

SecuraComm Consulting, Inc. v. Securacom Inc., 224 F.3d 273 (3d Cir. 2000) .......................... 52

Smith v. Danyo, 585 F.2d 83 (3d Cir. 1978) ................................................................................. 48

Summers v. Singletary, 119 F.3d 917 (11th Cir. 1997), *cert. denied*, 523 U.S.
1005 (1998).................................................................................................................................. 48

Thomas v. N.A. Chase Manhattan Bank, 1 F.3d 320 (5th Cir. 1993)............................................ 51

U.S. v. Conforte, 624 F.2d 869 (9th Cir. 1980) ............................................................................ 50

Universal City Studies, Inc. v. Reimerdes, 104 F. Supp. 2d 334 (S.D.N.Y. 2000) ................ 48, 51

United States v. Yonkers Bd. of Educ., 946 F.2d 180 (2d Cir. 1991) ...................................... 46, 51

United States v. York, 888 F.2d 1050 (5th Cir. 1989)..................................................................... 51

**STATE CASES**

Leon v. Martinez, 84 N.Y.2d 83, 614 N.Y.S.2d 972, 638 N.E.2d 511 (1994) ............................... 50

**DOCKETED CASES**

In re G-1 Holdings, Inc., Case No. 01-30135................................................................................ 16

In re Kensington Int'l Ltd., Case No. 03-4212........................................................................ 19, 26

In re Kensington Int'l Ltd., No. 03-4212 (3d Cir. Dec. 18, 2003)................................................... 53

Owens Corning, et al. v. Credit Suisse First Boston, et al., Adv. No. A-00-1575
  (filed Oct. 5, 2000) ..................................................................................................................... 19

**FEDERAL STATUTES**

11 U.S.C. § 1104(c)(2)...................................................................................................................... 7

11 U.S.C. § 524(g)........................................................................................................................... 16

28 U.S.C. § 455(a) ........................................................................................... 3, 4, 35, 36, 45, 46

Fed. R. Civ. P. 53............................................................................................................................ 10

Fed. R. Evid. 706 ................................................................................................ 9, 12, 14, 15, 38

**MISCELLANEOUS**

H.R. Rep. No. 93-1453 (1974), reprinted in 1974 U.S.C.C.A.N. 6351, 6355 ................................ 36

*Aguinda*, 24....................................................................................................................................... 37

Francis E. McGovern, "Resolving Mature Mass Tort Litigation," 69 B.U. L. Rev.
  659 (1989) .................................................................................................................................... 14

Francis E. McGovern, "The Tragedy of the Asbestos Commons," 88 Va. L. Rev.
  1721 (2002) .................................................................................................................................. 14

This Memorandum of Law is respectfully submitted on behalf of the Owens Corning Debtors, the Asbestos Claimants' Committees in the *Owens Corning, W.R. Grace,* and *USG* bankruptcy proceedings, and James J. McMonagle and Dean M. Trafelet,[1] the Representatives of Future Asbestos Personal Injury Claimants in *Owens Corning* and *USG*, in opposition to the Motions to Recuse Judge Alfred M. Wolin in the above-captioned bankruptcy cases (the "Recusal Motions") filed by Kensington International Limited and Springfield Associates, LLC (the "OC Movants"), D.K. Acquisition Partners, L.P., Fernwood Associates, L.P. and Deutsche Bank Trust Company Americas (the "Grace Movants"), and the Debtors in USG Corporation, *et al.* (the "USG Movants") (collectively, "Movants").

## I. **INTRODUCTION**

The discovery mandated by the Third Circuit makes clear that there is no merit to Movants' recusal motions. The reasonable man, aware of all the circumstances, would not, under 28 U.S.C. Section 455(a), have a reasonable basis to question the Court's impartiality. Nor did the Court gain "personal knowledge of disputed evidentiary facts concerning the proceeding," as set forth in 28 U.S.C. Section 455(b)(1). Morever, because Movants waited nearly two years before seeking recusal, their motions, even if they otherwise had merit, are untimely.

Movants do not allege actual bias or prejudice on the part of the Court. Rather, they rely primarily on the fact that the Court did not specifically disclose to the parties that C. Judson Hamlin and David R. Gross -- two of the five advisors appointed to assist the Court in overseeing five exceedingly complex asbestos-related bankruptcy cases -- also serve as the representative for future claimants and counsel to the futures representative, respectively, in the *G-I Holdings* bankruptcy proceeding pending before Judge Gambardella. However, the factual record generated in this case demonstrates that a

---

[1] Mr. Trafelet also joins in this brief in his capacity as the Representative of Future Asbestos Personal Injury Claimants in the *Armstrong World Industries, Inc.* bankruptcy proceedings.

reasonable observer, aware of all the circumstances, would not have had reason to question the Court's impartiality in appointing or meeting with the panel of five advisors.

The reasonable man would appreciate that in assigning five exceedingly complex asbestos bankruptcies (the "Five Cases") to this Court, Chief Judge Becker presented the Court with an enormous challenge. Having had no significant experience in the field of asbestos litigation, the Court had every reason to look to an experienced group of practitioners for background information regarding the unique aspects of asbestos bankruptcies. The fact that Judge Hamlin and Mr. Gross had roles in another asbestos bankruptcy before another Judge would not have given an observer a reasonable basis to question whether this Court is biased. Indeed, the record shows that the appointments of Hamlin and Gross in *G-1* were a matter of public record and were widely known within the close knit asbestos bankruptcy community. Mr. Hamlin's appointment was expressly reported in a widely circulated legal periodical. Counsel for the Creditors Committee in *Owens Corning*, counsel for the Creditors Committee in *W.R. Grace* and *USG*, USG's general counsel, counsel to the Bank Steering Committee in *Owens Corning*, and at least two members of the Steering Committee in *Owens Corning* all knew of Mr. Hamlin's appointment, yet almost two years passed before Movants raised any objection. Moreover, distinguishing among the stated views of diverse parties is a routine aspect of a judge's job every day. Consequently, nothing about the Court's appointment of Hamlin and Gross or its meetings with Hamlin and Gross, would have given an observer reason to doubt the Court's impartiality.

The Court's *ex parte* meetings with counsel also do not give rise to any reason to doubt the Court's impartiality. All parties knew from the outset that the Court would function via *ex parte* meetings and the parties, without exception, availed themselves of opportunities to meet with the Court. Again, however, no objection was ever raised.

Nor do the Court's *ex parte* contacts with either its panel of advisors or the parties provide grounds for disqualification under 28 U.S.C. Section 455(b)(1). All such contacts occurred with the consent of the parties and within the framework of the litigation. Hence, they were not extrajudicial.

2

Moreover, because the information received by the Court from its panel of advisors did not come from prospective witnesses, was not particular to any one of the Five Cases, and was directed toward case administration issues rather than the merits of any of the Five Cases, such information is not the sort of "disputed evidentiary facts concerning the proceeding" that would warrant disqualification.

In any event, given that Movants' counsel, agents, and representatives knew of the Hamlin and Gross appointments in *G-I*, Movants too are deemed to have known. Even if they did not know, Movants had constructive knowledge of Hamlin's and Gross's roles in *G-I*, which were both well known and readily determinable.

Finally, there is no substance to the notion that recusal is appropriate here on the grounds that the Court prejudged the instant motion. It is well settled that any opinion of the Court in the course of court proceedings -- not as a product of deep-seated favoritism or antagonism -- is not ground for disqualification.

Accordingly, Movants' motions should be denied in all respects.

## II. FACTUAL BACKGROUND

Pursuant to the command of the United States Court of Appeals for the Third Circuit, this Court has permitted expedited discovery proceedings into the activities of its advisors and the timeliness of the recusal motions. The massive discovery authorized by the Court is consistent with the expectations of the Court of Appeals and has served to establish a full record. Indeed, since the Third Circuit ruled on December 18, 2003, over 25,000 pages of documents have been produced by fourteen sources and eight lengthy depositions have been conducted under this Court's supervision. Based on this well-developed record, these motions are ripe for determination.

A.    The Court's Advisors

On December 28, 2001, this Court (acting consistent with its earlier announced intention) appointed five judicial advisors to assist it with the administration of these huge bankruptcy cases. Each

one of them had a distinguished career in mass tort litigation. Not one of them had any experience representing asbestos personal injury plaintiffs in the tort system; rather, three are retired judges, one is a distinguished academic and one is an accomplished mass tort defense lawyer who had served as a national coordinating defense counsel for asbestos claims asserted against Johns-Manville.

1.    C. Judson Hamlin

Hamlin has had extensive experience in the judicial administration of mass tort cases. After service as both a public defender and prosecutor in Middlesex County, New Jersey, Hamlin was appointed as a Judge of the New Jersey Superior Court in 1978. During his judicial career, Hamlin presided over the pre-trial proceedings for all mass tort cases in New Jersey, including working closely with Judge Pointer in the MDL breast implant litigation. Hamlin Deposition ("Dep."), Ex. 3 [App. 000001-20]. In 1993, in addition to his mass tort case administration duties, the Chief Justice of the State of New Jersey appointed Hamlin to be New Jersey's sole representative to the Mass Tort Litigation Committee of the National Conference of State Chief Justices. *Id.* After retirement from the bench, Hamlin has been sought out as a judicial advisor. Recently, he was appointed to the Mass Tort Advisory Committee of the New Jersey Supreme Court by Chief Justice Deborah Poritz. He also serves on New Jersey's Judicial Performance Commission, where he has the responsibility to "audit, evaluate and sometimes counsel presiding trial court judges and report to the court." Hamlin Dep. at 41:6-42:6. Following his return to private practice, Hamlin also has served as a special master in other mass tort cases including, most recently, an appointment by the Honorable Louis Bechtle as the director of the claims trust established in the Fen-Phen products liability litigation pending in the United States District Court for the Eastern District of Pennsylvania. Hamlin Dep. at 80:6-23, 84. Hamlin also conducts an ADR and mediation practice.

Hamlin had two roles in the Five Cases since his appointment by the Court on December 28, 2001. First, Hamlin, together with the other advisors, participated in early 2002 in a discussion of issues relevant to asbestos litigation generally. The evidence indicates that the purpose of these meetings was to

supply the Court with background knowledge concerning the historical experience of asbestos litigation in the tort system, which hopefully would assist the Court in designing a case management plan. *Id.* at 239:1-16. The Court held only four meetings with its advisors, including Hamlin, between January and May 2002. *Id.* at 46:18-47:4. These meetings reflected the extraordinary judicial challenge posed by the assignment of these bankruptcy cases and were designed to address general topics relating to asbestos litigation in order to educate this Court on the judicial task that confronted it. There was no discussion of the merits of individual creditors' claims in the Five Cases; nor of the distribution of the estates' assets among the competing claimants in those cases. *Id.* at 230:6-23. The focus of the discussions was procedural only: how best procedurally to approach resolution of the claims of both impaired and unimpaired asbestos claimants while getting whatever assets were available to the most seriously injured claimants first. *Id.* at 52:3-53:11, 57:10-58:8. To that end, substantial discussion took place about the advisability of the Court's appointment of a Federal Rule 706 panel of experts to determine the classification of asbestos claimants suffering various stages of impairment. *Id.* at 58:15-59:23. After the four preliminary meetings, however, the Advisory Committee effectively disbanded, without developing any recommendations with respect to an overall case management approach. No further meetings were held. *Id.* at 242:1-3.

Judge Hamlin testified about the purpose of these initial asbestos litigation background meetings:

> What, if any importance or value did these four meetings have?
>
> I think we, our attempt was to help crystallize the potential to various positions that were going to be raised on matters that were brought before the Court's attention. Trying to understand how arguments in one area might . . . have implication in other areas. And my hope was that some of the things we talked about would help the judge better identify and deal with the issues and controversy.

Hamlin Dep. at 235:18-236:5. Indeed, Judge Hamlin spoke to the challenge posed by these cases:

> [The meetings were very important] because to date [with] almost 30 years of litigation there's been no speed or efficiency in the resolution of asbestos claims as everybody knows. All the standard tools that are available to the judicial system have failed. I don't think anyone would

> seriously argue with that. . . . [C]learly, what everyone else had tried
> hadn't worked. If this [Gordian knot] was going to be cut, somebody
> was going to have to do something different. Somebody who wasn't
> afraid to do something different.

Hamlin Dep. at 238:25-239:13. At these meetings, Hamlin drew from his years of experience as a mass

torts judge in New Jersey. *See* Hamlin Dep. at 15:1-18:10, 23:17-25:20. He provided no non-public

information or disputed evidence to the Court, *see id.* at 48:4-61:18, but based his comments on his

experience as a mass tort judge. *Id.* He made no recommendations and proposed no findings on the

disposition of any issue in any of the bankruptcy cases before this Court. *Id.* In particular, Hamlin

provided no advice to the Court regarding any of the disputed asbestos claim issues that may at some

future date be litigated in these cases. [Hamlin Dep. 241:4-21].

In addition, this Court assigned specific tasks to Judge Hamlin. The Court asked Judge Hamlin to

draft proposed opinions on certain bankruptcy court appeals. These draft opinions involved discrete

issues of law in the following adversary proceedings or contested matters:

| Case | Matter | Date Draft Ruling Sent to Judge Wolin |
|------|--------|---------------------------------------|
| *In re W.R. Grace & Co., et al.* | Motion Seeking Leave to File Interlocutory Appeal from Order Establishing a Bar Date for Property Damage Claims | August 2002 |
| *In re USG Corp.* | Motion Seeking Leave to File Interlocutory Appeal from Order Establishing a Bar Date for Property Damage Claims | August 2002 |
| *Wood v. Armstrong World Indus., Inc. (In re Armstrong World Indus., Inc.)* | Motion for Leave to File Interlocutory Appeal of Order Denying Motion for Property Damage Claimants' Class Certifica-tion | September 2002 |
| *In re Owens Corning, et al.* | Appeal from Denial of Application by Plant Insulation Company for the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c)(2) | October 2002 |
| *Computer Sales Int'l, Inc. v. Federal Mogul Global, Inc. (In re Federal Mogul Global, Inc.)* | Appeal from Judgment in an Adversary Proceeding Permitting Debtor to Enter Into a Post-Petition Computer Equipment Lease | October 2002 |

*See* Owens Corning Appendix [App. 00021-65] (Hamlin Dep., Exs. 8-9; 12-14). Hamlin testified that this Court did not necessarily adopt the rulings as drafted and, in some cases, rejected them. *See* Hamlin Dep. at 265:18-267:22.

      2.    David R. Gross

David Gross is a New Jersey lawyer who has a reputation as a defense attorney in asbestos and other mass tort cases. During his career, Gross represented Johns-Manville Corporation as national coordinating asbestos defense counsel and was involved in Manville's bankruptcy proceedings. Gross Dep. at 368:5-24. Gross was also involved as a defense counsel in the Agent Orange products liability litigation and more recently in the products liability cases brought against gun manufacturers. *See In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 204 (2d Cir. 1987); *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435 (E.D.N.Y. 2003). No evidence exists that Gross ever represented an asbestos personal injury plaintiff in the tort system.

Like Hamlin, Gross participated in the four initial meetings between the Court and its advisors. Gross testified about the general role of the advisors at these meetings:

> I believe that the people who were there [the advisors] brought different histories in the litigation to the table and discussed their recollections. Some of the judges had tried asbestos cases, some of them having been appellate judges on asbestos litigation, and it was to bring Judge Wolin up to speed as much as we could on the procedures, if you will, of what had been going on. . . .
>
> It was a learning session as much as anything in trying to assist Judge Wolin in what had actually happened in the litigation by means of procedure. . . .

Gross Dep. at 58:23-59:12. Indeed, Gross testified that the public record of information relating to asbestos litigation was enormous. Gross Dep. at 369:22-370:2.[2] Gross provided no advice to the Court

---

[2]      "I don't know how best to describe it except that it is the largest single tort case that has ever been involved in the history of the courts or this country, both state and otherwise, and if one were really trying to assimilate the history of that litigation, I would think it would take years." *Id.*

regarding any of the disputed asbestos claim issues that may in the future be litigated in these cases. *Id.* at 376:17-377:8; 385:10-386:4. No non-public information was discussed. *Id.* at 379:12-380:14.

Gross testified that, apart from the advisors' meetings with Judge Wolin in 2002, he served as a mediator in the *Owens Corning, Federal Mogul* and *W.R. Grace* bankruptcy cases. Gross Dep. at 46:22-25; 198:18-201:9. As mediator, Gross had contact with the Court from time to time to discuss the progress of settlement discussions. There is no evidence that in that capacity or in his meetings with the Court Gross discussed his role or the positions he was advocating as a counsel in *G-I* in any way. *See* Gross Dep. at 381:24-384:4. Contrary to Movants' claims before the Third Circuit, Gross conducted no legal research for the Court and never participated in the adjudication of any matter in any of the Five Cases. *Id.* at 261:3-13; 387:24-388:12.

3.   John E. Keefe, Sr.

John E. Keefe, Sr. ("Keefe") is a former New Jersey trial and appellate judge with extensive experience in the administration and management of asbestos cases. Judge Keefe testified:

> [In approximately 1978 or 1979], the Chief Justice of New Jersey put me in charge of all asbestos cases in New Jersey. I was [a] participant in the National Center for State Courts' attempt to streamline discovery in asbestos litigation. I formulated some standardized interrogatories to be used by the parties, and I disposed of a lot of cases over the seven or eight years that I handled asbestos litigation in Middlesex County.

Keefe Dep. at 72:5-13. Indeed, Judge Hamlin (Judge Keefe's successor as New Jersey's asbestos case management judge) testified that Judge Keefe was a "pathfinder" in establishing case management procedures for asbestos cases in New Jersey. Hamlin Dep. at 224:21-23. Prior to serving on the bench, Judge Keefe maintained a civil trial practice defending medical malpractice and products liability cases.

Judge Keefe participated with the other advisors in the four initial meetings. Judge Keefe recalled a discussion whether to appoint of a panel of experts under Rule 706 to deal with the medical issues in asbestos cases. Judge Keefe testified that this issue was considered in the context of discussing the claims of unimpaired asbestos plaintiffs:

8

> [The discussion of unimpaired claimants] was a part of the 706 Panel discussions to determine – we didn't know the answers to these questions, we were all kind of speaking on an anecdotal basis – whether some group of professionals could assist the court in ultimately making determinations with respect to what the asbestos diseases were, how they could be categorized and how that might fit into an overall structure or reorganization.

*Id.* at 25:5-14. Judge Keefe testified that, at one of the meetings, the Court and the advisors met with a plaintiff's lawyer and a defense lawyer involved in asbestos litigation outside the Five Cases "to discuss with us the so-called hot issues in asbestos litigation starting from pleural thickening right through mesothelioma, what the medical issues were, what areas of dispute turned out to be and whether there was any body of scientists out there that could possibl[y] be put together that had no bias and could give the Court direction with respect to those issues." *Id.* at 27:1-8.

Apart from his participation in the meetings with the Court in 2002, Judge Keefe was given discrete assignments as a special master:[3]

| Case | Role | Date of Appointment |
|------|------|---------------------|
| *In re Armstrong World Industries, Inc.* | Draft ruling on whether a decision by the Bankruptcy Court relating to a *Daubert* issue was interlocutory or final | January 9, 2003 |
| *Dresser Industries, Inc. v. Federal-Mogul Products, Inc. (In re Federal-Mogul)* | Appointed as a Special Master for the purpose of ruling on discovery disputes | October 7, 2002 |
| *Safeco Insurance Co. of America v. The Center for Claims Resolution* and *Federal-Mogul Corp., et al. v. The Center for Claims Resolution (In re Federal-Mogul)* | Appointed as a Special Master for the purpose of ruling on discovery disputes | February 27, 2002 |

[3] This Court's Orders appointing Judges Dreier and Keefe as Special Masters specifically state that Bankruptcy Rule 9031 was suspended by consent of the parties. *See* Keefe Ex. 3 (at Exs. C and D) (Orders appointing Keefe as Special Master) [App. 000066-76]; (Order appointing Dreier as Special Master in *Owens Corning* case) [*Id.*]. No party ever objected to the suspension of Bankruptcy Rule 9031 or objected to the appointment of these judges as Special Masters in the cases in which they were appointed. In each case, this Court's appointments pre-dated the recently adopted amendments to Fed. R. Civ. P. 53 that became effective on December 1, 2003.

4. William A. Dreier

William A. Dreier is a retired New Jersey trial and appellate judge who is a recognized authority on products liability law. Judge Dreier testified regarding his background and expertise:

> I have authored the principal text in New Jersey on product liability law for the past 20 plus years. . . . I've lectured on product liability law annually in New Jersey. . . . I give an annual lecture to the New Jersey Judiciary on product liability law. I chair the American Law Institute and American Bar Association course on product liability law given nationwide each year in Chicago. . . . In addition, I was part of the consultant group working with the drafters [of the] restatement of torts third on products liability. . . . I have a number of additional lectures and writings. I have about 25 or 30 in that range in law review and law journal practices published on product liability, mostly product liability, a few other things, and as an appellate judge I have probably a half dozen published opinions on asbestos matters out of maybe 15 or 20 or maybe even more opinions on product liability, and I think that's what caused Judge Wolin, who also happens to be a personal friend, to choose me to aid in this endeavor.

Dreier Dep. at 181:2-182:9. Judge Dreier, now retired from the bench, has a law practice that includes product liability defense and is a member of the Defense Research Institute, an association of defense attorneys. *Id.* at 183:10 – 184:5.

Judge Dreier recalled that his participation in the four meetings between the advisors and Judge Wolin included a discussion of the classification of asbestos-related claims and the consideration of whether payments could be made more quickly to the most seriously impaired personal injury claimants:

> I would say the advisors all, and Judge Wolin included, had as an over-arching central theme to our discussion that as to that portion of any settlement which or payments that might come in that would be made to tort claimants, that we tried to speed up the process for those that were truly sick, the truly impaired claimants, because the history in these cases have been unfortunately that by the time the matter resolves, those who need it most have died and the only payments that come through will go to their families.

Dreier Dep. at 40:14 – 25. *See also Id.* at 42:23-44:12 (discussing the issues presented by property damage claimants).

10

Judge Dreier's testimony regarding the four meetings held between the Court and the advisors can be summarized as follows:

| Date | Persons Attending | Topics Discussed |
|---|---|---|
| January 7, 2002 | Wolin, Dreier, Gross, Hamlin, Keefe, McGovern | Background of case; assignment to Judge Wolin, Case management issues; general asbestos litigation issues presented by the bankruptcy cases; potential use of a Fed. R. Evid. 706 Panel. [Dreier Dep. 55:7-62:8] |
| January 18, 2002[4] | Wolin, Dreier, Gross, Hamlin, Keefe, McGovern, Whitney Chelnick (associate with Gross' firm) | Discussion of a potential Fed. R. Evid. 706 Panel of experts, criteria used in asbestos cases for determining impairment; identification of issues raised in *W.R. Grace* bankruptcy case. [Dreier Dep. at 66:20-76:13] |
| February 27, 2002 | Wolin, Dreier, Gross, Hamlin, Keefe, McGovern, Al Parnell (asbestos defense attorney), Bob Komitor (asbestos plaintiff attorney) | Meeting includes presentations from asbestos plaintiff and defense counsel to give Wolin and the advisors "the perspective of" plaintiffs' and defendants' sides in asbestos litigation generally. [Dreier Dep. 77:2-85:2] |
| May 17, 2002 | Wolin, Dreier, Gross, Hamlin, Keefe, McGovern, Evans Wohlforth (Judge Wolin's law clerk) | Summary of status of the asbestos bankruptcy cases, potential use of Rule 706 panels, potential problems with unimpaired claimants in plan confirmation [Dreier Dep. at 93:15 – 101:22] |

While Judge Dreier recalled a broad discussion in these meetings regarding asbestos litigation in general and background information about bankruptcy cases, it is undisputed that neither Judge Dreier nor any of the other advisors made any findings or recommendations as to the merits of any disputed matter in any of the Five Cases. Judge Dreier stated with regard to his role as an advisor:

---

[4]     It is undisputed that this Court did not attend the morning session of this meeting. *See* Hamlin Dep. at 48:25-49:7.

> When we hit the advisor function, it was toward a particular end and I've
> described that earlier, and it was not to favor a plaintiff or to favor a
> defendant but, either, to resolve the case and, secondly, even if the whole
> case couldn't be resolved, to try and direct payments up front to those
> severely injured, not to take anything away from the general creditors or
> the property damage people or anyone else, but just to provide a channel
> for payment to those really injured if they could prove their cases.
>
> That was – I didn't see this as being pro-plaintiff or pro-defendant. It
> was just to render advice to try to achieve that end.

Dreier Dep. at 201:20-202:9. Judge Dreier testified that, by May 2002, his role (and the role of the other advisors) as advisors to the court on case management issues had ended. In December 2002, Judge Dreier sent an unsolicited letter to Judge Wolin suggesting a procedural approach on a particular issue. Nothing came of that letter. Dreier Dep. at 210:19 – 211:12.

Apart from his role as an advisor, Judge Dreier also served as a discovery disputes special master in both the *Sealed Air* adversary action in the *W.R. Grace* bankruptcy case and, to a very limited degree, in the substantive consolidation proceedings in the *Owens Corning* bankruptcy case.[5]

5.     Professor Francis McGovern

Francis McGovern is a Duke University law professor who is a recognized expert in the mediation of mass tort disputes. In his affidavit to the Court of Appeals, McGovern stated: "I have served as a neutral in over forty cases and been appointed by over thirty federal and state judges since 1977." (McGovern Dep., Ex. 1) [App. 000077-79]. In addition, McGovern has written numerous law review articles referring to the mediation of complex disputes. *See, e.g.,* Francis E. McGovern, "The Tragedy of the Asbestos Commons," 88 Va. L. Rev. 1721 (2002); Francis E. McGovern, "Resolving Mature Mass Tort Litigation," 69 B. U. L. Rev. 659 (1989).

McGovern testified that he viewed his role as an advisor to the Court to provide information on the history of asbestos and mass tort litigation:

---

[5]     In the *Owens Corning* case, Judge Dreier conducted one telephone discovery conference with all counsel at a deposition leading up to the substantive consolidation trial. (Dreier Dep. At 204:5-205:3)

> Its analogous to the role that I've served in many circumstances as a
> reporter or an advisor or a consultant to a committee of judges or a
> commission where one acts as a person who is available to answer
> questions about issues, arguments, history, procedures, but not as
> someone who is there to express an opinion concerning those.
>
> In other words, when you serve as an advisor to these types of
> committees, judges typically aren't interested in what your opinion is.
> They're more interested in making sure they're aware of what the issues
> are and what the arguments are for or against and, so, my understanding
> of what [Judge Wolin] was asking me to do was to be available to him to
> answer questions that he had that typically would not be answerable from
> the published literature, having more to do with custom and practice or
> what was done in a particular case in the past or who certain people
> would be in order to get him up the learning curve as to the nature of the
> asbestos litigation, mass torts in general and then specifically the
> asbestos bankruptcies.

McGovern Dep. at 13:6-14:7. McGovern recalled that, at the four meetings held by the Court with its

advisors, he generally discussed the background of asbestos litigation and asbestos-related bankruptcies.

*Id.* at 14:10-17:24. He also recalled the discussions regarding potential appointment of a Federal Rule

706 panel of experts. *Id.* at 18:5-19:22. McGovern testified that his role as an advisor had essentially

concluded by the May 2002 meeting. *Id.* at 22:17-25.

McGovern's principal role in the Five Cases was to serve as a mediator. McGovern testified that

he spoke to the Court from time to time regarding the status of the mediation efforts but did not disclose

the specific economics of a party's position. *Id.* at 179:11-181:25. In general, McGovern described the

limits on his discussions regarding his mediation efforts with the Court:

> This is something I have been doing for 25 years in a large number of
> cases and it's something that's quite important in continuing one's roles
> as a mediator and, that is to say, that the mediator cannot provide to the
> decision-maker any substantive discussions concerning the mediation,
> and the information concerning the status or the mediation is to be
> provided in such a way as not to create any impression of one side doing
> the right thing and the other side not doing the right thing, so, that the
> information provided to the judge is related in this context to the progress
> of the mediation.

13

*Id.* at 24:25-25:12. McGovern testified that the Court itself was, with the consent of the parties, involved in mediating the resolution of the *Sealed Air* dispute in the *W.R. Grace* bankruptcy as well as the substantive consolidation dispute in the *Owens Corning* bankruptcy. *Id.* at 26:3-13, 26:19-27:8. McGovern then testified:

> Q. So, outside of the Sealed Air context in particular where you and the judge did actively discuss sort of a mediation that was ongoing, the discussions that you've had with the judge aren't about the substance of any mediations that you're conducting consistent with your own ethical obligations?
>
> A. Not at all.

*Id.* at 27:9-16.

Regarding the Court's sharing its views on any matter, McGovern was clear that the Court "[kept] his views pretty much to himself . . ." and did not share its judgment with the advisors. McGovern Dep. at 66:19-22.

B.     The Roles of Hamlin and Gross in the G-1 Bankruptcy Proceedings

On October 10, 2001, Hamlin was appointed as the Legal Representative of Present and Future Holders of Asbestos-Related Demands (the "futures representative") in the bankruptcy proceedings captioned *In re G-I Holdings, Inc.*, Case No. 01-30135, pending in the United States Bankruptcy Court for the District of New Jersey. (Order appointing Hamlin as Futures Representative) [App. 000080-82]. In that capacity, Hamlin is charged with the statutory duty to ascertain that any proposed plan of reorganization for G-1 Holdings is "fair and equitable" to the holders of future asbestos personal injury claims. 11 U.S.C. § 524(g). *See also* (Hamlin Dep., Ex. 3 at ¶ 6) [App. 000001-20]. To date, no plan of reorganization has been proposed in that bankruptcy case.

Hamlin testified that the *G-1* bankruptcy involved some unique litigation issues:

> G-I had now gone private, had previously been GAF and that I found that there was a very intense and contentious position between the debtors and the [asbestos] claimants committee, which by itself is kind of to be expected. But there was [sic] a number of other issues that

> seemed to be, that there had been some previous applicant seeking to include a subsidiary [Building Materials Corporation of America ("BMCA")] into the bankruptcy action which Judge Gambardella denied. That was a companion action alleging fraudulent conveyance pending in the Southern District of New York and just for some added seasoning, there were individual actions filed by [Samuel] Heyman against three well-known asbestos law firms alleging RICO violations which gave it a sort of an interesting patina.

Hamlin Dep. at 87:13-88:4. To date, that fraudulent conveyance action has not been resolved. *See In re G-I Holdings, Inc.*, 295 B.R. 211 (D. N. J. 2003).

Shortly after his appointment on or about December 10, 2001, Hamlin decided to retain the Cincinnati, Ohio law firm of Keating, Meuthing and Klekamp, P.L.L. as his principal counsel and Gross as his local counsel in the *G-I* case. *Id.* at 44:4-21. Hamlin and his counsel have very recently been granted leave to intervene in the fraudulent conveyance action before the United States District Court for the Southern District of New York. *Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 2003 U.S. Dist. LEXIS 21164 (S.D.N.Y. Dec. 1, 2003).

In his capacity as the *G-I* Futures Representative, Hamlin attended meetings with other futures representatives in other asbestos-related bankruptcy cases.[6] The first meeting was held in Chapel Hill, North Carolina on or about June 3, 2002, but was not attended by Hamlin or Gross (or McMonagle or Trafalet). It was organized by Professor McGovern.[7] McGovern Dep. at 122:19-22. Other meetings were held on August 2, 2002, March 25, 2003, May 12, 2003[8], June 1, 2003 and August 27, 2003, which Hamlin did attend. *Id.* at 115:23-117:1, 118:17-12:7, 120:11-124:5, 124:11-125:14. Hamlin testified

---

[6]  Gross attended these meetings as local counsel to Hamlin. (Gross Dep. at 164:1-8)

[7]  "I have spent a major portion of my professional career trying to make the justice system work a little better and I have spent a fair amount of time assisting judges in coordinating with each other and if you had, a mechanism by which they could get together and share information, but just how people do their work in the justice system, there's a mutual benefit, and I thought the same might apply as far as the futures representatives were concerned." McGovern Dep. at 122:24-123:12 (emphasis added).

[8]  Hamlin testified that he only attended part of the May 12, 2003 meeting by telephone. Hamlin Dep. at 124:18-25.

15

that, at these meetings, the futures representatives principally discussed two topics. First, at some of the meetings, the futures representatives discussed the negotiation of the trust distribution plan with the asbestos claimants committees (representing current asbestos claimants) in the various asbestos bankruptcies. Hamlin testified that:

> The futures reps were probably, although I don't have specific [recollection] as to what each one of them said, were discussing the nitty-gritty, elbowing, kneeing and gouging that goes on between futures reps and present claimants committee to make sure that they leave some food on the table for us.

*Id.* at 117:11-18. Hamlin testified that he did not participate in these discussions because the *G-I* bankruptcy case had not reached the point where a trust distribution plan was under discussion. *Id.* at 117:23-25.

At some of these meetings, the futures representatives discussed proposed federal legislation (S. 1125 of the "FAIR Act") that was intended to resolve asbestos liabilities. *Id.* at 93:21-94:3. During these meetings, Hamlin expressed no position for or against the merits of the proposed legislation but recalled that, at the meetings:

> My brief participation, and I was by far one of the least vocal was that in general a legislative solution was requested and necessary to the adjudication of asbestos liability. I indicated that I had questions with some of the specifics of the legislation in its current form. But as we all understand, as a legislative process goes forward, there are often changes and amendments that go forward.

*Id.* at 102:14-22. Hamlin did recall expressing only one concern regarding the procedures to be implemented by the proposed legislation:

> The only thing I remember speaking on directly was the initial proposal. . . .to create an Article [I] one court to deal with asbestos liability and construct a ring of Special Masters around the country. I think the original legislation called for appointment of people who lived 50 miles within Washington, D.C. I thought the pragmatic issue of that was completely unworkable. I did not speak to the other issues because, if other participants voiced a view that [was] consistent with mine I wouldn't [feel] a necessity to speak. I spoke very little.

16

*Id.* at 104:14-105:1. Neither Gross nor Hamlin's principal counsel, Kevin Irwin, expressed any concerns regarding the proposed legislation at these futures representatives meetings. *Id.* at 109:22-25. *See also* Gross Dep. at 256:10-19.

C. The Participants In The Five Cases Were Well Aware (or Should Have Known) About Hamlin's and Gross' Dual Roles. Furthermore, the Movants Were Aware of the Court's Plan to Administer these Five Cases Through *Ex Parte* Conferences and Did Not Object

In each of the cases where recusal has been sought, the Movants now suggest that this Court's impartiality may reasonably be questioned based on Hamlin's and Gross' appointments or on alleged personal knowledge of disputed evidence that indicates a bias in favor of asbestos claimants. Movants do not – and cannot – cite a single instance of pro-asbestos claimant bias by this Court in the voluminous evidentiary record developed in these recusal proceedings. Likewise, no evidence of any bias against commercial creditors (either individually or collectively) exists in this record. While any alleged bias is belied by the evidence produced by this Court's advisors, the record is equally clear that each Movant knew or should have known about the alleged conflict long before it was raised in these motions.

1. The Owens Corning Bankruptcy Proceedings

a. Background

Owens Corning filed its bankruptcy case on October 5, 2000. From the outset, a dispute regarding certain subsidiary guarantees existed between Owens Corning and its lenders under this certain Credit Agreement dated as of June 26, 1997 (the "Bank Debt"). *See Owens Corning, et al. v. Credit Suisse First Boston, et al.,* Adv. No. A-00-1575 (filed Oct. 5, 2000) [App. 000083-111]. As this Court is well-aware, the validity and value, if any, of these subsidiary guaranties is one of the defining issues involved in the litigation over Owens Corning's Proposed Plan of Reorganization (the "OC Plan"). *See In re Kensington Int'l Ltd.,* Case No. 03-4212, Response of the District Court Judge to Petitions for Writ of Mandamus, Pursuant to the Invitation of the Court of Appeals at 7 (filed Nov. 4, 2002) [App. 000112-125]. In the OC Plan, Owens Corning proposes a substantive consolidation of itself and certain of its subsidiaries into a single bankruptcy estate, eliminating any separate value from the subsidiary guaranties.

*See* Plan Proponents' Pre-Trial Brief in Support of Substantive Consolidation (filed March 17, 2003) at 1-2 [App. 000126-167].

In connection with the litigation over Owens Corning's proposed substantive consolidation, the Owens Corning debtors and certain creditor groups (including groups representing the lenders (or their successors) under the Credit Agreement (now known as the "Bank Group"), the Future Claimants' Representative, the Asbestos Claimants Committee and certain designated members of the Official Creditors Committee representing Owens Corning bondholders (the "Bondholders")) engaged in an Inter-Creditor Project in order to organize and conduct discovery regarding the relationship among Owens Corning, its various debtor and non-debtor subsidiaries and their various creditors. *See* Stipulation and Order Regarding Resolution of Inter-Creditor Issues (filed September 24, 2001) [App. 000168-176]. Kramer Levin Naftalis & Frankel LLP ("Kramer Levin") represented the interests of the Agent Bank, Credit Suisse First Boston ("CSFB"), and the Bank Group as a whole in the Inter-Creditor Project. *Id.* "Credit Suisse First Boston. . . retained Kramer Levin. . . to represent the Bank Group with respect to the Inter-Creditor Issues"). *See* Brodsky Dep. at 106:12-109:2; Eckstein Dep. at 59:16-19.[9]

This Court withdrew the reference regarding the substantive consolidation dispute on December 28, 2002. The Inter-Creditor discovery process, including voluminous document production and extensive fact stipulations, culminated in deposition discovery in the first quarter of 2003. Thereafter, the Court conducted a lengthy trial on the merits of the substantive consolidation provisions of the proposed

---

[9] Mark Brodsky, the principal representative of Movants Kensington and Springfield admitted that, in the beginning of the Owens Corning case, Kramer Levin represented Kensington and Springfield. In the spring or summer of 2001, Shearman & Sterling, then counsel for CSFB, as agent for the Bank Group, had a conflict and could not continue full representation. Brodsky testified that he sponsored Kramer Levin as a potential replacement and stated to the Bank Steering Committee that he would release Kramer Levin as Kensington's and Springfield's counsel if Kramer Levin was retained by CSFB, as agent. When Kramer Levin was retained by CSFB, as agent, Kensington and Springfield contend that Kramer Levin did not continue to represent them in their individual capacities. Nevertheless, Brodsky was in almost daily contact with Eckstein and other counsel of Kramer Levin working on the Owens Corning matter. *See* Affidavit of Edith K. Altice with Kramer Levin Invoices attached [App. 000208-872]. Brodsky testified that Kensington and Springfield did not thereafter retain separate counsel until June 2003. Brodsky Dep. at 106:12-109:2; Brodsky Ex. 3.

18

plan between April 8, 2003 and May 2, 2003. Kramer Levin represented CSFB and the Bank Group at the trial and opposed the substantive consolidation provisions of the proposed plan of reorganization. During that trial, the Court denied the Bank Group's Motion for Directed Verdict. *See* Excerpts from Substantive Consolidation Trial Transcript [App. 000177-207]. However, Kramer Levin never indicated either before or during this trial that it believed that this Court harbored any bias against the Bank Group or that the appearance of any bias existed. No decision has been rendered by this Court on the substantive consolidation dispute, but it is undisputed that the parties expected that ruling to be issued by this Court at or around the time the recusal motion was filed.

An Official Committee of Unsecured Creditors (the "OC Creditors Committee") has been appointed in *Owens Corning* case. From the outset, the membership of the OC Creditors Committee was split between holders of the Bank Debt and the Bondholders (4 Bank Group members, 3 Bondholders and 2 trade creditors). In fact, the OC Creditors Committee is co-chaired by a member of the Bank Group: J.P. Morgan/Chase (a lender under the Credit Agreement), and a Bondholder, Jackson National Life. The OC Creditors Committee is represented by Davis Polk & Wardwell ("Davis Polk"). Case Dep. at 6:16-19. In the hotly contested substantive consolidation trial proceedings, the interests of the Bank Group and the Bondholders differed. The Bank Group opposed substantive consolidation because it diminished the bank debt holders' potential recovery. The Bondholders supported it, arguing that the consolidated estate fairly represented the creditor estate to which they had lent $1.3 billion. Nevertheless, the OC Creditors Committee has continued to represent the interests of its members with regard to other matters where their interests are not in conflict.

OC Movants, Kensington and Springfield, have bet hundreds of millions of dollars that the substantive consolidation provisions of the OC Plan will fail. Since the beginning of these bankruptcy proceedings, Kensington and Springfield have acquired approximately $290 million in claims under the Credit Agreement. Brodsky Dep. at 22:9-15. As a result of these purchases, Brodsky (as Kensington and Springfield's representative) sits on the Bank Group Steering Committee, a select group of Bank Debt

holders who more closely monitor and communicate with each other and with counsel, Kramer Levin, regarding the *Owens Corning* bankruptcy proceedings. Brodsky Dep. at 18:13-20:8, 24:22-26:22.

b. The Relationship Among CSFB, Kramer Levin, the Bank Steering Group Members and the Bank Group

The knowledge of the parties and the knowledge to be imputed to the parties is relevant for purposes of assessing the timeliness of the recusal motions. CSFB is the Agent for the entire Bank Group under the 1997 Credit Agreement. Kramer Levin has represented not only CSFB, but the Bank Group, in all material matters, including the Inter-Creditors Issues, the proceedings on the Plan, the Disclosure Statement and in the trial on the Substantive Consolidation Motion. Kramer Levin was in reality counsel to Kensington and Springfield in this case until late spring 2003. Thus, for example, Kramer Levin, along with counsel for the other significant constituencies in this case, submitted a Stipulation and Order Regarding Resolution of Inter-Creditor Issues (Docket No. 3235), in which Kramer Levin stipulated that CSFB "has retained Kramer Levin Naftalis & Frankel LLP to represent the Bank Group with respect to the Inter-Creditor Issues." Brodsky, of Elliott Associates, formerly headed the bankruptcy department at Kramer Levin together with Ken Eckstein whom Elliott Associates retained in early 2001 to represent it in *Owens-Corning*. (Brodsky Dep. 103-04). Thereafter, at the urging of Elliott Associates, CSFB, which does not otherwise use Kramer Levin as counsel, retained Kramer Levin in *Owens-Corning*. (Brodsky Dep. 108; Eckstein Dep. 116-17). Although Elliott Associates then allegedly "released" Kramer Levin as Elliott's own counsel, Elliott Associates did not retain other counsel in *Owens-Corning* until late spring of 2003.(Eckstein Dep. 60).

CSFB, Elliott Associates (by Brodsky), Fleet, (as of the time it learned of the appointment of Hamlin in G-I contemporaneously with Hamlin's appointment), and JP Morgan/Chase were members of the Bank Steering Committee in the *Owens Corning* bankruptcy. As Brodsky explained in his Declaration filed with the Court of Appeals, after the filing of a large Chapter 11 case, the group of lenders traditionally forms "a steering committee (in essence a small working group) of lenders to take an

active role [in the bankruptcy case]. . ." *See* Brodsky Ex. 7 (Affidavit of Mark Brodsky). It is undisputed that Fleet knew of Hamlin's appointment in G-I and that JP Morgan/Chase, as a participant in both *G-I* and *Owens Corning*, had direct knowledge of Hamlin's and Gross' dual roles. The members of the Bank Group cannot divorce themselves from the knowledge of other members of the Bank Steering Group.

           c.      Members of the OC Creditors Committee and the Bank Group Steering Committee, as well as their Counsel, Knew About Hamlin's and Gross' Appointments in *G-I* Prior to September 24, 2003

                 i.      Davis Polk's Knowledge

The evidence produced in these recusal proceedings demonstrates that Davis Polk, as counsel to the OC Creditors Committee, and Kramer Levin, as counsel representing the interests of the Bank Group, both knew about – or repeatedly received information disclosing -- the appointments of Hamlin and Gross in the *G-I* bankruptcy proceedings, both at the time they assumed their assignments and thereafter.

Since at least January 2001, Davis Polk, in its capacity as counsel to the OC Creditors Committee, has billed tens of thousands of dollars, if not more, to the *Owens Corning* bankruptcy estate to monitor the proceedings in the *G-I* bankruptcy case.[10] *See* Case Dep. at 40:10-16, Case Ex. 2-4 [App. 000873-929]. A Davis Polk paralegal, on a regular and continuous basis, obtained the pleadings in the *G-I* case (Case Ex. 2-3) [App. 000873-920] and forwarded these pleadings to a Davis Polk attorney, James McClammy, who worked on the *Owens Corning* case. Case Ex. 4 [App. 000921-929]. It is not disputed that Davis Polk monitored the *G-I* bankruptcy proceedings before, during, and after Hamlin and Gross were appointed to roles in that case and before, during, and after Hamlin and Gross were appointed as advisors to this Court in the *Owens Corning* case. Moreover, Kenneth Eckstein ("Eckstein"), the lead Kramer Levin lawyer representing the interests of the Bank Group, testified that Davis Polk circulated

---

[10]      Case indicated that "for about the first three, four, [or] five months" of the *Owens Corning* case, Davis Polk associates who monitored the other bankruptcy cases, including the *G-I* case, would report on the proceedings in those cases at OC Creditors Committee meetings. Case Dep. at 42:18-25. Case could not recall when those reports stopped. *Id.* at 43:3-6.

information regarding its monitoring of other asbestos-related bankruptcy cases to members of the OC Creditors Committee and to Kramer Levin in particular. Eckstein Dep. at 71:10-73:1. *Id.*

In addition, after being appointed to serve as counsel to the OC Creditors Committee, Davis Polk subscribed to Mealey's *Asbestos Bankruptcy Reports* and billed the *Owens Corning* bankruptcy estate for this expense. Case Dep. at 58:7-14. Stephen H. Case, the lead lawyer for the OC Creditors Committee at Davis Polk, directed the purchase of this specialized news service "[f]rom the beginning of the *Owens Corning* bankruptcy case." *Id.* Case asked that the Mealey's Reporter be sent to him and to Gordon Harris, a Davis Polk partner who was also intimately involved in the representation of the OC Creditors Committee. *Id.* at 58:19-59:12. It is not disputed that, in January 2002, Mealey's *Asbestos Bankruptcy Reports* published an article that named the advisors appointed by this Court in the Five Cases and also reported that Hamlin and Gross had been appointed to future asbestos claimant duties in the *G-I* bankruptcy case.[11] Case Ex. 6.

Davis Polk's records also revealed extensive work in connection with its receipt of this Court's Order appointing its advisors. Case testified that he received and reviewed the Order. *Id.* at 45:21-46:2. A Davis Polk paralegal billed 5.4 hours to the review of this four page Order. Case Ex. 5 [App. 000930-966]. Case, head of the Davis Polk legal team, could not explain what work his paralegal was doing with respect to the Order. Davis Polk also acknowledged that it received notice of Hamlin's *G-I* appointment directly from a member of the OC Creditors Committee who was also at the time a member of the Bank Steering Committee. On October 15, 2001, Honor Heath, a representative of Fleet Bank who participated on the Bank Group Steering Committee,[12] and was a member of the OC Creditors Committee, sent a

---

[11]    Case testified that he recalled reading an article relating to the appointment of the advisors by this Court in a publication called *The Daily Deal*. Case Dep. at 65:17-23., Case Ex. 7. Case testified that he directed that the article identifying each of the advisors be circulated to each member of the OC Creditors Committee. *Id.* at 65:9-16, Case Ex. 8. [App. 001257-1262].

[12]    As noted, the Bank Group Steering Committee is a core group of large holders of the Bank Debt that monitors the proceedings and activities in *Owens Corning* bankruptcy case. *See* Brodsky Ex. 7 (Affidavit of Mark Brodsky) [App. 000967-974] ("it is customary to form a steering committee (in essence a small working group) of lenders to take an active role when a corporate borrower becomes financially

Davis Polk attorney involved in the OC Creditors Committee representation, Daniel Wenner, an e-mail that stated:

> FYI. The parties agreed to appoint C. Judson Hamlin, a former New Jersey superior court judge, in the G-I case. Judge Gambardella ordered that he be appointed last Wednesday.

Case Ex. 10. Wenner forwarded the e-mail to Case, amongst others, and Case testified that he "vaguely recall[ed] seeing it when it was forwarded to him." Case Dep. at 69:16-70:2.

Case received information from time to time from Leticia Chambers ("Chambers"), the asbestos claims valuation consultant retained by the OC Creditors Committee. *Id.* at 82:6-12. Chambers, who also served as a valuation consultant in the *G-I* bankruptcy case, sent James McClammy, the Davis Polk associate working on the *Owens Corning* case, an e-mail in November 2002 that contained a *G-I* pleading discussing the objection lodged by Hamlin, as futures representative, and by the asbestos claimants committee in *G-I*, to the use of her method to value asbestos claims liability. Case Ex. 12 [App. 000991-1069].

---

distressed."). Here, the members of the *Owens Corning* Bank Group consisted of large holders of the Bank Debt that could make (or influence) decisions regarding the ultimate positions taken by CSFB, as agent for the Bank Group, and by its counsel, Kramer. *See* Kramer Levin Certification of Bank Group Steering Committee Members (Doc. No. KL008170-8171) [App. 000975-976]. Under the terms of the Credit Agreement, many decisions regarding the Bank Debt in the bankruptcy case must be approved by lenders holding a majority of the total outstanding principal of the Bank Debt. [App. ___] (Credit Agreement ¶ 11.02 (Remedies Upon Default)). The status of Fleet Bank as a member of the Bank Group Steering Committee and the OC Creditors Committee at the time Ms. Heath sent her e-mail to Davis Polk has both legal and practical ramifications. As a member of those groups, her knowledge can reasonably be imputed to the other members of those groups.

ii.     Kramer Levin's Knowledge

Prior to September 2003, Kramer Levin also received information from multiple sources that disclosed Hamlin's and Gross' roles in the *G-I* bankruptcy case.

It is clear that since approximately June 2001, Kramer Levin has represented the interests of the Bank Group in the *Owens Corning* case. It has represented itself to the parties and the Court as the Bank Group's counsel. (Stipulation and Order Regarding Resolution of Inter-Creditor Issues) [App. 000168-176]. Indeed, on Kramer Levin's website, it boasts that, in the *Owens Corning* case, it represents "a 47-member bank group that holds approximately $1.6 billion in unsecured debt of Owens Corning and its subsidiaries." (Eckstein Dep., Ex. 1) [App. 001070-1082].

Since October 2001, shortly after its retention, Kramer Levin subscribed to Mealey's *Asbestos Bankruptcy Reports*. *See* Kramer Levin Certification of Publications Received (Doc. No. KL008163-8169) (the "KL Publication Certification") [App. 001083-89]. That publication was circulated to attorneys representing the Bank Group's interests, including Kenneth Eckstein ("Eckstein"), Gary Becker, and Jeffrey Trachtman. *Id.* It is not disputed that these Bank Group lawyers received the issue that disclosed Hamlin's and Gross' roles in the *Owens Corning* case and in the *G-I* case. Eckstein Dep. at 17:6-18:6. In addition, almost contemporaneously with its retention to represent the interests of the Bank Group in June 2001, Kramer Levin subscribed to Mealey's *Litigation Reports: Asbestos*, which also reported the same information about Hamlin and Gross. (KL Publication Certification at KL008164) [App. 001083-89]. In January 2002, both of these publications disclosed Hamlin's and Gross' roles in *G-I* and as advisors to this Court. (*Mealey's Asbestos Bankruptcy Report*, Vol. 1, No. 6 (Jan. 2002), *Mealey's Litigation Report: Asbestos*, Vol. 16, No. 24 (Jan. 2002), and *Andrews Asbestos Litigation Reporter*, Vol. 25, No. 15 (June 5, 2003) [App. 001090-1103]. This Court can reasonably infer from the timing of Kramer Levin's subscription to the Mealey's asbestos-related publications and the fact that the Mealey's *Asbestos Bankruptcy Reporter* was circulated to Kramer Levin attorneys working on the *Owens*

*Corning* case that Kramer Levin received these publications, at least in part, to assist it in its representation of the Bank Group in the *Owens Corning* case.

Like Davis Polk, Kramer Levin also received numerous pleadings in the *G-I* case that disclosed the appointment of Hamlin and Gross to roles in that case. *See* Kramer Levin Notice of Appearance and Request for Service of Papers in G-I, and Applications of Hamlin and Orders Appointing Gross as Hamlin's counsel in G-I [App. 001104-43]. Shortly after G-I Holdings filed its bankruptcy case, Kramer Levin entered its appearance in that case and requested copies of all notices. *See* Kramer Levin Notice of Appearance and Request for Service of Papers (the "KL G-I Notice") [*Id.*]; *see also* Eckstein Ex. 2 [App. 001145-1161]. While the KL G-I Notice did not disclose any client, Eckstein, the lead Kramer Levin lawyer representing the Bank Group, testified that it was prepared and filed by a Kramer Levin lawyer on behalf of Bear Stearns "in connection with claims trading, which is essentially the purchase and sale of securities generally of distressed companies. . . ." Eckstein Dep. at 24:17-25:5. Tom Mayer, the same Kramer Levin partner who first represented Kensington and Springfield in the *Owens Corning* case, represented Bear Stearns in connection with this engagement regarding the *G-I* case. *Id.* at 25:8-24. In connection with this Bear Stearns engagement, Kramer Levin received – and retained – the pleadings in the *G-I* case, including the specific pleadings related to Hamlin and Gross' appointments. (*G-I* pleadings produced by Kramer Levin) [App. 001104-43]. Eckstein testified that the work in *G-I* by Kramer Levin lawyers related to substantive consolidation and successor liability issues and ended in May 2001 "or so" -- at or around the time that Hamlin was proposed as the futures representative in the *G-I* case. Eckstein Dep. at 33:12-34:9. However, after that time, it is undisputed that Kramer Levin continued to receive the pleadings in the *G-I* case and that copies of these pleadings were in the law firm's files.

Another Kramer Levin lawyer who worked on the *Owens Corning* case, David Klein ("Klein"), obtained direct knowledge of Hamlin and Gross' appointments in the *G-I* case.[13] Klein, between

---

[13]     Eckstein's testimony regarding the knowledge of this Kramer Levin attorney contradicts the representation made in his Affidavit to the Third Circuit that no Kramer Levin lawyer "was aware until late September

September 2001 and July 2002, left Kramer Levin and clerked for Judge Gambardella, who was assigned the *G-I* case. Eckstein Dep. at 29:2-19. Klein worked for Judge Gambardella during the time that court considered and approved the appointments of Hamlin and Gross in the *G-I* case. Eckstein testified that Klein reported to him (in connection with the discovery in these recusal proceedings) that he was aware of Hamlin's appointment as the futures representative. *Id.* at 114:15-115:10. Klein, upon his return to Kramer Levin in July 2002, worked on the *Owens Corning* case on behalf of the Bank Group's interests. *Id.* at 115:14-116:5.

In addition, another Kramer Levin lawyer, Gary Becker, who was one of the principal lawyers working on the *Owens Corning* case, knew in July 2003 that Gross had been proposed as a futures representative in the *W.R. Grace* case in connection with Kramer Levin's representation of the Grace Equity Committee. (August 15, 2003 E-mail from Jan Baer to Gary Becker, *et al.*) [App. 001144]. This Court can reasonably conclude from Kramer Levin's silence that it believed that there was nothing inappropriate with the dual roles played and proposed to be played by Hamlin and Gross.

iii.     Mark Brodsky's Access to Knowledge about Hamlin and Gross

Mark Brodsky, Kensington and Springfield's principal representative, denies that he had any personal knowledge about Hamlin's or Gross' roles in the *G-I* case prior to September 2003. Brodsky Dep. at 83:6-25; 120:12-21. However, it is undisputed that Brodsky had access to information that disclosed the role of these advisors in *G-I*. Brodsky is an extremely sophisticated investor in bankruptcy-related debt instruments. He is an experienced bankruptcy lawyer with a Harvard law degree and

2003 of Messrs. Gross and Hamlin's dual roles in *G-I Holdings* and *Owens Corning. . . .* [n]or, to the best of my knowledge, was any other person working at Kramer Levin so aware prior to that time." *See* Eckstein Ex. 2 at ¶ 13 [App. 001145-61]. Eckstein's Affidavit was drafted by Jeffrey Trachtman, who learned of Klein's knowledge on November 24, 2003, several days before Eckstein signed his Affidavit. *See* Eckstein Dep. At 20:17-19; KL 008200. Indeed, this admission eviscerates Kensington's assertions to the Third Circuit that denied that Kramer Levin had any knowledge regarding Hamlin's and Gross' dual roles. *See In re Kensington Int'l Ltd.*, Case No. 03-4212, Reply to Answers to Emergency Petition for Writ of Mandamus at 9 (filed Dec. 3, 2003) ("It is not plausible – not even possible – that any Kramer Levin lawyer notified any creditor in the *Owens Corning* case of the facts that no Kramer Levin lawyer knew.") [App. 001162-1218].

undergraduate and masters degrees from the University of Pennsylvania. Brodsky Ex. 7 at ¶ 2 [App. 000967-74]. Prior to his work as a distressed debt investor, Brodsky was a Kramer Levin partner and had been co-head of Kramer Levin's creditor's rights practice with Eckstein. Brodsky Dep. at 42:23-43:14.

The record demonstrates that Brodsky was familiar with the *G-I* case as he and employees of Elliott Associates, L.P., Kensington and Springfield's affiliate company, had considered purchasing creditor claims in BMCA, a G-I Holdings subsidiary. *Id.* at 175:10-176:21. Brodsky was in charge of the possible investment and supervised the 2-3 weeks of research regarding BMCA that led to the decision not to invest. Brodsky, moreover, testified that, before he learned of Hamlin's and Gross' roles, he was aware that the *G-I* case was "one of the most hotly contested" asbestos bankruptcy cases. *Id.* at 123:4-12.

In addition, Brodsky maintained general information regarding other mass tort bankruptcies in his files relating to the *Owens Corning* case and closely monitored the *Owens Corning* bankruptcy proceedings. In October 2000, at about the time Brodsky was considering an investment (or had begun to invest) in the Owens Corning Bank Debt, he received detailed information regarding mass tort bankruptcy proceedings from Eckstein. Brodsky Ex. 4 [App. 001219]. In November 2000, Brodsky received materials from a Bear Stearns asbestos conference where the editor of Mealey's *Litigation Reports:Asbestos* appeared and spoke. Brodsky Ex. 6 [App. 001220-45]. Those conference materials, maintained in Elliott & Associates' files, advise that Mealey's publications were one of the "analysts' keys" to obtaining information regarding asbestos litigation. Brodsky Ex. 6 at EL0001379 [*Id.*]. During 2001, Brodsky conducted detailed analyses of Owens Corning and its subsidiaries and presented sophisticated analyses of the Owens Corning Bank Debt to other Bank Group members. *See* Brodsky Ex. 9 [App. 001246-48]. Brodsky apparently kept extensive files regarding the proceedings in the case. Brodsky Dep. at 101:14-102:23.

Brodsky also maintained close contact with the key players representing the interests of the Bank Group in the *Owens Corning* case. Kramer Levin time records reflect that Brodsky and his colleagues communicated with Eckstein or other Kramer Levin lawyers on at least 243 separate occasions between

June 2001 and September 2003. [App. 000208-872]. In fact, Brodsky was apparently so comfortable with Kramer Levin's representation of the interests of the Bank Group that he did not retain separate counsel to represent Kensington or Springfield until the summer of 2003 -- despite the fact that Brodsky's investors owned over a quarter of a billion dollars of the Bank Debt and the parties in the *Owens Corning* case were actively litigating the critically important substantive consolidation dispute. Brodsky Dep. at 108:15-109:2, Brodsky Ex. 3. This close relationship shows that Kramer Levin was *de facto* Brodsky's lawyer in the *Owens Corning* case.

In addition, other members of the Bank Group with whom Brodsky often dealt do not dispute that they were well-aware of Gross' and Hamlin's roles in *G-I*. For example, Fleet Bank's representative on the Bank Group Steering Committee, Honor Heath, sent an e-mail to a Davis Polk lawyer notifyng him of Hamlin's *G-I* role. *See* Case Dep. Ex. 10, October 15, 2001 E-mail from H. Heath to D. Wenner [App. 000990]. Likewise, J.P. Morgan/Chase ("Chase"), a member of the Bank Group Steering Committee and co-chair of the OC Creditors Committee, was a creditor in the *G-I* case and received pleadings in the *G-I* case from its counsel, Duane Morris, that disclosed Hamlin's role in October 2001. Chase raised no objection when Hamlin was appointed one of the Court's advisors.

Brodsky's easy access to information in the *Owens Corning* and *G-I* cases was demonstrated when he testified about how he came to know about Hamlin's and Gross' roles in the *G-I* case from public sources. Brodsky testified that he learned about their roles when Tom Fuller, who worked for another post-petition purchaser of *Owens Corning*'s Bank Debt and was himself a member of the Bank Group Steering Committee, called him to direct his attention to the counsel listed on a recent ruling in the *G-I* case. *Id.* at 83:9-25. Thereafter, according to Brodsky, he was in a matter of minutes, able to access the ruling over the internet. *Id.* Brodsky, who had personal access to the pleadings in all federal district court and bankruptcy court cases available over the PACER system (*id.* at 158:19-24), was able to search and review all of the pleadings in the *G-I* case and obtain pleadings that disclosed Hamlin's and Gross' roles. *See* Brodsky Exs.10-14 [App. 001249-56]. Indeed, the chain of e-mails relating to Brodsky's

alleged discovery of Hamlin's and Gross' roles in *G-I* demonstrates that it took Brodsky only 34 minutes from the time of his alleged discovery of Gross' role in *G-I* to obtain Gross' fee applications in the *G-I* case that fully reported his legal work for Hamlin. Brodsky Ex. 11 (first e-mail sent at 1:42 PM) [App. 001251], Ex. 12 (e-mail of 2:16 PM enclosing Gross' fee applications in *G-I*) [App. 001252]. Indeed, by 3:19 PM on the same day (about 97 minutes after Brodsky's alleged discovery), an Elliott employee had not only obtained information about Hamlin's role in *G-I* but had obtained information regarding the role of Kevin Irwin, Hamlin's lead counsel in *G-I*, in connection with his representation of the Asbestos Settlement Trust in Celotex, another asbestos-related bankruptcy. Brodsky Ex. 13 [App. 001253-54].

   d. Simple Monitoring of the Publicly Filed Time Records in the *Owens Corning*
     Case Would Have Revealed Hamlin's and Gross' Involvement in *G-I*

   Hamlin's and Gross' representation of future claimants was disclosed in the OC Futures Representative's publicly filed time records. Shortly after attending his first meeting of futures representatives on June 3, 2002, the OC Futures Representative filed a detailed fee statement with the Bankruptcy Court, on notice to all parties in interest in the *Owens Corning* chapter 11 cases (including the Bank Group, of which the OC Movants are members), timely disclosing (i) the existence of the futures representatives' meeting, (ii) the issues discussed at the meeting, and (iii) the participants at the meeting, including Mr. Gross.[14]

   After the second meeting, the OC Futures Representative again filed a detailed fee statement with the Bankruptcy Court, on notice to all parties in interest, timely disclosing (i) the existence of the meeting,

---

[14]   Included in the Appendix as Exhibit [A] is the OC Futures Representative's time record for the first Futures Representatives' meeting on June 3, 2002, which states:

     meeting in Chicago with Eric Greene, David Gross, Francis McGovern, Larry
     Fitzpatrick, and Sandy Esserman re: issues common to other Future
     Representatives and potential settlement of cases, review of status of
     outstanding cases, review of proposed trust distribution process template and
     discussions re: legality of the channeling injunction and substantial equivalency
     (4.50)

(ii) the issues discussed, and, (iii) the participants at the meeting including Judge Hamlin, who was specifically listed as a Futures Representative.[15]

Thus, all parties were on notice – through publicly filed documents in the Owens Corning cases – that Judge Hamlin attended meetings in his capacity as a futures representative and that Mr. Gross, his counsel, also attended futures representatives' meetings. In fact, the following parties received these documents electronically, thereby receiving actual notice: (i) CSFB as Agent for the OC Bank Group, (ii) the OC Creditors Committee, and (iii) DK Acquisition Partners, L.P.[16] Notwithstanding such notice, no party in interest lodged any objection with respect thereto.

        e.    Kensington and Springfield Participated In and Consented to the *Ex Parte* Consultations Conducted by this Court

No party in the *Owens Corning* case has lodged any objection to the Court's use of *ex parte* conferences in the management of that case. To the contrary, Brodsky testified that "everyone knew that

---

[15]    As set forth in Exhibit [A], the OC Futures Representative's time record for the second meeting he attended, dated August 2, 2002, states:

> meeting with Jane Parver and Futures Representatives, Messrs. Greene, Fitzpatrick, Esserman, Fagan, Hamlin, to review proposed TDP, trust agreements and other issues common to all of the bankruptcies, and review of present status of all bankruptcies (4.00)

*See also* October 11, 2002 time record (included in Exhibit [A]), referencing "phone call with Kevin Irwin, counsel to Judd Hamlin, Futures Rep. re: TDP Issues (.60)."

[16]    Exhibit [B] contains relevant excerpts from (i) the Notice of Electronic Filing of the Interim Application for Compensation for James J. McMonagle, for the Period of 6/1/2002 to 8/31/2002, pp. 2-3 (indicating receipt by counsel for CSFB as Agent for the Bank Group (Mark D. Collins, Esq., *et al.*, of Richards, Layton & Finger, P.A., and Kerri K. Mumford, Esq. of Klett Rooney Lieber & Schorling) and by counsel for the OC Creditors Committee (William H. Sudell, Esq., *et al.*, of Morris, Nichols, Arsht & Tunell), and (ii) the Notices of Electronic Filing of the Monthly Fee Statements of the OC Futures Representative for the months of June and August 2002. Notably, these documents also demonstrate that counsel for DK Acquisition Partners, L.P. (James E. Huggett, Esq. of Klehr, Harrison, Harvey, Branzburg & Ellers, LLP), Movant in the *W.R. Grace* chapter 11 case, received the OC Futures Representative's monthly fee statements. Exhibit [C] contains a copy of the Affidavit of Service for the relevant Quarterly Fee Statement of the OC Futures Representative (indicating receipt by co-counsel for the OC Creditors Committee (Stephen H. Case, Esq. of Davis, Polk & Wardwell, and William H. Sudell, Esq. of Morris, Nichols, Arsht & Tunell)).

it [*ex parte* conferences] was all going on." Brodsky Dep. at 151:6. Further, Eckstein testified that the Bank Group did not object to this Court's use of *ex parte* conferences. Eckstein Dep. at 101:8-18.

Brodsky, on behalf of Kensington and Springfield, participated in at least two *ex parte* conferences with this Court. Brodsky Dep. at 146:10-147:6, 150:18-151:12. Brodsky participated in a meeting in approximately August or September 2002 with the Court. *Id.* at 150:18-151:12. Brodsky also personally participated in the mediation sessions with Gross and McGovern, *id.* at 86:14-17, 97:18-23, 147:10-12, and met with the Court and consented to its service as a mediator in June 2003. *Id.* at 146:10-147:12.[17]

This Court attended an *ex parte* meeting in July 2002 with the OC Creditors Committee at Davis Polk's offices that was attended by Eckstein who represented the Bank Group's interests. *See* January 14, 2004 Declaration of Edmund M. Emrich [App. 001945-61]; Brodsky Dep. at 81:14-82:11. In addition, the OC Creditors Committee, which advocated the interests of the Bank Group on matters other than substantive consolidation, also made an *ex parte* submission to the Court. *See* Case Ex. 8 [App. 001257-62].

2.      The W.R. Grace & Company Bankruptcy Proceedings

   a.      Grace Case Background

Like the *Owens Corning* parties, the *Grace* parties are no strangers to this Court. When it filed its bankruptcy petition in April 2001, W.R. Grace identified four major litigation issues to be resolved: (1) asbestos personal injury litigation; (2) "conventional" asbestos property damage litigation; (3) property damage litigation arising from Grace's Zonolite Attic Insulation ("ZAI") product; and (4) certain

---

[17]      At no point did Brodsky request that McGovern's services as a mediator be terminated, *id.* at 97: 24-98:3, even though he claims he privately harbored concerns regarding McGovern's impartiality. Prior to these events and during the summer of 2003, Brodsky conducted a detailed investigation of McGovern because he was becoming "uncomfortable" with his performance as a mediator. Brodsky Dep. at 86:6-96:15. As part of that investigation, Brodsky obtained detailed information regarding objections or disputes about McGovern's performance in other cases and spoke with "other commercial creditors and insurers who are active in the field. . . ." *Id.* at 96:8-15.

fraudulent conveyance and asbestos-related litigation against entities formerly affiliated with Grace. *See* W.R. Grace & Company's "Informational Brief" (filed April 2, 2001) at 55, 56-68 [App. 001263-1333].

The Court has moved the case expeditiously toward resolution of these issues. Within three months of its December 20, 2001 status conference held at the outset of the Five Cases, the Court withdrew the reference from the bankruptcy court for the fraudulent conveyance proceedings related to Grace's 1996 and 1998 transactions with Fresenius and Sealed Air (the "*Sealed Air*" litigation) and authorized the Asbestos Personal Injury Claimants' Committee (the Grace "PI Committee"), the Asbestos Property Damage Claimants' Committee (the "Grace PD Committee") (collectively the "Grace Asbestos Committees") to jointly prosecute a fraudulent conveyance action on behalf of the Grace bankruptcy estate. In June 2002, at the same time that the Grace Asbestos Committees and Grace were in the midst of the hotly-contested *Sealed Air* litigation, the Court entered an Order setting a briefing schedule for addressing the competing proposals for "case management of asbestos personal injury claims" which required the parties to brief this issue by August 21. Order Concerning Briefing of Motion For Entry of A Case Management Order Governing Asbestos Personal Injury Claims, entered in the *Grace* case on June 19, 2002.[18]

In the meantime, Grace's asbestos property damage litigation and ZAI litigation proceeded in the Bankruptcy Court.

On November 27, 2002, Sealed Air, Fresenius and the two Asbestos Committees reached a settlement in principle that resolved the *Sealed Air* litigation. The final settlement agreement between

---

[18]    The Court also entered an Order in the *USG* case requiring the parties in USG to brief their competing case management/estimation proposals for resolving USG's asbestos personal injury liabilities on the same schedule. Order Concerning Briefing of Motion For Entry of A Case Management Order Governing Asbestos Personal Injury Claims, entered in the USG case on June 19, 2002. Given the significant investment by counsel and the Court in the Sealed Air fraudulent conveyance adversary proceeding, the Court adjourned the previously scheduled October 17 hearing on the parties' proposals for case management of asbestos personal injury claims. *See* Notice from Court dated October 9, 2002 to All Counsel in the W.R. Grace and USG bankruptcy proceedings. As discussed below, the hearing on case management proposals for asbestos personal injury claims estimation in the *USG* case went forward on October 17.

32

Sealed Air and the two Asbestos Committees was signed and filed with the Court for its approval on November 26, 2003. *See* Motion for An Order Approving Authorizing and Implementing [the Sealed Air] Settlement Agreement, filed November 26, 2003. W.R. Grace is not a party to that agreement.

3.    The Grace Creditors Committee's Early Knowledge of Judge Hamlin's Role in *G-I*

In October 2003, three of Grace's commercial creditors, D. K. Acquisition Partners, Fernwood Associates, and Deutsche Bank Trust Co. Americas (the "*Grace* Movants"), moved for Judge Wolin's recusal, identifying the same alleged conflict of interest raised by Kensington and Springfield in the *Owens Corning* case. The *Grace* Movants apparently had not appeared in the *Grace* bankruptcy proceedings prior to filing their recusal motion.

In contrast to the protestations of ignorance by the *Owens Corning* and *Grace* Movants, the Official Committee of Unsecured Creditors in the *W.R. Grace* bankruptcy proceedings (the "Grace Creditors Committee"), through its counsel, was unquestionably aware of Hamlin's appointment in the *G-I* case by early 2002, yet neither the Grace Committee nor any member of it raised any objection regarding Hamlin's role as an advisor to this Court.

The law firm of Stroock & Stroock & Lavan LLP ("Stroock") is counsel to the Grace Creditors Committee. On or before January 24, 2002, Stroock lawyers learned that Judge Hamlin had been appointed as the futures representative in the *G-I* bankruptcy proceedings and specifically considered whether it was a conflict of interest for Judge Hamlin to serve as a special master for Judge Wolin. Pasquale Declaration dated January 9, 2004 at ¶ 5. [App. 001334-37]. Stroock's senior partner representing the Grace Creditors Committee even had a telephone conversation with USG's General Counsel concerning a possible "objection to Hamlin, as he is Future Rep in *G-I*." *Id.*, ¶ 7 [*Id.*]; Stroock, Stroock & Lavan February 14, 2002 Fee Application at p. 5 [App. 001338-86, at 1349]. No member of the Grace Creditors Committee raised any objection to Judge Hamlin serving as a consultant to the Court prior to the filing of the recusal motion by the Grace Movants.

a. The Grace Creditors Committee's and the Grace Equity Committee Agreed with Grace's Proposal To Nominate David Gross as the Futures Representative in the Grace Proceedings

The *Grace* Movants and the *Owens Corning* Movants point to Gross' and Hamlin's proposed appointment as a futures representative in the *W.R. Grace* case as evidence of an appearance of partiality. Of course, this Court was never called upon to rule on the proposed appointment, as the motion was presented to the Bankruptcy Court. Nevertheless, the proposed appointments speak volumes about the widespread notice of Gross' and Hamlin's roles in the *G-I* case. Moreover, the lack of any objection for several months shows that, tactical considerations aside, informed parties did not perceive any partiality problem.

In July 2003, after several unsuccessful attempts to reach agreement with its creditors on an individual who could serve as the futures representative, Grace proposed David Gross for that position. *See* July 22, 2003 letter from E. Inselbuch to D. Bernick (K00098-99) [App. 001387-88]. Janet Baer, a partner at Kirkland & Ellis who was involved in Grace's attempts to obtain the consent of its creditors to the appointment of Gross as the futures representative, spoke with both counsel for the Grace Creditors Committee (Lewis Kruger from Stroock) and counsel for the Grace Equity Committee (Gary Becker of Kramer Levin) about Gross's suitability for the position of futures representative in Grace.[19] *See* July 31, 2003 e-mail from J. Baer to D. Bernick re: conversation with L. Kruger (K00102) [App. 001389]; August 1, 2003 e-mail from J. Baer to D. Bernick re: conversation with G. Becker (K00106) [App. 001390]; Eckstein Dep. at 43:9-18. Neither the Grace Creditors Committee nor the Grace Equity Committee (represented by Kramer Levin) ever stated that it objected to Gross's appointment as futures representative and, accordingly, Baer announced on August 15, 2003, that Grace would be moving forward to file a Motion to appoint Gross. *See* August 15, 2003 e-mail from J. Baer to L. Kruger, G.

---

[19] Mr. Becker's firm, and Mr. Becker personally, also appeared in court on behalf of the Bank Group in the Owens Corning case.

34

Becker, *et al.* (K00107) [App. 001391]; Gross Depo. at 356:24-356:5 ("I was told that it [nomination as a futures representative in Grace] would be acceptable to the other parties in the case").[20]

    4.    The USG Bankruptcy Proceedings

        a.    USG Background

The asbestos liability issues in the *USG* bankruptcy are closely contested. According to its Informational Brief, the principal issue that USG wished to resolve through bankruptcy was its "enormous, growing, and grossly disproportionate asbestos liabilities." *See* USG Debtors' Informational Brief, filed June 27, 2001 at 1 [App. 001392-1426]. Yet, in this case, the debtors were also aware of Hamlin's role in *G-1* and raised no question as to his role as an advisor or this Court's impartiality.

Like the *Owens Corning* motion, the *USG* motion arises out of closely contested litigation before this Court that has not gone according to USG's wishes. Significantly, the parties in the *USG* case have extensively litigated the issues surrounding an asbestos bar date – an issue that the *Owens Corning* and *Grace* Movants suggest specifically implicates Hamlin's and Gross' alleged conflict. *See In Re USG Corp.*, Memorandum Opinion and Order dated February 19, 2003 [App. 001427-39]. Yet, their recusal motion does not derive from a perceived conflict involving Hamlin and Gross, rather USG complains about this Court's *ex parte* conferences.

In USG litigation over the scope of the cancer claims bar date remains unresolved since this Court entered its memorandum and Order holding that it would establish a cancer claims bar date which would then be followed by an estimation hearing to value the cancer claims. [*Id.*]. The Court instructed USG to propose a cancers-only bar date order and proof of claim form within 30 days of its Order and stated that it would afford all parties the opportunity to comment upon it. [*Id.*]. USG duly filed its proposed Bar

---

20    Gross ultimately declined to be nominated as the Grace futures representative. Gross Dep. at 354:5-355:12. Baer communicated that fact to counsel for the Grace Asbestos PI and PD Committees, counsel for the Grace Creditors Committee and counsel for the Grace Equity Committee, and proposed Judge Hamlin instead. September 16, 2003 e-mail from J. Baer dated (KL00160) [App. 001440]. Both Gross and Hamlin testified that had either appointment gone forward, they would have resigned as advisors to Judge Wolin because Grace was a case assigned to Judge Wolin. Gross Dep. at 362:13-20; Hamlin Dep. at 184:23-185:17.

Date Order, Claim Form and Notice Program and on April 7, 2003 it notified all interested parties that (1) any objections to USG's proposed claim form must be served by letter to the Court no later than April 18 [2003] and that (2) the Court would hold a Status Conference on April 23 [2003]. *See* April 7, 2003 letter from USG counsel Stephen Neal to the Court [App. 001471]. The USG Official Committee of Asbestos Personal Injury Claimants ("USG ACC") and the USG futures representative filed their objections to USG's proposed proof of claim form and notice program. *See* April 18, 2003 letter from E. Inselbuch to the Court [App. 001472-83] and a status conference was held on April 23, 2003.

Following that status conference, over the next several months the parties attempted, but were unable, to resolve their differences relating to the scope of the cancer claims bar date, the values for cancer claims to be used for estimation purposes, the valuation of USG's business or the information to be required on the proof of claim form.[21]

Despite two additional status conferences with the Court on June 5 and September 30, 2003, the issues dividing the parties remained unresolved. *See* September 25, 2003 letter from E. Inselbuch to Court and opposing counsel [App. ___] By October 31, 2003, the parties were still discussing the cancer claimant bar date order and information required for the proof of claim form. See October 31, 2003 Letter from E. Inselbuch to USG counsel [App. __].

On November 21, 2003, USG filed its motion to recuse the Court.

      b.    USG's Early Knowledge of Judge Hamlin's Role in *G-I*

Despite the close litigation of the asbestos liability issues between USG and the Asbestos Claimants' Committee in that case, USG never raised any objection to Hamlin's role as an advisor to this

---

[21]     *See* (April 30, 2003 letter from counsel for USG to opposing counsel) [App. 001484] (relating to values for cancer claims); (June 12, 2003 letter from USG's counsel to the Court and opposing counsel [App. 001485]; (June 19, 2003 letter from Elihu Inselbuch to USG counsel [App. 001486-87]; (July 22, 2003 letter from Elihu Inselbuch to the Court and opposing counsel) [App. 001488-90]; (July 25, 2003 Letter from Stephen Neal to the Court and opposing counsel; [App.001491-92]; (Supplemental Brief in Support of Debtors' Memorandum Regarding Bar Date Order and Claim Form, filed by USG July 23, 2003 ) [App. 001493-1501]; (Response of the Asbestos Personal Injury Creditors Committee to Debtors' Supplemental Brief in Support of Their Memorandum Regarding Bar Date Order and Claim Form, filed August 13, 2003) [App. 001502-18].

Court after it learned of his role in *G-I*. In January 2002, USG learned of Judge Hamlin's role as the futures representative in *G-I*. January 12, 2004 USG Stipulation [App. 001469-70]; Pasquale Declaration ¶ 5 [App. 001334-37]; Stroock Fee Application dated February 14, 2002, at p. 5 [App. 001338-86, 1349]. On January 24, 2002 USG's general counsel Stanley Ferguson and Lewis Kruger, the lead counsel to the USG Creditors Committee, had a telephone conversation regarding an "objection to Hamlin as he is Future Rep in *G-I*". *Id.* On February 20, 2002, USG's counsel wrote a letter to the Court in which he stated "while everything we have heard about Messrs. Hamlin and Keefe suggests they are well-suited for the role the Court envisions, we remain concerned that an unsatisfied party would attempt to overturn an approved plan of reorganization by claiming that they are conflicted." Cooley Godward February 20, 2002 letter to Judge Wolin at p. 12 [App. 001519-32].

        c.    USG's Ex Parte Contacts

USG and its counsel have engaged in *ex parte* communications with both the Court and the Court's Advisor Francis McGovern. See November 20, 2003 Declaration of Stanley L. Ferguson [App. 001533-36]; November 20, 2003 Declaration of Scott D. Devereaux [App. 001537-42]; Cooley Godward, LLP Fee Application for the Period January 1-31, 2002 at p. 43 [App. 001543-1692, at 1661]; Cooley Godward, LLP Fee Application for the Period April 1-30, 2002 at p. 9 [App. 001693-1824, at 001706]. Despite being on notice since December 2001 that the Court and its advisors would engage in *ex parte* communication with the parties and their counsel in the Five Cases, neither USG nor any other party in the USG case ever objected to the Court or its advisors engaging in *ex parte* communications until it filed the instant recusal motion.

### III. ARGUMENT

A.    Movants Have Failed to Show That Disqualification Is Warranted Under 28 U.S.C. § 455(a)

28 U.S.C. § 455(a) provides:

> "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

The Third Circuit has stated in this case that "[t]he test for recusal under § 455(a) is whether a reasonable person, *with knowledge of all the facts*, would conclude that the judge's impartiality might reasonably be questioned." *In re Kensington Int'l Ltd.*, 2003 U.S. App. LEXIS 26554 (3d Cir. 2003) (emphasis added). *Accord In re Prudential Ins. Co. America Sales Practice Litig. Agent*, 148 F.3d 283 (3d Cir. 1998), *aff'd in part, rev'd in part*, 278 F.3d 175 (3d Cir. 2002). ("Under § 455(a), 'if a reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality under the applicable standard then the judge must recuse'"). As used in § 455(a), the term "impartiality" means not having a "prejudice or bias." *See Liteky v. United States*, 510 U.S. 540, 552 (1994).

In evaluating a challenge under § 455(a), "the Court must begin its analysis of the allegations supporting such a request with a presumption against disqualification." *Cobell v. Norton*, 237 F. Supp. 2d 71, 78 (D.D.C. 2003). *See also First Interstate Bank of Arizona, N.A. v. Murphy, Weir & Butler*, 210 F.3d 983, 985 (9th Cir. 2000). Moreover, "there must be a more compelling standard for recusal under § 455(a) after the conclusion of a trial than before its inception." *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 237 (3d Cir. 2001). "[T]he disqualification decision must reflect *not only* the need to secure public confidence through proceedings that appear impartial, *but also* the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." *In re Allied-Signal, Inc.* 891 F.2d 967, 970 (1st Cir. 1989). *See also In re Aguinda*, 241 F.3d 194, ___ (2d Cir. 2001) ("'a judge is as much obliged not to recuse himself where it is not called for as he is obliged to when it is'").

1.     The Court's Contacts With The Members Of The Advisory Panel Are Not <u>Grounds For</u>
       <u>Disqualification</u>

Here, Movants do not contend that this Court actually is biased or prejudiced. Nor has discovery revealed a single instance of pro-asbestos claimant bias by this Court or prejudicial influence by any of the advisors. Rather, movants point to this Court's contacts with its panel of five advisors as somehow creating doubts about the Court's impartiality. In particular, the movants point to there being a so-called "structural conflict" given that two of the advisors to this Court -- Judge Hamlin and Mr. Gross -- are also the futures representative and his counsel, respectively, in the *G-I Holdings* case pending before Judge Gambardella.    Movants fail to establish, however, that the reasonable man, knowing all the circumstances, would have had reason to question the Court's impartiality. Consequently, Movant's motions, pursuant to 28 U.S.C. § 455(a), should be denied.

It is common knowledge that the courts have been inundated for years by a flood of tort cases seeking damages as a consequence of asbestos exposure. As the United States Supreme Court has recognized: "The 'elephantine mass of asbestos cases' lodged in state and federal courts . . .' defies customary judicial administration.'" *Norfolk & Western Railway Co. v. Freemanayers*, 538 U.S. 135, \*\*\*55 (2003). As a result, on November 27, 2001, Chief Judge Becker of the Third Circuit Court of Appeals assigned the Five Cases to this Court, characterizing the consolidation as "critically important to the administration of justice" given that "a significant portion of the asbestos cases in this country are proceeding under the aegis of this litigation." *See* November 27, 2001 Order [App. 001825-26]. Hence, the reasonable man would recognize that this case is, borrowing the words of the First Circuit in *In re Allied-Signal, Inc.*, 891 F.2d 967, 971 (1st Cir. 1989),

> not an ordinary case. It is large, complex, and time consuming; it involves hundreds of lawyers, thousands of parties, and hundreds of millions of dollars in potential damages. It is a case where the need for judicial management by the district court counsels caution prior to intervention by an appellate court. And it is a case of a sort that the Supreme Court has singled out for somewhat special treatment.

Given that this Court was, in late 2001, unfamiliar with the world of asbestos litigation, the reasonable observer would have had no reason to perceive that the Court exhibited prejudice or bias in promptly seeking input from a panel of advisors experienced in various aspects of asbestos litigation. The Court made the appointments openly, formally designating the advisors "Court Appointed Consultants to advise the Court and to undertake such responsibilities, including by way of example and not limitation, mediation of disputes, holding case management conferences, and consultation with counsel, as the Court may delegate to them individually." *See* Dreier Dep. Ex. 1.

Industry media reporting on the Court's advisory group made clear that the advisors were, indeed, experienced and distinguished, describing Mr. Dreier as "former presiding judge in the appellate division of the Superior Court of New Jersey," Mr. Gross as a senior partner in the Budd Larner law firm "who has served as a national counsel for Johns-Mansville's asbestos litigation cases," Mr. Hamlin as having been a New Jersey Supreme Court judge from 1978 to 1998, Mr. Keefe as a former New Jersey Superior Court judge and Mr. McGovern as a "law school professor and expert on alternative dispute resolution." Case Dep. Ex. 8 [App. 001257-62]. The public record reflected that Mr. Gross had 40 years of experience in mass tort, products liability, primary and excess insurance coverage, class actions and multi-district litigation including complex asbestos and asbestos-related bankruptcy litigation. (Gross Decl. at ¶ 2). He had represented both plaintiffs and defendants but was, by reputation, considered a "defense lawyer" for most of his career. (*Id.*) The public record also showed that, as a judge in New Jersey, Judge Hamlin was assigned statewide responsibility for complex mass tort matters, managing statewide litigation involving, *inter alia*, breast implants, Norplant contraceptive claims and large scale environmental claims. (Hamlin Ex. 3, Ex. 1). Finally, in January 2002 industry media disclosed that Hamlin had previously been appointed as Futures Representative in *G-I* and that Gross was to be his local counsel.

The mere fact that the Court looked for assistance to individuals knowledgeable about asbestos litigation generally is not alone sufficient to give rise to a reasonable basis for questioning the Court's impartiality. *Cf. United States v. Bonds*, 18 F.3d 1327, 1329 (6th Cir. 1994) ("[T]he law is clear that a

40

judge's interest or expertise in a given area, or his methods of informing himself as to a given area of the law, do not constitute grounds for recusal unless they come within some other, specific grounds for recusal"); *In re Aguinda*, 241 F.3d 194 (2d Cir. 2001) ("we see little reason to adopt a rule . . . that would deter judges from seeking to educate themselves in various disciplines. This is particularly the case in an age in which specialized knowledge is important to the exercise of the judicial function").

Nor is the fact that two of the Court's five advisors had roles in another asbestos case before another judge reasonable grounds for doubting this Court's impartiality in the Five Asbestos Cases. There has been no suggestion that there was any relationship between decisions by this Court in the Five Cases and the activities of Judge Hamlin and Mr. Gross in the *G-I Holdings* case. Even if Judge Hamlin and Mr. Gross had expressed views on asbestos litigation that were colored in some way by their participation in *G-I Holdings*, that would not be grounds for recusal. As the Second Circuit stated in *In re Aguinda*, 241 F.3d 194, 205 (2d Cir. 2001):

> [F]ederal judges routinely receive free copies of books, journals, magazines, and other publications that discuss disputed policy issues without any imputation . . . that, if they read some of the unsolicited materials, they are thereafter recused on any matter connected with those issues . . . 'That a lecture or seminar may emphasize a particular viewpoint or school of thought does not in itself preclude a judge from attending. Judges are continually exposed to competing views and arguments and are trained to weigh them.' Codes of Conduct at IV-151.

Moreover, the perception of the fully informed reasonable person would no doubt be influenced heavily in this situation by the fact that not one of the litigants here expressed any objection to any member of the Court's advisory panel for two years. To be sure, Movants' attempt to make much of the fact that the Court did not expressly call attention to the fact that Mr. Hamlin was appointed in October 2001 as the representative of future claimants in the *G-I Holdings* case and that Mr. Gross was acting as his counsel. However, even assuming, *arguendo*, that some interested parties in this case were unaware, until recently, of the roles Messrs. Hamlin and Gross played in the *G-I Holdings* case, the informed reasonable observer would appreciate that their participation in *G-I Holdings* was clearly not a secret.

The involvement of Messrs. Hamlin and Gross was a matter of public record and was not widely known in the world of asbestos litigation. Nonetheless, for two years, there was no objection from any of the litigants in any of the Five Cases. As the court stated in *Allied-Signal*, 891 F.2d at 972:

> [T]he parties' own words and deeds may help determine the extent to which a knowledgeable observer would see, in a particular circumstance, a sign of partiality. Here, the record suggests that the district court reasonably believed that the parties . . . were aware, or should have been aware, of the relationships involved.

In the words of the First Circuit, the fact that the parties knew or should have known about the involvement of Hamlin and Gross in *G-I Holdings* suggests that those associated with the case did not see their roles in *G-I Holdings* "as carrying . . . a threat to the impartiality of the [instant] proceedings; and that fact helps to support the . . . conclusion that a 'knowledgeable' objective observer would not have seen . . . a significant indication of partiality." *Id.*

The fully informed reasonable man would be aware that *Mealey's Litigation Report: Asbestos*, dated January 18, 2002, reported on the very same page about both Judge Gambardella's appointment of Judge Hamlin as the futures representative in *G-I Holdings* and on this Court's appointment of the panel of five advisors. In discussing this Court's appointment of Judge Hamlin in this case, *Mealey's* expressly described him as the "legal representative of present and future holders of asbestos-related demands in G-I Holding's Chapter 11 case." Case Dep. Ex. 9. The same information also appeared in *Mealey's Asbestos Bankruptcy Report* for January 2002. Case Dep. Ex. 6. Discovery has shown that Davis Polk, counsel to the Creditors Committee in *Owens-Corning*, Kramer Levin, counsel to the Bank Group in *Owens-Corning* and Stroock & Stroock & Lavan, counsel to the Creditors Committee in *USG* all subscribed to at least one of the two Mealey's reporters.

Furthermore, discovery has revealed that Judge Hamlin's appointment in the *G-I Holdings* case was actually known, at the time, by Davis Polk, Kramer Levin, Stroock, and the general counsel of USG. On October 15, 2001, Stephen Case of Davis, Polk and Wardwell received an e-mail that had come to

Davis Polk from Fleet, then a member of both the Bank Steering Committee in *Owens-Corning* and the OC Creditors Committee, advising of Mr. Hamlin's appointment in *G-I*. (Case Ex. 10; Case Dep. 69-70).

The Kramer Levin firm was a regular recipient of the filings in the *G-I Holdings* case on behalf of a client that was considering an investment. Eckstein Decl., at ¶¶ 5-6 [App. 001162-1218, at 001204]. As a result, in October 2001, Kramer Levin received and retained copies of the *G-I* order appointing Judge Hamlin as the futures representative. [App. 000080-82]. In January 2002, Kramer Levin received and retained a copy of the *G-I* order appointing Mr. Gross and his firm as Mr. Hamlin's counsel. [App. 001104-43]. Furthermore, David Klein, a Kramer Levin associate from January 2001 until June 2001 and again since September 2002, clerked for Judge Gambardella between September 2001 and July 2002, when Judge Gambardella appointed Messrs. Hamlin and Gross in the *G-I Holdings* case, and knew of the Hamlin appointment. (Eckstein Dep. at 27-29).

Stroock and its client, USG, admittedly were aware of Hamlin's *G-I* role early in 2002 and considered the possibility of there being a conflict. Needless to say, Stroock decided not to challenge Mr. Hamlin's participation as an advisor in this case.

More recently, but well before the recusal motion, Mr. Gross's roles in both *G-I Holdings* and the instant cases were mentioned from the podium during a panel discussion on asbestos litigation. Indeed, at a June 2, 2003, Mealey's Asbestos Bankruptcy Conference held in Philadelphia, David Gross, a participant in one of the panel presentations was introduced by the moderator as "one of the members of the management committee appointed by Judge Wolin and is also the counsel for the futures representative on the G-I bankruptcy." Mealey's Asbestos Bankruptcy Litigation Conference Attendee List and Videotape [App. 001935-44; videotape]. The moderator of the discussion was Prof. Frances McGovern, another of Judge Wolin's advisors and the panel included Judge Gambardella, the judge in the *G-I Holdings* case, and Lewis Kruger of Stroock, counsel to the Creditors Committee in the USG case. The conference was attended by scores of lawyers involved in asbestos litigations including Helen

Hamilton from Movant Deutsche Bank and William S. Katchen of Duane Morris LLP, co-counsel to the creditors committee in *USG.* [*Id.*].

It would also be significant to the informed reasonable man that the publicly available time records filed by Judge Hamlin and Mr. Gross reflect that the advisory panel meetings concluded in May 2002. (Hamlin Dep. at. 231-233). There were only four such meetings and they lasted a total of 18 hours. (*Id.*) Beyond the four meetings, Mr. Hamlin's role was limited to writing draft opinions on discrete issues; he had no further personal contact with Judge Wolin after May 2002. (Hamlin Dep. at 242). In other words, whatever Mr. Hamlin may have done in the *G-I* case after May 2002 pursuant to his fiduciary duties as the futures representative, could not possibly have had any impact on this Court or the instant cases.[22]

Mr. Gross's time records reflect that after the four meetings with Judge Wolin his role became that of a settlement facilitator rather than an advisor to the Court. There has been no suggestion that Mr. Gross' conduct in that role was colored by his being Judge Hamlin's counsel in *G-I.* Finally, in light of the fact that the advisors meetings with the Court ended in May 2002, the fact that Messrs. Gross and Hamlin may, in 2003, have cited to events in the Five Cases as precedent in the *G-I Holdings* case most certainly does not suggest that the participation by Messrs. Gross and Hamlin in the Five Cases is a reasonable basis for questioning the Court's impartiality.[23]

Furthermore, the factual record demonstrates that there was nothing improper about the substance of the Court's communications with the advisors. All of the advisors testified that they discussed general matters with this Court with regard to the history and judicial administration of asbestos cases. They

---

[22] The meetings of the futures representatives collectively, which at times included Judge Hamlin as well as the futures representatives in the instant cases, are thus irrelevant in that they occurred after Judge Hamlin's last personal contact with this Court. (Hamlin Dep. at 261-62).

[23] We note that both Judge Hamlin and Mr. Gross made clear at their depositions that they never communicated with the Court regarding the principal issues in the Five Cases such as the imposition of a bar date and claim valuation. (Gross Dep. at 372-81; Hamlin Dep. at 58, 241). As Mr. Hamlin said of the advisors' meetings with the Court: "We took no position on specific issues." (Hamlin Dep. at 230).

44

drew upon their knowledge of asbestos and mass tort litigation to discuss such topics as the use of a Rule 706 expert panel or the appropriate manner to administer claims asserted by unimpaired asbestos claimants.

Moreover, with respect to Hamlin and Gross, no evidence exists that either of them advocated that the Court take any position whatsoever on any disputed asbestos related matter in these cases. Neither Hamlin nor Gross presented the Court with any disputed evidence. And neither Hamlin nor Gross, whose decades of experience as a mass torts judge and defense counsel, respectively, belie any claimed pro-asbestos bias, discussed with the Court any fact or matter they may have gained from their involvement in the *G-I* case in any of the four meetings they had with the Court in their role as advisors between January and May 2002. *See* Gross Dep. at 381:24-382:4. Against this background, no reasonable person could infer the appearance of any pro-asbestos partiality by this Court.

The cases that have been cited by Movants do not support their contention that recusal is warranted. In *In re School Asbestos Litig.*, 977 F.2d 764, 770 (3d Cir. 1992), for example, the recusal motion was predicated on the fact that the judge had approved an *ex parte* request by plaintiffs for $50,000 from a settlement fund to support a scientific conference on a key merits issue -- the hazards of asbestos. The judge attended the apparently "one-sided event" at which "most of the plaintiffs' expected expert witnesses presented views similar to those they intended to express at trial." *Id.* In deciding that the district judge should have been disqualified, the Third Circuit pointed to the fact that the judge had "attended a predominantly pro-plaintiff conference on a key merits issue"; that the conference was indirectly sponsored by funding which the judge approved; that the funding approved by the judge had largely defrayed the judge's expenses; and that the judge had observed a "pre-screening" of the plaintiffs' case, hearing thirteen of the eighteen expert witnesses. *Id.* at 781-82. Here, by contrast, the advisors were not scientific experts and/or prospective trial witnesses. They provided background information generally gleaned from public sources or collected through years of observation in unrelated litigation.

45

Similarly, in *In the Matter of Edgar*, 93 F.3d 256, 257 (7th Cir. 1996), the court disqualified a district judge who met *ex parte* with three court-appointed experts who provided a "preview" of the expert panel's conclusions and who sought to persuade the Court that the panel's methodology was sound. Again, as in *School Asbestos Litig.*, the judge heard potential trial evidence directly from experts who were to be trial witnesses. Moreover, the Seventh Circuit characterized the experts as having become "partisans" by the time they met with the judge. Here, the members of the Court's panel were not to be testifying witnesses. Nor is there any suggestion that, collectively, they favored certain parties over others.

*Hall v. Small Bus. Admin.*, 695 F.2d 175 (5th Cir. 1983), which Movants have cited, concerned a law clerk who worked on a decision with the judge even though the clerk was a member of the plaintiff class and went to work for the plaintiff's law firm before the decision in question issued. Here, by contrast, the members of the Court's advisory panel do not have a personal stake as plaintiffs nor do they have any relationship with the firms involved in the Five Cases. Similarly, *First Interstate Bank of Arizona, N.A. v. Murphy, Weir & Butler*, 210 F.3d 983 (9th Cir. 2000), concerned a situation where a bankruptcy judge's law clerk was hired for employment after the clerkship by counsel to a creditor in a proceeding before the judge. The clerk continued working on the case with the judge. In other words, the clerk had a relationship with one of the firms litigating the case the clerk was working on. Here, the members of the advisory panel have no relationship with the firms involved in the Five Cases. Any supposed conflict arises from the participation of Judge Hamlin and Mr. Gross in another litigation before a different judge.

Finally, the Court's contacts with the five advisors does not constitute a basis for disqualification under § 455(a) because the contacts were not extrajudicial. Rather, they occurred within the framework of the instant litigations. *See Liteky v. United States*, 510 U.S. 540 ("opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated

favoritism or antagonism that would make fair judgment impossible"). A full discussion of the applicable law is set forth in Point II below.

2.     The Court's *Ex Parte* Contacts With The Parties Are Not Grounds For Disqualification

The Court's *ex parte* meetings with the various parties to the Five Cases most certainly do not warrant recusal. As explained above, the Court made clear to the parties from the outset that the Court intended to have ex parte contacts with the parties. [App. 001911-25, at 001915-23]. And, absent any expressed objection by the parties, all objections were deemed waived. (*Id.*).

Furthermore, as this Court has indicated in its submission to the Third Circuit, the Court has made itself available to all parties and no allegation has been made that this Court has granted favored access to one interest over another. [App. 001911-25]. This fact has been borne out in the discovery conducted in connection with these recusal motions. In virtually every case, either the Movants or a representative of a creditor's committee that represented a Movant's interest has had access to the Court for *ex parte* conferences. Brodsky Dep. at 81:14-82:8; 150:3-151:12 (detailing *ex parte* conferences in which Kensington and Springfield or the OC Creditors Committee participated). Based on this record, no reasonable observer could conclude that the Court's impartiality could be reasonably questioned from the *ex parte* contacts.

B.     The Movants Have Not Shown That Disqualification Is Warranted Under 28 U.S.C. 455(b)(1)

28 U.S.C. § 455(b)(1) requires that a judge disqualify himself "where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." Here, though, none of the Movants contend that this Court is actually biased or prejudiced. To the extent the Movants address Section 455(b)(1), the focus of the argument is on alleged improper *ex parte* communications among the Court, the Advisors and the parties.[24] For example, USG argues that

---

[24]     Only USG extensively relies upon Section 455(b)(1) in making its recusal arguments. The Movants in W.R. Grace (D.K. Acquisitions, *et. al.*) and CSFB in Owens Corning have not even asserted a violation of Section 455(b)(1), while Kensington in Owens Corning and the Creditors Committee in USG provide only a cursory Section 455(b)(1) argument. (*See* Kensington Motion ¶¶ 4, 8, 55-56; USG Committee Motion ¶ 37.)

the Court must recuse itself because by communicating *ex parte* with the parties in the Five Cases as well as with the Court's five advisors, the Court has "gained knowledge regarding disputed issues in the case through an extrajudicial source." (USG Motion at 3.) Similarly, some of the Movants argue that the Court must recuse itself because its advisors had *ex parte* communications with individual parties. (*See* USG Motion at 25; USG Committee Motion ¶ 37; Kensington Motion ¶¶ 55-56.)

As demonstrated below, there are multiple reasons why a motion under Section 455(b)(1) here is baseless.

1.  *Ex Parte* Communication With The Court And/Or The Advisors Was Proper Given Movants' Consent And Willing Participation

As Movants concede, *ex parte* communications are permitted where the judge obtains "the parties' advance consent to confer with them separately in an effort to mediate or settle a pending matter." (USG Motion at 21). Indeed, the Third Circuit approvingly cited that the "Code of Judicial Conduct for United States Judges permits separate conversations with parties with the consent of counsel who are authorized to object." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 182 n.5 (3d Cir. 2002) (approving decision that district court (Judge Wolin) "could permissibly engage in ex parte communication in a complex class action") (quotation marks and citation omitted).

In *In re Beard*, 811 F.2d 818 (4th Cir. 1987), a group of product liability claimants in the Dalkon Shield litigation appealed the decision of the district court to deny their recusal motion under §§ 455(a) and 455(b)(1). The motion was based upon, *inter alia*, an *ex parte* meeting that the judge had with the owners of the debtor before the company filed for Chapter 11 protection. The Fourth Circuit held that the meetings did not require disqualification because, among other reasons, all the parties in the cases "pending before the district court consented to the meeting." *Id.* at 829. "Because the parties agreed to the action taken by Judge Merhige, we see no basis for disqualification." *Id. See also In re Big Rivers Elec. Corp.*, 213 B.R. 962 (Bankr. W.D. Ky. 1997) (denying recusal motion that was predicated on court's confidential *ex parte* conversations with a court-appointed Examiner where the court had

informed the parties that *ex parte* communications would be taking place and no objection was raised); *Geneva Assurance Syndicate Inc. v. Med. Emergency Servs. Associates (MESA), S.C.*, 1993 WL 384566 (N.D. Ill. Sept. 28, 1993) (frequent *ex parte* contact with consent of parties in attempt to settle case was not basis for recusal); *Lazofsky v. Sommerset Bus Co.*, 389 F. Supp. 1041, 1044 (E.D.N.Y. 1975) (denying recusal motion where plaintiff had consented to *ex parte* communication between the defendant and the judge).

On December 20, 2001, the Court informed each of the parties in the Five Cases that "in order to effectively case manage complex litigation, it is necessary for the judge to speak and/or meet with attorneys on an <u>ex parte</u> basis, without permission of adversary attorneys any objection to such ex parte communication is deemed waived." [App. 001911-25]. Since that time, all of the parties, including all of the proponents of the Recusal Motion or their representatives, have availed themselves of the opportunity and have raised no objection to the Court having such contacts. (*Id.*) Moreover, the record indicates that *ex parte* communications occurred on a fair and an even-handed basis, with no constituency being provided with special access to the Court. [App. 001945-61]. Movants cannot pretend that they did not know about the Court's *ex parte* meetings with other constituencies because all such meetings were disclosed in multiple publicly filed fee applications.

Thus, because Movants consented to and willingly engaged in *ex parte* communications with the Court and the advisors, such communications do not provide a basis for recusal.[25]

---

[25]    USG suggests that the frequency of *ex parte* contacts has only recently become so pervasive in its case, thus explaining both its delay in moving for recusal on this ground and apparently negating its consent to the procedure which it has utilized. But, this is disingenuous -- the record demonstrates that there has been no increase in *ex parte* contact in any of the cases pending before the Court. To the contrary, over the past year, the number of *ex parte* communications with the Court in all the cases has decreased. [App. 001945-61].

2.     Movants' Section 455(b)(1) Argument Fails Because The *Ex Parte* Communications
       Here Do Not Satisfy The Extrajudicial Source Requirement

Movants virtually ignore *Liteky v. United States*, 510 U.S. 540, 555 (1994), the leading Supreme

Court decision concerning 28 U.S.C. §§ 455(a) and 455(b)(1), which makes clear that the *ex parte*

argument raised by Movants must fail because "opinions formed by the judge on the basis of facts

introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not

constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or

antagonism that would make fair judgment impossible."[26]  *Liteky* controls here because the Court's

appointment of Messrs. Hamlin and Gross as advisors and the Court's alleged *ex parte* contacts with the

advisors and with parties in the Five Cases all occurred within the framework of the pending cases; there

is no allegation that the Court communicated with an extrajudicial source.

Courts have routinely held that *ex parte* contact made during the course of a pending proceeding

is not a basis for recusal under 28 U.S.C. § 455. For example, in *United States v. Yousef*, 327 F.3d 56,

169-170 (2d Cir. 2003), the defendants in the World Trading Center bombing case moved to recuse the

district court judge from ruling on a motion relating to the sealing of materials provided to the

government by an informant because of, *inter alia, ex parte* communications between the court and the

government relating to the sealed materials.  The Second Circuit affirmed the denial of the motion

because the meetings occurred in the course of judicial proceedings.  *Id.* at 170.  The Second Circuit

explained that "the Supreme Court has held that judicial rulings and the opinions formed by judges on the

basis of facts introduced in the course of proceedings almost never constitute a valid basis for a bias or

partiality motion . . . unless they display a deep-seated favoritism or antagonism that would make fair

judgment impossible." *See also In re Grand Jury 95-1*, 118 F.3d 1433, 1438 (10th Cir. 1997) (only

"knowledge which the judge obtained extrajudicially, *e.g.*, through prior representation of a party, or by

---

[26]     Only USG even cites *Liteky* (at 24), and, in that case, only in passing.

witnessing the events at issue in the proceeding," and not "knowledge obtained in the course of related judicial proceedings" constitutes personal knowledge) (internet quotation marks and citation omitted), *United States v. Yonkers Bd. of Educ.,* 946 F.2d 180, 184 (2d Cir. 1991) (recusal motion premised on various *ex parte* meetings that the judge and his housing advisor had with opposing counsel and non-parties to the case denied because, among other reasons, the information "was acquired by Judge Sand in his judicial capacity" and "did not relate to disputed evidentiary facts"); *In re Beard,* 811 F.2d 818, 829 n.16 (4th Cir. 1987); *United States v. Page,* 828 F.2d 1476, 1480-81 (10th Cir. 1987); *United States v. Hillsberg,* 812 F.2d 328, 335 (7th Cir. 1987); *In re Big Rivers Elec. Corp.,* 213 B.R. 962, 976 (Bankr. W.D. Ky. 1997) ("Where, as in this case, the allegations of impropriety stem from ex parte communications occasioned by the exercise of judicial functions known to the parties and contemplated by unchallenged court orders, such contacts cannot be considered 'extra-judicial'").

Here, the fact that the parties would have *ex parte* communications was part of the Court's initial case management order. The Court engaged in such communications in an attempt to manage effectively the five massive and complex bankruptcy cases. Under the overwhelming case law cited above, any facts learned at such meetings, either with the advisors or the parties, was not an extra-judicial source and therefore does not mandate recusal under § 455(b)(1).[27]

---

[27] USG argues that improper *ex parte* meetings between the advisors and the parties violates Section 455(b)(1). But the record is clear -- Hamlin, Keefe and Dreier testified that they did not meet with the parties *ex parte*, while McGovern and Gross only met with the parties in their role as mediators or settlement facilitators. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 278 F.3d 175, 182 n. 5 (3d Cir. 2002) (agreeing with district court statement that *ex parte* communication during settlement is permitted); *Bilello v. Abbott Labs.,* 825 F. Supp. 475, 479 (E.D.N.Y. 1993) (denying defendant's recusal motion in DES litigation where judge's *ex parte* meetings with plaintiffs and plaintiff's counsel in which they revealed all of the prospective evidence did not constitute extra-judicial knowledge because he obtained the information in his role as settlement judge). Moreover, as mediators, they did not report back information that they learned from the parties to the Court. In fact, in Owens Corning, the parties consented to allow the Court to mediate their dispute in 2003, thus, waiving any argument that *ex parte* meetings with the Court were improper.

51

3.  Movants' § 455(b)(1) Argument Also Fails Because There Is No Evidence That The Court Was Provided With Improper *Ex Parte* Information Of Disputed Evidentiary Facts Concerning The Proceeding

In order to prevail on a motion to recuse pursuant to § 455(b)(1), a movant must establish that the Court has personal knowledge of "disputed evidentiary facts concerning the proceeding." "The disqualification provision is directed toward knowledge of disputed evidentiary facts, that is, matters underlying the cause of action." *Plechner v. Widener College, Inc.*, 569 F.2d 1250, 1263 (3d Cir. 1977) (holding that issues "directed toward routine judgments of credibility," such as knowing a fact witness, do not qualify as "disputed evidentiary facts"). Consequently, when a judge learns non-evidentiary background information not particular to the case or undisputed facts, even extrajudicially, § 455(b)(1) does not require recusal.

Courts have held, therefore, that background facts, facts regarding the administration of a case, and factual information that the judge obtains in order to ensure that orders are complied with, are not evidentiary facts.

In *In re Prudential Ins. Co. Of Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 344 (3d Cir. 1998), *aff'd in part, rev'd in part*, 278 F.3d 175 (3d Cir. 2002), the Third Circuit held that an *ex parte* meeting between the judge and insurance regulators did not constitute grounds for recusal as the purpose of the meeting was to "address the possibility of merging" two settlements related to a deceptive sales practices class action lawsuit against Prudential Life Insurance Company. As such, the meeting with the insurance regulators was not a basis for recusal because it did not relate to disputed evidentiary facts before the court, *e.g.*, whether the proposed settlement was adequate. *See also In re Wyoming Tight Sands Antitrust Cases*, 726 F. Supp. 288, 291-92 (D. Kan. 1989) (denying recusal where, among other things, judge's testimony "provides background information" and did not concern "disputed evidentiary facts"); *Beard*, 811 F.2d at 829 (denying mandamus petition requesting recusal where, among other things, the subject of an *ex parte* meeting with the owners of the defendant "was not upon the merits of

the litigation, but only a limited inquiry into the chances that the company would file its petition in bankruptcy."

Facts regarding the administrative aspects of a case are also not evidentiary facts. In *In re Casco Bay Lines, Inc.*, 17 B.R. 946, 956 (1st Cir. 1982), stockholders of the debtor attempted to recuse the judge pursuant to 455(a) and 455(b)(1) based, *inter alia*, on *ex parte* communications between the judge and the trustee. *Id.* at 952. The First Circuit held that "*ex parte* communications between a bankruptcy judge and a...trustee do not require a judge to disqualify himself where such contacts involved questions on administrative aspects of cases or an exchange of pleasantries, and did not involve disputed issues or trial strategy." *Id.* at 956. *See also Cobell*, 237 F. Supp. 2d at 92 (denying recusal where court received from court-appointed monitor, just "the general nature of his activities," but never disclosed to the Court "any of the bare facts").

Even evidentiary facts, when undisputed, do not create grounds for recusal under § 455(b)(1). In *N.Y. State Nat'l Org. for Women v. Terry*, 732 F. Supp. 388 (S.D.N.Y. 1990), defendants argued that the judge should recuse himself from ruling on a pending civil contempt motion relating to various anti-abortion protests because the judge happened to pass by a protest that was at issue in the case. The court denied the motion holding that "[b]ecause the fact that a demonstration occurred . . . is not disputed by either defendants or respondents," and therefore, "there is simply no basis upon which to justify recusal under Section 455(b)(1)." *Id.* at 398.

*Edgar v. K.L.*, 93 F.3d 256, 259-60 (7th Cir. 1996), the case that is repeatedly cited by the Movants, involves a completely different factual scenario than here. First, the court appointed experts were appointed to be supposedly neutral fact witnesses who would study the health care system and then present an opinion concerning the state of the Illinois health care system, which was the critical fact issue in the case. *Id.* at 257. The appointment order specifically did not allow for ex parte contact, but the panel began to meet privately with the judge expressing partisan views concerning the subject after receiving "secret submissions from advocacy groups," after which the judge "expressed confidence that

the panel's report is invulnerable to challenge." *Id.* at 260-61.

The advisors here are not fact witnesses. The Court has utilized them to educate itself concerning general issues in asbestos bankruptcy, not the specific facts of the Five Cases. (*See, e.g.*, McGovern Dep. at 48:19-49:3 ("generally speaking, people were at a much more abstract level of discussion than any kind of specifics about anything the Judge should or shouldn't do. It . . . was more at that level than anything specific").[28] There is no evidence that the Court has relied upon a single advisor, let alone Hamlin or Gross, in issuing any substantive decisions in these cases. That *ex parte* contact would exist between the Court and the advisors, and between the advisors and the parties has been known by all since the advisors were first appointed. It would be completely unprecedented to require recusal in such circumstances.

Because the advisors provided the Court with background information regarding asbestos litigation generally, and not "disputed evidentiary facts concerning the proceeding[s]" pending before the Court, § 455(b)(1) is not a basis for recusal.[29]

## C.    The Recusal Motions Are Untimely Or Are Barred By Laches

The need for timely filing of recusal motions is obvious -- avoiding unnecessary waste of judicial and litigant resources while discouraging the strategic use or timing of recusal motions when a litigant receives or expects an unfavorable ruling. As the Third Circuit stated in *Smith v. Danyo*, 585 F.2d 83, 86 (3d Cir. 1978): "The judicial process can hardly tolerate the practice of a litigant with knowledge of

---

[28]    Movants may argue that that Judge Dreier's notes apparently indicate that at one meeting, attended by the Court, Dreier, Gross and McGovern, there was a discussion about the fact that the parties in OC disagreed about asbestos claims valuation. (Gross Dep. at 118:21-120:7.) Gross testified that he did not recall such a discussion. *Id.* Nevertheless, the fact that the OC Creditors Committee, ACC and Futures' Representative have different views of the valuation of asbestos claims against Owens Corning is hardly a "disputed" fact. Moreover, any knowledge gained by the Court regarding this difference was obtained in the context of its participation in settlement and mediation efforts between the parties and cannot form a basis for recusal. *See Prudential*, 278 F.3d at 182 n. 5; *Bilello*, 825 F. Supp. at 479-80.

[29]    *United States v. Craven*, 239 F.3d 91, 103 (1st Cir. 2001), which Movants cite, was a decision not to remand, not a recusal motion under 28 U.S.C. § 455. The district court unquestionably issued its sentencing decision in the criminal case based on an *ex parte* discussion it had with its court-appointed expert psychologist. Moreover, the parties were never told that an *ex parte* discussion had taken place between the judge and the expert and therefore "the government had no realistic opportunity to challenge the expert's conclusions."

circumstances suggesting possible bias or prejudice holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming." *See also In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 2001) (recusal motions must be scrutinized with care because of risk that party is engaging in "judge-shopping"); *In re Kansas Pub. Employees Sys.*, 85 F.3d 1353, 1360 (8th Cir. 1996) ("even though § 455 has no express timeliness requirements, claims under § 455 will not be considered unless timely made"); *E. & J. Gallo Winery v. Gallo Cattle Co.* 967 F.2d 1280, 1295 (9th Cir. 1992) (timeliness requirement prevents parties from "withhold[ing] recusal motions, pending a resolution of their dispute on the merits, and then if necessary invoke section 455 in order to get a second bite at the apple"); *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333-34 (2d Cir. 1987) (late recusal motion evidences effort by party to "hedg[e] its bets").

Courts have repeatedly denied recusal motions based on violations of § 455(a) where the movant did not bring the motion at the earliest moment after acquiring knowledge or notice of the facts giving rise to the disqualification motion. *See Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 236 (3d Cir. 2001) (affirming denial of recusal motion based on untimeliness); *Smith v. Danyo*, 585 F.2d 83, 86 (3d Cir. 1978); *Schreiber v. Kellogg*, 838 F. Supp.. 998, 1004 (E.D. Pa. 1993) ("A request for recusal or disqualification under either section [144 or 455(b)(1)] must be timely made"); *Samuel v. Univ. of Pittsburgh*, 395 F. Supp. 1275, 1279 (W.D. Pa. 1975), vacated by 538 F.2d 991, 22 Fed.R.Serv.2d 51 (3rd Cir. 1976) (stating that when plaintiff's counsel filed disqualification motion thirteen months "after knowledge of all facts showing the supposed bias" motion to disqualify was untimely).[30]

---

[30] Courts in other jurisdictions similarly follow this rule of law. *See In re Kansas Pub. Employees Sys.*, 85 F.3d 1353, 1360 (8th Cir. 1996); *Summers v. Singletary*, 119 F.3d 917, 920 (11th Cir. 1997); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1295 (9th Cir. 1992); *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333-34 (2d Cir. 1987) ("It is well-settled that a party must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim"); *United States v. Murphy*, 768 F.2d 1518, 1541 (7th Cir. 1985) (rejecting disqualification motion where verdict had already been reached in case); *Singer v. Wadman*, 745 F.2d 606, 608 (10th Cir. 1984) (denying motion to disqualify where it was "filed about one year after complaint filed and after the appellants had suffered some adverse rulings on interlocutory matters");*United States v. Int'l Bus. Machines (In re Int'l Bus. Machines)*, 618 F.2d 923, 932 (2d Cir. 1980); *Jackson v. Fort Stanton Hospital*

The need for timeliness in a bankruptcy case is all the more important as the rights and interests of all the parties are prejudiced by untimely filings. In this case, literally tens of millions of dollars were invested in a process involving a proposed reorganization plan, disclosure statement, Inter-Creditor process, and a trial of the Substantive Consolidation Motion. Movants would have this Court rule that knowledge by their counsel, their agents and other representatives of their interests, and the ease of discovery from the public record, is to be given no consideration. Instead, the Court is told it must rely on the self-serving assertions of the Movants, which lack credibility, that they first discovered facts leading to these motions on or about September 24, 2003; that they cannot be charged with knowledge despite their counsel's and their agents' knowledge; and that they should be allowed to assert their claim even though those charged with representing their interests – those upon whom the Court relied in that respect – knew the facts from the outset and elected not to object.

1.      Movants Had Actual Knowledge of the Dual Roles of Hamlin and Gross

USG Movants cannot dispute that they knew of the dual roles undertaken by Hamlin and Gross since the outset. Kensington and Springfield deny actual knowledge but, candidly, that denial stretches credibility to the limit:

- Brodsky (representing Kensington and Springfield) was a member of the Bank Group Steering Committee. At least two other members of that Group (Fleet and JP Morgan/Chase), had direct knowledge of Hamlin's appointment in *G-I* and one, JP Morgan/Chase, had direct of Hamlin's and Gross' role in both cases [Case Dep. Ex. 10];

- Davis Polk, with whom Brodsky dealt repeatedly, monitored the G-1 case assiduously for the OC Creditors Committee and reported to the committee on its findings [App. 000873-920; Eckstein Dep. at 71:10-73:1]; and

- Eckstein and others at Kramer Levin had notice of the dual roles played by Hamlin and Gross from publications and receipt of *G-I* pleadings and had an intimate relationship with Brodsky, conferring at least 243 times about the *Owens Corning* case since June 2001 [App. 000208-872].

---

*& Training School*, 757 F. Supp.. 1231, 1243 (D.N.M. 1990) (denying plaintiff's motion based on *ex parte* communications between expert selected by defendant that assisted judge in formulating his opinion since plaintiffs previously agreed to the procedure).

Given this substantial circumstantial record, it is difficult to accept Kensington's and Springfield's claim that they lacked direct knowledge.

In *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223 (3d Cir. 2001) the movant, despite protestations of ignorance, was found to have actual knowledge of grounds for disqualification in circumstances strikingly similar to this case. Among other things, the judge's prior offer to disqualify himself in a related case "was a matter of public record" and the judge's prior employment at the defendant attorney's law firm "had been published in his profile contained in .....*Justices and Judges of the United States Courts.*" Most importantly, parties closely intertwined with the movant had knowledge of the alleged grounds of recusal from the time of the offer to disqualify in the related case. Under these circumstances, the Third Circuit rejected the movant's claim of lack of actual knowledge:

> [I]t is hardly possible to accept such a representation [lack of knowledge] in light of the circumstances***[Movants] will not be permitted to hide behind corporate forms to assert lack of knowledge or notice. Agency's argument that neither it nor its counsel knew of the prior CGA disqualification was not convincing to the District Court, nor to us.

240 F. 3d at 236-37.[31] Kensington and Springfield's assertion of lack of knowledge must be viewed with equal skepticism and should not be a basis for excusing the untimeliness of its motion.

2. In Considering The Timeliness Of A Party's Motion to Recuse, That Party Is Charged With The Knowledge Of Its Counsel

In litigation, a party is charged with knowledge of facts that are learned by the party's attorney, who acts as the party's agent and whose knowledge is imputed to the client. *See Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994); *U.S. v. Daley*, 564 F.2d 645 (2d Cir. 1977); *Universal City Studios, Inc. v. Reimerdes*, 104 F. Supp. 2d 334, 349 (S.D.N.Y. 2000) (imputing attorney's knowledge to client for

---

[31] The *Martin* case has another remarkable similarity to this case. In *Martin*, the movant, after trial, began the process to seek the judge's recusal on other meritless grounds. In the course of such action the movant allegedly discovered the facts on which it ultimately relied. In this case, Kensington and Springfield alleged that they "discovered" the roles of Hamlin and Gross while looking for improprieties regarding Professor McGovern.

57

purposes of determining timeliness of recusal motion); *Georgine v. Amchem Products, Inc.*, 1994 WL 637404 (E.D. Pa. Nov. 10, 1994) (imputing knowledge that attorney gained in representing different client in the same proceeding to plaintiffs even though firm did not even represent plaintiffs at the time that the knowledge was learned); *In re Land,* 215 B.R. 398 (B.A.P. 8th Cir. 1997); *In the Matter of Robinson*, 228 B.R. 75 (Bankr. E.D.N.Y. 1998) (knowledge of creditor's attorney imputed to creditor); *In re Felberman*, 196 B.R. 678 (Bankr. S.D.N.Y. 1995); *In re Savage,*167 B.R. 22 (Bankr. S.D.N.Y. 1994); *Jensen v. Snellings*, 636 F. Supp.. 1305, 1311 (E.D. La. 1986) ("The laws of agency apply to the attorney-client relationship").[32]

Between June 2001 and June 2003 (when Kensington retained separate counsel), Kramer Levin, according to its own representation to the parties and the Court, represented the entire Bank Group in the *Owens Corning* bankruptcy case. Stipulation and Order Regarding Inter-Creditor Discovery unless in the brief [App. 000177-207]. Throughout this period (which included the substantive consolidation discovery and trial proceedings), Brodsky consulted closely and continuously with Kramer Levin on case developments and trial strategy. *E.g.*, Eckstein Dep. at 71:10-73:1 During these critically important proceedings, Kensington and Springfield saw no divergence in their interests and those of CSFB, as agent, or the other members of the Bank Group. Kensington did not retain separate counsel despite the fact that it had purchased $290 million face value of the bank debt.

In the recusal proceedings, Kensington and Springfield attempt to distance themselves from the knowledge of Kramer Levin. In the context of a recusal motion, this Court need not rely upon technical niceties to avoid practical realities. This Court can and should conclude that an attorney-client

---

[32] As set forth above, Stroock, counsel to the Creditors Committee in both *USG* and *W.R. Grace*, was well aware of Judge Hamlin's appointment in *G-I Holdings* and considered the possibility of there being a conflict in early 2002. (Pasquale Decl. para. 5-6 .) The Duane Morris firm, which represents the USG Creditors Committee, is also counsel to the Creditors Committee in *G-I Holdings* and necessarily knew of the appointments of both Judge Hamlin and Mr. Gross. Consequently, creditors of both USG and W.R. Grace are charged with having had knowledge long ago. Movant Deutsche Bank also was represented at a June 2 Mealey's conference at which Mr. Gross's roles in *G-I Holdings* and the Five Cases were mentioned. Finally, each of the Grace Movants is or was during the relevant period an owner of the Bank Debt and is, thus, charged with the knowledge of CSFB and the Bank Group's counsel.

relationship exists between Brodsky and Eckstein. As the Court has itself observed, Eckstein has repeatedly represented Brodsky in proceedings before the Court.

It is undisputed that Kramer Levin received the notice of appointment of Hamlin and his employment of Gross. *Jenkins v. Sterlacci*, 849 F.2d 627, 632-34 (D.C. Cir. 1988) (disqualification denied where a partner of the movant's counsel had knowledge of relevant facts), *reh'g denied*, 856 F.2d 274 (D.C. Cir. 1988); *Universal City Studios*, 104 F. Supp. 2d at 349. *Cf. Thomas v. N.A. Chase Manhattan Bank*, 1 F.3d 320, 325 (5th Cir. 1993) (finding that, under New York law, the knowledge of a partner or an agent is imputed to other partners and principals). In this proceeding, the date on which Kramer Levin received these notices marks the time when Kensington, Springfield and the entire Bank Group are to be charged with the knowledge of the relevant facts. Because Kramer Levin received notice at the time of Hamlin's and Gross's dual appointments, it is far too late to move for recusal now.[33]

3.  The Movants Are Also Charged With Knowledge of Facts Readily Available In The Public Record

Proof of actual and conscious knowledge of the grounds for recusal is not necessary for a timeliness or laches defense to a recusal motion.

Movants are "charged with knowledge of all facts known or knowable, if true, with due diligence from the public record or otherwise." *Universal City Studios, Inc. v. Reimerdes*, 104 F. Supp. 2d 334, 349 (S.D.N.Y. 2000) (internal quotation marks and citations omitted). *Martin*, 240 F.3d at 236 (judge's prior offer of disqualification in related case "was a matter of public record, as was waiver" of other counsel and the judge's prior affiliation with a law firm). *See also Hirschkop v. Virginia State Bar Ass'n*, 406 F. Supp. 721, 724 (E.D. Va. 1975); *Accord United States v. Daley*, 564 F.2d 645, 651 (2d Cir. 1977), (holding application untimely because, *inter alia*, facts upon which it was based "as a matter of public

---

[33]  Kensington and Springfield are also charged with the knowledge of their agent and representative CSFB. As a matter of law, CSFB possesses the knowledge of Kramer Levin as its counsel. Again under ordinary agency principles, CSFB's knowledge (through counsel) imputed to Kensington and Springfield as CSFB's principals.

record were at all times discernable by counsel"), *cert. denied,* 435 U.S. 933 (1978); *Reilly v. United States,* 863 F.2d 149, 160 (1st Cir. 1988) (condemning appellant's belated complaint about district judge's appointment of a technical advisor where the district court "advised the parties that it [would] . . . employ a technical advisor" and appellant "did not inquire as to the expert's identity or express any objection to the court's use of an (unknown) expert," failed to "request that any safeguards be set in place," and instead "sat back and knowingly acquiesced in the court's unconditional hiring of an unidentified technical advisor").

If the rule were otherwise, a mere denial of knowledge – like that asserted here – would be sufficient to avoid the timeliness bar despite the dire consequences to all other parties in permitting such belated motions. *Travelers Ins. Co. v. Liljeberg Enterprises, Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994) (rejecting movants' argument that they did not have knowledge of the fact that judge and attorneys were members of an exclusive, elitist club, stating that it was significant that the district court had stated that he had disclosed his membership in the club during his confirmation process (approximately ten years earlier), and had listed it for approximately the past eight years in the Almanac of the Federal Judiciary, which was "widely circulated to the bench and bar"); *U.S. v. Branco*, 798 F.2d 1302, 1305 (9th Cir. 1986) (denying recusal motion that was premised upon statement the district judge had made nine years earlier that he would impose maximum sentences on persons affiliated with organized crime; court stated, among other things, "surely, this material could have been found before sentencing"); *United States v. Daley*, 564 F.2d 645, 651 (2d Cir. 1977), (holding application untimely because, *inter alia,* facts upon which it was based "as a matter of public record were at all times discernable by counsel"); *Huff v. Standard Life Insurance Co.*, 643 F. Supp.. 705, 708 (S.D. Fl. 1986) (denying motion that was in part based on the assertion that the judge deliberately retained the case after it had been assigned to another judge, as the movant "could have easily ascertained from the public records in the office of the Clerk of Court, the facts pertaining to transfer of cases to new judges in August 1985" and movant "demonstrated a lack of diligence in waiting almost one year to raise this issue as a ground for recusal...six days before trial"); *In*

*re Big Rivers Elec. Corp.*, 213 B.R. 962, 967 (Bankr. W.D. Ky. 1997) (*ex parte* conversations with Examiner did not constitute basis for recusal where that fact was known and could have been discovered by examining order appointing the Examiner, Examiner's application for fees, and the Examiner's monthly billing statements); *Hirschkop v. Virginia State Bar Ass'n*, 406 F. Supp. 721, 724 (E.D. Va. 1975).

The Movants are, thus, charged with knowledge of the voluminous disclosures in the public record. Here, that record contained a flood of information regarding Hamlin's and Gross' roles in *G-I*. In this context, the claim of ignorance by Kensington and Springfield, even if believed, looks at best like a claim of willful blindness. The claimed ignorance of the Grace Movants is equally unavailing. Indeed, it is most telling that when it suited their purposes, Movants were able to search the entire public record and identify multiple sources confirming the roles played by Hamlin and Gross in a matter of minutes. The case of that search clearly demonstrates that the public record provided ample notice to Movants all along, had they been in the least bit interested or concerned about the identities and activities of Hamlin and Gross.

4.    Kensington And Springfield Are Bound By The Failure Of Either The OC Creditors Committee Or CSFB, As Agent, To Object

As detailed above, Davis Polk, counsel to the OC Creditors Committee, learned from a member of the Committee in October 2001 that Judge Hamlin had been appointed the futures representative in *G-I Holdings*. (Case Dep. at 69-71; Case Ex. 10). Moreover, Davis Polk regularly followed the docket in the *G-I Holdings* case which reflected the appointments of both Judge Hamlin and Mr. Gross. (Case Dep. at 40-41). In addition, Davis Polk received the January 2002 edition of *Mealey's Asbestos Bankruptcy Reporter* which reported the appointment of Mr. Hamlin in *G-I Holdings*.

As counsel to the OC Creditors committee, Davis Polk represented the interests of all the non-asbestos creditors in *Owens-Corning*, including Kensington and Springfield. A creditors committee is a fiduciary for the body of unsecured creditors as a whole. *See, e.g., Woods v. City Nat'l Bank & Trust Co.*,

312 U.S. 262, 268 (1941); *In re Mountain States Power Co.*, 118 F.2d 405, 407 (3d Cir.1941); *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 655, 664 (Bankr.E.D.Pa.1987); *In re Johns-Manville Corp.*, 26 B.R. 919, 924-26 (Bankr.S.D.N.Y.1983); Comment, The Chapter 11 Creditors Committee: Statutory Watchdog?, 2 Bankr. Dev. J. 247, 271-72 (1985); and A. DeNatale, The Creditors Committee Under the Bankruptcy Code--A Primer, 55 Am Bankr. L.J.. 43, 56-58 (1981). Counsel for the Committee, as a fiduciary for the client, is also a fiduciary for the unsecured creditor body as a whole. *See, e.g., Pension Benefit Guaranty Corp. v. Pincus, Verlin, Hahn, Reich & Goldstein, P.C.,* 42 B.R. 960, 963 (E.D.Pa.1984); *Grant Broadcasting*, supra, 71 B.R. at 662; and Comment, supra, 2 Bankr. Dev. J. at 275-76.

As the representative of the creditor body, the action or inaction of the committee may bind creditors without specific notice or knowledge, as the committee is deemed to have adequately represented their interest. For example, in *Lindsey v. Dept. of Labor (In re Harris Management Co., Inc.)*, 791 F.2d 1412 (9th Cir. 1986) the debtors sent notice of a proposed assumption of contract, assuming the court would give creditors the chance to object. Instead, the court signed an order granting the assumption almost immediately. When debtors' counsel learned of the signed order, they notified the Creditors Committee and suggested that the committee notify the court of any objection. The committee did not object. A subsequent Chapter 7 trustee argued the assumption would not bind the estate because the creditors generally were not properly given an opportunity to object. The court rejected the trustee's position, holding that the committee's decision not to object was sufficient to bind all creditors. In *Van Dorn Retail Mgt., Inc. v. Sovran Bank/DC National, Inc.*, 1991 WL 222061 (D. D.C. Oct. 9, 1991), the court, citing *Harris*, found that a creditor who did not receive actual notice of the assumption and assignment of certain leases "had constructive notice of the bankruptcy proceedings" because "the unofficial creditors' committee had notice of the debtor's motions for assumption and assignment and when a creditors' committee receives notice of an assumption, no further notice to individual creditors is required." *In Jonas v. U.S. Small Business Admin. (In re Southland Supply, Inc.)*, 657 F.2d 1076 (9th Cir.1981), actual notice to creditors was not required where committee counsel participated in loan

negotiations and signed an order approving arrangement on behalf of the committee. This was considered adequate to represent the rights of all creditors of the estate and bind the entire estate. In each of these contexts, as here, a creditors' committee and its counsel are the agents or representatives of all creditors, sparing such creditors of the requirement to participate personally in all aspects of the case. Thus, if a creditors committee or its counsel learns of facts which might give rise to a motion for recusal early in the case yet does not raise any objection, an individual member of that creditor body should not be heard to complain long after the fact.

Were the rule otherwise, there could never be any notion of finality or timeliness on a motion for recusal in a bankruptcy case. A bankruptcy proceeding is not like normal litigation, where the parties to the case remain the same throughout and are typically actively involved in the litigation. Creditors within each constituency change on a regular basis as bank or bond debt is traded from its initial holders to third parties. The Official Committee of Asbestos Personal Injury Claimants represents the interests of a class of creditors that has over 200,000 members and is growing daily. Unless a motion for recusal brought by a creditor based on facts that were both publicly disclosed and known to counsel for the OC Creditors committee more than two years before is treated as untimely, there would never be any certainty or finality in this bankruptcy case. Each new creditor would have the independent right to seek recusal.

The First Circuit applied a similar principle to the analogous situation of a mass tort litigation in which certain parties brought a recusal motion after trial based on the relation of certain attorneys in the case to a law clerk. *In re Allied-Signal, Inc.*, 891 F.2d 967, 972 (1st Cir. 1989) (Breyer, J.). The Court held that the fact that representative parties with knowledge did not seek recusal was relevant to consideration of the recusal motion. The First Circuit also noted "those associated with the case did not see the 'sibling relationship' as carrying with it a threat to the impartiality of the proceedings; and that fact helps to support the district court's conclusion that a 'knowledgeable' objective observer would not have seen in the relationship a significant indication of partiality." Moreover, the proper remedy even if they had found an appearance of partiality would be "to proceed without the clerks, not to disqualify

himself." *Id.* It was clear to the First Circuit that the remedy sought by the movant was unwarranted and would render substantial injustice far outweighing any possible appearance of partiality. 891 F.2d at 973.

It is clear in this case that none of the Movants have any basis to excuse the highly prejudicial delay in bringing these motions. The other parties to these bankruptcy cases should not be made to bear the consequences of these motions brought tardily for strategic reasons.

5.   Movants Are Barred From Relying On *Ex Parte* Communications As The Basis For A Motion Under 28 U.S.C. Section 455(b)(1) Because They Knew And Participated In Such Communications For Two Years

Just as a recusal motion based upon § 455(a) must be brought in a timely fashion, a motion premised on § 455(b) must also be timely. *Summers v. Singletary*, 119 F.3d 917, 920 (11th Cir. 1997) ("timeliness is a component of § 455(a) . . . we see no reason to distinguish between [(a) and (b)]"); *In re Kansas Pub. Employees Ret. Sys.*, 85 F.3d 1353, 1360 (8th Cir. 1996) ("our circuit has consistently required timely action as to § 455 in general, i.e., as to both (a) and (b)"); *United States v. York*, 888 F.2d 1050, 1055 (5th Cir. 1989) ("we conclude that it is more consistent with the legislative purposes underlying the entirety of section 455 for us to construe both subsections (a) and (b) as requiring timeliness").

Accordingly, courts have frequently denied recusal motions under § 455(b)(1) where the motions were untimely. *See, e.g., United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 183 (2d Cir. 1990) (request for recusal untimely under§ 455(b)(1) as "motion to disqualify must be made at the earliest possible moment") (internet quotation marks and citation omitted); *United States v. York*, 888 F.2d 1050, 1055 (5th Cir. 1989); *Willner v. Univ. of Kan.*, 848 F.2d 1020, 1023 (10th Cir. 1988) ("[w]ithout reaching the question of whether [petitioner's] several allegations might ever suffice in a timely-filed § 455 [(a) and (b)(1)] motion, we conclude that denial of these untimely motions did not constitute an abuse of discretion"); *In re Int'l Bus. Machines Corp.*, 618 F.2d 923, 932 (2d Cir. 1980); *Schreiber v. Kellogg*, 838 F. Supp.. 998, 1004 (E.D. Pa. 1993) (recusal motion untimely under both §§ 455(a) and (b)(1)); *In re*

*Wyoming Tight Sands Antitrust Cases,* 726 F. Supp.. 288, 289 (D. Kan. 1989).[34]

There is no dispute that the Court made clear at its initial December 20, 2001 conference with the parties in these cases that it contemplated conducting *ex parte* meetings with the various parties. (Wolin 11/21/03 Supp. Response).[35] Since then, "CEOs, General Counsel, CFO's and varied litigation counsel were uniformly granted access to the Court." (Id.; *see also* Judge's log, Ex. ___). Moreover, from the time records filed by the Courts' five advisors, all parties knew that in early 2002 the Court was meeting with the advisors outside the presence of the parties. Movants cannot argue now that the District Court's *ex parte* meetings require recusal when they participated in such communications, without objection, for close to two years. Having sat on their hands for all this time, any effort by movants to disqualify this Court by reason of its *ex parte* meetings with the parties or the advisors, is barred by laches.

D.     Any Assertion That The Court Should be Disqualified Because It Has Prejudged The Motion Is Factually Incorrect And Contrary To Law

Movants may argue, based on the deposition testimony of Judge Dreier, that the Court should be disqualified on the grounds of bias because it has allegedly prejudged the merits of the Motion. However, Judge Dreier's testimony that he had a conversation with the Court, on October 31, 2003, in which the Court expressed its opinion that the Motion was "baseless," (*see* Dreier Tr. 130-133),[36] is not a basis for recusal.

---

[34]     In *In re Kensington Int'l Ltd.,* 2003 U.S. App. LEXIS 26554, at *23 (3d Cir. 2003), the Third Circuit stated that, in contrast to § 455(a), waiver does not apply under § 455(b). However, this does not negate the timeliness requirement under § 455(b). Although Section 28 U.S.C. § 455(e) provides that only § 455(a) conflicts are waivable, as demonstrated above, the Third Circuit has distinguished between waiver and timeliness.

[35]     Although at the time, the Court stated that all objections to that procedure were deemed waived, that did not prevent Movants or any other party from objecting to the Court's *ex parte* rule, at the time or thereafter.

[36]     Q:     Did the subject matter of any of those discussions relate to the recusal motion itself or the circumstances relating to the recusal motion? (130:12-15)
         A:     The circumstances, no. The fact of the motion and the opinion, his opinion of the validity, yes. But the underlying facts we never discussed. (130:18-21)
         Q:     What did he say?
         A:     That it was baseless. (131:1-4)
         Q:     Tell me everything you recall that Judge Wolin said that day regarding the recusal motion.
         A:     I have no specific recollection of the language other than his thought that the motion was baseless, that there was no influence on him or expressed by the other alleged participants and that he hoped that this matter would be resolved quickly. (133:8-17).

Courts routinely reject motions for recusal premised upon a court expressing its view of a pending motion. Granting recusal in such circumstances would run contrary to the rule set forth by the Supreme Court in *Liteky v. United States*, 510 U.S. 540, 555-56 (1994), that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *See SecuraComm Consulting, Inc. v. Securacom Inc.,* 224 F.3d 273, 278 (3d Cir. 2000) (affirming denial of recusal motion which was premised on judge's "negative comments" of defendant); *Blanche Rd. Corp. v. Bensalem Township,* 57 F.3d 253, 266 (3d Cir. 1995).

In *Johnson v. Trueblood,* 629 F.2d 287 (3d Cir. 1980), the Third Circuit affirmed the denial of the plaintiff's recusal motion that was based, among other things, on statements made by the district court during settlement negotiations of a federal securities lawsuit expressing esteem for the defendants, while questioning the "motive [of the defendants] in bringing the lawsuit." *Id.* at 291. The plaintiff's argued that the statements reflected extra-judicial bias because they were made "before any evidence had been adduced." *Id.* The Third Circuit rejected that argument holding that a "judge often can get a feel for a case prior to trial" and the "relevant inquiry is whether the trial judge's pretrial comments were linked to his evaluation of the case based on the pleadings and other materials . . . or whether the comments were based on purely personal feelings." *Id. See also United States v. Young,* 45 F.3d 1405, 1414-16 (10th Cir. 1995); *In re Casco Bay Lines, Inc.,* 17 B.R. 946, 955 (1st Cir. 1982); *Noli v. Comm'r of Internal Revenue,* 860 F.2d 1521, 1527 (9th Cir. 1988); *In re Kramer,* 64 B.R. 531, 532 (9th Cir. 1986); *In re M. Ibrahim Khan, P.S.C.,* 751 F.2d 162, 165 (6th Cir. 1984); *United States v. Azhocar,* 581 F.2d 735, 739 (9th Cir. 1978); *In re The Inn at Goose Rocks Ltd. Partnership,* 1990 WL 19988, at *6 (D. Me. Feb. 22, 1990).

Accordingly, as the cases make clear, this Court's statement to Judge Dreier concerning its views of the recusal motion cannot serve as the basis for a motion to disqualify as the statement does not constitute evidence of outside bias or prejudice. The conversation occurred after the Court had received and reviewed the motion papers. As demonstrated above, courts frequently express their preliminary

66

views concerning the merits of motions pending before them. Indeed, if every judge were to be recused who expressed a view of the merits of a motion prior to a final ruling, disqualification would become an everyday occurrence -- an abused tool to support unscrupulous litigation strategies.[37]

Moreover, subsequent to the conversation with Judge Dreier, on November 3, 2003, in its response to the Mandamus Petition, this Court unequivocally stated that it "will judge the Motion to Recuse on the law and facts presented after all of the parties have been heard in full." Indeed, the Third Circuit explicitly rejected a similar argument previously raised by Movants in connection with their mandamus petition, requesting that the motion be remanded to another district court judge because the Court had expressed skepticism about the merits of the Motion in its responses to the Third Circuit. (*See* Kensington Mandamus Reply at 3, 27-28.) The Third Circuit held that "we do not believe that Judge Wolin's written responses demonstrate that he will be unable to render an impartial decision on the recusal motions." *In re Kensington Int'l Ltd.*, 2003 U.S. App. LEXIS 26554 n.12 (3d Cir. 2003).

## IV. CONCLUSION

For the reasons stated herein, the motions to recuse filed in the *Owens Corning*, *W.R. Grace* and *USG* bankruptcy cases must be denied.

Respectfully submitted,

*Charles O. Monk, II*

SAUL EWING LLP
Norman L. Pernick (I.D. # 2290)
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE 19899-1266
(302) 421-6800

---

[37] That the Court's comment related specifically to the recusal motion, not the pending cases, does not alter the analysis. *See, e.g., Hook v. McDade*, 89 F.3d 350, 355-56 (7th Cir. 1996) (refusing to recuse a district judge after the judge stated that he found the recusal motion "offensive").

791286.2 1/15/04

Charles O. Monk, II
Matthew G. Dobson
100 South Charles Street
Baltimore, MD 21201-2773
(410) 332-8600

Attorneys for the Owens Corning Debtors
and Debtors-in-Possession

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
Peter Van N. Lockwood
Nathan D. Finch
399 Park Avenue
New York, NY 10022
(212) 319-7125

CAMPBELL & LEVINE
Marla Eskin (I.D. # 2989)
Chase Manhattan Center
15th Floor
1201 Market Street
Wilmington, DE 19899
(302) 426-1900

Attorneys for the Official Committees of
Asbestos Claimants

KAYE SCHOLER LLP
Michael J. Crames
Jane W. Parver
Aaron Stiefel
Edmund M. Emrich
425 Park Avenue
New York, NY 10022
(212) 836-8000

YOUNG, CONAWAY, STARGATT & TAYLOR LLP
James L. Patton, Jr. (I.D. #2202)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600

Attorneys for James J. McMonagle and
Dean M. Trafelet, Legal Representatives for
Future Claimants

Dated: January 15, 2004