IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |

## W.R. GRACE'S AMENDED RESPONSE TO THE MOTION OF D.K. ACQUISITION PARTNERS, LP. et al. TO DISQUALIFY THE HONORABLE ALFRED M. WOLIN

For over thirty years, simple formulas have not worked to solve the problems posed by the asbestos litigation. Formulas similarly are counterproductive in assessing the procedures that have been crafted by this Court to address those same problems through the bankruptcy process. Yet formulaic, extreme positions not only animate but dominate much of the briefing that has taken place concerning the issue of recusal. Examples include assertions that:

- This Court's Consultants are simply the equivalent of "law clerks" and their relationship with the Court should be analyzed as such;

- Assigned to preside over the largest consolidated asbestos proceeding ever, this Court must wear blinders to shield itself from what the active participants in the litigation themselves already know about the history of that litigation;

- The Court's consideration of any information about litigation so notorious that it appears in the daily newspapers warrants disqualification;

- Whether the Official Committees have known about the roles of Judge Hamlin and Mr. Gross has no relevance to whether their constituents are on notice of the same facts;

- A party can both know of and actively seek the benefit of procedures deployed by the Court for almost two years, and still proceed as if it were an innocent victim of those proceedings.

None of these fervently advocated assertions holds water—much less comes to grips with the reality of what has occurred in these cases. Faced with extraordinary problems, this Court

deployed extraordinary means to effectively manage these cases. And what the movants have now had the opportunity to demonstrate, but have failed to show, is dramatic:

- That anybody at any time objected to any of the procedures adopted by the Court;
- That any of the consultants provided legal or factual advice to the Court;
- That any official Committee only recently discovered the role of Hamlin or Gross in *G-I*;
- That any contested adjudication was tainted with nonpublic information;
- That any adjudication in the Grace case has related to personal injury.

What are most needed now are, *first*, a complete and balanced presentation of the facts and, *second*, an analysis of the law that squarely addresses the unique circumstances of these cases. Grace consistently has asked for the development of the facts, and in the proceedings before this Court has sought to explore those facts fully. This brief attempts to set out the resulting record, including the full context in which this Court has acted. By contrast, Grace consistently has left to others the ultimate issue of what legal standard should be applied to those facts. Again, in these proceedings, and in this brief, Grace seeks to delineate the unique legal issues that must be analyzed and does not take a position on what the appropriate legal standard is.

## STATEMENT OF FACTS

### I. This Court's Case Management System

On November 27, 2001, five complex asbestos-related Chapter 11 cases pending in the United States District Court for the District of Delaware (hereinafter "the five asbestos bankruptcies" or "the five cases") were transferred to this Court by order of then-Chief Judge Becker of the Third Circuit. Given the enormity of the task it was thus assigned, this Court (1) elected to permit *ex parte* contacts with the constituencies involved in these cases and (2)

2

sought the aid of a group of five experienced lawyers and judges to serve as "Court Appointed Consultants," all as part of a case management system.

These steps have been a matter of public record since these cases were transferred in late 2001. The developed record in this case now shows further that the roles played by Mr. Gross and Judge Hamlin in the *G-I* bankruptcy case were likewise well known to counsel for the Committee charged with representing the movants in the *Grace* case—as they were to other counsel actively participating in the *Owens Corning* and *USG* cases. No objection was raised for nearly two years by any party in any of the five cases. Thus, as the Court surmised in its original filing in the Third Circuit, the timing of the belated effort to recuse this Court in the *Grace* case continues only to support the inference that the movants' motives are strategic.

A.   **Fallout of a tort system in crisis:  The enormity of the task posed by these asbestos bankruptcy cases.**

As the Supreme Court observed in 1999, the tort system is besieged by an "elephantine mass of asbestos cases" that "defies customary judicial administration."[1] For years, the situation has been "a disaster of major proportions to both the victims and the producers of asbestos products" alike.[2] The Rand Institute observed recently that "[t]he projections vary, but they do agree that the litigation is far from over.  It is possible that millions of claims have yet to be made."[3] The tort system has failed to resolve that litigation fairly or efficiently.  Many

---

[1]   *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999).

[2]   REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 2 (Mar. 1991). *See also Georgine v. Amchem Prods., Inc.*, 157 F.R.D. 246, 265 (E.D. Pa. 1994), *vacated*, 83 F.3d 610 (3d Cir. 1996), *aff'd*, 521 U.S. 591 (1997).

[3]   DEBORAH R. HENSLER ET AL., ASBESTOS LITIGATION COSTS AND COMPENSATION: AN INTERIM REPORT 78 (Rand Inst. 2002)

3

manufacturers have already sunk into bankruptcy as a result, and many more will in the future. In short, this is a system in "crisis."[4]  Courts, scholars and journalists have described this as an "avalanche of litigation"[5] a "serious problem,"[6] a "dilemma,"[7] a "disaster,"[8] a "monster,"[9] and a "mass farce."[10]  Indeed, "[n]o mass tort litigation . . . has received more intense criticism than the litigation concerning exposure to asbestos."[11]

In the absence of judicial or legislative solutions to the asbestos morass, even otherwise healthy companies have broken under the load of asbestos-related claims against them.  As claims volumes have increased and plaintiff settlement demands have risen dramatically, more

---

[4]  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 597 (1997); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 618 (3d Cir. 1996) , *aff'd*, 521 U.S. 591 (1997).

[5]  *Jenkins v. Raymark Indus.*, 782 F.2d 468, 470 (5th Cir. 1986).

[6]  *In re Asbestos Litig.*, 829 F.2d 1233, 1235 (3d Cir. 1987), *cert. denied*, 485 U.S. 1029 (1988).

[7]  *Jenkins*, 782 F.2d at 470.

[8]  REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 2 (Mar. 1991); *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 14 (1999) (statement of Professor William N. Eskridge, Jr., Yale Law School).

[9]  Michael France and Stephanie Anderson Forest, *The Asbestos Monster: How Scary for Halliburton?* BUS. WK., Dec. 24, 2001.

[10]  Roger Parloff, *The $200 Billion Miscarriage of Justice: Asbestos Lawyers are Pitting Plaintiffs who aren't Sick Against Companies that Never Made the Stuff—and Extracting Billions for Themselves*, FORTUNE MAG., Mar. 4, 2002.

[11]  Howard M. Erichson, *Mass Tort Litigation and Inquisitorial Justice*, 87 GEO. L. J. 1983, 2017 (1999).  *See also* Peter H. Schuck, *The Worst Should Go First: Deferral Registries in Asbestos Litigation*, 15 HARV. J.L. & PUB. POL'Y 541, 541 (1992); Steven L. Schultz, In re Joint Eastern and Southern District Asbestos Litigation: *Bankrupt and Backlogged – A Proposal for the Use of Federal Common Law in Mass Tort Class Actions*, 58 BROOK. L. REV. 553, 590 (1992); *In re Asbestos Litig.*, 829 F.2d at 1235, 1261.

4

than 20 U.S. manufacturers have sought bankruptcy protection from asbestos claims since 2000, including the Debtors in these five cases.

While Chapter 11 perhaps provides the last resort for resolution of these cases, moving the asbestos crisis from the tort system into the bankruptcy system hardly simplifies the issues facing presiding courts.   In any major asbestos bankruptcy case, a dizzying array of constituencies appear before the court, all jockeying to achieve their diverse objectives.  As Professor McGovern testified at deposition, potential stakeholders participating in an asbestos bankruptcy may include current tort claimants, future tort claimants, secured financial creditors, unsecured financial creditors, insurers, property damage tort claimants, pension funds, the debtor's unions, shareholders, management, directors and employees, plus the U.S. Trustee. (McGovern Dep. at 186-188.)  Not only will disputes arise *between* these constituencies, but even *within* constituencies there is the potential for conflict.  For example:

> there are wide varieties of insurance contracts that companies enter into over a long period of time and, as a result, the interpretation of those contracts can create conflicts among insurance companies because one interpretation would benefit one set of carriers and another interpretation would benefit another." (*Id*. at 188.)

As another example, unimpaired asbestos bodily injury claimants may have different interests than severely impaired claimants.  (*See, e.g. id*. at 187-88; 10/24/03 Memorandum [of the Official Committee of Unsecured Creditors] in Support of Motion for Structural Relief Required to Eradicate the Legal and Ethical Conflicts of Asbestos Law Firms, *In re Owens Corning et al.*, Case No. 00-03837.)   Aligned constituencies may change during the course of a case. (McGovern Dep. at 189-190.)  Sources of negotiating power may evolve over time.  (*Id*. at 191-192.)  And, with billions of dollars on the line, no stone is left unturned by *any* of these parties.

It was against this backdrop that Judge Becker issued the November 27, 2001 order transferring the five cases to this Court, writing that "[a]s Chief Judge of the Court of Appeals

and presiding officer of the Judicial Council of the Third Circuit, it is my considered judgment that these bankruptcy cases, which carry with them tens of thousands of asbestos claims, need to be consolidated before a single judge so that a coordinated plan for management can be developed and implemented." (11/27/01 Order, Jt. App. Ex. 91 at JA002177.) Judge Becker candidly noted that "[a]s a significant portion of the asbestos cases in this country are proceeding under the aegis of this litigation, I deem this assignment and consolidation critically important to the administration of justice." (*Id.* at JA002177-2178)

Judge Becker sought to enhance the oversight of these cases by assigning all five of them to a single judge, and the logic behind this assignment is not questioned. But it likewise cannot be questioned that the challenges facing this Court were compounded by the fact that the Court had to address not just one, but *five* multibillion dollar bankruptcies, simultaneously. The Court must deal with five complete sets of the complex array of stakeholders described above. And, beyond the common conceptual threads running across these Chapter 11 cases, each case also presents its own unique factual and legal issues.[12]  No such consolidated assignment of five asbestos cases had ever been undertaken in the bankruptcy context. (McGovern Dep. at 195, 196.) Judge Hamlin—a jurist with twenty years of experience on the bench—described the task at hand poignantly:

---

[12] Professor McGovern summarized some of the prominent differences in the cases: In Owens Corning, "the issues that were pushed were substantive consolidation, fraudulent conveyance, estimation of tort personal injury claims"; for Armstrong, "there was an interest on the part of management to provide some type of compensation to shareholders," fraudulent conveyance and substantive consolidation were not issues, but property damage was a significant issue; in Federal-Mogul, there was no property damage, substantive consolidation or fraudulent transfer, but there was "an effort on the part of management to get warrants for equity"; Grace's unique issues included Zonolite attic insulation litigation issues and an asbestos-related mining problem in Libby, Montana. (*Id.* at 210-216.)

And for those of us who had been in this business more than 20 minutes, these were central issues on a[n] unsolvable problem. And if we could be part of a cutting edge to solve a problem that nobody else seemed to have been able to do, for anybody that's been in this business that was pretty exciting kind of field. Trying to devise new solutions to old problems which seemed insurmountable and frankly still seem insurmountable at this stage. I think that's what lawyers and judges are supposed to be doing, but I don't know. (Hamlin Dep. at 230.)

**B.**      ***Ex parte* contacts: All major constituencies participated in *ex parte* contacts with the Court, as anticipated by the initial Case Management Order.**

From the time the first Case Management Conference was held in these cases on December 20, 2001, this Court declared that *ex parte* contacts would be used as part of the Court's case management system, regardless of any objection by any party. "In order to effectively manage complex litigation, it is necessary for the judge to speak and/or meet with attorneys on an *ex parte* basis, without permission of adversary attorneys. Any objection to such *ex parte* communication is deemed waived. It is a power that calls for an act of faith on your part and a power that I intend to use sparingly." (12/20/01 Asbestos Cases Management Conference, Jt. App. Ex. 62 at JA001919-1920, ¶ 5.) The Court then invited all parties at that same initial Case Management Conference to provide *ex parte* submissions to the Court:

Counsel for the debtors and counsel for other interested parties shall, within ten days of the entry of this order, on an *ex parte* basis, identify those issues with specificity to enable the Court to implement a representative case management plan. No privileges shall be waived as a result of any communication of information between counsel and the Court. (*Id.*, Jt. App. Ex. 62 at JA001918, ¶ 2.)

Further development of the factual record, including but not limited to recent depositions and privilege log entries, demonstrates that, as anticipated by the December 2001 Case Management conference, this Court afforded the entire range of parties involved in these cases the opportunity to provide input on an *ex parte* basis, and that **all** of the major constituencies participated, with no record of any objection. The Court received confidential written

submissions on behalf of Debtors, asbestos claimants, insurers and the like. Professor McGovern

further testified about meetings that occurred:

> ....*it would be lawyers, principals, some for debtor, some for financial people, some for futures representatives, some for the tort claimants. It was the whole panoply of people[. H]e had an interest in these ex parte meetings of meeting everybody*....

(McGovern Dep. at 46 (emphasis added).) Mr. Gross similarly testified about *ex parte* contacts

with the court:

> I am unaware of any exclusions by Judge Wolin. He made himself available, from what I know, and I did not participate in every meeting, quite obviously, *he made it publicly clear that he would sit down with anyone who, I think, had any credibility involving the facets of the plaintiff's bar, the defense bar, and the bankruptcy bar*.

(Gross Dep. at 374-75; *see also* 12/5/03 Sur-Reply by the District Court Judge, *In re Kensington*

*Ltd.*, Case No. 03-4212 (3d Cir.) at 5 ("As Court conference records indicate, *ex parte* interviews

with the Court were eagerly sought and granted.").)

### C.     The December 2001 appointment of five "Court Appointed Consultants."

Another element of the Court's publicly disclosed case management approach was the

appointment of "Court Appointed Consultants" to aid in these cases. The order of appointment

gave notice that the scope of responsibilities might be broad, but provided that the

responsibilities actually undertaken by the consultants would be determined through future

"delegation":

> ORDERED that William A. Dr[e]ier, Esq., David R. Gross, Esq., C. Judson Hamlin, Esq., John E. Keefe, Esq., and Professor Francis E. McGovern are hereby designated as Court Appointed Consultants to advise the Court and to undertake such responsibilities, including by way of example and not limitation, mediation of disputes, holding case management conferences, and consultation with counsel, *as the Court may delegate to them*....

(12/28/01 Order, Jt. App. Ex. 105 at JA002534 (emphasis added).) The same order also

provided that "the Court may, without further notice, appoint any of the Court-Appointed

8

Consultants to act as a Special Master to hear any disputed matter and to make a report and recommendation to the Court on the disposition of such matter...." (*Id.*)

Not one slouch among them, the five consultants include lions of the New Jersey Bar, three former judges with a total of 70 years of experience on the bench, and a Duke University Law School professor. Together, this group offers a wealth of knowledge and diverse experiences with -- and perspectives on -- asbestos litigation, product liability, mass tort and asbestos bankruptcy proceedings. Specifically:

- Judge Dreier, now in private practice, is the retired Presiding Judge of the Superior Court of New Jersey, Appellate Division. He served for over twenty-five years as a Judge in the Superior Court of New Jersey and its predecessor courts, the last fifteen years on the Appellate Division.

- Judge Keefe, also now in private practice, served on the New Jersey bench for 25 years, including service as a judge in Superior Court, Law Division, presiding judge in General Equity beginning 1984, and Appellate Division since 1988, retiring in 2001. At one point he "was in charge of asbestos litigation in New Jersey." (Keefe Dep. at 10, 13.)

- Judge Hamlin served as a judge on the Superior Court of New Jersey from 1978 through 1998, including responsibility at different times for overseeing and administering all mass tort cases and managing the asbestos calendar. (Hamlin Dep. at 223-24.)

- Professor Francis McGovern is a tenured professor of law at Duke University and a visiting professor of law at the University of California at Berkeley, Boalt Hall. He has served as a 'neutral' (special master, court appointed expert or mediator) in numerous cases and been appointed by over thirty federal and state judges since 1977.

- David Gross has "over 40 years of experience in mass tort, products liability, primary and excess insurance coverage, class actions and multidistrict litigation, including complex asbestos and asbestos-related bankruptcy litigation." (Gross aff't, Jt. App. Ex. 97 at JA002213, ¶ 2.) He was "national defense counsel to Johns-Manville Co., the first company to seek bankruptcy protection based on asbestos liabilities, and [has] since handled a number of asbestos and other mass tort cases...." (*Id.*)

### D.    The contemporaneous appointment of Judge Hamlin and David Gross in the *G-I* asbestos bankruptcy.

On October 10, 2001, shortly before the five asbestos bankruptcies at bar were assigned to this Court and the five consultants were appointed, Chief Judge Rosemary Gambardella

appointed Judge Hamlin to serve as the futures representative in the *G-I* bankruptcy. (10/10/01

Order Appointing Legal Representative of Present and Future Holders of Asbestos-Related

Demands in G-I's Chapter 11 Case, *In re G-I Holdings Inc. f/k/a GAF Corp.* (U.S. Bankr. Court,

D. N.J.), Jt. App. Ex. 106 at JA002536-2538.)   *G-I* is another complex asbestos Chapter 11

proceeding, currently pending in the District of New Jersey.   By mid-January 2002, Judge

Hamlin retained David Gross as his local counsel in that matter. (*E.g.* Gross aff't, Jt. App. Ex.

97 at JA002213-2214, ¶ 4.)

It cannot be disputed that the service of Judge Hamlin and David Gross as futures

representative and counsel in the *G-I* Chapter 11 case *and* as Court Appointed Consultants in the

five asbestos cases has been a matter of public record since day one, since each of those

appointments occurred pursuant to publicly filed court order. (*E.g.* Jt. App. Ex. 105 at

JA002533-2535 (12/28/01 Order appointing the consultants in the five asbestos cases); Jt. App.

Ex. 106 at JA002536-2538 (10/10/01 Order appointing the *G-I* futures representative); Jt. App.

Ex. 97 at JA002213-2214 (Gross aff't at ¶ 4, Gross' firm was appointed in *G-I* pursuant to order

dated 1/16/02).)

Nor can it be disputed that there was no *formal* disclosure in the five asbestos cases

before this Court[13] of the role being played by David Gross and Judge Hamlin in *G-I*: no

pleading, no order, no affidavit, no filing of any kind.

---

[13] As for disclosures in G-I:  Mr. Gross could not recall whether in that case he had disclosed his
appointment as a consultant to Judge Wolin, although he thought people were generally
aware of it.  (Gross Dep. at 28-30.)  Judge Hamlin never formally disclosed in the G-I
bankruptcy his role as an adviser in the five bankruptcy cases before Judge Wolin, but
thought it was "common knowledge." (Hamlin Dep. at 168.)

Although there was no formal disclosure, a record regarding the ***parties' actual
knowledge*** of the respective roles of David Gross and Judge Hamlin now has been developed.
Judge Hamlin captured the essence of how information circulated as follows:

> I said even if it wasn't 'common knowledge', you know, these cases, one thing
> took place on the fourth floor, the other took place on the second floor in the same
> building, within the same community of lawyers.  If you look at the distribution
> list of people who got served with copies of all of this stuff, ***nobody was hiding
> this under a bushel basket***.  (Hamlin Dep. at 170-71 (emphasis added).)

Testimony and documentary evidence confirm Judge Hamlin's observation.  In each and
every case presently before this Court, counsel for Committees—including, importantly, counsel
for the Committee charged with the responsibility to represent the movants in the *Grace* case—
had early and actual knowledge of the responsibilities of Mr. Gross and Judge Hamlin in the *G-I*
case.  Specifically:

- **The asbestos bodily injury committee**, through its counsel—which also represents the
  bodily injury claimants in *G-I*—was aware from the outset of the role Judge Hamlin and
  David Gross had in *G-I*.  The record reflects that Caplin Drysdale actively worked with
  the futures representative in the *G-I* case on a variety of critical issues including § 502(c)
  estimation, withdrawal of the reference and notice/bar date issues.  Indeed, in the pending
  recusal litigation, David Gross has asserted the 'common interest' privilege as the basis
  for withholding from production certain of Mr. Gross' communications with the Caplin
  Drysdale firm in the *G-I* case.  (Gross priv. log, Jt. App. Ex. 79 at JA002083-002085 and
  183 at JA003622-3678 <u>and</u> 1/9/04 e-mail from Nancy Washington (David Gross'
  counsel), Jt. App. Ex. 80 at JA002086 (withholding DRG6030-6040, DRG6045-6045,
  DRG6056-6057 and DRG6676, communications with Trevor Swett of Caplin Drysdale,
  under the "common interest" privilege); *see also* 1/8/02 Letter from Trevor Swett, Jt.
  App. Ex. 120 at JA002935; 12/6/02 Letter from Caplin Drysdale, Jt. App. Ex. 121 at
  JA002938, n.1; 2/3/03 Letter from David Gross, Jt. App. Ex. 122 at JA002944; 5/6/03
  Letter from David Gross, Jt. App. Ex. 123 at JA002947.)  Caplin Drysdale identified in
  the five cases no conflict attendant in its concurrent relationship with Judge Hamlin and
  Mr. Gross in *G-I*.

- **The Unsecured Creditors' Committee** in the *Grace* Chapter 11 is represented by
  Stroock, Stroock and Lavan, which also represents the Unsecured Creditors' Committee
  in the USG Chapter 11 case.  Stroock has conceded that lawyers at the firm were aware
  of the appointment of Judge Hamlin as futures representative in the *G-I* case no later than
  January 24, 2002 and considered whether this posed a conflict in the context of the *USG*
  asbestos bankruptcy.  (*See also* USG Stipulation, Jt. App. Ex. 45 at JA001469.)  There is
  no record that Stroock raised any potential conflict issue in the *Grace* case.

11

- **The Equity Committee** in the *Grace* Chapter 11 is represented by Kramer Levin, which also represents CSFB as agent bank in the *Owens Corning* bankruptcy. Kenneth Eckstein has testified that until September 2003, no one at Kramer Levin had actual knowledge of the role of Judge Hamlin and David Gross in the *G-I* case, despite the fact that his firm filed an appearance in *G-I*, received pleadings from *G-I*, and (Mr. Eckstein learned only recently) hired an associate in September 2002 who had served as a law clerk to Judge Gambardella during the time that Judge Hamlin was appointed the futures representative in *G-I*. (*E.g.* Eckstein Dep. at 26-30, 39-40, 112-116.) Purportedly, this second or third year associate was aware of the appointment but "did not come to Kramer Levin and apprise anybody at Kramer Levin of Mr. Hamlin's involvement in *G-I Holdings*," and had only peripheral involvement in the *Owens Corning* bankruptcy case while at Kramer Levin. (*Id.* at 115-116.)

- **The *Grace* movants**—in contrast to the movants in the *Owens Corning* case who have provided sworn testimony that they were unaware of the role of Judge Hamlin or David Gross in *G-I* until late September 2003—have provided *no* evidence thus far indicating when they first learned of Mr. Gross and Judge Hamlin's activities in *G-I*. As bank creditors, however, the interests of these movants are represented in the *Grace* case by the Stroock firm, which has testified to *actual* knowledge of the potential conflict since early 2002. Grace further believes that at least some of these movants were part of the Grace bankruptcy since summer 2001.

Finally, there is no evidence that any party or Committee in the *Grace* Chapter 11 registered any objection to the roles being played in this case by David Gross or Judge Hamlin— or any of the Court Appointed Consultants—until after October 10, 2003 when Kensington filed its motion to recuse this Court in the Owens Corning matter.

### E.     Steps taken by Mr. Gross and Judge Hamlin to avoid potential conflict.

Testimony now elicited in this proceeding confirms that both Judge Hamlin and David Gross believed that any potential conflict between their roles in the *G-I* proceedings and the five cases could be and was avoided. Judge Hamlin—a lawyer for 40 years, including 20 years on the bench—was well aware of the standards of judicial conduct, including "those rules as to what constituted conflicts of interest." (Hamlin Dep. at 227.) He noted that the delegation of responsibility to the Court Appointed Consultants could vary under the initial appointment order: Whether there could be a potential conflict with *G-I* would depend on what he might be asked to do by this Court. Hamlin took care *not* to engender any conflicts by avoiding any assignment

12

entailing advice regarding the value or validity of asbestos personal injury claims (his area of

responsibility in *G-I*). For example:

> A:   *I would not have touched the personal bar date issue* [if i]t had been sent
> to me.  I would prefer to have that assigned to somebody else....*Any of the five
> cases I wouldn't have touched the personal injury bar date issue.*
>
> Q:   Why is that?
>
> A:   *Because that's what I'm dealing with in G-I.*
>
> Q:   In any of your conversations with Judge Wolin, did you ever make clear
> you wouldn't deal with issues that in any way related to what your role might
> have been as Futures representative in *G-I*?
>
> A:   We did not have a specific discussion, but *if any issue or any
> responsibility was sought from me in regard to any issue that I felt impinged on
> by G-I stuff, I would have asked the assignment be given to somebody else*, not
> walked away."
>
>          *        *        *        *
>
> Q:   What is the first time you recall considering this issue, in your mind, that
> the possibility of a conflict or no conflict might depend to some degree upon the
> scope of your duties in the five cases?
>
> A:   I don't think there was a conflict because it would depend upon what I was
> asked to do.  Obviously, I would not undertake anything that would, in my mind,
> constitute a conflict.  It would depend on what he was looking for us to do.

(Hamlin Dep. at 195, 22-23.)

David Gross, too, testified that he took care to avoid conflict between his roles in the

cases.  He testified, for example:

> At no time have I discussed, participated or assisted in any way in Judge Wolin's
> decision-making function.  I have not discussed with Judge Wolin, in any manner
> or form, any legal or factual issues before the Court or likely to come before the
> Court in any of the five bankruptcies assigned to Judge Wolin, or, indeed, in the
> *G-I Holdings* case....Judge Wolin has not solicited, nor have I submitted, any
> written or oral advice or recommendations, or any analysis or commentary
> concerning any such matters.

Gross aff't, Jt. App. Ex. 97 at JA002216, ¶ 10.  At deposition, Mr. Gross confirmed again that

the statements in his affidavit were true and accurate.  (Gross Dep. at 364.)

13

As discussed further below, Judge Hamlin and Mr. Gross remained diligent in avoiding actual or apparent conflicts.   Alert to the issue throughout the course of his responsibilities, Judge Hamlin testified that his work in no "way, shape or form" constituted a conflict or created the "appearance of an apparent conflict or appearance of impropriety." (Hamlin Dep. at 239.)  In untold hours of deposition, the movants never asked the key questions necessarily anticipated by the Third Circuit on remand:  Did these consultants provide advice or undertake work in this court on personal injury claims or other issues that could potentially conflict with their respective roles in the *G-I* case?   The Debtor, which has consistently advocated the importance of a complete factual record, was thus compelled to make the inquiry.   In response, Mr. Gross and Judge Hamlin repeatedly and consistently testified that they provided no advice to this Court and undertook no responsibility for any issue related to personal injury claims or in potential conflict with their roles in *G-I*. (*See infra* Section I.F.1.)  There is no contrary evidence.

**F.**     **The role actually played by the "Court Appointed Consultants" in the *Grace* case.**

As set out above in Section I.C, the initial order designating the five Court Appointed Consultants indicated both that these individuals were being designated "to advise the court" and also that this Court might further elect to delegate to any of the consultants particular tasks in any of the five cases, including the role of mediator or Special Master. (12/28/01 Order, Jt. App. Ex. 105 at JA002534.)  Anticipating that the *Grace* movants may now attempt to challenge each and every role assumed by Judge Hamlin and David Gross in these cases over the last two years, Grace addresses below the factual record as to the only four[14] discrete roles apparently ever

---

[14] In other of the five cases, this Court may also be asked to review a fifth role:  Judge Hamlin's participation as a Futures representative in meetings with his counterparts in other asbestos bankruptcies beginning in June 2002. (*E.g.* Hamlin Dep. at 93-94, 98-99, 103-105, 113 *et*
(Continued...)

undertaken by these two individuals in the *Grace* Chapter 11: *First*, the initial role of Judge

Hamlin and David Gross as "Court Appointed Consultants" in four introductory sessions with

the other consultants and the Court, the last of which sessions occurred in May 2002. *Second*,

the limited role of Judge Hamlin in drafting a single opinion for this Court on a property damage

matter.    *Third*, the role of David Gross as mediator of the Sealed Air fraudulent transfer

litigation, which he undertook at the request of *non-debtor parties* rather than by appointment of

this Court. *Fourth*, this Court's recent request that David Gross oversee "working committees"

in an attempt to aid in the resolution of the five cases.

> **1.    The four meetings with the Court on January 7, 2002, January 18,
> 2002, February 27, 2002 and May 17, 2002**

The record demonstrates unequivocally that there were four—and only four—meetings of

the group of five consultants with Judge Wolin. The meetings were held on January 7, 2002,

January 18, 2002, February 27, 2002 and May 17, 2002. In total, those sessions took roughly 18

hours. (Hamlin Dep. at 233; *see also id* at 231-232.)

The five consultants—three of whom are former judges—have each now been deposed at

length regarding what took place in these sessions. While perspectives vary slightly, there are

important consistencies across the testimony:

- **A wide range of topics was covered:**  A wide range of topics relating to asbestos
  litigation, mass tort and asbestos bankruptcy were discussed by this group, all in broad
  strokes.

- **The advisors provided an enormous knowledge base:**  This group of advisers was
  uniquely well suited to provide Judge Wolin with historical perspective on these issues
  based on more than one hundred and fifty years' combined experience at bench and bar

---

*seq.*, 261.) Because there has been no futures representative appointed in the Grace case, that
matter is not addressed here. In Section II below, however, Grace does discuss its proposed
appointment of Judge Hamlin to serve as futures representative in the Grace Chapter 11 case.

dealing with complex litigation and mass tort, including asbestos litigation and bankruptcy.

- **Meetings provided background information only:** The meetings were introductory sessions, designed to provide this Court quickly—beginning only six weeks after the transfer of these cases on November 27, 2001—with generalized, high level, background information relating to forty years of relevant history in these topics. No judicial decisionmaking resulted from these discussions and, as part of these meetings, the consultants were not asked to and did not provide substantive advice regarding any factual or legal matter pending in the five bankruptcy cases.

- **No confidential information was provided to the Court:** Although this Court shared with the consultants some confidential information as part of these meetings, including relaying confidential communications and *ex parte* submissions received in response to this Court's December 2001 invitation, there is no evidence that the advisors provided any confidential or non-public information to this Court. *See, e.g.*, Dreier Dep. at 6-7 (Court ruling maintaining the confidentiality of certain materials received by David Gross and Judge Dreier).

*First*, it is plain that a wide array of issues was discussed at the four meetings. Mr. Gross testified that topics included, among other things: Substantive consolidation; the potential use of a 706 panel of experts, the American Thoracic Society (ATS) guidelines; 524(g); the types of disease processes that evolved from asbestos exposure; the types of asbestos fiber; the types of claims by asbestos personal injury claimants that might be compensable; the fact "that the judge was bound by the laws of the individual states that set up the compensability of the claims"; the "types of defenses that were offered such as fiber defense and the like" (although he could not recall discussion of the merits "about whether they were good or bad or valid or invalid defenses"); the chrysotile defense; historical values of claims, provided by a visiting defense lawyer and plaintiff lawyer who were asked to attend one of the meetings of the advisor group; the issue of unimpaired claimants; the use of green cards and pleural registries in certain states (so "that if one is unimpaired within the definition of what that state calls unimpaired, one can get a green card and come back later if one develops a compensable disease"); the "use of statistics in the prediction of potential claims" as a way "to predict the incidents[sic] and claims

in the future that would arise"; there were "claim form discussions with Judge Wolin and the advisors as to what the proper—what a proper claim form would be in the bankruptcy court. Specific discussions as to the content of the claim—claims form, no, but there were discussions, there's no question about that, at some point." (Gross Dep. at 110, 265-269, 272-273, 279, 321-322.) Judge Keefe also recalled the general topic of bar dates "and the timing of bar dates and the question of whether there was sufficient discovery completed in order to do that, yes." (Keefe Dep. at 29-30.) Judge Hamlin, too, agreed that discussion at a general level included asymptomatics, impaired or unimpaired, the role of insurance coverage, people with mesothelioma who "were dying without getting compensated," property damage claimants, use of a 706 panel, and whether "the 524G rep had the power to either oppose or veto" a plan. (Hamlin Dep. at 16-18, 50-52, 54, 58, 60.) Judge Dreier testified similarly.

*Second*, the testimony confirms that these advisers brought to the table different and substantial historical experiences and their function was to report historical facts and provide a foundation for case management. (*See also supra* Section I.C.) As Judge Keefe described the role of advisors generally, "my understanding at the time [before the first meeting] was that as a group we had some background in asbestos litigation, insurance coverage, management of mass tort cases and background in some bankruptcy and that we were going to—he was going to ask us to give him advice with respect to some issues that may have applied to the litigation in general with respect to management." (Keefe Dep. at 16-17.) Professor McGovern similarly testified that he had been asked by Judge Wolin to "serve as a resource of information about asbestos litigation, mass tort litigation and asbestos bankruptcies." (McGovern Dep. at 10-11.) McGovern elaborated:

> It's analogous to a role that I've served in many circumstances as a reporter or an
> adviser or a consultant to a committee of judges or a commission where *one acts*

17

*as a person who is available to answer questions about issues, arguments, history, procedures, but not as someone who is there to express an opinion concerning those.* In other words, when you serve as an adviser to these types of committees, judges typically aren't interested in what your opinion is. They're more interested in making sure they're aware of what the issues are and what the arguments are for and against and so, my understanding of what he was asking me to do was to be available to him to answer questions that he had that typically would not be answerable from the published literature, having more to do with custom or practice or what was done in a particular case in the past or who certain people would be *in order to get him up the learning curve as to the nature of the asbestos litigation, mass torts in general, and then specifically the asbestos bankruptcies.*" (McGovern Dep. at 13-14.)

David Gross testified similarly:

I expected to do what it was -- *whatever it was that Judge Wolin would think would be helpful to him in making him more aware of the issues involved in the asbestos litigation.* And because of my history of being involved in this kind of litigation and being involved with insurance companies, that I would be involved to some extent in dealing with insurers, which was the case.... (Gross dep. at 366.)

Judge Hamlin brought a breadth of relevant experience as well:

Somewhere in, I would guess the late eighties, early nineties I started getting assignments of complex litigations. I wound up with the mass tort court....I managed and administered all the mass tort cases which included Fen-phen, HIV blood cases, applications for class certification. And...then I was responsible for managing the asbestos calendar. (Hamlin Dep. at 223-24.)

Judge Dreier wrote the book on product liability in New Jersey -- literally. *See* New Jersey Products Liability & Toxic Torts Law. And "Judge Keefe was really the Pathfinder in managing asbestos litigation. He was the first guy who did it." (Hamlin Dep. at 224.)

*Third*, the record reflects that the substance of the meetings was historical fact and case management—not the adjudication of issues, and no advice was provided on such issues. The series of four meetings was held to begin to help this Court quickly up "the learning curve" on asbestos, mass tort and bankruptcy issues generally. Getting up to speed on these issues was an enormous project, since asbestos litigation has been pending for so long that "Memory of man

runneth not to the contrary." (Hamlin Dep at. 237.) Education on the history was necessarily a

central part of this Court's task. As Judge Hamlin testified:

> It was very important because to date almost 30 years of litigation there's been no
> speed or efficiency in the resolution of asbestos claims as everybody knows. All
> the standard tools that are available to the judicial system have failed. I don't
> think anybody would seriously argue with that. Obviously, we were going to
> have to invent...a new paradigm....But clearly, whatever everybody else tried
> hadn't worked. If this cord or not was going to be cut, somebody was going to
> have to do something different. Somebody who wasn't afraid to do something
> different. (Hamlin Dep. at 239.[15])

And there can be no doubt that time was considered to be of the essence because of the potential

impact on severely impaired claimants:

> I would say the advisers all, and Judge Wolin included, had as an over-arching
> central theme to our discussion that as to that portion of any settlement or
> payments that might come in that would be paid to the tort claimants, *that we
> tried to speed up the process for those who were truly sick, the truly impaired
> claimants, because the history in these cases have been unfortunately that by
> the time the matter resolves, those who need it most have died and the only
> payments that come through will go to their families....That was stated over
> and over at each of the meetings and that was the principal moving issue from
> day one*. (Dreier Dep. at 40.)

The discussions were simply background material for the Court's upcoming work,

however:

> *[W]e only discussed these in terms of these are the problems confronting us.* I
> don't think anybody understood where we ought to go or what would be an
> appropriate resolution....We were asked to read background stuff of asbestos
> litigation, general, and more of anything it was ; here's what's confronting us,
> take a look at it." (Hamlin Dep. at 17-18.)

Critically, the testimony is clear that as part of these meetings, no substantive advice was

provided by the consultants, including Judge Hamlin or David Gross, on any issue pending in the

---

[15] *See also* McGovern Dep. at 201-202 (describing enormity of task that would have faced this
Court if it attempted to get up to speed on the history of asbestos litigation *without* the
assistance of the five advisors: "I'm not certain you could do it."); Gross Dep. at. 369-370.

five cases,[16] including such critical issues as the use of a personal injury bar date, proof of claim forms, the use of *Daubert* hearings, substantive consolidation, the right to a jury trial, product identification, impaired versus unimpaired claims, or the like.

Judge Hamlin, for example, testified that at these meetings or otherwise in these cases he took no position with respect to whether there should be bar dates; he recalled no discussion of proof of claim forms; he recalled no discussions as to whether *Daubert* hearings should be held with respect to certain scientific hearings or experts in the pending matters; he took no position with respect to whether any of the debtors should go through substantive consolidation; he did not discuss with Judge Wolin or the other advisers how the right to jury trial or the application of state law should be resolved with respect to any of the five bankruptcies; they did not discuss whether it would be appropriate to have a physician panel to set standards to determine which claimants should be deemed impaired versus unimpaired; he did not take any positions on product identification; he made no statements as to what should be done with unimpaired or asymptomatic claimants; and he provided no advice on the validity or value of personal injury claims or the process of determining those matters and has never been asked to do so (Hamlin Dep. at 213-216, 219-220, 241, 279-280.)

David Gross similarly testified that he "never participated in the fashioning of any relief Judge Wolin has given in any case," including all five Delaware cases.[17]  (Gross Dep. at 388.)

---

[16] Judge Keefe did testify that the group discussed the removal by Ford Motor Company of several cases to the district court and whether they should be remanded. (Keefe Dep. at 20-21.) None of the other five consultants recalled this in their testimony, however.

[17] In addition, Mr. Gross testified that he never acted as a special master in the sense of making findings in these cases; he never conducted an investigation as an examiner; and he never acted in any way, shape or form as a 706 expert. (Gross Dep. at 383.) Rather, "Q: If we
(Continued...)

Like Judge Hamlin, he testified that did not provide any substantive advice to Judge Wolin on any of the significant factual or legal issues pending in the five bankruptcy cases including the validity or value of any current or future personal injury asbestos claims; fraudulent transfer, vermiculite, personal injury or property damage in the Grace case; 502(c) estimation; the imposition of a bar date for personal injury claims; or the creation of trust fund distribution procedures in any of the five bankruptcies  (Gross Dep. at 376-382, 390-391.)

Critically, since *to date* this Court has still not ruled on *any* issues relating to personal injury asbestos claims in the Grace case—in fact, it is precisely because these issues have not been addressed that there has been no need to have a futures representative appointed in this case—it is just not possible to credibly articulate the conflict that may have arisen between Judge Hamlin and Mr. Gross' participation in these early 2002 meetings with Judge Wolin and their respective roles in *G-I*.  No more meetings of this group took place after May 2002.  (*E.g.* Dreier Dep. at 205.)  Afterwards, the Court instead called upon some of the consultants, including Mr. Gross and Judge Hamlin, to undertake only defined and limited roles in the various of the five cases, described in the subsections below.

> **2.      Judge Hamlin's only other service in Grace consisted of drafting a single, five page opinion for this Court, unrelated to personal injury claims**

Judge Hamlin testified that other than participating in the four 2002 sessions, the only other work he was asked to do for this Court was to draft a total of five opinions in these

---

were to use the label, quote, 'advisor,' close quote, to describe your position, is there any better or more accurate term that we can think of other than an advisor to describe your position in connection with the five cases?  A:  No."  (*Id.*)

bankruptcies, one for each of the cases.[18]  (Hamlin Dep. at 243-44.)  Judge Hamlin received his

assignment to work on these opinions from the Judge's law clerk and he did not discuss the

substance of the opinions with either Judge Wolin or the clerk.  (*Id*. at 247-48 ("In fact, you

know, it was almost kind of cryptic.  I would get the appeal with absolutely no direction or

anything other than, you know, get this done and turn it back to us.").)

    None of the opinions on which he worked in any of the cases, including the Grace

opinion, related to personal injury claims.  (*Id*. at 245.)  Further, Judge Hamlin testified that he

did not believe that any of the opinions on which he worked pertained to his work as Futures

representative in the *G-I* case.  (*Id*. at 246 ("Q:  Did any of those opinions that you worked on

pertain to issue in the *G-I* case with respect to which you had any obligation as Futures

representative?  A:  None that I understood to apply.").)

    In the *Grace* case, the subject matter of the sole opinion on which Judge Hamlin worked

was an appeal regarding property damage claims.  (*Id*. at 244.)    Judge Hamlin spent

approximately 6 hours working on this *Grace* opinion, which was about five pages long.  (*Id*. at

245-46.)  With respect to this opinion, he testified that "my job was prepare it and submit it.

[Judge Wolin] could either accept it, reject it, or cover whatever he wanted to do with it."  (*Id*. at

250.)  In connection with his work on the five cases, Judge Hamlin testified that he had no

contact with Grace or anyone representing Grace, and did no work as an advisor specific to the

*Grace* case other than drafting this single opinion.  (*Id*. at 249; *see also id*. at 250.)

_____

18 Judge Hamlin did not consider this role to be that of a Special Master.  (Hamlin Dep. at 255.)
   He also testified that he was never asked to "conduct a formal investigation and report the
   results of that investigation to Judge Wolin," and that he never acted as an expert witness in
   the five cases.  (*Id*. at 255-256.)  Rather, his role was more of an "advisor."  (*Id*. at 256-259.)

**3.    David Gross' participation as a mediator in the Sealed Air fraudulent transfer litigation was undertaken at the request of the parties, not the Court, and was not part of his role of "Court Appointed Consultant."**

David Gross has also testified that he was asked *by non-debtor parties*—not this Court— to participate as a mediator in the Sealed Air and Fresenius fraudulent transfer litigation in the *Grace* Chapter 11 case.  In these matters, this Court permitted the Asbestos Bodily Injury and Property Damage committees to initiate an adversary proceeding challenging two complex, tax-free corporate transactions that Grace undertook with Fresenius and Sealed Air, respectively, in the 1990s.  (3/12/02 Order re: Fraudulent Conveyance Proceedings, Jt. App. Ex. 124 at JA002949-2956.)    The adversary proceeding, which involved two multibillion dollar transactions, was litigated intensely for months and settled Thanksgiving weekend 2002.  Mr. Gross testified that:

> In addition, *by agreement of two non-debtor entities*, Sealed Air Corporation and Fresenius Medical Care Holdings, Inc., I was asked to mediate issues between the parties in two pending adversary proceedings in the *W.R. Grace & Co.* bankruptcy case, one of the five cases assigned to Judge Wolin.    *This engagement was independent from my role as a court appointed consultant.* (Gross aff't, Jt. App. Ex. 97 at JA002218, ¶ 16 (emphasis added).)

Mr. Gross played no other role in the Sealed Air litigation other than that of settlement mediator. (Gross Dep. at 387.)

As this Court has acknowledged, the settlement of the Fresenius and Sealed Air litigation should result in the recovery of nearly one billion dollars in value to the Grace estate.  (12/5/03 Sur-Reply by the District Court Judge, *In re Kensington Ltd.*, Case No. 03-4212 (3d Cir.) at 4.) No wrongdoing by Mr. Gross or the Court has been alleged in relation to this proceeding. Notably, having agreed to pay such substantial sums to settle this transaction, Fresenius and Sealed Air presumably would have significant interest in appearing in these recusal proceedings

23

if there was even a hint of wrongdoing by Mr. Gross or this Court in that matter. Yet, tellingly, neither Fresenius nor Sealed Air have sought to participate here.

> **4.      The proposed oversight by David Gross of "Working Committees" to aid in the resolution of the five cases.**

As the fourth potentially relevant role of these consultants, the record indicates that on September 12, 2003, Judge Wolin ordered the creation of "working committees" to "explore resolution of issues common to each of the five proceedings...." (*E.g.* 9/24/03 Letter from David Gross, attaching 9/12/03 Order, Jt. App. Ex. 125 at JA002957-2961.)  As court appointed advisors, David Gross and Professor Francis McGovern were charged with overseeing the establishment of these groups including ensuring that "the number and membership of the Working Committees shall be determined such that each interest and constituency in the above-referenced proceedings is represented to the fullest extent practicable." (*Id.*)

Correspondence produced by Mr. Gross suggests that in September 2003, Mr. Gross extended invitations to potential participants in these groups and that the committees were constituted no later than October 27, 2003. The working groups included: Insurers Working Committee; Property Damage Working Committee; Debtor and Financial Creditors Working Committee; Tort Claimants Working Committee; and Future Claimants Working Committee. (*E.g.* 10/27/03 Letter from David Gross, Jt. App. Ex. 126 at JA002962-2967.)  In terms of the Grace case, participants on the committees included representatives for the Debtor, Official Committee of Unsecured Creditors and major asbestos personal injury and property damage claimants.  In addition, Judge Hamlin was identified as a participant on the Future Claimants Working Committee. (*Id.*)

Whatever the ultimate ambition for these working groups, testimony elicited to date suggests that so far Mr. Gross has participated in only one initial meeting of any of these groups,

the asbestos plaintiffs lawyers, in Chicago in September 2003. (Gross Dep. at 322-327.) Mr. Gross testified that he has participated in no other meetings of any of these groups: "No. We sent out the letters. I got back responses from most people saying they would be willing to serve and the committees never got off the ground." (Gross Dep. at 326.) There is no testimony to date reflecting, either way, whether the lack of progress on these committees is due to the fact that their creation occurred almost simultaneously with the filing of the initial Kensington motion to recuse on October 10, 2003.

## II.   The Proposed Appointment of Judge Hamlin as Futures Representative in the W.R. Grace Chapter 11

After eight depositions and the exchange of thousands of documents, including productions from W.R. Grace, Kirkland & Ellis LLP and each of the five consultants, one thing remains clear: There is not one shred of evidence of any impropriety in Grace's proposed appointment of Judge Hamlin as futures representative in its Chapter 11 case. Rather, the record reflects that in the summer of 2003, Grace discussed with the Committees the potential appointment of David Gross as the futures representative for the Chapter 11, proceeding so far as to draft appointment papers for Mr. Gross' review. At the time, Committees—including the Unsecured Creditors' Committee, represented by Stroock—were already familiar with the role that Mr. Gross (and Judge Hamlin) had in G-I. (*See supra* Section I.D.) By mid-September 2003, after Mr. Gross declined the invitation to serve as futures representative and *before* any recusal papers were filed in any of the five bankruptcies, Grace switched its consideration to Judge Hamlin as futures representative, again consulting with each of the major constituencies in the Grace Chapter 11. On October 13, 2003, the deadline for filing motions for an upcoming omnibus hearing with Bankruptcy Judge Fitzgerald, Grace filed papers proposing Judge Hamlin's appointment. At that hearing, Judge Fitzgerald indicated that Judge Hamlin would not

be acceptable as the futures representative in this case and, as a result, Grace withdrew its application.

**A.**     **In the summer of 2003, Grace and the Committees discussed the potential appointment of David Gross as futures representative.**

To date in the W.R. Grace Chapter 11 case, this Court has not addressed any asbestos personal injury issues and, accordingly, there has been no role for a futures representative in this case. The record now reflects, however, that the parties did discuss the appointment of a futures representative intensively beginning in July 2003. David Gross has testified that to the best of his recollection, one of the lawyers – he believes it was Mr. Inselbuch, counsel for the asbestos bodily injury committee – called him and asked whether he would be interested in becoming the Grace futures representative. (Gross Dep. at 354.) Mr. Gross thought this call took place some time in 2003. (*Id.*) Gross indicated that he said he would consider whether to undertake the role of futures representative, but later "I decided that it was not what I was interested in doing and said 'No, thank you.'" (*Id.* at 354-55.) Before declining to act as futures representative, however, he did receive at some point a call from someone from Kirkland & Ellis "and I think they said 'Your name has been submitted and we're going to send you some papers' and then I decided I wasn't going to do it, but there was a call from someone whose name I don't remember." (*Id.* at 356.)

Mr. Gross has now testified as to his reasons for declining the role of futures representative:

Q:     Why did you decide that it was something you were not interested in?

A:     Because I was the counsel for Mr. Hamlin in G-I and I thought that I would rather, assuming that were available to me, and there was no such offer at that point, that I would rather do that and be counsel to the Futures rep in another bankruptcy.

Q:      Now, was that because you thought your work as Mr. Hamlin's lawyer in the G-I case would interfere with your work as a Futures rep?

A:      No, because there are people who do both.  No.  I just decided that in my own mind that was what I would rather do assuming – but I didn't want to be a Futures rep in this case, that I decided.

Q:      And you've told us all of the reasons why you made that decision?

A:      Yes.  (*Id.* at 355.)

The paper record regarding Mr. Gross' potential appointment as futures representative is slightly more detailed.   Documents produced by Kirkland & Ellis reflect that the Debtor discussed the potential appointment of David Gross as futures representative with the W.R. Grace Committees in July 2003:  The Asbestos Bodily Injury Committee and Asbestos Property Damage Committees had no objection to the appointment of Mr. Gross as futures representative.[19]   The Unsecured Creditors Committee and Equity Committee were informed of the potential appointment but relayed mixed responses in late July and early August 2003.[20]

By August 15, 2003, the Debtor told the Committees that "Grace intends to move forward and file a Motion to Appoint Mr. Gross as the Futures Representative in the Grace Chapter 11 cases."  (8/15/03 E-mail from J. Baer, Jt. App. Ex. 130 at JA002971.)  Kirkland & Ellis' privilege log reflects that attorneys worked internally on draft application papers to appoint

---

[19] 7/22/03 Letter from E. Inselbuch, Jt. App. Ex. 127 at JA002968; 7/31/03 E-mail from S. Baena, Jt. App. Ex. 128 at JA002969.

[20] 7/31/03 E-mail from J. Baer, Jt. App. Ex. 129 at JA002970 ("Lou [Counsel for the Unsecured Creditors Committee] said that he had no issue with Gross but wanted to know who Gross would be hiring as his counsel.  Lou said that they look upon Gross as the Asbestos Committee's guy and in an effort to balance things out, they may not object if they are happy with or can pick his counsel.  Lou said this is the deal they struck in the Owens Corning case."); 8/1/03 E-mail from J. Baer, Jt. App. Ex. 134 at JA002982 (discussing Equity Committee reaction).

Mr. Gross as the futures representative in late August and early September 2003. (*See* K&E

privilege log, Jt. App. Ex. 131 at JA002974-2975 (entries dated 8/28/03 – 9/04/03).) A draft

application was sent to Mr. Gross from Kirkland & Ellis on September 5, 2003. (9/5/03 E-mail

from Lane, Jt. App. Ex. 132 at JA002976-2980.) By September 16, 2003, however, Grace

informed the Committees that it had learned that Mr. Gross did not wish to be retained as futures

representative. (9/16/03 E-mail from J. Baer, Jt. App. Ex. 133 at JA002981.)

> **B.**     **After David Gross declined to serve as futures representative, Grace discussed the appointment of Judge Hamlin with all of the Committees.**

The same September 16, 2003 correspondence informing the committees that Mr. Gross

was declining the potential role of futures representative in the Grace case also stated that Judge

Hamlin would be considered in his stead:

> As you may have heard by now, David Gross has decided he does not wish to be
> retained as Futures Representative in the Grace Chapter 11 cases. As a result, we
> are proposing to request the retention of C. Judson Hamlin for the position.
> *Judge Hamlin is a retired Judge of the Superior Court of New Jersey and
> currently serves as the Futures Representative in the G-I Holdings, Inc. case.*
> Please let us know if you have any objections to the appointment of Judge
> Hamlin.

(9/16/03 E-mail from J. Baer, Jt. App. Ex. 133 at JA002981 (emphasis added).) Interestingly,

this e-mail—sent to Stroock, Kramer Levin, Caplin Drysdale and Bilzen Sumberg—clearly

identifies Judge Hamlin as the futures representative in G-I and was dated a full week before the

movants in the Owens Corning matter were supposedly first shocked to learn on September 24,

2003 of Judge Hamlin's dual roles.

The September 16, 2003 e-mail precipitated no comparable firestorm of activity in the

Grace case. Instead, in September and early October, before there was any hint of the recusal

wars to follow, Grace communicated with the Committees about the proposed appointment of

Judge Hamlin, redrafted the papers seeking his appointment, and made absolutely clear that it

intended to file the papers seeking approval of the futures representative by October 13, 2003 in time to be heard at the next omnibus hearing before Judge Fitzgerald. On September 16, for example, Stroock indicated receipt of the request and indicated that they would get back to Grace with their answer. (9/16/03 E-mail from A. Krieger, Jt. App. Ex. 135 at JA002983.) On September 25, 2003, Mr. Inselbuch responded that the Asbestos Personal Injury Committee had no objections to the appointment of Judge Hamlin. (9/25/03 Letter from E. Inselbuch, Jt. App. Ex. 136 at JA002984.)

By October 1, 2003—again, before any recusal challenges had been made—neither the Property Damage Committee nor the Unsecured Creditors' Committee had identified whether or not they agreed to this appointment, so Grace followed up with them: *"We would like to get this matter on the court's call for the November hearing. Motions for that hearing are due to be filed by 10/13.* As a result, your prompt response would be greatly appreciated." (10/1/03 E-mail from J. Baer, Jt. App. Ex. 137 at JA002985 (emphasis added).) In response, Mr. Baena for the Property Damage Committee wrote "We have shared this with our Committee, however, they have not voted to approve as yet as some wanted to find out more about the candidate which is ongoing. Hopefully, we can respond after our next meeting tomorrow." (10/1/03 E-mail from S. Baena, Jt. App. Ex. 138 at JA002986.) The same day, Ms. Krieger from Stroock, on behalf of the Unsecured Creditors' Committee, wrote: "Can you tell me how the Debtors came to propose Hamlin and why the Company believes he is the appropriate person." (10/1/03 E-mail from A. Krieger, Jt. App. Ex. 139 at JA002987.)

On Friday October 3, 2003—still before the recusal issue had been raised in any case— Kirkland & Ellis on behalf of the Debtor wrote Mr. Hamlin and indicated "We are finalizing our draft of the application and expect to have it ready for your review on Monday afternoon. *The*

*filing deadline for the application is Monday October 13 for the application to be heard at the*
*November 17 hearing.*" (10/3/03 E-mail from C. Lane, Jt. App. Ex. 140 at JA002988 (emphasis
added).) As anticipated, the draft papers were sent to Mr. Hamlin on Monday, October 6.
(10/6/03 E-mail from C. Lane, Jt. App. Ex. 141 at JA002989.) The next day, Mr. Hamlin stated
"Have reviewed proposed application, certification and order. All acceptable." (10/7/03 E-mail
from J. Hamlin, Jt. App. Ex. 141 at JA002990.)

        C.      **On October 13, 2003, Grace moved to appoint Judge Hamlin as futures representative.**

Consistent with the representations that had been made to the Committees for weeks, on
Monday, October 13, 2003 Grace filed it motion to appoint Judge Hamlin as futures
representative in time to be heard at the November omnibus hearing. (10/13/03 W.R. Grace
Application for Appointment of C.J. Hamlin as Legal Representative for Future Claimants, *In re
W.R. Grace et al.*, Case No. 01-01139 (JKF) (Bankr. Ct. D. Del.).) On October 10, 2003,
however, the Friday before Grace's filing, the Owens Corning movants filed their papers to
recuse this Court.[21] A flurry of recusal-related activity then followed in various of the five cases
pending before this Court, including service of an extensive Subpoena Duces Tecum on Grace
seeking discovery into its decision to propose Judge Hamlin.

By the time of the November 17, 2003 omnibus hearing before Judge Fitzgerald, motions
had been filed to disqualify this Court in the Owens Corning and Grace cases and Kensington
had filed an emergency writ seeking mandamus in the Third Circuit. In light of this maelstrom

---

[21] On the same day, Stroock—which now admits it had known of Judge Hamlin's role in G-I
since January 2002—finally responded to Grace's inquiry, stating that the Debtor could not
represent that the Unsecured Creditors' Committee had no objection to Judge Hamlin's
appointment. (10/10/03 E-mail from A. Krieger, Jt. App. Ex. 142 at JA002991.)

of activity, Grace moved to hold in abeyance the application to appoint the futures representative.   (11/3/03 Debtors' Request to Hold in Abeyance Their Application for Appointment of a Futures Representative, *In re W.R. Grace et al.*, Case No. 01-01139 (JKF) (Bankr. Ct. D. Del.).)  Judge Fitzgerald then stated at the hearing:

> All right.  I received on—with respect to item number 6, that's the debtor's request to retain Mr. Hamlin as the Futures Rep., a request to postpone this, but frankly, I think we should go forward with this matter because I'm very concerned about the application, and under the circumstances, I don't think Mr. Hamlin can represent the Futures.  I don't think he ever will be able to represent the Futures in this case, and I don't see any point to delay that decision.  We need a Futures Rep.  So I asked to keep this on although I saw the request to postpone it, I simply don't see a basis to postpone it because I don't see a basis to grant the application.

(11/17/03 Tr., Jt. App. Ex. 115 at JA002703-2705 and Jt. App. Ex. 143 at JA002992-2993.)  In response, Grace withdrew the application.  (*Id*. at 31.)

**D.  Judge Hamlin's testimony confirms there was no impropriety in his proposed appointment as futures representative.**

Now that extensive discovery has proceeded, there is *still* no indication that there was any impropriety in the proposed appointment of Judge Hamlin as futures representative.  Indeed, Judge Hamlin testified at deposition:

> A:     I think clearly if I was to be a Futures rep in Grace, I would have to— haven't already been formally terminated, I would have to formally terminate any connection with Judge Wolin as one of his advisers.
>
> Q:     Your understanding is that's what would happen if you were appointed?
>
> A:     Absolutely.
>
> Q:     Certainly your attention then is to resign from the adviser panel?
>
> A:     Yeah, if I was still participating."  (Hamlin Dep. at 185.)

Judge Hamlin also testified that any contacts he had regarding his potential role as futures representative before the application was submitted were minimal.  He testified that his first

telephone contact regarding this potential appointment came from Mr. Gross. (Hamlin Dep. at 198-199.) "[H]e indicated someone—he didn't indicate who had approached him with being a Futures rep. He indicated he didn't prefer to do that, and he wanted to know if he could advance my name for the appointment." (*Id*. at 199.)  The next call he received was some time later, from members of Grace's Property Damage Committee.  (*Id*.)  He testified that they asked him some background information about his experiences in asbestos and that no part of the conversation related to his role as adviser in the five cases.  (*Id*. at 200.)  Another conversation he testified about was a telephone call from Judge Wolin, in which Judge Hamlin was asked "if he had heard that somebody was prepared to submit my name as a Futures reps. He wanted to know if I was actually willing to serve," in response to which Judge Hamlin said yes.  (*Id*. at 201.)

The only contacts with Grace counsel which Judge Hamlin identified was a phone call and follow up e-mail correspondence with Kirkland & Ellis attorneys Samuel Blatnik and Christian Lane who, perhaps unbeknownst to Judge Hamlin, were the associates responsible for drafting up the application papers for his appointment. (*See id*. at 202-204.)

## ARGUMENT

The movants here have painted with a broad brush, asserting that this Court's appointment of the Consultants and use of *ex parte* contacts were *per se* erroneous, and that the error *per se* warrants this Court's recusal in all five cases—*regardless* of any facts that might emerge in discovery.  *See, e.g.*, Emergency Petition for a Writ of Mandamus, *In re Kensington Int'l Ltd.*, 3d Cir. No. 03-4212, at 25 ("What is *already* known to Judge Wolin about his advisors' conflict makes the need for disqualification of the judge clear and indisputable. ... [The Third Circuit] should conclude that *already* it is clear and indisputable that an appearance of impropriety will remain as long as Judge Wolin presides over these cases.") (emphasis in original).

The Third Circuit properly rejected this broad-brush approach, and remanded for careful consideration of, and development of a factual record on, among other things, "such matters as (i) the full extent of the Consultants' activities in the Five Asbestos Cases; (ii) Messrs. Gross and Hamlin's activities in *G-I Holdings;* (iii) the timeliness of the Petitions for Mandamus; and (iv) the extent to which recusal, if warranted in one of the bankruptcies, must be held to extend to the other bankruptcies." 2003 WL 23010148, at *10. The question now before this Court is whether, in light of the discovery that has taken place on these and other issues, the Consultants' role is proper and, if not, whether this Court's recusal is warranted in one or more of these cases.

The many other parties to these proceedings have fully explored these issues, and Grace sees no need to "pile on" either way. Rather, Grace believes that it can best assist the proper resolution of these issues by outlining what Grace believes is the proper framework for analyzing what are concededly novel legal issues.

The key question here involves the role of the Consultants in this case. As the Third Circuit noted, "[w]e must confess that we have struggled to define the role and position of the 'Consultants.' To the best of our knowledge, the Consultants' roles and positions are truly novel in terms of the powers they were assigned." 2003 WL 23010148, at *9 n.11. The heart of the problem, as the Third Circuit recognized, is that the Consultants' roles do not fit neatly into traditional pigeonholes.

- As the Third Circuit noted, the Consultants are not "masters" within the meaning of Fed. R. Civ. P. 53(a). *See* 2003 WL 23010148, at *9 n.11. A master assists a judge in his adjudicatory capacity, and has the power to propose findings of fact and conclusions of law. Under the most recent amendment to the Federal Rules of Civil Procedure, effective on December 1, 2003 (*after* the procedures in this case were adopted), masters can only perform duties "consented to by the parties." Fed. R. Civ. P. 53(a)(1)(A).

- As the Third Circuit also noted, the Consultants are not "court-appointed experts" within the meaning of Fed. R. Evid. 706. *See* 2003 WL 23010148, at *9 n.11.

33

That rule by its terms applies only to "expert *witnesses*," and the Consultants were not "witnesses" in the sense that they did not provide the court with evidence or adjudicatory facts. *See, e.g., Techsearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1380 (Fed. Cir. 2002); *Reilly v. United States*, 863 F.2d 149, 155-56 (1st Cir. 1988).

- As the Third Circuit again noted, the Consultants are not "magistrate judges" within the meaning of 28 U.S.C. § 636(b)(1). *See* 2003 WL 23010148, at \*9 n.11. They were not designated "to hear and determine any pretrial matter pending before the court," with the exception of certain matters enumerated in that statute. *Id.*

- The Consultants are not "mediators" in the sense that their role was not limited exclusively to mediation, although they did perform a mediation role in some of the cases.

It is therefore fairly straightforward to articulate what the Consultants are *not*; the question is how to articulate what they *are*, and whether their role is a legitimate one.

Grace respectfully submits that the First Circuit's opinion in *Reilly* provides an appropriate analytical framework for answering that question. The district court in that case—without informing the parties or their counsel—sought out the assistance of an economist "in respect to certain technical aspects pertinent to the calculation of a damage award," 863 F.2d at 153, a subject on which the parties had presented their own expert testimony. The United States (the defendant in the case) learned of the court's plan "[b]y happenstance," and requested a chambers conference. *Id.* The district court confirmed its intention to hire a technical advisor, and "[t]he government voiced no contemporaneous objection to the procedure, did not ask the name of the economist whom the court intended to retain, did not ask that either the court's instructions to the expert or the expert's advice be reduced to writing, and did not request an opportunity to question him." *Id.* at 154. Only after the district court had awarded the plaintiff a sizeable damages award did the government for the first time complain about the advisor. *See id.*

In rejecting the government's challenge to the district court's use of the advisor, the First Circuit held that (1) Rule 706 (which authorizes and provides procedures governing judicial

34

appointment of expert witnesses) does not implicitly limit the courts' inherent power to appoint advisors, *see id.* at 155-56, (2) the district court did not abuse its discretion by appointing a technical advisor at all, *see id.* at 156-57, (3) the district court did not improperly allow its advisor "to roam far beyond the precincts to which a technical advisor must properly be confined," *id.* at 157-59, and (4) the district court did not abuse its discretion by failing to implement certain procedural safeguards, *see id.* at 159-61. In the course of these holdings, the court elucidated several important principles relevant here.

*First*, the *Reilly* court explained that the appointment of an outside advisor was not *per se* improper, at least where (as in that case) "[t]here is no suggestion of bias or any other disqualifying characteristic on the expert's part." *Id.* at 161. Rather, the court confirmed that district courts have inherent power to appoint technical advisors, *see id.* at 155 n.4 (citing *Ex parte Peterson*, 253 U.S. 300, 312-13 (1920) (Brandeis, J.)), above and beyond their power to appoint expert witnesses under Fed. R. Evid. 706, or masters under Fed. R. Civ. P. 53, *see id.* at 155-56 & n.4. "Trial judges in the federal system possess[] 'inherent power to provide themselves with appropriate instruments required for the performance of their duties,' including the power to 'appoint persons unconnected with the court to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause.'" *Id.* at 157 (quoting *Peterson*, 253 U.S. at 312); *see also General Elec. Co. v. Joiner*, 522 U.S. 136, 149 (Breyer, J., concurring) (endorsing the appointment of specialists to assist district courts in understanding technical evidence); *Techsearch,* 286 F.3d at 1377 (same).

*Second*, the *Reilly* court explained that "such appointments should be the exception and not the rule, and should be reserved for truly extraordinary cases where the introduction of outside skills and expertise, not possessed by the judge, will hasten the just adjudication of a

dispute without dislodging the delicate balance of the juristic role." 863 F.2d at 156; *accord* Hamlin Dep. at 256-259. In particular, the court emphasized its "strongly-held view that the appointment of a technical advisor must arise out of some cognizable judicial need for specialized skills"—a situation the court predicted would be "hen's-teeth rare." 863 F.2d at 156-57; *see also id.* at 157 ("The modality is, if not a last, a near-to-last resort, to be engaged only where the trial court is faced with problems of unusual difficulty, sophistication, and complexity, involving something well beyond the regular questions of fact and law with which judges must routinely grapple."). The court was satisfied that the *Reilly* case itself fell into this category, even though the parties had presented expert testimony on the very subject addressed by the advisor, because the parties' experts gave the court "feeble" assistance, and "the litigation was ... far outside the mainstream." *Id.*

**Third**, the *Reilly* court explained that an advisor's role must be "limited to appropriate technical assistance." *Id.* Advisors of this sort are neither witnesses (so they may not contribute evidence), and are not judges (so they may neither "brief [the judge] on legal issues," nor "undertake an independent mission of finding facts outside the record of the case"). *Id.* at 157-58 (internal quotations omitted). Rather, "the advisor's role is to act as a ***sounding board*** for the judge—helping the jurist to educate himself in the jargon and theory disclosed by the testimony and to think through the critical technical problems." *Id.* at 158 (emphasis added).

**Fourth**, the *Reilly* court explained that a trial court should implement adequate procedural safeguards to provide at least a modicum of accountability regarding its use of advisors. "We think it advisable in future cases that the parties be notified of the expert's identity before the court makes the appointment, and be given an opportunity to object on grounds such as bias or inexperience." *Id.* at 159. "We also think that there is much to commend the

preformulation of a written 'job description' for the advisor (or in lieu thereof, that the judge deliver comprehensive verbal instructions to the advisor, on the record, in the presence of all counsel). At the conclusion of his stint, the advisor should file an affidavit attesting to his compliance with the job description." *Id.* at 159-60; *see also Techsearch*, 286 F.3d at 1377-78 (district court must "establish[] safeguards to prevent the technical advisor from introducing new evidence and to assure that the technical advisor does not influence the district court's review of the factual disputes").

*Fifth*, the *Reilly* court explained that any such procedural safeguards were subject to waiver by the litigants. Thus, where a party does not express any opposition to an advisor at the outset, and does not request any specific procedural safeguards, that party cannot later "sandbag" the proceedings by complaining about the advisor only after "wait[ing] to see which way the wind blew." 863 F.2d at 160. This factor was highly significant in *Reilly* itself, where the government (1) "did not inquire as to the expert's identity or express any objection to the court's use of an (unknown) expert," and (2) did not "request that any safeguards be set in place," but instead "sat back and knowingly acquiesced in the court's unconditional hiring of an unidentified technical advisor." *Id.* "[W]hen a trial judge announces a proposed course of action which litigants believe to be erroneous, the parties detrimentally affected must act expeditiously to call the error to the judge's attention or to cure the defect, not lurk in the bushes waiting to ask for another trial when their litigatory milk curdles." *Id.*[22]

---

[22] The movants' objections to the Court's *ex parte* contacts would appear to fall into this category. It is undisputed that this Court openly declared that *ex parte* contacts would be used as part of the Court's case management system in order to advance efforts to facilitate a consensual resolution of these sprawling cases. The movants argue, however, that (1) such *ex parte* contacts mandate recusal on the ground that they imparted to the Court "personal knowledge of disputed evidentiary facts concerning the proceeding," 28 U.S.C. § 455(b), and

(Continued...)

The application of the foregoing principles in the five cases at issue here, in Grace's view, must take into account their bankruptcy context. Unlike ordinary civil litigation, where adversaries sue each other and proceedings tend to be bipolar, a bankruptcy case requires a court to divide a "pie" (the debtor's assets) among different constituencies (the creditors) and proceedings tend to be multipolar. Bankruptcy thus fits uneasily into the traditional litigation paradigm of advocates walking into court and simply arguing their case. The goal is not to pick a "winner" and a "loser," but to reach a fair consensual resolution that provides closure to all affected parties. Presiding over a bankruptcy, thus, is in many ways more similar to presiding over a settlement than presiding over litigation. If anything, the Consultants bear the greatest resemblance to court-appointed mediators (who are now used in virtually every circuit, *see, e.g.,* 3d Cir. Local Appellate Rule 33), who do not participate in the adjudicatory process, but assist courts in attempting to work out a settlement among the litigants. Clearly, the appointment of the Consultants in this case represented this Court's attempt to tap into the accumulated experience of lawyers and former judges intimately familiar with the issues and constituencies at issue here, in order to facilitate effective case management and an overall settlement that provided the greatest good for the greatest number of affected individuals and entities. In this regard, it is important to keep in mind that the Consultants here have testified that they did not impart any confidential information to the Court, but instead merely educated the Court with

---

(2) litigants cannot consent to a § 455(b) violation, 28 U.S.C. § 455(e). *In re USG Corp.* (11/21/03), at 20-23. But that extreme position cannot be correct: courts, after all, can and often do engage in *ex parte* contacts with litigants in order to explore a potential settlement. Here, of course, it is undisputed that the Court engaged in *ex parte* contacts with **all** interested parties (including the movants) in order to structure a case management system tailored to the ultimate bankruptcy goal of achieving a consensual plan, and that no one objected for almost two years.

respect to publicly available and non-confidential information regarding the 40-year history of asbestos litigation, in order to afford a foundation for the Court's case management decisions.

The twist here, of course, as the Third Circuit recognized, is that the Consultants perform a "hybrid" role, *see* 2003 WL 23010148, at *9 n.11: they are both mediators and advisors to the Court. The central issue is thus whether this twist is dispositive, *i.e.*, whether the Consultants' hybrid role is impermissible even though a pure advisor or a pure mediator might be permissible. Grace is not aware of any precedent on that specific issue. Certainly, these roles are usually separated, but that does not necessarily mean that they **must** be separated. In any event, the resolution of this issue is not as easy as analogizing the Consultants to special masters or law clerks. Rather, resolution of the issue requires careful consideration of all the facts and circumstances of the case, just as the First Circuit performed in *Reilly*.

At the very least, *Reilly* underscores that the movants here cannot possibly be correct to suggest that this Court's recusal is *per se* warranted merely because this Court consulted with the Consultants. Technical advisors will necessarily have a particular perspective on the subject-matter of their expertise; if they had no substantive views on the subject matter, that would not mean that they were disinterested, but rather that they were ignorant. The logical implication of movants' position is that judges should be precluded from considering **anything** beyond the litigants' briefs and arguments in a case, which may be a perfectly fine system, but is emphatically not our system. Rather, under our system, judges are not sequestered like juries, but are free to consult a wide variety of materials beyond the parties' submissions, including (for example) law review articles. If a judge is free to consult a law review article not cited by the parties, it is far from clear logically why he or she should not be free (at least upon proper disclosure) to consult with the author of that article.

Finally, it is worth bearing in mind that the movants bear the burden of justifying the extraordinary step of recusal in these cases—especially given the fact that the movants are seeking to undo more than two years' of work, and thereby cause substantial delays in the resolution of these time-sensitive matters. Judges must be presumed innocent of the reality or appearance of impropriety until proven otherwise. Thus, "the absence of *any* evidence even suggesting an impropriety on the part of the district court militates against a conclusion that the district court abused its discretion" in consulting with technical advisors. *Association of Mexican-American Educators v. California*, 231 F.3d 572, 591 (9th Cir. 2000) (*en banc*) (emphasis in original). "Although it is at least *possible* ... that [a technical advisor] may have impermissibly influenced the court's ultimate finding, we instead assume that the district court did its job properly when we lack evidence to the contrary." *Id.* (emphasis added; internal quotation omitted).

## CONCLUSION

The issues now before the Court are not only novel, but extraordinarily fact-intensive. These issues, in Grace's view cannot be resolved on the basis of slogans or labels, but require careful inquiry into the specific facts and circumstances of this case.

Dated: January 20, 2004       Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Michelle H. Browdy
Janet Baer
Samuel Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

KIRKLAND & ELLIS LLP
Christopher Landau
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession