# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Replacement Memorandum Per Court's Direction,** |
| | | **Related Docket No. 4937** |


**MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION OF D.K. ACQUISITION PARTNERS, L.P., FERNWOOD ASSOCIATES, L.P. AND DEUTSCHE BANK TRUST COMPANY AMERICAS TO DISQUALIFY THE HONORABLE ALFRED M. WOLIN, UNITED STATES DISTRICT JUDGE, FROM FURTHER PARTICIPATION IN THESE JOINTLY ADMINISTERED CASES**


**KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP**
919 Market Street, Suite 1000
Wilmington, DE 19809-3062
(302) 426-1189


**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019
(212) 728-8000


- 1-

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ............................................................................................ 2

PROCEDURAL BACKGROUND ........................................................................................ 3

    A.  Grace And The Grace Movants ................................................................................ 3

    B.  Consolidation Of The Five Asbestos Cases ............................................................ 4

    C.  The Owens Recusal Motion ...................................................................................... 4

    D.  The Owens Petition For Mandamus ......................................................................... 5

    E.  The Grace Movants' Recusal Motion And Petition For Mandamus ........................ 6

    F.  The Third Circuit's Opinion ..................................................................................... 7

    G.  Further Proceedings Before The District Court ........................................................ 7

RELEVANT FACTUAL BACKGROUND ........................................................................... 8

    A.  The December 20, 2001 Case Management Conference And The
        Appointment Of The Five Advisors ......................................................................... 8

    B.  Messrs. Hamlin's And Gross's Roles In The G-I Bankruptcy Case ...................... 10

    C.  The Court's Knowledge Of Messrs. Hamlin's And Gross's Role In G-I ............... 11

    D.  The Unprecedented Scope Of The Authority Granted To The Advisors And
        Lack Of Guidelines For Their Conduct Provided By The Court ............................ 12

    E.  The Five Advisors Discussed A Number Of Substantive Issues With The
        Court And The Parties At Numerous *Ex Parte* Meetings ..................................... 14

    F.  Messrs. Hamlin's and Gross's Participation In Meetings Of Futures
        Representatives In Both The Five Asbestos Cases And Others ............................. 17

ARGUMENT ....................................................................................................................... 19

I.  Section 455(a) Mandates Disqualification Under The Circumstances Present
    Here ............................................................................................................................. 19

    A.  Standards For Disqualification Under 28 U.S.C. § 455(a) ................................... 19

B.  The Court's Management Of The Five Asbestos Cases Through *Ex Parte* Meetings Raises Serious Questions About The Fairness And Impartiality Of These Proceedings ................................................................................................21

C.  The Unprecedented Authority Granted to The Five Advisors Coupled With The Lack Of Notice Surrounding Their Appointment Also Raise Serious Questions About The Fairness And Impartiality Of These Proceedings ........................25

D.  The Dual And Conflicting Roles Fulfilled By Messrs. Hamlin And Gross In The Five Asbestos Cases And The G-I Case Mandate Disqualification Under 455(a) ........................................................................................................29

E.  The Dual And Conflicting Roles Played By Messrs. Hamlin And Gross Have Tainted The *Grace* Proceedings As Well As The Other Four Asbestos Cases ..............................................................................................................31

F.  Mr. Hamlin's Application to Be Appointed as the Futures Representative In the *Grace* Proceedings, Apparently At The Urging Of The Court, Underscores the Conflicts and Appearance of Partiality or Bias Present in these Cases ............................................................................................................33

G.  The Grace Movants Have Not Waved Their Right To Seek The Court's Disqualification Pursuant To 28 U.S.C. § 455(a) ........................................35

II.  Based On Its Own Admissions, And The Evidence Adduced During The Limited Discovery Allowed, The Court's Disqualification Also Is Mandated Under 28 U.S.C. § 455(a)........................................................................................37

CONCLUSION ........................................................................................................39

## TABLE OF AUTHORITIES

**Case**                                                                                      **Page(s)**

Alexander v. Primerica Holdings, Inc., 10 F.3d 155 (3d Cir. 1993) ................................. 19, 20, 30

Apple v. Jewish Hosp. and Med. Ctr., 829 F.2d 326 (2d Cir. 1987) ............................................. 36

Brennan v. Owens-Corning Fiberglass Corp., 10 P.3d 749 (Idaho 2000) ..................................... 12

Burns v. A.P. Green Indus., Inc., 761 N.E.2d 380 (Ill. App. Ct. 2001) ......................................... 12

Edgar v. K.L., 93 F.3d 256 (7th Cir. 1996) ..................................................................................... 38

In re Ira Haupt & Co., 361 F.2d 164 (2d Cir. 1966) ................................................................. 19, 26

In re Johns-Manville Corp., 36 B.R. 743 (Bankr. S.D.N.Y. 1984) ............................................... 10

In re Kansas Pub. Employees Ret. Sys., 85 F.3d 1353 (8th Cir. 1996) ......................................... 36

Kenndey v. Great Atlantic & Pacific Tea Co., 551 F.2d 593 (5th Cir. 1977) ............................... 38

Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847 (1988) ............................. 19, 20, 30, 33

Liteky v. United States, 510 U.S. 540 (1994) ................................................................................. 39

Price Bros. Co. v. Philadelphia Gear Corp., 629 F.2d 444 (6th Cir. 1980) ................................... 38

Reilly v. United States, 863 F.2d 149 (1st Cir. 1988) .................................................................... 27

In re Sch. Asbestos Litig., 977 F.2d 764 (3d Cir. 1992) ............................................... 19, 20, 33

Te-Te-Ma Truth Found. v. World Church of the Creator, 246 F. Supp. 2d 980 (N.D.
        Ill. 2003) ................................................................................................................................. 21

Techsearch L.L.C. v. Intel Corp., 286 F.3d 1360 (Fed. Cir. 2002), cert. denied, 537
        U.S. 995 (2002) ....................................................................................................................... 27

United States v. Cerralla, 529 F. Supp. 1373 (S.D. Fla. 1982) ..................................................... 20

United States v. Nobel, 696 F.2d 231 (3d Cir. 1982) ............................................................... 20, 30

In re Wisconsin Steel, 48 B.R. 753 (N.D. Ill. 1985) ...................................................................... 25

## STATUTES

28 U.S.C. § 455 .............................................................................................................................. 37

FED. R. CIV. PRO. 53 ....................................................................................................................28

## OTHER AUTHORITIES

MANUAL FOR COMPLEX LITIGATION (THIRD) § 21.51 (2003) ...............................................26

D.K. Acquisition Partners, L.P., Fernwood Associates, L.P. and Deutsche Bank Trust Company Americas (collectively, the "Grace Movants"), hereby respectfully submit this Memorandum of Law and the Declaration of Joanne Wills, dated January 15, 2004, and the exhibits attached thereto, in further support of their motion, pursuant to 28 U.S.C. §§ 455(a) and (b)(1), and the Code of Conduct for United States Judges, for an order disqualifying the Honorable Alfred M. Wolin, United States District Judge, from further participation in these jointly administered chapter 11 cases.

## PRELIMINARY STATEMENT

As the Court is aware, issues of extreme significance to the Grace Movants and all other parties to this case and the other asbestos-related cases pending in this Court are the subject of recusal proceedings here, as well as in In re Owens Corning, et al., Case No. 00-03837 (the "Owens Corning Case") and In re USG Corp. et al., Case Nos. 01-2094 through 01-2104 ("USG").[1]  Indeed, what has been brought into greater focus through the limited discovery permitted by the Court is that Messrs. David R. Gross and C. Judson Hamlin, two of the "Advisors" appointed by the Court, have participated substantially in the Court's administration of the Five Asbestos Cases and have been discussing with the Court and certain parties the "salient" and "common" issues central to resolution of each of the Five Asbestos Cases, primarily on an *ex parte* basis, while at the same time acting as partisan advocates for the interests of asbestos claimholders in another major and highly-contested (and related) asbestos bankruptcy case -- that of G-I Holdings Inc., f/k/a GAF Corporation, and its affiliates (collectively, "G-I").

---

[1]    These three cases, along with the cases of In re Armstrong World Indus., Inc., et al., Case Nos. 00-4471, 00-4469, 00-4470 ("Armstrong") and In re Federal Mogul Global, Inc., T&N Ltd., et al., Case No. 01-10578, are referred to herein as the "Five Asbestos Cases."

The Grace Movants believe that these facts, at the very least, create a clear and substantial perception that the Court has surrounded itself with, and has been taking *ex parte* advice from, Advisors who have an agenda distinctly at odds with their purported role as neutrals. What is more, one of these Court-appointed Advisors, Mr. Hamlin, affirmatively has sought to be appointed the representative of future asbestos claimants in the Grace case, apparently at the urging of the Court, in circumstances that only can call into question the fairness and transparency of these proceedings.

Furthermore, while the evidentiary record available at the time these motions were filed would lead a reasonable person to perceive that bias might exist, and warranted disqualification under 28 U.S.C. § 455(a), the record developed through the limited discovery permitted by the District Court, as well as statements made by the District Court, now demonstrate that disqualification also is warranted pursuant to 28 U.S.C. § 455(b)(1). Indeed, the Court has acknowledged acquiring extra-judicial, personal knowledge through numerous *ex parte* conferences, both with parties and with the conflicted Advisors, relating to whether, and to what extent, any of the claims at issue in these cases "were just." There can be little doubt that, under these circumstances, section 455(b)(1) mandates the Court's recusal. The Grace Movants therefore supplement the grounds pursuant to which they seek disqualification to include 28 U.S.C. 455(b)(1).

## PROCEDURAL BACKGROUND

A. **Grace And The Grace Movants.**

On April 2, 2001, W.R. Grace & Co., and 61 of its predecessors, subsidiaries, and other related entities (collectively, "Grace"), filed for reorganization under Chapter 11 of the United States Bankruptcy Code. Each of the Grace Movants is a creditor in the Grace

- 3 -

Chapter 11 cases, holding claims against Grace arising under: (i) a certain $250 million credit facility, entered into as of May 14, 1998; and/or (ii) a certain $250 million revolving credit facility dated as of May 5, 1999 (collectively, the "Credit Facilities"). While the Grace Movants are unsecured creditors, they are not, nor have they ever been, members of the Official Committee of Unsecured Creditors in the Grace case. See Declaration of Joanne B. Wills.[2]

B.    **Consolidation Of The Five Asbestos Cases.**

On November 27, 2001, then-Chief Judge Becker ordered that the Five Asbestos Cases be transferred from the Bankruptcy Court and assigned to the Court, who temporarily was assigned to the District of Delaware. (Designation of a District Judge for Service in Another District Within the Circuit (the "Designation Order"), JA pp. 2177-78 .)[3] Judge Becker directed that "these bankruptcy cases, which carry with them tens of thousands of asbestos claims, need to be consolidated before a single judge so that a coordinated plan for management can be developed and implemented." (Id. ¶ 2.)

C.    **The Owens Recusal Motion.**

On or about October 10, 2003, Kensington International Limited and Springfield Associates, LLC, creditors of Owens Corning, filed a motion to recuse the Court from further participation in the Owens Corning bankruptcy proceedings (the "Owens Recusal Motion"). The Owens Recusal Motion highlighted the dual and conflicting capacities in which Messrs. Hamlin and Gross have been acting in their roles as Advisors to the Court in these cases and as representatives of pending and future asbestos claimants in the G-I bankruptcy proceedings.

---

[2]    The Declaration of Joanne B. Wills was inadvertently left out of the Joint Appendix. A copy of the Declaration is being served on all parties and the Court with this replacement Memorandum.

[3]    Citations to "JA pp. Ex. __" refer to the Joint Appendix filed in this matter and filed with the Court on January 20, 2004.

Kensington and Springfield sought discovery of Hamlin and Gross, as well as of their law firms, and of Grace in connection with the Owens Recusal Motion.

D.    **The Owens Petition For Mandamus.**

On October 23, 2003, the Court *sua sponte* suspended all briefing and discovery in connection with the Owens Recusal Motion. (Letter Opinion ("October 23, 2003 Order"), JA pp. 2179-84.) The next day, Kensington and Springfield filed an emergency petition for a writ of mandamus directing the Court to recuse itself from further participation in the Owens Corning proceedings or to expedite consideration of (including discovery on) the Owens Recusal Motion. On October 28, 2003, the Court entered an order entitled "Case Management Order and Order to Show Cause" concerning the Owens Recusal Motion, which, among other things, ordered the Advisors to submit affidavits to the District Court setting forth certain information relating to their activities as Advisors and in the G-I case. (Case Management Order and Order to Show Cause Concerning Motion to Recuse Alfred M. Wolin, U.S.D.J. ("October 28, 2003 Order"), JA pp. 2185-87.)

On October 30, 2003, the Court of Appeals for the Third Circuit issued an order instructing respondents affected by the Petition for Mandamus to file answers with the Third Circuit no later than noon on November 6, 2003, and invited the District Court to address and respond to the Petition. (Order, dated October 30, 2003, JA pp. 2188-90.) A few days later, on November 3, 2003, the District Court filed a Response to the Petition.[4] Contemporaneously with the filing of the District Court's Response on November 3, 2003, the Third Circuit issued an

---

[4]    Response by the District Court Judge to the Petition for a Writ of Mandamus, Pursuant to the Invitation of the Court of Appeals, ("District Court Response"), JA pp. 112-25.

order which, among other things, modified the briefing schedule to extend the date for responses

to the Petition to November 21, 2003. (Order, dated November 3, 2003, JA p. 2191.)

E.    **The Grace Movants' Recusal Motion And Petition For Mandamus.**

On November 14, 2003, the Grace Movants filed their motion for recusal and

each of the Five Advisors filed affidavits in response to the Owens Recusal Motion in support of

the District Court's actions and their roles in the Five Asbestos cases. (See (Affidavits of C.

Judson Hamlin, David R. Gross, William H. Dreier, Francis E. McGovern, and John E. Keefe,

Sr.) JA pp. 1-20; 77-79; 2192-2259.) On November 21, 2003, there having been no action by the

District Court in respect of the Grace Movants' recusal motion, the Grace Movants filed a

Petition for Mandamus in the Third Circuit. That same day, the debtors in the USG case filed a

motion to recuse the District Court and an *amicus* brief in support of the Kensington Petition,

and the District Court submitted a Supplemental Response to the Kensington Petition to the

Third Circuit.[5]

Thereafter, in early December 2003, the Grace Movants' Petition and the Owens

Petition were consolidated by the Third Circuit, and at least a dozen answers and replies were

filed in connection with those petitions, including a Sur-Reply by the District Court on

December 9, 2003.[6] Finally, on December 12, 2003, the Third Circuit heard oral argument with

respect to the Petitions.

---

[5]    Supplemental Response by the District Court Judge to the Petition for a Writ of Mandamus, Pursuant to the Invitation of the Court of Appeals, ("District Court Supplemental Response"), JA pp. 1911-25.

[6]    Sur-Reply by the District Court Judge to the Petition for a Writ of Mandamus, Pursuant to the Invitation of the Court of Appeals, ("District Court Sur-Reply"), JA pp. 2260-67.

F.    **The Third Circuit's Opinion.**

The Third Circuit issued its Opinion on December 18, 2003. In that Opinion, the

Third Circuit, stated that "we have decided to direct the district court judge to rule on the

withdrawn recusal motions. In doing so, we will vacate the district court judge's order staying

discovery on the recusal motions and direct that expedited discovery proceed without

interruption." Opinion, at 6. The Third Circuit also instructed that discovery should be

conducted with respect to, "[a]mong other things . . . (1) the full extent of the Consultant's

activities in the Five Asbestos Cases; (ii) Messrs. Gross and Hamlin's activities in *G-I Holdings*;

(iii) the timeliness of the Petitions for Mandamus; and (iv) the extent to which recusal, if

warranted in one of the bankruptcies, must be held to extend to the other bankruptcies." Id. at

26. Finally, the Third Circuit directed the District Court to render its decision by January 31,

2004.

G.    **Further Proceedings Before The District Court.**

The next day, December 19, 2003, Judge Wolin vacated the stay of discovery and

ordered a discovery scheduling conference for December 23, 2003. Prior to the conference, the

various movants served discovery requests (and subpoenas) on a number of parties with

information relevant to the recusal motions. (Discovery Requests, JA pp. 2268-2404.) At the

hearing on December 23, 2003, the District Court issued a blanket order quashing all discovery

requests served by movants; ordering movants to consolidate and narrow their requests and

provide them to the District Court for its review by 9:00 a.m. the next day. (See Transcript of

December 23, 2003 Hearing at 93, 101, JA pp. 2405-07.)

On December 24, 2003, the District Court ruled on movants' revised requests,

limiting the scope of several requests and denying many outright, and also permitting discovery

-7-

of movants and certain other parties supporting recusal. (See Transcript of December 24, 2003

Hearing and subsequent Order, JA pp. 2408-2490; 2491-2532.) The Court further directed that

responsive documents be produced by January 2, 2004. Finally, the District Court limited the

scope of deposition discovery sought by movants and respondents, and ordered that the

depositions of the Five Advisors, as well as Stephen Case, Mark Brodsky, and Ken Eckstein be

taken on January 5-6, 2004 in the District Court courthouse in Newark.[7] (Id.)

　　　　The discovery permitted by the Court has been completed, and the Grace Movants

submit this Memorandum of Law pursuant to the Court's Order dated December 23, 2003.

## RELEVANT FACTUAL BACKGROUND

　　　　While the Court did not permit much of the discovery sought by movants, the

limited discovery allowed did shed further light on the role of the Advisors in all of the Five

Asbestos Cases. The factual background relevant to this motion, which was drawn from the

limited discovery allowed and from publicly-filed documents, is summarized below.

A. **The December 20, 2001 Case Management Conference
And The Appointment Of The Five Advisors.**

　　　　As noted, on November 27, 2001, then-Chief Judge Becker ordered the Five

Asbestos Cases transferred from the Bankruptcy Court and assigned to this Court. Faced with

the formidable and daunting task of managing these cases, and the thousands of asbestos claims

that forced the debtors into bankruptcy in the first place, the Court embarked on an

unprecedented management approach in each of the Five Asbestos Cases. The Court

inaugurated its handling of the cases by convening an off-the-record Joint Management

Conference on December 20, 2001. While there is no contemporaneous record of what

---

[7]　　The Grace Movants note that they object to certain rulings District Court that denied otherwise proper
discovery into the issues relevant to this motion.

- 8 -

transpired at this conference, notes apparently drafted by the Court as an outline to be used by the Court at the conference, and submitted during these recusal proceedings by the Court, reflect that the Court announced two unique and, perhaps, unprecedented case management techniques that it intended to employ.

First, the Court announced that to "effectively case manage complex litigation, it is necessary for the judge to speak and/or meet with attorneys on an ex parte basis, without permission of adversary attorneys." (See Notes Attached To Court's Supplemental Response To The Petition For A Writ Of Mandamus, JA pp. 1911-25.) The Court's notes also stated that "[a]ny objection to such ex parte communication is deemed waived." (Id.) Significantly for purposes of this motion, the Court at the same time represented that *ex parte* meetings would be "used sparingly." (Id.)

Second, the Court noted it "anticipated appointing special masters and/or case management consultants . . . to advise the Court on issues that may arise in these five large Chapter 11 cases." (Order Designating Court Appointed Consultants And Special Masters ("Appointment Order"), JA pp. 2533-35.) A little more than a week later, the Court, true to its word, appointed five advisors:  William A. Dreier, Esq., David R. Gross, Esq., C. Judson Hamlin, Esq., John E. Keefe, Esq., and Professor Francis E. McGovern (the "Five Advisors").

Notably, as the Appointment Order makes clear, the Five Advisors were appointed *sua sponte*. (Appointment Order, JA pp. 2533-35.) And, other than the Court's announced intention to appoint advisors, there was not any sort of application, notice, disclosure, or hearing typically attendant to such appointments. As such, the Five Advisors were not required, as they were in G-I, to provide the parties in the case with notice of the Advisors' other engagements or interests so that the parties could consider the existence of any conflicts; nor, did

- 9 -

the Advisors voluntarily undertake to provide such information. (See, e.g. Transcript of

Deposition of C. Judson Hamlin ("Hamlin Tr.") at 168-171; Transcript of Deposition of David

R. Gross ("Gross Tr.") at 28-31.) It is not surprising, therefore, that at the time that the Five

Advisors were appointed, there was no formal disclosure of the fact that, as discussed below, two

of the Advisors appointed by the Court as neutrals were in fact participating in an important and

substantive way in a related asbestos-driven bankruptcy.

B.    **Messrs. Hamlin's And Gross's Roles In The G-I Bankruptcy Case.**

On January 5, 2001, just a few months before Grace filed for bankruptcy, G-I

filed for chapter 11, and its case currently is pending before the Honorable Rosemary

Gambardella in the United States Bankruptcy Court for the District of New Jersey (the "G-I

Court"). As the Grace Movants discovered for the first time only in October 2003, on October

11, 2001, the G-I Court appointed Mr. Hamlin to serve as the "Legal Representative of Present

and Future Holders of Asbestos-Related Demands." (Order Appointing Legal Representative of

Present and Future Holders of Asbestos-Related Demands in G-I's Chapter 11 Case, JA pp.

2536-38) Mr. Hamlin, in turn, hired Mr. Gross (and the firm with which he was then a partner)

to represent the interests of the asbestos claimants in that case. (Hamlin Tr. at 44.)

As Mr. Hamlin testified, in G-I he acts as a fiduciary to future asbestos claimants,

and is duty bound to maximize the financial recovery of these claimants; and Mr. Gross acts as a

fiduciary to him. (Hamlin Tr. at 43; Gross Tr. at 47-48.) Moreover, as Futures Representative,

the central and extremely important role Mr. Hamlin would play in the G-I case is undeniable.

As the court in the Manville bankruptcy noted, "future claimants are indeed the central focus of

the entire reorganization. Any plan not dealing with their interests precludes a meaningful and

- 10 -

effective reorganization and thus inures to the detriment of the reorganization body politic." In re Johns-Manville Corp., 36 B.R. 743, 749 (Bankr. S.D.N.Y. 1984).

C.    **The Court's Knowledge Of Messrs. Hamlin's And Gross's Role In G-I.**

There appears to be no dispute that, at the time he appointed Messrs. Hamlin and Gross as Advisors in the Five Cases, the Court was aware of their roles in the similar G-I bankruptcy case. For example, Mr. Gross has testified that "I know he [Judge Wolin] was aware of the appointment" in G-I. (Gross Tr. at 26.) And, Mr. Hamlin testified that he specifically told the Court that he was the Futures representative in G-I, and asked the Court if that was one of the cases with respect to which the Court sought to appoint him as an advisor. (Hamlin Tr. at 9.) The reason for Mr. Hamlin's inquiry was that he did not believe he could advocate on behalf of a class of claimants while at the same time acting as an "Advisor" to the Court that was presiding over the fortunes of that class of claimants. (Hamlin Tr. at 9, 183-84.)

Despite the Court's knowledge of Messrs. Hamlin's and Gross's roles as representatives of asbestos claimants in G-I, and Mr. Hamlin's concerns regarding a potential conflict, it apparently was decided that no conflict existed with Messrs. Hamlin's and Gross's appointment as Advisors. It also was decided that the parties in the Five Asbestos cases need not be given formal notice of these dual roles prior to the appointment, or at any point thereafter.[8] The only reason provided for the lack of such notice is that the dual roles of Mr. Hamlin and Mr. Gross, though not made part of the record or disclosed in any formal manner in the Five

---

[8]    In response to this issue, the Court, in its Sur-Reply filed with the Third Circuit, suggests that "[movants] would put the burden on the Court of providing affirmative notice to thousands of parties-at-interest of the alleged conflict of interest of its advisors." (Sur-Reply at 6, JA pp. 2260-67.) To the contrary, the only burden the Grace Movants seek to impose is the same burden that Messrs. Hamlin and Gross were put to when appointed as partisan advocates in G-I (see Affidavit of C. Judson Hamlin, JA pp. 1-20; 2192-2211); that is, providing disclosure to the parties, prior to being appointed, of any interests and engagements that may give rise to a conflict.

Asbestos Cases, purportedly was discussed in certain trade publications. (See, e.g., District Court Sur-Reply at 7, JA pp. 2260-67; Hamlin Tr. at 28; and Gross Tr. at 143.) Nevertheless, when pressed to name a single publication in which their dual roles were discussed, neither Mr. Hamlin nor Mr. Gross could do so (and Mr. Gross observed that he only rarely reads such publications himself). (Hamlin Tr. at 27; Gross Tr. at 143-144, 111.)

Moreover, the close relationship between the Five Asbestos Cases and the G-I case is not mere speculation. The debtors in the Five Asbestos Cases and the G-I case were manufacturers of asbestos-containing products and were the subject of thousands of asbestos-related claims that eventually forced them into bankruptcy. Because asbestos claimants frequently claim to have been exposed to asbestos-containing products produced by more than one manufacturer, or are unsure of the identity of the manufacturer who produced the product that allegedly caused their injuries, it is not uncommon for asbestos claimants to assert claims against different manufacturers of similar products. See, e.g., Brennan v. Owens-Corning Fiberglass Corp., 10 P.3d 749 (Idaho 2000) (lawsuit relating to asbestos-related personal injury claims against, among others, Grace, Armstrong, Owens Corning, USG, and G-I); Burns v. A.P. Green Indus., Inc., 761 N.E.2d 380 (Ill. App. Ct. 2001) (same). Thus, it cannot reasonably be disputed (nor has it been) that it is likely a significant number of the asbestos claimants in the G-I bankruptcy case, to whom Messrs. Hamlin and Gross owe a fiduciary duty, are or will be claimants in the Five Asbestos Cases as well.

D.    **The Unprecedented Scope Of The Authority Granted To The Advisors And Lack Of Court-Imposed Guidelines For Their Conduct.**

Though the Appointment Order starts out by noting that the Court had put the parties "on notice" that it would be appointing "special masters and/or case management consultants" to whom the Court "may from time to time delegate certain authority to hear

- 12 -

matters and to advise the Court on issues that may arise" (see Appointment Order at 1-2, JA pp.
2533-35), the actual scope of the appointment was far broader. The Five Advisors were
appointed to "undertake [certain] responsibilities, including by way of example and not
limitation, mediation of disputes, holding case management conferences, and consultation with
counsel . . . ." (See id ¶ 3.) In addition, the Appointment Order provided that the Court could,
"without further notice, appoint any of the Court Appointed Consultants to act as a Special
Master to hear any disputed matter and to make a report and recommendation to the Court on the
disposition of such matter." (Id. ¶ 4.)

    Indeed, the Court described the Advisors as "functioning in a manner in all
respects similar to examiners as provided for in the Bankruptcy Code."[9] And, while the
Advisors, in their affidavits, tried to downplay the scope of the grant of authority they received
from the Court, their deposition testimony lays bare the sheer breadth of their appointments. For
example, Mr. Gross described his role in the first meeting with the Court and the Five Advisors
as meetings regarding "Special Masters." (Gross Advisor Timesheets, at 1, JA pp. 2544-78.)
Mr. Dreier testified that he acted as an "advisor," a "master," and a "law clerk." (Transcript of
the Deposition of William Dreier ("Dreier Tr."), at 27, 35-36.) And Mr. Hamlin saw his role as,
among other things, providing expertise to the Court with respect to a number of issues. (See
Hamlin Tr. at 23-25.) The Advisors also do not dispute that the Court never limited the scope of
their appointment in any way. (See, e.g., Dreier Tr. at 27; Transcript of the Deposition of John
E. Keefe, Sr. ("Keefe Tr.") at 18.)

---

[9]     Order 1) Partially Withdrawing the Reference and 2) Governing Applications for the Allowance of Fees
and Expenses to Court Appointed Advisors, JA pp. 2539-2543.

E.    **The Five Advisors Discussed A Number Of Substantive Issues
With The Court And The Parties At Numerous _Ex Parte_ Meetings.**

While certain of the Advisors at their depositions and in their affidavits suggested

that only "procedural" matters were discussed in four, all-hands, "A-Team" or "Asbestos

Management Committee" meetings held on January 7, 2002, January 18, 2002, February 27,

2002, and May 27, 2002, the brief, and somewhat cryptic, notes of those meetings taken by the

participants tell a much different story. Indeed, those notes, and the candid testimony of the Five

Advisors when confronted with those notes, clearly establish that what was discussed at those

meetings was what Mr. Dreier correctly termed the "salient" issues relating to resolution of the

Five Asbestos Cases. (See Dreier Aff. ¶ 6, JA pp. 2251-57.)

Notes taken by Whitney Chelnick, Esq., an associate from Mr. Gross's firm who

attended one of the "A-Team" meetings, disclose just how substantive these meetings were. (See

Chelnick Notes, JA pp. 2004-7.) For example, Ms. Chelnick notes that: "[O]n Friday January

18, 2002, a meeting was held at the Budd Larner offices regarding the possibility of a 706 Panel

and legal strategies applicable to the cases at hand." (Id. (emphasis added).) The notes further

reflect that the meeting was attended by the Court and the Five Advisors. Id.

At a later point in the notes, it is made clear that the method by which the Grace

case would be handled was a major topic of discussion, and that a "consensus" was reached

among the participants:

VI.    **FRAUDULENT TRANSFER**

As to W.R. Grace, how was the transfer completed?

. . .

The consensus at the meeting was that Judge Wolin must take care of the
fraudulent transfer issue first, before proceeding on with the general
asbestos/bankruptcy matters. Therefore, it must be determined whether Judge

- 14 -

Wolin can take the case or if it will be handled by a bankruptcy judge. Also, is a jury required. In Judge Wolin's Opinion, he could have the fraudulent transfer claims tried by this summer. (possible schedule trial for July or August.)

W.R. Grace case will be divided into four parts:
1.    fraudulent transfer
2.    vermiculite
            -Dr. Edward Eldrid is the expert on vermiculite
3.    Property damage
4.    personal injury

(Id. at 3.) (emphasis added.) Rather than discussing these issues central to the resolution of the Grace case at an on-the-record meeting with the parties who would be affected present, the Court discussed them -- and apparently decided them -- *ex parte*, with his Advisors, including the G-I Futures representative and his counsel.

Moreover, in addition to Grace, the Court and the Advisors discussed a "myriad of problems" faced in all asbestos bankruptcy cases, including the Five Asbestos cases, such as: (i) the setting of a bar date for both asbestos property damage and asbestos personal injury claimants; (ii) issues relating to the proof of claim form; (iii) the advisability of applying the American Thoracic Society Guidelines as a means of distinguishing between asbestos claimants; (iv) trust distribution procedures, or "TDPs"; (v) Bankruptcy Rule 502(c) estimation proceedings; and (vi) claim valuation and validity for asbestos related personal injury claims, including for asymptomatic and unimpaired claimants, among others. (See, e.g., Gross Tr. at 84-85, 91; Hamlin Tr. at 16-17, 89-90; Dreier Tr. at 61, 74, 80; Transcript of the Deposition of Francis McGovern ("McGovern Tr.") McGovern Tr. at 36, 83; Notes from Meetings, JA pp. 2577-2628.) These issues, referred to by Mr. Hamlin as the "common issues," are at the heart of each of the Five Asbestos Cases, including Grace, and, depending on their resolution, will greatly affect the amount various creditors of the estates will receive as compared to current and future asbestos claimants. (See Hamlin Tr. at 177-179, 186.)

- 15 -

Despite the central, and hotly contested, nature of these issues, the Court entertained round-table, *ex parte* discussions, information relating to them was provided to the Court without the opportunity for any party who would be affected by that information to hear or challenge what was said. Worse yet, without any official record of what was said, other than cryptic notes and spotty memories, the legal representative and fiduciary of pending and future asbestos claimants in G-I, and his counsel, were permitted to partake in these conversation with the Court and provide their views.[10]

Nor were the all-hands meetings the only *ex parte* meetings among the Advisors and either the Court or the parties. Such meetings continued on well into 2003 and occurred numerous times and in many incarnations. In fact, over the past 24 months, the Court has spent more than 300 hours in *ex parte* consultations with its Advisors, including 57 hours of *ex parte* communications with "name withheld" or "redacted." (Five Advisors' Timesheets, JA pp. 2544-78; 2629-2659; 2863-96.) Similarly, the Advisors themselves, including the Futures Representative in G-I and his counsel, have spent more than 325 hours in *ex parte* meetings with counsel for the parties in the Five Asbestos Cases. Id.

Furthermore, not only did the Five Advisors provide information to the Court relating to the "common issues," but the Court actually invited in lawyers -- from both the plaintiff and defense bar to be fair -- to provide their views on the "hot issues" in asbestos litigation. (See Hamlin Tr. at 220; Keefe Tr. at 44-47.) Again, the knowledge and views presented by these lawyers to the Court were not recorded in any way, and exactly what was said will never be known (and certainly will not be subject to the adversary process).

---

[10]    As Mr. Keefe noted, he wished he had taken notes of the meetings, since his memory of those meetings was not that helpful in determining precisely what was said and done. (Keefe Tr. at 58.)

Most troubling, however, is that these *ex parte* discussions attended by the G-I Futures Representative and his counsel included discussion and consideration of issues <u>directly</u> relevant to their constituents. For example, as both Mr. Hamlin and Mr. Gross testified, the meetings included discussions relating to the "radically different views" held by the parties relating to (i) whether unimpaired asbestos claimants were entitled to compensation and, if so, how to divide them into different classes for purposes of valuing their claims; (ii) what type of personal injury claims would be compensable; (iii) defenses to such claims; (iv) the historical value of different types of personal injury claims; (v) the use of statistics to predict the scope of future incidents of asbestos claims; and (vi) how the 524(g) representative would fit into the valuation process. (Gross Tr. at 267-68, 279; Hamlin Tr. at 53, 57, 89; Notes of Meetings, JA pp. 2577-2628.) As Mr. Hamlin conceded, these were the very same issues he would be facing in his role as a fiduciary in G-I. (Hamlin Tr. at 187 ("Q. Were the commons issues that were discussed with Judge Wolin the same types of issues that you had to face as a Futures Representative in *G-I*? A. Yeah, the same issues [were] involved.").)

F.    **Messrs. Hamlin's and Gross's Participation In Meetings Of Futures**
      <u>**Representatives In Both The Five Asbestos Cases And Others.**</u>

Also troubling are the actions taken by Mr. Hamlin and Mr. Gross while acting as fiduciaries for present and future asbestos demand holders in G-I and the degree to which those tasks clearly overlapped with their role as purportedly neutral advisors to the Court in the Five Asbestos Cases. Indeed, the record demonstrates that at the same time that they have been advising the Court, Hamlin and Gross have been involved in numerous meetings with legal representatives of future asbestos claimants both in the Five Asbestos Cases and other asbestos-related bankruptcy cases.

-17-

A review of the time sheets of Mr. Hamlin and Mr. Gross shows that during the period in which Mr. Hamlin and Mr. Gross were acting as purportedly neutral advisors to the Court, one or both of them attended at least ten separate meetings of Futures Representatives from the other Five Asbestos Cases as well as other then-pending asbestos-related bankruptcies. (Hamlin and Gross G-I Timesheets, JA pp. 2660-2702.) As explained by Mr. McGovern, who also attended these meetings, "the meetings were conducted to provide an opportunity for futures representatives to share information <u>concerning their common interests and concerns</u>."[11] (McGovern Tr. at 111 (emphasis added).) And the meetings were clearly <u>not</u> limited to procedural issues. Instead, as Mr. Hamlin explained, the meetings, among other things, involved "the nitty-gritty, . . . elbowing, kneeing and gouging that goes on between futures reps and present claimants committee." (Hamlin Tr. at 117.)

Mr. Hamlin also testified that he attended these meetings, which he <u>knew</u> were attended by Futures Representatives in the Five Asbestos cases in which he was acting as an Advisor to the Court (<u>see</u> Hamlin Tr. at 99, 173), to gain "knowledge." (<u>Id.</u> at 174.) The transfer of knowledge from the perspective of those with partisan leanings and relating to the same hotly-contested, common issues Mr. Hamlin and Mr. Gross had been discussing with the Court is precisely what occurred at those meetings. (<u>See, e.g.</u>, Gross Tr. at 171-72 and Hamlin Tr. at 177-79 (noting that matters such as TDP's, proof of claim forms, and issues relating to assessing and valuing asbestos-related personal injury claims were discussed at meetings among the Futures Representatives).)

---

[11]     Mr. McGovern's attendance at these meetings while acting as an advisor to the Court also raises questions. Indeed, it was Mr. Gross's view that Mr. McGovern was attending as a representative of Judge Wolin: "Q. In what capacity was he [Mr. McGovern] attending these meetings? A. As a mediator for Judge Wolin. I would say for Judge Wolin. . . ." (Gross Tr. at 168.)

## ARGUMENT

I.    **Section 455(a) Mandates Disqualification Under The Circumstances Present Here.**

  A.    **Standards For Disqualification Under 28 U.S.C. § 455(a).**

As the Third Circuit has noted, "public confidence in the judicial system mandates, at a minimum, the appearance of neutrality and impartiality in the administration of justice." Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 157 (3d Cir. 1993). Indeed, "impartiality and the appearance of impartiality in a judicial officer are the sine qua non of the American legal system." Id. at 167 (emphasis added). These qualities are important in all judicial proceedings, and none more so than bankruptcy proceedings. See In re Ira Haupt & Co., 361 F.2d 164, 168 (2d Cir. 1966) ("The conduct of bankruptcy proceedings not only should be right but must seem right.").

Congress has recognized the need "to promote public confidence in the integrity of the judicial process." Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 860 (1988); see also In re Sch. Asbestos Litig., 977 F.2d 764, 777 (3d Cir. 1992) (noting "Congress's great concern for the public's confidence in the judiciary"). That concern resulted in the enactment of 28 U.S.C. section 455(a), which provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a) (emphasis added); see also Judicial Conduct Code Canon 3C ("Disqualification (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned . . . .").

As observed by the Third Circuit, "Congress enacted subsection 455(a) precisely because 'people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges.' In high profile cases . . . , the outcome of which

- 19 -

will in some way affect millions of people, such suspicions are especially likely and untoward."
In re Sch. Asbestos Litig., 977 F.2d at 782 (citations omitted).

Because of the extremely important concerns underlying the enactment of section 455, the standards applied to its enforcement are exacting, and leave little room for doubt. "Whenever a judge's impartiality 'might reasonably be questioned' in a proceeding, 28 U.S.C. § 455(a) commands the judge to disqualify himself sua sponte in that proceeding." Alexander, 10 F.3d at 162 (emphasis added) (citations omitted). "[W]hether the district court judge actually harbors any bias against a party" is irrelevant -- what matters is that the court maintain its appearance of impartiality. Id.

Further, it is not relevant whether the judge "actually harbors any illegitimate pro-plaintiff bias." In re Sch. Asbestos Litig., 977 F.2d at 782. Nor does it even matter "whether or not the judge actually knew of the facts creating an appearance of impropriety. . . ." Liljeberg, 486 U.S. at 860. Rather, all that matters is whether, "regardless of [the judge's] actual impartiality, a reasonable person might perceive bias to exist, and this cannot be permitted." Id.; see also United States v. Nobel, 696 F.2d 231, 235 (3d Cir. 1982) (the focus of the disqualification inquiry "is on the objective appearance of bias, rather than bias-in-fact").

Finally, the "reasonable person" referred to in the Third Circuit's holdings is not an asbestos plaintiff's lawyer, a member of a major law firm, or even a United States District Court Judge. It is instead, the proverbial "man on the street," the casual observer of the judicial process. As observed by the Third Circuit, "Congress enacted subsection 455(a) precisely because 'people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges.'" In re Sch. Asbestos Litig., 977 F.2d at 782 (citations omitted) (emphasis added); see also United States v. Cerralla, 529 F. Supp. 1373, 1382

- 20 -

(S.D. Fla. 1982) ("The appearance of partiality to a 'man in the street' on which the court

grounds its recusal has an extrajudicial rather than a judicial origin."); <u>Te-Ta-Ma Truth Found.</u>

<u>v. World Church of the Creator</u>, 246 F. Supp. 2d 980 (N.D. Ill. 2003).

      Thus, the question here is whether a "man on the street," with knowledge of the

*ex parte* regime established by this Court and the *sua sponte* appointment of the Five Advisors,

and the numerous conflicts that have arisen since, would perceive potential bias to exist.

B.     **The Court's Management Of The Five Asbestos Cases Through *Ex Parte* Meetings Raises Serious Questions About The Fairness And Impartiality Of These Proceedings.**

      The Court faced a daunting task when it was assigned the Five Asbestos Cases

and the thousands upon thousands of asbestos claims that came along with them. Thus, perhaps

the Court cannot be faulted for, as it noted in it Supplemental Response, establishing a case

management system that relied on routine *ex parte* communications between the Court and

counsel and parties to the cases. (District Court Supplemental Response, JA pp. 1911-25.) Nor

is it surprising that the Court explains how, in its view at least, that mode of case management

was necessary and effective. (<u>Id.</u>)

      As framed by the Grace Movant's motion, however, the issue is not whether

having a case management system in which the parties are encouraged -- or required -- to engage

in *ex parte* communications with the Court is or is not an effective case management tool. The

issue is that such a system increases the likelihood that the judicial administration of these cases

is neither transparent nor conducive to the fostering of an appearance of impartiality and fairness.

Indeed, while it may have started out as a novel approach, the problems with the Court's

approach are heightened when such meetings become the preferred, if not primary, method of

managing these cases.

- 21 -

Indeed, despite the Court's representation at the December 20, 2001 case management conference that its "power" to hold *ex parte* meetings would be "use[d] sparingly" (see Memorandum of Asbestos Case Management Conference dated December 29, 2001, attached to Supplemental Response, JA pp. 1911-25), that certainly is contrary to what happened. Over the past 24 months, the Court has spent more than 300 hours in *ex parte* consultations with its Advisors, including 57 hours of *ex parte* communications with "name withheld" or "redacted." (Five Advisors' Timesheets, JA pp. 2544-78; 2629-2659; 2863-96.) Similarly, the Advisors themselves, including the Futures Representative in G-I and his counsel, making full use of the broad authority granted to them and the Court's establishment of an *ex parte* case management regime, have spent more than 325 hours in *ex parte* meetings with counsel for the parties in the Five Asbestos Cases. (Id.)

While the clear perception of impropriety created by such *ex parte* meetings is palpable, it is even more evident when a substantial portion of such meetings occur with two Court-appointed Advisors who represented, and represent, future asbestos claimants in a similar asbestos bankruptcy case. That is, hours upon hours of the *ex parte* meetings at issue in these cases occurred between the Court and individuals who have a fiduciary duty to a class of claimants whose fortunes could be affected by the outcome of rulings issued by the Court and who may, in fact, actually be future claimants here as well.

An examination of Mr. Gross's bills provides a concrete example of how the dual roles played by Mr. Gross can and do raise concerns about whether Mr. Gross is using, or is able to use, his relationship with the Court to his advantage in his advocacy outside of the courtroom. On March 21, 2003, Mr. Gross participated in an *ex parte* conference call with the Court to discuss the "Overall Asbestos Program." (Gross Advisor Timesheets, JA pp. 2544-78.) On

- 22 -

March 25, 2003 just a few days after that call with the Court, Mr. Gross met with Mr. Hamlin and "all other Futures Reps" in New York City to discuss matters relating to the handling of claims by future asbestos claimants. (Gross G-I Timesheets, JA pp. 2660-2702.) Then, just two days later, Mr. Gross again had a conference call with the Court. (Gross Advisor Timesheets, JA pp. 2544-78.)

The timing of Mr. Gross's *ex parte* communications with the Court (which he billed as a Advisor) and his meetings with partisan advocates for asbestos claimants (which he billed to G-I) would lead any casual observer, including the Grace Movants, to have grave concerns that Mr. Gross has been intermingling his role as a Court-appointed consultant, and the *ex parte* access to the Court it allows, with his role as a partisan advocate to asbestos claimants -- the group of individuals who, by far, seek the largest distribution of assets in these bankruptcies. Thus, when pieced together, these time logs clearly create the appearance of an unfair and potentially biased judicial process.

Further, the affidavits filed by each of the Advisors do nothing to quell the concerns raised by their advocacy roles and their *ex parte* contact with the Court. Indeed, unlike the other Advisors, Messrs. Hamlin and Gross have not even tried to allege in their Affidavits that their *ex parte* contact was limited to procedural and scheduling matters; nor could they. As the sworn testimony of both Mr. Hamlin and Mr. Gross makes clear, the *ex parte* discussions they had with the Court and the other Advisors did include discussions regarding the "hotly contested" issues central to resolution of each of the Five Asbestos Cases such as: (i) the setting of a bar date for both asbestos property damage and asbestos personal injury claimants; (ii) issues relating to the proof of claim form; (iii) TDPs; and (iv) claim valuation and validity for asbestos related personal injury claims. (See, e.g., Gross Tr. at 84-85, 91; Hamlin Tr. at 16-17,

- 23 -

89-90; Dreier Tr. at 61, 74, 80; McGovern Tr. at 36, 83, Notes from Meetings, JA pp. 2577-2628.)

Nor does the Court's reference to a purported record of these meetings lessen the concerns raised by such meetings. In its Supplemental Response to the Mandamus Petitions, the Court, after noting that it met with "interested parties" on an *ex parte* basis on "innumerable occasions," stated that "[a] record of these meetings is contained in the proceeding minutes of the Court's deputy clerk." (District Court Supplemental Response, JA pp. 1911-25.) A review of those minutes, however, reveals that they are far less than a complete record of the "innumerable" *ex parte* meetings conducted by the Court, and, in all events, reveal nothing about the substance or purpose of those meetings. (See Declaration of Jennifer L. Scoliard, dated January 15, 2004.)[12]

In short, there simply is no adequate record of the hundreds of *ex parte* meetings that took place between, or among, the Court, the Advisors, and certain parties over the course of the past two years; if the depositions prove nothing else, they certainly prove that a full and accurate recitation of what was discussed at the various *ex parte* meetings cannot be left to the memories of the participants. (See, e.g., Keefe Tr. at 58.) Thus, denials aside, there simply is no way to gauge or quantify exactly what information was passed along at these meetings nor what role this information, untested by the adversary process, played in these Five Asbestos Cases. Such is the nature, and inherent vice, of a case management system reliant on *ex parte* meetings.

Regardless, after-the-fact statements about what was and was not discussed in *ex parte* meetings is of little use in ameliorating the appearance of bias. As one court observed, "it

---

[12]    The Declaration of Jennifer L. Scoliard was inadvertently left out of the Joint Appendix. A copy of the Declaration is being served on all parties and the Court with this replacement Memorandum.

- 24 -

is rarely possible to prove to the satisfaction of the party excluded from the communication that

nothing prejudicial occurred.  The protestation of the participants that the communications were

entirely innocent may be true, but they have no way of showing it except by their own self-

serving declaration.  This is why the prohibition is not against 'prejudicial' *ex parte*

communications, but against *ex parte* communications."  In re Wisconsin Steel, 48 B.R. 753, 760

(N.D. Ill. 1985).

Finally, any suggestion that the Grace Movants have availed themselves of *ex*

*parte* communications and that, as a result, any objection they may have to *ex parte*

communications is waived, should be questioned.  As an initial matter, even if the Grace

Movants had had *ex parte* communications, the fact that parties find themselves having to play

by the rules established by the Court does not mean that that system is appropriate or immune

from challenge.  Moreover, the statement attached to the Court's Supplemental Response reflects

that the Court *sua sponte* deemed any objection to have been waived prospectively.  (See District

Court Supplemental Response, JA pp. 1911-25.)  In any case, the Grace Movants have not

availed themselves of what the Court describes as "free access to the Court" in the Grace case.

(See Movants' Affidavits, JA pp. 2901-09.)

C.      **The Unprecedented Authority Granted To The Five Advisors Coupled With
The Lack Of Notice Surrounding Their Appointment Also Raise Serious
Questions About The Fairness And Impartiality Of These Proceedings.**

The manner in which the Five Advisors were appointed, as well as the apparently

unprecedented scope of their authority and the lack of guidelines regarding their conduct raise

serious concerns, causing an appearance of impropriety and a lack of transparency in these

proceedings.  As noted above, although it might have avoided the very issues at the heart of the

recusal motions, the Court did not require any sort of disclosures or hearing before appointing its

- 25 -

Advisors, despite the fact that "professionals" employed in the bankruptcy context generally are subjected to such requirements. Indeed, Federal Rule of Bankruptcy Procedure 2014 requires that the submission of a formal application for the employment of professional under sections 327, 1103 and 1114 of the Code must state specific facts showing, among other things, all of "the person's connections with the debtor, creditors, any other party in interest, [and] their respective attorneys and accountants, ..." FED. R. BANKR. P. 2014.

More troubling, however, is that the decision not to require such disclosures apparently was made by the Court with knowledge of the partisan roles played by Mr. Hamlin and Mr. Gross in the G-I bankruptcy matter. (See Hamlin Tr. at 9; Gross Tr. at 26.) Thus, contrary to the fundamental principle that the "conduct of bankruptcy proceedings not only should be right but must seem right" In re Ira Haupt & Co., 361 F.2d at 168, the Court apparently decided that there was no need to inform the parties in any formal way about this potential conflict.

Further, the sheer breadth of the authority granted to the Advisors, and the lack of clarity as to exactly what roles they would play in these cases, runs directly counter to the rules established by the Manual for Complex Litigation, statutes, and case law relating to such appointments. For example, in appointing experts, the Manual for Complex Litigation counsels that the following is required: "(1) giving the parties notice of the expert's identity and precise function, [and] (2) providing written instructions detailing the expert's duties." MANUAL FOR COMPLEX LITIGATION (THIRD) § 21.51 (2003) (emphasis added). Regarding special masters, the Manual specifies that the order of reference should define the scope of the reference with specificity, the issues to be investigated, when the report is to be delivered, and the scope of the master's powers. Id. Finally, the Manual discourages the use of advisors that do not fit into the

- 26 -

above listed categories as "[t]he referrals to court-appointed experts, special masters, and magistrate judges authorized by statute or rule should be adequate in most cases to provide the needed assistance." Id.

Nevertheless, the Five Advisors themselves appeared unsure as to precisely what role they as a group were to fulfill in these cases. For example, David Gross described his role in the first meeting with the Court and the Five Advisors as a "Special Master." (Gross Timesheets, JA pp. 2544-78.) Mr. Dreier considered himself an "advisor," a "master," and, apparently, a "law clerk" (Dreier Tr. at 27, 35-36.) And Mr. Hamlin saw his role as, among others, providing expertise to the Court with respect to a number of issues. (See Hamlin Tr. at 23-25.)

Worse yet, despite the extremely broad scope of the appointment and the numerous roles fulfilled by the Five Advisors, the Court imposed none of the standard limitations usually concomitant with such appointments. For example, a technical advisor must not introduce new evidence nor influence the court's review of the factual dispute and the court must institute procedural safeguards to prevent this from happening. See Techsearch L.L.C. v. Intel Corp. 286 F.3d 1360 (Fed. Cir. 2002), cert. denied, 537 U.S. 995 (2002). Moreover, the court should clearly define and limit the advisor's duties in a writing disclosed to all parties, guard against extra-record information, and make explicit the nature and content of the advisor's tutelage (perhaps in a report). Id. at 1379. And, unlike a 706 expert, a technical advisor may not be relied on as a source of evidence. Id.

Similarly, a court may not employ an advisor to brief him on legal issues, nor to "undertake an independent mission of finding facts" outside the record of the case. Reilly v. United States, 863 F.2d 149 (1st Cir. 1988). Finally, the 2003 amendments to Rule 53 of the Federal Rules of Civil Procedure, relating to the appointment of special masters, make clear that:

- 27 -

(i) *ex parte* communications between master and the court present troubling questions; and (ii) the master's report should be the primary means of communication with the court. See FED. R. CIV. PRO. 53 (as amended Dec. 1, 2003).

Nevertheless, the Advisors here had no idea what the "ground rules" were regarding the scope of their appointment, and what they could or could not do, particularly in regard to *ex parte* communications. For example, Judge Hamlin was asked the following questions and provided the following answers during his deposition:

> Q.   What is your understanding as to the ground rules in the Five Asbestos Cases with respect to *ex parte* communications between Judge Wolin and counsel for any of the parties in this case?
>      …
>
> A.   Nobody asked me about it. . . . I can't tell you anything about it.
>      …
>
> Q.   I'm just asking whether you have an understanding as to what the ground rules are?
>
> A.   No I don't.

(Hamlin Tr. at 220-21); see also Gross Tr. at 204 ("Q. At the time Judge Wolin first asked you to participate as an advisor, did he set out any guidelines or restrictions for you to govern your conduct as an advisor. A. No.").) The other advisors were equally in the dark regarding any limitations on what they could and could not do. (See, e.g., Dreier Tr. at 21-24; Keefe Tr. at 18; McGovern Tr. at 12-13.) And, despite the general prohibition against *ex parte* communications, the Five Advisors believed that such communications were not only permitted, but the favored method of achieving their charge. (See, e.g., Gross Tr. at 204; McGovern Tr. at 39-40.)

- 28 -

D.    **The Dual And Conflicting Roles Fulfilled By Messrs. Hamlin And Gross In The Five Asbestos Cases And The G-I Case Mandate Disqualification Under 455(a).**

By virtue of the unique positions they hold in the Five Asbestos Cases, Mr. Hamlin and Mr. Gross have the ability to play a material role in the manner in which these cases are administered. More importantly, they have the power to shape or influence precedent and decision-making. And, while the Court established high standards for the Advisors in the Appointment Order, regrettably, those standards appear to have fallen by the wayside. Indeed, the record developed through the limited discovery permitted by the Court demonstrates that at the same time they have been involved in *ex parte* meetings with the Court and other parties to discuss and consider the "common issues" in the Five Asbestos Cases, Hamlin and Gross have been meeting with other futures representatives and counsel in order to develop a coordinated strategy in a large number of asbestos-related bankruptcy cases with respect to the very same issues.

For example, as Mr. Hamlin explained, the Court and the Advisors had discussed a "myriad of problems" faced in all asbestos bankruptcy cases, including the Five Asbestos cases, which he referred to as the "common issues." (Hamlin Tr. at 15, 177-179, 186.) As he also explained, these "common issues" are at the heart of each of the Five Asbestos cases, including Grace. (See Hamlin Tr. at 177-179, 186.)

A review of the time sheets of Mr. Hamlin and Mr. Gross, then shows that during the period in which Mr. Hamlin and Mr. Gross were acting as purportedly neutral advisors to the Court, one or both of them attended at least ten separate meetings of futures representatives from the other Five Asbestos cases as well as other then-pending asbestos-related bankruptcies. As explained by Mr. McGovern, who also attended those meetings, "the meetings were conducted to

- 29 -

provide an opportunity for futures representatives to share information concerning their common interests and concerns." (McGovern Tr. at 111.) And, Mr. Hamlin testified that these were the same "common" issues he had been discussing with the Court and the other Advisors. (Hamlin Tr. at 177-179, 186.)

That is, at the same time that they had the "ear" of the Court in the Five Asbestos cases as Court-appointed neutrals, Messrs. Hamlin and Gross were meeting with the Futures representatives in the Five Asbestos Cases discussing "common issues" between future asbestos cases in G-I and other cases, including certain of the Five Asbestos cases. The conflicts of such meetings are inherent. It is simply not credible to think that, when he is discussing the "common" issues in this or any of the other Five Asbestos Cases with the Court, Mr. Hamlin can shed his partisan instincts and provide the Court with wholly neutral and unbiased views on many of the same issues that can or will affect his clients in G-I. This dual role clearly creates the appearance that the Court's adjudications in these Five Asbestos Cases have been and will be influenced by the leanings of the advisors, who are anything but neutral and impartial.

And, it matters not whether the Court's impartiality actually has been compromised in this case. What matters, is that as a result of Mr. Hamlin's and Mr. Gross's dual and conflicting roles, a reasonable person might perceive partiality or bias to exist. This cannot reasonably be disputed, nor can it be permitted. See Liljeberg, 486 U.S. at 860. Thus, because the Court's "impartiality 'might reasonably be questioned'" in this proceeding, "28 U.S.C. § 455(a) commands" that the Court be disqualified. See Alexander, 10 F.3d at 162 (emphasis added) (citations omitted).

- 30 -

E.    **The Dual And Conflicting Roles Played By Messrs. Hamlin And Gross Have Tainted The Grace Proceedings As Well As The Other Four Asbestos Cases.**

As discussed above, the dual and conflicting roles undertaken by Messrs. Hamlin and Gross, at the very least, create a perception that the Court has surrounded itself with, and is taking *ex parte* advice from, conflicted, non-neutral advisors. While common sense clearly suggests that the appearance of impropriety flowing from the appointment of the conflicted Advisors in the Five Asbestos Cases would infect <u>all</u> five cases, including Grace, one need not rely on common sense alone to reach that conclusion, as the evidence in the record also establishes the point.

The Five Asbestos Cases are closely interrelated. Indeed, this was the very reason Judge Becker appointed the Court to supervise <u>all</u> of the cases. (Designation Order, JA pp. 2177-78.) It was -- and is -- the substantive overlap among the Five Asbestos Cases that ties them together, as well as the fact, which no one disputes, that asbestos claimants in one case are often claimants in the others, as well as in the G-I case. Thus, what happens in the Owens Corning case or in the USG case, is directly relevant to the Grace case.

Hamlin and Gross and their law firms have billed hundreds of hours as Advisors, and have done so while acting as advocates of asbestos claimants in the G-I case. The fact that the Advisors' time was spent focusing on issues relating to Owens Corning or to the Five Asbestos Cases generally, rather than specifically to Grace, or that they chose to allocate the costs of their services to other debtors, simply is irrelevant. The related nature of the Five Asbestos Cases makes the Advisors' conflicts, and the *ex parte* meetings and communications they have had with the Court, are undeniably relevant to <u>all</u> of the Five Asbestos Cases. If the dual and conflicting roles played by Hamlin and Gross have tainted the proceedings in one of the Five Asbestos Cases, which they have, there is little question that "a reasonable person might

- 31 -

suspect bias to exist" in the other cases, including Grace. See United States v. Nobel, 696 F.2d at 235.

Moreover, as both Mr. Hamlin and Mr. Gross have testified, the "hotly-contested" central issues that were discussed at the "A-Team" meetings, as well as the Futures Representative meetings they attended, were "common" to all five asbestos cases, including Grace. (See Gross Tr. at 342-343; Hamlin Tr. at 177-79, 186.) Thus, for all the reasons discussed above, and based on the clear admissions of the Advisors themselves, there is no reason to find that the conflicts that have tainted the proceedings in the Five Asbestos Cases, in general, do not also apply to Grace.

In addition, several of the Advisors have testified to issues discussed, and decided, at the "A-Team" meetings, and in other meetings between the Court and certain of the Advisors, directly relating to Grace. For example, both Mr. Gross's testimony and the memorandum drafted by an associate from his firm, Whitney Chelnick, demonstrate that the handling of the Grace case was discussed among the Five Advisors and Judge Wolin, and that a "consensus" was reached about the best way to proceed with that case. (See Gross Tr. at 346-48; Chelnick Memo, JA pp. 2004-7.) Judge Keefe similarly provided his recollection of discussions at which the best manner in which to resolve the Grace case were discussed. (Keefe Tr. at 57-58.)

Thus, not only were the G-I Futures Representative and his counsel, both of whom have fiduciaries obligations to a class of claimants with interests adverse to those of the Grace Movants, involved in roundtable, *ex parte* discussions concerning hotly-contested central issues in asbestos-related bankruptcy cases, including Grace, but those conflicted individuals had

- 32 -

a say -- the full extent of which shall forever remain unknown -- into how the Grace case should

proceed to resolution.

Further, Mr. Hamlin's testimony was telling on the point that any work and/or

"consensus" reached in one of the Five Asbestos Cases, or G-I for that matter, was likely to

resolve the issue in the other cases as well:

> I think generally some of the people who were there [at the meetings of the
> Futures Representatives] who thought they were close to resolution talked about
> what some of the terms they thought they were negotiating. I don't remember
> what those terms were specifically. My interest was that once, since just as you
> have a lot of the same law firms representing multiple debtors, so to do you have
> many of the same claimants' counsel appearing in different cases, and some cases
> multiple futures reps. It doesn't take a scientist to figure out that if a particular
> formula started getting agreed upon in two or three other cases you could pretty
> much guess that the present claimants in another case would probably stand fast
> on this kind of terms when you got the negotiating of TDP. So to the extent,
> although we weren't close to it, trying to keep an ear out on what was going on in
> the other cases would give me some idea of what flexibility we might or might not
> have going down the road.

(Hamlin Tr. at 123-124.) Thus, regardless of whether certain issues had been reached in Grace,

Mr. Hamlin's testimony makes clear that the work being done by the Advisors in all the cases

would, without question, have an impact on the Grace case as well. Faced with such facts, "a

reasonable person might perceive bias to exist, and this cannot be permitted." Liljeberg, 486

U.S. at 860.

F.    **Mr. Hamlin's Application to Be Appointed as the Futures Representative
In the *Grace* Proceedings, Apparently At The Urging Of The Court,
Underscores the Conflicts and Appearance of Partiality or Bias Present in
these Cases.**

An unusual development in the Grace case highlights the troubling perceptions

created by the participation of Messrs. Hamlin and Gross in these cases, especially at a time

when "people . . . are often all too willing to indulge suspicions and doubts concerning the

integrity of judges." In re Sch. Asbestos Litig., 977 F.2d at 782 (citations omitted). At the very

- 33 -

same time that Mr. Hamlin continued to serve as an Advisor in the Five Asbestos Cases, and a

partisan advocate for asbestos claimholders in G-I, he sought to become appointed as Futures

Representative for asbestos claimants in the Grace bankruptcy proceedings. (Application Of

Debtors, JA pp. 2910-33.) Whatever pretense of neutrality that Mr. Hamlin may have retained

despite his role as representative of asbestos claimants in the G-I case certainly was destroyed by

the filing of this Application, seeking to have Mr. Hamlin fill the same role here as he has filled

in the G-I case, as a partisan advocate for asbestos claimants.[13]

Grace's decision to seek Mr. Hamlin's appointment as Futures Representative in

Grace apparently was based, at least in part, on the urging of the Court. Indeed, Grace's General

Counsel reported that his counsel, David Bernick, had informed him that the Court had called

Mr. Bernick, informed him that Mr. Hamlin was a "good guy," and that it made sense to have

him seek his appointment as Futures Representative in Grace. (See Affidavit of Tony Yoseloff,

sworn to January 15, 2004, and Notes attached thereto, JA pp. 2897-2900.) That is, at the same

time that Mr. Hamlin was acting as a purportedly neutral advisor to the Court with respect to the

Five Asbestos Cases, the Court was suggesting that one of the debtors in those cases should seek

to have Mr. Hamlin appointed a fiduciary to asbestos claimants.[14]

Irrespective of whether the Court was involved in or aware of Graces' selection of

Mr. Hamlin, however, the mere fact that Grace (and perhaps others) chose to ignore the patent

---

[13] The Application was ultimately withdrawn in response to the multiple objections filed and Judge Fitzgerald's stated opinion that Mr. Hamlin could never be an appropriate Future Representative in the Grace case. (Objections to Application, JA pp. 2703-2862; Transcript dated November 17, at pp. 30-31, JA pp. 2703-05.)

[14] While Mr. Hamlin has testified that he would have stepped down from his role as Advisor had he been appointed (see Hamlin Tr. at 185), there is no evidence of any such intent in the Application filed with the bankruptcy court. (See Application, JA pp. 2910-33.) Nor did Grace's counsel raise that issue when he argued before the Third Circuit the merits of having Mr. Hamlin fulfill both roles.

- 34 -

PHIL1 553793-2

conflicts of interest presented by his dual and conflicting roles raises serious questions about the fairness and transparency of the proceedings in the case. It is unfortunate that these facts raise an appearance of impropriety, but it is the fact that they do, and this is just the sort of situation that section 455(a) was enacted to remedy.

G.    **The Grace Movants Have Not Waived Their Right To Seek
The Court's Disqualification Pursuant To 28 U.S.C. § 455(a).**

Finally, the Grace Movants have not acquiesced in the Court's *ex parte* contact with non-neutral advisors, or with any other party for that matter. While some parties have known there would be *ex parte* communications, the Grace Movants themselves were not involved in the case when any such disclosures were made. (See Affidavits, JA pp. 1-20; 77-79; 2901-9.) Further, the case management directive disclosed by the Court in its Supplemental Response does not appear to have been entered in the docket as a case management order; nor, in any event, can it be said that the directive adequately disclosed that the Court's case management in the Five Asbestos Cases would consist mainly of off-the-record conferences and *ex parte* meeting and conversations with parties, their counsel, and the Court-appointed Advisors. In these circumstances, it hardly can be said that any party, much less the Grace Movants, have acquiesced in these "unorthodox" and inappropriate *ex parte* communications.

Nor should the Grace Movants' request for disqualification be denied as untimely. Affidavits submitted by representatives of each of the Grace Movants (see JA pp. 2901-09) make clear that none of the Grace Movants knew about the conflicts at the heart of this motion until October 2003.[15] The Grace Movants brought this motion promptly after first learning about, and

---

[15]    It is our understanding that Stroock & Stroock & Lavan, counsel for the Official Committee of Unsecured Creditors in both the USG and Grace Proceedings has submitted an affidavit, after a conversation with counsel for USG, stating that the appointment of Hamlin as Futures Representative was a conflict. Nevertheless, this knowledge cannot be imputed to the Grace Movants because this affidavit was submitted

- 35 -

having an opportunity to consider, the matters at issue herein. Indeed, it appears that the only

reason a motion for disqualification was not brought earlier is because the Court deemed it

unnecessary to disclose Messrs. Gross's and Hamlin's roles as partisan advocates for asbestos

claimants in G-I when it *sua sponte* appointed them as Advisors in these Cases.

Further, there is "no express timeliness requirements" for a motion under section

455(a). See In re Kansas Pub. Employees Ret. Sys., 85 F.3d 1353, 1360 (8th Cir. 1996).

Instead, a motion under section 455(a) should be brought "at the earliest possible moment after

obtaining knowledge of facts demonstrating the bases for such a claim." Apple v. Jewish Hosp.

and Med. Ctr., 829 F.2d 326, 333 (2d Cir. 1987). That is precisely what was done here by the

Grace Movants. Their motion to disqualify the Court is timely.

*     *     *

In sum, it is not reasonable to believe that every time Messrs. Hamlin and Gross

have counseled and advised the Court on matters relating to the administration of this case they

have set aside their partisan leanings as advocates for their constituents in the G-I case. It is, on

the other hand, reasonable to believe that Messrs. Hamlin and Gross are no more capable of

compartmentalizing their conflicts than any one else would be in similar circumstances. In fact, it

appears that they may not have even attempted to do so.

Any outside observer who is not privy to the *ex parte* discussions between the

Advisors, especially Hamlin and Gross, and the Court would reasonably question the impartiality

of the Court and perceive the real potential for partiality or bias to exist. As such, regardless of

---

in the USG proceeding and not in the Grace proceeding. Furthermore, and more importantly, at no point
have the Grace Movants been a part of the Official Committee of Unsecured Creditors. In fact, the Grace
Movants have intentionally isolated themselves from the Official Committee because of concerns relating
to their ability to trade. Thus, regardless of whatever knowledge Stroock may have obtained it cannot be
imputed to the Grace Movants.

- 36 -

whether the Court's impartiality actually has been affected in this case, section 455(a) mandates that the court disqualify itself. Public confidence in the judicial system, and the appearance of neutrality and impartiality in the administration of these large Chapter 11 cases, permits nothing less.

II.    **Based On Its Own Admissions, And The Evidence Adduced During The Limited Discovery Allowed, The Court's Disqualification Also Is Mandated Under 28 U.S.C. § 455(b)(1).**

Unfortunately, concerns about the Court's bias now go beyond mere perception. Indeed, on December 23, 2003, at a Case Management Conference, the Court noted that counsel for USG had stated that its need for discovery might be reduced if the Court were to admit on the record that it received extra-judicial information. In response, the Court stated "that it did receive extra-judicial information" concerning the Five Asbestos Cases. (Transcript of December 23, 2003 Hearing at 10, JA pp. 2405-07). In fact, the Court described one occasion where, during an *ex parte* conference with counsel and a party, the Court received extra-judicial information and went on to note that "the balance of many other[] [conferences] held with the Court surely contained extra-judicial information." (Id. (emphasis added).) And, as the Court described in one of its Reponses to the Petitions filed in the Third Circuit, the purpose of these *ex parte* meetings was to provide the parties "the opportunity to provide to the Court insights as to why . . . . its claim was just." (District Court Supplemental Response at 3, JA pp. 1911-25.) Thus, the Court, by its own admission has received extra-judicial information relating to the merits of these claims.

Section 455(b)(1) requires that a judge recuse himself "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1) (emphasis added). Indeed, section 455(b)(1)

- 37 -

codifies the <u>duty</u> of a judge "to avoid any contacts <u>outside the record</u> that might affect the outcome of litigation." <u>Price Bros. Co. v. Philadelphia Gear Corp.</u>, 629 F.2d 444, 446 (6th Cir. 1980) (emphasis added) (quoting <u>Kennedy v. Great Atlantic & Pacific Tea Co.</u>, 551 F.2d 593, 596 (5th Cir. 1977)). Here, however, the Court has admitted acquiring extra-judicial, personal knowledge through numerous *ex parte* conferences both with parties and with the conflicted Advisors. There can be little doubt that, under these circumstances, section 455(b)(1) mandates the Court's recusal.

Furthermore, not only did the Five Advisors provide extra-judicial information to the Court relating to the Common Issues, but the Court actually invited in lawyers -- from both the plaintiff and defense bar to be fair -- to provide their views on the "hot issues" in asbestos litigation. (<u>See</u> Hamlin Tr. at 220; Keefe Tr. at 44-47.) Again, the knowledge and views presented by these lawyers to the Court were not recorded in any way, and exactly what was said will never be known (and certainly will not be subject to the adversary process).

Indeed, these recent disclosures by the District Court make the similarities between this situation and the situation presented in <u>Edgar v. K.L.</u>, 93 F.3d 256 (7th Cir. 1996) even more palpable. In its decision in that case, the Seventh Circuit was especially critical of *ex parte* meetings held by the judge, noting that "[o]ff-the-record briefings in chambers . . . leave no trace in the record . . . . [and] [w]hat information passed to the judge, and how reliable it may have been, are now unknowable." <u>Id.</u> at 259. The Seventh Circuit went on to explain that *ex parte* meetings in which extrajudicial information relating to the issues in the case was acquired are no less egregious than if the judge himself had undertaken a personal investigation of the facts involved. <u>Id.</u> at 259-60. On that basis, the court ordered the disqualification of the judge.

- 38 -

The facts here compel the same result. The record filed in support of the Motion for Recusal shows that the Court had countless hours of *ex parte* meetings with parties to this case and/or their counsel. Even more troubling, is the record's disclosure of the more than 300 hours of *ex parte* meetings between the Court and the Advisors, two of whom have partisan interests in direct conflict with their purported role as neutrals in this case, and each of whom also has spent countless hours holding *ex parte* meetings with certain parties in these cases. And, to the extent there was any doubt that the Court had acquired extrajudicial information, untested by the adversary process, during these hours upon hours of meetings, the Court now has confirmed that it did. The facts of this matter, as now confirmed by the Court, mandate disqualification under section 455(b)(1).[16]

## CONCLUSION

For all the foregoing reasons, Movants respectfully submit that their request for an order, pursuant to 28 U.S.C. § 455(a) and the Code of Conduct for United States Judges, disqualifying the Honorable Alfred M. Wolin, United States District Judge, from further participation in these jointly administered chapter 11 cases should be granted.

*[Signatures on Next Page]*

---

[16]    While the Grace Movants original motion did not seek disqualification under 28 U.S.C. 455(b)(1), no party to these proceedings will be prejudiced by the addition of this additional ground for disqualification, as the extra-judicial source doctrine of section 455(b)(1) is encapsulated in 28 U.S.C. § 455(a). See Liteky v. United States, 510 U.S. 540 (1994). Further, the issue of extra-judicial knowledge as a ground for disqualification under section 455(b)(1) has been raised in the consolidated proceedings before the Third Circuit and was the subject of the discovery relating to these proceedings. As a result, all parties are well familiar with the subject matter of this argument.

- 39 -

Dated:  January 20, 2004

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP

By: _____
      Joanne B. Wills (2357)
      Jennifer L. Scoliard (4147)
      919 Market Street, Suite 1000
      Wilmington, DE  19809-3062
      (302) 426-1189

WILLKIE FARR & GALLAGHER LLP
Richard Mancino
Marc Abrams
Christopher J. St. Jeanos
Nisha Menon
787 Seventh Avenue
New York, NY  10019
(212) 728-8000

Counsel for D.K. Acquisition Partners, L.P.,
Fernwood Associates, L.P. and Deutsche Bank Trust
Company Americas

- 40 -