IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>W.R. GRACE & CO., et al.,<br><br>        Debtors. | Chapter 11<br>Case Nos. 01-1139 through 01-1200<br><br>Adv. No. 02-2210<br>[LEAD DOCKET] |
| OFFICIAL COMMITTEE OF ASBESTOS<br>PERSONAL INJURY CLAIMANTS, et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>SEALED AIR CORPORATION and<br>CRYOVAC, INC.,<br>        Defendants. | |
| OFFICIAL COMMITTEE OF ASBESTOS<br>PERSONAL INJURY CLAIMANTS, et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>FRESENIUS MEDICAL CARE<br>HOLDINGS, INC. and<br>NATIONAL MEDICAL CARE, INC.,<br><br>        Defendants. | Adv. No. 02-2211<br><br><br><br><br><br><br>This Document Pertains<br>to Adv. No. 02-2210 |

**MOTION FOR AN ORDER APPROVING, AUTHORIZING, AND IMPLEMENTING
SETTLEMENT AGREEMENT**

SUPP. APP. 003628

The Official Committee of Asbestos Property Damage Claimants (the "Property Damage Committee") and the Official Committee of Asbestos Personal Injury Claimants (the "Personal Injury Committee") (collectively, the "Plaintiffs") of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), Sealed Air Corporation ("SAC") and Cryovac, Inc. ("Cryovac," and together with SAC, the "SAC Defendants"), hereby file this motion requesting that the Court enter an order approving, authorizing, and implementing the Settlement Agreement and Release, dated November 10, 2003, by and among the Plaintiffs, on their behalf and on behalf of the Debtors' estates, and the SAC Defendants (the "Settlement Agreement"),[1] pursuant to section 105(a) of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), in connection with the captioned adversary proceeding commenced by the Plaintiffs on behalf of the Debtors' estates against the SAC Defendants. In support of this motion, the Plaintiffs and the SAC Defendants respectfully represent to the Court as follows:

## I.   **JURISDICTION**

1. This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H) and (O). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Court has the authority to grant the relief requested herein pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(a).

---

[1]      A copy of the Settlement Agreement is attached hereto as Exhibit "A".

## II.    BACKGROUND

### The Bankruptcy Proceedings

2.  On April 2, 2001 (the "Petition Date"), each Debtor commenced a case under the Bankruptcy Code. The Debtors' cases are being jointly administered pursuant to Bankruptcy Rule 1015. Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.  No trustee or examiner has been appointed in the Debtors' chapter 11 cases. On April 12, 2001, the United States Trustee appointed the Personal Injury Committee, the Property Damage Committee, and the Official Committee of Unsecured Creditors (the "Unsecured Creditors Committee").

4.  On the Petition Date, the Debtors filed a Verified Complaint for Declaratory and Injunctive Relief (the "Complaint for Injunction"), styled <u>W.R. Grace & Co., et al. v. Margaret Chakarian, et al.</u>, adversary no. A-01-771, and a Motion for a Temporary Restraining Order and Preliminary Injunction Staying All Asbestos-Related and Fraudulent Transfer Claims Against Affiliated Entities (the "Motion for TRO"). In the Complaint for Injunction and the Motion for TRO, the Debtors sought, among other things, to enjoin prosecution of pending and future asbestos-related/fraudulent transfer actions against certain non-debtor entities, including, without limitation, the SAC Defendants, and Fresenius Medical Care Holdings, Inc. and National Medical Care, Inc. (together, the "NMC Defendants," and together with the SAC Defendants, the "Defendants").

5.  On April 2, 2001, the Bankruptcy Court entered an Order Granting Temporary Restraining Order (the "TRO"), effectively staying all parties from filing any asbestos-related

2

**SUPP. APP. 003630**

actions against certain entities identified in the TRO, including the Defendants, pending resolution of the motion for a preliminary injunction. Thereafter, on April 12, 2001, the Bankruptcy Court entered an Order Extending the Temporary Restraining Order, extending the TRO through and including April 24, 2001. At a status conference held by the Bankruptcy Court on April 18, 2001, the Bankruptcy Court issued a preliminary injunction further staying all parties from filing any asbestos-related actions against the Defendants, through and including a hearing on the Complaint for injunction.

6.   On May 3, 2001, the Bankruptcy Court conducted a hearing on the request for a preliminary injunction and entered an Order Granting Preliminary Injunction (the "May 3 Preliminary Injunction Order") staying, among other things, pending actions concerning certain asbestos-related/fraudulent transfer claims against the Defendants, pending a final judgment in the adversary proceeding or further order of the Court. The May 3 Preliminary Injunction Order, however, did not stay future actions against the Defendants.

7.   On January 22, 2002, the Bankruptcy Court entered a modified preliminary injunction order which, among other things, broadened the scope of the May 3 Preliminary Injunction Order and stayed both pending and, upon completion of service, future asbestos-related/fraudulent transfer actions against the Defendants, pending a final judgment in the adversary proceeding or further order of the Court.

**Plaintiffs' Prosecution of this Action**

8.   On June 14, 2001, the Property Damage Committee and the Personal Injury Committee filed their Joint Motion for Authority to Prosecute Fraudulent Transfer Claims (the "Motion to Prosecute") [Dkt. No. 527], seeking authority to prosecute certain fraudulent transfer and successor liability claims against the Defendants.

3

9.  At the January 3, 2002 hearing on the Motion to Prosecute, over the objection of the Debtors, without ruling upon the Motion to Prosecute, the Bankruptcy Court sua sponte ordered each of the official Committees – the Property Damage Committee, the Personal Injury Committee, and the Unsecured Creditors Committee – to investigate whether the alleged claims against the Defendants should be prosecuted.  The Bankruptcy Court further ordered each of the Committees to report their conclusions to the Bankruptcy Court during the April omnibus hearing.

10.  Thereafter, during the January 29, 2002 omnibus hearing, Judge Fitzgerald informed the parties that this Court[2] had indicated that the Motion to Prosecute should be granted prior to the conclusion of the Committees' investigation and that the Plaintiffs would have leave to investigate and prosecute the claims against the Defendants.  On March 12, 2002, this Court entered an order withdrawing the reference with respect to these claims and granting the Motion to Prosecute [Adv. Proc. 02-2210 Dkt. No. 4].

**The Lawsuits**

11.  Prior to entry of the March 12, 2002 order, on February 20, 2002, the parties participated in a case management conference.  In order to establish discovery and pleading deadlines, and after considerable negotiation and discussion, the parties submitted a draft case management order to this Court for approval.  The first Case Management Order in this action was included within this Court's March 12, 2002 order [Adv. Proc. 02-2210 Dkt. No. 4].

12.  On March 18, 2002, the Plaintiffs filed a complaint against the SAC Defendants, alleging, among other things, that the SAC Defendants were liable as successors for

---

[2]      By order dated November 29, 2001, the Third Circuit Court of Appeals designated the Honorable Alfred M. Wolin to preside over five asbestos-related bankruptcies pending in the United States Bankruptcy Court for the District of Delaware, including the Debtors' cases.

SUPP. APP. 003632

the asbestos liability of the Debtors and that the SAC Defendants were recipients of fraudulent transfers in respect of the Debtors. Adv. Proc. 01-2210, Dkt. No. 1 (the "SAC Action"). On March 18, 2002, the Plaintiffs also commenced an action against the NMC Defendants, alleging, among other things, that the NMC Defendants were liable as successors for the asbestos liability of the Debtors and that the NMC Defendants were recipients of fraudulent transfers in respect of the Debtors. See Adv. Proc. 01-2211, Dkt. No. 1 (the "NMC Action"). On April 1, 2002, the SAC Defendants and the NMC Defendants filed their respective answers. See Adv. Proc. 01-2210, Dkt. Nos. 6, 7.

13.    Thereafter, at a case management conference held in Chambers, among other things, the Court granted the Plaintiffs' request to stay the NMC Action pending the outcome of the SAC Action.

**Taxes and the IRS 1993-1996 Tax Audit**

14.    From January 1, 1993 through and including September 28, 1996, Fresenius Medical Care Holdings, Inc., a New York corporation (formerly, W.R. Grace & Co.) ("Grace New York"), certain of the Debtors (including W.R. Grace & Co.-Conn., a Connecticut corporation ("Grace-Conn.")) and Cryovac were members of the Grace New York Group,[3] and, as a result, the operations (through and including September 28, 1996) of Grace New York, each such Debtor and Cryovac were included in Grace New York's U.S. federal consolidated income tax return for each of the tax years ending December 31, 1993, December 31, 1994, December 31, 1995, and December 31, 1996 (collectively, the "Applicable Tax Years"). In addition, from the time of its formation in 1996 and ending on and including September 28, 1996, SAC was

---

[3]    All capitalized terms used, but not defined in this motion, shall have the meaning set forth in the Settlement Agreement. To the extent that the terms of the Settlement Agreement conflict with anything herein, the terms of the Settlement Agreement shall control.

SUPP. APP. 003633

also a member of the Grace New York Group and, as a result, its operations (through and including September 28, 1996) were included in Grace New York's U.S. federal income tax return for the tax year ending on December 31, 1996. Pursuant to applicable U.S. federal income tax law, each corporation that is a member of a U.S. federal income tax consolidated group for one or more days of any taxable year is liable severally for the entire amount of U.S. federal income taxes payable by the consolidated group for such taxable year. I.R.C. Treas. Reg. 1.1502-6. Accordingly, Grace New York, as parent of the Grace New York Group for each of the Applicable Tax Years, is liable severally for the entire amount of the Grace New York Group's U.S. federal income tax liability for each of the Applicable Tax Years, and each subsidiary that was a member of the Grace New York Group, including Grace-Conn., Cryovac and SAC, during one or more days of an Applicable Tax Year is also liable severally for the entire amount of the Grace New York Group's U.S. federal income tax liability for such taxable year.

15. Pursuant to the Tax Sharing Agreement, dated as of March 30, 1998, by and among SAC, Grace-Conn., and Sealed Air Corporation (now known as Sealed Air Corporation (US)) (the "1998 Tax Sharing Agreement"), Grace-Conn. is required to indemnify SAC, Sealed Air Corporation (US), and their affiliates for certain tax liabilities relating to tax years ending on or before December 31, 1998, including all U.S. federal income tax liabilities of the Grace New York Group for each of the Applicable Tax Years. Similarly, pursuant to the Tax Sharing and Indemnification Agreement, dated September 27, 1996 by and among Grace New York, Grace-Conn., and Fresenius AG (the "1996 Tax Sharing and Indemnification Agreement"), Grace-Conn. is required to indemnify Grace New York and certain of its affiliates for certain tax

6

SUPP. APP. 003634

liabilities of the Grace New York Group relating to tax years ending on or prior to December 31, 1996.

16.  In October of 1997, the Internal Revenue Service (the "IRS") commenced an examination of the U.S. federal consolidated income tax returns of the Grace New York Group with respect to the Applicable Tax Years (the "1993-1996 Tax Audit").  Under the 1996 Tax Sharing and Indemnification Agreement, Grace-Conn. has been acting as the agent of the Grace New York Group in dealing with the IRS during the course of the 1993-1996 Tax Audit.  Under the 1998 Tax Sharing Agreement, Grace-Conn. has also acted as agent for the U.S. federal income tax affiliated group filing consolidated tax returns of which SAC is the common parent ("SAC Group") during the course of the 1993-1996 Tax Audit (relating to the taxable year beginning September 29, 1996 and ending December 31, 1996) and for certain other Tax matters.

17.  In August of 2002, the IRS issued a Revenue Agent's Report to the Grace New York Group (the "Grace New York RAR") with respect to the 1993-1996 Tax Audit that proposed certain adjustments in U.S. federal income tax ("Federal Income Tax") relating to the Applicable Tax Years.  The proposed adjustments would result in the Grace New York Group owing additional Federal Income Taxes (not including interest) for tax years ending December 31, 1993, December 31, 1994, December 31, 1995, and December 31, 1996, respectively, of approximately $27.841 million, $42.158 million, $22.093 million, and $21.842 million.  In August of 2002, the IRS also issued a Revenue Agent's Report (the "SAC RAR") to the SAC Group that proposed certain adjustments in Federal Income Tax relating to the taxable year beginning September 29, 1996 and ending December 31, 1996.

7

18. On August 14, 2002, Grace-Conn., as agent for the Grace New York Group, filed a letter with the IRS protesting certain proposed adjustments in the Grace New York RAR that related to the deductibility of policy loan interest attributable to Corporate Owned Life Insurance ("COLI") owned by Grace-Conn. and/or its affiliates. On August 27, 2002, Grace-Conn., as agent for the SAC Group, filed a letter with the IRS protesting certain proposed adjustments in the SAC RAR that also related to COLI. In addition, on September 3, 2002, Grace-Conn., as agent for the Grace New York Group and the SAC Group, respectively, filed two protest letters with the IRS with respect to certain other proposed adjustments set forth in the Grace New York RAR and the SAC RAR.

19. On September 24, 2002, the Debtors filed a motion entitled Motion For The Entry Of An Order Authorizing The Debtors To Enter Into A Settlement Agreement With The Internal Revenue Service In Connection With Interest Deductions Claimed With Respect To Corporate Owned Life Insurance (the "COLI Motion") to settle the large adjustments in Federal Income Tax proposed by the IRS relating to COLI that are set forth in both the Grace New York RAR and the SAC RAR. Any such settlement with the IRS will also involve large adjustments in Federal Income Tax to the SAC Group for taxable years ending December 31, 1997 and December 31, 1998. On October 22, 2002, the Bankruptcy Court issued an order providing in general that the Debtors are authorized to enter into settlement negotiations with respect to the contested COLI interest deductions consistent with the settlement terms set forth in the order, and any agreement reached between the IRS and the Debtors shall be subject to prior Bankruptcy Court approval.

20. The IRS has filed priority tax claims against the estates of the Debtors. Certain state tax authorities have filed similar priority tax claims.

8

21. In 2003, the IRS also commenced an examination of the U.S. federal consolidated income tax returns filed by the SAC Group for tax years ending December 31, 1997 and December 31, 1998.

**Sealed Air Indemnity Litigation**

22. Prior to January 23, 2002, the NMC Defendants had asserted to the SAC Defendants that the SAC Defendants were liable to the NMC Defendants for indemnification and contribution with respect to various claims asserted or that could be asserted against the NMC Defendants, including asbestos-related claims and claims related to any tax deficiencies of the Grace New York Group arising out of the 1993-1996 Audit or otherwise. On January 23, 2002, SAC commenced a declaratory judgment action against the NMC Defendants in the Supreme Court of the State of New York, County of New York, asserting that SAC is not liable to the NMC Defendants for indemnification or otherwise with respect to any such claims asserted against the NMC Defendants (the "Sealed Air Indemnity Litigation").

## III.   THE PROPOSED SETTLEMENT

**Background**

23. On November 27, 2002, at the direction of the Court, each of the Plaintiffs, the SAC Defendants and the NMC Defendants participated in a lengthy settlement conference during which they were able to negotiate successfully a settlement embodied in two term sheets, one involving the Plaintiffs and the NMC Defendants (the "NMC Term Sheet") and the other involving the Plaintiffs and the SAC Defendants (the "SAC Term Sheet").

**The NMC Settlement**

24. Pursuant to the NMC Term Sheet, the NMC Defendants agreed, among other things, to (i) pay $15,000,000, as directed by the Court, upon the confirmation of a plan of

9

SUPP. APP. 003637

reorganization in respect of the Debtors, (ii) pay the net federal and state income tax liabilities of the Grace New York Group for years ending on or before December 31, 1996, subject to certain control and cooperation requirements, and (iii) not assert any claims against the SAC Defendants for any tax liabilities or for any asbestos liabilities, including past and future attorney's fees or litigations costs related thereto. These latter two components were of critical importance to the SAC Defendants because of their interest in achieving a global resolution of all possible claims against them, including claims relating to the Sealed Air Indemnity Litigation and claims by the IRS or the NMC Defendants for or related to Taxes of the Grace New York Group. Accordingly, all parties were required to agree on a satisfactory approach to these potential liabilities. By Order dated November 27, 2002, the Court approved the term sheet.

25. For a variety of reasons more particularly set forth in the motion to approve the settlement of the NMC Action [Dkt. No. 16 (02-2211)], the Plaintiffs, Debtors, and the NMC Defendants agreed to modify the agreement set forth in the NMC Term Sheet. In general, the terms of the Settlement Agreement and Release of Claims, February 6, 2003, by and among the NMC Defendants and the Plaintiffs, as amended by the First Amended Settlement Agreement and Release of Claims, which was also signed by the Debtors, and approved by this Court by Order dated June 25, 2003 [Dkt. No. 19 (02-2211)] (the "NMC Settlement Agreement"), provide that the NMC Defendants have agreed to release the SAC Defendants from all Grace-Related Claims (as defined in the NMC Settlement Agreement).

26. In contrast to the NMC Term Sheet, the NMC Settlement Agreement provides that (i) the NMC Defendants have agreed to make a one-time lump sum payment in the amount of $115 million in exchange for full protection from current and future Grace-Related Claims, including Asbestos-Related Claims (each as defined in the NMC Settlement

10

SUPP. APP. 003638

Agreement), including claims arising out of the 1993-1996 Tax Audit and other Taxes and (ii) the Debtors will retain control of and responsibility to pay (or indemnify the NMC Defendants) for, Indemnified Taxes (as defined in the NMC Settlement Agreement) (e.g., income Taxes imposed on the Grace New York Group as a result of the 1993-1996 Tax Audit).

### The SAC Settlement[4]

27. The SAC Term Sheet resulted in the Settlement Agreement, pursuant to which if approved, and subject to the terms and conditions contained therein:

- the SAC Defendants shall pay $512.5 million in cash plus interest thereon and transfer nine million shares of Sealed Air Common Stock as adjusted for Anti-Dilution, having a current market value of approximately $321.5 million (based on December 5, 2002, closing price of $35.72), for a current aggregate consideration (without interest, at such current market value, and without any adjustment for Anti-Dilution) of approximately $834 million;

- the SAC Defendants' payment and transfer obligations are conditioned upon receiving the full benefit of an injunction under sections 524(g) and 105(a) of the Bankruptcy Code with respect to any and all Asbestos-Related Claims;

- the Confirmation Order and Chapter 11 Plan must provide that each of the Plaintiffs and the Debtors release SAC and its affiliates from all Asbestos-Related Claims as well as certain other liabilities, as more fully described in the Settlement Agreement;

- the Confirmation Order and Chapter 11 Plan must provide that the Plaintiffs deliver a release from the NMC Defendants;

- each of the Plaintiffs shall use its best efforts to structure the transactions contemplated by the Settlement Agreement to achieve favorable tax treatment to Cryovac and its Affiliates, including in general by maximizing the amount of the Cryovac Cash Amount and Settlement Shares transferred directly by Cryovac to one or more trusts formed pursuant to section 524(g) of the Bankruptcy Code; and

---

[4]    This motion summarizes certain portions of the Settlement Agreement and is not intended to describe fully each of its terms. In the event of any inconsistency between the summary contained in this Motion and the Settlement Agreement, the latter shall govern and be dispositive.

11

SUPP. APP. 003639

- the Confirmation Order and Chapter 11 Plan must provide that the 1998 Tax Sharing Agreement is an assumed agreement of each of the Debtors pursuant to section 365 of the Bankruptcy Code, and nothing contained in or contemplated by the Settlement Agreement, the Chapter 11 Plan or the Confirmation Order shall adversely affect the rights of SAC or any of its Affiliates under the 1998 Tax Sharing Agreement.

28. The provisions of the Settlement Agreement are more specifically summarized in the paragraphs that follow.

**SAC Defendants' Obligations**

29. On the Effective Date, Cryovac shall transfer in the aggregate (i) the sum of $512.5 million in cash, plus interest thereon from December 21, 2002 until the Effective Date, at a rate of 5.5% per annum compounded annually (the "Cryovac Cash Amount"), and (ii) nine million shares of Sealed Air Common Stock, as adjusted for Anti-Dilution (the "Settlement Shares"). Such transfer shall be made as directed in the Confirmation Order subject to each of the Plaintiff's best efforts obligation to, in general, maximize the amount of the Cryovac Cash Amount and the Settlement Shares transferred directly by Cryovac to one or more trusts formed pursuant to section 524(g) of the Bankruptcy Code, as described below and in the Settlement Agreement more fully. Cryovac's obligations are guaranteed by SAC.

30. The Effective Date is defined as the date that is ten business days after the Confirmation Order becomes a Final Order or, if later, the date by which transfers to the 524(g) Trusts must be made pursuant to the Chapter 11 Plan and Confirmation Order.

SUPP. APP. 003640

**Conditions Precedent to SAC Defendants' Obligations**

31. As a condition to the obligations of the SAC Defendants, each of the Confirmation Order and the Chapter 11 Plan must provide that:

- each of the Plaintiffs and the Debtors shall execute and deliver the Release, and the Government Plaintiff shall execute and deliver the Government Release;

- in consideration of the transfers made, each of the Non-Debtor Affiliates irrevocably releases, acquits, and forever discharges the Released Parties from any and all Asbestos-Related Claims, and any and all Claims, Debts, and Damages on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, that have accrued or been asserted or that hereafter might accrue or be asserted against the Released Parties;

- the SAC Action shall be dismissed with prejudice;

- the Plaintiffs shall deliver the Fresenius Release;

- the Released Parties shall receive the full benefit of an injunction under sections 524(g) and 105(a) of the Bankruptcy Code, which injunction shall be in form and substance reasonably acceptable to the SAC Defendants and which injunction shall include, without limitation, provisions enjoining any and all Persons from taking any and all legal or other actions (including, without limitation, the continued prosecution of pending 'Actions' or the commencement of future 'Actions' as such term is defined in the Preliminary Injunction) or making any demand (as such term is defined in section 524(g)(5) of the Bankruptcy Code) for the purpose of, directly or indirectly, claiming, collecting, recovering, or receiving any payment, recovery or any other relief whatsoever from any of the Released Parties with respect to any and all Asbestos-Related Claims;

- the Debtors shall, jointly and severally, indemnify, defend, and hold-harmless the Released Parties from and against (1) any and all Asbestos-Related Claims and all Indemnified Taxes, (2) any and all losses, costs, and expenses incurred as a result of any breach of any of the Debtors' or Non-Debtor Affiliates' obligations, covenants, and agreements set forth or referred to in the Agreement, including without limitation, any such obligation, covenant or agreement of any Debtor or Non-Debtor Affiliate provided in the Confirmation Order or Chapter 11 Plan; (3) if any Non-Debtor Affiliate has not executed and delivered a Release, any and all Asbestos-Related Claims based on, arising out of, or attributable to such Non-Debtor Affiliate and (4) any and all attorneys' fees or costs and

13

expenses attributable to any Indemnity Claim, subject to certain exclusions; and each of the Debtors shall execute and deliver an indemnity agreement in the form annexed as an exhibit to the Settlement Agreement;

- there shall be established under state law the 524(g) Trusts, each of which shall be subject to the continuing jurisdiction of the Bankruptcy Court;

- if one or more Cryovac 524(g) Trusts is established, then each Cryovac 524(g) Trust shall be established to qualify as a "qualified settlement fund" for federal income tax purposes within the meaning of Treasury Regulations section 1.468B (each, a "Qualified Settlement Fund"), and, unless otherwise required by a Final Determination, the Plaintiffs and the Cryovac 524(g) Trusts shall be required to take or refrain from taking certain actions as more fully described in the Settlement Agreement;

- if one or more Cryovac 524(g) Trusts is established, then unless otherwise required by a Final Determination, the Cryovac 524(g) Trusts shall treat for all Tax purposes any and all payments by Cryovac directly to the Cryovac 524(g) Trusts pursuant to paragraph II(a) of the Agreement as a direct payment by Cryovac to the Cryovac 524(g) Trusts for Asbestos Claims that constitutes an ordinary and necessary expense of Cryovac;

- if one or more 524(g) Trusts is established, then unless otherwise required by a Final Determination, the Cryovac 524(g) Trusts shall treat for all Tax purposes all payments, if any, by Cryovac to Grace Specialty as ordinary income of Grace Specialty; and

- the 1998 Tax Sharing Agreement is an assumed agreement of each of the Debtors (including, without limitation, Grace Specialty and W.R. Grace & Co.-Conn.) pursuant to section 365 of the Bankruptcy Code, and nothing contained in or contemplated by the Settlement Agreement, the Chapter 11 Plan or the Confirmation Order shall adversely affect the rights of Sealed Air Corporation or any of its Affiliates under the 1998 Tax Sharing Agreement.

## The Allocation of Defendants' Consideration Is Preserved for a Later Time

32.   The Settlement Agreement does not predetermine and fix the allocation of the Defendants' consideration among any of the various creditor constituencies in this case. Rather, that determination will occur at a later time in the Debtors' bankruptcy cases during the chapter 11 plan development process.

33.   In this regard, the Settlement Agreement requires each of the Plaintiffs to:

14

- first, use its best efforts to require the Chapter 11 Plan to provide that the Cryovac Cash Amount and the Settlement Shares shall be transferred by Cryovac directly to one or more 524(g) Trusts for Asbestos Claims, subject to certain limitations as set forth more fully in the Settlement Agreement, and in furtherance of such best efforts obligation, take certain actions (and not take certain actions) in connection with supporting a Chapter 11 Plan that provides that the Cryovac Cash Amount and the Settlement Shares shall be transferred directly by Cryovac directly to one or more 524(g) Trusts for Asbestos Claims, as set forth more fully below and in the Settlement Agreement; and

- second, if the Chapter 11 Plan cannot be confirmed in accordance with the immediately preceding terms, use its best efforts to require the Chapter 11 Plan to maximize the amount of the Cash Amount and the Settlement Shares transferred directly by Cryovac to one or more 524(g) Trusts for Asbestos Claims, and in furtherance of such best efforts obligation, take certain actions (and not take certain actions) in connection with supporting a Chapter 11 Plan that maximizes the Cryovac Cash Amount and the Settlement Shares that will be transferred directly by Cryovac directly to one or more 524(g) Trusts for Asbestos Claims, as set forth more fully below and in the Settlement Agreement.

**Obligation of Each Plaintiff to Support Approval of a Conforming Plan**

34. With respect to the obligations of the Plaintiffs described generally in paragraph 32 of this motion, the Settlement Agreement requires that each Plaintiff:

- support the approval of a disclosure statement that relates to a Chapter 11 Plan that satisfies the provisions set forth in paragraph II(a) of the Settlement Agreement (such a Chapter 11 Plan, the "Conforming Plan"), as long as the Conforming Plan meets the requirements for confirmation set forth in sections 524 and 1129 of the Bankruptcy Code, regardless of whether confirmation may be obtained under section 1129(a) or (b) of the Bankruptcy Code;

- recommend to the creditors and parties in interest the interests of which are represented by it to vote in favor of the confirmation of the Conforming Plan;

- oppose the approval of any disclosure statement that relates to a non-Conforming Plan;

- recommend to the creditors and parties in interest the interests of which are represented by it to vote against the confirmation of a non-Conforming Plan;

15

SUPP. APP. 003643

- not take any action, of whatever kind and nature, to oppose, or designed to prevent confirmation of, the Conforming Plan; and

- take any action, of whatever kind and nature, that is necessary, required or appropriate in order to confirm the Conforming Plan,

provided, however, that the Plaintiffs shall not be required to support or recommend a Conforming Plan which, in the exercise of Plaintiffs' respective fiduciary obligations, is determined to be unacceptable (other than as to provisions required by the terms of the Settlement Agreement), and provided, further, that the Plaintiffs shall not be bound by the provisions referred to above if (i) the Bankruptcy Court determines in a Final Order, on a motion brought by a party in interest, and on notice to the SAC Defendants, seeking an order excusing their performance under these provisions, that the Conforming Plan cannot meet the confirmation requirements set forth in sections 524 and 1129 of the Bankruptcy Code, or (ii) the Bankruptcy Court refuses to confirm the Conforming Plan, except if such refusal relates to issues unrelated to the requirements contained in paragraph II(a) of the Settlement Agreement.

## Other Material Provisions

35. In addition, the Settlement Agreement contains other material provisions, including that:

- the Released Parties shall not seek indemnity, contribution, or reimbursement for any payments or transfers made under the Settlement Agreement from any source, including, without limitation, the insurers of the Debtors (but solely to the extent of coverage procured by the Debtors or any of its predecessors);

- the transfers made by the SAC Defendants under the Settlement Agreement shall be made in full compromise and settlement of any and all Asbestos-Related Claims against any and all of the Released Parties;

- any order of the Court approving the Settlement Agreement shall provide that the Preliminary Injunction shall remain in full force and effect through and including the Effective Date;

- any order of the Court approving the Settlement Agreement shall provide that, unless otherwise ordered by this Court, none of the Debtors shall sue or prosecute, institute or cooperate in the institution, commencement, filing, or prosecution of any suit, administrative proceeding, demand, claim or cause of action, whether asserted individually or derivatively against any of the Released Parties for any Asbestos-Related Claims, pending

16

confirmation of a Chapter 11 Plan consistent with the terms of the Settlement Agreement; and

- Cryovac and SAC as guarantor, shall have a right of setoff or reduction against the payment and transfers required to be made under the Settlement Agreement or otherwise for, and upon the payment by any of the Released Parties of, the amount of all Indemnified Taxes or any obligation of any of the Debtors or the 524(g) Trusts set forth or referred to in the Settlement Agreement, including, without limitation, any Indemnity Obligation required to be provided in the Confirmation Order or Chapter 11 Plan that any of the Debtors has failed to pay the Released Parties.

36. Beyond the material provisions outlined above, the Settlement Agreement contains further material provisions, including that:

- each of the Plaintiffs shall use its best efforts to cause the Confirmation Order and the Chapter 11 Plan expressly to provide that:
  - o each of the Debtors shall use its best efforts to cause each of the trusts to which all or any portion of the Cryovac Cash Amount or the Settlement Shares is directly transferred by Cryovac pursuant to paragraph II(a) of the Settlement Agreement to qualify, and to maintain its status, as a Qualified Settlement Fund, and structure the transactions contemplated by the Settlement Agreement to achieve favorable tax treatment to Cryovac and its Affiliates, as set forth in paragraphs II(a) and (b) of the Settlement Agreement;
  - o each of the Debtors shall use its best efforts to cause the constitutive document(s) of each of the trusts to which all or any portion of the Cryovac Cash Amount or the Settlement Shares is directly transferred pursuant to paragraph II(a) of the Settlement Agreement to contain provisions, reasonably satisfactory to Cryovac, qualifying and maintaining its status as a Qualified Settlement Fund, and providing that Cryovac or its designee shall be a Transferor to each such trust;
  - o each of the Debtors and Non-Debtors Affiliates shall take all actions that are reasonably requested by Sealed Air Corporation and consistent with the certain provisions of the Settlement Agreement relating to Tax treatment of all payments and transfers made by Cryovac pursuant to paragraph II(a) of the Settlement Agreement (the "Tax Treatment Provisions") and be prohibited from taking any actions inconsistent with the Tax Treatment Provisions, subject to certain limitations and exceptions;
  - o each of the Debtors shall use its best efforts not to make any statement in a court document filed in the Debtors' chapter 11 cases or in any oral statement to the court in the Debtors' chapter 11 cases that is

17

inconsistent with the Tax Treatment Provisions, subject to certain limitations and exceptions;

o   each of the Debtors shall cause each of the Non-Debtor Affiliates to perform and satisfy fully all obligations, covenants, and agreements of such Non-Debtor Affiliate set forth or referred to in the Settlement Agreement, including, without limitation, any such obligation, covenant, or agreement of any Non-Debtor Affiliate provided in the Chapter 11 Plan or Confirmation Order;

o   unless otherwise required by a Final Determination, the Debtors and the Non-Debtor Affiliates (A) shall file all Tax Returns required to be filed by such Person, if any, consistent with certain Tax Treatment Provisions and shall take all other actions that are reasonably requested by SAC and consistent with certain of the Tax Treatment Provisions and (B) shall be prohibited from taking any action that may result in the disqualification of any Cryovac 524(g) Trust as a Qualified Settlement Fund or be inconsistent with Cryovac being treated as a Transferor to each Cryovac 524(g) Trust of the cash and Settlement Shares transferred by Cryovac directly to such Cryovac 524(g) Trust or each Cryovac 524(g) Trust constituting a Qualified Settlement Fund, subject to certain limitations and exceptions;

o   if one or more Cryovac 524(g) Trusts is established, then unless otherwise required by a Final Determination, the Debtors and the Non-Debtor Affiliates shall treat for all Tax purposes any and all payments by Cryovac directly to the Cryovac 524(g) Trusts pursuant to paragraph II(a) of the Settlement Agreement as a direct payment by Cryovac to the Cryovac 524(g) Trusts for Asbestos Claims that constitutes an ordinary and necessary expense of Cryovac and the Debtors and Non-Debtor Affiliates (A) for financial accounting or any other regulatory purpose, shall be prohibited from treating any payment by Cryovac directly to a Cryovac 524(g) Trust as a payment by Cryovac to any of the Debtors or Non-Debtor Affiliates, or as a payment by any Debtor or Non-Debtor Affiliate to any Person (including any 524(g) Trust) (or as resulting in the accrual by any Debtor or Non-Debtor Affiliate of an expense or deduction for any such payment), (B) shall be prohibited from claiming that any payment by Cryovac directly to a Cryovac 524(g) Trust results or gives rise to the accrual or allowance of a deduction or expense for Tax purposes for any Debtor or Non-Debtor Affiliate, and (C) shall take all actions that are reasonably requested by SAC and consistent with the provisions of this paragraph, (D) shall not take any position inconsistent with the foregoing on any Tax Return or with any Tax authority, and (E) shall not make any statement in any public or regulatory filing or release or otherwise that is inconsistent with the obligations of such Person pursuant to this paragraph, subject to certain limitations and exceptions; and

18

SUPP. APP. 003646

    o  unless otherwise required by a Final Determination, the Debtors and the Non-Debtor Affiliates shall treat for all Tax purposes all payments, if any, by Cryovac to Grace Specialty pursuant to paragraph II(a) of the Settlement Agreement as ordinary income of Grace Specialty, and the Debtors and the Non-Debtor Affiliates (A) shall file all Tax Returns required to be filed by such Person, if any, consistent with the provisions of this paragraph and shall take all other actions that are reasonably requested by SAC and consistent with the provisions of this paragraph and (B) shall be prohibited from taking any action that is inconsistent with the foregoing provisions of this paragraph or that is inconsistent with any such payment being treated as an ordinary and necessary expense incurred by Cryovac, subject to certain limitations and exceptions.

- The Debtors may prepare and execute (but not file with the IRS or other governmental authority, which filing shall be effected only by Cryovac, Inc. pursuant to and in accordance with the Agreement) a Grace Protective Claim for a Relevant Tax Year, and require Cryovac, Inc. to file such Grace Protective Claim with the IRS or other governmental authority for and on behalf of the Debtors, subject to terms and conditions as more fully described in the Settlement Agreement.

- Simultaneously with and in exchange for the transfers contemplated by paragraph II(a) of the Settlement Agreement, the Plaintiffs shall deliver to Cryovac, Inc. and Sealed Air Corporation, *inter alia*, the Registration Rights Agreement, in the form annexed to the Settlement Agreement as Exhibit 1, with appropriate insertions therein, duly executed by the Initial Holders.

37.  The Settlement Agreement also contains detailed Anti-Dilution provisions (Paragraph III), investment representations (Paragraph IV), and other detailed provisions regarding tax matters (Paragraph VI).

38.  By the terms of the Settlement Agreement, the Plaintiffs, and the SAC Defendants agreed to seek the relief requested in this motion within forty-five days of the execution of the Settlement Agreement.

SUPP. APP. 003647

39. For the reasons that will be discussed hereinafter, the Plaintiffs and the SAC Defendants believe that the Settlement Agreement is in the best interests of the Debtors' estates, creditors and other parties in interest, and should be approved by the Court.

## IV.   THE SETTLEMENT IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS AND OTHER PARTIES IN INTEREST

40. Pursuant to this motion and in accordance with Bankruptcy Rule 9019(a), this Court is respectfully requested to enter an order (a) approving the Settlement Agreement in all respects, and (b) authorizing the Plaintiffs to take any and all action necessary to effectuate the Settlement Agreement. Bankruptcy Rule 9019(a) provides as follows:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the Court may direct.

41. Generally, courts encourage settlements and favor compromises both in bankruptcy, In re Penn Central Transp. Co., 455 F.2d 811, 814, n.6 (3d Cir. 1972), and complex cases. Doe v. Delie, 257 F.3d 309, 322 (3d Cir. 2001). The standards by which courts evaluate a proposed compromise and settlement are well established. In bankruptcy, a court should approve a proposed compromise and settlement when it is fair and equitable and in the best interests of the debtor's estates and its creditors. See In re Marvel Entm't Group, Inc., 222 B.R. 243, 249 (D. Del 1998); In re Louise's Inc., 211 B.R. 798, 801 (D. Del. 1997); In re Texaco, 84 B.R. 893, 901-02 (Bankr. S.D.N.Y. 1988).[5] The court must "assess and balance the value of the

---

[5]   See also In re Energy Coop., Inc., 886 F.2d 921, 927 (7th Cir. 1989); LaSalle Nat'l Bank v. Holland (In re American Reserve Corp.), 841 F.2d 149, 161 (7th Cir. 1987)(a court is not required to resolve the issues of fact and law compromised by a proposed settlement); Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Services, Inc.), 762 F.2d 185, 187-89 (2d Cir. 1985).

SUPP. APP. 003648

claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." In re Martin, 91 F.3d 389, 393 (3d Cir. 1996).

42.  The settlement need not be the best that the estate could have achieved, but rather the settlement should be approved if it falls "within the reasonable range of litigation possibilities." In re Penn Central Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); see also Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 822 (1983). In determining whether a settlement is within the range of reasonableness, the Court should consider four criteria:  (a) the probability of success in the litigation; (b) the likely difficulties in collection;  (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors. See In re Martin, 91 F.3d at 393; Marvel, 222 B.R. at 249; see also In re Pennsylvania Truck Lines, Inc., 150 B.R. 595, 598 (E.D. Pa. 1992), aff'd, 8 F.3d 812 (3d Cir. 1993); In re Grant Broadcasting of Philadelphia, Inc., 71 B.R. 390, 395 (Bankr. E.D. Pa. 1987).

43.  It is not necessary for the Court to conduct a "mini trial" of the facts or the merits underlying the dispute.  See Grant Broadcasting, 71 B.R. at 396; see also In re A&C Properties, 784 F.2d 1377, 1384 (9th Cir.), cert. denied, 479 U.S. 854 (1986). Instead, the Court need only consider those facts that are necessary and pertinent to enable it to evaluate the settlement and to make an informed and independent decision concerning the settlement.  See Penn Central, 596 F.2d at 1114. The Plaintiffs and the SAC Defendants respectfully submit that the Settlement favorably falls within the Martin criteria and, thus, should be approved by the Court.

21

**Probability of Success on the Merits**

44. While the SAC Action was set to go to trial shortly after the parties successfully negotiated a settlement on November 27, 2002, its ultimate outcome was and is at best uncertain. The Plaintiffs' standing to prosecute the SAC Action has been challenged by the SAC Defendants in light of Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.), 304 F.3d 316 (3d Cir.), *vacated, reh. en banc granted,* 310 F.3d 785 (3d Cir. 2002), *rev'd,* 330 F.3d 548 (3d Cir. 2003). In addition, Plaintiffs candidly admit that litigation risks abound as proof of the Debtors' insolvency and the applicable standards to be applied to this issue in the Third Circuit are challenging issues.

**Complexity, Expense, and Inconvenience of Litigation and Attendant Delay**

45. Indisputably, the SAC Action engenders complex legal and factual issues. Indeed, the complexity of the SAC Action resulted in the Court's truncation of the issues to be tried initially, leaving the other alleged claims for determination only if the Plaintiffs failed to prevail on constructive fraudulent transfer theories.

46. The expense of prosecuting the SAC Action to a final judgment, which inevitably will include appellate proceedings, would be substantial. In addition, in light of the amounts involved, even if successful, there is no assurance as to when and how much the Plaintiffs would be able to collect.

47. Furthermore, the prosecution of the SAC Action is likely to entail the commitment of substantial human resources by key personnel of the Debtors and Plaintiffs' counsel. The commitment of such resources and the duration of the litigation would assuredly result in further delays in developing, negotiating and confirming a plan of reorganization for the

SUPP. APP. 003650

Debtors. Indeed, during the prosecution of the SAC Action, many other reorganization activities were delayed.

**Paramount Interest of Creditors**

48. Approval of the Settlement Agreement is in the best interests of creditors of the Debtors' estates for at least three reasons. First, it will increase the funds available to fund a plan of reorganization both through the consideration to be provided by the SAC Defendants as well as facilitating the NMC settlement, which itself requires that the NMC Defendants release the SAC Defendants as a condition precedent to the payment obligation of the SAC Defendants. Both settlements in the aggregate will provide in the neighborhood of $1 billion to creditors of these estates. Second, it will allow the Plaintiffs and the Debtors to focus their attention on other pending matters in the Debtors' cases, including the resolution of the Zonolite Attic Insulation science trial, the 1993-1996 Tax Audit and other tax matters (including resolution of Tax issues relating to COLI for all taxable years, including tax years ended December 31, 1997 and December 31, 1998), and the formulation of a reorganization plan. Third, the expense associated with the prosecution of the SAC Action will be fully and finally abated resulting in a net economic benefit to the Debtors' estates and their creditors, in the range of $1 billion.

49. For all of the foregoing reasons, the Settlement Agreement is fair, reasonable, and in the best interests of the Debtors, their estates and creditors and should be approved under section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

**Notice and Procedure**

50. Copies of this Motion have been given to (a) the Office of United States Trustee, (b) counsel to the Debtors' post-petition Lender, (c) counsel to the Official Committee of Unsecured Creditors, (d) counsel to the Official Committee of Equity Security Holders, (e) all

23

SUPP. APP. 003651

parties to the SAC Action, and (f) those parties that requested service of papers under Bankruptcy Rule 2002.

51. Bankruptcy Rule 9019(a) provides that notice of a hearing on approval of settlement be given in accordance with bankruptcy Rule 2002. Bankruptcy Rule 2002(a)(3), requires notice to all creditors, "unless the court for cause shown . . . directs that notice not be sent." The parties submit that cause exists not to send a notice to all creditors under the circumstances at hand. The Debtors have thousands, if not tens of thousands of creditors. Creditors who are interested in this case and, thus, filed a demand for service of papers will be served with copies of this Motion. The interests of unsecured creditors are fully represented by the Official Committees appointed in these cases, all of which are either parties to the Settlement Agreement, or will be duly served. Thus, the Plaintiffs and the SAC Defendants submit that the notice of this Motion is proper and adequate in all respects and should be approved.

WHEREFORE, for the reasons set forth above, the Plaintiffs and the SAC Defendants respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit "B," authorizing and approving the Settlement Agreement and granting such other relief that it deems proper.

24

SUPP. APP. 003652

Dated:  November 26, 2003

Respectfully submitted,

BILZIN SUMBERG BAENA
PRICE & AXELROD, LLP
Scott L. Baena
Robert W. Turken
Jay M. Sakalo
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
(305) 374-7580
Attorneys for The Official Committee of
Asbestos Property Damage Claimants

-and-

FERRY, JOSPEH & PEARCE, P.A.


/s/ Theodore J. Tacconelli
Theodore J. Tacconelli (No. 2678)
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899
(302) 575-1555
Attorneys for The Official Committee of
Asbestos Property Damage Claimants

-and-

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
Rita C. Tobin
399 Park Avenue, 27th Floor
New York, NY 10022
(212) 319-7125

-and-

25

SUPP. APP. 003653

CAPLIN & DRYSDALE, CHARTERED
Peter Van N. Lockwood
Trevor W. Swett
Nathan D. Finch
One Thomas Circle, N.W.
Washington, D.C. 20005
(202) 862-5000
Attorneys for the Official Committee
Of Asbestos Personal Injury Claimants

-and-

CAMPBELL & LEVINE, LLC

/s/ Marla R. Eskin
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 King Street
Suite 300
Wilmington, DE 19810
(320) 426-1900
Attorneys for the Official Committee
Of Asbestos Personal Injury Claimants

-and-

MILBERG WEISS BERSHAD
HYNES & LERACH LLP
Brad N. Friedman
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300
Attorneys for Plaintiffs

-and-

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM  LLP
Sheila L. Birnbaum
Henry P. Wasserstein
Bert L. Wolff
Four Times Square
New York, New York 10036-6522
(212) 735-3000
Attorneys for Sealed Air Corporation and
Cryovac Inc.

26

SUPP. APP. 003654

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case Nos. 01-1139 through 01-1200 |
| W.R. GRACE & CO., et al., | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| _____ | ) | |
| OFFICIAL COMMITTEE OF | ) | |
| ASBESTOS PERSONAL INJURY | ) | |
| CLAIMANTS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -against- | ) | Adv. No. 02-2210 |
| | ) | [LEAD DOCKET] |
| SEALED AIR CORPORATION | ) | |
| and CRYOVAC, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| OFFICIAL COMMITTEE OF | ) | |
| ASBESTOS PERSONAL INJURY | ) | |
| CLAIMANTS, et al., | ) | |
| | ) | Adv. No. 02-2211 |
| Plaintiffs, | ) | |
| | ) | |
| -against- | ) | |
| | ) | |
| FRESENIUS MEDICAL CARE, | ) | This Document Pertains to Adv. No. |
| HOLDINGS, INC., et al., | ) | 02 2210 |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## SETTLEMENT AGREEMENT AND RELEASE

SUPP. APP. 003655

This Settlement Agreement and Release, dated November 10, 2003, is made by and among the Official Committee of Asbestos Personal Injury Claimants, the Official Committee of Asbestos Property Damage Claimants, Sealed Air Corporation, a Delaware corporation, and Cryovac, Inc., a Delaware corporation.

**I.    Definitions**

As used in this Agreement, the following capitalized terms shall have the following meanings (such meanings to be equally applicable to the singular and plural forms of the terms defined), unless a paragraph or subparagraph of this Agreement expressly provides otherwise:

a.    "Action" means the suit styled Official Committee of Asbestos Personal Injury Claimants and Official Committee of Asbestos Property Damage Claimants of W.R. Grace & Co., suing in behalf of the Chapter 11 Bankruptcy Estate of W.R. Grace & Co., et al. v. Sealed Air Corporation and Cryovac, Inc., Adv. No. 02-2210 (D. Del.).

b.    "Actually Realized" shall have the meaning set forth in paragraph VI(h) of this Agreement.

c.    "Affiliate" means with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.

d.    "Agreement" means this Settlement Agreement and Release and any exhibits, schedules, and annexes thereto, including, without limitation, the Registration Rights Agreement attached hereto as Exhibit 1 (the "Registration Rights Agreement").

e.    "Announcement" means an "Announcement" (including any successor name to an Announcement) published in the Internal Revenue Bulletin (including any successor publication).

f.    "Anti-Dilution" means the provisions set forth in Article III of this Agreement.

2

SUPP. APP. 003656

g.    "Asbestos Claims" means, collectively, Asbestos Personal Injury Claims, Asbestos Property Damage Claims, and any 'demand' related thereto as the term is defined in section 524(g)(5) of the Bankruptcy Code.

h.    "Asbestos Personal Injury Claims" means any and all Claims, Debts, and Damages for death, bodily injury, sickness, disease, medical monitoring, or other personal injuries (whether physical or not) caused or allegedly caused by, based on, arising out of, or attributable to, directly or indirectly, in whole or in part, the presence of or exposure at any time to asbestos or asbestos-containing material or products, mined, processed, consumed, used, stored, manufactured, designed, sold, assembled, distributed, disposed of, or installed by or on behalf of any Debtor or any of its predecessors, successors, or assigns, or any current or former Affiliate of any of the foregoing, including, without limitation, any Claims, Debts, and Damages for reimbursement, indemnification, subrogation, or contribution.

i.    "Asbestos Property Damage Claims" means any and all Claims, Debts, and Damages for or arising out of property damage, including, without limitation, the cost of inspecting, maintaining, encapsulating, abating, repairing, decontaminating, removing, or disposing of asbestos or asbestos containing materials or products in buildings or other structures, or other property caused or allegedly caused by, based on, arising out of, or attributable to, directly or indirectly, in whole or in part, the installation in, presence in, or removal of asbestos or asbestos-containing material or products mined, processed, consumed, used, stored, manufactured, designed, sold, assembled, distributed, disposed of, or installed by or on behalf of any Debtor or any of its predecessors, successors, or assigns, or any current or former Affiliate of any of the foregoing, including, without limitation, any Claims, Debts, or Damages for reimbursement, indemnification, subrogation, or contribution.

3

SUPP. APP. 003657

j.      "Asbestos-Related Claims" means any and all Claims, Debts, or Damages based on or arising from, in whole or in part, directly or indirectly: (i) Asbestos Claims or (ii) Successor Claims based on or arising from, in whole or in part, directly or indirectly, the Cryovac Transaction.

k.      "Bankruptcy Code" means title 11 of the United States Code as in effect on the date of this Agreement.

l.      "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

m.      "Bankruptcy Termination Event" means, in the case of either of Sealed Air Corporation or Cryovac, Inc., (a) the filing by such entity of a voluntary petition for relief under the Bankruptcy Code or (b) the pendency against such entity of an involuntary petition for relief under the Bankruptcy Code (i) that has not been dismissed within ninety days of the filing or (ii) upon which an order for relief granting the involuntary petition has been entered.

n.      "CFO Annual Statement" shall have the meaning set forth in paragraph VI(j)(ii) of this Agreement.

o.      "Change in Circumstances" means (i) for U.S. federal income tax purposes, (x) any amendment to the Internal Revenue Code or the final or temporary regulations promulgated under the Internal Revenue Code, (y) a decision by any federal court, or (z) a Revenue Ruling, Notice, Revenue Procedure, or Announcement, which amendment is enacted, promulgated, issued, or announced, or which decision, Revenue Ruling, Notice, Revenue Procedure, or Announcement is issued or announced, in each case, after the Execution Date, and (ii) for financial accounting purposes, any amendment to or change in generally accepted accounting principles, which amendment is issued or announced or, which change occurs, in each case, after the Execution Date.

p.      "Chapter 11 Plan" means a confirmed plan or plans of reorganization of the Debtors.

4

q.      "Claims" means any and all claims, whether direct, indirect, derivative or otherwise, including, without limitation, 'claim' as the term is defined in section 101(5) of the Bankruptcy Code (except that a right to an equitable remedy shall also be considered a claim whether or not the breach gives rise to a right to payment), remedies, or causes of actions, liability, Debts, or Damages, known or unknown, now existing or hereafter arising, that have been, could have been, may be, or could be alleged or asserted now or in the future by any Person against the Debtors, their predecessors, successors, assigns, or any current or former Affiliate of any of the foregoing, or the Released Parties, of whatsoever kind or nature, whether alleged or asserted or not, whether founded in law, equity, admiralty, tort, contract, statute, or otherwise, and includes, without limitation, demands, liability, suits, judgments, and all legal or equitable theories of recovery whether arising under the common law or any statute, ordinance, or regulation.  Without limiting the generality of the foregoing, Claims shall include any and all claims, causes of action, Debts, or Damages under or attributable to:  (i) chapter 5 of the Bankruptcy Code; (ii) successor liability, piercing the corporate veil, alter ego liability, agency liability, transferee liability, or other similar claims or causes of action seeking to hold a Person liable for the debts or obligations of another Person; (iii) chapter 176 of title 28 of the United States Code or any other similar statutes; (iv) any debtor-creditor, fraudulent transfer or fraudulent conveyance statutes; or (v) any other similar claims or causes of action (all such Claims, causes of action, Debts, or Damages under or attributable to (i) through (v), collectively, "Successor Claims").

r.      "Confirmation Order" means an order or orders confirming the Chapter 11 Plan.

s.      "Contrary Opinion" means (i) a written opinion from a nationally recognized law firm experienced in Tax matters that states that, as a result of a Change in Circumstances, there is no "reasonable basis", as defined under section 6662 of the Internal Revenue Code (or successor

5

provision thereof), for the taking of, or the failure to take, a Defined Action referred to in paragraph II(c)(ix), (x), or (xi), VI(b) or VI(g), of this Agreement, as the case may be, by such Plaintiff, 524(g) Trust, Debtor or Non-Debtor Affiliate, as the case may be, or (ii) a written opinion from nationally recognized accounting firm that states that, as a result of a Change in Circumstances, the taking, or the failure to take, a Defined Action referred to in paragraph II(c)(ix), (x), or (xi), VI(b) or VI(g), of this Agreement, as the case may be, by such Plaintiff, 524(g) Trust, Debtor or Non-Debtor Affiliate, as the case may be, will be inconsistent with generally accepted accounting principles.

    t.    "Court" means the court in which the Action is pending or, if no longer pending, the Bankruptcy Court.

    u.    "Cryovac Cash Amount" shall have the meaning set forth in paragraph II(a) of this Agreement.

    v.    "Cryovac Remaining Amount" means an amount of cash and the number of shares of Sealed Air Common Stock equal to the excess, if any, of (i) the Cryovac Total Amount over (ii) the Cryovac 524(g) Trust Amount.

    w.    "Cryovac Total Amount" means the sum of the Cryovac Cash Amount and the Fair Market Value of the Settlement Shares, provided, however, that this sum shall be subject to any setoff or reduction pursuant to paragraph II(j) of this Agreement.

    x.    "Cryovac 524(g) Trust Amount" means an amount of cash and the number of shares of Sealed Air Common Stock equal in the aggregate to the lesser of (i) the Cryovac Total Amount and (ii) the 524(g) Trust Total Amount less the Grace Specialty Initial Contribution.

    y.    "Cryovac 524(g) Trust" means any 524(g) Trust to which all or a portion of the Cryovac Cash Amount or the Settlement Shares will be directly transferred by Cryovac, Inc. pursuant to paragraph II(a) of this Agreement.

6

SUPP. APP. 003660

z.      "Cryovac Transaction" means the transfers of assets, the distributions of stock, the merger, and all predecessor, related, and ancillary transactions, agreements, transfers, and distributions relating to the transactions described in, referred to, or contemplated by Form S-4 Registration Statement filed by W.R. Grace & Co. with the Securities and Exchange Commission under the Securities Act of 1933, as amended, on or about February 13, 1998, SEC File No. 333-46281, including all attachments, exhibits, and schedules thereto.

aa.     "Damages" means any and all potential elements of recovery or relief, including, without limitation, those that are known, unknown, certain, uncertain, anticipated, or unanticipated, that have been, could have been, may be, or could be alleged or asserted now or in the future against the Released Parties, whether alleged, unalleged, asserted, or unasserted by Plaintiffs or by any other Person under any legal, regulatory, administrative, or equitable theory against the Released Parties, and includes, without limitation, equitable relief, declaratory relief, actual damages (whether for successor liability, fraudulent transfer, fraudulent conveyance, alter ego liability, agency liability, property damage, environmental liability, Tax liability, economic loss, loss of profits, medical expenses, medical monitoring, personal injury, loss of consortium, wrongful death, survivorship, or compensatory, proximate, consequential, general, incidental, or special damages, or any other liability, loss, or injury), statutory or treble, or multiple or penal or punitive or exemplary damages, attorneys' fees, interest, expenses, and costs of court.

bb.     "Debtors" means W.R. Grace & Co., W.R. Grace & Co.-Conn., and related entities that have filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, each of their estates, any trustee or examiner that may be appointed in any of the Debtors' cases under the Bankruptcy Code, and the reorganized Debtors and includes, without limitation, any new corporation or other entity to which the stock or the assets of any of the Debtors,

7

SUPP. APP. 003661

or any combination thereof, are transferred pursuant to the Chapter 11 Plan (other than a 524(g) Trust, or an unrelated third-party that has purchased assets from a Debtor pursuant to section 363 of the Bankruptcy Code).

    cc.     "Debts" means any liability or obligation arising from, based on, or attributable to any Claim.

    dd.     "Defined Action" means any action, including the filing of any Tax Return, a Protective Claim or other information with respect to Taxes, making any statement in any public or regulatory filing or press release or otherwise, relating to any obligation of a Person set forth or referred to in paragraph II(c)(ix), (x), or (xi), VI(b) or VI(g), of this Agreement, provided, however, that a Defined Action shall not include the making of a statement by any of the Plaintiffs or the Debtors in a court document filed in the Debtors' chapter 11 cases or in an oral statement to the court in the Debtors' chapter 11 cases if, with respect to such Defined Action, such Plaintiff or Debtor has used its best efforts to satisfy its obligations set forth or referred to in paragraphs II(c)(ix), (x), and (xi), VI(b) or VI(g), of this Agreement, and provided, further, that a Defined Action shall not include (x) the preparation and execution of a Grace Protective Claim by the Debtors pursuant to and in accordance with paragraph VI(h) of this Agreement and (y) the pursuit by the Debtors of a Grace Protective Claim pursuant to and in accordance with the third sentence of paragraph VI(i) of this Agreement.

    ee.     "Effective Date" means the date that is ten business days after the Confirmation Order becomes a Final Order or, if later, the date by which transfers to the 524(g) Trusts must be made pursuant to the Chapter 11 Plan and Confirmation Order.

SUPP. APP. 003662

ff.      "Excluded Fees" means costs and expenses (including lawyer's fees, expert's fees, and accountant's fees) incurred by the Released Parties in defending the Action or any other proceedings or controversies arising out of or based upon Asbestos-Related Claims prior to the Effective Date.

gg.      "Execution Date" means November 10, 2003.

hh.      "Fair Market Value" means (i) with respect to each of the Settlement Shares the last sale price on the New York Stock Exchange of a share of Sealed Air Common Stock, regular way, one business day before the Effective Date, and (ii) with respect to other property, the value assigned to such property in the disclosure statement approved by a Final Order of the Bankruptcy Court pursuant to section 1125(b) of the Bankruptcy Code with respect to the Chapter 11 Plan.

ii.      "Final Determination" means any assessment or resolution of liability for any Tax for any taxable period with respect to a Tax Claim against such Person required to take, or prohibited from taking, a Defined Action pursuant to the provisions set forth or referred to in this Agreement (i) by a decision, decree or other order by a court of competent jurisdiction, which has become final and unappealable or (ii) by any other means (including a closing agreement or accepted offer in compromise under section 7121 or 7122 of the Internal Revenue Code) if Cryovac, Inc. has consented to such other means, which consent shall not be unreasonably withheld or delayed.

jj.      "Final Order" means an order or judgment, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or to seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed, or if filed, remains pending.

kk.      "Fresenius" means Fresenius Medical Care Holdings, Inc., its Affiliates, and any and all of their predecessors, successors, and assigns.

9

ll.     "Fresenius Release" means a duly executed release in the form annexed hereto as Exhibit 5, with appropriate insertions thereto.

mm.    "Fresenius Transaction" means the transfer of assets, the distributions of stock, and the merger and all predecessor related and ancillary transactions, agreements, transfers, and distributions relating to the transactions described in, referred to, or contemplated by Form S-4 Registration Statement filed by W.R. Grace & Co. with the Securities and Exchange Commission under the Securities Act of 1933, as amended, on or about August 2, 1996, SEC File No. 333-09497, including all attachments, exhibits and schedules thereto.

nn.     "Government Plaintiff" means the United States of America, acting for and on behalf of the United States Environmental Protection Agency.

oo.     "Government Release" means a release in the form annexed hereto as Exhibit 2, with appropriate insertions therein.

pp.     "Grace New York" means W.R. Grace & Co., a New York corporation (now known as Fresenius Medical Care Holdings, Inc.) (Taxpayer Identification Number 13-3461988).

qq.     "Grace New York Group" means that group of corporations, including, without limitation, W.R. Grace & Co.-Conn., Cryovac, Inc., and Sealed Air Corporation, that were members through (and including) September 28, 1996 or December 31, 1996, as applicable, of the affiliated group of corporations within the meaning of section 1504 of the Internal Revenue Code, and the Treasury Regulations, of which Grace New York was the common parent, and, with respect to Taxes of other jurisdictions (domestic or foreign), that group of corporations that included Grace New York or one or more members of the Grace New York Group with respect to any combined, consolidated, joint, or similar Tax Return under the laws of any jurisdiction (domestic or foreign).

10

SUPP. APP. 003664

rr.     "Grace Protective Claim" shall have the meaning set forth in paragraph VI(h) of this Agreement.

ss.     "Grace Specialty" means W.R. Grace & Co. (formerly known as Grace Specialty Chemicals, Inc.) (Taxpayer Identification Number 65-0773649), or its successor.

tt.     "Grace Specialty Initial Contribution" means, with respect to the 524(g) Trusts in the aggregate, the "voting shares of" and "rights" in (as those terms are used in section 524(g)(2)(B)(i)(III) of the Bankruptcy Code) Grace Specialty or one or more other Debtors to be received by such 524(g) Trusts pursuant to section 524(g)(2)(B)(i)(III)(aa), (bb), or (cc), as the case may be, which voting shares and rights, if exercised, would entitle such 524(g) Trusts to own the lesser of (i) 50.1% of the voting shares of such entity or entities or (ii) the percentage of voting shares of such entity or entities that are to be received by the 524(g) Trusts.

uu.     "Grace Taxes" means all Taxes imposed on or with respect to, or related or attributable to, the Grace New York Group or any member thereof for or attributable to any taxable period (or any portion thereof) ending on or before December 31, 1996.

vv.     "Indemnified Taxes" means all Taxes and other amounts that W.R. Grace & Co.-Conn. or any other Debtor is responsible for or required to pay, or is required to indemnify any Released Party for or in respect thereto, pursuant to the 1998 Tax Sharing Agreement and including, without limitation, all Grace Taxes.

ww.     "Internal Revenue Code" means the Internal Revenue Code of 1986.

xx.     "IRS" means the Internal Revenue Service.

yy.     "Material Draft" means each of (i) the first draft of a Trust Document circulated to any Person who is not in an attorney-client relationship with the draftsman, (ii) the first draft of a Trust Document circulated following the draft of such Trust Document that Cryovac, Inc. or its

11

SUPP. APP. 003665

representatives provided comments with respect thereto, pursuant to and in accordance with the last sentence of paragraph VI(a) of this Agreement (such comments, the "Cryovac Language"), (iii) the first draft of a Trust Document that contains the Cryovac Language (or any variation thereof), (iv) any draft of a Trust Document which contains changes to the Cryovac Language (as the same may be amended or modified), or language inconsistent with the Cryovac Language or paragraphs II(c)(ix), (x), and (xi) of this Agreement, (v) the draft of a Trust Document that the Plaintiffs or the Debtors, as the case may be, reasonably believe is the penultimate draft of such document and (vi) the final draft of a Trust Document.

zz.     "Non-Debtor Affiliates" means the Affiliates of the Debtors that are not debtors or debtors in possession under the Bankruptcy Code.

aaa.     "Notice" means a "Notice" (including any successor name to a Notice) published in the Internal Revenue Bulletin (or successor publication).

bbb.     "Paragraph II(a) Proviso" shall have the meaning set forth in paragraph II(a) of this Agreement.

ccc.     "Paragraph VI(f) Issue" shall have the meaning set forth in paragraph VI(f) of this Agreement.

ddd.     "Person" means any individual, corporation, company, partnership, limited liability company, firm, association, joint venture, joint stock company, trust, estate, business trust, unincorporated organization, any other entity, and any 'governmental unit' (as that term is defined in section 101(27) of the Bankruptcy Code).

eee.     "Plaintiffs" means the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants of W.R. Grace & Co., suing in behalf of the Chapter 11 Bankruptcy Estate of W.R. Grace & Co.

12

fff.    "Preliminary Injunction" means the preliminary injunction issued by the Bankruptcy Court on May 3, 2001, as modified on January 22, 2002, in W.R. Grace & Co. v. Chakarian, Adversary No. A-01-771 (Bankr. D. Del.), staying all actions arising from alleged exposure to asbestos indirectly or directly allegedly caused by Debtors or alleging fraudulent transfer or fraudulent conveyance claims that were filed or pending against Sealed Air Corporation, Cryovac, Inc., or certain of their Affiliates and staying all such future actions upon filing and service against Sealed Air Corporation, Cryovac, Inc., or certain of their Affiliates.

ggg.    "Protective Claim" means a Form 1120X (Amended U.S. Corporation Income Tax Return) or similar state or local tax form, which is prominently and clearly labeled on every page thereof with the words "Protective Claim Only" and which clearly and prominently states that the Person filing such form asserts its right to the claimed Tax benefits conditionally or contingently, and only in the event that such Tax benefits are denied in full to Cryovac, Inc. (or the consolidated, combined, unitary or similar group of which Sealed Air Corporation is the common parent) by a decision, decree or other order by a court of competent jurisdiction, which has become final and unappealable, or by a closing agreement or accepted offer in compromise under section 7121 or 7122 of the Internal Revenue Code entered into by Sealed Air Corporation and the Internal Revenue Service.

hhh.    "Qualified Settlement Fund" shall have the meaning set forth in paragraph II(c)(ix) of this Agreement.

iii.    "Release" means a release, in the form annexed hereto as Exhibit 3, with appropriate insertions therein.

jjj.    "Released Parties" means Sealed Air Corporation, Cryovac, Inc., and all of their parent corporations, subsidiary corporations, joint venturers, Affiliates, and sister corporations, and

13

SUPP. APP. 003667

any and all of their past, present, and future agents, servants, officers, directors, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries, insurers (but solely to the extent of coverage procured by Sealed Air Corporation (after March 31, 1998) or Cryovac, Inc. (after such date) of any liabilities of Sealed Air Corporation or Cryovac, Inc. for Asbestos-Related Claims), or any of them, including any Person acting on behalf of or at the direction of any of them, but specifically excluding (i) the Debtors, (ii) all Non-Debtor Affiliates, (iii) Fresenius (to the extent of any and all Claims, Damages, or Debts arising out of the Fresenius Transaction), and (iv) any and all insurers of the Debtors or the Non-Debtor Affiliates to the extent that they have provided coverage for Asbestos-Related Claims now or hereafter asserted or which could have been asserted at any time against the Debtors or the Non-Debtor Affiliates.

kkk.    "Relevant Tax Year" shall have the meaning set forth in paragraph VI(h) of this Agreement.

lll.    "Revenue Procedure" means a "Revenue Procedure" (including any successor name to a Revenue Procedure) published in the Internal Revenue Bulletin (or successor publication).

mmm.    "Revenue Ruling" means a "Revenue Ruling" (including any successor name to a Revenue Ruling) published in the Internal Revenue Bulletin (or successor publication).

nnn.    "Sealed Air Common Stock" means the voting common stock, par value $0.10 per share, of Sealed Air Corporation.

ooo.    "Sealed Air Opinion" means, with respect to any Contrary Opinion obtained by any Plaintiff, Cryovac 524(g) Trust, Debtor, or Non-Debtor Affiliate, as the case may be, with respect to a Defined Action (i) if such Contrary Opinion is with respect to a Tax issue, a written opinion addressed to such Plaintiff, Cryovac 524(g) Trust, Debtor or Non-Debtor Affiliate, as the case may be, from a nationally recognized law firm experienced in Tax matters that states that there is

14

SUPP. APP. 003668

"substantial authority", as defined under section 6662 of the Internal Revenue Code (or successor provision thereof), for the taking of, or the failure to take, such Defined Action or, (ii) if such Contrary Opinion is with respect to an accounting issue, a written opinion addressed to such Plaintiff, Cryovac 524(g) Trust, Debtor or Non-Debtor Affiliate, as the case may be, from nationally recognized accounting firm that states that the taking, or the failure to take, such Defined Action will not be inconsistent with generally accepted accounting principles.

ppp.    "Settlement Shares" shall have the meaning set forth in paragraph II(a) of this Agreement.

qqq.    "SOL" shall have the meaning set forth in paragraph VI(h) of this Agreement.

rrr.    "Successor Claims" shall have the meaning set forth in the definition of Claims.

sss.    "Tax" or "Taxes" means all taxes, customs, duties, levies, fees, tariffs, imports, deficiencies, or other charges or assessments of any kind whatsoever, including all net income, gross income, capital gains, gross receipt, property, franchise, sales, use, excise, withholding, payroll, employment, social security, worker's compensation, unemployment, occupation, severance, capital stock, ad valorem, value added, transfer, gains, profits, net worth, asset, transaction, business consumption or other taxes, and any interest, penalties, fines, additions to tax or additional amounts with respect thereto, imposed by any governmental authority (whether domestic or foreign).

ttt.    "Tax Benefit" shall have the meaning set forth in paragraph VI(h) of this Agreement.

uuu.    "Tax Benefit Accountant" shall have the meaning set forth in paragraph VI(j) of this Agreement.

vvv.    "Tax Benefit Dispute Notice" shall have the meaning set forth in paragraph VI(j) of this Agreement.

SUPP. APP. 003669

www.   "Tax Benefit Report" shall have the meaning set forth in paragraph VI(j) of this Agreement.

xxx.   "Tax Benefit Start Date" shall have the meaning set forth in paragraph VI(j)(ii) of this Agreement.

yyy.   "Tax Benefit Statement" shall have the meaning set forth in paragraph VI(j) of this Agreement.

zzz.   "Tax Claim" shall have the meaning set forth in paragraph VI(c) of this Agreement.

aaaa.   "Tax Return" means all returns, reports and information (including elections, declarations, disclosures, schedules, estimates and information returns) required to be supplied to a Tax Authority relating to Taxes.

bbbb.   "Transfer" shall have the meaning set forth in paragraph VI(h) of this Agreement.

cccc.   "Transferor" shall have the meaning set forth in paragraph II(c)(ix) of this Agreement.

dddd.   "Treasury Regulations" means the treasury regulations (including temporary regulations) promulgated pursuant to the Internal Revenue Code.

eeee.   "Trust Document" means, for each trust to which all or any portion of the Cryovac Cash Amount or the Settlement Shares is directly transferred by Cryovac, Inc. pursuant to paragraph II(a) of this Agreement, each of the plan of reorganization of the Debtors, and any document pursuant to which such trust is organized or created (and any amendments thereto).

ffff.   "524(g) Trust" means any trust established pursuant to 11 U.S.C. § 524(g), as provided in the Chapter 11 Plan and the Confirmation Order.

gggg.   "524(g) Trust Total Amount" means the sum of the aggregate amount of cash and the Fair Market Value of all property to be contributed to all of the 524(g) Trusts, as provided in the Chapter 11 Plan and the Confirmation Order.

16

hhhh.  "1998 Tax Sharing Agreement" means the Tax Sharing Agreement by and among W.R. Grace & Co., W.R. Grace & Co.-Conn., and Sealed Air Corporation, dated as of March 30, 1998.

## II.  Settlement Agreement and Release of All Claims

a.      On the Effective Date, Cryovac, Inc. shall, subject to paragraph II(j) of this Agreement, transfer in the aggregate (i) the sum of $512.5 million in cash, plus interest thereon from December 21, 2002 until the Effective Date, at a rate of 5.5% per annum compounded annually (the "Cryovac Cash Amount"), and (ii) nine million shares of Sealed Air Common Stock, as adjusted for Anti-Dilution (the "Settlement Shares").  Such transfer shall be made as directed in the Confirmation Order; provided, however, that each of the Plaintiffs shall use its best efforts to require the Chapter 11 Plan (whether confirmed under section 1129(a) or (b) of the Bankruptcy Code) to provide that the Cryovac Cash Amount and the Settlement Shares shall be transferred by Cryovac, Inc. directly to one or more of the 524(g) Trusts for Asbestos Claims, unless the 524(g) Trust Total Amount reduced by the Grace Specialty Initial Contribution is less than the Cryovac Total Amount, in which case, the Chapter 11 Plan shall provide that Cryovac, Inc. shall transfer (x) in the aggregate directly to one or more of the 524(g) Trusts for Asbestos Claims, an amount of cash and shares of Sealed Air Common Stock equal, in the aggregate, to the Cryovac 524(g) Trust Amount, in the same proportion that the Cryovac Cash Amount and the Fair Market Value of the Settlement Shares, respectively, bears to the sum of both, and (y) directly to Grace Specialty, an amount of cash and shares of Sealed Air Common Stock equal, in the aggregate, to the Cryovac Remaining Amount, in such same proportions (this proviso, the "Paragraph II(a) Proviso").  The provisions of paragraph II(b) of this Agreement shall apply first with respect to the Plaintiffs' obligations set forth in the Paragraph II(a) Proviso.  If the Chapter 11 Plan cannot be confirmed in accordance with both the Paragraph II(a)

17

Proviso and paragraph II(b) of this Agreement, then each of the Plaintiffs shall use its best efforts to require that the Chapter 11 Plan (whether confirmed under section 1129(a) or (b) of the Bankruptcy Code) (x) maximize the initial funding of one or more of the 524(g) Trusts from the Cryovac Cash Amount and the Settlement Shares, and provide for the transfer of such funding by Cryovac Inc. directly to such 524(g) Trusts for Asbestos Claims and (y) provide that such amounts not transferred by Cryovac Inc. directly to such 524(g) Trusts will be transferred by Cryovac Inc. directly to Grace Specialty, and paragraph II(b) of this Agreement shall apply anew to these obligations. If the transfers made pursuant to this paragraph II(a) are directed to more than one 524(g) Trust, then the portion of the entire amount to be transferred to such 524(g) Trusts shall be allocated among each of such 524(g) Trusts pursuant to and in accordance with the Confirmation Order. Under no circumstances shall any fractional shares of Sealed Air Common Stock be transferred pursuant to this Agreement or any Person be the transferee of less than one thousand shares of Sealed Air Common Stock pursuant to this Agreement, provided, however, that in no event shall the Cryovac 524(g) Trusts incur any costs or expenses associated with such one thousand share limitation, nor shall such limitation affect the apportionment, if any, of the Settlement Shares and the Cryovac Cash Amount that may be allocated between the Cryovac 524(g) Trusts, on the one hand, and Grace Specialty, on the other hand. Sealed Air Corporation irrevocably, absolutely and unconditionally guarantees the performance of the obligations of Cryovac, Inc. set forth in this paragraph II(a) and the right of the Plaintiffs to enforce this guaranty shall not require the Plaintiffs first to proceed against Cryovac, Inc.

      b.    In furtherance of the Plaintiffs' obligations pursuant to paragraph II(a) of this Agreement, each of the Plaintiffs shall: (i) support the approval of a disclosure statement(s) that relates to a Chapter 11 Plan that satisfies the provisions set forth in paragraph II(a) of this Agreement

18

(such a Chapter 11 Plan, the "Conforming Plan"), as long as the Conforming Plan meets the requirements for confirmation set forth in sections 524 and 1129 of the Bankruptcy Code, regardless of whether confirmation may be obtained under section 1129(a) or (b) of the Bankruptcy Code; (ii) recommend to the creditors and parties in interest the interests of which are represented by it to vote in favor of the confirmation of the Conforming Plan; (iii) oppose the approval of any disclosure statement that relates to a non-Conforming Plan; (iv) recommend to the creditors and parties in interest the interests of which are represented by it to vote against the confirmation of a non-Conforming Plan; (v) not take any action, of whatever kind and nature, to oppose, or designed to prevent confirmation of, the Conforming Plan; and (vi) take any action, of whatever kind and nature, that is necessary, required or appropriate in order to confirm the Conforming Plan, provided, however, that the Plaintiffs shall not be required to support or recommend a Conforming Plan which, in the exercise of Plaintiffs' respective fiduciary obligations, is determined to be unacceptable (other than as to provisions required by the terms of this Agreement), and provided, further, that the Plaintiffs shall not be bound by the provisions of paragraphs II(b)(i) through (vi) of this Agreement if (x) the Bankruptcy Court determines in a Final Order, on a motion brought by a party in interest, and on notice to Sealed Air Corporation and Cryovac, Inc., seeking an order excusing their performance under the provisions contained in paragraphs II(b)(i) through (vi) of this Agreement, that the Conforming Plan cannot meet the confirmation requirements set forth in sections 524 and 1129 of the Bankruptcy Code, or (y) the Bankruptcy Court refuses to confirm the Conforming Plan, except if such refusal relates to issues unrelated to the requirements contained in paragraph II(a) of this Agreement. The provisions of this paragraph II(b) shall apply as set forth in paragraph II(a) of this Agreement.

19

SUPP. APP. 003673

c.      As a condition to the obligations of Cryovac, Inc. set forth in paragraph II(a) of this Agreement, each of the Confirmation Order and the Chapter 11 Plan shall expressly provide that:

(i) each of the Plaintiffs and the Debtors shall execute and deliver the Release, and the Government Plaintiff shall execute and deliver the Government Release;

(ii) in consideration of the transfers made pursuant to paragraph II(a) of this Agreement, each of the Non-Debtor Affiliates irrevocably releases, acquits, and forever discharges the Released Parties from any and all Asbestos-Related Claims, and any and all Claims, Debts, and Damages on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, that have accrued or been asserted or that hereafter might accrue or be asserted against the Released Parties, and that each Non-Debtor Affiliate shall not institute, participate in, maintain, maintain a right to or assert against the Released Parties, either directly or indirectly, on its own behalf, derivatively, or on behalf of any other Person any and all Asbestos-Related Claims, and any and all Claims, Debts, and Damages on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction;

(iii) the Action shall be dismissed with prejudice;

(iv) each of the Release and the Government Release is approved;

(v) the Plaintiffs shall deliver the Fresenius Release;

(vi) the Released Parties shall receive the full benefit of an injunction under sections 524(g) and 105(a) of the Bankruptcy Code, which injunction shall be in form and substance reasonably acceptable to Sealed Air Corporation and Cryovac, Inc. and which injunction shall include, without limitation, provisions enjoining any and all Persons from taking any and all legal or other actions (including, without limitation, the continued prosecution of pending 'Actions' or the commencement of future 'Actions' as such term is defined in the Preliminary Injunction) or making any demand (as such term is defined in section 524(g)(5) of the Bankruptcy Code) for the purpose of, directly or indirectly, claiming, collecting, recovering, or receiving any payment, recovery or any other relief whatsoever from any of the Released Parties with respect to any and all Asbestos-Related Claims;

(vii) (A) the Debtors shall, jointly and severally, at their sole expense, indemnify, defend, and hold-harmless the Released Parties from and against (1) any and all Asbestos-Related Claims and all Indemnified Taxes, (2) any and all losses, costs, and expenses incurred as a result of any breach of any of the Debtors' or Non-Debtor Affiliates' obligations, covenants, and agreements set forth or referred to in this Agreement, including, without limitation, any such obligation, covenant, or agreement of any Debtor or Non-Debtor Affiliate set forth in the Chapter 11 Plan or Confirmation Order, (3) if any Non-Debtor Affiliate has not executed and delivered a Release, any and all Asbestos-Related Claims based on, arising out of, or attributable to, directly or indirectly, in whole or in part, such Non-Debtor Affiliate and (4)

20

SUPP. APP. 003674

any and all attorneys' fees or costs and expenses attributable to any Indemnity Claim, provided, however, that in each case such indemnification shall not apply to Excluded Fees (such indemnity obligations, collectively, the "Debtors' Indemnity Obligation"; any and all Claims, Debts, or Damages that could be asserted by any of the Released Parties under Debtors' Indemnity Obligation, the "Indemnity Claims"), and provided, further, that nothing in this Agreement shall adversely affect any rights of any Person to file and pursue, or object to, a proof of claim for Excluded Fees in the Debtors' chapter 11 cases, (B) each Debtor shall execute and deliver an indemnity agreement in favor of the Released Parties in the form annexed hereto as Exhibit 6 (the "Indemnification Agreement"), (C) the Debtors' Indemnity Obligation (and the obligations, covenants, and agreements of each of the Debtors and Non-Debtor Affiliates set forth or referred to in this Agreement, including, without limitation, any such obligation, covenant, or agreement of any Debtor or Non-Debtor Affiliate set forth in the Chapter 11 Plan or Confirmation Order) shall not be discharged, expunged, estimated, or otherwise adversely affected in the Debtors' bankruptcy cases or by the confirmation of the Chapter 11 Plan, and (D) the Debtors' Indemnity Obligation (and the obligations, covenants, and agreements of each of the Debtors and Non-Debtor Affiliates set forth or referred to in this Agreement, including, without limitation, any such obligation, covenant, or agreement of any Debtor or Non-Debtor Affiliate set forth in the Chapter 11 Plan or Confirmation Order) shall continue unaffected as a post-confirmation obligation of each of the reorganized Debtors;

(viii) there shall be established under state law the 524(g) Trusts, each of which shall be subject to the continuing jurisdiction of the Bankruptcy Court;

(ix) if one or more Cryovac 524(g) Trusts is established, then each Cryovac 524(g) Trust shall be established to qualify as a "qualified settlement fund" for federal income tax purposes within the meaning of Treasury Regulations section 1.468B (each, a "Qualified Settlement Fund"), and, unless otherwise required by a Final Determination, the Plaintiffs and the Cryovac 524(g) Trusts (A) shall file all Tax Returns required to be filed by such Person, if any, consistent with the provisions of this paragraph II(c)(ix) and shall take all other Defined Actions that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this paragraph II(c)(ix) and (B) shall be prohibited from taking any Defined Action that may result in the disqualification of any Cryovac 524(g) Trust as a Qualified Settlement Fund or be inconsistent with Cryovac, Inc. being treated as a "transferor" (as defined under Treasury Regulations section 1.468B-1(d)) ("Transferor") to each Cryovac 524(g) Trust of the cash and Settlement Shares transferred by Cryovac, Inc. directly to such Cryovac 524(g) Trust or each Cryovac 524(g) Trust constituting a Qualified Settlement Fund, provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this paragraph II(c)(ix) if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph II(c)(ix), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-

21

five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion;

(x) if one or more Cryovac 524(g) Trusts is established, then unless otherwise required by a Final Determination, the Cryovac 524(g) Trusts shall treat for all Tax purposes any and all payments by Cryovac, Inc. directly to the Cryovac 524(g) Trusts pursuant to paragraph II(a) of this Agreement as a direct payment by Cryovac, Inc. to the Cryovac 524(g) Trusts for Asbestos Claims that constitutes an ordinary and necessary expense of Cryovac, Inc., and the Plaintiffs and the Cryovac 524(g) Trusts (A) shall be prohibited from taking any Defined Action that is inconsistent with the foregoing provisions of this paragraph II(c)(x), and (B) shall take all Defined Actions that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this paragraph II(c)(x); provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this paragraph II(c)(x) if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph II(c)(x), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion;

(xi) if one of more Cryovac 524(g) Trusts is established, then unless otherwise required by a Final Determination, the Cryovac 524(g) Trusts shall treat for all Tax purposes all payments, if any, by Cryovac, Inc. to Grace Specialty pursuant to paragraph II(a) of this Agreement as ordinary income of Grace Specialty, and the Plaintiffs and the Cryovac 524(g) Trusts (A) shall file all Tax Returns required to be filed by such Person, if any, consistent with the provisions of this paragraph II(c)(xi) and shall take all other Defined Actions that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this paragraph II(c)(xi) and (B) shall be prohibited from taking any Defined Action that is inconsistent with the foregoing provisions of this paragraph II(c)(xi) or that is inconsistent with any such payment being treated as an ordinary and necessary expense incurred by Cryovac, Inc.; provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this paragraph II(c)(xi) if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph II(c)(xi), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion; and

(xii) the 1998 Tax Sharing Agreement is an assumed agreement of each of the Debtors (including, without limitation, Grace Specialty and W.R. Grace & Co.-Conn.) pursuant to section 365 of the Bankruptcy Code, and nothing contained in or contemplated by this

SUPP. APP. 003676

Agreement, the Chapter 11 Plan, or the Confirmation Order shall adversely affect the rights of Sealed Air Corporation or any of its Affiliates under the 1998 Tax Sharing Agreement.

d.    Simultaneously with and in exchange for the transfers contemplated by paragraph II(a) of this Agreement, the Plaintiffs shall deliver to Cryovac, Inc. and Sealed Air Corporation: (i) the Release duly executed by each of the Plaintiffs and the Debtors; (ii) a copy of the Chapter 11 Plan; (iii) a copy of the Confirmation Order; (iv) a duly executed Stipulation of Dismissal With Prejudice of the Action, in the form annexed hereto as Exhibit 4, denying any other recovery against the Released Parties; and (v) the Registration Rights Agreement, in the form annexed hereto as Exhibit 1, with appropriate insertions therein, duly executed by the Initial Holders.

e.    The Released Parties shall not seek indemnity, contribution, or reimbursement for any payments made under paragraph II(a) of this Agreement from any source, including, without limitation, the insurers of the Debtors (but solely to the extent of coverage procured by the Debtors or any of its predecessors).

f.    The transfers made pursuant to paragraph II(a) of this Agreement shall be made in full compromise and settlement of any and all Asbestos-Related Claims against any and all of the Released Parties.

g.    Any order of the Court approving this Agreement shall provide that the Preliminary Injunction shall remain in full force and effect through and including the Effective Date.

h.    Neither this Agreement nor any of the transactions contemplated hereby is, or shall be construed as, an admission of liability, fault or wrongdoing by the Released Parties, who have denied and continue to deny any liability, fault, or wrongdoing, but, instead, is a compromise settlement of disputed claims, made in order to avoid the further substantial expense, burden, and

23

SUPP. APP. 003677

inconvenience of protracted litigation and appeal that may occur in further proceedings relating to these actions or any future actions, by which the Released Parties have forever bought their peace.

      i.      The Plaintiffs do hereby and the Confirmation Order shall expressly provide that the Debtors, the Plaintiffs, and the Non-Debtor Affiliates fully understand and agree that Cryovac, Inc. and Sealed Air Corporation have entered into this Agreement in order to settle, release, extinguish, and terminate fully, finally, and forever any and all further controversy respecting any and all Asbestos-Related Claims against any and all of the Released Parties. The Plaintiffs do hereby and the Confirmation Order shall expressly provide that the Debtors, the Plaintiffs, and the Non-Debtor Affiliates acknowledge and agree that this provision is an essential and material term of this Agreement and the compromise settlement leading to this Agreement, and that, without such provision, neither Cryovac, Inc. nor Sealed Air Corporation would have executed this Agreement and the compromise settlement would not have been accomplished.

      j.      Notwithstanding anything in this Agreement to the contrary, Cryovac, Inc., and Sealed Air Corporation as guarantor, shall have a right of setoff or reduction against, the payments and transfers required by paragraph II(a) of this Agreement or otherwise for, and upon the payment by any of the Released Parties of, the amount of any Indemnified Taxes or any obligation of any of the Debtors or the 524(g) Trusts set forth or referred to in this Agreement, including, without limitation, any Indemnity Obligation required to be provided in the Confirmation Order and Chapter 11 Plan that any of the Debtors has failed to pay to the Released Parties.

      k.      Each of Sealed Air Corporation, Cryovac, Inc., and the Plaintiffs (upon court approval) represents and warrants, as to itself, that this Agreement has been duly authorized, and executed and delivered, constitutes the valid and binding obligation of such party, enforceable in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy,

24

SUPP. APP. 003678

insolvency (including, without limitation, all laws relating to fraudulent transfers), reorganization, moratorium or other similar laws relating to or affecting enforcement of creditors' rights generally, or by general principles of equity (regardless of whether enforcement is considered in a proceeding in equity).

### III.   Anti-Dilution

a.      In the event Sealed Air Corporation should at any time after the date of this Agreement but prior to the Effective Date fix a record date for (i) the effectuation of a split or subdivision of the outstanding shares of Sealed Air Common Stock, or (ii) the payment of a dividend or making of a distribution on Sealed Air Common Stock in additional shares of Sealed Air Common Stock, then as of such record date, the number of Settlement Shares to be transferred by Cryovac, Inc. on the Effective Date shall be increased in proportion to the increase in the aggregate number of shares of Sealed Air Common Stock outstanding immediately following such action.

b.      If the number of shares of Sealed Air Common Stock outstanding after the date of this Agreement but prior to the Effective Date is decreased by a combination of the outstanding shares of Sealed Air Common Stock or a reverse stock split, then following the record date for such combination or reverse stock split, the number of Settlement Shares transferable by Cryovac, Inc. upon the Effective Date shall be decreased in proportion to the decrease in the aggregate number of shares of Sealed Air Common Stock outstanding immediately following such action.

c.      In the event Sealed Air Corporation, after the date of this Agreement but prior to the Effective Date, declares a distribution payable to all holders of Sealed Air Common Stock in shares of capital stock of Sealed Air Corporation or its subsidiaries (other than Sealed Air Common Stock), or evidences of its indebtedness or other assets (excluding quarterly cash dividends) or options or rights not referred to in paragraph III(a) above, then in each such case, on the Effective Date, holders

SUPP. APP. 003679

of Settlement Shares shall be entitled to any such distribution as if the Effective Date had occurred immediately prior to the record date fixed for the determination of the holders of Sealed Air Common Stock entitled to such distribution.

      d.      In case of any reclassification of the Sealed Air Common Stock, any consolidation of Sealed Air Corporation with another entity, or merger of another entity into Sealed Air Corporation (other than a merger that does not result in any reclassification, conversion, exchange, or cancellation of outstanding shares of Sealed Air Common Stock), or Sealed Air Corporation into another entity, any sale or transfer of all or substantially all of the assets of Sealed Air Corporation or any compulsory share exchange pursuant to such share exchange, the Sealed Air Common Stock is converted into other securities, cash, or property, then lawful provision shall be made as part of the terms of such transaction, whereby on the Effective Date, holders of Settlement Shares shall be entitled to receive from Cryovac, Inc. the kind and amount of securities, cash, and other property receivable upon the reclassification, consolidation, merger, sale, transfer, or share exchange as if the Effective Date had occurred immediately prior to the reclassification, consolidation, merger, sale, transfer or exchange.  The provisions of this paragraph III(d) shall similarly apply to successive reclassifications, consolidations, mergers, sales, transfers, or share exchanges.

IV.     **Investment Representations**

      a.      Each of the Plaintiffs, and the Confirmation Order shall expressly provide that each of the Debtors, acknowledges and agrees with Sealed Air Corporation that the Settlement Shares have not been and, upon delivery as provided in (ii) of the first sentence of paragraph II(a) of this Agreement, will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), and that the certificates for the Settlement Shares will bear a legend to that effect. Each of the Plaintiffs, and the Confirmation Order shall expressly provide that each of the Debtors, also

26

SUPP. APP. 003680

understands that any transfer of Settlement Shares to the 524(g) Trusts or Grace Specialty is being made pursuant to an exemption from registration contained in the Securities Act, based in part upon their respective representations contained in this Agreement.

b.      The Confirmation Order shall expressly provide that, upon any transfer of the Settlement Shares to the 524(g) Trusts or Grace Specialty, the trustee(s) of each such 524(g) Trust or Grace Specialty, as applicable, shall represent and warrant, and agree on behalf of the 524(g) Trust or Grace Specialty with Sealed Air Corporation, that: (i) the 524(g) Trust or Grace Specialty, as applicable, is acquiring the Settlement Shares for its own account for investment and not with a view toward distribution in a manner which would violate the Securities Act; and (ii) the 524(g) Trust or Grace Specialty, as applicable, and its respective transferees will comply with all filing and other reporting obligations under all applicable laws which shall be applicable to such 524(g) Trust or Grace Specialty with respect to the Settlement Shares.

c.      Upon delivery of the Settlement Shares, Cryovac, Inc. and Sealed Air Corporation shall represent and warrant to the Plaintiffs and the Debtors (and deliver a certification to that effect upon the transfer of the Settlement Shares to the 524(g) Trusts or Grace Specialty) that all adjustments to the Settlement Shares have been made in compliance with the Anti-Dilution provisions of this Agreement.

## V.     **Covenant Not to Sue and Tolling**

a.      Subject to paragraph V(c) of this Agreement, unless ordered otherwise by this Court, none of the Plaintiffs, and any order of the Court approving this Agreement shall provide that none of the Debtors, shall sue or prosecute, institute or cooperate in the institution, commencement, filing, or prosecution of any suit, administrative proceeding, demand, claim or cause of action, whether asserted individually or derivatively against any of the Released Parties for any Asbestos-Related

27

SUPP. APP. 003681

Claims, pending confirmation of a Chapter 11 Plan consistent with the terms of this Agreement. The Final Order approving this Agreement shall provide that the Debtors are bound by the terms of this paragraph.

      b.     (i) In the event that the payment and transfer obligations of Cryovac, Inc. set forth in paragraph II(a) of this Agreement are not satisfied, the Plaintiffs (but not Sealed Air Corporation or Cryovac, Inc.) shall have the option jointly to terminate this Agreement by providing written notice thereof to Sealed Air Corporation and Cryovac, Inc. (ii) Upon the occurrence of a Bankruptcy Termination Event, before the payment and transfer obligations of Cryovac, Inc. set forth in paragraph II(a) of this Agreement have been completely performed, the Plaintiffs may seek relief from the automatic stay to reinstitute the Action in the Court and neither Cryovac, Inc. nor Sealed Air Corporation shall (x) object to such relief being granted, or (y) seek to enforce the terms of this Agreement against the Debtors' estate. (iii) In the event the Plaintiffs' obligations set forth in paragraph II(a) or the provisions of paragraph II(b), (c), or (d), or VI, of this Agreement are not satisfied, Sealed Air Corporation and Cryovac, Inc. shall have the option jointly to terminate this Agreement by providing written notice thereof to the Plaintiffs. (iv) Any termination right exercised pursuant to this Agreement, other than upon the occurrence of a Bankruptcy Termination Event, shall become effective on the date (the "Termination Date") ten days following receipt of a notice of intention to terminate by the party exercising such termination right to the other parties to this Agreement, which notice shall specify the reasons for termination; provided, however, that such notice provided by the Plaintiffs shall not become effective if the payment and transfer obligations of Cryovac, Inc. set forth in paragraph II(a) of this Agreement shall have been satisfied prior to the Termination Date.

28

SUPP. APP. 003682