1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .          Chapter 11
                                .
Owens Corning. et al.,          .
                                .
        Debtor(s).              .          Bankruptcy #00-03837 (JKF)
.............................................................

Wilmington, DE
February 25, 2002
4:00 p.m.

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtor(s):              Norman Pernick, Esq.
                            Saul, Ewing, LLP
                            222 Delaware Ave.
                            Wilmington, DE 19899

                            Charles O. Monk, II, Esq.
                            Saul, Ewing, LLP
                            100 South Charles Street
                            Baltimore, MD 21201

                            Edith K. Altice, Esq.
                            Saul, Ewing, LLP
                            100 South Charles Street
                            Baltimore, MD 21201

                            Henry R. Abrams, Esq.
                            Saul, Ewing, LLP
                            100 South Charles Street
                            Baltimore, MD 21201

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191

SUPP. APP. 003793

2

```
1                              Nicole Pastore, Esq.
                               Saul, Ewing, LLP
2                              100 South Charles Street
                               Baltimore, MD 21201
3
    For Creditor's Committee:  Eric Schwartz, Esq.
4                              Morris, Nichols, Arsht
                               & Tunnell
5                              1201 North Market Street
                               Wilmington, DE 19899
6
                               Lowell Gordon Harris, Esq.
7    (Via Telephone)           Davis, Polk & Wardwell
                               450 Lexington Ave.
8                              New York, NY 10017
9                              James I. McClammy, Esq.
                               Davis, Polk & Wardwell
10                             450 Lexington Ave.
                               New York, NY 10017
11
    For Plant Insulation:      Mary MaloneyHuss, Esq.
12                             Wolf, Block, Schorr
                               & Solis-Cohen, LLP
13                             Ste. 300
                               920 King Street
14                             Wilmington, DE 19801
15                             Monte S. Travis, Esq.
                               Travis & Pon
16                             2001 Fillmore St.
                               San Francisco, CA 94115
17
    For Futures:               Edmund M. Emrich, Esq.
18                             Kaye, Scholer, LLP
                               425 Park Ave.
19                             New York, NY 10022
20                             Jane W. Parver, Esq.
                               Kaye, Scholer, LLP
21                             425 Park Ave.
                               New York, NY 10022
22
23
24
25
```

SUPP. APP. 003794

```
 1                                  Edwin Harron, Esq.
                                    Young, Conaway, Stargatt
 2                                  & Taylor, LLP
                                    The Brandywine Bldg.
 3                                  1000 West St.-17th Fl.
                                    Wilmington, DE 19801
 4
        For Baron & Budd:          Sander L. Esserman, Esq.
 5                                  Stutzman & Bromberg, PC
                                    2323 Bryan Street-Ste. 2200
 6                                  Dallas, TX 75201

 7                                  Daniel R. Hogan, Esq.
                                    1701 Shallcross Ave.-Ste. C
 8                                  Wilmington, DE 19801

 9      For Official Committes of:  Julie Davis, Esq.
        Asbestos Claimants          Caplin & Drysdale
10                                  One thomas Circle, N.W.
                                    Washington, DC 20005
11
                                    Walter Slocombe, Esq.
12                                  Caplin & Drysdale
                                    One Thomas Circle, N.W.
13                                  Washington, DC 20005

14                                  Matthew Zaleski, iII, Esq.
                                    Campbell & Levine, LLC
15                                  1201 North Market St.-Ste. 1501
                                    Wilmington, DE 19801
16
        For Banks:                 Kenneth Eckstein, Esq.
17                                  Kramer, Levin, Naftalis
                                    & Frankel, LLP
18                                  919 Third Ave.
                                    New York, NY 10022
19
        Special Counsel For:       Frank Monaco, Esq.
20      Creditor's Committee        Walsh, Monzack & Monaco, PA
                                    1201 Orange st.-Ste. 400
21                                  Wilmington, DE 19801

22                                  Andrew J. Rahl, Jr., Esq.
                                    Anderson, Kill & Olick
23                                  1251 Ave. of the Americas
                                    New York, NY 10020
24

25
```

SUPP. APP. 003795

4

```
 1                                    Larry D. Henin, Esq.
                                      Anderson, Kill & Olick
 2                                    1251 Ave. of the Americas
                                      New York, NY 10020
 3
          For MGM:                    William Bowden, Esq.
 4                                    Ashby & Geddes
                                      222 Delaware Ave.-17th Fl.
 5                                    Wilmington, DE 19899

 6        For U.S. Trustee:           Frank J. Perch, III, Esq.
                                      U.S. Trustee's Office
 7                                    844 King Street-Ste. 2313
                                      Lock Box 35
 8                                    Wilmington, DE 19801

 9        Audio Operator:             Rachel Bello

10        Transcribing Firm:          Writer's Cramp, Inc.
                                      6 Norton Rd.
11                                    Monmouth Jct., NJ 08852
                                      732-329-0191
12
     Proceedings recorded by electronic sound recording, transcript
13   produced by transcription service.

14

15

16

17

18

19

20

21

22

23

24

25
```

SUPP. APP. 003796

1    (Proceeding in progress)

2        MR. PERNICK:  Okay.  Moving back to the agenda, I

3    think I'd like to take everything in order except Mr. Eckstein

4    and I had spoken about exclusivity and since it's related to

5    the Intercreditor Report I think -- and that's basically their

6    objection ties into that Intercreditor status and what the

7    Court might do on that, I think we'll take those together, but

8    we'll probably will ask the Court if we can have that

9    Intercreditor Status Report in discussion, and then move after

10   that to exclusivity at the end of that --

11       THE COURT:  That's okay.

12       MR. PERNICK:  -- just 'cause it seemed to make sense.

13   I don't know if Mr. Eckstein agrees with that particular

14   order, but he can -- maybe when we get to the Intercreditor

15   we'll deal with all that.

16       Starting with Agenda Item #1 was the Motion of the IRS

17   for Relief from the Automatic Stay to Exercise its Set-up

18   Rights, and on consent of the parties, we have adjourned that

19   until April 22nd at 1:00.  And we understand that's in

20   Pittsburgh on April 22nd.

21       THE COURT:  Yes.  Are you coming to Pittsburgh?  I

22   will be in Pittsburgh.

23       MR. PERNICK:  I think it depends on what ends up

24   being on, but if there are pretty substantive matters on, I

25   think we probably will.  If we think it's going to be a quick

SUPP. APP. 003797

1  hearing, I think we probably won't.

2       THE COURT:  All right.

3       MR. PERNICK:  Moving to Agenda Item #2, and I don't

4  know if you want to, if you've had a chance to review Items 2

5  through, I think it's 7 or 8 --

6       THE COURT:  Yes.

7       MR. PERNICK:  It's 7.  If you want me to go through

8  those --

9       THE COURT:  I am waiting for the orders to be

10 entered.  I have not signed those orders yet.  The agenda

11 binder that I was presented with did not have the motions or

12 the orders in.  So they may be here somewhere, but I don't

13 physically have them.

14      MR PERNICK:  I have duplicates with me, actually.

15 I'll be happy to --

16      THE COURT:  You signed them?  You stamped them for

17 me?

18      (The Judge confers with the clerk)

19      THE COURT:  I've talked to Rachel, but I haven't seen

20 the order appearing in that hotel.  So okay.

21      MR. PERNICK:  All right.  So that's Item -- just so

22 I've read the Courtroom notes, if they don't have an agenda in

23 front of them, that's Item #2, which is the Environmental

24 Settlement with the State of Ohio.  Item #3, which is the

25 Motion for Leave to File Proof of Claim Out of Time, by

SUPP. APP. 003798

1  Crossroads Distribution; Item #4, Authorizing the

2  Discontinuance of the Y2K Insurance Litigation; Item #5, which

3  is the Modification of the Automatic Stay to Effectuate a Set-

4  off between Specialty Products and Insulation Co., and the

5  Debtor; #6 is Exterior Systems' Motion to Enter into an Asset

6  Purchase Agreement.  That's regarding Morin -- M-O-R-I-N.  And

7  #7 is Exterior's Motion to Assume and Assign an Equipment

8  Lease Agreement with American Equipment Leasing.

9       That takes us up to Item #8, which you've got a

10  Certificate of No Objection on, but all of the parties have

11  not -- they had signed off, but had not actually signed the

12  final CMO, and I have that with me today.

13            THE COURT:  All right.  That's fine, I'll take it.

14            MR. PERNICK:  And I have an original and an extra

15  copy, if I can.

16            THE COURT:  All right.

17            MR. PERNICK:  I guess I should have started out by

18  saying that we're pleased to actually to have a final CMO in

19  this case, and we view it as a form book that everybody in the

20  Courtroom should get.  And anybody who can understand every

21  word in there should be elevated to some senior status.  It is

22  quite a work of art.

23            (Laughter)

24            THE COURT:  My question was, who's going to interpret

25  this, if there are any issues that arise?

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

SUPP. APP. 003799

1    MR. PERNICK: Oh, the Debtors are. It'll be binding,

2  too.

3        (Laughter)

4        THE COURT: Do you want a copy of this back?

5        MR. PERNICK: Yes, please.

6        THE COURT: I take it there'll have been no changes -

7  - I should have asked that before I signed it -- from the

8  draft that I was presented except --

9        MR. PERNICK: Actually, that's -- thank you for

10  raising that. Attached to your copy I believe is a red line,

11  or if not, I have it here, that shows you the changes. The

12  only changes were -- when we filed it, we anticipated caps on

13  certain of those numbers, but we did not -- the financial

14  advisors had not completed meeting yet -- so we filed it with

15  no caps, with the understanding that we negotiate those and

16  put them in. And those are the changes that are in there now.

17        THE COURT: All right. And no one has an objection

18  to that?

19        MR. PERNICK: Not that I know of. I think everybody

20  has signed off, and everybody has signed the document.

21        THE COURT: All right. And that's the only change?

22        MR. PERNICK: There are several of them, but yes, but

23  that's the category of changes.

24        THE COURT: Okay, that's fine. That order is

25  entered.

SUPP. APP. 003800

1       MR PERNICK: Thank you.

2       THE COURT:  On #9, I signed the modified order on #9

3  on February the 12th.  I don't know where it is, I don't know

4  why it's not docketed, and I don't know why you don't have it,

5  but I did sign it.  However, I did modify it.

6       MR. PERNICK:  Okay.

7       THE COURT:  So, I have a copy in Pittsburgh.  I had

8  one faxed here Friday I think, but apparently it's missing, so

9  I will have another one faxed --

10       MR. PERNICK:  Okay.

11       THE COURT:  -- and hopefully, you will get it.

12       MR. PERNICK:  Okay, yeah.  If we can just -  we'll

13  get that if you want us to copy it, and hand copies out, we'll

14  be happy to do that for the Court.

15       THE COURT:  All right.

16    (Pause in proceedings)

17       MR. PERNICK:  Now, the next matter is Baron & Budd's

18  Motion for Relief from Stay, and as we recall, the status of

19  that was that we were to attempt to reach a consensual order

20  on that, and if we couldn't, we were going to come to Court,

21  and Your Honor, I think, was either going to tell us that you

22  were reserving judgment, or you were going to issue your

23  ruling.  So I'm not sure that there's more argument on that.

24  I don't know what people have to say about that, or whether

25  you want them to say anything, but that's the status of it as

SUPP. APP. 003801

1    of now, and Mr. Podesta from the Debtor is here.

2    　　　THE COURT:  Okay.  I thought from the consent letter

3    that you had resolved this, no?

4    　　　MR. PERNICK:  We did not resolve it, no.  I

5    apologize.

6    　　　THE COURT:  Okay.  Oh -- not in consent.

7    　　　MR. PERNICK:  Right.

8    　　　THE COURT:  I can't read, I apologize.  I thought it

9    said the parties will be --

10   　　　MR. PERNICK:  No.

11   　　　THE COURT:  Okay.

12   　　　MR. PERNICK:  Unfortunately, that there are two

13   diametrically different views of where this should go, so it

14   was not resolved.

15   　　　THE COURT:  Okay.  Mr. Podesta?

16   　　　MR. PODESTA:  Your Honor, I don't want to present any

17   argument, but as part of the parties' efforts to reach a

18   settlement, we did clarify somewhat the status of certain of

19   the Plaintiffs, and I thought it would be useful to put it on

20   the record in as neutral a manner as I can.

21   　　　You'll recall that the principle amount of the Fiberboard

22   Escrow Account was $44 million and the principle amount of the

23   OC Escrow Account was $66 million as originally established.

24   Under the agreement, Baron & Budd was permitted to draw down

25   from the escrow account, with respect to those of their

SUPP. APP. 003802

1  clients who received written approval from OC or Fiberboard,

2  if that particular client had met the requirements of the

3  agreement.

4       Prior to the petition date, Fiberboard issued approvals

5  with respect to 5,372 Plaintiffs, formal written approvals

6  under Part 12 of the Settlement Agreement.  Prior to the

7  Petition, some $15,700,000 was paid to those Plaintiffs.  If

8  those 5,372 Fiberboard Plaintiffs were to receive their second

9  and third installments, those second and third installments

10 would completely consume, with a substantial amount left over

11 in potential further claims, the full amount of the 44

12 million.

13       THE COURT:  I'm sorry.  It would consume --

14       MR. PODESTA:  Yes.  The second and third installments

15 to those 5,372 Plaintiffs would consume the full amount of the

16 remaining principle of the escrow, so that in paying those

17 installments, the entire 44 million principle amount of the

18 escrow would be gone.  The 28,200,000 or so that is now in

19 principle in the escrow would be consumed by those payments

20 alone.

21       With respect to Owens Corning, the situation is somewhat

22 different.  Prior to the petition date, 3,511 Plaintiffs

23 received formal written approval under the agreement, and they

24 were paid pre-petition some 17,200,000 which would leave in

25 the escrow accounts, in principle, in rough round numbers,

SUPP. APP. 003803

1  48,800,000. Completing the second and third installment

2  payments to those 3,511 individuals would involve the payment

3  of slightly over $39 million more, such that there would be

4  approximately $7,400,000 remaining in the escrow accounts, in

5  principle, for OC after those individuals were fully paid.

6     Now, there is one other category of claimants that I

7  think I should -- that I think Baron & Budd and we were able

8  to identify, and I would just set out the facts as to them to

9  the Court. These are individuals as to whom OC or Fiberboard

10  internally determined pre-petitioned, that they had met the

11  preconditions to payment under the agreement, but that they --

12  these individuals were not the recipients of formal notices of

13  approval per se, pursuant to Part 12 of the contract.

14     In the Fiberboard case, there were 946 Plaintiffs, and --

15  who if they were paid all their money would receive

16  $11,210,000. Of course, the Fiberboard escrow, as I've

17  already pointed out, the principle amount would be consumed

18  simply by those who had already received their full -- have

19  received full, formal written approval under Part 12.

20     With respect to Owens Corning, where there is some seven

21  -- if you pay all those who receive the formal written

22  approval there would be some 7,400,000 left in principle

23  amount, there are 646 who received internal approval from OC,

24  but not formal written approval prior to the petition date.

25  And those 646, if they were paid in full their three

1  installments, they would consume the remaining principle

2  amount of the OC account. And I pass those facts along

3  without argument.

4      THE COURT: Okay. Well, I don't known that I can do

5  much more to try to articulate my findings on the record. I

6  think I was pretty specific about what I would conclude. Does

7  anybody wish to address what I have already stated on record,

8  essentially with respect to these Plaintiffs who were

9  identified and received a distribution through the petition,

10  it seems to me that either through an assumption of the

11  contract, if this were deemed to be an executory contract, or

12  through whatever damage they're going to be able to prove,

13  since they have negotiated the settlement agreement and issued

14  a release, that there is fair consideration for the payment,

15  they're entitled to the payment, and they should be paid. Now

16  the Debtor has an issue as to whether that payment should be

17  made now or at planned confirmation. Quite frankly, I'm not

18  sure why we need to hold that up 'til planned confirmation,

19  when I think it's pretty clear that they're entitled to be

20  paid. On that issue, I'm somewhat less adamant, I suppose,

21  and can be probably swayed your way, but it seems to me that

22  those Plaintiffs will have allowed claims in the amount of the

23  settlement. There is consideration, I do not think there are

24  fraudulent conveyances involved to the extent that releases

25  have been issued. I don't see any defense to the payment, and

SUPP. APP. 003805

1    I think they need to be paid.

2    With respect to the category that was just identified by

3    Mr. Podesta, Plaintiffs who may have internally asked to the

4    two Debtors that identify as entitled to receive payments, but

5    who were not notified in writing that the settlements would be

6    approved, it seems to me that as to those, they are not in any

7    better a position, because no formal releases have been

8    executed by those parties than any other Plaintiff in the

9    case.  And as a result, they are not entitled to payment at

10   this time.  If they choose to go forward with their settlement

11   proposals, I suppose their claims can be limited to that

12   amount, if the debtor decides at some point through the plan

13   to assume those settlement agreements as executory contracts.

14   To the extent the Debtor does not decide to do that, and

15   therefore pay the amounts that would be due at least at

16   planned confirmation, they have the entitlement to file their

17   full claims in full, because there is not an approved

18   settlement of those claims.

19   So one way or the other, I think there's an issue out

20   there to be adjudicated with respect to them, and I think the

21   Debtor gets the first bite at attempting to decide what to do

22   with them.  With respect to everybody else, as to whom the

23   administrative process has not yet gotten to the point where

24   the Debtors even have requests to consider whether the

25   settlements were approved, there is no such (in quotes),

SUPP. APP. 003806

1   "executory contract," to be approved, there was no settlement

2   offer, and they're not entitled to payment at this time.  And

3   those funds, to the extent there are any left over, have to be

4   rebated back to this estate.  Those are, as much as I can, I

5   guess, succinctly put on record today.

6          MR. PODESTA:  Your Honor, two points of

7   clarification.  First, I don't believe the Debtors are taking

8   the position that the distribution to these Plaintiffs has to

9   await planned confirmation.  We had argued early on that no

10  distributions to these Plaintiffs of the third installment

11  could be made until January 17, 2002, when it was

12  contractually due, but that date has now passed.  And

13  secondly, I just want to clarify that when I say that the

14  Debtors had determined internally that these -- this other

15  group had met the requirements to the agreement, that included

16  the delivery of releases.

17         THE COURT:  Oh, so they've already delivered

18  releases --

19         MR. PODESTA:  They --

20         THE COURT:  -- and didn't get a distribution.

21         MR. PODESTA:  they -- that's right.  They have

22  delivered releases, they've met the medical requirements,

23  they've met product I.D. requirements, but they've not

24  received the formal written notice of approval from the

25  Debtors to Baron & Budd, saying you can release the money

**SUPP. APP. 003807**

1   under the agreement.  Rather, it's just, if you look at the

2   Debtor's internal records, they have check marks that these

3   people had met the requirements for medical product I.D. and

4   releases.

5          THE COURT:  Well, I think the problem with that is,

6   that I'm not inclined at this point to say that the Fiberboard

7   entities are different from the Owens Corning entities in that

8   respect.  In the event there's no money to pay the Fiberboard,

9   I think the Owens people are probably going to have to wait as

10  well.

11         To the extent that releases have been delivered though, I

12  still think the law in the Circuit's pretty clear, that any

13  transfer in connection with that is not going to be deemed to

14  be a fraudulent conveyance, i.e., it would have been made with

15  their consideration, given the parameters of -- the fact that

16  the release is a contractually bargained for exchange.  But I

17  think, on balance, that there was no distribution, and the

18  Debtors still have right to those funds.  Until a distribution

19  was made, the debtor still has rights to those funds, and they

20  have to be rebated back to the estate.  I don't see another

21  way at this point in time, given the law under which I think

22  we work, to get around that proposition.

23         So, I think the answer is that the Plaintiffs identified

24  who received a partial distribution who are now entitled to

25  distributions two and three, and who executed releases and

SUPP. APP. 003808

1  otherwise got the formal consent of the Debtor, should be

2  paid. All others should not. And any funds in excess of the

3  payments to the class who is entitled to be paid should be

4  rebated back to this estate.

5          MR. PODESTA: Your Honor, do you want us to submit

6  an order to that?

7          THE COURT: I think that would be helpful, but does

8  anyone want to be heard on this matter further? I'll give you

9  literally two minutes. Mr. Esserman?

10         MR. HARRIS: Your Honor --

11         THE COURT: Oh, yes, sir.

12         MR. HARRIS: Sorry, Your Honor, this Gordon Harris

13  from Davis, Polk & Wardwell, representing the Unsecured

14  Creditors Committee. I appreciate the opportunity to

15  participate via telephone. We understand Your Honor's ruling

16  and legal argument and won't bother the Court anymore with

17  that, although I say, with all respect, that we do disagree,

18  and I believe that it's highly probable that the Committee

19  will want to appeal.

20      In terms of, I believe Mr. Podesta in the Court was just

21  mentioning a possible order. Certain things Mr. Podesta put

22  on the record, and I believe I understood most of them, I

23  would point out though, that terms of exactly, for lack of a

24  better phrase, I would say, who gets what, pursuant to Your

25  Honor's ruling is somewhat unclear. I think we all know that

SUPP. APP. 003809

1   somewhere between, you know, 40 and 45% of this goes out in

2   terms of contingent fees and the like to lawyers, and exactly

3   who else gets -- each of the individuals who gets how much,

4   and what records are kept, there is really nothing in terms

5   this record and the like, so that the Court and indeed and the

6   parties have knowledge of who is purported to get what.  So I

7   was merely going to suggest in the terms of the order that

8   Your Honor take that measure and perhaps require some

9   specificity.

10       THE COURT:  All right, yes.  I think it's appropriate

11  to identify the particular Plaintiffs who get a distribution

12  and the amount of that distribution.

13       MR. HARRIS:  In addition, Your Honor, I infer from

14  the comment you made earlier about findings, whether a payment

15  would be now or later, and inferring from your further comment

16  that you see no great reason to wait until the end of the

17  case, if I am correct, and if the Committee from this do take

18  an appeal, it would be appropriate to appeal now and not have

19  to wait until they do the final calculations, etcetera, for

20  each person.  I just raise that as an issue.  Perhaps we can

21  get it out of the way.

22       THE COURT:  Okay.  It seems to me that with respect

23  to -- well, let's see, I was going to say an allowance of

24  claims, but this is not an allowance of claims proceeding,

25  although I think it's sort of turned into one because in order

SUPP. APP. 003810

1  to authorize Baron & Budd to either repay funds sufficient to

2  pay these claims, or else to make a distribution, essentially,

3  I'm allowing these claims in the amount of the settlement.

4  So, maybe the thing to do is simply an order that allows the

5  claims in the amount of settlement and then directs the

6  payment.  Is that what you're asking?

7      MR. HARRIS:  Well, I was thinking about one, you

8  know, proceeding was an appeal if the identification was going

9  to take a long time for individuals.

10     THE COURT:  Oh, well the order won't be entered

11 until I get the list that identifies the individuals and

12 states what there's to be -- what amounts they're to get.  So,

13 there won't be an order actually entered on record and

14 appealable until I get it from counsel to the Debtor, and I

15 won't get it until they have the list.

16     MR. HARRIS:  Okay, Your Honor.  I just wanted to

17 understand these proceedings.  Quite honestly, I -- we may be

18 able to expedite this.  I don't know if there -- if it makes

19 any sense to -- in the appeals process now, I don't think it's

20 going to change much.  The issues on appeal with respect to

21 which GOC individuals are identified --

22     THE COURT:  Well, it may not, but it seems to me that

23 that would provide them with some appropriate notice in any

24 event of the fact that their claims were going to be

25 essentially allowed, and that's the end.  Because they've

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

SUPP. APP. 003811

1   executed releases, they have no further claims against this

2   estate.  So I think it would be appropriate to send that out

3   by way of notice to those parties anyway.

4           MR. PODESTA:  Your Honor --

5           THE COURT:  Mr. Podesta?

6           MR. PODESTA:  I don't believe it will take us very

7   long to come up with a list of individuals who meet the

8   description of Your Honor's order.  These are the individuals

9   who we already paid, and I think we've reached agreement with

10  one or two -- a handful of exceptions of the individuals who

11  have received payment.  So it should not take much longer than

12  the time it would take to draft up and reach an agreement on

13  the order to be submitted.

14          THE COURT:  Okay.  If the Creditors' Committee --

15  well, you may have a number of disagreements, but is your

16  primary dispute with my legal analysis, or is your primary

17  dispute with the payment now, or as opposed to your own plan?

18          MR. HARRIS:  I think it's both, Your Honor.  We

19  believe, and this is based on a comment that -- especially at

20  the prior hearing, that the individuals who received the first

21  payment have -- yes, they have claims against the estate, they

22  have no particular claims to these funds.  They should be paid

23  like any Creditor with a fixed contract claim out of these

24  funds through the Debtor's funds.  And separately, aid should

25  be -- aid at the end of the case, the way every other contract

SUPP. APP. 003812

1  creditor is paying, and should abide by the plan.

2          THE COURT:  I'm sorry, you faded out.  And should

3  what?

4          MR. HARRIS:  Should abide by the confirmation of the

5  plan.

6          THE COURT:  Oh, okay.  Well, as I said earlier, with

7  respect to when the payment's made, that's part of it,

8  frankly, I'm not so wedded to.  In terms of the fact that they

9  should be paid from this fund, though, for the reasons that

10 I've attempted to articulate several times in the past, and

11 don't want to go into again to day necessarily, I think they

12 are entitled to a payment from this fund.  So to that extent,

13 that the funds are available to these Creditors, it seems to

14 me that there really isn't much of an issue about their

15 entitlement to be paid from them, for the reasons I've already

16 gone into, but as to when the distribution takes place, I

17 think that's a little more difficult decision.

18         MR. HARRIS:  Fine, then maybe we will just wait until

19 we see Mr. Podesta and Baron & Budd's Form of order.  And

20 perhaps we can, if the Court wanted to enter and interim order

21 and we'll address the timing of payment later.

22         THE COURT:  Yeah, that may make sense, because I

23 still am hoping that you folks will come to some agreement

24 with respect to this.  So when you take a look at the order,

25 I'll give you sufficient time to circulate it around and see

1   if you're able to come up with something that you can all live

2   with.

3        MR. HARRIS:   Thank you, Your Honor.

4        THE COURT:   Okay.  Mr. Emrich?

5        MR. EMRICH:   Your Honor, just two quick points, one

6   is a clarification.  I don't believe Mr. Podesta in his

7   remarks alluded to the investment proceeds, but that's also as

8   I understand it, in the account and consistent with Your

9   Honor's prior findings, it is my understanding that those

10  would revert to the estate.

11       THE COURT:   They should come back to the estate, yes.

12       MR. EMRICH:   (Cough) excuse me.  Your Honor, we share

13  Mr. Harris's concerns.  We strenuously believe that these

14  payments shouldn't be made in advance of a plan.   These

15  claimants do have claims.  The Code recognizes that whether

16  these Creditors are secured, unsecured, or otherwise, they get

17  paid under a plan.

18       And I would point Your Honor to the A.H Robbins 4th

19  Circuit Decision that 832 F.2d 299, 4th Circuit, 1987, where

20  the 4th Circuit overturned a Bankruptcy Court order which had

21  set aside funds in a mass tort context to set up an emergency

22  treatment fund for claimants.  And it was predicated solely on

23  the basis, Your Honor, that payments to Creditors ought to be

24  under a plan, and that is what the Code envisions, and there

25  are only a limited set of exceptions to that, and this

1  circumstance does not fit in to the necessity of payment

2  doctrine, Your Honor.  There is nothing compelling the Debtors

3  to make these payments now.

4        THE COURT:  Yeah, Mr. Emrich, that's what I tried to

5  say.  I'm really not so wedded to the concept of when this

6  disbursement has to be.  I think the legal issue simply is,

7  are they entitled to be paid from this specific fund as

8  opposed to a general Debtor account, a general Debtor fund.

9  And for the reasons I've gone into, I think they do have a

10 claim to the specific fund that has been identified as to

11 them, because once those Plaintiffs have been identified, and

12 they have, pursuant to their first distribution, under Texas

13 law, I think as to those entities, there is actually an escrow

14 that they then have a right to claim against.  As to the

15 entities that have not received that fund and have not been

16 identified, I don't think the same interpretation of the law

17 applies.

18      So I'm not, as I said earlier, I'm not so married to when

19 the distribution has to be.  I think it's a bit inconsistent

20 to say that these are escrowed funds for the benefit of these

21 Plaintiffs, and then also say that they have to wait plan

22 distribution, because to the extent that they're escrowed

23 funds for their benefit, I'm not sure it's property of the

24 estate.  But I don't know that we need to get there, so --

25      MR. EMRICH:  I don't want to open the whole argument

1   up again, Your Honor, but the point I'd made at the first

2   argument very simply was that even if these were Secured

3   Creditors, which they're not, that the Code envisions that

4   Secured Creditors would be paid under a plan.

5       THE COURT:  Well, but yeah, but the Code also

6   envisions though that there are adequate protection remedies

7   for other Secured Creditors, and to the extent that there is a

8   rate which is identified specifically for a group of

9   beneficiaries, under 541, I think there is an issue as to

10  whether those proceeds are property of the estate that would

11  be subject to distribution to any of the Debtor's other

12  Creditors anyway.  But, as I said, Mr. Emrich, I'm really not

13  sure it's worth getting into the issue.  Holding the

14  disbursement off 'til the end of the case isn't going to cause

15  them any more prejudice, than it's going to cause any other

16  asbestos Plaintiff in the case.

17      MR. EMRICH:  Thank you, Your Honor.

18      THE COURT:  Mr. Esserman?

19      MR. ESSERMAN:  Your Honor, I'd first like to address

20  -- I'm sorry, for the record, Sandy Esserman of Stutzman and

21  Bromberg.  I'd first like to address that the timing of the

22  disbursement.  It seems to me that if the Plaintiffs have

23  rights in these funds, there's no need to hold up the

24  distribution.  I think that legal and equitable title has

25  merged in those Plaintiffs that have complied with Your

SUPP. APP. 003816

1   Honor's ruling, and at that point, there is questionable

2   authority in my mind as to whether or not it's estate property

3   at all, and whether or not it should be held up to the end of

4   the case.   It seems to me an obvious answer, and that answer

5   is no.

6        I do want to address Your Honor's prior rulings on the

7   investment income.  Mr. Emrich raised that issue, and I

8   assume, pursuant to Your Honor's ruling you're overruling all

9   of my arguments on the investment interest being a property of

10  the Trust or property to which the Plaintiffs would be

11  entitled through escrow or trust or under either theory, and I

12  enunciated some of those at the last hearing.

13       I will not enunciate those again for Your Honor, but

14  there was an additional argument.  I just wanted to make sure

15  the record was clear that, as Your Honor recalls, there are

16  three steps of payment: a zero, zero, two thousand, year 2000

17  payment; a January 2001 payment; and a January 2002 payment.

18  To the extent the plaintiffs should have been paid their

19  qualified pre-petition and were not paid on those dates,

20  interest income has accrued in those escrow or trust accounts,

21  and there is a question as to if they should have been paid on

22  01, and if they should have been paid on 02, whose interest

23  would that be?  I just wanted to make sure that I understood

24  Your Honor's ruling clearly that any interest that accrued on

25  those funds would have to be returned to the Debtor, versus

SUPP. APP. 003817

1  property of those Plaintiffs that have been qualified and

2  didn't get their --

3      THE COURT:  I think the issue is whether they are

4  still treated as Unsecured Creditors, and to the extent that

5  they're still Unsecured Creditors, they're not entitled to

6  interest on their claims.  So I don't see why interest on

7  those claims is attributable to those Plaintiffs.  I think

8  they are entitled to a disbursement of their settlement amount

9  in full, but I don't see a theory under which interest would

10  be attributable to an Unsecured Claimant.

11      MR. ESSERMAN:  That's fine, Your Honor.  I just

12  wanted to make sure that I understood your ruling correctly.

13  The other issue on the disbursement immediately versus a

14  delayed disbursement, obviously there's going to be interest

15  that accrues on this rather substantial amount of money from

16  say, today forward, and to the extent the Plaintiffs were not

17  to receive their money, the interest that accrued on that

18  money that they should have received pursuant to Your Court's

19  order it would seem to me would clearly be property of those

20  Plaintiffs.  But nevertheless, I did want to raise those

21  issues also.

22      THE COURT:  Well, yeah, that's the troublesome part

23  of the distribution issue, Mr. Esserman, because if it isn't

24  property of the estate, I mean if this ruling stands for the

25  proposition that now it's known that it's not property of the

SUPP. APP. 003818

1  estate, yes, I'm going forward.  I think the interest on the

2  funds that would be disbursed to those Plaintiffs would be

3  their interest, because it's their money.  To the extent,

4  however, that it's still property of the Estate, but subject

5  to a limited distribution, that is, only particular asbestos

6  Plaintiffs have a claim to this specific fund, even though the

7  property is still property of the Estate, that interest would

8  be attributed to the Estate, not to those Plaintiffs.

9      So it really comes down to a question of whose property

10 it is, and that's what I said.  I don't think this motion

11 compels me to make a determination.  I'm not really prepared

12 to make that determination.  It just seems to me that these

13 Plaintiffs are entitled to a disbursement from this fund.

14 Based on the way the contract is written, and the fact that

15 the Debtor essentially has the rights to ordinary interest in

16 these accounts, and I understand the argument that the Debtor

17 then has to apply that reversionary interest in specific ways,

18 but nonetheless, the reversionary interest is that of the

19 Debtor.

20     It seems to me that until the funds are distributed,

21 they're still property of the Estate.  It's just that I don't

22 think that the Debtor can do anything under these settlement

23 agreements with those funds of Plaintiffs who've met the

24 qualifications, as I've described on this record, except

25 disbursed money matter.  So, on balance, I think it's probably

SUPP. APP. 003819

1   still going to be interest that belongs to the Estate, not to

2   the Debtors -- I'm sorry, not to the Plaintiffs in the case.

3          MR. ESSERMAN: Okay.

4          THE COURT:  But, that's sort of a gut reaction.

5          MR. ESSERMAN:  Thank you.  The only other thing I'd

6   like to address is something Mr. Emrich said about the A.H.

7   Robbins Case.  I think that was completely inapposite, and I

8   don't believe that that particular fund was set up pre-

9   petition with a particular class of Plaintiffs in mind who had

10  given releases pre-petition, and had been approved for payment

11  pre-petition.  I think that situation was totally inapposite.

12         THE COURT:  I don't really see much similarity in the

13  situation of Robbins either Mr. Esserman. My ruling is not

14  based on what happened in Robbins.  My ruling is based on my

15  view of the construction of this contract, and what I think

16  the applicable law is with respect to property of the estate

17  and fair consideration paid in exchange for a settlement

18  agreement coupled with a release.

19         MR. ESSERMAN:  Your Honor, we will try and pout

20  together an order for your consideration.

21         THE COURT:  Okay.

22         MR. ESSERMAN:  Thank you.

23         THE COURT:  All right.  I know this one may take a

24  while because you're going to have to circulate it to people,

25  but when can I expect this?  Two weeks, three weeks?

SUPP. APP. 003820

1      MR. PERNICK:  I think we certainly want to see the

2   transcript, and I don't know how long that's going to take,

3   but certainly we would want to see the transcript in order to

4   track Your Honor's ruling as accurately as possible.

5      THE COURT:  Okay.  Six weeks?

6   (Laughter)

7      MR. ESSERMAN:  When's the next omnibus hearing?

8      MR. PERNICK:  Two weeks, I think.

9      THE COURT:  The next omnibus is March the 18th.

10      MR. PERNICK:  Now it's March 18th, I can actually

11   answer that --

12      THE COURT:  Okay.

13      MR. PERNICK:  -- question.

14   (Laughter)

15      MR. PERNICK:  The date that Your Honor has open is

16   March 25th, at 9:30 for two hours in Pittsburgh,which I think

17   works.  We may need to shorten the timeframes that Your Honor

18   talked about earlier on when things will be due, and when

19   objections will be due, because if you back up from the 25th,

20   you don't make it, but it's close.

21      THE COURT: Yeah, that's fine.

22      MR. PERNICK:  Okay, so we'll just fix separate orders

23   for that -- separate dates for that hearing in the order.

24      THE COURT:  So are we not doing hearings in <u>Owens</u> on

25   March 18th?

1    MR. PERNICK:  Correct.

2    THE COURT:  We do them all on March 25th.

3    MR. PERNICK:  Unless anybody has a major problem with

4  that, that's what we would suggest.  We just move March 18th

5  to March 25th at 9:30 in Pittsburgh and, you know, we'll see

6  whether we need it or not.

7    THE COURT:  Okay.  You may not have your transcripts

8  and drafts circulated that soon, though.  That's fine --

9    MR. PERNICK:  May not.

10    THE COURT:  -- but I don't know how long it's going

11  to take.  I would think that the transcript of the prior

12  proceedings would be of more value than this one.

13    MR. ESSERMAN:  And we've got that transcript of the

14  prior proceeding.

15    THE COURT:  You do?

16    MR. ESSERMAN:  Yes, Your Honor, at least I've got it.

17  I'll be happy to share it with anyone who would like a copy.

18    (Laughter)

19    MR. PERNICK:  Why don't we take --

20    MR. ESSERMAN:  I'll send you a copy, Your Honor.

21    MR. PERNICK:  Why don't we take a shot at that

22  Order, and if we can get it in by the next hearing, and if we

23  can't, we'll let the Court know where we are, because we'll

24  have to order the other transcript.

25    THE COURT:  All right.  Why don't I do this? I'll say

SUPP. APP. 003822

1  that the order is to be entered when brought to Court in

2  Pittsburgh, if it's ready by then, and if not, the parties

3  will tell me a day.

4     MR. PERNICK:  Now I have one other question on this

5  Form of Order, Your Honor.  The ruling that Your Honor just

6  made obviously has implications for other escrow accounts that

7  the Debtor has.  We may as well just deal with that straight

8  up, and I've thought about this a little bit, although I may

9  not have the right thoughts.  Obviously the parties to those

10  escrow agreements are not in Court, so I don't think that

11  order, just being entered can be binding on them.  However, I

12  do think that the rulings that you made will probably mean

13  that, you know, it gives you an answer on those other escrows.

14     I have two suggested ways to handle that.  One is to

15  draft the order with those other escrows in mind, and

16  contemplate it and cover by it, and put it out on notice to

17  those parties for them to have it chance to come in and object

18  to it, and put their reasons in.  The second would be for us

19  to file some kind of Declaratory Judgment Action, based on

20  that order with respect to the other escrows, to determine

21  what their status is, and the status of those monies.  There

22  may be a third way, I don't know.

23     THE COURT:  Well, are the escrow agreements all

24  alike?

25     MR. PERNICK:  No.

SUPP. APP. 003823

1    MR. ESSERMAN:  They're completely -- Your Honor,

2  Sandy Esserman, for the record, excuse me.  They're completely

3  different types of agreements, I believe, between the various

4  parties, and I would strenuously object to any other escrow

5  agreements coming into play within this Order.  I think we've

6  teed it up specifically for the Baron & Budd Agreement by

7  motion.  The parties have responded specifically to the Baron

8  & Budd Motion.  There are other issues which are not present

9  in the other settlement agreements, or agreements, between the

10 parties that are not present in the Baron & Budd Motion, and I

11 think it would be unfair to Baron & Budd to try and tie that

12 into those other agreements into this process.

13    THE COURT:  Why I don't think that is a part of what

14 is applied to them.  I think what is wanted to do is to say

15 this is how the Judge ruled in this case, so --

16    MR. PERNICK:  This case does apply.

17    MR. ESSERMAN:  I have no problem with him talking the

18 order and this motion and showing the other parties what Your

19 Honor has ruled and said, "here's the law," and that's fine.

20    THE COURT:  At least until some other Judge changes

21 it, okay?

22    MR. ESSERMAN:  That's fine, but on the other hand, I

23 don't want the entry of this order to be in any way dependant

24 on any other party, other than those in the Courtroom today.

25    MR. PODESTA:  Well, why don't we do this?  Why don't

SUPP. APP. 003824

1    we --

2    MR. HARRIS:  Your Honor, Gordon Harris of Unsecured

3    Creditor's Committee.  The issue that we agree with Mr.

4    Esserman on.  Based on the limited facts we know, the

5    agreements are different, underlying factual circumstances are

6    different.  We would strenuously urge the Debtor to do, is

7    commence competing against the others for whatever

8    determination the Debtors want, and we will then will make a

9    determination whether or not -- THE COURT:  All right, Mr.

10   Harris, I'm sorry, you're fading out.  Let me see and make

11   sure I can restate what you said.  Do you agree with Mr.

12   Esserman that these agreements are different and the facts

13   underlying them are different.  You'd like the Debtor to start

14   subpleading against the others, and then --

15        MR. HARRIS:  You are correct Your Honor, and we

16   believe that they -- the proceedings will be different and we

17   will want to participate in those.  I agree with Mr. Esserman

18   that this order should not address those other agreements.

19        THE COURT:  All right.

20        MR. PERNICK:  I was just looking for a mechanism, but

21   I think that's a good suggestion.  We'll modify it a little

22   bit.  When we get this order, we're going to go to the other

23   parties first, and make a demand for what we want, and if they

24   don't accede to that demand, then we'll bring whatever

25   appropriate action we need to --

SUPP. APP. 003825

1    THE COURT:  Okay, that's fine.

2    MR. PERNICK:  -- rather than just suing.

3    THE COURT:  All right.

4    MR. PERNICK:  They may see the light when they see

5  the order.

6    THE COURT:  Okay.

7    MR. ESSERMAN:  Thank you, Your Honor.  We will see

8  you in Pittsburgh -- a common phrase speaking these days.

9    (Laughter)

10    MR. PERNICK:  Your Honor, the next Motion is #11,

11  which is the continuation of Plant Insulation's Motion for An

12  Order Appointing An Examiner On Fiberboard.

13    MR. ESSERMAN:  Your Honor, may I be excused --

14    THE COURT:  Yeah.

15    MR. ESSERMAN:  -- from further proceedings?

16    THE COURT:  Yeah.  Anyone who is not interested in

17  the rest of the agenda is free to leave.  Is this Plant

18  Insulation Motion going forward today?

19    MR. PERNICK:  I think as far as Plant's concerned it

20  is, Your Honor.

21    THE COURT:  Okay.

22    MR. PERNICK:  I do believe that there was a

23  subcommittee set up among the Creditors to deal and

24  investigate the Plant issues, and I think that Miss Parver has

25  a report that she'd like to make to Your Honor, and a proposal

SUPP. APP. 003826

1    for what to do, but I think that Plant would like it to go

2    forward.

3          THE COURT:  Okay.  Then, if we're going to go forward

4    on this issue, may I ask my legal questions first, and then

5    I'll be happy to address any issues.  This Motion for the

6    appointment of the examiner is under 1104(c)(s) --

7          (Pause in proceedings)

8          THE COURT:  -- which states, in essence, that if the

9    Court does not order the appointment of a Trustee under this

10   section, that being section 1104, section 1104(a) says: "at

11   any time after the commencement of the case, but before

12   confirmation of a plan, on a request of a Party-In-Interest of

13   the United States Trustee, and after notice and hearing, the

14   Court shall order the appointment of the Trustee,"etc.  Have I

15   ever received a Motion to appoint a Trustee?

16         MR. PERNICK:  You have not received a Motion to

17   appoint a Trustee.

18         THE COURT:  Well then, how do I have to appoint an

19   Examiner?  I have never been asked to, nor denied the

20   appointment of a Trustee.  So, even if the appointment of an

21   examiner is mandatory under (c)(2), if I don't appoint one

22   under (a), I've never been asked to appoint one under (a).

23   So, I think the issue is not framed appropriately.  I don't

24   think the release can be granted, and I think the motion has

25   to be dismissed without prejudice.  Anybody here for Plant who

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

1    wants to convince me that I'm in error?  Okay, then --

2        MR. TRAVIS:  We're not sure.

3    (Laughter)

4        THE COURT:  If I have an order that I cannot -- Mr.

5    Pernick can you submit me an order?

6        MR. PERNICK:  Yeah, I think there is somebody here

7    from Plant who wants to address the Court.

8        THE COURT:  Oh, I'm sorry, I apologize.  Yes?

9        MS. MALONEY:  Good afternoon, Your Honor.  Mary

10   Maloney Huss for Plant, and I'd to introduce my Co-counsel,

11   Monte Travis of Travis and Pon.  He has already been admitted

12   pro hoc, Your Honor.

13       THE COURT:  All right, thank you.

14       MR. TRAVIS:  Thank you, Your Honor.  Yes, on behalf

15   of Plant Insulation, Your Honor, the reason we've brought this

16   motion is because Owens Corning had the motive, and the

17   opportunity, and we believe there are indications that they

18   did improperly use Fiberboard settlement trust moneys to

19   settle Owens Corning asbestos liabilities.  And there's no

20   one, at this point, who is either -- that has an incentive to

21   find this out, or who is unconflicted with respect to whether

22   they should find this out.  And in fact, most of the people

23   seated in this Courtroom today have an incentive not to find

24   this out.  Now, I am not aware of any case involving a Motion

25   to appoint an examiner in which the Court found that there was

SUPP. APP. 003828

1  a pre-condition in 1104,

2  that --

3      THE COURT:  Well, I ruled that way in an unpublished

4  decision in another case and I think, being consistent with

5  myself, I still that's the correct reading.

6      MR. TRAVIS:  All right, while then you're one case

7  ahead of me, Your Honor.

8      (Laughter)

9      THE COURT:  It's nice to be consistent with yourself,

10  occasionally.

11      (Laughter)

12      MR. TRAVIS:  On the other hand, it's also nice

13  sometimes to change one's mind, when it appears to be the

14  right thing to do.

15      (Laughter)

16      THE COURT:  It is.

17      MR. TRAVIS:  And the examiner provisions of section

18  1104, of course, were a result of compromise which took out

19  trustee provisions that previously had been part of the

20  bankruptcy law.  And again, I haven't read Your Honor's

21  unpublished decision.  I also haven't seen any other

22  decisions, published or otherwise, or any suggestion in the

23  commentary to the effect that there must be an application

24  first, a Motion for Trustee --

25      THE COURT:  Well, I know.  But how else do you read

SUPP. APP. 003829

1   the rule?  I mean, if you look at the Code, the Code

2   specifically says -- and, you know, the argument has been

3   raised by Plant that the language of the statute is clear on

4   its face, it needs essentially no hearing.  Well, I agree.  I

5   think it is clear on its face, and it says if the Court does

6   not order the appointment of the trustee under this section,

7   which is section 1104, and the only section to provide

8   appointment of the trustee -- well, actually either 11(a) or

9   11(b)  -- but they both require motions, and I have no such

10  motion.  Therefore, I don't have to appoint an examiner, and I

11  don't see a ground to appoint an examiner on a mandatory

12  basis, because I have never refused to appoint a trustee, nor

13  has anybody yet presented me with information to show cause of

14  why a trustee should be appointed.

15          MR. TRAVIS:  Your Honor, in that respect, again, I

16  would look at the plain language of the statute.  If the Court

17  does not order the appointment of a trustee under this

18  section, the Court has not --

19          THE COURT:  That's right.

20          MR. TRAVIS:  -- ordered the appointment of a trustee

21  under this section.

22          THE COURT:  I've never been asked to.

23          MR. TRAVIS:  And --

24          THE COURT:  So I've never refused it.

25          MR. TRAVIS:  -- I don't believe that Section C

SUPP. APP. 003830

1   requires, on its face, that there be a prior application or a

2   refusal, merely that it hasn't happened.  Because an examiner

3   of course has a different burden, I mean a different task,

4   different role, and it's intended to be something that's far

5   less intrusive than a trustee.

6          THE COURT:  Oh sure.  I think you could read the

7   statute to say that in lieu of a trustee that an examiner in

8   some circumstances might be appropriate, as opposed to a

9   trustee.  But it seems to me that the only time it's mandatory

10  is if I haven't entered the appointment of a trustee, and I've

11  never been presented with that motion.

12         MR. TRAVIS: So --

13         THE COURT:  I've never had a chance to either refuse

14  or not refuse.

15         MR. TRAVIS:  All right.  Well, I recognize that I'm

16  swimming hopelessly upstream on this one, Your Honor.

17  Procedurally then, Plant still has an interest that it

18  believes is not being protected, and it is a very large

19  interest as far as Plant is concerned.  What Your Honor then

20  would require in order to get to the point where we would be

21  able to bring a motion for an examiner is a prior motion for a

22  trustee.

23         THE COURT:  No, I'm sorry.  I think you may have the

24  grounds to file a request for an examiner for some other

25  cause.  I think the issue is whether I must, whether I am

1  compelled, to appoint an examiner on your motion because there

2  is no trustee in the case.  And I do not think that the law

3  requires me to do that when I have never been presented with a

4  request to appoint a trustee in a case, and have never looked

5  at the issue of whether a trustee, or a trustee with limited

6  powers, or an examiner in lieu of a trustee, is appropriate in

7  a case.  So, you may have grounds to request an examiner.  The

8  issue is, am I mandatorily required to appoint one?  And I

9  think the answer is, under the circumstances facing me here,

10  I'm not.

11       MR. TRAVIS:  All right.  And if instead, we now move

12  for the appointment of a trustee in conjunction with an

13  alternative motion for an examiner, would that then present

14  the situation for the Court properly, as the Court reads that

15  statute?

16       THE COURT:  Well, your grounds for appointment of the

17  trustee have to be pretty intense.

18       MR. TRAVIS:  Right.  But if we lost that, is that the

19  foundational -- is that the foundation that Your Honor's --

20       THE COURT:  That's the foundation that is required

21  for me to have a mandatory requirement to appoint a trustee.

22  Now, I recognize the fallacy in this reasoning, because if I

23  deny the appointment of the trustee, it's probably because I

24  don't think you have grounds to appoint a trustee, and

25  therefore, then I'm back into this examiner if you ask for

SUPP. APP. 003832

1   that relief as an alternative.  But, you know, it may very

2   well be at that point that there is some mandatory reasoning.

3   I don't think the statute is as clear as Plant believes it to

4   be for the reasons I'm explaining now.  But, yes, that would

5   be my understanding of the foundational underpinning.

6           MR. TRAVIS:  All right.  Thank you, Your Honor.

7           THE COURT:  So, I think at this point, this motion is

8   either -- on a mandatory grounds, should be denied without

9   prejudice.  If you have some other grounds that you want to

10   articulate on a non-mandatory discretionary basis, then I

11   think you always have the right to make that request.

12          MR. TRAVIS:  All right.  Well, so far our motion has

13   been couched in terms of the mandatory grounds, and we have

14   not placed it in terms of the discretionary.  So, we will take

15   another look at it, Your Honor, because this is something we

16   feel very strongly has not been yet protected by the

17   constellation of parties currently before the Court.

18          THE COURT:  Okay.  Has Plant taken advantage of the

19   opportunity I provided to get into the intercreditor issues?

20          MR. TRAVIS:  Well, this is very interesting, because

21   I saw in the status report from, I believe it was from the

22   Debtors, saying well, Plant never called, Plant had the

23   opportunity, we set up a subcommittee on December 21st, and so

24   on.  I think they have our phone number.  I think they could

25   have called us and said, "Hey, we're having a big meeting

SUPP. APP. 003833

1  about your motion, do you want to come?" And nobody did. And

2  we would be happy to take advantage of that. However, the

3  intercreditor issues -- although a lot of the documents, I

4  understand, are being developed as part of that -- may be

5  relevant to what we think an examiner needs to do, and

6  therefore could make the appointment of an examiner both

7  cheaper and easier; that is, make the examiner's job cheaper

8  and easier.

9       It really arises from different concerns, concerns that

10  the banks had about guarantees given them by subsidiaries who

11  supposedly are not subject to asbestos claims and bondholder

12  claims, and so on. It doesn't really respond to our concern

13  that Fiberboard's Selma Trust, in effect, was purchased by

14  Owens Corning so they could use that in their nationwide

15  settlement program, or any other settlement program they

16  pursued, to help defer Owens Corning's asbestos liabilities.

17  And we had requested the U.S. Trustee to appoint a separate

18  Creditor's Committee for Fiberboard, and the U.S. Trustee

19  didn't think that that was the right thing to do at that time,

20  and we've been active on this issue, and I guess we intend to

21  continue to be active, and we certainly will avail ourselves

22  of whatever opportunity is going to be presented to us to

23  participate with respect to that. And I was not aware of this

24  meeting in December.

25       THE COURT: All right. Well, Mr. Pernick, to the

SUPP. APP. 003834

1  extent that Plant would like to participate, please provide

2  notice of when the documents are available, so that --

3       MR PERNICK:  Your Honor --

4       THE COURT:  -- they can look at the documents.

5       MR. PERNICK:  -- that's never been a problem.  Let's

6  be clear about what happened.  When we were in Court, I don't

7  remember when it was, October or November on the original

8  motion, Plant understood what the process was.  We said we

9  were going to get those documents together, and we offered

10  basically for them to participate.  I think it's a nice

11  argument to say we should call them at every step of the way,

12  but frankly, I'm not going to beg them to come get information

13  to look into this claim.

14       We're very comfortable with the subcommittee which the

15  Debtor has stayed out of, except to supply information and

16  answer questions.  We don't know what they're doing.  We got a

17  little bit of a report that was a public -- a whole group

18  report last week about where they were.  But we haven't been

19  participating in that, and if Plant has questions, all they

20  have to do is ask.  So to push it back on us, and say, "You

21  know, should have asked us whether we had any questions,"

22  that's garbage.  I mean, you know, I don't -- I'm sorry for

23  characterizing it that way, but it's a little disingenuous.

24       MR. TRAVIS:  Well, I don't think we need to burden

25  the record with this discussion, Your Honor.  I think we can

SUPP. APP. 003835

1   probably talk about this and set the garbage aside,

2   prospectively.

3          MR. PERNICK:  If they want information and document

4   statements, I think Miss Parver's going to give you a little

5   report on what they've done to date, and what they're doing.

6   All they have to do is contact her, and they can get whatever

7   they want.

8          THE COURT:  Okay.  Then, Plant is aware of the fact

9   at this point that you can contact Miss Parver and get

10  documents that you're interested in looking at with respect to

11  the transfer that you're alleging.  I will enter an order that

12  denies this motion for appointment of an examiner without

13  prejudice, when it's submitted to me within a week by the

14  Debtor.  Okay.

15         MR. TRAVIS:  Thank you, Your Honor.

16         THE COURT:  All right.  Thank you.  Miss Parver?

17         MS. PARVER:  Yes, Your Honor.  I guess I'm supposed

18  to give you a report.

19      (Laughter)

20         MS. PARVER:  Your Honor, there has been a

21  subcommittee of the Futures representative and the Unsecured

22  Creditor's Committee to look into all of the allegations

23  raised by the Plant motion.  Frankly, they're very relevant,

24  not only to the intercreditor, but as well to issues of the

25  Future representative, because we are the Future

SUPP. APP. 003836

1   representative for Future claimants rising from any Fiberboard

2   asbestos liability as well.

3       In that regard, Your Honor, we have interviewed the

4   lawyers from the Debevoise, Plimpton firm who negotiated many

5   of the NSP agreements, going into the basis on how they were

6   negotiated, etc.  We have asked for and received voluminous

7   documents as well as the Debtor's analysis of how they would -

8   - the allegations of Plant.  We've interviewed the leading

9   lawyer from the Brobeck, who was with the Brobeck firm, who

10  represented Fiberboard pre-acquisition by Owens Corning, and

11  subsequent to the acquisition by Owens Corning negotiated many

12  of the NSP agreements for Fiberboard with respect to the same

13  allegations from Plant.  We have further interviews to be

14  conducted with respect to the interim trustee and the present

15  trustee of the Fiberboard Trust.  We're still awaiting a lot

16  of documents, and we have additional requests for information

17  in terms of disbursements and the financial accounting for the

18  trust.

19      And in addition, Your Honor, we have been speaking,  both

20  the Unsecured Creditor's Committee and we as well, with our

21  asbestos claims experts, Your Honor, because in many respects,

22  the process that they will be going through in terms of

23  arriving at estimations of asbestos claims will be looking at

24  the settlement histories, the tort histories, of both of these

25  companies, and as a matter of timing, they'll be looking at it

SUPP. APP. 003837

1  from pre-acquisition of Fiberboard imposed acquisition, so

2  they can do subsequent analyses, Your Honor, which will also

3  give the Court, if you will, a mathematical or a very

4  objective estimate or calculation with respect to how

5  liability was apportioned.

6        THE COURT:  All right.  Is there any reason why Plant

7  has raised this issue and is concerned with the outcome that,

8  especially in lieu of looking at an examiner motion or a

9  trustee motion again, Plant can't benefit from the work that's

10  been done?

11        MS. PARVER:  Your Honor, I don't see why they -- I

12  assume there are -- they will be entering into the same kind

13  of confidentiality agreements and orders.

14        THE COURT:  Yes, they'd have to have a

15  confidentiality agreement.

16        MS. PARVER:  And right now, obviously our

17  communications with our own experts and the Unsecured's

18  communications with theirs are still separate.  But apart from

19  that, Your Honor, I don't see myself, a problem with making a

20  lot of this information available in relevant documents, and

21  they should contact me.

22        THE COURT:  Okay.  Plant's counsel so hears.  Mr.

23  Travis, you heard.  Okay.

24        MR. TRAVIS:  I heard, thank you, Your Honor.

25        THE COURT:  All right.  Anything else by way a status

SUPP. APP. 003838

1  report with respect to that portion of the Intercreditor

2  Agreement?  Do we want to get into the rest of that issue now,

3  or later?

4        MR. PERNICK:  I think if I can, there's a few more

5  things that we can get through quickly, and we'll --

6        THE COURT:  All right.

7        MR. PERNICK:  -- give the Intercreditor.  The next

8  one would be #13, which is the Debtor's 7th motion for an

9  order under 365(a) authorizing the Debtors to reject

10  miscellaneous contracts and unexpired leases, and it's with

11  respect to the Caterpillar objection.  And we've actually got

12  a Proposed Form of Order that's been agreed to by Caterpillar.

13  I think I -- let me see if I have a red line, I'm not sure.

14  Yes, I do.  It just, it says, that "provided, however, that

15  the leases and contacts with Caterpillar shall be deemed

16  rejected as of the date the Debtor surrenders possession of

17  the equipment subject to the Caterpillar leases, the Debtors

18  and Caterpillar shall provide one another all reasonable

19  cooperation, so that the Caterpillar equipment is surrendered

20  to Caterpillar as soon as reasonably possible."

21        On Paragraph #3, on the rejection, on the date for claims

22  subject to the rejection, "Caterpillar has 30 days from the

23  date the Debtors surrender," obviously because that date's

24  going to be later than today, "the Caterpillar equipment to

25  file their claim, and the Court retains jurisdiction to hear

SUPP. APP. 003839

1    and determine any disputes arising under the order."

2    THE COURT:  Okay.  With respect to those agenda items

3    12 and 13, I -- yes, I have a problem with this.  I'm going to

4    enter these orders this time because you've resolved it.  But

5    I really do expect the parties to stick to no extensions

6    beyond the calendar week before my hearings, because I cannot

7    get ready for them.  I will enter these orders today.  I will

8    not do it again.  They will be automatically pushed over to

9    the next agenda.

10   MR. PERNICK:  Okay.

11   THE COURT:  Okay, anybody here for Caterpillar who

12   wishes to be heard?  All right, I'll take your order Mr.

13   Pernick, if you --

14   MR. PERNICK:  Okay.

15   (Pause in the proceedings)

16   MR. PERNICK:  Item #14, Your Honor, and I apologize

17   for it getting resolved late this time, but it was actually a

18   lot more complicated, and obviously going forward, we will

19   adhere to the one-week ahead.  But this was the Debtor's

20   motion pursuant to sections 105, 363 for authority to transfer

21   pursuant to an Asset Purchase Agreement of Shielding Solution

22   Assets, and there were three objections: MGM Consumer

23   Products, Credit Suisse-First Boston, and Andrew Woodside.

24   And all three of those objections have been resolved.  I've

25   actually got to bench file the Notice of Withdrawal from Mr.

1  Woodside, because he's pro se, and obviously when we were

2  resolved it, we told him he didn't need to come out.  We did

3  tell him he could be available by phone with the Court if he

4  wanted to, and I think he chose not to do that, but --

5          THE COURT:  Okay.

6          MR. PERNICK:  -- I have his original signed

7  withdrawal for the Court.

8          THE COURT:  All right.  Thank you.

9          MR. PERNICK:  And I have a blacklined, if I can

10 approach, I'll give you the duplicate and the original order

11 and then a blacklined order, and then if you want, I can walk

12 you though what those changes were.

13         THE COURT:  All right.  Just one second, please.

14     (Pause in the proceedings)

15         THE COURT:  Okay.

16         MR. PERNICK:  Did I give you a blacklined copy, Your

17 Honor?

18         THE COURT:  No, you didn't.

19         MR. PERNICK:  Let me do that, because it would be

20 easier for you to follow.

21         THE COURT:  Can I just read it quickly?

22         MR. PERNICK:  Sure.

23         THE COURT:  It might take less time to read the

24 order.

25         MR. PERNICK:  Sure.  If you look in paragraphs three

1  and four while you're reading it, those are the major changes.

2       THE COURT:  All right.  Have the parties seen this?

3       MR. PERNICK:  Yes.  I just passed around another copy

4  so everybody could see it and make sure, but we did circulate

5  it before the hearing.

6       (Pause in the proceedings)

7       THE COURT:  Anyone wish to be heard on the changes in

8  this order?

9       MR. BOUGHTON:  Your Honor, good afternoon, Bill

10  Boughton for MGM.  I just wanted to alert Your Honor that the

11  changes to the Form of Order resolve MGM's limited objection.

12  We're happy to have it withdrawn.  Thank you.

13       THE COURT:  Okay, thank you.  Good afternoon.

14       MR. ECKSTEIN:  Your Honor, Kenneth Eckstein, Kramer,

15  Levin, on behalf of CSFB as agent for the banks.  Your Honor,

16  we had raised several issues, I think connected with this

17  motion.  We had raised similar issues in connection with

18  prior motions.  We're satisfied that the purposes of this

19  motion paragraph three, preserves the banks' rights, and I

20  think is adequate for purposes of entering the order.

21       THE COURT:  Okay.  Okay.  That order is signed.

22       MR. PERNICK:  If I could trouble the Court for the

23  duplicate original of that, because --

24       THE COURT:  Here.

25       MR PERNICK:  -- I think the purchaser's in the

SUPP. APP. 003842

1  Courtroom.

2      (Pause in proceedings)

3          THE COURT:  Okay.

4          MR. PERNICK:  The next one is #15, which is the

5  hearing on the Debtor's request for preliminary injunction.

6  You might recall that there is a standstill agreement that was

7  entered into, but Standard Chartered Bank Societe Generale and

8  KBC Bank were not part of that.  They had a separate

9  agreement.  And as to them, the TRO, I believe, expires

10  tomorrow.  So this is a stipulation in order with us and those

11  banks.  Further extending the TRO, it runs through April 22nd

12  at 5:00 p.m.

13      The reason for that, Your Honor, is simple.  There are

14  negotiations going on to resolve those claims.  They mostly

15  deal with loans or related to loans with non-filing foreign

16  joint-ventures that Debtor is in, and there work-outs to be

17  done in each of those joint ventures, and they're complicated.

18  But they have been proceeding, and there are discussions that

19  continue, so those banks have agreed to continue with the TRO

20  while those discussions take place.

21          THE COURT:  All right.  Do you have an order?

22          MR. PERNICK:  Yes.

23      (Pause in proceedings)

24          THE COURT:  Here you are, Mr. Pernick.

25          MR. PERNICK:  Thank you.  That leaves us with 16,

SUPP. APP. 003843

1   which is the intercreditor status report; 12, which is the

2   exclusivity motion, and then one quick one, which I can get

3   out of the way, #17, which was the status report on the fee

4   examiner.  As you probably recall, the Court asked us to look

5   into that and make a proposal.  We did get actually a very

6   excellent suggestion from Mr. Esserman.  A gentleman, Warren

7   Smith, who has been the fee examiner on a number of Delaware

8   cases, and he sent me a proposal, and I anticipate that we'll

9   provide the Court with a proposal either to retain him or some

10  other party before the next hearing.

11       THE COURT:  Okay.

12       MR. PERNICK:  But I did send that around to everybody

13  in the Courtroom.  I haven't received any objections to him

14  yet, and I'll just make sure that we're okay with the

15  arrangement.  We have to talk to him about the fee, because in

16  some of the other cases, he's gotten a percentage --

17       (Laughter)

18       MR. PERNICK:  -- of the gross fees reviewed, and in

19  this case, I guess the good news for him is that it's a large

20  set of fees each year.  I don't think we want to go that high,

21  so we're going to talk to him about it.  It'll probably be

22  some kind of sliding scale that makes it a more reasonable

23  number.

24       THE COURT:  Okay.  He has recently been appointed as

25  the fee examiner in the Grace Case as well.  And I guess,

SUPP. APP. 003844

1  since I don't use fee examiners very often, I didn't make what

2  use of him I thought my be appropriate clear in Grace.

3         MR. PERNICK:  Right.

4         THE COURT:  And he was asking whether he could talk

5  to me about that.  I thought it might be better if he came to

6  Court, and we all resolved that issue.  So, in the Grace Case,

7  I was about ready to enter an administrative order that writes

8  things into the same types of categories that we're using in

9  this case, because it makes my own review much easier.  Mr.

10  Smith apparently doesn't think that's necessary from his point

11  of view.  In fact, it may make things more complicated, rather

12  than less.  I think you need to raise this issue with him,

13  Mr.Pernick --

14         MR. PERNICK:  Okay.

15         THE COURT:  -- to see what's going to work best.  I

16  do not want to increase fees simply to review fees.

17         MR. PERNICK:  Right.

18         THE COURT:  That isn't the point.  It's just that

19  it's getting very difficult to get through all these fee apps

20  in all these big cases, and I simply need help.

21         MR. PERNICK:  Sure.

22         THE COURT:  If he wants to come to Court and raise

23  whatever issues so we all can work it out, I'm happy to do

24  that, but I really do not prefer to have a private discussion

25  --

SUPP. APP. 003845

1          MR. PERNICK:  Okay.

2          THE COURT:  -- along those lines.

3          MR. PERNICK:  Okay.  I will talk to him about that.

4          THE COURT:  Okay.

5          MR. PERNICK:  And we'll come to the Court with a

6   proposal either from him or from somebody else.

7          THE COURT:  All right.

8          MR. PERNICK:  All right.  I'm going to turn it over

9   now to Mr. Monk for the status report on the intercreditor.

10          THE COURT:  Good afternoon.

11          MR. MONK:  Good afternoon, Your Honor.  Charles Monk

12   from Saul, Ewing in behalf of the Debtors.  Your Honor,

13   obviously, we submitted a written status report in advance and

14   I apologize.  I know that the Court has lots to do, and I

15   realize that it arrived very late, and I won't repeat the

16   matters in the written status report, because I'm certain the

17   Court has read it and given it some thought.  Let me do a

18   review, and then I'll be happy to answer any questions the

19   Court may have, and I'll make a recommendation from the

20   Debtors.

21      The overview is that we have been proceeding with

22   additional information production.  We've had -- our schedule

23   has worked out so we've had about one meeting a month, usually

24   in advance of the omnibus hearing, in which we can sort of

25   report on the status of information requests that have been

SUPP. APP. 003846

1    made in the preceding period.  The parties are basically down

2    to letter requests and then the Debtor or other parties

3    responding to those letter requests.  And that process seems

4    to be working, I think, well by all accounts.

5        At our last meeting, we had some very frank and, as you

6    can see from the list of issues, pretty substantive discussion

7    about issues that the parties were beginning to glean from

8    their factual review.  We think that that discussion -- these

9    meetings last anywhere from two and a half to three hours.

10   Much longer than  that, I think, sort of gets into diminishing

11   returns.  So that's sort of been the timeframe that I've been

12   operating on, as, if you will, the major dumbo of this

13   process.  I think the process is working quite well, and I'd

14   like to see it continue.

15       We have some work to do with third party sources of

16   information, although we've actually made some progress on

17   that front.  We've been informed by the underwriters that they

18   will turn their documents over for us to review, and we're --

19   we still have to work out how we get copies of those

20   documents, but I can also report that in an order entered on

21   Friday of last week, the Court in Boston set a hearing date of

22   March the -- I think the 13th -- but in that week in March --

23   for a possible hearing on the Motion to Dismiss, which was the

24   one basis that the underwriters and the parties in that case

25   were asking us to hold off on production there.

1    I'm sure there are other issues that the parties will

2 bring forward.  These are the ones that we have discussed so

3 far, and I don't mean to suggest that these are --that those

4 discussions are in any way complete.  I was happy that we

5 could identify the issues and get agreement that those

6 subjects are generally the subjects that we think require

7 further investigation.  The banks have come forward and made a

8 strong recommendation that we initiate a litigation posture,

9 and I -- in their statement, that I'm sure the Court has read,

10 they are encouraging the parties to think about this in terms

11 of proceeding with valuation hearings, or valuation litigation

12 procedures.  It's interesting that they would have the Debtors

13 initiate that process, which I think is -- the Debtors are not

14 interested in doing in any way.

15    We think this negotiation posture is the way to go.

16 The parties have been -- frankly, at the very first meeting

17 there was a general agreement among the parties that these

18 discussions were for purposes of settlement, that the

19 discussions were therefore protected from further use, that

20 the parties could then have some assurance that they could be

21 candid in their discussions, as lawyers sit down and across

22 the table.  We think if you put this in a litigation posture

23 at this point in time, the benefits of those discussions will

24 go out the window, issues will -- that it may be possible to

25 persuade a litigant might not be worthy of their pursuing,

SUPP. APP. 003848

1   might suddenly pop to the fore as, if we're going to fight

2   this in litigation, every issue that people have is going to

3   come up and be put on the table.

4       The Debtors believe that the next -- the way to move the

5   process along, the next affirmative thing we can do is to

6   present on a schedule, which we propose, factual stipulations

7   that try to clear away the underbrush of some of these issues

8   which are heavily ensconced in accounting facts.  Let me give

9   you an example there.  We have, for instance, the whole

10  question of the Owens Corning Fiberglass Technology License

11  Agreement, and the Court will remember -- I'll just do a

12  little background facts here -- that Owens Corning in 1991

13  entered into a contract with an new entity it created called

14  Owens Corning Fiberglass Technology, by which Owens Corning

15  transferred its domestic intellectual property then in its

16  possession to Owens Corning Fiberglass Technology, and

17  licensed that technology back from OCFT.

18      The reason for that is clearly because there were certain

19  tax strategies that Owens Corning could take advantage of that

20  would assist it in managing its state income tax liabilities.

21  I don't think there's any real -- very much debate about that

22  subject.  That process involved paying royalties to OFCT, and

23  in return, OFCT immediately loaning that money back to Owens

24  Corning under a revolving credit agreement that was entered

25  into at the same time the licensing agreement was entered

1  into.  That agreement was pretty much in place -- there were a

2  few factual developments in connection with it -- but that's

3  basically the arrangement for the past 10 years, and it's a 20

4  year agreement.

5      When the Debtors first began to focus on this agreement,

6  and think about the implications of that agreement in

7  connection with this bankruptcy, we frankly brought it to the

8  attention of the banks and other Creditors.  And we said, "you

9  know what we've learned about this arrangement we have with

10  OCFT?  We think it has implications here.  We think it is

11  going to require some fairly thorough factual development for

12  everyone to understand about these issues."  We recognized at

13  the same time that there was an enormous possibility that the

14  partes could go spinning off on litigation involving these

15  issues, and it was our objective to avoid that litigation, to

16  get people talking, but at the same time understanding that

17  they needed a lot facts, so they would feel comfortable in

18  discussing those issues and reaching agreements regarding the

19  values that would be represented by the claims against OCFT,

20  and who had the rights to those claims.

21      There are other Debtor entities that face -- that have

22  similar issues associated with it, OCFT being the one that's

23  most prominent in our discussion, but certainly Integrex, and

24  Fiberboard, and IPM, which is the holding company for many of

25  Owens Corning's foreign entities, and was set up for similar

SUPP. APP. 003850

1   tax strategies -- this is another entity that will have a

2   significant amount of facts that need to be pulled together.

3   A lot of those issues are not -- I have taken accountants'

4   depositions before, Your Honor, and frankly, that -- they're

5   very -- not -- that's -- lawyers, you know, I think went to

6   law school because math wasn't their thing, and --

7       (Laughter)

8       THE COURT:  I should advise you in the interest of

9   fair disclosure, that I'm married to a CPA Mr. Monk --

10      (Laughter)

11      MR. MONK:  Well, Your Honor, what -- what I was going

12  to say --

13      THE COURT:  -- so I perfectly well understand.

14      (Laughter)

15      MR. MONK:  Well, I think it makes some sense to try

16  for the Debtor, if the Debtor takes the lead and uses the

17  majesty of the Debtor's responsibility here as the basis for

18  our actions, the Debtor takes the lead, and tries to pull

19  together a factual stipulation that would deal with the

20  accounting issues in some sort of rational way, rather than

21  spend lots and lots of time with lawyers interviewing

22  accountants and lots of conversations that don't seem to link

23  up.  We think that advances the ball.  We think that helps the

24  parties understand where their rights may be, and we think

25  that that will move the process forward.