1    Obviously, this litigation, this bankruptcy, in many

2  respects is being driven by asbestos values, and it is

3  incredibly important that the -- that this intercreditor

4  project proceed on a pace that will bring the parties to a

5  level of understanding about what their respective rights are

6  at a time when the asbestos valuation numbers become known to

7  the participants.  Those are the two ingredients we think that

8  are necessary for the parties to have serious, planned

9  negotiations.

10    The Debtor would love to have planned negotiations

11  tomorrow, if we thought the parties were in a position to do

12  so.  We're ready to go.  We don't want to be in bankruptcy one

13  moment longer than is absolutely necessary.  We think there's

14  a significant opportunity here to negotiate a plan, and we

15  would like to move this intercreditor project and that

16  asbestos estimation process on the same time schedule.

17    We think if we initiate litigation now, we will lose the

18  benefit of the discussions that we've been having, the parties

19  will retreat to their respective corners, we will discuss over

20  deposition subpoenas and formal document requests, and we will

21  not have the level of candor and, frankly, debate that has

22  taken place in our discussions so far.  We do think it's

23  important for the Debtor to be able to demonstrate to the

24  Court real progress in this regard.  And that's why we're

25  proposing the factual stipulation approach that I recommended

SUPP. APP. 003852

1   earlier.  The details of that are set forth in our letter,

2   Your Honor.  But we would encourage the Court to enter a

3   Status Order that embodies those concepts and moves this

4   process forward on the basis in which it now is operating.

5          THE COURT:  Okay.  I have -- I don't know if I have

6   the Debtor's status report.  There wasn't one in this volume.

7          MR. PERNICK:  Your Honor, I could probably get you an

8   extra copy if you want.

9          MR. MONK:  I have one more.

10         THE COURT:  I wanted a copy so that I could look at

11  the time frame set --

12         MR. PERNICK:  Here you are, Your Honor.

13         THE COURT:  Oh, thank you so much.  I'm sure this

14  makes sense to those of you who have been involved in the

15  document production.  But I'm not quite sure I understand what

16  it is that the Debtor is proposing.  You want to break down by

17  entity apparently the types of disclosures and factual

18  stipulations that the Debtors are willing to do.  So the one

19  you propose for May 15th -- it deals with OCFT.  And then June

20  14, 5:00 p.m. and July 15th, Integrex, and August 15th,

21  Fiberboard Exterior Systems and other affiliated companies.

22         MR. MONK:  Yes, Your Honor.

23         THE COURT:  Okay.  What I don't know is, is that the

24  universe of these Inter-Creditor agreements?

25         MR. MONK:  It is not.  But it is the four major --

1  let me back up.  One of the problems -- it's one of the

2  problems, frankly, with the Bank's proposal -- is that there

3  is a huge amount of interrelationships between these entities.

4  To take a for instance, OCFT, the entity that holds the

5  technology, issued a $501,000,000 dividend in the form of a

6  note to its parent, Owens Corning, which was assigned to

7  Integrex to capitalize Integrex.  That note sits at Integrex.

8  Obviously, there's a relationship between those two entities.

9  Part of this process is we have to figure out does the value

10  say at OCFT, does the value go to Integrex, or does it go

11  someplace else?  It's that kind of interrelationship that we

12  find all over, because these were operating entities that --

13  where -- and the company moved money back and forth between

14  them as it saw fit for business purposes.  But the only way we

15  know to set a deadline schedule -- we can't provide facts

16  regarding everything all at one time -- was to break it up in

17  that -- that's the convenient chunks that we could arrive at

18  as a way to propose entities to stipulate about.  There will

19  be clearly stipulations of fact that relate to two or more

20  entities that we'll have to address at some point in time,

21  Your Honor.

22       THE COURT:  Okay.  Now, you're proposing these dates

23  by which the Debtor would propose the stipulations.  But then

24  what happens to them once the Debtor proposes them?

25       MR. MONK:  Well, Your Honor, my thought on that was

SUPP. APP. 003854

1  that the Debtor would present them.  We would have an Inter-

2  Creditor meeting and see how much accord I can achieve in the

3  negotiation with the other participants, with the idea that in

4  the spirit of the discussion we've had so far I think a lot of

5  the facts would be cleared away by stipulation, and we can

6  then narrow and hopefully then achieve a set of issues and

7  unresolved facts.  And I'm thinking as a litigator, like,

8  okay, I have a -- here's my stipulation of agreed to facts.

9  And here are the issues that we have yet to resolve.  So that

10  if we have to have a hearing on plan confirmation at a later

11  point in this case, I'll have an organized factual record that

12  I can present to the Court for resolution.

13       THE COURT:  Okay.  The -- what you're proposing

14  includes corporate history, management and financial

15  operations, and some other things depending on the particular

16  identity of the company involved.  Does it include -- does

17  this information somehow get to the Bank's issue of valuation?

18       MR. MONK:  Yes, Your Honor.

19       THE COURT:  Okay.  How?

20       MR. MONK:  The information -- well, let me use OCFT

21  as my example.  One of the questions with respect to OCFT is

22  how you interpret the license agreement.  Among the questions

23  that go into that, the subsidiary questions, if you will, are

24  the license agreement provides that they'll pay a percentage

25  royalty on net product sales.  All right?  Did they calculate

SUPP. APP. 003855

64

1  net product sales correctly?  Did they include products that

2  shouldn't have been included in net product sales?  Did they —

3  — the license agreement provides for all discounts to be

4  applied to that number.  Were the discounts properly applied?

5  All those accounting issues, which are very relevant to the

6  Bank's valuation issues, have got to be resolved.  There are

7  half a dozen of those just with respect to OCFT alone.

8       Then you have — so, a stipulation that addresses all

9  those questions will advance the whole issue of what do we

10  understand about the royalty payments that were made by Owens

11  Corning to OCFT?  Did Owens Corning overpay its royalty, or

12  not?  If it did overpay its royalty, does it have a claim

13  against OCFT?  Can it recover that money, or not?  That's

14  where all that takes you.

15       THE COURT:  Okay.  Now, these  stipulations are going

16  to be put together from the documents that have been produced,

17  or from —

18       MR. MONK:  Both.

19       THE COURT:  — witnesses that will be identified?

20       MR. MONK:  Both.  Mostly from the documents.  But the

21  Debtor has the luxury of having access to the accounting

22  people at the company.  And rather than — I mean my hope is

23  that I can — will be able to interview the accountants,

24  organize a stipulation, and know the financial advisors are

25  gonna be given access to that information, let the financial

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

SUPP. APP. 003856

1   advisors and the accountants talk about it, and hopefully I

2   can get people to sign up to the stipulation.

3        THE COURT:  Okay.  So you're not contemplating at

4   this point that there would be like an objection process per

5   se.  What you're hoping to do is look to what you can put

6   together by way of stipulation.  And what you can, you'll have

7   a good database for.

8        MR. MONK:  Correct.

9        THE COURT:  And what you can't, at some point you'll

10  put together in another list.

11       MR. MONK:  That's right.

12       THE COURT:  Okay.  Of material facts that aren't

13  stipulated to for whatever the issue is going to be.  Because

14  at the moment I'm not sure I can articulate what the issues

15  are enough to give a logical example.

16       MR. MONK:  Right.  That's exactly right, Your Honor.

17  And I thought about, in making the recommendation that we have

18  made, putting together sort of a deadline for people on the

19  other side to respond to our proposed factual stipulations.

20  Frankly, I think that pushes us too much to the why isn't this

21  just like litigation anyhow side of the ledger.  And I would

22  prefer -- because frankly in most instances we can agree on

23  the facts.  I think it would just continue -- if we propose

24  factual stipulations, we will begin to lock up facts that we

25  all agree upon.  I can say in our discussion last time the

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

SUPP. APP. 003857

1  parties actively participated.  Everybody at the table

2  participated.  I believe that all of the constituents are

3  working on this assignment.  They have been doing the work

4  that's necessary to understand it.  So I don't think that's

5  going to be our problem.

6      I think there will be hefty disagreements about the

7  application of the law in certain instances.  And I think

8  there will be some disagreement about the facts.  And

9  hopefully we can narrow those disagreements about the facts

10  with the idea if as we submit a plan of -- if there's

11  something that has to be litigated here, we'll have it down to

12  the narrowest possible subject so that the Court will -- we

13  won't use any more of the Court's time than we absolutely have

14  to.

15      THE COURT:  Okay.  So your expectation of what you're

16  gonna do with all this information is try to put it together

17  in a plan context, and not have to bring the actual litigation

18  against anyone.

19      MR. MONK:  Absolutely correct, Your Honor.  We think

20  if this has to be litigated, there are so many facts, so many

21  issues that go along with this, that we could take up most of

22  your year in a major --

23      THE COURT:  I don't have --

24      MR. MONK:  -- case litigation.

25      THE COURT:  -- most of a year, Mr. Monk.

SUPP. APP. 003858

1    (Laughter)

2        MR. MONK:  We just think that that's a big mistake.

3        THE COURT:  Okay.  Thank you.

4        MR. PERNICK:  Your Honor, your question actually

5    leads me into -- Mr. Monk has described this to you from the

6    Inter-Creditor standpoint.  I want to just impose on the Court

7    for a minute and just talk globally about what we have in

8    mind, and why this fits in.  Because I think you need that

9    piece of the puzzle to really see where we're going.  First --

10   and I'm gonna be, as I always am with the Court, brutally

11   honest about what our strategy is, because I've already told

12   the other side that numerous times.  They can agree or

13   disagree with that, but this is what it is.  This is really

14   about how to get this case resolved.  From a big picture

15   perspective, how do we get out of Chapter 11?  We'd like to

16   get out with a consensual plan.  If we can't, we'd like to get

17   out with maybe a confirmable plan.  Even if we have a

18   contested confirmation hearing, we'll at least have something

19   that's confirmable, and maybe we'll settle it at that point.

20       And so the question is how do you get there?  And we

21   spoke to Judge Wolin about this, because he asked us, "How can

22   I help?"  And the way that the Court -- and I'm using that in

23   the plural, meaning you and Judge Wolin -- can help is to

24   either agree or disagree with the strategy, or come up with

25   your own strategy about how to get the parties in a posture

1  when they will best resolve this case consensually.  Because

2  that's what bankruptcy's all about.  You know that better than

3  I do or anybody else in this Courtroom.  And so our strategy

4  has been to be a mediator.  I don't know that we can be

5  independent.  And people have argued that we can't be

6  independent.  But in some sense of the word we are

7  independent, because there's really very little chance that

8  there will be money left over for equity.  There is, I guess,

9  you could argue a possibility.  But everybody's on the

10  assumption at this stage of the game anyway that absent a

11  consensual plan that leaves some money for equity, that

12  there's not.  And so the question is, how's the pie getting

13  divided up?  When you look at it that way, the Debtor doesn't

14  have a particular interest in how that pie gets divided up.

15  What the Debtor cares about is getting it over as soon as

16  possible so we can get this business out, and move on with our

17  business and not with a bankruptcy case.  And there's a cost

18  factor too.  But that fits in with that.

19      So what we've tried to do is we've tried to -- and the

20  parties have been great about letting us do this.  We've tried

21  to assess the facts, put them together at each step of the

22  game in an objective way, like this is what we found.  We have

23  been pressed numerous times.  We will be pressed numerous

24  times in the future about what our view of how those facts fit

25  into the law is.  We have resisted that temptation because we

SUPP. APP. 003860

1  believe, at least at this stage of the game, once we play that

2  card, we pick sides.  And we don't want to pick sides right

3  now.  We want everybody else to decide among themselves, with

4  our facilitation, how to get this resolved and how the pie's

5  divided up.  Unfortunately, if we can't get them there, we

6  will have to pick sides.  And we understand that.

7      We have a basic strategic dispute with the Banks.  We

8  want to do that through a plan.  We think that's the Debtor's

9  right.  We think with all the cases that we've all been in,

10  that the best way to get a case resolved is to take this whole

11  bag of whatever you want to call it, and put it together in a

12  plan, as opposed to litigating it piecemeal.  Because once you

13  litigate piecemeal, and no matter what the answer is, somebody

14  gets an advantage over another side.  Forget about the

15  litigation and the timing and appeals and all that which may

16  mess up your plan in itself, or at least the timing of it.  It

17  takes away part of your ability to put it together and

18  negotiate with a little give here and a little take there.

19  And you know.  You know the process as well as I do.  So we,

20  from a theoretical standpoint, would like to sit down today

21  with everybody.

22      But the other practical reality of this case, which I

23  believe most if not all of the major constituencies agree to,

24  is we could sit from now until kingdom come, but without a

25  Futures number, it's almost impossible.  Because the possible

SUPP. APP. 003861

1  swings, at least right now in the Futures number, are so large

2  that nobody's really gonna sit down and agree to a piece of

3  the pie until they know generally what the pie consists of and

4  what their potential shares are.  Now, it is possible that the

5  parties could just sit down and say, "Look.  Let's just do

6  this really rough cut.  What number do you have for me?  You

7  know, is that acceptable or not?"  That's a possibility.  And

8  some of those discussions may actually take place.  But being

9  as practical as I am, I don't believe that you're really gonna

10  solve this until there's a Futures number.

11      So now you get to Judge Wolin.  And we talked to him at

12  our meeting about when he thought.  And he wants us to come

13  back with a Scheduling Order on asbestos valuation, which

14  we're gonna try to do.  And we've been circulating one for a

15  couple of months now, and discussing it.  We have narrowed it

16  down to something that's realistically gonna take place at the

17  end of the third quarter, beginning to the middle of the

18  fourth quarter of this year.  And really until that number

19  comes out, it's a tough one.  So we can all rush, and we can

20  get this valuation done, which we don't agree will get you

21  anywhere anyway.  We think it'll -- it involves -- when you

22  say "valuation," you're gonna litigate all the Inter-Creditor

23  issues.  Because you have to make all those legal judgments

24  before you could ever get a valuation done.  So we have come

25  from this approach.  If you're not gonna have an estimation

SUPP. APP. 003862

1  number until the end of the third, beginning of the fourth

2  quarter, how do we get everybody into a position so when that

3  number hits, literally they can almost sit down and start

4  talking?  And that's really where this proposal comes from.

5      I mean I think with that perspective -- although we'd

6  like to do it now, and we're not happy that it's gonna be six

7  months from now, practically and realistically I think

8  avoiding litigation and keeping the parties on this track and

9  getting the Court's assistance to keep everybody moving -- you

10  know, we're not looking to waste time, we're not looking to

11  delay anything.  So the key to this whole proposal is keep

12  everybody moving, but keep it in a direction so that when that

13  asbestos estimation number hits, for Futures particularly,

14  then we can sit down and really talk and hopefully get a plan,

15  you know, consensually negotiated, or at least get one that's

16  confirmable with enough parties so that we can then move to

17  the next step.

18      THE COURT:  Okay.

19      MR. ECKSTEIN:  Your Honor, good evening.  Kenneth

20  Eckstein on behalf of the Bank Group.  It's a little difficult

21  at 5:30 after a complete day to have a philosophical

22  discussion.  But this is in some respects a philosophical

23  discussion about the direction of the case.  Your Honor heard

24  Mr. Monk talk about some specifics.  And Your Honor heard Mr.

25  Pernick talk about macro philosophy.  And I feel it's

SUPP. APP. 003863

1  incumbent upon me to address both of those topics.   I'll try

2  to do it as briefly as I can.   Let me preface it by saying,

3  Your Honor, the Banks filed a week ago a statement in respect

4  of the Inter-Creditor issues that were scheduled to be heard

5  today.

6        THE COURT:   I've read it.

7        MR. ECKSTEIN:   We received a statement by the

8  company, which I received on Friday afternoon.   And I frankly

9  have not even had an opportunity to review it with my clients.

10  And, unfortunately, while we had prepared for today's hearing

11  and thought that this was a significant milestone in the case,

12  it is somewhat of a disadvantage to have to contend with a new

13  proposal that came to us only Friday afternoon.   And I think

14  that's troublesome.   Notwithstanding that, Your Honor, we do

15  have a disagreement with the Debtor about several of the

16  approaches that are being taken.   What we don't disagree with,

17  what I think we have a complete consensus on, is the fact that

18  we agree with the company and have all along agreed with the

19  company that this is a case that for the benefit of all

20  parties should not follow the path of the typical mass tort

21  case.   And I've heard the Debtor.   And I've heard the Debtor's

22  senior management speak passionately about the fact that we

23  need to avoid the protracted environment that has beset many

24  other mass tort cases, and not get mired down in a multi-year

25  bankruptcy.

SUPP. APP. 003864

1    And when we were first before Judge Wolin, I believe the

2  expectation that he had when he walked away from that hearing

3  was that this case was not going to be one that was going to

4  require a significant amount of his time and attention.

5  Apparently over the last several weeks the case has evolved,

6  and we seem to be heading unavoidably to an estimation hearing

7  that will be contested.  I've heard mention that it'll be some

8  time in the third quarter or the fourth quarter.  And I

9  believe that we cannot today predict with any certainty when

10  the estimation matters will be heard by Judge Wolin.  Whether

11  they'll be heard with this case alone, together with other

12  cases, I think are issues that are significant and leave us

13  wondering when this case is going to be moving to a point when

14  they will have a handle on the asbestos claims.

15    Where we are -- and frankly, Your Honor, what we believe

16  is the ideal approach -- and I'm gonna do this backwards.  We

17  believe that the approach in this case has always been to try

18  to lay a foundation for the parties to be incentivized and

19  adequately informed, try to negotiate settlement without

20  litigating the two major issues.  The two major issues are

21  litigating the asbestos claims and litigating the Inter-

22  Creditor issues.  And our view has always been -- and I

23  thought the Debtor shared the view -- that we wanted to put

24  the parties in a position to try to either settle, or in the

25  absence of settle, realize that there were going to be

SUPP. APP. 003865

74

1  hearings.  As Your Honor will recall, we came before this

2  Court in August of 2001, six months ago.  What we said to Your

3  Honor in connection with the exclusivity hearing at that point

4  in time was we felt it was imperative to put the Inter-

5  Creditor issue in a position where it could be either resolved

6  or litigated, so that it would not fall behind the asbestos

7  issues.  And in the event it appeared that the asbestos issues

8  were going to take longer than people hoped to resolve -- and

9  that we recognized then was a possibility -- we felt it was

10  important to put the subsidiaries, that we don't believe had

11  any asbestos liability, in a position where they could, if

12  it's appropriate, be dealt with under a separate plan.  And

13  we're not suggesting today that that's necessarily the way to

14  go.  But we thought that's an appropriate approach to take.

15      Your Honor was instrumental in helping the parties enter

16  into a stipulation at that point in time.  And I think it's

17  fair to say that the Banks have participated actively in the

18  process that was contemplated by the stipulation.  The

19  stipulation had an end date.  And the end date was today.  And

20  unlike all the prior conferences, the stipulation contemplated

21  that today was going to be a pre-trial conference, not merely

22  a status conference.  And the notion was that the parties

23  would have done due diligence, discovery.  It was contemplated

24  there was gonna be witness discovery that has not taken place.

25  There was going to be discovery.  There was going to be

SUPP. APP. 003866

1   discussion.  And that the purpose of today was in the event

2   there was not a resolution of the case, or at least of the

3   Inter-Creditor issues, that we would address what is the

4   appropriate next step.  How do we go about implementing claims

5   resolution?

6       Your Honor had a concern at the August 28th hearing that

7   it was premature to establish a process for claims resolution,

8   because there were no claims on file at that point in time.

9   And that was something that we specifically built into the

10  stipulation.  And at the beginning of November the Banks did

11  file claims against the various subsidiaries, as well as

12  against Owens Corning based upon the guarantees.  And the

13  Debtor has fixed the bar date.  And as far as we know,

14  whatever claims are being asserted against the other

15  subsidiaries, with the exception of the tort claims, have been

16  filed.  And we're not aware that any significant new claims

17  have emerged against the subsidiaries that would change the

18  landscape.

19      So in essence what we are dealing with, Your Honor, on

20  the inner Creditor front, is we have Bank claims based upon

21  guarantees that have been filed against a variety of Debtor

22  subsidiaries.  And there are Bank claims based upon guarantees

23  against non-Debtor subsidiaries as well.  And we think that

24  there is the opportunity now to have a claims resolution

25  process.  The question is, what makes sense right now?  Your

SUPP. APP. 003867

1   Honor, I did receive the Debtor's report.  And before dealing

2   with their response I think it's important for Your Honor to

3   appreciate that before coming here today we felt that it was

4   important to try to explore whether or not it was realistic to

5   have plan negotiations during this phase of the case.  And we

6   have in fact had, I think, very intensive discussions with the

7   Debtor about the prospects for a plan, about the format for a

8   plan.  And we respectfully disagree with the Debtor that it is

9   not possible at this stage to proceed with a plan of

10  reorganization.  We, in fact, believe that the parties could -

11  - all of the parties could sit down and negotiate a plan.  And

12  that may or may not happen.

13      We have become convinced that at this point in time our

14  efforts alone are not gonna motivate that, although we stand

15  ready and willing to continue our efforts, and we believe that

16  we have come up with a process that we think would be quite

17  constructive, and we think that over the next several weeks

18  and months parties should engage in that process.  But we are

19  persuaded by what has taken place over the last several weeks

20  that the notion of plan negotiations aside, that a near term

21  settlement are not likely to occur.  And that has caused the

22  Banks, at least, Your Honor, to look to an alternative vehicle

23  to solve its issues, at least, in the case, and we think the

24  issues generally in the case.

25      What we believe makes sense is now that we've done as

SUPP. APP. 003868

1  much discovery as has been done, we think what makes sense not

2  to propel into all out litigation.  We understand that that's

3  not efficient or desired.  But at the same time we believe

4  that it's important for the parties to focus on the issues

5  that need to be addressed.  Now, Mr. Monk pointed Your Honor

6  to the fact that a variety of issues have been identified, and

7  they were catalogued in the Debtor's response.  I went back to

8  the transcript of the August 28th hearing.  And I went back to

9  the stipulation.  And I would submit to Your Honor that the

10  issues that were catalogued in the Debtor's response are

11  essentially identical to the issues that were catalogued on

12  August 28th of 2001, and the issues that are catalogued in the

13  September 24th stipulation.  The fact of the matter is I think

14  the parties have gotten a lot smarter about the details.  But

15  the reality is we knew six months ago what the issues are, we

16  know today what the issues are.  And what Mr. Monk did not

17  tell you was if any of the issues had been closed.  Because it

18  is human nature in this process for parties not to concede

19  issues.  Parties are identifying all kinds of items that they

20  might want to allege as bases to undermine the Bank's

21  guarantees.  And that's what this is all about is can we come

22  up with -- how many arguments can we come up with to undermine

23  the Bank's guarantees?

24       And what we would submit, Your Honor, is that the parties

25  know what issues are out there.  And the question is, are

SUPP. APP. 003869

1  these serious issues or are they not serious issues?  Are

2  these gonna have validity, or are they not gonna have

3  validity?  I would suggest that what we need to do in this

4  case is relatively simple.  Separate and apart from the tort

5  claim -- and I don't think we can control that today -- with

6  regard to the Inter-Creditor issue, which I think is the other

7  issue, we need to understand are the Bank claims valid?  We

8  need to understand that if the Bank claims are valid, what is

9  the value of the Bank claims against the Guarantors?  And we

10  need to understand whether there are any other Claimants who

11  have claims against these guarantees?  Those are three

12  questions.

13        I would submit that until we can answer those questions,

14  it is not going to be possible for the Debtor to simply make a

15  plan proposal and have that plan proposal and essentially

16  advance the ball.  All the plan proposal will do, if we wait a

17  year, for example, to answer those questions, is for the

18  Debtor to say, "Here's our suggestion.  And if you don't take

19  this suggestion, you'll be mired down in two to three years of

20  litigation."  And that'll be a year from now or 18 months from

21  now when people are more fatigued.  And it's, frankly, a

22  tactic that's gonna be used to hold up legitimate Creditors of

23  this Estate.  What we want to do is we want to avoid that

24  process.  And we think that we have proposed an approach that

25  makes a lot of sense.  And that approach was based upon

SUPP. APP. 003870

1  discussions we had with the Debtor.

2      Now, Your Honor, we believe that the valuation issue is

3  the issue that is separating us most significantly from the

4  Debtor.  That's not to suggest there are not other issues.

5  But we believe that if we can identify the value of the key

6  subsidiaries, we will have made significant progress in at

7  least clarifying, if not resolving, the Inter-Creditor issues.

8  I'm not looking to litigate, Your Honor.  But I recognize we

9  may not agree.  And what we had always envisioned was that we

10 would sit down and work through an approach with the Debtor.

11 And we have no objection to stipulations, Your Honor.  We've

12 always talked about stipulations.  But our view is that the

13 stipulation should be focused on an end game.  If we can reach

14 an agreement, we would be happy to submit that agreement to

15 the Court for approval.  In the absence of agreement, we

16 believe that we need to have the prospects for a hearing for

17 the Court to consider the disputes.  And we thought that was a

18 relatively narrow dispute.  And that's what we're talking

19 about.  What is a Debtor worth?  What is a particular

20 Guarantor worth?  Because that will help shape the terms of a

21 plan.

22      And I think we have an agreement as to the two key

23 subsidiaries that we should start with.  We agree OCFT and IPM

24 -- IPM is a non-Debtor.  But for purposes of the plan we think

25 it would be useful to start with those.  We think determining

SUPP. APP. 003871

1   the value of those two subsidiaries would make eminent sense.

2   To the extent the parties think it's going to wrap in other

3   issues, Your Honor, we're happy to have an objection to claim

4   process for those two subsidiary Guarantors as well.  We see

5   no reason why by a date certain, whether it's March 30th or

6   April 15th, parties cannot simply file an objection to those

7   claims.  Those claims are out there.  If there are issues that

8   people think need to be raised, let them frame the issues.  If

9   we're gonna do a stipulation, I want to know what I'm

10  stipulating about.  I mean there are numerous issues that the

11  Debtor has laid out, most of which go to fraudulent

12  conveyance.  And with all due respect, we don't believe

13  fraudulent conveyance is an issue that should be litigated in

14  this case.  We don't even believe the Debtor's gonna want to

15  prosecute fraudulent conveyance.  Sure, it's been thrown out

16  as an issue.  But we don't believe it should be litigated

17  here.  These were subsidiaries.  In the case of OCFT you heard

18  Mr. Monk say it was set up 10 years ago.  I don't think

19  anybody's gonna prosecute that OCFT was a fraudulent

20  conveyance.  I'm not aware of any statute of limitation that

21  goes to undoing a subsidiary that was set up 10 years ago.  To

22  the extent people want to attack the guaranty given by OCFT,

23  Your Honor, I can't prevent people from raising issues.  But I

24  respectfully do not think that when people put pen to paper,

25  that that's going to be a litigation that's gonna go very far

SUPP. APP. 003872

1  here.  But until people are forced to frame the issue and

2  present it to the Court and start to find out where issues

3  come out, respectfully we're not gonna get resolution.

4     So we believe that we can marry the stipulation concept

5  with a claims resolution process.  And we think that objection

6  to claims -- and if they want to use OCFT and IPM as the first

7  ones, that's fine.  But if you have a claims objection process

8  and a valuation process, you can do them together for those

9  two subsidiaries.  With all due respect, it's not as

10  complicated as people want to make out.  If people want to

11  make it simple, we believe it can be made simple.  We're

12  simply talking about discretely taking those subs.  We agree

13  with the company.  Let the company start and present its

14  accounting information.  There'll probably be experts.

15  There'll be one expert on this side, one expert on that side.

16  If we need to take a deposition, we'll take two depositions.

17  That happens.  And our view is over the next six months the

18  parties can either stipulate to the facts, identify which

19  issues they don't agree on, submit memoranda of law on the

20  particular issues.  And if we need a day or two of hearings,

21  Your Honor, we should schedule them.  We could have a pre-

22  trial conference in advance.  But we believe that the

23  existence of that hearing date, and the fact that parties have

24  to join some issues and finally find out whether or not we are

25  or are not going to get resolutions, that more than anything

SUPP. APP. 003873

1  else in our mind is the most likely scenario to motivate the

2  parties to sit down and talk about a resolution.  Because if

3  you have a tort claim hearing pending on the one hand, and an

4  Inter-Creditor hearing on the other hand, people have the

5  alternative of litigation or settlement.

6      THE COURT:  Yeah, well you're not -- your time frames

7  as articulated in the Bank's status report and as articulated

8  in the Debtor's status report are a little bit different.  The

9  Bank's was more expedited.  But quite frankly I'm not sure

10  you're really all that far apart in what you propose to do.

11  The Debtor seems to want to have a month between things.  I

12  guess to make sure that if there is a possibility of having

13  people agree to stipulations with respect to a subsidiary,

14  that that's kind of fixed in cement before you move to the

15  next seat.  I honestly don't know enough about the Inter-

16  Creditor relationships at all to have a view about whether

17  that's a better way to structure it, or whether it should just

18  be opened up for wholesale mass stipulation.  I tend to think

19  that based on the number of issues that have been identified,

20  it probably makes more sense to try to get the stipulations

21  together by entity, as opposed to by every entity at one time.

22  Maybe your argument really is with the time frame.  You're

23  talking about six months.  You're talking about getting the

24  stipulations proposed within four.

25      MR. ECKSTEIN:  I think the difference between our

SUPP. APP. 003874

1   view and the Debtor is simply we believe that after the

2   stipulations have been done we think that there needs to be a

3   hearing date.

4           THE COURT:  Oh.

5           MR. ECKSTEIN:  And we think there needs to be a

6   litigation process set up, because merely stipulating in a

7   vacuum, in our view, is not going to get us a solution.  We

8   need to know what we're stipulating about.  And we need to

9   know what issues are gonna be presented for a hearing.  And if

10  we can't reach agreement, we would like to have a hearing

11  before Your Honor.  That's really the difference between where

12  the Banks are and where the company is.

13          THE COURT:  Okay.  Well the Banks have filed proofs

14  of claim.  I mean at any -- there's no bar date for filing

15  objections to those claims.  And anybody who wishes to

16  challenge those Bank claims I guess can do it.  You've all

17  been on a standstill agreement not to do those challenges, in

18  essence, because you've been looking at the documents.  And

19  I'm not quite sure until you have a chance to try to do some

20  stipulations that the Debtor is proposing, for example

21  corporate history.  Is that really gonna be an issue?  I mean

22  it make take some work to get the stipulations in place, but

23  is that gonna be an issue?

24          MR. ECKSTEIN:  No, Your Honor.  I think as the Debtor

25  knows -- we've talked about stipulations before.  And we agree

SUPP. APP. 003875

1  that most of the facts will be stipulated.  I think what we

2  need is we need a goal.  And to merely -- a stipulation in our

3  view is not a sufficient goal.  We're happy to work with

4  stipulations.  And we're happy to work with interim dates.

5  But we need to know that there's going to be a date out there

6  in the future that people are targeting toward either to

7  settle or to litigate issues.  And we think that is what's

8  going to move this along, not merely stipulating to the issues

9  for the sake of stipulating to issues.  Because we believe

10  that a lot of these issues are going to fall away.

11       THE COURT:  All right.  Well, let's assume for the

12  moment that I think, okay, we'll go with the Debtor's proposal

13  with respect to the time frames within which to do the

14  stipulations.  That means that sometime in September, in

15  essence, we could get together to decide what to do next.  Are

16  you saying that that's not sufficient because that's too much

17  time to look at whatever stipulations the Debtor may want to

18  put together?

19       MR. ECKSTEIN:  I think that would be too long, Your

20  Honor.  And I think that it would be inefficient.  Frankly, if

21  the Debtor wants to start with OCFT and IPM, we're agreeable

22  with that.  That basically in their time frame was May and

23  June.  What we believe needs to be done there is either reach

24  an agreement as to the issues in that stipulation, or not

25  reach an agreement.  I think the Debtor has told us that we're

SUPP. APP. 003876

1  not going to reach an agreement as to value.  I mean we know

2  that in advance.  And that's not -- there's no secret about

3  that.  We have agreed with each other that we're gonna

4  disagree on value.  And I believe what we need is either to

5  have an opportunity to negotiate the value, or if not

6  negotiate, resolve the value at a hearing.  And we're prepared

7  to do that.  But we believe we're only gonna get to the

8  resolution if as a backdrop to the negotiation there is a

9  hearing date.  And that's -- our suggestion is that if they

10  want to tee up a stipulation in May, for example, for OCFT,

11  whether it's July or August, I don't want to quibble about

12  dates at this point, Your Honor.  I'm simply saying that we

13  need to know that by a certain date in time if we haven't

14  agreed upon the value of that entity, then we should have a

15  hearing to determine the value.

16         THE COURT:  All right.

17         MR. ECKSTEIN:  And we need to have expert --

18         THE COURT:  I'm sorry.

19         MR. ECKSTEIN:  And we would need to have experts

20  probably on both sides.  Not many of them, but we would need

21  to have experts on both sides who would have their view.  And

22  we would present the open issues to the Court with briefs.

23         THE COURT:  Okay.  With respect to the valuation of

24  each particular entity, if I understood Mr. Monk correctly,

25  because of Inter-Creditor transfers the issue of value may not

SUPP. APP. 003877

1  be particularly what each specific asset's worth.  It may be

2  where the value lies -- in which of the entities the value

3  should be attributed.  And it may very well be that you can

4  agree to the value of the particular component asset, but you

5  may not agree as to which entity is entitled to have that

6  value recognized as one of its assets.  Did I misunderstand?

7          MR. MONK:  No, Your Honor.

8          MR. ECKSTEIN:  Respectfully, and while it's very

9  difficult if you're not in the room, in this case -- in the

10  case of both OCFT and IPM we understand that there are notes

11  that both the entities had issued.  But the reality is the

12  dispute that we're told is going to exist is as to the value

13  of the underlying entity, not -- we all know the note is out

14  there.  And whether the note is or is not enforceable is a

15  discrete issue.  But the real issue is what is the entity

16  worth?  And there is a fundamental disagreement on what the

17  entities are worth.  And that's where we need a process to

18  resolve that dispute.

19          THE COURT:  All right.  You're not talking about the

20  asbestos or the Futures --

21          MR. ECKSTEIN:  No, I'm not.  Not at all.

22          THE COURT:  -- or valuing these at -- this is an

23  accounting function.

24          MR. ECKSTEIN:  Accounting function.  And hopefully we

25  can do it without a hearing.  But I'm told that that's not

1    likely.  And we're happy to try, but we don't believe we'd get

2    there without the process that says, "If you don't reach some

3    kind of a resolution, then your alternative is to have a

4    trial."

5    THE COURT:  All right.  Well, maybe what you need is

6    a better defined goal, rather than just identifying

7    stipulations.  You may need a goal that says we're attempting

8    to stipulate to the value of this particular entity, and

9    here's how we're going to go about it.  And if we don't, then

10    at a certain date we're gonna come in with pre-set

11    stipulations of fact and agreements to disagree about a

12    different set of facts.  And perhaps then we need to decide

13    where to go.

14    MR. ECKSTEIN:  I would agree with that, Your Honor.

15    That's exactly what I'm suggesting would be useful.  And we

16    would try to work towards something like that.

17    THE COURT:  All right.  You don't have a challenge

18    with the four-month period Debtor is proposing to get through

19    this.

20    MR. ECKSTEIN:  No.  As I say, Your Honor, I got this

21    Friday.  I did not speak to my clients.  To me personally it

22    does not seem unreasonable.  But I would like to know that

23    there is a process that they're willing to agree to that goes

24    beyond merely tendering a draft.  And I think if I knew, Your

25    Honor, that I could bring back to my clients a process that

1    was going to get to a resolution, I would certainly take that

2    back to my clients and try to get a resolution on that basis.

3         THE COURT:  All right.  Well, I guess my lack of

4    knowledge about the Inter-Creditors actually will be glaring

5    at the moment.  But I'm concerned about forcing stipulations

6    to be filed as to any particular subsidiary until you get

7    through the whole process of all four of the major

8    subsidiaries, because it may be that as you go through the

9    identification of the assets, you will find things that you

10   may agree either to agree about or disagree about.  And if you

11   set them too early, they're gonna be fixed in cement.  And

12   people don't like to retract from positions.  It would seem to

13   me that the Debtor's proposal with respect to the four monthly

14   periods that are set out should probably be approved.  But

15   what I should add to it is a deadline after that by which the

16   parties will file a stipulated record as to the facts that the

17   Debtor has been able to induce the parties to agree to as to

18   each of those entities, and a list of the facts that are in

19   dispute.  Once -- and since the overall goal is to value the

20   entity, the Bank's claim against those entities may be a piece

21   that can be addressed after we know what the factual

22   stipulations are with respect to the particular assets and

23   where they reside.

24        MR. ECKSTEIN:  If I can just suggest, Your Honor, and

25   I think it's in part a desire not to suffer too much delay,

SUPP. APP. 003880

1  and at the same time to try to see whether the process works,

2  I would respectfully submit that OCFT and IPM, which are the

3  first two that the Debtor has identified, are discrete and

4  should not be combined with Integrex and Fiberboard, both of

5  which have very different issues.  I would suggest that it

6  also makes sense to try to work with those two entities, and

7  to try to work toward a stipulated record and identification

8  of what issues would need to be resolved with those two

9  entities, and see whether it works for those two entities.

10  And then we'll have an easier time doing the others, rather

11  than trying to tackle all four or five, and then being in a

12  sense potentially overwhelmed or in the wrong direction.

13        THE COURT:  Well, again, pardon me, because if I'm

14  misstating things it's just because I've misheard.  But did

15  not Mr. Monk say that the $501,000,000 dividend note was

16  assigned from OCFT, or OC, I guess, to Integrex?

17        MR. MONK:  Correct, Your Honor.

18        THE COURT:  Okay.

19        MR. ECKSTEIN:  But it does not require getting into

20  the underlying Integrex value.  Integrex holds the note.  You

21  can put the note aside.  It's a claim against OCFT, a claim

22  against IPM.  We don't need to get into the value of Integrex

23  or Fiberboard in order to understand OCFT and IPM.  I believe,

24  based upon the information we all have, if we can wrestle OCFT

25  and IPM to the ground, we will have made tremendous progress

1   in, I think, laying a foundation for the resolution of the

2   Inter-Creditor issues.  Our believe, Your Honor, is that

3   significant value resides in those two subsidiaries.  And

4   while the other subsidiaries may be important, I think once we

5   have crystallized the facts pertaining to those two

6   subsidiaries, I would submit that we will have made

7   significant progress.  And if we need to resolve disputes, I

8   believe that it would be more efficient and it will be

9   consistent with the Debtor's goal of not having overwhelming

10  litigation if we focus open disputes on those two entities.

11          THE COURT:  All right.  Does anyone else want to

12  weigh in for a few minutes?  Good evening.

13          MR. RAHL:  Good evening, Your Honor.  Andrew Rahl,

14  Anderson, Kill & Olick on behalf of the Non-Bank members of

15  the Official Unsecured Creditor's Committee.  Your Honor, we

16  agree completely with the Debtor's approach.  Mr. Monk's

17  recommendation is the best way to proceed.  We also agree with

18  the Debtor's characterization of the Bank's position in the

19  Debtor's response as -- that the Banks are being selfishly

20  strategic in the way they are trying to tee up this inner

21  Creditor process.  And I really just want to focus -- aside

22  from registering our strong support for the Debtor's

23  recommendation in this matter, I just want to focus on

24  precisely how it is that the Banks are being selfishly

25  strategic.

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-929-0191*

SUPP. APP. 003882

1    It is -- would be to the tremendous advantage of the

2    Banks in the posture of this to -- if the Banks are able to

3    succeed, if you will, in getting the Court and the other

4    constituencies in this case to focus on individual

5    subsidiaries, OCFT, IPM, what have you, as distinct from the

6    Debtor's overall business, in two obvious respects.  One is

7    the minute you get into, for example, a valuation hearing for

8    OCFT, there's an implicit presumption that OCFT's guarantee of

9    the Bank debt is valid.  There's no need to have -- to value

10   OCFT, if OCFT has no separate enforceable obligation to the

11   Bank Group, just as one example.

12       Also, Your Honor, to stay with OCFT, a very significant

13   issue in this case, and one which without question in the

14   bankruptcy process is initially in the province of the Debtor

15   to make a determination here is substantive consolidation.

16   Once again to the extent that this Debtor substantively

17   consolidates any of its entities with the parent, to the

18   extent that there are separate Bank guarantees, they would not

19   be recognized.  And any sort of valuation exercise with

20   respect to those subsidiaries would be irrelevant and a

21   complete waste of time.  It is -- the Debtor has given you an

22   outline of 34 separate factual and legal questions over -- in

23   the course of three pages of its status report in response to

24   the Banks.  And it's apparent from just simply looking at this

25   list of issues, that there are a great many questions of

SUPP. APP. 003883

1   interaction among the different subsidiaries, the different

2   topics that are raised. And I'll simply point out that the

3   list begins and ends with the question of the validity of the

4   Bank guarantees at the outset. And at the end the questions -

5   - and there are a number of them related to substantive

6   consolidation.

7        Your Honor, I -- without getting into the specific facts

8   at this late hour I'll simply say I'm quite sure that the

9   Debtor will acknowledge that it has been the Debtor's public

10  position stated repeatedly in a number of different forums,

11  including, among other things, a presentation at a bankruptcy

12  conference, that this Debtor, like many multi-national

13  corporations, has always operated from the perspective of the

14  efficient execution, if you will, of its lines of business.

15  And that it has done so and has functioned -- organized itself

16  around lines of business without reference to the specific

17  legal entities that make up a vast complex of affiliated

18  subsidiaries, both domestic and foreign.

19        THE COURT: And I thought this was just a mom and pop

20  grocery store.

21        (Laughter)

22        MR. RAHL: My only point, Your Honor, is that the --

23  to frame this discussion going forward on the Inter-Creditor

24  issue with reference to one or two or three or four of these

25  individual entities simply make no sense.

SUPP. APP. 003884

1    THE COURT:  Okay.

2    MR. RAHL:  And for that reason we strongly support

3  the Debtor's recommendation, Your Honor.

4    THE COURT:  All right, thank you.  Yes, ma'am.

5    MS. DAVIS:  Yes, Your Honor.  I'm Julie Davis from

6  Caplin & Drysdale on behalf of the Official Committee of

7  Asbestos Creditors.  I know the time is short and there are

8  other constituencies to be heard from, so I will just limit my

9  comments to two points.  First and foremost, our Committee is

10  unalterably opposed to this Court and the parties spending any

11  substantial amount of time in the foreseeable future to

12  determining the present value of the Debtor's subsidiaries

13  that guaranteed the Bank debt.  The major focus of the Inter-

14  Creditor issues is the validity of those guarantees, not the

15  value of the guarantee subsidiaries.  The Bank's proposal

16  makes sense if, and only if, we assume that the guarantees are

17  valid.  Because if the guarantees are found invalid, there is

18  absolutely no reason to spend 15 minutes worth of time for the

19  purposes of the Inter-Creditors issues, and probably for plan

20  negotiations worrying about the valuation of the constituent

21  parts.  And that is our basic objection.

22    Secondly, it's our -- we are concerned that engaging in a

23  valuation process will be a distraction for both the Court and

24  the other parties.  It will divert attention away from the

25  stipulation process that the Debtors have proposed, and that

94

1   we support.  It will be a waste of our resources.  It will

2   delay time.  And we may ultimately be forced to file

3   individual claims, start formal litigation, engage in the very

4   adversary proceeding that will be time consuming and costly

5   which we're all here and have agreed would be very detrimental

6   to this case.  We support the Debtor's proposal.  We think the

7   Inter-Creditor discovery process to date has been productive.

8   We want to see it concluded, and satisfactorily concluded.  We

9   have some comments on the specifics of the stipulation process

10  set forth in the Debtor's status report.  We've given those

11  comments to the Debtors.  But our bottom line is that we think

12  the stipulation process is a sensible next step in the Inter-

13  Creditor discovery process, and that we think wasting the

14  Court's time and our resources at this point is -- on

15  valuation issues for the particular subsidiaries that

16  guaranteed the Bank's debt would be a waste of time.  It's

17  putting the cart before the horse.  It's out of order.  And we

18  should not engage in it.

19       THE COURT:  How is the Debtor's proposal with respect

20  to the stipulations going to get to the issue of the validity

21  of the Bank guarantees?  I don't understand in this process --

22  it talks about overall management and financial operations.

23  Under IPM it includes issuance of the dividend note.  But it

24  doesn't seem to talk about guarantees.

25       MS. DAVIS:  Well, to the Inter-Creditors as a legal

1   basis envisions that there -- and the Banks have admitted

2   this, and it's been an underlying assumption all along --

3   there are numerous legal theories with respect to which you

4   could vitiate or invalidate the Banks guarantees:  Substantive

5   consolidation, alter ego, constructive trust, equitable

6   subordination, fraudulent transfer.  There are many, many

7   legal theories that one could bring to bear that would

8   potentially invalidate those guarantees.  What the Inter-

9   Creditor discovery process has been about to date is a process

10  by which we all have the opportunity to get into the facts

11  besides the various transactions and events regarding the

12  Debtor's subsidiaries and the Debtor's overall operations,

13  which are critical to this inquiry from a substantive

14  consolidation point of view, where we would all have access to

15  the facts, documentary and otherwise, and we could then sort

16  of sort through this information and determine from our

17  particular Creditors constituent point of view what arguments

18  one could conceivably make or claims we could conceivably

19  assert that bear on the validity of those guarantees.

20       What the Debtor is proposing, now that we have more or

21  less gotten our arms around the relevant documents, is

22  evaluating those documents, evaluating those facts, coming up

23  with stipulations of those facts, and with those stipulations

24  in hand and the documents in hand we would then be in a

25  position -- the various constituents -- to decide when we sit

SUPP. APP. 003887

1   down to negotiate a consensual plan -- the strength of our

2   claims.  We absolutely agree with the Debtor that it is of

3   critical importance to determine what the asbestos liabilities

4   are.  And then we will all know, at least arguably, what we

5   will have by way of a -- shares of the Debtor's Estate.  But

6   those shares, and our right to the particular share, depends

7   first and foremost on whether or not the Bank's guarantees are

8   valid.  And we've got to resolve the Inter-Creditor issues

9   before we can sit down with a consensual plan.  We've got to

10  know what the validity of these various legal theories are.

11  And unless and until we do that, as well as come up with a

12  number for future asbestos liabilities, we can't get to plan

13  negotiation.

14       My point is that that having been done, if it's

15  determined through the Inter-Creditor process that the Bank's

16  guarantees are invalid, we'll never get to the value of these

17  particular subsidiaries, because it's not gonna matter.  All

18  of us will share and share alike pari passu in the Debtor's

19  equity.  The value of the constituent parts will not be

20  relevant for those plan discussions or even to propose a plan,

21  because we will all be on the same basis in terms of sharing

22  in the equity of the parent Debtor, as opposed to who has

23  direct claims against the Debtor subsidiaries.

24       THE COURT:  So your view of the stipulation process

25  isn't so much that it's designed to get the stipulations of

SUPP. APP. 003888

1   assets and where they belong.  It's designed to ferret out

2   facts to see whether or not there is a claim that can be

3   brought against the Bank by any of the Banks -- by any of the

4   constituent parties to strike the validity of their claim.

5           MS. DAVIS:  Primarily, yes.

6           THE COURT:  So this probably will go along both

7   lines.

8           MS. DAVIS:  Yes, Your Honor, absolutely.  And we

9   think that the Debtor has come up with a very sensible

10  proposal that will track the asbestos liability estimation

11  process, that will get us into the station, so to speak, at

12  the same time with at least understanding what the parties'

13  respective rights are to the Debtor's assets, whether the

14  Banks do in fact have direct claims against particular

15  subsidiaries by virtue of the guarantees, or whether they

16  don't.  But if their guarantees are invalid, we'll never get

17  to what the value of the particular guarantees -- or

18  subsidiaries are.  We just won't need it.

19          THE COURT:  All right.  Well, I'm still not seeing

20  that even in that view that the Debtor's overall proposal

21  can't be coupled with the deadline by which to file

22  stipulations that you agree on, and lists of facts that you

23  don't agree on.

24          MS. DAVIS:  Oh, I -- we're not taking exception to

25  that this afternoon, Your Honor.  What I'm addressing is the

1  Bank's proposal that we carve out and put on some separate

2  track that is going to be time consuming and costly and

3  distracting, this valuation exercise.

4         THE COURT:  Okay.

5         MS. DAVIS:  Thank you, Your Honor.

6         MR. RAHL:  Your Honor, just for the record we don't

7  disagree with the concept either of a date by which a

8  stipulation needs to be filed.

9         MR. ECKSTEIN:  Maybe we can get a consensus, Your

10  Honor.  Because I don't want it to be a -- we're not trying to

11  discourage people from raising the validity issue.  And,

12  frankly, we believe that we should deal with validity and

13  value for a particular entity simultaneously because they will

14  merge.

15         THE COURT:  I think that's what I'm --

16         MR. ECKSTEIN:  But --

17         THE COURT:  -- trying to understand after a lengthy

18  discussion.

19         MR. ECKSTEIN:  But I think as Your Honor can hear

20  from the colloquy there are disputes.  And if people want to

21  challenge validity, our view is it needs to happen at some

22  point in time rather than holding it over our head

23  indefinitely.  And we filed our claims, filed them at the

24  request of the Court timely.  And we think at some point in

25  time we're entitled to get a resolution of whether those

SUPP. APP. 003890

1  claims are or are not valid. We believe they are. And we

2  believe these issues are gonna be held out there as leverage.

3      THE COURT: All right. It still seems to me overall

4  that the Debtor's time frame is not untoward, and that all I

5  need to do is add a date by which some stipulations should be

6  filed. I think what we ought to do is perhaps keep, so that

7  everybody's feet are to the fire, keep this issue on every

8  monthly agenda so that I can find out what progress is being

9  made. I don't know that you need a specific Order to that

10 effect. I think you all agree that you need a status report.

11 And keeping me up to speed might help as well. So I have no

12 disagreement, from what I've heard, with the Debtor having

13 until May 15th to put together the stipulations via OCFT, June

14 14th with respect to IPM, July 15th with respect to Integrex,

15 August 15th with respect to Fiberboard Exterior Systems and

16 affiliated companies.

17     My next question though is, is that going to be

18 sufficient to determine A) whether parties have challenges to

19 the validity of the Bank's claims, and B) the significance of

20 the asset valuations that the Bank is going to need with

21 respect to its guarantees in the event that there is either no

22 substantive consolidation proposed by the Debtor, or no other

23 method by which the Bank's claims are going to be challenged?

24 Because if it isn't, then I need to know what's next.

25     MR. MONK: Your Honor, I liked your idea of a

1  deadline by which we'll submit those stipulations to the

2  Court.  And I would propose that we do that.  Respecting the

3  fact that August is -- sometimes at the end of August is a

4  vacation time, and the parties have to have some time after

5  our August stipulation is on the record, I was thinking maybe

6  the end of October would be a reasonable period of time to

7  complete that process.  In answer to your question, I would

8  love to say that, yes, this will absolutely answer that, and

9  we'll know.  But I think we just have to go through the

10 process to find out.  The reality is the Debtor -- the

11 litigation that Mr. Eckstein is anxious to get us to start is

12 a litigation that we don't have to undertake if we can put a

13 plan together in this case.  And one of the reasons for

14 substantive consolidation, if we were to get there, because we

15 have negotiated values among the parties, was to avoid that

16 very litigation that he is anxious to launch us on.

17       So I would respectfully suggest that we should continue

18 our status reports, have our stipulation deadlines -- that'll

19 keep the Debtor's feet to the fire in keeping this process

20 moving forward -- force the other parties to give us their

21 response by a date certain.  I like that idea because that

22 will for sure make sure that we will accomplish, I think, a

23 lot in this process.  And then let's see where we are.

24       THE COURT:  All right.  Well, let's see about this.

25 It seems to me that without necessarily sharing information

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

SUPP. APP. 003892

1  among all the Creditor constituents, that that's going to be

2  an issue.  I don't know that it is.  But in the event that it

3  is, there could perhaps be dates by which each Creditor

4  constituent could comment back to the Debtor about the

5  Debtor's proposed stipulation, giving the Debtor an

6  opportunity to continually revise the tracks.

7          MR. MONK:  Absolutely.

8          THE COURT:  Now, this may be harder to do than it is

9  to explain.  But -- so let's say by May 15th the Debtor takes

10  a shot at putting together the OCFT.  Then perhaps by the next

11  deadline, which is June 14th, the Creditors ought to have

12  their comments back to the Debtor about the OCFT stipulation.

13  Not by the way of final objections or anything, just, "Well,

14  you know, you said somebody's tie was red.  It was really

15  mauve" type of thing.  To see whether they can be tweaked in a

16  way that everyone will agree to it.  Now, from the Creditors'

17  point of view, do you want to share those comments with each

18  other?  Or do you simply want them to go to the Debtor?

19          MS. DAVIS:  Your Honor, to date I think there's been

20  a very open exchange of information.  And generally any

21  request for information is shared with everyone.  So --

22          THE COURT:  You want to share it.  Okay.  So how

23  about if we have a rolling date then?  The Debtor will put

24  together the initial stips with respect to OCFT by May 15th.

25  The parties will comment back to the Debtor by June 14th.  And

SUPP. APP. 003893

1  by July 15th the Debtor will have together what it thinks --

2  what it hopes is the final set of stips with respect to OCFT.

3  While that's going on, okay, the Debtor will start the process

4  so that by June 14th the Debtor will have a draft with respect

5  to IPM.  The Creditors will return their comments to the

6  Debtor by July 15th.  And the Debtor will have what it hopes

7  is the final draft by August 15th.  So that keeping the same

8  date, but keeping a rolling going.  That will also get us into

9  the October time frame to file a final set of stipulations,

10  because you'll need two extra months to let this process roll

11  through.

12      Then, once I get the final stipulations, I think it would

13  be productive simply to have a status conference at which we

14  could figure out whether Creditors are satisfied that they

15  don't have challenges to validity, or whether you've made

16  enough progress in the plan negotiation process at that point

17  in time that you want another deferral of the issue, or

18  whether at that point somebody knows that it's time to bring a

19  piece of litigation either against the Bank on the validity

20  issue, or perhaps by the Bank as to the valuation issue.  The

21  Debtor doesn't want to bring the valuation challenge.

22  Frankly, I don't think I'm in a position to force the Debtor

23  to bring that challenge.  I think the Debtor, for plan

24  purposes, is going to have to pursue some evidence of

25  valuation of assets for confirmation reasons.  But I don't

SUPP. APP. 003894

1    think before then that Debtor has to bring that challenge.

2    Other parties are free to do it.  But I think if you let this

3    process roll through a little, it may make more sense to do it

4    that way.

5          So, how about a commitment that final -- well, let me see

6    if I work through the dates.  August 15th would be the date to

7    submit the initial Fiberboard.  September 16th would be the

8    date to have comments back.  October 15th would be the date to

9    have what the Debtor will hope will be a final set of stips as

10   to Fiberboard.  And then you need to mush them all together.

11   All right?

12          MS. DAVIS:  Your Honor, may I say something?  There

13   is one additional category, if you will, of stipulations that

14   I know the three Creditor constituencies feel is important to

15   add to the list.  And there's just one additional category for

16   now.  And we've talked to the Debtors, and they have agreed, I

17   believe -- Debtor's counsel -- that this category of

18   stipulations is very relevant and important.  And that is

19   stipulations regarding how Owens Corning, as a parent

20   corporation, interacted both financially and from a management

21   perspective with all of its corporate affiliates.  Because

22   this is a central issue with respect to substantive

23   consolidation.  And so it's important not just to look at

24   three or four individual subsidiaries, as important as they

25   are.  We also need to look at the over arching issue of how

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

SUPP. APP. 003895

1    Owens Corning conducted its affairs with its subsidiaries.

2              THE COURT:  All right.  Can I put that -- I would

3    assume that that's going to be a somewhat more complex

4    process.  If you start on it now, can you get through a draft

5    of that done by August 15th, as well as with the Fiberboard

6    issues?

7              MR. MONK:  Yes, Your Honor, we can.

8              THE COURT:  Okay.  So you'll -- then the Debtor will

9    revise this agenda to include that issue.  All right, now you

10   need some time to mush these facts together.  How much time?

11   I don't know whether this is sufficient for you.  Your October

12   hearing date is October 28th.  Your November hearing date is

13   November 25.  If this is going -- which is the Monday before

14   Thanksgiving.  If this is going to require a lengthy time in

15   Court, we may want not to put this on a motions day for the

16   status conference.  I really don't know what you're looking

17   at.

18             MR. ECKSTEIN:  Your Honor, if I can make a

19   suggestion, what might make sense -- I think the notion of

20   having status conferences as we proceed makes a lot of sense.

21   And, in fact, I could envision as we go down this path there

22   are going to be refinements and specific things that various

23   parties may need.  I could certainly envision that in our case

24   the Banks may need certain things.  It may turn out that the

25   Debtor and the other Creditor constituencies ultimately have a

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

SUPP. APP. 003896

1  single view, and to a certain extent it becomes a two party

2  exchange.  But there could be things we may need.  We may need

3  access to certain individuals at the company, for example, to

4  understand the basis for certain factual statements.  We may

5  want to make sure that our statements are incorporated into

6  these stipulations, because there are two sides of the story.

7  So it may make sense, Your Honor, to come back, I would

8  suggest maybe in April after we've had a chance to talk

9  through what has taken place today, digest it with our

10  clients, and the Debtor has taken hopefully a pretty good stab

11  at the stipulation.  And I think we'll have some views as

12  well.  And maybe ask Your Honor for a little more guidance or

13  clarification.

14        I mean certainly I think once the first stipulation has

15  been prepared, I think we'll have a good idea -- probably in

16  May or June we'll have a real good sense of what we need to do

17  in order to docket hearings if it appears that there are

18  disputes.  Because we'll know after the first stipulation.

19  We'll know if there are disputes.  We'll know what the

20  disputes are.  And I think it might be a more informed

21  opportunity to try to schedule a hearing that'll be

22  productive.  So I would suggest that we actually have these

23  conferences as we go along the path, and try to talk maybe

24  later in the Spring about when it makes sense to schedule

25  something farther out, I understand.  But once we have the

SUPP. APP. 003897

1   information in front of us, we'll know what the disputes are,

2   or if there are disputes.

3          THE COURT:  Okay.  So the first stipulation isn't

4   going to be due at the outset until May 15th.  And by the time

5   the Debtor gets around to finalizing any comments about it,

6   that's the July 15th date.  But you want a status conference

7   before that process starts?

8          MR. ECKSTEIN:  I was thinking, Your Honor, that we

9   might -- I doubt that we'll be having discussions with the

10  Debtor.  And to the extent we have issues, I want to make sure

11  we can come back to Your Honor at the status conferences to do

12  that.

13         THE COURT:  Absolutely, every month.  I think that

14  we'll just have a status conference about this process

15  automatically put on the agenda every month.  I --

16         MR. ECKSTEIN:  I'm suggesting that in July, for

17  example -- I believe by July we'll be able to have a very

18  substantive discussion as to what is needed at that point in

19  time.  At least after that first entity.

20         THE COURT:  All right.  Then --

21         MR. ECKSTEIN:  And it's probably a more informed

22  discussion as to what is needed from the Court.

23         THE COURT:  Okay.  My -- your hearing date on this

24  Estate is July 22nd at 3:00.  Why don't we just have a

25  detailed status conference about the first set of stipulations

SUPP. APP. 003898

1   that day?  Now, do you want them filed with me so I can see

2   them?  I mean I'm hesitant to make you file things too soon,

3   because I really don't want you to pin yourselves down and

4   then decide you're gonna change things.  I don't think that's

5   a good idea.

6        MR. ECKSTEIN:  It might be useful -- I mean the way

7   we filed statements today, maybe we want to submit a statement

8   as to where we are.

9        THE COURT:  That would be helpful, to give me a

10  statement in advance.  But I think without the stipulation --

11       MR. ECKSTEIN:  I don't think that Your Honor needs

12  the stipulation as much as understanding where the parties

13  stand and what we think needs to happen.

14       THE COURT:  Okay, that's fine.  So we will have a

15  status conference on July 22nd.  We're going to have a status

16  conference every month anyway.  But that month we will look at

17  the first set of stipulations.  No, I'm sorry.  We will look

18  at whatever issues have been developed as a result of the

19  first set of stipulations, and see whether this process

20  continues to make sense.  That's, I think, what you're asking

21  for.

22       MR. ECKSTEIN:  When is the June conference, Your

23  Honor?  Only because I know we're going to be hearing about

24  vacations and all these other things that happen in July.  If

25  there's any way to possibly grapple with June and just --

SUPP. APP. 003899

1            THE COURT:  It's June the 18th, I think.

2       (Pause in proceedings)

3            THE COURT:  Okay.  I'm being told it's June the 20th.

4    So I -- oh, I do have a calendar here.  I'm sorry.

5            MR. ECKSTEIN:  Even if -- I think if we just adjusted

6    the dates by a couple of days, we'll probably be able to make

7    the June setting which would be probably very productive, Your

8    Honor --

9            THE COURT:  Okay.

10           MR. ECKSTEIN:  -- from our perspective.

11           THE COURT:  It's currently set at 3:00 p.m. on June

12   20.  But do we have to have it that late that day?

13           ALL:  No.

14           THE COURT:  Could we do it at 1:00?

15           MR. MONK:  Your Honor, I assume -- and let me propose

16   that I reduce your rulings to a Form of Order of the Status

17   Order.  And I'll circulate it to all the parties.

18           THE COURT:  Okay.  I think I still need a date by

19   which your final stipulations are due.  Or is that something

20   you want to address on July 20?

21           MR. ECKSTEIN:  We can use a carry date.  Will we use

22   October 28th as the date?  Or I mean October 15th as a date?

23       (Pause in proceedings)

24           THE COURT:  No.  The final responses to the last set

25   of stips is due back to the Debtor by October 15th.  The

SUPP. APP. 003900

1    Debtor is going to need some time to put everything together,

2    and have a cohesive list of what is stipulated to and what

3    isn't stipulated to.  I think.

4            MR. MONK:  Yes, Your Honor.  How does your calendar

5    -- I mean should be pick a date separate and apart from the

6    omnibus hearing dates that are on there?

7            THE COURT:  Well for -- I just need a date by which

8    you're gonna file this stuff first.  And then I think we can

9    work the hearing date around it.  So if you get all of the

10   last comments in by October 15th, how much time after that do

11   you need to put your final documents together?

12           MR. MONK:  I think a month.  You'd better give me to

13   November the 15th, Your Honor.

14           THE COURT:  So those are actually going to be filed

15   and served, right -- the stipulations.  The parties will --

16           MR. MONK:  Yes, Your Honor.

17           THE COURT:  -- either have agreed or not agreed --

18           MR. MONK:  Right.

19           THE COURT:  -- at that point in time.

20           MR. MONK:  And I understand that I'll have a list of

21   these are facts that we agree to and stipulate to, and these

22   are disputed facts.

23           MR. ECKSTEIN:  And I'm assuming that by that time we

24   will have identified what issues need to be resolved by the

25   Court that haven't been resolved.

110

1      THE COURT:  Well, I would suspect that in your

2  process of talking to each other that's going to be the case.

3  I mean you're probably going to be clueing me in as the status

4  reports go by, as to where you think you are.

5      MR. ECKSTEIN:  I think that makes sense, Your Honor.

6      THE COURT:  Okay.  I think, however, for my purposes

7  I'd like to see the stips and the non-stips first.  And then

8  maybe address at this November 25th hearing what to do next.

9      MR. MONK:  Okay.

10      MR. ECKSTEIN:  I would just urge, Your Honor, if we

11  can use June 20th as the first target, it would help us, I

12  think, get to that stage efficiently, rather than let it slip

13  into July as we'll tend to back up to the date.

14      THE COURT:  Okay.  Now, Judge Wolin may be unhappy

15  with this time frame.  Because I think he's hoping to get

16  through this asbestos, personal injury estimation process

17  sooner than this.  So what happens if that's the case?

18      MR. PERNICK:  Well, and this was actually one of the

19  points that I just wanted to make.  Nobody's going to stop

20  talking through this process.  And I think that if we had an

21  asbestos estimation number, enough of these facts would be out

22  that maybe people will decide they want to sit down and start

23  talking, even though they don't have, you know, final stips.

24  I can't swear that everybody will do that, but I'd be willing

25  to bet on it.  And so I think discussions -- you know, the

1  only thing I agree with, with Mr. Eckstein today, is I do

2  think discussions --

3       (Laughter)

4       MR. PERNICK:  This is the only thing, Your Honor.  I

5  do think discussions -- we're not going to stop trying to

6  talk.  We're not going to stop trying to get the parties

7  together to talk.  And I do think some discussions will even

8  happen in the next month or two.  We just didn't think they

9  would really get serious 'til there is an estimated Futures

10 number.  So if that happens on an earlier schedule, you know,

11 we'll all take that into account and I think do a couple

12 things.  One, we may sit down and talk, even though these

13 stips aren't finalized.  And, two, at that point maybe the

14 schedule can be looked at again to see what makes sense, and

15 to see if parties want to do something else.

16      THE COURT:  All right.  At that -- I've forgotten now

17 -- the June hearing date, we will take a look at the schedule

18 and see whether it needs any modifications.  But otherwise

19 this is the schedule that's in place for now.

20      MR. PERNICK:  A couple of really quick points for

21 Your Honor.  One, I think we just submitted -- the Clerk's

22 reminded me -- a revised omnibus hearing date scheduling

23 order.  And you probably shouldn't sign that, and let us

24 submit another one, because we just changed a couple of the

25 times --

1      THE COURT:  Okay.

2      MR. PERNICK:  -- like the June hearing.  We'll do

3  another one and submit it to the Court.

4      THE COURT:  Did I sign it?  I don't even remember.

5      MR. PERNICK:  Well in case -- if you get it, I would

6  just pull it out and don't sign it.  We'll do another one.

7  The second thing is just to remind everybody when we're

8  submitting these things and obviously more important -- what I

9  think everybody remembers, but this is a public company.  And

10  so it's important that what we file is filed in that context.

11  And I think by the time we get to those final stipulations,

12  you know, we'll be in accordance with that.  But we have to

13  all discuss that before we file anything --

14      THE COURT:  Well --

15      MR. PERNICK:  -- and make --

16      THE COURT:  -- it seems to me that to the extent that

17  these documents may have some anti-competitive aspect, you can

18  file them under seal.  You're subject to confidentiality

19  agreements.

20      MR. PERNICK:  Right.

21      THE COURT:  I don't expect you to disclose this to

22  anybody outside this Courtroom.

23      MR. PERNICK:  Okay.  We can -- but I think

24  everybody's got that same concern, actually.  So we'll deal

25  with that when we get down to that point.

SUPP. APP. 003904

1    THE COURT: Okay.

2    MR. MONK: Yeah, Your Honor, I was just -- the

3 general counsel and chief restructuring officer just reminded

4 me the issue really is we're concerned about the public

5 trading of the bonds. And we're concerned about regulation

6 FT. And the company has an obligation if something becomes

7 public, to make sure the rest of the world knows about it. So

8 that's why we've asked for the stipulations in confidentiality

9 by and large. And we've been able to work with the

10 constituent parties in that context.

11    THE COURT: Well, why don't you just make a note then

12 that the stipulations that are going to be filed -- both the

13 stipulations and the non-stipulated facts that are due by

14 November 15th must be filed under seal? But now I don't know

15 with electronic case filing how that works.

16    MR. PERNICK: We do it. We just file it.

17    THE COURT: You file a notice --

18    MR. PERNICK: Yeah, we file a notice and we attach it

19 in a brown envelope and mark it "under seal."

20    THE COURT: Okay. And since you're all signed off on

21 it, you'll all have product.

22    MR. PERNICK: Right.

23    MR. ECKSTEIN: Yes.

24    MR. PERNICK: All the constituents get unsealed

25 copies.

SUPP. APP. 003905

1    THE COURT:  All right.  Okay.  How long is this going

2 to take?

3    MR. MONK:  By the end of this week, Your Honor.

4    THE COURT:  Okay.  I'll expect it in two weeks.

5    MR. MONK:  Better give him until next month, knowing

6 how he is.

7    (Laughter)

8    THE COURT:  All right.  I'll expect the Debtor to

9 submit all the Orders I'm waiting for by March 4th, except the

10 one that's to be brought to the Court March 27th, unless they

11 aren't done for whatever reason.

12    MR. PERNICK:  Did you say March 1st?  It's a Friday?

13    THE COURT:  March 4th.

14    MR. PERNICK:  March 4th, sorry.

15    THE COURT:  Okay.  What else?

16    MR. PERNICK:  Just exclusivity.  And I'm gonna try to

17 do it quickly.  I don't know where we are.

18    (Laughter)

19    MR. PERNICK:  Well I guess my only technical issue is

20 I don't know where Mr. Eckstein is.  I mean I think --

21    THE COURT:  He's there.

22    (Laughter)

23    MR. PERNICK:  I think -- let me make this suggestion.

24 I have Mar-Avon Smith in Court with me.  She's the senior vice

25 president and general counsel and chief restructuring officer

SUPP. APP. 003906

1    of the company.  I would proffer her testimony.  And at this

2    point let me proffer the facts that are in the motion as her

3    testimony.

4            THE COURT:  Fine.

5            MR. PERNICK:  I just want to make sure if there's an

6    appeal, I don't know where --

7            THE COURT:  Well, let's --

8            MR. PERNICK:  -- he is on that issue.

9            THE COURT:  -- find out.  Mr. Eckstein, is there an

10   objection to the Debtor's exclusive period at this point being

11   extended?

12           MR. ECKSTEIN:  Your Honor, I've been through enough

13   exclusivity hearings to know that we don't need a protracted

14   hearing today on exclusivity.  And while I have not consulted

15   with my clients, I will recommend to them that my consent

16   today, based upon the record that we just developed, was

17   probably the prudent thing to do.

18           THE COURT:  All right.  Then this is what I will do.

19   I will extend the Debtor's exclusivity period until when?

20           MR. PERNICK:  Well, we had actually asked for August

21   2nd --

22           THE COURT:  I know.

23           MR. PERNICK:  -- to file.  But --

24           THE COURT:  It doesn't --

25           MR. PERNICK:  It doesn't make --

SUPP. APP. 003907

1    THE COURT:  -- make a lot of sense.

2    MR. PERNICK:  -- a lot of sense.  But because we

3  didn't raise a different time frame with anybody else, I think

4  that's up to the Court.  It seems to make sense to make them

5  coincide.  But I don't know if he'd --

6    MR. ECKSTEIN:  Well, Your Honor --

7    MR. PERNICK:  -- want to talk about it.

8    MR. ECKSTEIN:  -- notwithstanding the fact that I'm

9  sure the Debtor would rather not grapple with exclusivity, I

10  think that the August date, in light of the fact that we have

11  not consulted with a different date, would make sense right

12  now.  And if it makes sense, at that point in time we can

13  always extend it further for short periods or long periods.

14  But I would prefer that we held that day.

15    THE COURT:  Okay.  My suggestion would be that we

16  extend exclusivity actually through the end of December,

17  subject to parties moving to have it shortened for cause.

18  Because I think if we really are moving toward a plan

19  negotiation process, it makes some sense to get you through

20  the time frame within which the stips are due, to let that

21  process work through.

22    MR. ECKSTEIN:  Your Honor, I don't have -- I

23  appreciate that if the process is working, that is the likely

24  result.  And I don't think we would quarrel with that process

25  if the process was working.  We think that this -- the

SUPP. APP. 003908

1   exclusivity dates, for better or for worse, have provided very

2   good checkpoints in this case. And while I appreciate Your

3   Honor's sentiments, I think that it would be appropriate to

4   have one further checkpoint, whether it's in August or the

5   hearing is actually going to be in September. Either way, I

6   think another checkpoint at that point in time would be

7   appropriate.

8           THE COURT: All right. Well, then at least it should

9   be through August the 30th. The hearing in August is on

10  August 26th. So I think the exclusivity period should go at

11  least until August 30, with the hearing set on August 26th for

12  the next round of motions for exclusivity extension.

13          MR. ECKSTEIN: That makes sense, Your Honor.

14          THE COURT: Anyone have an objection to the Debtor's

15  exclusive period being extended until August 30th? If so, I

16  do want to make a record. If not, I will accept the Debtor's

17  proffer. Does anybody have any cross examination questions

18  with respect to Debtor's proffer? Everybody is silent, Mr.

19  Pernick, so I think the Order that exists is not for August

20  30.

21          MR. PERNICK: It's August 2nd. So we can submit a

22  revised Order.

23          THE COURT: Okay. And that'll come March 4th. And

24  I'm not sure when the next -- well, this will govern until

25  August 30. Because I'm not sure when your current period is

SUPP. APP. 003909

1    up.

2          MR. PERNICK:  I think the language is that it is

3    extended until the Court rules on the motion.

4          THE COURT:  Okay.

5          MR. PERNICK:  So when you enter the Order, you'll be

6    ruling on the motion.

7          THE COURT:  All right.  Okay.  What else?

8          MR. PERNICK:  Your Honor, I think that's it from the

9    Debtor's side.

10         THE COURT:  Anyone else?

11         ALL:  (No verbal response).

12         THE COURT:  We're adjourned.  Thank you.

13         ALL:  Thank you, Your Honor.

14      (Court adjourned)

15

16                        CERTIFICATION
     I certify that the foregoing is a correct transcript from the
17   electronic sound recording of the proceedings in the above-
     entitled matter.

18

19   _____        3-4-02
     Signature of Transcriber         Date

20

21

22

23

24

25

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

SUPP. APP. 003910