# EXHIBIT E

1

1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF DELAWARE
2
     IN RE:  ARMSTRONG WORLD          CHAPTER 11
3    INDUSTRIES, INC., et al.,        Case Nos. 00-4471
                                                   00-4469
4           Debtors.                        00-4470
     --------------------------
5    IN RE:  W.R. GRACE CO.,      CHAPTER 11
     et al.,                          Case No. 01-1139
6                                        through 01-1200
            Debtors.
7    --------------------------
     IN RE:  FEDERAL-MOGUL          CHAPTER 11
8    GLOBAL, INC., T & N               Case Nos. 01-10578,
     LIMITED, et al.,                      et al
9
            Debtors.
10   ---------------------------
     IN RE:  USG CORPORATION,             CHAPTER 11
11   a Delaware Corporation,       Case Nos. 01-2094
     et al.,                              through  01-2104
12
            Debtors.
13   ---------------------------
     IN RE:  OWENS CORNING,        CHAPTER 11
14   et al.,                           Case Nos. 00-3837
                                          through 00-3854
15          Debtors.
     ---------------------------
16                              January 16, 2004
                                Newark, New Jersey
17
     B E F O R E:  HONORABLE ALFRED M. WOLIN, USDJ
18

19   Pursuant to Section 753 Title 28 United States Code, the
following transcript is certified to be an accurate record
20   as taken stenographically in the above-entitled proceedings.

21
     JACQUELINE KASHMER
22   Official Court Reporter

23             JACQUELINE KASHMER, C.S.R., C.R.R.
                    OFFICIAL COURT REPORTER
24                      P. O. Box 12
                     Pittstown, NJ 08867
25                      (609) 656-2595

1
   A P P E A R A N C E S:
2

3

   ROBBINS, RUSSELL, ENGLERT, ORSECK &
4   UNTEREINER, LLP
   1801 K Street, N.W. - Suite 411
5   Washington, D.C. 20006
   BY:  ROY ENGLERT, ESQ.,
6      LAWRENCE ROBBINS, ESQ.,
   For Kensington and Springfield
7

8

   COOLEY GODWARD, LLP
9   Five Palo Alto Square
   3000 El Camino Real
10   Palo Alto, CA 94306-2155
   BY:  STEPHEN C. NEAL, ESQ.
11   For USG Corporation

12

13   WILLKIE, FARR & GALLAGHER
   787 Seventh Avenue
14   New York, NY 10019
   BY:  RICHARD MANCINO, ESQ.,
15   For D.K. Acquisition Partners, Fernwood Associates, and
   Deutsche Bank Trust Company America
16

17

   SAUL EWING, LLP
18   100 South Charles Street
   Baltimore, MD 21201-2773
19   BY:  CHARLES O. MONK, II, ESQ.
   For Owens Corning
20

21

   KIRKLAND & ELLIS, LLP
22   200 East Randolph Drive
   Chicago, IL 60601
23   BY:  DAVID M. BERNICK, ESQ.,
   For W.R. Grace
24

25

```
 1
    A P P E A R A N C E S:
 2

 3
        KAYE SCHOLER, LLP
 4      425 Park Avenue
        New York, NY 10022-3598
 5      BY:   MICHAEL J. CRAMES, ESQ.,
              JANE W. PARVER, ESQ.,
 6  For James McMonagle, Owens Corning Futures
        Representative, and Dean Trafelet, USG and
 7      Armstrong Futures Representative

 8

 9      CAPLIN & DRYSDALE
        One Thomas Circle, N.W.
10      Washington, D. C., 20005
        BY:   ELIHU INSELBUCH, ESQ.,
11      For the Asbestos Claimants Committee in Owens
        Corning, USG, W.R. Grace and Armstrong
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  The first thing I'd like to do is take

2    appearances please.

3          MR. ENGLERT:  Roy Englert on behalf of the Movants

4    Kensington and Springfield.

5          THE COURT:  Good morning.

6          MR. NEAL:  Good morning, your Honor.  Stephen Neal

7    on behalf of USG.

8          THE COURT:  Good morning, Mr. Neal.

9          MR. MANCINO:  Richard Mancino on behalf of D.K.
10   Acquisition Partners, Fernwood Associates, Deutsche Bank
11   Trust Companies America.

12         THE COURT:  Thank you.  Good morning.

13         MR. MONK:  Good morning, your Honor.  Charles Monk,

14   Matthew Dobson, Henry Abrams and Norm Pernick on behalf of

15   the Owens Corning debtor.  I'm the only one speaking.

16         THE COURT:  Okay.  Thank you.

17         MR. CRAMES:  Good morning.  Michael Crames and Jane

18   Parver of Kaye Scholer for James McMonagle, the futures rep

19   in Owens Corning, and Dean Trafelet, the futures rep in USG

20   and Armstrong.

21         THE COURT:  All right.  Good morning, Mr. Crames.

22         MR. INSELBUCH:  Elihu Inselbuch from Caplin &
23   Drysdale for the Asbestos Committees in Owens Corning, USG,

24   W.R. Grace and Armstrong.

25         THE COURT:  Okay.  Thank you.

```
 1          MR. BERNICK:  Good morning, your Honor.  David
 2  Bernick for Grace.

 3          THE COURT:  All right.  Good morning.  A couple of

 4  housekeeping matters, if we may.  Mr. Englert, I have a
 5  letter from Mr. Orseck dated January 14, 2004, and the
 6  letter pertains to Judge Dreier's notes requesting that they

 7  be filed under seal and we will take care of that if you'll

 8  submit to us a sealing order.

 9          MR. ENGLERT:  Yes, your Honor.

10          THE COURT:  Your application is granted.  Mr.
11  Mancino, I have a slight problem.  Your brief wasn't

12  received until this morning.  It was filed electronically in

13  Delaware yesterday at 12:17.  You're the only counsel that

14  did not afford this Court a courtesy copy.

15          I have not read your brief.  You may argue today,

16  I'm going to permit you to argue, but I've not read your
17  brief.  I've read every brief that was submitted with a
18  courtesy copy to the Court.  You're the only one that

19  didn't.

20          MR. MANCINO:  Your Honor, I have no explanation but

21  I do have an apology for that oversight.

22          THE COURT:  I just want to let you know I haven't

23  read your brief.  I'm going to permit you to argue.

24          MR. MANCINO:  Thank you, your Honor.

25          THE COURT:  Okay.  I've established the order of
```

1   argument.  It will be the Owens Corning movants, so, that

2   will be you, Mr. Englert, and then the W.R. Grace movants,

3   that will be you, Mr. Mancino, then the debtor USG Corp.,

4   that will be you, Mr. Neal, and then what I think we'll do

5   is we'll then take a ten-minute break and then we'll go to

6   the debtor, Owens Corning, the debtor, W.R. Grace, and the

7   committees, who are going to share their time.

8           Everybody has 30 minutes.  There will be a sign
9   when you have five minutes left.  The Court reserves the
10  right to engage in a colloquy and I guess everybody by
11  invitation would be pleased with that because anyone who's

12  ever argued an appeal in any court would not like to just

13  stand there for 30 minutes and just have the court look
14  blankly at you.

15          I'll try not to interrupt unduly.  I don't want to

16  use the word sparingly because it's taken on its own life in

17  this case.  Should we have an undue colloquy, I will

18  consider that in your request for more time.  I have nowhere

19  to be today so I've got all day for this.

20          Mr. Englert, with that being said, you may

21  approach.  I don't care if counsel use the counsel table or

22  use the podium, it's up to them.

23          Mr. Englert, you may proceed.

24          MR. ENGLERT:  Thank you very much, your Honor, and

25  good morning again.  Let me say I certainly welcome

1    colloquy.  What's of interest to you is of interest to me.

2            I would like to start with the question of did your

3    advisers render advice, and I start with that question
4    because the Third Circuit, in its opinion, quoted paragraph

5    ten of Mr. Gross's November 14 affidavit in which he said he

6    rendered no advice, and I was surprised to read in the W.R.

7    Grace brief yesterday that the advisers rendered no advice

8    and there is no contrary evidence.  On page 202 --

9            THE COURT:  You're going to have to let me get with

10   you if you're going to refer to transcripts.  Is that what

11   you're going to do?

12           MR. ENGLERT:  Briefly, yes, your Honor.

13           THE COURT:  Just tell me whose transcript.

14           MR. ENGLERT:  Judge Dreier's.

15           THE COURT:  Okay.  I have Judge Dreier's

16   transcript, page 202.

17           MR. ENGLERT:  This is under questioning from Mr.

18   Inselbuch's partner, Mr. Finch.

19           THE COURT:  Could you give me a line please.

20           MR. ENGLERT:  Sure.  Lines seven to nine, your
21   Honor.

22           THE COURT:  Okay.

23           MR. ENGLERT:  Judge Dreier said "I didn't see this

24   as being pro plaintiff or pro defendant.  It was just to
25   render advice to try to achieve that end, the end of making

1   sure the truly injured were compensated."

2          Later on the same page, lines 21 through 23, Judge

3   Dreier, "The earlier meetings were closer together when we

4   thought something could be done with our advice to help to

5   resolve these matters."

6          The Grace brief filed yesterday, which is the brief

7   that takes the position there was no advice and there is no

8   contrary evidence, quotes on page 17 from Judge Keefe's
9   deposition --

10         THE COURT:  Yes.

11         MR. ENGLERT:  These are brief quotations, your
12  Honor.  I'm happy to wait for you but I think they'll be
13  quick.

14         THE COURT:  It's just a matter of finding them.  Go

15  ahead.  I have it.

16         MR. ENGLERT:  Judge Keefe, early in his deposition,

17  in describing his understanding of the role he was given by

18  this Court, said he was -- "We were going to" -- "he", your

19  Honor, "was going to ask us to give him advice with respect

20  to some issues that may have applied to the litigation in

21  general with respect to management."

22         Couple pages later, the Grace brief quotes in
23  footnote 17, where Mr. Gross's deposition, "QUESTION:  If we

24  were to use the label 'adviser' to describe your position,

25  is there any better or more accurate term that we can think

1    of other than an adviser to describe your duties in

2    connection with the five cases?"

3            "ANSWER:  No."

4            The next page, footnote 18 quotes from Judge

5    Hamlin's deposition to the extent he saw his role as an
6    adviser.

7            So, I'm not quite sure, your Honor, what Mr. Gross

8    in his affidavit and the authors of the Grace brief mean in

9    saying there was no advice, but every adviser testified
10   either that he gave advice, that all the advisers gave
11   advice, that the Court asked for advice or that adviser was

12   the best way to describe it.

13           THE COURT:  I guess we'll have to go to Webster to

14   find out all the ramifications of what the word "advice"

15   means.  Did they provide background, history?  Is that
16   advice?  Certainly.

17           MR. ENGLERT:  Yes.

18           THE COURT:  There's been no contra-statement that

19   they didn't provide that type of background.  That's advice.

20           MR. ENGLERT:  I agree.

21           THE COURT:  Whether they gave substantive advice as

22   how to decide legal issues, I think if you read the

23   depositions in their total, totality, you'll find that they

24   never gave me substantive legal advice as to how to decide

25   an issue.  But you may proceed.

1          MR. ENGLERT:  Well, your Honor, a couple comments

2     on that, if I may.  First of all, I would respectfully
3     disagree with you.  For example, at page -- I may not have

4     the right page off the top of my head but around page 62 of

5     Judge Dreier's deposition, I believe there was testimony
6     about substantive advice but, in any event, your Honor,
7     skillful advocates can give historical background in many

8     different ways and they can lead people toward certain
9     conclusions.

10         With background information, even if everything
11    that's presented is presented in a way that each fact alone

12    is irrefutable but the sum total of what's being given is

13    being given from a particular perspective, so, I don't think

14    the requirement for finding that there are conflicted

15    advisers in the case law is that the adviser must be proven

16    to have said to the judge, Judge, please decide this issue

17    this particular way.

18         I think the problem with conflicted advisers that

19    runs through the case law is when people have an interest in

20    stating things from a particular perspective, it is assumed

21    that there is a problem.

22         THE COURT:  Well, you will agree, won't you, that

23    when you asked that question of the advisers, most of them

24    categorically said they gave no substantive legal advice.

25    Would you agree with that?

1          MR. ENGLERT:  No, I would quite strongly disagree,

2   at least with respect to Judge Dreier.  With respect to --

3          THE COURT:  You asked the question of almost every

4   one of the advisers whether there was any discussion of
5   claim valuation or validity of claims.  Everybody said no.

6          MR. ENGLERT:  I don't think that's correct, your

7   Honor.

8          THE COURT:  The only one you rely upon is Dreier,

9   whose statements disagree with the other four, but, you
10  know, you can try to convince me, and I don't really want to

11  waste your time arguing the issue.  You and I have a

12  different conception of what advice really means.

13          I'm satisfied the record will demonstrate that
14  there was no substantive legal advice given, probably

15  discussed a hundred different issues that portend asbestos

16  litigation.  There's never been a denial of that.

17          MR. ENGLERT:  Well, your Honor understands my
18  position.

19          THE COURT:  Sure.

20          MR. ENGLERT:  And I do suggest that Judge Dreier, a

21  completely unconflicted adviser from anyone's standpoint,

22  not only testified that substantive advice was given but has

23  contemporaneous notes that certainly seem to suggest that

24  his testimony was --

25          THE COURT:  The Circuit Court of Appeals will have

1    the opportunity to see those notes --

2            MR. ENGLERT:  Okay.

3            THE COURT:  -- if the matter should go there.
4            MR. ENGLERT:  Let us talk about what some of the

5    subjects of these discussions were.  We've at least

6    tentatively for purposes of this discussion agreed to

7    disagree about what advice constitutes.

8            Let's talk about subject matters, whether to

9    convene a Rule 706 panel to look into scientific criteria,

10   proof of claim forms, American Thoracic Society guidelines,

11   what to do with unimpaired claimants, fraudulent conveyance,

12   estimation under Section 502(c) trust distribution processes

13   or procedures, I can never remember.

14           THE COURT:  These are all the items that you listed

15   in your brief, if I recall.

16           MR. ENGLERT:  We listed these and additional items,

17   yes.

18           THE COURT:  Right.

19           MR. ENGLERT:  And with citations to each deposition

20   and documentary evidence suggesting that all of these

21   subjects were discussed.  Many, many of these subjects
22   overlap closely with the G-1 Holdings case and, in fact, as

23   your Honor is well aware, on certain occasions your Honor

24   has issued rulings and very soon after you have issued a
25   ruling, either Judge Gambardella or Judge Bassler has been

1    urged to follow your Honor's ruling.

2            As you also know from our brief, Judge Chin, in the

3    Southern District of New York, in the Keene creditors trust

4    case, was urged to follow a path similar to your Honor's
5    path in the Sealed Air decision with regard to fraudulent

6    conveyance.

7            THE COURT:  And by the way, I didn't learn that
8    until yesterday when I read your brief.

9            MR. ENGLERT:  I learned very recently myself, your

10   Honor.

11           THE COURT:  I know nothing about the Keene trust

12   case.  I know that Mr. Gross is involved in it.  I do not

13   even know the issues in it, nor do I really know the issues

14   in G-1, as I have said to the Circuit Court of Appeals
15   before.

16           MR. ENGLERT:  But you see, your Honor --

17           THE COURT:  No, no.  And I've never spoken to Judge

18   Bassler about G-1, nor have I spoken to Judge Gambardella

19   about G-1.  I know it's an asbestos litigation not being
20   administered by me.

21           MR. ENGLERT:  And that's the point.  That's the
22   point, your Honor.  You are not following G-1, you are not

23   following these other litigations, but you are being advised

24   by the people who not only follow them but are partisans in

25   these litigations, and it's rather difficult for your Honor

1  acting in complete good faith to filter out what may be
2  advice that is colored by the roles these gentlemen are
3  playing in other litigation from what advice is not colored

4  by their roles in other litigation, but that's the core
5  fundamental problem here.

6      And as your Honor is aware, the major cases talking

7  about disqualifying a judge because of his advisers, they're

8  mostly law clerk cases.  There also one Rule 706 expert case

9  but the generic --

10     THE COURT:  And then there's the Reilly case.
11     MR. ENGLERT:  I'll come to Reilly.  It's a very
12  important case for our side.

13     THE COURT:  Okay.

14     MR. ENGLERT:  But your Honor, the cases that

15  involve disqualification of judges are not cases of judges

16  who have said, by golly, I want to get bad advice from these

17  people.  They're cases of judges who, operating in all
18  innocence, have gotten advice from people with conflicts and

19  have, in the words of, I believe it's the Hall case, then

20  made errors of judgment once the conflicts were called to

21  their attention of the advisers.

22     Now, let me turn, your Honor, since your Honor has

23  expressed an interest in that, we have never argued, your

24  Honor, that there's anything wrong with appointing advisers

25  in this case.  Reilly provides good support for the

1   proposition that your Honor had the authority on December

2   20, 2001, on December 28, 2001, to appoint advisers.

3          The problem is conflicted advisers, and Reilly does

4   not stand for the proposition that advisers serving a

5   conflicting role in other litigation may be appointed.
6          Quite the contrary.  The First Circuit, in

7   rejecting the government's argument in that case, emphasized

8   both waiver and the problem that the objection was not
9   well-taken on the merits because there was no allegation of

10  bias, there was an unbiased adviser.

11         In fact, the judge in Reilly, trial judge had
12  earlier tried to appoint someone who did have a conflict or

13  not tried to, had been thinking about, discussing appointing

14  someone who did have a conflict.  That person was not

15  appointed.  He came up with someone who was unbiased and the

16  First Circuit said if there were any suggestion of bias on

17  this record, we would consider reversing for plain error.

18  So, yes, we read Reilly for all it's worth.  It stands for

19  the proposition, and you can see as far as we're concerned

20  it stands for the proposition you had the authority to
21  appoint advisers but one must be careful what advisers one

22  appoints.

23         THE COURT:  You will concede that when I appointed

24  Gross on December 28, he had not been appointed in G-1.  I

25  think he was not appointed till January of 2002.

1          MR. ENGLERT:  I think that's correct with regard to

2    formal appointment.

3          THE COURT:  I think that Hamlin had been appointed

4    sometime in September.

5          MR. ENGLERT:  October 10, I believe was the date.

6          THE COURT:  September, October of 2001.  My

7    appointment was December.  I may have known about Hamlin's

8    appointment.  I'm not sure whether I knew or learned later

9    on or whatever.  But when I appointed Gross, he was not
10   appointed in G-1 at that time and I had no knowledge of his

11   pending appointment.  I certainly did learn after his

12   appointment.

13         MR. ENGLERT:  Okay.  Well, your Honor, our --

14         THE COURT:  And I've never contended otherwise.
15         MR. ENGLERT:  All right.  We don't need to have a

16   dispute about this particular point, but where we may not

17   see eye to eye is on the question of what consequences flow

18   from your Honor's knowledge of Hamlin's role and your

19   Honor's knowledge a bit after the appointment of Mr. Gross's

20   role in G-1.

21         Once those gentlemen were serving as partisans down

22   the hall in the G-1 case on issues very similar to those
23   they were certainly discussing with this Court, frankly,
24   this Court had a problem and the --

25         THE COURT:  Assuming that this Court knew of the

1    similarity of the issues, which it did not.

2         MR. ENGLERT:  No, your Honor.  I really

3    respectfully would disagree with you.  You have an even
4    greater problem if you didn't know of the similarity of the

5    issues because in all, as I said earlier, in all innocence

6    you had no way to filter out the advice that may have been

7    tainted by knowing that it had something to do with what was

8    going on down the hall.

9         THE COURT:  I just learned in the briefs recently

10   or discovery reading that G-1 had a substantive

11   consolidation issue.  I never knew about that, never

12   influenced me in any way, nor would it.

13        MR. ENGLERT:  No, your Honor.  Again, at the risk

14   of repeating myself, I am not suggesting that your personal

15   knowledge of what was going on down the hall is a problem

16   here.

17        I am suggesting that the role of Mr. Gross and Mr.

18   Hamlin being advocates down the hall with respect to some

19   issues pending before you creates a problem of appearance of

20   impropriety under Section 455(a) because you were receiving

21   advice from people who had an incentive to slant their
22   advice in particular ways.

23        The recent decision just a week ago, which you may

24   have seen in our brief, of the 6th Circuit discussing

25   bankruptcy examiners in the Big Rivers Electric case pointed

1  out the reason examiners have to be disinterested is because

2  there's an incentive to shade their actions one way or
3  another and to find an examiner not disinterested, one
4  doesn't have to say the examiner acted on his conflict.  One

5  has to say simply he had a conflict, and that's a problem.

6  And again, with the Hall and First Interstate cases, when an

7  adviser had has a conflict, the Court has a conflict.

8          THE COURT:  Okay.  I understand your argument.
9          MR. ENGLERT:  Let me, if I may, your Honor run
10 through quickly --

11         THE COURT:  Sure.

12         MR. ENGLERT:  -- what the conflicts are with

13 respect to three of the advisers in this case.

14         Mr. Gross is counsel to the futures representative

15 in G-1 Holdings.  Not only is that a very similar case, but

16 as was admitted in the argument before the Third Circuit,

17 some of Mr. Gross's clients in G-1 Holdings are necessarily

18 parties to the Owens Corning case.  They are necessarily
19 future claimants in Owens Corning, just as they are future

20 claimants in G-1 Holdings.

21         That is a major, major problem not even alluded to

22 in any of the briefs filed by respondents with your Honor

23 yesterday.  Overlapping parties between the two cases mean

24 we're beyond issue conflicts, and we're into the realm that

25 it's as if the case were Smith v. Jones and Mr. Smith's

1    lawyer in some other case were serving as a court-appointed

2    lawyer in Smith v. Jones.  It's a very large problem.

3         Second problem which we had a brief colloquy about

4    already this morning and which, apparently, not much more to

5    say about it, is the Keene creditors trust problem.  Again,

6    another case like G-1 Holdings in which Mr. Gross went to

7    another judge and urged that judge to follow your Honor's

8    rulings in one of the five asbestos cases in which he was

9    serving as adviser to your Honor.

10        The third problem, Mr. Gross served as a mediator,

11   and there are two particularly fundamental things mediators

12   must do.  One is be neutral, and this is just the same
13   problem over again with regard to the role as mediator, in

14   addition, with regard to adviser, having a non-neutral
15   mediator is, as far as I know of, unheard of in American
16   jurisprudence.  But Mr. Gross served as a mediator in the

17   five asbestos cases while also being an advocate in G-1.

18        The second problem, mediators may not disclose the

19   substance of parties' negotiating positions to the court
20   unless there is consent by the parties.

21        Now, let me try to put to one side a false issue

22   here.  There certainly was consent by the parties to

23   mediation in which your Honor was personally involved, and I

24   believe it was June of 2003, after the --

25        THE COURT:  That's my understanding.

1         MR. ENGLERT:  We're not at all complaining about

2    that.  It is a problem, however, that before June of 2003,

3    there appears to have been unconsented to revelation of
4    parties' settlement positions to your Honor.

5         Professor McGovern, in his deposition, was

6    extremely emphatic that that's a major, major no-no in
7    mediation.  Mr. Gross, in his deposition, said, oh, yes,
8    I've done that and Professor McGovern has done that.

9         And this is, of course, sliding into one of the two

10    problems we have with Professor McGovern based on discovery.

11        THE COURT:  What's not been said, Mr. Englert, if I

12    may, there were several status conferences in the Owens
13    Corning case held in open court here, anywhere between 20

14    and 40 people in attendance, including Professor McGovern,

15    all the people from all constituencies concerned in the
16    substantive consolidation case, even Judge Fitzgerald was

17    here, where the parties at that time discussed matters that

18    would be used in a mediation.

19        For example, I remember sitting here and having the

20    bank say that the asbestos litigation was worth, claims of

21    the ACC were two billion dollars and other people on the
22    other side of the room saying they could run as high as 24

23    billion, and then people said maybe it's 16, maybe it's 12.

24    You know, there was no secret with --

25        MR. ENGLERT:  Except, your Honor --

1          THE COURT:  Let me just finish.

2          MR. ENGLERT:  I apologize.

3          THE COURT:  And I'm taking your time, I'll give you

4     another minute.  There was no secrecy as to where the banks

5     were, the bonds were, the asbestos litigants.  Everybody
6     knew the numbers.  There wasn't any revelation.

7          And certainly in June, when there was a consensual

8     mediation of trying to settle the case, the Court was told

9     all the numbers and the numbers never changed, so, there was

10    never any revelation to the Court from any mediator as to

11    what was supposed to be non-neutral information.  You may

12    proceed.

13         MR. ENGLERT:  Thank you, your Honor.  Your Honor

14    has referred to the valuation of the tort claims and we do

15    have a concern about the revelation of those terms.  But
16    there's another set of numbers that appear to have been
17    revealed by mediators that I don't believe were ever

18    discussed in the court.  The Court can certainly correct me

19    if I'm wrong, but I don't believe these numbers were ever

20    discussed in open court, and that is, the settlement value

21    of the bonds' guarantees, how many cents on the dollar
22    the --

23         THE COURT:  In June the bonds were here.  There was

24    a discussion of what the bonds would get on the dollar, I

25    can give you the number, and, further, if they decided to

1    take a payment by stock instead of cash, it could add three

2    cents on the dollar.

3              MR. ENGLERT:  Yes, your Honor, that's June of 2003,

4    post trial.

5              THE COURT:  That's correct.

6              MR. ENGLERT:  Now, the problem I'm talking about

7    arose, we believe, in November of 2002, pretrial.

8              THE COURT:  Okay.

9              MR. ENGLERT:  There is a document that I want to be

10   careful about referring to in light of your Honor's past
11   rulings.  I think you're aware we disagreed with your

12   Honor's rulings on 408, but I want to be very careful about

13   what I say in open court, but there is a document and there

14   is deposition testimony suggesting that before June of 2003,

15   there was revelation to your Honor who was going to try the

16   substantive consolidation case before there was later

17   consent to mediation about the parties' positions.  That's a

18   problem.

19             THE COURT:  Do you know that there were -- I can't

20   tell you how many status conferences, probably the Kramer

21   Levin people, who keep records because they get paid for
22   that and I don't, probably know far better than I do how
23   many there were.  When I say all of this was revealed to the

24   Court, the trial didn't take place until late April or
25   middle of April and continued into May.  So, these numbers

1    were known, these numbers were known by the Court.

2         MR. ENGLERT:  I don't think the settlement offers

3    were known by the Court.  I think the parties' litigation

4    positions were known by the Court.

5         THE COURT:  Yes.  The parties' litigation positions

6    were known by the Court and numbers attributable to each
7    side were known to the Court.  Where there actual settlement

8    number was, that may be something different.  You know, maybe

9    the banks said I want 78 but we're willing to take some
10   lesser number.  That I would not have known.  That I

11   wouldn't have known.  But I did know numbers based upon the

12   status conferences.

13        In fact, because I didn't want to be involved in

14   it, I appointed McGovern as a mediator and I appointed Judge

15   Fitzgerald as a settlement judge.  I think they went to
16   Pittsburgh.  I think they went to New York, wherever.

17        MR. ENGLERT:  Your Honor, let me say if the trial

18   judge is advised of parties' settlement positions in advance

19   of trial, that's a problem, and it's a problem because it

20   may lead the trial judge --

21        THE COURT:  It's not a problem if it's consensual.

22        MR. ENGLERT:  It's not a problem if it's

23   consensual, but if there's a mediation with certain

24   mediators and then those mediators reveal that information

25   to the court without consensual information, that's a

                    .

1    problem.

2            Professor McGovern testified very emphatically
3    that's a problem, and I'm being a little imprecise in what

4    I'm saying here because I want to be careful about your
5    Honor's rulings, but I would suggest for the reasons given

6    in our brief, it's a problem.

7            THE COURT:  Okay.  We understand.

8            MR. ENGLERT:  Now, the other issue we have raised

9    in our brief with respect to Professor McGovern is we

10   learned through the proceedings on remand not only that
11   Professor McGovern has been meeting with futures

12   representatives on a regular basis, which is a somewhat
13   eyebrow-raising fact, but that they regard him as their
14   mentor in the process of pushing legislation on Capitol
15   Hill --

16           THE COURT:  I saw --

17           MR. ENGLERT:  -- that could affect the outcome of

18   these very cases.

19           THE COURT:  I saw the e-mail.

20           MR. ENGLERT:  We would suggest that a neutral
21   mediator who is meeting regularly with one side of the
22   proceeding, to give them information, I don't remember
23   Professor McGovern's exact words, but to give them

24   information that would in substance make them more effective

25   in doing that job and help them lobby on Capitol Hill has

1    stepped out of the neutrality.

2         THE COURT:  He's an academic.  He's the leading
3    academic in the nation on mass tort and asbestos bankruptcy

4    Chapter 11 litigation.  He speaks to many constituencies.

5    He's been a reporter to many committees.

6         MR. ENGLERT:  And speak -- I'm sorry.

7         THE COURT:  And he was there to offer whatever he

8    could offer.

9         MR. ENGLERT:  Speaking in the sense of giving
10   public speeches is, of course, not a problem with an

11   academic.  Writing --

12        THE COURT:  Professor McGovern probably gives 20

13   speeches a year and probably does ten programs a year like

14   Mealey's all over the country.

15        MR. ENGLERT:  These were not Mealey's programs to

16   which anyone could come.  These were not speeches to which

17   anyone could come.

18        THE COURT:  It was, my understanding, a gathering

19   of futures who were, as I now learned from reading, were
20   talking about the position they should take in connection

21   with the FAIR legislation in asbestos, and he was there to

22   provide an oversight of what was going on that he understood

23   in his academic position, because if you talk to McGovern,

24   he's got four ways the legislation should go.  All right.

25   But you may continue.

1          MR. ENGLERT:  But he was not, your Honor, having

2     meetings like this and having e-mail exchanges like this
3     with commercial creditors, with a group of debtors, with
4     equity holders, lots of other constituencies in this case.

5     It was with the futures representative Professor McGovern

6     was meeting and corresponding with.

7          THE COURT:  Can you tell me if the legislation were

8     to pass, is that better or worse for creditors than if it

9     failed, because actually you're coming --

10         MR. ENGLERT:  The S1125?

11         THE COURT:  -- you're coming at it from a

12    creditor's point of view, I take it.

13         MR. ENGLERT:  My clients are commercial creditors.

14         THE COURT:  That's right.

15         MR. ENGLERT:  And they, I believe, support the
16    current form of S1125.

17         THE COURT:  Would they receive more under the FAIR

18    legislation than they would receive if there were no

19    legislation?

20         MR. ENGLERT:  That depends in part on the outcome

21    of the substantive consolidation issue.  I think they get a

22    hundred cents on a dollar if there is not substantive

23    consolidation and I think they probably are not better off

24    under S1125 than by winning substantive consolidation.

25         THE COURT:  Okay.

1          MR. ENGLERT:  I see I have relatively little time.

2   Let me --

3          THE COURT:  If I've interrupted you, I'll give you

4   a couple extra minutes.

5          MR. ENGLERT:  Thank you.  I appreciate that, your

6   Honor.  Let me turn to a couple things I haven't gotten to.

7          Ex parte contacts and some of the defenses that

8   have been raised, there is no rule of law that says ex parte

9   contacts are okay as long as they're even-handed, and I do

10  understand your Honor met with any constituency, not with

11  any one constituency.  This is not like --

12         THE COURT:  Even Mr. Brodsky twice.

13         MR. ENGLERT:  Well, with respect, your Honor, to

14  Mr. Brodsky, other than in the context of the consented-to

15  mediation in June of 2003 --

16         THE COURT:  And there was an ex parte conference in

17  that consensual mediation as well.

18         MR. ENGLERT:  Yes.

19         THE COURT:  Which he frankly admitted to in his

20  deposition.

21         MR. ENGLERT:  Of course.

22         THE COURT:  Okay.

23         MR. ENGLERT:  Sure.  I'm not disputing you on the

24  facts.  I am suggesting that the legal significance of

25  consented-to mediation involving the Court is rather

1   different from the legal significance of ex parte contacts

2   that --

3         THE COURT:  Go ahead.

4         MR. ENGLERT:  Rather, that your Honor said on
5   December 23rd were not in the nature of settlement

6   discussions.

7         THE COURT:  Did you take the position, because you

8   alluded to it in your brief, that all these five jointly
9   administered cases and the asbestos litigation through
10  bankruptcy as opposed to the torts system isn't complex and

11  isn't extraordinary?  Is that your position?

12        MR. ENGLERT:  You may assume for purposes of this

13  decision that I admit they're complex.  My client has a view

14  that they're not particularly complex as commercial

15  bankruptcies go, but we're not basing any of our legal
16  arguments on the --

17        THE COURT:  Because Judge Becker, when he assigned

18  these, he thought they were extraordinary and he thought
19  they were complex and, in fact, he said so.

20        MR. ENGLERT:  Fine.  Let me say none of our legal

21  position turns on the proposition that it's not complex.

22        THE COURT:  There was something in your brief that

23  it's not as extraordinary or complex as maybe Judge Wolin

24  thinks.

25        MR. ENGLERT:  No, I didn't write it that way and I

1  sure hope you didn't take it that way.  The rest of that
2  sentence --

3           THE COURT:  All I do is read the language.

4           MR. ENGLERT:  The rest of that sentence says the

5  Court may assume that these cases are complex for purposes

6  of these --

7           THE COURT:  Okay.

8           MR. ENGLERT:  But we've already talked about the

9  Reilly case and why complexity doesn't generally justify
10  departure from the ordinary rules.

11          Let me say something about bankruptcy and whether

12  bankruptcy is different.  Bankruptcy is different.  Why is

13  bankruptcy different?  For just the opposite of the reason

14  my friends on the right-hand side of the courtroom say.
15          Bankruptcy is a system in which heavy emphasis is

16  placed on disclosure.  Heavy emphasis is placed on

17  disinterestedness.  The definition of disinterestedness in

18  Section 101(14) of the Code is extensive.  Section 327
19  requires disinterested professionals be hired to assist.

20  Section 1104 is particularly stringent, and I already

21  referred to the 6th Circuit's recent opinion in this regard

22  on examiners, and your Honor has said that the advisers in

23  this case were functioning in all respects similar to

24  bankruptcy examiners.

25          These people could not have --

1       THE COURT:  Well, you know, I don't think the
2  Circuit read of the Court's Order as the Court intended.

3  The Court did not empower any of its advisers to do

4  anything.  We said the broad range of duties may include,

5  and I think everybody has testified it would depend upon the

6  assignment of the Court, if the Court felt that that

7  particular adviser could fulfill a given role.

8       MR. ENGLERT:  And this is why it's critically
9  important, if I may, your Honor, to understand Section
10  455(a) standard.  It is not a standard of actual bias.  It

11  is not a standard of actual impropriety.  It is not a

12  standard of actual taint.

13       It is a standard of what would a reasonable person

14  knowing all the circumstances perceive and would that person

15  harbor doubts --

16       THE COURT:  By the way --

17       MR. ENGLERT:  -- about impartiality.

18       THE COURT:  -- during the deposition, Mr. Robbins

19  was sitting there and there was an issue that came up and I

20  said to Mr. Robbins, I said, who is this reasonable person.

21  How would you characterize this person?  Is it the man in

22  the street?  Is it a person of Mr. Brodsky's training and

23  sophistication?  Who is this reasonable person?

24       MR. ENGLERT:  It is a sophisticated person.

25  There's actually an excellent discussion of that exact

1   issue, your Honor, in the Flamm Book on Judicial

2   Disqualification, which I believe your Honor is familiar
3   with.

4           THE COURT:  You cited in the footnote.  I saw that.

5           MR. ENGLERT:  We didn't cite that particular point.

6           THE COURT:  But you cited the Flamm book.

7           MR. ENGLERT:  There is a very good discussion of

8   that particular issue.  Let me put it this way.

9           THE COURT:  Your time is expired.  Do you need a

10   couple more minutes so you can finish?

11           MR. ENGLERT:  Yes.  I'd like to talk about

12   timeliness, which has been a major argument.

13           THE COURT:  Fine.  Let's go to timeliness.

14           MR. ENGLERT:  Mr. Brodsky told the truth and Mr.

15   Eckstein told the truth.  That's the short version of

16   timeliness on the facts.

17           Mr. Brodsky's declaration on December 1st said he

18   learned of this on September 24.

19           THE COURT:  I've no reason to disbelieve Mr.

20   Brodsky in his testimony but, you know, let me tell you of a

21   concern I do have.  Mr. Brodsky is a very sophisticated
22   businessman.  Mr. Brodsky is a graduate of Harvard Law
23   School.

24           MR. ENGLERT:  We won't hold that against him.

25           THE COURT:  Yes.  Well, he didn't go to Yale

1   because people who go to Yale only go to Yale to teach at

2   Harvard, so I understand.

3          Mr. Brodsky had Pacer in his office.  In 90 minutes

4   he found out everything he needed to know after there was a

5   revelation to him by Mr. Fuller.

6          Mr. Brodsky used to be co-leader of the bankruptcy

7   department at Kramer Levin, had a close relationship with

8   Mr. Eckstein, signed a waiver for Mr. Eckstein so Mr.

9   Eckstein could then represent the bank group.

10          Mr. Brodsky then, who allegedly, and I know this

11   from reading the papers, has $275 million of the bank debt,

12   somebody said 290, I wouldn't know what he has, I don't know

13   what he paid for it, but throughout the proceedings, and he

14   was here at almost every proceeding, status conferences and

15   all, Mr. Brodsky was there.  In fact, for a long time I

16   didn't know who he was or what his role was.  I kept seeing

17   his face here, sat through the whole trial every day, never

18   said a word, and what I find really interesting is someone

19   who has $270 million worth of bank debt has no lawyer, has

20   no lawyer from the time he releases Mr. Eckstein until I

21   guess he employs you, has no lawyer.

22          Query.  As he sat here and Kramer Levin was

23   carrying the ball for the bank group, wasn't Kramer Levin de

24   facto his lawyer?

25          MR. ENGLERT:  Well, your Honor, you said -- first

```
 1    of all, my answer to that question is no; second, my answer

 2    is it doesn't matter, and third, my answer is you said some

 3    other things I'd like to respond to.

 4              THE COURT:  Sure.

 5              MR. ENGLERT:  The Pacer point, yes, once one has a

 6    reason to look for information about something that may have

 7    gone horribly awry about a judge or his advisers, one can

 8    sometimes find that information quickly, but our legal
 9    system doesn't assume that anything has gone horribly awry

10    by the judge or his advisers and we don't particularly want

11    or have, according to the case law, a rule of law that says

12    please go around digging up dirt on courts and advisers.

13              THE COURT:  Didn't stop Mr. Case from looking into

14    who the advisers were, who is the counsel for the creditors

15    committee, which is the bonds and the banks.

16              MR. ENGLERT:  Yes.  He conducted some superficial

17    inquiries, yes.

18              THE COURT:  It just strikes a discordant note that

19    if I invested $275 million, that I wouldn't be doing a full-

20    scale due diligence investigation to find out what's going

21    around.

22              MR. ENGLERT:  Well, there are two ways to go with

23    that, your Honor.  One is, do you disbelieve Mr. Brodsky as

24    a matter of fact and I would suggest you can't --

25              THE COURT:  I don't disbelieve Mr. Brodsky as a
```

1   matter of fact.

2           MR. ENGLERT:  The second way to go, if I may --

3           THE COURT:  Sure.

4           MR. ENGLERT:  -- is to say we're going to have a

5   legal standard, it is not actual knowledge, and that's an

6   issue we addressed at some considerable length in our brief,

7   all the appellate cases, there are a couple of cases but all

8   the appellate cases use an actual knowledge standard.  Why?

9   Because we don't want people in Mr. Brodsky's situation, who

10  have actual knowledge, to sit on that actual knowledge and

11  then come in after they lose something.

12          THE COURT:  What procedural safeguard is there
13  against that, that a person such as Mr. Brodsky, and I've

14  not accused Mr. Brodsky as I think you took umbrage in the

15  Circuit Court of Appeals when somebody assailed Mr. Brodsky.

16  I don't do that.  I will have to accept his deposition
17  testimony as it is.

18          I am speaking about someone who has that type of

19  investment, maybe they should have done more to inform
20  themselves and, as you indicate in your brief, in the Owens

21  Corning case there's probably a thousand people out there

22  who have an interest in this.  Is it the Court's obligation

23  to give notice to all these people and how do we do it and,

24  lastly, what is the procedural safeguard for the Court as

25  opposed to someone like Mr. Brodsky, at the conclusion of 22

1    months coming forward and saying, by the way, I never had

2    notice about Gross and Hamlin.

3         MR. ENGLERT:  Well, the answer to those last two

4    questions, in my view, your Honor, is the same answer.  The

5    procedural safeguard is when there's a problem with possibly

6    conflicted advisers or with any possibly conflicted

7    professional under Section 327, do what the Bankruptcy Code

8    suggests, make disclosure at the time of the appointment or

9    at the time the problem comes to the Court's attention and

10   see if the parties will accept those people as advisers or

11   as any other professionals under Section 327, or if the
12   parties won't accept it, then make a resolution about

13   whether the problem is real or imagined, but do it up front.

14        Let me mention just -- I know my time expired.  I

15   don't want to try your patience.  Let me mention one last

16   thing.  On page 62 of the Owens Corning brief or the joint

17   brief filed by Owens Corning and various tort interests,
18   there are a whole bunch of cases that talk about notice to

19   the creditors committee being notice to everybody so that

20   you don't need to give actual notice to anyone other than

21   the creditors committee.

22        Every one of those cases turns on a particular
23   bankruptcy rule.  None of those bases arises in the conflict

24   of interest or recusal situation.  None of them arises in a

25   Section 327 disinterestedness situation.  They all -- every

1    single one of them talks about a particular bankruptcy rule

2    that make notice of a particular action to the creditors
3    committee good enough as opposed to all.

4          With respect, your Honor, there should have been

5    notice to all creditors.  That would have headed off this

6    problem.  Thank you.

7          THE COURT:  All right.  Thank you.  Mr. Mancino.

8          MR. MANCINO:  Good morning, your Honor.  May it
9    please the Court, Richard Mancino on behalf of the movants

10   in the W.R. Grace bankruptcy proceeding.

11         Your Honor, with respect to 455(a)(1), the basis on

12   which we moved for your Honor's disqualification, a

13   reasonable observer would harbor doubts about the

14   impartiality of this Court that received briefings and
15   advice however the advisers may subjectively define advice

16   or no matter how the Court may define advice on substantive

17   issues going to the merits of these cases and received that

18   advice, that input from advisers who are partisans in

19   another complex, hotly contested bankruptcy proceeding that

20   raises issues similar to the issues that are being raised in

21   the five asbestos cases here and involve asbestos claimants

22   who may also have claims in these five asbestos cases.
23         Now, it's not relevant, your Honor, whether your

24   Honor was aware or unaware of Mr. Hamlin's and Mr. Gross's

25   role in the G-1 bankruptcy and it's not relevant whether or

     1   not your Honor was aware of the precise issues that would

     2   come up or could come up in that asbestos litigation, and

     3   the reason for that, your Honor, is explained by, well, the

     4   Supreme Court in Wilgabor, made that clear.

     5        There can be an appearance of partiality or bias

     6   that gives rise to a duty in the district court to

     7   disqualify himself or herself even if the district court is

     8   unaware of the facts and circumstances that give rise to
     9   that appearance or, as in the Wilgabor case, has forgotten

    10   those facts or circumstances.

    11        So, your Honor, we don't -- we accept your Honor's

    12   statements about what you were or were not aware of, but,

    13   unfortunately, under Section 455(a), that is not relevant.

    14        The other basis, your Honor, that we believe gives

    15   rise to a duty for your Honor to disqualify himself is that

    16   a reasonable observer would harbor even more doubts about

    17   the fairness and impartiality of your Honor and, indeed, of

    18   these entire bankruptcy proceedings where substantive issues

    19   that affect all of the cases are being discussed, whether or

    20   not advice is being given but are coming up and being

    21   discussed in off-the-record ex parte meetings and

    22   conversations, and those are ex parte meetings and

    23   conversations that involve both the District Court and the

    24   five advisers, including the two advisers whose roles in the

    25   G-1 case have brought us here today, but also, the ex parte

1    communications and discussions that have taken place among

2    the District Court and certain counsel and certain parties

3    in all of these bankruptcy proceedings, including the W.R.

4    Grace proceedings.

5         Now, your Honor asked a question of Mr. Englert

6    about the significance or lack of significance of the

7    complexity and difficulty of these matters and I, too, will

8    concede that the five bankruptcy cases that your Honor has

9    been entrusted with the administration of are complex.  They

10   are difficult.  They raise gargantuan challenges for your

11   Honor.

12        However, with respect to the ex parte

13   communications and the prohibition against them that's set

14   forth both in the case law and in Canon 3(a)(4) of the Code

15   of Conduct for U.S. Judges, there's no safe harbor that

16   permits a regime, a case management regime, of ex parte

17   communications because the case is complex or because it

18   raises serious and difficult challenges and issues.

19        THE COURT:  So, I guess what you're saying is there

20   can be no consent.

21        MR. MANCINO:  I'm not saying that, your Honor.

22   There can be consent to specific ex parte communications

23   that fall within the exception to the prohibition against

24   them.  In the case where matters of administration are being

25   raised, in matters involving settlement, where the Court