is --

THE COURT: Or procedure.

MR. MANCINO: Or procedure, your Honor, that's right.

THE COURT: There's not much left after that, Mr. Mancino.

MR. MANCINO: There is quite a bit left, your Honor. I mean, there's the whole breadth of substantive issues that have come up in these cases which I respectfully submit should not have been the subject of ex parte case management conferences, ex parte phone calls or discussions, without having the ability for parties interested in this case to know what has transpired in those discussions.

THE COURT: But doesn't the Reilly case say I have a right to talk to people as resource to gain education?

MR. MANCINO: With respect to your advisers, your Honor --

THE COURT: Forget about my advisers. Put my advisers aside for a moment. What about other people that came to see me, other people that were not designated advisers?

MR. MANCINO: Well, the difficulty with that, your Honor, is that the Court runs the risk of being subjected to factual information in an extra-judicial context, so, when you bring in, for example, the attorneys who had experience

representing plaintiffs in asbestos litigation and the attorney with experience in representing defendants, the problem, the appearance, the appearance issue that arises from that is that they are sharing with your Honor their observations about substantive issues that will certainly surface in these asbestos cases, and, in particular, there was the -- I think it's Whitney Chelnik's memo or Mr. Gross's notes, I can't recall which, your Honor, in which reflect that not only were they talking about how these cases progress in the courts, but they were also talking about specific medical experts, both on the plaintiff's side and on the defendant's side, and were sharing with the advisers and with your Court their observations about the nature of the opinions that these experts give and whether or not, from their own personal perspective, those opinions hold water; and, consequently, while some -- while the Court should be allowed to have neutral advisers assist in the management of the case --

THE COURT: In asbestos there are no neutral advisers. Everybody has taken a position on one side or the other. That was the discussion in the 706 panel, could neutral doctors be found, and the likelihood was no.

MR. MANCINO: Well, and the consequence of that, your Honor, at least with respect to a 706 panel, is you can't have them on the panel because they're not neutral,

because there may be a bias embedded in their views. That's the problem. Now --

THE COURT: This Court was aware that Judge Pointer in the Dow Corning case did use a 706 panel. It cost several million dollars and took two years. So, it's not an easy issue.

MR. MANCINO: It is not an easy issue, your Honor.

THE COURT: And by the way, in the Reilly case -- you've already told me that this is an extraordinary and complex case. What the court said there, it said in truly extraordinary cases where the introduction of outside skills and expertise not possessed by the judge, I never made any pretense that I was an expert in asbestos -- will hasten the just adjudication of a dispute without dislodging the delicate balance of the judicial role.

I think what Reilly is saying there is courts have the right to speak to people for purposes of education.

MR. MANCINO: I'm not challenging that right, your Honor, but what I am challenging is the fact that at least two of the advisers and, according to Kensington, perhaps a third of the advisers, a third member of the advising panel, are not neutral, do not come to this job as advisers.

THE COURT: That's the argument Mr. Englert made. Let's talk about all the other people in ex parte that you're raising. You raise Mr. Kommatore and you raise Mr.

Parnell. Mr. Kommatore was a plaintiffs' lawyer, Mr. Parnell was a defense lawyer to advise the Court what was going on in litigation throughout the country and, obviously, you assert that even receiving information from them for the Court's education is inappropriate.

MR. MANCINO: It can be inappropriate, your Honor.

THE COURT: Well, is it? Is it inappropriate? Was it inappropriate?

MR. MANCINO: In this case, yes, your Honor.

THE COURT: Why?

MR. MANCINO: And the reason for that is because there were no guidelines established that, at least from an outside observer's perspective, that would guard against the involvement as advisers, the involvement in these discussions of people who have an agenda or have duties, fiduciary duties in another bankruptcy case to advance the interests of asbestos claimants, some of whom are going to be asbestos claimants in these cases, so, there were no guidelines. They did not know what -- the advisers did not know what the limits of what they could or could not do.

Now, they may have thought in their minds that perhaps there are issues or subjects that I personally should not get into, but when you look at it in hindsight with more of the record having been revealed, you realize that those, whatever guidelines existed in their own minds

were not clear, and that's where the problem arises, and your Honor is unfortunately placed in a very difficult position because of that, because there are no checks or balances on what these advisers can or cannot do.

THE COURT: Did Mr. Kommatore or Mr. Parnell violate any guidelines that you would have imposed?

MR. MANCINO: Well, it's hard for me to say, your Honor, because I really don't know what they discussed with your Honor and the advisers, but I do think it raises questions when they are discussing specific medical experts who may come in front of this Court to testify. They may not, but you don't know that.

THE COURT: Okay.

MR. MANCINO: That's where the problem arises.

THE COURT: I understand your point.

MR. MANCINO: The other thing, your Honor, about the complex nature of these cases that bears on the 455(a) appearance of impartiality is that because they're complex, because these issues are so hotly contested and so much at stake for all of the constituents, that calls out for more transparency, not less, and the problem is, as we perceive it, is that lack of transparency; that we have no way of, and I'm talking now about my clients, for example, but we should also focus on this issue in the context of that, you know, reasonable observer that 455(a) says should be the

standard we look at, we have no ability to know what has been discussed with your Honor in these ex parte conferences.

THE COURT: So, we're talking about the ex parte conferences that on December 20 I stated to 200 to 250 people if you want to meet with the Court to provide me insight as to the particular issues in your case, the Court will meet with you, and notwithstanding the fact that it was with acquiescence, I'm not going to use the word consent, acquiescence, that those are inappropriate?

MR. MANCINO: Yes, your Honor.

THE COURT: Okay. So, I guess when your co-counsel in this case, Joanne Wills from Klehr, came to see this Court on two occasions to see if the Court could assist her to settle the property damage claims in Armstrong, and on the second occasion came to this Court with two of her clients with no adversary, no adversary, and complained about a decision of Judge Newsome where she had lost a Daubert hearing, unsolicited by the Court, that was inappropriate, wasn't it?

MR. MANCINO: I believe it was, your Honor.

THE COURT: Okay.

MR. MANCINO: And I'll say this, Miss Wills was not representing the Grace movants.

THE COURT: No, no, not at that time. Not at that

time. She does today.

MR. MANCINO: She does today.

THE COURT: This is the hypocrisy that runs throughout this case, that most of the signatories of the recusals and even the mandamus were people who regularly came to this Court seeking assistance. Nobody ever tried to persuade this Court on the merits, but came to this Court for assistance, and asbestos litigation, whether you agree or disagree, is a very small, discrete group of lawyers, very incestuous, and they know everything that's going on and everybody in this case knew exactly what was going on, and came to this Court for assistance, including your co-counsel here today, Miss Wills.

MR. MANCINO: But, your Honor, the important point there is because the Court imposed a case management system that, as it turned out in practice, relied very heavily on ex parte communications, it may be the case that some of those parties really had no choice.

THE COURT: Nobody forced them to come here. Nobody asked them to come here. They were told that if they want to seek the Court's assistance, they would, and people like Miss Wills did it, and the Gibbons firm, the Gibbons firm, Griffinger represented Armstrong, he represented Fresenius in the W.R. Grace, he represented the debtor; DeFilippo, when he was with the Gibbons firm, he represented

USG; Frank Vecchione today represents the debtor in Federal Mogul, you know, all these people came to see the Court.

Mr. Katchen, who's seated in the rear there, and Mr. Kruger, who represent USG and W.R. Grace, never hesitated to call the Court, could they stop by to see the Court to raise some issue with the Court, never had an adversary. They were complying with the December 28 statement of the Court. I didn't invite them. They called. I did not turn them down.

MR. MANCINO: I understand, your Honor, and from your Honor's own statements early on in these proceedings, I know -- I now know that there were innumerable such conferences with the Court, but that's the problem, your Honor, because someone whose -- perhaps whose judgment was not clouded and doesn't wish to participate in that ex parte case management regime will not know what's going on, will not have the opportunity to contest arguments, to try to put additional or different facts in front of the Court, and if I were to go back to try to find the Court's directive from December 20, 2001, whatever the precise date is, in the record, I don't think I can, I would have found that, your Honor, and if I had found that and saw that your Honor had said that there would be ex parte communications, I would have read further and I would have noted that your Honor also said that those would be used sparingly, that word that

you commented on earlier.

THE COURT: Well, Mr. Mancino, let's talk about sparingly. Okay. I've been involved in these cases for almost better than two years. Let's assume that I'm just an average Joe who only works eight hours a day. Let's assume that I only work 260 days a year. That's 4,000 hours over the course of this litigation.

The number of ex parte conferences and the time they consume, if we put that in the numerator in relation to the denominator is very, very slight.

MR. MANCINO: That may be the case, your Honor, but from what I've been able to gather from time records, from analyses done by other lawyers, there were many ex parte conferences and they covered, as I think everyone here is acknowledging, substantive issues.

THE COURT: I think I've already told you, there was an ex parte conference with every constituency in every case.

MR. MANCINO: Although, because it goes to the timeliness and waiver argument, I will just add, your Honor, that there were none with my clients.

Let me just, if I may, just --

THE COURT: Well, you say your clients. You're talking about --

MR. MANCINO: D.K. Acquisition.

THE COURT: But certainly Mr. Kruger represents the creditors committee of which your clients are a part. There were many meetings with Mr. Kruger where both USG and W.R. Grace were discussed.

MR. MANCINO: Well, Mr. Kruger represents the committee as such. He does not represent individual creditors.

THE COURT: Oh, no. I understand that.

MR. MANCINO: So, there's no attorney-client relationship between Mr. Kruger and his firm and the creditors whom I represent.

THE COURT: I never met with your creditors.

MR. MANCINO: Okay. But even so, your Honor, the standard is what will that reasonable observer think and it's not -- the reasonable observer is not, you know, someone with an ax to grind or someone with an interest in these proceedings.

You assume that person is objective and you see that there are all of these private conferences taking place in which substantive issues are being discussed and very few on-the-record court hearings that are transcribed into transcripts, and that raises, I submit, an appearance of partiality and bias.

THE COURT: And by the way, that's probably the difference between the bankruptcy system and the tort

system.

MR. MANCINO: Well, I'm not sure what you mean by that, your Honor, but in bankruptcy that I've been involved in, and I haven't been involved in the asbestos bankruptcy, that's true, but the ones I've been involved in, the proceedings do take place on the record and even if you're not at a hearing, you can later go back into the court docket and retrieve a transcript and find out what's going on. That, you can't do that here.

THE COURT: Have you looked at the Delaware web site from the bankruptcy court?

MR. MANCINO: I haven't personally, but I know that it's available there and you can get the docket. In fact, I've asked my colleagues to get me information from that.

THE COURT: There are probably 200 items, documents that have been placed there as to what this Court has been doing.

MR. MANCINO: There are many orders that your Honor has entered, including orders that have been generated sui sponte, but I submit, your Honor, that there are precious few on the record, conferences, hearings, at which the subject matter of those orders is being discussed.

THE COURT: I understand your argument.

MR. MANCINO: Okay. Your Honor, I'll be brief because I know I'm at the end of my time, but the --

THE COURT: If you have something different, I'm pleased to hear it.

MR. MANCINO: I do, your Honor. I just want to talk briefly about why it is the appearance of impropriety that the involvement of Mr. Gross and Mr. Hamlin as advisers and the ex parte conferences affects not just the Owens Corning case, not just the USG case, but all the cases including Grace, and the reasons for that are simple.

These cases were given to your Honor to administer because it was recognized by Judge Becker, and I suspect recognized by your Honor, that they raised common issues.

The advisers, Mr. Gross, Judge Hamlin, and the others have acknowledged that the issues that they were discussing in those four meetings with your Honor in 2002 covered issues, in many cases hotly contested issues that come up in all of the asbestos bankruptcies, including Grace.

Now, the other point on that that I want to make, your Honor, is an interesting comment.

THE COURT: Did you read the Grace brief?

MR. MANCINO: Your Honor, I must confess, I didn't have time.

THE COURT: The Grace brief would tell you that nothing has happened in that case towards a plan or a consensual plan or personal injury or any because in the

Grace case -- each case is different -- there were two major hurdles to get over.

First was fraudulent conveyance actions, which the Court addressed first. Second was the issue of the home insulation matter, which is on Judge Fitzgerald's docket. You couldn't even get to the personal injury or the futures or whatever until you satisfied those two prerequisites.

MR. MANCINO: I'll grant you that, your Honor. I think that's the case. But I also have in mind what Judge Hamlin testified to when he was describing what his fiduciary duties are to the future claimants whom he represents in the G-1 bankruptcy.

He says one of the first things I need to do within the boundary of the law is to try to get as -- to ensure that as many assets as possible are brought into the estate. And why is that of interest to him? Because he realizes there is a limited fund of assets available for distribution and he wants to ensure that there's some left over for his clients.

So, obviously, one of the first things as a futures representative that he's going to do is to determine whether there are other proceeds, other assets out there that can be brought back into the estate by way of fraudulent conveyance actions.

Now, it's also significant on that subject, your

Honor, that Mr. Gross and Mr. Hamlin were involved in that meeting in January, on January 18, 2002, in which there appears by virtue of our having Miss Chelnik's memo a very lengthy and detailed discussion of precisely how your Honor should handle the W.R. Grace bankruptcy, and Miss Chelnik writes and, apparently, she was there, that the consensus at the meeting was that Judge Wolin must take care of the fraudulent transfer issue first before proceeding on with the general asbestos bankruptcy matters, and then there's a discussion of how the Grace bankruptcy will be divided.

And it was apparently the consensus, at least from what we have now learned later, was to divide it in just the manner that your Honor has described on the record.

Now, Mr. Gross and Mr. Hamlin were involved in that discussion.

THE COURT: Yes. But if I remember that discussion, I arrived late, so, you don't know if I was there for that part of the discussion or not. Neither do I.

MR. MANCINO: I'll grant you that, your Honor. I don't know. And that's part of the problem in having these kinds of conferences.

Now, the other thing that Mr. Hamlin has noted is that the role of the property damage claimants is of keen significance to him in his role as a futures representative because there is yet another constituency with claims to

assets of a bankruptcy estate that can take money away from his clients, so, he has to be aware of what is happening in the bankruptcy cases as it relates not just to fraudulent conveyance matters but also to property damage matters and, on that subject, your Honor, Mr. Hamlin was involved in writing opinions on appeals relating to whether or not a bar date was correctly established for the property damage claimants in W.R. Grace, and someone with a suspicious mind or a reasonable observer might question what interest Judge Hamlin had in seeing that a property damage bar date was established early on in the Grace case, perhaps to put pressure on those claimants.

THE COURT: By the bankruptcy judge.

MR. MANCINO: By the bankruptcy judge, not by this Court. But he is, in connection with an appeal of that or a request to appeal that decision to your Honor, he is writing an opinion to your Honor saying that you should not accept that appeal. That right there raises an appearance of partiality and bias and with that, your Honor, I'll subside. Thank you very much.

THE COURT: All right. Thank you. Mr. Neal.

MR. NEAL: Good morning, your Honor.

THE COURT: Good morning, Mr. Neal.

MR. NEAL: Steve Neal again for the USG debtors. Your Honor, from the time this issue has been presented to

the Court, we obviously have had a profoundly different view than the Court as to what the controlling legal authority requires under 455 in light of the record in this case.

I don't think we've had significant differences at least until now with the Court about what the record was to the extent we've been able to develop the record.

I was surprised yesterday in reading the joint brief that was filed in opposition to our papers to see that the opponents who filed the joint brief have turned this more into, or have attempted to turn it more into a factual dispute than into a legal issue, which is the way your Honor has tended to, I think, present the issue, and I just want to comment on three things in that regard.

In their brief filed yesterday, they make the effort to argue that all of the ex parte communications that have taken place with the Court were in the nature of either settlement or ministerial conversations and, therefore, permissible under 455. The Court's never contended, and we don't believe that the conversations that took place can be properly characterized as exclusively either settlement or ministerial, but we've laid the evidence out as we see it in our brief in that regard.

Next, the opponents yesterday argued that in none of the ex parte communications that took place did the Court receive extra-judicial information. The Court has never

even embraced that view of the record and, again, as we've laid out in our brief filed yesterday, the record clearly shows that extra-judicial information was, in fact, received. Lastly --

THE COURT: Well, Mr. Neal, I was referring to meetings such as the meetings that you, your CEO, your general counsel, by invitation which you accepted, you arranged it, I met with you, and you confided, Mr. Foot confided certain information to the Court which the Court viewed as proprietary, sensitive to USG's business and operation. That was not for dissemination to the public. I would call that extra-judicial information.

MR. NEAL: Your Honor, I would not. I would not dispute that in that meeting your Honor did get extra-judicial information but --

THE COURT: You tried to pass it off as settlement at the discovery and you and I know it wasn't settlement. It was advising the Court as to what issues were important to USG.

MR. NEAL: Well, your Honor, with all due respect, as I said on December 22nd, and I'll say again, that meeting, of course, was the only ex parte meeting that we had with your Honor and it was in January of 2002, about 30 days after you first convened --

THE COURT: January 24th exactly.

MR. NEAL: -- about 30 days after your Honor first convened us. I continue to believe, and I know your Honor disagrees, that, in fact, it was largely a settlement conference because it was a conference in which your Honor was asking my client what they would be prepared to either give up or be prepared to live with for the equity holders in the company as part of a resolution of the dispute and, in that context, numbers were put on the table and in that context, Mr. Foot and others in the meeting advocated or explained why they thought that was an appropriate basis for a resolution.

THE COURT: The Court also asked Mr. Foot what was important to Mr. Foot and what could the Court do to assist Mr. Foot to emerge from bankruptcy and to return to an investment grade security, specific question that was put to every CEO.

MR. NEAL: And, again, your Honor, I think that question and the discussion about that issue was, as I continue to say, in our view at that meeting in the context of trying to broker a resolution.

But your Honor, more importantly, on the extra-judicial point, we lay out in our brief the evidence that's been developed in the last couple of weeks that demonstrates that however you characterize the one meeting we had in January of 2002, the Court is -- the Court itself

has acknowledged, in fact, it received extensive extra-judicial information from other parties and from third parties in the course of the last two years.

THE COURT: Well, if you view that as settlement, then I'll modify what I said about the receipt of extra-judicial information, because I view what your CEO told me as extra-judicial information and my statement was based upon that as a predicate that whenever I spoke to CEOs, CEOs told me about their company and what was important to their company, I viewed that as extra-judicial, not settlement, not administrative or procedural.

MR. NEAL: I only have information about one meeting with one CEO and that's my CEO.

THE COURT: Okay.

MR. NEAL: I attended that meeting. I never attended another ex parte meeting with this Court, the CEO of my client never attended another, and I don't know what went on in other discussions that you might have had with other CEOs, but I do know and we laid it out in our brief -- I don't need to take the Court's time -- the record establishing that in the context of other meetings with advisers, with asbestos plaintiffs' lawyers and with other parties, the Court received what is indisputably extra-judicial information.

Now, the third thing that surprised me in the paper

that was filed yesterday by the joint opponents was the claim on page two that all of the ex parte communications that your Honor and your Honor's advisers had were consented to by us, and that bold statement is made without any evidentiary support at the bottom of page two of the joint brief. There's no basis for that, your Honor.

THE COURT: Let me find that.

MR. NEAL: No basis.

THE COURT: I read that to mean that as a result of the Court's statement on December 20, that anyone who sought the availability of the Court for a conference was not objected to. That's all I took that to mean. I did not take it to mean that you individually consented on behalf of USG.

MR. NEAL: Okay. That is the clarification that obviously is critically important to me, your Honor, because you used the word acquiesce earlier. We obviously don't believe that what we did at the December conference constituted acquiescence or consent to what has now evolved into an extensive pattern of ex parte communications over a two-year period.

But more importantly, the concept of consent carries with it the concept of being informed and, your Honor, we had no information, no disclosure, no notice that the Court and the Court's advisers were meeting with

plaintiffs' asbestos lawyers, were having dinner meetings with those lawyers.

To this day, while we know some of the meetings that occurred as a result of some of the evidence that's been developed in the last couple of weeks, we still don't know what was said or took place at those meetings, and we had no clue that the Court and its advisers were meeting with Mr. Kommatore, who is, as far as I know, has no official role in this case but is a plaintiffs' asbestos lawyer, and having a meeting with Mr. Kommatore in which he trashed what your Honor knows is one of the most important defenses to USG, the chrysotile defense, and in which he or somebody else at that meeting called one of our witnesses a charlatan.

We didn't consent to those conversations, your Honor, we didn't consent to those meetings, and we had no clue that they were taking place and, yet, those are extra-judicial, highly prejudicial ex parte and, in our view, require recusal under both 455(a) and 455(b), but, your Honor, as I said when I stood up, we have laid out in our briefs our view of the cases, our view of the record, and I was struck by the efforts of the joint opponents yesterday to, in a sense, walk away from the record, which your Honor has never done, but the efforts to walk away from the record can't succeed in light of what the discovery in

this case has shown.

So, with that your Honor, I'm prepared to submit on the basis of our papers unless the Court has other questions.

THE COURT: I have no questions.

MR. NEAL: Thank you.

THE COURT: All right. I think I indicated what we'd do is we'd take ten minutes now and then we'll resume and hear the other side. Court will be in recess.

(A recess is taken.)

THE COURT: Mr. Monk, before you start, can you tell me how you're going to divide your 30 minutes, Mr. Crames?

MR. CRAMES: Yes, your Honor. With your permission, we, on behalf of the future reps, will take 15 and Mr. Inselbuch will take 15, and with your further permission, Miss Parver is going to address one point for ten minutes and I another point for five.

THE COURT: So, you're going to divide your 15 between you and Miss Parver.

MR. CRAMES: Yes, indeed. She gets twice as much as I do, your Honor.

THE COURT: That will be fine. Just so you're not yielding your time to anyone else.

MR. CRAMES: That's correct.

THE COURT: All right. Fine. Mr. Monk, I'll hear from you, sir.

MR. MONK: Good morning, your Honor.

THE COURT: Good morning, Mr. Monk.

MR. MONK: Your Honor, I'd like to address why we're here today. I think we're here today because of tactics. I don't think it's about impropriety or really reasonably questioning the Court's impartiality.

I think we're here today because Mr. Brodsky needed to buy time to see whether Congress was going to pass a piece of legislation that might affect his 200, I think, 90 million dollars was the largest number I've seen, but it might be still $275 million investment in the Owens Corning bank debt.

I think that the evidence is clear from Mr. Brodsky's affidavit that he went out looking for a problem with respect to Professor McGovern and he apparently hadn't found one. He did hire a new law firm about that time, we know that, and then we know that in September he learns from Mr. Fuller, he says, that Mr. Hamlin and Mr. Gross are involved in the G-1 case.

THE COURT: Well, let me ask you this. What evidence would you rely upon to indicate that Mr. Brodsky, in his motion for recusal and mandamus, is engaged in tactics related to legislation?

MR. MONK: Your Honor --

THE COURT: If you said that about other people in this case, I would understand that. I'm not so sure how it pertains to Mr. Brodsky.

MR. MONK: My recollection, and the Court will have the best recollection of this, is that there were mediation sessions that took place in June of 2003, and a further mediation session scheduled for the first of July of 2003 that was canceled, and it was canceled because the legislation was becoming an issue. And the pitch, as I -- my understanding, the Court will know because you were going to be the mediator at the session in early July.

THE COURT: No. I was the mediator in June.

MR. MONK: Correct, your Honor. And there was going to be a second session that was to be scheduled right at the end of June, first part of July, that was canceled because the legislation was becoming the key focus of the bank group, and their pitch was let's hold off, maybe this legislation solves the problem.

THE COURT: Let's assume for purposes of argument it is a tactic. Why does it matter?

MR. MONK: It only matters because what we are confronted with and what the Court is being asked to do is to overlook the fact that two years ago you announced who your advisers would be and the parties had the opportunity

to go look at those advisers then and raise objections if they had reason to do it, and we know that certain -- certain parties actually raised issues and brought the matter to the Court's attention, so, it was fully within the public knowledge and available in the public record to look at the advisers way back right after you appointed them and raise this issue.

There was no reason to raise a question because no one perceived a partiality problem from the appointment of these advisers.

The same can be said about the ex parte communications. Let's talk about that for a second. 220 lawyers or 240 lawyers, an entire assembly room of lawyers and clients were present when the Court stood up and said, I intend to conduct this case in part and give the parties the opportunity to have ex parte communications. I certainly -- and I was sitting there that day, I certainly sat back and said, okay, I've been in big cases before, I know the judges in mammoth cases with many, many parties frequently feel the need to conduct ex parte communications so they know what is the next step to take in connection with the case.

THE COURT: It's basics. If you were a rear-end hit with a plaintiff and a defendant and you come in for a settlement conference and the judge says to one party, may I speak to your adversary out of your presence, it's ex parte

towards settlement but it's ex parte nonetheless.

MR. MONK: I said to myself, that doesn't surprise me at all. I believe the rest of the very experienced lawyers in this case said exactly the same thing.

To come back now, two years later, after we have invested millions of dollars of my client's money in the progress of this estate and, let's face it, we're paying for most of the lawyers in our case on both sides of the aisle, to come back two years later and say, oh, my goodness, we have a problem with that, is just unfair to us, and I think the timeliness rules with respect to recusal go exactly to that point.

It isn't just about Mr. Brodsky, when Mr. Brodsky knew. It's about what a reasonable person in his circumstances needed to do to raise the point, and I think they failed on that point. I think they have tried to turn it into did Mr. Brodsky actually know and when he actually knew, and I don't think that's the law.

Now, let me turn to the role of the advisers because I think there's a lot of confusion about this.

As I read the Kensington and Springfield brief, they try using actually my argument at the Third Circuit, they try to box the point that the advisers must be neutral. I didn't find a case in their brief that said the advisers must be neutral, and I am not aware of a case that says your

advisers must be neutral.

In fact, the only authority that has been pointed to on this subject is the Manual for Complex Litigation which suggests that when you have a complex case, it may well be that the only person that you can turn to is someone that does bring some baggage to the table for the conversation that the Court will need in order to understand the issues and resolve the matter that's before the Court. These advisers didn't play any of the roles that are required for advisers to be neutral parties.

Now, before I get chastised by my opponents on that subject, let me be clear about what I'm saying. As we understand the record as it's now been developed, the Court used the advisers in that first, roughly, six-month period of time, might have been a little longer than that, but from our perspective, it's meetings from January of 2002 to May of 2002, in that first period of time to provide you with background information regarding asbestos litigation in the broadest sense of that term, in the Court's, as well as the bankruptcy implications, that arise to educate you about this large complex case that was coming before the Court.

THE COURT: They were a resource based upon their experience and that's why they were selected.

MR. MONK: They were obviously -- and we make this point in our brief and, so, I won't belabor it here. It was

obviously a balanced group of advisers with Mr. Gross's strong background in the defense bar, and former judges who experienced that, as well as Professor McGovern, who has obviously done a lot of work resolving complex cases and is an academic.

It's a little -- I mean, obviously, you did not appoint Mr. Gross or Mr. Hamlin because they were involved in the G-1 case. I think you did know, and I think the record is clear that you did know that Mr. Hamlin had that appointment, but was just -- he was just learning how to be a futures rep and, so, whatever information he could bring to the table would not have been significant, it seems to me, because he had literally just gotten the appointment almost simultaneously with your asking him to be an adviser to you.

Now, the advisers did, in limited instances where you entered a court order and you waived the bankruptcy rule that says you can't use masters in bankruptcy, take on specialized roles.

Judge Dreier was, in the Owens Corning case, the discovery master and that would require neutrality. At least certainly under Rule 53 as it's now progressed forward, that kind of thing would require neutrality.

THE COURT: I think there was one telephone call.

MR. MONK: But we had one telephone call.

Nobody -- we were fussing at each other in a deposition and we needed to have some assistance from him. It was a telephone call and it was over and resolved and, to my knowledge, he had no other involvement in the Owens Corning case.

There's been a lot of conversation about the role of mediation in this case and the role of a mediator. Clearly, Francis McGovern was a mediator in this case, has been appointed by this Court as well as by Judge Fitzgerald to serve a mediation role and --

THE COURT: I don't know that to be a fact. I signed an order appointing McGovern to be a mediator and Judge Fitzgerald to be the judge --

MR. MONK: Correct.

THE COURT: -- settlement judge. I don't know if she ever issued a separate order in Owens Corning as to mediation.

MR. MONK: She signed an order to allow Professor McGovern to be retained so he could be paid for his services, and the gist of that order is that he was being paid for mediation services.

Now, there's been a lot of talk, and we've heard the argument this morning about how terrible it might be if one of the people who were serving a mediation function, one of the advisers, were to have provided you with information,

and there was reference to a meeting in November of 2002, when that may have taken place, and I realize that we have a limitation on information that may have come that -- reflecting Judge Dreier, is contained in Judge Dreier's notes.

Let me just say this. The record is very clear that the Court had the opportunity to meet with and receive position papers from parties prior to November of 2002. You had the opportunity to meet with the debtors in the Owens Corning case, the official committee and others.

The record, only you will know what transpired in those conversations to bring to your attention the parties' positions regarding where the bidding may have been between the bank debt settlement position and the bond settlement position or the asbestos position or whatever.

So, to the extent that there's much trying to be made about Judge Dreier's notes and the various positions, it seems to me that there are plenty of sources that constitute waiver because it came from the parties themselves that would have given you the opportunity to get that information, and I don't believe the record at all supports the notion that it was somehow provided improperly by the mediators.

But I want to talk a little bit about the policy of a mediator providing the court with information and whether

that's inappropriate. In a case in which the Court has not offered to give parties the opportunity to come forward and have ex parte conversations and the court is going to be the fact finder in the case, it seems to me it is inappropriate for a mediator who is assigned to work in the case to tell the court what the parties' positions are. But that's not our case.

In our case, the parties themselves were given the opportunity to come in and tell the Court what their position was, so, to have some concern, to raise some issue of impartiality that a mediator provided that information when the parties themselves had the opportunity to do so seems to me to be -- to stand the rule on its head.

Let me, I also want to address the --

THE COURT: By the way, the Court should add that there was never any information given to the Court that differed from what the Court learned at the consensual mediation in June.

MR. MONK: Judge, I actually was not present personally for the June 2003 mediation session with the Court, but it strikes me as great evidence of the parties' view of your impartiality and fairness that they would be willing to agree, after we had just spent a month in trial and before you had rendered your decision, to ask the Court to assist to mediate the dispute.

Now, that takes me, I think, to the Allied Signal case because I think you can -- I think in determining what a reasonable man would do in the circumstances and, remember, it's a reasonable man with full knowledge of all the relevant facts, well, the parties' own conduct is maybe the best evidence of what a reasonable person would do.

We know that the Grace parties looked at the advisers, thought about it, decided to -- they wrote you a letter. That certainly is evidence that they didn't raise a problem. They didn't say, oh, my goodness, this is -- the appointment of these advisers is a problem and you shouldn't do it and they didn't question your impartiality as a consequence of that.

In the Owens Corning case, the parties agreed to allow you to mediate. They weren't saying, my goodness, we've had all these ex parte communications. That would be a reasonable basis for questioning your impartiality.

When Mr. Becker received the information in the Grace case about the possible appointment of Mr. Gross, the red flag didn't go off and somebody didn't say, wait a minute, stop, that's a problem.

It was only when Mr. Brodsky, who needed time, when he needed time, then we found that we have a problem with ex parte communications and with the role of the advisers here.

You know, right about the same time, Judge, as this

motion for recusal was filed, the bank group filed an attack on seeking appointment of a Chapter 11 trustee. A lawsuit was filed attacking the Owens Corning board of directors and the officers for breaching their fiduciary duty to the bank group. Within a couple days of that we had an attack on the structure of the asbestos committee saying that, you know, Mr. Inselbuch's committee was organized in a way that would be inappropriate and we have to throw that out and start all over again.

Each one of those motions or lawsuits or adversary proceedings it seems to me were designed to stop the process because either maybe Congress will act and change the rule or they don't like where the case is going. They didn't like the fact that we were proceeding forward.

THE COURT: And by the way, all those actions that were brought would have nothing to do with this Court, would be handled by a bankruptcy judge.

MR. MONK: You asked me earlier -- that's correct, your Honor. You asked me earlier, how would we know that it was about tactics and timeliness, and my point is you can look at all those filings and see from those objective facts what is happening.

All those things could have been raised earlier in the case. Every single one of the bases of those motions would have been known to the parties for a great deal of

time. What was going on in the underlying case at the time? Judge Fitzgerald is holding hearings on the proposed disclosure statement, the parties, the case is where Owens Corning debtor is doing everything we can to move towards getting a disclosure statement out and a plan of reorganization. And it is clearly Mr. Brodsky, because the proposed plan proposes substantive consolidation, wants to stop the process.

I think you can't overlook that fact when you're considering whether they were timely in raising these issues. There's no doubt that they knew about the ex parte conversations, they were involved in, and there's no doubt they knew about the appointment of their advisers and had access to a whole array of public information about the advisers.

I guess I want to make one other sort of what I would consider an Allied Signal kind of a point and, that is, that it's not just the parties involved in this case who had the opportunity to raise those issues.

Judge Gambardella knew that Mr. Gross had been appointed by you as an adviser and she had the opportunity on subsequent occasions to make a determination whether he could be reappointed, because you remember he left his law firm and was in his own law firm and then moved again to another law firm and she chose -- she raised no issue. It

was no concern of hers that there was potential impartiality or an issue raised.

I think the reality is that everything had the -- everyone had the opportunity to raise this. They did not. They chose not to, in some instances, and I think it's too late, and I think the Third Circuit case in Martin, the Second Circuit case involving General Motors, the auto dealers, auto brokers case, makes it clear that if you have the opportunity to raise recusal because you have access to the information on the public record and you don't, you can't then after the trial, after the parties have invested time, after the Court has invested time, when there may be a tactical basis to do so, and I think that's really where this motion must fail.

Unless the Court has any questions, that's all I have.

THE COURT: I have no questions.

MR. MONK: Thank you, your Honor.

THE COURT: Mr. Bernick.

MR. BERNICK: I'm going to use that today, if it's all right with the Court.

THE COURT: I'd be surprised if you didn't.

MR. BERNICK: Well, I've got a special picture to draw this morning.

THE COURT: No flash cards?

MR. BERNICK: No flash cards, just a simple sketch, and if I'm lucky, your Honor will see there's at least some resemblance to the Court's own artistry and I'll leave it at that.

I'd like to take the Court back to December the 20th, when the Court held the conference and everybody showed up. In a sense, all the issues that we're facing here today are issues where the die essentially was cast in two days in December almost two years ago, the first day being December 20, when your Honor invited everybody in, and Mr. Monk has adverted to this meeting and I want to come back to it as well because it really is very, very key.

It was a mob scene. There must have been 280 people there, 250 people there, and your Honor came out, I remember, to address the group as a whole, and I was struck at the time and I'm struck now by some of the contrast who were apparently in the room that day. One I know your Honor will not take offense because of the source. Your Honor was probably the second shortest person in the room, first one being myself.

THE COURT: No. I'm taller than Ron Motley.

MR. BERNICK: Another was just the sheer numbers. Your Honor was addressing a group of tremendous numbers, all of whom were lawyers, and I remember sitting kind of close to your Honor and thinking this is not easy and your Honor

had some notes and there was just a small tremble in the hand because it was a very, very difficult presentation to make.

The third contrast I think is probably the most important one, which is one of the reasons why I'm sure that that process was not easy, is that there was an enormous difference between your Honor and everybody else in the room without exception.

THE COURT: I was the only one wearing a vest and suspenders.

MR. BERNICK: No. It comes to experience and knowledge and expertise. Sitting out in that room were some of the most preeminent trial lawyers in the United States and certainly preeminent when it comes to mass tort liability involving asbestos. There were 30 plus years of experience in dealing with trying the underlying claims. They were all there, no exceptions.

There was also sitting in that room 30 years of bankruptcy experience in dealing with mass tort, and I know my distinguished colleague, Mr. Crames, probably goes back the furthest, but not any further than Mr. Inselbuch. They were there at the very beginning dealing with asbestos bankruptcies, and they had remained, and even more important perhaps than all of that experience is that there seems to be an omission in the proceedings before the Court, perhaps

ignorance, that immediately before your Honor got this assignment, there was a significant history of new wave cases, asbestos bankruptcy cases.

A whole series of them had been filed and in those cases people were trying to think outside of the box about different ways of handling mass tort bankruptcies, and I know I personally was involved in that and all the other people in this room were involved in that and in those cases.

All of the same issues that have been highlighted to the Court as being these unique issues that have to be addressed in these cases, they already had been addressed in a whole bunch of other cases by the lawyers who were sitting there in other cases. In fact, some of those issues have even been addressed in the very cases that were assigned to your Honor.

The Grace case had a significant history before your Honor took over the assignment of the Grace case. So, all of these people not only know the underlying litigation, they know mass tort bankruptcy. They know the most recent iterations of mass tort bankruptcy and all the issues that are associated with it, including the five cases that were cited to your Honor. It was the ultimate sophisticated audience, and your Honor was a newcomer. But differently from everybody else, you had the responsibility to manage

the case.

So, what did you do? You set out a structure and in the exhibits there is a short kind of written version of the presentation which you gave, but I looked to see whether it contained the sketch which you showed because you showed a sketch, and I haven't forgotten that sketch because I looked at that and I said the Court is genuinely trying to deal with this problem by creating an organization to help master the task, and I know I got perhaps the shapes wrong but the basic structure of it was that you were -- your Honor was going to augment the resources available by having a group of advisers and by having bankruptcy judges who would take on matters as to which the reference was not withdrawn, so that essentially the Court was not acting in isolation but gained the benefit of the experience of the advisers, getting the expertise of the bankruptcy judges, keeping the bankruptcy courts involved and proceeding on that basis on a very sound track.

Now, there's one other thing that you said that day, which was that you were going to permit ex parte contacts but with all sides, both people who were -- I think most people then were thinking about tort claimants as being on one side and pretty much everyone else was on the other. In any event, anybody who wanted to could have access to the Court, and that also was announced on that day.

Now, the advisers were not appointed till the 28th but essentially this structure was announced and the die was cast on December the 20th, and that's how it was. And this structure is what then creates a road map for the issues that we have here today, and I'm going to touch briefly on those issues because I think the issues have become refined during the course of the briefing process.

Let me, first of all, talk about the ex parte side of the equation. Setting aside what the bankruptcy judges did and how their matters came before the Court and what the advisers did, let's just talk about the direct ex parte context that your Honor has described as being innumerable and the parties have talked about in their papers again this morning.

Was it proper for the Court even to allow and arguably invite ex parte contacts? Was that proper? I think everyone would have to say that under the current state of the case law, the answer to that is unclear. That's why the Third Circuit is going to have to address it. It is an absolutely threshold issue that no one can point to your Honor and say here is good precedent for it or against it. We just don't know, and that is a threshold issue. If the Third Circuit says it was improper to do that, then based on that law, obviously there should be recusal, and that's the same in all the cases and right across the board.

If Mr. Neal talks about an issue of law, that's an issue of law for the Court to take up. It's got some factual content to it under the circumstances, but it is an issue of law for the Court to frame.

It's an interesting issue. It's not an easy issue. Were these really extra-judicial contacts when your Honor made it part of the judicial process? This is not like you go trotting off to a conference and nobody else knows about it and it's sponsored by the plaintiffs' bar. This is where you're saying it's going to happen in the context of this case as part of case management. It's important that it was open to everybody, very, very key. It's not one-sided.

And finally important that it's part of the bankruptcy process, and we know and I've learned, I'm not a bankruptcy lawyer but I've learned a few things about bankruptcy, some with a good deal of pain and one of the things that I've learned painfully is that much as I would like to litigate all the issues to resolution because the litigation process I think knows no peer in being able to get to the bottom of issues, there isn't tolerance for that at the end of the day in bankruptcy if the price to be paid is the case resolution is too long, too far prolonged.

Bankruptcy focuses on cases resolution and you're talking to a bunch of bankruptcy lawyers, what is it that you're saying. You're saying I'm creating a structure that

I'm going to use to administer the case in bankruptcy towards a resolution, so, we'll see what the Court does.

There's a reference this morning to Judge Pointer's role in the breast implant litigation. Actually, reminded me of something. I don't know if Ken Eckstein is here, he may remember this. In any event, Judge Pointer, when he acted as the MDL judge in connection with breast implant litigation, had kind of a roving courtroom. He'd go around the country to different states and hold his MDL status conferences, and the night before the status conferences there would be a cocktail hour, and those who know Judge Pointer know that that cocktail hour was very important for a variety of reasons, but everybody would be invited. The state court judge would be invited, all the litigants would be invited, and anybody who wanted to go could go right up and talk to Judge Pointer about the case, and it happened all the time, all the time. I can't -- as annoying as Ralph Noels, who is the lead plaintiffs' lawyer, was so effective in talking to Judge Pointer about the administration of the case. Everybody knew about it. It was done on purpose. Was that wrong? It's all extra-judicial but it's open. Everybody can participate.

Important question. What is much clearer is that the commercial interests in the Grace case consented to the ex parte process. I'll say consented. In what way? Number