UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:  ARMSTRONG WORLD INDUSTRIES, INC., et al., | CHAPTER 11 Case Nos. 00-4471 |
| Debtors. | 00-4469 00-4470 |
| ------------------------- | |
| IN RE:  W.R. GRACE CO., et al., | CHAPTER 11 Case No. 01-1139 through 01-1200 |
| Debtors. | |
| ------------------------- | |
| IN RE:  FEDERAL-MOGUL GLOBAL, INC., T & N LIMITED, et al., | CHAPTER 11 Case Nos. 01-10578, et al |
| Debtors. | |
| ------------------------- | |
| IN RE:  USG CORPORATION, a Delaware Corporation, et al., | CHAPTER 11 Case Nos. 01-2094 through  01-2104 |
| Debtors. | |
| ------------------------- | |
| IN RE:  OWENS CORNING, et al., | CHAPTER 11 Case Nos. 00-3837 through 00-3854 |
| Debtors. | |
| ------------------------- | |

January 16, 2004
Newark, New Jersey

B E F O R E:  HONORABLE ALFRED M. WOLIN, USDJ

Pursuant to Section 753 Title 28 United States Code, the following transcript is certified to be an accurate record as taken stenographically in the above-entitled proceedings.

_____
JACQUELINE KASHMER
Official Court Reporter

JACQUELINE KASHMER, C.S.R., C.R.R.
OFFICIAL COURT REPORTER
P. O. Box 12
Pittstown, NJ 08867
(609) 656-2595

```
 1
       A P P E A R A N C E S:
 2

 3
       ROBBINS, RUSSELL, ENGLERT, ORSECK &
 4     UNTEREINER, LLP
       1801 K Street, N.W. - Suite 411
 5     Washington, D.C. 20006
       BY:  ROY ENGLERT, ESQ.,
 6          LAWRENCE ROBBINS, ESQ.,
       For Kensington and Springfield
 7

 8
       COOLEY GODWARD, LLP
 9     Five Palo Alto Square
       3000 El Camino Real
10     Palo Alto, CA 94306-2155
       BY:  STEPHEN C. NEAL, ESQ.
11     For USG Corporation

12

13     WILLKIE, FARR & GALLAGHER
       787 Seventh Avenue
14     New York, NY 10019
       BY:  RICHARD MANCINO, ESQ.,
15     For D.K. Acquisition Partners, Fernwood Associates, and
       Deutsche Bank Trust Company America
16

17
       SAUL EWING, LLP
18     100 South Charles Street
       Baltimore, MD 21201-2773
19     BY:  CHARLES O. MONK, II, ESQ.
       For Owens Corning
20

21
       KIRKLAND & ELLIS, LLP
22     200 East Randolph Drive
       Chicago, IL 60601
23     BY:  DAVID M. BERNICK, ESQ.,
       For W.R. Grace
24

25
```

1    A P P E A R A N C E S:

2


3

       KAYE SCHOLER, LLP
4      425 Park Avenue
       New York, NY 10022-3598
5      BY:  MICHAEL J. CRAMES, ESQ.,
            JANE W. PARVER, ESQ.,
6      For James McMonagle, Owens Corning Futures
       Representative, and Dean Trafelet, USG and
7      Armstrong Futures Representative

8


9      CAPLIN & DRYSDALE
       One Thomas Circle, N.W.
10     Washington, D. C., 20005
       BY:  ELIHU INSELBUCH, ESQ.,
11     For the Asbestos Claimants Committee in Owens
       Corning, USG, W.R. Grace and Armstrong

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  The first thing I'd like to do is take

2     appearances please.

3          MR. ENGLERT:  Roy Englert on behalf of the Movants

4     Kensington and Springfield.

5          THE COURT:  Good morning.

6          MR. NEAL:  Good morning, your Honor.  Stephen Neal

7     on behalf of USG.

8          THE COURT:  Good morning, Mr. Neal.

9          MR. MANCINO:  Richard Mancino on behalf of D.K.

10    Acquisition Partners, Fernwood Associates, Deutsche Bank

11    Trust Companies America.

12         THE COURT:  Thank you.  Good morning.

13         MR. MONK:  Good morning, your Honor.  Charles Monk,

14    Matthew Dobson, Henry Abrams and Norm Pernick on behalf of

15    the Owens Corning debtor.  I'm the only one speaking.

16         THE COURT:  Okay.  Thank you.

17         MR. CRAMES:  Good morning.  Michael Crames and Jane

18    Parver of Kaye Scholer for James McMonagle, the futures rep

19    in Owens Corning, and Dean Trafelet, the futures rep in USG

20    and Armstrong.

21         THE COURT:  All right.  Good morning, Mr. Crames.

22         MR. INSELBUCH:  Elihu Inselbuch from Caplin &

23    Drysdale for the Asbestos Committees in Owens Corning, USG,

24    W.R. Grace and Armstrong.

25         THE COURT:  Okay.  Thank you.

1    MR. BERNICK:  Good morning, your Honor.  David

2    Bernick for Grace.

3    THE COURT:  All right.  Good morning.  A couple of

4    housekeeping matters, if we may.  Mr. Englert, I have a

5    letter from Mr. Orseck dated January 14, 2004, and the

6    letter pertains to Judge Dreier's notes requesting that they

7    be filed under seal and we will take care of that if you'll

8    submit to us a sealing order.

9    MR. ENGLERT:  Yes, your Honor.

10    THE COURT:  Your application is granted.  Mr.

11    Mancino, I have a slight problem.  Your brief wasn't

12    received until this morning.  It was filed electronically in

13    Delaware yesterday at 12:17.  You're the only counsel that

14    did not afford this Court a courtesy copy.

15    I have not read your brief.  You may argue today,

16    I'm going to permit you to argue, but I've not read your

17    brief.  I've read every brief that was submitted with a

18    courtesy copy to the Court.  You're the only one that

19    didn't.

20    MR. MANCINO:  Your Honor, I have no explanation but

21    I do have an apology for that oversight.

22    THE COURT:  I just want to let you know I haven't

23    read your brief.  I'm going to permit you to argue.

24    MR. MANCINO:  Thank you, your Honor.

25    THE COURT:  Okay.  I've established the order of

1  argument.  It will be the Owens Corning movants, so, that

2  will be you, Mr. Englert, and then the W.R. Grace movants,

3  that will be you, Mr. Mancino, then the debtor USG Corp.,

4  that will be you, Mr. Neal, and then what I think we'll do

5  is we'll then take a ten-minute break and then we'll go to

6  the debtor, Owens Corning, the debtor, W.R. Grace, and the

7  committees, who are going to share their time.

8       Everybody has 30 minutes.  There will be a sign

9  when you have five minutes left.  The Court reserves the

10  right to engage in a colloquy and I guess everybody by

11  invitation would be pleased with that because anyone who's

12  ever argued an appeal in any court would not like to just

13  stand there for 30 minutes and just have the court look

14  blankly at you.

15       I'll try not to interrupt unduly.  I don't want to

16  use the word sparingly because it's taken on its own life in

17  this case.  Should we have an undue colloquy, I will

18  consider that in your request for more time.  I have nowhere

19  to be today so I've got all day for this.

20       Mr. Englert, with that being said, you may

21  approach.  I don't care if counsel use the counsel table or

22  use the podium, it's up to them.

23       Mr. Englert, you may proceed.

24       MR. ENGLERT:  Thank you very much, your Honor, and

25  good morning again.  Let me say I certainly welcome

1  colloquy.  What's of interest to you is of interest to me.

2          I would like to start with the question of did your

3  advisers render advice, and I start with that question

4  because the Third Circuit, in its opinion, quoted paragraph

5  ten of Mr. Gross's November 14 affidavit in which he said he

6  rendered no advice, and I was surprised to read in the W.R.

7  Grace brief yesterday that the advisers rendered no advice

8  and there is no contrary evidence.  On page 202 --

9          THE COURT:  You're going to have to let me get with

10  you if you're going to refer to transcripts.  Is that what

11  you're going to do?

12          MR. ENGLERT:  Briefly, yes, your Honor.

13          THE COURT:  Just tell me whose transcript.

14          MR. ENGLERT:  Judge Dreier's.

15          THE COURT:  Okay.  I have Judge Dreier's

16  transcript, page 202.

17          MR. ENGLERT:  This is under questioning from Mr.

18  Inselbuch's partner, Mr. Finch.

19          THE COURT:  Could you give me a line please.

20          MR. ENGLERT:  Sure.  Lines seven to nine, your

21  Honor.

22          THE COURT:  Okay.

23          MR. ENGLERT:  Judge Dreier said "I didn't see this

24  as being pro plaintiff or pro defendant.  It was just to

25  render advice to try to achieve that end, the end of making

1  sure the truly injured were compensated."

2  Later on the same page, lines 21 through 23, Judge

3  Dreier, "The earlier meetings were closer together when we

4  thought something could be done with our advice to help to

5  resolve these matters."

6  The Grace brief filed yesterday, which is the brief

7  that takes the position there was no advice and there is no

8  contrary evidence, quotes on page 17 from Judge Keefe's

9  deposition --

10  THE COURT:  Yes.

11  MR. ENGLERT:  These are brief quotations, your

12  Honor.  I'm happy to wait for you but I think they'll be

13  quick.

14  THE COURT:  It's just a matter of finding them.  Go

15  ahead.  I have it.

16  MR. ENGLERT:  Judge Keefe, early in his deposition,

17  in describing his understanding of the role he was given by

18  this Court, said he was -- "We were going to" -- "he", your

19  Honor, "was going to ask us to give him advice with respect

20  to some issues that may have applied to the litigation in

21  general with respect to management."

22  Couple pages later, the Grace brief quotes in

23  footnote 17, where Mr. Gross's deposition, "QUESTION:  If we

24  were to use the label 'adviser' to describe your position,

25  is there any better or more accurate term that we can think

1    of other than an adviser to describe your duties in

2    connection with the five cases?"

3            "ANSWER:  No."

4            The next page, footnote 18 quotes from Judge

5    Hamlin's deposition to the extent he saw his role as an

6    adviser.

7            So, I'm not quite sure, your Honor, what Mr. Gross

8    in his affidavit and the authors of the Grace brief mean in

9    saying there was no advice, but every adviser testified

10   either that he gave advice, that all the advisers gave

11   advice, that the Court asked for advice or that adviser was

12   the best way to describe it.

13           THE COURT:  I guess we'll have to go to Webster to

14   find out all the ramifications of what the word "advice"

15   means.  Did they provide background, history?  Is that

16   advice?  Certainly.

17           MR. ENGLERT:  Yes.

18           THE COURT:  There's been no contra-statement that

19   they didn't provide that type of background.  That's advice.

20           MR. ENGLERT:  I agree.

21           THE COURT:  Whether they gave substantive advice as

22   how to decide legal issues, I think if you read the

23   depositions in their total, totality, you'll find that they

24   never gave me substantive legal advice as to how to decide

25   an issue.  But you may proceed.

1          MR. ENGLERT:  Well, your Honor, a couple comments

2    on that, if I may.  First of all, I would respectfully

3    disagree with you.  For example, at page -- I may not have

4    the right page off the top of my head but around page 62 of

5    Judge Dreier's deposition, I believe there was testimony

6    about substantive advice but, in any event, your Honor,

7    skillful advocates can give historical background in many

8    different ways and they can lead people toward certain

9    conclusions.

10          With background information, even if everything

11   that's presented is presented in a way that each fact alone

12   is irrefutable but the sum total of what's being given is

13   being given from a particular perspective, so, I don't think

14   the requirement for finding that there are conflicted

15   advisers in the case law is that the adviser must be proven

16   to have said to the judge, Judge, please decide this issue

17   this particular way.

18          I think the problem with conflicted advisers that

19   runs through the case law is when people have an interest in

20   stating things from a particular perspective, it is assumed

21   that there is a problem.

22          THE COURT:  Well, you will agree, won't you, that

23   when you asked that question of the advisers, most of them

24   categorically said they gave no substantive legal advice.

25   Would you agree with that?

1          MR. ENGLERT:  No, I would quite strongly disagree,

2   at least with respect to Judge Dreier.  With respect to --

3          THE COURT:  You asked the question of almost every

4   one of the advisers whether there was any discussion of

5   claim valuation or validity of claims.  Everybody said no.

6          MR. ENGLERT:  I don't think that's correct, your

7   Honor.

8          THE COURT:  The only one you rely upon is Dreier,

9   whose statements disagree with the other four, but, you

10  know, you can try to convince me, and I don't really want to

11  waste your time arguing the issue.  You and I have a

12  different conception of what advice really means.

13          I'm satisfied the record will demonstrate that

14  there was no substantive legal advice given, probably

15  discussed a hundred different issues that portend asbestos

16  litigation.  There's never been a denial of that.

17          MR. ENGLERT:  Well, your Honor understands my

18  position.

19          THE COURT:  Sure.

20          MR. ENGLERT:  And I do suggest that Judge Dreier, a

21  completely unconflicted adviser from anyone's standpoint,

22  not only testified that substantive advice was given but has

23  contemporaneous notes that certainly seem to suggest that

24  his testimony was --

25          THE COURT:  The Circuit Court of Appeals will have

1    the opportunity to see those notes --

2            MR. ENGLERT:  Okay.

3            THE COURT:  -- if the matter should go there.

4            MR. ENGLERT:  Let us talk about what some of the

5    subjects of these discussions were.  We've at least

6    tentatively for purposes of this discussion agreed to

7    disagree about what advice constitutes.

8            Let's talk about subject matters, whether to

9    convene a Rule 706 panel to look into scientific criteria,

10   proof of claim forms, American Thoracic Society guidelines,

11   what to do with unimpaired claimants, fraudulent conveyance,

12   estimation under Section 502(c) trust distribution processes

13   or procedures, I can never remember.

14           THE COURT:  These are all the items that you listed

15   in your brief, if I recall.

16           MR. ENGLERT:  We listed these and additional items,

17   yes.

18           THE COURT:  Right.

19           MR. ENGLERT:  And with citations to each deposition

20   and documentary evidence suggesting that all of these

21   subjects were discussed.  Many, many of these subjects

22   overlap closely with the G-1 Holdings case and, in fact, as

23   your Honor is well aware, on certain occasions your Honor

24   has issued rulings and very soon after you have issued a

25   ruling, either Judge Gambardella or Judge Bassler has been

1   urged to follow your Honor's ruling.

2          As you also know from our brief, Judge Chin, in the

3   Southern District of New York, in the Keene creditors trust

4   case, was urged to follow a path similar to your Honor's

5   path in the Sealed Air decision with regard to fraudulent

6   conveyance.

7          THE COURT:  And by the way, I didn't learn that

8   until yesterday when I read your brief.

9          MR. ENGLERT:  I learned very recently myself, your

10  Honor.

11         THE COURT:  I know nothing about the Keene trust

12  case.  I know that Mr. Gross is involved in it.  I do not

13  even know the issues in it, nor do I really know the issues

14  in G-1, as I have said to the Circuit Court of Appeals

15  before.

16         MR. ENGLERT:  But you see, your Honor --

17         THE COURT:  No, no.  And I've never spoken to Judge

18  Bassler about G-1, nor have I spoken to Judge Gambardella

19  about G-1.  I know it's an asbestos litigation not being

20  administered by me.

21         MR. ENGLERT:  And that's the point.  That's the

22  point, your Honor.  You are not following G-1, you are not

23  following these other litigations, but you are being advised

24  by the people who not only follow them but are partisans in

25  these litigations, and it's rather difficult for your Honor

1    acting in complete good faith to filter out what may be

2    advice that is colored by the roles these gentlemen are

3    playing in other litigation from what advice is not colored

4    by their roles in other litigation, but that's the core

5    fundamental problem here.

6        And as your Honor is aware, the major cases talking

7    about disqualifying a judge because of his advisers, they're

8    mostly law clerk cases.  There also one Rule 706 expert case

9    but the generic --

10        THE COURT:  And then there's the Reilly case.

11        MR. ENGLERT:  I'll come to Reilly.  It's a very

12    important case for our side.

13        THE COURT:  Okay.

14        MR. ENGLERT:  But your Honor, the cases that

15    involve disqualification of judges are not cases of judges

16    who have said, by golly, I want to get bad advice from these

17    people.  They're cases of judges who, operating in all

18    innocence, have gotten advice from people with conflicts and

19    have, in the words of, I believe it's the Hall case, then

20    made errors of judgment once the conflicts were called to

21    their attention of the advisers.

22        Now, let me turn, your Honor, since your Honor has

23    expressed an interest in that, we have never argued, your

24    Honor, that there's anything wrong with appointing advisers

25    in this case.  Reilly provides good support for the

1      proposition that your Honor had the authority on December

2      20, 2001, on December 28, 2001, to appoint advisers.

3              The problem is conflicted advisers, and Reilly does

4      not stand for the proposition that advisers serving a

5      conflicting role in other litigation may be appointed.

6              Quite the contrary.  The First Circuit, in

7      rejecting the government's argument in that case, emphasized

8      both waiver and the problem that the objection was not

9      well-taken on the merits because there was no allegation of

10     bias, there was an unbiased adviser.

11             In fact, the judge in Reilly, trial judge had

12     earlier tried to appoint someone who did have a conflict or

13     not tried to, had been thinking about, discussing appointing

14     someone who did have a conflict.  That person was not

15     appointed.  He came up with someone who was unbiased and the

16     First Circuit said if there were any suggestion of bias on

17     this record, we would consider reversing for plain error.

18     So, yes, we read Reilly for all it's worth.  It stands for

19     the proposition, and you can see as far as we're concerned

20     it stands for the proposition you had the authority to

21     appoint advisers but one must be careful what advisers one

22     appoints.

23             THE COURT:  You will concede that when I appointed

24     Gross on December 28, he had not been appointed in G-1.  I

25     think he was not appointed till January of 2002.

1        MR. ENGLERT:  I think that's correct with regard to

2    formal appointment.

3        THE COURT:  I think that Hamlin had been appointed

4    sometime in September.

5        MR. ENGLERT:  October 10, I believe was the date.

6        THE COURT:  September, October of 2001.  My

7    appointment was December.  I may have known about Hamlin's

8    appointment.  I'm not sure whether I knew or learned later

9    on or whatever.  But when I appointed Gross, he was not

10   appointed in G-1 at that time and I had no knowledge of his

11   pending appointment.  I certainly did learn after his

12   appointment.

13       MR. ENGLERT:  Okay.  Well, your Honor, our --

14       THE COURT:  And I've never contended otherwise.

15       MR. ENGLERT:  All right.  We don't need to have a

16   dispute about this particular point, but where we may not

17   see eye to eye is on the question of what consequences flow

18   from your Honor's knowledge of Hamlin's role and your

19   Honor's knowledge a bit after the appointment of Mr. Gross's

20   role in G-1.

21       Once those gentlemen were serving as partisans down

22   the hall in the G-1 case on issues very similar to those

23   they were certainly discussing with this Court, frankly,

24   this Court had a problem and the --

25       THE COURT:  Assuming that this Court knew of the

1   similarity of the issues, which it did not.

2          MR. ENGLERT:  No, your Honor.  I really

3   respectfully would disagree with you.  You have an even

4   greater problem if you didn't know of the similarity of the

5   issues because in all, as I said earlier, in all innocence

6   you had no way to filter out the advice that may have been

7   tainted by knowing that it had something to do with what was

8   going on down the hall.

9          THE COURT:  I just learned in the briefs recently

10  or discovery reading that G-1 had a substantive

11  consolidation issue.  I never knew about that, never

12  influenced me in any way, nor would it.

13         MR. ENGLERT:  No, your Honor.  Again, at the risk

14  of repeating myself, I am not suggesting that your personal

15  knowledge of what was going on down the hall is a problem

16  here.

17         I am suggesting that the role of Mr. Gross and Mr.

18  Hamlin being advocates down the hall with respect to some

19  issues pending before you creates a problem of appearance of

20  impropriety under Section 455(a) because you were receiving

21  advice from people who had an incentive to slant their

22  advice in particular ways.

23         The recent decision just a week ago, which you may

24  have seen in our brief, of the 6th Circuit discussing

25  bankruptcy examiners in the Big Rivers Electric case pointed

1    out the reason examiners have to be disinterested is because

2    there's an incentive to shade their actions one way or

3    another and to find an examiner not disinterested, one

4    doesn't have to say the examiner acted on his conflict.  One

5    has to say simply he had a conflict, and that's a problem.

6    And again, with the Hall and First Interstate cases, when an

7    adviser had has a conflict, the Court has a conflict.

8            THE COURT:  Okay.  I understand your argument.

9            MR. ENGLERT:  Let me, if I may, your Honor run

10   through quickly --

11           THE COURT:  Sure.

12           MR. ENGLERT:  -- what the conflicts are with

13   respect to three of the advisers in this case.

14           Mr. Gross is counsel to the futures representative

15   in G-1 Holdings.  Not only is that a very similar case, but

16   as was admitted in the argument before the Third Circuit,

17   some of Mr. Gross's clients in G-1 Holdings are necessarily

18   parties to the Owens Corning case.  They are necessarily

19   future claimants in Owens Corning, just as they are future

20   claimants in G-1 Holdings.

21           That is a major, major problem not even alluded to

22   in any of the briefs filed by respondents with your Honor

23   yesterday.  Overlapping parties between the two cases mean

24   we're beyond issue conflicts, and we're into the realm that

25   it's as if the case were Smith v. Jones and Mr. Smith's

1    lawyer in some other case were serving as a court-appointed

2    lawyer in Smith v. Jones.  It's a very large problem.

3           Second problem which we had a brief colloquy about

4    already this morning and which, apparently, not much more to

5    say about it, is the Keene creditors trust problem.  Again,

6    another case like G-1 Holdings in which Mr. Gross went to

7    another judge and urged that judge to follow your Honor's

8    rulings in one of the five asbestos cases in which he was

9    serving as adviser to your Honor.

10          The third problem, Mr. Gross served as a mediator,

11   and there are two particularly fundamental things mediators

12   must do.  One is be neutral, and this is just the same

13   problem over again with regard to the role as mediator, in

14   addition, with regard to adviser, having a non-neutral

15   mediator is, as far as I know of, unheard of in American

16   jurisprudence.  But Mr. Gross served as a mediator in the

17   five asbestos cases while also being an advocate in G-1.

18          The second problem, mediators may not disclose the

19   substance of parties' negotiating positions to the court

20   unless there is consent by the parties.

21          Now, let me try to put to one side a false issue

22   here.  There certainly was consent by the parties to

23   mediation in which your Honor was personally involved, and I

24   believe it was June of 2003, after the --

25          THE COURT:  That's my understanding.

1        MR. ENGLERT:  We're not at all complaining about

2   that.  It is a problem, however, that before June of 2003,

3   there appears to have been unconsented to revelation of

4   parties' settlement positions to your Honor.

5        Professor McGovern, in his deposition, was

6   extremely emphatic that that's a major, major no-no in

7   mediation.  Mr. Gross, in his deposition, said, oh, yes,

8   I've done that and Professor McGovern has done that.

9        And this is, of course, sliding into one of the two

10  problems we have with Professor McGovern based on discovery.

11       THE COURT:  What's not been said, Mr. Englert, if I

12  may, there were several status conferences in the Owens

13  Corning case held in open court here, anywhere between 20

14  and 40 people in attendance, including Professor McGovern,

15  all the people from all constituencies concerned in the

16  substantive consolidation case, even Judge Fitzgerald was

17  here, where the parties at that time discussed matters that

18  would be used in a mediation.

19       For example, I remember sitting here and having the

20  bank say that the asbestos litigation was worth, claims of

21  the ACC were two billion dollars and other people on the

22  other side of the room saying they could run as high as 24

23  billion, and then people said maybe it's 16, maybe it's 12.

24  You know, there was no secret with --

25       MR. ENGLERT:  Except, your Honor --

1      THE COURT:  Let me just finish.

2      MR. ENGLERT:  I apologize.

3      THE COURT:  And I'm taking your time, I'll give you

4  another minute.  There was no secrecy as to where the banks

5  were, the bonds were, the asbestos litigants.  Everybody

6  knew the numbers.  There wasn't any revelation.

7      And certainly in June, when there was a consensual

8  mediation of trying to settle the case, the Court was told

9  all the numbers and the numbers never changed, so, there was

10 never any revelation to the Court from any mediator as to

11 what was supposed to be non-neutral information.  You may

12 proceed.

13     MR. ENGLERT:  Thank you, your Honor.  Your Honor

14 has referred to the valuation of the tort claims and we do

15 have a concern about the revelation of those terms.  But

16 there's another set of numbers that appear to have been

17 revealed by mediators that I don't believe were ever

18 discussed in the court.  The Court can certainly correct me

19 if I'm wrong, but I don't believe these numbers were ever

20 discussed in open court, and that is, the settlement value

21 of the bonds' guarantees, how many cents on the dollar

22 the --

23     THE COURT:  In June the bonds were here.  There was

24 a discussion of what the bonds would get on the dollar, I

25 can give you the number, and, further, if they decided to

1    take a payment by stock instead of cash, it could add three

2    cents on the dollar.

3         MR. ENGLERT:  Yes, your Honor, that's June of 2003,

4    post trial.

5         THE COURT:  That's correct.

6         MR. ENGLERT:  Now, the problem I'm talking about

7    arose, we believe, in November of 2002, pretrial.

8         THE COURT:  Okay.

9         MR. ENGLERT:  There is a document that I want to be

10   careful about referring to in light of your Honor's past

11   rulings.  I think you're aware we disagreed with your

12   Honor's rulings on 408, but I want to be very careful about

13   what I say in open court, but there is a document and there

14   is deposition testimony suggesting that before June of 2003,

15   there was revelation to your Honor who was going to try the

16   substantive consolidation case before there was later

17   consent to mediation about the parties' positions.  That's a

18   problem.

19        THE COURT:  Do you know that there were -- I can't

20   tell you how many status conferences, probably the Kramer

21   Levin people, who keep records because they get paid for

22   that and I don't, probably know far better than I do how

23   many there were.  When I say all of this was revealed to the

24   Court, the trial didn't take place until late April or

25   middle of April and continued into May.  So, these numbers

1    were known, these numbers were known by the Court.

2    MR. ENGLERT:  I don't think the settlement offers

3    were known by the Court.  I think the parties' litigation

4    positions were known by the Court.

5    THE COURT:  Yes.  The parties' litigation positions

6    were known by the Court and numbers attributable to each

7    side were known to the Court.  Where there actual settlement

8    number was, that may be something different. You know, maybe

9    the banks said I want 78 but we're willing to take some

10   lesser number.  That I would not have known.  That I

11   wouldn't have known.  But I did know numbers based upon the

12   status conferences.

13   In fact, because I didn't want to be involved in

14   it, I appointed McGovern as a mediator and I appointed Judge

15   Fitzgerald as a settlement judge.  I think they went to

16   Pittsburgh.  I think they went to New York, wherever.

17   MR. ENGLERT:  Your Honor, let me say if the trial

18   judge is advised of parties' settlement positions in advance

19   of trial, that's a problem, and it's a problem because it

20   may lead the trial judge --

21   THE COURT:  It's not a problem if it's consensual.

22   MR. ENGLERT:  It's not a problem if it's

23   consensual, but if there's a mediation with certain

24   mediators and then those mediators reveal that information

25   to the court without consensual information, that's a

1    problem.

2          Professor McGovern testified very emphatically

3    that's a problem, and I'm being a little imprecise in what

4    I'm saying here because I want to be careful about your

5    Honor's rulings, but I would suggest for the reasons given

6    in our brief, it's a problem.

7          THE COURT:  Okay.  We understand.

8          MR. ENGLERT:  Now, the other issue we have raised

9    in our brief with respect to Professor McGovern is we

10   learned through the proceedings on remand not only that

11   Professor McGovern has been meeting with futures

12   representatives on a regular basis, which is a somewhat

13   eyebrow-raising fact, but that they regard him as their

14   mentor in the process of pushing legislation on Capitol

15   Hill --

16         THE COURT:  I saw --

17         MR. ENGLERT:  -- that could affect the outcome of

18   these very cases.

19         THE COURT:  I saw the e-mail.

20         MR. ENGLERT:  We would suggest that a neutral

21   mediator who is meeting regularly with one side of the

22   proceeding, to give them information, I don't remember

23   Professor McGovern's exact words, but to give them

24   information that would in substance make them more effective

25   in doing that job and help them lobby on Capitol Hill has

1  stepped out of the neutrality.

2         THE COURT:  He's an academic.  He's the leading

3  academic in the nation on mass tort and asbestos bankruptcy

4  Chapter 11 litigation.  He speaks to many constituencies.

5  He's been a reporter to many committees.

6         MR. ENGLERT:  And speak -- I'm sorry.

7         THE COURT:  And he was there to offer whatever he

8  could offer.

9         MR. ENGLERT:  Speaking in the sense of giving

10  public speeches is, of course, not a problem with an

11  academic.  Writing --

12         THE COURT:  Professor McGovern probably gives 20

13  speeches a year and probably does ten programs a year like

14  Mealey's all over the country.

15         MR. ENGLERT:  These were not Mealey's programs to

16  which anyone could come.  These were not speeches to which

17  anyone could come.

18         THE COURT:  It was, my understanding, a gathering

19  of futures who were, as I now learned from reading, were

20  talking about the position they should take in connection

21  with the FAIR legislation in asbestos, and he was there to

22  provide an oversight of what was going on that he understood

23  in his academic position, because if you talk to McGovern,

24  he's got four ways the legislation should go.  All right.

25  But you may continue.

1          MR. ENGLERT:  But he was not, your Honor, having

2     meetings like this and having e-mail exchanges like this

3     with commercial creditors, with a group of debtors, with

4     equity holders, lots of other constituencies in this case.

5     It was with the futures representative Professor McGovern

6     was meeting and corresponding with.

7          THE COURT:  Can you tell me if the legislation were

8     to pass, is that better or worse for creditors than if it

9     failed, because actually you're coming --

10         MR. ENGLERT:  The S1125?

11         THE COURT:  -- you're coming at it from a

12    creditor's point of view, I take it.

13         MR. ENGLERT:  My clients are commercial creditors.

14         THE COURT:  That's right.

15         MR. ENGLERT:  And they, I believe, support the

16    current form of S1125.

17         THE COURT:  Would they receive more under the FAIR

18    legislation than they would receive if there were no

19    legislation?

20         MR. ENGLERT:  That depends in part on the outcome

21    of the substantive consolidation issue.  I think they get a

22    hundred cents on a dollar if there is not substantive

23    consolidation and I think they probably are not better off

24    under S1125 than by winning substantive consolidation.

25         THE COURT:  Okay.

1        MR. ENGLERT:  I see I have relatively little time.

2    Let me --

3        THE COURT:  If I've interrupted you, I'll give you

4    a couple extra minutes.

5        MR. ENGLERT:  Thank you.  I appreciate that, your

6    Honor.  Let me turn to a couple things I haven't gotten to.

7        Ex parte contacts and some of the defenses that

8    have been raised, there is no rule of law that says ex parte

9    contacts are okay as long as they're even-handed, and I do

10    understand your Honor met with any constituency, not with

11    any one constituency.  This is not like --

12        THE COURT:  Even Mr. Brodsky twice.

13        MR. ENGLERT:  Well, with respect, your Honor, to

14    Mr. Brodsky, other than in the context of the consented-to

15    mediation in June of 2003 --

16        THE COURT:  And there was an ex parte conference in

17    that consensual mediation as well.

18        MR. ENGLERT:  Yes.

19        THE COURT:  Which he frankly admitted to in his

20    deposition.

21        MR. ENGLERT:  Of course.

22        THE COURT:  Okay.

23        MR. ENGLERT:  Sure.  I'm not disputing you on the

24    facts.  I am suggesting that the legal significance of

25    consented-to mediation involving the Court is rather

1   different from the legal significance of ex parte contacts

2   that --

3          THE COURT:  Go ahead.

4          MR. ENGLERT:  Rather, that your Honor said on

5   December 23rd were not in the nature of settlement

6   discussions.

7          THE COURT:  Did you take the position, because you

8   alluded to it in your brief, that all these five jointly

9   administered cases and the asbestos litigation through

10  bankruptcy as opposed to the torts system isn't complex and

11  isn't extraordinary?  Is that your position?

12         MR. ENGLERT:  You may assume for purposes of this

13  decision that I admit they're complex.  My client has a view

14  that they're not particularly complex as commercial

15  bankruptcies go, but we're not basing any of our legal

16  arguments on the --

17         THE COURT:  Because Judge Becker, when he assigned

18  these, he thought they were extraordinary and he thought

19  they were complex and, in fact, he said so.

20         MR. ENGLERT:  Fine.  Let me say none of our legal

21  position turns on the proposition that it's not complex.

22         THE COURT:  There was something in your brief that

23  it's not as extraordinary or complex as maybe Judge Wolin

24  thinks.

25         MR. ENGLERT:  No, I didn't write it that way and I

1    sure hope you didn't take it that way.  The rest of that

2    sentence --

3              THE COURT:  All I do is read the language.

4              MR. ENGLERT:  The rest of that sentence says the

5    Court may assume that these cases are complex for purposes

6    of these --

7              THE COURT:  Okay.

8              MR. ENGLERT:  But we've already talked about the

9    Reilly case and why complexity doesn't generally justify

10   departure from the ordinary rules.

11             Let me say something about bankruptcy and whether

12   bankruptcy is different.  Bankruptcy is different.  Why is

13   bankruptcy different?  For just the opposite of the reason

14   my friends on the right-hand side of the courtroom say.

15             Bankruptcy is a system in which heavy emphasis is

16   placed on disclosure.  Heavy emphasis is placed on

17   disinterestedness.  The definition of disinterestedness in

18   Section 101(14) of the Code is extensive.  Section 327

19   requires disinterested professionals be hired to assist.

20   Section 1104 is particularly stringent, and I already

21   referred to the 6th Circuit's recent opinion in this regard

22   on examiners, and your Honor has said that the advisers in

23   this case were functioning in all respects similar to

24   bankruptcy examiners.

25             These people could not have --

1      THE COURT:  Well, you know, I don't think the

2   Circuit read of the Court's Order as the Court intended.

3   The Court did not empower any of its advisers to do

4   anything.  We said the broad range of duties may include,

5   and I think everybody has testified it would depend upon the

6   assignment of the Court, if the Court felt that that

7   particular adviser could fulfill a given role.

8      MR. ENGLERT:  And this is why it's critically

9   important, if I may, your Honor, to understand Section

10  455(a) standard.  It is not a standard of actual bias.  It

11  is not a standard of actual impropriety.  It is not a

12  standard of actual taint.

13      It is a standard of what would a reasonable person

14  knowing all the circumstances perceive and would that person

15  harbor doubts --

16      THE COURT:  By the way --

17      MR. ENGLERT:   -- about impartiality.

18      THE COURT:   -- during the deposition, Mr. Robbins

19  was sitting there and there was an issue that came up and I

20  said to Mr. Robbins, I said, who is this reasonable person.

21  How would you characterize this person?  Is it the man in

22  the street?  Is it a person of Mr. Brodsky's training and

23  sophistication?  Who is this reasonable person?

24      MR. ENGLERT:  It is a sophisticated person.

25  There's actually an excellent discussion of that exact

1    issue, your Honor, in the Flamm Book on Judicial

2    Disqualification, which I believe your Honor is familiar

3    with.

4              THE COURT:  You cited in the footnote.  I saw that.

5              MR. ENGLERT:  We didn't cite that particular point.

6              THE COURT:  But you cited the Flamm book.

7              MR. ENGLERT:  There is a very good discussion of

8    that particular issue.  Let me put it this way.

9              THE COURT:  Your time is expired.  Do you need a

10   couple more minutes so you can finish?

11             MR. ENGLERT:  Yes.  I'd like to talk about

12   timeliness, which has been a major argument.

13             THE COURT:  Fine.  Let's go to timeliness.

14             MR. ENGLERT:  Mr. Brodsky told the truth and Mr.

15   Eckstein told the truth.  That's the short version of

16   timeliness on the facts.

17             Mr. Brodsky's declaration on December 1st said he

18   learned of this on September 24.

19             THE COURT:  I've no reason to disbelieve Mr.

20   Brodsky in his testimony but, you know, let me tell you of a

21   concern I do have.  Mr. Brodsky is a very sophisticated

22   businessman.  Mr. Brodsky is a graduate of Harvard Law

23   School.

24             MR. ENGLERT:  We won't hold that against him.

25             THE COURT:  Yes.  Well, he didn't go to Yale

1　because people who go to Yale only go to Yale to teach at

2　Harvard, so I understand.

3　　　　Mr. Brodsky had Pacer in his office.  In 90 minutes

4　he found out everything he needed to know after there was a

5　revelation to him by Mr. Fuller.

6　　　　Mr. Brodsky used to be co-leader of the bankruptcy

7　department at Kramer Levin, had a close relationship with

8　Mr. Eckstein, signed a waiver for Mr. Eckstein so Mr.

9　Eckstein could then represent the bank group.

10　　　　Mr. Brodsky then, who allegedly, and I know this

11　from reading the papers, has $275 million of the bank debt,

12　somebody said 290, I wouldn't know what he has, I don't know

13　what he paid for it, but throughout the proceedings, and he

14　was here at almost every proceeding, status conferences and

15　all, Mr. Brodsky was there.  In fact, for a long time I

16　didn't know who he was or what his role was.  I kept seeing

17　his face here, sat through the whole trial every day, never

18　said a word, and what I find really interesting is someone

19　who has $270 million worth of bank debt has no lawyer, has

20　no lawyer from the time he releases Mr. Eckstein until I

21　guess he employs you, has no lawyer.

22　　　　Query.  As he sat here and Kramer Levin was

23　carrying the ball for the bank group, wasn't Kramer Levin de

24　facto his lawyer?

25　　　　MR. ENGLERT:  Well, your Honor, you said -- first

1    of all, my answer to that question is no; second, my answer

2    is it doesn't matter, and third, my answer is you said some

3    other things I'd like to respond to.

4           THE COURT:  Sure.

5           MR. ENGLERT:  The Pacer point, yes, once one has a

6    reason to look for information about something that may have

7    gone horribly awry about a judge or his advisers, one can

8    sometimes find that information quickly, but our legal

9    system doesn't assume that anything has gone horribly awry

10   by the judge or his advisers and we don't particularly want

11   or have, according to the case law, a rule of law that says

12   please go around digging up dirt on courts and advisers.

13          THE COURT:  Didn't stop Mr. Case from looking into

14   who the advisers were, who is the counsel for the creditors

15   committee, which is the bonds and the banks.

16          MR. ENGLERT:  Yes.  He conducted some superficial

17   inquiries, yes.

18          THE COURT:  It just strikes a discordant note that

19   if I invested $275 million, that I wouldn't be doing a full-

20   scale due diligence investigation to find out what's going

21   around.

22          MR. ENGLERT:  Well, there are two ways to go with

23   that, your Honor.  One is, do you disbelieve Mr. Brodsky as

24   a matter of fact and I would suggest you can't --

25          THE COURT:  I don't disbelieve Mr. Brodsky as a

1    matter of fact.

2              MR. ENGLERT:  The second way to go, if I may --

3              THE COURT:  Sure.

4              MR. ENGLERT:  -- is to say we're going to have a

5    legal standard, it is not actual knowledge, and that's an

6    issue we addressed at some considerable length in our brief,

7    all the appellate cases, there are a couple of cases but all

8    the appellate cases use an actual knowledge standard.  Why?

9    Because we don't want people in Mr. Brodsky's situation, who

10   have actual knowledge, to sit on that actual knowledge and

11   then come in after they lose something.

12             THE COURT:  What procedural safeguard is there

13   against that, that a person such as Mr. Brodsky, and I've

14   not accused Mr. Brodsky as I think you took umbrage in the

15   Circuit Court of Appeals when somebody assailed Mr. Brodsky.

16   I don't do that.  I will have to accept his deposition

17   testimony as it is.

18             I am speaking about someone who has that type of

19   investment, maybe they should have done more to inform

20   themselves and, as you indicate in your brief, in the Owens

21   Corning case there's probably a thousand people out there

22   who have an interest in this.  Is it the Court's obligation

23   to give notice to all these people and how do we do it and,

24   lastly, what is the procedural safeguard for the Court as

25   opposed to someone like Mr. Brodsky, at the conclusion of 22

1   months coming forward and saying, by the way, I never had

2   notice about Gross and Hamlin.

3           MR. ENGLERT:  Well, the answer to those last two

4   questions, in my view, your Honor, is the same answer.  The

5   procedural safeguard is when there's a problem with possibly

6   conflicted advisers or with any possibly conflicted

7   professional under Section 327, do what the Bankruptcy Code

8   suggests, make disclosure at the time of the appointment or

9   at the time the problem comes to the Court's attention and

10  see if the parties will accept those people as advisers or

11  as any other professionals under Section 327, or if the

12  parties won't accept it, then make a resolution about

13  whether the problem is real or imagined, but do it up front.

14          Let me mention just -- I know my time expired.  I

15  don't want to try your patience.  Let me mention one last

16  thing.  On page 62 of the Owens Corning brief or the joint

17  brief filed by Owens Corning and various tort interests,

18  there are a whole bunch of cases that talk about notice to

19  the creditors committee being notice to everybody so that

20  you don't need to give actual notice to anyone other than

21  the creditors committee.

22          Every one of those cases turns on a particular

23  bankruptcy rule.  None of those bases arises in the conflict

24  of interest or recusal situation.  None of them arises in a

25  Section 327 disinterestedness situation.  They all -- every

1  single one of them talks about a particular bankruptcy rule

2  that make notice of a particular action to the creditors

3  committee good enough as opposed to all.

4      With respect, your Honor, there should have been

5  notice to all creditors.  That would have headed off this

6  problem.  Thank you.

7      THE COURT:  All right.  Thank you.  Mr. Mancino.

8      MR. MANCINO:  Good morning, your Honor.  May it

9  please the Court, Richard Mancino on behalf of the movants

10  in the W.R. Grace bankruptcy proceeding.

11      Your Honor, with respect to 455(a)(1), the basis on

12  which we moved for your Honor's disqualification, a

13  reasonable observer would harbor doubts about the

14  impartiality of this Court that received briefings and

15  advice however the advisers may subjectively define advice

16  or no matter how the Court may define advice on substantive

17  issues going to the merits of these cases and received that

18  advice, that input from advisers who are partisans in

19  another complex, hotly contested bankruptcy proceeding that

20  raises issues similar to the issues that are being raised in

21  the five asbestos cases here and involve asbestos claimants

22  who may also have claims in these five asbestos cases.

23      Now, it's not relevant, your Honor, whether your

24  Honor was aware or unaware of Mr. Hamlin's and Mr. Gross's

25  role in the G-1 bankruptcy and it's not relevant whether or

1 not your Honor was aware of the precise issues that would

2 come up or could come up in that asbestos litigation, and

3 the reason for that, your Honor, is explained by, well, the

4 Supreme Court in Wilgabor, made that clear.

5 There can be an appearance of partiality or bias

6 that gives rise to a duty in the district court to

7 disqualify himself or herself even if the district court is

8 unaware of the facts and circumstances that give rise to

9 that appearance or, as in the Wilgabor case, has forgotten

10 those facts or circumstances.

11 So, your Honor, we don't -- we accept your Honor's

12 statements about what you were or were not aware of, but,

13 unfortunately, under Section 455(a), that is not relevant.

14 The other basis, your Honor, that we believe gives

15 rise to a duty for your Honor to disqualify himself is that

16 a reasonable observer would harbor even more doubts about

17 the fairness and impartiality of your Honor and, indeed, of

18 these entire bankruptcy proceedings where substantive issues

19 that affect all of the cases are being discussed, whether or

20 not advice is being given but are coming up and being

21 discussed in off-the-record ex parte meetings and

22 conversations, and those are ex parte meetings and

23 conversations that involve both the District Court and the

24 five advisers, including the two advisers whose roles in the

25 G-1 case have brought us here today, but also, the ex parte

1    communications and discussions that have taken place among

2    the District Court and certain counsel and certain parties

3    in all of these bankruptcy proceedings, including the W.R.

4    Grace proceedings.

5         Now, your Honor asked a question of Mr. Englert

6    about the significance or lack of significance of the

7    complexity and difficulty of these matters and I, too, will

8    concede that the five bankruptcy cases that your Honor has

9    been entrusted with the administration of are complex.  They

10   are difficult.  They raise gargantuan challenges for your

11   Honor.

12        However, with respect to the ex parte

13   communications and the prohibition against them that's set

14   forth both in the case law and in Canon 3(a)(4) of the Code

15   of Conduct for U.S. Judges, there's no safe harbor that

16   permits a regime, a case management regime, of ex parte

17   communications because the case is complex or because it

18   raises serious and difficult challenges and issues.

19        THE COURT:  So, I guess what you're saying is there

20   can be no consent.

21        MR. MANCINO:  I'm not saying that, your Honor.

22   There can be consent to specific ex parte communications

23   that fall within the exception to the prohibition against

24   them.  In the case where matters of administration are being

25   raised, in matters involving settlement, where the Court

1     is --

2               THE COURT:  Or procedure.

3               MR. MANCINO:  Or procedure, your Honor, that's

4     right.

5               THE COURT:  There's not much left after that, Mr.

6     Mancino.

7               MR. MANCINO:  There is quite a bit left, your

8     Honor.  I mean, there's the whole breadth of substantive

9     issues that have come up in these cases which I respectfully

10    submit should not have been the subject of ex parte case

11    management conferences, ex parte phone calls or discussions,

12    without having the ability for parties interested in this

13    case to know what has transpired in those discussions.

14              THE COURT:  But doesn't the Reilly case say I have

15    a right to talk to people as resource to gain education?

16              MR. MANCINO:  With respect to your advisers, your

17    Honor --

18              THE COURT:  Forget about my advisers.  Put my

19    advisers aside for a moment.  What about other people that

20    came to see me, other people that were not designated

21    advisers?

22              MR. MANCINO:  Well, the difficulty with that, your

23    Honor, is that the Court runs the risk of being subjected to

24    factual information in an extra-judicial context, so, when

25    you bring in, for example, the attorneys who had experience

1    representing plaintiffs in asbestos litigation and the

2    attorney with experience in representing defendants, the

3    problem, the appearance, the appearance issue that arises

4    from that is that they are sharing with your Honor their

5    observations about substantive issues that will certainly

6    surface in these asbestos cases, and, in particular, there

7    was the -- I think it's Whitney Chelnik's memo or Mr.

8    Gross's notes, I can't recall which, your Honor, in which

9    reflect that not only were they talking about how these

10   cases progress in the courts, but they were also talking

11   about specific medical experts, both on the plaintiff's side

12   and on the defendant's side, and were sharing with the

13   advisers and with your Court their observations about the

14   nature of the opinions that these experts give and whether

15   or not, from their own personal perspective, those opinions

16   hold water; and, consequently, while some -- while the Court

17   should be allowed to have neutral advisers assist in the

18   management of the case --

19           THE COURT:  In asbestos there are no neutral

20   advisers.  Everybody has taken a position on one side or the

21   other.  That was the discussion in the 706 panel, could

22   neutral doctors be found, and the likelihood was no.

23           MR. MANCINO:  Well, and the consequence of that,

24   your Honor, at least with respect to a 706 panel, is you

25   can't have them on the panel because they're not neutral,