1   because there may be a bias embedded in their views.  That's

2   the problem.  Now --

3           THE COURT:  This Court was aware that Judge Pointer

4   in the Dow Corning case did use a 706 panel.  It cost

5   several million dollars and took two years.  So, it's not an

6   easy issue.

7           MR. MANCINO:  It is not an easy issue, your Honor.

8           THE COURT:  And by the way, in the Reilly case --

9   you've already told me that this is an extraordinary and

10  complex case.  What the court said there, it said in truly

11  extraordinary cases where the introduction of outside skills

12  and expertise not possessed by the judge, I never made any

13  pretense that I was an expert in asbestos -- will hasten the

14  just adjudication of a dispute without dislodging the

15  delicate balance of the judicial role.

16          I think what Reilly is saying there is courts have

17  the right to speak to people for purposes of education.

18          MR. MANCINO:  I'm not challenging that right, your

19  Honor, but what I am challenging is the fact that at least

20  two of the advisers and, according to Kensington, perhaps a

21  third of the advisers, a third member of the advising panel,

22  are not neutral, do not come to this job as advisers.

23          THE COURT:  That's the argument Mr. Englert made.

24  Let's talk about all the other people in ex parte that

25  you're raising.  You raise Mr. Kommatore and you raise Mr.

1    Parnell.  Mr. Kommatore was a plaintiffs' lawyer, Mr.

2    Parnell was a defense lawyer to advise the Court what was

3    going on in litigation throughout the country and,

4    obviously, you assert that even receiving information from

5    them for the Court's education is inappropriate.

6              MR. MANCINO:  It can be inappropriate, your Honor.

7              THE COURT:  Well, is it?  Is it inappropriate?  Was

8    it inappropriate?

9              MR. MANCINO:  In this case, yes, your Honor.

10             THE COURT:  Why?

11             MR. MANCINO:  And the reason for that is because

12   there were no guidelines established that, at least from an

13   outside observer's perspective, that would guard against the

14   involvement as advisers, the involvement in these

15   discussions of people who have an agenda or have duties,

16   fiduciary duties in another bankruptcy case to advance the

17   interests of asbestos claimants, some of whom are going to

18   be asbestos claimants in these cases, so, there were no

19   guidelines.  They did not know what -- the advisers did not

20   know what the limits of what they could or could not do.

21             Now, they may have thought in their minds that

22   perhaps there are issues or subjects that I personally

23   should not get into, but when you look at it in hindsight

24   with more of the record having been revealed, you realize

25   that those, whatever guidelines existed in their own minds

1  were not clear, and that's where the problem arises, and

2  your Honor is unfortunately placed in a very difficult

3  position because of that, because there are no checks or

4  balances on what these advisers can or cannot do.

5          THE COURT:  Did Mr. Kommatore or Mr. Parnell

6  violate any guidelines that you would have imposed?

7          MR. MANCINO:  Well, it's hard for me to say, your

8  Honor, because I really don't know what they discussed with

9  your Honor and the advisers, but I do think it raises

10  questions when they are discussing specific medical experts

11  who may come in front of this Court to testify.  They may

12  not, but you don't know that.

13          THE COURT:  Okay.

14          MR. MANCINO:  That's where the problem arises.

15          THE COURT:  I understand your point.

16          MR. MANCINO:  The other thing, your Honor, about

17  the complex nature of these cases that bears on the 455(a)

18  appearance of impartiality is that because they're complex,

19  because these issues are so hotly contested and so much at

20  stake for all of the constituents, that calls out for more

21  transparency, not less, and the problem is, as we perceive

22  it, is that lack of transparency; that we have no way of,

23  and I'm talking now about my clients, for example, but we

24  should also focus on this issue in the context of that, you

25  know, reasonable observer that 455(a) says should be the

1   standard we look at, we have no ability to know what has

2   been discussed with your Honor in these ex parte

3   conferences.

4           THE COURT:  So, we're talking about the ex parte

5   conferences that on December 20 I stated to 200 to 250

6   people if you want to meet with the Court to provide me

7   insight as to the particular issues in your case, the Court

8   will meet with you, and notwithstanding the fact that it was

9   with acquiescence, I'm not going to use the word consent,

10  acquiescence, that those are inappropriate?

11          MR. MANCINO:  Yes, your Honor.

12          THE COURT:  Okay.  So, I guess when your co-

13  counsel in this case, Joanne Wills from Klehr, came to see

14  this Court on two occasions to see if the Court could assist

15  her to settle the property damage claims in Armstrong, and

16  on the second occasion came to this Court with two of her

17  clients with no adversary, no adversary, and complained

18  about a decision of Judge Newsome where she had lost a

19  Daubert hearing, unsolicited by the Court, that was

20  inappropriate, wasn't it?

21          MR. MANCINO:  I believe it was, your Honor.

22          THE COURT:  Okay.

23          MR. MANCINO:  And I'll say this, Miss Wills was not

24  representing the Grace movants.

25          THE COURT:  No, no, not at that time.  Not at that

1   time.  She does today.

2         MR. MANCINO:  She does today.

3         THE COURT:  This is the hypocrisy that runs

4   throughout this case, that most of the signatories of the

5   recusals and even the mandamus were people who regularly

6   came to this Court seeking assistance.  Nobody ever tried to

7   persuade this Court on the merits, but came to this Court

8   for assistance, and asbestos litigation, whether you agree

9   or disagree, is a very small, discrete group of lawyers,

10  very incestuous, and they know everything that's going on

11  and everybody in this case knew exactly what was going on,

12  and came to this Court for assistance, including your

13  co-counsel here today, Miss Wills.

14        MR. MANCINO:  But, your Honor, the important point

15  there is because the Court imposed a case management system

16  that, as it turned out in practice, relied very heavily on

17  ex parte communications, it may be the case that some of

18  those parties really had no choice.

19        THE COURT:  Nobody forced them to come here.

20  Nobody asked them to come here.  They were told that if they

21  want to seek the Court's assistance, they would, and people

22  like Miss Wills did it, and the Gibbons firm, the Gibbons

23  firm, Griffinger represented Armstrong, he represented

24  Fresenius in the W.R. Grace, he represented the debtor;

25  DeFilippo, when he was with the Gibbons firm, he represented

1    USG; Frank Vecchione today represents the debtor in Federal

2    Mogul, you know, all these people came to see the Court.

3            Mr. Katchen, who's seated in the rear there, and

4    Mr. Kruger, who represent USG and W.R. Grace, never

5    hesitated to call the Court, could they stop by to see the

6    Court to raise some issue with the Court, never had an

7    adversary.  They were complying with the December 28

8    statement of the Court.  I didn't invite them.  They called.

9    I did not turn them down.

10           MR. MANCINO:  I understand, your Honor, and from

11   your Honor's own statements early on in these proceedings, I

12   know -- I now know that there were innumerable such

13   conferences with the Court, but that's the problem, your

14   Honor, because someone whose -- perhaps whose judgment was

15   not clouded and doesn't wish to participate in that ex parte

16   case management regime will not know what's going on, will

17   not have the opportunity to contest arguments, to try to put

18   additional or different facts in front of the Court, and if

19   I were to go back to try to find the Court's directive from

20   December 20, 2001, whatever the precise date is, in the

21   record, I don't think I can, I would have found that, your

22   Honor, and if I had found that and saw that your Honor had

23   said that there would be ex parte communications, I would

24   have read further and I would have noted that your Honor

25   also said that those would be used sparingly, that word that

1   you commented on earlier.

2          THE COURT:  Well, Mr. Mancino, let's talk about

3   sparingly.  Okay.  I've been involved in these cases for

4   almost better than two years.   Let's assume that I'm just

5   an average Joe who only works eight hours a day.  Let's

6   assume that I only work 260 days a year.  That's 4,000 hours

7   over the course of this litigation.

8          The number of ex parte conferences and the time

9   they consume, if we put that in the numerator in relation to

10  the denominator is very, very slight.

11         MR. MANCINO:  That may be the case, your Honor, but

12  from what I've been able to gather from time records, from

13  analyses done by other lawyers, there were many ex parte

14  conferences and they covered, as I think everyone here is

15  acknowledging, substantive issues.

16         THE COURT:  I think I've already told you, there

17  was an ex parte conference with every constituency in every

18  case.

19         MR. MANCINO:  Although, because it goes to the

20  timeliness and waiver argument, I will just add, your Honor,

21  that there were none with my clients.

22         Let me just, if I may, just --

23         THE COURT:  Well, you say your clients.  You're

24  talking about --

25         MR. MANCINO:  D.K. Acquisition.

1       THE COURT:  But certainly Mr. Kruger represents the

2   creditors committee of which your clients are a part.  There

3   were many meetings with Mr. Kruger where both USG and W.R.

4   Grace were discussed.

5       MR. MANCINO:  Well, Mr. Kruger represents the

6   committee as such.  He does not represent individual

7   creditors.

8       THE COURT:  Oh, no.  I understand that.

9       MR. MANCINO:  So, there's no attorney-client

10   relationship between Mr. Kruger and his firm and the

11   creditors whom I represent.

12       THE COURT:  I never met with your creditors.

13       MR. MANCINO:  Okay.  But even so, your Honor, the

14   standard is what will that reasonable observer think and

15   it's not -- the reasonable observer is not, you know,

16   someone with an ax to grind or someone with an interest in

17   these proceedings.

18       You assume that person is objective and you see

19   that there are all of these private conferences taking place

20   in which substantive issues are being discussed and very few

21   on-the-record court hearings that are transcribed into

22   transcripts, and that raises, I submit, an appearance of

23   partiality and bias.

24       THE COURT:  And by the way, that's probably the

25   difference between the bankruptcy system and the tort

1    system.

2         MR. MANCINO:  Well, I'm not sure what you mean by

3    that, your Honor, but in bankruptcy that I've been involved

4    in, and I haven't been involved in the asbestos bankruptcy,

5    that's true, but the ones I've been involved in, the

6    proceedings do take place on the record and even if you're

7    not at a hearing, you can later go back into the court

8    docket and retrieve a transcript and find out what's going

9    on.  That, you can't do that here.

10        THE COURT:  Have you looked at the Delaware web

11   site from the bankruptcy court?

12        MR. MANCINO:  I haven't personally, but I know that

13   it's available there and you can get the docket.  In fact,

14   I've asked my colleagues to get me information from that.

15        THE COURT:  There are probably 200 items, documents

16   that have been placed there as to what this Court has been

17   doing.

18        MR. MANCINO:  There are many orders that your Honor

19   has entered, including orders that have been generated sui

20   sponte, but I submit, your Honor, that there are precious

21   few on the record, conferences, hearings, at which the

22   subject matter of those orders is being discussed.

23        THE COURT:  I understand your argument.

24        MR. MANCINO:  Okay.  Your Honor, I'll be brief

25   because I know I'm at the end of my time, but the --

1          THE COURT:  If you have something different, I'm

2     pleased to hear it.

3          MR. MANCINO:  I do, your Honor.  I just want to

4     talk briefly about why it is the appearance of impropriety

5     that the involvement of Mr. Gross and Mr. Hamlin as advisers

6     and the ex parte conferences affects not just the Owens

7     Corning case, not just the USG case, but all the cases

8     including Grace, and the reasons for that are simple.

9          These cases were given to your Honor to administer

10    because it was recognized by Judge Becker, and I suspect

11    recognized by your Honor, that they raised common issues.

12         The advisers, Mr. Gross, Judge Hamlin, and the

13    others have acknowledged that the issues that they were

14    discussing in those four meetings with your Honor in 2002

15    covered issues, in many cases hotly contested issues that

16    come up in all of the asbestos bankruptcies, including

17    Grace.

18         Now, the other point on that that I want to make,

19    your Honor, is an interesting comment.

20         THE COURT:  Did you read the Grace brief?

21         MR. MANCINO:  Your Honor, I must confess, I didn't

22    have time.

23         THE COURT:  The Grace brief would tell you that

24    nothing has happened in that case towards a plan or a

25    consensual plan or personal injury or any because in the

1    Grace case -- each case is different -- there were two major

2    hurdles to get over.

3        First was fraudulent conveyance actions, which the

4    Court addressed first.  Second was the issue of the home

5    insulation matter, which is on Judge Fitzgerald's docket.

6    You couldn't even get to the personal injury or the futures

7    or whatever until you satisfied those two prerequisites.

8        MR. MANCINO:  I'll grant you that, your Honor.  I

9    think that's the case.  But I also have in mind what Judge

10    Hamlin testified to when he was describing what his

11    fiduciary duties are to the future claimants whom he

12    represents in the G-1 bankruptcy.

13        He says one of the first things I need to do within

14    the boundary of the law is to try to get as -- to ensure

15    that as many assets as possible are brought into the estate.

16    And why is that of interest to him?  Because he realizes

17    there is a limited fund of assets available for distribution

18    and he wants to ensure that there's some left over for his

19    clients.

20        So, obviously, one of the first things as a futures

21    representative that he's going to do is to determine whether

22    there are other proceeds, other assets out there that can be

23    brought back into the estate by way of fraudulent conveyance

24    actions.

25        Now, it's also significant on that subject, your

1   Honor, that Mr. Gross and Mr. Hamlin were involved in that

2   meeting in January, on January 18, 2002, in which there

3   appears by virtue of our having Miss Chelnik's memo a very

4   lengthy and detailed discussion of precisely how your Honor

5   should handle the W.R. Grace bankruptcy, and Miss Chelnik

6   writes and, apparently, she was there, that the consensus at

7   the meeting was that Judge Wolin must take care of the

8   fraudulent transfer issue first before proceeding on with

9   the general asbestos bankruptcy matters, and then there's a

10  discussion of how the Grace bankruptcy will be divided.

11          And it was apparently the consensus, at least from

12  what we have now learned later, was to divide it in just the

13  manner that your Honor has described on the record.

14          Now, Mr. Gross and Mr. Hamlin were involved in that

15  discussion.

16          THE COURT:  Yes.  But if I remember that

17  discussion, I arrived late, so, you don't know if I was

18  there for that part of the discussion or not.  Neither do I.

19          MR. MANCINO:  I'll grant you that, your Honor.  I

20  don't know.  And that's part of the problem in having these

21  kinds of conferences.

22          Now, the other thing that Mr. Hamlin has noted is

23  that the role of the property damage claimants is of keen

24  significance to him in his role as a futures representative

25  because there is yet another constituency with claims to

1    assets of a bankruptcy estate that can take money away from

2    his clients, so, he has to be aware of what is happening in

3    the bankruptcy cases as it relates not just to fraudulent

4    conveyance matters but also to property damage matters and,

5    on that subject, your Honor, Mr. Hamlin was involved in

6    writing opinions on appeals relating to whether or not a bar

7    date was correctly established for the property damage

8    claimants in W.R. Grace, and someone with a suspicious mind

9    or a reasonable observer might question what interest Judge

10   Hamlin had in seeing that a property damage bar date was

11   established early on in the Grace case, perhaps to put

12   pressure on those claimants.

13        THE COURT:  By the bankruptcy judge.

14        MR. MANCINO:  By the bankruptcy judge, not by this

15   Court.  But he is, in connection with an appeal of that or a

16   request to appeal that decision to your Honor, he is writing

17   an opinion to your Honor saying that you should not accept

18   that appeal.  That right there raises an appearance of

19   partiality and bias and with that, your Honor, I'll subside.

20   Thank you very much.

21        THE COURT:  All right.  Thank you.  Mr. Neal.

22        MR. NEAL:  Good morning, your Honor.

23        THE COURT:  Good morning, Mr. Neal.

24        MR. NEAL:  Steve Neal again for the USG debtors.

25   Your Honor, from the time this issue has been presented to

1   the Court, we obviously have had a profoundly different view

2   than the Court as to what the controlling legal authority

3   requires under 455 in light of the record in this case.

4           I don't think we've had significant differences at

5   least until now with the Court about what the record was to

6   the extent we've been able to develop the record.

7           I was surprised yesterday in reading the joint

8   brief that was filed in opposition to our papers to see that

9   the opponents who filed the joint brief have turned this

10  more into, or have attempted to turn it more into a factual

11  dispute than into a legal issue, which is the way your Honor

12  has tended to, I think, present the issue, and I just want

13  to comment on three things in that regard.

14          In their brief filed yesterday, they make the

15  effort to argue that all of the ex parte communications that

16  have taken place with the Court were in the nature of either

17  settlement or ministerial conversations and, therefore,

18  permissible under 455.  The Court's never contended, and we

19  don't believe that the conversations that took place can be

20  properly characterized as exclusively either settlement or

21  ministerial, but we've laid the evidence out as we see it in

22  our brief in that regard.

23          Next, the opponents yesterday argued that in none

24  of the ex parte communications that took place did the Court

25  receive extra-judicial information.  The Court has never

1    even embraced that view of the record and, again, as we've

2    laid out in our brief filed yesterday, the record clearly

3    shows that extra-judicial information was, in fact,

4    received.  Lastly --

5         THE COURT:  Well, Mr. Neal, I was referring to

6    meetings such as the meetings that you, your CEO, your

7    general counsel, by invitation which you accepted, you

8    arranged it, I met with you, and you confided, Mr. Foot

9    confided certain information to the Court which the Court

10   viewed as proprietary, sensitive to USG's business and

11   operation.  That was not for dissemination to the public.  I

12   would call that extra-judicial information.

13        MR. NEAL:  Your Honor, I would not.  I would not

14   dispute that in that meeting your Honor did get

15   extra-judicial information but --

16        THE COURT:  You tried to pass it off as settlement

17   at the discovery and you and I know it wasn't settlement.

18   It was advising the Court as to what issues were important

19   to USG.

20        MR. NEAL:  Well, your Honor, with all due respect,

21   as I said on December 22nd, and I'll say again, that

22   meeting, of course, was the only ex parte meeting that we

23   had with your Honor and it was in January of 2002, about 30

24   days after you first convened --

25        THE COURT:  January 24th exactly.

1          MR. NEAL:   -- about 30 days after your Honor first

2     convened us.  I continue to believe, and I know your Honor

3     disagrees, that, in fact, it was largely a settlement

4     conference because it was a conference in which your Honor

5     was asking my client what they would be prepared to either

6     give up or be prepared to live with for the equity holders

7     in the company as part of a resolution of the dispute and,

8     in that context, numbers were put on the table and in that

9     context, Mr. Foot and others in the meeting advocated or

10    explained why they thought that was an appropriate basis for

11    a resolution.

12          THE COURT:  The Court also asked Mr. Foot what was

13    important to Mr. Foot and what could the Court do to assist

14    Mr. Foot to emerge from bankruptcy and to return to an

15    investment grade security, specific question that was put to

16    every CEO.

17          MR. NEAL:  And, again, your Honor, I think that

18    question and the discussion about that issue was, as I

19    continue to say, in our view at that meeting in the context

20    of trying to broker a resolution.

21          But your Honor, more importantly, on the

22    extra-judicial point, we lay out in our brief the evidence

23    that's been developed in the last couple of weeks that

24    demonstrates that however you characterize the one meeting

25    we had in January of 2002, the Court is -- the Court itself

1    has acknowledged, in fact, it received extensive

2    extra-judicial information from other parties and from third

3    parties in the course of the last two years.

4         THE COURT:  Well, if you view that as settlement,

5    then I'll modify what I said about the receipt of

6    extra-judicial information, because I view what your CEO

7    told me as extra-judicial information and my statement was

8    based upon that as a predicate that whenever I spoke to

9    CEOs, CEOs told me about their company and what was

10   important to their company, I viewed that as extra-judicial,

11   not settlement, not administrative or procedural.

12        MR. NEAL:  I only have information about one

13   meeting with one CEO and that's my CEO.

14        THE COURT:  Okay.

15        MR. NEAL:  I attended that meeting.  I never

16   attended another ex parte meeting with this Court, the CEO

17   of my client never attended another, and I don't know what

18   went on in other discussions that you might have had with

19   other CEOs, but I do know and we laid it out in our brief --

20   I don't need to take the Court's time -- the record

21   establishing that in the context of other meetings with

22   advisers, with asbestos plaintiffs' lawyers and with other

23   parties, the Court received what is indisputably

24   extra-judicial information.

25        Now, the third thing that surprised me in the paper

1    that was filed yesterday by the joint opponents was the

2    claim on page two that all of the ex parte communications

3    that your Honor and your Honor's advisers had were consented

4    to by us, and that bold statement is made without any

5    evidentiary support at the bottom of page two of the joint

6    brief.  There's no basis for that, your Honor.

7            THE COURT:  Let me find that.

8            MR. NEAL:  No basis.

9            THE COURT:  I read that to mean that as a result of

10   the Court's statement on December 20, that anyone who sought

11   the availability of the Court for a conference was not

12   objected to.  That's all I took that to mean.  I did not

13   take it to mean that you individually consented on behalf of

14   USG.

15           MR. NEAL:  Okay.  That is the clarification that

16   obviously is critically important to me, your Honor, because

17   you used the word acquiesce earlier.  We obviously don't

18   believe that what we did at the December conference

19   constituted acquiescence or consent to what has now evolved

20   into an extensive pattern of ex parte communications over a

21   two-year period.

22           But more importantly, the concept of consent

23   carries with it the concept of being informed and, your

24   Honor, we had no information, no disclosure, no notice that

25   the Court and the Court's advisers were meeting with

1   plaintiffs' asbestos lawyers, were having dinner meetings

2   with those lawyers.

3        To this day, while we know some of the meetings

4   that occurred as a result of some of the evidence that's

5   been developed in the last couple of weeks, we still don't

6   know what was said or took place at those meetings, and we

7   had no clue that the Court and its advisers were meeting

8   with Mr. Kommatore, who is, as far as I know, has no

9   official role in this case but is a plaintiffs' asbestos

10  lawyer, and having a meeting with Mr. Kommatore in which he

11  trashed what your Honor knows is one of the most important

12  defenses to USG, the chrysotile defense, and in which he or

13  somebody else at that meeting called one of our witnesses a

14  charlatan.

15       We didn't consent to those conversations, your

16  Honor, we didn't consent to those meetings, and we had no

17  clue that they were taking place and, yet, those are

18  extra-judicial, highly prejudicial ex parte and, in our

19  view, require recusal under both 455(a) and 455(b), but,

20  your Honor, as I said when I stood up, we have laid out in

21  our briefs our view of the cases, our view of the record,

22  and I was struck by the efforts of the joint opponents

23  yesterday to, in a sense, walk away from the record, which

24  your Honor has never done, but the efforts to walk away from

25  the record can't succeed in light of what the discovery in

1    this case has shown.

2            So, with that your Honor, I'm prepared to submit on

3    the basis of our papers unless the Court has other

4    questions.

5            THE COURT:  I have no questions.

6            MR. NEAL:  Thank you.

7            THE COURT:  All right.  I think I indicated what

8    we'd do is we'd take ten minutes now and then we'll resume

9    and hear the other side.   Court will be in recess.

10           (A recess is taken.)

11           THE COURT:  Mr. Monk, before you start, can you

12   tell me how you're going to divide your 30 minutes, Mr.

13   Crames?

14           MR. CRAMES:  Yes, your Honor.  With your

15   permission, we, on behalf of the future reps, will take 15

16   and Mr. Inselbuch will take 15, and with your further

17   permission, Miss Parver is going to address one point for

18   ten minutes and I another point for five.

19           THE COURT:  So, you're going to divide your 15

20   between you and Miss Parver.

21           MR. CRAMES:  Yes, indeed.  She gets twice as much

22   as I do, your Honor.

23           THE COURT:  That will be fine.  Just so you're not

24   yielding your time to anyone else.

25           MR. CRAMES:  That's correct.

1              THE COURT:  All right.  Fine.  Mr. Monk, I'll hear

2      from you, sir.

3              MR. MONK:  Good morning, your Honor.

4              THE COURT:  Good morning, Mr. Monk.

5              MR. MONK:  Your Honor, I'd like to address why

6      we're here today.  I think we're here today because of

7      tactics.  I don't think it's about impropriety or really

8      reasonably questioning the Court's impartiality.

9              I think we're here today because Mr. Brodsky needed

10     to buy time to see whether Congress was going to pass a

11     piece of legislation that might affect his 200, I think, 90

12     million dollars was the largest number I've seen, but it

13     might be still $275 million investment in the Owens Corning

14     bank debt.

15             I think that the evidence is clear from Mr.

16     Brodsky's affidavit that he went out looking for a problem

17     with respect to Professor McGovern and he apparently hadn't

18     found one.  He did hire a new law firm about that time, we

19     know that, and then we know that in September he learns from

20     Mr. Fuller, he says, that Mr. Hamlin and Mr. Gross are

21     involved in the G-1 case.

22             THE COURT:  Well, let me ask you this.  What

23     evidence would you rely upon to indicate that Mr. Brodsky,

24     in his motion for recusal and mandamus, is engaged in

25     tactics related to legislation?

1       MR. MONK:  Your Honor --

2       THE COURT:  If you said that about other people in

3  this case, I would understand that.  I'm not so sure how it

4  pertains to Mr. Brodsky.

5       MR. MONK:  My recollection, and the Court will have

6  the best recollection of this, is that there were mediation

7  sessions that took place in June of 2003, and a further

8  mediation session scheduled for the first of July of 2003

9  that was canceled, and it was canceled because the

10  legislation was becoming an issue.  And the pitch, as I --

11  my understanding, the Court will know because you were going

12  to be the mediator at the session in early July.

13       THE COURT:  No.  I was the mediator in June.

14       MR. MONK:  Correct, your Honor.  And there was

15  going to be a second session that was to be scheduled right

16  at the end of June, first part of July, that was canceled

17  because the legislation was becoming the key focus of the

18  bank group, and their pitch was let's hold off, maybe this

19  legislation solves the problem.

20       THE COURT:  Let's assume for purposes of argument

21  it is a tactic.  Why does it matter?

22       MR. MONK:  It only matters because what we are

23  confronted with and what the Court is being asked to do is

24  to overlook the fact that two years ago you announced who

25  your advisers would be and the parties had the opportunity

1   to go look at those advisers then and raise objections if

2   they had reason to do it, and we know that certain --

3   certain parties actually raised issues and brought the

4   matter to the Court's attention, so, it was fully within the

5   public knowledge and available in the public record to look

6   at the advisers way back right after you appointed them and

7   raise this issue.

8          There was no reason to raise a question because no

9   one perceived a partiality problem from the appointment of

10  these advisers.

11         The same can be said about the ex parte

12  communications.  Let's talk about that for a second.  220

13  lawyers or 240 lawyers, an entire assembly room of lawyers

14  and clients were present when the Court stood up and said, I

15  intend to conduct this case in part and give the parties the

16  opportunity to have ex parte communications.  I certainly --

17  and I was sitting there that day, I certainly sat back and

18  said, okay, I've been in big cases before, I know the judges

19  in mammoth cases with many, many parties frequently feel the

20  need to conduct ex parte communications so they know what is

21  the next step to take in connection with the case.

22         THE COURT:  It's basics.  If you were a rear-end

23  hit with a plaintiff and a defendant and you come in for a

24  settlement conference and the judge says to one party, may I

25  speak to your adversary out of your presence, it's ex parte

1    towards settlement but it's ex parte nonetheless.

2         MR. MONK:  I said to myself, that doesn't surprise

3    me at all.  I believe the rest of the very experienced

4    lawyers in this case said exactly the same thing.

5         To come back now, two years later, after we have

6    invested millions of dollars of my client's money in the

7    progress of this estate and, let's face it, we're paying for

8    most of the lawyers in our case on both sides of the aisle,

9    to come back two years later and say, oh, my goodness, we

10   have a problem with that, is just unfair to us, and I think

11   the timeliness rules with respect to recusal go exactly to

12   that point.

13        It isn't just about Mr. Brodsky, when Mr. Brodsky

14   knew.  It's about what a reasonable person in his

15   circumstances needed to do to raise the point, and I think

16   they failed on that point.  I think they have tried to turn

17   it into did Mr. Brodsky actually know and when he actually

18   knew, and I don't think that's the law.

19        Now, let me turn to the role of the advisers

20   because I think there's a lot of confusion about this.

21        As I read the Kensington and Springfield brief,

22   they try using actually my argument at the Third Circuit,

23   they try to box the point that the advisers must be neutral.

24   I didn't find a case in their brief that said the advisers

25   must be neutral, and I am not aware of a case that says your

1    advisers must be neutral.

2         In fact, the only authority that has been pointed

3    to on this subject is the Manual for Complex Litigation

4    which suggests that when you have a complex case, it may

5    well be that the only person that you can turn to is someone

6    that does bring some baggage to the table for the

7    conversation that the Court will need in order to understand

8    the issues and resolve the matter that's before the Court.

9    These advisers didn't play any of the roles that are

10   required for advisers to be neutral parties.

11        Now, before I get chastised by my opponents on that

12   subject, let me be clear about what I'm saying.  As we

13   understand the record as it's now been developed, the Court

14   used the advisers in that first, roughly, six-month period

15   of time, might have been a little longer than that, but from

16   our perspective, it's meetings from January of 2002 to May

17   of 2002, in that first period of time to provide you with

18   background information regarding asbestos litigation in the

19   broadest sense of that term, in the Court's, as well as the

20   bankruptcy implications, that arise to educate you about

21   this large complex case that was coming before the Court.

22        THE COURT:  They were a resource based upon their

23   experience and that's why they were selected.

24        MR. MONK:  They were obviously -- and we make this

25   point in our brief and, so, I won't belabor it here.  It was

1    obviously a balanced group of advisers with Mr. Gross's

2    strong background in the defense bar, and former judges who

3    experienced that, as well as Professor McGovern, who has

4    obviously done a lot of work resolving complex cases and is

5    an academic.

6        It's a little -- I mean, obviously, you did not

7    appoint Mr. Gross or Mr. Hamlin because they were involved

8    in the G-1 case.  I think you did know, and I think the

9    record is clear that you did know that Mr. Hamlin had that

10   appointment, but was just -- he was just learning how to be

11   a futures rep and, so, whatever information he could bring

12   to the table would not have been significant, it seems to

13   me, because he had literally just gotten the appointment

14   almost simultaneously with your asking him to be an adviser

15   to you.

16       Now, the advisers did, in limited instances where

17   you entered a court order and you waived the bankruptcy rule

18   that says you can't use masters in bankruptcy, take on

19   specialized roles.

20       Judge Dreier was, in the Owens Corning case, the

21   discovery master and that would require neutrality.  At

22   least certainly under Rule 53 as it's now progressed

23   forward, that kind of thing would require neutrality.

24           THE COURT:  I think there was one telephone call.

25           MR. MONK:  But we had one telephone call.

1    Nobody -- we were fussing at each other in a deposition and

2    we needed to have some assistance from him.  It was a

3    telephone call and it was over and resolved and, to my

4    knowledge, he had no other involvement in the Owens Corning

5    case.

6            There's been a lot of conversation about the role

7    of mediation in this case and the role of a mediator.

8    Clearly, Francis McGovern was a mediator in this case, has

9    been appointed by this Court as well as by Judge Fitzgerald

10   to serve a mediation role and --

11           THE COURT:  I don't know that to be a fact.  I

12   signed an order appointing McGovern to be a mediator and

13   Judge Fitzgerald to be the judge --

14           MR. MONK:  Correct.

15           THE COURT:  -- settlement judge.  I don't know if

16   she ever issued a separate order in Owens Corning as to

17   mediation.

18           MR. MONK:  She signed an order to allow Professor

19   McGovern to be retained so he could be paid for his

20   services, and the gist of that order is that he was being

21   paid for mediation services.

22           Now, there's been a lot of talk, and we've heard

23   the argument this morning about how terrible it might be if

24   one of the people who were serving a mediation function, one

25   of the advisers, were to have provided you with information,

1    and there was reference to a meeting in November of 2002,

2    when that may have taken place, and I realize that we have a

3    limitation on information that may have come that --

4    reflecting Judge Dreier, is contained in Judge Dreier's

5    notes.

6            Let me just say this.  The record is very clear

7    that the Court had the opportunity to meet with and receive

8    position papers from parties prior to November of 2002.  You

9    had the opportunity to meet with the debtors in the Owens

10   Corning case, the official committee and others.

11           The record, only you will know what transpired in

12   those conversations to bring to your attention the parties'

13   positions regarding where the bidding may have been between

14   the bank debt settlement position and the bond settlement

15   position or the asbestos position or whatever.

16           So, to the extent that there's much trying to be

17   made about Judge Dreier's notes and the various positions,

18   it seems to me that there are plenty of sources that

19   constitute waiver because it came from the parties

20   themselves that would have given you the opportunity to get

21   that information, and I don't believe the record at all

22   supports the notion that it was somehow provided improperly

23   by the mediators.

24           But I want to talk a little bit about the policy of

25   a mediator providing the court with information and whether

1    that's inappropriate.  In a case in which the Court has not

2    offered to give parties the opportunity to come forward and

3    have ex parte conversations and the court is going to be the

4    fact finder in the case, it seems to me it is inappropriate

5    for a mediator who is assigned to work in the case to tell

6    the court what the parties' positions are.  But that's not

7    our case.

8         In our case, the parties themselves were given the

9    opportunity to come in and tell the Court what their

10   position was, so, to have some concern, to raise some issue

11   of impartiality that a mediator provided that information

12   when the parties themselves had the opportunity to do so

13   seems to me to be -- to stand the rule on its head.

14        Let me, I also want to address the --

15        THE COURT:  By the way, the Court should add that

16   there was never any information given to the Court that

17   differed from what the Court learned at the consensual

18   mediation in June.

19        MR. MONK:  Judge, I actually was not present

20   personally for the June 2003 mediation session with the

21   Court, but it strikes me as great evidence of the parties'

22   view of your impartiality and fairness that they would be

23   willing to agree, after we had just spent a month in trial

24   and before you had rendered your decision, to ask the Court

25   to assist to mediate the dispute.

1    Now, that takes me, I think, to the Allied Signal

2    case because I think you can -- I think in determining what

3    a reasonable man would do in the circumstances and,

4    remember, it's a reasonable man with full knowledge of all

5    the relevant facts, well, the parties' own conduct is maybe

6    the best evidence of what a reasonable person would do.

7        We know that the Grace parties looked at the

8    advisers, thought about it, decided to -- they wrote you a

9    letter.  That certainly is evidence that they didn't raise a

10   problem.  They didn't say, oh, my goodness, this is -- the

11   appointment of these advisers is a problem and you shouldn't

12   do it and they didn't question your impartiality as a

13   consequence of that.

14       In the Owens Corning case, the parties agreed to

15   allow you to mediate.  They weren't saying, my goodness,

16   we've had all these ex parte communications.  That would be

17   a reasonable basis for questioning your impartiality.

18       When Mr. Becker received the information in the

19   Grace case about the possible appointment of Mr. Gross, the

20   red flag didn't go off and somebody didn't say, wait a

21   minute, stop, that's a problem.

22       It was only when Mr. Brodsky, who needed time, when

23   he needed time, then we found that we have a problem with ex

24   parte communications and with the role of the advisers here.

25       You know, right about the same time, Judge, as this

1   motion for recusal was filed, the bank group filed an attack

2   on seeking appointment of a Chapter 11 trustee.  A lawsuit

3   was filed attacking the Owens Corning board of directors and

4   the officers for breaching their fiduciary duty to the bank

5   group.  Within a couple days of that we had an attack on the

6   structure of the asbestos committee saying that, you know,

7   Mr. Inselbuch's committee was organized in a way that would

8   be inappropriate and we have to throw that out and start all

9   over again.

10        Each one of those motions or lawsuits or adversary

11   proceedings it seems to me were designed to stop the process

12   because either maybe Congress will act and change the rule

13   or they don't like where the case is going.  They didn't

14   like the fact that we were proceeding forward.

15        THE COURT:  And by the way, all those actions that

16   were brought would have nothing to do with this Court, would

17   be handled by a bankruptcy judge.

18        MR. MONK:  You asked me earlier -- that's correct,

19   your Honor.  You asked me earlier, how would we know that it

20   was about tactics and timeliness, and my point is you can

21   look at all those filings and see from those objective facts

22   what is happening.

23        All those things could have been raised earlier in

24   the case.  Every single one of the bases of those motions

25   would have been known to the parties for a great deal of

1  time.  What was going on in the underlying case at the time?
2  Judge Fitzgerald is holding hearings on the proposed
3  disclosure statement, the parties, the case is where Owens
4  Corning debtor is doing everything we can to move towards
5  getting a disclosure statement out and a plan of
6  reorganization.  And it is clearly Mr. Brodsky, because the
7  proposed plan proposes substantive consolidation, wants to
8  stop the process.
9      I think you can't overlook that fact when you're
10 considering whether they were timely in raising these
11 issues.  There's no doubt that they knew about the ex parte
12 conversations, they were involved in, and there's no doubt
13 they knew about the appointment of their advisers and had
14 access to a whole array of public information about the
15 advisers.
16     I guess I want to make one other sort of what I
17 would consider an Allied Signal kind of a point and, that
18 is, that it's not just the parties involved in this case who
19 had the opportunity to raise those issues.
20     Judge Gambardella knew that Mr. Gross had been
21 appointed by you as an adviser and she had the opportunity
22 on subsequent occasions to make a determination whether he
23 could be reappointed, because you remember he left his law
24 firm and was in his own law firm and then moved again to
25 another law firm and she chose -- she raised no issue.  It

1    was no concern of hers that there was potential impartiality

2    or an issue raised.

3         I think the reality is that everything had the --

4    everyone had the opportunity to raise this.  They did not.

5    They chose not to, in some instances, and I think it's too

6    late, and I think the Third Circuit case in Martin, the

7    Second Circuit case involving General Motors, the auto

8    dealers, auto brokers case, makes it clear that if you have

9    the opportunity to raise recusal because you have access to

10   the information on the public record and you don't, you

11   can't then after the trial, after the parties have invested

12   time, after the Court has invested time, when there may be a

13   tactical basis to do so, and I think that's really where

14   this motion must fail.

15        Unless the Court has any questions, that's all I

16   have.

17        THE COURT:  I have no questions.

18        MR. MONK:  Thank you, your Honor.

19        THE COURT:  Mr. Bernick.

20        MR. BERNICK:  I'm going to use that today, if it's

21   all right with the Court.

22        THE COURT:  I'd be surprised if you didn't.

23        MR. BERNICK:  Well, I've got a special picture to

24   draw this morning.

25        THE COURT:  No flash cards?

1      MR. BERNICK:  No flash cards, just a simple sketch,

2   and if I'm lucky, your Honor will see there's at least some

3   resemblance to the Court's own artistry and I'll leave it at

4   that.

5      I'd like to take the Court back to December the

6   20th, when the Court held the conference and everybody

7   showed up.  In a sense, all the issues that we're facing

8   here today are issues where the die essentially was cast in

9   two days in December almost two years ago, the first day

10   being December 20, when your Honor invited everybody in, and

11   Mr. Monk has adverted to this meeting and I want to come

12   back to it as well because it really is very, very key.

13      It was a mob scene.  There must have been 280

14   people there, 250 people there, and your Honor came out, I

15   remember, to address the group as a whole, and I was struck

16   at the time and I'm struck now by some of the contrast who

17   were apparently in the room that day.  One I know your Honor

18   will not take offense because of the source.  Your Honor was

19   probably the second shortest person in the room, first one

20   being myself.

21      THE COURT:  No.  I'm taller than Ron Motley.

22      MR. BERNICK:  Another was just the sheer numbers.

23   Your Honor was addressing a group of tremendous numbers, all

24   of whom were lawyers, and I remember sitting kind of close

25   to your Honor and thinking this is not easy and your Honor

1 had some notes and there was just a small tremble in the

2 hand because it was a very, very difficult presentation to

3 make.

4   The third contrast I think is probably the most

5 important one, which is one of the reasons why I'm sure that

6 that process was not easy, is that there was an enormous

7 difference between your Honor and everybody else in the room

8 without exception.

9   THE COURT:  I was the only one wearing a vest and

10 suspenders.

11   MR. BERNICK:  No.  It comes to experience and

12 knowledge and expertise.  Sitting out in that room were some

13 of the most preeminent trial lawyers in the United States

14 and certainly preeminent when it comes to mass tort

15 liability involving asbestos.  There were 30 plus years of

16 experience in dealing with trying the underlying claims.

17 They were all there, no exceptions.

18   There was also sitting in that room 30 years of

19 bankruptcy experience in dealing with mass tort, and I know

20 my distinguished colleague, Mr. Crames, probably goes back

21 the furthest, but not any further than Mr. Inselbuch.  They

22 were there at the very beginning dealing with asbestos

23 bankruptcies, and they had remained, and even more important

24 perhaps than all of that experience is that there seems to

25 be an omission in the proceedings before the Court, perhaps

1    ignorance, that immediately before your Honor got this

2    assignment, there was a significant history of new wave

3    cases, asbestos bankruptcy cases.

4        A whole series of them had been filed and in those

5    cases people were trying to think outside of the box about

6    different ways of handling mass tort bankruptcies, and I

7    know I personally was involved in that and all the other

8    people in this room were involved in that and in those

9    cases.

10        All of the same issues that have been highlighted

11   to the Court as being these unique issues that have to be

12   addressed in these cases, they already had been addressed in

13   a whole bunch of other cases by the lawyers who were sitting

14   there in other cases.  In fact, some of those issues have

15   even been addressed in the very cases that were assigned to

16   your Honor.

17        The Grace case had a significant history before

18   your Honor took over the assignment of the Grace case.  So,

19   all of these people not only know the underlying litigation,

20   they know mass tort bankruptcy.  They know the most recent

21   iterations of mass tort bankruptcy and all the issues that

22   are associated with it, including the five cases that were

23   cited to your Honor.  It was the ultimate sophisticated

24   audience, and your Honor was a newcomer.  But differently

25   from everybody else, you had the responsibility to manage

1    the case.

2          So, what did you do?  You set out a structure and

3    in the exhibits there is a short kind of written version of

4    the presentation which you gave, but I looked to see whether

5    it contained the sketch which you showed because you showed

6    a sketch, and I haven't forgotten that sketch because I

7    looked at that and I said the Court is genuinely trying to

8    deal with this problem by creating an organization to help

9    master the task, and I know I got perhaps the shapes wrong

10   but the basic structure of it was that you were -- your

11   Honor was going to augment the resources available by having

12   a group of advisers and by having bankruptcy judges who

13   would take on matters as to which the reference was not

14   withdrawn, so that essentially the Court was not acting in

15   isolation but gained the benefit of the experience of the

16   advisers, getting the expertise of the bankruptcy judges,

17   keeping the bankruptcy courts involved and proceeding on

18   that basis on a very sound track.

19         Now, there's one other thing that you said that

20   day, which was that you were going to permit ex parte

21   contacts but with all sides, both people who were -- I think

22   most people then were thinking about tort claimants as being

23   on one side and pretty much everyone else was on the other.

24   In any event, anybody who wanted to could have access to the

25   Court, and that also was announced on that day.

1          Now, the advisers were not appointed till the 28th

2     but essentially this structure was announced and the die was

3     cast on December the 20th, and that's how it was.  And this

4     structure is what then creates a road map for the issues

5     that we have here today, and I'm going to touch briefly on

6     those issues because I think the issues have become refined

7     during the course of the briefing process.

8          Let me, first of all, talk about the ex parte side

9     of the equation.  Setting aside what the bankruptcy judges

10     did and how their matters came before the Court and what the

11     advisers did, let's just talk about the direct ex parte

12     context that your Honor has described as being innumerable

13     and the parties have talked about in their papers again this

14     morning.

15          Was it proper for the Court even to allow and

16     arguably invite ex parte contacts?  Was that proper?  I

17     think everyone would have to say that under the current

18     state of the case law, the answer to that is unclear.

19     That's why the Third Circuit is going to have to address it.

20     It is an absolutely threshold issue that no one can point to

21     your Honor and say here is good precedent for it or against

22     it.  We just don't know, and that is a threshold issue.  If

23     the Third Circuit says it was improper to do that, then

24     based on that law, obviously there should be recusal, and

25     that's the same in all the cases and right across the board.

1          If Mr. Neal talks about an issue of law, that's an

2     issue of law for the Court to take up.  It's got some

3     factual content to it under the circumstances, but it is an

4     issue of law for the Court to frame.

5          It's an interesting issue.  It's not an easy issue.

6     Were these really extra-judicial contacts when your Honor

7     made it part of the judicial process?  This is not like you

8     go trotting off to a conference and nobody else knows about

9     it and it's sponsored by the plaintiffs' bar.  This is where

10    you're saying it's going to happen in the context of this

11    case as part of case management.  It's important that it was

12    open to everybody, very, very key.  It's not one-sided.

13         And finally important that it's part of the

14    bankruptcy process, and we know and I've learned, I'm not a

15    bankruptcy lawyer but I've learned a few things about

16    bankruptcy, some with a good deal of pain and one of the

17    things that I've learned painfully is that much as I would

18    like to litigate all the issues to resolution because the

19    litigation process I think knows no peer in being able to

20    get to the bottom of issues, there isn't tolerance for that

21    at the end of the day in bankruptcy if the price to be paid

22    is the case resolution is too long, too far prolonged.

23         Bankruptcy focuses on cases resolution and you're

24    talking to a bunch of bankruptcy lawyers, what is it that

25    you're saying.  You're saying I'm creating a structure that

1    I'm going to use to administer the case in bankruptcy

2    towards a resolution, so, we'll see what the Court does.

3         There's a reference this morning to Judge Pointer's

4    role in the breast implant litigation.  Actually, reminded

5    me of something.  I don't know if Ken Eckstein is here, he

6    may remember this.  In any event, Judge Pointer, when he

7    acted as the MDL judge in connection with breast implant

8    litigation, had kind of a roving courtroom.  He'd go around

9    the country to different states and hold his MDL status

10   conferences, and the night before the status conferences

11   there would be a cocktail hour, and those who know Judge

12   Pointer know that that cocktail hour was very important for

13   a variety of reasons, but everybody would be invited.  The

14   state court judge would be invited, all the litigants would

15   be invited, and anybody who wanted to go could go right up

16   and talk to Judge Pointer about the case, and it happened

17   all the time, all the time.  I can't -- as annoying as Ralph

18   Noels, who is the lead plaintiffs' lawyer, was so effective

19   in talking to Judge Pointer about the administration of the

20   case.  Everybody knew about it.  It was done on purpose.

21   Was that wrong?  It's all extra-judicial but it's open.

22   Everybody can participate.

23        Important question.  What is much clearer is that

24   the commercial interests in the Grace case consented to the

25   ex parte process.  I'll say consented.  In what way?  Number