1   one, there was no objection to the process.  Number two,

2   there was no petition for relief in any way, shape or form;

3   and number three and, most importantly, they voted and they

4   consented with their feet and they consented to the process

5   with their feet.  Not necessarily to what anybody would say

6   in that process but to the process itself, because they

7   utilized it and action speaks louder than words is the

8   ultimate consent.

9        Why?  Why would they do that?  Well, perhaps for

10  the same kinds of reasons that Mr. Monk touched on and

11  perhaps others.  He said, well, people expected you to be

12  impartial.  I think that was the expectation.  I think there

13  was a further expectation, which is that precisely because

14  you didn't have a significant background, you were a new

15  face, you had an unbelievably important appointment in

16  charge of five cases, had enormous visibility, that's why

17  everybody showed up.  Everybody was dying to knock on your

18  door in order to tell you their vision of the world for

19  their clients.  They thought it was to their advantage and

20  they were content, and we know about how time has passed on

21  the focus on the Grace case, the committee, the unsecured

22  creditors committee never voiced an objection ever.  The

23  movants in the Grace case never objected.

24        Even when they filed their motion to recuse the

25  Court, they took the position that ex parte contacts were

1    not the issue in the case.  They said the issue in the case

2    is structure.  The ex parte contacts are simply ancillary to

3    that and main point, when they sought their petition for

4    writ of mandamus, again, they didn't argue the ex parte

5    point in the proceedings on remand back down here in this

6    court.  Again, they didn't take that position.

7         And now for the first time when they submit a brief

8    they drop a footnote saying, oh, by the way, we're now going

9    to make a 455(b)(1) argument.

10         And today Mr. Mancino spent his whole time almost

11    not talking about the structural issue anymore but talking

12    about 455(b)(1), and he's compounded the problem by making a

13    misrepresentation in his papers.  He says in his papers that

14    he cites is the affidavits -- he cites the affidavits for

15    the proposition that while some parties would --

16         THE COURT:  Where are you reading from?

17         MR. BERNICK:  Reading from his brief at page 35.

18         THE COURT:  Yes.  You see, one of the problems I

19    have, and I'll get there, is I've not read the brief because

20    I was not afforded a courtesy copy.

21         MR. BERNICK:  He says finally the Grace movants

22    have not acquiesced in the Court's ex parte contact with

23    non-neutral advisers or any other party for that matter.

24    While some parties have known there would be ex parte

25    communications, the Grace movants themselves were not

1    involved in the case when any such disclosures were made,

2    and he cites the Wills declaration exhibit JJ.

3         If you go to that declaration, it's a bunch of

4    affidavits and not one of those affidavits speaks to the

5    question of whether the movants knew about the ex parte

6    process.  Those affidavits all go to the point where the

7    movants are saying they didn't know about the alleged

8    conflicting appointments.  None of them say that they

9    weren't aware of the ex parte process.  Mr. Mancino doesn't

10   say that he wasn't aware of the ex parte process.

11        There's no record before the Court that says that

12   somehow they were in the dark and, yet, they're still

13   misrepresenting it to the Court, and Mr. Mancino today very

14   carefully got up and he said my clients didn't know.  He

15   never says that he didn't know.

16        All of this, all of this delay, all of this kind of

17   being careful about the affidavits, no explanation for it,

18   these people aren't being candid with the Court.  They're

19   asking the Court to be candid and they're not being candid

20   with the Court.

21        Let's talk a little bit about the advisers.

22   Advisers, we knew that there were going to be on the 28th,

23   we learned who they were going to be.  I've got four points

24   to cover and I will have to move through them very quickly.

25        First let's talk about the composition.  An

1    important point has been made, this is not just one adviser,

2    these are five advisers, and because there are five, you

3    have the opportunity for balance.  You've got judges.

4    You've got Francis McGovern, who is an academic and a unique

5    academic.  We've got a practitioner in the field, Mr. Gross.

6    There's a tolerance when you have a group for diversity of

7    opinions, there's a tolerance for people to already have

8    predispositions.  You're not depending on one person, it's

9    all five.

10          And who are you picking?  You're picking people who

11   are people of distinction, people who understand the

12   importance of the integrity of the process.

13          Beyond their diversity, the reason I put this over

14   here like this, beyond the diversity, the key thing is their

15   disciplines.  What disciplines were they from?  These were

16   not technical advisers in the sense of people who had the

17   ability to provide actual evidence to the Court that might

18   bear upon substantive issues.  They're not like a technical

19   adviser who's an engineer in an engineering case and who

20   could actually serve as a witness.

21          They're judges and lawyers.  Judges and lawyers

22   inherently can't actually offer evidence to the Court.  All

23   they can do is talk with the Court about what somebody else

24   has done and what is it that they talked about, what was the

25   reason that they were there, their discipline was that

1   history of asbestos litigation and case management of

2   asbestos litigation, key, key area for the Court, one they

3   could specifically address.

4       Now, counsel says, oh, well, gee, but they went

5   beyond that and they advised the Court with respect to this

6   long laundry list of issues that are all substantive issues

7   that are contested in the case, whether to convene a Rule

8   706 panel, whether and, if so, how to impose a bar date, the

9   use of particular types of proof of claim forms.

10      What counsel doesn't realize and doesn't understand

11  is that that's not something that's new.  That has been a

12  central focus of the bankruptcy cases since the Babcock &

13  Wilcox case was filed in 2000.  There have been massive

14  briefs submitted.  There are briefs submitted in the Grace

15  case about all of those issues.  Were the advisers not

16  supposed to read the briefs about case management?  Is your

17  Honor not supposed to read about case management?  That's

18  what they were there for.

19      They weren't there to provide the Court with

20  evidence.  They were there to provide the Court with history

21  and with case management.

22      What about the process?  Well, your Honor should

23  have done this and your Honor should have done this and

24  that, etc., etc., etc.  The Reilly case is clear on process.

25  It says two things.  One is it says that there are certain

1   procedural safeguards that should be adopted and the other

2   says that somebody who doesn't object to the way that it's

3   done, they waive their objections.

4        And what was done here?  Your Honor identified the

5   advisers.  Your Honor gave the opportunity.  If they wanted

6   to pursue relief, God knows they had two years to do it.

7   Your Honor described what they were going to do, maintained

8   a log, and after the fact your Honor asked for affidavits.

9   You can't go to Reilly and find that really more was

10  required.  You can't find it.  And in any event, Reilly is

11  crystal clear where those safeguards weren't in there, the

12  guy wasn't even identified, that if somebody objected, they

13  had to object then.

14       Well, your Honor did all these things with these

15  advisers, didn't have written descriptions up front, didn't

16  have recorded proceedings.  Where was Mr. Mancino?  Where

17  was the unsecured creditors committee?  They were where the

18  government was in the Reilly case.  They sat on their rights

19  and they did nothing and Mr. Mancino can't even tell you

20  today what the appropriate safeguards would have been.  He

21  doesn't know.  Process is a dead issue.

22       Then we get to bias; three people, McGovern, Hamlin

23  and Gross.  The case on bias with Professor McGovern is

24  frankly, your Honor, is laughable.  The idea that Francis

25  McGovern could go attend a meeting with a bunch of futures

1   representatives and that shows that he's biased, of course

2   he's going to be there.  He wants to know what they're

3   saying, what they're doing, just like he goes and visits

4   constituencies all over the country.  He is a reporter.  He

5   should be there.  He doesn't represent them.  He doesn't get

6   paid by the Court for acting on their behalf.  They are not

7   clients.  He's there to learn.

8          The only thing that's really been said that changes

9   that calculus is that Eric Green had the grace and presence

10  and perhaps wit to say "our mentor", our mentor.  Well, the

11  very articulate and capable guy at this table, Steve Neal,

12  he's my mentor, and you can see that it's done absolutely no

13  good in getting me to agree with him all the time.

14         The fact that Francis McGovern is a mentor enhances

15  and recognizes his stature.  It didn't somehow give him a

16  bias or represent a conflict of interest.

17         Let me go to Hamlin and Gross.  With respect to

18  Hamlin and Gross, the claim is G-1.  Now, what did they do

19  with G-1.  Hamlin was more explicit about it, Gross was less

20  explicit about it, but they basically walled themselves off

21  of giving substantive advice with respect to personal

22  injury, and my brief, I'm happy to be quoted in my brief for

23  things that I said that are wrong, but at least when it's

24  quoted, it ought to be for the right proposition.

25         I said there's no contrary evidence for what

1    proposition, it says Mr. Gross and Judge Hamlin repeatedly

2    and consistently testified that they provided no advice to

3    this Court and undertook no responsibilities for any issue

4    related to personal injury claims or in potential conflict

5    with their roles in G-1, and there was no contrary evidence

6    and there's still no contrary evidence.

7         In fact, the kinds of things that get cited here

8    actually cut the other way.  There are a citation in BB,

9    exhibit BB to the Kensington brief, that's the typewritten

10   version of a dialogue involving Mr. Gross and the Court and

11   other folks, and it's interesting, Mr. Gross is alleged to

12   have agreed with the certain proposition relating to the

13   underlying scientific evidence.

14        What you find throughout is Mr. Gross is doing one

15   thing.  He's asking questions.  How are these cases tried?

16   What's the science?

17        The one page, which is DRG 000643, what they quote

18   is basically people saying you don't need to show plaques to

19   make a meso claim is of Gross agreed with that, but it's

20   clear from the margin it says DG and BK, and the quote is

21   not from Gross specifically, and there is a question, what

22   is indication of meso.  Well, was that Gross's question?

23   Was it Gross's answer?  They never asked him that question

24   in his deposition.  They're misleading the Court concerning

25   the evidence.

1          In any event, whatever the situation was with Gross

2     and Hamlin in terms of whether that was an effective wall,

3     the fact remains as demonstrated exhaustively in the briefs,

4     their other role was well-known.  It was well-known to the

5     unsecured creditors committee, it was well-known to Deutsche

6     Bank, who showed up actually at a Mealey's conference where

7     Judge Gambardella sat on the sample panel as other folks.

8     It was quite clear that Hamlin was a futures representative,

9     Gross was the counsel of the other case.  It was known to

10    the Klehr, Harrison firm and it's never been denied.  Mr.

11    Mancino has never submitted an affidavit.  He's filed

12    affidavits.  Still, even after discovery is done, he's never

13    submitted an affidavit saying his firm wasn't aware of it at

14    the time.

15          So, that then brings me to the ultimate issue,

16    which is whether this whole system of advisers creates an

17    appearance of impropriety, and here I agree completely with

18    Mr. Monk, although with a slight modification.  He says the

19    conduct of the movants is the best indication that there's

20    not a problem here.  I would say it differently.  I would

21    say it's the conduct of counsel in this case that provides

22    the overwhelming and unequivocal evidence that there was no

23    appearance of impropriety or bias or conflict.

24          Who am I talking about?  We're not just talking

25    about ordinary practitioners of bankruptcy.  We are talking

1   about the dons of the New York bankruptcy bar, people who

2   are the gray-haired eminences, people that even with my

3   involvement in these cases for the last four years I never

4   had the privilege of meeting.  People like Mr. Case, is one

5   of the dons of the practice.  Mr. Kruger, I guess he's not

6   here anymore, another don.  There he is, another don of the

7   practice, and gray hair is not necessarily the only mark of

8   that.  Mr. Eckstein is exemplary evidence that you don't

9   need to have a lot of gray hair to be considered the don of

10  the practice.

11          All of these people knew generally early on that

12  there was this situation, this dual role that was being

13  played allegedly by Messrs. Hamlin and Gross and nobody

14  cared to do anything about it.  Why?  They didn't see that

15  it was a problem.  And even when we, that is Grace, applied

16  to have Mr. Gross serve as the futures representative just

17  this last fall, nobody came to us and said, he can't do

18  that, he's conflicted.  Nobody came to us and said Mr.

19  Hamlin can't do that, he's conflicted.  Nobody filed, when

20  we proposed Gross, recusal motions, even though it was known

21  that he played the role in G-1.

22          And beyond those individuals, I don't mean to

23  single them out, that's not the essence, I have nothing but

24  respect for all the people I've named and they know it, I

25  would go beyond to the entire audience of 280 plus people

1      who were sitting out there that day on December 20.

2            The entire bar that was involved in asbestos

3      bankruptcy sat there, listened to the Court, saw who the

4      advisers were and they reached the judgment that there was

5      not even the appearance of impropriety.  The evidence is

6      unequivocal and it's overwhelming.

7            THE COURT:  Do you remember the rest of the day,

8      December 20?  Do you remember the rest of the day?

9            MR. BERNICK:  There was --

10           THE COURT:  Private individual meetings --

11           MR. BERNICK:  There were five individual meetings.

12           THE COURT:  -- with each case where probably 40 or

13     50 people were there.  The Court discussed how it was going

14     to case manage --

15           MR. BERNICK:  That's right.

16           THE COURT:  -- and try to find out what the --

17           MR. BERNICK:  That there would be conferences,

18     indicated a second time there would be ex parte conferences.

19     I do not recall one objection.

20           I want to talk about three specific issues that

21     have been raised with respect to the advisers; personal

22     injury, settlement, and there was one further one that my

23     notes will refresh me on in a moment, oh, yes, the opinions

24     that were written.  Let me just briefly cover these.

25           The claim is made that Gross and Hamlin went beyond

1    their roles, did become involved in providing advice

2    regarding personal injury.  As I talk about it, I don't

3    think there's any evidence on the record to support that, at

4    least in connection with the Grace case.

5            There's a claim that Mr. Hamlin walked over the

6    line when he got involved in fraudulent conveyance.  That

7    ended up being the number one issue and maybe counsel wasn't

8    there, didn't know it, but the person -- the people who made

9    fraudulent conveyance in the Grace case the number one issue

10   were the folks over here, was Mr. Inselbuch and his clients,

11   who insisted it be the number one issue, and they had good

12   company because they're people who actually had prosecuted

13   fraudulent conveyance litigation both before and during the

14   early stages of the Grace case.

15           That was not something that, some bright idea that

16   came out of the blue for Mr. Hamlin.  They say that they

17   crossed the line, that is, Gross and Hamlin did.  I believe

18   that their efforts and their testimony indicates otherwise.

19           There's an issue that's been raised with respect to

20   settlement discussions and in the Owens Corning case that

21   there was an improper divulgence of information.  These are

22   all discrete issues they affect particular cases.

23           The settlement discussions problem, if there was a

24   problem in the Owens Corning case, Mr. Monk asserts and

25   argues, well, that there was not.  It's not Grace's

1  business, in any event.

2       There wasn't any problem that we're aware of in

3  connection with the Grace case of settlement information

4  making its way to the Court improperly. Indeed, in our first

5  meeting with the Court, we shared settlement information

6  directly.

7       There's a question that's been raised in the briefs

8  about the opinions that were written or were drafted for the

9  Court's review, actually were drafted at the direction, the

10  testimony goes, of Mr. Wohlforth and not with direct contact

11  with the Court at all. There was some draft opinions. It's

12  quite clear from the record that none of those draft

13  opinions related to personal injury claims at all. None of

14  those draft opinions were central to these cases at all.

15       Two, three other things and then I'll sit down, by

16  way of reference. One, the application to appoint Mr.

17  Hamlin as the futures representative, it's really

18  interesting. This was the essence of the arguments that

19  were made by Mr. Mancino. When the papers were first filed,

20  the Court did allow documentary discovery into those

21  matters.

22       The documents were produced by our firm and by my

23  client. Those documents demonstrate unequivocally that

24  there was no impropriety. They further demonstrate that

25  there was no objection to these individuals on the grounds

1  that are now being pursued.  The only footnote is that after

2  the close of discovery, Mr. Mancino and his client have seen

3  fit to offer an affidavit of a Mr. Yuslov.  Okay.  Mr.

4  Yuslov attaches what appear to be notes of a conversation

5  that he had with Mr. Siegal.  This affidavit is late.  It's

6  not part of the discovery process proper.  It was attached

7  to briefs.  We haven't had the opportunity to respond and,

8  in any event, it doesn't cure the problem, which is that Mr.

9  Yuslov wrote that affidavit or attested to that affidavit

10  without the proper opportunity for cross examination.

11          The affidavit is hearsay.  The underlying notes

12  probably have three or four layers of hearsay.  They

13  shouldn't be considered by the Court and we reserve the

14  right to object to the documents that were tendered in

15  connection with the briefs.

16          Number two, an issue was raised regarding the

17  discoverability of settlement discussions.  We took the

18  position in this proceeding that the settlement discussions

19  were not only inadmissible, they were immune from discovery,

20  and I made reference to a Sixth Circuit case.  That case is

21  the Goodyear case, 332 F.3d 976.  And finally, out of an

22  abundance of caution, one of the briefs that was filed, I

23  believe, from the creditors committee in the Armstrong case

24  said, well, gee, all these cases are interlinked and the

25  Third Circuit has said this, because of its decision

1   allegedly in Combustion Engineering, to delay the argument

2   on the pending appeal.

3          That kind of statement is very corrosive.  I think

4   it's very much a mischaracterization of what the Third

5   Circuit has done, but it probably does underscore the

6   importance in this case of the Court making clear that the

7   system of advisers and the ex parte procedures that were

8   announced on the 20th of December were confined to these

9   five cases.  They were never adopted in connection with the

10  CEABB case, that that case only came to the Court after the

11  record was closed, no new facts were taken in that case, and

12  in all of the documents that were produced by the advisers,

13  none of them reflected that they undertook any activities as

14  advisers to the Court in connection with that case.

15         I think it's very important to make clear why it is

16  that that case is on a very different tract, on a very

17  different circumstance, and that's all I have.  Thank you.

18         THE COURT:  Thank you, Mr. Bernick.  Ms. Parver.

19         MS. PARVER:  Thank you, your Honor.  Your Honor, I

20  would just like to take a few minutes to talk about the

21  futures reps because the movants here, particularly

22  Kensington and D.K. Acquisition, claim that the Court's

23  impartiality might reasonably be questioned because of the

24  presence of Messrs. Hamlin, Gross and Professor McGovern at

25  certain of the meetings of future reps appointed in

1    bankruptcies across the country, and these included futures

2    reps in the Owens Corning and the USG case.

3         Now, they argue that somehow, and they suggest that

4    the futures reps were discussing, they were taking positions

5    as a group on all of the key issues in the five bankruptcies

6    and that somehow Hamlin and Gross were, and this is to use

7    their words, plotting litigation and legislative strategies

8    with the federal reps in these cases while at the same time

9    advising the Court on the same issues.

10        Now, they argue this but, as your Honor, I'm sure,

11   knows well at this point, there is not a shred of evidence

12   in the record to support these contentions.

13        What did the future reps discuss?  Absolutely they

14   discussed various proposals for federal asbestos

15   legislation, including whether to present their views as a

16   group to Congress.

17        Now, Mr. Gross testified he never said a word on

18   the legislation because he wasn't conversant with it.  Judge

19   Hamlin testified his contribution took at best 90 seconds to

20   the group and that concerned whether his views that using a

21   single Article 1 court where people sitting on it had to

22   live within a 50-mile radius of Washington, D. C. was just

23   not practical, and Professor McGovern testified that he

24   never offered any views on any features of the legislation.

25   He never offered any guidance to future reps on what

1    positions they should take, and his contribution, as Mr.

2    Monk and Mr. Bernick have said, was to report on the

3    legislative proposals and where they were in the process.

4         The movants' briefs are just absolutely inaccurate

5    in describing these meetings.  But you know something, your

6    Honor, what does discussions of federal legislation,

7    asbestos legislation, have to do with the issues in the five

8    cases assigned to this Court?  Absolutely nothing.  Whether

9    the legislation passes and in what form it passes are not

10   issues that this Court is going to be deciding.  They have

11   nothing to do with the merits of these cases.

12        Now, what else did these futures reps discuss?

13   They discussed, and the record again is very clear, they

14   discussed issues of common interest.  What process should

15   they use to pick trustees for the 524(g) trust.  What about

16   claims processing facilities.  Let's hear from people like

17   that.  Nothing to do with the underlying merits of the

18   cases.  Everything having to do with what happens after a

19   524(g) trust is set up.  And they discussed TDPs, trust

20   distribution procedures, and we know that the TDP is the

21   mechanism that distributes the value to the present and to

22   the future claimants after, and that's very significant

23   here, after that value has been allocated to the trust.

24        Now, that's got nothing to do with the underlying

25   issues in the cases before this Court because it has nothing

1    to do with what's the amount of value that's going to be

2    allocated to the trust.  It's the amount of value that the

3    commercial creditors here care about.  They want to know how

4    much they're getting as opposed to how much the tort

5    claimants are getting, and that's not what was discussed at

6    the future rep meetings.

7         What did Judge Hamlin testify was discussed?  He

8    was discussing how are we going to deal with that ACC in the

9    various cases, because they're talking about a trust

10   distributions procedure that allocates value between present

11   and future claimants, and how do we ensure that the future

12   claimants are going to be treated substantially similar to

13   the present tort claimants.  So, did they talk about

14   unimpaireds?  Absolutely.  The record shows in the context

15   of the TDP how were the future unimpaireds treated vis-a-vis

16   the presents, how are the unimpaireds treated vis-a-vis the

17   impaireds.

18        The testimony of Judge Hamlin, Mr. Gross and

19   Professor McGovern concerning these meetings is consistent

20   and it's uncontradicted.  They never plotted litigation

21   strategy in any of these five cases.  They never considered,

22   counseled or advised the Owens Corning or USG or Armstrong

23   futures reps concerning issues or strategies in these

24   particular cases.  They never discussed issues such as

25   asbestos bar dates, claims estimations or product

1   identifications at these meetings, and the record is crystal

2   clear that they never reported the content of these meetings

3   to this Court.

4          In fact, Judge Hamlin testified the last time he

5   spoke or met with this Court was May 17, 2002, and the first

6   futures rep meeting that he attended was August 2002.

7          THE COURT:  I'll also take notice, Miss Parver, of

8   your cross examination of Mr. Gross commencing on 389

9   through 391, as to what he didn't do.

10          MS. PARVER:  And I thank you, your Honor.  I would

11   also call the Court's attention to pages 29 to 30 of our

12   consolidated brief in which we cite the fact that Owens

13   Corning futures rep, Mr. McMonagle, detailed fee statements

14   which were actually served on and received by the CSFB as

15   the agent for the Owens Corning bank group, the Owens

16   Corning creditors committee and D.K. Acquisition,

17   specifically set forth futures rep meetings with futures

18   representative Hamlin, futures rep meetings with Mr. Gross

19   in the presence of Professor McGovern, and they detailed all

20   the issues that were discussed there.

21          THE COURT:  Mr. Crames.

22          MR. CRAMES:  Your Honor, I have one issue I want to

23   address in the few minutes allotted to me.  Mr. Bernick, in

24   his inimical fashion, has stolen some of my thunder but I

25   want to pick up on the point he made which concerned, of

1   course, the roles of the advisers, and I think it's very

2   important for the Court to understand that even though

3   Kensington, at page 45 and following of their brief, use the

4   term disinterested, which is a defined term in the

5   Bankruptcy Code in connection 101(14), and reference 327(a),

6   professionals and trustees and examiners appointed under

7   1104, whatever the advisers rolls may be, they most

8   assuredly are none of those.  They are not retained 327(a)

9   professionals.  They are most assuredly not trustees or

10  examiners.

11       Your Honor has quite wisely and properly give them

12  discrete roles in each of the five cases, and I think Mr.

13  Bernick has very thoroughly covered the ground.  The point

14  being the whole disinterestedness notion is inapplicable and

15  irrelevant to these advisers.

16       But what does it say.  Assuming even for the sake

17  of argument that one wanted to refer to it to see whether

18  these advisers met the test, do they have an interest,

19  materially adverse to the interests of the estate or as

20  class of creditors or equity security holders, by reason of

21  any direct or indirect relationship to, connection with or

22  interest in the debtor or in an investment banker, which is

23  irrelevant entirely, I submit they meet the test.

24       What did they do in G-1?  What does a futures rep

25  do?  Miss Parver explained what the futures reps meetings

1    were all about.  That's what Mr. Hamlin's charge is.  That's

2    what Judge McMonagle's charge is.  That's what Judge

3    Trafelet's charge is.  The allocation of value to the trust

4    is a negotiation in the context of a Chapter 11 and my view

5    of the whole Chapter 11, your Honor, frankly is it's one

6    grand effort to settle and resolve by means other than

7    litigation.  Yes, there are litigations along the way, but

8    it's one grand settlement vehicle.  That's the thrust of the

9    whole statute.

10            The value once assigned is then distributed and the

11   main job of the futures rep frankly after the value for the

12   trust has been allocated is the negotiation with Mr.

13   Inselbuch and his asbestos claimants committee over how that

14   value gets distributed, and that was the main purpose of the

15   futures reps getting together.

16            Who are their clients?  Who are the clients of a

17   futures rep?  We don't know.  There are no people that we

18   can point to today and say they are our clients.  The day

19   they appear and become people, we can point to, they become

20   Mr. Inselbuch's clients and they're represented by his

21   committee.

22            So, to talk in terms of overlapping clients between

23   Mr. Hamlin being the futures rep in G-1 and being an adviser

24   here is, again, an irrelevancy, inapposite and totally

25   misunderstands what futures reps do.

1    THE COURT:  Are you counsel for the futures reps in

2    all five jointly administered cases?

3    MR. CRAMES:  No, I'm not, your Honor.  Only in

4    three.  Only in Owens Corning, Armstrong and USG.

5    THE COURT:  Okay.  And I believe in Armstrong there

6    was a trust disposition plan.

7    MR. CRAMES:  A plan provides for -- there's a

8    524(g) trust.  Judge Newsome made findings of fact,

9    conclusions of law and entered an order of confirmation

10   which abides the approbation of your Honor, at least the

11   district court, in order for it to become a final and

12   binding and efficacious order.

13   THE COURT:  So, there's been no trust distribution

14   plan in Owens Corning or the other case that you administer

15   and no allocation or discussion of funds until that occurs.

16   MR. CRAMES:  There is a trust distribution

17   procedure that has been negotiated in Owens Corning, your

18   Honor, and it will be incorporated in the plan that

19   ultimately is put before the Court, and it has been filed.

20   THE COURT:  All right.  Thank you.

21   MR. CRAMES:  Thank you, your Honor.

22   THE COURT:  Mr. Inselbuch please.

23   MR. INSELBUCH:  Thank you, Judge.  I have a few

24   miscellaneous points to touch on that come largely out of

25   the briefs that have been filed.

1          THE COURT:  Can I ask you one question, only

2     follow-up to Mr. Crames that I didn't ask him.  As far as my

3     recollection goes, I had nothing to do with the allocation

4     in Armstrong or the TDP in Armstrong between current and

5     futures.  Is that correct?

6          MR. INSELBUCH:  Clearly so, not to my recollection.

7     I fought that out with Mr. Crames.

8          THE COURT:  Without the assistance of the Court.

9     Correct?

10          MR. INSELBUCH:  Without either the benefit or the

11     burden of the Court.

12          THE COURT:  Thank you.  I accept that, by the way.

13          MR. INSELBUCH:  In some of these briefs, the

14     parties have argued that the 455(b)(1) point is conceded by

15     the Court because they say the Court has conceded that it

16     received extra-judicial information.

17          Now, I don't know what extra-judicial information

18     means other than anything that the Court hears I guess not

19     in this room and not on the record.  If that's true, then

20     every court is always getting extra-judicial information.

21     But that's not what 455(b)(1) talks about.

22          What 455(b)(1) says, there should be recusal where

23     the judge has personal bias or prejudice concerning a

24     party -- which has never been asserted here -- or personal

25     knowledge of disputed evidentiary facts concerning the

1      proceeding.

2            You're the judge about whether anybody gave you

3      evidentiary facts.  I suspect, based on the conversations

4      that I've had with the Court and with others, that what you

5      heard was a whole lot of lawyer talk about what the lawyers

6      thought was important and what they thought they would be

7      able to prove.  There's been no evidence suggesting that you

8      saw any witnesses or you saw any factual evidence or

9      documentary evidence that might implicate 455(b)(1).

10           Now, they also -- now, what's interesting to me is

11     when this began, we began with Mr. Brodsky saying, my

12     goodness, I didn't know about Judge Hamlin and Mr. Gross's

13     appointments in G-1, and that came to my mind and that's a

14     conflict, and then everybody piled on and Mr. Neal piled on,

15     but he couldn't say that because he knew the record was to

16     the contrary about his knowledge and USG's knowledge about

17     the G-1 situation appointments, so, he piled on and he said,

18     oh, my goodness, there's this problem with ex parte

19     conversations, and said  we couldn't have consented to that

20     because you said you used them only sparingly.

21           Well, I don't know what sparingly means and now

22     everybody seems to say they were innumerable.

23           Well, I went through the Court's records and I went

24     through Mr. Neal's materials and in the two years, as far as

25     I can tell from the court records, there were 21 meetings

1    that the Court held ex parte, and if you attribute those 21,

2    and that includes ex parte conversations with other debtors.

3    If you look at just the USG case and assume that every time

4    that the Court was meeting with a plaintiff that was

5    attributable to the USG case, there were 13 such meetings,

6    five with the plaintiffs, three with the unsecured creditors

7    committee, one with the debtors, and then I might say two

8    other days when the Court had all the constituents in court

9    and met seriatim with the various constituencies, including

10   Mr. Neal; one meeting with a combined PI and PD

11   constituency, one meeting with the unsecured creditors and

12   the plaintiffs, and three meetings with insurance companies

13   if they were involved in the USG case.

14         There were also two meetings with Owens Corning,

15   the debtors, one meeting with the Armstrong debtors, three

16   meetings with the Federal Mogul debtors, and when you add

17   this all up, you get 21 meetings.

18         Now, Mr. Neal puts in a piece of paper.  He says,

19   ah, you left some out and if you add in one, two, three,

20   four, five of the ones that he says you left out, two of

21   them were with plaintiffs, one is with a debtor, and one is

22   with an insurance company.  But then he goes on to say,

23   which I found quite troubling, that you left out a meeting

24   with Mr. Gross and the asbestos plaintiffs' lawyers for 12

25   hours in Chicago.

1          Now, I think I would have known about that, and I

2     have asked the plaintiffs' lawyers and they don't recall

3     this Court ever coming to Chicago for any meeting of any

4     kind in this case, and certainly not a 12-hour meeting with

5     the plaintiffs' lawyers in Chicago.

6          Now, the citation for this --

7          THE COURT:  Chicago isn't big enough for Mr.

8     Bernick and I to be there at the same time.

9          MR. INSELBUCH:  The date of this is September 14,

10    2003, and the citation for this, which I think is telling,

11    is an entry for Mr. Gross's diary, his time records that

12    says travel to a meeting in Chicago re working committee, no

13    reference to the Court.  Although there are references to

14    the Court in his time records whenever they were

15    appropriate.

16         THE COURT:  I will tell you for the record the

17    Court never traveled to Chicago.

18         MR. INSELBUCH:  I was confident of that, Judge, and

19    I would just say that it is incorrect to say that, oh, my

20    goodness, this whole case was run based on these ex parte

21    conversations.  In fact, in two years the Court had at most

22    26 which, by my calculation, is a little more than one a

23    month, and they ran for the most part an hour or less.

24         Now, what do the Grace petitioners now say, what do

25    the Grace committee now say and what do the Kensington

1   petitioners now say.  They were able to make up the facts

2   before and they were able to say anything they wanted in

3   their recusal papers and in their petition for mandamus, but

4   now we have a record and I think it's telling that Mr. Neal

5   only wanted to talk to you for five minutes so he could run

6   away from the record and claim that that's what we were

7   doing.

8           But, in fact, what everybody now seems to argue is

9   the two years that have gone on here while everybody

10  understood exactly how these cases were being run, while

11  everybody participated in the way these two cases were being

12  run, that's irrelevant because Grace petitioners say, well,

13  we didn't know about some of these things.  And why is that?

14  Because they deliberately tried to insulate themselves as

15  they say in a footnote so that they can continue to trade in

16  the stock.  The committee, the Grace and USG committee, they

17  say, and by the way, the Grace petitioners say at page 36,

18  if anybody wants to check me, the committee at page eight

19  says it doesn't matter what the committee knew, it didn't

20  matter what the committees' lawyers knew, so long as there

21  was one unsecured creditor that didn't know about this,

22  that's enough, and we can raise it at any time on their

23  behalf, but the ultimate, the ultimate statement is the

24  Kensington petitioners' at page 51 of their brief, they say

25  that there's no timeliness issue, there's no waiver issue,

1    there's no acquiescence issue, whatever you want to call

2    those things, because all parties who might be interested in

3    seeking recusal would have to be aware and on notice.

4         Now, if that -- I can't believe that that could be

5    the law.  I can't believe that.  And indeed, it is incorrect

6    that, as they said earlier, that the acquiescence or

7    timeliness doesn't apply to 455(b)(1)as well as to 455(a),

8    and for that I would just comment, you could look at the

9    material at page 64 of our brief that follows on that, but

10   if that were the law, look at the power I would have.

11        I've got 200,000 blue-collar workers.  I venture to

12   say very few of them follow these proceedings with any

13   detail, and if I could, I could proceed here in what is a

14   bankruptcy where, as Mr. Crames aptly states, the goal is to

15   reach a consensual resolution, a consensual reorganization

16   in each one of these five cases, and I could make whatever

17   deals I want, but then if I want to walk away from those

18   deals or walk away from my consents or walk away from my

19   acquiescence, I go find one, one injured asbestos worker and

20   he says, well, I didn't sign on for that.

21        That simply can't be the law.  That can't be the

22   law when we talk about what a reasonable observer

23   knowledgeable of the facts would know and how they should

24   act.

25        And finally, Judge, you asked about motives.  Who's

1    here and who's not here I think is telling.  Federal Mogul,

2    Grace, Armstrong and Owens Corning, four debtors do not

3    support recusal.  And in Owens Corning Mr. Monk said what

4    was really going on.  Why is there only part of the

5    commercial creditors, the unsecured creditors committee,

6    advancing this motion.  What points out more telling than

7    anything the tactical nature of what's going on.  The banks

8    are here yelling for recusal.  The bonds are not.  And why

9    is that?  That's because Mr. Brodsky perceived that he was

10   likely to lose or feared he would lose the substantive

11   consolidation case and had to find some way to prevent

12   reorganization in Owens Corning on the chance that he might

13   succeed, that his constituency might succeed in Congress.

14        As you're well aware, your Honor, the bonds are on

15   the other side of that issue.  Now, whether their decision

16   not to participate here is tactical or not, I don't know.

17   But it certainly points up the tacticalness of what's going

18   on here.

19        Now, how could you cure this?  People talked about

20   curing this problem.  They said you could cure this with

21   disclosure.  Well, what disclosures, what additional

22   disclosures would be made?  It strikes me that you could

23   always find things that were not disclosed in a manner that

24   parties will argue they should have been disclosed in, but

25   there was no lack of disclosure of the appointment of Judge

1    Hamlin in G-1, there was no lack of disclosure of the hiring

2    of Mr. Gross in G-1, there was no lack of disclosure of the

3    appointing of your five advisers in this case.

4         I mean, people want to argue that somebody should

5    have filed another piece of paper and should have filed

6    another piece of paper in another court house, and in a

7    perfect world, I guess when you go back and look at how a

8    record could be made so that it was absolutely perfect, you

9    could suggest other ways to do things.  We can do that in

10   every case.

11        But your Honor was charged with a very difficult

12   problem and your Honor adopted a strategy for dealing with

13   that problem.  You adopted it in sunlight transparently.

14   Everybody in this room could have come here in 2002, after

15   they thought about it for a while, even if they didn't

16   object when you announced it at first, even when they didn't

17   object when you held them in the court, when you held

18   separate conversations with the Court with each constituency

19   in each case in the courtroom, even if they didn't do it

20   right away, at any time within a reasonable period of time

21   they could have come into this court and said this, we don't

22   agree with this, we don't consent to this, we don't think

23   this is proper.

24        They didn't do that.  They didn't do it for two

25   years and it's too late, whether it's acquiescence or

1   whether it's waiver or whether it's timeliness or whatever

2   else you want to call it, this is just playing with the

3   Court.  This is playing with the Court, playing with the

4   facts for tactical advantage and my clients have to stand by

5   now for four and a half months waiting for this to get

6   decided.  Thank you.

7          THE COURT:  Thank you.  All right.  I indicated

8   that I'd permit people to make application for reply.  I'd

9   ask for a proffer if you're going to do it, Mr. Robbins, to

10  make sure that we are not just embellishing that which has

11  passed on the record.

12         MR. ROBBINS:  Your Honor, I think every point I

13  will make is either one Mr. Englert would have gotten to if

14  he had had time and yet has not been made or is responsive

15  to arguments that you just heard.

16         THE COURT:  All right.  I'll permit you to have ten

17  minutes.

18         MR. ROBBINS:  Thank you, your Honor.

19         THE COURT:  You're welcome.

20         MR. ROBBINS:  Let me proceed quickly and start with

21  the issue of timeliness.  Our position today is that only

22  actual knowledge triggers the duty to bring this motion

23  under 455(a).  The argument on the other side turns on a

24  series of imputations, and I think it's important to nip

25  this in the bud because it would make unprecedented and

1    quite erroneous law if the Court were to subscribe to it.

2            Here is the chain of imputations that respondents

3    ask you to draw.  First they ask you to infer from one young

4    associate knowing about Judge Hamlin's appointment as a

5    result of his clerkship, that is supposed to be imputed to a

6    partner at Kramer Levin.  From there it's to be imputed to

7    the entire firm.

8            THE COURT:  I didn't hear that argued today.  What

9    I heard argued today was that Mr. Becker, a member of that

10   firm who worked in the Owens Corning case, was also on the

11   equity committee in the W.R. Grace case, knew of Gross and

12   Hamlin's appointment in G-1.

13           MR. ROBBINS:  No one at Kramer Levin knew of those

14   dual roles.  There was no such evidence.  The argument in

15   the brief, as I say, is a chain of imputations that begins

16   with this associate Klein.  It goes from there to Eckstein;

17   from Eckstein to the firm; from the firm to CSFB as the

18   agent; from the agent imputed yet again to Mr. Brodsky's

19   firm.

20           THE COURT:  I understand that.  I read Mr.

21   Eckstein's testimony.  I read all the briefs.  Your argument

22   is imputations are inappropriate and I understand that.

23   Let's go to your next.

24           MR. ROBBINS:  Five layers of imputations, your

25   Honor, is the kind of chain of logic that would make even

1    Mrs. Palsgraf blush.  Let me move to the second point.

2         No one, not a soul, reported to this Court the bid

3    and asked price for the bank debt in 2002.  There is no

4    evidence that that happened.  I report from my clients,

5    though I was obviously not in the case then, that it did not

6    happen but, your Honor, it is exactly the byproduct of a

7    system of ex parte communications and the absence of a

8    record that would understandably make it impossible to

9    reconstitute those events.

10        That is, of course, exactly why proceeding in this

11   way, no matter how much the nature of the case cries out for

12   thinking outside the box, that cannot be abided.

13        THE COURT:  Mr. Robbins, when the status

14   conferences were held in open court, and there were a number

15   of them, there's some, maybe between 20 and 40 persons here,

16   if you put a reporter down there at the time that you hold

17   those status conferences, no one will deal with the issues

18   effectively or tell you what they're really thinking.  If

19   there's a record, the record hinders, doesn't help, case

20   management.

21        MR. ROBBINS:  Your Honor, I agree with one thing

22   Mr. Bernick said with regard to that, if it is true, that

23   cases like this require us to depart so dramatically from

24   settled principles of advocacy to subscribe to the

25   proposition that your Honor just said is required, that is,

1    I suppose for the Third Circuit to say.  No court has ever

2    intimated that it is permissible, not in this kind of a case

3    or not in the many, many other kinds of complex cases that

4    go on under other sections of the United States Code and,

5    so, the suggestion that we need to create new rules for this

6    set of cases I think is one to which the Court of Appeals

7    and, respectfully, your Honor should not, ultimately

8    subscribe.

9         THE COURT:  No.  This Court and potentially the

10   Court of Appeals will have to address the issue because the

11   issue is not clear-cut, as somebody indicated before.

12        MR. ROBBINS:  Let me turn very quickly in my

13   allotted time to a couple of other quick points.

14        THE COURT:  Sure.

15        MR. ROBBINS:  First, I don't propose to go nip and

16   tuck with opposing counsel on what people's motives were,

17   what their tactics are, what theories or strategies they

18   have and, fortunately, the Third Circuit has said that that

19   is neither my burden, nor their opportunity, nor this

20   Court's province, and an opinion by Judge Garth in Alexander

21   against Primerica holds, he said, as follows, this is 10 F.

22   3d 164, quote, "By the same token, we have no need to

23   address the issue of whether petitioners and their counsel

24   have abused the judicial process by acting in bad faith, as

25   that issue is similarly irrelevant to the 455 issue with

1   which we have been confronted.  Protecting important

2   institutional values against the appearance," appearance,

3   "of partiality does not require us to affix blame.  Rather,

4   the appropriate and the only inquiry to which we must

5   respond is whether a reasonable person knowing all the

6   acknowledged circumstances might question the district court

7   judge's continued impartiality."

8          Now, your Honor, I've heard it suggested that as of

9   December 2001, the die was cast, and I expect that's

10   probably right.  I expect that was indeed the moment when

11   this Court proceeded down the path that brought us to the

12   elaborate diorama that counsel introduced today, and I've

13   heard a number of, I will concede, out-of-the-box

14   suggestions about how this Court's advisers can be, I've

15   heard it said today that they need not be neutral because,

16   after all, how could you find anybody who's neutral.

17          Well, your Honor found Judge Dreier and there's no

18   suggestion that he's not neutral, and I doubt --

19          THE COURT:  I think the discussion was not advisers

20   but we were talking generally about people engaged in

21   asbestos litigation in terms of experts, difficult to find

22   neutrals.

23          MR. ROBBINS:  I could have sworn Mr. Monk said

24   advisers need not be neutral, he's not seen any authority

25   that requires.  Then I heard it said perhaps they need only

1   be balanced, they don't have to be balanced, they don't have

2   to be neutral as long as you have enough on each side.  Then

3   I heard it said maybe that you only need to be neutral about

4   new issues but not issues as old as Babcock & Wilcox.

5          That's not the law.  The law is this Court's

6   advisers must be neutral on any matter on which they advise

7   the Court for a variety of overlapping and mutually

8   reinforcing reasons.

9          Your Honor, this record cannot be read fairly in

10  any other way than that the advisers you appointed for

11  multiple reasons were indeed conflicted, that the conflict

12  runs to this Court and that under settled principles of

13  455(a), I respectfully submit your Honor, as unpleasant as

14  the duty, you have no choice but to recuse yourself, at

15  least in Owens Corning and I would submit in the other cases

16  as well.

17          THE COURT:  Okay.  Thank you, Mr. Robbins.  Mr.

18  Mancino, briefly.

19          MR. MANCINO:  Yes, your Honor.  I'd just like to

20  briefly address Mr. Bernick's attempt to satisfy his burden

21  of showing that we waived our objections on timely -- our

22  untimely asserting our objections by saying that we have not

23  proved a negative, and I'll just take a few minutes.

24          THE COURT:  Go ahead.

25          MR. MANCINO:  I should have expected that my name

1    would be used in vain and I was thinking about this last

2    night as I was flying back to the United States from

3    Switzerland, and I regret that I didn't have the opportunity

4    to read Mr. Bernick's brief because I suspect he made these

5    arguments in it.  However, he seems to suggest, your Honor,

6    that the burden was on me and my clients to prove the

7    negative; that is, that we did not waive our objections or

8    that we were timely.

9         Well, the fact is, Mr. Bernick had an opportunity

10   during the discovery process to question me under oath

11   because he specifically asked for my deposition.

12        THE COURT:  As far as I know, your deposition was

13   not taken.

14        MR. MANCINO:  You're right, your Honor.  Mr.

15   Bernick also requested the deposition of a person most

16   knowledgeable about my client.  Well, I was prepared to come

17   in here, I think it was on Monday, for that, to have to

18   enjoy a day in court with Mr. Bernick asking me questions,

19   but it was Mr. Bernick who said, your Honor, we don't need

20   his deposition.  So, whatever opportunity Mr. Bernick had to

21   develop evidence --

22        THE COURT:  And by the way, wasn't that vice versa

23   at first?  Didn't you want Bernick's deposition and then

24   abandoned it?

25        MR. MANCINO:  I think there's an element of tit for

1  tat in his request, I agree, your Honor. But he had an

2  opportunity to elicit evidence from me and from our clients

3  under oath and he elected not to do it, so, it's I think

4  inappropriate for him to suggest that your Honor should not

5  consider a document that we did produce in discovery and an

6  affidavit that my client did submit, which indicates that in

7  the process of Grace putting forward Judge Hamlin as a

8  futures rep candidate, my client was told by Mr. Bernick's

9  client that Mr. Bernick was contacted ex parte by your Honor

10  and your Honor urged Mr. Bernick to appoint Mr. Hamlin and,

11  according to my client's notes which were produced during

12  discovery, Mr. Siegal told him that Mr. Siegal or Grace was

13  going to pass on Hamlin until Wolin called him, Judge, it

14  says Wolin, I would have said Judge Wolin, called Bernick.

15       Now, had he wanted to, Mr. Bernick could have asked

16  questions about this document that was produced in

17  discovery. He chose not to. It's an admission against

18  interest on the part of his client. We have an affidavit

19  supporting it, affidavit, it's admissible.

20       THE COURT: Do you know when the Grace bankruptcy

21  was filed; how many years it was pending?

22       MR. MANCINO: I'm sorry?

23       THE COURT: Do you know how many years it was

24  pending?

25       MR. MANCINO: It was pending for some several

1    months before your Honor was --

2           THE COURT:   Several months?

3           MR. MANCINO:   It was sometime in 2000.

4           THE COURT:   By the time of that affidavit, is that

5    Mr. Yuslov --

6           MR. MANCINO:   Yes, it is.

7           THE COURT:   -- the Grace bankruptcy had been

8    pending almost two years or longer.

9           MR. MANCINO:   Probably.

10          THE COURT:   The Court said to all parties, Mr.

11   Inselbuch, Mr. Bernick, it's time to appoint a futures

12   representative because at that time Sealed Air had been

13   completed, Fresenius had been completed, Judge Fitzgerald

14   was about to complete the Taconite issue with the home

15   insulation.   It was time to move on with the case and have a

16   futures representative because you couldn't move on without

17   one.

18          MR. MANCINO:   Undoubtedly, your Honor.   However,

19   the candidate was Judge Hamlin, who was a futures rep in

20   G-1, a supposedly neutral adviser to your Honor and no one,

21   no one appreciated the conflict and the problems that that

22   presented.   The debtors didn't, Judge Hamlin didn't, your

23   Honor didn't.   We did.   We opposed it.   The U.S. Trustee

24   opposed it.   I believe the committee for unsecured creditors

25   opposed the Hamlin application and Judge Fitzgerald said no

1    way is he qualified to be a futures rep in this case and

2    denied it.

3         Now, it's also suggested that our clients, as Mr.

4    Bernick put it, voted with our feet in endorsing the case

5    management structure that we are complaining about now.

6    Well, we did not vote with our feet, your Honor.  My

7    clients, and we have affidavits in the record before the

8    Third Circuit and they're available to your Honor as well,

9    in which we make it clear, and your Honor has acknowledged

10   this, that my clients did not partake of ex parte

11   communications with the Court, my firm did not partake of ex

12   parte communications with the Court, and I made it clear to

13   the Third Circuit that we didn't appreciate what was going

14   on in this case until this issue regarding your

15   disqualification came to our attention.

16        THE COURT:  Did you make it clear to the Third

17   Circuit that the creditors committee, who really speak for

18   people that have debt, knew what was going on?

19        MR. MANCINO:  No, I did not, your Honor.

20        THE COURT:  Mr. Kruger is sitting back there, who

21   you can hardly see, knew very well what was going on with

22   the creditors committee not only in Grace but USG, and

23   sought the access to this Court on a number of occasions.

24        MR. MANCINO:  Well, the Third Circuit --

25        THE COURT:  You just can't hide on that.  You can't

1    hide.

2            MR. MANCINO:  I don't think anyone is hiding about

3    that, because those parties that participated in the ex

4    parte communications --

5            THE COURT:  Your two particular clients, where they

6    say they never met with me, that's true.  I did not know who

7    they are.  They never requested it, neither did I.

8            MR. MANCINO:  Yes.  And your Honor, I think it's

9    inappropriate that the price of admission to these

10   bankruptcy cases is that in order to get our voices heard,

11   we have to ask for ex parte communications with the judge.

12   That is not how the process should operate, I respectfully

13   submit.  Thank you, your Honor.

14           THE COURT:  Okay.  Thank you.  All right.  Anyone

15   else?

16           MR. NEAL:  Two minutes or less, your Honor.

17           THE COURT:  Sure, Mr. Neal.  You didn't use your

18   full time.

19           MR. NEAL:  I wasn't trying to hide it.  First of

20   all, your Honor, I'm not running from the record.  It would

21   be more tempting to say I'm running from the snow and the

22   cold but I'm not really doing that, either, your Honor.

23           Our brief lays out as thoroughly as we can at this

24   point what we think the record shows and I don't think it

25   would be a proper imposition on the Court to reiterate that,

1    so, we stand by what we say in the brief.

2            Our brief, when you read the brief, you'll see it

3    does not suggest, it does not say you were at that Chicago

4    meeting for 12 hours.

5            THE COURT:  I read your brief.  I did not see it.

6            MR. NEAL:  Again, there's an appendix that list

7    various items, but again -- I'm obviously not going to take

8    on most of what Mr. Inselbuch argued, even though I disagree

9    with virtually all of it, but for one point of clarification

10   on the record, actually will ask the Court this question.

11   Mr. Inselbuch says that, I think he said that in the USG

12   case there was a day when all parties were here but your

13   Honor met with parties individually seriatim.

14           I don't believe that happened in the USG case.

15   Your Honor may have a different recollection but I don't

16   think that happened in USG.  We had the January '02 meeting

17   and I don't think we had another session ex parte with the

18   Court even as part of a day-long program.

19           THE COURT:  We met several times, tried to work out

20   the claim form with the bar date.

21           MR. NEAL:  With everybody present.  Okay.  So, am I

22   -- is your recollection then the same as mine?  I don't

23   recall another session where we were ex parte.

24           THE COURT:  You're asking me to recollect over two

25   years five jointly administered cases whether there was

1   another conference with you?

2          MR. NEAL:  Just so there's no -- so, for the

3   record, on that point Mr. Inselbuch's recollection is

4   different.  I don't think that occurred in USG.  It may have

5   occurred in others.

6          And then finally, your Honor, Mr. Bernick says I

7   was his mentor, and just so there's no doubt on the part of

8   anybody in the courtroom, I want everybody to know I'm proud

9   of that fact.

10         THE COURT:  Mr. Monk.

11         MR. MONK:  No, your Honor.

12         THE COURT:  Ms. Parver?

13         MS. PARVER:  No, your Honor.

14         THE COURT:  Mr. Crames?

15         MR. CRAMES:  No, thank you.

16         THE COURT:  Mr. Bernick?

17         MR. BERNICK:  I have just one technical point which

18  I guess not to give it more distinction than it deserves but

19  kind of sounds parallel to Mr. Robbins' complaint about

20  imputation which I don't think really are essentially based

21  on but, in any event, Mr. Mancino wanted me to take his

22  deposition so that I could ask him about somebody else's

23  affidavit which talks about what that individual heard from

24  -- allegedly heard from my client, which my client allegedly

25  had heard from me which I allegedly heard from you.

1        Now, anybody knows that there's an evidentiary

2   problem with that chain, and everybody knows that you can't

3   cure that problem with an affidavit.  The fact of the matter

4   is this was hearsay as an affidavit.  To ask Mr. Mancino

5   about it is more hearsay and that the affidavit itself is

6   multiple layers of hearsay.

7        If they want to establish as a fact that some

8   alleged impropriety or improper contact was made by your

9   Honor, there are a lot of different steps they have to go

10  through and the Yuslov affidavit is not only late but it

11  doesn't solve the problem.

12       MR. MANCINO:  Your Honor, and of course, we did try

13  to get Mr. Siegal's --

14       THE COURT:  Mr. Mancino, you only get one reply.

15  You only get one reply.   Yes, Mr. Inselbuch.

16       MR. INSELBUCH:  One point.  No matter what Mr. Neal

17  wants to say now, the material filed with the Court is filed

18  under the following heading.  Judge Wolin's log does not,

19  italicized, include the following ex parte communications

20  which are recorded in recently produced documents or the

21  advisers' bills.  The last bullet point, September 14, 2003,

22  meeting with Gross and asbestos plaintiffs' lawyers for 12

23  hours in Chicago.

24       MR. NEAL:  I know there's one that either does not

25  indicate you were there.  The other items we identified you

1    were communications party --

2         THE COURT:  Mr. Neal, we heard you.  Let me ask the

3    parties.  I think the other day I found the diagram that I

4    used on December 20.  Would people like a smaller copy of

5    it, I think we made so that we can send it out to you.

6         MR. NEAL:  So we can impeach Mr. Bernick.

7         MR. BERNICK:  Only if mine was right.

8         THE COURT:  Does anybody care about the diagram?

9         MR. NEAL:  I'd like one.

10         THE COURT:  If you don't, we'll just leave it.  I

11    was going through a room, you know, and there was a diagram

12    there and it was reflective of your diagram.

13         MR. BERNICK:  I would like a copy of that diagram.

14         THE COURT:  I think the artistic content of mine

15    was better.

16         MR. BERNICK:  I'm sure.

17         MR. INSELBUCH:  I would suggest you insert it in

18    the record, your Honor.

19         THE COURT:  You know, everybody is talking about

20    mentors here and though I know Judge Gibbons is adverse to

21    me here today, the only time I sat in the Circuit Court of

22    Appeals was on a court where he presided and I watched him

23    as he presided in the many cases that came before the Court

24    and at the conclusion of most he said, I'll take this matter

25    under advisement.

1          I, too, will take this matter under advisement.

2    You will hear from the Court, as you all know, there's a

3    mandate from the Circuit Court of Appeals that I reply by or

4    that I issue an opinion by January 31st.  Rest assured we

5    will meet that commitment.  Court will be in recess.  Thank

6    you for coming.

7          (Whereupon the proceedings are adjourned.)