**FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
---------------------------
IN RE: OWENS CORNING,       :    Chapter 11
et al.,                     :    Case Nos. 00-3837 through
                            :              00-3854
        Debtors.           :
---------------------------
---------------------------
IN RE: W.R. GRACE & CO.,   :    Chapter 11
et al.,                     :    Case Nos. 01-1139 through
                            :              0-1200
        Debtors.           :
---------------------------
---------------------------
IN RE: USG CORPORATION,     :    Chapter 11
a Delaware Corporation,     :    Case Nos. 01-2094 through
et al.,                     :              01-2104
                            :
        Debtors.           :
---------------------------       **O P I N I O N**
```

APPEARANCES:

LAWRENCE S. ROBBINS, ESQ.
ROY T. ENGLERT, JR., ESQ.
GARY A. ORSECK, ESQ.
ARNON D. SIEGAL, ESQ.
ROBBINS RUSSELL ENGLERT ORSECK &
UNTEREINER LLP
1801 K Street, N.W., Suite 411
Washington, D.C. 20006

-and-

DAVID L. FINGER, ESQ.
FINGER & SLANINA, PA
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, Deleware 19801-1155

-and-

JOHN J. GIBBONS, ESQ.
GIBBONS DEL DEO DOLAN GRIFFINGER &
VECCHIONE
One Riverfront Plaza

Newark, NJ 07102

-and-

ISAAC M. PACHULSKI, ESQ.
K. JOHN SHAFFER, ESQ.
STUNTMAN TREISTER & GLATT PC
1901 Avenue of the Stars, 12 Floor
Los Angeles, CA 90067

Counsel for Movants Kensington &
    Springfield

STEPHEN C. NEAL, ESQ.
SCOTT D. DEVEREAUX, ESQ.
COOLEY GODWARD LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306

-and-

DAVID G. HEIMAN, ESQ.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio, 44114-1190

-and-

DANIEL J. DEFRANSESCHI, ESQ.
PAUL HEALTH, ESQ.
RICHARDS LAYTON & FINGER PA
One Rodney Square
PO Box 551
Wilmington, Delaware 19899

-and-

PAUL R. DE FILIPPO, ESQ.
WOLLMUTH MAHER & DEUTSCH
One Gateway Center
Newark, NJ 07102

Counsel for Movant USG Corp.

JOANNE B. WILLS, ESQ.
JENNIFER L. SCOLIARD, ESQ.
KLEHR HARRISON HARVEY BRANZBURG &
ELLERS LLP

919 Market Street, Suite 1000
Wilmington, DE 19809-3062

-and-

RICHARD MANCINO, ESQ.
MARC ABRAMS, ESQ.
CHRISTOPHER J. ST. JEANOS, ESQ.
NISHA MENON, ESQ.
WILKIE FARR & GALLAGHER, LLP
787 Seventh Avenue
New York, NY 10019

Counsel for Movants DK Aquisition Partners,
Fernwood Assoc., & Deutsche Bank Trust

CHARLES O. MONK, ESQ.
MATTHEW G. DOBSON, ESQ.
SAUL EWING LLP
100 South Charles Street
Baltimore, MD 21201-2773

-and-

NORMAN L. PERNICK, ESQ.
SAUL EWING LLP
222 Delaware Avenue
PO Box 1266
Wilmington, DE 19899-1266

Counsel for Respondent Owens Corning

DAVID M. BERNICK, ESQ.
MICHELLE H. BROWDY, ESQ.
JANEY BAER, ESQ.
SAMUEL BLATNICK, ESQ.
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601

-and-

CHRISTOPHER LANDAU, ESQ.
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005

-and-

LAURA DAVIS JONES, ESQ.

DAVID W. CARICKHOFF, JR., ESQ.
PACHULSKI STANG ZEIHL YOUNG JONES &
WEINSTRAUB PC
919 North Market Street, 16th Floor
PO Box 8705
Wilmington, DE 19899-8705

Counsel for Respondents W.R. Grace & Co.

ELIHU INSELBUCH, ESQ.
PETER VAN N. LOCKWOOD, ESQ.
NATHAN D. FINCH, ESQ.
CAPLIN & DRYSDALE
399 Park Avenue
New York, NY 10022

-and-

MARLA ESKIN, ESQ.
CAMPBELL & LEVINE
Suite 300
800 N. King Street
Wilmington, DE 19899

Counsel for Respondents the Official
Committees of Asbestos Claimants in In
re Owens Corning, In re W.R. Grace & Co.
and In re USG Corp.

MICHAEL J. CRAMES, ESQ.
JANE W. PARVER, ESQ.
AARON STIEFEL, ESQ.
EDMUND M. EMRICH, ESQ.
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022

-and-

JAMES L. PATTON, JR. ESQ.
YOUNG CONAWAY STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
PO Box 391
Wilmington, DE 19899-0391

Counsel for Respondents the Representatives
of Future Asbestos Claimants

**WOLIN, J.**

This matter has been opened before the Court upon the several motions of a number of interested parties for an Order recusing this Court from further participation in the above-captioned, jointly administered chapter 11 cases (the "Motions"). In In re Owens Corning, the movants are Kensington International Limited and Springfield Associates, L.L.C., joined by Credit Suisse First Boston ("CSFB") and amicus Washington Legal Foundation (with CSFB the "Owens Corning Movants"). In In re W.R. Grace, the movants are D.K. Acquisition Partners, L.P., Fernwood Associates, L.P., and Deutsche Bank Trust Company America (the ("W.R. Grace Movants"). In In re USG Corp., the movants are the debtor-in-possession and the Official Committee of Unsecured Creditors (the "USG Movants").[1] Respondents opposing recusal are the debtors-in-possession Owens Corning and W.R. Grace & Co., the Official Committees of Asbestos Tort Claimants in all three cases and the Representatives of Future Claimants in the Owens Corning and USG cases (no futures representative has been appointed in W.R. Grace).

---

[1]     For the convenience of the reader, the Court has provided a concordance of defined terms on the last page. Citations to (JA__) are to the joint appendix assembled by the parties per the Order of this Court for convenience of reference and to provide a consistent source of reference for further proceedings before the Court of Appeals.  Finally, some familiarity with the basic terms of asbestos bankruptcy is presumed in this Opinion.

1

The proceedings on the Motions have been governed by the Order to this Court dated December 18, 2003, by the United States Court of Appeals for the Third Circuit to develop a factual record and issue an Opinion on the Motions by January 31, 2004. In re Kensington Int'l Ltd., 2003 WL 23010148 (3d Cir. Dec. 18, 2003). Reference to the Bankruptcy Court of the above-captioned chapter 11 cases has been withdrawn with respect to the Motions by the prior Orders of the Court.

There is much that is extraordinary about these proceedings and their culmination, insofar as this Court's involvement is concerned, with this Opinion. This Court has previously been afforded the opportunity to address the Court of Appeals directly pursuant to their invitation under Federal Rule of Appellate Procedure 21(b)(4). This Court has the benefit of the thinking of the Court of Appeals as expressed in its formal Opinion and in the transcript of oral argument. Rarely does a district court have the opportunity to engage in so direct a dialog with its appellate brethren. The Court considers this a salutary feature of this litigation and will avail itself of the opportunity to address directly concerns or omissions in the record identified by the Court of Appeals.

The Court has reviewed the evidentiary record, including transcripts of testimony, and heard the arguments of counsel. What follows is the Opinion of the Court, constituting its

2

findings of fact and conclusions of law.  It is neither
practicable nor desirable, notwithstanding the length of this
Opinion, to address each of the Movants' accusations and set
forth a point-by-point rebuttal.  Each has been carefully
considered and discussed below in accordance with its merits.
More generally, the Court has attempted to set forth for the
Court of Appeals the rationale and practice of case management
this Court has brought to the above-captioned chapter 11 cases,
and In re Federal-Mogul, and In re Armstrong World Industries
(collectively the "Five Asbestos Cases") pursuant to the mandate
of Chief Judge Becker.

     As the District Court emerges from the stormy waters of
litigation, its course is steady and its grasp of the helm is
firm.  Through this simple maritime metaphor, the District Court
signals its intention to continue, with the Circuit Court's
approval, the stewardship of the jointly administered bankruptcy
estates.  The Movants say recusal is the right thing to do.  The
District Court disagrees.  The right thing to do is to resolve
all the outstanding claims, whatever their nature, and, should
the facts and the law so indicate, to return the debtors to that
which they do best - the conduct of their business.  Careful
consideration of the applicable legal standard and the context in
which the Motions arise only confirm this view.  Therefore, and
for the reasons set forth below, the Motions will be denied.

3

### BACKGROUND

While some of the history of the Motions has been recounted elsewhere by the Court, it is summarized here for convenient reference on appeal and for emphasis because it is relevant to the Court's disposition of the Motions.  Roughly speaking, the grounds advanced for the Motions are twofold.  First, the Movants contend that certain of the five advisors to the Court appointed by its Order of December 28, 2001, (JA2176)(the "Advisors"), are biased through their involvement in the chapter 11 case <u>In re G-I Holdings, Inc.</u>, Bankr. No. 01-30135 pending in the District of New Jersey before the Honorable Rosemary Gambardella.  Other allegations of bias of the Advisors are also raised.  In addition, the Movants contend that recusal is required due to certain <u>ex parte</u> communications that they claim were improper.

### 1.    **The Procedural History of the Motions**

The Court believes that the seed from which the present controversy grew was planted in December 2002.  It was represented to the Court at that time that a key issue in the Owens Corning bankruptcy was the resolution of a claim by the debtor and other potential plan proponents that the various subsidiaries of Owens Corning should be substantively consolidated for the purposes of the reorganization.  It was represented at that time, and repeated since in papers filed with the Court, that substantive consolidation put certain bank

4

creditors of Owens Corning (the "Banks") at risk for their
recovery of well in excess of $1 billion in debt guaranteed by
these subsidiaries.  Conversely, in the course of the substantive
consolidation litigation counsel have represented to the Court
that the Banks' recovery may approach 100 cents on the dollar if
they defeat the substantive consolidation motion, making these
claimants unique among the numerous other classes of commercial
and personal injury claimants who will receive only a fraction of
their claims.

     By Order dated December 23, 2002, this Court withdrew the
reference to the Bankruptcy Court of the substantive
consolidation issue and appointed the Honorable Judith K.
Fitzgerald, U.S.B.J., as settlement judge and Professor Francis
E. McGovern as mediator to explore the possibility of settlement.
The Order also contemplated that the debtors and the other
parties intended to file a proposed plan of reorganization and
that the motion for substantive consolidation was a part of that
plan.  It is, of course, "not at all unusual for a plan proponent
. . . to seek a determination prior to the confirmation hearing
as to the legitimacy of a particular provision of a proposed
plan."  In re Stone & Webster, Inc., 286 B.R. 532, 542 (Bankr. D.
Del. 2002).

     Settlement efforts failed and this Court held a bench trial
lasting four weeks on the merits of the substantive consolidation

5

motion.  Meanwhile, the proposed plan had been filed.  The plan
proponents are the debtors-in-possession, the Official Committee
of Asbestos Claimants, and the Representative of Future
Claimants.  The Plan Proponents and certain members of the
Unsecured Creditors Committee representing pre-petition
bondholders of Owens Corning, the self-styled "Designated Members
of the Official Committee of Unsecured Creditors," prosecuted the
substantive consolidation motion during the trial before this
Court.  A settlement conference was held in the courthouse
shortly after the trial concluded, at the parties' request and
with mutual consent.  The Court entertained this settlement
conference because it was represented that negotiations had
progressed to the point where only a judicial "nudge" would be
required to achieve a settlement.  Regrettably, this nudge was
unavailing.

Aware that settlement efforts were ongoing through the
summer and fall, this Court has nonetheless been reviewing the
extremely extensive record and the many technical financial
issues and is preparing an Opinion resolving the substantive
consolidation motion.  That Opinion had not issued, however, when
the first of the Motions was filed.  This Court believes that it
is safe to conclude that resolution of the substantive
consolidation issue will be the single most momentous event in
the life of this important bankruptcy, the successful conclusion

6

of which will effect the fortunes of so many individual persons
as well as corporate entities.

Meanwhile, in its third year, the Owens Corning bankruptcy
has arrived at a critical point.  The plan proponents have filed
a disclosure statement and Judge Fitzgerald held a hearing on
their motion to approve the disclosure statement on October 27,
2003.  Of course, the plan that is the subject of the proposed
disclosure statement assumes that the Court will rule in favor of
the plan proponents' motion for substantive consolidation.  Judge
Fitzgerald has not yet ruled upon the disclosure statement and
presumably will not rule until the Court's opinion on substantive
consolidation is issued.  She has stated on the record that, if
this Court denied substantive consolidation, then the plan
proponents will have to start again on a clean slate.

As this crisis in the Owens Corning reorganization effort
approached, the commercial creditors have not been idle.  The
initial Motion was filed by the Owens Corning Movants on October
10, 2003.  These parties, led by Mr. Mark Brodsky, are affiliated
entities that acquired a substantial position on the second-hand
market for the debtors' bank debt.  Seven days later, the
Unsecured Creditors Committee itself filed a motion for the
appointment of a chapter 11 trustee.  On October 24, 2003, the
commercial creditors moved to "re-structure" the representation
of the Committee of Asbestos Claimants and Future Claimants'

7

Representative, which re-structuring would require the disqualification of their present counsel and forfeiture of all of their fees. <u>Brief in Support of Motion for Structural Relief Required to Eradicate the Legal and Ethical Conflicts of Asbestos Law Firms</u> at 2 n.3. It was further represented to the Court that very extensive document and deposition subpoenas had been served in connection with the Motions. At least one of the targets of these discovery demands intended to move to quash, and sought the procedural guidance of the Court on how to go forward.

Whether consciously or not, the Owens Corning Movants had chosen to bring their Motion during a week in which the undersigned judicial officer was delivering a long-scheduled and widely publicized speech at a Commercial Law League conference in San Diego, California. Nonetheless, the Court acted swiftly to take control of proceedings. The Court has a responsibility to ensure that the reorganization over which it presides is not disrupted by the actions of any particular constituency free of judicial supervision. The Court is likewise responsible to see that persons who have served the Court ably and without objection by any party are not unfairly burdened. It appeared then, and it appears now to the Court in retrospect, that the flurry of activity by the commercial creditors in general and the highly suspect timing of that activity in relation to the Owens Corning plan process gave reasonable grounds for the Court to act to

8

prevent chaos and to impose order.

Therefore, on October 23, 2003, the Court issued an Order staying all proceedings, including discovery, until it could promulgate a more comprehensive case management order. On October 28, 2003, the Court issued its Case Management Order and Order to Show Cause Concerning Motion to Recuse Alfred M. Wolin, U.S.D.J. This Order provided that the five Advisors who were the subject of the Owens Corning motion should provide affidavits setting forth all of their activities and assistance to the Court undertaken pursuant to their appointment. All privilege or confidentiality that the Court might assert was expressly waived regarding the content of the Advisors' affidavits. Finally, the Order provided that

> any interested party may show cause why the Motion to
> Recuse should be denied without further proceedings or,
> in the alternative, why further proceedings including
> discovery should be had on the Motion to Recuse

Notwithstanding the fact that it was public knowledge that the Court was out of the State when the Motion was filed, it is apparent that the Court had not moved quickly enough for the Movants. On the same day the Court issued its Case Management Order and Order to Show Cause and a mere five days after the Court's first Order, the Owens Corning Movants filed a petition for an emergency writ of mandamus with the Third Circuit Court of Appeals. These Movants were apparently unwilling to take at face value the Court's statement in its Order that discovery and other

proceedings on the Motion would be delayed only until a case management conference had occurred and the _prima facie_ validity of the Motion had been considered.  Instead, they represented to the Court of Appeals that this Court had acted to obstruct discovery.

The Court of Appeals, improvidently this Court would respectfully submit, issued an Order on October 30, 2003, staying all proceedings in _In re Owens Corning_, excepting the requirement of the October 28, 2003, Order requiring the advisors to provide their affidavits.  This Court is convinced that the present stage of the litigation would have been reached at least a month sooner and no party would have been prejudiced had the October 30, 2003 order not been issued.  The Court of Appeals also ordered answers to be filed to the petition for mandamus.

On November 11, 2003, the W.R. Grace Movants filed their motion to recuse the Court.  On November 24, 2003, the debtor USG Corporation filed its motion to recuse the Court.  While lacking the immediacy of the crisis the Owens Corning Movants apparently perceived they were confronted with (_i.e._, an adverse substantive consolidation ruling), it requires little imagination to see how these other Movants would believe it in their narrow self-interest to recuse the Court at this juncture.

The Court has issued an Opinion and Order in _In re USG Corporation_ initiating the development of a case management order

10

that will ultimately permit the Court to test the allegation of the tort claimants that USG Corporation is insolvent even if one only counts those asbestos claimants who are allegedly sick with asbestos-related cancers and temporarily excludes the many thousands of so-called "unimpaired" claimants over whom there is so much controversy.  The tort claimants have contended that a practical course of action is for the Court to consider these claims alone through a "cancer-only" bar date and estimation proceeding, permitting the debtor to litigate its defenses.  The Court will find, it is contended, that even this limited pool of claimants will swamp any remaining equity in the company, thus eliminating the need to pursue the far more arduous course of litigation urged upon the Court by the debtor.

If this is so, and the Court has no opinion, then the debtors' existing equity and in all likelihood its existing management are in peril.  Yet, there are grounds to infer that the Movant USG wants the benefit of bankruptcy protection but does not want to participate in the judicial process.  The USG company website reports the comments of its CEO William G. Foote on October 24, 2003, on the occasion of the announcement of the company's third-quarter 2003 earnings.[2]

---

[2]    It is this same Mr. Foote who appeared at an ex parte conference with the Court and stated that he considered it his patriotic duty as an American to save his company from the asbestos tort claimants.

> Earlier this year, the Judiciary Committee of the
> United States Senate approved the Fairness in Asbestos
> Injury Resolution Act of 2003, a bill intended to
> establish a nationally administered trust fund to
> compensate asbestos personal injury claimants.  Since
> that time, various provisions of the bill have been the
> subject of intense discussions.  <u>USG has been actively
> and directly involved in these discussions</u> and remains
> very supportive of current efforts to pass asbestos
> litigation reform legislation.

http://investor.usg.com/news/20031024-120895.cfm (last visited

Jan. 19, 2004).

As all now know, corporate interests such as USG failed and

the asbestos bill did not emerge as law from the legislative

season just concluded.  Its prospects in the coming electoral

year are euphemistically termed "unclear."  Weighed against USG's

legislative prospects is the stated intent of the Court to test

the merits of the cancer-only bar date concept.  But, despite

several conferences to work out the language of the cancer-only

claim form and related documents, the Court's efforts to get the

cancer-only insolvency issue <u>sub judice</u> have been thwarted to

date.  Clearly, USG's best hope for legislative relief is a

substantial delay in the judicial arena.

It is difficult to dance with an unwilling partner.  USG

achieves both the needed hiatus and stalls the effort toward the

cancer-only bar date if the District Court is removed.

Meanwhile, it languishes in chapter 11, protected from the tort

system and (if it is indeed insolvent) surviving on its

creditors' money.

12

As with the substantive consolidation issue in <u>Owens</u>
<u>Corning</u>, the Court has not ruled on the validity of the tort
claimants' fundamental premise.  It has merely begun to assemble
the necessary procedural components to test that premise.
Counsel for the debtor has objected strenuously to this course of
action, however, and clearly do not relish the path the
bankruptcy has been taking.  Their motion to recuse cannot be
considered in isolation from this history.

There has been little activity in the W.R. Grace bankruptcy
since the settlement of a major fraudulent conveyance action in
the fall of 2002.  The W.R. Grace Movants are, however, similarly
situated to the Owens Corning Movants in that they have acquired
bank debt of the debtor for speculative purposes.  All sides have
conceded the overlap of issues between the several chapter 11
cases.   While the circumstances may not be as suggestive as for
the other Movants, the inference is still easily drawn that these
Movants are opportunistically jumping on the band wagon to see if
a change of judge will improve their fortunes.

**2.    The Court of Appeals**

The Court will not review here all of the arguments made to
the Court of Appeals except as may be directly relevant to this
Court's management of the expedited discovery pursuant to the
remand.  The Court of Appeals reviewed the applicable law and the
arguments of the parties, but found that "a remand allowing for

13

discovery is necessary because the primary inquiry to which we

must respond . . . is 'whether a reasonable person <u>knowing all</u>

<u>the circumstances</u> would harbor doubts concerning the judge's

impartiality' - an inquiry which necessarily requires that we

know all the circumstances." 2003 WL 23010148 at *9 (quoting

<u>Jones v. Pittsburgh Nat'l Corp.</u>, 899 F.2d 1350, 1356 (3d Cir.

1990)).

The Court of Appeals added the following paragraph:

> We realize, of course, that our decision to remand
> this matter to Judge Wolin will result in some delay,
> which causes us great concern. Not only can delay have
> unintended (and undesirable) ramifications for the
> debtors-in-bankruptcy; it can have a much more personal
> effect on the asbestos claimants who have filed claims
> against the debtors-in-bankruptcy and their related
> entities. We nevertheless believe that a short delay
> so that an evidentiary record may be developed is to be
> preferred rather than making an ill-informed decision
> on allegations alone. In an attempt to reduce the
> delay, however, we will order that expedited discovery
> and Judge Wolin's ruling on the recusal motions be
> completed no later than January 31, 2004. While this
> might ordinarily be deemed too short a time for
> discovery, we believe that it is manageable under the
> district judge's guidance and supervision. Indeed,
> <u>Kensington's attorney advised us at oral argument that</u>
> <u>expedited discovery probably could be completed in two</u>
> <u>to three weeks.</u>

2003 WL 23010148 at *11 (emphasis added). The representation by

Kensington's attorney referred to by the Court of Appeals

occurred in the following colloquy:

> THE COURT: What is expedited discovery from your
> standpoint?
>
> MR. ENGLERT: . . . We had proposed to take
> discovery of Mr. Gross, of Mr. Hamlin, and of W.R.

Grace, of Mr. Gross and of Mr. Hamlin not so much about
the advice that they gave Judge Wolin as about whether
Judge Wolin knew of the conflict.  As one of my
adversaries said in response to a question by Judge
Smith today, "It is now undisputed that Judge Wolin
knew of the conflict."  So that's pretty much by the
boards from our standpoint.

THE COURT:  All right.  So that's the extent of
the discovery that you are seeking.

MR. ENGLERT:  Well, we also asked for discovery
from W.R. Grace because we wanted to know what role
Judge Wolin played in nominating Hamlin or Gross to be
futures representatives.  Mr. Inselbuch's time records
answer to that question to some extent.  It's like a
Rule 56 hearing.  I don't think we need to know that in
order to prevail on our mandamus petition.

THE COURT:  We haven't of course decided the issue
yet, but just so we can keep it in mind, what is the
time frame that you're talking about?

MR. ENGLERT:  We would hope that if there were any
discovery, at this point we don't think that there
should be, but we would hope that if there were to be
discovery, it can be conducted in a matter of a very
small number of weeks, two or three.

Court of Appeals Tspt. at 77-78.

Thus the Court of Appeals directed that "Among other things,
discovery in this case may shed light on such matters as (I) the
full extent of the consultants' activities in the Five Asbestos
Cases; (ii) Messrs. Gross and Hamlin's activities in G-I
Holdings; (iii) the timeliness of the Petitions for Mandamus; and
(iv) the extent to which recusal, if warranted in one of the
bankruptcies, must be held to extend to the other bankruptcies."
2003 WL 23010148 at *10.

## 3.    <u>Discovery Proceedings Before the District Court</u>

Five days after the Court of Appeals issued its Opinion and
Order, this Court convened a case management conference.   In
light of the representations previously made to the Court of
Appeals and the expectations clearly spelled out in that Court's
Opinion, the discovery demands made by the parties were
astonishing in their breadth and oppressiveness.   Anyone who had
harbored the illusion that these proceedings could be conducted
fairly and in good faith by counsel must inevitably have been
disappointed.   Indeed, this Court is satisfied that the conduct
of the parties validated the approach taken by this Court in
October when it initially moved to take control of the
proceedings.

The Court quotes from its Opinion delivered from the bench
that day:

> When the Court took the bench this morning, it had
> every intention of setting a very short discovery
> schedule.  The Court intended to leave it to counsel to
> serve their requests and, if necessary, to object as
> necessary.  The Court's long experience with the
> attorneys in these cases engendered confidence that
> their professionalism and their respect for the mandate
> of the Court of Appeals would lead them to seek
> discovery in an orderly and focused fashion to permit,
> with perhaps some nudging by the Court, the parties to
> complete the process and permit a decision by January
> 31, 2004.
>     What the Court has learned today shows that its
> confidence was misplaced.  <u>The movants here report that
> they have served document subpoenas on some twenty-six
> entities and persons, most of whom are lawfirms and
> many of whom represent asbestos claimants.  Well over a
> dozen depositions are sought.  None of these demands</u>

16

<u>were served upon counsel opposing this Court's recusal
in time for today's hearing.</u>

It is now apparent, and the Court so finds, that
the parties before it seek to divert this discovery
process to different purposes, purposes that are at
odds with their own representations to the Court of
Appeals, the order of that Court to assemble a record
with all possible speed, or in the interest of arriving
at true facts that will guide this Court or the Court
of Appeals.

At best, the discovery requests are a fishing
expedition.  Counsel for USG was unable even to
accurately identify what role the persons or entities
played in the cases before the Court, much less
articulate any specific relevance of the information
they might possess.  Doubtless counsel would appreciate
the opportunity to rummage though the files of these
law firms.  Many have been adverse to them for years in
hard fought personal injury litigation.  That is not
what the Court of Appeals intended to permit.

Moreover, <u>simply litigating the objections and
motions to quash that would result from these requests
would make compliance with the order of the Court of
Appeals impossible.  Counsel for W.R. Grace read from a
document request he received from the movants.  If it
is representative of the other document requests
served, and no-one contradicted that it was, issues of
privilege alone would dominate any real attempt to
discover relevant facts.</u>

More seriously, the obviously absurd breadth of
the discovery demands raises an inference as to the
movants' true aims.  The Court will speak plainly.  The
movants here intend that this Court deny their
discovery.  They intend to raise this denial before the
Court of Appeals in support of their inevitable renewed
petition for a writ of mandamus.  The Court has earned
its knowledge of how the asbestos bankruptcy world
works through hard, and, it believes, honorable
experience.  It need not pretend to itself nor to the
world that counsel conduct themselves with the decorum
of a church social.

And it is clear that they have not.  Before the
Court of Appeals, counsel for the petitioners
represented that they needed two depositions and some
minor document discovery.  Counsel now argue[] that
they only made this representation with respect to
their structural conflict issue.  Of course, this
argument makes no sense, because their structural

conflict argument was complete on the record already
before the Court of Appeals.  In any event, this Court
has read the transcript and the opinion of the Court of
Appeals, and finds that counsel has not accurately
reported what happened there.

It is perfectly clear that discovery cannot go
forward without the Court's active involvement and
supervision.  It is the Order of the Court that counsel
may not propound any discovery request without the
Court's specific approval.  All of the discovery
requests propounded to date in this matter are hereby
quashed, subject to the exceptions that will be set
forth on the record here.  It is not the Court's wish
to proceed in this manner.  As previously stated, it
was not this Court's intention to do so as late as this
morning.  Having attempted to convert the discovery to
their own parochial interests, counsel cannot be
further trusted to guide these proceedings.

District Court Tspt. of Dec. 23, 2003 (emphasis added).

Yet, notwithstanding the affront to both Courts involved,

this Court did not restrict the parties to that discovery they

claimed was necessary before the Court of Appeals.  On the

contrary, the Court permitted discovery substantially in excess

of the scope expressly contemplated by the Court of Appeals.  It

is true that the higher court's deadline set a practical limit to

the possible discovery that might be taken.  This practical

constraint was exacerbated by the fact that the contentiousness

of counsel required the Court's frequent personal involvement.

Simultaneous depositions were held at the courthouse under the

Court's direct supervision.  At least two, lengthy, on-the-record

telephonic hearings were conducted by the Court to rule on

emergent discovery disputes.

In sum, the pace of discovery has been furious.  Eight

18

depositions were taken for twenty hours over a two-day period.  A

tremendous volume of document discovery, approximating 25,000

pages, has been exchanged.  The Court, in denying requests for

discovery, has been guided by the principles of triage - less

relevant discovery has been denied to permit more relevant

discovery to be completed in the time available.  Patently

irrelevant and oppressive discovery has been denied on the

merits, and privileges asserted by the parties have been

considered and honored where appropriate.  While the Court has

already and will continue to express its disapprobation of the

conduct of the Motions by counsel, it is clear that with their

undoubted skill and experience an extra-ordinary amount has been

accomplished.

**LEGAL STANDARD**

**1.    Section 455(a) and (b)(1)**

Section 455(a) of the Judiciary Code provides that a judge

must disqualify himself "in any proceeding in which his

impartiality might reasonably be questioned."  Section 455(b)(1)

has two parts.  First, it requires recusal when the judge "has a

personal bias or prejudice concerning a party."  Second, it

requires recusal when the judge has "personal knowledge of

disputed evidentiary facts concerning the proceeding."

The Court pauses to restate the basics in the interest of

clarity.  Both 455(a) and prong one of 455(b)(1) are concerned

19

with the judge's bias.  Section 455(a) addresses the appearance
of bias.  Section 455(b)(1)(prong 1) addresses actual bias.
Edelstein v. Wilentz, 812 F.2d 128, 131 (3d Cir. 1987).  Prong
two of section 455(b)(1) address "personal knowledge" solely and
is on its face unconcerned with either the appearance or presence
of bias.

It has been observed that section 455(a) and (b)(1) of Title
28 afford separate yet overlapping grounds for disqualification
of a judge.  Andrade v. Chojnacki, 338 F.3d 448, 454 (5th Cir.
2003).  Subsection (a) serves as a catch-all provision, covering
circumstances that aren't specifically delineated by the other
subsections.  Id; see also Liteky v. United States, 510 U.S. 540,
552 (1994) ("section 455(a) expands the protection of § 455(b),
but duplicates some of its protection as well").

Actual impartiality is irrelevant under 455(a) because the
statute speaks only to the appearance of impartiality.  In
evaluating whether this appearance is present, the entire course
of judicial proceedings are looked at, rather than isolated
incidents.  Thus recusal is warranted when, through an objective
standpoint, "a reasonable man knowing all the circumstances would
harbor doubts concerning the judge's impartiality."  Eienstein,
812 F.2d at 131 (emphasis added); see also The Prudential Ins.
Co. Of Am. Sales Practices Lithog., 148 F.3d 283, 343 (3d Cir.
1998); United States v. Altar, 53 F.3d 568, 574 (3d Cir. 1995).

Before the Court can apply the objective standard set forth in the statute and <u>Eienstein</u>, it must understand both what set of facts the "reasonable man" is to be charged with knowing and what attributes this "reasonable man" is supposed to have.  The Court of Appeals has supplied the answer to the first question. <u>Eienstein</u> speaks of knowing "<u>all</u> the circumstances." 812 F.2d at 131 (emphasis added).  The Court of Appeals in this very case emphasized the phrase "<u>knowing all the circumstances</u>," 2003 WL 23010148 at *9 (emphasis in original), and remanded the matter to develop a record more substantial than that set forth in the parties' papers on the petition for mandamus.

It cannot be, therefore, that the appearance of impropriety depends on the facts as known immediately prior to the time the motion for recusal is filed.  Nor must the movant's factual allegations be assumed true.  "There is considerable authority for the proposition that the factual accuracy of affidavits submitted pursuant to 28 U.S.C. § 455 may be scrutinized by the court deciding the motion for recusal."  <u>United States v. Sciarra</u>, 851 F.2d 621, 625 n.12 (3d Cir. 1988) (citing <u>United States v. Alabama</u>, 828 F.2d 1532, 1541 (11th Cir. 1987); <u>Hamm v. Members of Bd. of Regents of Florida</u>, 708 F.2d 647, 651 (11th Cir. 1983); <u>In re International Bus. Machs. Corp.</u>, 618 F.2d 923, 927-29 (2d Cir. 1980); <u>Hinman v. Rogers</u>, 831 F.2d 937, 939 (10th Cir. 1987); <u>Phillips v. Joint Legislative Comm.</u>, 637 F.2d 1014,

1019 n.6 (5th Cir. 1981); see also 13A Charles A. Wright, Arthur

R. Miller, et alia, Federal Practice and Procedure, §§ 3542, 3550

(1984). Indeed, a judge may supplement the record and even

contradict such allegations with facts from the judge's own

knowledge acquired in the course of the proceedings.  Cooney v.

Booth, 262 F. Supp. 2d 494, 504 (E.D. Pa. 2003).  The Court

concludes that it must make its "reasonable man" determination

based upon all of the facts now assembled before the Court.

A less obvious question, and one which counsel have

indicated is not completely settled, is who the "reasonable man"

may be.  Is the reasonable person an experienced asbestos

bankruptcy attorney or a non-lawyer member of the public?

Counsel for the Owens Corning Movants conceded that the viewpoint

of the "man on the street" cannot be the legal standard.  Gross

Dep. at 235, line 16-18 (JA4264) (colloquy with the Court).  But

the Court need not definitively answer this question today.

Sufficient guidance appears in the purpose of the statute itself.

It is a truism that Section 455(a) exists to protect the

confidence of the participants and the public in the integrity of

the judicial system.  In a case of this kind, however, the issues

are complex, inter-related and highly technical.  Direct

representation of individual interests is attenuated though

layers of more and more specialized counsel and then committees

of counsel, intended to provide coherence to the positions of a

22

myriad, like-situated parties.  Many, perhaps most, critical events are a product of inter-party leverage and independent of any input from the Court.[3]

For these reasons, the Court will rule out the non-professional public from the potential candidates for the post of reasonable person.  It is likewise not appropriate in this case to consider the understanding of the non-specialized bar. Confidence in the integrity of the large-scale asbestos chapter 11 process will live or die in the precincts of those who actually practice it.  Few others can be expected to expend the effort to understand this frequently bizarre and arcane legal world.[4]

The Court would not for a moment diverge from the proposition that the ultimate goal is the public's confidence in the integrity of the process, a proposition to be given particular consideration where so many individual personal injury claims are at stake.  But where proceedings are by their nature inscrutable to outsiders, the wider world must rely upon those persons actually involved to report on those proceedings'

---

[3]    Resolution of allocation of compensation between current and future asbestos claimants and between the asbestos claimants and a debtor's other creditors is rarely a product of court intervention and has not been in any of the Five Asbestos Cases to date.

[4]    A presentation by a panel of experts at the most recent Third Circuit Conference underscores this statement.

23

capacity to produce a fair result.  It would be a pointless exercise and do no material good to judge the appearance of impropriety based on the standard of those who are unlikely ever to look or to understand if they did look.

The Court will not, however, narrow the concept of the reasonable person further.  An objective standard must include more that just the most sophisticated practitioner or the subjective opinions of those actually involved with the proceedings.  The Court finds only that the reasonable person in the context of this motion does not include laypersons or attorneys not conversant with the basics of mass-tort bankruptcy practice.  On the other hand, no more will be required.  The reasonable person is merely one with the professional skills and experience in mass-tort bankruptcies sufficient to understand the import of the facts presented.

The Court acknowledges the caution of the Court of Appeals in In re School Asbestos Lithog., 977 F.2d 764, 782 (3d Cir. 1992), that the recusal statute is tuned to the concerns of "people who have not served on the bench" and who "are often all too willing to indulge suspicions and doubts concerning the integrity of judges."  The School Asbestos Court was writing of the level of sensitivity with which appearance of impropriety must be judged, not the complexity or technical nature in which those facts might arise.  In School Asbestos, the appearance of

24

impropriety of the judge appearing at a plaintiff-funded
conference was simple enough for anyone to grasp.  This Court
does not suggest that a less sensitive threshold for recusal
should obtain in mass-tort asbestos bankruptcies, only that the
hypothetical reasonable person whose sensitivities might be
offended should possess sufficient expertise to understand the
situation presented.

The Supreme Court has made clear that the ultimate question
in any bias inquiry is whether, either in appearance or
actuality, the judge harbors "a deep-seated favoritism or
antagonism that would make fair judgment impossible."  Liteky,
510 U.S. at 555.  Forming judgments about the positions of
parties in litigation is, of course, the heart of a judicial
officer's role.  "'If the judge did not form judgment of the
actors in those court-house dramas called trials, he could never
render decisions.'"  Id. at 551 (quoting In re J.P. Linahan,
Inc., 138 F.2d 650, 654 (2d Cir. 1943)).  Historically, the law
differentiated between judicial opinions properly acquired and
illegitimate bias by holding that the term "bias" covered those
judicial views derived from information gained outside the
proceedings before the Court, the so-called extra-judicial source
doctrine.

Although previous jurisprudence applying the federal recusal
statutes had found that an extra-judicial source of information

25

was a <u>sine qua non</u> of recusal, the Supreme Court found in <u>Liteky</u>, 510 U.S. at 554-55 (1994) that an extra-judicial source was merely a significant factor in judging the presence of a disqualifying bias under section 455(a).  The Third Circuit has confirmed that the extra-judicial source is not outcome determinative.  <u>SEC v. Altar</u>, 71 F.3d 97, 101 (3d Cir. 1995).  "The most critical factor is not the source of the judge's prejudicial knowledge or bias, but rather the judge's [apparent] 'inability to render fair judgment.'"  <u>Id.</u> at 102 (quoting <u>Liteky</u>, 510 U.S. at 551).

The Movants argue under section 455(a) that this Court should recuse itself for an appearance of bias.  This appearance is alleged to result from advice the Court is supposed to have received from advisors with an interest in the outcome of the litigation and from extra-judicial information received from <u>ex parte</u> communications with the parties.  No party claims that this Court has exhibited actual bias or prejudice concerning a party.  Therefore, with respect to section 455(b)(1), the Movants rely solely on the second prong condemning "personal knowledge of disputed evidentiary facts concerning the proceeding."

On its face, section 455(b) creates a more rigid regime.  In contrast to section 455(a), section 455(b)(1) posits judicial knowledge as a stand-alone factor; its plain language requires recusal <u>whenever</u> the judge acquires "personal knowledge of a

26

disputed evidentiary facts concerning the proceeding." There is no objective "reasonableness" standard in the statute. Plainly, actual knowledge controls, not the reasonable appearance thereof. In addition, as Movants have emphasized, grounds for recusal under section 455(b) cannot be waived. 28 U.S.C. § 455(e).

Yet it is immediately apparent that the facade is not as seamless as it appears. First of all, the proscribed "personal knowledge" must derive from an extra-judicial source. Whether this is a function of the adjective "personal"[5] or simply a matter of logic, it cannot be that knowledge acquired in the subject judicial proceeding itself would disqualify the judge.

Application of this rule requires an understanding of where the boundary lies between a judicial and an extra-judicial source. Facts learned in off-the-record conferences with the parties are not derived from an extra-judicial source under this rule. United States v. Bailey, 175 F.3d 966, 969 (11th Cir. 1999); see also United States v. Page, 828 F.2d 1476, 1480-81

---

[5]    In Liteky, Justice Scalia found that the word "personal" lacked content when used in connection with "bias" in section 455(b)(1). 510 U.S. at 449-50. This Court believes that "personal" has more bite when used in connection with "knowledge," even though consistency in statutory interpretation would hold that "personal bias" and "personal knowledge" are similarly imprecise. See Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc., 991 F.2d 1249, 1255 (7th Cir. 1993) (concluding "'[p]ersonal' knowledge of evidentiary facts means 'extrajudicial'"). For the reasons expressed in the text, the Court need not rely on the adjective in finding an extra-judicial source limitation to the proscribed knowledge.

(10th Cir. 1987) (prosecutor's <u>ex</u> <u>parte</u> chain-of-custody letter
not extra-judicial source of information in context of dispute
over <u>Brady</u> material).  It is settled that personal knowledge
gained in a related proceeding will not disqualify the judge
under section 455(b)(1).  <u>Clifford v. United States</u>, 136 F.3d
144, 148-49 (D.C. Cir. 1998); <u>In re Grand Jury 95-1</u>, 118 F.3d
1433, 1438 (10th Cir. 1997).

     The cases have construed the "disputed evidentiary fact"
element narrowly, looking to whether a specific, disputed fact at
issue in the case was within the judge's prior, non-judicially
acquired knowledge.  <u>See</u>, <u>e.g.</u>, <u>United States v. DeTemple</u>, 162
F.3d 279, 285 (4th Cir. 1998) (prior knowledge of defendant's
single debt acquired in judge's previous representation of the
defendant as attorney did not constitute knowledge of defendant's
financial condition); <u>Diamondstone v. Macaluso</u>, 148 F.3d 113, 121
(2d Cir. 1998) (judge's knowledge of litigant's participation in
peace demonstration only "tangentially relevant" to civil rights
claim arising from refusal to produce auto insurance card).  In
<u>United States v. Boyd</u>, 208 F.3d 638, 646 (7th Cir. 2000), <u>vacated
on Apprendi grounds</u>, 531 U.S. 1135 (2001), the judge properly
refused recusal despite knowledge of the subject conspiracy
gained as director of state police where he had no extra-judicial
knowledge of the particular defendant's connection to the
conspiracy.

28

The general tenor of the case law holds that extra-judicial knowledge gained through participation in general policy-making will not disqualify a judge from hearing a particular case under the personal knowledge prong of 455(b)(1).

> Supreme Court judges have refused to disqualify themselves from passing on legislation or regulations even when, as legislators, they were instrumental in drafting the law. Both Justices Black and Frankfurter participated in cases interpreting groundbreaking labor reform legislation that they had been instrumental in drafting. Similarly, Chief Justice Vinson sat in cases involving tax legislation that he had drafted as a member of Congress. Justice Jackson "participated in a case raising exactly the same issue that he had decided as Attorney General (in a way opposite to that in which the Court decided it)." Chief Justice Hughes wrote the opinion overruling Adkins v. Children's Hospital of D.C., in spite of having written a book that seriously criticized that decision.

Wessman v. Boston Sch. Comm., 979 F. Supp. 915, 917 (D. Mass. 1997)(citing and quoting Laird v. Tatum, 409 U.S. 824, 830 (1972) (Rehnquist, J., Mem.)(further citations omitted); see also Mistretta v. United States, 488 U.S. 361, 406-07 (1989) ("That federal judges participate in the promulgation of Guidelines does not affect their or other judges' ability impartially to adjudicate sentencing issues."); Laird, 409 U.S. at 835 ("Proof that a Justice's mind at the time he joined the Court was a complete tabula rasa in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias."); United States v. Voccola, 99 F.3d 37, 41-43 (1st Cir. 1996) (judge's participation in a commission investigating fraud in

29

financial institutions did not mandate recusal in case where
defendant was accused of such fraud); Ivy v. Diamond Shamrock
Chems. Co. (In re "Agent Orange" Product Liab. Lithog.), 996 F.2d
1425, 1438-39 (2d Cir. 1993) (fact that judge was the manager of
a settlement fund, the validity of which was at issue in the
litigation, did not mandate recusal); Schurz Communications, Inc.
v. Fed. Communications Comm'n, 982 F.2d 1057, 1061 (7th Cir.
1992) (judge not required to recuse himself where, as law
professor, he had given an affidavit in a previous case
concerning the same general question at issue in case before him
as judge); United States v. Glick, 946 F.2d 335, 336-37 (4th Cir.
1991) (fact that judge was Chairman of the United States
Sentencing Commission does not preclude judge from hearing case
in which sentencing guidelines were at issue); United States v.
Payne, 944 F.2d 1458, 1476-77 (9th Cir. 1991) (recusal not
required where judge had previously served on Attorney General's
Commission on Pornography and case before him involved sexual
abuse of child); In re Wyoming Tight Sands Antitrust Cases, 726
F. Supp. 288, 291-92 (D. Kan. 1989) (holding that judge's
previous testimony before the Federal Power Commission did not
mandate recusal in case involving similar issue on which judge
testified).  Indeed, "Courts have uniformly rejected the notion
that a judge's previous advocacy for a legal, constitutional, or
policy position is a bar to adjudicating a case, even when that

position is directly implicated in the case before the court."
Carter v. West Pub. Co., 1999 WL 994997, *9 (11th Cir. 1999)
(Tjoflat, C.J., supplementing pro forma order).

It is observed that information learned from published
sources is not subject to the personal knowledge ban, because
counsel are expected to be aware of and to have the opportunity
to challenge such sources in the adversarial process.  See
Liteky, 510 U.S. at 554 ("some opinions acquired outside the
context of judicial proceedings (for example, the judge's view of
the law acquired in scholarly reading) will not suffice.")
However, quite apart from published sources, cases hold that
knowledge of garden-variety facts that have not been published or
otherwise disseminated will similarly not disqualify if the judge
learned them merely as a member of the public.  For example, the
knowledge gained by a judge who, as a member of the public,
attended the trial of the defendant's fellow gang-member did not
require recusal.  In re Hatcher, 150 F.3d 631, 635 (7th Cir.
1998).  The judge "learned nothing about the Gangster Disciple
conspiracy that any member of the public could not also have
learned by attending the trial or reading a good newspaper
account of its progress."  Id.; see also Diamondstone, 148 F.3d
at 120 (lower court denied recusal in part because knowledge of
litigant's participation in peace vigils open to any passing
member of public).

31

Most fundamentally, disqualification "'must have a reasonable basis'" and while "'[l]itigants ought not [to] have to face a judge where there is a reasonable question of impartiality,'" they are also "not entitled to judges of their own choice." Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 162 (3d Cir. 1993) (quoting 93d Cong., 2d Sess. 5 (1974) House Report reprinted in 1974 U.S.C.C.A.N. at 6351, 6355 (hereinafter "House Report") (alteration in original). A mere fear of impropriety is not enough. United States v. Walker, 920 F.2d 513, 517 (8th Cir. 1990). Both the judge and the reviewing court "'must be alert to avoid the possibility that those who would question [the judge's] impartiality are in fact seeking to avoid the consequences of [an] expected adverse decision.'" Alexander, 10 F.3d at 162 (quoting House Report at 6355).

This Court will not indulge a presumption either in favor or against recusal. Contra Cobell v. Norton, 237 F. Supp. 2d 71, 78 (D.D.C. 2003). Rather the Court will exercise its most considered judgement, weigh the arguments of both sides equally, and heed the admonition that "a judge is as much obliged not to recuse himself where it is not called for as he is obliged to when it is." In re Allied-Signal, Inc., 891 F.2d 967, 970 (1st Cir. 1989).

## 2.   Timeliness of the Motions

Even though the statute does not impose an explicit time requirement for filing a motion to recuse, the Courts of Appeals of most Circuits require that a motion under 455(a) be timely. United States v. York, 888 F.2d 1050, 1054 (5th Cir. 1989); E.& J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1295 (9th Cir. 1992); United States v. Slay, 714 F.2d 1093, 1094 (11th Cir. 1983); Taylor v. Vermont Dept. of Educ., 313 F.3d 768, 794 (2d Cir. 2002); Willner v. University of Kansas, 848 F.2d 1023, 1028 (10th Cir. 1988); United States v. Mathison, 157 F.3d 541, 545 (8th Cir. 1998); United States v. Owens, 902 F.2d 1154, 1155-56 (4th Cir. 1990). This requirement forces litigants to raise the question of recusal at a reasonable time in order to prevent "knowing concealment of an ethical issue for strategic purposes." York, 888 F.2d at 1055; E. & J. Gallo Winery, 967 F.2d at 1295 (absence of timeliness requirement would create "heightened risk that litigants would use recusal motions for strategic purposes").

However, preventing tactical recusal litigation is only one interest at stake. Another reason for imposing a timeliness requirement is to avoid wasting judicial resources. York, 888 F.2d at 1054. Generally the party seeking disqualification must do so at the earliest opportunity after the facts upon which the motion for recusal is based become known. United States v.

33

Vadner, 160 F.3d 263, 264 (5th Cir. 1998); Apple v. Jewish Hosp.
& Med. Ctr., 829 F.2d 326, 333 (2d Cir. 1987).  Of course, the
most egregious delay is one where the moving party, knowing all
the facts and circumstances upon which the recusal is based,
waits until after an adverse ruling has been made.  Id.  But,
because there is no formula for how much time can elapse between
learning of the facts upon which a recusal motion is made and the
date of filing, several factors are looked at in determining
whether any delay was reasonable.  Apple, 829 F.2d at 333-34.
These include whether: "(1) the Movants has participated in a
substantial manner in trial or pre-trial proceedings, (2)
granting the motion would represent a waste of judicial
resources, (3) the motion was made after the entry of judgment,
and (4) the Movants can demonstrate good cause for delay."  Id.
at 334 (internal citations omitted).

    In In re Big Rivers Elec. Corp., 213 B.R. 962 (Bankr. W.D.
Ky. 1997), the bankruptcy court found that an order appointing an
examiner and disclosing the Court's intent to engage in ex parte
communications with the examiner made it the law of the case that
such communications were proper.  Indeed, the court went on to
find that the information learned was not even from an extra-
judicial source where the order "made clear that administration
of the bankruptcy proceedings would require the Court to consider
the factual analysis and recommendations of the Examiner."

Id. at 976; see also United States v. Yonkers Bd. of Educ., 946
F.2d 180, 184 (2d Cir. 1991) (ex parte information to enforce
housing desegregation order acquired within court's judicial
capacity); Cobell v. Norton, 237 F. Supp. 2d 71, 91 (D.C. Cir.
2003) (supervisory communication with judicial appointee, citing
Big Rivers). However, the real thrust of Big Rivers was the
failure of the parties to object to or appeal the order
appointing the examiner. 213 B.R. at 972.

Some circuits impose a timeliness requirement upon § 455
generally, some explicitly require timeliness under both
subsection (a) and (b), and others draw a distinction between (a)
and (b) for the purposes of timeliness. York, 888 F.2d at 1054
n.6; compare Summers v. Singletary, 119 F.3d 917, 920 (11th Cir.
1997) (extending timeliness requirement to subsection b) with E.
& J. Gallo Winery, 967 F.2d at 1295; Taylor, 313 F.3d at 794;
Mathison, 157 F.3d at 545; Owens, 902 F.2d at 1155-56 (all
applying timeliness requirement to section 455 generally) with
Willner, 848 F.2d at 1028 (distinguishing between subsection (a)
and (b) and applying timeliness requirement to subsection (a)).

The Movants argue vigorously that because the parties may
not consent to waive grounds for recusal under subsection (b),
there can be no timeliness requirement under that subsection.
See 28 U.S.C. § 455(e). The Court believes that this position
neglects important differences between the no-waiver rule and the

35

timeliness requirement.  Important institutional values require the recusal of a judge suffering from actual bias, extra-judicial knowledge or self-interest.  The parties' preferences weigh little in the face of these values.  Yet, as explained in Summers, the no-waiver rule is outcome neutral because any waiver that would have occurred absent the rule would have been agreed to by all parties.  That consensus would be unattainable where the litigation had advanced sufficiently to permit one or another party to perceive an advantage in refusing to waive.  119 F.3d at 920 (citing York, 888 F.2d at 1055).  Lack of a timeliness requirement, on the other hand, would permit a disappointed litigant to upset the result unilaterally.  Not only would this create an unfair advantage, but a far more serious waste of resources must result where a litigant moves for recusal after the proceedings are well advanced and particularly after a trial has been completed.  York, 888 F.2d at 1055.  The no-waiver rule will have no effect in this circumstance, because, as noted, waiver will be unattainable in any event when the proceedings are so far advanced.

Thus waste of judicial resources, prejudice to the non-movants and manipulation of the outcome are important institutional interests not implicated by the no-waiver rule. These interests must be weighed against the solemn interests protected by the substantive provisions of subsection 455(b).

The critical point is that these interests are threatened by a late recusal motion independent of any finding that the late Movants knew of the grounds for recusal and intentionally withheld them.  Where this latter type of gamesmanship is evident, the threat to the institutional interests requiring timely motions for recusal are only more acute.

Therefore, the Court will reject the arguments of the Movants based upon section 455(e).  "[P]olicy reasons supporting a timeliness requirement appear to be stronger than those supporting a waiver option.  Hence, we conclude that it is more consistent with the legislative purposes underlying the entirety of section 455 for us to construe both subsections (a) and (b) as requiring timeliness."  York, 888 F.2d at 1055.  Consistent with a majority of the Courts of Appeals to have ruled upon the issue, Summers, 119 F.3d at 920, this Court holds that a motion based upon section 455(b)(1) must be timely raised.

**DISCUSSION**

1.  **The Court Appointed Advisors**

    a.    **The Role of the Court Appointed Advisors and Their Communications with the Court.**

The Owens Corning and W.R. Grace Movants contend that recusal is necessary based upon the existence and role played by certain advisors to the Court, appointed pursuant to this Court's Order of December 28, 2001. (JA2176).  The argument before the Court of Appeals revealed some puzzlement on the part of panel

members regarding the Advisors, which puzzlement has not been remedied by the submissions of the parties to date. Therefore, to provide context to the discussion of the legal arguments raised, and to complete the record before the higher court, this Court will digress with a brief history of the Advisors and their function.

It has been stated by counsel, and this Court with humility will concede, that the Court assumed control over the Five Asbestos Cases as a neophyte in mass-tort asbestos bankruptcies. Moreover, Chief Judge Becker's assignment of these five cases to a single court created an unprecedented concentration of authority over nation-wide asbestos litigation. See Tspt. of Chief Judge Becker, dated Nov. 27, 2001 at 4 ("a significant portion of the asbestos cases in this country are proceeding under the aegis of this litigation"). Innumerable judicial and scholarly authors have bemoaned the intractable nature of the asbestos problem and the difficulties of case management it presents.

The Chief Judge in his transcribed remarks accompanying the appointment called for "a management plan to try to make a quantum leap forward in the interest of the sound administration of these cases" and "a coordinated plan for management [to] be developed and implemented." Id. at 3, 4. The Court accepted Chief Judge Becker's assignment and his mandate to change how

38

asbestos bankruptcies had been handled to date.

First in the order of business was to educate the Court. Despite the size of the cases, the asbestos bankruptcy bar is small and highly specialized.  Its major players have been involved for years, even decades.  Multiple representation is common.  To take only the example of the most prominent members of the bar involved, Mr. David Bernick represents the debtor, W.R. Grace & Co., but also represented the Big Three automakers in their bid to bring asbestos claims against them into the Federal-Mogul bankruptcy as indemnification creditors.  Mr. Lewis Kruger represents the unsecured creditors committees in two of the Five Asbestos Cases.  Mr. Elihu Inselbuch represents the asbestos claimants committees in all of the Five Asbestos Cases. Ms. Joanne Wills represents the asbestos property damage claimants in the Armstrong World Industries bankruptcy, and the W.R. Grace Movants in this proceeding.  Partners of Mr. John Gibbons, of Gibbons, Del Deo, Dolan, Griffinger and Vecchione, counsel to the Owens Corning Movants, have represented or appeared in each of the Five Asbestos Cases.[6]

In addition, the Court was confronted in its very first days of presiding over the Five Asbestos Cases with a crisis--the

---

[6]     Space precludes listing all of the many inter-relations of counsel, suffice it to say that the Court is not satisfied that it has learned even yet where all the many threads in the knot may lead.

previously mentioned motion of the Big Three automakers in the
Federal Mogul bankruptcy.  Numerous other automakers and
manufacturers joined in this motion, each Movants seeking to
import thousands and tens of thousands of individual personal
injury asbestos lawsuits into the existing single chapter 11
proceeding, transferring these cases wholesale from federal
district courts around the country.  Even the simple step of
providing legally sufficient notice to each of these claimants
required unorthodox methods of case management.

The Court believes it rose to the occasion and the results
are reported at In re Federal-Mogul Global, Inc., 282 B.R. 301
(D. Del.), appeal dismissed, mandamus denied, 300 F.3d 368 (3d
Cir. 2002), cert. denied, 537 U.S. 1148 (2003).  It was apparent,
however, from the first that, if the Court did not quickly learn
how to manage these cases, these cases would manage the Court.
In that event, Judge Becker's hopes that "a sound management plan
can be developed that can really move these cases forward," Tspt.
of Chief Judge Becker at 5, would come to naught.

It was for these reasons that the Court appointed the
Advisors in its Order of December 28, 2001.  (JA2533.)  At oral
argument, the Court of Appeals noted that it is difficult to
determine from this Order exactly whether the Advisors' role was
one familiar to the courts, such as special masters or court-
appointed experts, or whether some new function was contemplated.

40

The truth of the matter is that the Court did not at that time know how it would use the Advisors.  No specific responsibilities were delegated at that time.  The exception was Mr. Dreier who was named as special master in the W.R. Grace case, although no particular task within that chapter 11 proceeding was specified for him in the December 28, 2001 Order.

The kind of people the Court appointed shows what need they were intended to fill.  Messrs. Dreier, Keefe and Hamlin are all former judges of the Superior Court of New Jersey with some seventy years combined experience on the bench.  Keefe was at one time charged with managing all asbestos litigation in New Jersey. Keefe Dep. at 10, 13 (JA5485).  Dreier is the author of the principle treatise on products liability in New Jersey.  Hamlin had responsibility for overseeing New Jersey's mass tort cases and managing its asbestos calendar.  Hamlin Dep. at 223-24 (JA4860).

Professor McGovern is one of the most prominent authorities in the nation on mass and toxic tort litigation.  He has been appointed as a neutral by over thirty federal and state judges. McGovern has served on or assisted numerous judicial committees, including as special reporter and consultant to the working group of the Judicial Conference formed at the direction of Chief Justice Rehnquist to study mass torts.  The Report on Mass Tort Litigation 1-2 (1999).  Mr. Gross has acted as defense counsel in

41

some of the most important mass tort, product liability and complex litigation matters of the last forty years.  Notably, he was national defense counsel to Johns-Manville Company, (JA2213), whose asbestos related bankruptcy formed the proto-type for the current asbestos bankruptcy statute, 11 U.S.C. § 524(g).

As events progressed, it became clear to the Court that the primary service this distinguished group could render was to give the Court the necessary background to understand the proceedings before it.  The use of the Advisors as special masters was circumscribed by Bankruptcy Rule 9031 which excepts Rule of Civil Procedure 53 from operation in cases under the Bankruptcy Code. As the Five Asbestos Cases progressed, the Court deployed certain of the Advisors as special masters in particular proceedings only, and with the consent of all parties.  See Order of Jan. 17, 2002 (Hamlin in USG); Order of Feb. 27, 2002 (Keefe in CCR litigation); Order of March 12, 2002  (Dreier in W.R. Grace/Sealed Air Lithog.); Order of Sept. 12, 2002 (Keefe in Federal-Mogul/Dresser Indus. Lithog.); Order of Dec. 23, 2002 (Dreier in Owens Corning/Substantive Consolidation motion). Likewise, the Advisors acted as mediators only upon a supplemental appointment of either this Court or the Bankruptcy Court.  E.g., id. (McGovern in Owens Corning).

In short, this Court can report to the Court of Appeals that the Order appointing the Advisors had very little effect at all

42

beyond identifying a cadre of talent and experience which could be drawn upon as the need arose. The language employed did not empower the Advisors to do anything except as responsibilities were subsequently delegated to them by the Court. As the Five Asbestos Cases unfolded, this precatory language did no more than provide notice to all interested parties that the Court in the future might use one or more of the Advisors to undertake specific tasks as indicated by the examples listed.

C. Judson Hamlin was appointed as the futures claimants representative in In re G-I Holdings on October 10, 2001, prior to his appointment by this Court as an Advisor. David R. Gross, on the other hand, was appointed counsel to Hamlin in G-I Holdings after his appointment as an advisor by this Court. Tspt. of Jan. 16, 2004 at 15, line 23 to 16, line 20; Order of Oct. 10, 2001 (appointing Hamlin as Futures Representative in G-I Holdings) (JA80-82). Therefore, at the time of Gross's appointment by this Court he was not a conflicted advisor as that term has been used by the Movants.

The Advisors' distinguished roles in asbestos litigation has never been challenged by the parties. Nor were their roles in the Five Asbestos Cases challenged for twenty-two months. Their most important task was to serve as a resource to the Court and to inform the Court of the vast landscape of asbestos related issues that would permit the Court to make reasoned case

management decisions.   (JA4049-51; JA4214; JA4864.)   A multitude of asbestos related issues were explored.

The parties have clashed over whether the substance of the Court's meetings with the Advisors is properly characterized as discussions or advice.  A discussion is "consideration of a subject by a group; an earnest conversation."  See American Heritage College Dictionary 397 (3d edition 1993).  Advice on the other hand is defined as an "opinion about what could or should be done about a situation or problem."  Id. at 20.  The discussions held between the Court and its Advisors were general, earnest conversations about an extraordinarily complex area of the law.  They did not constitute advice as that term is generally understood.

Notwithstanding the contrary protestations by the Movants, this is borne out by the evidence of record.  It is true that, during their depositions the terms advice or advisor were intermingled with their roles as consultants.  However, reading their testimony fairly and in its totality establishes that at no time did they provide the Court with substantive advice as to any legal issue reserved for the Court to decide.

For example, the advisors repeatedly testified as to the complete absence of any discussion related to claim validity and claim valuation.  (JA4101; JA4272; JA4299; JA4857-58; JA4864; JA4874.)  The core task of any futures representatives is to

44

determine claim validity and claim valuation for a class of
individuals who after a period of latency find themselves
stricken with an asbestos related disease.   Though compensation
may be deferred, the creation of the fund to compensate these
individuals must be contemporaneous with plan confirmation and,
by law, that fund must treat future claimants "in substantially
the same manner" as present claimants are treated.   11 U.S.C. §
524(g)(2)(B)(ii)(V).   More generally, a future claimant, like the
other asbestos personal injury tort claimants, is interested in
obtaining a fair valuation of their claims.

In none of the Five Asbestos Cases, however, has a trust
disposition plan been presented to the Court for confirmation.
The issues of claim valuation and future claimant versus present
claimant equivalence have been neither briefed nor joined.[7]
Owens Corning is currently consumed with the issue of substantive
consolidation.   USG is struggling with the approval of a cancer-
only claim form and bar date.   W.R. Grace awaits approval of the
settlement in the Sealed Air fraudulent conveyance proceeding and
a determination of its home insulation responsibility currently
pending before Judge Fitzgerald.   Federal-Mogul, which is absent
from the proceedings on the Motions, is mired in a host of

---

[7]      Although Armstrong awaits the District Court's
confirmation of its plan, the debtor has acknowledged that the
District Court played no role in the allocation between present
claimants and future claimants of the funds provided for in the
trust disposition plan.

internal problems both domestically and internationally.

Thus, to contend that Hamlin's and Gross's discussions with the Court were tainted because of their activities in <u>G-I Holdings</u> is to misunderstand the stage to which these jointly administered cases have progressed. None of them have matured to the point that claim validity, claim valuation or equivalence is ripe for discussion. Neither Hamlin nor Gross have been disloyal to their charge in <u>G-I Holdings</u>, and they have explicitly testified that if the subject of claim valuation and claim validity had arisen in the Five Asbestos Cases they would not have participated. (JA4853; JA4861.) The allegation of taint is illusory.

The parties have focused attention on the notes taken at the meeting of the Advisors and the Court on January 18, 2002, by Ms. Whitney Chelnick, a junior attorney employed by Gross.[8] Chelnick's notes of that meeting suggest that there was a consensus among the consultants that the fraudulent conveyance

---

[8]    It is worth noting that Chelnick's notes as well as deposition testimony indicate that the Court missed a substantial part of the January 18, 2002 meeting.

As a whole, Chelnick's notes pose an interesting problem of double hearsay. The USG Movants have argued that Chelnick's notes are not hearsay because they are not adduced to prove the truth of any statement made at the meeting but only that it was made. This is error. The Chelnick notes themselves purport to recount what was said. That is what they are being introduced to prove. However, in a further exercise of caution and lenience, the Court will overlook the evidentiary problems with these notes and consider them on their merits.

issues be approached first in the W.R. Grace case.  The W.R.
Grace Movants argue that Chelnick's notes provide evidence that
the Court received substantive advice from its consultants in
that regard.  The notes say what they say, but the parties are
inaccurate as to their conclusions.

It should be recalled that none of the Advisors are
bankruptcy lawyers and they possessed no knowledge of substantive
bankruptcy law or procedure.  Rather they were selected for their
knowledge of the history of asbestos litigation.  What Chelnick's
notes refer to was the Court's report to the Advisors that the
Court intended to pursue the fraudulent conveyance claim and the
Court's explanation for its decision.  It was the Court reporting
its decision to the Advisors that Chelnick recorded, not the
Advisors urging that course on the Court.

Regardless of the accuracy of Chelnick's notes or even the
Court's recollection as to what occurred, to proceed with the
fraudulent conveyance actions made good sense.  Because of the
Court's decision the W.R. Grace estate will be enriched to the
tune of approximately $1 billion dollars.  The Court deserves
praise for this accomplishment, not condemnation.  This slender
reed of attack by the movants in an attempt to conjure up
arguments to recuse the Court breathes life into the old adage
that no good deed should go unpunished.

The overwhelming tenor of these meetings was general policy

47

and historical background information for the Court.  All or most
of this information was available to the Court from other
sources, although, as Gross and McGovern testified, the process
might have consumed years and the information may have included
much unwritten custom and practice.  The Court's review of the
case law indicates that judicial knowledge of facts available to
the public is not forbidden.  Logic suggests that acquiring
knowledge that would have come to the Court in any event cannot
justify recusal.  Finally, the law is clear that involvement of a
court with questions of policy does not constitute "personal
knowledge of disputed evidentiary facts."  The Movants seize on
isolated references in the record to argue that the Advisors were
impermissibly telling the Court how to rule.  They were not.

     Beyond what occurred at the meetings between the Court and
the Advisors is the reality that the Advisors met as a group on
only four occasions totaling eighteen hours over a period of five
months.  Ms. Wills, counsel for the W.R. Grace Movants represents
that the correct figure should be "more than 300 hours in ex
parte consultations with [the Court's] advisors."  W.R. Grace
Movants Brf. at 21.  This figure is completely divorced from the
Court's own experience and it is at a loss to imagine how such a
total might have been derived.

     After May, 2002, the Advisors as a group became functionally
obsolete despite their de jure existence.  Keefe Aff. ¶ 3

                              48

(JA2258); Dreier Aff. ¶ 6(a)(I) (JA2252-53).  Unfortunately, due
to the press of more weighty business, the Court neglected to
dismiss the Advisors by formal order.  Had the motions for
recusal not been filed in early October a formal order of
disbandment would have been filed.  If the Court of Appeals
sustains this Court's decision not to recuse itself, the Court
will vacate the December 28, 2001 Order.

Counsel for the Grace Movants complain that outsiders have
no ability to know what the Court's consultants have discussed
with the Court and therefore they are at a disadvantage.  Tspt.
of Jan. 16, 2004 at 44.  This contention is difficult to maintain
in light of the extra-ordinary access the parties have had in the
course of these Motions, including a complete, express waiver by
the Court of any privilege or confidentiality it might possess
regarding communications with its advisors.  It hardly lies in
the Movants mouths to complain of lack of transparency prior to
the Motions when, leaving aside for the moment the alleged G-I
Holdings conflict, all knew of the existence of the Advisors,
their background and the need to educate the Court.

The bottom line is that in this age of information as it
explodes into our society from countless sources, electronic as
well as traditional, the District Court cannot be limited to what
counsel choose to present to the Court.  Certainly, such an
artificial constraint on the Court's knowledge is incompatible

with the type of case management envisioned by Chief Judge
Becker.  The best gauge of the propriety of this Court's
management of the Five Asbestos Cases is the numerous Opinions,
Orders and Case Management Orders posted on the Delaware
bankruptcy website.  It is through these instruments that the
Court speaks to the wider world, and the Court is confident that
they duly answer any question over the Court's partiality.

  **b.** **Meetings of the Futures Representatives**.

  In their brief and at oral argument before the District
Court held on January 16, 2003, the Owens Corning Movants
introduced an argument not previously made before this Court or
the Court of Appeals on December 12, 2003.  That argument expands
the alleged taint of non-neutral advisors from Hamlin and Gross
to Professor McGovern.  The Movants allege that McGovern attended
meetings with future representatives on a regular basis to
provide oversight on the pending legislative efforts surrounding
the Fairness in Asbestos Litigation Act.  They claim that
McGovern lost his status as a neutral consultant to the Court as
a result, and the taint that colors the services of Hamlin and
Gross now likewise touches McGovern.  Thus, Movants contend,
McGovern's input as an academic on the proposed legislation and
the attendance of Hamlin and Gross has or will harm the public's
confidence in the judiciary and cause doubts concerning the
impartiality of any judge they might serve, regardless of the

judge's unbiased behavior.  Tspt. of Jan. 16, 2004 at 24, 25;
Kensington Brf. at 2-3.  The Court rejects this argument.

Throughout 2002 and 2003, Hamlin and Gross attended a series
of meetings of futures representatives at varying locations.
Notwithstanding the Movants' characterizations to the contrary,
these meetings were held at irregular intervals and consisted
mainly of discussions about the legislative position the futures
representatives should take on behalf of the futures class of
claimants in testimony before the Congress of the United States.
Additionally, there were status reports as to the progress of the
various asbestos bankruptcy cases in which the futures
representatives were involved.

In their deposition testimony Hamlin, Gross and McGovern
explained their roles at these conferences.[9]  Hamlin testified
that he recalled three meetings, in New York, Washington and
Philadelphia.  In the Philadelphia conference, he participated by
telephone.  He characterized his participation in these
conferences as brief, Hamlin Dep. at 102, line 14 (JA4830), and
that the main purpose of these conferences was to discuss the
proposed legislative solution to asbestos liability.  Id. at 98,
line 20, 102, line 14 (JA4829).

---

[9]    The Court permitted discovery into this area at the
request of the Movants, although it is completely unrelated to
those areas of inquiry they represented to the Court of Appeals
would be necessary to decide the Motions or contemplated by the
Opinion of that Court.

Moreover, and of greater import, is the fact that the prospect of legislation was not remotely relevant to the work Hamlin was doing as a consultant to the Court in these cases. Id. at 263, line 2 (JA4870). Hamlin did not regard his participation in these futures representatives' conferences as a conflict, an appearance of conflict, or an appearance of impropriety. Id. at 264, line 1-12 (JA4870). Additionally, neither Hamlin or Gross assisted other future representatives in developing their legal strategies in cases pending before this Court. Id. at 278, line 10-24 (JA4874).

Gross likewise attended meetings of futures representatives and characterized his contributions as "Probably none. Not because I don"t remember. I don't think I made any contributions." Gross Dep. at 256, line 6-7 (JA4269). Gross further testified that in the context of these meetings he did not formulate an opinion about the legislation. Id. at 10 (JA4269). Gross flatly denied providing any assistance to other futures representatives in developing their legal strategies in cases pending before this Court. Id. at 389, line 25 (JA4302) ("I did not.").

Professor McGovern's reputation is far too distinguished to require the defense of this Court. He is a prolific lecturer, writer and teacher and one of a very small handful of nationally recognized academics in the area of mass tort litigation,

particularly in the province of asbestos.  His appearance at meetings of futures representatives in his capacity as an academic does not convert his neutral status to that of a "tainted" advisor.  The Owens Corning Movants in their brief at page 25 acknowledge that Professor McGovern did not recommend a particular legislative approach.  Instead, he explored various alternative legislative possibilities with them.  See McGovern Dep. at 126 (JA4078).  This type of discourse is thoroughly appropriate for a respected, indeed revered, academic.

At oral argument counsel for the movants characterized Professor McGovern's attendance at futures meetings as an "eyebrow" fact, and criticized Professor McGovern for not holding similar type meetings with commercial creditors, debtors, equity holders and other constituencies.  Tspt. of Jan. 16, 2004 at 26.  But there is no evidence that other constituencies sought his expertise.  Their choice not to avail themselves of his knowledge surely cannot deprive Professor McGovern of his neutral status.

Lastly, McGovern didn't attend the future's meetings as an advisor of Judge Wolin.  McGovern Dep. at 124, line 9-17 (JA4077).  In his deposition testimony he made it emphatically clear that, although he thought a legislative solution was the preferred outcome, he did not state a choice as to the emerging legislative alternatives.  Furthermore, he gave no guidance as to what position the future's group should take in response to the

53

pending legislation.  Id. 126-128 (JA4078).  Clearly, he was
acting not as a mediator but purely as an academic.  The Movants
citation of Gross's deposition to the contrary is consistent with
their treatment of the record generally.  Gross actually
testified:

> Question:  In what capacity was [McGovern] attending
> these meetings?
>
> Gross:  As a mediator for Judge Wolin.  I would say for
> Judge Wolin.  I'm not sure.  I'm not sure what capacity
> officially he had, if any in these cases.  Professor
> McGovern was involved in the attempt to settle many of
> these cases and his capacity in attending the meetings
> I really don't - I just don't know.

Gross Dep. at 168, line 7-16 (JA4247).  Movants argument
regarding the attendance of three of the Court's advisors at
meetings of futures representatives is a make-weight of recent
conception, previously absent before the Circuit Court of
Appeals.

### c.    Gross's and McGovern's Role as Mediators.

Concerned that their arguments relating to the taint of the
futures representatives may lack force, the Owens Corning Movants
attempt to impugn the neutrality of Gross and McGovern as
mediators.  They unabashedly make this argument notwithstanding
the fact that no dissatisfaction with these mediators' services
were ever expressed to the Court prior to initiation of these
recusal proceedings.  Significantly, Brodsky testified that he
never registered his inclination to discontinue the mediation

efforts initiated under the auspices of the Court.  Brodsky Dep.
at 97, line 8 to 98, line 3 (JA5856-5857).  Nor did CSFB or its
counsel complain to the Court of the mediators' bias or lack of
neutrality in regard to the Owens Corning substantive
consolidation dispute.

What makes this frontal attack on Gross and McGovern more
astonishing is that the Owens Corning Movants' counsel, the
Gibbons firm, utilized them as mediators in November 2002 in the
Fresenius Medical Care Holdings adversary proceeding, a sub-
branch of the fraudulent conveyance litigation in W.R. Grace &
Co.  Freestones, a non-debtor third party in the litigation, was
represented by Mr. Michael Griffinger of that firm.  His
correspondence with the Court indicates that his client paid
thousands of dollars for the mediation services of McGovern and
Gross.  As will be discussed more fully below, the Gibbons firm
had actual notice of Hamlin's and Gross's G-I Holdings
involvement from its inception.  Yet this firm chose to rely on
Gross and his ability regardless of his alleged lack of
neutrality.  This selective advocacy should not be countenanced
by this Court nor by the Court of Appeals.

The Movants make much of their claim that the mediators led
the Court into error when they allegedly conveyed information to
the Court regarding the parties' settlement positions in the
Owens Corning case at a meeting on November 19, 2002, prior to

55

the substantive consolidation trial.  See Owens Corning Movants'
Brf. at 30.  The Court has no recollection of this exchange, nor
is it issue determinative.  Following the trial, at the urging of
the parties, a settlement conference was conducted by the Court.
This settlement conference was conducted not only at the parties'
request, but with their express consent and only on the
representation that their positions were extremely close and that
settlement was imminent.  To the extent Gross or McGovern may
have earlier shared information regarding the parties' settlement
positions prior to the trial, it could not possibly have been
more detailed than the information voluntarily shared with the
Court at the settlement conference in June 2003 following the
trial and obviously pre-dating the issuance of the Court's
Opinion.

     Moreover, with respect to this issue of settlement
information conveyed to the Court, a closer examination of the
record indicates that the Movants' arguments substantially
exaggerate the evidence on which they rely.  The testimony they
cite, from Gross's deposition, is that the Court was informed, in
numbers rounded to the billions of dollars, what parties claimed
was Owens Corning's asbestos personal injury tort liability.  Id.
at 30 n.101 (citing Gross Dep. 118-20 (JA4235)).  This cannot be
fairly characterized as a settlement position.  The settlement
positions of the parties were complicated combinations of cents

on the dollar, value "strips" of the reorganized debtor or straight equity or debenture positions, time value of money calculations, PIKs, LIBOR, and other factors.  In any event, general posturing as to Owens Corning's overall tort liability has been ongoing since this Court became involved with the case and likely pre-dates its chapter 11 petition altogether.

A reference in Dreier's notes of that meeting apparently discloses a cents-on-the-dollar position.  The Court has no recollection of these numbers being discussed at the November 19, 2002, meeting.  The Court does recall, however, that purported cents-on-the-dollar "positions" of the parties were freely discussed during this period at status conferences at which all parties were present.  Indeed, the Court considers it equally likely that it was the Court reporting the challenged information to the Advisors on November 19, 2002, and not the other way around.  In any event, fairly balancing all the many subsequent occurrences detailed here, to conclude that information allegedly shared in November, 2002, would create a later bias against the Banks would render the notion of proximate cause meaningless and cause Ms. Palsgraf to turn over in her grave.

The Movants claim McGovern and Gross violated their sacred trust as mediators by communicating confidential settlement positions with the Court.  They overlook the fact that McGovern was not appointed as a mediator until late December of 2002.

Gross was never appointed mediator in the Owens Corning case.
Gross has testified that he acted as a mediator without any
express direction from the Court.  Gross Dep. at 198, line 6 to
199, line 16 (JA4255).  However Gross may have perceived his role
later in the proceedings, the Court does not believe and the
evidence does not support that he was acting as a mediator in
Owens Corning in November of 2002.  In sum, the Movants' attack
on McGovern's and Gross's performance as mediators stretches the
record beyond recognition.  It requires the Court to look more
closely at their other specific allegations.

These lie prominently in the list of horribles set forth in
the Owens Corning Movants' Brief at 9-11.  As it happens, the
Court has no quarrel with some of the points raised.  For
example, the Movants cite discussions with the Advisors of "what
tensions exist among different creditor classes," "how different
States deal with unimpaired claims," "the historical value of
personal injury claims in other cases," and "different forms of
reorganization that may be acceptable in particular
bankruptcies."  Id. at 10.  Even as stated by the Movants, these
are precisely the type of general, thematic and informational
issues for which the Court originally sought assistance of the
Advisors.  If the Movants believe that the discussions on these
topics constituted illicit, substantive advice on issues actually
before the Court for decision, then the Court must simply

disagree.

At other points, the Movants mis-state the record.  For
instance, they contend that the Advisors and the Court discussed
"whether, and if so how, to use "green cards" or "pleural
registries" for unimpaired claimants who might someday develop
compensable symptoms[.]"  Id. at 9 (citing Gross Dep. at 273
(JA4273); Dreier Dep. at 74-75 (JA3698)).  The testimony does not
say that the Court was advised "whether, and if so how" to use
these devices.  It merely says that they were discussed.  The
Court did not assume control of the Five Asbestos Cases with a
working knowledge of green cards and pleural registries.

Likewise the Owens Corning Movants complain of
communications concerning "the nature and merits of various
conventional defenses in asbestos cases[.]"  Id. at 10 (citing
Gross Dep. at 91-95 (JA4228-29); Dreier Dep. at 82-83, 92-93
(JA3700, 3702); McGovern Dep. at 81 (JA4066)).  The testimony
supports the point that the common defenses and the rebuttals to
them were discussed, particularly the so-called chrysotile
defense important to the USG case.  But the "merits," in the
sense of whether these defenses were valid or not, was never
discussed and the cited testimony does not say to the contrary.

Space in this long Opinion precludes addressing each of the
Movants' claims that the Advisors attempted to influence the
Court with substantive advice on disputed issues.  The foregoing

59

examples show that the Movants' statements regarding the content of the Court's discussions with its advisors must be taken cum grano salis.[10]  The Movants can hardly argue that justice would be better served or the cases more effectively managed had the Court remained in ignorance of green cards, pleural registries or the wide-spread use of the chrysotile defense, features of asbestos litigation that date back many years.  Instead the Movants have imparted a "spin" to the testimony of the Advisors.

The Advisors have stated under oath that none of them presumed to advise the Court on how to decide a particular issue before it.  See, e.g., Gross Dep. at 388, line 10-12 (JA4302) (never participated in fashioning any relief in any case); Dreier Dep. at 207, line 9-13 (JA3731) (Advisors never formed any final position on any issue); Keefe Dep. at 74, line 18-75, line 1 (JA5501)(no advisor gave advice "with respect to any substantive issues involving specific cases").  The Court affirms that nothing of the kind took place.

At other places in their briefs, the Movants' have seized on isolated places in notes taken at the meetings with the Advisors as smoking-gun evidence that the Advisors offered their own value judgments on claims and defenses at issue in the Five Asbestos Cases.  See, e.g., USG Brief at 7 n.3 (USG filed brief arguing

---

[10]     "(With a grain of salt.) With allowance for exaggeration."  Black's Law Dictionary 342 (5th ed. 1979).

that chrysotile defense should be heard but was unaware that the defense had been "discussed, considered and rejected"); Letter of Lawrence S. Robbins, Esq., Jan. 27, 2004 at 2.  Notwithstanding the advocacy of counsel, the instances cited are for the most part ambiguous as to who was speaking or whether the speaker actually ascribed to a particular view or was merely reporting the views of the asbestos bar or the party-constituencies.  The notes are unsworn.  As an evidentiary matter, they cannot outweigh the repeated emphatic and direct testimony of the Advisors, and hardly merit the label "smoking gun."

The Court will not list and refute each example in the notes raised by the Movants.  The Court repeats:  it recalls no time at which one of the Advisors attempted to press his view on the Court on the ultimate merits of an issue to be decided.  The Court must candidly concede the possibility that personal views may, on occasion, have crept into the give and take of the discussions.  With their long experience, the Advisors would be scarcely human otherwise.  Based upon testimony of the Advisors and the recollection of the Court, the Court finds that any such crossing of the line from discussion to advocacy, to the extent it occurred at all, was de minimus and inadvertent.  It had no effect at all on the Court's view of the issues to be decided. It must be remembered that the central issue "is not the source of the judge's prejudicial knowledge or bias, but rather the

judge's 'inability to render fair judgment.'" Altar, 71 F.3d at 102 (quoting Liteky, 510 U.S. at 551). For the clarity of the record, the Court states that the merits of the chrysotile defense are wide open, that it is certainly not "considered and rejected," and that the Court looks forward to hearing the evidence and arguments of counsel on that issue.

The Movants' other claims are belied by their own actions with respect to the Advisors prior to deciding to attempt to recuse the Court. The character of the arguments demonstrates the fervor of the Movants to remove the District Court from these jointly administered cases. Through a shotgun approach they pray that perhaps an errant pellet will strike the intended victim regardless of their aim. The Court will not dignify their efforts with specific citations nor aggravate the situation with explicit repetition, but the submissions of counsel and the testimony of their partisans contain repeated, wholly gratuitous attempts to smear the reputations of persons who have served this and many other courts ably and well as advocates and in other capacities.

The Court is protected by its position. Others are not. The scorched earth tactics of the Movants demonstrate the tactical underpinnings of the Motions as well as any other fact. The District Court recognizes these cumulative arguments for what they are--meritless. It is satisfied that the Movants attacks on

the Advisors must fail, and that a reasonable person with knowledge of all of the facts would reject them and all of the airy and hyper-extended inferences the Movants spin to create either the reality or appearance of bias.

## 2.   **Ex Parte Contacts**

Throughout these recusal proceedings the Movants center on ex parte conferences as a reason for the grant of their application.  This issue requires the District Court to distinguish between ex parte conferences in general and ex parte conferences with the Advisors.  The arguments regarding the Advisors have been dealt with in the preceding section.  In this section, the Court will discuss the other ex parte contacts raised by the parties, first addressing ex parte conferences as a case management method and then focusing on the specific allegations that the Movants contend require the Court's recusal.

At the initial, global case management conference convened by the Court on December 20, 2001, the Court, inter alia, publicly announced that it would, in the near future, entertain requests for ex parte conferences.  In attendance were approximately 200 to 250 individuals, including lawyers and non-legal persons, associated with all of the Five Asbestos Cases. Upon completion of the opening conference and on the same date, the Court met with representatives of each jointly administered case separately.  Those separate meetings lasted approximately

63

one hour each.

Both at the larger meeting and in the case specific conferences, the Court repeated that the debtor and the committees, official and unofficial, would have the opportunity to meet with the Court to provide it with an overview of those issues they deemed important.  At this time, the Court was well versed in the methodology of complex case management, but repeats that it was unsophisticated in the contours of asbestos bankruptcy litigation.  The need to fill these contours with relevant interstitial detail was manifest.  Given the size of the task at hand, the Court determined that only through a series of conferences with the parties could the District Court accumulate and process the necessary information quickly enough to fulfill the mandate of Judge Becker.

The Court also at that time determined that these conferences must be ex parte.  The information conveyed was both proprietary and sensitive.  It included the type of information that would have never been entrusted to the Court in a public, adversarial setting.  The amount and quality of the information gained would surely have suffered if the parties appeared in the presence of their adversaries; in the Court's experience, posturing and lack of candor would have been the order of the day.  In prior submissions to the Court of Appeals, this Court stressed the atmosphere of competition that exists for payment

64

from a limited fund of money.  This is the zero sum game that
drives all chapter 11 asbestos litigation.

The obvious danger, and indeed the foundation of the <u>ex</u>
<u>parte</u> rule, is that a litigant will lie to the Court or, at best,
allow its view of the reality to be altered by self-interest in
the absence of a potential challenge by an adversary.  The Court
relied on two safeguards to minimize the risk.  First, all
parties were welcome.  The parties are well familiar with each
other's positions through years of litigation and chapter 11
proceedings.  The Court confidently expected that as one party
left chambers, the next would arrive ready to debunk the
"falsehoods" of its predecessor.[11]  So it proved.

Second, this Court is no babe in arms.  The Courts of
Appeals have noted that judges "are trained to lay aside personal
opinions and experiences when they sit in judgment."  <u>Mann v.</u>
<u>Thalacker</u>, 246 F.3d 1092, 1098 (8th Cir. 2001); <u>In re Aquinda</u>,
241 F.3d 194, 201 (2d Cir. 2001) (court not recused for attending
lecture or seminar advocating a particular viewpoint, "'[j]udges
are continually exposed to competing views and arguments and are
trained to weigh them'") (quoting Admin. Office of the Courts,
<u>Codes of Conduct for Judges and Judicial Employees</u>, in <u>Guide to</u>

---

[11]     It is to this category that the Court's meetings with
Messrs. Komitor and Parnell must belong.  These were,
respectively, experienced plaintiff and defense attorneys
introduced by the Advisors to educate the Court on the issues as
seen from their disparate points of view.

Judiciary Policies and Procedures IV-151 (1999)); Clifford v. United States, 136 F.3d 144, 149 (D.C. Cir. 1998) ("Judges are presumed to be able to compartmentalize the information they receive and only rely on evidence relevant for a particular decision.").

This Court was and remains confident of its ability not to be so swept away by counsel's eloquence or a party's pleas as to form a view on a disputed issue based upon statements outside the presence of their adversary.  This is particularly true in light of the early stages of the Court's involvement in the cases when the conferences occurred.  That any of the parties entertained a contrary expectation following a meeting with the Court, or even an objectively reasonable fear that this might be so, is simply not credible.

It must be recognized as a general premise, moreover, that all conferences with a court exhibit some indicia of an ex parte conference.  To assert otherwise would deny the manner and means universally applied by courts to manage their calendars. Obviously, a settlement conference where adverse parties consent to their adversaries speaking with the Court out of their presence is an ex parte conference of a benign nature.  From time immemorial these types of conferences have enabled the United States Courts orderly to dispose of their overwhelming caseloads.

It is important as well to recognize the realities of

routine contacts between the Court and the parties in the course of case management.  Formal proceedings in open court involve a significant expense to the debtor's estate due to the enormous number of counsel involved, most of whom must travel to participate. Obviously certain proceedings must be conducted in court.  The bulk of the proceedings, however, are status conferences and the like that focus on procedural or administrative matters and do not require an "all hands" formal hearing with its attendant expense to the debtor.

The give and take that permeates these sessions is ultimately embodied in a case management order to the satisfaction of all concerned.  The case management order is placed on the Bankruptcy Court's website as notice to all litigants as well as to counsel in other jointly administered cases.[12]  Plainly, these types of gatherings possess the indicia of ex parte proceedings because not all of the parties to the litigation choose to be present.  As a matter of simple practicality, the presence of counsel depends upon the issue under consideration.

Moreover, the attempt to label a conference administrative or procedural is of limited utility.  Such categorization only

---

[12]     Since the District Court entered into the joint administration of the Five Asbestos Cases, it has posted approximately 200 Orders and Opinions on the Delaware Bankruptcy Court's website.

defines the initial purpose of the proposed conference, but doesn't account for the unsolicited, extra-judicial facts that counsel inevitably visit on the court.  The District Court is sufficiently experienced and disciplined to disregard counsel's unsolicited attempt to influence the Court through the recitation of facts on an issue before it.  In the real world of complex litigation, there is no reasonable procedural safeguard to prevent this type of occurrence.

The foregoing should not be read to reveal a lack of understanding by the Court of the important difference between ex parte and other communications with the parties.  However, the reality of the situation requires a more pragmatic view than that advanced by the Movants.  The long-established practices of the courts discussed above establish as a minimum that in the absence of objection and where a valid case management goal is to be served, the judicial system will tolerate ex parte communication.

Admittedly, and the Court has never contended otherwise, the initial fact gathering conferences with debtors and their judicially sanctioned committees conveyed to the District Court extra-judicial information.  Yet, without this type of information it would be impossible for the Court to develop the relevant background to successfully case move the Five Asbestos Cases forward.  Most significantly, these conferences were held and widely participated in without objection for a period of

twenty-two months.[13]

Subsequent to these initial fact-gathering conferences, other ex parte conferences were held by the Court.  These conferences were primarily procedural, administrative or settlement conferences.  Not all of these conferences were held at the courthouse.  Some of the conferences were held in law offices or in local restaurants to accommodate the parties.  In the Owens Corning case a luncheon meeting was held at the offices of Davis Polk to accommodate Mr. Gordon Harriss who is wheel chair-bound.  Mr. Harriss and his law firm represent the Owens Corning Creditors Committee.  Other, off-site conferences were held to accommodate the schedule of out-of-state lawyers.  Mr. Lewis Kruger of the law firm Stroock Stroock & Lavan, together with Mr. William Katchen of Duane Morris, on a number of occasions preferred a luncheon conference to an in-chambers meeting.  Messrs. Kruger and Katchen are signatories on the petition for mandamus filed on behalf of the USG official committee of unsecured creditors.

Mr. Griffinger of the Gibbons firm was counsel to the debtor in Armstrong and local counsel to Freestones, a non-debtor defendant in the W.R. Grace fraudulent conveyance proceeding.  On

---

[13]    At oral argument Elihu Inselbuch, based on District Court minutes voluntarily supplied, calculated that the District Court had entertained twenty-one (or twenty-six) ex parte conferences over the twenty-two month period.

numerous occasions the Court either met with or spoke to him on an ex parte basis. In the Armstrong bankruptcy chapter 11 proceeding, Joanne B. Wills represented the official committee of property damage claimants. On at least two occasions, Ms. Wills met with the Court in order to seek its assistance in settlement of her client's claims. On one of those occasions, she brought her property damage claimants with her. While settlement of their claims was the avowed purpose of the meeting, Ms. Wills did not hesitate to supply the Court with unsolicited, extra-judicial facts in an unambiguous attempt to influence the Court to reverse Judge Randall Newsome's Daubert ruling in the Bankruptcy Court.[14] Likewise, there were meetings with various representatives of asbestos claimants. Much of the discussion with personal injury claimants was devoted to the procedural and administrative aspects of asbestos litigation.

Mr. Neal, counsel for USG Corporation, argued as amicus to the Court of Appeals that section 455(b)(1) forbids ex parte communications for the purpose of obtaining extra-judicial information. Tspt. of Court of Appeals at 26, lines 12-18. His position is astonishing in light of the history of the USG bankruptcy. It is precisely this type of information that he and

---

[14]     Ms. Wills is a member of the firm of Klehr, Harrison, Harvey, Branzburg & Ellers. She is also the counsel to the W.R. Grace Movants and signed their Motion. See Motion of D.K. Acquisition Partners, L.P., et alia.

others conveyed to the Court on January 24, 2002, in a meeting with counsel and principals of USG. At that meeting was William G. Foote, CEO of USG, Stanley Ferguson, its General Counsel, and Messrs. Neal and Scott Devereaux, both of the Cooley Goddard law firm. The meeting lasted for approximately two and one-half hours and afforded the USG corporate officers the opportunity to confide to the Court their corporate business plan and expectations arising out of the pending asbestos litigation and chapter 11 petition. Here again, counsel seeks to have it both ways, complaining now of the same type of contacts he had with the Court.

The Court records substantiate that all other conferences involving USG, particularly those of February 25, May 20, April 23 and September 30, 2003, although held in chambers, were ministerial or administrative in nature, and not _ex parte_ but were attended by diverse parties in interest. Yet Neal isolates the phrase "innumerable occasions to meet with interested parties on an _ex parte_ basis" from one of the Court's submissions to the Court of Appeals.[15] The Court intended to connote merely that the privilege extended to the debtors was also extended to other constituencies in the bankruptcy. These included representatives

---

[15]    Given Mr. Inselbuch's tally of the number of meetings, _supra_ note 13, of slightly more than one a month, the Court is comfortable that its original projection of "sparing" _ex parte_ conferences at the December 2001 conference was accurate.

of the personal injury claimants, property damage claimants, the commercial creditors and even representatives of the insurance industry from whom much of the actual cash is derived to fund the ultimate plans of reorganization and who vigorously complain that they are excluded from the settlement process.

The Court believes these conferences were necessary to provide it with the background necessary to administer the Five Asbestos Cases with some hope of success. They were primarily informational in nature. The parties were, of course, not shy about setting forth their own goals in the reorganizations. Nor was the Court blind to the fact that each parties' world view was colored by the prism of its own self-interest. It is these types of conferences that the Court referred to as "innumerable."

The allegation that the District Court engaged in improper conduct is both unproved and without merit. No party has been prejudiced and no impropriety occurred that requires the District Court's recusal. Lastly, the Court returns to the fact that it openly announced twice that ex parte conferences would be used as a case management procedure. The claim that the parties were unable to object or were intimidated by the Court into not objecting following the initial case management conference suggests so gross an abdication of a lawyers duty to their client that this contention is simply incredible. In any event, such a claim cannot be reconciled with the fact that all parties

72

actively sought to engage in the conduct they now contend
requires the recusal of this Court.

**3.   The Timeliness Requirement**

The Movants claim that the Motions are timely because they
brought them as soon as practicable upon learning of the grounds
therefore.   They claim that actual notice of the grounds for the
motion is the fulcrum of the timeliness requirement.   They base
this contention on the proposition that the purpose of the
timeliness requirement is to prevent gamesmanship by those who
would intentionally wait to bring a recusal motion until the tide
of the litigation turns against them.   Without actual knowledge,
the logic runs, there can be no such gamesmanship.

In evaluating this argument, it is important to keep
separate the different grounds advanced by the various Movants.
There is the participation of Hamlin and Gross in the G-I
Holdings case.   There is the issue of ex parte contacts between
the Court with the various parties.   Obviously no party can claim
lack of knowledge with respect to the general, ex parte contacts,
because it was announced in open court and representatives of all
of the constituencies have availed themselves of the Court's
invitation to have ex parte contact.   As to these contacts, the
Movants rely on their claim under section 455(b)(1) that there is
no timeliness requirement.   The Court has addressed that
contention generally above and will do so in more detail in this

section.  As to their claim of an appearance of impropriety under section 455(a) arising from the Advisors Hamlin and Gross, the Movants claim that they did not know of Hamlin's involvement in the G-I Holdings case until the fall of 2003, immediately before they filed their motion.

Much of the discovery in this matter has centered around what the key individuals in the Movants' camp knew and when they knew it.  Chief of these is Mr. Mark Brodsky, the principle protagonist of the Owens Corning Movants.  Brodsky averred under oath that he did not learn of the asserted conflicting roles of Hamlin and Gross until September 24, 2003.  Brodsky Decl. ¶ 11 (JA972).  The W.R. Grace Movants have represented that they had no notice of the Hamlin and Gross G-I Holdings connection until they learned of it from the Owens Corning Motion.  The USG Movants previously relied solely on the _ex parte_ contact issue and thus avoided the controversy over notice concerning Hamlin and Gross.[16]

The Court will examine in detail Brodsky's and the W.R. Grace Movants' professions of ignorance prior to late September-October 2003.  Before doing so, however, it is informative to survey the undisputed facts regarding who of the many counsel

---

[16]     In the last round of briefs, the USG Movants devote a short section to the issue of bias as well.  The points raised are similar to those the Court has dealt with in other sections of this Opinion.

involved in the Five Asbestos Cases indisputably did know of Hamlin's appointment as a Futures Representative in G-I Holdings. The evidence is relevant to the credibility of the Movants' claims of ignorance.  It is also important to the question whether, given the general knowledge of the alleged conflict among the parties and the bar, whether a claimed lack of actual knowledge on the part of these particular creditors will prevent application of the timeliness requirement.

The appointment of Hamlin in G-I Holdings was a made on motion in that case.  It became, of course, a matter of public record.  Gross's appointment as Hamlin's counsel was also the subject of a motion, and Gross filed a statement of disinterestedness in G-I Holdings that disclosed his appointment as an Advisor in this case.  The Movants contend that they had no actual notice of these papers and cannot be expected to track the docket of an unrelated case.[17]

Nonetheless, the existence of these public filings provide significant evidence of who in fact knew of Hamlin's and Gross's dual involvement.  As Mr. Hamlin correctly testified, "nobody was hiding this under a bushel basket."  Hamlin Dep. at 170-71 (JA4847).  Survey of the evidence reveals that there can be no

---

[17]    One notes, of course, the tension between this position and the Movants' argument that recusal is warranted in part because of the inter-related nature of G-I Holdings and In re Owens Corning.

real dispute that every major constituency, indeed the entire
asbestos bankruptcy bar, had actual and repeated notice of the
involvement of Hamlin and Gross in both cases.

Mr. Stephen Case and his firm, Davis Polk, is lead counsel
to the Unsecured Creditors Committee in Owens Corning.  Case Dep.
at 11 (JA6005).  The Owens Corning Movants are unsecured
creditors and thus the committee and its counsel are fiduciaries
of the Owens Corning Movants themselves.  Woods v. City Nat'l
Bank & Trust Co., 312 U.S. 262, 268 (1941); Pension Benefit Guar.
Corp. v. Pincus, Verlin, Hahn, Reich & Goldstein, 42 B.R. 960,
963 (E.D. Pa. 1984).  Mr. Case testified he received a forwarded
email by Honor Heath of Fleet Boston f/k/a/ Fleet Bank, a member
of the Committee.  This email, dated October 15, 2001, reads:
"FYI:  The parties agreed to appoint C. Judson Hamlin, a former
New Jersey superior court judge, in the G-I case.  Judge
Gambardella ordered that he be appointed last Wednesday."  Case
Dep. Exh. 10 (JA990.)  Davis Polk staff regularly reviewed the
docket in G-I Holdings throughout the relevant period.  Case Dep.
at 40-41 (JA6012).  The Pacer on-line docketing system of the G-I
Holdings Bankruptcy Court discloses the involvement of Hamlin and
Gross in its list of counsel every time it is opened.  See Case
Dep. Exh. 4 (JA925).

Mr. Lewis Kruger and Mr. Kenneth Pasquale and their firm
Strook, Strook and Lavan represent the Unsecured Creditors

Committees of both W.R. Grace and USG.  As in Owens Corning, the
W.R. Grace Unsecured Creditors Committee is the fiduciary of the
W.R. Grace Movants.  The Strook firm has conceded that it knew of
Hamlin's appearance in G-I Holdings as Futures Representative no
later than January 24, 2002.  (JA1335.)  The Strook firm has
further stipulated that it considered whether this posed an
objectionable conflict of interest at that time.  Id.  Upon
information and belief, Mr. Pasquale avers that the Strook firm
"may have" communicated its information to the then-existing
members of the W.R. Grace Creditors Committee, although records
were not found to substantiate this.  (JA1336.)  The Strook firm
has not then nor since taken the position that the positions of
Hamlin and Gross tainted the Court or required this Court's
recusal.[18]  Nor has any member of the W.R. Grace Creditors
Committee.

The debtor and Movants USG has stipulated that it knew of
Hamlin's G-I Holdings appointment in January of 2002.  (JA1469).
It appears that USG's General Counsel, Mr. Stanley Ferguson, may
have learned of it from Mr. Kruger of the Strook firm, as the
evidence shows they spoke by telephone on the subject on January
24 or 25.  (JA1335, JA1469.)  It is notable that, although the

---

[18]    The Strook firm on behalf of the USG Creditors
Committee has joined the debtor in that case as a Movants.  The
USG Movants do not, however, rely upon the alleged Hamlin and
Gross conflict.  They rely upon the ex parte contact theory
alone.

debtor USG requested that Mr. Hamlin not serve as a special master in their case, (JA1469-70), no party raised the possibility that the Court might be tainted and thus recusable because of Hamlin's G-I involvement.

The law firm of Kramer Levin represents Credit Suisse First Boston ("CSFB") as agent for the Banks in the Owens Corning case and the Committee of Equity Holders in the W.R. Grace case.  Mr. Kenneth Eckstein is the chair of that firm's insolvency group and lead counsel for the Banks (which include the Owens Corning Movants) in <u>Owens Corning</u>.  Although Mr. Eckstein has testified that he lacked actual, personal knowledge of Hamlin's role in <u>G-I Holdings</u>, the Kramer Levin firm filed an appearance in the <u>G-I Holdings</u> case and was served with pleadings in that proceeding. The public file reveals that, on May 29, 2001, Kramer Levin was served with the Notice of Motion to appoint Hamlin in the G-I Holdings case.[19]  <u>In re G-I Holdings, Inc.</u>, Bankr. No. 01-30135 Dckt. No. 326 (Certif. of Lalita Kabse) (Filed June 6, 2001). Indeed, in September 2002, the Kramer Levin firm hired Judge Gambardella's former law clerk, who, it has been established, was aware of the appointment of Hamlin in <u>G-I Holdings</u>.  Eckstein Dep. at 26-30, 39-40, 112-16 (JA5724-25; JA5727; JA5745-46).

Information of Hamlin's and Gross's exact status was widely

---

[19]     Mr. William Katchen, counsel to the USG Creditors Committee Movants was also served.  As will be discussed below, the Gibbons firm was also served with this notice.

available to the bar through less official channels as well.
Mealey's Asbestos Bankruptcy Reporter reported Hamlin's
appointment in its January 2002 issue.  Davis Polk subscribed to
this publication.  Case Dep. at 58 (JA6017).  David Gross was
introduced as a member of a panel at the Mealey's Asbestos
Bankruptcy Conference held in Philadelphia on June 2-3, 2003.
Professor McGovern acting as moderator explicitly stated that
Gross served both as counsel to Hamlin in G-I Holdings and as one
of this Court's Advisors.  The other members of the panel
included Mr. Lewis Kruger, counsel to the Creditors Committee in
USG and W.R. Grace, and Judge Gambardella herself![20]

     To claim that "everyone knew" may be not literally true.  As
a functional matter, however, it is hardly an exaggeration.  It
is indisputable that the Owens Corning Creditors Committee knew.
The USG and the W.R. Grace Creditors Committees knew.  The debtor
USG knew.  Discovery has not focused on whether the debtors Owens
Corning and W.R. Grace knew or when they knew it, because they
oppose the Motions to recuse the Court.  Obviously the Asbestos
Tort Committees of all three cases were aware of Hamlin's and
Gross's roles.  Attorneys at the Kramer Levin firm, counsel to
the very sub-constituency to which the Owens Corning Movants

---

[20]     It is not known who of the creditors bar were present
at the June 2003 Mealey's conference.  The debtor W.R. Grace
represents in its brief that the W.R. Grace Movants Deutsche Bank
was represented.  W.R. Grace Amended Brief at 66 n.32.

79

belong, knew it.  Even Judge Gambardella knew it.

These facts do dual duty in assessing the Motions at bar.
First, that not one of these parties or individuals has seen fit
raise a section 455 objection to the roles played by Hamlin or
Gross either in the Five Asbestos Cases or in G-I Holdings,
speaks volumes for the underlying merits of the motions.  At the
outset of the cases, no more than a month after this Court
appointed Hamlin and Gross, every major constituency and/or
constituency representative had actual notice of Hamlin's role in
G-I Holdings.  These are not minor players; they represent vast
interests at stake in these bankruptcies.  If there is an
objectively reasonable appearance of impropriety, why has no-one
but the Movants perceived it?

Second, the ubiquity of the knowledge regarding Hamlin and
Gross casts a pall on the factual claim of the Movants that their
first knowledge of Hamlin's and Gross's roles in G-I Holdings
came when Brodsky learned of it on September 24, 2003.  (JA972.)

It is undisputed that Brodsky has been a member of an organ
of the Creditors Committee known as the Bank Steering Committee
since the Spring of 2001.  Brodsky Decl. ¶ 7 (JA970).  At or
about the time that Brodsky joined the Bank Steering Committee,
the Kramer Levin firm was Brodsky's counsel.  Brodsky Dep. at
104, line 4 (JA5858).  Brodsky's connection with the Kramer Levin
firm is long-standing.  He was at one time co-chair with Mr.

Eckstein of the firm's insolvency group. He recommended the firm
to CSFB when it needed counsel for the Owens Corning matter. <u>Id.</u>
at 108, line 9 (JA5859).

Brodsky released Kramer Levin from its representation of the
Elliot entities "sometime that summer" of 2001 to permit Kramer
Levin to become counsel to CSFB, the designated agent for the
Owens Corning Bank Group. <u>Id.</u> at 104, line 11-12, at 107, line
20-24 (JA5858-59). CSFB was a member of the Creditors Committee.
Case Dep. at 12, line 5 (JA6005). As previously noted, Mr. Case
of the Davis Polk firm was lead counsel to the Creditors
Committee, and Case and Davis Polk had notice of the status of
Hamlin and Gross from the time they were appointed in G-I
Holdings. Moreover, although Mr. Brodsky was not an official
member of that Creditors Committee, he was invited as an
interested party to its meetings. <u>Id.</u> at 15, line 17 (JA6006).

As also noted above, Davis Polk staff were monitoring the
docket of <u>G-1 Holdings</u>. <u>Id.</u> at 40, line 16 (JA6012). The
information that was collected was, for a period of time,
reported to the Committee. Mr. Case testified that these regular
reports had ceased by June of 2001, but the Notice of Motion for
the appointment of Hamlin was served in the <u>G-I Holdings</u> case on
May 29, 2001. <u>Id.</u> at 42, lines 22-25 (JA6013). Thus, while it
appears clear that the Davis Polk firm had actual notice of the
pleadings associated with Hamlin's appointment, the record is

less clear whether the G-I Holdings appointment was the subject
of one of firm's regular reports on G-I Holdings to the full
Owens Corning Creditors Committee.

There is no question, of course, that the appointment of the
Advisors in the Five Asbestos Cases was received and reviewed by
Mr. Case. Id. at 45, line 25 to 46, line 2 (JA6013). Although
Mr. Case is unable to recall whether he authorized a background
check of the Advisors, an employee of Davis Polk, Ms.
Horbaczewski, billed 5.4 hours on January 2, 2002 reviewing the
four-page order designating the Advisors. Id. at 48, line 18 to
51, line 4 (JA6014). It is not known what Ms. Horbaczewski did
for that amount of time, but where it is established that her
firm was monitoring G-I Holdings, one must at least consider the
possibility that she checked the names of the Advisors against
the list of parties and counsel in other asbestos bankruptcies in
which her firm was interested. The case management order was
discussed at a Creditors Committee meeting held on January 9,
2002. Id. at 52, lines 1-8 (JA6015). Kenneth Eckstein's billing
records indicate that he attended that meeting for 2.8 hours.
(JA336.)

While this was taking place, Brodsky, a debtor holding $275
million in Owens Corning debt, testified that he was
unrepresented by counsel and did not retain new counsel until
June, 2003. Brodsky Dep. at 108, line 13, 106 line 12, 109 line

2 (JA5859).  The Owens Corning substantive consolidation trial
ended in May, 2003.  Brodsky's investment was, of course,
directly implicated by the outcome of the substantive
consolidation trial.

Notwithstanding the amount he had at risk, it is perhaps not
surprising that Brodsky had no need to retain counsel until June,
2003.  Kramer Levin lawyers met or otherwise communicated with
Brodsky and other Kensington personnel on 243 separate occasions
between June 2001 and September, 2003, more even than with its
nominal client CSFB.  (JA209, 210-872.)  Before and during the
substantive consolidation litigation, Brodsky attended all case
management status conferences.  From the Court's direct
observation, Brodsky was present for all or most of the
substantive consolidation trial.  Much conversation was observed
by the Court between Brodsky and members of the Kramer Levin
trial team.  Owen Corning's observation that Kramer Levin was
Brodsky's de facto lawyer in the Owen's Corning case cannot be
summarily dismissed as hyperbole.

Brodsky's declaration at paragraph 2 demonstrates his degree
of sophistication in the evaluation and management of
investments.  With a JD degree from Harvard Law School and
sixteen and one-half years of corporate and bankruptcy law
practice with Kramer Levin, Brodsky possessed all the attributes
of a ring-wise investor.  He had personal access to the PACER on-

line docketing system of the G-I Holdings Bankruptcy Court. Brodsky Dep. at 158, line 19-24 (JA5872).  In paragraph 3 of his declaration, Brodsky reveals that a large portion of his work involved financially troubled companies.  (JA968-69.)  This work, he asserts, included active participation in all facets of the reorganization process, both in and out of bankruptcy.  Id. Brodsky continues:  "Since 1977 I have participated in many bankruptcies and restructurings, including some of the largest and most complex in the country, and including many in the district of Delaware."  (JA969.)  Yet the Movants ask the Court to accept that Brodsky, with all of his sophistication and experience, lacked actual knowledge of the Hamlin and Gross G-1 Holdings appointment or that the information contained in published orders of the Bankruptcy Court and prominent trade periodicals such as Mealey's and the Daily Deal escaped his due diligence and the due diligence of his host of advisors.

Brodsky listed six law firms that have represented his affiliates in the Owens Corning bankruptcy proceedings, in response to an discovery request served upon him in the discovery proceedings on the Motions.  Brodsky Dep. Exh. 3 (JA5921).  Among those listed is the Gibbons firm, from late September 2003 to the present.  During his deposition, Brodsky confirmed that exhibit 3 was accurate.  Brodsky Dep. at 29, line 15 (JA5839).  Later in his deposition, however, he appears to narrow his response to

cover only those counsel actually "representing [him] in the
proceedings."   Id. at 30, line 8-13 (JA5840).   This arguably
carves out any lawyers or law firms Brodsky may have consulted or
sought advice from in connection with the Owens Corning
bankruptcy but who did not actually represent Brodsky and his
affiliates in the bankruptcy proceeding before the District
Court.

Brodsky's testimony and his discovery response strike a
curious note.   Shortly after completion of the Owens Corning
substantive consolidation trial in early May, 2003, the Court
received an unsolicited, ex parte telephone call from a senior
partner of the Gibbons firm.   That partner confided in the Court
that Brodsky had sought the Gibbons firm's advice and counsel in
connection with the then recently completed Owens Corning
substantive consolidation trial.   As with many prominent members
of the New Jersey bar, this senior partner has a long-standing
social relationship with the undersigned judicial officer.   The
purpose of his call was to solicit this judge's view of whether
his firm should accept the representation.   The telephone call
was not invited by the Court.   This judicial officer told the
Gibbons partner that, as far as he knew, the substantive
consolidation trial was concluded and that there would be little
for the Gibbons firm to do.

Events have shown that the Court was wrong and that Brodsky

85

intended to be very active in the Owens Corning matter.  Mr. John
Gibbons of the Gibbons Firm was the signatory of the emergency
petition for a writ of mandamus in these proceedings.  Brodsky's
discovery response, as explained in his deposition testimony,
would not reveal of itself whether the Gibbons firm was advising
him after the May 2003 telephone call from the Gibbons Firm to
the Court.

But it is clear that for the Gibbons firm to gainsay its
notice of Hamlin's and Gross's appointments in G-1 at the time
that Brodsky sought the Gibbons firm assistance would be both
unavailing and untrue.  The Gibbons firm is resident in Newark,
it is commercially astute, and it has participated at given times
in all of the Five Asbestos Cases.  Even more to the point, a
Gibbons firm partner, Ms. Elizabeth Kardos, was served with the
Notice of Motion for Hamlin's <u>G-I Holdings</u> appointment in late
May 2001.  <u>G-I Holdings</u>, Certif. of Kabse.

In their papers and at oral argument before the Court,
Brodsky's counsel vociferously argued that imputed notice to
Brodsky was insufficient to support an objection to the
timeliness or waiver arguments raised by the respondents.  To his
way of thinking, nothing short of actual notice could support
these theories.  The evidence establishes, however, that Brodsky
surrounded himself with a coterie of experienced and
sophisticated lawyers who through even a modicum of effort would

86

have unearthed Hamlin's and Gross's G-1 appointments.  Where the
record shows instances in which timing or other events broke the
chain by which knowledge of Hamlin and Gross might have passed to
Brodsky, they can fairly be characterized as multiple near
misses.  The law has always abhorred the type of blindness that
Brodsky and his lawyers advocate.

The respondents cite Martin v. Monumental Life Ins. Co., 240
F.3d 223 (3d Cir. 2001) to argue that knowledge may be imputed
for the purposes of the timeliness requirement in a motion to
recuse.  In Martin, the Court of Appeals refused to recuse the
District Court where the Movants shared a common principal with a
party that had appeared in a related litigation in which the
grounds for recusal were raised.  "The circumstances reveal that
the judge had strong reason to believe that [the parties] were so
intertwined that his conditional disqualification [in the related
matter] was known to the principals in this action."  Id. at 236.

The Martin case does not, however, stand for the proposition
that imputed knowledge may substitute for actual knowledge in
judging a recusal motion.  In Martin, the District Court and the
Court of Appeals both simply disbelieved the movant's
protestation of ignorance.  Id. ("it is hardly possible to accept
such a representation in light of the circumstances").  The Court
of Appeals' held that the Movants "will not be permitted to hide
behind corporate forms to assert lack of knowledge," where its

87

principal was in possession of the salient facts.   Id.

However, the evidence here establishes beyond quibble that
the several layers of counsel charged with representing the
Movants' interests had actual notice of the G-I Holdings
connection.   The Movants have been heard to argue that notice to
one lawyer in a firm cannot constitute notice to another in the
same firm to assess whether a recusal motion is timely.   The
Court rejects this.   One of the purposes of law firms is to
facilitate the communication between the courts and the parties
who are represented.   Any risk of a breakdown in internal
communication must fall on the parties concerned and not on the
courts or on innocent parties who have no wish to see the judge
recused.

While Brodsky's responses to discovery may have been limited
to counsel actually "representing" him in the Owens Corning case,
he was certainly consulting with the Gibbons firm and Kramer
Levin well before September 2003.   Both these firms had notice of
the G-I Holdings connection.   Brodsky's entities were important
members of the Bank Steering Committee, along with CSFB which was
also represented by Kramer Levin.   The Creditors Committees in
both Owens Corning and W.R. Grace were represented by counsel who
had notice of the alleged conflict.   As noted, these committees
are the formal fiduciaries of the Movants before the Court.

The Movants argument that knowledge must not be imputed is

based upon the rationale that, absent actual knowledge, they cannot be accused of a tactical motivation. That is only partly true, of course. A Movants might opportunistically seize on a previously unknown ground for recusal in hopes of avoiding a negative result. More importantly, however, the Movants overlook the truth that preventing gamesmanship is only one of several weighty justifications for the timeliness requirement.

The <u>Martin</u> court noted the need for "a more compelling standard" for recusal at the conclusion of a trial, particularly following "a massive proceeding" where "the court has invested substantial judicial resources." 240 F.3d at 237. Here the Court has conducted a lengthy trial. In <u>Owens Corning</u> alone the debtors have expended legal fees estimated in the tens of millions of dollars over two years in bankruptcy. The multitude of creditors involved has already been discussed. Time, as the Court of Appeals has expressly noted, is precious in these cases where great numbers of personal injury claimants are sick and dying.

Must the Court throw all of this over on the dubious claim of a pocket of ignorance on the part of these Movants? As Mr. Inselbuch argued before the Court, it would be absurd to suggest that one of his clients, say a factory worker with asbestosis, could come forward now and claim that the Court should be recused because she or he had not personally known that Hamlin and Gross

acted in G-I Holdings.  It is difficult to see why these
commercial creditors should be treated differently.  Where so
many knew, including the counsel for the Committees appointed
specifically to represent their interests, would it be a rational
balancing of the interests at stake to excuse an untimely recusal
motion by these creditors?

Turning from the issue of Hamlin and Gross to the issue of
general ex parte contacts, the same calculus must pertain.  As
discussed, the Court is satisfied that a timeliness requirement
must apply to a motion based upon extra-judicial knowledge under
section 455(b)(1) as well as under 455(a).  The parties were put
on notice of the Court's intentions in 2001.  Most counsel for
the present Movants and all counsel for the relevant committees
participated themselves in ex parte meetings with the Court.  USG
Corporation relies most heavily on the ex parte contact issue
although its chief executive actually met with the Court.  Can
the courts tolerate this kind of double-dealing, delay, and
tactical maneuvering?

The answers to these questions are obvious.  Waiver,
prohibited by section 455(e) is not the same as untimeliness.
The prevention of tactical concealment and delay in bringing a
recusal motion is only one end point for the timeliness
requirement.  The potential prejudice to the debtors and the non-
moving claimants to the estate is as compelling in this case as

90

this Court has seen in its lengthy judicial career.  Actual lack of knowledge on the part of Brodsky and the W.R. Grace Movants is inexcusable on the facts presented here.  The Court has weighed the issue of untimeliness in conjunction with the frailties of the Movants' case on the merits, as instructed by Martin.  240 F.3d at 237 (after trial and expenditure of judicial resources, recusal "should be supported by substantial justification").  Therefore, and on the special circumstances presented here, the Court finds that the Motions to recuse are untimely and that this untimeliness constitutes an adequate and independent ground to deny them.

## 4.  Case Management Redux

The uniqueness of asbestos litigation and the challenges it presents to traditional court rules and legal principles is widely recognized.  Victor E. Schwartz, et al., Addressing the "Elephantine Mass" of Asbestos Cases: Consolidation Versus Inactive Dockets (Pleural Registries) and Case Management Plans The Defer Claims Filed by the Non-Sick, 31 Pepp. L. Rev. 271, 273 (2004) ("Courts and commentators have long recognized the extraordinary problems created by the 'elephantine mass' of asbestos cases in this country") (citing Norfolk & Western Ry. Co. v. Ayers, 123 S. Ct. 1210, 1228 (2003) and Ortiz v. Fibreboard Corp., 527 U.S. 815, 821 (1999); both cases referring to asbestos litigation as an 'elephantine mass'); Patrick M.

Hanlon, <u>Asbestos Lithog. in the 21st Century</u>, ALI-ABA Course of
Study (Sept. 19-20, 2002) <u>available</u> <u>at</u> SH043 ALI-ABA 119, 124
(Westlaw) ("[T]he sheer size of the asbestos litigation makes it
unlike any other mass tort."); Todd R. Snyder & Deanne C. Siemer,
<u>The Patronis Technique: A Practical Proposal for Asbestos-Driven
Bankruptcies</u>, 11 J. Bankr. L & Prac. 357, 358 (2002) (asbestos is
"different;" noting "magnitude and utter unmanageability of the
problem" and "need of the community of professionals, jurists and
corporate investors to do something").

Across the United States, judges have been driven to create
new methods in order to effectively preside over these cases.
Hon. Alfred Chiantelli, <u>Judicial Efficiency in Asbestos
Litigation</u>, 31 Pepp. L. Rev. 171, 171 (2004) (recounting how the
California courts began issuing asbestos case-specific orders and
rules after realizing the California Code of Civil Procedure was
not equipt to handle these types of case); George L. Priest, <u>The
Cumulative Sources of the Asbestos Litigation Phenomenon</u>, 31
Pepp. L. Rev. 261, 268 (2004) (detailing how asbestos litigation
is different even from other mass torts);  Hon. Jack B.
Weinstein, <u>Ethical Dilemmas in Mass Tort Litigation</u>, 88 Nw. U. L.
Rev. 469, 558 (1994) ("The traditional model in which the passive
judge allows the litigants to manage the case through their own
motion practice and develop complex factual background through
their own experts does not work well in many mass tort cases");

Deborah R. Hensler, <u>As Time Goes By: Asbestos Litigation after</u>
<u>Amchem & Ortiz</u>, 80 Tex. L. Rev. 1899, 1901 (2002) (discussing
Judge Charles Weiner's techniques and reputation as efficient
manager of asbestos cases).

This Court itself has been cited favorably as an example of
using innovative approaches in asbestos litigation.  <u>Schwartz</u>,
<u>supra</u> at 297.  Indeed, the unique nature of asbestos litigation
is recognized by the existence of legislative attempts to address
this 'elephantine mass.'  Richard L. Cupp, Jr., <u>Asbestos</u>
<u>Litigation and Bankruptcy: A Case Study for Ad Hoc Public Policy</u>
<u>Limitations on Joint and Several Liability</u>, 31 Pepp. L. Rev. 203,
224-25 (2004) (recognizing "a history of courts treating asbestos
litigation as unique" and commenting that this area of the law is
crying out for judicially created remedies); <u>Hanlon</u>, <u>supra</u> at 126
("There has been no dearth of attempts to enact legislation to
address asbestos litigation over the years."); <u>see</u> <u>e.g.</u>, Fairness
in Asbestos Injury Resolution Act of 2003, S. 1125, 108th Cong.
(2003).

Substantial costs are also associated with asbestos
litigation and bankruptcies, including attorney's fees and
administrative costs.  <u>Cupp</u>, <u>supra</u> at 217.  The costs associated
with asbestos bankruptcies are even higher due to the numerous
tort creditors involved.  <u>Id.</u>  The average length of time for a
major asbestos bankruptcy to progress from petition to

93

confirmation has been stated at six years, not including the time required subsequent to confirmation to effectuate the payment of claimants.  Id. at 218; Joseph E. Stiglitz, et alia, The Impact of Asbestos Liabilities on Workers in Bankrupt Firms, 12 J. Bankr. L. & Prac. 51, 58-59 (2003); Michelle J. White, Why the Asbestos Genie Won't Stay in the Bankruptcy Bottle, 70 U. Cinn. L. Rev. 1319, 1321 (2002).  In an asbestos bankruptcy the debtor is the party that funds "all litigation efforts" and "[g]iven the time value of money, transaction costs, and the opportunity costs of a debtor in bankruptcy, the ability to delay the confirmation of a plan or reorganization creates a bargaining power in itself."  Francis E. McGovern, Asbestos Legislation II: Section 524(g) Without Bankruptcy, 31 Pepp. L. Rev. 233, 238 (2004); Snyder & Siemer, supra at 368-70 (discussing the substantial costs associated with asbestos bankruptcies and how, due to the economics of an asbestos bankruptcy "certain parties may feel less pressure than others to achieve a swift settlement").

In his article, Professor McGovern also notes that:

> The mere passage of so much time lends itself to much
> mischief because of inevitable temporal change in
> bargaining power and party alliances.  The negotiation
> process often becomes a game in which the parties
> strategically vie for power and position.  The sources
> of bargaining power include committee appointments,
> some of which do not occur until later in the case;
> decisions by the bankruptcy or federal district judge
> on the multiple issues discussed above; scientific
> developments on evidence that may or may not have been
> available during the course of the proceedings; and
> legislative changes.

Id. at 242-43.

It is also recognized that judges who are thrust into the role of settlement and case manager for mass tort cases such as these asbestos cases should take an activist role for the benefit of the case and the legal system generally. Weinstein, supra at 549-50; Dunn v. Hovic, 1 F.3d 1371, 1399 (3d Cir.) ("It is judicial paralysis, not activism, that is the problem in this area.") (Weiss, J., dissenting), modified on other grounds, 13 F.3d 58 (3d Cir. 1993). "Courts must be willing to try new techniques." Paul F. Rothstein, What Courts Can Do in the Face of the Never-Ending Asbestos Crisis, 71 Miss. L.J. 1, 34 (2001). The enlistment of outside help in the form of experts and special masters is cited as a necessary prerequisite for judges presiding over mass tort cases in order for the judge to adequately perform his duty. Weinstein, supra at 555-56. The justification for this extra assistance "stems from both the size and the complexity of these [mass tort] cases" under which asbestos bankruptcy squarely lies. Id. at 555.

Another consequence of the complexity of mass tort cases is the "repeated utilization of the relatively few persons with expertise in the area," which has been described as "inevitable". Id. at 558-59. This limited pool "unavoidably" leads to "repeat player[s]" in the field with possible conflicts of interest. Id. at 558-59. Because litigation is sure to occur concerning the

impartiality of a chosen special master, "[m]otions challenging appointments should be made early and be considered waived if they are untimely." Id. at 559; In re Joint Eastern & Southern District Asbestos Lithog., 737 F. Supp. 735, 744-46 (E. & S.D.N.Y. & N.Y. Sup. Ct. 1990) (holding that motion to recuse special master was untimely since movants knew the facts upon which the motion was based at the time of the special master's appointment).

This opinion represents the fourth response filed with the Circuit Court of Appeals.  To repeat the arguments previously advanced in those documents is unnecessary and accordingly the District Court incorporates them in this opinion by reference. This Court will not deny that it adopted an activist role in the case management of the Five Asbestos Cases.  Through its invitation to meet with interested parties, and by their acceptance of that invitation, the Court was provided with a unique opportunity to garner information that was unavailable elsewhere or if available would be both difficult and prohibitively time consuming to harvest.  Likewise, through the appointment of its Advisors, the Court surrounded itself with persons who possessed a wealth of knowledge relevant to the history of asbestos litigation and its case management.  They were a resource of impeccable credentials and even as the Court writes this opinion their expertise remains unchallenged.

The concern of what the Advisors may have confided to the
Court and how the Court used that information is misplaced.
First, judges each and every day of their judicial existence
carefully weigh information that is provided to them and extract
what is relevant and necessary to render a decision.  Their views
are not molded by substantive advice from others, and they
possess the rugged independence to make their own decisions.
This Court possesses this type of independence.  The decisions of
the Court were rendered in the same manner it has rendered
decisions throughout its career – free of outside influence.  See
Altar, 71 F.3d at 102 (quoting Liteky, 510 U.S. at 551) (ultimate
issue is judge's ability to rule fairly, not receipt of extra-
judicial information) (discussed supra).  The frailty of the
judiciary which this argument implies is simply non-existent
among persons who possess lifetime appointments.  Second, the
advisors have testified under oath that they did not provide any
substantive advice to the Court.  That is the record that the
Court of Appeals sought, and that is the record that exists
despite the efforts of the movants to contradict sworn testimony
by the use of random, incomplete and ambiguous notes of dubious
accuracy and prepared free of the imprimatur of an oath.

As a senior judge at the time of this appointment, the Court
had the opportunity to decline Chief Judge Becker's request.  A
sense of duty and the challenge to accomplish a break-through in

97

the disposition of asbestos-related issues were the driving
forces that led to this Court's acceptance of the call to arms by
the Chief Judge of our Circuit.    It has been a difficult but a
rewarding two years of effort.    Much has been accomplished and,
as the District Court has previously stated, the Five Asbestos
Cases stand on the brink of even greater accomplishment.    This
success didn't just inadvertently happen.    It is the product of a
learning curve that required a sufficient period of study.    No
person immediately ramps up to the level of expertise required to
meaningfully case manage the extraordinarily difficult cases that
currently exist under this Court's administration.

Moreover, as a senior judge, it would be very easy for this
Court to recuse itself and avoid the bruising battle that has
raged for the past three and one-half months.    While that course
of action may have had personal appeal, from an institutional
perspective it was unacceptable.    This is particularly true
because of the District Court's abiding conviction that under the
totality of circumstances it has conducted itself appropriately
regardless of the standard of conduct by which it may be judged.

Whether the Court of Appeals agrees with the case management
methodology of the District Court should not be the definitive
issue for its ultimate decision.    The District Court respectfully
reminds the Circuit Court of Appeals that the joint
administration of these cases has occurred against a backdrop of

98

zero guidelines to assist the Court.  Rather than condemn the
Court for venturing into uncharted waters, it is again
respectfully suggested that the Court of Appeals carve out what
it views as unacceptable case management methodology, establish
future case management rules, and permit the District Court to
finish its appointed duty.[21]

If this proposal is unpersuasive, then the District Court
will, perforce, rely on the compelling argument of Elihu
Inselbuch wherein he informed the Court of Appeals that
statistically, fifteen asbestos claimants die every day.  They,
together with other seriously ill asbestos claimants, deserve
closure without delay.  The debtors who pay the bills for this
litigation in the tens of millions of dollars similarly deserve
closure as do all other claimants.  To recuse this Court and
invalidate the progress to date would represent a consummate
waste of untold proportions.  The Court of Appeals possesses the
power to prevent this occurrence, one that would be of
unprecedented magnitude where no act of bias or unfairness has
been attributed to the District Court.  The allegations of the
appearance of impropriety when measured against the record do not
merit recusal.

---

[21]     Because case management is an evolving process the
District Court acknowledges that certain segments of its case
management could have been handled differently and perhaps for
the better.

## CONCLUSION

For the reasons set forth above, the Motions will be denied.
An appropriate Order is attached.


Alfred M. Wolin, U.S.D.J.


Date: **2-2-04**

## CONCORDANCE OF DEFINED TERMS

| | |
|---|---|
| Kensington International Limited, Springfield Associates, L.L.C., and Credit Suisse First Boston | The "Owens Corning Movants" |
| D.K. Acquisition Partners, L.P., Fernwood Associates, L.P., and Deutsche Bank Trust Company America | The "W.R. Grace Movants" |
| The debtor-in-possession USG Corporation and the Official Committee of Unsecured Creditors in In re USG Corp. | The "USG Movants" |
| Credit Suisse First Boston | "CSFB" |
| The chapter 11 cases In re Owens Corning, In re W.R. Grace & Co., In re USG Corporation, In re Federal-Mogul, and In re Armstrong World Industries | The "Five Asbestos Cases" |
| Messrs. David R. Gross, Francis E. McGovern, John E. Keefe, Sr., C. Judson Hamlim and William A. Dreier appointed Court Appointed Advisors by the Court's Order dated December 28, 2001. | Collectively, "The Advisors" |
| Certain bank creditors of Owens Corning, opponents of the plan proponents' substantive consolidation motion. | "The Banks" |

101