# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                  )   Chapter 11

W.R. GRACE & CO., et al.                    Case No. 01-01139 (JJF)
                                            Jointly Administered
        Debtors.
TIMOTHY KANE,                           )
                                        )
        Movant,                         )
                                        )
v.                                      )   Motion No.: A-01-_____

W.R GRACE & CO., et al.,

        Respondent.

## MOTION FOR RELIEF FROM AUTOMATIC STAY

1.   Movant, Timothy Kane (hereinafter "Movant"), moves this
Court for relief from the Stay Order issued by this Court in this
bankruptcy proceeding.

2.   Movant respectfully moves for relief from the automatic
stay of Section 362(a) of the Bankruptcy Code

3.   In support of his motion, Movant states that on July 19,
1999, Movant was injured at the Grand Floridian Resort in Orlando,
Florida while performing scaffold erection when he slipped and fell
while walking on a portion of the roof of Grand Floridian which had
been covered with The Vicor Ice Water Shield.  As a result of the
slip and fall, Movant fell from the roof of one of the buildings at
the Grand Floridian and sustained serious personal injuries

4.   Movant has filed a Complaint and an Amended Complaint for
damages in the Circuit Court of the Ninth Judicial Circuit in and
for Orange County, Florida.  The case is captioned Timothy Kane v.

Walt Disney World Co., a Florida corporation, W.R. Grace & Co., CONN, a foreign corporation, McEnany Roofing, Inc., a Florida corporation and A/R/C Associates Incorporated, a Florida corporation. This is case number CI-00-6803. A copy of Amended Complaint for Damages is attached to this Motion as Exhibit "A" and incorporated by reference.

5.    Movant alleges strict liability against Defendants W.R Grace and McEnany Roofing, Inc.   In addition, Movant alleges negligence against Defendants W.R. Grace, McEnany Roofing and A/R/C Associates.

6.    In support of his allegations of strict product liability and negligence, Movant alleges in the Florida Action that the Vicor Ice & Water Shield was designed, manufactured, distributed and sold in a defective condition, unreasonably dangerous to foreseeable users such as the Movant.   Movant likewise alleges, among other theories of relief, that these Defendants knew or should have known that the Vicor Ice Water Shield was defective and unreasonably dangerous and would be used without inspection.

7    As a direct result of the accident, Movant suffered serious personal injuries which are described at Exhibit "A"

8.    As set forth above, Movant has initiated suit against the Debtor, and other parties in the State Court in Florida, "State Court Action").

9.    Movant seeks relief from the Automatic Stay solely for the purpose of allowing Movant to proceed with discovery in the State Court Action.   At the present time, Movant hopes to depose the following individuals who are employed by W.R. Grace:

a.    Pete DiGiovanni, the individual who ran the slip resistant test, and;

b.    Dr. Jenkins, the W.R. Grace employee with the most knowledge regarding the design of the roofing underlayment.  The Movant would likewise request that the issue of additional discovery be left open pending the information gathering which occurs during these initial depositions.

10.    None of the creditors in this proceeding will be adversely effected by the granting of Movant's Motion for Relief from Stay in that Movant only seeks to proceed with this limited discovery

11.    This action is a core proceeding pursuant to 28 U.S.C §157(b)(2)(G)

12.    This motion is made pursuant to 11 U.S.C. §362(d) and is governed by Federal Bankruptcy Rules 4001(a) and 9014

13.    The automatic stay created by the filing of the petition for relief should be terminated pursuant to 11 U.S.C., §362(d) of the Bankruptcy Code to allow Movant to exercise his rights and remedies under non-bankruptcy by engaging in limited discovery in connection with the State Court Action.

14.    The automatic stay in this bankruptcy proceeding should be terminated in this case for cause, including but not limited to the fact that:

(a)    Upon information and belief prior to the filing of the Chapter 11 Petition, Debtor had in place liability insurance coverage;

(b)    Allowing the Movant to continue with the litigation

in the State Court of Florida for the purpose of taking limited discovery, would, in no way, prejudice the rights of the Debtor or other creditors in this Chapter 11 proceeding;

(c   The Debtor will have no equity in connection with the litigation in the State Court of Florida;

15.   By alleging specific grounds for the termination of the automatic stay under Section 361(d) of the Bankruptcy Code, Movant does not waive the requirements of Section 362(g) of the Bankruptcy Code allocating the burden of proof in hearing held on this motion.

16.   If Movant is not allowed to proceed against Debtor's for the purpose of taking the limited discovery set forth above, Movant will suffer irreparable harm.

17.   Nothing herein waives, elects, releases, affects, or terminates any title, claim, interest, estate, right, legal position, or remedy of Movant and this filing is made expressly subject thereto.  Nor is this filing an admission of any fact or point of law.  Without limiting the generality of the foregoing, this filing does not waive any other remedy that Movant may have for the acts and omissions of Debtor or other persons

### PRAYER

WHEREFORE, pursuant to 11 U.S.C. §362(d), Movant seeks to have the automatic stay lifted as to his personal injury claim against the Debtor in order to allow Movant to conduct the limited discovery described above in connection with the State of Florida litigation.

Respectfully Submitted,

AGOSTINI, LEVITSKY, ISAACS & KULESZA

_____

**NEAL J. LEVITSKY, ESQ.** (#2092)
824 N. Market Street, Ste. 810
P.O. Box 2323
Wilmington, DE  19899-2323
(302) 654-7444, ext. 3
Attorneys for Movant,
Timothy Kane

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                        )          Chapter 11
                                              )
W.R. GRACE & CO., et al.,                     )          Case No. 01-01139(JJF)
                                              )          Jointly Administered)
            Debtors.                          )
_____
TIMOTHY KANE,                                 )
                                              )
            Movant,                           )
                                              )
v.                                            )          Motion No.: A-01-
                                              )
W.R. GRACE & CO., et at.,                     )
                                              )
            Respondent                        )

## MOTION TO LIFT AUTOMATIC STAY
## FOR CAUSE

1.  Movant, TIMOTHY KANE, (hereinafter KANE), moves this Court for relief from

the from the Automatic Stay ordered by this Court pursuant to §362 (a) of the Bankruptcy

Code, and in support thereof, states as follows:


## UNDISPUTED FACTS

2.  On July 19, 1999, KANE, a construction worker, was injured while performing

scaffold erection at the Grand Floridian Resort Hotel in Orlando, Florida.  KANE's injuries

occurred when he slipped and fell on a portion of the roof of the Grand Floridian which had

been covered with a roofing underlayment manufactured by Debtor, W.R. GRACE & CO.

As a result of this slip and fall, KANE fell from the roof of the resort, sustaining serious

personal injuries.

3.  Thereafter, KANE filed a state court action for personal injuries in Florida's Ninth

Judicial Circuit against Debtor and several other defendants.  KANE's claims against Debtor sound in negligence and strict products liability under Florida Law.  A true and correct copy of KANE's Amended Complaint for Damages in this state court action is attached hereto as "Exhibit A."

4.  After KANE notified Debtor of his intent to pursue an action for personal injuries against Debtor, KANE received a response from Debtor's liability insurer, RSKCo.  This correspondence indicated that Debtor had liability insurance coverage applicable to KANE's claims with coverage limits of $10 million per occurrence, $15 million in the aggregate.[1]  A true and correct copy of RSKCO's correspondence is attached hereto as "Exhibit B."

5.  As a result of the imposition of the automatic stay on KANE's state court action, KANE has been prevented from receiving the actual policy of insurance issued by RSKCo to Debtor, nor has he been permitted conduct further discovery into the existence of further liability insurance over and above the $10 million disclosed by Debtor, which may also be applicable to his claim.

6.  This Court has previously entered an Order lifting the stay for the sole purpose of allowing KANE to take four depositions of Debtor's employees to discover whether there was any merit to KANE's strict liability or negligence theories against Debtor.  A true and correct copy of the Court's Order With Respect to Timothy Kane's Motion For Relief From Automatic Stay is attached hereto as "Exhibit C."

---

[1]Further, no policy or coverage defenses were disclosed which would somehow make this liability insurance inapplicable to KANE's claims.

7. At the hearing on the motion, counsel for KANE mentioned the $10 million in insurance coverage available to Debtor for KANE's claim.  In response, the Court suggested to KANE that if he thought he had grounds to lift the stay based on the existence of this insurance, he should file a Proof of Claim in the case and then move to lift the stay for cause.  KANE filed his proof of claim on February 28, 2002.

8. Further, the aforementioned depositions did, indeed, indicate that KANE's strict liability and negligence claims against Debtor have merit.  In fact, Debtor had admitted in these depositions that their product becomes extremely slippery when wet, and had re-engineered the slip resistance capabilities of the product on several occasions.  These admissions certainly create a factual question as to whether Debtor provided sufficient warnings of the slipperiness of its product, whether it exercised reasonable care in the design of its product, and whether its product was defective as a result of insufficient slip resistance or a failure to provide sufficient warnings.

9. Further, this deposition testimony also indicated that Debtor's previous discovery responses in KANE's state court action had been incomplete.  Many more documents relevant to the design and testing of the Debtor's product existed, but had not been provided to KANE in his initial requests.  As a result, additional discovery is needed from Debtor on these issues.

## I.
### The liability insurance policy
### issued by RSKCo to Debtor is
### not property of the debtor's estate

10.   The law is well established that the determination of whether an insurance policy issued to the Debtor will constitute "property of the estate" as contemplated by §362 (a) must be analyzed in light of the facts of each case. *Sfuzzi, Inc.*, 191 B.R. 664, 668 (Bankr. N.D.Tx. 1996).

11.   Further, the overriding question when determining whether insurance proceeds are "property of the estate" is whether the Debtor would have a right to receive and keep those insurance proceeds when the insurer paid on the claim.  When a payment by an insurer cannot possibly inure to the Debtors pecuniary benefit, then that payment should neither enhance nor decrease the bankruptcy estate. *Matter of Edgeworth*, 993 F.2d 51, 55 (5th Cir. 1993). ***A Debtor will not have a cognizable interests in the proceeds of the typical liability policy because the proceeds will normally be payable only for the benefit of those harmed by the Debtor under the terms of the insurance contract, such as KANE in the present case.*** *Edgeworth*, 993 F.2d at 55 (emphasis added).

12.   In the present case, the insurance `policy provided by RSKCo to Debtor is solely for ***liability*** insurance.  Further, it has been represented through RSKCo's May 24, 2000 correspondence to KANE that this liability insurance contract is payable, should liability be established on the part of Debtor, for the benefit of KANE, who has been harmed by the Debtor under the terms of the contract between RSKCo and Debtor. Thus, the liability insurance proceeds of RSKCO's policy here are not "property of the estate."


**II.**
**KANE agrees to limit any recovery on**
**his claims against Debtor to the extent of**
**the liability insurance proceeds  under RSKCO's**

**policy with Debtor**

13.    Although not specifically alleged in his Amended Complaint for Damages, KANE's injuries resulting from the alleged acts/omissions of the Debtor include partial paralysis (paraplegia).  As a result of the aforementioned fall from the roof of the resort, KANE became paralyzed from the waste down, lost bladder and bowel function and the permanent loss of his earning capacity.

14.    Although KANE'S damages are obviously substantial, nevertheless, it is highly unlikely that a jury's verdict or judgment rendered in KANE's state court action against the Debtor would exceed the $10 million liability insurance coverage limits.

15.    Regardless of any verdict rendered in the state court action, by the filing of this Motion, KANE hereby agrees to limit the extent of any recovery he may make against Debtor to the $10 million liability insurance coverage limits of RSKCO's policy of insurance with Debtor.  In fact, among the other relief requested herein, Kane respectfully requests that this Court specifically limit any judgment entered in favor of KANE and against Debtor in the state court action to the extent of the liability insurance coverage limits available to Debtor for KANE's claims.

### III.
### All equitable considerations favor the
### lifting of the automatic stay for cause as
### it applies to KANE's claims against the Debtor

16.    Although KANE has not received a copy of the actual policy of liability insurance issued by RSKCo to Debtor, RSKCo's May 24, 2000 correspondence indicates that no policy or coverage defenses were being asserted by RSKCo against Debtor.  As

a result, there is no potential that if the stay is lifted, KANE's claim could somehow reach the assets of Debtor's estate because of a denial of coverage by RSKCo .

17.    Further, the policy of liability insurance between RSKCo and Debtor provides that RSKCo pay the costs of defense of KANE's state court action.    In fact, upon information and belief, RSKCo has hired defense counsel for Debtor in KANE's state court action and is paying for Debtor's defense in its entirety.    Thus, KANE's claim will not diminish the assets of the Debtor's estate by forcing Debtor to incur costs to defend itself against KANE because RSKCo is bearing this cost for Debtor.

18.    Moreover, the recovery being sought by KANE herein arises out of the alleged defective nature of a roofing underlayment manufactured by Debtor.    Based upon the discovery responses of Debtor in KANE's state court action, there is no other current claim existing against Debtor alleging defectiveness of the same product, nor injuries arising under circumstances substantially similar to those involved in KANE's alleged injuries.

19.    Thus, no argument can be made by Debtor that payment of KANE's claim by the liability insurance carrier here would somehow "open the floodgates" to other similar claims, thereby reducing the extent of insurance proceeds available to Debtor and expose the assets of Debtor's estate to such claims.

20.    KANE's claim is therefore distinguishable from those arising  under a "mass tort" situation such as that in which Debtor is currently involved with its asbestos claims.  In *Sfuzzi*, the Bankruptcy Court thought this issue to be critical to its decision to lift the automatic stay as it applied to the movant's claims in that case. *Sfuzzi, Inc.*, 191 B.R. 664, 668 (Bankr. N.D.Tx. 1996); *Edgeworth*, 993 F.2d at 56 (5th Cir. 1993). It should be of like import to the Court's decision here.

## **CONCLUSION**

21.   In summary, no possibility exists that the assets of the Debtor's estate could be reached or effected in anyway by the claims of KANE since:

> (1) Debtor has $10 million in liability insurance coverage available to satisfy any settlement, verdict or judgment rendered in Kane's claims;

> (2) no policy or coverage defenses have been asserted under this liability insurance policy which could expose the assets of Debtor's estate to Kane's claims;

> (3) KANE has agreed to limit any recovery on his claims to the extent of the liability insurance proceeds thereby eliminating any possibility of the liability insurance proceeds being exhausted;

> (4) Kane's claim is not a "mass tort" claim, where lifting the stay applicable to it might "open the flood gates" to other similar claims.

WHEREFORE, based upon the foregoing, KANE respectfully requests that this Court lift the Automatic Stay entered by this Court for cause, limit the extent of any recovery by KANE against Debtor to the limit of the liability insurance coverage available to Debtor for KANE's claims, and respectfully requests such other and further relief as this Court deems just and proper.

Respectfully Submitted,

**AGOSTINI, LEVITSKY, ISAACS & KULESZA**

**NEAL J. LEVITSKY, ESQ. (#2092)**
824 N. Market Street, Ste. 810
P.O. Box 2323
Wilmington, DE 19899
(302) 654-7444, ext. 3
Attorneys for Movant,
Timothy Kane

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that one copy of the attached MOTION OF

TIMOTHY KANE FOR RELIEF FROM THE AUTOMATIC STAY was served this /8 day

of June, 2002, upon the following individuals in the manner designated below:

James H. M. Sprayregen, Esquire
James A. Stempel, Esquire
Matthew N. Kleiman, Esquire
Samuel A. Schwartz, Esquire
Kirkland & Ellis
200 E. Randolph Drive
Chicago, IL 60601

*(By First Class Mail Postage Prepaid)*

Laura Davis Jones, Esquire
Pachulski, Stang, Ziehl, Young & Jones
919 N. Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

*(By First Class Mail Postage Prapaid)*

William Kevin Harrington, Esquire
Michael Lastowski, Esquire
Duane, Morris & Heckscher, LLP
1100 N. Market Street, Suite 1200
Wilmington, DE 19801

*(By First Class Mail Postage Prepaid)*

Office of the United States Trustee
844 King Street, Suite 2313
Lockbox 35
Wilmington, DE 19801-3519

*(By First Class Mail Postage Prepaid)*

NEAL J. LEVITSKY, ESQUIRE

TAB A

994524

IN THE CIRCUIT COURT OF THE
9TH JUDICIAL CIRCUIT IN AND
FOR ORANGE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. CI-00-6803

TIMOTHY KANE,

      Plaintiff,

vs.

WALT DISNEY WORLD CO.,
a Florida corporation,
W.R. GRACE & Co.-CONN,
a foreign corporation, McENANY
ROOFING, INC., a Florida corporation,
and A/R/C ASSOCIATES, INCORPORATED,
a Florida corporation,

      Defendants.
_____/

### AMENDED COMPLAINT FOR DAMAGES

COMES NOW the Plaintiff, TIMOTHY KANE, by and through his undersigned attorneys and sues the Defendants, WALT DISNEY WORLD CO. (hereinafter "DISNEY"), a Florida corporation, W.R. GRACE & Co.-CONN (hereinafter "W.R. GRACE"), a foreign corporation, McENANY ROOFING, INC. (hereinafter "McENANY ROOFING"), a Florida corporation, and A/R/C ASSOCIATES, INCORPORATED (hereinafter "A/R/C ASSOCIATES"), a Florida corporation and alleges as follows:

### GENERAL ALLEGATIONS AS TO ALL COUNTS

1. This is an action for damages which exceed the sum of Fifteen Thousand Dollars ($15,000.00), exclusive of interest and costs.

2. The Defendant, DISNEY, is a corporation duly organized under the laws of the State of Florida, and which at all times material hereto was doing business within Orange County, Florida, therein.

3.  Defendant, W.R. GRACE, is a foreign corporation licensed to and doing business within the State of Florida, and within Orange County, Florida, therein.

4.  In the alternative, Defendant, W.R. GRACE is subject to the jurisdiction of this Court by way of the Florida Long Arm Statute in that it has established minimum contacts within this State, by, among other things, placing the product which is the subject matter of this action into the stream of commerce with the reasonable expectation that such product will eventually be sold within this jurisdiction to consumers residing therein.

5. Defendant, McENANY ROOFING is a corporation duly organized under the laws of the State of Florida, and which at all times material hereto was doing business within Orange County, Florida, therein.

6.  Defendant, A/R/C ASSOCIATES is a corporation duly organized under the laws of the State of Florida, and which at all times material hereto was doing business within Orange County, Florida, therein,

7.  The personal injuries which are the subject matter of this action were sustained by TIMOTHY KANE in Orange County, Florida, and thus, venue is proper.

8.  At all times material hereto, DISNEY was the owner of the Grand Floridian Resort and Spa (hereinafter "Grand Floridian") located on its premises, within its theme park in Orlando, Orange County, Florida.

CASE NO. CI-00-6803

9. At all times material hereto, DISNEY was actively engaged in a construction project on the Grand Floridian which involved the beautification, restoration, refurbishing and maintenance of the roof, exterior and interior of these premises.

10. At all times material hereto, McENANY ROOFING was under written contract with DISNEY to:

> (a)    create    design    plans    and specifications, for the beautification, restoration, refurbishing and maintenance of the roof of the Grand Floridian as part of the above-mentioned construction project; and

> (b)    implement those design plans and specifications    through    the    use    of contractors, subcontractors and its own personnel.

11. TIMOTHY KANE is in possession of this written contract, and a true and correct copy is attached hereto "EXHIBIT A."

12. At all times material hereto, A/R/C ASSOCIATES was under written contract with DISNEY to:

> (a)    create    design    plans    and specifications, for the beautification, restoration, refurbishing and maintenance of the roof of the Grand Floridian as part of the above-mentioned construction project; and

> (b)    implement those design plans and specifications    through    the    use    of contractors, subcontractors and its own personnel.

13. TIMOTHY KANE is in possession of this written

-3-

contract and a true and correct copy is attached hereto as "EXHIBIT B."

14. At all times material hereto, in the performance of their roofing work on the Grand Floridian, McENANY ROOFING, A/R/C ASSOCIATES, their contractors, subcontractors and personnel utilized Vycor Ice & Water Shield, a self-adhering roofing underlayment manufactured exclusively by W.R. GRACE.

15. The use of Vycor Ice & Water Shield on the Grand Floridian construction project was specified by McENANY ROOFING.

16. The use of Vycor Ice & Water Shield on the Grand Floridian construction project was specified and/or approved by A/R/C ASSOCIATES.

17. The use of Vycor Ice & Water Shield on the Grand Floridian construction project was specified and approved by DISNEY.

18. At all times material hereto, TIMOTHY KANE, was employed by Emery's Erection & Dismantling, Inc., an independent contractor of DISNEY, which had been hired to perform the erection and dismantling of scaffold for DISNEY as part of the aforementioned construction project.

19. On or about July 19th, 1999, TIMOTHY KANE was present on this construction project, performing scaffold erection in the course and scope of his employment with Emery's Erection & Dismantling, Inc.,

20. At the aforementioned time and place, TIMOTHY KANE, while walking on a portion of the roof of the Grand Floridian which had been covered with Vycor Ice & Water Shield, slipped and fell on the

-4-

Vycor Ice & Water Shield, falling from the roof and sustaining the serious personal injuries hereinafter alleged.

## COUNT I - TIMOTHY KANE'S CLAIM FOR STRICT PRODUCT LIABILITY

### AGAINST DEFENDANT W.R. GRACE

The Plaintiff realleges and reavers paragraphs one through twenty of this Amended Complaint as if fully set forth herein.

21. The aforementioned Vycor Ice & Water Shield was designed, manufactured, distributed and sold by W.R. GRACE in a defective condition, unreasonably dangerous to foreseeable users such as Plaintiff, TIMOTHY KANE, in that:

> a) Vycor Ice & Water Shield, which is specifically designed to be applied to angled, slanted or gabled roofs in the manner in which it was being applied and used on the Grand Floridian construction project, becomes dangerously slippery when wet;

> b) W.R. GRACE designed, manufactured, distributed and sold Vycor Ice & Water Shield without providing an adequate warning to its prospective consumers and users of the dangers presented by its tendency to become dangerously slippery when wet;

> c) W.R. GRACE failed to utilize existing state of the art design alternatives which were cost effective and which would have made its product less slippery when wet, and which would have prevented injuries such as those sustained by TIMOTHY KANE as described herein;

-5-

d) W.R. GRACE designed, manufactured, distributed and sold Vycor Ice & Water Shield in a hazardous condition in that W.R. GRACE failed to provide adequate instructions for the reasonably safe application and use of Vycor Ice & Water Shield;

e) W.R. GRACE designed, manufactured, distributed and sold Vycor Ice & Water Shield in a defective and unreasonably dangerous condition by failing to adequately warn TIMOTHY KANE and others like him of the dangers posed by the dangerous slipperiness of Vycor Ice & Water Shield when it is applied and used in its intended manner.

22. Through the defects described in paragraphs 21(a) through 21(e),the aforementioned Vycor Ice & Water Shield, designed, manufactured, distributed and sold by W.R. GRACE was not reasonably fit for the purpose for which it was intended at the time of its design, manufacture, distribution or sale, by W.R. GRACE.

23. Due to the defects described in paragraphs 21(a) through 21(e), Vycor Ice & Water Shield, designed, manufactured, distributed and sold by W.R. GRACE was placed on the market in a defective or inherently dangerous condition.

24. Due to the defects described in paragraphs 21(a) through 21(e), Vycor Ice & Water Shield was unreasonably dangerous because of its design, such that the risk of danger to foreseeable users, such as DISNEY, McENANY ROOFING, A/R/C ASSOCIATES and TIMOTHY KANE, outweighed the benefits of the product.

25. Due to the defects described in paragraphs 21(a) through

-6-

21(e), W.R. GRACE's Vycor Ice & Water Shield was dangerous beyond the expectation of the ordinary user when applied and used as intended, or in a manner reasonably foreseeable to W.R. GRACE.

26. Due to the defects described in paragraphs 21(a) through 21(e), W.R. GRACE's aforementioned Vycor Ice & Water Shield was unreasonably dangerous because a less dangerous alternative design and/or modifications to design were available and economically feasible to W.R. GRACE at the time it designed, manufactured, distributed and sold Vycor Ice & Water Shield.

27. TIMOTHY KANE was unaware of the defective and unreasonably dangerous condition presented by W.R. GRACE's Vycor Ice & Water Shield.

28. W.R. GRACE knew or should have known that its Vycor Ice & Water Shield would be used without inspection for the aforedescribed defects, and by placing it on the market, represented that it would safely do the job for which it was intended.

29. As a direct and proximate result of the defective and unreasonably dangerous condition in which W.R. GRACE designed, manufactured, distributed and sold Vycor Ice & Water Shield, TIMOTHY KANE was injured in and about his body and extremities, suffered bodily injury that is permanent within a reasonable degree of medical probability, resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, loss of income or earning capacity, expense of hospitalization, medical and

-7-

nursing care and treatment and aggravation of a previously existing condition.   These losses are either permanent and/or continuing in nature and the Plaintiff will continue to suffer them in the future.

WHEREFORE, Plaintiff, TIMOTHY KANE, demands judgment for damages against the Defendant, W.R. GRACE, his costs herein, and further demand trial by jury.

### COUNT II - TIMOTHY KANE'S CLAIM FOR STRICT PRODUCT LIABILITY
### AGAINST DEFENDANT, McENANY ROOFING

The Plaintiff realleges and reavers paragraphs one through twenty of this Amended Complaint as if fully set forth herein.

30.    The aforementioned Vycor Ice & Water Shield was distributed and sold by McENANY ROOFING in a defective condition, unreasonably dangerous to foreseeable users such as Plaintiff, TIMOTHY KANE, in that:

> a) Vycor Ice & Water Shield, which is specifically designed to be applied to angled, slanted or gabled roofs in the manner in which it was being applied and used on the Grand Floridian construction project, becomes dangerously slippery when wet;

> b) McENANY ROOFING distributed and sold Vycor Ice & Water Shield without providing an adequate warning to its prospective consumers and users of the dangers presented by its tendency to become dangerously slippery when wet;

> c) McENANY ROOFING failed to utilize existing state of the art design alternatives which were cost effective and which would have made Vycor Ice &

Water Shield less slippery when wet, and
which would have prevented injuries such
as those sustained by TIMOTHY KANE as
described herein;

d) McENANY ROOFING distributed and sold
Vycor Ice & Water Shield in a hazardous
condition in that it failed to provide
adequate instructions for the reasonably
safe application and use of Vycor Ice &
Water Shield;

e) McENANY ROOFING distributed and sold
Vycor Ice & Water Shield in a defective
and unreasonably dangerous condition by
failing to adequately warn TIMOTHY KANE
and others like him of the dangers posed
by the dangerous slipperiness of Vycor -
Ice & Water Shield when it is applied and
used in its intended manner.

31.  Through the defects described in paragraphs 30(a)

through 30(e),the aforementioned Vycor Ice & Water Shield, distributed

and sold by McENANY ROOFING was not reasonably fit for the purpose for

which it was intended at the time of its distribution and sale, by

McENANY ROOFING.

32.  Due to the defects described in paragraphs 30(a) through

30(e), Vycor Ice & Water Shield, distributed and sold by McENANY

ROOFING was placed on the market in a defectively or inherently

dangerous condition.

33.  Due to the defects described in paragraphs 30(a) through

30(e), Vycor Ice & Water Shield was unreasonably dangerous because of

its design, such that the risk of danger to foreseeable users, such as

DISNEY, A/R/C ASSOCIATES and TIMOTHY KANE, outweighed the benefits of the product.

34.   Due to the defects described in paragraphs 30(a) through 30(e), Vycor Ice & Water Shield was dangerous beyond the expectation of the ordinary user when applied and used as intended, or in a manner reasonably foreseeable to McENANY ROOFING.

35.   Due to the defects described in paragraphs 30(a) through 30(e), Vycor Ice & Water Shield was unreasonably dangerous because a less dangerous alternative design and/or modifications to design were available and economically feasible to McENANY ROOFING at the time it distributed and sold Vycor Ice & Water Shield.

36.   TIMOTHY KANE was unaware of the defective and unreasonably dangerous condition presented by Vycor Ice & Water Shield.

37.   McENANY ROOFING knew or should have known that Vycor Ice & Water Shield would be used without inspection for the aforedescribed defects, and by placing it on the market, distributing and selling it, represented that it would safely do the job for which it was intended.

38.   As a direct and proximate result of the defective and unreasonably dangerous condition in which McENANY ROOFING distributed and sold Vycor Ice & Water Shield, TIMOTHY KANE was injured in and about his body and extremities, suffered bodily injury that is permanent within a reasonable degree of medical probability, resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, loss of income or earning capacity,

expense of hospitalization, medical and nursing care and treatment and aggravation of a previously existing condition.   These losses are either permanent and/or continuing in nature and the Plaintiff will continue to suffer them in the future.

WHEREFORE, Plaintiff, TIMOTHY KANE, demands judgment for damages against the Defendant, McENANY ROOFING, his costs herein, and further demand trial by jury.

### COUNT III - TIMOTHY KANE'S CLAIM FOR NEGLIGENCE AGAINST DEFENDANT, W.R. GRACE

The Plaintiff readopts and reavers paragraphs one through twenty of this Amended Complaint as if fully set forth herein.

39.   At all times material hereto, W.R. GRACE owed a duty to TIMOTHY KANE to design, manufacture, distribute and sell Vycor Ice & Water Shield, and to provide adequate instructions and warnings to be utilized and relied upon by foreseeable users of its product such as DISNEY, McENANY ROOFING, A/R/C/ ASSOCIATES  and TIMOTHY KANE, in such a manner that its product, Vycor Ice & Water Shield, would be reasonably safe for its intended use.

40.   At all times material hereto, W.R. GRACE breached said duties for the reasons set forth as follows:

> a) Vycor Ice & Water Shield, which is specifically designed to be applied to slanted or gabled roofs in the manner in which it was being used on the Grand

Floridian construction project, becomes
dangerously slippery when wet;

b) W.R. GRACE designed, manufactured,
distributed and sold Vycor Ice & Water
Shield without providing an adequate
warning to its prospective owners and
users of the dangers presented by its
tendency to become extremely slippery
when wet;

c) W.R. GRACE failed to utilize existing
state of the art design alternatives
which were cost effective and which would
have made its product less slippery when
wet, and which would have prevented
injuries, such as those sustained by
TIMOTHY KANE as described herein;

d) W.R. GRACE designed, manufactured,
distributed and sold Vycor Ice & Water
Shield in a hazardous condition in that
W.R. GRACE failed to provide adequate
instruction for the reasonably safe
application and use of Vycor Ice & Water
Shield;

e) W.R. GRACE designed, manufactured,
distributed and sold Vycor Ice & Water
Shield in a defective and unreasonably
condition by failing to adequately warn
TIMOTHY KANE and others like him of the
dangers posed by the slipperiness of
Vycor Ice & Water Shield when it is
applied and used in its intended manner.

41. Through the defects described in paragraphs 40(a)

through 40(e),the aforementioned Vycor Ice & Water Shield, designed,

manufactured, distributed and sold by W.R. GRACE was not reasonably fit

for the purpose for which it was intended at the time of its design,

manufacture, distribution or sale by W.R. GRACE.

-12-

42. Due to the defects described in paragraphs 40(a) through 40(e), Vycor Ice & Water Shield, designed, manufactured, distributed and sold by W.R. GRACE was placed on the market in a defectively or inherently dangerous condition.

43. Due to the defects described in paragraphs 40(a) through 40(e), Vycor Ice & Water Shield was unreasonably dangerous because of its design, so that the risk of danger to foreseeable users, such as DISNEY, McENANY ROOFING, A/R/C ASSOCIATES and TIMOTHY KANE, outweighed the benefits of the product.

44. Due to the defects described in paragraphs 40(a) through 40(e), W.R. GRACE's Vycor Ice & Water Shield was dangerous beyond the expectation of the ordinary user when applied and used as intended, or in a manner reasonably foreseeable to W.R. GRACE.

45. Due to the defects described in paragraphs 40(a) through 40(e), W.R. GRACE's aforementioned Vycor Ice & Water Shield was unreasonably dangerous because a less dangerous alternative design and/or modifications to design were available and economically feasible to W.R. GRACE.

46. At all times material hereto, W.R. GRACE knew, or in the exercise of reasonable care, should have known, that its negligent acts and omissions with respect to the design, manufacture, distribution and sale of Vycor Ice & Water Shield, together with its negligent preparation and distribution of instructions and warnings for the

application and use of this product would result in injuries to users

of this product such as DISNEY and TIMOTHY KANE.

47. W.R. GRACE was negligent in failing to exercise due care

in the design, manufacture, distribution and sale of Vycor Ice & Water

Shield for the reasons alleged in paragraphs 40(a) through 40(e).

48. The negligent acts and omissions of W.R. GRACE alleged

herein directly and proximately caused TIMOTHY KANE to be injured in

and about his body and extremities, suffered bodily injury that is

permanent within a reasonable degree of medical probability, resulting

pain and suffering, disability, disfigurement, mental anguish, loss of

capacity for the enjoyment of life, loss of income or earning capacity,

expense of hospitalization, medical and nursing care and treatment and

aggravation of a previously existing condition. These losses are

either permanent and/or continuing in nature and the Plaintiff will

continue to suffer them in the future.

WHEREFORE, Plaintiff, TIMOTHY KANE, demands judgment for

damages against the Defendant, W.R. GRACE, his costs herein, and

further demand trial by jury.

## COUNT IV - TIMOTHY KANE'S CLAIM FOR NEGLIGENCE AGAINST

## DEFENDANT, McENANY ROOFING

The Plaintiff readopts and reavers paragraphs one through

twenty of this Amended Complaint as if fully set forth herein.

49. At all times material hereto, McENANY ROOFING owed a

duty to TIMOTHY KANE to:

(a) prepare design plans and specifications for its roofing work at the Grand Floridian construction project in such a manner so that TIMOTHY KANE, who would be performing work pursuant to those design plans and specifications, would not be unreasonably endangered thereby;

(b) to implement those design plans and specifications through the use of its own employees, contractors and sub-contractors in such a manner so that TIMOTHY KANE, who would be performing work pursuant to those design plans and specifications, would not be unreasonably endangered thereby.

50. At all times material hereto, McENANY ROOFING also owed a duty to TIMOTHY KANE to distribute and sell Vycor Ice & Water Shield, and to provide adequate instructions and warnings to be utilized and relied upon by foreseeable users of Vycor Ice & Water Shield such as TIMOTHY KANE, in such a manner that Vycor Ice & Water Shield, would be reasonably safe for its intended use.

51. At all times material hereto, McENANY ROOFING breached said duties for the reasons set forth as follows:

a) McENANY ROOFING created design plans and specifications for the roofing work to be performed on the Grand Floridian construction project which provided for the use of Vycor Ice & Water Shield as a roofing underlayment, when McENANY ROOFING knew, or in the exercise of reasonable care, should have known, that this product would become dangerously slippery when wet;

-15-

b) McENANY ROOFING created design plans and specifications for the roofing work to be performed on the Grand Floridian construction project which provided for the use of Vycor Ice & Water Shield as a roofing underlayment, but then failed to adequately warn TIMOTHY KANE of the unreasonable danger presented to him by working in the same area as this product, which becomes dangerously slippery when wet;

c) McENANY ROOFING created design plans and specifications for the roofing work to be performed on the Grand Floridian construction project which provided for the use of Vycor Ice & Water Shield as a roofing underlayment, but then failed to provide adequate safety measures to protect TIMOTHY KANE and others performing work on the roof of the Grand Floridian from the latent hazard presented by this product, when McENANY ROOFING knew or should have known through the exercise of reasonable care of the existence of the hazard;

d) McENANY ROOFING distributed and sold Vycor Ice & Water Shield without providing an adequate warning to its prospective owners and users of the dangers presented by its tendency to become extremely slippery when wet;

e) McENANY ROOFING failed to utilize existing state of the art design alternatives which were cost effective and which would have made its product less slippery when wet, and which would have prevented injuries, such as those sustained by TIMOTHY KANE as described herein;

f) McENANY ROOFING distributed and sold Vycor Ice & Water Shield in a hazardous condition in that McENANY ROOFING failed to provide adequate instruction for the

reasonably safe application and use of Vycor Ice & Water Shield;

g) McENANY ROOFING distributed and sold Vycor Ice & Water Shield in a defective and unreasonably condition by failing to adequately warn TIMOTHY KANE and others like him of the dangers posed by the slipperiness of Vycor Ice & Water Shield when it is applied and used in its intended manner.

(h) Failed to adequately supervise its employees, contractors and sub-contractors to assure that the work which was to be performed pursuant to the aforementioned plans and specifications was so performed;

(i) Failed to adaqutly supervise its employees, contractors and sub-contractors to ensure that they were able to perform work pursuant to the aforementioned plans and specifications without having to traverse unauthorized areas of the roof, or otherwise be exposed to the unreasonable danger of working in the area where Vycor Ice & Water Shield was being used by it as a roofing underlayment.

52. At all times material hereto, McENANY ROOFING knew, or in the exercise of reasonable care, should have known, that its negligent acts and omissions with respect to: (1) the creation of design plans and specifications; (2) its implementation of those plans and specifications; and (3) the distribution and sale of Vycor Ice & Water Shield, together with its negligent preparation and distribution of instructions and warnings for the application and use of this

product, would result in injuries to users of this product such as TIMOTHY KANE.

53. The negligent acts and omissions of McENANY ROOFING alleged herein directly and proximately caused TIMOTHY KANE to be injured in and about his body and extremities, suffered bodily injury that is permanent within a reasonable degree of medical probability, resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, loss of income or earning capacity, expense of hospitalization, medical and nursing care and treatment and aggravation of a previously existing condition. These losses are either permanent and/or continuing in nature and the Plaintiff will continue to suffer them in the future.

WHEREFORE, Plaintiff, TIMOTHY KANE, demands judgment for damages against the Defendant, McENANY ROOFING, his costs herein, and further demand trial by jury.

## COUNT V - TIMOTHY KANE'S CLAIM FOR NEGLIGENCE AGAINST
## DEFENDANT, A/R/C ASSOCIATES

The Plaintiff readopts and reavers paragraphs one through twenty of this Amended Complaint as if fully set forth herein.

54. At all times material hereto, A/R/C ASSOCIATES owed a duty to TIMOTHY KANE to prepare design plans and specifications for the roofing work at the Grand Floridian construction project in such a manner so that TIMOTHY KANE, who would be performing work pursuant to

-18-

CASE NO. CI-00-6803

those design plans and specifications, would not be unreasonably endangered thereby.

55.    In the alternative, at all times material hereto, A/R/C ASSOCIATES  owed a duty to TIMOTHY KANE to accept and approve  design plans and specifications submitted to it for roofing work at the Grand Floridian construction project in such a manner so that TIMOTHY KANE, who would be performing work pursuant to those design plans and specifications, would not be unreasonably endangered thereby.

56.    At all times material hereto, A/R/C ASSOCIATES also owed a duty to TIMOTHY KANE to oversee and supervise the roofing work being done on the Grand Floridian construction project in such a manner that TIMOTHY KANE, who was performing work on this construction project, would not be unreasonably endangered by any safety risk associated with the roofing work of which it was aware, or should have been aware through the exercise of reasonable care.

57.    At all times material hereto, A/R/C ASSOCIATES breached said duties for the reasons set forth as follows:

> a) A/R/C ASSOCIATES created design plans and specifications providing for the use of Vycor Ice & Water Shield for the roofing work to be performed on the Grand Floridian construction project when A/R/C ASSOCIATES knew, or in the exercise of reasonable care, should have known, that this product would become dangerously slippery when wet;
>
> b) A/R/C ASSOCIATES accepted and approved design plans and specifications for the roofing work to be performed on the Grand

-19-

Floridian construction project which provided for the use of Vycor Ice & Water Shield as a roofing underlayment, when A/R/C ASSOCIATES knew, or in the exercise of reasonable care, should have known, that this product would become dangerously slippery when wet;

c) A/R/C ASSOCIATES failed to adequately oversee and supervise the roofing work being done on the Grand Floridian construction project by:

    (1) failing to identify a specific safety risk associated with the use of Vycor Ice & Water Shield as a roofing underlayment; to wit: its propensity to become dangerously slippery when wet, and allowing TIMOTHY KANE and others to perform roof work on this construction project without adequately warning of its propensity to become dangerously slippery when wet.

    (2) failing to provide adequately safety precautions to TIMOTHY KANE and others performing work on this construction project to protect them from falling on Vycor Ice & Water Shield, despite the fact that it knew or should have known through the exercise of reasonable care that this product becomes dangerously slippery when wet;

    (3) failing to adequately warn TIMOTHY KANE and others performing work on this construction project that Vycor Ice & Water Shield would become dangerously slippery when wet, despite the fact that it knew

-20-

or should have known through
the exercise of reasonable care
of this propensity of the
product.

(4) failing to provide adequate
safety personnel to warn
TIMOTHY KANE and others
performing work on this
construction project that Vycor
Ice & Water Shield would become
dangerously slippery when wet,
despite the fact that it knew
or should have known through
the exercise of reasonable care
of this propensity of the
product.

58.  At all times material hereto, A/R/C ASSOCIATES knew, or

in the exercise of reasonable care, should have known, that its

negligent acts and omissions with respect to the creation and/or

acceptance of design plans and specifications, and its implementation

of those design plans and specifications, would result in injuries to

workers on this construction project who would come into contact with

Vycor Ice & Water Shield, such as TIMOTHY KANE.

59.  The negligent acts and omissions of A/R/C ASSOCIATES

alleged herein directly and proximately caused TIMOTHY KANE to be

injured in and about his body and extremities, suffered bodily injury

that is permanent within a reasonable degree of medical probability,

resulting pain and suffering, disability, disfigurement, mental

anguish, loss of capacity for the enjoyment of life, loss of income or

earning capacity, expense of hospitalization, medical and nursing care

and treatment and aggravation of a previously existing condition.

CASE NO. CI-00-6803

These losses are either permanent and/or continuing in nature and the Plaintiff will continue to suffer them in the future.

WHEREFORE, Plaintiff, TIMOTHY KANE, demands judgment for damages against the Defendant, A/R/C ASSOCIATES, his costs herein, and further demand trial by jury.

## COUNT VI - TIMOTHY KANE'S CLAIM FOR NEGLIGENCE

### AGAINST DEFENDANT, DISNEY

The Plaintiff realleges and reavers paragraphs one through twenty of this Amended Complaint as if fully set forth herein.

60. At all times material hereto, DISNEY, as the owner of the premises upon which this construction project was taking place, owed a duty to TIMOTHY KANE to:

a) Exercise reasonable care and diligence in the course of its inspection and supervision of this construction project for the protection of TIMOTHY KANE and others like him who might foreseeably and with reasonable certainty be injured by its failure to do so;

b) Exercise reasonable care and diligence in the creation of its design plans and specifications for this construction project for the protection of TIMOTHY KANE and others like him who might foreseeably and with reasonable certainty be injured by its failure to do so;

c) Exercise reasonable care and diligence in the approval of its design plans and specifications for this construction project for the protection of TIMOTHY KANE and others like him who might

-22-

foreseeably and with reasonable certainty
be injured by its failure to do so;

d) Provide a safe working environment on
this construction project for TIMOTHY
KANE, free of any unreasonably dangerous
working conditions of which it was aware,
or should have been aware through its
exercise of reasonable care, but which
with reasonable certainty would be
unknown to TIMOTHY KANE;

e) Warn TIMOTHY KANE and others like him
of any unreasonably dangerous condition
on this construction project, the
existence of which was known to DISNEY,
or should have been known to DISNEY
through the exercise of reasonable care
in its inspection and oversight of this
construction project;

f) Exercise reasonable care in the
retention and hiring of contractors for
the planning and performance of work on
this construction project for the
protection of TIMOTHY KANE and others
like him who might foreseeably and with
reasonable certainty be injured by its
failure to do so;

g) To provide TIMOTHY KANE with a safe
place to work by ensuring that all
applicable safety regulations were
followed on the construction project.

61.   On July 19th, 1999, DISNEY breached these duties owed to

TIMOTHY KANE, by the following negligent acts of commission/omission:

a) By creating design plans and
specifications for this construction
project calling for the use of Vycor Ice
& Water Shield when it knew or should
have known through the exercise of
reasonable care that this product becomes
dangerously slippery when wet;

-23-

b) By approving the design plans and specification for this construction project calling for the use of Vycor Ice & Water Shield when it knew or should have known through the exercise of reasonable care that this product becomes dangerously slippery when wet;

c) By retaining contractors for the planning and performance of work on this construction project who failed to adequately apprise it of the safety risks associated with the use of the products specified in those design plans, to wit: Vycor Ice & Water Shield;

d) By specifying the use of Vycor Ice & Water Shield for this construction project and thereafter allowing TIMOTHY KANE and other workers on this construction project to walk upon this product, despite the fact that it knew or should have known this through the exercise of reasonable care without that this product becomes dangerously slippery when wet and that this would be unknown to TIMOTHY KANE;

e) By failing to warn TIMOTHY KANE of the unreasonable dangers presented to him by allowing him, and others like him, to work in the area where a defective product, to wit: Vycor Ice & Water Shield, was being used pursuant to DISNEY's own plans and specifications.

f) By negligently failing to provide sufficient supervision and/or oversight of this construction project to ensure that TIMOTHY KANE and others like him were adequately warned of the unreasonable dangers presented to them through the use of Vycor Ice & Water Shield.

-24-

CASE NO. CI-00-6803

62.   As a direct and proximate result of the negligence of DISNEY, TIMOTHY KANE was injured in and about his body and extremities, suffered bodily injury that is permanent within a reasonable degree of medical probability, resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, loss of income or earning capacity, expense of hospitalization, medical and nursing care and treatment and aggravation of a previously existing condition.   These losses are either permanent and/or continuing in nature and the Plaintiff will continue to suffer them in the future.

WHEREFORE, Plaintiff, TIMOTHY KANE, demands judgment for damages against the Defendant, DISNEY, his costs herein, and further demand trial by jury.

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this 23rd day of August, 2001, to: Reinald Werrenrath III, Esq., P.O. Box 712, Orlando, Florida 32802 and Mark Ragusa, Esq., 401 E. Jackson Street, Suite 2700, Tampa, Florida 33602.

CONROY, SIMBERG, GANON, KREVANS & ABEL, P.A.
Attorneys for the Plaintiff
3440 Hollywood Blvd., 2nd Floor
Hollywood, Florida 33021
954-961-1400

BY: _____
     STUART F. COHEN, ESQ.
     Fla.Bar#986178

PROJECT:  DISNEY'S GRAND FLORIDIAN RESORT AND SPA-ROOF REPLACEMENT

CONTRACT NUMBER:  99DE-0904

PROJECT NUMBER:  5E-624-70-12-KGJA07CA

**EXECUTED**

MAY 3 1999

BY: _K M Ludwig_

LUMP SUM AGREEMENT

THIS AGREEMENT, made effective as of April 15, 1999, by and between **Walt Disney World Co.** (herein referred to as the "Owner"), whose mailing address is P.O. Box 10000, Lake Buena Vista, FL  32830-1000, Attention:  Contract Services, and **McENANY ROOFING** (herein referred to as the "Contractor"), whose mailing address is 8803 Industrial Drive, Tampa, FL  33637.

W I T N E S S E T H

In consideration of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

Article 1
DEFINITIONS: THE CONTRACT DOCUMENTS

1.1.            The capitalized terms used herein shall have the meanings set forth in the General Conditions of the Contract for Construction (herein referred to as the "General Conditions") unless a specific definition thereof is provided herein.  Unless otherwise specified, references herein to numbered articles and paragraphs are to those in this Agreement.  This Agreement shall be referred to throughout the Contract Documents as the "Agreement".

1.2.            The Contract Documents consist of this Agreement, the Conditions of the Contract (General, Special, Supplementary and other Conditions), the Drawings, the Specifications, all Addenda (except portions thereof relating purely to any of the bidding forms or bidding procedures), all Modifications and all other documents enumerated on the attached "List of Contract Documents".  Such documents form the Contract and all are as fully a part thereof as if attached to this agreement or repeated herein.

Article 2
STATEMENT OF THE WORK

The Contractor shall provide and pay for all materials, tools, equipment, labor and professional and nonprofessional services, and shall perform all other acts and supply all other things necessary to fully and properly perform and complete the following:

- Provide replacement of the roofs at Lodge Buildings 5, 6, 7, 8, and 9 (identified as Sago Cay, Conch Key, Sugar Loaf Key, Big Pine Key and Boca Chica Key) at Disney's Grand Floridian Resort And Spa in accordance with the Contract Documents.  The scope of the Contractor's Work shall include the removal of existing and installation of new shingles, underlayment, counterflashing, edge and rake metal, plywood sheathing, foam insulation, metal deck coating and all other Work as detailed within Specification Section 01010, Summary of Work, and all other Contract Documents.

- Owner may, at its option, elect to add to Contractor's scope of work via change order, the replacement of the roofs of Building 4 (Main Building), Monorail station and the ancillary building consisting of the Boat Dock, Narcoossee's restaurant, Pool Building and Summer House.  In the event Owner elects to have this additional Work performed, Contractor shall perform the Work in accordance with the Contract Documents for the lump sum amount of $3,303,405.  As per mutual understanding between Owner, Contractor and Contractor's Surety, coverage under Performance and Payment Bonds for this additional Work shall be subject to the consent of the Surety.  This in no way however, relieves the Contractor from its responsibility to provide Performance and

WDW-1
003001



BY: ---------------------

Exhibit A

Payment Bonds at no increase in cost to the Owner for this portion of the Work in the event Owner elects to award this Work to the Contractor.

- In the event Owner elects to replace areas of metal roof decking and deteriorated plywood, Contractor shall furnish and install new materials in accordance with the following unit prices. The unit prices include all labor, material, equipment and all other things necessary to fully and properly replace the damaged and deteriorated areas.

  - Metal Roof Decking:                          $18.00 per square foot
  - 5/8" Thick Pressure Treated Plywood:         $ 4.95 per square foot

The following listed documents are applicable to the foregoing work:

A.  Drawings:  Refer to Attachment A, List of Drawings
B.  Specifications:
- EPCOT Building Codes, latest edition, and all other applicable codes and regulations
- Design Standard for the Attachment of Overhead Objects, Rev. 1, dated 1/23/95, 19 pages
- Typical Fence Detail Types I, II, III, and IV, dated 9/16/92 (4 pages)
- Section 01010        Summary of Work, 28 pages, dated February 25, 1999
- Section 01018        Owner Furnished Products, 3 pages, dated February 25, 1999
- Section 01041        Project Coordination, 4 pages, dated February 25, 1999
- Section 01045        Cutting and Patching, 3 pages, dated February 25, 1999
- Section 01061        Applicable Building Codes, 1 page, dated February 25, 1999
- Section 01070        Abbreviations, Definitions and Standards, 6 pages, dated February 25, 1999
- Section 01202        Progress Meetings, 5 pages, dated February 25, 1999
- Section 01310        Construction Schedule, 9 pages, dated February 25, 1999
- Section 01315        Contract Time, Sequencing and Timing of Work, 2 pages, dated February 25, 1999
- Section 01340        Shop Drawings, Product Data, and Samples, 7 pages, dated February 25, 1999
- Section 01370        Schedule of Values, 3 pages, dated February 25, 1999
- Section 01400        Quality Control, 6 pages, dated February 25, 1999
- Section 01410        Testing Laboratory Services, 2 pages, dated February 25, 1999
- Section 01500        Temporary Construction Facilities, 4 pages, dated February 25, 1999
- Section 01568        Erosion Control, 4 pages, dated February 25, 1999
- Section 01630        Substitutions and Product Options, 2 pages, dated February 25, 1999
- Section 01640        Product Handling and Protection, 1 page, dated February 25, 1999
- Section 01700        Project Closeout, 5 pages, dated February 25, 1999
- Section 01710        Cleaning, 3 pages, dated February 25, 1999
- Section 01720        Project Record Documents, 3 pages, dated February 25, 1999
C.  Special Contract Conditions, 3 pages dated February 25, 1999
D.  General Conditions of the Contract for Construction, pages 1 through 19, February 1998, ed.
E.  Contractor's Guarantee, 1 page
F.  Performance Bond, 1 page
G.  Payment Bond, 1 page
H.  Change Order form June, 1990, ed.
I.  Close-out Change Order form June, 1990, ed.
J.  Addendum No. 1, Disney's Grand Floridian Beach Resort & Spa Construction Packages No. 2, 3, & 4, Roof Replacement, 3 pages, dated March 17, 1999.
K.  Addendum No. 2, Disney's Grand Floridian Beach Resort & Spa Construction Packages No. 2, 3, & 4, Roof Replacement, 4 pages, dated March 19, 1999.

The Contractor shall further provide and pay for all related facilities described in any of the Contract Documents, including all work expressly specified therein and such additional work as may be reasonably inferred therefrom, saving and excepting only such items of work as are specifically stated in the Contract Documents not to be the obligation of the Contractor. The totality of the obligations imposed upon the Contractor by this Article and by all other provisions of the Contract Documents, as well as the structures to be built and the labor to be performed, is herein referred to as the "Work".

Article 3
OWNER'S REPRESENTATIVE

The Owner's authorized representative (herein referred to as the "Owner's Representative") shall be **Facility Asset management** whose mailing address is Post Office Box 10000, Lake Buena Vista, Florida 32830-1000, ATTN: **Steve Coole** provided, however, that the Owner may, without liability to the Contractor, unilaterally amend this Article from time to time by designating a different person or organization to act as its representative and so advising the Contractor in writing, at which time the person or organization so designated shall be the Owner's Representative for purposes of this Contract.

Article 4
THE ARCHITECT/ENGINEER

The Architect/Engineer for the Project (herein referred to as the "A/E") is WDW Architecture and Facilities Engineering whose mailing address is P.O. Box 10000, Lake Buena Vista, FL 32830-1000.

Article 5
TIME OF COMMENCEMENT AND COMPLETION

5.1.        The Contractor shall commence the Work promptly upon receipt of written notice to proceed from the Owner and shall complete all work on or before **August 17, 2000** (such period of time is herein referred to as the "Contract Time") and in accordance with such interim milestone dates (herein referred to as the "Milestones") as may be specified in the Contract Documents. The Contract Time and any such Milestones are of the essence of the Contract.

5.2.        If any work is performed by the Contractor prior to the execution of this Agreement based on receipt of written notice to proceed, all such Work performed shall be in accordance with and governed by the Contract Documents.

5.3.        The Contractor acknowledges that the Owner has made no warranties to the Contractor, expressed or implied, that the Contractor will be able to follow a normal, orderly sequence in the performance of the Work or that there will be no delays in, or interference with, the Work.

Article 6
CONTRACT SUM

6.1.        Provided that the Contractor shall strictly and completely perform all of its obligations under the Contract Documents, and subject only to additions and deductions by Change Order or as otherwise provided in the General Conditions, the Owner shall pay to the Contractor, in current funds and at the times and in the installments hereinafter specified, the sum of **Three Million Six Hundred Thirty Eight Thousand Forty Five Dollars ($3,638,045.00)** (herein referred to as the "Contract Sum") to cover the Contractor's profit and general overhead and all costs and expenses of any nature whatsoever (including, without limitation, taxes, labor and materials), foreseen or unforeseen, and any increases in said costs and expenses, incurred by the Contractor in connection with the performance of the Work, all of which costs and expenses shall be borne solely by the Contractor.

6.2.          Also included within the Contract Sum is **Ten Dollars ($10.00)** to be paid by the Owner to the Contractor as the specific consideration for those provisions contained in the Contract Documents which provide for indemnity and/or guarantee among the Owner, the Owner's Representative, the A/E, their respective parent companies, the subsidiary, related and affiliated companies of each, as well as the officers, directors, agents and employees of each, the Contractor, any Subcontractor, Sub-subcontractor, or any combination of the foregoing, whereby any such person is granted indemnification from liability for damages to persons or property caused in whole or in part by any act, omission or default of any of the above named persons arising from the Contract or its performance. The said specific consideration for such indemnification is paid to the Contractor by the Owner on behalf of the Owner, the Owner's Representative, the A/E, their respective parent companies, the subsidiary, related and affiliated companies of each, and the officers, directors, agents and employees of each, and is allocated to, and shall be deemed to have been paid out of, the first installment of the Contract Sum payable hereunder.

Article 7
APPLICATIONS FOR PAYMENT

The Contractor shall, on the twenty-fifth (25th) day of each calendar month (herein referred to as the "Payment Application Date"), deliver to the Owner an Application for Payment in accordance with the provisions of Article 9 of the General Conditions. Before submitting the first Application for Payment, Contractor shall submit (and resubmit until approval is obtained) to the Owner's Representative for approval the "Schedule of Values", generally following the Uniform Construction Index (CSI) cost analysis format but further broken down by facility, labor and material, all as required by the Owner's Representative. Each item in the "Schedule of Values" shall only include its proper share of overhead and profit. The Schedule of Values, when approved by the Owner's Representative, shall be used as a basis for the Contractor's Application for Payment.

Article 8
PROGRESS PAYMENTS AND FINAL PAYMENT OF THE CONTRACT SUM

8.1.          Based on the Contractor's Application for Payment, the Schedule of Values submitted by the Contractor and approved by the Owner, and the approval of the Application for Payment issued by the Owner pursuant to Article 9 of the General Conditions, the Owner shall make monthly payments to the Contractor on account of the Contract Sum. Such monthly payments shall be made on or before the fifteenth (15th) day of each calendar month or the twentieth (20th) day after receipt by the Owner of the Contractor's Application for Payment, of such documentation, in proper form, to substantiate the amount owed and of such other documentation as the Owner may require pursuant to Article 9 of the General Conditions, whichever is later; provided, however, that the Owner shall have no obligation to make payment as aforesaid if it has withheld approval thereof as permitted under Subparagraph 9.3.1. of the General Conditions or if the Contractor has not submitted to the Owner with its Application for Payment all required documentation. Each such monthly payment shall be in an amount equal to ninety percent (90%) of the net amount allowed the Contractor for labor, materials and equipment incorporated or used in the Work (or suitably stored at the Job Site if the Owner has agreed in advance to pay for such stored materials and equipment) through the Payment Application Date, as indicated in the Owner's approval of the Application for Payment, after deducting any sums withheld by the Owner pursuant to the Contract Documents and the aggregate of all previous payments to the Contractor on account of the Contract Sum. Upon Substantial Completion of the Work, as determined by the Owner, the Owner shall pay to the Contractor a sum sufficient to increase the aggregate payments theretofore made to the Contractor on account of the Contract Sum to ninety percent (90%) of the Contract Sum, less such retainage as the Owner shall determine is necessary for all incomplete Work, unsettled claims or other matters for which the Owner is permitted to withhold under the General Conditions.

8.2.          Final payment, constituting the entire unpaid balance of the Contract Sum, shall be paid by the Owner to the Contractor within fourteen (14) days after completion of those items set forth in the Punch List, including, without limitation, approval by the Owner's Representative of the final Application for Payment, and execution by the Contractor of the Close-out Change Order, the form of which is attached hereto as Exhibit I, in accordance with the General Conditions; provided, however, that final payment shall in no event be due unless and until the Contractor shall have complied with all provisions of the Contract Documents, including those contained in Subparagraph 9.4.2. of the General Conditions.

Article 9
CONTRACTOR'S REPRESENTATIONS, WARRANTIES AND COVENANTS

9.1.        The Contractor hereby represents and warrants to the Owner that:

(a)        it is duly licensed to observe and perform the terms, covenants, conditions and other provisions on its part to be observed or performed hereunder;

(b)        it is experienced and skilled in the construction and work of the type described in, or required by, the Contract Documents;

(c)        all equipment and materials used in connection with the Work shall be new (except if otherwise required by the Specifications) and the equipment, the materials and the Work shall be of the best quality, free from faults and defects and shall strictly conform to the Contract Documents; and

(d)        it has, by careful examination satisfied itself as to: (i) the nature, location and character of the Job Site including, without limitation, the surface and subsurface conditions of the land and all structures and obstructions thereon, both natural and manmade, surface water conditions of the Job Site and the surrounding area and, to the extent pertinent to the Work, all other conditions; (ii) the nature, location and character of the general area in which the Job Site is located including, without limitation, its climatic conditions, the availability and cost of labor and the availability and cost of materials, tools and equipment; (iii) the quality and quantity of all materials, supplies, tools, equipment, labor and professional services necessary to complete the Work in the manner required by the Contract Documents; and (iv) all other matters or things which could in any manner affect the performance of the Work.  Without limitation on the foregoing, the Contractor recognizes the physical and operational restrictions on carrying on of the Work in or about the Project.

9.2.        The Contractor accepts the relationship of trust and confidence established by this Agreement between it and the Owner.  It covenants with the Owner that it shall:  furnish its best skill and judgment and cooperate with the Owner in furthering the interests of the Owner; furnish efficient business administration and superintendence and an adequate supply of workmen, equipment, tools and materials at all times; and perform the work in the best and soundest way and in the most expeditious and economical manner consistent with the best interests of the Owner.

Article 10
TERMINATION

Termination of the Contract by the Owner, with or without cause, and by the Contractor are provided for in Article 15 of the General Conditions.  If the Owner terminates the Contract pursuant to Paragraph 15.2. of the General Conditions, and the unpaid balance of the Contract Sum exceeds the costs and expenses incurred by or on behalf of the Owner in finishing the Work, including compensation for any additional architectural, engineering, management and administrative services, such excess shall, upon the completion of the Work, be paid to the Contractor.  If such costs exceed such unpaid balance, the Contractor shall pay the difference to the Owner upon demand.

Article 11
USE OF OWNER'S NAME/CONFIDENTIALITY

The Contractor, by virtue of this Contract, shall acquire no right to use, and shall not use, the name of the Owner or the name "Disney" (either alone or in conjunction with or as a part of any other work, mark or name) or any marks, fanciful characters or designs of The Walt Disney Company or any of its related, affiliated or subsidiary companies: in any advertising, publicity or promotion; to express or imply any endorsement of the Contractor's Work or services; or in any other manner whatsoever (whether or not similar to the foregoing uses hereinabove specifically prohibited).  The Contractor may, during the course of its engagement hereunder, have access to, and acquire knowledge of or from, material, data, strategies, systems or other information relating to the Work, the Project or

WDW-1
003005

the Owner, or its parent, affiliated, or related companies, which may not be accessible or known to the general public. Any such knowledge acquired by the Contractor shall be kept confidential and shall not be used, published or divulged by the Contractor to any other person, firm or corporation, or in any advertising or promotion regarding the Contractor or its Work or services, or in any other manner or connection whatsoever without first having obtained the written permission of the Owner, which permission the Owner may withhold in its sole discretion.

Article 12
LEGAL PROCEEDINGS

12.1.  The Contract Documents shall be construed and interpreted in accordance with the laws of the State of Florida and shall constitute the entire and sole understanding of the parties hereto notwithstanding any prior oral or written statements, instructions, agreements, representations, or other communications.

12.2.  Any legal proceeding of any nature brought by either party against the other to enforce any right or obligation under this Contract, or arising out of any matter pertaining to this Contract or the Work to be performed hereunder, shall be submitted for trial, without jury, before the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida; or, if the Circuit Court does not have jurisdiction, then before the United States District Court for the Middle District of Florida (Orlando Division); or if neither of such courts shall have jurisdiction, then before any other court sitting in Orange County, Florida having subject matter jurisdiction.  The parties consent and submit to the jurisdiction of any such court and agree to accept service of process outside the State of Florida in any matter to be submitted to any such court pursuant hereto, and expressly waive all rights to trail by jury regarding any such matter.

12.3.  In the event that any provision of any of the Contract Documents is judicially construed to be invalid by a court of competent jurisdiction, such provision shall then be construed in a manner allowing its validity or, if this leads to an impracticable result, shall be stricken but, in either event, all other provisions of the Contract Documents shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed effective as of the day and year first above written.

OWNER

WALT DISNEY WORLD CO

Authorized
Signature _____    Date: 5-11-99

Print Name/Title    George Leckie _____

Director, Procurement Services _____

CONTRACTOR

MCENANY ROOFING

Authorized
Signature _____    Date: 5/3/99

Print Name/Title    Mike McEnany _____

CONTRACTOR'S CORPORATE SEAL

_____

_____

-or-

WITNESSES:

(1) _____

(2) _____

ATTACHMENT A
List of Drawings
CONTRACT NUMBER  99DE-0904

PROJECT  DISNEY'S GRAND FLORIDIAN RESORT AND SPA-ROOF REPLACEMENT

| Sheet No. | Sheet Title | | Date |
|---|---|---|---|
| 200 | Overall Project Roof Plan | | 02/22/99 |
| 201 | Sago Cay (Building No.20 Roof Plan | | 02/25/99 |
| 202 | Main Building Roof Plan (Partial) | | 02/25/99 |
| 203 | Main Building Roof Plan (Partial) | | 02/25/99 |
| 204 | Main Building Roof Plan (Partial) | | 12/03/98 |
| 205 | Conch Key (Building No.3) Roof Plan | | 02/25/99 |
| 206 | Sugar loaf Key (Building No. 4) Roof Plan | | 02/25/99 |
| 207 | Boca Chica Key (Building No.5) Roof Plan | | 12/03/98 |
| 208 | Big Pine Key (Building No.6) Roof Plan | | 02/22/99 |

**The Following Drawings are Issued for Information Only**

| Sheet No. | Sheet Title | | Date |
|---|---|---|---|
| AM2.1 | Monorail Station, Bldg. 1, Bldg. Elevation | Bulletin II | 06/01/88 |
| AM2.2 | Monorail Station, Bldg. 1, Bldg. Elevation | Bulletin II | 06/01/88 |
| AM2.3 | Main Bldg., Bldg. 1, Bldg. Elevation | Revision 15 | 10/07/86 |
| AM2.4 | Main Bldg., Bldg. 1, Bldg. Elevation | Bulletin II | 06/01/88 |
| AM2.5 | Main Bldg., Bldg. 1, Bldg. Elevation | Revision 15 | 10/07/88 |
| AM2.6 | Main Bldg., Bldg. 1, Bldg. Elevation | Bulletin II | 06/01/88 |
| AM2.7 | Main Bldg., Bldg. 1, Bldg. Elevation | Bulletin II | 06/01/88 |
| AM2.8 | Main Bldg., Bldg. 1, Bldg. Elevation | Bulletin II | 06/01/88 |
| AM2.9 | Bldg. 1, Sections | Revision 9 | 06/17/86 |
| AM2.10 | Bldg. Sections | Bulletin Ii | 04/22/86 |
| AM2.1 | Lodge Bldg. "2" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.2 | Lodge Bldg. "2" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.6 | Lodge Bldg. "3" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.7 | Lodge Bldg. "3" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.11 | Lodge Bldg. "4" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.12 | Lodge Bldg. "4" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.15 | Lodge Bldg. "5" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.17 | Lodge Bldg. "6" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.18 | Lodge Bldg. "6" Exterior Elevations | Bulletin II | 06/01/99 |
| A-1 | Pool Bldg., Bldg. 7, floor, sections, elevations | Bulletin II | 06/01/99 |
| A3 | Seafood Lounge Bldg. "9" sections, elevations | TD 106R-4 | 05/15/87 |
| A-11 | Boat Bldg., Bldg "10", plans & elevations | TD126 | 06/04/87 |
| A-16 | Pargo Bldg., Bldg "12", elevations | JRG923BC | 10/01/86 |
| A-19 | Boat Dock, Bldg. "15" | Revision 15 | 10/07/86 |

WDW-1
003008

**8 ½ x 11 Details (Bound at the end of Project manual)**

| Sheet No. | Sheet Title |
|---|---|
| 1.01 | Eave Flashing with Gutter (Typical) |
| 1.02 | Balcony/Dormer Step Flashing |
| 1.03 | Ridge Flashing Isometric and Section (Typical) |
| 1.04 | Valley Underlayment (Typical) |
| 1.05 | Hip Ridge Flashing (Typical) |
| 1.06 | Dormer Isometric (Flashing Conditions) |
| 1.07 | Crown Cap at Turrets |
| 1.08 | Rake Condition (Typical) |
| 1.09 | Guest Balcony Isometric (Valley and Step Flashing) |
| 1.10 | Transition – Shingle to Mod. Bit. System (Pargo Building) |
| 2.01 | Guest Balcony Rail Flashing 9Turret Gables0 |
| 2.02 | Flashing at Headwall (Typical) |
| 2.03 | Guest Balcony Rail Flashing (Typical Gable) |
| 2.04 | Transition Fabrication at Guest Balcony |
| 2.05 | Termination of Gutter at Wall |
| 2.06 | Expansion Joint Flashing |
| 2.07 | End Termination at Side Wall Flashing |
| 2.08 | Step Flashing at Side Wall |
| 2.09 | Valley Metal Flashing and Section |
| 3.01 | Edge Metal Profiles at Shingles |
| 3.02 | Edge Metal Lap JOINT AT Rake Condition (Typical) |
| 3.03 | Guest Balcony Wall to Rack Transition Fabrication |
| 3.04 | Edge metal Splice joint Cleat Detail |
| 3.05 | Turret Balconies Corner Flashing Fabrication |
| 3.06 | Valley metal Flashing |
| 3.07 | Outside Corner Eave Drip |
| 3.08 | Hip Transition Flashing |
| 3.09 | Expansion Flashing Fabrication |
| 4.01 | Gutter Expansion Joint Replacement |
| 4.02 | Gutter Fabrication Replacement |
| 4.03 | Gutter End Closure Fabrication |
| 5.01 | Light Strip Mounts |
| 5.02 | Ship's Ladder Mount |
| 5.03 | Roof Transition and Light Fixture Mount |
| 5.04 | Lightning Conductor Penetration |
| 5.05 | Drain Outlet |
| 5.06 | Chimney Flashing |
| 5.07 | Fastener Layout for Plywood |
| 5.08 | Exterior Corridor (Balcony) Flashing |

WDW-1
003009

AGREEMENT NO. 99DE-1313

PROJECT: DISNEY'S GRAND FLORIDIAN RESORT AND SPA-ROOF REPLACEMENT QUALITY
CONTROL SERVICES

EXECUTED

JUN 7 1999

## AGREEMENT FOR PROFESSIONAL SERVICES

THIS AGREEMENT, made and entered into this **May 2, 1999**, between **Walt Disney World Co.** (herein referred to as the "Owner"), whose mailing address is P.O. Box 10000, Lake Buena Vista, FL 32830-1000, and **A/R/C Associates, Incorporated** (herein referred to as the "Consultant"), whose mailing address is 601 N. Fern Creek Ave. Su. 100, , Orlando, FL 32803-4899.

## WITNESSETH:

WHEREAS, Owner desires to employ the services of Consultant to perform the hereinafter described services in connection with Disney's Grand Floridian Resort And Spa-Roof Replacement Quality Control Services (hereinafter referred to as the "Project"), and Consultant desires to be so employed.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and obligations herein contained, the parties agree as follows:

1.    <u>Scope of Services</u>.

a.    The nature, scope and schedule of services (hereinafter referred to as the "Basic Services") to be performed by Consultant under this Agreement, to the satisfaction of Owner, shall be as follows:

See attached Exhibit A incorporated herein by reference.

b.    Owner may, from time to time, authorize Consultant in writing to perform, in which event Consultant shall perform, services in connection with the Project which are outside the scope of those Basic Services set forth above. Any such services shall hereinafter be referred to as "Additional Services" and shall be governed by the provisions of this Agreement.

c.    Owner shall have the right at any time during the course of this Agreement to amend, modify, or reduce Consultant's Scope of Services as set forth above. Owner shall be entitled to an appropriate reduction in the fee as set forth in Article 4 of this Agreement, for any reduction in Consultant's Scope of Services.

2.    <u>Time for Completion</u>. Consultant shall commence the Basic Services upon execution of this Agreement by Consultant and Owner or upon receipt from Owner of written notice to proceed, whichever is earlier, and shall complete the same in accordance with the following schedule (hereinafter referred to as the "Schedule"), it being understood and agreed that time is of the essence of this Agreement:

See attached Exhibit B incorporated herein by reference.

Consultant shall accelerate performance of its Basic Services and Additional Services in the manner directed by Owner in the event Owner, in its sole discretion, determines that such acceleration is necessary to maintain the Schedule. If acceleration is required as a result of delays caused solely by Consultant, acceleration shall be at no cost to Owner. If acceleration is required as a result of delays partially caused by Consultant, such portion of any delay partially caused by Consultant shall not be compensated as an Additional Service, and such other portion of any such delay shall be compensated as an Additional Service.

RECEIVED

JUN 2 2 1999

WDW-1
000990

Exhibit B

3.      Project Construction Budget. - Not Applicable.

4.      Fees.

a.      The Owner shall pay to Consultant, for its Basic Services as set forth in this Agreement, a not-to-exceed fee based on the hourly rates of Consultant's personnel, as set forth in Exhibit E, attached hereto and incorporated herein by reference.   The total of all such hourly rates multiplied by the total hours incurred by Consultant in performance of its Basic Services hereunder shall not exceed the amount of **Fifty Four Thousand Dollars ($54,000.00) DOLLARS**.  In addition to the above, the Owner shall pay the Consultant for Reimbursable Expenses in an amount not to exceed **Two Thousand One Hundred Dollars ($2,100.00) DOLLARS** as defined below.

b.      Progress payments shall be made monthly based upon actual services or hours completed plus Reimbursable Expenses. Consultant shall deliver to Owner, in the form approved by Owner, an invoice on the first day of each calendar month for services rendered during the preceding month plus Reimbursable Expenses. Subject to the hourly rates, the not-to-exceed fee, and the Reimbursable Expense Guidelines set forth below, Owner shall pay each approved invoiced amount within 30 days from receipt of such invoice.

c.      Reimbursable Expenses shall include only the following actual and necessary costs and expenses reasonably and properly incurred by Consultant in connection with the services rendered under this Agreement:

Expenses are limited to reimbursement for mileage only, at the rate of $0.31 per mile as approved by Owner.

d.      Consultant shall provide all supporting documentation with respect to its monthly invoice, as required by the Owner, in connection with all services performed and Reimbursable Expenses incurred.

e.      Consultant shall be compensated for any services beyond those set forth in Articles 1, 2, and 3 as Additional Services, in such an amount as the parties shall mutually agree in advance.  Consultant shall not be entitled to compensation for Additional Services unless Consultant has notified Owner in writing prior to performing such Additional Services, and has received prior written authorization from Owner.

f.      All invoices should reference the Agreement number and be returned to the following address:

WALT DISNEY WORLD®, Facility Asset Management
Attention: Steve Coole
P.O. Box 10000
Lake Buena Vista, FL 32830-1000

5.      Books and Records.  Consultant shall maintain comprehensive books and records relating to any services performed under this Agreement, which shall be retained by Consultant for a period of at least four (4) years from and after the completion of any services hereunder.  Owner, or its authorized representatives, shall have the right to audit such books and records at all reasonable times upon prior notice to Consultant.

6.    Ownership of Documents.

a.    Title to all plans, drawings, specifications, ideas, concepts, designs, sketches, models, artwork, programs, software, reports, or other tangible work product produced, originally developed, or submitted to Owner by Consultant, pursuant to this Agreement shall be and remain the sole and exclusive property of Owner when produced.

b.    The Consultant shall deliver all such original work product to Owner upon completion thereof unless it is necessary for Consultant in Owner's sole discretion, to retain possession for a longer period of time. Upon early termination of Consultant's services hereunder, Consultant shall deliver all such original work product whether complete or not. Owner shall have all rights to use any and all work product. Consultant shall retain copies for its permanent records, provided the same are not used without Owner's prior express written consent. Consultant agrees not to recreate any designs, or any other tangible work product contemplated by this Agreement, or portions thereof, originally developed under, which if constructed or otherwise materialized, would be reasonably identifiable with the tangible work product originally developed by Consultant pursuant to this Agreement, or the project. If said work product is used by Owner for any purpose other than that purpose which is intended by this Agreement, the Owner shall indemnify Consultant from any and all claims and liabilities which may result from such re-use, in the event Consultant does not consent to such re-use.

c.    Owner exclusively retains all manufacturing rights to all materials or designs developed under this Agreement. To the extent the services performed under this Agreement produce or include copyrightable or patentable materials or designs, such materials or designs are work made for hire for Owner as the author, creator, or inventor thereof upon creation, and Owner shall have all rights therein including, without limitation, the right of reproduction, with respect to such work. Consultant hereby assigns to Owner any and all rights Consultant may have including, without limitation, the copyright, with respect to such work. The Consultant acknowledges that Owner is the motivating factor for, and for the purpose of copyright or patent, has the right to direct and supervise the preparation of such copyrightable or patentable materials or designs.

7.    Confidentiality of Material. Consultant may, during the course of its engagement hereunder, have access to, be provided or acquire knowledge of or from, material, data, strategies, systems or other information relating to the Project or Owner, or its parent, affiliated, or related companies, which may not be accessible or known to the general public. All such information shall remain Owner's exclusive property and all such knowledge acquired by Consultant shall not be used, published or divulged by Consultant to any other person, firm or corporation, or in any advertising or promotion regarding Consultant or its services, or in any other manner or connection whatsoever without first having obtained the written permission of Owner, which permission Owner may withhold in its sole discretion.

8.    Insurance; Indemnification.

a.    Consultant shall, throughout the performance of its services pursuant to this Agreement maintain, {and in the case of item (iv) below,} for a period of one year from the date of completion of Consultant's services under this Agreement, or for a period of one year from the date of Substantial Completion of the construction of the Project, whichever is later:

(i)    Occurrence basis commercial general liability insurance (including broad form contractual coverage), with minimum limits of $1,000,000.00 per occurrence and $1,000,000.00 per annual aggregate liability for protection from claims for bodily injury (including death) and property damage which may arise from or in connection with the performance of Consultant's services hereunder or from or out of any act or omission of Consultant, its Subconsultants, and their officers, directors, agents, and employees;

(ii)    Automobile liability insurance with minimum limits of $1,000,000.00 per occurrence and $1,000,000.00 per annual aggregate;

(iii)    Workers compensation insurance as required by applicable Florida law (or employer's liability insurance with respect to any employee not covered by workers' compensation with minimum limits of One Hundred Thousand Dollars ($100,000) per accident with respect to any employee not covered by workers' compensation); and

(iv)    Professional liability insurance (including coverage for the Scope of Services to be performed under this Agreement) with minimum limits of $500,000.00 per claim and $500,000.00 per annual aggregate for protection from negligent acts, errors and omissions of Consultant from or in connection with the performance of Consultant's services hereunder.

b.    All such insurance required in Paragraph a. shall be with companies and on forms acceptable to Owner, shall name Owner, Owner's Representative, their parent companies, and the related, affiliated and subsidiary companies of each, and the officers, directors, agents, employees and assigns of each as additional insureds (except for such insurance provided under Paragraph a (iii) and (iv), and shall provide that the coverage thereunder may not be reduced or canceled unless thirty (30) days' prior written notice thereof is furnished to Owner. Certificates of insurance (and copies of all policies, if required by the Owner) shall be furnished to the Owner. In the event of any cancellation or reduction of coverage, the Consultant shall obtain substitute coverage as required hereunder, without any lapse of coverage to Owner whatsoever.

c.    Consultant shall defend (if required by Owner), indemnify and hold Owner, their parent company, the subsidiary, related and affiliated companies of each, and the officers, directors, agents, employees and assigns of each, harmless from and against any and all claims, demands, suits, judgments, damages to persons or property, injuries, losses, or expenses of any nature whatsoever (including attorneys' fees) arising directly or indirectly from or out of:  any negligent act or omission of Consultant, its Subconsultants, and their officers, directors, agents or employees, any failure of Consultant to perform its services hereunder in accordance with generally accepted professional standards, any material breach of Consultant's representations as set forth in this Agreement or any other failure of Consultant to comply with the obligations on its part to be performed hereunder. The provisions of this paragraph shall survive the expiration or sooner termination of this Agreement.

9.    Representations.  Consultant hereby represents to Owner:

a.    that it has the experience and skill to perform the services required to be performed by it hereunder;

b.    that it shall provide and employ in connection with the performance of such services personnel qualified and experienced in their profession; it being understood that the Owner may at any time require the Consultant to remove, and the Consultant shall forthwith remove, any person employed in connection with the performance of the services for any reason whatsoever;

c.    that it shall design to and comply with all applicable federal, state, and local laws and codes, including, without limitation, all professional registration and licensing requirements (both corporate and individual for all required basic disciplines) in effect during the term of this Agreement, and shall, if requested by Owner, provide certification of compliance with all registration and licensing requirements;

d.    that it shall perform said services in accordance with generally accepted professional standards, in the most expeditious and economical manner, and to the extent consistent with the best interests of Owner;

e.    that it is adequately financed to meet any financial obligations it may be required to incur hereunder; and

WDW-1
000993

f.     that the designs, plans, drawings, specifications or other work product of Consultant shall not call for the use of nor infringe any patent, trademark, service mark, copyright or other proprietary interest claimed or held by any person or business entity absent prior written consent from Owner.

10.     <u>Determination of Disputes</u>.  Any dispute, difference, claim or counterclaim between Owner and Consultant arising out of or in connection with this Agreement which cannot be amicably resolved by the parties shall be submitted to the Circuit Court in and for Orange County, Florida (or if the Circuit Court shall not have jurisdiction over the subject matter thereof, then to such other court sitting in said county and having subject matter jurisdiction) for trial and determination by the court sitting without jury.  Said parties hereby consent to the jurisdiction of such court and to the service of process outside the State of Florida pursuant to the requirements of such court in any matter so to be submitted to it, and they expressly waive the right to a jury trial.

11.     <u>Suspension or Termination</u>.  Anything herein to the contrary notwithstanding, Owner shall, in its sole discretion and with or without cause, have the right to suspend or terminate this Agreement upon three (3) days' prior written notice to Consultant.  In the event of suspension or termination, Owner's sole obligation and liability to Consultant shall be to pay to Consultant any amounts for services performed and Reimbursable Expenses incurred (to the extent Reimbursable Expenses are allowed Under Article 4), through the date of termination, and for which Owner has not reimbursed Consultant on any previously submitted invoice, in accordance with the terms of Article 4. Unless the Owner authorizes the Consultant to the contrary, Consultant shall not perform any services and shall not be entitled to receive payment from Owner on account of any such services performed during the period of suspension.  Upon receipt of notice from Owner that the suspension has been cancelled, Consultant shall perform its remaining services in accordance with the terms of this Agreement and Consultant shall be entitled to a time extension equal to the period of suspension.

12.     <u>Assignment</u>.  This Agreement is for the personal services of Consultant and may not be assigned by Consultant in any fashion, whether by operation of law, or by conveyance of any type, including without limitation, transfer of stock in Consultant, without the prior written consent of Owner, which consent Owner may withhold in its sole discretion.  Owner may assign all or any portion of this Agreement at any time without Consultant's consent. Upon such assignment, and provided the Assignee shall, in writing, assume Owner's obligations under this Agreement, Owner shall be automatically released and discharged from any and all of its obligations under this Agreement, and Consultant shall thenceforth look solely to the Assignee for performance of Owner's obligations hereunder.

13.     <u>Notice</u>.

a.     Notices required or permitted to be given hereunder shall be in writing, may be delivered personally or by mail, facsimile, cable, or courier service, and shall be deemed given when received by the addressee. Notices shall be addressed as follows:

If to Owner:     Walt Disney World Co.
                    P. O. Box 10000
                    Lake Buena Vista, FL 32830-1000
                    Attention:  Lee Greenwood
                                  Manager, Contract Services

If to Consultant:     A/R/C Associates, Incorporated
                    601 N. Fern Creek Ave. Su. 100
                    Orlando, FL 32803-4899

or to such other address as either party may direct by notice given to the other as hereinabove provided.

b.     Notwithstanding the foregoing, any notice sent to the last designated address of the party to whom a notice may be or is required to be delivered hereunder shall not be deemed ineffective if actual delivery

WDW-1
000994

cannot be made due to a change of address of the party to whom the notice is directed or the failure or refusal of such party to accept delivery of the notice.

14.    Promotion.  Consultant shall acquire no right under this Agreement to use, and shall not use, the name of the Owner, the name "Disney" (either alone or in conjunction with or as a part of any other word or name) or any fanciful characters or designs of The Walt Disney Company or any of its related, affiliated or subsidiary companies: in any of its advertising, (video, stills, film, etc.), publicity, or promotion: to express or imply any endorsement by Owner of its services; or in any other manner whatsoever (whether or not similar to the uses hereinabove specifically prohibited).

15.    Subconsultants/Separate Consultants.  If the Consultant desires to employ Subconsultants in connection with the performance of its services hereunder:

a.    Any proposed Subconsultants shall be submitted to Owner for approval prior to Consultant entering into a Subconsultant Agreement.  Such approval by the Owner shall not be unreasonably withheld.  The Owner shall not be liable to the Consultant in any manner arising out of the Owner's objection to a proposed Subconsultant.

b.    Consultant shall coordinate the services and work product of any Subconsultants, and remain fully responsible for the professional quality, technical accuracy and the coordination of all designs, drawings, specifications, and other services furnished by Consultant or its Subconsultants, and Consultant shall review and approve any designs, drawings, specifications, shop drawings, submittals, or other services produced or furnished by an Subconsultants prior to submittal to the Owner.  Consultant shall correct or revise any of its errors or deficiencies in the designs, drawings, specifications or other services produced pursuant to this Agreement and shall provide Owner with such corrected or revised designs, drawings, or specifications incorporating such corrections or revisions at its sole cost and expense.

c.    Any Subconsultant Agreement shall reflect the terms of this Agreement and require the Subconsultant to the extent of the services to be performed by the Subconsultant, to assume toward the Consultant all the obligations which Consultant by this Agreement assumes towards the Owner, it being understood that nothing herein shall in any way relieve Consultant from any of its duties under this Agreement.

d.    Consultant shall cooperate at all times with Owner, and cooperate and coordinate with, and incorporate the work product of, any Separate Consultant, in any fashion appropriate or necessary to facilitate the design and construction of the Project within the Project Construction Budget and Schedule.  In the event Owner so elects and upon written mutual consent (which consent shall not be unreasonably withheld), as evidenced by an amendment to this Agreement, Consultant shall accept an assignment of any agreement or contract Owner may have with any Separate Consultant, by which Consultant shall assume any and all obligations of Owner and shall be fully responsible for any such Separate Consultant as a Subconsultant.

16.    Key Employees.  Owner has relied upon and hired Consultant because of the involvement of certain individuals employed by Consultant identified on Exhibit D attached hereto and incorporated herein by reference, and Consultant agrees that the persons (Key Employees) listed on Exhibit D shall be assigned to the Project.  Consultant shall not remove any Key Employee from the Project absent prior written consent of Owner for any reason other than termination of employment.

17.    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the law of the State of Florida, to the exclusion of Florida rules of conflicts of laws.

18.    Miscellaneous Provisions.

a.    If this Agreement contains any provisions construed to be unenforceable or unlawful by a court of competent jurisdiction, the same shall be deemed modified to conform to applicable law, or if this would

WDW-1
000995

cause an illogical or unreasonable result, such provision shall be stricken from this Agreement without affecting the binding force and effect of the Agreement or any of its other provisions.

b.      Respecting the subject matter hereof, this Agreement contains the entire agreement of the parties and their representatives and agents, and incorporates all prior discussions or understandings, whether oral or written. No change, modification or amendment, nor any representation, promise or condition, nor any waiver, to this Agreement shall be binding unless in writing and signed by a duly authorized representative of the party to be charged.

c.      Any failure by Owner to require strict compliance with any provision of this Agreement shall not be construed as a waiver of such provision, and Owner may subsequently require strict compliance at any time, notwithstanding any prior failure to do so.

d.      The acceptance of final payment under this Agreement, or the acceptance of final payment upon early termination hereof, shall constitute a full and complete release of Owner by Consultant from any and all claims, demands and causes of action whatsoever which Consultant may have against Owner in any way related to the subject matter of this Agreement. Neither the Owner's review, approval or acceptance of, nor payment for, any of the services required under this Agreement shall be construed to operate as a waiver of any rights under this Agreement or any cause of action arising out of the performance of this Agreement, and Consultant shall be and remain liable to Owner for all damages to Owner caused by Consultant's performance of any of the services furnished pursuant to this Agreement.

e.      It is understood and agreed that Consultant is acting as an independent contractor in the performance of its services hereunder, and nothing herein contained shall be deemed to create an agency relationship between Owner and Consultant.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be duly executed and effective as of the day and year first above written.

CONSULTANT

**A/R/C ASSOCIATES, INCORPORATED**

Authorized
Signature _____     Date _June 11, 1999___

Print Name _Joseph J. Williams_____

Title _Corporate Secretary-Treasurer___

OWNER

**WALT DISNEY WORLD CO.**

Authorized
Signature _____     Date 6/13/99

Print Name _____David L. Ellis_____

Title _____Principal Services Representative____

WDW-1
000996

EXHIBIT A
SCOPE OF SERVICES
AGREEMENT NO. 99DE-1313

Consultant shall provide professional construction observation and quality control services in support of the ongoing roof replacement at Disney's Grand Floridian Resort And Spa. Consultant shall provide regular site visits to the project on a weekly basis to observe the work of the roofing contractor and ensure their work is in conformance with the Contract Documents.

In the event services performed by the roofing contractor are not in conformance with the Contract Documents, Consultant shall assist Owner in evaluating the cause of non-conformance and assist in determining the best course of action.

When non-conforming conditions are encountered and revised or alternate details are required, Consultant shall provide professional drafting services to document the solution developed by the Consultant.

**END OF EXHIBIT A**

WDW-1
000997

EXHIBIT B
SCHEDULE
AGREEMENT NO. 99DE-1313

The Consultant shall commence the services on May 2, 1999, and shall complete all services on or before December 31, 2000, in accordance with the Scope of Services.



END OF EXHIBIT B

WDW-1
000998

EXHIBIT C
PROJECT CONSTRUCTION BUDGET
AGREEMENT NO. 99DE-1313

N/A

END OF EXHIBIT C

EXHIBIT D
KEY EMPLOYEES
AGREEMENT NO. 99DE-1313

**Joseph Williams**

**END OF EXHIBIT D**

WDW-1
001000

EXHIBIT E
SCHEDULE OF RATES
AGREEMENT NO. 99DE-1313

The Consultant shall be compensated for the actual services provided at the following hourly rates. The rates below include all labor costs, direct and indirect, and overhead, profit and all other costs of Consultant whatsoever; except those Reimbursable Expenses expressly allowed under this Agreement.

**Principal, Joseph Williams, $100.00 per hour**

**Quality Assurance Technician $55.00 per hour**

**Drafting Services $50.00 per hour**

**END OF EXHIBIT E**

WDW-1
001001

WDW-1
001002

# TAB B

994524

 **RSKCo**

P.O. Box 946600  Maitland, Florida 32794-6600
2600 Lucien Way (Suite 150) Maitland, Florida 32751

**Twila Walburn**

*Claims Adjuster*

Telephone  407-919-2357
Toll Free   877-371-5121 x2357
Facsimile   407-919-2473

May 24, 2000

Stuart E. Cohen
Conroy Simberg & Ganon, P.A.
3440 Hollywood Blvd. - Second Floor
Hollywood, FL 33021

Re:    Our File:    2G083325 M5
        Our Insured:  W. R. Grace & Co.
        Your File:   994524
        Your Client:  Timothy Kane
        D/L:      07/19/99

Dear Mr. Cohen:

Your letter dated May 9, 2000 and addressed to our insured has been referred to this office for response.

Coverage information is as follows:

Insurer:           Continental Casualty Company
Insured:           W. R. Grace & Co.
Limit of Liability:    $10,000,000 per occurrence, $15,000,000 aggregate

There are no policy defenses or coverage issues known at this time. A copy of the policy can be provided if you need to review it. There will be a copy fee.

Your letter of representation is our insured's first notice of this occurrence. Please advise if we may be allowed the opportunity to interview your client concerning the circumstances of this accident and the nature and extent of his injuries.

Please also forward damage documentation at your earliest opportunity.

Very truly yours,

*Twila Walburn*

Twila Walburn

*Conflict*

Claims Service and Information Services are provided by Transcontinental Technical Services, Inc., Loss Control Services are provided by Ctek, Inc. and Smith System Driver Improvement Institute, Inc., Cost Management Services are provided by Continental Resources, Inc., RSKCo. member companies.

** TOTAL PAGE.04 **

# TAB C

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| re: | ) | |
| | ) | |
| W. R. GRACE & CO., et al., | ) | **Chapter 11** |
| | ) | |
| | ) | **Case No. 01-01139 (JJF)** |
| **Debtors.** | ) | **(Jointly Administered)** |
| | ) | **Docket No. 1034** |

## ORDER WITH RESPECT TO TIMOTHY KANE'S MOTION FOR RELIEF FROM AUTOMATIC STAY

This case came on for an Omnibus hearing on January 3, 2002 pursuant to the Amended Notice of Agenda of Matters Scheduled for Hearing (Docket No. 1415) and Timothy Kane's Motion for Relief from the Automatic Stay (Docket No. 1034).

After due deliberation and cause appearing therefore, accordingly:

IT IS HEREBY ORDERED that Timothy Kane's Motion for Relief from the Automatic Stay is granted solely to allow depositions to be taken by Kane in the action entitled Kane v. Walt Disney World Co., et al., Case No. CI-00-6803 (Cir. Ct. Orange City, Florida) (the "Kane action") of four previously designated employees of the Debtor, namely:

a) Robert Wiercinski, Cambridge, MA
b) Dr. R. F. Jenkins, Cambridge, MA
c) Keith Bartlett, Cambridge MA
d) Pete DiGiovani, Cambridge MA

The remainder of the Motion is denied and the Kane action against the Debtors is stayed.

Dated: January _25_, 2002

_Judith K. Fitzgerald_
_____
THE HONORABLE JUDITH K. FITZGERALD.
UNITED STATES BANKRUPTCY JUDGE