# EXHIBIT B

Testimony
United States Senate Committee on the Judiciary
**The Asbestos Litigation Crisis Continues – It Is Time for Congress to Act**
March 5, 2003

**Mr. David Austern**
President, Claims Resolution Managment, General Counsel for the Manville Personal Injury Settlement Trust

Mr. Chairman and Members of the Committee, my name is David T. Austern. I am President of the Claims Resolution Management Corporation ("CRMC") and General Counsel of the Manville Personal Injury Settlement Trust (the "Trust"). The CRMC is a fully-owned subsidiary of the Trust and serves as its claims processing facility. The CRMC also processes asbestos claims and performs services for three other asbestos trusts. On behalf of the Trustees of the Trust and the Directors of the CRMC, thank you for the opportunity to share my views here today.

Summary. When I testified before you last September, I delivered some dire news about the seemingly endless propensity to file asbestos claims. Sadly, things have not improved. The asbestos claims system is unfair to many victims, it drains resources from impaired and future victims, and it wreaks economic havoc on companies, workers, and retirees. Some have suggested that imposing medical criteria as a threshold to bringing an asbestos claim would be the best solution to the problem. In my view, however, the best legislative solution would be to create a National Asbestos Claims Facility that would ensure recovery to impaired victims, prioritize the claims of those with serious illnesses, preserve the rights of future claimants, and provide certainty to all parties.

The Problem. The system is unfair to victims, and is plagued by fortuity. Whether victims receive compensation at all and, if so, how much they receive depends on the fortuity of where and when they file claims, who the defendants happen to be, whether those defendants are solvent at the time the claims are filed, and the leverage and skill of the trial lawyer. The amount of victim awards diverge wildly -- some victims receive grand slam awards, while others receive little or nothing. Sadly, some victims die before their case is heard.

These distortions in the system are exacerbated by jurisdictional idiosyncrasies. Five states had two-thirds of all asbestos case filings between 1998 and 2000. The concentration of a huge number of filings in a small number of jurisdictions only increases the delays and inequities inherent in the current system.

While this fortuitous system creates some windfalls, it leaves the unlucky without compensation, and it is only getting worse. In order for victims to be compensated, they need to be able to look to solvent companies for resources. However, over 60 companies have declared bankruptcy because of asbestos claims, with more than 20 of those bankruptcies having occurred during the past two years. It is true that bankruptcy trust funds are an efficient way of compensating victims, but that is only part of the story. A study of a number of major asbestos defendant bankruptcies showed that the average time from petition to confirmation of a reorganization plan was six years. During these proceedings, claimants are not paid. What is worse, after a company declares bankruptcy, it has limited resources to compensate victims. Even the Manville Trust can pay victims only five percent of the value of a claim. Not one single extant asbestos trust or any of the 20 or so trusts pending in bankruptcy court can or will pay any more than a fraction of the value of a claim.

Leading actuarial firms predict that total losses due to asbestos liability in the United States will be from $200 billion to $275 billion, with a large portion of that total (between $78 billion and $175 billion) not covered by insurance. The Manville Trust alone has received about 600,000 claims. The Trust has received more asbestos claims than any defendant in the tort system, including other asbestos trusts. The Trust has paid over 500,000 of these claimants approximately $3 billion. Unfortunately, the billions of dollars paid to asbestos claimants account for less than one-half of all the asbestos claims that will be filed with the Trust.

While some of the problems in the system are obvious, there are also trickle-down effects that burden American workers and retirees. A recent report by Sebago Associates estimates that asbestos-related bankruptcies have led to as many as 60,000 lost jobs. On average, the report stated, these workers lost between $25,000 to $50,000 in wages, and the average worker at an asbestos-related bankrupt firm with a 401(k) plan suffered roughly a 25 percent reduction in the value of the 401(k) account.

Claims on the Manville Trust are increasingly from claimants with non-malignant cases. From the beginning of the Trust to date, 11 percent of the people we have paid have had cancer claims, and 89 percent have had non-cancer claims. Recently, the cancer versus non-cancer division has changed, so that in the year 2000, nine percent of the claims we received were cancer claims, and 91 percent were non-cancer claims. In 2001, cancer claims were only six percent of the claims filed, and non-cancer claims were 94 percent of the claims filed, while in 2002 the ratio was again 91 percent non-cancer and 9 percent cancer.

With respect to disease progression and how many of the non-cancers will eventually get cancer, of the approximately 450,000 non-cancer claimants who have been paid by the Trust, only 3,200 of them have -- after they received the non-cancer payment -- then developed an asbestos-related cancer for which they filed a claim. This is substantially less than one percent of all the non-cancer claims we have paid.

Predicting non-malignant claims has become a daunting challenge and, indeed, it may be impossible. Our most recent claims forecast – performed by experts employed by many other solvent and bankrupt entities with asbestos liabilities – estimated the Trust may receive between 750,000 and 2.7 million additional claims. The reason for this uncertain estimate is that it is no longer possible to use medical models to predict future claims.

A medical model assumes a person becomes ill, is referred to a physician and thereafter is referred to a lawyer. However, based on a sampling of non-malignant Trust claims reviewed during the past two years, it is obvious that a very large percentage of non-malignant claims are based on so-called screenings pursuant to which mostly asymptomatic claimants are identified by screening facilities and then encouraged to file a claim.

In that environment, there is an almost limitless number of potential asbestos claimants, and the financial community, both here and abroad, is justifiably skeptical as to whether anything short of a legislative solution will produce meaningful asbestos reform.

Given this almost limitless population of potential asbestos claimants, given the risk that victims will not be compensated fairly, that companies will continue to declare bankruptcy to the detriment of victims and workers, and that the flood of the unimpaired will continue to break down the system, it is indeed time for Congress to act.

There are two asbestos legislative proposals currently in the public debate. One establishes medical criteria to determine eligibility to file an asbestos claim. The other establishes a National Asbestos Claims Facility. For reasons I only partly understand, these two proposals have become competing legislative initiatives. I do not believe it is particularly keen or effective advocacy to be critical of another party's legislative proposal. Other than justification of principle, I do not believe any useful purpose is served by being critical of a good faith effort to solve the asbestos problem. However, after 15 plus years as an asbestos claims administrator, I believe very strongly that the better of the two legislative proposals is the one that establishes a National Asbestos Claims Facility, and I believe this because, in my judgment, it is the best way to compensate asbestos victims.

A national claims facility could provide fairness to victims and it could dramatically reduce the transaction costs that diminish victims' awards. By way of example, the Manville Trust uses only 3 percent of the dollars it pays to its beneficiaries for claims administration costs. Compare this to the asbestos litigation costs of up to 60 percent under the current system. Significantly, reducing transaction costs and attorneys' fees would create more money in the system to compensate victims. A national claims facility could ensure that adequate funds are available to compensate victims not only now but also in the future. Compare this to the current system that is draining resources now,

depriving many impaired claimants of meaningful recovery and leaving future claimants with the potential that they will receive even less. A comprehensive solution that provides certainty to defendants could help end the bankruptcy spiral and help ensure that there are solvent companies left to pay into the fund. Finally, a national claims facility could begin paying claims in a matter of months after enactment of legislation, and would pay eligible claimants very quickly.

Based on my experience with a large asbestos trust fund, I would like to offer a few observations about what kind of facility would work best. Such a facility should be a national, privately funded claims facility that is managed by trustees. The claims facility should be an exclusive remedy for asbestos claimants and should prioritize the claims of the sickest victims. It should be a no-fault system, reducing the burden on claimants. It should reduce transaction costs, leaving more money to be transferred to victims, and it should be a faster, more reliable way for sick victims to receive cash awards.

Administration. The claims facility should be privately funded by asbestos defendants and insurance carriers. Pending and confirmed bankrupt companies should be included. Federal legislation should set the size of the program and annual funding requirements. The facility should provide the exclusive remedy for all victims of asbestos-related disease, and should not require a finding of fault to provide recovery to victims. Compensation levels should be determined based on schedules set by legislation and a trust plan. Trustees should have claim audit authority and the authority to audit levels of trust fund contributions.

Compensation. Federal legislation should set scheduled values to compensate victims based on appropriate conditions and factors. Those people who suffer from the gravest asbestos-related disease should be given priority for their claims. In particular, mesothelioma victims should be granted a substantial expedited down payment on the full value of their claim. In general, there should be provisions expediting payment for all exigent cases. Furthermore, victims who are compensated for a non-malignant asbestos disease, who thereafter are diagnosed with a malignant asbestos disease, should be eligible for additional compensation.

The claims facility should grant compensation based on a doctor's diagnosis and medical evidence, including an in-person physical examination. Significant occupational exposure to asbestos should be a prerequisite to any compensation.

A national claims facility should free victims from having to meet a number of burdens typical of litigation, including establishing product identification and proving causation, to name a few. Rather than a system that relies on lawyers and judges to make medical determinations under the standards of 54 jurisdictions, the claims facility should rely on an individual patient-based decision that rests on standards established by a panel of independent, knowledgeable experts, an evaluation by a doctor, plus proof of exposure.

Of course, policy makers have a difficult task in evaluating the potential solutions to the asbestos crisis. No system is perfect, and all will have detractors. The main arguments against the claims facility thus far appear to center on a skepticism about whether the system is too complicated and difficult to implement. While it would be a large task to implement the system, many people have a good deal of experience with bankruptcy trust funds that can help our efforts. I have every reason to believe the task could be completed expeditiously, and in a matter of months claimants could begin receiving checks. Even in its worst light, the claims facility will easily improve life for claimants who now must withstand long delays, unequal and unpredictable treatment, and the loss of a significant amount of awards in transaction costs. Given that we still have not seen even one-half of the asbestos claims that will be presented, Congress should implement a solution that facilitates the smooth and speedy compensation of these claims, rather than permit the status quo to continue – a system that leads to further litigation, transaction costs, and unpredictability in the system.

The most appropriate resolution to the asbestos problem is through federal legislation. This was recognized by the Supreme Court in Amchem Products, Inc. v. Windsor, 521 U.S. 591, 597-98, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) and again in Ortiz v. Fibreboard Corp., 527 U.S. 815, 821, 119

S.Ct. 2295, 144 L.Ed.2d 715 (1999), when the Court emphasized the need for legislative intervention in the "elephantine mass of asbestos cases." 527 U.S. at 821. See also, In re Joint E. & S. Districts Asbestos Litig., 2001 WL 1464362 (E.D.N.Y. 2001); In re Johns-Manville Corporation, et al. Memorandum and Order, December 27, 2002 (E.D.N.Y. 2002).

In addition, many legal scholars have echoed the sentiments of the Supreme Court. See, inter alia, Griffin B. Bell, Asbestos Litigation and Judicial Leadership: The Courts' Duty to Help Solve the Asbestos Litigation Crisis, Briefly: Perspectives on Legislation, Regulation, and Litigation, National Legal Center for the Public Interest, Vol. 6, No. 6, June 2002; Mark A. Behrens, Some Proposals for Courts Interested in Helping Sick Claimants and Solving Serious Problems in Asbestos Litigation, 54 Baylor L. Rev. 331 (2002); James A. Henderson, Jr. & Aaron D. Twerski, Asbestos Litigation Gone Mad: Exposure-Based Recovery For Increased Risk, Mental Distress, and Medical Monitoring, 53 S.C. L. Rev. 815 (2002); Deborah R. Hensler, As Time Goes By: Asbestos Litigation After Amchem and Ortiz, 80 Tex. L. Rev. 1899 (2002); Samuel Issacharoff, "Shocked": Mass Torts and Aggregate Asbestos Litigation After Amchem and Ortiz, 80 Tex. L. Rev. 1925 (2002); Mark A. Behrens & Monica G. Parham, Stewardship for the Sick: Preserving Assets for Asbestos Victims Through Inactive Docket Programs, 33 Tex. Tech L. Rev. 1 (2001); Paul F. Rothstein, What Courts Can Do in the Face of the Never-Ending Asbestos Crisis, 71 Miss. L.J. 1 (2001); Peter H. Schuck, The Worst Should Go First: Deferral Registries in Asbestos Litigation, 15 Harv. J.L. & Pub. Pol'y 541 (1992).

During the hearing on asbestos litigation last September, the Judiciary Committee recognized that it has a critical role to play in solving the asbestos litigation problem. I commend the Committee for taking the next step with today's hearing, focusing on what type of solution is most promising. As the Committee considers today's testimony, I hope you will consider the National Asbestos Claims Facility. I am ready to assist you in any way I can as you work toward legislative solutions. Thank you for hearing my testimony, and I look forward to answering your questions.