## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| W.R. GRACE & CO., _et al_ | : | Case No. 01-1139 (JKF) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | Related Doc. No. 5460 |

## MEMORANDUM OF LAW IN SUPPORT CERTAIN INSURERS' LIMITED OBJECTION TO DEBTORS' MOTION TO APPOINT A LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS CLAIMANTS

COZEN O'CONNOR
Shelley A. Kinsella (DE No. 4023)
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
(302) 295-2000 Telephone
(302) 295-2013 Facsimile

COZEN O'CONNOR
William P. Shelley (PA ID 40875)
Jacob C. Cohn (PA ID 54139)
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000 Telephone
(215) 665-2013 Facsimile
Attorneys for Federal Insurance Company

BIFFERATO, BIFFERATO & GENTILOLTTI
Ian Connor Bifferato (DE No. 3273)
1308 Delaware Avenue
The Buckner Building
Wilmington, Delaware 19899-2165
(302) 429-1900 Telephone

-and-

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
Carl J. Pernicone
150 East 42nd Street
New York, New York 10017-5639
(212) 490-3000 Telephone
Attorneys for Royal & SunAlliance

Dated: May 7, 2004

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ........................................................................................................ 1

II.   LEGAL ARGUMENT ................................................................................................. 4

    A.   The Constituency of the FCR Should Be Defined to Reflect the Federal
         Bankruptcy Rule that Compensable Asbestos Personal Injury Claims Arise
         Only Upon Manifestation of Functional Impairment ................................................. 4

         1.   The Provisions of the Bankruptcy Code Addressing "Claims" Displace
               Underlying State Law ....................................................................................... 7

               a)   Federal Law Preempts State Law Treatment of Property Rights
                    in Bankruptcy Where Congress Directs or a Sufficient Federal
                    Justification Otherwise Exists for Displacing State Law ........................ 7

               b)   Ascertaining What Constitutes a "Claim" and When It "Arose" Is
                    Central to Effectuating the Entire Scheme of the Bankruptcy
                    Code ..................................................................................................... 8

               c)   Courts Recognize the Preemptive Effect of the Bankruptcy
                      Code's Definition of "Claim" and Generally Agree that the
                      Timing of When a "Claim" "Arose" Likewise Is Determined by
                      Federal Law ......................................................................................... 9

               2.   Courts Have Recognized that Inherent Limits Exist to What May Be
                 Considered a Pre-Petition Tort Claim and that Resolution of the
                 Statutory Ambiguities Requires Application of Interstitial Federal
                 Common Law ................................................................................................. 10

              3.   Numerous Federal Interests Implicated in Mass Tort Bankruptcies,
                 Supreme Court Pronouncements Regarding Asbestos Claims Under
                 Federal Common Law, and Congress's Codification of the Manville
                 Settlement in § 524(g), All Mandate Application of a Uniform Federal
                 Rule Disallowing Present Claims of Asymptomatics ..................................... 14

                 a)   The Courts that Pioneered the Settlement Trust Procedures
                      Ratified and Codified in §§ 524(g-h) Established a Federal
                      Common Law Rule of Disease Manifestation for Claim
                      Allowability and to Determine the Constituencies of the
                      Asbestos Creditors Committees and the Future Claimants' Legal
                    Representatives ................................................................................... 14

b)     Outside of Bankruptcy, Federal Common Law Does Not Recognize a Cause of Action for Asymptomatics ................................. 16

       (i)     In Metro-North, the Supreme Court Rejected Claims by Asymptomatic Asbestos Claimants as a Matter of Federal Common Law ............................................................................... 16

       (ii)    Subclinical Physiological Changes Do Not Constitute Actionable Impairment Under Federal Common Law ................. 18

c)     Application of the Federal Common Law Rule Disallowing Asymptomatic Claims in Bankruptcy Furthers Significant Federal Bankruptcy Policies and Is Necessary to Effectuate Congress's Intentions Expressed Through § 524(g) ............................. 19

       (i)     The Disease Manifestation Rule Complements the System Developed by the Courts and Ratified by Congress for Fostering Reorganization While Treating Present and Future Claimants Equitably ........................................................... 19

       (ii)    Application of a Uniform Federal Disease Manifestation Rule Is Necessary to Ensure that the Interests of Future Claimants Are Adequately Protected and That Constitutional Due Process Requirements Are Satisfied.............. 25

d)     By Contrast, Extension of Frenville's State Law Claim-Accrual Test to the Mass Tort Arena Would Engender Confusion, Conflict and Expense, All Contrary to the Policies of the Bankruptcy Code, the Intent of Congress, and the Requirements of Due Process ...................................................................................... 27

B.    Because Adequate Representation Is the Only Traditionally-Required Due Process Protection Available to Absent Future Claimants, It Is Especially Important that the FCR Be Untainted by Even the Appearance of Impropriety .............................................................................................. 32

C.    Because of the Inherent Danger of Favoritism, the FCR Should Be Independently Nominated by the United States Trustee, Not the Conflicted Constituencies, and Should Not Previously have Served as an FCR ...................... 35

III.     CONCLUSION ............................................................................................ 40

# TABLE OF AUTHORITIES

PAGE

## CASES

In re: A.H. Robins Co., Inc.,
        89 B.R. 555 (E.D.Va. 1988).................................................................................................20

In re Amatex Corp.,
        755 F.2d 1034 (3d Cir. 1985)................................................................... *passim*

Amchem Products, Inc. v. Winsoret,
        521 U.S. 591 (1997)..............................................................................................26, 33, 36

In re Asbestos Litigation,
        90 F.3d 963 (5th Cir. 1996), *rev'd*, Ortiz v. Fibreboard Corp., 527 U.S. 825
        (1999)...................................................................................................................................2

In re: Beeter,
        173 B.R. 108 (Bankr., W.D. Tex. 1994)............................................................11

Butner v. United States,
        440 U.S. 48 (1979).................................................................................................7

California Department of Health Services v. Jensen (In re Jensen),
        995 F.2d 925 (9th Cir. 1993) ..............................................................................10, 20

Consolidated Rail Corp v. Gottshall,
        512 U.S. 532, 544 (1994) ......................................................................................17, 18

In re: Dow Corning Corp.,
        211 B.R. 545 (Bankr., E.D. Mich. 1997).........................................................20

In re Eagle-Picher Industrial,
        144 B.R. 69 (Bankr. S.D. Ohio 1992)...............................................................33

In re Edge,
        60 B.R. 690 (Bankr. M.D. Tenn. 1986) ............................................................ 10, 20

Epstein v. Official Committee of Unsecured Creditors, (In re Piper Aircraft Corp.),
        58 F.3d 1573 (11th Cir.1995) .............................................................................12

Erie R. Co. v. Tompkins,
        304 U.S. 64 (1938)...............................................................................................7

In re Estate of Harrison,
    745 A.2d 676 (Pa. Super. 2000).....................................................................35

In re Estate of Hawley,
    538 N.E.2d 1220 (Ill. App. Ct. 1989) ..........................................................35

In re Estate of Stowell,
    595 A.2d 1022 (Me. 1991)..............................................................................34

FCC v. NextWave Personal Communications, Inc.,
    537 U.S. 293 (2003).........................................................................................9

Fogel v. Zell,
    221 F.3d 955 (7th Cir. 2000) ...................................................................12, 20

In re Frenville,
    744 F.2d, 332 (3d Cir. 1984), *cert. denied*,
    469 U.S. 1160  (1985)................................................................ *passim*

Gonzalez v. Banco Central Corp.,
    27 F.3d 751 (1st Cir. 1994).............................................................................35

Grady v. A.H. Robins,
    839 F.2d 198 (4th Cir*), cert. dismissed*,
    487 U.S. 1260 (1988)............................................................................9, 11, 13

Hanberry v. Lee,
    311 U.S. 21 (1940)............................................................................................1

In re: Johns-Manville Corp.,
    36 B.R. 743 (S.D.N.Y.), *appeal denied*,
    39 B.R. 234 (S.D.N.Y. 1984)....................................................... *passim*

In re Johns-Manville Corp.,
    52 B.R. 940 (S.D.N.Y. 1985)..........................................................................37

Johnson v. Home State Bank,
    501 U.S. 78 (1991)............................................................................................9

Jones v. Chemetron Corp.,
    212 F.3d 199 (3d Cir. 2000)..............................................................10, 27, 28

In re Kaiser Aluminum Corp.,
    Case No. 02-10429 (JKF) ................................................................................3

iv

Kamen v. Kemper Finance Services, Inc.,
       500 U.S. 90 (1991) .................................................................................................31

Kane v. Johns-Manville,
       843 F.2d 636 (2d Cir. 1988)...............................................................16, 21, 29

In re Kar Development Associate, L.P.,
       180 B.R. 597 (Bankr. D. Kan. 1994), aff'd,
       180 B.R. 629 (D. Kan. 1995) .............................................................7, 8, 14, 19

Kayes v. Pac. Lumber Co.,
       51 F.3d 1449 (9th Cir. 1995) ..............................................................................34

Kewanee Boiler Corp. v. Smith (In re Kewanee Boiler Corp.),
       198 B.R. 519 (Bankr. N.D. Ill. 1996) ..................................................................2

Lemelle v. Universal Manufacturing Corp.,
       18 F.3d 1268 (5th Cir. 1994) ..............................................................................12

Louisville Joint Stock Land Bank v. Radford,
       295 U.S. 555 (1935)...............................................................................................2

In re Lyons Transportation Lines, Inc.,
       123 B.R. 526 (Bankr. W.D. Pa. 1991) ...............................................................20

Martin v. Wilks,
       490 U.S. 755 (1989)...........................................................................................2, 33

In re Marvel Entertainment Group, Inc.,
       140 F.3d 463 (3d Cir. 1988).................................................................................32

Metropolitan-North Commuter Railroad Co. v. Buckley,
       521 U.S. 424 (1997)...................................................................................... passim

Norfolk & Western Railway Co. v. Ayers,
       538 U.S. 135, 123 S. Ct. 1210 (2003)..................................................................19

Norwest Bank Worthington v. Ahlers,
       485 U.S. 197 (1988)................................................................................................7

Ortiz v. Fibreboard Corp.,
       527 U.S. 825 (1999)..................................................................................33, 34, 36

Pepper v. Litton, 308 U.S. 295 (1939) ........................................................................20

v

In re Pillowtex, Inc.,
      304 F.3d 246 (3d Cir. 2002)............................................................32

Raleigh v. Illinois Department of Revenue,
      530 U.S. 15 (2000).................................................................8

Schweitzer v. Consolidated Rail Corp.,
      758 F.2d 936 (3d Cir.), *cert. denied*, 474 U.S. 864 (1985)........................................ *passim*

State of Vermont v. Homeside Lending, Inc.,
      826 A.2d 997 (Vt. 2003).............................................................33

Stephenson v. Dow Chemical Co.,
      273 F.3d 249 (2d Cir. 2001), *aff'd by evenly divided Court*,
      539 U.S. 111 (2003) .................................................................1, 35

In re: UNR Industries, Inc.,
      46 B.R. 671 (Bankr. N.D. Ill. 1985) ...........................................17, 37

In re: UNR Industries, Inc.,
      71 B.R. 467 (Bankr., N.D. Ill. 1987) ..........................................16, 21

United States v. The LTV Corp. (In re Chateaugay Corp.),
      944 F.2d 997 (2d Cir. 1991)............................................11, 12, 13, 14

Zadvydas v. Davis,
      533 U.S. 678 (2001)..................................................................30

## RULES AND STATUTES

11 U.S.C. § 101.......................................................................8

11 U.S.C. § 301.......................................................................8

11 U.S.C. § 327.....................................................................3, 32

11 U.S.C. § 502(b) .................................................................8, 20

11 U.S.C. § 524(g) .............................................................. *passim*

11 U.S.C. § 1123(b)(1) ..............................................................3

11 U.S.C. § 1141(d)(1) ..............................................................9

45 U.S.C. § 51 ....................................................................17, 18

Fed. R. Civ. P. 23 ..................................................................34

# OTHER AUTHORITIES

140 Cong. Record H10,765 (October 4, 1994)...................................................................22, 23, 24

4 Collier on Bankruptcy 524.07[2], at 524-51 & n.26
    (15th rev. ed.1996 & Supp. 2003)........................................................................................34

Resnick, Bankruptcy as a Vehicle for Resolving Enterprise-Threatening
    Mass Tort Liability, 148 U. Pa. L. Rev. 2045 (2000).........................................................37

Hill, The Erie Doctrine in Bankruptcy,
    66 Harv. L. Rev. 1013 (1953)...............................................................................................7

McGovern, Section 524(g) Without Bankruptcy,
    31 Pepperdine L. Rev. 233, 248 (2004)..............................................................................36

Henderson & Twerski, Asbestos Litigation Gone Mad: Exposure-Based
Recovery for Increased Risk, Mental Distress, and Medical Monitoring,
    53 S.C. L. Rev. 815, 830, 833-34 (2002).............................................................................19

Behrens & Parham, Stewardship for the Sick:
Preserving Assets For Asbestos Victims Through Inactive Docket Programs,
    33 Tex. Tech L. Rev. 1 (2001).............................................................................................22

Issacharoff, Governance and Legitimacy in the Law of Class Actions,
    1999 Sup. Ct. Rev. 337, 388 (1999) ...................................................................................36

Koniak & Cohen, Under Cloak of Settlement,
    82 Va. L. Rev. 1051, 1110-1111 (1996)..............................................................................38

Tung, The Future Claims Representative in Mass Tort Bankruptcy:
    A Preliminary Inquiry, 3 Chap. L. Rev. 43 (2000)..................................................1, 33, 38

## I.  INTRODUCTION

Certain Insurers[1] submit this Memorandum of Law in support of their Limited Objection to Debtors' Application for the Appointment of a Legal Representative for Future Asbestos Claimants.  (Docket No. 5460).

Certain Insurers issued liability insurance policies to one or more of the Debtors. Because Certain Insurers may be called upon to pay claims of future claimants, they have an interest in how those claims are treated in this proceeding.  In addition, Certain Insurers are among the limited types of non-debtor parties that Congress expressly designated as permissible beneficiaries of a § 524(g) channeling injunction.  § 524(g)(4)(A)(ii)(III).  Like other statutorily contemplated beneficiaries of a channeling injunction, the Insurers "have a stake in assuring that due process is accorded to future claimants.  A failure of due process would preclude the bankruptcy from affecting future claimants' legal rights[,] . . . frustrat[ing] the primary purpose of the bankruptcy filing-to achieve a comprehensive and final settlement of all future claims liability." [2]  Frederick Tung, *The Future Claims Representative in Mass Tort Bankruptcy: A Preliminary Inquiry*, 3 Chap. L. Rev. 43, 54 (2000).

Effectively binding absent future claimants to a present adjustment of their rights is a constitutionally dicey undertaking that will not succeed unless the absent parties' due process rights are scrupulously protected.  As the Supreme Court has repeatedly emphasized in an unbroken series of opinions beginning with *Hanberry v. Lee*, 311 U.S. 21 (1940) and continuing through *Ortiz v. Fibreboard Corp.*, 527 U.S. 825 (1999), adequate representation of absent plaintiffs is a constitutional *sine qua non* for binding the absentees through *res judicata* to the

---

[1]  Certain Insurers are Federal Insurance Company and Royal & SunAlliance.

[2]  *See*, *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 260 (2d Cir. 2001) (absent parties may not be bound when proceedings "violate due process"), *aff'd by evenly divided Court*, 539 U.S. 111 (2003).

outcome of a case.[3]  Because, by definition, future claimants have not yet become ill, and may

not even know that they have been exposed, "the due process standbys notice and an opportunity

to be heard are meaningless to countless future claimants."  *In re Asbestos Litigation*, 90 F.3d

963, 999 (5th Cir. 1996) (Smith, J. dissenting), *rev'd by Ortiz, supra*.  In those limited situations

where it is necessary to adjust the rights of absent claimants who cannot meaningfully be

afforded notice and a right to participate, adequate representation becomes the paramount means

of assuring due process.  And when adequate representation alone must bear the full load of

satisfying constitutional due process, issues concerning the adequacy of that representation

compel heightened scrutiny.

Certain Insurers have no objection *per se* to the Court's appointment of a legal

representative (an "FCR") as contemplated by 11 U.S.C. § 524(g)(4)(B)(i).  Rather, Certain

Insurers seek merely to ensure that the FCR's constituency is clearly and correctly defined, and

that he or she is independent and free from any appearance of impropriety.  We raise these issues

now, early in the process, seeking to minimize the risk that the negotiations that will follow and

any plan that eventuates will suffer from constitutional infirmities.

Before an FCR can begin to do his job, he first must be given a clear understanding of the

identity of his constituency.  As explained in Argument Section A, below, as a matter of federal

bankruptcy law, asbestos-exposed individuals who have no functional impairment, even though

they might have incurred some subclinical physiological changes such as "pleural thickening,"

---

[3]  The bankruptcy power, of course, is subject to the Fifth Amendment.  *See*, *e.g.*, *Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989) (scheme for terminating rights in bankruptcy must be "consistent with due process"); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935) (bankruptcy power is subject to the Fifth Amendment); *Kewanee Boiler Corp. v. Smith (In re Kewanee Boiler Corp.)*, 198 B.R. 519, 534 (Bankr. N.D. Ill. 1996) (future claimants bound only if handled "in a manner compatible with constitutional due process").

do not possess currently compensable claims.  Thus, current asymptomatics[4] are not creditors.
They are instead potential future demand holders and their potential interest in asserting future
demands in the event that they ever truly become ill is to be represented and protected solely by
the FCR.  Such a holding is entirely consistent with this Court's identification of the FCR's
constituency in the *Kaiser Aluminum Corp.* case, where this Court defined "Future Claimants" as
"[i]ndividuals who may have been exposed to asbestos or asbestos-containing products but who
have not yet manifested symptoms of asbestos-related diseases resulting from such exposure."[5]

Further, as set forth in Section B, as bankruptcy's equivalent of a common law guardian
*ad litem,* the FCR is a fiduciary whose independence and lack of conflicts must be beyond
reproach.  For this reason, 11 U.S.C. § 327, cited by Debtors as a statutory basis for appointing
an FCR, does not provide an adequate standard because, under the precedent of the Third Circuit,
§ 327 does not permit disqualification based upon the appearance of impropriety.  While such a
permissive standard might be sufficient when the issue is the retention of professionals to serve
constituencies who are present to choose and supervise them, it is constitutionally insufficient for
examining the adequacy of a fiduciary who is being hired to stand in the shoes of an *absent*
constituency.  For that purpose, appearance of impropriety must be the standard for
disqualification.

---

[4]  The term "unimpaireds" frequently is used to refer to asbestos-exposed individuals who may have some
subclinical physiological changes related to asbestos exposure but are not currently suffering from any
objective symptoms of an asbestos-related disease.  "Impaired" and "unimpaired," however, are
bankruptcy terms of art.  11 U.S.C. § 1123(b)(1).  Thus, to avoid confusion, in this Brief we refer to such
individuals as "asymptomatics."

[5]  *See In re Kaiser Aluminum Corp.*, Case No. 02-10429 (JKF), Order entered 1/27/03 (Dkt. No. 1685),
incorporating quoted definition of "Future Claimant" from Debtors' Application for an Order Appointing
Martin J. Murphy as Legal Representative for Future Claimants (Docket No. 1514).

Once it is recognized that the proper standard is the appearance of impropriety, it follows that the reported position of the Asbestos Property Damage Committee -- that a new, independent FCR should be appointed by the Court -- is quite correct.  As explained in Argument Section C, the Court should direct the United States Trustee, whose office exists for just such purposes, to identify and recommend one or more independent candidates for the Court to consider appointing as the FCR.  If anything, "nomination" of an FCR by other opposing constituencies is a disqualifying factor.  The FCR is a partisan who is in conflict with, and is supposed to bargain at arm's length from, the debtors and each of the creditor, equity and other interested constituencies.  Irrespective of the motivations of the proposed FCR or the proposing constituency, it is natural and expected human behavior that, consciously or not, an FCR would be favorably disposed towards the committees that sponsored his employment.  This gives rise to the appearance of impropriety.  Likewise, individuals who have served or are serving in the lucrative position of FCR in other bankruptcies should not be permitted to reprise their role because the natural temptation of someone trying to build a cottage industry as an FCR is to get too "cozy" with repeat players in these cases in order to encourage additional business.[6]

## II.  LEGAL ARGUMENT

### A.  The Constituency of the FCR Should Be Defined to Reflect the Federal Bankruptcy Rule that Compensable Asbestos Personal Injury Claims Arise Only Upon Manifestation of Functional Impairment

Some 20 years ago, the Third Circuit raised but left open the question of whether a uniform federal common law standard of claims accrual should be applied in asbestos mass tort bankruptcies.  *In re Frenville*, 744 F.2d, 332, 337 n. 8 (3d Cir. 1984), *cert. denied*, 469 U.S. 1160

---

[6]  To recognize this is not to question the personal integrity of any particular individual, but to recognize that here, as elsewhere, economic motivations tend to affect behavior.

4

(1985). The next year, the court raised but left unanswered "whether future claimants can or should be considered 'creditors' under the Code," *In re Amatex Corp.*, 755 F.2d 1034, 1043 (3d Cir. 1985), and "whether future claimants have dischargeable 'claims.'" *Id.* at 1040. At the time, mass tort bankruptcy litigation was in its infancy. Since then, a number of significant developments, both judicial and legislative, have illuminated the path to the correct resolution of these issues. As the *Frenville* Court noted, the *Johns-Manville* bankruptcy court announced a federal common law standard of disease manifestation to measure claim allowability, which it then applied in confirming a plan of reorganization in 1986. Then, in 1994, Congress approved of, and codified, that standard in adopting § 524(g) of the Code, distinguishing currently sick claimants from asymptomatic potential "demand" holders.

Further, the Supreme Court in 1997 declared as a matter of federal common law under FELA that asymptomatics have no claims, *Metro-North Commuter Railroad Co. v. Buckley*, 521 U.S. 424 (1997), and did so based on policy considerations that are widely acknowledged by commentators and courts throughout the country. Indeed, the *Metro-North* Court's concerns, if anything, are even more compelling in the bankruptcy context in light of important statutory objectives under the Bankruptcy Code, including fostering reorganization, maximizing the value of the estate, and ensuring equitable compensation to all those who are, or will be, truly injured by exposure to asbestos. This is particularly so given the massive influx of marginal claims which have flooded the tort system since 2000.

Properly analyzed in light of these developments in the law, the questions reserved by the *Frenville* and *Amatex* courts are correctly resolved as follows:

> 1.    A uniform federal common law claims-accrual standard of manifestation of an asbestos-related disease should be applied to mass tort asbestos bankruptcies so that current claims of asymptomatics are disallowed.

5

2.      Asymptomatics are not and should not be considered "creditors" under the Code.  Instead, they are potential future demand holders whose interests are to be represented by a statutory, court-appointed and court-supervised, legal representative.

3.      Future demand holders' claims may be discharged in bankruptcy as against the debtor so long as their interests are adequately protected by compliance with the provisions of § 524(g) and their claims are channeled to an appropriate trust once disease is manifested.

Thus, asymptomatics do not possess pre-petition claims that are currently cognizable, or compensable, under the Bankruptcy Code.  They are not "creditors" and are not entitled to vote to approve or reject proposed plans of reorganization.  Instead, as a matter of federal bankruptcy law, asymptomatics are potential future claimants who might someday be entitled to assert "demands" should they ever actually become ill with an asbestos-related disease.  Moreover, Congress, through its enactment of 11 U.S.C. § 524(g), has established that asymptomatics' potential interest as future claimants is to be represented by a court-appointed and supervised legal representative.  It is solely this legal representative who has standing to appear and advocate the interests of future asbestos claimants who do in fact eventually become sick.

It is critical that the Court properly define at the outset the interests represented by the FCR and the Official Committee of Asbestos Personal Injury Claimants ("P. I. Committee"). The FCR must clearly understand that he alone represents asymptomatics' rights as potential future claimants and that the P. I. Committee's constituency is limited solely to those who currently are truly ill with an asbestos-related disease.  Unless the FCR plainly understands that the myriad asymptomatics are not voting creditors, and therefore cannot use their votes to skew the confirmation process, the FCR will be unable to effectively represent his constituency in the negotiations that will take place with the P. I. Committee.  Thus, only when these representational issues are properly resolved and the constituencies correctly defined and aligned

6

may the process begin of negotiating a plan that comports with the requirements of § 524(g) and the constitutional strictures of due process.

**1. The Provisions of the Bankruptcy Code Addressing "Claims" Displace Underlying State Law**

    **a) Federal Law Preempts State Law Treatment of Property Rights in Bankruptcy Where Congress Directs or a Sufficient Federal Justification Otherwise Exists for Displacing State Law**

In *Butner v. United States*, 440 U. S. 48 (1979), the Supreme Court established the default rule that state law defines property rights in bankruptcy unless preempted by some articulable countervailing federal policy. While Congress clearly has the constitutional authority to legislate uniform rules in bankruptcy, the *Butner* Court noted, it has "generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Id*. at 54. Specifically in *Butner*, the Court rejected the application of a judge-made federal rule of equity because it was neither based upon "any congressional command," nor did it "serv[e] any identifiable federal interest." *Id*. at 55.

This "basic federal rule" in bankruptcy nevertheless yields in situations where state law either is expressly displaced by Congress, conflicts with the bankruptcy scheme established by Congress, or "some federal interest requires a different result." *Id*. at 55, 57.[7] "Thus, *Butner* permits federal courts to reject state law as the rule of decision when it conflicts with an

---

[7] *Butner* represents the application of the doctrine of *Erie R. Co. v. Tompkins*, 304 US 64 (1938), in the bankruptcy context in that "the source of the power to override state-created substantive rights in bankruptcy must now be found within the limits of the bankruptcy power and not in 'general equitable principles' considered apart from permissible bankruptcy objectives." *In re Kar Development Assoc., L.P.*, 180 B.R. 597, 614 (Bankr. D. Kan. 1994), *aff'd*, 180 B.R. 629 (D. Kan. 1995), *quoting* Alfred Hill, *The Erie Doctrine in Bankruptcy*, 66 Harv.L.Rev. 1013 (1953). *See also*, *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15 (2000) (Bankruptcy Code provides source of bankruptcy courts' equitable powers to adjust rights between creditors); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code").

'identifiable federal interest' or 'Congressional command.'" *Kar Development,* 180 B.R. at 615. As shown below, one such instance where Congress affirmatively exercised its power to displace state law in the treatment of property rights is found in those portions of the Bankruptcy Code providing for the definition and treatment of "claims."

> **b) Ascertaining What Constitutes a "Claim" and When It "Arose" Is Central to Effectuating the Entire Scheme of the Bankruptcy Code**

Displacement of otherwise applicable state law is appropriate where the provisions of the Bankruptcy Code preempt state law, expressly or implicitly. One example of such preemption is found in the Code's definition of a "claim" and the statutory scheme for addressing claims. Indeed, the interpretation and application of these provisions stand at the very core of the important federal policies embodied in the Code.

Whether a person has a "claim" and when that claim "arose" are key in determining the person's rights and remedies under the Code. In relevant part, "claim" is defined to mean a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). A "creditor" is defined as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." *Id.* § 101(10).

In a Chapter 11 case, the filing of a voluntary petition constitutes the "order of relief." 11 U.S.C. § 301. Thus, only the holder of a "claim" that "arose" pre-petition is a "creditor" who may file a proof of claim under § 501(a) which may be allowed under § 502, thereby permitting the creditor to vote on proposed plans of reorganization. The value of an allowed claim is determined "as of the date of the filing of the petition." 11 U.S.C. § 502(b).

8

Whether an asserted obligation is a "claim" and when it "arose" also affect, *inter alia*, whether it is dischargeable, whether it is an "administrative expense" and whether and how it is treated in a plan of reorganization. For example, only a "debt," defined as "liability on a claim," § 101(12), that arose prior to confirmation of a plan is discharged in a Chapter 11 case. 11 U.S.C. § 1141(d)(1).

### c) Courts Recognize the Preemptive Effect of the Bankruptcy Code's Definition of "Claim" and Generally Agree that the Timing of When a "Claim" "Arose" Likewise Is Determined by Federal Law

The term "claim" is, by intention, broadly defined. According to the Supreme Court, "'claim' has 'the broadest available definition.'" *FCC v. NextWave Personal Communications, Inc.*, 537 U.S. 293, 302 (2003), quoting *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991). As the Third Circuit explained, "Congress intended the definition of a claim to be very broad; the legislative history states:"

> "The definition is any right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured. . . . By this broadest possible definition and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court."

*Frenville,* 744 F.2d at 336. This broad definition of "claim" preempts state law. Thus, "federal law controls which claims are cognizable under the Code." *Id.*

Most courts have held that the Code also displaces state law in determining when a claim "arose." "[C]laim accrual for bankruptcy purposes must be determined in light of bankruptcy law and not state law." *Grady v. A.H. Robins*, 839 F.2d 198, 202 (4th Cir*), cert. dismissed*, 487 U.S. 1260 (1988). According to the Third Circuit, this approach to claim recognition and accrual

involves application of "a federal common law of bankruptcy."  *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir. 2000).

The Third Circuit has been the sole exception, holding in *Frenville* that "in most circumstances, a 'claim' arises for bankruptcy purposes at the same time the underlying state law cause of action accrues."[8]  *Id.*, 212 F.3d at 205.  Even the Third Circuit, however, recognized that that "[a] bankruptcy proceeding stemming from a mass tort – such as exposure to asbestos – may be a case in which the application of federal law is indicated."  *Frenville,* 744 F.2d at 337, n. 8.  The issue of whether federal bankruptcy common law determines when a claim "arose" in the context of a mass-tort asbestos bankruptcy thus is one of first impression in this circuit.

As explained below, especially in light of the enactment of § 524(g), this question should be answered in the affirmative and the Court should rule that a uniform federal standard governs the issue of when a claim arises in a mass tort asbestos bankruptcy.  Moreover, the appropriate standard should be that a claim does not arise until a claimant is functionally impaired.

**2.    Courts Have Recognized that Inherent Limits Exist to What May Be Considered a Pre-Petition Tort Claim and that Resolution of the Statutory Ambiguities Requires Application of Interstitial Federal Common Law**

Courts applying federal bankruptcy common law have tended to construe the concept of pre-petition claims expansively with a view toward fostering the policy of affording the broadest possible relief to debtors.  Courts taking an expansive view of "claim" and/or "arose" in the tort context have tended to focus on when the underlying negligent acts of the debtor occurred rather than when the harm occurred.   In *In re Edge*, 60 B.R. 690 (Bankr. M.D. Tenn. 1986), for

---

[8]  *Frenville*'s state-law accrual approach has been widely criticized "at least in part because it would appear to excise 'contingent' and 'unmatured' claims from § 101(5)(A)'s list."  *California Dep't of Health Servs. v. Jensen (In re Jensen)*, 995 F.2d 925, 927-28 (9th Cir. 1993). *See also, Jones v. Chemetron Corp.*, 212 F.3d at 206 (acknowledging "the criticism the *Frenville* decision has engendered" and citing opposing cases and commentary).

example, the court held that a malpractice claim against a dentist for pre-petition negligence

where the harm manifested only post-petition (but while bankruptcy proceedings were ongoing)

was a pre-petition "claim" that the plaintiff must assert as a bankruptcy creditor.

The Fourth Circuit has expressed the view that Congress, in defining "claim" under the

Code "create[d] a contingent tort or like claim, . . ." *Grady v. A.H. Robins*, 839 F.2d at 203.

Nevertheless, these courts have recognized that the concept of a "contingent tort" is not

boundless.  As one court explained,

> While the statute may appear to be clear and unambiguous on its
> face, its application to particular situations presents myriad
> challenges that belie such a conclusion. As the Second Circuit
> noted in *Chateaugay*, "that language [section 101(5) and the
> legislative history] surely point us in a direction, but provides little
> indication of how far we should travel." *United States v. The LTV
> Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1003 (2d Cir.
> 1991). At the margins, we encounter the ambiguity inherent in the
> words of the statute.

*In re: Beeter*, 173 B.R. 108, 118 (Bankr., W.D. Tex. 1994) (brackets in original).

As the delay between a debtor's pre-petition negligence and the harm to the victim

increases, and the uncertainty of future harm and of the identities of future victims increases, the

courts have recognized that, at some point, it becomes impossible, if not absurd, to treat some of

these future claims as pre-petition claims.

> A right that can be made the basis of a claim in bankruptcy may be
> contingent on something happening, such as the signing of a
> contract, . . . but if the contingency can be the tort itself, this spells
> trouble, both practical and conceptual. Suppose a manufacturer
> goes bankrupt after a rash of products-liability suits. And suppose
> that ten million people own automobiles manufactured by it that
> may have the same defect that gave rise to those suits but, so far,
> only a thousand have had an accident caused by the defect. Would
> it make any sense to hold that all ten million are tort creditors of
> the manufacturer and are therefore required, on pain of having
> their claims subordinated to early filers, to file a claim in the
> bankruptcy proceeding? Does a pedestrian have a contingent claim
> against the driver of every automobile that might hit him? We are

> not alone in thinking that the answer to these questions is "no." *See In re Chateaugay Corp.*, 944 F.2d 997, 1003 (2d Cir. 1991). Driving carelessly is not a tort and neither is the sale of a defective product. The products-liability tort occurs when the defect in the design or manufacture of the product causes a harm . . .. It is a fundamental principle of tort law that there is no tort without a harm, . . . and so until the harm occurs, the tort hasn't occurred.

*Fogel v. Zell*, 221 F.3d 955, 960 (7th Cir. 2000)(Posner, J.)(citations omitted).

At the outer end of the spectrum, in situations where a victim never had pre-bankruptcy contact with the debtor or pre-bankruptcy exposure to the debtor's negligent conduct, courts have held that such speculative claims were too attenuated to be cognizable in bankruptcy. *See*, *e.g.*, *Epstein v. Official Comm. of Unsecured Creditors, (In re Piper Aircraft Corp.*), 58 F.3d 1573 (11th Cir.1995) (bankruptcy court could not address or discharge claims of unknown individuals who will be harmed in the future by design defects in airplanes built pre-bankruptcy); *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268 (5th Cir. 1994) (victims of post-confirmation mobile home fire not bound by prior discharge of debtor manufacturer).

One step further within the spectrum is the situation where the debtor's negligence and the future victim's exposure occurred pre-bankruptcy, but the manifestation of any future harm was uncertain. This is the situation that courts, including this one, predominantly face in asbestos mass-tort bankruptcies in addressing the status and rights of asbestos-exposed, currently asymptomatic individuals.

Prior to § 524(g)'s enactment, several courts, including the Second and Third Circuits, noted, but did not decide, the thorny issue of whether those currently asymptomatic, asbestos-exposed individuals who eventually will become sick in the future are "creditors" with "claims." In *Amatex*, the Third Circuit ruled that unknown future asbestos claimants are "parties in interest" and directed the bankruptcy court to appoint a representative to protect their interests.

In doing so, the court recognized that it was not then addressing "the ultimate and difficult determination whether future claimants have dischargeable 'claims,'" *id*. at 1040, leaving unresolved "whether future claimants can or should be considered 'creditors' under the Code . . . ." 755 F.2d at 1043.

Likewise, in *In re Chateaugay Corp.* 944 F.2d at 1004, the Second Circuit observed that "[a]ccepting as claimants those future tort victims whose injuries are caused by pre-petition conduct but do not become manifest until after confirmation arguably puts considerable strain not only on the Code's definition of 'claim,' but also on the definition of 'creditor.'" Again, that court avoided deciding the issue: "We need not decide how the definition of 'claim' applies to tort victims injured by pre-petition conduct, especially as applied to the difficult case of pre-petition conduct that has not yet resulted in detectable injury [*e.g.*, current asbestos-exposed asymptomatics], much less the extreme case of pre-petition conduct that has not yet resulted in any tortious consequence to a victim [*e.g.*, persons who in the future come into contact with asbestos and contract an asbestos-related disease]."[9] *Id*. at 1005.

Thus, as the outer edges of the spectrum are approached, courts recognize that Congressional intent concerning the definition of "claims" and when they arise becomes unclear. Consequently, these courts have sought to interpret the Bankruptcy Code's provisions by reference to federal common law. Such "interstitial" federal common law focuses on situations "where federal courts are called upon to pronounce common law to fill in the interstices of a

---

[9]  The Fourth Circuit addressed this issue, but only in a limited fashion in *Grady v. A.H. Robins*. 839 F.2d 198.  The Fourth Circuit expressed its view that the implantation of the Dalkon Shield intrauterine device gave rise to a contingent tort claim at the time the device was implanted. *Id.* at 203.  That court, however, carefully limited its holding to the applicability of the automatic stay provision to such "contingent torts," expressly stating that it was not deciding whether the future claims were dischargeable or whether post-petition claims constitute an administrative expense. *Id.*

pervasively federal framework." *Kar Development,* 180 B.R. at 616, *quoting* Wright et al.,

*Federal Practice and Procedure* § 4514 (1982).  "The scope of this species of lawmaking power

lies along a continuum that varies inversely with the completeness of the legislative scheme and

the clarity of the congressional intent." *Id*.

3. **Numerous Federal Interests Implicated in Mass Tort Bankruptcies, Supreme Court Pronouncements Regarding Asbestos Claims Under Federal Common Law, and Congress's Codification of the *Manville* Settlement in § 524(g), All Mandate Application of a Uniform Federal Rule Disallowing Present Claims of Asymptomatics**

Having recognized that the 1978 enactment of the Bankruptcy Code "provide[d] little

indication of how far [courts] should travel" down the road of recognizing future torts as pre-

petition "claims," *Chateaugay*, 944 F.2d at 1003, Congress erected additional signposts, at least

with respect to asbestos claims, by enacting § 524(g) in 1994.  Drawing upon the experience of

the courts in fashioning a method for addressing future claims in the Johns-Manville and UNR

bankruptcies, Congress established procedures for addressing and discharging future claims as

part of bankruptcy proceedings.  As next explained, the history, structure and policies of § 524(g)

all support the conclusion that Congressional intent is best effectuated, and constitutional

safeguards satisfied, by application in bankruptcy of the federal common law rule that an

asbestos-exposed individual's claim does not arise unless and until he or she begins to suffer

functional impairment from an asbestos-related disease.

a) **The Courts that Pioneered the Settlement Trust Procedures Ratified and Codified in §§ 524(g-h) Established a Federal Common Law Rule of Disease Manifestation for Claim Allowability and to Determine the Constituencies of the Asbestos Creditors Committees and the Future Claimants' Legal Representatives**

In the first wave of asbestos bankruptcies in the 1980s, courts struggled to develop a

framework within the confines of the Code and constitutional due process requirements to

14

balance and address the competing considerations of providing asbestos manufacturers with a fresh start while fashioning a mechanism for fairly compensating both present and unknown future asbestos claimants.  Sidestepping the issue of whether future claimants had pre-petition claims, the courts developed the mechanisms of a legal representative to speak for the future claimants and the establishment of trusts with procedures intended to compensate both the currently ill and those who become ill in the future in a like manner.

The opinions of the court in the Johns-Manville bankruptcy merit attention, both because Congress ratified the resolution of that case in § 524(h), and because the Third Circuit in *Frenville* expressly cited *In re: Johns-Manville Corp.*, 36 B.R. 743 (S.D.N.Y.), *appeal denied*, 39 B.R. 234 (S.D.N.Y. 1984) ("*Johns-Manville*"), as an example of the type of case where an "overriding federal policy" might empower a court "to develop federal law."  *Frenville*, 744 F.2d 337 n. 8.  In *Johns-Manville*, the court considered, and ultimately granted, a motion to appoint a representative to protect the interests of future asbestos claimants.

Most significantly for present purposes, in its opinion the court pronounced that it was "clear . . . that state-created statutes of limitation, which vary widely from state to state, must yield to one nationwide uniform standard for claims allowability in bankruptcy."  *Id*. at 750 n. 4 (emphasis added).  After a lengthy discussion of precedent, the court concluded that:

> there is great justification for a bankruptcy court to authorize a *uniform standard specifying some form of disease manifestation as the point of health claim allowability*.  This will avoid the unfairly inconsistent results which would otherwise eventuate in applying multitudinous statutes of limitations to like claims.

*Id*. (emphasis added).

The structural treatment of the competing asbestos interests in the *Johns-Manville* bankruptcy also is instructive here.  In *Johns-Manville*, the "Asbestos Health Committee . . . took the position that it represented the interests only of 'present claimants,' persons who, prior to the

petition date, had been exposed to Manville asbestos and had already developed an asbestos-related disease." *Kane v. Johns-Manville*, 843 F.2d 636, 639 (2d Cir. 1988). Only persons with existing asbestos-related diseases were treated as "creditors" and permitted to vote. Both present and future claimants received identical treatment, however, "by virtue of the Injunction, which channels all claims to the Trust." *Id*. at 640. The court rejected attempts by other conflicted constituencies to speak for future claimants, with the Second Circuit declaring that "we may confidently leave that entire task to" the Legal Representative. *Id.* at 644.

Likewise, the court in *UNR* rejected any notion that asymptomatics had any compensable claims. Instead, such individuals "would only be entitled to damages from UNR if and when they contract an asbestos-related disease." *In re: UNR Industries, Inc.*, 71 B.R. 467, 479 (Bankr., N.D. Ill. 1987). Again, a legal representative represented future claimants. *In re: UNR Industries, Inc.*, 46 B.R. 671 (Bankr. N.D. Ill. 1985).

### b) Outside of Bankruptcy, Federal Common Law Does Not Recognize a Cause of Action for Asymptomatics

### (i) In *Metro-North*, the Supreme Court Rejected Claims by Asymptomatic Asbestos Claimants as a Matter of Federal Common Law

In *Metro-North Commuter Railroad Co. v. Buckley*, 521 U.S. 424 (1997), the United States Supreme Court ruled that asymptomatic asbestos exposure claimants have no cause of action under federal common law. In that case, a railroad worker who had been exposed by his employer to asbestos sought recovery under the Federal Employers' Liability Act ("FELA") for negligent infliction of emotional distress as well as for medical monitoring costs. The Supreme Court held that the worker "cannot recover *unless, and until, he manifests symptoms of a disease*." *Id*. at 427 (emphasis added).

16

The Court explained that it was making this determination based upon notions of federal common law.  "'[C]ommon law principles,' where not rejected in the text of the statute, 'are entitled to great weight in interpreting the Act." *Id*. at 429, *quoting  Consolidated Rail Corp v. Gottshall*, 512 U.S. 532, 544 (1994).  In other words, the "Court's duty 'in interpreting FELA . . . is to develop a federal common law of negligence . . . informed by reference to the evolving common law.'"  *Id*., *quoting Gottshall*, 512 U.S. at 557 (Souter, J. concurring, ellipses in original).

The operative provision of FELA makes railroads "liable in damages to any person suffering injury while . . . employed" by a railroad if the "injury" results from the railroad's "negligence."  45 U.S.C. § 51.  As the Court wrote: "The critical question before us in respect to Buckley's "emotional distress" claim is whether the physical contact with insulation dust that accompanied his emotional distress amounts to a 'physical impact'. . . ."  *Id*.  Answering in the negative, the Court emphasized that

> the words "physical impact" do not encompass every form of "physical contact." And, in particular, they do not include a contact that amounts to no more than an exposure--an exposure, such as that before us, to a substance that poses some future risk of disease and which contact causes emotional distress only because the worker learns that he may become ill after a substantial period of time.

*Id*. at 432.

The Court emphasized several reasons why courts should avoid expanding the parameters of emotional distress claims:

> general policy reasons . . . militate against an expansive definition of "physical impact" here. Those reasons include: (a) special "difficulty for judges and juries" in separating valid, important claims from those that are invalid or "trivial," *Gottshall*, 512 U.S. at 557; (b) a threat of "unlimited and unpredictable liability," *ibid*.;

17

and (c) the "potential for a flood" of comparatively unimportant, or
"trivial," claims, *ibid.*

*Id.* at 433.  The Court went on to reject Buckley's claim for medical monitoring expenses for

similar and additional reasons while assuming "that an exposed plaintiff can recover related

reasonable medical expenses if and when he develops symptoms."  *Id*. at 438.

### (ii) Subclinical Physiological Changes Do Not Constitute Actionable Impairment Under Federal Common Law

In the Third Circuit, the law is settled that "subclinical injury resulting from exposure to

asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to

sustain a cause of action under generally applicable principles of tort law" for purposes of stating

a claim under FELA.  *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir.), *cert.*

*denied*, 474 U.S. 864 (1985).  In so holding, the court expressed concerns quite similar to those

emphasized by the Supreme Court in *Metro-North*:

> [W]e are persuaded that a contrary rule would be undesirable as
> applied in the asbestos-related tort context. If mere exposure to
> asbestos were sufficient to give rise to a F.E.L.A. cause of action,
> countless seemingly healthy railroad workers, workers who might
> never manifest injury, would have tort claims cognizable in federal
> court. It is obvious that proof of damages in such cases would be
> highly speculative, likely resulting in windfalls for those who
> never take ill and insufficient compensation for those who do.
> Requiring manifest injury as a necessary element of an asbestos-
> related tort action avoids these problems and best serves the
> underlying purpose of tort law: the compensation of victims who
> have suffered. Therefore we hold that, as a matter of federal law,
> F.E.L.A. actions for asbestos-related injury do not exist before
> manifestation of injury.

*Id*.  Thus, under Third Circuit precedent applying federal common law, physiological changes

that do not impair functioning, such as asymptomatic pleural thickening, do not constitute a

compensable "symptom" of an asbestos-related disease.

The Supreme Court likewise has strongly suggested, although not squarely held, that subclinical changes, such as pleural thickening, that do not impair functioning do not constitute compensable symptoms of disease. In *Norfolk & Western Railway Co. v. Ayers*, 538 U.S. 135, 123 S. Ct. 1210 (2003), the Court held that railroad workers who had developed asbestosis could recover for emotional distress for fear of contracting cancer in the future. In its opinion, the Court equated "exposure-only plaintiffs" as described in *Metro-North* with "plaintiffs with pleural-thickening," and distinguished them from plaintiffs who have "developed asbestosis and thus suffered real physical harm." *Id.* at 156, 123 S. Ct. at 1223, citing Henderson & Twerski, *Asbestos Litigation Gone Mad: Exposure-Based Recovery for Increased Risk, Mental Distress, and Medical Monitoring*, 53 S. C. L. Rev. 815, 830, 833-34 (2002).

### c)  Application of the Federal Common Law Rule Disallowing Asymptomatic Claims in Bankruptcy Furthers Significant Federal Bankruptcy Policies and Is Necessary to Effectuate Congress's Intentions Expressed Through § 524(g)

### (i)  The Disease Manifestation Rule Complements the System Developed by the Courts and Ratified by Congress for Fostering Reorganization While Treating Present and Future Claimants Equitably

The concerns that led the Supreme Court to reject recovery for asymptomatics as a matter of federal common law under FELA (and the Third Circuit as well to reject recovery as "contingent claims" under the former Bankruptcy Act in *Schweitzer*) are yet more compelling in the current bankruptcy context. Courts have identified numerous federal interests and policies reflected in the Bankruptcy Code that are strongly implicated here:

1.  <u>Fostering Successful Reorganizations</u>. Chapter 11 of the Code embodies the strong federal statutory "objective of fostering reorganization." *In re: Kar Development*, 180 B.R. at 622. Because the preservation of a going concern almost always maximizes the pool of assets available to satisfy the liabilities of the debtor, "[one of] the key aims of Chapter 11 [is] to avoid liquidation at all reasonable costs." *Johns-Manville*, 36 B.R. at 746. *See also*, *e.g.*, *In re Lyons*

*Transportation Lines, Inc.*, 123 B.R. 526, 534 (Bankr. W.D. Pa. 1991) (primary purpose of Chapter 11 is to promote restructuring of debt and preservation of economic units rather than dismantling estate).

2. Giving Debtors a Fresh Start.  "There is a strong federal policy favoring the debtor's fresh start in bankruptcy." *Edge*, 60 B.R. at 699.  *See also*, *e.g.*, *In re: Jensen*, 995 F.2d at 928 ("overriding goal" of Bankruptcy Code is to provide debtor with "fresh start").

3. Treating Creditors Fairly and Equitably.  "[O]ne of the primary goals of bankruptcy is to treat all similarly-situated creditors fairly and equally." *In re: Dow Corning Corp.*, 211 B.R. 545, 565 (Bankr., E.D. Mich. 1997).  It is therefore incumbent upon bankruptcy courts to "'sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the bankrupt estate.'"  *In re: A.H. Robins Co., Inc.*, 89 B.R. 555, 561 (E.D.Va. 1988), *quoting Pepper v. Litton*, 308 U.S. 295 (1939).

4. Treating Present and Future Claimants Equitably:  A further federal policy is to "enable a nonarbitrary allocation of limited assets to be made between present and future claimants." *Fogel v. Zell*, 221 F.3d 961; *see also* 11 U.S.C. § 524(g)(2)(B)(II)(iii) (referencing threats to "plan's purpose to deal equitably with claims and future demands" as prerequisite for channeling injunction).

In order to foster the maximization of a debtor's assets through a reorganization, the reorganization plan must be feasible.  To be feasible, the plan must either address and discharge the debtor's liabilities or, when substantial future liabilities are foreseen, make appropriate allowance for addressing these claims in a manner consistent with due process.  With respect to future injuries that will arise among a small portion of a population exposed to a hazardous substance, such as asbestos, to permit mere exposure to give rise to a "contingent tort claim"

20

would mean that every exposed person would have an allowable contingent claim.  Under the

Code, the value of that allowed contingent claim would be determined "as of the date of the

filing of the petition."  § 502(b).  As a result, asymptomatics who eventually became sick would

be vastly undercompensated while those who never become ill will have been concomitantly

overpaid.  Further, in the zero-sum game of bankruptcy, the pot of assets available to compensate

the present and future truly sick (to say nothing of the debtor's other creditors) is depleted by

such payments to asymptomatics.

No court has endorsed such an outcome.  Indeed, as the Third Circuit opined in

*Schweitzer*, "if contingent claims were held to include possible future tort claims . . . then every

hypothetical chain of events leading to liability, regardless of how likely or unlikely, might be

the basis for a contingent claim . . . [and] every employee who had worked near asbestos and

whose address was known would be a known creditor."  *Schweitzer*, 758 F.2d at 944

(interpreting § 77(b) of the former Bankruptcy Act).

Instead, what developed in the 1980s was a system where, without addressing specifically

whether asymptomatics have "claims" or when such claims "arise," courts instead focused on

future claimants, *i.e.*, "individuals who have been exposed to asbestos but have not yet

manifested symptoms of asbestos-related diseases" (but will in the future get sick).  *Amatex*, 755

F.2d at 1035.  Courts held that this unknown future subset of present asymptomatics are real

parties in interest requiring one or more independent fiduciaries to represent them. Courts also

recognized that the interests of these future claimants cannot be adequately represented either by

Asbestos Creditors Committees ("ACCs") comprised of individuals who already suffer from

asbestos-related diseases or by the debtor, due to their conflicting interests *vis a vis* future

claimants.  *Id*. at 1043.  *See also, Kane v. Johns-Manville Corp*., 843 F.2d at 644; *Johns-*

21

*Manville*, 36 B.R. at 749, n. 3.  The result in the Johns-Manville and UNR bankruptcies was the creation of trusts to pay claims of both present and future claimants, but only those who became sick, not those who were merely exposed.[10]

In effecting a system where only the currently sick were treated as voting creditors and future claimants' interests were safeguarded by a legal representative, the courts drew a line. Asymptomatics were denied present creditor status, but those asymptomatics who eventually developed asbestos-related diseases were included in trust funds designed to compensate all victims equally.  As noted above, the *Johns-Manville* Court expressly recognized the need for a single "uniform federal standard specifying some form of disease manifestation as the point of health claim allowability . . .."[11]  36 B.R. at 750, n. 4.  *Cf.*, *UNR*, 71 B.R. at 479.

In 1994, Congress ratified, and codified, this policy judgment in § 524(g), which was "modeled on the trust/injunction in the *Johns–Manville* case."  140 Cong. Record H10,765 (October 4, 1994).  These asbestos trust injunction provisions, enacted in 1994, reflect Congress's agreement that asymptomatic asbestos-exposed individuals do not currently have

---

[10]  Despite that court's best intentions to ensure that only the sick were paid and were compensated as completely as possible, the mechanisms established for paying claims by the Manville Trust were woefully inadequate in weeding out claims of asymptomatics and others of questionable validity.  That those entrusted with safeguarding the Manville Trust misapplied the legal standards, however, does not mean that asymptomatics and other doubtful claimants should be compensated in other asbestos bankruptcies.  To the contrary, it simply points up the need for implementation of stringent checks and balances, and their active enforcement by the courts.

[11]  Indeed, this trend to compensate the truly ill while preserving and deferring the claims of the currently asymptomatic has been growing steadily outside of the bankruptcy context.  Notably, in this Circuit, Judge Weiner, who manages the federal MDL asbestos litigation, ordered the administrative dismissal of all asymptomatic plaintiffs whose cases were filed on the basis of mass litigation screenings, subject to reinstatement upon a showing that a plaintiff is suffering from an asbestos-related disease.  *See* Administrative Order No. 8, *In re Asbestos Prods. Liab. Litig.*, MDL 875 (E.D. Pa. Jan. 14, 2002). Courts in many states place asymptomatic claimants on suspense dockets, preserving the claims against statute of limitations challenges, but precluding the claims from coming to trial until the claimants actually have some functional impairment.  *See* Mark A. Behrens & Monica G. Parham, *Stewardship for the Sick:  Preserving Assets For Asbestos Victims Through Inactive Docket Programs,* 33 Tex. Tech. L. Rev. 1 (2001).

compensable "claims" and are not "creditors" entitled to vote on plans.  Congress recognized, and ratified, the disease-manifestation trigger for claims allowability established by the *Johns-Manville* court while expressing concern that "full consideration be accorded to the interests of the future claimants, who, by definition, do not have their own voice." *Id*.  The House Committee expressed the intention that future asbestos bankruptcy proceedings utilizing § 524(g)'s trust/injunction provisions "meet the same kind of high standards with respect for the rights of claimants, present and future, . . . displayed by the two pioneering cases [*Johns-Manville* and *UNR*]." *Id*.

A trust protected by a § 524(g) injunction must "assume the liabilities of a debtor which . . . has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products."  11 U.S.C. § 524(g)(2)(b)(i)(I).  The court must find that "the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction." *Id*., § 524(g)(2)(b)(ii)(I).

Importantly, § 524(g) introduces a new statutory term, "demand," which it distinguishes from a currently-assertable "claim:"

In this subsection, the term "demand" *means a demand for payment, present or future*, that –

(A) *was not a claim during the proceedings leading to the confirmation* of a plan of reorganization;

(B) *arises out of the same or similar conduct or events that gave rise to the claims* addressed by the injunction issued under paragraph (1); and

(C) pursuant to the plan, is to be paid by a trust described in paragraph (2)(B)(i).

*Id.*, § 524(g)(5) (emphasis added).

Currently compensable "claims" and "demands" are, by intention, mutually exclusive. Congress, just like the courts, recognized that a breaking point exists along the continuum beginning with initial exposure beyond which an individual has an assertable claim. Short of that point, however, that individual has no currently cognizable claim, but may eventually become entitled to assert a "future demand."[12] Moreover, as these federal statutory terms displace state law, they should be given a uniform federal law interpretation.

Application of the federal common law test that a claimant must be suffering symptoms of an asbestos-related disease before he will be permitted to participate as a present, voting creditor in the reorganization proceedings therefore is necessary to accomplish the Congressional policies embodied in the Code. This is especially so given the stated Congressional intent that the requirements of § 524(g) "simulate those met in the *Manville* case," 140 Cong. Record H10,765, which applied a uniform federal standard of disease manifestation to segregate present voting creditors from future claimants whose "voice" was provided by the legal representative.

Moreover such application furthers important bankruptcy policies. The Supreme Court was concerned about the "special difficulty for judges and juries in separating valid, important claims from those that are invalid or 'trivial.'" *Metro-North,* 521 U.S. at 433. These same concerns in bankruptcy translate into layers of inordinate expense that sap the value of the estate available to all creditors. This is contrary both to the policies of maximizing estate value and of fair and equitable treatment of creditors.

---

[12] A "present" "demand" is a deficient claim asserted by an asbestos-exposed individual who does not yet have a claim cognizable and compensable in bankruptcy, *e.g.*, an asymptomatic. That person's claim is disallowed, and therefore is "not a claim during the proceedings leading to the confirmation," without prejudice to the assertion of a future demand should that individual eventually become sick.

Likewise the Supreme Court was concerned that permitting claims by asymptomatics threatens "'unlimited and unpredictable liability.'" *Id.* In the bankruptcy context, such a condition diminishes the likely viability of any plan of reorganization. Further "the 'potential for a flood' of comparatively unimportant, or 'trivial' claims," *id.*, not only saps the value of the estate available to pay non-trivial claims, but threatens plan viability. Furthermore, as among the asymptomatics, such an outcome is both unjust and unfair because claimants with unimportant, trivial claims will receive a windfall at the expense of those who eventually become truly ill.

### (ii) Application of a Uniform Federal Disease Manifestation Rule Is Necessary to Ensure that the Interests of Future Claimants Are Adequately Protected and That Constitutional Due Process Requirements Are Satisfied

Adopting the federal common law standard also is necessary to preserve the integrity of the system the courts have developed and Congress has sanctioned through the enactment of § 524(g) for affording due process to future demand holders through the appointment of an independent legal representative under the careful supervision of the Court. "Claimants"[13] are entitled to vote on plans. Thus, a plan including a 524(g) trust must be approved by "a separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (i) . . . by at least 75 percent of those voting." § 524(g)(2)(B)(i)(IV)(BB).

Putative "demand" holders, on the other hand, do not vote. Instead, "the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands of such kind." *Id.,* § 524(g)(4)(B)(i). Their interests also are protected by the court, which must make statutorily-required fairness findings. Thus, the trust must "operate through mechanisms . . . that provide reasonable assurance that *the trust will value, and be in a*

---

[13]  Although "claimant" is not a defined term in § 524, there is no suggestion in that section, or in the legislative history, that Congress meant to override the existing provisions of the Bankruptcy Code that permit only "creditors" with allowed claims to participate in voting upon proposed plans.

*financial position to pay, present claims and future demands that involve similar claims in*

*substantially the same manner*." *Id.*, 524(g)(2)(B)(ii)(V) (Emphasis added).  Further, the statute

requires that, "as part of the proceedings leading to issuance of such injunction, the court must

determine that the inclusion of a debtor or third party within the scope of the injunction "is fair

and equitable with respect to the persons that might subsequently assert such demands, in light of

the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such

third party." *Id*., § 524(g)(4)(B)(ii).

Fundamentally, it is necessary to distinguish between creditors/claimants with allowed

claims who are represented by committees and entitled to vote and potential demand-holders

whose interests are represented by a legal representative.  Unless the legal representative's

constituency is clearly defined, it will be impossible for him to adequately represent their

interests. *Cf. Amchem Products, Inc. v. Winsoret*, 521 U.S. 591, 627 (1997) (asbestos settlement

class properly rejected, *inter alia*, because there was "no assurance . . . – either in terms of the

proper settlement or in the structure of the negotiations – that the named plaintiffs operated under

a proper understanding of their representational responsibilities").  Adequate representation, in

turn, is the touchstone of the constitutionality of using the mechanism of a legal representative to

safeguard the absent and unknown demand-holders' interests and satisfy the requirement of due

process.  Satisfaction of due process, of course, is necessary for the effective discharge of future

claims upon which the feasibility of a plan including a § 524(g) trust depends.

Application of the federal common law rule of disease manifestation permits clear

demarcation of the legal representative's scope of representation.  This, in turn, furthers

Congress's goals of fostering successful reorganization and giving debtors a "fresh start" and

treating present and future asbestos claimants fairly and equitably by satisfying the constitutional requirements of providing due process to future claimants.

Moreover, by clarifying whom FCRs represent, application of the federal common law standard also clarifies whom ACCs represent, and perhaps more importantly, whom they do *not* represent. When asymptomatics are enfranchised as voting creditors, they skew the system to the detriment of the sick, both present and future. Treating asymptomatics as voting creditors enables them to exert their presumptive veto power to insist upon lenient trust distribution procedures ("TDPs") which would benefit asymptomatics at the expense of the truly ill.

By contrast, if the putative claims of asymptomatics are disallowed without prejudice to future demand assertion upon disease manifestation, ACCs should be comprised of and represent only the currently, demonstrably sick. ACCs composed only of the currently sick will have a strong incentive to negotiate for, and approve, TDPs that deny payment of non-meritorious or trivial claims, avoid the concomitant waste of assets in claims investigation, and maximize the resources available for the truly ill. These same motivations will be shared by FCRs, who likewise will seek to ensure that resources will remain available for those who become ill in the future, in part by challenging payments to current claimants who are not sick.

   **d)  By Contrast, Extension of *Frenville's* State Law Claim-Accrual Test to the Mass Tort Arena Would Engender Confusion, Conflict and Expense, All Contrary to the Policies of the Bankruptcy Code, the Intent of Congress, and the Requirements of Due Process**

In circuits other than the Third Circuit, it is by now clear that the interpretation of "claim" and "arose," and related Code provisions, is a matter of federal common law. *Chemetron*, 212 F.3d at 205. The Third Circuit's approach in most situations, however, has been to apply state law to determine when a "right to payment" accrues, an approach that has been consistently criticized by courts and commentators alike over the past 20 years. Indeed, the Third Circuit

27

recently acknowledged the unpopularity of this decision, applying its holding solely because "*Frenville* is the law of this circuit," but making no attempt to defend its rationale. *Chemetron*, 212 F.3d at 206.

While *Frenville* may or may not be ripe for *en banc* reversal, it certainly is *not* binding precedent here.  To repeat, even though *Frenville* had nothing to do with asbestos, the court expressly reserved any ruling on whether a uniform federal common law claim-accrual standard might be appropriate in the mass tort context.  The court in essence issued an invitation for some interested party to raise the issue before it: "A bankruptcy proceeding stemming from a mass tort – such as exposure to asbestos – may be a case in which the application of federal law is indicated."  *Frenville*, 744 F.2d at 337 n. 8, citing, *inter alia*, *In re: Johns-Manville Corp.*, 36 B.R. at 751 n. 4.  Moreover, the Third Circuit has had no opportunity to address this issue in the wake of the enactment of § 524(g) or the Supreme Court's decision in *Metro-North*.

Important policy considerations militate against extending *Frenville's* piecemeal state-by-state claims accrual standard to mass tort asbestos bankruptcies such as this.  First, it is quite clear that the legal representative entrusted to safeguard the interests of future claimants must be independent and have real power to act on their behalf.  But if the state law claim-accrual test were applied, asymptomatics from states which recognize a cause of action for damages at the exposure-only stage, or the subclinical pleural thickening stage, would be creditors entitled to vote, while identically-situated asymptomatics from other states would not.  Asymptomatics permitted to assert present claims naturally would seek to have their claims liquidated at their value as of the date of the bankruptcy petition on the basis of the remote chance they might get sick in the future (*i.e.*, the same windfall/undercompensation scenario the Third Circuit found to be "undesirable" in *Schweitzer*).  On the other hand, for those asymptomatics from states which

provide recovery only for those who manifest an asbestos-related illness, their interest would be to ensure that only the truly sick will be compensated, and compensated as fully as possible. By pitting competing groups of asymptomatics against one another, the power and effectiveness of the legal representative is severely undercut. Giving the first group of asymptomatics the ability to participate as present, voting creditors compromises the role of the legal representative and effectively makes it impossible for him to protect either, much less both, groups of asymptomatics as future claimants. Such an outcome is manifestly inconsistent with Congressional intent and raises serious constitutional doubts as to whether due process can be satisfied for future claimants.

Second, currently sick individuals have interests that are in conflict with the asymptomatics. As both the Second and Third Circuits, in *Kane v. Johns-Manville* and *Amatex*, respectively, have recognized, it is in the interest of currently sick asbestos claimants to limit or eliminate payments to future claimants, just as it is in the interest of future claimants to maximize their future payments by minimizing payments to the currently sick. Allowing a third group consisting of asymptomatic creditors creates a constituency whose interests conflict with both currently sick claimants and with the future claimant subset of those asymptomatics whose state laws require them to wait until they get sick to seek recovery. These conflicts created by applying widely-varying state law accrual standards would further complicate reorganization efforts. Further, such an approach yields results that are skewed in favor of providing recovery to current asymptomatics and against the interests of current and future claimants who are truly sick, contrary to paramount federal bankruptcy objectives. Moreover, permitting asymptomatics, who by all accounts vastly outnumber truly sick plaintiffs, to "stuff the ballot boxes," potentially

29

overriding the votes of the truly sick, again raises due process issues of a constitutional dimension.

Third, if state law standards were applied, for those asymptomatics who are considered present claimants, their "comparatively unimportant, or 'trivial,'" claims would have to be liquidated. *Metro-North*, 521 U.S. at 433. This again would inflict upon the courts, estates, and other creditors and/or the truly sick beneficiaries of any § 524(g) trust precisely the layers of expense, uncertainty and arbitrariness that the Supreme Court and the Third Circuit refused to countenance as a matter of federal common law under FELA, all contrary to the legitimate federal bankruptcy goals enumerated above. In contrast, uniform application of the federal common-law disease-manifestation standard eliminates both the need to liquidate, or for that matter to estimate, the claims of asymptomatics, eliminating a layer of confusion and expense from the administration of the estates. Instead, the resources of the estate and of the court can be focused upon valuing the claims of the truly ill and estimating the claims of those who will become truly ill in the future.[14]

These problems are inherent in using diverse state rules of decision to determine whether asymptomatics have "claims" or when their claims "arose." These unpalatable and possibly unconstitutional consequences of expanding *Frenville's* discredited state law claims-accrual standard to asbestos bankruptcies would undercut the role and authority of the court-appointed future claims representative and add needless layers of conflict, complication and expense to the administration of the estate – all in frustration of the congressional intentions manifested in § 524(g). "It is a cardinal principle of statutory interpretation" that statutes should be read, where possible, to avoid serious constitutional questions. *Zadvydas v. Davis*, 533 U.S. 678, 689

(2001) (internal quotation marks and citation omitted).  Each of these problems is avoided by rejection of a state-law accrual test and application of the uniform federal common law standard of disease manifestation.

In sum, the question of what is a bankruptcy "claim" and when it "arose" are matters of statutory interpretation of federal bankruptcy law.  The courts are agreed that defining these terms becomes more difficult as the timing and certainty of any harm and the identity of putative victims become further removed from a debtor's pre-bankruptcy negligence.  Especially in light of the enactment of § 524(g), "the scheme in question evidences a distinct need for nationwide legal standards" and, therefore, this is a situation where the "court should endeavor to fill the interstices . . . with uniform federal rules . . .."  *Kamen v. Kemper Fin. Services, Inc.*, 500 U.S. 90, 98 (1991) (citation omitted).  The rationale for the Supreme Court's interpretation of federal common law to deny FELA recovery to asbestos asymptomatics in *Metro-North*, as well as for the Third Circuit's interpretation in *Schweitzer*, is equally applicable, if not more compelling, in the context of interpreting the Bankruptcy Code.  Accordingly, asymptomatics do not have "claims" that "arose" pre-petition.  Instead, the legions of asymptomatics are potential holders of "future demands" whose interests are to be represented by the FCR and safeguarded by the oversight of the courts pursuant to the requirements of § 524(g).

The immediate result of such a ruling that the FCR should be properly informed of his powers and the nature of his constituency and will be able to begin negotiating to protect truly sick future claimants without fearing the need to make costly concessions to pay current asymptomatics in order to prevent them from scuttling any plan of reorganization.  As well, the P. I. Committee should, at a minimum, be reoriented such that it understands that asymptomatics are not creditors and that it represents only the interests of the currently ill.

31

**B. Because Adequate Representation Is the Only Traditionally-Required Due Process Protection Available to Absent Future Claimants, It Is Especially Important that the FCR Be Untainted by Even the Appearance of Impropriety**

In support of their application, Debtors cite 11 U.S.C. § 327, which permits a trustee (and, through § 1107, the debtor-in-possession) to select professionals to aid in the administration of the bankruptcy estate, but requires court approval to ensure that any such professional has no conflict of interest with the bankruptcy estate.[15]  The Third Circuit forbids the court to disqualify such a professional based on the appearance of conflict, and thus mandates extensive deference to the choice made by the trustee or debtor-in possession.  *See In re Pillowtex, Inc.*, 304 F.3d 246, 251 (3d Cir. 2002); *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 476 (3d Cir. 1988).

Such deference makes sense when the trustee has chosen the professional, because the trustee remains present to supervise that professional.  Section 327 thus exists to protect the interests of the bankruptcy estate against a proposed professional who might have the interests of the debtor or a particular creditor at heart. The trustee, however, can monitor the performance of the professional and can seek his removal if dissatisfied with his performance.

Here, however, the FCR is not a "professional," *i.e.*, an agent who answers to a present constituency— the situation with which § 327 is concerned.  Instead, Congress codified in § 524(g) a " virtual representation" approach that follows other areas of the law in which absent or incompetent parties must be adequately represented -- for example, by class representatives or guardians *ad litem.  See Amatex* (describing FCR as a guardian *ad litem); Johns-Manville,* 36

---

[15] Section 327 permits "the trustee, with the court's approval" to hire as professionals persons who "do not hold or represent an interest adverse to the estate, and that are disinterested persons."  11 U.S.C. § 327(a).

B.R. at 758-59 (same); *In re Eagle-Picher Indus.*, 144 B.R. 69, 71 (Bankr. S.D. Ohio 1992) (same).

The FCR therefore stands in the shoes of an absent constituency, which by its very nature cannot select its own representative, much less oversee the performance of that representative once selected.[16] Section 327 does not speak to that situation and therefore cannot supply the standard for choosing an FCR. This is a crucial distinction, because adequate representation of absent parties is an inescapable obligation under the Due Process Clause. It is a bedrock principle of our legal system that a person cannot be bound by a judgment unless he "'ha[s] his own day in court.'" *Ortiz v. Fibreboard*, 527 U.S. at 846 (quoting *Martin v. Wilks*, 490 U.S. at 763). While it is sometimes necessary to bind absent parties, and courts have permitted such judgments, exceptions to this "'deep-rooted historic tradition,'" *id.*, are not lightly created nor expansively construed. Courts have endorsed such "representative" mechanisms only with great caution, and in all cases only after putting adequate safeguards in place.

Adequate representation of the absent party in the proceeding leading to the judgment "is often labeled the most important of due process requirements." *State of Vermont v. Homeside Lending, Inc.*, 826 A.2d 997, 1012 (Vt. 2003). Essential to such representation is the representative's undivided loyalty to the absent party. See *id.* at 44-45 (representative must have "identical" interests to prevent "fraudulent and collusive sacrifice of the rights of absent parties"); *Ortiz*, 527 U.S. at 846 (class representative must have "same interests" as class); *Amchem*, 521 U.S. at 627 (class action representative's "role is to represent solely the

---

[16] "The FCR has principals only as a conceptual matter. The terms and quality of the FCR's representation are not subject to oversight by her ostensible 'clients.' A significant potential exists, therefore, for divergence between the respective interests of principal and agent." Tung, *The Future Claims Representative in Mass Tort Bankruptcy: A Preliminary Inquiry*, 3 Chap. L. Rev. at 60.

members" of the class).  Congress incorporated such concern for the future claimants into

§ 524(g) by requiring virtual representation through the FCR.  *See* 4 Collier on Bankruptcy

524.07[2], at 524-51 & n.26 (15th rev. ed.1996 & Supp. 2003) (analogizing requirement of FCR

to Fed. R. Civ. P. 23' s requirement of adequate representation).

     Where, as here, it is impossible to afford absent parties the other traditional due process

protections such as notice and an opportunity to participate directly (or to opt out), adequate

representation is paramount, and due process demands that the virtual representative be untainted

by even the appearance of impropriety.  Standards developed in reliance on the needs and

capabilities of present parties cannot possibly protect the interests of absent parties.  Future

claimants necessarily cannot evaluate the credentials of any particular representative, nor can

they assess the performance of a professional once retained.

     Courts selecting such representatives in other contexts presenting similar concerns about

representation of parties who cannot protect their own interests consistently require that such

representatives be free of even the appearance of conflict.  In the class action context, courts

have repeatedly emphasized that both class representatives and class counsel must have no

apparent conflicts.  "The responsibility of class counsel to absent class members whose control

over their attorneys is limited does not permit even the appearance of divided loyalties of

counsel*." Kayes v. Pac. Lumber Co*., 51 F.3d 1449, 1465 (9th Cir. 1995) (internal quotation

marks and citation omitted).  In probate cases in which the interests of unborn beneficiaries or

other incompetents are at stake, courts have emphasized that virtual representatives may not hold

"any interest that might affect the judgment exercised on behalf of a beneficiary, engender

conflicting interests, or create divided loyalties."  *In re Estate of Stowell*, 595 A.2d 1022, 1025

(Me. 1991); *see also In re Estate of Harrison*, 745 A.2d 676 (Pa. Super. 2000*). Cf. In re Estate of Hawley*, 538 N.E.2d 1220, 1222 (Ill. App. Ct. 1989).

Here, where the FCR will speak for potentially thousands of future claimants who cannot protect their own rights, the need for complete independence is particularly imperative. Any doubts about the undivided loyalty and advocacy of the futures representative necessarily will raise severe due process concerns, even assuming that the representative acts with the best intentions. *Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 757 n.4 (1st Cir. 1994) ("The perils of nonparty preclusion are real. Prominent among them is the prospect that an overly expansive arrangement of the concept, or too free use of it, may endanger constitutional rights."). Any such doubts could provide grounds for future claimants to challenge any channeling injunction that may be issued, perhaps years after confirmation. *See Stephenson v. Dow Chem. Co.*, 273 F.3d. at 260. Given the potential risks to those represented and those who may rely upon any relief granted in such cases, appointment of a truly independent and disinterested futures representative selected by the Court is essential to ensure the integrity and efficacy of this process.

Put simply, due process requires that future claimants be given the best protection that can be provided under the circumstances. In analogous situations, courts have refused to relax the traditional fiduciary standard that disqualification is mandatory in the face of any appearance of impropriety. Due process demands that no lesser standard be applied to FCRs.

### C. Because of the Inherent Danger of Favoritism, the FCR Should Be Independently Nominated by the United States Trustee, Not the Conflicted Constituencies, and Should Not Previously have Served as an FCR

Due process further requires that the process of selecting an FCR be above reproach. The practice of permitting interested constituencies to "select" a candidate and "nominate" him for court approval is therefore highly problematic. By definition, each of these present interested

constituencies has interests that conflict with future claimants. The pool of assets is limited, and the allocation of more assets to one constituency therefore necessarily leaves less for the other. The Supreme Court has twice recognized that the interests of current claimants in obtaining generous immediate payments diverges dramatically from future claimants' interest in ensuring an ample, inflation-protected fund for the future.  *Amchem*, 521 U.S. at 626; *see also Ortiz*, 527 U.S. at 856.  Likewise, a debtor interested in channeling all future claims to a trust and away from itself has interests fundamentally at odds with those of future claimants.  The debtor' s goal is to contribute as little as possible of its own money as the *quid pro quo* for a channeling injunction protecting it from future claims.  *See Amatex*, 755 F.2d at 1042-43 ("none of the parties currently involved in the reorganization proceedings have interests similar to those of future claimants, and therefore future claimants require their own spokesperson").

As one commentator (who has himself been intimately involved in the asbestos bankruptcy process as a mediator) has observed, "[t]he selection of the futures representative is problematic because having a weak futures representative is in the interest of both the debtor and the current claimants."  Francis E. McGovern, *Section 524(g) Without Bankruptcy*, 31 Pepperdine L. Rev. 233, 248 (2004).  This creates a due process problem, as another commentator aptly noted in the class action context: "If, as was implicit in *Amchem* and fleshed out expressly in *Ortiz*, the normal adversarial processes are an important guarantor of noncollusion in binding class action settlements, then the absence of a truly adversarial relation between the parties dooms this important guarantee that representation will be adequate." Samuel Issacharoff, *Governance and Legitimacy in the Law of Class Actions*, 1999 Sup. Ct. Rev. 337, 388 (1999).  Precisely because of these structural conflicts, this "fox guarding the henhouse" approach to FCR selection, even if judicially overseen, necessarily raises the hackles

36

of due process.[17]  The very fact act of a party's selecting his own "adversary" casts doubt upon

the genuineness of the ensuing "adversarial" process.

Again, the solution to this problem is simple enough – entrust the "nominating" process

to the United States Trustee, an official whose office was created precisely to handle appointive

matters of this kind and who is by intention above the fray.  That is what another commentator

recommends:

> Among the essential characteristics of a legal representative acting
> on behalf of future mass tort claimants are independence and a lack
> of conflicts of interest. . . .  [T]he legal representative should be
> selected by the United States trustee with court approval, rather
> than by the debtor, parties in interest, or attorneys purporting to
> represent future claimants when the bankruptcy petition is filed.

Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-Threatening Mass Tort

Liability*, 148 U. Pa. L. Rev. 2045 (2000).  It is also consistent with the way the issue was

handled by the *UNR* and *Johns Manville* courts, whose procedures were ratified and codified in

§§  524(g-h).  In *UNR*, the United States Trustee was given an exclusive 20-day period to

nominate the future claimants' representative. *See UNR*, 46 B.R. at 677.  In *Johns-Manville*, the

future claimants' representative was selected by the court.  *See In re Johns-Manville Corp*., 52

B.R. 940, 942 (S.D.N.Y. 1985).

Finally, there is the problem of the "professional" FCR.  At the last omnibus hearing,

counsel for the Unsecured Creditors Committee voiced his contention that any presently-serving

FCR has a conflict of interest in serving as the FCR in another case.  (3/22/04 Tr. At 52-53, Dkt.

No. 5374).  Certain Insurers believe that the conflict runs deeper and that no one who has already

---

[17]  The problem is made especially acute if courts refuse to apply the appearance of impropriety standard
which, as discussed in the preceding subsection, due process requires.

served as an FCR can be an appropriate candidate for a similar appointment.  As the court

knows, while the debtors change from case to case, many of the same personalities, especially

those representing the asbestos personal injury claimants who seek recovery in case after case,

are veritable fixtures in every asbestos bankruptcy.  The problem, especially in a system that

allows the conflicted constituencies to "nominate" their FCR "adversary," is the specter that the

FCR will subvert his absent constituency's interests, even if only in subtle or unconscious ways,

to curry favor with those in a position to recommend his employment in the next case.

This problem, has been recognized by critics of the abortive mandatory class-action

settlement schemes rejected by the Supreme Court in *Ortiz* and *Amchem*:

> special masters appointed by the court to review class settlements,
> or guardians appointed by the court to protect absent class
> members' interests, suffer from . . . their own self-interest in
> cultivating a reputation for not scuttling deals. Anyone who gained
> that reputation might never work as a class guardian again. The
> next pair of settling parties would vigorously protest the
> appointment of such a person and a court would be unlikely to
> insist in the face of that protest.  Moreover, we can report without
> attribution, for whatever it may be worth, that the guardians we
> have talked to understand their job is to approve the deal that the
> settling parties have constructed, after suggesting a few minor
> changes, not to recommend that the settlement be chucked.

Susan P. Koniak & George M. Cohen, *Under Cloak of Settleme*nt, 82 Va. L. Rev. 1051, 1110-

1111 (1996).

The issue is not whether a particular person is venal.  The problem is that it is human

nature that people try to gain favor with those who can advance their pecuniary interests.  It is

the temptation that is provided by the opportunity to be recommended for repeat business that

creates the appearance of impropriety.  Even without the temptation of personal aggrandizement,

"[t]he FCR may face pressure to compromise future claimants' interests in subtle ways."  Tung,

*The Future Claims Representative in Mass Tort Bankruptcy: A Preliminary Inquiry*, 3 Chap. L.

Rev. at 65.  Whatever benefits of experience that a former FCR may bring to the table are far outweighed by the constitutional due process problems that are raised by allowing repeat performances.

Take for example Professor Green who, judging from the "voting" of the debtor, creditor and equity constituencies reported in Debtors' FCR Application, is viewed as the darling of the current asbestos claimants.  Professor Green serves as the court-appointed futures representative in the *Babcock & Wilcox* and *Federal-Mogul* cases, and he previously served as futures representative in the *Fuller-Austin* case.  He also served as a special consultant to the Manville trust and as guardian ad litem for the future claimants in the *Ahearn v. Fibreboard* class-action litigation (approving a settlement that was ultimately rejected by the Supreme Court in *Ortiz*).

Although Debtors neglect to mention it, Professor Green is also serving as FCR in *In re Mid-Valley, Inc.*, a prepackaged bankruptcy that is pending in the Western District of Pennsylvania.  In that case, Mr. Green already has been paid nearly $1 million (at a *per diem* rate of $9,000) by the debtors prepetition to act as a "legal representative" for future claimants.  Thus, serving as a futures representative (court-appointed or otherwise) accounts for a significant portion of his professional practice and livelihood.

Again, the point is not that Professor Green has acted improperly.  The point is that a normal human being in Professor Green's position would be sorely tempted to sacrifice the interests of his constituency, who are in no position to do anything about it, for personal gain.  This temptation is structurally inherent in the practice of permitting repeat FCRs and gives rise to a constitutionally impermissible appearance of impropriety.

III.    **CONCLUSION**

For the reasons set forth above, none of the "candidates" proffered by the Debtors is

suitable for appointment as FCR.  The United States Trustee should be directed to propose a

candidate who is free from any appearance of impropriety.  Finally, whomever the Court

appoints as FCR should be properly informed that he or she is the sole representative of current

asymptomatics and his role is to protect their potential interest as future claimants should they

ever really become sick.


Dated:  May 7, 2004
          Wilmington, DE

Respectfully submitted,

COZEN O'CONNOR

/s/ Shelley A. Kinsella
_____
Shelley A. Kinsella (DE No. 4023)
Chase Manhattan Centre
1201 N. Market Street, Suite 1400
Wilmington, DE  19801
(302) 295-2000 Telephone
(302) 295-2013 Facsimile

COZEN O'CONNOR
William P. Shelley (PA ID 40875)
Jacob C. Cohn (PA ID 54139)
1900 Market Street
Philadelphia, PA  19103
(215) 665-2000 Telephone
(215) 665-2013 Facsimile

Attorneys for Federal Insurance Company

BIFFERATO, BIFFERATO & GENTILOLTTI

/s/ Ian Connor Bifferato
_____
Ian Connor Bifferato (DE No. 3273)
1308 Delaware Avenue
The Buckner Building
PO Box 2165
Wilmington, Delaware 19899-2165
(302) 429-1900 Telephone

-and-

Carl J. Pernicone
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
150 East 42nd Street
New York, New York 10017-5639
(212) 490-3000 Telephone

Attorneys for Royal & SunAlliance

PHILA1\2062119\2 113022.000

41