UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

_____

No. 03-4212

_____

IN RE: KENSINGTON
INTERNATIONAL LIMITED and
SPRINGFIELD ASSOCIATES, LLC,
Petitioners

_____

No. 03-4526

_____

IN RE: D.K. ACQUISITION
PARTNERS, L.P.; FERNWOOD
ASSOCIATES, L.P.
AND DEUTSCHE BANK TRUST
COMPANY AMERICAS, Petitioners

_____

No. 04-1468

_____

IN RE: USG CORPORATION,
Petitioner

On Petitions for Writs of Mandamus
to the United States Bankruptcy Court
for the District of Delaware
(Related to Bankruptcy Nos. 00-03837,
01-01139 and 01-02094)

_____

Argued on April 19, 2004

BEFORE:    FUENTES, SMITH and
GARTH, Circuit Judges

(Opinion Filed: May 17, 2004)

Roy T. Englert, Jr. (argued)
Lawrence S. Robbins
Robbins, Russell, Englert, Orseck &
Untereiner
1801 K Street, N.W
Suite 411
Washington, DC  20006

John J. Gibbons
Gibbons, Del Deo, Dolan, Griffinger &
Vecchione
One Riverfront Plaza
Newark, NJ 07102

*Attorneys for Petitioners in 03-4212*

Charles Fried (argued)
1545 Massachusetts Avenue
Cambridge, MA 02138

Richard Mancino
Marc Abrams
Willkie, Farr & Gallagher
787 Seventh Avenue
New York, NY 10019-6099

Joanne B. Wills
Jennifer L. Scoliard
Klehr, Harrison, Harvey, Branzburg &
Ellers
919 North Market Street
Suite 1000
Wilmington, DE 19083

*Attorneys for Petitioners in 03-4526*

Stephen C. Neal (argued)
Scott D. Devereaux
Cooley Godward
3000 El Camino Real
5 Palo Alto Square
Palo Alto, CA 94306

Daniel J. DeFranceschi
Paul N. Heath
Richards Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

David G. Heiman
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190

Paul R. DeFilippo
Wollmuth, Maher & Deutsch
One Gateway Center
Newark, NJ 07102

*Attorneys for Petitioner in No. 04-1468*

Charles O. Monk, II   (argued)
Saul Ewing
100 South Charles Street
Baltimore, MD  21201

Norman L. Pernick
J. Kate Stickles
Saul Ewing

222 Delaware Avenue
P.O. Box 1266, Suite 1200
Wilmington, DE  19899

Richard E. Flamm
2840 College Avenue
Suite A
Berkeley, CA 94705

*Attorneys for Respondents Owens Corning, et al.*

David M. Bernick (argued)
Michelle H. Browdy
Janet S. Baer
Kirkland & Ellis
200 East Randolph Drive
Suite 6500
Chicago, IL 60601

Christopher Landau
Ashley C. Parrish
Kirkland & Ellis
655 Fifteenth Street, NW
Washington, DC 2005

Laura Davis Jones
David W. Carickhoff, Jr.
Pachulski, Stang, Ziehl, Young, Jones & Weintraub
919 North Market Street
16th Floor
P.O. Box 8705
Wilmington, DE 19899

*Attorneys for Respondent W.R. Grace & Co.*

Elihu Inselbuch (argued)
Peter Van N. Lockwood
Nathan D. Finch
Caplin & Drysdale
399 Park Avenue, 27th Floor
New York, NY 10022

Marla R. Eskin
Mark T. Hurford
Campbell & Levine
800 North King Street
Suite 300
Wilmington, DE 19801

*Attorneys for Respondents Official Committee of Asbestos Claimants of Owens Corning, Official Committee of Asbestos Personal Injury Claimants of W.R. Grace and Official Committee of Asbestos Personal Injury Claimants of USG Corporation*

Michael J. Crames (argued)
Jane W. Parver
Aaron Stiefel
Edmund M. Emrich
Kaye Scholar
425 Park Avenue
New York, NY 10022

Edwin J. Harron
Young, Conaway, Stargatt & Taylor
P.O. Box 391, 1000 West Street
Brandywine Building, 17th Floor
Wilmington, DE 19899

*Attorneys for Respondents James J.*

*McMonagle and Dean M. Trafelet*

Daniel K. Hogan
Law Offices of Daniel K. Hogan
1701 Shallcross Avenue
Suite C
Wilmington, DE 19806

Sander L. Esserman
Robert T. Brousseau
David J. Parsons
Stutzman, Bromberg, Esserman & Plifka
2323 Bryan Street
Suite 2200
Dallas, TX 75201-2689

*Attorneys for Respondent Baron & Budd Claimants*

Jeffrey S. Trachtman
Kramer, Levin, Naftalis & Frankel
919 Third Avenue
39th Floor
New York, NY 10022

Adam G. Landis
Rebecca L. Butcher
Landis, Rath & Cobb
919 Market Street
Suite 600, P.O Box 2087
Wilmington, DE  19899

*Attorneys for Respondent Credit Suisse First Boston Corp*

Neal J. Levitsky
L. Jason Cornell
Fox Rothschild
824 North Market Street
Suite 810

Wilmington, DE 19899-2323

Henry W. Simon
Robert A. Simon
Simon & Simon
3327 Winthrop Avenue
Suite 200
Fort Worth, TX 76116

*Attorneys for Respondent Waters &
Kraus*

Edward L. Jacobs
26 Audubon Place
P.O. Box 70
Fort Thomas, KY 41075

*Attorney for Respondent Harry Grau &
Sons*

Michael R. Lastowski
Duane Morris
1100 North Market Street
Suite 1200
Wilmington, DE 19801

*Attorney for Intervenor Official
Committee of Unsecured Creditors of
USG Corp.*

Mark E. Felger
Jeffrey R. Waxman
Cozen & O'Connor
1201 Market Street
Suite 1400
Wilmington, DE 19801

*Attorneys for Intervenor Official
Committee of Unsecured Creditors of*

*Armstrong World Industries, Inc.*

Kenneth Pasquale
Lewis Kruger
Stroock, Stroock & Lavan
180 Maiden Lane
New York, NY 10038

*Attorneys for Intervenor Official
Committee of Unsecured Creditors of
USG Corporation*

Roderick R. McKelvie
Fish & Neave
1899 Pennsylvania Avenue, NW
Washington, DC 20006

Daniel J. Popeo
Richard A. Samp
Washington Legal Foundation
2009 Massachusetts Avenue, N.W.
Washington, DC 20036

*Attorneys for Amicus Curiae Washington
Legal Foundation*

James L. Patton, Jr.
Young, Conaway, Stargatt & Taylor
P.O. Box 391, 1000 West Street
Brandywine Building, 17th Floor
Wilmington, DE 19899

*Attorney for Amicus Curiae Eric D.
Green*

Timothy K. Lewis
Schnader Harrison Segal & Lewis

4

2001 Pennsylvania Avenue NW
Suite 300
Washington, DC 20006

Craig Berrington
Lynda S. Mounts
American Insurance Association
1130 Connecticut Avenue, NW
Suite 1000
Washington, DC 20015

*Attorneys for Amicus Curiae American Insurance Association*

Garth, <u>Circuit</u> <u>Judge</u>:

Approximately six months ago, two emergency petitions were filed in this Court asking us to issue Writs of Mandamus disqualifying Senior District Court Judge Alfred M. Wolin of the District of New Jersey from continuing to preside over two of five asbestos-related bankruptcies that this Court had assigned to him in December 2001 for coordinated case management. The five companies in bankruptcy are Owens Corning, W.R. Grace & Co., USG Corporation, Armstrong World Industries, Inc., and Federal-Mogul Global, Inc. (collectively, the "Five Asbestos Cases").

The Petitions, which were brought by creditors of Owens Corning and W.R. Grace & Co., alleged that Judge Wolin had, through his association with certain consulting Advisors which he had appointed, created a perception that his impartiality "might reasonably be questioned" under 28 U.S.C. § 455(a). The Petitions asserted that disqualification was also warranted under 28 U.S.C. § 455(b)(1) as a result of *ex parte* communications among Judge Wolin and his advisors, the parties, and the attorneys.[1]

Following a hearing on December 12, 2003, we concluded that we should not reach the merits of the Mandamus Petitions. Our decision was "prompted by our overarching concern that we [did] not have an adequately developed evidentiary record before us." *In re Kensington Int'l Ltd.,* 353 F.3d 211, 214 (3d Cir. 2003). "[R]eluctant to act in a complex situation such as this one, where so many vital interests are at stake, without a developed evidentiary record," we remanded the proceedings to Judge Wolin while retaining jurisdiction. *Id.* at 223. We instructed Judge Wolin to vacate his order staying discovery and allow expedited discovery to proceed. We also directed that he issue an expedited ruling on all of the recusal motions pending before him. *Id.* USG Corp. by this time had also filed a recusal motion.

---

[1] The Petitioners had originally moved for recusal in the Bankruptcy Court, but filed Petitions for Writs of Mandamus in this Court after Judge Wolin withdrew the recusal motions from the Bankruptcy Court and stayed the corresponding discovery. At the time that the Petitions were filed, Judge Wolin had not ruled on the recusal motions.

On remand, Judge Wolin and the parties faithfully followed our instructions. Under stringent time restrictions and Judge Wolin's effective oversight, the parties conducted extensive discovery into the facts surrounding the recusal motions. Following an additional round of briefing, Judge Wolin issued a comprehensive written opinion and order on February 2, 2004 denying the recusal motions both on the merits and on timeliness grounds. *See generally In re Owens Corning,* 305 B.R. 175 (D. Del. 2004).

As noted, we retained jurisdiction over the Mandamus Petitions. These Petitions were joined by USG Corp., the debtor in the USG Corp. bankruptcy. The Official Committee of Unsecured Creditors in the Armstrong World Industries, Inc. bankruptcy filed a fourth Petition, but due to its late filing we did not consolidate it with the other Petitions.

## I.

Having exhaustively reviewed the now developed record, we have reached the following conclusions:

*First*, a reasonable person, knowing all of the relevant circumstances, would conclude that Judge Wolin's impartiality might reasonably be questioned in the Owens Corning, W.R. Grace & Co. and USG Corp. bankruptcies. Although the record does not demonstrate that Judge Wolin has done anything wrong or unethical or biased, he must be disqualified under 28 U.S.C. § 455(a)

from further presiding over those three bankruptcies. *See Alexander v. Primerica Holdings, Inc.,* 10 F.3d 155, 162 (3d Cir. 1993) ("For purposes of § 455(a) disqualification, it does not matter whether the district court judge actually harbors any bias against a party or the party's counsel."). We emphasize that our review of the record has not revealed the slightest hint of any actual bias or partisanship by Judge Wolin. On the contrary, Judge Wolin has throughout his stewardship over the Five Asbestos Cases exhibited all of the judicial qualities, ethical conduct, and characteristics emblematic of the most experienced, competent, and distinguished Article III jurists. But the test for disqualification under § 455(a) is not *actual* bias; it is the *perception* of bias. *See id.*

*Second*, we find that the motions for recusal in the Owens Corning and W.R. Grace & Co. bankruptcies were timely under 28 U.S.C. § 455(a). In reaching that conclusion, we disagree with Judge Wolin that it was appropriate, in this case, to impute knowledge of the grounds for disqualification to the Petitioners. The evil that a timeliness requirement is intended to prevent—namely, holding in reserve a recusal demand until such time that a party perceives a strategic advantage—is served by requiring actual knowledge. Because the Petitioners did not themselves learn about the Advisors' conflict of interest (discussed *infra*) until shortly before they moved for disqualification, their motions were timely.

6

*Third*, USG Corp. stands on a different footing. The record discloses that the USG debtors and Unsecured Creditors Committee knew as early as January 2002 about the Advisors' conflict. However, other factors come into play as to USG Corp. (which we discuss *infra*) requiring Judge Wolin's disqualification.

*Fourth*, we do not decide whether the *ex parte* communications between Judge Wolin, on the one hand, and the Advisors, parties, and attorneys, on the other, provide a separate ground for disqualification under 28 U.S.C. § 455(b)(1). Nor do we decide whether those motions are timely. We feel constrained, however, to note that we look with disfavor upon both the extent to which, and manner in which, Judge Wolin engaged in *ex parte* communications. Whatever value the *ex parte* meetings may have had in moving the Five Asbestos Cases along or creating a settlement-friendly atmosphere was outweighed by the attendant risks and problems, which are catalogued in some detail in the Petitioners' briefs. *See also* Code of Conduct for U.S. Judges Canon 3 § A(4) (2003).

*Fifth*, we reach no decision on the Petition for Mandamus filed in the Armstrong World Industries, Inc. bankruptcy. As mentioned above, that Petition was not consolidated with the Petitions in Owens Corning, W.R. Grace & Co., and USG Corp. Rather than delay this opinion, and recognizing that our initial orders dated October 30, 2003 and November 3, 2003 stayed certain proceedings before the Bankruptcy Courts, we will set a separate date to hear argument on the Armstrong Petition and will render a decision in that case in due course.

*Sixth*, we likewise do not rule on, or express an opinion as to, the fifth bankruptcy, Federal-Mogul Global, Inc., albeit for a different reason. None of the parties in Federal-Mogul has moved for Judge Wolin's recusal in the Bankruptcy Court or filed a Petition for Mandamus in our Court. Accordingly, we will not disturb Judge Wolin's assignment in dealing with the Federal-Mogul Global, Inc. bankruptcy.

## II. BACKGROUND

In our earlier opinion, we described the parties, the allegations, the responses, the procedures, our standard of review, and our standards for disqualification under 28 U.S.C. § 455(a) and (b)(1). *See Kensington,* 353 F.3d at 214-22. We perceive no need to repeat these matters in detail, but we will refer to those that are particularly relevant here, as well as the supplemental concerns and facts that have come to our attention.

After our December 12, 2003 hearing, which gave rise to the expedited discovery and Judge Wolin's expedited ruling on the recusal motions, we received two additional Petitions for a Writ of Mandamus in the USG Corp. and Armstrong World Industries, Inc.

bankruptcies. Accordingly, we list the parties now seeking Judge Wolin's disqualification and those opposing it:

*Parties Seeking Recusal*[2]
Kensington International Ltd, et al.; Credit Suisse First Boston, as agent for Owens Corning's pre-petition bank creditors; D.K. Acquisition Partners, L.P., et al.; USG Corp.; Official Committee of Unsecured Creditors of USG Corp.; Official Committee of Unsecured Creditors of Armstrong World Industries, Inc.

*Parties Opposing Recusal*[3]
Owens Corning; Baron & Budd Claimants; Legal Representative for Future Asbestos Personal Injury Claimants in Owens Corning & USG Corp.; W.R. Grace & Co.; Official Committee of Asbestos Personal Injury Claimants of W.R. Grace & Co.; Official Committee of Asbestos Personal Injury Claimants of USG Corp.

Essentially, the parties seeking disqualification assert that Judge Wolin had appointed five Advisors to assist him

---

[2]   The following *amicus curiae* supported the recusal petitions: American Insurance Partners and Washington Legal Foundation.

[3]   *Amicus curiae* Eric Green, Legal Representative for Future Asbestos Personal Injury Claimants in Federal Mogul Global, Inc., supported the entities opposing recusal.

in the discharge of his functions. These Advisors were not selected from any judicial category (i.e., they were not federal magistrate judges, special masters, or law clerks[4]); they consisted of lawyers, retired state court judges, and professors with prior experience in asbestos litigation. The Petitioners claim that Judge Wolin, who has presided over the Five Asbestos Cases since December 2001, has through his appointment of the Advisors and his participation with them in administering the bankruptcies, created a perception in the mind of the reasonable person that his impartiality could be questioned, and this being so, that he must be disqualified.

The Petitions filed in the Owens Corning and W.R. Grace & Co. bankruptcies seek Judge Wolin's disqualification primarily pursuant to 28 U.S.C. § 455(a), which reads: *"Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."* As we stated in our earlier opinion, "[t]he test for recusal under § 455(a) is whether a reasonable person, with knowledge of all the facts, would conclude that the judge's

---

[4]   As a matter of historical interest, then-District Court Judge Sarokin was assisted in an action involving the Tobacco Industry by a Magistrate Judge and a Special Master. *See Haines v. Liggett Group Inc.,* 975 F.2d 81 (3d Cir. 1992).

impartiality might reasonably be questioned." *Kensington,* 353 F.3d at 220 (citing *Edelstein v. Wilentz,* 812 F.2d 128 (3d Cir. 1987)). While this test is acknowledged to be the standard for disqualification under § 455(a), the interpretation of what constitutes a reasonable person has been contested here. We will discuss that issue later in this opinion.

After we scheduled the briefing and hearing dates for the Owens Corning and W.R. Grace & Co. Petitions, USG Corp. filed a third Petition for Mandamus. That Petition, while also seeking disqualification pursuant to § 455(a), focused primarily on the standard of disqualification found in § 455(b)(1). That particular subsection requires a justice, judge, or magistrate judge to disqualify himself only if *"he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."* 28 U.S.C. § 455(b)(1). The thrust of USG Corp.'s Petition is that Judge Wolin acquired personal knowledge of disputed evidentiary facts by conducting *ex parte* meetings with the Advisors, parties, and attorneys.

More recently, the Official Committee of Unsecured Creditors of Armstrong World Industries, Inc. (the "Armstrong Committee") also filed a Petition for a Writ of Mandamus. That Petition neither seeks nor opposes Judge Wolin's disqualification. Instead, it asks that we extend to the Armstrong

bankruptcy whatever relief, if any, we apply to the Owens Corning, W.R. Grace, and USG Corp. bankruptcies.

To complete our recital of the matters we must consider, we note that the parties in the Federal-Mogul Global, Inc. bankruptcy, which is the fifth asbestos-related bankruptcy under Judge Wolin's charge, have not participated in any of the proceedings which we review.[5]

Even though we described the facts in some detail in our earlier opinion, certain factual circumstances require further elaboration here because they bear directly on the merits and timeliness of the petitions.

## A.  *The Parties*

The first petition was filed by Kensington International Limited and Springfield Associates, LLC, two creditors of Owens Corning (collectively, "Kensington"). That petition was followed in short order by a second petition from D.K. Acquisition Partners,

---

[5]  An *amicus curiae* brief was filed by Eric D. Green, who is the representative for future asbestos personal-injury claimants in the Federal-Mogul bankruptcy. *See* note 3 *supra.* An *amicus curiae* brief does not trigger our jurisdiction and we lack the authority to issue a writ of mandamus to non-parties. *See In re School Asbestos Litig.,* 977 F.2d 764, 798 (3d Cir. 1992).

L.P., Fernwood Associates, L.P., and Deutsche Bank Trust Company Americas, three creditors of W.R. Grace & Co. (collectively, "D.K. Acquisition Partners"). The third petition was filed more recently by USG Corporation, the debtor in the USG bankruptcy.

## B. *Ex Parte Communications and the Advisors*

On December 20, 2001, Judge Wolin held a case management conference for the Five Asbestos Cases. Although there is no official record of what was said at that conference, Judge Wolin produced a script ("talking points") which reflects what he said to the parties. According to the script, Judge Wolin announced that *"[i]n order to effectively case manage complex litigation, it is necessary for the judge to speak and/or meet with attorneys on an ex parte basis, without permission of adversary attorneys."* Judge Wolin further announced that *"[a]ny objection to such ex parte communications is deemed waived,"* but he assured the parties and attorneys that he would use his power to meet *ex parte* "sparingly." None of the parties objected at that time.

A week later, Judge Wolin named five "Court Appointed Consultants" (the "Advisors") to assist him in the Five Asbestos Cases. The five individuals he named were David Gross, Judson Hamlin, William Dreier, John Keefe, and Francis McGovern, all of whom had prior experience with asbestos or mass tort litigation either as state court judges,

private practitioners, or academics. Pursuant to Judge Wolin's order, the Advisors were to "advise the Court and to undertake such responsibilities, including . . . mediation of disputes, holding case management conferences, and consultation with counsel, as the Court may delegate to them individually." The Advisors could also be delegated "certain authority to hear matters and to advise the Court on issues that may arise in these five large Chapter 11 cases." Judge Wolin's order provided that he could, "without further notice, appoint any of the Court-Appointed Consultants to act as a Special Master to hear any disputed matter and to make a report and recommendation to the Court on the disposition of such matter."

Over the next two years, Judge Wolin met repeatedly, on an *ex parte* basis, with the parties and their attorneys. Despite his prior assurance that he would do so "sparingly," he acknowledged more recently that he met *ex parte* with interested parties "on innumerable occasions." (Supp. Resp. dated Nov. 20, 2003). This is supported by the fee applications filed by the Advisors, which reveal more than 325 hours of *ex parte* meetings with the attorneys for various parties in the Five Asbestos Cases. Many of these meetings took place at restaurants over lunch or dinner or at law firms. During the proceedings on remand, Judge Wolin acknowledged that he received extra-judicial information at the *ex parte* conferences. (*See* Joint Appendix "JA" at 1165.)

The *ex parte* meetings were not limited to the parties and their attorneys. In the first half of 2002, Judge Wolin and the Advisors held a series of four *ex parte* meetings at which they discussed, in Advisor McGovern's words, "[j]ust whatever issue you can think of," including claims bar dates, the chrysotile defense,[6] proof of claim forms, pleural plaques,[7] the pros and cons of various approaches to estimation under 11 U.S.C. § 502(c),[8] the tensions between various creditor classes, and Rule 706 panels.[9] These issues are highly relevant concerns in asbestos litigation. The primary purpose of these meetings was to educate Judge Wolin on the issues likely to arise in the Five Asbestos Cases or, as Advisor Gross put it, "to assist Judge Wolin . . . in becoming more conversant with the details of the asbestos litigation."

One of these initial meetings was attended by Bob Komitor, a plaintiff's attorney. According to Advisor Dreier, Komitor described an expert, Dr. Peter Barrett, as "a charlatan" and criticized the chrysotile defense. Dr. Barrett had been previously engaged by USG Corp. While there is no official record of this meeting, notes taken by Advisor Gross suggest that some of the Advisors also expressed negative views about the positions taken by USG's expert and other USG Corp. defenses.

Following this series of initial meetings, Judge Wolin also held an *ex parte* meeting on November 19, 2002 with

---

[6] "Of the three basic kinds of asbestos fibers—amosite, crocidolite, and chrysotile—the straight, solid amosite and crocidolite fibers are less likely to break up in the lungs and more likely to cause mesothelioma than are the curly, hollow chrysotile fibers." *Menne v. Celotex Corp.,* 861 F.2d 1453, 1456 (10th Cir. 1988). Thus, asbestos manufacturers sometimes raise a so-called "chrysotile defense" when sued by asbestos victims. We have stated, however, that "[t]he absence or presence of chrysotile in asbestos products is not an affirmative defense which would require the presentation of any evidence . . . ." *Blancha v. Raymark Indus.,* 972 F.2d 507, 514 (3d Cir. 1992).

[7] Pleural plaques is a medical condition that consists of extensive pleural thickening on the exterior of the lungs. *See Dunn v. HOVIC,* 1 F.3d 1362, 1365 (3d Cir. 1993). Pleural plaques are "frequently seen in people who have been exposed to significant doses of asbestos." *Rogers v. Raymark Indus.,* 922 F.2d 1426, 1428 (9th Cir. 1991).

[8] 11 U.S.C. § 502(c) states: "[t]here shall be estimated for purpose of allowance under this section . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case."

[9] Rule 706 of the Federal Rules of Evidence permits the court to appoint an independent panel of expert witnesses.

Advisors Gross, McGovern and Dreier to discuss certain issues in the Owens Corning bankruptcy. There is no official transcript of this meeting, but Advisor Dreier took notes. On remand, Judge Wolin rejected inquiries concerning this meeting on the ground that it included settlement discussions. As a result, Advisor Dreier's notes were filed under seal both in the District Court and by us.

Two days before the meeting, Owens Corning had distributed a draft plan of reorganization that was supported by Credit Suisse First Boston, as agent for the pre-petition creditors. The draft plan called for certain issues to be resolved prior to plan confirmation. At the November 19th meeting, the Advisors discussed some of the key issues contained in the proposed plan with Judge Wolin and explained their effects as well as what appear to be certain settlement figures that had been discussed with the parties.

At a conference held on November 21, 2002, Judge Wolin stated that he did not favor Owens Corning's proposed plan. In January 2003, Owens Corning filed a revised plan of reorganization that this time was supported by the tort claimants who had objected to the first draft plan.[10]

---

[10]    The Petitioners argue that a reasonable person could perceive that Judge Wolin's impartiality could reasonably be questioned in this sequence of events.

During the course of the Five Asbestos Cases, Advisor Hamlin prepared a draft opinion in each of the Five Asbestos Cases, a role that Hamlin likened to that of a federal magistrate judge. At his deposition, Hamlin explained that he would normally receive a phone call from Judge Wolin's chambers informing him that an appeal had been taken from the Bankruptcy Court and that he was to prepare a draft opinion for Judge Wolin. The issues on which he drafted opinions included, among other things, bar dates for asbestos property claims, defenses by USG Corp. to asbestos personal injury claims, and proof of claim forms.

## C. *The G-I Holdings Bankruptcy*

Two months before Judge Wolin appointed the Advisors in the Five Asbestos Cases, the Bankruptcy Court for the District of New Jersey (Chief Judge Rosemary Gambardella) had appointed Advisor Hamlin to serve as the "Legal Representative of Present and Future Holders of Asbestos-Related Demands" in still another asbestos-related bankruptcy case captioned *In re G-I Holdings Inc.* The *G-I Holdings* bankruptcy is not related to the Five Asbestos Cases, and Judge Wolin has played no role in the *G-I Holdings* proceedings. There is, however, a substantial likelihood and a tacit, if not express, agreement that some of the future claimants in *G-I Holdings* will also have claims against one or more of the debtors in the Five Asbestos Cases.

Less than one month after Judge

Wolin appointed the five Advisors, Hamlin filed an application in *G-I Holdings* to engage Advisor Gross as his local counsel. Chief Judge Gambardella approved Gross as Hamlin's local counsel.

### D. *Kensington's Recusal Motion*

Almost two years later, Kensington filed a motion in the Bankruptcy Court seeking to recuse Judge Wolin from further participation in the Owens Corning bankruptcy. Kensington asserted that Judge Wolin was precluded under 28 U.S.C. § 455(a) from continuing to preside over the Owens Corning bankruptcy because two of his Advisors (Gross and Hamlin) allegedly had a conflict of interest as a result of their participation in *G-I Holdings*.

Three days later, the debtors in the W.R. Grace bankruptcy applied to Bankruptcy Judge Fitzgerald to appoint Mr. Hamlin as the Legal Representative for Future Asbestos Claimants of W.R. Grace & Co. The application disclosed that Mr. Hamlin was already serving as an Advisor to Judge Wolin in the Five Asbestos Cases, including, of course, the W.R. Grace bankruptcy. W.R. Grace & Co. ultimately withdrew its application after Judge Fitzgerald expressed her opinion that Hamlin could not serve as the Futures Representative in the W.R. Grace bankruptcy.

On October 23, 2003, Judge Wolin entered an order staying all discovery in connection with Kensington's recusal motion. That stay prompted Kensington to file a petition in our Court seeking a Writ of Mandamus directing Judge Wolin either to disqualify himself or to withdraw his discovery stay.

### E. *The District Court's Responses*

Judge Wolin submitted three written responses to Kensington's petition. In his first response, dated November 3, 2003, Judge Wolin announced that he would "judge the Motion to Recuse on the law and facts presented after all of the parties have been heard in full" and that he would seek to resolve the motion as quickly as possible.

In his second response, dated November 21, 2003, Judge Wolin answered the suggestion that his *ex parte* communications with the Advisors and various attorneys somehow required his recusal. Judge Wolin explained that the purpose of the *ex parte* communications "was to ensure that each committee or corporate constituency was afforded the opportunity to provide to the Court insights as to why, in the competition for limited dollars, its claim was just." Judge Wolin also wrote that, "[g]iven that these meetings occurred on a regular basis without complaint and given that the December 20, 2001 case management conference alerted all concerned that ex parte meetings were part of the District Court's case management plan, it strikes a discordant note that the conduct of ex parte conferences would be the ground for

a recusal motion."[11]

In his third response, dated December 5, 2003, Judge Wolin again defended his Case Management methods and, in particular, his decision to allow *ex parte* communications.

### F.  *D.K. Acquisition Partners' Mandamus Petition*

Meanwhile, D.K. Acquisition Partners filed a motion in the W.R. Grace bankruptcy case seeking Judge Wolin's recusal.  A week later, D.K. Acquisition Partners filed a petition in this Court seeking the same relief requested by Kensington.    We consolidated D.K. Acquisition Partners' Mandamus Petition with Kensington's Petition.

### G.  *Remand*

Following an extended hearing and after we had received briefs from the parties and *amici*, we remanded the proceedings to Judge Wolin with

---

[11]  Around the same time that Judge Wolin filed his second response, USG Corporation filed a motion in the Bankruptcy Court seeking his recusal. USG Corporation argued that the extensive *ex parte* communications between Judge Wolin and the Advisors (as well as other persons) provided an independent basis for Judge Wolin's disqualification under both 28 U.S.C. § 455(a) and (b)(1).

instructions that he allow expedited discovery to proceed.  We also required that he rule on the pending recusal motions.  We were motivated primarily by our concern that we did not have an adequately developed evidentiary record before us.

As we previously stated, on February 2, 2004, following expedited discovery, Judge Wolin issued a 102-page written opinion and order denying the motions for recusal.  First, Judge Wolin found that the evidence failed to disclose that there was an appearance of impropriety under § 455(a) or that his *ex parte* communications required his recusal under § 455(b)(1).  Second, Judge Wolin determined that the motions were not timely because the parties seeking his recusal either had actual or imputed knowledge of the facts giving rise to the recusal motions long before the motions were filed.  He also charged that the Petitions were prompted by strategic, rather than ethical, motivations.

### III.  JURISDICTION

We have jurisdiction to issue Writs of Mandamus under the All Writs Act, 28 U.S.C. § 1651(a), which provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  We also retained jurisdiction when we remanded the proceedings to Judge Wolin for discovery and his ruling.    *See*

*Kensington*, 353 F.3d at 214 ("We will retain jurisdiction over any further proceedings . . . .").

## IV. STANDARD OF REVIEW

When a Petition for a Writ of Mandamus challenges a district court judge's decision not to recuse himself, we normally review that decision for an abuse of discretion. *Selkridge v. United of Omaha Life Ins. Co.,* 360 F.3d 155, 166 (3d Cir. 2004). But the mandamus petitions in Owens Corning and W.R. Grace & Co. are somewhat unique, from a procedural perspective, in that they arrived in our Court *before* the District Court ruled on the recusal motions. Had we reached the merits at that time instead of remanding to the District Court, we would have applied the "clear and indisputable" standard that governs Petitions for a Writ of Mandamus. *See Kerr v. U.S. Dist. Ct.,* 426 U.S. 394, 403 (1976). The abuse of discretion standard, even though it may have led to the same result, would have had no application.

At oral argument, we asked the parties to submit supplemental letters addressing the appropriate standard of review where, as here, a Petition for Mandamus seeking to disqualify a district court judge precedes a ruling by the district court. Having reviewed the submissions made by the parties, we now hold that Judge Wolin's decision not to recuse himself must be reviewed for an abuse of discretion, as it is, in effect, no different than an appeal from a district court's order denying recusal. *See* S. Rep. 93-419 (1973), H. Rep. 93-1453 (1974) (explaining that the addition of subsection (a) to § 455 was not intended to alter the abuse of discretion standard of review). "When the need for a writ of mandamus is determined by this court to be 'clear and indisputable,' a district judge's decision not to recuse himself or herself necessarily also will have been an abuse of discretion or a clear legal error."[12]

---

[12] It is somewhat strange to speak in terms of an abuse of discretion where the underlying statute, 28 U.S.C. § 455, states that a judge "shall" disqualify himself or herself if certain grounds are present. The abuse of discretion standard may be an anachronistic vestige of an earlier version of § 455. Prior to 1974, § 455 provided in its entirety that a judge had to "disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, *in his opinion,* for him to sit on the trial, appeal, or other proceeding therein." 28 U.S.C. § 455 (amended 1974) (emphasis added). Under that version, a judge had broad discretion to deny a recusal request even if the grounds for recusal were present. To the extent judges continue to retain any discretion under the post-1974 version of § 455, it is only to determine if the "facts asserted as comprising bias, a forbidden financial interest, kinship, or the appearance of partiality bring the trial court judge within the disqualifying

*Alexander,* 10 F.3d at 163 n.9.

# V. DISCUSSION

## A. *Standard for Disqualification Under § 455(a)*

Whenever a judge's impartiality "might reasonably be questioned" in a judicial proceeding, 28 U.S.C. § 455(a) requires that the judge disqualify himself. The test for recusal under § 455(a) is whether a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned. *Alexander,* 10 F.3d at 164.

> "Under § 455(a), if a reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality under the applicable standard, then the judge must recuse." *In re Prudential Ins. Co. of America Sales Practices Litigation,* 148 F.3d 283, 343 (3d Cir. 1998) (internal quotations omitted); *see Massachusetts School of Law at Andover, Inc. v.*

definition." 2 Steven Alan Childress & Martha S. Davis, *Federal Standards of Review* § 12.05 (3d ed. 1999). If the answer to that inquiry is "yes," disqualification must follow.

*American Bar Ass'n,* 107 F.3d 1026, 1042 (3d Cir. 1997) ("The standard for recusal is whether an objective observer reasonably might question the judge's impartiality.").

*Selkridge,* 360 F.3d at 167.

A party moving for disqualification under § 455(a) need not show actual bias because § 455(a) "concerns not only fairness to individual litigants, but, equally important, it concerns 'the public's confidence in the judiciary, which may be irreparably harmed if a case is allowed to proceed before a judge who appears to be tainted.'" *Alexander,* 10 F.3d at 162 (quoting *School Asbestos,* 977 F.2d at 776).

## B. *Who is the Hypothetical Reasonable Person under § 455(a)?*

Judge Wolin's opinion of February 2, 2004 supporting his order denying the recusal motions held that the reasonable person under § 455(a) is someone "with the professional skills and experience in mass-tort [asbestos-related] bankruptcies sufficient to understand the import of the facts presented," thus excluding "laypersons or attorneys not conversant with the basics of mass-tort bankruptcy practice." *Owens Corning,* 305 B.R. at 190. In reaching that conclusion, Judge Wolin reasoned that, "where proceedings are by their nature inscrutable to outsiders, the wider world must rely upon those

persons actually involved to report on those proceedings' capacity to produce a fair result." *Id.*

To the best of our knowledge, Judge Wolin's gloss on § 455(a)'s "reasonable person" standard has no precedent. It also appears to be in tension with our observation in *School Asbestos* that § 455(a) was enacted by Congress because "'people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges.'" *School Asbestos,* 977 F.2d at 782 (quoting *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 864-65 (1988)). Notably, the *School Asbestos* lawsuit was precisely the sort of complex, mass-tort litigation that Judge Wolin believed required a more nuanced definition of the reasonable person.

Judge Wolin distinguished *School Asbestos* on the ground that the appearance of impropriety in that case—the district court judge had attended a scientific conference organized by the plaintiffs' counsel—"was simple enough for anyone to grasp." *Owens Corning,* 305 B.R. at 190. Judge Wolin's characterization suggests that the perception of impropriety in the Five Asbestos Cases is, by comparison, too complex for the average person to comprehend. We cannot agree.

No one disputes that asbestos bankruptcies are complicated, but the alleged perception of impropriety is fairly straightforward in this case. The gravamen of the Petitions is that Judge Wolin was tainted by the involvement of two court-appointed advisors who, at the same time that they were supposed to be giving neutral advice in the Five Asbestos Cases, represented a class of tort claimants in another, unrelated asbestos-driven bankruptcy and espoused views therein on the same disputed issues that are at the core of the Five Asbestos Cases.[13]

We are confident that the average layperson could grasp this alleged impropriety and, after being fully informed of all the surrounding circumstances, could draw a conclusion about Judge Wolin's ability to render a fair and impartial decision. That being so, we perceive no reason to depart from the traditional "man on the street" standard. *See Moran v. Clarke,* 296 F.3d 638, 648 (8th Cir. 2002) (using "average person on the street" standard); *Home Placement Serv., Inc. v. Providence Journal Co.,* 739 F.2d 671, 676 (1st Cir. 1984) (same); *Potashnick v. Port City Constr. Co.,* 609 F.2d 1101, 1111 (5th Cir. 1980) (same).

Judge Wolin's definition of the hypothetical reasonable person is contrary

_____

[13] The Petitions also assert that Judge Wolin should be recused because of his *ex parte* communications with the Advisors and the parties, but that is grounded primarily in § 455(b)(1), which does not employ a reasonable person "perception" standard.

17

to the goal of § 455(a). An attorney familiar with asbestos bankruptcies presumably would have a higher threshold for conflicts and alleged improprieties than the average layperson. This contravenes the purpose of § 455, which is "to promote public confidence in the integrity of the judicial process." *Liljeberg,* 486 U.S. at 860 (citing S. Rep. No. 93-419, p. 5 (1973); H.R. Rep. No. 93-1453, p. 5 (1974)). Accordingly, we agree with the Fourth Circuit Court of Appeals that the hypothetical reasonable person under § 455(a) must be someone outside the judicial system because judicial insiders, "accustomed to the process of dispassionate decision making and keenly aware of their Constitutional and ethical obligations to decide matters solely on the merits, may regard asserted conflicts to be more innocuous than an outsider would." *United States v. DeTemple,* 162 F.3d 279, 287 (4th Cir. 1998); *see also United States v. Jordan,* 49 F.3d 152, 156-57 (5th Cir. 1995) (remarking that average person on street "is less likely to credit judges' impartiality than the judiciary"); *In re Mason,* 916 F.2d 384, 386 (7th Cir. 1990) (noting that lay observer is less inclined to presume judge's impartiality than members of judiciary). Thus, we hold that the appearance of impropriety must be viewed from the perspective of the objective, reasonable layperson, who is not necessarily familiar with asbestos bankruptcies and litigation.

## C. *Did the Advisors have a Conflict of Interest?*

Before we can decide whether the reasonable person might question Judge Wolin's impartiality, we must determine if his Advisors had a conflict of interest. If not, then our inquiry comes to an end because the Petitioners will have failed to show that they have a clear and indisputable right to disqualification. On the other hand, if there was a conflict, then we must reach the question of whether that conflict might be perceived by the reasonable person as having tainted Judge Wolin.

Aside from the timeliness of the recusal motions, the existence of a conflict of interest by the Advisors may be the most sharply contested issue in these proceedings. Judge Wolin explained in his written opinion that he was an asbestos "neophyte" when he assumed control of the Five Asbestos Cases, and that he brought the Advisors on board to "inform the Court of the vast landscape of asbestos related issues that would permit the Court to make reasoned case management decisions." *Owens Corning,* 305 B.R. at 198.

We conclude that two of the Advisors, Gross and Hamlin, did, in fact, operate under a structural conflict of interests at the same time that they served as Judge Wolin's Advisors. This conflict arose from the dual roles they played in the Five Asbestos Cases and the *G-I Holdings* bankruptcy.

On the one hand, Gross and Hamlin clearly had a duty to remain neutral in the

Five Asbestos Cases and to provide objective, unbiased information to Judge Wolin. As Judge Wolin stated in his original appointment order, the Advisors' role "was to advise the Court and to undertake [certain] responsibilities, including by way of example and not limitation, mediation of disputes, holding case management conference, and consultation with counsel . . . ."

We would be hard pressed to overstate the importance of the Advisors' role in the Five Asbestos Cases. As a result of their appointment, the Advisors had a unique level of access to Judge Wolin. Indeed, Judge Wolin himself acknowledged in a fee allowance order that the Advisors "occup[ied] a unique position in the [Five Asbestos] cases not shared by other persons" and that they "function[ed] in a manner in all respects similar to examiners as provided in the Bankruptcy Code." The Advisors also had a unique level of influence over Judge Wolin, given the role they played at the outset of the Five Asbestos Cases in educating Judge Wolin (a self-admitted neophyte) on all of the key asbestos-related issues.

On the other hand, Advisors Gross and Hamlin also had a duty to act as zealous advocates for the future asbestos claimants in the *G-I Holdings* bankruptcy. Hamlin was at all relevant times the legal representative of the present and future asbestos personal injury claimants in *G-I Holdings* and Gross served as his local

counsel.[14]    In those roles, Gross and Hamlin owed the future asbestos claimants in *G-I Holdings* a fiduciary duty to advance their interests and to see that they received the greatest possible share of the bankruptcy estate.[15] To achieve that end, the very Advisors who were advising Judge Wolin had to take positions in *G-I Holdings* and the Five Asbestos Cases that favored the future asbestos claimants. By their very position as representatives of the future asbestos claimants in *G-I Holdings,* Gross and Hamlin signaled to all that they

_____

[14] As we noted earlier, W.R. Grace & Co.'s motion to appoint Hamlin as a Futures Representative was withdrawn in light of Bankruptcy Judge Fitzgerald's reaction.

[15] Some of the parties opposing Judge Wolin's disqualification have emphasized that the future claimants in *G-I Holdings* are, as yet, unidentified individuals because they have not yet developed any outward medical symptoms as a result of their exposure to asbestos. We are not persuaded that this is a mitigating factor. Although the future claimants are, by definition, a group of unknown individuals, their interests in pursuing claims against the asbestos manufacturers are clearly identifiable and, as such, Hamlin and Gross were duty-bound to further the claimants' collective interests. In this sense, Hamlin and Gross's role could be likened to that of a class representative and his attorney at the inception of a class action lawsuit, before the class members are identified.

could not be non-partisan, benign, or neutral.

Given their dual roles, we find that Gross and Hamlin had a conflict of interest. The structural conflict arose primarily out of the close relationship between the future asbestos claimants and the issues in the Five Asbestos Cases and *G-I Holdings.* In both proceedings, the debtors were leading manufacturers of asbestos products who were forced into bankruptcy by a flood of asbestos-related claims, including those of future claimants not yet identified. Consequently, many of the same legal issues (e.g., bar dates, proof of claim forms, medical manifestations, etc.) either have arisen or will arise in both the Five Asbestos Cases and the *G-I Holdings* bankruptcy. Both Judge Wolin and Advisor Hamlin implicitly acknowledge that there existed a conflict of interest. Hamlin stated in his deposition that "[i]f any issue or any responsibility was sought from me [by Judge Wolin] in regard to any issue that I felt impinged on by G-I stuff, I would have asked that assignment be given to somebody else." Specifically, Hamlin stated that "I wouldn't have touched the personal injury bar date issue . . . [b]ecause that's what I'm dealing with in G-I." While the parties opposing recusal contend that this statement proves there was no conflict of interest, it proves just the opposite. Had there been no conflict, Hamlin would have perceived no need to reject any assignments in the Five Asbestos Cases.

Despite his conclusion that "no conflict exists," Judge Wolin nevertheless shares Hamlin's concerns. Recognizing that "[t]he core task of any futures representatives is to determine claim validity and claim valuation" for future claimants, Judge Wolin explains that no conflict materialized because "[t]he issues of claim valuation and future claimant versus present claimant equivalence have been neither briefed nor joined" in the Five Asbestos Cases. *Owens Corning,* 305 B.R. at 198. Judge Wolin's statements further demonstrate the tension between Hamlin's and Gross's dual roles as advisors to Judge Wolin in the Five Asbestos Cases and Futures Representatives in *G-I Holdings.*

If Gross and Hamlin were precluded from addressing issues such as bar dates and claim valuation, we cannot understand how it could be appropriate for them to discuss other issues of importance to Futures Claimants in *G-I Holdings.* If both Hamlin and Judge Wolin would question the Advisors' ability to remain neutral with respect to bar dates, a reasonable person certainly would be suspicious of discussions with the Advisors on potential affirmative defenses to liability, the proper content of proof of claims forms, or the processes for estimating claims under 11 U.S.C. § 502(c). See *supra* at 10 (discussing the subjects addressed in Judge Wolin's *ex parte* meetings with the Advisors).

As discussed below in Section V-E, these suspicions are heightened by the *ex*

*parte* nature of the communications between Judge Wolin and his Advisors. We do not hold that *ex parte* communications alone—in the absence of any conflict of interest—require recusal. We emphasize that it is the *conflict of interest* and not the particular specialty of the neutral expert or advisor that concerns us. A judge may engage an expert or someone to assist him who has no conflict and is "disinterested." Here, however, we have concluded that the Advisors were conflicted and were not disinterested. Hence, any decision by us that would preclude a judge from obtaining assistance from a non-conflicted advisor would unnecessarily restrict a judge's ability to communicate with neutral experts. Indeed, a judge may consult *ex parte* with a *disinterested* expert provided that the judge "gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond." Code of Conduct for U.S. Judges Canon 3 § A(4) (2003).

A reasonable observer, understanding that certain issues were "off limits," would be concerned by the absence of any mechanism to police those limits. Indeed, the record before the Court contains substantial evidence that these limits were, in fact, violated. Although Hamlin testified that a bar date was not discussed by the Advisors, and although Gross testified that he could not recall whether a bar date was discussed, the other three Advisors testified that the issue of whether and how to impose a bar date was discussed with Judge Wolin.

Moreover, there is a substantial likelihood that many of the future claimants in *G-I Holdings* will also be future claimants in the Five Asbestos Cases because it is not unusual for asbestos claimants to bring claims against different asbestos manufacturers.

As counsel for Kensington argued:

[I]t is our view that Judge Wolin has rendered a number of rulings favorable to tort claimants after discussions with the future - - with the advisors who are Futures Representatives in *G-I.*

Do I have a signed, sealed confession, we urged this result on Judge Wolin and he then did it? No, I don't have that. But the problem here is a 455(a) problem.

\* \* \*

But this much is undeniable. On October 31st, 21 days before that [Nov. 21] status conference, Owens Corning circulated a draft plan of reorganization that was met, in letters in the record before you, with great approval by the commercial creditors and great disapproval by the tort creditors.

21

After the November 21st untranscribed hearing at which we recall Judge Wolin saying he did not like that plan, Owens Corning went back and formulated a brand-new plan that is so favorable to the tort claimants that they are coproponents of the plan. This is two days after meeting with Mr. Gross, a representative of future claimants. There are real appearance problems here, even if there are not certain types of smoking guns.

(*Transcript of April 19, 2003 Oral Argument* at 47-48, 52-53.) Whether or not we reach the same conclusions that counsel did, the fact remains that the matters set forth in the depositions which we ordered, which are too voluminous to duplicate here but which we have studied, do reflect that counsel's view of the § 455(a) problem is indeed accurate.

## D. *Did the Advisors' Conflict Taint Judge Wolin?*

We turn now to the question of whether Gross's and Hamlin's conflict of interest irreversibly tainted Judge Wolin. We obviously do not equate this "taint" of Judge Wolin with any wrongdoing or bias on his part. We are fully aware that the § 455(a) standard asks only if a reasonable person knowing all the circumstances might question Judge Wolin's impartiality.

Judge Wolin stated in his opinion that he met with the Advisors as a group on only four occasions for a total of eighteen hours and that, after May 2002, "the Advisors as a group became functionally obsolete despite their *de jure* existence." *Owens Corning,* 305 B.R. at 200. Judge Wolin also emphasized that his meetings with the Advisors consisted merely of discussions, which he defined as "consideration of a subject by a group; an earnest conversation," and that he never received any advice, which he defined as an "opinion about what could or should be done about a situation or problem." *Id.* at 198 (citing American Heritage College Dictionary 397, 20 (3d ed. 1993)).

Judge Wolin's distinction between discussions and advice cuts too fine a line. As Kensington points out, "[i]t is hard to fathom why Judge Wolin wanted [a] crash course in asbestos litigation if *not* to assist him in deciding 'the merits' of 'disputed' issues that he could expect to face." Indeed, the four meetings in early 2002 between Judge Wolin and the Advisors covered almost all of the major issues in asbestos litigation, including the Rule 706 panel, claims bar date, claim forms, pleural registries, fraudulent conveyance claims, various defenses, claims estimation, trust distribution procedures, tensions among the creditor classes, and the asbestos claimants' veto power under 11 U.S.C. § 524(g).

In deciding whether Gross and Hamlin's involvement in the Five Asbestos Cases and interactions with

22

Judge Wolin leads to disqualification under § 455(a), we find instructive the Fifth Circuit Court of Appeals' decision in *Hall v. Small Business Administration,* 695 F.2d 175 (5th Cir. 1983). In that case, the losing party moved after trial to disqualify the judge and to vacate the judgment because it came to light that the judge's law clerk had, among other things, accepted, prior to the judgment being entered, an offer to join the law firm which represented the winning party. *Id.* at 178. The judge denied the motion on the ground that the law clerk had never expressed an opinion to him about the winning party and because the law clerk had accepted the offer of employment only after the judge had made up his mind about the case and had written a rough draft of the opinion. *Id.*

On appeal to the Fifth Circuit, the court reversed and entered an order disqualifying the judge. In reaching that decision, the court remarked that the goal of § 455(a) "is to exact the appearance of impartiality" and therefore it was, in the court's opinion, immaterial "[w]hether or not the law clerk actually affected the judge's decision." *Id.* at 179. The court also emphasized that law clerks hold a special position of trust and influence insofar that they are "sounding boards for tentative opinions and legal researchers who seek the authorities that affect the judge's decision."[16] *Id.*

---

[16]    The Ninth Circuit Court of Appeals discussed a similar motion for

The same factors that required recusal in *Hall* apply here. Although Gross and Hamlin were not law clerks *per se*, they were in some respects the substantial equivalent of law clerks.[17] Hamlin, for example, drafted legal opinions in each of the Five Asbestos Cases for Judge Wolin. Thus, not only was Hamlin the "legal researcher[] who [sought] the authorities that affect[ed] the judge's decision," but he was also the scrivener who, in the first instance, tried his hand at crafting the decision that, if accepted by Judge Wolin, would dispose of an appeal taken from the Bankruptcy Court in one of the Five Asbestos Cases. *See id.* Moreover, Gross and Hamlin held a special position of trust and influence because they, together with the other three Advisors, were perceived by Judge Wolin

---

recusal in *First Interstate Bank of Arizona v. Murphy, Weir & Butler,* 210 F.3d 983 (9th Cir. 2000). There, a bankruptcy judge recused herself because her law clerk had continued to have some contact with a Chapter 11 bankruptcy proceeding after the law clerk accepted an offer to join the law firm representing the creditors. *Id.* at 985.

[17]    The "hybrid" status of the Advisors has given us considerable concern. That concern is expressed in note 20, *infra.* As counsel for Respondent Owens Corning admitted at our first hearing, he had no knowledge of such a hybrid status or of individuals having assumed that status being asked to assist a judge.

as being experts in the asbestos litigation field and depended on them to educate him on all the relevant issues.

There is, of course, nothing inherently wrong with appointing a panel of experts. But when *ex parte* discussions between the judge and the panel veer into the merits, recusal may follow. For example, in *Edgar v. K.L.,* 93 F.3d 256 (7th Cir. 1996), a district court judge appointed, with the parties' consent, a panel of experts. Although the parties were aware that the panel had *ex parte* meetings with the judge from time to time to discuss administrative matters, the parties only discovered later that one of the meetings involved a discussion of the merits and possibly a preview of the panel's final report. *Id.* at 257-58. When the parties moved to disqualify the judge, he blocked discovery and denied the motion. A petition for a writ of mandamus in the Seventh Circuit Court of Appeals followed. *Id.* at 257.

The Seventh Circuit issued a writ of mandamus disqualifying the judge. As to § 455(a), the court held: "A thoughtful observer aware of all the facts . . . would conclude that a preview of evidence by a panel of experts who had become partisans carries an unacceptable potential for compromising impartiality." *Id.* at 259-60 (citations omitted). The court also noted that "[e]xperts appointed and supervised by a court carry special weight because of their presumed neutrality," and that the panel of experts appointed by the district court judge were not truly neutral

because they had been influenced by submissions from advocacy groups and counsel supporting plaintiffs in other lawsuits against the defendant.[18] *Id.* at 261-62.

The *Edgar* decision, like the *Hall* decision, is instructive in that the Seventh Circuit Court of Appeals did not hesitate to disqualify the district court judge under

---

[18] The *Edgar* court held that the district court judge had acquired "personal" knowledge from the panel of experts, which is another way of saying that the judge acquired information from an extrajudicial source. *Edgar,* 93 F.3d at 259. The extrajudicial source doctrine, as it is commonly known, provided at one time that recusal was not warranted unless the grounds for recusal emanated from an extrajudicial source (i.e., a source outside of the judicial proceedings at hand). *See Liteky v. United States,* 510 U.S. 540, 544-545 (1994). In *Liteky,* the Supreme Court held that the extrajudicial source also applied to § 455(a), but it tempered its effect by explaining that it was merely a factor and not a prerequisite for disqualification. *Id.* We agree with the *Edgar* court that off-the-record discussions on substantive issues in chambers constitute "personal" or "extrajudicial" knowledge in the sense that the information conveyed to the judge leaves no trace in the record and cannot "be controverted or tested by the tools of the adversary process." *Edgar,* 93 F.3d at 259.

§ 455(a) even though there was no evidence of actual bias. The theme running through both *Edgar* and *Hall* is that there is an almost irrebutable presumption that a judge is "tainted" and must be disqualified where, as here, he surrounds himself with individuals who may not be truly disinterested.

Some of the parties opposing Judge Wolin's disqualification attempt to distinguish the *Hall* and *Edgar* decisions on the ground that the Five Asbestos Cases do not involve a district court's relationship with its law clerks or court-appointed experts. The Respondents contend that court-appointed "Advisors," such as Gross and Hamlin, are mere consultants, of whom pure neutrality is not required.

While the Respondents' attempt to distinguish *Hall* and *Edgar* has some superficial appeal, we believe their approach values form over substance and relies too heavily on overly-technical categorizations. More importantly, it fails to take into account the underlying considerations that drove the courts' decisions in *Hall* and *Edgar*. The primary concern in both *Hall* and *Edgar* is that a party which held a special position of trust and influence over the judge was found to be not truly disinterested in the outcome of the proceedings. The same can be said here. As court-appointed Advisors to Judge Wolin, Gross and Hamlin were given very broad powers. The order appointing them provided, among other things, that they could advise Judge

Wolin, mediate disputes, hold case management conferences, and consult with the attorneys. Hamlin himself likened the powers that he exercised to those of a magistrate judge. Given these wide-ranging powers, surely the five Court-Appointed Advisors were under a duty to maintain at least the degree of neutrality normally required of law clerks or court-appointed experts. However, that neutrality was seriously compromised by virtue of their participation in *G-I Holdings*, a bankruptcy involving many of the same issues present in the bankruptcies assigned to Judge Wolin, many of the same creditors, and possibly some of the same asbestos claimants.

We also note that Kensington's Reply Brief emphasizes that over a 22-month period Judge Wolin received substantive information from:

•    two Advisors (Gross and Hamlin), who had a fiduciary duty in *G-I Holdings* to advance the interests of the future asbestos claimants (Joint Appendix ("JA") 1545);

•    two Advisors (Gross and Hamlin), who had an incentive to make helpful precedent in the Five Asbestos Cases, which they could then rely on (and did rely on) in *G-I Holdings* in support of the future claimants (JA 1621, 978B, 980, 2728);

•    three Advisors (Gross, Hamlin and McGovern) who met on multiple occasions with the future representatives

in a wide range of asbestos-related cases (including the Five Asbestos Cases), to develop a common strategy with respect to pending asbestos legislation and to discuss common issues (JA 1645); and

•    two Advisors (Gross and McGovern) who allegedly breached their duties as mediators by disclosing to Judge Wolin substantive positions of the mediating parties (JA 1393, 1409, 1412, 1432).[19]

Given the unique level of access and influence that Gross and Hamlin had, the length of their appointment, and the overlapping issues and clients, we find that the reasonable person, with familiarity of these circumstances, would conclude that their conflict of interest tainted Judge Wolin.

### E.  *The Ex Parte Communications Contributing to Taint*

The extensive *ex parte* communications between Judge Wolin, on the one hand, and the Advisors and parties, on the other, further support disqualification under § 455(a).  *See United States v. Furst,* 886 F.2d 558, 583

---

[19] Kensington alleges that Advisors Gross and McGovern, who served as mediators in the Owens Corning bankruptcy, improperly shared with Judge Wolin information that they had gained from the parties during the course of mediation.

(3d Cir. 1989) (disqualifying judge under § 455(a) because of *ex parte* communications).  We have previously described *ex parte* communications as "anathema in our system of justice." *School Asbestos,* 977 F.2d at 789.  One leading reason is that *ex parte* meetings are often, as they were here, unrecorded. Consequently, there is no official record of what was said during those meetings.  Of even greater concern is the argument urged upon us by the Petitioners who, without knowledge of what was discussed at these meetings, contended that they could not respond to these "silent" facts. As we explained in *City of Pittsburgh v. Simmons,* 729 F.2d 953 (3d Cir. 1984):

> The record taken by a certified court reporter is always the best evidence of what has been said, what actions have been taken, and what rulings have been made.  "Meaningful review requires that the reviewing tribunal must be able to review a decision of a trial court . . . to determine its correctness and if necessary control the course of the litigation whether by appeal or by use of a writ . . . ." *Wood v. Zapata Corp.,* 482 F.2d 350, 358 (3d Cir. 1973) (Biggs, J., dissenting).  Without a record of the proceedings "[w]e are left with conflicting statements of

counsel which cannot be reconciled and, in any event, are not part of the record and therefore cannot serve as a basis for adjudication." *Id.*

. . . Indeed, the best protection for the litigants, the bar, and the bench at trial and on appeal is a verbatim record. Rather than having to speculate upon what was said and the manner in which an argument was made, the court then has before it, when a record is taken, the exact words of counsel and the exact words and rulings of the court. Thus, there is no need for characterization in affidavits or for reconstruction at a later date of what the parties or court thought each said or meant or what each intended.

*Id.* at 955-56.

The other problem is that *ex parte* communications run contrary to our adversarial trial system. The adversary process plays an indispensable role in our system of justice because a debate between adversaries is often essential to the truth-seeking function of trials. *See Polk County v. Dodson,* 454 U.S. 312, 318 (1981) ("The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness"). If judges engage in *ex parte* conversations with the parties or outside experts, the adversary process is not allowed to function properly and there is an increased risk of an incorrect result.

Attuned to that concern, the Code of Conduct for United States Judges cautions that a judge should "neither initiate nor consider *ex parte* communications on the merits, or procedures affecting the merits, of a pending or impending proceeding." Code of Conduct for U.S. Judges Canon 3 § A(4) (2003). The rule is designed to prevent all of the evils of *ex parte* communications: "bias, prejudice, coercion, and exploitation." Jeffrey M. Shaman et al., *Judicial Conduct and Ethics* § 5.03 (3d ed. 2000). The Code provides for only two narrow exceptions. First, "[a] judge may . . . obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond." Code of Conduct for U.S. Judges Canon 3 § A(4) (2003). Second, "[a] judge may, with consent of the parties, confer separately with the parties and their counsel in an effort to mediate or settle pending matters." *Id.*

Judge Wolin apparently recognized the dangers of *ex parte* meetings, but relied on two "safeguards" to minimize the risk. First, Judge Wolin explained that all

parties were welcome to participate in the *ex parte* meetings and "as one party left chambers, the next would arrive ready to debunk the 'falsehoods' of its predecessor." *Owens Corning,* 305 B.R. at 206. Second, Judge Wolin explained that he was "no babe in arms." *Id.* This characterization, which finds expression in Judge Wolin's February 2, 2004 opinion, is obviously in tension with his earlier self-characterization as an asbestos "neophyte."

Unfortunately, we do not share Judge Wolin's confidence that these safeguards adequately minimized the risks. Obviously Judge Wolin is correct when he states that he is "no babe in arms," but the same could be said of the overwhelming majority of Article III judges. Moreover, the Code of Judicial Conduct does not draw a distinction between newly-appointed and veteran judges; the general prohibition against *ex parte* communications on the merits applies to all judges.

As for the second safeguard, we must first assume that all parties took equal advantage of Judge Wolin's invitation to participate in *ex parte* meetings, even though experience informs us that certain parties may be more aggressive than others. But even if all parties met for the same amount of time with Judge Wolin, there was no way for them to adequately respond to or counter facts presented by their adversaries because they had no way of knowing what was said during those unrecorded

meetings. Thus, the risk of an incorrect result was still present. This would be of little consequence if the *ex parte* meetings had been limited to procedural matters, but Judge Wolin himself explained that "[t]he purpose of the *ex parte* meetings was to ensure that each committee or corporate constituency was afforded the opportunity to provide to the Court insights as to why, in the competition for limited dollars, its claim was just." (Supp. Resp. at 3.) In other words, the *ex parte* meetings went to the very heart of the proceedings.

The *ex parte* meetings with the parties are flawed because, as we have explained, no opportunity existed for their adversaries to know precisely what was said, when it was said, by whom, and what effect could be drawn from their offerings. On the one hand, although all parties may at one time or another have been invited to an *ex parte* meeting with Judge Wolin, the probability of "slippage" and omission in the content of the material discussed, whether procedural or substantive, was evident. As we have stated, no one could know what had been said or proffered. On the other hand, Judge Wolin's *ex parte* meetings with the Advisors presented an even more egregious problem. The instant record reveals a conflict as to what the Advisors brought to the meetings from their extrajudicial experience and, in the case of Hamlin and Gross, from their advocate roles in *G-I Holdings*, and the extent of their influence on the entire process. We know, for instance, that someone at one of the meetings disparaged a possible expert witness and

28

criticized a defense. Of equal concern is the record's disclosure that at a November 19, 2002 meeting attended by Advisors Gross, McGovern, and Dreier, matters of substance were discussed, but we have no knowledge about their content. The record is silent in this respect. Advisor Dreier made notes in handwriting which are under seal and we find difficult to comprehend. No discovery of that meeting was permitted by Judge Wolin.

We have previously discussed the distinction between our holding, that conflicted advisors who participate or influence a judge requires the judge's disqualification, as distinct from an expert or other assistant to the judge who is disinterested and non-conflicted. It should be understood that we do not hold that a judge may not or should not have *ex parte* meetings or communications with the parties or their counsel appearing before him. However, the hallmark of such meetings or communications requires the consent of the parties. We have pointed out in this section that the Code of Conduct for United States Judges proscribes *ex parte* communications except where the judge has entered into them with the consent of all the parties.

It will be recalled that Judge Wolin stated at the December 2001 Case Management Conference that:

> In order to effectively case manage complex litigation, it is necessary for the judge to speak and/or meet with

attorneys on an *ex parte* basis, without permission of adversary attorneys. Any objection to such *ex parte* communications is deemed waived.

While we have no record of any objections being registered at that time, we cannot regard the silence that accompanied the preemptive statement that "[a]ny objection to such *ex parte* communications is deemed waived" as manifesting consent. To fulfill the principles and objectives of Canon 3 of the Code of Conduct, which proscribes *ex parte* communications except with consent, *affirmative consent* is dictated. The record reveals no such consent was ever given.

Given all of these considerations, we are confident that the reasonable person would be troubled by the fact that so many communications between Judge Wolin and Gross or Hamlin took place outside the presence of the parties. If the structural conflict of interests gave Gross and Hamlin a motive to give Judge Wolin less-than-neutral advice, it was the *ex parte* meetings that gave them the opportunity. In the absence of the parties, Gross and Hamlin were in a position to influence Judge Wolin without concern about judicial constraints or independent challenges from those individuals or entities with a stake in the outcome of the

Five Asbestos Cases.[20]

## F. *Were the Recusal Motions Timely Under § 455(a)?*

------------

[20]   We have previously noted that the Advisors chosen by Judge Wolin were not of the judicial family in the sense that they were neither magistrate judges, law clerks, or special masters. As such, the Advisors were not subject to the constraints imposed upon judicial personnel, either through the Code of Conduct for United States Judges, the Code of Conduct for Judicial Employees, or Bankruptcy Rule 9003 ("Prohibition of Ex Parte Contacts"). We do not imply that because of their hybrid status as Advisors, that the Advisors breached any of the rules by which judicial personnel are bound. We cannot help but point out, however, that judicial personnel could not have undertaken or been engaged in positions or other functions at odds with their judicial position. We are obliged to look with disfavor upon appointment of personnel who have the access and influence with the judiciary that the Advisors had and yet are not constrained from accepting positions that conflict with their advisory duties. *See* Code of Conduct for United States Judges Canon 3 § (B)(2) (stating that "[a] judge should require court officials, staff, *and others subject to the judge's direction and control,* to observe the same standards of fidelity and diligence applicable to the judge") (emphasis added); *see also* Notes 4 and 18, *supra.*

Notwithstanding that § 455 does not contain an express timeliness requirement, the Courts of Appeals cases that have addressed the issue have concluded that parties seeking disqualification under § 455(a) should do so in a timely manner. *See, e.g., In re IBM Corp.,* 45 F.3d 641, 643 (2d Cir. 1995); *In re Apex Oil Co.,* 981 F.2d 302, 304 (8th Cir. 1992). The reason most often given for applying a timeliness requirement to recusal motions is that "[t]he judicial process can hardly tolerate the practice of a litigant with knowledge of circumstances suggesting possible bias or prejudice holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming." *Smith v. Danyo,* 585 F.2d 83, 86 (3d Cir. 1978). Yet timeliness, as the Court in *Danyo* stated, is but one of the factors which engages a court's discretion in determining whether a judge shall be relieved from its assignment. *Id.*

On remand, Judge Wolin concluded that the motions seeking his recusal were untimely under § 455(a). In reaching that holding, Judge Wolin charged that the Petitioners either knew or should have known about Gross and Hamlin's participation in *G-I Holdings* long ago, but waited until October 2003 to act on that information. Judge Wolin also questioned the Petitioners' true motivations for filing the recusal motions, claiming that they were not based on ethical considerations but were strategic maneuvers by the Petitioners calculated to gain a larger percentage of the bankruptcy estates,

either through a legislative solution or through delay.[21]

Judge Wolin and the parties opposing recusal have focused primarily on Mark Brodsky, the senior portfolio manager at Elliot Management, which provides services to Kensington's parent companies. Brodsky testified that he first learned about Gross and Hamlin's participation in *G-I Holdings* on September 24, 2003, a little more than two weeks before Kensington filed the first of the recusal motions. Brodsky testified that he acquired this knowledge from another Owens Corning creditor who brought to his attention an opinion issued in the *G-I*

Holdings bankruptcy. While reviewing that opinion, Brodsky noticed that Advisor Gross was listed as the counsel for the Futures Representative. This, in turn, prompted an investigation by Brodsky which disclosed Hamlin's role in *G-I Holdings*. Brodsky's claim that this was the first time he learned of Gross and Hamlin's participation in *G-I Holdings* is corroborated by a September 24, 2003 e-mail in which Brodsky expresses shock at Gross's involvement in *G-I Holdings*.

It is not surprising, therefore, that Judge Wolin in his written opinion found that Brodsky (or, for that matter, D.K. Acquisition Partners) did not have *actual* knowledge of Gross or Hamlin's participation in *G-I Holdings* prior to September 2003.[22] He did conclude, however, that they either had constructive or imputed knowledge prior to September 2003.

As we understand the phrase, constructive knowledge is "knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Black's Law Dictionary* 876 (7th ed. 1999). Judge Wolin implied that Brodsky had constructive knowledge of the Advisors' conflict because: (a) Hamlin's

---

[21] Congress has recently undertaken an attempt to improve the current asbestos litigation system. *See* 150 Cong. Rec. S4103-S4114 (daily ed. Apr. 20, 2004). Senator Hatch, Chairman of the Senate Judiciary Committee, has introduced Senate Bill 1125, the Fairness in Asbestos Injury Resolution Act ("FAIR" Act), which is designed to bring compensatory relief to those suffering from mesothelioma and asbestosis. If enacted in its current form, the bill would create for the benefit of asbestos victims a $114 billion fund under the auspices of a streamlined no-fault system. *See id.* Senator Frist has described this proposal as "a substantially better means of obtaining compensation than through bankruptcy trusts." *Id.* at S4105. Insurers and defendant companies for the most part support the bill.

---

[22] At the hearing which Judge Wolin held in January 2004, he stated, when questioned if he disbelieved Brodsky, "I don't disbelieve Mr. Brodsky as a matter of fact."

appointment as the Futures Representative and Gross's selection as local counsel in *G-I Holdings* was a matter of public record; (b) asbestos-related trade periodicals reported Hamlin and Gross's involvement in *G-I Holdings*; and (c) many of the attorneys involved in the Five Asbestos Cases knew about Hamlin or Gross's involvement in *G-I Holdings.* As Judge Wolin explained it, "Brodsky surrounded himself with a coterie of experienced and sophisticated lawyers who through even a modicum of effort would have unearthed Hamlin's and Gross's G-1 appointments."

We believe Judge Wolin improperly placed the burden on the Petitioners to uncover Gross and Hamlin's participation in *G-I Holdings.* Such a requirement does not further the purpose of § 455(a), which "mandates, at a minimum, the appearance of neutrality and impartiality in the administration of justice." *Alexander,* 10 F.3d at 157. In the recusal context, we are satisfied that if there is to be a burden of disclosure, that burden is to be placed on the judge to disclose possible grounds for disqualification. *See United States v. Bosch,* 951 F.2d 1546, 1555 n.6 (9th Cir. 1991) (noting that § 455(a) "has a de facto disclosure requirement."); *see also Parker v. Connors Steel Co.,* 855 F.2d 1510, 1525 (11th Cir. 1988) (recognizing that recusal motion could have been avoided if judge had disclosed grounds for recusal to parties).

As we stated in *United States v.*

*Schreiber,* 599 F.2d 534, 537 (3d Cir. 1979), "sound public policy considerations . . . militate for the adoption of a . . . rule that the parties should be apprised of any possible ground for disqualification known privately to the judge." The most compelling of these public policy considerations is that the judge is in the best position to know of the circumstances supporting a recusal motion. The Five Asbestos Cases are no exception.

The record in this case demonstrates that Judge Wolin knew about Gross and Hamlin's participation in *G-I Holdings* from or near the inception of Hamlin's appointment as the Futures Representative.[23] Moreover, at least one of the parties (USG Corp.) brought Hamlin's potential conflict to Judge Wolin's attention in February 2002, more than one-and-one-half years before Kensington filed its recusal motion.[24] It is

_____

[23] Gross submitted an affidavit which declared: "At all relevant times, Judge Wolin was aware of my representation of Mr. Hamlin in *G-I Holdings.*" This was corroborated by Hamlin, who testified at his deposition that he informed Judge Wolin at the outset that he was the Futures Representative in *G-I Holdings.*

[24] The record contains a stipulation signed by USG Corp.'s counsel which unequivocally states that USG Corp. learned in January 2002 about Hamlin's appointment in *G-I Holdings.* That same

undisputed, however, that Judge Wolin never disclosed to the parties, either on or off the record, that Gross and Hamlin were actively participating as zealous advocates in *G-I Holdings*.

There may be instances in which constructive knowledge is so pervasive that it is tantamount to actual knowledge, but this is not one of those instances. *See, e.g., Nat'l Auto Brokers Corp. v. Gen. Motors Corp.,* 572 F.2d 953, 958-59 (2d Cir. 1978) (finding that parties had constructive knowledge of judge's former affiliation with a large law firm located in same community); *Universal City Studios v. Reimerdes,* 104 F. Supp. 2d 334, 353 (S.D.N.Y. 2000) (same).[25]   The parties'

access to a burgeoning stream of information in the Five Asbestos cases does not naturally lead to the conclusion that they should have known about the participation of Hamlin and Gross in *G-I Holdings*.  We are persuaded that nothing short of actual knowledge of the facts giving rise to the recusal motions and the Petitions for Mandamus would satisfy the § 455(a) timeliness factor here.

In addition to relying on *constructive* knowledge, Judge Wolin found that the Petitioners had *imputed* knowledge of Gross and Hamlin's participation in *G-I Holdings*. "Imputed knowledge" means that knowledge attributed to one person may be deemed to give notice to another party.

We agree with Judge Wolin that imputed knowledge can, under limited circumstances, render a recusal motion untimely.  For example, when a party's attorney is aware of the grounds supporting recusal, but fails to act until the judge issues an adverse ruling, the recusal motion is not timely  *See, e.g., E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1295 (9th Cir. 1992) (denying as untimely motion for disqualification where party's attorney knew about alleged conflict but did not file motion until after judgment was entered against him).  Aside from the fact that the attorney is only one step removed from the client, the attorney and client have an agency relationship and

---

month, Judge Wolin issued an order appointing Hamlin to serve as a Special Master in the USG Corp. bankruptcy. Although USG Corp. acquiesced to that appointment, it wrote Judge Wolin a letter expressing its concern that "an unsatisfied party" might later try to overturn an approved plan of reorganization by claiming that Hamlin was conflicted.

[25]   The parties opposing recusal have directed our attention to *In re Allied-Signal, Inc.,* 891 F.2d 967 (1st Cir. 1989), wherein the Court of Appeals for the First Circuit affirmed a district court judge's decision not to recuse himself based in part on constructive knowledge.  It is important to note, however, that this observation was not made in the context of a timeliness determination under § 455(a), but rather on assessment of the

merits.

therefore any facts known by the attorney may generally be imputed to the client. *See* Restatement (Second) of Agency § 9(3) (1958) ("A person has notice of a fact if his agent has knowledge of the fact . . . .").

We do not, however, agree with Judge Wolin that the recusal motions in the Five Asbestos Cases present an appropriate avenue for imputing knowledge to the Petitioners. There are simply "too many dots that must be connected" before the Petitioners can be deemed to have known about Gross and Hamlin's participation in *G-I Holdings.* For example, Judge Wolin determined that knowledge could be imputed to Kensington through the law firm of Davis Polk & Wardwell, which is lead counsel for the Unsecured Creditors Committee in the Owens Corning bankruptcy. A Davis Polk partner testified that he received an e-mail in October 2001 disclosing Hamlin's appointment in *G-I Holdings.* Judge Wolin concluded that this constituted notice to the Petitioners in Owens Corning because the Unsecured Creditors Committee and Davis Polk owed a fiduciary duty directly to Kensington.

While it is true that the Unsecured Creditors Committee in Owens Corning represented Kensington's interests in the Owens Corning bankruptcy, it is established that a Creditors Committee owes a fiduciary duty to the unsecured creditors as a whole, not to the individual members. *See Drexel Burnham Lambert Group,* 138 B.R. 717, 722 (Bankr.

S.D.N.Y. 1992) ("The duty [of the committee and its counsel] extends to the class as a whole, not to its individual members."); *In re Levy,* 54 B.R. 805, 807 (Bankr. S.D.N.Y. 1985) ("Counsel for the creditors' committee do not represent any individual creditor's interest in this case; they [are] retained to represent the entire unsecured creditor class."). So while the Committee had a duty to represent the collective interests of the unsecured creditors, it did not have the authority to bind each individual creditor. This stands in stark contrast to the attorney-client relationship we discussed above.

In looking at the issue of timeliness through the lens of imputed knowledge, we find that the record in this case discloses facts that are too far removed and far too attenuated from the concept of knowledge that would cause a party to take action to vindicate their interest. We have pursued the trail of imputed knowledge that the record has laid out before us, and we are satisfied that the knowledge allegedly imputed could not have led any of the participants to the point where they could be deemed to have "known" about the conflict of the Advisors. If connecting the dots could not have led to such a conclusion, then it is evident to us that in order to sustain the principles of § 455(a), where a judge's impartiality may appear to be questioned, we must require actual knowledge (or its undeniable equivalent) to be shown. Because the Petitioners in Owens Corning and W.R. Grace & Co. did not have actual knowledge of the conflict of the Advisors

which we have discussed and which the record discloses, we hold that the motions seeking Judge Wolin's recusal under § 455(a) were timely.

### G. *Disqualification Under § 455(b)(1)*

We express no view on the timeliness of the motions for disqualification under § 455(b)(1). As mentioned above, the Petitioners also seek Judge Wolin's disqualification under § 455(b)(1) on the basis of his *ex parte* communications with the Advisors, parties, and attorneys. Because we have determined that Judge Wolin must be disqualified under § 455(a), there is no need to reach the issues of timeliness or the merits of § 455(b)(1). *See School Asbestos*, 977 F.2d at 781 (declining to reach § 455(b)(1) issue where disqualification was warranted under § 455(a)). Section 455(b)(1) is embraced within the perception that a reasonable person might entertain that the judge's impartiality might reasonably be questioned.[26]

### VI. USG Debtors and the Official Committee of Unsecured Creditors (collectively, "USG")

As we previously indicated, USG

---

[26] Because we are not addressing disqualification under § 455(b)(1), we express no view as to whether the claims made by the Petitioners relying on § 455(b)(1) require disqualification.

stands in a different posture than does Kensington or D.K. Acquisition Partners insofar as Judge Wolin's disqualification is concerned. The record reveals, with no uncertainty, that Kensington and D.K. Acquisition Partners did not have actual knowledge of the Advisors' conflict until September and October 2003, respectively, and that they filed motions seeking Judge Wolin's disqualification weeks later.

On the other hand, USG became aware of the Advisors' conflict in January 2002. *See* Note 25, *supra*. It did not take any action, however, until after the motions filed by Kensington and D.K. Acquisition gave rise to a similar motion by USG. We assume this is the reason why USG's motion (and ensuing Petitions for Mandamus) focused principally on § 455(b)(1) and the *ex parte* communications that Judge Wolin had with the Advisors, the parties, the attorneys, and others. We will not speculate, however, on this score because USG's Petitions were also couched in terms of § 455(a) and dealt as well with the Advisors' conflict which we have discussed in connection with the Kensington and D.K. Acquisition Partners Petitions.

If timeliness turned solely on "actual knowledge" and constituted the only factor we could consider in deciding whether to reach the merits of a recusal motion, we might well have second thoughts about relieving Judge Wolin of his assignment over the USG Corp.

bankruptcy. But as we explained earlier in this opinion, timeliness is just one of the factors—albeit a significant one—which engages our discretion in determining whether another judge should be assigned to oversee the USG Corp. bankruptcy. *See Danyo*, 585 F.2d at 86.

As the *Danyo* Court noted and as we have recounted, "[t]he judicial process can hardly tolerate the practice of a litigant with knowledge of circumstances suggesting possible bias or prejudice holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming." *Id.* at 86. The *Danyo* Court went on to caution circumspection by stating "[b]ut especially when the circumstances giving rise to the charge of bias occur or are discovered after the case has commenced, timeliness should be measured *not in some absolute and arbitrary manner from the date of discovery, but with respect to the future stages of the case.*" *Id.* at 86 (emphasis added). *Danyo* then instructs us that we are to consider an appropriate accommodation between the competing institutional interest in avoiding the appearance of impropriety, on the one hand, and avoiding the abuse of § 455(a) procedure, on the other. *Cf. id.*

The record informs us that the USG debtors had one meeting with Judge Wolin in early 2002. At the time that it filed its motion to recuse Judge Wolin, it had received but one ruling in all the intervening time, and that ruling was a

decision that favored it.[27] As USG's Unsecured Creditors Committee has argued, § 455(a) contains no explicit timeliness requirement and "the seriousness of the grounds for recusal that exist on this record far outweighs any significance that might exist on the date the Motion was filed."[28] If, as USG claims, public policy is the polestar to which we must look, it is these concerns of public policy that are implicated in USG's Petitions.

First, Judge Wolin had issued just one adverse ruling at the time that USG's motion was filed and, as mentioned, this ruling was favorable to USG. As both the USG Committee and USG Debtors have taken pains to point out, Judge Wolin has issued no substantive rulings in their case at all, other than the one ruling which we have just recounted. Moreover, the Motions to Recuse filed by USG were filed only after the Owens Corning

----

[27]  On February 19, 2003, Judge Wolin issued a case management order instructing the USG Debtor to propose a bar date for asbestos cancer claimants and proof of claim form. This ruling had been opposed by the asbestos claimants.

[28]  Brief of Petitioner the Official Committee of Unsecured Creditors of USG Corporation, et al. in Support of Petitions for a Writ of Mandamus (citing *In re Edgar*, 93 F.3d at 257 (noting that "passage of time is not conclusive if the justification for disqualification is compelling")).

Petitioners and the W.R. Grace Petitioners had filed theirs. It is of interest to note that insofar as the Petitions seeking disqualification of Judge Wolin, none of them seeks to overturn any of his prior rulings. Rather, the recusal proceedings are concerned only with his continuing into the "future stages"of these cases.

USG seeks Judge Wolin's recusal because, as we have been made aware during the discovery that took place after our first hearing, the Advisors billed their fees equally to each of the Five Asbestos Cases on the theory that the issues concerned each case equally. There is, therefore, some logic in USG's argument that it should be entitled to the same remedy which we have decided is necessary in Owens Corning and W.R. Grace.

We are not disposed to have the issue of timeliness trump what we have concluded are the principles of § 455(a), even though the record discusses no improper acts by Judge Wolin. In light of the record that has been developed, and in light of the factors which have been outlined in *Danyo*, *supra,* and their application to USG, we are satisfied that, in the unique context of this case, it is appropriate for us to disqualify Judge Wolin from administering the USG bankruptcy, just as we have disqualified him from administering the Owens Corning and W.R. Grace bankruptcies.

## VII.

We would be remiss if we did not close this opinion, which concerns Senior District Judge Alfred M. Wolin, with thoughts that were so ably expressed years ago by our colleague, Senior Judge Ruggero J. Aldisert. Judge Aldisert wrote for the Court in *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 98 (3d Cir. 1992), a case which required the reassignment of another distinguished District Court Judge. The Court held in *Haines* that Judge Sarokin, the district court judge who had to be reassigned, had exhibited the "appearance of partiality" in presiding over an action against the Tobacco Industry. We take the liberty of repeating verbatim Judge Aldisert's words as they appeared in the *Haines* opinion because they are so appropriate and relevant here:

> The right to trial by an impartial judge "is a basic requirement of due process." *In re Murchison,* 349 U.S. 133, 136, 75 S. Ct. 623, 625, 99 L. Ed. 942 (1955). To fulfill this requirement—and to avoid both bias and the appearance of bias—this court has supervisory authority to order cases reassigned to another district court judge. *Lewis v. Curtis,* 671 F.2d 779, 789 (3d Cir.), *cert. denied,* 459 U.S. 880, 103 S. Ct. 176, 74 L. Ed.2d 144 (1982). Therein we stated:

Impartiality and the appearance of impartiality in a judicial officer are the sine qua non of the American legal system. In *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 89 S. Ct. 337, 340, 21 L. Ed.2d 301 (1968), the United States Supreme Court stated: "[A]ny tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias."

671 F.2d at 789. *See also Nicodemus v. Chrysler Corp.,* 596 F.2d 152, 157 (6th Cir. 1979); *United States v. Robin,* 553 F.2d 8, 10-11 (2d Cir. 1977) (en banc) (per curiam). Reassignment is appropriate to "preserve not only the reality but also the appearance of the proper functioning of the judiciary as a neutral, impartial administrator of justice." *United States v. Torkington,* 874 F.2d 1441, 1447 (11th Cir. 1989).

The district judge in this case has been a distinguished member of the federal judiciary for almost 15 years[29] and is no stranger to this court; he is well known and respected for magnificent abilities and outstanding jurisprudential and judicial temperament. On the basis of our collective experience, we would not agree that he is incapable of discharging judicial duties free from bias or prejudice. Unfortunately, that is not the test. It is not our subjective impressions of his impartiality gleaned after reviewing his decisions these many years; rather, the polestar is "[i]mpartiality and the appearance of impartiality."

*Haines,* 975 F.2d at 98.

## VIII. CONCLUSION

We conclude as follows:

The Kensington, D.K. Acquisition Partners, and USG Corp. Petitioners have demonstrated a clear and indisputable right to have the Writs of Mandamus

---

[29] Judge Wolin has been a federal district court judge for seventeen years. Prior to joining the federal judiciary, he served as a judge on the County District Court and Superior Court of New Jersey for seven years.

issue. The record reveals that the Advisors' conflict, which cannot at this stage be disassociated from Judge Wolin as well as the *ex parte* meetings that the Advisors and Judge Wolin participated in, reveal an abuse of discretion that requires disqualification. If these circumstances were revealed to a reasonable person, it would undoubtedly lead to a perception that Judge Wolin's impartiality might be seriously questioned.

As to Kensington, D.K. Acquisition Partners, and USG Corp., who have asked us to issue a Writ of Mandamus disqualifying Judge Wolin from further presiding over the Owens Corning, W.R. Grace & Co. and USG Corp. bankruptcies, we will grant their request.

We will take no action at this time with respect to the Armstrong World Industries, Inc. bankruptcy, but will schedule appropriate briefing and argument on the Petition for Mandamus filed by the Official Committee of Unsecured Creditors of Armstrong World Industries, Inc.

We will take no action in the Federal-Mogul Global, Inc. bankruptcy, leaving its administration with Judge Wolin.

We will vacate any and all stays that we previously imposed on the District Court and Bankruptcy Court proceedings, so that the matters pending or to be brought before the District and Bankruptcy Courts may be resumed.

Because Judge Wolin, a United States District Court Judge from the District of New Jersey, was appointed in the District of Delaware as Coordinator of Case Management for the Five Asbestos Cases by the then-Chief Judge of this Court (Senior Judge Edward R. Becker), we deem it appropriate to file this Opinion and Writ of Mandamus with the present Chief Judge of this Court (Judge Anthony J. Scirica) for either appointment or reassignment of the Owens Corning, W.R. Grace & Co. and USG Corp. bankruptcies to another judge within the Third Circuit pursuant to 28 U.S.C. § 292(b).[30]

*In re Kensington Int'l Ltd.*

Nos. 03-4212, et al.

FUENTES, *Circuit Judge*, dissenting.

In November 2001, then-Chief Judge Becker of this Court ordered the consolidation of the Five Asbestos Cases on the grounds that "these bankruptcy cases, which carry with them tens of thousands asbestos claims, need to be consolidated before a single judge so that

---

[30]  28 U.S.C. § 292(b) provides: "The chief judge of a circuit may, in the public interest, designate and assign temporarily any district judge of the circuit to hold a district court in any district within the circuit."

a coordinated plan for management can be developed and implemented." JA at 191. Judge Becker stressed the magnitude of this task, noting that because "a significant portion of the asbestos cases in this country are proceeding under the aegis of this litigation, I deem this assignment and consolidation critically important to the administration of justice." Id. at 191-92. Judge Wolin accepted this Court's mandate and immediately set himself to the task of managing this unprecedentedly large asbestos bankruptcy litigation. My colleagues, disapproving of the manner in which Judge Wolin executed his mandate, have decided that he must be recused.

I disagree with this conclusion for several reasons. First, I cannot concur that a reasonable observer would perceive any appearance of partiality on the part of Judge Wolin: specifically, I do not agree that the Advisors labored under any sort of conflict, nor do I perceive Judge Wolin's practice of *ex parte* communications to warrant his recusal. I find it telling that Petitioners have not asked, and the majority has not seen a need, for any of Judge Wolin's prior rulings to be disturbed. In my view, this fact belies the seriousness of the taint that Petitioners have sought to ascribe to Judge Wolin's court. Second, the petitions for recusal in this case are clearly untimely, and should be rejected on that basis alone. Accordingly, I must respectfully dissent from my colleagues' decision to recuse Judge Wolin.

**I.**

**A.**

First, I must disagree with my colleagues' conclusion that Gross and Hamlin had a conflict of interest. The majority discerns that "Gross and Hamlin, did, in fact, operate under a structural conflict of interest" arising "from the dual roles they played in the Five Asbestos Cases and the G-I Holdings bankruptcy." Maj. Op. at 18. The majority agrees with Petitioners that Gross and Hamlin are conflicted by their futures representative roles because the issues in G-I overlap to such a great degree with those in the Five Asbestos Cases. Specifically, the majority writes: "By their very position as representatives of the future asbestos claimants in G-I Holdings, Gross and Hamlin signaled to all that they could not be non-partisan, benign or neutral." Maj. Op. at 19.

There is no doubt, as the Supreme Court recognized long ago, that "[c]ourts have (at least in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their duties. This power includes authority to appoint persons unconnected with the court to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause." In re Peterson, 253 U.S. 300, 312 (1920) (Brandeis, J.) (internal citations omitted). Although "there is no statute which expressly authorizes" the appointment of the Advisors in this case, "the court possesses the inherent power to supply itself with this instrument for the administration of

justice when deemed by it essential."[31]  Id.
The Advisors may well have been
extraordinary and unprecedented
appointments in this asbestos bankruptcy
proceeding, but this is a case of
extraordinary and unprecedented
complexity and magnitude. In that light, I
cannot agree that a reasonable observer,
with knowledge of all of the relevant facts,
would discern their role as creating any
appearance of partiality.

To see why this is true, one need
only look at the role of a futures
representative in asbestos bankruptcy
litigation.   In an asbestos bankruptcy
proceeding, all present and future asbestos
claims are steered away from the bankrupt
debtor and applied to a properly funded
trust approved by the bankruptcy court.
Present asbestos litigants are those who
suffer asbestos-related injury before the

debtor-defendant's Chapter 11
reorganization plan is confirmed, while
future claimants are those who do not
manifest any injury until after the plan is
confirmed. Because asbestosis symptoms
can take an extremely long time to
manifest themselves, and because the
whole point of Chapter 11 proceedings is
to give the debtor finality as to pre-
bankruptcy liabilities, future claimants are
given their own "futures representative."
This representative is charged with
representing the interests of future
claimants, i.e., by maximizing their share
of the trust corpus.  Much like unnamed
class members are bound to the results of
a class action, a future claimant is bound
by the resolution to which his or her
representative agrees.   By definition,
future claimants are unidentified during
the plan process, so the futures
representative does not have any concrete
clients, only a nebulous "client" comprised
of latent future interests.

Consequently, Gross and Hamlin do
not have any clients in G-I, nor will they
have any clients by the point at which their
job in G-I is finished: their duty is to
promote the collective interest of those
parties that will have future claims against
the G-I post-confirmation trust. In other
words, Gross and Hamlin are charged with
safeguarding future claimants' "cut" of the
G-I trust.  This duty does not place Gross
and Hamlin in a materially adverse
position to the estates in the Five Asbestos
Cases, nor does it give them a direct
interest in manipulating those estates in
any way.  See In re Marvel Entertainment

---

[31] The Advisors appointed by Judge
Wolin were: 1) William Dreier, a retired
New Jersey appellate judge and products
liability expert; 2) David Gross, a New
Jersey lawyer and mediator who had
previously served as counsel for both
asbestos plaintiffs and defendants; 3) C.
Judson Hamlin, a retired New Jersey
Superior Court judge who had managed all
asbestos litigation in New Jersey for a
number of years; 4) John Keefe, a retired
New Jersey appellate judge who had
managed all asbestos litigation in New
Jersey for a different period of time; and 5)
Francis McGovern, a Duke University law
professor with his area of expertise in mass
tort litigation.

Group, Inc., 140 F.3d 463, 476 (3d Cir. 1998) ("one is a 'disinterested person' only if he has no interest that is materially adverse to a party in interest in the bankruptcy").

Petitioners' failure to point out any interest held by Gross or Hamlin is unsurprising, given that they do not represent any of the parties in the Five Asbestos Cases. While there may be some overlap among those who eventually share in the money set aside for future claimants in the Five Asbestos Cases and those who share in the money set aside for future claimants in G-I, the "parties" themselves—the future claimant interests—are distinct. The clear distinction between the futures claimants in G-I and those in the Five Asbestos Cases is highlighted by the facts that future claimants in the Five Asbestos Cases could be present claimants in G-I or vice versa, and that Gross and Hamlin will not even know which claimants fall into which category until their roles are concluded.

Moreover, the *subject matters* of the cases are entirely different. As observed before, the G-I litigation is a dispute over how to divide the assets of the G-I trust. Similarly, each of the Five Asbestos Cases is a dispute over how to divide the assets of the trust of one of the five debtors. In other words, the money at stake in G-I has no relation whatsoever to the money at stake in any of the Five Asbestos Cases, and the responsibility held by Gross and Hamlin to maximize future G-I asbestos claimants' share of the *G-I trust* presents no duty with respect to the

division of the trusts in the Five Asbestos Cases.

Despite the total lack of commonality among the parties and subject matter in G-I and the Five Asbestos Cases, the majority perceives the appearance of a conflict because, as an asbestos bankruptcy case, G-I contains similar issues to those in the Five Asbestos Cases.[32] In my view, this simply cannot constitute grounds for a reasonable, fully informed observer to perceive a conflict, and the majority does not explain why it would constitute such grounds. It is true that decisions from Judge Wolin benefitting future claimants in the Five Asbestos Cases might benefit the G-I future claimants, but this does not make Gross and Hamlin non-neutral as Judge Wolin's Advisors. Any person with expertise in a given field invariably forms opinions about that field. For example, judges are empowered to appoint attorneys as experts. It is almost certain that an expert attorney will have opinions about

---

[32] The majority contends that Hamlin and Judge Wolin implicitly conceded a conflict when they stated that Hamlin would have had to recuse himself from any assignment in the Five Asbestos Cases dealing too closely with G-I. Maj. Op. at 19. A reasonable observer, however, would not view Hamlin's and Judge Wolin's cautious statement about self-recusal in hypothetical situations as an admission that a structural conflict actually existed, or even that recusal would be *mandatory* in those hypothetical situations.

the matters within his or her expertise. Accordingly, it is possible, if not probable, that the attorney will have opinions about the merits of the case for which he or she is called. Furthermore, it is also possible, if not probable, that the practice upon which the attorney built his or her expertise will contain clients that would be benefitted by the judge's ruling in a certain way. These are just natural consequences of the attorney being an expert in his or her field, but would not cause the reasonable observer to demand the judge's recusal because the attorney is "conflicted." Similarly, a judge would obviously not have to recuse himself from all criminal cases if his law clerk was committed to working for the Federal Defender after his or her clerkship. Although the law clerk would arguably have an incentive to promote pro-defendant precedent, no reasonable observer would demand that the judge screen off the law clerk from all criminal cases.

In short, there is no colorable basis for perceiving Gross and Hamlin to be "non-neutral." They do not represent any parties in the Five Asbestos Cases, they do not directly represent any interest materially adverse to any of those parties, and the subject matter of their representation is wholly separate from the subject matter of the Five Asbestos Cases. At most, Petitioners have shown that Gross and Hamlin have opinions about the subject matter in front of them as a result of their knowledge of asbestos litigation, but strong opinions about the law are to be expected in any well-educated and well-

informed judicial advisor (or judge). The majority gleans an appearance of conflict from the mere existence of similarities between the Five Asbestos Cases and G-I, but a reasonable observer *with knowledge of all relevant facts*[33] would easily pierce through these superficial similarities and conclude that there is no conflict.

### B.

Because I find that Gross and Hamlin were not conflicted by their roles in G-I, I find it necessary to briefly discuss Petitioners' other allegations of conflict. The second purported conflict is the attendance by Gross, Hamlin and McGovern at the futures representatives' meetings. Petitioners assert that because the meetings included futures

---

[33] The majority correctly observes that the reasonable person envisioned by § 455(a) is a lay person, not a member of the asbestos bar. However, even if the District Court's description of the reasonable person was technically wrong, the practical import of this mistake was minimal. As respondents observe, the "reasonable observer" in recusal cases must still have "*knowledge of all the facts*." In re Kensington Int'l Ltd., 353 F.3d 211, 220 (3d Cir. 2003) (emphasis added). Thus, although the reasonable person is a lay person, the observer with which the Court is concerned is a lay person with complete knowledge of the demands and intricacies of asbestos bankruptcy litigation, as well as the actual events that transpired in the District Court.

representatives for the Five Asbestos Cases and had as their goal the promotion of future claimants' interests in the planning of upcoming legislation, the neutrality of the three Advisors was compromised. Attendance at a conference or meeting where a particular point of view is advocated or dominates the discussion, however, does not by itself create a reasonable question as to a judge's impartiality. United States v. Bonds, 18 F.3d 1327, 1330-31 (6th Cir. 1994). Going to such a conference creates no more of an appearance of bias than reading a law review article or book with the same viewpoint. Id. at 1330-32.

In Bonds, the criminal defendants appealed a conviction based largely on challenged DNA evidence, and then moved for rehearing *en banc* after losing the appeal. Id. at 1328. The defendants unsuccessfully sought the recusal of an appellate judge from the *en banc* panel because that judge had attended a scholarly conference in which the speakers vigorously defended the FBI's DNA methods and denigrated defense counsel challenging those methods. Id. at 1329. In refusing to grant the recusal motion, the Bonds court specifically distinguished In re School Asbestos Litig., 977 F.2d 764, 782 (3d Cir. 1992), on the grounds that the conference in the latter case was actually funded by the judge in that case, and provided a pre-screening of the plaintiffs' case on the actual facts of the case. 18 F.3d at 1330-31. This case has neither of these salient attributes, as there is no evidence that the actual facts of the Five

Asbestos Cases were spun in any particular light to the Advisors. This case is therefore more like Bonds than School Asbestos.

Petitioners' final three grounds of conflict are also unpersuasive. First, Petitioners' argument that Gross's advocacy for the Keene Creditors Trust created a conflict fails for the same reasons that he and Hamlin were not conflicted by their roles in G-I. Second, Petitioners allege that after Gross and McGovern acted as mediators, they divulged confidential information gathered in that capacity from the parties to Judge Wolin, and that this constituted an ethical breach of their mediator duties. The record indicates that Gross made some reports of his mediation discussions to Judge Wolin, and that McGovern did, in fact, report to the Advisors and Judge Wolin that the parties to an earlier mediation in Owens Corning disagreed on the extent of Owens Corning's tort liability, estimating it to be anywhere from $6 to $20 billion.[34] Furthermore, McGovern has testified that disclosures of the mediation's substance, even to the decisionmaker in the case, are an ethical breach.

At most, Petitioners have shown that McGovern and Gross may have breached their ethical duties as mediators;

---

[34] Petitioners contend that this account is verified by Dreier's notes, but Dreier's penmanship makes this impossible to confirm. JA at 3122-35.

however, Petitioners have not shown any way in which this purported breach would actually constitute a conflict or an appearance of partiality on Judge Wolin's part.  Petitioners have no evidence that the mediations' substance was conveyed to Judge Wolin in a manner that would bias him in the Five Asbestos Cases.  Indeed, as Judge Wolin has pointed out in his opinion, the total amount of Owens Corning's liability was not the key settlement issue in the case; rather, because the bankruptcy dispute is over the distribution of the pie rather than its size, the truly sensitive information in this case would be the parties complicated claims as to their shares of the estate.

Finally, Petitioners contend that Hamlin's nomination as a futures representative in <u>Grace</u> created a conflict, and that Hamlin admitted as much. Hamlin, of course, merely observed that *if* he became the futures representative in <u>Grace</u>, he would have to leave his Advisor position.  Hamlin's observation, in fact, highlights why his role in <u>G-I</u> did *not* create a conflict here: as a <u>Grace</u> futures representative, he would be fighting with other creditors of Grace over the proper distribution of the Grace estate. As a <u>G-I</u> futures representative, in contrast, he has no direct interest in the division of the Grace estate.  In conclusion, for the reasons stated above, none of Petitioners' arguments that a conflict existed is persuasive.

### C.

The majority also comments that

Judge Wolin's practice of *ex parte* communications contributed to an appearance of partiality: "If the structural conflicts of interest gave Gross and Hamlin a motive to give Judge Wolin less-than-neutral advice, it was the *ex parte* meetings that gave them the opportunity." Maj. Op. at 29.  Of course, if there were no conflict to begin with, then Judge Wolin's *ex parte* conferences with his Advisors were no more objectionable than any judge's *ex parte* communications with his or her law clerks.  Thus, the *ex parte* communications with the Advisors clearly did not provide any independent grounds for recusal.

While I share my colleagues' wariness of the scope of Judge Wolin's *ex parte* contacts with the parties, I do not find those contacts disturbing to the point of requiring his recusal under § 455(a). Petitioner USG's brief implies that *ex parte* contacts in themselves cause a judge's impartiality to be reasonably questioned.  This blanket indictment of *ex parte* communications is belied by caselaw in both this Circuit and others.  <u>In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions</u>, 278 F.3d 175, 182, n. 5 (3d Cir. 2002) (stating that "any reasonable attorney would have understood that Judge Wolin could permissibly engage in *ex parte* communication in a complex class action" and noting recusal movant's concession that premising his motion on Judge Wolin's *ex parte* contacts was baseless) (internal quotations omitted); <u>Aiken County v. BSP Div. of Envirotech Corp.</u>,

866 F.2d 661, 679 (4th Cir. 1989) (recusal inquiry based on *ex parte* contacts must take all circumstances of contact into account).

Indeed, contrary to USG's arguments, cases ordering recusal on the basis of *ex parte* contacts did so based on the contacts' specific circumstances, not as part of some general rule against *ex parte* contacts. In United States v. Kelly, 888 F.2d 732, 745 (11th Cir. 1989), for example, the Eleventh Circuit recused the judge in question because the judge communicated *ex parte* with a friend's wife regarding the friend's decision to testify; indeed, the judge himself conceded the appearance of impropriety. Similarly, the School Asbestos court recused a trial judge who, *in his personal capacity*, had unwittingly attended a conference sponsored by the plaintiffs in his case on the very topics central to his case, funded by money he had approved for plaintiffs' fund. School Asbestos, 977 F.2d at 781-82. In that case, we ruled that *all* of those facts in concert, combined with the judge's own recognition of a possible taint, warranted recusal. Id. at 782-83. In other words, the *ex parte* contacts in those cases possessed attributes that made them specifically vulnerable to allegations of bias.

In trying to analogize to these cases, USG makes much of the large number of *ex parte* contacts in this case, but does not cite to any caselaw that indicates that the *quantity* of contacts is a factor in determining recusal. Rather, as indicated above, courts ordering recusal examined the *qualitative* circumstances of the contacts and their consequences in making their decisions. In this case, Judge Wolin made his practice of using *ex parte* communications widely known at the outset of the bankruptcy proceedings, and the record indicates that while every single party did not participate, there was no favoritism given to any particular bloc of interests. JA at 1854-70. The only suspicious circumstance alleged by USG is that Judge Wolin issued a Case Management Order favoring USG's position on setting a bar date, had numerous *ex parte* contacts with asbestos claimants' counsel, and then "retreated" from enforcing the Case Management Order. However, the Case Management Order itself was not binding, but explicitly described itself as a proposal that was subject to comment by all interested parties, after which it might not be executed. JA at 286. In conclusion, there is nothing about the *ex parte* communications in this case to warrant recusal.

### D.

Because I would reject Petitioners' § 455(a) challenge, I reach the §455(b)(1) challenge as well, and conclude that the *ex parte* communications here do not warrant recusal under § 455(b)(1). In relevant part, 28 U.S.C. § 455(b)(1) demands a judge's recusal when "he has . . . personal knowledge of disputed evidentiary facts concerning the proceeding." Accord Kensington, 353 F.3d at 219, n. 6. Canvassing caselaw from various jurisdictions, Judge Wolin held that the

46

proscribed knowledge in § 455(b)(1) does not include information gained *ex parte* within a judicial proceeding, generally known facts, opinions on broad topics formed outside the courtroom, or irrelevant facts. Rather, the District Court concluded, § 455(b)(1) mandates recusal if and only if "a specific, disputed fact at issue in the case was within the judge's prior, non-judicially acquired knowledge." JA at 104. Petitioners argue that *ex parte* contacts are almost entirely forbidden by §455(b)(1). Respondents counter that the District Court's standard was basically correct, and that § 455(b)(1) recusal is only triggered if a judge gains information on a disputed evidentiary fact outside of judicial proceedings, or if he shows actual bias.

As discussed above, case law in this Court casts doubt on Petitioners' sweeping indictment of *ex parte* communications. See In re Prudential, 278 F.3d at 182, n. 5. Furthermore, other Circuits unanimously support Respondents' contention that §455(b)(1) recusal requires the "personal knowledge" to have its source *outside* of the matter over which the judge is presiding. Bogosian v. Woloohojian, 158 F.3d 1, 11 (1st Cir. 1998) (information gained by judge "acting in a judicial capacity . . . was not 'personal' knowledge raising a recusal question"); Conkling v. Turner, 138 F.3d 577, 592-93 (5th Cir. 1998) (same); Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse–Wisc., Inc., 991 F.2d 1249, 1255-56 (7th Cir. 1993) (same); Hale v. Firestone Tire & Rubber Co., 756 F.2d 1322, 1329 (8th Cir. 1985) (same); United States v. Bailey, 175 F.3d 966, 969 (11th Cir. 1999) (same); In re Beard, 811 F.2d 818, 829, n. 16 (4th Cir. 1987) (knowledge acquired by judge through *ex parte* communication did not fall under § 455(b)(1) because it was acquired during "the course of his judicial duties"); United States v. Yousef, 327 F.3d 56, 170 (2d Cir. 2003) (same); United States v. Flowers, 818 F.2d 464, 468-69 (6th Cir. 1987) (recusal not warranted where "all the information the judge acquired about the case arose from his association with the proceeding"); In re Grand Jury 95–1, 118 F.3d 1433, 1438 (10th Cir. 1997) (information must be obtained outside course of judicial proceeding, such as "by witnessing the events at issue in the proceeding") (internal quotations omitted).

The Circuits also seem to agree with Respondents that recusal is only appropriate under § 455(b)(1) when the knowledge gained is pertinent to a specific disputed fact at issue in the case before the judge. United States v. DeTemple, 162 F.3d 279, 285 (4th Cir. 1998) (judge's knowledge of facts gained by representation of one of defendant's prior creditors did not require recusal because none of those facts was "a disputed evidentiary fact in the criminal trial"); United States v. Smith, 210 F.3d 760, 764 (7th Cir. 2000) (judge's extrajudicial knowledge that anhydrous ammonia is a dangerous substance did not justify recusal from sentencing defendant even though danger posed by anhydrous ammonia was material fact at issue because danger posed

was not in dispute). This Court has agreed that the "disputed evidentiary facts" described in § 455(b)(1) are "matters underlying the cause of action." Plechner v. Widener College, Inc., 569 F.2d 1250, 1263 (3d Cir. 1977).

Petitioners' attempts to establish a per se rule requiring recusal for *ex parte* communications are unavailing. For example, they cite to Price Bros. Co. v. Philadelphia Gear Corp., 629 F.2d 444, 446 (6th Cir. 1980), but that case was not a recusal case, and dealt with a judge whose law clerk gathered facts through first-hand observation of the allegedly defective pipe at the heart of the lawsuit; in other words, the judge gained extrajudicial knowledge regarding a disputed fact at the heart of the litigation. The Price Bros. court explicitly stated, however, that "not every ex parte communication to the trial court" is impermissible. Id. Similarly, United States v. Craven, 239 F.3d 91 (1st Cir. 2001), cited by USG, is not a recusal case either, and also stated "that not every ex parte contact between a judge and a court-appointed expert" is improper. Id. at 103, n. 3. Petitioners do cite a recusal case, Hathcock v. Navistar Int'l Transp. Co., 53 F.3d 36, 41 (4th Cir. 1995), but in that case the judge was recused on § 455(a) grounds because he had plaintiff's counsel draft an opinion for him without informing opposing counsel.

The precedent most strongly urged by Petitioners as persuasive in this case is Edgar v. K.L., 93 F.3d 256 (7th Cir. 1996), but even that case does not stand for the broad proposition that any information gained by the judge outside the adversarial process (i.e., *ex parte*) mandates recusal. Rather, in Edgar the recused judge sent a panel of appointed experts to personally inspect the conditions of an Illinois mental health facility that was found to be constitutionally infirm. Id. at 257. In other words, the Edgar judge's officers obtained first-hand knowledge of disputed evidentiary facts at the heart of the case, and that circumstance squarely fits within the requirements for recusal outlined by Judge Wolin in his opinion.

Petitioners' final attempt to create an unconditional nexus between *ex parte* communications and recusal lies in a reference to the Code of Judicial Conduct, which cautions against *ex parte* communications. Code of Conduct for United States Judges, 175 F.R.D. 363, Canon 3(A)(4). However, the Code tellingly leaves out *ex parte* communications in its listing of grounds for disqualification, refuting Petitioners' claim that the Code endorses recusal based on *ex parte* contacts. Id. at Canon 3(C). Furthermore, although the Code was largely codified in 28 U.S.C. § 455, see Ausherman v. Bank of Am. Corp., 216 F.Supp.2d 530, 531 (D. Md. 2002), "violations of the Code do not necessarily give rise to a violation of" that statute. Andrade v. Chojnacki, 338 F.3d 448, 459 (5th Cir. 2003). Indeed, as Respondents point out, the fact that Congress codified so much of the Code but *did not* codify the prohibition on *ex parte* communications evinces a Congressional judgment that *ex*

48

*parte* communications do not warrant recusal per se. In short, *ex parte* communications must give the judge information on a *specific disputed material fact gleaned from outside the judiciary process* to warrant recusal under § 455(b)(1).[35]

Petitioners fail to show that Judge Wolin gained any "personal" knowledge from outside judicial proceedings, as all of the *ex parte* contacts in this case were conducted within the context of Judge Wolin's management of the case, as announced in December 2001. Petitioners rely on Judge Wolin's statement that he learned information that was "extra-judicial," but Judge Wolin's opinion rejected the allegation that he learned any information that was "extra-judicial" in the sense prohibited by § 455(b)(1). USG also argues that if the *ex parte* communications at issue in this case are not deemed extrajudicial, then no *ex parte* communication can ever justify recusal. USG's argument is overstated: *ex parte* contacts are extrajudicial if they are received by a judicial officer in his "personal" capacity, i.e., through first-hand perception of disputed matters such as in Edgar. Put another way, § 455(b)(1)

warrants recusal if the judge or an attendant officer could become a direct witness in the case. Because Petitioners cannot demonstrate such circumstances in this case in regard to Judge Wolin, his recusal is not warranted under § 455(b)(1).

## II.

Even if I believed that any of Petitioners' recusal arguments had merit, I would deny Petitioners' motion as untimely.

## A.

Most troubling in this case is the conduct of Petitioners USG and the USG Unsecured Creditors. As the majority recognizes, both of these Petitioners knew of the Advisors' alleged conflict in January 2002. Furthermore, it is undisputed that all parties knew of the *ex parte* scheme in December 2001, at the inception of Judge Wolin's control of the Five Asbestos Cases. It is also undisputed that no motion for recusal was made until October 2003. This Circuit has joined others in imposing a timeliness requirement on recusal motions. E.g., United States v. Rosenberg, 806 F.2d 1169, 1173 (3d Cir. 1986). In determining whether a request for recusal is timely, the Court considers the time elapsed between the complained-of conduct and the motion, the timeline of the case between the conduct and the motion, and the effect of recusal on the case going forward. Smith v. Danyo, 585 F.2d 83, 86 (3d Cir. 1978); Apple v. Jewish Hosp. and Med. Ctr., 829 F.2d 326, 334 (2d Cir. 1987). These factors, taken together, effectively

---

[35] Kensington also cites to Flamm, Judicial Disqualification § 14.1, which in turn cites to state law cases for the proposition that *ex parte* contacts demand recusal; § 455(b)(1), a *federal* statute, is clearly not implicated by these citations.

disallow recusal motions by "a litigant with knowledge of circumstances suggesting possible bias or prejudice holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming." Smith, 585 F.2d at 86.

USG and the USG Unsecured Creditors perfectly fit the Smith court's description of the "sneak attack" litigant. Astonishingly, these two Petitioners kept silent about the matters underlying their motions for over 20 months. USG tries to minimize the appearance of delay by observing that Judge Wolin's December 2001 statement only disclosed that he would "sparingly" resort to *ex parte* communications, and alleging that it did not know of the actual scope of the *ex parte* communications until late 2003. As mentioned above, however, the quantity of *ex parte* communications is irrelevant to USG's claim: it is undisputed that USG knew that Judge Wolin was (allegedly improperly) engaging in *ex parte* communications to *some* extent for almost two years before it brought its motion to recuse, and that is the relevant measure of the time elapsed. USG cites to Edgar, 93 F.3d at 257, but in that case a one-year delay in bringing the recusal motion was justified because the movants had only recently discovered the objectionable *qualitative* nature of the *ex parte* contacts at issue.

USG and the USG Unsecured Creditors also try to excuse their delay by arguing that they did not feel empowered to object to the *ex parte* communications

because Judge Wolin announced that all objections would be deemed waived. I do not believe that a responsible attorney would have reasonably reacted to Judge Wolin's instruction in that manner. First, Judge Wolin's statement most naturally indicates that under his announced practice, any objections to any particular *ex parte* communication would be waived, not that parties could not voice their objections to the practice itself. Second, even if USG and the USG Unsecured Creditors felt that their objection would fail before Judge Wolin, attorneys routinely make seemingly futile objections for the purpose of preserving their objection on the record. See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1181, n. 16 (3d Cir. 1993) (attorney's failure to object not excused by belief that objection would be futile). Third, even if USG and the USG Unsecured Creditors felt that objection would be futile, they had the available remedy that they have chosen to exercise now, two years later: a motion for recusal. In short, USG and the USG Unsecured Creditors have no colorable excuse for why they did not proceed for more than 20 months with their efforts to recuse Judge Wolin.

The majority seems to recognize that USG and the USG Unsecured Creditors have no excuse for their dilatory conduct, but then proceeds to excuse that conduct anyway on the grounds that USG had no improper motive for its recusal motion. Specifically, the majority observes that the timeliness requirement was crafted largely to prevent parties from

trying to recuse a judge once they felt that they were losing their case. The majority then accepts USG's allegation that the only ruling made by Judge Wolin so far has been in its favor: the aforementioned February 2003 Case Management Order. The majority concludes that, because USG had not yet suffered any adverse ruling, it did not have the fear of losing that lays at the heart of the timeliness requirement, and that there is therefore no need to enforce the timeliness requirement against USG.

Of course, as USG has itself observed in its argument that it suffered prejudice from the *ex parte* contacts, the District Court eventually refused to enforce that Case Management Order, meaning that, in effect, the District Court ruled *against* USG's wishes. USG cannot, on the one hand, claim in support of its recusal argument that it has perceived Judge Wolin's *ex parte* contacts as predisposing him against USG, and then on the other hand, claim that Judge Wolin has shown *no* predisposition against USG to bolster its timeliness claim. In any event, even if USG had not suffered any adverse rulings yet, it does not change the fact that USG has no justification for its delay in bringing its motion to recuse, as well as the fact that the delay to this case that will result from recusal will erase two years of case management. As this Court has previously noted, delay in this case could be catastrophic to many of the constituencies involved, and that issue looms especially large in this timeliness inquiry. Kensington, 353 F.3d at 224-25.

Accordingly, I would reject the § 455(a) challenge to Judge Wolin's *ex parte* practice on timeliness grounds with respect to USG.[36]

### B.

Although I do not find the conduct of the Petitioners in Owens Corning and Grace as clearly inexcusable as that of the Petitioners in USG, I would still find their recusal motions untimely as well. The recusal motion on *ex parte* grounds is clearly untimely for the reasons stated earlier: namely, that all parties knew of Judge Wolin's plan for *ex parte* communications in December 2001. The recusal motion on conflict grounds,

---

[36] I would also find Petitioners' § 455(b)(1) claim untimely. Although no published decision from this Court has decided whether § 455(b) has a timeliness requirement, it is worth noting that almost every other Circuit that has considered the question has implicitly or explicitly recognized such a requirement. Apple, 829 F.2d at 334 (applying requirement to § 455(b) motion); Oglala Sioux Tribe of Pine Ridge Indian Reservation v. Homestake Mining Co., 722 F.2d 1407, 1414 (8th Cir. 1983) (same); E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1295 (9th Cir. 1992) (same); Summers v. Singletary, 119 F.3d 917, 920-21 (11th Cir. 1997) (explicitly rejecting argument that timeliness requirement applies only to § 455(a) motions and not § 455(b) motions); United States v. York, 888 F.2d 1050, 1054-55 (5th Cir. 1989) (same).

however, requires further discussion with respect to the <u>Owens Corning</u> and <u>Grace</u> Petitioners. These Petitioners contend that their motion is timely because they did not actually know of the alleged conflict until September 2003. I agree with the majority that constructive knowledge is not sufficient to trigger timeliness concerns, but that imputed knowledge can sometimes be sufficient. However, I disagree with the majority's conclusion that we should not impute the Owens Corning and Grace Unsecured Creditors Committees' knowledge of the alleged conflicts to the <u>Owens Corning</u> and <u>Grace</u> Petitioners.

It is uncontroverted that the firms of Davis Polk & Wardwell and Stroock & Stroock & Lavan, counsels for the Owens Corning and W.R. Grace Unsecured Creditors Committees respectively, learned of the alleged conflicts no later than January 2002. A party, of course, is charged with the knowledge of its counsel. <u>E.g.</u>, <u>Veal v. Geraci</u>, 23 F.3d 722, 725 (2d Cir. 1994). Therefore, both of the Unsecured Creditors Committees knew of the alleged conflicts. The Unsecured Creditors Committees are fiduciaries of all unsecured creditors, including Kensington and the Grace Creditors. <u>Woods v. City Nat'l Bank & Trust Co.</u>, 312 U.S. 262, 268 (1941); <u>In re Mountain States Power Co.</u>, 118 F.2d 405, 407 (3d Cir. 1941). Accordingly, notice to the Unsecured Creditors Committees is the equivalent of notice to Kensington and the Grace Creditors. <u>In re Harris Management Co., Inc.</u>, 791 F.2d 1412, 1415 (9th Cir. 1986)

(notice to creditors' committee constituted notice to individual creditors).

Imputing the Unsecured Creditors Committees' knowledge to creditors makes sense. As a parallel example, Respondents point out that the Asbestos Claimants Committee is presumed to speak for all claimants; it would be staggeringly onerous to require notice of relevant events to be given to all 200,000+ asbestos claimants rather than the Committee, which represents their collective interest. There is no reason why unsecured creditors should be given any different treatment than their asbestos claimant counterparts; to the contrary, given that in bankruptcy cases creditors within each constituency change on a regular basis, the necessity of using the Unsecured Creditors Committee as a conduit of notice to unsecured creditors is even more manifest. Indeed, the streamlining function of these Committees is largely their reason for existing in the first place. Finally, imputing knowledge from the Committees to individual creditors would safeguard the interests behind the timeliness requirement. In particular, this rule would prevent Creditors Committees from strategically preserving recusal claims by insulating those claims from individual creditors, and would encourage Creditors Committees to execute their duties to creditors more vigilantly.

Kensington and the Grace Creditors cite authority purportedly against this rule, but the cited cases do not contradict the rule of imputing notice. <u>In re Levy</u>, 54

B.R. 805, 806-07 (Bankr. S.D.N.Y. 1985), merely states the truism that a Committee represents the collective interest of its members, rather than any member's individual interest. Kunica v. St. Jean Fin., Inc., 63 F.Supp.2d 342, 347 (S.D.N.Y. 1999), simply quotes the underlying bankruptcy opinion, which in turn made its decision not to impute notice on the grounds that the notice to the Committee in that case was oral and informal. Kunica v. St. Jean Fin., Inc., 233 B.R. 46, 57 (S.D.N.Y. 1999). Here, in contrast, Davis Polk and Stroock received written notice of the alleged conflicts. In In re Masters, Inc., 149 B.R. 289, 292-93 (E.D.N.Y. 1992), Petitioners' next cited case, the court held that actual notice to individual creditors was required in the specific context of Bankr. R. 9019(a). Finally, Petitioners cite to Maldonado v. Ramirez, 757 F.2d 48 (3d Cir. 1985), but that case does not deal with creditors committees at all and is therefore inapposite. In conclusion, Stroock's and Davis Polk's knowledge of the alleged conflicts should count as knowledge on the parts of the Grace Creditors and Kensington, and the motion to recuse on conflict grounds is therefore untimely.

It is worth noting that although Judge Wolin has not yet made any significant rulings in Owens Corning or Grace, he was, at the time the recusal petitions were filed, on the cusp of issuing a ruling on the issue of "substantive consolidation." After much debate, Owens Corning had submitted a reorganization plan that incorporated substantive consolidation, which was opposed by the bank creditors. Under the status quo, the bank creditors would get almost a full return on their credits; on the other hand, under substantive consolidation, the debts of all subsidiaries would be thrown into a single bankruptcy estate with that of Owens Corning, putting the bank creditors on an equal footing with all other creditors of Owens Corning. According to Judge Wolin, the effect of consolidation on the banks would be to eliminate more than $1 billion in debt guaranteed by the Owens Corning subsidiaries. The District Court held a hearing in April 2003 on the substantive consolidation issue, and an opinion was pending on that matter when Kensington asked for Judge Wolin's recusal. This set of facts and circumstances leads me to two conclusions. First, Kensington had an incentive to seek Judge Wolin's recusal: in its moving papers, Kensington has indicated its belief that Judge Wolin has implicitly promoted this claimant-friendly plan, and whether Kensington is correct or not, it has clearly shown that it finds Judge Wolin to be ill-disposed to its interests.[37]

_____

[37] As for the Grace Petitioners, Judge Wolin observed that they were also holders of bank debt, and so they might reasonably have feared a fate similar to that anticipated by Kensington in Owens Corning. Furthermore, two of the Grace Petitioners are themselves holders of Owens Corning's bank debt, meaning that they have the same interest in Owens Corning that Kensington does.

Second, recusal would lead to months if not years of delay in <u>Owens Corning</u>, as it would at the very least require a retrial of the extremely contentious substantive consolidation issue, and threatens to nullify over two years of case management. <u>See</u> <u>Kensington</u>, 353 F.3d at 224, n. 14 ("assigning another judge to the <u>Owens Corning</u> bankruptcy would set the proceedings in <u>Owens Corning</u> back at least one year"). As this Court noted in its earlier opinion, the brunt of this delay falls upon the claimants themselves, who wait for the conclusion of this bankruptcy proceeding for resolution of their claims. <u>See</u> <u>id.</u> at 224, n. 13.

## III.

Pursuant to a mandate from this Court, Judge Wolin took admittedly extraordinary measures to manage an unprecedentedly large and complex asbestos bankruptcy proceeding. Although his methods were unconventional, none of them would inspire within the reasonable and informed observer legitimate questions regarding Judge Wolin's impartiality. I fear that in moving for Judge Wolin's recusal, Petitioners have employed a guerrilla tactic timed to serve their own economic interests in this case, rather than the interests of justice and judicial integrity. In the end, putting the stamp of judicial approval on this kind of litigious gamesmanship threatens to undermine the integrity of our judicial proceedings far more than any techniques employed by Judge Wolin. I must respectfully dissent.