Peter P. Pearson
P.O. Box 26301
Tucson, AZ. 85726
(520) 247-1535
E-mail: drp2p@yahoo.com

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

In re:

W.R. GRACE & CO., et al.,

      Debtor.

) Case No.: 01-01139
) Claim Number 2281
)
) **RESPONSE TO DEBTORS' FIFTH**
) **OMNIBUS OBJECTION**
)

    Peter P. Pearson, creditor, against the above entitled debtors hereby submits a formal response to the "Debtors' fifth omnibus objection to claims (substantive)".

## Jurisdiction

    1. This court has jurisdiction over this matter under 28 U.S.C. § 1334.

## Back Ground

    2. On October 31, 2002 Peter P. Pearson, "Creditor", correctly and timely filed a claim against Grace Specialty Chemicals, Inc. This claim was filed within, and in accordance with, the court's April 25,

1  2002 order setting a claims bar date of March 31, 2003.

2  (**Exhibit 1: Copy of Claim**)

## PRODUCT HISTORY

3    3. W.R. Grace pioneered the development and use of self-stick membrane systems in the 1960's under the trade name of "Bituthene", and since then over 200 million square meters of Bituthene have been specified and installed on various construction projects around the world. (**Exhibit 2: "Information sheet on Bituthene History"**).

    4. As noted in the "Professional Roofing Magazine" January 2003 issue an article focuses on the G.R.M. history. "The Grace Roof Membrane (GRM) for newcomers in our midst, was a take-off on a Bituthene waterproofing membrane 'specially formulated' to provide a roof membrane. The Bituthene waterproofing system was a proven performer that generally performed its intended function reasonably well. GRM didn't fare as well and eventually was phased out (nobody ever withdraws a roofing product from the market)" (**Exhibit 3: Copy of Article**).

5. The G.R.M. product line, which was manufactured by the Grace Specialty Chemical division, as a self-stick, single-ply roofing and water proofing material, of the Bituthene family. This roofing and water proofing product was labeled under the names "G.R.M. 120", "G.R.M. 230", "G.R.M. 500", Bituthene waterproofing membrane 3000, 5000, 5300, as with several other name types and descriptions. W.R. Grace sold this product line to the industrial and commercial building industry with a product manufacture warranty of ten (10) years.

6. Due to product failure caused the delamination of the surface material Tedlar© from ultraviolet (UV) light and excess heat; W.R. Grace was faced with the liability of warranty roof repairs for several hundred buildings in the Phoenix / Tucson area, along with other buildings in several cities in the Southwestern part of the United States. As such, in 1996 W.R. Grace formed a warranty service department to correct and address the product failure and related roof repair problems.

7. From the management of W.R. Grace, out of the Cambridge Massachusetts office, this was a money saver for the company. W.R. Grace was able to hire a crew to do the roof damage assessments and related roof repair work; this compared to hiring a contracting firm to do the same warranty roof repairs.

## Creditor's History

8. This Creditor was employed with the W.R. Grace & Co., under the division of Grace Specialty Chemicals, between the dates of March 1986 through February 1992. He worked in the Warranty Service Department for the Grace Roofing Membrane (G.R.M.) produce line. The office location was at the Grace vermiculite processing plant, 4220 W. Glenrosa, Phoenix, Arizona. 85019.

9. The Creditor was hired to handle G.R.M repairs in the Phoenix / Tucson area; later he completed work in Los Angeles, San Diego, Las Vegas, Reno, El Paso, and several other cities in the Southwestern part of the United States. In the position that the Creditor had, he was hired as a working supervisor. He had between 1 and 3 men working under him at any one time. His direct supervisors were: Dan Kuball, Product

1 Specialist, between 1986 and 1988, and Ken Porter,
2 Warranty Service Department, between 1988 and 1992.

3

4    10. On a daily basis during his employment, the
5 Creditor handled the G.R.M. product line of materials,
6 including support related materials, either
7 manufactured by W.R. Grace or purchased from different
8 vendors for the necessary work to complete the warranty
9 roof repairs as needed.

10

11    11. The Creditor was exposed to daily the following
12 chemicals, without safety equipment or protective
13 measures. The chemicals he was exposed to are not
14 limited to the just the following: Xylene, as a cleaner
15 and product solvent; Toluene, as a cleaner and product
16 solvent; Unprocessed Naphthenic oil, active product
17 ingredient; Styrene Butadiene polymer, active product
18 ingredient; Asphalt, active product ingredient; and
19 Polyolefin film, active product ingredient; Petroleum
20 Extracts, active product ingredient; Styrene Polymer
21 with 1, 3-Butadiene, active product ingredient. This
22 Creditor also used several of the G.R.M. roof coating,
23 mastics, and seam calks, on a daily basis, all of which
24 were unique to the application and repairs to the
25 G.R.M. product line. None of these chemicals are safe

1  for human contact or conducive to a healthy

2  environment.

3

4      12. During the Creditor's employment with W.R.

5  Grace, he was never trained in how to properly handle

6  the special products or chemicals that they provided.

7  He was never given the proper safety equipment, such as

8  rubber gloves, protective clothing, or proper

9  respirators,  to protect his body from these toxic,

10 dangerous, and hazardous materials, nor was he ever

11 told just how dangerous and carcinogenic these

12 different materials were to the human body, either

13 individually or combined.

14

15

16     13. This Creditor can recalls breathing these toxic

17 fumes and suffering headaches for days during the

18 course of working with the G.R.M. materials, not aware

19 of why he was suffering these headaches. In 1990, when

20 the Creditor asked his director supervisor for a

21 respirator after all the guys on the crew complained of

22 the fumes, the director supervisor actually acted

23 offended and noted that a respirator was not needed. He

24 did however allow me to purchase a single respirator

25 for the Creditor which was also to be used among the

other two crew members. However, the Creditor was not trained on how to get a proper type of respirator for the kinds of chemicals being used. The respirator did not work, in that it was designed for fine dust and not for the volatile chemicals that were being used.

14. To further support the Creditor's claim he has obtained a letter from Mr. James Nelson, Project Manager for the "Thomas & Mack Center", Las Vegas Nevada, 89154-0003, whereby he complains to the Creditor's director supervisor, Ken Porter about the toxic roofing materials that were not properly handled. As noted in Mr. Nelson's letter, "If this was known by UNLV's Hazardous Waste Material Department, they would close down the roofing project". As evident by the letter and statements made, the Creditor had no training in handling the toxic, hazardous materials that W.R. Grace provided, and that liability for this fell directly on the management of W.R. Grace. (**Exhibit 4: also attached as 'Exhibit A' with the original Grace Non-Asbestos Proof of Claim Form**)

15. On or about 1989 the Creditor was handed a large loose-leaf notebook from his direct supervisor.

He was told to keep the book in the truck. Ken Porter
stated that the book had to remain in the truck for
purposes of an audit. It was not until later that the
Creditor found out that this book contained what may
have been Material Safety Data Sheets, (MSDS). The
Creditor however, was never trained to read these forms
or understand the significance what these forms meant,
or how they pertained to the G.R.M. products.

## BASELESS OBJECTION

16. The debtors have provided no legal or objective
reason that this Creditor's claim cannot be paid in
full. There are no inaccuracies in the complaint that
this Creditor has presented to the court and the
debtors, this as alluded to in the boiler-plate
affidavit by Mr. David B. Siegel, Senior Vice
President. Each and every fact that this Creditor has
presented is based upon objective accuracy and sound
scientific facts; as with the object history relating
to the G.R.M product line.

## DAMAGES

17. The Creditor case is suffering from an acute
form of joint pain in his hands, along with diminished
vision in both eyes as a direct result of handling in
an unsafe and unprotected manner the G.R.M materials

and application solvents. Creditor also has had skin cancer removed twice from his hands and facial area where he had accidentally spilled Xylene while working for W.R. Grace. **(Exhibit 5: Affidavit from Creditor)**

18. During the Creditors employment he was indirectly and directly threatened that he would lose his job if he questioned his supervisors about the safety concerns and medical problems that were being experienced at the time. **(Exhibit 5: Affidavit from Creditor)**

19. During the Creditor's time of employment he suffered several times sever head pains and unexplained skin rashes due to the chemicals that he was exposed to. **(Exhibit 5: Affidavit from Creditor)**

## DISCOVERY

20. In the early part of 2002, the Creditor in this case, while researching a cause for the unexplained joint pains, skin problems, and diminished eyesight problem, as with the skin cancer issue, discovered that the chemicals he was exposed to while working for W.R. Grace were the reason for the medical issues he was experiencing. **(Exhibit 5: Affidavit from Creditor)**

## MOTIVE

21. W.R. Grace sustained a motive of financial control and corporate oversight regarding the failed G.R.M. product line. In the interest of share holders and the company bottom line, W.R. Grace and it management mandated that the product line be terminated because of failure and that roof warranty expenditures be closely monitored. With this agenda set forth, W.R. Grace Management devised a plan to maintain the roof warranties and at the same time spend as little as possible to comply with their warranty obligations. This management decision resulted in the lack of formal training for the crew members that worked in the G.R.M. warranty division, denial of standard safety equipment, and a general position of apathy towards those men that worked in this sector of the company.


## CAUSES OF ACTION

22. Paragraphs 1 through 23 are incorporated and pleaded in full, and Creditor realleges all preceding allegations as if set forth in full herein.


23. W.R. Grace, with malicious intent, caused the Creditor harm and personal injury, arising by reason

1  of, directly or indirectly, physical, emotional or
2  other personal injuries or other damage caused, or
3  allegedly caused, directly or indirectly, by the
4  exposure to dangerous, hazardous and toxic materials,
5  chemicals and/or products, manufactured, sold,
6  supplied, produced, specified, selected, distributed or
7  in any way  marketed by W.R. Grace for their Grace Roof
8  Membrane (G.R.M.) and/or Bituthene products used in and
9  for the Roof Warranty Service Department.

10

11      24. Paragraphs 1 through 25 are incorporated and
12  pleaded in full, and Creditor realleges all preceding
13  allegations as if set forth in full herein.

14

15

16      25. W.R. Grace, with malicious intent, violated
17  this Creditor's civil rights and human rights, through
18  acts or omissions, arising by reason of, directly or
19  indirectly, physical, emotional or other personal
20  injuries or other damage caused, or allegedly caused,
21  directly or indirectly, by the exposure to dangerous,
22  hazardous and toxic materials, chemicals, and/or
23  products manufactured, sold, supplied, produced,
24  specified, selected, distributed or in any way marketed
25  for W.R. Grace for their G.R.M. and/or Bituthene

1  products used in and for the Roof Warranty Service
2  Department.
3
4      26. Paragraphs 1 through 27 are incorporated and
5  pleaded in full, and Creditor realleges all preceding
6  allegations as if set forth in full herein.
7
8
9      27. W.R. Grace, with malicious intent, violated
10 this Creditor's personal safety and personal well
11 being, through acts or omissions, arising by reason of,
12 directly or indirectly, physical, emotional or other
13 personal injuries or other damage caused, or allegedly
14 caused, directly or indirectly, by the exposure to
15 dangerous, hazardous and toxic materials, chemicals,
16 and/or products manufactured, sold, supplied, produced,
17 specified, selected, distributed or in any way marketed
18 for W.R. Grace for their G.R.M. and/or Bituthene
19 products used in and for the Roof Warranty Service
20 Department.
21
22     28. Paragraphs 1 through 29 are incorporated and
23 pleaded in full, and Creditor realleges all preceding
24 allegations as if set forth in full herein.
25

29. W.R. Grace, with negligent and tortious intent, caused this Creditor's personal harm and injury, through acts or omissions, arising by reason of, directly or indirectly, physical, emotional or other personal injuries or other damage caused, or allegedly caused, directly or indirectly, by the exposure to dangerous, hazardous and toxic materials, chemicals, and/or products manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed for W.R. Grace for their G.R.M. and/or Bituthene products used in and for the Roof Warranty Service Department.

30. Paragraphs 1 through 31 are incorporated and pleaded in full, and Creditor realleges all preceding allegations as if set forth in full herein.

31. W.R. Grace, with negligent and tortious intent, violated this Creditor's civil rights and human rights, through acts or omissions, arising by reason of, directly or indirectly, physical, emotional or other personal injuries or other damage caused, or allegedly caused, directly or indirectly, by the exposure to dangerous, hazardous and toxic materials, chemicals,

1 and/or products manufactured, sold, supplied, produced,

2 specified, selected, distributed or in any way marketed

3 for W.R. Grace for their G.R.M. and/or Bituthene

4 products used in and for the Roof Warranty Service

5 Department.

6

7

8 **LEGAL ARGUMENT**

9

10                                    Dated this 13th day of May,
11                                    2004
                                            By:_____
12                                               Peter P. Pearson
                                                 P.O. Box 26301
13                                               Tucson, AZ. 85726
                                                 (520) 247-1535
14                                               E-mail:
                                                 drp2p@yahoo.com
15

16

17

18

19

20

21

22

23

24

25

1  products used in and for the Roof Warranty Service

2  Department.

3

4     26. Paragraphs 1 through 27 are incorporated and

5  pleaded in full, and Creditor realleges all preceding

6  allegations as if set forth in full herein.

7

8

9     27. W.R. Grace, with malicious intent, violated

10  this Creditor's personal safety and personal well

11  being, through acts or omissions, arising by reason of,

12  directly or indirectly, physical, emotional or other

13  personal injuries or other damage caused, or allegedly

14  caused, directly or indirectly, by the exposure to

15  dangerous, hazardous and toxic materials, chemicals,

16  and/or products manufactured, sold, supplied, produced,

17  specified, selected, distributed or in any way marketed

18  for W.R. Grace for their G.R.M. and/or Bituthene

19  products used in and for the Roof Warranty Service

20  Department.

21

22     28. Paragraphs 1 through 29 are incorporated and

23  pleaded in full, and Creditor realleges all preceding

24  allegations as if set forth in full herein.

25

29. W.R. Grace, with negligent and tortious intent, caused this Creditor's personal harm and injury, through acts or omissions, arising by reason of, directly or indirectly, physical, emotional or other personal injuries or other damage caused, or allegedly caused, directly or indirectly, by the exposure to dangerous, hazardous and toxic materials, chemicals, and/or products manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed for W.R. Grace for their G.R.M. and/or Bituthene products used in and for the Roof Warranty Service Department.

30. Paragraphs 1 through 31 are incorporated and pleaded in full, and Creditor realleges all preceding allegations as if set forth in full herein.

31. W.R. Grace, with negligent and tortious intent, violated this Creditor's civil rights and human rights, through acts or omissions, arising by reason of, directly or indirectly, physical, emotional or other personal injuries or other damage caused, or allegedly caused, directly or indirectly, by the exposure to dangerous, hazardous and toxic materials, chemicals,

1  and/or products manufactured, sold, supplied, produced,
2  specified, selected, distributed or in any way marketed
3  for W.R. Grace for their G.R.M. and/or Bituthene
4  products used in and for the Roof Warranty Service
5  Department.

6

7      32. Paragraphs 1 through 33 are incorporated and
8  pleaded in full, and Creditor realleges all preceding
9  allegations as if set forth in full herein.
10

11

12     33. W.R. Grace violated this Creditor's Fourteenth
13 Amendment Constitutional Right to Equal Protection
14 under the law, through acts or omissions, arising by
15 reason of, directly or indirectly, physical, emotional
16 or other personal injuries or other damage caused, or
17 allegedly caused, directly or indirectly, by the denial
18 of providing standard safety and protective health
19 equipment, and training to handle dangerous, hazardous
20 and toxic materials, chemicals, and/or products
21 manufactured, sold, supplied, produced, specified,
22 selected, distributed or in any way marketed for W.R.
23 Grace for their G.R.M. and/or Bituthene products used
24 in and for the Roof Warranty Service Department.

25

34. Paragraphs 1 through 35 are incorporated and pleaded in full, and Creditor realleges all preceding allegations as if set forth in full herein.

35. W.R. Grace violated this Creditor's Fourteenth Amendment Constitutional Right to the Due Process of Law, through acts or omissions, arising by reason of, directly or indirectly, physical, emotional or other personal injuries or other damage caused, or allegedly caused, directly or indirectly, by the denial of providing standard safety and protective health equipment, and training to handle dangerous, hazardous and toxic materials, chemicals, and/or products manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed for W.R. Grace for their G.R.M. and/or Bituthene products used in and for the Roof Warranty Service Department.

## **LEGAL ARGUMENT**

36. The debtors' in this case have provided no legal reason that this claim cannot be paid in full. However, the Creditor, who has the burden of proof in

establishing his claim when an objection is filed, has presented prima facie evidence to support his claim.

33. The U.S. Supreme has stated, "Burden of proof is essential element of claim itself, and one who asserts claim in bankruptcy is entitled to burden of proof that normally comes with it." Raleigh v. Illinois Department of Revenue, 120 S.Ct. 1951 (2002).

34. The U.S. Supreme further held that, "The sworn proof of a claim against a bankrupt's estate is prima facie evidence of its allegations. Whitney v. Diesser, 26 S.Ct. 316 (1906).

35. Taken in its totality, this Creditor has suffered physical and mental harm as a result of greed, mismanagement, negligence and will full wrong at the hands of a large corporation. No amount of money can duly make up this wrong. The court is asked to review all the facts and render a ruling consistent with the simple request that this Creditor is asking.

## CLAIM ASSESSMENT FACTS AND REQUEST

36. Creditor is asking for four hundred dollars, (400.00) per day for everyday he was employed with W.R.

Grace & Co. handling their G.R.M. Roof Warranty Service Department to settle this claim. The following formula was used to determine the cash figure:

**TOTAL DAYS WORKED:** 03/01/1986 through 02/01/1992 = 2163 days.

**TOTAL WEEKS WORKED:** 2163 days / 7 days in a week = 309 weeks.

**TOTAL WORK DAYS:** 309 weeks X 6 days a week = 1854 work days with W.R. Grace.

**TOTAL CLAIM AMOUNT:** 1854 work days x $400.00 = $741600.00 dollars.

Respectfully Submitted this __19__ day of May, 2004.

Peter P. Pearson

Original and three (3) copies

Of the forgoing sent this

__19__ day of May, 2004.

To:

United States Bankruptcy Court

District of Delaware

Attn: Clerk of the Court

824 Market Street

Wilmington, Delaware. 19801

**CERTIFIED MAIL NUMBER: 7003-3110-0002-8587-9051**

One copy of the foregoing

Sent this __19__ day of May, 2004

To:

Kirkland & Ellis LLP

200 E. Randolph Drive

Chicago, Illinois. 60601

Attn: Rachel R. Schulman

**CERTIFIED MAIL NUMBER: 7003-3110-0002-8587-9037**

-And-

1 | Pachulski, Stang, Ziehl, Young, Jones & Weintraub,
2 | P.C.
3 | 919 North Market Street, 16th Floor
4 | P.O. Box 8705
5 | Wilmington, Delaware. 19899-8705
6 | Attn: David W. Carickhoff, Jr.

7

8 | **CERTIFIED MAIL NUMBER: 7003-3110-0002-8587-9044**

9

10

11

12

13

14 | Dated this 19th day of May, 2004

15 | By:_____
   | Peter P. Pearson

16 | P.O. Box 26301
   | Tucson, AZ. 85726

17 | (520) 247-1535
   | E-mail:

18 | drp2p@yahoo.com

19

20

21

22

23

24

25

# EXHIBIT 1:

## Copy of claim

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF Delaware | | **GRACE NON-ASBESTOS PROOF OF CLAIM FORM** |
|---|---|---|

| Name of Debtor: W. R. Grace & Co. | Case Number 01-01139 (JKF) | **COPY** |
|---|---|---|

**NOTE: Do not use this form to assert an Asbestos Personal Injury Claim, a Settled Asbestos Claim or a Zonolite Attic Insulation Claim. Those claims will be subject to a separate claims submission process. This form should also not be used to file a claim for an Asbestos Property Damage Claim or Medical Monitoring Claim. A specialized proof of claim form for each of these claims should be filed.**

| Name of Creditor (The person or other entity to whom the Debtor owes money or property): <br><br> PETER P. PEARSON, Sr. <br><br> Name and address where notices should be sent: <br><br> ASPC-Eyman-Cook <br> P.O. Box 3200 #53430 <br> Florence, Arizona. 85232-3200 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. <br> ☒ Check box if you have never received any notices from the bankruptcy court in this case. <br> ☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|

| Account or other number by which creditor identifies Debtor: | Check here ☐ replaces <br> if this claim ☐ amends a previously filed claim, dated: |
|---|---|

Corporate Name, Common Name, and/or d/b/a name of specific Debtor against whom the claim is asserted:

Grace Specialty Chemicals, Inc.

| **1. Basis for Claim** <br> ☐ Goods sold <br> ☐ Services performed <br> ☐ Environmental liability <br> ☐ Money loaned <br> ☒ Non asbestos personal injury/wrongful death <br> ☐ Taxes <br> ☒ Other failure to provide safety equipment, information or training with respect to G.R.M. related materials. See attached Statement of Claim letter, affidavit. | ☐ Retiree benefits as defined in 11 U.S.C § 1114(a) <br> ☐ Wages, salaries, and compensation (fill out below) <br><br> Your SS #: 521 68 6091 <br> Unpaid compensation for services performed <br> from _____ to _____ (date) |
|---|---|

| **2. Date debt was incurred: Between 3/1986 to 2/1992** | **3. If court judgment, date obtained:** |
|---|---|

**4. Total Amount of Claim at Time Case Filed:** $ 741600.00

If all or part of your claim is secured or entitled to priority, also complete Item 5 below.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Classification of Claim. Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured Nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.**

| ☐ SECURED CLAIM (check this box if your claim is secured by collateral, including a right of setoff.) <br><br> Brief Description of Collateral: <br><br> ☐ Real Estate        ☐ Other (Describe briefly) <br><br> Amount of arrearage and other charges at time case filed included in secured claim above, if any: $_____ <br><br> Attach evidence of perfection of security interest <br><br> ☒ UNSECURED NONPRIORITY CLAIM <br><br> A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim. | ☐ UNSECURED PRIORITY CLAIM - Specify the priority of the claim. <br><br> ☐ Wages, salaries, or commissions (up to $4650), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3). <br><br> ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4). <br><br> ☐ Taxes or penalties of governmental units - 11 U.S.C. § 507(a)(7). <br><br> ☒ Other - Specify applicable paragraph of 11 U.S.C. § 507(a(_____). |
|---|---|

| **6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. | This Space is for Court Use Only |
|---|---|
| **7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. | |
| **8. Acknowledgement:** Upon receipt and processing of this Proof of Claim, you will receive an acknowledgement card indicating the date of filing and your unique claim number. If you want a file stamped copy of the Proof of Claim form itself, enclose a self addressed envelope and copy of this proof of claim form. | |

| Date <br> 10-23-2002 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): ~~signature~~ Sr. | |
|---|---|---|

**REC'D OCT 3 1 2002**

See General Instructions and Claims Bar Date Notice and its exhibits for names of all Debtors and "other names" used by the Debtors

### AFFIDAVIT

I, Peter P. Pearson, Sr., swear that the following information is true to
the best of my ability, under the penalty of perjury:

1.) I was employed with W.R. Grace and worked out of their plant located
at 4220 W. Glenrosa, Phoenix, Arizona, 85019. This employment went from about
2/1986 through 3/1992.

2.) I was hired to supervise a crew to handle the roof repairs to
the commercials roof projects that were still under warranty from W.R. Grace.
I worked in the Warranty Service Department for the Grace Roofing Membrane
(G.R.M.) product that was manufactured by W.R. Grace.

3.) W.R. Grace never provided me training, instruction, or information
on how to properly handle the hazardous, dangerous, and toxic chemicals that
I was subjected to during my employment.

4.) W.R. Grace never provided me safety equipment to protect myself from
the hazardous, dangerous, and toxic chemicals that I was subjected to while
repairing the G.R.M. roof under their warranty.

5.) The G.R.M. roof products were different then standard roofing
products. The G.R.M. products were made with special chemicals and special
repairs were required to comply with their specifications.

6.) During the time of my employment I suffered from sever head pains
and skin rashes due to the chemicals that I was exposed to.

7.) I felt threatened that I would lose my job if I questioned my
supervisor about the working conditions and safety issues.

8.) I felt that W.R. Grace did not care about my physical well being
while I was working for them.

9.) I discovered this year that some of the chemicals I was exposed
to while working for W.R. Grace, including xylene and several others will
detericrate the cartilage between the bones if exposed to the skin. These
same chemicals are considered carcinogenic.

Nothing Further.

_____
Peter P. Pearson, Sr.

Signed before me this 23 day of October, 2002.

_____
Public Notary

My Commission Expires:



OFFICIAL SEAL
JAMES C. KINSEY
Notary Public - State of Arizona
PIMA COUNTY
My Comm. Expires May 7, 2003

Peter P. Pearson, Sr. #53430
ASPC-Eyman-Cook
P.O. Box 3200
Florence, Arizona. 85232-3200

RE: GRACE NON-ASBESTOS PROOF CLAIM ATTACHMENT LETTER
    CASE NUMBER 01-01139 (JKF)

STATEMENT OF CLAIM
ATTACHMENT LETTER

I was employed with W.R. Grace & Co. between the dates of March 1986
to February 1992. I worked in the warranty service department for the Grace
Roofing Membrane (G.R.M.) product line. The office I worked out of was;
W.R. Grace & Co. Phoenix Plant, 4220 W. Glenrosa, Phoenix, AZ. 85019.

The G.R.M. product line, which was manufactured under the Grace
Specialty Chemical, Inc. Division, was a self-stick, single-ply roofing and
water proofing material. The roofing product was labeled under G.R.M. 120,
G.R.M. 230, G.R.M. 500 as with several other name types and descriptions.
Grace sold the roofing product with a 10 year manufacture warranty.

Due to product failure caused by delamination of the surface material
from ultra violate (UV) light and excess heat, Grace was faced with the
liability of warranty roof repairs for hundreds of buildings in the Phoenix
area, along with other buildings in other cities in the Southwestern parts
of the United States. As such, in 1986 Grace formed a warranty service
department to address the roof repairs and problems. This was a money saver
for Grace compared to paying a contractor to do the work. It was also about
this time that Grace stopped marketing the G.R.M. roofing products.

I was hired to handle these repairs in the Phoenix area, and later did
completed work in Los Angeles, Las Vegas, El Paso, and other cities. In the
position I had, as a working supervisor, I had between 1 and 3 men working
under me at any one time. My direct supervisors were: Dan Kuball, Product
Specialist, between 1986 and 1988, and Ken Porter, Warranty Service
Department, between 1988 and 1992.

Page 2: STATEMENT OF CLAIM ATTACHMENT LETTER

On a daily basis, during my employment, I handled the G.R.M. product
line of materials, including support materials to complete the warranty
roof repairs needed. I also handled the inventory of these products on a
daily basis. This included using, but not limited to, Xylene as a cleaner
and product solvent, Toluene (Toluene) as a cleaner and product solvent.
I also used several of the G.R.M. roof coatings which consisted of numerous
different types of chemicals. None of these materials were safe for human
contact or environmentally safe. This fact I learned just this year after
studying chemistry.

During my employment with Grace, I was never trained in how to properly
handle the chemicals they provided, I was never given proper safety equipment
to protect my self from these toxic, dangerous, and hazardous materials,
nor was I ever told just how dangerous and carcinogenic these different
materials were.

Several times I can remember breathing these toxic fumes and suffering
headaches for days during the course of working with the G.R.M. materials,
not aware of why I was suffering these headaches. In 1990, when I asked
my direct supervisor for a respirator after we all complained of the fumes,
he actually acted offended and noted that we really did not need one. He
allowed me to get a respirator for me and the other two guys I had working
with me. However, I was not trained on how to get a proper kind of respirator
for the kind of chemicals I was using. The respirators did not seem to work,
they turned out to be made for dust not fumes.

To further support my claim I obtained a letter from Mr. James Nelson,
Project Manager for "Thomas & Mack Center", Las Vegas, Nevada, 89154-0003,
where he complained to my direct supervisor, Ken Porter about the toxic
roofing materials that were not properly handled. As evident by the letter
I had no training in handling the toxic, hazard materials that Grace provided.
(Exhibit "A").

I believe that it was around 1989 I was handed a large loose leaf notebook from my direct supervisor. I was told to keep this book in the truck. I found out later it was "Material Safety Data Sheets" (MSDS) forms. However, I was never trained in how to read these forms or what they specifically meant, or how they pertained to the G.R.M. products.

The G.R.M. products were a unique roofing product. The Grace company spent a lot of time and money producing this product, yet failed at basic considerations for the humans that handled their products on a daily basis.

CAUSES OF ACTIONS

1.) W.R. Grace, with malicious intent, caused me harm, through acts or omissions, arising by reason of, directly or indirectly, physical, emotional or other personal injuries or other damage caused, or allegedly caused, directly or indirectly, by the exposure to dangerous, hazardous and toxic materials, chemicals and/or products, manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by Grace for their G.R.M. products used in and for the Roof Warranty Service Department.

2.) W.R. Grace, with malicious intent, violated my civil rights and human rights, through acts or omissions, arising by reason of, directly or indirectly, physical, emotional or other personal injuries or other damage caused, or allegedly caused, directly or indirectly, by the exposure to dangerous, hazardous and toxic materials, chemicals, and/or products manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by Grace for their G.R.M. products used in and for the Roof Warranty Service Department.

3.) W.R. Grace, with malicious intent, violated my personal safety and personal well being, through acts or omissions, arising by reason of, directly or indirectly, physical, emotional or other personal injuries or other personal injuries or other damage caused, or allegedly caused, directly or

Page 4: STATEMENT OF CLAIM ATTACHMENT LETTER

indirectly, by the exposure to dangerous, hazardous and toxic materials, chemicals, and/or products manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by Grace for their G.R.M. products used in and for the Roof Warranty Service Department.

### CLAIM ASSESSMENT FACTS

I am asking for four hundred dollars, ($400.00) per day for every work day I was employed with W.R. Grace & Co. in their Roof Warranty Service Department to settle this claim. The following formula I used to determine the cash figure I arrived at:

TOTAL DAYS EMPLOYED: 03/01/1986 to 02/01/1992 = 2163 days.
TOTAL WEEKS WORKED: 2163 days / 7 days in a week = 309 weeks
TOTAL WORK DAYS: 309 weeks * 6 work days a week = 1854 work days with Grace.
TOTAL CLAIM AMOUNT AT TIME CASE FILED:
                1854 work days * $400.00 = $741600.00 Dollars.


SIGNED under the penalty of perjury.

Peter P. Pearson, Sr.

                    10-22-2002

EXHIBIT "A"

LETTER FROM JAMES NELSON, PROJECT MANAGER
THOMAS & MACK CENTER

# THOMAS & MACK

## It happens here!

November 1, 1995

Peter P. Pearson Sr.
P. O. Box 1170
Bandon, OR. 97411

Dear Peter:

RE:   PROJECT VERIFICATION.

In answer to your letter asking about the dates you worked here for W.R. Grace, I don't have the exact date you started, but this is what I do have.

1.   July 2, 1991, UNLV's Purchasing Department wrote W.R. Grace to start the contract: Warranty Roof Work at the Thomas & Mack Center in Las Vegas, NV.

2.   Work was started by W.R. Grace at the end of July of 1991;

3.   I'm sending a copy of a letter I wrote to Ken Porter of W.R Grace showing that you were on the job on August 11, 1991. It seems that you were working for about six weeks here in Las Vegas, @ UNLV.

4.   W.R. Grace sent a completed invoice# 265257 requesting payment on purchase order# 114773 Warranty Roof Repair at Thomas & Mack Center on October 25, 1991.

Should you have any more questions, please contact me at 895-4817.

Sincerely,

James Nelson
Maintenance/Project Manager
Thomas & Mack Center





THOMAS & MACK CENTER          4505 MARYLAND PARKWAY • LAS VEGAS, NEVADA 89154-0003
(702) 739-3761 • FAX (702) 739-1099

August 13, 1991

Mr. Ken Porter
W. R. Grace & Co.
4220 W. Glenrosa Ave.
P.O. Box 14279
Phoenix, AZ  85019

Dear Mr. Porter,

I would like to address the warranty work being done at the Thomas
& Mack Center by W. R. Grace & Co.

Saturday, August 10, 1991, we experienced a heavy thunder storm
here. Your roofing crew had six scupper drains left opened around
the parapet wall. Also four roof drains had been sealed over so
no water could drain out. The result of this caused flooding on
the concourse, arena floor, equipment room, and the air handler
rooms. I had to call in workers Sunday at 3:00 am to clean up the
water. This work amounted to fourteen (14) man hours at thirteen
(13) dollars per hour, which cost a total of $182.00.

Peter came over Sunday to correct the problem with the drains. I
also expressed to Peter my concern about all the black roofing
product that is being trashed all over our building and sidewalks.
At the pump site I have observed toxic roofing material being
washed down the sidewalk into the water drain. If this was known
by UNLV's Hazardous Waste Material Department, they would close
down the roofing project.

We are greatful for the warranty work that is being done, however
I would appreciate you talking to your crew asking them to show
more concern in helping us keep the Thomas & Mack Center neat and
clean. I would like to see them use more drop clothes, clean up
right when they spill, close doors when they leave the air handler
rooms, and keep used product drums picked up.

Sincerely,

Jim Nelson
Maintenance/Project Manager

# EXHIBIT 2:

## Information Sheet on Bituthene History


**NUPLEX**

**NUPLEX BUILDING PRODUCTS:** (Back) (Contact Details)
The industry leaders in specialist finishes & systems **since 1956**

## BITUTHENE

| PRODUCT | DESCRIPTION | USAGE | APPLICATION INFORMATION |
|---|---|---|---|
| Bituthene 2000 | A composite sheet of 0.9mm minimum of rubberized asphalt and 0.1mm of cross-laminated polyethylene film | For all horizontal and vertical non-critical dampproofing where economical cost is prime consideration | Remove release paper and adhere membrane to substrate. Roll thoroughly and apply protection course and backfill or wearing course promptly. |
| Bituthene 3000 | A composite sheet of 1.4mm rubberized asphalt and 0.1mm of cross-laminated polyethylene film. | For all horizontal and vertical general waterproofing of structural concrete above and below grade. | Remove release paper and adhere membrane to substrate. Roll thoroughly and apply protection course. and backfill or wearing course promptly. |
| Bituthene 5300 | A composite sheet of rubberized asphalt and polypropylene mesh with a total thickness of 1.6mm minimum. | For waterproofing horizontal decks with asphalt concrete as wearing course. | Remove release paper and adhere membrane to concrete. Roll thoroughly and place asphalt concrete overlay promptly. |
| Bituthene Solvent Based Primer | A fast drying asphalt cutback solution black in colour. | Primer to neutralize dust on all horizontal and vertical concrete surfaces. | Spray, roller or brush application at 5m$^2$/litre. Dry 1 hour or until tack free. |
| Bituthene Mastic | A black rubberized asphalt putty. | For sealing membrane terminations, patches and detail areas. | Apply from caulking gun or by trowel. |

## The Bituthene Advantage

Grace pioneered the development and use of self-adhering membrane systems during the 1960's and since then over 200 Million Square Metres of Bituthene have been specified and installed on various construction projects around the world. Bituthene is the preferred waterproofing membrane of experienced professionals for eliminating water damage in foundations, plaza and parking decks, tunnels and earth sheltered structures. Bituthene versatility and reliability enables the membrane to be used extensively in:

**Split Slab Construction**

- Plaza Decks & Planters
- Structural Slabs

**Tunnels**

- Rapid Transit
- Vehicular

**Interior Waterproofing**

- Mechanical Rooms
- Laboratories

- Parking Decks
- Utility
- Pedestrian
- Kitchens & Bathrooms

**Foundations**

**Earth-Sheltered Structures**

- Non-Residential Building
- Non-Building Construction
- Residential Building

- Residential
- Commercial

## Superior Waterproofing Technology

### Description

Bituthene is a double barrier membrane consisting of a tough, pliable, waterproof sheet of polyethylene film coated on one side with a layer of adhesive consistency, rubberized asphalt with a special release paper on the other. Roll size is 20 metres long by 1 metre wide.



### Self Adhesive

Bituthene totally and permanently fully adheres to the substrate thus preventing the movement of water between the membrane and the substrate.

### Flexible

Bituthene will not become hard and brittle with age. It will bridge shrinkage cracks and is flexible enough to continually withstand typical substrate movements under a wide range of temperature and environmental conditions.

### Self Sealing

The "built-in" rubberized asphalt adhesive will self seal small punctures.

### Cold Applied

Bituthene simply rolls out by removing the special release paper therefore eliminating the hazardous fumes and fire risk associated with other water proofing systems. Bituthene is safe to use on all building sites.

### Thickness

Bituthene is manufactured to ensure a consistent uniform thickness. It cannot be subjected to variations in thickness by the applicator.

### Membrane Laps

Case 01-01139-AMC    Doc 5637    Filed 05/20/04    Page 38 of 52

Bituthene laps are simply pressed together to give a permanent watertight seal. Membranes that require taping or welding cannot be effectively site joined with the same assured success.

Advisory Service

Specification detailing and "on site" application assistance is available from our highly trained and experienced Bituthene Technical Representatives.

Contact Details     Waterproofing

# EXHIBIT 3:

## Copy of article from "Professional Roofing Magazine

# PROFESSIONAL ROOFING

Official publication of the 🏛 National Roofing Contractors Association

**Home**

**Web exclusives**

**Contact**

**Photographs**

**Subscribe**

**Advertisers**

**Archives**

**Search**



**January 2003**

Average user rating

 3.66 out of 5

Rate this article

# A contractor's insight

## In his unique style, Dick Baxter shares his opinions about industry issues

### by Dick Baxter

***Editor's note:*** *Following are the author's opinions. Views expressed are not necessarily those of NRCA.*

This month, I originally had intended to provide some guidelines explaining the process by which FM Global engineers decide whether submitted roof systems are "Approved" or "Accepted." However, it appears FM doesn't want to provide that type of information to those of us who submit new/replacement/re-cover projects for review. The FM engineer who originally had volunteered to help with this article suddenly had his responsibilities changed and his "time" was so limited that participation in this type of article became impossible. It might lead one to believe FM's "Approvals" and "Acceptance" of roof systems are more subjective than FM would like us to know.

So lacking a clear (or any) direction, we as an industry are left to muddle through our dealings with FM as best we can.

## RoofNav, etc.

RoofNav was supposed to be in Beta testing by this time, but so far, there is no indication RoofNav is anywhere close to being completed despite major emphasis on development of the program by FM. It is encouraging FM hired an outside consultant from the roofing industry to help put the final touches on RoofNav; perhaps that will put a more practical spin on the end product.

You should know FM Property Loss Prevention Data Sheets 1-28, "Design Wind Loads"; 1-29, "Above-Deck Roof Components"; and 1-31, "Metal Roof Systems," have been revised and Data Sheet 1-7 has been "deemed obsolete" and no longer should be considered applicable. Because Data Sheet 1-7 addressed "Wind Forces on Buildings and Other Structures," one can't help but wonder whether the weather gods have changed their methods of influence on wind forces in our lives.

According to FM correspondence dated October 2002, the only "revisions" to Data Sheets 1-28 and 1-29 were "Revised Title." For the paltry sum of $75, you can update your FM titles to these data sheets. Data Sheet 1-31 needed a lot of help, so a $75 fee might be worth it to determine just how much help FM provided in the revised data sheet (though you shouldn't get your hopes too high). But for a limited time, you can have all three revised data sheets for only $75—an obvious bargain too good to pass up. If you call in the next 10 minutes, FM might throw in a revised order form!

## Substrates

Stick around this industry long enough, and old friends revisit. Remember GRM? The Grace Roof Membrane (GRM), for newcomers in our midst, was a take-off on a Bituthene

waterproofing membrane "specially formulated" to provide a roof membrane. The Bituthene waterproofing system was a proven performer that generally performed its intended function reasonably well. GRM didn't fare as well and eventually was phased out (nobody ever withdraws a roofing product from the market).

The self-adhered bituminous roof membrane concept is back with multiple entries from multiple sources. Self-adhered sheets are made "sticky" by the introduction of special process oils to SBS-modified asphalt. The sticky surfaces typically are covered with a release paper that is removed as the self-adhered membrane is applied. In the past, it generally was recommended a self-adhered membrane be rolled with heavy rollers immediately following placement to ensure positive contact with the substrate over which it was installed. Installation guidelines for new self-adhered products have yet to be well-defined.

The attraction to self-adhered roof membranes is obvious: They suffer no volatile organic compound-related problems; no special equipment is required for installation; no odors during installation are experienced (primers don't "smell"); no skilled labor is required for installation; and they can be installed in one ply. (It seems we haven't yet learned the value of base sheets and backer sheets for system redundance.)

Nobody wants to talk about the truckloads of release paper to dispose of following installation of self-adhered roof membranes. Or the safety issues concerning the roof mechanic who has to pull the release paper off the roll while walking backward off the roof edge. Or the problem of compensating for a "curl" in a sheet induced during manufacture and the side lap eventually running to below minimum width. Or the fact that once a self-adhered membrane solidly is in place, there is no room for adjustment. Or the problems associated with end laps and "T" laps in the membrane. Or the fact that special surface preparation of substrates usually is necessary and all available substrates are not suitable for direct installation of self-adhered membranes.

There have been minimal advances in technology in the "oiled" SBS business, so the installation problems common to the first self-adhered roof membranes remain the principal challenges for applicators. The configuration of self-adhered sheets may have changed, and some (such as mineral granule- or metal foil-faced sheets) will be substantially more difficult to handle than the smooth Tedlar® or polyethylene film surface of the old GRM!

For instance, Dens Deck® Prime may provide a good substrate for self-adhered roof membranes because the top surface of the gypsum board is sealed with a proprietary coating and the glass fibers in the facer essentially are encapsulated in the coating. Even multiple coats of asphalt primer couldn't make the surface of regular Dens Deck suitable for installation of a self-adhered roof membrane because natural voids in the fiberglass mat facer would not allow uniform bonding of the self-adhered roof membrane to the primed, regular Dens Deck surface.

Perlite and some types of wood/cane fiber roof insulation will be challenging for contractors to provide suitable substrates for self-adhered bituminous roof membranes.

Polyisocyanurate foam roof insulation boards may be suitable substrates for self-adhered roof membranes depending on the boards' facer compositions. Some special preparation may be necessary with some polyisocyanurate foam roof insulation to be suitable substrates for self-adhered roof membranes. The key to this application will be the use of small (48- by 48-inch [1219- by 1219-mm]) boards and positive mechanical attachment of polyisocyanurate foam insulation substrate. Any upward "curling" of inadequately secured edges of the polyisocyanurate foam roof insulation will result in delamination of the self-adhered roof membrane making it susceptible to "peel" under high wind forces.

## Base sheets

Now, let's talk about suitable base sheets. Virtually all fiberglass-reinforced base sheets are manufactured with sand parting agents. Sand becomes a parting agent when it is applied to a sheet during manufacture, and sand isn't smart enough to know that its role changes when the base sheet roll is set in place as an intended substrate for self-adhered roof membranes. Even polymer-modified asphalt base sheets will come with some type of

parting agent on their surfaces, which means some special attention must be paid to virtually all base sheets to make them suitable substrates for self-adhered roof membranes.

Mechanically fastened base sheets will be included as substrates for self-adhered roof membranes by any prudent manufacturer for applications over wood, cementitious wood fiber and/or lightweight insulating concrete roof decks. Therefore, a suitable preparation of included base sheets must be prescribed by roof membrane purveyors.

## Laps

The Achilles heel of self-adhered roof membranes has been and will continue to be the formation of laps—both side and end. Neither Tedlar nor the surface polyethlene sheet on GRM provided good bonding surfaces—they were too "slick." It doesn't appear likely anyone will reintroduce polyethylene or Tedlar surfaces for the new lines of self-adhered roof membranes, but mineral granule and metal foil surfaces will present even greater challenges for applicators and/or manufacturers. Mineral granules and metal foil must be removed from end-lap or flashing-lap areas to allow a bitumen-to-bitumen bond. Even if manufacturers are able to provide rolls with selvage ends, there still will be times when rolls are cut and a selvage end goes in one direction or another.

EPDM suppliers have developed (after one or two dismal generations) self-adhered seam tapes that have performed admirably for many years. But priming of the mated surfaces is a critical step in the success of seam tapes. It may well be that the current line of self-adhered bituminous roof membranes will require some special treatment at side laps and end laps to ensure satisfactory long-term lap performance.

End-lap formation will be the major challenge during application of a self-adhered roof membrane system because the adjacent rolls overlap each other and form a mass, or pile, of polymer-modified asphalt membrane. The thicker the membrane, the greater the challenge in sealing the end-lap junctures because the thicker sheets will "bridge" and not conform readily at the end-lap junctures. Additional system sealants may be required at "T" laps. Staggering end laps will be essential in the application process.

## Other issues

And how might the current self-adhered bituminous roof membrane systems fare under wind uplift? That will depend on the integrity of the substrate over which a roof membrane is installed, appropriate preparation of the substrate and how well the self-adhered membrane can bond to the substrate surface. In prior attempts to promote self-adhered bituminous roof membranes, heavy rollers were used to ensure as much adhesion as possible was acquired in the application process. It will be interesting to see how metal foil-faced, self-adhered bituminous roof membranes tolerate what may be necessary embedment techniques.

Flashing of self-adhered bituminous roof membrane systems also will present a challenge because a flashing membrane must be positively tied onto a roof membrane's surface. How well a tie-in performs depends on the surfacing and juncture treatment at the roof membrane surface.

A polymer-modified asphalt backer sheet could be installed and the self-adhered roof membrane could run continuously up vertical surfaces as a starter sheet at roof perimeters. But we still must address flashing membranes at roof penetrations, and varying flashing heights may make elimination of separate flashing sheets impossible. And what about treatment of interior and exterior flashing corners?

Outwardly, the self-adhered bituminous roof membrane system appears to be a simple concept. But selection of system components, selection and preparation of substrates, special provisions for formation of side laps and end laps, membrane flashing installation and juncture treatment make this outwardly simple system much more complex. Self-adhered bituminous sheets *will not* stick to just anything—even themselves in select instances.

Case 01-01139-AMC    Doc 5837    Filed 05/20/04    Page 44 of 52

It looks as if the learning curve for the manufacture and installation of self-adhered bituminous roof membrane systems is just beginning—again.

We continue to see blister-related problems when hot-applied roof membrane systems are installed over Dens Deck substrates. Remember, Dens Deck initially may contain acceptable quantities of moisture, but when stored under humid environmental conditions, Dens Deck may absorb enough ambient moisture to cause blistering of solidly adhered base sheets or ply sheets. Dens Deck is moisture-*resistant*, not moisture-*proof*. Perforated venting base sheets should be considered as the initial ply for hot-applied membrane roof systems installed over Dens Deck or other gypsum-type thermal barriers.

*Dick Baxter is president of CRS Inc., Monroe, N.C.*

🖳 Print page        📇 E-mail page

© Copyright 2004 National Roofing Contractors Association

4

# EXHIBIT 4:

## Letter from University of Nevada, Las Vegas Mr. Nelson, Project Manager for the Thomas & Mack Center



# THOMAS & MACK

## It happens here!

November 1, 1995

Peter P. Pearson Sr.
P. O. Box 1170
Bandon, OR. 97411

Dear Peter:

RE:    PROJECT VERIFICATION.

In answer to your letter asking about the dates you worked here for W.R. Grace, I don't have the exact date you started, but this is what I do have.

1.    July 2, 1991, UNLV's Purchasing Department wrote W.R. Grace to start the contract: Warranty Roof Work at the Thomas & Mack Center in Las Vegas, NV.

2.    Work was started by W.R. Grace at the end of July of 1991:

3.    I'm sending a copy of a letter I wrote to Ken Porter of W.R Grace showing that you were on the job on August 11, 1991. It seems that you were working for about six weeks here in Las Vegas, @ UNLV.

4.    W.R. Grace sent a completed invoice# 265257 requesting payment on purchase order# 114773 Warranty Roof Repair at Thomas & Mack Center on October 25, 1991.

Should you have any more questions, please contact me at 895-4817.

Sincerely,

James Nelson
Maintenance/Project Manager
Thomas & Mack Center



THOMAS & MACK CENTER          4505 MARYLAND PARKWAY • LAS VEGAS, NEVADA 89154-0003
                             (702) 739-3761 • FAX (702) 739-1090

August 13, 1991

Mr. Ken Porter
W. R. Grace & Co.
4220 W. Glenrosa Ave.
P.O. Box 14279
Phoenix, AZ   85019

Dear Mr. Porter,

I would like to address the warranty work being done at the Thomas
& Mack Center by W. R. Grace & Co.

Saturday, August 10, 1991, we experienced a heavy thunder storm
here.  Your roofing crew had six scupper drains left opened around
the parapet wall.  Also four roof drains had been sealed over so
no water could drain out.  The result of this caused flooding on
the concourse, arena floor, equipment room, and the air handler
rooms.  I had to call in workers Sunday at 3:00 am to clean up the
water.  This work amounted to fourteen (14) man hours at thirteen
(13) dollars per hour, which cost a total of $182.00.

Peter came over Sunday to correct the problem with the drains.  I
also expressed to Peter my concern about all the black roofing
product that is being trashed all over our building and sidewalks.
At the pump site I have observed toxic roofing material being
washed down the sidewalk into the water drain.  If this was known
by UNLV's Hazardous Waste Material Department, they would close
down the roofing project.

We are greatful for the warranty work that is being done, however
I would appreciate you talking to your crew asking them to show
more concern in helping us keep the Thomas & Mack Center neat and
clean.  I would like to see them use more drop clothes, clean up
right when they spill, close doors when they leave the air handler
rooms, and keep used product drums picked up.

Sincerely,

Jim Nelson
Maintenance/Project Manager

5

# EXHIBIT 5:

## Affidavit from Creditor, Peter P. Pearson

## AFFIDAVIT

State of Arizona    )
                  ) §
County of Pima    )

       I, Peter P. Pearson, swear that the following information is true and correct to the best of my ability, under the penalty of perjury:

1.) I am the Creditor that is listed in this cause of action against the debtors, W.R. Grace.

2.) All the facts contained in the "Response to Debtors' Fifth Omnibus Objection" are correct and true, this under the penalty of perjury.

3.) I have suffered harm and damages as a direct result of the actions and/or inaction relating to the policies and procedures of the management for W.R. Grace in their handling of the Grace Roof Membrane product line.

4.) In the early part of 2002 I discovered, while researching the apparent unexplained medical problems I was suffering, that the chemicals I was exposed to as a result of working for W.R. Grace were to cause for these problems.

5.) I suffer from an unexplained acute severe pain in the joints of my hands caused by the exposure to the toxic chemicals that were a part of my employment with W.R. Grace.

6.) I have had skin cancer removed from my face and hands where Xylene accidentally spilled on me while working for W.R. Grace.

7.) I was threatened, either directly and/or indirectly that I would lose my job if I raised any questions about safety concerns or medical problems that I was experiencing at the time.

8.) Several times while working for W.R. Grace I suffered sever head pains and unexplained skin rashes due to the chemicals I was being exposed to.

9.) As a direct result of the chemicals I was exposed to in an unsafe and unprotected manner, I now have diminished vision in both eyes.

10.) I am expected to suffer life-long medical and related health problems as a direct result of the chemical exposures I experienced while working for W.R. Grace.

Peter P. Pearson

Signed Before me this _17Th_ day of May, 2004.

Notary Public

My Commission Expires:

OFFICIAL SEAL
DANA L. COOPER
NOTARY PUBLIC-ARIZONA
PIMA COUNTY
My Comm. Exp. Feb. 8, 2008

Affidavit Page 2 of 2