### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.*, | ) | Case No. 01-1139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date: June 21, 2004 @ 12:00 p.m.** |

## CREDITOR CHL ADMINISTRATIONS, INC.'S RESPONSE TO DEBTORS' FIFTH OMNIBUS OBJECTION TO CLAIMS (SUBSTANTIVE) [DKT. NO. 5527]

Creditor CHL Administration, Inc. (*"CHL"*) hereby responds to Debtors' Fifth Omnibus Objection to Claims (the *"Fifth Omnibus Objection"*) and in support thereof, states as follows:

1.      CHL's claim against Debtor W.R. Grace & Company's (*"W.R. Grace"*) is for remedial action costs that have been incurred and will be incurred to investigate and remediate CHL's contaminated real property at 7737 NE Killingsworth, Portland, Oregon (the *"Property"*), contamination caused in whole or in part by Debtor's spills and releases of toxic pesticides. CHL's claim is numbered 851 and was filed in a timely manner. A copy of claim 851 is attached as Exhibit "A".

2.      The Debtors' Fifth Omnibus Objection asks the Court to disallow CHL's claim due to Debtors' allegations that Debtors have no liability for the claim and that the claim is unliquidated.

**W.R. Grace Is Liable for the Investigation and Cleanup of CHL's Contaminated Property**

3.      The Property is located in Portland, Oregon about 0.5 mile south of the Columbia Slough, approximately 2 miles south of the Columbia River, and immediately to the west of the Columbia South Shore Wellfield Wellhead Protection Area. A map is attached as Exhibit "B".

The Columbia South Shore Wellfield, potentially endangered by Debtor's acts and omissions, is part of the City of Portland's water supply, is capable of producing 100 million gallons of water per day and is the emergency backup and supplemental drinking water supply for 800,000 people.

4.    In 1959, the Miller Products Company (*"Miller"*) acquired the Property and formulated horticultural chemicals on site. In 1966, W.R. Grace acquired the assets of Miller in a de factor merger and expanded the pesticide formulation operations at the site. W.R. Grace continued to operate the facility under the Miller Products Company name as a division of W.R. Grace. In 1970, CHL (then known as the *"Chas H. Lilly Co."*) purchased certain assets of the Miller Products Company division from W.R. Grace, including the Property. CHL has owned and operated the facility since 1970. In 1996, CHL ceased production at the facility and decommissioned the plant. The soil and groundwater at the Property are contaminated by pesticides.

5.    In 1991 the Oregon Department of Environmental Quality (*"ODEQ"*) proposed to list the Property on Oregon's Confirmed Release List, an inventory of sites where hazardous substances have been discharged into the environment. Exhibit "C". ODEQ added the Property on the Confirmed Release List in 1997, and designated it as a high priority site due to the Property's proximity to the Columbia Slough and the Columbia South Shore Wellfield, which provides drinking water to the City of Portland, Oregon. *Id.*; Exhibit "D". Rather than have ODEQ institute a formal enforcement action, CHL entered into a voluntary agreement dated December 20, 2001 with ODEQ to investigate and remediate soil and groundwater contamination at the Property. Exhibit "E". Recognizing the compulsory nature of a

- 2 -

"voluntary" agreement with an environmental agency, Oregon law defines such an agreement as the legal equivalent of a lawsuit. Or. Rev. St. § 465.480(1).

6.     Of the contamination encountered in CHL's investigation thus far, some of the most significant contamination is associated with various dry wells on the Property.   In approximately 1964, W.R. Grace installed numerous trench drains on the Property that led from pesticide formulation areas and drained to the dry wells.  W.R. Grace released pesticides to the dry wells and is responsible, at least in part, for this contamination.

7.     Recent investigation has found high levels of pesticide contamination in soil deep below areas that were paved sometime before CHL acquired the Property in 1970.  The highest levels of organochlorine pesticides, specifically chlordane and toxaphene, have been found in these soils well below the surface in the northern part of the Property.   This contamination occurred before the area was paved and, therefore, was caused by W.R. Grace and Miller before CHL acquired the Property.

8.     Further, W.R. Grace and its predecessor, Miller, formulated the pesticide products that have caused the most significant contamination at the Property.   The majority of the contamination at the Property has resulted from the ten pesticides listed on Exhibit "F".  W.R. Grace and Miller formulated products containing these pesticides at the Property between 1959 and 1970.  Of the ten pesticides, nine were either banned or had their registration cancelled by 1970 or during the 1970s. *See* Exhibit "F".  The registration was cancelled for most uses of the tenth pesticide by 1982. *Id.*  Thus, the highest priority contaminants at the property likely were spilled and released by W.R. Grace and/or Miller and have been damaging the environment since they were spilled and released.  Because CHL acquired the Property in 1970, it formulated little, if any, products containing the pesticides that constitute the most significant contamination on

- 3 -

the Property.    If W.R. Grace is not compelled to pay for the contamination it caused, CHL, a comparatively innocent third party, will be forced to bear the cleanup costs or, if as is likely, CHL is unable to afford the entire cleanup, the costs will be borne by Oregon's taxpayers.

9.    Under Oregon law, W.R. Grace is liable for the remedial action costs which have been or will be incurred by CHL and that are associated with the Property.  W.R. Grace is liable for remedial action costs in at least three different ways.  First, W.R. Grace owned and operated the Property from 1966 through 1970, during which time releases of hazardous substances occurred on the Property.  Or. Rev. St. § 465.255(1)(a).  Second, W.R. Grace became the owner and operator of the Property in 1966, after Miller's operations had caused releases of hazardous substances on the Property between 1959 and 1966, and W.R. Grace reasonably should have known of such releases.  Or. Rev. St. § 465.255(1)(b).  Third, W.R. Grace caused, contributed to and/or exacerbated releases of hazardous substances at the Property.    Or. Rev. St. § 465.255(1)(d).    In addition, W.R. Grace is liable for contribution for CHL's past and future remedial action costs because W.R. Grace is a liable party under Or. Rev. St. § 465.255.  Or. Rev. St. § 465.257(1).

10.    W.R. Grace is also liable to CHL under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 et seq, for response costs that it has incurred or will incur in connection with environmental contamination associated with the Property because W.R. Grace owned and operated the Property between 1966 and 1970 and hazardous substances were released at the Property during that period.  42 U.S.C. § 9607(a)(2).  Additionally, W.R. Grace is liable for contribution for CHL's past and future remedial action costs because W.R. Grace is a liable party under 42 U.S.C. § 9607.  42 U.S.C. § 9613(f)(1).

- 4 -

11.    W.R. Grace is also liable as the successor to Miller's liability for the Property because W.R. Grace's 1959 acquisition of Miller's assets constituted a de facto merger, and the result of the de facto merger is to impart successor liability on W.R. Grace. *Aluminum Co. of America v. Beazer East, Inc.*, 124 F.3rd 551, 565 (3rd Cir. 1997) (successor liability doctrine applies to CERCLA) *citing Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 310 (3rd Cir. 1985) *cert. den.* 474 U.S. 980 (1985) (factors determining successor liability). First, following the acquisition of Miller, W.R. Grace continued Miller's enterprise by operating the business under Miller's name, operating the business from the same facilities, producing the same product line, retaining Miller's operating assets, assuming Miller's general business obligations, and retaining at least one of Miller's management employees. Second, shareholder continuity existed before and after the transaction because W.R. Grace paid for Miller's assets with shares of its own stock. Third, following the transaction Miller ceased its ordinary business operations, liquidated, and dissolved. Fourth, W.R. Grace assumed those obligations of Miller necessary for the uninterrupted continuation of Miller's normal business operations.

12.    Under Oregon law, W.R. Grace is liable as the successor to Miller for the remedial action costs which have been or will be incurred by CHL and that are associated with the Property. First, Miller owned and operated the Property from 1959 through 1966, during which time releases of hazardous substances occurred on the Property. Or. Rev. St. § 465.255(1)(a). Second, Miller caused, contributed to and/or exacerbated releases of hazardous substances at the Property. Or. Rev. St. § 465.255(1)(d). In addition, W.R. Grace is liable as the successor to Miller for contribution for CHL's past and future remedial action costs under Or. Rev. St. § 465.255. Or. Rev. St. § 465.257(1).

- 5 -

13.     W.R. Grace is also liable to CHL under CERCLA as the successor to Miller for response costs that it has incurred or will incur in connection with environmental contamination associated with the Property because Miller owned and operated the Property between 1959 and 1966 and hazardous substances were released at the Property during that period. 42 U.S.C. § 9607(a)(2). W.R. Grace is also liable as the successor to Miller for contribution for CHL's past and future remedial action costs under 42 U.S.C. § 9607. 42 U.S.C. § 9613(f)(1).

**W.R. Grace Is Liable for CHL's Past and Future Investigation and Remediation Costs**

14.     The presence of high levels of pesticides in the groundwater and soil at the Property has forced CHL to perform a remedial investigation and remediation. Through May 2004, CHL has incurred $691,385 in past investigation and cleanup costs associated with the Property. Invoices for these past costs are attached as Exhibit G. These costs are liquidated and should not be disallowed by the Court.

15.     At least three additional phases of investigation will be required to meet the remedial investigation objectives specified by ODEQ. In addition, ODEQ will require that CHL complete human health and ecological risk assessments. It is probable that ODEQ will conclude that the risk assessments show that hazardous substances at the Property pose an unacceptable risk. Based on this determination, ODEQ will require that a feasibility study be completed to select a final remedy for the Property. ODEQ will then require implementation of the remedy it selects.

16.     At a minimum, it is likely that the final remedy required by ODEQ will include replacement of the existing storm water system to prevent storm water from continuing to drive soil contamination from the dry wells into groundwater. In addition, it is likely that ODEQ will require the final remedy to include (a) removal of soil below selected dry wells to eliminate a

- 6 -

potential pathway of hazardous substance migration to groundwater; (b) removal of soils in the northwest tank farm, around the former septic tanks, beneath former formulation and packaging building trenches, beneath the former malathion/toxaphene tank, and around the existing and former underground storage tanks to eliminate potential sources of hazardous substance migration to groundwater; (c) removal of surface soils on the adjacent Hoffman Construction property that pose a potential offsite threat to human health and the environment; (d) capping of selected areas to prevent hazardous substance migration to groundwater and adjacent properties via runoff or wind erosion; (e) in-situ treatment of the shallow, perched groundwater zone to address a potential source of hazardous substance migration to deep groundwater; and (f) long-term groundwater monitoring to demonstrate the effectiveness of source removal activities and remedy protectiveness. Based on the results of pending investigations, ODEQ may require removal of soil or other remedial actions in other areas as well.

17.     CHL will present expert testimony at the hearing estimating future remedial action costs to exceed $6.6 million. These costs will cover the following activities necessary to complete the investigation and remediation of the Property: (a) completion of remedial investigation tasks; (b) completion of human health and ecological risk assessments; (c) completion of a feasibility study; (d) negotiation of a Record of Decision, including preparation and review of the ODEQ staff report and soliciting public comment; (e) negotiation of a Consent Decree; (f) implementation of the final remedy; (g) continued groundwater monitoring before and as part of the final remedy; (h) abandonment of monitoring wells; and (i) preparation of final remedial action report.

18.     CHL's future costs of investigation and remediation are allowable under *In re Allegheny Intern., Inc.*, 126 B.R. 919 (W.D.Pa. 1991) *aff'd* 950 F.2d 721 (3rd Cir. 1991) (without

- 7 -

opinion).  In that case, the bankruptcy court had disallowed the creditor's claim, for CERCLA remedial action costs, pursuant to 11 U.S.C. § 502(e)(1)(B) because it found that the claim was contingent and that the creditor and debtor were co-liable for remediation costs to federal and state environmental protection agencies.  *Id.* at 921.

The district court reversed, finding that § 502(e)(1)(B)[1] "is not a means of immunizing debtors from contingent liability, but instead protects debtors from multiple liability on contingent debts."  *Id.* at 923-24.  Although both the creditor and debtor were liable under CERCLA, the creditor had begun the remediation itself, and thus the debtor was directly liable to the creditor.  *Id.* at 920-21.  The environmental agencies had not performed the cleanup or demanded payment from the creditor, causing the creditor in turn to seek contribution from the co-liable debtor.  The court found that "the distinction between a cleanup performed by [the creditor] and a cleanup performed by EPA is crucial."  *Id.* at 921.  On later appeal, the Third Circuit refused the debtor's invitation to revisit the issue and upheld the holding that section 502(e)(1)(B) did not disallow the claim.  *AL Tech Specialty Steel Corp. v. Allegheny Intern. Credit Corp.*, 104 F.3rd 601, 605-6 (3rd Cir. 1997).

19.    *In re Allegheny Intern., Inc.* demonstrates that CHL's claim for future remedial action costs is allowable.  As in that case, CHL, not a government agency, has begun to perform the investigation and remediation.  The key fact is that ODEQ has not performed a cleanup and

---

[1] 11 U.S.C. § 502(e)(1)(B) provides:

"[T]he court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on . . . the claim of a creditor, to the extent that –

. . .

(B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution;"

sought cost recovery from CHL, causing CHL to then seek contribution from W.R. Grace. As in *In re Allegheny Intern., Inc.*, CHL has asserted a direct claim against W.R. Grace, and therefore § 502(e)(1)(B) does not apply to prevent multiple claims against the debtor.[2]

20.    There is no question that Debtor is liable for CHL's past costs of $691,385. Because the Court should allow CHL's claim for future remedial action costs, the Court may at a later time estimate the claim pursuant to 11 U.S.C. § 502(c). At this point, however, W.R. Grace has not moved for such a claim estimation.

21.    Debtors may contact CHL's attorneys, listed below, regarding CHL's claim, Debtor's objection, or settlement discussions.

Dated: June 4, 2004

**BLANK ROME LLP**

*[signature]*

Elio Battista, Jr. (DE No. 3814)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:    (302) 425-6400
Facsimile:    (302) 425-6464

Michael B. Schaedle
**BLANK ROME LLP**
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone:    (215) 569-5500
Facsimile:    (215) 569-5522

- and -

---

[2] *In re Kaiser Group Intern., Inc.*, 289 B.R. 597 (D. Del. 2003), denying future CERCLA remediation costs under § 502(e)(1)(B), is distinguishable. Although the court's analysis of § 502(e)(1)(B) was minimal, *id.* at 608, the court appeared to disallow the claim to avoid the possibility of multiple recoveries against the debtor's estate. Here there is no such possibility of multiple recoveries. Instead, *Allegheny Intern., Inc.*, a case approved by the Third Circuit, is on point and its reasoning applies to this case—disallowing the claim for future costs would unfairly immunize Debtor from its liability.

- 9 -

**STOEL RIVES LLP**
Richard Josephson (Oregon Bar No. 73374)
Paul Logan (Oregon Bar No. 01509)
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204
Telephone:    (503) 224-3380
Facsimile:    (503) 222-2480

Attorneys for CHL Administration, Inc.

900200.00001/40140648v1