# EXHIBIT A

B10 (Official Form 10) (Rev. 04/01)

| UNITED STATES BANKRUPTCY COURT<br>For the District of Delaware | PROOF OF CLAIM |
|---|---|

| In re: W. R. Grace & Co., et al., Debtors | Case Number: 01-1139 (JJF)<br>(jointly administered) |
|---|---|

NOTE: This claim should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**Creditor Name**
(Person or entity debtor owes) CHL Administration, Inc.

Address Line 1   PO Box 6029

Address Line 2

Address Line 3

City, ST ZIP   Portland, OR  97228

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach Copy of statement giving particulars.

☒ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court

THIS SPACE IS FOR COURT USE ONLY

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:

Check here if this claim ☐ replaces ☐ amends a previously filed claim dated: _____

**1. BASIS FOR CLAIM**

☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other (Describe Briefly)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (Fill out below)

Your social security No. _____

Unpaid compensation for services performed
from _____ to _____
(date)         (date)

contribution claim for remediation of contaminated property

**2. Date Debt Incurred: (MMDDYY)**
1 2 | 2 0 | 0 1

**3. If Court Judgment, Date Obtained:**

**4. CLASSIFICATION OF CLAIM.** Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

☐ SECURED CLAIM
Attach evidence of perfection of security interest
Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle   ☐ Other (Describe briefly)

Amount of arrearage and other charges at time case filed included in secured claim above, if any $ _____

☒ UNSECURED NONPRIORITY CLAIM
A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

☐ UNSECURED PRIORITY CLAIM - Specify the priority of the claim.
☐ Wages, salaries, or commissions (up to $4,650), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3)
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4)
☐ Up to $2,100 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6)
☐ Taxes or penalties of governmental units - 11 U.S.C. § 507 (a)(7)
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a) _____

**5. AMOUNT OF CLAIM AT TIME CASE FILED:**

| (Secured) | u n l i q u i d a t e d (Unsecured Nonpriority) | (Unsecured Priority) |
|---|---|---|

☐ Check this box if claim includes charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

**6. CREDITS AND SETOFFS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.

**7. SUPPORTING DOCUMENTS:** *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, attach a summary.   see attachment A

**8. TIME-STAMPED COPY:** To receive an acknowledgment of the filing of your claim, enclosed a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**Exhibit A**



John A. Kitzhaber, M.D., Governor

**Department of Environmental Quality**
Northwest Region Portland Office
2020 SW 4th Avenue, Suite 400
Portland, OR 97201-4987
(503) 229-5263
FAX (503) 229-6945
TTY (503) 229-5471

December 20, 2001

Fred Trullinger
CHL Administration
PO Box 6029
Portland Oregon 97228

RE:   **Charles H Lilly**
      **7737 NE Killingsworth Street, Portland, Oregon**
      **DEQ ECSI File No. 102**

Dear: Mr. Trullinger:

This letter serves as an Agreement (Letter Agreement) between the Department of Environmental Quality (DEQ) and CHL Administration (CHL) regarding DEQ review and oversight of a focused remedial investigation (RI) to investigate the nature and extent of the hazardous substance releases documented at the site. The site is the former Charles H. Lilly Facility located at 7737 NE Killingsworth in Portland, Oregon and is identified by DEQ as ECSI file #102. This letter also serves to clarify DEQ's role and intentions with regard to the work to be conducted by CHL under this Letter Agreement.

**Work to be Performed**

The site was used as a pesticide blending and packaging facility. Following site assessment work in 1991, the site was placed on the Confirmed Release List and Inventory. The extent of contamination has yet to be determined. DEQ has determined that a focused RI of the former Charles H. Lilly facility is necessary to adequately evaluate risks to human health and the environment. DEQ is requiring that you complete a RI. The RI will be completed under DEQ oversight pursuant to a letter agreement between DEQ and CHL.

Under this Letter Agreement, DEQ will perform the following review and oversight activities.

- Conduct a file and document review to clarify the DEQ concerns presented in the assessment and review CHL proposals for investigation scope of work.
- Conference with you and/or your consultants to discuss projects issues or matters.
- Review environmental documents submitted by CHL or on CHL's behalf, and provide DEQ comments within 30 days of DEQ's receipt of documents.
- Perform limited laboratory analyses of soil or groundwater samples collected by CHL, as necessary to validate your data.

**Attachment B**

RECEIVED
STOEL RIVES LLP

- Conduct site visit (s), inspection(s) or sampling event(s) as necessary during the course of this Letter Agreement.
- Conduct public outreach within the limits of Oregon cleanup law.
- Perform administrative tasks required for management of DEQ's cleanup program.
- If results of the RI indicate soil and groundwater contamination do not exceed acceptable risk-based concentrations, complete a No Further Action (NFA) determination.
- If results of the RI indicate soil and groundwater contamination does exceed acceptable risk-based concentrations, negotiate a Consent Order and Scope of Work for further site investigation.

Under this Letter Agreement, CHL agrees to perform a focused RI in accordance with the statement of work included as attachment A with this letter.

All work done under this Letter Agreement must be performed in compliance with ORS 465 and with the State's Environmental Cleanup Rules, Oregon Administrative Rules (OAR) 340-122, and be consistent with the Department's guidance. Any monitoring wells installed as part of this work must be installed in accordance with OAR 690-240 and DEQ's "Groundwater Monitoring Well Drilling, Construction, and Decommissioning" guidelines dated August 24, 1992. In addition, a site-specific health and safety plan must be prepared in compliance with 29 CFR 1910.120. The work may incorporate existing data so long as the data is of sufficient quality for the intended use.

Through each phase of the work covered under this Letter Agreement, CHL agrees to proceed with timely and good faith negotiations for work scoping and to expeditiously carry out the work necessary to address DEQ's concerns regarding historic releases of hazardous substances at the site.

## DEQ Access and Oversight

CHL must notify DEQ 5 days in advance of any drilling, sampling, or other site activities performed under this Letter Agreement. CHL will allow DEQ and its agents to enter and move freely about the facility at all reasonable times for the purpose of observing activities performed under this Agreement, conducting tests, and taking samples as DEQ deems necessary, and verifying data submitted to DEQ by you or on your behalf. DEQ agrees to abide, to the extent possible, consistent with its statutory responsibilities, by all reasonable health and safety rules, plans and procedures provided by CHL or their consultants.

## Reimbursement of DEQ Oversight Costs

DEQ requires a deposit in the amount of $5,000.00 as an advance against costs that DEQ's Site Response Program has incurred related to the Lilly Facility since August 1, 2001 and future oversight costs. The advance deposit must be in the form of a check payable to DEQ. Once you have signed this letter and your deposit is received, DEQ will credit the CHL sub-account of the Hazardous Substances Remedial Action Fund established for the Charles H. Lilly site. Funds in the sub-account will be drawn upon as project costs are incurred by DEQ.

DEQ will provide CHL with a monthly statement, a sample of which is attached. In the event project costs exceed the sub-account balance, DEQ will submit to CHL an invoice for any costs in excess of the advance. In the event project costs do not exceed the sub-account balance, DEQ will refund the amount of the deposit remaining in excess of the actual costs within 60 days of the close of the project. If an agreement for further action is necessary then DEQ will apply any remaining amount toward oversight of an administrative agreement.

DEQ project costs will include direct and indirect costs. Direct costs include site-specific expenses and legal costs. Indirect costs are those general management and support costs of DEQ and of the Waste Management and Cleanup Division (WMCD). Indirect costs are those allocable to DEQ oversight of this Letter Agreement, which are not charged as direct, site-specific costs. Indirect charges are based on actual costs and are applied as a percentage of direct personnel services costs. Review and oversight costs shall not include any unreasonable costs or costs not otherwise recoverable by DEQ under ORS 465.255.

## No Admission of Liability or Release of Claims

DEQ shall not be liable for any claims (including but not limited to claims of property damage or personal injury) arising from activities performed by CHL and their employees, officers, agents, and consultants under this Letter Agreement.

This Letter Agreement is not and shall not be construed as an admission by CHL or its officers, shareholders, directors or agents of any liability under ORS 465.255 or any other law or as a waiver of any defense to such liability. This Letter Agreement is not and shall not be construed as a waiver, release or settlement of any present or future claims DEQ may have against CHL or any other person or as a waiver of any enforcement authority DEQ may have with respect to CHL or the CHL property. Upon DEQ's request and as necessary to oversight of the work performed under this Letter Agreement CHL shall provide DEQ with data and records related to evaluation and/or investigation work at the property, excluding any privileged documents identified as such by CHL.

## Duration and Termination

This Letter Agreement shall terminate upon entry of a Consent Agreement or formal VCP Agreement, if necessary, or completion of all DEQ-approved work and final payment of all oversight costs leading to DEQ issuance of an NFA determination. DEQ's decision to issue a Consent Agreement, or an NFA will be made within 45 days of receiving the final focused RI report from CHL.

This letter agreement may be amended and/or extended by written agreement between CHL and DEQ. Either party, by giving 15-days written notice, may also terminate this Letter Agreement. If CHL declines to enter this Letter Agreement, terminates the Letter Agreement prior to completion of the required work, or fails to perform the required work within a reasonable time, then DEQ will use its authority under the Environmental Cleanup Law and will take appropriate action necessary to assure the required work is completed and to protect human health and the environment.

Upon completion of the focused RI submitted by CHL to DEQ under this Letter Agreement, CHL shall notify DEQ and request (1) confirmation of completion of the work, and (2) an NFA determination by DEQ. If the work has been completed in accordance with the DEQ-approved plans, DEQ shall confirm such completion in writing. If the work meets the requirements for an NFA determination and de-listing criteria, DEQ shall issue a written determination of NFA.

Only those costs incurred or obligated by DEQ prior to the effective date of any termination of the Letter Agreement shall be recoverable under this Letter Agreement. Termination of this Letter Agreement will not affect any other right the DEQ may have for recovery of costs under any applicable law.

DEQ designates Robert Williams as the DEQ Project Manager for the review and oversight activities previously described. The Project Manager can be reached at (503) 229-6802 for further information. DEQ looks forward to working with you and appreciates your timely response to investigating the release of hazardous substances.

Sincerely,

Dave St Louis, Manager
Site Response Section
DEQ Northwest Region

If the terms of this Letter Agreement are acceptable to you, please sign in the space provided below and return a signed copy to us.

Accepted and agreed to this 6th day of January 2002.
CHL Administration, Inc.

By: _____

Title: Pres. _____

Attachments

cc:   Robert Williams, DEQ, NWR, Larry Edelman, DOJ, Dave St. Louis, DEQ, NWR,
      Norm King, DEQ, HQ

## ATTACHMENT A

### FOCUSED REMEDIAL INVESTIGATION SCOPE OF WORK

**I.    SCHEDULE**

CHL will submit a summary of historical and recent investigations and conceptual options for a Remedial Investigation (RI). This will be followed by an RI work plan and report to address all elements of this Scope of Work (SOW). DEQ will review and approve documents. All work completed under this Agreement will proceed in accordance with the schedule below:

| SUBMITTALS | SCHEDULE |
|---|---|
| RI Historical Summary/Scoping Document | To DEQ by Jan 31, 2002 |
| DEQ Review and Comment | To CHL within 10 days of receipt of scoping document |
| Draft RI Work Plan | To DEQ within 30 days of receipt of DEQ comments on RI Scoping document |
| DEQ Review and Comment | To CHL within 21 days of receipt of draft RI Work Plan |
| Final RI Work Plan | To DEQ within 21 days of receipt of DEQ comments on draft RI Work Plan |
| Initiation of RI | To be specified in RI Work Plan. |

CHL will collaborate with DEQ and, as necessary, to reflect or incorporate newly discovered information and/or environmental conditions, may amend all work plans. Additional work plans and work plan amendments are subject to DEQ review and approval and will be processed according to schedules negotiated between the parties at the time of each phase change or task addition. CHL will initiate and complete work according to the schedule specified in the applicable approved work plan or amendment.

**II. OBJECTIVES**

    A.    Work performed under this Agreement will complement and incorporate existing site information with the following overall objectives:

        1.    Identify the hazardous substances, which have been released to the environment.

        2.    Determine the nature, extent and distribution of hazardous substances in affected media.

        3.    Determine the direction and rate of migration of hazardous substances.

        4.    Identify migration pathways and receptors.

        5.    Evaluate the risk to human health and/or the environment.

    B.    Work performed under this Agreement will complement and incorporate existing site information with the following specific objectives:

1.      Investigation of releases to soil and groundwater from all building drains, dry wells, storage tanks, and general operations.

2.      Determination of land and water uses within the locality of the facility.

3.      Documentation regarding the presence or absence of any contaminant pathways to the Columbia Slough.

4.      Documentation on the current use and regulatory status of site dry wells.

## III.    RI PROPOSAL

The RI Proposal will briefly discuss CHL's proposed approach to the RI, addressing soil, groundwater, surface water, sediments, and air, as necessary to characterize the facility. The proposal will provide the framework for the RI Work Plan and will include at a minimum, a summary of data collected to date, a conceptual site model (including a conceptual site hydrogeologic model), a description of RI goals and objectives and an estimated schedule for completion of the RI.

## IV.    REMEDIAL INVESTIGATION WORK PLAN

The work plan will be developed in accordance with applicable Oregon Administrative Rules (OAR 340-122-010 through -115), DEQ guidance and, as appropriate, the Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA, OSWER Directive 9355.3-01, 1988. The submitted work plan shall include, but not be limited to the following items:

### A.    PROJECT MANAGEMENT

The RI Work Plan will include a proposed schedule for submittals and implementation of all proposed activities and phases pertaining to this SOW. This schedule will specify submittal dates for the draft and final RI Report. It will also include a description of the personnel (including subcontractors, if known) involved in the project, and their respective roles in the project; and a discussion of how variations from the approved work plan will be managed.

### B.    SITE DESCRIPTION

The RI work plan will include a discussion of the current understanding of the physical setting of the site and surrounding area; the site history; hazardous substance and waste management history; and current site conditions.

### C.    SITE CHARACTERIZATION

The RI work plan will include a Site Characterization plan consistent with DEQ guidance and the requirements specified in OAR 340-122-080, including but not be limited to, characterization of the hazardous substances, characterization of the facility, identification of potential receptors and the collection and evaluation of information relevant to the identification of hot spots of contamination. The Site Characterization plan will address the following:

1.      Soils

Objective:      To identify and characterize releases of hazardous substances at or from the facility to soils.

Scope:    The plan will supplement previous soil sampling at the facility.  The plan will address all areas which could potentially have received spills, leaks from tanks or piping, waste treatment or disposal, or contaminated surface water or storm water runoff, and all other areas where soil contamination is known or suspected.

Procedures: The plan will be designed and conducted to determine the vertical and lateral extent of soil contamination, characterize the site geology, determine the physical and chemical soil characteristics relevant to the RI, evaluate the potential for contaminant migration and gather the information necessary to identify hot spots of contamination.  The plan will include the proposed methodology for characterizing soil.

2.    <u>Groundwater</u>

Objective:  To identify and characterize releases of hazardous substances at or from the facility to groundwater.

Scope:  The plan will supplement previous investigations at the facility, and identify and characterize all past, current and potential releases of hazardous substances to groundwater.

Procedures:  The plan will be designed and conducted to determine the vertical and lateral extent of groundwater contamination; characterize the site hydrogeology, determine the physical and chemical water bearing zone characteristics relevant to the RI.  The plan will evaluate the potential for contaminant migration through groundwater; and gather the information necessary to identify hot spots of contamination.  The plan will include the proposed methodology for characterizing groundwater.  Monitoring wells and other holes must be drilled, constructed and decommissioned in accordance with OAR Chapter 690, Division 240 and DEQ "Ground Water Monitoring Well, Drilling, Construction and Decommissioning" guidelines (1992).

3.    <u>Surface Water and Sediments</u>

Objective: To identify and characterize releases of hazardous substances at or from the facility to surface water and sediments.

Scope:    The plan will supplement previous investigations at the facility and will identify and characterize all past, current, and potential impacts to surface waters and sediments.

Procedures:  At a minimum, the plan will delineate past and present surface drainage patterns at the site and evaluate whether surface water and sediments may have been impacted by releases of hazardous substances. Unless this evaluation is sufficient to demonstrate that surface water or sediment quality has not been impacted, an appropriate surface water and sediment characterization plan will be prepared. The plan will be designed to delineate the nature and extent of contamination, characterize the site hydrology, determine the physical and chemical surface water and sediment characteristics relevant to the RI, evaluate the potential for contaminant migration and gather the information necessary to identify hot spots of contamination.  The plan shall include the proposed methodology for characterizing surface water and sediments.

4. .    <u>Air</u>

Objective: To identify and characterize the release of hazardous substances to the air, from soil, surface water, or groundwater contamination at or from the facility.

Scope: The plan will supplement previous investigations at the facility and will identify and characterize all past, current and potential releases (e.g. from contaminated soil or groundwater) of hazardous substances to indoor or outdoor air.

Procedures: The plan will include the proposed methodology for evaluating air emissions and vapor intrusion using appropriate emission calculations and/or a field sampling program. The plan will be designed to delineate the nature and extent of contamination, characterize the site climatology, determine the physical and chemical air characteristics relevant to the RI, evaluate the potential for contaminant migration and gather the information necessary to identify hot spots of contamination.

5. Identification of Current and Reasonably Likely Future Land and Water Use

Objective: To identify current and reasonably likely future land and water uses in the locality of the facility.

Scope: The plan will be designed to identify current and reasonably likely future land and water uses for the purposes of identifying hot spots of contamination and conducting baseline human health and ecological risk assessments in accordance with OAR 340-122-080 and DEQ Guidance.

Procedures: The plan will include the proposed methodology for identifying current and reasonably likely future land and water uses in the locality of the facility.

D.    SAMPLING AND ANALYSIS PLAN (SAP)

Objective: To adequately document all sampling and analysis procedures.

Scope:    In preparation of the SAP, the following guidance documents will be utilized: EPA Guidance on Data Quality Assurance, January 1997 and Test Methods for Evaluating Solid Waste, SW-846. The SAP will address all topics listed in Land Quality Division Policy #760.000, Quality Assurance Policy.

Procedures: The work plan will include a sampling and analysis plan (SAP). The SAP will include quality assurance and quality control (QA/QC) procedures for both field and lab procedures. The SAP will be sufficiently detailed to function as a manual for field staff.

E.    HEALTH AND SAFETY PLAN (HASP)

Objective: To establish policies and procedures to protect workers and the public from the potential hazards posed by the hazardous materials at the site.

Scope: The HASP portion of the work plan will comply with 29 CFR 1910.120 and OAR Chapter 437, Division 2.

Procedures: The HASP will include a description of risks related to RI activities, protective clothing and equipment, training, monitoring procedures, decontamination procedures and emergency response actions required to safely conduct the work.

### F.    MAPS

The work plan shall include a scaled map or maps of the facility, which clearly show site topography, on-site structures including all past and present product and fuel storage tanks, any waste disposal areas, spill and soil removal areas, dry wells, existing monitoring wells, past and proposed sampling locations.

## V.    RISK ASSESSMENT SCREENING

### A.    HUMAN HEALTH RISK ASSESSMENT SCREENING

CHL shall complete a screening level risk assessment based on the results of the land and water use determinations, and potentially complete exposure pathways. Criteria to be used in the risk screening shall include standards in OAR 340-122-045 and U.S. EPA Region 9 Preliminary Remediation Goals (PRGs). The risk screening will be used to determine the need for additional RI data collection and completion of a more comprehensive baseline risk assessment in accordance with DEQ guidance.

### B.    ECOLOGICAL RISK ASSESSMENT SCREENING

CHL shall complete a Level I Ecological Risk Assessment scoping in accordance with DEQ guidance. The results of the scoping activities will be used to identify the need for additional RI field activities to characterize the potential risks to ecological receptors.

## VI.    REPORT DISTRIBUTION.

1.    Three (3) bound and one (1) unbound copy(s) of all reports will be submitted to DEQ.

2.    DEQ requests that all copies be duplex printed on recycled paper.

## ATTACHMENT A TO PROOF OF CLAIM
## OF
## CHL ADMINISTRATION, INC.

In re W.R. Grace & Co., et. al., Debtors, Chapter 11 Case No. 01-1139 (JJF)
United States Bankruptcy Court for the District of Delaware

W.R. Grace & Co. ("W.R. Grace") is indebted to CHL Administration, Inc. ("CHL"), formerly the Chas H. Lilly Company ("Lilly"), for all or part of the costs of remedial action regarding CHL's contaminated property at 7737 NE Killingsworth, Portland, Oregon (the "Property"). W.R. Grace owned the Property and operated a pesticide formulation facility on the Property from 1966 until 1970. In 1970 W.R. Grace sold the Property to Lilly. Lilly and CHL have owned the Property from 1970 to the present.

In a letter dated December 20, 2001, the Oregon Department of Environmental Quality demanded that CHL begin remedial action to address soil and groundwater contamination at the Property. A copy of the letter is attached as Attachment B. CHL believes that W.R. Grace is responsible for some, if not all, of the contamination. Under ORS 465.255 and ORS 465.257, CHL has a claim for its remedial action costs, or for contribution to its remedial action costs, that it has incurred or will incur in connection with any release for which W.R. Grace is liable.

Similarly, CHL has a claim against W.R. Grace under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607, for its response costs, or for contribution to its response costs, that it has incurred or will incur in connection with any release for which W.R. Grace is liable.