IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

**Objection Deadline:  July 2, 2004 at 4:00 p.m.**
**Hearing Date:  July 19, 2004 at 12:00 p.m.**

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(A) AND 363 OF THE
BANKRUPTCY CODE FOR THE ENTRY OF AN ORDER AUTHORIZING THE
DEBTORS TO ADVANCE FUNDS TO A NON-DEBTOR SUBSIDIARY TO ACQUIRE
ALLTECH INTERNATIONAL HOLDINGS, INC. AND ITS SUBSIDIARIES**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby submit this motion (the "Motion") for the entry of an order authorizing the Debtors to

advance funds to The Separations Group ("TSG"), a wholly-owned, non-debtor subsidiary of

W.R. Grace & Co.-Conn ("Grace-Conn"), to acquire Alltech International Holdings, Inc., a

Delaware corporation, and all of its subsidiaries (collectively, "Alltech"), for a purchase price not

to exceed $54.8 million plus an additional $3.1 to fund any initial cash requirements.  In support

of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## Jurisdiction

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this motion is proper under 28 U.S.C. § 1408.

2.      The statutory predicates for this Motion are sections 105(a) and 363(b) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rule 9019 the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

3.      On April 2, 2001 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Chapter 11 Cases have been consolidated for administrative purposes only, and, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

4.      The Debtors operate their specialty chemicals and materials businesses through five business units. Specialty Materials (formerly Silica Products) is one of those business units, which includes TSG's primary business line of separations products (the "Separations Business"). The Separations Business manufactures and sells chromatography products[2] to pharmaceutical, biopharmaceutical, biotechnology, specialty chemical and other industries, and is the fastest-growing product line in Specialty Materials.

---

[2]  Chromatography products consist of media (e.g., silica), columns, accessories and instruments (e.g., pumps, detectors and software) that enable the separation of thousands of molecules in a complex mixture. Chromatography products are used to perform analysis, production purification and quality assurance functions. For example, chromatography products are used to separate a sample of potential drug candidates or chemicals from a water sample for further analysis.

5.    The proposed acquisition represents a continuation of the Debtors' strategy to increase the value of its Specialty Materials business by moving the business into the high-growth, high-margin $6.7 billion media-based separations segment.[3]  To date, the Debtors have executed this strategy through both an extensive program of research and development and through a series of acquisitions by the Separations Business (the "Prior Acquisitions").  The Debtors believe that this strategy will result in a market valuation for its Separations Business that will be considerably higher than the traditional market valuation for specialty chemical companies.

6.    Alltech would be the fourth acquisition by the Separations Business.  Founded in 1970, Alltech is a privately-held chromatography company headquartered in Deerfield, Illinois, that employs 262 people globally; 146 in the United States and 116 internationally.   The company manufactures, markets and distributes a broad line of chromatography products primarily consisting of consumables and instruments used in High Performance Liquid Chromatography ("HPLC"), Gas Chromatography ("GC"), Ion Chromatography ("IC") and Solid Phase Extraction ("SPE") technologies.  In 2003, Alltech had worldwide sales of $46.2 million.  Alltech has manufacturing facilities in the United States, England and Belgium, and it has R&D laboratories in those same locations.

7.    Alltech has an extensive sales, marketing and distribution organization that sells chromatography consumables and instruments throughout the world, including in countries

---

[3]  Media-based separations are techniques that exploit the physical or chemical characteristics of a mixture's components to achieve molecular separation that is enabled by the use of media (e.g., silica or polymer).  Chromatography and magnetic separations are two examples of techniques that use media to separate.

where biotechnology and pharmaceutical growth is concentrated such as China, Japan, England, Germany, and the United States.    Alltech has 147 sales, marketing, technical service and customer service employees based out of 22 locations globally offering a complete line of chromatographic products, timely delivery and regional customer support.    Alltech also has an extensive dealer and distributor relationship outside of the United States with dealers servicing over 60 countries.

### The Transaction

8.    TSG and certain shareholders of Alltech holding over 90% of the outstanding shares of capital stock of Alltech have negotiated Stock Purchase Agreements, by which TSG will purchase all of those shares from the Alltech shareholders.

9.    The closing of the stock purchase transaction (the "Closing") will be followed by a short-form merger between TSG and Alltech, with Alltech surviving.

10.    As a result of the transaction, the merged company will become a wholly-owned subsidiary of W. R. Grace & Co.-Conn.    German antitrust premerger approval will be required before the transaction closes.    The parties have negotiated a total purchase price of $54.8 million for the combined stock purchase and merger transaction (the "Purchase Price").    The Purchase Price is comprised of $47 million in cash and the assumption or repayment of $7.8 million of outstanding Alltech debt.    The Purchase Price is also subject to (a) a post-closing net worth adjustment and (b) an escrow to secure indemnity obligations under the Stock Purchase Agreement.

11.    The Debtors intend to fund TSG's purchase of Alltech and its initial cash requirements with a portion of the approximately $84 million the Debtors collected from Grace

4

GmbH and Co. KG in the 2nd Quarter of 2004 as payment of principal on an intercompany loan owed by Grace GmbH and Co. KG to the Debtors. The acquisition of Alltech will be completed with the combination of a loan to TSG ($27 million) and an investment in TSG ($20 million).

12.    Each item of Alltech debt outstanding at the time of the Closing will remain outstanding after the Closing or, if so required by a lender, will be discharged by repayment in full by Alltech at or before the Closing. As of December 31, 2003, Alltech's debt (the "Alltech Debt") consisted of:

(a)    a $5.6 million, secured Bank One line of credit that was scheduled to expire on May 31, 2004 if not renewed for one year through May 31, 2005, but the line of credit was recently extended for 30 days to June 30, 2004; the loan bears interest at Bank One's prime rate; $2.5 million was outstanding under that line of credit;

(b)    a $0.2 million Bank One installment loan balance related to equipment financing; the loan bears interest at 9.5%;

(c)    a $2.7 million unsecured note payable to the majority shareholder, Richard Dolan; the note bears interest at prime, which is currently 4.0%, and is payable on demand; $2.6 million was outstanding under the note; and

(d)    certain foreign mortgages, loans and similar financial obligations of Alltech's foreign subsidiaries, totaling approximately $2.5 million.

13.    TSG and the Debtors have conducted intensive due diligence of Alltech. Among other matters, the Debtors: (i) reviewed documentation provided by Alltech; (ii) had extensive discussions with Alltech management; (iii) reviewed Alltech's historical audited financial statements and Alltech's 2003 draft audited financial statements and audit work papers; (iv) inspected Alltech's facilities in Illinois, Pennsylvania, Belgium and the U.K. and is completing its evaluation of Alltech's environmental risks. In addition, the Debtors believe that the Stock Purchase Agreement provides contractual protections suitable and customary for a transaction of this nature, including the net worth adjustment and the indemnity escrows.

14.    Alltech has been sued in Federal District Court in California by Dionex Corporation for alleged infringement of 3 Dionex patents in connection with Alltech's sale of certain ion chromatography suppressor devices. The litigation is in the early stages of discovery. Debtors' patent counsel has investigated the litigation and has evaluated Alltech's liability exposure and its prospects in defending the litigation. TSG will require Alltech's controlling shareholder to indemnify against a proportion of the liability arising out of the litigation, and a portion of the purchase price will be deposited into escrow to secure that indemnity obligation.

15.    As part of the transaction, TSG will agree to pay to one high-level employee severance equal to 2-times base salary, in the event that the employee is involuntarily terminated by TSG within three years of the closing of the transaction. The agreement will also provide that, in certain other circumstances, the employee may become entitled to severance equal to 1-times salary upon his termination of employment with TSG within 3 years of such closing. In all other cases, employees of Alltech will be covered by the existing Grace severance plan for salaried employees. TSG will also agree to pay each of 4 other high-level key employees "stay bonuses" equal to 20% of base salary, if such employee remains employed after the closing and until at least December 31, 2005.

## Relief Requested

16.    The Debtors respectfully request that the Court enter an Order authorizing the Debtors to provide funds, up to $57.9 million, to TSG for (i) the acquisition of Alltech on substantially the terms and conditions described in this Motion and (ii) the initial cash requirements for the operation of Alltech and its subsidiaries and/or (iii) for purposes of paying and discharging Alltech's debt obligations simultaneously with the closing of the acquisition.

6

## Basis for Relief

17.     Section 105(a) of the Bankruptcy Code "permits the court to issue any order that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a). Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." A court has the statutory authority to authorize a debtor to use property of the estate pursuant to section 363(b)(1) of the Bankruptcy Code when such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith. In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); see also Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by "some articulated business justification"); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b)); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Ernst Home Center, Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

18.     Under section 363(b) of the Bankruptcy Code, a debtor must establish that it has a valid business purpose for using the estate's property outside the ordinary course of business. See Lionel Corp., 722 F.2d at 1070-71. Once the debtor has articulated such a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the debtor's best interest. See In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R.

7

612, 615-16 (Bankr. S.D. N.Y. 1986) ("[T]he Code favors the continued operations of a business by a debtor and a presumption of reasonableness attaches to debtor's management decisions."). A party in interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." Montgomery Ward, 242 B.R. at 155.

19.     Courts have applied four factors in determining whether a sound business justification exists: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided. See Lionel Corp., 722 F.2d at 1071 (setting forth the "sound business purpose" test); Abbotts Dairies, 788 F.2d at 145-47 (implicitly adopting the articulated business justification test of the Lionel standard and adding the "good faith" requirement); Delaware & Hudson, 124 B.R. at 176 (adopting Lionel in this district). The acquisition of Alltech meets each of these requirements.

20.     *Sound Business Reasons*. The Debtors have a history of successful "bolt-on" acquisitions of this type. These types of acquisitions are, and will continue to be, integral to the Debtors' growth strategy, and give the Debtors access to product lines, technologies and markets that they cannot economically develop internally. Combined with the Prior Acquisitions, the proposed acquisition of Alltech continues the Debtors' strategy to improve the value of the Specialty Materials business by providing an extensive, worldwide sales and marketing infrastructure dedicated to chromatography products, and by moving into high-growth industry segments with high margin potential. The Alltech acquisition is particularly attractive because it would combine the Debtors' silica material and surface chemistry science expertise with Alltech's expertise in the design, manufacture and sale of chromatography columns and

8

instruments. The Debtors believe that their strategy will result in a market valuation for the Separations Business that will be considerably higher than the normal valuation for specialty chemical companies.

21.    The Debtors' strategy is to grow the Separations Business to become a significant supplier of chromatography instruments and consumables, including columns and media, with sufficient financial, technological, manufacturing and sales capabilities to substantially expand its existing share of chromatography markets and to sustain on its own the investment necessary to become a major industry player. The Alltech acquisition is expected to substantially increase TSG's revenues and would provide an established global infrastructure upon which to build such a business. With 22 sales offices, manufacturing plants, and research facilities around the world, and with a balanced global distribution of experienced sales, technical service and customer service people, Alltech is particularly well-positioned to assist the Debtors in realizing its strategy.

22.    At present, TSG sells its chromatography products primarily through distribution. The proposed acquisition would provide TSG with a new channel to directly market chromatography products through an extensive and experienced direct sales force and technical service organization in North America, Europe and Asia. As a result, TSG will not need to develop its own direct sales force or expand its existing technical service capabilities through internal investment over a period of several years. Alltech's substantial and experienced direct sales force and technical service organization would immediately expand TSG's ability to penetrate chromatography markets on a worldwide basis.

9

23.     TSG's and Alltech's technologies and product offerings complement each other in several respects.   TSG continuously seeks to expand its participation in other silica-based separations technologies, particularly into segments that offer significant growth potential. TSG's consumable sales are primarily in the HPLC and low pressure liquid chromatography segments today. The proposed acquisition offers an opportunity for TSG to significantly expand its market share in consumables used in HPLC as well as to enter new silica-based consumable segments such as GC and SPE.   SPE is one of the highest growing media-based separations segments with a market compound-annual growth-rate of 11%.

24.     TSG currently sells primarily consumable chromatography products, *e.g.*, packed columns and bulk media. The proposed acquisition will enable the Debtors to broaden its product portfolio by offering instruments and accessories as well e.g., HPLC pumps and IC suppressors. In addition, Alltech offers considerable expertise in packing columns with chromatography media.   Acquiring this capability will significantly enhance TSG's existing expertise in manufacturing chromatography columns. Finally, Alltech's technical capabilities in HPLC, GC, IC and SPE provide a technology platform that would enable TSG to expand its product offerings on a worldwide basis.

25.     The acquisition of Alltech is an excellent growth opportunity for the Debtors. The acquisition would combine the Debtors' 80 years of silica material expertise with Alltech's proven technology (including numerous patents and patent applications) and demonstrated success in designing and producing chromatography products.

26.     *Fair and Reasonable Consideration.*   The proposed Purchase Price of $54.8 million is economically attractive to the Debtors (the $54.8 million purchase price is comprised

10

of: (i) $47 million in cash and (ii) the assumption or payment, at closing, of up to $7.8 million of Alltech's then-outstanding debt). First, the price-to-sales ratio is comparable to the price-to-sales ratios in comparable transactions. Alltech's 2003 sales were $46.2 million. Therefore, the proposed transaction represents a price multiple of approximately 1.2 times sales ($54.8 million divided by $46.2 million). The industry-average price-to-sales multiple for comparable companies have recently ranged from 1 to 5 times sales. The Debtors believe that the industry average price-to-sales ratio is a relevant valuation measure for the proposed transaction because Alltech has demonstrated potential for continued future growth, as demonstrated by: (a) the strong global presence and name recognition that has proven successful for the past 30 years, (b) the HPLC, SPE and IC segments have exhibited consistent or above market growth trends from 2000 to 2003 and (c) the media-based separations segment's fundamental growth drivers, including the aging of the population, which drives R&D investment in new drug development. (There has been a 7-fold increase in such investment in the past two decades). Moreover, the acquisition would enhance the ability of the Separations Business to maintain its competitiveness through achievement of critical mass, efficiency gains and reduced costs. Overall, the Debtors expect that the cost synergies offered by the transaction will translate into increased cash flows and earnings that can be re-invested into additional internal and external expansion of the Separations Business in the future.

27.     *Continuing Debt Obligations – Sound Business Reasons.* Continuing the Alltech Debt in place would be advantageous to the Debtors since the current rates of interest under those obligations in place are reasonable for middle market companies such as The Separations Business. Debtors' management believes that the Debtors should be permitted to continue the Alltech Debt in place in order to reduce the amount of cash required from the Debtors to TSG to

11

fund the Alltech acquisition. Should, however, Bank One fail to renew Alltech's line of credit facility or should one or more of Alltech's lenders fail to consent to Alltech's change of control, the Debtors seek authority, up to a maximum amount of $7.8 million, to pay off that debt at closing.

28.     *Cash Requirements – Sound Business Reasons*.   TSG estimates that it may need up to $3.1 million in cash as of the date of the closing to fund any interim cash requirements of Alltech in the event that Alltech cannot pay all of such obligations from its internally-generated cash in the short-term (one year). These interim cash requirements would include Alltech's working capital needs, plus expenses related to the proposed transaction and costs of integrating Alltech's operations into the Separations Business. The Debtors believe that these cash requirements are reasonable.

29.     *Continuing Debt Obligations-Fair and Reasonable Consideration*.   In total, therefore, the Debtors may be required to pay up to $57.9 million to (i) acquire Alltech ($47. million), (ii) fund Alltech's operations ($3.1 million) and/or (iii) retire all of Alltech's debt ($7.8 million). The Debtors anticipate, however, that Alltech will probably have sufficient internally-generated cash to pay off its debt and continue its operation without any contribution from the Debtors. In addition, it is reasonably likely that Alltech's existing debt may remain in place after the proposed transaction closes. Therefore, the risk that the Debtors would be required to pay the maximum amount for which the Debtors are seeking authorization hereunder is relatively small.

30.     *Good Faith*.   The Debtors and Alltech have negotiated the proposed Stock Purchase Agreement at arm's-length and in good-faith. As outlined above, the Debtors believe that the terms of the proposed transaction are fair to the Debtors.

31.    *Adequate and Sufficient Notice.*  In satisfaction of the requirements of Rule 2002 of the Bankruptcy Rules, the Debtors intend to serve copies of this Motion in accordance with the process described in the "Notice" section below.

32.    *Conclusion.*  In light of the foregoing, the Debtors have determined in their business judgment that the acquisition of Alltech is fair and reasonable.  The Debtors believe that the proposed transaction is in the best interest of their estates, grounded in sound business judgment and satisfies the "sound business judgment" test for the use of assets outside the ordinary course of business under Section 363(b) of the Bankruptcy Code.

### Notice

33.    Notice of this Motion has been given to:  (i) the United States Trustee, (ii) counsel to the DIP lender, (iii) counsel to all official committees appointed by the United States Trustee, (iv) counsel for Alltech, and (v) all those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002.  In light of the nature of the requested relief, the Debtors submit that no further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto, (i) authorizing the Debtors to provide funds up to $57.9 million to TSG for (a) the acquisition of Alltech on substantially the terms and conditions described in this Motion and (b) the initial cash requirements for the operation of Alltech and its subsidiaries and/or (c) for purposes of paying and discharging Alltech's debt obligations simultaneously with the closing of the acquisition; and (ii)granting such other relief as the Court deems just and proper.

Dated: June 14, 2004

KIRKLAND & ELLIS LLP
James H.M. Sprayregen, P.C.
Janet S. Baer
James W. Kapp III
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

91100-001\DOCS_DE:95279.1