## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & COMPANY, | ) | |
| *et al.*, | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | Related Doc. 5747 |

## STATUS REPORT SUBMITTED BY THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS

The Official Committee of Asbestos Personal Injury Claimants ("ACC") of W.R. Grace & Company, *et al.* ("Grace" or "Debtors"), files this Status Report pursuant to the Court's directive in its Memorandum and Order dated June 8, 2004. This Status Report provides the Court with the ACC's views on the events that led to Grace's filing for bankruptcy protection in April 2001; describes the significant events that have transpired in the bankruptcy proceedings to date; and discusses the major unresolved issues that remain to be decided. This Status Report also suggests a strategy and approach to best facilitate completion of this Chapter 11 case.

## I.    Events Leading to Grace's Bankruptcy Filing

When it filed its bankruptcy petition in April 2001, Grace identified four major litigation issues that drove it into bankruptcy: (1) asbestos personal injury litigation; (2) "conventional" asbestos property damage litigation; (3) property damage litigation arising from Grace's Zonolite Attic Insulation; and (4) certain fraudulent conveyance and asbestos-related litigation against entities formerly affiliated with Grace. *See* Grace "Informational Brief" (filed April 3, 2001) at 55, 56-68 [Docket # 6]. By its own admission, this bankruptcy case stems from Grace's inability to deal with its mounting and ultimately overwhelming asbestos and environmental liabilities. Through the mid-1970s Grace or its predecessors designed and sold numerous products made

with asbestos that were distributed throughout the United States and used in tens of thousands of job sites across the country.  Workers exposed to asbestos during application of these Grace products, who developed asbestos-related diseases resulting in whole or in part from that exposure, filed almost 300,000 personal injury tort claims against Grace for their injuries and deaths prior to April 2001.  Because the latency period for asbestos-related diseases can exceed 40 years, hundreds of thousands of other workers who develop such diseases in later years will file tort claims against Grace for decades to come.

During the late 1990s, Grace became increasingly unable to deal with these mounting asbestos problems.  In 1996 it engaged in a corporate restructuring that had the effect of transferring its medical-care business to Fresenius A.G. ("Fresenius"); and in March 1998 it engaged in another corporate restructuring that transferred its packaging business to Sealed Air Corporation ("Sealed Air").  These transfers resulted in a large diminution of value of the assets remaining in what is now known as W.R. Grace & Company.[1]

In 1997 and 1998, at about the same time that it was planning the spin-off of its packaging business to Sealed Air, Grace entered into numerous "Master Settlement Agreements" or "Moratoria Agreements" with law firms representing large numbers of asbestos personal-injury victims.  These "Moratoria Agreements" generally provided that in exchange for settling the law firms' backlog of pending asbestos personal-injury cases (which in some cases involved the simultaneous settlement of thousands of cases), the law firm would agree to postpone filing

---

[1]     Not surprisingly, these corporate restructurings were challenged in lawsuits filed prepetition against Sealed Air and Fresenius by certain Grace asbestos creditors alleging either that the defendants were successors to Grace's asbestos liabilities or that the transfers were fraudulent.  The claims at issue in those lawsuits would be resolved pursuant to the Settlement Agreements described in the text below.

any new asbestos lawsuits against Grace for a "moratorium period," typically two or three years.[2] These "Moratoria Agreements" had the effect of depressing temporarily the number of new asbestos claim filings against Grace during 1997-1999.  Predictably, however, as soon as the moratoria periods began to expire in late 1999 and early 2000, the number of new asbestos personal-injury claims increased significantly.  Grace also suffered several large adverse jury verdicts in 1998 which had the effect of increasing plaintiffs' settlement demands.  This combination of increasing claim numbers and higher per-claim resolution costs drove Grace's asbestos personal-injury liabilities to unmanageable levels.  The ACC believes, based on analysis by its experts, that Grace is insolvent if one considers its asbestos personal-injury liabilities alone.

In addition to its mounting asbestos personal-injury liabilities, by early 2001 Grace was facing pressure on three new fronts – (1) large and growing environmental clean-up costs; (2) highly negative publicity related to the asbestos pollution generated by its vermiculite mining and processing operations in Libby, Montana; and (3) a new species of property damage lawsuit related to Grace's Zonolite Attic Insulation ("ZAI") product, which contains trace amounts of asbestos.  Although Grace contends that the presence of trace amounts of asbestos in ZAI should not give rise to valid property damage claims, Grace's ZAI product is installed in more than one million homes.  Thus, the ZAI litigation conceivably could generate very large liabilities.

II.    **Significant Matters Substantially Completed to Date**

    A.    **The <u>Sealed Air</u> Litigation**

---

[2]    The "Moratoria Agreements" also contained provisions tolling the statutes of limitation for future cases until the relevant moratorium was over.

Perhaps the most significant event in the Grace bankruptcy case to date is the litigation and proposed resolution of the fraudulent conveyance actions related to Grace's 1996 and 1998 transactions with Fresenius and Sealed Air (together, the "Sealed Air" litigation).  If the proposed settlements are approved, defendants Fresenius and Sealed Air will make contributions to the Grace bankruptcy estate in excess of $1 billion.

In 2001, the District Court withdrew the reference from the Bankruptcy Court for the Sealed Air litigation and authorized the ACC and the Official Committee of Asbestos Property Damage Claimants (the "Grace PD Committee") (collectively, the "Asbestos Committees") to prosecute jointly the fraudulent conveyance actions against Fresenius and Sealed Air on behalf of the Grace bankruptcy estate.  After the Asbestos Committees filed complaints against both defendants, the action against Fresenius was stayed and the action against Sealed Air went forward.  In June 2002, Grace sought and was permitted to intervene in the case as a defendant. In July 2002, the District Court issued a ruling *in limine* that Grace's solvency as of the date of the 1998 transaction with Sealed Air would be determined under an objective standard, rather than on the basis of what Grace believed at the time.  *Official Committee of Asbestos Personal Injury Claimants, et al. v. Sealed Air Corp. (In re W.R. Grace & Co.),* 281 B.R. 852 (D. Del. 2002).

On September 20, 2002, just ten days before the trial of the constructive fraudulent transfer allegations in Sealed Air was scheduled to begin, a panel of the Third Circuit issued its decision, later reversed by the Court *en banc*, in the Cybergenics case. *Official Committee of Unsecured Creditors of Cybergenics Corporation v. Chinery (In re Cybergenics Corporation),* 304 F.3d 316 (3d Cir. 2001), *reh'g en banc granted and opinion vacated,* 310 F.3d 785 (3d Cir. 2002), *on reh'g en banc,* 330 F.3d 548 (3d Cir. 2003), *cert. denied,* ___ U.S. ___, 124 S.Ct. 530

(2003). This panel opinion temporarily threw into doubt the standing of the Asbestos Committees to prosecute the Sealed Air action on behalf of the Grace bankruptcy estate. The District Court accordingly postponed the trial and held a case management conference with all interested counsel present. Following this conference, the parties filed a variety of motions and briefs in the Bankruptcy and District Courts, including a Motion for An Order Appointing a Trustee for W.R. Grace & Co. filed by the ACC [Docket # 2804]. The other motions included a motion to dismiss by defendant Sealed Air, a motion for an appointment of an examiner or limited-purpose trustee filed by Grace and the Equity Committee, and a motion for an Order resetting the matter for trial filed by the Grace PD Committee. See Opinion in Sealed Air dated October 24, 2002 [Docket # 336]. The Court granted the PD Committee's motion in part; rescheduled the trial for December 2002; denied all of the other parties' motions; and certified the matter for an immediate interlocutory appeal. *Id.*

On November 27, 2002, on the eve of the rescheduled trial of the fraudulent conveyance allegations, Sealed Air, Fresenius and the Asbestos Committees reached a settlement in principle that resolved the Sealed Air litigation. A final settlement agreement between the Asbestos Committees and Fresenius was submitted to the District Court for its approval. *See* Motion for An Order Approving, Authorizing and Implementing [the Fresenius] Settlement Agreement, filed April 15, 2003 [Docket # 16 – Adv. Proc. No. 02-2210]. The final settlement agreement between Sealed Air and the Asbestos Committees was signed and filed with the Court for its approval on November 26, 2003. *See* Motion for An Order Approving, Authorizing and Implementing [the Sealed Air] Settlement Agreement, filed November 26, 2003 [Docket # 597 –

Adv. Proc. No. 02-2210]. Motions to approve both Settlement Agreements, to which Grace is

not a party, are now pending before this Court.[3]

**B.    Briefing of Competing Proposals for Determining Grace's
Aggregate Liability for Asbestos Personal-Injury Claims**

On the liability side, a major focus of dispute in this bankruptcy concerns the

determination of the Debtors' aggregate liability for present and future asbestos personal-injury

claims. The parties have submitted radically different proposals for determining this liability.

Briefing on this subject, which proceeded in two phases, has been substantially completed. No

hearing or oral argument on these competing proposals has yet been held, and they remain

pending before this Court.

Phase 1 of the briefing, which was directed to the Bankruptcy Court, was largely

completed during 2001. In June 2001, the Debtors filed motions for entry of a proposed "Case

Management Order" and for approval of a proposed proof-of-claim form, a proposed April 1,

2002 bar date, and a notice program designed to reach some 200,000 asbestos personal-injury

claimants. In September 2001, the ACC and the Grace PD Committee filed Oppositions to these

motions. The Debtors filed an "Omnibus Reply" in November 2001; the ACC filed a Sur-Reply

in December 2001, and the Debtors filed a further Reply in February 2002.

The scheme set forth in the Debtors' proposed "Case Management Order" envisioned that

the 200,000 expected claimants, after being notified, would each file an 11-page proof-of-claim

---

[3]       Sealed Air recently filed a motion to vacate the *in limine* ruling that Judge Wolin issued
in July 2002, four months before the Sealed Air case was settled. *See* Motion of Sealed Air
Corporation and Cryovac, Inc. for an Order Vacating Judge Wolin's July 29, 2002, *in limine*
Standards Opinion and Order (filed June 8, 2004) [docket # 665 – Adv. Proc. No. 02-2210].
However, this Motion states that "the Sealed Air Defendants are ***not*** seeking to abrogate the
settlement agreement" and that the Motion is being filed now "as a protective measure in the
event the settlement agreement is ultimately not approved or implemented." Motion at 1
(emphasis in original). The filing of this protective Motion, therefore, should not interfere with
this Court's consideration of the pending motions to approve the Settlement Agreements.

form.  The Debtors' proposed form, in contrast to the simple one-page Form 10 routinely used in bankruptcy, would have demanded answers to more than 170 questions for the simplest of claims and would have required the submission of seven types of medical records for every diagnosis of every asbestos-related disease.   The Debtors proposed that they would initially "audit" the expected 200,000 claims for "completeness and reliability."   Claims that survived this review would then be subjected to "omnibus summary judgment motions."   By such motions, Grace hoped to establish three defenses as a matter of law – that claimants did not suffer from a "clinical" asbestos-related disease; that claimants who suffered from such disease had not been exposed to Grace's asbestos-containing products; and that exposure to Grace's products in any event was not a "substantial contributing factor" to claimants' injuries.   Under the Debtors' proposal, claimants would be barred from having their own lawyers represent them in these summary-judgment proceedings; instead, a "Personal Injury Litigation Committee" would be appointed to handle what the Debtors referred to as "common issues."   Finally, the Debtors proposed that claims which survived summary judgment would be assigned dollar values – via estimation or liquidation – while remaining vague about how these values would be derived.

In opposing the Debtors' motions, the ACC pointed that the linchpin for their entire scheme – the omnibus summary-judgment procedure – was irretrievably flawed.  The issues that Grace sought to resolve – the extent of a particular claimant's injury, whether he had ever been exposed to Grace's products, the extent of his exposure (if any) to Grace's products, and whether that level of exposure was sufficient to cause the person's asbestos-related injury – could not be resolved in summary-judgment proceedings covering tens of thousands of cases.  Rather, these questions would have to be resolved for each claimant individually – based on the varying tort laws and choice-of-law rules of the 50 States – following particularized discovery and jury trials

7

where facts were in dispute. The process of liquidating claims individually, the ACC explained, would be extremely costly and take decades to complete. The ACC contended that the Debtors' proof-of-claim form and bar-date proposal were also flawed, both on their own terms (because they were extremely burdensome and unnecessary), and because they were constituent components of a summary-judgment scheme that was itself unworkable.

On December 10, 2002, Judge Wolin withdrew the reference from the Bankruptcy Court on all matters relating to asbestos personal-injury claims. [Docket # 1321]. Judge Wolin did not rule on the Debtors' June 2001 motions. Instead, during a May 22, 2002 status conference, the District Court ordered a new briefing schedule for addressing the parties' competing proposals for "case management of asbestos personal injury claims." See Order dated June 19, 2002 [docket # 2265 (entered June 21, 2002)]. Phase 2 of the briefing was carried out pursuant to this schedule. The Debtors submitted a Supplemental Brief on June 21, 2002; the ACC filed a competing Case Management Proposal on July 22, 2002; other interested parties (including the Equity Committee, the Unsecured Creditors Committee, and the Unofficial Committee of Select Asbestos Claimants) filed responses on August 6, 2002; and Grace and the ACC filed simultaneous replies on August 21, 2002.

In its Supplemental Brief, Grace adhered to the position that its aggregate asbestos liability should be determined by a process that relies on a complex notice program, lengthy and burdensome proof-of-claim forms, and "omnibus" litigation procedures aimed at excluding thousands of claims. However, the Debtors now proposed that the Court bifurcate its proceedings for addressing "common liability issues" by initially confining its attention to *pre-petition* claims, that is, claims filed in state courts prior to the date (April 2, 2001) on which Grace filed for bankruptcy. Grace proposed that it would file proof-of-claim forms on behalf of

these pre-petition litigants, who would then be forced to amend those forms to incorporate the voluminous information upon which the Debtors insisted.  These pre-petition claims would be resolved, under Grace's proposal, by the same "omnibus summary judgment" procedure that it had previously advocated.  Those summary-judgment rulings, in turn, would constitute "exemplar" rulings that Grace hoped to use – following implementation of a bar date and elaborate notice program – to resolve *post-petition* claims.  This would be done, according to Grace, by requiring post-petition claimants to "show cause" why they should not be bound by the exemplar rulings entered against the pre-petition claimants.  Finally, Grace proposed an "estimation" of the surviving claims, but it again failed to indicate how the Court would go about placing monetary values on such claims.

In response, the ACC contended that the Debtors' revised scheme was even more complex and fraught with legal obstacles than its original scheme.  The ACC showed, among other things, that the Debtors' proposal (1) improperly attempted, by its amended-proof-of-claim mechanism, to shift the burden of going forward to claimants in violation of the Bankruptcy Rules; (2) deprived claimants of discovery rights to which they were entitled under the Bankruptcy Code; (3) sought to negate liability by use of mechanisms, such as "show cause" hearings, that violated collateral estoppel principles and claimants' due process rights; (4) improperly sought to resolve inherently factual issues, such as exposure, injury, and causation, as a matter of law by summary judgment; (5) improperly sought to have entire categories of claims declared non-compensable, in defiance of governing state law; and (6) improperly sought to use so-called "Daubert hearings," not to determine a particular expert's qualifications to testify, but to create substantive legal standards to govern prospective determinations of liability.

Apart from these legal defects, the ACC explained that Grace's "litigation protocol" would ultimately prove to be a pointless exercise. Claims that survived all of the Debtors' proposed defenses and "liability filters" would, by definition, be *successful* claims that must be valued by reference to judgments (jury verdicts) in the tort system. Given the size of the judgments that Grace has suffered in cases that have gone to verdict, the Debtors would be hopelessly insolvent – many times over – if their aggregate liability for present and future personal-injury claims were determined in this way.

As an alternative to the Debtors' costly, impractical, and legally flawed proposal, the ACC recommended an immediate estimation, under § 502 of the Bankruptcy Code, of the Debtors' aggregate liability for present and future asbestos personal-injury claims. In an estimation proceeding, the numbers and types of claims against Grace would be determined statistically, based on projections from prior experience. This makes it unnecessary for particular claimants to identify themselves and their disease categories by filing proof-of-claim forms, thus eliminating the need for costly notification, claim-preparation, and bar-date procedures. The valuation of such claims, moreover, would be determined on an aggregate basis, in light of Grace's own prior claims-paying experience and claim-rejection ratio. This makes it unnecessary to place actual values on individual claims, thus eliminating the need for the Debtors' proposed "omnibus summary judgment" and "show cause" procedures (which would be legally impermissible in any event) or for jury trials on each claim (which would take forever).

The function of the estimation procedure recommended by the ACC would be to determine the sum of money needed to fund a Trust, established under § 524(g) of the Bankruptcy Code, to pay present and future asbestos personal-injury claims as they arise. The time-

consuming process of determining the validity and value of individual claims would be discharged post-bankruptcy by the Trust, thus enabling the Debtors to emerge swiftly from Chapter 11.  This common-sense method for valuing pending and future claims – tailored to the facts of each case – has been used in numerous asbestos-related bankruptcies since the Manville case.  Testimony concerning estimation of asbestos liability has been cited favorably and accepted by courts in several bankruptcy reorganizations that have already been consummated, such as Eagle-Picher, ACMC (involving the National Gypsum Trust), Celotex, UNR, Raytech, and Western McArthur.  See, e.g., In re National Gypsum Co., 257 B.R. 184, 198-99 (Bankr. N.D. 2000); In re Celotex Corp., 204 B.R. 586 (M.D. Fla. 1996); In re Eagle-Picher Industries, Inc., 189 B.R. 681 (Bankr. S.D. Ohio 1995).  Testimony concerning estimation of asbestos liability has also been received in several bankruptcies in which plans of reorganization are now awaiting final approval (such as Babcock & Wilcox and Armstrong).

As noted earlier, briefing on the parties' competing proposals for determining the Debtors' aggregate liability for asbestos personal-injury claims was completed in August 2002. Further progress on these matters was deferred pending the appointment of a Futures Representative to represent the interests of future asbestos claimants in such proceedings.  The role and appointment of the Futures Representative is discussed at pages 12-14 below.

C.    **Zonolite Attic Insulation**

Litigation between the Debtors and property damage claimants alleging damages arising from the presence of Grace's ZAI product in their homes has substantially progressed in the Bankruptcy Court before Judge Judith Fitzgerald.   Cross motions for summary judgment are pending and the hearing date for these motions is scheduled for October 18 and 19, 2004.  [See

Docket # 4984 and 5590 scheduling a status conference for the May 24, 2004 Omnibus Hearing. At that hearing, the motions were rescheduled to the October 2004 dates].

### D.    "Conventional" Asbestos Property Damage Litigation

On April 22, 2002 the Bankruptcy Court entered a Bar Date Order setting March 31, 2002 as the deadline for filing asbestos property-damage claims. [Docket # 1960]. The Debtor received approximately 4,200 proofs of claim. Subsequently, the Debtor sought a waiver of the Local Rule of Bankruptcy Practice and Procedure ("Local Rule") 3007-1, which imposes limitations on the number of claims that may be subject to a substantive omnibus objection and requires all substantive objections to a particular claim to be filed in a single objection. [Docket # 4853]. The Court granted the requested relief, in part, and ordered the parties to submit a proposed form of Order. A proposed form of Order has been submitted to the Court waiving Local Rule 3007-1 as to objections that (i) contain substantially incomplete Proof of Claim Forms; (ii) contain materially insufficient supporting information; (iii) fail to include any product identification information; (iv) are barred by the applicable statutes of limitations or repose; (v) are barred by laches; or (vi) are barred by prior settlements. [Docket # 5440]. As of the date of this filing, the Bankruptcy Court has not signed that proposed Order.

### E.    Appointment of the Future Claimants' Representative

The long latency period between a claimant's exposure to asbestos and manifestation of disease poses unique challenges in asbestos bankruptcy cases. Present asbestos claimants – those who manifest injury prior to confirmation of a plan of reorganization – are identifiable individuals who can participate in Chapter 11 proceedings along with a debtor's other creditors. However, future asbestos claimants – those individuals who will not manifest injury until after

the plan of reorganization has been confirmed – are unidentifiable and cannot themselves participate and be heard in connection with the reorganization process.

Because the Bankruptcy Code only discharges "claims" that arise prior to confirmation (11 U.S.C. § 1141(d)), the distinction between "present claims" and "future demands" has long been a key concern to companies that have filed bankruptcy petitions in the hope of achieving a "fresh start."  If a debtor is actually to achieve a fresh start, future claimants must be bound by the outcome of the bankruptcy proceeding, which requires that their rights be protected consistent with due process standards.  The mechanism for protecting the rights of future claimants in an asbestos bankruptcy proceeding is the appointment of a legal representative for them ("Futures Representative").

The Futures Representative is charged with ensuring that future asbestos claimants (i) are adequately represented in connection with plan negotiations and (ii) will be treated fairly vis-a-vis present asbestos claimants.  See In re Johns-Manville Corp., 52 B.R. 940, 942 (Bankr. S.D.N.Y. 1985).  Section 524(g) of the Bankruptcy Code, which was modeled on the injunctive relief granted in the Manville case, is the statutory provision that allows an asbestos debtor to reorganize with the protection of a "channeling injunction" against future claims.  The statute requires that "as part of the proceedings leading to issuance of such injunction, the court [must] appoint a legal representative for the purpose of protecting the rights of persons that might subsequently assert [asbestos-related] demands."  11 U.S.C. § 524(g)(4)(B)(i).

On May 24, 2004, the Bankruptcy Court entered an Order appointing David Austern as the Legal Representative for Future Claimants in the Grace bankruptcy proceedings.  [Docket # 5645].  The Order appointing Mr. Austern has been appealed by the Grace PD Committee and by certain insurance companies [Docket # 5705, 5793, 5775].

### III.    Major Unresolved Issues and Suggested Strategy for Resolution

As with any bankruptcy case, the ultimate goal of Grace's creditors, including the ACC, is to achieve a plan of reorganization that is either consensual or can successfully be "crammed down" on a dissenting creditor class (or on objecting shareholders).  In this case, there are both contingent liabilities and potential asset recoveries from third parties that must be resolved before any confirmable plan can proceed to a confirmation hearing.  In the ACC's view, the major unresolved issues in this case are (1) approval of the settlement agreements in the <u>Sealed Air</u> and <u>Fresenius</u> litigation; (2) determination of the Debtors' aggregate liability for present and future asbestos personal-injury claims; (3) determination of the Debtors' aggregate liability, if any, for ZAI claims.

Of course, Grace has significant other liabilities, such as fixed obligations to commercial and trade creditors, "conventional" (non-ZAI) asbestos property-damage claims, environmental cleanup liabilities (in Libby, Montana and elsewhere), and disputed tax liabilities.  However, the ACC believes that these other obligations can be readily estimated or litigated to conclusion as part of the normal bankruptcy process; however they are resolved, they are unlikely to have a significant impact on Grace's ability to reorganize successfully.  Similarly, although there may be some dispute over the value of Grace's assets available for distribution to creditors, the ACC believes that, once the Sealed Air and Fresenius contributions to the bankruptcy estate are finalized, any other disputes can be resolved relatively expeditiously by the Bankruptcy Court at an appropriate time.

By contrast, determining the magnitude of Grace's total asbestos personal-injury liability and the magnitude of its liability (if any) for ZAI claims will have an enormous impact on the contours of any confirmable bankruptcy plan.  The Sealed Air and Fresenius settlements must

also be finally approved in order to determine the asset side of the equation. We set forth below the ACC's position on each of these issues and a suggested strategy and timeline for their resolution.

### A.    Approval of Settlement of the Sealed Air and Fresenius Litigation

The ACC has listed the proposed Fresenius and Sealed Air Settlement Agreements as a major unresolved issue because final approval of these settlements will result in contributions to the Grace bankruptcy estate, for the benefit of all unsecured creditors, in excess of $1 billion. As noted above, motions seeking approval of the Settlement Agreements are now pending before this Court. As explained more fully in those motions, these Agreements represent fair and equitable compromises of extremely risky and hard-fought litigation. Although the ACC anticipates possible opposition to the Sealed Air Settlement from Grace (which is not a party thereto) or the Official Committee of Unsecured Creditors, based on certain non-economic terms required by Sealed Air as conditions to settlement, we do not believe these conditions are objectionable or grounds for refusing to approve the Settlement.

If the two Settlement Agreements are not approved, the Asbestos Committees and Fresenius and Sealed Air will have to (1) renegotiate the Agreements and/or (2) continue the litigation to a conclusion. Because of the magnitude of the potential recovery for the Grace bankruptcy estate, as compared to nothing if the defendants were ultimately to prevail, this litigation must be resolved one way or the other as a practical matter. Otherwise, the parties with interests in the Grace bankruptcy could not make intelligent decisions about any plan of reorganization.

B.    **Determination of Grace's Aggregate Liability for Asbestos Personal-Injury Claims**

The parties have proposed radically different methods for determining the Debtors' aggregate liability for asbestos personal-injury claims, and substantial briefing on these proposals has already been submitted. The first order of business, we believe, is for this Court to decide – after appropriate hearing, and after receiving whatever additional briefs it believes desirable – which of these two proposals should be adopted. The Court would then issue a Case Management Order with an appropriate schedule for implementing such proposal.[4]

As fully discussed in the two phases of briefing that have already occurred, the ACC firmly believes that Grace's various "litigation protocols" for determining its overall liability for present and future asbestos personal-injury claims are unworkable practically and impermissible legally. The only sensible route to determining this liability is to commence immediately an estimation proceeding under Bankruptcy Code § 502. If this Court agrees with that submission, we believe that the estimation procedure could be implemented fairly expeditiously, and that the parties could get to a hearing on estimation in as little as six months.

Both the ACC and the Debtors have already retained experts with the statistical and epidemiological experience required to produce an estimation. The first step would be a limited amount of fact discovery to provide the experts with any additional data that they may need. Each side's expert would then produce a report that explains the expert's methodology, marshals the relevant data, and determines an overall estimate of the Debtors' liability for present and

---

[4]    Any proceeding that involves consideration or valuation of future asbestos claims is one in which the Futures Representative would be expected to be actively involved. As noted earlier, a Futures Representative was recently appointed in this case, but he will naturally require some time to become familiar with the issues. Moreover, his appointment is currently the subject of an appeal. The Court may wish to take note of these factors when the time comes to determine an appropriate schedule.

future asbestos personal-injury claims.   A short period would then be allowed for expert discovery.   In due course, a hearing would be held at which the experts would defend their reports and be subject to cross-examination.   The Court could request briefing either prior to the hearing or subsequently.   After considering the experts' testimony and the parties' briefs, the Court would makes its own determination of the Debtors' overall liability for present and future asbestos personal-injury claims.   This decision would determine the contours and feasibility of any plan(s) of reorganization that are ultimately submitted for confirmation.

### C.      Zonolite Attic Insulation Litigation

The Debtors contend that the presence of trace amounts of asbestos in ZAI does not give rise to a valid property damage claim.   The ACC considers this a "major unresolved issue" because, if the ZAI claims were successful, they could dwarf all other types of claims in magnitude and thus significantly alter the recoveries to other creditors under a bankruptcy plan. As a result, the ACC agrees with the Debtors that this litigation, currently scheduled to be heard on cross-motions for summary judgment in October, should continue in the Bankruptcy Court on as expedited schedule as is possible.

### CONCLUSION

The parties' ultimate objective in any bankruptcy is to produce a confirmable plan of reorganization.   Since filing for bankruptcy in April 2001, the Debtors have been accorded the exclusive right, over the ACC's objections, to propose a plan.   At the most recent hearing on exclusivity, the Debtors stated in open court that they intended to file a plan of reorganization during the next several months.   However, given the magnitude of the uncertainties discussed above – on both the asset side and the liability side of the equation – it is hard to imagine how

any plan of reorganization could proceed to confirmation until those uncertainties have been resolved.

Respectfully submitted,

Date: June 21, 2004                    CAMPBELL & LEVINE, LLC

                                       _/s/ Kathleen J. Campbell_____
                                       Marla R. Eskin (I.D. #2989)
                                       Mark T. Hurford (I.D. #3229)
                                       Kathleen J. Campbell (I.D. #4229)
                                       800 North King Street Suite 300
                                       Wilmington, DE  19801
                                       (302) 426-1900

                                       -and-

                                       Elihu Inselbuch
                                       Caplin & Drysdale, Chartered
                                       399 Park Avenue
                                       New York, NY  10022-4614
                                       (212) 319-7125

                                       -and-

                                       Peter Van N. Lockwood
                                       Nathan D. Finch
                                       Albert G. Lauber
                                       Caplin & Drysdale, Chartered
                                       One Thomas Circle, N.W.
                                       Washington, D.C.  20005
                                       (202) 862-5000

                                       Counsel to the Official Committee of
                                       Asbestos Personal Injury Claimants of W.R.
                                       Grace & Company, et al.