## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO., et al.** | ) | **Case No. 01-01139 (JKF)** |
| | ) | **(Jointly Administered)** |
| **Debtors.** | ) | |

## STATUS REPORT BY THE OFFICIAL COMMITTEE
## OF UNSECURED CREDITORS IN COMPLIANCE WITH
## <u>DISTRICT COURT'S ORDER DATED JUNE 8, 2004</u>

The Official Committee of Unsecured Creditors of W. R. Grace & Co., et al. (the

"Creditors' Committee"),[1] by its undersigned counsel, submits this status report in compliance

with the order of the District Court, S.D.J. Buckwalter, dated June 8, 2004. The format that

follows is that suggested in the Court's Order. In that the Creditors' Committee expects the

Debtors' status report to discuss the issues in detail, we provide below only that background

necessary for the Court to understand the positions of the Creditors' Committee with respect to

certain significant issues in these bankruptcy cases.

### I.    <u>Background</u>

The Creditors' Committee represents all non-asbestos unsecured creditor

interests, with claims well in excess of $500 million. Significantly, these bankruptcy cases do

not in any way concern a financial need for the Debtors to restructure their obligations.

The reasons for the Debtors' bankruptcy filing on April 2, 2001 are best described

by the Debtors, but have been stated, among other places, in <u>W.R. Grace & Company's</u>

---

[1]    As of the date of this status report, the official members of the Creditors' Committee are (i) JPMorgan Chase Bank, (ii) The Bank of Nova Scotia, (iii) Wachovia Bank, and (iv) Sealed Air Corporation.

Informational Brief, dated April 2, 2001 ("Informational Brief"), filed in the Bankruptcy Court concurrently with the bankruptcy petitions. In that brief, the Debtors made crystal clear that the *sole* reason they filed for bankruptcy was to resolve their escalating asbestos liabilities: "[t]he task [in the Chapter 11 cases] is to determine the true scope of Grace's liability to asbestos claimants and then provide for the payment of valid claims on a basis that preserves Grace's still strong core business operations." Informational Brief at 1. Noting the absence of any feasible procedure in the tort system to resolve the asbestos claims against them, the Debtors explained that "Chapter 11 now affords the only solution for Grace." Id. at 2.

Grace explained in its Informational Brief that its asbestos liabilities were historically of three types: personal injury claims, property damage claims, and Zonolite Attic Insulation ("ZAI") claims. The personal injury claims are those, numbering in the thousands, brought by persons claiming exposure to products manufactured by Grace that contained asbestos, most significantly the wet spray-on fireproofing product known as Monokote 3. The property damage claims are those brought by building owners for abatement or remediation costs resulting from the presence of Monokote 3 and other asbestos-containing products manufactured by Grace. Only seven property damage cases were pending as of the day the Debtors filed for bankruptcy. Finally, the ZAI claims are those seeking, inter alia, the costs of removal of this Grace vermiculite insulation product that contained a trace amount of asbestos and was used in residential homes for attic insulation. The ZAI issues first arose in 2000 and the litigation was thus in its nascent stage when the Debtors filed for bankruptcy.

In that the disputes in these bankruptcy cases ultimately concern the actual value of the Debtors' asbestos liabilities as compared to the enterprise value of the Debtors' businesses available to creditors, the Creditors' Committee is the real party in interest to these disputes

2

because its constituency will share their recoveries *pro rata* with the asbestos claimants. The
Creditors' Committee is therefore entirely supportive of the Debtors' attempts to properly define
their asbestos liabilities to only those claims that are brought by persons with cognizable injuries
caused by exposure to a Grace product. Simply said, if the Debtors are correct that their
enterprise value, after satisfying only valid asbestos claims, is sufficient to provide a recovery for
existing shareholders, then application of the pertinent bankruptcy rules would require that
unsecured creditors are paid in full, with interest where appropriate. That is, of course, the goal
of the Creditors' Committee in these bankruptcy cases.

## II.    Status

### A.  Asbestos Personal Injury Claims

In their Informational Brief and thereafter, the Debtors (with the support of the
Creditors' Committee), proposed a case management plan designed to litigate the various
defenses to the asbestos claims against them, including most notably the asbestos personal injury
claims. Although the Debtors revised their case management proposal over time, the essence of
the proposal remained the same and calls for, in sum, detailed proof of claim forms to be filed by
asbestos personal injury claimants, to be followed by objections by the Debtors to those proofs of
claims to be resolved through common issue litigation under Fed. R. Civ. P. 42 and Fed. R. Evid.
702. By those objections, the Debtors' various defenses to the asbestos claims could be
adjudicated.

The Debtors' defenses to the asbestos personal injury claims are premised on
enforcement of the claimants' burden of proof. As set forth in the Debtors' Informational Brief,
it is axiomatic that a toxic tort plaintiff must prove that (i) the defendant released the substance
into the environment, (ii) plaintiff was exposed, (iii) plaintiff was injured and (iv) the substance

3

released by the defendant caused plaintiff's injuries.  See Informational Brief at 64, n.127 (citing

In re TMI, 67 F.2d 1103, 1119 (3d Cir. 1995), cert. denied, 516 U.S. 1154 (1996); Hines v.

Consolidated Rail Corp., 926 F.2d 262, 275 (3d Cir. 1991); Dombrowski v. Gould Electronics,

Inc., 85 F.Supp.2d 456, 459 (M.D. Pa. 2000)).  Application of this burden of proof here would

require the claimants to show that they sustained injury from exposure to asbestos released from

a Grace product.  Some of the specific issues that would give rise to challenges include (i) claims

based upon diagnostic evidence of injury lacking sufficient reliability, reproducibility and

scientific validity to be admissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509

U.S. 579 (1993); (ii) claims lacking reliable evidence of restrictive impairment (the so-called

"asymptomatic" or "unimpaired" claimants, who can show only microscopic changes to lung

tissue but no detrimental effects from those changes); (iii) claims that do not show any

occupational history of the claimant's work with Grace's products and (iv) claims that lack a

reliable evidentiary basis to show that Grace's products were a substantial contributing factor in

causing the claimed disease.  See W.R. Grace's Supplemental Brief Regarding Procedures for

the Litigation of the Common Personal Injury Liability Issues, June 21, 2002, at 28-39.  The

Debtors' proposal would litigate these common issues through summary judgment motions filed

in connection with objections to claims.

        The Debtors repeatedly tried to have their case management proposal decided by

the Court.  Their initial motion was filed in June 2001 and ultimately scheduled for hearing for

November 21, 2001, when it was indefinitely stayed upon the appointment of Judge Wolin by

the Court of Appeals for the Third Circuit.  In December 2001, Judge Wolin issued an order

withdrawing the reference to the bankruptcy court on all asbestos personal injury issues.

Subsequently, Judge Wolin requested that the Debtors and other parties again brief the case

management issues, which was done through the spring and summer of 2002. A hearing on the parties' case management proposals was scheduled for October 2002, but then adjourned by the District Court sua sponte and never rescheduled. No case management order was ever issued by Judge Wolin and, indeed, no claims bar date has been set and no order has been issued with regard to a resolution of the issues underlying the asbestos personal injury claims. See also sections III and IV below.

**B.    Asbestos Property Damage Claims**

The process of resolving asbestos property damage claims is taking place before the Bankruptcy Court. On April 22, 2002, the Bankruptcy Court entered an order setting March 31, 2003 as the deadline for filing pre-petition asbestos property damage claims (as well as medical monitoring claims and all non-asbestos unsecured claims). On March 18, 2004 and on May 21, 2004, the Debtors provided the Bankruptcy Court with a status report concerning those claims. As set forth in the latter report, approximately 3,968 property damage claims were filed against the Debtors. The Debtors have advised the Bankruptcy Court that they plan to soon file substantive omnibus objections and proceed with common issue litigation with respect to many of the asbestos property damage claims.

**C.    ZAI Claims**

Pursuant to orders of the Bankruptcy Court, litigation has been proceeding in that Court to determine whether the Debtors' ZAI product is unreasonably dangerous. Discovery in this "Science Trial" proceeded under the Bankruptcy Court's supervision and, in July 2003, the respective parties (the Debtors and the ZAI claimants) filed various motions, including motions for summary judgment. Following the close of briefing on those motions, the parties began

settlement discussions which, the Committee understands, are continuing. The Bankruptcy

Court has scheduled oral argument on the pending motions for October 18 and 19, 2004.

      The impact of the ZAI claims upon these bankruptcy cases is potentially dramatic.

Although the Debtors believe that the ZAI claims have no legal validity as a matter of law and

science, the ZAI claimants argue that, should they prevail, the total cost of removing ZAI from

homes may be between $3 - $5 billion (using "conservative estimates" of 1 million homes

contaminated and $3,000 - $5,000 for each removal). Should the ZAI claimants prevail and

should they be able to prove damages anywhere near their estimate, the value of the claims of

other unsecured creditors of these bankruptcy estates – all of whom will share in any recovery

*pro rata* – will be drastically reduced.

### D.    <u>Sealed Air Fraudulent Transfer Litigation</u>

      On June 21, 2001, the Asbestos Property Damage Committee and Asbestos

Personal Injury Committee filed a Joint Motion for Authority to Prosecute Fraudulent Transfer

Claims, seeking authority to prosecute certain fraudulent transfer claims against, among others,

Sealed Air Corporation and Cryovac, Inc.[2] On March 12, 2002, the District Court (D.J. Wolin),

entered an order withdrawing the reference of the fraudulent transfer claims and granting the

asbestos committees' motion to prosecute. On March 18, 2002, the asbestos committees,

*expressly on behalf of the Debtors' bankruptcy estates*, filed a complaint against Sealed Air and

Cryovac that asserted fraudulent transfer and related claims against them.

      Following intensive and expedited discovery (and the issuance by Judge Wolin of

a controversial *in limine* ruling dated July 29, 2002 that is the subject of a motion very recently

---

[2]    A second fraudulent transfer action was commenced by these committees on behalf of the Debtors' bankruptcy estates against Fresenius Medical Care Holdings, Inc. and National Medical Care, Inc. The claims asserted in that adversary proceeding were settled and the settlement approved by the District Court by order dated June 25, 2003.

filed by Sealed Air in this District Court seeking that the ruling be vacated), the parties on November 27, 2002 entered into a settlement term sheet to govern resolution of the litigation. The actual settlement agreement was arduously negotiated and finally executed by the parties on or about November 10, 2003 (the "Settlement Agreement"). On or about November 26, 2003, the plaintiff asbestos committees filed a motion with the District Court seeking approval of the settlement agreement (the "Settlement Motion").

In sum, the Settlement Agreement between the bankruptcy estates (as represented by the asbestos committees) and the Sealed Air defendants requires the defendants to pay $512.5 million in cash and nine million shares of Sealed Air common stock, as adjusted for Anti-Dilution (which was worth approximately $321.5 million at the stock's December 5, 2002 market price), but only if the defendants obtain the benefit of an injunction pursuant to §§ 524(g) and 105(a) of the Bankruptcy Code, and only if the plaintiff asbestos committees use their "best efforts" to ensure that the consideration paid by the defendants is transferred directly by those defendants to one or more trusts to be formed under a plan of reorganization pursuant to § 524(g).

No action has been taken with respect to the Settlement Motion because of the stay in effect as a result of the recusal proceedings that were pending when the motion was filed. Indeed, both the Creditors' Committee and the Debtors advised the parties to the Settlement Agreement that they reserved the right to file objections to the Settlement Motion at the appropriate time, following lifting of the stay and imposition of a briefing schedule. See also sections III and IV below.

**III. and IV.    Major Unresolved Issues and Suggested
                  Strategies to Facilitate Completion of Proceedings**

### A. Asbestos Personal Injury Claims

Each of the asbestos claims issues described above is a major unresolved issue

that requires closure before the Debtors' Chapter 11 proceedings can be completed.  All parties

to these cases would likely agree that the amount of the asbestos personal injury claims is the

most important issue to be determined, because it is that amount that will determine recoveries of

the other unsecured creditors (and perhaps the Debtors' equity).

Resolving the asbestos personal injury claims, however, will require litigation.

Although all constituencies would desire a consensual resolution leading to a plan of

reorganization, the fact is that the parties' positions as to the value of the asbestos liabilities are

so diverse that the Creditors' Committee believes that litigation of the Debtors' defenses to the

claims is the only viable procedure for advancing these cases to completion.

The Creditors' Committee has consistently supported the Debtors' proposals for

case management governing the litigation of the asbestos personal injury issues and continues to

do so.  In lieu of restating the same points here, we attach as Exhibit A to this status report the

Creditors' Committee's Memorandum in Support of Debtor's Case Management Proposal, dated

August 6, 2002, which sets forth in detail the reasons for the Committee's support of the

Debtors' proposals, and which the Creditors' Committee expressly incorporates here by

reference.  The Creditors' Committee continues to believe that this Court should enter a case

management order that:

> a.  Sets a bar date for the filing of asbestos personal injury claims,
>     utilizing a detailed proof of claim form such as that proposed by the
>     Debtors in their previously-filed case management motions;

8

      b.  Provides a schedule for the filing of objections to asbestos personal injury claims, for any discovery that might be appropriate, and for summary judgment motions with respect to the proof issues raised by those objections;

      c.  Provides for an estimation proceeding (if necessary) to determine, based upon the Court's rulings on the summary judgment motions, the amount necessary to fund a §524(g) and/or §105(a) trust to satisfy present and future asbestos personal injury claims.

Recently, by order dated June 16, 2004, Bankruptcy Judge Fitzgerald directed the Debtors to file a plan of reorganization by October 14, 2004. In light of the present posture of these cases, it is virtually certain that whatever plan of reorganization the Debtors file will not be a consensual plan and that litigation will likely result from its filing. The possibility exists that the amount of the asbestos personal injury claims can be litigated in the context of the Debtors' proposed plan (in lieu of the case management process described above), but that possibility cannot be addressed until that plan (or some other plan of reorganization that may be advanced by another constituency) is actually proposed. What is certain is that a process should be promptly commenced by this Court that requires the asbestos personal injury claimants to present proof of their claims, subject to the Debtors' defenses.

**B.**    <u>**Other Asbestos Claims**</u>

The processes for resolving the asbestos property damage claims and ZAI claims are in full motion before the Bankruptcy Court. The Creditors' Committee believes that the litigation of these respective claims should be permitted to continue before the Bankruptcy Court, which has been presiding over these matters from the beginning. Progress has been made with respect to these categories of claims and the Bankruptcy Court already has in place a schedule for resolving them, including determination of the ZAI "science" issues later this year if settlement negotiations with the ZAI claimants are not fruitful.

C.    **Sealed Air Settlement**[3]

The Creditors' Committee believes that this Court should take no action with respect to the Settlement Motion at this time. As the Settlement Agreement and the Settlement Motion make clear, the parties' obligations under the Settlement Agreement become effective on the "Effective Date," a date ten days after the confirmation order of a plan of reorganization becomes final, or if later, the date that transfers are to be made to the § 524(g) trusts to be established under the plan. As of the date of this status report, there has been no plan of reorganization proposed by the Debtors, although the Bankruptcy Court has directed the Debtors to do so by October 14, 2004. Thus, there is absolutely no urgency in this Court considering the Settlement Motion in the near term, because the Settlement Agreement does not become effective until the confirmation order becomes final.

The Creditors' Committee believes that deferring consideration of the Settlement Motion until later in these cases is especially appropriate because of certain problematic provisions in the Settlement Agreement. Among other issues,[4] the Creditors' Committee is troubled by the provisions that require the plaintiff asbestos committees to use their "best efforts" to ensure that the proceeds of the settlement are transferred directly to one or more § 524(g) trusts for the benefit of asbestos claimants. Because the asbestos committees prosecuted and settled the Sealed Air lawsuit in their derivative capacity *on behalf of the bankruptcy estates*, any proceeds received as a result of that litigation should be received by the estates, not by any particular class of creditors (here, under the Settlement Agreement, the asbestos claimants). As a

---

[3]    Sealed Air is a member of the Creditors' Committee but did not participate in the Committee's consideration of this position and, indeed, does not participate in any of the Committee's discussions and decisions concerning the Sealed Air litigation and its settlement.

[4]    The Creditors' Committee reserves its right to oppose the Settlement Motion on any and all grounds at the appropriate time.

result of the application of the very terms of the Settlement Agreement that tie the settlement to the plan of reorganization, whether the "best efforts" provisions are ultimately objectionable to the Creditors' Committee will depend upon the terms of the plan of reorganization in these cases and, more precisely, the recoveries that the various constituencies may receive under that plan.

Accordingly, the Creditors' Committee believes that this Court should only consider the Settlement Motion at such time as the amount of asbestos personal injury claims has been determined (whether through consensus or litigation), or when sufficient progress has been made in the advancement of a plan of reorganization so that the parties can determine their likely respective recoveries under that plan and, thereby, can consider the ramifications of the Settlement Agreement in the context of the plan of reorganization.

The Creditors' Committee looks forward to the opportunity to address the issues discussed in this status report with the Court.

Dated: June 21, 2004

                        Respectfully submitted:

                        **STROOCK & STROOCK & LAVAN LLP**
                        Lewis Kruger
                        Kenneth Pasquale
                        (Members of the Firm)
                        180 Maiden Lane
                        New York, New York  10038-4982
                        Tel: (212) 806-5400
                        Fax: (212) 806-6006

                        and

                        **DUANE MORRIS LLP**

                        Michael R. Lastowski (DE I.D.3892)
                        William S. Katchen
                        1100 North Market Street
                        Suite 1200
                        Wilmington, Delaware 19801
                        Tel: (302) 657-4900
                        Fax: (302) 657-4901

                        Co-Counsel for the Official Committee
                        of Unsecured Creditors