**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 01-1139 (JKF) |
| W.R. GRACE & CO., et al., | : | (Jointly Administered) |
| | : | |
| Debtors. | : | |

## CERTAIN INSURERS' STATUS REPORT TO THE COURT

By Order of June 8, 2004 (the "Order"), the Court invited all parties in interest to

submit status reports to aid the Court in gaining familiarity with the various aspects of this case.

As parties in interest with a significant practical stake in the outcome of these proceedings, the

Insurers[1] submit the following status report in order to identify and briefly explain certain issues

that are of particular importance to the Insurers and to suggest some strategies to facilitate

completion of the bankruptcy proceedings of W.R. Grace and its affiliates (collectively, the

"Debtors").

### The Insurers' Interests

The Insurers have issued excess liability insurance policies to the Debtors.  Given

the volume of asbestos-related bodily injury and property damage claims asserted against the

Debtors, it seems apparent that the Debtors will look to their unexhausted insurance policies to

provide a substantial source of funding for any § 524(g) trust(s) designed to compensate these

and future claimants.  The Insurers are ready and willing to meet with the Debtors, the tort

claimants and the other constituencies to negotiate a consensual plan of reorganization, either

face-to-face or through the auspices of a mediator.

---

[1]     The "Insurers" joining in this status report are: Federal Insurance Company, Royal & SunAlliance, Certain Underwriters at Lloyd's, London and Certain London Market Companies, Continental Casualty Co. and Continental Insurance Co.

It must be remembered that these policies provide the Insurers with important contractual rights that must be respected in bankruptcy.  Among other things, these policies typically give the Insurers the right to control or participate in the defense and settlement of claims.  Further, these policies make clear that the Insurers are not obligated to indemnify the Debtors for settlements entered into without the Insurers' written consent.  Moreover, the policies expressly prohibit their assignment without the Insurers' consent.  The policies also obligate the Debtors to cooperate and assist in the defense of all claims for which they seek coverage from the Insurers.[2]  The Court may expect that the Insurers will appear to be heard in connection with those aspects of the bankruptcy case where these contractual interests are, or may be, implicated.

Of course, the Insurers may well agree, in the context of a consensual, negotiated resolution, to compromise these or others of their contractual rights.  Among other reasons, this is why participation by the Insurers in the negotiations leading up to any proposed plan is necessary to avoid the extended and contentious proceedings that have occurred in other bankruptcy cases where insurance companies were purposefully excluded from the negotiation process, presented with a purported *fait accompli* plan that trammeled upon their rights, and thereafter forced them to resort to litigation to defend those rights.

Next, Congress has expressly recognized that insurance companies frequently play a central role in the successful reorganization of debtors plagued by mass assertions of asbestos tort liability.  Indeed, liability insurers are among the narrowly-limited categories of non-debtor entities that Congress has authorized to benefit from a § 524(g) channeling injunction in exchange for their contribution of appropriate consideration to the trust.  11 U.S.C.

---

[2]    Some Insurers have entered into pre-petition settlement agreements with the Debtors with respect to some or all of the policies they issued.  These settlement agreements contain additional contractual obligations that must be respected.

§ 524(g)(4)(A)(ii)(III).  With the appointment of a legal representative for future claimants ("FCR"), the Debtors have announced that they intend to address their asbestos liabilities through § 524(g)'s trust/channeling injunction procedure.  The Insurers are desirous of obtaining their statutorily-contemplated benefits of inclusion in such a channeling injunction.  Toward that end, the Insurers are prepared to participate in the negotiation of a plan that includes them in the scope of the channeling injunction and provides for the Insurers to supply mutually-agreeable consideration to the trust in return.  They also are prepared to raise issues relating to their statutory interests with the Court where appropriate.

For example, as Congressionally-authorized beneficiaries of a § 524(g) channeling injunction, the Insurers have a keen interest in seeing to it that the peace they would purchase in exchange for contributing to the trust is a lasting one.  That means making sure that any channeling injunction is not vulnerable to subsequent collateral attack by future claimants asserting that they are not bound by the injunction for the reason that their interests were not adequately protected in this case.[3]  This, in turn, requires that great care be taken to ensure that the due process rights of these future claimants are scrupulously honored in these proceedings.

As the Third Circuit only recently has reemphasized, structural safeguards are central to the integrity of the entire judicial process.  This is doubly so in the case of voiceless future claimants for whom the FCR serves as a virtual representative.  Certain Insurers have raised concerns regarding the structural adequacy of the FCR mechanism, as it is currently being administered by the Bankruptcy Court, to satisfy the requirements of due process.  Appeals by these Insurers (and by the Asbestos Property Damage Committee) of several of these issues are pending before the District Court and will be briefed in the coming weeks.

---

[3]    *See*, *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 260 (2d Cir. 2001) (absent parties may not be bound when proceedings "violate due process"), *aff'd by evenly divided Court*, 539 U.S. 111 (2003).

## As "Parties In Interest," The Insurers May
## Raise and Be Heard on Any Issue in this Case

Especially since Congress expressly authorized liability insurers to share in the benefits of a channeling injunction, the Insurers' contractual and statutory interests give them precisely the sort of "practical stake in the outcome" from which "party in interest" standing under § 1109(b) flows. *In re Amatex Corp.*, 755 F.2d 1034, 1041 (3d Cir. 1985). "[S]ection 1109(b) must be construed broadly to permit parties affected by Chapter 11 proceedings to appear and be heard." *Id*. at 1042. As parties in interest, the Insurers have the unambiguous statutory right to "raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b).

Certainly, where attempts are made to use the reorganization process to modify or extinguish the Insurers' contractual rights, the Insurers are parties in interest with standing to be heard. *See In re Congoleum*, Order Denying Motion For Determination That Insurers Lack Standing To Raise Objections And Be Heard With Respect To Debtors' Modified Joint Prepackaged Plan, Case No. 03-51524 (Bankr. D. N.J., June 7, 2004) (recognizing insurers' standing to object to plan); *see also Wallace & Gale,* No. 85-4-0092, (Chapter 11), Transcript of Oral Ruling at 119-21 (Bankr. D. Md., July 22, 1998) (denying confirmation of plan that violated insurers' contractual rights).

A few lower courts in this Circuit apparently are of the view that the standing of insurers to be heard as "parties in interest" in plenary proceedings may be limited on an *ad hoc*, issue-by-issue basis within a case. Such a view, however, contradicts binding Third Circuit precedent holding that a party in interest has "the absolute right to be heard" and to be heard on any issue in a case. *In re Marin Motor Oil,* 689 F.2d 2d 445, 453 (3d Cir. 1982). *Marin* flatly rejected arguments that permitting the broad rights of participation that Congress unambiguously

bestowed upon parties in interest would lead to chaotic results.  *Id*.  The Third Circuit instead

expressed confidence that the investment of resources necessary to participate in a particular

proceeding provided sufficient incentive for self-regulation by parties in interest.  *Id*.

The Insurers' conduct to date in this case has validated the Third Circuit's faith in

such self-regulation.  Indeed, for the first three years of the life of this case, the Insurers have

only rarely exercised their rights as parties in interest to raise and be heard on issues.  With the

appointment of an FCR and a directive that the Debtors file a plan by October, the case now has

reached a stage where the insurers expect that issues potentially impacting their contractual

rights and statutory interests may come to the fore.  Nevertheless, the Insurers intend to continue

their established practice of seeking to raise or be heard only where they believe that their

practical stake in particular issues warrants their participation.

### Insurers' Views on Specific Issues Likely to Arise in Coming Months

From the Insurers' perspective, the single most significant issue in this case is

how any plan of reorganization, confirmation proceedings and confirmation order will affect

their insurance contracts and any proceeds potentially payable thereunder.[4]  The Debtors have

asserted, and the Insurers agree, that but for the overwhelming weight of frivolous and improper

claims of unimpaired claimants, there would be more than sufficient assets to pay valid claims of

persons genuinely injured by the Debtors' asbestos products.  The Debtors have to date

appropriately sought to prevent compensation of invalid claims and to preserve assets for

payments of valid claims and for other stakeholders.  The Insurers are prepared to work toward

the payment of valid present and future asbestos claims in accordance with the terms and

---

[4]     The weighty concerns about structural deficiencies in the FCR process raised by several
        Insurers will be separately briefed in the pending appeals of the order appointing the FCR
        and therefore will not be addressed here.

conditions of their policies.  The Insurers will not stand by, however, if any party to this bankruptcy proposes to help itself to insurance moneys as a way to buy off claimants who have no compensable injuries.

The Insurers believe the following broad substantive issues may arise during the reorganization process: (a) disallowance of invalid claims during the bankruptcy proceedings; (b) negotiation of trust distribution procedures ("TDPs") governing the allowance and payment of asbestos personal injury claims; (c) efforts to assign the insurance contracts to the trust; (d) plan provisions that purport to bind insurers; and (e) the *"UNR"* issue.  Many of these issues are overlapping – and may not arise at all if the Insurers are included by the other constituencies in the negotiation process.  In accordance with the Order, these potential unresolved issues are briefly addressed below, together with suggestions for moving this case forward with respect to such issues.

A.    **Disallowance of Invalid Claims in the Course of Bankruptcy Proceedings**

1.    *Unresolved Issues*

The bankruptcy court has the power to dispose of claims pending against the Debtors.  It is in the interest of all parties to dispose of claims that can be identified as meritless in the course of the proceeding, so that only valid claims are referred to the § 524(g) trust.  This is particularly important in order to assure that claimants who are permitted to vote to approve the trust hold valid claims.  If persons with frivolous claims are permitted to vote, then it is a foregone conclusion that the trust will compensate invalid claims, thus frittering away the limited assets (including insurance proceeds) that should be preserved for genuinely injured persons.

In considering this issue, the Court should be aware that the majority of asbestos claims are made by persons with little or no impairment. As Justice Breyer noted in 1997, "up to one-half of asbestos claims are now being filed by people who have little or no physical

impairment." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 631 (1997).  Even at the time, this may well have been an understatement.  One study estimated that by 1992, 60 to 70% of new claims were being filed by individuals who had only a "marker" of asbestos exposure – pleural plaques – but who suffered no asbestos-related impairment.  Lester Brickman, *The Asbestos Litigation Crisis: Is There A Need For An Administrative Alternative*, 13 Cardozo L. Rev. 1819, 1853 (1992).  Similarly, the late Judge Carl Rubin determined, through the use of his own medical expert to evaluate claimants in 65 pending asbestos cases, that although all plaintiffs *claimed* an asbestos-related condition, 65% had no asbestos-related condition whatsoever.  Carl B. Rubin & Laura Ringenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35 (1991).

More recently, a study from the Rand Institute demonstrates that the phenomenon of unimpaired claimants has worsened considerably.  Rand found that the combined number of mesothelioma and other cancer filings remained almost constant from 1990 to 2000.  By contrast, in 2000 non-cancer claims were being filed at ***more than triple*** the 1990 rate.  Deborah Hensler, et al., Rand Institute for Civil Justice, *Asbestos Litigation in the U.S.: A New Look At An Old Issue,* 6 (2001)("Rand study").[5]  Rand found that, for one major representative defendant, fully 90% of all claims, and over 60% of all compensation paid, were for claimants who did not suffer the most serious injuries – mesothelioma and other asbestos-related cancers.  Rand study, at 29.

This does not mean that only claimants with cancer are entitled to recovery.  It does mean that a singularly pressing issue for this Court is to distinguish between persons with genuine claims and those without, and to assure that assets are preserved so as to compensate

---

[5]    The Rand study can be found at http://www.rand.org/publications/DB/DB362.0/DB362.0.pdf (last visited 6/18/04).

claimants genuinely injured by Grace products.  If trust payment procedures cannot make this distinction, then trust assets – no matter how abundant – will quickly be dissipated to the point that all claimants, sick or not, receive only cents on the dollar for their claims.

2.    *Suggested Strategies*

It might seem obvious that the Trust should pay only valid claims.  The problem, however, is that 524(g) requires a "supermajority" vote of 75% of current claimants who vote in order to impose a channeling injunction.  Current claimants permitted to vote as creditors, of course, will not vote for a plan that does not provide them with compensation.  As noted above, most claimants have no functional impairment.  If such claimants are permitted to vote, their numbers will overwhelm the votes of the genuinely sick.  Under § 524(g), current and future claimants must be treated similarly.  Therefore, no Trust can be approved which will not compensate future claimants who also have no functional impairment.  Such a trust unavoidably will attract an unchecked flow of claimants without genuine injury.

The only way to prevent this result is to establish a claims procedure and a bar date for asbestos personal injury claimants and disallow invalid claims.  Indeed the Debtors have long had pending unaddressed before the prior district court judge motions designed to address these issues.  If only the truly sick can vote as creditors, they can be expected to insist upon and approve trust procedures that will conserve trust assets and ensure that these assets are used only to pay genuinely injured persons like themselves.

B.      **Trust Distribution Procedures**

1.      *Unresolved Issues*

In other cases (usually where a conscious effort has been made to exclude the Insurers from the negotiations) TDPs generated in connection with plans of reorganization have not recognized insurers' rights to be involved in claim adjudication, and have disregarded the debtors' obligations to the insurer with respect to claims for which defense and/or indemnity are sought.  Compounding these problems, other plans have provided that trustees are subject to the control of Trust Advisory Committees ("TACs") composed of asbestos plaintiffs' lawyers with every reason to pay, rather than resist, questionable claims.  This raises inevitable concerns and collateral disputes about breach of the insurers' contractual rights.

2.      *Suggested Strategies*

Proposed claims resolution procedures should acknowledge insurer interests and rights and require asbestos trusts to tender all potentially covered claims to the insurers to allow insurers to become involved in claims resolution.  Moreover, asbestos-driven bankruptcy proceedings bring thousands of claimants within the jurisdiction of a single court.  A claim resolution model that establishes appropriate medical criteria, evaluates scientific standards of causation, and enforces product identification defenses will discourage and disallow spurious claims, while maximizing resources available to pay meritorious claims of the truly ill.

C.      **Assignment Of Insurance Contracts**

1.      *Unresolved Issues*

These same proposed plans frequently seek to effect an invalid and unlawful "assignment" to a trust of the policies and/or the "right" to recover insurance proceeds, despite

contractual anti-assignment provisions.  Such assignments typically purport to permit the trust the right to collect insurance proceeds for present claims that have not yet been reviewed and valued, and for future claims which have not even been asserted.  If such an assignment is proposed in this case, the Insurers will oppose it by invoking the protections of their anti-assignment rights.

### 2.    *Suggested Strategies*

Anti-assignment provisions set forth important rights for the Insurers and should be enforced.  They protect the Insurers by: (i) preventing a stranger to their contracts from reaping the benefits of the contracts without the ability to meet the original insured's obligations; (ii) preventing collusive and improper settlements; (iii) ensuring that the risk contemplated by the Insurers' contracts is not expanded; and (iv) protecting the Insurers' right to settle or try cases and enforce the insured's duty of cooperation.  Improper assignments must not be permitted if they violate the terms of an Insurer's contract, are the product of collusion between the Debtors and the asbestos claimants seeking recovery of the Debtors' insurance proceeds, or are contrary to fundamental notions of liability insurance.

### D.    __Plan Provisions That Purport To Bind Insurers__

### 1.    *Unresolved Issues*

Another common pattern in asbestos bankruptcies is that the debtor, in exchange for a promise from the plaintiffs' bar that it will deliver the supermajority vote, agrees that invalid or otherwise non-compensable claims will be paid by the Trust.  The plan is designed so that much or most of the funding for such payments will come from Insurers.  Insurers, of course, are not required under their policies to pay meritless claims and are entitled to put

claimants to their proof.  In order to prevent them from raising objections to Trust payments on insufficient evidence, plan documents are frequently packed with provisions that purport to bar Insurers from objecting to the Trust's resolution of claims.  These are typically inserted in subtle ways so that only experts in insurance coverage may be able to spot them and understand their import.

### 2.     Suggested Strategies

Of course, the best way to avoid all of these problems is to include the Insurers in plan negotiations and resolve all such issues consensually.  Failing that, plan language that purports to deprive insurers of the right to review claims decisions should be deleted.  Moreover, the plan documents and confirmation order should be purged of insurance-dispositive "code words" and the plan documents must contain carefully-worded provisions sufficient to ensure that (a) all the Insurer's contract rights are preserved notwithstanding any other provision of the plan and (b) the Insurers will not in any way be prejudiced by the plan or the confirmation order in any subsequent coverage litigation.

### E.     The *UNR* Issue

### 1.     Unresolved Issues

The Seventh Circuit's decision in *UNR Industries, Inc. v. Continental Ins. Co.*, 942 F.2d 1101 (7th Cir. 1991), *cert. denied*, 503 U.S. 971 (1992), often drives the strategies of asbestos claimants and debtors who make common cause against insurers.  Without reviewing the opinion in detail, it should suffice to note that it encourages debtors and claimants to conclude that they can force Insurers to pay their full policy limits into the Trust immediately upon its creation, without the need for any actual claim adjudication or payment to claimants.  Often, code-words designed to ensure a "*UNR*" result are inserted into plans, without any indication to the

Bankruptcy Court that this is the intent.  Insurers believe that *UNR* is not good law in this circuit.  *See Amatex Corp. v. Stonewall Ins. Co.*, 102 B.R. 411, 412 (E.D. Pa. 1989), *aff'd*, 908 F.2d 964 (3d Cir. 1990).

By accelerating a future stream of payments over a period of decades into a single lump-sum payment, *UNR* enormously increases the cost to insurers of paying their policy limits to their insureds, in violation of their contractual rights. Insurers firmly believe that *UNR* is not a correct statement of either bankruptcy or insurance law.   Further, the *UNR* result is inapposite where, as here, insurers are participating in the bankruptcy and attempting to work with their insureds, the Debtors, toward a confirmable plan.

### 2.       *Suggested Strategies*

*UNR*, like other insurance coverage issues that may emerge (such as the allocation of payments among insurers or the applicability of any disputed coverage defenses) is not an appropriate issue for determination in the context of a plan confirmation proceeding.  If indeed the plan proponents intend to seek a *UNR* result, they should do so in the context of coverage litigation, not by seeking to insert coded language into the plan documents and the confirmation order.  The Court should police the tendered plan documents to remove such language, and should make clear, through the use of "super-preemptory provisions," that no pre-judgment of the issue is intended.

### CONCLUSION

The Insurers appreciate the opportunity to provide the Court with this status report.  The Insurers stand ready to take their place at the negotiating table to work toward reaching a plan of reorganization acceptable to all constituencies, but are prepared, if necessary, to invoke the assistance of the Bankruptcy Court or of this Court to protect their legitimate

interests.  In other cases where debtors and asbestos personal injury constituencies have worked together seriously and in good faith they have been quite successful, notwithstanding enormous complexity of the issues, in reaching consensual resolutions.

Dated:  June 21, 2004

                    COZEN O'CONNOR

          By:    /s/ Shelley A. Kinsella
                    Shelley A. Kinsella (DE No. 4023)
                    1201 North Market Street
                    Suite 1400
                    Wilmington, DE  19801
                    302-295-2000 Telephone
                    302-295-2013 Fax No.

                    William P. Shelley (PA ID 40875)
                    Jacob C. Cohn (PA ID 54139)
                    1900 Market Street
                    Philadelphia, PA  19103
                    (215) 665-2000 Telephone
                    (215) 665-2013 Facsimile

                    **Attorneys for Federal Insurance Company**

                    and

                    Ian Connor Bifferato (DE No. 3273)
                    BIFFERATO, BIFFERATO & GENTILOLTTI
                    1308 Delaware Avenue
                    The Buckner Building
                    Wilmington, Delaware 19899-2165
                    (302) 429-1900 Telephone

                    Carl J. Pernicone
                    WILSON, ELSER, MOSKOWITZ, EDELMAN
                    & DICKER, LLP
                    150 East 42nd Street
                    New York, New York 10017-5639
                    (212) 490-3000 Telephone

                    **Attorneys for Royal & SunAlliance**

                    and

13

Francis J. Murphy
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805-1266
(302) 654-4600 Telephone

Joseph L. Ruby
BAACH ROBINSON & LEWIS PLLC
1201 F Street, NW
Washington, DC 20004
(202) 833-8900 Telephone

**Attorneys for Certain Underwriters
at Lloyd's, London and Certain London
Market Companies**

and

Elizabeth M. DeCristofaro, Esq.
Charles A. Booth, Esq.
Ford Marrin Esposito Witmeyer & Gleser, L.L.P.
Wall Street Plaza
New York, New York 1000-1875
(212) 269-4900 Telephone

Robert Fishman, Esq.
Shaw Gussis Fishman Glantz Wolfson
& Towbin LLC
321 North Clark Street, Suite 800
Chicago, Illinois 60610
(312) 541-0151 Telephone

**Attorneys for Continental Casualty Co. and
Continental Insurance Co**.