**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., <u>et al.</u>, | ) | Case No. 01-01139 |
| | ) | |
| Debtors. | ) | |

**STATUS REPORT OF THE ZAI CLAIMANTS**

**I.     Introduction**

Pursuant to this Court's June 8, 2004 Order, the Zonolite Attic Insulation Claimants ("ZAI Claimants") submit this status report. The ZAI Claimants assert that ZAI can and has released asbestos fiber into millions of homes, contaminating them and giving rise to asbestos property damage claims compensable in this bankruptcy.

**II.    Background**

From the 1940s until 1984 (when ZAI was withdrawn from the market) millions of homeowners and their contractors unwittingly poured tons of asbestos-contaminated Zonolite Attic Insulation into their attics. ZAI had been represented to be 100% vermiculite with no disclosure of its asbestos content. Grace[1] marketed its asbestos-contaminated ZAI as a "do-it-yourself" material for home improvement and remodeling projects. ZAI's marketing campaign, complete with pictures showing children assisting their parents in ZAI installation, assured homeowners and their contractors that:

(1)   "Installing Zonolite is as easy as pouring popcorn out of a bag";[2]

(2)   ZAI was "clean", "safe" and "easy to install";[3]

---

[1] As used herein, "Grace" refers to W.R. Grace & Co. and its predecessor, Zonolite Company, who first developed and marketed the ZAI product line that Grace assumed when it took over Zonolite in 1963.

[2] Sales Booklet, (Exh. 1).

1

    (3)    ZAI was "not … in any way injurious to … health", "absolutely safe", a product that would keep children "happy and healthy", that "contains no harmful substance", was "safe" and "clean", "dust-free" and "non-irritating", and "[s]o lightweight, dustless, clean, simple to handle that a child could pour it between attic joists".[4]

ZAI's marketing materials further assured homeowners that once installed, ZAI would never be a problem. Homeowners were told they could "[j]ust pour it right over the old fluff, level it off at the top of the joists and forget it".[5] Ironically, ZAI ads assured homeowners that not only was the initial cost of installing ZAI low, but the "first-cost is the last".[6]

Grace's marketing campaign was, unfortunately, quite successful. While estimates vary, ZAI was likely installed in five million or more homes.[7] Unknown to these homeowners, ZAI had a dark side. It was not "100% Vermiculite" as advertised by Grace.[8] Rather, each bag is laced with millions upon millions of loose asbestos fibers from the asbestos that contaminated the vermiculite ore veins at Grace's Libby, Montana mine. This contaminated vermiculite ore was "popped" in furnaces to expand it, packed into three or four cubic foot bags, and sold to the public as ZAI. The bags never contained a warning concerning ZAI's asbestos content even though Grace's safety director had recommended as early as 1969 that because of the

---

[3] Id.

[4] Grace ads, (Exh. 2).

[5] "Down with Goose Pimple Sale," (Exh. 2).

[6] "Zonolite Attic Insulation Puts Its 'R' Values to Work," (Exh. 2).

[7] EPA estimates place the number of installations as high as 10 million homes, (Exh. 13).

[8] Product packaging, (Exh. 3).

mesothelioma risk from asbestos, Grace should label all of its vermiculite products.[9] Because of Grace's inaction, homeowners, their children and contractors were permitted to pour ZAI between joists and around pipes with no notice of a potential asbestos hazard. Indeed, it was not until 1977, when Grace was internally forecasting that ZAI would eventually be banned by the government, that Grace reluctantly placed an innocuous "Avoid creating dust" statement on the ZAI bags. In light of the intensely dusty nature of ZAI, as discussed later, this warning was akin to telling the sun not to shine. One court has described a similar impossible-to-effectuate warning on an asbestos product as "black humor". <u>Borel v. Fibreboard Paper Prods., Corp.</u>, 493 F.2d 1076, 1104 (5th Cir. 1973). Grace's General Counsel understandably advised Grace not to mention the label in dealing with federal agencies because:

> … I have doubts as to whether the caution labels are very helpful to our case … The caution label used on attic insulation does not specifically identify asbestos and, accordingly, could be viewed by the CPSC as being inadequate warning of the risks which may be associated with use of this product.[10]

A Grace internal memo explains why Grace never mentioned to consumers the asbestos contamination of ZAI:

> It is believed that product labeling would have a serious, adverse, and irreversible effect upon consumer acceptance of our products.[11]

Because homeowners, contractors and others outside of Grace were unaware of ZAI's asbestos content, ZAI was not known as an asbestos-containing product. And because Grace represented to the EPA that ZAI always contained less than 1% asbestos (EPA's general

---

[9] March 11, 1969 memo from P. Kostic to R.W. Sterrett, (Exh. 4). ("I think it would be well at this time, with the advice of counsel, to consider applying a warning or precautionary label or statement on all containers of products containing vermiculite.")

[10] March 27, 1980 Memo from O.M. Favorito to E.S. Wood at 1. (Exh. 5)

[11] May 17, 1976 R.H. Locke "Binder Development Program" at 1. (Exh. 6)

regulatory threshold for defining an "asbestos-containing product"), EPA did not pursue the ZAI issue in the 1970s when it banned the application of certain asbestos products.

Early in these bankruptcy proceedings, Grace clung to its "minimal asbestos" position. It claimed that the available evidence would show that ZAI "contains by weight one one-hundred to one one-thousandth of one percent of asbestos, if it's in there at all".[12] But scientific evidence established by the ZAI Claimants shows that ZAI contained much more asbestos than Grace has ever admitted. Reports from ZAI testing around the country show that far from being .001% asbestos (ten parts per million), ZAI can contain up to 5% asbestos (50,000 parts per million).[13] In fact, Grace's own expert conceded during discovery by the ZAI Claimants that he found asbestos in a ZAI home at levels up to 2.5%.[14]

But whether ZAI has .001% or 5% asbestos is not the critical factor. The weight of the asbestos in ZAI is not controlling because asbestos fibers are infinitesimally light. Rather, it is the extreme friability of ZAI that makes it such an effective contaminant and so potentially lethal. Grace's General Counsel acknowledged this inescapable fact twenty-five years ago in commenting on Grace's proposed representation to regulatory agencies that ZAI had less than 1% asbestos:

> I understand that the reason for wanting to indicate the percent by weight of tremolite content is to give the recipient the indication that he is not getting a product containing commercial asbestos and that the tremolite asbestos contaminant content is low. However, I think that this could be construed as an

---

[12] Omnibus Hearing Transcript at 46 (Sept. 23, 2002). (Exh. 7) ZAI Claimants' counsel believe that Grace's Special Asbestos Counsel made this statement in good faith at this relatively early stage of discovery because that was Grace's consistent response to everyone (including counsel) who inquired.

[13] Memo from J.M. Spiak to R.L. Asher (July 2, 1987) [attaching article on ZAI with asbestos content of "1, 2 and 5 percent"]. (Exh. 8); see also J. of Light Constr. at 14 (May 2003) [vermiculite sample may contain "asbestos up to 5% or so" [citing EPA official, Jim Christiansen]]. (Exh. 9); Pinchin Report, at 1 [sample of ZAI with 5-10% asbestos]. (Exh. 10)

[14] Deposition of Richard Lee, at 72 (June 6, 2003). (Exh. 11—"Lee Deposition").

4

>   invitation for the recipient to believe that because the percent tremolite asbestos content is low that the amount of tremolite asbestos fiber released in handling the product can be assumed to be less than this prescribed by the asbestos standard. As you know, respirable tremolite asbestos fibers are light and countless numbers may be present even though the percent by weight is low.[15]

An EPA official recently concurred that focusing on a one percent asbestos content as a hazard cutoff is erroneous:

>   The 1 percent standard was developed for things like pipe wrap, where you're talking about a solid material. … The asbestos in vermiculite is so friable and becomes airborne so easily that it's hazardous even at very low levels.[16]

ZAI's extreme friability derives from its fundamental nature. Unlike most asbestos products, where the asbestos was mixed with a gypsum or clay binder and either applied wet or as a solid pre-formed material, ZAI was simply vermiculite flakes and asbestos fibers lying loosely together in a bag. Even though ZAI may contain less asbestos by weight than other asbestos products, its fiber level upon disturbance can greatly exceed that of higher asbestos content products. For instance, even at a one percent tremolite content, a typical thirteen pound bag of ZAI would contain approximately 125 trillion asbestos fibers.[17] Once poured into place, those fibers do not become encapsulated within the material, as they might in wet-applied or pre-formed material. Rather, they remain loose in millions of attics around the country, awaiting inevitable activities that periodically disturb them. Whether that activity is a homeowner moving the vermiculite away to install an attic fan, run a wire or do remodeling, the effect is the same.

---

[15] Handwritten notes from O.M. Favorito to R.C. Ericson (Apr. 8, 1977) [emphasis added]. (Exh. 12). These notes are difficult to read, and the Claimants have provided their best reading of the document, along with a typewritten transcription.

[16] J. of Light Constr., at 14 (May 2003) [quoting EPA official, Jim Christiansen] (Exh. 9).

[17] Richard Hatfield & William Longo, "Zonolite Attic Insulation Report", at 17 (Apr. 4, 2003). (Exh. 14 - "Hatfield & Longo Report").

5

Enormous numbers of asbestos fibers will be released into the air, further contaminating the area. Air testing by the ZAI Claimants confirms that virtually any disturbance of ZAI or the dust in its vicinity will release significant numbers of asbestos fibers. Realistic simulations of foreseeable ZAI disturbance produced air readings of 3,000 times background levels in a home, well over the current OSHA excursion level, and thousands of times higher than outside ambient asbestos levels.[18] The ZAI Claimants' testing is consistent with non-litigation testing preformed by the Canadian government showing very high fiber levels upon disturbance of ZAI.[19] And testing of settled dust in ZAI homes confirms that asbestos fibers have indeed been released from ZAI and come to rest on attic surfaces.[20]

As noted previously, Grace's downplaying of ZAI's asbestos content effectively moved ZAI off the asbestos radar screen for several decades. It was not until relatively recently that ZAI became the focus of attention as a result of the government's renewed interest in the asbestos disease arising from the Libby vermiculite mining operation. In March 2000, a group of law firms, including ZAI Special Counsel, filed a ZAI statewide class action in Washington, <u>Barbanti v. W.R. Grace & Company-Conn, et al.</u>, No. 00201756-6 (Sup. Ct. Spokane Co. March 24, 2000).[21] Shortly thereafter, the same law firms filed a nationwide class action in federal district court in Montana, <u>Price, et al v. W.R. Grace & Company, et al.</u>, No. CV-00-71-M-DWM

---

[18] Ewing, et al "Zonolite Insulation Exposure Studies", Att. 2, at 12, 14 (March 15, 2003) [worker exposure during ZAI movement of 4.6-16 f/cc with a 34-minute TWA of 12.5 f/cc]. (Exh. 15) The OSHA 30-minute excursion limit is 1 f/cc. See OSHA Asbestos Standard, 29 C.F.R. § 1910.1001(c)(2) (1996). (Exh. 16)

[19] Pinchin Report. (Exh. 10).

[20] Exh. 14 at 13, 22-4.

[21] In November, 2000, the <u>Barbanti</u> plaintiffs moved for a preliminary injunction seeking to have Grace fund a state-wide notice program to ZAI homeowners. Grace opposed the motion on the ground that there was no imminent hazard warranting the extraordinary relief of requiring Grace to fund a notice program prior to determination of the merits of the action. The Court denied the plaintiffs' motion, in part, because it anticipated there would be a class action notice issued in due course. (Exh. 22).

6

(D. Mo. April 3, 2000). On November 28, 2000, the Court certified the <u>Barbanti</u> case as a statewide class action.[22] On December 7, 2000, the <u>Price</u> case was transferred through multidistrict litigation proceedings as part of an MDL to the Honorable Patti Saris, District of Massachusetts. <u>In re Zonolite Attic Insulation Productions Liability Litigation</u>, No. 1376 (J.P.M.L. Dec. 7, 2000). Under the MDL scheduling order, the motion to certify <u>Price</u> as a nationwide class was filed on January 23, 2001, and was scheduled to be heard on April 25, 2001. Grace filed for bankruptcy on April 2, 2001.

Thus, by the time Grace had filed for bankruptcy, the ZAI issue was just beginning to mature.

### III.  Status

Following Grace's bankruptcy filing on April 2, 2001, the ZAI aspect of the case was assigned to the Honorable Judith K. Fitzgerald. The ZAI Claimants sought class action treatment of ZAI claims within the bankruptcy, while Grace challenged the viability of any ZAI claims. Judge Fitzgerald recognized that appropriate treatment of ZAI claims was an important and somewhat unique aspect of any reorganization effort. Unlike traditional asbestos property damage suits brought against Grace since the early 1980s for its other asbestos-containing products, there had been no established litigation history for ZAI claims due to their recent vintage. As a result, there had been little ZAI discovery. Accordingly, on July 22, 2002, Judge Fitzgerald appointed ZAI Special Counsel[23] to investigate ZAI and marshal the Claimants' evidence looking toward a trial on the science issues involving ZAI.

---

[22] Exh. 21.

[23] Edward J. Westbrook of Richardson Patrick Westbrook & Brickman, and Darrell Scott of Lukins & Annis.

As discovery proceeded, both sides recognized that preparation for a ZAI science trial required more document review and scientific investigation than originally contemplated. Accordingly, the parties requested, and the Court granted, several extensions of time, culminating in the filing of extensive cross motions for summary judgment on July 7, 2003. Responsive and reply briefing continued until August, 2003. A hearing on these and related motions regarding ZAI issues is now set for October 18 and 19, 2004.

Judge Fitzgerald also determined that it was appropriate for the discovery to encompass issues surrounding the scope and extent of ZAI sales and installation so that the parties and the Court would have a better view of the parameters for potential resolution of ZAI claims. Toward that end, the parties have been exchanging information. Grace has been providing its available sales and distribution data, while ZAI Claimants' Special Counsel has been providing data on the typical costs and methods of removing ZAI from home attics and walls. This has enabled the parties to get a better, though not yet complete, understanding of the extent of the problem and illuminated possible paths to resolution. The parties are continuing this information exchange.

## IV. Major Unresolved Issues

The major issue involving ZAI that needs to be resolved by discussion or decision is how ZAI claims can be addressed to facilitate Grace's reorganization. While there are scientific disputes about the precise amount of asbestos in a typical bag of ZAI, the precise amount of asbestos released from different disturbances of ZAI, the amount of ZAI that needs to be removed to accomplish small home improvements safely, the exact precautions necessary when working around ZAI, the extent of ZAI asbestos contamination in settled dust in attics, the reasonable cost of ZAI removal and the pace at which that removal is likely to take place in the years to come, these issues are all subsidiary to the major unresolved issue. The ZAI Claimants

touch on these subsidiary issues throughout this status report and can supply to the Court the several hundred pages of summary judgment briefing and attachments supporting their position on these issues if the Court desires. As discussed hereafter, preparation for the science trial has revealed a remarkable convergence of position, with differences revolving more around the timing of ZAI removal than its eventual necessity. The major issue for ZAI thus recognizes the inevitability of ZAI abatement costs in millions of homes and focuses on the need to address these costs in the bankruptcy.

      A.    **ZAI Claimants' Proposal to Address ZAI Claims to Facilitate a Bankruptcy Reorganization**

The work of ZAI Claimants' Special Counsel shows that not only are ZAI claims viable, but they are compelling. In many respects, ZAI claims are more compelling than "traditional" asbestos property damage claims because they involve a product with an undisclosed asbestos component, installed in homes, with the asbestos lying unbound in attics, accessible to families and children, containing a particularly virulent form of asbestos (tremolite), that has caused extensive disease in the community of Libby, Montana, and which can release enormous numbers of asbestos fibers with slight disturbance. So forceful is this evidence that the ZAI Claimants deemed it appropriate to file a motion for summary judgment asking Judge Fitzgerald to declare that there was no material issue of fact that the ZAI claims were viable asbestos property damage claims.[24] While Grace will continue to contest the viability of ZAI claims, as it contested traditional asbestos property damage claims for years while paying out millions of dollars in settlements and verdicts, the ZAI Claimants believe the productive focus now should be on how ZAI claims can be addressed to facilitate the timely reorganization of the debtor.

---

[24] Predictably, Grace filed a cross motion for summary judgment seeking the opposite ruling.

9

The ZAI Claimants' discovery efforts have revealed a remarkable consensus on the short and long term remedial needs of homes contaminated with ZAI. Indeed, the differences dividing the Claimants and Grace on this issue are relatively small and primarily concern the timing of ZAI removal. While some Claimants' experts, former Grace scientists and government officials favor a pro-active approach to removing ZAI before it is disturbed, virtually everyone agrees that ZAI must be removed with special precautions and expense before remodeling or other significant disturbance. Claimants' expert, Steve Hays, a certified industrial hygienist involved in the Claimants' testing, stated:

> ZAI should be disturbed only under properly designed and controlled asbestos abatement conditions. Surfaces contaminated with tremolite from ZAI should be abated.[25]

Grace's former manager of industrial hygiene, Thomas E. Hamilton, agreed:

> Q: And based on your testing if you had zonolite attic insulation in your home what action would you take?
>
> MR. RESTIVO: Object to the form.
>
> A: If I had it in my home, I would have it removed.
>
> Q: And why?
>
> A: Because it would be very easy to do, it would not cost that much money to do it, and there are other substitutes for it that are just as good that do not present the asbestos hazard that this material does.[26]

The EPA official in charge of the Libby cleanup also agreed on the ultimate solution for ZAI:

> The only way to eliminate the problem is to have a qualified asbestos-abatement contractor come in and remove the vermiculite

---

[25] Hays & Gobbell Report, at 4. (Exh. 17)

[26] Deposition of Thomas Hamilton, at 126 (Feb. 25, 2003). (Exh. 18)

10

> and confirm that the area and the living space are free of fibers. There are well-established methods for doing that, but it's not going to be cheap. Don't try to remove the material yourself, or you're likely to spread asbestos fibers throughout the living space.[27]

Remarkably, Grace's asbestos-in-buildings expert, Dr. Morton Corn, agrees that only removal will solve the problem, but feels that such removal can be postponed until a major remodel or demolition:

> Q: Fair enough, Doctor. Let's look at the next point, if you plan to remodel or conduct renovations that would disturb the vermiculite, hire professionals trained and certified to handle asbestos to safely recover (sic) the material.
>
> Do you agree with that?
>
> A: I agree with that.[28]

Finally, EPA's National Headquarters has advised:

> If you plan to remodel or conduct renovations that would disturb the vermiculite, hire professionals trained and certified to handle asbestos to safely remove the material.[29]

Thus, the question becomes how to provide appropriate abatement assistance to ZAI homeowners, many of whom will not confront a necessity to remove ZAI for years, while providing Grace the certainty of a dollar figure that can be incorporated into a reorganization plan. Claimants believe that the pragmatic solution is to structure a ZAI claims resolution facility through the vehicle of the pending certified ZAI class action[30] and the proposed national

---

[27] J. of Light Constr., at 14 (May 2003) [citing EPA official, Jim Christiansen]. (Exh. 9)
[28] Deposition of Morton Corn, at 113 (May 29, 2003) (Exh. 19).

[29] EPA, "Current Best Practices for Vermiculite Attic Insulation – May 2003" (Exh. 20).

[30] Barbanti v. W.R. Grace & Company-Conn, et al., No. 00101756-6 (Sup. Ct. Spokane Co. March 24, 2000) (Exh. 21).

11

class action that was awaiting certification when Grace filed for bankruptcy.[31] As the Washington state court recognized, and other courts would likely have concluded as well, ZAI claims share common bases that makes them suitable for class-wide resolution. They involve one product, sold by one company (and its predecessor), for one primary use (home insulation), that presents a common problem for homeowners when disturbed. A damage range can be calculated based on the increasing experience with ZAI removals being reported to ZAI Claimants' counsel. Such a class-based, remedially-focused resolution would give Grace the certainty it needs to reorganize and the Claimants a fund they need to assist with past, current and future abatement efforts. While the guidelines for abatement assistance would have to be negotiated, including the conditions and allowed costs for removals, these issues are not insurmountable.

ZAI claims are undoubtedly a significant element of this bankruptcy. Even using a conservative estimate of one million homes with ZAI and a $3,000-$5,000 per home cost to remove ZAI by vacuum truck, the total cost of that effort would be $3-$5 billion. Claimants believe there are many more homes with ZAI and know that the costs of ZAI removal can be much higher than the range noted. Under virtually any scenario, however, the value of the ZAI claims alone exceeds the value of the estate. The ZAI Claimants understand that this bankruptcy will require them to accept a significant discount on their claims, as will all claimants.

V.  **Suggested Strategy to Facilitate Completion of These Proceedings**

The ZAI Claimants have outlined above what they believe to be the best hope for reasonable resolution of the ZAI claims. The Claimants suggest that they and Grace be permitted to continue their information exchange. As the ZAI Claimants obtain additional information on removal costs and methods, they will pass this information on to Grace. If Grace

---

[31] Price, et al v. W.R. Grace & Company, et al., No. CV-00-71-M-DWM (D. Mo. April 3, 2000).

discovers additional information concerning its sales patterns and distribution, Claimants expect that Grace would share that, as it has in the past. The ZAI Claimants believe that while a negotiated resolution with Grace is possible, an impediment to reorganization is Grace's inability to date to deal with the asbestos personal injury issue owing, according to Grace, to intransigence on the part of the personal injury committee. The ZAI Claimants have not been privy to those discussions and cannot comment further. However, if the Court can fashion a plan that will eliminate the impasse over the unimpaired personal injury issue, the ZAI Claimants believe that good faith on both sides can lead to resolution of their issues.

It has been suggested by some that rather than attempting to resolve the ZAI claims on a collective basis through class settlement and common claims facility, that ZAI claims should be subjected to an individual proof of claim procedure. There are numerous practical and organizational problems with this approach. First, it would certainly delay ultimate reorganization in this case for years. This is true because the vast majority of homeowners whose homes are contaminated with ZAI remain unaware of this fact. As set forth above, ZAI was sold with no disclosure of its asbestos content, much less a warning about it.

The ZAI homeowner's ignorance results in an inability to present a timely claim upon simple request. The absence of a reasonable opportunity to be informed of the basis for presenting a claim, in turn, results in a difficult due process issue for this bankruptcy. A constitutionally sufficient bar date procedure for individual claims is impossible where ZAI homeowners have not had a fair opportunity to learn of the facts necessary to present their claim. <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306 (1950).

> Inadequate notice is a defect which precludes discharge of a claim in bankruptcy. Due process requires notice that is "reasonably calculated to reach all interested parties, reasonably conveys all the required information, and permits a reasonable time for a response".

13

Chemetron Corp. v. Jones, 72 F.3d 341, 346 (3d. Cir. 1995) (quoting Greyhound Lines, Inc. v. Rogers (In re Eagle Bus Mfg., Inc.), 62 F.3d 730, 735 (5th Cir. 1995)).

It is difficult to conceive how an effective notice program passing due process muster could be designed and implemented in less than several years time. Not only would all potential claimants who had contact with Grace over the years (through letters of inquiry or other means) have to be identified from Grace's records and mailed individual notices, but efforts would have to be made to locate the supply houses that sold, and contractors who installed, ZAI in homes. The supply houses at least should be identifiable from Grace records and some of them may have records of their customers, although it is uncertain what document retention policies they had. The notice program would certainly have to include steps to alert potential claimants to check their attics for this material, repeated notice to be sure that homeowners would be likely to see it, and publication not just in national papers, whose fine print notices are ignored by virtually everyone, but in numerous state and local publications which are more likely to be read.

This notice campaign would have to be virtually unprecedented in scope, depth and repetition because it involves a product that was last sold over 20 years ago for which there can be no expectation of instant product recognition, such as the case with notices involving drugs recently taken (e.g. phen-phen) or well-known products subject to significant publicity (e.g. Firestone 500 tires). This notice campaign would have to reach millions of uninformed homeowners, tell them about an obscure product, and urge them to make a specific investigation to see if they have a problem. Failure to satisfy due process for potentially millions of ZAI homeowners could doom any plan of reorganization by requiring a never-ending stream of otherwise tardy claims. U.S. v. Cardinal Mine Supply, Inc., 916 F.2d 1087, 1089 (6th Cir. 1990) ("the creditor must be permitted to file tardily").

Even assuming that such a publicity campaign could be designed, mounted and carried out within several years, that would only be the beginning of the process. Once the claimants came forth to file their proofs of claim, there would undoubtedly be a series of requests for further information, challenges to claims, disputes over claims, etc. before there could be any resolution through the proof of claim process of the value of the claims. While this is a significant impediment to expeditious resolution of the ZAI claims through a proof of claim process, it does not present an impediment to resolution through the class action / facility process because all those issues would be handled by the facility without impeding Grace's reorganization. The vigorous representation of the ZAI Claimants' interest by the class representative would, as already found by the <u>Barbanti</u> court, satisfy due process, while the existence of the claims facility would provide claimants with a continual source of information, notice and access to abatement assistance after reorganization. For as important as it is to secure financial assistance for homeowners in the long run, it is also important to educate homeowners of the potential hazard of ZAI in the short-run. A facility could be structured to achieve both these goals.

## VI. Conclusion

The evidence is inescapable that ZAI can and has contaminated the homes in which it is installed. The major issue is the timing of its removal. ZAI will impose an inevitable burden on homeowners with ZAI. Nothing can make the ZAI problem go away, but good faith efforts to address the ZAI problem need not unduly delay resolution of this bankruptcy. The ZAI Claimants stand ready to work with the Court in any way to move this Grace bankruptcy to its much-needed resolution.

ELZUFON AUSTIN REARDON
TARLOV & MONDELL, P.A.


*/s/ William D. Sullivan*
William D. Sullivan (No. 2820)
Charles J. Brown, III  (No. 3368)
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE  19899

Darrell W. Scott, Esq.
Burke D. Jackowich, Esq.
Lukins & Annis, PS
717 W. Sprague Ave., Suite 1600
Spokane, WA  99201
ADDITIONAL SPECIAL COUNSEL

Allan M. McGarvey, Esq.
McGarvey, Heberlinh, Sullivan
& McGarvey
745 South Main
Kalispell, MT  59901-5399

Edward J. Westbrook, Esq.
Robert M. Turkewitz, Esq.
James L. Ward, Esq.
Robert S. Wood, Esq.
Richardson Patrick Westbrook
& Brickman
1037 Chuck Dawley Blvd, Bld. A
Mount Pleasant, SC  29464
ZAI CLAIMANTS'
SPECIAL COUNSEL


Fabrice N. Vincent, Esq.
Lieff, Cabraser, Heimann
& Bernstein, LLP
Embacadero Center West, 30th Floor
275 Battery Street
San Francisco, CA 94111


Dated:  June 21, 2004