IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

## W.R. GRACE'S STATUS REPORT

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Andrew Running
Janet S. Baer
James W. Kapp III
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

PACHULSKI, STANG, ZIEHL,
  YOUNG, JONES &
  WEINTRAUB P.C.
Laura Davis Jones (Bar # 2436)
David W. Carickhoff, Jr. (Bar # 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

- Co-Counsel for the Debtors and Debtors in Possession -

Dated: June 21, 2004

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## Introduction

When Grace filed this case, it hit the ground running. A comprehensive roadmap for defining its true liability to asbestos personal-injury claimants was filed the first day. The sudden and scientifically unexplainable explosion of such claims in 2000-1 was what had driven Grace to file for protection. Grace's roadmap also spelled out how to address other areas of asbestos litigation.

Grace is able to report now that substantial progress has been made in the other, non personal-injury asbestos-litigation. Indeed, Grace should know shortly whether such litigation can be settled.

Progress has not been made in the most critical area of personal-injury liability -- notwithstanding Grace's repeated efforts. Judge Farnan was on the verge of deciding on Grace's roadmap when the case was assigned to Judge Wolin in late 2001. Judge Wolin never took up the personal-injury issue.

Two options for defining and resolving Grace's personal-injury liability soon will be available. One option -- preconfirmation common issue litigation -- is fully briefed and can be reviewed by the Court now. Grace is prepared to pursue immediately such litigation, either in this Court or in the Bankruptcy Court.

A second option is a plan which will capture hoped-for settlements of non personal-injury litigation and, additionally, provide for litigation of many personal-injury issues post-confirmation. With this approach, this case can be resolved soon. As already promised to Judge Fitzgerald, Grace will file a plan along these lines within 90-120 days.

Grace is prepared to pursue either of these two options. Both options are described further below.

2

## I. Grace's Current Business Operations

Grace and its affiliates is a group of specialty chemicals and materials businesses, operating on a worldwide basis, with its corporate headquarters located in Columbia, Maryland. The parent company, W. R. Grace & Co., is a global holding company that conducts substantially all of its business through W.R. Grace & Co. - Conn., a direct, wholly owned subsidiary. Grace-Conn. owns substantially all of the assets, properties, and rights of Grace in the United States and has 77 domestic subsidiaries and affiliates, 60 of which are Debtors in these chapter 11 cases. As of year-end 2003, Grace had approximately 6,300 full-time employees worldwide.

But for its legacy asbestos-related liabilities, Grace is a strong and profitable business. Unlike many chapter 11 debtors, Grace did not seek chapter 11 relief for failure in its business operations. For 2003 and 2002, pre-tax income from core operations (which excludes costs not related to current operations, in this case primarily asbestos and environmental charges related to pre-petition periods) was $148.7 million and $180.8 million, respectively.

Grace is organized into two principal divisions: Davison Chemicals and Performance Chemicals.

### A. Davison Chemicals

Davison Chemicals is a leading global-supplier of refining and chemical catalysts and silica-based products. Refining catalysts include: (i) fluid cracking catalysts used by petroleum refiners to convert crude oil into transportation fuels and other petroleum-based products; (ii) hydroprocessing catalysts that upgrade heavy oils and remove impurities; and (iii) chemical additives for treatment of feedstock impurities. Davison Chemicals' refining catalysts are used by every major oil company in the world and are critical in transforming hydrocarbons into finished goods such as gasoline, jet fuel and diesel fuel. Davison Chemicals is a recognized

leader in new catalyst technologies that reduce sulfur in gasoline and assist petroleum refiners in meeting more stringent clean-air regulations. Davison Chemicals' chemical catalysts are essential components in the manufacture of polyethylene resins used to produce such products as plastic film, high performance pipe, and household containers. Davison Chemicals also is the only source of supply for certain unique chemical catalysts. Davison Chemicals' silica-based products are used in a wide variety of industrial and consumer applications such as coatings, food processing, plastics, adsorbents, personal care products and biotechnology separations. Davison Chemicals accounted for approximately 52% of Grace's 2003 sales.

### B. **Performance Chemicals**

Performance Chemicals' major product groups include: (i) specialty construction chemicals and building materials used primarily by the commercial construction industry; and (ii) container sealants and coatings for food, beverage and other packaging. Performance Chemicals' construction chemicals are used to add strength, control corrosion, and enhance the handling and application of concrete. Performance Chemicals' building materials are used worldwide for waterproofing and to provide fireproofing protection to structural steel. Performance Chemicals' container products are used to seal beverage and food containers, to protect metal packaging from corrosion and to protect the contents of such packages from the effects of metal. Performance Chemicals is a leader in container products technology and its rigid package sealing is used to protect safety and freshness in billions of cans annually. Performance Chemicals accounted for 48% of Grace's 2003 sales.

### II. **The History of Grace's Former Involvement in the Asbestos Business**

Grace was a late entrant into the asbestos business. Its contact with asbestos began with the purchase of the Zonolite Company in 1963. Grace purchased the assets of Zonolite and merged them with what is now Grace Performance Chemicals. Zonolite mined, milled, and

processed vermiculite from a mine located ten miles north of Libby, Montana. Vermiculite is itself an inert mineral that is non-asbestos and has no known toxic properties. When mined, however, vermiculite ore in the Libby Mine deposit contained a secondary mineral – fibrous asbestiform tremolite.[2] Grace operated the Libby Mine from 1963 until 1990. Grace also used commercial asbestos in manufacturing building products such as acoustical plaster and fireproofing insulation.

In the years leading up to its chapter 11 filing, Grace faced different types of claims alleging asbestos-related injuries and damages. There were four general categories:

- asbestos property-damage claims,
- claims arising out of vermiculite mining and processing operations;
- Zonolite Attic Insulation ("ZAI") claims, and
- claims for personal-injury from asbestos exposure.

Until recently, Grace's most significant asbestos litigation involved, not personal-injury, but property-damage. The primary product for which most of the property claims arose was known as Monokote-3 ("MK-3"), a spray fireproofing product being sold by Zonolite when Grace acquired the company in 1963. MK-3 was (i) 60% gypsum – a naturally occurring mineral mined and sold by the gypsum companies – which acted as the binding, cementitious component of the product, (ii) 30% vermiculite from the Libby mine, and (iii) 10% added chrysotile asbestos purchased by Grace from asbestos producers. Grace ceased producing and selling MK-3 in the United States in 1973. The asbestos property-damage claims against Grace

---

[2] Fibrous asbestiform tremolite impurities in vermiculite are atypical and not characteristic of most vermiculite deposits. It is believed that the depth of the ore deposit in Libby is correlated to the amount of impurities, whereas most vermiculite deposits – such as those at Grace's Enoree, South Carolina mine – are relatively shallow.

generally seek payment for the cost of removing or containing MK-3 and other asbestos containing products manufactured by Grace, which were used primarily in high-rise buildings.

The litigation arising from Grace's vermiculite operations involves both personal-injury and property-damage claims of exposure to naturally-occurring asbestos in connection with the mining and processing of vermiculite at Grace's mine in Libby. The vermiculite ore was mined at Libby from relatively deep open-pits. The asbestos content of ore from the pits was as high as 30%. Grace mined the ore and then milled it into a concentrate through a crushing, screening, washing, and flotation separation process. After milling, the vermiculite concentrate contained up to 3% asbestos, although the asbestos content was typically less than 1%. At Grace's "expansion plants," the concentrate was passed through vertical furnaces at temperatures approaching 2,000 degrees, which resulted in the further reduction of asbestos content. The heating process transformed embedded moisture into steam, causing vermiculite to "pop" or expand into the light-weight material used commercially. When finished, expanded vermiculite – which typically contained a fraction of 1% asbestos – was bagged and sold for various uses under the Zonolite trade name. Property-damage and personal-injury suits have been prosecuted by those working for, and living around, the Libby operation.

ZAI claims are claims relating to the expanded vermiculite product itself, used as loose-fill attic insulation. These claims were first brought against Grace only shortly before its chapter 11 filing. They have been styled as class-actions, purportedly on behalf of homeowners who used Grace's attic insulation products and are now seeking damages and other relief, including removal of the attic insulation allegedly containing asbestos. ZAI typically contains, at most, *trace* quantities of asbestos – minute fractions of 1%.

Grace's product-related personal-injury claims primarily involve alleged exposure to its MK-3 spray fireproofing product. For many years, Grace dealt with these asbestos-related claims in the normal course of its business. Grace first relied upon the court system to address such claims. Then, when the tort system became besieged with asbestos-related litigation cases, Grace turned to privately-negotiated settlement agreements.

At the time of the chapter 11 filing, Grace had the asbestos property-damage claims well in hand, with only 7 cases of any significance pending. ZAI claims, which are really a type of asbestos property-damage claim, were relatively new and immature. However, asbestos personal-injury claims, which traditionally had not been a significant problem for Grace, proved to be the catalyst that forced Grace to seek chapter 11 relief.

### III.    Events That Led to Grace's Chapter 11 Filing

Grace's history furnishes a dramatic demonstration of the problem posed by the ongoing asbestos-litigation debacle. Because Grace was a consumer, rather than a manufacturer of asbestos, personal-injury claims did not pose a significant liability problem until the mid 1990's. As reflected in the claim chart attached as Exhibit A, claims rose in the early 1990's and peaked in 1996. This is not to say that the rising claims were valid — analysis of Grace's 1997 and 2000 claims has confirmed that the claims were filed by the wrong people, in the wrong occupations, and were based upon the wrong data. For example, very few claims were filed by people in industries traditionally supplied with Grace products. See Exhibit B. Further, 64% and 76% of the claims that were filed against Grace in 1997 and 2000, respectively, were filed on behalf of non-malignant claimants. See Exhibit C. Only 2.8% and 3.3% (in 1997 and 2000, respectively) of those non-malignant claimants had 1/1 ILO and PFTs (see Exhibit D), as required to meet the American Medical Associations' Mild Impairment standards. But the

claims during the late 1990's were manageable. Indeed, by the late 1990's, claims were on a steady decline.

All this changed in 2000, as claims skyrocketed 81%. See Exhibit A. No medical, scientific or legal explanation of this surge ever has been proffered. Time has shown only that Grace was not alone, as more companies went into chapter 11 and even already-existing chapter 11 trusts saw payouts for valid claims diluted by a similar influx of bogus claims. For example, Exhibit E illustrates the dramatic increase in claims that were filed against the Manville Trust on behalf of non-malignant claimants during the period from 1998 through 2001. During this same period, however, the number of claims filed on behalf of malignant claimants remained relatively steady. See Exhibit F.

The precipitous increase in asbestos litigation had a very real effect on Grace's business. Asbestos claims were no longer merely siphoning off Grace's profits - they threatened Grace's financial health and its core businesses. Under these circumstances, Grace concluded that there was no way to define and resolve its asbestos liability, while preserving the value and viability of its core business operations, other than through a reorganization under chapter 11 of the Bankruptcy Code, which Grace filed on April 2, 2001 (the "Petition Date").

### IV. Grace's Original Approach to Resolving Asbestos Claims in Chapter 11

From the first day of this case, Grace has sought to present and implement a transparent framework for defining and resolving its asbestos liability. Thus, on the Petition Date, Grace filed an Information Brief, which included (i) a detailed summary of the Grace's involvement in the asbestos business, (ii) the Grace's historical procedures for resolving asbestos-related claims, and (iii) the crisis facing Grace as a result of the skyrocketing personal-injury claims. Critically, the Informational Brief set forth proposals for how the Court could deal with the various issues

facing Grace, especially with respect to the personal-injury claims. (A copy of the Information Brief is attached hereto as <u>Exhibit G</u>.)

And Grace diligently pursued those proposals. For example, on the Petition Date, Grace acted to shut down other litigation that could compete with Grace's expected chapter 11 litigation. In particular, Grace obtained a temporary retraining order - and later, a preliminary injunction - enjoining all pending and prospective actions against key non-Debtors that: (i) arose from alleged exposure to asbestos indirectly or directly allegedly caused by the Debtors; (ii) may be covered under the Debtor's insurance policies; (iii) allege fraudulent transfer or fraudulent conveyance claims; or (iv) are asserted against the Debtors' insurance carriers and allege coverage for asbestos-related liabilities.

Next, on June 17, 2001, at the request of District Judge Farnan (the original District Court Judge assigned to the Grace cases), Grace filed a proposed case management order (the "<u>CMO</u>"), which outlined Grace's proposal for resolving all of the key-issues facing Grace in its chapter 11 case. The CMO proposed, amongst other things, that asbestos-related claims be resolved by (i) requiring potential claimants to prepare and file detailed proof of claims forms by a court-established bar date, (ii) followed by Rule 42 common issue litigation. Because the scope of Grace's true liability was undefined and that gap constituted the principal obstacle to a consensual plan, the common-issue litigation would occur before any reorganization plan could be proposed.

The CMO was fully-briefed and set to be tried before Judge Farnan on November 21, 2001. On the morning of November 21, Grace was told that the Court of Appeals for the Third Circuit had reassigned the Grace cases, along with the asbestos bankruptcy cases of four other major debtors, to the Honorable Judge Alfred M. Wolin.

9

## V. Evolution of the Grace Case Under Judge Wolin

The Third Circuit assigned Judge Wolin five, high-profile, asbestos-related chapter 11 cases. Judge Wolin, in turn, sought to prioritize the major issues in each of the five cases. When Judge Wolin received the Grace bankruptcy, he (i) asked the parties to identify the major issues facing Grace, (ii) then retained the asbestos bodily-injury issues and certain key fraudulent transfer litigation, and (iii) referred all other matters to Bankruptcy Judge Judith Fitzgerald.

### A. The Fraudulent Transfer Proceedings

At the time Grace filed chapter 11, an uncertified class action alleging fraudulent transfer claims was pending against Grace, Sealed Air Corporation and Fresenius Medical Care A.G. This litigation related to certain corporate divesture transactions that took place between (i) Grace and Fresenius Medical Care A.G. in 1996 and (ii) Grace and Sealed Air Corporation in 1998.

These claims were litigated before Judge Wolin in 2002. After extensive discovery and litigation of certain key issues, the litigation was resolved in November of 2002. That resolution, if approved, will result in the recovery of almost $1 billion dollars.[3]

### B. The Property-Damage and Non-Asbestos Litigation

As part of the CMO, Grace sought the approval of a detailed proof of claim form and bar date for all potential asbestos property-damage claims, as well as ZAI, medical monitoring, and

---

[3] On November 26, 2003, a Motion to approve the resolution of the fraudulent transfer litigation was filed by the settling parties thereto with Judge Wolin. However, due to the stay imposed by the 3rd Circuit as a result of the Wolin recusal matters, no objection deadlines or hearing date was set and the Motion remains pending before the Court. In addition, on June 8, 2004, Sealed Air filed a motion with this Court to vacate Judge Wolin's July 29, 2002 opinion on the legal standard to be applied regarding fraudulent transfer claims. According to Sealed Air's motion: (i) Sealed Air does not challenge the settlement agreement signed and presented to the court for approval in November 2003; and (ii) Sealed Air still expects the settlement agreement will become effective with court approval and the Debtors' emergence from bankruptcy.

non-asbestos claims. The development of the resulting bar date order and notice program was a 10 month process that included exhaustive efforts by Grace, the Bankruptcy Court and the Committees.[4]

By an order dated April 22, 2002 (the "Bar Date Order"), the Bankruptcy Court set March 31, 2003 as the last date for filing proofs of claim for all pre-petition claims relating to (i) asbestos property-damage, (ii) non-asbestos claims (including all governmental claims) and (iii) medical monitoring claims (the "Bar Date"). Once the detailed proof of claim forms were approved and the bar date order was entered, Grace spent over $4 million to publish the bar date notice. In this regard, Grace mailed out at least 201,116 bar date notice packages.

Pursuant to the Bar Date Order, approximately 15,438 proofs of claims were filed. Of these claims, approximately 5,566 are asbestos-related and 6,938 are protective claims filed by the Debtors' employees and former employees. The Debtors have lodged a series of omnibus claim objections to many of the remaining (approximately 2,934) non-asbestos, non-employee claims.[5] The Debtors believe that many of the proofs of claims are patently illegitimate, duplicative, or otherwise grossly overstated in amount. As a result of the Debtors' first, second and third omnibus objections and other matters, 970 claims have been expunged and 566 claims have been reconciled, leaving approximately 1,398 non-asbestos, non-employee claims to be

---

[4] The following official committees have been appointed in these cases (i) The Official Committee of Equity Security Holders (the "Equity Committee"), (ii) the Official Committee of Unsecured Creditors (the "Creditors Committee"), (iii) The Official Committee Asbestos Personal Injury Claimants (the "PI Committee"), and (iv) The Official Committee of Asbestos Property Damage Claimants (the "PD Committee").

[5] The Debtors filed: (i) Debtors' First Omnibus Objection to Claims (Substantive) on 7/21/2003, (ii) Debtors' Second Omnibus Objection to Claims (Non-Substantive) on 7/21/2003; (iii) Debtors' Third Omnibus Objection to Claims (Non-substantive) on April 14, 2004; (iv) Debtors' Forth Omnibus Objection to Claims (Substantive) on May 5, 2004; and (v) Debtors' Fifth Omnibus Objection to Claims (Substantive) on May 5, 2004.

91100-001\DOCS_DE:95642.1

reconciled. The Debtors are also completing an analysis to quantify the number of claims which have been paid or to which they have no objection and will allow the claims.

On June 12, 2004, Grace filed a motion to establish an alternative dispute resolution program to liquidate certain contested, non-asbestos claims. The proposed ADR program would establish procedures for resolving such contested claims through negotiation and then, if necessary, mediation. The ADR motion is set to be heard on July 19, 2004. The Debtors anticipate pursuing further omnibus objections in addition to, and simultaneous with, the ADR program outlined in the Motion

### C. The ZAI Science Proceedings

Grace also sought approval of a detailed proof of claim form and bar date notice program for ZAI claims. Grace's approach was opposed by ZAI claimants, who favored class-certification and a class proof of claim process. The matter was litigated in the Bankruptcy Court. Since no ZAI claims had ever been tried to judgment, and ZAI liability was a relatively new theory at the time Grace filed its chapter 11 cases, Judge Fitzgerald decided that the first order of business should be to receive evidence on whether ZAI created any unreasonable risk of harm.

On April 12, 2002, the Debtors, pursuant to section 501(c) of the Bankruptcy Code, filed ten proofs of claim (the "ZAI Claims") on behalf of claimants for claims relating to ZAI. The Debtors subsequently filed objections to these ZAI Claims. On October 21, 2002, the Bankruptcy Court entered an Order scheduling discovery and briefing with respect "to what science demonstrates with regard to whether ZAI creates an unreasonable risk of harm." (Docket No. 2855). Discovery has been completed on this subject, and summary judgment is fully-briefed. The Bankruptcy Court has now set a hearing date of October 18-19, 2004.

12

D.   <u>Asbestos Personal-Injury Claims</u>

The Debtors first proposed a detailed procedure for resolving the asbestos personal-injury claims in their June 27, 2001 CMO, and the parties were ready to argue that motion on November 21, 2001, when the cases were reassigned to Judge Wolin. Following the Third Circuit's assignment of the case to Judge Wolin, the Debtors, at the court's request, made the following submissions, which further explained and refined their case management proposals for the personal-injury claims: (i) a February 12, 2002 memorandum (Docket No. 1666), (ii) a June 21, 2002 supplemental brief (Docket No. 2275 ), and, (iii) an August 21, 2002 reply brief (Docket No. 2581), which responded to the PI Committee's proposals.

Through these submissions, the Debtors' proposal evolved from requesting an immediate bar date and detailed proof of claim form for all claimants, to a modified proposal (described in more detail below) under which only claimants with currently pending litigation claims would file proofs of claim, and the core issues from those claims would be the subject of common issue litigation. However, the case management proposals were never heard and remain pending.

VI.   <u>Major Unresolved Issues and Two Options for Resolving this Case</u>

Both in its decision to file for bankruptcy protection and in the prosecution of its chapter 11 case, Grace's sole focus has been to develop practical solutions to a problem that has proven intractable for the courts, Congress and corporate America for many years. The problem is to define and resolve asbestos personal-injury liability, so that it provides fair compensation for <u>deserving</u> claimants and imposes no unfair and unjustifiable burden on vital, growing businesses. Grace still has no other agenda.

Grace's CMO proposals are animated by a simple concept: to adhere studiously to all relevant rules and frame for adjudication key common-issues on which the scope of Grace's true

13

legal liability turns. The proposals call for a notice and bar date process that would direct all current claimants to come before the Court with claimant-specific information that is germane to such common issues. As noted above, however, Grace's approach has never been addressed by this Court.

New developments have prompted the development of a second, alternative plan. On June 16, 2004, the Bankruptcy Court entered an order directing the Debtors to file a chapter 11 plan no later than October 14, 2004.[6]

Today, therefore, two options shortly will be available for addressing asbestos personal-injury claims, as well as contested asbestos property-damage claims and ZAI claims: (i) pre-confirmation litigation or (ii) confirmation of a plan that contains a detailed post-confirmation litigation mechanism, to be implemented by a trust established to liquidate and pay claims.

A.  **The Pre-Confirmation Litigation Mechanism**

The pre-confirmation litigation mechanism embodied in the proposed CMO can be summarized as follows:

- Pursuant to Bankruptcy Rule 3004, Grace would promptly file claims on behalf of all claimants who had lawsuits pending against Grace as of the Petition Date;

- Grace would also serve a Court-approved claim form on counsel for these claimants;

---

[6] Given these critical developments, it was clear that the time had come to appoint a futures' representative. On April 19, 2004, the Debtors filed an Application for the appointment of a Legal Representative for Future Asbestos Claimants. Prior to filing the application, the Debtors conferred with each of the Committees and, based upon such dialogue, determined that there was no consensus support for any single applicant. Accordingly, the Debtors asked the Bankruptcy Court to appoint one of three individuals. Numerous responses and objections were filed, and, on May 24, 2004, the Bankruptcy Court entered an order appointing David T. Austern as the futures' representative. The following parties have each filed notices of appeal from the Bankruptcy Court's order: (i) Federal Insurance Company, (June 3, 2004)(Docket No. 5705), (ii) Royal Indemnity Company (June 10, 2004) (Docket No. 5775), and (iii) the PD Committee (June 11, 2004) (Docket No. 5793). Federal Insurance Company filed its appellant designation with the Bankruptcy Court on June 14, 2004. The other appellants each have until June 21, 2004 to file their respective appellant designations.

14

- The claimants would then complete and return the form; The information disclosed in those forms would be critical to the litigation that would follow;

- Grace would file omnibus claims objections, FRCP 42 consolidation and Bankruptcy Rule 7056 summary judgment motions raising common issues for litigation before this Court;

- The Court could decide at an early stage whether to appoint a FRE 706 Expert Panel to facilitate the resolution of disputes over scientific issues; In any event, those disputes could be resolved through expert discovery and *Daubert* proceedings;

- After the Court rules on the motions, Grace would then execute a Court-approved notice program to advise all other claimants of the Court's bar date; A claim form tailored to the Court's liability rulings would be used by these new claimants to file their claims, expediting the completion of this last phase of the litigation; and

- A show cause hearing would be held after the bar date to provide these new claimants with the opportunity to challenge or seek modifications to the Court's liability rulings.

As explained in-detail in the CMO and personal-injury procedures briefs, this process would afford the Court an opportunity to efficiently identify and resolve all of the critical common-issues raised by the pending personal-injury claims.

### B. The Post-Confirmation Litigation Mechanism

An alternative approach would expedite the confirmation of the Debtors' plan of reorganization. Given the progress that has been made in the evaluation of the asbestos property-damage claims following the Bar Date and the progress that has been made in the litigation before Judge Fitzgerald on the ZAI claims, the Debtors believe that this Court has the option of establishing a procedure for the resolution of the personal-injury claims following plan confirmation, provided that (i) case management procedures for personal-injury litigation are established as a part of the plan, and (ii) the estimation of the size of the personal-injury trust needed to satisfy certain present and future claims for which Grace is actually liable is also completed.

15

Under this plan, Grace would seek to settle each of the categories of claims summarized above during the plan confirmation process, with the important exception of the asbestos personal-injury claim category. Grace believes that some of the personal-injury claims could also be settled. However, many personal-injury claims cannot be settled.

With respect with claims, Grace believes that, with some exceptions, much of the necessary litigation could be passed through to a post-confirmation trust, which would litigate both common and individual issues raised by those claims.

## Conclusion

Grace has been working diligently since the Petition Date to resolve the issues it faces and emerge from chapter 11. Grace has made substantial progress. However, due to unforeseen and unusual circumstances - including the recusal of District Judge Wolin - the Court has not addressed Grace's proposals for approaching asbestos personal-injury claims. Two alternatives now exist for the Court in addressing those claims. One involves establishing a pre-confirmation litigation protocol, and the other seeks to use the plan confirmation process to settle what can and should be settled and leave much of the litigation to the post-confirmation trust. The Debtors are prepared to proceed down either path.

Dated: June 21, 2004

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Andrew R. Running
Janet S. Baer
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB P.C.

_____
Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for Debtors and Debtors in Possession

91100-001\DOCS_DE:95642.1