IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
* * * * * * * * * * * * * * * * * * * * * *
                                        *
In re                                   *
                                        *      Chapter 11
W.R. GRACE & CO., et al.,               *      Case No. 01-01139 (JKF)
                                        *      Jointly Administered
         Debtor.                        *
                                        *
* * * * * * * * * * * * * * * * * * * * * *
```

## STATUS REPORT SUBMITTED BY THE LIBBY CLAIMANTS

Claimants injured by exposure to tremolite asbestos from Grace's operations in and near

Libby, Montana[1] (the "Libby Claimants"), by and through their counsel, McGarvey, Heberling,

Sullivan & McGarvey, P.C.; Cohn Khoury Madoff & Whitesell LLP; and Landis Rath & Cobb

LLP, hereby submit this status report pursuant to the Court's directive in its Memorandum and

Order dated June 8, 2004.

### Introduction

Nowhere have the effects of asbestos been so devastating as in Libby, Montana – a town

of about 2,600 residents. From 1963 to 1990, Grace owned and operated a mining and

manufacturing facility in Libby, at which it produced vermiculite, an ore that was used to create

zonolite, an insulating material. But the vermiculite ore also contained dangerous levels of

tremolite asbestos.[2]

---

[1] As identified in the Verified Statement of Cohn Khoury Madoff & Whitesell LLP and Landis Rath & Cobb LLP Pursuant to Fed. R. Bankr. P. 2019 [Docket No. 4807] filed in Case No. 01-01139 (JFK), as it may be amended and supplemented from time to time.

[2] Although Grace has manufactured products that contain asbestos as a working ingredient, the asbestos in the Libby Mine was essentially a waste product.

Tremolite asbestos may be the most deadly form of asbestos, and must be distinguished from the more common chrysotile asbestos, which was the type used in 95 percent of commercial applications. Tremolite asbestos is about 10 times as carcinogenic and fibrogenic as chrysotile asbestos, and is hundreds of times more productive of mesothelioma, the type of lung cancer specific to asbestos. Hundreds of Libby residents – workers at the Libby mine, their families, and townspeople who had the misfortune to breathe the dust-laden air – have been diagnosed with Libby tremolite asbestos disease ("Libby Tremolite Disease"). A person so diagnosed has approximately a 76 percent likelihood of progressing to severe disease, which is about three times the progressivity rate for chrysotile asbestos disease. Patients with Libby Tremolite Disease are dying at a rate of approximately a dozen per year.

In addition to the particular severity of Libby Tremolite Disease, the Libby Claimants carry an additional burden not experienced by the majority of asbestos claimants in the Grace bankruptcy case. Where most asbestos claimants may seek recovery from multiple producers of asbestos products, the Libby Claimants' claims result from exposure to a single source of asbestos, thus limiting the range of potential sources of recovery. It would compound what is already a national tragedy if the Libby Claimants were left without adequate compensation for their injuries.

## I.    BACKGROUND

Grace operated a vermiculite mine and mill seven miles northeast of Libby, Montana from 1963-1990. Before then the mine was operated by The Zonolite Company, which is now known as Montana Vermiculite Company and is inactive.

Grace's Vermiculite Mountain near Libby was the largest source of vermiculite in the world, supplying two-thirds of the vermiculite used in the United States. The vermiculite itself

2

was harmless. It was an excellent product for insulation, ceiling plaster, building materials and potting soil. The problem was that the vermiculite had naturally occurring tremolite asbestos in it. The ore was 3-20 percent asbestos, but that led to 40 percent or more asbestos in the dust in the air in the workplace, because the asbestos was far more friable than the other minerals.[3] The mining operation was open cut, reducing the top of Vermiculite Mountain to benches. Blasting loosened the ore, which was then loaded into trucks. Half or more of the loads were asbestos or other waste materials, which were dumped down the side of the mountain. The vermiculite ore was dumped to a conveyor belt, leading to the dry mill. This was a seven-level refining process, with the raw ore introduced at the top level. It then passed through shakers, crushers, hammermills and down chutes to screens for sorting out asbestos and other impurities. The final product was vermiculite concentrate, which traveled on a railroad car down the mountain to storage, then by truck to storage by the river, then by conveyor across the river to be loaded onto railroad cars, which were pushed to Libby. Twelve to sixteen railroad cars per day of vermiculite concentrate left Libby for points east and west. Every time the vermiculite was moved it produced clouds of dust, containing a high percentage of asbestos fiber. The blasting produced clouds of dust. The railroad cars produced clouds of dust. Workers have testified that inside the dry mill, they could not see a light bulb at 15 feet. (A photograph of the dry mill will be provided to the Court at the Status Conference and provided to interested parties upon request to the undersigned.) A 1967 study by Grace on the dust from the large stack on the dry mill showed 24,000 pounds of dust *per day*. At 40 percent asbestos, that was 10,000 pounds of asbestos raining down on the workers in the service area near the mill.

---

[3] The facts come from the transcript and exhibits in *Finstad v. W.R. Grace & Co.,* 8 P.3d 778 (Mont. 2000). The proof met Montana's high standard for punitive damages, and Grace was found guilty by a jury of intentional, reckless and/or malicious conduct. Mont. Code Ann. § 27-1-221 (1997).

## A.    **What Grace knew**

The operators of the Libby mine knew of the asbestos in the ore from the 1920s forward.
In 1956 the State of Montana, Division of Disease Control, performed an industrial hygiene
inspection. The State did a thorough report finding asbestos levels far in excess of the standard,
and citing medical literature on the hazards of asbestos. The Zonolite Company recognized in
1956 that the asbestos was toxic and fatal, and "a serious hazard." The State reports also listed
many recommendations on dust control. These were not followed. The State continued
inspections, and repeatedly objected to poor progress on dust control. But the workers were
never told of the inspection reports, or the asbestos hazard.

Management did, however, begin monitoring the health of the workers. In 1959, then in
1964 and every year thereafter, chest x-rays were taken. Every year 25-30% of the workers had
abnormal chest x-rays. In 1961 three workers died of asbestosis. The Zonolite Company did not
tell the workers, nor did Grace after it acquired the mine including its management personnel in
1963. In 1964 Grace was informed of the greatly elevated risk of lung cancer with asbestos
exposure. A 1965 study of chest x-rays and lung function tests showed that 20 percent of the
workforce had asbestosis. By 1973, 16 were dead. Yet Grace told the workers the dust was no
more harmful than farm dust. The Chief Engineer was famous for saying "you can breathe a ton
of it, it won't hurt you." He knew otherwise. Grace intentionally exposed the workers to
asbestos fibers, knowing workers were dead and dying. As to the period through 1974, Grace
recently admitted to the Court of Appeals for the Ninth Circuit that "[t]here is no question, and
Grace does not deny, that workplace conditions at the Libby mill . . . were dangerous, and
tragically caused or contributed to disease and/or death as a result of asbestos exposure."[4]

---

[4] U.S. v. W.R. Grace & Co., No. 03-35924 (9th Cir.), Appellant's Brief dated April 26, 2004, at 8.

4

By 1979, when Grace finally told the workers of the hazard of asbestos exposure, 30 were dead. By 1999, at least 97 were dead. Others have certainly died of asbestos disease as well, but exact numbers will never be known because not all workers have been tracked, and because the family doctors were not informed and generally were not equipped to diagnose asbestos disease.

### B.    Dust Control at the Libby Mine and Mill was Feasible

Vacuum trucks and baghouses were available in the 1950s and before. The owners of the Libby mine, including Grace after 1963, chose not to use them. The State reports give long lists of maintenance measures not undertaken. Grace executives visited other similar plants and reported "the lack of dust laden air [and] excellent housekeeping." In 1974 Grace replaced the old dry mill with a new wet mill. In the 1970s and 1980s, Grace added other dust control measures. However, Grace never did meet industrial hygiene standards and the operation remained dusty to the end. Workers often worked in visible dust, which at the Grace mine and mill meant a violation at over 100 times the asbestos standard. In the final demolition of most of the facilities from 1991-1993, workers were exposed to extreme asbestos dust.

In this regard, others besides Grace are responsible for failing to protect workers and the community from Grace's asbestos. Maryland Casualty Company, Grace's workers' compensation carrier from 1962 through 1973,[5] had an engineering division and a medical division which undertook in 1964 to design an industrial hygiene program for the Libby mine. They called it the Maryland Casualty Safety Program. Maryland Casualty was fully aware of the magnitude of the problem; indeed, the 1965 study showing 20 percent incidence of asbestosis was conducted by Maryland Casualty's own consulting pulmonologist. Nevertheless, the industrial hygiene program undertaken by Maryland Casualty did not provide for adequate dust control measures,

---

[5]  CNA, which became Grace's insurer in 1973, may have taken on a similar role at that time.

5

did not provide for proper medical monitoring, did not provide for workers to be told of their exposure to asbestos, and did not provide for workers or their families to be educated about how to protect themselves. For example, change houses and showers were standard at other Montana mines since the 1950s. Grace never had a change house or showers for workers all the way to end in 1990. As a result, Grace workers went home dusty. The asbestos dust permeated their houses and cars, resulting in a 24-hour exposure for the workers, and extending the asbestos exposure to the worker's families.

### C.    Families and the Community

Asbestos fibers are so small that they go right through a vacuum cleaner. They are reported to remain in houses over ten years after entry. The Libby community became contaminated with vermiculite and its associated asbestos fibers. Vermiculite provided superb insulation for houses. Members of the community could obtain pickup loads free from Grace's piles along the railroad tracks on the edge of downtown Libby. The vermiculite was also used in gardens as a soil enhancer. The piles of slippery shale-like vermiculite concentrate were great for kids to slide on. Grace did not prevent children from using the piles on the Grace property along the railroad. The Grace piles and storage areas were across from the swimming pool and baseball parks. Film footage shows kids playing baseball with the Grace expansion plant in the background spewing asbestos-laden dust.

Libby is in a small bowl-like valley in the Rocky Mountains. Dust entering this bowl can be re-circulated for years. On a typical day, 12 to 16 railroad cars per day full of dusty vermiculite were shipped out of Libby. In addition, another 15-20 trains of 100 cars went through Libby each day at 50 mph, recycling Grace's dust into the community. Libby was a dusty place. The dust was permeated with asbestos.

6

As a result, there are now more cases of community asbestos disease than there are cases

for workers or family members of workers.  The Montana firm of McGarvey, Heberling,

Sullivan & McGarvey now has:

     185 ex-worker cases

     112 worker family member cases

     <u>205</u> community exposure cases

     502 total cases

The Montana firm of Lewis, Slovak, & Kovacich also has over 100 cases, similarly distributed.[6]

According to news reports, over 1,100 people have been diagnosed with asbestos disease.  This

is a terrible concentration of misery in one small town, population 2,600.

This American tragedy has been the subject of a major documentary "Dust to Dust," by

Michael Brown, shown on PBS.  Libby has been the subject of NBC Dateline, ABC 20/20, CBS

48 Hours, CNN Time, and other investigative news reporting.  The Libby story has also been the

subject of three books:

    <u>An Air that Kills</u> - How the Asbestos Poisoning of Libby, Montana, Uncovered
    a National Scandal, by A. Schneider and D. McCumber, (Putnam, 2004).

    <u>Libby, Montana</u> - Asbestos and the Deadly Silence of an American Corporation,
    by A. Peacock (Johnson, 2003).

    <u>Fatal Deception</u>, by M. Bowker (Rodale, 2003).

The United States Environmental Protection Agency has spent upwards of $110 million on

cleaning up the Libby area.  For the first portion of the clean-up effort, the EPA obtained

judgment against Grace in the amount of approximately $55 million—a judgment that Grace has

appealed to the Ninth Circuit.  Fixing the property damage continues apace.  Meanwhile, despite

---

[6] These Libby Claimants are also represented by the undersigned counsel.

a Grace program under which Grace pays certain medical expenses of some of its victims, the vast majority of the injury *to people* remains uncompensated. Victims of advanced Libby Tremolite Disease die of strangulation as their lungs become unable to take in enough oxygen to support life. While these victims struggle for every breath, Grace's Chapter 11 case grinds on.

## II.    STATUS

To date the primary focus of the Libby Claimants in the Grace bankruptcy case has been to obtain the Bankruptcy Court's permission to continue their pursuit of independent tort causes of action against non-debtor third parties such as Maryland Casualty Company, Continental Casualty Company ("CNA"), and Montana Vermiculite Company and its insurers. At the beginning of the bankruptcy case, Grace obtained from the Bankruptcy Court an injunction (the "Preliminary Injunction") which not only barred actions against affiliates and insurers of Grace as such (a legitimate and well-recognized exercise of jurisdiction) but which the Bankruptcy Court to date has applied, at Grace's request, so as to block the Libby Claimants from proceeding even with independent actions against non-debtor third parties (which the Libby Claimants assert is beyond the Bankruptcy Court's jurisdiction). In addition to disputing Grace's legal position, the Libby Claimants have wondered why Grace would think the interests of its bankruptcy estate are best served by blocking litigation against third parties which, if successful, could provide compensation for the Libby Claimants other than from assets of the estate—thus potentially freeing up estate assets to pay creditors who do not have recourse to third parties.

### A.    Maryland Casualty Litigation

Libby Claimants have sued Maryland Casualty Company in Maryland and Montana state courts, asserting that under Montana law, by undertaking to implement an industrial hygiene program at the Libby mill and then failing to develop a program that met then-prevailing

8

standards for such programs, Maryland Casualty breached a duty to the Libby Claimants.[7] The

Bankruptcy Court rejected the Libby Claimants' motion to clarify the Preliminary Injunction to

establish that while actions against Maryland Casualty as Grace's insurer are stayed, actions

against Maryland Casualty based on its own independent liability are not. The District Court,

per Judge Wolin, vacated the Bankruptcy Court's order on the basis that the Bankruptcy Court

had exceeded its jurisdiction by barring the Libby Claimants' pursuit of independent claims

against Maryland Casualty. Grace and Maryland Casualty appealed to the Third Circuit, but

Grace voluntarily dismissed its appeal leaving Maryland Casualty as sole appellant. The appeal

has been fully briefed. The parties have received notice from the Third Circuit that it is

considering scheduling oral argument for September.

### B.     Montana Vermiculite Litigation

Libby Claimants who worked at the Libby mine before it was purchased by Grace in

1963 have brought suit in Montana state court against the mine's former owner, Montana

Vermiculite Company (then named The Zonolite Company). While Montana Vermiculite is not

believed to have assets of its own, the Libby Claimants believe that insurance through Royal

Indemnity Company is available to satisfy any recovery. Grace filed a motion seeking to expand

the Preliminary Injunction so that it would bar the Libby Claimants from pursuing these claims.

The Bankruptcy Court heard argument on December 15, 2003. At the Bankruptcy Court's

request, the Libby Claimants agreed to a temporary stay of litigation against Montana

Vermiculite to accommodate the Court's schedule in rendering a decision. The matter remains

pending.

Judge Fitzgerald indicated at oral argument that she would likely grant Grace's motion to

bar the Montana Vermiculite litigation. The Libby Claimants intend to appeal from that order,

---

[7] Libby Claimants may have similar claims against CNA but have been unable to pursue them to date.

once entered. That appeal will represent one of the matters that this Court will be called upon to decide in the near term.

### III.   MAJOR UNRESOLVED ISSUES

Major unresolved issues primarily affecting the Libby Claimants include: (a) the Libby Claimants' right to pursue independent actions against non-debtor third parties, both currently and after confirmation of a Chapter 11 plan; and (b) the equitable treatment of the claims of the Libby Claimants under a Chapter 11 plan. In addition to Libby-specific issues, the Libby Claimants of course have a great interest in issues that affect the Chapter 11 case generally. Concerning those issues, the Libby Claimants generally join in the views expressed in the Status Report Submitted by the Official Committee of Asbestos Personal Injury Claimants of even date herewith.[8]

### A.   Libby Claimants' Right to Pursue Independent Actions Against Non-Debtor Third Parties

Bankruptcy jurisdiction extends to matters "related to" a bankruptcy case.[9] In both the Maryland Casualty and Montana Vermiculite matters, Grace and/or its insurers have argued that what makes the Libby Claimants' litigation against third parties related to the bankruptcy case is: (1) the existence of an indemnity agreement whereby Grace is obligated to indemnify the third party, and (2) the burden on Grace created by the litigation. In the case of Maryland Casualty, the District Court rejected both contentions. Judge Wolin concluded that the language of the indemnity agreement did not extend to claims against Maryland Casualty for Maryland Casualty's own negligence. And he concluded that the litigation would impose a minimal burden on Grace; the events occurred so long ago that no current employees of Grace have relevant

---

[8] The Libby Claimants have a seat on that Committee.

[9] 28 U.S.C. § 1334(b).

testimony, and the relevant documents are already collected in a document repository.
Accordingly, the District Court correctly ordered that the injunction against the Maryland
Casualty Litigation be vacated because the Bankruptcy Court had no jurisdiction to issue it.

This Court will be called upon to decide similar issues when it hears the appeal that will
likely be brought once the Bankruptcy Court rules on Grace's motion to expand the Preliminary
Injunction to cover the Libby Claimants' litigation against Montana Vermiculite. Grace has
argued that its agreement to indemnify Royal Indemnity Company (Montana Vermiculite's
insurer) extends to the Libby Claimants' claims and thus creates related-to jurisdiction. The
Libby Claimants argue that the indemnity does not by its terms apply to their claims, and that
even if it did, their litigation against Montana Vermiculite cannot sufficiently affect Grace's
bankruptcy case to support related-to jurisdiction.[10] Grace can be expected to continue to argue
that the burden of the Montana Vermiculite litigation on Grace causes it to be related to the
Grace bankruptcy. The Libby Claimants assert that since the events giving rise to liability
occurred before Grace purchased the Libby mine in 1963, the litigation would pose no burden for
Grace.

The foregoing issues relate to the Libby Claimants' ability to pursue independent claims
against third parties while Grace is attempting to reorganize under Chapter 11. It is possible that
at the time of a Chapter 11 plan, an attempt might be made to permanently block the Libby
Claimants from pursuing their independent claims. This would present the issue whether Section
524(g) of the Bankruptcy Code or any other authority would support such an injunction.

---

[10] The Third Circuit has held, as to a common law right of indemnity (*Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir.
1984)) and as to a disputed contractual right of indemnity (*In re Federal-Mogul Global, Inc.*, 300 F.3d 368 (3d Cir.
2002) (denying mandamus), *cert. denied sub nom. Daimler Chrysler Corp. v. Official Committee of Asbestos
Claimants*, 537 U.S. 1148 (2003)), that these indemnity claims against the debtor were insufficient to support
related-to jurisdiction because the indemnity claim could be allowed as a valid claim against the debtor only as a
result of a separate proceeding in which collateral estoppel could not be invoked against the debtor by reason of the
litigation and judgment against the indemnitee that occurred while the debtor was under protection of the automatic
stay under the Bankruptcy Code.

Section 524(g) of the Bankruptcy Code was enacted in 1994 to codify the manner in which asbestos personal-injury claims were resolved in the <u>Johns-Manville</u> bankruptcy case: establishing a trust to pay present and future asbestos claims, enjoining such claims from being asserted against the debtor and discharging the debtor from such liabilities.  One of the most important features of Section 524(g) is its provision for a "channeling injunction" whereby third parties' liability for claims against the debtor can be channeled so as to become the exclusive liability of the asbestos trust established under the plan, where the third party's liability arises from its affiliation with or providing insurance or financing for the debtor.  The Libby Claimants believe that Section 524(g) does not apply to their independent actions against third parties because, *inter alia*, those actions do not seek to hold third parties liable for claims against Grace but rather for their own independent torts, and the third party liability does not arise from affiliation, financing or insurance to Grace (notwithstanding the happenstance, in the case of Maryland Casualty, that it served as Grace's insurer as well as having independent responsibility for the industrial hygiene program).  The Libby Claimants believe that any attempt to take away their independent rights against third parties would violate their Constitutional rights as well.

**B.     The Equitable Treatment of the Claims of the**
     <u>**Libby ClaimantsUnder a Plan of Reorganization**</u>

The Libby Claimants are gravely concerned that the proof-of-claim procedure proposed by Grace would result in a costly administrative nightmare that would delay Grace's emergence from Chapter 11, and hence the commencement of payment to Grace's victims, certainly for years and potentially for decades.  Instead, the Libby Claimants support the recommendation put forth by the Official Committee of Asbestos Personal Injury Claimants to conduct an immediate estimation, under Section 502 of the Bankruptcy Code, of Grace's aggregate liability for present and future asbestos personal-injury claimants.  Such an estimation procedure is a necessary step

in establishing a trust under Section 524(g) of the Bankruptcy Code to pay present and future asbestos personal-injury claims as they arise.

While the Libby Claimants support the establishment of a trust, the unique aspects of the Libby exposure and of Libby Tremolite Disease do not completely fit the traditional Trust Distribution Procedures compensation structure adopted in other asbestos-related bankruptcy cases.

**Issue:** *How will the Trust Distribution Procedures properly recognize that the Libby Claimants have just one exposure site?*

Of the 500 Libby Claimants represented by the firm of McGarvey, Heberling in Montana, it is estimated that under five percent have any significant asbestos exposure outside of Libby, Montana. The typical asbestos claimant, a construction or insulation worker, can often collect from many, even dozens of defendants. For the Libby Claimants, there is just one exposure site. Although the Libby Claimants exposed before the mine and mill was bought by Grace in 1963 might be able to recover from the prior owner's insurance company, Grace is the only exposure source for most of the Libby Claimants. Cases are pending against other defendants—such as the State of Montana, the railroad, and Maryland Casualty—but such litigation entails different risks from claims against a producer of asbestos.

In other asbestos bankruptcy cases, the special situation of claimants for whom the debtor was the sole source of exposure has been recognized by designating them as "Extraordinary Claims" entitled to a multiple of the distribution otherwise available. (Such distributions are calculated with reference to historical verdict and settlement levels based largely on severity of the claimant's injury.) Because there was just one exposure site and because the Grace bankruptcy may pay a fraction of the total claim value, fairness requires that the Libby Claimants receive a multiple of the fractional distribution for which they would otherwise qualify.

13

**Issue:** *How will the Trust Distribution Procedures properly recognize community asbestos disease in Libby?*

The EPA has noted the unprecedented incidence of community asbestos disease in Libby. The firm of McGarvey, Heberling has more community exposure asbestos disease cases than worker cases or family member of worker cases. According to the EPA, this is the first instance of widespread asbestos disease in a single industrial community, extending well beyond workers and their families. The recent proposed asbestos legislation, S. 2290, recognized this and granted Libby an exemption from the bill's provisions which generally required an occupational exposure. Fairness requires inclusion of a similar provision in the Trust Distribution Procedures for Grace's Chapter 11 plan.

**Issue:** *How will the Trust Distribution Procedures properly recognize the highly progressive and deadly nature of pleural disease in Libby?*

Pleural disease is one of the less severe disease categories under Trust Distribution Procedures utilized in other asbestos cases. Libby pleural disease is different.

Over 95 percent of the asbestos used in construction materials was chrysotile asbestos. As a result, the vast majority of the asbestos disease is due to chrysotile exposure. Similarly, the vast majority of medical research is on chrysotile asbestos disease. The Libby tremolite asbestos is amphibole asbestos, which is different from serpentine asbestos (chrysotile). The amphiboles are long, sharp spear-like fibers, whereas the chrysotile fiber is more of a curlicue shape. The amphiboles migrate more readily through the structure of the lung to the pleura (the lung lining), and cause pleural disease. Amphibole asbestos, including Libby tremolite asbestos, is far more toxic than is chrysotile asbestos. Studies have indicated that amphiboles are about 10 times as carcinogenic as chrysotile fibers, that tremolite asbestos is roughly five to ten times as fibrogenic (asbestosis causing) as chrysotile asbestos, that pleural disease resulting from Libby tremolite

14

asbestos is much more highly progressive (meaning that that the victim has a far greater chance of progressing from mild to moderate to severe disease) and that patients can die of tremolite pleural disease without any evidence of interstitial disease.

Not surprisingly, the highly progressive and deadly nature of pleural disease in Libby has resulted in historical verdicts and settlements that are far greater than for pleural disease in other asbestos cases. Libby average settlements for pleural disease have ranged from $212,000 (unimpaired claimant) to $343,000 (impaired claimant) compared with, for example, $8,000 (unimpaired) and $19,000 (impaired) fixed as the pleural disease claim levels under the Trust Distribution Procedures of the Owens Corning case. A similar disparity is apparent in the category of combination pleural/interstitial disease. As a matter of fairness, the Trust Distribution Procedures under Grace's plan must place pleural disease resulting from tremolite asbestos in a separate category from pleural disease resulting from chrysotile asbestos, with claim amounts reflecting the relative historical verdicts/settlements for these two very different diseases.

## IV.    SUGGESTED STRATEGY TO FACILITATE COMPLETION

Although the focus of this report has necessarily been on the status of litigation and the pendency of unresolved issues, the most important goal of the Libby Claimants—which is to achieve confirmation of a Chapter 11 plan that treats them fairly—can best be accomplished through negotiation if others are willing to reciprocate. This Court can advance the goal of achieving confirmation of a Chapter 11 plan that is fair to all parties not only by providing a speedy and just determination of issues presented to this Court for decision but also by utilizing the tools at its disposal to require that real negotiations occur. Finally, whether the Chapter 11 plan is forged by negotiation or litigation, the Libby Claimants ask for this Court's compassion in

15

recognizing the uniquely horrific circumstances with which they are faced and in assuring that

the Libby Claimants are fairly treated.

Dated:  June 21, 2004                       LANDIS RATH & COBB LLP


                                            Adam G. Landis, Esq. (#3407)
                                            Kerri Mumford, Esq. (#4186)
                                            919 Market Street, Suite 600
                                            P.O. Box 2087
                                            Wilmington, DE 19801
                                            (302) 467-4400

                                            - and -

                                            Daniel C. Cohn
                                            David B. Madoff
                                            COHN KHOURY MADOFF & WHITESELL LLP
                                            101 Arch Street
                                            Boston, MA  02110
                                            (617) 951-2505

                                            - and -

                                            Jon L. Heberling
                                            MCGARVEY, HEBERLING, SULLIVAN &
                                              MCGARVEY, P.C.
                                            745 South Main
                                            Kalispell, MT  59904
                                            (406) 752-5566

                                            Counsel to the Libby Claimants