IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| | ) | |
| In re: | ) | Case No. 01-01139 (JKF) |
| | ) | |
| W. R. GRACE & CO., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Related Docket No. 5747 |
| | ) | |
| | ) | |
| _____ | ) | |

**STATUS REPORT OF THE OFFICIAL COMMITTEE
OF ASBESTOS PROPERTY DAMAGE CLAIMANTS**

The Official Committee of Asbestos Property Damage Claimants (the "PD Committee"),

by and through undersigned counsel, pursuant to the Court's Order dated June 8, 2004, hereby

files this status report, and states as follows:

**PRELIMINARY STATEMENT**

W. R Grace & Co., et al. ("Grace" or the "Debtors") have long been confronted with

significant liabilities resulting from the manufacture of asbestos-containing products; however,

despite popular misconception, *historically, Grace settled or suffered judgments for asbestos

property damage which exceeded payments made by Grace in respect of asbestos personal

injury claims*.  Due to the widespread market of Grace products and the fact that its products

made their way into commercial and residential buildings throughout the United States, asbestos

property damage will continue to be an enormous financial liability that Grace must address as

part of its reorganization.

Little has happened in Grace's bankruptcy case to facilitate its reorganization. Indeed, by

any standard, the most significant accomplishment to date was the settlement for more than $1

billion of fraudulent transfer litigation commenced by the PD Committee and the Official Committee of Asbestos Personal Injury Claimants (the "PI Committee"), which Grace not only opposed the commencement of (in unison with the Official Committee of Unsecured Creditors), but oddly enough also intervened in and aligned itself with the defendants.

In fairness to Grace, its reorganization has been hampered to some extent by two occurrences in the case. First, the District Court in effect withdrew the reference over all matters pertaining to asbestos personal injury claims. As a consequence, while the Bankruptcy Court has endeavored to move the case along, it has only been able to do so in respect of asbestos property damage claims and non-asbestos claims. Second, the motions to remove Judge Wolin as the presiding District Court Judge in this case and other asbestos bankruptcy cases pending in the Third Circuit served to further delay reorganization as all matters before Judge Wolin, including the management of Grace's asbestos personal injury liabilities, were stayed pending the outcome of those motions.

This status report is intended to briefly provide the background of Grace's asbestos manufacturing activities and liabilities, and a discussion of Grace's bankruptcy proceedings, as well as to identify pending motions and proposals that will facilitate a successful reorganization of Grace.

## I.    BACKGROUND

### A.    Grace's Manufacture of Asbestos Containing Material

Although Grace chooses to characterize itself as a latecomer to the asbestos debacle through its purchase of the Zonolite Company ("Zonolite") in 1963, Grace enjoyed a substantial market share of the manufacture of asbestos containing products ("ACM"), and incurred huge

asbestos liabilities for various products that were manufactured pre- and post-1963.[1]  Grace mined, milled and processed vermiculite and also included asbestos in the manufacture of its building products.[2] Some of the Grace vermiculite containing products which Grace profitably sold and marketed were *Zonolite Attic Insulation* ("ZAI")---a product that, while not marketed as ACM, contained asbestos and found its way into the attics of U.S. homes,[3] as well as *Zonolite High Temperature Cement* and *Zonolite Masonry- Fill*.  Additionally, Zonolite manufactured a variety of construction products that included contaminated vermiculite.  These products were spray applied to steel frames and ceilings in buildings, and commercial asbestos was added as an inexpensive filler to enable the products to be pressure ejected from the spray nozzle.

In addition, Grace manufactured many  "hand application" and "spray-on" asbestos surfacing materials over the years including: *Zono-Coustic* (1960 to 1973); *Zonocoustic Acoustical Plaster* (1945 to 1972); *Zonolite Finish Coat* (1950 to 1973); *Zonolite Spra-Tex* (1955 to 1972); *Econo-White* 70 (1956 to 1970); Z-Tex (1958 to 1962); *Zonolite Board of Education Texture* (1962 or 1963); *Zonolite Spra-Insulation* (1959-1973); *Zonolite High Temperature Cement* (1938 to 1970); *Art-Zonolite Texture* (1961-1964); *Perltex Super-40 Perlite* (unknown up to 1973); *Perltex Super-40 SAV* (unknown up to 1973); *Perltex Super-40 Polycoarse* (unknown up to 1973); *Perltex Super-40 Fog* (unknown up to 1973); *Perltex Spray Surfacer*

---

[1] More than nine years prior to the Zonolite acquisition, Grace acquired the Dewey & Almy Chemical Company, which manufactured friable asbestos products. Grace would obviously prefer to limit its asbestos liabilities to a date after the Zonolite acquisition; however, several courts have found Grace to be responsible under the theory of successor liability for ACM produced by Zonolite prior to the 1963. See e.g., In re State of West Virginia Public Building Asbestos Litigation, 454 S.E.2d 413, 425 (W.Va. 1994)(finding trial court had not erred in its conclusion that Grace was responsible for Zonolite ACM under the theory of successor liability) cert. denied 515 U.S. 1160 (1995); Harashe v. Flinkote Co., 848 S.W.2d 506, 509 (Mo. Ct. App. 1993)(concluding Zonolite acquisition was a de facto merger and finding Grace obligated for Zonolite liabilities as a successor in interest); T.H.S. Northstar Associates v. W.R. Grace and Co. Conn., 840 F. Supp 676, 679 (D. Minn. 1993)(Grace found to be liable as successor in interest to both Western Mineral Products Co. and Zonolite).

[2] Much of the factual information contained herein regarding Grace's business and processing history is taken from Grace's Informational Brief.  For brevity's sake, pinpoint citations to the brief have not been provided.

[3] As the Court has requested an independent status report from the ZAI Claimants, this report will not address the ZAI liabilities in depth.

(unknown up to 1973); *Hi-sorb Acoustical Plaster* (unknown up to 1973); *Spra-Wyt* (1954 to 1973); *Versakote* (unknown up to 1973); *Prep Coat #3* (unknown up to 1973); *Perlcoustic* (unknown manufacture dates).[4]   Additionally, Grace was one of the largest producers of spray-on asbestos fireproofing (*MonoKote-3*) used to provide fire protection for the enclosed steel beams of large structures throughout the United States.[5]

### B.    Grace's Asbestos Liabilities

Court records amply demonstrate that Grace has been no stranger to asbestos litigation since its first personal injury lawsuit in 1977. As latent effects of asbestos exposure began to more widely appear and be identified, as the dangers of asbestos became well known to workers, building occupants and building owners in the 1980s, and as mandatory asbestos abatement legislation was passed, personal injury and property damage lawsuits were steadily filed against Grace.  By the end of the decade, Grace was facing approximately 28,000 lawsuits relating to its production of ACM.  The number of lawsuits against Grace continued to increase throughout the 1990s.

While Grace has argued that many of the lawsuits filed against it were meritless, Grace cannot marginalize the fact that, prior to bankruptcy, 163,698 asbestos personal injury claims were resolved by settlement or judgment against Grace for some $645.6 million.[6]  Moreover, and despite popular misconception, Grace's property damage experience was even worse as it settled

---

[4] See Asbestos; Publication of Identifying Information; Notice, 50 Fed. Reg. 30, 5160-5162 (E.P.A. Feb. 13, 1990). It should be noted that many of the products listed above were marketed by Grace under distinct names not identified herein, but are, for the most part, identified in the Federal Register report cited.

[5] Prior to 1963, Zonolite manufactured a similar asbestos product marketed as MonoKote-1, for which Grace also faces liability.  MonoKote-3 was phased out sometime after 1973 with the introduction of MonoKote-4 and MonoKote-5, which, according to the Debtors, purportedly do not contain asbestos.

[6] See W.R. Grace & Co 2004 Form 10-K, F-17 to F-18.

over 207 asbestos property damage cases for the sum of $696.8 million, and judgments were entered against it in eight property damage cases for over $86.1 million before the Chapter 11.[7]

The foregoing also dramatically demonstrates that the dichotomy between asbestos personal injury claims and asbestos property damage claims ("PD Claims") is characterized by higher damages in respect of each occurrence of property damage. Although each property damage claim will vary due to the size of the building or the type of ACM implicated, the removal of asbestos is labor intensive and requires compliance with numerous guidelines and procedures to protect all entering the environment, resulting in hefty damages for containment and abatement, oftentimes ranging in the millions of dollars on a per building basis. There is no question that Grace's remaining allowable property damage liabilities (some of which were the subject of class action litigations pending at the date of the bankruptcy) are enormous and their resolution will be a centerpiece of any reorganization plan.

C.    **Synopsis of Asbestos Property Damage Claims**

Due to the wide variety of Grace PD Claims that existed prior to the filing of the bankruptcy, the U.S. Trustee appointed an array of property damage claimants to the PD Committee, including *Marco Barbanti*, the class representative in a ZAI statewide class action pending in the state of Washington; *Princeton University*; *Pacific Freeholds*, a private building owner; *Prudential Insurance Company*, the owner of several large high rises located in Newark, NJ; *Anderson Memorial Hospital*, a class representative for *all* privately-owned buildings in the United States; the *Catholic Archdiocese of New Orleans*, the owner of numerous contaminated buildings; and, *Paul Price*, another ZAI class action plaintiff.

Early in this bankruptcy, Bankruptcy Judge Fitzgerald approved proof of claim forms, a substantial notice program and a bar date of March 31, 2003 (the "PD Bar Date") for

---

[7] See W.R. Grace & Co 2004 Form 10-K, F-17.

"traditional" property damage claims, as well as non-asbestos claims. See II.A., *infra.* Although Grace sought case management procedures in respect of asbestos personal injury claims, no bar date was set by Judge Wolin for personal injury claimants, as a consequence of which the amount of allowable personal injury claims is subject to no more than rank speculation that widely differs from constituency to constituency in this bankruptcy case.[8] *It is simply impossible to reorganize Grace until personal injury claims are subjected to Court approved procedures for their quantification.* While it may well be the case that the liquidation or estimation of personal injury claims are non-core proceedings that require the involvement of the District Court, the antecedents to such proceedings are the approval of a proof of personal injury claim form and the establishment of a bar date for personal injury claimants which *can* be adeptly dealt with by the Bankruptcy Court. See 28 U.S.C. §157.

As of the PD Bar Date, over 4,000 PD Claims were timely filed against the Grace estate. What is immediately clear from the PD Claims Registry is that there is a diverse claimant group representing all types of buildings, located in virtually every state and Canadian province. As a sampling, the types of claimants include insurance companies, school boards, individual homeowners, transportation authorities, state and municipal governments, religious organizations, small and large businesses, utility companies, as well as private and public colleges and universities. Aside from individual homes, the buildings that have been or will need to be abated of Grace ACM are even more diverse, including hotels, motels, churches, airports, academic facilities, government buildings, restaurants, hospitals, condominiums, country clubs, convention centers, department stores, high rises, skyscrapers, railway facilities, and museums.

---

[8] For many reasons, a bar date was not established by the Bankruptcy Court for ZAI Claimants. Again, although the PD Committee represents the interests of ZAI claimants, as the ZAI Claimants are filing a separate brief, the status of ZAI claims is not addressed in depth within this report.

### D.    Fraudulent Transfer Litigation

Prior to bankruptcy, Grace engineered a series of complicated transactions in an effort to excise its medical business division and its packaging business division from Grace in an effort to insulate those non-asbestos related assets from claims against Grace for asbestos property damage and personal injury liabilities.   In 1996, the medical business was transferred to Fresenius A.G. ("Fresenius"), and in 1998, the packaging business was sold to Sealed Air Corporation ("Sealed Air").

At the date of Grace's bankruptcy, significant litigation was pending against Grace, Fresenius and Sealed Air which implicated the transfers of these business segments.   Among many others, a class action was brought on behalf of ZAI property damage victims in Spokane, Washington.

Immediately after seeking Chapter 11 protection, Grace moved to stay all fraudulent transfer claims against affiliated entities, including Sealed Air and Fresenius. The Unsecured Creditors Committee supported the Debtor's request for a stay and further urged that any prosecution of the fraudulent transfer claims against Sealed Air and Fresenius (the "Fraudulent Transfer Claims") be postponed until a determination of Grace's solvency or insolvency at the time of the transfers was made.   In contrast, the PD Committee and the PI Committee (collectively, the "Asbestos Committees") maintained that the Sealed Air and Fresenius transfers were clearly fraudulent in intent and effect as adequate consideration had not been paid and because Grace was hopelessly insolvent at the date of the transfers taking into account Grace's then present and future asbestos liabilities.   Further, the Asbestos Committees recognized and argued that delay in the prosecution of the Fraudulent Transfer Claims could impair the

likelihood of success of such litigation.[9]  Most importantly, however, the Asbestos Committees realized that a recovery based on the Fraudulent Transfer Claims had the potential of literally doubling the value of Grace for reorganization purposes.

It was manifestly apparent that Grace's principal concern over the Fraudulent Transfer Claims was that the avoidance of such transfers would adversely affect Grace shareholders who, in the case of the Sealed Air transfer, received stock in the acquiring company and that the Unsecured Creditors Committee was motivated against the litigation for fear that it would engender a determination of the true extent of Grace's asbestos liabilities which might further impair the prospects of recovery by non-asbestos unsecured claimants.

No doubt recognizing the importance of the Fraudulent Transfers Claims to this bankruptcy, the District Court withdrew the reference of the issue from the Bankruptcy Court and granted the Asbestos Committees' motion for leave to prosecute, over the objections of Grace and the Unsecured Creditors Committee.  Oddly enough, Grace sought leave to intervene in the actions and to align itself with *the defendants*, which was permitted by the District Court albeit with a high degree of skepticism about Grace's discharge of its fiduciary duty to its creditors. The District Court also fast-tracked the matter and set a six-month briefing and discovery schedule, as well as a trial date of September 30, 2002.

The Court also authorized the Asbestos Committees to engage Milberg Weiss Bershad Hynes & Lerach, LLP ("Milberg Weiss") to augment their resources.  As there was no question that the transfers occurred, in major part the fraudulent transfer cases depended on establishing Grace's insolvency based on off balance sheet liabilities for asbestos and environmental hazards. For efficiency and to avoid duplication of efforts, the PD Committee's counsel, Bilzin Sumberg

---

[9] It was immediately apparent that the determination of solvency could take years and any delay would increase the potential of the loss of evidence, faded memories of witnesses as well as the accrual of new defenses.

Baena Price & Axelrod LLP, undertook responsibility for proving Grace's property damage liabilities, the PI Committee's counsel, Caplin & Drysdale, did the same in respect of personal injury liabilities, and Milberg Weiss did the same in respect of environmental liabilities with the assistance of the Department of Justice on behalf of the Environmental Protection Agency.

In the course of the litigation, counsel for the Asbestos Committees asserted that, under the Uniform Fraudulent Transfer Act's solvency legal standard, the District Court was required to determine whether Grace became insolvent as a result of the transfers, whereas, in contrast, Sealed Air argued that so long as Grace's 1998 estimations of liability were "reasonable" when made, the Court could not consider the transfers to have been constructively fraudulent. The matter of which test was the appropriate solvency standard was hotly contested. On July 29, 2002, Judge Wolin issued an opinion on the legal standards (the "Standards Opinion"), in which he concluded "post-1998 claims should be included in the solvency analysis of W.R. Grace for this constructive fraudulent conveyance proceeding." See In re W. R. Grace & Co., 281 B.R. 852, 869 (D. Del. 2002).

The significance of the Standards Opinion became immediately apparent as Sealed Air's common stock dropped 60% in just two days for a loss of more than $2.3 billion dollars in market capitalization.[10] Indeed, on November 27, 2002, the Asbestos Committees reached settlements in principle with both Sealed Air and Fresenius whereby the Grace estate will receive more than $1 billion in cash and marketable securities from the defendants to fund a plan of reorganization that conforms to the terms of the settlements. The settlements were finalized by November 10, 2003, and the parties jointly moved for approval of the Sealed Air and Fresenius settlements under Bankruptcy Rule 9019. As a consequence of the recusal proceedings against

---

[10] See Sealed Air Motion to Vacate, p. 6, fn 1, page 10, *infra.*

Judge Wolin, the settlement motions have not been heard.[11] *The PD Committee is hopeful that this Court will forthwith establish a schedule for the filing of objections to the proposed settlements and the filing of responses to all such objections, as well as schedule a hearing thereon at the earliest possible date.*

The Court should also be aware that, within the last two weeks, Sealed Air filed a motion to vacate the Standards Opinion (the "Motion to Vacate") "as a protective measure in the event the settlement agreement is ultimately not approved or implemented."[12]  Consistent with the recitals in the Motion to Vacate, counsel for Sealed Air has given every indication that despite the Motion to Vacate, Sealed Air deems itself bound to its settlement with the Asbestos Committees unless and until the Court denies approval of the settlement; however, such counsel is concerned that Sealed Air's failure to raise the matters asserted in the Motion to Vacate at this juncture could lead to an argument later that those matters are equitably or legally barred.

The Motion to Vacate is premised on the grounds that the Standards Opinion may have been derived through the very conduct that resulted in Judge Wolin's recusal by the Third Circuit. The Asbestos Committees place no stock in the argument; however, we remain concerned that further delays in convening a hearing to consider the approval of the settlements only serve to promote other fertile hypotheses. Moreover, Bankruptcy Judge Fitzgerald has ordered Grace to file a plan of reorganization by October 14, 2004. Clearly, we put the cart before the horse if we wend our way through confirmation without knowing for certain whether the Grace estate---and thus, creditors---will benefit from the more than $1 billion of consideration available under the settlements.

---

[11] The PD Committee did not take any position with respect to the recusal, in part, because the Estate was already being taxed by the involvement of the PI Committee and Grace itself.
[12] Sealed Air Motion to Vacate, p. 1.

Relatedly, Judge Wolin also withdrew the reference from the Bankruptcy Court to determine the fees and expenses incurred in connection with the Fraudulent Transfer Claims by counsel for the PD Committee, the PI Committee and Grace, as well as Milberg Weiss. Consistent with our understanding of what Judge Wolin intended, counsel for the Asbestos Committees made monthly fee applications to Judge Wolin and were paid 80% of their fees as no objections thereto were ever filed, but we left to the conclusion of the litigation applications for the payment of the 20% of our fees that was held back under this procedure. Unfortunately, however, Judge Wolin stayed all matters before him in this case during the pendency of the recusal proceedings, including our fees. Paradoxically, other estate lawyers such as counsel for the Unsecured Creditors Committee filed their applications for fees---which matched or exceeded the fees charged by counsel for the Asbestos Committees---incurred *monitoring* (as opposed to prosecuting or defending) the fraudulent transfer litigation with Bankruptcy Judge Fitzgerald and *they have been paid in full*. Therefore, *the PD Committee is also hopeful that this Court will attend to the payment of the holdbacks for which its counsel has applied.*

## II.    STATUS

### A.    Case Management Issues

In June 2001, Grace filed a Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program ("Initial CMO Motion").  The PD Committee filed an objection to the Initial CMO Motion on multiple grounds, including that the proposed proof of claim forms were excessively burdensome and not designed to elicit the information ordinarily obtained by way of a poof of claim and that the proposed notice program was inadequate.  The PI Committee also objected to the Initial

CMO Motion as to the treatment of PI Claims, as did certain ZAI claimants. Thereafter, Grace filed an omnibus reply to the various objections.

Immediately prior to the hearing on the Initial CMO Motion on November 22, 2001, the PD Committee received notice that the Grace bankruptcy and four other asbestos bankruptcies were being reassigned to the Judge Wolin, thus postponing the hearing on the Initial CMO Motion. On December 10, 2001, Judge Wolin entered an order referring these cases to Bankruptcy Judge Fitzgerald. Judge Wolin further ordered "that withdrawal of the reference is specifically <u>contemplated</u> with respect to asbestos–related claims and issues…" (emphasis added). While Judge Wolin ordered that he "contemplated" withdrawing the reference with respect to asbestos-related issues, the fact remains that a withdrawal of the reference has not been entered in respect of PI Claims, and thus, technically-speaking, the Bankruptcy Court still retains jurisdiction over all matters not specifically withdrawn.

During the January 3, 2002 omnibus hearing, Bankruptcy Judge Fitzgerald directed Grace to re-file its case management motion, but to separate its proposals in respect of personal injury claims from all other claims. Accordingly, in February 2002, Grace filed a case management motion with respect to personal injury issues ("Personal Injury CMO Motion") and a case management motion for the non-asbestos claims, asbestos property damage and ZAI claims ("Property Damage CMO Motion"). The Property Damage CMO Motion sought the establishment of a bar date for non-asbestos claims, traditional asbestos property damage claims and ZAI claims.

Judge Fitzgerald conducted a series of hearings between March 2002 and April 2002 on the Property Damage CMO Motion. At the conclusion of those hearings, Judge Fitzgerald entered an order establishing March 15, 2003 as the bar date for all asbestos property damage

claims other than ZAI, medical monitoring claims and general unsecured non-asbestos claims (the "Bar Date").  Significantly, the Bar Date did not apply to asbestos personal injury claims. As aforesaid, by the PD Bar Date, over 4,000 PD Claims were filed.

On December 22, 2003, Grace filed a motion seeking a waiver from Delaware Local Bankruptcy Rule 3007-1(a) (the "Local Rule") that (a) requires all substantive objections to a proof of claim be filed in a single objection, and (b) limits the number of claims subject to an objection to 150.  Grace sought authority to file omnibus "gateway objections" to claims that (i) contain incomplete proof of claim forms; (ii) contain materially deficient supporting documentation; (iii) fail to include any product identification information; (iv) are barred by applicable statutes of limitation or repose; (v) are barred by laches; and (vi) are barred by prior settlements.  The PD Committee objected to Grace's motion on the grounds that objections to PD Claims could not be lumped together into the purported "gateway objections" due to the fact-intensive nature of each claim.  In addition, the PD Committee argued that claimants would be prejudiced by having to address serial objections and that the Local Rule was specifically designed to protect against such attacks by debtors.   After a hearing on the motion, the Bankruptcy Court granted Grace's motion; however, the Court required Grace to provide notice to each claimant subject to a "gateway objection" for purported materially insufficient supporting information that Grace intended to file one or more "gateway objections" in respect of such claim and that such claimant shall have 60 days in which to provide additional information to Grace if it so chooses, prior to Grace being permitted to file the "gateway objections."   A proposed form of Order has been submitted to the Court, but has not yet been entered.  The PD Committee is unaware of any notices being sent by Grace.

With respect to asbestos personal injury matters, there has not been one substantive decision made in respect of establishing case management procedures. As explained above, the Initial CMO Motion addressed asbestos personal injury claims. In September 2001, the PI Committee filed an objection to the Motion, to which Grace filed a reply and the PI Committee filed a sur-reply. However, no action was taken in respect of the Initial CMO Motion prior to the assignment of this case to Judge Wolin.

Thereafter, during a May 22, 2002 status conference, Judge Wolin ordered a second round of briefing on the parties' various proposals to address asbestos personal injury issues. Grace submitted a supplemental brief on June 21, 2002; the PI Committee filed an alternative proposal on July 22, 2002; the Equity Committee, the Unsecured Creditors Committee and the Unofficial Committee of Select Asbestos Claimants filed responses to the Debtors' and the PI Committee's proposals on August 6, 2002; and lastly, Grace and the PI Committee each filed replies on August 21, 2002. With briefing complete, the parties were proceeding towards October 17 and 18 hearing dates to argue their respective positions. However, on October 9, 2002, the District Court entered an order adjourning the hearing due to the "significant investment of effort by the Court and by counsel in the fraudulent conveyance adversary proceeding. . ." See Letter to All Counsel, dated October 9, 2002 (Adv. Proc. 01-2210). Since that date, *no progress whatsoever has occurred in resolving personal injury case management issues.*

### B.    Zonolite Attic Insulation

In April 2002, during the course of hearings on the Property Damage CMO, Bankruptcy Judge Fitzgerald ordered that ZAI claims be placed on a separate track to determine "what science demonstrates with regard to whether ZAI creates an unreasonable risk of harm." See

Amended Order, dated November 25, 2002 (Case No. 01-1139).  This process was ordered partly in response to the contentions of ZAI claimants' that ZAI, if disturbed in the process of determining whether it was present in a structure, would be harmful to the residents of the structure and that, therefore, notification of a bar date for such claims should include warnings about the dangers of the product.  Grace, on the other hand, argued that ZAI was not harmful and that no warnings were necessary.

A rigorous briefing and discovery schedule was established by Bankruptcy Judge Fitzgerald, with argument on dispositive motions originally scheduled for September 16 and 17, 2003.  After the submission of cross motions for summary judgment, special counsel to the ZAI claimants and Grace mutually agreed to continue the hearing on the motions while discussing a consensual resolution.  During the May 2004 omnibus hearing, the parties selected October 18 and 19, 2004 as hearing dates on the summary judgment motions in the event a consensual agreement is not reached.

### C.    Future Claimants Representative

On October 13, 2003, only days after the first motion seeking the recusal of Judge Wolin was filed in the Owens-Corning bankruptcy, Grace filed an application to retain C. Judson Hamlin, one of Judge Wolin's five advisors, as the representative of future claimants (the "FCR") in these cases.  Bankruptcy Judge Fitzgerald indicated she would not be able to approve the appointment of Mr. Hamlin, and Grace withdrew its motion.  This Spring, after prompting by Judge Fitzgerald, Grace once again moved to appoint a FCR (the "FCR Motion") and proposed three candidates for the position---David Austern, Dean Trafalet, and Eric Green---all of whom have served and continue to serve as future claimants representatives in other asbestos-related bankruptcies.  The PD Committee objected to the selection of any of the three proposed

candidates due what we perceive to be a conflict in serving as the FCR in these cases while simultaneously (or previously) serving as the FCR in another asbestos bankruptcy case. The PD Committee requested that the Bankruptcy Court (or the U.S. Trustee at the Bankruptcy Court's direction) appoint an independent third party to serve as the FCR. Similarly, two insurers objected to the candidates based on conflicts. The Unsecured Creditors Committee and the Equity Committee both supported Austern, whereas the PI Committee opposed Austern, but was willing to accept either of the other two candidates. During the May 24, 2004 omnibus hearing, Grace indicated it supported Austern because the Combustion Engineering pre-packaged bankruptcy is supposedly approaching closure and Austern would not have outstanding obligations.[13]

The Bankruptcy Court appointed Austern over the objections of the PD Committee, the insurers and the PI Committee ("<u>FCR Appointment Order</u>"). The PD Committee and the insurers have filed notices of appeal of the FCR Appointment Order. *As Mr. Austern has not taken any meaningful positions in this case as yet, the PD Committee believes that now is the time to replace him with a truly independent FCR to ensure the adequacy of representation of future claimants, to avert any challenges to confirmation of a plan of reorganization based on Mr. Austern's ability to serve as the FCR, as well as to promote public confidence in these proceedings which has suffered greatly due to the events of the past six months.*

### III.    UNRESOLVED ISSUES AND SUGGESTED STRATEGY FOR COMPLETION OF THESE PROCEEDINGS

Throughout this Report, the PD Committee has endeavored to identify matters that it believes this Court should undertake in an effort to move this case to reorganization. To recap, as

---

[13] Grace had moved to file a reply in support of Austern, but the motion was denied. Pursuant to the 2014 Disclosure Statement filed within the last week, Austern's duties in Combustion Engineering are continuing, and he has also agreed to serve as a future claimants representative in an undisclosed asbestos bankruptcy yet to be filed.

well as to provide further amplification, the PD Committee respectfully urges the Court to consider the following:

- Leave to the Bankruptcy Court the approval of a proof of claim form and the establishment of a bar date in respect of asbestos personal injury claims (the "PI Bar Date"). Proof of claim forms and bar dates while critical are nonetheless ho-hum bankruptcy exercises. Bankruptcy Judge Fitzgerald is all too familiar with Grace, its asbestos products and the sort of claim form information necessary to size Grace's asbestos liabilities. After all, Judge Fitzgerald spent substantial time and energy doing the very same things in respect of Grace's property damage claims, all of which was fully brief and argued at multiple hearings.

- Before the occurrence of the PI Bar Date, determine the method by which asbestos personal injury claims will be determined or estimated and by which court. If that is to occur before this Court, then this Court should also determine or estimate asbestos property damage claims. There is no basis or justification to make a distinction between determining the magnitude of Grace's asbestos personal injury claims and its asbestos property damage claims---asbestos is asbestos. The uniform and consistent adjudication of these claims mandates the allowance and determination of all asbestos claims be made in the same forum. In the history of asbestos bankruptcy cases, except for W.R. Grace and Federal-Mogul, there has not been a single asbestos bankruptcy case in which the responsibility for the determination of asbestos personal injury and property damage liabilities was divided between a bankruptcy court and a district court. There is a rational, explicable reason why this "model" has never been used

before---it simply does not work.  If a consensual plan cannot be reached, the determination of the Debtors' personal injury and property damage liabilities should move at the same pace before the same forum.  This was the model used in the <u>Johns-Manville</u>, <u>Celotex</u> and <u>National Gypsum</u> bankruptcies and, respectfully, should be the model used in these cases as well.

- Promptly schedule deadlines for objections and responses to objections to the motions for approval of the settlements with Sealed Air and Fresenius, as well as schedule a hearing on such settlements.

- Approve the payment of the holdbacks from the fees due to counsel for the Asbestos Committees in connection with the Fraudulent Transfer Claims. In this regard it should be noted that the undersigned counsel for the PD Committee has served its application for the payment of such fees and no objections were timely made in respect thereof.

- Dismiss without prejudice or stay further consideration of the Motion to Vacate pending hearing on the settlement with Sealed Air.

## <u>CONCLUSION</u>

The PD Committee anxiously welcomes this Court's involvement in moving this bankruptcy to its natural conclusion. Too much "old business" remains unresolved as a result of the unfortunate distraction occasioned by the proceedings that resulted in Judge Wolin's recusal. Worse yet, perhaps, well-intentioned efforts to develop novel approaches to a perceived asbestos litigation/bankruptcy crisis have proved to be a self-fulfilling prophecy. No plan of reorganization has materialized some three years after Grace filed for bankruptcy. Notwithstanding the October deadline for Grace to file a plan, we are likely at least another year

18

away from the resolution of this case. Thus, the effort to do something different here and in the other asbestos bankruptcies pending in this Circuit has only resulted in paralysis and claims of uneven treatment. Conventional wisdom dictates that we have strayed too far afield. The success or failure of this reorganization does not and should not depend on the outcome in any other case. We have learned all too well by now that one size does not fit all. Likewise we have learned that the boundaries of the jurisdiction that will be exercised by this Court and by the Bankruptcy Court cannot be so elastic that inconsistency and interminable delays become the order of the day. While all parties in interest and both Courts are assuredly single-minded in the objective of reaching confirmation of a viable plan of reorganization, we are doomed to failure unless each Court's jurisdiction is clearly and explicitly staked out and all parties can expect that common issues will be uniformly resolved.

Wilmington, Delaware
Dated:  June 21, 2004                              Respectfully submitted,

                                                   BILZIN SUMBERG BAENA
                                                     PRICE & AXELROD LLP
                                                   200 South Biscayne Boulevard
                                                   Suite 2500
                                                   Miami, Florida  33131-2336
                                                   Telephone:  (305) 374-7580

                                                   Scott L. Baena (Admitted Pro Hac Vice)
                                                   Jay M. Sakalo (Admitted Pro Hac Vice)

                                                           -and-

                                                   FERRY JOSEPH & PEARCE, P.A.
                                                   824 Market Street, Suite 904
                                                   P.O. Box 1351
                                                   Wilmington, Delaware  19899
                                                   Telephone:  (302) 575-1555

                                                   By: /s/ Theodore J. Tacconelli
                                                           Theodore J. Tacconelli
                                                           (Del. Bar No. 2678)

CO-COUNSEL FOR THE OFFICIAL
COMMITTEE OF ASBESTOS PROPERTY
DAMAGE CLAIMANTS