IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

Hearing Date: August 23, 2004 at 12:00 p.m.
Objection Deadline: August 6, 2004 at 4:00 p.m.

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO MAKE CONTRIBUTIONS TO DEFINED BENEFIT PLANS COVERING DEBTORS' EMPLOYEES

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by their undersigned counsel, respectfully move this Court (the "Motion") for the entry of an order authorizing, but not requiring, the Debtors to make contributions in 2004, not to exceed $20 million, to the trust that funds the defined benefit retirement plans covering the Debtors' employees (the "Grace Retirement Plans") in accordance with the funding strategy described herein. In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## Jurisdiction

1.      The Court has jurisdiction over this Motion purusant to 28 U.S.C. §§ 157(b)(2)(A) and (O).  Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief sought herein is §§ 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code").

## Background

2.      On April 2, 2001 (the "Petition Date"), each of the Debtors in these chapter 11 cases (collectively, the "Chapter 11 Cases") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases have been consolidated for administrative purposes only, and, pursuant to §§1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

3.      Approximately one year ago, the Debtors submitted to the Court a motion and proposed Court order authorizing the Debtors to make contributions to the Grace Retirement Plans of approximately $40 million in each of 2003 and 2004, in accordance with a specific funding strategy (the "2003 Funding Motion").[2]

4.      After discussions with the Official Committee of Unsecured Creditors, the Official Committee of Property Damage Claimants and the Official Committee of Personal Injury Claimants (collectively, the "Creditor Committees"), the proposed order was amended to authorize the Debtors to make a contribution of approximately $40 million  to the Grace Retirement Plans in 2003 only, using funds from the Debtors' non-debtor affiliates.  There was no objection submitted to the amended order, which was signed by the Court on July 28, 2003 (the "2003 Court Order").

---

[2]  The motion and proposed Court order was submitted in June 2003, for the July 28, 2003 hearing date.

91100-001\DOCS_DE:97047.1

5.     In accordance with the 2003 Court Order, the Debtors made contributions to the Grace Retirement Plans during the last half of 2003 in the aggregate amount of $40 million.[3]

6.     The Debtors' management agreed that they, along with the actuary of the Grace Retirement Plans (and others), would again evaluate updated data during the first-half of 2004 and would then, in accordance with the amended order, consult with the Creditor Committees and submit another motion and proposed order with regard to contributions to the Grace Retirement Plans to be made in 2004 and thereafter.

7.     This motion (and the accompanying proposed Court order) incorporates the results of that evaluation.  The Debtors provided the Creditor Committees and the futures representative with a prior draft of this motion and have discussed the motion with the Committees and their representatives who have requested such discussions.

### Grace Retirement Plans

8.     The 2003 Funding Motion includes considerable background regarding the Grace Retirement Plans and the importance of maintaining those Plans and restoring their financial viability. That background continues to be valid.  In summary, following is some of the information noted in the 2003 Funding Motion:

- The Grace Retirement Plans currently consist of fourteen funded, defined benefit pension plans, each of which is qualified under section 401(a) of the Internal Revenue Code (the "Code").[4]

---

[3]  During 2003, the Debtors actually made contributions to the Grace Retirement Plans totalling $48.5 Million.  Approximately $8.5 Million was contributed to the Debtors' Curtis Bay Pension Plan pursuant to the Court order dated March 3, 2003, and $40 Million  pursuant to the 2003 Court Order dated July 28, 2003.

[4]  The 2003 Funding Motion actually noted that the Grace Retirement Plans consisted of nineteen pension plans.  However, during 2003, the assets and liabilities of five smaller plans were merged into one larger plan, leaving fourteen plans.

- 3 -

- The most significant Grace Retirement Plan is the W.R. Grace & Co. Retirement Plan for Salaried Employees (the "Grace Salaried Plan"), which comprises approximately 83% of the assets and 85% of the liability of the Grace Retirement Plans in the aggregate (depending on the measure of liability).

- The Debtors have a long history of providing employees with defined benefit pension plans.

- Many of the Grace Retirement Plans are maintained pursuant to collective bargaining agreements.

- The employers that are considered competitors or peers of the Debtors' businesses generally maintain defined benefit pension plans for their employees.

### Employees Covered by the Grace Retirement Plans

9.    Virtually all of the Debtors' current employees are currently covered by one of the Grace Retirement Plans. The Grace Salaried Plan alone covers over 2,160 active, salaried employees (of a total U.S. workforce of approximately 3,400 employees), or 64% of the Debtors' U.S. workforce.

10.    The Debtors' employees consider continued benefit accruals under the Grace Retirement Plans and the financial viability of those Plans important aspects of their employment relationship with the Debtors.

11.    The Debtors' employees continue to question the financial viability and future of the Grace Retirement Plans.

12.    The Debtors' management continues to believe that continuing to make substantial annual contributions aimed at restoring the funded status of the Grace Retirement Plans will have a significant positive impact on the morale of the Debtors' workforce, and thereby the productivity and profitability of the Debtors' businesses.

13.    The Debtors believe that the Grace Retirement Plans promotes the retention of the Debtors' employees. The employees are vital to the Debtors' successful reorganization.

## Funded Status of the Grace Retirement Plans

14.     As of January 1, 2004 and January 1, 2003, depending on the measure of liability,

the funded status of the Grace Retirement Plans, is as follows:[5]

### January 1, 2003[6]

| Measures of Liability | Economic Obligation (FAS 35) | ABO | PBO |
|---|---|---|---|
| | $ 675 | $ 781 | $ 799 |
| Asset Value | 557 | 557 | 557 |
| Funded Status | -$ 118 | - $ 224 | -$ 242 |

### January 1, 2004

| Measures of Liability | Economic Obligation (FAS 35) | ABO | PBO |
|---|---|---|---|
| | $ 741 | $ 879 | $ 912 |
| Asset Value | 658 | 658 | 658 |
| Funded Status | -$ 83 | -$ 221 | -$ 254 |

---

[5]  As more fully explained in the 2003 Funding Motion, Financial Accounting Standard ("FAS") 35 defines "actuarial present value of accumulated plan benefits" (Economic Obligation) as follows: "[a]ccumulated plan benefits are those future benefit payments that are attributable under the plan's provisions to employees' service rendered to the benefit information date. Accumulated plan benefits comprise benefits expected to be paid to (a) retired or terminated employees or their beneficiaries, (b) beneficiaries of deceased employees, and (c) present employees and their beneficiaries. ... The actuarial present value of accumulated plan benefits is that amount as of the benefit information date that results from applying actuarial assumptions to the benefit amounts determined pursuant to [the prior sentence and certain other factors]." ... FAS 35, ¶¶ 16 and 19.

Under FAS 87, "projected benefit obligation" (PBO) is defined as "[t]he actuarial present value as of a date of all benefits attributed by the pension benefit formula to employee service rendered prior to that date. The projected benefit obligation is measured using assumptions as to future compensation. ..." FAS 87, ¶ 264, Glossary. The "accumulated benefit obligation" (ABO) is defined as "[t]he actuarial present value of benefits ...attributed by the pesnion benefit formula to employee service rendered before a specific date and based on employee service and compensation...prior to that date. The accumulated benefit obligation differs from the projected benefit obligation in that it includes no assumption about future compensation levels. ...". Id.

The Economic Obligation is calculated in a manner that is similar to the ABO calculation (versus the PBO calculation), except that, in the case of the Grace Retirement Plans, the interest rate assumptions used to derive the present value portion of those calculations differ and, in the case of Plans covering union employees, the ABO calculation takes into consideration future scheduled increases in annual retirement benefits whereas the Economic Obligation does not consider such increases.

[6]  Amounts rounded to nearest million. Calculations performed by the actuary of the Grace Retirement Plans.

## Change From 1/2003 to 1/2004

| Measures of Liability | Economic Obligation (FAS 35) | ABO | PBO |
|---|---|---|---|
| Change | + $ 35 | + $ 3 | - $ 12 |

15.    As indicated, the Grace Retirement Plans are still underfunded by any generally

accepted measure.  While the asset value increased by approximately $101 million during 2003, the

liabilities also increased significantly.  Using the Economic Obligation as a measure of liabilities, the

amount of underfunding decreased.  However, the underfunding remained essentially unchanged using the

ABO as a measure of liabilities, and actually increased slightly using the PBO as a measure.[7]

16.    In addition, a cash flow analysis of the Grace Retirement Plans indicates that for

2004 and subsequent calendar years, annual benefit payments from the Grace Retirement Plans will total

approximately $70 million per year.  As stated above, the total market value of assets as of January 1,

2004 is $658 million.   The Debtors believe that this represents a high proportion of total funds paid-out

on an annual basis, when compared to comparable funded retirement plans of other employers, and

highlights the necessity to continue to make sustantial contributions to the Grace Retirement Plans in

order to assure their continued financial viability.

---

[7]  The increase in the asset value during 2003 was the result of the Debtors' contribution of approximately
$48 Million  to the Grace Retirement Plans and asset returns of approximately 22.5% during 2003.
   According to the actuary of the Grace Retirement Plans, the increase in liabilities from 2003 to 2004 is
largely the result of annual earned pension benefits for 2004, updated demographic assumptions (e.g.,
mortality, turnover, etc.) and a decrease in interest rates in the calculations:  Economic Obligation 8.25%
for 2003, and 8.0% for 2004; ABO and PBO 6.75% for 2003, and 6.25% for 2004.
   The increase in liabilities was less under the Economic Obligation measure, when compared to the
ABO and PBO, primarily because, as indicated above, the interest rate used to calculate the Economic
Obligation decreased by only 25 basis points, whereas the interest rate used to calculate the ABO and
PBO decreased by 50 basis points.

## Funding Strategies

17.    In the 2003 Funding Motion, the Debtors articulated a funding strategy that satisfied specific objectives.[8]

18.    The Debtors and its advisors have again evaluated the funded status of the Grace Retirement Plans during the first half of 2004, and have refined the strategy articulated in the 2003 Funding Motion.

19.    Specifically, the Debtors' management believes that the strategy used to calculate the contributions for 2004 (and perhaps thereafter) should satisfy the following objectives:[9] (a) satisfy all legally required minimum contributions under Code section 412; (b) avoid the requirement imposed by ERISA section 4011 to provide underfunding notices to Grace Retirement Plan participants; and (c) provide an opportunity to minimize the aggregate funding required over 2, 3 and 4 calendar year periods to the extent possible through making contributions slightly earlier than legally required (collectively, the "2004 Funding Strategy"). [10]

---

[8]  Those objectives were as follows:  (a) contributions of at least the annual required minimum for each Grace Retirement Plan, as calculated under Code section 412; (b) avoiding the requirement to provide an "underfunding notice" to Grace Retirement Plan participants under ERISA section 4011; (c) eliminating the underfunded status of the Grace Retirement Plans within a reasonable period; and (d) accomplishing these objectives through generally level annual contributions.  The 2003 Funding Motion also adopted the "Economic Obligation (FAS 35)" measurement of liabilities of the Grace Retirement Plans, in order to measure the underfunded status of the Plans.

[9]  These objectives implicitly utilize the legally required minimum funding requirements under Code section 412 to measure the underfunded status of the Grace Retirement Plans, so there is no need to refer to the Economic Benefit, ABO or PBO with regard to the 2004 Funding Strategy.

[10]  In addition, the Debtors will time the contributions during 2004 to maximize tax benefits or other advantages to the Debtors.

At the request of certain representatives of the Committees, the Debtors at this time are only seeking authorization to make contributions in 2004.  Therefore, Debtors will continue to evaluate the situation, and seek Court approval to make further contributions during the first half of 2005.

-7-

20.     Calculating contributions for 2004 using the 2004 Funding Strategy would also have the important benefit of permitting the Debtors' management to report to concerned employees that substantial contributions will be made in 2004, consistent with the objective of significantly improving the funded status of the Grace Retirement Plans in a reasonable time period.

21.     Exhibit A illustrates estimated contributions consistent with a continuation of the 2004 Funding Strategy for the period 2004 to 2007. As indicated on Exhibit A, the total contribution for 2004 using that Strategy would be approximately $20 million. This amount is $20 million less than the $40 million of contributions made last year pursuant to the 2003 Funding Motion.

22.     The Debtors' management believes that the only viable alterative to the 2004 Funding Strategy that could result in a smaller contribution in 2004 would be to make contributions to each Grace Retirement Plan, only at the time and in the amount required by Code section 412 ("Just-In-Time-Funding").

23.     Exhibit A also illustrates Just-In-Time-Funding for the period 2004 to 2007. As specified, only $109,000 is required under Code Section 412 to be contributed during 2004. However, over $79 million would then be required in 2005.

24.     Overall, for each multiple calendar year period, Just-In-Time-Funding results in greater cumulative cash contributions than a continuation of the 2004 Funding Strategy. (Compare the "Cumulative Totals" columns on Exhibit A.)[11]

---

[11] The Debtors, of course, will continue to evaluate the Plans and reserve the right to refine or change the funding strategy for 2005 and thereafter. The Debtors nevertheless believe at this time that the 2004 Funding Strategy offers a sound, basic outline from which future funding strategies may be derived.

- 8 -

25.    Under Just-In-Time-Funding, the Debtors' management could not report to employees that significant contributions were made during 2004. In addition, underfunding notices would be required to be distributed to employees.

### Importance of 2004 Funding Strategy

26.    The Debtors have determined that the 2004 Funding Strategy is an effective approach to funding the Grace Retirement Plans because the legal funding requirements will be satisfied in a manner that will also address the employee morale and competitiveness issues described above.

27.    The 2004 Funding Strategy represents the continuation of a systematic approach to address the underfunding of the Grace Retirement Plans, and demonstrates to employees (and others) a continued commitment by the Debtors to fund those Plans by making significant annual contributions.

28.    The 2004 Funding Strategy also provides the Debtors with the opportunity to contribute less to the Grace Retirement Plans in years following 2004, when compared to only satisfying minimum funding requirements (i.e., Just-In-Time-Funding).

29.    The Debtors have determined that merely satisfying the minimum funding requirements each year through Just-In-Time-Funding would not address the concerns of employees because no significant contributions would be made to the Grace Retirement Plans in 2004. Moreoever, only satisfying the minimum funding requirements would cause the Debtors to provide underfunding notices to Grace Retirement Plan participants, further heightening employee concerns. Finally, Just-In-Time-Funding would actually result in greater cumulative cash outlays over the next several years, when compared to a continuation of the 2004 Funding Strategy.

## Relief Requested

30.     By this Motion, the Debtors seek authority to make contributions to one or more of

the Grace Retirement Plans during 2004 in accordance with the 2004 Funding Strategy outlined herein,

but in no event more than $20 million.

## Basis for Relief

31.     Section 105(a) of the Bankruptcy Code "permits the court to issue any order that is

necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) of

the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell,

or lease, other than in the ordinary course of business property of the estate." A court has the statutory

authority to authorize a debtor to use property of the estate pursuant to section 363(b)(1) of the

Bankruptcy Code when such use is an exercise of the debtor's sound business judgment and when the use

of the property is proposed in good faith. In Re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del.

1991); In Re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); see also, Fulton State Bank v. Schipper,

993 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by "some articulated business

justification"); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound

business purpose" standard for sales proposed pursuant to section 363(b); In Re Montgomery Ward

Holding Corp., 242 B.R. 147, 153 (Bankr.D.Del. 1999); In Re Ernst Home Center, Inc., 209 B.R. 974,

979 (Bankr. W.D. Wash. 1997).

32.     Under section 363(b) of the Bankruptcy Code, a debtor has the burden to establish

that it has a valid business purpose for using estate property outside the ordinary course of business. See

Lionel Corp., 722 F.2d at 1070-71. Once the debtor has articulated such a valid business purpose,

however, a presumption arises that the debtor's decision was made on an informed basis, in good faith

- 10 -

and in the honest belief that the action was in the debtor's best interest. See In Re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D. N.Y. 1992). A party in interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." Montgomery Ward, 242 B.R. at 155.

## The Proposed Transactions Are Supported by Sound Business Judgment

33.      The Debtors respectfully submit that implementing the 2004 Funding Strategy is the most effective approach to funding the Grace Retirement Plans in 2004. That Strategy allows for the funding of the Grace Retirement Plans in a manner that maintains or improves the morale and productivity of Debtors' employees throughout the United States, as well as maintains competitive employee benefits vis-à-vis the Debtors' competitors and peers, which is key to continuing to maintain a dedicated, motivated and loyal work force. Such work force is a vital component of the Debtors' restructuring efforts.

34.      In evaluating options with respect to funding the Grace Retirement Plans, the Debtors have determined that: (a) the morale of the Debtors' employees is adversely affected by the current financial status of the Grace Retirement Plans and failing to address these employee concerns will lead to further erosion of morale and productivity and thereby have a negative impact on the Debtors' ability to successfully reorganize, (b) merely satisfying the minimum funding requirements on an ongoing basis (i.e., Just-In-Time-Funding) will not alleviate the employees' concerns, and (c) providing the underfunding notices to Grace Retirement Plan participants would heighten employees' concerns regarding the financial status of the Grace Retirement Plans, as well as the financial situation of the Debtors.

35.    The employees' morale, continued loyalty to the Debtors and faith in the Debtors' management will be furthered by implementing the 2004 Funding Strategy because it clearly signals the Debtors' continuing commitment to profitably grow their businesses for the benefit of the Debtors' stakeholders, including their employees.

36.    The Debtors' management have determined in their business judgment that implementing the 2004 Funding Strategy is in the best interests of the Debtors' estates and creditors. As specified above, clear business reasons exist to justify, under section 363(b) of the Bankruptcy Code, the Debtors' 2004 Funding Strategy. Continuing accruals under the Grace Retirement Plans and addressing the underfunded status of those Plans continues to be vital to maintaining a focused and motivated workforce.

<u>Notice</u>

37.    Notice of this Motion has been given to (i) the Office of the United States Trustee, (ii) counsel to the Debtor-In-Possession lenders, (iii) counsel to each Official Committee appointed by the United States Trustee, and (iv) those parties that requested papers under Fed.R.Bankr.P. 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

<u>No Prior Request</u>

38.    No prior Application for the relief requested herein has been made to this or any other Court.

- 12 -

WHEREFORE, the Debtors respectfully request that the Court enter an Order substantially in the form attached hereto (i) authorizing the Debtors to make contributions to the Grace Retirement Plans in 2004 consistent with the 2004 Funding Strategy, and (ii) granting such other and further relief as the Court deems just and proper.

Dated:  July 19, 2004

Respectfully submitted,

KIRKLAND & ELLIS
James H.M. Sprayregen, P.C.
James W. Kapp, III
Janet S. Baer
Samuel Blatnick
200  East Randolph Drive
Chicago, ILL 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB, P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 4715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile (302) 652-4400

Co-Counsel for the Debtors and Debtors-In-
Possession