UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .  Case No. 01-01139
                                .
     W.R. GRACE,                .
                                .  USX Tower, 54th Floor
                                .  600 Grant Street
                     Debtor.    .  Pittsburgh, PA 15222
                                .
                                .
                                .  May 24, 2004
. . . . . . . . . . . . . . . .. 2:03 p.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              Kirkland & Ellis
                             By:  DAVID BERNICK, ESQ.
                                  JANET BAER, ESQ.
                             200 East Randolph Drive
                             Chicago, IL  60601


For the Debtor:              Reed, Smith LLP
                             By:  JIM RESTIVO, ESQ.
                             435 Sixth Avenue
                             Pittsburgh, PA  15219


For Costa & Thornburg:       PETER CHAPMAN, ESQ.
                             24 Perdicaris Place
                             Trenton, NJ  08618


For Unsecured Creditors:     Stroock & Stroock & Lavan, LLP
                             By:  LEWIS KRUGER, ESQ.
                             By:  ARLENE KRIEGER, ESQ.
                             180 Maiden Lane
                             New York, NY  10038

Audio Operator:              Janet Kozloski

Proceedings recorded by electronic sound recording, transcript
               Produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311       Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For Personal Injury         Caplin & Drysdale, Chartered
Claimants' Committee:       by:  PETER LOCKWOOD, ESQ.
                            One Thomas Circle, NW
                            Washington, DC  20055

For Asbestos Claimants:     Campbell & Levine
                            By:  MARLA ESKIN, ESQ.
                                 CHRISTIAN LANE, ESQ.
                            800 King Street, Ste. 300
                            Wilmington, DE  19899

For Maryland Casualty:      Connolly, Bove, Lodge & Hutz, LLP
                            By:  JEFFREY WISLER, ESQ.
                            1220 Market Street, 10th Floor
                            Wilmington, DE  19899

For Libby Mine Claimants:   Klehr, Harrison, Harvey,
                            Branzburg & Ellers
                            By:  STEVEN KORTANEK, ESQ.
                            919 Market Street, Ste. 1000
                            Wilmington, DE  19801

For Libby Mine Claimants:   Cohn, Khoury, Madoff & Whitesell,
                            LLP
                            By:  DANIEL COHN, ESQ.
                            101 Arch Street
                            Boston, MA  02110

APPEARANCES BY TELEPHONE:

For Property Damage         Bilzin, Sumberg, Baena, Price
Committee:                  By:  JAY SAKALO, ESQ.
                                 SCOTT BAENA, ESQ.
                            200 S. Biscayne Blvd.
                            Suite 2500
                            Miami, FL  33131

For Equity Committee:       Kramer, Levin, Naftalis & Frankel
                            By:  GARY M. BECKER, ESQ.
                                 SCOTT BAYNE, ESQ.
                            919 Third Avenue
                            New York, NY 10022

For Royal Sun:              Wilson, Elser, Moskowitz, Edelman
                            By:  CARL J. PERNICONE, ESQ.
                            150 East 42nd Street
                            New York, NY  10017

| | |
|---|---|
| For Federal Insurance Co.: | Cozen, O'Connor<br>By:  JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Maryland Casualty: | Eckert, Seamans, Cherin & Mellott<br>By:  ED LONGOSZ, ESQ.<br>1747 Pennsylvania Avenue N.W.<br>Suite 1200<br>Washington, DC  20006 |
| For Asbestos Property<br>Damage Claimants: | DAVID ZICLE, ESQ. |
| For the Petitioners: | SHELDON RITTY, ESQ. |
| For Zonelite Attic<br>Insulation: | Lukins & Annis<br>By:  DARRELL SCOTT, ESQ.<br>1600 Washington Trust Fin. Ctr.<br>West 717 Sprague Avenue<br>Spokane, WA  99201 |
| For National Union: | MICHAEL DAVIS, ESQ. |
| For ACE Entitles: | LINDA CARMICHAEL, ESQ. |
| For Neal Levitsky: | TOM MARTIN, ESQ. |
| For Timothy Kane: | Conroy, Simberg, Ganon, Krevans<br>By:  STUART COHEN, ESQ.<br>3440 Hollywood Blvd.<br>Second Floor<br>Hollywood, FL  33021 |
| For Continental Casualty: | Ford, Marrin, Esposito, Witmeyer<br>By:  ELIZABETH DeCRISTOFARO, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |
| For Undisclosed Party: | Vorys, Sater, Seymour & Pease<br>By:  TIFFANY COBB, ESQ.<br>52 East Gay Street<br>Columbus, OH  43216 |
| | DAVID CARACOFF, ESQ. |
| | CAROL IANCU, ESQ. |

APPEARANCES CONT'D:

SCOTT DANA, ESQ.

THEODORE TACANELLI, ESQ.

EDWARD WESTBROOK, ESQ.

NEAL LEVITSKY, ESQ.

JAMES HARMON, ESQ.

SANDY ESSERMAN, ESQ.

DAVID PARSONS, ESQ.

JENNIFER SKOLLARD, ESQ.

KERI MUMFORD, ESQ.

MICHAEL WESTOWSKI, ESQ.

FRANK MONACO, ESQ.

KEVIN MANGIN, ESQ.

FRANK PERCH, ESQ.

1         THE COURT:  Good afternoon.  This is the matter of

2  W.R. Grace, Bankruptcy No. 01-133 -- I'm sorry -- 1139, pending

3  in the District of Delaware.  The parties I have set to appear

4  by phone are David Caracoff (phonetic), Carol Iancu, I-a-n-c-u,

5  Scott Dana, Theodore Tacanelli, Edward Westbrook, Neal

6  Levitsky, James Harmon, Sandy Esserman, David Parsons, Jennifer

7  Skollard, Jeff Wisler, Keri Mumford, Michael Westowski, Lewis

8  Kruger, Arlene Kruger (sic), Frank Monaco, Kevin Mangin and

9  Frank Perch.  Are there changes to that list?

10        MR. SCOTT:  Yes, ma'am.

11        MR. KRUGER:  Your Honor, just to correct, it's Arlene

12 Krieger, not Kruger.

13        THE COURT:  On, Krieger?  Pardon me just one second.

14 Okay.

15        MR. SCOTT:  And Darrell Scott, Your Honor, of Lukins

16 and Annis, special counsel to ZIA claimants.

17        THE COURT:  I'm sorry.  Special counsel for whom?

18        MR. SCOTT:  Zonelite Attic Insulation.

19        THE COURT:  Okay.

20        MR. SCOTT:  Thank you.

21        THE COURT:  Thank you.

22        MR. DAVIS:  Michael Davis is on for National Union.

23        THE COURT:  All right.  Just one minute.  All right.

24 Anyone else?

25        MS. CARMICHAEL:  Yes, Your Honor.  Linda Carmichael,

6

1  for the ACE entities.

2       THE COURT:  Are you folks on a -- on speaker phones?

3  If you are, please pick up the lines.  It's very hard to hear

4  and when I turned the speakers up before, we were getting some

5  pretty awful feedback.  Okay.  I've got Ms. Carmichael's.  Who

6  else?

7       MR. MARTIN:  Tom Martin, for Neal Levitsky.

8       THE COURT:  All right.

9       MR. MARTIN:  And Stuart Cohen.

10      MR. COHEN:  Also on the same case, Your Honor, from

11  Conroy, Simberg --

12      THE COURT:  I'm sorry.  I know somebody's speaking.

13  I can't hear you.

14      MR. COHEN:  My name is Stu Cohen, Your Honor.  Tom

15  Martin just announced my appearance, also on the Kane matter,

16  for Timothy Kane.

17      THE COURT:  Also on the Kane matter?

18      MR. COHEN:  Correct.

19      THE COURT:  All right.  Mr. Cohen, you're really

20  going to have to speak up.  We can hardly hear you.

21      MR. COHEN:  That's okay, Your Honor.  I won't be

22  speaking very much.

23      THE COURT:  All right.  Anyone else?

24      MS. COBB:  Tiffany Cobb, from the law firm, Vorys,

25  Sater, Seymour and Pease.

1          THE COURT:  I'm sorry.  Who -- I -- who were you for?

2          MS. COBB:  I'm not at liberty to disclose my client.

3          THE COURT:  I beg your pardon?

4          MR. BERNICK:  Then you're not at liberty to enter an

5 appearance.

6          MS. COBB:  I'm just attending to listen in.

7          THE COURT:  All right.  Anyone else?

8          MS. DeCRISTOFARO:  Yes, Your Honor.  Elizabeth

9 DeCristofaro, from Ford, Marrin, for Continental Casualty.

10          THE COURT:  I got Elizabeth Cristofararo (sic).  I

11 didn't hear what else you said.

12          MS. DeCRISTOFARO:  The law firm of Ford, Marrin.

13          THE COURT:  All right.

14          MS. DeCRISTOFARO:  For Continental Casualty.

15          THE COURT:  All right.  Anyone else?  Okay.  I'll

16 take entries of appearances in court, please.  Just one second

17 here.  Okay.  Good morning.

18          MR. BERNICK:  Good afternoon, Your Honor.

19          THE COURT:  Good afternoon.

20          MR. BERNICK:  David Bernick, for the debtor, and Ms.

21 Jan Baer, and obviously, Mr. Restivo, who needs no introduction

22 here, but he's also here for the debtor.

23          THE COURT:  Good morning.

24          MR. BECKER:  Good afternoon, Your Honor.  Gary

25 Becker, from Kramer, Levin, Naftalis and Frankel, representing

8

1  the equity committee.

2            THE COURT:  Good morning.

3            MR. SAKALO:  Good afternoon, Your Honor.  Jay Sakalo,

4  Bilzin, Sumberg, Baena, Price and Axelrod, on behalf of the

5  property damage committee.  My colleague, Scott Baena, is on

6  the telephone.

7            MS. ESKIN:  Marla Eskin, Campbell, Levine, for the

8  asbestos personal injury claimants.

9            MR. LOCKWOOD:  Peter Lockwood, Caplin and Drysdale,

10  for the ACC.

11            MR. PERNICONE:  Good afternoon, Your Honor.  Carl

12  Pernicone, from Wilson, Elser, for Royal Sun Alliance.

13            MR. COHN:  Jacob Cohn, Your Honor, Cozen, O'Connor,

14  Federal Insurance Company.

15            THE COURT:  You'll have to use the microphone.  We

16  won't be able to hear you back there.  I'm sorry.

17            MR. D. COHN:  That's all right, Your Honor.  Daniel

18  Cohn, for the Libby claimants, firm of Cohn, Khoury, Madoff and

19  Whitesell, in Boston.

20            MR. LONGOSZ:  Good afternoon, Your Honor.  Ed

21  Longosz, from Maryland Casualty, from the law firm of Eckert,

22  Seamas.

23            THE COURT:  Mr. Bernick.

24            MR. BERNICK:  Yes.

25            THE COURT:  I have entered orders on agenda items

1   number one, three, four and five.  I know that a COC was filed

2   on number two, but I have some questions about number two.  So

3   I have not entered that order.  So I believe that --

4           MR. BERNICK:  So you -- I'm sorry, Your Honor.  You

5   said you've entered orders on?

6           THE COURT:  One, three, four and five.

7           MR. BERNICK:  Four -- one, three, four and five.  And

8   then I guess that would only leave ten and number two.  If you

9   have questions regarding the order in item two, I'm sure Ms.

10  Baer will be able to respond to those questions.

11          THE COURT:  All right.  I -- actually, I have two.

12  There is a reference to a contingency fee, but the entire

13  application process talks about a fixed fee only.  So I'm a

14  little confused.  It appears that you're asking for authority

15  to have a contingency fee applied to certain lease transactions

16  that were entered into.

17          MS. BAER:  That's correct, Your Honor.  That's the

18  only portion of the application where there's a contingency.

19  That was a part of the overall retention of Deloitte and

20  Touche, and the only part that is on a contingency and related

21  to that one specific item, which is the one thing that was not

22  on their original application when they were retained.

23          THE COURT:  Okay.  And the other is, the agreement

24  indicates that Deloitte can assign or subcontract its interests

25  in I guess the lease arrangement to any other entity without

1 either a motion or a court order, and I'm not sure whether that

2 refers to the services that Deloitte is performing for the

3 debtor, because if that's the case I don't think they can

4 subcontract or assign without court approval.

5        MS. BAER: Your Honor, I don't know what specifically

6 they're referring to. It's not my understanding that they're

7 subcontracting or assigning it to anybody. If it makes some

8 sense, perhaps I can talk to them about striking that out.

9        THE COURT: I think that would be advisable, and give

10 me a revised certificate of counsel, and then I think I could

11 enter that order.

12        MS. BAER: I will do that, Your Honor.

13        THE COURT: All right. I'll sign that order when I

14 get a revised COC, then. Mr. Bernick.

15        MR. BERNICK: Yes. I think with respect to item six,

16 I think we've reached agreement on that, as well. That is the

17 motion of Timothy Kane. I think that they have prepared an

18 order for Your Honor, if I'm not mistaken.

19        THE COURT: All right.

20        MR. LEVITSKY: We have an order -- a proposed order,

21 Your Honor. We can submit that with certificate of counsel, if

22 it pleases the Court.

23        THE COURT: You can do that or you did do it, sir?

24 I'm sorry. I'm having --

25        MR. LEVITSKY: We can do that, Your Honor.

11

1          THE COURT:  You can do it.  Fine.  What is the

2  agreement?

3          MR. LEVITSKY:  Mr. Cohen, Stuart Cohen, can address

4  the substance of the agreement.

5          MR. COHEN:  Your Honor, if I may, this is Stu Cohen.

6  Can you hear me okay?

7          THE COURT:  Yes.

8          MR. COHEN:  This was Mr. Kane's motion to lift the

9  stay in order to proceed directly against the insurance

10 proceeds that were available to Grace --

11         THE COURT:  Yes.

12         MR. COHEN:  -- in this action.

13         THE COURT:  Yes.

14         MR. COHEN:  We've gone ahead and agreed to allow the

15 stay to be lifted so that Kane's action may proceed to trial

16 and/or settlement with the proviso that Kane be limited at the

17 time the judgment is entered or the settlement is reached to

18 the pro rata share of policy proceeds that are left available

19 to satisfy his claim at the time the judgment or settlement is

20 reached.

21         THE COURT:  All right.  That's fine.  Okay.  Who's

22 going to submit this COC?

23         MR. MARTIN:  I shall.  This is Tom Martin, from Fox,

24 Rothschild and Wilmington, Your Honor.

25         THE COURT:  All right.  Thank you.  I will enter that

**J&J COURT TRANSCRIBERS, INC.**

12

1 order when I get it.

2           MR. MARTIN:  Thank you.

3           THE COURT:  Okay.  Mr. Bernick.

4           MR. BERNICK:  Yes, Your Honor.  I think with respect

5 to the contested matters, if I can make a suggestion that might

6 make the process go a little bit more smoothly.  Item seven,

7 which is Docket 5460, pertains to the appointment of a futures

8 representative, and I think we should proceed with that one

9 first.

10          But then, rather than proceeding to item eight --

11 items eight and nine, both of which pertain to the Libby

12 claimants, it might be appropriate as we're talking about going

13 forward in the main case also to talk about item 11, which is

14 Docket 5027 and deals with exclusivity.

15          So our proposal would be to take up item seven, then

16 11 and then proceed to the Libby matters eight and nine.  And I

17 believe that those will comprise the more substantial matters

18 yet this afternoon that we really have.  I think all the others

19 will take not quite so much time.

20          THE COURT:  All right.  That's fine.

21          MR. BERNICK:  Okay.  If I could begin on the futures

22 representative, I think that the briefs have laid out the

23 status before the Court.  But let me state first of all that we

24 did try to file a reply brief.  Your Honor suggested that if we

25 wanted to stand by that request, we would continue the matter.

1   We're happy to dispose with the reply brief and proceed today.

2   So we're prepared to argue the merits today.

3          The state of play is that there are three candidates.

4   All three candidates I know are well known to the Court.   No

5   alternative candidate actually has been proposed.   Nor, as I

6   read the papers, do we really see that there is a substantive

7   objection to the qualifications of any of the three candidates.

8          Instead, we have three legal issues and I want to

9   cover them briefly.   The first issue is whether it's

10  permissible to have a futures representative serve in more than

11  one case.   That's the first legal issue that's raised.   And

12  apparently, as you look through the language in the briefs that

13  raise this issue, part of this is an effort to somehow derive

14  some learning from the recent recusal litigation relating to

15  Judge Wolin before the Third Circuit.

16         I think, however, that there really is no learning

17  from that process that really directly applies to the

18  application that we have here.   First, I should note that the

19  Third Circuit's decision is yet to become actually final in the

20  mandate issue.   In fact, it's my understanding that there is to

21  be a motion for a rehearing en banc of that matter.   So it may

22  not be final at the present time.

23         But more tellingly, even that opinion is really not

24  on point, because the factual circumstances were very

25  different.   The issue in that case was whether somebody who is

1 already a futures representative -- and the papers here

2 underscore that a futures representative is essentially acting

3 as an advocate or a representative on behalf of a constituency

4 -- can simultaneously act as a court-appointed advisor where

5 there is to be neutrality.

6        THE COURT:  I can't see a parity between the Judge

7 Wolin recusal litigation with the FCR acting as an "independent

8 advisor," and also serving as an FCR in another case, in this

9 situation.

10        MR. BERNICK:  Yeah.  That --

11        THE COURT:  If that's the case, and I need to not

12 consider people who have represented the same party, then I'm

13 afraid that the asbestos plaintiffs' committee probably needs

14 new counsel.  In this case probably not the trade committee,

15 but other committees in various cases will also need new

16 counsel.

17        So if they want to pursue this objection I guess I'll

18 consider it, but folks, understand the consequences.  I've said

19 before, what's good for the goose is good for the gander.

20        MR. BERNICK:  I'm therefore, not -- in light of Your

21 Honor's comments I'm not going to spend real time on this,

22 unless it's necessary in response.  I would venture to say that

23 if Your Honor takes a look at the many cases that have been --

24 have dealt with this matter, that is, the appointment of a

25 futures representative, they consistently look to either

1 Section 327 -- 327(a) or Section 101 for the test about whether
2 there is a conflict of interest.

3        As you know, that's an actual disinterest in the
4 standard.  It requires that there be an actual conflict.  As
5 the U.S. Trustee has pointed out here, there is no actual
6 conflict.  And even if you were to look at a more permissive
7 appearance of conflict or appearance of impropriety standard,
8 we just don't see it here.

9        The fact that different representatives or the same
10 person acting as a representative in different cases might
11 ultimately take a different, substantive position is, first of
12 all at this point, a matter of speculation, but in any event,
13 would lead to no consequence that would give rise to a
14 conflict.

15        For the very reason that the representative stands in
16 the shoes of his or her constituency, the only constituency
17 that's bound by the representative statements is the
18 constituency in that case.  So there's no sense in which
19 there's an overlap of the constituencies.

20        The so-called futures with respect to one case are
21 different from the futures with respect to another.  So we
22 don't see that there's even an appearance of impropriety
23 problem.

24        THE COURT:  Well, Mr. Bernick, I think it's -- I
25 think the issue could be handled if we ever get to a trust

1 distribution procedure by simply imposing the obligation, which

2 is usually in the trust anyway, on the trustee to make sure

3 that if an entity files a claim in more than one case, either

4 present or future, that there is some recognition of that fact

5 and attention paid to it.

6       MR. BERNICK:  Very well, Your Honor.

7       THE COURT:  So to the extent that the future claims

8 rep is the future claims rep in more than one case, I think the

9 obligations are to those "clients," future demand holders in

10 each of those cases.  But I think the potential for making sure

11 that there isn't a double-dip that's inappropriate is still

12 there and can be handled in the trust mechanism.

13      So any order that I'd enter that would appoint a

14 futures rep in this case who also is a futures rep in another

15 case is going to be conditioned on the fact that there will be

16 a procedure in the trust distribution process to fix this.

17      MR. BERNICK:  Well, and it was right that

18 incorporated -- or at least some reference to it incorporated

19 in the order appointing the futures representative in this

20 case?

21      THE COURT:  I don't know that it's necessary in this

22 order, because we're not to the place --

23      MR. BERNICK:  We're not there yet.

24      THE COURT:  -- where you've got a trust.  I just --

25      MR. BECKER:  Yes.

1          THE COURT:  -- I'm sure your memory will be good

2   enough to --

3          MR. BERNICK:  Okay.

4          THE COURT:  -- recollect this discussion.

5          MR. BERNICK:  Two other legal issues that have been

6   raised and then a suggestion by the debtor about the three that

7   have been proposed.  The second legal issue is raised by one of

8   the insurance companies.  They filed a limited objection that

9   ended up going for 40 pages.

10         And basically, the objection reduces the proposition

11  that we have to litigate the merits of who really has a futures

12  claim.  Then we're going to decide who all represents or who

13  all is the constituency represented by the futures

14  representative before we ever get to appointing a futures

15  representative.

16         And obviously, in our view this puts the cart before

17  the horse.  The whole idea is to have a representative that can

18  participate in these cases for the purposes of litigating

19  precisely those kinds of issues.  So we ought to have a

20  representative first, before we go to litigating, you know,

21  whether the constituency that that representative serves

22  includes people who are unimpaired or not.

23         I don't know of any precedence for this kind of

24  proposal.  Counsel called me to talk about it and I had to be

25  candid and say that I thought that the objection was a silly

1 one and I still believe that today.  The third issue is raised

2 by a couple of the different responses.

3       And the essence of this issue is that to be truly

4 independent the futures representative must be independently

5 appointed.  And by independently appointed we're really talking

6 about a process that as is described would be pure as the

7 driven snow.

8       The suggestion that's actually made is that the U.S.

9 Trustee, who is not a party -- not an interested party in the

10 sense of the other constituencies in the case, although through

11 the appointment, the U.S. Trustee has filed what I thought was

12 a very clear brief that first of all said that the U.S. Trustee

13 does not have the statutory power to fulfill that function, and

14 secondly, then went on to analyze really whether there was a

15 conflict at all and found that there was not.

16       So the U.S. Trustee cannot serve in that role, but it

17 is our view, it is the debtor's view, that we don't have to

18 look far for how to insure independence here.  The whole

19 purpose of making an application and having the Court make the

20 appointment, we don't appoint anybody.

21       We're simply making candidates -- suggestions for who

22 the candidates might be, and the input of other parties is for

23 precisely the same kind of purpose.  It is ultimately Your

24 Honor's order of appointment that is the governing document and

25 is the governing decision.

1           And because it's the Court who makes the appointment,

2  the process is an independent one, and the representative is an

3  independent one.   And that is the practice that's been followed

4  in each and every one of the cases that I am familiar with.   So

5  we believe that the process is one that's sound, doesn't have

6  to become overly elaborate.

7           It is interesting to us that the London Market goes

8  on at length about how this whole process should be followed

9  and then they conclude their brief by saying, oh, but guess

10 what, David Austern (phonetic) is okay with us.   So if Austern

11 is okay with the London Market, presumably, they don't have a

12 problem with the procedures that were used to suggest him.

13          That then brings me back to the three candidates.

14 We've been diligent, Your Honor, I think in polling all the

15 constituencies, finding out their views.   I think that no one

16 has quarreled with the three that we have proposed in the sense

17 that there is some other more preeminently qualified candidate.

18          The only objection that I see to Mr. Austern comes

19 from the asbestos claimants' committee.   And you know, we

20 obviously respect their views.   That's why we solicited them.

21 I'll note, however, that they did not have objection to Mr.

22 Austern in connection with the ACE case.   So I'm a little bit

23 curious about why they would object now.

24          But we actually believe that in light of all the

25 briefing that's occurred it probably does make the most sense

20

1  to appoint Mr. Austern.  He does not have any other engagements

2  currently as an appointed futures representative.  So to the

3  extent that the debtor's voice does make a difference here, we

4  think that that's probably the best choice.

5          THE COURT:  All right.  Who'd like to address the

6  objection?  Mr. Lockwood?

7          MR. LOCKWOOD:  Your Honor, first, I think Mr. Bernick

8  perhaps slightly overstates the ACC's position on Mr. Austern.

9  I don't believe we filed an objection.  I think we indicated to

10 the Court our preference for Professor Green and I think that

11 our preference for Professor Green ties in to one of the points

12 that Mr. Bernick and Your Honor just discussed a few minutes

13 ago about this notion that there's some kind of a conflict if

14 you have a futures representative in more than one case.

15          I've read the papers that have been filed on this

16 subject.  I'm not aware of anybody who has described in

17 intelligible terms what the supposed conflict is here.  I mean,

18 the futures representative in the Grace case is out to look

19 after and make sure that the present and future claimants of

20 the Grace estate are treated substantially the same in whatever

21 trust mechanism may come into existence.

22          What possible conflict that duty could have with the

23 service as a futures representative in the Federal Mogul case

24 or the Armstrong case or the Owens Corning case is an absolute

25 mystery to me.  This -- the only suggestion that I've heard

1 today is some sort of double-dipping issue.

2         That to me is unintelligible because what the issues

3 are in these cases is the several liability.  This is not the

4 tort system.  We don't come in here attempting to impose on the

5 Grace estate or any of the other estates in these, some sort of

6 joint liability the way one would have in the tort system with

7 the possibility that, therefore, a debtor could wind up somehow

8 or another picking up the share of some other entity here.

9         And the TDPs, to the extent that they come into

10 existence in these cases, are quite explicit that what you are

11 being compensated for is the several liability of that debtor

12 and the TDP will not pay or listen to or entertain any notion

13 that somehow or another there's some joint liability here that

14 this trust ought to be responsible for.

15         So to me, it makes no sense, and indeed, it actually

16 has the exact opposite result.  The reason, quite candidly,

17 that we have expressed a preference for Professor Green is

18 precisely because it's our view that he is more experienced.

19 The notion of going out and pulling somebody that has never had

20 anything to do with asbestos torts and asbestos bankruptcies --

21 I mean, Your Honor perhaps more than anybody else is aware that

22 there is a learning curve in this area, and we believe that of

23 the three candidates, none of whom, as I say, we have objected

24 to as being unqualified or otherwise unacceptable, Professor

25 Green has demonstrated the most experience and the broadest

22

1  range of activity in these cases.

2          Dean Trafalat (phonetic) is a close second.  David

3  Austern is a fine fellow and -- but he's only had one pre-pack

4  that he's been involved with, which by hypothesis didn't deal

5  with the kind of negotiations and interplay that some of these

6  other more contested cases, the regular filings are.

7          And his other involvement has been on the claims

8  handling side through his association with the Manville Trust,

9  which is a somewhat different role than a futures

10 representative who is an advocate.  So that's our -- the

11 committee's view on the candidates.

12         This point that Mr. Bernick said about the insurer

13 statement of the need for -- oh, and by the way, I might add

14 one final comment before I get away.  The -- Your Honor's

15 absolutely correct.  It seems to me if there's a notion that

16 somehow or another there's a conflict between futures reps, I

17 don't know where you draw the line.

18         I mean, how do you represent multiple debtors that

19 might have claims against -- in these asbestos bankruptcies

20 everybody's got contribution claims against everybody else, as

21 Your Honor is familiar with.  The unsecured creditors'

22 committee, the Stroock firm in this case, is also counsel to

23 the unsecured creditors' committee in the USG case.

24         The -- Mr. Bayne's firm is counsel for the property

25 damage committee in virtually every case in which a property

23

1 damage committee's been appointed.  I mean, it just -- it's

2 unprecedented and it makes no sense.

3          With respect to the -- this issue that somehow or

4 another -- some of the insurers have raised -- that we need to

5 have some sort of instruction or declaratory judgment from this

6 Court telling the futures representative who he represents, to

7 me is a giant red herring.

8          If you read the insurer's papers, what they're really

9 asking for is a declaratory judgment that the present claimants

10 and future claimants, both of them, if they are "unimpaired,"

11 to use the insurer's favorite undefined term, undefined only

12 whenever it suits their convenience, they want this Court right

13 now, under the guise of instructing a futures rep, who its

14 constituency is to disallow claims by persons who would not

15 meet their definition of an unimpaired claimant.

16          And they want to litigate that issue, which

17 Mr. Bernick has been eagerly awaiting Judge Wolin's permission

18 to litigate for some number of years now, they want to litigate

19 that issue in the connection with the employment of a futures

20 representative.

21          THE COURT:   Yeah.  I think Mr. Bernick's right.   That

22 simply puts the cart before the horse.  We need to get the

23 futures rep in place, and then I believe it's up to the futures

24 rep to decide what position, if any, to take if litigation

25 actually comes up.

24

1           But I can't define who the future demand holders are
2   going to be at this point in time.  That's why they're future
3   demand holders.  Otherwise, they'd be current claimants and --
4           MR. LOCKWOOD:  Well, it's even more difficult than
5   that, because the futures representative is the mirror image,
6   if you will, of the committee as it relates to the present
7   claimants.  He represents everybody.  What they're basically
8   trying to say is that the futures rep should decide that he
9   isn't going to take the position for future claimants that
10  people who have plural diseases in the future, for example, and
11  who the asbestos claimants' committee are asserting have claims
12  in the present, they shouldn't get compensated in the present,
13  which by hypothesis means they wouldn't get compensated in the
14  future.
15          THE COURT:  Well, I suppose it --
16          MR. LOCKWOOD:  So in effect, what they're asking is
17  the futures rep should decide in lieu of this Court that the
18  future plural claimants don't have a claim.
19          THE COURT:  No.  I think the way to do it is if
20  somebody raises the issue, if it's raised and if it's permitted
21  to go forward to litigation, I would assume that the futures
22  rep's going to take a position, because I think whatever ruling
23  comes down in a case on a case by case basis that binds the
24  present is going to bind the futures, because otherwise, you
25  can't get parity in the distribution mechanisms.

1          MR. LOCKWOOD:  Exactly, Your Honor.  I mean, the goal

2  of the futures rep, the role of the futures rep is to make sure

3  that his constituents get treated in substantially the same

4  manner on similar claims.

5          THE COURT:  That's right.

6          MR. LOCKWOOD:  Not for him to cherry pick his

7  constituency and decide which among them gets paid and which

8  doesn't.  Thank you, Your Honor.

9          THE COURT:  This is kind of the flip side of the

10 issue we saw in a different case about the fact that there was

11 an argument that the futures representative could not represent

12 all of the futures demand holders, that we need a different

13 futures rep for different classifications of demand holders,

14 and I don't think that argument makes any sense, either,

15 according to the statute, so.  Good afternoon.

16         MR. SAKALO:  Good afternoon, Your Honor.  Jay Sakalo,

17 on behalf of the asbestos property damage committee.  A couple

18 of points I want to address that were raised by Mr. Bernick and

19 that Mr. Lockwood addressed, and I think Mr. Bernick addressed

20 with respect to the learning curve that a new candidate, unlike

21 Mr. Austern, Mr. Green and Mr. Trafalat, would face in being

22 appointed as a futures rep in this case, really, I think speaks

23 to the validity of having a new person other than one of those

24 three candidates appointed.

25         THE COURT:  Well, who do you want in?

1       MR. SAKALO:  Oh, we have not come up with a

2  candidate's name, Your Honor, because we don't believe that we

3  should be advocating a particular person as the candidate to

4  serve as a future claimants' rep.

5       THE COURT:  Well, are you advocating against the

6  three that have been selected by the various constituents here?

7       MR. SAKALO:  Yes.  We don't believe that any of the

8  three have the proper -- not -- they're qualified in respect of

9  their ability to serve.  However, we believe that given that

10 they have served or are currently serving as a future

11 claimants' rep in other asbestos cases, they should not be

12 appointed in these cases.

13      THE COURT:  So you're going to tell me that I

14 shouldn't appoint the three who have been proposed, even though

15 they're qualified, but I should just go out and pick the next

16 common man on the street and pull him in and have him be the

17 futures rep?

18      MR. SAKALO:  Well, it's not the common man on the

19 street.  We believe that the future claimants --

20      THE COURT:  It is to me, if you're not going to give

21 me a recommendation.  I don't have -- I don't know

22 qualifications of people who sit in various capacities and

23 things.

24      MR. SAKALO:  Well, I think a process can be

25 established where we can provide names to you on an anonymous

1  basis.  So nobody knows if it's a proposed nominee of the

2  property damage committee, personal injury committee, the

3  debtor's.

4         THE COURT:  But it's the debtor's obligation under

5  the statute, isn't it?

6         MR. SAKALO:  It's the Court's obligation to a point.

7  Now, the debtors raise in their papers that they have the right

8  under 327 to nominate professionals.

9         THE COURT:  I think they do.

10         MR. SAKALO:  But are you -- I'm not in agreement that

11  the future claimants' rep is a professional.

12         THE COURT:  The future claims representative, I

13  suppose, is the representative.  He stands in the capacity of

14  the future demand holders and can seek appointment through the

15  Court for his own professionals.

16         MR. SAKALO:  Correct, and they would be professionals

17  and they would be subject to --

18         THE COURT:  But he has to be appointed under 524, and

19  the only mechanism for appointing somebody that I know of is as

20  a professional.  So for purposes of this appointment process I

21  think he's treated as though he were a professional, even

22  though he's going to have the status of a party.

23         MR. BERNICK:  Mr. Sakalo, maybe I could make a small

24  suggestion that might expedite this.  In terms of your

25  constituency -- and I think this is correct, Your Honor, if my

1 memory serves -- Mr. Austern acted as the futures

2 representative in CEABB (phonetic) and there were no property

3 damage claims that were at issue in that case.

4        So if the concern is that he's already served and

5 he's already somehow framed his views -- if we can agree is the

6 subject here -- I don't think that that applies to Mr. Austern.

7 Matter of fact, if I read Mr. Lockwood's comments, I think his

8 point, the papers did not actually say, we object, or there

9 wasn't a formal objection.

10        Maybe if we can just focus on Mr. Austern, their

11 concerns really don't have application to Mr. Austern.  That

12 would also pick up the London Market, who apparently think that

13 Mr. Austern is okay, which I guess the only issue will be

14 Federal over there.

15        THE COURT:  All right.

16        MR. SAKALO:  Well, it appears, in fact, Mr. Bernick,

17 our concern with Mr. Austern is not that there were no claims

18 in CE for property damage.  Our concern with Mr. Austern is

19 that there were personal injury claims in CE.  That was all

20 that case is about, and we have a concern that in this case he

21 comes to the table with an understanding of personal injury

22 claims, future claims, future demands, however they might be

23 characterized.

24        We believe that somebody who needs to get up this

25 learning curve is the appropriate person, because they need to

1  be educated by themselves and by their professionals.  We're at

2  a point in this case, and we'll hear it a little bit later when

3  we deal with exclusivity, there's not a plan on the table.

4       There's not a plan proposed to our committee or to

5  the PI committee as we understand it.  There's ample time for a

6  professional or for a future claimants' rep to be appointed and

7  get up the learning curve.  They speak of these complex issues

8  that can't be learned in such a quick manner; it would cost too

9  much.

10       THE COURT:  Are you sure you want to pursue this,

11 because honestly, if this is an issue that's going to come up,

12 the next time there's a property damage claim I'm going to

13 expect that the committees' representatives are going to be

14 somebody who has absolutely no understanding of property damage

15 claims and can hit the ground unrunning, crawling and relying

16 on their own professionals, who likewise have no understanding

17 of what current property damage claims are.

18       I mean, this is an absurd argument to me, that this

19 is -- they should have to incur so much additional expense to

20 try to get somebody up and running when there are qualified

21 people who -- if they have a conflict that's a different issue.

22 But unless I'm hearing something about an actual conflict, this

23 same argument applies to every single committee and its

24 professionals.

25       MR. SAKALO:  It does, except, Your Honor, there's one

30

1  difference, and that is, we're assuming that they're up the

2  learning curve because they understand asbestos personal injury

3  issues.  As to each debtor those issues are different.  For

4  instance, Grace has issues related to its product.

5        It has certain defenses that it will raise to its

6  products that other debtors won't raise.  USG has defenses that

7  they will raise.

8        THE COURT:  Well, if that's the case --

9        MR. SAKALO:  Both --

10        THE COURT:  -- then the futures rep really isn't up

11  and running because he has to learn the specific facts of every

12  case.

13        MR. SAKALO:  And that's my point, Your Honor.  Mr.

14  Austern, Mr. Green and Mr. Trafalat, as it relates to Grace's

15  products and Grace's claims, no further up the learning curve

16  than another representative who would be appointed.

17        THE COURT:  I can't agree with that.  I mean, that's

18  the same thing putting it into the property damage committee as

19  saying that you don't understand what the global context of the

20  issues are, even though they may apply differently to the

21  specific facts of the case.

22        It's exactly the same argument that applies with

23  respect to every counsel, and I really think you should assess

24  whether this is an argument you want to pursue, because if I

25  buy this argument it will apply in the future to any case in

1  which I'm assigned and as to which I don't yet have committees

2  appointed, so.

3          MR. SAKALO:  I --

4          THE COURT:  Because I think I'd be untrue to myself

5  if I said, well, it applies in this instance and not in all

6  others.  If it's an argument that holds water here, it's

7  meritorious for everybody in all contexts in these asbestos

8  cases.

9          MR. SAKALO:  Thank you, Your Honor.

10          THE COURT:  Good afternoon.

11          MR. J. COHN:  Good afternoon, Your Honor.  Jacob

12  Cohn, Cozen, O'Connor, for Federal Insurance Company.

13  Mr. Bernick has essentially, perhaps implicitly, perhaps not

14  implicitly, accused us of trying to make hay with the Judge

15  Wolin situation.  You'll not find any reference to that in our

16  briefs.

17          The case does stand for a central proposition,

18  though.  That is that structure matters.  Structure is

19  important.  It's fundamental to binding future claimants.  And

20  it's not any kind of process that's the most convenient to give

21  to the arms of future claimants.

22          It's the best practicable under all reasonable

23  circumstances that you could give to them.  And the problem

24  with 327, nowhere does it say that under 327 the debtors have

25  the right to nominate an FCR.

32

1          THE COURT:  Regardless of who does it, how's it going
2   to come up if it doesn't come from the debtor, since the debtor
3   has the --
4          MR. J. COHN:  Any party in interest --
5          THE COURT:  -- fiduciary obligation to all creditors.
6   And --
7          MR. J. COHN:  -- any party in interest should --
8          THE COURT:  -- if seeking in a 524(g) injunction to
9   the future demand holders, who else has that obligation prior
10  to the appointment of an FCR?
11         MR. J. COHN:  Any party in interest or the Court sua
12  sponte should be a --
13         THE COURT:  Absolutely not.  An insurance company has
14  no standing whatsoever to deal with a future claims
15  representative.
16         MR. J. COHN:  Your Honor, the -- this is one section
17  of the code where you're going to find insurance companies'
18  names.  And if I showed up here a year from now and --
19         THE COURT:  In --
20         MR. J. COHN:  -- raised these issues, you'd say,
21  where were you a year ago when we started down this road.
22         THE COURT:  -- in 327 for how to get professionals
23  appointed in the estate, insurance companies are named?
24         MR. J. COHN:  These are -- this is not a professional
25  for the estate, Your Honor.  This is a constituency

1 representative.  This is somebody without a principal.  That's

2 the fundamental distinction between 327, where you are hiring a

3 professional to work for somebody who's there, well, they don't

4 like other to look and say, Your Honor, fire this professional;

5 discipline this professional.  You're hiring the person to be

6 the constituency.

7        THE COURT:  Yeah, I agree with that.

8        MR. J. COHN:  And when you're doing that, in all

9 other contexts that we are aware of that are analogous, the

10 courts require an appearance of impropriety standard.  If you

11 look to UNR, if you look to Johns Manville, and I suggest to

12 Your Honor that those two courts, those two "pioneering cases"

13 that are referred to by Congress when they enact 524(g) and

14 (h), provide legislative gloss to the interpretation of these

15 statutes.

16        The House of Representatives said, we want to make

17 sure that these future cases meet the same kind of high

18 standards with respect to consideration of these future

19 claimants.

20        THE COURT:  I haven't seen anything in any of the

21 papers that challenge either Professor Green or Mr. Trafalat or

22 Mr. Austern's high standards in the case.

23        MR. J. COHN:  Structure matters, Your Honor.  It's

24 the highest standards of the structure.

25        THE COURT:  It does indeed.  I'm going to appoint

34

1  somebody.  There will be a structure.

2          MR. J. COHN:  The structure of permitting the

3  conflicted constituencies to say, hire somebody to be --

4          THE COURT:  Who's conflicted?

5          MR. J. COHN:  -- my arm's-length partisan is a

6  structural effect.

7          THE COURT:  Wait.  Who's conflicted?  Who is it who's

8  conflicted?

9          MR. J. COHN:  Who is conflicted vis-à-vis the futures

10 representative?  The debtor, the insurers, the other creditors,

11 everybody --

12          THE COURT:  The debtor is absolutely not conflict --

13          MR. J. COHN:  -- that is a real party in interest has

14 a different --

15          THE COURT:  No.  The debtor is absolutely not

16 conflicted with respect to the FCR or the ACC or the trade

17 committee or any other --

18          MR. J. COHN:  Ambatex (phonetic) says to the

19 contrary, Your Honor.

20          THE COURT:  -- or any other creditor in the case.

21 The debtor has a fiduciary obligation property damage on -- to

22 make sure that all of those constituencies are appropriately

23 treated within the case.  It doesn't represent those entities,

24 but it is not a conflict in the sense that you're now arguing

25 that there's a conflict.  It has a fiduciary duty.  How can it

**J&J COURT TRANSCRIBERS, INC.**

1  be in conflict?

2          MR. J. COHN:  Well, Your Honor, _Ambatex_ holds flatly
3  to the contrary.

4          THE COURT:  _Ambatex_ is not a bankruptcy case.

5          MR. J. COHN:  Your Honor, _Ambatex_ certainly is a
6  bankruptcy case.  It is part of the judicial gloss of --
7  legislative gloss of 524(g).  _Ambatex_ is the law of this
8  Circuit.

9          THE COURT:  Oh, I'm sorry.  I apologize.  I was
10  thinking of the Supreme Court case, now the name has escaped
11  me.

12          MR. J. COHN:  _Amkit_ (phonetic).

13          THE COURT:  Yes.  Thank you.  I apologize.  I had the
14  wrong case.

15          MR. J. COHN:  _Ambatex_, _Ambatex_, 7055 F.2d.

16          THE COURT:  Yeah.

17          MR. J. COHN:  Whatever it is.

18          THE COURT:  Sorry.

19          MR. J. COHN:  Is what I'm referring to.

20          THE COURT:  Okay.

21          MR. J. COHN:  This is the law of the Circuit, and it
22  says the debtors can't look out for the interests of the
23  futures because they have a conflicting interest.  _Johns_
24  _Manville_ says that.

25          THE COURT:  They can't look out for them, but with

36

1  respect to who's going to bring a motion to get somebody

2  appointed to represent them, they have no conflict.  They have

3  a fiduciary duty to make sure that the case is structured in a

4  way that all creditors and demand holders' interests are

5  appropriately met.

6      MR. J. COHN:  I suggest to you that a structure that

7  permits any of these conflicted constituencies to propose

8  somebody, to vet somebody, to nominate a particular person is

9  in and of itself --

10     THE COURT:  Right.  And then I'll ask you the same

11 question I'll ask them.

12     MR. J. COHN:  -- structurally unconstitutional.

13     THE COURT:  Am I to go out on the street and pull the

14 first person I see and pull them in as the futures rep?

15     MR. J. COHN:  No.  Your Honor, you're to fix the

16 structure.  If the structure were to be fixed.

17     THE COURT:  I have fixed one.  I instructed the

18 debtor to talk with the constituents and figure out who an

19 appropriate futures rep would be and --

20     MR. J. COHN:  That's the structural problem, Your

21 Honor.

22     THE COURT:  -- and then to make recommendations, and

23 if they didn't agree, to propose names.  I don't know whose

24 names any of these three people were proposed by.

25     MR. J. COHN:  And I --

1          THE COURT:  I don't see that as a structural problem.

2          MR. J. COHN:  -- my problem, Your Honor, is that --

3          THE COURT:  I see it as a main --

4          MR. J. COHN:  -- the conflicted constituencies,

5 certain of whom repeat in other bankruptcies, are permitted

6 under the structure --

7          THE COURT:  They are not conflicted.

8          MR. J. COHN:  -- Your Honor allows to have in place,

9 contrary to UNR and contrary to Manville.

10          THE COURT:  They are not conflicted.  Please stop

11 referring them -- to them in that fashion.  They are different

12 constituent parties.  With respect to the debtor, in making a

13 motion to appoint a futures rep the debtor is not conflicted.

14 The debtor does not represent the futures rep.

15          It is only assuring that future demand holders have a

16 representative.  That is not a conflict and I don't want to

17 hear that anymore in this record.  That can be your position.

18 It's not mine.  So please, I'm making a finding.

19          MR. J. COHN:  I suggest to you --

20          THE COURT:  There is no conflict.

21          MR. J. COHN:  -- Your Honor, that to answer your

22 follow-up question of who do I pick --

23          THE COURT:  Okay.

24          MR. J. COHN:  -- that if you fix the structure such

25 that a party in interest may say, Your Honor, please select a

1 | futures rep and put one in place it may not nominate or vet,

2 | that would take care of the substantial bulk of my problem with

3 | repeat performers.

4 | THE COURT: And I've just said that if they can't

5 | nominate or vet how am I to find out who the persons are or

6 | what their qualifications are? Am I to go out on the street

7 | and pull the first person in and say, hey, you want to be a

8 | futures rep?

9 | MR. J. COHN: My suggestion on behalf of my clients

10 | is that you permit the trustee an exclusive period to give you

11 | some names.

12 | THE COURT: I don't have a trustee in this case.

13 | MR. J. COHN: The U.S. Trustee; I'm sorry.

14 | THE COURT: I have the debtor. They stand in the

15 | position of a trustee in the case.

16 | MR. J. COHN: The U.S. Trustee; I mis-spoke.

17 | THE COURT: Absolutely not. They've already told me

18 | they can't do it by statute.

19 | MR. J. COHN: Well, is it practicable for the Court

20 | to do this? The question is --

21 | THE COURT: To order the Department of Justice to do

22 | something --

23 | MR. J. COHN: -- is it practicable?

24 | THE COURT: -- that it's said that it can't do by

25 | statute? I don't think so.

39

1          MR. J. COHN:  No.  No.  No, not the U.S. Trustee.
2  Unless you can say under the circumstances it is not
3  practicable to give them that level of --

4          THE COURT:  It's not legal.

5          MR. J. COHN:  -- official protection.

6          THE COURT:  It's not only not practicable, it's not
7  legal.

8          MR. J. COHN:  Not the U.S. Trustee, Your Honor.

9          THE COURT:  Who?

10         MR. J. COHN:  The Court.

11         THE COURT:  Wait a minute.  You just said I should
12 make the U.S. Trustee give me representation.

13         MR. J. COHN:  That's my suggestion to make it easier.
14 The U.S. Trustee won't, and the Court doesn't want to do it,
15 then --

16         THE COURT:  Fine.  Now, I'm back to the same question
17 I've asked five times:  how do I do it?  Do I go out onto the
18 street and pull somebody in and say, hey, do you want to be a
19 future claims representative?  Is that how I do it?

20         MR. J. COHN:  Or you put out an RFP.

21         THE COURT:  I think the structure is perfectly well
22 defined in prior cases.  This is not the first asbestos case
23 that's come up in which an FCR has been nominated by the
24 debtor; that has never been an issue; that has been, as far as
25 I know, addressed by the courts in a fashion that says the

1   debtor has a conflict in making a nomination.

2          If the parties are unhappy with the nominations I get

3   objections to them.  If they were not qualified, I agree, that

4   would be an inappropriate thing.  But I don't see anything in

5   anybody's papers that say these gentlemen are not qualified.

6   And I can't see how they have conflicts if they are in fact

7   future claims reps in other cases, because their duties are the

8   same in each case, but their constituency is different.

9          That's no different from one law firm representing a

10  -- you know -- a client in one case and a different client in a

11  different case, and the two may have competing interests in

12  some third case.  I mean, that doesn't stop the law firm from

13  standing in the shoes or getting a power of attorney or

14  something to act.

15         MR. J. COHN:  Well, it may, exactly, because a law

16  firm may get a waiver, a conflict waiver.  You can't get a

17  conflict waiver from an absent future claimant.

18         THE COURT:  There is no conflict.  I don't need a

19  conflict waiver.  Where is there a conflict?

20         MR. J. COHN:  There's an appearance of impropriety in

21  people turning the FCR --

22         THE COURT:  As to who?

23         MR. J. COHN:  -- position into a cottage industry.

24  Their employment depends upon their being nominated by people

25  that are representative of constituencies that are in conflict

1  with the constituencies they're being asked to represent.  It's
2  not an arm's-length transaction.

3         THE COURT:  Well, I can't -- I just -- in this
4  instance, I just can't see that.  I really just can't see it.
5  I would be happy -- if there were some additional future claims
6  representative nominees in cases coming up, I think it wouldn't
7  be inappropriate to have a wider variety to choose from, but in
8  this instance I've got three very highly qualified individuals
9  who have been nominated by somebody.

10         I know they've come up by the debtor's motion.  I
11  understood Mr. Bernick to say that the constituents were
12  consulted.  I don't know who proposed these names.  I know I'm
13  getting them in the motion, and I have no challenge to the
14  qualifications.

15         I don't see an appearance of a conflict.  I don't see
16  that these gentlemen are representing, for example, the present
17  asbestos constituents in one case.  If that were the case I may
18  see a conflict, but to the extent that they're standing as FCRs
19  in each case, I don't see that as a conflict.

20         MR. J. COHN:  We respectfully disagree.  If I may
21  turn to the second issue, which is, again, one that you have
22  indicated you don't agree with us on, which is whether or not
23  you need to define the constituency of the FCR up front.

24         THE COURT:  I will.

25         MR. J. COHN:  And the question --

42

1        THE COURT:  I will do that.  My definition of the

2   FCR's constituency up front is all future demand holders,

3   period, who have some asbestos-related disease.  Period.  End

4   of story.  It's for him to determine whether there is a claim

5   on which to base some representation in the future, but in

6   terms of who his constituents are, everybody and anybody who

7   contends that they have an asbestos-related injury that has not

8   yet manifested itself is his constituency.

9        MR. J. COHN:  I suggest to Your Honor that the

10  question that the <u>Frenville</u> court left open in 1984, which was

11  a very good question then, is a compelling question today:

12  what is the law that governs whether or not somebody has a

13  presently compensable claim in bankruptcy.

14       THE COURT:  That is an issue I do not need to figure

15  out today.

16       MR. J. COHN:  I -- I --

17       THE COURT:  Whether it's presently compensable.  All

18  I need to know is, if it's presently compensable, then it's not

19  the future demand holders' constituency.  If the claim is known

20  now so that it is compensable and allowable in bankruptcy, it's

21  not his constituency.

22       MR. J. COHN:  Your Honor, one of the fundamental

23  problems that the <u>Ortiz</u> court had in reversing, again, the

24  settlement that Professor Green approved in the asbestos

25  litigation --

1          THE COURT:  Um-hmm.

2          MR. J. COHN:  -- was that the District Court took no

3 steps at the outset to insure that the potentially conflicting

4 interests of easily identifiable characters of claimants be

5 protected by provisional certification of subclasses, relying

6 instead on its post-hoc findings at the fairness hearing that

7 these subclasses in fact had been adequately represented.

8          THE COURT:  This isn't a class certification issue.

9 This is an issue that Congress -- if anything, Congress in 524

10 has I think disagreed with that type of analysis in <u>Ortiz</u>,

11 because 524 doesn't provide for different future claims

12 representatives based on the type of disease or the

13 classification of disease that an asbestos holder chooses to

14 raise.

15          It simply defines an entity that will represent

16 future demand holders.  That's Congress.  This argument, I

17 think you need to take to Congress.

18          MR. J. COHN:  Two things, if I may.  First of all,

19 Congress legislates subject to the due process clause.  And

20 we're talking about adequate representation because of due

21 process, and the bankruptcy power exists on the constitutional

22 plane along with and subject to the Fifth Amendment.

23          THE COURT:  When was <u>Ortiz</u> decided?

24          MR. J. COHN:  1999, Your Honor.

25          THE COURT:  Okay.

1          MR. J. COHN:  But the problem becomes, how is a

2 future representative to represent his constituency if he

3 doesn't know the applicable law?  Now, Mr. Bernick --

4          THE COURT:  Well, oh, no, wait.  Nobody has said that

5 Mr. Austern, Mr. Green or Mr. Trafalat can't figure out the

6 applicable law.  I haven't seen an argument raised about that

7 or can't hire professionals who will assist them in figuring

8 out the applicable law.

9          MR. J. COHN:  Nobody can answer the question left

10 open under _Frenville_ by the court.

11          THE COURT:  I have answered it.  This constituency

12 for the FCR will be all future demand holders who claim

13 exposure to or asbestos injury, just like that's what the ACC

14 has for the presence.

15          MR. J. COHN:  Damage with a compensable claim under

16 the law of the several states, or under federal common law?

17          THE COURT:  That's an issue that will be determined

18 when the claims resolution mechanisms get put in place.  That's

19 exactly why those future demand holders need a representative.

20          MR. J. COHN:  Well, if asymptomatic people are to be

21 treated as having compensable claims or not compensable claims

22 under state law, some of them will, some of them won't.  And if

23 they're all considered under federal law, there'll be a rule.

24 and I have abdicated a rule that they don't.

25          Now, if they're not voting creditors, what the FCR

1  needs to advocate for is a different body of people, and the

2  concessions they will have to make is different.  Is it facing

3  being swamped by --

4          THE COURT:  I can't address that issue.

5          MR. J. COHN:  -- voting asymptomatic putative

6  creditors?

7          THE COURT:  But I can't address that issue unless and

8  until there is a resolution as to whether the asbestos, as you

9  call them, asymptomatic asbestos plaintiffs have claims that

10  are allowable and that entitle them to vote.  I can't know

11  that.  The issue is going to follow on for the future claims

12  rep exactly as it gets determined for the presence.

13          MR. J. COHN:  And I suggest to you, Your Honor, that

14  it can be decided now.  It needs to be decided now or the --

15          THE COURT:  How can I?  There's --

16          MR. J. COHN:  -- zealous advocacy of an FCR is

17  fatally compromised.

18          THE COURT:  And who's going to represent these

19  alleged asymptomatic people in this litigation when they don't

20  have a representative?  That's a good way to get a default

21  order against them all, and an equally good way not to have

22  that order worth the paper it's printed on.

23          MR. J. COHN:  Well, if --

24          THE COURT:  Because they won't have an asbestos

25  representative.

46

1          MR. J. COHN:  -- if the federal -- if the bankruptcy
2 law is that it is federal common law, that it is a federal
3 bankruptcy law rule that functionally unimpaired people don't
4 have currently compensable claims in bankruptcy, a pure legal
5 question, then their putative interests as potential future
6 demand holders is -- it is represented by the FCR.

7          THE COURT:  Yeah.

8          MR. J. COHN:  Now, the answer is --

9          THE COURT:  That's right.  If I have an FCR in place,
10 I agree it's representative.

11          MR. J. COHN:  But to FCR means a split.

12          THE COURT:  If I don't have an FCR in place, there's
13 nobody there.

14          MR. J. COHN:  The FCR, if you pluck him out of thin
15 air, if you pull him off the street, if you hire one of the
16 nominees, you have to give him a script.  You have to say, this
17 is the character you're playing.

18          THE COURT:  I've said, who -- what character he's
19 playing.  He represents all future asbestos demand holders.

20          MR. J. COHN:  Yeah, but that character you haven't
21 defined.

22          THE COURT:  I have defined it.

23          MR. J. COHN:  Well, who are they?

24          THE COURT:  I've done it at least five times on this
25 record.

**J&J COURT TRANSCRIBERS, INC.**

47

1          MR. BERNICK:  Your Honor, if I can make a suggestion.
2 Mr. Cohn's arguments are interesting.  They're all in his
3 brief.

4          THE COURT:  They are all in the brief, but
5 everybody's are.

6          MR. BERNICK:  Yeah, they're all in the brief.  The
7 limited objection is not a limited objection -- is an effort to
8 dramatically revolutionize and change the way that
9 representations take place.  He's entitled to his opinion.
10 He's offered his opinion.

11          He's now gone for much longer than anybody else
12 that's spoken to this issue, and we are mindful that we have
13 other items on the agenda this afternoon.

14          THE COURT:  Well --

15          MR. BERNICK:  And I'm very concerned about our
16 ability to get done at 1:30.

17          THE COURT:  I have read the brief.  The arguments by
18 all the parties have tracked the briefs, and frankly, I just
19 can't agree with this position for the reasons I've already
20 stated.  And I have defined that term.  This record stands for
21 the definition of that term.

22          I am going to put a future claims representative in
23 place.  In the event that there is litigation concerning
24 whether or not asymptomatic asbestos injury victims are or are
25 not entitled to have a vote or hold a claim in this case, they

48

1 will have a representative in the form of a future claims rep.

2         Otherwise, that litigation would not be binding on

3 them, because at that point in time, you're quite correct, all

4 of the cases would stand for the proposition that they were not

5 represented, and therefore, can't be bound.

6         MR. J. COHN:  If I may have a final thought, Your

7 Honor.

8         THE COURT:  Yes.

9         MR. J. COHN:  By doing that, we contend that you set

10 up an inherent conflict because you have asbestos futures that

11 are going to be truly injured in the future.

12         THE COURT:  Yes.

13         MR. J. COHN:  And now, you're saying that their

14 representative has also at this point in time to represent

15 asymptomatic future claimants.

16         THE COURT:  Yes, just like the ACC does it for

17 presence, exactly.  Their committee even consists of people who

18 have different levels of diseases appointed by the United

19 States Trustee.

20         MR. J. COHN:  And --

21         THE COURT:  Whom you would like to have appoint the

22 futures rep.

23         MR. J. COHN:  We take no position on that issue right

24 now.  Thank you, Your Honor.

25         THE COURT:  I take a position on it.  The Code says

1 that they're to be treated similarly, and therefore, we're

2 going to figure out a way to treat them similarly, whoever that

3 "they" turn out to be in the long run.

4        Mr. Lockwood, I think at this point in time I'm

5 inclined to grant the motion to appoint Mr. Austern, simply

6 because I think at this point Mr. Austern is not actively

7 involved as a futures rep.  To the extent that there is some

8 alleged appearance of impropriety, I don't think that

9 appearance can be attached to him right now.

10        And for that reason, I think it would be simply

11 better at this point to appoint Mr. Austern.  That's not to

12 have a negative as to Professor Green or Mr. Trafalat.  They

13 are both very highly respected people within the bankruptcy

14 community.  But I just think in this case at this time it's

15 better to put Mr. Austern in place.

16        MR. LOCKWOOD:  Your Honor, I obviously have no

17 objection to that.  My only comment is I really wish, if you're

18 going to appoint Mr. Austern, you don't lend credence to the

19 notion that Professor Green or Mr. Trafalat would have some

20 sort of an appearance of conflict.

21        I think Mr. Bernick and I have addressed that at some

22 length, and I frankly have yet to hear anybody else identify

23 what the conflict is, other than its --

24        THE COURT:  I don't see a conflict.

25        MR. LOCKWOOD:  -- asymptomatic issues, so.

1          THE COURT:  I don't see a conflict for those

2 gentlemen.  Nonetheless, to the extent that there is an issue,

3 that there is some appearance of impropriety, it cannot attach

4 to Mr. Austern, regardless of whether it could attach to Mr.

5 Green or Mr. Trafalat, and I'm not finding that it does, just

6 regardless of whether it does or doesn't.

7          It can't attach to Mr. Austern.  Therefore, I will

8 take an order that appoints Mr. Austern.  Thank you.

9          MR. BERNICK:  We did not fill in the name right

10 there, Your Honor.  It's blank as it's being tendered to you.

11          THE COURT:  All right.  I filled in Mr. Austern's

12 name.  Okay.  That order is entered.

13          MR. BERNICK:  Thank you, Your Honor.  If we can, as I

14 suggested at the outset, turn to item 11.

15          THE COURT:  That's fine.

16          MR. BERNICK:  Which is exclusivity.  And I know Your

17 Honor has read the briefs.  There are some things, though, that

18 I would like to add.  They shouldn't take very long, and then

19 we can hear from others.  There's only one objection that's

20 been made to the extension, and that's by Mr. Lockwood's

21 client, the committee.

22          We have been at an impasse with the bodily injury

23 claimants.  We did meet with their representatives.  We

24 attempted to see if there was common ground to negotiate a

25 consensual plan, and it has not materialized.  We do not blame

**J&J COURT TRANSCRIBERS, INC.**