51

1  them for that.

2       Obviously, the question of claim value for the tort

3  claims is very, very important to them, not only in this case,

4  but in all the other cases, and I think it'd be very difficult

5  for them to proceed in a way that they didn't feel comfortable

6  as applicable to other cases.

7       At the same time, it does not seem appropriate to the

8  debtors that we be blamed for the fact that further progress

9  has not been made with respect to valuing the personal injury

10 claims.  As I know Your Honor is very well aware, and in fact

11 the ACC is very well aware, since the very beginning of this

12 case in our very initial informational brief and every step

13 that we've taken we've been extraordinarily diligent to try to

14 get this matter resolved.

15      It has not been resolved and it's not worth at this

16 point in time visiting upon our efforts, as Mr. Lockwood put

17 it, over years to get this matter resolved by the Court.  It

18 seems to us that there's really only one path now.  We

19 understand Your Honor's concern to advance the case, and it

20 seems to me that the path that we have is really one to create

21 two alternatives.

22      Alternative one is the litigation or estimation

23 alternative, and I think that that alternative already has been

24 created.  It's been refined, but it's there.  In fact, we've

25 never raised this before, but in lieu of -- in light of the

52

1 fact that there is an issue about who our district judge is

2 going to be, we're also prepared -- to add to many of Your

3 Honor's burdens -- to bring that matter here.

4        It's not a matter that requires that there be a jury

5 trial, and in light of _In re Chateaugay_, which actually

6 squarely confronted this issue, this Court does have

7 jurisdiction to deal with personal injury claims, provided that

8 the functions accorded only to the Article III court, which is

9 a jury trial, are not in -- there's no impingement on those.

10        So we could actually proceed in the Bankruptcy Court

11 with respect to litigation.  But all the work in any event has

12 been done, and whatever Your Honor's guidance would be on that,

13 we would obviously appreciate hearing.  The second alternative

14 is to develop a plan, but a plan that at least at this point in

15 time does not include a settlement with respect to the personal

16 injury claims.

17        Now, that is a plan that we have devoted a lot of

18 thought to.  We hope it can mature into one that is fully

19 consensual, but in light of Your Honor's concern and, frankly,

20 our concern to advance the case, we are prepared to craft a

21 plan that we hope will be one that reflects consent and

22 agreement for all of the constituencies, all of the

23 constituencies except the bodily injury constituency.

24        This is a subject that not only we studied.  We have

25 been in conversation with other constituencies to share our

**J&J COURT TRANSCRIBERS, INC.**

1  ideas about how it might be done, and we are prepared to put

2  pen to paper and to craft that plan and to submit it to the

3  Court.

4         My partners and associates and client would urge that

5  we have 120 days to do that.  If Your Honor is intolerant of

6  that, we do need at a minimum 90 days to put that plan

7  together, particularly because we're going to have to be in

8  discourse with Mr. Austern now, and also the other

9  constituencies to try to make it something that people feel

10  that they can agree to.

11        We'll also hope that we can get agreement from the

12  bodily injury folks, as well, but we are determined, as Your

13  Honor has indicated, to advance the case, to craft this plan.

14  And then I think that we've done everything that we possibly

15  can do.  We've offered to litigate it.  We're still prepared to

16  do that.

17        We'd be -- also be prepared to offer up a plan and

18  pursue the plan.  The only other item that I wanted to raise in

19  connection with exclusivity is -- and I understand that the

20  last time I think that Your Honor heard from us in connection

21  with this case, that you underscored your desire to see some

22  progress with respect to nonasbestos claims and litigation.

23        In light of the time today, I don't know that it

24  would be a good use of our time to review exactly what we have

25  come up with, but we do have a proposal.  I have a chart here

1 that lays it all out for how to handle the nonasbestos

2 litigation.  I'd be happy to share it with counsel today.

3        I'd be happy to give Your Honor an outline of it, as

4 well, but we do have that.  We think that we've investigated

5 and we do have that in the framework and we think it would be

6 very, very handleable.  So we've been diligent in that area, as

7 well.  And for all those reasons --

8        THE COURT:  All right.  Well, much as I would like to

9 hear it, frankly, I think you ought to share it with the

10 committees and the other constituents first, because if there

11 is no objection to it, it will probably take less of my time

12 than if there is.  So I would prefer if there is going to be a

13 structure in place that -- something other than filing omnibus

14 objections to claims -- that you discuss it with the committee.

15        If what you're going to start doing is filing claims

16 objections, then I think you just need to get to it.

17        MR. BERNICK:  Yeah.  No, it is much more than that.

18 We frankly think that with respect to many, many, many of the

19 plans, mediation is the best way to go.  We think that many,

20 many of them can simply be resolved, but we have to break them

21 out by categories.

22        Some will be back saying they're personal injury

23 claims and they really have to be handled pursuant to case

24 management order procedures that we've outlined.  But with

25 respect to others, we don't think that that's necessarily so.

1 So a lot of the bulk of the claims are matters that really

2 don't have -- they shouldn't require extensive litigation.

3          THE COURT:  All right.  Well, I definitely want some

4 proposal at the next omnibus about it, but I think you should

5 share it with the other constituents first.

6          MR. BERNICK:  That's fine.

7          THE COURT:  Mr. Lockwood.

8          MR. LOCKWOOD:  I confess to a feeling of some level

9 of frustration, Your Honor, on being back on exclusivity again

10 here.  And while I acknowledge that Mr. Bernick has been

11 champing at the bit for a number of years to litigate asbestos

12 personal injury issues, and he helpfully reminded the Court

13 that I had said that, I would also point out that as a general

14 proposition in bankruptcy the debtors and their constituents

15 are encouraged to try and work out consensual plans, rather

16 than spending multiplicities and years litigating with one

17 another about the various ways in which one could slice up the

18 pot.

19          This case has now been going on for close to three

20 years, and the only offer that my committee has ever received

21 from the debtor was something that would have allowed the

22 debtor to retain 50 percent more or less of its equity.  And

23 that's in the teeth of property damage claims, personal injury

24 claims, commercial claims and the Zonelite Attic Insulation,

25 that litigation which seems to have somehow or another ground

56

1 on very slowly, but there's no near-term resolution of that,

2 even though the addendum (phonetic) involved in that would

3 dwarf everybody else's claims, to say nothing of the equity.

4      And I -- in a sense I really just don't know what to

5 say.  I mean, if the Court continues to give extensions of

6 exclusivity to this debtor, as far as I can tell, an observer,

7 the debtor is quite happy to remain in bankruptcy and talk

8 about -- in prior times we've heard sort of generalized notions

9 of, well, we'll negotiate.

10      And now, we've heard some nebulous idea there's going

11 to be some sort of a plan that's going to apparently be

12 satisfactory to everybody but my constituency that's apparently

13 been discussed with some people among the constituencies, not

14 mine.

15      THE COURT:  Well, is the issue with the ACC this

16 issue of the "unimpaireds"?  Is that what's holding up

17 progress?

18      MR. LOCKWOOD:  I would -- I couldn't say that there's

19 any particular issue.  I mean, Mr. Bernick, when we first

20 launched on this effort where he wanted to sort of litigate his

21 way into solvency here, it is true that the unimpaired claims

22 were a major piece of that litigation, but I think he had quite

23 a number of other defenses that he wanted to litigate.

24      I can't remember them all at this time, but there

25 were a lot of them and they sure weren't limited to unimpaired

**J&J COURT TRANSCRIBERS, INC.**

1 claims.  And it seems to me that the only way that this Court

2 is going to be able to move this matter along is to do

3 something that in effect forces the debtor to get out of the

4 comfortable -- apparently comfortable environment in which it

5 finds itself, and either stop granting exclusivity so they'll

6 have to worry about somebody else is going to file a plan that

7 might get voted on, or at a minimum, certainly not give them

8 another six months, which is what the pending request is here.

9           It's true that Judge Wolin's situation has left

10 things in a bit of a state of flux at the moment, but just

11 continued grants of exclusivity at six months intervals,

12 frankly, Your Honor, we're going to be here forever, as far as

13 I could tell.  And this other thing about the nonasbestos

14 claims litigation, mediation, I mean, I don't even know what

15 claims we're talking about there.

16           THE COURT:  I don't either.  That's --

17           MR. LOCKWOOD:  Much less --

18           THE COURT:  -- why I want them to meet with you.

19           MR. LOCKWOOD:  -- whether they involve the Zonelite

20 Attic Insulation, which I hope we'll hear some kind of a

21 progress report on, because I for one haven't heard anything

22 about it in months.  Thank you, Your Honor.

23           THE COURT:  Well, can we move to the ZAI progress

24 report first and then get back to the exclusivity issue?  Could

25 I get a progress report on ZAI, Mr. Restivo?

58

1          MR. RESTIVO:  Good afternoon, Your Honor.  I believe

2 Mr. Westbrook and I think also Mr. Scott are representing those

3 ZAI claimants are on the line.

4          MR. WESTBROOK:  That's correct, Your Honor.

5          THE COURT:  Okay.  Thank you.

6          MR. RESTIVO:  Your Honor, around July of 2002 this

7 Court issued case management orders submitted by the parties

8 and case budgets with respect to the ZAI claims.  In the

9 ensuing 10 months since those orders were issued and pursuant

10 to the CMO order issued by the Court, the parties engaged in

11 the following, Your Honor.

12          Over 500,000 pages of documents were produced,

13 reviewed, indexed by each side.  Multiple sets of written

14 discovery were served and responded to.  That included

15 interrogatories, request for admissions, document requests.

16 There were numerous confer and consult sessions over discovery

17 disagreements.

18          All of those were resolved without the need to get

19 guidance from this Court.  Thereafter, the ZAI claimants took

20 the depositions of five former Grace employees and those

21 depositions took place in Florida, South Carolina,

22 Massachusetts and California.

23          The debtor took the depositions of 13 fact witnesses

24 identified by the ZAI claimants, and those depositions took

25 place in Spokane, Tacoma, Minneapolis, Virginia Beach,

**J&J COURT TRANSCRIBERS, INC.**

1 Washington, D.C., Vermont, Charleston, South Carolina and other

2 places.  Pursuant to the case management order, the ZAI

3 claimants got expert reports.  They had seven experts.

4          Grace filed expert reports.  We have five experts.

5 Each of those 12 experts were then deposed by the parties.  At

6 the end of the process we gave the Court a status report as to

7 where we stood.  We requested an increase in the trial budgets,

8 which the Court did.

9          And on July 7, both sides filed multiple motions for

10 summary judgment, motions for partial summary judgment and

11 motions to limit testimony under the Daubert standards.

12 Pursuant to this Court's order on August 8th, each side

13 responded to the other side's motions, and then on August 18

14 each side replied to the responses of the other.

15          And at that time, all of those materials were placed

16 in binders for the Court, and my recollection is, Your Honor,

17 the parties submitted to the Court 13 binders of material.  At

18 that point, Your Honor, the parties jointly asked the Court to

19 defer argument so that some discussions could be held, and the

20 Court did that.

21          The parties have had a number of discussions, all of

22 which have been conducted in an atmosphere of cooperation.  And

23 the discussions on occasion included representatives of

24 traditional property damage claims, as well as representatives

25 of the ZAI claimants.

**J&J COURT TRANSCRIBERS, INC.**

60

1          In those discussions, Your Honor, a lot of concepts
2   have been discussed.  Some of the concepts do depend upon what
3   progress is made or not made with respect to the bodily injury
4   cases.  The parties, Your Honor, intend to continue such
5   discussions, intend to closely monitor progress, if any, with
6   respect to bodily injury claims.

7          But in the meantime, we've agreed we really need to
8   have a strategy for going forward.  And so Your Honor, today
9   the parties are requesting that the Court give us one and a
10  half days in either October or November for oral argument on
11  the outstanding motions.

12          Obviously, if there's some resolution before then
13  consensual with ZAI claimants, or with ZAI claimants and
14  property damage claimants, we would advise the Court and we
15  wouldn't need to argue the motions.  On the other hand, we
16  think in order to move forward we should take the day and a
17  half that the Court had set aside, and then deferred at our
18  request set it up in October or November, depending on the
19  Court's calendar.

20          And if these matters are not resolved then, we would
21  then argue those motions.  In addition, Your Honor, we would
22  like to submit to the Court a motion to increase the budget,
23  since I think both sides are either up to or indeed maybe a
24  little bit over the budgets, but we need to talk about that and
25  we would submit our motion.


**J&J COURT TRANSCRIBERS, INC.**

1          And so the status report is that the most of the
2  heavy lifting has been done.  The next heavy lifting will be
3  argument, and the Court's digestion of 13 volumes of material,
4  and we would like to do that in either October or November, and
5  have a day and a half to do that.

6          THE COURT:  Okay.  Let me think about the day and a
7  half.  Mr. Westbrook or Mr. Scott, do you have any comments to
8  make?

9          MR. WESTBROOK:  Your Honor, Ed Westbrook from South
10 Carolina.  Mr. Restivo, as usual, Your Honor, has
11 comprehensively summarized what has occurred and where we are.
12 I would just add that I think that both sides know enormously
13 more about each other's position now then we did when we began,
14 and I think that the schedule that Mr. Restivo has outlined
15 would permit us to continue our discussions and get to, if the
16 Court's schedule permits, get to a hearing, if that's
17 necessary, in due course.

18         THE COURT:  Okay.  Mona, did you get into the
19 calendar?

20         THE CLERK:  Yes.  Oh, we didn't get that far; that's
21 why.  That's right before Nancy BJ and that's probably not very
22 good.  This is probably better.

23    (Court and clerk confer)

24         THE COURT:  Okay.  How about October 18th and 19th?

25         MR. WESTBROOK:  Your Honor, this is Ed Westbrook.

62

1 That would be fine from our standpoint.

2       MR. RESTIVO:  And that's fine from the debtor's

3 standpoint, Your Honor.

4       THE COURT:  Okay.  That will be on October 18th

5 starting at 9:00 a.m.  That's a Monday, and continuing onto

6 Tuesday, October 19th, here in Pittsburgh.  I take it since

7 it's a day and a half you'll both be here; you're not going to

8 try to do a phone hearing for a day and a half, correct?

9       MR. WESTBROOK:  No, Your Honor.  I'll be there.

10       THE COURT:  All right.  Okay.  Thank you.  Okay.

11 Mr. Bernick.

12       MR. BERNICK:  Yeah.  I just want to come back to the

13 exclusivity motion and just respond very, very briefly to Mr.

14 Lockwood.  First, he's taking the liberty of talking about some

15 of the substance of our settlement discussions, and put out a

16 figure that's somewhat misleading; the 50 percent equity figure

17 is somewhat misleading.

18       Actually, under the debtor's -- on the debtor's books

19 and records as of the time that it went into Chapter 11 it had

20 already created a very, very substantial reserve for the

21 payment of personal injury claims.  So actually, if you took

22 the personal injury claims out and calculated the entire equity

23 that would be there for purposes of, in a sense, dividing up

24 the pot, there'd be much less than 50 percent equity that we

25 were actually talking about.

1          We're actually talking about a very discrete sum of

2 money.  That's how it's always been put by the debtor.  It is

3 actually a modest sum of money, and while he might find it

4 outlandish that others might be prepared to agree to this

5 resolution that he talks about, all the other kinds of

6 litigation that are there, the fact of the matter is that it's

7 solely with respect to the bodily injury constituency that we

8 have a problem reaching consensual resolution, I think in part

9 because they're worried that in some fashion they're creating a

10 benchmark by letting us have any equity, that then somehow

11 carries over to the other cases.

12          Be that as it may, we are at an impasse, and the only

13 question therefore is, how can we resolve that impasse, and

14 we're exploring both dimensions, either litigation, which we've

15 suggested since the outset, or a plan.  And the proof of the

16 pudding is in the plan that's going to take us 90 days to do.

17          I will say also, though, that Your Honor asked a very

18 good question, which is, is the reason that we're at an impasse

19 because of asymptomatics?  In the case of Grace, they so-called

20 asymptomatic for nonmalignant claims actually are a very

21 important part of the equation.

22          If all you do is focus on the malignant side of the

23 picture, the malignant claims, if you use even very, very

24 aggressive valuations of those claims in the very aggressive

25 models for modeling out, how much would it cost to resolve all

64

1 the meso claims, as an example, even under their theories the

2 debtor is solvent; there's equity left.

3         So what happens to the asymptomatics or the

4 nonmalignants is a turnkey in this case in a big way.  Again,

5 we'd always posed that it be done through litigation, but there

6 are also ideas that we have to explore in terms of a plan if

7 we're dealing with the so-called asymptomatics.

8         So we need 90 days.  I think we're demonstrating to

9 the Court, just as Mr. Restivo has demonstrated to the Court

10 together with the concurrence of Mr. Westbrook, the progress

11 that's being made on ZAI.  With respect to the personal

12 property damage claims, again, it's always been Grace's view

13 that those are amenable to resolution, and we've got no

14 indication to the contrary.  We think that an agreement can be

15 reached there.

16         So it does come back to the bodily injury people, and

17 now we're going to take the last step with them, which is to

18 propose a plan that basically tries to resolve this case,

19 albeit not on the basis where we have complete agreement with

20 them.  So give us a chance; we'll see how it looks.

21         THE COURT:  Mr. Lockwood.

22         MR. LOCKWOOD:  Well, all I can say is that I just sat

23 here and heard that we're going to spend five months

24 negotiating on the ZAI side for a hearing on October the 18th

25 and 19th on matters which, as described by Mr. Restivo, have

65

1 been -- discovery has been completed on.

2        Experts have been consulted and everybody is ready,

3 in essence, to go, but we're going to have five months worth of

4 negotiations, I guess, or something.  I mean, thee's just no

5 urgency to this case, Your Honor.

6        THE COURT:  Well, the problem is --

7        MR. LOCKWOOD:  And if Mr. Bernick wants to litigate

8 with us whether or not -- he helpfully equates "asymptomatics"

9 with "nonmalignants."  Even Mr. Bernick knows better than that,

10 and the Supreme Court of the United States in the Norfolk and

11 Western case just decided that asbestosis, as a matter of

12 federal law, is a compensable disease.

13        Last time I looked, something like 75 percent or more

14 of the nonmalignancy claims are for asbestosis, and what people

15 want to litigate here in the teeth of the Supreme Court

16 decision in Norfolk and Western is whether or not as a matter

17 of law we're going to have ILO requirements for specific types

18 of x-ray reading made part of a body of a law that would be

19 imported into -- through the bankruptcy case, when the United

20 States hasn't seen fit to do so.

21        Yeah, I'm quite sure that the nonmalignancy claims

22 make up 50 percent or so of the value, give or take 10 percent,

23 of what our expert would estimate value of the claims are,

24 whether or not the remaining 50 percent, particularly if they

25 were treated as litigation claims for mesothelioma and lung

1 cancer, as opposed to let's use settlement history the way, as

2 Your Honor is familiar, the experts traditionally evaluate

3 these claims, would leave any equity for the debtor.

4     I'm somewhat dubious.  We were embarked in the USG

5 cases, as Your Honor is familiar, on a cancer only estimation

6 before Judge Wolin, until that got sort of blown off the

7 tracks.  But suffice it to say that, you know, basically, we're

8 still in a kind of wait and see mode with this debtor three

9 years into the case.

10     And I have no idea from sitting here and listening to

11 Mr. Bernick this morning, maybe the Court is more prescient

12 than I am as to what Mr. Bernick's plan that he's going to lay

13 on us in the next 90 days is going to look like, although from

14 the description of it, it sounds like something that my

15 constituency is not likely to be enamored of, given the way in

16 which he described everybody else as being cooperative and my

17 people aren't.

18     THE COURT:  Well, I don't know what his plan is --

19     MR. LOCKWOOD:  I guess we'll see in the fullness of

20 time.

21     THE COURT:  -- I don't know what his plan's going to

22 be either, Mr. Lockwood, but the reality is, that all of these

23 plans are just pot plans.  The only question is, how much of

24 the pot goes to any one side.  And you know, from the debtor's

25 point of view, I don't know that the debtor really has that

67

1  much of an issue with -- the debtors; other parties may -- with

2  respect to the fact that they're going to commit x dollars to

3  the constituency personal injury people and let you divide it

4  up how you want.

5          The question is whether you're going to decide that

6  that pot's big enough.  And maybe that's what the issue has to

7  be and maybe that doesn't even really take too much of an

8  estimation.  It may be a liquidation alternative analysis.

9          MR. LOCKWOOD:  I have no idea, Your Honor.

10          THE COURT:  I don't, either.

11          MR. LOCKWOOD:  And furthermore, I confess to some

12  interest to seeing what the negotiations on the ZAI front are

13  going to be, because that's a pretty big claim and I don't hear

14  my constituency being invited to have any input into that,

15  either.  But I will state right now that we haven't delegated

16  to the debtor the authority to make any kind of a deal they

17  want to in terms of your pot plan analysis as to how big the

18  ZAI share of that's going to be.

19          THE COURT:  Oh, well, I -- if they have some

20  settlement they're going to have to bring it, just like if they

21  have a settlement with the ACC, they're going to have to bring

22  it, if it's not done through a plan.  If it's done through a

23  plan, that's a good vehicle for getting all these objections

24  raised.

25          MR. LOCKWOOD:  Exactly, which is the --


**J&J COURT TRANSCRIBERS, INC.**

68

1          THE COURT:  We'll just have one nice, mass hearing.

2 Shall I reserve a date now for it, like --

3          MR. LOCKWOOD:  Well, Your Honor, we might have a

4 quicker date if Your Honor limited the grant of exclusivity or

5 denied it all together.  Then --

6          THE COURT:  Well, I'm not inclined to deny it right

7 now, Mr. Lockwood, but I am, like you, getting a little

8 frustrated with the fact that I don't have a plan on the table.

9 So I think I am going to give the debtor a last period of

10 exclusivity, and that's what it's going to be, a last period of

11 exclusivity to get this done.

12          I think Mr. Restivo and Mr. Westbrook have their

13 orders in the status conferences that have been provided to me

14 as this has gone on.  I've been trying to get them settled.  I

15 understand that they are sort of in lockstep with the ACC.  I

16 don't think it has to be that way, because they want to see

17 what the settlements are going to be there.

18          I think at this point in time they ought to just

19 figure out whether they can come to some negotiation on their

20 own.  And if they can, fine, and it'll be in the plan.  And if

21 they can't, then I guess the debtor will do whatever the

22 debtor's going to do, and we'll be litigating with everybody

23 instead of just a few people.

24          MR. LOCKWOOD:  Thank you.

25          THE COURT:  All right.  Mr. Bernick, Mr. Lockwood was

1 concerned about six months because that's what your motion asks

2 for.  Frankly, I think that's the good period of time.  I think

3 I should extend the debtor's exclusive period for six months

4 and -- but not to file a plan.  I think the initial plan should

5 be filed, if not within 90 days, at least within 120 days,

6 because in all probability it's going to need some

7 modifications in these cases.

8        They're -- it's very unlikely that it's going to get

9 through without some.  So frankly, my preference would be 90

10 days to get a draft of a plan proposed.  I think that will get

11 the parties to the table, and see how it goes.  And if you want

12 to try to work out dates for disclosure statement and plan

13 hearings, I'm willing to do that.

14        So why don't you see what you can work out with the

15 constituents, put it back on the list for next month, and we'll

16 try to set dates.  But that's assuming, of course, the debtor's

17 going to honor this commitment to get something on the table in

18 90 days.

19        MR. BERNICK:  I said that we would do it, and I

20 wouldn't have said that if I didn't have the expectation that

21 that's exactly what we're going to do.

22        THE COURT:  All right.  I'll take an order, then,

23 that we'll extend exclusivity for six months.  It will be

24 subject, in this instance, to termination for cause if there is

25 some cause shown by another party.  And in all probability,

70

1 it's not going to be extended again unless we happen to be in a

2 plan process where I think it would be unfair at that point not

3 to extend it.

4        But if I don't have a plan that's on track and headed

5 toward the confirmation arena, if nothing else, I don't think

6 there will be another extension.  Do you have an order, or do

7 you need to submit one?

8        MR. BERNICK:  I think we're going to --

9        MS. BAER:  We'll submit one, Your Honor.  The last

10 one had dates in it that wouldn't be applicable.

11        THE COURT:  All right.  I'll take an order when it's

12 submitted on a COC.

13        MR. BERNICK:  All right.  Your Honor, if I could turn

14 to items eight and nine, I believe that they are.  And if, with

15 the Court's indulgence, I think it might be appropriate to take

16 them up at the same time because they relate to would-be

17 claimants, and they're really kind of -- they're part of a

18 sequence.

19        THE COURT:  That's fine.

20        MR. BERNICK:  I'd like to underscore the importance

21 of this.  This is no longer just a question of contempt

22 sanctions.  What's now happened is that we have a problem that

23 really does threaten to unravel a very carefully preserved

24 status quo position, vis-à-vis the tort claimants, one that Mr.

25 Lockwood and his committee and his clients have been good

71

1  enough to respect and honor, and one that the Libby claimants

2  alone have seen fit not to honor.

3          I'd like to go back for just a moment and to just

4  remind the Court, I think that the Court probably doesn't need

5  any reminding, of how clear Your Honor was regarding the

6  contempt that's now been found.  Your Honor said at page 60 of

7  the last transcript:

8          "Look, let me make this clear.  It is contempt.  It

9  is a direct contempt.  This is a contempt of the automatic

10 stay, let alone the preliminary injunction as to CNA.  It's

11 also a contempt of Judge Wolin's orders."  At page 62 you said:

12 "I don't know a more clear contempt."

13         The conduct that gave rise to those kinds of

14 observations was part of a pattern that actually goes back to

15 the very beginning of the case.  The Libby claimants through

16 their counsel have repeatedly represented or suggested to the

17 Court that somehow they were not aware of the original

18 preliminary injunction, because they didn't "receive notice of

19 it."

20         The fact of the matter is that Mr. Heberling's firm

21 was on the service list.  Mr. Heberling represents people on

22 the committee.  This was a matter of public record.  It was the

23 most substantially contested matter at the beginning of the

24 case; not, I will add, by the tort claimants' committee, but by

25 other interested parties.

72

1        Not only did they take the position that they didn't
2   know when they did, but they then pursued litigation on their
3   own without giving any prior notice to the Court or any prior
4   notice to the debtor.  It was only later that they decided to
5   service discovery requests, and when we said no they said, oh,
6   well, we need clarification; we need clarification.

7        There was no clarification necessary.  What they're
8   doing -- what they were doing was in violation of that
9   preliminary injunction.  Then we have the strategic response
10  that they offered up to Judge Wolin's opinion.  Your Honor went
11  through this last time, the scheduling order, the amended
12  complaint.

13       There was a pattern of conduct and that pattern
14  continues today.  Let me talk about what's happened since Your
15  Honor last devolved upon this subject in February.  Number one,
16  they still have not withdrawn their amended complaint, the
17  amended complaint that specifically names Grace, that
18  specifically names CNA, that makes allegation after allegation
19  relating to Grace.

20       And actually, if you read the complaint, they ask for
21  relief against the defendants without excepting Grace.  The
22  include conspiracy charges with respect to Grace, specific
23  allegations with respect to Grace.  That complaint has not been
24  withdrawn.

25       Number two, notwithstanding Your Honor's remarks last

1  time, they seek to revisit the merits of the contempt finding,

2  arguing that somehow they'll get off the hook if the Court of

3  Appeals later finds that there wasn't jurisdiction for the

4  preliminary injunction.

5      That contention, that yet repeated contention ignores

6  what they did in violation of Judge Wolin's order.  It ignores

7  their conduct with respect to CNA.  It ignores their conduct

8  with respect to Grace.  None of those three things can be

9  affected by any matter now before the Court of Appeals.

10     Their violation of the order that they seek to

11  affirm, Judge Wolin's order, that's not going to be exonerated

12  or somehow expunged by what the Court of Appeals does.  Their

13  continued pursuit of claims against Grace is not going to be

14  exonerated, and their pursuit of claims against CNA is not

15  going to be exonerated.  Nothing that the Court of Appeals'

16  done can somehow wipe clean their misconduct in the past.

17     Number three, they seek a stay with respect to the

18  finding of contempt and the imposition of sanctions, and they

19  acknowledge in that process that they have to meet certain

20  requirements.  And yet, you don't see any kind of proof that

21  they meet those requirements.

22     They have to show probability of success on the

23  merits.  They make absolutely no argument with respect to the

24  underlying merits.  They say that they have to find irreparable

25  harm.  How can there be irreparable harm for a money damage

1 sanction against the plaintiff's firm?  Are the sanctions
2 wrong?

3       Grace is there; we can give the money back.  And
4 somehow, again, to argue that somehow public policy is served
5 by a stay.  The most important public policy is to send an
6 unequivocal message that these people have to stop.  That then
7 brings me to the last chapter of what's happened since that
8 time, that is February, which is that they've opened up a whole
9 new series of problems and the conduct continues with respect
10 to discovery.

11       And this is a very, very significant matter, these
12 perpetuation for preservation depositions.  From day one in
13 this case the debtor was concerned with people finding a back
14 door to continuing litigation against Grace.  This is the
15 problem with asbestos litigation.  It kind of meanders around
16 and it finds the little chinks.

17       And as a result, this debtor -- and we were in court
18 day one to prevent that from happening.  And again, the
19 asbestos claimants' committee was very cooperative in that, as
20 they have been in other cases.  Almost all tort claimants have
21 been cooperative.

22       Tens of thousands of claimants have not sought to
23 initiate discovery, have not sought to impose litigation in
24 this process without permission of the Court.  Libby counsel
25 alone have persisted and they're not on the verge of being

75

1 rewarded.  How so?

2          Well, the first thing that they did is that they
3 convinced Judge Wolin that to allow the continued prosecution
4 of these so-called independent claims would impose no burden on
5 Grace.  And Judge Wolin's opinion says:  "It is clear that the
6 debtor's estate will in no way be affected by a remand of the
7 independent claims."

8          Going on in the same page, Judge Wolin says:  "The
9 burden on Grace is insignificant."  They also told you, number
10 two, that they only intended to take one preservation
11 deposition.  This was back on September 22nd.  Your Honor is
12 nodding.

13          This page cite is to page 33:  "We do intend to
14 notice that single deposition."  That is what they said at that
15 time.  What is the status today?  Well, the one deposition now
16 has been three depositions that have been taken, and they want
17 10 depositions and they want more.

18          They want open license to go take any kind of
19 preservation deposition they want.  They've got a doctor who
20 will, of course, say all of these people in fact are in
21 extremis.  So one has become 10 has become an indefinite
22 number.  Number two --

23          THE COURT:  Well, have the three people whose
24 depositions were taken died?

25          MR. BERNICK:  I don't know.

1          THE COURT:  Well, that may be some indication of

2     whether or not they were in extremis.

3          MR. BERNICK:  I don't -- I don't know.  I --

4          THE COURT:  Well, perhaps somebody can tell me.

5          MR. BERNICK:  Yeah.  Number two is, they haven't

6     confined the depositions to any kind of medical evidence.

7     They've opened the depositions up, by their own admission, to

8     matters that implicate the interests of Grace, exposure

9     matters, occupational exposure matters.

10          Number three -- Grace facts.  Number three, they seek

11    to use all of this against Grace, specifically against Grace.

12    They say, these are our proofs of claim; this is the evidence

13    that we will offer against Grace.  And oh, by the way, case

14    management.  Well, we have our own case management procedure

15    that we'd like the Court to endorse.

16          They've now got document discovery categories that

17    they are prepared to negotiate.  They now say, let the Montana

18    courts enter the whole thing, they'll supervise these

19    depositions; don't you worry.  What is the effect of all of

20    this?  The effect, number one, is to give plain lie to what

21    they said to Judge Wolin regarding how this is no burden on

22    Grace.

23          This is very interesting.  The last time that they

24    were here they actually represented to the Court when you

25    confronted them with the fact of the allegations they've made,

1 Mr. Cohn says:  "It's the debtors just inherently involved --

2 the debtors are inherently involved in our 'independent claims

3 against Maryland Casualty in the sense that,'" and the Court

4 then interrupted the dialogue.

5         So it's kind of a contradiction in terms to say, just

6 inherently involved, on the one hand, and independent claims on

7 the other.  But one thing is for sure, which is that there's a

8 burden to Grace, we're now facing the prospect of all these

9 depositions being taken, having to prepare for the depositions,

10 deal with the exposure facts, having to deal with all the other

11 facts that relate to the prosecution of a personal injury

12 claim.

13         It's given lie to what they told Judge Wolin.  They

14 now admit this in open court before Your Honor.  And they now

15 have given lie to the whole idea of case management.  Somehow,

16 they are entitled to their own case management order,

17 notwithstanding the fact that the committee that represents

18 tens of thousands of claimants has been prepared to abide by

19 whatever determination is made by the Court in how case

20 management should proceed.

21         Their only argument at the end of the day is that

22 somehow they -- we acquiesced in all of this unfolding

23 development.  And I have to say, Your Honor, they did lead us

24 down the garden path.  They cite a letter, October 15 of 2003.

25 We assume that this was the one deposition.

1      It was a deposition that had already actually been
2 taken.  So okay.  It's one deposition.  It's a past deposition.
3 No big deal.  So we didn't say anything in response to this
4 letter, because it seemed to us it had already been covered.
5 Then they sent out a notice on November 10, 2003, somewhat
6 emboldened by our failure to object vigorously to the October
7 letter.

8      They say:  "Please find enclosed copies of orders
9 from the Workmans' Compensation Court allowing me to take pre-
10 litigation perpetuation depositions of Louie O'Brien."  Okay.
11 So they're not telling us, well, these are orders from the
12 Workmans' Comp court.  There's no indication, no mention at all
13 about proofs of claim, no mention at all about the bankruptcy
14 process.

15      So they go ahead and take the depositions and then
16 they say, oh, guess what, now that we took the depositions,
17 there are people who had a similar interest to your own who are
18 representing your interest there; you don't really need -- you
19 don't really care about these depositions.

20      So they've already now taken the depositions, no
21 longer Workmans' Comp depositions.  They're actually intending
22 to use them, and that's exactly what they've now done.  They've
23 now said, okay, well, let's just continue on the path, we're
24 taking these all in the Workmans' Comp case, but by the way, we
25 intend to use them in the bankruptcy case.

**J&J COURT TRANSCRIBERS, INC.**

1          We did get led down the garden path, and it's now
2 time to stop, because this may now seek approval.  They say,
3 well, now we're coming into the court to ask for permission.
4 Does that sound familiar where they go down a path -- they lead
5 people down a path.

6          They say, oh, well, everything's okay; then only
7 later do they come back in and ask for permission.  Their
8 conduct, their malfeasance continues.  It's time for it to
9 stop.  Nobody else in the entire case enjoys the privilege of
10 being able to conduct personal injury litigation related to
11 asbestos exposure.

12          That's been the precept of this case since day one.
13 It ought to be followed here.  These people should be found in
14 contempt, and the sanction that we've asked for actually is a
15 modest one.  Your Honor only asked for the fees and expenses
16 that were associated with the last contempt motion.

17          Doesn't say anything about what we're now incurring,
18 and certainly, nothing about the entire course of conduct that
19 preceded the contempt motion.  So we think that the contempt
20 sanctions are warranted, Your Honor.  We'd ask that they be
21 awarded and that there be no further perpetuation depositions,
22 that it come to a halt right now.

23          If they want to then come back in, make application
24 to the Court and explain how it is that they made the
25 misrepresentation to Judge Wolin, we can take that up in

80

1 appropriate time.

2        THE COURT:  Well, I'm not willing --

3        MR. BERNICK:  But today, it should be denied.

4        THE COURT:  -- I'm not willing to say that no further

5 perpetuation depositions can be taken, because in fact, if

6 there is somebody who is literally dying or within a -- you

7 know -- several months, according to what the best medical

8 evidence would provide, I think it's appropriate to take those

9 depositions.

10        But I think it can be done on a motion by motion

11 basis with some medical evidence attached that indicates why

12 that deposition needs to be done.  I haven't required that in

13 the past.  I haven't seen the need for it, but I think I do see

14 it now.  So I'll simply modify -- at least as to the Libby

15 situation.

16        I don't think there have been that many notices going

17 forward in other cases.  So maybe it's not necessary to even

18 modify it there.

19        MR. BERNICK:  Well --

20        THE COURT:  But if it is, okay.

21        MR. BERNICK:  -- the problem, and Mr. Lockwood can

22 address it, is that I am sure, as I sit here today that there

23 are many, many other claimants that are really picked up within

24 his constituency who are mesothelioma victims.

25        THE COURT:  There may be.

1          MR. BERNICK:  And who have the same and perhaps a
2  better in extremis case.

3          THE COURT:  There may be, but I still think the order
4  that I entered with respect to the injunctions indicates that
5  if there is a situation where deposition testimony needs to be
6  perpetuated, I'll permit it.  What I want, though, is some
7  evidence that it needs to be, because quite frankly, it's very
8  difficult to see how this many depositions are coming up in one
9  specific area so suddenly.

10          THE COURT:  Mr. Cohn.

11          MR. D. COHN:  Your Honor, we have heard much about
12  impaired claims, unimpaired claims, asymptomatics.  None of
13  that applies to Libby.  In Libby you have approximately 500
14  people, all of whom indisputably are seriously ill and are
15  headed toward death.  Not all of them, of course, are going to
16  die in the next few months.

17          THE COURT:  Yes.  And that's the issue for the
18  depositions.

19          MR. D. COHN:  We have asked for nine depositions.
20  Three of them were already taken in Workers' Comp cases and
21  we're simply asking Grace to review the transcripts, which we
22  have provided.

23          THE COURT:  A Workers' Comp case for somebody who's
24  near death?

25          MR. D. COHN:  Yes, Your Honor.

1        THE COURT:  Why haven't they received Workers'

2 Compensation since the injury was -- were occurred?

3        MR. D. COHN:  Apparently, these cases go on for some

4 time, Your Honor, but unfortunately, I'm not completely

5 familiar with the process, except to tell you that they are --

6 that Grace has Workers' Comp coverage.  There is a Workers'

7 Comp insurer, Transportation Insurance, and that process is

8 wending its way through the Workers' Compensation court in

9 Montana.

10        THE COURT:  Well, it may, but that doesn't mean that

11 there -- that the depositions are authorized by this Court

12 pursuant to the perpetuation issue.  Just because somebody has

13 a Workers' Comp claim doesn't mean that you can get a

14 perpetuation deposition.  The purpose was in extremis.

15        MR. D. COHN:  I -- no, Your Honor.  I absolutely

16 acknowledge that.  And the only reason -- there are, by the

17 way, many of these Workers' Comp cases wending their way

18 through, but the only ones as to which we ask perpetuation

19 depositions are for those who are seriously ill and believed to

20 be near death.

21        THE COURT:  And did they die, the three people whose

22 depositions were taken?

23        MR. D. COHN:  They have not, Your Honor.

24        THE COURT:  And how long ago were the depositions?

25        MR. D. COHN:  One of them I think was in October and

83

1 the other two were in December.

2         THE COURT:  That --

3         MR. D. COHN:  Well, but Your Honor, what you need to

4 understand, what you need to understand though about the

5 condition of these people is, the issue is not simply death.

6 The issue is that as you approach death, you know, one of these

7 people has one lung.  That's it.

8         Another one is unable to walk more than 10 feet.

9 These people can barely breathe.  They are suffering a death by

10 slow strangulation and it is true, Your Honor --

11        THE COURT:  Mr. Cohn, I had a parent who just died of

12 a very similar, not mesothelioma, but I understand what they go

13 through, and I also understand that there is a period of time

14 at which the deposition is appropriate.  But nearly a year

15 before that event happens does not to me in extremis.

16        MR. D. COHN:  Well, but -- well, Your Honor, the --

17 during the period when they are breathing with increased

18 difficulties in which they are strangling, in which they can't

19 walk anymore, there is a -- first of all, medically, you cannot

20 predict exactly when.

21        THE COURT:  Of course.

22        MR. D. COHN:  They're just going to run out of gas,

23 Your Honor, and just die.  And second, Your Honor, even as you

24 approach that point, there also is a point where you may not

25 realistically be able to take their deposition.  They need to

84

1 be able to breathe in order to talk, and they need to be in

2 sufficient condition in terms of the drugs that they're taking

3 for the pain and so on, to have their depositions taken.

4        THE COURT:  That's fine.  That's what I said.  From

5 now on, I want the evidence, the medical evidence submitted to

6 me on a motion on a witness by witness basis.

7        MR. D. COHN:  Exactly, Your Honor.  Now, we have --

8 and by the way, we --

9        THE COURT:  Including the ones you're asking for now,

10 because I don't have that medical evidence.  I want to know

11 from a doctor, and then if the debtor or the committee decide

12 that they want to get some other medical expert within the

13 period of time within this motion is submitted to look at the

14 criteria or examine a person, they can do it, and then I'll

15 know whether it's consented or not consented.

16        I'm not going to face these issues in the future.  So

17 just whatever order comes out today with respect to anything

18 other than these perpetuation depositions, that is continued

19 till next month.  I want you to submit the medical evidence and

20 a doctor's analysis.

21        I believe the doctor's opinion is there, and that

22 way, the -- everybody else will have whatever the case

23 management order provides for a period of time, to analyze it

24 and see if they want to contest them.

25        MR. D. COHN:  Your Honor, the --

85

1          MR. BERNICK:  I'm sorry.  Can I make a suggestion,

2 Your Honor, which is that the doctor's letter that they have

3 tended to provide --

4          THE COURT:  Yes.

5          MR. BERNICK:  -- is literally a form letter.

6          THE COURT:  Yes, it is.

7          MR. BERNICK:  It all comes from the same doctors, the

8 same doctor who basically has advanced their cause for many,

9 many years.  It seems to us in light of the threat that this

10 poses to this proceeding there ought to be some independent

11 verification.  One of the -- one --

12          THE COURT:  That's what I'm saying.  If the debtor

13 want it, they can get it.  With respect to this doctor,

14 however, a form letter is not going to do it.  I want a

15 diagnosis on a person by person basis, and I want to know that

16 the doctor has actually seen the person and evaluated the

17 condition.

18          MR. BERNICK:  One of the deponents actually was

19 deposed, not just within the last year, but in January of '03.

20 So we're talking about 18 months ago.  Still not --

21          MR. D. COHN:  There is, Your Honor, an issue as to

22 the depositions that have already been taken, Your Honor.

23 Let's assume for the moment that the medical criteria are met

24 for those people.  In this --

25          THE COURT:  Medical criteria for what?


**J&J COURT TRANSCRIBERS, INC.**

1        MR. D. COHN:  Medical criteria for being near death
2 or near a condition --

3        THE COURT:  Okay.

4        MR. D. COHN:  -- in which their depositions will no
5 longer be able to be taken.

6        THE COURT:  All right.

7        MR. D. COHN:  There is an issue of both practicality
8 and decency involving those people, Your Honor.  And that is,
9 they have been deposed.  Their transcripts are available.  They
10 were provided to Grace.  And the question is whether Grace can
11 review those transcripts.

12        They already have and they've said as to two of them
13 that they didn't think that there was going to be a need to
14 redepose them, but perhaps they're changing their tune here
15 today.  But if they're going to change their tune, would they
16 -- can we please direct them to do it quickly so that they can
17 then come in and take it?

18        THE COURT:  Okay.  What's the purpose -- if the
19 deposition was only for a Workers' Comp claim, not for purposes
20 of asbestos litigation in this case court or some other court,
21 why do they need to be bothered with it?

22        MR. D. COHN:  Well, when you say for purposes of,
23 what we are seeking to do is to use the same deposition that
24 was done in the Workers' Comp case.

25        THE COURT:  Did I approve it?  Did I approve the

1  deposition?

2          MR. D. COHN:  That's the question of the motion that
3  goes to retroactive approval.

4          THE COURT:  I'm not -- I am not retroactively
5  approving things.  Your firm has been doing things on a nunc
6  pro tunc basis since the outset.  I've been -- I've told you at
7  the last hearing, I'm not doing that anymore.  You know how to
8  get here before me in a timely basis.  I'm not approving a nunc
9  pro tunc deposition use in this case for something I didn't
10  approve at the outset.

11          MR. D. COHN:  Then we'll -- then we shall proceed
12  accordingly, Your Honor.  So then is that --

13          THE COURT:  If you want to renotice them, you know,
14  if it's necessary to renotice them then -- or if the person
15  really is so near death that it can't be done, you can tell me
16  that on a doctor's, as I said before, person by person
17  evaluation and I'll certainly take a look at that.  But I'm not
18  going to approve it nunc pro tunc without that information.

19          MR. D. COHN:  Well, then we will -- okay.  Then we
20  will come before you with the information as to these -- as to
21  the people that we've asked to be able to perpetuate their
22  testimony.

23          THE COURT:  All right.

24          MR. D. COHN:  On a case by case basis.  And I guess
25  we should just expect that we'll file those within the very

1  near term and have them heard at the next -- omnibus hearing.

2  THE COURT:  Yes.  I'm sure.  It -- I don't know what

3  the dates are.  I can't tell you, Mr. Cohn, but I think it's --

4  there's still time to get it onto the June agenda.  You might

5  have to -- we might have to consolidate the dates a little, but

6  I'm willing to do that.

7  I think if they do need their testimony perpetuated,

8  then the Court shouldn't dilly-dally, and I don't intend to.

9  But I do want the things put into a mechanism where I can

10 understand all of the evidence that's there, and give the other

11 parties a chance to see if they have some objection.

12 MR. D. COHN:  Well, thank you, Your Honor.  And you

13 did make this very clear on September 22nd, and we appreciate

14 your, you know, standing by that now, and we will go forward.

15 We will attempt to take as few of these as we can, given our

16 responsibilities to our client, and we'll provide the evidence

17 that everybody needs to evaluate them.

18 THE COURT:  All right.  What's your position with

19 respect to the amount of the sanction that the debtor's asking

20 for?

21 MR. D. COHN:  Your Honor, we filed our papers.  The

22 amount of $61,000, I know there are people here who are dealing

23 with billions of dollars in this case, can just shrug it off as

24 being not a meaningful sanction, but when you're talking about

25 some lawyers who have devoted, really, the substantial part of

1  their practice to representing these people at Libby and

2  they're -- you know -- they're small town lawyers in Montana.

3  A sanction --

4          THE COURT:  With 500 clients dying of mesothelioma?

5          MR. D. COHN:  Yes, Your Honor.

6          THE COURT:  They're small town lawyers not getting

7  fees?

8          MR. D. COHN:  Well, first of all, Your Honor, they

9  are -- it's not mesothelioma.  It's Libby Trimlite --

10          THE COURT:  I'm sorry.

11          MR. D. COHN:  -- asbestos disease.  And the answer

12  is, Your Honor, that they are.  They are a small trial firm

13  that has essentially devoted itself to this cause.  I know here

14  it's hard to look at it as a cause where we -- you know -- the

15  tendency is to just look at it as these people are just

16  claimants and creditors and just pushing -- you know -- pushing

17  their agenda and so are billions of dollars of other people.  I

18  understand that, Your Honor.

19          But out there, this town was just devastated by this

20  asbestos that raced unleashed upon that community.  And yes,

21  when they needed redress they turned to their local tort

22  lawyers to seek that redress for them, not to one of the

23  national personal injury firms.

24          They turned to their local people, and those -- and

25  they've been doing the best that they can, Your Honor.  I think

90

1  that you've seen some of the rough edges.  I have tried to

2  repair those in the bankruptcy sense, Your Honor, and I think

3  we're on track to do that.  But these are Montana trial lawyers

4  in a small town for whom $61,000 would be an enormous sanction.

5       THE COURT:  Well, it seems to me that the sanction is

6  warranted, because they have so clearly violated every order

7  that Judge Wolin or I have issued in this case that, frankly,

8  $61,000 I don't think is enough.  But since that's what the

9  debtor's asking for, that's what I'm going to award.

10      If in fact they want to produce some financial

11  statements and tax returns to me for let's say the last three

12  years that substantiate that they're not able to pay this

13  $61,000 fee, attached to a motion for reconsideration, their

14  tax returns obviously I will accept under seal, but they're

15  going to be shared with the parties here so that there will be

16  some effort to rebut, but it will be shared under a

17  confidentiality agreement, then I'll reconsider.

18      Otherwise, if I don't get that information I think

19  $61 (sic) is a very fair sanction.

20      MR. D. COHN:  I would accept $61, Your Honor.

21      THE COURT:  Well, you just told me they couldn't

22  afford it; $61,000.

23      (Laughter)

24      MR. D. COHN:  I'm sorry, Your Honor.  I'm trying --

25  it's not a subject to be made light of, but I am -- I tried to

91

1  make some poor attempt at a joke.  But Your Honor --

2          THE COURT:  All right.  Well, it's $61,717.57, I

3  believe is the amount that I was requested.

4          MR. BERNICK:  Let me be more precise.  It's actually

5  a little bit less.  It's $57,281.

6          THE COURT:  All right.  What happened?

7          MR. D. COHN:  There is, however, one aspect of that

8  figure which is overstated.  It has been brought to Grace's

9  attention that we simply never got a definitive answer on it,

10 and that is this.  You may recall that they first filed a

11 motion in the general case and -- when it should have been

12 filed in the --

13         THE COURT:  Adversary.

14         MR. D. COHN:  -- in the adversary proceeding.  The

15 filing of the motion in the original case resulted in

16 additional fees, and those have been removed, to our

17 satisfaction.  So that is not an issue.  However, there were

18 expenses incurred in the obviously larger process of serving

19 the motion in the larger case in the amount of $4,978.  And

20 since that was not the proper place for it to be filed, we

21 would respectfully submit that the --

22         THE COURT:  Well, who filed it there?

23         MR. D. COHN:  Grace did.

24         THE COURT:  Grace filed --

25         MR. D. COHN:  In the estate --

92

1          THE COURT:  -- Grace filed it?

2          MR. D. COHN:  Yes.  This was -- this is Grace's

3   motion for contempt, which should have been filed --

4          THE COURT:  Oh, the motion for contempt was filed in

5   the main case.  I'm sorry.

6          MR. D. COHN:  Yes.  Because what we're talking about,

7   Your Honor, are the fees and expenses --

8          THE COURT:  Yes.

9          MR. D. COHN:  -- that are incurred by the estate in

10  prosecuting the contempt motion.

11         THE COURT:  Okay.

12         MR. D. COHN:  And so what we're saying is that of the

13  expenses for which they've sought compensation, $4,978 appears

14  to relate to service of the motion in the Grace Chapter 11

15  case.

16         THE COURT:  All right.

17         MR. D. COHN:  And since that was a mistake we

18  respectfully submit that should not be part of the sanction.

19         MR. BERNICK:  I'll accept -- if it'll enable us to

20  get the order done and to be able to get on, I'll accept

21  counsel's representation.  We'll double-check it, but for today

22  I'll accept counsel's representation, and that would mean that

23  we're talking about $53,281.

24         THE COURT:  53,000 what?

25         MR. BERNICK:  $281.


J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  Well, that subtracts $4,000.  Is that
2 what you're asking?

3          MR. BERNICK:  That subtracts $4,000.  He represented
4 it was $4,000.  I don't know if that's true, but I'll accept
5 it.

6          THE COURT:  I thought he said -- 4798 I thought was
7 the number.

8          MR. D. COHN:  4,978.

9          THE COURT:  Oh, 4,978.

10          MR. BERNICK:  Four nine -- so it's 5,000.

11          THE COURT:  So it's $5,000.

12          MR. BERNICK:  It'd be $2,281.

13          THE COURT:  All right.

14          MR. D. COHN:  Your Honor, that -- very well, then.
15 The final point that I need to make on the subject of
16 sanctions, Your Honor, is that there has been a motion
17 addressed to your discretion to stay proceedings relating to
18 the contempt sanctions.  And the reason for it is a matter --

19          THE COURT:  Related to the?

20          MR. D. COHN:  The contempt sanction.

21          THE COURT:  Yes.

22          MR. D. COHN:  And the reason for it is a matter of
23 really sound judicial economy, which is, it is Hornbook law and
24 has not been contested by Grace that if this Court is without
25 jurisdiction over the underlying matter, that is, those

94

1  independent claims --

2      THE COURT: I clearly have jurisdiction with respect

3  to the automatic stay. In fact, I'm the only court that does,

4  and this most recent complaint violates the automatic stay.

5  The firm is in contempt. I order that that complaint be

6  withdrawn as to the debtor. Apparently, it hasn't been done

7  and you're, in my view, going to be subject to court sanctions

8  if it doesn't happen soon.

9      MR. D. COHN: Excuse me, Your Honor. Then I really

10  do need to address the really incorrect statements that were

11  made by Grace's counsel just now. The order -- after the

12  hearing at which you stated what you wished to be done we

13  agreed upon a form of order, and that was submitted under

14  certification of counsel.

15      That order, to my knowledge, has not been entered.

16  No one, in any event, has supplied us a copy. We've been

17  reviewing the docket. It's apparently just sitting out there.

18      THE COURT: I haven't seen it.

19      MR. D. COHN: In fact -- well, it is -- it I believe

20  exists. Grace has submitted it. If you'd --

21      THE COURT: Okay. I will look for it.

22      MR. D. COHN: All right. And Your Honor, in the

23  meantime what we've done is we have submitted to Grace the form

24  of pleading that we propose to submit to the Maryland court.

25  Grace got back to -- to withdraw the complaint. Grace has

1 gotten back to us with comments.

2          We incorporated those comments, sent them a proposed

3 form of withdrawal and have not heard back from them since.  I

4 have said that immediately upon entry of the order that has

5 been submitted under certificate of counsel, we would withdraw

6 that complaint, Your Honor.

7          THE COURT:  All right.

8          MR. BERNICK:  And then, your --

9          MR. D. COHN:  So there is no -- there's absolutely no

10 basis to say that we are --

11          THE COURT:  I will have that order searched for, and

12 if I can find it today the order will be entered today.

13          MR. BERNICK:  Yeah.

14          MR. D. COHN:  And I will repeat the representation,

15 Your Honor, that as soon as that order is entered, that that

16 complaint will be formally withdrawn.  Now, in the meantime, I

17 do want you to know, no further proceedings have been taken on

18 it.  The judge in Maryland has just stopped acting upon it.

19          We're not asking him to act upon it and so this whole

20 -- there has been no further proceeding on that matter.

21          THE COURT:  All right.

22          MR. BERNICK:  Yeah.  And they don't need a court

23 order.  They don't need anything from us to withdraw an amended

24 complaint.

25          THE COURT:  No, they don't.

1          MR. BERNICK:  They just file it --

2          THE COURT:  I ordered them done, but now, I'll sign

3     an order so that they have to do it.

4          MR. BERNICK:  I think that this actual form of order,

5     because it pertains to more matters than simply the withdrawal

6     of the complaint, probably is out of date.

7          THE COURT:  The one on the COC?

8          MR. BERNICK:  The one on the COC, right.

9          THE COURT:  All right.  So you're going to submit a

10    revised one?

11         MR. BERNICK:  So I think if Your Honor would direct

12    them today to do what they should have done a long time ago,

13    which is simply to withdraw the amended complaint, I think that

14    that will have covered all matters, other than the actual

15    issuance of an order on the contempt and the contempt

16    sanctions.

17         THE COURT:  Let me see your -- the order you have to

18    see if I can modify it, Mr. Bernick.

19         MR. BERNICK:  Okay.

20      (Pause)

21         MR. BERNICK:  It just talks about the itemization of

22    fees, which is already done.  It says that the Court will

23    consider a finding of contempt, as I recall it.

24         THE COURT:  I think if I simply change paragraph 3 to

25    say that, "Counsel for the debtors has provided" --

1          MR. BERNICK:  Yes.

2          THE COURT:  -- "an itemization of the fees and

3 expenses."

4          MR. BERNICK:  And then 4 --

5          THE COURT:  And I'm having the hearing now.  So I can

6 say, "This Court at the May 25th hearing."

7          MR. BERNICK:  Right.

8          THE COURT:  "Determined the amount of fees and

9 expenses to be paid" --

10          MR. BERNICK:  Right.

11          THE COURT:  -- by Gerard (phonetic) counsel to the

12 debtor's estate to be."

13          MR. BERNICK:  Yeah.

14          THE COURT:  "$52,281."

15          MR. BERNICK:  Yes.

16          THE COURT:  "And further considered the Court's

17 earlier ruling as to contempt."  Cross out the sentence that

18 says:  "April 26th hearing may be continued by agreement."  I

19 think that will do it.  Would you like to take a look at this,

20 Mr. Cohn, as I've marked it up, and Mr. Bernick, as well, and

21 see whether --

22          MR. BERNICK:  The only thing I think it would then be

23 -- I don't know, does Your Honor intend to issue a separate

24 order making -- ordering or finding the contempt and then

25 awarding the sanction?

98

1          THE COURT:  I think I'll write it into this one --

2          MR. BERNICK:  That's fine.

3          THE COURT:  -- when I get this back.  But I want to

4 make sure that with respect to the issue of the withdrawal of

5 the complaint and the amount of the fee that it's correct, and

6 then I can add it into this.

7          MR. BERNICK:  That's fine.

8          THE COURT:  Okay.  Apparently, there is not a

9 certificate of counsel showing at adversary 01-771.  The last

10 one was filed in March of '04, unless that's it.

11          THE CLERK:  That's it.

12          THE COURT:  That is it.  Okay.

13          THE CLERK:  Yes.

14          THE COURT:  All right.  That's it.

15          MR. BERNICK:  Your Honor said it; so we're fine.

16          THE COURT:  All right.  Mr. Cohn.

17          MR. D. COHN:  As to form, Your Honor, they are

18 satisfactory to the Libby claimants.

19          THE COURT:  All right.  I'm going to add a -- I guess

20 I need to add here --

21          MR. D. COHN:  Well, Your Honor, if I may for just a

22 moment?

23          THE COURT:  Yes.

24          MR. D. COHN:  The point that I was raising was that

25 while it is true that this Court is the court that has

J&J COURT TRANSCRIBERS, INC.

1 jurisdiction over violations of the automatic stay, the only
2 violation of the automatic stay that was ever alleged here was
3 the mere inclusion of the debtor in the -- the debtor's name in
4 the caption, which in the context of -- which if that had been
5 the only violation, would obviously not have been regarded as
6 anything serious because it was simply a continuation of the
7 pre-bankruptcy caption.

8          There's no further relief sought against Grace.  The
9 determination of contempt, Your Honor, as I understood it at
10 the hearing was most prominently as to CNA, that the action was
11 sought to be continued as to CNA, notwithstanding the pendency
12 of the preliminary injunction.

13          And for purposes of this hearing we accept that
14 determination.  We're not trying to relitigate that in any way
15 on its merits.  I would simply point out to Your Honor, that it
16 is Hornbook law that in order to be able to issue a sanction
17 for contempt, this Court would need to have jurisdiction over
18 the underlying action.

19          And it is precisely the issue of to what extent this
20 Court has jurisdiction over independent claims of the Libby
21 claimants against parties other then W.R. Grace, precisely that
22 issue which is in contest.  Right now, the contest is in the
23 form of an appeal that is pending in the Third Circuit where
24 Judge Wolin already found that as to Maryland Casualty there's
25 no jurisdiction.

1      And -- but that's being opposed by Maryland Casualty,

2 and is happily in the Third Circuit.  Grace, by the way, has

3 joined now with the -- with us at appellants to urge the Court

4 of Appeals to affirm Judge Wolin's decision that there's no

5 jurisdiction, but that's the current -- that is the current --

6 excuse me -- that is the current state of play on that issue.

7      What will happen presumably, Your Honor, is the Third

8 Circuit will rule in a way that will provide I think the

9 groundwork for all of us to deal with, the issues that relate

10 to CNA, Continental.  When we come back to this Court --

11      THE COURT:  Okay.  I believe that these sanctions are

12 appropriate for all the violations, because I think they're all

13 in contempt, including naming the debtor and seeking relief in

14 a wherefore clause against the debtor without having the debtor

15 excepted from that amended complaint.

16      It's just as easy to put a paragraph in a complaint

17 that says the debtor's being named for purposes of whatever

18 only, and we understand that the debtor -- that the automatic

19 stay applies and the debtor will not take any further action.

20 We're not asking the debtor to.

21      I'm not even sure that does it, but at least then

22 it's clear that you're not seeking relief against the debtor.

23 This amended complaint seeks relief against the debtor, and I

24 think it's in violation of Section 362 of the Bankruptcy Code.

25 I think it also violates as to CNA, Section 105.