## HOMCO INTERNATIONAL, INC.
## AMENDED AND RESTATED ASSETS PURCHASE AGREEMENT

AMENDED AND RESTATED ASSETS PURCHASE AGREEMENT dated as of January 28, 1993 by and among Homco International, Inc., a Delaware corporation, A-1 Bit & Tool Co., Inc., a Delaware corporation, A-1 Bit & Tool Company B.V., a Dutch corporation, A-1 Bit & Tool Company A/S, a Norwegian corporation, A-1 Bit & Tool Company GmbH, a German corporation, A-1 Bit & Tool Company Pte. Ltd., a Singapore corporation, Homco Arabian Gulf, Inc., a Delaware corporation, Homco International, Ltd., an Alberta, Canada provincial corporation, W. R. Grace & Co., a New York corporation, and Weatherford International Incorporated, a Delaware corporation.

### W I T N E S S E T H:

In consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

### ARTICLE 1

### Definitions; Interpretation

As used in this Agreement, the following terms have the meanings set forth in this Article 1. All Article, Section, Exhibit and Schedule numbers and references used herein refer to Articles and Sections of this Agreement and Exhibits and Schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically described.

1.01 "Bellaire Sublease" means the sublease in form and substance reasonably satisfactory to Homco and Purchaser between Homco and Purchaser relating to the sublease of certain offices by Purchaser as sublessee, which contains the same terms as Homco's lease with its landlord for such offices.

1.02 "Business" means the fishing and cutting services, tool and pipe rental, oilfield supply, pipe recovery services, gas flow measurement and manufactured products businesses presently conducted by Sellers.

1.03 "Closing" means the consummation of the purchase and sale of the Subject Assets as contemplated by this Agreement.

1.04 "Closing Date" means the date on which the Closing occurs.

1.05 "Closing Documents" means the Employee Benefits Agreement, and subject to obtaining the consent of the landlord for the sublease of the lease covering Homco's Bellaire, Texas headquarters, the Bellaire Sublease, and subject to obtaining the consent of the landlord for the sublease of the lease covering the underlying land, the Lafayette Lease, and the Transition Agreement, and the other agreements and documents described in Sections 4.02 (a) through (e).

1.06 "Confidentiality Agreement" means the Agreement dated as of September 14, 1992, between Weatherford International

Incorporated and The First Boston Corporation, as representative of Grace, regarding the keeping confidential of certain information furnished to Weatherford International Incorporated in connection with its evaluation of an acquisition of Homco or its assets.

1.07 "DOJ" means the United States Department of Justice.

1.08 "Employee Benefits Agreement" means the Employee Benefits Agreement substantially in the form of Exhibit A among Grace, Grace Energy, Homco and Purchaser relating to retirement, employee benefit and similar plans and programs for Sellers' employees, and other personnel matters related to Sellers.

1.09 "Environmental Law" means any law, regulation, rule, ordinance, by-law, or order of any Governmental Authority, in effect on the Closing Date, which relates to or otherwise imposes liability, obligations, or standards with respect to (a) the control of any potential pollutant or the protection of the environment, (b) solid waste, gaseous waste or liquid waste generation, handling, treatment, storage, disposal or transportation, and (c) exposure to hazardous, toxic or other substances alleged to be harmful, but in each case excluding the Occupational Safety and Health Act of 1970, as amended, and any regulation issued thereunder.

3

1.10    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

1.11 "Excluded Assets" means (i) cash and cash equivalent items, other than petty cash or deposits with suppliers or customers, (ii) refunds and adjustments on account of Income Taxes, (iii) Sellers' corporate minute books, stock transfer records and other similar corporate records, (iv) insurance policies, surety bonds, prepaid insurance premiums, insurance claims, and refunds or adjustments of amounts previously paid on account of insurance, (v) employee benefit plans and funds, and refunds or adjustments of amounts previously paid on account of employee benefits, except as otherwise provided in the Employee Benefits Agreement, (vi) the NL Litigation and any amounts payable to Homco or any affiliate with respect thereto, (vii) the real property owned by any of Sellers listed on Part I of Schedule 1.11, (viii) rights under the leases covering the real property listed on Part II of Schedule 1.11, and (ix) all furniture, fixtures, office equipment and supplies located on or at the real property listed on Schedule 1.11, other than Homco's Bellaire, Texas headquarters.

1.12 "Excluded Liabilities" means the following liabilities or obligations of Sellers:

(i)    liabilities for all Income Taxes (including penalties and interest) relating to all periods of time ending on or prior to the Closing Date;

4

(ii)    liabilities and obligations arising out of, result-ing from or related to (A) except as otherwise provided in Section 14.02, injury to individuals (other than employees), or damage to the property of any third party, occurring prior to the Closing, or (B) except as may otherwise be provided by law, workers' compensation claims relating to occurrences prior to the Closing;

(iii)    liabilities and obligations resulting from occur-rences prior to the Closing which are covered under Sellers' or any Grace Entities' insurance policies and programs for which Sellers are indemnified against;

(iv)    liabilities and obligations for premiums, deduct-ibles or other charges under insurance programs maintained by or for Sellers prior to the Closing;

(v)    liabilities and obligations with respect to Sellers' employee benefit plans and funds related to periods ending prior to the Closing, except as otherwise provided in Section 9.05 and the Employee Benefits Agreement;

(vi)    liabilities and obligations for (A) remediation of contaminants and pollutants as contemplated by Section 14.02(b), and (B) litigation expenses and all other amounts owed by any of the Sellers arising out of or in connection with the NL Litiga-tion;

(vii)    liabilities related to "negative cash" and "cash overdraft" balances as of the Closing Date;

(viii) liabilities and obligations of Sellers, contingent or otherwise, not arising or incurred in the ordinary course of business of Sellers and described on Schedule 1.12; and

(ix)    liabilities and obligations with respect to Computalog, Ltd. vs. Homco International, Ltd. - Queens Bench of Alberta, Edmonton, Alberta, Canada - Case No. 9101-16668.

1.13 "Facilities" means the sales and service facilities, manufacturing facilities, buildings and improvements owned or leased by the Sellers, which are located on the Properties.

1.14 "FTC" means the Federal Trade Commission.

1.15 "Governmental Authority" means the government of the United States of America, any state of the United States of America, any foreign country, or any political subdivision of any of the foregoing, or any agency, board, bureau, court, department or commission of any of the foregoing.

1.16 "Grace" means W. R. Grace & Co., a New York corporation.

1.17 "Grace Energy" means Grace Energy Corporation, a Delaware corporation and an indirect subsidiary of Grace.

1.18 "Grace Entity" means Grace or any of its subsidiaries or affiliates, excluding Sellers.

1.19 "Homco" means Homco International, Inc., a Delaware corporation and a subsidiary of Grace Energy.

1.20 "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

1.21 "Income Taxes" means any taxes, fees or other charges imposed by a Governmental Authority based upon income of any person or entity.

1.21(a)   "Lafayette Lease" means the lease in form and substance reasonably satisfactory to Homco and Purchaser between Homco and Purchaser relating to the lease of the building located at 4009 Cameron Road, Lafayette, LA and the sublease of the underlying land.

1.22 "Material Adverse Effect" means a material adverse effect upon the business, financial condition or results of operations of Sellers, taken as a whole.

1.23 "NL Acme" means NL Acme Tool, Inc., a Delaware corporation.

1.24 "NL Industries" means NL Industries, Inc., a New Jersey corporation.

1.25 "NL Litigation" means the actions entitled Homco International, Inc. vs. NL Industries, Inc. and NL Acme Tool, Inc., Case No. H-89-3112 (D. Texas filed September 13, 1989) and N.C. Corff Partnership, Ltd, et al vs. Homco International Incorporated, et al, Oklahoma County, Okla. Case No. CJ-92-3937.

1.26 "NL Recovery" means the aggregate amount paid to Homco pursuant to Section 14.01.

1.27 "OSK" means Oilfield Services Kuwait Joint Stock Company, a Kuwaiti corporation, to be formed pursuant to the Oilfield Services Kuwait Joint Stock Company Shareholders' Formation Agreement dated November 26, 1992 among Homco Arabian Gulf, Inc., Petroleum Services Company W.L.L., Tariq Abdulaziz Sultan Al Essa, Ayman Bader Sultan Al Essa and Iyad Bader Sultan Al Essa.

1.28 "PBGC" means the Pension Benefit Guaranty Corporation.

1.29 "Properties" means the real property owned or leased by Sellers, which are listed on Schedule 1.29.

1.30 "Purchase Price" means $97,500,000, subject to adjustment pursuant to Article 5.

1.31 "Purchaser" means Weatherford International Incorporated, a Delaware corporation.

1.32 "Scheduled Closing Date" has the meaning specified in Section 3.01.

1.33 "Sea Oil" means Sea Oil Homco Limited, a limited liability company organized under the laws of the United Kingdom in which Homco owns a 40% interest.

1.34 "Securities" means the capital stock of Sea Oil owned directly or indirectly by Homco.

1.35 "Sellers" means Homco, A-1 Bit & Tool Co., Inc., a Delaware corporation, A-1 Bit & Tool Company B.V., a Dutch corporation, A-1 Bit & Tool Company A/S, a Norwegian corporation, A-1 Bit & Tool Company GmbH, a German corporation, A-1 Bit & Tool Company Pte. Ltd., a Singapore corporation, Homco International, Ltd., an Alberta, Canada provincial corporation, and Homco Arabian Gulf, Inc., a Delaware corporation.

1.36 "Subsidiaries" means Homco International, Ltd., an Alberta, Canada provincial corporation, A-1 Bit & Tool Co., Inc., a Delaware corporation, A-1 Bit & Tool Company B.V., a Dutch corporation, A-1 Bit & Tool Company A/S, a Norwegian corporation, A-1 Bit & Tool Company GmbH, a German corporation, A-1 Bit & Tool Company Pte. Ltd., a Singapore corporation, and Homco Arabian Gulf, Inc., a Delaware corporation.

1.37 "Subject Assets" means all of the assets, properties, rights and interests (other than the Excluded Assets) of Sellers, wherever located, of every type and description, whether real, personal or mixed, and whether tangible or intangible, which, as of the Closing, are used or held for use in connection with, which are generated by, derived from or attributable to, or which otherwise relate to, the Business, including, but not limited to:

(i)     all notes receivable, accounts receivable (including accounts receivable from Grace Drilling Company, Grace Offshore Company or Sea Oil and accounts and notes receivable arising from the sale of real property, or any personal property located thereon, by any of the Sellers prior to the Closing), employee advances, trade acceptances receivable and general intangibles of a similar nature;

(ii)    all prepaid expenses and similar items, the benefit of which may be effectively transferred to Purchaser, including, without limitation, advance payments, security deposits and other prepaid items;

(iii)   all inventories wherever located, including, without limitation, all raw materials, work-in-progress, finished goods, office and operating supplies, and packaging materials and supplies;

(iv)    the real property described on Part I of Sched-ule 1.29, including, without limitation, all right, title and interest in and to all buildings, structures, other improvements, fixtures and appurtenances thereon and thereto, whether currently in existence or under construction;

(v)     the leasehold interest and other rights of Sellers under the leases of real property listed on Part II of Sched-ule 1.29;

(vi)    all owned personal property, including, without limitation, all equipment, computer equipment, machinery, office

10

equipment, rental and fishing tools, furniture, cars, trucks and other vehicles;

(vii)    all rights under contracts, agreements or commitments, including, without limitation, contracts providing for the lease by Sellers of equipment, machinery, office equipment, furniture, cars, trucks and other vehicles;

(viii)    all rights under orders, bids and quotations, and similar arrangements relating to the purchase or sale of goods or services;

(ix)    all rights under the sales representative agreements, distributor agreements, consignment agreements and other similar agreements, whether as principal or agent or distributor, and under any license agreement, including those listed on Schedule 1.37(ix);

(x)    all right, title and interest in and to (A) the name "Homco" and all variations thereof and (B) all patents, patent applications, trade secrets, secret processes, copyrights, trademarks, trade names and service marks and similar items pertaining to the Business, including the patents, patent applications, copyrights, trademarks, trade names and service marks listed on Schedule 1.37(x);

(xi)    the Securities and any corporate documents relating to Sea Oil and OSK in the possession of Sellers;

(xii)    to the extent assignable, all permits, approvals, qualifications, licenses and the like issued by a Governmental Authority and any pending applications therefor; and

11

(xiii) subject to the provisions of Section 15.02 hereof, all books and records of account and other records, whether written or in machine-readable form (including, without limitation, operating systems and application software, and computerized records maintained on tapes, disks and other electronic or optical storage media), generated in connection with or otherwise related to the conduct of the Business, including, without limitation, all financial, tax, operating, inventory, legal, personnel, payroll, supplier/vendor rights, interests and customer records and all sales and promotional literature, correspondence and files.

1.38 "Subject Liabilities" means (i) all liabilities and obligations relating to (A) salaries and payroll, (B) claims related to Severance Entitlement Programs (as defined in Section 9.05) as more particularly provided in Section 9.05 and in the Employee Benefits Agreement, including FICA, payroll and employment taxes related thereto and (C) employees of any of the Sellers, except as provided in the Employees Benefits Agreement, (ii) all environmental liabilities, except as otherwise provided in Article 14, (iii) liabilities and obligations of Sellers under Section 5.01 of the Asset Purchase Agreement dated October 16, 1987 by and between NL Acme, NL Industries and Homco, (iv) all liabilities and obligations arising after the Closing with respect to the Business, and (v) all liabilities and obligations of Sellers, whether disclosed or undisclosed, related to or arising in the ordinary course of business of Sellers prior to

12

the Closing.  Notwithstanding the foregoing, the Subject
Liabilities do not include the Excluded Liabilities.

 1.39  "Transition Agreement" means the transition
agreement in form and substance reasonably satisfactory to Homco
and Purchaser between Homco and Purchaser relating to the
transition of the Business.

## ARTICLE 2

### Purchase and Sale of the Subject Assets; Consideration

 2.01  Purchase and Sale.  Upon the terms and subject
to the conditions of this Agreement, at the Closing, Sellers
shall sell and transfer the Subject Assets to Purchaser and
Purchaser shall purchase and acquire the Subject Assets from
Sellers.  Purchaser may assign any or all of its rights to
purchase any of the Subject Assets to any of its wholly-owned
subsidiaries upon written notice to Sellers.

 2.02  Payment of Purchase Price.  In consideration
for the sale of the Subject Assets as described in Section 2.01,
Purchaser shall pay to Homco, on behalf of Sellers, the Purchase
Price in the manner described in Article 4 and assume the Subject
Liabilities.

 2.03  Price Allocation.  The Purchase Price shall be
allocated among the Subject Assets based upon the fair market
value thereof as determined by an appraisal conducted by an
independent appraiser selected by Purchaser.

## ARTICLE 3

### Closing Date: Termination

3.01  Scheduled Closing Date.  The "Scheduled Closing Date" shall be the fifth business day following the day on which the last to be fulfilled or waived of the conditions set forth in Sections 11.03, 11.04, and 12.03 shall be fulfilled or waived, unless Sellers and Purchaser shall agree to a different Scheduled Closing Date in an amendment to this Agreement executed and delivered in accordance with Section 18.06.  For purposes of this Article, "business day" shall mean a day which is not a Saturday or Sunday, nor a day on which banks are generally closed in The City of New York.

3.02  Termination.

(a) This Agreement may be terminated at any time prior to the Closing by mutual written agreement of the parties.

(b) If the Closing has not occurred by April 15, 1993, then unless the parties shall agree otherwise in an amendment to this Agreement executed and delivered in accordance with Section 18.06, either Sellers or Purchaser may terminate this Agreement by giving notice to the other, in the manner provided in Section 17.01, at any time after such date and prior to the fulfillment or waiver of all such conditions; provided, however, that the right to terminate this Agreement under this Section 3.02(b) shall not be available to any party whose intentional

14

failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date.

(c)    If since the date of this Agreement there has been a material adverse change (other than as a result of changes attributable to general industry conditions) in the Business or the financial condition of Sellers, taken as a whole, Purchaser shall have the right to terminate this Agreement at any time thereafter by giving at least three business days' prior written notice of such termination to Sellers.

(d) If Grace or Purchaser shall have refused to litigate or participate in any administrative action regarding any filing under the HSR Act referred to in Section 9.02, this Agreement may be terminated by any party hereto at any time thereafter by giving at least three business days' prior written notice of such termination to the other parties.

(e) If the Board of Directors of Grace or a committee thereof shall not have approved and authorized the transactions contemplated by this Agreement and the Closing Documents by February 5, 1993, any party hereto may terminate this Agreement upon three days' prior written notice to Grace.

(f) (i) In the event that (A) the Boards of Directors of Grace or of any of the Sellers shall not have approved and authorized the transactions contemplated by this Agreement

15

and the Closing Documents by February 5, 1993 or (B) all of the Subsidiaries shall not have duly executed and delivered this Agreement by February 5, 1993, Purchaser may terminate this Agreement upon three days' prior written notice to Grace.

(ii) In the event that Purchaser terminates this Agreement pursuant to Section 3.02(f)(i), then Grace shall pay Purchaser an amount equal to (but in no event more than $2,000,000) the amount of any commitment fees paid by Purchaser to Texas Commerce Bank National Association and Credit Lyonnais pursuant to their commitment letter dated January 26, 1993 and January 25, 1993, respectively, providing financial commitments related to the purchase of Homco.

(g) The termination of this Agreement, whether in accordance with any of the preceding provisions of this Section or otherwise, shall not affect the rights of either Sellers or Purchaser against the other for breach of any covenant or agreement contained in this Agreement.

## ARTICLE 4

### Actions at Closing: Discharge of Certain Obligations: Further Assurances

4.01 Closing. The Closing shall take place at 10:00 a.m. local time at the offices of Fulbright & Jaworski at 1301 McKinney Street, Houston, Texas 77010, or at such other time and place as the parties hereto shall agree in writing.

4.02 Actions at the Closing. At the Closing:

16

(a)    Sellers shall deliver to Purchaser duly executed special warranty deeds, bills of sale, assignments, stock certificates with executed stock powers, and other instruments of transfer in order to vest in Purchaser all of Sellers' right, title and interest in and to the Subject Assets.

(b)    Purchaser shall pay to Homco, on behalf of Sellers, $97,500,000 in immediately available United States funds, by wire transfer to an account designated by Homco on account of the Purchase Price.  Such amount shall be subject to adjustment as provided in Section 5.01.

(c)    Purchaser shall deliver to Sellers a duly executed agreement whereby Purchaser assumes, and agrees to perform, the Subject Liabilities.

(d)    Grace, Grace Energy, Homco and Purchaser shall deliver to each other the executed Employee Benefits Agreement.

(e)    Sellers shall deliver to Purchaser the certificate and opinion of counsel described in Sections 11.06 and 11.07, respectively.

(f)    Purchaser shall deliver to Sellers the certificate and opinion of counsel described in Sections 12.05 and 12.06, respectively.

17

(g)    Subject to receipt of landlords' consents, Homco and Purchaser shall execute and deliver the Bellaire Sublease and the Lafayette Lease.

(h)    Homco and Purchaser shall execute and deliver the Transition Agreement.

4.03    <u>Effectiveness of Closing</u>.    No action to be taken or delivery to be made at the Closing shall be effective until all of the actions to be taken and deliveries to be made at the Closing are complete.

4.04    <u>Discharge of Certain Intercompany Liabilities</u>. All obligations of any Seller to reimburse Grace, Grace Energy or any other Grace Entity for checks written by such Seller in the ordinary course of business prior to the Closing Date, and honored by Grace, Grace Energy or such other Grace Entity, shall be deemed paid and discharged, effective as of the Closing.

4.05    <u>Further Assurances</u>.    At any time and from time to time from and after the Closing, Sellers shall, at the request and expense of Purchaser, take all such actions as Purchaser shall reasonably request in order to more fully and effectively vest in Purchaser all Sellers' right, title and interest in and to the Subject Assets.

18

## ARTICLE 5

## Post-Closing Adjustments

5.01    Purchase Price Adjustment.  (a) Immediately after the Closing, representatives of Grace and Purchaser shall cooperate to close the books of Sellers on a going concern basis as of the close of business on the Closing Date.  Within two weeks of the Closing Date, Grace and Purchaser shall cooperate to take a physical inventory of the inventories of products held for sale by Sellers (not including rental tools) that are included in the Subject Assets, in accordance with Sellers' prior inventory-taking practices and procedures.  Purchaser shall make available to Grace Purchaser's employees for such purposes and shall provide Grace with access to any Facilities necessary or desirable for such purposes.  Grace and Purchaser shall each be permitted to have their respective representatives and advisors observe such inventory taking and closing of the books and other actions to be taken pursuant to this Section.  Grace shall use all reasonable efforts to prepare and deliver to Purchaser, within 60 days after the Closing Date, a consolidated balance sheet of Homco and the Subsidiaries as of the Closing Date (the "Closing Balance Sheet").  The Closing Balance Sheet shall be prepared on a going concern basis, in accordance with U.S. generally accepted accounting principles, applied on a consistent basis with those used in the preparation of the Audited Financial Statements and using the same levels of materiality used in the preparation of the Audited Financial Statements, except that (a)

19

there shall be no accrual for severance entitlements described in the "Grace Energy Corporation and Subsidiary, Special Retention and Severance Pay Program" attached as part of Schedule 9.05, (b) vacation pay for 1993 shall be accrued on a pro rata basis, and (c) no adjustment shall be made as a result of any physical inventory of rental tools and equipment currently in progress. The Closing Balance Sheet shall be accompanied by a report of Price Waterhouse, Sellers' independent accountants, stating whether the Closing Balance Sheet has been prepared in accordance with the provisions of this Agreement.

(b)    Simultaneously with the delivery of the Closing Balance Sheet, Grace shall deliver to Purchaser a statement (the "Closing Statement") setting forth the amount (the "Adjusted Book Value") equal to: (i) the dollar amount of the total assets reflected on the Closing Balance Sheet, less (ii) the dollar amount of the Excluded Assets reflected on the Closing Balance Sheet, less (iii) the dollar amount of the total liabilities reflected on the Closing Balance Sheet, plus (iv) the dollar amount of the Excluded Liabilities reflected on the Closing Balance Sheet plus or less (v) the aggregate amount of all after tax gains or losses recognized from the sale of fixed assets from sales generating net proceeds in excess of $30,000 in the aggregate, which sales occurred during the period beginning the date hereof and ending on the Closing Date, accompanied by a report of Price Waterhouse stating whether the Closing Statement has been prepared in accordance with the provisions of this Agreement.

(c)     Upon receipt of the Closing Balance Sheet and Clos-
ing Statement, Purchaser shall have the right to have its inde-
pendent accountants inspect the work papers of Price Waterhouse.
In the event that Purchaser does not object to the Adjusted Book
Value as proposed by Grace on the Closing Statement, by written
notice of objection delivered to Grace within 30 days after
Purchaser's receipt of the Closing Statement, then the Adjusted
Book Value set forth on the Closing Statement shall be deemed
conclusive and binding on the parties.  If Purchaser does so
object to the Adjusted Book Value set forth on the Closing
Statement, Purchaser shall set forth its objections in reasonable
detail and Grace and Purchaser shall then promptly endeavor to
resolve the matters in dispute and agree upon the proper amount
of the Adjusted Book Value.  If a written agreement determining
the Adjusted Book Value has not been reached within 30 days after
Grace's receipt of Purchaser's notice of objection to Grace's
determination of the Adjusted Book Value, then either party may,
by notice to the other, submit for determination to Ernst & Young
(the "Arbitrator") the question of what adjustments, if any, must
be made in the Closing Balance Sheet or the Closing Statement in
order for the Adjusted Book Value to be determined in accordance
with the provisions of this Agreement.  Any such determination
made by the Arbitrator shall be conclusive and binding on the
parties.  Nothing herein shall be construed to (i) authorize or
permit the Arbitrator to determine any question or matter under
or in connection with this Agreement, except the determination of

21

what adjustments if any must be made in the amount set forth on the Closing Statement delivered by Sellers in order for the Adjusted Book Value to be determined in accordance with the provisions of this Agreement or, (ii) require the Arbitrator to follow the rules or procedures of the American Arbitration Association.

(d)    The costs of any determination made by the Arbitrator pursuant to Section 5.01(c) shall be borne as follows.  Grace shall bear that portion of such costs equal to the total of such costs multiplied by a fraction, the numerator of which shall be that amount, if any, by which the Adjusted Book Value proposed by Grace in the Closing Statement exceeds the Adjusted Book Value as determined by the Arbitrator, and the denominator of which shall be the difference between the Adjusted Book Value proposed by Purchaser and the Adjusted Book Value as proposed by Grace.  Purchaser shall bear the remainder of such costs.  Nothing herein shall permit the Arbitrator to determine any question or matter whatsoever under or in connection with this Agreement except the determination of what adjustments, if any, must be made in the amounts set forth on the Closing Statement in order for the Adjusted Book Value to be determined in accordance with the provisions of this Agreement.

(e)    Within five days after the final determination of the Adjusted Book Value pursuant to Section 5.01(c), an adjusting payment shall be made by Sellers to Purchaser or by Purchaser to

Sellers as follows.  If the Adjusted Book Value exceeds
$120,648,000, Purchaser shall pay to Homco, on behalf of Sellers,
in immediately available funds, the amount of such excess,
together with interest on such amount for the period from the
Closing Date to the date such payment is made at an interest rate
(the "Specified Interest Rate") equal to the prime lending rate
announced by Texas Commerce Bank, Houston, Texas as of the
Closing Date.  If the Adjusted Book Value is less than
$120,648,000, then Homco shall, on behalf of Sellers, pay to
Purchaser, in immediately available funds, an amount equal to
such deficiency, together with interest on such amount for the
period from the Closing Date to the date such payment is made at
the Specified Interest Rate.  Any adjusting payment shall be
allocated among the Subject Assets according to the proportions
determined from the appraisal described in Section 2.03.

5.02   <u>Transactions with Grace Entities</u>. Any amounts
owed by any Grace Entity to any Seller, or by any Seller to any
Grace Entity, other than amounts owed which are included in the
Subject Assets, shall be deemed paid and discharged, effective
upon the occurrence of the Closing.

ARTICLE 6

<u>Representations and Warranties by Homco and Grace</u>

Each of Homco and Grace hereby represents and war-
rants to Purchaser as follows:

23

6.01  Incorporation.  (a) Homco is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, with full corporate power and authority to execute and deliver this Agreement and the Closing Documents to which it is a party and perform its obligations hereunder and thereunder and to own, lease and operate all of its properties and assets and to conduct its business as the same is currently being conducted.

(b)  Each of the other Sellers is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, with full corporate power and authority to execute and deliver this Agreement and the Closing Documents to which it is a party and perform its obligations hereunder and thereunder and to own, lease and operate all of their respective properties and assets and to conduct their respective businesses as same are currently being conducted. Schedule 6.01(b) sets forth the jurisdiction of incorporation of such Sellers.

6.02  Authorization.  Upon receipt of the approval of the Board of Directors of Grace and the Sellers, the execution and delivery of this Agreement and the Closing Documents by each Seller and Grace Entity that is a party thereto and the performance by each such Seller and each Grace Entity of their respective obligations hereunder and thereunder, will be duly and validly authorized by the respective boards of directors of Grace

24

and Sellers (or persons exercising similar authority) and by all necessary corporate action of each Seller and each such Grace Entity, and this Agreement will become duly executed and validly delivered by such Seller when executed by all the Sellers and constitute legal, valid and binding obligations of each such Seller and Grace enforceable against such Sellers and Grace in accordance with its terms, except as such enforcement may be limited by (i) any applicable bankruptcy, insolvency, reorganization, receivership, moratorium, fraudulent transfer and conveyance laws and other similar laws of general application relating to or affecting the rights and remedies of creditors or (ii) general principles of equity, whether applied by a court of law or equity.  The Closing Documents, when executed and delivered at Closing, will have been duly executed and validly delivered by each Seller and each Grace Entity that is a party thereto and will constitute legal, valid and binding obligations of such Seller and such Grace Entity enforceable against such Seller and such Grace Entity in accordance with their terms, except as such enforcement may be limited by (i) any applicable bankruptcy, insolvency, reorganization, receivership, moratorium, fraudulent transfer and conveyance laws and other similar laws of general application relating to or affecting the rights and remedies of creditors or (ii) general principles of equity, whether applied by a court of law or equity.

6.03 _No Conflict_.  Except as set forth on _Schedule 6.03_ and except for contract terms requiring consent to  assign-

25

ment, neither the execution and delivery of this Agreement and the Closing Documents by each Seller and each Grace Entity that is a party thereto, nor the performance by such Seller and such Grace Entity of their respective obligations hereunder and thereunder, will (a) conflict with the certificate of incorporation or by-laws or comparable charter or organizational documents of such Seller or such Grace Entity, (b) result in any breach of any of the provisions of, or constitute a default under, any judgment, order, decree, or writ to which such Seller or such Grace Entity is a party or by which such Seller or such Grace Entity is bound, which breach or default would have a Material Adverse Effect, (c) violate any provision of law applicable to such Seller or such Grace Entity, or (d) breach or constitute a default (or an event that, with notice or lapse of time or both, would constitute a default) under, or permit the termination of any provision of, or result in the creation or imposition of any lien upon any Subject Asset under, any note, bond, indenture, mortgage, deed of trust, lease, franchise, permit, authorization, license, contract, instrument or other agreement or commitment to which such Seller or such Grace Entity is a party or by which such Seller or such Grace Entity or any Subject Asset is bound or encumbered, except for such breaches, defaults or liens that would not have a Material Adverse Effect.

6.04  Ownership of Seller Sea Oil and OSK. Each Seller and Grace Energy is an indirect wholly owned subsidiary of Grace.   Homco is the record and beneficial owner of 40% of the

26

outstanding capital stock of Sea Oil and such shares of capital stock are subject to the terms of the agreements governing the Sea Oil joint venture, true and complete copies of which have been delivered or made available to Purchaser.  Although the Oilfield Services Kuwait Joint Stock Company Shareholders' Formation Agreement dated November 26, 1992 among Homco Arabian Gulf, Inc., Petroleum Services Company W.L.L., Tariq Abdulaziz Sultan Al Essa, Ayman Bader Sultan Al Essa and Iyad Bader Sultan Al Essa, has been executed by the parties thereto, the transactions contemplated thereby are subject to governmental approval and no shares of the capital stock of OSK have been issued to Homco Arabian Gulf, Inc.

6.05  <u>Absence of Adverse Claims</u>.  Except as set forth on <u>Schedule 6.05</u>, Sellers have and will transfer to Purchaser at Closing good title to the Subject Assets (other than real property) free and clear of all liens and encumbrances whatsoever, with the following exceptions:

(a)    liens and encumbrances referred to in the Audited Financial Statements;

(b)    with respect to the shares of capital stock of Sea Oil, any lien or encumbrance under the agreements governing the Sea Oil joint venture;

(c)    liens for taxes not yet due and payable or which are being contested in good faith;

(d)    mechanics', warehousemen's and other statutory liens incurred in the ordinary course of business and consistent with prior practice; and

(e)    other liens and encumbrances (excluding chattel mortgages or other security interests granted in connection with monies borrowed) incidental to the conduct of the Business in the ordinary course of business and consistent with past practice to the extent not required to be disclosed in the Audited Financial Statements or which do not materially detract from the value or use (in the manner used as of the Closing Date) of such Subject Assets or the value of the Business.

6.06 <u>Financial Statements</u>. Homco has delivered to Purchaser and <u>Schedule 6.06</u> contains the following:

(a) Complete copies of the following consolidated financial statements of Homco and the Subsidiaries (the "Management Reports"): (i) unaudited balance sheets as of December 31, 1990 and 1991; (ii) unaudited income statements for each of the two years ended December 31, 1990 and 1991; and (iii) unaudited income statements for the three-month periods ended March 31, 1991 and 1992 and the six-month periods ended June 30, 1991 and 1992. The Management Reports have been prepared by the accounting staffs of Sellers in the ordinary course of business and consistent with past practice. Except as set forth in <u>Schedule 6.06(b)</u>, the Management Reports have been prepared in accordance with the accounting principles used by Sellers in the ordinary course of business and consistent with past practice.

(b)    Complete copies of the following financial statements of Sellers (the "Standard Reports"):  (i) unaudited balance sheets as of December 31, 1990, 1991 and 1992 and (ii) unaudited income statements for each of the three years ended December 31, 1990, 1991 and 1992.  Except as set forth in Schedule 6.06(b), the Standard Reports have been prepared by the accounting staffs of Sellers in the ordinary course of business and consistent with past practice.  Except as set forth in Schedule 6.06(b), the Standard Reports have been prepared in accordance with the accounting principles used by Sellers in the ordinary course of business and consistent with past practice.

(c)    Audited consolidated balance sheets of Homco and the Subsidiaries as at December 31, 1991 and 1992, an audited consolidated statement of income of Homco and the Subsidiaries for the year ended December 31, 1992, and an audited consolidated statement of cash flows of Homco and the Subsidiaries for the year ended December 31, 1992 (collectively, the "Audited Financial Statements"), together with a report of Price Waterhouse thereon.  The Audited Financial Statements present fairly, in all material respects, in conformity with generally accepted accounting principles, the consolidated financial position of Homco and the Subsidiaries as at December 31, 1991 and 1992, and the consolidated results of their operations and their consolidated cash flows for the year ended December 31, 1992.

(d)    Statements setting forth reconciliations of the differences between (i) the Audited Financial Statements and

the corresponding Standard Reports and (ii) the Standard Reports
and the corresponding Management Reports.

(e) Since December 31, .1992, there has not been (i)
any material change in Sellers' accounting methods, principles or
practices, or (ii) any revaluation of the assets of Sellers,
including, but not limited to, writing down the value of invento-
ry or writing off notes or accounts receivable other than in the
ordinary course of business and consistent with past practice.

6.07   Litigation and Claims.   Except as set forth on
Schedule 6.07, there are no claims, actions, suits or proceedings
pending (except for those which have been filed in United States
federal court with respect to which none of Sellers has received
service of process) or, to the knowledge of Sellers and Grace,
threatened against any Seller or any of the Subject Assets,
before or by any Governmental Authority, or before any arbitra-
tion board or panel, wherever located, which individually or in
the aggregate if adversely determined would reasonably be expect-
ed to (i) affect the ability of any of Sellers to execute,
deliver or perform its obligations under this Agreement or any
Closing Document or (ii) have a Material Adverse Effect.

6.08   Labor and Employment.   Schedule 6.08 sets
forth a list of (a) all collective bargaining or other agreements
with labor unions to which any Seller is a party, and (b) all
written employment agreements to which any Seller is a party
which will remain in effect after the Closing, other than stan-

dard employment agreements entered into by employees of the
Subsidiaries employed outside the United States.  Sellers have
delivered or made available to Purchaser true and complete copies
of all such agreements.  Except as otherwise disclosed on Sched-
ule 6.08(c), there is no labor strike, dispute, work slowdown,
work stoppage or other job action pending or, to the knowledge of
the Sellers and Grace, threatened against any Seller, which would
have a Material Adverse Effect.  Except as otherwise disclosed in
Schedule 6.08(d), each Seller is in material compliance with all
applicable laws, rules or regulations respecting employment and
employment practices, terms and conditions of employment and
wages and hours, and no Seller has engaged in any unfair or
illegal labor practice which has not been remedied as of the date
hereof.  Except as disclosed in Schedule 6.08(e), there is no
unfair labor practices complaint or charge of employment discrim-
ination pending or, to Homco's knowledge, threatened against any
Seller with respect to any employee before the National Labor
Relations Board, if applicable, the Equal Employment Opportunity
Commission, or any other state, federal or local court or govern-
ment board, agency or commission.

     6.09  Insurance.  Schedule 6.09 describes all mate-
rial property and casualty insurance coverage maintained by or on
behalf of Sellers.

     6.10  Contracts.  Except for master service and
other similar agreements and any schedules or addenda thereto,

Schedule 6.10 lists all contracts and agreements ("Contracts") to
which any Seller is a party under which it is reasonably expected
that the Sellers will make expenditures or obtain receipts during
the remaining noncancellable portion of the term of such Contract
of more than $100,000 per year.  Each of the Contracts is a valid
and binding obligation of the Seller that is a party to such
Contract and, to the knowledge of Sellers and Grace, a valid and
binding obligation of the other party or parties thereto, except,
in each case, as may be limited by (i) the course of conduct of
the parties to the Contracts, (ii) any applicable bankruptcy,
insolvency, reorganization, receivership, moratorium, fraudulent
transfer and conveyance laws and other similar laws of general
application relating to or affecting the rights and remedies of
creditors or (iii) general principles of equity, whether applied
by a court of law or equity.  Neither any Seller nor, to the
knowledge of Sellers and Grace, any other party has terminated or
canceled any of the Contracts.  Neither any Seller nor, to the
knowledge of Sellers and Grace, any other party is in breach of,
or default under, any provision of such Contract, which default
or breach, in each case, could have a Material Adverse Effect.
Homco has heretofore delivered or made available to Purchaser
true and complete copies of all such Contracts, including all
formal written amendments thereof.

  6.11  Employees; Benefit Plans.  Schedule 6.11 lists
all plans pursuant to which employees of Sellers receive or may
receive health, hospitalization or life insurance benefits or

pension or other retirement benefits.  Homco has heretofore delivered or made available to Purchaser summaries of all such plans.

6.12    Employee Benefit Matters.  As used in this Section 6.12, the "Company" shall include Homco and any member of a controlled group or affiliated service group as defined in Sections 414(b), (c), (m) and (o) of the Internal Revenue Code of 1986, as amended (the "Code"), and Section 4001 of ERISA of which Homco is a member.

The consummation of the transactions contemplated by this Agreement (and the employment by Purchaser of former employees of Homco) will not result in any liability to Purchaser for taxes, penalties, interest or any other claims resulting from any employee benefit plan (as defined in Section 3(3) of ERISA) or other employee benefit agreement or arrangement of any member of the Company.  With respect to employee pension benefit plans of the Company: as of the Closing Date, (i) no member of the Company is subject to a lien arising under ERISA or the Code or has become liable to the PBGC under Section 4062, 4063 or 4064 of ERISA under which a lien could attach to the assets of any member of the Company; (ii) no member of the Company has ceased operations at a facility so as to become subject to the provisions of Section 4062(e) of ERISA; and (iii) no member of the Company has made a complete or partial withdrawal from a multiemployer plan (as defined in Section 3(37) of ERISA) so as to incur withdrawal

liability as defined in Section 4201 of ERISA which liability exists on the Closing Date.

6.13    Permits and Licenses.    Sellers possess the permits and licenses (the "Permits"), including the permits and licenses within the categories listed on Schedule 6.13, necessary for the conduct of the Business as it is now being conducted and necessary to own, operate, maintain and use the Subject Assets in the manner in which they are now being operated, maintained and used, except for those Permits where the failure to possess would not have a Material Adverse Effect.

6.14    Subject Assets.    Except with respect to the provision by Grace Entities of certain legal, financial, administrative and other staff functions and services, the Subject Assets and the Excluded Assets, to the extent related to the Business, together constitute the material properties, rights, interests and other assets, of every type and description, whether real, personal or mixed and whether tangible or intangible, used by Sellers in connection with the conduct of the Business.

6.15    Subject Liabilities.    The Subject Liabilities and the Excluded Liabilities, to the extent related to the Business, together constitute the material liabilities and obligations, of every type and description, affecting or related to the Business.

34

6.16    <u>Compliance with Laws</u>. Except as otherwise set forth on <u>Schedule 6.16</u> and except with respect to Environmental Laws (the representations and warranties in respect of which are set forth in Section 6.19), each of Sellers is in compliance with all laws, ordinances, codes, restrictions, judgments, orders, rules, regulations and other legal requirements, domestic or foreign, applicable to the conduct of the Business, other than where the noncompliance therewith would not have a Material Adverse Effect.

6.17    <u>Operation in Ordinary Course</u>. Except as set forth on <u>Schedule 6.17</u> and the sale of certain surplus properties, since December 31, 1992 the Business has been operated in the ordinary course and consistent with past practice. Since December 31, 1992, Sellers have not disposed of, other than in the ordinary course of business and consistent with past practice, or suffered an uninsured casualty loss with respect to, any asset whose fair market value at the time of such disposition or loss was greater than $100,000.

6.18    <u>Absence of Adverse Changes</u>. Except as otherwise set forth on <u>Schedule 6.18</u> and except as may result from changes attributable to general industry conditions, since December 31, 1992, there has not been any material adverse change in the financial condition, results of operations or business of Sellers, taken as a whole, or any condition, event or development

that reasonably may be expected to result in any such material adverse change.

6.19  <u>Environmental Matters</u>.  Except as set forth on <u>Schedule 6.19</u> or <u>Schedule 14.02(b)</u>: (a) the Business, Properties, and Facilities are in substantial compliance with all Environmental Laws; (b) to the knowledge of Sellers and Grace, Sellers have no liability for remediation actions (including removal, response, cleanup, investigative and monitoring of contaminants or pollutants) resulting from any release, discharge, placement, migration or movement of contaminants or pollutants into the environment from any of the Facilities or Properties; (c) there are no claims, actions, suits or proceedings, judgments, orders, writs, or injunctions of any court or Governmental Authority pending or presently in effect or, to the knowledge of Sellers and Grace, threatened against any Seller relating to Environmental Laws, which would reasonably be expected to (i) have an adverse effect on the ability of the Sellers and Grace to execute, deliver, or perform their obligations under this Agreement or (ii) have a Material Adverse Effect.  Homco has made available to Purchaser copies of all environmental audits or assessments prepared with respect to the Facilities or Properties, or any portion of the Facilities or Properties, which are in the possession of any of Sellers.

## ARTICLE 7

## Representations and Warranties by Purchaser

Purchaser hereby represents and warrants to Seller as follows:

7.01   Incorporation.   Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, with full corporate power and authority to execute and deliver this Agreement and the Closing Documents to which it is a party and to perform its obligations hereunder and thereunder.

7.02   Authorization.   The execution and delivery by Purchaser of this Agreement and the Closing Documents to which it is a party, and the performance by Purchaser of its obligations hereunder and thereunder, has been duly and validly authorized by all necessary corporate action of Purchaser.  This Agreement has been duly executed and validly delivered by Purchaser and constitutes legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its terms, except as such enforcement may be limited by (i) any applicable bankruptcy, insolvency, reorganization, receivership, moratorium, fraudulent transfer and conveyance laws and other similar laws of general application relating to or affecting the rights and remedies of creditors or (ii) general principles of equity, whether applied by a court of law or equity.  The Closing Documents, when executed and delivered at the Closing, will have been duly executed and

37

validly delivered by Purchaser and will constitute legal, valid
and binding obligations of Purchaser enforceable against Purchas-
er in accordance with their terms, except as such enforcement may
be limited by (i) any applicable bankruptcy, insolvency, reorga-
nization, receivership, moratorium, fraudulent transfer and
conveyance laws and other similar laws of general application
relating to or affecting the rights and remedies of creditors or
(ii) general principles of equity, whether applied by a court of
law or equity.

7.03  No Conflict.  Neither the execution and deliv-
ery by Purchaser of this Agreement and the Closing Documents to
which it is a party, nor the performance by Purchaser of its
obligations hereunder and thereunder, will (a) conflict with the
certificate of incorporation or by-laws of Purchaser, (b) result
in the breach of any of the provisions of, or constitute a
default under, any judgment, writ, order or decree to which
Purchaser is a party or by which Purchaser is bound, which breach
or default would have a material adverse effect upon the busi-
ness, financial condition or results of operation of Purchaser
and its subsidiaries, taken as a whole, (c) violate any provision
of law applicable to Purchaser, or (d) breach or constitute a
default (or an event that, with notice or lapse of time or both,
would constitute a default) under, or permit the termination of
any provision of, or result in the creation or imposition of any
lien upon any properties, assets or business of Purchaser under,
any note, bond, indenture, mortgage, deed of trust, lease,

38

franchise, permit, authorization, license, contract, instrument or other agreement or commitment to which Purchaser is a party or by which Purchaser or any of its assets or properties is bound or encumbered, except those that are required pursuant to bank loan agreements or leasing arrangements, as set forth on Schedule 7.03, and except in any of the cases enumerated in clauses (c) and (d) those which breach or default would not adversely affect the ability of Purchaser to execute and deliver this Agreement or any Closing Document to which it is a party or perform its obligations hereunder or thereunder.

7.04 Sufficient Funds. Purchaser will have on the Scheduled Closing Date sufficient funds to consummate the transactions contemplated hereby.

## ARTICLE 8
### Disclaimer of Additional and Implied Warranties

8.01 General Disclaimer. EXCEPT AS SET FORTH IN ARTICLE 6 OR THE SCHEDULES THERETO, AND EXCEPT FOR ANY EXPRESS WARRANTIES OF OR CONCERNING TITLE CONTAINED IN ANY DEED OR OTHER INSTRUMENT OF CONVEYANCE EXECUTED AND DELIVERED, OR TO BE EXECUTED AND DELIVERED, PURSUANT TO THIS AGREEMENT, PURCHASER UNDERSTANDS AND AGREES THAT NONE OF THE SELLERS, GRACE ENTITIES OR ANYONE ACTING ON THEIR BEHALF IS MAKING ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES WITH RESPECT TO SELLERS, SUBJECT ASSETS, SUBJECT LIABILITIES, EXCLUDED ASSETS, EXCLUDED LIABILITIES OR BUSINESS, INCLUDING, BUT NOT LIMITED TO, CAPACITY,

SUITABILITY, UTILITY, SALABILITY, AVAILABILITY, COLLECTIBILITY, OPERATION, CONDITION, MERCHANTABILITY OR FITNESS FOR ANY PURPOSE OR A PARTICULAR PURPOSE. SUBJECT TO THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE 6 AND THE SCHEDULES THERETO, PURCHASER ACCEPTS THE SUBJECT ASSETS ON AN "AS IS, WHERE IS, WITH ALL FAULTS" BASIS.  PURCHASER ASSUMES THE FULL RISK OF FUTURE PROSPECTS AND CONTINUATION OF RELATIONSHIPS WITH CUSTOMERS AND SUPPLIERS AS WELL AS ALL BUSINESS AND FINANCIAL RISK, INCLUDING THE NEED FOR SUBSTANTIAL WORKING CAPITAL, IN CONNECTION WITH THE OPERATION OF THE BUSINESS AFTER CLOSING.

Except as may be set forth in Article 6 and the Schedules thereto, and in the Closing Documents, Sellers and the Grace Entities expressly disclaim any and all obligations or liability for any representations and warranties, express or implied, contained in any oral communications heretofore made by any Seller or Grace Entity to Purchaser in the course of its investigation of Sellers, the Subject Assets, the Subject Liabilities, the Excluded Assets, the Excluded Liabilities and the Business.

8.02  **Asbestos**.  Purchaser acknowledges that asbestos-containing materials were in frequent use in the construction and/or renovation of buildings and are or may be present in the Facilities.  Purchaser represents that it has inspected, or, has been given the opportunity to inspect, the Facilities for the same to the extent it has deemed appropriate.  Purchaser acknowledges that no representations or warranties, expressed or im-

40

plied, are or have been made by Sellers or Grace regarding the
presence or condition of such asbestos-containing materials in
the Facilities.

### ARTICLE 9

### Covenants of Sellers and Purchaser; Employees

9.01  Access and Inquiry.  Between the date of this
Agreement and the Closing Date, Purchaser shall have access to
the Facilities and the Properties and will, upon request, be
permitted to contact and make reasonable inquiry of Sellers'
personnel regarding the Business, the Subject Assets and the
Subject Liabilities.   Sellers shall make available to Purchaser
all books, records, relevant purchasing and other financial and
operational data and files of Sellers relating to the Business,
Sellers, the Subject Assets and the Subject Liabilities to the
extent reasonably requested by Purchaser.  Purchaser agrees that
the terms of the Confidentiality Agreement shall apply to infor-
mation gained by Purchaser pursuant to the foregoing and/or
previously made available to Purchaser.

9.02  Hart-Scott-Rodino Act.  As promptly as practi-
cable after the date of this Agreement, Grace and Purchaser shall
file appropriate Notification and Report Forms under the HSR Act
with respect to this Agreement and the transactions contemplated
hereby.  Grace and Purchaser shall cooperate to coordinate such
filings, and to make reasonable efforts to respond to any govern-
mental request or inquiry with respect thereto; but neither

41

Grace, Purchaser nor any of their respective affiliates shall be required to make any payment (other than for reasonable legal fees) that it is not presently contractually required to make, divest any assets, make any change in the conduct of its business, accept any limitation on the future conduct of its business, enter into any other agreement or arrangement with any person that it is not presently contractually required to enter into, accept any significant modification in any existing agreement or arrangement, or agree to any of the foregoing, or to litigate or participate in administrative actions regarding such filings.  In the event that the parties determine that it is appropriate to engage an economist in connection with any filings under the HSR Act, the parties will engage Lexecon Inc.

9.03  <u>Permits and Licenses</u>.  As soon as practicable after the date hereof, Purchaser shall prepare and file with the appropriate permitting and licensing authorities applications for the issuance to Purchaser of all federal, state, local and foreign permits and licenses required for the Purchaser to operate the Business or the Facilities, and Purchaser shall use all reasonable efforts to secure such permits and licenses. Sellers shall use their reasonable efforts to assist Purchaser in preparation of such applications.

9.04  <u>Notices; Consents; Reasonable Efforts</u>.  Subject to the terms and conditions of this Agreement, Sellers and Purchaser shall cooperate to (i) give notice to all third parties and obtain all consents, waivers, approvals, authorizations and

42

orders required in connection with the authorization, execution
and delivery of this Agreement and the consummation of the
transactions contemplated hereby, including consents of third
parties set forth on Schedule 9.04; and (ii) take, or cause to be
taken, all reasonable action, and do, or cause to be done, all
reasonable things to consummate and make effective as promptly as
practicable the transactions contemplated by this Agreement. It
is understood that Sellers' obligations under this Section 9.04
do not require any of the Sellers to compromise in any manner or
settle the NL Litigation.

9.05 Employees. (a) As referred to in this Section
9.05, the term "Employees" shall include all of Sellers' active
employees and those on lay-off, temporary furlough or leave of
absence, whether paid or unpaid, immediately prior to the
Closing. Effective as of the Closing, except as otherwise agreed
by the parties, Sellers will terminate the employment of all of
their Employees. Not later than the Closing Date, all Employees
employed in the United States will be offered employment,
commencing on the Closing Date, by Purchaser or an affiliate or
subsidiary of Purchaser (collectively, for purposes of this
Section 9.05, the "Purchaser") on such terms and conditions as
are determined by Purchaser, or shall be notified that they are
entitled to receive the severance entitlements described in the
"Grace Energy Corporation and Subsidiary, Special Retention and
Severance Pay Program" and certain other special severance
arrangements as set forth in Schedule 9.05 (the "Severance

Entitlement Program"). Purchaser shall reimburse to Grace any amounts incurred by Grace as a result of providing those severance entitlements, in accordance with the Employee Benefits Agreement. Not later than the Closing Date, all Employees employed outside of the United States shall be offered employment, commencing on the Closing Date, by Purchaser on substantially the same terms and conditions as were applicable to such Employee immediately prior to Closing.

(b)    Purchaser shall, at the time Purchaser makes an offer of employment to any Employee employed in the United States, notify such Employee that he or she will continue to be covered by Purchaser under Purchaser's new temporary severance plan or program that provides to salaried Employees benefits comparable to the Severance Entitlement Program and to hourly Employees benefits comparable to the Sellers' severance pay plan or program for hourly Employees ("Purchaser's Temporary Severance Plan") for a 12 month period following the Closing Date if he or she elects to accept such offer of employment. Purchaser shall also, at the time Purchaser makes an offer of employment to any Employee employed outside the United States, notify such Employee that he or she will be covered by Purchaser's Temporary Severance Plan for a 12 month period after the Closing Date.

(c)    Purchaser shall pay to each Employee, who becomes an employee of Purchaser on the Closing Date, on the next regularly scheduled payroll date for such Employee after the

44

Closing Date, the amount of salaries, wages and any incentive compensation due to such Employee as of the Closing Date. With respect to an Employee who does not become an employee of Purchaser on the Closing Date, Sellers shall pay to such Employee when owed, and Purchaser shall reimburse Sellers within five business days after receipt of an invoice therefor from Sellers, the amount of salaries, wages and any incentive compensation due to such Employee as of the Closing Date.

(d)     Purchaser agrees to indemnify Grace, Sellers and any Grace Entity for any claim or action relating in any way to termination after the Closing of Employees employed by Purchaser outside of the United States.

9.06    No Shopping. No Grace Entity will, directly or indirectly, through any officer, director, employee, representative or otherwise, solicit, initiate or encourage submission of proposals or offers from any person or entity (other than Purchaser) relating to any merger, acquisition or purchase of all or (other than in the ordinary course of business and consistent with prior practice) substantially all of the assets of, or any equity interest in, any Seller or any business combination with any Seller (collectively, an "Acquisition Transaction") or participate in any negotiations regarding, or furnish to any other person any information with respect to any Seller for the purposes of, or otherwise cooperate in any way with, or assist or

45

participate in, facilitate or encourage, any effort or attempt by any other person to seek or effect an Acquisition Transaction.

9.07   <u>Notification of Certain Matters</u>.   Sellers shall give prompt notice to Purchaser, and Purchaser shall give prompt notice to Sellers, orally and in writing, of (i) the occurrence, or failure to occur, of any event which occurrence or failure would cause any representation or warranty contained in Article 6 to be untrue or inaccurate in any material respect at the Closing Date, and (ii) any material failure of Sellers, Grace or Purchaser, as the case may be, or any officer, director, employee or agent thereof, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder.

9.08   <u>Public Statements</u>.   Prior to the Closing Date, Grace, Sellers and Purchaser agree to consult with each other prior to issuing any press release or otherwise making any public statement with respect to the transactions contemplated hereby, and shall not issue any such press release or make any such public statement prior to such consultation, except as may be required by law or applicable stock exchange policy.

9.09   <u>Grace and Sellers' Corporate Action.</u>   (a) The management of Grace shall, on or prior to February 5, 1993, (a) present to its Board of Directors for approval, and recommend that its Board of Directors approve, the execution and delivery of this Agreement and the Closing Documents and the performance

46

of its obligations hereunder and thereunder, and (b) recommend to
its Board of Directors that it approve of the Sellers' execution
and delivery of this Agreement and the Closing Documents and the
performance of their respective obligations hereunder and there-
under.

(b)    Upon receipt of the approval of the Board of
Directors of Grace of the matters presented to it pursuant to
Section 9.09(a), Grace and Homco shall cause any of the other
Sellers that have not executed and delivered this Agreement on
the date hereof (i) to take all necessary corporate action re-
quired to duly authorize the execution and delivery of this
Agreement and to consummate the transactions contemplated hereby,
and (ii) to execute and deliver this Agreement to Purchaser.

### ARTICLE 10

### Conduct of Business Prior to the Closing

Except as otherwise consented to by Purchaser, from
the date of this Agreement until the Closing:

10.01  <u>Operation in Ordinary Course</u>.  Sellers shall
conduct the Business only in the ordinary course of business and
consistent with prior practice.

10.02  <u>Disposition of Assets</u>.  Sellers (a) shall not
sell, lease (as lessor), transfer, license (as licensor), or
otherwise dispose of, or encumber any Subject Asset, other than
inventory in the ordinary course of business and consistent with

47

prior practice, and (b) shall not sell any fixed assets or rental tools where the aggregate net proceeds exceed $30,000.

10.03   <u>Material Agreements</u>.   Sellers shall not enter into any agreement with any third party, other than in the ordinary course of business and consistent with prior practice.

10.04   <u>Business Organization and Customer Relations</u>. Sellers shall use reasonable efforts to preserve intact the Business and relations with customers, suppliers and employees, and to maintain the Subject Assets in such operating condition as exists as of the date hereof, except for deterioration due to wear and tear and damage due to casualty.

10.05   <u>Title Commitments</u>.   Purchaser may cause a title search of the Properties to be made by a reputable title insurance company authorized to do business in the state where the subject property is located within fifteen (15) days from the date of this Agreement.   In the event that Sellers shall be unable to convey good and marketable title, Purchaser shall deliver to Sellers a written notice within five (5) days from the date of Purchaser's receipt of a title report, time being of the essence, specifying any title defect ("Noncompliance"), whereupon Sellers shall exercise reasonable efforts to cure the Noncompliance prior to Closing.

### ARTICLE 11

#### <u>Conditions Precedent to the Obligations of Purchaser</u>

All obligations of Purchaser under this Agreement are subject, at Purchaser's option, to the fulfillment or waiver prior to or at the Closing, of each of the following conditions:

11.01  <u>Accuracy of Representations and Warranties</u>. Each and every representation and warranty of Homco and Grace under this Agreement shall be true and accurate in all material respects as of the date when made and as of the Closing, except for changes in the ordinary course of business and consistent with past practice between the date of this Agreement and the Closing, none of which alone or in the aggregate has a Material Adverse Effect.

11.02  <u>Performance of Covenants and Agreements</u>. Each Seller and Grace shall have performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by such Seller or Grace at or prior to the Closing in accordance with this Agreement.

11.03  <u>Hart-Scott-Rodino Act</u>.  All waiting periods under the HSR Act applicable to the transactions contemplated by this Agreement shall have expired, by passage of time or by valid early termination by the FTC or the DOJ; no representative of either the FTC or the DOJ shall be taking the position that any of such waiting periods has not commenced to run or has not expired for any reason; and no representative of either the FTC or the DOJ shall have requested a delay of the Closing for a

period which has not expired, which request has not been with-drawn.

11.04  **Permits, Consents, etc**.  There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority re-quired in connection with the transactions contemplated by this Agreement or consent of a third party listed on Schedule 11.04 which has not been accomplished or obtained and which may not be accomplished or obtained after the Closing.

11.05  **Litigation**.  No action, suit, proceeding, investigation, inquiry or request for information by any third person (including but not limited to any Governmental Authority) shall have been instituted or threatened against any Seller or Purchaser or any of their respective affiliates that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement, the Employee Benefits Agreement or the transactions contemplated hereby or thereby which, if successful, would adversely affect the right of Purchaser to consummate the transactions contemplated hereby or to continue the Business substantially as currently conducted.

11.06  **Certificate of Homco and Grace**.  Homco and Grace shall have delivered to Purchaser a certificate of Homco and Grace, dated the Closing Date, signed by the President or any Vice President of Homco and the President or any Vice President of Grace, certifying that (i) each and every representation and

50

warranty of Homco and Grace under Article 6 was true and accurate in all material respects as of the date hereof and is true and accurate in all material respects as of the Closing, except for changes in the ordinary course of business and consistent with past practice between the date of this Agreement and the Closing, none of which alone or in the aggregate would have a Material Adverse Effect; and (ii) each of the Sellers has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by such Seller at or prior to the Closing in accordance with this Agreement.

11.07  Opinion of Seller's Counsel.  Sellers shall have delivered to Purchaser an opinion of Robert H. Beber, Senior Vice President and General Counsel of Grace, dated the Closing Date, with respect to due organization of certain of the Sellers, and the due authorization, execution and delivery of this Agreement and the Closing Documents by certain of the Sellers and Grace.  Such opinion may be limited to the laws of the State of New York and the Delaware General Corporation Law.

11.08  Bellaire Sublease and Lafayette Lease.  All landlords' consents required to be obtained by Homco in order to enter into the Bellaire Sublease and the Lafayette Lease shall have been obtained or waived.

## ARTICLE 12

## Conditions Precedent to the Obligations of Sellers

All obligations of Sellers under this Agreement are subject, at Sellers' option, to the fulfillment or waiver prior to or at the Closing, of each of the following conditions:

12.01  **Accuracy of Representations and Warranties.** Each and every representation and warranty of Purchaser under this Agreement shall be true and accurate in all material respects as of the date when made and as of the Closing.

12.02  **Performance of Covenants and Agreements.** Purchaser shall have performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by Purchaser at or prior to the Closing in accordance with this Agreement.

12.03  **Hart-Scott-Rodino Act.**  All waiting periods under the HSR Act applicable to the transactions contemplated by this Agreement shall have expired, by passage of time or by valid early termination by the FTC or the DOJ; no representative of either the FTC or the DOJ shall be taking the position that any of such waiting periods has not commenced to run or has not expired for any reason; and no representative of either the FTC or the DOJ shall have requested a delay of the Closing for a period which has not expired, which request has not been withdrawn.

12.04  <u>Litigation</u>.  No action, suit, proceeding, investigation, inquiry or request for information by any third person (including but not limited to any Governmental Authority) shall have been instituted or threatened against any of the Sellers or Purchaser or any of their respective affiliates that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement, the Employee Benefits Agreement or the transactions contemplated hereby or thereby which, if successful, would adversely affect the right of any Seller to consummate the transactions contemplated hereby.

12.05  <u>Certificate of Purchaser</u>.  Purchaser shall have delivered to Sellers a certificate of Purchaser, dated the Closing Date, signed by the President or a Vice President of Purchaser, certifying that: (i) each and every representation and warranty of Purchaser under Article 7 was true and accurate in all material respects as of the date hereof and is true and accurate in all material respects as of the Closing; and (ii) Purchaser has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by Purchaser at or prior to the Closing in accordance with this Agreement.

12.06  <u>Opinion of Purchaser's Counsel</u>.  Purchaser shall have delivered to Sellers an opinion of H. Suzanne Thomas, Senior Vice President and General Counsel of Purchaser, dated the

Closing Date, with respect to due organization of Purchaser and due authorization, execution and delivery of this Agreement and the Closing Documents by Purchaser. Such opinion may be limited to the laws of the State of Texas and the Delaware General Corporation Law.

12.07 <u>Board Approval</u>. The Boards of Directors of Sellers and Grace or duly established committees thereof shall have duly approved and authorized the transactions contemplated by this Agreement and the Closing Documents.

ARTICLE 13

<u>General Indemnification</u>

13.01 <u>Definitions</u>. As used in this Article:

(a) "Damages" means any and all penalties, judgments, fines, damages, liabilities, losses, expenses or costs (including, without limitation, Litigation Expenses, but excluding consequential damages and damages for lost profits).

(b) "Litigation Expenses" means reasonable attorneys' fees and other costs and expenses incident to proceedings or investigations respecting, or the prosecution or defense of, a claim.

(c) "Third Party Claims" means any and all claims, demands, suits, actions or proceedings by any person or entity, other than Purchaser or Sellers or their respective affiliates, which could give rise to a right of indemnification under this Article.

13.02   <u>Indemnification by Purchaser</u>.

(a)    Subject to the terms, conditions and limita-
tions of this Article, Purchaser shall defend, indemnify and hold
each Seller and the Grace Entities, and their respective affili-
ates and controlling persons, officers, directors and employees
harmless from and against any Damages caused by or arising out of
(i) the failure of Purchaser to perform or fulfill any agreement
or covenant to be performed or fulfilled by it under this Agree-
ment or any Closing Document, (ii) any inaccuracy in any repre-
sentation or breach of any warranty of Purchaser set forth in
Article 7 or any Closing Document, or (iii) the failure of the
Purchaser to pay or satisfy, or to cause to be paid or satisfied,
any of the Subject Liabilities for which any of the Sellers or
any Grace Entity is or becomes liable, whether by guaranty or
otherwise.

(b)    The representations and warranties of Pur-
chaser set forth in Article 7 shall survive the Closing.

13.03   <u>General Indemnification by Homco and Grace</u>.

(a)    Subject to the terms, conditions and limita-
tions of this Article and except for the matters governed by
Section 14.02, Homco and Grace shall defend, indemnify and hold
Purchaser, and its affiliates and controlling persons, officers,
directors and employees harmless from and against any Damages
caused by or arising out of

(i) the failure of any Seller or Grace to perform or
fulfill any agreement or covenant (other than the covenant set

55

forth in Section 10.02(b)) to be performed and fulfilled by it under this Agreement or under any Closing Document,

(ii) any inaccuracy in any representation or breach of any warranty of Homco or Grace set forth in Article 6 or in any Closing Document (in each case, other than Section 6.19(b), the indemnification provisions with respect thereto being addressed in Section 14.02),

(iii) claims asserted against Purchaser which seek relief in the form of (A) return, replacement or repair of products made or assembled by or on behalf of any Seller and sold by or on behalf of any Seller (as an authorized representative, agent or distributor of such Seller) prior to the Closing Date, (B) additional curative services related to services rendered prior to the Closing Date, pursuant to express or implied product or service warranties extended by any Seller in connection with the sale of such products or services, and (C) product liability claims relating to products made or assembled by or on behalf of any of Sellers and sold by or on behalf of any of Sellers (or an authorized representative, agent or distributor of any of Sellers) prior to the Closing Date, except that Homco and Grace shall have no liability or obligation under this Section 13.03(a)(iii) unless and until the aggregate amount of Damages incurred or suffered by Purchaser referred to in this Section 13.03(a)(iii) exceeds an amount equal to the sum of (x) $100,000 and (y) the amount reserved for such claims set forth on the Closing Balance Sheet, as may be adjusted pursuant to Section 5.01(c) (the

"Warranty Threshold"), and then only with respect to the amount by which such aggregate Damages exceed the Warranty Threshold.

(b)    The representations and warranties of Homco and Grace set forth in Article 6 shall survive the Closing.  The representations and warranties set forth in Sections 6.04 through 6.18 shall expire and be of no further force and effect on the thirtieth month anniversary of the Closing Date except with respect to claims Purchaser has asserted against Homco or Grace in writing, setting forth with reasonable specificity the nature of such claims, at or before 5:00 p.m. (central time) on or before such date.

(c)    Sellers and Grace shall have no liability for or in connection with the failure of Sellers or Grace to comply with the provisions of Article 10 if such failure to comply was known by Purchaser on or prior to the Closing Date.

(d)    Purchaser waives compliance by Sellers, and Sellers waive compliance by Purchaser, with the applicable provisions of the Uniform Commercial Code regarding bulk sales, or any other similar bulk sales law, as presently in effect, and Homco and Grace covenant and agree to pay and discharge when due (and indemnify Purchaser from and against) all claims of creditors which could be asserted against Purchaser (or against assets sold or purportedly sold by Sellers to Purchaser) by reason of such non-compliance, to the extent that such liabilities are not Subject Liabilities.

13.04  Limitations.  (a) Except for indemnification provided for under Section 13.03(a)(iii), Purchaser may not assert any claim for indemnification against Homco or Grace under this Article (collectively, "Section 13.03 Claims") unless (i) the condition, event, occurrence, action or omission giving rise to such Section 13.03 Claim gives rise to Damages in excess of $10,000 ("Threshold"); and (ii) the aggregate amount of Section 13.03 Claims that may be asserted under clause (i) of this subsection shall exceed $750,000 ("Deductible"), and then only with respect to the excess of such Section 13.03 Claims over $750,000.  In determining whether Damages have exceeded the Threshold or the Deductible, Litigation Expenses shall be excluded.

(b)  The dollar threshold and limitations set forth in this Section have been negotiated for the special purposes of the provisions in which they appear, and are not to be taken as evidence of the level of "materiality" for purposes of any statutory or common law which may be applicable to the transactions contemplated by this Agreement under which a level of materiality might be an issue.

13.05  Procedure for Claims.  If any party indemnified under Section 13.02 or 13.03 (the "Claimant") desires to make a claim against any party obligated to provide indemnification under Section 13.02 and 13.03 (the "Indemnitor"), with

respect to any matter covered by such indemnification obligation, the procedures for making such claim shall be as follows:

(a) <u>Third Party Claims</u>. If the claim is for indemnification with respect to any Third Party Claim, the Claimant will give prompt written notice to the Indemnitor of the institution, assertion or making of such Third Party Claim, and the nature thereof. Upon delivery of such notice, the claim specified therein shall be deemed to have been made for purposes of this Agreement. If the Claimant fails to give such notice and Indemnitor is precluded from asserting a defense, Claimant shall be deemed to have waived rights to indemnification or payment with respect to such Third Party Claim but only to the extent the Indemnitor suffers actual loss as a result of such failure. Upon prior written notice to Claimant, Indemnitor may, within 30 days after receipt of Claimant's notice, proceed, at the Indemnitor's sole expense, to cure, defend, compromise or settle the Third Party Claim, in the name of the Claimant or otherwise. If Indemnitor undertakes defense of any Third Party Claim, Claimant shall cooperate with Indemnitor and its counsel in the investigation and defense thereof, and may participate in such investigation and defense, at its own expense, but Indemnitor shall control the negotiation, tactics, trial, appeals and other matters and proceedings related thereto, except that Indemnitor shall not, without the prior written consent of Claimant, in connection with such Third Party Claim, require Claimant to take or refrain from taking any action, or make any public statement,

59

which Claimant reasonably considers to be against its interest, or consent to any settlement that requires Claimant to make any payment that is not fully indemnified hereunder.  If the Indemnitor notifies Claimant that it does not wish to assume the defense of such Third Party Claim, or if the Indemnitor fails to respond to the Claimant's notice of the Third Party Claim within 30 days after receipt of such notice or fails to proceed in a diligent and timely manner to cure, defend, compromise or settle a Third Party Claim for which it has assumed the defense pursuant to the foregoing provisions, the Claimant may proceed to cure, defend, compromise or settle the Third Party Claim as it shall in its sole discretion deem to be advisable, without prejudice to any right to indemnification the Claimant may have against the Indemnitor with respect thereto, whether pursuant to this Agreement or otherwise, and in such event any liability of the Indemnitor to the Claimant for indemnification with respect to such Third Party Claim shall be determined by a final and nonappealable judgment entered by a court of competent jurisdiction, or by written consent of the Indemnitor.

(b)  <u>Non-Third Party Claims</u>.  If the claim is for indemnification with respect to a matter other than a Third Party Claim, the Claimant will give prompt written notice to the Indemnitor of such claim, setting forth with reasonable particularity the basis, nature and dollar amount thereof.  Upon delivery of such notice the claim specified therein shall be deemed to have been made for purposes of this Agreement.  The Indemnitor

shall, within 30 days after receipt of such notice, give written notice to the Claimant as to whether or not the Indemnitor accepts the responsibility to indemnify the Claimant with respect to such claim.   If the Indemnitor fails to respond to notice of such claim within 30 days after receipt of such notice or denies responsibility therefor, the liability of the Indemnitor to the Claimant for indemnification with respect to such claim shall be determined by a final and nonappealable judgment entered by a court of competent jurisdiction, or by written consent of the Indemnitor.

      13.06   <u>Consequential and Lost Profit Damages</u>. Neither party shall seek or be entitled to consequential damages or damages for lost profits in any claim for indemnification under this Article, nor shall it accept payment of any award or judgment against the other party to the extent that such award or judgment includes consequential damages or damages for lost profits.

      13.07   <u>Survival Upon Sale of Business</u>.   In the event Purchaser sells all or any portion of the Business to one or more third parties, any of Homco's and Grace's continuing indemnification obligations under Section 13.03 shall remain owing to Purchaser, to the extent Purchaser may continue to have liability in respect thereof, whether pursuant to a claim by a Governmental Authority or such third parties.

## ARTICLE 14

### NL Litigation; Environmental Indemnification

14.01 NL Litigation.

(a)     In the event Purchaser shall receive any amounts after the Closing Date pursuant to Article VI of the Asset Purchase Agreement dated October 16, 1987 by and between NL Acme, NL Industries and Homco, including, but not limited to, all amounts which may be paid in settlement of, or in satisfaction of a judgment rendered in, the NL Litigation or otherwise attributable to the NL Litigation, Purchaser shall immediately pay to Homco all such amounts.

(b)  Homco shall retain complete control of all matters related to the NL Litigation.  Upon notice reasonably provided to Purchaser, Purchaser shall render to Homco such assistance as may be reasonably requested by Homco and its counsel, in the investigation and prosecution of the NL Litigation, shall make available to Homco, its counsel and other representatives all information and documents available to Purchaser which refer or relate to the NL Litigation, and shall render to Homco such assistance as may reasonably be required in order to ensure the proper and adequate prosecution of the NL Litigation.  Homco shall reimburse Purchaser for any out-of-pocket costs and expenses incurred by Purchaser in providing such assistance.  Purchaser shall not take any action with respect to the NL Litigation, except at Homco's request.  Purchaser agrees

to refer all inquiries referring or relating to the NL Litigation to Homco.

14.02  <u>Environmental Indemnification by Homco and Grace</u>.

(a)  For purposes of this Section, "Environmental Liabilities" means any and all liabilities, responsibilities, claims, suits, losses, costs (including remedial, removal, response, abatement, cleanup, investigative, and/or monitoring costs and any other related costs and expenses), other causes of action recognized now, damages, settlements, expenses, charges, assessments, liens, penalties, fines, prejudgment and post-judgment interest, attorneys' fees and other legal costs incurred or imposed (i) pursuant to any agreement, order, notice of responsibility, directive (including requirements embodied in Environmental Laws), injunction, judgment or similar documents (including settlements) arising out of, in connection with or under Environmental Laws, (ii) pursuant to any claim by a Govern-mental Authority or other entity or person for personal injury, property damage, damage to natural resources, remediation, or payment or reimbursement of response costs incurred or expended by such Governmental Authority or other entity or pursuant to common law or statute, or (iii) as a result of any act, omission, event, circumstance or condition on or in connection with the Business, the Facilities or the Properties prior to Closing, including, but not limited to, any course of conduct or operating practice which existed or commenced prior to Closing and any pollution, contamination, degradation, damage or injury caused

63

by, arising from or in connection with the generation, use,
handling, treatment, storage, disposal, discharge, emission or
release of contaminants or pollutants prior to Closing.

(b)    Homco and Grace shall defend, indemnify and hold
harmless Purchaser and its affiliates, controlling persons,
officers, directors and employees from and against and in respect
of any and all Environmental Liabilities that may be imposed
upon, asserted against or incurred by Purchaser, arising out of,
or in connection with, (i) the Excluded Assets, provided such
Environmental Liability is asserted against Purchaser as a result
of its purchase of Subject Assets from Sellers, (ii) any breach
by Homco or Grace of the representation or warranty contained in
Section 6.19(b), or (iii) remediation actions (including removal,
response, cleanup, investigative and monitoring of contaminants
or pollutants) resulting from any release, discharge, placement,
migration or movement of contaminants or pollutants into the
environment from any of the Facilities or Properties on or prior
to the Closing Date which conditions or contaminants were known
by Homco to exist on or prior to the Closing Date.

Part I of Schedule 14.02(b) sets forth a description of the
conditions or contamination existing at or on the Facilities or
Properties which the parties agree are known by Homco as of the
date hereof for which remediation actions are required as provid-
ed in Section 14.02(b)(iii).  Promptly after the date hereof,
Homco shall engage Sweetwater Corporation ("Sweetwater") to
prepare a written environmental report of the Facilities and

Properties for which Sweetwater prepared previous reports set forth in Part II of Schedule 14.02(b), based on Sweetwater's previously conducted investigation of such Facilities and Properties.  The costs and expenses of Sweetwater's report shall be paid by Homco.  Any conditions or contamination described in such report or any other report furnished to Purchaser by Homco for which remediation would be required by the owner or operator of such Facilities or Properties under any existing Environmental Law shall be deemed to be known by Homco on or before the Closing Date for purposes of Section 14.02(b)(iii) and shall be added to Part I of Schedule 14.02(b).

(c)    Subject to the terms, conditions and limitations of this Section 14.02(c), Homco and Grace shall defend, indemnify and hold harmless Purchaser and its affiliates and controlling persons, officers, directors and employees from and against and in respect of any and all Environmental Liabilities for remediation actions (including removal, response, cleanup, investigative and monitoring of contaminants or pollutants) that may be imposed upon, asserted against or incurred by Purchaser arising out of or resulting from any release, discharge, placement, migration or movement of contaminants or pollutants into the environment from any of the Facilities or Properties, which conditions or contaminants were not known by Homco to exist on or prior to the Closing Date.  Purchaser shall not be entitled to indemnification under this Section 14.02(c) until Purchaser's expenditures with respect to the occurrence giving rise to the Environmental Liability

exceed $100,000. With respect to an Environmental Liability attributable to an occurrence for which Purchaser's expenditures exceed $100,000, Homco and Grace shall defend, indemnify and hold harmless Purchaser for 50% of the amount by which such Environmental Liability exceeds $100,000. Further, when the total amount of Environmental Liabilities for which Purchaser is responsible pursuant to the sharing arrangement in this Section 14.02(c) equals $20 million, Homco and Grace shall defend, indemnify and hold harmless Purchaser for 100% of all such additional Environmental Liabilities incurred by Purchaser. For purposes of this Section 14.02(c), "occurrence" shall mean any condition, event, action, or omission which existed or took place prior to the Closing, provided, however, that (i) repeated conditions, events, actions or omissions at the same Facility or Property shall be deemed to be a single occurrence and (ii) separate occurrences that cause indivisible harm or require indivisible remediation action shall be deemed to be a single occurrence if such harm or remediation action cannot be reasonably allocated among such separate occurrences.

(d)    With respect to the Environmental Liabilities for which Purchaser may be entitled to indemnification under Sections 14.02(b)(ii), 14.02(b)(iii) or 14.03(c), Grace shall have the right to perform and complete all actions required by a Governmental Authority or may request Purchaser to undertake such actions. If Grace elects to take all actions required by a Governmental Authority, Grace shall coordinate such actions with

66

Purchaser so that such actions will be undertaken in a manner that does not unreasonably interfere with the business of Purchaser.  In addition, Grace shall keep Purchaser informed of all actions to be undertaken or implemented by Grace and shall provide Purchaser with copies of all plans, reports and correspondence submitted to the Governmental Authority.  Further, Grace shall give due consideration to any comments, suggestions or requests made by Purchaser with respect to the actions taken by Grace at the Facilities or Properties.  Similarly, if Grace requests Purchaser to take all actions required by a Governmental Authority, Purchaser shall take all actions required by such Governmental Authority.  Purchaser shall also keep Grace informed of the progress of such actions and shall provide Grace with copies of all plans, reports and correspondence submitted to the Governmental Agency with respect to such actions.  Purchaser shall also give due consideration to any comments, requests, or suggestions made by Grace with respect to such actions.

(e)    The Environmental Liabilities for which Homco and Grace shall be responsible under Sections 14.02(b)(ii) and 14.02(c) shall be Environmental Liabilities resulting from or related to a condition, event, action or omission for which Purchaser provides notice to Homco or Grace within five years after the Closing Date.

(f)    In the event Purchaser sells any Facility or Property to one or more third parties, any of Homco's and Grace's continuing indemnification obligations under this Section 14.02

for Environmental Liabilities relating to the ownership or operation of such Facility or Property shall remain owing to Purchaser, to the extent Purchaser may continue to have liability in respect thereof, whether pursuant to a claim by a Governmental Authority or such third parties (including any party that purchases such Facility or Property from Purchaser), and so long as Purchaser continues to fulfill its obligations under Section 14.02(d).

## ARTICLE 15

### Cooperation in Various Matters

15.01 <u>Mutual Cooperation</u>. After the Closing, each party to this Agreement shall cooperate with each other party and its affiliates, which cooperation shall include the furnishing of testimony and other evidence, permitting access to employees and providing information regarding the whereabouts of former employees, as reasonably requested by such other party in connection with the prosecution or defense of any claims or other matters relating to Sellers, Sea Oil, OSK or the Business.

15.02 <u>Preservation of Purchaser's Files and Records</u>. For a period of five years after the Closing, Purchaser shall preserve all files and records relating to Sellers, Sea Oil, OSK or the Business that are in existence as of the Closing Date and that are less than five years old as of the Closing Date, shall allow Sellers and Grace access to such files and records and the right to make copies and extracts therefrom at

any time during normal business hours, and shall not dispose of
any thereof, provided that at any time after the Closing, Pur-
chaser may give Grace written notice of its intention to dispose
of any part thereof, specifying the items to be disposed of in
reasonable detail.  Grace may, within a period of sixty days
after receipt of any such notice, notify Purchaser of Grace's
desire to retain one or more of the items to be disposed of.
Purchaser shall, upon receipt of such a notice from Grace,
deliver to Grace, at Grace's expense, the items specified in
Purchaser's notice to Grace which Grace has elected to retain.

  15.03  <u>Preservation of Seller's Files and Records</u>.
For a period of five years after the Closing, Sellers and Grace
shall preserve all files and records in Sellers' or Grace's
possession relating to Sellers, Sea Oil, OSK or the Business that
are in existence as of the Closing Date and that are less than
five years old as of the Closing Date, shall allow Purchaser
access to such files and records and the right to make copies and
extracts therefrom at any time during normal business hours, and
shall not dispose of any thereof, provided that at any time after
the Closing, Sellers or Grace may give Purchaser written notice
of its intention to dispose of any part thereof, specifying the
items to be disposed of in reasonable detail.  Purchaser may,
within a period of sixty days after receipt of any such notice,
notify Sellers or Grace of Purchaser's desire to retain one or
more of the items to be disposed of.  Sellers or Grace shall,
upon receipt of such a notice from Purchaser, deliver to Purchas-

er, at Purchaser's expense, the items specified in Sellers' or Grace's notice to Purchaser which Purchaser has elected to retain.

15.04  Preparation of Reports, etc. Purchaser shall cooperate and cause its employees to cooperate with Sellers or Grace in the preparation, in accordance with Sellers' or Grace's instructions, of financial and other reports and statements relating to Sellers, Sea Oil, OSK or the Business, for periods ending on or prior to the Closing.

15.05  Amendment of Guaranteed Agreements, etc. Without the prior written consent of Grace and Sellers, which consent may be granted or refused at Grace's or Sellers' discretion, Purchaser shall not alter any obligation of Grace or any Seller under, or extend the term of, any agreement or other arrangement to which any Seller, Sea Oil or OSK is a party and under which any Seller or any Grace Entity has any liability, whether by guaranty or otherwise.

## ARTICLE 16

### Expenses; Termination of Services

16.01  Expenses. Each party to this Agreement shall pay all expenses incurred by it or on its behalf in connection with the preparation, authorization, execution and performance of this Agreement and the Closing Documents, including, but not limited to, all fees and expenses of agents, representatives, counsel and accountants engaged by such party. Purchaser shall

70

be solely responsible for (a) the cost of obtaining title insurance with respect to the Properties, (b) any sales, use, transfer and similar taxes and all recording and similar fees applicable to the transactions contemplated by this Agreement, and (c) the costs and expenses incurred in connection with obtaining all permits and licenses required by Purchaser to operate the Business, the Properties, and the Facilities.  Each of Grace and Purchaser shall pay one-half of the fees and expenses of Lexecon Inc. incurred in connection with its engagement pursuant to Section 9.02 hereof.

16.02  <u>Termination of Sellers' Services</u>.  All contracts, agreements, commitments or other arrangements, whether written or oral, and whether express or implied, pursuant to which Sellers or any Grace Entity provides legal, financial, accounting, insurance or other services to any Seller, Sea Oil, OSK or the Business shall be terminated as of the Closing except as provided under the Employee Benefits Agreement, the Bellaire Sublease or the Lafayette Lease.  Purchaser shall execute and deliver to Sellers, at Sellers' request, documents necessary or desirable to release each of the Sellers and any such Grace Entity from any obligations with respect to such terminated contracts, agreements, commitments and arrangements and to otherwise confirm such termination.

16.03  <u>Broker's Fees</u>.  Each party to this Agreement shall indemnify and hold harmless the other parties with respect to any broker's, finder's or other similar agent's fee with

respect to the transactions contemplated hereby claimed by any broker, finder or similar agent engaged, employed by or otherwise acting on behalf of the indemnifying party.

## ARTICLE 17

### Notices

17.01  Procedure and Addresses.  All notices, requests, demands and other communications required or permitted to be given hereunder shall be deemed to have been duly given if in writing and delivered personally or delivered by facsimile transmission or delivered by courier service, at the following addresses:

If to Grace:

W. R. Grace & Co.
One Town Center Road
Boca Raton, Florida  33486-1010
Attention: Secretary
Facsimile number:     (407) 362-1970
Confirmation number: (407) 362-1959

If to Sellers:

Homco International, Inc.
4710 Bellaire Blvd, Suite 200
Bellaire, Texas 77401
Attention: President
Facsimile number:     (713) 663-5592
Confirmation number:    (713) 663-5502

With copies to:

Grace, and

Grace Energy Corporation
Two Galleria Tower
Suite 1500
13455 Noel Road
Dallas, Texas  75240-6681
Attention: President

72

```
Facsimile number:    (214) 772-0215
Confirmation number: (214) 776-0200
```

If to Purchaser:

```
Weatherford International Incorporated
1360 Post Oak Boulevard
Suite 1000
Houston, Texas 77056-3098
Attention: President
Facsimile number: (713) 622-0913
Confirmation number: (713) 439-9400
```

With copies to:

```
Fulbright & Jaworski L.L.P.
1301 McKinney Street
Houston, Texas 77010
Attention: Charles L. Strauss
Facsimile: (713) 651-5246
Confirmation number: (713) 651-5151
```

17.02  Notice of Change of Address.  Any party may change the address to which such communications are to be directed to it by giving written notice to the other parties in the manner provided in Section 17.01.

### ARTICLE 18

### General

18.01  Entire Agreement.  This Agreement, the Closing Documents, and the Confidentiality Agreement set forth the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and supersede all prior agreements, arrangements and understandings, whether written or oral, among the parties or any of them, relating to the subject matter hereof.

73

18.02  <u>Headings</u>.  The Article and Section headings contained in this Agreement are for convenient reference only, and shall not in any way affect the meaning or interpretation of this Agreement.

18.03  <u>Governing Law</u>.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Texas, excluding the conflict of laws provisions thereof that would otherwise require the application of the law of any other jurisdiction.

18.04  <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts (including counterparts executed by one party), each of which shall be an original, but all of which shall constitute a single agreement.

18.05  <u>Binding Agreement; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but this Agreement shall not be assignable by any party without the prior written consent of the other parties, except that Purchaser may assign any or all of its rights hereunder to any of its wholly-owned subsidiaries.

18.06  <u>Amendment</u>.  This Agreement may be amended only in a writing executed by the parties hereto which specifically states that it amends this Agreement.

18.07   <u>No Waiver</u>.   Failure of any party to insist upon strict observance of or compliance with any term of this Agreement in one or more instances shall not be deemed to be a waiver of its rights to insist upon such observance or compliance with the other terms hereof, or in the future.

18.08   <u>Third Party Beneficiaries</u>.   Neither this Agreement nor any document delivered in connection with this Agreement confers upon any person not a party hereto any rights or remedies thereunder except as provided in Articles 13 and 14 hereof.

18.09   <u>Schedules</u>.   The parties hereto shall use their best efforts to agree upon the content of, and complete, <u>Schedule 14.02(b)</u> as soon as practicable, but in no event later than the day prior to Closing.   Upon such agreement such Schedule shall become part of this Agreement.

18.10   <u>Transition Agreement</u>.   The parties hereto shall use their best efforts to agree upon the form and content of the Transition Agreement as soon as practicable.

[ RECEIVED 02/17 17:12 1993 AT 6515235    PAGE   2 (PRINTED PAGE   2) ]
FEB-17-93 WED 17:51 GRACE LSG BOCA RATON                P.02

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

Homco International, Inc.

By _Harry D. Ferdinel_____

A-1 Bit & Tool Co., Inc.

By _Harry D. Ferdinel_____

A-1 Bit & Tool Company B.V.

By _Harry D. Ferdinel_____

A-1 Bit & Tool Company A/S

By _Harry D. Ferdinel_____

A-1 Bit & Tool Company GmbH

By _Harry D. Ferdinel_____

A-1 Bit & Tool Company Pte. Ltd.

By _Harry D. Ferdinel_____

Homco Arabian Gulf, Inc.

By _Harry D. Ferdinel_____

Homco International, Ltd.

By _Harry D. Ferdinel_____

W. R. Grace & Co.

By _____

Weatherford International Incorporated

By _____

RECEIVED 02/17 FEB-17-93 WED 17:52   GRACE LSC BOCA RATON                    P. 83

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

Homco International, Inc.              A-1 Bit & Tool Company Pte. Ltd.

By _____            By _____

A-1 Bit & Tool Co., Inc.              Homco Arabian Gulf, Inc.

By _____            By _____

A-1 Bit & Tool Company B.V.           Homco International, Ltd.

By _____            By _____

A-1 Bit & Tool Company A/S            W. R. Grace & Co.

By _____            By _____

A-1 Bit & Tool Company GmbH           Weatherford International Incorporated

By _____            By _____

76

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

Homco International, Inc.

By _____

A-1 Bit & Tool Co., Inc.

By _____

A-1 Bit & Tool Company B.V.

By _____

A-1 Bit & Tool Company A/S

By _____

A-1 Bit & Tool Company GmbH

By _____


A-1 Bit & Tool Company Pte. Ltd.

By _____

Homco Arabian Gulf, Inc.

By _____

Homco International, Ltd.

By _____

W. R. Grace & Co.

By _____

Weatherford International Incorporated

By _____

76