Exhibit B

STATE OF MICHIGAN
CIRCUIT COURT FOR THE 30TH JUDICIAL CIRCUIT
INGHAM COUNTY

FRANK J. KELLEY, Attorney General
of the State of Michigan, ex rel,
MICHIGAN DEPARTMENT OF NATURAL
RESOURCES,

        Plaintiffs,

v

W. R. GRACE & CO. - CONN.,
HOMCO INTERNATIONAL, INC.,
N. L. INDUSTRIES, WEATHERFORD
U.S. INC., AND WEATHERFORD
INTERNATIONAL, INCORPORATED,

        Defendants.

File No. _Michael Harrison_

HON. _94-78718-CE_

## CONSENT DECREE

The Plaintiffs are Frank J. Kelley, Attorney General of the
State of Michigan, and Michigan Department of Natural Resources
("MDNR").

The Defendants are W.R. Grace & Co. - Conn. ("Grace"), HOMCO
International, Inc. ("HOMCO"), NL Industries, Inc. ("NL"),
Weatherford U.S. Inc. ("Weatherford U.S.") and Weatherford
International Incorporated ("Weatherford International").

The Consent Decree requires the preparation and performance
of the Remedial Action for contamination at or emanating from the
HOMCO site, Kalkaska, Michigan (hereafter "Facility", as the term
is defined in the Michigan Environmental Response Act ("MERA")).
Defendants agree not to contest: (a) the authority or jurisdic-

tion of the Court to enter this Consent Decree; or (b) any terms
or conditions set forth herein.

The entry of this Decree by Defendants is neither an admis-
sion of liability with respect to any issue dealt with in this
Decree nor is it an admission or denial of any factual allega-
tions or legal conclusions stated or implied herein.

The Parties agree, and the Court by entering this Decree
finds that the Remedial Actions set forth herein are necessary to
abate Releases of Hazardous Substances into the environment to
control future Releases and to protect public health, welfare,
safety and the environment.

NOW, THEREFORE, before the taking of any testimony, and with-
out this Consent Decree constituting an admission of any of the
allegations in the Complaint or as evidence of the same, and upon
the consent of the Parties, by their attorneys, it is hereby
ORDERED, ADJUDGED AND DECREED:

## I.   JURISDICTION

1.1.   This Court has jurisdiction over the subject matter of
this action pursuant to MCL 299.616.   This Court also has per-
sonal jurisdiction over the Defendants.   Defendants waive all
objections and defenses that they may have to jurisdiction of the
Court or to venue in this District.

1.2. The Court determines that the terms and conditions of this Consent Decree are reasonable, adequately resolve the environmental issues raised and properly protect the interests of the people of the State of Michigan.

1.3. The Court shall retain jurisdiction over the Parties and subject matter of this action to enforce this Consent Decree and to resolve disputes arising under this Consent Decree, including those that may be necessary for its construction, execution or implementation, subject to Section XX (Dispute Resolution).

## II. PARTIES BOUND

2.1. This Consent Decree shall apply to and be binding upon Plaintiffs and Defendants and their successors and assigns. No change or changes in the ownership or corporate status of Defendants shall in any way alter Defendants' responsibilities under this Consent Decree. Defendant Weatherford shall provide the MDNR with written notice prior to the transfer of ownership of part or all of the Facility in Kalkaska, Michigan and shall also provide a copy of this Consent Decree to any subsequent owners or successors prior to the transfer of any ownership rights. Defendants shall comply with the requirements of Section 10(c) of the Michigan Environmental Response Act ("MERA"), MCL 299.610(c). Defendants shall provide a copy of this Consent Decree to all contractors, subcontractors, laboratories, and consultants retained to conduct any portion of the Response Activities per-

formed pursuant to this Consent Decree, within fourteen (14) days after the effective date of this Consent Decree or after the date of such retention. Notwithstanding the terms of any contract, Defendants are responsible for compliance with this Consent Decree and for ensuring that their contractors, subcontractors, laboratories, and consultants perform all work in conformance with the terms and conditions of this Consent Decree.

2.2. The signatories to this Consent Decree certify that they are authorized to execute and legally bind the parties they represent.

### III.  STATEMENT OF PURPOSE

3.1. The mutual objectives of Plaintiffs and Defendants in entering into the Consent Decree are to: (a) reimburse the MDNR for past response costs incurred for Response Activities relating to the Facility; (b) provide for payment of the MDNR's future response costs in verifying or overseeing the conduct of Response Activities concerning the Facility; (c) remediate releases or threatened releases of hazardous substances, pollutants, or contaminants or any discharge of injurious substances attributable to Defendants' activities at the Facility, or emanating from the Facility, through the implementation of the selected remedial action; and (d) provide contribution protection, as provided in Section XXV.

3.2.   The activities conducted under this Consent Decree are subject to approval by the MDNR and Defendants shall provide all appropriate necessary information that is consistent with MERA, 1982 PA 307, as amended, MCL 299.601 et seq; MSA 13.32(1) et seq; the MERA Rules, MAC R 299.5101 et seq; and other applicable or relevant and appropriate federal and state laws and regulations.

## IV.   DEFINITIONS

4.1.   "Consent Decree" means this Consent Decree and the Statement of Work attached hereto, including any future modifications pursuant to Section XVIII (Modifications/Incorporation by Reference), and any reports, plans, specifications and schedules required by the Consent Decree which, upon approval of the MDNR, shall be incorporated into and are enforceable under this Consent Decree.

4.2.   "Defendants" means Grace, HOMCO, NL, Weatherford, U.S. and Weatherford International.

4.3.   "Plaintiffs" means Frank J. Kelley, Attorney General, of the State of Michigan, ex rel. Michigan Natural Resources Commission and MDNR.

4.4.   "Parties" means the Plaintiffs and Defendants.

4.5.   All other terms used in this Consent Decree which are defined in MERA and/or the MERA Rules shall have the same meaning

in the Consent Decree as in MERA and the MERA Rules or as set
forth in other provisions of this Consent Decree.

## V.    IMPLEMENTATION

5.1.  Defendants shall prepare and perform all Response
Activities in accordance with the time schedule set forth in this
Section.  The Response Activities conducted pursuant to this
Consent Decree are subject to approval by the MDNR in accordance
with Section XVI (Progress Reports), and shall be consistent with
and in compliance with MERA and the MERA Rules.

5.2.  Defendants shall deliver to the MDNR for approval the
following submittals or commence or complete the following
actions, as appropriate, in accordance with the following time
schedule:

## SCHEDULE

| SUBMITTAL/RESPONSE ACTIVITY | DUE DATE |
| --- | --- |
| Statement of Work ("SOW") | Attached to Consent Decree |
| Plume Delineation/Investigation | 90 days after entry of Consent Decree |
| Plume Delineation Report | 60 days after completion of all plume investigation efforts |
| MDNR Comments to Plume Delineation Report | 30 days after submission of Plume Delineation Report |
| Corrective Action Plan for end-of-plume treatment system at Old M-72 road location | 60 days after MDNR approval of Plume Delineation Report |
| Implementation of Corrective Action Plan for end-of-plume | 60 days after MDNR approval of Corrective Action Plan |

treatment system at Old M-72
road location

| Closure Reports for Corrective Action | When levels of chemical of concern are at or below Type 3 levels for a period of 12 consecutive months |

5.3.   The Parties acknowledge and agree that this Consent Decree does not constitute a warranty or representation of any kind by the MDNR that the work performed in accordance by Defendants herein will result in the achievement of the remedial criteria as established by law.

5.4.   Any report or plan submitted pursuant to this Section shall include, but not be limited to, an overview of the work conducted, a description of the methodologies employed, and documentation and analysis of data collected pursuant to this Consent Decree and the subject submission, report, plan, or other document.

## VI.   ADDITIONAL RESPONSE ACTIVITY

6.1.   As used in this Section, "Additional Response Activity" shall mean all activities not specifically set forth in the approved remedial action, SOW, or Work Plan that the MDNR determines are necessary to meet the Performance and Cleanup Standards described in the administrative rules pursuant to MERA, MAC R 299.5101 et seq., and all applicable state and federal requirements, that do not fundamentally change the overall remedial approach outlined in the approved remedial action, SOW, and Work Plan.  These activities may include modifications to the

components of the remedial action and to the type and cost of
materials, equipment, facilities, services.and supplies used to
implement the remedial action.

6.2.  In the event that the MDNR determines that Additional
Response Activity is necessary, notification of such Additional
Response Activity will be provided to the Parties' project
coordinators.  Any Additional Response Activities agreed to by
the Parties, shall be completed by Defendants in accordance with
the standards, specifications, and schedules approved by the
MDNR.

6.3.  Defendants shall submit a plan for the Additional
Response Activities to the MDNR for approval within sixty (60)
days of agreement.  The plan shall be developed in conformance
with the requirements of this Consent Decree.  Upon approval, the
plan shall be incorporated herein and made an enforceable part of
this Consent Decree.  Defendants shall implement the plan for
Additional Response Activities in accordance with the schedule
contained therein.

6.4.  Nothing in this Section shall limit the power and
authority of MDNR, the State of Michigan, or this Court, to take,
direct, or order all appropriate action to protect public health,
welfare, and safety, or the environment or to prevent, abate, or
minimize an actual or threatened release of hazardous substances,

pollutants or contaminants on, at, or from the Facility in accord
with Section XI (Creation of Danger).

## VII.   ENGAGEMENT OF A CONTRACTOR

7.1.   ENSR Consulting and Engineering has been designated by
Defendants to be their contractor to perform the technical activ-
ities required under this Consent Decree.  All work performed by
said contractor pursuant to this Consent Decree shall be under
the general direction and supervision of a qualified individual.
Defendants' contractor shall also employ project personnel who
shall have direct experience in the investigation and cleanup of
sites of environmental contamination.  In the event Defendants
desire to replace said contractor, Defendants shall notify MDNR
regarding the identity and qualifications of the new contractor
as soon as the contractor is engaged or at least two weeks prior
to the contractor's commencement of Facility work, whichever
comes first.  Defendants shall notify MDNR regarding the identity
and qualifications of all subcontractors as soon as each subcon-
tractor is engaged or at least two (2) weeks prior to the
subcontractor's commencement of facility work, whichever occurs
first.  MDNR shall have the right to disapprove, within ten (10)
days of notification of a subcontractor, or project personnel,
based on professional qualifications, conflicts of interest,
and/or deficiencies in previous similar work, any such
subcontractor, or project personnel.  If MDNR disapproves any
such person(s), MDNR will provide Defendants written notice

thereof, and Defendants shall have thirty (30) days to identify
any replacement(s).

## VIII.   QUALITY ASSURANCE/SAMPLING

8.1.   Defendants shall assure that MDNR and its authorized
representatives are allowed access to any laboratory utilized by
Defendants in implementing this Consent Decree for quality assur-
ance monitoring.

8.2.   Defendants shall submit to the MDNR the verified
results of all sampling or tests and all other verified data gen-
erated by Defendants or their contractor(s), or on Defendants'
behalf, in the course of implementing this Consent Decree upon
receipt of such information by Defendants.  Verified sampling
data generated under this Consent Decree shall be admissible in
evidence without waiving any objection as to weight or relevance.

8.3.   At the request of MDNR, Defendants shall allow MDNR or
its authorized representatives to take split and/or duplicate
samples of any samples collected by Defendants pursuant to the
implementation of this Consent Decree.  Except as may be neces-
sary for sampling required pursuant to Section XI (Creation of
Danger), Defendants shall notify MDNR not less than seven (7)
days in advance of any sample collection activity.  In addition,
MDNR shall have the right to take any additional samples that it

deems necessary providing Defendants reciprocal notice and rights
to take split and/or duplicate samples.    .

8.4.   Notwithstanding any provision of this Consent Decree,
MDNR shall retain all of its information gathering, inspection,
and enforcement authorities under MERA and other applicable stat-
ute or regulation.

## IX.  PROJECT COORDINATORS

9.1.   Defendants' project coordinator shall be J.D. Tucker,
Senior Project Engineer for Grace.  Defendants' project coordina-
tor shall have primary responsibility for implementation of the
Response Activities at the Facility.  The MDNR's project coordi-
nator shall be Brian Maturen, Environmental Quality Analyst,
Environmental Response Division, MDNR.  The MDNR's project coor-
dinator will be the primary designated representative for the
MDNR at the Facility.  All communication between the parties and
all documents, reports, approvals, and other submissions and cor-
respondence concerning the activities performed pursuant to the
terms and conditions of this Consent Decree shall be directed
through the project coordinators.  If any party decides to change
its designated project coordinator, the name, address, and tele-
phone number of the successor shall be provided, in writing, to
the other party seven (7) days prior to the date on which the
change is to be effective.  This subsection does not relieve
Defendants from other reporting obligations under the law.

9.2.    Subject to Section X (Access), the MDNR may designate other authorized representatives, employees, contractors, and consultants to observe and monitor the progress of any activity undertaken under this Consent Decree.

## X.    ACCESS

10.1.    To the extent access to the Facility is owned, controlled by, or available to Defendants from the effective date of this Consent Decree, the MDNR, its authorized employees and representatives, upon presentation of proper credentials, shall have access at all reasonable times to the Facility for the implementation of the response activities under the Consent Decree, and for dealing with contamination migrating onto or under the Facility from an off-site source, including, but not limited to:

(a)    Monitoring the response activities or any other activities taking place under this Consent Decree on the Facility;

(b)    Verifying any data or information submitted to MDNR;

(c)    Conducting investigations relating to contamination at the Facility;

(d)    Obtaining samples;

(e)    Assessing the need for or planning and implementing response actions at the Facility; and

(f)    Inspecting and copying non-privileged records, operating logs, contracts, or other documents upon reasonable notice required to assess compliance with this Consent Decree.

10.2.  To the extent that the Facility or any other area where the Response Activities are to be performed by Defendants under this Consent Decree is owned or controlled by persons other than Defendants, Defendants shall use their best efforts to secure from such persons access for the Parties and their authorized employees and representatives.  Each access agreement shall be embodied in a written document and Defendants shall provide the MDNR with a copy of each access agreement secured pursuant to this subsection.  For purposes of this subsection, "best effort" includes, but is not limited to, reasonable compensation to the owner to secure such access.  If, after using best efforts, Defendants are unable to obtain access within forty-five (45) days of the entry of this Consent Decree, Defendants shall promptly notify the MDNR.  Plaintiffs may thereafter assist Defendants in obtaining access.  Defendants shall, within thirty (30) days of a receipt of a written request from Plaintiffs, reimburse the Plaintiffs for all costs not inconsistent with law incurred by the Plaintiffs in obtaining access in the manner provided in Paragraph 21.3.

10.3.  All parties granted access to the Facility pursuant to this Consent Decree shall comply with all applicable health and safety laws and regulations.

10.4.  Notwithstanding any provision of this Consent Decree, the MDNR shall retain all of its inspection and access authorities under any applicable statute or regulation.

## XI.   CREATION OF DANGER

11.1.   Upon obtaining information concerning the occurrence of any event during performance of Response Activities conducted pursuant to this Consent Decree that causes or threatens a release of a hazardous substance from the facility or that may present an imminent and substantial endangerment to on-site personnel or to the public health, safety, welfare, or the environment, Defendants shall immediately undertake all appropriate action to prevent, abate, or minimize such release or endangerment and shall immediately notify the MDNR's project coordinator or, in the event of his or her unavailability, shall notify the Pollution Emergency Alerting System (PEAS, 1-800-292-4706). In such an event, any action undertaken by Defendants shall be in accordance with all applicable health and safety laws and regulations, and with the provisions of the Health and Safety Plan, as prepared by the Defendants' contractor. Defendants shall submit a written report setting forth the events that occurred and the measures taken and to be taken to mitigate any release or endangerment caused or threatened by the incident and to prevent recurrence of such an incident. Regardless of whether Defendants notify the MDNR under this subsection, if Response Activities undertaken under this Consent Decree cause or threaten a release or may present an imminent and substantial endangerment to on-site personnel or to public health, safety, welfare, or to the environment, MDNR may: (a) require Defendants to stop Response Activities at the Facility for such period of time as may be needed to prevent or

abate any such release, threat, or endangerment; (b) require
Defendants to undertake any such activities that MDNR determines
are necessary to prevent or abate any such release, threat, or
endangerment; and/or (c) undertake any actions that MDNR deter-
mines are necessary to prevent or abate such release, threat, or
endangerment.  In the event that Defendants fail to take appro-
priate Response action as required by this Section and the MDNR
undertakes any action to abate such a release, threat, or
endangerment, Defendants shall reimburse the MDNR for all costs
incurred by the MDNR that are not inconsistent with law.  Payment
of such costs shall be made in the manner provided in Paragraph
21.3.

11.2  Nothing in the preceding subsection shall limit the
power and authority of the MDNR, the State of Michigan, or this
Court to take, direct, or order all appropriate action to protect
the public health, welfare, and safety, or the environment, or to
prevent, abate, or minimize an actual or threatened release of
hazardous substances, pollutants, or contaminants on, at, or from
the Facility in accord with Section XI (Creation of Danger).

## XII.  COMPLIANCE WITH OTHER LAWS

12.1.  All actions required to be taken pursuant to this
Consent Decree shall be undertaken in accordance with the
requirements of all applicable or relevant and appropriate state
and federal laws and regulations, including MERA, the MERA Rules,
laws relating to occupational safety and health, and other State

environmental laws.  Other agencies may also be called upon to
review the conduct of Response Activities under this Consent
Decree.  Further, Defendants must designate, in a report to the
MDNR, any facilities that Defendants propose to use for such off-
site transfer, storage, treatment, or disposal of materials.

## XIII.  RECORD RETENTION/ACCESS TO INFORMATION

13.1.  Defendants and their representatives, consultants, and
contractors shall preserve and retain, during the pendency of
this Consent Decree and for a period of seven (7) years after its
termination, all records, sampling or test results, charts, and
other documents relating to historical hazardous substance
disposal, treatment or handling activities at the facility or
that are maintained or generated pursuant to any requirement of
this Consent Decree.  After the seven (7) year period of document
retention, Defendants and their successors shall obtain the writ-
ten permission of the MDNR prior to the destruction of such docu-
ments and, upon request, Defendants and/or their successors shall
relinquish custody of all documents to the MDNR.  Defendants'
request shall be accompanied by a copy of this Consent Decree and
sent to the following address:

Chief
Environmental Response Division
Michigan Department of Natural Resources
P.O. Box 30426
Lansing, MI 48909

13.2.   Defendants shall, upon request, provide to the MDNR
all documents and information within its possession or control or
that of its employees or authorized representatives relating to
the Response Activities at the Facility or to the implementation
of this Consent Decree, including, but not limited to, verified
sampling, analysis, chain of custody records, manifests, trucking
logs, receipts, reports, correspondence, or other documents or
information related to the Response Activities.  Defendants shall
also, upon request, make available to the MDNR, upon reasonable
notice, Defendants' employees, contractors, agents, or represen-
tatives with knowledge of relevant facts concerning the perform-
ance of the Response Activities.

13.3.   Defendants may assert a confidentiality or privilege
claim, if appropriate, covering all or part of the information
requested under this Consent Decree.  Such an assertion shall be
adequately substantiated when it is made.  If no such claim
accompanies the information when it is submitted to the MDNR, it
may be made available to the public by the MDNR without further
notice to Defendants.  Analytical data shall not be claimed as
confidential or privileged by Defendants.

XIV.   NOTICES

14.1.   Whenever, under the terms of this Consent Decree, notice is required to be given or a report, sampling data, analysis, or other document is required to be forwarded by one party to the other, such correspondence shall be directed to the following individuals at the specified addresses or at such other address as may subsequently be designated in writing:

As to MDNR:                              As to Defendants:

Brian Maturen                           R. J. Medler
Environmental Response Division         W.R. Grace & Co. - Conn.
Michigan Department of                  Homco International, Inc.
   Natural Resources                    100 N. Main, Ste. 1700
Route#1                                 Memphis, TN  38103
8015 S. Mackinaw Trail                  (901) 522-2051
Cadillac, MI  49601
(616) 775-9777

                                        Barry Sams
                                        NL Industries, Inc.
                                        Corporate Environmental
                                           Services
                                        P.O. Box 1090
                                        Wyckoffs Mill Road
                                        Hightstown, NJ  08520
                                        (609) 443-2410

                                        Robin C. Palmer, Esq.
                                        Weatherford U.S. Inc. and
                                        Weatherford International
                                           Incorporated
                                        1360 Post Oak, Ste. 1000
                                        Houston, TX  77056
                                        (713) 439-9416

XV.   SUBMISSIONS AND APPROVALS

15.1.  All plans, reports or other submissions
("submissions") shall be delivered to the MDNR in accordance with
the schedule set forth in this Consent Decree.  Prior to receipt
of the approval, any report submitted to the MDNR for approval
shall be marked "Draft" and shall include, in a prominent loca-
tion in the document, the following disclaimer:  "Disclaimer:
This document is a DRAFT document prepared by Defendants pursuant
to a Court Order, which has not received final acceptance from
the Michigan Department of Natural Resources ("MDNR").  The
opinions, findings, and conclusions expressed are those of the
authors and not those of MDNR."

15.2.  Upon receipt of any submission relating to the
Response Activities that is required to be submitted for approval
under this Consent Decree, the MDNR project coordinator will in
writing:  (a) approve the submission; (b) disapprove the
submission, notifying Defendants of deficiencies; or (c) approve
the submission with modifications to cure a deficiency.  In the
case of a MDNR disapproval or modification, a written explanation
shall be appended.  Upon receipt of a notice of approval or modi-
fication from the MDNR, Defendants shall proceed to take any
action required by the plan, report, or other submission as
approved or as modified, and shall submit a new cover page marked
"Final."

15.3.  Notice of any disapproval will specify the reason(s) for the disapproval.  Unless a notice of disapproval specifies a longer time period, upon receipt of a notice of disapproval from the MDNR, Defendants shall, within thirty (30) days thereafter, correct the deficiencies and resubmit the submission for approval.  Notwithstanding a notice of disapproval, Defendants shall proceed to take any response action not directly related to the deficient portion of the submission.  If, upon resubmission, the submission is not approved, the MDNR shall so advise Defendants and will consider Defendants to have failed to complete the submittal in a timely manner or failed to have provided a submission of acceptable quality.

15.4.  A finding of approval or an approval with modifications shall not be construed to mean that the MDNR concurs with all conclusions, methods, or statements in the submissions or warrants that the submission comports with law.

15.5.  No informal advice, guidance, suggestions, or comments by the MDNR regarding any submissions by Defendants shall be construed as relieving Defendants of their obligation to obtain such formal approval as may be required by this Consent Decree.

XVI.    PROGRESS REPORTS

16.1.    Defendants shall provide to the MDNR written progress
reports relating to response action that shall: (a) describe the
actions that have been taken toward achieving compliance with
this Consent Decree during the previous year; (b) describe data
collection and activities scheduled for the next year; and (c)
include all results of sampling and tests and other data received
by Defendants, their employees or authorized representatives dur-
ing the previous year relating to the Response Activities per-
formed pursuant to this Consent Decree.  Annual reports shall be
submitted to the MDNR sixty (60) days following the entry date of
this Consent Decree by the Court and thereafter on the anniver-
sary date of such submission until issuance of the Certificate of
Completion as provided in Section XXVI (Certification).

16.2.    Defendants shall provide quarterly reports in accor-
dance with the SOW.  The current schedule for conducting quar-
terly sampling is the third week of January, April, July and
October.  Quarterly reports will be submitted to the MDNR within
60 days of receiving analytical data.  All comments received from
the MDNR will be addressed in writing within 30 day after
receipt.

XVII.    INDEMNIFICATION

17.1.    Defendants shall indemnify and save and hold harmless
the State of Michigan and its departments, agencies, officials,
agents, employees, contractors, and representatives for any and
all claims or causes of action arising from or on account of acts
or omissions of Defendants, their officers, employees, agents,
and any persons acting on its behalf or under its control in car-
rying out response activities pursuant to this Consent Decree.
Plaintiffs shall notify Defendants of any such claims or actions
promptly after receipt of notice.  Neither the State of Michigan
nor its departments, agencies, officials, agents, employees,
contractors, and representatives shall be held out as a party to
any contract entered into by or on behalf of Defendants in carry-
ing out actions pursuant to this Consent Decree.  Neither
Defendants nor any contractor shall be considered an agent of the
State.

17.2.    Defendants waive any and all claims or causes of
action against the State of Michigan and its departments,
agencies, officials, agents, employees, and representatives for
damages, reimbursement, or set-off of any payments made or to be
made to the State that arise from or on account of any contract,
agreement, or arrangement between Defendants and any person for
performance of Response Activities at the Facility or any other
property where Response Activities are performed under this

Consent Decree, including claims on account of construction delays.

17.3.   Defendants shall indemnify and hold harmless the State of Michigan and its departments, agencies, officials, agents, employees, contractors, and representatives for any and all claims or causes of action for damages or reimbursement from the State arising from or on account of any contract, agreement, or arrangement between Defendants and any person for performance of Response Activities at the Facility or any other property where Response Activities are performed under this Consent Decree, including claims on account of construction delays.

17.4.   Prior to commencing Response Activities, Defendants shall secure, and shall maintain for the duration of this Consent Decree, comprehensive general liability insurance with limits of not less than $1 million per claim/$3 million aggregate, combined single limit, naming the MDNR and the State of Michigan as additional insureds.   If Defendants demonstrate by evidence satisfactory to the MDNR that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then with respect to that contractor or subcontractor, Defendants need to provide only that portion, if any, of the insurance described above that is not maintained by the contractor or subcontractor.   Regardless of the method used to insure, Defendants shall provide the MDNR with certificates evidencing said insurance and the MDNR's and the State of Michigan's status as additional insureds.   In addition,

for the duration of this Consent Decree, Defendants shall satisfy, all applicable laws and regulations regarding the provision of Workers' Disability Compensation Insurance for all persons performing response action on behalf of Defendants in furtherance of this Consent Decree. Prior to commencement of the Response Activity under this Consent Decree, Defendants shall provide to the MDNR satisfactory proof of such insurance.

## XVIII.    MODIFICATIONS/INCORPORATION BY REFERENCE

18.1.   This Consent Decree may only be modified upon the written agreement of the MDNR by signature of the Director and Defendants' authorized representatives.

18.2.   Any submission and attachments to submissions required by this Consent Decree which have been approved by the MDNR are incorporated into this Consent Decree. Any delay or non-compliance with such submissions or attachments to a submission shall be considered delay or noncompliance with the requirements of this Consent Decree and shall subject Defendants to penalties pursuant to Section XXII (Stipulated Penalties).

## XIX.    DELAYS IN PERFORMANCE

19.1.   Any delay attributable to a Force Majeure shall not be deemed a violation of Defendants' obligations under this Consent Decree in accordance with this Section.

19.2.  Defendants shall perform the requirements of this Consent Decree within the time limits established herein, unless performance is prevented or delayed by events which constitute a "Force Majeure."  "Force Majeure" is defined, for the purpose of this Consent Decree, as an occurrence or nonoccurrence arising from causes entirely beyond the control of and without the fault of the Defendants.  "Force Majeure" does not include unanticipated or increased costs, changed financial circumstances, commencement of a proceeding in bankruptcy, contractual disputes, or failure to obtain a permit or license as a result of Defendants' actions or omissions.

19.3.  When circumstances occur that Defendants believe constitute a Force Majeure, Defendants shall notify the MDNR by telephone or telefax of the circumstances within twenty-four (24) hours after it first becomes aware of those circumstances. Within five (5) working days after Defendants first become aware of such circumstances, Defendants shall supply the MDNR, in writing, an explanation of the cause(s) of any actual or expected delay, the anticipated duration of the delay, the measures taken, and to be taken, by Defendants to avoid, minimize, or overcome the delay, and the timetable for implementation of such measures. Failure of Defendants to comply with the written notice provision of this subsection shall constitute a waiver of Defendants' right to assert a claim of Force Majeure with respect to the circumstances in question.

19.4.   If the MDNR agrees that a delay is or was caused by Force Majeure, Defendants' delay shall be excused and the MDNR shall provide Defendants such additional time as may be necessary to compensate for the Force Majeure event.   Defendants shall have the burden of demonstrating (i) that the delay is or was caused by a Force Majeure event; and (ii) that the amount of additional time requested is necessary to compensate for that event.

19.5.   An extension of one compliance date based upon a particular Force Majeure incident does not mean that Defendants qualify for an extension of a subsequent compliance date without meeting their burden of proof for each incremental step or other requirement for which an extension is sought.

## XX.   DISPUTE RESOLUTION

20.1.   The dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under this Consent Decree and shall apply to all provisions of this Consent Decree, excluding Section XI (Creation of Danger). Any dispute that arises under this Consent Decree shall in the first instance be the subject of informal negotiations between the Parties.   The period of negotiations shall not exceed ten (10) days from the date of written notice by any party that a dispute has arisen, but it may be extended by agreement between the Parties.   The period for informal negotiations shall end when MDNR provides a written statement setting forth its proposed res-

tion in accordance with and in the manner provided in Section
XXII (Stipulated Penalties), as appropriate.

20.5.  In proceedings on any dispute relating to the
selection, extent, or adequacy of any aspect of the work,
Defendants shall have the burden of demonstrating on the adminis-
trative record that the position of MDNR is arbitrary and capri-
cious or otherwise not in accordance with law.  For purposes of
this subsection, the adequacy of the work includes:  (1) the ade-
quacy or appropriateness of permits, licenses, and plans, and
procedures to implement such permits, licenses, or plans, or any
other item requiring approval by MDNR under this Consent Decree;
and (2) the adequacy of construction and remedial action per-
formed pursuant to this Consent Decree.  In proceedings on any
dispute, Defendants shall bear the burden of persuasion on fac-
tual issues.  Nothing herein shall prevent MDNR from arguing that
the Court should apply the arbitrary and capricious standard of
review to all disputes under this Consent Decree.

## XXI.  REIMBURSEMENT OF COSTS

21.1.  On the entry date of this Consent Decree, Defendants
shall pay MDNR Twenty Three Thousand Two Hundred and 18/100
Dollars ($23,200.18) in reimbursement of response costs incurred
by MDNR from July 1, 1991, through June 30, 1994, for Response
Activities relating to the Facility.  For the purposes of this
Decree, the term "costs incurred" is defined as costs that have

been dispersed or paid out by the State. It does not include costs that are due or owed by the State.

21.2. As soon as possible after each anniversary of the entry date of this Consent Decree, MDNR will provide Defendants with a written demand of response costs incurred by the State in overseeing or verifying the conduct of the Response Activities concerning the Facility, including, but not limited to, reviewing, developing, or modifying submissions; split sampling; undertaking an action to prevent or abate a release, threat, or endangerment; overseeing field work; entering into a contract with a contractor to oversee or verify any or all portions of the Response Activities at the Facility; and enforcing, monitoring and documenting compliance with this Consent Decree. Any such demand will set forth with reasonable specificity the nature of the costs incurred.

21.3. All costs recovered pursuant to this Section shall be deposited in the Environmental Response Fund in accordance with the provisions of Section 9(3) of MERA, MCL 299.609(3). Defendants shall have the right to request a full and complete accounting of all demands hereunder. Defendants shall reimburse MDNR for such costs within sixty (60) days of receipt of a written demand and complete accounting, if requested, from MDNR. In any challenge by Defendants to a demand for recovery of costs by MDNR, Defendants shall have the burden of establishing that the costs were not lawfully incurred, in accordance with Section 12(2)(a) of MERA, MCL 299.612(2)(a), and are inconsistent with

- 29 -

the National Contingency Plan  40 CFR Part 300).  All payments
made pursuant to this Consent Decree shall be by check payable to
the "State of Michigan," and shall be sent by first-class mail to
the following address:

> Assistant Attorney General In Charge
> Natural Resources Division
> P.O. Box 30028
> Lansing, MI  48909

The Facility name and Court Docket number shall be identified on
each check. A copy of the transmittal letter and the check shall
be provided simultaneously to the MDNR Project Coordinator.

## XXII.  STIPULATED PENALTIES

22.1.  Except as provided by Sections XIX (Delays in
Performance) and XX (Dispute Resolution), if Defendants fail or
refuse to comply with any term or condition in Sections V
(Implementation), VI (Additional Response Activity), XI (Creation
of Danger), XVI  (Progress Reports), and XXI (Reimbursement of
Costs), Defendants may be required to pay the MDNR stipulated
penalties in the following amounts for each day for every failure
or refusal to comply or conform:

| Period of Delay | Penalty Per Violation Per Day |
|---|---|
| 1st through 15th Day | $   500.00 |
| 15th through 30th | $1,000.00 |
| Beyond 30 Days | $1,500.00 |

22.2.  Except as provided in Section XX and XXI, if
Defendants fail or refuse to comply with any other term or condi-
tion of this Consent Decree, Defendants may be required to pay
the MDNR stipulated penalties of $500.00 a day for each and every
failure or refusal to comply.

22.3.  Defendants shall notify the MDNR, in writing, of any
violation of this Consent Decree no later than five (5) days
after becoming aware of such violation and shall describe the
violation.

22.4.  Stipulated penalties may begin to accrue on the day
performance was due, or other failure or refusal to comply
occurred, and may continue to accrue until the final day of cor-
rection of the noncompliance.  Separate penalties may accrue for
each separate failure or refusal to comply with the terms and
conditions of this Consent Decree.

22.5.  Except as provided in Section XX (Dispute Resolution),
stipulated penalties owed to the MDNR shall be paid no later than
thirty (30) days after receiving a written demand from the MDNR.
Payment shall be made in the manner provided in Paragraph 21.3.
Interest may accrue on the unpaid balance at the end of the
thirty (30) day period at the rate provided for in Section 12(4)
of MERA, MCL 299.612(4).  Failure to pay the stipulated penalties

within thirty (30) days after receipt of a written demand consti-
tutes an independent violation of the terms and conditions of
this Consent Decree.

22.6.  Liability for or payment of stipulated penalties are
not MDNR's exclusive remedy in the event Defendants violate this
Consent Decree.  MDNR reserves the right to pursue any other rem-
edy or remedies that it is entitled to under this Consent Decree
or any applicable law for any failure or refusal of Defendants to
comply with the requirements of this Consent Decree, including,
but not limited to, seeking civil penalties, injunctive relief,
specific performance, reimbursement, exemplary damages in the
amount of three (3) times the costs incurred by the State of
Michigan, and sanctions for contempt of court, provided that the
stipulated penalties set forth above shall be credited against
any such civil penalties.

### XXIII.    COVENANT NOT TO SUE BY PLAINTIFFS
###           AND RESERVATION OF RIGHTS

23.1.  In consideration of the actions that will be performed
and the payments that will be made by Defendants under the terms
of the Consent Decree, and except as specifically provided in
this Section, Plaintiffs covenant not to sue or to take adminis-
trative action against Defendants for Covered Matters.

23.2.  "Covered Matters" shall include any liability to the
State of Michigan of the Defendants herein under applicable state

and federal law relating to the Facility (including MERA and
CERCLA) for the following:

> (a) Performance of the agreed upon Work by Defendants under
> the Consent Decree;
>
> (b) Payment of past response costs and future oversight
> costs incurred by the State as set forth in Paragraphs
> 21.1 and 21.3 of this Consent Decree;
>
> (c) Performance of Response Activities related to releases
> of Methyl Ethyl Ketone or any of its constituents and
> breakdown products at or emanating from the Facility.

23.3.  The covenant not to sue set forth in this Section does
not pertain to any matters other than those expressly specified
in "Covered Matters" in Paragraph 23.2.  Plaintiffs reserve, and
this Consent Decree is without prejudice to, all rights against
Defendants with respect to all other matters, including but not
limited to, the following:

> (a) Liability arising from a violation by Defendants of a
> requirement of this Consent Decree, including conditions
> of approved submissions required herein;
>
> (b) Liability for any Additional Response Activities
> required at the Facility;
>
> (c) Liability for any response costs incurred by the MDNR
> other than those referred to in Section XXI;
>
> (d) Liability arising from the past, present, or future
> treatment, handling, disposal, release, or threat of
> release of hazardous substance(s) taken from the
> Facility;
>
> (e) Liability for damages for injury to, destruction of, or
> loss of natural resources;
>
> (f) Liability for criminal acts,
>
> (g) Any matters for which the State is owed indemnification
> under Section XVII (Indemnification) of this Consent
> Decree; and

(h) Liability for violations of federal or state law which occur during or after implementation of the Remedial Action.

23.4.  With respect to liability for Facility response costs incurred prior to the effective date of this Consent Decree, this covenant not to sue shall take effect upon receipt by the MDNR of the payments required by Paragraph 21.1.  With respect to liability for performance of response activities required to be performed under this Consent Decree, and response activity costs incurred by the State after the effective date of this Consent Decree and reimbursement of those costs by Defendants pursuant to Paragraph 21.2 of this Decree, the covenant not to sue shall take effect upon issuance by MDNR of the Certification of Completion in accordance with with Section XXVI.  The covenant not to sue is conditioned upon the complete and satisfactory performance by Defendants of their obligations under this Consent Decree.  The covenant not to sue extends only to the Defendants and does not extend to any other person.

23.5.  Plaintiffs' Pre-Certification of Completion Reservations: Notwithstanding any other provision of this Consent Decree, the Plaintiffs reserve, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order seeking to compel Defendants (1) to perform further response activities relating to the Facility or (2) to reimburse the State

of Michigan for additional costs of response if, prior to
Certification of Completion of the Remedial Action:

    (a)  Conditions at the Facility, previously unknown to the
        MDNR, are discovered after the entry of this Consent
        Decree; or

    (b)  New information is received regarding conditions at the
        Facility after the entry of this Consent Decree;

and these previously unknown conditions or this information
together with any other relevant information indicates that the
Remedial Action is not protective of the public health, safety,
or welfare, or the environment.


    23.6.  Plaintiffs' Post-Certification of Completion
Reservations: Notwithstanding any other provision of this Consent
Decree, the Plaintiffs reserve, and this Consent Decree is with-
out prejudice to, the right to institute proceedings in this
action or in a new action, or to issue and administrative order
seeking to compel Defendants (1) to perform further response
activities relating to the Facility or (2) to reimburse the State
of Michigan for additional costs of response if, subsequent to
Certification of Completion of the Remedial Action:

    (a)  Conditions at the Facility, previously unknown to the
        MDNR, are discovered after the Certification of
        Completion; or

    (b)  New information is received regarding conditions at the
        Facility after the Certification of Completion;

and these previously unknown conditions or this information
together with other relevant information indicate that the

Remedial Action is not protective of the public health, safety, or welfare, or the environment.

23.7.   For purposes of Paragraph 23.5, the information previously received by and the conditions known to the MDNR shall include only that information and those conditions set forth in the administrative record supporting the Remedial Action.   For purposes of Paragraph 23.6, the information previously received by and the conditions known to the MDNR shall include only that information and those conditions set forth in the administrative record supporting the Remedial Action, and any information received by MDNR pursuant to the requirements of this Consent Decree prior to Certification of Completion of the Remedial Action.

23.8.   In the event MDNR determines that Defendants have failed to implement any provisions of the Consent Decree in an adequate or timely manner, MDNR may, after ten (10) days written notice to Defendants and an opportunity to confer with the MDNR, perform, or contract to have performed, any and all portions of the Response Activities as MDNR determines necessary and obtain reimbursement for such activities.

23.9.   Notwithstanding any other provision of this Consent Decree, MDNR retains all authority and reserves all rights to take any and all Response Activities authorized by Section XI (Creation of Danger).

## XXIV.    COVENANT NOT TO SUE BY DEFENDANTS

24.1.    Defendants hereby covenant not to sue and agree not to assert any claim or cause of action against the State of Michigan with respect to the Facility or response activities relating to the Facility arising from this Consent Decree, including, but not limited to, any direct or indirect claim for reimbursement from the Environmental Response Fund pursuant to Section 20f(5) of MERA, MCL 299.610f(5) or any other provision of law.

24.2.    In any subsequent administrative or judicial proceeding initiated by the Attorney General for injunctive relief, recovery of Response Activity costs, or other appropriate relief relating to the Facility, Defendants agree not to assert, and may not and shall not maintain any defense or claim based upon principles of waiver, res judicata, collateral estoppel, issue preclusion, claim splitting, or other defenses based upon any contention that the claims raised by the MDNR or the Attorney General in the subsequent proceeding were or should have been brought in this case; provided, however, that nothing in this Paragraph affects the enforceability of the covenant not to sue set forth in Section XXIII (Covenant Not to Sue by Plaintiffs and Reservation of Rights) or the Contribution Protection set forth in Section XXV.

## XXV.  CONTRIBUTION PROTECTION


25.1.  Pursuant to Section 12c(5) of MERA, MCL 299.612c(5),
Section 13 of CERCLA, 42 USC 9613 and any other state or federal
law and consistent with Section XXIII (Covenant Not to Sue by
Plaintiffs and Reservation of Rights), Defendants shall not be
liable for claims for contribution under Section 12 of MERA, MCL
299.612; 42 USC 9607 and 9613; or any other state or federal
cause of action regarding matters addressed in this Consent
Decree, which include without limitation any past, ongoing or
future investigation, remedial, or other response activities and
costs due to an actual or threatened release of hazardous sub-
stances at or emanating from the Facility. Entry of the Consent
Decree does not discharge the liability of any other person(s)
liable under Section 12 of MERA, MCL 299.612.  In any action by
Defendants for contribution from any person not a party to this
Consent Decree, Defendants' cause of action shall be subordinate
to the rights of the State of Michigan if the State files an
action pursuant to MERA or other applicable federal or state law,
in accordance with Section 12c(8) of MERA, MCL 299.612c(8).


## XXVI.  CERTIFICATION


26.1.  When Defendants determine that they have completed all
the Response Activities required by this Consent Decree, they
shall submit to the MDNR a Notification of Completion and a draft
final report.  The draft final report shall summarize all
response activities performed under this Consent Decree.  The

draft final report shall include or reference any supporting documentation.

26.2.   Upon receipt of the Notification of Completion, the MDNR will review the Notification of Completion, the draft final report, any supporting documentation, and the actual response activities performed pursuant to this Consent Decree.  Within ninety (90) days of receipt of the Notification of Completion, the MDNR will determine whether Defendants have satisfactorily completed all requirements of this Consent Decree, including, but not limited to, completing the Response Activities required by this Consent Decree, complying with all terms and conditions of this Consent Decree, and paying any and all cost reimbursement and stipulated penalties owed to the MDNR.  If the MDNR determines that all requirements have been satisfied, the MDNR will so notify Defendants, and upon receipt of a "Final" final report in accordance with Section XV, shall issue a Certificate of Completion.

## XXVII.   SEPARATE DOCUMENTS

27.1.   This Consent Decree may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

## XXVIII.   EFFECTIVE DATE

28.1.   This Consent Decree shall be effective upon the date that the Court enters this Consent Decree.  All times for performance of activities under this Order shall be calculated from that date.

IT IS SO AGREED BY:

Gary L. Finkbeiner (P25363)
Assistant Attorney General
Natural Resources Division
530 Allegan Street
8th Floor, Mason Building
Lansing, MI   48909
(517) 383-7540

DATE: _____Oct 14 1994_____

IT IS SO AGREED BY:

W. R. GRACE & CO.-CONN.

By: _____
Its: _____
Date: _____

IT IS SO AGREED BY:

HOMCO INTERNATIONAL, INC.

By: _____
Its: _____
Date: _____

IT IS SO AGREED BY:

NL INDUSTRIES, INC.

By: _____
Its: _____
Date: _10/6/94_

IT IS SO AGREED BY:

WEATHERFORD U.S., INC.


By: _~Suanne Thomas_
Its: _Senior Vice President_
Date: _October 3, 1994_


IT IS SO AGREED BY:

WEATHERFORD INTERNATIONAL INCORPORATED


By: _Suanne Thomas_
Its: _Senior Vice President_
Date: _October 3, 1994_

IT IS SO AGREED BY:

HOMCO INTERNATIONAL, INC.

By: _____
Its: _____
Date: _____10/5/94_____

IT IS SO AGREED BY:

W. R. GRACE & CO.-CONN.


By: _7P Beer_
Its: _Executive Vice President_
Date: _Oct 9, 1997_

IT IS SO AGREED BY:

NL INDUSTRIES, INC.

By: _____
Its: _____
Date: _____

IT IS SO AGREED BY:

WEATHERFORD U.S., INC.

By: _____
Its: _____
Date: _____

IT IS SO AGREED BY:

WEATHERFORD INTERNATIONAL INCORPORATED

By: _____
Its: _____
Date: _____

IT IS SO ORDERED, ADJUDGED AND DECREED
THIS _____ day of _____, 1994.

_____
Honorable
Circuit Court Judge

ATTEST:  A TRUE COPY

_____
Deputy Court Clerk

rvd/cases/9400068 grace.9-23

- 41 -

## Scope of Work (SOW)
## Kalkaska Site

The investigative and corrective action process as outlined in this Scope of Work (SOW) provides a guide that will be followed for characterizing the nature and extent of impacted groundwater, for evaluating potential remedial options, for implementing the selected remedial option (treatment system) and operation of all treatment systems. This SCW is a flexible process that must be tailored to specific characteristics and needs as they arise. This SCW provided a continuous process to investigate and remediate impacted groundwater in a time-efficient and cost-effective manner.

The objectives of the SCW are as follows:

1.  Delineate the extent (horizontal and vertical) of the impacted groundwater in a timely and cost-effective manner.

2.  Gather a sufficient amount of data to develop a list (minimum of two) of interim corrective action alternatives to be evaluated for the untreated portion of the plume.

3.  Evaluate the effectiveness and cost of at least two (2) alternatives and to evaluate a "no action" alternative.

4.  Prepare and submit "Corrective Action Plans" as needed, to the MDNR, which recommend and justify a specific corrective action.

5.  Install a treatment system as described in the "Corrective Action Plans".

6.  Operate, maintain, monitor and report to MDNR the effectiveness of all treatment systems.

7.  Prepare and submit to MDNR closure reports after achieving Type B levels for each specific corrective action taken.

Specifically the Scope of Work includes:

1.  <u>Plume Delineation/Investigation</u> - Installation of temporary monitor wells by the Casing Pull Back (CPB) or other MDNR approved method to determine the vertical and horizontal extent of the impacted groundwater. Temporary CPB wells may be installed in the right of way of public roads or on private land if access can be arranged with the property owner. The exact location of each well will be determined in part by the availability of appropriate drilling locations.

1

Scope of Work (SOW)
Kalkaska Site

Groundwater samples will be analyzed by an acceptable laboratory (currently S.O.S. Analytical in Traverse City). Quality assurance will be maintained and will provide for quality control, sampling protocol, chain of custody procedures and quality assurance (duplicates).

Permanent monitor wells will be installed to provide permanent delineation and migration monitoring points along the plume. The well will be installed to delineate the vertical and horizontal extent of the impacted area. It is understood that as the plume migrates additional monitor wells may be required and that original delineation wells may lose their usefulness and no longer require sampling. All wells may lose their usefulness and no longer require sampling. All wells will be installed at agreed upon locations and sampled in accordance with the current MDNR guidelines. Monitor wells will be installed and sampled within 90 days of entry of the Consent Decree.

2.   Delineation/Investigation Report - A plume delineation report will be prepared describing the additional plume delineation effort and results since submittal of the previous delineation report entitled "Interim Report 11, Subsurface Investigation of the TCE Plume Area" and will focus on the area downgradient of the UVB treatment system located at Coral and Norway Streets.

The report will be sufficiently detailed to provide delineation of the TCE plume from the source area to the last documented downgradient point of existence. The report will be prepared upon completion of all delineation efforts and submitted to the MDNR within 60 days thereafter. Comments from the MDNR will be addressed in writing within 30 days. If necessary, the report will be modified or amended to provide sufficient data and information to satisfy MDNR comments or requests.

The report will include the following:

- Outline of work accomplished to date,
- Explanation of any deviations from the work plan,
- Summary of analytical results in table form,
- Laboratory data,
- Discussion of data gaps,
- Boring and well logs,

2

Scope of Work (SOW)
Kalkaska Site

- Site maps with applicable data (surveyed boring
locations, well locations and CPB locations with/without
analytical results and other appropriate data), and
- Recommendations for further investigations.

3.  <u>Corrective Action Plan</u> - A corrective action plan which
addresses the untreated portion of the TCE plume, downgradient
of the UVB system, will be prepared and submitted to the MDNR
for approval.  The Plan will evaluate at least two remedial
alternatives and make a specific recommendation for an
additional treatment system to be installed downgradient of
the UVB treatment system at Coral and Norway Streets.  <u>Any
additional treatment systems shall include additional
performance monitoring wells both laterally and downgradient
of the new treatment systems</u>.  Upon MDNR approval of the Plan
and obtaining property access and appropriate permits, HOMCO
and Grace will proceed within 60 days with installation of the
approved systems.

4.  <u>Corrective Action</u> - HOMCO and Grace will continue to operate
the Granular Activated Carbon (GAC) treatment system located
at 424 East Dresden, the UVB in-situ remedial system located
at Coral and Norway Streets in Kalkaska, along with an
additional system to be installed at the end of the TCE plume.
Each system will be operated until chemical analysis of the
groundwater indicates that Type B levels of the chemical of
concern have been achieved.

During excavation to remove TPH impacted under the machine
shop building floor in June 1991, one area could not be
excavated further because it was directly beneath the building
supporting wall.  Samples from borings on the opposite side of
the wall showed that TPH impacts did not extend east of the
building foundation.  The amount of soil above groundwater
level is estimated to be 8 to 12 feet below grade, five feet
in width and 10 feet in length.  Groundwater beneath the area
will be treated by the on-site GAC treatment system to Type B
levels.  HOMCO and Grace will reexamine the area of the
impacted soil beneath the building supporting wall to
determine closure requirement.

Quarterly Reports of TCE plume monitoring data will be
expanded to include appropriate monitor wells along the plume
up to the location of the UVB systems at Coral and Norway.
The Quarterly Reports will be expanded as needed to include
additional plume area and additional treatment systems as
required.  Quarterly reporting for both the Northwest Plume

3

**Scope of Work (SOW)**
**Kalkaska Site**

and the TCE plume will continue until operation of the treatment system or systems is terminated.

The current schedule for conducting quarterly sampling is the third week of January, April, July and October. Quarterly Reports will be submitted to the MDNR within 60 days of receiving analytical data. All comments received from the MDNR will be addressed in writing within 30 days after receipt.

5.  <u>Closure Reports</u> - Upon MDNR approval of closure, the associated system will be shutdown, dismantled and removed, and all associated monitor wells will be plugged and abandoned.

- After reaching target cleanup levels, the purge wells and all monitoring wells within the defined plume must show target Type A or Type B standards with the system running for six consecutive months. The purge well is to be sampled quarterly for all constituents of concern; the monitoring wells are to be sampled for two quarters (i.e., six months) for all constituents of concern prior to purge well shut down.

- After purge system shutdown, all wells within the defined plume shall be sampled quarterly for one year for all constituents of concern.

- Sample results from all wells must show the target levels or below--Type A or Type B--for 12 consecutive months to demonstrate cleanup.

- Levels exceeding the target levels--Type A or Type B--at any monitoring point during the post closure monitoring triggers purge system start-up.

4