UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                        . Case No. 01-01139
                              .
    W.R. GRACE,               .
                              . USX Tower, 54th Floor
                              . 600 Grant Street
                  Debtor.     . Pittsburgh, PA 15222
                              .
                              .
                              . May 24, 2004
. . . . . . . . . . . . . . .. 2:03 p.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              Kirkland & Ellis
                             By:  DAVID BERNICK, ESQ.
                                  JANET BAER, ESQ.
                             200 East Randolph Drive
                             Chicago, IL  60601


For the Debtor:              Reed, Smith LLP
                             By: JIM RESTIVO, ESQ.
                             435 Sixth Avenue
                             Pittsburgh, PA  15219


For Costa & Thornburg:       PETER CHAPMAN, ESQ.
                             24 Perdicaris Place
                             Trenton, NJ  08618


For Unsecured Creditors:     Stroock & Stroock & Lavan, LLP
                             By:  LEWIS KRUGER, ESQ.
                             By:  ARLENE KRIEGER, ESQ.
                             180 Maiden Lane
                             New York,  NY  10038


Audio Operator:              Janet Kozloski


Proceedings recorded by electronic sound recording, transcript
Produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

| For Personal Injury<br>Claimants' Committee: | Caplin & Drysdale, Chartered<br>by:  PETER LOCKWOOD, ESQ.<br>One Thomas Circle, NW<br>Washington, DC  20055 |
|---|---|
| For Asbestos Claimants: | Campbell & Levine<br>By:  MARLA ESKIN, ESQ.<br>     CHRISTIAN LANE, ESQ.<br>800 King Street, Ste. 300<br>Wilmington, DE  19899 |
| For Maryland Casualty: | Connolly, Bove, Lodge & Hutz, LLP<br>By:  JEFFREY WISLER, ESQ.<br>1220 Market Street, 10th Floor<br>Wilmington, DE  19899 |
| For Libby Mine Claimants: | Klehr, Harrison, Harvey,<br>Branzburg & Ellers<br>By:  STEVEN KORTANEK, ESQ.<br>919 Market Street, Ste. 1000<br>Wilmington, DE  19801 |
| For Libby Mine Claimants: | Cohn, Khoury, Madoff & Whitesell,<br>LLP<br>By:  DANIEL COHN, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |

APPEARANCES BY TELEPHONE:

| For Property Damage<br>Committee: | Bilzin, Sumberg, Baena, Price<br>By:  JAY SAKALO, ESQ.<br>     SCOTT BAENA, ESQ.<br>200 S. Biscayne Blvd.<br>Suite 2500<br>Miami, FL  33131 |
|---|---|
| For Equity Committee: | Kramer, Levin, Naftalis & Frankel<br>By:  GARY M. BECKER, ESQ.<br>     SCOTT BAYNE, ESQ.<br>919 Third Avenue<br>New York, NY 10022 |
| For Royal Sun: | Wilson, Elser, Moskowitz, Edelman<br>By:  CARL J. PERNICONE, ESQ.<br>150 East 42nd Street<br>New York, NY  10017 |

| | |
|---|---|
| For Federal Insurance Co.: | Cozen, O'Connor<br>By:  JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Maryland Casualty: | Eckert, Seamans, Cherin & Mellott<br>By:  ED LONGOSZ, ESQ.<br>1747 Pennsylvania Avenue N.W.<br>Suite 1200<br>Washington, DC  20006 |
| For Asbestos Property<br>Damage Claimants: | DAVID ZICLE, ESQ. |
| For the Petitioners: | SHELDON RITTY, ESQ. |
| For Zonelite Attic<br>Insulation: | Lukins & Annis<br>By:  DARRELL SCOTT, ESQ.<br>1600 Washington Trust Fin. Ctr.<br>West 717 Sprague Avenue<br>Spokane, WA  99201 |
| For National Union: | MICHAEL DAVIS, ESQ. |
| For ACE Entitles: | LINDA CARMICHAEL, ESQ. |
| For Neal Levitsky: | TOM MARTIN, ESQ. |
| For Timothy Kane: | Conroy, Simberg, Ganon, Krevans<br>By:  STUART COHEN, ESQ.<br>3440 Hollywood Blvd.<br>Second Floor<br>Hollywood, FL  33021 |
| For Continental Casualty: | Ford, Marrin, Esposito, Witmeyer<br>By:  ELIZABETH DeCRISTOFARO, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |
| For Undisclosed Party: | Vorys, Sater, Seymour & Pease<br>By:  TIFFANY COBB, ESQ.<br>52 East Gay Street<br>Columbus, OH  43216<br><br>DAVID CARACOFF, ESQ.<br><br>CAROL IANCU, ESQ. |

APPEARANCES CONT'D:

                         SCOTT DANA, ESQ.

                         THEODORE TACANELLI, ESQ.

                         EDWARD WESTBROOK, ESQ.

                         NEAL LEVITSKY, ESQ.

                         JAMES HARMON, ESQ.

                         SANDY ESSERMAN, ESQ.

                         DAVID PARSONS, ESQ.

                         JENNIFER SKOLLARD, ESQ.

                         KERI MUMFORD, ESQ.

                         MICHAEL WESTOWSKI, ESQ.

                         FRANK MONACO, ESQ.

                         KEVIN MANGIN, ESQ.

                         FRANK PERCH, ESQ.

1          THE COURT:  Good afternoon.  This is the matter of

2 W.R. Grace, Bankruptcy No. 01-133 -- I'm sorry -- 1139, pending

3 in the District of Delaware.  The parties I have set to appear

4 by phone are David Caracoff (phonetic), Carol Iancu, I-a-n-c-u,

5 Scott Dana, Theodore Tacanelli, Edward Westbrook, Neal

6 Levitsky, James Harmon, Sandy Esserman, David Parsons, Jennifer

7 Skollard, Jeff Wisler, Keri Mumford, Michael Westowski, Lewis

8 Kruger, Arlene Kruger (sic), Frank Monaco, Kevin Mangin and

9 Frank Perch.  Are there changes to that list?

10          MR. SCOTT:  Yes, ma'am.

11          MR. KRUGER:  Your Honor, just to correct, it's Arlene

12 Krieger, not Kruger.

13          THE COURT:  On, Krieger?  Pardon me just one second.

14 Okay.

15          MR. SCOTT:  And Darrell Scott, Your Honor, of Lukins

16 and Annis, special counsel to ZIA claimants.

17          THE COURT:  I'm sorry.  Special counsel for whom?

18          MR. SCOTT:  Zonelite Attic Insulation.

19          THE COURT:  Okay.

20          MR. SCOTT:  Thank you.

21          THE COURT:  Thank you.

22          MR. DAVIS:  Michael Davis is on for National Union.

23          THE COURT:  All right.  Just one minute.  All right.

24 Anyone else?

25          MS. CARMICHAEL:  Yes, Your Honor.  Linda Carmichael,

1  for the ACE entities.

2          THE COURT:  Are you folks on a -- on speaker phones?

3  If you are, please pick up the lines.  It's very hard to hear

4  and when I turned the speakers up before, we were getting some

5  pretty awful feedback.  Okay.  I've got Ms. Carmichael's.  Who

6  else?

7          MR. MARTIN:  Tom Martin, for Neal Levitsky.

8          THE COURT:  All right.

9          MR. MARTIN:  And Stuart Cohen.

10         MR. COHEN:  Also on the same case, Your Honor, from

11 Conroy, Simberg --

12         THE COURT:  I'm sorry.  I know somebody's speaking.

13 I can't hear you.

14         MR. COHEN:  My name is Stu Cohen, Your Honor.  Tom

15 Martin just announced my appearance, also on the Kane matter,

16 for Timothy Kane.

17         THE COURT:  Also on the Kane matter?

18         MR. COHEN:  Correct.

19         THE COURT:  All right.  Mr. Cohen, you're really

20 going to have to speak up.  We can hardly hear you.

21         MR. COHEN:  That's okay, Your Honor.  I won't be

22 speaking very much.

23         THE COURT:  All right.  Anyone else?

24         MS. COBB:  Tiffany Cobb, from the law firm, Vorys,

25 Sater, Seymour and Pease.

1          THE COURT:  I'm sorry.  Who -- I -- who were you for?

2          MS. COBB:  I'm not at liberty to disclose my client.

3          THE COURT:  I beg your pardon?

4          MR. BERNICK:  Then you're not at liberty to enter an

5 appearance.

6          MS. COBB:  I'm just attending to listen in.

7          THE COURT:  All right.  Anyone else?

8          MS. DeCRISTOFARO:  Yes, Your Honor.  Elizabeth

9 DeCristofaro, from Ford, Marrin, for Continental Casualty.

10          THE COURT:  I got Elizabeth Cristofararo (sic).  I

11 didn't hear what else you said.

12          MS. DeCRISTOFARO:  The law firm of Ford, Marrin.

13          THE COURT:  All right.

14          MS. DeCRISTOFARO:  For Continental Casualty.

15          THE COURT:  All right.  Anyone else?  Okay.  I'll

16 take entries of appearances in court, please.  Just one second

17 here.  Okay.  Good morning.

18          MR. BERNICK:  Good afternoon, Your Honor.

19          THE COURT:  Good afternoon.

20          MR. BERNICK:  David Bernick, for the debtor, and Ms.

21 Jan Baer, and obviously, Mr. Restivo, who needs no introduction

22 here, but he's also here for the debtor.

23          THE COURT:  Good morning.

24          MR. BECKER:  Good afternoon, Your Honor.  Gary

25 Becker, from Kramer, Levin, Naftalis and Frankel, representing

1 the equity committee.

2          THE COURT:  Good morning.

3          MR. SAKALO:  Good afternoon, Your Honor.  Jay Sakalo,

4 Bilzin, Sumberg, Baena, Price and Axelrod, on behalf of the

5 property damage committee.  My colleague, Scott Baena, is on

6 the telephone.

7          MS. ESKIN:  Marla Eskin, Campbell, Levine, for the

8 asbestos personal injury claimants.

9          MR. LOCKWOOD:  Peter Lockwood, Caplin and Drysdale,

10 for the ACC.

11          MR. PERNICONE:  Good afternoon, Your Honor.  Carl

12 Pernicone, from Wilson, Elser, for Royal Sun Alliance.

13          MR. COHN:  Jacob Cohn, Your Honor, Cozen, O'Connor,

14 Federal Insurance Company.

15          THE COURT:  You'll have to use the microphone.  We

16 won't be able to hear you back there.  I'm sorry.

17          MR. D. COHN:  That's all right, Your Honor.  Daniel

18 Cohn, for the Libby claimants, firm of Cohn, Khoury, Madoff and

19 Whitesell, in Boston.

20          MR. LONGOSZ:  Good afternoon, Your Honor.  Ed

21 Longosz, from Maryland Casualty, from the law firm of Eckert,

22 Seamas.

23          THE COURT:  Mr. Bernick.

24          MR. BERNICK:  Yes.

25          THE COURT:  I have entered orders on agenda items

1 number one, three, four and five.  I know that a COC was filed

2 on number two, but I have some questions about number two.  So

3 I have not entered that order.  So I believe that --

4          MR. BERNICK:  So you -- I'm sorry, Your Honor.  You

5 said you've entered orders on?

6          THE COURT:  One, three, four and five.

7          MR. BERNICK:  Four -- one, three, four and five.  And

8 then I guess that would only leave ten and number two.  If you

9 have questions regarding the order in item two, I'm sure Ms.

10 Baer will be able to respond to those questions.

11          THE COURT:  All right.  I -- actually, I have two.

12 There is a reference to a contingency fee, but the entire

13 application process talks about a fixed fee only.  So I'm a

14 little confused.  It appears that you're asking for authority

15 to have a contingency fee applied to certain lease transactions

16 that were entered into.

17          MS. BAER:  That's correct, Your Honor.  That's the

18 only portion of the application where there's a contingency.

19 That was a part of the overall retention of Deloitte and

20 Touche, and the only part that is on a contingency and related

21 to that one specific item, which is the one thing that was not

22 on their original application when they were retained.

23          THE COURT:  Okay.  And the other is, the agreement

24 indicates that Deloitte can assign or subcontract its interests

25 in I guess the lease arrangement to any other entity without

1 either a motion or a court order, and I'm not sure whether that

2 refers to the services that Deloitte is performing for the

3 debtor, because if that's the case I don't think they can

4 subcontract or assign without court approval.

5         MS. BAER:  Your Honor, I don't know what specifically

6 they're referring to.  It's not my understanding that they're

7 subcontracting or assigning it to anybody.  If it makes some

8 sense, perhaps I can talk to them about striking that out.

9         THE COURT:  I think that would be advisable, and give

10 me a revised certificate of counsel, and then I think I could

11 enter that order.

12         MS. BAER:  I will do that, Your Honor.

13         THE COURT:  All right.  I'll sign that order when I

14 get a revised COC, then.  Mr. Bernick.

15         MR. BERNICK:  Yes.  I think with respect to item six,

16 I think we've reached agreement on that, as well.  That is the

17 motion of Timothy Kane.  I think that they have prepared an

18 order for Your Honor, if I'm not mistaken.

19         THE COURT:  All right.

20         MR. LEVITSKY:  We have an order -- a proposed order,

21 Your Honor.  We can submit that with certificate of counsel, if

22 it pleases the Court.

23         THE COURT:  You can do that or you did do it, sir?

24 I'm sorry.  I'm having --

25         MR. LEVITSKY:  We can do that, Your Honor.

1            THE COURT:  You can do it.  Fine.  What is the

2  agreement?

3            MR. LEVITSKY:  Mr. Cohen, Stuart Cohen, can address

4  the substance of the agreement.

5            MR. COHEN:  Your Honor, if I may, this is Stu Cohen.

6  Can you hear me okay?

7            THE COURT:  Yes.

8            MR. COHEN:  This was Mr. Kane's motion to lift the

9  stay in order to proceed directly against the insurance

10 proceeds that were available to Grace --

11           THE COURT:  Yes.

12           MR. COHEN:  -- in this action.

13           THE COURT:  Yes.

14           MR. COHEN:  We've gone ahead and agreed to allow the

15 stay to be lifted so that Kane's action may proceed to trial

16 and/or settlement with the proviso that Kane be limited at the

17 time the judgment is entered or the settlement is reached to

18 the pro rata share of policy proceeds that are left available

19 to satisfy his claim at the time the judgment or settlement is

20 reached.

21           THE COURT:  All right.  That's fine.  Okay.  Who's

22 going to submit this COC?

23           MR. MARTIN:  I shall.  This is Tom Martin, from Fox,

24 Rothschild and Wilmington, Your Honor.

25           THE COURT:  All right.  Thank you.  I will enter that

1 order when I get it.

2          MR. MARTIN:  Thank you.

3          THE COURT:  Okay.  Mr. Bernick.

4          MR. BERNICK:  Yes, Your Honor.  I think with respect

5 to the contested matters, if I can make a suggestion that might

6 make the process go a little bit more smoothly.  Item seven,

7 which is Docket 5460, pertains to the appointment of a futures

8 representative, and I think we should proceed with that one

9 first.

10          But then, rather than proceeding to item eight --

11 items eight and nine, both of which pertain to the Libby

12 claimants, it might be appropriate as we're talking about going

13 forward in the main case also to talk about item 11, which is

14 Docket 5027 and deals with exclusivity.

15          So our proposal would be to take up item seven, then

16 11 and then proceed to the Libby matters eight and nine.  And I

17 believe that those will comprise the more substantial matters

18 yet this afternoon that we really have.  I think all the others

19 will take not quite so much time.

20          THE COURT:  All right.  That's fine.

21          MR. BERNICK:  Okay.  If I could begin on the futures

22 representative, I think that the briefs have laid out the

23 status before the Court.  But let me state first of all that we

24 did try to file a reply brief.  Your Honor suggested that if we

25 wanted to stand by that request, we would continue the matter.

1 We're happy to dispose with the reply brief and proceed today.

2 So we're prepared to argue the merits today.

3          The state of play is that there are three candidates.

4 All three candidates I know are well known to the Court.  No

5 alternative candidate actually has been proposed.  Nor, as I

6 read the papers, do we really see that there is a substantive

7 objection to the qualifications of any of the three candidates.

8          Instead, we have three legal issues and I want to

9 cover them briefly.  The first issue is whether it's

10 permissible to have a futures representative serve in more than

11 one case.  That's the first legal issue that's raised.  And

12 apparently, as you look through the language in the briefs that

13 raise this issue, part of this is an effort to somehow derive

14 some learning from the recent recusal litigation relating to

15 Judge Wolin before the Third Circuit.

16          I think, however, that there really is no learning

17 from that process that really directly applies to the

18 application that we have here.  First, I should note that the

19 Third Circuit's decision is yet to become actually final in the

20 mandate issue.  In fact, it's my understanding that there is to

21 be a motion for a rehearing en banc of that matter.  So it may

22 not be final at the present time.

23          But more tellingly, even that opinion is really not

24 on point, because the factual circumstances were very

25 different.  The issue in that case was whether somebody who is

1 already a futures representative -- and the papers here

2 underscore that a futures representative is essentially acting

3 as an advocate or a representative on behalf of a constituency

4 -- can simultaneously act as a court-appointed advisor where

5 there is to be neutrality.

6       THE COURT:  I can't see a parity between the Judge

7 Wolin recusal litigation with the FCR acting as an "independent

8 advisor," and also serving as an FCR in another case, in this

9 situation.

10       MR. BERNICK:  Yeah.  That --

11       THE COURT:  If that's the case, and I need to not

12 consider people who have represented the same party, then I'm

13 afraid that the asbestos plaintiffs' committee probably needs

14 new counsel.  In this case probably not the trade committee,

15 but other committees in various cases will also need new

16 counsel.

17       So if they want to pursue this objection I guess I'll

18 consider it, but folks, understand the consequences.  I've said

19 before, what's good for the goose is good for the gander.

20       MR. BERNICK:  I'm therefore, not -- in light of Your

21 Honor's comments I'm not going to spend real time on this,

22 unless it's necessary in response.  I would venture to say that

23 if Your Honor takes a look at the many cases that have been --

24 have dealt with this matter, that is, the appointment of a

25 futures representative, they consistently look to either

1 Section 327 -- 327(a) or Section 101 for the test about whether

2 there is a conflict of interest.

3         As you know, that's an actual disinterest in the

4 standard.  It requires that there be an actual conflict.  As

5 the U.S. Trustee has pointed out here, there is no actual

6 conflict.  And even if you were to look at a more permissive

7 appearance of conflict or appearance of impropriety standard,

8 we just don't see it here.

9         The fact that different representatives or the same

10 person acting as a representative in different cases might

11 ultimately take a different, substantive position is, first of

12 all at this point, a matter of speculation, but in any event,

13 would lead to no consequence that would give rise to a

14 conflict.

15         For the very reason that the representative stands in

16 the shoes of his or her constituency, the only constituency

17 that's bound by the representative statements is the

18 constituency in that case.  So there's no sense in which

19 there's an overlap of the constituencies.

20         The so-called futures with respect to one case are

21 different from the futures with respect to another.  So we

22 don't see that there's even an appearance of impropriety

23 problem.

24         THE COURT:  Well, Mr. Bernick, I think it's -- I

25 think the issue could be handled if we ever get to a trust

16

1 distribution procedure by simply imposing the obligation, which
2 is usually in the trust anyway, on the trustee to make sure
3 that if an entity files a claim in more than one case, either
4 present or future, that there is some recognition of that fact
5 and attention paid to it.

6          MR. BERNICK:  Very well, Your Honor.

7          THE COURT:  So to the extent that the future claims
8 rep is the future claims rep in more than one case, I think the
9 obligations are to those "clients," future demand holders in
10 each of those cases.  But I think the potential for making sure
11 that there isn't a double-dip that's inappropriate is still
12 there and can be handled in the trust mechanism.

13          So any order that I'd enter that would appoint a
14 futures rep in this case who also is a futures rep in another
15 case is going to be conditioned on the fact that there will be
16 a procedure in the trust distribution process to fix this.

17          MR. BERNICK:  Well, and it was right that
18 incorporated -- or at least some reference to it incorporated
19 in the order appointing the futures representative in this
20 case?

21          THE COURT:  I don't know that it's necessary in this
22 order, because we're not to the place --

23          MR. BERNICK:  We're not there yet.

24          THE COURT:  -- where you've got a trust.  I just --

25          MR. BECKER:  Yes.

1          THE COURT:  -- I'm sure your memory will be good

2 enough to --

3          MR. BERNICK:  Okay.

4          THE COURT:  -- recollect this discussion.

5          MR. BERNICK:  Two other legal issues that have been

6 raised and then a suggestion by the debtor about the three that

7 have been proposed.  The second legal issue is raised by one of

8 the insurance companies.  They filed a limited objection that

9 ended up going for 40 pages.

10          And basically, the objection reduces the proposition

11 that we have to litigate the merits of who really has a futures

12 claim.  Then we're going to decide who all represents or who

13 all is the constituency represented by the futures

14 representative before we ever get to appointing a futures

15 representative.

16          And obviously, in our view this puts the cart before

17 the horse.  The whole idea is to have a representative that can

18 participate in these cases for the purposes of litigating

19 precisely those kinds of issues.  So we ought to have a

20 representative first, before we go to litigating, you know,

21 whether the constituency that that representative serves

22 includes people who are unimpaired or not.

23          I don't know of any precedence for this kind of

24 proposal.  Counsel called me to talk about it and I had to be

25 candid and say that I thought that the objection was a silly

1  one and I still believe that today.  The third issue is raised

2  by a couple of the different responses.

3        And the essence of this issue is that to be truly

4  independent the futures representative must be independently

5  appointed.  And by independently appointed we're really talking

6  about a process that as is described would be pure as the

7  driven snow.

8        The suggestion that's actually made is that the U.S.

9  Trustee, who is not a party -- not an interested party in the

10  sense of the other constituencies in the case, although through

11  the appointment, the U.S. Trustee has filed what I thought was

12  a very clear brief that first of all said that the U.S. Trustee

13  does not have the statutory power to fulfill that function, and

14  secondly, then went on to analyze really whether there was a

15  conflict at all and found that there was not.

16        So the U.S. Trustee cannot serve in that role, but it

17  is our view, it is the debtor's view, that we don't have to

18  look far for how to insure independence here.  The whole

19  purpose of making an application and having the Court make the

20  appointment, we don't appoint anybody.

21        We're simply making candidates -- suggestions for who

22  the candidates might be, and the input of other parties is for

23  precisely the same kind of purpose.  It is ultimately Your

24  Honor's order of appointment that is the governing document and

25  is the governing decision.

1            And because it's the Court who makes the appointment,
2 the process is an independent one, and the representative is an
3 independent one.  And that is the practice that's been followed
4 in each and every one of the cases that I am familiar with.  So
5 we believe that the process is one that's sound, doesn't have
6 to become overly elaborate.

7            It is interesting to us that the London Market goes
8 on at length about how this whole process should be followed
9 and then they conclude their brief by saying, oh, but guess
10 what, David Austern (phonetic) is okay with us.  So if Austern
11 is okay with the London Market, presumably, they don't have a
12 problem with the procedures that were used to suggest him.

13            That then brings me back to the three candidates.
14 We've been diligent, Your Honor, I think in polling all the
15 constituencies, finding out their views.  I think that no one
16 has quarreled with the three that we have proposed in the sense
17 that there is some other more preeminently qualified candidate.

18            The only objection that I see to Mr. Austern comes
19 from the asbestos claimants' committee.  And you know, we
20 obviously respect their views.  That's why we solicited them.
21 I'll note, however, that they did not have objection to Mr.
22 Austern in connection with the ACE case.  So I'm a little bit
23 curious about why they would object now.

24            But we actually believe that in light of all the
25 briefing that's occurred it probably does make the most sense

1 to appoint Mr. Austern.  He does not have any other engagements

2 currently as an appointed futures representative.  So to the

3 extent that the debtor's voice does make a difference here, we

4 think that that's probably the best choice.

5          THE COURT:  All right.  Who'd like to address the

6 objection?  Mr. Lockwood?

7          MR. LOCKWOOD:  Your Honor, first, I think Mr. Bernick

8 perhaps slightly overstates the ACC's position on Mr. Austern.

9 I don't believe we filed an objection.  I think we indicated to

10 the Court our preference for Professor Green and I think that

11 our preference for Professor Green ties in to one of the points

12 that Mr. Bernick and Your Honor just discussed a few minutes

13 ago about this notion that there's some kind of a conflict if

14 you have a futures representative in more than one case.

15          I've read the papers that have been filed on this

16 subject.  I'm not aware of anybody who has described in

17 intelligible terms what the supposed conflict is here.  I mean,

18 the futures representative in the Grace case is out to look

19 after and make sure that the present and future claimants of

20 the Grace estate are treated substantially the same in whatever

21 trust mechanism may come into existence.

22          What possible conflict that duty could have with the

23 service as a futures representative in the <u>Federal Mogul</u> case

24 or the <u>Armstrong</u> case or the <u>Owens Corning</u> case is an absolute

25 mystery to me.  This -- the only suggestion that I've heard

1 today is some sort of double-dipping issue.

2          That to me is unintelligible because what the issues

3 are in these cases is the several liability.  This is not the

4 tort system.  We don't come in here attempting to impose on the

5 Grace estate or any of the other estates in these, some sort of

6 joint liability the way one would have in the tort system with

7 the possibility that, therefore, a debtor could wind up somehow

8 or another picking up the share of some other entity here.

9          And the TDPs, to the extent that they come into

10 existence in these cases, are quite explicit that what you are

11 being compensated for is the several liability of that debtor

12 and the TDP will not pay or listen to or entertain any notion

13 that somehow or another there's some joint liability here that

14 this trust ought to be responsible for.

15          So to me, it makes no sense, and indeed, it actually

16 has the exact opposite result.  The reason, quite candidly,

17 that we have expressed a preference for Professor Green is

18 precisely because it's our view that he is more experienced.

19 The notion of going out and pulling somebody that has never had

20 anything to do with asbestos torts and asbestos bankruptcies --

21 I mean, Your Honor perhaps more than anybody else is aware that

22 there is a learning curve in this area, and we believe that of

23 the three candidates, none of whom, as I say, we have objected

24 to as being unqualified or otherwise unacceptable, Professor

25 Green has demonstrated the most experience and the broadest

1 range of activity in these cases.

2        Dean Trafalat (phonetic) is a close second.  David
3 Austern is a fine fellow and -- but he's only had one pre-pack
4 that he's been involved with, which by hypothesis didn't deal
5 with the kind of negotiations and interplay that some of these
6 other more contested cases, the regular filings are.

7        And his other involvement has been on the claims
8 handling side through his association with the Manville Trust,
9 which is a somewhat different role than a futures
10 representative who is an advocate.  So that's our -- the
11 committee's view on the candidates.

12        This point that Mr. Bernick said about the insurer
13 statement of the need for -- oh, and by the way, I might add
14 one final comment before I get away.  The -- Your Honor's
15 absolutely correct.  It seems to me if there's a notion that
16 somehow or another there's a conflict between futures reps, I
17 don't know where you draw the line.

18        I mean, how do you represent multiple debtors that
19 might have claims against -- in these asbestos bankruptcies
20 everybody's got contribution claims against everybody else, as
21 Your Honor is familiar with.  The unsecured creditors'
22 committee, the Stroock firm in this case, is also counsel to
23 the unsecured creditors' committee in the USG case.

24        The -- Mr. Bayne's firm is counsel for the property
25 damage committee in virtually every case in which a property

1 damage committee's been appointed.  I mean, it just -- it's

2 unprecedented and it makes no sense.

3         With respect to the -- this issue that somehow or

4 another -- some of the insurers have raised -- that we need to

5 have some sort of instruction or declaratory judgment from this

6 Court telling the futures representative who he represents, to

7 me is a giant red herring.

8         If you read the insurer's papers, what they're really

9 asking for is a declaratory judgment that the present claimants

10 and future claimants, both of them, if they are "unimpaired,"

11 to use the insurer's favorite undefined term, undefined only

12 whenever it suits their convenience, they want this Court right

13 now, under the guise of instructing a futures rep, who its

14 constituency is to disallow claims by persons who would not

15 meet their definition of an unimpaired claimant.

16         And they want to litigate that issue, which

17 Mr. Bernick has been eagerly awaiting Judge Wolin's permission

18 to litigate for some number of years now, they want to litigate

19 that issue in the connection with the employment of a futures

20 representative.

21         THE COURT:  Yeah.  I think Mr. Bernick's right.  That

22 simply puts the cart before the horse.  We need to get the

23 futures rep in place, and then I believe it's up to the futures

24 rep to decide what position, if any, to take if litigation

25 actually comes up.

24

1          But I can't define who the future demand holders are

2 going to be at this point in time.  That's why they're future

3 demand holders.  Otherwise, they'd be current claimants and --

4          MR. LOCKWOOD:  Well, it's even more difficult than

5 that, because the futures representative is the mirror image,

6 if you will, of the committee as it relates to the present

7 claimants.  He represents everybody.  What they're basically

8 trying to say is that the futures rep should decide that he

9 isn't going to take the position for future claimants that

10 people who have plural diseases in the future, for example, and

11 who the asbestos claimants' committee are asserting have claims

12 in the present, they shouldn't get compensated in the present,

13 which by hypothesis means they wouldn't get compensated in the

14 future.

15          THE COURT:  Well, I suppose it --

16          MR. LOCKWOOD:  So in effect, what they're asking is

17 the futures rep should decide in lieu of this Court that the

18 future plural claimants don't have a claim.

19          THE COURT:  No.  I think the way to do it is if

20 somebody raises the issue, if it's raised and if it's permitted

21 to go forward to litigation, I would assume that the futures

22 rep's going to take a position, because I think whatever ruling

23 comes down in a case on a case by case basis that binds the

24 present is going to bind the futures, because otherwise, you

25 can't get parity in the distribution mechanisms.

1          MR. LOCKWOOD:  Exactly, Your Honor.  I mean, the goal

2 of the futures rep, the role of the futures rep is to make sure

3 that his constituents get treated in substantially the same

4 manner on similar claims.

5          THE COURT:  That's right.

6          MR. LOCKWOOD:  Not for him to cherry pick his

7 constituency and decide which among them gets paid and which

8 doesn't.  Thank you, Your Honor.

9          THE COURT:  This is kind of the flip side of the

10 issue we saw in a different case about the fact that there was

11 an argument that the futures representative could not represent

12 all of the futures demand holders, that we need a different

13 futures rep for different classifications of demand holders,

14 and I don't think that argument makes any sense, either,

15 according to the statute, so.  Good afternoon.

16          MR. SAKALO:  Good afternoon, Your Honor.  Jay Sakalo,

17 on behalf of the asbestos property damage committee.  A couple

18 of points I want to address that were raised by Mr. Bernick and

19 that Mr. Lockwood addressed, and I think Mr. Bernick addressed

20 with respect to the learning curve that a new candidate, unlike

21 Mr. Austern, Mr. Green and Mr. Trafalat, would face in being

22 appointed as a futures rep in this case, really, I think speaks

23 to the validity of having a new person other than one of those

24 three candidates appointed.

25          THE COURT:  Well, who do you want in?

1        MR. SAKALO:  Oh, we have not come up with a

2   candidate's name, Your Honor, because we don't believe that we

3   should be advocating a particular person as the candidate to

4   serve as a future claimants' rep.

5        THE COURT:  Well, are you advocating against the

6   three that have been selected by the various constituents here?

7        MR. SAKALO:  Yes.  We don't believe that any of the

8   three have the proper -- not -- they're qualified in respect of

9   their ability to serve.  However, we believe that given that

10  they have served or are currently serving as a future

11  claimants' rep in other asbestos cases, they should not be

12  appointed in these cases.

13       THE COURT:  So you're going to tell me that I

14  shouldn't appoint the three who have been proposed, even though

15  they're qualified, but I should just go out and pick the next

16  common man on the street and pull him in and have him be the

17  futures rep?

18       MR. SAKALO:  Well, it's not the common man on the

19  street.  We believe that the future claimants --

20       THE COURT:  It is to me, if you're not going to give

21  me a recommendation.  I don't have -- I don't know

22  qualifications of people who sit in various capacities and

23  things.

24       MR. SAKALO:  Well, I think a process can be

25  established where we can provide names to you on an anonymous

1 basis.  So nobody knows if it's a proposed nominee of the

2 property damage committee, personal injury committee, the

3 debtor's.

4         THE COURT:  But it's the debtor's obligation under

5 the statute, isn't it?

6         MR. SAKALO:  It's the Court's obligation to a point.

7 Now, the debtors raise in their papers that they have the right

8 under 327 to nominate professionals.

9         THE COURT:  I think they do.

10         MR. SAKALO:  But are you -- I'm not in agreement that

11 the future claimants' rep is a professional.

12         THE COURT:  The future claims representative, I

13 suppose, is the representative.  He stands in the capacity of

14 the future demand holders and can seek appointment through the

15 Court for his own professionals.

16         MR. SAKALO:  Correct, and they would be professionals

17 and they would be subject to --

18         THE COURT:  But he has to be appointed under 524, and

19 the only mechanism for appointing somebody that I know of is as

20 a professional.  So for purposes of this appointment process I

21 think he's treated as though he were a professional, even

22 though he's going to have the status of a party.

23         MR. BERNICK:  Mr. Sakalo, maybe I could make a small

24 suggestion that might expedite this.  In terms of your

25 constituency -- and I think this is correct, Your Honor, if my

1 memory serves -- Mr. Austern acted as the futures

2 representative in <u>CEABB</u> (phonetic) and there were no property

3 damage claims that were at issue in that case.

4        So if the concern is that he's already served and

5 he's already somehow framed his views -- if we can agree is the

6 subject here -- I don't think that that applies to Mr. Austern.

7 Matter of fact, if I read Mr. Lockwood's comments, I think his

8 point, the papers did not actually say, we object, or there

9 wasn't a formal objection.

10        Maybe if we can just focus on Mr. Austern, their

11 concerns really don't have application to Mr. Austern.  That

12 would also pick up the London Market, who apparently think that

13 Mr. Austern is okay, which I guess the only issue will be

14 Federal over there.

15        THE COURT:  All right.

16        MR. SAKALO:  Well, it appears, in fact, Mr. Bernick,

17 our concern with Mr. Austern is not that there were no claims

18 in CE for property damage.  Our concern with Mr. Austern is

19 that there were personal injury claims in CE.  That was all

20 that case is about, and we have a concern that in this case he

21 comes to the table with an understanding of personal injury

22 claims, future claims, future demands, however they might be

23 characterized.

24        We believe that somebody who needs to get up this

25 learning curve is the appropriate person, because they need to

1 be educated by themselves and by their professionals.  We're at
2 a point in this case, and we'll hear it a little bit later when
3 we deal with exclusivity, there's not a plan on the table.

4         There's not a plan proposed to our committee or to
5 the PI committee as we understand it.  There's ample time for a
6 professional or for a future claimants' rep to be appointed and
7 get up the learning curve.  They speak of these complex issues
8 that can't be learned in such a quick manner; it would cost too
9 much.

10        THE COURT:  Are you sure you want to pursue this,
11 because honestly, if this is an issue that's going to come up,
12 the next time there's a property damage claim I'm going to
13 expect that the committees' representatives are going to be
14 somebody who has absolutely no understanding of property damage
15 claims and can hit the ground unrunning, crawling and relying
16 on their own professionals, who likewise have no understanding
17 of what current property damage claims are.

18        I mean, this is an absurd argument to me, that this
19 is -- they should have to incur so much additional expense to
20 try to get somebody up and running when there are qualified
21 people who -- if they have a conflict that's a different issue.
22 But unless I'm hearing something about an actual conflict, this
23 same argument applies to every single committee and its
24 professionals.

25        MR. SAKALO:  It does, except, Your Honor, there's one

1 difference, and that is, we're assuming that they're up the

2 learning curve because they understand asbestos personal injury

3 issues.  As to each debtor those issues are different.  For

4 instance, Grace has issues related to its product.

5          It has certain defenses that it will raise to its

6 products that other debtors won't raise.  USG has defenses that

7 they will raise.

8          THE COURT:  Well, if that's the case --

9          MR. SAKALO:  Both --

10          THE COURT:  -- then the futures rep really isn't up

11 and running because he has to learn the specific facts of every

12 case.

13          MR. SAKALO:  And that's my point, Your Honor.  Mr.

14 Austern, Mr. Green and Mr. Trafalat, as it relates to Grace's

15 products and Grace's claims, no further up the learning curve

16 than another representative who would be appointed.

17          THE COURT:  I can't agree with that.  I mean, that's

18 the same thing putting it into the property damage committee as

19 saying that you don't understand what the global context of the

20 issues are, even though they may apply differently to the

21 specific facts of the case.

22          It's exactly the same argument that applies with

23 respect to every counsel, and I really think you should assess

24 whether this is an argument you want to pursue, because if I

25 buy this argument it will apply in the future to any case in

1 which I'm assigned and as to which I don't yet have committees

2 appointed, so.

3          MR. SAKALO:  I --

4          THE COURT:  Because I think I'd be untrue to myself

5 if I said, well, it applies in this instance and not in all

6 others.  If it's an argument that holds water here, it's

7 meritorious for everybody in all contexts in these asbestos

8 cases.

9          MR. SAKALO:  Thank you, Your Honor.

10          THE COURT:  Good afternoon.

11          MR. J. COHN:  Good afternoon, Your Honor.  Jacob

12 Cohn, Cozen, O'Connor, for Federal Insurance Company.

13 Mr. Bernick has essentially, perhaps implicitly, perhaps not

14 implicitly, accused us of trying to make hay with the Judge

15 Wolin situation.  You'll not find any reference to that in our

16 briefs.

17          The case does stand for a central proposition,

18 though.  That is that structure matters.  Structure is

19 important.  It's fundamental to binding future claimants.  And

20 it's not any kind of process that's the most convenient to give

21 to the arms of future claimants.

22          It's the best practicable under all reasonable

23 circumstances that you could give to them.  And the problem

24 with 327, nowhere does it say that under 327 the debtors have

25 the right to nominate an FCR.

1          THE COURT:  Regardless of who does it, how's it going

2 to come up if it doesn't come from the debtor, since the debtor

3 has the --

4          MR. J. COHN:  Any party in interest --

5          THE COURT:  -- fiduciary obligation to all creditors.

6 And --

7          MR. J. COHN:  -- any party in interest should --

8          THE COURT:  -- if seeking in a 524(g) injunction to

9 the future demand holders, who else has that obligation prior

10 to the appointment of an FCR?

11          MR. J. COHN:  Any party in interest or the Court sua

12 sponte should be a --

13          THE COURT:  Absolutely not.  An insurance company has

14 no standing whatsoever to deal with a future claims

15 representative.

16          MR. J. COHN:  Your Honor, the -- this is one section

17 of the code where you're going to find insurance companies'

18 names.  And if I showed up here a year from now and --

19          THE COURT:  In --

20          MR. J. COHN:  -- raised these issues, you'd say,

21 where were you a year ago when we started down this road.

22          THE COURT:  -- in 327 for how to get professionals

23 appointed in the estate, insurance companies are named?

24          MR. J. COHN:  These are -- this is not a professional

25 for the estate, Your Honor.  This is a constituency

1 representative.  This is somebody without a principal.  That's

2 the fundamental distinction between 327, where you are hiring a

3 professional to work for somebody who's there, well, they don't

4 like other to look and say, Your Honor, fire this professional;

5 discipline this professional.  You're hiring the person to be

6 the constituency.

7          THE COURT:  Yeah, I agree with that.

8          MR. J. COHN:  And when you're doing that, in all

9 other contexts that we are aware of that are analogous, the

10 courts require an appearance of impropriety standard.  If you

11 look to UNR, if you look to Johns Manville, and I suggest to

12 Your Honor that those two courts, those two "pioneering cases"

13 that are referred to by Congress when they enact 524(g) and

14 (h), provide legislative gloss to the interpretation of these

15 statutes.

16          The House of Representatives said, we want to make

17 sure that these future cases meet the same kind of high

18 standards with respect to consideration of these future

19 claimants.

20          THE COURT:  I haven't seen anything in any of the

21 papers that challenge either Professor Green or Mr. Trafalat or

22 Mr. Austern's high standards in the case.

23          MR. J. COHN:  Structure matters, Your Honor.  It's

24 the highest standards of the structure.

25          THE COURT:  It does indeed.  I'm going to appoint

34

1 somebody.  There will be a structure.

2          MR. J. COHN:  The structure of permitting the

3 conflicted constituencies to say, hire somebody to be --

4          THE COURT:  Who's conflicted?

5          MR. J. COHN:  -- my arm's-length partisan is a

6 structural effect.

7          THE COURT:  Wait.  Who's conflicted?  Who is it who's

8 conflicted?

9          MR. J. COHN:  Who is conflicted vis-à-vis the futures

10 representative?  The debtor, the insurers, the other creditors,

11 everybody --

12          THE COURT:  The debtor is absolutely not conflict --

13          MR. J. COHN:  -- that is a real party in interest has

14 a different --

15          THE COURT:  No.  The debtor is absolutely not

16 conflicted with respect to the FCR or the ACC or the trade

17 committee or any other --

18          MR. J. COHN:  <u>Ambatex</u> (phonetic) says to the

19 contrary, Your Honor.

20          THE COURT:  -- or any other creditor in the case.

21 The debtor has a fiduciary obligation property damage on -- to

22 make sure that all of those constituencies are appropriately

23 treated within the case.  It doesn't represent those entities,

24 but it is not a conflict in the sense that you're now arguing

25 that there's a conflict.  It has a fiduciary duty.  How can it

1 be in conflict?

2          MR. J. COHN:  Well, Your Honor, Ambatex holds flatly

3 to the contrary.

4          THE COURT:  Ambatex is not a bankruptcy case.

5          MR. J. COHN:  Your Honor, Ambatex certainly is a

6 bankruptcy case.  It is part of the judicial gloss of --

7 legislative gloss of 524(g).  Ambatex is the law of this

8 Circuit.

9          THE COURT:  Oh, I'm sorry.  I apologize.  I was

10 thinking of the Supreme Court case, now the name has escaped

11 me.

12          MR. J. COHN:  Amkit (phonetic).

13          THE COURT:  Yes.  Thank you.  I apologize.  I had the

14 wrong case.

15          MR. J. COHN:  Ambatex, Ambatex, 7055 F.2d.

16          THE COURT:  Yeah.

17          MR. J. COHN:  Whatever it is.

18          THE COURT:  Sorry.

19          MR. J. COHN:  Is what I'm referring to.

20          THE COURT:  Okay.

21          MR. J. COHN:  This is the law of the Circuit, and it

22 says the debtors can't look out for the interests of the

23 futures because they have a conflicting interest.  Johns

24 Manville says that.

25          THE COURT:  They can't look out for them, but with

1 respect to who's going to bring a motion to get somebody

2 appointed to represent them, they have no conflict.  They have

3 a fiduciary duty to make sure that the case is structured in a

4 way that all creditors and demand holders' interests are

5 appropriately met.

6        MR. J. COHN:  I suggest to you that a structure that

7 permits any of these conflicted constituencies to propose

8 somebody, to vet somebody, to nominate a particular person is

9 in and of itself --

10        THE COURT:  Right.  And then I'll ask you the same

11 question I'll ask them.

12        MR. J. COHN:  -- structurally unconstitutional.

13        THE COURT:  Am I to go out on the street and pull the

14 first person I see and pull them in as the futures rep?

15        MR. J. COHN:  No.  Your Honor, you're to fix the

16 structure.  If the structure were to be fixed.

17        THE COURT:  I have fixed one.  I instructed the

18 debtor to talk with the constituents and figure out who an

19 appropriate futures rep would be and --

20        MR. J. COHN:  That's the structural problem, Your

21 Honor.

22        THE COURT:  -- and then to make recommendations, and

23 if they didn't agree, to propose names.  I don't know whose

24 names any of these three people were proposed by.

25        MR. J. COHN:  And I --

1        THE COURT:  I don't see that as a structural problem.

2        MR. J. COHN:  -- my problem, Your Honor, is that --

3        THE COURT:  I see it as a main --

4        MR. J. COHN:  -- the conflicted constituencies,

5 certain of whom repeat in other bankruptcies, are permitted

6 under the structure --

7        THE COURT:  They are not conflicted.

8        MR. J. COHN:  -- Your Honor allows to have in place,

9 contrary to <u>UNR</u> and contrary to <u>Manville</u>.

10        THE COURT:  They are not conflicted.  Please stop

11 referring them -- to them in that fashion.  They are different

12 constituent parties.  With respect to the debtor, in making a

13 motion to appoint a futures rep the debtor is not conflicted.

14 The debtor does not represent the futures rep.

15        It is only assuring that future demand holders have a

16 representative.  That is not a conflict and I don't want to

17 hear that anymore in this record.  That can be your position.

18 It's not mine.  So please, I'm making a finding.

19        MR. J. COHN:  I suggest to you --

20        THE COURT:  There is no conflict.

21        MR. J. COHN:  -- Your Honor, that to answer your

22 follow-up question of who do I pick --

23        THE COURT:  Okay.

24        MR. J. COHN:  -- that if you fix the structure such

25 that a party in interest may say, Your Honor, please select a

1  futures rep and put one in place it may not nominate or vet,

2  that would take care of the substantial bulk of my problem with

3  repeat performers.

4          THE COURT:  And I've just said that if they can't

5  nominate or vet how am I to find out who the persons are or

6  what their qualifications are?  Am I to go out on the street

7  and pull the first person in and say, hey, you want to be a

8  futures rep?

9          MR. J. COHN:  My suggestion on behalf of my clients

10  is that you permit the trustee an exclusive period to give you

11  some names.

12          THE COURT:  I don't have a trustee in this case.

13          MR. J. COHN:  The U.S. Trustee; I'm sorry.

14          THE COURT:  I have the debtor.  They stand in the

15  position of a trustee in the case.

16          MR. J. COHN:  The U.S. Trustee; I mis-spoke.

17          THE COURT:  Absolutely not.  They've already told me

18  they can't do it by statute.

19          MR. J. COHN:  Well, is it practicable for the Court

20  to do this?  The question is --

21          THE COURT:  To order the Department of Justice to do

22  something --

23          MR. J. COHN:  -- is it practicable?

24          THE COURT:  -- that it's said that it can't do by

25  statute?  I don't think so.

1          MR. J. COHN:  No.  No.  No, not the U.S. Trustee.

2 Unless you can say under the circumstances it is not

3 practicable to give them that level of --

4          THE COURT:  It's not legal.

5          MR. J. COHN:  -- official protection.

6          THE COURT:  It's not only not practicable, it's not

7 legal.

8          MR. J. COHN:  Not the U.S. Trustee, Your Honor.

9          THE COURT:  Who?

10          MR. J. COHN:  The Court.

11          THE COURT:  Wait a minute.  You just said I should

12 make the U.S. Trustee give me representation.

13          MR. J. COHN:  That's my suggestion to make it easier.

14 The U.S. Trustee won't, and the Court doesn't want to do it,

15 then --

16          THE COURT:  Fine.  Now, I'm back to the same question

17 I've asked five times:  how do I do it?  Do I go out onto the

18 street and pull somebody in and say, hey, do you want to be a

19 future claims representative?  Is that how I do it?

20          MR. J. COHN:  Or you put out an RFP.

21          THE COURT:  I think the structure is perfectly well

22 defined in prior cases.  This is not the first asbestos case

23 that's come up in which an FCR has been nominated by the

24 debtor; that has never been an issue; that has been, as far as

25 I know, addressed by the courts in a fashion that says the

1 debtor has a conflict in making a nomination.

2          If the parties are unhappy with the nominations I get

3 objections to them.  If they were not qualified, I agree, that

4 would be an inappropriate thing.  But I don't see anything in

5 anybody's papers that say these gentlemen are not qualified.

6 And I can't see how they have conflicts if they are in fact

7 future claims reps in other cases, because their duties are the

8 same in each case, but their constituency is different.

9          That's no different from one law firm representing a

10 -- you know -- a client in one case and a different client in a

11 different case, and the two may have competing interests in

12 some third case.  I mean, that doesn't stop the law firm from

13 standing in the shoes or getting a power of attorney or

14 something to act.

15          MR. J. COHN:  Well, it may, exactly, because a law

16 firm may get a waiver, a conflict waiver.  You can't get a

17 conflict waiver from an absent future claimant.

18          THE COURT:  There is no conflict.  I don't need a

19 conflict waiver.  Where is there a conflict?

20          MR. J. COHN:  There's an appearance of impropriety in

21 people turning the FCR --

22          THE COURT:  As to who?

23          MR. J. COHN:  -- position into a cottage industry.

24 Their employment depends upon their being nominated by people

25 that are representative of constituencies that are in conflict

1 with the constituencies they're being asked to represent.  It's

2 not an arm's-length transaction.

3          THE COURT:  Well, I can't -- I just -- in this

4 instance, I just can't see that.  I really just can't see it.

5 I would be happy -- if there were some additional future claims

6 representative nominees in cases coming up, I think it wouldn't

7 be inappropriate to have a wider variety to choose from, but in

8 this instance I've got three very highly qualified individuals

9 who have been nominated by somebody.

10          I know they've come up by the debtor's motion.  I

11 understood Mr. Bernick to say that the constituents were

12 consulted.  I don't know who proposed these names.  I know I'm

13 getting them in the motion, and I have no challenge to the

14 qualifications.

15          I don't see an appearance of a conflict.  I don't see

16 that these gentlemen are representing, for example, the present

17 asbestos constituents in one case.  If that were the case I may

18 see a conflict, but to the extent that they're standing as FCRs

19 in each case, I don't see that as a conflict.

20          MR. J. COHN:  We respectfully disagree.  If I may

21 turn to the second issue, which is, again, one that you have

22 indicated you don't agree with us on, which is whether or not

23 you need to define the constituency of the FCR up front.

24          THE COURT:  I will.

25          MR. J. COHN:  And the question --

1          THE COURT:  I will do that.  My definition of the

2  FCR's constituency up front is all future demand holders,

3  period, who have some asbestos-related disease.  Period.  End

4  of story.  It's for him to determine whether there is a claim

5  on which to base some representation in the future, but in

6  terms of who his constituents are, everybody and anybody who

7  contends that they have an asbestos-related injury that has not

8  yet manifested itself is his constituency.

9          MR. J. COHN:  I suggest to Your Honor that the

10  question that the <u>Frenville</u> court left open in 1984, which was

11  a very good question then, is a compelling question today:

12  what is the law that governs whether or not somebody has a

13  presently compensable claim in bankruptcy.

14          THE COURT:  That is an issue I do not need to figure

15  out today.

16          MR. J. COHN:  I -- I --

17          THE COURT:  Whether it's presently compensable.  All

18  I need to know is, if it's presently compensable, then it's not

19  the future demand holders' constituency.  If the claim is known

20  now so that it is compensable and allowable in bankruptcy, it's

21  not his constituency.

22          MR. J. COHN:  Your Honor, one of the fundamental

23  problems that the <u>Ortiz</u> court had in reversing, again, the

24  settlement that Professor Green approved in the asbestos

25  litigation --

1           THE COURT:  Um-hmm.

2           MR. J. COHN:  -- was that the District Court took no

3  steps at the outset to insure that the potentially conflicting

4  interests of easily identifiable characters of claimants be

5  protected by provisional certification of subclasses, relying

6  instead on its post-hoc findings at the fairness hearing that

7  these subclasses in fact had been adequately represented.

8           THE COURT:  This isn't a class certification issue.

9  This is an issue that Congress -- if anything, Congress in 524

10 has I think disagreed with that type of analysis in _Ortiz_,

11 because 524 doesn't provide for different future claims

12 representatives based on the type of disease or the

13 classification of disease that an asbestos holder chooses to

14 raise.

15          It simply defines an entity that will represent

16 future demand holders.  That's Congress.  This argument, I

17 think you need to take to Congress.

18          MR. J. COHN:  Two things, if I may.  First of all,

19 Congress legislates subject to the due process clause.  And

20 we're talking about adequate representation because of due

21 process, and the bankruptcy power exists on the constitutional

22 plane along with and subject to the Fifth Amendment.

23          THE COURT:  When was _Ortiz_ decided?

24          MR. J. COHN:  1999, Your Honor.

25          THE COURT:  Okay.

1          MR. J. COHN:  But the problem becomes, how is a

2 future representative to represent his constituency if he

3 doesn't know the applicable law?  Now, Mr. Bernick --

4          THE COURT:  Well, oh, no, wait.  Nobody has said that

5 Mr. Austern, Mr. Green or Mr. Trafalat can't figure out the

6 applicable law.  I haven't seen an argument raised about that

7 or can't hire professionals who will assist them in figuring

8 out the applicable law.

9          MR. J. COHN:  Nobody can answer the question left

10 open under _Frenville_ by the court.

11          THE COURT:  I have answered it.  This constituency

12 for the FCR will be all future demand holders who claim

13 exposure to or asbestos injury, just like that's what the ACC

14 has for the presence.

15          MR. J. COHN:  Damage with a compensable claim under

16 the law of the several states, or under federal common law?

17          THE COURT:  That's an issue that will be determined

18 when the claims resolution mechanisms get put in place.  That's

19 exactly why those future demand holders need a representative.

20          MR. J. COHN:  Well, if asymptomatic people are to be

21 treated as having compensable claims or not compensable claims

22 under state law, some of them will, some of them won't.  And if

23 they're all considered under federal law, there'll be a rule.

24 and I have abdicated a rule that they don't.

25          Now, if they're not voting creditors, what the FCR

1 needs to advocate for is a different body of people, and the

2 concessions they will have to make is different.  Is it facing

3 being swamped by --

4          THE COURT:  I can't address that issue.

5          MR. J. COHN:  -- voting asymptomatic putative

6 creditors?

7          THE COURT:  But I can't address that issue unless and

8 until there is a resolution as to whether the asbestos, as you

9 call them, asymptomatic asbestos plaintiffs have claims that

10 are allowable and that entitle them to vote.  I can't know

11 that.  The issue is going to follow on for the future claims

12 rep exactly as it gets determined for the presence.

13          MR. J. COHN:  And I suggest to you, Your Honor, that

14 it can be decided now.  It needs to be decided now or the --

15          THE COURT:  How can I?  There's --

16          MR. J. COHN:  -- zealous advocacy of an FCR is

17 fatally compromised.

18          THE COURT:  And who's going to represent these

19 alleged asymptomatic people in this litigation when they don't

20 have a representative?  That's a good way to get a default

21 order against them all, and an equally good way not to have

22 that order worth the paper it's printed on.

23          MR. J. COHN:  Well, if --

24          THE COURT:  Because they won't have an asbestos

25 representative.

1           MR. J. COHN:  -- if the federal -- if the bankruptcy

2 law is that it is federal common law, that it is a federal

3 bankruptcy law rule that functionally unimpaired people don't

4 have currently compensable claims in bankruptcy, a pure legal

5 question, then their putative interests as potential future

6 demand holders is -- it is represented by the FCR.

7           THE COURT:  Yeah.

8           MR. J. COHN:  Now, the answer is --

9           THE COURT:  That's right.  If I have an FCR in place,

10 I agree it's representative.

11           MR. J. COHN:  But to FCR means a split.

12           THE COURT:  If I don't have an FCR in place, there's

13 nobody there.

14           MR. J. COHN:  The FCR, if you pluck him out of thin

15 air, if you pull him off the street, if you hire one of the

16 nominees, you have to give him a script.  You have to say, this

17 is the character you're playing.

18           THE COURT:  I've said, who -- what character he's

19 playing.  He represents all future asbestos demand holders.

20           MR. J. COHN:  Yeah, but that character you haven't

21 defined.

22           THE COURT:  I have defined it.

23           MR. J. COHN:  Well, who are they?

24           THE COURT:  I've done it at least five times on this

25 record.

47

1          MR. BERNICK:  Your Honor, if I can make a suggestion.

2   Mr. Cohn's arguments are interesting.  They're all in his

3   brief.

4          THE COURT:  They are all in the brief, but

5   everybody's are.

6          MR. BERNICK:  Yeah, they're all in the brief.  The

7   limited objection is not a limited objection -- is an effort to

8   dramatically revolutionize and change the way that

9   representations take place.  He's entitled to his opinion.

10  He's offered his opinion.

11          He's now gone for much longer than anybody else

12  that's spoken to this issue, and we are mindful that we have

13  other items on the agenda this afternoon.

14          THE COURT:  Well --

15          MR. BERNICK:  And I'm very concerned about our

16  ability to get done at 1:30.

17          THE COURT:  I have read the brief.  The arguments by

18  all the parties have tracked the briefs, and frankly, I just

19  can't agree with this position for the reasons I've already

20  stated.  And I have defined that term.  This record stands for

21  the definition of that term.

22          I am going to put a future claims representative in

23  place.  In the event that there is litigation concerning

24  whether or not asymptomatic asbestos injury victims are or are

25  not entitled to have a vote or hold a claim in this case, they

48

1  will have a representative in the form of a future claims rep.

2          Otherwise, that litigation would not be binding on

3  them, because at that point in time, you're quite correct, all

4  of the cases would stand for the proposition that they were not

5  represented, and therefore, can't be bound.

6          MR. J. COHN:  If I may have a final thought, Your

7  Honor.

8          THE COURT:  Yes.

9          MR. J. COHN:  By doing that, we contend that you set

10 up an inherent conflict because you have asbestos futures that

11 are going to be truly injured in the future.

12          THE COURT:  Yes.

13          MR. J. COHN:  And now, you're saying that their

14 representative has also at this point in time to represent

15 asymptomatic future claimants.

16          THE COURT:  Yes, just like the ACC does it for

17 presence, exactly.  Their committee even consists of people who

18 have different levels of diseases appointed by the United

19 States Trustee.

20          MR. J. COHN:  And --

21          THE COURT:  Whom you would like to have appoint the

22 futures rep.

23          MR. J. COHN:  We take no position on that issue right

24 now.  Thank you, Your Honor.

25          THE COURT:  I take a position on it.  The Code says

49

1 that they're to be treated similarly, and therefore, we're

2 going to figure out a way to treat them similarly, whoever that

3 "they" turn out to be in the long run.

4         Mr. Lockwood, I think at this point in time I'm

5 inclined to grant the motion to appoint Mr. Austern, simply

6 because I think at this point Mr. Austern is not actively

7 involved as a futures rep.  To the extent that there is some

8 alleged appearance of impropriety, I don't think that

9 appearance can be attached to him right now.

10        And for that reason, I think it would be simply

11 better at this point to appoint Mr. Austern.  That's not to

12 have a negative as to Professor Green or Mr. Trafalat.  They

13 are both very highly respected people within the bankruptcy

14 community.  But I just think in this case at this time it's

15 better to put Mr. Austern in place.

16        MR. LOCKWOOD:  Your Honor, I obviously have no

17 objection to that.  My only comment is I really wish, if you're

18 going to appoint Mr. Austern, you don't lend credence to the

19 notion that Professor Green or Mr. Trafalat would have some

20 sort of an appearance of conflict.

21        I think Mr. Bernick and I have addressed that at some

22 length, and I frankly have yet to hear anybody else identify

23 what the conflict is, other than its --

24        THE COURT:  I don't see a conflict.

25        MR. LOCKWOOD:  -- asymptomatic issues, so.

1          THE COURT:  I don't see a conflict for those

2 gentlemen.  Nonetheless, to the extent that there is an issue,

3 that there is some appearance of impropriety, it cannot attach

4 to Mr. Austern, regardless of whether it could attach to Mr.

5 Green or Mr. Trafalat, and I'm not finding that it does, just

6 regardless of whether it does or doesn't.

7          It can't attach to Mr. Austern.  Therefore, I will

8 take an order that appoints Mr. Austern.  Thank you.

9          MR. BERNICK:  We did not fill in the name right

10 there, Your Honor.  It's blank as it's being tendered to you.

11          THE COURT:  All right.  I filled in Mr. Austern's

12 name.  Okay.  That order is entered.

13          MR. BERNICK:  Thank you, Your Honor.  If we can, as I

14 suggested at the outset, turn to item 11.

15          THE COURT:  That's fine.

16          MR. BERNICK:  Which is exclusivity.  And I know Your

17 Honor has read the briefs.  There are some things, though, that

18 I would like to add.  They shouldn't take very long, and then

19 we can hear from others.  There's only one objection that's

20 been made to the extension, and that's by Mr. Lockwood's

21 client, the committee.

22          We have been at an impasse with the bodily injury

23 claimants.  We did meet with their representatives.  We

24 attempted to see if there was common ground to negotiate a

25 consensual plan, and it has not materialized.  We do not blame

1 them for that.

2          Obviously, the question of claim value for the tort

3 claims is very, very important to them, not only in this case,

4 but in all the other cases, and I think it'd be very difficult

5 for them to proceed in a way that they didn't feel comfortable

6 as applicable to other cases.

7          At the same time, it does not seem appropriate to the

8 debtors that we be blamed for the fact that further progress

9 has not been made with respect to valuing the personal injury

10 claims.  As I know Your Honor is very well aware, and in fact

11 the ACC is very well aware, since the very beginning of this

12 case in our very initial informational brief and every step

13 that we've taken we've been extraordinarily diligent to try to

14 get this matter resolved.

15          It has not been resolved and it's not worth at this

16 point in time visiting upon our efforts, as Mr. Lockwood put

17 it, over years to get this matter resolved by the Court.  It

18 seems to us that there's really only one path now.  We

19 understand Your Honor's concern to advance the case, and it

20 seems to me that the path that we have is really one to create

21 two alternatives.

22          Alternative one is the litigation or estimation

23 alternative, and I think that that alternative already has been

24 created.  It's been refined, but it's there.  In fact, we've

25 never raised this before, but in lieu of -- in light of the

52

1 fact that there is an issue about who our district judge is

2 going to be, we're also prepared -- to add to many of Your

3 Honor's burdens -- to bring that matter here.

4        It's not a matter that requires that there be a jury

5 trial, and in light of <u>In re Chateaugay</u>, which actually

6 squarely confronted this issue, this Court does have

7 jurisdiction to deal with personal injury claims, provided that

8 the functions accorded only to the Article III court, which is

9 a jury trial, are not in -- there's no impingement on those.

10        So we could actually proceed in the Bankruptcy Court

11 with respect to litigation.  But all the work in any event has

12 been done, and whatever Your Honor's guidance would be on that,

13 we would obviously appreciate hearing.  The second alternative

14 is to develop a plan, but a plan that at least at this point in

15 time does not include a settlement with respect to the personal

16 injury claims.

17        Now, that is a plan that we have devoted a lot of

18 thought to.  We hope it can mature into one that is fully

19 consensual, but in light of Your Honor's concern and, frankly,

20 our concern to advance the case, we are prepared to craft a

21 plan that we hope will be one that reflects consent and

22 agreement for all of the constituencies, all of the

23 constituencies except the bodily injury constituency.

24        This is a subject that not only we studied.  We have

25 been in conversation with other constituencies to share our

1 ideas about how it might be done, and we are prepared to put

2 pen to paper and to craft that plan and to submit it to the

3 Court.

4       My partners and associates and client would urge that

5 we have 120 days to do that.  If Your Honor is intolerant of

6 that, we do need at a minimum 90 days to put that plan

7 together, particularly because we're going to have to be in

8 discourse with Mr. Austern now, and also the other

9 constituencies to try to make it something that people feel

10 that they can agree to.

11       We'll also hope that we can get agreement from the

12 bodily injury folks, as well, but we are determined, as Your

13 Honor has indicated, to advance the case, to craft this plan.

14 And then I think that we've done everything that we possibly

15 can do.  We've offered to litigate it.  We're still prepared to

16 do that.

17       We'd be -- also be prepared to offer up a plan and

18 pursue the plan.  The only other item that I wanted to raise in

19 connection with exclusivity is -- and I understand that the

20 last time I think that Your Honor heard from us in connection

21 with this case, that you underscored your desire to see some

22 progress with respect to nonasbestos claims and litigation.

23       In light of the time today, I don't know that it

24 would be a good use of our time to review exactly what we have

25 come up with, but we do have a proposal.  I have a chart here

1 that lays it all out for how to handle the nonasbestos
2 litigation.  I'd be happy to share it with counsel today.

3       I'd be happy to give Your Honor an outline of it, as
4 well, but we do have that.  We think that we've investigated
5 and we do have that in the framework and we think it would be
6 very, very handleable.  So we've been diligent in that area, as
7 well.  And for all those reasons --

8       THE COURT:  All right.  Well, much as I would like to
9 hear it, frankly, I think you ought to share it with the
10 committees and the other constituents first, because if there
11 is no objection to it, it will probably take less of my time
12 than if there is.  So I would prefer if there is going to be a
13 structure in place that -- something other than filing omnibus
14 objections to claims -- that you discuss it with the committee.

15       If what you're going to start doing is filing claims
16 objections, then I think you just need to get to it.

17       MR. BERNICK:  Yeah.  No, it is much more than that.
18 We frankly think that with respect to many, many, many of the
19 plans, mediation is the best way to go.  We think that many,
20 many of them can simply be resolved, but we have to break them
21 out by categories.

22       Some will be back saying they're personal injury
23 claims and they really have to be handled pursuant to case
24 management order procedures that we've outlined.  But with
25 respect to others, we don't think that that's necessarily so.

1 So a lot of the bulk of the claims are matters that really

2 don't have -- they shouldn't require extensive litigation.

3        THE COURT:  All right.  Well, I definitely want some

4 proposal at the next omnibus about it, but I think you should

5 share it with the other constituents first.

6        MR. BERNICK:  That's fine.

7        THE COURT:  Mr. Lockwood.

8        MR. LOCKWOOD:  I confess to a feeling of some level

9 of frustration, Your Honor, on being back on exclusivity again

10 here.  And while I acknowledge that Mr. Bernick has been

11 champing at the bit for a number of years to litigate asbestos

12 personal injury issues, and he helpfully reminded the Court

13 that I had said that, I would also point out that as a general

14 proposition in bankruptcy the debtors and their constituents

15 are encouraged to try and work out consensual plans, rather

16 than spending multiplicities and years litigating with one

17 another about the various ways in which one could slice up the

18 pot.

19        This case has now been going on for close to three

20 years, and the only offer that my committee has ever received

21 from the debtor was something that would have allowed the

22 debtor to retain 50 percent more or less of its equity.  And

23 that's in the teeth of property damage claims, personal injury

24 claims, commercial claims and the Zonelite Attic Insulation,

25 that litigation which seems to have somehow or another ground

1 on very slowly, but there's no near-term resolution of that,

2 even though the addendum (phonetic) involved in that would

3 dwarf everybody else's claims, to say nothing of the equity.

4          And I -- in a sense I really just don't know what to

5 say.  I mean, if the Court continues to give extensions of

6 exclusivity to this debtor, as far as I can tell, an observer,

7 the debtor is quite happy to remain in bankruptcy and talk

8 about -- in prior times we've heard sort of generalized notions

9 of, well, we'll negotiate.

10          And now, we've heard some nebulous idea there's going

11 to be some sort of a plan that's going to apparently be

12 satisfactory to everybody but my constituency that's apparently

13 been discussed with some people among the constituencies, not

14 mine.

15          THE COURT:  Well, is the issue with the ACC this

16 issue of the "unimpaireds"?  Is that what's holding up

17 progress?

18          MR. LOCKWOOD:  I would -- I couldn't say that there's

19 any particular issue.  I mean, Mr. Bernick, when we first

20 launched on this effort where he wanted to sort of litigate his

21 way into solvency here, it is true that the unimpaired claims

22 were a major piece of that litigation, but I think he had quite

23 a number of other defenses that he wanted to litigate.

24          I can't remember them all at this time, but there

25 were a lot of them and they sure weren't limited to unimpaired

1  claims.  And it seems to me that the only way that this Court

2  is going to be able to move this matter along is to do

3  something that in effect forces the debtor to get out of the

4  comfortable -- apparently comfortable environment in which it

5  finds itself, and either stop granting exclusivity so they'll

6  have to worry about somebody else is going to file a plan that

7  might get voted on, or at a minimum, certainly not give them

8  another six months, which is what the pending request is here.

9          It's true that Judge Wolin's situation has left

10  things in a bit of a state of flux at the moment, but just

11  continued grants of exclusivity at six months intervals,

12  frankly, Your Honor, we're going to be here forever, as far as

13  I could tell.  And this other thing about the nonasbestos

14  claims litigation, mediation, I mean, I don't even know what

15  claims we're talking about there.

16          THE COURT:  I don't either.  That's --

17          MR. LOCKWOOD:  Much less --

18          THE COURT:  -- why I want them to meet with you.

19          MR. LOCKWOOD:  -- whether they involve the Zonelite

20  Attic Insulation, which I hope we'll hear some kind of a

21  progress report on, because I for one haven't heard anything

22  about it in months.  Thank you, Your Honor.

23          THE COURT:  Well, can we move to the ZAI progress

24  report first and then get back to the exclusivity issue?  Could

25  I get a progress report on ZAI, Mr. Restivo?

1          MR. RESTIVO:  Good afternoon, Your Honor.  I believe

2  Mr. Westbrook and I think also Mr. Scott are representing those

3  ZAI claimants are on the line.

4          MR. WESTBROOK:  That's correct, Your Honor.

5          THE COURT:  Okay.  Thank you.

6          MR. RESTIVO:  Your Honor, around July of 2002 this

7  Court issued case management orders submitted by the parties

8  and case budgets with respect to the ZAI claims.  In the

9  ensuing 10 months since those orders were issued and pursuant

10 to the CMO order issued by the Court, the parties engaged in

11 the following, Your Honor.

12         Over 500,000 pages of documents were produced,

13 reviewed, indexed by each side.  Multiple sets of written

14 discovery were served and responded to.  That included

15 interrogatories, request for admissions, document requests.

16 There were numerous confer and consult sessions over discovery

17 disagreements.

18         All of those were resolved without the need to get

19 guidance from this Court.  Thereafter, the ZAI claimants took

20 the depositions of five former Grace employees and those

21 depositions took place in Florida, South Carolina,

22 Massachusetts and California.

23         The debtor took the depositions of 13 fact witnesses

24 identified by the ZAI claimants, and those depositions took

25 place in Spokane, Tacoma, Minneapolis, Virginia Beach,

1 Washington, D.C., Vermont, Charleston, South Carolina and other

2 places.  Pursuant to the case management order, the ZAI

3 claimants got expert reports.  They had seven experts.

4          Grace filed expert reports.  We have five experts.

5 Each of those 12 experts were then deposed by the parties.  At

6 the end of the process we gave the Court a status report as to

7 where we stood.  We requested an increase in the trial budgets,

8 which the Court did.

9          And on July 7, both sides filed multiple motions for

10 summary judgment, motions for partial summary judgment and

11 motions to limit testimony under the Daubert standards.

12 Pursuant to this Court's order on August 8th, each side

13 responded to the other side's motions, and then on August 18

14 each side replied to the responses of the other.

15          And at that time, all of those materials were placed

16 in binders for the Court, and my recollection is, Your Honor,

17 the parties submitted to the Court 13 binders of material.  At

18 that point, Your Honor, the parties jointly asked the Court to

19 defer argument so that some discussions could be held, and the

20 Court did that.

21          The parties have had a number of discussions, all of

22 which have been conducted in an atmosphere of cooperation.  And

23 the discussions on occasion included representatives of

24 traditional property damage claims, as well as representatives

25 of the ZAI claimants.

1        In those discussions, Your Honor, a lot of concepts

2 have been discussed.  Some of the concepts do depend upon what

3 progress is made or not made with respect to the bodily injury

4 cases.  The parties, Your Honor, intend to continue such

5 discussions, intend to closely monitor progress, if any, with

6 respect to bodily injury claims.

7        But in the meantime, we've agreed we really need to

8 have a strategy for going forward.  And so Your Honor, today

9 the parties are requesting that the Court give us one and a

10 half days in either October or November for oral argument on

11 the outstanding motions.

12        Obviously, if there's some resolution before then

13 consensual with ZAI claimants, or with ZAI claimants and

14 property damage claimants, we would advise the Court and we

15 wouldn't need to argue the motions.  On the other hand, we

16 think in order to move forward we should take the day and a

17 half that the Court had set aside, and then deferred at our

18 request set it up in October or November, depending on the

19 Court's calendar.

20        And if these matters are not resolved then, we would

21 then argue those motions.  In addition, Your Honor, we would

22 like to submit to the Court a motion to increase the budget,

23 since I think both sides are either up to or indeed maybe a

24 little bit over the budgets, but we need to talk about that and

25 we would submit our motion.

1          And so the status report is that the most of the

2 heavy lifting has been done.  The next heavy lifting will be

3 argument, and the Court's digestion of 13 volumes of material,

4 and we would like to do that in either October or November, and

5 have a day and a half to do that.

6          THE COURT:  Okay.  Let me think about the day and a

7 half.  Mr. Westbrook or Mr. Scott, do you have any comments to

8 make?

9          MR. WESTBROOK:  Your Honor, Ed Westbrook from South

10 Carolina.  Mr. Restivo, as usual, Your Honor, has

11 comprehensively summarized what has occurred and where we are.

12 I would just add that I think that both sides know enormously

13 more about each other's position now then we did when we began,

14 and I think that the schedule that Mr. Restivo has outlined

15 would permit us to continue our discussions and get to, if the

16 Court's schedule permits, get to a hearing, if that's

17 necessary, in due course.

18          THE COURT:  Okay.  Mona, did you get into the

19 calendar?

20          THE CLERK:  Yes.  Oh, we didn't get that far; that's

21 why.  That's right before Nancy BJ and that's probably not very

22 good.  This is probably better.

23      (Court and clerk confer)

24          THE COURT:  Okay.  How about October 18th and 19th?

25          MR. WESTBROOK:  Your Honor, this is Ed Westbrook.

1 That would be fine from our standpoint.

2          MR. RESTIVO:  And that's fine from the debtor's

3 standpoint, Your Honor.

4          THE COURT:  Okay.  That will be on October 18th

5 starting at 9:00 a.m.  That's a Monday, and continuing onto

6 Tuesday, October 19th, here in Pittsburgh.  I take it since

7 it's a day and a half you'll both be here; you're not going to

8 try to do a phone hearing for a day and a half, correct?

9          MR. WESTBROOK:  No, Your Honor.  I'll be there.

10          THE COURT:  All right.  Okay.  Thank you.  Okay.

11 Mr. Bernick.

12          MR. BERNICK:  Yeah.  I just want to come back to the

13 exclusivity motion and just respond very, very briefly to Mr.

14 Lockwood.  First, he's taking the liberty of talking about some

15 of the substance of our settlement discussions, and put out a

16 figure that's somewhat misleading; the 50 percent equity figure

17 is somewhat misleading.

18          Actually, under the debtor's -- on the debtor's books

19 and records as of the time that it went into Chapter 11 it had

20 already created a very, very substantial reserve for the

21 payment of personal injury claims.  So actually, if you took

22 the personal injury claims out and calculated the entire equity

23 that would be there for purposes of, in a sense, dividing up

24 the pot, there'd be much less than 50 percent equity that we

25 were actually talking about.

1          We're actually talking about a very discrete sum of

2 money.  That's how it's always been put by the debtor.  It is

3 actually a modest sum of money, and while he might find it

4 outlandish that others might be prepared to agree to this

5 resolution that he talks about, all the other kinds of

6 litigation that are there, the fact of the matter is that it's

7 solely with respect to the bodily injury constituency that we

8 have a problem reaching consensual resolution, I think in part

9 because they're worried that in some fashion they're creating a

10 benchmark by letting us have any equity, that then somehow

11 carries over to the other cases.

12          Be that as it may, we are at an impasse, and the only

13 question therefore is, how can we resolve that impasse, and

14 we're exploring both dimensions, either litigation, which we've

15 suggested since the outset, or a plan.  And the proof of the

16 pudding is in the plan that's going to take us 90 days to do.

17          I will say also, though, that Your Honor asked a very

18 good question, which is, is the reason that we're at an impasse

19 because of asymptomatics?  In the case of Grace, they so-called

20 asymptomatic for nonmalignant claims actually are a very

21 important part of the equation.

22          If all you do is focus on the malignant side of the

23 picture, the malignant claims, if you use even very, very

24 aggressive valuations of those claims in the very aggressive

25 models for modeling out, how much would it cost to resolve all

64

1 the meso claims, as an example, even under their theories the
2 debtor is solvent; there's equity left.

3          So what happens to the asymptomatics or the
4 nonmalignants is a turnkey in this case in a big way.  Again,
5 we'd always posed that it be done through litigation, but there
6 are also ideas that we have to explore in terms of a plan if
7 we're dealing with the so-called asymptomatics.

8          So we need 90 days.  I think we're demonstrating to
9 the Court, just as Mr. Restivo has demonstrated to the Court
10 together with the concurrence of Mr. Westbrook, the progress
11 that's being made on ZAI.  With respect to the personal
12 property damage claims, again, it's always been Grace's view
13 that those are amenable to resolution, and we've got no
14 indication to the contrary.  We think that an agreement can be
15 reached there.

16          So it does come back to the bodily injury people, and
17 now we're going to take the last step with them, which is to
18 propose a plan that basically tries to resolve this case,
19 albeit not on the basis where we have complete agreement with
20 them.  So give us a chance; we'll see how it looks.

21          THE COURT:  Mr. Lockwood.

22          MR. LOCKWOOD:  Well, all I can say is that I just sat
23 here and heard that we're going to spend five months
24 negotiating on the ZAI side for a hearing on October the 18th
25 and 19th on matters which, as described by Mr. Restivo, have

1 been -- discovery has been completed on.

2        Experts have been consulted and everybody is ready,

3 in essence, to go, but we're going to have five months worth of

4 negotiations, I guess, or something.  I mean, thee's just no

5 urgency to this case, Your Honor.

6        THE COURT:  Well, the problem is --

7        MR. LOCKWOOD:  And if Mr. Bernick wants to litigate

8 with us whether or not -- he helpfully equates "asymptomatics"

9 with "nonmalignants."  Even Mr. Bernick knows better than that,

10 and the Supreme Court of the United States in the Norfolk and

11 Western case just decided that asbestosis, as a matter of

12 federal law, is a compensable disease.

13        Last time I looked, something like 75 percent or more

14 of the nonmalignancy claims are for asbestosis, and what people

15 want to litigate here in the teeth of the Supreme Court

16 decision in Norfolk and Western is whether or not as a matter

17 of law we're going to have ILO requirements for specific types

18 of x-ray reading made part of a body of a law that would be

19 imported into -- through the bankruptcy case, when the United

20 States hasn't seen fit to do so.

21        Yeah, I'm quite sure that the nonmalignancy claims

22 make up 50 percent or so of the value, give or take 10 percent,

23 of what our expert would estimate value of the claims are,

24 whether or not the remaining 50 percent, particularly if they

25 were treated as litigation claims for mesothelioma and lung

1 cancer, as opposed to let's use settlement history the way, as

2 Your Honor is familiar, the experts traditionally evaluate

3 these claims, would leave any equity for the debtor.

4       I'm somewhat dubious.  We were embarked in the USG

5 cases, as Your Honor is familiar, on a cancer only estimation

6 before Judge Wolin, until that got sort of blown off the

7 tracks.  But suffice it to say that, you know, basically, we're

8 still in a kind of wait and see mode with this debtor three

9 years into the case.

10       And I have no idea from sitting here and listening to

11 Mr. Bernick this morning, maybe the Court is more prescient

12 than I am as to what Mr. Bernick's plan that he's going to lay

13 on us in the next 90 days is going to look like, although from

14 the description of it, it sounds like something that my

15 constituency is not likely to be enamored of, given the way in

16 which he described everybody else as being cooperative and my

17 people aren't.

18       THE COURT:  Well, I don't know what his plan is --

19       MR. LOCKWOOD:  I guess we'll see in the fullness of

20 time.

21       THE COURT:  -- I don't know what his plan's going to

22 be either, Mr. Lockwood, but the reality is, that all of these

23 plans are just pot plans.  The only question is, how much of

24 the pot goes to any one side.  And you know, from the debtor's

25 point of view, I don't know that the debtor really has that

1  much of an issue with -- the debtors; other parties may -- with

2  respect to the fact that they're going to commit x dollars to

3  the constituency personal injury people and let you divide it

4  up how you want.

5        The question is whether you're going to decide that

6  that pot's big enough.  And maybe that's what the issue has to

7  be and maybe that doesn't even really take too much of an

8  estimation.  It may be a liquidation alternative analysis.

9        MR. LOCKWOOD:  I have no idea, Your Honor.

10       THE COURT:  I don't, either.

11       MR. LOCKWOOD:  And furthermore, I confess to some

12  interest to seeing what the negotiations on the ZAI front are

13  going to be, because that's a pretty big claim and I don't hear

14  my constituency being invited to have any input into that,

15  either.  But I will state right now that we haven't delegated

16  to the debtor the authority to make any kind of a deal they

17  want to in terms of your pot plan analysis as to how big the

18  ZAI share of that's going to be.

19       THE COURT:  Oh, well, I -- if they have some

20  settlement they're going to have to bring it, just like if they

21  have a settlement with the ACC, they're going to have to bring

22  it, if it's not done through a plan.  If it's done through a

23  plan, that's a good vehicle for getting all these objections

24  raised.

25       MR. LOCKWOOD:  Exactly, which is the --

1          THE COURT:  We'll just have one nice, mass hearing.

2  Shall I reserve a date now for it, like --

3          MR. LOCKWOOD:  Well, Your Honor, we might have a

4  quicker date if Your Honor limited the grant of exclusivity or

5  denied it all together.  Then --

6          THE COURT:  Well, I'm not inclined to deny it right

7  now, Mr. Lockwood, but I am, like you, getting a little

8  frustrated with the fact that I don't have a plan on the table.

9  So I think I am going to give the debtor a last period of

10  exclusivity, and that's what it's going to be, a last period of

11  exclusivity to get this done.

12          I think Mr. Restivo and Mr. Westbrook have their

13  orders in the status conferences that have been provided to me

14  as this has gone on.  I've been trying to get them settled.  I

15  understand that they are sort of in lockstep with the ACC.  I

16  don't think it has to be that way, because they want to see

17  what the settlements are going to be there.

18          I think at this point in time they ought to just

19  figure out whether they can come to some negotiation on their

20  own.  And if they can, fine, and it'll be in the plan.  And if

21  they can't, then I guess the debtor will do whatever the

22  debtor's going to do, and we'll be litigating with everybody

23  instead of just a few people.

24          MR. LOCKWOOD:  Thank you.

25          THE COURT:  All right.  Mr. Bernick, Mr. Lockwood was

1 concerned about six months because that's what your motion asks

2 for.  Frankly, I think that's the good period of time.  I think

3 I should extend the debtor's exclusive period for six months

4 and -- but not to file a plan.  I think the initial plan should

5 be filed, if not within 90 days, at least within 120 days,

6 because in all probability it's going to need some

7 modifications in these cases.

8          They're -- it's very unlikely that it's going to get

9 through without some.  So frankly, my preference would be 90

10 days to get a draft of a plan proposed.  I think that will get

11 the parties to the table, and see how it goes.  And if you want

12 to try to work out dates for disclosure statement and plan

13 hearings, I'm willing to do that.

14          So why don't you see what you can work out with the

15 constituents, put it back on the list for next month, and we'll

16 try to set dates.  But that's assuming, of course, the debtor's

17 going to honor this commitment to get something on the table in

18 90 days.

19          MR. BERNICK:  I said that we would do it, and I

20 wouldn't have said that if I didn't have the expectation that

21 that's exactly what we're going to do.

22          THE COURT:  All right.  I'll take an order, then,

23 that we'll extend exclusivity for six months.  It will be

24 subject, in this instance, to termination for cause if there is

25 some cause shown by another party.  And in all probability,

1 it's not going to be extended again unless we happen to be in a

2 plan process where I think it would be unfair at that point not

3 to extend it.

4        But if I don't have a plan that's on track and headed

5 toward the confirmation arena, if nothing else, I don't think

6 there will be another extension.  Do you have an order, or do

7 you need to submit one?

8        MR. BERNICK:  I think we're going to --

9        MS. BAER:  We'll submit one, Your Honor.  The last

10 one had dates in it that wouldn't be applicable.

11        THE COURT:  All right.  I'll take an order when it's

12 submitted on a COC.

13        MR. BERNICK:  All right.  Your Honor, if I could turn

14 to items eight and nine, I believe that they are.  And if, with

15 the Court's indulgence, I think it might be appropriate to take

16 them up at the same time because they relate to would-be

17 claimants, and they're really kind of -- they're part of a

18 sequence.

19        THE COURT:  That's fine.

20        MR. BERNICK:  I'd like to underscore the importance

21 of this.  This is no longer just a question of contempt

22 sanctions.  What's now happened is that we have a problem that

23 really does threaten to unravel a very carefully preserved

24 status quo position, vis-à-vis the tort claimants, one that Mr.

25 Lockwood and his committee and his clients have been good

1 enough to respect and honor, and one that the Libby claimants

2 alone have seen fit not to honor.

3         I'd like to go back for just a moment and to just

4 remind the Court, I think that the Court probably doesn't need

5 any reminding, of how clear Your Honor was regarding the

6 contempt that's now been found.  Your Honor said at page 60 of

7 the last transcript:

8         "Look, let me make this clear.  It is contempt.  It

9 is a direct contempt.  This is a contempt of the automatic

10 stay, let alone the preliminary injunction as to CNA.  It's

11 also a contempt of Judge Wolin's orders."  At page 62 you said:

12 "I don't know a more clear contempt."

13         The conduct that gave rise to those kinds of

14 observations was part of a pattern that actually goes back to

15 the very beginning of the case.  The Libby claimants through

16 their counsel have repeatedly represented or suggested to the

17 Court that somehow they were not aware of the original

18 preliminary injunction, because they didn't "receive notice of

19 it."

20         The fact of the matter is that Mr. Heberling's firm

21 was on the service list.  Mr. Heberling represents people on

22 the committee.  This was a matter of public record.  It was the

23 most substantially contested matter at the beginning of the

24 case; not, I will add, by the tort claimants' committee, but by

25 other interested parties.

1         Not only did they take the position that they didn't

2 know when they did, but they then pursued litigation on their

3 own without giving any prior notice to the Court or any prior

4 notice to the debtor.  It was only later that they decided to

5 service discovery requests, and when we said no they said, oh,

6 well, we need clarification; we need clarification.

7         There was no clarification necessary.  What they're

8 doing -- what they were doing was in violation of that

9 preliminary injunction.  Then we have the strategic response

10 that they offered up to Judge Wolin's opinion.  Your Honor went

11 through this last time, the scheduling order, the amended

12 complaint.

13        There was a pattern of conduct and that pattern

14 continues today.  Let me talk about what's happened since Your

15 Honor last devolved upon this subject in February.  Number one,

16 they still have not withdrawn their amended complaint, the

17 amended complaint that specifically names Grace, that

18 specifically names CNA, that makes allegation after allegation

19 relating to Grace.

20        And actually, if you read the complaint, they ask for

21 relief against the defendants without excepting Grace.  The

22 include conspiracy charges with respect to Grace, specific

23 allegations with respect to Grace.  That complaint has not been

24 withdrawn.

25        Number two, notwithstanding Your Honor's remarks last

73

1 time, they seek to revisit the merits of the contempt finding,

2 arguing that somehow they'll get off the hook if the Court of

3 Appeals later finds that there wasn't jurisdiction for the

4 preliminary injunction.

5          That contention, that yet repeated contention ignores

6 what they did in violation of Judge Wolin's order.  It ignores

7 their conduct with respect to CNA.  It ignores their conduct

8 with respect to Grace.  None of those three things can be

9 affected by any matter now before the Court of Appeals.

10          Their violation of the order that they seek to

11 affirm, Judge Wolin's order, that's not going to be exonerated

12 or somehow expunged by what the Court of Appeals does.  Their

13 continued pursuit of claims against Grace is not going to be

14 exonerated, and their pursuit of claims against CNA is not

15 going to be exonerated.  Nothing that the Court of Appeals'

16 done can somehow wipe clean their misconduct in the past.

17          Number three, they seek a stay with respect to the

18 finding of contempt and the imposition of sanctions, and they

19 acknowledge in that process that they have to meet certain

20 requirements.  And yet, you don't see any kind of proof that

21 they meet those requirements.

22          They have to show probability of success on the

23 merits.  They make absolutely no argument with respect to the

24 underlying merits.  They say that they have to find irreparable

25 harm.  How can there be irreparable harm for a money damage

1  sanction against the plaintiff's firm?  Are the sanctions

2  wrong?

3         Grace is there; we can give the money back.  And

4  somehow, again, to argue that somehow public policy is served

5  by a stay.  The most important public policy is to send an

6  unequivocal message that these people have to stop.  That then

7  brings me to the last chapter of what's happened since that

8  time, that is February, which is that they've opened up a whole

9  new series of problems and the conduct continues with respect

10 to discovery.

11        And this is a very, very significant matter, these

12 perpetuation for preservation depositions.  From day one in

13 this case the debtor was concerned with people finding a back

14 door to continuing litigation against Grace.  This is the

15 problem with asbestos litigation.  It kind of meanders around

16 and it finds the little chinks.

17        And as a result, this debtor -- and we were in court

18 day one to prevent that from happening.  And again, the

19 asbestos claimants' committee was very cooperative in that, as

20 they have been in other cases.  Almost all tort claimants have

21 been cooperative.

22        Tens of thousands of claimants have not sought to

23 initiate discovery, have not sought to impose litigation in

24 this process without permission of the Court.  Libby counsel

25 alone have persisted and they're not on the verge of being

1 rewarded.  How so?

2        Well, the first thing that they did is that they

3 convinced Judge Wolin that to allow the continued prosecution

4 of these so-called independent claims would impose no burden on

5 Grace.  And Judge Wolin's opinion says:  "It is clear that the

6 debtor's estate will in no way be affected by a remand of the

7 independent claims."

8        Going on in the same page, Judge Wolin says:  "The

9 burden on Grace is insignificant."  They also told you, number

10 two, that they only intended to take one preservation

11 deposition.  This was back on September 22nd.  Your Honor is

12 nodding.

13        This page cite is to page 33:  "We do intend to

14 notice that single deposition."  That is what they said at that

15 time.  What is the status today?  Well, the one deposition now

16 has been three depositions that have been taken, and they want

17 10 depositions and they want more.

18        They want open license to go take any kind of

19 preservation deposition they want.  They've got a doctor who

20 will, of course, say all of these people in fact are in

21 extremis.  So one has become 10 has become an indefinite

22 number.  Number two --

23        THE COURT:  Well, have the three people whose

24 depositions were taken died?

25        MR. BERNICK:  I don't know.

1          THE COURT:  Well, that may be some indication of

2 whether or not they were in extremis.

3          MR. BERNICK:  I don't -- I don't know.  I --

4          THE COURT:  Well, perhaps somebody can tell me.

5          MR. BERNICK:  Yeah.  Number two is, they haven't

6 confined the depositions to any kind of medical evidence.

7 They've opened the depositions up, by their own admission, to

8 matters that implicate the interests of Grace, exposure

9 matters, occupational exposure matters.

10          Number three -- Grace facts.  Number three, they seek

11 to use all of this against Grace, specifically against Grace.

12 They say, these are our proofs of claim; this is the evidence

13 that we will offer against Grace.  And oh, by the way, case

14 management.  Well, we have our own case management procedure

15 that we'd like the Court to endorse.

16          They've now got document discovery categories that

17 they are prepared to negotiate.  They now say, let the Montana

18 courts enter the whole thing, they'll supervise these

19 depositions; don't you worry.  What is the effect of all of

20 this?  The effect, number one, is to give plain lie to what

21 they said to Judge Wolin regarding how this is no burden on

22 Grace.

23          This is very interesting.  The last time that they

24 were here they actually represented to the Court when you

25 confronted them with the fact of the allegations they've made,

1 Mr. Cohn says:  "It's the debtors just inherently involved --

2 the debtors are inherently involved in our 'independent claims

3 against Maryland Casualty in the sense that,'" and the Court

4 then interrupted the dialogue.

5         So it's kind of a contradiction in terms to say, just

6 inherently involved, on the one hand, and independent claims on

7 the other.  But one thing is for sure, which is that there's a

8 burden to Grace, we're now facing the prospect of all these

9 depositions being taken, having to prepare for the depositions,

10 deal with the exposure facts, having to deal with all the other

11 facts that relate to the prosecution of a personal injury

12 claim.

13         It's given lie to what they told Judge Wolin.  They

14 now admit this in open court before Your Honor.  And they now

15 have given lie to the whole idea of case management.  Somehow,

16 they are entitled to their own case management order,

17 notwithstanding the fact that the committee that represents

18 tens of thousands of claimants has been prepared to abide by

19 whatever determination is made by the Court in how case

20 management should proceed.

21         Their only argument at the end of the day is that

22 somehow they -- we acquiesced in all of this unfolding

23 development.  And I have to say, Your Honor, they did lead us

24 down the garden path.  They cite a letter, October 15 of 2003.

25 We assume that this was the one deposition.

1          It was a deposition that had already actually been
2    taken.  So okay.  It's one deposition.  It's a past deposition.
3    No big deal.  So we didn't say anything in response to this
4    letter, because it seemed to us it had already been covered.
5    Then they sent out a notice on November 10, 2003, somewhat
6    emboldened by our failure to object vigorously to the October
7    letter.
8          They say:  "Please find enclosed copies of orders
9    from the Workmans' Compensation Court allowing me to take pre-
10   litigation perpetuation depositions of Louie O'Brien."  Okay.
11   So they're not telling us, well, these are orders from the
12   Workmans' Comp court.  There's no indication, no mention at all
13   about proofs of claim, no mention at all about the bankruptcy
14   process.
15         So they go ahead and take the depositions and then
16   they say, oh, guess what, now that we took the depositions,
17   there are people who had a similar interest to your own who are
18   representing your interest there; you don't really need -- you
19   don't really care about these depositions.
20         So they've already now taken the depositions, no
21   longer Workmans' Comp depositions.  They're actually intending
22   to use them, and that's exactly what they've now done.  They've
23   now said, okay, well, let's just continue on the path, we're
24   taking these all in the Workmans' Comp case, but by the way, we
25   intend to use them in the bankruptcy case.

1          We did get led down the garden path, and it's now

2 time to stop, because this may now seek approval.  They say,

3 well, now we're coming into the court to ask for permission.

4 Does that sound familiar where they go down a path -- they lead

5 people down a path.

6          They say, oh, well, everything's okay; then only

7 later do they come back in and ask for permission.  Their

8 conduct, their malfeasance continues.  It's time for it to

9 stop.  Nobody else in the entire case enjoys the privilege of

10 being able to conduct personal injury litigation related to

11 asbestos exposure.

12          That's been the precept of this case since day one.

13 It ought to be followed here.  These people should be found in

14 contempt, and the sanction that we've asked for actually is a

15 modest one.  Your Honor only asked for the fees and expenses

16 that were associated with the last contempt motion.

17          Doesn't say anything about what we're now incurring,

18 and certainly, nothing about the entire course of conduct that

19 preceded the contempt motion.  So we think that the contempt

20 sanctions are warranted, Your Honor.  We'd ask that they be

21 awarded and that there be no further perpetuation depositions,

22 that it come to a halt right now.

23          If they want to then come back in, make application

24 to the Court and explain how it is that they made the

25 misrepresentation to Judge Wolin, we can take that up in

1  appropriate time.

2          THE COURT:  Well, I'm not willing --

3          MR. BERNICK:  But today, it should be denied.

4          THE COURT:  -- I'm not willing to say that no further

5  perpetuation depositions can be taken, because in fact, if

6  there is somebody who is literally dying or within a -- you

7  know -- several months, according to what the best medical

8  evidence would provide, I think it's appropriate to take those

9  depositions.

10         But I think it can be done on a motion by motion

11 basis with some medical evidence attached that indicates why

12 that deposition needs to be done.  I haven't required that in

13 the past.  I haven't seen the need for it, but I think I do see

14 it now.  So I'll simply modify -- at least as to the Libby

15 situation.

16         I don't think there have been that many notices going

17 forward in other cases.  So maybe it's not necessary to even

18 modify it there.

19         MR. BERNICK:  Well --

20         THE COURT:  But if it is, okay.

21         MR. BERNICK:  -- the problem, and Mr. Lockwood can

22 address it, is that I am sure, as I sit here today that there

23 are many, many other claimants that are really picked up within

24 his constituency who are mesothelioma victims.

25         THE COURT:  There may be.

1          MR. BERNICK:  And who have the same and perhaps a
2  better in extremis case.

3          THE COURT:  There may be, but I still think the order
4  that I entered with respect to the injunctions indicates that
5  if there is a situation where deposition testimony needs to be
6  perpetuated, I'll permit it.  What I want, though, is some
7  evidence that it needs to be, because quite frankly, it's very
8  difficult to see how this many depositions are coming up in one
9  specific area so suddenly.

10          THE COURT:  Mr. Cohn.

11          MR. D. COHN:  Your Honor, we have heard much about
12  impaired claims, unimpaired claims, asymptomatics.  None of
13  that applies to Libby.  In Libby you have approximately 500
14  people, all of whom indisputably are seriously ill and are
15  headed toward death.  Not all of them, of course, are going to
16  die in the next few months.

17          THE COURT:  Yes.  And that's the issue for the
18  depositions.

19          MR. D. COHN:  We have asked for nine depositions.
20  Three of them were already taken in Workers' Comp cases and
21  we're simply asking Grace to review the transcripts, which we
22  have provided.

23          THE COURT:  A Workers' Comp case for somebody who's
24  near death?

25          MR. D. COHN:  Yes, Your Honor.

1        THE COURT:  Why haven't they received Workers'

2  Compensation since the injury was -- were occurred?

3        MR. D. COHN:  Apparently, these cases go on for some

4  time, Your Honor, but unfortunately, I'm not completely

5  familiar with the process, except to tell you that they are --

6  that Grace has Workers' Comp coverage.  There is a Workers'

7  Comp insurer, Transportation Insurance, and that process is

8  wending its way through the Workers' Compensation court in

9  Montana.

10        THE COURT:  Well, it may, but that doesn't mean that

11  there -- that the depositions are authorized by this Court

12  pursuant to the perpetuation issue.  Just because somebody has

13  a Workers' Comp claim doesn't mean that you can get a

14  perpetuation deposition.  The purpose was in extremis.

15        MR. D. COHN:  I -- no, Your Honor.  I absolutely

16  acknowledge that.  And the only reason -- there are, by the

17  way, many of these Workers' Comp cases wending their way

18  through, but the only ones as to which we ask perpetuation

19  depositions are for those who are seriously ill and believed to

20  be near death.

21        THE COURT:  And did they die, the three people whose

22  depositions were taken?

23        MR. D. COHN:  They have not, Your Honor.

24        THE COURT:  And how long ago were the depositions?

25        MR. D. COHN:  One of them I think was in October and

1 the other two were in December.

2            THE COURT:  That --

3            MR. D. COHN:  Well, but Your Honor, what you need to

4 understand, what you need to understand though about the

5 condition of these people is, the issue is not simply death.

6 The issue is that as you approach death, you know, one of these

7 people has one lung.  That's it.

8            Another one is unable to walk more than 10 feet.

9 These people can barely breathe.  They are suffering a death by

10 slow strangulation and it is true, Your Honor --

11            THE COURT:  Mr. Cohn, I had a parent who just died of

12 a very similar, not mesothelioma, but I understand what they go

13 through, and I also understand that there is a period of time

14 at which the deposition is appropriate.  But nearly a year

15 before that event happens does not to me in extremis.

16            MR. D. COHN:  Well, but -- well, Your Honor, the --

17 during the period when they are breathing with increased

18 difficulties in which they are strangling, in which they can't

19 walk anymore, there is a -- first of all, medically, you cannot

20 predict exactly when.

21            THE COURT:  Of course.

22            MR. D. COHN:  They're just going to run out of gas,

23 Your Honor, and just die.  And second, Your Honor, even as you

24 approach that point, there also is a point where you may not

25 realistically be able to take their deposition.  They need to

1 be able to breathe in order to talk, and they need to be in

2 sufficient condition in terms of the drugs that they're taking

3 for the pain and so on, to have their depositions taken.

4          THE COURT:  That's fine.  That's what I said.  From

5 now on, I want the evidence, the medical evidence submitted to

6 me on a motion on a witness by witness basis.

7          MR. D. COHN:  Exactly, Your Honor.  Now, we have --

8 and by the way, we --

9          THE COURT:  Including the ones you're asking for now,

10 because I don't have that medical evidence.  I want to know

11 from a doctor, and then if the debtor or the committee decide

12 that they want to get some other medical expert within the

13 period of time within this motion is submitted to look at the

14 criteria or examine a person, they can do it, and then I'll

15 know whether it's consented or not consented.

16          I'm not going to face these issues in the future.  So

17 just whatever order comes out today with respect to anything

18 other than these perpetuation depositions, that is continued

19 till next month.  I want you to submit the medical evidence and

20 a doctor's analysis.

21          I believe the doctor's opinion is there, and that

22 way, the -- everybody else will have whatever the case

23 management order provides for a period of time, to analyze it

24 and see if they want to contest them.

25          MR. D. COHN:  Your Honor, the --

1            MR. BERNICK:  I'm sorry.  Can I make a suggestion,

2  Your Honor, which is that the doctor's letter that they have

3  tended to provide --

4            THE COURT:  Yes.

5            MR. BERNICK:  -- is literally a form letter.

6            THE COURT:  Yes, it is.

7            MR. BERNICK:  It all comes from the same doctors, the

8  same doctor who basically has advanced their cause for many,

9  many years.  It seems to us in light of the threat that this

10 poses to this proceeding there ought to be some independent

11 verification.  One of the -- one --

12           THE COURT:  That's what I'm saying.  If the debtor

13 want it, they can get it.  With respect to this doctor,

14 however, a form letter is not going to do it.  I want a

15 diagnosis on a person by person basis, and I want to know that

16 the doctor has actually seen the person and evaluated the

17 condition.

18           MR. BERNICK:  One of the deponents actually was

19 deposed, not just within the last year, but in January of '03.

20 So we're talking about 18 months ago.  Still not --

21           MR. D. COHN:  There is, Your Honor, an issue as to

22 the depositions that have already been taken, Your Honor.

23 Let's assume for the moment that the medical criteria are met

24 for those people.  In this --

25           THE COURT:  Medical criteria for what?

1          MR. D. COHN:  Medical criteria for being near death

2 or near a condition --

3          THE COURT:  Okay.

4          MR. D. COHN:  -- in which their depositions will no

5 longer be able to be taken.

6          THE COURT:  All right.

7          MR. D. COHN:  There is an issue of both practicality

8 and decency involving those people, Your Honor.  And that is,

9 they have been deposed.  Their transcripts are available.  They

10 were provided to Grace.  And the question is whether Grace can

11 review those transcripts.

12          They already have and they've said as to two of them

13 that they didn't think that there was going to be a need to

14 redepose them, but perhaps they're changing their tune here

15 today.  But if they're going to change their tune, would they

16 -- can we please direct them to do it quickly so that they can

17 then come in and take it?

18          THE COURT:  Okay.  What's the purpose -- if the

19 deposition was only for a Workers' Comp claim, not for purposes

20 of asbestos litigation in this case court or some other court,

21 why do they need to be bothered with it?

22          MR. D. COHN:  Well, when you say for purposes of,

23 what we are seeking to do is to use the same deposition that

24 was done in the Workers' Comp case.

25          THE COURT:  Did I approve it?  Did I approve the

1 deposition?

2          MR. D. COHN:  That's the question of the motion that
3 goes to retroactive approval.

4          THE COURT:  I'm not -- I am not retroactively
5 approving things.  Your firm has been doing things on a nunc
6 pro tunc basis since the outset.  I've been -- I've told you at
7 the last hearing, I'm not doing that anymore.  You know how to
8 get here before me in a timely basis.  I'm not approving a nunc
9 pro tunc deposition use in this case for something I didn't
10 approve at the outset.

11          MR. D. COHN:  Then we'll -- then we shall proceed
12 accordingly, Your Honor.  So then is that --

13          THE COURT:  If you want to renotice them, you know,
14 if it's necessary to renotice them then -- or if the person
15 really is so near death that it can't be done, you can tell me
16 that on a doctor's, as I said before, person by person
17 evaluation and I'll certainly take a look at that.  But I'm not
18 going to approve it nunc pro tunc without that information.

19          MR. D. COHN:  Well, then we will -- okay.  Then we
20 will come before you with the information as to these -- as to
21 the people that we've asked to be able to perpetuate their
22 testimony.

23          THE COURT:  All right.

24          MR. D. COHN:  On a case by case basis.  And I guess
25 we should just expect that we'll file those within the very

1 near term and have them heard at the next -- omnibus hearing.

2          THE COURT:  Yes.  I'm sure.  It -- I don't know what

3 the dates are.  I can't tell you, Mr. Cohn, but I think it's --

4 there's still time to get it onto the June agenda.  You might

5 have to -- we might have to consolidate the dates a little, but

6 I'm willing to do that.

7          I think if they do need their testimony perpetuated,

8 then the Court shouldn't dilly-dally, and I don't intend to.

9 But I do want the things put into a mechanism where I can

10 understand all of the evidence that's there, and give the other

11 parties a chance to see if they have some objection.

12          MR. D. COHN:  Well, thank you, Your Honor.  And you

13 did make this very clear on September 22nd, and we appreciate

14 your, you know, standing by that now, and we will go forward.

15 We will attempt to take as few of these as we can, given our

16 responsibilities to our client, and we'll provide the evidence

17 that everybody needs to evaluate them.

18          THE COURT:  All right.  What's your position with

19 respect to the amount of the sanction that the debtor's asking

20 for?

21          MR. D. COHN:  Your Honor, we filed our papers.  The

22 amount of $61,000, I know there are people here who are dealing

23 with billions of dollars in this case, can just shrug it off as

24 being not a meaningful sanction, but when you're talking about

25 some lawyers who have devoted, really, the substantial part of

1  their practice to representing these people at Libby and

2  they're -- you know -- they're small town lawyers in Montana.

3  A sanction --

4          THE COURT:  With 500 clients dying of mesothelioma?

5          MR. D. COHN:  Yes, Your Honor.

6          THE COURT:  They're small town lawyers not getting

7  fees?

8          MR. D. COHN:  Well, first of all, Your Honor, they

9  are -- it's not mesothelioma.  It's Libby Trimlite --

10         THE COURT:  I'm sorry.

11         MR. D. COHN:  -- asbestos disease.  And the answer

12 is, Your Honor, that they are.  They are a small trial firm

13 that has essentially devoted itself to this cause.  I know here

14 it's hard to look at it as a cause where we -- you know -- the

15 tendency is to just look at it as these people are just

16 claimants and creditors and just pushing -- you know -- pushing

17 their agenda and so are billions of dollars of other people.  I

18 understand that, Your Honor.

19         But out there, this town was just devastated by this

20 asbestos that raced unleashed upon that community.  And yes,

21 when they needed redress they turned to their local tort

22 lawyers to seek that redress for them, not to one of the

23 national personal injury firms.

24         They turned to their local people, and those -- and

25 they've been doing the best that they can, Your Honor.  I think

90

1 that you've seen some of the rough edges.  I have tried to

2 repair those in the bankruptcy sense, Your Honor, and I think

3 we're on track to do that.  But these are Montana trial lawyers

4 in a small town for whom $61,000 would be an enormous sanction.

5          THE COURT:  Well, it seems to me that the sanction is

6 warranted, because they have so clearly violated every order

7 that Judge Wolin or I have issued in this case that, frankly,

8 $61,000 I don't think is enough.  But since that's what the

9 debtor's asking for, that's what I'm going to award.

10          If in fact they want to produce some financial

11 statements and tax returns to me for let's say the last three

12 years that substantiate that they're not able to pay this

13 $61,000 fee, attached to a motion for reconsideration, their

14 tax returns obviously I will accept under seal, but they're

15 going to be shared with the parties here so that there will be

16 some effort to rebut, but it will be shared under a

17 confidentiality agreement, then I'll reconsider.

18          Otherwise, if I don't get that information I think

19 $61 (sic) is a very fair sanction.

20          MR. D. COHN:  I would accept $61, Your Honor.

21          THE COURT:  Well, you just told me they couldn't

22 afford it; $61,000.

23      (Laughter)

24          MR. D. COHN:  I'm sorry, Your Honor.  I'm trying --

25 it's not a subject to be made light of, but I am -- I tried to

1 make some poor attempt at a joke.  But Your Honor --

2         THE COURT:  All right.  Well, it's $61,717.57, I

3 believe is the amount that I was requested.

4         MR. BERNICK:  Let me be more precise.  It's actually

5 a little bit less.  It's $57,281.

6         THE COURT:  All right.  What happened?

7         MR. D. COHN:  There is, however, one aspect of that

8 figure which is overstated.  It has been brought to Grace's

9 attention that we simply never got a definitive answer on it,

10 and that is this.  You may recall that they first filed a

11 motion in the general case and -- when it should have been

12 filed in the --

13         THE COURT:  Adversary.

14         MR. D. COHN:  -- in the adversary proceeding.  The

15 filing of the motion in the original case resulted in

16 additional fees, and those have been removed, to our

17 satisfaction.  So that is not an issue.  However, there were

18 expenses incurred in the obviously larger process of serving

19 the motion in the larger case in the amount of $4,978.  And

20 since that was not the proper place for it to be filed, we

21 would respectfully submit that the --

22         THE COURT:  Well, who filed it there?

23         MR. D. COHN:  Grace did.

24         THE COURT:  Grace filed --

25         MR. D. COHN:  In the estate --

1           THE COURT:  -- Grace filed it?

2           MR. D. COHN:  Yes.  This was -- this is Grace's

3 motion for contempt, which should have been filed --

4           THE COURT:  Oh, the motion for contempt was filed in

5 the main case.  I'm sorry.

6           MR. D. COHN:  Yes.  Because what we're talking about,

7 Your Honor, are the fees and expenses --

8           THE COURT:  Yes.

9           MR. D. COHN:  -- that are incurred by the estate in

10 prosecuting the contempt motion.

11           THE COURT:  Okay.

12           MR. D. COHN:  And so what we're saying is that of the

13 expenses for which they've sought compensation, $4,978 appears

14 to relate to service of the motion in the Grace Chapter 11

15 case.

16           THE COURT:  All right.

17           MR. D. COHN:  And since that was a mistake we

18 respectfully submit that should not be part of the sanction.

19           MR. BERNICK:  I'll accept -- if it'll enable us to

20 get the order done and to be able to get on, I'll accept

21 counsel's representation.  We'll double-check it, but for today

22 I'll accept counsel's representation, and that would mean that

23 we're talking about $53,281.

24           THE COURT:  53,000 what?

25           MR. BERNICK:  $281.

1          THE COURT:  Well, that subtracts $4,000.  Is that

2 what you're asking?

3          MR. BERNICK:  That subtracts $4,000.  He represented

4 it was $4,000.  I don't know if that's true, but I'll accept

5 it.

6          THE COURT:  I thought he said -- 4798 I thought was

7 the number.

8          MR. D. COHN:  4,978.

9          THE COURT:  Oh, 4,978.

10          MR. BERNICK:  Four nine -- so it's 5,000.

11          THE COURT:  So it's $5,000.

12          MR. BERNICK:  It'd be $2,281.

13          THE COURT:  All right.

14          MR. D. COHN:  Your Honor, that -- very well, then.

15 The final point that I need to make on the subject of

16 sanctions, Your Honor, is that there has been a motion

17 addressed to your discretion to stay proceedings relating to

18 the contempt sanctions.  And the reason for it is a matter --

19          THE COURT:  Related to the?

20          MR. D. COHN:  The contempt sanction.

21          THE COURT:  Yes.

22          MR. D. COHN:  And the reason for it is a matter of

23 really sound judicial economy, which is, it is Hornbook law and

24 has not been contested by Grace that if this Court is without

25 jurisdiction over the underlying matter, that is, those

1 independent claims --

2          THE COURT:  I clearly have jurisdiction with respect

3 to the automatic stay.  In fact, I'm the only court that does,

4 and this most recent complaint violates the automatic stay.

5 The firm is in contempt.  I order that that complaint be

6 withdrawn as to the debtor.  Apparently, it hasn't been done

7 and you're, in my view, going to be subject to court sanctions

8 if it doesn't happen soon.

9          MR. D. COHN:  Excuse me, Your Honor.  Then I really

10 do need to address the really incorrect statements that were

11 made by Grace's counsel just now.  The order -- after the

12 hearing at which you stated what you wished to be done we

13 agreed upon a form of order, and that was submitted under

14 certification of counsel.

15          That order, to my knowledge, has not been entered.

16 No one, in any event, has supplied us a copy.  We've been

17 reviewing the docket.  It's apparently just sitting out there.

18          THE COURT:  I haven't seen it.

19          MR. D. COHN:  In fact -- well, it is -- it I believe

20 exists.  Grace has submitted it.  If you'd --

21          THE COURT:  Okay.  I will look for it.

22          MR. D. COHN:  All right.  And Your Honor, in the

23 meantime what we've done is we have submitted to Grace the form

24 of pleading that we propose to submit to the Maryland court.

25 Grace got back to -- to withdraw the complaint.  Grace has

1 gotten back to us with comments.

2          We incorporated those comments, sent them a proposed

3 form of withdrawal and have not heard back from them since.   I

4 have said that immediately upon entry of the order that has

5 been submitted under certificate of counsel, we would withdraw

6 that complaint, Your Honor.

7          THE COURT:  All right.

8          MR. BERNICK:  And then, your --

9          MR. D. COHN:  So there is no -- there's absolutely no

10 basis to say that we are --

11          THE COURT:  I will have that order searched for, and

12 if I can find it today the order will be entered today.

13          MR. BERNICK:  Yeah.

14          MR. D. COHN:  And I will repeat the representation,

15 Your Honor, that as soon as that order is entered, that that

16 complaint will be formally withdrawn.  Now, in the meantime, I

17 do want you to know, no further proceedings have been taken on

18 it.  The judge in Maryland has just stopped acting upon it.

19          We're not asking him to act upon it and so this whole

20 -- there has been no further proceeding on that matter.

21          THE COURT:  All right.

22          MR. BERNICK:  Yeah.  And they don't need a court

23 order.  They don't need anything from us to withdraw an amended

24 complaint.

25          THE COURT:  No, they don't.

1        MR. BERNICK:  They just file it --

2        THE COURT:  I ordered them done, but now, I'll sign

3 an order so that they have to do it.

4        MR. BERNICK:  I think that this actual form of order,

5 because it pertains to more matters than simply the withdrawal

6 of the complaint, probably is out of date.

7        THE COURT:  The one on the COC?

8        MR. BERNICK:  The one on the COC, right.

9        THE COURT:  All right.  So you're going to submit a

10 revised one?

11        MR. BERNICK:  So I think if Your Honor would direct

12 them today to do what they should have done a long time ago,

13 which is simply to withdraw the amended complaint, I think that

14 that will have covered all matters, other than the actual

15 issuance of an order on the contempt and the contempt

16 sanctions.

17        THE COURT:  Let me see your -- the order you have to

18 see if I can modify it, Mr. Bernick.

19        MR. BERNICK:  Okay.

20      (Pause)

21        MR. BERNICK:  It just talks about the itemization of

22 fees, which is already done.  It says that the Court will

23 consider a finding of contempt, as I recall it.

24        THE COURT:  I think if I simply change paragraph 3 to

25 say that, "Counsel for the debtors has provided" --

1          MR. BERNICK:  Yes.

2          THE COURT:  -- "an itemization of the fees and

3 expenses."

4          MR. BERNICK:  And then 4 --

5          THE COURT:  And I'm having the hearing now.  So I can

6 say, "This Court at the May 25th hearing."

7          MR. BERNICK:  Right.

8          THE COURT:  "Determined the amount of fees and

9 expenses to be paid" --

10         MR. BERNICK:  Right.

11         THE COURT:  -- by Gerard (phonetic) counsel to the

12 debtor's estate to be."

13         MR. BERNICK:  Yeah.

14         THE COURT:  "$52,281."

15         MR. BERNICK:  Yes.

16         THE COURT:  "And further considered the Court's

17 earlier ruling as to contempt."  Cross out the sentence that

18 says:  "April 26th hearing may be continued by agreement."  I

19 think that will do it.  Would you like to take a look at this,

20 Mr. Cohn, as I've marked it up, and Mr. Bernick, as well, and

21 see whether --

22         MR. BERNICK:  The only thing I think it would then be

23 -- I don't know, does Your Honor intend to issue a separate

24 order making -- ordering or finding the contempt and then

25 awarding the sanction?

1           THE COURT:  I think I'll write it into this one --

2           MR. BERNICK:  That's fine.

3           THE COURT:  -- when I get this back.  But I want to

4  make sure that with respect to the issue of the withdrawal of

5  the complaint and the amount of the fee that it's correct, and

6  then I can add it into this.

7           MR. BERNICK:  That's fine.

8           THE COURT:  Okay.  Apparently, there is not a

9  certificate of counsel showing at adversary 01-771.  The last

10 one was filed in March of '04, unless that's it.

11          THE CLERK:  That's it.

12          THE COURT:  That is it.  Okay.

13          THE CLERK:  Yes.

14          THE COURT:  All right.  That's it.

15          MR. BERNICK:  Your Honor said it; so we're fine.

16          THE COURT:  All right.  Mr. Cohn.

17          MR. D. COHN:  As to form, Your Honor, they are

18 satisfactory to the Libby claimants.

19          THE COURT:  All right.  I'm going to add a -- I guess

20 I need to add here --

21          MR. D. COHN:  Well, Your Honor, if I may for just a

22 moment?

23          THE COURT:  Yes.

24          MR. D. COHN:  The point that I was raising was that

25 while it is true that this Court is the court that has

1 jurisdiction over violations of the automatic stay, the only

2 violation of the automatic stay that was ever alleged here was

3 the mere inclusion of the debtor in the -- the debtor's name in

4 the caption, which in the context of -- which if that had been

5 the only violation, would obviously not have been regarded as

6 anything serious because it was simply a continuation of the

7 pre-bankruptcy caption.

8          There's no further relief sought against Grace.  The

9 determination of contempt, Your Honor, as I understood it at

10 the hearing was most prominently as to CNA, that the action was

11 sought to be continued as to CNA, notwithstanding the pendency

12 of the preliminary injunction.

13          And for purposes of this hearing we accept that

14 determination.  We're not trying to relitigate that in any way

15 on its merits.  I would simply point out to Your Honor, that it

16 is Hornbook law that in order to be able to issue a sanction

17 for contempt, this Court would need to have jurisdiction over

18 the underlying action.

19          And it is precisely the issue of to what extent this

20 Court has jurisdiction over independent claims of the Libby

21 claimants against parties other then W.R. Grace, precisely that

22 issue which is in contest.  Right now, the contest is in the

23 form of an appeal that is pending in the Third Circuit where

24 Judge Wolin already found that as to Maryland Casualty there's

25 no jurisdiction.

1        And -- but that's being opposed by Maryland Casualty,

2  and is happily in the Third Circuit.  Grace, by the way, has

3  joined now with the -- with us at appellants to urge the Court

4  of Appeals to affirm Judge Wolin's decision that there's no

5  jurisdiction, but that's the current -- that is the current --

6  excuse me -- that is the current state of play on that issue.

7        What will happen presumably, Your Honor, is the Third

8  Circuit will rule in a way that will provide I think the

9  groundwork for all of us to deal with, the issues that relate

10 to CNA, Continental.  When we come back to this Court --

11        THE COURT:  Okay.  I believe that these sanctions are

12 appropriate for all the violations, because I think they're all

13 in contempt, including naming the debtor and seeking relief in

14 a wherefore clause against the debtor without having the debtor

15 excepted from that amended complaint.

16        It's just as easy to put a paragraph in a complaint

17 that says the debtor's being named for purposes of whatever

18 only, and we understand that the debtor -- that the automatic

19 stay applies and the debtor will not take any further action.

20 We're not asking the debtor to.

21        I'm not even sure that does it, but at least then

22 it's clear that you're not seeking relief against the debtor.

23 This amended complaint seeks relief against the debtor, and I

24 think it's in violation of Section 362 of the Bankruptcy Code.

25 I think it also violates as to CNA, Section 105.

1          But I am really more concerned at this point about

2 the fact that the debtor has to continually show up to defend

3 itself when it filed bankruptcy for the very purpose of

4 eliminating those needs.  So this sanction is awardable under

5 362 and under 105 and under either of them, independently,

6 jointly and severally.  I am not going to stay it.

7          MR. D. COHN:  All right.  Then thank you, Your Honor.

8 We have your ruling.  Thank you.

9          THE COURT:  Okay.  As modified, I've added one

10 sentence which says:  "For the reasons expressed on the record

11 today and at prior hearings, Gerard counsel is in contempt of

12 court and sanctions are appropriate."  I added that to the end

13 of paragraph 4.

14          MR. BERNICK:  Thank you, Your Honor.

15          THE COURT:  All right.  That deals also with motions

16 eight or -- do I need a separate order on nine?

17          MR. BERNICK:  No.  I think that with respect to nine,

18 I think that we should continue that as Your Honor has

19 suggested.  I think the directions from the Court are very,

20 very clear on that, and I'm assuming that we're not going to

21 have any further problems before next time.  Otherwise, we'll

22 be back asking for more sanctions.

23          But what Your Honor has indicated is that counsel's

24 supposed to come back on a case by case basis and present the

25 motion to take a perpetuation deposition and we'll deal with it

1  at that time.  So I think that I would hold nine over.

2  Actually, it's their motion for leave to take.  I suppose,

3  really, what Your Honor has directed is that they make that

4  motion on a case by case basis.

5         THE COURT:  Yes.

6         MR. BERNICK:  And in that respect maybe nine

7  technically is moot.  Maybe it's moot because they're

8  presumable going to be coming back on a case by case basis.

9         THE COURT:  Mr. Cohn.

10        MR. D. COHN:  Your Honor, I think maybe deny without

11 prejudice is probably the correct term, because we can then --

12        THE COURT:  All right.  That's fine.  Will you --

13 I'll have Mr. Bernick submit an order, then, that will deal

14 with nine.  I'll deny it without prejudice because I am

15 expecting that as you need depositions I will get that

16 information from you piecemeal.

17        MR. D. COHN:  Correct, Your Honor.  Thank you.

18        THE COURT:  All right.

19        MR. BERNICK:  Your Honor, with respect to the

20 remaining contested matters, that is 10 and 12, and then the

21 omnibus objections, number 14 obviously has already been taken

22 care of.  There's also a National Union matter and the claim

23 status report.  I would respectfully ask the Court for leave to

24 -- for me to catch an airplane that is going to leave, and I'm

25 worried about the weather.  Ms. Baer was the one who was going

1  to address all those matters, anyhow.

2              THE COURT:  That's fine.

3              MR. BERNICK:  With the Court's indulgence, I'll ask

4  her to take that over.

5              THE COURT:  All right.  Anyone else who is planning

6  to leave because of the weather, you're free to go.

7              MR. D. COHN:  Thank you, Your Honor.  I appreciate

8  that.

9              THE COURT:  Thank you.

10      (Pause)

11             THE COURT:  No, I have -- I signed this order, Mona.

12  Thank you.

13             MS. BAER:  Good afternoon, Your Honor.

14             THE COURT:  Good afternoon.

15             MS. BAER:  Your Honor, the next matter on your call

16  is matter number 10, the motion of Unesa (phonetic) Rodriguez.

17  This is one that's been carried on from time to time.  This is

18  zero dollar insurance coverage.  My understanding from CNA's

19  counsel is that they have reached a settlement in principle

20  with the plaintiffs.

21             This was a proof of claim; it never was a complaint.

22  It was just a proof of claim and it would be essentially a

23  claims resolution.  Your Honor, I think it makes sense to just

24  take this off your calendar as it is really going to be mooted,

25  although we do not have -- have not seen a signed settlement

1 agreement yet.  I don't think counsel for Rodriguez is on the

2 phone.

3          THE COURT:  Is anyone present for the Rodriguez's?

4 For CNA?  Okay.  Why don't I just say that it's continued for a

5 settlement agreement to be proposed, and you can put it back on

6 when it's appropriate.

7          MS. BAER:  That's fine, Your Honor.  Just, it's been

8 carried for about six months and I didn't want you to have to

9 keep looking at these papers every month.

10          THE COURT:  Okay.  You don't need to put them back in

11 the binders until I have some settlement proposal.

12          MS. BAER:  Your Honor, matter number 11 we've already

13 taken up, and that takes us to matter number 12.  Matter number

14 12, Your Honor, is the motion of the Massachusetts Department

15 of Environmental Protection for relief from the automatic stay

16 to effectuate a setoff.  That's been fully briefed.  I don't

17 know who is on the phone from Massachusetts.

18          MS. IANCU:  Carol Iancu, Assistant Attorney General.

19          THE COURT:  Yes.  Go ahead.

20          MS. IANCU:  Thank you very much, Your Honor.  Yes, we

21 are seeking relief from the stay to setoff the debtor's pre-

22 petition environmental liability owed to the Commonwealth

23 against part of a 1986 state corporate excise tax refund that

24 is owed to the debtor by the Department of Revenue.

25          THE COURT:  Ma'am, are you on a speaker phone?

1          MS. IANCU:  I am.

2          THE COURT:  Could you please pick up?  You're very

3 hard to hear.

4          MS. IANCU:  Okay.  Is that better?

5          THE COURT:  Yes, thank you.

6          MS. IANCU:  Okay.  Thank you.  Section 553 of the

7 Bankruptcy Code -- sorry.  Now, I've -- I feel like I was

8 shouting because I was on the speaker.  I'll try not to shout

9 at you.  The Bankruptcy Code preserves whatever right of setoff

10 already exists.

11          It's clear that it does not affect the right of a

12 creditor to offset mutual debts that are owing as between the

13 creditor and the debtor that arose pre-petition.  And the

14 Commonwealth papers set out that all of these requirements are

15 met.

16          First, under Massachusetts case law it's clear that a

17 state agency has the right to setoff funds that are owed to a

18 taxpayer by and through the Department of Revenue against funds

19 that a taxpayer owes to a different state agency.  And I would

20 just direct the Court to paragraph 1 and note 2, footnote 2 of

21 the reply brief, which are on page 2 of that brief, and in

22 particular, the cases, the <u>Dakota v. Town of Stouton</u>, 504 --

23          THE COURT:  Ma'am, would you mind shouting at me,

24 because I'm having trouble hearing you even though you're on

25 the headset.

1          MS. IANCU:  Okay.

2          THE COURT:  Thank you.

3          MS. IANCU:  All right.  Do I need to repeat what I

4 said?

5          THE COURT:  No.  Go ahead.

6          MS. IANCU:  Okay.  So I won't be labor it, but I

7 think it's clear under Massachusetts case law, and the cases

8 are cited in the reply brief, that the state agency does have

9 the right for setoff under state common law.  This is

10 completely consistent with federal case law as to mutuality,

11 both in non-bankruptcy and bankruptcy contexts.

12          The Supreme Court and every Circuit Court that has

13 looked at this issue has gone along with what the Supreme Court

14 set out in the Cherry Cotton Mills case, what's been termed the

15 unified creditor theory, where federal agencies are deemed to

16 be -- or constitute a single entity for setoff purposes, as

17 long as they're not acting in a private capacity, which is of

18 course the typical situation.

19          And the cases are talked about on my reply brief,

20 paragraph 6, pages 4 to 5.  You can see all the different cases

21 and in which circuits that have gone that way.  Courts have

22 also applied this same principle to state agencies, and of

23 course, it is an analogous situation that state agencies

24 similar to federal, you know, they're set up in a similar

25 fashion so that it's completely analogous and common sense,

1 logic dictate that the same would apply.

2          And in fact, several courts that have looked at it,

3 have applied the theory that state agencies also constitute

4 single entities for setoff purposes.  And for example, Illinois

5 state agencies, New York and just very recently, in

6 Connecticut, as well.

7          And I'll give you the cite for that because it came

8 out the day I filed the motion.  So actually, I wasn't aware of

9 it, but it's a Second Circuit case, Charter Oaks -- sorry --

10 Charter Oak Associates, 361 F.3d, 760, and that allows setoff

11 as between Connecticut agencies.

12          The debtors in their objections try to distinguish

13 the New York case, in re Bison, and for the life of me I don't

14 quite get it.  They're -- the distinction they point out is

15 that they say that the Department of Labor, the New York State

16 Department of Labor and the New York Department of Tax and

17 Finances are not sacrosanct government units, but rather,

18 they're a subdivision of a larger entity.

19          They're organized subunits of the larger entity,

20 which would be the State of New York for operational purposes,

21 and they think that that distinguishes the situation in

22 Massachusetts, which of course, it doesn't.  The Massachusetts

23 Department of Revenue and the Massachusetts Department of

24 Environmental Protection were both created by state legislature

25 as part of the executive department.

1          There's statutes for that that establish both of

2 those.  The Massachusetts Constitution gives the governor the

3 power to reorganize such executive agencies, to expand, to

4 contract, to modify as he sees fit, to create such a plan and

5 submit it to the legislature.

6          So just as in <u>Bison</u>, these state agencies are defined

7 by the state.  Their structure, their purpose, their function

8 are all derived from the state, and the distinction that

9 debtors try to create just does not exist.  In fact, I would

10 just note for the Court that to the extent that this unified

11 creditor theory is -- has become the general rule, which

12 debtors concede in the federal cases -- or sorry -- for federal

13 agencies, the Federal Constitution that sets off that structure

14 is actually based on the Massachusetts Constitution.

15          The Massachusetts Constitution came first and was the

16 template for the federal from which these other cases,

17 including the Supreme Court, find.  To the extent that the

18 debtors try and rely on <u>Lakeside</u>, which was a case from the

19 Bankruptcy Court from the Northern District of Illinois, Your

20 Honor, this case is no longer good law.

21          The debtors are correct.  It hasn't been directly

22 overruled, but the same exact court, the Bankruptcy Court for

23 the Northern District of Illinois, seeing what the Seventh

24 Circuit did in a subsequent case, no longer follows what

25 <u>Lakeside</u> did.

1        In the case, <u>Doctors' Hospital I</u>, the first one, 272

2 B.R. 677, that court allowed the setoff between Illinois state

3 agencies.  And while debtors are correct that it did not set

4 out a per se rule that all state agencies should be treated as

5 single entities, it is certainly indicative of the weight that

6 this Court should give to the <u>Lakeside</u> opinion.

7        And there is other opinion cited in my reply that

8 make it clear that <u>Lakeside</u> has been discredited.  It was, you

9 know, the minority view.  And I think the extent to which

10 debtors try to suggest that it represents a valid, persuasive

11 authority is a distortion of what the current case law truly is

12 in the area.

13        To the -- and to the extent that they point to an

14 appeal of the <u>Doctors' Hospital</u> case, I would just point out to

15 the Court that mutuality was not an issue in that case.  To the

16 extent that Judge Pozner spoke to the issue at all, it's

17 completely dicta.

18        That case did not involve a common-law right of

19 setoff, but rather, it involved whether or not two different

20 Illinois statutes, one that purported to give a right of setoff

21 and one that did not, whether those were in conflict.  And the

22 issue was whether or not there was an implied right of setoff

23 in a contract that arose that was at issue there.

24        So I think that it would defy logic and also go

25 against the predominant case law to not go ahead and be

1 consistent with what has been the prevailing law that federal

2 agencies, and therefore, the state agencies in this case,

3 specifically the Department of Revenue and the Department of

4 Environmental Protection, would constitute a single entity for

5 setoff purposes here.

6        As to debtor's attempt to say that the pre -- that

7 the tax refund did not arrive until post-petition, again, the

8 reply brief that is before Your Honor sets out that the case

9 upon which debtor relies for that point has been overturned.

10 It's no longer good law.

11        Again, there's not a genuine dispute in the case law

12 on that point, and I think the general rule is very clear that

13 tax refunds arrive at the end of the tax year.  Even if they

14 have not been fully adjudicated at that time, that is the

15 general rule.  And so I really won't spend more time on that

16 unless you have questions.

17        Finally, Your Honor, the third point that debtors try

18 and argue is that they intend to dispute the Commonwealth's

19 claims.  And I would just point out that the Commonwealth

20 believes that not an obstacle to authorizing setoff at this

21 point.  And Collier on Bankruptcy also sets out that, you know,

22 generally, a claim that's not -- a claim is not disabled from

23 setoff simply because it's being disputed.

24        To the extent any adjustments would need to be made,

25 if and when they succeed on a challenge to our claims, that

1 could be handled at that point.

2          THE COURT:  All right.  Thank you.

3          MS. BAER:  Your Honor, under Section 553 of the

4 Bankruptcy Code you have the discretion to determine whether or

5 not a setoff is appropriate.  Setoff is actually contrary to

6 the general way in which bankruptcy cases run, because it does

7 allow someone who has a pre-petition claim to get paid in 100

8 cent dollars when others may not.

9          Your Honor, in this particular situation I think it's

10 important to look at the two kinds of claims you have, and then

11 the two entities you have making the claims.  Number one,

12 you've got taxes that are owed to the debtor from a 1986

13 divestiture.  From day one the debtor has challenged the

14 payment of those taxes and has sought to get those taxes

15 returned to it.

16          Finally, Your Honor, in December of 2003, the

17 Massachusetts Department of Revenue and the debtors entered

18 into settlement negotiations, and actually came before this

19 Court and received an order on January 22nd, 2004 authorizing

20 the debtors to enter into a settlement agreement with

21 Massachusetts for the return of 1,292,000 some odd dollars.

22 This tax refund they've been attempting to get since 1986.

23          Your Honor, the other claims, the claims that the

24 Department of Environmental Protection has in Massachusetts,

25 are claims for alleged environmental cleanup costs and fees

1  associated with environmental cleanup.  They have filed three

2  proofs of claim in the bankruptcy case for a little under

3  $800,000.

4          Those claims are all contested claims.  Those claims

5  are all the subject of omnibus objections that will be coming

6  up shortly.  Those are the two claims you have by two

7  completely different state agencies.  One is the Department of

8  Revenue.  One is the Department of Environmental Protection.

9          Your Honor, we do not dispute that there is case law

10  from the Supreme Court that has decided that when you're

11  talking about a setoff of federal agencies one can setoff

12  against the other.  That is the federal government.  There's

13  only one federal government.  It is set up pursuant to certain

14  federal statutes.

15          But Your Honor, we have 50 separate sovereigns, 50

16  separate states.  Each has their own rules and regulations.

17  Each government is set up separately.  There is no definitive

18  rule from the Supreme Court or from the Third Circuit on

19  whether or not different state agencies can be permitted to

20  setoff amounts owing to and from other state agencies with the

21  debtor.

22          Your Honor, the case law that's out there is kind of

23  all over the place, but Judge Pozner in the Doctors' Hospital

24  case that counsel was speaking of is kind of the last word,

25  although apparently, there's something in the Second Circuit I

1 have not also seen that was referred to on the phone today.

2        Judge Pozner basically said, it's clear with the

3 federal government; it's not clear with the states.  And in the

4 State of Illinois, even there, there's a conflict between the

5 Bankruptcy Courts as to whether or not state agencies are the

6 same for purposes of setoff and for purposes of mutuality under

7 Section 553.  The <u>Bison</u> case that's referred to from the

8 Western District --

9        THE COURT:  Well, even if they are, this is an

10 agreement that was entered into by one of the state agencies.

11 Even if they're treated as one agency, isn't the other agency

12 bound by the agreement of the agency that negotiated it?

13        MS. IANCU:  Your Honor, the settlement agreement has

14 not been entered into.

15        THE COURT:  So what you're doing at this point is

16 objecting to the fact that the taxing body wants to pay back a

17 refund?

18        MS. IANCU:  No.  No.  We're seeking a setoff, which

19 is something to which we are entitled, and to which there is --

20 should be, according to the case law, a preference to see that

21 it happens.

22        THE COURT:  Well, I guess my concern is if there's a

23 negotiation by the taxing authorities to issue a refund check

24 to the debtor and you're all one agency, it seems -- for

25 purposes of setoff and everything else, it would seem that they

1 ought to get the consent of the other agencies beforehand, and

2 if they don't, aren't you bound by it?  I don't know how you

3 can be treated as one agency for setoff purposes and not for

4 settlement purposes.

5         MS. IANCU:  Well, I think what we are -- the

6 settlement agreement that the Department of Revenue had been

7 negotiating with the debtors -- and I was not involved in that,

8 but it's my understanding that that settlement negotiation was

9 to resolve the amount that would be due.

10         We are not at this point trying to say that it's not

11 due or to undermine whether or not that amount is, you know,

12 reliability related to that amount.  It's more just that that

13 shouldn't be setoff against the amounts that the debtor owes

14 for its pre-petition environmental liability.

15         And just to note, Your Honor, our proof of claims did

16 just kind of put on the Court's radar screen that there's

17 potential future liability that we set out in our claims of up

18 to $41 million.  This setoff is just as to the pre-petition

19 portion, to be consistent with Section 553.

20         THE COURT:  Okay.  I just don't understand how if

21 it's one agency you're not all involved in the negotiations,

22 because it would seem that if they're agreeing as to what the

23 tax liability was and they're retaining the rest, they have an

24 obligation to refund it.  So I'm not sure --

25         MS. IANCU:  Well, they are two separate state

1 agencies organized that way for operational purposes.

2          THE COURT:  Yes, I understand.

3          MS. IANCU:  And clearly, you know, you -- for

4 operational purposes it wouldn't be necessarily feasible for

5 the Department of Environmental Protection to be aware and

6 apprised of every negotiation that's going on in the Department

7 of Revenue.

8          THE COURT:  Well, how do you know about it now?

9          MS. IANCU:  Well, I was alerted to it by a party,

10 another party in this case.  Otherwise, I would not have known

11 about it.  I didn't know about it until another party in this

12 case saw that there had been a judicial approval of the

13 impending settlement, and I was notified of it at that time.

14          THE COURT:  Okay.

15          MS. IANCU:  But just to make a point, it's -- they

16 are separate agencies, subunits of a larger, the exact same as

17 the federal agencies are subunits for functional purposes of

18 the federal government.  And that is -- so as far as them being

19 separate agencies, that's one thing.  The fact that they are

20 deemed a single entity for setoff purposes -- and again, I

21 would go back to Cherry Cotton Mills, the Supreme Court case --

22          THE COURT:  Wait.  Ma'am, I heard your argument.  I

23 was letting the debtor make her argument.

24          MS. IANCU:  Okay.

25          THE COURT:  So I'll give you a chance to rebut.

1          MS. IANCU:  Okay.

2          THE COURT:  But you're repeating what you've told me

3 already.

4          MS. IANCU:  Okay.

5          THE COURT:  And I understood it.  I just don't

6 understand --

7          MS. IANCU:  No.  I was going to --

8          THE COURT:  -- how you can be as --

9          MS. IANCU:  -- make a new point, actually, but I'll

10 save it until rebuttal, if you'd like.

11          THE COURT:  All right.  Ms. Baer.

12          MS. BAER:  Your Honor, this conversation is clearly

13 showing you why there's no mutuality here.  You know, the

14 Department of Revenue negotiated a settlement with Grace.

15 Grace came to this Court.  Grace got the approval of this Court

16 to go forward and compromise the amount that is owed to Grace

17 on these very, very old taxes and interest related to those

18 taxes.

19          Now, after the fact when we're going to sign the

20 settlement agreement, which by the way made no mention

21 whatsoever of any other agency being owed something, now we get

22 the Department of Environmental Protection coming in here.

23 These are not mutual at all.

24          These are two separate agencies.  They do two

25 separate things, two separate functions, different sets of

1 people, completely different circumstances.  And Your Honor,

2 not only are the agencies not -- not only are there not

3 agencies mutual for purposes of the setoff, but Your Honor, in

4 addition to that we don't have mutual claims.

5        We got a finally liquidated amount owed for these

6 taxes and we've got three proofs of claim filed by the company

7 that have not been adjudicated, that are contested that could

8 end up being zero or some other number that may not be

9 adjudicated for a period of time; very different from your

10 typical setoff situation.

11        And again, setoff is an equitable relief, and we're

12 asking Your Honor to not permit that equitable relief, because

13 there is not mutuality under Section 553.  And in this

14 particular circumstance with these entities and this kind of

15 debt and this kind of obligation owing to the debtor, it is not

16 the kind that is contemplated by 553 and should not be

17 permitted.

18        THE COURT:  Okay.  All right.  Now, go ahead.  You

19 had another point you wanted to make?

20        MS. IANCU:  Yeah.  Cherry Cotton Mills specifically

21 identifies that who bears the losses and gets the profits is

22 something worthy of consideration in terms of determining

23 whether it's a single entity for setoff purposes.  I think

24 what's being confused is a single entity for setoff purposes,

25 as opposed to a separate agency for operating the government in

1 a realistic way.

2          The Department of Revenue to refund a tax payment,

3 that payment comes from the treasurer, from the general fund.

4 Any environmental liability that is paid to the Commonwealth

5 goes into the general fund.  They come in and out of the same

6 pot.  The Cherry Cotton Mills said that that is precisely

7 relevant.

8          This new case that I mentioned, Charter Oaks, also

9 says precisely that.  It says:  "We believe that in determining

10 whether governmental units should be read as state or agency,

11 the inquiry should focus on the relationship between the

12 agencies and the state treasury.

13          If that relationship reveals that the agencies act in

14 effect as a unitary creditor for non-bankruptcy purposes, the

15 agency should be treated as such in the bankruptcy context, as

16 well."

17          THE COURT:  Okay.  I think the issue here is under

18 553(a)(1), the setoff is not permitted if the creditor's claim

19 against the debtor is disallowed.  And for 553(a)(3)(c), if the

20 debt owed to the debtor by the creditor was incurred by the

21 creditor -- oh, that's not relevant.  I apologize.

22          MS. IANCU:  No.

23          THE COURT:  Just (a)(1), I believe at this point in

24 time is relevant.  And the debtor is telling me at this point

25 they have some objection to claim that's going to be processed

1 quickly.  So it seems to me that for now that setoff is not

2 appropriate.  It may be after the claims allowance process

3 works it way through.

4          So I think what I have to do with this issue is

5 simply continue it until the objection to claim process goes

6 forward, because I'll know at that point whether the claim is

7 allowed or is not allowed.  And if it's not allowed, no setoff

8 will be appropriate.

9          And if it is allowed, then a setoff may be.  I think

10 that should give the debtor some incentive to bringing this

11 proof of claim promptly so that we can get this issue

12 adjudicated, because I don't know at this point whether the

13 claim will be allowed or will not be allowed.

14          MS. IANCU:  No.

15          THE COURT:  Is the debtor intending to go forward

16 with the settlement in the event that the setoff -- in the

17 event that I simply postpone this until the objection to claim

18 process?

19          MS. BAER:  Well, Your Honor, I'm troubled because it

20 seems to me that through the process --

21          MS. IANCU:  I'm sorry.  I can't hear her.

22          THE COURT:  She'll go to a microphone.

23          MS. IANCU:  Thank you.

24          MS. BAER:  Your Honor, I'm troubled because it seems

25 just through the process of who holds the checkbook, they're

1 not going to pay us the settlement amount.

2          THE COURT:  Well, it appears that based on the amount

3 of the pre-petition claim that at least 400,000 of this ought

4 to be returned to the debtor, because the only thing that is at

5 issue is 800 of the 1.2 million.  So at least 400,000 of it is

6 not appropriate for setoff, because there's no claim at this

7 point that that meets the mutuality requirements.

8          But I get -- my concern is, the debtor indicated that

9 the settlement was because you weren't aware that there was

10 going to be this offset.  Are you going to go forward with the

11 settlement if there is an offset?

12          MS. BAER:  Well, Your Honor, I believe that the

13 settlement is a compromise and I think my client will have to

14 look at whether or not knowing they are not going to get the

15 full amount, if it makes sense to go forward with the

16 settlement.

17          THE COURT:  All right.  I think what I will do is

18 continue this.  How long will it take the debtor to get the

19 objection to claim process teed up?  Are you ready to go with

20 this one?

21          MS. BAER:  Your Honor, we have a great body of

22 environmental claims, and there's also the ramifications of an

23 overall settlement we're negotiating with the regular

24 Environmental Protection Agency.  I don't know these claims

25 well enough to know if there's interplay.  If I could have 60

1 days I think then I will know.

2        THE COURT:  Why don't you work with counsel for the

3 DEP and simply put this back on the agenda, either teed up with

4 an objection to claim process, or if the debtor decides you're

5 going forward with the settlement anyway, then it seems to me

6 that the appropriate order would say that, but for the amount

7 that is in issue.

8        The balance should be paid over to the debtor

9 forthwith, and I would be content to enter that type of an

10 order and to push the rest of the issue off until the objection

11 to claim process.  I'm not permitting a setoff.  Yes, the

12 debtor won't have all of that refund readily available for

13 operating cash, that's quite true, but it would still have a

14 third of what its settlement proposal is for.

15        So that's I think better than nothing, and when the

16 debtor gets the rest of it, if it gets any of it, could be teed

17 up by the debtor as promptly as the debtor chooses.

18        MS. IANCU:  All right.  There is case law, Your

19 Honor.  It's just, if -- once a payment is made to the extent

20 that that waives a right to setoff.  So I would need to

21 research and look into the issue as to whether or not it would

22 be appropriate or wise to even pay the portion that's not at

23 issue without --

24        THE COURT:  Oh, I think --

25        MS. IANCU:  -- running afoul of potentially risking

1 waiving our rights.

2          THE COURT:  No.  I think the order can clearly say

3 that the balance is being withheld from distribution pending

4 the objection to claim process, and that your right to claim

5 that setoff is not waived.

6          MS. IANCU:  Okay.

7          THE COURT:  That should not be an issue.

8          MS. IANCU:  Okay.  Thank you.

9          THE COURT:  All right.  So why don't I -- do you want

10 60 days to work with counsel to see whether you're going

11 forward with the settlement, or --

12          MS. BAER:  Your Honor, why don't we just continue

13 this until the July omnibus hearing, and we'll -- I'll find out

14 from my clients where we are on the claims objections process

15 and then we can talk about where they are in the settlement,

16 because I do understand the settlement agreement had not been

17 signed.  So I'll see where that stands.

18          THE COURT:  All right.  Is that all right with you if

19 this is continued until the July omnibus?

20          MS. IANCU:  Yes.  Obviously, I'd prefer a positive

21 ruling now, but yes, I can wait until then.

22          THE COURT:  All right.  If you come to an agreed upon

23 order --

24          MS. IANCU:  Yes.

25          THE COURT:  -- you can always submit it on a COC.

1 But Ms. Baer, make sure Ms. Bello gets a copy, because I --

2 she's normally pretty good at sending me things.  I'm not sure

3 what happened to this one.

4          MS. BAER:  Yes, Your Honor, I will.

5          THE COURT:  If you -- as I said, if you arrange -- if

6 you agree upon an order, then I've already indicated what I am

7 willing to do.  So you can submit that order on a certification

8 of counsel, and then I won't need another hearing on this

9 matter.  It will simply be continued till the claims objection

10 process.  Okay?

11          MS. BAER:  Thank you, Your Honor.

12          THE COURT:  All right.  Thank you.

13          MS. IANCU:  Thank you.

14          MS. BAER:  Your Honor, the next matter on your call

15 is the debtor's third omnibus objections.  Those are

16 nonsubstantive omnibus objections.  We received approximately

17 15 responses.  Of those 15 responses, several have been

18 resolved and I believe we have nine left that are being

19 continued.

20          I have a draft order, Your Honor, with exhibits that

21 shows what's being expunged, what's being withdrawn --

22          THE COURT:  All right.

23          MS. BAER:  -- and what's being continued.

24     (Court and clerk confer)

25          THE COURT:  Are you just continuing the ones that are

1 objected as to which responses were filed?

2         MS. BAER:  Yes, Your Honor, and not -- and we've even

3 resolved some of those.  We're continuing the ones that are on

4 Exhibits A and Exhibits B.

5         THE COURT:  All right.

6         MS. BAER:  There are nine on Exhibit A.  There are

7 three on Exhibit B.  Those are continued all to the June

8 hearing, and the rest of those are being resolved by being

9 expunged, being withdrawn, being reduced, whatever the relief

10 was being requested.

11         THE COURT:  Okay.  This order is entered.

12         MS. BAER:  Your Honor, the next matter is actually

13 not on your call, but should have been.  It was on the April

14 agenda and for some reason was not put on May.

15         THE COURT:  Yes.

16         MS. BAER:  And that was the status on the National

17 Union matter.

18         THE COURT:  Yes.

19         MS. BAER:  As you recall, we had a contested hearing

20 in this Court.  Your Honor ruled.  We submitted a draft order

21 to the parties and I believe yesterday counsel for Read, Morgan

22 and Quin submitted a revised order, and I believe counsel for

23 both National Union and for Read, Morgan and Quin are on the

24 phone.

25         THE COURT:  Somebody from National Union?

1          MR. DAVIS:  Yes, Your Honor.  Michael Davis.

2          THE COURT:  Yes, Mr. Davis.

3          MR. DAVIS:  I think the short story from there is

4 that Mr. Esserman and I spoke this morning.  We've suggested

5 some changes in his draft.  He's asked me to implement those

6 changes and send it to him for review, and I expect that by the

7 end of the week he and I will have a redraft, which we will

8 circulate appropriately.

9          THE COURT:  Okay.

10          MR. ESSERMAN:  This is Sandy Esserman, Your Honor.  I

11 think that that's correct, and I expect to have an agreed order

12 submitted to the Court.

13          THE COURT:  All right.  With respect to the amount,

14 are you all agreeing to the amount?

15          MR. ESSERMAN:  No.

16          MR. DAVIS:  We haven't agreed to any amount yet.

17 Under your Court's prior ruling, National Union was given the

18 right to go back and look at the unpaid claims and the debtor

19 also was going to have that right.  The agreed order that we're

20 contemplating would implement that process.

21          THE COURT:  All right.  So what I've authorized, I

22 think, is the withholding of $4 million unless I -- is this the

23 same claim?

24          MR. ESSERMAN:  No.  I think you may be confusing it

25 with a different matter.

1          THE COURT:  Oh, pardon me.  That might be in Kaiser.

2 Just a minute.  Yes.  Okay.  I see.

3          MR. ESSERMAN:  That's -- that's --

4          THE COURT:  I'm looking at my Kaiser proceeding memo.

5 I apologize.

6          MR. ESSERMAN:  I'm involved in that one, as well,

7 Your Honor, but --

8          THE COURT:  Okay.

9          MS. BAER:  This one, Your Honor, was just procedural,

10 that before any further monies were paid, before National Union

11 had any obligation to pay, these reviews were to be conducted.

12 And this is a procedural order that sets forth the time frames

13 for the reviews.

14          THE COURT:  Okay.  That's fine.  When I get it on a

15 COC I will enter it.  All right.  Thank you.

16          MR. DAVIS:  Thank you, Your Honor.

17          THE COURT:  I'll just continue it generally speaking.

18          MR. DAVIS:  I think we probably need to continue it

19 for status conference at some future date.  We can put it on

20 the docket again.  The agreed order provides for basically a

21 60-day review period and a response period as to the debtors,

22 and we'll see what results that yields.  And we're going to

23 have to put it back on the docket again, and I suspect, argue

24 it again.

25          THE COURT:  All right.  That's fine.  It'll be put

1 back on the agenda when you all agree.

2              MS. BAER:  Thank you, Your Honor.

3              MR. DAVIS:  Thank you.

4              THE COURT:  Okay.

5              MR. ESSERMAN:  Thank you.

6              THE COURT:  Anything else?

7              MS. BAER:  Your Honor, I'd just note that earlier in

8 the proceedings Mr. Bernick referred to our nonasbestos

9 litigation procedures.  We did file a status memo with the

10 Court on Friday that updates the Court on where we are on

11 omnibus objections, and suggests a framework for how we intend

12 to go forward with nonlitigation claims.

13              Counsel was served with a copy of that.  We will have

14 further conversations with counsel in the next number of days

15 to talk more about that procedure.  This is again the procedure

16 for nonasbestos litigation.  We anticipate in conjunction with

17 that, filing a motion for mediation.

18              THE COURT:  Okay.  That's fine.

19              MS. BAER:  And that's all I have on the agenda, Your

20 Honor.

21              THE COURT:  Anyone have any housekeeping matters?

22 All right.  We're adjourned.  Thank you.

23              MS. BAER:  Thank you.

24              THE COURT:  We'll take a five-minute recess so we can

25 get set up for the Kaiser case, and then start Kaiser.

1      (Whereupon, at 2:37 p.m., the hearing in the above-

2 entitled matter was concluded.)

3                              --oOo--

4                           <u>CERTIFICATE</u>

5           I certify that the foregoing is a correct transcript,

6 to the best of the transcriber's ability, from the official

7 electronic sound recording of the proceedings in the above-

8 entitled matter.

9

10

11 _____        <u>June 7, 2004</u>
12 Elizabeth Reid-Grigsby
13 AAERT CET**00145
14 J&J Court Transcribers, Inc.