# EXHIBIT B

Deloitte & Touche LLP
Two Prudential Plaza
180 North Stetson Avenue
Chicago, Illinois 60601-6779

Tel: (312) 946-3000
Fax: (312) 946-2600
www.deloitte.com

# Deloitte
# &Touche

March 14, 2003

Mr. John Akers
Chairman of the Compensation Committee
W.R. Grace & Company
1 Stamford Plaza
263 Tresser Boulevard, 9th Floor
Stamford, CT  06901-3264

Re: Compensation Consulting Services

Dear John:

The purpose of this letter is to confirm the retention of Deloitte & Touche LLP (D&T or Deloitte) to assist the W.R. Grace & Company ("Grace") Compensation Committee with compensation and benefits matters on an as needed basis. The remainder of this letter summarizes the services to be provided, including the specific project scope and approach, project team, timing and associated fees.

On April 2, 2001, Grace filed in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As a result, Grace is now operating as Debtor-in-Possession. Grace and the Compensation Committee have requested that D&T perform the services described herein and D&T has agreed to perform such services, subject to the terms and conditions of this engagement letter. This engagement letter, and D&T's obligations and responsibilities relating to this engagement, shall be effective as of March 14, 2003 subject to obtaining Bankruptcy Court approval in the matter In re W.R. Grace & Co., et al. (the "Case"); provided, however that, in addition to D&T's other rights or remedies, D&T may, in its sole discretion and without any liability arising there from, terminate this engagement in the event that (a) a third party objects or threatens to object, or D&T reasonably believes that a third party may object, in the form of an objection or otherwise, to D&T's retention by Grace in the Case on the terms and conditions set forth in this engagement letter, or (b) a final order authorizing the employment of D&T to provide the services described here in for Grace is not issued by the Bankruptcy Court in the Case on or before sixty (60) days from the date hereof or, the terms and conditions set forth herein or on such other terms and conditions as are satisfactory to D&T, or (c) the application of Grace seeking such order is denied by the Bankruptcy Court in the Case.  In such event, Grace hereby agrees to withdraw or amend, promptly upon D&T's request, any application filed or to be filed with the Bankruptcy Court to retain Deloitte's services in the Case.

## PROJECT SCOPE & APPROACH
We will assist Grace and the Compensation Committee by providing analysis, data, and guidance regarding various compensation and benefits matters.  We will have a working relationship with both Grace's management as well as the Compensation Committee, but will ultimately be responsible to the Compensation Committee.  We will also be available to attend and participate in Compensation Committee meetings to present our findings and recommendations, as required  Our goal is to assist, inform, and enhance the abilities of both Senior Management and the Compensation Committee to effectively make decisions regarding executive compensation that are aligned with Grace's business strategies and market practices.

Deloitte
Touche
Tohmatsu

Mr. John Akers
March 14, 2003
Page 2

The scope of this particular engagement includes:

◇ Assisting in the competitive benchmarking for the top 600 employees.
◇ Conducting an Annual Incentive Plan assessment.
◇ Designing and implementing a Long-Term Incentive Plan upon emergence from bankruptcy.

To complete this engagement, we have developed an approach consisting of three phases that focus on providing the information and advice the Compensation Committee requires regarding Grace's compensation program.

## PHASE I: COMPENSATION BENCHMARKING

*Step 1: Project Planning* We will conduct a planning meeting by teleconference with the appropriate members of Grace's management ("Working Team"), where we will confirm the survey sources and the methodology used for the benchmarking. We will also determine the appropriate positions to be benchmarked and discuss compensation structure alternatives during the call.

*Step 2: Compensation Philosophy* During this step, we will review and discuss Grace's compensation philosophy. If necessary, we will draft a revised philosophy based on this discussion for the review by the Compensation Committee.

*Step 3: Competitive Assessment ("Benchmarking")* Select job positions will then be matched and competitive data will be collected. Once the data has been compiled, it will be analyzed to determine the competitive market positioning for each benchmarked job. We will then meet with the Working Team to discuss the results of this analysis.

*Step 4: Develop Compensation Structure and Guidelines* Based on the competitive analysis alternative compensation structures will be developed and discussed with the Working Team.

*Step 5: Finalize the Compensation Structure* In the final step, the remaining jobs will be slotted and a cost analysis of the new structure will be conducted. We will also assist in the development of implementation and communication plans

We anticipate that we will be in contact with the Working Team on a day-to-day basis during all steps in this phase. Grace's Human Resources group will complete many of the key activities described in Steps 3 through 5 with assistance from D&T. Under this joint approach, Grace's compensation staff members will gather and array the data as well as slot all the individuals into the appropriate salary grades. We will, in turn, be available to assist in the process by providing worksheet templates, methodologies and technical guidance. We will also be responsible for analyzing the results and developing the key findings in conjunction with Grace's Human Resources group to be presented to the Compensation Committee for review and approval.

## PHASE II: ANNUAL INCENTIVE PLAN ASSESSMENT

*Step 1: Project Planning* We will conduct a planning meeting by teleconference with the Working Team to determine the goals and objectives of the annual incentive plan and insure the incentive compensation philosophy supports these objectives.



Mr. John Akers
March 14, 2003
Page 3

*Step 2: Review of Annual Incentive Plan Design*   During this step, we will review the Company's goal setting process and historical performance versus actual payouts. We will also review the design components of the plan including eligibility, bonus opportunities, payouts, etc., to determine the linkage between Grace's business strategy, goals and competitive practice.

*Step 3: Summary of Annual Incentive Plan Review Findings*   Finally, we will prepare observations and recommendations regarding the annual incentive plan design and meet with both the Compensation Committee and Grace's management to discuss our recommendations and next steps.

## PHASE III: LONG-TERM INCENTIVE PLAN ASSESSMENT

*Step 1: Project Planning*   We will conduct a planning meeting by teleconference with the Working Team, where we will determine the goals and objectives of the long-term incentive plan as well as gain a clearer understanding of the key business objectives. We will also discuss the current compensation marketplace, trends, influences and potential implications.

*Step 2: Equity Dilution*   During this step we will assist in developing the business case for the desired levels of equity dilution. We also assist Grace's advisors in determining and negotiating the appropriate percentage of equity to be divided among the creditors and Grace's management. We will provide competitive data on dilution levels of other companies that have emerged from bankruptcy.

*Step 3: Long-Term Incentive Plan Design*   The next step will include identifying the potential long-term incentive plan types and the pros and cons for each from a compensation, tax, accounting and disclosure perspective. We will also assist in determining the appropriate long-term incentive mix and in identifying eligible plan participants. We will review other plan provisions and meet with Grace's management and the Compensation Committee to decide on the appropriate potential design alternatives to be modeled.

*Step 4: Long-Term Incentive Modeling & Other Quantitative Analyses*   During this step, we will determine the appropriate long-term incentive opportunity guidelines and decide on how much equity should be granted upon emergence from bankruptcy. We will also model the potential costs of the selected long-term incentive alternatives and develop stock ownership and retention guidelines, if appropriate. We will perform various share usage and cost analyses and meet with the Compensation Committee to review the analyses and decide on a final plan design.

*Step 5: Implementation and Communication*   The final step will include a review of the plan document drafted by Grace's counsel and assist in the development of the comprehensive communication plan. We will also assist in the development of the policies, procedures and communication materials with the Working Team. We will participate in the Compensation Committee meeting to obtain approval of the awards under the new long-term incentive plan and, if necessary, assist in conducting training sessions to roll-out the long-term incentive program.

## PROJECT TEAM

*Nick Bubnovich* will serve as the Engagement Partner and have the responsibility for the delivery of timely and quality services as well as the Compensation Committee and Senior Management's overall satisfaction with our work. He will also serve as a senior technical and subject matter expert to the engagement team.

*Jane Zeis* will serve as the Engagement Manager. Her primary responsibilities are to maintain overall project direction, ensure project objectives are realized, and provide benchmarking and compensation



Mr. John Akers
March 14, 2003
Page 4

program design expertise. Jane will serve as the Working Team's primary point of contact throughout the project.

*Allison Prybylo and Katie O'Neill* will serve as the Senior Consultants, possessing relevant compensation and benchmarking experience as well as strong analytics. Their primary responsibilities will include data gathering and analysis, as well as the preparation of draft findings and deliverables.

Other consulting staff will be identified as the project begins to efficiently and effectively assist with data collection, analysis and report development.

## PROJECT TIMING & FEES

The estimated professional fees for this engagement are outlined in the table below:

| Engagement | Step | Description | Estimated Fees |
|---|---|---|---|
| **Compensation Benchmarking** | | | |
| | 1 | Project Planning | $5,000 - $6,000 |
| | 2 | Compensation Philosophy | $2,500 - $3,000 |
| | 3 | Competitive Assessment ("Benchmarking") | $10,000 - $15,000 |
| | 4 | Develop Compensation Structure and Guidelines | $25,000 - $32,000 |
| | 5 | Finalize Compensation Structure | $13,000 - $16,000 |
| | | *Total Compensation Benchmarking Fees* | *$55,500 - $72,000* |
| **Annual Incentive Plan Assessment** | | | |
| | 1 | Project Planning | $5,000 - $7,500 |
| | 2 | Review of Annual Incentive Plan Design | $10,000 - $15,000 |
| | 3 | Summary of Annual Incentive Plan Review Findings | $7,500 - $10,000 |
| | | *Total Annual Incentive Plan Assessment Fees* | *$22,500 - $32,500* |
| **Long-Term Incentive Plan Assessment** | | | |
| | 1 | Project Planning | $5,000 - $7,500 |
| | 2 | Equity Diffusion | $7,500 - $10,000 |
| | 3 | Long-Term Incentive Plan Design | $18,000 - $26,000 |
| | 4 | Long-Term Incentive Modeling & Other Quantitative Analyses | $20,000 - $37,000 |
| | 5 | Implementation & Communication (does not include actual issuing expenses) | $22,000 - $27,000 |
| | | *Total Long-Term Incentive Plan Assessment Fees* | *$82,500 - $105,500* |
| | | | |
| | | **TOTAL FEES** | **$160,500 - $210,000** |

In the case of a project scope change, D&T will notify you immediately and outline the changes for the Compensation Committee's review. Any revised fees will be agreed upon by both parties before the commencement of the additional work.

Any out-of-pocket expenses will be charged at cost. D&T will seek reimbursement for fees and expenses incurred in connection with its provision of the services described in this engagement letter consistent with the compensation and reimbursement procedures in effect in the Case.

## ACCEPTANCE AND AGREEMENT

This engagement letter, together with the attached General Business Terms, constitutes the entire agreement with respect to this engagement. Please indicate your agreement to this letter by signing one of the two enclosed copies and returning it to my attention.

Mr. John Akers
March 14, 2003
Page 5

Please be assured that we will work closely with you to meet your objectives and expectations of high quality service. If you have any questions, please do not hesitate to call Jane Zeis at 312-946-3696 or me at 312-946-2260.

Very truly yours,

DELOITTE & TOUCHE LLP

By *N. A. Bubnovich*
Nick Bubnovich
Partner

AGREED AND ACCEPTED BY
W.R. Grace and Company

Name: _____

Title: *Chairman Audit Committee, Board of Directors*

Date.   *3 - 28 - 03*

Copies to:        Brian McGowan, W.R. Grace & Co.
                  Michael Piergrossi, W.R. Grace & Co.
                  Jane Zeis, Deloitte & Touche LLP

## GENERAL BUSINESS TERMS

**1. Services.** It is understood and agreed that D&T's services may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, the Client. In connection with its services hereunder, D&T shall be entitled to rely on all decisions and approvals of the Client.

**2. Payment of Invoices.** Properly submitted invoices upon which payment is not received within thirty (30) days of the invoice date shall accrue a late charge of the lesser of (i) 1¼% per month or (ii) the highest rate allowable by law, in each case compounded monthly to the extent allowable by law. Without limiting its rights or remedies, D&T shall have the right to halt or terminate its services entirely if payment is not received within thirty (30) days of the invoice date.

**3. Term.** Unless terminated sooner in accordance with its terms, this engagement shall terminate on the completion of D&T's services hereunder. This engagement may be terminated by either party at any time by giving written notice to the other party not less than thirty (30) days before the effective date of termination.

**4. Ownership.**

a) <u>D&T Technology.</u> D&T has created, acquired or otherwise has rights in, and may, in connection with the performance of services hereunder, employ, provide, modify, create, acquire or otherwise obtain rights in, various concepts, ideas, methods, methodologies, procedures, processes, know-how, and techniques (including, without limitation, function, process, system and data models); templates; generalized features of the structure, sequence and organization of software, user interfaces and screen designs, general purpose consulting and software tools, utilities and routines; and logic, coherence and methods of operation of systems (collectively, the "D&T Technology").

b) <u>Ownership of Deliverables.</u> Except as provided below, upon full and final payment to D&T hereunder, the tangible items specified as deliverables or work product in the engagement letter to which these terms are attached (the "Deliverables") shall become the property of the Client. To the extent that any D&T Technology is contained in any of the Deliverables, D&T hereby grants the Client, upon full and final payment to D&T hereunder, a royalty-free, fully paid-up, worldwide, non-exclusive license to use such D&T Technology in connection with the Deliverables.

c) <u>Ownership of D&T Property.</u> To the extent that D&T utilizes any of its property (including, without limitation, the D&T Technology or any hardware or software of D&T) in connection with the performance of services hereunder, such property shall remain the property of D&T and, except for the license expressly granted in the preceding paragraph, the Client shall acquire no right or interest in such property. Notwithstanding anything herein to the contrary, the parties acknowledge and agree that (a) D&T shall own all right, title, and interest, including, without limitation, all rights under all copyright, patent and other intellectual property laws, in and to the D&T Technology and (b) D&T may employ, modify, disclose, and otherwise exploit the D&T Technology (including, without limitation, providing services or creating programming or materials for other clients). D&T does not agree to any terms that may be construed as precluding or limiting in any way its right to (a) provide consulting or other services of any kind or nature whatsoever to any person or entity as D&T in its sole discretion deems appropriate or (b) develop for itself, or for others, materials that are competitive with those produced as a result of the services provided hereunder, irrespective of their similarity to the Deliverables.

**5. Limitation on Warranties. THIS IS A SERVICES ENGAGEMENT. D&T WARRANTS THAT IT SHALL PERFORM SERVICES HEREUNDER IN GOOD FAITH. D&T DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

6. Limitation on Damages and Indemnification.

a) The Client agrees that D&T and its personnel shall not be liable to the Client for any claims, liabilities, or expenses relating to this engagement for an aggregate amount in excess of the fees paid by the Client to D&T pursuant to this engagement, except to the extent finally judicially determined to have resulted primarily from the bad faith or intentional misconduct of D&T. In no event shall D&T or its personnel be liable for consequential, special, indirect, incidental, punitive or exemplary loss, damage, or expense relating to this engagement.

b) The Client shall indemnify and hold harmless D&T and its personnel from all claims, liabilities, and expenses relating to this engagement, except to the extent finally judicially determined to have resulted primarily from the bad faith or intentional misconduct of D&T.

c) The provisions of this Paragraph and Paragraphs 9 and 11(b) shall apply to the fullest extent of the law, whether in contract, statute, tort (such as negligence), or otherwise. In circumstances where all or any portion of the provisions of this Paragraph or Paragraph 11(b) are finally judicially determined to be unavailable, D&T's aggregate liability for any claims, liabilities, or expenses relating to this engagement shall not exceed an amount which is proportional to the relative fault that D&T's conduct bears to all other conduct giving rise to such claims, liabilities, or expenses.

7. Cooperation   The Client shall cooperate with D&T in the performance by D&T of its services hereunder, including, without limitation, providing D&T with reasonable facilities and timely access to data, information and personnel of the Client. The Client shall be responsible for the performance of its personnel and agents and for the accuracy and completeness of all data and information provided to D&T for purposes of the performance by D&T of its services hereunder.

8. Force Majeure.  D&T shall not be liable for any delays or non-performance resulting from circumstances or causes beyond its reasonable control, including, without limitation, acts or omissions or the failure to cooperate by the Client (including, without limitation, entities or individuals under its control, or any of their respective officers, directors, employees, other personnel and agents), acts or omissions or the failure to cooperate by any third party, fire or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

9. Limitation on Actions   No action, regardless of form, relating to this engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for non-payment may be brought by a party not later than one year following the date of the last payment due to such party hereunder.

10. Independent Contractor.  It is understood and agreed that each of the parties hereto is an independent contractor and that neither party is, nor shall be considered to be, an agent, distributor, partner, fiduciary or representative of the other. Neither party shall act or represent itself, directly or by implication, in any such capacity in respect of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.

11. Confidentiality and Internal Use.

a) The Client agrees that all services hereunder and Deliverables shall be solely for the Client's informational purposes and internal use, and are not intended to be and should not be used by any person or entity other than the Client. The Client further agrees that such services and Deliverables shall not be circulated, quoted, disclosed, or distributed to, nor shall reference to such services or Deliverables be made to, any person or entity other than the Client.

b) Notwithstanding anything to the contrary in these terms or the engagement letter to which these terms are attached, (i) D&T hereby acknowledges and agrees that there are no conditions of confidentiality associated with the tax services, if any, provided by D&T or its personnel under these terms or such engagement letter, (ii) neither D&T nor any party known to D&T has or claims to have any proprietary interest in the terms or substance of any tax services, if any, provided by D&T or its personnel under these terms or such engagement letter, and (iii) except as otherwise provided in this subparagraph (b), all services

in connection with this engagement shall be solely for the Client's informational purposes and internal use, and this engagement does not create privity between D&T and any third party. This engagement is not intended for the express or implied benefit of any third party. No third party is entitled to rely, in any manner, or for any purpose, on the advice, opinions, reports, or other services or Deliverables of D&T. The Client further agrees that the advice, opinions, reports and Deliverables issued by D&T shall not be distributed to any third party without the prior written consent of D&T. D&T agrees that such consent will ordinarily be granted with respect to tax services-related materials, provided that the Client makes a specific written request of D&T and the third party seeking such tax services-related materials executes an acknowledgment of non-reliance and a release acceptable to D&T. In order to protect D&T from any unauthorized reliance or claims, and from breach of the Client's obligation not to distribute D&T's advice, opinions, reports or Deliverables to any third party without D&T's prior written consent, the Client agrees to indemnify and hold harmless D&T and its personnel from all claims, liabilities, and expenses relating to such a breach. However, nothing in this Paragraph 11 shall be construed as limiting or restricting disclosure of every aspect of D&T's tax services, if any, provided under these terms or the engagement letter to which these terms are attached for purposes of §6111(d) of the Internal Revenue Code. The Client and its employees, representatives or agents may disclose the structure and tax aspects of a transaction to any and all persons without limitation of any kind.

c) To the extent that, in connection with this engagement, D&T comes into possession of any proprietary or confidential information of the Client, D&T will not disclose such information to any third party without the Client's consent, except (a) as may be required by law, regulation, judicial or administrative process, or in accordance with applicable professional standards, or in connection with litigation pertaining hereto, or (b) to the extent such information (i) shall have otherwise become publicly available (including, without limitation, any information filed with any governmental agency and available to the public) other than as the result of a disclosure by D&T in breach hereof, (ii) is disclosed by the Client to a third party without substantially the same restrictions as set forth herein, (iii) becomes available to D&T on a nonconfidential basis from a source other than the Client which D&T believes is not prohibited from disclosing such information to D&T by obligation to the Client, (iv) is known by D&T prior to its receipt from the Client without any obligation of confidentiality with respect thereto, or (v) is developed by D&T independently of any disclosures made by the Client to D&T of such information.

**12. Survival and Interpretation.** The agreements and undertakings of the Client contained in the engagement letter to which these terms are attached, together with the provisions of Paragraphs 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16 hereof, shall survive the expiration or termination of this engagement. For purposes of these terms, "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; to the extent providing services under the engagement letter to which these terms are attached, Deloitte Touche Tohmatsu, its member firms, and the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu and its member firms, all of their partners, principals, members, owners, directors, staff and agents; and in all cases any successor or assignee.

**13. Assignment.** Except as provided below, neither party may assign, transfer or delegate any of its rights or obligations hereunder (including, without limitation, interests relating to this engagement) without the prior written consent of the other party. D&T may, without the consent of the Client, assign or subcontract its rights and obligations hereunder to (a) any affiliate or related entity or (b) any entity which acquires all or a substantial part of the assets or business of D&T.

**14. Waiver of Jury Trial.** D&T AND THE CLIENT HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER IN CONTRACT, STATUTE, TORT (SUCH AS NEGLIGENCE), OR OTHERWISE) RELATING TO THIS ENGAGEMENT.

**15. Entire Agreement, Amendment and Notices.** These terms, and the engagement letter to which these terms are attached, including exhibits, constitute the entire agreement between D&T and the Client with respect to this engagement, supersede all other oral and written representations, understandings or agreements relating to this engagement, and may not be amended except by written agreement signed by the parties. In the event of any conflict, ambiguity, or inconsistency between these terms and the engagement letter to which these terms are

attached, these terms shall govern and control   All notices hereunder shall be (i) in writing, (ii) delivered to the representatives of the parties at the addresses first set forth above, unless changed by either party by notice to the other party, and (iii) effective upon receipt.

16. Governing Law and Severability. These terms, the engagement letter to which these terms are attached, including exhibits, and all matters relating to this engagement (whether in contract, statute, tort (such as negligence), or otherwise), shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof). If any provision of such terms or engagement letter is found by a court of competent jurisdiction to be unenforceable, such provision shall not effect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

## ATTACHMENT A

15

## ATTACHMENT A

Parties-in-Interest for whom Deloitte & Touche LLP or its affiliates (for this purpose only, "Deloitte") has provided or is currently providing services in matters unrelated to these Chapter 11 cases or with whom Deloitte has other relationships including banking relationships.

American Casualty Company of Reading, Pennsylvania

Amro Trust Company N.V.

Atlantic 960 Corp.

Atlantic Financial Services, Inc.

Atlantic New Jersey Corp.

Bank of America Corporation

Bank of Nova Scotia

Barclay';s Bank PLC

BASF AG and affiliates

BNY Capital Markets

C N A Financial Corporation

Caplin & Drysdale

Chase & M.D. Sass Partners, L.P.

Citigroup Inc.

CNA Financial Corp and affiliates

Commerzbank AG

Continental Assurance Company

Continental Corporation

Credit Lyonnais

Credit Suisse First Boston Corporation and affiliates

DCP & MSP Trusts

Delta Chemical Cleaning Inc

Depository Trust Company Inc

DLJ Fund Partners

Dresdner Bank Group

Dresdner RCM Global Investors LLC

Dupont Pharmaceuticals Company

DuPont, John

DuPont, Michele

DuPont, Philip A.

Dupont, Richard

DuPont, Thomas L.

E I DuPont De Nemours & Co

Fresenius Medical Care Co.

FTI

Gramercy Leasing Services, Inc.

HSBC Bank and affiliates

Huntsman Corporation

Illinois Tool Works Inc

Ingersoll-Rand Company Inc

Invest. C. of Bank Hapoalim

JP Morgan Chase Bank and affiliates

Kamax

Kirkland & Ellis

Latham & Watkins

Lloyds Acceptance Corp

Lloyds Bank PLC

Los Angeles Unified School District

Murphy, John, Estate of

Northern Trust Corp.

Omega Commercial Mortgage Corp.

Omni Commercial LLC

Perch, Frank, III

Potash Corporation

Radian Group Inc.

RCB International In

Rexene Corporation

Sealed Air Corporation

Siegel, David

Sky Investment Corporation

Standard Funding Corp.

Stroock & Stroock & Lavan LLP

The Bank of New York Co.

Union Carbide Corporation

Valeron Strength Films, LP

Wachovia Corporation and affiliates