IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**Objection Deadline: September 10, 2004**
**Hearing Date: September 27, 2004 at Noon ET**

### DEBTORS' MOTION FOR AN ORDER
### APPROVING THE SETTLEMENT AND RELEASE AGREEMENT
### BETWEEN THE DEBTORS AND AKZO NOBEL INC.

The above-captioned debtors and debtors in possession (collectively, the

"Debtors"), respectfully move this Court (the "Motion") for the entry of an order approving the

Settlement and Release Agreement, dated July 28, 2004, between W.R. Grace & Co.-Conn.

("Grace") and Akzo Nobel, Inc. (the "Settlement Agreement," a copy of which is attached hereto

as Exhibit 1). The Settlement Agreement requires (i) Grace to pay Akzo Nobel Inc. ("Akzo")

one-million eight hundred thousand U.S. dollars ($1,800,000.00 USD) (the "Settlement

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

Amount") in exchange for (ii) Akzo's (a) release of all of its claims, asserted or reserved, against

Grace relating to Grace's alleged post-petition infringement of certain Akzo patents, (b) release

of all other claims, whether warranted or not, for past patent infringement under the Akzo

patents, and (c) withdrawal, with prejudice, of its claim for patent infringement that was filed in

this Court on March 27, 2003 (Claim No. 9561).

### Jurisdiction

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this

motion is proper under 28 U.S.C. § 1408.

2.      The statutory predicates for this Motion are sections 105, 363, and 503(b)

of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Background

3.      On April 2, 2001 (the "Petition Date"), the Debtors filed their voluntary

petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11

Cases").  The Chapter 11 Cases have been consolidated for administrative purposes only, and,

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate

their businesses and manage their properties as debtors in possession.

4.      On August 27, 2002, Grace received a letter from Akzo, in which Akzo

notified Grace that it believed certain of Grace's products infringed upon three of Akzo's utility

patents (U.S. Pat. Nos. 4,866,019; 4,946,581; and 4,952,382) (collectively, the "Akzo Patent

2

Rights"). These patents concern products or methods relating to the use of hydrotalcite containing materials in combination with catalysts to treat $SO_2$ and/or $SO_2$-containing emissions from hydrocarbon cracking processes. In particular, Akzo alleged that certain of Grace's products contained hydrotalcite and, therefore, infringed upon the Akzo Patent Rights.

5.      In response to Akzo's letter, Grace conducted an internal investigation and eventually concluded that certain Grace products (the "Grace Additives") may have included small amounts of hydrotalcite. However, to the extent that any of the Grace Additives did contain hydrotalcite, Grace also concluded it had no knowledge, prior to May 1, 2002 of such an occurrence, and that any such inclusion was inadvertent. Grace's investigation further revealed that any hydrotalcite in the Grace Additives was neither (i) separately added nor (ii) a desired component in the Grace Additives, and any presence of hydrotalcite in the Grace Additives was solely the result of a change in the manufacturing process, which was unrelated to the Akzo patents.

6.      In a letter dated March 13, 2003, Grace responded to Akzo's allegations, based on the conclusions described in Paragraph 5 above. Grace further explained that it had taken measures to ensure that hydrotalcite would no longer be present in any future Grace Additives, and Grace anticipated disposing of its existing inventories (which may have contained hydrotalcite) by March 31, 2003.

7.      On June 13, 2003, Grace and Akzo met to discuss Grace's alleged infringement of the Akzo Patent Rights. During this meeting, it became clear that Akzo believed the scope of Grace's inclusion of hydrotalcite in the Grace Additives was substantially more broad than the discoveries made during Grace' internal investigation. To correct Akzo's

3

misunderstanding, Grace offered more information concerning the possible causes of the alleged

hydrotalcite formation in the Grace Additives. Grace and Akzo conducted subsequent settlement

negotiations concerning the scope and timing of Grace's alleged infringement of the Akzo Patent

Rights. These settlement discussions culminated in the Settlement Agreement, which provides

for Grace to pay Akzo the Settlement Amount in exchange for Akzo's agreement to (i) release

Grace from any liability for any violation of the Akzo Patent Rights that may have occurred

during the period between May 1, 2002 and April 30, 2003 (the "Critical Period"), (ii) withdraw

the proof of claim that it filed in these bankruptcy cases and (iii) release the Debtors' from any

liability for any other violations of the Akzo Patent Rights that may have occurred outside the

Critical Period.

## Relief Requested

8.      By this Motion, the Debtors seek an order approving the Settlement

Agreement, which has been executed by the parties and, by its terms, will become effective only

upon the approval of this Court.

## Legal Authority for Requested Relief

9.      This Court has statutory authority to authorize and approve the Debtors'

entry into the Settlement Agreement pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy

Code. See Northview Motors Inc. v. Chrysler Motors Co., No. 98-3387,1999 U.S. App. LEXIS

13403, at *11 (3d Cir. 1999) (settlement of claims and causes of action by a debtor in possession

constitutes a use of property of the estate). If a settlement is outside of the ordinary course of

business of the debtor, it requires approval of the Bankruptcy Court pursuant to section 363(b) of

the Bankruptcy Code. See id.

4

10.     This Court has statutory authority to allow payment of the Settlement

Amount as an administrative expense pursuant to section 503(b)(1)(A) of the Bankruptcy Code,

which states that administrative expenses include "the actual, necessary costs and expenses of

preserving the estate, including wages, salaries, or commissions for services rendered after the

commencement of the case." 11 U.S.C. §503(b)(1)(A). Courts have held that claims stemming

from post-petition violations of federal laws, and, specifically, patent infringement, constitute

administrative expenses under section 503. See Reading Co. v. Brown, 391 U.S. 471 (1968);

Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp., 443 F.2d 867, 874 (2d Cir. 1971)

("Damages for infringing a patent in the course of [post petition] sales for profit would seem an *a*

*fortiori* case for [administrative] priority."); In re N.P. Min. Co, Inc., 963 F.2d 1449, 1453 (11[th]

Cir. 1992) (finding that punitive civil-penalties assessed for post-petition mining activities

qualify as administrative expense). The Settlement Amount represents an administrative expense

because it settles claims for alleged post-petition patent infringement.[2]

11.     Bankruptcy Rule 9019 provides that, after notice and a hearing, a Court

may approve a proposed settlement or compromise. See Rule 9019 of the Bankruptcy Rules. To

minimize litigation and expedite the administration of a bankruptcy estate, "[c]ompromises are

---

[2] In 1999, Grace adopted the production method responsible for permitting the alleged formation
of hydrotalcite in Grace Additives. However, Grace believes that its liability for infringement, if
any, could only accrue after it learned of the potential presence of hydrotalcite. This knowledge
occurred in May of 2002 - at the beginning of the Critical Period. Akzo is also releasing Grace
from infringement liability that may have occurred prior to the Critical Period. However, sales
that were the subject of this additional release (i.e., sales prior to the Critical Period) (i) were not
employed in the development of the settlement dollar-value and (ii) have been included solely to
achieve final settlement of all potential claims. The end of the Critical Period signifies the time
when the method responsible for permitting hydrotalcite presence was discontinued.

5

favored in bankruptcy." In re Martin, 91 F.3d 389, 393 (3d Cir. 1996), quoting 9 Collier on

Bankruptcy ¶ 9019.03[1] (15th ed.1993). The final decision whether to accept or reject a

compromise, however, lies within the sound discretion of the Court. In re Resorts Int' l Inc., 145

B.R. 412, 451 (Bankr. D. N.J. 1990); In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803

(Bankr. E.D. Pa. 1986).

### Argument

12.     In reviewing this Motion, the Court should "assess and balance the value

of the claim that is being compromised against the value to the estate of the acceptance of the

compromise proposal." In re Martin, 91 F.3d at 393. This requires Court consideration of the

following criteria:  "(1) the probability of success in litigation, (2) the likely difficulties in

collection, (3) the complexity of the litigation involved, and the expense, inconvenience and

delay necessarily attending it; and (4) the paramount interest of the creditors."  Id. (collectively,

the "Martin Factors").

13.     When considering the Martin Factors, courts typically give deference to

the debtor's business judgment.  Specifically, the Court should, "avoid second-guessing the

[debtor in possession] in the exercise of his business judgment but rather should endeavor to

ascertain whether the terms of the Trustee's proposed settlement fall below the lowest range of

reasonableness." In re Eastwind Group, Inc., 303 B.R. 743, 748 (Bankr. E.D. Pa. 2004), citing In

re Neshaminy Office Bldg Assocs. 62 B.R. 798, 803 (E.D. Pa. 1986). Further, courts generally

favor compromises because they "are a normal part of the reorganization process." In re Schakk

Electronics, Inc., 85 B.R. 521, 524 (Bankr. D.Minn. 1986).

6

14.     This Court should approve the Settlement Agreement because it is in the best-interests of the Debtors' estates. Azko filed a proof of claim for patent infringement (Claim No. 9561), in which it asserted a claim against the Debtors' estates for an unspecified amount. It is in the best-interests of the Debtors' estates to settle these claims because: (a) Akzo is likely to establish *some* patent infringement liability for sales of the Grace Additives , (b) there are substantial inherent uncertainties in the outcome of patent litigation and, in any event, the Debtors will incur substantial costs to defend any such litigation, and (c) the Debtors would like to avoid the distractions that defending against Akzo's claims will cause the Debtors during their reorganization efforts. In light of these factors, the Debtors have determined, in their sound business judgment, that the terms of the Settlement Agreement are in the best-interests of their estates.

15.     The following summary of potential patent-infringement damages demonstrates the risks - both in terms of uncertainty with respect to the final amount and the maximum amount that may be awarded - associated with litigating Akzo's claims.

16.     For infringement of a utility patent, the patent owner is entitled to recover damages, pursuant to 35 U.S.C. § 284 (a copy of which is attached hereto as Exhibit 2), that are "adequate to compensate" the patent holder. Such amounts are measured by either (1) the patent owner's actual damages (*e.g.*, profits from lost sales, price erosion, and/or future damages) or (2) a so-called "reasonable royalty," which has been defined as the amount that a person who desired to manufacture, use, or sell a patented product would have been willing to pay as a royalty and yet be able to make a reasonable profit. See Trans World Mfg. Corp. v. Al Nyman & Sons, Inc., 750 F.2d 1552, 224 USPQ 259 (Fed. Cir. 1984). As a result, the "reasonable royalty"

7

determination requires the finder of fact to engage in a "hypothetical negotiation" conducted at arm's length between a willing licensor and a willing licensee as of the date when the infringement began.  See Wang Labs., Inc. v. Toshiba Corp., 993 F.2d 858, 26 USPQ 2d 1767 (Fed. Cir. 1993); Fromson v. Western Litho Plate & Supply Co., 853 F.2d 1568, 7 USPQ 2d 1646 (Fed. Cir. 1988); TWM Mfg. Co. v. Dura Corp., 789 F.2d 895, 229 USPQ 525 (Fed. Cir), cert. denied 479 U.S. 852 (1986).  This process bestows the finder-of-fact with tremendous discretion, which makes the ultimate resolution extremely uncertain.

17.    In addition, absent unusual circumstances, the patent owner also will be entitled under 35 U.S.C. § 284 to recover prejudgment interest at a rate to be set in the sound discretion of the trial court, and/or post-judgment interest at the statutory rate periodically prescribed in 28 U.S.C. § 1961.

18.    Further, if the fact finder determines that the infringement was willful, the trial court has discretion under 35 U.S.C. § 284 to increase or "enhance" the total damages award up to three times the amount of the patent owner's compensatory damages (prior to the calculation of interest).

19.    Should the fact finder determine that the conduct of the losing party (*i.e.*, either the alleged infringer or the patent owner) is "exceptional" under 35 U.S.C. § 285, the trial court has discretion to award to the prevailing party its reasonable attorney fees. Alternatively, where warranted (under the standards of regional circuit precedent), the trial court may award attorney fees under 28 U.S.C. § 1937 or Fed. R. Civ. P. 11.  As a matter of course, the trial court generally will permit the prevailing party to recover certain qualifying costs incurred during the litigation under Fed. R. Civ. P. 54.

8

20.   Finally, under appropriate circumstances on appeal, the Federal Circuit also may award attorney fees and/or costs to a prevailing party either under 35 U.S.C. § 285 or Fed. R. App. P. 38.

21.   Given the wide discretion by the Court and the uncertainty created by a wide range of potential overall exposure, the parties elected to adopt the reasonable royalty framework for determining the settlement dollar value by taking into account established royalties on both sides, the possibility of enhancement, interest, and the vagaries and imponderables of litigation.  Accordingly, in an effort to avoid the cost and disruption of litigation and to settle the matter, not only for Grace but also for its customers, Grace and Akzo signed the attached Settlement Agreement wherein Grace has agreed to pay Akzo the Settlement Amount within 30 days of approval of the Settlement Agreement by this Court.

### Notice

22.   Notice of this Motion has been given to (1) the Office of the United States Trustee, (ii) Akzo; (iii) counsel to the debtor in possession lenders, (iv) counsel to each official committee appointed by the United States Trustee and (v) those parties that requested papers under *Fed. R. Bankr. P. 2002*.  In light of the nature of the relief requested, the Debtors submit that no further notice is required.

9

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, approving the Settlement Agreement and granting such other and further relief as the Court deems just and proper.

Dated: August 23, 2004

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
James W. Kapp III
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB P.C.

Laura Davis Jones (No. 2436)
David W. Carickhoff, Jr. (No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:   (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession