# Attachment 1

# Alchem Sale Agreement

## ATLANTA COMMERCIAL BOARD OF REALTORS, INC.
## STANDARD COMMERCIAL SALES AGREEMENT 1998

1.  **PURCHASE AND SALE:**

    As a result of the efforts of <u>Wilson, Hull & Neal</u> ("Broker"), a licensed real estate broker, and <u>Building Blocks Commercial Real Estate Services, LLC</u> ("Co-Broker"), a licensed real estate broker, ALCHEM CHEMICAL COMPANY ("Purchaser"), agrees to buy, and W.R. GRACE & CO.- CONN. ("Seller"), agrees to sell all that tract of land <u>containing approximately 73,062 SF office/warehouse on approximately 12.54 acres of land known as 5225 Phillip Lee Drive, Atlanta, Fulton County, Georgia</u>, as more particularly described in Exhibit "A" attached hereto and by this reference made a part hereof, together with all improvements now located thereon, including all electrical, mechanical, plumbing and other systems and all fixtures and personalty located therein, as well as plants, trees and shrubbery thereon (collectively, the "Property"), but excluding therefrom the equipment, fixture and personalty items listed on Exhibit "C" attached hereto and made a part hereof by this reference.

2.  **PURCHASE PRICE AND METHOD OF PAYMENT:**

    The purchase price of the Property shall be <u>Eight Hundred Fifty Thousand and 00/100</u> DOLLARS (U.S.) (<u>$850,000.00</u>), to be paid as follows:

    <u>All cash at Closing in immediately available funds</u>.

3.  **EARNEST MONEY:**

    Purchaser has paid to Broker <u>$25,000.00</u>; the receipt of which is hereby acknowledged by Broker, as "Earnest Money" which Earnest Money shall be applied as part payment of the cash portion of the purchase price of the Property at the time the sale is consummated. If Purchaser's check for the Earnest Money is returned by Purchaser's bank for any reason, Seller shall have the option to declare this Agreement null and void by written notice to Purchaser and Broker. Purchaser and Seller understand and agree that Broker shall deposit Earnest Money in Broker's escrow trust account within three (3) banking days following the execution of this Agreement by all parties. The parties to this Agreement agree that Broker may deposit the earnest money in an interest-bearing escrow trust account and that Broker will retain the interest earned on said deposit as its sole compensation for the escrow services contemplated herein. The parties to this Agreement understand and agree that the disbursement of Earnest Money held by the broker as escrow agent can occur only (A) at Closing (B) upon written agreement signed by all parties having an interest in the funds; (C) upon court order, or (D) pursuant to interpleader as set forth herein. In the event of a dispute between Purchaser and Seller sufficient in the discretion of Broker to justify its doing so, Broker shall be entitled to interplead all or any disputed part of the Earnest Money into court, and thereupon be discharged from all further duties and liabilities hereunder. The filing of any such interpleader action shall not deprive Broker of any of its rights under this Agreement. Purchaser and Seller agree that Broker shall be entitled to be compensated by the party who does not prevail in the interpleader action for its costs and expenses, including reasonable attorney's fees, in filing said interpleader action. In such disputed cases, if Broker proposes to make a disbursal to which all parties to this Agreement do

not expressly agree, Broker shall give all parties fifteen (15) days notice in writing of Broker's intent to disburse. Such notice shall be delivered by certified mail to the parties' last known addresses and must recite to whom and when the disbursal will be made. If either party objects by written notice to the Broker and the other party, Broker shall interplead.

4. **WARRANTY OF TITLE:**

At the time the sale is consummated, Seller agrees to convey "good and marketable, fee simple title" to the Property to Purchaser by limited warranty deed. "Good and marketable, fee simple title" is hereby defined as title which is insurable by a national title insurance company at its standard rates on an ALTA Owner Policy, without exception other than the following "Permitted Title Exceptions": (A) zoning ordinances affecting the Property (B) general utility, sewer and drainage easements of record upon which any buildings on the Property do not encroach; (C) subdivision restrictions of record; (D) current city, state and county ad valorem property and sanitary taxes not yet due and payable; and (E) other matters declared or deemed to constitute "Permitted Title Exceptions" pursuant to Paragraph 5 of this Agreement. Seller shall deliver to Purchaser within five (5) business days of the effective date of this Agreement a copy of Seller's vesting deed(s) and a copy, if any, of any title policies or surveys of the Property in Seller's possession.

5. **TITLE EXAMINATION:**

Purchaser shall move promptly and in good faith after acceptance of this Agreement to examine title to the Property and to furnish Seller, on or before the thirtieth (30th) day following acceptance of this Agreement (time being of the essence of such obligation), with a written statement of objections materially and adversely affecting good and marketable, fee simple title to the Property, as defined in Paragraph 4 of this Agreement, other than the Permitted Title Exceptions. Seller shall have until the expiration of Purchaser's "Inspection Period" (as hereinafter defined) to either satisfy all valid and timely objections or to agree to satisfy same at or before Closing, and if Seller fails to satisfy or to agree to satisfy such valid objections on or before Closing, then at the option of the Purchaser, evidenced by written notice to Seller, (A) this Agreement shall be null and void, and all Earnest Money shall be promptly returned to Purchaser, or (B) Purchaser shall waive such objections and proceed to Closing in which event any such unsatisfied objection shall be conclusively deemed waived and shall thereupon become a Permitted Title Exception. In the event that Purchaser fails to make such election on or before Closing, Purchaser shall be deemed to have selected (B) above. Seller agrees to satisfy any valid title objections that consist of monetary claims or encumbrances (i.e., security deeds, mortgages, liens of mechanics or materialmen) by payment at or before Closing or pursuant to other arrangements that shall allow the Property to be conveyed free and clear of the matters constituting such objections.

6. **WARRANTIES:**

Seller represents that to the best of Seller's knowledge, there are no existing or proposed governmental orders or condemnation proceedings affecting the Property and Seller has received no notice of any such orders or proceedings. In addition, Seller has furnished to Purchaser for its use, without any representation or warranty whatsoever, a copy of each of the following reports

prepared for Seller regarding the environmental condition of the Property: (a) July 22, 2002 Report of Phase I Environmental Site Assessment prepared by Law Engineering and Environmental Services, Inc.; (B) August 8, 2003 Phase II Environmental Assessment Report prepared by MACTEC Engineering and Consulting.

7. **INSPECTIONS:**

Commencing on the date of this Agreement, and subject to the rights of the tenants, if any, Purchaser, Purchaser's agents, employees and contractors, shall have the right during regular business hours, but without interfering with operations being carried on upon the Property, to enter the Property, for the purposes of making surveys, inspections, soil tests and other investigations (including without limitation Phase I and/or Phase II environmental site assessments) of the Property, the physical condition of any improvements and of mechanical and electrical systems thereof, and any service and management contracts affecting the Property. Purchaser shall and does hereby agree (a) to keep all information furnished to Purchaser or gathered as a result of its investigations and inspections confidential; (b) to promptly furnish Seller with copies of all inspection and investigation reports and materials received as a result of its investigations and inspections; (c) to obtain Seller's prior written approval (not to be unreasonably withheld or delayed) for any sampling or testing that is invasive of the land or improvements; and (d) to indemnify, defend and hold Seller and Brokers (as that term is herein defined) harmless from any loss or damage suffered by Seller and Brokers or others as a result of the exercise by Purchaser of the rights herein granted, including any damage resulting from the negligence of Purchaser or Purchaser's agents. The indemnity obligation of Purchaser shall include, without limitation, the duty to repair and restore the Property or any improvements situate on the Property to the condition that existed prior to Purchaser's investigations and inspections. The indemnity and other obligations of this Paragraph 7 shall survive the rescission, cancellation, termination or consummation of this Agreement.

8. **APPLIANCES AND MECHANICAL SYSTEMS:**

Seller warrants and represents that at Closing all appliances remaining with the Property, if any, and the heating, air conditioning, plumbing, and electrical systems will be in the same condition as they are on the date this Agreement is signed by Purchaser, natural wear and tear and damage caused by casualty or condemnation or by the exercise of Purchaser's inspection rights excepted. Purchaser shall have the privilege and responsibility of making inspections of said appliances and systems prior to Closing and notwithstanding anything contained herein to the contrary, Seller's responsibility in connection with the foregoing shall cease at Closing.

9. **CONDITION OF PROPERTY:**

Seller represents that at Closing the improvements on the Property will be in the same condition as they are on the date this Agreement is signed by Purchaser, natural wear and tear and damage caused by casualty or condemnation or by the exercise of Purchaser's inspection rights excepted. Until Closing, Seller shall, at Seller's expense, maintain in full force and effect the same fire and extended coverage insurance carried by Seller on the Property as of the date of this Agreement. However, should the Property be destroyed or substantially damaged before

Closing, then at the election of Purchaser: (A) this Agreement may be canceled; or (B) Purchaser may consummate this Agreement and receive such insurance proceeds as are paid on the claim of loss. This election must be exercised within ten (10) days after Seller provides Purchaser written notice of the insurance proceeds, if any, which Seller will receive on the claim of loss. If Purchaser has not been so notified by Seller within forty-five (45) days subsequent to the occurrence of such damage or destruction, or by the date of Closing, whichever occurs first, Purchaser may at its option cancel this Agreement and receive a refund of its Earnest Money.

10. **AGENCY DISCLOSURE:**

Purchaser and Seller acknowledge that Broker (X) has acted as an agent for Seller, or ( ) has acted as a transaction broker and not as an agent for Purchaser or Seller with respect to the transaction contemplated herein. Purchaser and Seller acknowledge that Co-Broker ( X )has acted as the agent for <u>Alchem Chemical Company</u>, or ( ) has acted as a transaction broker and not as an agent for Purchaser or Seller, with respect to the transaction contemplated herein.

11. **REAL ESTATE COMMISSION:**

In negotiating this Agreement, Broker and Co-Broker (collectively 'Brokers") have rendered a valuable service for which Brokers shall be paid by Seller, if and when (and only if and when) the transaction hereby contemplated actually closes, in an amount equal to six percent (6%) of the Purchase Price (<u>one half [50%] of which shall be paid to Broker and one half [50%] to Co-Broker</u> as follows:

<u>All cash at Closing</u>.

Upon payment of the aforesaid commission amounts and as a condition thereto Broker and Co-Broker shall furnish such affidavits and lien waivers and releases as Seller and Purchaser shall reasonably require. In no event shall Purchaser be liable for any commission payable to Brokers. Purchaser and Seller each hereby represent and warrant to the other, that no party other than Brokers is entitled as a result of the actions of Seller or Purchaser, as the case may be, to a commission or other fee resulting from the execution of this Agreement or the transactions contemplated hereby, and Seller and Purchaser hereby agree to indemnify, defend and hold each other harmless from and against any and against any and all costs, damages and expenses, including attorneys fees, resulting directly or indirectly, from any such claim arising out of the actions of or contact with the indemnifying party, as the case may be. This representation, warranty and indemnity shall survive the rescission, cancellation, termination or consummation of this Agreement.

Broker and Co-Broker each hereby represent and warrant to the other, and to Seller and Purchaser, that no party other than Brokers is entitled as a result of the actions of Broker or Co-Broker, as the case may be, to a commission or other fee resulting from the execution of this Agreement or the transactions contemplated hereby, and Broker and Co-Broker hereby agree to indemnify, defend and hold each other and Seller and Purchaser harmless from and against any and against any and all costs, damages and expenses, including attorneys fees, resulting directly or indirectly, from any such claim arising out of the actions of or contact with the indemnifying party, as the case may be. This representation, warranty and indemnity shall survive the rescission, cancellation, termination or consummation of this Agreement.

12. **DISCLAIMER:**

Purchaser acknowledges that Purchaser has not relied upon the advice or representations, if any, of Seller or of Brokers, or their associate brokers or salespersons, concerning, without limitation: (A) the legal and tax consequences of this Agreement or the sale or purchase of the Property; (B) the terms and conditions of financing or its availability; (C) the purchase and ownership of the Property; (D) the structural condition of the Property; (E) the financial condition of any party to this Agreement; (F) the operating condition of the electrical, heating, air conditioning, plumbing, water heating systems and appliances on the Property: (G) the availability of utilities to the Property; (H) the investment potential or resale value of the Property; (I) any conditions existing off the Property which may affect the Property; (J) any matter which could have been revealed through an accurate survey, comprehensive title search or thorough inspection of the Property; or (K) any other matter material to Purchaser's decision to enter into or consummate the transaction contemplated by this Agreement. Purchaser acknowledges that if such matters have been a concern to them, it has sought and obtained independent advice relative thereto and has not relied upon information furnished by Seller or Brokers or their officers, representatives or agents.

13. **ASSIGNMENT:**

This Agreement, and the rights and obligations hereunder, may not be assigned by Purchaser without the prior written consent of Seller, which consent may not be unreasonably withheld. Notwithstanding anything contained herein to the contrary, however, any such approved assignee shall assume in writing all of the obligations and liabilities of Purchaser hereunder, and a copy of such assignment shall be provided to Seller in writing within two (2) days after it is signed by Purchaser and assignee. Purchaser and any subsequent assignor of this Agreement shall be and remain liable jointly and severally for the performance of all obligations of Purchaser hereunder, including, without limitation, for the payment of the Purchase Price at Closing.

14. **BINDING EFFECT:**

This Agreement shall bind and inure to the benefit of Seller, Purchaser and Brokers, and their respective heirs, executors, legal representatives, successors and assigns.

15. **RESPONSIBILITY TO COOPERATE:**

Seller and Purchaser agree that such documentation as is reasonably necessary to carry out the terms of this Agreement shall be produced, executed and/or delivered by such parties within the time required to fulfill the terms and conditions of this Agreement.

16. **NOTICES:**

Except as may otherwise be provided for in this Agreement, all notices required or permitted to be given hereunder shall be in writing and shall be deemed delivered either (A) in person, (B) by overnight delivery service prepaid, (C) by facsimile (FAX) transmission, receipt to be confirmed by telephone conference with the recipient; or (D) U.S. Postal Service, postage prepaid, registered or certified, return receipt requested, to the party being given such notice at

the appropriate address set forth below:

| | | | |
|---|---|---|---|
| *As to Purchaser:* | Alchem Chemical Company | *As to Seller:* | W.R. Grace & Co.- Conn. |
| Name: | Bart Whitaker c/o Whitaker Oil Co. | Name: | Akos L. Nagy |
| Address: | 1557 Marietta Road | Address: | 7500 Grace Dr. |
| City, State, ZIP: | Atlanta, GA 30318 | City, State, ZIP: | Columbia, MD 21044 |
| Fax No. | 404-355-2436 | Fax No. | 410-531-4604 |

with copy to (which shall not constitute notice):

Burr & Forman LLP
Atlantic Station
171 Seventeenth Street, NW
Suite 1100
Atlanta, Georgia 30363
Fax: (404) 817-3244
Attn: William T. McKenzie

with copy to (which shall not constitute notice):

Nelson Mullins Riley & Scarborough, L.L.P.
Suite 1400, 999 Peachtree Street
Atlanta Georgia 30309
404-817-6050
Attn: Jeffrey N. Plowman

| | | | |
|---|---|---|---|
| *As to the Broker:* | Wilson, Hull & Neal | *As to Co-Broker:* | Building Blocks Commercial Real Estate Services, LLC |
| Name: | Rusty Epperson | Name: | Isaac Frank |
| Address: | 1600 Northside Drive, Suite 100 | Address: | 5784 Lake Forrest Drive, Suite 195 |
| City, State, ZIP: | Atlanta, GA 30318 | City, State, ZIP: | Atlanta, GA 30328 |
| Fax No. | 404-351-2701 | Fax No. | 404-255-1481 |

17. **TIME:**

Time is of the essence of this Agreement.

18. **ENTIRE AGREEMENT; AMENDMENT:**

This Agreement constitutes the sole and entire agreement between the parties hereto with respect to the subject matter hereof, and no modification of this Agreement shall be binding unless signed by all parties to this Agreement. No representation, promise, or inducement not included in this Agreement shall be binding upon any party hereto.

19. **MISCELLANEOUS:**

  A.  Real estate taxes on the Property or the calendar year in which the sale is closed shall be prorated as of the date of Closing.

  B.  Utilities, including all sanitary taxes and charges applicable to the Property, shall be prorated as of the date of Closing.

  C.  Seller shall pay the State of Georgia property transfer tax and, if applicable, Purchaser shall pay Georgia intangible taxes for any security deed obtained in connection with Purchaser's financing, if any.

D.  The sale of the Property shall be closed on or before the thirtieth (30th) day following the date on which Seller notifies Purchaser that Seller has fully and finally perfected its authorization to complete the sale contemplated by this Agreement pursuant to the "De Minimis Asset Order" (as set forth in Special Stipulation C of this Agreement), but in no event shall Purchaser be obligated to close any sooner than thirty (30) days after expiration of the Inspection Period, at a date, place and time acceptable to Purchaser and Seller, provided, however, if Purchaser and Seller fail to agree on a time and place, the Closing shall be held on the aforesaid tenth (10th) day at 10:00 A.M. in the Atlanta, Georgia office of Nelson Mullins Riley & Scarborough, L.L.P. at the address shown above. If the time period by which any right, option or election provided under this Agreement must be exercised, or by which any act required hereunder must be performed, or by which the Closing must be held, expires on a Saturday, Sunday or legal holiday, then such time period shall be automatically extended to the close of business on the next regular business day.

E.  Possession of the Property shall be granted by Seller to Purchaser no later than Closing.

F.  Conditions precedent to the obligation of either party to close hereunder, if any, are for the benefit of such party only, and any and all of said conditions may be waived in the discretion of the party benefited thereby.

G.  Seller and Purchaser agree to comply with and to execute and deliver such certifications, affidavits and statements as are required at the Closing in order to meet the requirements of Internal Revenue Code Section 1445 (Foreign/Non-Foreign Sellers) and any comparable requirements of state law.

H.  This Agreement shall be construed under the laws of the State of Georgia.

20. **SPECIAL STIPULATIONS:**

The following Special Stipulations shall, if conflicting with the foregoing control:

See Exhibit "B" attached hereto and made a part hereof.

This instrument shall be regarded as an offer by the first party to sign it and is open for acceptance by the other party until 5 o'clock P.M. on the ___ day of July, 2004, by which time written acceptance of such offer must have been actually received by Broker, who shall promptly notify the other party of such acceptance.

**Purchaser acknowledges that Purchaser has read and understood the terms of this Agreement and has received a copy of it.**

The date of this Agreement is July ___, 2004.

7

IN WITNESS WHEREOF, Purchaser, Seller and Broker have hereunto set their hands and seals as of the date indicated below.

PURCHASER:

ALCHEM CHEMICAL COMPANY

By: *C. B. [signature]*
Its: *President*

Date and time executed by Purchaser: *7/9/2004*

SELLER:

W.R. GRACE & CO. - CONN.

By: _____
Its: _____

Date and time executed by Seller: _____

BROKER:

Wilson Hull & Neal

By: _____
Its: _____

CO-BROKER:

Building Blocks Commercial Real Estate, LLC

By: _____
Its: _____

8

## EXHIBIT A

### Legal Description

See attached Tracts One and Two as set forth in Warranty Deed recorded in Deed Book 4395, Page 227, in the Office of the Clerk of Superior Court, Fulton County, Georgia.

TRACT ONE

All that tract or parcel of land lying and being in Land Lots 86 and 87 of the 14th FF District, Fulton County, Georgia, and being Lots 7, 8 and 9 of the Atlantic Coast Line Railroad Industrial Site No. 1 of the Fulton Industrial District, as shown on plat of property of Dewey and Almy Chemical Division, W. R. Grace & Co., made by Ernest L. Boggus, Surveyor, dated February 1965, revised to show three tracts northwest of Railroad, on February 17, 1965, and recorded in Plat Book 82, page 14, in the Office of the Clerk of the Superior Court of Fulton County, Georgia, being composed of two parcels of land separated by Philip Lee Drive, and more particularly described as follows:

PARCEL NO. 1: BEGINNING at a point on the southwesterly side of Philip Lee Drive, Philip Lee Drive being 100 feet in width, which point is 2,020 feet northwesterly from the intersection of the southwesterly side of Philip Lee Drive with the northwesterly side of Georgia State Highway No. 74, Georgia State Highway No. 74 being 200 feet in width; and from said point of beginning extending south 52 degrees 55 minutes west 405 feet to the easterly side of a proposed Lead Track of Atlantic Coast Line Railroad, said proposed Lead Track right of way being 100 feet in width; thence north 37 degrees 05 minutes west along the easterly side of said proposed railroad right of way 190.4 feet to a point; thence along the arc of curve on the westerly side of said proposed railroad right of way, 322.1 feet to a point, said arc of curve being subtended by a chord having a bearing of north 29 degrees 08 minutes west and a length of 319 feet; thence continuing northerly and northeasterly along the arc of curve of said easterly side of proposed railroad right of way 455.2 feet to the intersection of the easterly side of said proposed railroad right of way with the southwesterly side of Philip Lee Drive, said arc of curve on the easterly side of said proposed railroad right of way being subtended by a chord having a bearing of north 10 degrees 07 minutes east and a length of 446.5 feet; thence south 37 degrees 05 minutes east along the southwesterly side of Philip Lee Drive 803.2 feet to the point or place of beginning; being Lot 7 and the west part of Lot 9 of Atlantic Coast Line Railroad Industrial Site No. 1.

PARCEL NO. 2: BEGINNING at a point on the northeasterly side of Philip Lee Drive, Philip Lee Drive being 100 feet in width, and said point of beginning being 2,012 feet northwesterly from the point of intersection of the northeasterly side of Philip Lee Drive with the northwesterly side of Georgia State Highway 74, Georgia State Highway 74 being 200 feet in width; thence north 37 degrees 05 minutes west along the northeasterly side of Philip Lee Drive 836.9 feet to the intersection of the northeasterly side of Philip Lee Drive with the southeasterly side of proposed right of way of Lead Track of Atlantic Coast Line Railroad, said proposed Lead Track right of way being 100 feet in width; thence northeasterly along the arc of curve of the easterly side of said proposed railroad right of way 90.5 feet, said arc of curve being subtended by a chord having a bearing of north 42 degrees 42 minutes east and a length of 90.4 feet; thence continuing north 46 degrees 35 minutes east along the easterly side of said proposed Atlantic Coast Line Railroad right of way 622.3 feet to the intersection of said proposed right of way of Lead Track of Atlantic Coast Line Railroad with the westerly side of a proposed track of Atlantic Coast Line Railroad, said proposed track right of way being 100 feet in width; thence southerly along the arc of curve on the westerly side of said proposed Atlantic Coast Line right of way 530 feet to a point, said arc being subtended by a chord having a bearing of south 1 degree 13 minutes east and a length of 519.7 feet; thence continuing southeasterly along the arc of curve on the westerly side of said proposed right of way of Atlantic Coast Line Railroad 258.5 feet to a point, said arc of curve on the westerly side of said proposed Atlantic Coast Line Railroad right of way being subtended by a chord having a bearing of south 30 degrees 48 minutes east and a length of 257.2 feet; thence continuing south 40 degrees 21 minutes east along the westerly side of said proposed Atlantic Coast Line Railroad right of way 244.9 feet to a point; thence south 52 degrees 55 minutes west 388.6 feet to the northeasterly side of Philip Lee Drive at the point or place of beginning; being Lot 8 and the east part of Lot 9 of Atlantic Coast Line Railroad Industrial Site No. 1.

10

TRACT TWO

All that tract or parcel of land lying and being in Land Lot 86 of the 14th FF District of Fulton County, Georgia, and being Tract No. 2 northwest of the Atlantic Coast Line Railroad right of way as shown on plat of property of Dewey and Almy Chemical Division, W. R. Grace & Co., made by Ernest L. Boggus, Surveyor, dated February 1965, revised to show three tracts northwest of Railroad, on February 17, 1965, and recorded in Plat Book 82, page 16, in the Office of the Clerk of the Superior Court of Fulton County, Georgia, and more particularly described as follows:

TO FIND THE POINT OF BEGINNING, start at the corner formed by the intersection of the southwesterly side of Philip Lee Drive with the northwesterly side of Georgia State Highway No. 74, Georgia State Highway No. 74 being 200 feet in width, and from said point extend thence northwesterly along the southwesterly side of Philip Lee Drive 2020 feet to a point marked by an iron pin; thence north 37 degrees 05 minutes west along the southwesterly side of Philip Lee Drive 803.2 feet to an iron pin marking the intersection of the southwesterly side of Philip Lee Drive with the southeasterly right of way line of Lead Track of Atlantic Coast Line Railroad; thence north 57 degrees 29 minutes west across said Atlantic Coast Line Railroad right of way 100.1 feet to an iron pin on the northwesterly line of said right of way; thence northeasterly along the arc of curve of the northwesterly side of said Atlantic Coast Line Railroad right of way 215.9 feet to a point marked by an iron pin, said arc of curve being subtended by a chord having a bearing of north 38 degrees 23 minutes east and a length of 215.8 feet, said iron pin being the POINT OF BEGINNING of the Tract herein described; thence from said point of beginning extend north 37 degrees 05 minutes west 525 feet to an iron pin on the bank of the southeasterly side of Chattahoochee River; thence north 49 degrees 44 minutes east along the southeast bank of Chattahoochee River 269.9 feet; thence continuing north 55 degrees 05 minutes east along the southeast bank of the Chattahoochee River 63 feet to a point marked by an iron pin; thence south 37 degrees 05 minutes east 500 feet to a point marked by an iron pin on the northwesterly right of way line of the Lead Track of Atlantic Coast Line Railroad; thence south 46 degrees 33 minutes west along the northwesterly right of way line of said Railroad 330.5 feet to a point marked by a hub; thence continuing south 46 degrees 04 minutes west along the northwesterly right of way line of Lead Track of Atlantic Coast Line Railroad 4.5 feet to the iron pin at the point of beginning.

11

# EXHIBIT "B"

The following Special Stipulations shall, if conflicting with the foregoing, control:

A.  Inspection Period: Purchaser shall have a period of forty five (45) days after this Agreement becomes a binding agreement (the "Inspection Period") to conduct such studies (including environmental site assessments) as will reasonably satisfy Purchaser that the Property is suitable for the purposes for which Purchaser has entered into this Agreement. If Purchaser shall not in good faith find the Property to be so suitable, then Purchaser shall have the right to terminate this Agreement and receive a full refund of the Earnest Money and the parties shall have no further obligation to each other or to Brokers.

B.  The Property (and all improvements) shall be sold to Purchaser at Closing "as is" with all faults. Seller shall have no obligation before or after Closing to make any repairs or to remedy any title or survey defects or any environmental condition affecting the Property.

C.  On April 1, 2001, the Seller, and 61 of its affiliated entities, each filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Chapter 11 Cases have been consolidated for administrative purposes only; they have been assigned Case No. 01-01139, and they are currently pending before Judge Judith K. Fitzgerald. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Seller continues to operate its business and manage its properties as a debtor in possession.

Pursuant to the Bankruptcy Court's <u>Order Establishing Procedures for the Sale or Abandonment of De Minimis Assets</u> (herein the "De Minimis Asset Order" or "DMAO", a copy of which has been furnished to the Purchaser), dated August 2, 2001, the Seller is not authorized to dispose of assets until it has satisfied certain guidelines, and the appropriate guidelines are determined by the price of the assets being sold. Given the purchase price herein, the De Minimis Asset Order requires the Seller to give certain third-parties (the "Notice Parties") notice of the transaction contemplated herein, along with the opportunity to (i) make an alternative offer <u>or</u> (ii) object to the within offer (collectively, "Notice Party Veto Rights"). The Seller shall take reasonable steps to resolve any objections filed by the Notice Parties. **If a Notice Party successfully exercise its Notice Party Veto Rights, the terms of this Agreement shall be rendered null and void.** In the event that a Notice Party makes a superior offer, the Seller shall promptly notify the Purchaser of the existence and terms of such offer. In the event that a Notice Party successfully objects to the sale contemplated herein, the Seller shall notify Purchaser within 5 (five) business days of the Bankruptcy Court's order denying the sale contemplated herein. If this Agreement is not consummated because of the Notice Party Veto Rights, then the Seller shall return the Earnest Money within five (5) business days of such event.

12

-Doc# 562432.07-

The perfection of full and final authorization for Seller to complete the sale of the Property pursuant to the foregoing De Minimis Asset Order, including without limitation the resolution of any appeals filed thereto or the expiration of any appeal periods without the filing of any appeals, shall be and constitute a condition precedent to the obligations of Seller under this Agreement.

Seller shall give prompt notice of the proposed sale under this Agreement to all parties entitled to notice thereof under the DMAO. Seller shall furnish Purchaser with prompt notice of any objections to the proposed sale filed or served by any party under the DMAO. If Purchaser has not received notice from Seller within sixty (60) days of the date of this Agreement that Seller is authorized under the DMAO to sell the Property to Purchaser pursuant to this Agreement, then Purchaser shall have the right to terminate the Agreement and receive a refund of its Earnest Money.

D. Seller shall vacate the Property at Closing. Any items of personalty or equipment left on the Property after Closing shall pass to Purchaser with the title and shall become the property of Purchaser, unless otherwise specified herein.

E. Purchaser shall have the right to assign this Agreement to an affiliated entity subject to the assumption obligations specified in Section 13 above.

F. In the event of a default by Seller under this Agreement, Purchaser shall have the following election of remedies: (a) Purchaser may terminate this Agreement and demand the return of its Earnest Money and the amount actually incurred, not to exceed $5000.00, of Purchaser's out of pocket due diligence expenses; or (b) Purchaser may seek specific performance of this Agreement. The foregoing remedies shall not be cumulative. Purchaser's election of (a) or (b) as set forth above shall constitute a waiver of the other remedy available to Purchaser. In no event shall Seller be liable to Purchaser for damages or for any cost or expense incurred by Purchaser in connection with such breach or Purchaser's election and pursuit of remedies for Seller's breach.

G. In the event of a default by Purchaser under this Agreement, Seller as its sole remedy may terminate this Agreement and retain the Earnest Money as liquidated damages for Purchaser's breach. In no event shall Purchaser be liable to Seller for damages or for any cost or expense incurred by Seller in connection with such breach or Seller's election and pursuit of remedies for Purchaser's breach (except for forfeiture of the Earnest Money as herein provided).

## EXHIBIT "C"

## EXCLUDED PROPERTY ITEMS

Office equipment consisting of a copier and a fax machine shall be removed by Seller from the Property prior to Closing or abandoned to Purchaser. Seller shall furnish the Property at Closing and shall remove debris and other items prior to Closing, unless otherwise agreed with Purchaser.