1    tends to make me question why only Libby plaintiffs are in

2    this type of extremis?  It's not -- That's why I wanted some

3    independent medical verification because I'm not seeing it

4    from anybody else other than this one doctor from Libby.

5           MR. COHN:  Well now just a second.  That -- And

6    Grace can say these things, Your Honor.  That doesn't make

7    them true.

8           THE COURT:  That Grace has personal injury

9    plaintiffs?

10          MR. COHN:  No, no.

11          THE COURT:  Grace didn't say that, I'm looking at

12   this issue.

13          MR. COHN:  No, you know, Your Honor, that Dr.

14   Whitehouse is the only doctor in here.  You see three

15   different medical doctors in the evidence that has been

16   supplied.  You have not just Dr. Whitehouse.  You have  Dr.

17   Black from the clinic.  You have -- There's earlier there's a

18   Dr. Gunther and I believe there's one other person whose name

19   I don't recall.  It was not just Dr. Whitehouse.

20          THE COURT:  Well, I have that for one of the

21   deponents.  I'm not sure that I have for the others.  I did

22   not have anybody but Dr. Whitehouse for one, and I haven't

23   had a chance to look at the other two.

24          MR. COHN:  It is also the case, Your Honor, that

25   this -- It's a real slander of Dr. Whitehouse.  It is just

1    not called for.  He --

2              THE COURT:  No, it's not a slander.  It's just --

3    it's an aberration that the only place that I'm getting these

4    motions are coming from Libby where Dr. Whitehouse is the

5    medical doctor who is saying things like, The person is

6    likely to die within a year or two, and there's nothing else

7    in terms of the medical criteria.

8              MR. COHN:  Well, first of all, Dr. Whitehouse is

9    really the national expert on Libby tremellite (phonetical)

10   asbestos disease.  And that's --

11             THE COURT:  Then it shouldn't be difficult for him

12   to tell me that the woman has end-stage cancer of some sort.

13             MR. COHN:  Well, or pleurolysis.  That's what he

14   says in here.

15             THE COURT:  Well --

16             MR. COHN:  When he says in the -- When you read

17   about these people who are -- who cannot lie down in their

18   sleep, when they are sleeping in the sitting position because

19   they're bringing up so much flem in the course of the night,

20   Your Honor, and when you see the other details of what these

21   people are going through and you combine that with the

22   prediction that they have no more than a year or two --

23             THE COURT:  But I don't have those details.  All I

24   have is the one sentence letter from Dr. Whitehouse in one

25   instance that indicates that a specific claimant may die

1  within a year or two.  That's all he says.

2  MR. BERNICK (TELEPHONIC):  Your Honor, this is

3  David Bernick.  May I make a suggestion?

4  THE COURT:  Yes.

5  MR. BERNICK (TELEPHONIC):  I don't know if this was

6  the same counsel that was at the hearing before when we took

7  up the request that we made for contempt sanctions.  If it's

8  counsel from Massachusetts I think that that is so, and I

9  specifically rode back to the airport with that gentleman.  I

10  said, Look, there's no question but that if you can actually

11  establish there's somebody other than Dr. Whitehouse who

12  clearly has interest in the prosecution of these cases that

13  these people are truly in extremis and you're talking about a

14  diet of depositions.  It's not two a month or not five or ten

15  or something like that, but people who are really in the

16  eminent stages of death, we do not have a problem.  And the

17  only reason that this thing has dragged on is that they've

18  come back with essentially exactly the same kind of request

19  that they've made before with no more credibility.  If these

20  people are truly in extremis, it's not a question of a year

21  or two from now, it is really that their deposition testimony

22  must be preserved now because they're going to die.  If they

23  were to consult with somebody that we would agree did not

24  have the same kind of interest as Dr. Whitehouse and

25  establish that these people are at death's door, which is

1   what preservation depositions are all about, and they take

2   place all the time, we would not be taking up the Court's

3   time.   The only reason that they're here is they're insisting

4   upon Dr. Whitehouse and they're insisting upon especially

5   urging to the Court that Your Honor adopt a standard that's

6   so loose that we're going to have a whole diet of these

7   depositions taking place on an ongoing basis.   They are the

8   only ones to blame for the fact that they haven't gotten a

9   deposition taken.   The object of the company is not to have

10  no depositions, it's to have depositions take place only when

11  the circumstances are such that there really isn't any

12  alternative.   And this was not an esoteric point and doesn't

13  depend upon whether there's tremellite disease, which, Your

14  Honor, is something that Dr. Whitehouse alone articulates.

15  There's nobody else who articulate it.   It's a question of

16  whether these people are at death's door.   So I think if Your

17  Honor were to impose a requirement that an independent

18  physician attest to the fact they are in extremis, i.e.,

19  within the next four to six months, expected to die, I think

20  will solve this whole problem.

21          MR. COHN:   We are -- That is to request a level of

22  certainty that the doctors are unable to provide.

23          THE COURT:   Well, I don't --

24          MR. COHN:   If you take a look --

25          THE COURT:   -- know that that's the case.   I mean,

1  medical doctors obviously make predictions all the time, as

2  has Dr. Whitehouse, and to suggest that the doctors are

3  unable to predict that somebody is going to die within six

4  months, yes, it may be five, yes, it may be seven, but

5  medical science has gotten very good with respect to

6  identifying when somebody is in an end stage lung pulmonary

7  problem and likely to die.  So I can't agree necessarily that

8  you can't make at least some prediction within a relevant

9  range.  Now would I want to push it for people to say that

10 they have to die within four months according to what the

11 doctors predict?  No, I wouldn't, but two years does not seem

12 to me to be something that requires preservation of testimony

13 now.  Here's the problem.  Here's, for example, this letter

14 from Dr. Whitehouse concerning Lois Shea dated April 6,

15 states only -- It's addressed to John Heberling, Attorney.

16 "Ms. Shea has extremely severe asbestos-related disease.  She

17 has severe pulmonary restriction, lung volumes, and oxygen

18 transport and is on continuous oxygen, and it is anticipated

19 her survival would be less than two years, possibly less than

20 one."  That does not indicate that she in an end-stage.  It

21 says she has a severe disease and uses oxygen.  People get

22 around on oxygen quite well.

23        MR. COHN:  Well, then, Your Honor, the reality of

24 it is that if we're expected to cut it finely, more finely

25 than the year or two, within a year or two of death, the

1  reality of it is there will be more Mr. Ericksons who die

2  because this Court is unwilling to accept that these matters

3  are inherently unpredictable.  That when you say that

4  somebody may, you know, is expected to die within a year or

5  two --

6        THE COURT:  No.  That's not the standard.

7        MR. COHN:  -- they may live five years, Your Honor.

8        THE COURT:  Yes, they may.

9        MR. COHN:  Or they may expire in the next five

10 weeks.

11        THE COURT:  That's exactly correct, but I do expect

12 a diagnosis that says they're in some end-stage.  This

13 diagnosis does not say that.  It simply says this particular

14 woman, unfortunately, has severe pulmonary problems.  It does

15 not say that she's in an end-stage.  It seems to me that if

16 you want to preserve depositions, we at least ought to have a

17 diagnosis that says there is an actual end-stage, and yes,

18 there can be medical criteria that can be established to show

19 that someone is in final stages of an illness.

20        MR. COHN:  Well, Your Honor, with all due respect,

21 that is what is in these medical reports right there.  When

22 they say -- when you have a report that describes Dayton

23 Hill, for example.  I mean there's a guy who by the measures,

24 the measures of lung capacity that are set forth in the

25 medical reports is down to less than fifty percent of lung

1  capacity.  He is -- statistically he should be dead, but

2  you've got a person --

3          THE COURT:  People can live with one lung and

4  therefore have an automatic fifty percent capacity all the

5  time.

6          MR. COHN:  Well, that's fine.  If the Court is in

7  effect substituting its medical judgment for that of these --

8          THE COURT:  I'm certainly not.  What I'm attempting

9  to do is set up some parameter within which preservation

10 testimony ought to take place.  And I agree, if somebody is

11 in an end-stage at that point, the deposition testimony ought

12 to go forward.  The problem I have here is except for Mr.

13 Erickson as I recall, I said earlier I didn't get through all

14 these documents, so, I'm not attempting to make this an

15 exclusive proposition.  It appeared from the documents that

16 Mr. Erickson was in an end-stage and his deposition testimony

17 should have been taken.  But with respect to Ms. Shea, it

18 doesn't appear, quite frankly, that she is in that position.

19 And so, at some point, yes, deposition testimony may need to

20 be taken, but it doesn't appear for Ms. Shea from the

21 documents that are here that she is in a critical end-stage.

22 I also agree with you that it should not be to the point

23 where your client is not able to sit for a deposition.  I

24 mean, obviously, the deposition should be taken before

25 somebody is in such poor health that they cannot effectively

1  tolerate a deposition.  I agree with that.  But it does seem

2  to me that there is a pretty wide gap between somebody who

3  has -- in the doctor's estimate, two years to live versus

4  somebody who has six months to live and is in an end-stage.

5  There is just a difference.

6         MR. COHN:  Well, with all due respect, Your Honor,

7  you are asking us to roll the dice about whether these

8  depositions can be completed given the necessity to compile

9  the medical reports that meet the criteria that you're

10  attempting to lay down, to then put it in a form of a motion,

11  to then have the deposition actually take place and have all

12  of that happen in a time when the patient is still capable of

13  sitting for a deposition.  All this, Your Honor, is really

14  not realistic.  We've attempted to be disciplined in response

15  to your earlier concerns.  We've attempted to be disciplined

16  about this.  We have not brought -- This has not opened the

17  flood gates, Your Honor.  We have not brought a ton of these

18  things.  We have brought exactly four, and there are no more

19  of them pending because we have not been able to get the

20  specific medical information that would present a case of

21  someone who has entered the terminal stage of this disease.

22  But, the terminal stage of this disease is not predictable

23  how long the terminal stage can go.  You can very serious

24  problems, and you can live on for a number of years, or you

25  can have very serious problems and you can go very quickly.

1    THE COURT:  I agree.

2    MR. COHN:  And we're not God.  We can't tell you

3    when someone enters the stage where they'll be alive, you

4    know, three months from now to have their deposition taken.

5    THE COURT:  I think from having looked at quite a

6    few of these documents in this and another case, is doctors

7    generally are pretty good at saying this is a terminal stage.

8    So I cannot agree that doctors cannot say, Yes, from here on

9    in you're definitely not getting any better.  There is no

10    hope that you're getting better.  I don't know how long it's

11    going to take to die, but you are definitely in a terminal

12    stage.

13    MR. COHN:  Well, Mr. Erickson's information said he

14    was making headway.  He was getting better.  And he died.

15    But, you know, if the magic words are terminal stage, if

16    that's what we need to do is to go to these doctors and say,

17    You have to expressly state the person is in a terminal stage

18    of this disease, then we will go back and we'll ask them to

19    do that, and obviously, they're exercise their medical

20    judgment, which we thought in effect they already had, and

21    provide the specifics of that conclusion, not just, you know,

22    not just the magic words.

23    THE COURT:  All right.

24    MR. COHN:  But the magic words have to part of it

25    too, Your Honor.  We'll go back and we'll do our best and

1   hope that nobody dies in the meantime.

2           THE COURT:  Tell me what the problem is with

3   respect to the medical information I'm having you put

4   together?  I thought at our last hearing that was something

5   that generally was contained either in the medical files or

6   in your own file.  So I'm somewhat surprised that it is a

7   problem to put it together, because I thought from the last

8   discussion that this was something that was pretty much

9   readily available.

10          MR. COHN:  Apparently, in some cases, you know,

11  these people -- Well, they don't get around too easily, Your

12  Honor, and they don't necessarily go to the clinic or to any

13  doctor very often.  And so, the fact that you have someone

14  who can barely breath, can barely move around, appears to be

15  terminal it doesn't cut it if their last report says that

16  we're not supplying the specifics that you seem to be

17  requiring, that would buttress the assertion that they're in

18  a terminal stage.  So you have to actually get them to go

19  down to the doctor, and, Your Honor, these are human beings,

20  okay.  One thing that they don't necessarily look forward to

21  is -- well, is having a deposition taken --

22          THE COURT:  Yes, I'm sure.  Or being told that

23  they're dying.

24          MR. COHN:  And being told that the reason for the

25  deposition is that they're dying and being told that we need

1   you to go down to the doctor so the doctor can certify that

2   you're dying.  I mean, these, you know, at some point, Your

3   Honor, it might be that we should just say there are only

4   four of these motions pending.  The evidence is exactly as

5   set forth in the motion.  These are very seriously ill

6   people.  We're being disciplined about bringing these

7   motions.  We're not flooding the courts with them.  We're --

8   and, you know, of the four motions we brought one of them,

9   sadly, Your Honor, and I take no joy in this, but one of them

10  has been, you know, in one of those cases, our position has

11  been vindicated by events, and it would seem to me that at

12  some point we just have to stop, if you will, loitering this

13  thing to death and just understand.  These people are dying.

14  They're very seriously ill, and these depositions need to be

15  taken, and if you perceive -- if we bring another set of

16  motions and they come before you in October and you feel that

17  they're too many or that the medical information that's

18  attached to those motions doesn't indicate the same, you

19  know, severity of people who can't sleep through the night

20  because they get up several times in the night to cough up

21  flem or if there are people who, you know, are --

22          THE COURT:  That's not a criteria for having a

23  deposition preserved.  The fact that you can't sleep through

24  the night for whatever reason does not mean that you're in

25  extremis and subject to preservation of deposition.

1    MR. COHN:  Your Honor, what I would ask, if you can

2   bring yourself to do it, would be to just to acknowledge that

3   whether it is expressly set forth here or not in terms that

4   you would have preferred, such as in extremis or terminal

5   stage, that this medical evidence does show these people are

6   very seriously ill, that their situations aren't going to

7   improve, that these depositions should be taken and that the

8   process that Ms. Baer wants to go through which involves more

9   than the 30 days that we've proposed, you know, we can agree

10   on reasonable deadlines and perhaps more than 30 days would

11   be appropriate, but we've got to get started on this because

12   we are playing with people's lives.  We're rolling the dice.

13   We're dealing with areas that none of us can --

14    THE COURT:  That's true, but that's true with all

15   of the asbestos victims.  That's the problem.  That's one

16   reason I'm pushing the debtor to get the plan through because

17   it's time to let these cases sort of fall through the system

18   and get people who are entitled to compensation compensated.

19    MR. COHN:  Amen to that.

20    THE COURT:  But that is not a reason just for Libby

21   plaintiffs or any other group of plaintiffs to start having

22   depositions one at a time.

23    MR. COHN:  The reason that Libby claimants find

24   themselves in this position, Your Honor, I believe -- I

25   obviously can't speak for the larger community of asbestos

1    claimants, but most asbestos claimants have multiple sources

2    of recovery to which they can look.  They're involved in

3    litigation against other parties where discovery is not

4    stayed, and they have the opportunity to, as a practical

5    matter, preserve their testimony without obtaining relief

6    from this Court.  In our situation, Your Honor, we have only

7    Grace and people who are barred by -- whom we are barred from

8    pursuing by the preliminary injunction in many instances.  So

9    that those people who don't happen to have, for example, a

10   Worker's Comp proceeding pending or some other context in

11   which their testimony can be taken and preserved.  Those

12   people have no way of having their depositions taken and

13   preserved other than by seeking relief from this Court.  That

14   is why you are seeing motions from Libby, I believe.  Why --

15   It is certainly why you're receiving motions from Libby even

16   though I really cannot tell you why you are not receiving

17   motions from other asbestos claimants.

18         THE COURT:  All right.

19         MR. BERNICK (TELEPHONIC):  Your Honor, can I just

20   get one further word in here.  This is -- I don't mean to

21   prolong this, it just seems to me that this is such a simple

22   matter at the end of the day.  It is not a question of, you

23   know, sympathy.  It's not a question of morality.  It's not a

24   question of the broad litigation system.  This happens every

25   day of the week.  Why can't we get a certification that says

1   (a) the patient is in extremis or in the end-stage, and (b)

2   either from a physician who will certify that they have no

3   financial or business ties to any of the plaintiffs' law

4   firms and Libby.

5           THE COURT:  Well, does Dr. Whitehouse have some tie

6   to --

7           MR. BERNICK (TELEPHONIC):  Well, yeah, I believe

8   that he acts as a litigation expert in connection with the

9   Libby cases.  That's part of the whole problem here is that

10  we want somebody who's just independent, and I don't know if

11  that's the magical language, but somebody who has no

12  financial stake in any litigation matters or financial ties

13  to the firms.

14          THE COURT:  Well, I'm not sure I know what Dr.

15  Whitehouse's stake is because he is hired to testify as an

16  expert doesn't give him a financial stake in the outcome of

17  litigation; does it?

18          MR. BERNICK (TELEPHONIC):  Well, I guess, the

19  financial stake in the litigation itself and I think that we

20  would all agree that that is not an independent physician.

21  He is an expert.  I'm not sure, Your Honor, I would defer to

22  the Court on the appropriate language.  I've made a proposal

23  which is simply that we get beyond the people who have, you

24  know, already staked out a position that says, you know, let

25  me turn a life disease into a new diagnostic entity and it's

1  being pursued in all these different cases.  You know, the

2  question of whether somebody is in extremis or not doesn't

3  require that they be, you know, hyper-specialists.  It's just

4  a question of observing the person's condition and what's

5  happening to that condition.  We --

6           THE COURT:  Well, I haven't heard Dr. Whitehouse's

7  qualifications attacked, and so at this point in time I have

8  to assume that he, like every other doctor who's going to

9  examine a patient, has the appropriate qualifications to be

10  able to make this type of diagnosis, and Mr. Bernick, really

11  if people are dying, I don't think that's the time to require

12  them to go to new physicians.

13           MR. BERNICK (TELEPHONIC):  Well, I'm sorry, Your

14  Honor, but that is precisely the source of the problem here

15  is that Dr. Whitehouse is a credibility issue.  He has a

16  stake in the prosecution of these cases.  He is an expert who

17  is retained in these cases.

18           THE COURT:  Well --

19           MR. BERNICK (TELEPHONIC):  And I think that we

20  would cut through -- and he's now established from the

21  letters that he submitted to the Court that he's not prepared

22  to make these more specific statements.  It just seems to me

23  that in terms of, you know, counsel made a speech about how,

24  you know, this is being overly lawyer-ed, we provided a very

25  simple way out of this whole situation which is just get us

1    somebody who is independent and can say these people are --

2    this specific person is in extremis and why, we wouldn't be

3    having this battle.  We don't want to fight a battle that's

4    -- where the facts are that these people are dying.  That's

5    not our objective here.

6        THE COURT:  Are there other doctors in Libby that

7    can be used for this purpose?

8        MR. COHN:  Well, there are -- In some cases there

9    are other doctors who are seeing these patients, and in that

10    instance we, for example, Dr. Black, that's why you see a

11    medical report from Dr. Black.  Dr. Whitehouse has patients

12    from Libby, and, by the way, that statement that Mr. Bernick

13    just made isn't correct.  If you look at Mr. -- at the Dayton

14    Hill report you have Dr. Whitehouse taking a definite

15    position about the longevity of the patient, and he says,

16    patients, you know, he estimates patients can die within two

17    years.

18        MS. BAER:  Excuse me, Your Honor.  I have Dayton

19    Hill's letter right in front of me.  He says he could easily

20    live several more years with his disease, particularly since

21    he seems to have a fairly high level of tolerance.  Then he

22    goes on to estimate roughly two years, but I think those two

23    sentences have to be read in conjunction with each other.

24    He's very vague on Dayton Hill.

25        THE COURT:  Well, you know, counsel, it almost

1    seems to me that these are your clients, and probably you

2    have contact with them, and frankly you probably know whether

3    they're in a position where their deposition testimony needs

4    to be preserved.  It's not necessarily a matter in all

5    instances of looking at the hard and fact medical situation,

6    and most of the motions that I've had coming in other cases

7    are coming by counsel who have seen their clients and say,

8    Look, this person's in really bad shape and starting to lose

9    communication skills.

10           MR. COHN:  Correct.

11           THE COURT:  And frankly, that's what I really need.

12   And I don't have any of that assertion.  When I look at Ms.

13   Shea, I can't tell from this information whether -- I'm not a

14   medical doctor, so let me get that clear.  I'm not

15   substituting medical judgment.  I'm simply trying to make a

16   determination as to whether preservation of deposition

17   testimony is advisable given the cost and the expense to the

18   estate and the other parties who are going to have to be

19   involved, or whether it's possible to let that wait because

20   of the fact that the person hopefully will still be around in

21   time to go through this in the normal process.  That's the

22   balancing act.

23           MR. COHN:  Your Honor, I actually -- I agree with

24   everything that you've just said.  It is -- I am bankruptcy

25   counsel to the Libby claimants.  I am not the person whom

1   they see who is familiar with their condition, who interacts

2   with them.   That is Mr. Heberling and his colleagues in

3   Montana.   I can assure you that we have been specifically

4   directed by him to bring these motions because of the

5   determination that they have made that this testimony needs

6   to be preserved.   In the case of Mr. Erickson, I mean, they

7   have been proved correct by events.   Ms. Taylor-Regjovich,

8   you know, my understanding is that whatever you can glean

9   from these medical reports, that testimony very badly needs

10  to be preserved, and that is true of these other people as

11  well, and that is that the lawyer's judgment and it's been

12  made as to these four people whose motions you have now in

13  front of you and --

14          THE COURT:   Well --

15          MR. COHN:   -- four is not a lot.

16          THE COURT:   Four probably isn't a lot but if it's

17  four this month, then four next month, and four the month

18  after, that's getting to be a lot.

19          MR. COHN:   I think I said that it wasn't going to

20  be.   There are none -- There are no motions scheduled for

21  next month.   First of all, we're only talking about three

22  this month because of Mr. Erickson.   So, we're talking about

23  three depositions we've requested.   No more until -- no more

24  motions until being heard at the October omnibus hearing, at

25  the earliest.   And I'm not sure that we'll have any by then,

1    and so this is a, you know, I'm trying to keep this to a mole

2    hill, Your Honor, not a mountain, and that's -- We would just

3    --

4          THE COURT:  Well, it's already grown beyond a mole

5    hill with four, but that's okay if that's necessary, I want

6    the testimony preserved.  I said that earlier.  I do not

7    intend this bankruptcy to stop legitimate depositions that

8    need to be taken from going forward.  Frankly, with respect

9    to Ms. Shea, I don't see the necessity for it now.  I truly

10   do not having looked at these documents see the necessity for

11   her deposition now.  I may see it in six months, but I don't

12   see it now.  I don't know.  I don't know what may change.

13   With respect to Mr. Erickson, unfortunately I was prepared to

14   permit that, but it appears unfortunately that that's not

15   necessary now.   Where is the next one in the binder?   I

16   don't know what exhibit we're up to.  Nine is --

17          MR. COHN:  Well, there is --

18          MS. BAER:  Your Honor, number 7 on the agenda is

19   Ms. Regjovich.

20          THE COURT:  Okay, let me take a look at hers.

21   Okay.  This is a diagnosis of asbestosis, not even lung

22   cancer.

23          MR. COHN:  Your Honor, Libby claimants -- While

24   some of them do die of cancer, Your Honor, Libby claimants

25   die of asbestos disease without necessarily proceeding to

1  cancer.

2      THE COURT:  How is it that you determine that
3  somebody is in an end-stage asbestosis situation?

4      MR. COHN:  You do it by looking at these -- at the
5  criteria for chronic obstructive pulmonary disease, which are
6  basically measures of lung capacity and that's what is being
7  outlined in this letter.

8      THE COURT:  All right, pardon me, Dr. Whitehouse's
9  opinion is that Ms. Taylor-Regjovich would perish secondary
10  to asbestos disease in one to two years, has a significant
11  risk of disease at any time within two years based on
12  asbestosis.

13      MR. COHN:  Correct.

14      THE COURT:  Okay, with respect to her, I think at
15  this point I need something that indicates that in fact she
16  is in some terminal position because this is not even a
17  cancer.

18      MR. COHN:  But when you say "not even a cancer"
19  this is what will be the cause of her death, Your Honor.

20      THE COURT:  Well --

21      MR. COHN:  I mean obviously she can get run over by
22  a car, if she were able to leave the house, but she -- This
23  is what is going to kill her if something doesn't kill her
24  sooner.

25      THE COURT:  Well --

1    MR. BERNICK (TELEPHONIC):  Your Honor, the whole

2    idea that somebody at Libby at this stage could have terminal

3    asbestosis, just pure terminal asbestosis, those cases are

4    exceedingly rare.  Those are associated with very, very heavy

5    exposures, and they are a rarity these days, and I don't know

6    if there is anything in her record that indicates that she's

7    got anything that comes close to that level of exposure.

8    THE COURT:  Well, it indicates that she was

9    apparently a smoker because she has a smoking history and

10    that coupled with asbestos disease is apparently the issue

11    that you're dealing with.

12    MR. BERNICK (TELEPHONIC):  Well --

13    MR. COHN:  And we're not asking the Court at this

14    time to make determinations as to Grace's liability although

15    it might seem obvious that if someone lives --

16    MR. BERNICK (TELEPHONIC):  It's not --

17    MR. COHN:  -- for decades in a -- If someone lives

18    for decades in an environment which --

19    THE COURT:  No, we're not going there.

20    MR. BERNICK (TELEPHONIC):  There's no -- but this

21    is a medical issue.  There's no evidence of any kind.

22    There's never been scientific evidence or even frankly an

23    assertion that smoking and asbestos exposure is inner-gistic

24    (phonetical) with respect to asbestosis.

25    MR. COHN:  Well, let me express it this way:  The

1   issue is not what she's dying of.  If she were dying of

2   something totally unrelated to --

3            THE COURT:  It wouldn't matter.

4            MR. COHN:  It wouldn't matter.

5            THE COURT:  That's right.

6            MR. COHN:  Because the issue is is she close to

7   death and as the -- within the limits of a doctor's ability

8   to forecast such things, this doctor is saying that she has a

9   significant risk of death at any time within the next two

10  years, more probably than not.

11           MR. BERNICK (TELEPHONIC):  You don't get asbestosis

12  from smoking cigarettes.  You get lung cancer.  If she

13  doesn't have lung cancer, then what is the basis for saying

14  that she's going to die.

15           THE COURT:  Well, the issue too indicates that the

16  doctor took a chest x-ray in April of 2004 that showed

17  minimal pleural thickening and bi-bacillar interstitial lung

18  disease consistent with asbestos disease, but it says

19  "minimal".  So I do not believe at this point that this

20  deposition is appropriate.  These are all subject to

21  reconsideration.  If you get additional medical evidence, I

22  will reconsider at any time.  You do not need to recraft this

23  motion.  You need to ask me for reconsideration.  But I am

24  denying the motion with respect to number 7.  Now, I do not

25  see a basis for the deposition preservation based on the

1   letter of July 1st and the accompanying documents from Dr.

2   Whitehouse.  So I'll simply say denied without prejudice to

3   requesting reconsideration on additional evidence.  All

4   right, number 8 --

5         MR. COHN:  I'm sorry, Your Honor, could we set a

6   notice period for that?  I mean could we do that if we have

7   the evidence within 10 days before an omnibus hearing?  Can

8   we come back in front of the Court?

9         THE COURT:  You may do it at any time so you meet

10  the filing requirements of the omnibus hearing dates, at any

11  time you get the additional information.

12        MR. COHN:  Right.  The problem is that those

13  actually take us out quite a bit of time in advance of a

14  hearing date.

15        THE COURT:  Oh, well, but in these all you need to

16  file is the additional information, and tell me please --

17        MR. COHN:  I see.  So treat it like a supplement to

18  an existing motion.

19        THE COURT:  Yes.

20        MR. COHN:  So it just needs to be filed within the

21  week before the hearing in order to have it --

22        THE COURT:  Well, at least two weeks before so I

23  can get responses.

24        MR. COHN:  Yep.

25        THE COURT:  But, please, when you do file those,

1  point out to which agenda the document that the original

2  motion was in and which item it was --

3  　　　　MR. COHN:  Yes, Your Honor.

4  　　　　THE COURT:  -- so that I can refresh myself, my

5  recollection with respect to those matters.

6  　　　　MR. COHN:  Yes, Your Honor.

7  　　　　THE COURT:  All right.  The same thing is true with

8  respect to item 8.  That was Ms. Shea.  Number 9 is Mr. Hill.

9  　　　　MR. COHN:  Your Honor, this man is 79 years old.

10  He is more short of breath in the last year, so his condition

11  is deteriorating.  That's a report by Dr. Black, not Dr.

12  Whitehouse, not that I in any way accept the notion that one

13  doctor's word is any better than another.

14  　　　　MS. BAER:  Your Honor, this is the one I would

15  simply like to point out a recent letter, June 7, 2004 from

16  Dr. Whitehouse himself concludes the gentleman can live for

17  several more years and estimates roughly two years.  Of all

18  of them this is the one least compelling in terms of the

19  severity of his condition.

20  　　　　MR. COHN:  The fact that Dr. Whitehouse is

21  unwilling to sentence one of his patients to death in writing

22  --

23  　　　　THE COURT:  No.  No, no, no --

24  　　　　MR. COHN:  -- in any more clearly than that is just

25  --

1    THE COURT:  Mr. Cohn, please.  The doctor is not

2    sentencing anybody to death, but he is as a medical

3    professional likely to be consulted in a routine basis about

4    how people's medical condition is, what it is at any given

5    time.  That's why people go to the doctor, particularly

6    people who have been exposed to asbestos.  They want to know

7    what their medical condition is.  And it seems to me, as I

8    said earlier, that I need something more than that somebody

9    is likely to die within two years.  This does indicate that

10   Mr. Hill had a colon cancer, but it apparently had not spread

11   -- It basically indicates that his condition was pretty much

12   the same as it was the last time that he was visited, which

13   appears to have been a month before.

14        MS. BAER:  Your Honor, it also indicates that his

15   current film is pretty much the same.  His prior film is back

16   to 2000, meaning the condition they're looking at in his

17   lungs hasn't changed in four years.

18        THE COURT:  And the doctor's report of June 7

19   indicates there's been a slow but progressive deterioration

20   in his pulmonary function over the last three to four years,

21   but he still has a capacity of 55 percent.  And the doctor

22   indicates that if his -- assuming that Mr. Hill's colon

23   cancer doesn't recur, he could easily live several more

24   years.  His diagnosis, again, is asbestosis at this point in

25   time.  I'm going to do the same thing with respect to this

one.  I will deny this one on the same terms and conditions

that a motion for reconsideration may be filed because I do

not think that there is evidence at this point in this record

that indicates the deposition testimony has to be preserved

now, but if you have some additional evidence, I take it that

the gentleman is going to this doctor on a regular basis.

There are numerous medical reports with respect to this

gentleman, so at any point in time, if there is a serious

change in his condition, I will reconsider.

MR. COHN:  Then that, Your Honor, just brings us

back to Mr. Erickson.  The request as to Mr. Erickson was to

take his deposition.  That part of it is, of course, moot.

THE COURT:  Yes.

MR. COHN:  But there was -- his testimony was

preserved in connection with the Worker's Compensation case,

and one of the requests for relief was that that -- that the

preservation deposition that was taken in that matter be also

considered a preservation deposition for which we had the

requisite permission of this Court to apply in this one.

THE COURT:  The problem with that was that

apparently the debtor didn't get notice, and so there may

have been preservation deposition testimony taken, but

without notice to the other parties and, therefore, not

subject to any type of cross-examination.  It seems to me

that what would be --

1    MR. COHN:  So then what happens, Your Honor?  What
2    then happened is we provided the transcript to them and gave
3    them the chance to -- We're now going back to the very
4    beginning of this year at a time when his deposition still
5    could have been taken.  Offered them the opportunity to
6    reopen and be subject to further testimony.  In the case of
7    the debtor, the debtor said affirmatively no.  In the case of
8    Maryland Casualty I'm not sure whether we got a response or
9    not, but they got the same invitation and did not take us up
10   on it.  And now he's dead.

11   MR. BERNICK (TELEPHONIC):  Your Honor, I don't know
12   what the procedural basis is for making that request.  This
13   is not a request for discovery.  It's not a request for any
14   kind of process.  It's a request that Your Honor make what's
15   essentially an advisory determination regarding
16   admissibility.  The deposition is otherwise hearsay.
17   Basically what they're saying is because of the circumstances
18   it should be deemed now to be a preservation deposition at
19   which we participated.

20   THE COURT:  All I'm going to do with respect to
21   number 10 is say that the taking of that deposition, that the
22   automatic stay was annulled nunc pro tunc for the taking of
23   that deposition even though it was without notice, without
24   making any determination as to the admissibility of the
25   deposition.  I simply am going to eliminate under these

1   circumstances the possibility that there was a violation of

2   the automatic stay.

3        MR. COHN:  Your Honor, also the preliminary

4   injunction?  On the same basis?

5        THE COURT:  And also the preliminary injunction on

6   that basis.  So I'll do it on this instance only because the

7   gentleman unfortunately has died, otherwise, I would have, as

8   I said, indicated that the deposition could have gone forward

9   in any event.  But I'm not making a ruling on the

10  admissibility at this time.  For future motions, if you could

11  please comply with what Rule 27 is requesting, I think that

12  will help significantly to get the information into the

13  motion in accord with what Rule 27 asks for for preservation,

14  please.

15       MR. COHN:  We shall do that, Your Honor.

16       THE COURT:  All right, Ms. Baer, do you want to

17  work on an order with respect to number 10 that can be

18  submitted.  Show it to Mr. Cohn first.

19       MS. BAER:  Yes, Your Honor.

20       MS. deCRISTOFARO:  Your Honor, if I just may be

21  heard for . . . (microphone not recording).

22       THE COURT:  Yes, ma'am.

23       MS. deCRISTOFARO:  Your Honor, my name is Elizabeth

24  deCristofaro from Ford Marrin,  I represent Continental

25  Casualty.  I've been here many times in connection with the

1   Libby claimant motions.  I just wanted to point out we didn't

2   file a objection because we weren't served with the motion by

3   Mr. Cohn, and it does not agree -- does not reflect our

4   acquiescence, and we join in the objection.  The other thing

5   that I'd like to address Mr. Cohn's remark that they've been

6   very disciplined, and I think Your Honor's been dealing with

7   this whole thing for three years and knows it, but for

8   example, I got an envelope addressed to me from Mr.

9   Heberling, I think, from his firm dated July 2nd.  It had

10  medical records for Claud Frank, which I believe was one Your

11  Honor already turned down or something.  There's no present

12  application.  It's just medical records as if they're going

13  ahead after Your Honor's already said no on a deposition, but

14  there's no cover letter, there's nothing.  And similarly,

15  with respect to one of the ones that Your Honor just heard,

16  Mr. Hill, Mr. Heberling sent me with a cover letter medical

17  records dated July 21st a month before this hearing saying

18  that if I want to see other medical records I'd have to, you

19  know, review or ask copies from them.  I don't think this is

20  proceeding in a disciplined manner when there's matters

21  before the Court, where there's applications of people and

22  Mr. Cohn just represented there's only four, but now I have

23  an envelope with no cover letter addressed to me from Montana

24  counsel with medical records for another person there's not

25  even an application for.  To me this is not proceeding in a

1  disciplined way.  Your Honor's issued many orders regarding

2  this whole milieu on these things, and I just -- We haven't

3  made a formal application, but --

4          THE COURT:  All right.

5          MS. deCRISTOFARO:  -- I just wanted to bring it in

6  light of the whole discussion today to Your Honor's

7  attention.

8          THE COURT:  I think that's a good point and I think

9  what I'm going to do is have another administrative order

10 entered.  So, I will ask the parties to simply get together

11 to address so that it will apply to anyone who wants

12 preservation of testimony until plan confirmation.  And it

13 can simply lay out the procedures whereby a motion that

14 complies with Rule 27(c) must be filed along with the copies

15 of the medical evidence that are going to be used to support

16 the motion, that there must be an allegation by counsel that

17 he has interviewed the client and believes that it's

18 necessary to go forward with the deposition for whatever

19 reasons counsel feels are appropriate in addition to the

20 medical criteria that are set forth.  That has to be filed

21 and served on all parties.  It's not to be sent in advance.

22 It's to be filed and served in accord with my normal case

23 management procedures.  In the event that someone is so ill

24 that it's necessary to take that deposition without complying

25 with those case management procedures, I always will consider

1   some emergency motion.  I mean, things do happen.  There are

2   people who are ill.  But that should be the very rare

3   exception, not the rule.

4        MS. deCRISTOFARO:  As I said, Your Honor, what this

5   seemed to us to be is just going ahead without anything

6   related to the Court's orders or the proceedings, and we --

7        THE COURT:  Well --

8        MS. deCRISTOFARO:  -- We've had this problem

9   before, and I just wanted to bring it to Your Honor's

10  attention.

11       THE COURT:  Well, I appreciate it so we'll simply

12  do an administrative order and then it will be laid out in

13  detail.

14       MR. COHN:  Your Honor, just to clarify, these are

15  the Rule 2002 list, obviously is enormous, and when you say

16  "all parties" I would assume that means all parties to the

17  adversary proceeding which includes the debtor and parties

18  protected by the preliminary injunction.

19       THE COURT:  Well, I think it includes whoever the

20  parties in interest are with respect to a particular

21  deponent.

22       MR. COHN:  Of course, Your Honor, but I just mean

23  it does not -- It need not include because the expense would

24  truly be enormous of serving the whole Rule 2002 notice.

25       THE COURT:  I think it will make it easier with

1   respect to the service. The documents are being

2   electronically filed; are they not as exhibits to the

3   motions?  So -- No?

4          MS. BAER:  Your Honor, they're supplying -- as Ms.

5   deCristofaro pointed out, we get packets in the mail --

6          THE COURT:  Fine, they're to be filed

7   electronically and then everybody will have the documents and

8   the notes.  So file them electronically.  File the motion

9   with the exhibits electronically, and then it will be spread

10  to everybody who's on the adversary if it's filed in the

11  adversary.

12         MR. COHN:  Well that was the only question that we

13  needed to address, Your Honor.  I understand.  I mean, just

14  so that the record here is clear, Your Honor, the reason that

15  medical records have been supplied is that when they're

16  available we've tried to supply them at the earliest possible

17  date as to motions that would be brought in the future so

18  that they can be evaluated.

19         THE COURT:  Well, but sending them without a cover

20  letter doesn't do much good to anybody.  If I got documents

21  sent just from one day's hearings without cover letters, I'd

22  have no clue what they were about.

23         MR. COHN:  Your Honor, I understand, and it's

24  certainly fine for records not to be -- just as an

25  administrative matter, for records not to be supplied except

in conjunction with an actual motion, but I just want -- I just would like it to be understood that what we have been doing or what my co-counsel in Montana has been doing is just trying to keep people -- give people as much advance notice of those people who are in serious medical condition as was possible.

THE COURT:  Well, okay.  I appreciate that. They'll get sufficient notice by complying with the case management procedures to get the matters set on the docket for any given hearing.  So I will get an administrative order together.  I'll ask the debtor and -- I don't know if the committees are getting copies of the adversaries?  Are you on the list for service for matters being filed in the adversaries?  No.  You need to add to them.

UNIDENTIFIED SPEAKER:  I don't believe we are, Your Honor.  I mean we occasionally get a courtesy copy.

THE COURT:  Ms. Baer, could we possibly amend the service list in the adversary to add counsel for all the committees and the Future Rep?

MS. BAER:  Your Honor, counsel for all the committees is always on our service list.

THE COURT:  But it may not be in the adversary.

MS. BAER:  Well, this is the Chicarian (phonetical) adversaries, the only one it relates to, and they are on that list.  There just hasn't been very much filed, other than

1   these motions which I believe they've received.

2          THE COURT:  All right.  So fine, so if you file

3   them electronically, then everybody who's on that list should

4   get served, and we can put in this administrative order that

5   electronic filing will constitute service for anybody who's

6   on the electronic list.  Now if somebody else needs service

7   who is a party in interest, then you have to make paper copy

8   service.

9          MR. COHN:  We understand, Your Honor.

10          MR. WISLER:  Good afternoon, Your Honor.  Jeff

11   Wisler on behalf of Maryland Casualty Company.  Your Honor,

12   we filed a response and I only want to address one aspect of

13   that response, and that is that we asked that if any of these

14   depositions are going forward, we get a minimal amount of

15   information, at least 30 days prior to the deposition, and in

16   the Libby plaintiffs' reply that they filed on Thursday,

17   essentially what they said is, Well, you can have some

18   things, but it's really difficult for us to get some things,

19   and it takes awhile to get some things and maybe you should

20   wait until the Social Security Administration acts.  My

21   suggestion -- And they also suggested that they might be

22   willing to give us some releases from their clients so that

23   we could go get information on our own.  This is the same

24   information that we asked for in our April 19th response.  On

25   July 19th the Libby plaintiffs filed the current set of 362

motions, and on August 19th, they filed a reply that said,

This stuff is hard to get, and it also takes a long time and

we don't have time to wait.  My suggestion is, we've now told

them twice what we need and when we need it, and my

suggestion is that they use the time between now and their

next motion for reconsideration or set for 362 motion to get

us that specific information that we need which is minimal

information to make the depositions meaningful for both --

for all parties.

THE COURT:  Well, I think, Mr. Wisler, what I've

just asked is that at least some, if not all, of that

information be attached to the motion.  All the medical

information on which the motion is based should be attached

to the motion.  With respect to the Social Security records,

if counsel knows now that they're going to be filing requests

for reserved testimony, they ought to be sending in the

requests to the Social Security Administration and get the

information.  It doesn't take that long.  It does take awhile

but, you know --

MR. WISLER:  A week.

THE COURT:  -- if they start now and they file a

motion to be heard three months from now, that should be

sufficient time to get the information.

MR. WISLER:  Right, and the information that we

need is much greater than what the Court needs.  The Court

1  needs to determine whether the depositions need to be taken

2  now.   We need the information because we're defending novel

3  theories of liability that say an insurance carrier is liable

4  for asbestos problems related to a plant that we insured.   So

5  the scope of minimal information is greater than what would

6  be required in the motion, and we need that ahead of time so

7  that we can make the deposition effective if it in fact is

8  going to be the only deposition or testimony of that

9  particular plaintiff.

10      THE COURT:   Well, I think you can build this into

11  the administrative order that that's the information that's

12  gong to be required to be exchanged.   I don't think that has

13  to be submitted in connection with the motion, but at least

14  an affidavit should be submitted that indicates that the

15  necessary steps have been taken to obtain it.

16      MR. WISLER:   Right, and I'm not asking that it be

17  submitted to the Court.

18      THE COURT:   No.

19      MR. WISLER:   I'm only suggesting that the sooner

20  they get it to us the less likely it is that we stand up here

21  next time they bring this motion and say, Judge, we're okay

22  with the deposition, but they've still got to get us this

23  information.

24      MS. BAER:   Your Honor, in their response the

25  problem is that what they're saying is, No, we're not going

1   to get it.  We'll give you a release, you go get it.  What

2   we're saying, Your Honor, and I think what the administrative

3   order should provide is that the plaintiffs should get that

4   information.  It eliminates a step and it's the right person

5   to be asking for that stuff.

6          MR. COHN:  There are two, Your Honor.  There are

7   two problems with that.  One problem is that this is a gross

8   effort to shift costs in a way that is not done in customary

9   litigation.  For example, medical records can be quite

10  expensive to obtain.  They want a lifetime with a person's

11  medical records.  What is done in these situations is --

12         THE COURT:  That's not to say that whoever asks for

13  it can't bear the cost of it.  It's just to say that you have

14  to produce it.

15         MR. COHN:  Well, we can certainly -- assuming that

16  the requesting party is willing to bear the cost, then we can

17  start that process as soon as that commitment is made.  So

18  that's not a -- that would not be an issue, Your Honor.  The

19  next issue is timing.  That the timing of these things is,

20  you know, you can't predict when these things are going to be

21  received.  It's beyond our control and the need for the

22  deposition, you know, will typically be such that the

23  deposition needs to be taken before you can be assured of

24  receiving these things.

25         THE COURT:  Well, Mr. Cohn, it appears that at some

1   point, all of your clients are going to be subject to these

2   depositions.  So why don't you start -- at some point, not

3   necessarily preservation of testimony, but some type of

4   deposition or inquiry.  So, why don't you start getting the

5   information that is within your client's control and isn't

6   expensive like a letter or a call to the Social Security

7   Administration to get that type of information.  Or a letter

8   from the Workman's Comp carrier indicating who the employer

9   was and what the award was, if any.  That doesn't take

10  anything except maybe a postage stamp and in most instances

11  just a local phone call.

12          MR. COHN:  We can on the basis -- That information

13  that is of nominal cost, those are things that we can take

14  the initiative and start to assemble, Your Honor, within

15  obviously, you know, the bounds of reason because there are,

16  you know, obviously lots of these people, and we can't always

17  guess whose condition is going to worsen suddenly, but we'll

18  do -- we'll act reasonably in this regard, Your Honor,

19  understanding that that's the instruction.  For those things

20  that are of more than a nominal expense, Your Honor, then we

21  will attempt to work with Grace and the carriers to provide

22  some mechanism whereby in advance of having all of this

23  brought before the Court, they can have the option to pursue

24  or not pursue obtaining that information at their expense,

25  and we'll try to build something reasonable into the

1  administrative order that would address that.

2          THE COURT:  All right.  That should help in terms

3  of how far back somebody has to go for medical records.  You

4  know, it seems to me that improving a claim, the asbestos

5  victim is going to have to produce some type of medical

6  record.

7          MR. COHN:  Correct.

8          THE COURT:  So, there has to be some balance.

9          MR. COHN:  And as you say, Your Honor, we have

10 produced recent medical records that are necessary to back --

11 to show the patient's condition.

12         THE COURT:  All right.  I'll let you see if you can

13 work it out in the administrative order.

14         MR. COHN:  Thank you, Your Honor.

15         THE COURT:  Okay, Ms. Baer, thank you.

16         MS. BAER:  Your Honor, agenda items number 11, 12,

17 and 13 are all vis-a-vis debtor's omnibus objections.  Agenda

18 item number 11 relates to the debtor's third omnibus

19 objection to claims.  I have an order to submit to Your Honor

20 which resolves a couple of claims and then continues a few of

21 the remaining objected to claims to the next hearing.

22         THE COURT:  All right.  Thank you.  All right, that

23 order is entered.

24         MS. BAER:  Thank you, Your Honor.  With respect to

25 agenda item number 12, that's the debtor's fourth omnibus

1  objections to claims.  Once again, Your Honor, I have an

2  order to submit to you which resolves a couple of objections

3  and continues a few to September 27th.

4         THE COURT:  All right.  Okay, that's entered.

5         MS. BAER:  Your Honor, agenda item number 13, the

6  debtor's fifth omnibus objections to claims.  I have an order

7  to submit, once again resolves several objections, continues

8  several to September 27th.

9         THE COURT:  Okay.  That's entered too.

10        MS. BAER:  Thank you, Your Honor.  Your Honor,

11 agenda item number 14, I believe you've already entered an

12 order on that matter.  That was the Nelson Mullins & Riley

13 application.

14        THE COURT:  Yes.

15        MS. BAER:  Your Honor, that concludes the agenda.

16 The only other matter which was pending as you may recall is

17 the debtors have filed an emergency motion with respect to

18 the ERISA litigation commenced by the Evans plaintiffs

19 against some of the debtor's current and former directors and

20 officers.  All the parties have stipulated and that matter

21 will be heard on Your Honor's agenda on September 27th.

22        THE COURT:  All right.

23        MS. BAER:  Your Honor, that's all I have on the

24 agenda.

25        THE COURT:  Anyone else have any matters to

1    address?

2        MR. LEVIN (TELEPHONIC):  Good afternoon, Your

3    Honor.  Bruce Levin, I represent Spaulding & Slye relative to

4    the fourth omnibus objection.  It has not yet been resolved,

5    and I have not been notified by anyone that they have wish to

6    continue it.

7        THE COURT:  Ms. Baer.

8        MS. BAER:  Your Honor, I will quickly look at the

9    attachment and see what happened.  In most instances, Your

10    Honor, if we were not able to resolve an objection we

11    continued it.  There should have been communication with

12    counsel, however.  Let me look at the exhibit.  Your Honor,

13    with respect to the Spaulding & Slye matter the order

14    indicates that it is being continued to September 27th at the

15    next omnibus hearing.

16        THE COURT:  Mr. Levin?

17        MR. LEVIN (TELEPHONIC):  I've not received that,

18    but I have no qualm with their doing so although I might

19    suggest that we might just want to put it on a schedule and

20    get going on it.

21        THE COURT:  I'm sorry, might as well what?  I

22    couldn't hear you.

23        MR. LEVIN (TELEPHONIC):  Schedule it to go forward

24    vis-a-vis discovery deadlines, et cetera.

25        MS. BAER:  Your Honor, my notes indicate that the

1  debtor is preparing a reply to the response on that objection

2  and then we would certainly anticipate going forward with it

3  in whatever manner that would be appropriate.

4          THE COURT:  All right.   I don't know what the

5  response or the reply is about in this instance.   Is it

6  something that's going to need to be argued at the next

7  hearing?

8          MS. BAER:  Your Honor, I'm not familiar with the

9  claim itself.   I only have a report from the people who have

10  been adjudicating the claim.   I will certainly follow up on

11  that.   Normally, Your Honor, if it's only a couple of minutes

12  worth of argument we would anticipate taking it up at an

13  omnibus hearing.   If it in fact is litigation which is going

14  to be much more complicated than that I would suggest two

15  things.   Number one, sounds like it might be something you

16  want to go to an ADR on.   That's the very kind of thing that

17  we anticipate the ADR will be there for.   But before we do

18  that, I really have to look at the details and we can let

19  Your Honor know.

20          THE COURT:  Mr. Levin, why don't I suggest that you

21  and Ms. Baer talk between now and when the next hearing is.

22  They're preparing a reply.   If discovery's necessary, I'll

23  take that up at the next hearing.   If you folks decide that

24  you do want to go to ADR on this claim in the meantime, you

25  can simply submit an order to that effect.

1      MR. LEVIN (TELEPHONIC):  That would be fine, Your

2  Honor.

3      THE COURT:  All right.  Anyone else have any

4  matters to address?  Okay, we're adjourned.  Thank you.

5      MS. BAER:  Thank you, Your Honor.

6      (Whereupon at 1:57 p.m. the hearing in this matter

7  was concluded for this date.)

8

9

10

11

12

13

14      I, Elaine M. Ryan, approved transcriber for the

15  United States Courts, certify that the foregoing is a correct

16  transcript from the electronic sound recording of the

17  proceedings in the above-entitled matter.

18

19  _Elaine M. Ryan_                    8 - 26 - 0 4
    Elaine M. Ryan

20  2801 Faulkland Road
    Wilmington, DE 19808

21  (302) 683-0221

22

23

24

25