| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | GRACE NON-ASBESTOS PROOF OF CLAIM |
|---|---|

| Name of Debtor[1] W.R. GRACE & CO. - CONN | Case Number 01-1179 |
|---|---|

**NOTE:** Do not use this form to assert an Asbestos Personal Injury Claim, a Settled Asbestos Claim or a Zonolite Attic Insulation Claim. Those claims will be subject to a separate claims submission process. This form should also not be used to file an Asbestos Property Damage Claim or Medical Monitoring Claim. A specialized proof of claim form for each of these claims should be filed.

Name of Creditor (the person or other entity to whom the Debtor owes money or property):
**MASSACHUSETTS BAY TRANSPORTATION AUTHORITY**

Name and address where notices should be sent:
MICHAEL CROSSEN
DAVID C. FIXLER
RUBIN AND RUDMAN LLP
50 ROWES WHARF
BOSTON, MA 02110
TELEPHONE: (617) 300-7000

___ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.
___ Check box if you have never received any notices from the bankruptcy court in this case.
_x_ Check box if the address differs from the address on the envelope sent to you by the court.

COPY
THIS SPACE IS FOR COURT USE ONLY

| Account or other number by which creditor identifies Debtor: | Check here ___ replaces if this claim ___ amends a previously filed claim, dated:_____ |
|---|---|

Corporate Name, Common Name, and/or d/b/a name of specific Debtor against whom the claim is asserted:

**W.R. GRACE & CO. - CONN**

**1. Basis for Claim**
___ Goods sold
___ Services performed
___ Environmental liability
___ Money loaned
___ Non-asbestos personal injury/wrongful death
_X_ Taxes
Other  **ENVIRONMENTAL CONTAMINATION**

___ Retiree benefits as defined in 11 U.S.C. § 1114(a)
___ Wages, salaries, and compensation (fill out below)
Your SS #: _____
Unpaid compensation for services performed
from _____ to _____ (date)

**2. Date debt was incurred:**
UNKNOWN

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $_____  **SEE ATTACHED EXHIBIT A**
If all or part of your claim is secured or entitled to priority, also complete Item 5 below.
___ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Classification of Claim.** Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured Nonpriority; (2) Unsecured Priority, (3) Secured. It is possible for a part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

___ SECURED CLAIM (check this box if your claim is secured by collateral, including a right of set off.

Brief Description of Collateral:

___ Real Estate   Other *Describe briefly)
_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

Attach evidence of perfection of security interest

_X_   UNSECURED NON PRIORITY CLAIM

A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

___ UNSECURED PRIORITY CLAIM - Specify the priority of the claim.

___ Wages, salaries, or commissions (up to $4,650,* earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).

___ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).

___ Taxes or penalties of governmental units - 11 U.S.C. § 507(a)(7).

___ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. **SEE ATTACHED EXHIBIT A.**

**8. Acknowledgement:** Upon receipt and processing of this Proof of Claim, you will receive an acknowledgement card indicating the date and filing and your unique claim number. If you want a file stamped copy of the Proof of Claim form itself, enclose a self-addressed envelope and copy of this proof of claim form.

THIS SPACE IS FOR COURT USE ONLY

| Date 3/27/03 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):  By: _~signature~_   _DIR OF ENVIRO AFFAIRS_  Name                     Title |
|---|---|

REC'D MAR 2 8 2003

_____

[1] See General Instructions and Claims Bar Date Notice and its exhibits for names of all Debtors and "other names" used by the Debtors.

545986_1

# SPECIFIC INSTRUCTIONS FOR COMPLETING
## GRACE NON-ASBESTOS PROOF OF CLAIM FORMS

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances, there may be exceptions to these general rules.*

This Proof of Claim form is for Creditors who have **Non-Asbestos Claims** against any of the Debtors. **Non-Asbestos Claims** are any claims against the Debtors as of a time immediately preceding the commencement of the Chapter 11 cases on April 2, 2001 other than Asbestos Personal Injury Claims, Asbestos Property Damage Claims, Zonolite Attic Insulation Claims, Settled Asbestos Claims or Medical Monitoring Claims, as defined on the enclosed General Instructions. More specifically, **Non-Asbestos Claims** are those claims against one or more of the Debtors, whether in the nature of or sounding in tort, contract, warranty or any other theory of law or equity for, relating to or arising by reason of, directly or indirectly, any injury, damage or economic loss caused or allegedly caused directly or indirectly by any of the Debtors or any products or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors and arising or allegedly arising directly or indirectly, from acts or omissions of one or more of the Debtors, including, but not limited to, all claims, debts, obligations or liabilities for compensatory and punitive damages.

**Administrative Expenses:** Those claims for, among other things, the actual, necessary costs and expenses of preserving the estate as defined in Section 503 of the Bankruptcy Code that arose after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to Section 503 of the Bankruptcy Code. This form should not be used to make a claim for an administrative expense.

**Secured Claim:** A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property. Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right to setoff), the creditor's claim may be a secured claim. (See also Unsecured Claim.)

**Unsecured Claim:** If a claim is not a secured claim, it is an unsecured claim. Unsecured claims are those claims for which a creditor has no lien on the debtor's property or the property on which a creditor has a lien is not worth enough to pay the creditor in full.

**Unsecured Nonpriority Claim:** Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as Unsecured Nonpriority Claims.

**Information about Creditor:** Complete this section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the court which sent notice, or if this proof of claim replaces or amends a proof of claim that was already filed, check the appropriate box on the form.

1. **Basis for Claim:** Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

2. **Date Debt Incurred:** Fill in the date the debt was first owed by the debtor.

3. **Court Judgments:** If you have a court judgment for this debt, state the date the court entered the judgment.

4. **Amount of Claim:** Insert the amount of claim at the time the case was filed in the appropriate box based on your selected Classification of Claim in item 5. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

5. **Classification of Claim:** Check either Secured, Unsecured Nonpriority or Unsecured Priority as appropriate. (See Definitions above.)

   **Unsecured Priority Claim:** Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See Definitions, above). A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

6. **Credits:** By signing this proof of claim, you are stating under oath that in calculating the amount of your claim, you have given the debtor credit for all payments received from the debtor.

7. **Supporting Documents:** You must attach to this proof of claim form, copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

*Be sure to date the claim and place original signature of claimant or person making claim for creditor where indicated at the bottom of the claim form. Please type or print name of individual under the signature. Be sure all items are answered on the claim form. If not applicable, insert "Not Applicable".*

RETURN CLAIM FORM (WITH ATTACHMENTS, IF ANY) TO THE FOLLOWING CLAIMS AGENT FOR THE DEBTORS:

Claims Processing Agent
Re: W. R. Grace & Co. Bankruptcy P.O. Box 1620
Faribault, MN 55021-1620

**The Bar Date for filing all NON-ASBESTOS CLAIMS against the Debtors is March 31, 2003 at 4:00 p.m. Eastern Time.**

545986_1

545986_1

## EXHIBIT A

On August 4, 1998, the City of Cambridge, Massachusetts (the "City") sent a demand letter to the Massachusetts Bay Transportation Authority (the "MBTA"), which was supplemented on June 8, 2001 (collectively referred to as the "Demand Letter"), attached hereto, noticing potential claims against the MBTA and certain other parties, including W.R. Grace & Co. – Conn. (the "Debtor"), a result of alleged environmental contamination on certain City-owned property in Cambridge ("Russell Field"). The parties are currently involved in statutorily-imposed, pre-litigation negotiations and no lawsuit has been filed to date.

In its Demand Letter, the City alleged that during construction of a subway extension, the MBTA and others, used Russell Field as a staging area for materials excavated during their work and that hazardous materials, including asbestos, were released during those operations. The City claimed that these parties are liable under Massachusetts General Laws ch. 21E for the property damage it has suffered due to the presence of asbestos and other hazardous materials on Russell Field. The City also seeks various costs it has incurred and will incur in responding to the asbestos and other hazardous materials released at Russell Field (the "Response Costs"). As of June 8, 2001, the City alleged that it had spent approximately $600,000 in Response Costs and estimated that future Response Costs could range from approximately $550,000 to over $14.2 million.

The City alleged that the Debtor is the owner of property located adjacent to Russell Field. The City has also alleged that activity of the Debtor caused the release and/or transport of asbestos and other hazardous materials at Russell Field. In the event that liability is assessed against the MBTA for property damage to Russell Field or Response Costs, the MBTA will assert a claim for contribution, indemnity or reimbursement against the Debtor for any and all liability incurred by the MBTA in connection with the property damage or Response Costs.

The MBTA expressly reserves its right to amend or supplement this Proof of Claim for any reason and at any time and in any respect and to include, inter alia, any additional claims in the event that the MBTA incurs any additional liability relating to alleged environmental contamination at Russell Field, and the MBTA reserves the right to make all or part of its claim as an administrative expense claim pursuant to Bankruptcy Code §§ 507(a) and 503(b). This proof of claim is made without prejudice to the filing by the MBTA of additional proofs of claim with respect to any other indebtedness or liability of the Debtor to the MBTA.

The MBTA submits itself to the jurisdiction of the District Court and, solely to the extent the Bankruptcy Court may constitutionally exercise the powers of the District Court, to the Bankruptcy Court solely for the purpose of the resolution of the claims set forth herein. The MBTA objects to the exercise of jurisdiction by the District Court or the Bankruptcy Court over the MBTA or over any cases or controversies concerning the MBTA for any other purpose. The MBTA demands trial by jury on all issues so triable.



# ANDERSON & KREIGER

### LIMITED LIABILITY PARTNERSHIP
*Attorneys at Law*

STEPHEN D. ANDERSON
Also admitted in CT

ARTHUR P. KREIGER
Also admitted in NY

GEORGE A. HALL, JR.
Also admitted in NH

The Bulfinch Building
47 Thorndike Street
Cambridge, MA 02141
(617) 252-6575
Fax: (617) 252-6899

ACHESON H. CALLAGHAN
Of counsel

JULIE F. PRUITT

RUTH H. SILMAN

August 4, 1998

**BY CERTIFIED MAIL - R.R.R.**
**Article No. Z022864514**
Patrick J. Moynahan
Chairman
Massachusetts Bay Transportation Authority
10 Park Plaza Room 3910
Boston MA 02116

  RE: Claimant:    City of Cambridge
     Subject Property: Russell Field
     Notification:  Contamination Release Notification
            and Demand Under General Laws
            Chapter 21E, Section 4A, and Public
            Records Request

Dear Mr. Moynahan:

  This firm represents the City of Cambridge (the "City") with respect to the release or threat of release of oil and/or hazardous material to or at certain real property in North Cambridge located on and in the vicinity of Rindge Avenue, Alewife Brook Parkway, Harvey Street and Clifton Street, which is used for public recreation purposes and is known as Russell Field (the "Russell Field Property"). The Massachusetts Bay Transportation Authority (the "MBTA") previously used the Russell Field Property as a staging area for materials excavated as a result of the construction of the Red Line Extension, and the MBTA reconstructed the Property at the conclusion of that work.

  By letter dated June 19, 1998, from the undersigned to the MBTA's general counsel William A. Mitchell, Jr., the City (a) invited the MBTA to participate in and/or observe ongoing investigations designed to determine whether the Russell Field Property (including the soil and/or groundwater beneath it) has been damaged or affected by the release of oil or hazardous material, (b) solicited the MBTA's assistance in the event that the Russell Field Property has been contaminated as a result of activities conducted by the MBTA in connection with its use of the Property as a staging area, and (c) requested that the MBTA enter a proposed Standstill Agreement tolling any applicable

Patrick J. Moynahan
August 4, 1998
Page 2

statutes of limitations to maintain a cooperative relationship as
the parties studied this issue and its resolution. By letter
dated July 28, 1998, the MBTA's general counsel declined the
City's request.

Pursuant to Massachusetts General Laws Chapter 21E, Section
4A, this letter notifies the MBTA as a former operator of the
Russell Field Property of the City's claims and potential claims
against the MBTA and of the City's proposal for the allocation of
liability for the release or threat of release in an effort to
resolve that liability without litigation. In addition, pursuant
to the written agreement between the MBTA and the City regarding
the MBTA's work at the Russell Field Property (copy enclosed as
Exhibit 1), the City demands that the MBTA fulfill its
obligations to the City under the following hold harmless and
indemnity provision (the "Indemnity Agreement"):

> The Authority shall hold harmless and indemnify the
> City and its employees for any amounts paid by the City
> as compensation for property or other damage or
> personal injury for which the Authority is responsible
> in connection with its occupancy of Russell Field and
> the City Dump or which is based in any way on the
> Authority's project of extending its Red line through
> the City.

Pursuant to Section 4A of General Laws Chapter 21E, as
amended, and pursuant to the Indemnity Agreement, this letter
notifies the MBTA that:

(a) The City has undertaken, is undertaking, and intends to
undertake necessary and appropriate response actions with
respect to the release or threat of release of oil or
hazardous material to or at the Russell Field Property;

(b) The City reasonably believes that the Department of
Environmental Protection may allege that the City is liable
pursuant to Section 5 of Chapter 21E with respect to such
release or threat of release at the Russell Field Property;

(c) The City reasonably believes that the MBTA is liable
pursuant to Section 5 of Chapter 21E with respect to the
release or threat of release at the Russell Field Property;

(d) The City requests that the MBTA make contribution or
reimbursement or pay its equitable share of the costs of
those response actions or other liability pursuant to the
provisions of Chapter 21E; and



Patrick J. Moynahan
August 4, 1998
Page 3

    (e)  The City believes that, damage to soil and/or
groundwater from the release or threat of release of oil or
hazardous material constitutes property damages[1] and the
costs to assess, contain and remove such oil or hazardous
material represents "amounts paid by the City as
compensation for property or other damage ... for which the
Authority is responsible in connection with its occupancy of
Russell Field ..." under the Indemnity Agreement.

## A.  THE MBTA'S RELATIONSHIP TO THE RUSSELL FIELD PROPERTY

    Pursuant to the Indemnity Agreement, during the construction
of the Red Line extension, the MBTA used the Russell Field
Property for purposes of "construction staging i.e. construction
equipment, mills, lay down, storage, backfill, and construction
personnel ... " (Indemnity Agreement, Section I.1).  At the
conclusion of the construction staging activities, the MBTA
reconstructed the Russell Field Property for public open space
purposes.  In connection with these activities, the MBTA operated
various heavy equipment at the Russell Field Property; stored,
deposited and disposed of various materials and fill on the
Russell Field Property; excavated, bulldozed, and otherwise
performed earth work activities at the Russell Field Property;
and otherwise controlled operations at the Russell Field Property
over an extensive period of time.  On information and belief the
MBTA's operations at the Russell Field Property did result or may
have resulted in the release or threat of release of oil or
hazardous material at the Russell Field Property.

## B.  RESPONSE ACTIONS AT THE SITE

    The City has retained various consultants and a Licensed
Site Professional ("LSP") to undertake surface and subsurface
investigations of the Russell Field property constituting
response actions under Chapter 21E and the Massachusetts
Contingency Plan, 310 CMR 40.000 et seq. ("the MCP").  With my
June 19, 1998 letter, the City has previously provided to the
MBTA's General Counsel the Gore-Sorber Screening Survey Final
Report of the Russell Field Property dated February 13, 1998.
Enclosed with this letter are the following:

    1.    Laboratory analytical results of recent tests for
        asbestos performed on soil samples collected at the
        Russell Field Property (Exhibit 2).  Please note that
        asbestos was detected in subsurface soil samples PS-2,
        PS-6 and PS-14 at levels ranging from 3% to 11%.

---

[1]    See Hazen Paper Co. v. U.S.F. & G Co., 407 Mass. 689, 698 (1990) ("The contamination of soil and
groundwater by the release of hazardous material involves property damage.")



ANDERSON   KREIGER
LIMITED LIABILITY PARTNERSHIP
Attorneys at Law

Patrick J. Moynahan
August 4, 1998
Page 4

2.  Laboratory analytical results of recent deep soil tests
    conducted for the City of the Russell Field Property
    including Woods Hole Group's case narrative dated July
    23, 1998, Chain of Custody records, Metals and Wet
    Chemistry data, Volatile Organics data, and
    Semivolatile Organics data (Exhibit 3).  Please note
    that various constituents have been detected in these
    deep soil data.

3.  Laboratory analytical results of recent groundwater
    tests conducted for the City beneath the Russell Field
    Property including Chain of Custody records, Metals and
    Wet Chemistry data, Volatile Organics data,
    Semivolatile Organics data, and PAH via GC/MS-SIM data
    (Exhibit 4).

4.  Raw data for certain other asbestos tests conducted on
    Russell Field on July 22, 1998 (the City is awaiting
    the final laboratory report) (Exhibit 5).

5.  Initial Vibratory Soil Sample Logs for work on June 17,
    1998 through July 7, 1998 (Exhibit 6).

6.  Alewife Neighbors, Inc.'s deep soil and groundwater
    data for recent tests conducted on the Russell Field
    Property (Exhibit 7).

On information and belief, the MBTA performed work in the
affected areas and the MBTA is or may be responsible for the
release or threat of release of asbestos and other oil or
hazardous materials at the Russell Field Property.

The City has incurred approximately $227,285 of assessment
costs, exclusive of attorneys fees, to date in response to the
release or threat of release to or at the Russell Field Property.
The City anticipates that there will be substantial additional
costs to complete the assessment, containment, and removal
actions that are or may be required under the MCP.

C.    THE BASIS FOR THE MBTA'S LIABILITY AT THE SITE

Pursuant to G.L. c. 21E, §§ 5(a)(2) and 5(a)(5), the MBTA is
liable as a former operator of the Russell Field Property and as
a person that caused or is legally responsible for the release or
threat of release of oil and/or hazardous material at the Russell
Field Property.  Pursuant to G.L. c. 21E, §§ 4 and 4A, the MBTA
is liable for all necessary and appropriate response costs
incurred by the City with respect to the MBTA's release or threat
of release.  The MBTA's liability is strict, joint and several.



ANDERSON & KREIGER
LIMITED LIABILITY PARTNERSHIP
Attorneys at Law

Patrick J. Moynahan
August 4, 1998
Page 5

In addition, the MBTA has agreed to indemnify and hold the City harmless against the costs associated with the property damage to the Russell Field Property pursuant to the terms of the Indemnity Agreement.

## D.  THE MBTA'S PROPOSED SHARE OF LIABILITY

As between the MBTA and the City, the MBTA must assume 100% of the costs of all past, present and future response actions by the City to assess, contain and remove any release or threat of release of oil or hazardous material caused by the MBTA's operations at the Russell Field Property. Not only is this result required by the express terms of the Indemnity Agreement, but also the MBTA controlled its operations resulting in any such release or threat of release. As such, the City is the innocent victim of any such release or threat of release caused by the MBTA's operations.

The City is aware that investigations are ongoing at the property of W.R. Grace & Co.-Conn. ("Grace") abutting the Russell Field Property and that those investigations have identified the release or threat of release of oil or hazardous material, including, without limitation, the release or threat of release of asbestos and other constituents, at and/or from the Grace property. For example, on or about July 3, 1998, the Department of Environmental Protection issued an asbestos contamination directive to Grace requiring additional asbestos assessment and imminent hazard evaluation activities to be performed at the Grace property. The City is investigating to determine whether a release of oil or hazardous material from the Grace property to the Russell Field Property has occurred and/or is occurring, including, without limitation, the release of asbestos and other constituents.

Pending the results of these ongoing investigations to determine the relationship between the release or threat of release of oil or hazardous material at the Grace property and the release or threat of release of oil or hazardous material to the Russell Field Property, and pending the results of additional assessments actions with respect to the Russell Field Property itself, it is premature to attempt to allocate overall shares of responsibility between the MBTA and Grace. However, with respect to both the MBTA and Grace, the City is the innocent owner of the Russell Field Property and accordingly should be allocated no share of liability with respect to the release or threat of release to or at the Russell Field Property.



ANDERSON & KREIGER
LIMITED LIABILITY PARTNERSHIP
Attorneys at Law
Printed on recycled paper

Patrick J. Moynahan
August 4, 1998
Page 6

E.   <u>THE CITY'S DEMANDS TO THE MBTA</u>

Accordingly, pursuant to appropriate public involvement processes, the City demands that the MBTA:

1.   Perform all necessary investigations of the Russell Field Property to determine the extent to which the Russell Field Property has been affected as a result of activities conducted by the MBTA in connection with its use of the Property;

2.   Enter the proposed Standstill Agreement, tolling any applicable statutes of limitations, provided to the MBTA's General Counsel William A. Mitchell, Jr. by letter dated June 19, 1998;

3.   Reimburse all of the City's assessment, containment and removal costs incurred to date, with interest through settlement, with respect to any release or threat of release caused by the MBTA's operations;

4.   Retain a qualified licensed site professional and environmental remediation contractor reasonably acceptable to the City who shall perform all additional assessment, containment and removal actions required by Chapter 21E and the Massachusetts Contingency Plan to achieve a class A1 response action outcome statement as soon as reasonably possible and within the time allowed by law with respect to any release or threat of release caused by the MBTA's operations, or, in the alternative reimburse all future assessment, containment and removal expenses incurred by the City with respect to achieving such a response action outcome;

5.   Defend, indemnify and hold harmless the City from and against any environmental claims asserted against it by any person or governmental entity with respect to any release or threat of release caused by the MBTA's operations;

6.   Reimburse the City for damage to its real property resulting from any release or threat of release caused by the MBTA's operations;

7.   Undertake all actions required by any and all DEP audits of the response actions with respect to any release or threat of release caused by the MBTA's operations;



Patrick J. Moynahan
August 4, 1998
Page 7

    8.  Restore the Russell Field Property to a condition
        satisfactory to the City upon completion of any
        required remediation work; and

    9.  Reimburse the City for its reasonable attorney's fees
        and expert's fees in connection with this matter.

    Pursuant to Chapter 21E, Section 4A(a), the MBTA has 45 days
from receipt of this notification to respond in writing.  If the
MBTA fails to respond or fails to agree to pay its equitable
share of liability for any release or threat of release caused by
the MBTA's operations, the MBTA may be liable for the City's
litigation costs and attorney's fees under Section 4A(d).

    The City requests that you notify the MBTA's liability
insurance carriers of this claim.  The City is willing to give
that notice itself if you give me the appropriate names and
addresses promptly.

F.   REQUEST FOR INFORMATION

    Pursuant to G.L. c. 21E, § 4A, and pursuant to G.L. c. 4, §
7, cl. 26, and G.L. c. 66, § 10, the City respectfully requests
that the MBTA produce for inspection and copying the following
documents and public records as soon as reasonably possible and
within the time required by law:

    1.  All documents concerning any contracts, agreements,
understandings, communications, or instructions made or exchanged
between or among the City, the MBTA, and/or the MBTA's
contractors and subcontractors (including, without limitation,
Modern Continental Construction Co., Inc. and Sverdrup/Parcel
Associates) concerning any work or activities involving the
Russell Field Property, including but not limited to the
transport, delivery, treatment, dumping, excavation, or movement
of fill or other materials to, on, from, at, or within the
Russell Field Property.

    2.  All documents concerning any transport, delivery,
treatment, dumping, excavation, or movement of fill or other fill
materials or the release of any wastes, fill, or contaminants to,
on, from, at or within the Russell Field Property or its
vicinity.

    3.  All documents concerning the identity, activities,
dates of work, or compensation of the drivers, haulers, truckers
or other persons who were involved in the transport, delivery,
dumping, excavation or movement of fill or other fill material,
or who were hired, contracted, instructed, granted permission, or
allowed to transport, deliver, treat, dump, excavate or move fill



ANDERSON & KREIGER
LIMITED LIABILITY PARTNERSHIP
Attorneys at Law

Patrick J. Moynahan
August 4, 1998
Page 8

or other materials to, on, from, at or within the Russell Field
Property.

4.    All documents concerning any payment of money or other
consideration, including property, or any proposed, anticipated,
or attempted payment of money or other consideration, to the MBTA
and/or the MBTA's contractors and subcontractors in connection
with any transport, delivery, treatment, dumping, excavation, or
movement of fill or other materials to, at, on, from, or within
the Russell Field Property, or any arranging of the same, no
matter who paid or was to pay such money or consideration.

5.    All documents concerning the source of any fill, oil or
hazardous materials that were transported, delivered, treated,
dumped, excavated or moved to, at, on, from, or within the
Russell Field Property or its vicinity.

6.    All documents concerning the precise nature and
quantities (e.g., cubic yards, tons, truck loads) of fill or
other materials that were transported to, delivered to, treated
at, or dumped at the Russell Field Property or its vicinity.

7.    All documents concerning any contracts, agreements,
understandings, communications, or instructions made or exchanged
between or among the MBTA and its contractors and subcontractors
concerning any work or activities involving the Russell Field
Property, including without limitation the transport, delivery,
treatment, dumping, excavation, or movement of fill or other
materials to, on, at, from, or within the Russell Field Property.

8.    All documents concerning any meetings, conferences,
discussions or other communications between or among the City,
the MBTA, and/or the MBTA's contractors or subcontractors
relating to the discovery or release of any oil or hazardous
materials at or from the Russell Field Property.

9.    All documents concerning any meetings, conferences,
discussions or other communications between or among the City,
the MBTA, and/or the MBTA's contractors or subcontractors
concerning any work or activities involving the Russell Field
Property, including without limitation the transport, delivery,
treatment, dumping, excavation, or movement of fill or other fill
materials to, on, at, from, or within the Russell Field Property.

10.   All documents concerning any stop work order or other
violation notice issued to the MBTA or its contractors or
subcontractors or any other person or entity relating to work at
or in the vicinity of the Russell Field Property.



ANDERSON & KRIEGER
LIMITED LIABILITY PARTNERSHIP
Attorneys at Law
Printed on recycled paper

Patrick J. Moynahan
August 4, 1998
Page 9

11.  All documents concerning any actual, proposed, or attempted inspection, testing, assessment, evaluation, treatment, or remediation of any fill or other materials which were present at the Russell Field Property or were transported to, delivered to, treated at, or dumped at the Russell Field Property, or were excavated from or moved around the Russell Field Property, whether or not MBTA participated in or arranged for any such transportation, delivery, treatment, dumping, excavation, or movement.

12.  All documents concerning any evaluation, analysis, testing, consideration or review by or for the MBTA concerning (a) any fill or other fill material dumped, deposited, treated, land-filled and/or released at the Russell Field Property or its vicinity, (b) the chemical constituents thereof, or (c) whether it is, has been or would be injurious or dangerous to the public health, safety, welfare or the environment.

13.  All documents concerning the discovery of oil or hazardous materials at the Russell Field Property or its vicinity.

14.  All documents concerning the release of oil or hazardous materials at or from the Russell Field Property or its vicinity.

15.  All documents concerning UMTA Grant Nos. MA-29-9001 and/or MA-23-9008 referenced on page 1 of the Indemnity Agreement including all documents concerning fill or other material transported to the Russell Field Property or its vicinity, including, without limitation, all tests and analyses performed thereon.

16.  All documents concerning any measures taken or structures or devices installed, or attempted to be taken or installed, to prevent unauthorized delivery or dumping of MBTA fill or other fill materials to, at, on, or within the Russell Field Property or its vicinity.

17.  All photographs and documents concerning photographs of the transport, delivery, treatment, dumping, excavation, or movement of fill, other material, wastes, or contaminants to, at, from, on, or within the Russell Field Property or its vicinity.

18.  All documents concerning any contamination or alleged contamination (including but not limited to oil and hazardous materials) at, on, or within the Russell Field Property or its vicinity.



ANDERSON & KRIEGER
LIMITED LIABILITY PARTNERSHIP
Attorneys at Law
Printed on recycled paper

Patrick J. Moynahan
August 4, 1998
Page 10

19.  All documents concerning project diaries, field logs, meeting memoranda and other documents recording observations of the MBTA's Work relating to the Russell Field Property.

20.  All documents constituting plans, elevations, topographic information or as built plans concerning the Russell Field Property.

21.  All documents concerning any use by the MBTA or any of its contractors or subcontractors of materials or equipment containing asbestos at the Russell Field Property.

22.  All documents concerning any notification, demand or report to any insurance company concerning the release of oil or hazardous material at the Russell Field Property.

23.  All documents concerning any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment against the MBTA concerning any matters set forth in this Demand.

24.  All documents concerning any notification, demand or report to any insurance company concerning any claim that is the subject of this Demand.

25.  All documents and communications concerning the destruction or shredding of any documents within any category requested in this pleading, including but not limited to any copies of documents that have been shredded or destroyed.

Sincerely,

Stephen D. Anderson

Enclosure(s)
SDA:kmf
cc:  Robert W. Healy, City Manager (by fax 349-4307 w/o encl.)
     William A. Mitchell, Jr., Esq. (by fax 617-222-3194 w/o encl.)
     Donald A. Drisdell, Esq., Deputy City Solicitor
         and Nancy E. Glowa, Esq. (by fax 617-349-4134 w/o encl.)
     Susanne Rasmussen and John Bolduc,
         Community Development Department (by fax 349-4633 w/o encl.)

camb\env\l\mbta.003



ANDERSON & KRIEGER
LIMITED LIABILITY PARTNERSHIP
*Attorneys at Law*
Printed on recycled paper

# ANDERSON & KREIGER LLP

*Attorneys at Law*

STEPHEN D. ANDERSON
Also admitted in CT

ARTHUR P. KREIGER
Also admitted in NY

GEORGE A. HALL, JR.
Also admitted in NH

The Bulfinch Building
47 Thorndike Street
Cambridge, MA  02141
(617) 252-6575
Fax: (617) 252-6899

ACHESON H. CALLAGHAN
Of Counsel
DOUGLAS H. WILKINS
Of Counsel

PETER J. CURA
JEFFREY L. ROELOFS
DAWN M. STOLFI

June 8, 2001

**CERTIFIED MAIL # 7099 3400 0018 4002 5502 RRR**
James H. M. Sprayregen, Esq.
James W. Kapp III, Esq.
Samuel A. Schwartz, Esq.
Roger J. Higgins, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601

**CERTIFIED MAIL # 7099 3400 0018 4002 5482 RRR**
J.F. White Contracting Company,
Morrison Knudsen Corporation, and
Mergentime Corporation
c/o Barry P. Fogel, Esq.
Keegan, Werlin & Pabian LLP
21 Custom House
Boston, MA 02110

**CERTIFIED MAIL # 7099 3400 0018 4002 5208 RRR**
Modern Continental Construction Co., Inc.
c/o Anton T. Moehrke, Esq.
Moehrke, Mackie & Shea, P.C.
283 Dartmouth Street
Boston, MA 02116

**CERTIFIED MAIL # 7099 3400 0018 4002 5284 RRR**
Massachusetts Bay Transportation Authority
c/o Michael Crossen, Esq.
Rubin & Rudman LLP
50 Rowes Wharf
Boston, MA 02110

**CERTIFIED MAIL # 7099 3400 0018 4002 5499 RRR**
Laura Davis Jones, Esq.
Hamid R. Rafatjoo, Esq.
David W. Carickhoff, Jr., Esq.
Pachulski, Stang, Ziehl, Young & Jones P.C.
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

**CERTIFIED MAIL #7099 3400 0018 4002 5475 RRR**
Perini Corporation
c/o Jeffrey L. Salinger, Esq.
Mintz, Levin, Cohen, Ferris, Glovsky and Popeo, P.C.
1 Financial Center
Boston, MA 02111

**CERTIFIED MAIL # 7099 3400 0018 4002 5277 RRR**
Sverdrup & Parcel and Associates, Inc.
c/o Stanley Martin, Esq.
Gadsby & Hanna LLP
225 Franklin Street
Boston, MA 02110

RE:   Claimant:           City of Cambridge
      Subject Property:    Russell Field
      Notification:        Initial Contamination Release Notification to W.R. Grace and Affiliates and Supplemental Demand To Other Potentially Responsible Parties Listed Above Under Massachusetts General Laws Chapter 21E, Section 4A

♻ Printed on recycled paper

PRP Counsel
June 8, 2001
Page 2

Dear Counsel:

This firm represents the City of Cambridge (the "City") with respect to contamination of real property owned by the City in North Cambridge which is used for public recreation purposes and is known as Russell Field (the "Russell Field Property").[1]  This letter constitutes a formal release notification pursuant to M.G.L. c. 21E, § 4A, to bankruptcy counsel for W.R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W.R. Grace & Co.-Conn., and any of their predecessors, successors and affiliated entities having any current or former ownership, operation or other connection to the property abutting the Russell Field Property, including without limitation 36-64 Whittemore Avenue, Cambridge, Massachusetts, and/or the operations conducted thereon (collectively, "W.R. Grace" or "Grace").  This letter also serves as a follow-up to release notification and demand letters previously served, pursuant to Massachusetts General Laws ("M.G.L.") c. 21E, § 4A, on each of the other above-referenced potentially responsible parties ("PRPs").[2]

## W.R. GRACE BANKRUPTCY PROCEEDINGS

The City recognizes that W.R. Grace (including some sixty affiliated entities) has filed for bankruptcy relief under Chapter 11 of the federal Bankruptcy Code (United States Bankruptcy Court for the District of Delaware, Case Nos. 01-1139 through 01-1200).  In satisfaction of the pre-litigation notification requirements of M.G.L. 21E, § 4A, the City is sending this letter to W.R. Grace's bankruptcy counsel for notification purposes only to advise bankruptcy counsel that the City may file a proof of claim, petition for relief from stay and/or other appropriate pleadings in the Bankruptcy Court concerning this matter and the basis therefor.

The City also wants to advise bankruptcy counsel that, prior to commencing bankruptcy proceedings, W.R. Grace entered into a Standstill Agreement with the City on June 5, 1998, a copy of which is attached hereto as Exhibit C.  The City has kept W.R. Grace, through its local

---

[1]    The Russell Field Property is a City-owned recreational facility located on and in the vicinity of Rindge Avenue, Alewife Brook Parkway, Harvey Street and Clifton Street.  The Russell Field Property consists of two baseball fields, a football field, a soccer field, public access walkways, landscaped areas and a parking lot (off Rindge Avenue).  It is bordered to the north and west by property owned by W.R. Grace, to the south by Rindge Avenue and a Metropolitan District Commission (MDC) swimming pool, and to the east by Clifton Street residences.

[2]    On August 4, 1998, the City served a release notification and demand letter, pursuant to MGL c. 21E, § 4A, on the MBTA.  On October 27, 1998, the City served a release notification and demand letter, pursuant to MGL c. 21E, § 4A, on (1) Perini Corporation, (2) Sverdrup & Parcel and Associates, Inc., (3) Modern Continental Construction Co., Inc., (4) J.F. White Contracting Company, (5) Morrison Knudsen Corporation, and (6) Mergentime Corporation.  All of these parties, as well as W.R. Grace, have since entered into Standstill Agreements with the City with respect to contamination at the Russell Field Property.



ANDERSON & KREIGER LLP
*Attorneys at Law*
♻ Printed on recycled paper

PRP Counsel
June 8, 2001
Page 3

environmental counsel,[3] informed of the City's investigation of contamination at the Russell Field Property. Accordingly, the City is sending a courtesy copy of this letter to Attorney Cooke, in the event she is still involved in handling this matter for W.R. Grace in any way.

While the City understands that it may need to pursue claims against W.R. Grace through the appropriate bankruptcy procedures, the City is also mindful of the statutory prerequisite to the City's filing in court its claims against W.R. Grace pursuant to M.G.L. c. 21E, § 4A. Therefore, the City respectfully invites W.R. Grace's bankruptcy counsel (and/or, with bankruptcy counsel's permission, its local environmental counsel if she is still involved in this matter) to attend or participate by speaker phone in the proposed conference related to these matters, as described below. If bankruptcy counsel is or is not willing to do so for whatever reason, the City respectfully requests that bankruptcy counsel simply inform the undersigned.

Finally, because the activities of other PRPs in this matter involved the excavation, transportation, storage, disposal and/or release of materials at the Russell Field Property which had allegedly been contaminated by the release of oil and hazardous materials at or from the W.R. Grace property in North Cambridge, MA, and because the other PRPs are strictly, jointly and severally liable under Massachusetts law for such matters, the City's description of its claims against such other PRPs necessarily includes reference to the activities of W.R. Grace. The City intends to pursue its separate and independent claims against the other PRPs in accordance with applicable Massachusetts law.

## PROPOSED CONFERENCE AMONG THE CITY AND THE PRPs

Subject to the foregoing, the City invites representatives of each of the PRPs identified above to attend a meeting on July 27, 2001 at Anderson & Kreiger, LLP, 47 Thorndike Street, Cambridge, Massachusetts, to discuss the status of the City's investigations of the Russell Field Property, the basis for the City's claims against each of the parties, and potential settlement of those claims. The City respectfully requests that you respond to the undersigned by June 29, 2001 as to whether or not you or other representatives of your client(s) will attend. If you or other representatives of your client(s) cannot attend on July 27 but would like to participate in a meeting with the City, please advise as to any dates prior to July 27 that you are available. We will attempt to arrange an alternative meeting(s) with the parties individually or in subgroups if necessary.

## OVERVIEW OF EACH PARTY'S RELATIONSHIP TO RUSSELL FIELD

Since at least the early 1900's, W.R. Grace and it predecessors or affiliates have owned and operated property directly abutting the Russell Field Property. On information and belief, the activities of W.R. Grace and its predecessors or affiliates resulted in the generation,

---

[3]  Susan M. Cooke, P.C., McDermott, Will & Emery, 75 State Street, Boston, MA 02109-5077.



ANDERSON & KREIGER LLP
*Attorneys at Law*
♻ Printed on recycled paper

PRP Counsel
June 8, 2001
Page 4

transport, storage, disposal and release of oil and hazardous materials into the environment, including but not limited to releases of polycyclic aromatic hydrocarbons ("PAHs"), napthalenes, asbestos, metals and other hazardous constituents, which have affected the soils and/or groundwater on and near the W.R. Grace property including, without limitation, the Russell Field Property.

In connection with the construction of the Massachusetts Bay Transportation Authority's ("MBTA") Red Line Extension in the early 1980's, the MBTA and its contractors used and controlled the use of the Russell Field Property for purposes of "construction staging i.e., construction equipment, mills, lay down, storage, backfill, and construction personnel. . . ." (Indemnity Agreement between MBTA and City, Section I.1, DPW00447-455).[4]  At the conclusion of the construction staging activities, the MBTA and its contractors reconstructed the Russell Field Property for public open space purposes. In connection with these activities, the MBTA and its contractors operated various heavy equipment at the Russell Field Property, stored, deposited and disposed of various materials and fill on the Russell Field Property, excavated, bulldozed, and otherwise performed earth work activities at the Russell Field Property, and/or otherwise controlled those and other operations at the Russell Field Property over a period of several years.

On information and belief, Sverdrup & Parcel and Associates, Inc. ("Sverdrup") was the design engineering and architecture firm contracted by the MBTA for the construction of the Red Line Extension pursuant to MBTA Contract Nos. 091-508A and 091-509. On information and belief, Perini Corporation ("Perini") was the general contractor for the construction of the Red Line Extension including the tunnel constructed from Harvey Street to the Alewife Station, pursuant to U.M.T.A. Project Number MA-23-9008, MBTA Contract Nos. 091-508, 091-508A, and 091-601. On information and belief, the Joint Venture of J.F. White Contracting Co., Morrison Knudsen Corporation, and Mergentime Corporation ("White/Morrison/Mergentime") performed work on the Red Line Extension tunnel from Davis Square to Harvey Street pursuant to MBTA Contract No. 91-509. On information and belief, Sverdrup, Perini, and White/Morrison/Mergentime used the Russell Field Property as a staging area for materials excavated as a result of the construction of the Red Line Extension, including without limitation materials contaminated by the release of oil and hazardous materials released at or from the W.R. Grace property.

On information and belief, Modern Continental Construction Co., Inc. ("Modern Continental") was the general contractor for the MBTA on the restoration of the Russell Field Property pursuant to MBTA Contract No. E1CN36. On information and belief, Sverdrup was also the design engineering and architecture firm contracted by the MBTA for the restoration of

---

[4]      The City has made available to the parties a large volume of documents pertaining to this matter. References to those documents by Bates Number are set forth in the text. The City will make copies of any of these documents available at cost to any party that so requests.



ANDERSON & KREIGER LLP
*Attorneys at Law*
Printed on recycled paper

PRP Counsel
June 8, 2001
Page 5

the Russell Field Property pursuant to MBTA Contract Nos. E1CN36 and 091-512.  On information and belief, Modern Continental and Sverdrup reconstructed the Russell Field Property on behalf of the MBTA.

On information and belief, the operations of W.R. Grace, the MBTA, Perini, Modern Continental, Sverdrup, and White/Morrison/Mergentime at and in the vicinity of the Russell Field Property resulted in the release of oil and hazardous materials at the Russell Field Property. The City has incurred and expects to incur in the future significant costs associated with the assessment, containment and removal of the release of such oil and hazardous materials at the Russell Field Property. A more detailed description of W.R. Grace's operations and the activities of the MBTA and its contractors resulting in the the release of such oil and hazardous materials at the Russell Field Property is attached hereto as Exhibit A.

## RESPONSE ACTIONS AT THE SITE

The City has retained various consultants and a Licensed Site Professional ("LSP") to undertake surface and subsurface investigations of the Russell Field Property constituting response actions under M.G.L. c. 21E and the Massachusetts Contingency Plan, 310 CMR 40.000 et seq. ("the MCP").  The investigations conducted to date are described in various reports and documents previously made available to the parties including, without limitation, the following documents (additional copies of which are available at cost on request):

1. Phase I Assessment Report and Tier Classification for the City by Environmental Health & Engineering, Inc. dated July 23, 1999, summarizing previous investigations at the site through Spring 1999;

2. Environmental Site Assessment Subsurface Conditions at the Russell Field Property, Final Report, prepared for the City by Environmental Health & Engineering dated October 22, 1998, indicating that various hazardous constituents in excess of DEP's reportable concentrations have been detected in the soils from beneath the Russell Field Property in areas where each of the parties performed and/or controlled the foregoing operations;

3. Laboratory analytical results of tests for asbestos performed on soil samples collected at the Russell Field Property, indicating that asbestos was detected in subsurface soil samples PS-2, PS-6 and PS-14 at levels ranging from 3% to 11%; and

4. Environmental Health & Engineering's Final Report of Subsurface Asbestos Investigation at the Russell Field Property dated October 7, 1998, also finding asbestos in PS-4, PS-12, PS-14 and the garden area.



ANDERSON & KREIGER LLP
*Attorneys at Law*
♻ Printed on recycled paper

PRP Counsel
June 8, 2001
Page 6

Additional investigations are ongoing.

Recently, the City's consultants have prepared a series of draft maps of the Russell Field Property dated May 24, 2001 showing conditions at the field and the distribution of contaminants at the field. These are as follows (copies included as Exhibit F hereto):

1.    "Contour Plot - Topsoil Fill Boundary," depicting the depth to the bottom of the topsoil and top of the fill layer boundary across the Russell Field Property;

2.    "Surface Plan - RCRA Metals By Zone," depicting the concentrations of total metals detected in surficial soil composites (0-6") within various zones at the Russell Field Property;

3.    "Surface Plan - Total PAHs By Zone," depicting the concentrations of total PAHs detected in surficial soil composites (0-6") within various zones at the Russell Field Property;

4.    "Contour Plot - Polynuclear Aromatic Hydrocarbons in soil < 3 feet," depicting concentrations of PAHs detected in soils less than 3 feet below ground surface across the Russell Field Property;

5.    "Contour Plot - Polynuclear Aromatic Hydrocarbons in soil > 3 feet," depicting concentrations of PAHs detected in soils greater than 3 feet below ground surface across the Russell Field Property;

6.    "Contour Plot - Naphthalene in soil < 3 feet," depicting concentrations of naphthalene detected in soils less than 3 feet below ground surface across the Russell Field Property;

7.    "Contour Plot - Naphthalene in soil > 3 feet," depicting concentrations of naphthalene detected in soils greater than 3 feet below ground surface across the Russell Field Property;

8.    "Potential Shallow Soil Remediation Areas (top 3 feet of soil)," depicting those soils in the top 3 feet across the Russell Field Property currently expected to require remediation due to the presence of asbestos, PAHs, and/or Metals; and

9.    "Potential Deep Soil Remediation Areas (~ top 6 feet of soil - to water table)," depicting those soils at depths greater than 3 feet below ground surface across the Russell Field Property currently expected to require remediation due to the presence of asbestos, PAHs, and/or Metals.

ANDERSON & KREIGER LLP
*Attorneys at Law*
♻ Printed on recycled paper

PRP Counsel
June 8, 2001
Page 7

These plans show a series of "hot spots" of contamination at the Russell Field Property which show the following characteristics:

1.      They are below the topsoil layer and therefore not the result of a release which has occurred after the MBTA and its contractors concluded their activities at the Russell Field Property.

2.      They are associated with the fill layer at depths corresponding to the specific operations undertaken by the MBTA and its contractors at the Russell Field Property.

3.      They exist in areas (a) proximate to W.R. Grace's property and its historical waste disposal lagoons and activities and (b) in specific areas where the MBTA and its contractors transported, handled, stockpiled, stored, moved and/or disposed of materials excavated as a result of the construction of the Red Line Extension (including without limitation materials contaminated by the release of oil and hazardous materials released at or from the W.R. Grace property) and materials brought to and moved around the Russell Field Property in connection with its restoration by the MBTA and its contractors.

4.      They are contaminated with chemicals of concern (including PAHs, napthalenes, asbestos, metals and other hazardous constituents) which were generated, transported, disposed of and released by W.R. Grace at or from its property and which were transported, handled, stockpiled, stored, moved and/or disposed of by the MBTA and its contractors during the construction of the Red Line Extension and the restoration of the Russell Field Property.

To date, the City has incurred approximately $600,000 in investigation and related response costs in connection with contamination at the Russell Field Property. Based on current conditions, the City's consultants preliminarily estimate that future response costs necessary to address contamination at the Russell Field Property will fall in one of the following two sets of ranges (based on certain assumptions and based on the current regulatory uncertainty concerning asbestos performance standards):[5]

1.      The first range assumes that the City can arrive at a Response Action Outcome for the Russell Field Property by excavating contaminated soil to a depth of 3 feet,

---

[5]     These estimates include, without limitation, the cost of complying with the City's asbestos ordinance which will require tenting and venting in connection with the removal and management of asbestos-contaminated soils. See Exhibit D hereto. The MCP requires that the City conduct its response actions in compliance with local law (see, 310 CMR Sections 40.0006 (definition of "Response Action Cost"), 40.0018(3), 40.0031 and 40.0170), and, accordingly, these costs are recoverable under the MCP and Chapter 21E.



ANDERSON & KREIGER LLP
Attorneys at Law
♻ Printed on recycled paper

PRP Counsel
June 8, 2001
Page 8

disposing of it off-site, and placing an Activity and Use Limitation ("AUL") on the property that will remove the need for remediating soils deeper than 3 feet. For this option, the consultants used two alternate sets of assumptions to provide a reasonable range of costs based on what is currently known about the Russell Field Property.[6] The first assumes that 8 locations (approximately 1000 tons each) will require soil removal. The second assumes that either the tonnage can be reduced or that some locations will be eliminated. In each case, costs depend heavily on the quantity and disposal characteristics of the soil removed ($70 to $300/ton for disposal). The preliminary estimates are:

> 8 Locations @ 1000 tons per location:
> Without tent and vent: $653,000 - $2,493,000
> With tent and vent: $878,000 - $2,718,000

> 4 Locations @ 1000 tons or 8 locations @ 500 tons per location:
> Without tent and vent: $326,500 - $1,246,500
> With tent and vent: $551,500 - $1,471,500

2.  The second range assumes that the City can arrive at a Response Action Outcome for the Russell Field Property by excavating contaminated soil and disposing of it off-site without an AUL such that deeper soils need to be remediated. For deeper soil remediation (to a depth of 6 feet or water table) without an AUL, the consultants included all shallow locations and additional deep locations and used two similar sets of assumptions to provide a reasonable range of costs based on what is currently known about the Russell Field Property. The first assumes that 15 locations (approximately 3000 tons each) will require soil removal. The second assumes that either the tonnage can be reduced or that some locations will be eliminated. Again, costs depend heavily on the quantity and disposal characteristics of the soil removed ($70 to $300/ton for disposal).

> 15 Locations @ 3000 tons per location:
> Without tent and vent: $3,379,000 - $13,729,000
> With tent and vent: $3,879,000 - $14,229,000

> 8 Locations @ 3000 tons or 15 locations @ 1500 tons per location:
> Without tent and vent: $1,791,000 - $7,276,000
> With tent and vent: $2,056,000 - $7,541,000

The City is planning to conduct additional sampling in the near future. The sampling

---

[6]    Due to existing drainage problems and floodplain issues, capping is not likely to be a viable option at the Russell Field Property.



ANDERSON & KREIGER LLP
*Attorneys at Law*
♻ Printed on recycled paper

PRP Counsel
June 8, 2001
Page 9

may identify additional areas requiring remediation, which would increase the anticipated costs of remediation.

## THE CITY'S DEMANDS

Pursuant to Chapter 21E, the MCP, and appropriate public involvement processes, the City renews its demands that the PRPs as appropriate:[7]

1. Reimburse all of the City's assessment, containment and removal costs incurred to date, with interest through settlement, with respect to any release or threat of release caused by operations of W.R. Grace, MBTA, Perini, Modern Continental, Sverdrup and White/Morrison/Mergentime;

2. Perform any and all necessary additional investigations of the Russell Field Property to determine the extent to which the Russell Field Property has been affected as a result of activities conducted by W.R. Grace, MBTA, Perini, Modern Continental, Sverdrup and White/Morrison/Mergentime;

3. Reimburse the City for all future assessment, containment and removal expenses required by Chapter 21E, the MCP and other applicable laws to achieve a class A1 response action outcome with respect to any release or threat of release caused by the operations of W.R. Grace, MBTA, Perini, Modern Continental, Sverdrup and White/Morrison/Mergentime;

4. Defend, indemnify and hold harmless the City from and against any environmental claims asserted against it by any person or governmental entity with respect to any release or threat of release caused by the operations of W.R. Grace, MBTA, Perini, Modern Continental, Sverdrup and White/Morrison/Mergentime;

5. Reimburse the City for damage to its real property resulting from any release or threat of release caused by the operations of W.R. Grace, MBTA, Perini, Modern Continental, Sverdrup and White/Morrison/Mergentime;

6. Undertake and/or reimburse the City for all actions required by any and all DEP audits of the response actions with respect to any release or threat of release caused by the operations of W.R. Grace, MBTA, Perini, Modern Continental, Sverdrup and White/Morrison/Mergentime;

---

[7]   With respect to W.R. Grace, the City is hereby notifying W.R. Grace's bankruptcy counsel of its intent to pursue its claims against W.R. Grace for the legal, equitable and declaratory relief set forth below, as appropriate. The City may file a proof of claim, petition for relief from stay and/or other appropriate pleadings in the Bankruptcy Court concerning this matter as appropriate in connection with its claims against W.R. Grace.



ANDERSON & KREIGER LLP
Attorneys at Law
Printed on recycled paper

PRP Counsel
June 8, 2001
Page 10

7.     Restore the Russell Field Property to a condition satisfactory to the City upon completion of any required remediation work; and

8.     Reimburse the City for its reasonable attorney's fees and expert's fees in connection with this matter.

In the event this matter proceeds to litigation, the City will seek the foregoing legal, equitable and declaratory relief, and any additional relief to which it is entitled in law or in equity, jointly and severally.

The City requests that you notify your clients' respective liability insurance carriers of this demand. The City is willing to give that notice itself if you give me the appropriate names and addresses promptly.

## SETTLEMENT OFFER

Pursuant to Chapter 21E, Section 4A, the City makes the following settlement offer with respect to the foregoing claims:

1.     The City will abide by an "80/20" equitable allocation of the City's assessment, containment and removal costs incurred to date, with interest through settlement. The City's share of those costs will be 20%. The PRP's (W.R. Grace, MBTA, Perini, Modern Continental, Sverdrup and White/Morrison/Mergentime) share of the costs will be 80%. The City is amenable to an appropriate sub-allocation of the PRPs' 80% share in an equitable manner, as long as the City is not left to pursue a disproportionate share against W.R. Grace in the Bankruptcy proceedings or otherwise as appropriate. Given joint and several liability under Chapter 21E, the City suggests a per capita equitable allocation among the six PRPs (W.R. Grace, MBTA, Perini, Modern Continental, Sverdrup and White/Morrison/Mergentime) unless the parties otherwise agree.

2.     The City is willing to retain a qualified licensed site professional and environmental remediation contractor to perform all additional assessment, containment and removal actions required by Chapter 21E, the MCP and other applicable law to achieve a response action outcome reflecting a permanent solution for the Russell Field Property within the time allowed by law; provided that the same "80/20" allocation shall apply as in item 1. The City is willing, if reasonably possible, to achieve such a response action outcome supported by an Activity and Use Limitation acceptable to the City, provided that the AUL shall not limit or restrict any use of the Russell Field Property for public recreation purposes, including the uses to which it is currently being put and any reasonably foreseeable uses to which it may be put, and specifically including recreation by



ANDERSON & KREIGER LLP
*Attorneys at Law*
♻ Printed on recycled paper

PRP Counsel
June 8, 2001
Page 11

children.

3.  The City is willing to incorporate in the Settlement Agreement an exception to
any mutual releases and a continuing Standstill Agreement preserving the City's
rights against the PRPs and the PRPs' rights against each other and against the
City for defense, indemnity, contribution and other cross-claims and third party
claims in the event any environmental claims are asserted against the City and/or
the PRPs by any third party or governmental entity with respect to any release or
threat of release of oil or hazardous materials at or from the Russell Field
Property.

4.  The City is willing to forego reimbursement for damage to its real property
resulting from any release or threat of release caused by the operations of W.R.
Grace, MBTA, Perini, Modern Continental, Sverdrup and
White/Morrison/Mergentime and by the imposition of the AUL; provided,
however, that the PRPs shall agree to (a) undertake or fund all actions required by
any and all DEP audits of the response actions at the site, (b) restore or fund the
restoration of the Russell Field Property to a condition satisfactory to the City
upon completion of any required remediation work, and (c) in the event of any
future activities at the Russell Field Property triggering actvities under the AUL
(e.g. excavations for a new field house), reimburse the City for any added costs
associated with those activities occasioned by the effect of the AUL and the
presence of the contaminated soil at the site.

## SECTION 4A CONFERENCE

As set forth at the outset of this letter, the City invites each of you or other
representatives of the parties identified above to attend a meeting on July 27, 2001 at 10 a.m. at
Anderson & Kreiger, LLP, 47 Thorndike Street, Cambridge, Massachusetts to discuss the status
of the City's investigations of the Russell Field Property, the basis for the City's claims against
each of the PRPs, and potential settlement of those claims. The City respectfully requests that
you respond to the undersigned by June 29, 2001, as to whether or not you or other
representatives of your client(s) will attend. If you or other representatives of your client(s)
cannot attend on July 27 but would like to participate in a meeting with the City, please advise as

PRP Counsel
June 8, 2001
Page 12

to any dates prior to July 27 that you are available.  We will attempt to arrange an alternative meeting(s) with the parties individually or in subgroups if necessary.

Sincerely,

Stephen D. Anderson
sanderson@andersonkreiger.com

Enclosures
cc:    Robert W. Healy, City Manager
        Nancy E. Glowa, Esq.
        Susanne Rasmussen
        John Bolduc
        Roger J. Ludlam, President (Perini)
        Richard Eugene Beumer, President (Sverdrup)
        Lelio Marino, President (Modern Continental)
        Peter T. White, President (J.F. White Contracting Company)
        Robert Allen Tinstman, President (Morrison Knudsen Corporation)
        C.E. Mergentime, President (Mergentime Corporation)
        Kevin J. Sullivan, Chairman (MBTA)
        Susan Cooke, Esq.

# EXHIBITS

Exhibit A:    Summary of Factual Basis for Liability of W.R. Grace, the MBTA and Their Contractors for Contamination at the Russell Field Property

Exhibit B:    Copies of MBTA Photographs (CDD08043-CDD08066)

Exhibit C:    Standstill Agreement between W.R. Grace & Co. and the City of Cambridge

Exhibit D:    City of Cambridge Asbestos Ordinance

Exhibit E:    Draft Figure, dated May 1997, entitled "W.R. Grace Site Historic Site Uses" (CDD08067)

Exhibit F:    Draft Figures, dated May 24, 2001, prepared by Environmental Health & Engineering, Inc.

camb\env\l\PRP Demand Letter.003.wpd

ANDERSON & KREIGER LLP
Attorneys at Law
Printed on recycled paper