## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **W.R. Grace & Co., et al.,** | ) | **Case No. 01-1139 (JFK)** |
| | ) | **(Jointly Administered)** |
| **Debtors.** | ) | |
| | ) | Objection Deadline: September 9, 2004 at 4:00 p.m. (by agreement) |
| | ) | Hearing Date: September 27, 2004 at 12:00 p.m. |

## RESPONSE OF THE CITY OF CAMBRIDGE, MASSACHUSETTS, TO THE DEBTORS' FIFTH OMNIBUS OBJECTION TO CLAIMS (SUBSTANTIVE) [REFER TO DOCKET NO. 5527]

The City of Cambridge, Massachusetts, by and through its attorneys, hereby responds to the

Debtors' Fifth Omnibus Objection to Claims (Substantive) (the "Objection"), as follows:

## FAILURE OF DEBTORS TO OVERCOME *PRIMA FACIE* VALIDITY OF CITY'S CLAIMS

**City's Claims:**

1.      The City of Cambridge, Massachusetts (the "City") has timely filed Proofs of Claim in this action related to contamination of real property owned by the City in Cambridge, Massachusetts. Those Proofs of Claim are Numbered 4720 and 4722 (the "Claims").[1] The subject City-owned property is approximately 10 acres, is currently used as a public recreation facility, and is known as Russell Field (the "Russell Field Property").

2.      W.R. Grace & Co. – Conn. and/or its predecessors (including Dewey & Almy Chemical Company), successors and affiliated entities (including W.R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.)), the Debtors herein (collectively, "Grace"), have owned and operated property abutting the Russell Field Property for industrial and/or commercial purposes since at least the early 1900's.

---

[1]      The City has also filed another proof of claim unrelated to the contamination at the Russell Field Property,

3.     The information currently available to the City of Cambridge related to Grace's operations on its property – which consists primarily of publicly available documents, the City not yet having conducted any formal discovery – demonstrates that Grace handled numerous hazardous materials in connection with its historical operations, which have been identified at elevated levels in soils and/or groundwater at Grace's property and the abutting Russell Field Property.

4.     The City has incurred in excess of $1,200,000 to date, and will incur significantly more costs, in response to contamination at the Russell Field Property.  It has also incurred and continues to incur property damages and other economic losses.

5.     The nature and basis for the City's claims against Grace were described in the City's Proofs of Claims and substantiated through evidentiary materials submitted with the Proofs of Claims and otherwise referenced therein.

**Debtors' Objection to City's Claims**

6.     The Debtors have included the City's Claims on Exhibit C to the Objection as "No Liability Claims."  The Debtors object to those Claims and seek their disallowance based on the following unsubstantiated declaration:

> Material placed on Russell Field by MBTA Contractor not Grace and groundwater flow is from Russell Field to Grace Property.

7.     The Debtors do not provide or reference any evidence to substantiate their declaration.

**Debtors' Objection Is Insufficient To Overcome the *Prima Facie* Validity of the City's Claims**

8.     The Debtors' Objection should be overruled insofar as it relates to the City's Claims because Debtors have failed to produce any evidence to overcome the *prima facie* validity of the Claims.

---

which has been designated as Claim No. 7550.  That claim is not subject to the Objection.

9.      Pursuant to § 502(a) of Title 11 of the United States Code, 11 U.S.C.§§ 101, *et seq.*, a proof of claim is deemed to be allowed unless a party in interest objects. 11 U.S.C.§ 502(a). A proof of claim operates as *prima facie* evidence of the validity and amount of such claim. *See* Bankruptcy Rule 3001(f); H.R. Rep. No. 95-595, 95th Cong., 1st Sess., at 352 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess., at 62 (1978).

10.     The burden of proof for claims against a debtor rests on different parties at different stages of the proceedings. The claimant must initially allege facts sufficient to support its claim, as the City has done in its Proofs of Claim and the substantiating information submitted therewith. Once this is done, the claim is *prima facie* valid. The burden of proof then shifts to the objecting party to produce sufficient evidence to negate the *prima facie* validity of the proof of claim by refuting at least one of the essential allegations of such claim. Only after the objecting party produces evidence equal in force to the *prima facie* claim does the burden revert to the claimant to prove the validity of its claim by a preponderance of the evidence. *See In re Allegheny Int'l. Inc.,* 954 F.2d 167, 173-74 (3d Cir. 1992); *In re Hemingway Transp., Inc.,* 993 F.2d 915, 925 (1st Cir. 1993) ("The interposition of an objection does not deprive the proof of claim of presumptive validity unless the objection is supported by 'substantial evidence' (citation omitted)); *see also Fullmer v. U.S.,* 962 F.2d 1463, 1466 (10th Cir. 1992) ("A properly filed proof of claim is *prima facie* evidence of the validity and amount of the claim. This evidentiary presumption remains in force even though an objection to the claim is filed by a party in interest. To overcome this *prima facie* effect, the objecting party must bring forward evidence equal in probative force to that underlying the proof of claim.") (citations omitted).

11.     Debtors have failed to present any evidence in support of their Objection, let alone evidence sufficient to overcome the *prima facie* validity of the City's Claims.

3

12.    Accordingly, on that basis alone, the Debtors' Objection should be overruled.

13.    Moreover, even without the benefit of such *prima facie* validity, the City has submitted with its Proofs of Claim information and documents that affirmatively establish the validity of its Claims. It also identified in its Proofs of Claim additional documents substantiating its Claims and has made those available to the Debtors for inspection. Finally, submitted herewith are more documents, many prepared by Grace and/or its consultants, providing further support for the validity of the City's Claims.

## STATEMENT OF FACTS

### Introduction

14.    Documents currently available to the City, compiled without the benefit of any formal discovery, demonstrate that hazardous materials have been released at and from Grace's property to the Russell Field Property. In its Objection, Grace appears to be arguing that it is not liable because (1) the MBTA and its contractors, not Grace, placed hazardous materials on the Russell Field Property, and (2) groundwater flow is from the Russell Field Property to the Grace property.

15.    With respect to Grace's assertion regarding the MBTA and its contractors, the City agrees that the MBTA and its contractors placed and handled hazardous materials on the Russell Field Property. However, as discussed below, that such entities also contributed to the contamination of the Russell Field Property does not absolve Grace of its own joint and several liability.

16.    With respect to Grace's assertion that groundwater flow is from Russell Field to the Grace property, Grace's own consultants have compiled data refuting this assertion (discussed below). Moreover, Grace's liability for contamination on the Russell Field Property does not relate merely to those hazardous materials that migrated there via groundwater. Indeed, investigations

conducted to date, including those conducted by Grace's own consultants, demonstrate that contaminants from Grace's activities and property have come to be located on the Russell Field Property through several different mechanisms, including, but not limited to, (1) direct releases from Grace's historical activities (e.g. dispersal of airborne asbestos fibers during demolition activities on Grace's property), (2) migration from Grace's property through soils, sediments, groundwater, surface water and/or airborne mechanisms, and (3) active transport to and storage on the Russell Field Property of Grace's contaminated sludge and soils during the construction of the MBTA's Red Line Extension by Grace, the MBTA, and their contractors during that project.

## Grace's Historical Operations and Handling of Hazardous Materials

17.    Grace's property consists of an irregularly shaped 27-acre parcel that abuts the northern and western boundaries of the Russell Field Property (Ex. 23 at EPA00018 and EPA00033). As discussed below, Grace used the property for industrial and/or commercial purposes since at least the early 1900's. In connection with those activities, Grace handled materials constituting or containing hazardous materials, including, among others, asbestos, napthalene, PAHs and metals – contaminants of concern in soils and groundwater at the Grace property and the Russell Field Property.

18.    A February 2001 "Removal Program Preliminary Assessment/Site Investigation Report," prepared by Roy F. Weston, Inc. for the United States Environmental Protection Agency ("USEPA"), summarizes Grace's historical operations as follows:

> Dewey & Almy [Chemical Company] was founded in 1919 for the manufacture of rubber products. In 1954, Dewey & Almy merged with W.R. Grace & Co., to become the Dewey & Almy Chemical Division of W.R. Grace & Co. According to Haley & Aldrich (H&A) reports, in the early 1930s it is believed that asbestos was stored and used in two on-site buildings as part of a brake lining development program. Asbestos-related activities also occurred on site in the late

5

1960s and early 1970s when a "small-scale" laboratory analysis and research program was conducted for asbestos-containing fireproofing materials. The above-referenced buildings were constructed in 1929 and used for warehousing, experimental process development, and the manufacture of solvent-based jar sealing compound, air-entraining agents for concrete, a silicone masonry sealant, and a dispersant. One of the major products manufactured on site was naphthalene sulfonate, which is a compound used to facilitate the dispersion of rubber in water. During the period of naphthalene sulfonate manufacture, on-site lagoons were used as settling ponds and as sources of cooling water. From 1946 to 1961, one of the buildings housed chemical tank churns, and from 1979 to 1984, this building was used for various chemical manufacturing processes. It is reported that acetone was used on site as a raw material by W.R. Grace. Hazardous substances known to exist in on-site soils include asbestos, naphthalene, and polycyclic aromatic hydrocarbons (PAHs). Reported asbestos concentrations ranged up to 12 percent in subsurface soils. Demolition of on-site buildings after 1954 may have also introduced asbestos into site soils.

(Ex. 23, pp. 3-4 (EPA00008-9)).

19.     Grace used "lagoons" on its property for the treatment and disposal of process wastes containing hazardous materials. See, for example, the following:

a. Ex. 4 hereto: 2/4/80 Letter from Grace to Massachusetts Department of Environmental Quality and Engineering ("DEQE"), discussing sludge and "filter cake" material in lagoons on Grace's property (at CCC02050-CCC02051).

b. Ex. 5 hereto: 3/5/80 "Groundwater Investigation" report (DEP00085-DEP00103), prepared by Grace's consultant, Haley & Aldrich, discussing, among other things, Grace's historical practice of disposing of "process wastes" on its property, including "sludge" settled out of wastewater effluent in the "settling pond" and "filter cake which is disposed of on-site," and further discussing soil and groundwater contamination associated with such practices (DEP00085 and DEP00088-90).

c. Ex. 8 hereto: 8/29/80 Notice of Intent related to proposed "sludge solidification" process, stating in part that Grace's site "contains approximately 10,000 cubic yards of sludge which is a waste product of W.R. Grace & Company's chemical manufacturing process" (CCC00005).

20.     Grace's use of such waste disposal lagoons on its property continued into the early

1980's (see, e.g., Ex. 5, 3/5/80 Report, wherein Grace's consultant recommends that Grace cease

such activities and/or take measures to prevent further environmental impacts associated with them).

21.    What appears to be the largest of such waste disposal lagoons was located directly adjacent to the Russell Field Property. See, for example, the following:

a.  Ex. 25 hereto: At Figure 3, "Historic Property Use," attached to 1/6/04 "Phase II Comprehensive Site Assessment for the Presence of Asbestos, W.R. Grace & Co.-Conn., 62 Whittemore Avenue, Cambridge, Massachusetts," prepared by Grace's consultants, Haley & Aldrich (at CDD12650).

b.  Ex. 1 hereto: 12/25/78 Figure entitled "Location Plan," prepared by the MBTA's consultant, identifying the "approx. extent of pre-1978 sludge disposal area" on Grace's property adjacent to the Russell Field Property.

c.  Ex. 8 hereto: At CCC00030, Figure prepared by the MBTA's consultant identifying the sludge disposal areas/lagoons adjacent to the Russell Field Property.

d.  Ex. 6 hereto: 1980 Figure prepared by Goldberg, Zoino, Dunnicliff & Associates entitled "Monitoring Well Location Plan," identifying sludge disposal areas as being adjacent to the Russell Field Property (CCC00562) (reduced version).

22.    Grace also stored various chemical compounds in aboveground storage tanks and underground storage tanks on its property, including acetone, toluene, methanol, white oil, latex, zinc, chloride, ammonia, rosin, propane, diesel fuel, gasoline, light oil, heavy fuel oil, calcium lignosulfate, soap, fatty acid, muriatic acid, alcohol, vinyl acetate, nitrogen, sodium hydroxide, potassium hydroxide, sulphuric acid, naphthalene, and formaldehyde (see Ex. 23, USEPA's "Removal Program Preliminary Assessment/Site Investigation Report" (at EPA00019); and Ex. 19, two Figures depicting "Site Conditions During Dewey and Almy Operations," prepared by Grace's consultant, Haley & Aldrich).

23.    Specifically, Grace handled materials containing asbestos, which is a widespread contaminant of concern in soils at Grace's property and the Russell Field Property (see, e.g., Ex. 25, Phase II report related to asbestos at Grace's property; Exs. 3-7 of City's Proofs of Claim). In a July 13, 2004 letter from the Massachusetts Department of Environmental Protection ("DEP", the

successor to the DEQE) to Grace, DEP states in part as follows with respect to Grace's use of asbestos in its historical operations:

> The W.R. Grace facility was the location of the manufacture, research and development of several products containing asbestos. Information in the Department's files include copies of patents received by the W.R. Grace, Cambridge, MA facility for the manufacture of several products made with, or potentially made with, asbestos fibers. These products include polyurethane foam sheets, container sealing resins, gasket forming compositions, and flowed-in polyurethane gaskets for pail and drum covers.

(Ex. 27, at p. 1). Letters to the MADEP from Alewife Neighbors, Inc., dated January 23, 2004 and January 22, 2004, also document Grace's historical use of asbestos (Ex. 26). Through those letters, Alewife Neighbors, Inc. provides copies of patents specifying or suggesting the presence of asbestos in products manufactured or handled by Grace at its Cambridge facility. Grace's own reports also attribute asbestos contamination in soil at its property as being primarily attributable to demolition and decommissioning activities by Grace (see Ex. 25, Phase II Report, at CDD12564).

## Contamination on Grace's Property

24.    Subsurface investigations conducted on Grace's property in the 1970's in anticipation of the Massachusetts Bay Transportation Authority's ("MBTA") Red Line Extension project (described below) confirmed that releases of hazardous materials into soils and groundwater on and under Grace's property occurred as a result of Grace's activities. Numerous investigations by Grace and others of Grace's property since then have further documented the presence of oil and hazardous materials in soils, groundwater and surface water at and in the vicinity of Grace's property, including, among other hazardous materials, asbestos, napthalene, PAHs and metals – which are also the primary contaminants of concern at the abutting Russell Field Property. See, for example, the following:

a. Ex. 25 hereto:  Excerpts from January 6, 2004 "Phase II Comprehensive Site Assessment for the Presence of Asbestos, W.R. Grace & Co.-Conn., 62 Whittemore Avenue, Cambridge, Massachusetts," prepared by Grace's consultants, Haley & Aldrich, where Haley & Aldrich documents the presence of asbestos in soils and surface water at Grace's property and opines that the presence of asbestos is primarily due to the release of fibers during the demolition and decommissioning of the Grace facility (at CDD12564).

b. Ex. 22 hereto: Excerpts from November 1998 "Final Asbestos Sampling Plan, W.R. Grace & Co.-Conn., Cambridge, Massachusetts," prepared by Grace's consultants, Haley & Aldrich, describing results of previous investigations documenting the presence of "volatile and semi-volatile organics, petroleum products, and metals" in soils and groundwater at the Grace property, and proposing an additional asbestos sampling plan to further define the extent of asbestos contamination (at CDD06187).

c. Ex. 23 hereto:  "Removal Program Preliminary Assessment/Site Investigation Report," summarizing investigations to date at the Grace site, confirming the presence of contamination in soil and groundwater at the Grace property.  Stating, in part, as follows:

> "Hazardous substances known to exist in on-site soils include asbestos, naphthalene, and polycyclic aromatic hydrocarbons (PAHs).  Reported asbestos concentrations ranged up to 12 percent in subsurface soils.  Demolition of on-site buildings after 1954 may have also introduced asbestos into site soils.

d. Ex. 20 hereto: At CCC01997, Haley & Aldrich Figure entitled "Naphthalene And Other Polynuclear Aromatic Hydrocarbon Concentrations In Groundwater And Surface Water" [on the Grace Property].

e. Ex. 4 hereto: December 6, 1979 report (with Grace's February 4, 1980 cover letter) prepared by Haley & Aldrich on behalf of Grace entitled "Summary of Investigations and Conclusions" (CCC02054-CCC02059), identifying areas on Grace's property where approximately 8,600 cubic yards of "process wastes" were disposed (at CCC02054, para. 4), identifying the "settling pond" and "waste disposal pit" as source areas of groundwater contamination at Grace's property (at CCC02054, paras. 5-8), also noting that "[t]he wash lagoon may also have some localized influence" (at CCC02054, para. 8).  H&A concludes that vertical and horizontal contamination migration "is apparent" and that "the settling pond must be reconstructed to eliminate apparent leakage" and "[t]he wash lagoon should be eliminated or lined to prevent leakage" (at CCC02055, paras. 9-11).

f. Ex. 5 hereto:  3/5/80 "Groundwater Investigation" report, prepared by Grace's consultant, Haley & Aldrich, discussing, among other things, Grace's historical practice of disposing of "process wastes" on its property, including "sludge" settled

out of wastewater effluent in the "settling pond" and "filter cake which is disposed of on-site," and further discussing soil and groundwater contamination associated with such practices (DEP00085 and DEP00088-90).

25.     Numerous other reports and communications, in addition to the examples referenced above, document environmental contamination at Grace's property. A partial index of those reports was attached as Exhibit 9 to the City's Proofs of Claim and is attached hereto as Exhibit 28.[2]

## Contamination on the City's Russell Field Property and Evidence of Releases from Grace's Property to the Russell Field Property

26.     Information available to date also confirms that the environmental impacts of Grace's activities did not end at its property boundaries.

27.     Investigations conducted at the Russell Field Property over the last several years have confirmed the presence of hazardous materials there, including, among others, asbestos, naphthalene sulfonate, PAHs and metals (see, e.g., Exs.1-9 to City's Proofs of Claim).

28.     It is indisputable that at least some of the hazardous materials detected at the Russell Field Property originated from activities conducted on Grace's property and came to be located on the Russell Field Property as a result of (1) direct releases from Grace's historical activities, (2) migration from Grace's property through soils, sediments, groundwater, surface water and/or air, and (3) active transport to and storage on the Russell Field Property of contaminated sludge and soils during the construction of the MBTA's Red Line Extension by Grace, the MBTA, and their contractors during that project. These transport mechanisms are discussed in turn below.

## Direct Releases To Russell Field Property

29.     With respect to evidence of direct releases of hazardous materials from Grace's property to the Russell Field Property, see, for example, the following:

---

[2]     The City has produced approximately 15,000 documents to date related to its claims concerning contamination at the Russell Field Property, which include many of those environmental reports, as well as numerous

a. Ex. 2 hereto: February 14, 1979 to February 23, 1979 correspondence between Grace, the Massachusetts DEQE, and City (CDD03923-CDD03926), regarding "an unfortunate failure of a piece of equipment in our [W.R. Grace] Cambridge facility caus[ing] a temporary reduction in the effectiveness of our stack scrubber system ... connected to deposits of powder on the ground in the athletic field and adjacent neighborhood ... [containing] DAXAD 17 ... the sodium salt of polymerized alkyl naphthalene sulfonate."

b. Ex. 9 hereto: At PER1017, 9/22/81 Letter from Sverdrup & Parcel and Associates, Inc. to MBTA recommending certain measures to protect construction workers "from future skin irritations at the MBTA/W.R. Grace 091-601 construction site," including discussion of "nose and throat irrigation and nausea" which "may be associated with inhalation of airborne chemical constituents," and also proposing air monitoring.

c. Ex. 25 hereto: Excerpts from January 6, 2004 "Phase II Comprehensive Site Assessment for the Presence of Asbestos, W.R. Grace & Co.-Conn., 62 Whittemore Avenue, Cambridge, Massachusetts," prepared by Grace's consultants, Haley & Aldrich, where Haley & Aldrich documents the presence of asbestos at the Grace property, opines that "[b]ased on the known historic uses of the Site, the presence of asbestos in soil is most likely attributable to the release of fibers during the demolition and decommissioning of these buildings" (at CDD12564), and further documents that soils from the Grace property become airborne and impact adjacent properties.

d. Ex. 27 hereto: June 3, 2004 Memorandum at p. 2-3, attached to MADEP's July 13, 2004 Letter to Grace, wherein MADEP states that it believes Grace's consultants have underestimated the amount of soil and potentially associated asbestos fibers that become airborne from the Grace property.

30.    In addition to the direct evidence of airborne releases from the Grace property to the Russell Field Property, the presence of asbestos in soils across Grace's property – which Grace's consultants attribute primarily to Grace's activities – provides significant circumstantial evidence of impacts to the Russell Field Property from Grace's activities. There is no reason to believe that asbestos releases associated with Grace's activities, including its demolition and decommissioning activities, stopped at Grace's property boundary.

## Migration of Hazardous Materials From Grace Property to the Russell Field Property

31.    With respect to evidence of the migration of hazardous materials from Grace's

other documents relevant to the City's claims. A partial index of those documents is attached as Exhibit 29 hereto.

property to the Russell Field Property through soils, sediments, groundwater, and surface water, see the following:

a. Ex. 20 hereto: Haley & Aldrich Figures dated February 1988 entitled (1) "Concentrations of Total Volatile Organic Compounds in Groundwater and Surface Water," confirming presence of volatile organic compounds in groundwater at the Grace site, including in close proximity to the Russell Field Property (e.g. B207), and (2) "Naphthalene And Other Polynuclear Aromatic Hydrocarbon Concentrations In Groundwater And Surface Water," confirming presence of naphthalene and other PAHs in groundwater and/or surface water at the Grace site, including in close proximity to the Russell Field Property (e.g. S1 & S10, B704, B705, B707 and B807) (CCC01996-CCC01997).

b. Ex. 4 hereto: 12/6/79 report (with Grace's February 4, 1980 cover letter) prepared by Haley & Aldrich on behalf of W.R. Grace entitled "Summary of Investigations and Conclusions" (CCC02054-CCC02059), identifying areas on Grace's property where approximately 8,600 cubic yards of "process wastes" were disposed (at CCC02054, para. 4), identifying the "settling pond" and "waste disposal pit" as source areas of groundwater contamination at Grace's property (at CCC02054, paras. 5-8), also noting that "[t]he wash lagoon may also have some localized influence" (at CCC02054, para. 8). Haley & Aldrich concludes that vertical and horizontal contamination migration "is apparent" and that "the settling pond must be reconstructed to eliminate apparent leakage" and "[t]he wash lagoon should be eliminated or lined to prevent leakage" (at CCC02055, paras. 9-11).

c. Ex. 5 hereto: 3/5/80 "Groundwater Investigation" report, prepared by Grace's consultant, Haley & Aldrich, discussing, among other things, Grace's historical practice of disposing of "process wastes" on its property (DEP00085 and DEP00088-90) and groundwater contamination associated with such practices (DEP00090-92), and stating that "[t]he groundwater surface has been found to be influenced by infiltration of water from the cooling channel and the settling pond. This infiltration results in a mounding of the groundwater surface in the disposal pit area. Localized groundwater surface flow is from the mounded area to the north, south, east and west" (DEP00091).

d. Ex. 9 hereto: Various correspondence and articles from July 1, 1981 through November 16, 1981 related to problems encountered by the MBTA and its contractors during excavation and construction activities on the Grace property due to the presence of contamination in soils and groundwater, including "complaints of facial burns, dryness of the eyes, nose and mouth" (PER0992), "symptoms of nose and throat irritation and nausea" that "may be associated with inhalation of airborne chemical contaminants" (PER1017), and sample results confirming "high concentrations of Napthalene and other organic compounds" in "underlying soils" (PER0996) and similar contamination in groundwater (PER0999).

e. Ex. 10 hereto: 12/9/81 letter from the MBTA to the Massachusetts DEQE, confirming that an additional 25,000 cubic yards of contaminated soils from the Grace property would have to be removed from the site as part of the Red Line Extension activities (PER1002).

f. Ex. 13 hereto: April 1983 "Status Report on the Monitoring Program for Groundwater Quality in the Sludge Solidification Area" (DPW00402-DPW00434), documenting the detection of contamination in solidified sludge and groundwater at the Grace site (*see, e.g.,* DPW00434) and the failure to properly implement the required groundwater monitoring program during the MBTA's Red Line Extension activities (at DPW00409).

32.    With respect to groundwater flow, even if the general groundwater flow in the vicinity of the Grace property and the Russell Field Property is to the northwest – as Grace's consultants have reported on occasion – Grace's consultants have documented localized flow patterns in the vicinity of its former waste process areas and the northwest corner of the Russell Field Property as flowing from Grace's property to the Russell Field Property. See, for example, the following:

a. Ex. 18: Various groundwater flow figures, prepared by Grace's consultant, Haley & Aldrich, over the period 1986-1994.

b. Ex. 5: 3/5/80 "Groundwater Investigation" report, prepared by Grace's consultant, Haley & Aldrich, stating that "[t]he groundwater surface has been found to be influenced by infiltration of water from the cooling channel and the settling pond. This infiltration results in a mounding of the groundwater surface in the disposal pit area. Localized groundwater surface flow is from the mounded area to the north, south, east and west" (DEP00091).

## MBTA Red Line Extension Activities and Sludge Solidification Process

33.    It is also clear that hazardous materials from Grace's property and operations were actively transported to, stored on and released into soils at the Russell Field Property during the construction of the MBTA's Red Line Extension as a result of activities conducted by Grace, the MBTA, and their contractors during that project, as described below.

34.    The MBTA's Red Line Extension was designed to pass through the northern section

of the Russell Field Property and a portion of Grace's property, including "an area which has been used for many years by W.R. Grace & Company for the disposal of sludge containing organic compounds" (Ex. 8, Notice of Intent for sludge solidification project, at CCC00004; *see also* Ex. 3, 11/7/79 Notice of Intent for Red Line Extension construction activities, including the staging of excavated materials on the Russell Field Property, at CDD00210-CDD00226, and Ex. 1, Location Plan for MBTA Red Line Extension).

35.     In anticipation of the Red Line Extension construction activities, Grace, the MBTA and their contractors jointly designed and conducted a process to excavate and solidify what was believed to be the most contaminated sludge on the Grace Property, including sludge from the process sludge waste disposal areas adjacent to the Russell Field Property. The sludge contained napthalene and napthalene constituents, as well as PAHs and other hazardous materials, as documented by the MBTA's consultant, Goldberg, Zoino Associates, as well as Grace's consultant, Haley & Aldrich. See, for example, the following:

a.  Ex. 4 hereto: 2/4/80 Letter from Grace to the Massachusetts DEQE, discussing Grace's proposal to address contaminated sludge on its property (at CCC02050-CCC02051) and enclosing copy of 12/6/79 report documenting nature of contaminated sludge.

b.  Ex. 7 hereto: 4/7/80 Letter from MBTA to Massachusetts DEQE describing proposed manner of addressing "sludge, contaminated water, and contaminated soil" on Grace's property (CDD00189-CDD00190).

c.  Ex. 8 hereto: 8/29/80 Notice of Intent to Cambridge Conservation Commission describing the proposed sludge solidification process as being "a cooperative effort" undertaken by Grace and the MBTA (CCC00005); describing the sludge and underlying groundwater as containing contaminants, including naphthalene (CCC00005 and CCC000022-27); and outlining the proposed process as involving four steps (CCC00005): First, the contaminated sludge would be excavated and loaded into a "charging area." Second, the sludge would be loaded into a "mixing area," where the "chemicals" and "contaminated groundwater" would be blended in with the sludge to achieve solidification. Third, "the treated sludge, still in liquid form," would be transported to a deposit area, adjacent to the Russell Field Property

(CCC00030), formed by unlined, earth berms. Fourth, the solidified sludge was stockpiled and stored until such time as it could be "either (1) removed from the site or (2) graded on the existing site."

d. Ex. 6 hereto: 1980 Figure prepared by Goldberg, Zoino, Dunnicliff & Associates entitled "Monitoring Well Location Plan," identifying sludge disposal areas as being adjacent to the Russell Field Property (CCC00562).

e. Ex. 9 hereto: Various correspondence and articles from July 1, 1981 through November 16, 1981 related to problems encountered by the MBTA and its contractors during excavation and construction activities on the Grace property due to the presence of contamination in soils and groundwater, including "complaints of facial burns, dryness of the eyes, nose and mouth" (PER0992), "symptoms of nose and throat irritation and nausea" that "may be associated with inhalation of airborne chemical contaminants" (PER1017), and sample results confirming "high concentrations of Napthalene and other organic compounds" in "underlying soils" (PER0996) and similar contamination in groundwater (PER0999).

f. Ex. 10 hereto: 12/9/81 letter from the MBTA to the Massachusetts DEQE, confirming that an additional 25,000 cubic yards of contaminated soils from the Grace property would have to be removed from the site as part of the Red Line Extension activities – below the areas where sludge had been removed as part of the sludge solidification process.

g. Ex. 11 hereto: 4/20/82 report referencing stockpiled sludge directly on the Russell Field Property (DEP01728).

h. Ex. 13 hereto: April 1983 "Status Report on the Monitoring Program for Groundwater Quality in the Sludge Solidification Area," documenting the detection of contamination in the solidified sludge and groundwater.

i. Ex. 14 hereto: 6/14/83 "Memorandum of the Record," prepared by DEQE regarding complaints of odors associated with the soils being staged at the Russell Field Property and used as backfill. The Memorandum states, in part, as follows:

> "The stockpiled fill had originally been excavated during tunnel construction adjacent to WR Grace and Company. The fill, predominantly clay, was mixed with sandy soil to improve its handling characteristics and stockpiled for future use as tunnel backfill."

j. Ex. 16 hereto: 7/25/83 Letter from GZA to Sverdrup describing the status of sludge excavation at the Grace site as of that time and attaching specifications for the removal of the solidified sludge; these documents confirmed the presence of contamination in soils and groundwater at the Grace site (CCC00500), that Grace

participated in the sludge solidification process (CCC00500), that "approximately 12,000 cubic yards of solidified sludge material" was present at the Grace site (CCC00499), and that process areas with earth berms, latex waste area, and the "temporary storage stockpile" for the solidified sludge were adjacent to the Russell Field Property (Figure at CCC00502).

    k.   Ex. 21 hereto: February 1988 Figure prepared by Haley & Aldrich entitled "Waste Storage Areas During Sludge Solidification by the MBTA," identifying "Temporary Solidified Sludge Stockpiles" as being directly on the Russell Field Property and a "curing" area adjacent to the Russell Field Property.

36.    A plan dated August 1980 depicts the various proposed process areas involved in the sludge solidification process, identifying them as being in close proximity to the Russell Field Property (Ex. 8 hereto, CCC00030). In fact, according to Grace's own consultant, portions of the solidified sludge stockpiles were actually located on the Russell Field Property (Ex. 21, CDD00315). No liners or other structures, other than earth berms, were proposed to prevent the spreading or migration of hazardous materials onto the Russell Field Property (see Ex. 8, at CCC00005).

37.    During the sludge solidification process, excavated untreated contaminated sludge was loaded onto an unlined area abutting and/or directly on the Russell Field Property prior to being loaded into the "charging area." This area of the Russell Field Property has been confirmed to contain elevated levels of contaminants (see, e.g., Ex. 1.F. to City's Proofs of Claim). In addition, one of the solidified sludge stockpiling locations was directly on the Russell Field Property – again correlating directly with an area of elevated contaminants (see, e.g., Ex. 1.F. to City's Proofs of Claim). Two other solidified sludge stockpile areas were immediately adjacent to the Russell Field Property (Ex. 21, H&A Figure VI-9 entitled "Waste Storage Areas During Sludge Solidification By The MBTA," CDD00315, and Ex. 11, 4/20/82 report referencing stockpiled sludge on the Russell Field Property, DEP01728).

38.    During the implementation of the sludge solidification process, Grace, the MBTA

and their contractors processed more contaminated sludge than they had anticipated (*see, e.g.*, Ex. 12, 6/15/82 Letter from Perini to the MBTA, at CDD00123-124; Ex. 10, 12/9/81 letter from the MBTA to the Massachusetts DEQE, confirming that an additional 25,000 cubic yards of contaminated soils from the Grace property would have to be removed from the site as part of the Red Line Extension activities – below the areas where sludge had been removed as part of the sludge solidification process). In addition, while Grace and the MBTA had initially intended to stockpile the sludge on and near the Russell Field Property for only a brief period, they ultimately left the stockpiles there for several months (id.).[3]

### Use and Operation of the Russell Field Property by MBTA and its Contractors as a Staging Area for Materials Excavated from the Grace Property

39.     From commencement of the Red Line Extension construction work in 1980 until the Russell Field Property's reconstruction in 1986, the MBTA and its contractors utilized the Russell Field Property as a staging area for, among other things, contaminated soils excavated from the Grace Property. Soils staged at the Russell Field Property contained oil and/or other hazardous materials, including but not limited to napthalene and PAHs. See, for example, the following:

  a.  Ex. 3 hereto: 11/7/79 Notice of Intent to Cambridge Conservation Commission discussing proposed excavation and construction activities on and in the vicinity of Grace's property, including proposed use of the Russell Field Property as a staging area for excavated soils (at CDD00214 and CDD00217).

  b.  Ex. 17 hereto: 9/27/83 Letter from MBTA to Cambridge Conservation Commission, stating that "Of the disturbed soils containing napthalene, a portion has been used as backfill for the Red Line Tunnel and a portion is stockpiled at Russell Field").[4]

---

[3]     The MBTA had contracted with Perini to dispose of the solidified sludge. The June 15, 1982 letter from Perini to the MBTA states that 14,880 cubic yards were excavated from November 2, 1981 to December 1, 1981 and that the sludge was not removed until April 3, 1982. Perini also states that the site where the sludge was to be disposed of had closed for the winter, which "in turn lead to a shutdown of operations in the area of the Solidified Sludge piles." (Ex. 12, CDD00123-124).

[4]     See also, November 1, 1982 Letter from DEQE to R&R Trucking, responding to R&R's request for opinion as to proper use of "clay and sandy clay being excavated from the MBTA Redline Extension tunnel construction

    c.  Ex. 15 hereto: 7/15/83 Memorandum from the Secretary of the Cambridge Conservation Commission, regarding "Description of the Conservation Commission's involvement with the W.R. Grace site and Russell Field," with a focus on its involvement issues concerning soil and groundwater at the Grace site.

40.    Although these activities give rise to claims by the City against the MBTA and its contractors, they also support claims against Grace to the extent the contaminated materials stockpiled and managed on the Russell Field Property by the MBTA and its contractors came from Grace's property or resulted from Grace's operations.

## ARGUMENT

41.    The City's Claims against Grace include common law claims, including, among others, nuisance, trespass, and negligence, as well as state and federal statutory claims, including, among others, claims under the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Mass. G.L. c. 21E ("Chapter 21E") and its federal counterpart, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9606, *et seq.* ("CERCLA"). Liability under Chapter 21E and CERCLA is broad. *See, e.g., Taygeta Corp. v. Varian Assocs., Inc.*, 436 Mass. 217, 223 (2002) ("G.L. c. 21E was drafted in a comprehensive fashion to compel the prompt and efficient cleanup of hazardous material and to ensure that costs and damages are borne by the appropriate responsible parties"); *United States v. Bestfoods*, 524 U.S. U.S. 51, 56, fn.1 (1998) ("The remedy that Congress felt it needed in CERCLA is sweeping: everyone who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup") (internal citations omitted). Given the limited, unsubstantiated nature of Grace's Objection, the following discussion of legal liability relates only to Grace's liability under M.G.L. Chapter 21E. However, Grace's liability is also premised on other theories.

---

project" and noting that "any soil exhibiting such low levels of contamination were excavated and stockpiled on site

The City reserves its right to supplement this response to address other theories of liability and to pursue such other theories against Grace.

42.     Chapter 21E § 5(a) establishes five categories of persons who "shall be liable, without regard to fault" for certain releases or threats of release of oil or hazardous materials, as follows:

> (1)   the owner or operator of a vessel or a site from or at which there is or has been a release or threat of release of oil or hazardous material;

> (2)   any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material;

> (3)   any person who by contract, agreement, or otherwise, directly or indirectly, arranged for the transport, disposal, storage or treatment of hazardous material to or in a site or vessel from or at which there is or has been a release or threat of release of hazardous material;

> (4)   any person who, directly or indirectly, transported any hazardous material to transport, disposal, storage or treatment vessels or sites from or at which there is or has been a release or threat of release of such material; and

> (5)   any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from vessel or site.

43.     Section 5(a)(iii) provides that each such person "shall be liable without regard to fault" to any person for "damage to his real or personal property incurred or suffered as a result of such release or threat of release." *See Hill v. Metropolitan District Commission, et al.*, 439 Mass. 266, 271 (2003) ("one of the primary features of G.L. c. 21E ... [is] the imposition of liability without regard to fault" and "the purpose of G.L. c. 21E, [is] 'to compel the prompt and efficient cleanup of hazardous material and to ensure that costs and damages are borne by the appropriate responsible

---

for future use as backfill on top of the completed tunnel" (CDD00101).

parties.' *Taygeta Corp. v. Varian Assocs., Inc.*, 436 Mass. 217, 223 (2002).")

44.    Section 4 provides that "any person who undertakes assessment, containment or removal action regarding the release or threat of release of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such assessment, containment and removal." G.L. c. 21E, § 4; *Hill, supra,* 439 Mass. at 269 ("Under G.L. c. 21E, private parties may seek to recover response costs from any 'person' 'liable for [the] release or threat of release [of oil or hazardous material.'"). Finally, Section 15 specifically provides that "in any suit by Massachusetts residents to enforce the requirements of this chapter, or to abate a hazard related to oil or hazardous materials in the environment, the court may award costs, including reasonable attorney and expert witness fees, to any party other than the Commonwealth who advances the purposes of this chapter." G.L. c. 21E, § 15.

45.    The MADEP has promulgated regulations known as the Massachusetts Contingency Plan ("MCP") to effectuate the purposes of Chapter 21E.  310 CMR 40.00 et seq.  Once a site is identified as a site where there is or has been a release of oil or hazardous material, a complicated set of investigation and remedial steps must be undertaken.  The City has undertaken and continues to undertake those steps, in compliance with the MCP, with respect to contamination on the Russell Field Property.  The City has incurred in excess of $1,200,000 to date, primarily stemming from investigative and remedial design measures (cleanup activities have just recently commenced).

46.    Based on the information set forth in the limited documents currently available to the City (without the benefit of any formal discovery), it is indisputable that Grace is a party liable under Chapter 21E for contamination at the Russell Field Property.  Indeed, Grace falls into several of the specified categories of liable parties under Section 5(a), as follows:

a.    Grace is liable under Section 5(a)(1) as the current "owner or operator of ... a site

[Grace's property] from or at which there is or has been a release or threat of release of oil or hazardous material."

b.  Grace is liable under Section 5(a)(2), as the former owner of a site (Grace's property) "at the time of storage or disposal of any hazardous material ... from which there is or has been a release or threat of release of hazardous material" to the Russell Field Property. *See Hill, supra,* 439 Mass. at 531, fn.11 (Plaintiff prevailed against the defendant owner of abutting property "simply by proving that the oil on its property came from [the defendants'] property" (quoting lower court). Affirming that liability under c.21E can be premised solely on where the defendants' property was and whether the oil or hazardous material came from the defendants' property, regardless of what the defendants did or did not do on that property.)

c.  Grace is liable under Section 5(a)(3) because during its historical operations on its property it "arranged for the ... disposal, storage or treatment of hazardous material to or in a site [its own property]... from or at which there is or has been a release or threat of release of hazardous material" to the Russell Field Property; Grace is also liable under Section 5(a)(3) due to its involvement in the sludge solidification process conducted in anticipation of the Red Line Extension project because during those activities Grace "arranged for the transport, disposal, storage or treatment of hazardous material to or in [portions of the Grace Property and the Russell Field Property] from or at which there is or has been a release or threat of release of hazardous material" to the Russell Field Property.

d.  Grace is liable under section 5(a)(5) because through its historical activities, as well as its involvement in the Red Line Extension activities, Grace "otherwise caused or is

legally responsible for a release or threat of release of oil or hazardous material from [its] site" and the Russell Field Property.

47.    The facts established in the subset of information discussed in the City's Proofs of Claim and this Response, and the reasonable inferences that can be drawn from those facts, are sufficient to establish Grace's liability under Chapter 21E, § 5(a).   That the MBTA and its contractors also face joint and several liability with respect to contamination at the Russell Field Property does not absolve Grace from its own liability.

48.    If the City is compelled to pursue its claims against Grace through formal litigation, either before the bankruptcy court or state court (if the automatic stay is lifted), the City expects to develop further facts substantiating its claims against Grace through formal factual and expert discovery.

49.    The City reserves the right to supplement this response with additional information substantiating its claims, including but not limited to additional documents and expert testimony.

## CONCLUSION

**Debtors' Objection Should Be Overruled**

50.    For the foregoing reasons, the City respectfully requests that the Court overrule the Debtors' Objection as to the City's Claims.

**Request for Opportunity to Supplement, to Conduct Discovery and for Initial Status Conference**

51.    The City also respectfully requests that the Court allow the City an opportunity to supplement this response and to conduct fact and expert discovery against Grace prior to proceeding with an evidentiary hearing related to its Claims.

52.    Finally, in the event the hearing scheduled for September 27, 2004 is not stayed by

mutual agreement of the parties (to pursue settlement discussions or otherwise), the City requests

that the Court treat that hearing as an initial status conference to discuss an appropriate scheduling

order related to the City's Claims.

Dated: September 9, 2004

**MONZACK AND MONACO, P.A.**

Joseph J. Bodnar, Esq. (#2512)
Kevin J. Mangan, Esq. (#3810)
1201 N. Orange Street, Suite 400
Wilmington, DE 19801
Tel. No.: (302) 656-8162 ext. 231
Fax. No.: (302) 656-2769
Email: kmangan@monlaw.com

and

Stephen D. Anderson, Esquire
Jeffrey L. Roelofs, Esquire
Anderson & Kreiger, LLP
43 Thorndike Street
Cambridge, MA 02141
(617) 252-6575

Docs\Camb\Env\P\Response to Grace Objection v.4 (JR).doc