IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

Objection Deadline: October 8, 2004
Hearing Date: October 25, 2004 at Noon

**DEBTORS' MOTION FOR THE ENTRY OF AN ORDER FOR AUTHORIZATION TO (i) ENTER INTO A SETTLEMENT AGREEMENT WITH THE INTERNAL REVENUE SERVICE WITH RESPECT TO INTEREST DEDUCTIONS FOR CERTAIN COLI POLICIES, (ii) PAY AMOUNTS DUE PURSUANT TO THE SETTLEMENT AGREEMENT, AND (iii) TERMINATE THE COLI POLICIES**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by their undersigned counsel, respectfully move this Court (the "Motion") for the entry of an order authorizing the Debtors to (i) settle a federal income tax controversy with the Internal Revenue Service ("IRS") relating to interest deductions claimed by the Debtors with respect to corporate

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

owned life insurance ("COLI") currently insured by Hartford Life Insurance Company ("Hartford") (a copy of the Model Closing Agreement is attached as Exhibit A); (ii) make payment to the IRS and respective state tax authorities of additional taxes and interest attributable to the settlement (collectively referred to herein as the "COLI Related Taxes"); and (iii) terminate the Hartford insured COLI policies (the "COLI Policies"). The Court should grant the Motion because the proposed settlement is in the best interests of the Debtors' estates. Further, payment of these settlement amounts as they become due is appropriate because the taxes at issue are required to be paid in full under agreements to which the Debtors are subject that have been previously approved by this Court. In support thereof, the Debtors respectfully submit as follows:

### Jurisdiction

1. This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this motion is proper under 28 U.S.C. § 1408.

2. The predicate for the relief requested herein is Federal Rule of Bankruptcy Procedure 9019.

### Background

3. On April 2, 2001, the Debtors filed their voluntary petitions for relief (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"). The Chapter 11 Cases have been consolidated for administrative purposes only, and pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

2

### a. The COLI Dispute

4. In 1988 and 1990, Grace purchased the COLI Policies from Mutual Benefit Life Insurance Company ("MBL") insuring an aggregate of 10,000 employees and former employees.[2] MBL's COLI business, including Grace's COLI Policies, was subsequently acquired by Hartford. Grace was one of many Fortune 500 companies that acquired broad-based COLI programs created by the insurance industry in the mid-1980s primarily as a vehicle to fund long-term employee post retirement health obligations. The Debtors continue to be the owner and beneficiary of the COLI Policies.

5. Grace has paid in full all premiums for its COLI Policies utilizing, in part, loans secured by the COLI Policies (the "Policy Loans"). As of June 30, 2004, the gross value of the COLI Policies was approximately $366.7 million, which secured Policy Loans balances of approximately $ 352.4 million. Interest on the Policy Loan balances is calculated annually based upon a Moody's Corporate Bond Index.

6. Commencing with the taxable year ending on December 31, 1989, through the taxable year ending December 31, 1998, Grace claimed on its federal consolidated income tax returns for each of those years deductions of the interest accruing on the Policy Loans (the "COLI Interest Deductions"), which totaled approximately $252.4 million for all of the taxable years at issue. Grace did not claim any COLI interest deductions for any taxable years

---

[2] The term "Grace" refers to all members of the consolidated groups of corporations (including the Debtors) that filed consolidated tax returns during the taxable years at issue (1989 through December 31, 1998). As discussed more fully in this Motion, Grace included other entities now unrelated to the Debtors, Fresenius National Medical Care Holdings, Inc., (and certain of its subsidiaries) and Sealed Air Corporation (and its subsidiary, Cryovac, Inc.) in most of the taxable years at issue.

commencing after December 31, 1998, because federal legislation enacted in 1996 prohibited such deductions.

7. Since the mid-1990s, the IRS has challenged the right of taxpayers (including Grace) to claim interest deductions on loans secured by COLI Policies. In 1997, the IRS disallowed the COLI Interest Deductions (approximately $81.5 million) claimed during the 1990 - 1992 taxable years. This resulted in an assessment of approximately $21.2 million in tax and interest. Grace paid that amount to the IRS in July 2000 and subsequently filed a refund claim for the amount paid.

8. In July 2002, the IRS challenged approximately $116.5 million of COLI Interest Deductions claimed with respect to the 1993 - 1996 taxable years. Grace both protested this issue and requested that the IRS Office of Appeals ("IRS Appeals") consider the COLI Interest Deductions issue in its entirety for the taxable years 1989 - 1998 (i.e., approximately $252.4 million of deductions) for possible settlement alternatives. IRS Appeals granted this request.

**b.     The Court Motion and Order Authorizing Settlement Negotiations**

9. On September 23, 2002, the Debtors filed a motion (the "Initial COLI Motion") with the Court seeking authority to pursue settlement of the COLI tax controversy along general guidelines issued by the IRS, providing that the government concede 20% of the aggregate COLI Interest Deductions, and the Debtors concede 80% of the aggregate COLI Interest Deductions. (the "80/20 Settlement Proposal").

10. On October 22, 2002, the Court authorized Debtors to pursue such negotiations, but the Court directed the Debtors to move the Court for approval of the final terms of any COLI related settlement. The Initial COLI Motion and the Court Order granting the Motion are attached hereto as Exhibits B and C, respectively.

## Proposed Settlement Relating to COLI Interest Deductions

### c. Consistency with the 80/20 Settlement Proposal.

11. The terms of the proposed settlement relating to COLI Interest Deductions (the "COLI Settlement") are consistent with the 80/20 Settlement Proposal and are set forth in the Model Closing Agreement. Specifically, Debtors are permitted (a) approximately $42.2 million, or 20%, of the approximately $211.2 million in COLI Interest Deductions claimed from 1989 through 1996 and (b) 20% of the COLI Interest Deductions claimed in 1997 and 1998. The Model Closing Agreement does not specify the exact amount of COLI Interest Deductions permitted for the 1997 and 1998 tax years because the IRS has not yet completed its audit of Debtors' income tax returns for those tax years. However, the Debtors claimed a total of approximately $41 million in COLI Interest Deductions in the 1997 and 1998 tax years.

### d. Additional Settlement Terms

12. As part of the proposed COLI Settlement, the Debtors also agreed to allocate a portion of the permitted COLI Interest Deductions against Debtors foreign source income for purposes of determining the availability of foreign tax credits in each of the tax years at issue. As a general rule, taxpayers are typically required to allocate a portion of their overall US interest expense against foreign source income based upon a ratio of foreign to worldwide assets as set forth in Treasury Regulations. This effectively decreases the amount of foreign tax credits that taxpayers may apply to reduce US taxes on foreign source income. Treasury Regulations provide a limited exemption from the allocation rules for interest incurred on funds borrowed in connection with an "integrated financial transaction," as defined under Treasury Regulations. Under the terms of the COLI Settlement, Debtors would concede that COLI Interest Deductions do not qualify for this or any other exemption from the interest allocation rules (see Model

91100-001\DOCS_DE:100108.1

Closing Agreement par. 12). Consequently, Debtors' utilization of foreign tax credits would be further restricted as a result of the COLI Settlement.

13. The chart below illustrates an estimate of the tax impact of the COLI Settlement, including foreign tax credit restrictions. The actual cash impact of the COLI Settlement may be less than the amounts listed below due to Debtors' other tax attributes, such as business credits, NOL carrybacks, additional prepayments and other credits impacting the years at issue.

| Comparison of Current Estimated Exposure to Income Tax and Interest With and Without the 80/20 Settlement Proposal[1] | | |
|---|---|---|
| ($ Millions) | Without Settlement (Assumes loss of all COLI Interest Deductions) | With Settlement |
| Federal Income Tax | 66.6 | 53.5[2] |
| Interest | 44.0 | 30.2 |
| Total | 110.6 | 83.7 |
| Tax Payments ('90-'92) | (21.2) | (21.2) |
| Tax Payments ('93-'96) | (43.2) | (43.2) |
| Est. Federal Income Tax and Interest Owed | 46.2 | 19.3 |
| Est. State Income Tax and Interest Owned | 9.6 | 7.8 |
| Estimated Total Taxes and Interest | <u>55.8</u> | <u>27.1</u> |

[1] This chart was also included in the Initial COLI Motion but the amounts listed have been further refined. Debtors' assume that the tax prepayments of $43.2 shown in the chart with respect to the 1993-1996 tax years will be applied by the IRS to the COLI Related Taxes for that period.

[2] Includes impact of settlement on foreign tax credits.

14. Although the Model Closing Agreement is currently in draft form, the terms of the COLI Settlement, described therein, are not anticipated to change. The only substantive revisions anticipated to the Model Closing Agreement are to the bracketed information describing the COLI termination provisions. A description of the proposed termination, Debtors' reasons in support thereof and the financial impact are discussed separately in paragraphs 26-31, herein.

7

e.  **Joint Committee on Taxation Review and Approval**

15. The IRS submitted the Model Closing Agreement to the Joint Committee on Taxation (the "Joint Committee") for final review and approval. By letter dated April 26, 2004, the IRS notified the Debtors that the Joint Committee had no objection to the document (the IRS letter is attached hereto as Exhibit D). Consequently, the parties are prepared to finalize the COLI termination provisions in the Model Closing Agreement and execute a final closing agreement (the "Final Closing Agreement") upon obtaining this Court's approval.

f.  **Payment of Taxes Under the Settlement Agreement**

16. Once the Final Closing Agreement is executed, the IRS has the right to either (i) promptly demand payment from Debtors for COLI Related Taxes pertaining to the 1993 - 1996 audit period or (ii) refrain from demanding payment until all tax issues (including non-COLI issues) relevant to the 1993-1996 tax period have been resolved. Debtors estimate that the impact of COLI Related Taxes for the 1993 - 1996 tax period would be approximately $42.6 million, including accrued interest through 2004. As indicated on the chart in paragraph 12, herein, Debtors have already prepaid approximately $43.2 million in taxes for the 1993-1996 tax years. Therefore, the prepaid amounts should be sufficient to offset all additional Federal COLI Related Taxes for the 1993 - 1996 period (additional state taxes are discussed below).

17. Grace is currently working with the IRS Examination Team to conclude its 1993 – 1996 federal income tax audit. It is anticipated that the Examination Team's review will conclude by the fall of 2004, with any remaining issues subject to review by IRS Appeals. The number of non-COLI issues to be submitted and reviewed by IRS Appeals and the time period for review cannot be determined at this time. Debtors anticipate that the COLI Settlement will be executed prior to the settlement of the overall 1993 - 1996 federal income tax audit and that the entire $43.2 million income tax prepayment will be credited against COLI Related Taxes, but

there can be no assurance that the tax prepayments will not be applied by the IRS to other tax liabilities arising from other Final Determinations (as defined in the Fresenius Agreement) in the 1993-1996 federal income tax audit.

18. The IRS is currently conducting federal income tax audits of all of the remaining tax years in which there is exposure for COLI Related Taxes. Debtors cannot at this time predict when such IRS audits will conclude and therefore Debtors cannot estimate when the remaining COLI Related Taxes will be due.

19. With respect to state taxes, Debtors estimate that approximately $4.7 million in taxes and interest will be due and owing to various state tax authorities upon execution of the Final Closing Agreement. This amount represents COLI Related Taxes with respect to the 1990-1992 tax years. The remaining estimated $3.1 million of taxes and interest is expected to become due upon the completion of the Federal Tax audit for the 1993-1996 tax period. Additional state taxes attributable to the 1997 and 1998 tax periods are expected to be sheltered by state tax NOLs.

### g. Fresenius and Sealed Air – Several Liability

20. Treasury regulations permit the IRS to seek payment of federal income tax and interest owed by a consolidated group from any entity that joined in the filing of a consolidated return for the taxable year at issue. See Treas. Reg. § 1.1502-6(a). Pursuant to this Treasury Regulation, the IRS may seek payment of a substantial portion of such Taxes from Fresenius National Medical Care Holdings, Inc., (or certain of its subsidiaries, collectively, "Fresenius") and Sealed Air Corporation (or its subsidiary, Cryovac, Inc., collectively, "Sealed Air"), which are currently unrelated entities, but were members of the Debtors' consolidated group for federal income tax purposes during many of the taxable years at issue. Similar rules apply in many states. Fresenius was a member for the 1988 taxable year through September 28, 1996. Sealed

Air was a member from the 1988 taxable year through March 31, 1998. This issue is discussed in substantial detail in the Initial COLI Motion (paragraphs 18-24).

21. Sealed Air has reviewed the terms of the Model Closing Agreement and is prepared to execute a final document upon obtaining this Court's authorization. Fresenius has also reviewed the Model Closing Agreement and will execute a final document, provided that Debtors comply with the terms of the Settlement Agreement and Release of Claims dated February 6, 2003 (the "Fresenius Agreement"), which is attached hereto as Exhibit E.

### h. The Fresenius Agreement

22. Under the Fresenius Agreement, as will be further explained below, Debtors are required to seek this Courts approval to pay substantially all of the COLI Related Taxes when due.

23. Under the Fresenius Agreement and subject to certain preconditions, Fresenius agreed to pay, within five business days after the Settlement Effective Date (defined below), $115 million as directed by this Court for the benefit of the Debtors' Estates (the "Fresenius Payment"). The "Settlement Effective Date" is the later of (a) the effective date of the Debtors' plan of reorganization or (b) the satisfaction or waiver of all preconditions to the Fresenius Payment. One precondition to the Fresenius Payment is that the Fresenius Group be released from all Grace-Related Claims (as defined in the Fresenius Agreement), including all Indemnified Taxes. "Indemnified Taxes" include all taxes (including accrued interest and penalties thereon) of the Debtors with respect to any tax period ending on or before December 31, 1996.

24. Substantially all of the COLI Related Taxes at issue in this Motion qualify as Indemnified Taxes under the Fresenius Agreement (i.e., attributable to approximately $233.9 million out of approximately $252.4 million in COLI Interest Deductions). In addition to COLI

10

Related Taxes attributable to periods prior to December 31, 1996, Indemnified Taxes also include COLI Related Taxes attributable to approximately $22.5 million in COLI Interest Deductions claimed in 1997, by virtue of a carryback refund claim from the 1997 tax year to the 1988 and subsequent tax years. Since the Debtors have already received the tax refund, adjustments to the NOL carryback will technically result in an underpayment of taxes for periods prior to December 31, 1996, when Fresenius (then Grace New York as explained in the Initial COLI Motion) was the parent of the W. R. Grace & Co. Consolidated Tax Group. Therefore, the corresponding tax liability is within the definition of Indemnified Taxes. In addition, the entire estimated state cash tax liability would be included in Indemnified Taxes. The only portion of COLI Related Taxes not qualifying as Indemnified Taxes are those taxes attributable to the 1998 full tax year. Debtors claimed approximately $18.5 million in COLI Interest Deductions in 1998 and anticipate a corresponding cash tax liability of approximately $3 million, plus accrued interest.

25. The Fresenius Agreement gives Grace-Conn. the sole authority to act with respect to Indemnified Taxes. However, under Section 3.03(B) of the Fresenius Agreement, none of the Debtors may voluntarily agree to the payment, assessment or other resolution of any Indemnified Taxes prior to the Settlement Effective Date, unless (a) the Debtors have obtained authorization from this Court to pay in full any such Indemnified Taxes when due pursuant to a Final Determination or (b) Fresenius has consented in writing to such agreement by the Debtors. Further, pursuant to Paragraph 2(iii) of the Order of District Judge Wolin approving the

11

Fresenius Agreement,[3] the Debtors are authorized to make any payment of Indemnified Taxes in connection with any settlement of such Taxes.

26. In compliance with the terms of the Fresenius Agreement, Debtors seek authorization to pay COLI Related Taxes qualifying as Indemnified Taxes when due.

### Termination of the COLI Policies

i. **Consistency with the 80/20 Settlement Proposal.**

27. In its Initial COLI Motion, Debtors stated that discussions were ongoing with the IRS concerning the federal income tax consequences of terminating the COLI Policies and that any such settlement would be the subject of a subsequent motion. Debtors and the IRS have reached a tentative agreement to terminate the COLI Policies that is consistent with the terms of the 80/20 Settlement Proposal.

28. As previously stated, under the 80/20 Settlement Proposal, Debtors agree to concede 80% of the COLI Interest Deductions. In recognition of this concession, the IRS is willing to exempt Debtors from 80% of the gain that is typically recognized by taxpayers upon termination of the COLI Policies, provided that such termination occurs in the context of a COLI Settlement Agreement. Generally, when a taxpayer terminates a life insurance policy, any gain realized must be included in taxable income. However, as part of the COLI Settlement, Debtors will be taxed on only 20% of the gain realized on termination. Associated dividends will continue to be fully taxed.

29. Hartford has provided the Debtors with an estimate of the cash and tax consequences if the COLI Policies had terminated on June 30, 2004. As set forth below, as of

---

[3] A copy of the Order approving the Settlement Agreement is attached hereto as <u>Exhibit F</u>.

June 30th, Debtors would have received a cash payment of approximately $22.3 million and would have been required to include approximately $56.6 million in taxable income in the year of termination. Pursuant to the proposed COLI Settlement terms, Debtors would be entitled to an exemption from taxable income of approximately $194.4 million in termination gain.

| Consequences of a Termination As of June 30, 2004 | |
|---|---|
| ($ Millions) | |
| *Cash* | |
| Total COLI Policy Value | 366.7 |
| Total Loan Balances | (352.4) |
| Remaining Policy Value | 14.3 |
| Dividends/Reserves | 8.0 |
| Cash Payout on Termination | 22.3 |
| *Tax Consequences* | |
| Termination Gain Realized | 243.0 |
| Settlement Exemption from Taxable Income | (194.4) |
| Termination Gain Taxable Income | 48.6 |
| Dividends/Reserves | 8.0 |
| Total Increase in Taxable Income | 56.6 |

30. The amounts listed in the above referenced chart will differ from the final termination amounts to reflect additional death benefits paid, fluctuations in applicable interest rates, increases in accrued interest on Policy Loans and changes in overall Policy Value. Further, assuming that termination occurs as part of the COLI Settlement, Debtors anticipate that there will be sufficient net operating losses to offset the increase in taxable income attributable to the termination, although alternative minimum taxes may apply.

j. **Additional Rationale for Termination as part of the COLI Settlement**

31. Hartford has provided the Debtors with an actuarial estimate of projected death benefits and cash flow with respect to the COLI Policies. As of June 30, 2004, the COLI

Policies represent "insurance-in-force" of approximately $2,004.3 million in tax-free death benefits and projected cumulative death benefits totaling $1,505 million over an approximately 65-year period.[4] Although actual experience has and may continue to vary, Hartford forecasts that annual net cash flow derived from the COLI Policies, after factoring in death benefits, loan principal repayment and interest payments will be negative until 2020. Debtors have explored with Hartford various alternatives to improve upfront cash flows, but this would likely result in a substantial reduction of insurance in force.

32.     COLI has also been the focus of legislative proposals, media attention and policy discussions concerning the tax treatment of both death benefits received from COLI policies and the appreciation in policy value.[5] Under current law, death benefits are not subject to tax upon receipt and the appreciation in policy value is generally not subject to tax unless a taxpayer terminates its COLI policies. However, recent federal legislative proposals would require current taxation of death benefits, taxation of the appreciation in value of COLI policies and certain notification requirements.[6] Although many of the current legislative proposals would

---

[4] This actuarial projection assumes that loan interest is paid when due with no additional borrowing, that there is a 4% crediting rate on unborrowed cash value, that interest rates would continue in future years at current levels and that, to the extent possible, policies would be prevented from lapsing by reducing death benefits on policy anniversaries. Notwithstanding the foregoing, it is assumed that certain policies will lapse prior to payment of death benefits, creating a discrepancy between "insurance in force" and the projected cumulative death benefits.

[5] Present-Law Federal Tax Treatment, Proposals, and Issues Relating to Company-Owned Life Insurance ("COLI"), prepared by the Staff of the Joint Committee on Taxation, October 14, 2003, JCX-91-03.

[6] See H.R. 414 (introduced January 28, 2003) and H.R. 2127 (introduced May 15, 2003). An amendment relating to COLI was adopted in the markup in the Senate Committee on Finance of the "National Employee Savings and Trust Equity Guarantee Act" on September 17, 2003. Two amendments relating to COLI were filed in connection with the markup in the Senate Committee
(Continued...)

apply prospectively, there is no assurance that final legislation will adopt a prospective approach. Moreover, as with its challenges to COLI interest deductions, there is no assurance that the IRS might not attempt to apply the principles of such legislation retroactively to challenge the tax-free nature of death benefits derived from broad-based COLI policies.

### k.     Procedural Issues re: Termination

33.     Assuming Debtors terminate the COLI Policies, the following information must be included in the Final Closing Agreement entered into with the IRS: (i) the projected COLI policy termination date, (ii) the anticipated cash payout upon termination and (iii) the projected termination taxable gain in total and after applying the 80% exemption. Further, the termination of the COLI Policies must take place on the same day, immediately before the Final Closing Agreement is executed. The attached Model Closing Agreement contains the above referenced information in brackets, assuming a March 19, 2004 termination date. The chart set forth in paragraph 28, above, updates this information based upon a June 30, 2004 termination date. Assuming Debtors are authorized to accept the COLI Settlement and terminate the COLI Policies, the Final Closing Agreement will state the actual Closing Date and the financial information relating to the termination of the COLI Policies on such date.

### Relief Requested

34.     By this Motion, Debtors seek authority to (i) execute a Final Closing Agreement containing the COLI Settlement terms described herein and providing for termination of the

---

on Finance of the "Jumpstart Our Business Strength (JOBS) Act," with modifications, on October 1, 2003

COLI Policies; (ii) pay the COLI Related Taxes when due in accordance with the terms of the Fresenius Agreement; and (iii) terminate the COLI policies.

## Basis For Relief

35. Federal Rule of Bankruptcy Procedure 9019 authorizes the Court to approve compromises or settlements entered into by the Debtors. The decision whether to accept or reject a particular compromise lies within the sound discretion of the Court. In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986). Approval of a compromise settlement is appropriate if it is in the "best interests of the estate." Id.

36. In determining whether a compromise settlement is in the best interests of a debtor's estate, courts in the Third Circuit have considered the following four factors:

- the probability of success in the litigation;
- the difficulties, if any, to be encountered in the matter of collection;
- the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and
- the paramount interest of the creditors.

Id.; see also In re Pennsylvania Truck Lines, Inc., 150 B.R. 595, 598 (E.D. Pa. 1992), aff'd, 8 F.3d 812 (3d Cir. 1993); In re Grant Broadcasting of Philadelphia, Inc., 71 B.R. 390, 395 (Bankr. E.D. Pa. 1987).

37. The settlement need not be the best that the debtor could have achieved, but only must fall "within the reasonable range of litigation possibilities." In re Penn Central Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979). In making its determination, a court should not substitute its own judgment for that of the debtor. Neshaminy Office, 62 B.R. at 803. Moreover, it is not necessary for the court to conduct a "mini trial" of the facts or the merits underlying the dispute. Grant Broadcasting, 71 B.R. at 396; see also In re A & C Properties, 784 F.2d 1377, 1384 (9th

16

Cir.), cert. denied, 479 U.S. 854 (1986). Rather, the court need only consider those facts that are necessary to enable it to evaluate the settlement and to make an informed and independent judgment about the settlement. Penn Central, 596 F.2d at 1114; see also In re Energy Cooperative, Inc., 886 F.2d 921, 924-25 (7th Cir. 1989).

### Argument

38.     The Court should approve the Final Closing Agreement and payment of the COLI Related Taxes because they are in the best interests of (i) the Debtors' estates and (ii) creditors of the Debtors' estates.

39.     Debtors' management has determined that accepting the COLI Settlement and terminating the COLI Policies at this time is in the best interests of their estates and their creditors for several reasons. Although the Debtors continue to believe in the merits of their case regarding the COLI tax controversy, they recognize that there are substantial hazards of litigation given that the IRS has successfully challenged interest deductions claimed by other corporations with respect to broad-based COLI policies in a preponderance of court decisions regarding this matter. See In re CM Holdings, Inc., 254 B.R. 578 (D. Del. 2000), aff'd, 301 F.3d 96 (3rd Cir. 2002); Winn-Dixie Stores, Inc. and Subsidiaries v. Commissioner of Internal Revenue, 113 T.C. 254 (1999), aff'd, 254 F.3d 1313 (11th Cir. 2001); reh'rg en banc denied, 275 F.3d 49 (11th Cir. 2001); writ of cert. denied, 122 S. Ct. 1537 (2002). American Electrical Power, Inc. v. United States, 326 F.3d 737 (6th Cir. 2003) affirming 136 F. Supp. 2d 762 (S.D. Ohio 2001) writ of cert. denied, 124 S.Ct.1043 (2004). At present, there is only one case, Dow Chemical Co. v. United States, in which a court ruled in favor of the taxpayer. See, Dow Chemical Co. & Subsidiaries v. U.S., 278 F.Supp.2d 748 (E.D. Mich. 2003), modifying 250 F. Supp. 2d, 844 (E.D. Mich. 2003). Debtors have no certainty that the Dow precedent will prevail for other taxpayers who chose to litigate the COLI controversy. Therefore, consistent with many other taxpayers and in order to

avoid the high cost of litigation, Debtors believe that acceptance of the Government settlement guidelines is the most prudent course of action. Indeed, in a letter to the Department of the Treasury dated April 22, 2004, Mark W. Everson, the Commissioner of the IRS, stated that "most taxpayers accepted the settlement and, as a result, just a small number of broad-based post-1985 COLI cases remain unresolved."

40. If the Debtors' do not accept the COLI Settlement, choose to litigate the controversy, and do not prevail in such litigation, the amount of federal income tax owed by Debtors for the taxable years at issue could exceed the settlement offer by as much as approximately $29 million. In addition, the IRS would likely seek to impose penalties in this matter and the anticipated attorney litigation fees would be substantial.

41. Terminating the COLI Policies is in the best interest of Debtors estates and creditors because the policies will not produce a positive cash flow on an annual basis in the near future, and there is continuing controversy surrounding the tax treatment of COLI proceeds and the ultimate beneficiaries of such proceeds.

42. Payment of the COLI Related Taxes, when due, is appropriate because such payment is required under the Fresenius Agreement. The Fresenius Agreement was previously approved by the District Court and will result in the payment of $115 million by Fresenius to the Debtors on the Effective Date of their chapter 11 plan. Therefore, it is appropriate for this Court to authorize the Debtors to pay the COLI Related Taxes when due.

### Notice

43. Notice of this Motion has been given to (i) the Office of the United States Trustee, (ii) counsel to the debtor-in-possession lenders, (iii) counsel to each official committee appointed by the United States Trustee and (iv) those parties that requested papers under Fed. R. Bankr. P. 2002.

91100-001\DOCS_DE:100108.1

## No Prior Request

44.  No prior motion for the relief requested herein has been made to this or any other Court. The Debtors submit that no further notice or a hearing is necessary for this Court to enter an order granting the relief requested by this Motion.

WHEREFORE, the Debtors respectfully request (i) the Court's authority to (a) execute a Final Closing Agreement containing the COLI Settlement terms described herein, (b) pay the COLI Related Taxes when due in accordance with the terms of the Fresenius Agreement, (c) terminate the COLI policies; and (ii) that the Court grant such other and further relief as the Court deems just and proper.

Dated: September 20, 2004

Respectfully submitted,

KIRKLAND & ELLIS LLP
James H.M. Sprayregen
Janet S. Baer
James W. Kapp III
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.

_____
Laura Davis Jones (#2436)
David W. Carickhoff, Jr. (#3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession

91100-001\DOCS_DE:100108.1