## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------- x
:
In re: :
:
W.R. GRACE & CO., ET AL., : Case No. 01-1139 (JKF)
: Chapter 11
Debtors. :
: (Jointly Administered)
:
------------------------------------- x

**STATEMENT OF CONWAY, DEL GENIO, GRIES & CO., LLC SUPPORTING FEE STRUCTURE RELATED TO ITS ENGAGEMENT AS FINANCIAL ADVISOR FOR THE OFFICIAL COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS.**

TO THE HONORABLE JUDITH K. FITZGERALD,
UNITED STATES BANKRUPTCY JUDGE:

Conway, Del Genio, Gries & Co., LLC ("CDG") files this statement (the "Fee Statement") in response to the Court's request for a report indicating why CDG's fees are appropriate with respect to CDG's fee structure outlined in the Retention Order dated October 22, 2001, executed in connection with financial advisory services provided to the Official Committee of Asbestos Property Damage Claimants of W.R. Grace & Co., et al. (the "PD Committee") commencing April 27, 2001, and respectfully represents:

1

## Introduction

1.  On April 27, 2001, the PD Committee chose to retain CDG as its financial advisor. By application, dated July 6, 2001, the PD Committee sought Court approval for the retention of CDG as financial advisor to the PD Committee *nunc pro tunc* to April 27, 2001.

2.  Pursuant to the Order of the Court dated October 22, 2001 (the "Retention Order"), CDG was retained as financial advisor to the PD Committee to perform services set forth in our engagement letter dated June 15, 2001.

3.  Pursuant to the Retention Order, the Court authorized the PD Committee to retain CDG as financial advisor at a rate of $150,000 per month for twelve months and $100,000 per month thereafter, plus reimbursement of actual and necessary expenses *nunc pro tunc* to April 27, 2001, pursuant to sections 1103(a) and 328(a) of title 11 of the United States Code. The fee arrangement in these chapter 11 cases is consistent with CDG's past billing practices.

4.  While CDG's retention was *nunc pro tunc* to April 27, 2001, pursuant to an agreement with the PD Committee, CDG did not begin billing the estate for services rendered until May 27, 2001. In addition, in June 2004, CDG voluntarily agreed to reduce its fees to $50,000 per month (50% of CDG's fees pursuant to CDG's retention) for periods in which CDG has provided the PD Committee reduced levels of services.

5.  Since our retention, CDG has made itself available to address the needs, issues and questions of the PD Committee with respect to the Debtors' operations, business performance and financial results. CDG's flat fee structure takes into account periods of high and low case activity, such as the work load incurred by CDG in 2002 when CDG served as a testifying witness and consulting expert in the fraudulent transfer lawsuit filed by the PD Committee and the Official Committee of Asbestos Personal Injury Claimants (the "PI Committee") against Sealed Air Corporation (the "Sealed Air Adversary Proceeding") and as a consulting expert in the fraudulent transfer lawsuit filed by the PD Committee and the PI Committee against Fresenius National Medical Care, Inc. (the "Fresenius Adversary Proceeding"

2

and, together with the Sealed Air Adversary Proceeding, the "Adversary Proceedings"), and the work load incurred year to date.

6. As of the filing of CDG's Twelfth Interim Fee Application, CDG has submitted fee applications to this Court covering 35 months of the case, but has only requested fees for 34 of those months during which CDG spent a total of 9,260.9 hours working on behalf of the PD Committee, for total requested fees of $4,013,333.

7. CDG typically bills its advisory clients based on a monthly fee or a monthly fee plus bonus. CDG is efficient in its provision of services to the PD Committee and does not duplicate services, etc. While CDG's billing practices do not include billing at an hourly rate, if CDG were to calculate an hourly rate for its professionals, that rate would be in keeping with those of other financial advisors in this case.

8. Typically, an hourly rate structure charges higher rates for the time spent by senior professionals and lower rates for less tenured ones. As this case has been replete with complex issues, CDG's fixed rate fee structure benefits the PD Committee and the Debtors because CDG does not charge a premium for the ongoing involvement of more experienced senior professionals. Indeed, more than one-third of the 9,261 hours spent on this case by CDG have been recorded by professionals at or above the Managing Director level.

9. CDG has provided services to the PD Committee related to matters in both the main bankruptcy case and the Sealed Air Adversary Proceeding. CDG has incurred 9,261 hours of which 4,026 relate to the main bankruptcy case and 5,235 relate to the Adversary Proceedings. When CDG was asked by the PD Committee to be a consulting expert and testifying witness in the Adversary Proceedings, CDG did not change its fee structure despite knowing that significant time would be incurred. CDG also notes that no other financial advisor in this case was involved in the Adversary Proceedings.

<u>Bankruptcy Related Services</u>

10. During the course of our engagement, CDG has provided 4,026 hours of services to the PD Committee in the main bankruptcy case. CDG responds to all requests of the

3

PD Committee, which requests generally focus on preserving or enhancing the estate that will be available for all claimants under a plan of reorganization. More specifically, we have provided services in the bankruptcy case in the following areas:

### A.  Acquisitions and Divestitures

The Company has historically embraced a business strategy of growth through "bolt-on" acquisitions, while focusing on its core strengths and responding to market changes with strategic divestitures. Since the filing of this bankruptcy case, we have been noticed on numerous proposed acquisitions and divestitures, including seven of which were proposed in 2004 alone. For each material acquisition and divestiture proposed by the Debtors, CDG performs various analyses to determine and advise the PD Committee of the benefits or risks associated with each such transaction. CDG reviews materials from the Debtors and their financial advisors and performs valuation and market research to determine whether there is value added or lost by any transaction, and to be certain diligence matters impacting value were addressed. CDG's valuation analyses include comparable company trading analyses, precedent transaction analyses, and, for larger acquisitions, discounted cash flow analyses. CDG reports to the PD Committee the details of each transaction and a recommended course of action.

### B.  Annual Business Plan

CDG reviews and analyzes Grace's annual business plan, which includes analyzing projected performance relative to historical trends, assessing industry trends, and meeting with management to review the plan. CDG performs various analyses to evaluate the reasonableness and achievability of the plan. CDG prepares a preliminary assessment of value available for creditors based upon the Debtors' projected future operating performance. CDG apprises the PD Committee of any significant issues.

### C.     Quarterly Operating Reports

CDG reviews the Debtors' quarterly operating results. CDG analyzes detailed financial information provided by the Debtors, reviews the Debtors' public disclosures, and meets with Grace Management to review financial performance and discuss any operational issues. CDG also reviews historical trends and evaluates performance relative to the Grace's annual business plan. CDG apprises the PD Committee of significant issues and observations.

### D.     Fraudulent Conveyance Assessment

Early in the case, CDG reviewed and evaluated all acquisitions and divestitures within the statutory period covering fraudulent conveyances to determine the merits of pursuing certain potential litigation. CDG performed a detailed review of asset divestitures to both Fresenius National Medical Care and Sealed Air Corporation. CDG's analyses were relied upon by both the PD Committee and the PD Committee's counsel to develop certain strategies for pursuing litigation.

### E.     KERP Motions

CDG reviewed the Debtors' various motions for key employee retention plans and analyzed the impact on cash of the proposed programs. CDG participated in the negotiation of the terms of these plans and apprised the PD Committee on the proposed programs. CDG reviews the merits of the programs each year as the Debtors extend the KERP program.

### F.     Pension Funding Motions

Primarily due to declining economic and market conditions in 2002, the Debtors' pension reserves became underfunded giving rise to extraordinary cash needs to remain in compliance with Federal pension laws. CDG examined and researched the pension issues and advised the PD Committee on the Debtors' proposed solution to its underfunded

5

status, and recommend alternatives that preserved cash that may be available to satisfy claims under the plan of reorganization.

### G. Valuation / Debt Capacity / Plan of Reorganization

While the Debtors have endeavored to put together a plan for over a year, CDG has been engaged in conversations and analyses to anticipate the structure of a proposal. CDG has performed several analyses in anticipation of the Debtors filing a plan, including debt capacity, claims review, and valuation analyses. CDG has valued the Debtors on a consolidated basis and by business unit using discounted cash flow analyses, comparable company trading analyses and precedent transactions analyses.

CDG anticipates that once the Debtors' plan of reorganization is filed, the amount of time required to analyze the plan and the multitude of issues raised therein and to properly advise the PD Committee will be very significant.

### H. Other Miscellaneous Motions and PD Committee Requests

From the outset of this case, CDG has actively participated in weekly conference calls with the PD Committee and attended other periodic meetings scheduled by the PD Committee. During the course of this case, CDG has been asked by the PD Committee to review certain other actions taken or proposed by the Debtors. Each motion filed by the Debtors that potentially impacts upon the Debtors' financial condition is directed to CDG for our review and analysis. This includes key employee retention plans, incentive pay, severance packages, pension funding requests, etc. CDG has spent many hours reviewing the supporting documents for the motions and conducting independent analyses and due diligence in order to advise the PD Committee of which action, if any, would be beneficial to the Constituents represented by the PD Committee. CDG has been and continues to be responsive to numerous requests from the PD Committee that requires CDG's financial expertise.

### Adversary Proceedings Services

11. CDG has provided 5,235 hours of services to the PD Committee and the bankruptcy estate in the Adversary Proceedings. At the request of the PD Committee and with the approval of the PI Committee, CDG served as a consulting expert and testifying expert witness in the Adversary Proceedings. On behalf of the plaintiffs, CDG prepared analyses, due diligence, and provided other related services to prepare Michael Gries to testify on certain key aspects of the transactions being litigated. CDG worked closely with counsel in devising trial strategies, providing substantive proof of the fraudulent conveyance, preparing counsel for examination and cross-examination, responding to other financial advisors, and preparing to serve as a testifying expert witness at trial in an effort to reconstitute value lost that would, if recovered, enhance the estate that available for all claimants under a plan of reorganization. The Adversary Proceedings resulted in two settlements that will result in a recovery in excess of $1 billion to the estate. More specifically, we provided services in the Adversary Proceedings in the following areas:

### A. **Due Diligence / Document Production**

CDG received and reviewed more than 30,000 pages of documents spanning approximately four years of corporate activity. These documents were delivered in electronic format with no index, document separators, or identifiable order. Each page was read for relevance to the case, grouped into its appropriate category, and then sorted by date and author.

CDG was served a subpoena in the adversary proceeding and compelled to assemble all documents produced in connection with the Sealed Air Adversary Proceeding. CDG professionals reviewed and printed all related e-mails, voicemails, non-confidential documents, source documents, research materials, and hand written notes for copying and distribution to the defendant, Sealed Air. We received copies of all e-mails, voicemails, non-confidential documents, source documents, research materials, and hand written notes for the defendant's experts, along with copies of all depositions taken in the case.

CDG reviewed all of these documents and was able to identify certain documents that were critical to the arguments to be made in the case. CDG also identified incongruencies in the documents that pointed toward problems with the initial valuation performed at the time of the transfer.

### B. Valuation Analysis

Based on public documents and documents discovered during our diligence activities, CDG performed comparable company trading analyses, precedent transaction analyses and discounted cash flow analyses on Grace as a consolidated entity and Grace as a sum of its business segments before and after the asset transfer. CDG also performed these valuation analyses on the acquiring company, Sealed Air, before and after the transfer.

### C. Trial Preparation

CDG spent a significant amount of time engaged in preparation for trial. CDG participated in meetings with counsel one to two times a week for 5 months in preparation for trial.

CDG also spent significant time in meetings with counsel preparing Michael Gries for testimony and assisting counsel in preparing strategies for cross-examination of other experts involved in the case. Pursuant to the direction and requests of counsel, CDG spent significant time preparing trial exhibits to be used by counsel to better demonstrate certain points that counsel wanted to emphasize during examination of Michael Gries and the cross-examination of other financial advisor witnesses.

### D. Depositions

CDG was requested to aid in counsel's preparation for and to attend depositions of the defendant's witnesses. CDG spent considerable time prior to the depositions assisting counsel in preparing questions and examination strategies for each deposition involving

financial and valuation related matters. CDG also attend and actively assisted counsel in numerous depositions.

### E. Expert Report Drafts and Responses to Other Reports

As an expert witness, Michael Gries was required to file several reports with the court in connection with the Sealed Air Adversary Proceeding. CDG assisted Michael Gries in preparing his expert reports. CDG spent significant time preparing these reports which required CDG to outline Michael Gries' views and expert opinion in a cohesive written report relying upon significant quantities of information gathered through discovery and depositions, independent research performed by CDG and numerous analyses prepared by CDG. Because of (1) the in depth knowledge of the issues of the litigation and (2) the quality analysis prepared by CDG, CDG was also asked to assist counsel in preparing certain other experts for testimony.

CDG's research and analyses were also used by counsel to controvert deposition testimony and reports of the defendant's experts in the case. Pursuant to counsel's request, CDG prepared a response to every financial expert report issued in the case. CDG's responses to these opposing reports required significant additional research and analysis.

### F. Settlement Negotiations

CDG actively participated in settlement negotiations. CDG assisted in negotiating the structure of the Sealed Air and Fresenius settlements. CDG advised counsel and the PD Committee on structures that maximized value for the estate. CDG was required to perform significant amounts of research and analyses in preparing for settlement negotiations. CDG's participation greatly assisted counsel in reaching settlements that will bring in excess of $1 billion to the Debtors' estates.

## G. Conference Calls and Meetings

CDG participated in many calls during the course of the Adversary Proceedings. In order to assess solvency, CDG needed to rely on the findings of other experts for the PD Committee. All experts for the PD Committee, including asbestos claims experts, environmental experts, insurance consultants, etc. needed to coordinate the source data for analysis and exchange findings for use in CDG's valuation analyses.

### Review of CDG's Fee Structure

12. Currently, there are four financial advisory firms retained in this chapter 11 proceeding. Two institutions, L Tersigni Consulting P.C. and Capstone (formerly FTI Policano & Manzo), bill on an hourly fee arrangement and CDG and Blackstone bill on a flat monthly fee arrangement. In addition, Blackstone's retention includes a restructuring bonus of $5,000,000. The PD Committee persuaded CDG not to request a restructuring fee. CDG believes that its fees are comparable and reasonable when compared to the effective hourly rates of the other financial advisors.

| Fee Structure | L Tersigni Consulting Hourly | FTI/ Capstone Hourly | Blackstone Monthly | CDG Monthly |
|---|---|---|---|---|
| Total Fees[1] | $1,527,366 | $2,586,110 | $4,194,167 | $4,013,333 |
| Professional Hours Incurred | | | | |
| Bankruptcy | 4,532 | 6,952 [2] | 5,415 | 4,026 |
| Adversary Proceedings | | | | 5,235 |
| Total Hours | 4,532 | 6,952 | 5,415 | 9,261 |
| **Effective Hourly Rate** | $337 | $372 | $775 | $433 |
| Restructuring Fee [3] | na | na | $5,000,000 | na |

[1] Represents actual fees from WR Grace's filing through March 2004.
[2] Capstone has spent approximately 50% more hours than both Tersigni and CDG while providing similar services to their committee.
[3] CDG is not requesting a restructuring fee.

10

13. In the Fee Auditor's amended Final Report Regarding Twelfth Interim Quarterly Fee Application of CDG, the Fee Auditor stated "we believe that $677.39 may be towards the high end of the range of reasonableness, but is not an unreasonable fee for the services performed by CDG." CDG's effective hourly rate is significantly below the Fee Auditor's reasonable "high end" of the range for CDG's fees.

14. In June 2004, prior to the court's request for this document, CDG agreed to reduce its fees to $50,000 per month for quarters where CDG provided reduced level of services to the PD Committee. As a result, while CDG has not submitted its Thirteenth and Fourteenth Interim Fee Applications, it will be requesting compensation of $50,000 per month for the period of April 2004 through September 2004. CDG believes that it has adequately addressed the concerns of this Court by voluntarily reducing its fees in accordance to the level of work required in these proceedings.

15. As previously noted, CDG is the only financial advisory firm involved in the bankruptcy related matters who was also involved in the Adversary Proceedings. CDG did not alter or amend its fee structure when it became a consulting expert and testifying expert witness. The Adversary Proceedings required CDG professionals to expend significant time in preparation for testimony. CDG did not request additional compensation under the belief that the time and effort of CDG will be "high and low" during the course of the bankruptcy case and, over time, CDG's compensation will balance out. Based on an allocation of fees between the main bankruptcy case and the Adversary Proceedings, CDG was paid $1,115,116.13 in respect of the Adversary Proceedings (including holdback amounts) for services provided that contributed to adding in excess of $1 billion to the estate. CDG believes that its fees were not representative of the value contributed by CDG and we note that the Financial Advisor/Expert Witness appearing at a deposition on behalf of Sealed Air testified that through September 2002, the advisory firm had been paid in excess of $2,255,000 for services provided to Sealed Air, which services were equivalent to those provided by CDG for the benefit of the PD Committee.

16. CDG has provided substantial, valuable and necessary services to the PD Committee. CDG is familiar with the Debtors' business operations, their operating results, their

planning and budgeting methodologies, the environmental and asbestos liabilities, and the claims and expectations of the PD Committee. CDG is well-qualified to represent the PD Committee based on its knowledge and familiarity with the issues in this case and the expectations of the PD Committee.

17. Based on the exigencies of this case at the present time, CDG respectfully suggests that the Fee Arrangement approved in the Retention Order should not be modified. As in the past, CDG will continue to monitor the level of its activity in consultation with the PD Committee. CDG's fee arrangement in this case is commensurate with fee arrangement in other engagements in which CDG is currently retained and is commensurate with the fees of other advisors in this case.

18. CDG and the PD Committee's counsel anticipate significant future need for CDG's services as a plan of reorganization is negotiated between the Debtors and the various official committees. CDG further believes that its fees have been reasonable given the amount of time in which CDG professionals have spent on this case on behalf of the PD Committee and is not inconsistent with the level of fees billed by other financial advisors in this case. CDG had already agreed with the Debtors to reduce its fees in periods where reduced levels of services were provided by CDG. CDG believes that the current fee arrangement of $100,000 per month, reduced to $50,000 for periods of reduced work load, is appropriate.

19. CDG is pleased to provide additional information as requested by the Court in this matter and respectfully reserves the right to file a response if the Court raises further issues.

Dated: New York, New York
September 22, 2004

Conway, Del Genio, Gries & Co., LLC

By: _____
Gregory S. Boyer
Managing Director