UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                      .    Case No. 01-1139 (JKF)
                            .    (Jointly Administered)
W.R. GRACE & CO., et al.,.       Adv. No. 01-771
                            .
          Debtors.          .
. . . . . . . . . . . . . .
W.R. GRACE & CO., et al.,.        USX Tower - 54th Floor
                            .     600 Grant Street
          Plaintiffs,   .         Pittsburgh, PA 15219
                            .
       v.                   .
                            .
MARGARET CHAKARIAN,         .
et al., and John Does       .     September 30, 2004
1-1000,                     .     2:05 p.m.
                            .
          Defendants.   .
. . . . . . . . . . . . . .
```

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Scotts Company:   Vorys, Sater, Seymour & Pease, LLP
                          By:  ROBERT J. SIDMAN, ESQ.
                          52 East Gay Street
                          Columbus, OH  43216

                          By:  TIFFANY S. COBB, ESQ.
                          (Telephonic Appearance)

                          Morris, Nichols, Arsht & Tunnell
                          By:  WILLIAM H. SUDELL, JR., ESQ.
                          1201 North Market Street
                          Wilmington, DE  19899

Audio Operator:           Janet Kozloski

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Donald and Judith Webber: | Fox, Rothschild, LLP<br>By:  BERNARD G. CONAWAY, ESQ.<br>Citizens Bank Center<br>919 North Market Street<br>Suite 1300<br>Wilmington, DE  19899<br>(Telephonic Appearance) |
| | Clark, Depew & Tracey, LLP<br>By:  ROBERTA KARP, ESQ.<br>440 Louisiana<br>Suite 1600<br>Houston, TX<br>(Telephonic Appearance) |
| For Royal Indemnity Co.: | Wilson, Elser, Moskowitz,<br>   Edelman & Dicker, LLP<br>By:  PETER ANDREWS, ESQ.<br>New York, NY<br>(Telephonic Appearance) |
| For Maryland Casualty Company: | Connolly, Bove, Lodge & Hutz, LLP<br>By:  JEFFREY C. WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19801<br>(Telephonic Appearance) |
| For the Debtors: | Kirkland & Ellis, LLP<br>By:  JANET S. BAER, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601<br>(Telephonic Appearance) |
| For the Unsecured Creditors' Committee: | Stroock & Stroock & Lavan, LLP<br>By:  ARLENE G. KRIEGER, ESQ.<br>180 Maiden Lane<br>New York, NY  10038<br>(Telephonic Appearance) |
| For Official Committee of Asbestos Personal Injury Claimants: | Campbell & Levine, LLC<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19801<br>(Telephonic Appearance) |

APPEARANCES (Cont'd.):

For Property Damage Asbestos   By:  ELLEN DANSEISEN, ESQ.
Claimants:   (Telephonic Appearance)

For Continental Casualty   By:  ELIZABETH DeCRISTOFORO, ESQ.
Company:   (Telephonic Appearance)

For Crane Co.:   Kirkpatrick & Lockhart, LLP
   By:  DANIEL P. TROCCHIO, ESQ.
   Pittsburgh, PA

1           THE COURT:  Good afternoon.  This is the matter of

2  W.R. Grace; Bankruptcy Number 01-1139.  This is the time set

3  for argument, at Adversary 02-771, on the motion of the Scotts

4  Company; for a temporary stay of the Rand action, that is

5  currently set for trial in State court in October of 2004.

6  Will you enter your appearance here in court, please?

7           MR. SIDMAN:  Good afternoon, Your Honor.  Robert

8  Sidman, of the firm of Vorys, Sater, Seymour and Pease,

9  representing the Scotts Company; the movant today.

10           THE COURT:  Okay.  Those of you on the phone, please

11  will you enter your appearances?

12           MS. COBB:  Good afternoon, Your Honor.  Tiffany Cobb,

13  also representing the Scotts Company.

14           MR. SUDELL:  Your Honor, this is William Sudell, of

15  Morris Nichols, also representing the Scotts Company.

16           MR. CONAWAY:  Good afternoon, Your Honor.  Bernard

17  Conaway; Fox, Rothschild, representing the -- Mr. and Mrs.

18  Donald and Judith Webber.

19           THE COURT:  I'm sorry.  You -- wait.

20           MS. KARP:  Your Honor, Roberta --

21           THE COURT:  Pardon me.  Mr. Conaway, you faded out.

22  You're representing the Webbers?

23           MR. CONAWAY:  Yes, Your Honor.  My apology.

24           THE COURT:  All right.  Thank you.

25           MS. KARP:  Your Honor, Roberta Karp, of Clark Depew

1  and Tracey, in Houston; also representing the Webbers.

2          THE COURT:  Thank you.

3          MR. ANDREWS:  Your Honor, Peter Andrews, of Wilson,

4  Elser, Moskowitz, Edelman and Dicker, in New York; representing

5  Royal Indemnity.

6          MR. WISLER:  Good afternoon, Your Honor.  Jeff

7  Wisler, on behalf of Maryland Casualty Company.

8          MS. BAER:  Good afternoon, Your Honor.  Janet Baer,

9  on behalf of the debtors.

10          MS. KRIEGER:  Good afternoon, Your Honor.  Arlene

11  Krieger, of Stroock and Stroock and Lavan; on behalf of the

12  Unsecured Creditors' Committee.

13          MR. HURFORD:  Good afternoon, Your Honor.  Mark

14  Hurford, of Campbell Levine, on behalf of the Official

15  Committee of Asbestos Personal Injury Claimants.

16          MS. DANSEISEN:  Ellen Danseisen, on behalf of the

17  Property Damage Asbestos Claimants.

18          THE COURT:  Anyone else?

19          MS. DeCRISTOFORO:  Yes, Your Honor.  Good afternoon.

20  This is Elizabeth DeCristoforo, for Continental Casualty

21  Company.

22          THE COURT:  Anyone else?  Okay.  Oh, good afternoon.

23          MR. TROCCHIO:  Good afternoon, Your Honor.  Dan

24  Trocchio, with Kirkpatrick and Lockhart, for Crane Co.

25          THE COURT:  Okay.  Mr. Sidman?

1          MR. SIDMAN:  Thank you, Your Honor.  May it please

2   the Court; you may recall that a couple of months ago, we were

3   on the phone with you on a prior motion related to similar

4   issues.  That prior motion had requested the application of

5   your January 22nd, 2002 injunction order to all asbestos

6   litigation -- naming Scotts -- on the basis that Scotts is or

7   may be an additional insured under certain W.R. Grace insurance

8   policies, and that Scotts alleged liability was premised solely

9   upon the corporation of W.R. Grace vermiculite, in its product.

10  In other words, the case against Scotts was, in fact, a case

11  against W.R. Grace.

12         The Court denied Scotts' relief at that point in

13  time, but in doing so, suggested that Scotts could -- or should

14  -- take steps to protect itself.  Among those steps were that

15  Scotts could enter into tolling agreements with plaintiffs;

16  thereby postponing the liability issue until W.R. Grace could

17  propose a plan, and presumably, have one confirmed by this

18  Court; (2) Scotts could ask State trial courts for

19  continuances, regarding liability of Scotts, pending the W.R.

20  Grace plan; and/or (3) Scotts could ask W.R. Grace to

21  voluntarily participate in State court litigation, so that the

22  true defendant was represented and could answer for its

23  liability, if any, to the plaintiffs.

24         We have taken to heart, Your Honor, the Court's

25  suggestions, and attempted to resolve the Scotts dilemma by

1  agreement.  That dilemma, Your Honor, is that while Scotts was
2  named in the asbestos litigation as a substitute for W.R. Grace
3  -- merely because of the W.R. Grace bankruptcy -- Scotts could
4  not require Grace to participate in that litigation, nor could
5  Scotts call -- at least at this time -- on Grace's insurers to
6  defend Scotts as an additional insured under those Grace
7  policies.

8        I'm here to report, Your Honor, that we have met with
9  -- I wanted to say limited success, but I will say no success
10 -- on those suggestions, to date.  We have asked numerous
11 plaintiffs for tolling agreements, and have not been
12 successful; either because they have said no, or they have not
13 yet responded.  We now find ourselves facing an October 11th
14 trial in Texas, that puts both W.R. Grace and Scotts at risk.

15       Your Honor should also know that another effort to
16 protect ourselves and determine our legal rights, we have filed
17 an adversary proceeding in this court, seeking a declaration on
18 the insurance coverage issue.  That case was filed, I believe,
19 September 2nd.  And we are awaiting the answers of the various
20 insurance company named defendants and intend, as quickly as
21 possible, to litigate the insurance -- shared insurance policy
22 coverage issue -- in front of you.

23       Your Honor, let me talk a bit about the Rand case.
24 And the Rand case is somewhat of a misnomer, because the only
25 plaintiff that we're concerned about at this point is by the

1  name of Webbers, but Rand apparently is the lead plaintiff.

2  Your Honor, originally there were seven plaintiffs in that

3  litigation.  I believe there still are seven plaintiffs.

4  However, after discovery and other events in that case, only

5  one plaintiff -- Mr. Webber -- has any alleged claims left

6  against Scotts.  The other six have conceded, I believe, that

7  they have no such claims.

8        The defendants in that case were literally scores of

9  companies, whose products had allegedly made the plaintiffs

10 sick.  And my understanding is that there are now many fewer

11 defendants left in the litigation, although there are several

12 left.  I was told ten to twenty.  The other defendants have

13 been dismissed, or settled in some fashion or another.  But Mr.

14 Webber and the other plaintiffs still have pending claims

15 against numerous defendants other than Scotts, and we do not

16 seek to impair the assertion of those claims, nor to halt the

17 October 11th trial, as to those defendants.

18       Your Honor, Scotts has made efforts to resolve with

19 Mr. Webber some of the trial issues that we see in -- eleven

20 days from now -- and have not been successful.  Scotts has

21 asked Mr. Webber to sever and stay his action against Scotts,

22 in exchange for a tolling agreement.  Mr. Webber has declined

23 to do so.  Scotts has asked the State court to sever and stay

24 the claims against Scotts.  And at a hearing held on September

25 28th -- two days ago -- the Court refused to entertain such

1  relief at this point in time.

2        I was not there, Your Honor, now was I a participant

3  by phone.  But I understand that the Court deferred

4  consideration of the matter of severing and staying Scotts

5  until after a mediation.  That sounds very logical at first

6  blush, Your Honor.  But I understand that there is no mediation

7  currently scheduled, and we have an October 11th trial facing

8  us.  I don't know if the Judge intended to mandate a mediation

9  next week, but the time is short.  With a trial date of October

10 11th -- with depositions ongoing, both this week and next, and

11 with trial preparation absolutely necessary at this time --

12 this Court can see, I believe, the difficulties facing both

13 Scotts and W.R. Grace.

14        Let me talk a minute about the decision we would ask

15 this Court to render.  As it presently stands, the Webber

16 claims against Scotts will be tried, starting October 11th.

17 Scotts has asked Webber to stipulate that Scotts' liability is

18 not related to the W.R. Grace vermiculite, because if that were

19 true, we would not need to be in this court today asking you

20 for relief.  Mr. Webber has refused.  Because then, we believe

21 the liability that will be asserted against Scotts is based

22 upon the presence of W.R. Grace vermiculite and its product,

23 the following consequences of that October 11th trial are

24 likely.

25        (1) There will be factual findings and/or legal

1 rulings which will be made, that may or will be detrimental to

2 both W.R. Grace and Scotts.  (2) Those findings and rulings may

3 or will implicate the insurance coverage issues now pending

4 before this court in the declaratory judgment action.  (3) The

5 proceeds of the W.R. Grace insurance policies will or may be

6 subject to conflicting or adverse claims as a result of the

7 Texas case, thereby impairing W.R. Grace's reorganization

8 efforts.

9          Scotts asked this court to temporarily issue an order

10 which will sever Scotts from the Rand case in Texas, pending

11 resolution of the W.R. Grace reorganization -- and as I

12 understand it, and I believe Your Honor ordered, the plan is

13 due to be filed shortly -- and the disposition of the

14 declaratory judgment action, which is now pending in this

15 court.  Scotts does not ask this court to stay or interfere, in

16 any way, with the Rand/Webber trial, except to order that the

17 claims against Scotts should not go forward at this time,

18 because they affect W.R. Grace.  They affect the insurance

19 policies.  And they affect the Chapter 11 reorganization.

20          Mr. Webber can proceed against all other defendants

21 on October 11th.  And his claims against Scotts and/or W.R.

22 Grace are unaffected.  There is and can be no harm to Mr.

23 Webber from this relief.  And the granting of this relief

24 clearly prevents significant potential harm to both W.R. Grace

25 and Scott.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Well, has Scotts raised a claim against

2  W.R. Grace, because -- I mean, there hasn't been an asbestos

3  injury bar date in this case.  But, has he filed a claim here?

4          MR. SIDMAN:  Mr. Webber?

5          THE COURT:  Yes.

6          MR. SIDMAN:  I do not know that, Your Honor --

7          THE COURT:  So, right now --

8          MR. SIDMAN:  -- one way or the other.

9          THE COURT:  -- the only claim -- Grace was not a

10  defendant in the State court suite, correct?

11          MR. SIDMAN:  That's correct.

12          THE COURT:  All right.

13          MR. SIDMAN:  Because of the stay, Your Honor.  That

14  concludes my initial argument.  I'd like to save some time for

15  rebuttal.

16          THE COURT:  All right.

17          MR. SIDMAN:  Thank you.

18          THE COURT:  Ms. Baer?

19          MR. CONAWAY:  Good afternoon, Your Honor.  Bernard

20  Conaway, on behalf of Donald and Judith Webber.

21          THE COURT:  All right.  I thought, perhaps, that the

22  parties who were joining with Scotts might wish to be heard

23  first?

24          MR. CONAWAY:  Thank you, Your Honor.

25          MS. BAER:  Thank you, Your Honor.  Janet Baer, on

**J&J COURT TRANSCRIBERS, INC.**

1  behalf of the debtor.  Your Honor, we filed a response, joining

2  in Scotts' motion.  Obviously, Your Honor -- as you have keyed

3  into it -- our focus and our concern is W.R. Grace, and whether

4  or not what will occur in the State court will have any affect

5  on the estate of W.R. Grace.  At this point, we do not know if

6  the insurance will be implicated or not, but we believe it

7  could.  And that is really what your preliminary injunction was

8  meant to stop, which is actions that may affect our insurance

9  assets.

10         In addition to that, Your Honor, certainly we're

11  concerned about whatever discovery and whatever testimony would

12  occur in the State court action; vis-a-vis, W.R. Grace's

13  product.  We understand that discovery is going forward.  Grace

14  is not in a position to participate in that discovery; has not

15  been participating in that discovery, and time could, frankly,

16  not be worse; in terms of whether or not W.R. Grace will be

17  forced to participate in that discovery.  As you know, we are

18  set to file a Chapter 11 plan and disclosure statement within

19  the next couple of weeks.  And it is a very intense time, as

20  the Grace Company is getting all of the information together.

21         Your Honor, if it is clear -- or, if the plaintiffs

22  will make it clear that they do not intend to be putting W.R.

23  Grace's product on trial -- then, of course, we have no

24  objection, and the case should go forward.  Otherwise, we

25  believe that Scotts' request and Scotts' proposal for the

1  litigation to go forward without Scott -- if it, in fact,

2  implicates Grace product -- is a logical way to address the

3  plaintiff's concerns about moving forward, yet caps the

4  debtor's estate.

5          THE COURT:  All right.  Does someone wish to speak on

6  behalf of Maryland Casualty?  No one?  All right.  Anyone else

7  wish to speak on behalf of the parties who have joined the

8  motion?

9          MR. WISLER:  Your Honor, I'm sorry.  This is Jeff

10 Wisler, from Maryland Casualty.  My mute button was on, and I

11 was speaking.  We don't have anything to add to our response.

12         THE COURT:  All right.  Anyone else?  Okay.  Mr.

13 Conaway?

14         MR. CONAWAY:  Thank you, Your Honor.  May it please

15 the courts; I first would argue that this matter has resolved

16 by the law of the case doctrine.  Mr. Sidman went through great

17 pains to point out to the Court how the application it has made

18 today differs from that which was argued in July.  But in point

19 of fact, had the Court granted relief that Scott sought at that

20 point in time, we would not be here today.

21         THE COURT:  Mr. Conaway, I'm sorry, but we're having

22 a great deal of difficulty hearing you.  Are you on a speaker

23 phone?

24         MR. CONAWAY:  I am not.

25         THE COURT:  Okay.  Then, I guess I have to ask you to

1  shout, please.

2       MR. CONAWAY:  I'm sorry.  Is that any better?

3       THE COURT:  Yes, it is.  Thank you.

4       MR. CONAWAY:  Shall I start over, Your Honor?

5       THE COURT:  No.  I think I'm up with you.  The law of

6  the case doctrine, and had the relief been granted at the last

7  time that Scotts requested it, then obviously, you wouldn't be

8  here today.

9       MR. CONAWAY:  And clearly, that's the case.  There is

10 only a difference in specifics that separate what happens today

11 and what would have happened in July, had Scotts been

12 successful.  I further argue that this Court lacks jurisdiction

13 over this matter.  I point out that Scotts is a non-debtor;

14 that the parties that seek to enjoin from action are

15 non-debtors, but the operations with which it discusses --

16 which is the manufacture and sale of its own products -- have

17 nothing, whatsoever, to do with W.R. Grace.

18       I want to get into the specifics of the motion.

19 Scotts has argued that this is a case against W.R. Grace.  That

20 is simply not true.  It was a point that was made to Your Honor

21 back in July.  It is a point that is made in our papers.  The

22 allegations against Scott -- and as are supported by tort law

23 -- are that Scott remains solely and primarily responsible for

24 its product.  The importance of that point is this.  At least,

25 in the context of this discussion, Scotts has tried to argue

1 that the insurance -- that they are insured under the policies,

2 because there is language in the policies that would seem to

3 permit that those who act as middlemen for W.R. Grace product

4 might be covered under that insurance.  But the fact of that

5 matter is that Scotts repackaged this material; sold it on its

6 own.  And it turns out, Scotts has purchased material --

7 potentially, asbestos containing materials -- from other

8 supplies; not just W.R. Grace.

9        Scotts has failed to make any credible argument that

10 there is an irreparable argument that is over-weighed by the

11 prejudice that would be suffered by our own client.  Mr. Webber

12 is terminally ill.  He has a disease with which we all know

13 ultimately leads to death.  He has the right to try his case

14 before a jury, and he has the right to have all defendants who

15 may have some responsibility in that matter hear that case.  If

16 Scotts is not there, he will be denied that right.  By the time

17 he gets around to -- the Court gets around to rescheduling this

18 matter -- in all likelihood, Mr. Webber will have passed away.

19 Also --

20        THE COURT:  All right.  Mr. Conaway, is there some

21 allegation that concerns the debtor's product?  Do you intend

22 to prove, as part of your case, that in any way, Grace's

23 product was used as part of the vermiculite in Scotts' product?

24        MR. CONAWAY:  Part of the history of Scotts' product

25 manufacture involved purchases from W.R. Grace, Your Honor.

1          THE COURT:  So, you are going to get into the fact,

2   then, that Scotts has vermiculite that it may have purchased

3   from W.R. Grace in the product that your client used?

4          MR. CONAWAY:  Among other product supplies, W.R.

5   Grace was one of them.  Also point out, Your Honor, that Scotts

6   was -- never ever told us that they don't have insurance

7   coverage to handle this matter on their own -- their own

8   insurance coverage.  They've never told us that.  They've never

9   denied it.

10         The appropriate remedy here seems to be, if we're all

11  concerned about the insurance coverage that W.R. Grace may

12  have, if the -- impose an injunction against claims against

13  that coverage, to prohibit those who might assert claims from

14  doing so.

15         THE COURT: I agree.

16         MR. CONAWAY:  Instead of --

17         THE COURT:  I agree that that is the appropriate

18  remedy.

19         MR. CONAWAY:  Instead of precluding my client from

20  his day in court, given that his days are numbered here.

21         THE COURT:  I agree.  It appears to me that this

22  claim needs to be liquidated.  And to the extent that there is

23  independent tort liability -- and I'm not making findings.

24  It's not before me.  But to the extent that there may be

25  independent tort liability on behalf of Scotts, I believe that

1  claim does, indeed, need to be liquidated.  And the plaintiff

2  has the right to have it liquidated in the State court system.

3          However, to the extent that Scotts or anyone else is

4  going to claim that Grace's insurance stands to be liable for

5  that coverage, I will impose an injunction against that claim -

6  - against the insurance at this point in time, because that

7  insurance is clearly an asset of this estate -- a substantial

8  estate of this estate -- that the debtor needs to use in order

9  to put the plan together and pay all claims in a fashion that

10 the plan will direct.  So, I think the liquidation of the

11 claims is appropriate.  To the extent, however, that the next

12 step -- i.e., recovery on that claim against Grace or Grace's

13 assets, including Grace's insurance, would be attempted --

14 that, I believe, is appropriate for injunctive relief at this

15 time.

16          MR. CONAWAY:  Thank you, Your Honor.

17          THE COURT:  Mr. Sidman?

18          MR. SIDMAN:  I'd like to make two points, Your Honor.

19 Mr. Conaway has, I guess, suggested that W.R. Grace is both

20 implicated and not implicated in the present litigation.  I

21 think you have to go all in or not go all in.  If the potential

22 liability of W.R. Grace is part of the Rand trial, I think it

23 should be covered by this Court's January 22nd injunction.  You

24 can't say, well, it might be.  And there might be other

25 vermiculite suppliers.  We're not going to tell you until we

1 get to the end of the day.  Because our defense of that case,

2 it makes a difference.

3        THE COURT:  Okay.

4        MR. SIDMAN:  We need W.R. Grace, if W.R. Grace's

5 product is going to be implicated in the trial.  And we don't

6 have W.R. Grace today, because they have not voluntarily agreed

7 to participate.  The Court won't make them agree to

8 participate.  And if the trial, in that sense, is against W.R.

9 Grace, we are left without an adequate remedy to defend

10 ourselves.

11        THE COURT:  Well, that does seem to make some sense

12 to me, Mr. CONAWAY.  If Grace is -- if Scott purchased the

13 vermiculite from Grace as part of its history -- as you put it,

14 a few minutes ago -- then I'm not sure whether you are

15 contending that Grace's product caused the damage -- I mean,

16 that Scotts' use of Grace's product caused the damage.  Because

17 if you are, it seems to me that there should be some

18 injunction, with respect to a trial of Grace's product, because

19 that's as much a claim against the debtor and the debtor's

20 estate as can be implicated.  And I think it is barred by the

21 automatic stay.  That doesn't even take an injunction.  That's

22 simply an action that is covered by the stay.

23        MR. CONAWAY:  Your Honor, if I understand Mr. Sidman

24 correctly, it's this.  If the plaintiffs intend to put on --

25 the plaintiffs in Texas, excuse me -- intend to put on a trial,

**J&J COURT TRANSCRIBERS, INC.**

1  and part of the prosecution of that case on their behalf

2  involves evidence that Scotts purchased W.R. Grace material --

3  that therefore, there is some liability -- I think the answer

4  to that is yes.  But what we -- what Mr. Sidman fails to

5  recognize is that there is independent tort liability that is

6  imposed upon Scott for that.  That is strict liability.  They

7  have placed a product into the stream of commerce, for which

8  they bear independent responsibility, separate and apart from

9  whatever it is W.R. Grace may or may not have done with their

10 product.

11         THE COURT:  All right.  Well then, can there be a

12 limitation, I guess, with respect to the issue for trial, to

13 indicate that the findings -- if, in fact there are any

14 findings with respect to whether Scott used Grace's product or

15 not -- are binding upon the parties to that litigation, but not

16 against the debtor?  Because otherwise, I think the problem is

17 that the debtor has to participate, in order to either agree

18 that Scotts did use it products, or to defend against that

19 claim.

20         MR. CONAWAY:  Scotts has tort liability, simply by

21 virtue of placing that product -- which they re-labeled as

22 their own -- into the stream of commerce, Your Honor.

23         THE COURT:  Yes.  And I understand, with respect to

24 the independent liability theory, that that's what you're

25 attempting to prove.  And it seems to me, that's a theory that

1  Scott can defend.  The problem is, if you intend, then, to take

2  those findings to say -- you know, to waive a judgment, I

3  guess, in front of Grace -- and say, we now have a judgment

4  that says that Scott used your product.  Your product was the

5  cause of the harm.  And now, we have a claim against you.  And

6  Grace isn't there to defend itself.

7       MR. CONAWAY:  Is the answer to the question, Your

8  Honor, then, that the judgment -- whatever the jury might

9  render -- the parties agree that it has no application as to

10  W.R. Grace?

11       THE COURT:  Yes.

12       MR. CONAWAY:  I think that would be a matter that my

13  clients and their Texas counsel could discuss.  I don't see why

14  that would not work for them.  But again, I don't want to speak

15  for them.

16       THE COURT:  All right.  It seems to me that if they

17  would come up with that agreement, so that this estate is not

18  impacted by the trial -- I mean, you know, if, at a later time,

19  it turns out that your client has a claim against Grace,

20  obviously, there will be a mechanism within the bankruptcy

21  context to raise that issue.  But I don't think that the debtor

22  should be subject to a liability determination, when it's not

23  there to defend itself.

24       MS. KARP:  Your Honor, may it please the Court?  This

25  is Roberta Karp.  I'm the Texas counsel for the Webbers.

1          THE COURT:  Yes?

2          MS. KARP:  Your Honor, just a couple points of

3  clarification in this.  Scotts, as you well can tell, is the

4  only defendant for this particular exposure that is named in

5  this lawsuit.  W.R. Grace has not been in this lawsuit.  The

6  only -- this is a failure to warn case.  It goes strictly as to

7  Scotts' knowledge of the dangers of asbestos contained within

8  their product.  The jury verdict form would be strictly naming

9  Scotts.  There would be no findings as to any of the underlying

10 suppliers in this case.  So at this juncture, W.R. Grace is not

11 even a consideration, other than they happened to have been one

12 of the suppliers of vermiculite to Scotts.  They will not be on

13 a verdict form.

14         THE COURT:  Okay.  Well, Ms. Baer, I'm not sure I

15 understand how the debtor is impacted, then.

16         MS. BAER:  I'm not sure I understand exactly the

17 distinction that's trying to be made here.  But Your Honor, if

18 what is on trial is the Grace product and whether the Grace

19 product causes harm, I'm afraid evidence is being established

20 that's ultimately going to impact a claim against Grace.

21         MS. KARP:  Your Honor, Roberta Karp again.  That is

22 not the -- the theory of liability that is played is strictly a

23 failure to warn case.  It is not a products defect.  It's a

24 manufacturing defect, in that Scotts failed to warn of dangers

25 contained within their product.

1            THE COURT:  Yes.  But how are you going to

2    substantiate that their product was dangerous?  I think you're

3    going to have to show that it had contained some asbestos, and

4    that the asbestos fibers were the cause of the harm, correct?

5            MS. KARP:  Correct.

6            THE COURT:  So then the issue is, who provided the

7    fibers?  Or you're saying, you don't care who provided them.

8    The fact that you're going to have evidence, generally, that

9    vermiculite is a dangerous product, without regard to who

10   manufactured it?

11           MS. KARP:  Correct.

12           MS. BAER:  Your Honor, with all due respect, we -- I

13   think we all know enough about this situation to know that

14   vermiculite is not asbestos.  The issue that's going to be out

15   there is whether or not this vermiculite contained asbestos.

16   And we get back into, where did it come from, is it dangerous?

17   And I don't know how you can avoid not getting into -- to the

18   extent that you're going to be putting on proof that it came

19   from Grace's Libby mine -- getting into those issues.

20           THE COURT:  Well, it seems to me that the State court

21   may have to separate that out.  I believe that the injunction

22   that is appropriate is to say that the debtor's product

23   essentially cannot be the subject of adverse findings, because

24   it's -- any claim against the debtor -- and I think the

25   debtor's product, at this point in time, because that is an

1 asset of the debtor -- is barred by the automatic stay.  So,

2 you can't do through the back door what you can't do directly.

3          They could not bring a suit right now against the

4 debtor, with respect to its Montana asbestos that made its way

5 into vermiculite.  Therefore, they can't bring that suit

6 through the back door.  Now they can prove, I suppose, that

7 vermiculite has an asbestos product, and that asbestos can

8 cause the type of disease that Mr. Webber has.  But, I think

9 it's going to have to be done without an attribution in

10 subsequent proceedings against the debtor.

11          MS. BAER:  Your Honor, I have to remind everybody

12 that this isn't just the plaintiff.  Scotts, in defending

13 themselves, also is enjoined in making claims against Grace.

14          THE COURT:  Well, yes.  I think Scotts is.  The

15 issue, in that instance, is what I said earlier.  That's a

16 claim directly against the debtor that has to come up through

17 the bankruptcy, not through the State court litigation process.

18 But I still am having difficulty seeing why just because there

19 may be a claim made against insurance proceeds at a later date,

20 somehow or other impacts the trial, itself.  It doesn't seem to

21 me that on that score, the injunction should be extended.

22 There will be claims against insurance.  The debtor is going to

23 have to reconcile those claims.

24          MR. SIDMAN:  Your Honor, may I just briefly comment?

25          THE COURT:  Yes, sir.

1          MR. SIDMAN:  Bob Sidman, again.  We have been told

2    repeatedly, by various plaintiff's counsel -- and I don't

3    include this plaintiff's counsel among them, if it's not -- if

4    they haven't made the claim, that but for the presence of W.R.

5    Grace vermiculite and Scotts product, they wouldn't have been

6    sued at all.  So, we are in a very difficult position of being

7    told that the reason you're in the lawsuit is because you

8    incorporated W.R. Grace vermiculite in your product, yet you

9    can't defend this case, nor go against W.R. Grace's insurers,

10   because W.R. Grace vermiculite was in your product.  It just

11   seems to me --

12          THE COURT:  Well --

13          MR. SIDMAN:  -- it's a distinction, without a

14   difference.

15          THE COURT:  Well, I don't know how you're going to go

16   against Grace's insurance as a non-named insured.  That's an

17   issue for a different proceeding, I think; not here.

18          MR. SIDMAN:  Well, that may be, Your Honor.  But if

19   the judgment comes down in Texas that's adverse to Scotts and

20   it's -- and we can successfully argue that we were a named

21   insured under the policies -- or an additional insured -- the

22   estate is necessarily affected.  And I think Ms. Baer is saying

23   that.  There is no distinction here.  The estate has -- almost

24   has to be affected, unless W.R. Grace's product is not

25   mentioned once in the trial.

1          THE COURT:  But the issue for the insurance proceeds,

2  I think, is this.  That the insurance proceeds are property of

3  this estate.  If Scott, in fact, is somehow going to be deemed

4  to be an additional insured, then it will have some claim

5  against those insurance proceeds.  I am not going to permit

6  that claim to go forward, until I can determine whether, in

7  fact, those insurance proceeds are entirely property of this

8  estate.  If they are, there is no claim to be made.  If they're

9  not, then they're not property of the estate, as to which the

10  injunction ought to lie, anyway.

11          So, I don't see how the issue of the insurance

12  proceeds is impacted by the determination of Scotts' underlying

13  liability in the State court in this instance.  It would be

14  different in Scotts were, for example, an affiliate of the

15  debtor, as a named insured.  But Scotts' claim to these

16  insurance proceeds is a very different animal from a co-named

17  insured saying, we have the right to access these policies.

18  I'm sure --

19          MR. SIDMAN:  I don't think it's materially different,

20  Your Honor.  We are --

21          THE COURT:  Well, I think it is.

22          MR. SIDMAN:  -- named as -- we are included within

23  the ambit of the vendor endorsement --

24          THE COURT:  Maybe.

25          MR. SIDMAN:  -- in our position.  And if you decide,

1 or some court decides that as true, then whatever happens in

2 Texas that implicates W.R. Grace's product, means we are

3 covered for that loss.  And it means that whatever pot of

4 insurance money there is, we have as much right to as W.R.

5 Grace does.

6        THE COURT:  That may be.  What I -- but there are so

7 many other issues.  For instance, Scotts' own insurance and

8 where the layers of coverage are, and whether Scotts has to

9 access and deplete its own insurance and own assets before it

10 could cover -- could access the debtors -- even if it's

11 covered. There are so many myriad of issues that haven't even

12 started to be explored and can't in this proceeding.  This is

13 not the proper adversary.  Your declaratory judgment proceeding

14 may be, but this is clearly -- this injunction proceeding is

15 clearly not the place for that determination.

16        MR. SIDMAN:  I understand that.  But I think it's

17 incorrect to assume that Scotts; (a) has insurance, and (b)

18 they would be covering these losses.  I mean, that's a purely

19 --

20        THE COURT:  If Scotts doesn't have --

21        MR. SIDMAN:  -- hypothetical --

22        THE COURT:  Well, if Scotts has no liability

23 insurance and is operating on an international basis, I think

24 that would lead to other issues.

25        MR. SIDMAN:  Well, I'm not saying they don't, Your

1 Honor.  I'm just saying, for purposes of this argument, I don't

2 think you can assume that they do and that somehow it will

3 preempt the W.R. Grace policies.

4        THE COURT:  I'm not making that assumption.  I don't

5 care.  Because at this point in time, I don't think it's

6 relevant.  That's why I don't care -- in these proceedings.

7 The issue for these proceedings is whether the impact on the

8 debtor's estate will be, I think, a significant impact.  The

9 reality is that the debtor has insurance proceeds.  To the

10 extent that the proceeds are out there and available to pay

11 claims, that's where they're going to be used.  They'll be used

12 to pay claims.  Who holds those claims is an issue that has to

13 be determined by liability determinations.  So, the liability

14 factor has to be adjudicated no matter what, before we ever get

15 to the issue of whether there are proceeds to pay them.

16        I simply cannot see why the liability determination

17 shouldn't be made in the State court as to Scotts.  There is a

18 significant reason why it should not be made as to Grace's

19 product.  Grace should not have to go into the State court to

20 defend its product, when its got this bankruptcy for that very

21 purpose.  So all I'm wrestling with at this point is whether or

22 not it is appropriate to enjoin, in some fashion, the use -- by

23 either plaintiff or defendant in the State court -- of the

24 Grace product information, because Grace isn't there and will

25 not be compelled to be there to defend its own product.

1          And so Ms. Karp, if I understood, your evidence is

2   going to be -- if I understood you correctly -- that

3   vermiculite contains asbestos; that you don't care where the

4   asbestos came from; it's simply that Scotts purchased a product

5   that contained asbestos, re-marketed it to the general public

6   without sufficient warnings of their exposure?

7          MS. KARP:  Yes, ma'am.

8          THE COURT:  So if that's the case, I'm having some

9   difficulty seeing why Grace's product, specifically, is

10  involved.

11         MR. SIDMAN:  Your Honor, I'm not an asbestos

12  litigator.  But I don't understand how you can prove that

13  vermiculite contains asbestos without inputting what

14  vermiculite you're talking about and where it came from.

15         THE COURT:  I don't know, either.  But that seems, to

16  me, to be a matter of proof.  And to the extent that it

17  involves Grace's product and Grace isn't there to defend

18  against it, I believe the issue simply is whether there's some

19  collateral consequence to Grace.  If there is, then I a hundred

20  percent agree that it has to be enjoined.  If there is not,

21  then I a hundred percent disagree that it has to be enjoined.

22  And that's the issue I'm wrestling with.  So --

23         MS. KARP:  Your Honor, Roberta -- Your Honor, would

24  you like me to just clarify one issue, with regard to Grace?

25  This is Roberta Karp.

1        THE COURT:  Yes.

2        MS. KARP:  Clearly, the -- we know or have a general

3  idea of who the suppliers are.  So the names -- certainly, W.R.

4  Grace and Libby Mine -- will come up.  The jury findings,

5  though, are not that W.R. Grace supplied the product.  That's

6  not what we ask the jury in these cases to find.  We only ask

7  whether the seller -- or the retailer -- of the product knew or

8  should have known that it was dangerous, and they failed to

9  warn the end user.

10        THE COURT:  Well, what if they ask for a jury

11  instruction that says, tell me what product it was?

12        MS. KARP:  The only name on the verdict form will be

13  Scotts.  There is no adjudication or no binding findings at all

14  with regard to W.R. Grace.  I's the same -- typically, you'll

15  have Johns-Manville has supplied -- another bankrupt company

16  has supplied products to other people, who are still solvent.

17  And we would litigate against those people, even though the

18  insolvent may have provided, you know, the joint compound or

19  the raw asbestos.  That is not who the verdict from, and that

20  is not who the adjudication goes against.  It goes against, in

21  this case, the retailer only.  We ask the Court, and the jury

22  makes no findings with regard to liability of the supplier.

23        MR. SIDMAN:  Your Honor, may I suggest that that's a

24  disingenuous argument?  They can argue in front of the jury,

25  during the course of trial, it was W.R. Grace's product, it was

1 W.R. Grace's product -- over and over again -- and then give

2 them a verdict form that says, and by the way, Scotts ought to

3 be liable for this.  I don't think you can draw the

4 distinction.

5       THE COURT:  Well, I think the theory is different.

6 The theory here is that Scotts is liable because Scotts took

7 the use of this product, put it into your own product,

8 repackaged it, re-marketed, and did not put the warnings on.

9 So, the theory of liability is the failure to warn, not the

10 fact that you used a dangerous product.  It's not a strict

11 liability of the product use.  It's a liability on the failure

12 to warn case.

13       MR. SIDMAN:  Let's assume, for the moment, that W.R.

14 Grace was the only supplier of vermiculite.  And I'm not asking

15 Ms. Karp to agree to that or not.  If that were true, are the

16 years in which the exposure allegedly occurred -- that was

17 true, then it would necessarily implicate W.R. Grace.  Because

18 if you're suggesting that the jury verdict could say, Scotts,

19 you failed to warn about this product -- and the only place you

20 would have gotten the ingredient for this product is W.R. Grace

21 -- W.R. Grace has to be implicated.

22       THE COURT:  Then, I agree.  If it's the only place

23 where Scotts got the product, Grace has to be implicated.  And

24 I believe the automatic stay, in essence, prohibits that type

25 of finding, simply because even though the issue is against

1  Scotts, it is Grace's asset -- Grace's product -- that is

2  involved.  It's an end run around trying to sue Grace.  But

3  that's not what I'm hearing is happening.  I think maybe, Ms.

4  Karp, the best solution is to simply enjoin any use of Grace's

5  product in this trial, period.  If you've got evidence to go

6  forward against Scotts on some other product, it seems to me

7  that Scotts has to make that defense.  If it's as to Grace,

8  though, I'm very concerned about Grace not being there to

9  defend its own product.

10        MR. CONAWAY:  Your Honor, Bernard Conaway.  I

11  strenuously object to an entry of an order that would prohibit

12  our clients from at least mentioning the name W.R. Grace.  I

13  think Mr. Sidman's problem with this is a failure to comprehend

14  the theory of liability that Scotts has.  We are not alleging

15  that Scotts bears primary responsibility as the manufacturer

16  for this product.  They are not the Johns-Manville here.  They

17  are the supplier, and they failed to warn.

18        To follow through with Mr. Sidman's example, if it

19  turned out that Scotts had only ever, during the course of its

20  history, purchased W.R. Grace vermiculite, our clients would

21  still be entitled to recover on a failure to warn theory

22  against Scotts.  End of sentence.  That's it.  And it would not

23  matter whether or not Scotts was -- excuse me -- W.R. Grace was

24  one of a thousand suppliers, or the only supplier.  The theory

25  of liability -- and as Ms. Karp has described -- the --

1          THE COURT:  No.  But the issue in that case is that

2   the verdict against Scott necessarily would implicate Grace's

3   product, if Grace is the only supplier.  And I believe that

4   that is not permitted by either the automatic stay or the

5   injunction that I entered, because Grace has to be there to

6   defend its own product.

7          MR. CONAWAY:  That is a claim that Scotts may have

8   some point in time against Grace.  But that's not the claim

9   that the plaintiffs present in trial in Texas.

10          THE COURT:  Yes, I understand.  But the issue is the

11   collateral consequence to the debtor.  And --

12          MR. CONAWAY:  At this point, there is none.

13          THE COURT:  Well, but -- I know.  But if there is a

14   verdict against Scott based on the fact that Scott used only

15   Grace's product, and the verdict against Scott is adverse,

16   based on the fact that they used a dangerous product that they

17   acquired from Grace and only Grace, then it's Grace's product

18   that essentially caused the jury to say that Scotts didn't warn

19   -- used a dangerous product and didn't warn.  And Grace is not

20   there to defend its product.

21          MR. CONAWAY:  Scotts could defend that entire case

22   without at all mentioning W.R. Grace.  And the way they would

23   do it is simply point to the jury and say, but ladies and

24   gentlemen, this is what we did to warn.  This is what our

25   product had.  This is what we did, and these were reasonable

**J&J COURT TRANSCRIBERS, INC.**

1 efforts on our part.  That defense could occur without any

2 reference to W.R. Grace, as well.

3          THE COURT:  Well, I need some resolution that is

4 going -- where there will be a clear indication that there will

5 not have collateral consequences to Grace or Grace's product as

6 a result of this trial.  Now, if you folks can work out some

7 language to that effect, then I will not issue the injunction.

8 If you cannot -- if, in fact, there are going to be collateral

9 consequences -- then I believe it is covered by the stay, and

10 also, by the preliminary injunction -- as to Grace's product.

11          With respect to the insurance, I agree that the issue

12 is simply to enjoin any claims against the insurance proceeds,

13 until there is a determination as to who "owns" -- has the

14 right to the proceeds.  So I will issue an issue an injunction,

15 with respect to claims against the insurance.  But I still need

16 some indication from you about how to get around this

17 collateral estoppel consequence.

18          MS. KARP:  Your Honor, is it -- this is Roberta Karp,

19 I'm sorry.  Is it truly a collateral estoppel issue, or is it a

20 -- I'm afraid I don't do bankruptcy, I apologize -- but

21 collateral consequences; is that a different concept than the

22 collateral estoppel?

23          THE COURT:  Well, I'm not sure that everything

24 doesn't have a collateral consequence.  I think the issue is

25 whether or not -- in a subsequent proceeding against the debtor

1  -- there would have already been a determination that the

2  debtor manufactured dangerous; i.e., asbestos containing

3  product, that somehow or other got put into Scotts' products

4  and then distributed, so that Grace's liability to others may

5  -- who already are not identified as creditors in this case --

6  may exist.  And that is a serious issue.  I mean, that could

7  add -- I don't know -- untold millions of creditors to this

8  case.

9          MS. KARP:  I just -- Your Honor, Roberta Karp.  In

10  terms of the res judicata or collateral estoppel issues, if

11  Scotts is the only person on the verdict form, and -- not the

12  only, but of this type of defendant -- if Scott is on there and

13  W.R. Grace is not on the jury verdict form, we are not asking

14  them to determine -- I mean, honestly, we would never say the

15  name W.R. Grace, if we didn't have to.  We just ask for the

16  sources of the vermiculite.

17          There may come in -- the name may come in, in terms

18  of knowledge or where they got knowledge.  But there is nothing

19  in this case, that I can see from either a collateral -- true

20  collateral estoppel or res judicata situation -- that would

21  somehow preclude Grace from saying, wait a minute, we're not

22  liable for this.  We have no -- there is no consequences that I

23  see coming from the stock verdict against W.R. Grace.

24          THE COURT:  But --

25          MS. KARP:  Because there's no finding as to W.R.

1  Grace.

2          THE COURT:  Don't you have to prove not just that

3  there is vermiculite in the product, but that the vermiculite

4  contains asbestos, and the source of the asbestos?  I mean, I

5  don't know what your --

6          MS. KARP:  They don't have to show -- I don't have --

7  I have to show that the vermiculite in this case contained --

8  was contaminated with asbestos, and that that particular --

9  that vermiculite found its way into the products, and that

10  Scotts knew or should have known of the dangers of particular

11  vermiculite.

12          THE COURT:  Right.  Now, that's the problem.  The

13  particular vermiculite is the problem, because when you start

14  talking about Grace's particular vermiculite, then it's Grace's

15  product that's in question.  There will be, essentially, a

16  collateral consequence that indicates that, in theory, Grace's

17  vermiculite is a dangerous product.  Because if it's not

18  dangerous, then there is no failure to warn case, at all.

19          MS. KARP:  Correct.  But there is going to be no

20  finding -- there is no finding in the State court case against

21  W.R. Grace.  There is no finding that a jury will make.  There

22  is no finding that a court will make regarding W.R. Grace.  It

23  will be strictly as to Scotts, and their knowledge of the

24  dangers of the component parts of their product.

25          THE COURT:  All right.  How far along is discovery?

1  I think what might be appropriate is for me to have you

2  conclude the discovery, to find out whether there is going to

3  be some evidence that indicates that some other vermiculite or

4  asbestos product -- other than Grace's -- is going to be

5  alleged against Scotts.  If it is only Grace's, I think I've

6  been convinced that the collateral consequences will be -- and

7  collateral estoppel -- possibility will be simply too risky to

8  permit that suit to go forward at this time.

9          But if there are other products, as well, then I do

10 not think that's the case, because the jury could rely on any

11 one of the products; not necessarily Grace's.

12         MS. KARP:  Yes, Your Honor.  I believe -- this is

13 Roberta Karp, again.  I believe I can represent to the Court

14 that there are potentially other suppliers of vermiculite.  We

15 will, of course, argue in the State court with Scotts'

16 attorneys whether it was contaminated with asbestos or not.

17 The exposure years, to the best of my understanding, are --

18 exposure years are from '59 to 2002.  There was a -- I believe

19 my information is, is that in approximately 1980, the W.R.

20 Grace was not being used any longer.  So I have a period of

21 potential exposure from '80 to 2000; certainly, where there

22 were likely other suppliers.

23         MS. COBB:  Your Honor, this is Tiffany Cobb, also on

24 behalf of the Scotts Company.  A statement was just made that

25 in 1980, W.R. Grace was not used.  And in fact, the -- perhaps

1  confusion here -- is that a different mine was used.  But, W.R.

2  Grace vermiculite was used up until 2000.

3          THE COURT:  Okay.  Only Grace's vermiculite?

4          MS. COBB:  No.  Not only W.R. Grace vermiculite.

5          THE COURT:  So the evidence that's going in is that

6  Grace, among others, supplied vermiculite that contained

7  asbestos?  That's what the plaintiffs intend to prove?

8          MS. COBB:  It is our understanding -- we don't know,

9  in this case -- but it is our understanding, from many of the

10 plaintiff's comments to Scotts, that it is by virtue of the

11 W.R. Grace vermiculite that it contends was contaminated with

12 asbestos that ended up in the Scotts product, that that is the

13 reason that Scotts is finding itself the defendant in --

14         THE COURT:  Well, I know that's what Scotts is

15 contending.  But I'm trying to find out from the plaintiffs

16 whether they are going forward only with Grace's product

17 against Scotts.  If they are, I think I have to stay the

18 action.  If they are not -- and, in fact, they intend to prove

19 that other suppliers supplied Scotts with the vermiculite that

20 contained asbestos -- then I agree with the plaintiffs, that at

21 that point in time, the jury could believe that it was any of

22 those products.  And if there isn't a specific finding against

23 Grace, then there is not a collateral consequence.

24         But if it's only Grace's product, then there will be

25 a collateral consequence.  And I won't permit the trial to go

1  forward.  So I need to know from the plaintiffs what the

2  allegations are going to be, and what you intend to prove.

3        MS. KARP:  Your Honor, Roberta Karp, again.  There is

4  still ongoing discovery with regard to the other suppliers and

5  the nature of their vermiculite and asbestos.  There were

6  Virginia vermiculite, I believe, and some South African

7  vermiculite that was also used during this time period in those

8  products.  Discovery is ongoing, as to the extent of the

9  asbestos in those products.

10        THE COURT:  All right.  Then, I think I have to let

11  you get through the conclusion of the discovery.

12        MS. COBB:  Your Honor, the discovery -- this is

13  Tiffany Cobb, again.  The discovery has already been cut off in

14  this case, and exhibit lists were already due, so -- for

15  clarification.

16        THE COURT:  All right.  Well then Ms. Karp, if that's

17  the case, you ought to know what you intend to go forward with,

18  by way of your evidence at trial.

19        MS. KARP:  Your Honor, we've -- it's not quite as

20  simple as that.  We have a -- there is a repository that Scotts

21  has made available to us in limited form, with some agreements

22  we're trying to work out.  We are attempting to get all of

23  those documents, at this point.

24        THE COURT:  Well, all right.  I'm going to continue

25  this, then, because I think you need to get through the

1 discovery.  If, in fact, the evidence is going to be that Grace

2 was the only source of supply of the vermiculite, then I am not

3 going to permit the trial to go forward against Scotts at this

4 time, because I think Grace would have to be there to defend

5 its product, if it chose to do that.  And I'm not going to

6 compel the debtor to do it three weeks or two weeks before the

7 plan is due.

8        So, I will not -- I simply will not permit the debtor

9 to be involved in this case, unless the debtor chooses to do it

10 voluntarily.  I'm not going to force it, at this stage.  So,

11 you need to finish the exhibits -- the discovery -- and finish

12 the exhibits.  And then, I want an affidavit from plaintiff's

13 counsel as to whether or not there will be evidence introduced

14 at trial, as to whether some product other than Grace's was

15 involved with the Scotts claim -- the claim against Scotts.

16        MR. SIDMAN:  Can I suggest, Your Honor, we set a date

17 -- maybe, you know, next Thursday or Friday -- that we can have

18 a continued hearing with Your Honor on that issue?

19        THE COURT:  Ms. Karp, how soon can you decide whether

20 you're going forward against Scotts on some product, other than

21 Grace's?

22        MS. KARP:  Your Honor, I -- we are going forward on

23 other than W.R. Grace.  The question of the scientific basis

24 and the scientific evidence of the amount or quantity of

25 asbestos in other supplies is a litigated issue in this case.

1 We believe there are other suppliers.  We never just thought to

2 go through W.R. Grace on this, because there were at least two

3 other major suppliers that Scott had.  It's a matter of proof;

4 whether we can show that there -- that other source of

5 vermiculite was contaminated.  That's a question of proof.

6       But we are clearly not just saying that W.R. Grace is

7 the only supplier.  We are looking to -- there are clearly,

8 Your Honor, more suppliers of vermiculite.  We have not said

9 that the only vermiculite we are going after is the one that

10 Scott used from W.R. Grace.

11       THE COURT:  All right.  Then I think the way around

12 this, then, is to simply make a determination and issue an

13 injunction against any findings that in any way mention W.R.

14 Grace.  If, in fact, the evidence at trial substantiates that

15 there was a product used that was dangerous and, in fact, there

16 are three sources of potentially dangerous products, then it

17 seems to me that the jury could pick any one or all.  The jury

18 -- the evidence, you know, may be that -- for example; just by

19 way of example -- that the Virginia vermiculite asbestos

20 fibers, from the defendant's point of view, shouldn't have

21 caused this.  But the jury can disbelieve that, and still find

22 that it was the Virginia fibers that caused the product.

23       So, as long as there is more than one product

24 involved, I do not believe the collateral consequence that I'm

25 concerned about will have any affect against Grace.  And I will

1 simply issue an injunction that indicates that the findings may

2 not, in any way, involve Grace specifically, by name -- Grace

3 or Grace's product.  So, I think the trial can still go

4 forward.

5        MR. CONAWAY:  Your Honor, Bernard Conaway.  Do I

6 understand, then, there is no further need for a follow-up

7 teleconference with Your Honor?

8        THE COURT:  As long as there is an assertion that

9 there is going to be more than Grace's product alleged against

10 Scotts.  If that turns out not to be the case, then there will

11 be hefty sanctions imposed by this Court.  So, I want you folks

12 to be very clear that your evidence is going to show that Grace

13 used -- I'm sorry -- that Scotts used more than Grace's product

14 in the relevant time frame.

15        MR. SIDMAN:  And that that product was contaminated.

16        THE COURT:  Yes.  Contaminated products are the

17 issue, yes.

18        MS. KARP:  Your Honor, Roberta Karp.  The issue of,

19 you know, contamination, or that -- I mean, in terms of proof

20 at this point -- I mean, that's something for the jury to

21 decide, et cetera.  If we are talking about suppliers of

22 vermiculite --

23        THE COURT:  No.  I'm talking about suppliers of

24 contaminated vermiculite, because if it's not contaminated,

25 there can't be a finding of liability against Scotts.  You

1 don't have to warn for something that's not a dangerous

2 product.

3          MS. KARP:  Correct.

4          THE COURT:  So if it's not contaminated vermiculite,

5 it automatically can't be the basis for a judgment against

6 Scotts, period.

7          MS. KARP:  Correct.  But also, there is a complete

8 disagreement as to other vermiculite from other sources, as to

9 whether it is contaminated and the level of contamination, et

10 cetera.  That is a disputed fact -- severely disputed fact --

11 in this case.  So, Your Honor, I can't represent to you -- and

12 I certainly would not represent to you -- that we're going to

13 be -- the jury is going to be able to make a determination that

14 the only -- that the vermiculite from the other suppliers was

15 asbestos contaminated vermiculite.

16          THE COURT:  Now, I'm not asking what the jury's going

17 to find.  You've already told me that the jury isn't going to

18 be asked to do special findings about whose vermiculite caused

19 the problem.  What I"m asking about is your evidence.  I mean,

20 are you going forward with evidence that indicates that there

21 was a supplier of vermiculite that was contaminated, other than

22 Grace's vermiculite?

23          MS. KARP:  We are going -- Your Honor, we are -- I

24 want to be really -- I've got to be very careful about this,

25 Your Honor.  We believe that there is other contaminated

1 vermiculite. And that is the theory we're going forward on,

2 including W.R. Grace's vermiculite. That is the theory. That

3 is our understanding. But I -- but Your Honor, at this point,

4 we do not have -- the evidence as to that is not completed.

5           THE COURT: Well, it's two weeks before trial.

6           MS. KARP: I understand, Your Honor.

7           THE COURT: So, does that mean you're not going to

8 attempt to prove that the Virginia or South African vermiculite

9 was contaminate, because you don't have the evidence to do it?

10          MS. KARP: We are -- yes. We are going to try to do

11 that, Your Honor.

12          THE COURT: All right. Well, going to try and

13 telling me that you are going to do it are two different

14 things. I want the discovery to get completed. And if, in

15 fact -- and then, I want an affidavit from counsel for the

16 plaintiffs before trial, that indicates whether they are or are

17 not going forward with evidence that indicates that some

18 product -- other than Grace's -- was contaminated.

19          MS. KARP: Defendants.

20          THE COURT: If the answer to that is yes, and they're

21 going forward -- I don't want specifics; I'm not trying the

22 case. I just want to know whether you're going forward, with

23 respect to evidence of contamination by Grace and somebody

24 else, or by Grace alone. And once I get that affidavit, then I

25 will enter an order. If it's against Grace alone, I am not

1 going to permit the trial to go forward as to Scotts, because

2 of the fact that it will -- that any verdict against Scotts

3 would necessarily be a verdict against the debtor's product,

4 and could possibly implicate the debtor's insurance.

5          If the answer is yes, you are going forward with

6 evidence that some other product, in addition to Grace's, was

7 contaminated that was used by Scotts, then I will permit the

8 trial to go forward.  But, I will enjoin any special findings

9 that will in any way indicate that it was Grace's product that

10 was the cause of the problem.  All right.  Is that clear, what

11 I'm trying to get to?

12          MS. KARP:  Yes, Your Honor.  Is there a --

13          MR. SIDMAN:  I think --

14          MS. KARP:  Should we go back to the previous

15 timetable that Mr. Conaway had suggested, or what --

16          THE COURT:  Yes.

17          MS. KARP:  -- time frame?

18          THE COURT:  I was asking how much time it's going to

19 take you to decide and file and submit this affidavit.

20          MS. KARP:  We have -- this, Your Honor, is what -- we

21 do have a mediation that is scheduled for October 6th in this

22 case, which I believe is next Wednesday.  That was scheduled

23 yesterday.

24          THE COURT:  Is it likely that trial is going on on

25 October 11th, then?

1          MS. KARP:  Your Honor, we were actually -- we are a

2 -- one of a number of cases on that docket.  I believe we're

3 probably somewhere between number ten and twenty, depending on

4 who has settled in front of us.  So we are not number one at

5 this point, and it's a two week docket.

6          THE COURT:  All right.  So, it's going to start

7 somewhere between October 11 and two weeks after that?

8          MS. KARP:  Correct.  If it is called, it will start

9 during that time period.

10          THE COURT:  Well, that's the question.  Is it going

11 to be called?

12          MS. KARP:  Yes.  We don't -- that's strictly up to

13 the State court judge.  Typically, if you have a living meso,

14 he likes to -- you know, to go ahead and take those quickly.

15 We have no indication from the Court, other than he said you're

16 on call and your number -- you know, somewhere between ten and

17 twenty on the docket.

18          THE COURT:  All right.

19          MS. KARP:  So, we do not have a specially set trial

20 date.

21          THE COURT:  Well, if that's the case, then what's the

22 problem in simply asking -- simply ordering a stay until the

23 next call of the list, so that you folks can get the discovery

24 done, get through the mediation -- and, you know, I'm not quite

25 sure what the problem is.

1          MS. KARP:  Well, the problem exists in that we have a

2  -- Mr. Webber is alive, and that we're not sure what the next

3  trial date would be from the Judge, at this point.

4          THE COURT:  All right.  And he has mesothelioma?

5          MS. KARP:  Yes, ma'am.

6          THE COURT:  All right.  Well, okay.  Then, let me

7  give you a date by which I'll continue this call.

8          MS. KARP:  Okay.

9          THE COURT:  An affidavit is due from Webber's

10  counsel, as to whether Webber will introduce evidence that a

11  supplier's product -- other than Grace's -- was contaminated

12  with asbestos when used by Scotts, in whatever product, you

13  know, is at issue in the trial.  Now, that affidavit is due

14  October the 7th, by noon, Eastern time.  And this hearing is

15  continued to Friday --

16          MR. CONAWAY:  Your Honor, Bernard Conaway.

17          THE COURT:  -- October --

18          MR. CONAWAY:  Your Honor, I will be out of the office

19  that entire morning, and would -- if the Court could indulge me

20  for at least two hours?  I would ask that the affidavit be

21  filed as late as two o'clock that day.

22          THE COURT:  All right.  Two p.m., Eastern time.

23          MR. CONAWAY:  Thank you.

24          THE COURT:  The hearing is continued until Friday,

25  October 8th at -- just a second please.  Can you give me a

1  time, Mona?  Oh, wait.  I think I have them up here.  I'm

2  sorry.  Is the time difference two hours?

3          MS. KARP:  Your Honor, in Houston, it's one hour.

4          THE COURT:  One hour.

5          MS. KARP:  So, I'm an hour behind you.

6          THE COURT:  And is anybody more than an hour behind

7  me?  It's three o'clock here.  Okay.  How about ten o'clock,

8  Eastern time?

9          MR. CONAWAY:  Your Honor, Bernard Conaway, again.  I

10 apologize, but I am scheduled for a deposition at ten.  I

11 expect it to last no more than an hour.  If it proves

12 inconvenient, I may be able to reschedule it.  But at this

13 point, I don't know that I can do that.

14         THE COURT:  All right.  Just a minute.  All right.

15 What about at eleven a.m. Eastern time?

16         MR. CONAWAY:  Thank you, Your Honor.

17         THE COURT:  Is that enough time?

18         MR. CONAWAY:  Yes, Your Honor.

19         THE COURT:  All right.  At eleven a.m. then, Eastern.

20 Ms. Baer, did you arrange the phone call?

21         MS. BAER:  No, Your Honor.  This one was arranged by

22 Scotts' counsel.

23         THE COURT:  Okay.  Can --

24         MR. SUDELL:  We will arrange the next, Your Honor, if

25 you'd like.

48

1         THE COURT:  I'm sorry.  Who was speaking?

2         MR. SUDELL:  It was Bill Sudell, of Morris Nichols,

3 Your Honor.

4         THE COURT:  All right.  Yes, Mr. Sudell.  If you

5 would, please arrange a conference call for anybody who wishes

6 to call in.  Okay.  It's continued until October 8th at eleven.

7         UNIDENTIFIED ATTORNEY:  Thank you.

8         THE COURT:  Thank you.

9         UNIDENTIFIED ATTORNEYS:  Thank you, Your Honor.

10                         * * * * *

11              C E R T I F I C A T I O N

12         I, Shirley Nenno, court approved transcriber, certify

13 that the foregoing is a correct transcript from the official

14 electronic sound recording of the proceedings in the

15 above-entitled matter.

16

17 /s/ Shirley Nenno              DATE: October 5, 2004

18 SHIRLEY NENNO

19 J&J COURT TRANSCRIBERS, INC.

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**