IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**Hearing Date on Interim Relief: October 25, 2004 at Noon**
**Objection Deadline to Interim Relief Becoming Final: December 3, 2004**
**Hearing Date on Interim Relief Becoming Final: December 20, 2004 at Noon**

## DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER PURSUANT TO SECTIONS 105(a), 362(a)(3) AND 541 OF THE BANKRUPTCY CODE (A) LIMITING CERTAIN TRANSFERS OF EQUITY SECURITIES OF THE DEBTORS AND (B) APPROVING RELATED NOTICE PROCEDURES

The above-captioned debtors and debtors in possession (the "Debtors") hereby

move the Court (the "Motion") for entry of an interim order pursuant to Sections 105(a),

362(a)(3) and 541 of the Bankruptcy Code (A) limiting certain transfers of equity securities of

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food >N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

the Debtors and (B) approving related notice procedures. In support of the Motion, the Debtors respectfully state as follows:[2]

## Jurisdiction

1.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.    Venue of this proceeding and the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

3.    W. R. Grace & Co. ("Grace"), through its subsidiaries, is principally involved in the manufacture and sale of specialty chemicals and materials through two business segments.

4.    Grace and certain of its affiliates are defendants in asbestos property damage and bodily injury lawsuits.

5.    As of the date of filing for the chapter 11 cases, there were approximately 129,000 asbestos claims pending against the Debtors.

## The Debtors' Net Operating Losses

6.    Principally as a result of certain environmental expenditures and payments made in connection with asbestos claims, the Debtors have had significant operating losses for tax purposes in the recent past.

---

[2] The facts and circumstances supporting this Motion are set forth in the Affidavit of Elyse Filon, filed contemporaneously herewith.

7.      Grace and certain of its domestic corporate subsidiaries file a consolidated U.S. federal income tax return. Since calendar tax year 1999, the Debtors have not incurred significant federal income tax liability and in fact have incurred substantial net operating losses ("NOLs").[3] The Debtors' NOLs are an extremely valuable asset of the Debtors' estates because under the Internal Revenue Code (the "IRC"), the Debtors can carry forward their NOLs to offset their future taxable income for up to 20 taxable years and thereby reduce their future aggregate tax obligations.[4] The Debtors believe the NOLs will be a vital asset of their reorganized business upon emergence from Chapter 11.

8.      The Debtors' NOLs are currently estimated to be approximately $348 million as of December 31, 2003, which, based on the 35% corporate tax rate now in effect, are worth approximately $122 million in potential future tax savings.[5] These tax savings – and the accompanying increase in the Debtors' cash flow as it emerges from Chapter 11 – will greatly facilitate the Debtors' successful reorganization. As one bankruptcy court has recognized, "what is certain is that the NOL has a potential value, as yet undetermined, which will be of benefit to creditors and will assist [the debtors] in their reorganization process. This asset is entitled to protection while [the debtors] move forward toward their reorganization." See In re Phar-Mor, Inc., 152 B.R. 924, 927 (Bankr. N.D. Ohio 1993).

---

[3] NOLs can be used as either "carrybacks" (in which the corporation uses the NOLs to offset taxable income for up to two previous taxable years) or "carryovers" (in which the corporation uses the NOLs to offset taxable income for up to twenty taxable years into the future).

[4] See 26 U.S.C. § 172.

[5] Approximately one-third of these NOLs are currently subject to challenge by the Internal Revenue Service.

3

9.      A corporation's ability to use its NOLs is subject to certain statutory limitations. One limitation is contained in 26 U.S.C. § 382 ("Section 382"), which, for a corporation that undergoes an "ownership change," limits that corporation's ability to use its NOLs to offset future income. For purposes of Section 382, an "ownership change" occurs if, immediately after a "testing date," and as measured during a rolling 3-year "testing period,"[6] the percentage of the corporation's stock (measured by value) held by certain significant shareholders (*i.e.*, shareholders owning 5% or more) increases by 50 percentage points or more. For example, if a 10% shareholder purchased additional stock and became a 61% shareholder, the percentage of stock owned by 5% stockholders would have increased by 51 percentage points, thereby causing an "ownership change."[7]

10.     If an ownership change under Section 382 occurs, the corporation's use of its NOLs becomes subject to an annual limitation. The amount of such annual limitation generally equals the value of the corporation multiplied by the typical interest rate on long-term tax-exempt bonds ("the long-term tax-exempt rate").

11.     In the case of the Debtors, it is possible that their current market capitalization, which is approximately $770 million as of October 19, 2004, would be considered

---

[6] Generally, a "testing date" occurs when there is a change in the percentage of stock owned by a 5% shareholder before or after the change, or when an option to purchase the stock of the corporation is granted by the corporation. The "testing period" generally consists of the 3-year period prior to any testing date.

[7] Under IRC § 382(g)(4)(A), all stockholders who individually hold less than 5% of the shares of stock of a company are generally deemed to be a single 5% stockholder throughout the 3-year testing period, and transfers between such stockholders are disregarded for purposes of determining whether an "ownership change" has occurred (the "Public Group Rule"). Thus, so long as half or more of the debtor's stock is owned by less than 5% stockholders throughout the 3-year testing period, there will be no "ownership change" under IRC § 382.

4

to be the value of the corporation for purposes of Section 382. The long-term tax-exempt rate is currently approximately 4.6%. If an ownership change were to occur, therefore, Grace's ability to use its $348 million NOL arguably could be reduced to approximately $35 million per year.

12.    Once all or part of a NOL is disallowed under Section 382, its use is limited forever, and once an equity interest is transferred, the transfer cannot be nullified without court action. Thus, unrestricted transfers of equity securities in the Debtors could hinder the Debtors' reorganization efforts by limiting their ability to use NOLs to offset future taxable income.

13.    Restricting the transfer of Grace's equity securities is particularly important in the Debtors' chapter 11 cases because certain entities have recently acquired substantial ownership stakes in Grace's equity securities. If such acquisitions were allowed to continue, an "ownership change" of the Debtors could occur, thereby impairing the Debtors' ability to use their NOLs to offset future taxable income.

14.    As a result of filings made with the Securities and Exchange Commission, the Debtors are aware of at least two entities that have acquired significant equity positions in Grace within the applicable three-year testing period. One entity acquired approximately 6,418,000 shares of Grace's common stock (approximately 9.8% of the shares outstanding) in April 2004. In August 2004, another entity acquired 3,750,000 shares of Grace's common stock (approximately 5.7% of the shares outstanding). The aggregate 15.5% interest acquired by these two entities is treated under Section 382 as contributing towards an ownership change of the Debtors.

5

15.    At least one shareholder of Grace who previously held more than 5% of the outstanding stock has sold some or all of their equity interest within the applicable three year period. As a general rule, stock sold by a 5% shareholder is treated as counting towards an ownership change under Section 382, even if the acquirer does not hold 5% of the corporation's stock. Together, these sales could contribute another 5.2% towards an ownership change of the Debtors. Accordingly, the Debtors may already have experienced, in the aggregate, a shift in ownership of approximately 20%. In addition, the Debtors are aware that a third entity holds approximately 16% of the equity securities of Grace. Under Section 382, any sales of Grace's equity securities by this entity would contribute to an ownership change, even if the purchaser acquired less than 5% of the outstanding shares. A sale of all of Grace's equity securities currently held by this entity could cause Grace's level of ownership change to increase to approximately 36%.

16.    Because of the significant potential tax savings that could be lost if an "ownership change" occurs, the further trading of equity securities of Grace must be restricted to avoid an ownership change and to facilitate a successful restructuring.

17.    In recent days, following an announcement by Grace on October 15, 2004, that the Debtors had made sufficient progress in discussions with the official representatives of the asbestos creditors and the future asbestos claimants to conclude that additional negotiations could lead to a consensual chapter 11 plan, the trading volume in Grace common stock has significantly increased over recent average trading volumes. As a result of this significant amount of additional trading, the risk that another party has acquired a 5% or greater interest in Grace common stock has increased, leading the Debtors to file this Motion as on an emergency

6

basis in order to ensure that the Debtors' NOLs are protected. Because this Motion is filed as an

emergency motion, the Debtors' are seeking only an interim order to implement certain notice

requirements with respect to the trading of Grace's equity securities. Any party adversely

affected by the requested interim relief may file an objection seeking to prevent the interim relief

from becoming permanent.

### Relief Requested

18.    By this Motion, the Debtors request that this Court order that certain

notice and waiting periods govern transfers of equity securities of Grace. This will provide the

Debtors with advance notice of certain transfers that may jeopardize their NOLs, and will enable

the Debtors, if necessary, to obtain substantive relief from this Court to protect their NOLs. The

limited relief requested in this Motion will enable Debtors to closely monitor certain transfers of

equity, and ensure that the Debtors are in a position to act expeditiously to prevent such transfers

if necessary, and thus allow the Debtors to protect and preserve their NOLs. Specifically, the

Debtors request that the Court enter the Interim Order attached hereto, approving the procedures

and restrictions set forth in such Interim Order (the "Notice and Hearing Procedures").

19.    The only restrictions sought by the Debtors are to limit (i) acquisitions of

equity securities of Grace by persons or entities who already hold 4.75% or more of Grace's

equity securities (each, a "Substantial Equityholder"), and (ii) acquisitions of equity securities of

Grace by persons or entities who hold less than 4.75% of Grace's equity securities (including

persons or entities that currently hold no equity securities of Grace) if such acquisitions would

cause such persons or entities to hold more than 4.75% of the Grace's equity securities. The use

of a 4.75% threshold (as opposed to a 5% threshold) is intended to provide Debtors with a

7

"cushion" to allow for the inherent ambiguity and complexity of Section 382. Such a cushion is customary in orders such as the interim order sought here.

20.    The restrictions sought by the Debtors here impose no limitations on any shareholder disposing of its equity securities of Grace (unless the proposed acquirer of such equity securities is restricted from acquiring such equity securities pursuant to the requested interim order). Moreover, the restrictions sought by the Debtors here impose no limitation on any person or entity purchasing equity securities of Grace, so long as such purchase would not result in the shareholder owning 4.75% or more of Grace's equity securities.

21.    The restrictions sought by this Motion are therefore quite limited and minimal in nature, and are substantially less onerous than the restrictions sought and granted in other cases (see discussion below).

<u>**Applicable Authority**</u>

**A.    <u>NOLs are Property of a Debtor's Estate Entitled to Protection</u>**

22.    Courts have uniformly held that a debtor's NOLs constitute property of the estate under section 541 of the Bankruptcy Code. Courts also have uniformly held that they have the authority to impose measures intended to protect and preserve a debtor's NOLs. The seminal case articulating this rule is <u>In re Prudential Lines, Inc.</u>, 107 B.R. 832 (Bankr. S.D.N.Y. 1989), <u>aff'd</u>, 119 B.R. 430 (S.D.N.Y. 1990), <u>aff'd</u>, 928 F.2d 565 (2d Cir. 1991), <u>cert. denied</u> 502 U.S. 821 (1991). In <u>Prudential Lines</u>, the Court enjoined a parent corporation from taking a worthless stock deduction with respect to its equity in a bankrupt wholly-owned subsidiary, on the grounds that allowing the parent to take such a deduction would destroy its debtor-subsidiary's NOLs. In issuing the injunction, the Court held that the "debtor's potential ability to

8

utilize NOLs is property of an estate," and that "the taking of a worthless stock deduction is an

exercise of control over a debtor's NOLs" that was properly subject to the automatic stay.

Prudential Lines, 107 B.R. 832, 838-42; see also In re Southeast Banking Corp., Case No. 91-

14561-BKC-PGH (Bankr. S.D. Fla., July 21, 1994) (debtor's interest in their NOLs "constitutes

property of the estate within the scope of [11 U.S.C. § 541(a)(1)] and is entitled to the protection

of the automatic stay"); In re Phar-Mor, Inc., 152 B.R. 924, 926 (Bankr. N.D. Ohio 1993) ("the

sale of stock is prohibited by § 362(a)(3) as an exercise of control over the NOL, which is

property of the estate"); In re Grossman's, Inc., Case No. 97-695 (PJW) (Bankr. D. Del.

Oct. 9, 1997) (the debtors' net operating loss carryforward is property of the debtors' estates and

is protected by the automatic stay).

        23.      Because the Debtors' NOLs are property of their estates, this Court has the

authority under section 362 of the Bankruptcy Code to enforce the automatic stay by restricting

the transfer of the Debtors' equity securities in and of the Debtors which could reduce the value

of the NOLs

**B.**    **Propriety of Relief Requested**

        24.      Courts have commonly granted the relief requested herein (*i.e.*, the

restriction or enjoining of transfers of claims or equity securities in order to protect a debtor

against the possible loss of its NOLs), even when the relief requested is substantially more

onerous than the relief sought here. See, e.g., In re Enron Corp., et al., Case No. 01-160-34

(ALJ) (Bankr. S.D.N.Y. April 25, 2003) (no person can acquire debtor stock if (i) such person

owns 4.75% of the debtors' stock before such acquisition or (ii) would own 4.75% of the

debtor's stock after such acquisition and is provided 20 days notice of any proposed transfer of

9

stock by a 4.75% stockholder); In re UAL Corp., et al., Case No. 02-B-48191 (ERW) (Bankr.

N.D.Ill. February 24, 2003) (holders of substantial equity or claims interests must provide debtor

notice of such holdings and must provide debtor 15 days notice to object to any proposed

transfers or acquisitions of stock or claims that would increase the transferee's holdings to or

above approximately 4.5% of all shares or a designated dollar threshold for claims); In re US

Airways Group, Inc., et al., Case No. 02-83984 (SSM) (Bankr. E.D. Va. Oct. 2, 2002) (debtor

provided 10 days notice to object to proposed transfers of claims against the debtor that would

increase the transferee's holdings to or above $100 million in the aggregate face amount; $100

million in claims was the lowest amount that could reasonably be expected to lead to a

distribution of 5% of the stock in the reorganized debtor); In re Williams Comm. Group, Inc.,

Case No. 02-11957 (BRL) (Bankr. S.D.N.Y. July 24, 2002) (debtor provided 30 days notice to

object to proposed transfers of claims against the debtor that would increase the transferee's

holdings to or above $200 million in the aggregate face amount; $200 million in claims was the

lowest amount that could reasonably be expected to lead to a distribution of 5% of the stock in

the reorganized debtor); In re Metrocall, et al., Case No. 02-11579 (RB) (Bankr. D. Del. June 6,

2002) (debtor provided 5 business days notice to object to proposed transfers of stock that would

result in the transferee holding 5% or more of the debtor's stock or a reduction in the ownership

interest of an existing 5% or greater shareholder); In re Casual Male Corp., Case No. 01-41404

(REG) (Bankr. S.D.N.Y. May 18, 2001) (enjoining transfers of common stock and convertible

notes that would result in the transferee's holdings increasing to or beyond 4.99%; debtor

provided 30 days notice to object to proposed transfers of senior subordinated notes or other

general unsecured claims  against the debtor); In re Worldtex, Inc., Case No. 01-785 (MFW)

10

(Bankr. D. Del. Apr. 2, 2001) (debtor provided 30 days notice to object to proposed transfers that would result in the transferee holding 5% or more of the debtor's common stock or decrease the ownership interest of an existing 5% or greater shareholder); In re Reliance Acceptance Group Inc., Case No. 98-288 (PJW) (Bankr. D. Del. Apr. 28, 1998) (debtor provided 30 days notice to object to proposed transfers that would result in the transferee holding 5% or more of debtor's common stock); In re First Merchants Acceptance Corp., 1998 Bankr. LEXIS 1816 (Bankr. D. Del. 1998) (debtor provided 30 days notice to object to proposed transfers of stock in the debtor that would increase the transferee's holdings to or above 300,000 shares of the debtor's stock and to any proposed transfers of 1995 subordinated reset notes or general unsecured claims against the debtor); In re Grossman's, Inc., Case No. 97-695 (PJW) (Bankr. D. Del. Oct. 9, 1997) (debtor provided 30 days notice to object to proposed transfers of stock that would increase the transferee's holdings to or above 1,350,000 shares of debtor's stock and to proposed transfers of general unsecured claims that would increase the transferee's holdings to or above an aggregate face amount of $3,500,000); In re Southeast Banking Corp., Case No. 91-14561-BKC-PGH (Bankr. S.D. Fla. July 21, 1994) (enjoining 5% trades of common stock); In re Phar-Mor, Inc., 152 B.R. 924 (Bankr. N.D. Ohio 1993) (enjoining shareholders from selling stock in the debtor unless they obtained relief from the automatic stay); In re McLean Indus. Inc., Case Nos. 86-B-12238-12241 (Bankr. S.D.N.Y. Feb. 16, 1989) (requiring an application to the court for authority to transfer any claims).

   25. Courts ordering such relief generally have done so by imposing notice and hearing requirements on any proposed transfer of claims or stock to or by a person or entity whose holdings of such claims or stock exceeds, or would exceed as a result of the proposed

11

transfer, a certain threshold amount.  The order in <u>UAL Corp</u>, <u>supra</u>, was typical in this regard.

There, the Court entered an order imposing on any party a duty to provide notice to the Court

and to debtor's counsel if such party intended to (a) acquire, accumulate or sell more than a

prescribed number of shares of the debtor, or to add additional shares to such a block, or

(b) acquire or sell certain claims against the debtors.  The debtor then was afforded 15 days to

object to such transaction, at which point a hearing would be held so that the court could decide

whether to allow any such transfer to be consummated.  <u>See also</u> <u>In re Williams Comm. Group,</u>

<u>Inc.</u>, Case No. 02-11957 (BRL) (Bankr. S.D.N.Y. July 24, 2002) (claims trading restrictions

applied to certain claimholders); <u>In re Worldtex, Inc.</u>, Case No. 01-785 (MFW) (Bankr. D. Del.

Apr. 2, 2001) (stock trading restrictions applied to persons who were, or would become as a

result of the proposed transfer, 5% stockholders).

## C.    The Relief Sought Is Narrow in Scope

26.    The requested relief has been narrowly tailored to apply only to those

persons or entities who own (or would own as a result of the proposed transfer) equity in Grace

representing 4.75% or more of the equity securities of Grace.  As of the date hereof, the Debtors

are aware of only three persons or entities whose holdings meet or exceed this threshold.  The

procedures requested by the Debtors would still permit most transactions involving the

acquisition or disposition of equity securities to continue, subject only to Bankruptcy Rule

3001(e) and applicable securities, corporate and other laws.[8]

---

[8]  The Debtors do not seek to impose the requested notice and hearing procedures on persons or
entities holding less than approximately 4.75% of the Debtors' stock, so long as an acquisition
would not result in the ownership by such person or entity of  4.75% or more of Grace's equity
securities.

12

27.     Unlike a number of the orders described above, the Debtors are not

seeking to impose any notification procedures upon holders of claims against the Debtors or

otherwise limit trading in such claims.  Thus, the Debtors' proposed procedures are significantly

less burdensome, and apply to a much more narrow group of persons and entities, than those

approved in other cases.

28.     It is imperative that the Debtors closely scrutinize any transactions that

would increase the risk of an "ownership change" because such a large shift of ownership has

already occurred.  The proposed restrictions are crucial because once equity securities are

transferred, the transaction is unlikely to be reversible for tax purposes.  Accordingly, once a

transfer acts to limit the Debtors' ability to use their NOLs under Section 382, such limitation

may be permanent.

### No Prior Request

29.     No previous request for the relief sought herein has been made to this or

any other Court.

### Conclusion

30.     The Debtors' NOLs are valuable assets of their estates that will facilitate

the Debtors' reorganization and benefit all of their stakeholders.  If the Debtors are unable to

monitor and object to the above-referenced transfers, the Debtors' future use of their NOLs may

be jeopardized.  The Debtors have proposed notice and hearing procedures that impose minimal

burdens on affected entities to achieve a substantial benefit to the Debtors' estates, and the

Debtors believe that granting the relief requested in this Motion is in the best interests of the

Debtors' estates, their creditors and other parties in interest.

13

## Notice

31.    Notice of this Motion has been given by overnight mail to: (i) the United

States Trustee, (ii) counsel to the DIP Lender, (iii) counsel to each of the Committees,[9] and (iv)

all known Substantial Equityholders.  Notice of this Motion has been given by first class U.S.

Mail on all other parties that requested service and notice of papers in accordance with Fed R.

Bankr. P. 2002.  In light of the nature of the relief requested, the Debtors submit that no further

notice is required.

---

[9]    To date, four official committees have been established in these bankruptcy cases: an equity
committee, a committee of unsecured creditors, an asbestos personal-injury committee, and an
asbestos property-damage committee.

14

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, approving the relief requested herein and granting such other and further relief as is just and proper.

Dated: October 20, 2004

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
James W. Kapp, III
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:   (302) 652-4400

Co-Counsel for the Debtors and Debtors in
Possession