IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.*,[1] | ) | Case No.  01-1139 (JFK) |
| | ) | Jointly Administered |
| | ) | **Objection Deadline: Oct. 26, 2004** |
| Debtors. | ) | **Hearing Date: Nov. 15, 2004, 12:00 p.m.** |
| | ) | **Docket No. 6271** |

## MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION'S OPPOSITION TO DEBTORS' OBJECTION TO CERTAIN CLAIMS FILED BY THE MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION

The Massachusetts Department of Environmental Protection (MADEP) hereby opposes

Debtors' Objection to Certain Claims Filed by the MADEP (Objection).  In support of this

opposition, the MADEP states as follows:

### Relevant Facts

1.     On April 2, 2001,  W.R. Grace & Co.–Conn., W.R. Grace & Co., Grace Energy

Corporation and other affiliated entities (collectively, "Debtors") each filed a voluntary petition

for relief under Chapter 11 of the United States Bankruptcy Code.

---

[1]The Debtors consist of the following 62 entities: W.R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W.R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc, Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.) G C Management Inc. (f/k/a Grace Cocoa Management , Inc.), GEC Management Corporation, CN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace Grace A -B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Service Corporation, Grace International Holdings, Inc., (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W.R. Grace Capital Corporation, W.R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International Inc., Kootenai Development Company, L B Realty, Inc., Litigation Managmenet, Inc. (f/k/a GHSC Holding, Inc., Grace JVH Inc., Asbestos Management Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA , Inc.) MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc.(f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden -Gulch West Coal Company, H-G Coal Company.

2.      In March 2003, the MADEP filed a timely Proof of Claim against W.R. Grace & Co.–Conn. (Claim #12849), W.R. Grace & Co. (Claim #12848), and Grace Energy Corporation (Claim #13487) (collectively, "Claims") for environmental liability to the Commonwealth of Massachusetts in connection with certain contaminated sites throughout the Commonwealth, under federal and state laws and regulations, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9606, et seq. (CERCLA), the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Mass. G.L. c. 21E, the Massachusetts Contingency Plan (MCP), 310 C.M.R. §§ 40.0000, et seq., and the Timely Action Schedule and Fee Provisions, 310 C.M.R. §§ 4.00, et seq.

3.      The total amount of the general unsecured claims owed to the Commonwealth by Debtors for unreimbursed or unpaid pre-petition response costs and fees, as expressly set forth in the Claims, is $799,418.84.[2] This amount consists of the following costs for the performance of assessment, containment, or removal activities, or the oversight of such activities, at the following sites, consistent with Mass. G.L. c. 21E and the MCP, and for unpaid, pre-petition annual compliance fees, that Debtors owe consistent with 310 C.M.R. §§ 4.00, et seq.:

| | |
|---|---|
| Former Zonolite Plant Site | $42,293.39 |
| Acton Plant Superfund Site | $709,642.04 |
| Wells G&H Aberjona River Valley Site | $17,337.25 |
| Blackburn & Union Privileges Site | $5,980.96 |
| MMR Pipeline Site | $24,165.20 |
| | $799,418.84 |

---

[2]Debtors mischaracterize the Claims as asserting general unsecured pre-petition claims in the amount of $42,134,987.26.  See Obj. ¶ 7; Debtors' Exhs. D-L (setting forth erroneous amounts).  See also ¶¶ 4-6, herein (explaining what the Claims actually seek presently and state protectively); Part I, herein (explaingin why Debtors' objections as to post-petition amounts are premature); and MADEP's Opposition Exhibit A, attached hereto (summarizing how Debtors' objections relate to what the Claims actually seek presently or state protectively).

*See* Claims, Exhs. A and B.[3]

4.      To put the Debtors, the Court, and other Creditors on notice as early as possible as to the total potential environmental liability the Debtors have, or may have, to the Commonwealth regarding these Sites and other Sites throughout the Commonwealth, as well as to protect and preserve the MADEP's rights, the express language of these Claims also identifies (a) the total amount of all post-petition response costs and fees that the MADEP knew Debtors already owe or will owe annually; and, (b) an estimate of the total amount that could possibly be owed if it becomes necessary for the MADEP to perform or fund cleanup activities at these Sites.  The MADEP provided clear, express notice that it *may* seek payment, *at some appropriate future time*, for post-petition fees and costs, as administrative expenses.[4]  For example, the Claims each state:

> The Commonwealth is entitled to administrative expense priority, and *may file an administrative expense application at the appropriate time*, for the cost of post-petition response action costs it incurs in connection with property of the estate, costs of complying with the Debtor's injunctive obligations, post-petition Annual Compliance Assurance Fees, and for any post-petition penalties.  *The remainder of the Commonwealth's claim is filed as a general unsecured claim*.

Claims, ¶ 9 (emphases added); *see also* Claims, ¶ 2 (expressly describing the factual bases of liability and timing of each amount or estimate).  Thus, the face of the Claims clearly establishes the amounts that are pre-petition general unsecured claims and the amounts that are identified in a purely protective nature.

---

[3]Claim #12848 and Claim #12849 each assert all of these claims against W.R. Grace & Co. and W.R. Grace & Co.–Conn., respectively.  Claim #13487 asserts only claims regarding the MMR Pipeline Site against Grace Energy Corporation.  As explained in Part IV, below, Debtors' claims process mandated such filings.

[4]To the extent that Debtors do not own a Site at which MADEP may incur such post-petition response costs in the future, MADEP would then seek such post-petition costs as general unsecured claims.  *See In re Insilco Technologies, Inc.*, 309 B.R. 111 (Bankr. D. Del. 2004).

5.      The Claims identify in a protective nature the following post-petition response costs and fees *already owing* or that *will be due annually*:

| Site | Amounts Already Owing | Amounts Due Annually[5] |
|------|------|------|
| Former Zonolite Plant Site | $1,863.21 | |
| Daramic Plant | 0.00 | $2,600/yr annual fees |
| Acton Plant Superfund Site | $31,361.26 | |
| Cambridge Site | $3,900.00 | $1,950/yr annual fees |
| Wells G&H Aberjona River Valley Site | $6,450.62 | |
| Parcel 2322 | 0.00 | $1,950/yr annual fees |
| MMR Pipeline Site | $8,543.33 | up to $10,000/yr annual fees |
| | $52,118.42 | up to $16,500/yr annual fees |

*See* Claims, Exhs. A and B.

6.      Also in a protective nature, the Claims identify the following *estimates* of *post-petition* response costs that could possibly be owed to the Commonwealth if Debtors cease to perform their obligations in relation to the Sites so that it becomes necessary for the MADEP to perform or fund response actions at the Site:

| | |
|------|------|
| Former Zonolite Plant Site | $150,000. |
| Daramic Plant | $125,000. |
| Acton Plant Superfund Site | $25,000,000. |
| Wells G&H Aberjona River Valley Site | $12,000,000. |
| Blackburn & Union Privileges Site | $4,000,000. |
| | $41,275,000. |

*See* Claims, Exhs. A and B.

7.      By order dated January 22, 2004, the Court authorized Debtors to settle and compromise a tax refund claim, for the tax year 1986, with the Massachusetts Department of

---

[5]At the time the MADEP filed the Claims, these were the amounts of the applicable Annual Compliance Assurance Fees as identified by the Claims.  By regulatory amendment, however, these amounts have changed, and, new rates will apply for all billable years ending on or after June 27, 2003, in the following amounts: $4,000/yr for the Daramic Plant and $3,000/yr for the Cambridge and Parcel 2322 Sites.

Revenue. That settlement will establish $1,292,340 as the total amount of corporate excise tax to be abated to Debtors by the Commonwealth for the 1986 tax year.

8.    On March 19, 2004, the Commonwealth moved for relief from the automatic stay to effect setoff of the 1986 tax refund against Debtors' pre-petition, liquidated environmental liability, in the amount of $799,418.84. *See* Motion for Setoff, at 2-3, ¶ 3. One of Debtors' grounds for objection to setoff was that it intended to object to the Commonwealth's Claims. Therefore, at a hearing on May 24, 2004, the Court ordered Debtors to file any such objections within 60 days.

9.    On August 27, 2004, Debtors belatedly filed the Objection in which they challenge "$42,134,987.26 total unsecured claims" – even though the express and unambiguous language of the MADEP Claims plainly identifies general unsecured claims in the amount of only $799,418.84. The summary tables provided as MADEP's Opposition Exhibit A, attached hereto, show how Debtors' objections to its inflated total relate to what the Claims actually seek or state protectively.

**Argument**

Debtors mischaracterize the total unsecured claims being sought by MADEP's Claims as being $42,134,987.26 as opposed to the $799,418.84 actually at issue. Debtors' total erroneously includes protective amounts that, at an appropriate time in the future, if and when they are actually incurred and sought, may be properly classified as administrative expenses. At present, they are simply estimates, made at the time of filing the Claims in March 2003, of what the MADEP's contingent and unliquidated post-petition response costs could be. Part I, below, explains why the Court should only reach the merits of Debtors' objections as to the $799,418.84 pre-petition unsecured claims actually being sought by the Claims. Part II, below, explains why each of those

5

objections fails. Part III, below, explains why Debtors' objections as to all post-petition amounts also will fail, when timely raised. Part IV, below, explains why Debtors' general objection that the Claims are "duplicative" is also premature and should be rejected.

I.    **ONLY MADEP'S PRE-PETITION UNSECURED CLAIMS OF $799,418.84 ARE PROPERLY AT ISSUE.**

Debtors seek a premature ruling on potential post-petition costs that are not presently being sought by the Claims. They do this by objecting to the Claims "to the extent they seek any sort of administrative or other priority." Obj. ¶ 11. However, MADEP's Claims seek general unsecured pre-petition claims totaling $799,418.84, no portion of which are post-petition costs or administrative expenses. MADEP's post-petition response costs are not ripe for review, and, in fact, may never be an actual issue that this Court needs to resolve.

Whether the MADEP will ever actually incur post-petition response costs – other than relatively *de minimis* fees that will accrue annually – in relation to any of the Sites for which Debtors are liable under CERCLA or Chapter 21E remains entirely unclear. It will depend on the extent to which Debtors, or others, comply with environmental obligations at these Sites. MADEP has authority to compel such cleanup activities, and, thereby may avoid having to incur any response costs itself. Further, MADEP's ability to so enforce environmental laws against Debtors is not a "claim." *See e.g., Ohio v. Kovacs*, 469 U.S. 274, 284-85 (1985); *In re Chateaugay*, 944 F.2d at 1008. Thus, it is unnecessary and imprudent for the Court to make determinations at this time as to classification (as general unsecured claims or administrative expenses) or as to amounts of post-petition costs that have not yet – *and may never be* – actually incurred. Rather, the Court should restrict its review to the issues actually raised by the Claims:

the pre-petition costs already owing and for which MADEP filed timely and proper proof of claims, as required by Debtors' and the Court's procedures.

On April 22, 2002, the Court approved the notice of bar date and proof of claim forms proposed by Debtors. The approved claims procedures mandated that a proof of claim "should *not* be used to make a claim for an administrative expense" (Non-Asbestos Proof of Claim Form (emphasis added)). In compliance with these instructions, MADEP, indeed, did not use the form to make a request for administrative expenses.

Even more to the point, Debtors have not yet even requested the Court to establish a bar date by which creditors must request payment of administrative expenses, and the Court has not done so. Likewise, the MADEP, indeed, has *not yet* filed a request for administrative expenses. Rather, the Claims identify generally MADEP's potential post-petition costs and fees for the purpose of providing early notice to Debtors, the Court, and other creditors as to the total environmental liability the Debtors have, or may have, to the Commonwealth. *See e.g.*, Claims, ¶ 9.

Debtors object to MADEP's Claims on grounds that the agency has not established that any part of the Claims are actual, necessary costs and expenses of preserving the estate, as is required for administrative expenses. Obj. ¶ 13. The inclusion of the protective amounts in MADEP's Claims in no way constitutes a present request for administrative expenses and does not, therefore, trigger the burden of substantiating such claims.

Debtors' attempt to accelerate the determination of claims for administrative expense priority that have not even been made yet is inconsistent with its own established claims procedure, as approved by the Court, and also runs counter to common sense and law. The Court should not reach the merits of Debtors' objections as to any amounts that are not part of the

$799,418.84 actually being sought in the Claims (*see,* ¶ 3, above) and should dismiss all aspects of Debtors' Objection related to post-petition costs as premature and potentially unnecessary to ever resolve. Short of that, at the very least, the Court should schedule an estimation hearing, or provide for some other process by which to litigate or negotiate the appropriate amounts of these contingent, unliquidated post-petition amounts.

## II.   EACH OF DEBTORS' SPECIFIC OBJECTIONS TO MADEP'S PRE-PETITION UNSECURED CLAIMS FAILS.

Debtors assert various specific objections to parts of the $799,418.84 pre-petition claims being sought by MADEP's Claims. For the reasons explained below, each fails.

### A.   Debtors Have Not Settled or Paid to EPA any of the Pre-Petition Response Costs being Sought in MADEP's Claims.

In relation to the W.R. Grace Acton Plant Superfund Site, Debtors object to $208,000 of pre-petition contractor costs and $465,099.23 of pre-petition oversight costs ($163,318.58 for Operating Unit 1, $1,368.23 for Operating Unit 3, and $300,412.42 for the master Operating Unit) based on the contention that such costs arose prior to 1998 and were resolved by a "1997 Partial Consent Decree between Grace and the EPA, which settled past response costs through December 31, 1997, including State oversight costs." Obj. ¶ 24-26. Debtors' reliance on the 1997 Partial Consent Decree is misplaced as it does not resolve costs included in MADEP's Claims.

Any state costs that may have been compromised in the 1997 Partial Consent Decree – to which MADEP is not a party – are not included in the Claims, but rather would be state costs that were federally funded by EPA, under a Cooperative Agreement between the governments.

Pursuant to Section 104(c)(3) of CERCLA, MADEP entered into a Cooperative Agreement with the EPA that provides federal funding to the Commonwealth to participate in the Superfund Program. Affidavit of Jay Naparstek, attached hereto as Exhibit A, ¶ 7. Under the

Cooperative Agreement, the federal government provides funds to Massachusetts to reimburse *certain* – but not all – state response costs. *Id*. In turn, EPA may seek to recover such funds from responsible parties, such as the Debtors. *Id*. Even if Debtors' settlement with EPA included payment for "state costs" – as they allege without any evidence in support – such payments would have been in settlement of the state costs funded by EPA. Such costs are wholly separate and apart from – and thereby irrelevant to – response costs being sought in MADEP's Claims.

Similarly, also in relation to the Acton Plant Superfund Site, Debtors object to pre-petition oversight costs incurred after December 31, 1997 on grounds that they already paid $29,491.76 *to EPA* for the MADEP's 1998 oversight costs and prevailed in a dispute *with EPA* regarding the payment of $51,406 of the MADEP's 1999 oversight costs. Obj. ¶ 25. For the same reasons, whatever costs Debtors may or may not have paid to EPA for state costs in relation to this Site would relate only to costs funded by the EPA and are completely separate from – and irrelevant to – the costs at issue in MADEP's Claims.

There simply is no overlap between response costs paid to EPA to reimburse federally funded state costs and state response costs that remain unpaid and are being sought in the Claims. The documentation provided as Exhibit B of the Claims establishes this. The MADEP uses a cost tracking system that includes an account number to assist in assuring that costs are assigned to the proper funding source. Naparstek Aff. ¶ 8. The account number that MADEP uses to track and assign all state costs that it submits to EPA for reimbursement under the Cooperative Agreement is: 2200-9724. *Id*. None of the response costs included in the Claims have been assigned to account number 2200-9724. *Id.* ¶ 9. Claims, Exh. B. Therefore, none of these response costs have been funded by EPA. Because the EPA obviously lacks authority to compromise state costs that it did not fund, such costs could not have been part of the amounts compromised in the 1997

Partial Consent Decree. Thus, the MADEP may seek to recover any unreimbursed costs and fees directly from potentially responsible parties, such as Debtors.

**B.    Debtors Have Not Paid to MADEP any of the Pre-Petition Response Costs being Sought in MADEP's Claims.**

In relation to the Wells G&H Superfund Site, Debtors object to $15,823.88 of pre-petition costs ($15,039.77 for the master Operable Unit and $784.11 for Operable Unit 01) based on their allegation – unsupported by evidence – that they already paid such costs. Obj. ¶ 34. Debtors' bare allegation is not sufficient to rebut the validity and amount of these claims, as established by MADEP's properly filed claims and documentation. *See In re Chateaugay Corp.*, 154 B.R. 29, 32 (Bankr. S.D. N.Y. 1993). Moreover, MADEP's cost tracking system disproves such a claim. *See* Naparstek Aff. ¶ 9. Based on how the cost tracking system database operates, if MADEP had been reimbursed for those response costs, they would not have appeared in the printouts generated and included as Exhibit B to the Claims. *See id.*

**C.    Debtors Have Not Received a Release of Liability from MADEP for Any of the Pre-Petition Response Costs Being Sought in MADEP's Claims.**

In relation to the Acton Plant Superfund Site, Debtors object to all pre-petition contractor costs that were incurred between January 1, 1998 and the petition date based on the allegation that the agency "has never sought" such recovery and that "MADEP has repeatedly stated that they did not intend to seek such costs." Obj. ¶ 24. Debtors provide no evidence whatsoever in support of these bare allegations. Moreover, even if such statements had been made – which MADEP strongly disputes (*see* Naparstek Aff. ¶ 10) – they would carry no legally binding weight to provide a release or shield from any statutory liability that Debtor otherwise has. Similarly, the fact that MADEP has not yet taken steps to recover such costs does not legally preclude it from doing so now.

**D.      MADEP'S Claims Expressly State Valid Bases for its Right to Recover Pre-Petition Response Costs Being Sought.**

In relation to the Acton Plant Superfund Site, Debtors also object to all pre-petition contractor costs that were incurred between January 1, 1998 and the petition date on grounds that MADEP "has previously stated to Debtors that such contractor costs are not recoverable" and that "the agency has not stated a basis for its right to such recovery." Obj. ¶ 24. The express language of MADEP's Claims contradicts these allegations and demonstrates that MADEP has expressly stated valid bases for recovery of pre-petition response costs from Debtors. For example, the Claims each state:

> The Debtor is liable to the Commonwealth in connection with environmental contamination at various sites throughout the Commonwealth, pursuant to federal and state laws and regulations, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9606, et seq. ("CERCLA"), the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Mass. G. L. c. 21E, the Massachusetts Contingency Plan ("MCP"), 310 C.M.R. §§ 40.0000, et seq., and the Timely Action Schedule and Fee Provisions, 310 C.M.R. §§ 4.00, et seq.

Claims, ¶ 1. As described in detail in the Claims, Debtors satisfy each of the statutory elements under CERCLA and Mass. G.L. c. 21E with regard to each of the Sites. *See* Claims, ¶ 2. As such, MADEP has a valid right to recovery of the claims being sought.

**E.      Debtors are Liable for Payment of Annual Compliance Fees for any Site at which they Perform Response Actions.**

With regard to the MMR Pipeline Site, Debtors argue that they have no liability and that MADEP should look to the Permittee, Sampson Hydrocarbons, or the owner of the pipeline at the Site, Kaneb Pipeline Operating Partnership, for the payment of annual compliance fees already due pre-petition ($24,165.20) and to be due in the future ($8,543.33 through the billable year ending November 20, 2002). Claim #12848 and 12849, ¶ 2.h.; Claim #13487, ¶ 2.a.; *see also* Obj.

¶ 43-44 (incorrectly referring to these amounts as oversight costs).  This objection demonstrates a fundamental misunderstanding of the applicable law.

Debtors' legal liability to pay the annual compliance fees due at this Site does not turn on whether Debtors are legally liable to perform response actions or reimburse costs under Mass. G.L. c. 21E, § 5(a), or on whether there is another entity that may be liable with regard to the Site. *See* 310 C.M.R §§ 4.02-.03; Mass. G.L. c. 21E, § 3B.  Rather, Debtors' duty to pay fees arises from their performance of response actions at the Site.  *Id.*  From 1996 through 2002, Grace Energy Corp. performed a variety of response actions at the Site.  Affidavit of Robert D. Lucci, attached hereto as Exh. B, ¶ 7.  The response actions they performed at the Site include Immediate Response Action activities, Release Abatement Measures activities, Phase II Comprehensive Site Assessment activities, and Response Action Outcome Statement activities under 310 C.M.R. §§ 40.0424, *et seq.*, §§ 40.0830, *et seq.*, §§ 40.0440, *et seq.*, and §§ 40.1000, *et seq.*, respectively. Lucci Aff. ¶ 7.  Grace Energy Corp. submitted plans and other requisite items to the MADEP, thereby constituting authorization, within the meaning of the applicable regulations, to perform such response actions at the Site.

Any such authorized entity that conducts response actions at a Site is responsible for paying annual compliance assurance fees for the billable year in which such actions are conducted. 310 C.M.R §§ 4.02-.03.  *See also*, Lucci Aff. ¶ 8.  Specifically, the MADEP's fee regulations mandate that "[a]nnual compliance assurance fees shall be payable by all permitees" (310 C.M.R. § 4.03(1)) where "permitee" is defined to be "[a]ny person authorized to conduct any activity or business pursuant to a valid permit issued by or filed with the Department" (310 C.M.R. § 4.02(1)) and "permit" is defined to be "[a]ny . . . plan or other approval issued by or required by the

Department or any of its divisions, pursuant to any statute or regulation." *See also* Mass. G.L. c. 21E, § 3B.

Thus, Grace Energy Corp. is a "permitee" under 310 C.M.R. §§ 4.02(1), and, therefore, is liable under 310 C.M.R. § 4.03(1) and Mass. G.L. c. 21E, § 3B, for annual compliance fees for all billable years in which it has performed response actions at the Site.[6]

## III.   WHEN PROPERLY BEFORE THE COURT, DEBTORS' OBJECTIONS TO MADEP'S POST-PETITION RESPONSE COSTS SHOULD FAIL.

For the reasons explained in Part I, above, the MADEP does not currently seek a ruling on its potential post-petition costs and strongly urges the Court not to reach the merits of this issue; however, in response to the Debtor's attempt to accelerate the determination of this non-issue, MADEP presents, in the remainder of this Part III, a brief explanation of why, when ripe, Debtors' objections should fail.

### A.   Under Applicable Case Law, Actual and Necessary Post-Petition Costs and Fees that MADEP Incurs and Seeks May Properly be Classified as Administrative Expenses.

Debtors argue that, because the conduct of Debtors that gives rise to its environmental liability to the Commonwealth occurred pre-petition, any amounts expended by or due to the MADEP, regardless of whether expended or due pre- or post-petition, are pre-petition claims and not administrative expenses. Obj. ¶ 13. When this issue is ripe for review – in the context of an objection to a request for administrative expenses – consistent with applicable case law, the Court

---

[6]W.R. Grace & Co.-Conn. paid the annual compliance fees for the billable year ending November 20, 1996. Lucci Aff. ¶ 9. Also, to the extent that such response actions may have been conducted in relation to an indemnity agreement between Grace Energy Corp. and Sampson Hydrocarbon, that would not alter Grace Energy Corp.'s liability under Chapter 21E or the fee regulations.

should rule that post-petition costs and fees that are actual and necessary costs and expenses of preserving the estate will properly be classified as administrative expenses.

Under the law of this Circuit, costs incurred by a state agency post-petition are "properly classified as administrative expenses" even if the debtor's conduct giving rise to such costs occurred pre-petition. *Commonwealth of Pennsylvania v. Conroy*, 24 F.3d 568, 570 (3rd Cir. 1994). In *Conroy*, before filing a Chapter 11 bankruptcy petition, the Debtor placed drums and canisters of hazardous waste at a site he operated, and the Pennsylvania Department of Environmental Resources ordered him to dispose of such waste. 24 F.3d at 569. Due to concerns for public health and safety and debtor's failure to comply with the order, post-petition, the state agency hired a private contractor to perform the clean up of the facility and then filed an administrative expense claim to recover the costs it had incurred. 24 F.3d at 569. The Third Circuit reasoned that since a debtor's estate could not avoid cleanup costs through abandonment – under the Supreme Court's holding *Midlantic National Bank v. New Jersey Dep't Envt'l Protection*, 474 U.S. 494 (1986) – then the expense of environmental cleanup is necessary to preserve the estate and therefore properly classified as an administrative expense. 24 F.3d at 569-70.

The Third Circuit also noted that other Circuits have held that response costs incurred post-petition by environmental agencies should be classified as administrative expenses. *Id. citing In re Chateaugay Corp.*, 944 F.2d 997, 1010 (2nd Cir. 1991); *In re Wall Tube & Metal Products, Co.*, 831 F.2d 118, 123-24 (6th Cir. 1987) (costs incurred by the state of Tennessee to assess an environmental hazard on debtor's property were necessary to protect public health and safety and were administrative expenses). *See also In re Smith-Douglass, Inc.*, 856 F.2d 12, 17 (4th Cir. 1988) ("[c]leaning up environmental violations is properly considered an administrative

14

expense"); *In re Peerless Plating Co.*, 70 B.R. 943, 948-49 (Bankr. W.D. Mich. 1987); *In re Stevens*, 68 B.R. 774, 783 (D. Me. 1987); *In re Vermont Real Estate Inv. Trust*, 25 B.R. 804 (Bankr. D. Vt. 1982) (costs incurred by a City to remove a dangerous building from property leased by a debtor was entitled to be paid as an administrative expense as necessary to preserve the leasehold of the estate and as a matter of public safety and welfare); *In re Rauringburg Oil Co., Inc.* 49 B.R. 652 (Bankr. M.D.N.C. 1984) (expenses of debtor to comply with state water pollution laws were administrative expenses); *In re Digtrigas Corp.*, 66 B.R. 382 (Bankr. D. Mass 1986)(New Jersey's clean-up costs on property of Chapter 11 debtor were, at the very least, administrative expenses); *In re National Gypsum Co.*, 139 B.R. 397, 413 (N.D. Tex. 1992) (response costs incurred post-petition by the government at a site owned by Debtor and incurred as a result of a debtor's pre-petition conduct are entitled to administrative expense priority where such costs were necessitated by conditions that posed an imminent and identifiable harm to the environment and public health); *In re TP Long Chemical Inc.*, 45 B.R. 278 (Bankr. N.D. Ohio 1985) (EPA's costs of responding to a release were administrative expenses).

If this issue were properly before the Court, the Debtors' argument that response costs incurred by MADEP post-petition must be treated as pre-petition costs would fail.

**B.**     **Debtors obligations in relation to the Sites are not limited by the existence of Any Other Potentially Responsible Parties.**

With regard to the Former Zonolite Plant Site, the Blackburn & Union Site, and the MMR Pipeline Site, Debtors argue that they do not own the Sites, and that MADEP should look to the current owner or another potentially responsible party for recovery of any costs of future remediation the MADEP may incur. Obj. ¶¶ 15, 38, 44. This argument is inconsistent with well established CERCLA and Mass. G.L. c. 21E case law, and, therefore, fails.

Under CERCLA, where the environmental harm at a site is indivisible, all responsible parties are jointly and severally liable for all costs. *See United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 267-71 (3rd Cir. 1992); *In re National Gypsum Co*, 139 B.R. 397, 414 (Bankr. N.D. Tex. 1992) ("courts uniformly have imposed joint and several liability where the harm has been indivisible"). To avoid such joint and several liability, a responsible party "must establish that (1) the environmental injury is in fact capable of divisibility; and (2) a reasonable basis exists for such apportionment." 139 B.R. at 414. Moreover, "[d]ivisibility of harm is a question of fact to be determined by presentation of evidence." *Id. citing Kelley v. Thomas Solvent Co.*, 714 F.Supp. 1439, 1448 (W.D. Mich. 1989). Similarly, Chapter 21E imposes joint and several strict liability on owners and operators. *See e.g., Martignetti v. Haigh-Farr, Inc.*, 425 Mass. 294, 315 (1997) ("persons who are subject to strict liability under G. L. c. 21E, § 5, for a hazardous waste release are jointly and severally liable").

Debtors argue that they have no liability at these Sites due to the existence of another potentially responsible party. Obj. ¶ 15 (alleging that Old Limited Partnership owns the Former Zonolite Plant Site); Obj. ¶38 (alleging that Tyco Healthcare is undertaking response actions at the Blackburn & Union Site); Obj. ¶ 44 (alleging that Samson Hydrocarbons is a permitee and Kaneb Pipeline Operating Partnership owns the MMR pipeline). However, Debtors offer no evidence to show – nor do they even allege – that the environmental injury at these Sites is capable of division. Nor do they provide a reason for arguing that they have no liability if they otherwise meet the criteria triggering liability under CERCLA and Mass. G.L. c. 21E, § 5(a)(1)-(5).

Because existence of any other potentially responsible party does not eliminate Debtors' legal liability, and because they have not established divisibility of the harm as a basis for

reducing their liability, to the extent Debtors meet one of the statutory criteria of Chapter 21E and CERCLA, they have liability with regard to these Sites.

As to the Former Zonolite Plant Site, Debtors also object to MADEP's estimate of potential future costs as being duplicative of claims filed by the current site owner. Obj. ¶ 15. Because CERCLA and Mass. G.L. c. 21E provide for contribution protection as to costs paid to governments as between PRPs, Debtors will not be responsible for paying duplicate claims.

### C. Debtors' Obligation to Remediate Sites at Which it is Liable is Not Limited to Sites it Owns.

In relation to the Former Zonolite Plant Site, Blackburn and Union Superfund Site, and MMR Pipeline Site, Debtors object to any possible future remediation costs by arguing that they do not own the Sites. Obj. ¶¶ 15, 38, 44. However, a debtor's status as a non-owner of a site, in and of itself, does not excuse its cleanup obligations. *See In re Torwico Electronics, Inc.*, 8 F.3d 146, 151 (3rd Cir. 1993) (rejecting debtor's defense that it no longer owned or occupied the land and finding it "has an ongoing responsibility for the wastes"). To the extent MADEP may compel cleanup activities at these sites, such enforcement of environmental laws would not constitute a "claim." *See e.g., Ohio v. Kovacs*, 469 U.S. 274, 284-85 (1985); *In re Chateaugay*, 944 F.2d at 1008. To the extent the MADEP may incur response costs in relation to these sites, under relevant case law, simply to disallow such potential future costs would be wholly inappropriate. *See In re Insilco Technologies, Inc.*, 309 B.R. 111 (Bankr. D. Del. 2004) (holding that the state's post-petition costs related to a site debtor did not own, while not entitled to administrative expense priority, were unsecured pre-petition claims). Thus, because Debtors' obligation to remediate any Site that it does not own, but for which it otherwise is liable, remains intact and is not avoided by the bankruptcy petition, Debtors' request simply to disallow such possible future costs now is premature and should be dismissed.

17

D.    **Debtors' Obligations in Relation to the Sites are not Limited by Debtors' Ongoing Performance Under Prior Partial Settlements.**

With regard to both the Acton and Wells G&H Superfund Sites, Debtors allege that their ongoing performance of response actions at the Sites are grounds to justify extinguishing MADEP's rights to recover any post-petition costs now or in the future. See Obj. 23, 33. Debtors allege that they only will continue with remediation activities on their own properties and only as required under consent decrees to which they are bound. *Id.* However neither of these conditions limit Debtors' legal liability or obligations with regard to these or other Sites.

Under CERCLA, certain specified categories of entities[7] may be held liable for a release or threatened release of a hazardous substance from a "facility," where "facility" is broadly defined to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed *or otherwise come to be located* . . . ." 42 U.S.C. 9601(9) (emphasis added). Chapter 21E, the state analogue of CERCLA, *Sheehy v. Lipton Indus., Inc.*, 24 Mass. App. Ct. 188, 198 (1987), extends liability to similar categories of entities for releases or threats of release of oil or hazardous material to the environment from or at a "site," where "site" is broadly defined to include any "place or area where oil or hazardous material has been deposited, stored, disposed of or placed, *or otherwise come to be located*." Mass. G.L. c. 21E, § 2 (emphasis added).

With regard to the Acton Plant Superfund Site, Debtors state that they are currently performing remediation of the area where the release occurred, which is the property they own, as required under a consent decree. Obj. 23. The consent decree to which they refer includes performance of the remediation of that portion of the Site (known as "Operable Unit 1" or OU1) in

---

[7]These categories are: current owners or operators, owners or operators at the time of the disposal or storage, generators, transporters, or entities that caused or contributed to the release or threatened release.

accordance with the EPA's "Record of Decision" or "ROD" for that area.  (The ROD is the document in which EPA identifies the final remedy for a Site or a portion of a Site.)  EPA has not yet selected a final remedy or issued a ROD for other aspects of the Acton Site (such as ground water remediation, known as "Operable Unit 3" or OU3), Naparstek Aff. ¶ 11, which is why the consent decree at issue does not address final remediation of other parts of the Site.

Similarly, with regard to the Wells G&H Superfund Site, Debtors allege that they are planning to remediate the Source Area property, which they own, as required by a consent decree. Obj. ¶ 33.  However, they concede that the decree to which they refer does not include full final remediation of all other portions of the Site.  *See* Obj. ¶ 33 (noting it will only go through investigation and feasibility study for the Central Area).  In fact, EPA has not yet identified a final remedy or issued a ROD for the Central Area or Aberjona River portions of the Wells G&H Site. Naparstek Aff. ¶ 11.

At both the Acton and Wells G&H Superfund Sites, contamination from the properties owned by Debtors has migrated and/or is migrating to other areas of the Site not owned by them. Naparstek Aff, ¶ 11.  The fact that the consent decrees under which Debtors currently are performing work at these Sites do not include all portions of those Sites does not in any way limit Debtors' obligations.  Thus, Debtors' stated intentions regarding remediation at these Sites falls short of their legal obligations and provides no bases to extinguish the MADEP's right to seek recovery from them, should it be necessary.

Similarly, no ROD has been issued and no final remedy has been selected for the Blackburn & Union Superfund Site.  *Id.*  Debtors argue that MADEP should look to the entity currently performing investigative actions and feasability work at that Site to perform the final remedy or cover any post-petition costs.  For the reasons discussed in Part III.B., above, another

potentially responsible party doing work at the Site does not eliminate Debtors' liability. Also, as to the contention that an entity performing investigative activities should be held to complete the final remedy, Debtors' own contrary contention to this with regard to the Acton and Wells G&H Sites demonstrates that the performance of some work at a Site, by a potentially responsible party, does not signify commitment also indicate a willingness to complete all necessary response actions.

Regarding the Daramic Plant Site, the Parcel 2322 Knox Trail Site, and the Cambridge Plant Site, Debtors say they plan to complete the investigation and remediation at the Sites. Obj. ¶¶ 19, 30, 41. Unless and until the remediation is actually complete, however, there exists the possibility that circumstances or intentions could change. For that reason, short of a judicially enforceable order requiring such work, the Commonwealth has the right to protect its rights to seek recovery, and it would be improper to extinguish such rights now.

Because neither Debtors nor any other entity are bound by a judicial order to perform all remedial actions at each Site for which Debtors are liable within the Commonwealth, there is no basis to extinguish the MADEP's rights to attempt to recovery such costs from Debtors if necessary, at the appropriate time.

**E.** **If EPA Incurs Remediation Costs in Relation to the Sites, MADEP Will Most Likely Bear a Share.**

Debtors contend that even if they (or another entity) do not complete all necessary response actions at a Superfund Site, it is EPA – and not MADEP – that will ultimately bear the costs to complete the remediation. This contention is just plain wrong. CERCLA establishes a cost-sharing arrangement between the federal and state governments with regard to the performance of work at Superfund Sites. Under this arrangement, the Commonwealth is responsible for ten percent of the capital costs of a remedy and 100 percent of the operation and maintenance costs. 42 U.S.C. §

9604(c)(3) (CERCLA, § 104(c)(3). Therefore, a share of the response costs EPA may incur to perform such remedial actions at the Sites will be borne by the Commonwealth. In fact, MADEP's protective estimates were based on this cost-sharing arrangement. Had MADEP's estimates not taken this arrangement into account – as Debtors seem to think is the case – the estimates would have been much higher.

## IV.    THE MADEP'S VALID GENERAL UNSECURED CLAIMS AGAINST DIFFERENT DEBTORS ARE NOT DUPLICATIVE.

Debtors argue that the Court should disallow Claims #12848 and #13487, entirely, solely based on Debtors' alleged intent to seek approval by the Court to substantively consolidate the Debtors' estates. Obj. ¶¶ 8-9. This challenge is premature and does not justify disallowance.

The Court's equitable power to consolidate the estates of separate debtors "is no mere instrument of procedural convenience, but a measure vitally affecting substantive rights." *In re Snider Bros., Inc.*, 18 B.R. 230, 234 (Bankr. D. Mass. 1982). "[I]n almost all instances, [substantive consolidation] threatens to prejudice the rights of creditors. *Id.* Substantive consolidation "is a power that should be used sparingly. . . . [and] considered with extreme caution and granted only in extraordinary situations." *In re United Stairs Corporation v. Manzo*, 176 B.R. 359, 368-69 (Bankr. D. NJ 1995) (citations omitted). *See also In re Snider Bros., Inc.*, 18 B.R. at 234.

Here, each of the Debtors has a separate estate from which to satisfy liabilities owed to its creditors. Debtors do *not* assert that W.R. Grace & Co. or Grace Energy Corporation – the two debtors that Claims #12848 and #13487, respectively, are against – are not liable. Nor, are they arguing that the MADEP filed claims against the wrong entities. Moreover, Debtors have *not yet even requested* the Court to exercise the extraordinary, equitable power of substantive consolidation; rather, they rest their objection on the mere "anticipation" of doing so, without even proffering any justification for their intended request in support.

21

In addition, MADEP's Claims were filed in strict compliance with Debtors' own rules, as approved by the Court. Grace's Claims Bar Date Notice expressly mandates: "IF YOU HAVE A CLAIM AGAINST MORE THAN ONE OF THE DEBTORS YOU MUST FILE A SEPARATE PROOF OF CLAIM ASSERTING EACH SUCH CLAIM AGAINST THE APPROPRIATE DEBTOR." Claims Bar Date Notice, ¶ 6 (all caps in original). The notice further cautioned that the failure to do would result in having those claims "**FOREVER BARRED, ESTOPPED, AND ENJOINED**." *Id.* ¶ 9, (emphasis and all caps in orig); *see also id.* ¶¶ 6, 8.

Based on the limited information available to the MADEP about the operations and activities of the numerous Debtor entities, MADEP believes that more than one of the Debtors could potentially be liable for the existing environmental contamination at various sites throughout the Commonwealth. Under the claims process established by Debtors and approved by the Court, and based on MADEP's need to preserve its rights, the MADEP had no choice but to file a "SEPARATE PROOF OF CLAIM" as against each Debtor that it believes potentially to be "THE APPROPRIATE DEBTOR" for particular claims.

"A properly executed proof of claim is 'prima facie evidence of the validity and amount of the claim.'" *In re Chateaugay Corp*., 154 B.R. 29, 32 (Bankr. S.D.N.Y. 1993) *quoting* Fed. R. Bankr.P. 3001(f). The debtor may overcome this presumption with respect to the validity and amount of a creditor's claim only *with evidence to the contrary. See In re Chateaugay Corp*., 154 B.R. at 32. Here, not only do Debtors fail to offer any evidence, whatsoever, to contradict the validity or the amount of the Claims, but their "duplicative objection," disregards their own claims process.

Debtors offer that in the "unlikely event that Debtors' estates are not substantively consolidated" that Debtors "will agree and acknowledge that the MADEP reserves its rights to raise

22

certain claims against W.R. Grace & Co. and Grace Energy Corp."  However, it makes no sense to "reserve the right" to do again that which MADEP has already done.  Rather, this "offer" is an implicit concession that Debtors' "duplicative objection" is premature, nonsensical, and should be rejected.

## CONCLUSION

For the foregoing reasons, the Commonwealth requests that the court:

(1)  dismiss as premature each of Debtors' objections that do not relate to the $799,418.84 in pre-petition costs presently being sought by the MADEP as general unsecured claims;

(2)  deny each of Debtors' objections that relate to the $799,418.84 in pre-petition costs presently being sought by the MADEP as general unsecured claims as being contrary to facts and law and unsupported by evidence; and

(3)  order such other relief as the court may deem just and proper.

Respectfully submitted,

MASSACHUSETTS DEPARTMENT OF
ENVIRONMENTAL PROTECTION

By its attorney,

THOMAS F. REILLY
ATTORNEY GENERAL


    /s/ Carol Iancu
By:  Carol Iancu, Mass. BBO # 635626
Assistant Attorney General
Massachusetts Office of the Attorney General
Environmental Protection Division
One Ashburton Place, Rm. 1813
Boston, MA 02108-1598
617.727.2200, Ext. 2428
Fax:  617.727.9665

Date: October 26, 2004