IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | Re: Docket No. 6557 |

## DEBTORS' RESPONSE IN OPPOSITION TO THE TOWN OF ACTION'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND FOR RELATED DETERMINATIONS

The Court should deny the Town of Acton's Motion for Relief from the Automatic Stay and for Related Determinations (the "Motion") because (i) the Town seeks payment on behalf of an alleged *prepetition* claim, and (ii) the Town has failed to establish that "cause" exists to lift the Debtors' automatic stay with respect to such claim. Further, the Town's argument that it is entitled to the extraordinary relief it requests is not compelling because, among other things, (i) the Town is seeking payment from the Debtors for a sewer system that will likely never confer

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

any appreciable benefit upon the Debtors or their successors; and (ii) the Town's alleged reliance upon payments from the Debtors is unreasonable.

### Summary of Argument

The Town has not established that it is entitled to the extraordinary relief it has requested, and the Debtors and their creditors would be substantially harmed if the Motion is granted. The Town seeks substantial payment ($3,369,692.38) from the Debtors for a sewer system that will likely never confer any appreciable benefit upon the Debtors' estates. Under the sewer program, the owners of all "benefited" land were assessed. The program defines "benefited" land as any real property that is adjacent to the system, regardless of whether (i) the property is already developed or (ii) the system will actually have available capacity when any undeveloped land is eventually developed. The Debtors' land is currently undeveloped and, due to a myriad of factors, development of the land will be at least 5-10 years off, or even longer if some of the development constraints discussed herein below cannot be solved. Even when the Debtors' land is eventually developed, it would be virtually impossible to develop the land to the capacity assumed by the Town in assessing the Debtors' land. Despite these factors, the Town has assigned the Debtors' responsibility for approximately 15% of the total final assessments.[2]

It would be impossible for the Debtors to use 15% of the sewer system. The sewer system has a 250,000 gallon/day capacity, and approximately 225,000 gallons are already spoken for. Therefore, less than 10% of the total capacity is currently available for use, and, even if the Debtors could ever develop their land to the extent assumed in the Town's assessment, the sewer

---

[2]   Under the estimated assessments, the Debtors were responsible for approximately 20% of the total assessments. The Town has received contributions from other parties and, therefore, the Debtors would be responsible for approximately 15% of the total final assessments.

2

system would be unable to handle such capacity. Further, given that (i) development of the land

is many years off and (ii) other landowners that hold "benefited" undeveloped land will likely

develop their properties before the Debtors develop their parcels, there is a distinct probability

that, when the Debtors actually develop their land, there would be no available capacity.

Therefore, it is very difficult to see how the Debtors' property has been "benefited."

Second, the Town's reliance upon payments from the Debtors is unreasonable. The

Debtors filed for bankruptcy shortly after construction of the sewer had commenced, and the

Town knew of the Debtors' bankruptcy cases. Thus, the Town was well aware at an early stage

in the project that the Debtors may not be able to pay the assessment, and that any such payment

would be enjoined by the automatic stay. The Debtors also have a separate right to seek an

abatement of its sewer assessment once the final assessments have issued, which makes the

Town's alleged reliance upon the Debtors' assessment even more questionable. Given the

magnitude of the Debtors' betterment assessment by the Town and the "interdependence of all

betterment assessments in the [s]ewer [d]istrict,"[3] the Town should have acted more prudently.

However, rather than stopping or scaling back the scope of its sewer project, the Town continued

to sink funds into the project. The Court should not penalize the Debtors and the Debtors' other

creditors for the Town's unilateral decisions.

Finally, the Town has not established that it would actually be prejudiced if the Debtors'

automatic stay is not lifted. The Town's chief argument in support of its requested relief is an

extremely-qualified assertion that, unless it is allowed to pursue payment from the Debtors, its

annual *appropriations* for payment on account of its sewer bonds would be short. However, the

---

[3]    Motion pg. 14, §31.

Town fails to assert (i) that it does not actually have *funds* to pay such obligations or even that (ii) the Debtors failure to pay would actually cause the Town to incur a deficit. Instead, the Town only suggests that "in a *worst case* analysis, the *possibility* of defaulting on its bond for the Sewer District" exists. Motion pg. 15, ¶32. This is particularly unlikely since the revenue stream provided by the estimated betterments will increase when the Town moves from estimated betterments that are based on one-half the incurred contract liability for the sewer system to final betterments that are based on one-hundred percent of actual costs. Further, if the Court denies the relief sought, the Town could simply issue a new set of final betterments that exclude Grace from the sewer district and redistribute the cost amongst the remaining properties.

Given these circumstances, the Court should (i) deny the Motion and (ii) allow the Debtors to resolve the Town's claim in the same manner as similarly situated claims.

## Summary of Relevant State Law

1.      In the Motion, the Town seeks (i) payment from the Debtors of a pre-petition claim and (ii) permission to record a lien on account of assessments for sewer betterments. The Town's rights to build, and assess payment for, sewer betterments is governed by Massachusetts General Law ("M.G.L."). In particular, M.G.L. chapter 80 governs assessments of betterments, generally, and M.G.L. chapter 83 governs assessments of betterments for sewers.

2.      Pursuant to the M.G.L. chapter 83, a Massachusetts municipality has the authority to construct public sewer systems that service a portion, or all, of the land in the respective municipality. M.G.L. chapter 83 further provides that the municipality has the option of either

4

(i) financing the construction of the sewer system through its general tax revenues[4], (ii) assessing "betterments," or (iii) by a combination of these methods. A "betterment" is an assessment made only to benefited landowners for the cost of a public improvement. A betterment may be assessed pursuant to M.G.L. whenever "a limited and determinable area receives benefit or advantage, other than the general advantage to the community, from a public improvement." M.G.L., c. 80, §1. The betterment is a charge against the land benefited and is for the cost of construction of the public sewer system; it is not a user fee and is payable regardless of whether the landowner connects to the sewer system.

3.      Under M.G.L. c. 83, §15B, pending a determination of the final costs of construction of a sewer system, the municipality may assess "estimated betterments" up to an amount equal to one-half of the municipality's liability under all contracts it has entered into for the construction of the sewer system. Subsequently, once the actual costs of construction are known, the municipality "may assess and collect actual sewer assessments." Id.

4.      Under M.G.L. c. 83, §15, the municipality may make an (actual) sewer betterment assessment against benefited land by a "uniform unit method," which requires the municipality to (i) divide "sewerage construction costs" from "among the total number of existing and potential sewer units to be served" and (ii) calculate sewer units for potential non-residential uses on the basis of "residential equivalents."

---

[4]      Which are typically derived principally from real property taxes that are assessed (i) on all property owners and (ii) in an amount that is  proportional to the value of the respective land.

5

5.      Under M.G.L. c. 80, §4, the landowner is not personally liable for the betterment. The betterment is an *in rem* assessment against the land and the remedy for nonpayment is to take and sell the land in satisfaction of the obligation.

6.      The obligation to pay the assessment arises by virtue of an "order of construction." Massachusetts law further provides that "All assessments ... imposed under this chapter [chapter 83, entitled "SEWERS, DRAINS AND SIDEWALKS"] ... upon land ... shall constitute a lien upon such land from the time such statement is recorded." M.G.L. c. 83, § 27.

### Facts and Background

7.      On October 5, 1998, the Town adopted a local sewer assessment bylaw during a town meeting (the "Bylaw"). The Bylaw provided that the entire cost of the proposed sewer system was to be paid by betterments that would be assessed against all parties that owned land adjacent to the proposed sewer system, regardless of whether such landowners would actually use the system. The Town also decided to petition the Massachusetts state legislature to enact a "special act" that would allow the Town to collect the sewer assessments in quarterly payments over 30 years, rather than (i) in one lump-sum or (ii) over 20 years. The state legislature eventually enacted a special act allowing the Town to collect the betterments over 30 years.

8.      On November 15, 1999, during a town meeting, the Town voted to amend the Bylaw so that the design and planning costs for the sewer system would be paid by taxpayers at large.

9.      On January 25, 2001, the Town Board of Selectmen, acting as the sewer commissioners, issued an order for construction (the "Order"), laying out the sewer system, and defining the parcels to be assessed betterments (*i.e.*, the parcels to be included in the sewer district). The Order lists the properties and sets forth the estimated betterments to be assessed (the "Estimated Assessments"). Six of the Debtors' parcels are included in the sewer district.

6

The parcels are part of a larger tract of land which was formerly used by the Debtors for production of container sealant products, latex products, plasticizers and resins, as well as paper and polyethylene battery separators. All of the former manufacturing facilities have been demolished, and the Debtors have been actively remediating the property since the early 1980's.

10.    On February 2, 2001, a notice of the Estimated Assessments and payment options was sent to landowners, including the Debtors. The notice indicated that the Debtors were assessed a total of 302.66 sewer units, which, under the Bylaw, translates into an implicit assumption that the Debtors' parcels can be developed for more than 1.2 million square feet of office space.

11.    On February 14, 2001, the Town recorded the Order against four of the parcels owned by the Debtors. On February 15, 2001 the Town recorded the Order against the Debtors' two remaining parcels.

12.    On March 2, 2001, the Debtors elected to pay the assessments pursuant to the 30-year payment option, and they made their initial payments on account of the six parcels.

13.    On April 2, 2001 (the "Petition Date"), the Debtors commenced their respective reorganization cases by filing petitions under chapter 11 of the Bankruptcy Code. By operation of law, all pending and prospective judicial proceedings against any of the Debtors were automatically stayed pursuant to 11 U.S.C. § 362(a)(1) (the "Automatic Stay").

14.    On May 22, 2001, the Debtors filed an action for declaratory relief in the Superior Court for the Commonwealth of Massachusetts (the "Superior Court"), seeking a determination that the sewer assessment Bylaw is invalid. The Debtors argued that the sewer Bylaw does not properly implement the "uniform unit method" that is required under M.G.L. c. 83, §15, because the Bylaw adopts a formula for converting actual and potential business and industrial uses into

7

"residential equivalents" that systematically under-assesses residential properties and shifts an

unreasonable burden to business and industrial uses. In particular, this formula placed

approximately 20% of the total estimated assessments upon the Debtors - all for property that is

not developed and may never be developed. The Debtors also argued that they had been

assessed for a betterment that does not "benefit" the Debtors' parcels because the capacity of the

sewer system would be insufficient to accommodate the Debtors' property if such land is ever

developed.

15.    By an order dated April 22, 2002 (the "Bar Date Order"), the Court set March 31,

2003 as the last date for filing proofs of claim for all pre-petition claims relating to (i) asbestos

property-damage, (ii) non-asbestos claims (including all governmental claims) and (iii) medical

monitoring claims (the "Bar Date"). Pursuant to the Bar Date Order, the Town filed proofs of

claim against W.R. Grace & Co. (Claim No. 4384) and W.R. Grace & Co. -Conn. (Claim No.

4385) (collectively, the "Town Proofs of Claims"). The Town Proofs of Claims are identical,

except that each is asserted against a different Debtor, and they each assert secured non-priority

claims for "at least $2.1 million" on account of "sewer betterment improvements" that arose

"prior to April 2001." See Claim No. 4384 (a copy of which is attached as Exhibit A).[5]

16.    On August 12, 2003, the Superior Court entered summary judgment finding that

the sewer Bylaw is valid. Grace appealed this decision to the Appeals Court for the

Commonwealth of Massachusetts (the "MA Appeals Court"). The MA Appeals Court has heard

---

[5]    The Debtors have not attached Claim No. 4385 because (i) it is essentially identical to Claim
No. 4384 and (ii) is quite voluminous. However, any party seeking to obtain a copy of this
claim can do so by contacting Bankruptcy Management Corporation, the Debtors' claims
agent.

8

oral argument on the Debtors' appeal, but it has not rendered a decision with respect to the appeal.

17.     On September 13, 2004, the Town's Board of Selectmen issued (i) a supplemental order for construction ("Supplemental Order"), which modified the boundaries of the sewer district (but left in all of the Debtors' parcels) and (ii) an order determining final assessments ("Final Assessments"). The Final Assessments would supercede the Estimated Assessments, but relate to the same costs for which the Estimated Assessments were issued. Pursuant to the Motion, the Town seeks the Court's approval to file the Supplemental Order and seek payment from the Debtors on account of the Final Assessments.

18.     Based on the Estimated Assessments, the Debtors' portion of the expected cost of the sewer project was $4,499,083.30. The Debtors' portion of the proposed Final Assessments total $3,691,692.37. The final amount is less than the Estimated Assessments primarily because of expected contributions from governmental and school users who were exempt from assessment. Due to these contributions, the Debtors would be responsible for approximately 15% of the total Final Assessments.

19.     Based on the number of sewer units allocated by the Town to the Debtors, the Town has assumed that the Debtors parcels can be developed for 1,190,000 square feet of office space. Based upon the following factors, the Debtors believe that the land's development potential is significantly more limited. First, it should be noted that the property was designated by the United States Environmental Protection Agency (the "EPA") as a Superfund site in the early 1980's due to soil and groundwater contamination, and the Debtors have been actively remediating the site since that time. As the result of the contamination and the remediation efforts, which are ongoing, the property's development potential is limited by a number of

9

factors, including an on-site treatment plant, groundwater extraction and monitoring wells throughout the site, a seven acre industrial landfill, and odor discharge from the area known as "sinking pond" (the pond in which treated groundwater is discharged). Second, limited access to the site is a major obstacle to its successful redevelopment. Access to the property is severely limited, as it can occur in only two locations, both of which are by secondary roadways through residentially zoned districts. Third, physical site constraints include steep slopes scattered throughout the site (with approximately 72 acres of the Debtors' property containing slopes greater than 15%), significant surface waters and wetlands, an active railroad commuter line which bisects the site, and a major gas transmission line also bisecting the site, but in a different location. Fourth, the zoning classification of the site is as a "Technology Park," which limits the uses of the site in ways inconsistent with the recommendations of the Debtors' land planning consultants, and the Town has indicated that it will not cooperate with the Debtors to have the zoning changed. Taking into account all of the foregoing factors, the Debtors' land planning consultants have estimated that, at most, 720,000 square feet of office space could be built on the site, and that even such development is unlikely without solving the access constraint. The EPA has just recently issued a draft preliminary site reuse assessment (dated September, 2004) a copy of which is attached hereto as <u>Exhibit B</u>, which acknowledges the foregoing factors, and the complications they will impose on future development.

**Argument**

(a)    **The Town Possesses a Single, Prepetition Claim Against the Debtors' Estates**

(i)    **The Town Possesses a Single Claim**

20.    The Town's Motion is based upon an assumption that the Estimated Assessment is separate from the Final Assessment, and, since the Final Assessment could only be assessed after construction of the sewer system was completed (which was after the Petition Date), then

10

any claim that the Town may possess for assessments from the Sewer Project should be considered post-petition. This argument is flawed. It fails to address the fact that the Town possessed a claim for the Estimated Assessment *before* the Petition Date. In fact, the Final Assessment is essentially the liquidation of the Town's contingent, unliquidated pre-petition claim for the Estimated Assessment. Therefore, the Town possesses a single claim, which arose before the Petition Date. The Final Assessment serves to "square away" the ultimate amounts due on account of the sewer project. However, it only serves to liquidate or fix the amount of the original claim; it does not give rise to a new, separate claim that can be considered independently from the Town's original right to payment on account of the Estimated Assessment.

21.    The Town's allegations that it now possesses a post-petition claim for the assessments is inconsistent with the Bankruptcy Code's definition of "claim." The Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured..." 11 U.S.C. § 101(5). The legislative history to this provision suggests that Congress intended the definition of a claim to be very broad and to create an explicit distinction between the point when (i) a right to payment arises and (ii) the amount of such payment is fixed and determinable. Specifically, the legislative history to 101(5) states as follows:

> The definition is any right to payment, *whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured....* By this broadest possible definition and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court."

11

H.R.Rep. No. 595, 95th Cong., 2d Sess. 309, *reprinted in* 1978 U.S.Code Cong. & Ad.News

5963, 6266; *see also* S.Rep. No. 989, 95th Cong., 2d Sess. 21-22, *reprinted in* 1978 U.S. Code

Cong. & Ad.News 5785, 5807-08 (virtually identical statement) (emphasis added).

> **(ii)    The Town's "Right to Payment" Arose Before the Petition Date and, Therefore, The Town's Claim is a Prepetition Claim**

22.    The Town's claim against the Debtors for the Sewer Project is a prepetition claim.

In re M. Frenville Co. ("Frenville"), 744 F.2d 332 (3d Cir.); cert denied; 469 U.S. 1160, 105

S.Ct. 911, 83 L.Ed.2d 925 (1985) is the controlling Third Circuit case for determining when a

claim arises under the Bankruptcy Code. Frenville concerned whether an indemnification action

was subject to the automatic stay. The underlying acts of the alleged tortfeasors (negligent

preparation of financial statements) occurred pre-petition, but neither the underlying suit nor the

tortfeasors' indemnification action against their bankrupt employer was filed until after the

bankruptcy case had been commenced.

23.    The Frenville court found that a "claim" arises when the party seeking recovery

has a "right to payment." The Frenville court further concluded that, in the absence of a relevant

federal law, state law must control as when to a particular "right to payment" arises. See id at

337 ("[W]hile federal law controls which claims are cognizable under the Code, the threshold

question of when a right to payment arises, absent overriding federal law, 'is to be determined by

reference to state law."). Frenville remains the law of the Third Circuit. See, e.g., Jones v.

Chemetron Corp., 212 F.3d 199, 106 (3d Cir. 2000). Therefore, the Town's claim is a pre-

petition claim if its right to payment arose before the Petition Date, regardless of when the sewer

was actually completed or when the Town expended the funds used to construct the sewer. See

In re Northeastern Ohio Gen. Hosp. Assn., 126 B.R. 513, 515 (Bankr. N.D. Ohio 1991) ("For

purposes of administrative expense allowance, a tax claim is incurred on the date it *accrues* rather than the date it is assessed or becomes payable.") (emphasis added).

24.     The Town's "right to payment" for amounts expended to construct the sewer system arose before the Petition Date, regardless of when the specific amount was determinable. The prepetition nature of the Town's claim is evidenced by the following factors: (i) the Town filed the Town Proofs of Claim against the Debtors' estates, in which the Town asserts prepetition claims for amounts allegedly owed by the Debtors on account of the sewer betterments; (ii) before the Petition Date, the Town gave the Debtors and other land-owners payment options with respect to amounts owed on account of the sewer assessments, and the Debtors actually made their first payments on account of such assessments; and (iii) the Town alleges that the Estimated Assessments gave rise to a pre-petition lien against the Debtor's property, and such a lien could not have been created unless there was also an underlying claim.

25.     The Town Proofs of Claims each assert secured non-priority claims for "at least $2.1 million" on account of "sewer betterment improvements" that arose "prior to April 2001." See Exhibit A. Further, the Town Proofs of Claims explicitly contemplate that the amount of the final assessment could exceed the estimated amounts sought in the Town Proofs of Claim and that the Town Proofs of Claims were intended to include the Estimated Assessment and, if necessary, any additional amounts on account of the Final Assessment. Specifically, each of the Town Proofs of Claims states as follows:

> As noted above, the above amounts ($2,249,541) reflect "estimated" assessments in an amount slightly less than half the actual construction costs, without interest ... The Town intends to make a "final" or "actual" assessment that will supplement the estimated assessments. The Town reserves the right to amend this proof of claim to reflect the "final" or "actual" assessments when such assessments are made..."

See the Town Proof of Claims pg. 2.

13

26.     Clearly, the Town viewed Grace's alleged obligation for the Estimated

Assessment as a claim.  And, the Town did not view its claim for the Estimated Assessment as

being separate from its claim for the Final Assessment.  Instead, the Town Proofs of Claims

suggest that the Town viewed the Final Assessment as simply the liquidation of the ultimate

liability for the Estimated Assessment, which arose before the Petition Date.

27.     Not only did the Town's claim for assessments on account of the sewer-

betterments arise before the Petition Date, but the Town gave the Debtors and other property-

owners payment options with respect to such amounts before the Petition Date, and the Debtors

actually made payments on account of the sewer assessments before the Petition Date.  In 1998,

shortly after passing the original sewer Bylaw, the Town petitioned the Massachusetts state

legislature to enact a "special act" that would allow the Town to collect the sewer assessments in

quarterly payments over 30 years, rather than (i) in one lump-sum or (ii) over 20 years.  The state

legislature enacted such an act prior to the Petition Date, and, on March 2, 2001, the Debtors (i)

elected to pay the assessment pursuant to the 30-year payment option, and (ii) made their initial

payments on account of their six parcels.  The Debtors would not have made an election or a

payment unless they had an obligation to do so, and the Town's right to receive such payment

constituted a "claim" against the Debtors, a claim that arose *before* the Petition Date.

28.     Finally, the Town argues that its recordation of the Order created a valid lien on

the Debtors' parcels.  In particular, the Town states that, "In this case, the Town's lien arose

when the Town recorded the Order for Construction with the land registry - an act the Town

completed approximately six weeks pre-petition."  Motion, pg. 12, ¶28.  While the Debtors do

not concede that the Town has a valid prepetition lien, surely if it does, the lien could not have

arisen unless there was an existing prepetition-claim.  In fact, the Town could not have obtained

14

a lien on the Debtors' property unless the Debtors had a preexisting obligation to the Town, as the very definition of a lien is, "a right to hold goods, the property of another, in security for some debt, duty or other obligation." Arnold v. Delano, 4 Cush. 33, 38 (Mass. 1849).

### (b)    The Town has Not Established "Cause" for Lifting the Automatic Stay

29.    The Town has failed to establish "cause" to lift the automatic stay so that it may pursue (i) collection of payments from the Debtors and (ii) permission to file a lien against the Debtors property on account of the assessments.

30.    Section 362(d)(1) of the Bankruptcy Code provides that, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay - (1) for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. §362(d)(1).

31.    There is no rigid test for determining whether sufficient cause exists to modify an automatic stay. See In re Continental Airlines, Inc., 152 B.R. 420 (D. Del. 1993). Rather, in resolving motions for relief for "cause" from the automatic stay, courts generally consider (i) the policies underlying the automatic stay and (ii) the competing interests of the debtor and the movant. In balancing the competing interests of the debtor and the movant, Courts consider three factors: (1) the prejudice that would be suffered should the stay be lifted; (2) the balance of the hardships facing the parties; and (3) the probable success on the merits if the stay is lifted. See id, citing Int'l Business Machines v. Fernstrom Storage & Van Co., 938 F.2d 731, 734-37 (7th Cir. 1991).

### (i) The Policies Underlying the Automatic Stay Apply to the Town's Claim

32.    The legislative history to section 362(a) of the Bankruptcy Code states as follows:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment, or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

Historical and Statutory Notes to 11 U.S.C. § 362(a).

33.    The relief provided by the Automatic Stay is critical to the Debtors during the current stage in their bankruptcy cases. The Court originally instructed the Debtors to file a plan of reorganization by October 14, 2004. However, on October 25, 2004, the Court granted the Debtors a one-month extension, so that the Debtors could pursue negotiations with the official committees and futures representative. The Debtors are engaging in such discussions in an attempt to reach agreement on a consensual plan by the new November 15, 2004 deadline. In the event that an agreement for a consensual plan is not reached, the Debtors are prepared to file a plan of reorganization that is not wholly-consensual, as instructed by the Court. These processes, however, have (and continue to) place an immense strain on the Debtors' collective resources.

### (ii) The Harms to the Debtors (and the Debtors' Other Creditors) Would be Great

34.    The Debtors' estates and other creditors would be harmed if the Court grants the Motion. In the present situation, the Town has not simply sought leave to establish the Debtors' Final Assessment for the sewer betterment. Instead, the Town has requested leave from the Automatic Stay so that it can: (i) "assess *and bill*" the Debtors and (ii) record a lien against the Debtors' property for the assessment. This is an extraordinary request. Indeed, even section 362's police and regulatory exception to the automatic stay, "expressly states that enforcement of

16

a money judgment does not fall within the police and regulatory exception to the automatic stay." Brock v. Morysville Body Works, Inc., 820 F.2d 383, 389 (3d Cir. 1987).

35.     The Town seeks payment for a sewer system that will likely never confer any appreciable benefit upon the Debtors or their successors. Under the sewer program, the owners of all "benefited" land were assessed. The program defines "benefited" land as any real property that is adjacent to the system, regardless of whether (i) the property is already developed or (ii) the system will actually have available capacity when any undeveloped land is eventually developed. The Debtors' land is currently undeveloped and, due to a myriad of factors, it may never be developed. Even if the Debtors' land is eventually developed, it would be virtually impossible to develop the land to the capacity assumed by the Town in assessing the Debtors' land. Despite these factors, the Town has assigned the Debtors' responsibility for approximately 15% of the Final Assessments

36.     It would be impossible for the Debtors to use 15% of the sewer system. The sewer system has a 250,000 gallon/day capacity, and approximately 225,000 gallons are already spoken for. Therefore, less than 10% of the total capacity is currently available for use, and, should the Debtors ever develop their land to the extent assumed in the Town's assessment, the sewer system would be unable to handle such capacity. Further, given that (i) the Debtors have no plans for developing their land and (ii) other landowners that hold "benefited" undeveloped land may develop their properties before the Debtors develop their parcels, there is a distinct possibility that, should the Debtors actually develop their land, there would be no available capacity. Therefore, it is very difficult to see how the Debtors' property has been "benefited."

37.     The Town's requested relief would also afford the Town superior treatment to all of the Debtors' other prepetition creditors, which would "violate the basic bankruptcy purpose of

17

treating all similarly situated creditors alike." In re Mako, Inc., 985 F.2d 1052, 1056 (10th Cir. 1993).

<h3 style="text-align:center">(iii)    The Town's Alleged Reliance on the Debtors' Payments is Unreasonable</h3>

38.    To the extent the Town is relying upon the Debtors' payments to service the sewer bonds, such reliance is highly unreasonable. Under the Town's sewer program, the Town went after the Debtors' perceived proverbial "deep pocket" by assessing the Debtors with a whopping 15% of the total cost of the sewer betterment program.[6] The Town, however, knew in April 2001 that the Debtors had filed for bankruptcy. Therefore, the Town knew at an early stage in the project that it may not be able to collect the assessments from the Debtors because of their chapter 11 cases and the Automatic Stay. Further, once the Final Assessment is issued, the Debtors have a right to seek an abatement of the Final Assessment. See Memorandum and Order on Cross Motions for Summary Judgments, pg. 8 (which is attached as Exhibit B to the Motion). Therefore, the Debtors may ultimately have no, or at least a much smaller, obligation to the Town on account of the sewer program.

39.    In light of the aforementioned uncertainty, and the fact that the Town was originally assessing 20% of the total cost against the Debtors, the Town could have either (i) scaled back and/or delayed the sewer project or (ii) sought leave from the Automatic Stay *before* it had expended the funds it now seeks to collect from the Debtors for completing the sewer project. Instead, the Town forged ahead - knowing that its ability to collect funds from the Debtors would be protected by the Automatic Stay. Now that the sewer project has been

---

[6]    As noted above, all of this amount is on account of (i) land owned by the Debtors that is not presently developed (and may never be developed) and (ii) a sewer system that would not accommodate the Debtors' land if the Debtors' land was ultimately developed for office use.

completed, the Town relies upon its own imprudence as its primary justification for seeking approval to assess the Debtors and file the order for the final assessment. The Debtors and its other creditors should not be held accountable for the Town's decision to spend money it did not have.

### (iv)    The Town has Failed to Assert Any Specific, Identifiable Harm that it Would Incur if the Motion is not Granted

40.    The Town's chief argument for supporting its requested relief is its extremely-qualified assertion that it has been servicing the sewer bonds by using funds received from landowners that elected to pay the estimated betterments up-front, and, without payment from the Debtors, the Town's annual *appropriations* for payment on account of its sewer bonds would fall short. See Motion pg. 14, ¶30 (emphasis added). The Town fails to state that (i) it actually lacks available *funds* to pay such obligations, or even (ii) that it would *actually* incur a deficit if Grace does not pay the claims now. Instead, the Town only provides the highly-qualified statement that, "the Town faces, in a *worst case* analysis, the *possibility* of defaulting on its bond for the Sewer District." Motion pg. 15, ¶32 (emphasis added). This is particularly unlikely since the alleged annual shortfall from the estimated betterments presently is $272,000, but the revenue stream provided by the estimated betterments (alleged to be $450,000 per year in the Motion, §16) will increase when the Town moves from estimated betterments that are based on one-half the incurred contract liability for the sewer system to final betterments that are based on one-hundred percent of actual costs. Further, if the Court denies the relief sought, the Town could simply issue a new set of final betterments that exclude Grace from the sewer district and redistribute the cost amongst the remaining properties. Then, if the Debtors' property is developed, and the Debtors or their successor(s) sought to tie into the sewer system, the Town

19

could either say "no" or charge Grace under the provisions of Massachusetts General Law c. 83, §20.

41.    The Town has already preserved its rights against the Debtors by filing proofs of claim pursuant to the Debtors' Bar Date. Therefore, the Town's claims will be handled during the course of the Debtors' normal claims resolution process. The Debtors have procedures in place for objecting to proofs of claim that were filed pursuant to the Bar Date, and the Debtors have filed (and continue to file) a series of omnibus objections with respect to such claims. In addition, the Debtors have worked with the Court and various constituencies in these bankruptcy cases to develop an alternative dispute resolution program that will allow the Debtors to resolve many of the Debtors' contested claims. Given the pendency of the Debtors' appeal of the sewer Bylaws, the Debtors believe that it would be premature to presently pursue resolution of the Town's claims through either of these channels. However, should the appeal ultimately be resolved in a manner that imposes an obligation upon the Debtors to pay any portion of the assessment, then the Debtors' would seek resolution of the Town Proofs of Claims through the above (or other) claims resolution mechanisms.

WHEREFORE, the Debtors respectfully request that this Court deny the Motion.

Dated: October 29, 2004

Respectfully Submitted:

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB P.C.

Laura Davis Jones (#2436)
David W. Carickhoff, Jr. (#3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for the Debtors and Debtors in
Possession

21

91100-001\DOCS_DE:101967.1