UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .  Case No.: 01-1139
                                .
   W. R. GRACE & CO., ET AL,    .
                                .
                Debtor.         .  821 North Market Street
                                .  Wilmington, Delaware 19801
                                .
                                .  October 25, 2004
. . . . . . . . . . . . . . ..     12:05 p.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the debtor:                 Kirkland & Ellis, LLP
                                By:  DAVID SIEGEL, ESQ.
                                     JANET BAER, ESQ.
                                200 Randolph Drive
                                Chicago, IL 60601

                                Pachulski, Stang, Ziehl, Young
                                 Jones & Weintraub, P.C.
                                By:  DAVID W. CARICKHOFF, ESQ.
                                919 North Market Street
                                Wilmington, DE 19899

For the Asbestos Committee:     Caplin & Drysdale
                                By:  PETER VAN N. LOCKWOOD, ESQ.
                                One Thomas Circle, N.W.
                                Washington, DC 20005

For the Unsecured Creditors     Stroock & Stroock & Lavan, LLP
                                By:  KENNETH PASQUALE, ESQ.
                                180 Maiden Lane
                                New York, NY 10038

Audio Operator:                 Todd Kirk

  Proceedings recorded by electronic sound recording, transcript
              Produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609)586-2311     Fax No. (609) 587-3599

APPEARANCES (cont'd)

For Century:                    White and Williams, LLP
                                By:  LINDA M. CARMICHAEL, ESQ.
                                824 North Market Street
                                Wilmington, DE 19801

For the Property Damage         Bilzin Sumberg Baena Price &
  Committee:                      Axelrod, LLP
                                By:  SCOTT L. BAENA, ESQ.
                                     JAY M. SAKALO, ESQ.
                                Miami, Florida


                                Ferry, Joseph & Pearce
                                By:  THEODORE TACCONELLI, ESQ.
                                824 Market Street
                                Wilmington, DE 19899

For Futures Rep:                Phillips, Goldman & Spence
                                By:  JOHN C. PHILLIPS, ESQ.
                                1200 North Broom Street
                                Wilmington, DE 19806

                                Swidler, Berlin, Shereff &
                                  Friedman, LLP
                                By:  RICHARD H. WYRON, ESQ.
                                300 K Street, N.W.
                                Washington, DC 20007

For the ACC:                    Campbell & Levine, LLC
                                By:  MARLA R. ESKIN, ESQ.
                                800 N. King Street
                                Wilmington, DE 19801

For the Equity Committee:       Kramer, Levin, Naftalis &
                                  Frankel
                                By:  PHILIP BENTLEY, ESQ.
                                919 Third Avenue
                                New York, NY 10022

For the Scotts Company          Vorys, Sater, Seymour & Pease
                                By:  ROBERT J. SIDMAN, ESQ.
                                52 East Gay Street
                                Columbus, OH 43216

                                Morris, Nichols, Arsht & Tunnell
                                By:  WILLIAM H. SUDELL, ESQ.
                                1201 North Market Street
                                Wilmington, DE 19899

APPEARANCES (cont'd)

For Federal Insurance:          Cozen, O'Connor
                                By:   SHELLEY A. KINSELLA, ESQ.
                                1201 North Market Street
                                Wilmington, DE 19801

For David Slaughter:            Jacobs & Crumplar
                                By:   ROBERT JACOBS, ESQ.
                                2 East 7th Street
                                Wilmington, DE 19899

For Elliott International:      Smith, Katzenstein & Furlow
                                By:   KATHLEEN M. MILLER, ESQ.
                                800 Delaware Avenue
                                Wilmington, DE 19899

                                Cadwalader, Wickersham & Taft
                                By:   JOHN H. BAE, ESQ.
                                      BRUCE R. ZIRINSKY, ESQ.
                                100 Maiden Lane
                                New York, NY 10038

For the ZAI Claimants:          Buchanan Ingersoll
                                By: WILLIAM D. SULLIVAN, ESQ.
                                1007 West Orange Street
                                Wilmington, DE 19801

For Maryland Casualty:          Connolly, Bove, Lodge & Hutz
                                By:   JEFFREY C. WISLER, ESQ.
                                1007 West Orange Street
                                Wilmington, DE 19801

TELEPHONIC APPEARANCE:

For the Debtors:                Kirkland & Ellis, LLP
                                By:   TODD F. MAYNES, ESQ.
                                      DAVID BERNICK, ESQ.
                                200 Randolph Drive
                                Chicago, IL 60601

For ZAI Claimants:              Lukins & Annis
                                By:   DARRELL W. SCOTT, ESQ.
                                West 717 Sprague Avenue
                                Washington, DE 99201

                                Richardson, Patrick, Westbrook &
                                  Brickman
                                By:   EDWARD WESTBROOK, ESQ.
                                174 East Bay Street
                                Charleston, SC 29401

TELEPHONIC APPEARANCE: (cont'd)

For the Scotts Company:      Vorys, Sater
                              By:  TIFFANY STRELOW-COBB, ESQ.

For Reaud, Morgan & Quinn:   Stutzman, Bromberg, Esserman &
                                Plifka
                              By:  SANDER ESSERMAN, ESQ.
                                     DAVID J. PARSONS, ESQ.
                              2323 Bryan Street
                              Dallas, TX 75201

For David Slaughter:        Baggatt, McCall, Burgess
                              Watson & Gaughan
                              By:  ROGER BURGESS, ESQ.
                              3006 Country Club Road
                              Lake Charles, LA 70606

For Spaulding & Slye:       Bernkopf, Goodman, LLP
                              By:  BRUCE D. LEVIN, ESQ.
                              125 Summer Street
                              Boston, MA 02110

For Sealed Air Corporation:  Skadden, Arps, Slate, Meagher &
                              Flom, LLP
                              By:  MARK S. CHEHI, ESQ.
                              One Rodney Square
                              Wilmington, DE 19801

1    THE COURT:  This is the matter of W. R. Grace 01-1139.

2              (Dialing of phone)

3    THE COURT:  Hello.  Is anybody on the phone?

4    UNIDENTIFIED FEMALE:  Yes, Judge, I think everyone has

5  their mute buttons on.

6    UNIDENTIFIED MALE:  Your Honor, everyone has their mute

7  buttons on.

8    THE COURT:  Okay, thank you.  This is the matter of W.

9  R. Grace 01-1139.

10   UNIDENTIFIED MALE:  Okay.

11   THE COURT:  Not everyone.  Would you check your mute

12 buttons, please?  The participants I have by phone are Mark

13 Chehi, Todd Maynes, David Bernick, Darrel Scott, Ed Westbrook.

14             (Phone rings)

15   THE COURT:  Folks, please check your mute buttons and

16 put them on.  Tiffany Strelow, Sander Esserman, David Parsons,

17 Roger Burgess, Bruce Levin.  Ms. Baer.

18   MS. BAER:  Good morning, Your Honor, Janet Baer on

19 behalf of the debtors.  Your Honor, if we could we would like to

20 take the agenda with one matter slightly out of order and that is

21 matter Number 13 the debtors motion to continue its time to file

22 its Chapter 11 plan.  David Bernick of my office is on trial in

23 Washington, D.C. and he's participating by phone and would like

24 to cover this matter first as he needs to get back to the trial.

25   THE COURT:  All right, Mr. Bernick.

1          MR. BERNICK:  I just took myself off mute.  I hope I'm
2  off mute.

3          THE COURT:  Yes, you are.

4          MR. BERNICK:  Your Honor, just very briefly the issue
5  today is not a merit of what may possibly turn out to be a
6  consensual plan of reorganization.  There is no such plan today,
7  there may not be such a plan as we go forward.  The only issue
8  today is whether we should have 30 more days to try to reach a
9  consensual plan.  And we submit that the obvious answer to that
10  question is yes.

11          Number one, 30 days is a very modest period of time
12  compared to the potential benefits this will accrue to success --
13  if we have success in the negotiations when we have a consensual
14  plan.  Number two, this is not a matter of giving the debtor a
15  break from what was previously accepted.  As we all know as a
16  firm base for the submission of a plan the debtor is in fact
17  ready, willing and able to meet that commitment and to meet it
18  whenever Your Honor determines that it is appropriate.

19          This is a situation where both the debtor and others
20  want an extension not for purposes of getting work done in the
21  way of formulating a plan to be filed, but in order to continue
22  what we believe to be productive and very important continuing
23  discussions.

24          Number three, if the motion for an extension is not
25  granted we'll be forced to file a nonconsensual plan and we've

1  received very strong messages -- statements -- messages is not
2  the correct word.  Strong statements, that filing a nonconsensual
3  plan could well have significant adverse effects on the parties'
4  willingness to continue to negotiate.

5        So, in light of that we think there's a case for this
6  modest extension of exclusivity is overwhelming.  We've touched a
7  little bit on what is somewhat perplexing which is why the folks
8  who are opposed, the equity people who are opposed are in fact
9  opposed.  Number one, it can't be because Grace hasn't exerted
10 itself at every stage to preserve equity value for equity.  As
11 Your Honor is very well acquainted since the very beginning of
12 this case we've called into question the extent of the asbestos
13 personal entry in property damage liability.  Our position always
14 has been and is still that Grace is a solvent entity and that
15 there is value from the equity.  Your Honor will also know that
16 we've taken the exact same position on behalf of other clients
17 and have been in the forefront in doing so.

18       So this is not a situation where the debtor is thrown
19 equity to the wind.  If there is some potential leverage that the
20 equity people who object gain to the extent that they're seeking
21 to gain leverage in the negotiations by there being a plan on
22 file one of the leverages there, it's already there, we bate
23 presentations to all constituencies outlining the plan that we
24 would file if we can't reach consent.  Everybody knows what it
25 is, whatever the leverage accrues to that and therefore that is

8

1 | not really at issue here.

2 | There's a suggestion in the papers of the opponent to
3 | our motion that somehow there's complicity between the debtor and
4 | the asbestos personal injury claimants.  There is nothing, no
5 | truth to that proposition and no other system supports that
6 | proposition.  But again, it runs completely contrary to the very
7 | arms length and as you know somewhat contentious relationship
8 | between the debtor and the asbestos personal injury claimants
9 | heretofore.

10 | And then finally, there is a suggestion that somehow
11 | transparency will be advanced if the plan that we are prepared to
12 | file is in fact filed now.  That again is a suggestion that
13 | borders on the frivolous.  Everybody knows what the plan is.  We
14 | have told everybody what the plan is.  We've shared with them the
15 | approach, taken them the plan.  There is complete transparency
16 | here.  And we all know that if there is in fact consensual plan
17 | there will be scrutiny by whomever wants to ask for such scrutiny
18 | as the circumstances leading up to this presentation goes.

19 | We don't really see that there is a useful purpose to
20 | be served by the opposition.  We're wondering what the real
21 | purpose is.  But whatever it is it's not sufficient to outweigh
22 | the very legitimate and strong interest that we have in
23 | attempting to reach consensual plan.

24 | One last thing that I want to underscore is that we are
25 | still prepared to file the plan that we have prepared in meeting

1 our commitment if we can't reach a consensual plan.  It's done,
2 we believe that it's a very sound and viable plan.  In deed, it's
3 a very, very good plan.  We believe all serve to bring this case
4 to a close even in the absence of consent from people with whom
5 we can't reach agreement although we've obviously either desirous
6 of reaching an agreement with whomever we can.  And we're
7 prepared to proceed if we can't reach universal consent.

8        So, we're prepared to go.  But 30 days to see if we
9 can't get broad consent is certainly time that is well spent.

10        THE COURT:  Does anyone wish to speak on behalf of the
11 debtors' position first?  All right, opposed to the debtors'
12 position.

13        MR. BENTLEY:  Your Honor, yes.  Philip Bentley, Kramer,
14 Levin for the equity committee.

15        THE COURT:  You need to use the microphone, sir.

16        MR. BENTLEY:  Yes, Your Honor.  Good afternoon, Your
17 Honor.  Philip Bentley of Kramer, Levin for the equity committee.
18 Your Honor, we do not object to the debtors' request for a month
19 extension.  We understand that on the day the debtors were to be
20 filing their nonconsensual plan there was, for the first time in
21 this case, very substantial movement by the tort claimants
22 towards a plan that the debtor is taking seriously enough that
23 they've made present application.  We think that's very important
24 and valuable and we do think that a one month extension is not
25 unreasonable to see what can be done.

1          We do have two very substantial concerns in that regard
2    though, Your Honor, and I'd like to share them briefly with the
3    Court, if I may.

4          First, Your Honor, we think it's very important that
5    the extension be limited to a month and that the Court send a
6    signal to the parties that the Court intends to keep a tight
7    reign on the process.  We think it's almost self-evident that
8    what created the movement that appears to have occurred within
9    the past ten days -- 11 days was the fact that the debtors were,
10   within minutes, apparently from filing the plan that this Court
11   had directed them to file.  And as Mr. Bernick said it was a plan
12   that the debtors consider to be very sound.  We had reviewed the
13   plan and we worked closely with the debtor to review and comment
14   on the plan.  We concur.  We think it was a very sound plan.  And
15   we think it was a plan that was threatening to the tort claimants
16   and we think that's why -- we think it's not a coincidence that
17   you saw very substantial movement just as it was about to be
18   filed.

19         THE COURT:  I had a slightly different perspective.  I
20   thought these were all lawyers putting this together and it was
21   the day that you were approaching the court house steps.  So if
22   there was going to be movement that was the day that it would
23   happen.  But I like your analysis.

24         MR. BENTLEY:  I think Your Honor is really saying --
25   making a similar point slightly differently.  And that is it's a

1  deadline that forces the parties to come together.  So we would

2  urge Your Honor to keep a tight reign in setting further

3  deadlines and to underscore for the parties that you intend to

4  keep the case moving forward as you have been doing to date.

5          Second point, Your Honor, and on this I want to

6  underscore we don't fault the debtor for what happened 11 days

7  ago.  We don't fault the debtor for the fact that we were not in

8  the room when these negotiations occurred.  Nobody anticipated, I

9  think, the debtor or us or anyone else, that the parties were

10  going to make as much as progress as they did 11 days ago.

11          But we think going forward now that the debtor and the

12  tort claimants might be within striking distance, we think it's

13  critical that the equity committee now be brought into the

14  process and the creditors' committee for that matter, and that

15  the parties understand that in order for this case to potentially

16  achieve a consensual resolution that solve the otherwise very

17  good problems in the case that can't be done without the support

18  of the equity committee and most important a yes vote by equity

19  once the plan is sent out for a vote.

20          And if I may pause on that point for a moment, Your

21  Honor.  The debtor has been emphasizing we think very properly

22  throughout the case that you can't pay the tort claimants more

23  than 100 cents on the dollar, and that you need to employ

24  procedures that go beyond traditional estimation procedures in

25  order to determine what constitutes 100 cents on the dollar.  And

1  the point for today's purposes, Your Honor, is that even if the
2  debtor signs on to a consensual plan with the plaintiffs if
3  there's a no vote by equity, equity has the power to block that
4  plan unless it's established before the Court through appropriate
5  litigation procedures that the tort claimants are not being paid
6  more than in full.  Because obviously you can't cram down a
7  junior class when a senior class is being paid more than in full.

8          And in order to make that proof, that showing it will
9  be necessary, if the equity doesn't sign on, to go through all
10  the procedures that the debtor very properly has been advocating
11  throughout the case.  Just to mention two examples, Your Honor.
12  The debtor has put forward to the Court the fact that they have
13  done sampling of the claims in the case that were filed a few
14  years back and their sampling shows that the vast majority of the
15  claims that have been filed were filed with no proof of exposure
16  to a Grace product.  In fact, no proof even that the claimant was
17  a construction worker and therefore could even conceivably have
18  come into contact with a Grace product.  Somebody else's asbestos
19  product probably, but not a Grace product.  And that is something
20  that the plaintiffs will have to prove in order to show that
21  they're not being paid more than 100 cents if there's a no vote
22  by equity.

23          One other salient point, Your Honor, and then I think
24  I'm done, the nonmalignant claims, the so-called the unimpaired
25  claims.  There has been more and more scientific evidence, Your

Honor, in recent months, not to mention years, that the
settlements that the debtors entered into prior to the petition
date were the product of massive fraud on the part of B readers
hired by the plaintiffs who found overwhelmingly that x-rays
showed impairment when in fact scientists looking at this
objectively have since found there was very, very small
incidences of impairment.  And that is something that taint of
fraud is growing here, Your Honor, and that's something that will
have to be looked at very, very closely if there cannot be -- if
there isn't a consensual deal that includes all parties in this
case.  Not just the debtor and the plaintiffs.  Thank you, Your
Honor.

          MR. LOCKWOOD:  Your Honor, I had not realized that we
were here to debate the merits of the tort claimants' claims.

          THE COURT:  And we're not.

          MR. LOCKWOOD:  The committee has not objected to this
continuance of exclusivity.  That being the first time, I think,
in two years or so that we have not so objected.  We're content
to have the extension that the debtors have represented and I
just want to say that since we're not here to address the merits
I will restrain myself from responding to Mr. Bentley's one-sided
presentation about the tort claims.

          THE COURT:  Thank you.

          MS. MILLER:  Good afternoon, Your Honor, Kathleen
Miller of behalf of Elliott International.  I'd like to introduce

1  to Your Honor my co-counsel Bruce Zirinsky and John Bae of the

2  firm of --

3          THE COURT:  I'm sorry, will you spell the name for

4  Bruce?

5          MR. MILLER:  Z-i-r-i-n-s-k-y.

6          THE COURT:  Okay.

7          MS. MILLER:  And John's last name B-a-e.  Of

8  Cadwalader, Wickersham & Taft.  I have their pro hacs with me

9  which I'll file this afternoon.  And with Your Honor's permission

10 I'd ask permission they address the Court.

11         THE COURT:  Where are they admitted?

12         MS. MILLER:  In New York.

13         THE COURT:  All right.  Thank you.

14         MR. ZIRINSKY:  Good afternoon, Your Honor, thank you.

15 Bruce Zirinsky on behalf of Elliott International an equity

16 holder.  A large equity holder of the debtors.  Your Honor, first

17 of all, as a matter of procedure I listened to Mr. Bernick's

18 presentation and --

19         MR. BERNICK:  Excuse me, Bruce, for interrupting.  I

20 can hardly hear you.  If you could just speak up a little bit.

21         THE COURT:  All right, I'll ask.

22         MR. ZIRINSKY:  Is that better?

23         MR. BERNICK:  Yes, that's a little bit better.

24         THE COURT:  You can pull the microphone up.

25         MR. ZIRINSKY:  Is that better?

1          MR. BERNICK:  Yes.

2          MR. ZIRINSKY:  Okay.  Thank you.  As a matter of

3  procedure, Your Honor, I heard no evidence this morning in

4  support of the debtors' application.  I just heard argument by

5  counsel for the debtors in support of what I consider to be a

6  very extraordinary request of the Court.  On June 16th --

7          THE COURT:  Continued exclusivity?

8          MR. ZIRINSKY:  This is not a motion to continue

9  exclusivity.

10          THE COURT:  I'm sorry, continue the extension for the

11  disclosure statement?

12          MR. ZIRINSKY:  The motion to extend the time to file a

13  plan which was fixed by Your Honor in her Order of June 16th.

14          THE COURT:  Yes.

15          MR. ZIRINSKY:  Basically, Your Honor, we haven't heard

16  anything new other than an epiphanous meeting on the very day

17  that the debtors were required to file their plan and disclosure

18  statement.  As I said, there's no evidence in the record here.  I

19  think at the very least the debtors should be required to make an

20  evidentiary showing to support the bald allegations of

21  substantial progress having been made in negotiations and what's

22  happened since the Court's Order of June 16th.  And the reason I

23  say that, Your Honor, is first of all, the debtor does have an

24  obligation to show cause, not just to come in and made bald

25  assertions of progress particularly in a case that's been pending

16

1  for over three and a half years.

2         When the debtors sought their last extension of
3  exclusivity which resulted in the June 16 Order the debtors made
4  the same representations that they made today.  We have a plan
5  and disclosure statement that's ready to file, we're prepared to
6  initiate proceedings for claims estimation, we have two
7  alternative tracks we can go down.  One is to try to reach an
8  agreement with the plaintiffs, the other is to proceed with a
9  plan that can be confirmed over the objection of the plaintiffs.
10 So there's nothing new here.

11        Notably, and I guess in one sense I have the benefit of
12 being a brand new comer to this case, Your Honor, and not having
13 been involved in the case back in June, but I have read Your
14 Honor's order quite carefully.  And that Order extended
15 exclusivity to November 24th to file a plan and the exclusive
16 solicitation period to January 24th of 2005.  What that Order
17 also did, which I found to be extraordinary and compelling for
18 purposes of today is the Court directed that the debtors file
19 their plan on or before October 14th.

20        In deed, the Court in its Order said that the extension
21 of exclusivity that those periods -- that that Order was without
22 prejudice to a further extension provided that the debtors
23 complied in all other respects with the Order.  So the Court was
24 saying in that Order that exclusivity is extended for these
25 periods, you're required to file a plan on or before October 14th

1  and I'm not going to extend exclusivity again unless you comply
2  with my Order to file a plan by October 14th.

3         The debtors in apparent disregard of that instead filed
4  a motion on October 14th returnable today for purposes of
5  extending their period of time for another 30 days within which
6  to file a plan.

7         As I said, there's no basis here -- there's nothing new
8  since June through today.  In deed, shortly after the order was
9  entered in June the debtors filed a status report in which they
10 gave an updated status of these proceedings and on Page 8 of that
11 status report the debtors themselves reference the fact, and I
12 quote, the debtors -- as already promised to Judge Fitzgerald
13 Grace will file a plan along these lines within 90 to 120 days.
14 That's at Page 2 of this status report that the debtors filed on
15 June 21st, five days after the Order extending exclusivity was
16 entered.

17         The fact of the matter is, Your Honor, and I think
18 you've already heard it admitted by the various parties here that
19 are in support or in somewhat support of this extension that the
20 only thing that seems to work with the plaintiffs, the asbestos
21 committee in this case is a deadline.  The fact of the matter is
22 that not until the deadline was upon us was there any movement at
23 all.  And while we can all quibble about tactic and things like
24 that the fact of the matter is that deadlines in order to have
25 credibility need to be stuck with.  And we absolutely no reason

1 why the debtors shouldn't be required to comply with their prior
2 promises to the Court and with the Court's prior order and go
3 ahead and file the plan and disclosure statement that the debtors
4 say is ready to file.

5         Three and a half years is a long time for any Chapter
6 11 case.  There clearly is, and I think the parties now
7 acknowledge it, there clearly is value for equity in these
8 estates as --

9         THE COURT:  I haven't heard anybody acknowledge that
10 there is value for equity.  What I'm hearing is that if there
11 isn't a consensual plan there will have to be an estimation
12 hearing of the tort claims and probably evaluation of the
13 business so that I know exactly what it is that the debtor has to
14 put into the plan to pay the torts.

15         So at this point in time it seems to me that if in fact
16 there can be a consensus arrived at, and I agree with the
17 committee that the equity is going to have to buy off on that
18 consensus at some point if there is going to be a distribution to
19 equity or if there isn't going to be a distribution to equity
20 they have to know what those valuations are based on and buy off.
21 But I'm not sure how anybody is harmed provided that the debtor
22 complies with the November 24th exclusivity period.  They still
23 have exclusivity in that time.

24         MR. ZIRINSKY:  They have exclusivity, Your Honor, but
25 that exclusivity is going to expire on November 24th unless a

1 plan is filed.

2      THE COURT:  That's right.  So all they're asking is

3 that basically I don't hold them in contempt for not filing a

4 plan on October 14th.

5      MR. ZIRINSKY:  But, Your Honor, I think it goes beyond

6 that.  I think what it requires is that the Order itself said

7 that any further extension of exclusivity would depend upon the

8 debtors filing a plan by October 14th.

9      THE COURT:  Yes.

10      MR. ZIRINSKY:  And they haven't done it.

11      THE COURT:  All right.  So then if they ask me for

12 exclusivity I'll address it then.  If they file a plan before

13 November 24th they'll have it anyway.  Your Honor, I think

14 there's still no record here.  All we've heard is bald assertions

15 of progress.  Three and a half years into a case a bald assertion

16 by a debtor in support of maintaining exclusivity or maintaining

17 the ability to file a plan or to excuse itself from not filing a

18 plan pursuant to a court order requires more than a bald

19 assertion of progress.  We're well beyond the point in time three

20 and a half years where bald assertions will suffice.  And I

21 submit to Your Honor --

22      THE COURT:  That's fine.  Let me find out from the

23 committee whether the committee things there's a bald assertion

24 of progress because I think the rules prohibit me from asking

25 specifically what that progress may be.  And I'm not going to put

1  myself in the Hobson's choice of asking on the one hand and then

2  being disqualified because somebody tells me on the other.  And

3  so as a result I will accept the proposition if all parties who

4  were there feels that there was substantial progress being made

5  sufficient to justify until November 24th for the debtors to file

6  this plan I will accept that representation from counsel.  They

7  are officers of this court and I don't expect them to look me in

8  the eye or talk to me on the phone as the case may be and lie to

9  me.  There will be significant issues that we will address later

10 if I find out that that has happened.

11      MR. BERNICK:  Your Honor, David Bernick, just for a

12 moment here.  I don't think we really have to strain on this one

13 at all in terms of the proposition that's been advanced.  You

14 don't have to have an evidentiary showing, even assuming an

15 evidentiary showing as a matter of procedure in where we are in

16 the case what's to be required.  It is so easily satisfied.

17 Formal submissions have been made to the Court by parties who are

18 vitally interested in the case to the effect exactly as Your

19 Honor indicates that there has been -- there's support for our

20 request for an extension precisely because negotiations have

21 progressed here.  So there doesn't have to be people under oath.

22 We have actual pleadings in support of our position and the Court

23 certainly can take judicial notice of the fact of those pleadings

24 and what they stand for.

25      Insofar as the issue about nothing new, nothing new,

1  nothing new, that is a contention that really ought to have asked
2  -- that ought to call on the Court to ask for a justification
3  from the counsel who made it because it cannot be made in good
4  faith.  All the parties who have been involved in these
5  discussions know that there is in fact a plan that has been
6  drafted.  That there is in fact a plan that's waiting to be
7  filed, and that it is something that's new.  Mr. Zirinsky is the
8  one who is making a representation that there's nothing new.  My
9  simple response would be did he even contact the counsel for the
10  committee that first represented interest to assure that when he
11  makes that contention that he's not acting in bad faith.

12          The other thing I would add with regards to the people
13  who are objecting here is that we still have not heard from Mr.
14  Zirinsky or from his client on what the rational is for their
15  position other than they thing that there's a bigger threat to be
16  made when the plan actually gets filed.  Mr. Zirinsky says oh,
17  this is just a quibble.  It's not a quibble.  The question was
18  the justification for an important opposition that's been filed
19  from counsel from its client on why it is we're taking up here
20  that time here today stating something actually ought to be a
21  complete no-brainer, that when you made that co-consensual plan
22  you provide 30 days to see if you are going to get to a
23  consensual plan.

24          With regard to what might have to happen if there is
25  not a consensual plan I know that Your Honor has talked about

1  that briefly and Mr. Bentley on behalf of the equity committee
2  has talked about that briefly. I guess from our point of view
3  that falls into the same category as Mr. Lockwood acting nobly to
4  restrain himself in commenting on the merits of the tort claims.
5  I guess likewise we would feel that there would have to be a
6  substantial discussion about the procedures that would be
7  necessary to be followed in the event that there's not a
8  completely consensual plan including equity. But that is really
9  not for here -- here for us today as the merits of any plan
10  either consensual or nonconsensual are not before the Court
11  today.  The simply question is 30 more days.

12        MR. PASQUALE:  Your Honor, if I may.  Ken Pasquale for
13  the creditors' committee. You already have in the record through
14  the debtors' motion that the asbestos committee support the
15  extension. I thought in light of some of the comments I could
16  just stand and advise the Court that the creditors' committee
17  also does support this extension.

18        THE COURT:  All right.  Is the creditors' committee
19  satisfied that there has been a substantial progress made?

20        MR. PASQUALE:  We are, Your Honor.

21        THE COURT:  All right.

22        MR. ZIRINSKY:  Your Honor, I'm not going to engage in
23  response to ad hominems from Mr. Bernick.  The fact of the matter
24  is that it's the debtors' motion.  The debtor has the burden.
25  The burden is not on my client Elliott Associates to demonstrate

1 why the extension shouldn't be granted.  It's the burden on the

2 debtors to show why the extension should be granted.  The fact of

3 the matter is we have heard absolutely no reason why filing a

4 plan now as the debtor committee to do, as the Court has directed

5 to do, Number one, why that would prejudice the negotiations.  It

6 would seem to me that one can very clearly make the -- reach the

7 conclusion that filing of a plan where the threat of filing of a

8 plan has supposedly brought the plaintiffs to the table for the

9 first time, that actually filing that plan and proceeding with

10 that plan will expedite a consensual plan if a consensual plan is

11 achievable here.

12          THE COURT:  Why would I order a plan to be filed that

13 is in the process of negotiation knowing that if the parties in

14 fact conclude their negotiations it's going to have to be

15 amended?  I mean, that doesn't even make sense from an

16 administrative point of view.

17          MR. ZIRINSKY:  But, Your Honor, we're on a slippery

18 slope here.  I mean, I haven't heard anything regarding what

19 happens on November 15th when Mr. Bernick comes back in and says

20 to Your Honor, Your Honor, we're still negotiating, we need more

21 time?

22          THE COURT:  That's a different issue.  Because the

23 issue -- I think the remedy that I built in to not filing the

24 plan by October 14th was that I would probably not consider

25 favorably another request to extend exclusivity.  And that is

1 still my intent.  Not to consider favorably another extension of
2 exclusivity.  So if the parties really want to negotiate I think
3 they've got 30 days to get -- well toll whatever the day
4 exclusivity expires.  November 24th to get it done.  That's the
5 remedy I built in.  And quite frankly, I'm not sure how anybody
6 at this point in time really, except for the debtor, unless
7 you're asking by filing a motion to shorten the exclusivity
8 period has standing to object to this process.  Because I set the
9 deadline within the exclusivity frankly expecting that there
10 might be some movement.

11          MR. ZIRINSKY:  And Your Honor's expectation was
12 achieved.

13          THE COURT:  Good.

14          MR. ZIRNISKY:  That deadline did achieve some movement
15 according to the representations made by counsel.

16          THE COURT:  Good.  So let's hope that the next deadline
17 achieves final movement.

18          MR. ZIRINSKY:  But, Your Honor, it's only going to
19 achieve it if it's credible.  In other words, if it's a real
20 deadline.

21          THE COURT:  If I've lost credibility with the parties
22 I'm sure I'll soon be getting a motion to recuse myself which
23 based on how contentious these cases are in all probability I'd
24 be happy to grant.

25                    (Court laughs)

25

1    MR. ZIRINSKY:  We're not requesting that, Your Honor.
2  Your Honor, the other point is that this motion seeks an
3  extension until November 15th, not until November 24th.

4    THE COURT:  Yes.  I understand.  It was asking for 30
5  days from the date that the original plan was due.  All I'm
6  saying is I think I said exclusivity -- I believe I keyed it to
7  when I thought I was going to be in Delaware -- a week after I
8  was going to be in Delaware, I believe.

9    MR. ZIRINSKY:  Exclusivity is the 24th is the
10  expiration of the current exclusivity period.

11    THE COURT:  That's right.  And I did that because it
12  would take some time in the event that I was asked to extend it
13  again to get an order in.  So I keyed those dates with that in
14  mind.

15    MR. ZIRINSKY:  Your Honor, perhaps, you know, having
16  sort of standing here is the lonely end.  A football analogy.  It
17  would seem to me that perhaps the appropriate way to dispose of
18  this if Your Honor is inclined to grant the motion is to grant it
19  to November 15th with the express proviso that that date will not
20  be extended.

21    THE COURT:  I don't know whether I'll extend it.  I
22  don't know.  The one thing that this Court has to do with respect
23  to its motions to extend is take a look at the reasons for it.
24  If what I'm told is that the debtor is still bargaining with the
25  asbestos plaintiff's committee and nobody else has been involved

1 | then in all probability I'm going to say too bad, you've have
2 | three and a half years.  But if they get a deal at least in
3 | principle with one group and start on another I don't know that I
4 | won't grant some further extension.  I'm not going to bind myself
5 | to that.  What I am pretty much convinced is that if there isn't
6 | a deal and a plan on record by November 24th when exclusivity
7 | terminates in all probability I'm not going to grant an
8 | additional extension to exclusivity.

9 |          MR. ZIRINSKY:  Thank you, Your Honor.

10 |          THE COURT:  The debtors' motion to extend the time to
11 | file the plan to November 15th is granted.  Do you have an order?

12 |          MS. BAER:  We do, Your Honor.

13 |          THE COURT:  Thank you.

14 |          MR. BERNICK:  Your Honor, I'm going to -- if it's all
15 | right with the Court I'm going to sign off at this point and go
16 | back to my other matter.

17 |          THE COURT:  All right, Mr. Bernick.  Thank you.

18 |          MR. BERNICK:  Thank you very much.  Good bye.

19 |          THE COURT:  The order is entered with respect to Item
20 | 13.  Ms. Baer.

21 |          MS. BAER:  Thank you, Your Honor.  At this point we can
22 | go back to the beginning of the agenda.  Agenda Item Number 1 is
23 | the Scotts Company's declaratory judgment complaint.  That matter
24 | has been continued until the November 15th omnibus hearing.

25 |          Items Numbers 2, 3, and 4, Your Honor, are matters on

1  which you have already entered orders.  Therefore they are no
2  longer relevant.

3          Item Number 5, Your Honor, was debtors' motion for
4  entry of an order approving a settlement agreement with Honeywell
5  International.  Your Honor beat us to the gun on this one.  We
6  actually had submitted an order and submitted a Certificate of No
7  Objection only to then discover that what crossed in the mail was
8  a better order that had been negotiated with Honeywell.  And Your
9  Honor, we would ask today that Your Honor enter an amended order.
10 It does a couple of very significant things, Your Honor.  Number
11 one, the amended order deals with the Honeywell International
12 claim that relates to the settlement and gets rid of that claim.

13         Number two, it obligates Honeywell to work with the
14 debtors because there are many claims related to this particular
15 site where Honeywell is now effectively taking over and
16 indemnifying the debtor of those obligations so Honeywell is
17 agreeing to cooperate with us in order to also try to make those
18 claims go away.

19         In addition, Your Honor, the original order retained
20 jurisdiction not only over the amended order, but actually over
21 the district court settlement which really was not appropriate.
22 The Court doesn't have jurisdiction over that.  And so we fixed
23 that.

24         And then lastly, Your Honor, the new order of course
25 then supercedes the one that was entered on October 13th and

1 | actually vacates that.

2 | THE COURT: All right, I'll take your order. Thank
3 | you. Okay, that's fine.

4 | MS. BAER: Your Honor, the next item on your agenda,
5 | Item Number 6 was the continued motion of the debtor with respect
6 | to the KWELMBS settlement. Your Honor approved the settlement at
7 | the last hearing, but continued the issue of what we should do
8 | with the money. We've spoken with the asbestos committees as
9 | well as with the future representative and we've agreed to
10 | continue this once again to November 15th. Depending upon
11 | whether we do a consensual or nonconsensual plan the insurance
12 | proceeds may end up in different places and so we kind of all
13 | agreed let's see where we go on the plan, let's continue this and
14 | we'll take up the issue next time if we need to.

15 | THE COURT: Well, shouldn't it be continued to the
16 | December date then? If you're just going to file the plan in
17 | November will parties be ready to address this issue then? I
18 | mean, if you are, fine, but it sounds as though it's just going
19 | to get continued one more time.

20 | MR. LOCKWOOD: It's okay with the committee if you do
21 | that, Your Honor.

22 | MS. BAER: Then let's do that, Your Honor. I think
23 | that's a very constructive suggestion.

24 | THE COURT: Oh, Ms. Baer, I don't want to forget to
25 | give you dates for next year before you leave.

1          MS. BAER:  It's on our list of additional items, too.

2          THE COURT:  That December 20th is in Pittsburgh.

3          MS. BAER:  Yes.

4          THE COURT:  All right.

5          MS. BAER:  Your Honor, that takes us to agenda Item

6     Number 7 which is the motion of David Slaughter to lift the

7     automatic stay.  Your Honor, this is another motion brought by a

8     nonasbestos personal injury claimant who apparently was harmed --

9     was injured when he was making a delivery to a Grace facility.

10    Your Honor, this is a situation where the complaint that was

11    filed in the state court was filed in violation of the automatic

12    stay.  And the plaintiff admits that.  This is a situation, Your

13    Honor, where a proof of claim has been filed in the Grace

14    bankruptcy estate a timely proof of claim for $1,375,000.

15         Your Honor, there's nothing in the motion that

16    demonstrates why this matter should be dealt with any differently

17    than probably another 200 related nonasbestos personal product

18    injury liability type claims where there's either pending

19    litigation or a pending claim.  Your Honor, these are exactly the

20    types of claims we would hope to try to resolve or at least make

21    good progress with with respect to the ADR procedures that we've

22    asked the Court to approve.

23         Your Honor, there is insurance coverage here, but

24    there's a large deductible.  So if this matter would go forward

25    even with discovery the first dollars and the defense dollars are

1 on the debtor.  Under those circumstances, Your Honor, we believe
2 it does have an impact on the debtors' estate.  We believe
3 through the claims objection process and the ADR we may be able
4 to make progress with this claim and we'd ask the Court to give
5 us the opportunity to do that.
6             THE COURT:  Good afternoon.
7             UNIDENTIFIED ATTORNEY:  Good afternoon, Your Honor.  On
8 the phone is Mr. Burgess who's the attorney from Louisiana with
9 respect to the underlying action.
10             THE COURT:  Mr. Burgess.
11             MR. BURGESS:  Yes, I'm here, Your Honor.
12             THE COURT:  Okay, go ahead, sir.
13             MR. BURGESS:  Your Honor, this is a situation where we
14 have had a couple of judges in the 14th judicial district court
15 handle this in a different matter.  We've had a judge move up to
16 a court of appeals and a new judge come who finally agreed to
17 hear a motion to sever.
18             This is a case where W. R. Grace is the premise owner
19 of the property where Mr. Slaughter was injured.  There is a co-
20 defendant here in Louisiana who is a contractor that we believe
21 actually constructed the area where Mr. Slaughter was injured.
22             From the standpoint of the -- Mr. Slaughter he is -- he
23 has been bound from the minute that he found out through counsel
24 that there was a bankruptcy pending.  We had no notice of any
25 sort prior to the filing of the petition.  But we certainly did

1  find out within about a week of the filing of the petition

2  because Mr. Hughes contacted us who was at that time representing

3  W. R. Grace.

4          And so we immediately shut down the process here.  But

5  we have now been before Judge Richie who is the presiding Judge

6  in the 14th (inaudible) on the personal injury case and by his

7  instructions we've sought the relief of stay at least from the

8  standpoint of the insurer which is American Home as I understand

9  it.  We didn't even file an amended petition because we learned

10  from Mr. Hughes that the Court had ruled that even the insurers

11  were not to be brought in.  We have down here a direct action

12  statute that if a defendant files bankruptcy then there can be

13  direct action against the insurer.  But we're just -- we had the

14  whole process shut down and trying to sever out W. R. Grace the

15  Court has down here denied our motion to sever sort of pending

16  what your decision is going to be on the lifting of the stay.  At

17  least for us to pursue American Home who I understand is not

18  involved in any of the cases that have to do with the asbestos

19  litigation.  But again, I don't know.

20          THE COURT:  I'm not sure whether American Home has some

21  insurance coverage for asbestos or not.

22          MR. BURGESS:  And I don't have any real knowledge of

23  that (inaudible) 2000 accident.  My understanding is that the

24  coverages at least that I'm aware of that were at issue have to

25  do with terms long prior to that.  Excuse that grammar.

1          MR. JACOBS:  Two things.  The petition he's talking

2     about is not the petition of bankruptcy, but petition that he

3     filed in state court in Louisiana.

4          THE COURT:  Yes, I understood that.

5          MR. JACOBS:  I just want to make sure of that.

6          THE COURT:  Yes.  Thank you.

7          MR. JACOBS:  And I -- there's two parts here.  One, we

8     would appreciate it if the Court would retroactively allow this

9     suit to continue even if it is stayed because he inadvertently

10    filed the suit, even though it was five months after.  He had no

11    notice, no understanding.  And as soon as he was given notice by

12    counsel with the carrier actually of the bankruptcy within a week

13    of the filing of his petition for damages and he has ceased all -

14    - and in fact the court from Louisiana have now kept this action

15    not going forward for three and a half years.

16          THE COURT:  But why isn't it appropriate, however to

17    try to litigate with respect to the debtor or liquidate, pardon

18    me, liquidate the claim with respect to the debtor and the claims

19    objection process?  I mean, that's what claims objection

20    processes are for.

21          MR. JACOB:  Your Honor, we're going to have to have a

22    case down there against Turner where there is comparative

23    negligence and joint and several negligence and you're going to

24    have to litigate it down there and that question come to the

25    termination of the debtors' liability or protection of liability.

1  This Court then goes and has contrary finding with respect to
2  debtor.  I don't see why with the discovery --

3         THE COURT:  I don't know how it would be contrary.  I
4  mean, whichever court determines what the debtors' liability is
5  the other one has to give full faith and credit to that
6  determination.  They're not going to liquidate that claim twice.
7  It's going to be liquidated once.

8         MR. JACOBS:  But you are going to liquidate the damages
9  twice, Your Honor, because Turner is not before this Court and if
10 the Louisiana court now that you -- if you refuse to lift the
11 stay let's them go forward against Turner and they get a judgment
12 well before this proceeding seems to be moving since the three
13 and a half years you have not gone very far.  And the ADR then
14 isn't in effect now.  I don't know if it'll be in effect this
15 time next year based upon where the bankruptcy goes.

16        THE COURT:  The ADR will be in effect in a couple of
17 days.  I have the order here to ask them questions and as soon as
18 we get it resolved and get a revised COC here the ADR procedure
19 will be in effect.  But how soon it gets implemented with respect
20 to any other claim is a question.  But how soon a trial court if
21 it just has a complaint filed is going to get to trial is
22 questionable, too.

23        MR. JACOBS:  No, the complaint's two and a half years
24 old, Your Honor, down in Louisiana.

25        THE COURT:  But apparently nothing's happened with

1 respect to this case in discovery. Surely this debtor is

2 entitled to some discovery in the event the case is open. No

3 court is going to make this debtor go to trial without going back

4 in and taking a look at the allegations and offering a defense,

5 is it?

6        MR. JACOBS: No, Your Honor, but the Court's got to be

7 able to go forward against Turner. And since it's going forward

8 against Turner since you need discovery here anyway whether it's

9 in this court or that court I don't see any reason not to lift

10 this stay at least to allow discovery to proceed even if nothing

11 else gets forward before we -- and then come back here after that

12 has proceeded. That's going to have to get done and take the

13 debtors' time and/or the reformed debtors' time in the future.

14 So why not allow it to go forward against both parties on

15 discovery at the same time down in Louisiana? At that point

16 we'll have to see where it went, but it makes utmost sense to

17 allow it to go forward against both parties in Louisiana at least

18 for discovery.

19        THE COURT: Okay. Ms. Baer.

20        MS. BAER: Your Honor, a couple of things. Number one,

21 I believe that counsel indicated that the motion to sever has

22 actually been denied in Louisiana so the Court is not prepared to

23 go forward against only Turner Construction.

24        THE COURT: Well, I think he said denied pending a

25 ruling on my relief from stay.

1          MS. BAER:  Okay.

2          MR. BURGESS:  That's correct.

3          MS. BAER:  Your Honor, secondly, if discovery would

4 proceed against W. R. Grace we will start spending real money.

5 Again, with a deductible on the insurance policy generally

6 speaking that will include attorney's fees that usually goes as

7 the first dollars.  Therefore, we would immediately begin

8 incurring both the time and attention of our people as well as

9 cost with respect --

10          THE COURT:  But you're going to do that in the

11 mediation process anyway.  Hopefully it will be less expensive.

12 But nonetheless you're going to be incurring those dollars as to

13 this claim no matter what.

14          MS. BAER:  We will, Your Honor, but it makes a lot more

15 sense to do it in the ADR procedure where we're going to be doing

16 it with respect to others in kind of the same time frame in the

17 same type of a procedure.  And it would be our hope that it would

18 be much more efficient than if we're down in the state court of

19 Louisiana in what is really a brand new action.  Nothing has

20 proceeded so far therefore it's not as if we're doing something

21 counterproductive to what is happening in Louisiana since nothing

22 has proceeded there.

23          Frankly, Your Honor, we believe if this goes to ADR

24 there is probably a good possibility that all three parties will

25 talk which is probably the best thing that could happen to

1  efficiently deal with this situation.

2         The plaintiffs here have not asserted that they are any
3  different from hundreds of others who are in exactly the same
4  position here in the bankruptcy court and we believe it's
5  appropriate for the debtors to have the opportunity in the claims
6  objection process to deal with those claims.

7         THE COURT:  Okay, well, you know, the law in this
8  circuit is pretty touch when actions that are brought in
9  violation of the stay even when it's not a wilful violation of
10 the stay.  So with respect to authorizing the action nun pro tunc
11 frankly I'm not comfortable doing that.  I haven't done it for
12 other defendants in this or the other cases because I am
13 concerned about the third circuit rulings along those lines.

14        Something taken in violation of the stay and action in
15 violation of the stay in this circuit is void and it seems to me
16 that this action is void and I really feel I have no choice but
17 to strike it and require rather that the creditor move forward
18 with some motion for relief from stay to commence the action over
19 again if that's what you choose to do.

20        Frankly I think the mediation process is not a bad one.
21 It's something that maybe could resolve this claim.  It's not a
22 huge claim as far as the debtors' estate is concerned, but it is
23 a significant one where there is a large deductible that the
24 debtor has to face.  And so there are some economic pressures on
25 both sides that would seem to make this appropriate for

1   mediation.   So I hope you will consider that before you come back

2   with a motion for relief from stay.

3          MR. JACOBS:   I'm sure Mr. Burgess (inaudible) Your

4   Honor, but I just want to say two things.   One, I think an in re

5   source case this specifically was one of the grounds that the

6   third circuit found that the Court should take consideration in

7   retroactively allowing it.   That is an unknowing violation.   I

8   mean, it wasn't as if this was something where he knew about the

9   bankruptcy and went forward.   He could have come to this Court

10  and requested a filing.

11         Second, with respect t it being different than other

12  cases.   I don't know what these other 200 cases she talks about

13  are.   But as Mr. Slaughter's affidavit indicates he has not

14  worked in three years, he is in fiscal straights and that makes

15  it different than most court cases unless she can say that in

16  those 200 cases all these people have not been able to work

17  because of their injuries.   I think that really the equities rely

18  upon the Court retroactively doing it and allowing discovery to

19  go forward because discovery will go forward there much faster

20  than an ADA where we don't even if the Court signs it I don't

21  know when it's going to be implemented and I've seen ADAs not

22  implemented for many, many months or even a year.

23         THE COURT:   Well, I'll require the debtor to move this

24  one to the top of their ADA facility and then at least it will

25  get expedited.

1    MR. JACOBS:  Okay, thank you, Your Honor.  Mr. Burgess

2  can sign off now, Your Honor?

3        .    THE COURT:  Mr. Burgess?

4          MR. BURGESS:  Yes.

5          THE COURT:  Anything else you'd like to say, sir?

6          MR. BURGESS:  No, we understand the Court's ruling and

7  we thank the Court for the opportunity to participate by

8  telephone.

9          THE COURT:  All right.  I will take an order -- I have

10  the debtor draft the orders, but I'll ask counsel to run it by

11  you, Mr. Burgess, to make sure that it comports with your

12  understanding of what I've ruled on the record.  That will not

13  permit the action to go forward at this time.  I strongly suggest

14  that the mediation process ought to be employed.  As I said, if

15  you try to -- if you expect to file a different motion to lift

16  the stay to bring an action that's up to you.  But I hope that

17  you will consider mediation first.

18          MR. BURGESS:  Thank you, Your Honor.

19          THE COURT:  Thank you.

20          MS. BAER:  Thank you, Your Honor.  We will draft an

21  order and circulate it to counsel for Mr. Slaughter.

22          THE COURT:  All right.

23          MS. BAER:  Your Honor, that takes us to agenda Item

24  Number 8 which is the debtors' third omnibus objections to

25  claims.  Your Honor, we have an order to present with respect to

1   this matter.  This order essentially continues one remaining

2   claim and expunges two others.

3          THE COURT:  All right.  That order is signed.

4          MS. BAER:  Thank you, Your Honor.  Agenda Item Number 9

5   is the debtors' fourth omnibus objection to claims.  Again, Your

6   Honor, we have an order to present to the Court that continues

7   the three remaining contested issues in that omnibus objection.

8          THE COURT:  All right.  Okay.

9          MS. BAER:  Your Honor, with respect to Item Number 10

10  the debtors' fifth omnibus objection to claims we have an order

11  to submit to the Court.  This on expunges one claim, has one

12  claim withdrawn, and continues several to the November 15th

13  omnibus.

14         THE COURT:  Okay.  That order's in.

15         MS. BAER:  Thank you, Your Honor.  And finally agenda

16  Item Number 11 the debtors' sixth omnibus objection to claims we

17  have one remaining contested matter there which we're asking to

18  be continued to November 15th.

19         THE COURT:  Okay, that order is entered.

20         MS. BAER:  Thank you, Your Honor.  With respect to

21  agenda Item Number 12 this is the debtors' objection to the

22  claims filed by the Massachusetts Department of Environmental

23  Protection.  The MDEPA asked for us to give them additional time

24  to respond to our rather substantial objection and this matter is

25  also being put over to the November 15th hearing.

1      THE COURT:  All right.

2      MS. BAER:  Your Honor, that takes us to agenda Item

3 Number 14 which is the Scotts motion for a temporary stay of

4 claims asserted in a case down in Texas called the Gandy Action.

5 As you'll recall, Your Honor, Scotts filed this as an emergency

6 motion and asked for an order shortening time to hear the matter

7 today.  Your Honor denied that motion, did not set the motion

8 itself for a further date.  The debtors have filed a response,

9 Your Honor, and what we would ask is that the Court put this

10 matter on for the November 15th hearing.  Your Honor, the good

11 news is the trial that was supposed to go forward on November 1st

12 was continued by the state court for a reason unrelated to Scotts

13 and unrelated to W. R. Grace.  But Your Honor it raises a very

14 grave concern for the debtors.  We've now been provided discovery

15 by Scotts and it is very clear that there is discovery going on

16 against W. R. Grace and its product.  Several experts have been

17 deposed, the complete and total focus of the great significant

18 amount of their depositions is Grace's (inaudible) of Libby,

19 Montana and Grace's operations in Libby, Montana.  One of Grace's

20 former employees was also deposed.  And again, the focus was the

21 operations in Libby, the way in which the mine was run, the Grace

22 product.  Under these circumstances, Your Honor, the debtor is

23 very concerned that these actions going forward against Scotts

24 are nothing more than an end run around the Grace automatic stay

25 and Grace is being prejudiced by the discovery going forward and

1  will be prejudiced if the trial goes forward as to Scotts.

2         THE COURT:  Okay, you can schedule it for another

3  number.  I just assumed that it had been filed in time to get on

4  the November list.  I didn't realize I needed to do anything.  I

5  thought the order that's in place already put it on to the

6  November list.

7         MS. BAER:  It was a little unclear to us, Your Honor,

8  so we will then take it up in November.  Thank you.

9         THE COURT:  All right.

10        MS. BAER:  Your Honor, that then takes us to agenda

11 Item Number 15 on the Court's agenda.  This is the debtors'

12 emergency motion for entry of an interim order with respect to

13 limiting certain stock transfers.  Your Honor, we filed this on

14 an emergency basis and you entered an order indicating you would

15 hear this on an interim basis today.  Your Honor, this is an

16 unusual situation.  The Grace stock has been trading at an

17 enormous pace.  The Grace stock has been going up in value and

18 it's unusual for a debtor in Chapter 11 to have such active

19 trading in its stock.

20        Under these circumstances, Your Honor, Grace has become

21 very concerned about preserving its net operating losses.  Your

22 Honor, currently Grace has approximately $348 million in net

23 operating losses that resulted really from two things.  Number

24 one, its various asbestos liabilities and number two, various

25 environmental liabilities.

1       At a 35 percent tax rate, Your Honor, these have a real
2 value of $122 million in future tax savings for Grace.   The
3 concern, Your Honor, is with the kind of trading that has been
4 going on in Grace stock the fear is that under the Internal
5 Revenue Code at some point in time an ownership change could
6 occur.   And if an ownership change occurs Grace would be limited
7 as to how it could use the net operating losses.   And rather than
8 being able to, for example, use significant net operating losses
9 in the first couple of years of post-Chapter 11 operations to
10 offset income it may have to -- it may be limited to only use a
11 certain amount of those per year.   And rather than being able to
12 use them in the first couple of years of hopeful very profitable
13 operations it could effectively have to take more than ten years
14 before it could use those.

15       Your Honor, under those circumstances what we're asking
16 is for the Court on an interim basis between now and the December
17 20th hearing to enter an interim order that would restrict
18 trading in Grace stock so that Grace will have the opportunity to
19 react before it's too late if it sees the potential of an
20 ownership change.

21       Your Honor, the way in which the order is structured
22 what we're seeking to do is number one, put into place notice and
23 waiting periods.   The order would number one, provide that
24 everybody who is a substantial equity holder, and we have defined
25 that as someone who owns more than 4.75 percent of Grace stock

1    notify Grace that it is in fact a substantial equity holder.

2            Number two, we ask that before any acquisition by a
3    substantial equity holder of any additional Grace stock or before
4    the acquisition of Grace stock by an entity that will become
5    substantial equity holder they provide Grace and file with this
6    Court a motion of intent to purchase Grace stock.  The procedure
7    would be such that Grace would then have the opportunity to file
8    an objection with this Court and set the matter for a hearing as
9    to whether or not the purchase by the substantial equity holder
10   could go forward so that Grace could review and protect its NOLs.

11           In addition, Your Honor, to the extent that a
12   substantial equity holder would be disposing of Grace stock we
13   are not seeking the opportunity to object to that disposition we
14   are just asking that a notice of intent to sell the stock be
15   provided to the company so that again we would have the
16   opportunity to know where the ownership lines up and whether a
17   potential ownership change could occur based on further events.

18           Your Honor, under the objection process for sales by --
19   I'm sorry, for purchases by substantial equity holders we ask for
20   a 15 day period to determine whether or not we would object.  If
21   the 15 days passes and the debtor does not object then the
22   purchase can go through.  On the other hand, Your Honor, if the
23   debtor seeks to object they would file it with this Court and a
24   hearing would be held before any stock transfer could occur.

25           Your Honor, the reason we need to do this is because

1  once the stock is purchased it's too late.  The stock becomes
2  tainted and it goes into the counting, if you will, as to whether
3  or not the potential for substantial ownership changes.

4      Your Honor, there's precedent throughout numbers of
5  bankruptcy cases now to permit this kind of a notice procedure
6  and we believe its very substantial both to the company and
7  frankly to the creditors of this company who under a Chapter 11
8  plan could in fact become significant holders in the company.
9  Therefore, I would believe it's in everybody's best interest that
10  we put in these interim procedures through December 20th, give
11  parties an opportunity to object to them becoming permanent
12  procedures and hear this matter on December 20th as to whether or
13  not this procedure should be put in place as a permanent
14  procedure to take us forward through confirmation of the Grace
15  Chapter 11 plan.

16      THE COURT:  Okay.  Why is the 15 days the appropriate
17  period?  Because if the debtor doesn't object I'm concerned -- I
18  don't know the volatility in this stock going forward.  But if
19  somebody feels that there is a particularly good deal for that
20  person or entity's economic interest and wants to take advantage
21  of it today, 15 days from now that deal could be significantly
22  different.  So why 15 days?

23      MS. BAER:  Your Honor, it depends on the circumstances.
24  We felt that that was a reasonable period of time.  But there's
25  also something very key in the order.  And that is, there's a

1  provision in the order that gives the debtor the opportunity to
2  waive the notice requirements.  And if we're contacted by a
3  substantial equity holder and the parties are able to discuss
4  what the intention is without putting anything into the
5  marketplace, without filing a notice Grace has the opportunity to
6  waive the notice requirements and agree or not agree on something
7  much less than 15 days.

8          Your Honor, this is not unlike actually some things
9  that have occurred during the course of the situation already.
10  Clearly, we're very concerned about our shareholders.  We don't
11  want to restrict them in anyway, but we need to protect our NOLs.
12  So it gives the debtor the leeway, the opportunity to have a
13  discussion before anything occurs and then potentially we could
14  respond much quicker than 15 days.

15          THE COURT:  All right.  Anyone wish to be heard on
16  this?

17          MR. BENTLEY:  Hello, again, Your Honor, Philip Bentley
18  for the equity committee.  Your Honor, on this motion we find
19  ourselves in a position similar to the other motion namely we
20  don't object to the relief the debtor has sought.  We do share
21  the debtors' view that NOLs are a very important asset, that
22  reasonable measures should be taken to preserve them.  We're all
23  for that.  We're a little bit handcuffed in responding to the
24  motion today though, Your Honor, because of the haste with which
25  it was brought on and we have some significant concerns relating

1  to that.

2  The motion was served last week.  We received it at the

3  end of last week.  As Your Honor can appreciate it raises some

4  issues that are quite technical that require the input of tax

5  advisors and that would take a little bit of time to work

6  through.  And we've not yet had the time to work those through

7  with our tax counsel and to bring it to the committee for

8  deliberate consideration.

9  And we have the following concerns, Your Honor, which

10  we will be back to Your Honor about potentially in December, but

11  we just wanted to preview them for Your Honor at this point.  One

12  concern we have, one question we have, Your Honor, is whether

13  some of these provisions may be over broad.  Whether they may

14  impose greater costs, greater burdens than are necessary to

15  achieve the debtors' goal of preserving the NOLs.

16  The other concern we have, Your Honor, is really a

17  question which we don't claim to have an answer to, but it is a

18  question that concerns us.  And that relates to the timing of the

19  motion, Your Honor.  We understand that some stock has changed

20  hands recently as Ms. Baer said the volatility in the stock

21  trading has increased since the debtors made their announcement

22  ten days ago about the need to extend exclusivity.

23  But, Your Honor, stock has changed hands in this case

24  previously without any similar kind of response by the debtor.

25  Last April a block of almost ten percent changed hands.  In

1 August another block of almost six percent was acquired.  And the
2 debtor didn't feel the need to come into to court at that point
3 and certainly not to come into court and seek relief on an
4 emergency basis as they are now.

5        And the question, the concern that this raises in our
6 minds, Your Honor, is are there some aspects of this proposed
7 relief that may have the effect of chilling the market and
8 potentially dampening potential opposition among the equity to
9 the deal that is potentially being worked out with the
10 plaintiffs?

11       THE COURT:  Well, I think that's the issue for December
12 20th.  If the parties agree that some temporary solution is in
13 order certainly -- I want to be the last person in the world to
14 chill the value of this company.  Believe me.

15       MR. BENTLEY:  Well, we share Your Honor's view.  And
16 because we have not yet had sufficient time to look at this
17 carefully with our tax advisors we don't want to torpedo
18 something that may be necessary to observe the NOLs.  It may be
19 that emergency relief is required.  For that reason we don't
20 object to the relief that's up today, the interim order, but we
21 do -- we did want to share with the Court the fact that there may
22 be very real concerns that we will be addressing down the road.

23       THE COURT:  I think there should be some real concerns
24 that people want to address.  But I am also, I guess, concerned
25 that in the event that there is an ownership change and the

1  debtor hasn't done anything to address it that that could be
2  worse for everybody in the long run including the equity if there
3  is value in this company.  So, I think this is an issue where the
4  debtors' business judgment really has to have some persuasive
5  effect as long as it's not outrageous or unreasonable and this
6  doesn't appear to be, at least on an interim basis.

7         MR. BENTLEY:  We share Your Honor's view and for that
8  reason as I said we support the relief they're seeking today.

9         THE COURT:  All right.

10        MR. BENTLEY:  Thank you, Your Honor.

11        THE COURT:  Mr. Zirinsky.

12        MR. ZIRINSKY:  Thank you, Your Honor.  Your Honor, I
13  would echo the committee's sentiments with one exception and that
14  is I don't understand -- we understand this is brought on on very
15  short notice emergency basis.  My client really has not had an
16  opportunity to understand the technicalities of the order,
17  whether it's overly broad, unreasonable, and the question is why
18  do we have to go to December 20th before we revisit this?  It
19  would seem to me that there could be a much shorter period of
20  time for this order to be in place so that parties have an
21  opportunity to come back much earlier than December 20th.

22        THE COURT:  All right.  Well, I think the next hearings
23  are November 15th.  Can this be teed up in time to put back on
24  the November 15th calendar?

25        MS. BAER:  Your Honor, ours probably wasn't from the

1 debtors' perspective, but because that would require a shortening
2 of Your Honor's scheduling order we did not want to cut short the
3 opportunity for other parties to object.  And the way the
4 scheduling order works now they would be entitled to object up
5 until December 3rd so everybody could have an opportunity to
6 really think it through.  We wouldn't have a problem putting it
7 on for permanent hearing in November if they wouldn't mind have a
8 shortening of time on response.

9         MR. BENTLEY:  We would support that, Your Honor.

10         MR. ZIRINSKY:  As we would, too, Your Honor.

11         THE COURT:  Well, today's the 25th of October.  To have
12 any kind of meaningful response to me I need it by at least the
13 10th of November at noon eastern time.  That's only two business
14 days before the hearing.  So, I mean, I don't know whether --
15 does that give you adequate time?  If it does that's fine.

16         MR. BENTLEY:  We can work within that time frame.

17         THE COURT:  All right the time to object to the, I
18 guess, to the final -- to the order becoming final is November
19 10th at noon eastern.  And the hearing will be held on objections
20 on November 15 at noon.

21         MR. ZIRINSKY:  Thank you, Your Honor.

22         THE COURT:  Anyone object to the shortened notice?
23 Okay.  That's fine.

24         MS. BAER:  Your Honor, we will renotice the motion so
25 everybody is informed of the shortened time frame.

1      THE COURT:  All right.

2      MS. BAER:  Your Honor, I do have a draft order which
3  you could certainly modify.  This is the interim order and the
4  only thing that really needs to be modified is the end where we
5  talk about the timing.

6      THE COURT:  All right.

7      MS. BAER:  Your Honor, I believe it's paragraph 11 on
8  Page 7 where we talk about the timing.

9                    (Pause)

10      THE COURT:  Okay, I've amended paragraph 11 to change
11  the December 3rd date to be November 10th at noon eastern time.
12  And I've added a sentence that says if objections are filed they
13  will be heard on November 15th at noon eastern time in Delaware.

14      Has everyone had a chance to see this Order?  Any other
15  problems with it?

16      MS. BAER:  Your Honor, the Order is identical to what
17  was circulated with the motion except for that change.

18      THE COURT:  Okay.

19      MS. BAER:  Your Honor, and I would just encourage the
20  committee as well as Mr. Zirinsky's client to contact the debtor.
21  We want to work with them and make this work for everybody
22  especially our shareholders.  So anything that we can work out in
23  terms of language to make it more acceptable we'd be happy to
24  discuss.

25      Your Honor, that takes us to a couple of additional

51

1 housekeeping matters that are not on the agenda.  And I believe
2 Your Honor raised the first one that was on my list which is the
3 proposed ADR order.

4        THE COURT:  Yes.  The ADR procedures themselves and the
5 notices that are sent permit the party, the claimant party to
6 decide whether or not to go into mediation.  But the order still
7 says, I think, that it is up to the debtors to direct something
8 in the mediation.

9        MS. BAER:  I believe, Your Honor, what it should say is
10 the debtors decide whether to put something into mediation but
11 the other side can agree that they do not want it to go forward.

12        THE COURT:  It's at paragraph 7.  It says the debtors
13 are authorized, but not directed to refer any ADR claim that is
14 not resolved following a negotiation phase of the ADR program to
15 a mediator that's been approved by the Court.  To me that makes
16 it sound as though the other side doesn't have anything to say
17 about it and I think the other side does have something to say.
18 There's my view not much point forcing somebody to mediation.  If
19 they don't want to mediate you're not likely to get a settlement.

20        MS. BAER:  Your Honor, I will go back and look at the
21 procedures and see if I can amend that address the issue.  I know
22 what you're saying there.

23        THE COURT:  It's just the order.  I think the procedure
24 already permits both sides to make that election.  It essentially
25 gives the debtor the first stab at identifying the claims that

1  the debtor thinks are appropriate for that procedure.  Then the

2  debtor sends out a solicitation and the claimant can check off

3  yes, I want to go to mediation or no, I don't.  And then if the

4  claimant does the rest of the ADR process works and gets

5  implemented.  I think it's just this paragraph of the order that

6  needs to be modified.

7          MS. BAER:  Okay, we will do so, Your Honor.

8          THE COURT:  All right.  Paragraph 8 says that the

9  debtors are authorized to pay one half of the fees and related

10  expenses charged by the mediators, but I want the debtors

11  directed as opposed to authorized to pay it.  Because this is the

12  debtors' process being implemented and I think the debtors should

13  have to pay that half.  So it's not just authorized, but directed

14  to make that payment.

15          MS. BAER:  We'll make that change.

16          THE COURT:  All right.  I don't have a problem then

17  with paragraph 9 with respect to the claimant's portion because

18  they have the choice of opting in or out of the mediation

19  session.  I forgot, Ms. Baer, I didn't go back and look at the

20  motion I just frankly forgot to.  Is there a restriction on the

21  amount of claims that the -- dollar value of the claim that is

22  going into this process?

23          MS. BAER:  No, there's not, Your Honor.

24          THE COURT:  Do you have any idea what the smallest one

25  is?  Because I'm concerned about the cost if it's a small claim.

1    MS. BAER:  Your Honor, I don't know.  I can look.  I do
2  know that obviously since the debtor is paying one half of the
3  cost there's not a lot of incentive for the debtor to spend time
4  or money on it either as we pay half the freight.  But we can
5  certainly talk about some sort of a minimum amount if you think
6  that's appropriate.

7    THE COURT:  Well, I'm hoping that if there are minimum
8  amounts the debtor is going to get them resolved without the need
9  for reference mediation.  Because it doesn't seem as though that
10  would be productive.  But my concern is that if somebody objects
11  based on the fact that, you know, my claim's only $5000, for
12  example, then I'm going to have some question about why maybe
13  mediation is the route to go.

14    MS. BAER:  I can't imagine we would take that out of
15  the regular claims objection process for that small amount.

16    THE COURT:  Okay.  This order did what I asked which is
17  to give people two bites at the apple to make sure that before
18  their claim is disallowed they know that they've got the right to
19  opt in or opt out.  And the second time through they're going to
20  be deemed not to pursue their claim.  So I think that provides
21  appropriate notice.  The debtor will be providing this order as
22  well as the stipulation and the notices to all claimants that the
23  debtor identifies as part of the ADR process, right?

24    MS. BAER:  Yes, Your Honor.

25    THE COURT:  Okay.  I don't have a problem with any of

54

1 the other portions that.  I think they're all everything we
2 talked about at the last hearing.  So that really was the one
3 concern that I had.

4          MS. BAER:  Thank you, Your Honor.  We'll fix that and
5 we'll resubmit it to Your Honor in the next couple of days.

6          THE COURT:  This was agenda number --

7          MS. BAER:  It was not on the agenda, Your Honor.

8          THE COURT:  No, it was agenda Number 3 from the August
9 23rd hearing, I think.

10          MS. BAER:  That's correct, Your Honor.  In fact it says
11 that right on the draft order.

12          THE COURT:  All right.  So this time an order will be
13 entered when submitted on a COC to change paragraphs 7 and 8.

14          MS. BAER:  Thank you.  Your Honor, the next matter is
15 another housekeeping matter.  There's an omnibus order with
16 respect to the first omnibus claims objections that for some
17 reason did not get entered.

18          THE COURT:  All right.

19          MS. BAER:  I've provided you with the certificate of
20 counsel and for some reason it just got missed and did not get
21 entered.

22          THE COURT:  All right.  Is there somewhere where we
23 know where to relate this document to?  Oh, re Docket Number
24 4088.  I see.  It's right in the caption.  I'm used to looking on
25 the side so I don't read sometimes lengthy captions, I guess.

1 Okay, that's ordered.

2          MS. BAER:  Thank you Your Honor.  And then Your Honor
3 had mentioned taking up the issue of needing dates for 2005.

4          THE COURT:  Yes.  The date you already have, I believe,
5 is January 24th.  All these hearings will be at noon.  So far
6 this schedule seems to be working.  But once again I reserve the
7 right to change them in the event that it doesn't work for a
8 period of time.  All of the dates as far as I know will be in
9 Delaware except for December which will probably be in
10 Pittsburgh.  Please notice it as Pittsburgh.  Again, I may change
11 my mind about that later, but for now I think it will be there.

12          MS. BAER:  Thank you, Your Honor.

13          THE COURT:  January 24th, February 28th, March 21,
14 April 25, May 16, June 27th, July 18, August 22, September 26th,
15 October 24, November 14, and December 19.  December in
16 Pittsburgh.

17          Now, I know those two time frames where there are less
18 than 30 days between the hearings and then six weeks between some
19 of the others may cause a problem.  That was the best I could do
20 with arranging travel schedules here.  So if it turns out not to
21 be whatever the debtor needs and the other parties need then
22 you'll have to call me.  We'll have to arrange something else in
23 Pittsburgh.  But those will be the omnibus days.

24          MS. BAER:  We understand, Your Honor, and we will
25 prepare and circulate an order that has the dates and the

1  objection deadlines and the whole thing consistent with your
2  scheduling order.

3          THE COURT:  Okay.

4          MS. BAER:  Your Honor, that's all we have on the
5  agenda.

6          THE COURT:  Anyone have any housekeeping matters to
7  address?  Okay, we're adjourned.  Thank you.

8              * * * * *

9             **CERTIFICATION**

10     I, KIMBERLY A. UPSHUR, certify that the foregoing is a
11  correct transcript to the best of my ability, from the electronic
12  sound recording of the proceedings in the above-entitled matter.

13  *Kimberly A. Upshur*          DATE:  November 3, 2004
14  KIMBERLY A. UPSHUR
15  J&J COURT TRANSCRIBERS, INC.

16
17
18
19
20
21
22
23
24
25