# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELWARE

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| W.R. GRACE & CO., ET AL. | ) | CASE NO. 01-01139 (JFK) |
| | ) | JOINTLY ADMINISTERED |
| DEBTORS. | ) | |

### AFFIDAVIT OF JOHN MURRAY, III

I, John Murray, III, being duly sworn, state as follows:

1.    I am the Assistant Town Manager, the Treasurer, and the Tax Collector for the Town of Acton, Massachusetts ("Town"). In addition to assisting the Town Manager and the Board of Selectmen, as well as other Town Boards and officials, in the management of the Town's affairs, my responsibilities as Town Treasurer include the sound management of the Town's fiscal affairs in accordance with applicable provisions of the Massachusetts General Laws, and my responsibilities as Tax Collector include the collection of taxes and betterment assessments owed to the Town. In these capacities, I have been personally involved in making sure that the Town has the ability to meet its funding and debt service obligations for the Middle Fort Pond Brook Sewer Project ("Project"). I am familiar with the financing of the Project and make this affidavit upon personal knowledge and records within my official custody and control.

2.    I have reviewed "Debtors' Response in Opposition to the Town of Acton's Motion for Relief from the Automatic Stay and for Related Determinations" dated October 29, 2004 ("Response").

3.    In their Response, the Debtors understate the potential harm to the Town in the event the Town's requested relief is not allowed (at pages 3-4, 19-20).

4.    For the current fiscal year, the Town's annual budget is approximately $60,000,000. Over 70% of the budget is consumed by the public schools and the regional school district of which the Town is a member. Substantial additional portions of the budget are consumed by collective bargaining agreement commitments (for police and fire) and by public employee retirement assessments (over which the Town has no control). The remainder of the budget accounts for all other essential public services which the Town provides to its citizens and residents.

1

5.  The Town funds its budget through a combination of real estate taxes, state aid, fees and excise taxes. Real estate taxes comprise over 70% of the Town's revenues.

6.  During the current fiscal year, the Town taxed real estate at the maximum rate allowed by the Massachusetts law known as Proposition 2-1/2, M.G.L. c. 59, § 21C.[1] The Town has also exhausted its sources of state aid; and depleted its so-called "free cash" account. The Town has no general stabilization fund.[2]

7.  For the upcoming fiscal year, which begins on July 1, preliminary budgets from the Schools and the Town confirm that the Town cannot maintain its current level of municipal services unless it implements a significant "Proposition 2-1/2 Override" to increase real estate taxes beyond the level ordinarily allowed by law. Such an override requires a majority vote of the Town's registered voters at an annual election. As such, Town officials have no way to guarantee that a proposed override will pass. I estimate that an override of approximately $3 million will be required to maintain the Town's current level of services. Anything short of that will require budget cuts, curtailment of services, layoffs and/or the like.

8.  The Town's Sewer District is established as an "enterprise fund" intended to be self-sufficient. The Sewer District's revenues (e.g. sewer betterments and sewer use charges) are intended to cover the Town's costs to finance, construct, operate the sewer system. However, the bonds by which the construction of the sewer system was financed are backed by the full faith and credit of the Town.

9.  As a result, in the event the available revenues of the Sewer District do not cover the debt service on the Town's bonds, the Town can either default on the bonds or (if it obtains the requisite authorization of Town voters) transfer funds away from another essential municipal service to cover the debt service payment. In a Proposition 2-1/2 Override context, this decision comes at the very real cost of potential layoffs. Once again, under Massachusetts Home Rule, Town officials do not control this decision. Rather, the Town's legislative body is comprised of an Open Town Meeting, which occurs annually in April and at other times by

---

[1]      Under Massachusetts law, the allowable tax rate includes allowance for an "overlay" account to cover real estate tax abatements and defaults on real estate taxes. Use of the overlay account is governed by statute and requires affirmative vote of the Town's Board of Assessors and appropriation at the Open Town Meeting. The Town's sewer account has no similar overlay account built into the betterment assessments.

[2]      The Town has a separate enterprise account covering its participation in a long-term regional solid waste facility contract. That enterprise account includes a stabilization fund dedicated to that purpose until the Town's obligations under that contract are concluded. The term of the contract runs into September 2005 and the operator of the facility has a certain "right of first refusal" in the Town's trash disposal contract after that time. In any event, use of the enterprise stabilization fund requires a super-majority vote of the Open Town Meeting and, if it becomes available after the conclusion of the contract obligations for other purposes, may be dedicated to cover the Town's other ongoing solid waste obligations such as the required environmental closure of the Town's former solid waste landfill.

special petition or call. Any registered voter in the Town can attend and vote at a Town Meeting. There is no quorum requirement, so decisions of the meeting are made by a majority (and in some cases a super-majority) of voters who attend the meeting. If Town Meeting does not vote to appropriate or transfer funds, Town officials cannot unilaterally do so.

10. To illustrate the consequences of this system in the context of the Grace sewer betterments, I have attached an amortization table which fairly and accurately summarizes the quarterly payments that would be required from Grace if it elects to finance its final betterment assessment through the Town over the remaining life of the Town's bonds at an interest rate of 1.75%.

11. This amortization schedule is calculated as follows: The gross amount of the Grace final betterments is $3,691,692.38. Grace has made principal payments toward estimated betterments through 9/15/04 of $272,268.22. The beginning balance for purposes of the Town's claim in the amortization schedule is therefore $3,419,424.16 (gross actual minus received estimated). At 1.75% interest over 104 installments, the scheduled quarterly payment is $40,995. Between now and March 15, 2006, Grace would be therefore scheduled to pay $245,970 toward its actual betterment assessments. If Town voters did not approve a Proposition 2-1/2 Override or transfer for this amount, it would need to be deducted from other essential services – resulting in potential teacher layoffs, staff layoffs, or other draconian steps. If Town Meeting did not transfer such funds to pay the debt service, a default on the bond payment would be implicated.

12. It is this Hobson's choice of defaulting on its debt service or cutting essential public services that the Town is seeking to avoid by asking this Court's permission to continue the process of issuing final sewer betterment assessments so that Massachusetts law is followed and the current landowner of the bettered property pays its fair share of the construction costs of the sewer system from which its land benefits.

Signed Under Penalties of Perjury this 29th day of September, 2004,

_John Murray, III_
John Murray, III

## JURAT

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF MIDDLESEX

On this _29_ day of _September_ 2004, before me, the undersigned Notary Public, personally appeared the foregoing John Murray, III, proved to me through satisfactory evidence of identification, which was _he is personally known_

3

*to me* _____, to be the person whose name is signed on the preceding document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

*Carole L. Landry* (official signature and seal of notary)

My commission expires _____

CAROLE L. LANDRY
Notary Public
Commonwealth of Massachusetts
My Commission Expires
February 12, 2010

4

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELWARE

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| W.R. GRACE & CO., ET AL. | ) | CASE NO. 01-01139 (JFK) |
| | ) | JOINTLY ADMINISTERED |
| DEBTORS. | ) | |

## AFFIDAVIT OF ROLAND BARTL

I, Roland Bartl, being duly sworn, state as follows:

1. I am the Town Planner for the Town of Acton, Massachusetts ("Town"). I am a member of the American Institute of Certified Planners ("AICP") and the American Planning Association (APA). As a general practitioner in the planning field, my experience in city and town planning includes master planning, resource and build-out analyses, zoning, subdivision control, permit administration, and many related topics. I have held the position of Town Planner in Acton since1988. My responsibilities include advising the planning board, researching and drafting proposed bylaws, performing or overseeing all executive functions of the Town's Planning Board. I make this affidavit upon personal knowledge and, where applicable, upon personal knowledge of the authenticity of records within my custody as Town Planner.

2. I am familiar with property owned by W.R. Grace & Co. - Conn. ("Grace"), located off Parker Street and Independence Road, shown as Map I4, Parcels 5, 6 and 7, Map I3, Parcels 4 and 135, and Map H3, Parcel 251 on the Town's Assessors maps ("Property"). Pursuant to the Town of Acton Zoning Bylaw, the Property is located

1

entirely within the Technology District, and in the Groundwater Protection Districts (largely Zone 3).

3.  I have reviewed "Debtors' Response in Opposition to the Town of Acton's Motion for Relief from the Automatic Stay and for Related Determinations" dated October 29, 2004 ("Response"), and the draft "Preliminary Reuse Assessment" dated September 2004 prepared for the Environmental Protection Agency attached thereto.

4.  In Grace's Executive Summary ("ES") attached to the EPA Preliminary Reuse Assessment, Grace asserts that it owns 187 acres in Acton (ES p. 1), but that the "Net Usable Land Area" after taking into account all of the alleged limiting factors and environmental constraints on the property is 119 acres (ES p. 3).

5.  On Page 9 of the Debtors' Response, Grace indicates that "the Town has assumed that the Debtors [sic] parcels can be developed for 1,190,000 square feet of office space." That number correlates with the Sewer Commissioners' sewer assessment votes taken on 9/13/04.

6.  In accordance with the formula in the Acton Sewer Assessment Bylaw and the current Acton Zoning Bylaw, the 1,190,000 square foot number is based on a total acreage of 151.84 acres (the actual portion of the Grace property being assessed) with a developable site area of 136.59 acres. Not all of Grace's property in Acton is included in

2

the sewer betterment district, and Grace's calculation of "net usable land area" is defined

very differently from Acton's developable site area under the Zoning Bylaw.[1]

7.   Nonetheless, accepting for discussion purposes Grace's assertion that the "Net

Usable Land Area" of its Acton property after taking into account all of the alleged

limiting factors and environmental constraints on the property is 119 acres (with 27 Acres

in Area 1 and 92 acres in Area 2)(ES p. 3), I have estimated the land area needed to build

1,190,000 square feet of office space in the Technology District under the Acton Zoning

Bylaw as approximately 40.0127 acres, calculated as follows:

- 1,190,000 square feet of office building net floor area requires approximately 10.0168 acres of land in building footprints assuming gross floor area at 10% over net floor area and 3-story buildings.

- 1,190,000 square feet of office building net floor area requires 4,760 parking spaces based on the zoning requirement of 1 space per 250 sq. ft. of building net floor area.

- Based on zoning requirements of 9' x 18.5' for each parking space plus 9' x 12' for half the width of a maneuvering aisle, one parking space requires 274.5 square feet of land area.

- The total acreage needed for surface parking, including maneuvering aisles is approximately 29.9959 acres (4,760 x 274.5).

8.   As a result, Grace has more than enough "Net Usable Land Area" - even by its

own highly conservative calculation - to accommodate 1,190,000 square feet of office

buildings including the building footprints, parking spaces, and maneuvering aisles, with

---

[1]      For example, Grace asserts that all land with "steep slopes" greater than 15% (said to be about 72 acres of its property) is undevelopable (ES p. 2). A slope of 15% translates to a grade with 2" of rise per foot of run. Development can and does regularly occur on land with such a slope. In fact, it is only twice as steep as the State of Massachusetts allows for handicapped access ramps for disabled individuals to negotiate in wheelchairs. To imply that this minor grade is too steep to allow for construction is unfounded, especially when the underlying soils are some of the easiest soils to grade (cut and fill).

3

more than 50% of its "Net Usable Land Area" left over for driveways, inefficient parking layouts, landscaping, pedestrian amenities, etc.[2]

Signed Under Penalties of Perjury this 6⁴ day of November, 2004,

*Roland Bartl*

Roland Bartl

### JURAT

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF MIDDLESEX

On this ___ day of November, 2004, before me, the undersigned Notary Public, personally appeared the foregoing Roland Bart, proved to me through satisfactory evidence of identification, which was  Personally Known to me , to be the person whose name is signed on the preceding document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

*Christ W Joyce* (official signature and seal of notary)
My commission expires  Sept 26, 2008 

---

[2]      Of Grace's asserted 119 acres of "Net Usable Land Area," all 92 acres in Area 2 were bettered by the Town (fronting as it does on Independence Road, a sewered street), and some of the 27 Acres in Area 1 were bettered (based on frontage on Parker Street, a sewered street). The 92 acres in Area 2 alone is more than double the 40.0127 acre figure in my calculation.

4

# EXHIBIT C

2142

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. 01-2209

W.R. GRACE & Co. – Conn.,
    Plaintiff

)
)
)

VS.

)
)
)
)
)
)
)
)
)
)

**PLAINTIFF'S SUPPLEMENTAL
RESPONSE TO DEFENDANT'S RULE
9A(b)(5) STATEMENT OF UNDISPUTED
FACTS AND LEGAL PRINCIPLES AND
PLAINTIFF'S STATEMENT OF
ADDITIONAL MATERIAL FACTS AND
LEGAL PRINCIPLES**

TOWN OF ACTON,
    Defendant

In response to the affidavits submitted by the Plaintiff, W. R. Grace & Co. - Conn
("Grace") in opposition to the Defendant Town of Acton's motion for summary judgment and in
support of its cross-motion for summary judgment, the Town submitted the Second Affidavit of
Douglas Halley and the Second Affidavit of Roland Bartl. Grace here submits the facts presented
in response to the those second affidavits. However, because the Town did not set forth the
supplemental facts presented by those affidavits in any statement pursuant to Superior Court
Rule 9A(b)(5), except by way of response to Grace's rule 9A(b)(5) statement, Grace is unable to
present this response in the format usually required under the rule.

<u>STATEMENT OF FACTS</u>

    1.    The average daily water use for the approximately two year period from
September 2000 to September 2002. for those properties used for office, research and
development and commercial and industrial warehouse in Nagog Park was 29.80 gallons per
day per 1,000 square feet, or approximately 40% of the Title 5 standard for office uses. If the
restaurant and retail uses on Nagog Park are included, the average daily water use increases to

1

## 2143

38.46 gallons per day or approximately 51% of the Title 5 standard for office uses. *Second Affidavit of F. Alex Parra,* ¶4.

2.      The waste water treatment plant for the Middle Fort Pond Brook Sewer District currently has a permit from the Commonwealth of Massachusetts Department of Environmental Protection ("DEP") to discharge 250,000 gallons per day. *Deposition of Douglas Halley* ("Halley Deposition"), p. 37.

3.      The waste water treatment plant which serves the sewer district has an unused reserve capacity of approximately 23,280 gallons per day available to connect future sewage flows from currently undeveloped properties and for the increase in flow from existing users *Affidavit of Warren Terrell* ("Terrell Affidavit"), ¶2.

4.      If all of the reserve capacity were allocated to the properties in the sewer district owned by W. R. Grace & Co.-Conn. ("Grace properties"), and using the unit sewage flows for office space as set forth in Title 5 of the State Environmental Code, 310CMR 15.203 ("Title 5"), the reserve capacity is only sufficient to serve 310,400 square feet of office space. The computation is:

23,280 gpd /75 gpd/1,000 square feet x 1,000 = 310,400 square feet. *Terrell Affidavit,* ¶2.

5.      Average sewage flows should not be compared with Title 5 unit flows because Title 5 flows incorporate a factor to allow for variations from the average daily flows, so as to represent the expected maximum day flows. *Terrell Affidavit,* ¶ 3. Therefore, a comparison between average daily flows for single family residences (based on actual water meter readings) and Title 5 flows for offices is incorrect as it overstates the flows from office users in comparison to the single family residential users. *Terrell Affidavit,* ¶ 3. For sewer systems

2

## 2144

serving a mix of residential and commercial uses, the Title V flows are typically 30-40% higher than the average daily flows received for treatment. *Terrell Affidavit,* ¶ 3. Based on my experience for an average day, the office use flow will be approximately 45 gal/day. *Terrell Affidavit,* ¶ 3. This is 60% of the Title V unit flow for offices. *Terrell Affidavit,* ¶ 3.

6.    Assuming that the average daily sewage flow from office uses will be 45 gallons per 1,000 square feet, the treatment plant reserve capacity can accommodate up to 517,000 square feet of new office space.

The computation is: $\underline{23,280 \text{ gal/day}} = 517,000$ square feet. *Terrell Affidavit,* ¶ 4.
                   $45$ gal/day/1000 s.f.

7.    On a per square foot basis, facilities of a commercial nature such as car dealerships, studios, building trade shops, parking facilities, transportation services, warehouses and manufacturing uses are all likely to generate lower sewage flows than office uses. *Terrell Affidavit,* ¶ 5.

8.    Title 5 permits septic systems designed to handle up to 10,000 gpd, and that nothing prohibits multiple septic systems on a property. *Halley Deposition,* p. 64. Therefore, each such septic system is capable of servicing up to 133,333 square feet of office space (10,000gpd/75 times 1,000). Commercial and industrial users can exceed the 10,000 gpd limitation of Title 5 by use of a private sewage treatment plant. *Halley Deposition,* p. 65.

9.    Neither laundromats nor amusement centers are permitted uses of the Grace Property.  Restaurants require a special permit. *First Bartl Affidavit,* Exhibit C, Table of Principal Uses.

10.    All of the uses permitted at the Grace Property without a special permit in addition to site plan special permit would generate lower flows under Title 5 than office uses. *Zoning Bylaw,* § 3, Table of Principal Uses; *Terrell Affidavit,* ¶ 5.

3

## 2145

11.    All of the commercial and industrial uses permitted in the Technology District in which the Grace Properties are situated are subject to special permit site plan review. *Zoning Bylaw*, § 3, Table of Principal Uses, appended as part of Exhibit C to the *First Bartl Affidavit*.

12.    The purpose of the special permit site plan approval is to "ensure that adequate consideration will be given to the natural resources and characteristics of a site, its topographic, hydrologic and geologic conditions, to public convenience and safety and to the suitability of a proposed USE on a site." *Zoning Bylaw*, § 10.4.3.

13.    Therefore, pursuant to the Zoning Bylaw, in granting special permit site plan approval, the Town is required to consider, *inter alia*, such factors as whether the proposed development is "consistent with the Master Plan, *Zoning Bylaw*, § 10.4.5.1,"[p]rotects the neighborhood and the Town against seriously detrimental uses and against adverse effects on the natural environment, *Zoning Bylaw*, § 10.4.5.2,"[p]rovides for convenient and safe vehicular and pedestrian movement and that the locations of driveway openings are convenient and safe in relation to vehicular and pedestrian traffic circulation, including emergency vehicles, on or adjoining the site, *Zoning Bylaw*, § 10.4.5.3. and "will not derogate from the intent of the Bylaw to limit the adverse effects of the use and development of land on surface and groundwater resources, *Zoning Bylaw*, § 10.4.5.6.

14.    When the sewer project was designed, the first planning area was the so-called "Phase I Service Area." *Halley Deposition*, p. 27. The Phase I Service Area only incorporated a small part of the Grace Property, circled in yellow on the map attached to Exhibit 7 to the Halley Deposition. *Halley Deposition*, pp. 27-28. This corresponds to the property shown on Map H3, Parcel 251. See plan attached to *First Halley Affidavit* as Exhibit 1. According to Exhibit 3 to the

4

## 2146

Halley Deposition, this property contains 8.11 acres and has been assessed 17.66 sewer units out of the total 302.66 sewer units assessed to Grace.

15.     The Phase I Service Area included an expected average daily sewage flow from undeveloped property in the Phase 1 Service Area of approximately 12,200 gpd, out of the 250,000 gallon capacity provided. *Halley Deposition*, Exhibit 7, Table 2-1. According to Exhibit 7 to the Halley Deposition, as conceived originally, the future expansion of the sewer district was not to include the remainder of the Grace Properties. *Halley Deposition*, Exhibit 7 (second map) However, subsequent to the approval of the design of the sewer system, the Town sought from the Department of Environmental Protection to expand the Phase I Service Area without increasing the capacity of the sewage treatment plant by adding an area shown on Exhibit 8 to the Halley Deposition as the "expanded district street area," which included the remainder of the Grace Properties *Halley Deposition*, p. 29. This expanded area corresponds to the area designated "Contract 3" on Exhibit 9 to the Halley Deposition. *Halley Deposition*, p. 44

16.     Exhibit 9 to the Halley Deposition sets forth the total estimated sewage flow to the wastewater treatment plant based upon water meter readings for existing uses in the expanded Phase I Service Area (which includes the bulk of the Grace Property) plus a factor for infiltration and inflow into the sewer pipes *Halley Deposition*, pp. 40-45.

17.     Based on those calculations, existing uses together with expected inflow and infiltration use approximately 226,720 gpd out of the capacity of the sewer system of 250,000 gpd. There is no allowance made for the projected sewage flow from the Grace properties included in these calculations *Halley Deposition*, pp. 47-48.

## 2147

18.   The purpose of preparing Exhibit 9 to the Halley Deposition was to support the Town's request to DEP to *further* expand the sewer district without increasing capacity, a request which the Town continues to pursue. *Halley Deposition,* pp. 45-46, 50-51.

### STATEMENT OF LEGAL PRINCIPLES

1.   Under general principles of statutory construction:

> Words and phrases shall be construed according to the common and approved usage of the language; but technical words and phrases and such others as may have acquired a peculiar and appropriate meaning in law shall be construed and understood according to such meaning.
>
> G. L. c. 4, § 6. See also *L.W.K. v. E.R.C.,* 432 Mass. 438, 445-446, (2000) ("Where its terms are unambiguous, a statute must be held to mean what it plainly expresses.")

2.   It is a well established principle of statutory interpretation that "[n]one of the words of a statute is to be regarded as superfluous, but each is to be given its ordinary meaning without overemphasizing its effect upon the other terms appearing in the statute, so that the enactment considered as a whole shall constitute a consistent and harmonious statutory provision capable of effectuating the presumed intention of the Legislature."

> *Commonwealth v. Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 352 Mass. 617, 618 (1967), quoting *Bolster v. Commissioner of Corps. & Taxation,* 319 Mass. 81, 84-85 (1946).

3.   310 CMR 15.203(1), provides in relevant part:

> Design flow is equivalent to estimated generated flow for the proposed use *plus a factor representing flow variations."* [Emphasis added.]

4.   310 CMR 15.203(6) provides, in relevant part:

> System design flows for facilities other than those listed above shall be established, with approval of the Department, in relation to actual meter readings of established flows from known or similar installations. In those instances, design flows shall be based on

6

## 2148

*200% of average water meter readings in order to assimilate maximum daily flows."* [Emphasis added.]

Respectfully submitted,
W.R. Grace, Co.
The Plaintiff,
By its Attorneys,
D'AGOSTINE, LEVINE, PARRA &
NETBURN, P.C.

By: _____

Louis N. Levine BBO #296880
R. Alex Parra BBO # 390315
268 Main Street
P.O. Box 2223
Acton, Massachusetts 01720-6223
(978) 263-7777
February   21   , 2003

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by hand on February 21, 2003.

_____

civil\w.r. grace & co.\plaintiff's supplementary statement of sj

7

# EXHIBIT D

S.A. 9

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 01-2209

| | |
|---|---|
| W.R. GRACE & CO. - CONN., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| TOWN OF ACTON, a Municipal | ) |
| Corporation, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DEFENDANT'S RESPONSE REGARDING TERRELL CALCULATIONS

In the event that the Court considers the Affidavit of Warren W. Terrell, dated February 20, 2003, the Town points out the following numbers and calculations:

1.     Selection of a reserve capacity figure

Terrell selects 23,280 gallons per day for the reserve (i.e. unused) capacity of the Town's Wastewater Treatment Plant, **based upon only one of the three charts** included on Exhibit A to his affidavit (Ex. A, p. 1, first chart, showing estimated flow of 226,720.48, compared to a capacity of 250,000).[1]

There are two other charts in exhibit A, however. They show reserve capacity of over 50,000 gallons per day ("gpd") as follows:

Exhibit A, p. 1 second chart: **reserve capacity of 51,011.02 gpd** (250,000 gpd minus 198,988.98 gpd)

---

[1] Based upon Exhibit A, Acton advocated to DEP to allow expansion of the sewer district beyond the current contours. Halley Tr. 43-44. The Town is now asking DEP to approve additional expansion of the sewer district beyond what is shown on Exhibit A. Halley Tr. 51. Exhibit A does not reflect meter readings from the Grace property, because there were no metered flows from those properties 47.

S.A. 10

Exhibit A, p. 2, first chart: **reserve capacity of 57, 531.02 gpd** (250,000 gpd minus 192,468.98 gpd).

Derivation of Grace Square Footage

2.      Running Terrell's computation (Terrell Aff. par. 4), using either of the two reserve capacities that Terrell ignores, produces vastly different results, even accepting Terrell's assumption about office use flow (45 gpd)[2]:

$$\frac{57.531 \text{ gpd}}{45 \text{ gpd}/1000 \text{ s.f.}} = \textbf{1,278,466.67 square feet} \text{ attributable to the Grace property}$$

$$\frac{51,011 \text{ gpd}}{45 \text{ gpd}/1000 \text{ s.f.}} = \textbf{1,133,578} \text{ square feet attributable to the Grace property}$$

3.      These results correspond closely to the Town's bylaw's calculation: under the Bylaw, the Grace property is allocated **1,210,640 square feet** of office space.  See Grace's own First 9A Statement of Supplemental Facts, par. 14. The Terrell affidavit thus confirms that the Town has calculated Grace's flows consistently and evenhandedly throughout the process.

Confirmation of The Town's Ultimate Conclusions

4.      Terrell's statement (Aff., par. 3) that office use flows usually amount to 60% of Title V unit flows also supports the Town's ultimate conclusions, as well as the use of 300 gallons per day for purposes of defining a "residential unit." As shown by the Second Halley affidavit (par. 6), the actual water usage for 3 bedroom homes (158.02 gpd) is 52% of Title V figures used by

---

[2] Terell's other calculation (Aff., par. 2) compares actual flows with Title V flows, in violation of his own testimony (Id., par. 3) that "[a]verage sewage flows should not be compared with Title 5 unit flows . . .." Indeed, applying rounded Title V flows (i.e. 300 gpd) to the total number of betterment units (1390.94) would result in a needed treatment plant capacity of 417,282 gpd.  The Town did not do this. The treatment capacity is 250,000 gpd. Nor did it mix calculations of average sewage flows and Title 5 unit flows.  Rather, it used actual data as a reality check to guide its judgment in deciding how to use Title V guidelines.

## S.A. 11

the Town (i.e. 300 gpd). The actual water usage for 4 bedroom homes (177.41 gpd) is 59% of 300 gpd. Id.[3] This percentage is nearly the same 60% that Terrell predicts. It follows that the use of 300 gpd preserves the ratio between residential flows and office flows assumed in Title V — and it is the ratio, not the absolute numbers, that ultimately determines how commercial units are converted into residential equivalents. This again demonstrates that Grace's contentions about number of bedrooms and gallons per day are the irrelevant to the "bottom line".

By its Attorneys,

Acheson H. Callaghan, Jr., BBO #070060
Stephen D. Anderson, BBO #018700
Douglas H. Wilkins, BBO #528000
ANDERSON & KREIGER LLP
43 Thorndike Street
Cambridge, MA 02141
(617) 252-6575

Dated: February 25, 2003

### CERTIFICATE OF SERVICE

I certify that I served the foregoing Defendant's Response Regarding Terrell Calculations upon all counsel of record by email and hand delivery on this 25th day of February, 2003.

Douglas H. Wilkins, Esq.

acf\grace(sewer)\p\Chalk.wpd

---

[3] Indeed, since neither the most common, nor the average number, of bedrooms is as high as 4, the Town has arguably overstated the amount of sewage flow from a residential unit. That would benefit Grace, as it results in a lower number of sewer units for the same amount of commercial flow (because, when the bylaw uses a higher number for flow from a residential unit it takes more commercial flow to equal the corresponding number of residential units).

3

**S.A. 12**

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. 01-2209

W.R. GRACE & CO. – CONN.,                    )
     Plaintiff                                         )
                                     )
VS.                                                        )
                                     )
TOWN OF ACTON, a Municipal               )
Corporation,                                            )
     Defendant                                      )

### AFFIDAVIT OF WARREN W. TERRELL

I, Warren W. Terrell, state as follows:

1.    I am employed as a Senior Project Manager at Dufresne-Henry at 5 Lan Drive, Westford, Massachusetts. I am a registered professional engineer in the Commonwealth of Massachusetts since 1975. My career has been solely as a sewerage consultant for public and private clients. My experience covers a wide range of projects for planning, design and construction of sewers, pumping stations and treatment plants. In that capacity I have advised clients as to how to allocate costs of these systems considering the kinds of users, the variation in sewage flows and strengths, and the different processes within the treatment system.    Typical projects are summarized in my attached resume.

2.    I have reviewed the charts entitled "Estimated Flow Middle Fort Pond Brook Sewer District," copies of which are attached hereto as Exhibit A ("Estimated Flow Chart"). I have also been advised that the waste water treatment plan for the Middle Fort Pond Brook Sewer District currently has a permit from the Commonwealth of Massachusetts Department of Environmental Protection ("DEP") to discharge 250,000 gallons per day. Using the Estimated

S.A. 13

Flow Chart and the standards required by DEP, I estimate that the waste water treatment plant has an unused reserve capacity of approximately 23,280 gallons per day available to connect future sewage flows from currently undeveloped properties and for the increase in flow from existing users. If all of the reserve capacity were allocated to the properties in the sewer district owned by W. R. Grace & Co.-Conn. ("Grace properties"), and using the unit sewage flows for office space as set forth in Title 5 of the State Environmental Code, 310CMR 15.203 ("Title 5"), the reserve capacity is only sufficient to serve 310,400 square feet of office space. The computation is:

23,280 gpd /75 gpd/1,000 square feet x 1,000 = 310,400 square feet.

3.      I have reviewed the Affidavit of Douglas Halley dated November 19, 2002 ("First Halley Affidavit"), and the Second Affidavit of Douglas Halley dated January 31, 2003 ("Second Halley Affidavit"), in this matter. The Second Halley Affidavit uses average sewage flows, calculated in gallons per day, for single family residences to support the conclusion that 300 gallons per day is a reasonable sewage flow from a residential sewer unit. However, the First and Second Halley Affidavits use the Title 5 unit flow of 75 gallons per day per 1,000 square feet for office space as the basis for determining non-residential sewer units. The use of average and Title V flow in this formula is not correct. Average sewage flows should not be compared with Title 5 unit flows because Title 5 flows incorporate a factor to allow for variations from the average daily flows, so as to represent the expected maximum day flows. Therefore, a comparison between average daily flows for single family residences (based on actual water meter readings) and Title 5 flows for offices is incorrect as it overstates the flows from office users in comparison to the single family residential users. For sewer systems serving a mix of residential and commercial uses, the Title V flows are typically 30-40% higher than the average

2

## S.A. 14

daily flows received for treatment. Based on my experience for an average day, the office use flow will be approximately 45 gal/day. This is 60% of the Title V unit flow for offices.

4.    Based upon the Estimated Flow Chart, which shows the reserve capacity to be 23,280 gallons per day, and assuming that the average daily sewage flow from office uses will be 45 gallons per 1,000 square feet, the treatment plant reserve capacity can accommodate up to 517,000 square feet of new office space.

The computation is: $\dfrac{23,280 \text{ gal/day}}{45 \text{ gal/day}/1000 \text{ s.f.}}$ = 517,000 square feet.

5.    In my opinion, on a per square foot basis, facilities of a commercial nature such as car dealerships, studios, building trade shops, parking facilities, transportation services, warehouses and manufacturing uses are all likely to generate lower sewage flows than office uses.

Signed and sworn to the pains and penalties of perjury this 20TH day of February 2003.

Warren W. Terrell, P.E.

N:\DATA\D'agostine,Levine,Parra\Corresp\Terrell Affidavit.doc

3

S.A. 15

# Warren W. Terrell, P.E.
## Senior Project Manager

*EDUCATION*

B.S. Civil Engineering
Northeastern University, 1964

M.S. Civil Engineering
Northeastern University, 1972

*PROFESSIONAL
REGISTRATION*

Registered Professional
Engineer in Massachusetts,
1975

*COMMITTEES*

Technical Advisory Committee
on Civil Eng. Curriculum
University of Mass., Lowell

Building Committee
Littleton High School
Littleton, MA.

*PUBLICATIONS/
PRESENTATIONS*

Reducing and
Controlling Untreated CSO
Discharges From Outfalls:
MWRA's Hydraulic Relief
Projects in Cambridge and
Charlestown; NEWEA, Jan.
1999

CSO Planning For Fitchburg,
MA: A Partnering Case Study
Between Client, Regulator and
Engineer; NEWEA, Jan. 1999

Treatment of High Strength
Apple Juice Bottle Wastewater
Food Waste Conference
Georgia Tech

Mr. Terrell brings 39 years of wastewater systems planning and design experience with a focus on municipal and industrial waste treatment facilities, process design for conventional, advanced and tertiary treatment systems and various project delivery methods from conventional bidding to design/build and turnkey methods. The depth of his experience ranges from coastal, shoreline and interior communities, to medium-sized cites and towns and large sewerage districts and agencies in New England with more complex collection, pumping and treatment systems.

**Wastewater Treatment**

**Wastewater Treatment Plant Capacity Analysis and Sewerage Needs; Bridgewater, Massachusetts:**

Using 24 months of performance data, evaluated each unit process under average and maximum day loadings. This analysis revealed that the process could handle large variations in sewage and septage loads without degradation of effluent quality. In addition, the plant's reserve capacity (i.e., that over and above needed for maximum loads) was at least 0.4 MGD greater than allocated in the plant's design capacity. Based on these conclusions, the extensions of new sewers to needs areas and the ability to accept increased volumes of high-strength septage (an important revenue source) was justified to the regulatory agencies.

Evaluated the need for sewer system extensions because of the recent residential and business growth. The data from failing leaching systems and repairs thereto were used to analyze the likelihood of future failures and the associated public health and water pollution problems. This analysis indicated that half of the existing development would need sewering within 20 years as upgrading of subsurface systems was not feasible. The population and land use of the needs areas were used to estimate sewage flows which, if collected, would be conveyed for treatment.

**Comprehensive Wastewater Management Plan; Maynard, Massachusetts:**
Served as Project Manager and prepared and managed the town wide CWMP to determine the sewer extensions, rehabilitation and treatment needs for the next 20 years. The planning was a regional effort of six Assabet River municipalities which addressed all aspects of pollution control resulting from rapid residential and commercial development. This plan evaluated Maynard's need to extend sewers to the remaining areas and the WWTP's ability to achieve compliance with more stringent discharge limits for phosphorus.

**Fine Bubble Activated Sludge Treatment; Rutland, Vermont:** Designed 7 MGD sewage treatment plant with single stage fine bubble activated sludge for organics and



S.A. 16

# Warren W. Terrell, P.E.
## Senior Project Manager

suspended solids removal and nitrification of ammonia.  Negotiated effluent quality discharge limits with regulatory agencies.

**Nutrients Removal Upgrade; Maynard, Massachusetts:**  Project Manager for process planning, design and construction management for 1.4 MGD secondary treatment facility upgrade to remove nutrients.  Supervised pilot plant process evaluations and final design for the upgrade to provide ammonia nitrification and phosphorus removal.

**Tertiary Treatment with Groundwater Discharge, Mashpee, Massachusetts:** Provided process design permitting, construction management and follow-on process consulting services for a small sewage treatment plant serving commercial and residential districts.  Treatment includes organics removal, ammonia oxidation and nitrates removal on RBCs (aerobic and anoxic) followed by clarification, filtration, ultraviolet light disinfection and open percolation beds for discharge into the groundwater.

**Treatment Facilities, Veryfine Products Inc.; Littleton, Massachusetts:**  Prepared process design to treat high strength fruit juice wastewater using upflow anaerobic reactor, aerobic polishing in sequential batch reactors, phosphorous precipitation, filtration and ultraviolet light disinfection.  Effluent discharged to a small stream; hence, more than 99 percent organic removal and reduction to 0.1 mg/L phosphorus were required.

**Wastewater Collection**

**Sewers, Interceptors and Force Mains - Bridgewater, Fitchburg, Tyngsborough, Mashpee, Norton and Groton, Massachusetts:**  Prepared final design and managed construction for 20 sewer projects over 20 years.  Project components included installing more than 600,000 feet of lateral and cross country sewers, 15 pumping stations and 40,000 feet of force mains.  Negotiated all environmental permits and administered contractor's payments and grants reimbursements from regulatory agencies.  Prepared alternative methods for allocating capital and operating costs to users.

**Combined Sewer Separation; Fitchburg, Massachusetts:**  Serves as Project Manager for the preparation of design of a 15-year program to separate 20 miles of combined sewers.  The system has 58 combined sewer regulators discharging into the Nashua River and tributaries via 42 outfalls.  For immediate action prepared contract documents for sewer modifications to eliminate dry weather overflows from 20 locations.  Assisted the DPW and WWTP managers in negotiations with DEP and EPA for the preparation of the Administrative Consent Order.  In addition, prepared


Dufresne-Henry

S.A. 17

# Warren W. Terrell, P.E.
## Senior Project Manager

the cost and affordability assessment which demonstrated fiscal impacts to the City's budget.

**Sewerage Alternatives Evaluation, Marshfield, Massachusetts** - Prepared preliminary designs, environmental assessment and cost analyses of sewerage alternatives to serve the schools complex and the Town Center. The nearest existing sewer was four miles from the schools complex and all options would require construction along heavily traveled highways. The use of conventional trenching was cost prohibitive and would create long traffic delays. The recommended alternative used abandoned water mains along most of the highway for slip-lining sewage force mains; thus, reducing costs, construction time and traffic delays.

Developed a public information program to present the alternatives and recommended plan. Presentations were made to Town Boards and staff for technical evaluation to the public via open forums and cable television and to Town Meetings for authorization of funding.

N:\DATA\D'agostine,Levine,Parra\Corresp\Terrell, Warren Res.doc



## S.A. 18

| | | | | | |
|---|---|---|---|---|---|
| 30,929.83 | 30,309.46 | | | | |
| 13,362.11 | 14,942.26 | 13,647.41 | 866.00 | | 14,513.41 |
| 1,043.25 | 937.41 | 1,080.08 | 471.00 | | 1,551.08 |
| 2,074.95 | 2,822.29 | 2,568.50 | 1,175.00 | | 3,743.50 |
| 3,133.16 | 4,336.90 | 3,837.84 | 5,898.00 | | 9,735.84 |
| 43,168.77 | 55,202.19 | 49,806.56 | 13,677.00 | | 63,483.56 |
| 156,213.43 | 179,360.32 | 171,257.48 | 55,463.00 | | 226,720.48 |
| ided by Health Dept. | | | | | |

e Day Water Consumption and I/I estimated at 250 gpd/idm (TR-18 design range is 250 to 500 gpd/idm)

| ter Reading /00 (gpd) | Water Reading 9/89 (gpd) | Estimated Sewage Flow based on Average Daily Water Reading (gpd) | I/I Flow Estimate (gpd) (1) | Developable Land | Total Estimated Sewage Flow (gpd) |
|---|---|---|---|---|---|
| 0,278.49 | 23,401.93 | 22,039.12 | 6,760.50 | | 28,799.62 |
| 8,623.67 | 31,170.70 | 30,696.27 | 1,691.00 | | 32,287.27 |
| 8,672.20 | 9,131.13 | 8,990.58 | 2,076.50 | | 11,057.08 |
| 5,037.20 | 6,106.05 | 5,456.71 | 1,270.00 | | 6,726.71 |
| 0,929.63 | 30,309.46 | 33,234.40 | 4,890.00 | | 38,124.40 |
| 3,362.11 | 14,942.26 | 13,647.41 | 433.00 | | 14,080.41 |
| 1,043.25 | 937.41 | 1,080.08 | 235.50 | | 1,315.58 |
| 2,074.95 | 2,822.29 | 2,568.50 | 587.50 | | 3,156.00 |
| ,133.16 | 4,336.90 | 3,837.84 | 2,949.00 | | 6,786.84 |
| 3,158.77 | 55,202.19 | 49,806.56 | 6,838.50 | | 56,645.06 |
| 6,213.43 | 179,360.32 | 171,257.48 | 27,731.50 | | 198,988.98 |
| led by Health Dept. | | | | | |

wip\Engineering Services During Construction\Aofon Flow.xls

2/11/03

Estimated Flow.
Middle Fort Pond Brook Sewer District

Based on 80% of Average Day Water Consumption and I/I estimated at 500 gpd/idm

## S.A. 19

| ter Reading /00 (gpd) | Water Reading 9/99 (gpd) | Estimated Sewage Flow based on 80% of Average Daily Water Reading (gpd) | I/I Flow Estimate (gpd) (1) | Developable Land | Total Estimated Sewage Flow (gpd) |
|---|---|---|---|---|---|
| 0,278.49 | 23,401.93 | 17,631.29 | 13,521.00 | | 31,152.29 |
| 8,623.67 | 31,170.70 | 24,477.02 | 3,382.00 | | 27,859.02 |
| 3,572.20 | 9,131.13 | 7,192.48 | 4,163.00 | | 11,345.46 |
| 1,037.20 | 6,106.05 | 4,365.37 | 2,540.00 | | 6,905.37 |
| 0,929.63 | 30,309.46 | 28,587.52 | 9,780.00 | | 36,367.52 |
| 3,362.11 | 14,942.28 | 10,917.93 | 866.00 | | 11,783.93 |
| ,043.25 | 937.41 | 864.06 | 471.00 | | 1,335.06 |
| ,074.95 | 2,822.29 | 2,054.80 | 1,175.00 | | 3,229.80 |
| ,133.16 | 4,336.90 | 3,070.27 | 5,898.00 | | 8,968.27 |
| ,158.77 | 56,202.19 | 39,845.25 | 13,677.00 | | 53,522.25 |
| 8,213.43 | 179,380.32 | 137,005.98 | 65,463.00 | | 192,468.98 |

ed by Health Dept.

Based on 110 gpd per bedroom and I/I estimate of 500 gpd/idm.

| nber of mercial ots | Domestic Sewage Flow Calculation Based on 110 gpd/bedroom. Actun assume 3 bedrooms per lot | Commercial Sewage Flow Based on 95% of Water Consumption | I/I Flow Estimate (gpd) (1) | Total Estimated Sewage Flow (gpd) |
|---|---|---|---|---|
| | 0.00 | | 13,521.00 | 13,521.00 |
| | 0.00 | | 3,382.00 | 3,382.00 |
| | 0.00 | | 4,163.00 | 4,163.00 |
| | 0.00 | | 2,540.00 | 2,540.00 |
| | 0.00 | | 9,780.00 | 9,780.00 |
| | 0.00 | | 866.00 | 866.00 |
| | 0.00 | | 471.00 | 471.00 |
| | 0.00 | | 1,175.00 | 1,175.00 |
| | 0.00 | | 5,898.00 | 5,898.00 |
| | 0.00 | | 13,677.00 | 13,677.00 |
| 00 | 0.00 | 0.00 | 65,463.00 | 65,463.00 |

ted at 4,000 gpd.

tad flow is 80% x 250,000 gpd or 200,000 gpd.
tughtoning Services During Construction with flow tab

2/11/03

# EXHIBIT E

COMMONWEALTH OF MASSACHUSETTS

# Appeals Court

BRIEF FOR THE PLAINTIFF-APPELLANT
W.R. GRACE & CO. - CONN

42

**V.    The Sewer Bylaw Is Arbitrary As It Assesses Grace For A Benefit The Town Does Not Provide.**

As previously noted, the Town expanded the Phase I Service Area into the District by adding several residential areas as well as most of the Grace Property, without providing any additional treatment capacity in the System. In obtaining permission to do this from DEP, the Town did not account for any development of the Grace Property notwithstanding that under the formulation in the Sewer Bylaw, Grace is expected to account for 21.8% of the sewage to be treated by the System.

As a result of the expansion of the Phase I Service Area into what is now the District, even if all of the presently unused capacity of the System is reserved for the Grace Property (and there is no reason to suppose that it will be, given that the Town is presently seeking permission to further expand the District without increasing the capacity of the System) Grace will only be permitted to connect 310,400 square feet of office space (approximately one-quarter of what the Town has assessed to the Grace Property), if Title 5 standards are used as the basis of measurement, and only 517,000 square feet of office space (less than one-half of what the Town has

43

assessed to the Grace Property), if average daily water meter readings are used as the basis of measurement.

.Stated differently, the Sewer Bylaw assesses Grace for a benefit it cannot possibly receive because the Town has simply not provided the necessary capacity in the System.

This inequity is exacerbated by the fact that G.L. c. 83, § 14, will permit the Town to re-assess Grace the cost of increasing the capacity of the System to treat the sewage generated from the Grace Property if, as and when it is developed, notwithstanding the fact that Grace will have already paid for that capacity.

> A person who enters his particular drain into a main drain or common sewer, or who by more remote means *receives benefit thereby* for draining his land or buildings, shall pay to the town a proportional part of the charge of making and repairing the same, *and of the charge, not already assessed, of making and repairing other main drains and common sewers through which the same discharges, which shall be ascertained, assessed* . . . [Emphasis added.]

G.L. c. 83, § 14.

Grace respectfully submits that this result is contrary to the requirement of G.L. c. 83, § 14, that assessments be made for a benefit which the property

44

assessed can in fact utilize even if it is not doing so presently.

**VI. Based on the Undisputed Facts in the Summary Judgment Record, the Superior Court Erred When It concluded that the Sewer Bylaw Does Not Frustrate the Statutory Purpose of Proportionality.**

Grace respectfully submits that, based upon the undisputed facts in the summary judgment record, the Superior Court further erred in its perfunctory analysis of whether the Sewer Bylaw frustrates the statutory purpose of proportionality in assessments. The summary judgment record demonstrates that by design the Sewer Bylaw results in grossly disproportional assessment of business and industrial properties under any consistent standard of measurement.

If Title 5 standards are used and consistently applied to the most common residential and business uses, then the Sewer Bylaw results in an under-assessment of single-family residences by approximately 20% (A. 209) and an over-assessment of business uses by approximately 50% (at 75gpd per 1000 square feet instead of 50 gpd per 1000 square feet), even accepting the Town's development assumptions, and by significantly more if proper development assumptions are made.

# EXHIBIT F

COMMONWEALTH OF MASSACHUSETTS
APPEALS COURT

NO. 2003-P-1320

MIDDLESEX, ss.

---

W.R. GRACE & CO. - CONN.,

Plaintiff-Appellant,
v.

TOWN OF ACTON, a Municipal
Corporation,

Defendant-Appellee.

---

**BRIEF OF DEFENDANT/APPELLEE
TOWN OF ACTON**

---

On Appeal from a Judgment of the Superior Court

---

The Defendant-Appellee,
By its attorneys,

Stephen D. Anderson, BBO # 018700
Douglas H. Wilkins, BBO #528000
ANDERSON & KREIGER LLP
43 Thorndike Street
Cambridge MA  02141
(617) 252-6575

Dated: February 2, 2003

cases cited (no duty to consider the "specific conditions" of the plaintiff's facility).[18]  The Town followed the statute on this point, as on others. A. 2141.

> F.  *Grace's Assertion That The Plant Will Not Have Capacity For Development on the Grace Property Asks the Court To Ignore Large Amounts of Data.*

Finally, Grace argues that it is being assessed for a benefit it will not receive.  It asserts repeatedly, as though it were fact, that the Plant will lack capacity to serve development on the Grace Property.  Br. 19-20, 42-44.  In doing so, Grace asks the Court to speculate about the future, look selectively only at certain data and ignore other data. That approach, if adopted, would allow endless challenges to local sewer bylaws, throwing municipal sewer operations into disarray.

---

[18] The Legislature's overall intent not to subject Towns to the minutiae affecting each lot further appears in the "fixed uniform rate" methodology (G.L. c. 83, § 15 [second paragraph]), which requires consideration only of lot frontage or area.

The Legislature did not intend to permit well-financed taxpayers to haul Towns into Court, file affidavits from experts under contract to present purported alternative appraisals and opinions, and force Towns to choose between the cost and delay of hiring another expert or running a litigation risk.

Nor is the approach justified on the facts. Nearly on the eve of oral argument[19], Walter Terrell, Grace's own expert, presented his theory. The Town showed that Terrell's approach provided even greater support for the Town's calculations. As a matter of mathematics, even in light of Terrell's belated affidavit, the Town's approach was reasonable.

For one thing, the Plant's design reflects the capacity to receive 701,000 gallons, if all properties in the District discharge at their peak simultaneously. A. 2186, 2493. Terrell uses the current permit limit of 250,000 gallons per day (A. 2188), but permits can be amended to allow greater flows. Seeking an increased flow limit "remains an option" for Acton, although it is not being actively pursued at this time. A. 2202. Grace never supported its assumption that the permit limit will remain the same.

Moreover, the Town showed that, out of three data charts, Terrell had chosen to use only the one labeled "very conservative" in calculating the Plant's reserve

---

[19] When Grace claimed at oral argument that there was no affidavit countering Terrell's last-minute submission, the Town offered to submit an affidavit. The Court stated orally that she would allow an affidavit if she later determined it was necessary to her ruling. It was not.

38

(i.e. unused) capacity.  S.A. 9, citing A. 2585, first
chart (showing estimated flow of 226,720.48, compared
to a capacity of 250,000).[20]  That chart is "very
conservative" because it assumes, counter-intuitively,
that all drinking water passing through the water meter
of a property is discharged into the sewer system,
instead of being consumed in part.  A. 2191-2193.  Both
of the other charts attached to Terrell's affidavit
make one of two[21] more realistic assumptions: either
(1) that some drinking water is consumed or used for
watering lawns, filling pools, etc. or (2) that flow to
the Plant can be reduced by decreasing infiltration of
groundwater into leaky pipes and by minimizing inflow
due to illegal connections.  A. 2199, 2497-8. Those
charts showed reserve capacity of over 50,000 gallons
per day ("gpd").  A. 2585, A. 2586.[22]  Using either of

---

[20] Based upon these data, Acton advocated, and
continued to advocate, to DEP to allow  expansion of
the sewer district beyond the current contours.  A.
2195-2196.  The Town is now asking DEP to approve
additional expansion of the sewer district.  A. 2202.

[21] Obviously, making both assumptions would support
even greater plant capacity to treat planned
development.  The  Town did not complete an analysis
that would make both assumptions.  A.   2200.

[22] At A. 2585, the second chart showed reserve
capacity of 51,011.02 gpd (250,000 - 198,988.98 gpd).
At A. 2586, the first chart showed reserve capacity of
57,531.02 gpd (250,000 - 192,468.98 gpd).

those two other charts shows that, even without
increasing the permit limit, sufficient reserve
capacity exists (1.278 million square feet and 1.134
million square feet).[23] Those results bracket the
Town's calculation (1.211 million square feet), even
accepting Grace's assumption about office use flow (45
gpd). S.A. 9 - 10.  Unless the Court requires
counterintuitive calculations, the Terrell affidavit
confirms that the Plant has capacity to handle
development on the Grace property.

---

[23] For Grace's lots, the calculations are:
$\underline{51,011 \text{ gpd}}$  =  1,133,578  square feet
45 gpd/1000 s.f.

$\underline{57,531 \text{ gpd}}$  =  1,278,466.67 square feet
45 gpd/1000 s.f.

These results correspond closely to the Town's bylaw's
calculation: under the Bylaw,  Grace concedes that its
property is allocated 1,210,640 square feet of office
space.  See A. 211, par. 11.
     Terell's other calculation (A. 2579-80, par. 2)
compares actual flows with Title 5 flows, in violation
of his own testimony (Id., par. 3) that "[a]verage
sewage flows should not be compared with Title 5 unit
flows . . .."  Indeed, applying rounded Title 5 flows
(i.e. 300 gpd) to the total number of betterment units
(1390.94) would result in a needed treatment plant
capacity of 417,282 gpd.  The Town did not do this.
Rather, it used actual data as a reality check to guide
its judgment on how to use Title 5 guidelines.

40

# EXHIBIT G

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In Re: W.R. GRACE & CO. et al. | ) | Chapter 11 |
|  | ) | Case No. 01-1139 (JKF) |
|  | ) |  |
| Debtors, | ) | Jointly Administered |
|  | ) | re: Docket No. 6557 |

## AFFIDAVIT OF DOUGLAS HALLEY

I, Douglas Halley, being duly sworn, state as follows:

1.      I am the Health Director for the Town of Acton, Massachusetts ("Town"). I am a
member of the Massachusetts Health Officers Association.  As a general practitioner in the
health field my experience in public health includes subsurface sewage disposal, sanitary sewers,
storm-water management, solid waste management, hazardous waste management and cleanup
and food service management.

2.      I have held the position of Health Director in Acton since 1987.   My responsibilities
include advising the board of health, researching and drafting proposed bylaws relating to public
health issues and performing or overseeing all executive functions of the Town's Board of
Health. I also advise the Board of Selectmen on sewer related issues and have served as an ex-
officio member of the Sewer Action Committee. I make this affidavit upon personal knowledge
and, where applicable, upon personal knowledge of the authenticity of records within my
custody as Health Director.

3.      Upon receiving the Debtor's Opposition to the Town of Acton's Motion For Relief From
the Automatic Stay And Related Determinations, I was asked to evaluate W.R. Grace's claim
that the Town of Acton Sewer Plant will not have the capacity to serve W.R. Grace's property if
and when it is developed in the manner contemplated by the sewer betterment assessment

formula in the Town's bylaw.  As Grace notes, that formula assigned 302.66 sewer betterment units to the Grace Property (although Grace's number of betterment units drops to 297.5 under the calculation that the Town is asking this Court to approve).

4.      My calculations, based upon actual data regarding performance of the sewer system and the sewer plant, show that the Town of Acton Sewer Plant has more than enough capacity to handle Grace's 302.66 sewer betterment units (and, of course, the now-proposed 297.5 betterment units).  In particular, based upon my analysis, I anticipate the full service area when fully connected and fully built out – including all of Grace's 302.66 betterment units -- will generate 211,722 gallons per day ("gpd").  This is substantially below the Town of Acton's sewer plant's permitted capacity of 250,000 gpd.  Indeed, the Town is also preparing to apply for an increase in plant capacity to 300,000 gpd – which, if granted, would provide an even greater excess capacity.

5.      A memo reflecting my analysis and setting forth the underlying data is set forth as attachment A to this affidavit.  The data are accurate, and the analysis is correct.  I adopt that memo as part of this affidavit.

Signed Under Penalties of Perjury this  4  day of November, 2004.

Douglas Halley

-2-

## JURAT

COMMONWEALTH OF MASSACHUSETTS

On this _4_ day of _November_, 2004, before me, the undersigned Notary Public, personally appeared the foregoing Douglas Halley, proved to me through satisfactory evidence of identification, which was _____ _known to me_ _____, to be the person whose name is signed on the preceding document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

_Andrea H. Bishop_ (official signature and seal of notary)

My commission expires _2/27/09_ _____

ANDREA H. RISTINE
Notary Public
Commonwealth of Massachusetts
My Commission Expires
February 27, 2009

Exhibit A

November 4, 2004

TO:        Don Johnson, Town Manager

FROM:      Doug Halley, Health Director

SUBJECT:   Wastewater Treatment Plant

As part of their work on the proposed Powdermill Plaza extension Woodard & Curran did an analysis of the potential wastewater flows that may be received at the wastewater treatment plant from the existing service area. Their analysis was based on actual water flows received at the plant since February 2002 and their estimate of build-out within the service area. The Health Department reviewed those estimates and determined to check them by comparing actual water flows to the assessed build-out capacity as represented by the total Betterment Units within the service area.

In order to do that check the Health Department confirmed the following facts:

| | | |
|---|---|---|
| Total billable gallons | = | 105,400 |
| | | (water district readings from 10/03 to 4/04) |
| Non-Betterment billable gallons | = | 13,911 |
| | | (School and Town water flows) |
| Average Influent Wastewater flow | = | 98,447 |
| | | (average flow while school is in session) |
| Connected Betterment Units | = | 633.26 |
| Total Betterment Units | = | 1,369.19 |

The first thing we noted in these facts was the discrepancy between billable gallons and influent flow. The actual gallons received (influent flow) at the plant is only 95% of the gallons billed. This is true even though the Town only bills the winter water flows which would only have limited external water uses that do not discharge to the sewer system. Summer billing rates are typically considered to generate only an 80% discharge to the sewer system but even winter billing rates reflect a reduction either through discharges outside the sewer system, billing errors or billing round offs on the individual basis that blend into a lower flow when all users are combined. However, while we note this differential for this exercise we will not take the discrepancy into account. Ignoring the differential is conservative, because it assumes more flow at the plant than actually occurs.

In order to make a correlation between the actual water use and the build out betterment assessments the total billable gallons per day (gpd) of 105,400 must be reduced by the non-betterment billable gpd. The school system and town properties are not part of the betterment unit total and therefore should also be excluded from the billable gpd. With that calculation we

find that 91,489 gpd are being generated by 633.26 connected betterment units. With only minor exceptions these betterment unit connections are either at or nearly at build out capacity.

Based on those facts a comparison between the connected betterment units actual flow and the non-connected betterment predicted flows can be made. If the 633.26 connected betterment units generate 91,489 gpd than the 735.93 remaining betterment units (1369.19 – 633.26) can be predicted to generate 106,322 gpd (91,489/633.26 = 735.93). Note that the 735.93 remaining betterment units includes all Grace betterment units. Based on that comparison we expect that the total betterment units when fully connected (including Grace) will generate a flow of 197,811 gpd (91,489 + 106,322). Adding back the non-betterment flow of 13,911 gpd we anticipate the full service area when fully connected and fully built out will generate 211,722 gpd as compared to the 250,000 gpd permitted capacity.

This comparison of betterment units vs. water flows is consistent with Woodard and Curran's findings and is in fact a more liberal interpretation of potential water flows. As was noted previously the influent water is only 95% of the billable gallons. This calculation is at a minimum 5% greater than the water flows that the influent recordings can verify. We say at a minimum because there was no attempt to calculate potential inflow and/ or infiltration into the system, which would be recorded as influent flow. Inflow is unbilled water that discharges into the sewer usually from sump pumps or sub-drains. Infiltration is usually groundwater that enters the sewer through the wastewater pipes or pump stations. It is not unusual for sewer systems to have an inflow/infiltration flow that is 10% of the influent water total.