UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In Re:                        . Case No. 01-01139(JKF)
                              . Jointly Administered
                              .
W.R. GRACE & CO., et al.,     . 5414 USX Tower Building
                              . Pittsburgh, PA  15222
          Debtors.           .
                              . October 18, 2004
. . . . . . . . . . . . . . . . 9:00 a.m.

TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:               Reed Smith, LLP
                              By:  JAMES J. RESTIVO, JR., ESQ.
                                   JAMES W. BENTZ, ESQ.
                                   DOUG CAMERON, ESQ.
                              435 Sixth Avenue
                              Pittsburgh, PA  15210


For the Claimants (ZAI):      Richardson, Patrick, Westbrook
                               and Brickman, LLC
                              By:  EDWARD J. WESTBROOK, ESQ.
                                   ROBERT M. TURKEWITZ, ESQ.
                              174 East Bay Street
                              Charleston, SC  29401


                              Buchanan Ingersoll, LLC
                              By:  WILLIAM D. SULLIVAN, ESQ.
                              1007 North Orange Street
                              Wilmington, DE  19801

Audio Operator:               CATHY YOUNKER


Proceedings recorded by electronic sound
recording, transcript produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey  08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609)587-3599**

APPEARANCES: (continued)

For the Claimants (ZAI):        Lukins & Annis, PS
(continued)                     By:  DARRELL W. SCOTT, ESQ.
                                1600 Washington Trust Financial
                                  Center West
                                717 Sprague Avenue
                                Spokane, WA  99201

1           THE COURT:  This is the matter of W. R. Grace &

2   Company, Bankruptcy Number 01-1139 pending in the District of

3   Delaware.  Today is the time set for the science trial

4   concerning the ZAI litigation.

5           We were to have a participant by phone.  Do we?  The

6   counsel to the futures rep, is he expected to call in, Mr.

7   Weiran (phonetic)?

8           MR. RESTIVO:  The debtor doesn't know anything about

9   that, Your Honor.

10          UNIDENTIFIED SPEAKER:  The plaintiffs do not know

11  anything about it, Your Honor.

12          THE COURT:  All right, well, we'll proceed.  If he

13  does call in then that's fine.

14          Will you enter your appearances, please?

15          MR. RESTIVO:  Your Honor, James Restivo, Douglas,

16  Cameron and James Bentz for the debtor.  And Jan Baer is also

17  present, Your Honor, also for the debtor.

18          THE COURT:  All right.

19          MR. WESTBROOK:  Your Honor, for the ZAI claimants

20  Edward Westbrook, Rob Turkewitz and Robert Wood from

21  Richardson, Patrick, Westbrook & Brickman and Darrell Scott

22  from Lukins & Annis and Bill Sullivan, local counsel for the

23  claimants.

24          THE COURT:  I'm sorry, I missed whoever was number

25  two.  I'm sorry.  I got Westbrook, Wood, Scott and Sullivan,

1 but I didn't get --

2          MR. WESTBROOK:  Mr. Rob Turkewitz.

3          THE COURT:  Mr. Turkewitz, thank you.

4          Okay, does anyone else wish to enter an appearance?

5 Okay.

6          Pardon me one second.

7          Okay, I take it from the number of people and binders

8 that you have not come to a resolution of this matter.

9          MR. RESTIVO:  That is correct, Your Honor.

10          THE COURT:  All right, have you agreed on anything?

11 Because, frankly, from your briefs I'm not sure that we're

12 trying the same case, so I would like to know what it is that

13 you have agreed on and what the areas of disagreement are.

14          MR. RESTIVO:  Your Honor, I think that all of the

15 areas of disagreement set forth in the briefs remain, and the

16 parties will be arguing those issues, including what are the

17 issues.

18          Today before the Court we have reached, Your Honor,

19 agreements that we think will be helpful to the Court in terms

20 of the argument.  Mr. Westbrook, and I have agreed, Your Honor,

21 to certain ground rules.  Again, our goal is to present these

22 arguments in a fashion that will be most effective.

23          So, we've agreed that we will equally divide the

24 argument time.  We've agreed we will police that ourselves,

25 Your Honor.  If, for example, one of us gets involved in an

1 extended exchange with the Court on a particular issue, we will

2 make sure that the other side gets equal time, either on that

3 issue or on something else.  We've agreed we'll make sure we

4 each get equal time.

5          We have agreed, Your Honor, to present to the Court a

6 bench notebook of materials.  We realize the Court doesn't

7 really want another notebook, but what we have attempted to do

8 is from the 13 volumes of materials the Court has, to boil it

9 down to those exhibits which will be utilized in argument.  And

10 again, we think it will make it easier for the Court, and so

11 the debtor's notebook, for example, Your Honor, is the white

12 notebook.  It contains 12 or 13 exhibits we're going to use,

13 and we've exchanged that with Mr. Westbrook.

14          He has exchanged with us his bench notebook, which is

15 somewhat bigger.  And so we think if the Court focuses on these

16 it will avoid the parties and the Court diving into 13 volumes.

17          THE COURT:  All right.  Thank you.

18          Do I need yours now, Mr. Westbrook, or not until you

19 --

20          MR. WESTBROOK:  I don't think you'll need ours 'til

21 we start to argue.  It might just be confusing right now, Your

22 Honor.

23          THE COURT:  All right.

24          MR. RESTIVO:  We think, Your Honor, that the most

25 logical way to address these issues is to deal in the first

1  instance and for the substantial part of the time with the

2  competing motions for summary judgment.  Mr. Westbrook and I

3  will do that.  We believe that the presentation of arguments

4  and counter-arguments for each of us will run somewhere between

5  90 minutes and 120 minutes.

6          We will then deal with the more miscellaneous

7  motions, the Consumer Protection Act, damages, but we're

8  basically going to confront the guts of the disputes in arguing

9  the competing motions for summary judgment.

10          THE COURT:  All right.

11          MR. RESTIVO:  We have not agreed, Your Honor, and we

12  will argue about it at the present time whether or not non-

13  record evidence can be utilized during argument when we get to

14  that point.  Mr. Westbrook and I will discuss that and argue

15  that with the judge.

16          THE COURT:  All right.

17          MR. RESTIVO:  Your Honor, the issue to be determined

18  with respect to what has become known as the science trial is

19  set forth in this Court's orders of October 21, 2002 and

20  November 25, 2002, and that is what science demonstrates with

21  regard to whether ZAI creates an unreasonable risk of harm.

22          And at the September 23, 2002 omnibus hearing your

23  court explained precisely what the plaintiffs would have to

24  prove.  That is our Bench Exhibit number 1, Your Honor.  That's

25  the transcript of that hearing.  And at Page 84 Your Honor

1  stated, "You're going to have to show me that there is some

2  hazardous contamination.  Now, what makes it hazardous?  The

3  fact that it's going to be either hazardous to the environment

4  or to the people who live in the home or something.  There has

5  to be a hazard.  If there is no hazard there is no claim."

6        And Your Honor went on to say at that hearing that

7  the plaintiffs needed to show not that it's hazardous just

8  because it's sitting in an attic, but because somebody is going

9  to eventually be injured by virtue of the fact that it's a

10 noll.

11       And that direction, Your Honor, in September was

12 consistent with what the Court had previously said on many

13 occasions, including at the July 22, 2002 omnibus when a

14 question was raised about damages, and this Court said what

15 we're going to deal with is, quote, "There is some scientific

16 evidence that asbestos fibers in Zonolite products do pose an

17 unreasonable risk of harm.  I want to limit this trial to that

18 issue."

19       What I plan to do, Your Honor, is briefly put the

20 legal and scientific disputes in historic context with respect

21 to the record evidence, describing very briefly the mining and

22 milling of vermiculite at Libby, the manufacture and sale of

23 the ZAI end product.

24       I'll describe briefly the procedural and pre-

25 bankruptcy legal history of these claims, and then I will

1  address the debtor's motion for summary judgment.  That motion,

2  we believe Your Honor, establishes that based upon undisputed

3  scientific facts there is no evidence in this record and there

4  can be no evidence that the presence and disturbance of ZAI in

5  an attic doubles the risk of a homeowner or anyone else

6  contracting an asbestos-related disease.

7       When I talk about that I will explain the legal

8  requirement for doubling the risk, and I will deal with the

9  admissible and inadmissible evidence that the courts have dealt

10 with when issues of this sort are presented on a science trial.

11      I will then discuss the alleged scientific arguments

12 raised by the plaintiffs in opposition to our motion in support

13 of their motion, and hopefully I will be able to convince the

14 Court that in law and in fact those arguments are not supported

15 by credible, admissible scientific authority and cannot be used

16 to avoid summary judgment in this case.

17      Your Honor, ZAI is a mineral made of vermiculite.

18 Vermiculite is sometimes called mica.  Beginning in the 1920's

19 various companies mined vermiculite ore from the Zonolite

20 Mountain located outside Libby, Montana.  After the crude

21 vermiculite ore was mined it was then milled to remove

22 impurities.  It was then graded by ore size into five grades,

23 and it was shipped for later expansion and processing for

24 different end uses to different expanding plants across the

25 country.

1          These various grades of vermiculite concentrate, Your

2     Honor, were heated in a furnace at the various expanding

3     plants.  The vermiculite would, in effect, expand or pop like

4     popcorn.  For attic insulation Grace primarily used the two

5     largest grades, one and two, for ZAI.  The expanded or popped

6     vermiculite was known as Zonolite attic insulation.  We're

7     calling it ZAI, and it was sold to homeowners as an additional

8     or supplemental attic insulation to be spread in the unfinished

9     attics of homes.

10         There's no dispute, Your Honor, that vermiculite

11    itself is not an asbestos material.  However, the vermiculite

12    ore in Zonolite Mountain did contain other minerals.  It

13    contained in small amounts Tremolite.  Tremolite is a form of

14    asbestos.  Tremolite existed and exists today at Libby in two

15    forms which will become very significant as we talk about the

16    science issues here, Your Honor.

17         Tremolite exists at Libby as fibrous asbestos and

18    also as Tremolite rock, which is non-fibrous.  Fibrous asbestos

19    material is often denominated in the scientific literature.

20    You will see it also in the various briefs as an asbestiform

21    material.  The rock material, which is non-fibrous, is referred

22    to as non-asbestiform Tremolite or as cleavage fragments,

23    namely fragments of rock which have cleaved off the ore.

24         Now, at the mine, Your Honor, and there's no dispute

25    about this, the processing was designed to remove most of the

1  impurities in the ore and it did that.  It removed almost all

2  of the impurities from the ore, including Tremolite.  And I

3  don't believe that there's any dispute about that.

4        However, a trace amount of Tremolite, both fibrous

5  and non-fibrous, remained in the concentrate, and the finished

6  ZAI, popcorn-type product, did contain trace amounts of fibrous

7  and non-fibrous Tremolite.

8        I don't believe there's any dispute that the

9  existence of Tremolite cleavage fragments and Tremolite

10  asbestos fibers at the Libby mine were a matter of common

11  knowledge throughout the years that the mine operated.  I don't

12  believe there's any factual dispute in the record that the

13  finished ZAI attic insulation product could contain trace

14  amounts of Tremolite.

15        Around 1980, Your Honor, the Federal Consumer Product

16  Safety Commission was investigating and banning the sale of a

17  number of asbestos-containing products, dry wall joint

18  compounds, artificial fireplace logs, hair dryers and other

19  products.  You can see that in Exhibit 19 of the 13-volume set

20  in Volume 12.  It's attached to Mr. Scott's declaration.

21        In 1980 the Federal Product Safety Consumer

22  Commission examined the Tremolite presence in Zonolite attic

23  insulation, reviewed tests done by Grace in the installation of

24  ZAI in the attics and elected not to regulate or ban ZAI as an

25  asbestos-containing product.

1        Grace ceased the production of ZAI in 1984, and in

2   1990 the Libby mine was closed for good.

3            THE COURT:  In what year?

4            MR. RESTIVO:  1990.

5            THE COURT:  All right.

6            MR. RESTIVO:  Given that history, what prompted the

7   claims arising out of ZAI?  I don't think Mr. Westbrook will

8   dispute this, Your Honor.  In Libby, where Tremolite

9   contaminated vermiculite was mined from the ground for 60 years

10  and where the milling process at the mine site removed almost

11  all of the Tremolite from the ore, in the late 1990's concern

12  was expressed about former employees of the mine and the

13  milling process having pulmonary problems.

14           I'm not suggesting, Your Honor, that worker health

15  issues had not been raised earlier at the mine, because they

16  had and corrections were made, but the worker health issues

17  raised in the late '90's spread to concerns about the

18  environment in Libby and concerns about Libby residents.  That

19  made it newsworthy, Your Honor.

20            and as is common in asbestos litigation, the news

21  that there was an asbestos problem with the mining and milling

22  of vermiculite ore caused the plaintiff's bar or their clients

23  to look into the possibility of lawsuits involving finished

24  products, one of which was Zonolite attic insulation.

25            And so in the year or so prior to Grace's bankruptcy

1  there were a number of class actions filed in a number of

2  jurisdictions on behalf of homeowners alleging problems with

3  ZAI.

4          The only action, Your Honor, for which there was any

5  type of adjudication was the <u>Barbanti</u> class action in the State

6  of Washington.  That action was prosecuted by Mr. Westbrook, by

7  Mr. Scott and others, and that sought an injunction to require

8  Grace to advise the putative class members that ZAI presented a

9  health emergency problem.

10          On behalf of W.R. Grace we tried the preliminary

11  injunction in Spokane, Washington before Judge Kathleen

12  O'Connor.  On December 19, 2000 Judge O'Connor denied

13  plaintiff's motion for preliminary injunction and noticed the

14  class members.

15          In your white bench exhibit book, Your Honor, at

16  Exhibit number 2 is the opinion in order of Judge Kathleen

17  O'Connor, and she ruled, and I quote, "At this time I do not

18  believe the plaintiff has demonstrated an emergency which would

19  justify the court sanctioning a notice and in effect prejudge

20  the case.  There are factual disputes about the quantity of

21  asbestos in vermiculite, whether or not there is any threshold

22  levels of exposures which would not be dangerous, the quantity

23  of asbestos fibers found in the air of the homes tested and of

24  the testing protocols used."

25          And so that, Your Honor, was the state of play with

1  respect to ZAI litigation at the time Grace filed its Chapter

2  11 petition.  And the disputes identified by Judge O'Connor are

3  now dealt with in the 13 volumes of materials that are now

4  before the Court.

5          One other thing I should mention, Your Honor,

6  sometime after the Chapter 11 petition was filed the EPA in

7  Libby reached the same conclusions as Judge Kathleen O'Connor.

8  In addition to making multiple remediation efforts in the Libby

9  community with respect to vermiculite and vermiculite ore, the

10 EPA was requested to declare Libby a public health emergency

11 with respect to ZAI in Libby attics.

12         EPA's Office of Pollution Prevention and Toxics

13 denied the request, Your Honor.  That denial is in your bench

14 volume Bench Exhibit number 3.  And the EPA stated, quote, "We

15 do not think a supportable argument has been made to declare

16 Libby a public health emergency based on the questionable added

17 exposure burdens from ZAI."

18         Our motion, Your Honor, asks for summary judgment on

19 the grounds that there's no credible scientific evidence in

20 this record or otherwise that the presence or disturbance of

21 ZAI in an attic creates an unreasonable risk of harm.

22         In our motions we also attempt to discuss evidence

23 under Daubert.  In plaintiff's motions for summary judgment

24 they attempt to exclude under Daubert testimony of Dr. Richard

25 Lee.

Restivo - Argument                              14

1        What is the test for this Court in determining

2   whether ZAI creates an unreasonable risk of harm?  That, after

3   all, is the issue here.

4        It is true, Your Honor, that in some of the

5   claimants' papers they try to pose the issue as being whether

6   ZAI contains any Tremolite asbestos.  We concede that it does.

7   That's not the issue here.  The issue is whether or not there

8   is a significant release over a significant period of time at

9   significant levels to cause any type of asbestos disease.

10       In some others of their papers, Your Honor, claimants

11  argue that the issue to be decided in this science argument is

12  whether or not ZAI ever releases respirable asbestos fibers.

13  Again, that's not the scientific issue in play here.  We

14  concede, based upon the studies that have been done, that on

15  occasion small amounts of fibers sometimes can be released in

16  the disturbance of ZAI.  What is important is that the credible

17  scientific evidence is undisputed that the occasional and

18  sporadic disturbance of ZAI in an attic does not have the

19  concentration, frequency or duration over a person's lifetime

20  to double the risk of contracting a disease.

21       Now, I've mentioned "double the risk" twice, and that

22  is the standard for courts to follow in determining the

23  existence of a hazard, the existence of unreasonable danger.

24       That is spelled out nicely, Your Honor, in the

25  Federal Reference Manual on Scientific Evidence that was

1  published by the Federal Judicial Center for Guidance of the

2  Federal Courts in the year 2000.  It is fully consistent with

3  the _Daubert_ decision.  And, Your Honor, specific provisions

4  dealing with doubling the risk are in your bench notebook.

5  That's Exhibit number 4.

6       And the Federal Reference Manual on Scientific

7  Evidence provides at Page 383 and 384 the explanation of

8  doubling the risk.  And it goes as follows:  "The civil burden

9  of proof is described as showing that something to be proved is

10  more likely to be true than not true.  The threshold for

11  concluding that an agent is more likely than not the cause of

12  an individual's disease is a relative risk greater than two.

13  Recall that a relative risk of one means that the agent has no

14  effect on the incidence of disease.  When the relative risk

15  reaches two the agent is responsible for an equal number of

16  cases of disease as are all other background causes.  Thus, a

17  relative risk of two implies a 50 percent likelihood that an

18  exposed individual's disease was caused by the agent."

19       In other words, Your Honor, in order to show that ZAI

20  is more likely than not to present an unreasonable risk,

21  plaintiffs have the burden of showing that exposure or

22  disturbance of ZAI doubles the risk.

23       The Judicial Center's reference manual, Your Honor,

24  is fully consistent, as I said, with the _Daubert_ line of cases.

25  In _Daubert_ itself, the Ninth Circuit, which was dealing with

1 Bendectin, a drug mothers took, ruled as follows -- this is at

2 43 F 3rd, 1311 at Page 1320.  Quote, "The study must show that

3 children whose mothers took Bendectin are more than twice as

4 likely to develop limb reduction birth defects as children

5 whose mothers did not."  The Ninth Circuit went on to say that

6 quote, "A relative risk of less than two actually tends to

7 disprove causation."

8          With respect to the reference manual in the Court's

9 exhibit book you also see that the scientific evidence

10 sufficient to establish that a particular product creates an

11 unreasonable risk or is hazardous is epidemiological studies.

12 Epidemiological studies simply compare a group of individuals

13 who are exposed over time to a particular product or substance

14 to a group of individuals who were not exposed over the same

15 period of time, and from those two groups one can determine

16 whether or not the incidence of any disease is twice as

17 prevalent in the exposed group.  That is epidemiology.

18          Our motion, Your Honor, states that there is no

19 epidemiological evidence in the record before this Court or

20 otherwise to establish that the disturbance of ZAI in an attic

21 doubles the risk of contracting an asbestos-related disease.

22          Indeed, our evidence shows that the presence or

23 disturbance of ZAI in a home does not create an unreasonable

24 risk.

25          There is one community-wide study, Your Honor.  It's

1  the Libby Community Survey.  It is not technically an

2  epidemiological study, because it does not have the controls

3  required for an epidemiological study.  What the EPA did is

4  they examined, through medical examination and exposure

5  history, the exposure and the health of 6,149 present or former

6  Libby residents.  They did not have a control group of 6,149

7  non-Libby residents, and so in that respect it was not

8  technically an epidemiological study.

9          Nonetheless, the researchers found at Libby that

10 there were any number of exposure pathways to asbestos that

11 arguably led to asbestos-related disease.  Obviously the most

12 prevalent was mining or milling raw ore.  Another one was being

13 a family member of someone who spent his or her career mining

14 or milling raw ore.

15         For purposes of this science trial, Your Honor, the

16 EPA study found no connection, no connection between having or

17 using ZAI in a home in any asbestos-related disease.  The

18 documents to that effect, Your Honor, are in the record.  The

19 clearest one, and it is Grace Bench Exhibit number 5, Your

20 Honor, that, Your Honor, is a letter from EPA administrator,

21 Christine Todd Whitman responding to inquiries from Senator Max

22 Bacchus with respect to the Libby medical screening and

23 inquires as to why a decision was made not to take any action

24 with respect to attic insulation in the homes.  And as a result

25 of the Libby study Christine Todd Whitman writes that the

1 study, quote, "did not show that insulation by itself could be

2 linked with the health impacts found in Libby."

3      So, one needs an epidemiological study.  There is

4 none here.  We do have a pretty good substitute, a 6,000-person

5 community study that finds no adverse health connection with

6 the use or presence of ZAI insulation in home at Libby.

7      Your Honor, we have supported our motion for summary

8 judgment with affidavits and record testimony of four world-

9 renowned scientists, Dr. Richard Lee, Dr. Morton Corn, Dr.

10 William Hughson and Dr. Elizabeth Anderson.  Their curricular

11 vitaes are in the record.

12      Let me start with the opinions and scientific

13 evidence submitted by Dr. Richard Lee.  Dr. Lee truly is a

14 world-renowned scientist.  While employed as a United States

15 steel scientist years ago in Pittsburgh he was one of the first

16 people in the United States to be requested by the U.S.

17 Government to analyze the rocks brought back from the moon.

18      He has consulted for years with various government

19 agencies with respect to asbestos including the Occupational

20 Safety and Health Administration, the Environmental Protection

21 Agency and others.  He has consulted with the United States

22 Navy, the United States Army, NASA, the FBI, the State of

23 California and countless other governmental and private

24 organizations.

25      His report, Your Honor, is in Volume 2, Exhibit 6 of

1  the documents submitted in notebooks to the Court.

2           Dr. Lee analyzed air sampling results, Your Honor,

3  from six different simulations which disturbed the ZAI.  Some

4  of those were simulations done by experts for Grace, a Dr. Lees

5  and a Dr. Mylnorex.  those simulations involved moving storing

6  and cleaning boxes in an attic, small clearance and re-wiring

7  in an attic, small clearance and installing a fan in an attic,

8  small removal of ZAI material in an attic and a large removal

9  of ZAI material in an attic and re-filling the attic with new

10 material.

11          Some of the simulations Dr. Lee analyzed were done by

12 experts for the plaintiffs.  Some of the simulations were done

13 by the EPA in Libby.  Before discussing what he found, Your

14 Honor, I need to spend a minute or two on the scientific tests

15 for permissible versus impermissible exposure levels, and I'd

16 like to go to the blackboard to do that.

17          Your Honor, under the Occupational Safety and Health

18 Act exposure to asbestos is very highly regulated.  No worker

19 can be exposed on an eight-hour time-weighted average to

20 asbestos in excess of 0.1 fiber per cc of air over an eight-

21 hour time-weighted average.

22          A cc of air, I'm told, Your Honor, is about the size

23 of a sugar cube.  This threshold limit is known as the -- and

24 this is important -- permissible exposure limit.  And the Court

25 can read the OSHA regulation in Bench Exhibit number 6.

1          A determination, Your Honor, as to whether there is

2   asbestos in the air is done by air sample.  If you want to know

3   whether or not the air in this room contains any asbestos fiber

4   one samples the air in the room, looks at what is found under a

5   microscope and determines whether or not there are respirable

6   fibers.

7          In doing that one has to follow certain rules, and

8   one of the rules is in order for a fiber to be of concern and

9   to be counted under the .1 fiber per cc it has to have a length

10  longer than 5 microns.

11         Fibers shorter than that, Your Honor, are believed

12  not to be of concern.  Either they're so short that the body

13  doesn't inhale them, or they're so short that if the body

14  inhales them they are exhaled, or if the body inhales them and

15  they stay in the body, they're so small, the body's defenses

16  take care of it.

17         So, regulations say what you're going to count, what

18  you're concerned about for fibers in the air are those longer

19  than 5 microns.

20         In addition, in order for there to be a countable

21  fiber, the aspect ratio has to be 3 to 1.  That is, what people

22  are concerned about are the long, thin fibers that get imbedded

23  in the body.  The length of the fiber needs to be three times

24  its width.  That's the aspect ratio.

25         Now, you will see, Your Honor, some argument in the

1  plaintiff's papers which is basically the any-fiber-can-kill

2  theory or the no-threshold theory, that there is no safe

3  exposure to asbestos.  That theory has been argued in

4  traditional property damage cases and bodily injury cases from

5  the early days.

6          Medical experts and other scientists have disproved

7  that theory.  It's clear, Your Honor, that asbestos fibers are

8  ubiquitous.  They're all around us.  In urban areas, including

9  Pittsburgh, Pennsylvania, there is almost always a small amount

10  of asbestos fibers in the air.  Human beings can have millions

11  of asbestos fibers in their lungs, because it's in the air we

12  breathe, and they don't contract any asbestos-related disease.

13          Thus, the recognition by science and by regulatory

14  agencies of the permissible exposure limits is simply a

15  recognition that if any exposure to asbestos fibers cause

16  disease, everyone in America would have an asbestos-related

17  disease, or, as stated in the Federal Reference Manual that I

18  referred to earlier, and this is at Page 475 in your Bench

19  Exhibit 4, Your Honor, it's the dose that makes the poison.

20          So, the courts have rejected the one-fiber-can-kill

21  theory.  You will see in our memorandum at Pages 35 to 38

22  federal cases from the Eighth Circuit, the District of

23  Massachusetts, the Southern District of New York and other

24  districts to that effect.

25          Those cases, in addition to rejecting the no-

1  threshold theory, follow Daubert and hold, not only must the

2  plaintiff show that a particular substance may be a hazardous

3  substance, and not only must the plaintiff show some exposure

4  to that substance, the plaintiff must show that the exposures

5  were at levels such that the risk of disease was increased two-

6  fold, doubling the dose.

7          Now, Your Honor, under this permissible exposure

8  limit a worker can be exposed eight hours a day, five days a

9  week, 50 weeks a year for 45 years, the fibers at 0.1 fiber per

10  cc level under OSHA and under medical science without ever

11  increasing the risk of disease, let alone doubling the

12  increase.

13          Let me return to Dr. Lee.  Dr. Lee looked at these

14  six different studies involving disturbance of ZAI.  He looked

15  at what did they find in the air through air sampling during

16  those disturbances.  And in the simulations conducted by Drs.

17  Lees and Mylnorex -- those are the ones I described moving

18  boxes and installing a fan -- Dr. Lee found on an eight-hour

19  time-weighted average that the level of fibers in the air were

20  as follows:  0.002 fibers per cc, 0.0045 fibers per cc and 0.01

21  fibers per cc.  The highest finding in any of the simulations,

22  Your Honor, was one-tenth, 0.1, of the permissible exposure

23  limit.

24          When Dr. Lee looked at other ZAI simulations,

25  including studies in homes at Libby by the EPA and studies done

1  by the Versar Organization who has no involvement with this

2  litigation one way or the other, did its own study, he found

3  that the findings he found in the Lees Mylnorex study were

4  consistent.  All of the findings were less than 0.1 fibers per

5  cc on a time-weighted average, 45-year working life history.

6          He then looked at, Your Honor, the plaintiff's

7  studies.  And in order to describe to the Court what he found

8  on the plaintiff studies I must talk about fibers versus

9  cleavage fragments for a moment.

10          All of this is in the record, Your Honor, in the

11  affidavit of Dr. Lees, in the affidavit of Dr. Ed Ilgren.  It's

12  undisputed in the record that cleavage fragments cause no

13  disease.  A fiber, Your Honor, grows in one direction.  A fiber

14  has smooth sides and has tencel strength.  A fiber ends sharply

15  and its sides are parallel.  A fiber, as confirmed by Richard

16  Hatfield, their expert, a fiber almost always has a width less

17  than three microns.  The fiber almost always has a width less

18  than three microns.

19          Cleavage fragments, Your Honor, are pieces of rock.

20  Like rock, they grow prismatically.  They don't grow in one

21  direction.  Like rock, they are not smooth.  Like rock, width

22  can sometimes get wider as it gets longer.  Unlike a fiber,

23  which on occasion, depending how long it is, will show

24  curvature.  There's no curvature in rocks.

25          As Dr. Richard Lee and Mr. Hatfield, plaintiff's

1  expert, agree, for rocks, cleavage fragments, width is almost

2  always greater than three microns.  In addition, the sides are

3  rough.  In addition they end in a tapered fashion.  In

4  addition, while fibers, if they are aggregated, will split

5  lengthwise into a number of fibers.  Rocks will break

6  horizontally along the crevices.

7          With that is a background, what did Richard Lee find

8  with respect to plaintiff's simulations?  First thing he found

9  is that they did not follow the counting rules.  You will see

10 in Exhibit 7 in your book, Your Honor, under Longstanding

11 Federal Regulations, cleavage fragments, these things, these

12 pieces of rock are not to be counted as asbestos fibers because

13 they are not asbestos fibers.  That's Exhibit 7 in your book,

14 and I don't think there's any dispute that you're not allowed

15 to count them as fibers, but if there is, Exhibit 7 puts that

16 dispute to rest.

17         So, he looked at the plaintiff's simulations, Your

18 Honor, and this is what he found.  In the simulations the

19 plaintiffs did they reported out 665 fibers were found in the

20 air during these various simulations.  Their lab reports, Your

21 Honor, are in the record and so all of these numbers can be

22 checked.

23         208 of the particles they reported out were less than

24 5 microns in length and shouldn't have been counted at all and

25 should not have been reported at all.

1         That left, Your Honor, 457 particles they found in

2  the air that they reported out as fibers.  45 of those were not

3  only longer than .3 microns in width, they were longer than 1

4  micron in width, and so they should not have been counted.

5  Again, they weren't fibers, they were cleavage fragments.

6         The remaining particles had 349 which had widths

7  greater than .3 microns, leaving 63 true fibers found in the

8  plaintiff's simulations, not 665 or 10 times as much.  And when

9  that is taken into account, the findings in the plaintiff's

10 simulations upon disturbance of ZAI were fully consistent with

11 the findings of the simulations from the EPA, from Versar and

12 from Drs. Mylnorex and Lees.

13        And Dr. Lee concludes that over a lifetime none of

14 his findings -- his findings over a lifetime were orders of

15 magnitude lower than the permissible exposure levels.

16        Your Honor, we looked at this, not only from a

17 microscopy geology point of view, but also from an industrial

18 health point of view.

19        To correct the record I think when I wrote it, and I

20 said in order to be a fiber it needs to be 0.3 microns -- less

21 than .3 microns.  Mr. Cameron says on occasion I may have said

22 less than 3 microns.  That's incorrect if I said it.  A fiber

23 has a width of less than .3 microns; a cleavage fragment has a

24 width of more than .3 microns.

25        THE COURT:  Just a second.  When the report -- with

1 your 208 fibers is talking about something less than 5 microns,

2 is that .5 or 5?

3          MR. RESTIVO:  That's 5.

4          THE COURT:  I'm sorry, width.  If I said length, I'm

5 sorry.  I was talking about --

6          MR. RESTIVO:  Width is -- I'm sorry, with respect to

7 these fibers, Your Honor --

8          THE COURT:  No, wait.

9          MR. RESTIVO:  With respect to the 208 fibers --

10          THE COURT:  That's length.

11          MR. RESTIVO:  That's length --

12          THE COURT:  Right.

13          MR. RESTIVO:  They shouldn't have been counted.  I

14 don't know whether Dr. Lee analyzed the width or the aspect

15 ratio of those fibers at all, because since they are less than

16 45 microns in length you don't pay any attention to them at

17 all.

18          So, I don't know if we know what the width of those

19 208 were.

20          THE COURT:  All right, I've got it down as they were

21 less than 5 microns in length.

22          MR. RESTIVO:  That's correct.

23          THE COURT:  And shouldn't have been counted.  Okay,

24 if I said something other than that I apologize.  I may not

25 have been reading my own notes properly, because what I was

1  trying to do was concentrate on whether it was 5 of .5, and

2  it's 5.

3            MR. RESTIVO:  It is 5.

4            THE COURT:  All right.

5            MR. RESTIVO:  When you get to width it's .3.  On

6  occasion I may have said 3, and that's what confused it.

7            THE COURT:  Okay.

8            MR. RESTIVO:  That's also why I flunked organic

9  chemistry in college, Your Honor.

10           We move to an industrial health view of the

11  undisputed evidence.  Dr. Morton Corn, Your Honor, started his

12  career as a professor of industrial health at the University of

13  Pittsburgh.  He eventually became the director of the Johns

14  Hopkins University School of Public Health.  He was named by

15  President Gerald Ford as the head of the Occupational Safety

16  and Health Administration, and he has consulted with

17  governments and industry for over 40 years in the field of

18  asbestos.

19           And so while Dr. Richard Lee's opinions are based

20  upon microscopy, geology and air sampling, Dr. Corn's opinions

21  come from an industrial health point of view.  Dr. Corn

22  reviewed the various simulations.  He did this after he

23  actually visited the homes that were at issue in the Barbanti

24  case in Washington.

25           Dr. Corn concluded that the limited amount of

1 asbestos fibers released during the disturbance of ZAI and the

2 infrequency with which any such disturbance in an attic would

3 occur were such that any theoretical exposures to airborne

4 asbestos fibers were orders of magnitude lower than the

5 permissible exposure limits of 0.1 fibers per cc on a time-

6 weighted average.

7          Incidentally, Your Honor, not only did the plaintiffs

8 incorrectly count in their studies, and not only did they

9 incorrectly count cleavage fragments as fibers, they also

10 reported out their findings in an incorrect fashion.

11          These findings need to be reported out on an eight-

12 hour time-reported average.  They didn't do that.  They did it

13 on simply an activity basis.  And when one is attempting to

14 determine exposure and risk and unreasonable risk and doubling

15 the risk one needs to do that on an eight-hour time-weighted

16 average, and the reason for that is, is plain and simple.  If

17 someone goes into their attic on a Saturday morning and moves

18 aside some ZAI to rewire a light, and it takes that person an

19 hour to do that job, and then that person goes and plays golf

20 for the rest of the day he has been exposed to asbestos while

21 he was in the attic disturbing material for one hour.  He has

22 not been exposed for the rest of the day.  And consequently

23 science and regulators average that exposure over an eight-hour

24 time-weighted average.

25          And when Dr. Corn looked at that he concluded any

Restivo - Argument                              29

1  exposures, even theoretical exposures, were magnitudes and

2  orders lower than the permissible asbestos exposure limit of

3  0.1 fibers per cc.

4          THE COURT:  Well, I'm a little confused about that

5  standard, frankly, for use in the home, because I understand

6  that standard is an OSHA standard where most people are

7  expected to work eight hours a day, unlike lawyers who work

8  maybe twenty.

9          So, I understand that, the eight-hour exposure in

10 that context, but I don't understand it with respect to a home,

11 because people may or may not be in their homes for that period

12 of time.  Where do I have the evidence in the record that tells

13 me on average how much time people spend in their homes?

14         MR. RESTIVO:  The evidence you have -- let me answer

15 it this --

16         THE COURT:  And in their attics.

17         MR. RESTIVO:  Let me answer it this way, Your Honor.

18 The OSHA standard is an OSHA standard.  It does apply to

19 workers.

20         It is an excellent guide to what is permissible

21 exposure limits.  Clearly, they're concerned with people who

22 are exposed every day for 45 years.  Obviously no one is in

23 their attic every day for 45 years, and so it's a pretty good

24 guide for attics.

25         Secondly, there is no dispute from the plaintiffs or

1  from Grace that the mere presence of ZAI in an attic generates

2  any respirable fibers in the air.  All of their studies, our

3  studies, the EPA studies, the Versar studies establish that

4  when nothing is going on there is absolutely no asbestos fibers

5  in the air.

6          And so, the issue is disturbance of the material in

7  the attic, and so what the simulations attempt to do is they

8  attempt to replicate those disturbances.  Obviously in the

9  Mylnorex-Lee study removal, large-scale removal of ZAI by

10 definition is a once-in-a-lifetime activity.  Once it's gone

11 you don't do it again.

12         How many times one would put a fan in the attic you

13 have to count on one hand.  How many times one would wire a

14 light in the attic you'd count on one hand.  And Dr. Lee, who

15 visited these homes and -- many of which have attics that are

16 almost inaccessible, at least in Washington State, some of them

17 have floorboards over it -- concluded that the access to the

18 attic and the opportunity to do anything in the attic was so

19 infrequent, so sporadic that one would never ever reach levels

20 anywhere approaching a permissible exposure level, admittedly,

21 for workers.

22         There is no permissible exposure level for non-

23 workers, and so you have to look at what is available in the

24 science, and that's what Dr. Corn and other scientists have to

25 look at.

1          Now, plaintiffs, you'll see in one of their briefs,

2    say, "Well, wait a second.  Dr. Corn says that if you're going

3    to remove ZAI from the attic, you ought to get a professional

4    to do it, and therefore, that shows that ZAI is hazardous."

5          Dr. Corn did testify to that effect, Your Honor.

6    He's an industrial hygienist, and he believes that.  And that

7    was his testimony.  What they didn't tell you in tier papers is

8    the rest of his answer.  And the rest of his answer was, "Let

9    us say the homeowner goes ahead on his own.  They would get

10   some exposure during that removal, but I do not think the

11   integrated dose of that exposure would concern me."

12         He was then pressed, and he was asked, "So, you

13   wouldn't be concerned if a homeowner went up there and vacuumed

14   the material out himself or herself without a respirator at

15   all?"

16         And his answer was, "That is correct for that kind of

17   frequency of occurrence."

18         And so Dr. Corn did take into account access and

19   frequency, and he concluded, "I believe the risk, which I term

20   a hypothetical risk, from a once-in-a-lifetime removal is very

21   low if it exists at all."

22         Your Honor, we also looked at this from a medical

23   point of view.  We have submitted the report and the testimony

24   of Dr. William Hughson.  Dr. Hughson is a board certified

25   pulmonologist, a Rhodes scholar, the director of the Center of

1  Occupational and Environmental Medicine at the University of

2  California at San Diego.  He's a medical doctor.  He has

3  studied asbestos-related diseases for years.  He has treated

4  patients with asbestos-related diseases for years.

5          Dr. Hughson's opinion -- whether or not you're

6  talking about a worker or a non-worker, whether you're talking

7  about a miner, a miller or someone who has ZAI in their attic,

8  is that the risk of disease is created only if lifetime

9  exposures exceed 0.1 fibers per cc on an eight-hour working

10 life basis.  And so to the extent the Court isn't quite sure

11 how the OSHA asbestos permissible exposure limits technically

12 apply to someone living in a home, one can then move to medical

13 science which says whether you're in a home or a factory, if

14 you do not get an exposure equal to 0.1 fiber per day, five

15 days a week, 50 weeks a year, 45 years, there is no risk of

16 asbestos-related disease, no unreasonable risk, and certainly

17 no doubling of the risk.

18          A fourth way, Your Honor, we looked at it is through

19 risk assessment.  Dr. Elizabeth Anderson is the former director

20 of the EPA's Risk Assessment programs, a past president of the

21 Society of Risk Analysis, current editor of Risk Analysis, an

22 international journal.

23          Dr. Anderson teaches us that in order to determine

24 whether or not a particular substance, material or product is

25 hazardous that product has to present an unacceptable risk of

1  disease.  We believe, Your Honor, that an unacceptable risk of

2  disease is exactly the same as what this Court ordered, that

3  is, dealing with an unreasonable risk of harm.

4         Dr. Anderson teaches that from a regulatory and a

5  scientific point of view an acceptable risk, a reasonable risk

6  is calculated as one cancer in 10,000 cases to one cancer in

7  1,000,000 cases.

8         To the extent the EPA uses that paradigm, Your Honor,

9  it is in your bench exhibit number 9.  The Court should

10 appreciate -- and it's in our briefs.  This is a very

11 conservative risk estimate.  It doesn't mean that one in 10,000

12 or one in 1,000,000 will get cancer.  One assumes the worst in

13 determining risk estimates.  But that is the criteria.

14        After reviewing the half dozen simulations dealing

15 with ZAI, Dr. Anderson has concluded that any theoretical risks

16 are substantially less than one in 10,000 to one in 1,000,000

17 when one looks at asbestos fibers created, not pieces of rock,

18 in these experiments.

19        I would now, Your Honor, like to turn briefly to the

20 alleged scientific support offered in opposition to our record

21 scientific evidence.  What do the plaintiffs offer?  First,

22 they make reference to some historic Grace testing done, either

23 at the mine or at the expanding plant or on occasion in the

24 application of ZAI.

25        Those tests, Your Honors, were done primarily using

1 something known as phased contrast microscopy, a light

2 microscope.  Everyone agrees, Your Honor, that the

3 magnification power of a light microscope is relatively small

4 and that under a light microscope one cannot distinguish

5 between cleavage fragments, asbestos fibers, pieces of wool,

6 pieces of clothing, vermiculite platelets.  Light microscope

7 can't tell the difference, and so anything you see you count as

8 an asbestos fiber.

9        So, the historic Grace data is a count, but for

10 purpose of this science argument it is not a count of asbestos

11 fibers.

12        Secondly, they want this Court to rely upon case

13 reports, maybe newspaper articles, maybe other articles that

14 claim that some person contracted some disease as a result of

15 exposure to ZAI.  And you'll see in their papers, Your Honor,

16 reference to a case called _Hiroshi_.  In _Hiroshi_ the plaintiff

17 settled with all of the asbestos defendants and Grace was left

18 to go it alone at trial.  The plaintiff, who did have an

19 asbestos-related disease, but who had been exposed to asbestos

20 products throughout his working life, convinced the jury that

21 Grace was liable.  That's not scientific evidence.

22        At Pages 27 and 287 of our brief, Your Honor, we have

23 cited eight post _Daubert_ cases from federal district judges in

24 Colorado, Missouri, Oklahoma, Montana, California, Tennessee

25 and the Virgin Islands, as well as affirmments in some of those

1  cases from the Eighth, Tenth and Eleventh Circuit Courts of

2  Appeal.  They all hold that individual case reports are

3  inadmissible to establish causation or unreasonable risk.

4        You will see in the briefing, Your Honor, a

5  suggestion by plaintiff that perhaps the courts are split on

6  this issue, that perhaps in a science situation one can take

7  into account individual case reports.

8        I think you will find, Your Honor, that all of the

9  cases cited by the plaintiffs pre-date Daubert, they were

10 decided in the period 1987 to 1994.  Whether or not they were

11 good law, pre-Daubert, they clearly are not good law post

12 Daubert.

13       The only one of those eight cases,  Your Honor, I'd

14 like to mention specifically is Wade-Greaux v. Whitehall

15 Laboratories.  This is a 874 F Supp. 1441.  This was out of the

16 Virgin Islands.  It involved a claim that a child was born with

17 birth defects because her mother used an over-the-counter nasal

18 spray while pregnant.  The Court granted the defendant's motion

19 for summary judgment holding that the opinion of plaintiff's

20 medical expert on causation were inadmissable, insufficient as

21 a matter of law because that opinion was based upon

22 inadmissible, anecdotal reports which reports do not constitute

23 epidemiological studies.

24       And the reason I mention that is that while it comes

25 out of the Virgin Islands, Chief Judge James Giles of the

1  Eastern District of Pennsylvania was the judge sitting in the

2  Virgin Islands, and he ruled quote, "Anecdotal human data,

3  whether from published case reports or other litigation, have

4  inherent biases that make them unreliable.  As a result, such

5  anecdotal human data do not represent the type of data

6  reasonably relied upon by experts in the field of teratology to

7  draw conclusions regarding whether an agent discussed in the

8  case report is a human terragen, and accordingly any reference

9  thereto is inadmissible."  You will see when you look at the

10 federal reference manual it says the same thing.

11         Since you can't use case reports, since the air

12 sampling data shows no unreasonable risk, plaintiffs drop back

13 to something known as dust testing.  I've already discussed

14 some of the errors in plaintiff's simulations, but I haven't

15 discussed dust testing yet.

16         Plaintiffs will concede that there is not a single

17 regulatory agency in the United States of America that permits

18 or requires dust testing to determine the presence of an

19 unreasonable risk or the presence of an asbestos hazard.

20         We concede, Your Honor, that dust testing per se has

21 legitimate uses.  I mean, for example, Your Honor, it has been

22 used extensively in New York City after 9/11 to determine the

23 amount and dispersion of pollutants, such as lead, asbestos,

24 mercury, dioxins, cadmium, silica and beryllium onto the

25 surfaces and into the ventilation systems of other buildings

1 near the World Trade Center which were not destroyed by those

2 events but which had pollution and debris blown in from the

3 blast.  Dust testing allows someone to go in and see what is in

4 the debris.  And so there is a place for dust testing.

5          But dust testing cannot be used to determine the

6 presence or amount of toxic substances in the air.  The very

7 ASTM procedure that plaintiffs claim to follow in their dust

8 testing states that you cannot use it to evaluate the safety or

9 habitability of buildings with asbestos-containing material

10 And OSHA and the EPA and other regulations make you test the

11 air if you want to know what's in the air.  You can't test the

12 dust.

13          In this regard, Your Honor, there's no dispute as to

14 what plaintiffs have done.  Not only have they tested the dust

15 and tried to put it in the air, they've tested it -- prepared

16 it by way of what is known as an indirect preparation method.

17          In air sampling, Your Honor, you draw air through a

18 filter.  You then take that filter and you put it under the

19 microscope and you determine from that filter what was in the

20 air.  What they do in dust testing is they scoop up a little

21 bit of dust, Your Honor.  They will drop the dust in a beaker

22 of water.  They will then add to that beaker some acid.

23 They'll then shake it and they'll shake it some more.  They'll

24 then pour that beaker into another beaker.  They'll place the

25 other beaker into an ultrasound machine and they will vibrate

1 that beaker 60,000 times a second for two to three minutes.

2          They then take out a drop of that water, put it under

3 the microscope and start counting fibers.  The very fibers they

4 count, Your Honor, have been disaggregated by the shake and

5 bake method of indirect preparation.  Science is clear that

6 doing that increases the fiber count by anywhere from 3 to

7 1,700 times.  As used to show a hazard, it is junk science at

8 its worst.

9          THE COURT:  Wait a second.  Repeat that whole process

10 for me, because when I read this in the briefs I had the same

11 question that I think I have now.  So, repeat it for me and let

12 me see from your visual aid whether it helps.  If not, I have a

13 question.

14          MR. RESTIVO:  What they will do, Your Honor, is that

15 with a little mini vacuum they will go to a surface here in the

16 attic, and they'll suck up some dust.  They will pour that dust

17 from the vacuum into a beaker of water.  They will add to that

18 beaker some acid and they will shake it.  And they will shake

19 it again.  They will then pour what's in that beaker into

20 another beaker.  They will put that other beaker into an

21 ultrasound machine.  Ultrasound, as the Court may know, is used

22 to break up kidney stones in hospitals.  They will bombard the

23 beaker 60,000 times a second with ultrasound.  They'll do that

24 for two or three minutes.  They will put in an eyedropper, take

25 out a drop of the material and now put it on a filter, put it

1  under a microscope and see what's there.

2        Remember in air sampling you take the exact filter

3  that went through the air in this room, you put it under to see

4  what's there, you count fibers.  They will do all this, take

5  the water, put it on a filter and start counting.

6        THE COURT:  All right, so your contention is that by

7  this -- as you call it -- shake and bake process they can take

8  what might be something like a cleavage fragment or some other

9  substance, not an asbestos fiber, that was greater than .3

10 microns in width and make it less than .3 microns in width, or

11 somehow take something that was short and make it long?

12        MR. RESTIVO:  Your Honor, yes, shake and bake will do

13 that.  It doesn't really relate to any of these numbers,

14 because we concede these are their air sampling results.

15        THE COURT:  Okay.

16        MR. RESTIVO:  And we've dealt with them, and they

17 show orders of magnitude lower than the PEL, and so --

18        THE COURT:  But shouldn't the tests basically come

19 out with the same results, no matter which way you do the

20 tests?  I mean, fibers are fibers.  If they're in the air or in

21 the water or in the dust and you do an appropriate scientific

22 test, shouldn't, within some reasonable degree of certainty, I

23 get the same number of fibers in the same product?

24        MR. RESTIVO:  No.

25        THE COURT:  Okay.

1      MR. RESTIVO:  Absolutely not.

2      THE COURT:  All right.

3      MR. RESTIVO:  Under the shake and bake method -- Dr.

4  Lee has a video we've introduced at various trials -- you get a

5  little piece of dust.  You can see it, but it's a little piece

6  of dust.  Maybe like a grain of sand, okay?  He puts that with

7  a camera in it into the ultrasound machine.  He has the camera

8  inside the ultrasound machine.  And you start -- you can see it

9  on camera, little piece of dust.  Now, he bombards that little

10  piece of dust, little ball of dust, 50,000 times a second with

11  ultrasound.

12      It's like World War III.  There's stuff flying all

13  over.  At the end of three minutes he stops and he takes a

14  picture.  You see all over the screen thousands of particles.

15  Those thousands of particles weren't free fibers or free

16  platelets or free anything.  They were a piece of dust, and so

17  the indirect method tells you nothing about asbestos fibers in

18  the air, because you're starting with a little piece of dust.

19      The protocol I've described says it doesn't tell you

20  what's in the air.  It only tells you what's in the dust.  And

21  you can't use dust sampling to show what's in the air, 'cause

22  it only tells you what's in the dust.  If you want to know

23  what's in the air you test the air, and this is what you find.

24  And one cannot test the dust and try to do some black magic to

25  make what's in the dust in the air.

1            THE COURT:  But to the extent that ZAI has some form

2    of asbestos in -- to some degree, and this is all hypothetical.

3    I'm trying deliberately to stay away with what's in the briefs,

4    because there is obviously a dispute.  So, I'm making this up

5    for purposes of illustration.

6            Okay, let's assume that there is one percent

7    Tremolite in any given product -- in any given -- I'm not sure,

8    piece of ZAI that's subject to testing.  If I have appropriate

9    scientific testing done, that is, that fits within the <u>Daubert</u>

10   standards so that it can be replicated, regardless of the

11   method by which a scientist attempts to replicate, shouldn't I

12   get the same results?

13           MR. RESTIVO:  No, Your Honor.

14           THE COURT:  So, if I'm testing air, then regardless

15   of how I test the air, if the appropriate scientific method is

16   used I should, within some reasonable limits, get the same

17   result from a test of the same sample.  If I test it by putting

18   something into the shake and bake method, I should get the same

19   results of asbestos fibers regardless of the medium in which

20   the product has been dissimilated.

21           MR. RESTIVO:  Your Honor, that is simply

22   scientifically incorrect and inaccurate.

23           THE COURT:  Okay.  Then how can any of these tests be

24   replicated?  How can any of them meet the <u>Daubert</u> standards?

25   If I can't use a test, replicate it and come up within

1  reasonable limits, within scientifically acceptable limits, the

2  same result, how are any of these tests scientifically

3  acceptable?

4          MR. RESTIVO:  Your Honor, science and regulators and

5  the courts are all consistent that the test to determine

6  whether disturbance or presence of a product creates respirable

7  asbestos fibers in the air is air testing.

8          THE COURT:  Okay, so what you're telling me is --

9          MR. RESTIVO:  That air testing is duplicable --

10         THE COURT:  All right.

11         MR. RESTIVO:  -- replicable --

12         THE COURT:  I can do the air test and replicate the

13  air test.  I can do the dust sampling and replicate the dust

14  sampling.  I should be able to do this shake and bake method

15  and replicate the shake and bake.  But I cannot compare the

16  findings from one test to another test.

17         MR. RESTIVO:  You can't get, and they can't get

18  whatever is in the dust after shake and bake into the air.

19  There's no scientific way to do that.

20         If you want to know what is in the air, science and

21  regulators say you have to test to see what's in the air.

22         Another answer, Your Honor, is whatever is up in a

23  person's attic and they clearly have found that in the attic,

24  in addition to Zonolite, there is some dust.  They would argue

25  the dust contains, after shake and bake, some asbestos fibers.

1 Maybe it does, maybe it doesn't.  When one goes up in the attic

2 and does a simulation, moves stuff aside to put in a fan, moves

3 stuff aside to wire a light, one is moving not only the end

4 product, but if there's any dust there one is moving that.

5 Whatever is generated in the air as a result of that activity

6 is captured by air samples.

7         Air samples won't tell you whether a particular

8 particle came from ZAI or it came from the dust from ZAI, but

9 it doesn't matter.  What you're interested in is what's in the

10 air as a result of activity that disturbs ZAI or any dust

11 caused by ZAI?  And so one can determine the effect of having a

12 dusty versus a non-dusty product because it's up in the air.

13         We know that is not only science, Your Honor.  We

14 know that the issues which you've raised have already been

15 wrestled with in the Third Circuit, in the <u>Armstrong</u> asbestos

16 bankruptcy with respect to alleged property damage claims

17 against Armstrong.  And there Bankruptcy Judge Newsome

18 presented, basically with the same testing by some of the same

19 experts the plaintiffs are using here, held -- and it's in your

20 bench volume, Your Honor, that dust testing was inadmissible,

21 couldn't be used to show what was in the air, that there was no

22 scientific principle by which one can convert what's in the

23 dust to what's in the air, and therefore, plaintiffs under

24 <u>Daubert</u> could not submit dust testing to show in a property

25 damage case an asbestos hazard.

1          THE COURT:  Right, well, the plaintiffs contend that

2    that is not exactly correct, because he wasn't dealing with

3    something apparently that became -- that had a fibrous aspect

4    to it.

5          MR. RESTIVO:  Well, plaintiffs say the difference

6    between this case and Armstrong is in Armstrong you were

7    dealing with vinyl asbestos tile.  And vinyl asbestos tile is

8    hard, and it's non-friable.  Therefore, Armstrong does not give

9    us any precedent or any guidance.

10         Truth of the matter is they may have been dealing

11   with vinyl asbestos tile, Your Honor; nonetheless, they did

12   dust testing.  They did dust testing to show there was asbestos

13   fibers from the vinyl asbestos tile in the dust.  They did it

14   to try to show Judge Newsome some sort of hazard or increased

15   danger, increased risk was presented.

16         It's true he threw it out.  He didn't throw it out

17   because he was dealing with vinyl asbestos tile.  He threw it

18   out because you cannot use dust sampling to say what is in the

19   air or to use the terms of the ATS protocol itself, you cannot

20   use dust sampling to predict a hazard or exposure.

21         And so you simply can't use this test for how they

22   want to use it before Judge Newsome and how they want to use it

23   here.

24         There is, Your Honor, a little bit of history with

25   respect to this issue in addition to Judge Newsome.  We have

1  cited to the Court other difficulties plaintiffs' experts here

2  have had with respect to this science.  We have presented to

3  the Court a decision out of Lamar County.  There it was testing

4  by Longo and Hatfield.  There the judge specifically called it

5  quote, "junk science," unquote and said it did not withstand

6  the Daubert test.

7           In the Celotex bankruptcy case, Your Honor, this goes

8  back some years, 1996, at 196 BR 973, Bankruptcy Judge Baines

9  called Hatfield's collection of dust samples and method quote,

10 "anything but precise and accurate".  Both recently, Your

11 Honor, in a case decided after briefing, the CSX case out of

12 Florida, it used a Fry standard, Your Honor, not a Daubert

13 standard, because that was the test in Florida state court.

14 The judge threw out Hatfield and Longo's use of a simulation

15 chamber for air sampling.  He threw out their videotaped

16 demonstrations of work practices.  He held they were not

17 admissible.

18          He ruled, "The procedures used indicate a desire and

19 practice which taints the credibility of their study."  He was

20 also concerned, Your Honor, that these videotapes they made,

21 they made for litigation purposes.  They were made and sold to

22 litigants, and they were so prejudicial that they outweighed

23 any relevance.

24          I should point out, Your Honor, that in Judge

25 Newsom's case in Armstrong plaintiffs made an attempt, and I

think they make it here, to take what's in the dust and apply

something they call a K-factor, which must be some sort of

force, and in a theoretical application of that factor somehow

magically you get what's in the dust after shake and bake into

the air.  There's absolutely no science that supports that, no

regulations support it, and Judge Newsome didn't buy it, and

this Court shouldn't buy it.

I want to get close to conclusion, Your Honor, by

dealing with something I mentioned before.  It's really the no-

safe threshold argument.  Once one looks at air sampling one --

once one realizes there's no epidemiological data to support

their claim, one should reject counting pieces of rock as

fibers and trying to determine through shake and bake something

in the dust goes into the air, they really come down to the no-

safe threshold argument which when said pretty quick has had

surface appeal at least to juries.

What they want to say is asbestos is bad.  Therefore,

any exposure to asbestos is bad.  At least it's not good.  It's

clear that this product has asbestos in it.  They agree not

much, but it's tainted.  Some of the asbestos in it is

fragments, but some is fibers, and it's clear if you disturb it

enough some of those fibers get into the air and thus could be

breathed by someone.

Therefore, this stuff is contamination and therefore

it's unreasonably dangerous.  There are great leaps and holes

1  in what on the surface has appealed to at least some juries.

2  The release of fibers from any material is not contamination.

3  It is not contamination in science and it is not contamination

4  in the law.

5          What is it?  It is the release of fibers.  What makes

6  it contamination?  We have provided to the Court multiple cites

7  on this issue.  I'm just going to refer to two of them.  In

8  Farm Credit Bank of Louisville v. U.S. Mineral Products 864 F

9  Supp. 643, and that was a traditional asbestos property damage

10  case, the Federal Court for the Western District of Kentucky

11  held, "Contamination is defined as the release of toxic

12  asbestos fibers into the environment coupled with an ability to

13  ascertain a substantial and unreasonable risk of harm from that

14  release."

15          Plaintiffs cannot avoid summary judgment here by

16  simply showing a release of fibers.  In U.S. Gypsum v. The

17  Mayor and City Council of Baltimore, another traditional

18  asbestos property damage case reported at 647 Atlantic 2nd 405,

19  the Maryland Court of Appeals held that recovery in tort for

20  alleged property damage can be had only if, quote, "if the

21  defect," the release of fibers, "if the defect creates a

22  substantial and unreasonable risk of death or personal injury."

23          And so the argument that a fiber release is

24  contamination simply is not correct scientifically or legally.

25          One problem with that theory, Your Honor, in this

1 case is plaintiff's own medical expert, Dr. Henry Anderson,

2 conceded under oath at his deposition, and I quote, "There

3 certainly could be levels where there wouldn't be a significant

4 level of risk," unquote, so even Dr. Henry Anderson, their

5 expert, does not buy into the one fiber can kill.

6          In sum, Your Honor, the issue is whether or not the

7 presence of disturbance of ZAI in an attic doubles the risk of

8 asbestos related disease to the homeowner or to anyone else.

9 In order to carry their burden of showing a doubling of the

10 risk, law and science requires them to present to this Court

11 epidemiological evidence which they have not done and cannot

12 do, and a risk assessment which they cannot do -- which they

13 have not done.

14          We did present a risk assessment through Dr.

15 Elizabeth Anderson.  They have not countered her testimony with

16 their own expert.  We have affirmatively presented to the Court

17 evidence that the disturbance of ZAI does not double the risk,

18 that it is in orders of magnitude lower than what regulators

19 and science conclude are permissible exposure levels.

20          Dr. Richard Lee's testimony verifies that conclusion.

21 Dr. Morton Corn's report verifies that conclusion.  Medical

22 Doctor Hughson's testimony and report verifies that conclusion,

23 and Dr. Elizabeth Anderson's risk assessment verifies that

24 conclusion.

25          The only evidence plaintiff has to counter scientific

1  admissible record testimony is either legally or scientifically

2  inadmissable, because it consists of either case reports, junk

3  science, miscounting of rock fragments as asbestos fibers or

4  miscounting and adding fibers shorter than 5 microns to the

5  count.

6         Accordingly I end by returning to the question posed

7  by the Court for the science argument, namely, what does

8  science demonstrate with regard to whether ZAI creates an

9  unreasonable risk of harm?

10         The answer, Your Honor, is that science as well as

11  legal precedent demonstrates that ZAI does not create an

12  unreasonable risk of harm.

13         Thank you, Your Honor.

14         THE COURT:  Okay, why don't we take a ten-minute

15  recess, and then we'll reconvene.  Mr. Westbrook.

16         MR. WESTBROOK:  Thank you, Your Honor.

17                       (Recess)

18                (Off-the-record discussion)

19         MR. WESTBROOK:  Should I re-start, Your Honor?

20         THE COURT:  If you want it on the record, I think you

21  should, yes.

22         MR. WESTBROOK:  Okay, I'll give it the short version

23  then.

24         THE COURT:  Fortunately, we're just getting into some

25  substance so --

1        MR. WESTBROOK:  Just warming up.

2        May it please the Court, Your Honor, I'm pleased to

3   be here to present the claimants' views on the science.  And,

4   Your Honor, before I get into the merits, I would like to make

5   a comment that Reed Smith has been very professional in the way

6   it's handled the disputes, the numerous disputes we've had, and

7   we've been able to disagree without being disagreeable, and I

8   think for the profession that's something that should be said,

9   especially in light of some of the contention that's happened

10  in these bankruptcy proceedings.

11       Your Honor, as I was reading the briefs of W.R. Grace

12  it struck me as Yogi Berra would say that this is deja vu all

13  over again.  Because approximately 17 years ago, Your Honor, I

14  stood in the well of the Fourth Circuit Court of Appeals with

15  attorney general, former attorney general, Griffin Bell -- I'm

16  sorry, former attorney general Griffin Bell representing W.R.

17  Grace, and I heard the same arguments.

18       And to check my memory, Your Honor, I went and I

19  pulled out the briefs of W.R. Grace seventeen years ago in the

20  Greenville City Hall case, which became the landmark opinion in

21  these cases to see if they had said the same things.  And they

22  had, Your Honor, if I could put a demonstrative up which is not

23  going to be readable up there, Your Honor, 'cause it's so

24  small.  So, let me just read some excerpts from what Grace said

25  in 1987 in Greenville City Hall.

1       And, Your Honor, we will have copies of these.

2  Because of the copying we didn't get them all made last night.

3  We'll have copies of all these for the other side as well.

4       1987, "The worst fiber concentration show by the air

5  samples conducted for plaintiffs was less than .03 fibers per

6  cc."  2004 in today's brief, and we heard it today, "The

7  results of the ZAI claimants' own simulations were well below

8  OSHA's .1 fiber per cc."  Same argument.

9       1987, "Absent any epidemiological support the theory"

10 -- that was plaintiff's theory of building contamination -- "is

11 a wholly insufficient basis for finding product defect."

12      2004, today, "Claimants offer no epidemiologic

13 evidence showing that homeowners with ZAI in their attics have

14 an increased risk of disease."

15      1987, "Plaintiff's evidence of wipe samples taken on

16 another occasion was simply irrelevant.  Absent any way of

17 correlating the number of fibers wiped up with the level of

18 fibers in the air which building occupants might inhale, the

19 wipes provided no admissible evidence."

20      The Court has just heard the same argument here.

21      THE COURT:  Well, if you had 17 years to get the

22 epidemiologic evidence and it hasn't been done, why not?

23      MR. WESTBROOK:  Well --

24      THE COURT:  I mean, I understand in your briefs that

25 you say it takes a long time, but 17 years is a long time.

1  It's when I started on the bench.

2         MR. WESTBROOK:  As the ZAI -- what we're talking

3  about here today -- recall, Your Honor, that -- you may not

4  recall Dr. Corn, their industrial hygiene expert testified in a

5  deposition I took that ZAI was a new issue to him as of two

6  years ago, and he's been in the field for 30 years.  He didn't

7  realize that ZAI in attics would have asbestos, so the answer

8  on epidemiologic studies is nobody was looking outside of these

9  folks.

10        THE COURT:  Well, if nobody was looking, obviously

11 nobody got sick.  'Cause had they been sick, somebody would

12 have been looking.  So, where are we going with this?

13        MR. WESTBROOK:  Well, Your Honor, people were getting

14 sick.  In fact, the doctors will tell you that there is a

15 percentage of mesotheliomas which the scientists to date call

16 idiopathic, that is when they went looking at somebody's

17 occupation, when they went looking at somebody's school they

18 couldn't find asbestos exposure.  But nobody thought to look in

19 the home up in the attic.

20        And those studies will be started and will be going

21 ahead, but those studies just have not been done.  There have

22 been studies that have been done now after the 1980's began on

23 school custodians.  Dr. Chris Oliver, and it's in the record,

24 has found asbestos disease in school custodians.  Dr. Selikoff

25 studied school custodians.

1              THE COURT:  Regardless, that's not where we're going

2  today.

3              MR. WESTBROOK:  Right.

4              THE COURT:  This issue is ZAI in homes.  What

5  evidence do I have that some greater than otherwise exposure

6  from any other asbestos product is creating some unreasonable

7  risk of harm and people getting sick?

8              MR. WESTBROOK:  Yes, Your Honor, in the next 90

9  minutes I'm going to go all through that for you.

10             THE COURT:  All right.

11             MR. WESTBROOK:  Now, Your Honor, finally they argue

12  that you have to have a doubling dose of disease.  And we're

13  going to show you, as I go through my presentation, that that

14  is not the standard, has never been the standard in an asbestos

15  property damage case.

16             Now, the Court in setting up these proceedings was

17  concerned primarily -- and I'm quoting from the March 18th,

18  2002 transcript, when the Court stated what the inquiry was to

19  be.  You first said --

20             Oh, I'm sorry, can't pick me up that way.  You didn't

21  think it made a lot of sense to notify people about Zonolite in

22  their homes if in fact they're not exposed to any significant

23  risk.  But by the same token if the scientific evidence does

24  warrant it and they need to be aware of the problems, should

25  they disturb the Zonolite in their attic, then we probably

Westbrook - Argument                         54

1  ought to know that.

2        And I'm going to talk in some detail about those

3  problems if you disturb Zonolite in your attic.

4        Your Honor, Mr. Restivo made a number of broad

5  generalizations, and I want to make a number of statements, and

6  he'll have a chance to come up and refute them if he can.

7        He talked about doubling dose, and he cited you to

8  the Court Manual on Scientific Evidence.  And I know Your Honor

9  reads that manual and will see that what it is talking about in

10 there is the issue of causation for a personal injury case.

11 That is, when you have a disease, cancer -- he talked about

12 limb deformation -- you have the injury, you're looking for

13 causation, and there could be multiple causes.

14       In that situation the doubling dose evidence comes in

15 on the personal injury side so that you can show it's more

16 likely than not the disease came from that agent.

17       Here we have the causation.  Their experts admit that

18 the Tremolite fibers in the dust and the Tremolite fibers in

19 the air come from their product.  The issue here is whether

20 that's an injury that's compensable in the law.

21       So, they tried to take a personal injury causation

22 bit of evidence and use it in a property damage case on the

23 injury side.  It just doesn't happen.

24       Second -- number one, no asbestos property damage

25 case has ever used the doubling dose standard.  Number two, no

1 asbestos property damage trial to my knowledge has ever

2 excluded dust testing.  And I'll talk about Judge Newsome's

3 opinion a little bit later on, Your Honor.

4          Third, no asbestos property damage trial has ever

5 required an epidemiological study of a population exposed for

6 recovery.

7          Fourth, no asbestos property damage trial has ever

8 required any specific air test level for recovery.  In fact,

9 Your Honor, as I'll discuss as we go along, air levels lower

10 than are in ZAI attics and dust testing similar to what's in

11 ZAI attics has been sufficient in numerous cases to support

12 plaintiffs' verdicts.

13          Your Honor, I'd like to, if I could --

14          THE COURT:  Well, that may be the case, but I'm

15 really not sure what that has to do with the question of what

16 science tells me.  I mean, juries can find causation, damages,

17 whatever for a number of reasons because they're free to accept

18 any of the evidence that they have before them or to disregard

19 it.

20          So, I don't really care about those specifics.  In

21 fact, I don't even think they're relevant.  What I want to know

22 is what does science tell me about this product and whether or

23 not this product poses some unreasonable risk of harm.

24          MR. WESTBROOK:  Yes, Your Honor, and we're right

25 there.

Westbrook - Argument                          56

1        Your Honor, like Mr. Restivo, we have prepared for

2   the Court a notebook of materials we may reference.  The white

3   notebook, for Your Honor's information, contains copies of

4   charts --

5        THE COURT:  Okay.

6        MR. WESTBROOK:  -- I'll be putting up.  The black

7   notebook are copies of the frequently referenced materials.

8        THE COURT:  All right.  Thank you.  Thank you.

9        MR. WESTBROOK:  Your Honor, the first and most

10  fundamental point about ZAI that it's important for the Court

11  to understand to appreciate the science is that ZAI contains a

12  most toxic form of asbestos.

13       Second, Your Honor, we'll talk about the fact that

14  ZAI is ultra friable.  Third, Your Honor, ZAI can produce

15  significantly elevated asbestos air levels.  Fourth, ZAI can

16  produce significantly elevated asbestos dust levels.  Fifth,

17  lower dust and air contamination levels than in ZAI homes have

18  been found sufficient to show an asbestos product is

19  unreasonably dangerous.  Sixth, no state law asbestos property

20  damage trial has ever required any specific asbestos air level

21  or doubling dose evidence.  And seventh, the developing

22  scientific consensus is that ZAI is a serious building

23  contaminant and potential hazard that restricts attic use and

24  must be professional removed before disturbance.

25       Your Honor, this chart has some sub-parts under each

1 argument to help the Court follow along and will also help

2 everybody to know when we're getting closer to the lunch break.

3          First, Your Honor, ZAI contains a most toxic form of

4 asbestos.  Your Honor, ZAI contains Tremolite.  Tremolite is an

5 amphibole.  The defendant's experts agree that Tremolite is

6 much more hazardous than the chrysotile which is in school

7 buildings and around ubiquitously, as Mr. Restivo talked about,

8 in some urban areas.

9          Dr. Hughson testified that Tremolite is ten times

10 more hazardous than chrysotile in causing mesothelioma.  That's

11 Tab 1 of your reference notebook.  Dr. Ilgren, their other

12 medical expert says it is vastly more toxic, because he says

13 chrysotile, which was 95 percent of the asbestos used in this

14 country, does not cause mesothelioma.  He says it's all

15 attributable to the amphiboles like Tremolite.

16          Dr. Corn, Tab 33 of your notebook, their industrial

17 hygienist says the same thing.  Chrysotile does not cause

18 mesothelioma; it's these amphiboles.

19          Indeed, Your Honor, Dr. Corn testified at his

20 deposition that the mesotheliomas that are being caused up in

21 Quebec around the chrysotile miners are not being caused by the

22 chrysotile but by that less than one percent contaminant in the

23 chrysotile which is Tremolite.

24          Second, Your Honor, because of the nature of the

25 amphiboles Dr. Corn described them as rod-like, and he said

Westbrook - Argument                              58

1  they are more likely to lodge in the lung and stay in the lung.

2  You heard Mr. Restivo talk about that fibers can be removed

3  from the lung.  Dr. Corn says amphiboles, much more difficult

4  to remove.

5          Next, Your Honor, very dangerous lengths.  You will

6  see as I move through the evidence that the Tremolite fibers in

7  ZAI as measured in the air, most of them are greater than 5

8  microns, many of them greater than 10 microns, which scientists

9  say are very, very dangerous lengths.  So, you have very

10 dangerous lengths of very dangerous fibers in the ZAI.

11         Second, Your Honor, ZAI is ultra friable.  It's

12 undisputed, Your Honor, that ZAI, unlike virtually all other

13 asbestos products sold in this country, had no binder, it took

14 no set.

15         In this context, Your Honor, it is helpful to compare

16 floor tile to ZAI, because Your Honor had talked about

17 Armstrong with Mr. Restivo.  It's at Chart 3.

18         Your Honor, in your notebook that is Chart 3.  Floor

19 title versus ZAI.  Your Honor, floor tile is chrysotile.  ZAI

20 is Tremolite.  Floor tile is non-friable; ZAI ultra friable.

21 Floor tile, asbestos in a rigid vinyl matrix.  ZAI loose

22 asbestos lying in rubble.  Hazard.

23         EPA says if floor tile is intact and undisturbed it's

24 no problem.  With ZAI, EPA has said don't touch it without

25 professionals.

1       THE COURT:  But isn't that the same thing?  It's no

2  problem if it's intact?

3       MR. WESTBROOK:  Yes, but because floor tile is hard

4  and sits there in a square.  ZAI is not in -- ZAI in its intact

5  state is loose rubble.

6       THE COURT:  Well, I understand, but if you're going

7  to remove floor tile, I mean, the issue with respect to non-

8  friable is different.  That's not where I'm going.  The

9  question simply is if the issue is if left intact, i.e., the

10  floor tile's a floor tile, and if left intact the insulation's

11  the insulation, how is anybody harmed?

12       MR. WESTBROOK:  With floor tile?

13       THE COURT:  With either.

14       MR. WESTBROOK:  If it's left -- if floor tile's in

15  good condition and left intact the EPA says you don't have to

16  worry about it.  EPA has never said, like they do for ZAI,

17  don't go up near your floor tile.  But with ZAI they've said

18  don't go up in your attic and move the boxes around without a

19  respirator.

20       THE COURT:  Well, okay, show me that in the record,

21  'cause I thought what they said was that if you're going to

22  remove it, it would be better -- not required but better -- if

23  you used a professional who has the appropriate equipment to

24  make sure that there is no exposure.  It's an overkill, in

25  quotes.

1          MR. WESTBROOK:  Yes, Your Honor, and I'll move

2    through -- we'll get to the EPA discussion about that as well.

3          Your Honor, it may be helpful -- I learn, Your Honor.

4    It takes me a few minutes, Your Honor, but I learn.

5          Your Honor, it may be helpful in understanding the

6    nature of what we're talking about to take a look at some

7    electron photo micrographs of ZAI to see exactly what this

8    product looks like.  These are electron photo micrographs that

9    appear in the Hatfield Longo Report, which is in the reference

10   materials.

11         Your Honor, we have had these blown up, and I would

12   pass them to the Court.  You can see them better than in the

13   report.

14         THE COURT:  All right.

15         MR. WESTBROOK:  Your Honor, what those electron photo

16   micrographs illustrate is the fundamental problem with ZAI,

17   that is, unlike virtually every other asbestos product at the

18   microscopic level the asbestos fibers are lying loose

19   interspersed with the vermiculite.  They're lying on top of the

20   vermiculite, they're lying with the vermiculite.  There's no

21   gypsum that binds them together.  There's no asphalt vinyl

22   matrix, nothing.  It's just a pile of loose asbestos and

23   vermiculite, and that will have significant ramifications when

24   we talk about the indirect method.

25         Your Honor, they say a picture's worth a thousand

Westbrook - Argument                              61

1   words.  I think a video is worth a thousand pictures, and we

2   have a few minutes, Your Honor, short excerpts from the video

3   simulations done by our experts that I'd like to show on the

4   screen to the Court.

5           THE COURT:  All right.

6           MR. RESTIVO:  Objection, Your Honor.  I don't believe

7   that video is part of the record evidence.

8           MR. WESTBROOK:  Your Honor, these videos were all

9   taken by our experts and produced to the other side, and

10  they're in our reliance materials.

11          MR. RESTIVO:  Your Honor, we have seen the videos.

12  We believe they are not part of the record evidence, and we

13  also believe they are inadmissible for the same reason as cited

14  in the CSX case.  We believe that any possible information

15  would be outweighed by the prejudice of the videos, and they're

16  not in the record.

17          THE COURT:  All right, why are they not in the

18  record?

19          MR. WESTBROOK:  Your Honor, I don't understand

20  they're not in the record.  They were produced.  They were

21  deposed on them.

22          THE COURT:  Well, have they been part of the binders

23  that were submitted to me?  I mean, is there information about

24  them or an indication that I'm going to see a video as part of

25  the binders?

1        MR. WESTBROOK:  They are referenced, Your Honor.

2   Certainly I could find the reference to the videos.  I really

3   didn't anticipate that they'd have any trouble with the videos

4   that they've seen and been produced to them.

5        THE COURT:  Well, right, why don't we pass the videos

6   until after lunch.  You can show me where they are, where the

7   fact that you're going to use them appears in the record and

8   that way your argument won't be disturbed but we'll --

9        MR. WESTBROOK:  That's fine, Your Honor.

10       THE COURT:  -- pass them 'til then.

11       MR. WESTBROOK:  Your Honor, the important point, and

12  this came up early on in the briefing when Grace represented

13  early on in these proceedings, as they had out in the Barbanti

14  case, that ZAI would contain no more than .001 percent or .01

15  percent asbestos.  And we discovered that that was factually

16  incorrect.  Their own expert, Dr. Lee, who you've heard about,

17  tested ZAI, and he found two and a half percent Tremolite in

18  the sample he tested.  Other reports have been up to three and

19  even as high as five percent.

20       THE COURT:  When you're talking percentages, are you

21  talking about weight?

22       MR. WESTBROOK:  Yes, Your Honor.

23       THE COURT:  Weight, not volume.

24       MR. WESTBROOK:  Percentage by weight.

25       THE COURT:  Okay.

1          MR. WESTBROOK:   Internally at W.R. Grace, Your Honor,

2    and externally our experts have all agreed that it is not the

3    weight of asbestos in the product, but it is the friability and

4    the fiber release potential that makes it so hazardous.

5          A 100 percent asbestos hard laboratory table is much

6    less dangerous than a one percent ultra friable material.  Your

7    Honor, we have quoted in Tab 31 of the materials you have, the

8    reference materials, Grace's general counsel advising

9    internally that its company should not be relying on the weight

10   percent when talking about ZAI.

11         And he said, quote, "As you know, respirable

12   Tremolite asbestos fibers are light, and countless numbers may

13   be present, even though the percent by weight is low.  As

14   indicated above, a .5 percent Tremolite asbestos fiber content

15   could be significant because respirable fibers are light."

16         And, Your Honor, just how significant that is, we

17   have calculated, and it's calculated in the expert reports, how

18   many asbestos fibers in ZAI.  Your Honor, that is Chart 5 which

19   you have in your notebook, the white notebook of charts.

20         And Your Honor will see that at .01 percent asbestos

21   there are 1.25 trillion Tremolite fibers in each bag of ZAI.

22   And as the percentages go up, Your Honor, the numbers go up

23   significantly.

24         So, we have, as a Grace document reflected, a

25   reservoir of asbestos fibers.  In fact, Your Honor, Grace did a

1  test.  They poured ZAI and then they measured the asbestos that

2  came off it.  Then after they'd done that they ran a second

3  test with the same ZAI, and their conclusion was after ZAI

4  released enough fibers to double the occupational standard

5  tested at the time, they still found in the next test

6  additional high fiber readings that the asbestos in ZAI could

7  be re-suspended and that the asbestos in ZAI would keep being

8  released.

9           We have documents mentioned in the briefs, Your

10 Honor, which showed that after they had super-cleaned, what

11 they called super-cleaned vermiculite, treated it to try to get

12 the Tremolite out as much as possible, then took it from the

13 super-cleaning facility to be tested.  They found, to their

14 dismay, that when they tested it they got enormous numbers of

15 asbestos fibers.  What was happening, they concluded, was the

16 mere act of transporting ZAI, shaking it, released more

17 asbestos fibers from the Tremolite -- from the vermiculite

18 surfaces, so they were getting more loose Tremolite.

19          And we will see, Your Honor, when we talk about the

20 results that are coming up, that ZAI is indeed a reservoir for

21 Tremolite fiber.

22          Point 3, Your Honor, ZAI can produce significantly

23 elevated asbestos air levels.  Your Honor, in the asbestos

24 property damage litigation over the decades it was somewhat of

25 an inside joke between the attorneys that the defendants would

Westbrook - Argument                    65

1  own the air, and we own the dust.  But in this particular case,

2  Your Honor, I'm not concerned at all about talking about the

3  air levels, because the air levels from ZAI are, indeed,

4  significant, as the Court will see.

5        Your Honor, air testing -- first of all, the Court

6  should understand basically air testing is not recommended by

7  public health authorities to determine if there is an asbestos

8  contamination problem in the building.

9        The EPA stated this, Your Honor, in its guidance for

10  controlling asbestos-containing material in buildings.  It,

11  referring to air testing, measures only current conditions and

12  provides no information about fiber release potential in future

13  air levels.

14        In 1987 the asbestos industry tried to get the EPA to

15  set an air level for dangerous levels of asbestos in buildings.

16  The EPA said this.  Several commentors primarily from industry

17  encouraged the establishment of air monitoring standards as the

18  primary basis for hazard assessment.  EPA continues to

19  discourage the use of air monitoring as the primary technique

20  for assessing asbestos hazards since that method only measures

21  current conditions and provides no information about potential

22  and future levels of fiber release.

23        In order to determine, Your Honor, those levels of

24  fiber released from ZAI we did a series of simulations.  And

25  I'm going to talk about those in just a few minutes.  First,

however, I need to bring to the Court's attention a very

important aspect of air testing, why the EPA discourages the

use of air testing, because air testing is transient, air

testing results, Your Honor, can vary wildly depending on what

is being done around the asbestos material, particularly ZAI.

And the best example of that is that early in these proceedings

W.R. Grace cited results out of Libby the EPA, and they said

that it showed that the air levels never exceeded -- the number

was .00003 fibers per cc in Libby homes with vermiculite.

        The EPA was so concerned, Your Honor, that it filed

a pleading in this case.  United States response to motion for

entry of a case management order stating as follows, "Debtors

contend that scientific testing of the air in homes with

Zonolite attic insulation has found either no asbestiform

fibers or almost non-detectable levels.  This is incorrect and

misleading on several levels."  This is EPA speaking.

        As an initial matter debtors mis-state the findings

of EPA's early passive air sampling in certain Libby homes, the

apparent basis of debtor's intention.  In fact, EPA's early

testing found asbestos fibers in amounts 10 to 100 times higher

than the level debtors acknowledge in their memo.  Moreover,

the passive testing was intended to measure the presence of

asbestos in houses in quiet conditions and was not intended to

assess ambient fiber levels during typical household

activities, sweeping, vacuuming, home repair.  And the EPA

1  concluded, "As Grace is aware, EPA has conducted active sample

2  at homes in Libby that indicate exposure levels at 10,000 to

3  100,000 higher than the exposure level debtors referenced in

4  their memorandum."

5          Your Honor, we have conducted typical activity

6  simulations as well, and we're going to see those results.

7          The Court asked what is the evidence that people are

8  in their attics?  What do we have in the record?  Your Honor,

9  in our claimants' consumer protection reply brief we have a

10  series of attachments quoting the depositions of ZAI

11  homeowners, and I want to, as a prelude to discussing our

12  testing, reiterate some of these.

13          Mr. Ralph Bush, one of the claimants.  Quote, "I

14  estimate that between the attic bracing" -- he was up there

15  working in his attic -- "and the back porch, that I am close to

16  200 hours."  He's talking about disturbing the vermiculite.

17          Mr. Brendan King -- and that is Attachment I to our

18  claimants' consumer protection reply, Your Honor.  Brendan

19  King, "We bought the home knowing we were going to do remodel

20  on it.  We started ripping into walls and going up in the

21  attic, and as soon as we drilled a hole in the ceiling or

22  opened up a wall, vermiculite came pouring out."

23          Mr. King continued, "All of the water supply had to

24  run through the attic, through the insulation, and all of the

25  electrical.  A lot of wiring had to run through the attic

1  insulation."  That's Attachment J to claimants' consumer

2  protection reply.

3         Gladdon Warden, "I can't use that fan, because if I

4  do the vermiculite pours through when I turn it on."

5         Kurt Salsbury, "We began to see the stuff, ZAI, in

6  the kids' closets where it was coming through the cracks."

7  Attachment R to claimants' consumer protection reply.

8         Clark Russ, "We had two or three times when the

9  ceiling in our daughter Mary's room collapsed because of water,

10 and the Zonolite came down into her room."

11        Your Honor, these are things and others which are in

12 that claimants' reply that our claimants testify happened in

13 and around ZAI.

14        So, what did we do?  Well, we went in and we did

15 testing in these homes.  We simulated what would you have to do

16 to do a small job, if you were just putting in attic fan,

17 moving aside 10 or 15 square feet of the ZAI, the way a

18 homeowner would.

19        So, our people went in, they shoveled the ZAI aside,

20 like you'd clear the attic so you could cut through it.  We

21 said, "Well, what if you were putting a light up into the

22 ceiling and had to run the wiring?"  Well, you drill a little

23 hole through, go up through the ceiling, and then you'd run

24 your wiring through.

25        Well, what if you stored boxes up in the attic and

1  you wanted to keep it fairly clean?  You'd be up there and

2  you'd sweep off the boards that people sometimes have around

3  their attic.  These are things that our people talked about.

4  So, we simulated those.

5         And, Your Honor, in the claimants' ZAI testing chart,

6  the TEM testing chart, that's Chart 14, Your Honor, the chart

7  of ZAI claimants' testing that I'm showing on the board, it's

8  difficult to see.

9         THE COURT:  This is Chart 6, correct, in the book?

10         MR. WESTBROOK:  Yes, Your Honor.

11         THE COURT:  Okay.

12         MR. WESTBROOK:  Your Honor, it's difficult to see,

13  but what we have here, Your Honor, is at the very bottom here,

14  the line is so faint it's hard to see, is the only EPA level

15  that has ever been set for any building situation for

16  occupants.  That is .01 fibers per cc measured by an EPA-

17  prescribed procedure which says you have to go in and stir up

18  the dust by using a leaf blower.  This is intended for after

19  asbestos abatement so EPA can determine -- and once it

20  determined that there's no residual asbestos, go in there with

21  a leaf blower and make as much ruckus as you can.  Point it all

22  the surfaces, point it at the walls.

23         So, this says under the worst conditions in the

24  building your fiber levels, once you stir up the dust,

25  shouldn't be any higher than .01 fibers per cc.

1       Now, the Court can see from the chart that our

2  levels, Your Honor, measured -- by the way, everybody counts

3  except Dr. Lee, and we'll talk about that in a few minutes.

4  Our levels, Your Honor, were so much higher than the .01 fibers

5  per cc as to be almost off the chart.

6       For instance, moving ZAI with the homeowner method,

7  the blue lines shows all structures.  The Court will see that -

8  - Mr. Restivo was talking about the most dangerous fibers.  He

9  says they have to be greater than 5 microns.  Well, we ran the

10 red line, which is right next to it, the asbestos structures

11 greater than 5 microns.  And the Court will see that those

12 structure levels go up as high as 22 structures per cc on the

13 TEM.  This is compared to the only level -- now, this is not a

14 level, Your Honor, for homeowner occupancy.

15      There is no level, and the Court put its finger on it

16 a little bit earlier in talking to Mr. Restivo, the OSHA level

17 that I'm going to talk about in a minute is not for homeowners.

18 EPA has never said there is some safe level or set a regulatory

19 level in homes.

20      We took the same testing, Your Honor, PCM chart, and

21 we took our numbers and said let's compare to the OSHA levels.

22 Now, Mr. Restivo talked to the Court about a level called the

23 OSHA P-E-L, and I'm going to talk to the Court about that in

24 just a minute, but he didn't talk about another OSHA level

25      The OSHA P-E-L, as he stated, Your Honor, is a level

1 measured on an eight-hour time weighted average.  But he didn't

2 talk about the OSHA excursion limit or ceiling level.  Your

3 Honor, that is the level marked on this chart, one fiber per

4 cc, and that is a level that cannot be exceeded over a 30-

5 minute period.

6        Now, Your Honor will see at the bottom of that chart

7 that we have listed the times that the measurements actually

8 took place.  For three of the five they were over 30 minutes,

9 so those on their face are significantly higher than the OSHA

10 one fiber per cc ceiling.  That's the moving ZAI with the Grace

11 method.  And what that means, Your Honor, is Grace on its

12 website has various work practices they now advise people to

13 follow if they're going to be up there working around ZAI.

14 They know there are people that are up there.  And it's -- take

15 a mist bottle up there and mist it and get a mask and put a

16 mask on.

17        So, we did the procedure using the Grace method.  We

18 also did the procedure of moving some ZAI aside using the

19 method that the homeowners testified that they've used for

20 years, which is you go up there and you don't wear a dust mask.

21 Who wears a dust mask in their attic?  Who ever thought you'd

22 have to?

23        You don't mist things down.  You do it the way you do

24 some work.  So, moving ZAI with the Grace method with the

25 ceiling level of 1 fiber per cc, Your Honor, the levels were

1  4.6 to 16.2 with the average over the 34 minutes of 12.5.

2         Moving ZAI with the homeowner method, as you might

3  expect, higher levels.  A shop vac removal in the Matthews

4  home.  We went in there with a shop vac, because some of the

5  homeowners said, "I went in there, rather than moving with a

6  brush, I took my shop vac up there and vacuumed it out."  Of

7  course, once you vacuum out and the shop vac filles, you've got

8  to take the cannister and pour it into a plastic bag.  We did

9  that.

10         We did a sweeping test.  And Your Honor sees that

11  these levels are all above the OSHA excursion limit.  Now, for

12  the two, Your Honor, that are under 30 minutes, they might come

13  up and say, "Well, that's not measured over 30 minutes."  If

14  you take the ceiling penetration, the bush numbers, Your Honor,

15  with a 5.8 average over 26 minutes, even if they breathe

16  antarctic pristine air for the next four minutes, your average

17  is still going to be over one.

18         Same thing with the silver springs sweeping, Your

19  Honor.  With 17 minutes at an average of almost three, even if

20  you took the other 13 minutes at zero, you still have an

21  average over one.

22         So, when we compared our testing to the OSHA level

23  that the Court didn't hear about, it was significant.

24         THE COURT:  Now, this test is -- I'm sorry --

25  conducted how?

1    MR. WESTBROOK:  Your Honor, our simulators went up in

2 the attic, and they did various activities.  One, they cut into

3 the ceiling --

4    THE COURT:  Yes, but what are they measuring?  Air

5 samples --

6    MR. WESTBROOK:  Yes, air sampling.

7    THE COURT:  Air samples, all right.

8    MR. WESTBROOK:  I'm sorry, I didn't understand the

9 Court's question.

10    Your Honor, we can look at the air levels compared to

11 the limits of a different way, the bar chart.  This chart

12 shows, Your Honor, the average PCM levels -- taken from the

13 chart we just had the average PCM levels versus the OSHA

14 ceiling limit.  And you'll see the ceiling limit is the first

15 bar, one fiber per cc, and each and every one of our readings

16 was over that level.

17    Now, Your Honor, there's something very important

18 about the remodeling activities that we did, those simulations,

19 and that is this.  Our evidence also shows that remodeling

20 activity is expected to increase dramatically in the coming

21 years, so that we are facing a situation now where homes that

22 have not been remodeled are more likely to be remodeled in the

23 future.  Put up the rate of disturbance chart.

24    We took the deposition of Grace's expert, Donald Van

25 Cura.  Your Honor, Mr. Van Cura was hired by Grace to be

1  involved in their simulations, and he agreed with our

2  questioning that remodeling has now quote, "greatly exceeded

3  new construction in volume," and from 1980, Your Honor, to the

4  year 2000 remodeling -- dollars spent on remodeling have risen

5  from 43 billion to 153 billion, almost quadrupling.  In fact,

6  Mr. Van Cura said in his deposition, their expert, over the

7  past five to ten years the remodeling industry, quote, "has

8  been on a very steady strong increase."

9          So, these disturbances, Your Honor, were not at the

10 tail end of anything.  We're at the beginning.

11         On the question of exposure, Your Honor, it's helpful

12 also to look at it this way.  How much asbestos would a person

13 be breathing?  What are we talking about here?

14         Let's take the moving aside ZAI for 30 minutes, one

15 of the tests that were done --

16         THE COURT:  What chart are you on?

17         MR. WESTBROOK:  Your Honor, this is just a

18 demonstrative.  These are ones that we'll have for the Court

19 later.

20         THE COURT:  Okay.

21         MR. WESTBROOK:  That is not a chart.  This comes

22 directly from Mr. Ewing's report, Your Honor, which is Exhibit

23 12 in your reference notebook.  But at the 6.29 structures per

24 cc exposure level average that was measured during the moving

25 aside procedure, Mr. Ewing did the calculations, converting

1  structures per cc to structures per liter, because the

2  scientists talk about how many liters of air you breathe as

3  basically a thousand centimeters or cc's per liter.  So, you

4  multiply 6.29 by a thousand, and you get 6,290 structures per

5  liter.

6        Then we breathe 10 liters a minute.  So, you multiply

7  6,290 by ten liters a minute by the 30 minutes.  That

8  calculation, Your Honor, calculates to 1,887,000 asbestos

9  fibers that would be breathed, that is Tremolite fibers, the

10 kind that Dr. Ilgren, their expert, says are the amphiboles

11 that cause mesothelioma, not the chrysotile that he says are

12 benign, 1,887,000 asbestos fibers breathed in 30 minutes.

13       Well, how can we relate that to everyday terms, Your

14 Honor?  So, I did another calculation.  Again, Your Honor, this

15 is a calculation, and we'll hand up a copy to the Court.  What

16 does ZAI exposure mean in everyday terms?

17       We used another one of the numbers from our exposure,

18 30-minute ZAI, moving aside, a simulation, using the homeowner

19 method, and that number produced an average of 16 structures

20 per cc greater than 5 microns.  Doing the same calculation,

21 Your Honor, if you use the homeowner method in the 30 minutes,

22 the homeowner would breathe 4,800,000 asbestos structures.

23       Well, what do you compare that to?  Well, we compared

24 it, Your Honor, to how much asbestos a person would breathe in

25 a typical school building.  And for that we used numbers from

1  their expert, Dr. Corn.  Dr. Corn did a study in school

2  buildings, and Dr. Corn concluded that a person typically

3  breathes in an atmosphere that has .00024 structures per cc.

4  And that's Corn's article which is defense reliance document

5  120 for their reference, and it's in Tab 38 of your notebook.

6          So, at .0024 structures per cc we asked the question,

7  "How long would you have to breathe a building atmosphere at

8  that level to equal what you get in 30 minute at home?  Say

9  you're a teacher, you work 30 minutes at home on this project

10 on the weekend and then you come to school.  The calculation,

11 Your Honor, is that at that level, at that exposure, it would

12 take 4,760 days of breathing in school, that's 23.8 years, to

13 equal the 30 minutes of exposure you'd get on the weekend in

14 your attic.

15         Now, remember, Your Honor, that in addition to

16 getting the exposure in your attic, you also get the school

17 exposure.  This is bonus exposure, extra exposure simply

18 because you have ZAI in your home and exposure to Tremolite.

19         THE COURT:  Well, yes, that was the point.  Didn't

20 you just get done telling me earlier that the product in the

21 schools is not Tremolite?

22         MR. WESTBROOK:  That's correct, Your Honor.

23         THE COURT:  It's chrysotile.  Okay.

24         MR. WESTBROOK:  Yes, Your Honor.

25         THE COURT:  How do those structures compare?

1          MR. WESTBROOK:  They're counted the same way.

2   They're asbestos structures, chrysotile structures and

3   Tremolite structures are counted the same way by the

4   microscope, but the toxicology is what makes them so much more

5   -- so much different, Your Honor.

6          Your Honor, Mr. Restivo talked about Grace's

7   historical testing.  We did another check on our test.  We said

8   let's take a look -- we now have our testing of what happens

9   when you disturb ZAI in an attic.  We've seen that the levels

10  are above the OSHA excursion level.  Let's see if we can back

11  check against Grace's numbers.

12         And, Your Honor, this should be Chart 10, I believe,

13  in your notebook.  So what we did, Your Honor, is we took

14  Grace's historic testing numbers right from their documents,

15  and that's the first bar you'll see, Your Honor.  When they

16  tested ZAI they didn't start testing it until late in the

17  '70's, after they'd been selling it for years, but they started

18  testing it nonetheless, and they tried to do different things.

19         They tried to super clean it, they tried to spray a

20  binder on it, they tried to get a special grade of vermiculite.

21  They did everything they could to try to minimize the fiber

22  counts, because they were going to have to go to the government

23  with their results, and I'll talk about that in a second.  But

24  when they did all those things, Your Honor, they got results

25  which averaged -- the first bar shows .2 to 9 fibers per cc.

1  Those numbers, Your Honor, were above the OSHA level at the

2  time, but what they did, Your Honor, is they took the best of

3  their results, then they divided the results by four, because

4  they said no one would ever install ZAI more than two hours.

5  So, to get to an eight-hour time-weighted average we'll take

6  our results and we'll figure in six hours of zero exposure.

7  And they reported to the Consumer Product Safety Commission

8  those numbers.

9        When Mr. Restivo was talking to you about the

10 Consumer Product Safety Commission gave us a pass in 1980, the

11 Consumer Product Safety Commission didn't do any independent

12 testing.  It took Grace's numbers, counted by their

13 discriminatory counting, which Your Honor, the evidence shows

14 undercounted by 30 to 50 percent what the government would have

15 counted.  Then they took their discriminatory counting numbers,

16 cut them to a quarter by adding in six hours of fresh air.

17       Then they reported those to the Consumer Product

18 Safety Commission and told the Consumer Product Safety

19 Commission no one will have any exposure to ZAI once it's

20 installed.  So, don't worry about it, because we know, we've

21 tested in attics after it was installed.

22       Well, I took Mr. Eaton's deposition, who was in

23 charge of the testing.  I said, "What did you do?"

24       He said, "Well, after we installed it in a house we

25 let it sit up there.  Then we went up, opened the door, put an

1  air test up, air test monitor, closed the door and came back a

2  few days later."

3          I said, "Did you walk around up there?  Did you brush

4  it?"

5          "No, we didn't do anything."  They just sat it up

6  there like a museum and reported to the Consumer Product Safety

7  Commission.  That's how they got a pass from the Consumer

8  Product Safety Commission.  But I digress into liability, Your

9  Honor, but I -- when he said that I couldn't resist.

10          So, we're checking our numbers.  First bar are

11  Grace's numbers, which I would say are artificially bias

12  somewhat low by what they did on the testing.

13          Next, Your Honor, are the ZAI disturbance tests

14  measured the same way by PCM.  Mr. Restivo said, "Well, PCM,

15  you got to compare PCM and PCM."  This is PCM, our numbers.

16  And you'll see that our numbers run from 3 to 14 fibers per cc

17  in the same range, the same order of magnitude.  That's very

18  good concordance between testing.

19          Third, Your Honor, we said well, let's see if we're

20  just counting pure asbestos.  So, we used the electron

21  microscope counts, which as opposed to the light microscope,

22  counts just the asbestos fibers.  And when we counted just the

23  asbestos fibers, Your Honor, we found the numbers are still in

24  the same range.

25          So, this as well gives us comfort by checking our

Westbrook - Argument                          80

numbers against the Grace numbers, which they now criticize as saying their own science was no good back then.  But we think it's a test that is reasonable to take a look at, Your Honor.

Next, Your Honor, we said well, let's test our numbers and check our numbers to give some perspective.  What do our ZAI air tests mean -- put the next one up.  What do our ZAI air tests mean against other reported asbestos levels?  This is Chart 12, Your Honor, I think, in your notebook.

And Your Honor will see that we have there the ZAI tests.  First one, Your Honor, I haven't spoken about yet.  I really need to bring this up.  We're not the only ones who tested ZAI.

The Canadian Department of Defense commissioned an industrial hygienist, a noted industrial hygienist, Mr. Pinchen in Canada, no involvement from us, no involvement from Grace, nobody knew he was doing it, to test when they did a major remodel around ZAI buildings, Your Honor, to go in there and get air testing.

And Pinchen's results, Your Honor, we had to stop the chart, because we couldn't get it big enough, measured by the electron microscope -- this is asbestos being reported -- 174 fibers per cc, Your Honor.  It would be off the charts.

That was an extreme disturbance, but it shows exactly what the EPA was saying about air testing.  If you test when nothing's going on, you'll find very little in the air.  But

1  you go in there and you start doing activity, little activity,

2  more activity, more activity, the fiber levels are going to go

3  up dramatically.

4         So, we have Pinchen, the Canadian Department of

5  Defense testing first.  Then we pick up with our testing, Your

6  Honor, our air levels.  These are maximum levels reported for

7  various activities.

8         Homeowners' method, 22 structures per cc.  The Grace

9  method, 8.6 structures per cc.  Ceiling penetration, sweeping,

10  drop ceiling removal.  Those are all ours.

11         Now, comparing, Your Honor, to what are the air

12  levels that have been found -- for instance, we talked about

13  floor tile.  Abrading floor tile, and this is reported in the

14  HEI report, Your Honor, which is in your reference materials,

15  abrading floor tile, .06 fibers per cc.

16         How about if you completely rip up the floor tile?

17  1.3 fibers per cc.  Greenville City Hall, Your Honor, I come

18  back to Greenville City Hall, that's a Grace product, monokote.

19  The highest air level recorded in the building was .03 fibers

20  per cc.  The jury found that unreasonable dangerous.  The

21  Fourth Circuit affirmed it being unreasonably dangerous.  And

22  they said something very interesting.  They said when the

23  utility of asbestos in the product is low, a small risk can

24  make it unreasonably dangerous.

25         Everybody agrees here, Your Honor, whereas in the

1  Monokote cases at least Grace argued that they put asbestos in

2  the product to hold it together while it was wet and drying on

3  the beams.  But everybody agrees here, Your Honor, that

4  Tremolite was -- they call it a tramp contaminant.  It was

5  useless.  They didn't want it in there.  It had no utility

6  whatsoever.  So, on the risk utility test of what's

7  unreasonable dangerous, they fall down on utility.

8       EPA aggressive.  We talked about the AHERA, that air

9  test level.  When you go in with the leaf blowers, .01 fibers

10 per cc.  Buildings of normal maintenance, this is Dr. Lee's

11 results reported in the HEI, their Dr. Lee, .005 is what you're

12 going to find in a building.

13      Dr. Corn, their other expert, reported he went into

14 71 schools.  He said there's only .002 fibers per cc with

15 normal activity going on, including maintenance, whatever goes

16 on in a building.

17      And last, Your Honor, Mr. Restivo did talk about the

18 World Trade Center.  The EPA has set a World Trade Center -- a

19 clearance level for buildings around there that have to be

20 tested of .0009 fibers per cc.

21      So, comparing the ZAI levels that you get in the air

22 when you do something around -- and maybe the Court's inquiries

23 that we have to alert people about ZAI, or can we just let them

24 go about their business, the air levels are indeed enormous.

25      Your Honor, Mr. Restivo talked about their

1 simulations.  They went in and they did some simulations.  I

2 call it the kid glove simulations, Your Honor.  This company

3 has been selling this product for -- and its predecessor

4 selling it, I guess, for 60 years -- went into one building.

5 For reasons known to Grace it chose to test in only one

6 building.

7          They tested in a home, Your Honor, which did not have

8 ZAI totally in the attic.  What it had was fiberglass

9 insulation with just ZAI poured on top of it.  It was not a

10 complete ZAI installation like some of the homes we tested.

11          Grace scientists, years ago, Your Honor, had advised

12 Grace -- and this was their words -- test ZAI under the worst

13 case conditions.  That was Exhibit 8 to our motion for summary

14 judgment.

15          Grace did no such tests.  Dr. Lees, who was the

16 tester, different from Dr. Lee who's the microscopist, but Dr.

17 Lees and Mr. Mylnorex were the two scientists who they got to

18 do the work.  This is what they testified.  Grace chose not to

19 test major disturbance scenarios that the experts suggested.

20 That's Mylnorex's testimony, Exhibit 86 to our motion for

21 summary judgment at 91 to 2.

22          Mylnorex admitted they didn't try to simulate a worst

23 case condition -- his deposition at 123.  Grace didn't want to

24 do a second home, even though Dr. Lees, the other tester,

25 thought he'd feel more secure about his results if they got at

1  least two homes.  That's the Lees depo at 70 to 83, Tab 37 of

2  the Court's notebook.

3       Grace failed to authorize a suggested vacuuming test.

4  Mr. Van Cura admitted the experts -- and he was actually the

5  one, Van Cura's people were actually doing the work.  Lees and

6  Mylnorex were doing the sampling.  Van Cura said they were

7  permitted to do only minimal activity.  They failed to simulate

8  any of the activities advertised, such as renovation, major

9  renovation, attic stair installation.

10       And after each test, Your Honor, unlike what any

11  homeowner would do, they exhausted the air completely out of

12  the attic to clean it out before continuing.

13       On top of that, Your Honor, they used Dr. Lee's

14  aberrational counting technique.  And Mr. Turkewitz is going to

15  talk about that later this afternoon in some detail, Your

16  Honor, but basically, Your Honor, Dr. Lee, alone among

17  microscopists, has devised an unpublished, un-peer-reviewed,

18  unauthorized, rejected by EPA test so that he can exclude up to

19  90 percent of what everybody else in the world counts as

20  asbestos fibers, but Dr. Lee says they're not.  Dr. Lee

21  developed this at the request of W.R. Grace for litigation when

22  Grace was sued by EPA and Libby.

23       He used it out at Libby.  EPA's microscopist examined

24  it and rejected it as unscientific.  In fact, Your Honor, EPA

25  felt so strongly about the issue that again, EPA filed a

1  statement in these proceedings, the United States statement

2  regarding asbestos analysis issues in W.R. Grace's motion for

3  summary judgment and claimants' motion to exclude Dr. Lee's

4  opinion on cleavage fragments.

5          And this is what the EPA said.  "The United States

6  submits that the more relevant point is that when the Lees and

7  Mylnorex study," that's Grace's study, "is corrected to

8  eliminate the reduction in fiber count attributable to the use

9  of Dr. Lee's unique, non-peer-reviewed protocol, its results

10 are consistent with the results of the other five studies."

11 And those are the studies that others have done, including

12 ourselves.

13         And the EPA has studied this and has spent a lot of

14 your money and my money out at Libby, Your Honor, on this issue

15 more than any other group of scientists, and they have rejected

16 Dr. Lee out of hand.

17         Your Honor, what does the air testing tell us?  To

18 answer the Court's fundamental question, which is where the

19 science trial started, if we're going to go out with a notice

20 to the ZAI claimants we certainly have to include at a minimum

21 information that disturbance of ZAI can produce enormous fiber

22 counts.

23         And I'm going to talk about the implications of that

24 for risk, which is one of their favorite subjects, in just a

25 few minutes when we get to Dr. Anderson.

Westbrook - Argument                    86

1        First, Your Honor, I want to talk about one of my

2   favorite subjects, dust.  Your Honor, despite what they say,

3   and with deference to Judge Newsome, settle dust has been the

4   accepted way to assess asbestos contamination in buildings, in

5   the courtroom, outside the courtroom for going on two decades.

6        Out in Libby, Your Honor, the EPA fact sheet, which

7   is Attachment 64 to our motion for summary judgment, told the

8   public this.  "Asbestos fibers in dust are measured using TEM

9   after an indirect preparation step.  The indirect preparation

10  involves dissolving the filter and removing everything but

11  asbestos fibers."  And we're going to talk about the method in

12  just a second, but before that, Your Honor, let me talk about

13  the results.

14       Chart 13, Your Honor, in your notebook are some of

15  the results taken out of our experts' reports for asbestos and

16  settled dust in ZAI homes.  You'll see, Your Honor, in the

17  Salsbury home, for instance, the daughter's bedroom closet

18  cabinet -- it's the closet in the daughter's bedroom -- 37

19  million Tremolite structures per square foot.

20       Up in the Loner home, attic floor near the staircase,

21  195.6 million asbestos structures per square foot.  In the

22  Spencer home, heavy dust from the closet shelf support, 17.3

23  million asbestos structures per square foot.  And on and on,

24  Your Honor.

25       We also did a test, Your Honor, to see if in fact

1 there's some scientific support for Grace's conclusion that

2 after you stir up the ZAI and it releases a lot of asbestos it

3 still has plenty more asbestos to release.  So, we had our

4 experts carefully push the ZAI aside and dig down to the dust,

5 what had settled.  What's the reservoir at the bottom of the

6 ZAI?  And you'll see, Your Honor, in the Silver Spring home

7 when they measured the dust under the vermiculite, 1.8 billion

8 asbestos structures per square foot.

9        Now, again, what do those numbers mean?  What do

10 those raw numbers mean?  Your Honor, we can compare in Chart 14

11 the ZAI dust levels versus other reported asbestos dust levels.

12 On the left side, Your Honor, are dust levels reported in a

13 number of our homes, the Loner home, the Holbrook home

14        The third bar, Your Honor, is significant because

15 that is the average.  From all the dust samples we took in all

16 the homes, that's the average of the settled dust which was on

17 the surfaces.  We excluded from that the dust which was under

18 the vermiculite, 'cause we didn't want to have that 1.8 billion

19 fibers skew these results.  So, we wanted just the surface,

20 came off the surface, attic stairs, surface of floor boards.

21 We didn't use the numbers of what's sitting there in the attic

22 if you dug down a little more.

23        And that's the 92,119 structures per cubic

24 centimeter.  And, Your Honor, we talk about it a lot, and

25 sometimes it's difficult to understand the true meaning of what

1  that is, but if the Court looks on the upper right hand corner

2  of this chart, I had them put a square centimeter black dot on

3  this chart.  And that is the area in which that many Tremolite

4  fibers sit in the attic.

5          Now, moving on past our homes, the Salsbury home is

6  the last ZAI home, Your Honor, comparing to levels that have

7  been reported elsewhere.  The City of Greenville case, Your

8  Honor, there were 9,203, approximately 9,203 structures per

9  square centimeter.  In that case they reported per square foot,

10 but you just reduce it by 930 and that gets you to square

11 centimeters.

12         The EPA Libby action level, the action level at which

13 EPA comes into a home and does special cleaning, Your Honor, is

14 5,000 structures per square centimeter.  What I call the

15 chrysotile elevated cutoff, that is the level, Your Honor, at

16 which there's determined to be an elevated -- if you're in a

17 chrysotile environment -- the dust is getting you, Your Honor.

18         THE COURT:  I guess.  Something is.

19         MR. WESTBROOK:  It's the discussion of dust.

20         THE COURT:  I think it's more like a cold.

21         MR. WESTBROOK:  If you're in a chrysotile environment

22 that would be the level, if you get a number above 1,000

23 structures per cc, that's a level where people start to take

24 notice.

25         And the last number, Your Honor, is perhaps most

Westbrook - Argument                            89

1  significant here and most distinguishes this case from

2  virtually everything that's come before.  And that is

3  unanimously agreed to their experts, our experts, the

4  government, except perhaps in Libby, and we know why in Libby

5  there is no environmental background of Tremolite in dust.  So,

6  when you find Tremolite in the dust in a ZAI environment, you

7  know it has come from the ZAI.

8           There can be no argument, like we debated for years

9  in school cases, that the asbestos blew in, came from the auto

10  brakes.  Those are elevated levels from the ZAI.

11          Your Honor, what have the Courts said?  Mr. Restivo

12  talked about a couple of opinions about settled dust testing.

13  And he quoted to Your Honor the United States Gypsum Company v.

14  Mayor and City Council of Baltimore case very close to the

15  finish of his argument, because that was the case he said where

16  the court said you have to show contamination with substantial,

17  I think, and unreasonable risk of disease.

18          Your Honor, that happened to be a case where the

19  plaintiffs recovered a verdict -- if I get through this without

20  dropping everything at one point I'm going to be very happy.

21          THE COURT:  You can pull the try out underneath the

22  stand.  That might help you.

23          MR. WESTBROOK:  Thank you, Your Honor.

24          Your Honor, United States Gypsum, Mr. Restivo

25  mentioned, went to trial and lo and behold, Your Honor, one of

Westbrook - Argument                        90

1  the issues on appeal was dust testing after a multi-million

2  dollar verdict and a punitive damage verdict.  And what did the

3  court say, the Maryland Court of Appeals say about dust testing

4  and Mr. Hatfield and Mr. Longo in an asbestos and buildings

5  case?

6          Quote -- this is on page 423 to 4 of the opinion,

7  which is Tab 5 of our reference materials, Your Honor.  We now

8  turn to the defendant's argument that the trial court should

9  not have admitted into evidence the testimony of R. Hatfield

10 and W. Longo, our experts, regarding the use of surface dust

11 sampling to determine the level of asbestos contamination

12 inside those city buildings at issue in this case.

13         Defendant contends that the methods by which surface

14 dust is samples and analyzed to establish asbestos

15 concentrations are not generally accepted as reliable within

16 the scientific community and additionally, that the admission

17 of expert testimony on the dust sampling results misled the

18 jury.  We disagree.

19         The Court then described the ASTM method in detail,

20 including that sonication step that Mr. Restivo so dramatically

21 discussed, and concluded, "In examining the record in the

22 instant case, judicial opinions which have considered this

23 question and the available scientific commentary, it becomes

24 clear that dust sampling, through the processes employed here,

25 has achieved general acceptance in the scientific community.

Westbrook - Argument                          91

1  Such evidence has been accepted by numerous courts called upon

2  to consider asbestos property damage claims," citing 14 cases.

3          Likewise, Your Honor, just four years ago the

4  Minnesota Supreme Court had occasion to consider this issue in

5  the <u>Sentinel Management</u> case which is Tab 6, Your Honor, of

6  your reference materials.

7          After a jury verdict finding that the building had

8  been contaminated, speaking about the same experts and the same

9  dust testing in the same environment buildings, quote,

10 "Hatfield testified that he tested dust gathered from five

11 apartments, and four of the samples were positive for asbestos.

12 He also testified that his method for detective asbestos

13 contamination has been used by the Environmental Protection

14 Agency and was published as a method by the American Society

15 for Testing Materials, and that he has been accepted as an

16 expert on asbestos contamination --"

17         THE COURT:  But I think the question is what are they

18 testing?  Are they just testing for the presence of asbestos,

19 or are they testing for the presence of airborne asbestos

20 fibers so that they become respirable?  I mean, I --

21         MR. WESTBROOK:  He was testing for dust sampling just

22 as the dust sampling in this case.

23         THE COURT:  Yes, just to find out whether there is

24 asbestos in the dust, but that's not an issue.  I think

25 everybody's conceding that there are trace elements of

1  Tremolite, at least trace elements of Tremolite, in the ZAI.

2  So, what is the dust testing going to inform me about when

3  people -- when all of you agree that in fact there is some

4  Tremolite in the ZAI?

5         MR. WESTBROOK:  Well, because the ultimate question

6  -- and Your Honor, I think the air testing has already answered

7  what would have to go into the notice to claimants, but the

8  dust testing goes to the ultimate issue, which I think both

9  parties have sort of bled over into, that is whether ZAI states

10 a claim in this bankruptcy, and it's very important that the

11 evidence be in the record that ZAI as building contamination

12 claims -- because remember, the owners are not seeking to

13 recover for their fear of personal injury or medical

14 monitoring.  These folks want help in cleaning up the ZAI.

15        So, it's very important, and both sides have bled

16 into it, that we go beyond, I think, the Court's original

17 question which was what should go in this notice about don't

18 stir the stuff up, into whether there can be a building

19 contamination property damage claim from ZAI, and that's what

20 this goes to.

21        That's what these cases go to, because these cases

22 state the same standard, Your Honor, that you have to have

23 building contamination posing some unreasonable danger or a

24 risk.  And that's what they go into the dust testing about.

25 And that's what they're discussing, and they discuss why dust

1  testing is admissible even though it's not air testing.

2         THE COURT:  But if the purpose of the dust sampling

3  is to show -- I'll use your word -- contamination, what Mr.

4  Restivo calls a release of fibers into the air.  And everybody

5  agrees that ZAI has some fibers in it.  Then I'm not sure how

6  the dust testing informs of anything, because as a matter of

7  proving a claim, as opposed to determining whether ZAI is an

8  unreasonably hazardous product, okay, just to prove a claim,

9  the ZAI -- I'll call them plaintiffs for the moment,  claimants

10 -- would have to show, number one, that they have ZAI in the

11 home, number two, that the asbestos contamination is caused by

12 ZAI as opposed to some other product, which I understand from

13 your point of view may be an easy step, but nonetheless a step

14 that they would have to show, and number three, that they have

15 therefore suffered some damage.

16        Now, the damage perhaps could be that their home is

17 less marketable because no one's going to want to buy it --

18 this is all in theory -- if it has ZAI in it, and ZAI, because

19 it contains some asbestos fibers, could create a problem.  But

20 the problem they're afraid will be created is the fact that

21 they could get sick.

22        And that's really what it boils down to.  The reason

23 that it is of concern as a property damage claim is because it

24 may make their house less marketable to somebody who may, if

25 they purchase it and it isn't removed, gets sick.  So, what

1  does the dust testing inform me about?

2      MR. WESTBROOK:  Well, the dust testing tells you,

3  Your Honor, that you don't just have asbestos in the home, like

4  you might have it in a pipe wrap that's wrapped up somewhere,

5  that you have loose asbestos that's readily released.  And the

6  air testing then picks up and shows when you readily -- when

7  you make any disturbance how readily it can be released.  So,

8  the air testing shows that.

9      But the courts have held that you do not have to have

10 any air testing level whatsoever to prove your asbestos

11 property damage claim.  And in fact, in the Sentinel case, Your

12 Honor, the final sentence, the Court's opinion, "Therefore, it

13 does not follow that testing for airborne fibers is necessary

14 to prove that asbestos contamination in the building

15 constituted a health hazard for the building's tenants.

16     THE COURT:  Well, but see I think that's missing a

17 step.  I mean, I'm not sure that there's a building.  There may

18 be some.  I'm not sure that there's a building that was built

19 in this country, probably, before -- pick a date, the early

20 1980's that doesn't have some form of asbestos in it somewhere.

21 I mean, furnaces have it, pipes have it, ceiling insulation has

22 it.  I mean, how am I getting from the fact that -- and

23 certainly not every person in this country who lived between

24 the 1920's when this form of Tremolite asbestos was apparently

25 -- began to be marketed in Libby, through 1994 when the mine

1  was shut down.  Certainly not every person in this country has

2  died of mesothelioma caused by that Tremolite asbestos.

3        So, it seems to me that there's a huge gap between

4  the theory that Tremolite asbestos creates in all cases this

5  unreasonable risk of harm and whatever evidence you're going to

6  produce to me that, in fact, there have been people somewhere

7  or may be people in the future who will indeed face an

8  unreasonable risk of harm by that exposure, contract some

9  related cancer and die from it, especially since this is now 80

10 years or 90 years past when that Tremolite asbestos started to

11 be mined.  Obviously not when it closed, but started to be

12 mined.

13        MR. WESTBROOK:  Um-hmm.

14        THE COURT:  And so there is a diminishing population

15 of people who are going to get sick.  There will be a

16 diminishing number of homes, buildings, whatever that will have

17 had this Zonolite in place, because it's not being sold and

18 manufactured anymore.  So, where is the evidence going to come

19 from that shows me (a) that this is unreasonable, and (b) that

20 in fact historically there is some evidence upon which to base

21 a finding that it is unreasonable?  'Cause you have to have

22 some historical evidence by now.  It's been 90 years.

23        MR. WESTBROOK:  Your Honor, as to this point and

24 separating the two issues, one, what goes out in the notice,

25 and two, whether there is an asbestos property --

1          THE COURT:  Well, there is no notice if there is no

2    unreasonable risk of harm.  That's what this is -- partly what

3    this is all about, whether or not there should be a notice.

4          MR. WESTBROOK:  And, Your Honor, under the bankruptcy

5    law, as I understand it, and I'm no expert, that a bankruptcy

6    claim follows the tort law of the underlying jurisdictions, and

7    if the tort law permits an asbestos property damage claim in

8    numerous jurisdictions that we cited in our cases to be

9    established by evidence that asbestos has been released from a

10   product and that it can result in elevated levels above

11   background, that that is sufficient to establish an asbestos

12   property damage claim.

13         THE COURT:  If you establish a claim you still need

14   to show me what the damages are, because in this instance,

15   simply having a claim with no damage affiliated with it is

16   irrelevant.  And to show me that -- let me pick a number,

17   'cause I don't know what the number is.  Let's say 500,000

18   homes in the United States have some form of Zonolite

19   insulation it, just for hypothetically.

20         Okay, to show me what the damage is, where the

21   unreasonable risk of harm is for the 500,000 homes that exist.

22   Okay, we know -- I think it's a matter of record in this case,

23   and again, if it isn't I apologize.  I'm pretty sure there was

24   an argument in this case that indicated that homes have turned

25   over at least three times, generally speaking, from the time

1  they're built.  I think that was the argument.

2          And I'm not making findings, but just for purposes of

3  trying to get to what I'm -- the question I'm trying to ask,

4  let me assume that these 500,000 homes have changed owners

5  three times.  So, I now have 1,500,000 groups of people who

6  have lived in this home who have been exposed to the Zonolite

7  that's in my hypothetical population.

8          How many of them got sick?

9          MR. WESTBROOK:  Your Honor, you cannot do such an

10  epidemiological study.  You can't track them that way in the --

11          THE COURT:  Sure, you can.  I mean, you can.  It may

12  not have been done, but of course you can do it.

13          MR. WESTBROOK:  Your Honor, you would have to track

14  millions of people, and there's no entity that has the money or

15  the ability to track millions of people with homes being turned

16  over.

17          THE COURT:  Well, tell me how they're going to

18  produce their claim then.  I mean, if you don't even know who

19  they are, how are you ever going to get notice to them that

20  says you may have a claim.

21          MR. WESTBROOK:  Oh, I thought you meant people who

22  have turned over the homes.  People who don't own the homes no

23  longer have a property damage claim.

24          Obviously people who now own the homes, we can

25  certainly get notices out to those people.

1        THE COURT:  But that's not the issues.  The issue is

2   that in order to show that there's an unreasonable risk of harm

3   something had to have been damaged, someone had to have been

4   damaged.

5        So, you now have 1,500,000 families, in quotes, who

6   owned these hypothetical 500,000 homes.  How many of them have

7   been sick?  I need some evidence that shows me that that

8   population had an unreasonable risk of harm because they had

9   Zonolite in their attics and the rest of the population in the

10  United States didn't.

11       MR. WESTBROOK:  Yes, Your Honor, you can -- first of

12  all, focusing on the building, you can have a property damage

13  contamination claim without somebody being sick in the

14  building.  That's the unanimous --

15       THE COURT:  Of course you can.

16       MR. WESTBROOK:   -- view of the cases.

17       THE COURT:  But where are the damages?  And if we're

18  not going to get to any damages, then there's no need to get

19  into what I think the plaintiffs are asking me for, which is to

20  require the debtor to set up a trust to essentially repair the

21  homes that contain the Zonolite because of the fact that the

22  people living in the home are concerned that they will become

23  sick and/or that there is some evidence that, in fact, they

24  have been sick.  Because just to take the Zonolite out of the

25  attic for the sake of taking it out makes no sense.  If

Westbrook - Argument                          99

1  nobody's going to get sick from it, why do we care whether

2  there's Zonolite in the attic?

3        MR. WESTBROOK:  Well, Your Honor, there is -- and

4  we're going to talk about, when I get to it in the next point

5  or two, the risk assessments as they were done and as

6  corrected.  But there is evidence that when asbestos gets in

7  the air at these levels it increases the risk.

8        And the courts have uniformly held for 20 years that

9  the focus is on the building.  If you show you have asbestos

10 that's been released from the product, has contaminated the

11 building, whether or not you have certain air levels, whether

12 or not you have them, you're entitled to the cost of

13 remediating that building to get the loose asbestos fibers out

14 of the building, because the building owner does not have to

15 live with the building with loose friable asbestos that can be

16 spread throughout the building.

17       That's what the courts have held for -- unanimously

18 for 20 years.

19       THE COURT:  Well, that may be the case as to specific

20 people who are going through a trial, I guess, convincing a

21 jury that there is some unreasonable risk to that entity.  But

22 here we're talking about the entire population of people

23 exposed to Zonolite or homes that contain Zonolite, I think, is

24 more appropriately the way to say it.  And I need to see, not

25 just that there's a risk, but that the risk is unreasonable.

1  And that's -- how are you going to show me that it's

2  unreasonable if you can't tell me who's been sick.

3         MR. WESTBROOK:  Well, the evidence has uniformly

4  shown, Your Honor, that regardless of what home you go into

5  with ZAI, if you do the activities that the homeowners testify

6  are normally done in homes, that you increase the asbestos air

7  levels enormously --

8         THE COURT:  Okay.

9         MR. WESTBROOK:  -- with Tremolite fibers.

10        THE COURT:  But we've already agreed, I think we

11 have, that almost every home in the country has -- built before

12 some period, let's say the early 1980's, has some form of

13 asbestos in it, correct?  And not every person in the country,

14 in fact most of the people in the country have not died from

15 some form of asbestos-related disease, and most of the people

16 in the country have lived in a home at some period in time so

17 -- and gone to a school or a church or been in a hospital,

18 somewhere where there has been asbestos where they have been

19 exposed, not because they're workers in a plant or using

20 asbestos, but simply because it's there and they're exposed to

21 it.

22        MR. WESTBROOK:  Yes.

23        THE COURT:  I mean, everybody's exposed to it.  That

24 doesn't make it an unreasonably safe exposure.

25        MR. WESTBROOK:  Yes, Your Honor, you have to look at

Westbrook - Argument                    101

1  what are the circumstances of the exposure.  And in the ZAI

2  homes, unlike schools where there's chrysotile or most homes

3  that you're talking about now you might find asbestos in the

4  basement in the pipe insulation, usually in good shape intact,

5  sometimes not.  But you're not going to find, if you go down

6  there and start sweeping around in a basement, Your Honor, no

7  one has ever come up with levels anywhere approaching the

8  levels that doing a little disturbance of ZAI produces in an

9  attic.

10       And I'm going to get to the risk, 'cause I know Your

11 Honor wants to hear about the risk, but just since Mr. Restivo

12 was -- went on for awhile about the dust testing method, I

13 wanted to be sure that the Court understood that the ASTM dust

14 testing method was, first of all, unanimously approved by the

15 ASTM committee.  It requires a unanimous vote of the

16 scientists.

17       THE COURT:  But not for the purpose, I think, for

18 which you're offering it.  I mean, the testing standard that's

19 been repeated in the brief specifically says that it doesn't

20 distinguish between types of fibers.  As long as they meet a

21 specific criteria for length and width they're counted, whether

22 or not they're asbestos fibers.

23       MR. WESTBROOK:  I think, Your Honor, that that may be

24 a problem of interpretation.  The ASTM standard counts the

25 asbestos fibers.  The PCM method that Mr. Restivo was talking

1  about --

2          THE COURT:  Okay.

3          MR. WESTBROOK:  -- that's a different method.  That

4  was the earlier light microscope method, and he's correct that

5  that counts fibers.

6          The ASTM method is an electron microscope method

7  which --

8          THE COURT:  Whose phone?

9          MR. WESTBROOK:  I bet they won't claim it now.

10          THE COURT:  I guess they won't, 'cause I'm going to

11  confiscate it, so they'll see me before they claim it.

12          You can just leave it there, sir.  I'll have it

13  tested to make sure there's no bomb in it.

14          MR. WESTBROOK:  So, Your Honor, the ASTM method does

15  count just asbestos fibers.  It's been independently verified

16  by peer review.  And as we lay out in our brief, Your Honor, it

17  has a better analytical sensitivity than the air test method.

18  And I'm not going to go into all the details, because time is

19  short, but these are laid out in our brief.

20          I will you, however, a few excerpts -- put up the

21  ASTM method -- on precision, because there was some discussion

22  about it's not so precise, and I'll have to hand one of these

23  up to Your Honor, and I'll read it to you for right now.

24          The Research Triangle Institute, which is an

25  independent research body which receives government funds to

1  carry out research, under contract to the EPA tested the ASTM

2  method for precision and reproduceability, and a scientist by

3  the name of Owen Crankshaw, not connected with anybody, said

4  this.

5          What he did was, Your Honor, is he put various

6  amounts of asbestos out, used various methods, including this

7  ASTM dust method, to see if as you change the amount of

8  asbestos does the ASTM method track it, so that if you have

9  more asbestos on the surface you're going to get a

10 proportionate increase in the ASTM method report.

11         This is what he said.  "Results from the micro-vacuum

12 structure count samples indicate that the method adequately

13 tracks the concentration of asbestos in the dust and that the

14 variability is quite low.  When the concentration of asbestos

15 was increased ten-fold, as from .1 percent to 1 percent or from

16 1 to 10 percent, the number of structures per area increased

17 proportionately."

18         And, Your Honor, in the Hatfield and Longo expert

19 report, which is Tab 12 of your reference materials, at Page 19

20 to 20 they go through all the precision data and how it's been

21 peer reviewed and tested, that it's determined to be

22 scientifically accurate.

23         Your Honor, the United States Government has looked

24 at the ASTM method, and in its statement filed in this case,

25 statement regarding asbestos analysis issues in W.R. Grace's

1 motion for summary judgment, etcetera, stated as follows:

2 "Accordingly, the United States believes that the ASTM D-5755

3 protocol is a valid method for measuring Libby amphibole

4 asbestos in settle dust, and more generally that the indirect

5 preparation method is a scientifically valid sample preparation

6 technique, particularly when used to measure Libby amphibole

7 asbestos fibers longer than five microns."

8          Now, Mr. Restivo talked about this indirect method

9 and sonication breaking up fibers, Your Honor.  Well, we had a

10 test to determine whether that was correct in the circumstance.

11 If the method was breaking up these amphibole fibers, Your

12 Honor, which is their contention that one fiber can be broken

13 up into a million fibers, then you would expect to see a direct

14 --

15          MR. RESTIVO:  Objection, Your Honor, that was not --

16 my argument was a little ball of dust that they collect, when

17 subject to ultrasound and acid, and then they count does get

18 broken up into a whole bunch of particles and fibers.  I did

19 not say they start with a single fiber that gets cut up into a

20 million different fibers.  Fibers don't do that.

21          THE COURT:  All right.  That's sustained.

22          MR. WESTBROOK:  I accept what he said, Your Honor.

23          Just to follow up on his point before I go much

24 farther.  Dr. Lee has testified that asbestos bundles -- in

25 fact, he co-wrote an article, and it's cited in our briefs --

1 that when asbestos bundles, that is groups of fibers.  They're

2 not all single fibers, Your Honor, they can appear as bundles

3 of fibers.  He co-authored an article that said when those

4 bundles get into the lungs they break up, and they separate,

5 and they do their work, you know, as they separate in the

6 lungs.  But that's an aside.

7          What we did, Your Honor, is we took a look at the

8 indirect method versus the direct method, and the way we did

9 that was we had the results from <u>Barbanti</u>.  The Court heard

10 about the Washington case.  We had air sample results done by

11 the indirect method, out in <u>Barbanti</u>.  That's the sonication,

12 etcetera.

13          And the reason they did the indirect method -- I

14 probably should back up, Your Honor -- the reason they do the

15 indirect method for dust and for very dusty air samples, is

16 because the direct method cannot count them.  That is, when you

17 draw the dust through the filter it gets on the filter.  All

18 the other dust obscures the asbestos fibers, so you cannot see

19 them.

20          So, the indirect method, which is a recognized

21 scientific method, takes everything that's on the fiber,

22 suspends it in solution, then dilutes it, and then you take --

23 they call it an aliquot, take that and put it back on, so that

24 you then can spread out and have more uniform definition.  And

25 then you can count them.  That's the reason it's done, not just

Westbrook - Argument                    106

1 because somebody's trying to create something.

2          So, we had indirect dust testing done in <u>Barbanti</u>.

3 Here in our simulations, Your Honor, we did them all by the

4 direct method.  The way we did that, very difficult, the way we

5 did that was by constantly changing the filters.  I mean, every

6 few minutes they stopped and changed the filter, changed the

7 filter, changed the filter, so they wouldn't get so overloaded

8 that they had to be measured by the indirect method.

9          In <u>Barbanti</u>, Your Honor, disturbing the ZAI, and this

10 is Reliance Document 638, the indirect method in <u>Barbanti</u>

11 produced 7 to about 9.7 structures per cc.

12          Now, the direct --

13          THE COURT:  I'm sorry, is that the briefcase in the

14 back?

15          UNIDENTIFIED SPEAKER:  The briefcase, yes, Your

16 Honor.

17          THE COURT:  Okay, pardon me just a second.  I'm

18 taking a recess, just to get it to remove this bag.

19               (Off-the-record discussion)

20          THE COURT:  I'm sorry, Mr. Westbrook.  Let me tell

21 you where I left off when the phone started to ring again.

22          In the indirect method in <u>Barbanti</u> they produced 7 to

23 9 point structures per cc.

24          MR. WESTBROOK:  7 to 9.7 structures per cc.  That's

25 indirect method.

1          Now, using the direct method here, Your Honor, we

2    should expect to see many, many fewer orders of magnitude fewer

3    fibers in the air, because remember, the indirect method is

4    supposed to break up and make enormously greater counts.

5          But in the direct method, in our simulations, using

6    Grace's method, Your Honor, we had 1 to 8.6 structures per cc.

7    That was the range.  And using the homeowner method, same kind

8    of disturbance, about 12 to 29 structures per cc.

9          So that the direct method, Your Honor, actually

10   produced higher fiber counts than the indirect method.  There's

11   no support for ZAI and Tremolite, Your Honor, that the indirect

12   method is breaking up fibers.

13          In fact, Dr. Corn, in his deposition -- excuse me,

14   Your Honor, in an article that Dr. Corn wrote, which is in our

15   materials as well, Dr. Corn said that he was aware that

16   sonication, what Mr. Restivo talked about, has much less effect

17   on amphiboles than it does on chrysotile.

18          The reason for that is, Your Honor, chrysotile is

19   what they call serpentine.  It's a bundle of curly fibers, has

20   much less adhesive capacity, and chrysotile is much more likely

21   to break up under sonication than Tremolite fibers.  The HEI

22   found that as well, Your Honor.

23          Now, before I leave dust, Your Honor, and get on to

24   risk, where I know Your Honor wants to get, I want to just talk

25   about Armstrong for just a minute.  There are four major

Westbrook - Argument                        108

1  distinctions between this case and <u>Armstrong</u>.

2          First, as the Court pointed out, <u>Armstrong</u> concerned

3  floor tile in a vinyl matrix, and the problem -- perceived

4  problem with the indirect test when you're dealing with a

5  material that has organic binders, is that the acid dilution

6  step dissolves away binders which might be holding those fibers

7  where they could not get into the air.  That's a problem.

8          Second, <u>Armstrong</u> dealt with relatively short

9  chrysotile fibers as opposed to Tremolite fibers.

10          Third, in <u>Armstrong</u>, Your Honor, the claimants were

11  trying to use the settle dust testing to predict how much

12  asbestos could get into the air.  They did not have air

13  sampling that had been done.

14          Here, Your Honor, and you heard a discussion about K

15  factors, Your Honor, we are not using the dust sampling here to

16  relate if you have 60 million structures per square foot on the

17  dust you're going to get 35 fibers per cc.  We don't need that

18  here.  We have tested the air in these buildings, the same

19  buildings where the dust sampling was done.

20          We've got actual air levels.  We don't need what they

21  call the K factor.  But, Your Honor, it's interesting that Mr.

22  Restivo would talk about the K factor and that there's been no

23  relation when in fact, Your Honor, their expert, Dr. Lee, has

24  recently testified that he now believes that K factors can be

25  related to air factors.  Now, that's testimony he gave last

1 month, Your Honor.  I think they have an objection to talking

2 about it, but it's their expert who just testified under oath

3 to it, and I would like to go into it, but I don't want to

4 unless they have a chance to talk about it.

5          MR. RESTIVO:  Your Honor, we would object to that.  I

6 don't know what he's talking about.  Whatever he's talking

7 about we weren't involved.  We haven't -- counsel for the

8 debtor here in this case, we're not involved in it.  It doesn't

9 relate to this case.  We haven't seen the testimony.  Whatever

10 it is, it's outside of the record.  And I don't think he can

11 use it to support his argument.

12          THE COURT:  The deposition wasn't in this case?

13          MR. RESTIVO:  It was not, Your Honor.

14          THE COURT:  And it hasn't been produced.

15          MR. WESTBROOK:  Yes, Your Honor, we gave --

16          MR. RESTIVO:  Last night he gave us a copy of a

17 transcript --

18          THE COURT:  That's not sufficient production, I'm

19 sorry.  It just isn't, Mr. Westbrook.  You know, you've had --

20 this issue has been pending for over a year on my docket.  By

21 now you folks should have absolutely no discovery issue,

22 absolutely none.

23          That's not sufficient.  That objection is sustained.

24          MR. WESTBROOK:  Your Honor, for the record, this was

25 a deposition taken last month in New York that we just learned

1  about very recently.

2              THE COURT:  Well --

3              MR. WESTBROOK:  I understand.

4              THE COURT:  -- so did the debtor, apparently, last

5  night and that's not sufficient.

6              MR. WESTBROOK:  We did, that's correct, Your Honor.

7              So, Your Honor, with respect to K factors in

8  Armstrong and if you read Judge Newsome's opinion, he obviously

9  was concerned about the attempt to use these K factors, and

10 we're not using K factors.  You won't see that in our situation

11 here.

12             Armstrong was just a completely different situation,

13 Your Honor, and of course, I know as the Court knows, that

14 you're not bound by an opinion of a district judge in a multi-

15 judge district.  You're certainly not bound in a different

16 situation with chrysotile in a hard matrix using K factors in a

17 situation here where we have ultra friable asbestos Tremolite

18 in a loose material and we're not using K factors.

19             And when the Court has heard significant information

20 about the admissibility of dust testing in all these actual

21 property damage cases that have been tried -- but now, Your

22 Honor --

23             THE COURT:  I still think the purpose for that

24 admission, Mr. Westbrook, this is where I'm still parting

25 company, I think, with the theory of dust sampling, I think it

1  was admitted for a different purpose than you're attempting to

2  use it here.  And I've tried to ask that question before.  'm

3  still not sure I understand the answer.  So please, before you

4  leave the subject, give me an answer that I can think about for

5  awhile about how the dust sampling is relevant to what I need

6  to be looking at here.  Because it seems to me that in those

7  other cases the issue was is there asbestos, and if there is

8  does dust sampling prove it?  And the answer was yes.  If you

9  sample the dust and there is asbestos in the dust, the dust is

10  obviously in the building, so therefore, there's asbestos in

11  the building.

12          But that isn't the issue facing me.

13          MR. WESTBROOK:  But the issue, Your Honor, in those

14  cases beyond that was an issue of a building owner attempting

15  to recover in tort, because the situation created -- the

16  product was unreasonably dangerous, the same situation we have

17  here.  And that is the dust testing was used to show that

18  asbestos had escaped from the product, had contaminated the

19  building, and therefore, since it had been an escaped asbestos,

20  disturbance could stir it up, would raise levels above

21  background, and when you have levels significantly above

22  background the courts, to my knowledge, uniformly have said

23  that's sufficient to prove that the product is unreasonable

24  dangerous, because unreasonably dangerous also has in it the

25  test, which is either risk utility or consumer expectation.

Westbrook - Argument                                        112

1  That's the underlying theory of recovery.

2          That's why dust testing has come in and why

3  plaintiffs have received in cases without air levels anywhere

4  near these levels, because the courts have said, "You don't

5  need any specified air level."

6          If you were concerned -- if this was a medical

7  monitoring case or I had a cancer phobia case that I might have

8  to show that my risk was significantly elevated above somebody

9  else, and thus I have a legitimate concern about it.

10         The focus here is the building.  If the building is

11 contaminated, what does that mean contaminated?  It means

12 you've got a toxic substance in levels significantly above

13 background which can under certain circumstances pose a

14 potential heath risk.  This material, the air sampling shows,

15 it can pose a potential health risk.

16         And that will get me, Your Honor, to the issue of

17 risk.

18         THE COURT:  But see, that's where I'm still confused,

19 because the potential health risk isn't what I have to

20 determine.  I have to determine that there's an unreasonable

21 risk.

22         MR. WESTBROOK:  Your Honor, I think there we might

23 part because, based on my experience and the cases, no court

24 has said that you have to show that there is a present health

25 risk in the building, if the building has been contaminated

Westbrook - Argument                    113

1 before the building owner can take action.

2           In fact, the Fourth Circuit said very clearly that

3 the building owner does not have to await people dying in the

4 building or choose some other method to address it.  When there

5 is asbestos contamination, the building owner, having proved

6 the contamination, that is, asbestos released from the product,

7 asbestos where it should not be, out in the places where it's

8 out from the product, that's building contamination.  You don't

9 have to show, respectfully, Your Honor, a present health

10 hazard.  You don't have to show a level of asbestos in the air.

11          No Court -- Mr. Restivo can come up here, maybe he

12 has one -- no court in an asbestos property damage case has

13 ever said that, to my knowledge, ever said you have to have

14 asbestos today, tomorrow or next week in the air.  They said,

15 "Show it got out of the product, show it's lying on the

16 building surfaces and show that it can get into the air at

17 levels above background."  If you've done that, you go to the

18 jury.

19          THE COURT:  Okay.

20          MR. WESTBROOK:  Now, Your Honor, getting to risk

21 assessment.  Mr. Restivo talked about their expert, Dr.

22 Anderson.

23          Dr. Anderson's risk assessment, Your Honor, like the

24 black box, coming out is only as good as what goes in.  We took

25 Dr. Anderson's deposition, and Dr. Anderson was quite candid

1  about the deficiencies in what she had been provided.

2         And in fact, Your Honor, she made a number of errors

3  that we're going to talk about in just a second.

4         For instance, her risk assessment was based on data

5  provided to her by Grace from a Versar report, that there were

6  only 940,000 homes with ZAI.  That 1982 report, Your Honor,

7  which is referenced in Tab 19, we have the Anderson report

8  reference in Tab 19, covered only ten years of ZAI

9  installation.

10        ZAI was produced, Your Honor, over 60 years.  So, if

11 you take Dr. Anderson's assumption, that first assumption of

12 940,000 homes, she said that's what she had.  She just didn't

13 have anything else.

14        Her second assumption was that there were 81 million

15 homes in this country.  She based that on some 1993 census

16 data.  We brought to her attention to the fact that there's

17 more recent census data, and she said we should use that.  So,

18 we did use that.  That's our underlying data.

19        Second -- or third now, Your Honor, she made an

20 assumption that one percent of the homes in this country have

21 ZAI.  We asked her, "How did you do that."  'Cause in order to

22 know your risk you have to know the population.

23        She said, "Well, I used that outdated census data,

24 and I used the ten years of ZAI data.  I put 940,000 over 81

25 million, and I got about one percent."  Well, both numbers are

1  wrong.  And we correct that, and I'll show Your Honor that in

2  just a minute.

3          Now, she also had to make certain assumptions or get

4  certain data on how much time contractors would be in attics,

5  what type of work contractors would do, etcetera.

6          We asked her if she consulted any contractors

7  concerning the percentage of time they spent working in attics.

8  She said she didn't.

9          We asked her if she read the contract or depositions

10 in this case to see how much time they said they went in

11 attics.  She said she didn't.

12         She said she simply guessed at the probability of ZAI

13 contact in a ZAI home. She also guessed at the time contractors

14 would do work in ZAI homes.  She said, "Oh, by the way, I

15 called Dr. Corn. I figured he's know.  He's an industrial

16 hygienist."

17         Well, I took Dr. Corn's deposition, and Dr. Corn told

18 me as of two years ago he knew nothing about ZAI.  So, he's a

19 dubious source for how much contractors are going to be

20 impacting ZAI.  In fact, Dr. Corn told me in his deposition

21 that he's a do-it-yourselfer and he doesn't much fool with

22 contractors.

23         Dr. Anderson also had to make some assumptions about

24 what homeowners would be doing in homes and how often.  She

25 didn't consult any homeowners, she didn't read our homeowner

Westbrook - Argument                                116

1  depositions.  Again, she said she guessed at the frequency of

2  homeowner activities.  She guessed at the time homeowners would

3  be doing various things like going up into the attic or putting

4  in a ceiling fan, etcetera.

5           So, Your Honor, we have taken Dr. Anderson's risk

6  assessments, and we've corrected these -- some of these errors,

7  and we discussed these corrections in our brief.  Your Honor,

8  it might be helpful if I handed you one of these --

9           THE COURT:  All right.

10          MR. WESTBROOK:  -- so you can follow along.

11          Would you put that on the screen?

12          Your Honor, what we have -- oh, thank you.  Now we

13  all have one.  Your Honor, what we did is we took Dr.

14  Anderson's formula, her exact formula, her exact numbers, and

15  we made just three corrections.

16          The first column, Your Honor, so you understand the

17  chart is Dr. Anderson's risks as she calculated them.  And

18  you'll see,  Your Honor, even as Dr. Anderson calculated them,

19  with reference to Mr. Restivo saying that the ten to the fourth

20  is the level above which risk becomes unreasonable.  Even she

21  calculated that there were two scenarios, moving aside ZAI with

22  the Grace method and moving aside ZAI with the homeowner

23  method, which exceeded the ten to the fourth.

24          The second column makes a correct, Your Honor.

25  Correction one is we changed the number of ZAI homes from

Westbrook - Argument                              117

1  940,000 to three million, and that's based, Your Honor, on data

2  which indicates -- and estimates that put the number of ZAI

3  homes as high as ten million or more.  So, we simply took three

4  million homes, knowing it's not 940,000, 'cause that's only ten

5  years of sales.  We have another 50 years of sales.

6         So, we took three million.  Again, Your Honor, it's

7  an assumption.

8         MR. RESTIVO:  Mr. Westbrook, I apologize for

9  interrupting.  With respect to this chart, does this chart deal

10 with contractors, or is it dealing with residents in a home?  I

11 just didn't under -- I didn't hear you at the beginning, I'm

12 sorry.

13        MR. WESTBROOK:  This is a contractor chart.

14        MR. RESTIVO:  Okay, thank you.

15        MR. WESTBROOK:  The first correct, Your Honor, we

16 made is we just changed the number of ZAI homes to take account

17 of the sixty years of sale in a very conservative way, instead

18 of ten years, and we changed the number of total homes from 81

19 million to 91 million.  That actually helps Grace because it

20 makes the denominator larger, and we thought that was fair to

21 do.,  If we're going to update the numbers, we'll update the

22 numbers.

23        THE COURT:  Well, yes, but the questions -- I know

24 you need a denominator, but the problem is I think how many

25 homes have ZAI in them, not how many total homes there are.

Westbrook - Argument                    118

1          MR. WESTBROOK:  Well, we do need a denominator, but

2   the homes with ZAI, what we know, it's more than ten years of

3   sale, 'cause Versar says there's 940,000 just running, I think,

4   from 1970-something to 1980-something, ten years there.

5          THE COURT:  Well, I understand that, but when was ZAI

6   no longer produced in homes?  Because I'm not sure how you get

7   -- I don't know the time frames within this 81 million to 91

8   million were produced.  If ZAI wasn't being used in the time

9   frame in which you're updating --

10          MR. WESTBROOK:  But, Your Honor, it helps Grace

11   because if the denominator got --

12          THE COURT:  I understand, but if it's not correct,

13   it's not correct.  I mean, I'm not going to base a decision

14   based on incorrect information.

15          MR. WESTBROOK:  Well, it's just -- it's total homes,

16   because the number of homes, Your Honor, if you want a

17   percentage -- what she was trying to figure is what is the

18   percentage, the probability of contact with ZAI, and for that

19   you have to use the most current number of homes, because as

20   more homes are built your possibility of contacting ZAI --

21          THE COURT:  Goes down.

22          MR. WESTBROOK:  -- would go down.

23          THE COURT:  All right.

24          MR. WESTBROOK:  All right.  So, we just made that

25   correction, and just making that correction, Your Honor,

1 keeping everything else the same, Dr. Anderson's risks

2 increase, as you can see, Your Honor, that now we have three

3 that are above ten to the fourth and still in the ten to the

4 fourth column.  The fourth risk, which Dr. Anderson didn't

5 calculate.  She said she just didn't calculate that number, is

6 four times ten to the third, which is 48 times higher than the

7 EPA ten to the fourth level.

8          So, that's what the second column shows, what I call

9 Correction 1.

10          Correction 2, Your Honor, is we changed Dr.

11 Anderson's assumption, which she said just seemed reasonable to

12 her, and this was her assumption.  She said if there are one

13 percent of homes in the country with ZAI, that it's likely in

14 the north, where insulation was used more, that it would be

15 three times as likely that you'd use insulation than in the

16 south.

17          We asked her how she got that.  She said, "Well, it

18 just seemed like a number to pick, seemed reasonable."  Well,

19 we said, "Well, three sounds reasonable; four might seem

20 reasonably, too."

21          So, we just used four, changed three to four, kept

22 everything else the same in her equation,  Your Honor, and the

23 risk estimates now, you can see that we now go up to -- we have

24 two above ten to the fourth and now two above ten to the third.

25          Then we made the third correction, Your Honor, which

Westbrook - Argument                         120

1  is we changed the probability of ZAI contact.  This was Dr.

2  Anderson's assumption.  She said well, it seemed to her that it

3  would be likely that a contractor coming into a home with ZAI

4  might go hear it ten percent of the time.

5         We asked her if she'd read Grace's expert, Donald Van

6  Cura's deposition.  She said no.  Mr. Van Cura testified, Grace

7  expert at Pages 109 to 110, that roughly 20 percent of his work

8  involves attics and 75 percent of his work involves walls.

9         So, instead of Dr. Anderson's guess at 10 percent, we

10 used the evidence in the record, the Van Cura numbers of 20

11 percent.  So, when you make Correction 3, and Your Honor, at

12 column 3 now has three cumulative corrections, corrects the

13 number of homes, corrects -- changes cold climate from three to

14 four, and uses the Van Cura 20 percent rather than 10 percent.

15 We now have numbers, Your Honor, which all of them are above

16 the EPA unsafe level of concern, and three of them -- two of

17 them are 10 to 20 times higher, and the removal would be 130

18 times higher, the one in the red.

19        That's the risk assessment numbers as reasonably

20 recalculated.  There is something else, Your Honor, which Dr.

21 Anderson did not take note of, but one of Grace's other experts

22 did.  And that's Dr. Corn, their industrial hygienist, when I

23 took his deposition.

24        He testified, as Mr. Restivo said, that he wouldn't

25 be concerned -- he said he wouldn't be concerned about a

1 homeowner going up there with his children and removing ZAI in

2 an entire attic with no respiratory protection.  I will leave

3 that testimony where it is.  But I said, "Well, Dr. Corn, what

4 about a smoker?"

5         He said, 'Oh, oh, wait a minute.  Stop the presses.

6 If you smoke don't go anywhere near it."  Now, what does that

7 mean for the notice to the homeowners?

8         THE COURT:  It means people shouldn't smoke.

9         MR. WESTBROOK:  It sure does, not go near ZAI.

10 Here's what Dr. Corn said.

11         Question on Page 120 of his deposition, after he

12 talked about he wouldn't be concerned about people being in

13 their attics.

14         "How about a person who smokes?  Would your advice be

15 any different to a person who smokes about exposing themselves

16 to asbestos up in the attic?"

17         Answer, "No, I would be different.  For anyone who

18 smokes, I tell them you don't want to be near asbestos.  The

19 best thing you can do with asbestos is stay away from it

20 entirely."

21         Now, that's Dr. Corn who is their expert of 20 years

22 lineage.  In a notice going out to ZAI homeowners, we certainly

23 need to include that don't go in your attic if you smoke.

24         THE COURT:  But you certainly can't make Grace

25 responsible for the fact that somebody else causes another

Westbrook - Argument                    122

1  problem for themselves which increases their risk of asbestos

2  diseases because of some other pre-existing condition.

3          MR. WESTBROOK:  Well, stated the other way around,

4  Your Honor, the smoker, not exposed to asbestos, wouldn't have

5  the same risk.  And now, according to Dr. Corn, he can't use

6  his attic because it has ZAI with asbestos, never knowing when

7  the product was sold, Your Honor, and I have a demonstrative --

8          THE COURT:  Well, the problem with this is I

9  understand the medical opinion.  I think the problem is that we

10 don't have any way of knowing at this stage whether the

11 homeowner in question, any homeowner in question, was a smoker

12 before moving into the house, was a smoker before purchasing

13 ZAI.  You know, the time frames of the risks, I think, may

14 indicate where the appropriate liability or concern may lie.

15 And I'm just not sure that in a vacuum it's appropriate to say

16 that Grace's product creates an unreasonable risk of harm,

17 because nobody else is damaging themselves under Dr. Corn's

18 theory by smoking.

19         MR. WESTBROOK:  Now we're getting into an issue, Your

20 Honor, of the synergism between asbestos and smoking, and in

21 fact --

22         THE COURT:  No, I'm not trying to get to the

23 synergism, I'm only -- well, maybe I am.  I'm only trying to

24 get to the concept of where is the unreasonable product?  Okay.

25         MR. WESTBROOK:  And on that point, Your Honor, and

Westbrook - Argument                                123

1  this is one of the charts that's in your book, Your Honor, as

2  to where is the unreasonable product, we have a product that

3  was sold as absolutely harmless, contains no harmful substance,

4  perfectly safe, clean, dust-free, 100 percent vermiculite, and

5  the first cost when you put it in will be the last.

6          So, a homeowner may be forgiven for smoking, if

7  that's his or her personal choice, but that homeowner made no

8  choice about putting asbestos in their attic.  They didn't know

9  there was asbestos going into their attic.

10         THE COURT:  Well, it depends on when.

11         MR. WESTBROOK:  Your Honor, Dr. Corn didn't know

12  until two years ago that there was asbestos in ZAI.

13         THE COURT:  Well, as I said, it depends on when.  I

14  mean, the exposure issues, I think, are significant issues, but

15  I'm not sure at this point -- I think I'm still confusing the

16  claim that somebody will have to prov with the product, and

17  this issue today is about the product.

18         MR. WESTBROOK:  And, Your Honor, when -- I think it's

19  undisputed that -- correct me if I'm wrong, I know -- that

20  until this product was pulled off the market in 1984 there was

21  never any warning about any asbestos content of the product.

22         I'm just about ready to finish. I want to cover these

23  last two points.  I have touched on these, but I think it's

24  important as to the claim and because of Mr. Restivo's emphasis

25  on them that no state law asbestos property damage trial has

Westbrook - Argument                    124

1  ever required a specific air test level and no doubling dose

2  evidence.

3          That certainly -- that's a PI concept for causation.

4  It has nothing to do with property damage injury.

5          Your Honor, I have -- before I get to my last point,

6  one or two miscellaneous responsive points.

7          Mr. Restivo talked about fiber counting, and when he

8  was up at the board and Your Honor was talking to him about

9  that, the fiber counting rules, he said you don't count

10 anything, I think, less than .3 microns.  As a fiber you

11 wouldn't count that.

12         In fact, Your Honor, the OSHA counting rules, which

13 is Attachment 6 actually to Grace's response, to our motion to

14 exclude Lee, the OSHA counting rules say this:  You count

15 fibers longer -- equal to or longer than 5 microns and with an

16 aspect ratio length to width of 3 to 1 or greater.  Which

17 means, Your Honor, if it's 5 microns long and it's 1.6 roughly

18 microns wide, you count that.

19         Now, what he was talking about is individual fibers

20 themselves may be less than .3 microns, but this Tremolite, as

21 all asbestos, and as all the microscopists know, does not

22 appear simply as single fibers in a product.  It appears as

23 groupings of fibers, what the microscopists call bundles,

24 clusters and matrices, which are just different ways of

25 describing whether the fibers are altogether, whether they're

1 crossing each other.

2          So, you, for instance, can have a fiber which is 20

3 microns long and as long as it's three times as long as it's

4 wide, it's counted.  Dr. Longo testified to this precise point

5 in his deposition.

6          THE COURT:  So, it's an either/or standard.

7          MR. WESTBROOK:  Well, no, you -- it's an absolute

8 standard.  You count greater than 5 microns and it has to --

9 with a length to width ratio.  It has to have both.

10          THE COURT:  It has to have both, okay.

11          MR. WESTBROOK:  Greater than 5 microns and length to

12 width ratio.

13          THE COURT:  All right.

14          MR. WESTBROOK:  Talking about Tremolite at Page 19,

15 Line 20, Dr. Longo said, "Now, you have to be careful, because

16 with Tremolite and a lot of the amphiboles they're electron

17 dense."  So bundles, I would typically say 50 percent of the

18 time mis-identified as fibers, because according to the rules

19 you can't see the parallel sides.  So, what you have in Libby

20 is you have a lot of bundles that are structured or stated as

21 fibers.  So, you have to look at it very carefully.

22          So, on the counting rules -- and in fact, Your Honor,

23 OSHA has an admonition which they have in all capital letters.

24 After saying in Instruction 9, "Count bundles of fibers as one

25 fiber unless individual fibers can be clearly identified, and

1 each individual fiber is clearly not connected to another

2 counted fiber."

3          In caps at the bottom, quote, "When in doubt, count,"

4 unquote.  That's the mantra.  When in doubt, count.

5          Next, Your Honor, I wrote this down, because it is

6 very important, as quickly as I could scribble it.  Your

7 Honor's notes will have the exact language, but Mr. Restivo

8 said OSHA has a PEL of .1 fiber cc that you could be exposed to

9 eight hours a day for 40 years, quote, "without ever increasing

10 risk of disease, let alone the doubling dose."

11          In fact, Your Honor, OSHA itself has stated that that

12 is incorrect.  In Tab 30, Your Honor, of your notebook OSHA has

13 addressed what the risk is at the .1 fiber cc PEL.

14          THE COURT:  I'm sorry, what was the tab?

15          MR. WESTBROOK:  Tab 30, Your Honor.

16          THE COURT:  30, thank you.

17          MR. WESTBROOK:  At Page 35611, quote, "OSHA's risk

18 assessment also showed the persistence of a significant risk at

19 the .1 fiber action level.  The excess cancer risk remaining at

20 that level is a lifetime risk of 3.4 per thousand workers."

21 That would be, Your Honor, 3,400 per million.  "And," OSHA

22 continues, "a 20-year exposure risk of 2.3 per thousand

23 workers.  OSHA concludes, therefore, that continued exposure to

24 asbestos at the TWA," what Mr. Restivo called the PEL, "the TBA

25 permitted level and action level presents residual risks to

Westbrook - Argument                                127

1  employees which are still significant."

2          The OSHA level, Your Honor, and it's recognized

3  generally is not a safe level.  The OSHA level is a

4  bureaucratic trade-off for people who are working, informed

5  they're working with asbestos, given medical testing, given

6  respirators, etcetera.  It is not a safe level by any means.

7          In fact, Your Honor, in this same document, and this

8  is a 1988 OSHA document, OSHA says because of the significant

9  risk at .1 fibers per cc PEL, quote, "Imposing the excursion

10 limit will reduce the risk to employees," and it goes on.

11         The excursion limit, Your Honor, is the 1 fiber per

12 cc measured over thirty minutes level that I talked about on

13 our charts.  OSHA put in that level and said that you cannot

14 exceed that level for thirty minutes, because the PEL that Mr.

15 Restivo was talking about has such a significant risk to it.

16         Finally, Your Honor, number 7, the developing

17 scientific consensus that ZAI is a serious building contaminant

18 and potential hazard that restricts attic use and must be

19 professionally removed before disturbance.  The Court is aware

20 of the testimony about Dr. Corn.

21         Dr. Corn says although he's, on the one hand, not

22 concerned with the homeowner going up there with his kids for

23 the weekend, he agrees, another part in his deposition, that

24 you should get professionals to remove it.

25         EPA says you should get professionals to remove it.

1 The state governments are saying -- and we have it in our

2 materials -- you must get professionals to move it.  The EPA

3 advises, "Don't store boxes in your attic if you're going to

4 disturb the material."  This is simply additional scientific

5 consensus building, Your Honor, borne out by the testing that

6 we have done and Dr. Pinchen has done, which says that this is

7 very, very dangerous stuff.  If you go up in that attic and you

8 disturb it any way -- nobody has found a way, even their people

9 have found no way to disturb ZAI in any way that you don't get

10 Tremolite fibers launched into the air.

11        And for that reason, Your Honor, we believe on the

12 issue of the notice, which started off this science trial, that

13 the notice would have to be carefully crafted to take into

14 account all these factors.

15        And on the issue that we've bled over into, the issue

16 of whether there is an unreasonably dangerous product in the

17 attics, we say that based -- take the air testing, take the

18 risk assessment numbers, as corrected for the numbers, add in

19 the dust testing, add in the nature of the product and mix it

20 all with the fact that you've got Tremolite infinitely more

21 dangerous, according to Dr. Ilgren, their expert, you have as

22 one of the famous asbestos company documents said, not theirs,

23 all the ingredients of a first class hazard.

24        For that reason, Your Honor, we ask that you grant

25 out motion for summary judgment, denies Grace's motion, and

1  that we move on to crafting a notice which will assist in

2  moving this bankruptcy to a conclusion.

3  THE COURT:  Mr. Restivo, how long will you be on --

4  MR. RESTIVO:  Could I have one moment, Your Honor --

5  THE COURT:  Sure.

6  MR. RESTIVO:  -- to answer that question?

7  Your Honor, we know that the science argument was

8  scheduled for today and that you also gave us time tomorrow, I

9  think, up until 12 o'clock or 1 o'clock.  Mr. Westbrook and I

10  and our respective colleagues think we can get the argument

11  done today.  If the Court would like to do that, we think we

12  can do that.

13  I think my remarks in response to this argument will

14  be about ten or fifteen minutes long.  I'd like to do that

15  after the break.  I think Mr. Westbrook thinks his rejoinder to

16  my response will be maybe five or ten minutes long, and then we

17  would move on to other items.  And again, we think we can

18  probably get this done by the end of the day and give the Court

19  back its morning if the Court so desires.

20  THE COURT:  To read?  Okay, why don't we take a

21  recess.  Is an hour enough time?

22  MR. RESTIVO:  Sure.

23  THE COURT:  Okay, we'll reconvene at ten 'til two.

24  MR. RESTIVO:  Thank you, Your Honor.

25  THE COURT:  Thank you.

1            (Luncheon recess)

2            THE COURT:  Good afternoon.  Please be seated.

3            THE COURT:  Mr. Restivo.

4            MR. RESTIVO:  I hope to be brief, Your Honor.

5            Mr. Westbrook, in his remarks, made repeated

6  references to property damage litigation and what has happened

7  over the years in property damage litigation.

8            Fifteen years ago today, Your Honor, Mr. Westbrook

9  and I -- Mr. Cameron, were in the Court of Common Pleas of

10 Allegheny County trying a case known as the <u>Mount Lebanon</u>

11 <u>School Board</u> case -- school buildings case.  We tried that for

12 two months.  It resulted in a defense verdict from the jury.

13           We tried the longest state civil trial in the history

14 of West Virginia, all of the state-owned buildings in West

15 Virginia.  Tried it for over six months, jury came back with a

16 defense verdict.  The Supreme Court of Appeals of West Virginia

17 held that plaintiffs were entitled to a new trial.

18           State of West Virginia then retained Mr. Westbrook.

19 We promptly settled the case.  And Mr. Westbrook and I a few

20 years ago for two months tried a case in New York City where we

21 basically got a split verdict.

22           In asbestos bodily injury -- or asbestos property

23 damage litigation, Your Honor, a lot of cases have been tried.

24 A lot of cases have been won by W.R. Grace.  Some cases have

25 been lost by W.R. Grace.  None of those cases, win or lose,

1 constitute science, and the Court cannot determine the issue

2 before it based upon some jury result or some verdict.

3        Your Honor, I think it's clear, and I'm not going to

4 address it any further.  There is a dispute with respect to

5 contamination.  It's pretty clear that from the plaintiffs'

6 point of view, release of any fibers from any material above

7 background level constitutes contamination and constitutes an

8 unreasonable risk.

9        We think the law is, as I stated on direct, and so

10 clearly the Court will have to wrestle whether a release of a

11 fiber is contamination or whether the release has to be at a

12 level and a frequency and exposure to constitute a risk or

13 doubling of the risk of an asbestos disease.

14        THE COURT:  Well, where does -- I guess the confusion

15 that I have with the doubling the risk is I think Mr.

16 Westbrook's correct, that that standard is a causation standard

17 for personal injury cases.  And I'm not sure how I make -- if I

18 look at this as a continuum, that is that I have to have ZAI in

19 an attic, I have to have some release that creates

20 contamination that also is subject to being exposed to a person

21 who then gets injured, and that injury has to be more likely

22 than not caused by the asbestos exposure that came from ZAI.

23        I mean, if that's the continuum and the ultimate

24 issue is where are the damages?  And the damages are personal

25 injury damages, then maybe that's all part of the factor.  But

1 I think what Mr. Westbrook's saying is this isn't about the

2 personal injury.  This is a question of whether or not there is

3 a way to identify people's homes that contain ZAI, and if so

4 whether the risk is such that the home should be remediated at

5 some point, not necessarily now, in order to eliminate what

6 eventually could be the more likely than not risk of personal

7 injury.

8          MR. RESTIVO:  I think, Your Honor, that I would not

9 disagree with Mr. Westbrook that the doubling the risk does

10 come out of bodily injury cases, asbestos and drug cases.  I

11 concede that.

12          But in order to determine whether or not a particular

13 substance, such as the presence of disturbance of ZAI, creates

14 an unreasonable risk, it is really the same issue.  Can that

15 exposure, the frequency, the duration, the disturbance, what

16 goes in the air, is that an unreasonable risk?  That is, can it

17 cause disease, or to use the Court's language and the judicial

18 language, is it more likely than not that those types of

19 exposures in a person's attic over the person's lifetime is

20 more likely than not to cause disease?

21          And so while it's true doubling the dose comes from

22 personal injury cases, I think it is absolutely the same as

23 attempting to determine whether exposure to a product or a

24 substance, or to ZAI in this case, is more likely than not to

25 result in disease.  And so I think it's the same test, even

1 though I concede the test has been enunciated in bodily injury

2 cases.

3          Otherwise -- well, let me say.  As you know, we have

4 done other tests.  We have compared the findings from an

5 industrial health standpoint.  We have compared the findings

6 from a medical standpoint.  And we have compared the findings

7 from a risk assessment standpoint.  And so doubling the dose is

8 kind of the legal standard, but we've also done it from other

9 scientific methods.

10          And I think we've established, both legally,

11 regulatorily and scientifically that the theory that the

12 release of one fiber can harm someone or that the release of

13 one fiber constitutes contamination, and one needs to take all

14 this material out of people's homes, that simply is not the law

15 and not the science.

16          With respect to -- 'cause there was a reference, Your

17 Honor, by Mr. Westbrook.

18          I think Mr. Westbrook may have said if you see

19 something in the laboratory and it's longer than 5 microns, and

20 if the aspect ratio of length to width is greater than five to

21 one, it therefore --

22          THE COURT:  Three to one, I think.

23          MR. RESTIVO:  -- must be counted as a fiber.

24          THE COURT:  Three to one.

25          MR. RESTIVO:  Three to one.  I'm sorry, Your Honor,

1  three to one.  Therefore, it must be counted as a fiber.

2         Your Honor, that just simply is not accurate.  You

3  have in our white book as Exhibit 7 the OSHA regulation out of

4  29 CFR, and let me quickly read it.  It says, "In this file

5  standard the Occupational Safety and Health Administration

6  amends its present standards for regulating occupational

7  exposure to asbestos."

8         It goes on to say, "Based on the entire rule-making

9  record before it, OSHA has made a determination that

10 substantial evidence is lacking to conclude that non-

11 asbestiform Tremolite presents the same type of magnitude of

12 health effect as asbestos.  Further, substantial evidence does

13 not support a finding that exposed employees would be at a

14 significant risk because non-asbestiform Tremolite was not

15 regulated in the asbestos standard.  OSHA hereby lifts the

16 administrative stay, removes and amends the revised asbestos

17 standards to remove non-asbestiform Tremolite."

18        And so, Your Honor, one might see under a microscope

19 something that is longer than five microns, something that has

20 an aspect ratio of three to one.  If it is non-asbestiform

21 Tremolite it is not regulated by OSHA, it is not counted in the

22 OSHA asbestos permissible exposure limits.

23        THE COURT:  All right, well, how do I determine what

24 is non-asbestiform Tremolite that meets these standards versus

25 what is asbestiform Tremolite that meets these standards?

1          MR. RESTIVO:  That has been done for you, Your Honor.

2   That has been done for you by our expert, Dr. Richard Lee.  It

3   has also been done for you by their expert, Mr. Richard

4   Hatfield.  Both of those experts say that in addition to

5   parallel sides, uniform growth, flat ending versus tapered

6   ending, asbestos fibers have a width less than .3 microns.

7   Asbestos cleavage fragments have a width greater than .3

8   microns.  And so the counting and that work has been done for

9   you, Your Honor.

10          On the other hand, I got curious yesterday myself.

11  The Court would just take a moment and look at number 12 in our

12  white book.

13          THE COURT:  Okay.

14          MR. RESTIVO:  What this is, Your Honor, is this is

15  fiber counts, this is fiber counts from the plaintiffs'

16  laboratories, and this is a report of fiber counts from the

17  plaintiffs' laboratories done by the plaintiffs.  What it shows

18  for each of about 900 fibers found in their -- I'm sorry, what

19  it shows for about 900 particles reported out as fibers in

20  their laboratories are the dimensions of each and every fiber.

21          What I did is where a fiber was reported out which

22  was less than five microns in length and therefore should not

23  be counted, you will see I have highlighted that in yellow.

24  So, if the Court has an interest in how many things did the

25  plaintiffs count that were not countable because they were less

Restivo - Rebuttal Argument                    136

1  than five microns, you have in Exhibit 12 every one of them

2  highlighted in yellow.

3       Next I looked at the fiber width for the remaining

4  fibers, and I highlighted in pink or red all of those remaining

5  fibers that had a fiber width greater than .3.  You'll see,

6  Your Honor, on the first page, the first three had .6, .4, .4.

7  That's highlighted in red.

8       I also, Your Honor, if you go down maybe a third of

9  the page, to the extent a fiber width was one full micron or

10 larger, not only did I highlight that in red, but I ran the red

11 line all the way over.  You'll see that on the red

12 highlightings you have some wider highlightings, and you'll see

13 a fiber there that was 11.4 microns long, 1 fiber wide.  You'll

14 see -- I may have said fiber -- a particle.

15      You'll see a particle that was 16 fibers -- 16

16 microns long, 1 fiber in width.  An excellent one, Your Honor,

17 is on the next page, if I could have you just turn to that.

18      Take a look, Your Honor, at the second entry.  You'll

19 remember Mr. Westbrook said correctly that sometimes what one

20 sees under the microscope are bundles of fibers. In these

21 reports that's indicated by the letter B, and so the first

22 particle reported is a bundle.

23      The second particle reported, Your Honor, is a single

24 fiber.  You will see it is 56 microns long, and it's fiber

25 width is 4 microns wide.  In microscopy, Your Honor, that's

1 like the Rock of Gibralter.  That is a cleavage fragment, not

2 fibers.  And so if the Court wants to do its own analysis of

3 what are cleavage fragments and what are fibers, it is in and

4 color coded, Item 12 in our bench notebook.

5          THE COURT:  Okay.  And is that the basis for the

6 information that you put on the board earlier?

7          MR. RESTIVO:  No, Your Honor.  The 665 fibers counted

8 by Dr. Lee in the plaintiffs' simulations are included in these

9 900-odd fibers.

10          THE COURT:  All right.

11          MR. RESTIVO:  They also included some other fiber

12 counts from some other things they did, and so there's not a

13 perfect match to these numbers, but the whole rationale's the

14 same.  If it was a cleavage fragment over there, it's a

15 cleavage fragment here, and 665 of those are repeats over here.

16          THE COURT:  All right.

17          MR. RESTIVO:  Let me turn to risk, Your Honor, and

18 let me turn to Mr. Westbrook's recalculation of the answers on

19 risk assessment.  That's this document.

20          Significantly, Your Honor, and it's important for the

21 Court to understand, this document concedes that as to

22 homeowners who remove ZAI or do ceiling penetration or do a fan

23 or remove and replace, they are conceding that the risk is well

24 within Dr. Anderson's risk assessment.

25          What this deals with is their objection to Dr.

1 Anderson's risk assessment only as it impacts contractors, who

2 for a living remodel homes.  And so with respect to the

3 residents, I think they've conceded the Anderson risk

4 assessment is correct.

5        With respect to contractors, Your Honor, as I

6 understand it, their primary objection is to the number of

7 homes utilized by Dr. Elizabeth Anderson.  They use an estimate

8 of 3 million homes.  I don't think there's any evidence in the

9 record for that, Your Honor.

10        They question the record evidence of 940,000 homes,

11 but the truth of the matter is, and it's just a matter of

12 common sense, their assumption that any home that was ever

13 built that ever utilized ZAI would today still be in existence

14 or today still have ZAI is simply an unreasonable assumption.

15 Homes turn over, homes get remodeled, homes get destroyed for

16 new track development, and so the assumption they use doesn't

17 make any sense.

18        In any event, if one does not count cleavage

19 fragments, then you do not get any risk, even under their

20 assumptions.  These numbers are counting as asbestos fibers

21 cleavage fragments.  When Dr. Anderson does her assessment she

22 does it both ways.  She counts only fibers as reported to her

23 by Dr. Richard Lee, and then she counts cleavage fragments, and

24 she does not find any risk for anybody, including contractors,

25 in excess of one in 10,000.

1         I think Your Honor, with respect to dust testing, has

2    it right.  We are not attacking the ASTM protocol.  We're not

3    saying it's illegal or improper.  We're simply saying it cannot

4    be used here for the purpose they want to use it.  And in my

5    opening remarks I told you that the ASTM protocol itself says

6    you can't use it to evaluate the safety or the habitability of

7    buildings with ACM.

8         Your Honor, Mr. Westbrook did refer to some asbestos

9    property damage cases.  He did tell the Court what sort of

10   evidence was admitted.  Again, I think when the Court looks at

11   those cases you will find that all of them or almost all of

12   them were pre <u>Daubert</u> cases, and the evidence that may have

13   been admitted pre <u>Daubert</u>, based upon the law we've cited to

14   the Court, including post <u>Daubert</u> cases, would not be

15   admissible today.

16        And then lastly, Your Honor, you asked the question,

17   vermiculite has been mined, you know, for about 70 years.  ZAI

18   has been manufactured and sold for many years.  Where, Mr.

19   Westbrook, is the epidemiological evidence of injury?  What do

20   you have?

21        Mr. Westbrook says that, "Judge, no one has studied

22   this.  We don't have any data.  This is a new problem."

23        We concede, Your Honor, as I did in my opening, that

24   there's no technical epidemiological study.  On the other hand,

25   they have to concede that 6,149 present and former residents of

1  Libby who have lived there at some point throughout this

2  period, some of them for their whole lives throughout this

3  period, were studied to determine whether or not there was any

4  adverse health effects from various exposures to vermiculite or

5  with respect to residents in homes to insulation.  And the

6  results of that study of 6,149 was that they could not find any

7  connection between having or using ZAI in the home and disease.

8  And so while it's not technically an epidemiological study, it

9  is true someone did look for disease, they looked at Libby,

10  they looked at over 6,00 residents, and they didn't find any,

11  Your Honor.

12         Thank you.

13         MR. WESTBROOK:  Your Honor, first maybe we can put to

14  bed, maybe, the counting controversy.

15         And it's simply this, Your Honor.  Mr. Restivo talked

16  about an 11.4 micron-long structure which was 1 micron wide.

17  Dr. Lee does not count that.  He says it's too wide, because

18  it's not less than .3 microns.

19         But as the Court has heard with respect to asbestos

20  and Tremolite in particular, fibers Tremolite, when the

21  microscopist looks at the structure many times what he can

22  resolve is this.  That's what he can resolve.  That's one

23  micron long, let's say.  What is there, Your Honor, in many

24  instances what makes it up are bundles or clusters or matrices.

25  So, you can have a one micron wide structure which is actually

1  made up of a .3, a .3, a .2 or maybe it's made up of 10.1's.

2          OSHA and NYOSH, this is --

3          MR. RESTIVO:  Ed, you have to use -- none of them are

4  any good.  Use the one on the board.

5          MR. WESTBROOK:  This is the only one that will write,

6  okay.

7          MR. RESTIVO:  The one down in the tray will work.

8          MR. WESTBROOK:  Yeah, this is the one I have.  Okay.

9          OSHA says if you're in a fibrous population, this is

10 11.4 long, 1 wide, it's greater than 5 microns, it's greater

11 than a 3 to 1 aspect ratio.  When in doubt, count.

12         Mr. Restivo says, "Oh, yes, but this must be only a

13 single fiber one micron wide, because Dr. Longo reports it as a

14 fiber, not a bundle."

15         Well, Dr. Longo explained that he only put down

16 bundles in his report when you could clearly see that it was a

17 bundle.  And he talked about that for Tremolite fibers that's

18 very difficult to determine.

19         Page 20 of Dr. Longo's deposition.  Question, "In

20 your laboratory when you are reporting on fibers, if you see a

21 bundle, you report it as such."

22         Answer, "If you can see it as a bundle."

23         Question, "If you see a fiber you report it as such?"

24         Answer, "If you can tell that it is a single fiber,

25 yes.  If you can tell that it is a multiple bundle, yes.  It is

1  very easy to do with things like chrysitolite, chrysotile,

2  which are very thin and not as dense. The Libby amphiboles are,

3  on the other hand, very hard to demonstrate that."

4          What he was saying, and he goes on, is that the Libby

5  amphiboles, when you look at them through the electron

6  microscope, you cannot tell in many instances whether this is

7  one micron wide, or as more likely in a fibrous population, ten

8  that are one micron wide, three that are three micron wide.

9  So, he follows what every other microscopist in the country

10 follow, the OSHA rule, when in doubt, count.  The only person

11 who doesn't follow it is Dr. Lee.

12         Enough on counting.

13         THE COURT:  Didn't you tell me earlier, though, that

14 they have to meet both tests?  They have to be less than three

15 microns wide, and they have to be longer than five microns in

16 length.

17         MR. WESTBROOK:  No, less than three microns was Mr.

18 Restivo's statement.  That was what I took issue with.  In

19 fact, Your Honor, as long as it's longer than five microns and

20 a three-to-one aspect ratio, the width is not the controlling,

21 the actual width.  It's the aspect ratio versus the length.  It

22 has to be greater than five microns to be counted by OSHA.

23         THE COURT:  All right.

24         MR. WESTBROOK:  Your Honor, I asked hours ago -- they

25 were coming back up --

1        THE COURT:  Well, excuse me, Mr. Westbrook, before

2   you go on, let me make sure I get this.

3        The bundling that you're talking about, as viewed

4   under the electron microscope, will it impact length as well as

5   width or only width for these Tremolite fibers?

6        MR. WESTBROOK:  Width, Your Honor.  You can usually

7   discern the length.  Primarily it's width.

8        Now, Your Honor, I had asked if they had a case -- if

9   they had a case that either said you had to have a specified

10  air level to recover for property damage, if they had a case

11  that said you had to have doubling dose, if they had any case

12  in the hundreds of cases that we've had, had cases together,

13  any case to bring it to Your Honor's attention.

14       They have not.  Your Honor, they have not, because to

15  my knowledge, and I try to keep abreast of this stuff, it

16  doesn't exist.  The cases have been uniform, Your Honor, that

17  when you're dealing with asbestos property damage you look at

18  the contamination.  And we have cited a bankruptcy, case, Your

19  Honor, the Celotex decision, which is Attachment 5 to our

20  response to Grace's motion for summary judgment.

21       This is a decision, 2003 decision, Your Honor, just

22  last year.  On Page 32 of that decision, Your Honor, the

23  bankruptcy court said, "The issue is whether the presence of

24  initially unfriable but damaged VAT in a building gives rise to

25  a legally viable cause of action.  Stated another way, the

1  issue is whether," this happened to be the claimant, it was New

2  York City, "is whether New York City submitted reasonable

3  evidence of a legally viable cause of action, even though it

4  did not submit evidence specific to the buildings of fiber

5  release in addition to the overall evidence that VAT releases

6  fibers and that the VAT at issue had deteriorated dangerously.

7  The Court finds that New York City's documentation that normal

8  wear and tear can result in the release of fibers from

9  otherwise non-friable VAT, combined with its documentation that

10 floor tiles were damaged in the specific buildings at issue is

11 sufficient to produce an issue to the jury regarding whether

12 New York City asserted a legally viable cause of action and/or

13 compensable injury."

14       "The Court cannot conclude that New York City would

15 not cover under any reasonable view of the evidence.  The

16 property damage claims administrator did not abuse his

17 discretion in concluding that New York City presented

18 reasonable evidence of a legally viable cause of action, and

19 the property damage claims administrators did not abuse his

20 discretion in allowing the claims."  That's in the bankruptcy

21 context.

22       Now, coming out into the litigation context.  In the

23 Commonwealth of Pennsylvania case, Your Honor, which is in your

24 referenced notebook, Your Honor.  It is Tab 39, Your Honor, the

25 Commonwealth Court -- this happened to be, Your Honor, an

Westbrook - Rebuttal Argument                    145

1 analogous case.  This was a PCB case.  And in the year 2002 the

2 Commonwealth of Pennsylvania court cited the case that Mr.

3 Restivo and I had together, the Mount Lebanon School District

4 case.

5          And this was the issues.  Monsanto in that case said

6 that unless the levels which had been established for the PCB's

7 in the building, and I'll read what they said.  "Monsanto first

8 argues plaintiffs failed to present evidence of the magnitude

9 of the alleged increased risk of harm to occupants of the

10 building and failed to present evidence of the extent to which

11 the risk was increased over baseline or background."

12          "Monsanto contends plaintiffs were required to

13 present a statistical or epidemiological analysis of that risk.

14 In support of that argument Monsanto relies primarily on a

15 cite, the Simmons case, a 1996 Pennsylvania case, which they

16 said involved a claim for personal injuries allegedly incurred

17 by the plaintiff as a result of working with products

18 containing asbestos."

19          The Court responded, "Plaintiffs here are not

20 claiming damages in the nature of personal injuries.

21 Plaintiffs' claims involve alleged damages to property," and

22 then they cite Mount Lebanon.

23          In Mount Lebanon the school district sought recovery

24 for the cost of removing asbestos products from a high school.

25 citing the Mount Lebanon court, quote, "The product's defect is

Westbrook - Rebuttal Argument                    146

1 its capacity to expose individuals to a potentially life-

2 threatening safety risk and not in its failure to perform the

3 function for which it was purchased.

4          Mr. Restivo mentioned that case went to trial, and

5 he's correct that was a case that he won.  He failed to mention

6 that we reversed him on appeal.  And then we had the good sense

7 to settle the case.

8          Next, Your Honor, just to give you a flavor of this,

9 in the School District of Independence case, Your Honor, out of

10 the Missouri Court of Appeals, School District of Independence

11 case versus United States Gypsum Company, U.S. Gypsum was the

12 defendant.  The Appellate Court, "USG's fifth point alleges the

13 school district failed to make a submissable case, because

14 there's no evidence in the record that Autocoat," that was

15 their asbestos product, was unreasonably dangerous.  USG argues

16 that the School District's failure to quantify the risk of harm

17 to building occupants is fatal to the school district's case.

18 Without a standard for measuring the degree of risk presented

19 in the schools by Autocoat, claims USG, the jury had no way to

20 evaluate whether any danger posed by Autocoat was

21 unreasonable."

22          The Court went on to say, "Distinguished again a

23 personal injury situation, another case, and says the school

24 district states a claim for present injury to its property.

25 Although the claim of injury through contamination is related

Westbrook - Rebuttal Argument                    147

1  to the increased risk of future harm to building occupants, the

2  school district seeks recovery for present injury to its

3  property and not for future personal injuries."

4          It goes on to say, "The jury did not have to measure

5  the degree of risk against some external standard of risk."

6          One more, Your Honor, the <u>3250 Wilshire Boulevard</u>

7  case which is decided by the Federal Court in the Central

8  District of California, and its cite is 1989 <u>U.S. District</u>

9  <u>Lexus 17 287</u>.  The Court discussing what would make a

10  compensable asbestos property damage claim, quote -- and this

11  is on Page 12 of the report as I have it.

12          "Thus, if it could be shown that the air or other

13  portions of the 3250 Wilshire Building were contaminated beyond

14  normally expected levels by the failure to MK3," that was their

15  product, Monokote, "to lock in asbestos fibers at the site of

16  the original application of the product, the plaintiffs would

17  be entitled to the cost of abatement plus loss of use or the

18  diminution in value of the property, whichever is less."

19          Your Honor, Mr. Restivo mentioned that he and I had

20  tried a case over in New York, and it was a split decision.

21  The jury found that Grace's product was defective, but my owner

22  was comparatively negligent involving some things that he did

23  at construction.

24          In that case, Mr. Restivo will well recall, there

25  were 6,000 air samples done in the building.  None of them were

1  above outside air, except two when they had a collapse of

2  something in the building.  But there were dust tests submitted

3  in that case, and the jury found that there was a claim existed

4  in that situation.

5         Your Honor, with respect to the fiber issue, beyond

6  what I've done on the board there with respect to the cleavage

7  fragments and Dr. Lee's aberrational counting technique, that

8  will be the subject of a motion about Dr. Lee.  I won't get any

9  further into that.  The Court has gotten a taste of Dr. Lee's

10 counting versus some other methods of counting.

11        Mr. Restivo said we've conceded risk, Dr. Anderson

12 and homeowners.  Certainly not, Your Honor.  The errors that

13 infected Dr. Anderson's report about the contractors infected

14 about the homeowners as well, the problem with the number of

15 homes, the problem with the frequency, the guesses that she

16 made.  She had no more evidence as to the homeowners as she did

17 as to the contractors.

18        THE COURT:  But I don't see any -- the problem is I

19 don't see any basis for the changes, either.

20        I mean, they're still guesses.  There's still no

21 evidence that tells me how many homes are still out there with

22 ZAI in them or how many ever existed with ZAI in them in the

23 first place.  And I guess I can accept the fact that there is

24 some census that indicates that there were at one point 81

25 million or now 91 million homes, but I still have no way of

1 knowing whether this ratio is appropriate, because I don't know

2 what the ratio's based on.

3          MR. WESTBROOK:  Well, we certainly know that ten

4 years of sale produced 940,000 homes and the product was sold

5 for sixty years --

6          THE COURT:  Yes, but we don't know how many of those

7 homes are still in existence or how many of them have been

8 abated.  The ZAI that was at one point in time in the attics

9 may not be in the attics anymore.

10          MR. WESTBROOK:  Probably that would be a small

11 number, because homeowners just very recently are learning

12 about that, if Dr. Corn only knew it for the last two years.

13          THE COURT:  Well, yes, but the issue is the probably,

14 because homeowners may have decided to, you know, expand their

15 homes and knock their attics off and build new stories.  And I

16 mean, homeowners do lots of things with home.

17          MR. WESTBROOK:  And you have identified, Your Honor,

18 the problems with risk assessment.  Even Dr. Anderson admits

19 risk assessment is inherently uncertain, and that's one of the

20 reasons the courts say you don't need a risk assessment to

21 recover for asbestos contamination.  Because you're not trying

22 to recover for the increased risk of future harm, that would be

23 a cancer phobia case.  You're recovering, as the cases that

24 I've read and the others that are cited in our brief say,

25 recovering for the present contamination of the property.  If

1  you show that the toxic substance has gotten out of the

2  product, it's now on your property, and if you go further --

3  you don't have to, but if you go further and show that that can

4  get into the air, as we've done in spades, we're not talking

5  about one fiber release here, Your Honor.

6        I heard Mr. Restivo talk about that.  That's not our

7  theory.  There are millions and millions of asbestos fibers

8  that are being released and can be released when you disturb

9  this material.

10       Your Honor, on the point of personal injury, where

11 are the studies?  Your Honor, we asked Grace during this case

12 to produce its information on the instances when it had been

13 sued concerning ZAI in personal injury cases.

14       Grace responded to us, Your Honor, that that was

15 irrelevant to this case.  So, now to come up and say since we

16 haven't produced personal injury deaths and bodies from the

17 homes we should have some detriment, I don't believe that that

18 is playing on a fair field.

19       Interrogatory number 13, Your Honor, which we served

20 probably in 2002, shortly after we got into this.  It was, in

21 the summer of 2002 -- you appointed us in July.  I think the

22 first week I sent these out.

23       Identify all lawsuits brought against Grace alleging

24 asbestos disease from exposure to Grace's expanded vermiculite,

25 including ZAI.

1         Response, "Debtors object to this interrogatory on

2    the grounds that information requested by this interrogatory

3    has no relevance to and cannot lead to the discovery of

4    admissible evidence on the issues to be litigated in the ZAI

5    science trial."

6         They can have it one way or the other, but I don't

7    think they can have it both.

8         Your Honor, about sixty percent of all mesotheliomas

9    never bring a claim.  Sixty percent of people who get

10   mesothelioma don't sue anybody.  Why?  Maybe some people for

11   religious reasons don't sue.  The experts say the reason a lot

12   of people don't sue is when you go to the doctor, he or she

13   diagnoses you with mesothelioma and takes an occupational

14   history.  If the occupational history doesn't point to an

15   occupational exposure there's nobody thought left to sue,

16   nobody you can sue.  People did not look to see where the other

17   mesotheliomas were coming from.

18        People were starting to look, but they just didn't

19   look.

20        Your Honor, also now I want to turn to a point that

21   we left hanging at the early part of my presentation, and that

22   is the video we would like to show Your Honor on the

23   disturbance of ZAI in the attic.

24        This video, Your Honor, was referenced in Mr.

25   Hatfield's report which was produced over a year ago.  It's Tab

1 12 in the court's notebook.  It was the video which was done by

2 Mr. Hatfield's group, and he references the video, Your Honor,

3 and talks a bout the video.  In fact, the video appears right

4 under the pictures that I handed up to Your Honor on Page 13 of

5 Mr. Hatfield's report.

6 　　　　　And he says this, "The fine coating of asbestos dust

7 is illustrated by the following pictures," those are the

8 pictures I handed up.  The next sentence, "The ease with which

9 the material releases dust is evidenced by the simulations

10 involving the scooping of ZAI using the Tindall beam effect."

11 That's the directed light in the videos to show the ease with

12 which it releases fibers.

13 　　　　　Mr. Hatfield at the end of his report says he was

14 relying on the reliance materials attached.  The reliance

15 materials that were attached included as number 644 through 647

16 the videos of these simulations.

17 　　　　　In addition, Your Honor, and I know Mr. Restivo was

18 not in any way misrepresenting anything, but he and I talked

19 about this last week, and I told him that we were going to set

20 up equipment to show the videos, and he never said anything

21 about having any problem with that at that time.

22 　　　　　It's about three or four minutes, Your Honor, and we

23 think it would be important -- the Court has seen pictures --

24 to see what this is in the attic.  It may be as close as a lot

25 of people in the courtroom get to ZAI in their lifetimes.

1          MR. RESTIVO:  Your Honor, might I respond?

2          THE COURT:  Um-hmm.

3          MR. RESTIVO:  First, Mr. Westbrook and I did have a

4    discussion.  I asked him whether or not the video was in the

5    record.  I thought he told me it was in the record.  I checked.

6    It was not in the record.

7          I didn't, at the time, tell him it wasn't in the

8    record.  That was my thinking, but I didn't know that.  We did

9    not object to the Hatfield report.  It is in the record.

10         The pictures Hatfield uses are in the record.  We

11   have similar stuff.  We also took videos, Your Honor.  When he

12   didn't put his video into the record, we didn't see any needs

13   to put our videos in the record.

14         And so our objection is, yes, everyone talked about

15   the simulations, and it's true that Mr. Hatfield talked about a

16   video he took.  That doesn't make the video part of the record

17   anymore than the videos we didn't bring are part of the record,

18   and therefore, I think it's inappropriate for him to show a

19   video that's not part of the record.

20         THE COURT:  Well, I have to agree.  The only way

21   around this may be, Mr. Restivo, is if you want to produce a

22   video that is somehow contradictory.  If you think it's helpful

23   then I'll watch tow videos.

24         MR. RESTIVO:  I think, Your Honor, if he wants to try

25   to submit the video we ought to get our own video, we ought to

1 talk, and if we agree to submit combating videos, we'll submit

2 them subsequently.  If we don't agree, we'll ask the Court for

3 guidance.

4          THE COURT:  Yes, gentlemen, this record has been

5 available to everyone for over a year.  I mean, you submitted

6 these documents, my recollection is, in like September or July

7 or thereabouts of -- maybe not July, September of 2003.

8          So, it's not as if they couldn't be supplemented if,

9 in fact, there is something else that you wanted to produce.

10 So, I think that's kind of an unfair surprise issue, not to

11 mention the fact that I think the pictures are pretty

12 illustrative in any event.

13          MR. WESTBROOK:  Your Honor, on the issue of surprise,

14 just so we're clear, Mr. Hatfield's report was attached to our

15 motion for summary judgment.

16          THE COURT:  Yes, but the video isn't.

17          MR. WESTBROOK:  Well, it couldn't physically be

18 attached.  It's referenced right under the pictures, and we had

19 produced the video to them, and Hatfield's --

20          THE COURT:  But Mr. Westbrook, a lot of the material

21 that experts are used or referenced in a report, they're not

22 attached as exhibits to the report itself or as trial exhibits

23 to be used.

24          I mean --

25          MR. WESTBROOK:  Well, but it says he was relying on

1 that as part of his reliance materials for the report.

2         THE COURT:  Well, this discussion may be getting me

3 to where else I think I need to go anyhow, which is a lot of

4 what you two seem to be arguing or going to argue later today

5 has to do with, I think, credibility of some of your experts.

6 And I'm not sure how on a summary judgment issue, if I've got

7 to assess credibility of experts, I'm going to get this done on

8 summary judgment anyway.

9         So, you know, if he's testifying, that's one thing.

10 At that point in time if he's relying on a video it's probably

11 appropriate to introduce what he's relying on and subject it to

12 cross examination.  But on a motion for summary judgment it

13 seems to me I have his opinion.  No one has challenged the

14 credentials, actually, of any of the witnesses.  The methods

15 have been -- methodology has been challenged but not the

16 credentials of the witnesses.

17         So, I accept the fact that he relied on a video, but

18 I really do think that on a motion for summary judgment that

19 this record has been closed for quite some time and should stay

20 that way at this point.

21         But before you leave today, gentlemen, I want to know

22 how I'm going to do this on summary judgment.

23         So, if you can agree to produce the videos, fine,

24 I'll watch them.  If not, then I'm going to sustain the

25 objection at this stage.

1          MR. WESTBROOK:  Your Honor, finally in an effort, I

2    think, to blunt the near unanimous introduction -- I recognize

3    Judge Newsome did keep it out in the vinyl floor tile case --

4    but the near unanimous introduction of dust testing in the

5    cases, Mr. Restivo says well, they were under the <u>Fry</u> case -- I

6    mean, under the <u>Daubert</u> -- they were under <u>Fry</u>, and <u>Daubert</u>'s

7    come along, but <u>Daubert</u> itself, Your Honor, says that it was

8    intended to free scientific evidence from the rigidity of the

9    <u>Fry</u> test.

10          And they say this.  Supreme Court, 113 <u>Supreme Court</u>

11   at 2794.  "The drafting history makes no mention of <u>Fry</u> and a

12   rigid general acceptance requirement -- that's the <u>Fry</u> test,

13   would be at odds with the liberal thrust of the federal rules

14   in their general approach of relaxing the traditional barriers

15   to court opinion testimony."

16          So, before <u>Daubert</u> and after <u>Daubert</u> in courts

17   throughout the country in cases too numerous to list them all,

18   but we've listed many in our papers, Your Honor, dust testing

19   has been admitted in these cases and has formed the basis of

20   recovery in many of these cases.

21          THE COURT:  Well, if that's the case, does the same

22   thing happen with respect to Dr. Lee's report?  I mean, I have

23   a recent opinion that calls dust testing junk science.  And

24   that's a -- I realizes that's a term of art within the <u>Daubert</u>

25   literary sense, but nonetheless, if that's the standard that

1 I'm to apply, that rigid, generally accepted in the scientific

2 community is no longer the standard, and I think it isn't,

3 doesn't that equally as well apply to Dr. Lee's methodology?

4          MR. WESTBROOK:  Oh, I think, as Mr. Turkewitz will

5 discuss, Dr. Lee's method fails <u>Fry</u>, 'cause it's not generally

6 accepted.  It also fails <u>Daubert</u>.  Not peer reviewed, developed

7 for litigation, not been published, not been accepted by

8 anybody else, only used in litigation, etcetera, etcetera.  But

9 he'll talk about that in some detail, Your Honor.

10          Your Honor, you've been very patient with us.  Thank

11 you.

12          MR. RESTIVO:  Very quickly, Your Honor, none of the

13 cases that Mr. Westbrook referred to cause is any problems.  If

14 you listen to his quotations, the first used the term

15 unacceptable risk.  The second used the term unreasonable risk

16 and we think we can live well within that.

17          The only case which, frankly, does bother me, Your

18 Honor, and I'd ask the Court to look at it very closely, is the

19 <u>Celotex</u> case that he talked about.  That case does not appear

20 to be in line with the other authorities.  As I look at the

21 case, it appears to me, but I would ask the Court to look at it

22 closely, that what you have there is the creation in the

23 <u>Celotex</u> Bankruptcy of a property damage trust.

24          The Court, I believe, makes it clear that the

25 standards for recovery under that property damage trust, as a

1  consensual matter, were agreed by all the parties to be pretty

2  loose, pretty easy.  And so the issue there was whether or not

3  the property damage administrator utilizing those standards was

4  correct to accept the claim of New York City.

5         I think that case can best be explained by

6  appreciating that the test was a property damage trust,

7  consensually relied upon where, at least according to the

8  opinion, whatever standards they had were pretty loose.

9         Thank you, Your Honor.

10        THE COURT:  Well, I thought that <u>Celotex</u> was a

11  consensual property damage trust, and to the extent that there

12  were trust distribution procedures that were at issue and the

13  court was addressing whether or not a claim was properly

14  recognized, I think, as I perhaps earlier today was getting

15  into claims issues, this is not the time to look at claims

16  issues.  This is the time to look at the product and to

17  determine whether or not the product creates a problem.

18        So, that's as far as I think I can go today.

19        MR. RESTIVO:  I agree, Your Honor.

20        MR. WESTBROOK:  Your Honor, just so that there's no

21  confusion in the record, the standard agreed to in <u>Celotex</u> was

22  the claimant had to show that it presented a legally viable

23  cause of action and/or compensable injury under the controlling

24  state law in which it was located.  And that was the standard,

25  that it could get to the jury, basically, Your Honor.

1          THE COURT:  Mr. Restivo?

2          MR. RESTIVO:  I think, Your Honor, that what happens

3  next is a presentation by Mr. Turkewitz with respect to their

4  motion to exclude the opinions of Dr. Richard Lee.  I will then

5  respond to that argument to the extent I need to.

6          I will not, for that argument, repeat anything I've

7  said so far.  Necessarily so far some of what I said had to

8  deal with Dr. Lee, and I will not -- I don't think it's

9  necessary for me to repeat that, so it's in response to Mr.

10  Turkewitz.  As long as it's all in the record, I think it can

11  be used.

12          THE COURT:  All right, that's fine.

13          Mr. Turkewitz?

14          MR. TURKEWITZ:  Good afternoon, Your Honor.

15          THE COURT:  Good afternoon.

16          MR. TURKEWITZ:  Your Honor, for your convenience we

17  have prepared a notebook that has -- also has references so

18  that you don't have to basically search around for the

19  documents.

20          THE COURT:  Okay.

21          MR. TURKEWITZ:  With the Court's permission I'll hand

22  this up to the Court.

23          THE COURT:  When I retire I'm going into the business

24  of selling notebook binders.

25          MR. TURKEWITZ:  And, Your Honor, inside the notebook

1 is -- I've prepared some charts for Your Honor that basically

2 will track my argument and track basically what we believe --

3 why we believe that Dr. Lee's cleavage fragment claims and

4 arguments and opinions should be excluded in this case under

5 Daubert.

6         Under Daubert expert testimony under Rule 702 is

7 admissible if the reasoning or methodology underlying the

8 testimony is scientifically valid, and that reasoning or

9 methodology can properly be applied to the facts in issue.

10         And Dr. Lee's protocol that he has -- that he has

11 come up with does neither of those and should be excluded.

12         Your Honor, I'd like to give the Court a little

13 background.  I think, as the Court had mentioned before, this

14 case is about the product and the science aspects of the

15 product and perhaps we need to know more about the asbestos in

16 this product and the nature of that asbestos, and also the

17 distinction between the asbestos and cleavage fragments in the

18 product.

19         I would refer Your Honor to, as we go along, my

20 outline and the second page of my outline, if the Court wants

21 to basically look on as I go through it.

22         First off, Your Honor, Mr. Westbrook discussed

23 earlier about the different counting rules between -- that the

24 various methods that are recognized for counting asbestos

25 fibers in the air use.

1         And you have the OSHA method, OSHA protocol that

2  basically defines a fiber that is counted as a particle that is

3  five microns or longer with a length to width ratio of three to

4  one or longer.

5         And that three to one ratio, as Mr. Westbrook

6  mentioned, is the aspect ratio.  The iso method which is the

7  method that Dr. Lee used and then changed for this case

8  basically requires the counting of fibers, and they define

9  fiber as an elongated particle which has parallel or step

10  sides.  And it states, "For the purposes of this international

11  standard, a fiber is defined to have an aspect ratio equal to

12  or greater than five to one and a minimum length of .5 microns.

13         And then the AHERA standard, which is again another

14  standard counting protocol that's used by EPA, and that's what

15  our experts used in counting the asbestos during the

16  simulations.

17         And AHERA defines a fiber to be counted as a

18  structure greater than or equal to .5 microns in length with an

19  aspect ratio that's length to width of five to one or greater

20  and having substantially parallel sides.

21         Your Honor, let me talk a little bit about the

22  difference between asbestos fibers and cleavage fragments.

23  Asbestos fibers are long and thin.  And as Mr. Restivo talked

24  about, that's what makes the asbestos fiber fibrous.  It's its

25  length and width.  It is far longer than it is wide.

1          Now, the asbestos that is in this product, in ZAI is

2    extremely friable, and I refer Your Honor to Exhibit 5 or

3    Attachment 5.  Grace has acknowledged the friability of the

4    asbestos in ZAI.  And Grace has stated in a document by Yang

5    who -- Dr. Julie Yang who is their chief chemist.  She has

6    stated that the Tremolite bundles are soft and sometimes waxy

7    in touch, and they break down easily to find fibers when

8    degraded.

9          Now, the fact that the asbestiform Tremolite so

10   easily breaks down into fine respirable fibers and bundles

11   distinguishes this product from other products that Mr. Restivo

12   was talking about earlier, and that are the subject of some of

13   these decisions that the Court has looked at and that have been

14   discussed.

15         Dust testing has been applied and air testing has

16   been done with products that are not individual or fine

17   products -- that are easily separated, but products that are

18   encased in gypsum, at least, according to W.R. Grace and

19   others.

20         This product, Your Honor, does not have anything

21   encasing the fibers, and it is extremely friable and very

22   easily broken up into individual fibers and individual bundles,

23   smaller bundles.  And the photo micrographs that Mr. Westbrook

24   provided to the Court dramatically show this, as the Court had

25   indicated earlier.

1        You see asbestos fibers, individual fibers,

2   individual bundles laying on top of the surface. There's

3   nothing holding it together.

4        Now, what is a cleavage fragment?  And by the way,

5   Your Honor, we do not contest that there are cleavage fragments

6   in ZAI.  There is a non-asbestiform Tremolite that is

7   associated with the Libby ore.  But what we do contest is that

8   what Dr. Lee and what our experts and every other expert who

9   has tested this material has found to be asbestos fibers.  We

10  contest that Dr. Lee's calling it our opinion that they are

11  cleavage fragments.  And as we're going to discuss, Your Honor,

12  the science does not support that.

13       Cleavage fragments are short, blocky, non-fibrous

14  particles broken off of rock.  They're short and fat.  Dr. Lee

15  in his report gave a definition of cleavage fragments, and

16  that's Attachment 6, Your Honor, to your notebook that I

17  submitted.

18       And he stated in his report, "When non-asbestiform

19  cleavage minerals such as amphiboles are crushed fragments are

20  cleaved away from the main crystal mass, a process that

21  produces cleavage fragments.  The massive mineral will tend to

22  fracture along sets of systematic planes within the mineral

23  crystal and some long thin fragments may result; although, the

24  majority of fragments will be short, non-fibrous particles."

25       Your Honor, W.R. Grace internally discussed the

1  difference between the asbestiform Tremolite and cleavage

2  fragments.  In Attachment 7 a Grace official stated, "We felt

3  that Tremolite is basically of two types, one that is

4  relatively rocky and does not fragment or does not show a high

5  degree of friability, and this material we would probably have

6  to separate through a series of roll screenings.  We also

7  notice that some Tremolite is both fibrous and very friable,

8  likely to break down."

9           Your Honor, Dr. Lee actually tested what he found to

10 be cleavage fragments in ZAI, and that's in his report at Page

11 27 and basically he said that he used a mallet and a chisel,

12 and by hitting the cleavage fragments he was unable to break it

13 down into respirable particles.

14          And again, Your Honor, the photo micrographs

15 submitted by Mr. Westbrook show individual fibers and bundles.

16 They don't show pieces of rock.

17          Now, how to distinguish -- Your Honor asked before

18 how do you distinguish between asbestos fibers and cleavage

19 fragments, and OSHA has indeed addressed that.  And OSHA has

20 said, "Look at populations of fibers based on dimensional

21 criteria, i.e., aspect ratio distribution and the width.'  What

22 Dr. Lee is doing and what Grace is doing is basically saying

23 just look at the width.  And as Mr. Westbrook explained

24 earlier, you can't just look at the width when you're looking

25 at what has been counted by other laboratories, because of the

1 character of the Tremolite being electron dense.  You just are

2 not going to see the individual friables using TEM which is a

3 standard method of analyzing these fibers.

4          Dr. Lee's aberrational counting technique looks at

5 individual particles using a protocol that is unpublished, that

6 is not accepted by the scientific community and that was

7 actually rejected by EPA and the United States government.

8          No organization has accepted Dr. Lee's protocol.  It

9 has not been peer reviewed or published.  Now, W.R. Grace

10 submitted a protocol that Dr. Lee had used or that he had

11 submitted in a study of a quarry in New Jersey.  It's called

12 the South Dam Quarry, and Your Honor, it's -- I have included

13 that in your notebook. It's Attachment 8, and the Court will

14 note that that is a document that is labeled draft, privileged

15 and confidential work product.

16          It was put together by Dr. Lee specifically for this

17 litigation and for litigation that was going on relating to

18 issues of whether fibers are cleavage fragments or not or

19 asbestos fibers and was not put together in the ordinary

20 course.

21          If you look at the documents you'll see that the

22 protocol was submitted after other participants had signed off.

23 The QA product plan, and this is what's submitted by W.R. Grace

24 to show that this is a protocol that was -- that's being used.

25 the quality assurance project plan was dated January 24th,

1  2001.  Dr. Lee signed off after that date, February 26, 2001,

2  and the protocol is actually dated in August 2001.

3          So, there is no indication that the other authors,

4  the other individuals involved in that study reviewed it, peer

5  reviewed it, signed off on it.  In fact, they did not really --

6  it was not really an issue as to whether fibers were cleavage

7  fragments or fibers, because under that study they counted

8  everything as a fiber when it came to risk assessment.  There

9  was no incentive for any critical review of Dr. Lee's protocol.

10         And, Your Honor, Dr. Lee has previously  acknowledged

11  before this litigation that cleavage fragments -- the reliable

12  method to distinguish between cleavage fragments and asbestos

13  fibers is by evaluating populations of particles, not

14  individual fibers, which is what Dr. Lee does.

15         What Dr. Lee does is he puts every fiber through an

16  obstacle course.  And it doesn't matter what it is in relation

17  to other fibers.  If it doesn't meet any criteria, it's out.

18         Dr. Lee stated -- now, this is more recent.  This is

19  a article hat he co-wrote entitled, "Asbestiform and non-

20  asbestiform mineral growth habit and the relationship to cancer

21  studies," and that's Attachment 11 in the notebook.

22         He states morphological properties are difficult to

23  apply to single particles when classifying them as cleavage

24  fragment or a fiber.  Distinctions of morphology are most

25  reliably made on population."

1        And when you look at the populations, Your Honor, it

2  is clear that we are looking at asbestiform fibers in the ZAI.

3        The transmission electron microscope method used by

4  Dr. Lee, the iso method, specifically states, precludes

5  individual particle analysis to distinguish cleavage fragments.

6  And this is Attachment 12.  It states actually in the protocol,

7  "This international standard specifies a reference method using

8  transmission electron microscopy for the determination of the

9  concentration of asbestos structures in ambient atmosphere and

10 includes measurements of the lengths, widths and aspect ratios

11 of the asbestos structures."

12        "The method allows determination of the types of

13 asbestos fibers present.  The method cannot discriminate

14 between individual fibers of the asbestos and non-asbestos

15 analogs of the same amphibole mineral.

16        Your Honor, in addition, Dr. Lee's protocol has no --

17 has an unknown rate of error.  There's no known precision to

18 his protocol.  And in the OSHA standard which Mr. Restivo cited

19 earlier, the 1982 OSHA standard, they looked at that.  They

20 looked at whether or not you could look at cleavage fragments

21 and distinguish them from asbestos fibers based on an

22 individual analysis.

23        And they stated, "In summary, the discussion

24 indicates that populations of fibers and populations of

25 cleavage fragments can be distinguished from one another when

1  viewed as a whole.  For example, one could look at the

2  distribution of aspect ratios or even widths for a population

3  of particles as being asbestiform or non-asbestiform.  However,

4  when one looks at individual particles, e.g., particles from

5  air sampling fibers, sometimes these mineralogical distinctions

6  are not clear.  Unfortunately, the data in the record is

7  insufficient at this time to precisely determine how often

8  these situations occur."

9          Nothing has changed since then, Your Honor.  It is

10  still unknown at this time.

11          And, Your Honor, as Mr. Westbrook mentioned earlier,

12  Dr. Lee's cleavage fragment protocol was specifically rejected

13  by the United States government.  In a statement that the

14  government submitted in this case in response to W.R. Grace's

15  claims, the government stated, in sum, "Grace and Dr. Lee

16  contended that EPA, through its contract laboratories, included

17  cleavage fragments in its asbestos counts related to the Libby

18  asbestos site cleanup.  Grace and Dr. Lee now appear to be

19  making precisely the same argument regarding asbestos counts in

20  the analysis of ZAI that claimants' experts have prepared.  As

21  reflected in the responses to this argument excerpted above,

22  United States believes that Dr. Lee's unique protocol for

23  purportedly distinguish between asbestos fibers and cleavage

24  fragments significantly departs from accepted methodologies.

25          That's the United States government, Your Honor.

1  Now, Your Honor, Dr. Lee not only uses his own protocol to

2  analyze and purportedly distinguish between asbestos fibers and

3  cleavage fragments, but he also uses an algorithmic equation to

4  look at other researchers' data and make the distinction as to

5  whether it was a cleavage fragment or an asbestos fiber.  And,

6  Your Honor, that as well as not approved by any organization.

7  It has never been accepted by any organization, including the

8  United States government.

9          I asked Dr. Lee, "Are you aware of any organization

10 that has approved the use of that method using air samples,

11 using data from air samples?"

12         Answer, "No."

13         Question, "You testified earlier that you consulted

14 as an expert for W.R. Grace in this case brought against Grace

15 by EPA and Libby; is that correct?"

16         "Correct."

17         "And you made these same arguments regarding cleavage

18 fragments in that case; did you not?"

19         "Yes."

20         "And EPA rejected those arguments; did they not?"

21         "I think that's a fair characterization.  That's

22 right.  At least the individuals involved in EPA, yes."

23         Your Honor, overall, Dr. Lee's protocol and his

24 manner of evaluating the studies that were done by numerous

25 researchers following accepted methodologies for counting

Turkewitz - Argument                    170

1  fibers should be excluded.  It is unscientific.

2       But not only that, Your Honor, not only is it

3  unscientific, but Dr. Lee's results do not fit in this case,

4  and that is one of the things that Daubert asks the Court to

5  do, look at whether or not it fits.

6       And in Armstrong the Court found that the dust

7  sampling did not fit because all you had was dust sampling.

8  You didn't have any air sampling that would coincide with it to

9  show what the air levels would be.

10      We actually have that here, Your Honor.  In this

11 situation, Dr. Lee's results actually contradict his argument

12 and his protocol.

13      Now, Dr. Lee has -- Your Honor, the manner in which

14 to determine between whether asbestos is fibrous or cleavage

15 fragments again is looking at the population, looking at the

16 aspect ratio and the width.  And Dr. Lee has actually

17 previously acknowledged that aspect ratio is useful in

18 distinguishing asbestiform from non-asbestiform populations.

19 And he states in the same document I read from earlier, and

20 again, that's Attachment 11.

21      He states, "The aspect ratio concept when used with

22 caution can be useful in distinguishing the asbestiform or non-

23 asbestiform nature of a given dust population.  Due to the

24 tendency of asbestiform fiber bundles to separate into thinner

25 and thinner fibers when pressures is applied, i.e., ground, the

1  aspect tends to remain high.  In contrast, because non-

2  asbestiform minerals break or cleave in a more random fashion,

3  few relatively long thin particles are produced.  Non-

4  asbestiform dust populations will therefore generally retain

5  low aspect ratio characteristics."

6          Your Honor, we looked to OSHA to see how do you

7  define a cleavage fragment based on aspect ratio.  And OSHA

8  states that cleavage fragments may be present with aspect

9  ratios less than ten to one.

10         We asked Dr. Ilgren, one of Grace's medical experts,

11  and Dr. Ilgren stated that cleavage fragments are generally

12  less than ten to one aspect ratio.

13         Your Honor, I refer the Court to the chart that I

14  have, that we included as -- in the Longo affidavit in our

15  motion to exclude Lee, and Dr. Longo basically, as Mr. Restivo

16  mentioned earlier and gave the Court a copy, he actually

17  tracked and sized every fiber that was counted, both by MAS and

18  by Dr. Lee's laboratory.

19         And he also determined by doing that what the aspect

20  ratio was, what the average aspect ratio was for both Dr. Lee's

21  lab and for MAS.  And what he found was that the average aspect

22  ratio for the fibers counted by MAS was 24 to 1, and he found

23  that the fibers counted by -- all the fibers, whether cleavage

24  fragments or fibers counted by the R. J. Lee group had an

25  average aspect ratio of 22 to 1.  That's substantially over 10

Turkewitz - Argument                                172

1  to 1.

2          Now, Grace in their response to our motion included a

3  number of studies.  One of the studies that they included was a

4  study performed by Dr. Art Langer.  Dr. Art Langer looked at

5  Tremolite, and he looked at the difference between asbestiform

6  tremolite and non-asbestiform Tremolite.

7          And this actually led to or was part of the

8  controversy that led to OSHA coming out in 1992 withheld

9  distinction between cleavage fragments and asbestiform fibers.

10 They needed to be able to distinguish between it because there

11 are cleavage fragments that can be counted, and that was the

12 situation with play sand.

13         And what Dr. Langer did was he analyzed the play sand

14 and he found that the cleavage fragments in the play sand had

15 an aspect ratio -- this is Tremolite cleavage fragments in play

16 sand -- had an aspect ratio average of 3.7 to 1.  And he

17 contrasted that with the aspect ratio of asbestiform Tremolite,

18 which he stated was 10.9 to 1.

19         The Bureau of Mines has looked at the issue with

20 respect to Tremolite, and the Bureau of Mines found that

21 Tremolite cleavage fragments have an aspect ratio of less than

22 three to one.  On the other hand --

23         THE COURT:  Less than to three to one?

24         MR. TURKEWITZ:  Less than three to one, Your Honor.

25         On the other hand, Tremolite asbestiform fibers have

Turkewitz - Argument                                173

1  aspect ratios at or greater than ten to one.

2          Now, Dr. Longo did an analysis or an evaluation of

3  the fibers that were counted by both MAS and the R.J. Lee

4  group, and he found that 84 percent of the particles counted by

5  the R.J. Lee group had an aspect ratio of greater than ten to

6  one.

7          And MAS had -- 85 percent of the fibers counted by

8  MAS has an aspect ratio greater than ten to one.  What's

9  amazing about this is the consistency that you see.

10          Now, Dr. Lee in his report, he compared the Libby

11  Tremolite to other Tremolites, and he comopared it -- and this

12  is very interesting, because he compared it to a non-

13  asbestiform Tremolite in a mine in Shiness, and in that

14  situation there was an article -- or in Dr. Lee's article he

15  basically states that the aspect ratio at Shiness was around 80

16  percent of the fibers or particles was less than an aspect

17  ratio of ten to one.

18          And he comopared it to Jamestown.  Now, with Shiness,

19  that's never known to have any biological effect.  Jamestown,

20  he states, and I quote, "A fiber population that has been

21  repeatedly shown to be highly potent."  The Jamestown Tremolite

22  asbestos fibers had an aspect ratio 82 percent greater than ten

23  to one.  And as I mentioned before, Your Honor, the Tremolite

24  fibers, when you look at all of the particles counted by MAS

25  and R.J. Lee group, it is exceeding that 82 percent greater

Turkewitz - Argument                    174

1   than ten to one aspect ratio.  When you look at that it is

2   clear that what is being counted is an asbestiform population,

3   and following the method that OSHA recommends, it is an

4   asbestiform population.

5          W.R. Grace also mentions width, and they state that

6   because the fibers are greater than .3 microns it's a cleavage

7   fragment -- in width that is.  Your Honor, again, turning to

8   OSHA, and this is Attachment 20 of your notebook, OSHA

9   basically states that most cleavage fragments of the asbestos

10  minerals are easily distinguishable from asbestos fibers.  This

11  is because true cleavage fragments usually have larger

12  diameters than one micron.

13         Your Honor, if you look at Dr. Longo's affidavit he

14  calculated the percentage of asbestos fibers, the percentage of

15  all particles counted by both the R.J. Lee group and MAS that

16  is less than or -- equal to or less than one micron in

17  diameter.

18         And he found that for the R.J. Lee group data 80

19  percent of the particles is less than or equal to one micron in

20  diameter.  And again, OSHA says if it's over one micron that's

21  an indication of it being a cleavage fragment.  80 percent of

22  the particles was less than one micron.

23         MAS's data, Dr. Lee -- I mean, Dr. Longo, excuse me,

24  found 92 percent of the fibers having a diameter of less than

25  or equal to one micron.

1          Now, Your Honor, in Dr. Longo's affidavit which is,

2    for the record, Attachment 21 in our motion to exclude Dr.

3    Lee's cleavage fragment opinions, he actually listed all of the

4    fibers.  And Mr. Restivo was talking about some of MAS's

5    fibers.

6          And I want to just refer the Court to what you find

7    in Dr. Lee's results.  And there are particles, there are

8    fibers that Dr. Lee calls cleavage fragments that are -- have

9    an aspect ratio of as high as 183 to 1.  And in that situation

10   the 183 to 1 that he calls a cleavage fragment is .30 microns

11   wide.

12         It is almost impossible for an asbestos fiber to get

13   through Dr. Lee's obstacle course.  And this is the case that

14   we see here.  Dr. Lee also refers to fibers as asbestiform that

15   have diameters that exceed one micron in diameter.

16         What we see here, Your Honor, is that his test

17   results just do not fit with what is recognized as the

18   dimensional criteria of a cleavage fragment and an asbestos

19   fiber.

20         But, Your Honor, not only that, the airborne asbestos

21   fibers counted by Dr. Lee as cleavage fragments in W.R. Grace's

22   simulation that they conducted in Albany actually contradict

23   Dr. Lee's bulk analysis of the same material in that home that

24   they tested.

25         And Your Honor, this is in Attachment 17 to our

1  motion, and this is Attachment 21 of your notebook, Your Honor.

2  The chart essentially shows what Dr. Lee found in his actual

3  bulk sample analysis.

4        And what Dr. Lee found was that for particles that

5  were larger in size, greater than 500 microns in size, he found

6  about the same amount of asbestiform and non-asbestiform

7  fibers.

8        And the amount of asbestos in the samples actually

9  were as high as 2.63 percent asbestos.  But what's interesting

10 is that Dr. Lee, in the fine dust, found no non-asbestiform

11 cleavage fragments.  He only found asbestiform fibers in the

12 fine dust, and that's the dust, Your Honor, that is disturbed

13 when work is being done.  The bundles can also be disturbed and

14 be crushed and become airborne, but that is what is immediately

15 getting into the air when it's disturbed.

16       Your Honor, Dr. Lee's results are also contrary to

17 the scientific consensus of everyone who has looked at Libby

18 asbestos, looked at Libby vermiculite.  And, Your Honor, on

19 Attachment 22, EPA's response to comments -- this is in the

20 Libby litigation -- EPA states, "EPA, USGS and several other

21 researchers, including researchers for W.R. Grace have

22 evaluated the nature of the mineral habit of the Libby

23 amphibole asbestos in the Libby vermiculite.  With the

24 exception of Dr. Lee, this researchers have all concluded that

25 the amphibole asbestos population is fibrous in nature.  They

Turkewitz - Argument                    177

1  all also agree that amphibole asbestos in Libby vermiculite is

2  quite friable, giving off airborne fibers when disturbed."

3         Dr. J.C. McDonald, hired by W.R. Grace to conduct an

4  epidemiological study at Libby, which found a very, very high

5  rate of disease states in his article, which is Attachment 24

6  in your notebook, Your Honor, "It is well established that the

7  vermiculite deposit in Libby is contaminated by asbestiform

8  fibers."

9         OSHA in the document that Mr. Restivo cited earlier,

10 the 1992 document on health effects they state, "Mineralogic

11 analysis of the Libby mines ore showed the fibers to be mostly

12 an asbestiform type of fiber."

13        There was a blue ribbon panel convened recently.

14 And, Your Honor, that's on Attachment 27 in your notebook.  The

15 blue ribbon panel of scientists that looked at issues involving

16 asbestos state, "The Libby vermiculite deposits have been

17 reported to be significantly contaminated with asbestiform

18 amphiboles."

19        Your Honor, W.R. Grace has stated on numerous

20 occasions that the material -- that the asbestos is

21 asbestiform, the Tremolite is asbestiform from Libby.

22 Attachment 25, this is an April 24th, 1979 memo.  "Tremolite

23 present in finished products made from Libby vermiculite

24 concentrate is fibrous."

25        In another memo dated May 12th, 1983 -- again, this

1   is before this litigation began, "As I indicated to you on the

2   phone, the Tremolite causing our problem is clearly an

3   asbestiform material which when examined using phase contrast

4   microscopy looks somewhat like classical chrysitolite or a

5   micite.  It is in no way similar to the blocky in theory or

6   stuff which you people persist in passing off as Tremolite."

7          That was a letter that was written by a Grace

8   official in response to the allegations that there's cleavage

9   fragment in Grace's material.  And they were saying it is

10  asbestiform in our Libby -- in Libby, Montana.

11         Your Honor, most recently W.R. Grace stated in its

12  status report to this Court, and this is Attachment 29 in Your

13  Honor's notebook, W.R. Grace represented to this Court, "When

14  mined, however, vermiculite ore in the Libby mine deposit

15  contained a secondary mineral, fibrous asbestiform Tremolite."

16         And finally, Your Honor, Dr. Lee's conclusions that

17  he reached were rejected by EPA.  And EPA's response to this

18  Court -- excuse me, pardon me, in EPA's response to comments on

19  the second supplemental regarding Libby, EPA states, "Dr. Lee's

20  statements about inappropriate counting of cleavage fragments

21  do not have merit.  EPA's counted asbestiform fibers and

22  structures pursuant to the counting criteria of the methods

23  being implemented.  The counting criteria dictate discerning

24  fibers by length, width, aspect ratio and specific physical

25  characteristics.  Following these rules, the EPA laboratories

1 have consistently reported to EPA that the fibers found in air

2 samples collected are populated almost exclusively with Libby

3 amphibole fiber."

4          Now, Your Honor, if Dr. Lee is right that over 90

5 percent of the particles being counted are just broken up rock,

6 cleavage fragments, then either the cleavage fragments of the

7 same dimension of asbestos is just as dangerous, or the

8 remaining smaller percentage of actual fibers are more

9 dangerous.

10          And we asked Dr. William Hughson, Grace's medical

11 expert, that exact thing.  And we asked him, "You don't

12 disagree there is some fibrous Tremolite --" and by the way,

13 Your Honor, this is Attachment 28 in our notebook -- "You don't

14 agree there is some fibrous Tremolite in the Libby

15 vermiculite."

16          "No, I don't.  And in light of the right article it

17 would be hard for me to argue about that."

18          Question, "Do you have any opinions as to the health

19 effects from exposure to cleavage fragments?"

20          "I think that I'm mostly interested in particles that

21 are long, respirable and durable, and I think that if a fiber

22 fits those criteria and there's sufficient exposure, then at

23 least in my mind there's a potential for disease."

24          The United States statement to this Court, Your

25 Honor, in response to opinions by Dr. Lee, the government

1   states, "Grace grossly overstates the evidence that cleavage

2   fragments in and of themselves are benign.  There is

3   considerable evidence in the literature that any difference in

4   toxicology between cleavage fragments and fibers is explained

5   by their native difference and morphology.  That is, that

6   cleavage fragments appear to be less toxic because they tend to

7   be shorter, thicker and possibly less respirable than fibers;

8   however, it is quite possible that individual long, thin

9   cleavage fragments are as toxic as similarly sized fibers."

10         Your Honor, the government also stated that Grace's

11   cleavage fragment argument is logically flawed for the reasons

12   that I mentioned earlier.

13         Your Honor, following the accepted method for

14   identifying populations of particles, amphiboles counted in our

15   simulations and in Grace's simulations and in simulations done

16   by others, including Pinchen Environmental up in Canada,

17   basically show that the asbestos Tremolite -- that the

18   Tremolite from Libby is asbestiform in nature, and all

19   particles that meet the definition of a fiber should be counted

20   as asbestos fibers, and as Mr. Westbrook indicated earlier, it

21   is OSHA's position that if there is a question whether a fiber

22   is asbestos or not, follow the rule when in doubt, count.

23         Your Honor, if you look at Daubert and you look at

24   the factors under Daubert, there are a number of factors that

25   could be broken down, and when you look at all the different

1 factors it is clear that Dr. Lee's protocol is just not

2 scientific and has not been accepted.  It should not be

3 accepted by this Court.

4          Thank you, Your Honor.

5          THE COURT:  Mr. Restivo, how about a ten-minute break

6 and then we'll --

7          MR. RESTIVO:  That would be great, Your Honor.

8          THE COURT:  All right, ten-minute break.

9                         (Recess)

10          MR. RESTIVO:  The Court would be so kind as to turn

11 to turn to Item number 8 in our white notebook of exhibits that

12 come from the record evidence.

13          THE COURT:  Okay.

14          MR. RESTIVO:  Item number 8 is the testimony of their

15 expert, Richard Hatfield, and I want to stress it because while

16 Mr. Turkewitz is attempting to impeach the testimony or the

17 opinions of Dr. Richard Lee with respect to the width of

18 cleavage fragments versus fibers, in fact what he is really

19 doing is impeaching his own expert's testimony.

20          You will see at the deposition of Richard Hatfield I

21 asked him, "And is there normally a standard width or diameter

22 you see in the laboratory for Tremolite asbestos fibers?  And

23 by Tremolite I mean the type involved here in this case, and I

24 don't want to list all the possibilities?"

25          He answered, "You are fine if you just want to use

1 the term Tremolite or may have fallen back to Libby amphiboles

2 or whatever, but I think you will probably find that single

3 fibers of asbestos amphiboles are going to be in the

4 neighborhood of .1 microns.  I could probably look over some of

5 the data and see.  They can be larger than that, certainly.

6 They can probably be smaller than that, too.  But --"

7          And I interrupt him, I said, "And I am assuming,

8 given the generality of my question, when you say .1, you mean

9 .1, .2, kind of in that range."

10          And he says, "There you go."

11          So, that Mr. Hatfield, as well as Dr. Lee, with

12 respect to the width of Libby Tremolite fibers are in agreement

13 that if you see a particle with a width greater than .3 microns

14 it is probably a cleavage fragment and it is probably not an

15 asbestos fiber.

16          I'll talk about what Dr. Lee actually saw in a

17 moment, Your Honor.  I would note, referring back to our

18 exhibit which takes all of the findings out of their laboratory

19 as they report them, when you look at that, and I've put three

20 on the board so we didn't have to dive into the exhibit.

21 You'll see a number of things, Your Honor, that they report out

22 as individual fibers.

23          You will see in these three examples, or just

24 examples, 9 microns long, 1.6 microns wide or an aspect ratio,

25 and it's -- they did the math on the aspect ratio, 6.1.  If Mr.

1  Turkewitz is arguing that cleavage fragments are short and

2  bulky and have an aspect ratio of less than ten to one, how do

3  their experts call something which is 9 long, 1-6 wide, and an

4  aspect ratio of six to one, a respirable asbestos fiber?  It's

5  a cleavage fragment even under their argument.

6        The other two examples, Your Honor, are just further

7  examples, 8 long, 1 wide, aspect ratio 8 to 1.  12 long, 2

8  wide, aspect ratio of 6 to 1.  Under Mr. Turkewitz's argument

9  he would concede those are cleavage fragments if you don't know

10 anything else about them.  Their experts counted them as

11 respirable fibers.  And so, not only does Mr. Turkewitz's

12 argument impeach Mr. Hatfield, it also impeaches the reports of

13 their experts where they call what Mr. Turkewitz recognizes as

14 cleavage fragments, asbestos fibers.

15        Before turning to Dr. Lee, let me turn to the U.S.

16 government.  The U.S. government did disagree with Dr. Lee.

17 U.S. government disagreed with Dr. Lee in the context of

18 litigation involving the Libby clean-up action.

19        The EPA basically says if it meets the counting

20 criteria, count it as a fiber.  This is a science trial.  If

21 something is not a fiber, it should not be considered as such.

22 And most importantly, with respect, Your Honor, to the issue

23 your are going to wrestle with, whether or not ZAI presents an

24 unreasonable danger, the United States advised this Court it

25 takes no position on that issue.

1        There's kind of a suggestion, I think, in their

2   argument, and I'm surprised by it, that cleavage fragments may

3   be dangerous.  There is no evidence in the record to that

4   effect, Your Honor.  The only expert testimony on that is on

5   our side.  Dr. Ed Ilgren filed a report, was deposed, in which

6   he, agreeing with the OSHA and other scientific evidence,

7   spells out that cleavage fragments are not toxic and they don't

8   cause disease.

9        The best plaintiffs can do is they refer you to an

10  ambiguous answer by our expert, Dr. Hughson.  The question is,

11  "Do you have any opinions as to the health effects from

12  exposure to cleavage fragments?"

13       His answer is, "I think I'm mostly interested in

14  particles that are long, respirable and durable, and I think

15  that if a fiber meets those criteria and there's sufficient

16  exposure, then at least in my mind there's a potential for

17  disease."

18       I don't think that answer substitutes for their

19  failure to have any expert testimony on their side to counter

20  Dr. Ilgren.

21       Your Honor, much of what Mr. Turkewitz reported to

22  you in these various exhibits, we agree that the documents say

23  what the documents say, but when you look at what they're

24  talking about you will see that in almost all of the cases, not

25  all of them, but almost all, what they are talking about is

1 Libby ore and Libby ore in the ground.  And so, the OSHA health

2 effects talks about mine ore showed the asbestos to be mostly

3 an asbestiform type of fiber.

4        You'll see that the other quotes, again, deal

5 primarily with what is in the ground.  Obviously we are dealing

6 with the end product, we're dealing with the product after

7 milling, after expansion and what is in ZAI, and as Dr. Lee

8 says in his affidavit, references to what might be in the

9 ground in terms of raw ore doesn't answer the question what

10 does one see scientifically in ZAI.

11        The reference to Grace's bankruptcy court filing on

12 June 21, 2004 is in the same category, Your Honor.  They've

13 quoted it correctly.  "When mined, however, vermiculite ore in

14 the Libby mine deposit contained a secondary mineral fibrous

15 asbestiform Tremolite."  Looking at the mine simply does not

16 assist the Court in determining whether ZAI in this case poses

17 an unreasonable risk.

18        Let me turn quickly to Dr. Lee.  With respect, Your

19 Honor, to the simulations done by Grace's experts in the

20 laboratory analytical results, those results were analyzed by

21 R.J. Lee's laboratory.  They had the actual material drawn

22 through the filters.  They could look at the actual particles

23 under TEM and under other magnifications.

24        And so Dr. Lee has looked at every single particle

25 that was done in the Grace simulations.  He has taken

1 pictographs of every single one of those, and some of those

2 pictographs are in the record.  It may be that when Mr.

3 Westbrook and I talk about whether he can supplement the record

4 with his video I may want to supplement the record with those

5 pictographs of what Dr. Lee saw.

6        And those pictographs show everything I talked about

7 before, non-parallel lines, rough edges, funny aspect ratios.

8 And so, with respect to what Dr. Lee saw in his laboratory, the

9 Court needs to understand that while size and width and aspect

10 ratio was taken into account, Dr. Lee actually looked at the

11 particles, and using the other criteria, is it rough, is it

12 bulky, how does it end is there curvature, could determine what

13 he was looking at.

14        He did not look at, 'cause he didn't have, the actual

15 particles found in the plaintiffs' simulations.  The only thing

16 he had to look at there were the lab reports, such as the one

17 you and I looked at that I highlighted in yellow and pink which

18 reported out what they found on each particle.

19        And so with respect to what they found, he as dealing

20 primarily with size, meaning length, width and aspect ratios.

21 As it turns out, as he spells out in his affidavit, what he saw

22 from their reported laboratory findings, was consistent with

23 what he found actually looking at each and every fiber.

24        With respect to the methodology he used, I really,

25 Your Honor, can't do much better than the affidavit he provided

1    to the Court.  I'm not going to read it, but I'll try to

2    summarize it as best I can in layman's language for myself.

3         With respect to the air samples, he followed, without

4    modification, NYOSH 7400 and NYOSH 7402.  With respect to

5    counting he performed single particle deferential counting,

6    which is permitted and authorized by OSHA.  That's set forth in

7    his affidavit.  He sets forth, and we've seen it already, Your

8    Honor, the OSHA finding in 1992 that non-asbestos -- that non-

9    asbestiform cleavage fragments are not regulated and shouldn't

10   be counted, and he refers to that in Paragraph 24 of his

11   affidavit.

12        He spells out in Paragraph 25, Your Honor, that OSHA

13   expressly acknowledges and allows the use of differential

14   counting.  He provides as exhibits to his affidavit, Your

15   Honor, OSHA publications to that effect, Exhibit 6 and Exhibit

16   7 to his affidavit.

17        I'm not suggesting, Your Honor, that I fully grasp

18   what Exhibit 6 and what Exhibit 7 are saying, but it's clear

19   that it authorizes and it supports and it peer reviews exactly

20   what Mr. Lee did, that's what he -- Dr. Lee did, that's what he

21   followed.

22        He looked at the physical characteristics of

23   asbestos, the way all scientists do and the way the scientists

24   have written you should do.  And he attaches to his report, so

25   that the Court and the parties can see it, the Langer article,

1  the Brown article, and to suggest that Dr. Lee in the dark of

2  night came up with some procedure no one's ever heard about, if

3  one works one's way through the exhibits to his sworn

4  affidavit, one will see that the science he followed has been

5  adopted in the literature and has been peer reviewed.

6       Now, one thing he did which has caused the claimants

7  some concern is he did create a flow chart.  The flow chart

8  simply puts down on a piece of paper what all these steps

9  science says to follow so that one can follow what he did.  And

10 he annotated the flow chart with the scientific reference that

11 says, "You do this step, you do that step."  The flow chart

12 itself, again, simply takes his steps and plots them out so a

13 reader can determine what he did and what science he was

14 following.

15      The method he used, this is in Paragraph 31 of his

16 affidavit, and even the flow chart that he used had been

17 reviewed in the past by the Environmental Protection Agency,

18 Region 2.  Not only had it been reviewed, it was approved for

19 use in the South Down project which Dr. Lee was retained to

20 perform for the EPA, and this was an EPA-funded study of

21 possible Tremolite fiber exposure resulting from quarry

22 operations in the South Down quarry.

23      So, not only was the method approved, so was the flow

24 chart.

25      He goes on in his affidavit, Your Honor, to describe

1  the steps he went through.  I will not attempt to reiterate or

2  bore the Court with each step.  Suffice it to say with respect

3  to every step he carried out in the laboratory he has attached

4  as an exhibit the scientific writing, peer review protocol

5  which authorizes that step.  And so that would be, for example,

6  Exhibit 14, Exhibit 15, Exhibit 16.

7          All of these exhibits, Your Honor, are pretty heavy

8  reading for someone like myself who could not pass organic

9  chemistry, but one can tell that those steps have been

10  accepted, authorized, peer reviewed, in the literature.

11          And so if one is going to determine whether or not

12  the arguments made by Mr. Turkewitz, that no one does this, no

13  one has ever heard of this, we don't know where this came from,

14  one simply has to turn to the sworn affidavit of Dr. Richard

15  Lee and the attachments to that affidavit.  And I think from

16  that document this Court can determine whether or not the

17  procedures utilized by Dr. Lee are scientifically accepted and

18  have been peer reviewed.

19          That's all I really want to say about Dr. Lee, Your

20  Honor.

21          THE COURT:  All right.  Mr. Turkewitz?

22          MR. TURKEWITZ:  Yes, Your Honor.

23          Your Honor, if you look at Mr. Restivo's writing on

24  the board we are not impeaching our expert witness, Dr.

25  Hatfield, Mr. Hatfield, but you heard the testimony of Dr.

1  Longo where he explained exactly what the situation is when

2  these electron dense fibers are counted, and what you would see

3  here where you have a length of 9 microns and a width of 1.8

4  microns, you would have eight fibers in there, but because of

5  the limitations of the microscope and because of the electron

6  denseness of the Tremolite bundles you would not see the

7  individual fibers in there.

8       And what Grace has done and what Dr. Lee has done is

9  they have taken that, and they have tried to use that to say

10 that from now on anything that is greater than .3 microns has

11 to be a cleavage fragment.

12      And, Your Honor, everyone who has looked at cleavage

13 fragments and Tremolite, asbestiform and non-asbestiform

14 Tremolite, in the published literature has found that non-

15 asbestiform Tremolite has a low aspect ratio.  They are short

16 and fat, approximately three to one.  And what we found here,

17 and this is for Dr. Lee's cleavage fragments, what he

18 identifies as cleavage fragments, the aspect ratio, average

19 aspect ratio for Dr. Lee's cleavage fragments is 22 to 1, and

20 that's in Dr. Longo's affidavit.

21      Mr. Restivo talked about the statements that have

22 been made by just about every scientific organization who's

23 looked at Libby -- in fact every scientific organization who's

24 looked at Libby has found that it is asbestiform in nature.

25 And Mr. Restivo said, well, we're looking at the finished

Turkewitz - Rebuttal Argument                191

1  product here; we're not looking at the ore in Libby.

2          But, Your Honor, Dr. Lee, when he looked at Libby,

3  that's what he was dealing with.  He was dealing with Libby.

4  He was saying the same thing, and EPA rejected it.

5          THE COURT:  Well, wait, I thought that the documents

6  from both sides explained that the Tremolite that is in ZAI has

7  both asbestiform and non-asbestiform particles.

8          MR. TURKEWITZ:  It does, Your Honor.

9          THE COURT:  Okay.

10          MR. TURKEWITZ:  We don't contest that.  I said that

11  from the start.  But there is a drastic distinction between the

12  non-asbestiform and the asbestiform.  The non-asbestiform which

13  Dr. Lee is saying is -- the cleavage fragments which Dr. Lee is

14  saying -- the asbestos that Dr. Lee is saying is cleavage

15  fragments are short -- are long and thin, excuse me, with a

16  very high aspect ratio.

17          And under any definition, looking at OSHA's way of

18  looking and assessing the difference it would be an asbestos

19  fiber.  And Dr. Lee is the only one who finds that it is a

20  cleavage fragment.

21          Your Honor, we're looking at asbestos fibers and

22  bundles that are extremely friable and that are fibrous.  They

23  want to say that the cleavage fragments which are rock is what

24  we're looking at, and Your Honor, it just is not -- it's not

25  the real world, and everyone who has looked at this in the

1  scientific community has disagreed.  And EPA has come out very

2  strongly and stated that Dr. Lee's protocol is not

3  scientifically valid.

4          And, Your Honor, when Mr. Restivo got up I thought he

5  was going to say that maybe an organization, scientific

6  organization has accepted Dr. Lee's protocol, or that other

7  laboratories use Dr. Lee's protocol, but he did not say that.

8  No organization uses Dr. Lee's protocol, no scientific or

9  governmental agency has accepted Dr. Lee's protocol.

10         THE COURT:  When was this protocol developed?

11         MR. TURKEWITZ:  Your Honor, Dr. Lee testified that it

12  was developed recently, and I'm not sure exactly when it was,

13  but it was developed recently.  And we believe it was at around

14  the time that the Libby litigation began.

15         THE COURT:  Which is when?

16         MR. TURKEWITZ:  In the year 2000, 2001.  And his

17  protocol is dated August -- his protocol which, by the way,

18  states that it's privileged, confidential attorney work product

19  was dated August, 2001.

20         THE COURT:  Well, I guess the question is whether

21  anybody's attempted to duplicate what he's done.

22         MR. TURKEWITZ:  Your Honor, we're not aware of anyone

23  even using his protocol.

24         THE COURT:  Well, I understand.  You know, I'm not

25  exactly sure why it's not published, if in fact it's supposed

1  to be a scientifically valid assessment.  Certainly it would

2  seem that these days it might be a wise thing to publish, but

3  since it isn't published maybe it can't be peer reviewed in

4  that sense.  To the extent that Dr. Lee is picking up pieces of

5  things that have been otherwise peer reviewed and putting them

6  together into a new scientific pattern, I'm not sure <u>Daubert</u>

7  prohibits that.  But since it's 2001 and this is 2004, and

8  that's three years later, I'm not at all clear why it's not

9  published and it's not also attempted to be duplicated by

10  anybody, 'cause there isn't any evidence in this record that

11  tells me that anybody's tried to duplicate it.

12       Everybody says, "Well, no one else has used it."  And

13  I guess that's so, but who tried?

14       MR. TURKEWITZ:  Well, Your Honor, not only has --

15  we're not aware of anyone who uses it, but it's actually been

16  rejected.

17       THE COURT:  Well, it was rejected in the context of

18  litigation by an opponent.  Frankly, that doesn't -- I'm not

19  too troubled by that.

20       MR. TURKEWITZ:  Well, Your Honor, results of the

21  manner in which he's gone about it, and that's doing the

22  discriminate counting of looking at every single fiber.  They

23  call it a flow chart, and what it really is, is an obstacle

24  course.  And that's not how OSHA has set up the analysis of

25  asbestos that's done by all laboratories.

1          THE COURT:  Well, I understand, but you know, the

2    fact is that science and, you know, lenses and light particles

3    and things change exponentially as years go by, and so what may

4    not have been capable of having been produced two years or four

5    years or five years ago may very well be capable of being

6    produced or duplicated now.

7          There's nothing in the record that tells me that one

8    way or the other, so I'm not making any suppositions about it,

9    but it seems to me that after three years it's odd that this

10   has not been published, if it's something that Dr. Lee intends

11   to keep using for some purpose, and that no one has attempted

12   to duplicate it.  And that -- the fact that no one has

13   attempted to duplicate it, I think, is a fair inference from

14   the record, 'cause there is no evidence that anybody's tried

15   to.

16         I agree that no one, from what I have seen so far, no

17   one in your view has in quotes, "accepted it," but no one's

18   tried from what I can tell.  So, I don't know whether in that

19   sense it's peer reviewed or not.  Maybe they choose not to,

20   'cause they agree with it.

21         MR. TURKEWITZ:  Well, and, Your Honor, under <u>Daubert</u>

22   that would be indicating -- that would go against the

23   introduction of Dr. Lee's opinions.

24         THE COURT:  Well, not if each independent piece is a

25   valid scientifically reviewed step and put together in a new

1 process.  I don't think it would be excluded under <u>Daubert</u>.

2 The weight to be accorded to it may be something, but I'm not

3 sure that the methodology in and of itself, when you can

4 support each step with something that someone else has done in

5 the past, would exclude the evidence.

6          MR. TURKEWITZ:  And when you look at a protocol like

7 Dr. Lee's and you see that it also contradicts the facts in the

8 case, in other words the fitness.  It does not fit.  That by

9 itself, Your Honor, is reason to question the scientific

10 validity of this protocol.  And that is why, Your Honor, no one

11 uses it, because it does not fit.

12          THE COURT:  Well, okay, I know that's the argument,

13 but I don't have any evidence that no one's using it because it

14 doesn't fit.  I don't have any evidence about why no one's

15 using it.  I think a fair inference is no one's attempted to

16 use it 'cause it's not published.  It's pretty hard to peer

17 review something that isn't published.  And I'm concerned about

18 why it's not published.  If it's valid, I'd think you'd want to

19 publish it.

20          So, if it's not then, you know, good way to bury it

21 is not to publish it.  But in terms of the peer review, I don't

22 know how you go about peer reviewing it until it's published.

23          Okay.  Mr. Restivo, why isn't this published?  If

24 this is such a valid process that's been out there for three

25 years now, why hasn't Dr. Lee published it and subjected it to

1  some peer review?

2          MR. RESTIVO:  Your Honor, I think the Court's under a

3  little bit of a mis-impression, and it's my fault because of

4  the way I've described it.

5          The things that Dr. Lee did as evidenced by his

6  affidavit, those various steps are all a matter of published

7  peer review steps.  He simply did it.

8          THE COURT:  Yes, I understand that.

9          MR. RESTIVO:  In fact, Your Honor, as Dr. Lee tells

10 us in Paragraph 29 of his affidavit, the flow chart has been

11 published as part of a conference proceeding in 2001 called

12 Implications of Analytical Techniques for Asbestos

13 Identification, and that was presented at the National Stone

14 Associations Environmental Safety and Health Form.

15         THE COURT:  Well, that's the chart.  I'm talking --

16         MR. RESTIVO:  September 24, 2001.  Both the chart and

17 the analysis was reviewed -- I would say peer reviewed by the

18 EPA Region 2, and it was approved for use in the South Down

19 project.

20         THE COURT:  And when was that?

21         MR. RESTIVO:  That was -- he has a reference, Your

22 Honor, and it's in Appendix, Quality Assurance Project Plan

23 Dated January 24, 2001 and that is Exhibit 12, Your Honor, to

24 the R.J. Lee affidavit.

25         THE COURT:  That's nine months before the chart or

1  eight months before the chart was done.  How can you publish

2  something before you've got the results?

3          You know, the methodology may have been approved by

4  the EPA as part of this project, but most of the time when

5  you've got some compilation of events that are at least

6  changing the existing methodology, which -- or putting together

7  the methodology in a different order, and you want to rely on

8  that fact, you publish it.

9          So, where is it published, and why isn't it subject

10  to peer review?  It's been three years.

11          MR. RESTIVO:  Okay.

12          THE COURT:  You know, if Dr. Lee has the confidence

13  of this, I don't understand why he hasn't published it.

14          MR. RESTIVO:  Your Honor, I don't want to repeat my

15  answer, but Dr. Lee didn't make up the steps, okay.  That

16  wasn't something he created or invented.

17          THE COURT:  I understand that.

18          MR. RESTIVO:  So, those steps were published and he

19  tells you where they were published.  It's either OSHA or

20  whomever.

21          It's true that Dr. Lee put togther steps into a flow

22  chart to get from A to B.  A flow chart that talked about that

23  was at the September 24, 2001 conference, okay?

24          The January 24, 2001 quality assurance project plan

25  was the flow chart and the method, and that was reviewed by the

1 EPA, and so I did not mean to suggest that the flow chart

2 wasn't invented until September 24, 2001.  It's true they may

3 have a flow chart that bears that date, but his affidavit --

4 and no one has contested it -- is that the flow chart and the

5 method is part of -- and you can look at Exhibit 12 to his

6 affidavit -- part of the quality assurance project plan dated

7 January 24, 2001.  It's in the record, Your Honor.

8         If your question is why didn't he take that and, in

9 addition to using it at a scientific conference, in addition to

10 using it in an approved EPA funded study, why didn't he also

11 create an article on it, I just don't have an answer for that,

12 Your Honor.

13         THE COURT:  Okay.

14         MR. RESTIVO:  Quickly, Your Honor, I must point out

15 so that the Court follows what's going on, what Mr. Turkewitz

16 has done in his response to my remarks.

17         You'll remember he gave you his outline, and he said

18 cleavage fragments may be present with aspect ratios less than

19 ten to one.

20         THE COURT:  Actually, I don't know where this outline

21 is.

22         MR. RESTIVO:  Well, that's good, Your Honor.

23         THE COURT:  He referred to it, but I don't have it.

24         MR. RESTIVO:  'Cause it's his.

25         MR. TURKEWITZ:  Your Honor, it's in the notebook.

1          THE COURT:  Where?

2          MR. TURKEWITZ:  In the inside of the notebook.  I'm

3 not sure if you have the right notebook.

4          THE COURT:  That one's not it.  This one?  Okay,

5 thank you.

6          All right, now I have it, Mr. Restivo.

7          MR. RESTIVO:  Okay, and you'll see -- I don't know

8 what page it is, 'cause they're not numbered, but he has a big

9 page entitled, "Aspect Ratio," and you'll see that that talks

10 about cleavage fragments having aspect ratios less than ten to

11 one.

12          I pointed out to the Court that that's inconsistent

13 with his own expert's report where they report fibers out in

14 this nature, some of which are less than ten to one, and you

15 can look at the chart and you'll see, they did the ratios for

16 you, how many are less than ten to one.

17          Mr. Turkewitz gets back up and says the fiber ratio

18 or the aspect ratio is three to one.  I will concede, Your

19 Honor, that six to one, eight to one and six to one is more

20 than three to one, but that's not what he gave you.  In his

21 original argument it was ten to one.

22          Lastly, Your Honor, and this is very important, you

23 will see in their laboratory's list of particles counted, you

24 will see an F.  F equals fiber.  These are all fibers.  You

25 will see, Your Honor, something called B, bundle.  You've been

1  given the theory that really what Rich Lee is looking at is

2  he's looking at bundles of fibers and that screws up the aspect

3  ratio, but really it's not a single fiber.

4          When it is not a single fiber, it is a bundle of

5  fibers, Your Honor.  You will know about it, 'cause they code

6  it as a bundle.  I think one of the attorneys may have used the

7  word "matrix".  I'm not sure.  In any event, you will see in

8  some of the particles designation MF.  That means matrix of

9  fibers or matrix fiber.

10          In any event, it is not F, a fiber.  So, when any

11  laboratory sees a matrix or sees a bundle, they report it out

12  as a matrix or a bundle.  When they see an individual fiber

13  that's what they do.

14          Lastly, Your Honor, you will see some designations --

15  I think Mr. Westbrook may have used the term -- you'll see

16  designations C dash F.  This is matrix dash F.  You will see C

17  dash F.  That is a cluster of fibers.  When the laboratory sees

18  a cluster of fibers they report it out as a cluster of fibers.

19  They don't report it out as a single fiber.

20          Accordingly, Your Honor, Dr. Lee's evidence that

21  there are cleavage fragments in what is being released upon

22  disturbance no one disputes.  To the extent what the plaintiffs

23  have counted as fibers are greater than one micron in length,

24  they now -- except for Mr. Hatfield -- agree those are cleavage

25  fragments.

1          To the extent one takes Mr. Hatfield at his word, at

2    his sworn testimony as an expert, that cleavage fragments are

3    wider than .1 or .2 fibers, then one finds that Dr. Lee is

4    absolutely correct.  Almost 90 percent of what the plaintiffs

5    reported out as respirable Tremolite asbestos fibers were

6    nothing but cleavage fragments, and that is probably the

7    answer, Your Honor, to a question you asked earlier.

8          Why is it, if this stuff's been on the market for

9    fifty, sixty, seventy years, there's no evidence of disease?

10   That's the answer, Your Honor.  Thank you.

11          THE COURT:  Okay.  Okay, what next?

12          MR. RESTIVO:  At this point, Your Honor, we need some

13   guidance from the Court.  We think what remains is an argument

14   related to the Consumer Protection Act claims and the damage

15   claims.

16          Mr. Scott has come a long way to make that argument.

17   Mr. Bentz has come from across the street to respond to that

18   argument.  In talking to the argufiers, Mr. Westbrook and I

19   were trying to determine whether or not they could start and

20   finish and be done.

21          I think Mr. Scott thinks he needs 45 minutes to an

22   hour.  Mr. Bentz --

23          MR. BENTZ:  Less than that.

24          MR. RESTIVO:  Needs less than that, and so the

25   question, Your Honor, is should we start it and finish

Scott - Argument                                    202

1  tomorrow?  Should we adjourn and pick it up tomorrow, or should

2  we try to guts it out and get it done -- well, if you take them

3  at their word, and all attorneys speak longer than they say,

4  you're probably talking about going 'til 5:45.

5          THE COURT:  Not if we stay tonight.

6      (Off-the-record discussion among court personnel)

7          THE COURT:  All right, let's just do it.

8          MR. RESTIVO:  Gentlemen?

9          THE COURT:  Maybe we should take a five-minute recess

10 just to let you get set up.  Would that make sense?

11         MR. RESTIVO:  Yes, Your Honor.

12         THE COURT:  Okay, we'll take a five-minute recess

13 then.  Thank you.

14                         (Recess)

15         THE COURT:  Mr. Scott.

16         MR. SCOTT:  In preparing I was unsure whether I'd be

17 saying good morning or good evening or good afternoon.

18 Apparently it will be good evening.

19         I am Darrell Scott.  I am from Spokane.  I am the

20 personal attorney of Marco Barbanti and Mr. Busch, as well as

21 some of the Zonolite claimants from the Boston action who are

22 presently before this Court.

23         I had the pleasure about almost more than four years

24 ago now to welcome Mr. Restivo to Spokane Washington on the

25 Barbanti case before Judge O'Connor, and it truly is my great

1 pleasure to be here and to argue this very important matter at

2 this very important hearing.

3        The first remark I think out of the Court's mouth

4 this morning was having read the briefing, I think these two

5 parties are trying two different cases.   And the Court is

6 exactly right.   And I am hoping this afternoon to provide the

7 Court some guidance onto why that has come about.

8        And if I had a single thing to say to the Court that

9 I think would be of use to the Court it is this.   Whether

10 Zonolite represents an unreasonable risk of harm, the question

11 the Court is asking about that, the answer, the Court is more

12 likely to find in the case law on the Court's bookshelves,

13 rather than in the binders, whether this product creates an

14 unreasonable risk of harm requires an examination of what

15 constitutes harm under the applicable state laws.

16        And the reason the Court has seen this division is a

17 division that goes to the substantive laws of the state.   I

18 happen to be here on just one theory of law, consumer

19 protection law.   Consumer protection law I hope will provide a

20 little breath of fresh air to the subject, because unlike a

21 battle being fought out in a tort context, which is what the

22 Court has heard so far, where tort law, substantive tort law

23 requires physical harm to person or physical damage to

24 property, it's easy to get confused and twisted around about

25 whether you have to prove physical harm to person to reach

Scott - Argument                                    204

1   damage to property.

2         And we've heard the cases that have to do with that.

3   In my arena I am concerned at this point only with consumer

4   protection laws which always have only had to do with economic

5   loss and injury to property rights.  I hope to demonstrate to

6   the Court that the admissions this Court heard from Mr. Restivo

7   this morning establish all the scientific basis needed to

8   proceed to trial on consumer protection act claims.

9         I have one thesis, the scientific fact now

10  demonstrated after two years of inquiry that Zonolite contains

11  asbestos and that it releases asbestos when disturbed during

12  ordinary activities of home ownership, those two scientific

13  facts alone are foundations to risk of harm under consumer

14  protection act law, without any appeal to epidemiology.  It is

15  economy, not epidemiology, that determines harm in the consumer

16  product context.

17        I will address the law and then I will address what

18  constitutes risk of harm under that law.

19        Is there anyone in this room that doubts that

20  Zonolite contains asbestos?

21               (Off-the-record discussion)

22        MR. SCOTT:  You know, our minds are working slowly

23  enough, you might think that was actually an instantaneous

24  slide.  It's just registering.  I will spend almost no time on

25  the question as to whether Zonolite contains asbestos.  Their

Scott - Argument                                    205

1  own expert says it contains usually less than one percent.  Mr.

2  Restivo conceded this morning this, quote, "I don't think there

3  is any doubt that finished Zonolite attic may contain fibrous

4  Tremolite," and he's correct in that.

5          He also said, quote, "We concede small amounts of

6  fiber can be released."  There is no question of material fact

7  but that Zonolite contains and that it releases asbestos when

8  disturbed during ordinary activities of home ownership.

9          Now, I know that doesn't yet answer the question the

10  Court has, but I want it to be clear to the Court on motion for

11  summary judgment, which this is, where the test is, is there

12  any question of material fact as to the proposed findings,

13  there is none.  It contains, it releases.  The only question

14  remains, so what?

15          This is what the Court said on July 22nd of 2002.

16  And it is exactly the question.  So, the question is can

17  Zonolite attic insulation release?  But the second question is,

18  so what if Zonolite can release?  Is there a harm incident to

19  that release?

20          And that is the question I will answer.  We are here

21  on a science trial in a contested claim proceeding with

22  approximately five Zonolite claimants before us.  Whether they

23  have claims is determined by the substantive law of their

24  states.  I also know very little about bankruptcy law, although

25  I spend far too much time in bankruptcy court.  But I do know

Scott - Argument                                          206

1 that <u>Raleigh vs. the Department of Revenue</u> in the year 2000,

2 the U.S. Supreme Court said this, and I think it is important

3 to go through this before we talk about the law.

4        Quote, "A creditor's entitlement to bankruptcy arises

5 from the substantive law creating the debtor's obligation.  As

6 such, the validity of a claim is determined by reference to the

7 state law governing the substance of that claim.  And those

8 interests are analyzed no differently, absent some federal

9 interest to the contrary, than if the interest of the parties

10 were not in bankruptcy at all."

11        And the point I am about to make is contains and

12 releases are the two scientific cornerstones establishing risk

13 of harm in a consumer product context.

14        Every Zonolite claimant that is presently before this

15 Court comes from a state that had an applicable consumer

16 protection statute at the time that they purchased their

17 product.  This is not a coincidence.  This is because consumer

18 protection liability is among the most important claims that

19 these Zonolite claimants have.  So, I am not arguing a

20 technicality here.  I am making an argument about the

21 substantive law that is at the foundation of these claims

22 having even been brought in the first place.

23        Every claimant has an applicable consumer product

24 statute.  The same is true of essentially every other state in

25 this country, and I won't recite the material that we gave the

1  Court, because this Court has a fine reputation for

2  meticulously reading materials.  And I have confidence that's

3  true.

4          But I do want to briefly point out that essentially

5  every state where Zonolite was sold has an applicable consumer

6  product safety statute from at least 1970 through 1984.  I've

7  drawn a yellow line on this map.  This is made to reflect one

8  of the exhibits, and I can't recall which one it is.  It's

9  actually information probably favorable to Grace where Grace

10 has indicated that its sale of Zonolite was overwhelmingly

11 north of a line that ran from Denver through St. Louis to

12 Philadelphia.  And so I had my paralegal put that line on

13 there.

14         So, while we're talking about all of these states,

15 the reality is the Zonolite claimants will, and I think Grace

16 will agree, overwhelmingly come from a geographical area that

17 is roughly north of that line.

18         And even with that refinement, consumer protection

19 laws were applicable during the time period of 1970 through

20 1984 when they sold this material.

21         What constitutes harm under consumer protection law?

22 Let's reflect for just the briefest moment as to why consumer

23 protection laws came into existence.  Prior to state consumer

24 protection laws there were two grand bodies of law, contract

25 and tort law.  The problem with contract law was you needed

1  privity to bring a claim.  And although you were -- you may be

2  injured if you did not have a contractual relationship, there

3  was nothing you could do about it.  You had economic loss,

4  injury to your property interests, but no privity.

5        Tort law, on the other hand, preoccupied with

6  physical injury to person or to property.  And you didn't need

7  privity to bring the claim.  But the problem was if your damage

8  was merely economic, if it was merely injury to your property

9  interest, if it merely cost you money, that's economic loss,

10 like is compensable in contract, and you could not bring a

11 claim in tort.

12       And that's why the briefing that this Court got from

13 Grace at the outset of this bankruptcy was emphasizing economic

14 loss not compensable in tort.  That's generally true.  A few

15 states had exceptions.  One, aptly, was Washington.

16       Consumer protection filled the gap.  It afforded

17 recovery for economic loss without privity.  And that's what we

18 have in Zonolite.  We have a product that is costing consumers

19 money.  We have a product that is causing injury to the

20 financial interests of consumers in property.  If that's true,

21 then the fact it contains, the fact it releases risks injury in

22 the consumer protection sense.

23       Most of the statutes are express.  You've got to have

24 injury to business or to property.  You've got to have economic

25 loss or injury to your business.  In Washington if I had a

Scott - Argument                                           209

1  Zonolite claimant with a physical injury I couldn't bring a

2  claim in consumer protection, 'cause it doesn't recognize

3  physical injury as a harm.  I have to have economic loss.

4         And we cited the cases from Minnesota and from

5  Massachusetts that essentially say the same thing.  If it costs

6  you money that injures your property interests, like a contract

7  claim, we'll give you entitlement to recovery for those

8  economic losses so long as your losses were caused by wrongful

9  business behavior.

10        And what we have -- what we had there a moment ago

11 were the three kinds of harms that occur to Zonolite claimants,

12 loss of use of their property, diminution in the value of their

13 property and loss of money.  How do these three things come

14 about or how -- actually the question is how is there even a

15 risk that they come about?

16        If I were proving they would come about, I would have

17 Mr. Marco Barbanti here talking about loss of a sale on his

18 house because of the product.  I recognize we're not talking

19 about damages.  We're only talking about the risk of it

20 occurring.

21        Three words, three concepts, aversion, regulatory

22 burden, prudential burden.  Aversion to asbestos, regulatory

23 burdens associated with asbestos, prudential burdens.

24 Commonsense in the conduct of a home where Zonolite is present

25 all result in these three things.

1          The Washington court recently addressed the issue as

2    to whether in a consumer protection context you needed to go

3    further, with regard to homes actually, and show that there was

4    some risk to occupants of the home.  And it said this, "The

5    purpose of the consumer protection act to protect members of

6    the public from injury to their property or business by reason

7    of unfair or deceptive acts or practices in trade or commerce

8    would hardly be served if deception were not actionable unless

9    the consumers' very lives were at stake."

10         The point the Washington court was trying to make was

11   in the consumer arena we're concerned with those ordinary kinds

12   of losses that you would bring in contract but that you can't

13   because there's no privity.  And we're not concerned with tort

14   law which can take care of itself.

15         And if there's physical injury to person or property

16   you can bring a claim, and unfair practices is immaterial.

17         What information does this Court have to make the

18   judgment that there is even a likelihood that an asbestos-

19   containing, asbestos-releasing material is going to have any

20   consequence out there in the real world with real families who

21   happen to own homes that contain Zonolite?

22         The Environmental Protection Agency and the Agency

23   for Toxic Substance and Disease Registry, in their words,

24   strongly recommends each of the following.  And its advisory,

25   if this were larger, you would see that in the text the words

1  "do not disturb," are in bold, they are in red.  This body of

2  advisories issued for homeowners, incidentally on the day

3  Christine Todd Whitman resigned and received a letter from

4  Senator Murray of Washington complimenting her on her courage,

5  these recommendations provide a prudential framework for how

6  homeowners should act and may be expected to act.  And when I

7  have a home and I'm told I should not disturb Zonolite, that

8  means I have to tell my wife we can't remodel.

9          Or more precisely, we can't afford to remodel,

10  because if we remodel I have to hire prudentially, and we'll

11  see in a second by regulation, asbestos abatement professionals

12  to get rid of the material.  That hurts my pocketbook.  that is

13  an injury to my free, unfettered use of my property, and it

14  costs me in the end money.

15          Loss of money from hiring professionals and to remove

16  Zonolite, roughly $7,000 a house if you're lucky.  The EPA, I

17  think, is down to about $15,000 per house to just remove it

18  from an attic.  They have to pay high wages, apparently,

19  because of some federal regulations, and in the free market you

20  can do it cheaper than that, but it is still an expense that is

21  not inconsequential.

22          Washington's asbestos law, this is an example not of

23  a prudential burden, a regulatory burden.  And you heard Mr.

24  Restivo say this morning, "Asbestos is one of the most highly

25  regulated toxic materials in the country."  That's true.

Scott - Argument                    212

1  That's why people have an aversion for it.  And that's why

2  there are so many regulations that bear upon the homeowner's

3  pocketbook.

4       This is Washington's.  No person may work on an

5  asbestos project without the project being performed by a

6  certified asbestos worker.  What is an asbestos project?

7       In Washington asbestos project means the

8  construction, demolition, repair, maintenance, remodeling or

9  renovation of any public or private building releasing or

10 likely to release asbestos fibers into the air, period.  This

11 standard is not a standard that applies to asbestos-containing

12 materials.  Disturbance of an asbestos-containing material in

13 Washington is referred to and defined as an asbestos abatement

14 project, which brings to bear a whole 'nother series of

15 regulations.

16      And if Zonolite's above one percent you've got those,

17 too.  Any attic insulation that releases or is likely to

18 release asbestos fibers into the air triggers Washington's

19 regulatory burdens.  That's why as a practical matter, when

20 people look at a home to buy, as they did with Marco Barbanti,

21 they make him a firm offer.  He says, "I have to tell you it

22 has Zonolite attic insulation and it contains asbestos."  They

23 don't ask the question, "Was it fibrous?  Was it a fiber bundle

24 or was it a -- you know, a rock?"  they don't ask how long.

25 They say, "That is a detrimental condition on this property.  I

Scott - Argument                                        213

1  still may buy it.  What's it cost to remove?"

2         Some homeowners have had to remove it as a condition

3  for purchase.  Others, you have the price affidavit, had to

4  reduce the price of his house by $5,000 in order to sell his

5  house.  Those regulatory burdens that we all know about, and

6  just the commonsense prudential responsibilities to not expose

7  yourself unnecessarily to asbestos constitutes harm under

8  consumer protection.

9         Now, I'm not asking the Court to find that there's

10 any violation of consumer protection laws here.  The only thing

11 I have asked the Court for is summary judgment on two

12 scientific facts, it contains, and it releases.  And if I have

13 those two scientific findings agreed to, we can move on to the

14 proof and Grace can move on to its defense.

15        So, I -- Grace can rest assured, they can essentially

16 assume I would lose when I went into trial on consumer

17 protection.  I'm only trying to establish for the Court we've

18 established the risk of harm that brings us to the jury that

19 Grace hopes to never see.

20        Diminution in property values we don't need to talk a

21 lot about, but it's more complex than, "If I sell my house do I

22 have to reduce the price?"  It's also things like, "I can't

23 really afford to remodel this house in order to improve its

24 value because of the cost of doing so."

25        Ralph Busch, and this is a matter of record, was in

Scott - Argument                               214

1 the middle of renovating his South Hill Victorian home in 2000,

2 had the ceiling torn out at his kitchen table, vermiculite all

3 around, opened up the <u>Spokesman Review</u> and read, "Class action

4 brought against W.R. Grace because of vermiculite."  And he's

5 sitting, literally, in his kitchen with vermiculite around him.

6        He got an estimate to determine what the cost would

7 be to abate it, because he called the EPA and Washington State

8 Department of Health and they said, "You shouldn't be

9 disturbing this."  The cost exceeded the equity in his home.

10 His home was sold on the courthouse steps on foreclosure in

11 Spokane, the same courthouse steps he walked up to become

12 appointed class representative.

13        Grace at trial can prove that's all not true or try.

14 All I need here is contains and releases, runs a risk that it

15 may cost that homeowner a reduction in the value of their home.

16 And if that's true then you have to go to trial.

17        This slide helps us to understand how we are sure

18 that aversion for asbestos is going to take its toll.

19 Essentially every step, not all, has a disclosure law governing

20 what a homeowner has to disclose when they sell their home.

21 Not all of these laws require that you disclose asbestos, at

22 least they don't say that explicitly.  All of them essentially

23 require that you disclose any detrimental conditions on the

24 property, and in Washington, if it contains asbestos you've got

25 to disclose that at the time of sale.

1    This regulation also helps to ensure, together with

2 the EPA's recommendations that were recommendations to

3 homeowners, that this risk of harm to a property owner isn't

4 just theoretical.  It's going to strike home, it has struck

5 home, and that's why there is a risk, if not a reality, of

6 harm.

7    Aversion to property or aversion to asbestos.  We

8 provided the Court a variety of evidence about how people

9 wouldn't have bought the home had they known that it contained

10 asbestos.  And it may be that many people are -- don't have

11 that problem.  Some do, and that's what increases the market

12 time, that's what ultimately reduces the value of the home, and

13 so I think even Grace has to concede that there is an aversion

14 to asbestos, especially when this is what Grace was saying

15 about its product, Exhibit 22 to my declaration.

16    This is what Grace was saying about its product at a

17 time when it believed its product could not cause any physical

18 injury to anyone.  Even assuming that it said, "Product

19 labeling would have a serious adverse and irreversible effect

20 upon consumer acceptance of our product."

21    What were they saying?  In their own mind this is a

22 harmless material, but if we label it as containing asbestos it

23 would have a detrimental, irreversible impact on our ability to

24 sell that product.  Why?  Aversion to asbestos, regulatory

25 burdens associated with asbestos.  Why does anyone want to have

1 to deal with it?

2        It's no surprise then that if you put that same

3 product in a home and they have to disclose that it's there,

4 you might just have the same consequence, a serious adverse,

5 irreversible effect upon the property.

6        And that, I believe, is what we will prove happens at

7 the time of trial.  This quote -- I dread providing it only

8 because it goes to the extreme.  It's already in the briefing.

9 It's a Washington opinion that has been repeated four times now

10 in a nuisance context, which talks about what constitutes

11 property harm.  And it essentially makes the point, the

12 question is materiality, not toxicity.  Is the condition

13 material to the marketplace, not is there actual physical

14 threat.

15        This is a case that involved a sanitarium where

16 people worried that they might get tuberculosis.  And there was

17 significant evidence about how -- what went through the air and

18 could you possibly get it.  And the court said, when we're

19 talking about property damage here and marketability, the

20 questions, what's the marketplace believe is the case?  And

21 especially here where Grace knew what the marketplace thought

22 about asbestos, why they didn't label it, you certainly can't

23 have great sympathy when the marketplace takes its toll and

24 someone comes into court and says, "It's not my fault it's

25 here.  It's yours.  You didn't label the product."  Go beyond

1  this point.

2          Loss of use of property we've talked about.  And it's

3  not just a matter of not going up into your attic.  I mean,

4  some people have walk-up attics.  We provided some photographs

5  of attics I've been in, and they store the materials there, and

6  when they try to sell their home and say, "The walk-up attic,

7  there's a problem there," it's going to impact their home.

8          It also impacts -- there is a myth that Zonolite is

9  in the attic.  And we provided the Court with photographs and

10  commentary about how Zonolite actually is a loose film material

11  that filters through a house.  And it's found, if it's in the

12  house, it's in the walls, and it's in the piping and it's in

13  the electric wiring, and you run into it lots of places.  And

14  so you -- that ends up -- it's not just a question -- who cares

15  if you can't go up in the attic?  It becomes a question, "I

16  cannot repair the roof of my basement," which was the case with

17  Mr. Hatch, because the materials filtered all the way down to

18  the ceiling tiles.

19          You can go beyond this one.  I won't tell you the

20  story of the woman whose child died and his bi-plane is now

21  contaminated with asbestos.  It would be to no purpose.

22          The question this Court has been continually asking

23  is answered by looking at the law and looking at what the law

24  says about what constitutes harm and what constitutes causation

25  with harm.  That in truth is, I think, where the Court will

1  make the most progress in understanding what appears to be two

2  ships passing in the night, and it's brought to light by the

3  consumer protection law where physical injury isn't even

4  something you can recover for.

5           It is my great hope in the end that Grace recognizes

6  its consumer protection liability and remedies its liability by

7  notifying people, by educating them about how to manage it in

8  place so you don't spend money where you don't have to, where

9  money is available to remediate where it's necessary and not

10 everywhere and to pay for removal where it becomes necessary

11 and not everywhere.

12          This litigation was not commenced to create a check-

13 writing campaign.  It was brought in equity in the hope that

14 recognition of Grace's liabilities would bring about a sensible

15 solution that materially helped actual homeowners.

16          THE COURT:  Mr. Bentz.

17          MR. BENTZ:  Good evening, Your Honor.

18          I think I can start here with a few pieces of good

19 news.  I'm the last new lawyer you'll hear from. I have no

20 notebook for you.  And I think I can address the motion that

21 was just made and also address the two more that are on our

22 agenda in fairly quick fashion.

23          I think first of all, in response, I think there are

24 two ships passing in the night, and our position is that the

25 debtors are on the correct one here.

Claimants' motion here, if we think about it, is really a safety net that they attempt to erect outside the parameters that were set for this science trial. If, as Mr. Restivo argued for the debtors much of today, the claimants cannot show that ZAI creates an unreasonable risk of harm, they use this motion to try and save the day by saying, "It doesn't really matter whether we can prove that or not. As long as folks think there's a risk of harm, then Grace is liable, and we can just go on."

First and foremost, we don't think this science trial is either the time or the place for the motion that's been made. The science trial was to focus on whether ZAI creates an unreasonable risk of harm. During the hearings that led to the framing, and Mr. Restivo read some of those transcripts, the Court made clear an intention to stay away from issues of state statute liability and damages.

We've cited those in our briefs. Mr. Scott, I noted, made reference to a short fragment of a transcript on July 22nd. I won't read the whole transcript, obviously, but what he didn't mention is that same hearing, Page 86, the Court said, "I don't think we want to go to damages, and I don't think we want to go to strict statute liability at this point."

"That will obviously be necessary at some point. If there is some scientific evidence that asbestos fibers in Zonolite products do pose an unreasonable risk of harm, but I

1  really want to limit this trial to that issue."

2        That's what we've tried to do here today.  And so

3  first of all, we don't believe the motion is properly brought

4  there.  And indeed, the claimants' motion gets us really very

5  far afield of the hard science that was intended to be the

6  subject of this science trial.

7        In support of their CPA motions the claimants proffer

8  the testimony of a real estate appraiser named John Kilpatrick

9  and a purported expert in what they call the science of real

10 estate valuation.  And that testimony that whether ZAI actually

11 poses an unreasonable risk of harm to human health is of no

12 consequence.

13        He would purportedly testify that this is so because

14 under what they say is the important real estate valuation

15 principle, and I quote, "intuitive toxicology," end quote,

16 whether the product actually poses a hazard does not matter if

17 people think it does.

18        These proceedings should be confined to real

19 toxicology rather than to intuitive toxicology, and for that

20 matter to real science rather than to intuitive science.

21        Claimants' motion nevertheless, and Mr. Scott has

22 argued today, essentially saying, "We're spending too much time

23 here talking about real toxicology, about how much asbestos is

24 released upon disturbance of ZAI, what are the lifetime

25 duration and frequency of a homeowner's exposure, and whether

1 such lifetime exposures pose an unreasonable risk of harm to

2 human health."

3          They claim we should be talking about materiality and

4 not toxicity, something that Mr. Scott just repeated.  But

5 where is here the alleged misrepresentation?  Supporting these

6 theoretical CPA claims is it a manufacturer asserted its

7 product was safe when they claim it was unsafe.  Materiality

8 and toxicity become inseparable.

9          If take toxicity out of the equation by assuming that

10 ZAI does not pose an unreasonable risk of harm claimants cannot

11 allege a material misrepresentation.

12          If, for example, ZAI was contaminated with traces of

13 common house dust instead of fibrous Tremolite, no one would

14 argue that Grace's statement, for example, that ZAI was 100

15 percent vermiculite constituted a material misrepresentation.

16          Perhaps more directly, if the CPA claimed is that

17 Grace misrepresented that ZAI was safe when it was unsafe,

18 there's no claim unless claimants can establish that ZAI poses

19 an unreasonable risk of harm.

20          So, we come all the way back full circle to the

21 central issues that the Court correctly identified, does ZAI

22 pose an unreasonable risk of harm?  It was addressed at length

23 this morning and through the voluminous briefs and supporting

24 papers that we filed.

25          With respect to sort of the procedural posture here

Bentz - Argument                                          222

1  and what the plaintiffs are asking for, Mr. Scott talked in

2  terms of only needing to prove that ZAI contains asbestos and

3  that asbestos fibers can be released.  I think he discussed it

4  in varying terms, sometimes factual milestones, some other

5  things on the way to CPA liability.

6        Well, quite frankly, we disagree with that.  The

7  first part of what this is, and this is apparently a motion for

8  partial summary judgment under Rule 56D, they ask for a

9  declaration that there's no material question of fact that ZAI

10 is contaminated with asbestos.

11       Well, again, we've talked about contamination of

12 buildings and the various means there.  If what they're trying

13 to connote here is that there's some unreasonable risk of harm

14 by the use of the word "contamination," we believe that's wrong

15 for all the reasons stated earlier today.

16       If, on the other hand, what Mr. Scott is trying to

17 say in this part of his requested relief is that he wants a

18 declaration that there are merely some asbestos fibers in it,

19 we don't think that that's a -- frankly a determination that

20 would move the ball in any way.  What Rule 56D does is it

21 allows a Court the discretion to, if practicable, ascertain

22 what material facts exist without substantial controversy.

23       Quite frankly, the fact that ZAI poses some asbestos

24 fibers is not a material fact.  And so it would be

25 inappropriate to find that on a motion for partial summary

Bentz - Argument                                223

1  judgment.

2         The second thing that the ZAI claimants ask for a

3  declaration on in this motion for partial summary judgment,

4  they ask for a declaration, quote, "that there is no material

5  fact but that ZAI releases asbestos fibers into the air when

6  disturbed during foreseeable homeowner activities."

7         Again, Your Honor, that wouldn't be a material

8  declaration either, or a finding of a material fact, because it

9  merely begs the question, the question that's been asked and

10 discussed all day of how much, what are the exposures, what are

11 the lifetime exposures, what's the quantity, and does it pose

12 an unreasonable risk of harm to human health.

13        So, I guess in sum, with respect to the Consumer

14 Protection Act motion, we believe it's a distraction.  We

15 submit that the motion for partial summary judgment regarding

16 CPA claims was improperly brought here, does not advance the

17 disposition of these claims in any meaningful way and should

18 therefore be denied.

19        THE COURT:  Well, I haven't understood that it's

20 contested that ZAI contains some asbestos fibers.  I thought

21 that's what Mr. Restivo basically stood up and told me.

22 There's no contest that ZAI has some Tremolite asbestos fibers.

23 It also has non-asbestiform products.

24        MR. BENTZ:  And in fact, Your Honor, I think that's

25 correct.  We don't dispute that it contains some asbestos

Scott - Rebuttal Argument                    224

1 fibers, but that's not what they're asking here.  First of all,

2 they throw in the word "contamination," which I think has other

3 connotations.  And number two, when we're talking about a Rule

4 56D motion for partial summary judgment, we're talking about

5 something that in essence is worth doing for the Court, in

6 making a material finding of fact.

7        And just the fact -- if it were limited to just that,

8 for example, that ZAI may contain some asbestos fibers, that's

9 not a material determination.  It's really not a worthwhile

10 effort, and we're kind of missing the boat here.

11       THE COURT:  Well, I have to disagree that that's not

12 material.  If ZAI contained no asbestos fibers, then there are

13 no claims under any circumstances.  So, I think the fact that

14 it contains some asbestos fibers is material, but I'm not sure

15 that that answers the questions with respect to contamination

16 and unreasonable risk of harm.

17       MR. BENTZ:  And, Your Honor, what we would say is the

18 purpose for being here is to answer that central question of is

19 there an unreasonable risk of harm.  So, when we talk about is

20 something a material finding of fact, or is it not, it's within

21 that context.  And because it's not -- it's not going to move

22 the ball on that inquiry, there's no reason to have it entered.

23       THE COURT:  Okay.  Mr. Scott?

24       MR. SCOTT:  I only have just the very briefest of

25 comments.

1        The Court said on October 26th of 2002 at Page 6263

2   of the transcript, "I was trying very hard not to set the

3   parameters for what the issues would be until the discovery is

4   done.  I think the appropriate place to look at that is at the

5   pre-trial conference."

6        And that's where we're at.  And the Court was very

7   prudent in doing that, because at the point at which the Court

8   was being tugged one direction, then another, the Court just

9   didn't have the facts in front of it to ascertain what the

10  issues even were.

11        It would be a legitimate criticism if I tried to

12  prove Grace's misconduct, because that truly is beyond the

13  science.  And he did pose the question, "Where's the

14  misconduct?"  I will only say in response omission.  You didn't

15  tell people it contained asbestos, and that made all the

16  difference in the world.  And second, you said it was a do-it-

17  yourself 100 percent vermiculite product.  In fact it is a

18  don't-do-it-yourself product, because it's not 100 percent

19  vermiculite.

20        There was a criticism of Dr. Kilpatrick and the

21  materiality of his testimony.  Dr. Kilpatrick is a pre-eminent

22  economist in the field of property damage and in a particular

23  detriment to property.  The reason that we solicited his

24  opinions is because we thought it would be of value to the

25  Court, because it would assist this Court in understanding that

1  asbestos itself, just the fact of asbestos in the real estate

2  market is likely to have economic consequences, and more than

3  that to help explain why that's the case, why those economic

4  repercussions occur without talking about whether anyone's

5  going to die in the home.

6          And we're hopeful that it assisted in that way.  I

7  think it is just directing material to the question of harm in

8  the consumer protection context.

9          I appreciate all the time the Court has given this

10  case and all it gave this case this morning or today.  Thank

11  you.

12          THE COURT:  Mr. Bentz.

13          MR. BENTZ:  I think I can just briefly reply and go

14  int the second to last motion, I think the last contested

15  motion, at the same time because the last motion here deals

16  with Mr. Kilpatrick, Dr. Kilpatrick and Grace's motion to

17  exclude, and now that we've been through essentially the

18  science trial, the motion really would be that the -- and Grace

19  would request that the Court strike any references to Mr.

20  Kilpatrick's testimony in these proceedings and disregard them.

21          When arguing here as to why Mr. Kilpatrick is

22  relevant, in our viewing in the briefing, claimants have said

23  damages isn't appropriate here.  They recognize that.  He's a

24  causation witness for us, but what he admitted on deposition,

25  and I don't think there's any dispute, is this causation

Bentz - Rebuttal Argument                    227

1   witness of theirs isn't a microscopist.  He isn't an industrial

2   hygienist.  He isn't an epidemiologist, a pulmonologist, a

3   biostatistician or any of the types of experts that we've heard

4   about today.

5           So, what he purportedly brings from the science of

6   real estate valuation is this important principle of intuitive

7   toxicology.  So, our position is that where the claimants

8   cannot show through real toxicology that the concentration,

9   frequency and duration of lifetime exposures to ZAI poses an

10  unreasonable risk of harm, they attempt to fall back on

11  intuitive toxicology and the assertion that people need only

12  think that ZAI poses a hazard to recover against Grace.

13          That's just not the law, Your Honor.  Debtors submit

14  that it's one of those arguments that if you think about it

15  really scarcely survives its statement.  Among other things, it

16  makes a mockery out of product liability law, negligence,

17  strict liability, misrepresentation claims.  And the common

18  denominator to misrepresentation claims is that they'd be

19  material misrepresentations.

20          It also makes a mockery of <u>Daubert</u>, its ample progeny

21  and quite frankly, the tremendous effort and expense that both

22  sides have gone to, well, I guess gone to on Grace's -- at

23  Grace's expense, you put on a trial here about the real

24  science, not the intuitive science.

25          And for that reason we request the Court put an end

Scott - Rebuttal Argument                    228

1  to what's really kind of an unnecessary side show, in our view,

2  and strike all references to Mr. Kilpatrick's report from these

3  proceedings.

4          THE COURT:  All right.  Mr. Scott?

5          MR. SCOTT:  I was told we weren't going to argue it,

6  but we are, so let me make a few points.

7          Not only is he not an irrelevancy, he is the most

8  material witness, one of the most material witnesses we have on

9  the question as to whether an asbestos-containing, asbestos-

10 releasing material has any possibility of causing injury to

11 property and to property values.

12         That is his field and his arena.  Intuitive

13 toxicology was merely a concept in real estate economics that

14 explains why it is that the marketplace reacts to asbestos like

15 this.  It's not a -- intuitive toxicology isn't the science.

16 It's real estate economics that's the science.  And intuitive

17 toxicology is just a concept to explain the reality that if a

18 home contains asbestos it will have impacts.

19         The Fisher studies that were the final studies that

20 were part of that report, concrete economic studies, surveys of

21 actual appraisers as to whether asbestos in buildings, in this

22 case commercial buildings, made any material difference in

23 terms of length on the market, value of the property and the

24 cost of closure, and there was -- it's clear asbestos has

25 implications.

1          Now, we don't need Kilpatrick to prove damages.  Mr.

2  Barbanti and Mr. Busch and Mr. Price will prove their own

3  damages.  Mr. Kilpatrick helps address the general causation

4  question, Zonolite risk harm of property loss, risk harm of

5  diminished property value.  And his assessment, which is very

6  clear and based on peer reviewed literature is if it contains

7  asbestos, there's a risk it's going to impact the value of the

8  property.

9          And for that reason, it not only is not immaterial,

10  it is I think particularly useful for this Court.

11          MR. BENTZ:  Your Honor, just one last comment with

12  respect to -- at least one last comment from me with respect to

13  Mr. Kilpatrick.

14          If we accept the proposition that you really don't

15  need to look at the product itself and figure out whether or

16  not it poses an unreasonable risk of harm, if we only need to

17  take a poll or to assess what public opinion is and rule on

18  that basis, we're opening up an awfully dangerous door, and

19  frankly a big one that's foreign to the law.  And I would say

20  also foreign to consumer protection law as well.

21          THE COURT:  Mr. Restivo.

22          MR. RESTIVO:  I think, Your Honor, that that

23  concludes the arguments that the parties wish to present to the

24  Court today.

25          Mr. Westbrook and I would like to ask the Court for

1 ten days for us to talk about his videos, maybe my pictographs

2 and a few other documents to supplement the record so that we

3 could have until Thursday the 28th to either provide to the

4 Court his video and some other stuff or not provide and advise

5 the Court.

6       THE COURT:  You can frankly have as much time at this

7 point as you need, because it's going to take me a lot longer

8 than ten days to get through this evidence and substance.  So,

9 although I would appreciate getting it finished, I understand

10 the press of other business, and there is no way I'm going to

11 have a ruling to you in the near future.

12       MR. RESTIVO:  Okay, we'll make it 30 days, Your

13 Honor, then?

14       THE COURT:  Thirty days is fine.

15       MR. RESTIVO:  Your Honor, speaking, I'm sure, on

16 behalf of all the argufiers, all the parties, we really

17 appreciate the Court's indulgence --

18       THE COURT:  Argufier?

19       MR. RESTIVO:  Argufiers, Your Honor. We appreciate

20 the Court's interest and indulgence.  It's been a long day, and

21 everyone appreciates it.

22       THE COURT:  Okay, just a second, so I know what it

23 is.  Are you submitting supplemental briefs or supplemental

24 exhibits or what is it that I --

25       MR. RESTIVO:  We're only talking about whether or not

1 there will be supplemental exhibits or whether or not we need

2 to have an argument with each other in the court as to

3 supplemental exhibits.

4          THE COURT:  And this only applies to the cross

5 motions for summary judgment, not to --

6          MR. RESTIVO:  That is correct, Your Honor.

7          THE COURT:  -- Mr. Scott's motions or your motions

8 concerning Mr. Scott's expert.

9          MR. RESTIVO:  That is correct, Your Honor.

10          THE COURT:  All right.  So, supplemental exhibits are

11 due November -- how about the 19th?  That's Friday of that

12 week.  It's a little longer than thirty days, but as I said, I

13 really don't think, given the press, that I'm going to get to

14 this before then anyway.

15          MR. RESTIVO:  And Your Honor, so the record's clear,

16 supplemental exhibits are due, if we agree to submit

17 supplemental --

18          THE COURT:  Yes.

19          MR. RESTIVO:  -- exhibits.  If we don't, we'll have

20 to have another discussion with the Court.

21          THE COURT:  Okay.  While you're talking supplemental

22 exhibits, gentlemen, how about talking settlement, a serious

23 issue?

24          MR. RESTIVO:  We'll do that, Your Honor, and have

25 been doing that, and we will continue to do that.

1          THE COURT:  I know that from the, you know, very

2 brief status reports that I understand you've been talking

3 settlement.  That word has popped up in the discussion as a

4 reason to continue today's argument, but, gentlemen, you need a

5 very intense settlement discussion.

6          MR. WESTBROOK:  We will take that to heart, Your

7 Honor.

8          THE COURT:  Mr. Scott --

9          MR. RESTIVO:  Thank you, Your Honor.

10          THE COURT:  -- you need to be included in these very

11 intense settlement discussions.

12          MR. SCOTT:  I appreciate that, Your Honor.

13          THE COURT:  All right, is there anything further you

14 think you need to submit, Mr. Scott?

15          MR. SCOTT:  I don't believe so, unless there's

16 something the Court requests?

17          THE COURT:  Mr. Bentz?

18          MR. BENTZ:  No, Your Honor.

19          THE COURT:  Okay, then I will expect to get something

20 from you by November 19th, either telling me that you are -- or

21 just submitting, whatever it is that's supplemental, or else I

22 guess the letter saying that you haven't come to an agreement,

23 telling me whether you need me to make rulings or whether I

24 should just proceed on the basis of a rather voluminous record

25 you've already submitted.

1          MR. RESTIVO:  The rather voluminous and mighty

2  interesting record we've submitted, Your Honor.

3          THE COURT:  Absolutely.  I can't tell you the last

4  time I had to read anything about organic chemistry to this

5  level was in college, too, Mr. Restivo.  Fortunately, I did

6  pass the course.

7          Okay, thank you very much.  We're adjourned.

8          MR. WESTBROOK:  Thank you.

9                    (Recording ends)

10              *              *              *

11              C E R T I F I C A T I O N

12          I, Betsy Wolfe, certify that the foregoing is a

13  correct transcript from the electronic sound recording of the

14  proceedings in the above-entitled matter.

15

16  /s/ Betsy Wolfe                    October 25, 2004

17  Betsy Wolfe                        Date

18  J&J COURT TRANSCRIBERS, INC.

19

20

21

22

23

24

25