IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

**Objection Deadline: December 3, 2004**
**Hearing Date: To be determined**

## DEBTORS' MOTION FOR ENTRY OF A CASE MANAGEMENT ORDER ESTABLISHING PROTOCOLS FOR LITIGATING ASBESTOS-RELATED CLAIMS FOLLOWING PLAN CONFIRMATION

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by their undersigned counsel, file this motion (the "New CMO Motion"), seeking entry of a case management order (the "New CMO"), establishing protocols for litigating asbestos-related claims (the "Asbestos Claims") following plan confirmation.[2]

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the Glossary, which is Exhibit 2 to the Exhibit Book, filed on November 13, 2004.

### Introduction

1.      On the first day of these Chapter 11 Cases, the Debtors filed a detailed informational brief (the "Informational Brief") that laid out their proposals for defining and resolving their asbestos-related claims liability through common issues litigation.    Shortly thereafter, on June 27, 2001, the Debtors filed a motion for entry of a case management order, establishment of a bar date, approval of proof of claim forms and approval of notice program (as amended, the "Original CMO Motion").[3]  The Original CMO Motion, requested, among other things, an order providing for pre-confirmation litigation protocols for resolving the Debtors' Asbestos Claims.    The Debtors, Asbestos PI Committee and Equity Committee thoroughly briefed the issue, but no hearing on the Original CMO Motion was ever held.

2.      Three and one-half years have now passed since these Chapter 11 Cases were filed.  There remain over a hundred thousand unresolved Asbestos Claims pending or otherwise asserted against the Debtors' estates.    The Debtors, pursuant to the Bankruptcy Court's instruction, filed their Plan on November 13, 2004.  The Plan contemplates a process by which certain Holders of Asbestos Claims may elect to either settle their Asbestos Claims against the Debtors' estates or litigate pursuant to certain litigation protocols.

3.      In separate, accompanying papers, the Debtors have proposed settlement criteria for both Asbestos PI-SE Claims and Asbestos PI-AO Claims through the PI-SE TDP and PI-AO TDP, respectively.    The Debtors hope that these TDPs can capture hoped-for settlements of many pending Asbestos PI Claims.  Recognizing that not all Asbestos Claimants will meet the

---

[3]   The Debtors subsequently modified and amended the relief requested in the original June 27, 2001 filing, by filing their Debtors' Supplemental Brief Regarding Procedures for the Litigation of the Common Personal Injury Liability Issues, filed on June 21, 2002 (Docket No. 2275), and the Debtors' Reply Brief on Procedures for the Litigation of the Common Personal Injury Liability Issues, filed on August 21, 2002 (Docket No. 2581).

2

criteria set out in the TDPs and that some qualifying Asbestos PI Claimants will elect not to participate in these proposed settlements, the Debtors realize that provision must also be made for litigation of non-settling Asbestos Claims. This New CMO Motion addresses this issue.

4.      By this New CMO Motion, the Debtors seek to institute such litigation protocols by which non-settling Asbestos Claims (including Asbestos PI Claims and Asbestos PD Claims) can be effectively and efficiently resolved in these Chapter 11 Cases. In particular, the Debtors request that this Court either (a) enter an order granting the Original CMO Motion, establishing pre-confirmation litigation protocols for the resolution of Asbestos Claims, or, (b) in the alternative, enter an order granting the relief requested in this New CMO Motion, establishing litigation protocols for the post-confirmation resolution of non-settling Asbestos Claims. Although this New CMO Motion is presented in connection with the latter request, the Debtors do not oppose entry of an order granting the Original CMO Motion, should this Court consider the Original CMO Motion to be the more appropriate request for relief.

5.      In either case, the Debtors request this Court to establish the process by which their Asbestos Claims liability can be resolved in an efficient and effective manner pursuant to certain defined and sequential litigation protocols. While the Debtors are confident that they would succeed at trial with respect to a substantial majority of these Asbestos Claims, it would be an unnecessary waste of the estates' assets to pursue costly individual litigation of these Asbestos Claims at this time, particularly where many of these Asbestos Claims share similar deficiencies that can be effectively resolved *en masse*, saving both the Debtors and this Court valuable time and resources. This New CMO Motion proposes establishing case management protocols for the efficient post-confirmation resolution of such Asbestos Claims.

3

## Jurisdiction

6.      This Court has jurisdiction over this New CMO Motion pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(5).

7.      The statutory bases for the relief requested herein are Bankruptcy Code §§ 105(a), 502 and Fed. R. Bankr. P. 3007, 7042.

## Background

8.      The Debtors filed their Plan and Disclosure Statement with the Bankruptcy Court on November 13, 2004. The Plan provides for, among other things, the creation of the Asbestos Trust to which all Asbestos PD Claims and Asbestos PI Claims[4] will be channeled for resolution and possible recovery.

9.      Under the Plan, each Holder of an Asbestos Claim will have the right to litigate his Asbestos Claim against the Asbestos Trust pursuant to the litigation protocols requested in this New CMO Motion.

## Original CMO Motion

10.      As noted above, promptly after these Chapter 11 Cases began, the Debtors filed the Original CMO Motion to resolve their actual liability with Holders of Asbestos Claims through pre-confirmation common issues litigation. The Asbestos PI Committee opposed the Debtors' case management procedures, and responded instead with a proposal to estimate the size of the post-confirmation trust to be set aside for such claims based solely on its preferred method of extrapolating future claim obligations from the Debtors' pre-bankruptcy claim settlements. In the five or more years preceding the bankruptcy, those settlements were typically made on a large scale, "inventory" basis, because the volume of claims precluded the Debtors (or

---

[4]    Asbestos PI Claims consist of Asbestos PI-SE Claims and Asbestos PI-AO Claims.

4

any other defendant) from resolving them through the tort system based on their individual merits.

11.    As detailed in the Debtors' Original CMO Motion briefing, and further explained in Part III.C. and Part III.D. of the accompanying Estimation Motion (discussed below), an analysis of the claims asserted against Grace showed that the vast majority lacked any reliable evidence of medical impairment or injury, and also lacked evidence of any actual exposure to Grace's asbestos products.    Part III.C of the Estimation Motion provides examples of the numerous studies, court decisions and articles that have further confirmed Grace's experience of the widespread abuse of the tort system through the filing of unsubstantiated claims.

12.    As the Debtors detailed in the Original CMO Motion briefing, the unexplained and unprecedented surge of claims filed in 2000 made it impossible for the Debtors to continue these inventory settlements. Rather than addressing this problem, the Asbestos PI Committee's estimation proposals would perpetuate it.    The Asbestos PI Committee's approach would extrapolate the Debtors' liability for pending and future claims by assuming the claims filed in 2000 were valid, despite the overwhelming evidence to the contrary.

13.    While the Debtors' and the Asbestos PI Committee's proposals were extensively briefed in 2001 and 2002, neither this Court nor the Bankruptcy Court has ever addressed these issues.

14.    While the Debtors are prepared to commence pre-confirmation litigation pursuant to the Original CMO Motion, given the passage of three and one-half years since these Chapter 11 Cases were filed, this New CMO Motion provides an alternative path for litigating the common asbestos liability issues following the confirmation of the Plan.    Toward that end, the Debtors propose to set aside the Asbestos Trust for Asbestos Claimants satisfying recognized

5

evidentiary standards as to causation for asbestos-related claims, including sufficient exposure to the Debtors' asbestos-containing products.

**Estimation Motion**

15.    The Debtors also filed their Estimation Motion on November 13, 2004.[5] Among other things, the Estimation Motion requests that the Bankruptcy Court set a bar date by which certain Holders of Asbestos PI Claims or Previously Settled/Adjudicated Asbestos Claims as to which, in either case, litigation was actually commenced prior to the Petition Date (together, the "Asbestos PI Pre-petition Litigation Claims") must file proofs of claim to preserve their rights against the Debtors' estates.[6]

16.    In connection with this process, the Estimation Motion seeks approval to use and distribute a customized short-form proof of claim (the "Asbestos PI Proof of Claim") and a detailed questionnaire (the "Asbestos PI Questionnaire") for Holders of Asbestos PI Pre-petition Litigation Claims.

17.    The Debtors propose to use the Asbestos PI Questionnaire for (i) estimating the Debtors' aggregate Asbestos PI Claim liability and (ii) facilitating the settlement of Asbestos Claims by providing an option for Holders of Asbestos PI Claims to elect to receive a cash settlement payment from the Debtors' estates. The scope of each Asbestos PI Claimant's rights with respect to the election will depend upon whether such Claimant holds an Asbestos PI-SE Claim or an Asbestos PI-AO Claim.

---

[5]    The title of the Estimation Motion is the "Debtors' Motion for Entry of An Order Seeking the Estimation of Asbestos Claims and Certain Related Relief."

[6]    Pursuant to the March 2003 Bar Date Order, the Bankruptcy Court previously set a bar date for non-ZAI Asbestos PD Claims and approved the form and distribution of customized claim forms for Holders of non-ZAI Asbestos PD Claims (the "Asbestos PD Proofs of Claim"). A bar date, however, was not set for Asbestos PI Claims or ZAI Claims.

## Summary of Relief Requested

18.    The Debtors request that the proposed New CMO be applicable to Holders of (i) Asbestos PI Claims who elect (or are deemed to elect) the Litigation Option under the Plan; and (ii) non-ZAI Asbestos PD Claims.[7]

19.    The Debtors and the Asbestos Trust propose the following five step process for the litigation and allowance/disallowance of all Asbestos Claims pursuant to the New CMO:

    i.    Omnibus Objections and Summary Judgment.    Except as otherwise provided in paragraph 20 below, the Debtors propose to use the information obtained from the Asbestos PI Proofs of Claim, Asbestos PD Proofs of Claim (together with the Asbestos PI Proofs of Claim, the "Court-Approved Proofs of Claim") and Asbestos PI Questionnaires, and initially file omnibus claims objections and, where necessary, move for summary judgment, requesting dismissal of Asbestos Claims that fail to meet certain threshold requirements for a valid Claim, including:

        1)    Asbestos Claims that fail to comply with the requirements for completing and submitting the Court-Approved Proofs of Claim and Asbestos PI Questionnaires (as detailed below);

        2)    Asbestos Claims that are based upon unreliable scientific evidence of injury or causation (as detailed below);

        3)    Asbestos Claims that are subject to the statute of limitations defense;

        4)    Asbestos Claims that fail to allege the requisite exposure to the Debtors' products; and

        5)    Asbestos Claims that lack reliable evidence that the Debtors' products or conduct caused the claimed disease or property damage.

The omnibus objections and summary judgment motions would be filed with this Court on an aggregate basis, allowing the Court to efficiently

---

[7]    No bar date has been set for ZAI Claims. The Bankruptcy Court has scheduled a trial on the issue of what science demonstrates with regard to whether ZAI creates an unreasonable risk of harm (the "ZAI Science Trial"). Upon resolution of the liability issues in the ZAI Science Trial, the Debtors may request that this Court extend the New CMO to apply to the resolution of ZAI Claims as well. The Debtors reserve their rights to make such a request.

resolve these questions on a common issue basis with respect to numerous pending Asbestos Claims.

ii.    Rule 42 Trials.  For those Asbestos Claims that withstand summary judgment scrutiny, but which present common issues capable of resolution on an aggregate basis, the parties would proceed to Rule 42 common issue trials (the "Common Issue Trials").

iii.   Application of Common Issue Trial rulings to pending claims.  The Debtors (or the Asbestos Trust) would file motions for summary judgment with respect to those individual claims or groups of claims that failed to state a claim under the court's Common Issue Trial rulings.

iv.    Claims Review and Resolution Process.  Upon resolution of the Common Issue Trials, and any follow-on summary judgment motions, the proposed New CMO will provide for an individualized claims review by the Debtors (or the Asbestos Trust) for purposes of determining a settlement offer, that, if necessary, will be followed by a settlement procedure (as further delineated herein), including mandatory, court-supervised mediation.

v.     Jury Trial.  Those Holders of Asbestos Claims who reject the Debtors' settlement offer and/or for whom the mediation process is unsuccessful, will retain the right to a jury trial in this District.

Each of the above-described steps, which collectively comprise the operative components of the proposed New CMO, is described in additional detail below.

20.    Pursuant to the Asbestos PD Gateway Objection Order,[8] the Bankruptcy Court has already approved a streamlined protocol (similar, but not identical, to that discussed in

---

[8]    On July 19, 2004, the Bankruptcy Court entered an order (the "Asbestos PD Gateway Objection Order", Docket No. 6009) granting the Debtors a limited waiver of Del. Bankr. L. Rule 3007-1 for the purpose of streamlining objections to non-ZAI Asbestos PD Claims filed pursuant to the March 2003 Bar Date Order. Among other things, the Asbestos PD Gateway Objection Order provides a protocol by which the Debtors may file initial omnibus objections (the "Gateway Omnibus Objections") to groups of non-ZAI Asbestos PD Claims based upon certain "gateway" deficiencies (e.g., insufficient supporting documentation), notwithstanding the otherwise applicable restrictions of Del. Bankr. L. Rule 3007-1. The protocols provided in the Asbestos PD Gateway Objection Order are limited to the Gateway Omnibus Objections and do not include additional provisions for common issue or settlement proceedings for non-ZAI Asbestos PD Claims that withstand, or otherwise are not subject to, the Gateway Omnibus Objections.

paragraph 19(i) above) by which the Debtors may file Gateway Omnibus Objections against non-ZAI Asbestos PD Claims. The Asbestos PD Gateway Objection Order, however, does not provide for any additional protocols for resolving non-ZAI Asbestos PD Claims beyond the Gateway Omnibus Objections. Therefore, with respect to the non-ZAI Asbestos PD Claims, the Debtors request that the proposed litigation protocols under the New CMO apply for purposes of resolving those Asbestos PD Claims that withstand, or otherwise are not subject to, the Gateway Omnibus Objections. Among other things, the New CMO will provide (as previewed in paragraphs 19(ii)-(v) above) for such non-ZAI Asbestos PD Claims to be resolved through Rule 42 Common Issue Trials, mandatory settlement proceedings and, if necessary, trial.

## Proposed Litigation Protocols[9]

21.    The following is a discussion of the five procedural steps of the proposed New CMO.

**Step #1:**    **Omnibus Claims Objections and Summary Judgment Adjudication of Common Issues Raised By the Court-Approved Proofs of Claim and Completed Asbestos PI Questionnaires**

        **A.**    **Submission of the Court-Approved Proofs of Claim and Asbestos PI Questionnaires**

22.    The Court-Approved Proofs of Claim and PI Questionnaires provide an efficient mechanism for obtaining and identifying information essential to determining the validity of Asbestos Claims. Copies of the Asbestos PI Questionnaire and Court-Approved Proofs of Claim are collectively annexed hereto as Exhibit A.

23.    The Asbestos PI Questionnaires and Court-Approved Proofs of Claim have been specifically designed to request and effectively elicit relevant information necessary to assess the

---

[9]    With respect to the post-confirmation litigation/resolution of Asbestos Claims, the term "Debtors", as used in this New CMO Motion, should be read to mean the "Asbestos Trust."

merits and bases of each Holder's Asbestos Claim. The Debtors propose to use the information provided in the Court-Approved Proofs of Claim and Asbestos PI Questionnaires for purposes of resolving liability issues with respect to the Asbestos Claims.[10]

**B.     Omnibus Claim Objections and Summary Judgment Motions**

24.     Pursuant to the proposed New CMO, the Debtors will file omnibus claim objections and move for summary judgment for failure to state a valid claim, on issues where dispositive evidence or admissions are confirmed by the completed Court-Approved Proofs of Claim and Asbestos PI Questionnaires. The Debtors expect that such filings will result in expunging and dismissing large numbers of similarly-situated Asbestos Claims.[11]

25.     The Debtors will provide notice and serve the claims objections and summary judgment motions upon each of the affected Asbestos Claimants. Holders of disputed Asbestos Claims would then have thirty (30) days to file a written response with this Court that complies with the applicable Bankruptcy Rules and Local Rules. The Court would then determine

---

[10]  For example, for Asbestos PI Claims, the following are a few of the general categories of information requested by the Asbestos PI Questionnaire which are particularly relevant for determining the Debtors' liability:

- Information concerning the Asbestos PI Claimant's medical diagnosis, including the date of first diagnosis, and the medical records relating to the diagnosis, all of which are necessary to establish claims of disease causation.

- Information needed to identify any alternative causes of a Claimant's disease.

- Information concerning the Asbestos PI Claimant's exposure to asbestos, and to the Debtors' products, in particular.

- Information necessary to determine whether the Asbestos PI Claims are barred by the doctrine of *res judicata*, such as information concerning any prior asbestos-related lawsuits or workers' compensation claims filed by the Claimant and any settlements or judgments.

[11]  Examples of such issues are discussed below in Argument, Section B.

10

briefing schedules, motions, an appropriate structure and schedule for discovery (if any), an appropriate structure and schedule for evidentiary hearings, and the sequence of timing for the various categories of claim objections.

26.    Some of these omnibus objections can be resolved promptly in a relatively ministerial fashion based on information that is apparent from the face of the Asbestos PI Questionnaire or Court-Approved Proof of Claim itself.  Indeed, history has shown that, once objections are filed, many Asbestos Claims that are defective on their face are likely to be withdrawn.  This has been the experience in the Babcock & Wilcox bankruptcy, where thousands of purportedly "settled" proofs of claim were withdrawn after objections were lodged by the debtor.

**Step #2:        Common Issue Trials**

27.    The Debtors believe that the vast majority of Asbestos Claims will be resolved, dismissed and expunged as a result of the aforementioned summary judgment and omnibus objection proceedings.  However, in the event that the summary judgment proceedings identify one or more disputed issues of material fact that are common to a large number of Asbestos Claims, those issues can be resolved using the Common Issue Trials pursuant to Fed. R. Civ. P. 42.  Through Bankruptcy Rule 7042, Fed. R. Civ. P. 42 specifically applies in adversary proceedings in these Chapter 11 Cases.

**Step #3:        Application of Common Issue Trial Rulings**

28.    The Debtors would then file summary judgment motions seeking the denial of Asbestos Claims that do not meet the standards established in the Common Issue Trial Rulings.

**Step #4:        Individualized Claim Review and Mandatory Mediation**

11

29.     Following the completion of the aforementioned summary judgment proceedings and any necessary Common Issue Trials, the Debtors propose to evaluate the settlement value of the remaining Asbestos Claims and make settlement offers, where appropriate.   Where a settlement offer is extended to, and accepted by, an Asbestos Claimant, the Asbestos Claimant will obtain payment from the Asbestos Trust pursuant to the PI-SE TDP, PI-AO TDP or PD TDP, whichever is appropriate.

30.     Asbestos Claims that are not settled would be subject to a mandatory settlement conference conducted by court-appointed mediators.

**Step #5:       Jury Trials**

31.     As the final step under the proposed New CMO, any Asbestos Claims that remain unresolved would be transferred to this District's litigation docket for further pretrial proceedings and, if appropriate, a jury trial.

32.     Accordingly, by this New CMO Motion, the Debtors seek entry of an order requiring that all personal injury tort and wrongful death claims against the Debtors be tried in this District Court, pursuant to 28 U.S.C. § 157(b)(5).[12]

**Argument**

**A.     The Debtors' Proposed Use of the Asbestos PI Questionnaires and Court-Approved Proofs of Claim Is Proper and Efficient**

33.     The Debtors propose to use the information obtained by the Asbestos PI Questionnaires and Court-Approved Proofs of Claim for purposes of resolving liability issues with respect to Asbestos Claims.   This proposed use is consistent with prior orders of the Bankruptcy Court and with applicable law.

---

[12] Future personal injury claims would be resolved pursuant to the proposed Litigation Protocols. Future claims would also be tried, if necessary, in this District.

12

34.     As detailed below, determination of the validity of various categories of Asbestos Claims ensures that only meritorious Claims receive payment. The "claims allowance process" in bankruptcy is "similar" to "[s]ummary judgment . . . in that one purpose is to isolate and dispose of factually unsupported claims." In re Standard Insulations, Inc., 138 B.R. 947, 954 (Bankr. W.D. Mo. 1992). The type of information that is germane to summary judgment can be, and has been, effectively elicited through proofs of claim.

35.     Judge Fitzgerald has already approved the use of detailed proofs of claim in these Chapter 11 Cases pursuant to the March 2003 Bar Date Order. In addition, the Bankruptcy Court entered the Asbestos PD Gateway Objection Order, authorizing the Debtors to pursue a streamlined litigation process with respect to certain gateway liability issues that are identified on such non-ZAI Asbestos PD Proofs of Claim. The Debtors have since requested, pursuant to the Estimation Motion, that the Bankruptcy Court approve the Asbestos PI Proof of Claim form.

36.     The Debtors' proposed use of the Court-Approved Proofs of Claim and Asbestos PI Questionnaires for purposes of the New CMO is consistent with the detailed claim forms and liability questionnaires that have been used in prior mass tort bankruptcies. See, e.g., In re A.H. Robins Co., 862 F.2d 1092 (4th Cir. 1988) (approving detailed questionnaire); In re Babcock & Wilcox Corp., Case No. 00-0558, at 4 (Bankr. E.D. La. Oct. 30, 2000 (approving asbestos personal injury proof of claim form for use in litigation protocols); In re Eagle-Picher Indus., Inc., 158 B.R. 713, 716 (Bankr. S.D. Ohio 1993) (referencing court-approved detailed asbestos proof of claim); In re Celotex Corp., 204 B.R. 586, 593 (Bankr. M.D. Fla. 1996) (discussing court-approved special asbestos proof of claim form).

37.     The particular requirements with respect to proof of claim forms and questionnaires vary depending on what issues are being contested in a particular case. Thus, in

13

Babcock & Wilcox, the court approved a detailed claim form that focused on certain common issues such as "the appropriate standard of liability, the availability of punitive damages, the validity of claims by unimpaired individuals, the validity of claims based on unreliable scientific evidence of disease and/or causation, the appropriate statute of limitations, and the applicability of the sophisticated purchaser and government contractor defense." In re Babcock & Wilcox Co., 2000 WL 422372, at *4 (E.D. La. 2000).

38.     The Babcock & Wilcox proof of claim form was specifically designed to facilitate a case management process by eliciting information for ruling on "motions for summary judgment on threshold liability issues." See id., at *5. Similarly, in A.H. Robins, the court approved a detailed questionnaire that was designed to specifically elicit "information of the claimant's use of the Dalkon Shield, the type of injury alleged and the names of physicians or clinics visited by the claimant." In re A.H. Robins Co., 862 F.2d at 1095-96 & n.4.

39.     Additionally, the use of detailed proof of claim forms and questionnaires is a proven and efficient means of obtaining information that would inevitably be required to determine the validity of, and resolve the merits on, particular claims. To that end, even outside of Chapter 11, similar forms have been used to streamline mass tort litigation in large cases involving injuries allegedly arising from diet drugs, orthopedic bone screws, and latex. See, e.g., In re Diet Drugs, 1999 WL 387322, at *1 (utilizing claim forms in order to "minimize time consuming and expensive exchanges of discovery" by numerous plaintiffs); In re Orthopedic Bone Screw Prods. Liab. Litig., 1997 WL 70472, at *4 (E.D. Pa. Aug. 22, 1997) (noting use of "questionnaire that requested, among other things, pertinent medical, employment, and worker's compensation information"); In re Food Lion, Inc., 1998 WL 322682, at *11 (4th Cir. 1998)

14

(questionnaires utilized "to streamline discovery" and "provide basic information about each plaintiff's claim").

40.    Moreover, for the Asbestos PI Questionnaire, the information requested therein is consistent with information that is required by major asbestos personal injury trusts when assessing the merits of an asbestos claim for purposes of determining a settlement amount. For example, the Celotex, Eagle-Picher, UNR, and Manville settlement trusts all require essentially the same type of information from claimants for purposes of assessing the validity and merits of Asbestos PI Claims. A table comparing the Asbestos PI Questionnaire's requests with those of Celotex, Eagle-Picher, Manville and UNR is annexed hereto as Exhibit B.[13]

41.    The Debtors therefore submit that the proposed use of the Asbestos PI Questionnaires and Court-Approved Proofs of Claim, in the context of the proposed New CMO, is neither burdensome nor prejudicial to Holders of Asbestos Claims. Quite to the contrary, the Asbestos PI Questionnaire and Court-Approved Proofs of Claim provide a fair, efficient, and proven means to elicit and evaluate information that is required for the resolution and adjudication of the Asbestos Claims.

**B.    The Proposed Use of Summary Judgment Proceedings and Omnibus Claims Objections is Efficient and Proper**

42.    The Debtors' proposed omnibus claims resolution process is consistent with Del. Local Bankr. R. 3003 and the practice in other large bankruptcy cases in this District and in other jurisdictions.[14] Indeed, in such context, a number of courts have recognized that the resolution of

---

[13] In fact, the information required in the detailed claim form used by the largest and best known claims resolution facility, the Manville Personal Injury Trust, is far more extensive than that requested in the Asbestos PI Questionnaire. A copy of the Manville Personal Injury Trust Claim Form is annexed hereto as Exhibit C.

[14] See, e.g., In re Marvel Entertainment Group, Inc., 254 B.R. 817, 820 (D. Del. 2000) (expunging claim after claimant did not respond to omnibus objection); Bartel v. Bar Harbor

common issues is essential in effectively resolving complex bankruptcy proceedings. See In re
Columbia Gas Sys., Inc., 224 B.R. 540, 544 (Bankr. D. Del. 1998) (since "it would have been
extremely time-consuming for the court to consider the merits in the first instance of even a
portion of these claims," the court established "a procedure for initial resolution of issues generic
to all or to large categories" of claims). See also FED. R. CIV. P. 42(a) and FED. R. BANKR. P.
7042(a) ("When actions involving a common question of law or fact are pending before the
court, it may order a joint hearing or trial of any or all the matters in issue in the actions . . . and
it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs
or delay."); Williams v. National Surety Corp., 257 F.2d 771, 776 (5th Cir. 1958) (consolidating
single underlying legal issue into one trial).

43.    Once the omnibus objections have been filed, the Court may rule on the summary
judgment motions "to weed out those claims which do not present a genuine issue of material
fact, and for which the debtor is entitled to judgment as a matter of law." In re Dow Corning
Corp., 215 B.R. 346, 360 (Bankr. E.D. Mich. 1997). See also In re Babcock & Wilcox Co., 2000
WL 422372, at *4 (E.D. La. Apr. 17, 2000).

44.    The Debtors submit that this process best serves the interests of the Debtors'
estates by marshalling the Debtors' resources in an efficient yet equitable manner.

---

Airways, Inc., 196 B.R. 268, 270 (S.D.N.Y. 1996) (granting debtors' omnibus objection by
disallowing creditor's claim); In re Box Bros. Holding Co., 194 B.R. 32, 36 (D. Del. 1996)
("[Debtor] filed an Omnibus Objection to Certain Proofs of Claim . . . [and] the Bankruptcy
Court granted the Omnibus Objection . . ."); In re Int'l Wireless Communications Holdings,
Inc., 257 B.R. 739, 742 (Bankr. D. Del. 2001) (sustaining omnibus objection and equitably
subordinating creditor's claim); In re United Companies Fin. Corp., 267 B.R. 524,-27
(Bankr. D. Del. 2000) (allowing in part claim after objection filed in omnibus objection); In
re FIRSTPLUS Fin., Inc., 248 B.R. 60, 65 (Bankr. N.D. Tex. 2000); In re 50-Off Stores, Inc.,
231 B.R. 592, 593 (Bankr. W.D. Tex. 1999) (granting debtor's omnibus objection and
disallowing creditor's claim).

45.    The following are some of the issues that will likely form the bases of the
Debtors' proposed omnibus objections and summary judgment proceedings:

      1.    **Failure to Comply with the Court-Approved Requirements of the
Asbestos PI Questionnaire and/or Court-Approved Proof of Claim**

46.    Under the Bankruptcy Rules, the ultimate burden of proof to establish a valid
claim "always rests upon the claimant." In re Fidelity Holding Co., 837 F.2d 696, 698 (5th Cir.
1988). "Initially, a claimant must allege facts sufficient to support a legal basis for the claim."
In re Pinnacle Brands, Inc., 259 B.R. 46, 49-50 (Bankr. D. Del. 2001). See also In re Waterman
SS Corp., 200 B.R. 770, 774 (Bankr. S.D.N.Y. 1996) (same).

47.    Asbestos PI Questionnaires and Court-Approved Proofs of Claim that fail to meet
the minimum requisites for establishing a valid Asbestos Claim should be expunged and
disallowed.  To weed out those Asbestos Claims which do not even meet the requirements for a
properly-filed "claim" under the Bankruptcy Rules and the procedures established by the Court,
the Debtors propose to file both non-substantive and substantive omnibus objections and seek to
disallow such deficient Asbestos Claims for all purposes.

48.    In particular, consistent with Del. Local Bankr. R. 3003, the Debtors intend to file
non-substantive omnibus objections to expunge those Asbestos Claims for which the Asbestos PI
Questionnaires or Court-Approved Proofs of Claim are either duplicative, late-filed or lacking
any supporting documentation.  In addition, the Debtors also intend to file substantive omnibus
objections to those Asbestos Claims which, based upon the face of the Asbestos PI Questionnaire
and Court-Approved Proof of Claim, fail to set forth the most rudimentary facts necessary to
support a cause of action against the Debtors (e.g., Asbestos PI Questionnaires that fail to
provide *any* medical information, fail to attach *any* medical records, or fail to provide *any*
exposure or work site data).  Unless an Asbestos Claimant produces such basic information

17

necessary to establish a valid Asbestos Claim, the Asbestos Claim should be expunged and disallowed.

### 2.   Asbestos Claims Based On Unreliable Scientific Evidence

49.   In order to maintain a valid claim, a plaintiff must demonstrate that tests were conducted using reliable and admissible methods. See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742, 745 (3d Cir. 1994), cert. denied, 513 U.S. 1190 (1990) (sponsoring party must demonstrate expert's findings are based on the scientific method and are reliable; any failure to do so renders testimony inadmissible). The scientific method relied upon may not be based on subjective speculation. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) at 590. The methodology must be real, and it must produce consistent, reproducible results. See id. at 590 n.9. Even if a test is *generally* reliable, testing is inadmissible if performed in an unreliable manner. See, *e.g.*, Metropolitan St. Louis Equal Housing Opp'y Council v. Gundaker Real Estate Co., 130 F. Supp. 2d 1074, 1082-83 (E.D. Mo. 2001) (excluding expert testimony based on flawed testing protocols).

50.   For Asbestos PI Claims, the two tests needed to establish asbestosis - the ILO Rating Test and Pulmonary Function Tests (PFT) - are (as described below) unfortunately subject to manipulation and can produce unreliable and non-reproducible results. While these tests can be scientifically valid when performed in accordance with recognized procedures and standards, they are invalid if those procedures and standards are not followed. In the latter case, such test data will lack sufficient reliability, reproducibility and scientific validity to be admissible under Daubert.

51.   Accordingly, the Debtors intend to file a summary judgment motion seeking dismissal of claims based upon ILO and PFT readings that have not been obtained in compliance with accepted standards. Once again, the information submitted with the Asbestos PI

18

Questionnaire will be essential to determining the reliability of the submitted diagnostic evidence. For example, the Asbestos PI Questionnaire requires (for non-malignant claims) submission of the results of any medical tests in which a medical doctor measured the Asbestos PI Claimant's lung function or capacity, and copies of those reports and tests. Asbestos PI Claimants must also submit copies of any X-rays or CT scans performed in the last two years and reports of their interpretation, including the Asbestos PI Claimant's ILO Report form along with information concerning the medical professionals that performed such tests. As detailed below, if such tests were not performed or evaluated in conformance with recognized standards, then the claim should be invalidated. See, e.g., Eagle Picher Indus. v. Liberty Mut. Ins. Co., 829 F.2d 227, 236 n.14 (1st Cir. 1987).

52.    The following two sections address some of the inherent uncertainties associated with the ILO Rating and PFT Tests for purposes of supporting Asbestos PI Claims.

### (1)    ILO Tests

53.    The International Labour Organization (ILO) developed criteria for grading chest X-rays used to identify asbestosis within the lungs or pleural thickening in the outer lining of the lungs. In practice, a physician will grade the X-ray on an "ILO Rating" scale of 0/0 (no abnormality) through 3/3 (most severe). The American Thoracic Society (ATS) has set an ILO Rating of 1/1 as the minimum needed to support a diagnosis of asbestosis.[15] The fact that an ILO reading of 1/0 represents only "suspect" disease, combined with the variable nature of a 1/0 reading, has led physicians and scientists to conclude that a 1/1 classification is the minimum level at which asbestosis reliably can be diagnosed in a clinical setting. The "authoritative

---

[15]    American Thoracic Society, *The Diagnosis of Non-Malignant Disease Related to Asbestos*, AM. REV. RESPIR. DIS. 363-367 (1986).

consensus view" enunciated by the American Thoracic Society is that an ILO reading of 1/1 or higher should be used to diagnose asbestosis.[16]

54.    There are two major and interconnected problems with ILO scores – variability and subjectivity.    Numerous studies have shown that lung X-rays are interpreted with tremendous variability by different readers (inter-observer variability) and even by the same reader at different times (intra-observer variability).    The ILO itself acknowledges that "there is significant variation in repeated readings of the same radiograph, not only from reader to reader, but also between readings by the same reader."[17]    The variability problem is particularly pronounced when an ILO reading is at the lower end of the classification scale.    As Dr. Hans Weill, a leading pulmonologist and asbestos researcher, has written:    "It is in the lower categories (0/1 to 1/1) that the greatest degree of interobserver variability (disagreement) occurs."[18]

55.    In the face of these problems, ILO readings must be confirmed by two independent and qualified readers to be admissible under Daubert.    All ILO readings must satisfy this requirement.    The ILO itself "strongly recommend[s] that at least two, and preferably three independent readings are made for each radiograph."[19]    Other experts agree.    As Dr. Ducatman

---

[16]    Id., at 363-68.

[17]    ILO 1980 INTERNATIONAL CLASSIFICATION OF RADIOGRAPHS OF THE PNEUMOCONIOSES INTERNATIONAL LABOUR ORGANIZATION, GENEVA 1980, at 20.    NIOSH has further acknowledged that "[r]ecently, the [B-reader] program has been criticized, the main concern being that variability among readers is excessive despite the training and certification. ("1980 ILO Report") There is also the perception some B-readers systematically bias readings in legal proceedings." M. Attfield & D. Wagner, A Report on a Workshop on the National Institute for Occupational Safety and Health B Reader Certification Program, JOM 34: 875-78 (1992).

[18]    H. Weill, Diagnosis of Asbestos-Related Disease, CHEST 91:802-03 (1987).

[19]    1980 ILO REPORT at 20.

has stated, "[a]t present, individual diagnoses, legal decisions and population assessments ought to rely on multiple readings."[20] The ILO classification of 1/0 suffers from an additional defect, because by definition it recognizes that a second reader could find no evidence of fibrosis. ILO classifications below 1/1 further fail to meet Daubert requirements of reliability and reproducibility because they are wholly subjective and dependent on the impressions, bias and experience of the interpreter.

56.    Daubert forbids analyses based on "subjective speculation" and on data where the results have such an enormous known rate of error. Daubert, 509 U.S. at 590, 594.[21] Indeed, courts have considered an ILO reading of 1/0 to be too uncertain for reliable diagnostic use. See, e.g., Eagle Picher Indus. v. Liberty Mutual Ins. Co., 829 F.2d 227, 236 n.14 (1st Cir. 1987) ("a reading of 1/0 is too uncertain to be used to diagnose a particular case."); Raymark Indus., Inc. v. Stempel, Case No. 88-1014-K, 1990 WL 72588, at * 7 (D. Kan. May 30, 1990) ("On the ILO scale, a reading of 1/0 is only a 'suspect' finding of fibrosis, and is not sufficient to diagnose asbestosis.").

57.    As for ILO readings of 1/1 or higher, the variability problem may be reduced but still remains. Each B-reader brings an individual level of experience and bias to what indisputably is a subjective process of interpretation. Consequently, the only way to ensure that a radiographic reading is reliable and reproducible is to have it examined by more than one certified B-reader.

---

[20] Ducatman et al., *B-Readers and Asbestos Medical Surveillance*, JOM 30:644-47, 646 (1988) (emphasis added).

[21] Some doctors believe a 1/0 reading may be used to diagnose asbestosis for clinical and research purposes, but that cannot satisfy *Daubert*'s reliability standard. The unreliability of low ILO readings was one factor in the ATS's determination that the threshold should be 1/1 or higher. *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESP. DIS. 136:1516-17 (1987).

21

### (2)    Pulmonary Function Tests (PFTs)

58.    PFTs are the best tool to determine whether an Asbestos PI Claimant has a physical impairment due to asbestos. Put simply, PFTs measure a subject's lung capacity to determine levels of breathing obstruction. But such tests are reliable only if performed accurately, and they are particularly subject to manipulation. For this reason, the ATS has issued comprehensive standards governing PFTs.[22] Inaccurate or poorly performed tests can result in improper diagnoses. Where the quality of a test is suspect, any dysfunction shown on the test "should only indicate the need for more definitive testing," and the physician should "avoid specific diagnostic statements."[23]

59.    Pulmonary function tests need to be scrutinized even more closely in the litigation context because proper performance of the tests requires full patient cooperation and effort. "Variability is greater in pulmonary function tests than in most other laboratory tests because of the need for consistent patient effort. Therefore, proper testing and valid results require an expert technician, as well as the patient's full cooperation and ability to understand and perform the test correctly."[24] Because the test is so dependent on the cooperation of the patient, the ATS cautions that "[t]he effort-dependent spirogram must be carefully scrutinized for quality."[25]

60.    Therefore, in order to survive a <u>Daubert</u> challenge, Asbestos PI Claimants relying on pulmonary function tests must demonstrate that those tests were conducted in a reliable and

---

[22]  ATS, *Lung Function Testing: Selection of Reference Values and Interpretative Strategies*, AM. REV. RESP. DIS. 144:1202-18, 1211 (1991).

[23]  Id.

[24]  Fitzgerald et al., *Office Evaluation of Pulmonary Function: Beyond the Numbers*, AM. FAMILY PHYSICIAN 54: 525-34, 527 (1996).

[25]  *ATS Standardization of Spirometry–1987 Update*, AM. REV. RESP. DIS. 136:1285-98 (1987).

accurate fashion, in conformance with the well-accepted standards established by the ATS. Qualified experts, with knowledge of the ATS standards and experience in performing and interpreting PFTs, can review existing tests to determine whether they were conducted properly.[26]  If not, the test by definition is not reproducible for that patient, and serious questions exist about the quality of the test and the patient's cooperation.

61.     Another important check is whether the spirometer (i.e., the instrument used to determine lung capacity for PFTs) was set to record for the full length of time recommended by the ATS.  Improperly truncating the recording time will cause a test falsely to appear as if a restrictive lung abnormality is present.  Appropriate predictive values must also be used to identify what constitutes abnormality and normality.[27]

### 3.     Asbestos Claims Lacking Reliable Evidence of Restrictive Impairment or Injury

62.     Courts universally require the plaintiff to demonstrate "that the defendant had a duty of care which [was] breached, and that the breach proximately caused legally cognizable injury."  See, e.g., Faya v. Almaraz, 329 Md. 435, 448, 620 A.2d 327 (1993) (emphasis added). The mere prospect of future harm, without any actual current harm, is not a legally cognizable personal injury."  Actual loss or damage resulting to the interests of another "is a necessary element of a negligence cause of action."  "The threat of future harm, not yet realized, is not enough."  PROSSER & KEETON ON TORTS § 30, at 165 (5th ed. 1984).[28]  A "mere change or

---

[26]  For example, reproducibility of the tests, as described in the ATS standards, is an essential check of whether a Forced Vital Capacity (FVC) test was properly conducted.  A minimum of three curves (spirometric tracings) must be generated if an FVC test is performed properly, and those curves should be virtually identical to each other.

[27]  An independent facility already exists at Tulane University Health Sciences Center, School of Medicine that could analyze and determine the validity of existing pulmonary function tests.

alteration in some physical person, object or thing" does not constitute a legally compensable harm. "Physical changes or alterations may be either beneficial, detrimental or of no consequence to a person." A person suffers harm only "[i]n so far as physical changes have a detrimental effect" on that person. Id. § 7 cmt. B.

63.     For example, in the asbestos context, the Maine Supreme Court concluded in Bernier v. Raymark Industries, Inc., 516 A.2d 534 (Me. 1986), that subclinical injury is not actionable. "Even assuming that any inhalation of asbestos dust immediately causes microscopic injury to lung tissues, we conclude that the subclinical injury resulting from such inhalation is 'insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.'" Id. at 543. The Bernier court was quoting from a Federal Employers' Liability Act (FELA) case, Schweitzer v. Consolidated Rail Corp., 758 F.2d 936, 942 (3d Cir. 1985), cert. denied, 474 U.S. 864 (1985).

64.     As the U.S. Supreme Court has recognized in FELA cases, "the words 'physical impact' do not encompass every form of 'physical contact'. And, in particular, they do not include a contact that amounts to no more than an exposure." Metro-North Commuter Railroad Co. v. Buckley, 521 U.S. 424, 432 (1997); see also Amendola v. Kansas City Southern Ry. Co., 699 F. Supp. 1401 (W.D. Mo. 1988) (inhalation of asbestos fibers alone did not represent physical injury sufficient to support a claim).

65.     Courts have therefore repeatedly found that asymptomatic asbestosis is not a legally cognizable injury. For example, in Burns v. Jaquays Mining Corp., 752 P.2d 28 (Ariz. App. 1987), the court granted summary judgment to an asbestos mill owner with regard to

---

[28]  This law also bars claims for medical monitoring costs. Medical monitoring claims present no present injury, only the risk of future injury. By definition, a risk of future injury is not compensable.

24

subclinical asbestosis claims because subclinical injuries do not amount to physical harm. "[U]ntil the asbestosis manifests itself one can only speculate as to the debilitating effects the plaintiff will suffer. Not all asbestosis is one hundred percent debilitating." Id. Consequently, the court stated, "[w]e see no reason to depart from traditional tort concepts and allow recovery for injuries before any disease becomes manifest." Id. at 31. The court reasoned that a contrary rule would give rise to a cause of action for countless plaintiffs who are healthy and might never manifest injury. Id. Furthermore,

> proof of damages in such cases would be highly speculative, likely resulting in windfalls for those who never take ill and insufficient compensation for those who do. Requiring manifest injury as a necessary element of an asbestos-related tort action avoids these problems and best serves the underlying purposes of tort law: the compensation of victims who have suffered.

Id. at 30.

66.     Similarly, in Taylor v. Owens-Corning Fiberglas Corp., 666 A.2d 681, 687 (Pa. Super. Ct. 1995) the Pennsylvania Superior Court found that "a plaintiff . . . must suffer discernible physical symptoms to have a compensable injury." Several of the plaintiffs whose cases had been consolidated in Taylor had been diagnosed with asbestosis but had no symptoms attributable to asbestos exposure. The court found that none of the plaintiffs had an injury sufficient to sustain a legal cause of action. Id. "[I]f a plaintiff is able to 'lead active, normal [life], with no pain or suffering, no loss of an organ function ...,' he does not have a compensable injury." Id. (quoting Giffear v. Johns Manville Corp., 632 A.2d 880, 887 (Pa. Super. 1993)).

67.     For these reasons, any "asbestosis" that does not result in at least "mild impairment" under the AMA's standards for evaluating PFT results cannot support a claim of medical impairment.

25

### 4.   Asbestos Claims Lacking An Occupational History Entailing Work with the Debtors' Products

68.   The Debtors also intend to file summary judgment motions based on certain Asbestos PI Claimants' failure to identify any occupational history involving actual work with the Debtors' products. In order to bring a valid personal injury claim, "a plaintiff must produce evidence sufficient to support an inference that he inhaled asbestos dust from the defendant's product." Harris v. Owens Corning Fiberglas Corp., 102 F.3d 1429, 1432 (7th Cir. 1996). There can be no personal injury claim unless the plaintiff establishes exposure to defendant's product. See generally PROSSER & KEETON ON TORTS § 103, at 713 (5th ed. 1984) (an essential element of a plaintiff's case is "the identification of the named defendant as the manufacturer of the defective product"). Thus, "[i]t is axiomatic that, if the defendant never sold asbestos to any of the locations where [the claimant] was allegedly employed, no cause of action lies against defendant." Outlaw v. Keene Corp., No. 88-9490, U.S. Dist. LEXIS 1245, at *3-4 (E.D. Pa. Feb. 5, 1990). Here, again, the information on the face of the Asbestos PI Questionnaire will determine the validity of the asserted Asbestos PI Claims. The Asbestos PI Questionnaire requires a description of each occupational position and job location in which exposure to the Debtors' products occurred, the specific Grace products that the Asbestos PI Claimant was exposed to, the specific job performed by the worker while he was exposed to Grace's product, and the proximity and duration of exposure to Grace's product at each location.

### 5.   Asbestos Claims Lacking Reliable Evidence that the Debtors' Products Caused the Claimed Disease or Property Damage

69.   Under Daubert, claimants must provide reliable, reproducible scientific evidence demonstrating that the disease they claim could be *caused* at the level of exposure to which they were exposed. Thus, for each disease claimed -- at the least, mesothelioma, lung cancer and asbestosis -- this Court may be asked to determine, as a threshold legal matter, the level of

26

exposure to asbestos that science establishes is capable of causing a two-fold excess of risk above the background risk for the general population.[29] The Debtors will seek to disallow all claims with exposure levels below that threshold.

70.    It is a fundamental tenet of science that "the dose makes the poison."[30] This is true with asbestos as with all other chemicals. Virtually every person in North America has been exposed to asbestos. Indeed, pathology data reports show that individuals in the general population have thousands, even millions, of asbestos fibers in their lungs with no adverse effect.[31] According to Dr. Andrew Churg, a leading pathologist of asbestos diseases, "one may find as many as 40 million fibers of chrysotile, 40 million fibers of tremolite, and 400,000 fibers of amosite or crocidolite in the lungs of the general population of Vancouver, along with 40,000 asbestos bodies." Even so, "there is no evidence that this fiber burden produces asbestos-related disease in the general population."

71.    Hence, not every person who worked near a Grace asbestos product can demonstrate that product substantially contributed to his claimed injury. Here again, threshold

---

29  Daubert v. Merrell Dow Pharm., 43 F.3d 1311, 1320-22 (9th Cir. 1995) ("Daubert II") (plaintiffs' experts must establish at least a doubling of risk from exposure, or else their opinions would "tend[] to disprove legal causation" under a "more probable than not standard."); see also Hall v. Baxter Healthcare, 947 F. Supp. 1387, 1403 (D. Ore. 1996) (the fit prong of Daubert required plaintiffs to demonstrate on the basis of epidemiological evidence that "exposure to implants more than doubled the risk of their alleged injuries.").

30  This principle, first articulated by Paracelsus in the 16th century, is one of the foundations of modern toxicology. In the words of Paracelsus: "What is there that is not poison? All things are poison and nothing [is] without poison. Solely the dose determines that a thing is not a poison." See CASARETT AND DOULL'S PRINCIPLES OF TOXICOLOGY: THE BASIC SCIENCE OF POISONS (Klaasen ed., 5th ed., 1996); REFERENCE GUIDE ON TOXICOLOGY, IN FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 403 (2000).

31  "The first conclusion to be drawn is that everyone in the population carries a fairly substantial burden of asbestos fibers in their lungs." CHURG, A., NONNEOPLASTIC DISEASE CAUSED BY ASBESTOS, IN PATHOLOGY OF OCCUPATIONAL LUNG DISEASE 293 (Churg & Green, ed. 2nd 1998).

determinations must be made under <u>Daubert</u>. The whole concept that "the dose makes the poison" is incorporated into the Court's gatekeeping function under <u>Daubert</u>. A Holder of an Asbestos PI Claim thus has the burden of proving – by reliable and reproducible evidence – that (1) there is an established level of exposure to asbestos that causes disease in humans (i.e., general causation) and (2) the Asbestos PI Claimant himself was in fact exposed to the requisite dose (i.e., specific causation).[32] "[A] plaintiff in a toxic tort case must prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover." <u>Wright v. Willamette Indus., Inc.</u>, 91 F.3d 1105, 1106 (8th Cir. 1996). Absent "accurate information on the level of [plaintiff's] exposure," a plaintiff's causation testimony must be excluded and summary judgment granted. <u>Moore v. Ashland Chem. Co.</u>, 151 F.3d 269, 278 (5th Cir. 1998) (en banc), <u>cert. denied</u>, 526 U.S. 1064 (1999). Unless and until the Asbestos PI Claimant establishes the existence of a dose sufficient to establish a doubling of the normal, "background" risk – and further establishes actual exposure to an amount in excess of that dose – the trier of fact is left to guess whether that particular Asbestos PI Claimant's exposure was sufficient to cause disease. Guesswork is insufficient under <u>Daubert</u> or any other rule of evidence. In <u>Mitchell v. Gencorp.</u>, 165 F.3d 778 (10th Cir. 1999), the Tenth Circuit affirmed summary judgment because the plaintiff had not shown sufficient reliable scientific information of "levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance." As the Tenth Circuit explained: "Absent supporting scientific data, . . . estimates and . . . conclusions are little more than guesswork.

[32] <u>See</u> <i>Reference Guide on Epidemiology</i>, <i>in</i> FEDERAL JUDICIAL CENTER REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 382 (2000) ("The plaintiff must establish not only that the defendant's agent is capable of causing disease, but also that it did cause the plaintiff's disease.").

Guesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case." Id. at 781.

72.     It will be the Asbestos PI Claimants' burden to demonstrate through reliable scientific evidence the levels of exposure sufficient to contribute substantially to both malignant and non-malignant asbestos-related disease.  It will also be their burden, in certain cases, to prove the occupational activities where the Asbestos PI Claimants' exposures to a Grace product reached such levels.  Accordingly, following Daubert proceedings, the Debtors expect to move for summary judgment on certain Asbestos PI Claims where the occupational activity that involved exposure to Grace products has not been proven (through evidence meeting Daubert standards) sufficient to contribute substantially to the causation of the claimed disease.

## Conclusion

73.     The Debtors therefore submit that the post-confirmation resolution of their Asbestos Claims pursuant to the proposed New CMO will serve the collective best interests of the Debtors' estates and creditors by providing a fair and efficient means by which the Debtors and Holders of Asbestos Claims may resolve issues regarding the Debtors' liability and ultimately determine the amounts to be distributed by the Asbestos Trust to individual Holders of Allowed Asbestos Claims.  In the alternative, the Debtors request that this Court enter an order granting the Original CMO Motion, establishing litigation protocols by which Asbestos Claims can be effectively resolved pre-confirmation.

## Notice

74.     Notice of this New CMO Motion has been given to: (i) the Office of the United States Trustee, (ii) counsel to the debtor-in-possession lenders, (iii) counsel to the agent for the Debtors' pre-petition lenders, (iv) counsel to all official committees appointed by the United States Trustee and (v) all those parties that requested service and notice of papers in accordance

with Fed R. Bankr. P. 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter a case management order (i) establishing the foregoing protocols for litigating asbestos-related claims post-confirmation and (ii) granting such further relief as is deemed just and proper.

Dated: November 13, 2004

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Andrew R. Running
Janet S. Baer
Jonathan Friedland
Ryan Blaine Bennett
200 East Randolph Drive
Chicago, IL 60601
Telephone: (312) 861-2000

Bennett L. Spiegel
Lori Sinanyan
777 South Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 680-8400

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and
Debtors in Possession