IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

**Objection Deadline: December 3, 2004**
**Hearing Date: December 20, 2004 at Noon (Pittsburgh, PA)**

## DEBTORS' MOTION FOR ENTRY OF AN ORDER SEEKING THE ESTIMATION OF ASBESTOS CLAIMS AND CERTAIN RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Grace") file this motion (the "Estimation Motion") seeking (a) entry of an order determining estimates of the aggregate amounts needed to fund[2] the Asbestos Trust to enable the Asbestos Trust to pay in full all Allowed Asbestos Claims and Asbestos Trust Expenses, as and when they

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] It is contemplated that the Asbestos Trust will be funded 31 days following the Effective Date.

become due (the "Estimation Order"), and (b) entry of an order establishing a schedule and procedures for carrying out the requested estimations (the "Estimation Procedures Order").[3]

### Introduction

1.  Since the first day these Chapter 11 Cases were filed in April 2001, and as reflected in our June 21, 2004 Status Report to the District Court, the central task in these Chapter 11 Cases has always been to define the Debtors' true liability to Asbestos Claimants. A scientifically unexplainable and unexpected surge in claims in 2000 made it impossible for the Debtors to continue to manage their asbestos caseload without bankruptcy protection. For years before then, however, an impossibly high volume of claims filings forced Grace, like many other asbestos defendants, to settle tens of thousands of claims with no ability to weed out non-meritorious claims or cases for which no liability could ever be established.

2.  Promptly after the filing of these Chapter 11 Cases, we proposed in June 2001 to determine Grace's asbestos liability early, using traditional FRCP 42 common issue litigation before plan confirmation.[4] The District Court never considered the matter.

3.  As promised in our June 21, 2004 Status Report, and recognizing this Court's desire to proceed quickly to plan confirmation, today the Debtors propose an alternative protocol which calls for an estimation of the Debtors' liability *pre-confirmation*, with common issues litigation to follow *post-confirmation*. We are prepared to pursue either approach.

4.  Implementation of the estimation procedures detailed in this Estimation Motion would in fact facilitate either approach. As detailed herein, these estimation procedures can be used to determine the feasibility of the Plan and to cap Grace's liability for all classes of Asbestos Claims other than the Asbestos PI-AO Claims detailed in the Plan. Alternatively, the

---

[3]  Capitalized terms not otherwise defined herein have the meanings ascribed to them in the "Glossary of Terms Used in Plan Documents" (the "Glossary") filed simultaneously herewith.

[4]  On June 27, 2001, the Debtors filed their "Motion for Entry of Case Management Order, Establishment of Bar Date, Approval of Proof of Claim Forms & Approval of Notice Program" (Docket # 536), referred to herein as the "Original CMO Motion."

2

information gained through the estimation process would also be of critical value in defining Grace's liability through the litigation process proposed in Grace's Original CMO Motion.

5.      As described further within, this Estimation Motion proposes procedures for estimating liability for asbestos personal injury claims (both Asbestos PI-SE and Asbestos PI-AO Claims) and asbestos property damage claims (both traditional and ZAI Claims). Because these types of claims have proceeded on somewhat different paths thus far in these Chapter 11 Cases, the steps required for estimation vary somewhat, depending on the type of claim.

6.      For traditional (non-ZAI) property damage claims, the Court has already set a bar date and the completed claims forms have already been received and analyzed. These claims are therefore already in a posture, after an appropriate period for the completion of expert discovery and the scheduling of a contested estimation hearing, for the Court to reach a binding estimation. The validity of individual claims can then be litigated post-confirmation through omnibus objections and other common issue litigation procedures, with litigation of specific claims to follow if and when necessary.

7.      For ZAI property damage claims, the parties have completed discovery and have fully briefed summary judgment motions concerning the threshold science issues needed to determine whether any of these claims should be allowed. If any types of ZAI claims survive the science trial process, the next step should be to approve a bar date, claim form and a notice program to identify the actual ZAI claimants. The information gained through these claim forms would be critical to either an estimation of Grace's ultimate liability under a plan process, or in the alternative, to the litigation of the remaining ZAI common issues pursuant to the proposed Original CMO Motion.

8.      The personal-injury claims pose the biggest challenge, because no progress has been made on this front since Grace filed its Original CMO Motion. Whether these Chapter 11 Cases are resolved through a plan process or through pre-confirmation common issues litigation, the first priority should be to better understand the population of claimants with unresolved personal injury lawsuits as of the Petition Date. Those claimants have already

3

retained counsel, who in turn were sufficiently prepared to file suit against Grace. Grace knows who those claimants and their counsel are, so direct notice of a bar date can be served, and prompt responses can be required. Claims forms can be followed up with claims questionnaires, which will enable the parties to develop a detailed "snapshot" of the actual medical conditions and exposure histories of the claiming population as it existed on the Petition Date. From that information, the parties can develop meaningful estimates of Grace's actual liability to these claimants for plan confirmation purposes, as well as projections of Grace's liability to future claimants. Alternatively, the claims questionnaires can be used to litigate common issues through pre-confirmation litigation. Under either approach, obtaining the information requested in the questionnaire is a critical first step.

9. If the Court decides to pursue the plan process and to defer common issues litigation of the liability issues until the post-confirmation stage of these proceedings, it is critical that case management procedures be set as a part of the plan confirmation process. Grace is therefore filing today a post-confirmation case management procedures motion.

### Jurisdiction

10. This Court has jurisdiction over this Estimation Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding as provided by 28 U.S.C. § 157(b)(2)(B).

11. The statutory bases for the relief requested herein are Bankruptcy Code §§ 105(a) and 502(c).

4

## Background and Relief Requested

12.     The Debtors filed their Plan and Disclosure Statement on November 13, 2004. The Plan provides for, among other things, the creation of a post-confirmation trust (the "Asbestos Trust") to which all Asbestos PD Claims and Asbestos PI Claims[5] will be channeled for recovery. The Debtors propose, in their Plan, that the Asbestos Trust initially be funded with the amount of money the Court estimates pursuant to this Estimation Motion to be sufficient to enable the Asbestos Trust to pay all Allowed Asbestos PI-SE Claims, Asbestos PI-AO Claims, and Asbestos PD Claims in full, once they are eventually settled or adjudicated on the merits, and all Asbestos Trust Expenses.

13.     The Debtors intend to use these estimates in support of feasibility and other findings necessary to achieve confirmation of their Plan. The only alternative would be to litigate hundreds of thousands of Asbestos Claims individually prior to confirmation, an expensive and unwieldy proposition that would delay Distributions for years.

14.     To carry out the proposed estimations, this Estimation Motion also seeks an order (the Estimation Procedures Order) adopting the following five-step process:

(a)     Establishing an Asbestos PI Pre-petition Litigation Bar Date and Questionnaire Return Date (defined below);

(b)     Approving the scope and manner of notice of the Asbestos PI Pre-petition Litigation Bar Date and Questionnaire Return Date;

(c)     Approving the form and manner of distribution of Asbestos PI Proof of Claim Forms and Asbestos PI Questionnaires;

(d)     Setting an expert discovery schedule; and

(e)     Holding an evidentiary hearing to estimate the requisite monetary allocations to the Asbestos Trust.

---

[5]     Asbestos PI Claims consist of Asbestos PI-SE Claims and Asbestos PI-AO Claims.

I.      **Request for Estimating Asbestos Claims and Asbestos Trust Expenses to Determine the Requisite Monetary Allocations to the Asbestos Trust.**

15.     First, in conjunction with the Debtors' Plan, the Debtors request that this Court estimate the aggregate amounts needed to fund the Asbestos Trust to enable the Asbestos Trust to pay in full all Allowed Asbestos PI-SE Claims, Allowed Asbestos PI-AO Claims, Allowed Asbestos PD Claims, and Asbestos Trust Expenses, as and when they become due. These estimates are referred to in the Debtors' Plan as (a) the Asbestos PI-SE Class Fund, (b) the Asbestos PI-AO Class Fund, (c) the Asbestos PD Class Fund, and (d) the Asbestos Trust Expenses Fund.[6]

16.     Second, the Debtors request that this Court find that (a) the Asbestos PI-SE Class Fund shall constitute the maximum amount that the Reorganized Debtors shall have to pay on account of all Allowed Asbestos PI-SE Claims; (b) the Asbestos PD Class Fund shall constitute the maximum amount that the Reorganized Debtors shall have to pay on account of all Allowed Asbestos PD Claims; and (c) the Asbestos Trust Expenses Fund shall constitute the maximum amount that the Reorganized Debtors shall have to pay on account of all expenses of the Asbestos Trust.[7]

II.     **Establishing a Schedule and Procedures for Carrying Out the Estimates to Determine the Requisite Monetary Allocation to the Asbestos Trust.**

17.     While the crux of this Estimation Motion is the Debtors' request for estimation and determination of the requisite monetary allocations to the Asbestos Trust, the actual estimation is the last step in a five-step process by which this Court must first facilitate the identification of the scope of the Debtors' aggregate liability for Asbestos Claims.

---

[6]     Two of the conditions precedent to confirmation of the Debtors' Plan are (i) the Court shall have found the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expense Fund is not greater than $1,483,000,000; and (ii) the Court shall have found the Asbestos PI-AO Class Fund is not greater than $130,000,000. See Plan § 7.6.1.

[7]     These three findings are also set forth in the Debtors' Plan as conditions precedent to confirmation of the Plan. See Plan § 7.6.2(d).

A.     **Establishing an Asbestos PI Pre-petition Litigation Bar Date and Questionnaire Return Date.**

18.     As the first step in the estimation process, the Estimation Motion requests that this Court establish the Asbestos PI Pre-petition Litigation Bar Date as the final date by which any person or Entity holding an Asbestos PI Pre-petition Litigation Claim[8] must file an Asbestos PI Proof of Claim Form, in order to receive a Distribution in these Chapter 11 Cases.

19.     Bankruptcy Rule 3003(c)(3) provides that "the court shall fix . . . the time within which proofs of claim or interest may be filed."

20.     The Debtors request that the Asbestos PI Pre-petition Litigation Bar Date be 40 days after entry of the Estimation Order, allowing the Debtors to complete the mailing of the notice of the Asbestos PI Pre-petition Litigation Bar Date and Asbestos PI Proof of Claim Form within ten days of that Estimation Order. No later than five days after the Asbestos PI Pre-petition Litigation Bar Date, Holders of Asbestos PI Pre-petition Litigation Claims who timely filed Asbestos PI Proof of Claim Forms would be sent an Asbestos PI Questionnaire, which would be due 30 days later, the "Questionnaire Return Date."[9]

---

[8]   The term "Asbestos PI Pre-petition Litigation Claim," as defined in the Glossary, shall mean any Asbestos PI Claim that is based upon either (i) a Pre-petition Lawsuit for which no judgment or enforceable settlement was reached before the Petition Date, or (ii) to the extent that a final judgment was rendered or an enforceable settlement was reached, and the settlement or judgment, as applicable, places any obligation(s) upon any Debtor(s), such Debtor(s) has not satisfied its obligations pursuant to the judgment or settlement.

[9]   As set out further within, focusing on pre-petition claimants makes sense: This is a readily identifiable group, limited as a practical matter to those who have already retained counsel and gathered enough data to file a complaint against the Debtors. Thus, requiring these individuals to complete and file materials in support of their Claims should impose a minimal burden on the claimants, and on the flip side, notice costs to the estates should also be minimal because contact information for these individual claimants or their counsel is already available to the Debtors.

7

**B.    Approving the scope and manner of notice of the Asbestos PI Pre-petition Litigation Bar Date.**

21.    In connection with the request for establishing the Asbestos PI Pre-petition Litigation Bar Date described above, this Estimation Motion also seeks approval of the form and manner of notice of such bar date.

22.    In that regard, the Debtors propose that, within ten (10) calendar days after entry of the Order granting the relief requested herein, the Debtors will distribute notice of the Asbestos PI Pre-petition Litigation Bar Date (the "Asbestos PI Pre-petition Litigation Bar Date Notice") and the Asbestos PI Proof of Claim Form, to all known Holders of Asbestos PI Pre-petition Litigation Claims.  No later than five days after the Asbestos Pre-petition Litigation Bar Date, Grace will distribute notice of the Asbestos PI Questionnaire and the Asbestos PI Questionnaire to all Holders of Asbestos PI Pre-petition Litigation Claims who timely filed Asbestos PI Proof of Claim Forms.  The Asbestos PI Questionnaire would be required to be returned 30 days later, the Questionnaire Return Date.  The Asbestos PI Pre-petition Litigation Bar Date Notice, the Asbestos PI Proof of Claim Form, the notice of the Asbestos PI Questionnaire, and the Asbestos PI Questionnaire, which are annexed hereto as Exhibit B, Exhibit C, Exhibit D and Exhibit E respectively, will be hereinafter referred to collectively as the "Asbestos PI Claim Materials."

23.    Because the proposed Asbestos PI Pre-petition Litigation Bar Date Notice will apply only to Holders of Asbestos PI Claims who are known to the Debtors or their Professionals, there is no need for the Debtors' estates to incur the expense and burden associated with publishing notice of the Asbestos PI Pre-petition Litigation Bar Date or the Questionnaire Return Date.

**C.    Approving form and distribution of Asbestos PI Claim Materials.**

24.    As the third step in this estimation process, the Estimation Motion requests that this Court approve the form, use and manner of distribution of the Asbestos PI Claim Materials to Holders of Asbestos PI Pre-petition Litigation Claims (and certain other Holders of

8

Asbestos PI Claims who request an Asbestos PI Questionnaire) for purposes of eliciting information related to the nature and scope of such Claims.

### D.    Setting expert discovery schedule.

25.    Fourth, the Debtors request that this Court set an expert discovery schedule that provides for a reasonable period of time for the Debtors' and other interested parties' (including the various official committees') experts to review the data received in the Asbestos PI Proof of Claim Forms and Asbestos PI Questionnaires and prepare Rule 26 expert reports. The Debtors propose that the appointed claims processing agent in these Chapter 11 Cases, Rust Consulting, Inc. (the "Claims Processing Agent"), be given twenty-one (21) days from the deadline for receipt of the Asbestos PI Questionnaire to compile the Claims information into a navigable database and make it available to the Debtors' and the various official committees' estimation experts, if any. The Debtors also propose that the experts be allowed forty-five (45) days to complete their reports and be given two (2) weeks in which to be deposed.

### E.    Holding an evidentiary hearing to estimate the requisite monetary allocations to the Asbestos Trust.

26.    Finally, after the completion of the expert discovery process, the Debtors request that this Court permit the Debtors to proceed to the fifth and final step in the estimation process by holding an evidentiary hearing to estimate the requisite monetary allocations to the Asbestos Trust. The Debtors anticipate that the estimation hearing could be scheduled within six (6) months after the entry of the Estimation Order.

27.    At the conclusion of the evidentiary hearing, the Debtors request that, among other things, this Court estimate the aggregate amounts needed to fund the Asbestos Trust to enable the Asbestos Trust to pay in full, as and when they come due, all Allowed Asbestos PI-SE Claims, Asbestos PI-AO Claims, and Asbestos PD Claims, as well as the Asbestos Trust Expenses.

9

## Argument

I.    **The Bankruptcy Court has Jurisdiction to Estimate Asbestos PI Claims for Plan Purposes.**

28.    Pursuant to this Estimation Motion, the Debtors ask this Court to estimate the aggregate amount of certain classes of personal injury asbestos-related claims. These estimates are to be used in conjunction with determining confirmation of the Debtors' Plan, not for distribution purposes. Pursuant to 28 U.S.C. § 157(b)(2)(B), core proceedings, which may be heard by the bankruptcy court, include estimation for the purposes of confirmation of a plan under chapter 11, "but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution."

29.    Cases generally hold that the estimation of personal injury claims for purposes of determining plan feasibility is a core proceeding that can be heard by the bankruptcy court without a jury, while the estimation of such claims for distribution purposes may need to be heard by a district court, and may give rise to the claimants' right to a jury trial. *See, e.g., In re Poole Funeral Chapel, Inc.*, 63 B.R. 527, 532, 534 (Bankr. N.D. Ala. 1986) (the bankruptcy court concluded that it had the right and duty to estimate personal injury tort claims for purposes of feasibility of the plan (which is a core proceeding), and that after it estimated the tort claims for plan purposes, the reference could then be withdrawn, allowing the district court to *try* the tort cases for purposes of distribution); *In re UNR Industr., Inc.*, 45 B.R. 322, 326 (D.N.D. Ill. 1984) (while estimation of personal injury claims for purposes of distribution must be heard by a district court, prior to that, estimations of such claims for purposes of determining plan feasibility can be heard by the bankruptcy court without a jury); *A.H. Robins Company, Inc. v. Piccinin*, 788 F.2d 994, 1012 n.16, 1013 (4th Cir. 1986) (same).

30.    The policy supporting this conclusion is that estimating personal injury claims first best serves the ultimate goal of reorganization of the debtor. "[T]he first and primary purpose of the proceedings . . . is to ascertain whether a fair reorganization of the debtor can be achieved. This purpose may well be completely thwarted if the energies of the debtor's executives and officers are initially diverted by, and the resources of the debtor are dissipated in

10

the expenses of litigating, the trial of thousands of personal injury suits in courts throughout the land spread over an interminable period of time." *A.H. Robins Company, Inc. v. Piccinin*, 788 F.2d at 1012.

31.     Here, this Court has the jurisdiction to grant the relief requested in this Estimation Motion, including determining estimates of the aggregate amounts needed to fund the Asbestos Trust to enable the Asbestos Trust to pay in full all Allowed Asbestos PI-SE Claims, Allowed Asbestos PI-AO Claims, Allowed Asbestos PD Claims, and Asbestos Trust Expenses, as and when they become due.

32.     In the event this Court concludes that it does not have jurisdiction to grant the relief requested in this Estimation Motion, the Debtors request that this Court refer this Motion to the District Court.

II.     **The Court Has Authority to Estimate Claims and to Fix the Debtors' Aggregate Liability On Account of Certain Classes of Claims In These Chapter 11 Cases.**

33.     This Court has the authority to estimate Claims, including Asbestos PI Claims, in conjunction with confirmation of the Debtors' Plan. Furthermore, estimation in this case is necessary and integral to the Debtors' ability to reorganize.

34.     Where liquidating or fixing Claims by ordinary adjudication would unduly delay the administration of a bankruptcy case, Bankruptcy Code § 502(c)(1) provides that "there shall be estimated for purpose of allowance . . . any contingent or unliquidated Claim . . . ."

35.     As discussed in more detail below, early in these Chapter 11 Cases, the Debtors, in their Original CMO Motion, proposed a process for fairly and efficiently resolving the approximately 129,000 Asbestos Claims pending against the Debtors at the time these Chapter 11 Cases were filed. That proposed Original CMO Motion included litigation protocols and procedures for determining the Debtors' ultimate liability. This pre-confirmation Claims resolution process was put on hold for years, however. As set out in Grace's June 2004 Status Report to the District Court, the Debtors would still be prepared to follow those procedures. In the alternative, however, the Debtors now propose a plan to capture hoped-for settlements as

11

well as provide for litigation of personal injury issues *post*-confirmation.  In order to do so, the Debtors must now invoke the estimation process -- a process specifically authorized and contemplated by the Bankruptcy Code for dealing with contingent or unliquidated Claims so as not to unduly delay administration of these Chapter 11 Cases.

36.     Part of the relief requested by this Estimation Motion is that this Court find that: (a) the Asbestos PD Class Fund constitutes the maximum amount that the Reorganized Debtors shall have to pay on account of all Allowed Asbestos PD Claims and that (b) the Asbestos PI-SE Class Fund constitutes the maximum amount that the Reorganized Debtors shall have to pay on account of all Allowed Asbestos PI-SE Claims.  These findings are also conditions precedent to confirmation of the Debtors' Plan.  While these estimates would not be binding on any individual Asbestos PI-SE Claimant or Asbestos PD Claimant for distribution purposes, they will ultimately serve as a cap on the aggregate Distribution to the Asbestos PI-SE and Asbestos PD Classes, respectively.

37.     This Court has the authority to impose a capped estimate on these Classes of Claims.  Other courts have agreed to impose capped estimates on claims in the personal injury, mass tort context.  *See e.g. In re Eagle-Picher Industries, Inc.*, 189 B.R. 681, 682, 692 (Bankr. S.D. Ohio 1995) (the bankruptcy court estimated and fixed the total value for asbestos personal injury Claims at $2,502,511,000 for purposes of distribution); *In re A.H. Robins Co., Inc.*, 88 B.R. 742, 747 (D.E.D. Va. 1988) (the district court confirmed the debtor's plan, estimating and capping a class of mass tort personal injury Claims at $2.475 billion, finding that the estimated sum was sufficient to pay in full all Dalkon Shield personal injury claims); *In re UNR Industr., Inc.*, 45 B.R. at 327 (the district court recognized that a bankruptcy court could estimate a class of 17,000 asbestos-related personal injury and wrongful death Claims against the debtor, despite the objection of the creditors' committee of asbestos-related plaintiffs that allowing such an estimation would cap distribution on those claims).

38.     In light of the foregoing, and for the reasons set forth below, this Court should exercise its authority to estimate the aggregate Asbestos PI-SE Claims, Asbestos PI-AO

12

Claims and Asbestos PD Claims in these Chapter 11 Cases and fix the Debtors' liability on account of the classes of Asbestos PI-SE and Asbestos PD Claims.

**III.     Estimation of Asbestos Claims is Necessary in Conjunction with the Debtors' Plan if Litigation is Deferred Until After Confirmation.**

39.     As noted above, promptly after these Chapter 11 Cases began, the Debtors filed the Original CMO Motion, a detailed case management procedures motion intended to resolve the Debtors' actual liability to Asbestos PI Claimants through pre-confirmation common issues litigation.   The Asbestos PI Committee opposed the Debtors' case management procedures, and responded instead with a proposal to estimate the size of the post-confirmation trust to be set aside for such Claims based solely on its preferred method of extrapolating future Claim obligations from the Debtors' pre-bankruptcy Claim settlements.  In the five or more years preceding the bankruptcy, those settlements were typically made on a large scale, "inventory" basis, because the volume of Claims precluded the Debtors (or any other defendant) from resolving them through the tort system based on their individual merits.

40.     As we detailed in the Debtors' CMO Briefing,[10] the unexplained and unprecedented surge in Claims in 2000 made it impossible for the Debtors to continue these inventory settlements.   Rather than addressing this problem, the Asbestos PI Committee's

---

[10]  The Debtors' case management order briefing includes, (i) the Original CMO Motion, (ii) the Debtors' reply brief entitled "Consolidated Reply in Support of Their Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms and Approval of the Notice Program" (docket #1106), filed on November 11, 2001 (the "2001 CMO Reply Brief"), (iii) the Debtors' revised CMO Motion entitled "Debtors' Revised Motion as to All Asbestos Personal Injury Claims for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claims Forms and of the Notice Program" (docket #1664), filed on February 12, 2002, (iv) the Debtors' reply brief entitled "Consolidated Reply in Support of Their Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms with Respect to Asbestos Personal Injury Claims and Approval of the Notice Program" (docket #1666), filed on February 12, 2002 (the "2002 CMO Reply Brief"), (v) the Debtors' supplemental brief entitled "W.R. Grace's Supplemental Brief Regarding Procedures for the Litigation of the Common Personal Injury Liability Issues" (docket #2275), filed on June 21, 2002, and (vi) the Debtors' reply brief entitled "W.R. Grace's Reply Brief on Procedures for Litigation of the Common Personal Injury Liability Issues" (docket #2581), filed on August 21, 2002 (collectively, items (i) through (vi) are referred to herein as the Debtors' "CMO Briefing").

estimation proposals would perpetuate it. The PI Committee's approach would extrapolate the Debtors' liability for pending and future Claims by assuming the 2000 Claims were valid, despite the overwhelming evidence to the contrary.

41.     The Asbestos PI Committee's approach would also capitalize on the lack of effective Claim screening that was inherent in the pre-2000 inventory settlement approach, compounding rather than solving the problem of the mass filing of illegitimate Claims that drove the Debtors into bankruptcy. The Asbestos PI Committee's July 2002 deposition of Jay Hughes, the senior Grace Law Department attorney responsible for Asbestos PI Claims, confirmed that even before the 2000 surge of Claims, the Debtors had no means of limiting inventory settlements to valid Claims. Mr. Hughes testified that the sheer volume of the Claims against the Debtors in the mid- to latter-1990s forced the company to settle the Claims on a mass scale even though it knew most were of doubtful validity.

> Leaving aside the quality, the sheer volume of the cases and the resources available in the courts and the resources available to the company to defend the cases made an individual trial of the cases impossible. . . . In a situation where there's hundreds of thousands of cases being filed . . . . *even though we knew and were well aware that there were significant problems with the credibility of most of this evidence* and, but for the problems associated with the volumes of the cases, the money associated with the cases, that *these cases probably were not legitimate Claims against Grace, we were forced to pay them.*

(7/19/02 Hughes Dep. at 48-49 (emphasis added)).

42.     While the Debtors' and the Asbestos PI Committee's proposals were extensively briefed in 2001 and 2002, the District Court never addressed these issues. Given the passage of three and one-half years since these Chapter 11 Cases were filed, the Debtors recognize that as an alternative, the asbestos personal injury litigation can be deferred to the period following the confirmation of the Plan. Toward that end, the Debtors propose to set aside a post-confirmation trust (the Asbestos Trust) for Asbestos PI Claimants satisfying recognized medical standards for asbestos-related disease and impairment, who can also demonstrate sufficient exposure to the Debtors' asbestos products. The Debtors propose to estimate the amount needed to fund the Asbestos Trust based on the procedures set forth in this brief. But

14

before detailing those procedures, we will briefly summarize the unexplained surge in Claims that drove the Debtors into bankruptcy, because the Debtors' dispute with the Asbestos PI Committee over the validity of those Claims will be one of the principal subjects of the estimation hearing we are proposing.

### A. The Debtors' 2001 bankruptcy filings were the result of a surge of claims that overwhelmed the tort system.

43.     The Debtors' bankruptcies were necessitated by a sudden and scientifically unexplainable surge of asbestos Claim filings against the company. As reflected in the chart below, Claims that had been declining for years suddenly skyrocketed in 2000, overwhelming the Debtors' ability to resolve them through the tort system.



44.     This surge in Claims starkly demonstrated the irrationality of the privatized Claims process that evolved over the years, and left the Debtors with no choice but to break the pattern of history and file bankruptcy.

### B. There is no explanation - grounded either in medicine or in the Debtors' liability - for the 2000 spike in claims against the Debtors.

45.     The Asbestos PI Committee has never attempted to justify the spike in Claims against the Debtors based on an actual increase in disease caused by the Debtors' products. Actual asbestos-related malignant disease rates are declining in response to the

regulatory curtailment of significant asbestos exposures in the early 1970s.[11] The death rates for mesothelioma, the disease with the longest latency period, have been declining since 1992.[12] Leading medical researchers similarly have described asbestosis as a "disappearing disease."[13] A published study of asbestos-exposed workers reported that "we have not seen a single case of significant asbestosis with first exposure during the past 30 years."[14]

46.    Moreover, as detailed in the Debtors' 2002 CMO Reply Brief, only a small number of plaintiffs' law firms was responsible for the surge in Claims against Grace in 1999-2000, belying the notion that disease rates drive the increase. Seventeen law firms filed 22,550 more Claims in 2000 than they had filed in 1999, and were therefore responsible for 99.2% of the increase in total Claims filed against the Debtors. The Asbestos PI Committee has never explained how such a small number of firms was able to generate such a surge of Claims.

47.    Instead, the Asbestos PI Committee's expert Mark Peterson attributed the Debtors' Claims spike to unfavorable publicity in 2000 about the Debtors' Libby, Montana mine. (Peterson Aff. 23). Even if it were true that Libby publicity had a nationwide impact on the filing of Claims against the Debtors, this would only illustrate the problem the Debtors face. The issues concerning asbestos exposure at Libby pertain to only a small group of Claimants. Libby is a small town, with a population of 2,500. The cumulative total of Libby personal injury Claims is 232, a small fraction (.07%) of the 328,000 Claims asserted nationally. If Libby

---

[11]  *See generally* Neoplastic Asbestos-Induced Disease, Pathology of Occupational Lung Disease (Churg, A. & F. Green, ed., 2nd, 1998) at 339 ("progressive lowering of standards for permitted occupational exposure to asbestos has markedly decreased the incidence and severity of asbestosis"). *See also* R. Doll & J. Peto, *Asbestos: Effects on Health of Exposure to Asbestos* ("With reduction in the amount of exposure, the development of incapacitating fibrosis slows down and the reaction becomes so slight and its spread so slow that no person with otherwise healthy lungs would develop significant disability before reaching an age when he was likely to die of other causes.").

[12]  SEER data from the National Cancer Institute available at http://seer.cancer.gov/faststats/html/inc_mesoth.html.

[13]  K. Browne, *Asbestos-Related Disorders*, Occupational Lung Disorders, 3rd, 411-504 (1994).

[14]  Gaensler, Jederlinic & Churg, *Idiopathic Pulmonary Fibrosis in Asbestos-exposed Workers*, American Review of Respiratory Disease 144(3): 689-696 (1991) (emph. added).

publicity is causing a surge of Claims nationally, those Claims are being filed for the wrong reasons.

48.    Further, the "Libby" theory for the broad upsurge in Claims is unsupported by citation to any evidence and is contrary to the facts. *First*, the plaintiff law firms that are responsible for bringing these cases already had filed over 260,000 personal injury Claims against the Debtors before 2000. They did not need to be inspired by "adverse publicity" before filing additional Claims. *Second*, attributing the 2000 Claims spike to adverse Libby publicity would blink away the glaring fact that other asbestos defendants experienced similar surges in Claims in 2000. The following chart, included in the First Quarter 2001 Manville Trust Report, shows this same dramatic surge in new claims filings through May 2001:



49.    Asbestos claims against other defendants increased as well during the same time period. Equitas' March, 2001 Annual Report confirms that "[m]ost other defendants [in addition to the Manville Trust] also reported significant increases in the number of claims filed in 2001. The majority of these new claims have been filed on behalf of unimpaired persons." Likewise, a May 30, 2001 Tillinghast report estimates that average annual non-Center for Claims Resolution asbestos claims nearly doubled from 30,000 in 1998-99 to almost 60,000 in 2000.

91100-001\DOCS_DE:102549.1

C.    **Since Grace's 2001 chapter 11 filing, numerous courts, academics and other observers have confirmed widespread, national abuse of the asbestos claims process.**

50.    As of the filing of their Informational Brief on the first day of these Chapter 11 Cases, the Debtors made clear that the inability of the U.S. tort system to handle asbestos claims was the cause of their Chapter 11 filings.  As noted at the time, courts, scholars and journalists were already describing asbestos litigation as an "avalanche,"[15] a "serious problem,"[16] a "dilemma,"[17] and a "disaster."[18]  Impossibly high volumes of claims filings were forcing defendants to settle tens of thousands of claims, with no ability to weed out non-meritorious claims or cases for which no liability could ever be established.

51.    Perhaps not surprisingly, since the time of the Debtors' filing in April 2001, the nationwide situation has only deteriorated.  Indeed, the crisis is "worsening at a much more rapid pace than even the most pessimistic projections."[19]  Since Grace's 2001 filing, more than 20 additional U.S. manufacturers have sought bankruptcy protection from asbestos claims.[20]  As set out in this section, numerous studies, court decisions and articles not available at the time of the Debtors' initial filing have confirmed Grace's experience of the widespread abuse of the asbestos system across the country.  For example:

---

[15]  *Jenkins v. Raymark Indus.*, 782 F.2d 468, 470 (5th Cir. 1986).

[16]  *In re Asbestos Litig.*, 829 F.2d 1233, 1235 (3d Cir. 1987), *cert. denied*, 485 U.S. 1029 (1988).

[17] *Jenkins*, 782 F.2d at 470.

[18]  REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 2 (Mar. 1991); *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 14 (1999) (statement of Professor William N. Eskridge, Jr., Yale Law School).

[19]  Victor E. Schwartz, et al., Addressing the "Elephantine Mass" of Asbestos Cases: Consolidation Versus Inactive Dockets (Pleural Registries) and Case Management Plans that Defer Claims Filed by the Non-Sick, 31 PEPP. L. REV. 271 (2004).

[20]  *See* Deborah R. Hensler et al., *Asbestos Litigation Costs and Compensation: An Interim Report* 71 (Rand Inst. 2002) (at least 22 asbestos bankruptcies between 2000 and July 2002); Letter from the American Academy of Actuaries to Senator Frist (March 24, 2004) at Exhibit 2a (identifying more than 70 asbestos bankruptcy filings, 34 of which were filed in 2000 or later).

(i)      As the American Bar Association recognized in 2003, "by virtually all accounts, contemporary asbestos litigation is no longer driven solely, or even primarily, by the occurrence of disabling asbestos-related diseases."[21]

(ii)     In another ongoing asbestos bankruptcy case, it was recently disclosed that an expert retained by Owens Corning, Dr. Friedman, concluded that only 13.3% of claims met the minimal medical standards that had been agreed to by Owens Corning and asbestos plaintiffs' law firms to establish compensable claims under Owens Corning's National Settlement Program (NSP). The starkness of Dr. Friedman's finding that 87.3% of a random sample of settled nonmalignant claims lacked supporting medical evidence is stunning. However, even this number is apparently too low, as Dr. Friedman wrote that "a review of the radiographic reports and ILO forms raises serious questions concerning their reliability. These factors are likely to place downward pressure on the 13.3%."[22]

(iii)    As part of recent Senate hearings, a leading medical expert in asbestos-related diseases wrote claimants are being compensated "for illnesses that, according to the clear weight of medical evidence, either are not caused by asbestos or do not result in a significant impairment - i.e., are not generally regarded by the medical profession as an illness." *Id.* at 79 (citing Letter from Dr. James Crapo to Senator John Kyl, dated June 23, 2003).

(iv)     In 2002, another plaintiffs' expert witness wrote about medical screenings sponsored by plaintiffs' lawyers that: "Over the past 2 years, I have noted that many of these individuals [worker-plaintiffs] could not (due to inadequate latency or exposure) and did not manifest any evidence of asbestos-related disease... I was amazed to discover, that in some of the screenings, the worker's X-ray had been "shopped around" to as many as six radiologists until a slightly positive reading was reported by the last one of them. The "shopping around" of X-rays is not sound or proper medical practice and may, in fact, result in harm to some of the screened individuals. Some workers end up being unnecessarily and incorrectly advised that they have a potentially or invariably fatal disease. A number, no doubt, suffer anxiety and stress as a result. Others may change their life plans for no valid reason.... Finally, with respect to public policy, compensation dollars are now unnecessarily diverted from real victims of

---

[21]  Report of Am. Bar Ass'n Comm'n on Asbestos Litig. at 7 (Feb. 2003) ("ABA Report").

[22]  Brief in Support of Motion of CSFB, as Agent, to Establish Procedures to Obtain a Sample of Medical Records, Including X-rays, From Asbestos Personal Injury Claimants Asserting Nonmalignant Claims Against the Debtors and to Modify the Court's August 19, 2004 Scheduling Order, *In re Owens Corning*, Case No. 00-3837 to 3854 (JKF) (October 4, 2004) at Ex. C.

asbestos exposure and their families to transaction costs and compensation of the uninjured and unimpaired."[23]

(v)     Another expert has noted that "A select few handfuls of B-readers and doctors cooperate with the enterprises by 'diagnosing' massive numbers of those screened as having asbestosis or 'consistent with asbestosis."[24]

(vi)    According to a July 23, 2002 letter from Steven Kazan, a well-known plaintiffs' lawyer, to Judge Weinstein, 90% of the Manville Trust's last 200,000 claims originated from attorney-sponsored x-ray screening programs; 91% of all claims against that Trust allege only non-malignant asbestos "disease," and those claimants currently receive 76% of all Manville Trust payouts.

(vii)   Commenting on the resulting dilution of payouts to truly injured claimants, Judge Weinstein stated at a 2002 hearing that: "It is absolutely essential to cut unnecessary claims, invalid claims, improper claims to improve payments to those who are most seriously injured and to cut the costs of distribution."[25] As explained by one Senior Judge, "these suits are brought on behalf of individuals who are asymptomatic as to an asbestos-related illness and may not suffer in the future. Substantial transaction costs are expended, and therefore unavailable for compensation to truly ascertained asbestos victims."[26]

(viii)  The RAND organization, which for years has analyzed the asbestos litigation crisis, issued a 2002 report with blunt observations: "In asbestos litigation, however, mass litigation strategies have effectively opened the courts to everyone who alleges that they were exposed to asbestos and incurred some injury, without regard to whether and to what degree they are functionally impaired and sometimes without much attention to the strength of their evidence of exposure."[27]

---

23  David Egilman, Letter to the Editor, *Asbestos Screenings*, AM. J. OF INDUSTRIAL MED. 42:163 (2002).

24  Written Statement of Professor Lester Brickman, Subcommittee on Commercial and Administrative Law of the United States House of Representatives Committee on the Judiciary at 10 (July 21, 2004).

25  *Findley v. Falise*, No. 90-3973, hearing transcript at p. 34 (E.D.N.Y. Sept. 4, 2002).

26  *In re Asbestos Prod. Liab. Litig.* (No. VI), MDL 875, Admin. Order No. 8, at 1-2 (E.D. Pa. Jan. 14, 2002).

27  Deborah R. Hensler et al., Asbestos Litigation Costs and Compensation: An Interim Report 85 (Rand Inst. 2002).

(ix)    Former United States Court of Appeals Judge and United States Attorney
General Griffin Bell has written that "asbestos litigation now stands as the
only part of our tort system in which people who can show no real
physical injury are routinely allowed to recover."[28]

52.    It is precisely this widespread, historical abuse of the tort system that
makes these proposed estimation procedures so critical.    Put simply, it is impossible to
extrapolate from Grace's past, forced payment of these garbage claims to determine what its *true*
liability is.

**D.    The Debtors' analysis of the 1997 and 2000 Claims further confirms
the need for additional Claims information to define the Debtors'
liability.**

53.    In connection with the Original CMO Motion briefing, the Debtors
completed an analysis of 500 randomly selected Claim files from its 1997 and 2000 filings.    The
Debtors augmented the meager medical data and occupational exposure information in its own
inventory settlement files by obtaining information that the same Claimants filed with the
Manville Trust and the Center for Claims Resolution.    *See* Claims Report, Exhibit K to the 2001
CMO Reply Brief.    The combined data from that survey confirms that the vast majority of the
1997 Claims were invalid or of doubtful validity, and that valid year 2000 Claims are even more
scarce.

**E.    The vast majority of the Claims provide no evidence of impairment.**

54.    The surge in Claims against the Debtors is not due to an increase in the
most serious and best-documented Claims, i.e., cancer Claims, but overwhelmingly is due to
non-malignant Claims.    Less than 7% of the 1997 Claims were for mesothelioma, lung cancer, or
other cancers.    Seventeen percent of the Claims included so little information that the type of
disease could not even be determined.    And the remaining 76% were for non-malignant
conditions.

---

[28]    Griffin B. Bell, Asbestos Litigation & Tort Law: Trends, Ethics & Solutions: Asbestos & the
Sleeping Constitution, 31 PEPP. L.REV. 1 (2003) ("The Sleeping Constitution").

21

55.    The percentage of malignant Claims declined even further in 2000. Less than 6% of the Claims were for cancer. More than 30% of the Claims presented so little information that no disease could be identified. The remaining 64% were for non-malignant conditions.

56.    Analysis of diagnostic data relating to the sampled Claims shows the same picture: no new wave of disease is responsible for the new wave of Claims. Two diagnostic tests are widely used in combination to diagnose non-malignant injury: "ILO" readings of chest x-rays and Pulmonary Function Tests. X-rays are used to identify asbestosis within the lungs or pleural thickening in the outer lining of the lungs. The physician grades the x-ray on a scale of 0/0 (no abnormality) through 3/3 (most severe) based upon criteria developed by the International Labour Organization ("ILO"). The American Thoracic Society has set an ILO rating of 1/1 as the minimum needed to support a diagnosis of asbestosis.[29]

57.    Even an ILO rating of 1/1 does not establish any actual impairment in lung function. According to the American Medical Association, a second set of tests, Pulmonary Function Testing ("PFT"), is "the quantitative basis on which the evaluation of respiratory system impairment rests."[30] Two measurements of expiration function are taken: forced vital capacity (FVC) and forced expiratory volume in the first second ($FEV_1$). A third test, measuring the diffusing capacity of carbon monoxide in a single breath ($D_{co}$), is also performed. These results then are compared to normal predicted values calculated based on the gender, race, height and weight of the patient. For a diagnosis of "mild impairment," the AMA requires an FVC or $FEV_1$ result of 79% or less, or a $D_{co}$ result of 69% or less.[31]

58.    Applying these diagnostic criteria to the Debtors' 1997 and 2000 Claims, the Claims are found to be grossly wanting. Excluding the 33 cancer Claims in the 1997 sample,

---

[29]    American Thoracic Society ("ATS"), *The Diagnosis of Non-Malignant Diseases Related to Asbestos,* AM. REV. RESPIR DIS. (1986) 134: 363-367.

[30]    *AMA Guides to the Evaluation of Permanent Impairment,* § 5.2, p. 159 (4th ed. 1998).

[31]    *Id.* at Table 8, p. 162.

91100-001\DOCS_DE:102549.1

less than 2.8% of the Claims presented ILO ratings of 1/1 or higher and PFT results meeting the AMA criteria for "mild impairment." Only 3.3% of the 2000 sample Claims satisfied both standards.

59.     Beyond the failure to submit evidence meeting recognized medical standards of impairment, the unreliability of the data that is submitted shows that most of the claims will not be able to withstand scrutiny. For example, a 2004 published study showed that doctors acting as plaintiff expert witnesses in suits found asbestos-related injury in 95.9% of the chest X-rays submitted, while independent readers reviewing the *same* X-rays found possible damage in only 4.5%.[32] To establish liability, it is critical that the Claimants be required to submit diagnostic findings that can be replicated by independent, impartial medical reviewers.

> **F.     Most Claims fail to establish actual occupational exposure to the Debtors' products.**

60.     The recent sampling of the Debtors' 1997 and 2000 Claims also shows that very few Claimants can establish any actual exposure to the Debtors' asbestos products, either because they provide no exposure information or because they worked in industries and occupations in which exposure to the Debtors' products would have been unlikely or impossible.

61.     Half of the Claims provide no exposure information whatsoever. Of the 1997 sample Claims, 236 (47%) provide no information about the location where the alleged exposure occurred, the worker's employer or industry, or the Debtors' product to which he was exposed. Fifty-two percent of the 2000 sample Claims fail to provide any of that critical information. Even when the Debtors attempted to fill in these gaps by cross-referencing the Claimant's social security number to the Manville Trust and CCR databases, the Debtors were unable to identify the industry involved for 20% of the 1997 sample Claims, and 29% of the 2000 Claims. And, of course, the Manville Trust and CCR data provide no information about any exposures to the Debtors' products.

---

32  Joseph N. Gitlin, et al., Comparison of "B" Readers' Interpretations of Chest Radiographs for Asbestos Related Changes, 11 ACAD. RADIOL. 843, 855 (2004).

23

62.     For the other half of the Claims, the meager exposure information that is provided rarely implicates the Debtors.  For example, the Debtors' Monokote-3 fireproofing product was applied by plasterers primarily at high-rise steel construction sites.  Yet, only two of the 500 sample 1997 Claims and only one of the 2000 Claims were filed by plasterers.  Indeed, only 8% of the 1997 Grace sample Claimants and 3% of the 2000 Claimants identified themselves as construction workers.  Even after the Manville and CCR data was used to identify as many of the "unknown" Claimants as possible, only 16% of the 1997 sample Claims, and 12% of the 2000 Claims, were found to be filed by construction workers.

63.     All of the evidence points to one conclusion:  the pre-bankruptcy surge in Claims against the Debtors is due to the indiscriminate filing of Asbestos Claims against an ever-increasing number of defendants nationwide.  Even the Asbestos PI Committee's expert Mark Peterson conceded in his affidavit that "few plaintiffs" recall the specific products to which they were exposed, and that no product identification information was available in 79% of the sample Grace Claim files the Asbestos PI Committee reviewed *at the Claimants' own law firms.* (Peterson Aff. 34)

IV.     **The Debtors' Five-Step Estimation Procedure.**

64.     To address these obvious concerns over the validity of the surge in Asbestos PI Claims filed against the Debtors, while at the same time expediting the confirmation of the Debtors' Plan, we propose the following five-step estimation procedure.  **First,** this Court would approve a bar date (Asbestos PI Pre-petition Litigation Bar Date) by which all persons or Entities holding Asbestos PI Pre-petition Litigation Claims would be required to file their completed Asbestos PI Proof of Claim Form.[33]  This Court would also approve a Questionnaire Return Date by which all Holders of Asbestos PI Pre-petition Litigation Claims who filed Asbestos PI Proof of Claim Forms would be required to file their completed Asbestos PI

---

[33] Persons who had not commenced litigation before the Petition Date would not be subject to this bar date, minimizing the costs of the bar date notice and restricting the obligation of completing a Claim form at this time to those who had already retained counsel and had already filed a complaint against the Debtors.

24

Questionnaires. **Second**, this Court would approve the scope and manner of notice of the Asbestos PI Pre-petition Litigation Bar Date and Questionnaire Return Date. **Third,** this Court would approve the form and manner of distribution of the Asbestos PI Claim Materials. **Fourth**, this Court would establish an estimation expert discovery schedule – affording the Debtors' and various official committees' estimation experts, if any, a reasonable time in which to review the compiled Asbestos PI Proof of Claim Forms and Asbestos PI Questionnaires and prepare their Rule 26 expert reports. Those reports would address the Debtors' actual liability for pre-petition Claims and post-petition Claims, including future Claims. The experts would also be deposed. **Fifth**, after the completion of expert depositions, the Court would hold an evidentiary hearing to estimate the size of the Asbestos Trust, estimating the aggregate sums which would need to be funded into the Asbestos Trust in order to enable the Asbestos Trust to pay in full, as and when they come due, the (i) Asbestos PI-SE Claims, (ii) Asbestos PI-AO Claims, and (iii) Asbestos PD Claims, along with (iv) the Asbestos Trust Expenses.

65.     The Debtors believe that the evidentiary hearing, the fifth and last step of the estimation procedure, could take place within six months from this Court's approval of this process. The Debtors would be prepared to mail the Asbestos PI Bar Date Notice Package directly to the counsel of record for the Holders of Asbestos PI Pre-petition Litigation Claims within ten (10) days of the entry of the Estimation Order. The Claimants would be given thirty (30) days from the entry of the Order granting the relief requested herein to file the Asbestos PI Claim Form. The Debtors would then distribute the Asbestos PI Questionnaire no later than five (5) days after the Asbestos PI Pre-petition Litigation Bar Date. Claimants would be allowed thirty (30) days to return the Asbestos PI Questionnaire. The Claims Processing Agent would then be given twenty-one (21) days to compile the Claims information and make it available to the Debtors' and the various official committees' estimation experts, if any. The experts would then be allowed forty-five (45) days to complete their reports and would be given two (2) weeks in which to be deposed. The estimation hearing could be scheduled for shortly thereafter.

A.    **The need and basis for an Asbestos PI Pre-petition Litigation Bar
Date and Questionnaire Return Date.**

66.    Unlike traditional (non-ZAI) Asbestos PD Claims and General Unsecured
Claims, no bar date has been set in these Chapter 11 Cases for Asbestos PI Pre-petition
Litigation Claims. Before the Asbestos Trust can be adequately funded, such Asbestos PI Pre-
petition Litigation Claims must first be identified, quantified and evaluated on their merits.
Accordingly, by way of the Estimation Motion, the Debtors seek to undertake necessary steps to
ascertain the scope, extent and validity of such Asbestos PI Pre-petition Litigation Claims that
might be asserted against the Debtors' estates.

67.    Specifically, the Debtors request that this Court establish (1) January 31,
2005 at 5:00 p.m. (prevailing Eastern time) as the Asbestos PI Pre-petition Litigation Bar Date or
the last date and time by which those parties who believe that they hold Asbestos PI Pre-petition
Litigation Claims against any of the Debtors must complete and file the Asbestos PI Proof of
Claim Form on account of such Claims, and (2) March 7, 2005 at 5:00 p.m. (prevailing Eastern
time) as the Questionnaire Return Date or the last date and time by which those parties who
believe that they hold Asbestos PI Pre-petition Litigation Claims against any of the Debtors must
complete and file the Asbestos PI Questionnaire, or be forever barred from asserting such Claims
against the Debtors.

68.    Bankruptcy Rule 3003(c)(3) provides: "[t]he court shall fix and for cause
shown may extend the time within which proofs of Claim or interest may be filed." The Local
Rules of Practice and Procedure for the United States Bankruptcy Court for the District of
Delaware do not specify a time by which proofs of Claim or interest shall be filed in chapter 11
cases. Accordingly, the Debtors bring the Motion in order to establish the Asbestos PI Pre-
petition Litigation Bar Date respecting the filing of Asbestos PI Pre-petition Litigation Claims.

69.    The Debtors propose that, pursuant to Bankruptcy Rule 3003(c)(2), any
person or Entity who fails to complete and file an Asbestos PI Proof of Claim *and* an Asbestos PI
Questionnaire by the applicable dates on account of an Asbestos PI Pre-petition Litigation Claim

shall be forever barred, estopped and enjoined from (a) asserting any Asbestos PI Pre-petition Litigation Claim against any of the Debtors, or (b) receiving distributions under, any plan or plans of reorganization in these Chapter 11 Cases in respect of an Asbestos PI Pre-petition Litigation Claim, notwithstanding that such Entity may later discover facts in addition to, or different from, those which that entity knows or believes to be true as of the Asbestos PI Pre-petition Litigation Bar Date or the Questionnaire Return Date, and without regard to the subsequent discovery or existence of such different or additional facts.

**B.    Proposed procedures for providing notice of (i) the Asbestos PI Pre-petition Litigation Bar Date, (ii) the Questionnaire Return Date, and (iii) the procedures for filing Asbestos PI Claim Materials.**

70.    The Debtors also seek this Court's approval of the manner and scope of notice of the Asbestos PI Pre-petition Litigation Bar Date and Questionnaire Return Date. The Debtors propose to provide notice by direct mail to counsel of record for each Holder of an Asbestos PI Pre-petition Litigation Claim, and, where such information is available, to each Holder of an Asbestos PI Pre-petition Litigation Claim. The Debtors anticipate that, through their noticing agent, they will serve upon all persons or entities holding Asbestos PI Pre-petition Litigation Claims, (a) the Asbestos PI Pre-petition Litigation Bar Date Notice, (b) the short form Asbestos PI Proof of Claim Form, substantially in the form of Official Form 10, (c) the Asbestos PI Questionnaire Notice, and (d) the Asbestos PI Questionnaire (the Asbestos PI Claim Materials). The Debtors propose to serve the Asbestos PI Pre-petition Litigation Bar Date Notice and Asbestos PI Proof of Claim Form on counsel of record for all Holders of Asbestos PI Pre-petition Litigation Claims (and the Holders themselves where such information is available) via direct U.S. mail within ten (10) calendar days after entry of the Order approving the Estimation Motion and establishing the Asbestos PI Pre-petition Litigation Bar Date. No later than five (5) calendar days after the Asbestos PI Pre-petition Litigation Bar Date, the Debtors further propose to serve, via direct U.S. mail, the Asbestos PI Questionnaire Notice and the Asbestos PI Questionnaire on counsel of record for Holders of Asbestos PI Pre-petition Litigation Claims (and the Holders themselves where such information is available) who timely

filed Asbestos PI Proof of Claim Forms. The Debtors will also mail the Asbestos PI Claim Materials to the Office of the United States Trustee and to counsel to the official committees appointed in these Chapter 11 Cases.

71.    Unlike the more common bar date request, the names and identities of all of the Asbestos PI Pre-petition Litigation Claimants are known to the Debtors. Indeed, to qualify as such, a Claimant must have filed, or settled, a pre-petition lawsuit against one or more of the Debtors. And, due to the applicable service requirements in the underlying actions, the Debtors' and/or their professionals' records reflect the applicable names and addresses of the entire universe of Asbestos PI Pre-petition Litigation Claimants and/or their counsel of record. Consequently, the Debtors submit that a direct notice campaign with respect to the Asbestos PI Pre-petition Litigation Bar Date will be sufficient to capture the entire universe of affected Claimants. Indeed, there is no need for the Debtors' estates to incur the additional expense and burden associated with publication of the Asbestos PI Pre-petition Bar Date Notice when all affected creditors will receive direct notice of such bar dates.

72.    In conjunction with the setting of the Asbestos PI Pre-petition Litigation Bar Date and Questionnaire Return Date, the Debtors must ensure that the affected parties receive appropriate notice of such dates. To determine the adequacy of notice given to a creditor, bankruptcy law distinguishes between "known" and "unknown" creditors. *See Chemetron Corp. v. Jones (In re Chemetron Corp.)*, 72 F.3d 341, 345 (3d Cir. 1995). As the Third Circuit in *Chemetron* explained, "[k]nown creditors must be provided with actual written notice of a debtor's bankruptcy filing and bar Claims date. For unknown Claimants, notification by publication will generally suffice." *Id.* at 346 (citations omitted). A "known" creditor is one whose identity is either known or is "reasonably ascertainable by the debtor." *Id. (citing Tulsa Professional Collection Serv., Inc. v. Pope*, 485 U.S. 478, 490, 108 S.Ct. 1340, 1347, 99 L.Ed.2d 565 (1988)). An "unknown" creditor is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to

28

knowledge [of the debtor]." *Chemetron*, 72 F.3d at 346 (*citing Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 317, 70 S.Ct. 652, 659, 94 L.Ed. 865 (1950)).

      73.    In defining the efforts required to identify "known" creditors, the Third Circuit stated:

> Precedent demonstrates that what is required is not a vast, open-ended investigation . . .The requisite search instead focuses on the debtor's own books and records. Efforts beyond a careful examination of these documents are generally not required. Only those Claimants who are identifiable through a diligent search are 'reasonably ascertainable' and hence 'known' creditors.

*Chemetron*, 72 F.3d at 346-47 (citations omitted). As for the particular efforts a debtor must exert to identify known creditors, "[w]hether a creditor received adequate notice of a bar date 'depends upon the facts and circumstances of a given case.'" *In re The Grand Union Co.*, 204 B.R. 864, 871 (Bankr. D.Del. 1997) (*citing Oppenheim, Appel, Dixon & Co. v. Bullock* (*In re Robintech, Inc.*), 863 F.2d 393, 396 (5th Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 55, 107 L.Ed.2d 24 (1989)).

      74.    The Debtors submit that the proposed notice program respecting the Asbestos PI Pre-petition Litigation Bar Date and Questionnaire Return Date more than satisfies the *Chemetron* standard. Because of the limited and exclusive universe of Asbestos PI Pre-petition Claimants, all such Claimants are known to the Debtors and/or their professionals. Indeed, to qualify as an Asbestos PI Pre-petition Litigation Claimant, one must have initiated a pre-petition lawsuit against one or more of the Debtors. As such, the Debtors have identified all persons or entities that hold Asbestos PI Pre-petition Litigation Claims against one or more of the Debtors. Those persons or entities were identified following a careful review of the Debtors' books and records and those of the Debtors' professionals, where applicable. Accordingly, the Debtors believe that the persons or entities form the universe of "known" creditors that may hold Asbestos PI Pre-petition Litigation Claims. And, because the entire universe of Asbestos PI Pre-petition Claimants is "known", and the Debtors propose to send direct notice to such Claimants, the Debtors have satisfied the *Chemetron* requirements and submit that such proposed notice is

29

sufficient to provide all Asbestos PI Pre-petition Litigation Claimants with adequate notice of the Asbestos PI Pre-petition Litigation Bar Date and Questionnaire Return Date.

> **C.    Approving the form and distribution of notices and Asbestos PI Claim Materials.**

75.    The Debtors ask this Court to approve the form and use of the Asbestos PI Pre-petition Litigation Bar Date Notice, the Asbestos PI Proof of Claim, the Asbestos PI Questionnaire Notice, and the Asbestos PI Questionnaire, annexed hereto as <u>Exhibit B</u>, <u>Exhibit C</u>, <u>Exhibit D</u> and <u>Exhibit E</u>, respectively.

76.    In connection with the Debtors' overall Claims estimation process, the Debtors request that the Holders of Asbestos PI Pre-petition Litigation Claims be required to complete, certify and submit (1) the Asbestos PI Proof of Claim by the Asbestos PI Pre-petition Litigation Bar Date, and (2) the Asbestos PI Questionnaire by the Questionnaire Return Date.

77.    The Asbestos PI Questionnaire has been carefully formulated to elicit information from Holders of Asbestos PI Claims that will be sufficient to provide the Debtors' estimation experts and this Court with adequate information to adjudge the scope, degree and overall validity of a Holder's Asbestos PI Claim. In addition, the Asbestos PI Questionnaire asks Holders of Asbestos PI Claims who may have Asbestos PI Claims to designate whether they assert an Asbestos PI-AO Claim or Asbestos PI-SE Claim. Depending on which type of Asbestos Claim the Claimant designates, the Asbestos PI Questionnaire then asks the Claimant to elect the type of treatment for the Claim.[34]  Furthermore, parties who wish to contest the estimates may use the information elicited from the Asbestos PI Questionnaires to formulate their own estimates.

78.    The completion and filing of the Asbestos PI Proof of Claim Form and Asbestos PI Questionnaire would impose a minimal burden on Claimants who had already taken

---

[34]  In the case of an Asbestos PI-SE Claim, the Asbestos PI Questionnaire allows a Claimant to choose between the "Cash-Out Option" and the "Litigation Option." In the case of Asbestos PI-AO Claims, the Asbestos PI Questionnaire allows a Claimant to choose among the "Cash-Out Option," the "Litigation Option," and the "Registry Option."

the step of suing the Debtors prior to its bankruptcy filings, and who therefore should already be prepared to disclose the basic facts needed to support their Claims. But the completed Asbestos PI Proof of Claim Forms and Asbestos PI Questionnaires would be of considerable value to the parties and the Court in making a meaningful estimate of the Debtors' actual liability to these and to future Claimants, by providing critical product exposure and medical information that is needed to assess the validity of the Claims. As detailed above, this information is missing from the minimal records compiled for the large-scale "inventory" settlements negotiated by the Debtors and other asbestos defendants in the late 1990s, and therefore cannot be obtained from alternative sources. In addition, regardless of whether the Debtors' Plan is confirmed, this information will be vital to estimating Claims for the purpose of determining the feasibility of any plan of reorganization proposed in these Chapter 11 Cases.

**D.      Establishing an estimation expert discovery schedule.**

79.      The Debtors request that this Court set an expert discovery schedule that provides for a reasonable period of time for the Debtors' and other interested parties' (including the official committees') experts to review the data received and prepare Rule 26 expert reports. Such reports will address, among other things, the Debtors' actual liability for the Asbestos PI Claims. The expert reports will also reflect the experts' opinions as to the amount of the Debtors' aggregate Asbestos Claim liability and the aggregate Asbestos Trust Expenses. Likewise, the Debtors request that the schedule provide for the associated discovery deadlines for expert depositions and document requests. To that end, the Debtors propose that this Court allow the Claims Processing Agent twenty-one (21) days from the deadline for receipt of the Asbestos PI Questionnaire to compile the Claims information into a navigable database and make it available to the Debtors' and the various official committees' estimation experts, if any. The Debtors further propose that this Court allow the experts forty-five (45) days to complete their reports, followed by an additional two (2) weeks in which the experts may be deposed.

31

### E.    Estimations determined at the evidentiary hearing.

80.    After the completion of expert depositions, this Court would hold an evidentiary hearing to estimate the amount necessary to fund the Asbestos Trust, providing estimates of the aggregate amounts needed to fund the Asbestos Trust to enable the Asbestos Trust to pay in full the following, as and when they come due: (a) Allowed Asbestos PI-SE Claims, (b) Allowed Asbestos PI-AO Claims, (c) Allowed Asbestos PD Claims, and (d) Asbestos Trust Expenses.

81.    These estimates are referred to in the Debtors' Plan as (a) the Asbestos PI-SE Class Fund, (b) the Asbestos PI-AO Class Fund, (c) the Asbestos PD Class Fund, and (d) the Asbestos Trust Expenses Fund.    Three of the conditions precedent to confirmation of the Debtors' Plan are:  (i) the Asbestos PI-SE Class Fund shall constitute the maximum amount that the Reorganized Debtors shall have to pay on account of all Allowed Asbestos PI-SE Claims; (ii) the Asbestos PD Class Fund shall constitute the maximum amount that the Reorganized Debtors shall have to pay on account of all Allowed Asbestos PD Claims; and (iii) the Asbestos Trust Expenses Fund shall constitute the maximum amount that the Reorganized Debtors shall have to pay on account of all expenses of the Asbestos Trust.

82.    As indicated above, the Debtors believe that the evidentiary hearing, the fifth and last step of the estimation procedure, could take place within 6 months from this Court's approval of this estimation process.    Each of the four required estimations will be determined as described below.

### (i)    Determination of the Asbestos PI-SE Class Fund.

83.    As described above, the Debtors propose that this Court establish the Asbestos PI Pre-petition Litigation Bar Date and Questionnaire Return Date, requiring that all Asbestos PI Pre-petition Litigation Claimants must file Asbestos PI Proof of Claim Forms and Asbestos PI Questionnaires. The Debtors' expert will analyze the data compiled by the Claims Processing Agent and offer his opinion as to the amount needed to fund the Asbestos Trust to enable the Asbestos Trust to pay in full all Allowed PI-SE Claims as and when they come due.

32

This information would also provide evidentiary support for this Court's finding that the estimate is indeed adequate to pay all Allowed PI-SE Claims as and when they come due, a finding that is necessary to determine the feasibility of the Plan.

### (ii)    Determination of the Asbestos PI-AO Class Fund.

84.    The Debtors also propose that this Court require that all Asbestos PI-AO Claimants who have asserted Claims as of the petition date must also file Asbestos PI Proof of Claims Forms and Asbestos PI Questionnaires. Such a requirement would enable a meaningful estimate of the Debtors' potential liability, if any, to these Claimants. From this information, the experts will be able to estimate the amount needed to fund the Asbestos Trust to enable the Asbestos Trust to pay in full all Allowed Asbestos PI-AO Claims as and when they come due. This information would also provide evidentiary support for this Court's finding that the estimate is indeed adequate to pay all Allowed Asbestos PI-AO Claims as and when they come due, a finding that is necessary to determine the feasibility of the Plan.

### (iii)    Determination of the Asbestos PD Class Fund.

85.    The Debtors' liability with respect to Asbestos PD Claims can be divided into two sub-groups: (i) traditional Asbestos PD Claims; and (ii) ZAI Claims. All pre-petition traditional Asbestos PD Claims were required to be filed by the March 2003 Bar Date. As described more fully below, the Debtors propose a process by which the Asbestos PD Claims may be estimated so that this Court may determine the amount needed to fund the Asbestos Trust to enable the Asbestos Trust to pay in full all Allowed Asbestos PD Claims as and when they come due.

### (a)    *Traditional Property Damage Claims*

86.    Historically, the vast majority of the Asbestos PD Claims asserted against the Debtors related to its commercial spray-on fireproofing product, Monokote-3, and acoustical plasters. The sale of all such spray-on asbestos-containing products ended in 1973. When these Chapter 11 Cases were filed in April 2001, only seven significant traditional property damage claim cases against the Debtors remained unresolved.

33

87.    This Court set a March 31, 2003 Claims bar date for traditional property damage claims. Approximately 4,200 Claims were filed by such bar date.

88.    The Debtors propose to estimate the aggregate traditional Asbestos PD Claims as follows. **First**, the Debtors will object[35] to the Claims that failed to provide material information or documentation required by the Claim form. Examples of such deficient Claims are those that failed to produce any evidence of product identification or that failed to provide any supporting documentation. The Debtors will serve notice of those Claim objections, and will seek an order disallowing the Claim if the required information or documentation is not provided within two months of the date of the Claim objection.

89.    **Second,** after the Debtors' threshold objections to those Claims that failed to provide the required information or documentation are resolved, the Debtors will file within two months an expert report estimating the Debtors' liability for the remaining Claims. That estimation report will address the value of the Claims in light of the Debtors' liability defenses, which include the applicable statute of limitations and statue of repose, laches, *res judicata*, prior settlements, incorrect or unsupported product identification, assumption of the risk, and other defenses. While that estimation report is being prepared, the Debtors will also attempt to

---

[35]    On July 19, 2004, this Court entered an order (the "Asbestos PD Gateway Objection Order," Docket No. 6009) granting the Debtors a limited waiver of Del. Bankr. L. Rule 3007-1 for the purpose of streamlining objections to non-ZAI Asbestos PD Claims filed pursuant to the March 2003 Bar Date Order. Among other things, the Asbestos PD Gateway Objection Order provides a protocol by which the Debtors may file initial omnibus objections (the "Gateway Omnibus Objections") to groups of non-ZAI Asbestos PD Claims based upon certain "gateway" deficiencies (*e.g.*, insufficient supporting documentation), notwithstanding the otherwise applicable restrictions of Del. Bankr. L. Rule 3007-1. The protocols provided in the Asbestos PD Gateway Objection Order are limited to the Gateway Omnibus Objections and do not include additional provisions for common issue or settlement proceedings for non-ZAI Asbestos PD Claims that withstand, or otherwise are not subject to, the Gateway Omnibus Objections. Pursuant to the Asbestos PD Gateway Objection Order, the Bankruptcy Court has already approved a streamlined protocol by which the Debtors may file Gateway Omnibus Objections against non-ZAI Asbestos PD Claims.

negotiate a resolution of some or all of the Claims, perhaps by negotiating with respect to groups of similarly situated Claims.

90.     **Third,** after the Debtors' and the Asbestos PD Committee's estimation experts file their reports and are deposed, the Debtors expect that a hearing on the Debtors' estimation motion for these Claims could be held promptly. The Debtors therefore expect that the estimation of the traditional property damage post-confirmation trust could be completed within approximately 6 months, or in the same timeframe as we are proposing for the estimation of the Asbestos PI Claims.

(b) *ZAI Claims*

91.     On October 21, 2002 and November 25, 2002, this Court entered orders providing for discovery as to "what science demonstrates with regard to whether ZAI creates an unreasonable risk of harm" and setting a schedule for the trial of this issue, referred to by the parties as the "ZAI Science Trial." Following the completion of fact and expert discovery on that issue, the Debtors moved for summary judgment on July 7, 2003. Contending that *Daubert* standards require exclusion of much of the ZAI Claimants' evidence, the Debtors seek summary judgment on the ground that there is no valid scientific evidence showing any causal relationship between ZAI and disease. The ZAI Claimants also moved for summary judgment, contending that ZAI contaminates homes and poses an unreasonable danger to persons in the vicinity of any disturbance of ZAI. The Court held a hearing on the ZAI Science Trial motions on October 18, 2004, and has taken the motions under advisement.

92.     The Debtors propose that the Court set a ZAI Claims Bar Date and approve a ZAI claim form and notice program for any types of ZAI Claims that remain viable following the Court's decision on the "ZAI Science Trial" summary judgment motions, and if necessary, after the trial of any material disputes of fact identified in this Court's summary judgment ruling. Since the content of the ZAI claim form and notice program will be tailored to the Court's rulings on the ZAI Science Trial issues, the Debtors will propose the specific claim

35

form and will detail their proposed ZAI Notice Program promptly after the ZAI Science Trial phase is concluded.

93.     Following the ZAI Claim bar date, the Debtors will submit within two months an expert report estimating their liability, if any, to the present and future ZAI Claimants. The Debtors will be prepared to try this estimation issue promptly after the completion of the depositions of the estimation experts.   Depending on the timing of this Court's summary judgment decision and the scheduling of any ZAI Science Trial, the Debtors expect that the ZAI estimation can be completed within approximately eight months to one year.

(iv)     <b>Determination of the Asbestos Trust Expenses Fund.</b>

94.     In order to assure that expenses of the Asbestos Trust shall be paid in full as, or as soon as practicable after, they become due, the Debtors ask the Court to establish the amount of the Asbestos Trust Expenses Fund.   This Asbestos Trust Expenses Fund is the estimated aggregate dollar value amount by which the Asbestos Trust must be funded in order to assure that the Asbestos Trust shall be able to pay all Asbestos Trust Expenses in full as, or as soon as practicable after, they become due.   This estimate will be addressed in the experts' reports and will be based on, among other things, the information gathered from the Asbestos PI Claim Materials, the number of Asbestos Claims, and estimates of certain fixed costs of the Asbestos Trust, such as insurance, and administration of the Asbestos Trust.   Again, one of the conditions precedent to confirmation of the Debtors' Plan is that the Asbestos Trust Expenses Fund shall constitute the maximum amount that the Reorganized Debtors shall have to pay on account of all expenses of the Asbestos Trust.

<u>Notice</u>

95.     Notice of this Estimation Motion and the accompanying Memorandum has been given to: (i) the Office of the United States Trustee, (ii) counsel to the debtor-in-possession lenders, (iii) counsel to the agent for the Debtors' pre-petition lenders, (iv) counsel to all official committees appointed by the United States Trustee, and (v) all those parties that requested

36

service and notice of papers in accordance with Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

## No Prior Request

96.    No prior motion for the relief requested herein has been made to this or any other Court.

## Conclusion

97.    The Debtors request that this Court establish procedures for the identification and estimation of certain pre-petition Asbestos Claims against the Debtors' estates, and for the determination of the aggregate amount needed to fund the Asbestos Trust such that all Allowed Asbestos Claims and Asbestos Trust Expenses may be paid in full by the Asbestos Trust as and when they come due. By establishing such an estimation process, the Debtors will finally be able to advance toward a resolution of their asbestos-related Claims and an effective confirmation of a chapter 11 plan.

WHEREFORE, the Debtors respectfully request that the Court establish a schedule and procedures for carrying out the requested estimations to determine the aggregate amounts needed to fund the Asbestos Trust to enable the Asbestos Trust to pay in full all Allowed Asbestos Claims and Asbestos Trust Expenses, as and when they become due. Specifically, the Debtors request that this Court enter the Estimation Order, substantially in the form of that which is annexed to the Estimation Motion as Exhibit A, that (i) sets the Asbestos PI Pre-petition Litigation Bar Date and Questionnaire Return Date; (ii) approves the proposed form and manner of notice of the Asbestos PI Pre-petition Litigation Bar Date and Questionnaire Return Date; (iii) approves the form, distribution and use of the Asbestos PI Claim Materials; (iv) establishes an estimation expert discovery schedule that provides for a reasonable time for the Debtors' and other interested parties' experts to conduct discovery and prepare Rule 26 expert reports; and (v) schedules an evidentiary hearing at the conclusion of which this Court will determine estimates of the aggregate amounts needed to fund the Asbestos Trust to enable the Asbestos Trust to pay

37

in full all Allowed Asbestos PI-SE Claims, Allowed Asbestos PI-AO Claims, Allowed Asbestos PD Claims, and Asbestos Trust Expenses, as and when they become due.

Dated: November 13, 2004

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Andrew R. Running
Janet S. Baer
Jonathan Friedland
Samuel L. Blatnick
200 East Randolph Drive
Chicago, IL 60601
Telephone: (312) 861-2000

Bennett L. Spiegel
Lori Sinanyan
777 South Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 680-8400

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and
Debtors in Possession