IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re                                        :    Chapter 11

W. R. GRACE & CO., et al.,                   :    Case No. 01-01139 (JKF)
                                             :    Jointly Administered
                           Debtors.
                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :
W. R. GRACE & CO., et al.,
                                             :
                           Plaintiffs,
                                             :
     -against-
                                             :    Adversary No. A-01-771 (JKF)
MARGARET CHAKARIAN, et al.,
And John Does 1-1000,                        :
                                                  Hearing Date: December 20, 2004 at 12:00 p.m. (Pittsburgh)
                           Defendants.       :    Objection Date: December 3, 2004 at 4:00 p.m.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
```

MOTION OF THE DEBTORS AND THE SCOTTS COMPANY
FOR A TEMPORARY STAY TO ENJOIN THE PROSECUTION
OF ALL CLAIMS AGAINST SCOTTS IN THE STATE ACTIONS

Debtors and The Scotts Company move this Court for a temporary stay to enjoin

the prosecution of all asbestos-related actions as to Scotts that are based, in whole or in part, on

alleged exposure to vermiculite that Scotts acquired from Grace and subsequently marketed and

sold (the "State Actions") pending confirmation of the Debtors' plan of reorganization.

Plaintiffs' discovery, disclosures and pretrial pleadings in these State Actions leave no doubt that

the State Actions are in fact actions against Grace and its product.  The Court's January 22, 2002

Modified Preliminary Injunction ("Modified Preliminary Injunction") and the automatic stay

thus prohibit the continuation of the State Actions as to Scotts.

As set forth more fully below, recent deposition testimony of Scotts' experts

taken by plaintiffs and plaintiffs' experts has focused almost entirely on Grace vermiculite and

Grace products. In addition, the "expert" disclosure by at least one plaintiff of a Grace former

employee discusses, among other things, alleged "efforts by W. R. Grace to conceal," "W. R.

Grace's failure to educate," the Zonolite Grace Company's alleged failure to "give workers

information," and the "unreasonably dangerous nature of W. R. Grace's asbestos containing

products." Pleadings in the State Actions similarly focus solely on Grace and its vermiculite. As

plaintiffs' discovery, pleadings, and disclosures make clear, the State Actions are, in effect,

improper actions against Grace and its products that have the intent, and effect of circumventing

this Court's jurisdiction. Accordingly, both the automatic stay and the Modified Preliminary

Injunction prohibit plaintiffs from pursing these State Actions as to Scotts.

<u>Background and Procedural History</u>

1. Beginning in approximately 1960 and continuing for some 40 years, Scotts

purchased vermiculite ore from Grace, including vermiculite ore from Grace's mine in Libby,

Montana ("Libby").

2. In the State Actions, Scotts is currently defending claims based on the

allegation that Grace vermiculite that Scotts incorporated into certain products for re-sale was

contaminated with asbestos. As such, the State Actions inevitably implicate W.R. Grace and its

vermiculite.

3. On April 2, 2001 (the "Petition Date"), each of the Debtors filed voluntary

petitions for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the

Debtors have continued to operate their businesses as debtors in possession pursuant to sections

1107 and 1108 of the Bankruptcy Code.

4. Contemporaneously with the filings of their Chapter 11 petitions, the Debtors

filed the adversary proceeding entitled <u>W. R. Grace & Co., et al. v. Margaret Chakarian, et al.</u>

and John Does 1-1000, Case No. A-01-771.  A temporary restraining order was initially entered

on April 2, 2001 and on May 3, 2001, the Court issued a preliminary injunction.  See Adversary

Proceeding Docket No. 31.

     5.  On January 22, 2002, the Court entered an "Order Granting Modified

Preliminary Injunction" (Adversary Proceeding Docket No. 87) which, among other things,

enjoined the commencement or continuation of certain actions against non-debtor third-parties,

including actions: (1) that arise from alleged exposure to asbestos, indirectly or directly,

allegedly caused by the Debtors, against (a) Fresenius, (b) Sealed Air, (c) Merrill Lynch, (d)

Credit Suisse First Boston, (e) certain of the Debtors' insurance carriers, (f) Affiliates of the

Debtors that are not filing entities for purposes of the Chapter 11 Cases, or (g) present and

former officers, directors and employees of the Debtors; (2) for which there may be coverage

under certain of the Debtors' insurance policies; (3) brought against certain of the Debtors'

insurance carriers, which allege coverage for asbestos-related liabilities; or (4) against current

and former officers, directors or employees of the Debtors that arise out of such officer's,

director's or employee's employment or relationship with the Debtors.[1]

     6.  On June 24, 2004, Scotts filed its expedited motion ("Expedited Motion")[2] for

a stay of the State Actions on the ground that the State Actions were actions for which there may

be insurance coverage under certain of Debtors' insurance policies and that their prosecution was

thus enjoined by the Modified Preliminary Injunction.

---

[1] On October 7, 2004, the Court entered its Order Granting Motion to Expand Preliminary Injunction to Include Actions Against Montana Vermiculite Company (the "Montana Vermiculite Order") and Memorandum Opinion relating thereto (the "October 7, 2004 Memorandum Opinion").  See Adversary Proceeding Docket Nos. 298, 299

[2] On June 24, 2004, Scotts filed its Expedited Motion for Order under 11 U.S.C. §§ 105(a) and 362(a)(i) Enforcing January 22, 2002 Order Granting Modified Preliminary Injunction; (ii) Enforcing Automatic Stay to Enjoin Prosecution of Certain Asbestos-Related Actions Against The Scotts Company; and (iii) Finding all such Actions Filed After the Petition Date to be Void *ab Initio* ("Expedited Motion").  See Docket from Adversary Proceeding No. A-01-771(JKF), at Docket No. 208.

7.  On July 22, 2004 the Court entered an order denying Scotts' Expedited Motion (the "July 22, 2004 Order"). Id. at Docket No. 253.  Among other things, the July 22, 2004 Order provides that Debtors shall not be required to participate in discovery or as witnesses at trial in any action in which Scotts is a party until the Debtors have filed a plan of reorganization. Id.

8.  Although prevented from securing discovery directly from Grace or from requiring its participation at trial, since the Court's July 22, 2004 Order, plaintiffs in the State Actions—through their discovery, pleadings, and designations—have left no doubt that they nonetheless intend to put Grace on trial *in absentia*.

9.  For example, counsel to certain of the plaintiffs in the State Actions advised Scotts that the State Actions would be tried as "a case against W. R. Grace" and that but for Scotts' purchase of Grace's Libby vermiculite, there would be no case against Scotts. See Adversary Proceeding Docket No. 208, Exhibit B to Scotts Expedited Motion, Declaration of David M. Aronowitz, Scotts' Executive Vice President, General Counsel & Corporate Secretary, sworn to June 23, 2004, at ¶ 3.  Other of the plaintiffs' counsel has also similarly characterized the State Actions against Scotts as cases designed to target Grace without naming it as a defendant. Id. at ¶ 4.

10. In one of the State Actions plaintiffs have designated Thomas Adkins—a former Grace employee—as one of their "expert" witnesses. See Exhibit A, Plaintiffs' Expert Witnesses, at p. 2.  The description of Mr. Adkins' testimony does not even mention Scotts, but instead focuses on Grace.  Among other things, the plaintiffs in that action intend to have Mr. Adkins testify regarding "efforts by W. R. Grace to conceal," "W. R. Grace's failure to educate," the Zonolite Grace Company's alleged failure to "give workers information," and the

"unreasonably dangerous nature of W. R. Grace's asbestos containing products."[3]

11. In a similar State Action (the "Madden Action") plaintiffs opposed summary judgment on the alleged ground that "Scotts Company manufactured fertilizer and other home garden products that contained vermiculite mined by W.R. Grace in Libby, Montana. That vermiculite was contaminated with asbestos." See Exhibit B, Plaintiffs' Kenneth Madden and Juanita Madden Response to Defendant, The Scotts Company's "No Evidence" Motion for Summary Judgment at p. 1, Kenneth Madden and Juanita Madden v. Ametek, Inc., et al., Cause No. 22045-2 (23d Jud. Dist., Brazoria County, Texas) (served March 31, 2004). The brief includes an extensive discussion of how the "Libby mine in Montanna [sic], owned and operated by W.R. Grace was found by the E.P.A. to be contaminated with asbestos" and asserted that "W.R. Grace" was "Scott's [sic] main supplier of vermiculite until 1980." Id. at 4. As supporting "evidence," the brief attaches a "Letter from W.R. Grace to the Consumer Product Safety Commission, April 1, 1980" and an EPA report highlighting the fact that "the Libby mine, formerly owned and operated by the W.R. Grace and Company, was known to contain deposits of fibrous tremolite asbestos." Id.

12. In yet another of the State Actions (the "Rand Action") plaintiffs engaged in

---

[3] In full, the disclosure regarding Mr. Adkins states:

Mr. Adkins is a former employee of W. R. Grace and may testify about the working conditions in the Libby Montana Vermiculite Mine and Zonolite/Grace plants from 1968 to 1990. He may also testify about the laboratory conditions where the vermiculite ore containing asbestos was measured, heated, and separated. He may also testify about the working conditions at the processing plant in Libby Montana where various Mononkote Zonolite Fireproofing and plaster products were processed. He may testify that the Zonolite Grace Company did not give workers information about the asbestos contained in the vermiculite or the hazards of the asbestos in the vermiculite ore while he worked for W. R. Grace and efforts by W. R. Grace to conceal the hazards of asbestos and tremolite associated with the vermiculite operation and its asbestos containing products. He may discuss the TLV generally and W. R. Grace's failure to educate workers about TLVs. He may also testify about the unreasonably dangerous nature of W. R. Grace's asbestos containing products. In addition to being a witness in the case in chief he may also be a rebuttal witness to various ex-corporate witnesses for W. R. Grace.

Id. at p. 2.

recent discovery focused on Grace and its Libby vermiculite.  Specifically, on October 6, 2004, the Rand Plaintiffs deposed Richard J. Lee, Ph.D., a Scotts-designated expert witness in the Rand Action and focused their examination mainly on Grace vermiculite and Libby, Montana. Plaintiffs' counsel questioned Dr. Lee extensively about Libby, Montana and what he knew about Grace's Libby operations.  He also asked at length about the vermiculite ore that Grace mined in Libby.  Questioning also focused heavily on Scotts' products incorporating vermiculite mined by Grace, primarily vermiculite mined in Libby.  Leaving no doubt that the case against Scotts is in fact a case against Grace, plaintiffs' counsel inquired in detail about Dr. Lee's familiarity with Libby vermiculite-based Grace products, including Zonolite Attic Insulation (ZAI).  In fact, before the deposition ended, plaintiffs' counsel requested that Dr. Lee produce any files or information that he obtained from Grace or that otherwise related to his study of ZAI, attic insulation tests, and Grace's Libby operations.  Plaintiffs' counsel's attention turned to Grace and Libby -- and stayed there for the rest of the deposition -- after Dr. Lee testified that, based on his own work and that of Dr. Eric Chatfield, as a practical matter, the commercial grade vermiculite produced from the non-Grace mines in Louisa, Virginia and Phalaborwa, South Africa from which Scotts obtained vermiculite is free of asbestos fibers.  See, e.g., Exhibit C (Deposition Transcript Excerpts from 10/6/04 Deposition of Dr. Lee) at pp. 19:16; 20:18; 21:5; 22:2; 22:15; 22:19-25:4; 65:18; 66:5; 67:10; 67:19; 68:2; 68:16; 69:7; 71:4; 74:5; 74:14; 86:4; 86:19; 91:14; 100:4; 100:23; 102:2; 102:6; 102:17; 104:13; 146:11; 147:4; 147:12; 151:2; 151:2; 151:8; 156:16; 159:12; 160:14.

       13. At the end of Dr. Lee's deposition, plaintiffs' counsel in the Rand Action requested Dr. Lee's files regarding Grace vermiculite testing:

> MR. DiMUZIO:  I don't have any more questions, but I do just want to make a statement that the Doctor has identified some materials regarding the testing of

vermiculite on behalf of both W. R. Grace and The Scotts Company in particular and photographs, et cetera. I do think that those would have been appropriate materials to turn over pursuant to the Subpoena Duces Tecum here; and I would like to suggest that we get together with counsel and reach some sort of agreement about having Plaintiffs get access to those materials.

Id. at p. 159:12.

14. The Rand Plaintiffs' recent deposition questioning of another Scotts-retained expert in the Rand Action, Edward Ilgren, M.D., D. Phil. also focused on Grace and its products:

Q.    Okay. Let's get back to W. R. Grace. See Exhibit D (Deposition Transcript Excerpts from 9/29/04 Deposition of Dr. Ilgren) at p. 38:24.

* * *

Q. Okay. Who were you communicating with at W. R. Grace? Id. at p. 41:2.

* * *

Q. Okay. Well, in a nutshell what are your opinions regarding any sort of health problems or lack thereof at the Libby mines that were operated by W. R. Grace? Id. at p. 41:19.

* * *

Q. Sure. Did W. R. Grace ever utilize you in either deposition or trial testimony in cases involving their vermiculite? . . . . And what were the opinions you delivered in that attic insulation litigation? Id. at p. 50:2.

* * *

Q. And of those four sites [the W. R. Grace Libby, Montana mine, the W. R. Grace South Carolina mine, the Phalaborwa, South Africa mine, and the Louisa, Virginia mine], did all four of those have some level of asbestos contamination?
A. To my knowledge, only the one, the Libby. Id., p. 55:19.

* * *

Q. What about W. R. Grace; do you have any idea when they first found out about it? Id., p. 134:22.

15. In fact, the Rand Plaintiffs' own expert witnesses, Dr. Arthur Frank had no opinions about Scotts' products, which he had not examined or analyzed, but was willing to offer

some opinions about Libby vermiculite generally.  <u>See</u> Exhibit E, Deposition Transcript Excerpts from 8/27/04 Deposition of Dr. Frank at pp. 108:20-109:3.  With respect to vermiculite, his testimony was limited to his understanding that Libby, Montana vermiculite "was contaminated with tremolite asbestos" and that this contamination "has caused many cases of mesothelioma both among miners and people who lived in the town."  <u>Id.</u> at pp. 38:8-15.

16. As a result, on September 10, 2004, Scotts filed its Motion for a Temporary Stay of the Rand Action (the "Rand Motion"), another State Action then scheduled for trial on October 11, 2004.

17. On September 30, 2004, the Court conducted a hearing on the Rand Motion (the "September 30, 2004 Hearing").  The Court may recall that despite repeated inquiry from the bench during the September 30, 2004 Hearing, counsel for the Rand Plaintiffs never disclaimed this intention to make Grace, and its products, a center-piece of its claims against Scotts.  As a result, the Court imposed on the Rand Plaintiffs a supplemental filing deadline of October 7, 2004 to make a showing that their action against Scotts was something other than purely a case about Grace and its products.

18. The Rand Plaintiffs did not make the supplemental filing.  Instead, on October 6, 2004—the eve of the supplemental filing deadline—the Rand Plaintiffs deposed Dr. Lee, the questioning and testimony from which leaves no doubt that the State Actions are, in effect, actions against Grace.  After the Dr. Lee deposition and before the supplemental filing deadline, the Rand Plaintiffs approached Scotts about continuing the trial and the adjourned bankruptcy hearing.  The Rand Plaintiffs and Scotts then entered into an agreement to continue that trial and to further adjourn the hearing on the Rand Motion in this Court.  <u>See</u> Exhibit F, Agreed Order of Continuance of Rand Action.

19. On October 14, 2004, Scotts filed its motion for a temporary stay of another State Action, the Gandy Action, which was then set for trial on November 1, 2004. On November 8, 2004 (the Response deadline), the Gandy Plaintiffs informed Scotts that they would nonsuit Scotts in exchange for a tolling agreement. On November 12, 2004, Scotts filed its Notice of Withdrawal as Moot the Gandy Motion. See Adversary Proceeding Docket No. 320.

<u>Relief Requested</u>

20. Debtors and Scotts seek to enjoin plaintiffs' prosecution of the State Actions as to Scotts pending confirmation of Debtors' anticipated plan of reorganization. Both the Modified Preliminary Injunction and the automatic stay prohibit the continuation of the State Actions as to Scotts.

<u>Basis For Relief And Applicable Authority</u>

21. Among other things, Section 362 of the Bankruptcy Code enjoins the commencement or continuation of any judicial action against the Debtors and enjoins any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate. See 11 U.S.C. § 362(a). The State Actions as to Scotts are fundamentally cases "against Grace" that, but for the automatic stay, would have also involved Grace as a defendant.

22. Section 105 of the Bankruptcy Code provides a mechanism for a bankruptcy court to stay litigation against a non-debtor. Section 105 provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a).

23. Indeed, the Court recently found that it had jurisdiction to enjoin a lawsuit against a non-debtor, where "the Debtors [would] be affected by the outcome of the lawsuit."

See In re W. R. Grace & Co., Case No. 01-01139 (JKF) (Bankr. D. Del. October 7, 2004) (the

"Memorandum Opinion") (Adv. Pro. 01-771, Docket No. 298).

       24. As recently acknowledged by the Third Circuit Court of Appeals, "the courts

have never adopted the absence of collateral estoppel as the test for preventing actions from

proceeding against third parties when the debtor is protected by the automatic stay.  Rather,

courts employ a broader view of the potential impact on the debtor."  See Exhibit G, Gerard v.

Maryland Casualty Company (In re W.R. Grace & Co.), 2004 WL 2404546, *4 (3d Cir. Oct. 28,

2004) (emphasis added).

Argument

       25. This Court must prevent the State Actions from proceeding against Scotts

because of the potential negative impact such proceedings will have on the Debtors.  Were the

State Actions against Scotts to proceed, Grace would suffer irreparable harm because Grace and

its vermiculite would necessarily be on trial, and the plaintiffs in the State Actions are poised to

blame Grace for their injuries.

       26. The nature of Debtors' vermiculite is inextricably intertwined with the

resolution of the State Actions as to Scotts.  As set forth more fully above, Plaintiffs' discovery,

designations, and pretrial pleadings demonstrate that the State Actions as to Scotts are really

actions about Grace vermiculite.  The disclosure of Adkins, a former Grace employee, leaves no

doubt that the plaintiffs plan to place Grace and its product on trial.  The pleading in the Madden

Action likewise confirms that the State Actions against Scotts are effectively "back-door" cases

against Grace.  Deposition discovery in the Rand Action demonstrates that the actions against

Scotts are undeniably predicated on claims about W.R. Grace.  The Dr. Lee testimony leaves

Grace vermiculite as the sole alleged source of the Rand Plaintiffs' alleged injuries.  Further, the

10

Rand Plaintiffs' deposition questioning of Scotts-retained expert Dr. Ilgren  and of its own

expert, Dr. Frank, illustrates plaintiffs' interest in and focus on Grace and further demonstrates

that plaintiffs in the State Actions are pursuing what amounts to a case against Grace, with Grace

*in absentia*.  Simply put, any supposed case against Scotts is necessarily based on the allegation

that W.R. Grace supplied Scotts with asbestos-contaminated vermiculite.  Therefore, any finding

against Scotts in the any of the other State Actions unavoidably would implicate Grace.  Such a

result would cause the very harm to W.R. Grace that this Court has said the automatic stay

prohibits.

> 27. Further, as the Court recently recognized, witness testimony in the State

Actions could negatively affect the Debtors.  In the absence of a stay of the State Actions as to

Scotts, there remains a very real risk that testimony will be established that could be used against

Debtors:

> 'once a witness has testified to a fact, or what sounds like a fact, that witness may
> be confronted with his prior testimony under oath in a future proceeding directly
> involving Manville, whether or not Manville was a party to the record on which
> the initial testimony was taken. Once an admission against interest is made, under
> oath or otherwise, by the agent of a party, that admission stands for all time. No
> matter what Lake may stipulate, the thousands of other claimants and cross-
> claimants who are after Manville's assets, would be entitled to use the product of
> such discovery.'

See Exhibit G, Gerard v. Maryland Casualty Company (In re W.R. Grace & Co.), 2004 WL

2404546, *4 n.4 (3d Cir. Oct. 28, 2004) (quoting In re Johns-Manville Corp., 40 B.R. 219, 225

(S.D.N.Y. 1984)); see, also, 5 Wigmore, Evidence, §§ 1386-1388 (3d Ed. 1940) ("it ought, then

to be sufficient to inquire whether the former testimony was given upon such an issue that the

party-opponent in that case had the same interest and motive in his cross-examination that the

present opponent has; and the determination of this ought to be left entirely to the trial judge");

Tug Raven v. Trexler, 419 F.2d 536 (4th Cir. 1969) (prior testimony admissible where "[t]he

interests of those present and represented by counsel [in prior proceeding] were substantially the same as those who [were] parties to [the subsequent] proceeding").

28. The advancement of the State Actions could thus deplete the Debtors' estates and would distract the Debtors from their reorganization efforts during a critical stage in their bankruptcy cases.[4]  The Debtors filed for bankruptcy in response to an onslaught of asbestos-related lawsuits, and the resolution of these chapter 11 cases is married to the resolution of such claims.  The Debtors should be allowed to pursue the resolution of these chapter 11 cases without the distraction of ancillary litigation that would allow certain asbestos claimants to enjoy more favorable treatment than that afforded to the thousands of other asbestos claimants who are awaiting resolution of their claims within the confines of these chapter 11 cases.

29. Moreover, in the absence of a stay, Scotts would be significantly handicapped were the State Actions to proceed to trial.  This Court's July 22, 2004 Order provides that unless Debtors voluntarily agree to participate in discovery or trial, Scotts cannot compel them to.  To date, the Debtors have not voluntarily agreed to participate in the State Actions.  Yet, at the heart of the claims against Scotts in the State Actions is whether Grace's vermiculite had impurities and, if so, whether those impurities caused the plaintiffs' alleged injuries.  Because neither the plaintiffs nor the state courts have stayed or continued the State Actions, in the absence of a bankruptcy stay, Scotts would be forced to defend the claims against it without the necessary participation of W.R. Grace.  In other words, the risks, if any, of Grace's products will be decided with literally no input from Grace.  That is both fundamentally unjust for Scotts, which is left to defend without key evidence, and more importantly for this proceeding, has potentially

---

[4] Were the State Actions to proceed to trial, there could also be a negative impact on the Shared Insurance Policies (and, in turn, Grace), in the event that it is determined that Scotts is an insured there under.

far-reaching implications for Grace's reorganization efforts.

       30. In the interest of the Debtors' reorganization and to further the objectives of the Bankruptcy Code, the Court should enforce the Modified Preliminary Injunction Order and the automatic stay to stay the State Actions.  Alternatively, this Court should exercise its equitable powers pursuant to section 105 and grant a preliminary injunction to temporarily stay the State Actions against Scotts pending confirmation of Debtors' plan of reorganization.

       WHEREFORE, for the foregoing reasons, the Debtors and Scotts respectfully request that the Court enter an Order temporarily staying the State Actions as to Scotts pending confirmation of Debtors' anticipated plan of reorganization and further order of the Court.  The Debtors and Scotts respectfully move for an order in the form attached hereto.

Dated:  November 15, 2004

PACHULSKI, STANG, ZIEHL, YOUNG & JONES

*/s/ David W. Carickhoff, Jr.*
David W. Carickhoff, Jr.
Laura Davis Jones
919 N. Market Street
16th Floor
Wilmington, DE  19899-8705
Phone:  (302) 652-4100
Facsimile:  (302) 652-4400

and

David M. Bernick
Janet S. Baer
Samuel Blatnick
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois  60601
Phone:  (312) 861-2000
Facsimile:  (312) 861-2200

Attorneys for Movant, Debtors

And

MORRIS, NICHOLS, ARSHT &
TUNNELL


*/s/ Daniel B. Butz*
William H. Sudell, Jr. (#0463)
Daniel B. Butz (#4227)
1201 North Market Street
P. O. Box 1347
Wilmington, DE 19899-1347
Phone:  (302) 658-9200
Facsimile:  (302) 658-3989

and

Robert J. Sidman (Ohio Bar #0017390)
Tiffany Strelow Cobb (Ohio Bar #0067516)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH  43215
Phone:  (614) 464-6400
Facsimile:  (614) 719-4663

Attorneys for Movant, The Scotts Company