reflective of the range of the fully diluted reorganized equity value per share ascribed herein, or elsewhere in the Plan Documents, may or may not correlate with the actual trading price (if any) of Parent Common Stock on the New York Stock Exchange. It represents hypothetical reorganized values based on numerous assumptions. The estimated values set forth herein do not necessarily reflect values that could be attainable in public or private markets, and do not consider market trading characteristics, trading limitations possibly imposed on the Parent Common Stock, or perceptions in public or private markets about the Reorganized Debtors and/or Non-Debtor Affiliates that may affect the trading price of Parent Common Stock.

### 8.4.1 The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results

The Reorganized Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that they have assumed in projecting future business prospects. If the Reorganized Debtors do not achieve these projected revenue or cash flow levels, they may lack sufficient liquidity to continue operating as planned after the Effective Date. The Debtors' financial projections represent management's view based on current known facts and hypothetical assumptions about the Reorganized Debtors' future operations. However, the Projections set forth herein do not guarantee the Reorganized Debtors' future financial performance.

### 8.4.2 The Reorganized Debtors May Not Be Able to Meet Post-Reorganization Debt Obligations and Finance All Operating Expenses, Working Capital Needs and Capital Expenditures

To the extent the Reorganized Debtors are unable to meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may be unable to service their debt obligations as they come due or to meet the Reorganized Debtors' operational needs. Such a failure may preclude the Reorganized Debtors from developing or enhancing their products, taking advantage of future opportunities, growing their business or responding to competitive pressures.

### 8.4.3 Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors

Holders of Claims should carefully review Article 10 (Federal Income Tax Consequences of the Plan) to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Reorganized Debtors.

## 8.5 Factors Associated with the Business

There are many business factors that create risks for the Debtors' current business operations, as well as Reorganized Grace's future operations. These risks include the following:

- loss of senior management and other key employees;

- greater than expected liabilities for environmental remediation;

84

- a decline in worldwide oil consumption or the development of new methods of oil refining;

- increases in the price of raw materials and energy costs;

- consolidation of major customers, which could increase customer purchasing power, thereby putting pressure on operating profits;

- inability to gain customer acceptance, or slower than anticipated acceptance, of new products or product enhancements;

- changes in environmental regulations or societal pressures that make Grace's business operations more costly or that change the types of products used by customers, especially petroleum-based products;

- slower than anticipated economic advances in less developed countries;

- foreign currency devaluations in developing countries or other adverse changes in currency exchange rates (in particular, the U.S. dollar to Euro exchange rate);

- technological breakthroughs rendering a product, a class of products, or a line of business obsolete;

- inability to adapt to continuing technological improvements or operating strategies by competitors or customers;

- inability to adapt to other improvements made by direct or indirect competitors;

- acquisition (through theft or other unlawful means) or use by others of Grace's proprietary technology and other know-how; and

- an adverse change in relations with employees and/or labor unions.

### 8.5.1   Reorganized Grace May Not Obtain Post-Confirmation Financing

The Plan envisions that Reorganized Grace will obtain Exit Financing. There is no guarantee that Reorganized Grace will be able to obtain such Exit Financing, or obtain it on the terms contemplated by the proforma and prospective financial information.

## 8.6   Factors Affecting the Asbestos Trust

### 8.6.1   Risk that the Asbestos Trust Will not be Able to Pay All Allowed Claims

Even if the Plan is confirmed and consummated, Claimants and Holders of Equity Interests should be aware of certain risks associated with confirmation and the ability of the Debtors to perform under the Plan. The Plan provides that the Asbestos Trust will pay all Allowed Asbestos Claims. The Plan further provides that the Asbestos Trust will be funded by:

85

(1) $512.5 million in Cash, plus interest thereon from December 21, 2002 until the Effective Date, at a rate of 5.5% per annum compounded annually, from Sealed Air, (2) 9 million shares of Sealed Air Common Stock (subject to antidilution adjustments outlined in the Sealed Air Settlement Agreement), (3) Parent Common Stock in an amount to be determined, and (4) Warrants exercisable for additional Parent Common Stock, which, together with the Parent Common Stock being issued under the Plan, could represent, up to an aggregate of 50.1% of the voting shares of the Parent. There is no guarantee that the value of Sealed Air Common Stock or Parent Common Stock will not decline such that the Asbestos Trust will not be able to pay all Allowed Asbestos Claims, as provided in the Plan. Finally, the amount of Allowed Asbestos Claims could be significantly more than estimated by the Court.

### 8.6.2    Risk of Appointing Different Trustees for the Asbestos Trust

At the Confirmation Hearing, the Debtors will request that the Court appoint certain individuals to be designated prior to the Confirmation Hearing as the three initial Trustees of the Asbestos Trust. However, the Court may reject one or more of the proposed Trustees. If the Court rejects the nomination of a Trustee, another person would need to be designated, which may delay the Effective Date of the Plan. The selection of different Trustees also could impact administration of the Asbestos Trust.

### 8.7    Risk that the Information in this Disclosure Statement May be Inaccurate

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein. The Debtors may subsequently update the information in this Disclosure Statement, but they have no duty to update this Disclosure Statement unless ordered to do so by the Court. Further, the proforma and prospective financial information contained herein, unless otherwise expressly indicated, is unaudited. Finally, neither the SEC nor any other governmental authority has passed upon the accuracy or adequacy of this Disclosure Statement, the Plan, or any Exhibits in the Exhibit Book.

This financial information contains certain statements that are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements are subject to a number of assumptions, risks and uncertainties, many of which are beyond the control of the Debtors, including the implementation of the Plan, existing and future governmental regulations, the continuing availability of sufficient borrowing capacity or other financing to fund operations, currency exchange rate fluctuations, natural disasters, terrorist actions or acts of war, operating efficiencies, labor relations, actions of governmental bodies and other market and competitive conditions. Holders of Claims and/or Equity Interests are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements and the Debtors undertake no obligation to update any such statements.

86

## 9.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords the Holders of Claims and Equity Interests the potential for the greatest realization on their Claims and Equity Interests and, therefore, is in the best interest of such Holders.  If the Plan is not confirmed, however, the theoretical alternatives include (1) continuation of the pending Chapter 11 Cases, (2) alternative plans of reorganization, or (3) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### 9.1  Continuation of the Chapter 11 Cases

If the Debtors remain in Chapter 11 and the Plan, as currently proposed, is not confirmed within the time period projected, the Debtors could continue to operate their businesses and manage their properties as Debtors in Possession.  However, the value of assets and cash flow could be affected by the expenses of operating under Chapter 11 of the Bankruptcy Code for a further extended period of time.  Such delay may significantly reduce the recoveries received by Claimants and Equity Interest Holders under any future plan of reorganization.

### 9.2  Alternative Plans of Reorganization

If the Plan is not confirmed, it is possible that any other party in interest in the Chapter 11 Cases could attempt to formulate and propose a different plan or plans on such terms, as they may desire.  Such alternative plan would still have to meet the requirements of confirmation. The Debtors believe that the Plan proposed by the Debtors provides the best potential return to both the Debtors' Claimants and Equity Interest Holders.

### 9.3  Chapter 7 Liquidation

Bankruptcy Code § 1129(a)(7) requires that even if a plan is accepted by a class of creditors or equity interest holders, the Bankruptcy Court must nonetheless determine that the plan is in the "best interests" of any class of creditors or equity interest holders that are impaired by the plan.  The "best interests" test requires that Bankruptcy Court find either that (i) all members of an impaired class have accepted the plan or (ii) the plan will provide the holder of a Claim or Equity Interest in such class a distribution of a value, as of the effective date of the plan, that is at least equal to what such holder would receive in a hypothetical liquidation of the debtor under Chapter 7 of the Bankruptcy Code.

In a hypothetical liquidation of the Debtors under Chapter 7, a trustee would be elected or appointed to liquidate the assets of the Debtors and the Non-Debtor Affiliates.  This "liquidation value" would consist primarily of the proceeds from a sale of the assets of the Debtors and Non-Debtor Affiliates.  The amount of the liquidation value available would be distributed first to secured Claimants, to the extent of the value of their collateral.  Thereafter, any remaining funds would be distributed in accordance with the priorities of the Bankruptcy Code.  The estimate of liquidation value available to Claimants and Equity Interest Holders would be further reduced by (i) the costs and expenses incurred as a result of the Chapter 7 liquidation, and (ii) Administrative Expense Claims and Priority Claims incurred in the Chapter 11 Cases allowed in the Chapter 7 case.

87

The Best Interests Analysis requires estimates of the net proceeds that may be generated as a result of a hypothetical Chapter 7 liquidation. Any such liquidation would necessarily take place in the future under circumstances that cannot be predicted; the amount of such proceeds is therefore highly speculative and could be significantly impacted as a result of the uncertainty that exists as to whether a Chapter 7 trustee could sell the assets free and clear of any Claims that could be asserted against the Debtors. The amount of proceeds available from the liquidation of other assets is an estimate that assumes conditions that may not be present at the time of the Chapter 7 liquidation.

The Debtors' liquidation analysis is included as a component of the "Best Interests Analysis," attached as Exhibit 3 in the Exhibit Book, was prepared by the Debtors with the assistance of Blackstone. Reference is made to the Best Interests Analysis for estimates of liquidation value, costs and expenses and claims amounts, and for a description of the procedures followed, the factors considered, and the assumptions made in preparing the analysis. In preparing the Best Interests Analysis, the Debtors have projected a range for the Amount of Allowed Claims based on a review of their Schedules and Filed proofs of claim. No order or finding has been entered estimating or fixing the amount of Claims. The actual amount of Claims against the estate could vary significantly from the Debtors' estimates. For all of the foregoing reasons, the actual net proceeds available to Holders of Allowed General Unsecured Claims and Holders of Equity Interests in the Parent could vary materially from the amounts in the Best Interests Analysis. The Best Interests Analysis can be found in Exhibit 3 in the Exhibit Book and shows that Holders of General Unsecured Claims would receive an estimated Distribution of 54% - 89% on their Claims under a Chapter 7 liquidation while such Holders would receive an estimated 100% Distribution under Chapter 11.

Based on its Best Interests Analysis, the Debtors believe that they have complied with the best interests test. Creditors and Holders of Equity Interests in the Parent are expected to receive under the Plan a distribution that is at least as much as they would receive in a hypothetical liquidation under Chapter 7 of the Bankruptcy Code.

## 10. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtors, the Reorganized Debtors, the Asbestos Trust, the Holders of Claims and the Holders of Equity Interests based upon the IRC, judicial authorities and current administrative rulings and practices now in effect, all of which are subject to change at any time by legislative, judicial or administrative action. Any such change could be retroactively applied in a manner that could adversely affect the Debtors, the Reorganized Debtors, the Asbestos Trust, Holders of Claims and Holders of Equity Interests. In particular, some of the consequences discussed herein are based on United States Department of Treasury regulations or IRS notices that have been proposed but not finalized, which regulations are particularly susceptible to change at any time.

The tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below. The Debtors have not requested a tax ruling from the IRS. The Debtors may obtain either (a) a private letter ruling establishing that the Asbestos Trust is a "qualified settlement fund" pursuant to Section 468B of the IRC, or (b) an opinion of counsel

88

regarding the tax consequences satisfactory to the Debtors and Sealed Air. However, there can be no assurance that the treatment set forth in the following discussion will be accepted by the IRS. Further, the federal income tax consequences to the Debtors, the Reorganized Debtors, the Asbestos Trust, and Holders of Claims and/or Equity Interests may be affected by matters not discussed below. For example, the following discussion does not address state, local or foreign tax considerations that may be applicable; further, it does not address the tax consequences of the Plan to certain types of Holders of Claims or Equity Interests, creditors and stockholders (including foreign persons, financial institutions, life insurance companies, tax-exempt organizations and taxpayers who may be subject to the alternative minimum tax) who may be subject to special rules not addressed herein.

The discussion set forth below is included for general information only. The Debtors and their counsel and financial advisors are not making any representations regarding the particular tax consequences of confirmation and consummation of the Plan, nor are they rendering any form of legal or tax advice on such tax consequences. The tax laws applicable to corporations in bankruptcy are extremely complex, and the following summary is not exhaustive. Holders of Claims and/or Equity Interests are strongly urged to consult their tax advisors regarding tax consequences of the Plan, including U.S. federal, state and local, and foreign tax consequences.

Except where essential to the context, references to the "Debtors" in Article 10 herein refer to both the Debtors and the Reorganized Debtors, collectively.

## 10.1    Federal Income Tax Consequences to the Debtors

### 10.1.1  General Discussion

In general, the Debtors do not expect to incur any substantial tax liability as a result of implementation of the Plan, and do not expect to realize any significant amount of cancellation of indebtedness income. Upon consummation of the Plan, the Debtors expect to have an NOL available to offset future taxable income. The amount of that NOL is uncertain at this point, but is currently estimated to be approximately $348 million as of December 31, 2003. As discussed in Section 10.1.2 below, this NOL should be increased by the tax deductions received by the Debtors upon consummation of the Plan, which deductions should be based on the value of the consideration transferred by the Debtors in satisfaction of their tort, environmental and other liabilities. The actual amount of the NOL available to the Debtors after consummation of the Plan will depend on the value of those deductions, as well as the outcome of certain unresolved past tax liabilities and the mechanism by which the Debtors finance their bankruptcy emergence. As discussed in Section 2.5.3.2 of this Disclosure Statement, approximately one-third of the NOLs are currently subject to challenge by the IRS. The utilization of those NOLs may also be subject to certain annual limitations, as discussed in more detail below.

In order to ensure that the Debtors' NOL will continue to be available following emergence from bankruptcy, certain restrictions will be placed upon transfers of Parent Common Stock. In particular, without the consent of the Parent for a period of three years after emergence from bankruptcy, any Entity (other than the Asbestos Trust) who currently owns or controls more than 4.75% of the Parent Common Stock will be prohibited from increasing their ownership percentage, and any Entities (other than the Asbestos Trust) who do not own any Parent Common Stock or own or control less than 4.75% of the Parent Common Stock, will be

89

prohibited from increasing their ownership percentage of the Parent Common Stock to an amount equal to or greater than 4.75%. Further, the Asbestos Trust will be prohibited from selling the Parent Common Stock contributed to the Asbestos Trust for a period of three years after the Effective Date.

Certain restrictions will also be imposed on the exercise of the Warrants that the Debtors will contribute to the Asbestos Trust. The amount of Warrants that the Asbestos Trust will be able to exercise, for a period of three years after emergence, will be limited to approximately 1/2 of the Asbestos Trust's total Warrants. In addition, the Debtors will have the right, as necessary to protect the utilization of their NOLs, and to purchase Warrants from the Asbestos Trust for their fair market value, in lieu of permitting the exercise of such Warrants.

In connection with obtaining adequate capital to fund its operations upon emergence from bankruptcy, the Debtors may be required to take capital as a dividend from certain of its foreign subsidiaries. The receipt of these dividends would be taxable to the Debtors for U.S. income tax purposes, and could therefore have an adverse impact on the Debtors' tax planning. In addition, the Debtors or their Non-Debtor Affiliates may be forced to pledge some or all of their foreign assets as security in order to obtain Exit Financing, which may be treated as a deemed dividend for U.S. income tax purposes. Either of these actions could result in the Debtors being forced to realize a significant charge to earnings.

### 10.1.2 Deduction of Amounts Transferred to Satisfy Asbestos Claims

The tax treatment of transfers of property by the Debtors to the Asbestos Trust will vary depending on the characterization of the trust, e.g., as a "grantor trust" as defined by Section 671 et seq. of the IRC, or as a "qualified settlement fund" ("QSF") as defined by Treasury Regulation Section 1.468B-1 et seq. The Debtors currently expect that the Asbestos Trust will be treated as a QSF for federal income tax purposes, meaning that the Debtors should be entitled to an immediate deduction for the fair market value of any property contributed by the Debtors to the Asbestos Trust.

Any transfer of Parent Common Stock by the Debtors to the Asbestos Trust should be deductible by the Debtors in an amount equal to the fair market value of such stock. No gain or loss should be recognized by the Debtors with respect to this stock. The transfer of Cash, if any, to the Asbestos Trust should be deductible by the Debtors in an amount equal to the amount of such Cash.

The IRS has not provided any specific guidance as to whether the transfer of Warrants to the Asbestos Trust will constitute the transfer of property that gives rise to an immediate deduction. The Debtors expect to take the position that the transfer of Warrants to the Asbestos Trust does not constitute the transfer of property, and that only the exercise of the Warrants will constitute a deductible transfer. If so, the Debtors will be entitled to a deduction equal to the fair market value of the Parent Common Stock upon exercise, less the exercise price of such Warrants. The IRS may, however, later disagree with that conclusion and take the position that the transfer of the Warrants themselves constitutes the transfer of property. In that case, the Debtors' tax deduction would be accelerated and the amount of such deduction may be materially different.

90

### 10.1.3 Cancellation of Debt Income

Under the IRC, a taxpayer generally recognizes gross income to the extent that indebtedness of the taxpayer is cancelled for less than the amount owed by the taxpayer, subject to certain judicial or statutory exceptions. The most significant of these exceptions with respect to the Debtors is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not required to recognize such income. In that case, however, the taxpayer must reduce its tax attributes, such as its NOLs, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the cancellation of indebtedness income ("CODI") avoided.

The Debtors do not expect to realize any significant CODI upon consummation of the Plan, since the Debtors expect that Claimants entitled to Distributions under the Plan will receive an amount of consideration that should equal the total amount of their Claims (including accrued but unpaid interest). In order to ensure that Claimants receive full consideration for their Claims, the value of the Parent Common Stock transferred to the Claimants will be determined based on the average of the closing prices of such stock on the trading days during the 30 days beginning on the Effective Date.

### 10.1.4 Net Operating Losses

As a result of existing NOLs and additional deductions that will be generated by the resolution of tort, environmental and other claims upon emergence from bankruptcy, the Debtors expect to have an NOL after emerging from bankruptcy. The amount of the NOL may be reduced somewhat by any CODI realized upon emerging from bankruptcy, although as stated above the Debtors do not expect that there will be CODI realized upon emergence.

The extent to which the Debtors will be able to utilize their NOL after emerging from bankruptcy will depend on Section 382 of the IRC, which generally imposes an annual limitation on a corporation's use of its NOLs (and may limit a corporation's use of certain built-in losses if such built-in losses are recognized within a five-year period following an "ownership change," as defined below) if a corporation undergoes an ownership change. This discussion describes the limitation determined under Section 382 of the IRC in the case of an ownership change as the "Section 382 Limitation." The annual Section 382 Limitation on the use of pre-change losses (the NOLs and built-in losses recognized within the five year post-ownership change period) in any "post-change year" is generally equal to the product of the fair market value of the loss corporation's outstanding stock immediately before the ownership change multiplied by the long-term tax-exempt rate in effect for the month in which the ownership change occurs. The long-term tax-exempt rate is published monthly by the IRS and is intended to reflect current interest rates on long-term tax-exempt debt obligations. It is presently approximately 4.5%. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. As discussed below, however, a special exception from these rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

In general, an ownership change occurs when the percentage of the corporation's stock owned by certain "5 percent shareholders" increases by more than 50 percentage points in the aggregate over the lowest percentage owned by them at any time during the applicable "testing period" (generally, the shorter of (a) the 36-month period preceding the testing date or (b) the period of time since the most recent ownership change of the corporation). Although the Debtors

91

K&E 9907839.25

will be giving Parent Common Stock under the Plan to certain of its Claimants, the Debtors are not certain whether the amount of such Parent Common Stock will be sufficient to constitute an ownership change under Section 382 of the IRC. Consequently, the Debtors do not know whether their ability to utilize their NOL following emergence from bankruptcy will be subject to the Section 382 Limitation.

The uncertainty regarding whether an ownership change will occur is increased by the presence of the Warrants in the Asbestos Trust. As the Asbestos Trust exercises Warrants over the three-year period following emergence from bankruptcy, it is possible that the combination of such exercises, coupled with certain other transactions that occurred prior to emergence from bankruptcy or that may occur after bankruptcy emergence, could give rise to an ownership change within the meaning of Section 382 of the IRC. However, the existence of such ownership change may not give rise to any limitation on the Debtors' ability to use their NOLs. In particular, Section 382(l)(5) of the IRC provides a special rule applicable in the case of a bankruptcy reorganization (the "Section 382(l)(5) Exception"). If a corporation qualifies for the Section 382(l)(5) Exception, the annual Section 382 Limitation will not apply to the corporation's NOL on account of an ownership change occurring as a result of the bankruptcy reorganization. The Section 382(l)(5) Exception does, however, require that the corporation's NOL and credit carryovers be computed without taking into account the aggregate amount of all interest deductions in respect of debt exchanged for the corporation's stock during the three prior taxable years and the portion of the current taxable year ending on the date of the ownership change.

A corporation will qualify under the Section 382(l)(5) Exception if the corporation's pre-bankruptcy shareholders and holders of certain debt ("Qualifying Debt") own at least 50% of the stock of the corporation after the bankruptcy reorganization, and the corporation does not "elect out" of the Section 382(l)(5) Exception. Qualifying Debt is a claim which (i) was held by the same creditor for at least 18 months prior to the bankruptcy filing or (ii) arose in the ordinary course of a corporation's trade or business and has been owned, at all times, by the same creditor. Indebtedness will be treated as arising in the ordinary course of a corporation's trade or business if such indebtedness is incurred by the corporation in connection with the normal, usual or customary conduct of the corporation's business. While not free from doubt, the Debtors expect that Asbestos Claims will qualify as Qualifying Debt, and that the stock acquired by the Asbestos Trust upon exercise of the Warrants will be treated as stock acquired in exchange for Qualifying Debt within the meaning of the Section 382(l)(5) Exception. In addition, any debt held by a creditor who receives an amount of stock representing less than 5.0% of the equity interests in the Debtors upon emerging from bankruptcy will also be treated as Qualifying Debt, unless such creditor actively participated in formulating the Debtors' bankruptcy plan and in doing so made it clear to the Debtors that its debt was not Qualified Debt.

If an ownership change occurs and the Debtors do not qualify for the Section 382(l)(5) Exception, the Debtors would then be subject to an annual Section 382 Limitation. Under Section 382(l)(6) of the IRC, if a corporation is otherwise not eligible for the Section 382(l)(5) Exception (or if it elects out of Section 382(l)(5)), then the annual Section 382 Limitation is calculated by taking into account the increase in equity value resulting from the issuance of equity upon emergence in exchange for debt claims.

92

The Debtors expect at this point that, if an ownership change occurs, it would be likely that the Debtors would qualify for a Section 382(l)(5) Exception. However, Section 382 of the IRC provides that if a company that utilizes the Section 382(l)(5) Exception undergoes another ownership change within two years, that company's NOL is reduced to zero. For that reason, the Parent Common Stock, upon emergence, will be subject to certain transfer restrictions in order to ensure that another ownership change does not occur after emergence. Those restrictions were discussed above under Section 10.1.1 (General Discussion). The general effect of these restrictions is to ensure that no Entity acquires an amount of Parent Common Stock after emerging from bankruptcy that would cause such Entity to hold more than 4.75% of the Parent's equity value, without the consent of the Parent's Board of Directors, and to ensure that no shareholder who owns more than 4.75% of the Parent's equity value after emergence buys additional Parent Common Stock. The amount of Warrants that the Asbestos Trust will be able to exercise within the three years after emergence will also be limited to an amount equal to approximately 50% of the Asbestos Trust's total Warrants.

These transfer restrictions will generally not impose any limitations on a Claimant or other Entity that holds less than 4.75% of the Parent Common Stock after emergence to either buy or sell stock on the open market, so long as such purchase or sale does not cause the Claimant or other Entity to then hold more than 4.75% of the Parent Common Stock.

### 10.2    Federal Income Tax Consequences to Holders of Claims and the Asbestos Trust

#### 10.2.1  Holders of Asbestos Claims

To the extent that payments from the Asbestos Trust to Claimants constitute damages received by such Claimants on account of personal injuries, such payments should not constitute gross income to such Claimants, except to the extent that such payments are attributable to medical expense deductions allowed under Section 213 of the IRC for a prior taxable year.

To the extent that payments from the Asbestos Trust to Claimants constitute compensatory damages for destruction or damage to property, and such payments do not exceed the Claimant's tax basis in its property, such payments should not be included in taxable income. Instead, such payments would be treated as a return of capital to such Claimant, reducing the holder's tax basis in the property. Any amounts received in excess of the Claimant's tax basis should be treated as gain from the disposition of the property, and would therefore give rise to capital gain assuming that the Claimant held such property as a capital asset.

#### 10.2.2  Treatment of the Asbestos Trust

The Debtors expect that the Asbestos Trust will be a QSF for federal income tax purposes. As a QSF, the Asbestos Trust will be subject to a separate entity level tax on its income at the maximum rate applicable to trusts and estates. In determining the taxable income of the Asbestos Trust, (a) any amounts contributed to the Asbestos Trust will not be treated as taxable income, (b) any sale, exchange or distribution of property by the Asbestos Trust will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of the sale, exchange or distribution and the adjusted tax basis of such property, (c) interest income and dividend income will be treated as taxable

93

K&E 9907839.25

income, and (d) administrative costs (including state and local taxes) will be deductible. In general, the adjusted tax basis of property received by the Asbestos Trust will be its fair market value at the time of receipt. As discussed above, the Debtors believe that the transfer of Warrants to the Asbestos Trust will not be treated as a transfer of property until such time as the Warrants are exercised. For that reason, the Debtors believe that the Asbestos Trust will not recognize any income or gain upon exercise of the Warrants. This result is not free from doubt, however, and it is possible that the IRS would take the position that the exercise of such Warrants should be treated as taxable income or gain to the Asbestos Trust.

### 10.2.3 Consequences to Holders of General Unsecured Claims

Pursuant to the Plan, each Holder of a General Unsecured Claim will receive, in full satisfaction and discharge of its Allowed Claim, a combination of Cash and Parent Common Stock. The federal income tax consequences of the Plan to a Holder of a General Unsecured Claim depend, in part, on whether such Claim constitutes a "security" for federal income tax purposes.

Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.

In general, the Debtors believe that the General Unsecured Claims do not qualify as "securities" for federal income tax purposes. If a debt instrument constituting a surrendered Allowed General Unsecured Claim is not treated as a security, the Holder of such a Claim should be treated as exchanging its Allowed General Unsecured Claim for Parent Common Stock and Cash in a fully taxable exchange. The Holder of an Allowed General Unsecured Claim who is subject to fully taxable exchange treatment should recognize gain or loss equal to the difference between (i) the fair market value of the Parent Common Stock as of the Effective Date plus the Cash received that is not allocable to accrued interest, and (ii) the Holder's basis in the debt instrument constituting the surrendered Allowed General Unsecured Claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debt constituting the surrendered Allowed General Unsecured Claim were held for more than one year. To the extent that a portion of the Parent Common Stock or Cash received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income. See Section 10.2.3.1 (Accrued Interest). A Holder's tax basis in the Parent Common Stock received should equal the fair market value of the Parent Common Stock as of the date received. A Holder's holding period for the Parent Common Stock should begin on the day following the Effective Date.

94

### 10.2.3.1      Accrued Interest

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued interest that was not previously included in the Holder's gross income, such amount should be taxable to the Holder as interest income. Conversely, a holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Pursuant to the Plan, all Distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Claim, to the extent otherwise permitted and as determined for federal income tax purposes, and thereafter to the remaining portion of such Claim, if any. However, there can be no assurance that the IRS will respect this allocation.

### 10.2.3.2      Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of the gain realized by a Holder of a debt instrument constituting an Allowed Claim who exchanges the debt instrument for other property on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with an original-issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of surrendered debts (determined as described above) that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### 10.2.4 Consequences to Holders of Equity Interests

Pursuant to the Plan, each Holder of an Allowed Equity Interest in the Debtors will retain their Allowed Equity Interest, subject to dilution on account of, among other things, Parent Common Stock issued (i) under the Management Stock Incentive Plan, (ii) to other Holders of Allowed Claims, or (iii) to the Asbestos Trust upon exercise of Warrants. Holders of Allowed Equity Interests will therefore recognize neither gain nor loss with respect to the reorganization.

95

Such Holders will retain their existing tax basis and holding period in their Allowed Equity Interests.

### 10.3    Backup Withholding

Debtors will withhold any amounts required by law to be withheld from payments of interest and dividends and will comply with all applicable reporting requirements of the IRC.

## 11.  SECURITIES IMPLICATIONS OF THE PLAN

### 11.1    The Issuance of Securities Pursuant to the Plan

The Debtors will be relying on an exemption from registration under the Securities Act and applicable provisions of applicable state securities or "blue sky" laws with respect to the issuance of shares of the Parent Common Stock pursuant to the Plan.

The Debtors intend to rely upon the exemption from the registration requirements of the Securities Act (and of equivalent state securities or "blue sky" laws) provided by Bankruptcy Code § 1145(a)(1).  Generally, Bankruptcy Code § 1145(a)(1) exempts the offer and sale of securities pursuant to a plan of reorganization from the registration requirements of the Securities Act and equivalent state securities and "blue sky" laws if the following conditions are satisfied (1) the securities are issued by a debtor (or its affiliate or successor) or plan sponsor under a plan of reorganization, (2) the recipients of the securities hold a claim against, and interest in, or a claim for an administrative expense against, the debtor, and (3) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" for Cash or property.  The Debtors believe that the exchange of the Parent Common Stock for Claims satisfies such requirements.

The Parent Common Stock issued to Holders of Claims pursuant to the Plan may be resold by such Entities without restriction unless, as more fully described below, any such Holder is deemed to be an "underwriter" with respect to such securities, as defined in Bankruptcy Code § 1145(b)(1).  Generally, Bankruptcy Code § 1145(b)(1) defines an "underwriter" as any party who (1) purchases a claim against, or equity interest in, the debtor in a bankruptcy case, with a view towards the distribution of any security to be received in exchange for such claim or equity interest, (2) offers to sell securities issued under a bankruptcy plan on behalf of the holders of such securities, (3) offers to buy securities issued under a bankruptcy plan from parties receiving such securities, if the offer to buy is made with a view towards distribution of such securities, or (4) is an "issuer," as such term is defined in Section 2(11) of the Securities Act.

The reference contained in Bankruptcy Code § 1145(b)(1)(D) to Section 2(11) of the Securities Act would include as "underwriters" all parties who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a party, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor (or its affiliate or successor) under a plan of reorganization may be deemed to "control" such

96

debtor (and therefore be an underwriter for purposes of Bankruptcy Code § 1145), particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or affiliate's or successor's) voting securities. In addition, the legislative history of Bankruptcy Code § 1145 suggests that a creditor with at least 10% of the securities of a debtor could be deemed a "control" person.

Holders may, under certain circumstances, be able to sell their securities pursuant to the safe harbor resale provisions of Rule 144 under the Securities Act. Generally, Rule 144 provides that if certain conditions are met (e.g. one-year holding period with respect to "restricted securities," volume limitations, manner of sale, availability of current information about the issuer, etc.), specified persons who (1) resell "restricted securities" or (2) resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in Section 2(11) of the Securities Act. Under paragraph (k) of Rule 144, the aforementioned conditions to resale will no longer apply to restricted securities sold for the account of a Holder who is not an affiliate of the Debtors at the time of such resale and who has not been such during the three-month period next preceding such resale, so long as a period of at least two years has elapsed since the later of (1) the Effective Date and (2) the date on which such holder acquired his or its securities from an affiliate of the Debtors. The SEC has taken the position in no-action letters that the holding period requirement set forth in Rule 144(d) is not applicable to holders of securities issued pursuant to Bankruptcy Code § 1145.

Under Bankruptcy Code § 1145(a)(4), stockbrokers are required to deliver a copy of this Disclosure Statement (and supplements hereto, if any, if ordered by the Court) at or before the time of delivery of securities issued under the Plan to their customers for the first 40 days after the Effective Date. This requirement specifically applies to trading and other aftermarket transactions in such securities.

The foregoing summary discussion is general in nature and has been included in this Disclosure Statement solely for information purposes. The Debtors do not make any representations concerning, and do not provide an opinion or advice with respect to, the securities law and bankruptcy law matter described above. The Debtors encourage each Entity who is to receive Parent Common Stock pursuant to the Plan to consider carefully and consult with their own legal advisor(s) with respect to such (and any related) matters in view of the uncertainty concerning the availability of exemptions from the registration requirements of the Securities Act and equivalent state securities and "blue sky" laws to a recipient of Parent Common Stock, who may be deemed to be an "underwriter" (within the meaning of Bankruptcy Code § 1145(B)(1) and/or an "affiliate of" or a person who exercised "control" over Grace under applicable federal and state securities laws.

## 12. CONCLUSION AND RECOMMENDATION

Your vote on the Plan is important. The Debtors strongly recommend that you vote in favor of the Plan.

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to Holders

97

of Claims and Equity Interests. Nonacceptance of the Plan may result in protracted delays, uncertainty, substantial additional administrative costs, a chapter 7 liquidation, or the confirmation of another less favorable Chapter 11 plan. These alternatives may not provide for distribution or retention of as much value to Holders of Allowed Claims and/or Equity Interests as does the Plan. Further, the Debtors believe that the Plan, as a whole, is in the best interests of all of their Claimants and Holders of Equity Interests. **Therefore, the Debtors recommend that all Holders of Claims and Equity Interests entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan**

98

Dated:  November 13, 2004

Respectfully submitted,

**W. R. GRACE & CO., et al.**
(on behalf of the Debtors and Debtors In
Possession)

By:
Name:  David B. Siegel
Title:   Senior Vice President, General Counsel &
         Chief Restructuring Officer

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

## EXHIBIT BOOK

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this exhibit book (the "Exhibit Book") in conjunction with the filing of the Debtors' chapter 11 plan and accompanying disclosure statement. The Exhibit Book includes the following documents:

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

| **Document Title** | **Exhibit/ Tab No.** |
|---|:---:|
| Debtors' Plan of Reorganization ................................................................................ | 1 |
| Glossary of Defined Terms ...................................................................................... | 2 |
| Best Interests Analysis ......................................................................................... | 3 |
| W. R. Grace & Co. and Subsidiaries, Historical, Pro Forma and Prospective Financial Information ........................................................... | 4 |
| Asbestos Trust Agreement .................................................................................... | 5 |
| PI-SE Trust Distribution Procedures........................................................................ | 6 |
| PI-AO Trust Distribution Procedures........................................................................ | 7 |
| PD Trust Distribution Procedures .............................................................................. | 8 |
| List of Non-Debtor Affiliates ................................................................................ | 9 |
| List of Subject Asbestos Insurance Policies.............................................................. | 10 |
| Retained Causes of Action ..................................................................................... | 11 [To Follow] |
| Sealed Air Settlement Agreement .......................................................................... | 12 |
| Fresenius Settlement Agreement............................................................................ | 13 |
| Case Management Order (CMO) ............................................................................ | 14 [To Follow] |
| Description of Warrants ........................................................................................ | 15 [To Follow] |
| Management Stock Incentive Plan Term Sheet ........................................................ | 16 [To Follow] |

2

# Exhibit Tab 1

Debtors' Plan of Reorganization

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## DEBTORS' PLAN OF REORGANIZATION

**THIS PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF INJUNCTIONS UNDER BANKRUPTCY CODE §§ 105 AND 524(g) THAT RESULT IN THE CHANNELING OF ALL ASBESTOS-RELATED LIABILITIES OF W. R. GRACE & CO. AND THE ASBESTOS PROTECTED PARTIES (AS DEFINED HEREIN) INTO A TRUST AS MORE FULLY DESCRIBED HEREIN.**

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Jonathan P. Friedland
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB P.C.
Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100

and

Bennett L. Spiegel
Lori Sinanyan
777 South Figueroa Street
Los Angeles, California 90017
Telephone: (213) 680-8400

- Co-Counsel for the Debtors and Debtors in Possession -

Dated: November 13, 2004

---

[1]     Debtors are defined in the Glossary.

# TABLE OF CONTENTS

**Article 1.**    **DEFINITIONS, CONSTRUCTION OF TERMS, EXHIBITS AND ANCILLARY DOCUMENTS** ........................................................................ 1
1.1   Defined Terms .................................................................................... 1
1.2   Other Terms/Interpretation ............................................................... 1
1.3   The Plan Documents .......................................................................... 2
1.4   Ancillary Documents .......................................................................... 3

**Article 2.**    **PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS** ..................................... 3
2.1   Unclassified Claims ........................................................................... 3
2.2   Payment of Allowed Administrative Expense Claims ...................... 3
2.3   Priority Tax Claims ............................................................................ 3

**Article 3.**    **CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS** ...................................................................... 4
3.1   Summary ............................................................................................ 4
   3.1.1   Class 1. Priority Claims ..................................................... 4
   3.1.2   Class 2. Secured Claims ..................................................... 5
   3.1.3   Class 3. Unsecured Pass-Through Employee Related Claims ................. 5
   3.1.4   Class 4. Workers' Compensation Claims ........................... 6
   3.1.5   Class 5. Intercompany Claims ........................................... 6
   3.1.6   Class 6. Asbestos PI-SE Claims ......................................... 6
   3.1.7   Class 7. Asbestos PI-AO Claims ........................................ 7
   3.1.8   Class 8. Asbestos PD Claims ............................................. 8
   3.1.9   Class 9. General Unsecured Claims ................................... 9
   3.1.10   Class 10. Equity Interests in the Parent .......................... 9
   3.1.11   Class 11. Equity Interests in the Debtors other than the Parent .......... 10
3.2   Effect of Asbestos PI Claimant Electing Various Options ............. 10
   3.2.1   Cash-Out Option ............................................................... 10
   3.2.2   Litigation Option .............................................................. 10
   3.2.3   Registry Option ................................................................ 11

**Article 4.**    **MODIFICATION OR WITHDRAWAL OF THIS PLAN** ............. 11
4.1   Modification of this Plan; Amendment of Plan Documents ........... 11
   4.1.1   Modification of this Plan ................................................. 11
   4.1.2   Amendment of Plan Documents ...................................... 11
4.2   Withdrawal of this Plan ................................................................... 11
   4.2.1   Right to Withdraw this Plan ............................................ 11
   4.2.2   Effect of Withdrawal ....................................................... 11

**Article 5.**    **PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS AND ASBESTOS CLAIMS GENERALLY** ..................................... 12
5.1   Objections to Claims (other than Asbestos Claims); Prosecution of Disputed Claims ............................................................................... 12
5.2   Distribution on Account of Disputed Claims ................................. 12

i

| | | |
|---|---|---|
| 5.3 | Resolution of Asbestos Claims | 12 |
| | 5.3.1 Making of an Election by Asbestos PI Claimants | 13 |
| | 5.3.2 Claims Materials for Asbestos PI Claimants | 13 |
| | 5.3.3 Information Obtained by the Asbestos Trust or Reorganized Debtors Regarding Asbestos PI Claims | 13 |
| | 5.3.4 Withdrawal of Claims | 13 |

**Article 6.    ACCEPTANCE OR REJECTION OF THIS PLAN** ........................................ 14

| | | |
|---|---|---|
| 6.1 | Impaired Classes to Vote | 14 |
| 6.2 | Acceptance by Impaired Classes of Claims | 14 |
| 6.3 | Presumed Acceptance of this Plan | 14 |
| 6.4 | Nonconsensual Confirmation | 14 |
| | 6.4.1 Cramdown | 14 |
| | 6.4.2 General Reservation of Rights | 14 |

**Article 7.    IMPLEMENTATION OF THIS PLAN** .................................................. 15

| | | |
|---|---|---|
| 7.1 | Corporate Governance of the Parent and the Other Debtors | 15 |
| | 7.1.1 Amendment of Certificates of Incorporation or Articles of Incorporation of the Debtors | 15 |
| | 7.1.2 Amendment of By-Laws of the Parent | 15 |
| | 7.1.3 D&O and Fiduciary Liability Tail Coverage Policies | 15 |
| 7.2 | The Asbestos Trust | 16 |
| | 7.2.1 Creation of the Asbestos Trust | 16 |
| | 7.2.2 Funding of the Asbestos Trust | 16 |
| | 7.2.3 Transfer of Assets into the Asbestos Trust | 16 |
| | 7.2.4 Transfer of Claims and Demands to the Asbestos Trust | 17 |
| | 7.2.5 Creation of Asbestos Trust Sub-Accounts | 17 |
| | 7.2.6 Appointment and Termination of Trustees | 17 |
| | 7.2.7 Creation and Termination of the TAC | 17 |
| | 7.2.8 Cooperation Agreement | 17 |
| | 7.2.9 Institution and Maintenance of Legal and other Proceedings | 18 |
| 7.3 | Payments and Distributions Under this Plan | 18 |
| | 7.3.1 Asbestos Trust Payments and Plan Distributions | 18 |
| | 7.3.2 Timing of Plan Distributions | 18 |
| 7.4 | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 18 |
| | 7.4.1 Delivery by the Reorganized Debtors of Distributions in General | 18 |
| | 7.4.2 Undeliverable Distributions by the Reorganized Debtors | 19 |
| 7.5 | Payments under this Plan | 19 |
| | 7.5.1 Manner of Payments under this Plan | 19 |
| | 7.5.2 Fractional Payments under this Plan | 19 |
| 7.6 | Occurrence of the Confirmation Date | 19 |
| | 7.6.1 Findings of Fact and/or Conclusions of Law | 19 |
| | 7.6.2 Orders of this Court | 24 |
| 7.7 | Conditions to Occurrence of the Effective Date | 24 |
| 7.8 | Management of the Reorganized Debtors | 26 |
| 7.9 | Corporate Action | 26 |
| 7.10 | Effectuating Documents and Further Transactions | 27 |

ii

7.11    Allocation of Plan Distributions Between Principal and Interest ......................... 27
7.12    No Successor Liability ................................................................................. 27
7.13    Deemed Consolidation of the Debtors for Plan Purposes Only ........................... 28

**Article 8.    INJUNCTIONS, RELEASES & DISCHARGE** ............................................. **28**
8.1    Discharge ..................................................................................................... 28
    8.1.1    Discharge of the Debtors and Related Discharge Injunction ................ 28
    8.1.2    Discharge of Liabilities to Holders of Asbestos Claims ....................... 29
    8.1.3    Disallowed Claims and Disallowed Equity Interests ............................ 29
    8.1.4    Non-Dischargeable ERISA Liability .................................................... 29
8.2    The Asbestos Channeling Injunction ............................................................... 29
8.3    Asbestos Insurance Entity Injunction .............................................................. 31
    8.3.1    Injunction ......................................................................................... 31
    8.3.2    Reservations from the Asbestos Insurance Entity Injunction ............... 32
8.4    Released Matters Injunction ........................................................................... 32
    8.4.1    Injunction ......................................................................................... 32
    8.4.2    Reservations from the Released Matters Injunction ............................. 33
8.5    Term of Certain Injunctions and Automatic Stay ............................................. 34
    8.5.1    Injunctions and/or Automatic Stays in Existence Immediately
        prior to Confirmation ....................................................................... 34
    8.5.2    Injunctions Provided for in this Plan .................................................. 34
8.6    Additional Releases and Indemnification ......................................................... 34
    8.6.1    Representatives of the Debtors ........................................................... 34
    8.6.2    Release of Sealed Air Indemnified Parties .......................................... 35
    8.6.3    Release of Fresenius Indemnified Parties ............................................ 35
    8.6.4    Specific Releases by Holders of Claims .............................................. 36
    8.6.5    Approval of Sealed Air Settlement Agreement ..................................... 36

**Article 9.    EXECUTORY CONTRACTS, UNEXPIRED LEASES,
           GUARANTIES, AND INDEMNITY AGREEMENTS** ............................. **36**
9.1    Assumption of Executory Contracts and Unexpired Leases ................................ 36
9.2    Letters of Credit, Surety Bonds, Guaranties, and Certain Indemnity
    Agreements ................................................................................................... 37
9.3    Compensation and Benefits Program ............................................................... 38

**Article 10.    RETENTION OF JURISDICTION** ..................................................... **39**
10.1    Plan Documents ........................................................................................... 39
10.2    Executory Contracts and Unexpired Leases ..................................................... 39
10.3    Disputed Claims Allowance/Disallowance ....................................................... 39
10.4    Enforcement/Modification of this Plan ............................................................ 39
10.5    Compensation of Professionals ...................................................................... 40
10.6    Settlements .................................................................................................. 40
10.7    Taxes .......................................................................................................... 40
10.8    Specific Purposes ........................................................................................ 41
10.9    Insurance Matters. ....................................................................................... 41

iii

**Article 11.    MISCELLANEOUS PROVISIONS** ................................................................. 41
11.1    Authority of the Debtors ............................................................................. 41
11.2    Payment of Statutory Fees.......................................................................... 41
11.3    Retained Causes of Action ......................................................................... 41
         11.3.1    Maintenance of Causes of Action ......................................... 41
         11.3.2    Preservation of Causes of Action .......................................... 42
         11.3.3    Preservation of All Causes of Action not Expressly Settled or
                       Released ................................................................................. 42
11.4    Third-Party Agreements............................................................................. 42
11.5    Purpose of the Fresenius Payment and Consistency of Treatment ...................... 43
11.6    Purpose of the Sealed Air Payment and Consistency of Treatment...................... 43
11.7    Dissolution of the Unsecured Creditors' Committee, the Asbestos PI
         Committee, the Asbestos PD Committee and the Equity Committee;
         Continued Retention of the Future Claimants' Representative............................ 44
11.8    Exculpation................................................................................................. 45
11.9    Title to Assets; Discharge of Liabilities .................................................... 45
11.10  Notices  45
11.11  Headings..................................................................................................... 47
11.12  Governing Law............................................................................................ 47
11.13  Filing of Additional Documents................................................................. 47
11.14  Compliance with Tax Requirements .......................................................... 48
11.15  Exemption from Transfer Taxes ................................................................ 48
11.16  Further Assurances ..................................................................................... 48
11.17  Further Authorizations ............................................................................... 49

iv

W. R. Grace & Co. and the above-captioned debtors and debtors in possession (collectively, "Grace" or the "Debtors") hereby propose the following Plan of Reorganization pursuant to the provisions of chapter 11 of title 11 of the United States Code. Reference is made to the Disclosure Statement (as defined herein) distributed contemporaneously herewith for, among other things, a discussion of the history, businesses, properties, results of operations, projections for future operations of the Debtors, and risks associated with this Plan.

## Article 1.
## DEFINITIONS, CONSTRUCTION OF TERMS, EXHIBITS AND ANCILLARY DOCUMENTS

### 1.1 DEFINED TERMS

All capitalized terms used herein shall have the respective meanings specified herein or in the Glossary for this Plan listed as Exhibit 2 in the Exhibit Book, unless the context otherwise requires.

### 1.2 OTHER TERMS/INTERPRETATION

(a) Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the other genders.

(b) When used in this Plan, the term "Claim" shall be broadly construed to include all manner and type of Claim, whenever and wherever such Claim may arise, and shall include Asbestos PI-SE Claims, Asbestos PI-AO Claims, and Asbestos PD Claims.

(c) Any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions shall mean that such document shall be substantially in such form or substantially on such terms and conditions.

(d) Any reference in this Plan to an existing document or exhibit in the Exhibit Book Filed or to be Filed shall mean the document or exhibit as it may have been or may be amended, modified or supplemented.

(e) Any reference to an Entity as a Holder of a Claim shall include that Entity's successors, assigns and affiliates.

(f) The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan.

(g) The word "including" (and, with correlative meaning, the forms of the word "include") shall mean including, without limiting the generality

1

of any description preceding that word; and the words "shall" and "will" are used interchangeably and have the same meaning.

(h) Unless otherwise indicated herein, all references to dollars are to United States dollars.

(i) An initially capitalized term used herein that is not defined herein shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require.

(j) The descriptive headings contained in this Plan are included for convenience of reference only and are not intended to be a part of and shall not affect in any way the meaning or interpretation of this Plan.

(k) All references in this Plan to sections, articles, and exhibits are references to sections, articles and exhibits of or to this Plan unless otherwise specified.

(l) Unless otherwise expressly provided herein, in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

(m)The rules of construction set forth in Bankruptcy Code § 102 shall apply.

## 1.3 THE PLAN DOCUMENTS

The Plan Documents, once Filed, shall also be available for review:

(a) in the office of the clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court;

(b) on Business Days from 9:00 a.m. through 5:00 p.m. (Eastern Time) at the following address:

> Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
> 919 North Market Street, 16th Floor
> P.O. Box 8705
> Wilmington, Delaware 19899-8705
> Telephone: (302) 652-4100
> Attn: David W. Carickhoff, Jr.

(c) by download from the following website: www.bmccorp.net/wrgrace

Holders of Claims and Equity Interests may also obtain a copy of the Plan Documents following their Filing with the Clerk of the Court by contacting counsel for the Debtors by a written request sent to the above address.

2

## 1.4 ANCILLARY DOCUMENTS

Each of the Plan Documents is an integral part of this Plan and is hereby incorporated by reference and made a part of this Plan.

### Article 2.
## PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

### 2.1 UNCLASSIFIED CLAIMS

In accordance with Bankruptcy Code § 1123(a)(1), Administrative Expense Claims and Priority Tax Claims are not classified and are excluded from the Classes set forth in Article 3 of this Plan.

### 2.2 PAYMENT OF ALLOWED ADMINISTRATIVE EXPENSE CLAIMS

Subject to the provisions of Bankruptcy Code §§ 330(a), 331, and 503, each Holder of an Allowed Administrative Expense Claim shall be paid the Allowed Amount of its Administrative Expense Claim either (i) in full, in Cash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Administrative Expense Claim and the Reorganized Debtors or otherwise established pursuant to an order of the Bankruptcy Court; provided that (A) Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession on or after the Petition Date or assumed by the Debtors in Possession pursuant to this Plan or an order of the Bankruptcy Court shall be paid by the Reorganized Debtors in accordance with the terms and conditions of the particular transactions and any agreements relating thereto or any order of the Bankruptcy Court and (B) Allowed Administrative Expense Claims of Professionals shall be paid pursuant to order of the Bankruptcy Court.

All final applications for compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Confirmation Date, and any other request for compensation by any Entity for making a substantial contribution (as described in Bankruptcy Code § 503(b)(3)(D)) in the Chapter 11 Cases (except only for Claims under 28 U.S.C. § 1930 and for fees incurred by the Clerk's Office), shall be Filed no later than ninety (90) days after the Effective Date. Any Professional or Entity with a Claim for payment of such an Administrative Expense Claim that does not File an application for payment of such Claim or expenses by the deadline set forth herein shall be forever barred from asserting such Claim and shall receive no Distribution under this Plan or otherwise on account of such Claim.

### 2.3 PRIORITY TAX CLAIMS

Each Holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Priority Tax Claim, at the option of the Reorganized Debtors, either (i) in full, in Cash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Priority Tax Claim and the Reorganized Debtors, or (iii) in equal quarterly Cash payments on the Initial Distribution Date and, thereafter, on each Quarterly Tax Distribution Date in an aggregate

3

amount equal to such Allowed Priority Tax Claim, together with interest at 3.5% per annum, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim, or upon such other terms determined by the Bankruptcy Court, which will provide the Holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

**Article 3.**
**CLASSIFICATION AND TREATMENT**
**OF CLAIMS AND EQUITY INTERESTS**

### 3.1 SUMMARY

Claims and Equity Interests are classified for all purposes, including voting, confirmation, and Distribution pursuant to this Plan and pursuant to Bankruptcy Code §§ 1122 and 1123(a)(1), as follows:

| CLASSIFICATION | | IMPAIRMENT AND VOTING |
|---|---|---|
| Class 1 | Priority Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 2 | Secured Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 3 | Unsecured Pass-Through Employee Related Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 4 | Workers' Compensation Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 5 | Intercompany Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 6 | Asbestos PI-SE Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 7 | Asbestos PI-AO Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 8 | Asbestos PD Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 9 | General Unsecured Claims | Impaired -- vote being solicited. |
| Class 10 | Equity Interests in the Parent | Impaired -- vote being solicited. |
| Class 11 | Equity Interests in Debtors Other than the Parent | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |

#### 3.1.1   Class 1.       Priority Claims

(a) Classification

Class 1 consists of all Priority Claims against the Debtors.

4

(b) Treatment

Each Holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim either (i) in full, in Cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Priority Claim becomes an Allowed Priority Claim, or as soon as practicable thereafter, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Priority Claim and the Reorganized Debtors.

(c) Impairment and Voting

Class 1 is unimpaired. The Holders of the Allowed Priority Claims in Class 1 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.1.2  Class 2.        Secured Claims

(a) Classification

Class 2 consists of all Secured Claims against the Debtors.

(b) Treatment

Each Holder of an Allowed Secured Claim shall be paid the Allowed Amount of its Allowed Secured Claim at the option of the Reorganized Debtors, either (i) in full, in Cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Secured Claim becomes an Allowed Secured Claim, or as soon as practicable thereafter; (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Secured Claim and the Reorganized Debtors; (iii) by the surrender to the Holder or Holders of any Allowed Secured Claim of the property securing such Claim; or (iv) notwithstanding any contractual provision or applicable law that entitles the Holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Bankruptcy Code § 1124(2)(A)-(D).

(c) Impairment and Voting

Class 2 is unimpaired. The Holders of the Allowed Secured Claims in Class 2 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.1.3  Class 3.        Unsecured Pass-Through Employee Related Claims

(a) Classification

Class 3 consists of all Unsecured Pass-Through Employee Related Claims.

(b) Treatment

This Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim.

5

91100-001\DOCS_DE:102550.1

(c) Impairment and Voting

Class 3 is unimpaired. The Holders of the Unsecured Pass-Through Employee Related Claims in Class 3 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.1.4   Class 4.          Workers' Compensation Claims

(a) Classification

Class 4 consists of all Workers' Compensation Claims against the Debtors.

(b) Treatment

This Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim.

(c) Impairment and Voting

Class 4 is unimpaired. The Holders of the Workers' Compensation Claims in Class 4 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.1.5   Class 5.          Intercompany Claims

(a) Classification

Class 5 consists of all Intercompany Claims.

(b) Treatment

This Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim.

(c) Impairment and Voting

Class 5 is unimpaired. The Holders of Intercompany Claims in Class 5 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.1.6   Class 6.          Asbestos PI-SE Claims

(a) Classification

Class 6 consists of all Asbestos PI-SE Claims against the Debtors.

(b) Treatment

     (i)      All Allowed Class 6 Claims shall be paid in full.

     (ii)     All Allowed Class 6 Claims shall be processed and paid in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement and the PI-SE TDP.

6

(iii)    All Allowed Class 6 Claims shall be paid by the Asbestos Trust out of the Asbestos PI-SE Class Fund, which shall be funded solely by the Sealed Air Payment and the Parent Common Stock component of the Debtors' Payment, if necessary.

(iv)    In accordance with the terms of the Asbestos Trust Agreement and the PI-SE TDP, each Holder of an Asbestos PI-SE Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Litigation Option or (B) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim shall be conclusively presumed to have elected the Litigation Option.

(v)    Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option.

(vi)    Notwithstanding the foregoing, nothing shall prevent the Holder of an Asbestos PI-SE Claim that has not yet been Allowed from agreeing with the Entity against whom the Claim is asserted (or after the Effective Date, with the Asbestos Trust) for such Claim to be liquidated and paid in an amount lower than if the Claim were to be Allowed in the amount asserted.

(c) Asbestos Channeling Injunction

The sole recourse of the Holder of an Asbestos PI-SE Claim on account of such Claim shall be to the PI-SE Account of the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Asbestos Trust Agreement, and the PI-SE TDP.

(d) Impairment and Voting

Class 6 is unimpaired. The Holders of the Allowed Asbestos PI-SE Claims in Class 6 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.1.7    Class 7.        Asbestos PI-AO Claims

(a) Classification

Class 7 consists of all Asbestos PI-AO Claims against the Debtors.

(b) Treatment

(i)    All Allowed Class 7 Claims shall be paid in full.

(ii)    All Allowed Class 7 Claims shall be processed and paid in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement and the PI-AO TDP.

(iii)    All Allowed Class 7 Claims shall be paid initially by the Asbestos Trust out of the Asbestos PI-AO Class Fund which shall be funded by the Sealed Air Payment (to the extent any funds remain after first funding the Asbestos PI-SE Class Fund, the

7

Asbestos PD Class Fund and the Asbestos Trust Expenses Fund) and the Warrants. After the exhaustion of the Asbestos PI-AO Class Fund in its entirety, all Allowed PI-AO Claims shall be paid in Cash by the Asbestos Trust from funds to be paid to the Asbestos Trust by the Reorganized Debtors, such funds being in addition to the Debtors' Payment.

(iv)    In accordance with the terms of the Asbestos Trust Agreement and the PI-AO TDP, each Holder of an Asbestos PI-AO Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Litigation Option, (B) the Registry Option, or (C) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim shall be conclusively presumed to have elected the Litigation Option.

(v)    Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option.

(vi)    Notwithstanding the foregoing, nothing shall prevent the Holder of an Asbestos PI-AO Claim that has not yet been Allowed from agreeing with the Reorganized Debtors for such Claim to be liquidated and paid in an amount lower than if the Claim were to be Allowed in the amount asserted.

(c) Asbestos Channeling Injunction

The sole recourse of the Holder of an Asbestos PI-AO Claim on account of such Claim shall be to the PI-AO Account of the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Asbestos Trust Agreement, and the PI-AO TDP.

(d) Impairment and Voting

Class 7 is unimpaired. The Holders of the Allowed Asbestos PI-AO Claims in Class 7 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.1.8    Class 8.    Asbestos PD Claims

(a) Classification

Class 8 consists of all Asbestos PD Claims against the Debtors.

(b) Treatment

(i)    All Allowed Class 8 Claims shall be paid in full.

(ii)    All Allowed Class 8 Claims shall be processed and paid out of the Asbestos PD Class Fund (funded solely by the Sealed Air Payment and the Parent Common Stock component of the Debtors' Payment, if necessary) in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement and the PD TDP.

(iii)    Notwithstanding the foregoing, nothing shall prevent the Holder of an Asbestos PD Claim that has not yet been Allowed from agreeing with the Entity

8

against whom the Claim is asserted (or after the Effective Date, with the Asbestos Trust) for such Claim to be liquidated and paid in an amount lower than if the Claim were to be Allowed in the amount asserted.

### (c) Asbestos Channeling Injunction

The sole recourse of the Holder of an Asbestos PD Claim on account of such Claim shall be to the PD Account of the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Asbestos Trust Agreement, and the PD TDP.

### (d) Impairment and Voting

Class 8 is unimpaired. The Holders of the Asbestos PD Claims in Class 8 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

#### 3.1.9   Class 9.          General Unsecured Claims

### (a) Classification

Class 9 consists of all General Unsecured Claims against the Debtors.

### (b) Treatment

Each Holder of an Allowed General Unsecured Claim shall be paid the Allowed Amount of its General Unsecured Claim on the GUC Distribution Date. Such payment shall be either (i) in full, plus post-petition interest, for those Claimants who, but for the Filing of the Chapter 11 Cases, would be entitled to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law, such payment to be 85% in Cash and 15% in Parent Common Stock, such Parent Common Stock being subject to, among other things, the transactions described in Section 7.2.2 of this Plan, and the Management Stock Incentive Plan, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed General Unsecured Claim and the Reorganized Debtors.

The Parent Common Stock paid to the Holders of Allowed General Unsecured Claims in accordance with this Section 3.1.9(b) shall be valued at the average of the closing prices on The New York Stock Exchange for the trading days within the thirty (30) calendar days immediately preceding the GUC Distribution Date.

### (c) Impairment and Voting

Class 9 is impaired. The Debtors are soliciting the votes of Holders of the General Unsecured Claims in Class 9 to accept or reject this Plan in the manner and to the extent provided in the Confirmation Procedures Order.

#### 3.1.10  Class 10.        Equity Interests in the Parent

### (a) Classification

Class 10 consists of Equity Interests in the Parent.

9

(b) Treatment

On the Effective Date, Holders of Class 10 Equity Interests in the Parent shall retain such interests; provided that such Equity Interests shall: (i) be subject, among other things, to the transactions described in Section 7.2.2 of this Plan, and the Management Stock Incentive Plan and (ii) be restricted as described in Section 7.1.1 of this Plan.

(c) Impairment and Voting

Class 10 is impaired. The Debtors are soliciting the votes of Holders of the Allowed Equity Interests in the Parent in Class 10 to accept or reject this Plan in the manner and to the extent provided in the Confirmation Procedures Order.

### 3.1.11  Class 11.        Equity Interests in the Debtors other than the Parent

(a) Classification

Class 11 consists of Equity Interests in the Debtors other than the Parent.

(b) Treatment

This Plan leaves unaltered the legal, equitable, and contractual rights to which each such Equity Interest entitles the Holder of such Equity Interest.

(c) Impairment and Voting

Class 11 is unimpaired. The Holders of the Equity Interests in the Debtors other than the Parent in Class 11 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.2 EFFECT OF ASBESTOS PI CLAIMANT ELECTING VARIOUS OPTIONS

#### 3.2.1  Cash-Out Option

If an Asbestos PI Claimant elects the Cash-Out Option, (i) his election is irrevocable, (ii) his Claim will be treated under the terms of the PI-SE TDP or PI-AO TDP, as applicable, and (iii) he shall be precluded, pursuant to the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction, from seeking any further recovery against an Asbestos Protected Party, any Asbestos Insurance Entity or any Entity released under any provision of this Plan on account of such Claim.

#### 3.2.2  Litigation Option

If an Asbestos PI Claimant elects, or is deemed to elect, the Litigation Option, (i) his Claim will be litigated against the Asbestos Trust and (ii) he shall be precluded, pursuant to the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction, from seeking any further recovery against an Asbestos Protected Party, any Asbestos Insurance Entity or any Entity released under any provision of this Plan on account of such Claim.

10

### 3.2.3    Registry Option

If an Asbestos PI-AO Claimant chooses the Registry Option, he shall (i) register his name on the Registry, (ii) be precluded, pursuant to the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction, from seeking any further recovery against an Asbestos Protected Party, any Asbestos Insurance Entity or any Entity released under any provision of this Plan, (iii) have the statute of limitations be deemed to be tolled to the extent that such Claimant becomes an Asbestos PI-SE Claimant and (iv) be entitled to seek further recovery, in accordance with the provisions of this Plan, against the Asbestos Trust if such Holder becomes an Asbestos PI-SE Claimant.

## Article 4.
## MODIFICATION OR WITHDRAWAL OF THIS PLAN

### 4.1 MODIFICATION OF THIS PLAN; AMENDMENT OF PLAN DOCUMENTS

#### 4.1.1    Modification of this Plan.

The Debtors may alter, amend, or modify this Plan, or any other Plan Document, under Bankruptcy Code § 1127(a) at any time prior to the Confirmation Date so long as this Plan, as modified, meets the requirements of Bankruptcy Code §§ 1122 and 1123. Except as set forth in Section 4.1.2 below, after the Confirmation Date, and prior to the Effective Date, the Debtors may alter, amend, or modify this Plan in accordance with Bankruptcy Code § 1127(b).

#### 4.1.2    Amendment of Plan Documents.

From and after the Effective Date, the authority to amend, modify, or supplement the Plan Documents shall be as provided in this Plan or such documents.

### 4.2 WITHDRAWAL OF THIS PLAN

#### 4.2.1    Right to Withdraw this Plan

This Plan may be withdrawn by the Debtors prior to the Confirmation Date.

#### 4.2.2    Effect of Withdrawal

If this Plan is withdrawn prior to the Confirmation Date, this Plan shall be deemed null and void. In such event, nothing contained herein or in any of the Plan Documents shall be deemed to constitute a waiver or release of any claims or defenses of, or an admission or statement against interest by, the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

11

## Article 5.
## PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS
## AND ASBESTOS CLAIMS GENERALLY

### 5.1 OBJECTIONS TO CLAIMS (OTHER THAN ASBESTOS CLAIMS); PROSECUTION OF DISPUTED CLAIMS

The Debtors or Reorganized Debtors, as applicable, may object to the allowance of any Administrative Expense Claims, Priority Tax Claims, Class 1 Claims, Class 2 Claims, Class 3 Claims, Class 4 Claims, Class 5 Claims and Class 9 Claims Filed with the Bankruptcy Court or to be otherwise resolved by the Debtors or Reorganized Debtors pursuant to any provisions of this Plan with respect to which the they dispute liability, in whole or in part. The Debtors' pending objections to any Claims not channeled to and assumed by the Asbestos Trust shall be transferred to the Reorganized Debtors for final resolution.

All objections that are Filed and prosecuted by the Reorganized Debtors as provided herein may be: (i) compromised and settled in accordance with the business judgment of the Reorganized Debtors without approval of the Bankruptcy Court or (ii) litigated to Final Order by the Reorganized Debtors. Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by the Reorganized Debtors to Claims shall be served and Filed no later than one (1) year after the Effective Date, subject to any extensions granted pursuant to a further order of the Bankruptcy Court. Such further order may be obtained by the Reorganized Debtors without a hearing or notice. The Debtors reserve the right to designate, upon notice to the Holders of such Claim, any Claim as a Disputed Claim on or before the Confirmation Date.

To the extent that the Court enters an alternative dispute resolution order which contemplates that an order shall survive confirmation of this Plan, such order shall be controlling.

### 5.2 DISTRIBUTION ON ACCOUNT OF DISPUTED CLAIMS

Notwithstanding Section 5.1 hereof, a Distribution shall be made to the Holder of a Disputed Claim only when, and to the extent that, such Disputed Claim becomes Allowed and pursuant to the appropriate provisions of this Plan covering the class of which such Disputed Claim is a part. No Distribution shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof in the manner prescribed by Section 5.1 hereof.

### 5.3 RESOLUTION OF ASBESTOS CLAIMS

The Allowed Amount of Asbestos Claims shall be determined in accordance with the Bankruptcy Code, the Bankruptcy Rules, the applicable TDP, and the CMO. If any Asbestos Claim becomes Allowed, it shall be satisfied from the Asbestos Trust in accordance with the Asbestos Trust Agreement and the applicable TDPs.

The Asbestos Trust shall have the sole right and authority to resolve all Asbestos PI-SE Claims and Asbestos PD Claims. All Asbestos PI-SE Claims whose Holders elect the Litigation Option shall be litigated by, and at the expense of, the Asbestos Trust in the name of the Asbestos Trust.

12

The Asbestos Trust shall also have the sole right and authority to resolve all Asbestos PI-AO Claims to the extent the Holder of an Asbestos PI-AO Claim elects the Registry Option or the Cash-Out Option.

If the Holder of an Asbestos PI-AO Claim elects the Litigation Option, the Reorganized Debtors shall have the sole right and authority to resolve all such Asbestos PI-AO Claims. All Asbestos PI-AO Claims whose Holders elect the Litigation Option shall be litigated by the Reorganized Debtors in the name of the Asbestos Trust, initially at the expense of the Asbestos Trust out of the Asbestos PI-AO Class Fund.

### 5.3.1   Making of an Election by Asbestos PI Claimants

The Holders of Asbestos PI Claims shall make the election described in Section 3.2 of this Plan either in the Asbestos PI Questionnaire (if submitted to the Debtors prior to the Effective Date), or the Claims Materials (if submitted to the Asbestos Trust after the Effective Date).

### 5.3.2   Claims Materials for Asbestos PI Claimants

The Asbestos Trust shall provide the Claims Materials to any Asbestos PI Claimant upon a written request for such materials to the Asbestos Trust. The Claims Materials include: (i) the Asbestos PI Proof of Claim Form, (ii) the Asbestos PI Questionnaire, (iii) a certification to be completed by the Asbestos PI Claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure, (iv) a copy of the Disclosure Statement, and (v) instructions to the Asbestos PI Claimants in such form as the Trustees shall approve.

### 5.3.3   Information Obtained by the Asbestos Trust or Reorganized Debtors Regarding Asbestos PI Claims

The Asbestos Trust or Reorganized Debtors may obtain information directly from an Asbestos PI Claimant who completes the Asbestos PI Questionnaire or the Claims Materials. The Asbestos Trust or Reorganized Debtors may also request that an Asbestos PI Claimant supply evidence of recovery from other asbestos claims resolution organizations. Asbestos PI Claimants may provide any or all information to the Asbestos Trust or Reorganized Debtors in an electronic format.

If an Asbestos PI Claimant fails to provide the requested information, the Asbestos Trust or Reorganized Debtors may obtain information (that would otherwise be provided by the Asbestos PI Questionnaire or the Claims Materials) from electronic databases maintained by any asbestos claims resolution organization instead of collecting some or all of the Claims information from a Claimant or the Claimant's attorney but only if: (i) the Asbestos Trust or Reorganized Debtors inform the Asbestos PI Claimant that it plans to obtain information as may be available from such other organizations and (ii) the Asbestos PI Claimant does not provide such information directly to the Asbestos Trust or Reorganized Debtors.

### 5.3.4   Withdrawal of Claims

An Asbestos PI Claimant may withdraw its Asbestos PI Claim at any time, upon written notice to the Asbestos Trust, and subsequently file another Claim. Any such Claim that is filed after withdrawal shall be given a place in the applicable FIFO Processing Queue based on the

13

date of such subsequent filing. The withdrawal of an Asbestos PI Claim shall not revoke the Claimant's election of the Cash-Out Option, which is irrevocable. Except for Asbestos PI Claims held by representatives of deceased or incompetent Claimants for which court approval of the Asbestos Trust's offer is required, a Claim will be deemed to have been withdrawn if the Claimant neither accepts, rejects, nor initiates arbitration within six months of the Asbestos Trust's offer of payment or rejection of the Claim. Upon written request and for good cause within such six month period, the Asbestos Trust may extend this period for up to an additional six months.

**Article 6.**
**ACCEPTANCE OR REJECTION OF THIS PLAN**

### 6.1 IMPAIRED CLASSES TO VOTE

Each Holder of a Claim or Equity Interest in an impaired Class is entitled to vote to accept or reject this Plan to the extent and in the manner provided herein or in the Confirmation Procedures Order.

### 6.2 ACCEPTANCE BY IMPAIRED CLASSES OF CLAIMS

Acceptance of this Plan by any impaired Class of Claims shall be determined in accordance with the Confirmation Procedures Order and the Bankruptcy Code.

### 6.3 PRESUMED ACCEPTANCE OF THIS PLAN

Classes 1, 2, 3, 4, 5, 6, 7, 8 and 11 of Claims and Equity Interests are unimpaired. Under Bankruptcy Code § 1126(f), the Holders of Claims and Equity Interests in such Classes are conclusively presumed to have voted to accept this Plan.

### 6.4 NONCONSENSUAL CONFIRMATION

#### 6.4.1    Cramdown

With respect to impaired Equity Interests and any impaired Class of Claims, including Classes of Claims created pursuant to amendments to this Plan, that fail to accept this Plan in accordance with Bankruptcy Code §§ 1126 and 1129(a), the Debtors intend to request, to the extent consistent with applicable law, that the Court confirm this Plan in accordance with Bankruptcy Code § 1129(b) with respect to such non-accepting Classes, in which case this Plan shall constitute a motion for such relief.

#### 6.4.2    General Reservation of Rights

Should this Plan fail to be accepted by the requisite number and amount of the Holders of Claims and Equity Interests required to satisfy Bankruptcy Code §§ 524(g) and 1129, then, notwithstanding any other provision of this Plan to the contrary, the Debtors reserve the right to amend this Plan.

14

## Article 7.
## IMPLEMENTATION OF THIS PLAN

### 7.1 CORPORATE GOVERNANCE OF THE PARENT AND THE OTHER DEBTORS

#### 7.1.1   Amendment of Certificates of Incorporation or Articles of Incorporation of the Debtors

The Certificates of Incorporation or Articles of Incorporation, as applicable, of each of the Debtors that is a corporation shall be amended as of the Effective Date. The amended Certificates of Incorporation or Articles of Incorporation, as applicable, of the Debtors shall, among other things:   (i) prohibit the issuance of nonvoting equity securities as required by Bankruptcy Code § 1123(a)(6), and subject to further amendment as permitted by applicable law, (ii) as to any classes of securities possessing voting power, provide for an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in payment of such dividends, (iii) include, in the case of the Parent, restrictions on the transfer of the Parent Common Stock as necessary to protect the Reorganized Debtors' tax position, and (iv) effectuate any other provisions of this Plan. The amended Certificates of Incorporation or Articles of Incorporation, as applicable, shall be filed with the Secretary of State or equivalent official in their respective jurisdictions of incorporation on or prior to the Effective Date and be in full force and effect without any further amendment as of the Effective Date.

The restrictions on stock transfers in order to protect the Reorganized Debtors' tax position shall include a three (3) year prohibition, waivable by the Parent's Board of Directors, on:  (i)  any Entity other than the Asbestos Trust acquiring after the Effective Date an amount of shares of the Parent Common Stock that would cause such Entity to become a Holder of 4.75% or more of the Parent Common Stock, and (ii) any Entity that as of the Effective Date holds 4.75% or more of the Parent Common Stock from increasing its ownership of the Parent Common Stock.  In addition, any Parent Common Stock held by the Asbestos Trust will not be transferable for a period of at least three (3) years after the Effective Date. Other restrictions will apply with respect to the Warrants held by the Asbestos Trust, including a prohibition on the Asbestos Trust exercising an amount of Warrants greater than 50% of its total Warrants for a period of at least three (3) years after the Effective Date.

#### 7.1.2   Amendment of By-Laws of the Parent

The By-Laws of the Parent shall be amended as of the Effective Date substantially in the form to be included in the Plan Supplement to, among other things, effectuate the provisions of this Plan.

#### 7.1.3   D&O and Fiduciary Liability Tail Coverage Policies

The Reorganized Debtors shall obtain sufficient tail coverage for a maximum period of six years under both (i) a directors and officers' insurance policy and (ii) a fiduciary liability coverage insurance policy for the current and former directors, officers, and employees of the Debtors.

15

91100-001\DOCS_DE:102550.1

## 7.2 THE ASBESTOS TRUST

### 7.2.1   Creation of the Asbestos Trust

Upon the entry of the Confirmation Order, effective as of the Effective Date, the Asbestos Trust shall be created in accordance with the Plan Documents. The Asbestos Trust shall be a "qualified settlement fund" for federal income tax purposes within the meaning of regulations issued pursuant to Section 468B of the IRC.

The purpose of the Asbestos Trust shall be to, among other things: (i) assume the liabilities of the Debtors with respect to all Asbestos Claims (whether now existing or arising at any time hereafter); (ii) process, liquidate, pay and satisfy all Asbestos Claims in accordance with this Plan, the Asbestos Trust Agreement, the respective TDPs, the CMO, and the Confirmation Order and in such a way that provides reasonable assurance that the Asbestos Trust will value, and be in a position to pay, present and future Asbestos Claims and to otherwise comply with Bankruptcy Code § 524(g)(2)(B)(i); (iii) preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Allowed Asbestos Claims; and (iv) otherwise carry out the provisions of the Asbestos Trust Agreement and any other agreements into which the Trustees have entered or will enter in connection with this Plan.

The Asbestos Trust shall file all tax returns required to be filed by the Asbestos Trust consistent with the terms of the Sealed Air Settlement Agreement.

### 7.2.2   Funding of the Asbestos Trust

Effective on the Effective Date, Sealed Air shall fund the Sealed Air Payment into the Asbestos Trust in accordance with this Plan and the provisions of the Sealed Air Settlement Agreement. Effective on the thirty-first (31st) day after the Effective Date, the Parent shall transfer or cause the transfer of the Debtors' Payment into the Asbestos Trust in accordance with this Plan.

The Sealed Air Payment and that portion of the Debtors' Payment consisting of the Parent Common Stock, to the extent necessary, shall first fund the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund. The remainder of the Sealed Air Payment, if any, and the Warrants included as part of the Debtors' Payment shall fund the Asbestos PI-AO Class Fund.

In addition, in the event that the proceeds of the sale of Parent Common Stock following exercise of all of the Warrants are insufficient to pay all Allowed Asbestos PI-AO Claims in full, the Reorganized Debtors shall pay the Asbestos Trust in full and in Cash for the benefit of the Holders of such Claims, such payment to be made by the Reorganized Debtors on the first Business Day of the next calendar quarter after the date upon which the Asbestos PI-AO Claim becomes Allowed, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of such next calendar quarter, in which case the payment date shall be the first Business Day of the next succeeding calendar quarter.

### 7.2.3   Transfer of Assets into the Asbestos Trust

Upon the transfer of the Sealed Air Payment into the Asbestos Trust, and the transfer of the Debtors' Payment into the Asbestos Trust, each such transfer shall be vested in the Asbestos

16

Trust, free and clear of all Claims, Equity Interests, Encumbrances and other interests of any Entity.

### 7.2.4   Transfer of Claims and Demands to the Asbestos Trust

On the Effective Date, without any further action of any Entity, all liabilities, obligations, and responsibilities of any Asbestos Protected Party relating to all Asbestos Claims shall be channeled to and assumed by the Asbestos Trust whether or not (A) a proof of Claim based on such Claim was Filed or deemed Filed under Bankruptcy Code § 501, (B) such Claim is or was Allowed under Bankruptcy Code § 502, (C) such Claim was listed on the Schedules of a Debtor, or (D) the Holder of such Claim voted on or accepted this Plan. This paragraph is intended to further effect the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, the Release Matters Injunction, and the Discharge described in Section 8.1 of the Plan. This paragraph is not intended to, and it shall not, serve as a waiver of any defense to any claim the Debtors or the Asbestos Trust would otherwise have.

### 7.2.5   Creation of Asbestos Trust Sub-Accounts

On the Effective Date, the Asbestos Trust shall contain the PD Account, the PI-AO Account, the PI-SE Account, the Trust Expenses Account, and such other accounts as may be provided for in and in accordance with the Asbestos Trust Agreement.

### 7.2.6   Appointment and Termination of Trustees

On or before the Confirmation Date, the Debtors shall nominate the initial three (3) Trustees of the Asbestos Trust. The Bankruptcy Court, after notice and opportunity for hearing, shall be asked to appoint the three individuals named by the Debtors to serve as Trustees of the Asbestos Trust effective as of the Effective Date. Upon termination of the Asbestos Trust, the Trustees' employment shall be deemed terminated and the Trustees shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to or arising from or in connection with the Chapter 11 Cases.

### 7.2.7   Creation and Termination of the TAC

Pursuant to the terms of the Asbestos Trust Agreement, the Debtors, the FCR, the Asbestos PI Committee and the Asbestos PD Committee, acting jointly, shall nominate the three (3) initial members of the TAC. On the Confirmation Date, effective as of the Effective Date, the Bankruptcy Court shall be asked to appoint the initial members of the TAC (and thereupon the TAC shall be formed) to serve as members of the TAC in accordance with the Asbestos Trust Agreement. Upon termination of the Asbestos Trust, the TAC shall be deemed dissolved and the TAC shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to or arising from or in connection with the Chapter 11 Cases.

### 7.2.8   Cooperation Agreement

On the Effective Date or as soon thereafter as is practicable, the Reorganized Debtors and the Asbestos Trust shall enter into a cooperation agreement pursuant to which:   (a) the Reorganized Debtors shall provide to the Asbestos Trust the non-privileged books and records of the Debtors and the Reorganized Debtors that pertain directly to Asbestos Claims and (b) the Asbestos Trust shall provide to the Reorganized Debtors books and records of the Asbestos Trust

17

that pertain to Asbestos Claims so as to fully enable the Reorganized Debtors to recover any amounts available under any Asbestos Insurance Policy as if the Reorganized Debtors were processing, litigating and/or paying all Asbestos Claims directly. Execution of the cooperation agreement, in a form acceptable to the Debtors, is a condition precedent to the Sealed Air Payment and the Debtors' Payment being delivered to the Asbestos Trust.

The Debtors shall File the draft of the cooperation agreement prior to the Effective Date and shall seek an order from the Court that the providing of books and records under such cooperation agreement shall not result in the destruction, impairment or waiver of any applicable privileges pertaining to such books and records.

### 7.2.9   Institution and Maintenance of Legal and other Proceedings

As of the Effective Date, without any further action of any Entity, the Asbestos Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Asbestos Trust, provided that the Reorganized Debtors shall have the sole right and authority to resolve Asbestos PI-AO Claims for which the Holder of such Asbestos PI-AO Claim elects the Litigation Option.

### 7.3 PAYMENTS AND DISTRIBUTIONS UNDER THIS PLAN

### 7.3.1   Asbestos Trust Payments and Plan Distributions

Payments to Holders of Allowed Asbestos Claims shall be made by the Asbestos Trust in accordance with the Asbestos Trust Agreement, the respective TDPs and the CMO.   All Distributions or payments required or permitted to be made under this Plan (other than to Professionals) shall be made by the Reorganized Debtors in accordance with the treatment specified for each such Holder as specified herein (unless otherwise ordered by the Bankruptcy Court).  Distributions to be made on the GUC Distribution Date, the Initial Distribution Date or the Quarterly Distribution Date shall be deemed actually made on such distribution date if made either (i) on the GUC Distribution Date, the Initial Distribution Date or the Quarterly Distribution Date or (ii) as soon as practicable thereafter.  Professionals shall be paid pursuant to the order of the Bankruptcy Court.

### 7.3.2   Timing of Plan Distributions

Whenever any Distribution to be made under this Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without the accrual of any additional interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

### 7.4 DELIVERY OF DISTRIBUTIONS AND UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS.

### 7.4.1   Delivery by the Reorganized Debtors of Distributions in General

Payments by the Asbestos Trust to Holders of Allowed Asbestos Claims shall be made in accordance with the Asbestos Trust Agreement and the respective TDPs.  All other Distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Claim as set forth on the Schedules, unless superseded by a new address, or as set forth (i) on a proof of

18

91100-001\DOCS_DE:102550.1

Claim Filed by a Holder of an Allowed Claim, (ii) in another writing notifying the Reorganized Debtors of a change of address prior to the date of Distribution, or (iii) in a request for payment of an Administrative Expense Claim, as the case may be.

### 7.4.2   Undeliverable Distributions by the Reorganized Debtors

Any Cash, assets, and other properties to be distributed by the Reorganized Debtors under this Plan to Holders of Claims, other than Asbestos Claims, that remain unclaimed (including by an Entity's failure to negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before the later of (i) one year after Distribution or (ii) one-hundred twenty (120) calendar days after an order allowing such Entity's Claim becomes a Final Order, shall become vested in, and shall be transferred and delivered to, the Reorganized Debtors. In such event, such Entity's Claim shall no longer be deemed to be Allowed, and such Entity shall be deemed to have waived its rights to such payments or Distributions under this Plan pursuant to Bankruptcy Code § 1143, shall have no further Claim in respect of such Distribution, and shall not participate in any further Distributions under this Plan with respect to such Claim.

### 7.5 PAYMENTS UNDER THIS PLAN

#### 7.5.1   Manner of Payments under this Plan

Unless the Entity receiving a Distribution or payment agrees otherwise, any such Distribution or payment in Cash to be made by the Reorganized Debtors or the Asbestos Trust shall be made, at the election of the Reorganized Debtors or the Asbestos Trust, as applicable, by check drawn on a domestic bank or by wire transfer from a domestic bank.

#### 7.5.2   Fractional Payments under this Plan

Notwithstanding any other provision of this Plan, payments of fractions of dollars or of fractional shares shall not be made. Whenever, under this Plan, any payment of a fraction of a dollar or a fractional share of Parent Common Stock would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar or nearest whole share of Parent Common Stock, as applicable, (up or down), with half dollars or half shares being rounded up.

### 7.6 OCCURRENCE OF THE CONFIRMATION DATE

The following shall constitute conditions precedent to confirmation of this Plan:

#### 7.6.1   Findings of Fact and/or Conclusions of Law

The Court shall have made the following findings of fact and/or conclusions of law, among others, substantially to the effect as follows, in connection with the confirmation of this Plan, each of which shall be expressly set forth in the Confirmation Order:

> (a) The Plan complies with all applicable sections of the Bankruptcy Code, including Bankruptcy Code § 524(g);

91100-001\DOCS_DE:102550.1

(b) Claimants in Classes 6 through 8 shall be deemed to have voted for acceptance under the Plan in the requisite numbers and amounts required by Bankruptcy Code §§ 524(g), 1126 and 1129;

(c) As of the Petition Date, the Debtors have been named as defendants in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(d) On the Effective Date, the Asbestos Trust shall assume the liabilities of the Debtors with respect to all Asbestos Claims;

(e) The Asbestos Trust is to be funded in part by securities of the Parent and by the obligations of the Reorganized Parent to make future payments;

(f) On the Effective Date, the Asbestos Trust would be entitled to own (if specific contingencies occur), the majority of the voting shares of the Reorganized Parent, by exercise of rights granted under the Plan;

(g) The Asbestos Trust is to use the Asbestos Trust Assets to pay Asbestos Claims;

(h) The Debtors are likely to be subject to substantial Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Claims, which Demands are addressed by the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction;

(i) The actual amounts, numbers, and timing of Demands cannot be determined;

(j) Pursuit of Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with the Asbestos Claims and Demands;

(k) The terms of the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, and the Released Matters Injunction, including any provisions barring actions against third parties, are set out in the Plan in accordance with the requirements of Bankruptcy Rule 3016(c) and are adequately described in the Disclosure Statement;

(l) Pursuant to Court orders or otherwise, the Asbestos Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, matrices, or periodic review of estimates of the numbers and values of Asbestos Claims or Demands, or other comparable mechanisms that provide reasonable assurance that the Asbestos Trust

20

shall value, and be in a position to pay, Asbestos Claims or Demands that involve similar claims in substantially the same manner;

(m) The FCR shall have been appointed by the Court as part of the proceedings leading to the issuance of the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, and the Released Matters Injunction for the purpose of, among other things, protecting the rights of Entities that might subsequently assert Demands of the kind that are addressed in the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, and the Released Matters Injunction and transferred to the Asbestos Trust;

(n) In light of the benefits provided, or to be provided, to the Asbestos Trust by, or on behalf of, each Asbestos Protected Party, the Asbestos Channeling Injunction is fair and equitable with respect to the Entities that might subsequently assert Demands against any Asbestos Protected Party;

(o) The Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction are to be implemented in connection with the Plan and the Plan Documents;

(p) The Asbestos Channeling Injunction is essential to the Plan and the Debtors' reorganization efforts;

(q) An identity of interests exists among the Debtors and the Asbestos Protected Parties such that a Claim asserted against any of the Asbestos Protected Parties gives rise to a Claim against the Debtors, including by the operation of the law of indemnity and/or contribution;

(r) The Sealed Air Payment to the Asbestos Trust, together with the Debtors' Payment, and the Fresenius Payment constitute both (i) substantial assets of the Plan and the reorganization, and (ii) a fair, reasonable, and equitable settlement of all Asbestos Claims asserted against any Asbestos Protected Party;

(s) As of the Effective Date, the Reorganized Debtors have the ability to pay and satisfy in the ordinary course of business their respective obligations and liabilities as set forth in the Fresenius Settlement Agreement and the Sealed Air Settlement Agreement;

(t) Upon the transfer of the Sealed Air Common Stock to the Asbestos Trust, the Trustees shall represent and warrant and agree (on behalf of the Asbestos Trust) with Sealed Air, that the Asbestos Trust is acquiring the Sealed Air Common Stock for its own account for investment and not with a view toward distribution in a manner which would violate the Securities Act and the Asbestos Trust and its transferees will comply with all filing and other reporting obligations

21

under all applicable laws which shall be applicable to such Asbestos Trust with respect to the Sealed Air Common Stock.

(u) Upon confirmation and consummation of the Plan, each of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement shall be in full force and effect.

(v) The Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than one billion, four hundred eighty three million ($1,483,000,000).[2]

(w) The Court shall have found the Asbestos PI-AO Class Fund is not greater than one hundred thirty million ($130,000,000).

(x) The Court has entered an order finding that Class 6, Class 7, and Class 8 are unimpaired.

(y) The Court has entered the Confirmation Order granting the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, and the Released Matters Injunction to take effect as of the Effective Date.

(z) The terms of the Plan and the Confirmation Order thereof do not violate any obligation of the Debtors or any Asbestos Insurance Entity under any Asbestos Insurance Policy or Asbestos Insurance Settlement Agreement.

(aa)    The terms of the Plan and the Confirmation Order do not violate any obligation of the Debtors or any Asbestos Insurance Entity under any consent-to-settlement, cooperation, management-of-claims, or no-action provision of any Asbestos Insurance Policy or Asbestos Insurance Settlement Agreement.

(bb)    The confirmation of the Plan does not materially increase any Asbestos Insurance Entity's risk of providing coverage for the asbestos-related liabilities under the Asbestos Insurance Policies as compared to the risk that was otherwise being borne by the Asbestos Insurance Entity prior to the Effective Date.

(cc)    The duties and obligations of the Asbestos Insurance Entities under the Asbestos Insurance Policies and Asbestos Insurance Settlement Agreements are not diminished, reduced or eliminated by (1) the

---

[2] This figure does not include Asbestos PD Claims that are fully secured by an appeal bond in the case of Solow, et al. v W. R. Grace & Co.-Conn currently pending in the New York Supreme Court, Appellate Division.

discharge, release, and extinguishment of the obligations and liabilities of the Asbestos Protected Parties for and in respect of all Asbestos Claims or (2) the assumption by the Asbestos Trust of responsibility and liability for all Asbestos Claims.

(dd)   All Asbestos Claims shall be channeled to the Asbestos Trust.

(ee)   All Asbestos PI-SE Claims whose Holders elect the Litigation Option shall be litigated by, and at the expense of, the Asbestos Trust in the name of the Asbestos Trust.

(ff) All Allowed PI-SE Claims shall be paid by the Asbestos Trust out of the Asbestos PI-SE Class Fund, which shall be funded solely by the Sealed Air Payment and the Parent Common Stock component of the Debtors' Payment, if necessary.

(gg)   All Allowed PI-AO Claims shall be paid initially by the Asbestos Trust out of the Asbestos PI-AO Class Fund, which shall be funded solely by the Warrants.

(hh)   All Asbestos PI-AO Claims whose Holders elect the Litigation Option shall be litigated by the Reorganized Debtors in the name of the Asbestos Trust, initially at the expense of the Asbestos Trust out of the Asbestos PI-AO Class Fund.

(ii) After the exhaustion of the Asbestos PI-AO Class Fund in its entirety, all Allowed PI-AO Claims shall be paid in Cash by the Asbestos Trust from funds to be paid to the Asbestos Trust by the Reorganized Debtors, such funds being in addition to the Debtors' Payment.

(jj) Although the litigation of Asbestos PI-AO Claims and Asbestos PI-SE Claims both are or will be in the name of the Asbestos Trust, the Asbestos Trust is the true party in interest in defending and/or objecting to Asbestos PI-SE Claims whereas, the Reorganized Debtors are the true parties in interest in defending and/or objecting to Asbestos PI-AO Claims.

(kk)   There is no unity of economic interest between the Asbestos Trust in the context of the litigation of Asbestos PI-SE Claims and the Reorganized Debtors, acting nominally for the Asbestos Trust, in the context of the litigation of Asbestos PI-AO Claims.

(ll) Any findings of fact or conclusions of law arising out of the adjudication of any disputed Asbestos PI-SE Claims by the Asbestos Trust, and in which the Reorganized Debtors shall not appear as parties in interest and shall not participate directly, will not have collateral estoppel or any other preclusive effect on the Reorganized

23

Debtors and/or the Asbestos Trust in the context of adjudication of any disputed Asbestos PI-AO Claim.

This Plan shall not be confirmed and the Confirmation Order shall not be entered until and unless each of the foregoing conditions to confirmation is either satisfied or waived by the Debtors and by Sealed Air and Fresenius with respect to the conditions set forth in paragraphs 7.6.1(r) and 7.6.1(s) above, and by Sealed Air with respect to the condition set forth in paragraph 7.6.1(t) above.

### 7.6.2   Orders of this Court

(a) The Confirmation Order shall be in form and substance acceptable to the Debtors.

(b) The Confirmation Order shall be consistent with the requirements of the Sealed Air Settlement Agreement and Fresenius Settlement Agreement.

(c) The Court shall have entered the CMO in form and substance acceptable to the Debtors.

(d) The Court shall have entered the Estimation Order in form and substance acceptable to the Debtors, including the following findings:

(i)     the Asbestos PI-SE Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PI-SE Claims;

(ii)     the Asbestos PD Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PD Claims; and

(iii)     the Asbestos Trust Expenses Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all expenses of the Asbestos Trust.

(e) The Court shall have entered an order in form and substance acceptable to the Debtors approving the Sealed Air Settlement Agreement.

This Plan shall not be confirmed and the Confirmation Order shall not be entered until and unless each of the foregoing conditions to confirmation is either satisfied or waived by the Debtors.

### 7.7 CONDITIONS TO OCCURRENCE OF THE EFFECTIVE DATE

The "effective date of the plan," as used in Bankruptcy Code § 1129, shall not occur, and this Plan shall be of no force and effect, until the Effective Date. The occurrence of the Effective

24

Date is subject to satisfaction of the following conditions precedent, any of which may be waived by the Debtors:

(a) The Confirmation Order shall have been issued or affirmed by the District Court and shall have become a Final Order; provided that, at the option of the Debtors, the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order unless the effectiveness of the Confirmation Order has been stayed or vacated, in which case, at the option of the Debtors, the Effective Date may be the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order.

(b) The District Court shall have entered or affirmed an order(s) entering the Asbestos Channeling Injunction.

(c) The District Court shall have entered or affirmed an order(s) approving this Plan and all the Plan Documents and such order(s) shall have become Final Orders.

(d) The Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction shall be in full force and effect.

(e) The Plan Documents, including the Sealed Air Settlement Agreement, necessary or appropriate to implement this Plan shall have been (i) executed, in a form acceptable to the Debtors, (ii) delivered by Sealed Air and, where applicable, (iii) filed with the appropriate governmental or supervisory authorities.

(f) The Certificate of Incorporation or Articles of Incorporation, as applicable, of each of the Debtors, as amended in accordance with this Plan, shall be in full force and effect.

(g) The Exit Financing, in an amount and on such terms satisfactory to the Debtors, shall be in full force and effect and available immediately upon the occurrence of the Effective Date and after all necessary parties have executed the documentation relating thereto.

(h) The Debtors shall have obtained either (i) a private letter ruling establishing that the Asbestos Trust is a "qualified settlement fund" pursuant to Section 468B of the IRC, or (ii) an opinion of counsel regarding the tax consequences satisfactory to the Debtors and Sealed Air.

(i) The Sealed Air Settlement Agreement shall have been duly approved by the board of directors of Sealed Air.

25

(j) The Court shall have entered a finding that the cooperation agreements entered into between the Reorganized Debtors and the Asbestos Trust do not result in the destruction, impairment, or waiver of any applicable privileges pertaining to the books and records subject thereto.

The Effective Date shall not occur unless and until each of the foregoing conditions is either satisfied or waived by the Debtors, and by Sealed Air with respect to the conditions set forth in paragraphs 7.7(h) and 7.7(i). Notice of the occurrence of the Effective Date reflecting that the foregoing conditions have been satisfied or waived shall: (i) be signed by the Debtor and each Entity whose consent is required pursuant to this Plan, (ii) state the date of the Effective Date; and (iii) be Filed with the Bankruptcy Court by the Debtors' counsel. No waiver shall be effective unless it complies with the requirements of this provision.

If the Effective Date does not occur by September 30, 2005, the Debtors reserve the right to seek dismissal of the Chapter 11 Cases. In the event that the Effective Date does not occur, all parties shall be returned to the position they would have held had the Confirmation Order not been entered. In such event, nothing contained herein or in any of the Plan Documents shall be deemed to constitute a waiver or release of any claims or defenses of, or an admission or statement against interest by, the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

### 7.8 MANAGEMENT OF THE REORGANIZED DEBTORS

On and after the Effective Date, the business and affairs of the Reorganized Debtors will be managed by their respective Boards of Directors or equivalent thereof. Upon the Effective Date, the Board of Directors of the Reorganized Parent shall be composed of at least five (5) directors. The Debtors shall specify the directors of the Reorganized Parent in the Plan Supplement. The directors of the Reorganized Parent appointed upon the Effective Date shall serve for two (2) years without replacement other than as a consequence of resignation, death or action of the Board of Directors. Thereafter, the directors may be replaced by stockholder action. In addition, as will be specified in the Plan Supplement, certain key members of current management are expected to continue with the Reorganized Debtors.

### 7.9 CORPORATE ACTION

On or prior to the Effective Date, the Boards of Directors of the respective Debtors that are corporations shall adopt an amendment to their respective Certificates of Incorporation or Articles of Incorporation, as applicable (the Certificate of Incorporation of the Parent to be substantially in the form included in the Plan Supplement) and the Parent shall adopt the By-Laws substantially in the form included in the Plan Supplement, and such corporate actions shall be authorized and approved in all respects, in each case without further action under applicable law, regulation, order, or rule, including any action by the stockholders of the Parent, the Debtors in Possession, or the Reorganized Debtors. On the Effective Date or as soon thereafter as is practicable, the Parent shall file with the Secretary of State of the State of Delaware, in accordance with the applicable Delaware statutes, rules, and regulations, such amendment to its Certificate of Incorporation and each of the other Debtors shall file their respective Certificates of Incorporation or Articles of Incorporation, as applicable with the Secretary of State, or equivalent official in their respective jurisdictions. On the Effective Date,

26

the approval and effectiveness of matters provided under this Plan involving the corporate structure of the Reorganized Debtors or corporate action by the Reorganized Debtors shall be deemed to have occurred and to have been authorized, and shall be in effect from and after the Effective Date without requiring further action under applicable law, regulation, order, or rule, including any action by the stockholders or directors of the Debtors, the Debtors in Possession, or the Reorganized Debtors.

### 7.10    EFFECTUATING DOCUMENTS AND FURTHER TRANSACTIONS

Each of the officers of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and to take such actions as may be necessary or appropriate, for and on behalf of the Debtors and the Reorganized Debtors, to effectuate and further evidence the terms and conditions of this Plan, the transactions contemplated by this Plan, and any securities issued pursuant to this Plan.

### 7.11    ALLOCATION OF PLAN DISTRIBUTIONS BETWEEN PRINCIPAL AND INTEREST

To the extent that any Allowed Claim entitled to a Distribution under this Plan consists of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for federal income tax purposes, be allocated first to the principal amount of the Claim and then, to the extent the Distribution exceeds the principal amount of the Claim, to the accrued but unpaid interest.

### 7.12    NO SUCCESSOR LIABILITY

Except as otherwise expressly provided in this Plan, the Debtors, the Reorganized Debtors, the Asbestos PI Committee, the Asbestos PD Committee, the FCR, and the Asbestos Protected Parties will not, pursuant to this Plan or otherwise, assume, agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any of the Debtors' past or present Affiliates, as such liabilities or obligations may relate to or arise out of the operations of or assets of the Debtors or any of the Debtors' past or present Affiliates or any of their respective successors, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date. Neither the Asbestos Protected Parties, the Reorganized Debtors, nor the Asbestos Trust is, or shall be, a successor to the Debtors or any of the Debtors' past or present Affiliates by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors and the Asbestos Trust shall assume the obligations specified in this Plan and the Confirmation Order.

Except as otherwise expressly provided in this Plan, effective automatically on the Effective Date, the Asbestos Protected Parties and their respective Representatives shall be unconditionally, irrevocably and fully released from any and all Claims and causes of action, including Claims and causes of action arising under Chapter 5 of the Bankruptcy Code or similar Claims or causes of action arising under state or any other law, including, if applicable, claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego-type claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtors (or any of their predecessors) or any of their respective businesses or operations that occurred or existed prior to the Effective Date.

27

**7.13    DEEMED CONSOLIDATION OF THE DEBTORS FOR PLAN PURPOSES ONLY**

Subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under this Plan for Plan purposes only. Each and every Claim Filed or to be Filed against any of the Debtors shall be deemed Filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors.

Such deemed consolidation, however, shall not (other than for purposes related to funding Distributions under this Plan and as set forth above in this Section 7.13) affect: (i) the legal and organizational structure of the Debtors; (ii) any Encumbrances that are required to be maintained under this Plan (A) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed, (B) pursuant to this Plan, or (C) in connection with any Exit Financing; (iii) the Sealed Air Settlement Agreement; and (iv) the Fresenius Settlement Agreement.

Notwithstanding anything contained in this Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on any of the Claims (other than Asbestos Claims) being reinstated and left unimpaired under this Plan, and the legal, equitable, and contractual rights to which the Holders of any such Claims (other than Asbestos Claims) are entitled shall be left unaltered by this Plan.

## Article 8.
## INJUNCTIONS, RELEASES & DISCHARGE

### 8.1 DISCHARGE

#### 8.1.1    Discharge of the Debtors and Related Discharge Injunction

The rights afforded in this Plan and the treatment of all Claims, Demands and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims, Demands and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against the Debtors and the Debtors in Possession, or their assets, properties, or interests in property. Except as otherwise provided herein, on the Effective Date, all Claims, Demands against, and Equity Interests in the Debtors and the Debtors in Possession shall be satisfied, discharged, and released in full. The Reorganized Debtors shall not be responsible for any obligations of the Debtors or the Debtors in Possession except those expressly assumed by the Reorganized Debtors pursuant to this Plan. All Entities shall be precluded and forever barred from asserting against the Debtors and the Reorganized Debtors, or their assets, properties, or interests in property any other or further Claims or Demands based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date, except as expressly provided in this Plan.

With respect to any debts discharged by operation of law under Bankruptcy Code §§ 524(a) and 1141, the discharge of the Debtors operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover, or offset any such debt as a personal liability of the Debtor, whether or not the discharge of such debt is waived.

28

### 8.1.2  Discharge of Liabilities to Holders of Asbestos Claims

The transfer to, vesting in, and assumption by the Asbestos Trust of the Asbestos Trust Assets as contemplated by this Plan, among other things, shall (i) discharge the Debtors, the Reorganized Debtors and their Representatives for and in respect of all Asbestos Claims and (ii) discharge, release, and extinguish all obligations and liabilities of the Asbestos Protected Parties and Asbestos Insurance Entities for and in respect of all Asbestos Claims, subject to the reservations listed in Section 8.3.2 herein.  On the Effective Date, the Asbestos Trust shall assume the liabilities of the Debtors with respect to all Asbestos Claims and shall pay the Allowed Asbestos Claims in accordance with the Asbestos Trust Agreement and the appropriate TDPs.

### 8.1.3  Disallowed Claims and Disallowed Equity Interests

On and after the Effective Date, the Debtors, the Reorganized Debtors and their Representatives shall be fully and finally discharged of any liability or obligation on a Disallowed Claim or Disallowed Equity Interest, and any order creating a Disallowed Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to Bankruptcy Code § 502 or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.  The Confirmation Order, except as otherwise provided herein, or unless the Court orders otherwise, shall constitute an order disallowing all Claims (other than Asbestos Claims) to the extent such Claims are not allowable under any provision of Bankruptcy Code § 502, including time-barred Claims, and Claims for unmatured interest.

### 8.1.4  Non-Dischargeable ERISA Liability

The Parent is a controlled group member within the meaning of 29 U.S.C. § 1301(a)(14) and may also be a contributing sponsor of one or more ongoing, defined benefit pension plans to which Title IV of the Employee Retirement Income Security Act ("ERISA") applies (the "Pension Plans").  Nothing contained in this Plan, Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases shall be construed to discharge, release or relieve the Debtors, or any other party, in any capacity, from any liability or responsibility to the Pension Benefit Guaranty Corporation ("PBGC") with respect to the Pension Plans under any law, governmental policy, or regulatory provision.  The PBGC shall not be enjoined or precluded from enforcing such liability or responsibility, as a result of any of the provisions of this Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims), the Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases.  Notwithstanding the foregoing, neither the PBGC nor any other Entity shall assert any liability or responsibility with respect to the Pension Plans under any law, governmental policy or regulatory provisions against, and such liability or responsibility shall not attach to, the Asbestos Trust or any of the Asbestos Trust Assets.

### 8.2  THE ASBESTOS CHANNELING INJUNCTION

In order to supplement, where necessary, the injunctive effect of the discharge provided by Bankruptcy Code §§ 1141, 524(a) and 105 and as described in this Article 8, and pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code

29

§§ 524(g) and 105(a), the Confirmation Order shall provide for issuance of the Asbestos Channeling Injunction to take effect as of the Effective Date. On and after the Effective Date, the sole recourse of the Holder of an Asbestos Claim on account of such Claim shall be to the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction and the appropriate TDPs and such Holder shall have no right whatsoever at any time to assert its Asbestos Claim against the Debtors, Reorganized Debtors, any other Asbestos Protected Party, or any property or interest (including any Distributions made pursuant to this Plan) in property of the Debtors, the Reorganized Debtors, or any other Asbestos Protected Party. Without limiting the foregoing, from and after the Effective Date, the Asbestos Channeling Injunction shall apply to all present and future Holders of Asbestos Claims, and all such Holders permanently and forever shall be stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Claims other than from the Asbestos Trust in accordance with the Asbestos Channeling Injunction and pursuant to the Asbestos Trust Agreement and the appropriate TDPs, including:

(a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(b) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(d) setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party; and

(e) proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the Asbestos Trust, except in conformity and compliance with the Asbestos Trust Agreement and the appropriate TDPs.

Notwithstanding anything to the contrary above, this Asbestos Channeling Injunction shall not enjoin the rights of Entities to the treatment accorded them under Article 3 of this Plan, as applicable, including the rights of Entities with Asbestos Claims to assert such Asbestos Claims in accordance with the appropriate TDPs.

30

Except as otherwise expressly provided in this Plan, the Sealed Air Settlement Agreement, or the Fresenius Settlement Agreement, nothing contained in this Plan shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtors, the Reorganized Debtors, or the Asbestos Trust may have against any Entity in connection with or arising out of or related to any Asbestos Claim.

### 8.3 ASBESTOS INSURANCE ENTITY INJUNCTION

Pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code § 105(a), the Confirmation Order shall provide for issuance of the Asbestos Insurance Entity Injunction to take effect as of the Effective Date.

#### 8.3.1 Injunction

(a) All Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim, Demand, or cause of action, against any Asbestos Insurance Entity, based upon, relating to, arising out of, or in any way connected with any Claim, Demand, Asbestos Insurance Rights, Asbestos Insurance Policies, or Asbestos Insurance Settlement Agreements, whenever and wherever arisen or asserted (including all Claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty) shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Claim, Demand, or cause of action, including:

(i) commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

(ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

(iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

(iv) setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity; and

(v) proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the Asbestos Trust, except in conformity and compliance

31

with the Asbestos Trust Agreement, the appropriate TDPs, and the appropriate Asbestos
Insurance Settlement Agreements.

    (b) The Reorganized Debtors shall have the sole and exclusive authority at
any time to terminate, reduce or limit the scope of, the Asbestos
Insurance Entity Injunction as it may apply to any Asbestos Insurance
Entity upon express written notice to that Asbestos Insurance Entity;
and

    (c) The Asbestos Insurance Entity Injunction is not issued for the benefit
of any Asbestos Insurance Entity, and no Asbestos Insurance Entity is
or may become a third-party beneficiary of the Asbestos Insurance
Entity Injunction.

### 8.3.2   Reservations from the Asbestos Insurance Entity Injunction

Notwithstanding anything to the contrary above, the Asbestos Insurance Entity Injunction
shall not enjoin:

    (a) the rights of any Entity to the treatment accorded it under this Plan;

    (b) the rights of any of the Reorganized Debtors or the Non-Debtor
Affiliates, as the case may be, to prosecute any cause of action or to
assert any Claim, Demand, debt, obligation, or liability for payment
against any Entity, including any Asbestos Insurance Entity, based on
or arising from the Asbestos Insurance Rights for the Debtors',
Reorganized Debtors' or the Non-Debtor Affiliates' benefit; and

    (c) the rights of any of the Reorganized Debtors or the Non-Debtor
Affiliates, as the case may be, to receive any settlement, award,
payment of Cash or other property of any kind whatsoever from any
Entity, including any Asbestos Insurance Entity, in satisfaction of any
Asbestos Insurance Rights that any of the Debtors, the Reorganized
Debtors or the Non-Debtor Affiliates, as the case may be, may have
against any of the foregoing.

### 8.4 RELEASED MATTERS INJUNCTION

Pursuant to the exercise of the equitable jurisdiction and power of the Court under
Bankruptcy Code § 105(a), the Confirmation Order shall provide for issuance of the Released
Matters Injunction to take effect as of the Effective Date.

### 8.4.1   Injunction

    (a) All Entities that have held or asserted, that hold or assert, or that may
in the future hold or assert any Claim, Demand, or cause of action,
against any Entity released under any provision of this Plan, shall be
enjoined from taking any action for the purpose of directly or

32

indirectly collecting, recovering, or receiving payments, satisfaction, or recovery on account of such released matters, including:

(i)     commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Entity released under any provision of this Plan, or any property or interest in property of any such released Entity;

(ii)     enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Entity released under any provision of this Plan, or any property or interest in property of any such released Entity;

(iii)     creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Entity released under any provision of this Plan, or any property or interest in property of any such released Entity; and

(iv)     setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Entity released under any provision of this Plan, or any property or interest in property of any such released Entity.

### 8.4.2   Reservations from the Released Matters Injunction

Notwithstanding anything to the contrary above, the injunction provided in Section 8.4.1 of this Plan shall not enjoin:

(a) the rights of any Entity to the treatment accorded it under this Plan;

(b) the rights of any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to prosecute any cause of action or to assert any Claim, Demand, debt, obligation, or liability for payment against any Entity, including any Asbestos Insurance Entity, based on or arising from the Asbestos Insurance Rights for the Debtors', Reorganized Debtors' or the Non-Debtor Affiliates' benefit; and

(c) the rights any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to receive any settlement, award, payment of Cash or other property of any kind whatsoever from any Entity, including any Asbestos Insurance Entity in satisfaction of any Asbestos Insurance Rights that any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, may have against any of the foregoing.

33

## 8.5 TERM OF CERTAIN INJUNCTIONS AND AUTOMATIC STAY

### 8.5.1    Injunctions and/or Automatic Stays in Existence Immediately prior to Confirmation

All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Cases, whether pursuant to Bankruptcy Code §§ 105, 362, or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to the Confirmation Date shall remain in full force and effect until the injunctions set forth in this Plan become effective, and thereafter if so provided by this Plan, the Confirmation Order, or by their own terms. In addition, on and after the Confirmation Date, the Reorganized Debtors may seek such further orders as they may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

### 8.5.2    Injunctions Provided for in this Plan

Each of the injunctions provided for in this Plan shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by this Plan. Notwithstanding anything to the contrary contained in this Plan, all actions in the nature of those to be enjoined by such injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

## 8.6 ADDITIONAL RELEASES AND INDEMNIFICATION

### 8.6.1    Representatives of the Debtors

#### (a) Release of Representatives of the Debtors

For good and valuable consideration, the receipt and sufficiency of which is acknowledged in this Plan, all Representatives of the Debtors will be released, as of the Effective Date, from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that any Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date for Claims or liabilities resulting from their services as Representatives of the Debtors or any of the Non-Debtor Affiliates to the extent such Claims or liabilities relate to the business, operations, or management of any of the Debtors prior to the Effective Date or any of the matters referred to in Section 11.8. These releases are conditioned on the released Representatives giving a mutual release, except that such Representatives are not releasing Claims with respect to commercial obligations of the Debtors, any Claims for indemnification in favor of the released Representatives, or Claims for wages, fees, benefits, commissions and expenses. Further, these releases are not intended to, and shall not, alter in any way the rights of the present and/or former officers and/or directors of the Parent, or of any of the other Debtors or Non-Debtor Affiliates, under the Parent's By-Laws and/or Certificate of Incorporation, or any of the other Debtors' or Non-Debtor Affiliates' applicable by-laws and/or certificates of incorporation, whatever those rights, if any, may be.

34

### (b) Indemnification of Representatives of the Debtors and Non-Debtor Affiliates

The Reorganized Debtors will defend, indemnify, and hold harmless to the fullest extent permitted by applicable law, all Representatives of the Debtors, and all Representatives of the Non-Debtor Affiliates, on and after the Effective Date for all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever that are purported to be released pursuant to Section 8.6.1(a) herein.

#### 8.6.2    Release of Sealed Air Indemnified Parties

Upon receipt of the Sealed Air Payment (i) the Debtors, the Asbestos PD Committee and the Asbestos PI Committee shall execute and deliver the Release; (ii) the Government Plaintiff shall execute and deliver the Government Release; and (iii) the Asbestos PI Committee and the Asbestos PD Committee shall deliver the Fresenius Release, all as provided for and defined in the Sealed Air Settlement Agreement.  In addition, each of the Non-Debtor Affiliates shall irrevocably release, acquit, and forever discharge the Sealed Air Indemnified Parties from any and all Asbestos Claims and any and all Claims, on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, as that term is defined in the Sealed Air Settlement Agreement, that have accrued or been asserted or that hereafter might accrue or be asserted against the Sealed Air Indemnified Parties, and that each Non-Debtor Affiliate shall not institute, participate in, maintain, maintain a right to or assert against the Sealed Air Indemnified Parties, either directly or indirectly, on its own behalf, derivatively, or on behalf of any other person any and all Asbestos Claims, and any and all Claims on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, as that term is defined in the Sealed Air Settlement Agreement.

The Debtors, the Reorganized Debtors and the Asbestos Trust shall defend, indemnify, and hold harmless each of the Sealed Air Indemnified Parties as provided in, and to the extent set forth in the Sealed Air Settlement Agreement, and the indemnification provisions set forth in the Sealed Air Settlement Agreement shall be binding on the Asbestos Trust with the same force and effect as if the Asbestos Trust was a party to the Sealed Air Settlement Agreement.

#### 8.6.3    Release of Fresenius Indemnified Parties

Upon receipt of the Fresenius Payment, the Debtors, the Reorganized Debtors, the Asbestos PI Committee and the Asbestos PD Committee will fully, finally and forever release, relinquish and discharge each and every Fresenius Indemnified Party from any and all Grace-Related Claims, as that term is defined in the Fresenius Settlement Agreement, that the Debtors, the Reorganized Debtors, the Asbestos PI Committee or the Asbestos PD Committee have asserted or could have asserted in the Bankruptcy Court or any other forum against any of the Fresenius Indemnified Parties and the release that is attached as Appendix B to the Fresenius Settlement Agreement shall become effective.  Upon receipt of the Fresenius Payment, the Debtors and the Reorganized Debtors shall indemnify, defend and hold harmless the Fresenius Indemnified Parties as provided in and to the extent set forth in the Fresenius Settlement Agreement.

35

### 8.6.4   Specific Releases by Holders of Claims

Without limiting any other provisions of this Plan, each Holder of a Claim or Equity Interest who votes in favor of this Plan or receives or retains any property under this Plan shall be deemed to unconditionally have released the Asbestos Protected Parties, the Asbestos Insurance Entities, the Unsecured Creditors' Committee, the Asbestos PI Committee, the Asbestos PD Committee, the Equity Committee and the FCR, and each party's Representatives, as of the Effective Date from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date in any way relating or pertaining to, the Debtors or the Reorganized Debtors, the Chapter 11 Cases, or the negotiation, formulation, and preparation of this Plan or any related agreements, instruments, or other documents.

### 8.6.5   Approval of Sealed Air Settlement Agreement

The Confirmation Order shall constitute an order approving, as a compromise and settlement pursuant to Bankruptcy Code § 1123(b)(3)(A), the release of Sealed Air, the respective releases of each of the Reorganized Debtors and the Asbestos Trust contained in the Sealed Air Settlement Agreement, and the execution and delivery of the Sealed Air Settlement Agreement which contains the foregoing releases.

## Article 9.
## EXECUTORY CONTRACTS, UNEXPIRED LEASES, GUARANTIES, AND INDEMNITY AGREEMENTS

### 9.1 ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Except for (i) executory contracts and unexpired leases that the Debtors reject prior to the Effective Date or designate (on a list to be included in the Plan Supplement) as being subject to rejection in connection with the Effective Date and (ii) agreements, to the extent executory, providing for indemnification of third parties for Asbestos Claims, all executory contracts and unexpired leases, including all Asbestos Insurance Policies and the 1998 Tax Sharing Agreement (as defined in the Sealed Air Settlement Agreement), not previously assumed by the Debtors pursuant to Bankruptcy Code § 365 shall be deemed to have been assumed by the Reorganized Debtors on the Effective Date, and this Plan shall constitute a motion to assume such executory contracts and unexpired leases as of the Effective Date.

The Debtors reserve the right for 30 days after the Confirmation Date to modify the list of rejected contracts to be included in the Plan Supplement to add executory contracts or leases or remove executory contracts or leases, provided that the Debtors shall file a notice with the Bankruptcy Court and serve each affected party with such notice.  Notwithstanding the foregoing, such affected parties shall not be entitled to any Administrative Expense Claim for any executory contracts or leases added to the list of rejected contracts and will only be entitled to a Claim for rejection damages.

36

Pursuant to the terms of the March 2003 Bar Date Order and Bankruptcy Rule 3002(c)(4), and except as otherwise ordered by the Bankruptcy Court, a proof of Claim for each Claim arising from the rejection of an executory contract or unexpired lease pursuant to this Plan or otherwise shall be Filed with the Bankruptcy Court within thirty (30) days of the later of: (i) the date of the entry of an order, prior to the Confirmation Date, approving such rejection, (ii) the Confirmation Date, or (iii) service of notice of rejection if such party is an affected party as described in the paragraph immediately above. Any Claims not Filed within such applicable time period shall be forever barred from assertion. All Allowed Claims for damages arising from the rejection of an executory contract or unexpired lease shall be included in Class 9 and shall be treated in accordance with Article 3 herein.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such assumptions pursuant to Bankruptcy Code § 365(a) and a finding by the Court that each such assumption is in the best interests of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases.

With respect to each such executory contract or unexpired lease assumed by the Reorganized Debtors, unless otherwise determined by the Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, any defaults of the Debtors with respect to such assumed executory contracts or leases existing as of the Effective Date shall be cured in the ordinary course of the Reorganized Debtors' business promptly after any such default becomes known to the Debtors and, if the cure amount is disputed, such cure amount shall be established pursuant to applicable law, and the assumed executory contracts or leases shall be binding upon and enforceable upon the parties thereto, subject to any rights and defenses existing thereunder. Subject to the occurrence of the Effective Date, upon payment of such cure amount, all defaults of the Debtors existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

To the extent executory, all agreements providing for indemnification of third parties for Asbestos Claims shall be deemed rejected by operation of entry of the Confirmation Order unless expressly identified and assumed pursuant to an order of the Bankruptcy Court.

Executory Contracts and unexpired leases previously assumed by the Debtors during the case pursuant to Bankruptcy Code § 365 shall be governed by and subject to the provisions of the order of the Court authorizing the assumption thereof.

## 9.2 LETTERS OF CREDIT, SURETY BONDS, GUARANTIES, AND CERTAIN INDEMNITY AGREEMENTS

Unless otherwise designated by the Debtors in the Plan Supplement, agreed to in writing by the affected parties, or modified by order of the Court, the Debtors' obligations under letters of credit, surety bonds, guaranties (which for purposes of this Section 9.2 include contingent liabilities arising in connection with assigned executory contracts and unexpired leases), or written indemnity agreements with respect to letters of credit, surety bonds or guaranties existing as of the Effective Date shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under this Plan. The Debtors' obligations under such letters of credit, surety bonds, guaranties, and indemnity agreements shall be deemed assumed pursuant to Bankruptcy Code § 365(a), survive entry of the Confirmation Order and occurrence of the

37

Effective Date, remain unaffected thereby (except as provided in this Section 9.2), and not be discharged in accordance with Bankruptcy Code § 1141.

The Debtors reserve the right for 30 days after the Confirmation Date to modify the list to be included in the Plan Supplement to add or remove letters of credit, surety bonds, guaranties, or indemnity agreements with respect to letters of credit, surety bonds or guaranties existing as of the Effective Date, provided that the Debtors shall file a notice with the Bankruptcy Court and serve each affected party with such notice.

Pursuant to the terms of the March 2003 Bar Date Order and Bankruptcy Rule 3002(c)(4), and except as otherwise ordered by the Bankruptcy Court, a proof of Claim for each Claim arising from the rejection of a: (i) letter of credit, (ii) surety bond, (iii) guaranty, or (iv) written indemnity agreement with respect to a letter of credit, surety bond or guaranty existing as of the Effective Date shall be Filed with the Bankruptcy Court within thirty (30) days of the later of: (A) the date of the entry of an order, prior to the Confirmation Date, approving such rejection, (B) the Confirmation Date, or (C) service of notice of rejection if such party is an affected party as described in the paragraph immediately above. Any Claims not Filed within such applicable time period shall be forever barred from assertion. All Allowed Claims for damages arising from the rejection of a letter of credit, surety bond, guaranty, or written indemnity agreement with respect to a letter of credit, surety bond or guaranty existing as of the Effective Date shall be included in Class 9 and shall be treated in accordance with Article 3 herein.

The Reorganized Debtors shall have the right to cure any defaults existing as of the Effective Date under any such letters of credit, surety bonds, guaranties, or written indemnity agreements with respect to letters of credit, surety bonds, or guaranties existing as of the Effective Date promptly after any such default becomes known to the Debtors or Reorganized Debtors and, if disputed, established pursuant to applicable law. All letters of credit, surety bonds, guaranties, or written indemnity agreements with respect to letters of credit, surety bond or guaranties existing as of the Effective Date shall be deemed reinstated on the Effective Date notwithstanding any default therein by the Debtors, any delay in the cure thereof by the Debtors, or the Filing or existence of the Chapter 11 Cases, or any action taken in connection therewith, and shall be binding upon, and enforceable against, all parties thereto, subject to any rights and defenses existing thereunder.

Nothing in Article 9, however, shall (i) constitute a reinstatement, continuation or assumption of any warranty provision, guaranty or any other contractual or other obligation, Demand or Claim by the Reorganized Debtors to the extent that the Claim, Demand or obligation constitutes an Asbestos PD Claim, an Asbestos PI-SE Claim, or an Asbestos PI-AO Claim, or (ii) limit, restrict or otherwise impair the releases afforded to the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties that are granted elsewhere in this Plan or Plan Documents.

### 9.3 COMPENSATION AND BENEFITS PROGRAM

Unless otherwise agreed to by the affected parties, or modified by order of the Court, all of the Debtors' obligations under employment and severance contracts and policies, and all compensation and benefit plans, policies, and programs shall be treated as though they are executory contracts that are deemed assumed under this Plan.

91100-001\DOCS_DE:102550.1

## Article 10.
## RETENTION OF JURISDICTION

Pursuant to Bankruptcy Code §§ 105(a) and 1142, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (i) arising under the Bankruptcy Code, (ii) arising in or related to the Chapter 11 Cases or this Plan, or (iii) that relates to the following, provided that the District Court shall retain jurisdiction for such matters to which the automatic reference to the Bankruptcy Court has been withdrawn:

### 10.1  PLAN DOCUMENTS

To interpret, enforce, and administer the terms of the Plan Documents and all annexes and exhibits thereto);

### 10.2  EXECUTORY CONTRACTS AND UNEXPIRED LEASES

To hear and determine any and all motions or applications for the assumption and/or assignment or rejection of (i) executory contracts, (ii) unexpired leases, (iii) letters of credit, (iv) surety bonds, (v) guaranties (which for purposes of this Section 9.2 include contingent liabilities arising in connection with assigned executory contracts and unexpired leases), or (vi) written indemnity agreements with respect to letters of credit, surety bonds or guaranties existing as of the Effective Date to which the Debtors are parties or with respect to which the Debtors may be liable that are: (A) pending on the Confirmation Date or (B) within the 30-day reservation period described in Sections 9.1 and 9.2 of this Plan, and to review and determine all Claims resulting from the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date;

The Debtors reserve the right for 30 days after the Confirmation Date to modify the list of rejected contracts to be included in the Plan Supplement to add or remove executory contracts, leases, letters of credit, surety bonds, guaranties, or written indemnity agreements with respect to letters of credit, surety bonds or guaranties existing as of the Effective Date, provided that the Debtors shall file a notice with the Bankruptcy Court and serve each affected party with such notice.

### 10.3  DISPUTED CLAIMS ALLOWANCE/DISALLOWANCE

To hear and determine any objections to: (i) the allowance of Claims, including any objections to the classification of any Claim; (ii) to allow or disallow any Disputed Claim in whole or in part; and (iii) to allow or disallow any disputed Asbestos Claim;

### 10.4  ENFORCEMENT/MODIFICATION OF THIS PLAN

(a) To issue such orders in aid of execution of this Plan to the extent authorized or contemplated by Bankruptcy Code § 1142;

(b) To consider and approve any modifications of this Plan or Plan Documents, remedy any defect or omission, or reconcile any inconsistency in any order of the Court, including the Confirmation Order;

39

(c) To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with this Plan or any other Plan Documents or their interpretation, implementation, enforcement, or consummation;

(d) To hear and determine all objections to the termination of the Asbestos Trust;

(e) To determine such other matters that may be set forth in, or that may arise in connection with, this Plan, the Confirmation Order, the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, the Released Matters Injunction, or the Asbestos Trust Agreement;

(f) To hear and determine any proceeding that involves the validity, application, construction, enforceability, or modification of the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, or the Released Matters Injunction;

(g) To enter an order or final decree closing the Chapter 11 Cases;

(h) To hear and determine any other matters related hereto, including matters related to the implementation and enforcement of all orders entered by the Court in the Chapter 11 Cases;

(i) To enter such orders as are necessary to implement and enforce the injunctions described herein; and

(j) To enter orders authorizing immaterial modifications to this Plan which are necessary to comply with Section 468B of the IRC.

### 10.5   COMPENSATION OF PROFESSIONALS

To hear and determine all applications for allowance of compensation and reimbursement of expenses of Professionals under Bankruptcy Code §§ 327, 328, 329, 330, 331 and 363 and any other fees and expenses authorized to be paid or reimbursed under this Plan;

### 10.6   SETTLEMENTS

To the extent that Court approval is required, to consider and act on the compromise and settlement of any Claim or cause of action by or against the Debtors' or Reorganized Debtors' estates or the Asbestos Trust;

### 10.7   TAXES

To hear and determine matters concerning state, local, and federal taxes (including the amount of net operating loss carryforwards), fines, penalties, or additions to taxes for which the Debtors or Debtors in Possession may be liable, directly or indirectly, in accordance with Bankruptcy Code §§ 346, 505, and 1146.

40

**10.8    SPECIFIC PURPOSES**

To hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order; and

**10.9    INSURANCE MATTERS.**

To hear and determine matters concerning the Asbestos Insurance Policies; provided that the Court shall have nonexclusive jurisdiction over such matters.

## Article 11.
## MISCELLANEOUS PROVISIONS

**11.1    AUTHORITY OF THE DEBTORS**

On the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement effectively (i) the provisions of this Plan and (ii) the creation of the Asbestos Trust.

**11.2    PAYMENT OF STATUTORY FEES**

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Court at the hearing on confirmation of this Plan, shall be paid by the Debtors on or before the Effective Date.

**11.3    RETAINED CAUSES OF ACTION**

### 11.3.1  Maintenance of Causes of Action

Nothing in this Section 11.3 of this Plan shall be deemed to be a transfer by the Debtors and the Reorganized Debtors of any Claims, causes of action, or defenses relating to assumed executory contracts or otherwise which are required by the Reorganized Debtors to conduct their businesses in the ordinary course subsequent to the Effective Date. Moreover, except as otherwise expressly contemplated by this Plan, the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement or other Plan Documents, from and after the Effective Date, the Reorganized Debtors shall have and retain any and all rights to commence and pursue any and all Claims, causes of action, including the Retained Causes of Action, or defenses against any parties, including Claimants and Holders of Equity Interests, whether such causes of action accrued before or after the Petition Date, including those Retained Causes of Action listed on Exhibit 11 in the Exhibit Book.

The Reorganized Debtors shall retain and may exclusively enforce any and all such Claims, rights or causes of action, including Retained Causes of Action, and commence, pursue and settle the causes of action in accordance with this Plan. The Reorganized Debtors shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and causes of action, including Retained Causes of Action, without the consent or approval of any third party and without any further order of the Court.

41

### 11.3.2  Preservation of Causes of Action

The Debtors are currently investigating whether to pursue potential causes of action against any Claimants or Entities. The investigation has not been completed to date, and, under this Plan, the Reorganized Debtors retain the right on behalf of the Debtors to commence and pursue any and all Retained Causes of Action. The potential causes of action currently being investigated by the Debtors, which may, but need not, be pursued by the Debtors before the Effective Date or by the Reorganized Debtors, after the Effective Date are described more fully in the Disclosure Statement. In addition, there may be numerous Unknown Causes of Action. The failure to list any such Unknown Causes of Action herein, or on Exhibit 11 in the Exhibit Book, is not intended to limit the rights of the Reorganized Debtors to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtors.

### 11.3.3  Preservation of All Causes of Action not Expressly Settled or Released

Unless a Claim or cause of action against a Claimant or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order, the Debtors expressly reserve such Claim or Retained Cause of Action (including any Unknown Causes of Action) for later adjudication by the Reorganized Debtors, as applicable. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Retained Causes of Action upon or after the Confirmation Date or Effective Date of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Claims or Retained Causes of Action have been released in this Plan or other Final Order. In addition, the Debtors, the Reorganized Debtors, and the successor entities under this Plan expressly reserve the right to pursue or adopt any Claim alleged in any lawsuit in which the Debtors are defendants or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.

Any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Debtors or the Reorganized Debtors, and may, if appropriate, be the subject of an action after the Effective Date, whether or not (i) such Entity has filed a proof of Claim against the Debtors in the Chapter 11 Cases; (ii) such Claimant's proof of Claim has been objected to; (iii) such Claimant's Claim was included in the Debtors' Schedules; or (iv) such Claimant's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as a Disputed Claim, a Contingent Claim, or an Unliquidated Claim.

### 11.4  THIRD-PARTY AGREEMENTS

The Distributions to the various classes of Claims hereunder will not affect the right of any Entity to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto will remain in full force and effect.

42

### 11.5   PURPOSE OF THE FRESENIUS PAYMENT AND CONSISTENCY OF TREATMENT

The Debtors acknowledge and agree, that the Fresenius Indemnified Parties have entered into the Fresenius Settlement Agreement for the purpose of settling and terminating any and all controversies relating to the assertion of Asbestos Claims, as well as other Grace-Related Claims, as that term is defined in the Fresenius Settlement Agreement, against the Fresenius Indemnified Parties.  The Fresenius Payment is intended and shall be treated by the Settling Parties, as that term is defined in the Fresenius Settlement Agreement, as a payment by the Fresenius Indemnified Parties of an ordinary and necessary expense incurred by the Fresenius Indemnified Parties and as income of the Debtors and Reorganized Debtors in the same amount. Any indemnification payments made by Grace-Conn to the Fresenius Indemnified Parties to the extent the indemnified obligation would have been an ordinary and necessary expense if incurred directly by Grace-Conn, shall be treated by the Settling Parties, as that term is defined in the Fresenius Settlement Agreement, as a payment by Grace-Conn of an ordinary and necessary expense incurred by Grace-Conn and, to the extent the indemnified obligation was itself deducted as an ordinary and necessary expense of the Fresenius Indemnified Parties as income of the Fresenius Indemnified Parties.  None of the Settling Parties, as that term is defined in the Fresenius Settlement Agreement, shall take a position inconsistent with the foregoing in any Tax Return, as that term is defined in the Fresenius Settlement Agreement, or with any tax authority.

### 11.6   PURPOSE OF THE SEALED AIR PAYMENT AND CONSISTENCY OF TREATMENT

The Debtors, the Reorganized Debtors and the Asbestos Trust shall treat for all tax purposes any and all payments by the Sealed Air Indemnified Parties directly to the Asbestos Trust as a direct payment by the Sealed Air Indemnified Parties to the Asbestos Trust for Asbestos Claims that constitutes an ordinary and necessary expense of the Sealed Air Indemnified Parties, and the Debtors, the Reorganized Debtors, the Asbestos PI Committee, the Asbestos PD Committee and the Asbestos Trust (i) shall be prohibited from taking any Defined Action, as that term is defined in the Sealed Air Settlement Agreement, that is inconsistent with the provisions of the Sealed Air Settlement Agreement and (ii) shall take all Defined Actions, as that term is defined in the Sealed Air Settlement Agreement, that are reasonably requested by Sealed Air and consistent with the provisions of the Sealed Air Settlement Agreement unless otherwise permitted under the Sealed Air Settlement Agreement and the procedures outlined therein.  The Debtors, the Reorganized Debtors and the Asbestos Trust shall file all Tax Returns, as that term is defined in the Sealed Air Settlement Agreement, required to be filed by such person, if any, consistent with the provisions of the Sealed Air Settlement Agreement.  Each of the Debtors shall use its best efforts to:  (i) cause the Asbestos Trust to qualify, and to maintain its status, as a Qualified Settlement Fund, as that term is defined in the Sealed Air Settlement Agreement, and (ii) structure the transactions contemplated by the Sealed Air Settlement Agreement to achieve favorable tax treatment to the Sealed Air Indemnified Parties as set forth in the Sealed Air Settlement Agreement, provided that nothing in the Sealed Air Settlement Agreement shall in any way be construed as a representation, warranty, or covenant concerning the treatment for federal income tax purposes of any transfer by the Sealed Air Indemnified Parties pursuant to the Sealed Air Settlement Agreement.

The Debtors, the Reorganized Debtors and the Asbestos Trust shall promptly notify Sealed Air upon receipt by any such party of any notice of any pending or threatened audit or assessment, suit, litigation, proposed adjustment, deficiency, dispute, administrative or judicial

43

proceeding or other similar claim involving the Asbestos Trust, any Debtor, Reorganized Debtor or Non-Debtor Affiliate from any tax authority or any other person challenging the qualification of the Asbestos Trust as a Qualified Settlement Fund, as that term is defined in the Sealed Air Settlement Agreement, or the Sealed Air Payment as a direct payment to the Asbestos Trust that constitutes an ordinary and necessary expense of the Sealed Air Indemnified Parties and the Sealed Air Indemnified Parties shall be entitled to participate in such matters as outlined in the Sealed Air Settlement Agreement.

The Debtors and the Reorganized Debtors acknowledge and agree that the Debtors will account in their books and records for the liabilities satisfied by the Sealed Air Payment and the transfer of the Sealed Air Payment to the Asbestos Trust consistent with provisions of the Sealed Air Settlement Agreement.

Notwithstanding the foregoing, the Debtors and the Reorganized Debtors shall not be required to take any action or refrain from taking any action in connection with the Sealed Air Settlement Agreement if the Debtors or the Reorganized Debtors reasonably believe in their professional judgment, that the taking of such action or the failure to take an action would expose the Debtors or the Reorganized Debtors or any Representative of the Debtors or the Reorganized Debtors, to potential civil or criminal liability.

**11.7  DISSOLUTION OF THE UNSECURED CREDITORS' COMMITTEE, THE ASBESTOS PI COMMITTEE, THE ASBESTOS PD COMMITTEE AND THE EQUITY COMMITTEE; CONTINUED RETENTION OF THE FUTURE CLAIMANTS' REPRESENTATIVE**

On the Effective Date, the Asbestos PI Committee, the Asbestos PD Committee, and the Equity Committee shall thereupon be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Chapter 11 Cases, and those committees shall be deemed dissolved.

The Unsecured Creditors' Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Chapter 11 Cases, and those committees shall be deemed dissolved on the first date on which the Reorganized Debtors shall have paid the Holders of seventy five percent (75%) (in dollar amount) of Allowed General Unsecured Claims (the "UCC Dissolution Date").

Notwithstanding the foregoing, if the Effective Date or the UCC Dissolution Date, as applicable, occurs prior to the entry of a Final Order with respect to final fee applications of Professionals retained by order of the Bankruptcy Court during the Chapter 11 Cases, the Unsecured Creditors' Committee, the Asbestos PI Committee, the Asbestos PD Committee, and the Equity Committee may, at their option, continue to serve until a Final Order is entered with respect to such proceedings.

The FCR shall continue to serve through the termination of the Asbestos Trust in order to perform the functions required by the Asbestos Trust Agreement. Upon termination of the Asbestos Trust, the FCR's employment shall be deemed terminated and the FCR shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Chapter 11 Cases.

All reasonable and necessary post-Effective Date fees and expenses of the Professionals retained by the Unsecured Creditors' Committee shall be paid by the Reorganized Debtors. If any dispute regarding the payment of such fees and expenses arises, the parties shall attempt to

44

resolve such dispute in good faith. If they fail to resolve such dispute, they shall submit the dispute to the Bankruptcy Court for resolution.

### 11.8   EXCULPATION

None of the Reorganized Debtors, the Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties, the Trustees of the Asbestos Trust, the Asbestos Trust Advisory Committee, the Asbestos PI Committee, the Asbestos PD Committee, the Unsecured Creditors' Committee, the Equity Committee, the FCR, or any of their respective Representatives are to have or incur any liability to any Entity for any act or omission in connection with or arising out of the negotiation of this Plan or the settlement provided in the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, the pursuit of confirmation of this Plan, the consummation of this Plan or the settlement provided in the Sealed Air Settlement Agreement or Fresenius Settlement Agreement, or the administration of this Plan or the property to be distributed under this Plan. In all respects, they will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

### 11.9   TITLE TO ASSETS; DISCHARGE OF LIABILITIES

Upon the transfer of the Sealed Air Payment into the Asbestos Trust, and the transfer of the Debtors' Payment into the Asbestos Trust, each such transfer shall be vested in the Asbestos Trust free and clear of all Claims, Equity Interests, Encumbrances, and other interests of any Entity. Except as otherwise provided in this Plan and in accordance with Bankruptcy Code § 1123(b)(3), on the Effective Date, title to all of the Debtors' assets and properties and interests in property, including the Retained Causes of Action, shall vest in the Reorganized Debtors free and clear of all Claims, Equity Interests, Encumbrances, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors.

### 11.10   NOTICES

Any notices, statements, requests, and demands required or permitted to be provided under this Plan, in order to be effective, must be: (i) in writing (including by facsimile transmission), and unless otherwise expressly provided herein, shall be deemed to have been duly given or made (A) if personally delivered or if delivered by facsimile or courier service, when actually received by the Entity to whom notice is sent, (B) if deposited with the United States Postal Service (but only when actually received), at the close of business on the third business day following the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, or (C) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid) (but only when actually received) and (ii) addressed to the appropriate Entity or Entities to whom such notice, statement, request or demand is directed (and, if required, its counsel), at the address of such Entity or Entities set forth below (or at such other address as such Entity may designate from time to time by written notice to all other Entities listed below in accordance with this Section 11.10):

| If to the Debtors: | W. R. Grace & Co. |
|---|---|
| | 7500 Grace Drive |
| | Columbia, MD 21044 |
| | Attn: Secretary |
| | Telephone:      (410) 531-4000 |
| | Facsimile:      (410) 531-4545 |

45

| With a copy to: | Kirkland & Ellis LLP<br>777 South Figueroa Street, 37th Floor<br>Los Angeles, CA 90017<br>Attn: Bennett L. Spiegel / Lori Sinanyan<br>Telephone: (213) 680-8400<br>Facsimile: (213) 680-8500<br><br>and<br><br>Kirkland & Ellis LLP<br>200 East Randolph Drive<br>Chicago, IL 60601<br>Attn: Jonathan Friedland / Ryan Bennett<br>Telephone: (312) 861-2000<br>Facsimile: (312) 861-2200<br><br>and<br><br>Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.<br>919 North Market Street, 16th Floor<br>P.O. Box 8705<br>Attn: Laura Davis Jones / David W. Carickhoff, Jr.<br>Wilmington, Delaware 19899-8705 (Courier 19801)<br>Telephone: (302) 652-4100<br>Facsimile: (302) 652-4400 |
| If to the Asbestos PI Committee: | Caplin & Drysdale, Chartered<br>One Thomas Circle NW, Suite 1100<br>Washington D.C. 20005<br>Attn: Peter Van N. Lockwood<br>Telephone: (202) 862-5000<br>Facsimile: (202) 429-3301 |
| If to the Asbestos PD Committee: | Bilzin Sumberg Baena Price & Axelrod LLP<br>200 South Biscayne Blvd., Suite 2500<br>Miami, FL 33131-2336<br>Attn: Scott L. Baena / Jay Sackalo / Minda A. Mora<br>Telephone: (305) 374-7580<br>Facsimile: (305) 374-7593 |
| If to the Future Claimants' Representative: | David T. Austern<br>8260 Willow Oaks Corp. Drive<br>P.O. Box 10415<br>Fairfax, VA 22031<br>Telephone: (703) 204-9300<br>Facsimile: (703) 205-6249 |
| With a copy to: | Swidler, Berlin, Shereff, Friedman LLP<br>The Washington Harbour<br>3000 K Street, NW, Suite 300<br>Washington, DC 20007<br>Attn: Roger Frankel<br>Telephone: (202) 424-7500<br>Facsimile: (202) 424-7643 |
| If to the Unsecured Creditors' Committee: | Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, NY 10038-4982<br>Attn: Lewis Kruger / Arlene Krieger / Kenneth Pasquale<br>Telephone: (212) 806-5400<br>Facsimile: (212) 806-6006 |

46

| If to Sealed Air: | Sealed Air Corporation<br>Park 80 East<br>Saddlebrook, NJ 07663<br>Attn: Mary A. Coventry<br>Telephone:     (201) 791-7600<br>Facsimile:     (201) 703-4205 |
|---|---|
| With a copy to: | Skadden, Arps, Slate, Meagher & Flom LLP<br>Four Times Square<br>New York, NY 10036<br>Attn: Jan Baker / Shmuel Vasser<br>Telephone:     (212) 735-3000<br>Facsimile:     (212) 735-2000 |
| If to Fresenius: | Fresenius Medical Care North America<br>Corporate Headquarters<br>Corporate Law Department<br>95 Hayden Avenue<br>Lexington, MA 02420-9192<br>Attn: General Counsel<br>Telephone:     (781) 402-9000<br>Facsimile:     (781) 402-9700 |
| With a copy to: | McDermott, Will & Emery<br>227 W. Monroe, Suite 4400<br>Chicago, IL 60606<br>Attn: David S. Rosenbloom<br>Telephone:     (312) 372-2000<br>Facsimile:     (312) 984-7700 |
| If to the Equity Committee: | Kramer Levin Naftalis & Frankel LLP<br>919 Third Avenue<br>New York, NY 10022<br>Attn: Phillip Bentley / Gary M. Becker<br>Telephone:     (212) 715-9100<br>Facsimile:     (212) 715-8000 |

### 11.11  HEADINGS

The headings used in this Plan are inserted for convenience only and neither constitute a portion of this Plan nor in any manner affect the construction of the provisions of this Plan.

### 11.12  GOVERNING LAW

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Delaware, without giving effect to any conflicts of law principles thereof that would result in the application of the laws of any other jurisdiction, shall govern the construction of this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise expressly provided in such instruments, agreements, or documents.

### 11.13  FILING OF ADDITIONAL DOCUMENTS

On or before the Effective Date, the Debtors, the Asbestos PI Committee, the Asbestos PD Committee, the Equity Committee, the Unsecured Creditors' Committee, and the FCR shall File with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

47

**11.14  COMPLIANCE WITH TAX REQUIREMENTS**

In connection with this Plan, the Debtors, the Reorganized Debtors, and the Asbestos Trust will comply with all applicable withholding and reporting requirements imposed by federal, state, and local taxing authorities, and all Distributions hereunder or under any Plan Document shall be subject to such withholding and reporting requirements, if any. Notwithstanding any other provision of this Plan, each Entity receiving a Distribution pursuant to this Plan, or any other Plan Document, will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income tax and other obligations, on account of that Distribution.

**11.15  EXEMPTION FROM TRANSFER TAXES**

Pursuant to Bankruptcy Code § 1146(c), the issuance, transfer, or exchange of notes or equity securities under this Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan shall be exempt from all taxes as provided in Bankruptcy Code § 1146(c).

**11.16  FURTHER ASSURANCES**

The Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, the Asbestos Indemnified Parties, the Asbestos Insurance Entities, the Asbestos Trust, and all Holders of Claims receiving Distributions under this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other action consistent with the terms of this Plan as may be necessary to effectuate the provisions and intent of this Plan, with each such Entity to bear its own costs incurred in connection therewith.

48

### 11.17  FURTHER AUTHORIZATIONS

The Debtors, and, after the Effective Date, the Reorganized Debtors or the Asbestos Trust, if and to the extent necessary, may seek such orders, judgments, injunctions, and rulings that any of them deem necessary to carry out further the intentions and purposes of, and to give full effect to the provisions of, this Plan, with each such Entity to bear its own costs in connection therewith.

Dated:  November 13, 2004

Respectfully submitted,

**W. R. GRACE & CO., et al.**
(on behalf of the Debtors and Debtors In Possession)

By:
Name: David B. Siegel
Title:  Senior Vice President, General Counsel &
        Chief Restructuring Officer

# Exhibit Tab 2

## Glossary of Defined Terms

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-1139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## GLOSSARY OF TERMS USED IN PLAN DOCUMENTS

Terms defined herein apply to the Plan, the Disclosure Statement and all other Plan Documents except where specifically provided for otherwise.

---

[1]   The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

1

1.  **"Additional Indemnities"** shall have the meaning ascribed to it in Section 3.5 of the Asbestos Trust Agreement.

2.  **"Administrative Expense Claim"** shall mean:   (i) any Claim constituting a cost or expense of administration in the Chapter 11 Cases, on or after the Petition Date but prior to the Effective Date, under Bankruptcy Code §§ 503(b), 507(a)(1), 507(b) or 1114(e)(2), including: (a) any actual and necessary costs and expenses of preserving the estates of the Debtors, (b) any actual and necessary costs and expenses of operating the businesses of the Debtors, (c) any indebtedness or obligation incurred or assumed by the Debtors (including any executory contracts of the Debtors assumed pursuant to Bankruptcy Code § 365 by order of the Bankruptcy Court or the Plan) in connection with the conduct of their businesses or for the acquisition or lease of property or the rendition of services, and (d) any allowed compensation or reimbursement of expenses awarded or allowed under Bankruptcy Code §§ 330(a), 331 or 503, and (ii) any fees or charges assessed against the estates of the Debtors under 28 U.S.C. § 1930.

3.  **"Affiliate"** shall mean as to any specified Entity: (i) any other Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by, or is under common control with, the specified Entity, and (ii) any Entity that is an "affiliate" (within the meaning of Bankruptcy Code § 101(2)) of the specified Entity. As used in clause (i) of this definition, "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an Entity (whether through ownership of Capital Stock of that Entity, by contract, or otherwise).

4.  **"Allowed"** shall mean:

    (a)    With respect to Asbestos Claims, in such amount as is determined pursuant to the procedures set forth in the respective TDPs or the CMO, as applicable.

    (b)    With respect to any Claim other than an Administrative Expense Claim or Asbestos Claim, as to which a proof of Claim was Filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Court, (i) as to which no objection to the allowance thereof has been interposed within the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, or (ii) as to which an objection to the allowance thereof has been interposed within such time as is set by the Bankruptcy Court pursuant to the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, such Claim to the extent that such objection has been (A) overruled in whole or in part by a Final Order of the Bankruptcy Court, or (B) resolved by agreement of the relevant parties, or (C) resolved via settlement, mediation, litigation, or otherwise pursuant to the terms of any alternative dispute resolution program that is implemented in the Chapter 11 Cases.

    (c)    With respect to any Claim other than an Administrative Expense Claim or Asbestos Claim, as to which no proof of Claim was Filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, such Claim to the extent that it has been listed by the Debtors in their Schedules as liquidated in amount and not disputed or contingent and not otherwise subject to an objection Filed within such time as is set by the Bankruptcy Court pursuant to the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court;

    (d)    With respect to any Equity Interest in Parent, any Equity Interest registered in the stock register maintained by or on behalf of the Debtors as of the Voting Record Date; and

    (e)    With respect to any Claim that is asserted to constitute an Administrative Expense Claim:

        (i)    that represents a Claim of a Professional to the extent it is allowed in whole or in part by a Final Order of the Bankruptcy Court; or

2

(ii)    other than with respect to a Claim of a Professional, (X) a Claim to the extent that the Debtors or the Reorganized Debtors determine it to constitute an Administrative Expense Claim, or (Y) a Claim to the extent it is allowed in whole or in part by a Final Order of the Bankruptcy Court and only to the extent that such allowed portion is deemed, pursuant to a Final Order of the Bankruptcy Court, to constitute a cost or expense of administration under Bankruptcy Code §§ 503 or 1114.

5.    **"Allowed Amount"** shall mean the lesser of: (i) the dollar amount of an Allowed Claim; or (ii) the Estimated Amount of a Claim, but only to the extent that the Court has expressly estimated such Claim for purposes of distribution.

6.    **"Articles of Incorporation"** shall mean Certificate of Incorporation.

7.    **"Asbestos Channeling Injunction"** shall mean the order(s) entered or affirmed by the District Court, in accordance with and pursuant to Bankruptcy Code §§ 524(g), 105(a) and/or 1141 or otherwise, permanently and forever staying, restraining, and enjoining any Entity from taking any action against any Asbestos Protected Party (except as may be specifically provided in such order(s)) for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Claims, all of which shall be channeled to the Asbestos Trust for resolution as set forth in the appropriate TDPs (other than actions brought to enforce any right or obligation under the Plan or any agreement or instrument between the Debtors or the Reorganized Debtors, on the one hand, and the Asbestos Trust, on the other hand, entered into pursuant to the Plan). The Asbestos Channeling Injunction is further described in Section 8.2 of the Plan.

8.    **"Asbestos Claims"** shall mean all Asbestos PI Claims and Asbestos PD Claims.

9.    **"Asbestos Insurance Action"** shall mean any claim, cause of action, or right of any Debtor or Reorganized Debtor, as the case may be, against any Asbestos Insurance Entity, arising from or related to: (i) any such Asbestos Insurance Entity's failure to provide coverage, pay or agree to pay a Claim under an Asbestos Insurance Policy; (ii) the refusal of any such Asbestos Insurance Entity to compromise or settle any Asbestos Claim under or pursuant to any Asbestos Insurance Policy; or (iii) the interpretation or enforcement of the terms of any Asbestos Insurance Policy with respect to any Asbestos Claim.

10.    **"Asbestos Insurance Entity"** shall mean any Entity (other than the Debtors and the Non-Debtor Affiliates), including any insurance company, broker, or guaranty association, that has issued, or that has actual or potential liability, duties or obligations with respect to, any Asbestos Insurance Policy.

11.    **"Asbestos Insurance Entity Injunction"** shall mean the injunction described in Section 8.3 of the Plan.

12.    **"Asbestos Insurance Policy"** shall mean any insurance policy, whether known or unknown, including the policies listed on the schedule attached as Exhibit 10 in the Exhibit Book, that actually or potentially provides insurance coverage for any Asbestos Claim; provided that an Asbestos Insurance Policy shall not include any rights or obligations under any insurance policy or settlement agreement to which any of the Debtors are a party insofar as the insurance policy or settlement agreement relates to Workers' Compensation Claims.

13.    **"Asbestos Insurance Rights"** shall mean any and all rights, titles, privileges, interests, claims, demands or entitlements to any proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, causes of action, and choses in action related to any of the Asbestos Insurance Policies and/or the Asbestos Insurance Settlement Agreements, whether now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including:

3

(a)    any and all rights to pursue or receive payments with respect to Asbestos Claims under any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement, whether for liability, defense, or otherwise;

(b)    any and all rights to pursue or receive payments related to any Asbestos Insurance Policy and/or any Asbestos Insurance Settlement Agreement that was entered into by any domestic or foreign insolvent insurance company, whether in receivership, liquidation, rehabilitation, run-off, scheme of arrangement, or any other form of proceeding; and

(c)    any and all rights to pursue or receive payments related to any Asbestos Insurance Policy and/or any Asbestos Insurance Settlement Agreement from any insurance guaranty association of a Governmental Unit in connection with any insurance guaranty association statute of any Governmental Unit;

provided that Asbestos Insurance Rights shall not include any rights or obligations under any insurance policy or settlement agreement to which any of the Debtors are a party insofar as the insurance policy or settlement agreement relates to Workers' Compensation Claims.

14.    **"Asbestos Insurance Settlement Agreement"** shall mean any settlement agreement between or among any of the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, or any of them or their predecessors, and a Resolved Asbestos Insurance Company or a Settled Asbestos Insurance Company relating to any Asbestos Claim or any Asbestos Insurance Action.

15.    **"Asbestos Medical Monitoring Claim"** shall mean: (i) a Claim, Demand, or remedy, including all related claims, debts, obligations, or liabilities for compensatory (including general, special, and consequential damages) and punitive damages, (ii) a cross-claim, contribution claim, subrogation claim, reimbursement claim or indemnity claim, or (iii) any debt, liability, or obligation of one or more of the Debtors or any other Asbestos Protected Party (whether or not such Claim, Demand, remedy, debt, liability, or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; whether or not the facts of or legal bases therefor are known or unknown; and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty), for, relating to, or arising out of, resulting from, or attributable to, directly or indirectly:

(a)    personal injuries or damages by or on behalf of those who have not, as of the Petition Date, suffered any personal injury but who are alleging that:

(i)    the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable) wrongfully caused them to be significantly exposed to hazardous asbestos fibers,

(ii)    this exposure significantly increased the Claimant's risk of contracting a serious latent disease,

(iii)    medical monitoring could reasonably be expected to result in early detection of the onset and mitigation of the severity of such disease, and

(iv)    because of this exposure it is necessary for the Claimant to be examined by a physician or receive medical testing more often that he or she otherwise would.

Asbestos Medical Monitoring Claims are included within the Class of Asbestos PI-AO Claims.

4

91100-001\DOCS_DE:102552.1

16.  **"Asbestos PD Claim"** shall mean: (i) a Claim, Demand, or remedy, including all related claims, debts, obligations, or liabilities for compensatory (including general, special, and consequential damages) and punitive damages, (ii) a cross-claim, contribution claim, subrogation claim, reimbursement claim or indemnity claim, or (iii) any debt, liability, or obligation of one or more of the Debtors or any other Asbestos Protected Party (whether or not such Claim, Demand, remedy, debt, liability, or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; whether or not the facts of or legal bases therefor are known or unknown; and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty):

  (a)  arising directly from acts or omissions of one or more of the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable); and

  (b)  for, relating to, or arising out of, resulting from, or attributable to, directly or indirectly, the cost of removal, abatement, diminution of property value, environmental damage, or economic loss caused or allegedly caused:

      (i)  by asbestos in products or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable); or

      (ii)  from vermiculite mined, milled, or processed by the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable).

  Notwithstanding anything to the contrary, Previously Settled/Adjudicated Asbestos Claims are not included within the Class of Asbestos PD Claims. ZAI Claims are included within the Class of Asbestos PD Claims.

17.  **"Asbestos PD Claimant"** shall mean the Holder of an Asbestos PD Claim.

18.  **"Asbestos PD Class Fund"** shall mean the aggregate dollar amount, as determined by the Court in the Estimation Order, that must be funded into the Asbestos Trust (on or within thirty-one (31) days of the Effective Date) so as to enable all Allowed Claims in the Class of Asbestos PD Claims to be paid in full by the Asbestos Trust as, or as soon as practicable after, they become Allowed Claims.

19.  **"Asbestos PD Committee"** shall mean the Official Committee of Asbestos Property Damage Claimants appointed in the Chapter 11 Cases.

20.  **"Asbestos Personal Injury Claim"** shall mean an Asbestos PI Claim.

21.  **"Asbestos Personal Injury-Asymptomatic / Other Claim"** shall mean an Asbestos PI-AO Claim.

22.  **"Asbestos Personal Injury-Symptomatic / Eligible Claim"** shall mean an Asbestos PI-SE Claim.

23.  **"Asbestos PI Claim"** shall mean: (i) a Claim, Demand, or remedy, including all related claims, debts, obligations, or liabilities for compensatory (including general, special, and consequential damages) and punitive damages, (ii) a cross-claim, contribution claim, subrogation claim, reimbursement claim or indemnity claim, or (iii) any debt, liability, or obligation of one or more of the Debtors or any other Asbestos Protected Party (whether or not such Claim, Demand, remedy, debt, liability, or obligation is

5

reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; whether or not the facts of or legal bases therefor are known or unknown; and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty), for, relating to, or arising out of, resulting from, or attributable to, directly or indirectly:

(a)     death, wrongful death, personal or bodily injury (whether physical, emotional, or otherwise), sickness, disease, loss of consortium, survivorship, medical monitoring, or other personal injuries or other damages caused, or allegedly caused, and arising or allegedly arising, from acts or omissions of one or more of the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable); and

(b)     exposure to:

(i)     any products or materials containing asbestos that were manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors (or any of their respective past or present Affiliates, or any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable); or

(ii)    vermiculite mined, milled or processed by the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable).

Notwithstanding anything to the contrary, neither Workers' Compensation Claims nor Previously Settled/Adjudicated Asbestos Claims are included within the Class of Asbestos PI Claims.

24.    **"Asbestos PI Claimant"** shall mean the Holder of an Asbestos PI Claim.

25.    **"Asbestos PI Committee"** shall mean the Official Committee of Asbestos Personal Injury Claimants appointed in the Chapter 11 Cases.

26.    **"Asbestos PI Pre-petition Litigation Bar Date"** shall mean the date that the Court establishes, by the Estimation Procedures Order or other order of the Court, as the last day for Filing Asbestos PI Pre-petition Litigation Claims.

27.    **"Asbestos PI Pre-petition Litigation Claim"** shall mean any Asbestos PI Claim that is based upon either (i) a Pre-petition Lawsuit for which no judgment or enforceable settlement was reached before the Petition Date, or (ii) to the extent that a final judgment was rendered or an enforceable settlement was reached, and the settlement or judgment, as applicable, places any obligation(s) upon any Debtor(s), such Debtor(s) has not satisfied its obligations pursuant to the judgment or settlement.

28.    **"Asbestos PI Proof of Claim Form"** shall mean the proof of claim form, as it may be modified from time to time, that each Holder of an Asbestos PI Claim must file, either pursuant to the terms of the Debtors' proposed Estimation Procedures Order or pursuant to the Plan and the applicable TDP, in order to receive a distribution in these Chapter 11 Cases.

29.    **"Asbestos PI Questionnaire"** shall mean the questionnaire, as it may be modified from time to time, that each Holder of an Asbestos PI Claim must complete and submit, either pursuant to the terms of the

6

Debtors' proposed Estimation Procedures Order or pursuant to the Plan and the applicable TDP, in order to receive a distribution in these Chapter 11 Cases.

30.   **"Asbestos PI-AO Cash-Out Claim"** shall mean an Asbestos PI-AO Claim that is eligible for the Cash-Out Option under the Plan and the Holder of which has elected such Cash-Out Option.

31.   **"Asbestos PI-AO Claim"** or **"Asbestos Personal Injury-Asymptomatic / Other Claim"** shall mean any Asbestos PI Claim that is not an Asbestos PI-SE Claim and is not a Previously Settled/Adjudicated Asbestos Claim.

32.   **"Asbestos PI-AO Claimant"** shall mean the Holder of an Asbestos PI-AO Claim.

33.   **"Asbestos PI-AO Class Fund"** shall mean the aggregate dollar amount, as determined by the Court in the Estimation Order, that must be funded into the Asbestos Trust (on or within thirty-one (31) days of the Effective Date) so as to enable all Allowed Claims in the Class of Asbestos PI-AO Claims to be paid in full by the Asbestos Trust as, or as soon as practicable after, they become Allowed Claims.

34.   **"Asbestos PI-SE Cash-Out Claim"** shall mean an Asbestos PI-SE Claim that is eligible for the Cash-Out Option under the Plan and the Holder of which has elected such Cash-Out Option.

35.   **"Asbestos PI-SE Claim"** or **"Asbestos Personal Injury-Symptomatic Eligible Claim"** shall mean an Asbestos PI Claim that is not a Previously Settled/Adjudicated Asbestos Claim, and whose Holder meets the Asbestos PI-SE Eligibility Requirements.

36.   **"Asbestos PI-SE Claimant"** shall mean the Holder of an Asbestos PI-SE Claim.

37.   **"Asbestos PI-SE Class Fund"** shall mean the aggregate dollar amount, as determined by the Court in the Estimation Order, that must be funded into the Asbestos Trust (on or within thirty-one (31) days of the Effective Date) so as to enable all Allowed Claims in the Class of Asbestos PI-SE Claims to be paid in full by the Asbestos Trust as, or as soon as practicable after, they become Allowed Claims.

38.   **"Asbestos PI-SE Eligibility Requirements"** shall mean the Medical/Exposure Criteria for any of Disease Levels I, II, III, IV, V or VI under the PI-SE TDP.

39.   **"Asbestos Property Damage Claim"** shall mean an Asbestos PD Claim.

40.   **"Asbestos Protected Party"** shall mean any of the following parties:

    (a)   the Debtors;

    (b)   the Reorganized Debtors;

    (c)   the Non-Debtor Affiliates;

    (d)   predecessors of the Debtors and the Non-Debtor Affiliates;

    (e)   the Resolved Asbestos Insurance Companies;

    (f)   the Sealed Air Indemnified Parties;

    (g)   the Fresenius Indemnified Parties;

    (h)   any Entity that, pursuant to the Plan or otherwise on or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any of the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, or the Fresenius Indemnified Parties, or any

7

of their respective assets (but only to the extent that any liability is asserted to exist as a result of its becoming such a transferee or successor);

(i)    any Entity that, pursuant to the Plan or otherwise on or after the Effective Date, makes a loan to any of the Reorganized Debtors, the Non-Debtor Affiliates, the Asbestos Trust, or to a successor to, or transferee of any of the respective assets of, the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, or the Asbestos Trust (but only to the extent that any liability is asserted to exist as a result of its becoming such a lender or to the extent any Encumbrance of assets made in connection with such a loan is sought to be invalidated, upset or impaired in whole or in part as a result of its being such a lender);

(j)    each of the respective present and future Affiliates of each of the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties, and the Resolved Asbestos Insurance Companies (but only to the extent that any liability is asserted to exist as a result of its becoming such an Affiliate); or

(k)    each of the respective Representatives of each of the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties, and the Resolved Asbestos Insurance Companies.

41.    **"Asbestos-Related Lung Cancer 1"** shall mean a Claim that meets the Medical/Exposure Criteria for Disease Level V under the PI-SE TDP.

42.    **"Asbestos-Related Lung Cancer 2"** shall mean a Claim that meets the Medical/Exposure Criteria for Disease Level IV under the PI-SE TDP.

43.    **"Asbestos-Related Other Cancer"** shall mean a Claim that meets the Medical/Exposure Criteria for Disease Level III under the PI-SE TDP.

44.    **"Asbestos Trust"** shall mean the WRG Asbestos Trust, a Delaware statutory trust, established in accordance with the Asbestos Trust Agreement, created upon entry of the Confirmation Order and effective on the Effective Date.

45.    **"Asbestos Trust Accounts"** shall have the meaning ascribed to it in Section 4.1 of the Asbestos Trust Agreement.

46.    **"Asbestos Trust Aggregate Fund"** shall mean the sum of the Asbestos PI-SE Class Fund, the Asbestos PI-AO Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund.

47.    **"Asbestos Trust Agreement"** shall mean the agreement, effective as of the Effective Date, substantially in the form of Exhibit 5 in the Exhibit Book, to be entered into by and among the Debtors, the Future Claimants' Representative, the TAC and the Trustees in connection with the formation of the Asbestos Trust.

48.    **"Asbestos Trust Assets"** shall mean the Debtors' Payment and the Sealed Air Payment, and any proceeds thereof.

49.    **"Asbestos Trust Expenses"** are all costs, tax obligations arising out of the assets comprising the Asbestos Trust Expenses Fund, and expenses of or imposed on the Asbestos Trust, including: (i) compensation of the Trustees, the FCR, the TAC and each of their professionals; (ii) insurance premiums; (iii) legal, accounting and other Professional fees and expenses; (iv) overhead; and (v) disbursements and expenses relating to the implementation of the TDPs, but excluding (A) payments to the Holders of Asbestos Claims on account of such Claims and (B) the cost of litigating any Asbestos PI-AO Claims whose Holders elect the Litigation Option.

8

50. **"Asbestos Trust Expenses Fund"** shall mean the aggregate dollar amount, as determined by the Court in the Estimation Order, that must be funded into the Asbestos Trust (on or within thirty-one (31) days of the Effective Date) so as to enable the Asbestos Trust Expenses to be paid in full as, or as soon as practicable after, they become due.

51. **"Asbestosis"** shall mean a Claim that meets the Medical/Exposure Criteria for Disease Level I under the PI-SE TDP.

52. **"Ballot"** shall mean the form or forms distributed to certain Holders of Claims and Equity Interests by which such parties may indicate acceptance or rejection of the Plan.

53. **"Bankruptcy Code"** shall mean title 11 of the United States Code, as set forth in §§ 101 et seq., and applicable portions of titles 18 and 28 of the United States Code.

54. **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the District of Delaware.

55. **"Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure, as amended, as applicable to the Chapter 11 Cases, including the Local Rules of the Bankruptcy Court.

56. **"Blackstone"** shall mean The Blackstone Group L.P., the financial advisors to the Debtors.

57. **"Board of Directors"** shall mean the Board of Directors of any of the Debtors, or any of the Reorganized Debtors, as the case may be, as it may exist from time to time.

58. **"Business Day"** shall mean any day other than a Saturday, Sunday or legal holiday (as defined in Bankruptcy Rule 9006(a)) in the United States of America.

59. **"By-Laws"** shall mean the by-laws of any of the specified Debtors, as amended as of the Effective Date or thereafter.

60. **"Capital Stock"** shall mean, with respect to: (i) any corporation, any share, or any depositary receipt or other certificate representing any share, of equity interest in that corporation; and (ii) any other Entity, any share, membership, or percentage interest, unit of participation, or other equivalent (however designated) in or of equity interest in that Entity.

61. **"Case Management Motion"** shall mean a motion Filed or to be Filed with the Court in the Chapter 11 Cases, which will seek, among other things, to establish the procedural framework for the post-Confirmation Date adjudication of Asbestos Claims.

62. **"Case Management Order"** or **"CMO"** shall mean the contemplated order by which the relief sought in the Case Management Motion shall be effectuated.

63. **"Cash"** shall mean lawful currency of the United States of America.

64. **"Cash-Out Option"** shall mean one of the treatment options available to be chosen by the Holders of Asbestos PI Claims, as described in Section 3.2 of the Plan.

65. **"Certificate of Incorporation"** or **"Articles of Incorporation"** shall mean the Certificate or Articles of Incorporation or equivalent document of any of the Debtors, as applicable, as amended as of the Effective Date or thereafter.

66. **"Chapter 11 Cases"** shall mean the cases commenced by the Filing, on the Petition Date, by the Debtors of voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

9

67.    "**Claim**" shall mean a claim (as defined in Bankruptcy Code § 101(5)) against a Debtor, including any right to: (i) payment from any of the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.

68.    "**Claimant**" shall mean the Holder of a Claim.

69.    "**Claims Materials**" shall mean the Claims materials prepared by the Asbestos Trust for use by Claimants as described in Section 5.3.2 of Plan.

70.    "**Class**" shall mean any group of Claims or Equity Interests classified by the Plan pursuant to Bankruptcy Code § 1122(a)(1).

71.    "**Clinically Severe Asbestosis**" shall mean a Claim that meets the Medical/Exposure Criteria for Disease Level II under the PI-SE TDP.

72.    "**CMO**" shall mean the Case Management Order.

73.    "**Confirmation Date**" shall mean the date the clerk of the District Court enters on the docket an order entering or affirming the Confirmation Order.

74.    "**Confirmation Hearing**" shall mean the hearing that the Court conducts to consider confirmation of the Plan pursuant to Bankruptcy Code § 1129, as such hearing may be adjourned or continued from time to time.

75.    "**Confirmation Order**" shall mean the order(s) entered by the District Court on the Confirmation Date confirming the Plan.

76.    "**Confirmation Procedures Order**" shall mean the order(s) of the Bankruptcy Court (i) approving procedures relating to the solicitation and tabulation of votes with respect to the Plan; and (ii) providing or establishing the basis for calculating the amount of any Claim or Equity Interest for voting purposes.

77.    "**Contingent Claim**" shall mean any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened, or been triggered, as of the date on which such Claim is sought to be estimated or an objection to such Claim is Filed, whether or not such event is within the actual or presumed contemplation of the Holder of such Claim and whether or not a relationship between the Holder of such Claim and the Debtor now or hereafter exists or previously existed.

78.    "**Court**" shall mean either the Bankruptcy Court or the District Court, as appropriate.

79.    "**Debtor in Possession**" or "**Debtors in Possession**" shall mean one or more of the Debtors, each in its capacity as a debtor in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

80.    "**Debtors**" or "**Grace**" shall mean, collectively, W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical

10

Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

81.   **"Debtors' Payment"** shall mean the consideration delivered on the thirty-first (31st) day after the Effective Date, by or on behalf of the Debtors or the Reorganized Debtors, on account of the Asbestos Claims to the Asbestos Trust pursuant to Section 7.2.2 of the Plan.  The Debtors' Payment shall be comprised of:

   (a)   the positive difference, if any, between the Asbestos Trust Aggregate Fund and the Sealed Air Payment, with such difference to be funded by:

      (i)   Warrants in an amount sufficient to fund the Asbestos PI-AO Class Fund; and

      (ii)   Parent Common Stock valued at the average of the closing prices on The New York Stock Exchange for the trading days within the thirty (30) calendar days beginning on the Effective Date, such Parent Common Stock being subject to, among other things, the transactions described in Section 7.2.2 of the Plan; and

   (b)   additional Warrants in an amount such that, upon the payment of the Sealed Air Payment and the Debtors' Payment into the Asbestos Trust, the Parent Common Stock and Warrants (if exercised) that make up the Debtors' Payment would constitute the majority of the issued and outstanding voting shares of the Reorganized Parent.

For purposes of determining the Debtors' Payment, the Sealed Air Common Stock shall be valued at the average of the closing prices on The New York Stock Exchange for the trading days within the thirty (30) calendar days beginning on the Effective Date.

82.   **"Demand"** shall mean a present or future demand for payment that (i) was not a Claim in the Chapter 11 Cases prior to the Effective Date; (ii) arises out of the same or similar conduct or events that gave rise to the Claims addressed by the Asbestos Channeling Injunction; and (iii) pursuant to the Plan, shall be dealt with by the Asbestos Trust.

83.   **"Disallowed"** shall mean (a) with respect to a Claim or Equity Interest, disallowed in its entirety by a Final Order of the Bankruptcy Court, District Court, or another court of competent jurisdiction; or (b) with respect to an Asbestos PI Claim whose Holder elects the Cash-Out Option, determined not to be entitled to a payment pursuant to the terms of the PI-SE TDP or PI-AO TDP, as applicable.

84.   **"Disclosure Statement"** shall mean the disclosure statement relating to the Plan, including all exhibits, appendices and schedules thereto, approved by order of the Bankruptcy Court in connection with the Plan pursuant to Bankruptcy Code § 1125, together with any amendments and supplements thereto.

85.   **"Disease Levels"** shall mean the asbestos-related disease levels specified in Section 5.2(a)(3) of the PI-SE TDP.

11

91100-001\DOCS_DE:102552.1

86.    **"Disputed Claim"** shall mean a Claim that is neither Allowed nor Disallowed.

87.    **"Distribution"** shall mean the payment, distribution, or assignment under the Plan by the Reorganized Debtors of property or interests in property to: (i) any Holder of an Allowed Claim (other than an Asbestos Claim) or Allowed Equity Interest; and (ii) the Asbestos Trust.

88.    **"District Court"** shall mean the United States District Court for the District of Delaware.

89.    **"Effective Date"** shall mean the first Business Day after the date on which all of the conditions precedent to the effectiveness of the Plan specified in Section 7.7 thereof shall have been satisfied or waived or, if a stay of the Confirmation Order is in effect on such date, the first Business Day after the expiration, dissolution, or lifting of such stay.

90.    **"Encumbrance"** shall mean with respect to any property or asset (whether real or personal, tangible or intangible), any mortgage, lien, pledge, charge, security interest, assignment as collateral, or encumbrance of any kind or nature in respect of such property or asset (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction) to secure payment of a debt or performance of an obligation.

91.    **"Entity"** shall mean any person, individual, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, the United States Trustee or any Governmental Unit or any political subdivision thereof.

92.    **"Equity Committee"** shall mean the Official Committee of Equity Security Holders appointed in the Chapter 11 Cases.

93.    **"Equity Interest"** shall mean any interest in any of the Debtors pursuant to an "equity security" within the meaning of Bankruptcy Code § 101(16).

94.    **"Estimated Amount"** shall mean (except with respect to Asbestos Claims) the estimated dollar value of an unliquidated Claim, Disputed Claim, or Contingent Claim pursuant to Bankruptcy Code § 502(c); provided that, in the event the Court shall estimate one or more unliquidated Claims, Disputed Claims, or Contingent Claims for purposes of allowance, such estimate shall constitute and represent the maximum amount in which such Claims may ultimately become Allowed Claims.

95.    **"Estimation Motion"** shall mean a motion Filed or to be Filed with the Court in the Chapter 11 Cases, which seeks, among other things, to:

    (a)    implement procedures to be used in establishing the amount of the Asbestos PI-SE Class Fund, the Asbestos PI-AO Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund;

    (b)    establish the Asbestos PI-SE Class Fund, the Asbestos PI-AO Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund; and

    (c)    set the Asbestos PI Pre-petition Litigation Bar Date.

96.    **"Estimation Order"** shall mean the order by which the Court would establish the Asbestos PI-SE Class Fund, the Asbestos PI-AO Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund, pursuant to the Estimation Motion.

97.    **"Estimation Procedures Order"** shall mean the order by which the Court would implement procedures to be used in establishing the amount of the Asbestos PI-SE Class Fund, the Asbestos PI-AO Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund; and set the Asbestos PI Pre-petition

12

Litigation Bar Date, both pursuant the Estimation Motion. A proposed form of Estimation Procedures Order is Exhibit A to the Estimation Motion.

98.   **"Exhibit Book"** shall mean the exhibits to the Disclosure Statement or the Plan, as filed contemporaneously with the Disclosure Statement and Plan, as such exhibits may be amended, supplemented, or modified from time to time.

99.   **"Exhibit Book Supplement"** shall mean a supplement of Plan related documents, as amended from time to time, which shall include: (i) the Certificate of Incorporation of the Parent, as to be amended pursuant to the Plan; (ii) the By-Laws of the Parent, as to be amended pursuant to the Plan; (iii) an opinion of counsel regarding whether the Asbestos Trust qualifies as a "qualified settlement fund" pursuant to Section 468B of the IRC; (iv) the list of rejected contracts as of the Effective Date; (v) the list of letters of credit, surety bonds, guaranties, and certain indemnity agreements not to be assumed pursuant to Section 9.2 of the Plan; (vi) the Management Stock Incentive Plan; (vii) a list of certain key members of current management who shall continue with the Reorganized Debtors; (viii) a list of the Resolved Asbestos Insurance Companies, which list may be supplemented, at the sole discretion of the Reorganized Debtors, by Filing a notice with the Bankruptcy Court; and (ix) a list of the Settled Asbestos Insurance Companies.

100.   **"Exit Financing"** shall mean such financing agreement(s) or commitment(s) as the Debtors shall obtain to provide the Reorganized Debtors with appropriate credit availability.

101.   **"Expedited Review"** shall mean a review pursuant to the Expedited Review Process.

102.   **"Expedited Review Process"** shall mean the process employed to liquidate Asbestos PI-SE Cash-Out Claims, as set forth in Section 5.2(a) of the PI-SE TDP and the process employed to liquidate Asbestos PI-AO Cash-Out Claims, as set forth in Section 5.2(a) of the PI-AO TDP.

103.   **"FCR"** shall mean Future Claimants' Representative.

104.   **"FEV1"** shall mean forced expiratory volume (1 second), which is the maximal volume of air expelled in 1 second during performance of the spirometric test for forced vital capacity.

105.   **"FIFO"** shall have the meaning set forth in Section 2.1 of each of the TDPs.

106.   **"FIFO Payment Queue"** shall have the meaning set forth in Section 5.1(c) of the PI-SE TDP, Section 5.1(c) PI-AO TDP, or Section 5.1 of the PD-TDP, as applicable.

107.   **"FIFO Processing Queue"** shall have the meaning set forth in Section 5.1(a)(1) of the PI-SE TDP, as applicable.

108.   **"File" or "Filed"** shall mean file or filed with the Court in the Chapter 11 Cases.

109.   **"Final Order"** shall mean an order as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing by all Entities possessing such right, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or from which reargument or rehearing was sought or certiorari has been denied, and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; provided that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a Final Order.

13

110.    **"Financial Information"** shall mean the historical, proforma and prospective financial information included as, or incorporated by reference into, Exhibit 4 to the Disclosure Statement entitled "W. R. Grace & Co. and Subsidiaries, Historical, Proforma and Prospective Financial Information."

111.    **"Fresenius"** shall mean Fresenius Medical Care Holdings, Inc. and National Medical Care, Inc.

112.    **"Fresenius Indemnified Parties"** shall mean Fresenius and each of their respective present and former subsidiaries, parents, affiliates, officers, directors, employees, partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and assigns, including Fresenius Medical Care AG and Fresenius AG, but not including the Debtors, the Reorganized Debtors and Sealed Air.

113.    **"Fresenius Payment"** shall mean the $115,000,000 consideration to be paid by Fresenius to the Debtors pursuant to the terms of the Fresenius Settlement Agreement.

114.    **"Fresenius Settlement Agreement"** shall mean that certain settlement agreement and release of claims dated February 6, 2003 by and among the Parent, Grace-Conn, Fresenius, the Asbestos PI Committee, and the Asbestos PD Committee, in the form attached as Exhibit 13 in the Exhibit Book, as such agreement may be amended from time to time.

115.    **"Future Claimants' Representative"** or **"FCR"** shall mean David T. Austern (or any court-appointed successor), appointed as the legal representative for future asbestos-related personal injury Claimants in the Chapter 11 Cases for the purpose of protecting the interests of persons that may subsequently assert Demands channeled to the Asbestos Trust.

116.    **"FVC"** shall mean forced vital capacity, which is the maximal volume of air expired with a maximally forced effort from a position of maximal inspiration.

117.    **"General Unsecured Claim"** shall mean any Claim in the Chapter 11 Cases that is not an Administrative Expense Claim, Priority Tax Claim, Priority Claim, Secured Claim, Unsecured Pass-Through Employee Related Claim, Workers' Compensation Claim, Intercompany Claim, Asbestos PI-SE Claim, Asbestos PI-AO Claim, or Asbestos PD Claim.

118.    **"Glossary"** shall mean this Glossary of Terms for the Plan Documents, as this document may be modified from time to time.

119.    **"Grace"** shall mean the Debtors.

120.    **"Grace-Conn"** shall mean W. R. Grace & Co.-Conn., one of the Debtors in these Chapter 11 Cases.

121.    **"Grace Exposure"** shall have the meaning as set forth in Section 5.4(b)(3) of the PI-SE TDP and Section 5.4(b)(2) of the PI-AO TDP.

122.    **"GUC Distribution Date"** shall mean: (a) when used with respect to a General Unsecured Claim that is Allowed prior to the Effective Date, the Effective Date or as soon as practicable thereafter; and (b) when used with respect to a General Unsecured Claim that is not Allowed prior to the Effective Date, the first Business Day of the next calendar quarter after the date upon which the Claim becomes Allowed, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of such next calendar quarter, in which case the Distribution Date shall be the first Business Day of the next succeeding calendar quarter.

123.    **"Holder"** shall mean any Entity holding any Claim or Equity Interest and, with respect to a vote on the Plan, shall mean the beneficial holders on the voting record date or any authorized signatory who has completed and executed a Ballot or on whose behalf a Master Ballot has been properly completed and executed.

14

124. **"ILO Grade"** shall mean the radiological ratings for the presence of lung changes as determined from a chest x-ray, all as established from time to time by the International Labor Organization.

125. **"Individual Review Process"** shall mean the individual review process described in Section 5.2(b) of the PI-SE TDP or 5.2(b) of the PI-AO TDP, as applicable.

126. **"Initial Distribution Date"** shall mean: (i) a date within the first sixty (60) days after the Effective Date selected by the Reorganized Debtors, or (ii) such later date as the Bankruptcy Court may establish, upon request by the Reorganized Debtors, for cause shown.

127. **"Intercompany Claim"** shall mean: (a) any Claim that arose prior to the Effective Date by: (i) any Debtor against any other Debtor, or (ii) a Non-Debtor Affiliate against any Debtor; or (b) any claim that arose prior to the Effective Date by any Debtor against any Non-Debtor Affiliate,.

128. **"IRC"** shall mean the Internal Revenue Code of 1986, as amended, and any applicable regulations (including temporary and proposed regulations) promulgated thereunder by the United States Treasury Department.

129. **"IRS"** shall mean the United States Internal Revenue Service.

130. **"Litigation Option"** shall mean one of the treatment options available to be chosen by Holders of Asbestos PI Claims, as described in Section 3.2 of the Plan.

131. **"Management Stock Incentive Plan"** shall mean the W. R. Grace Stock Incentive Plans under which stock options exercisable for up to 8.2 million shares of Parent Common Stock have been issued to the management of Grace and the Non-Debtor Affiliates, which options will remain outstanding under the Plan, and any additional stock incentive plans which may be implemented on or after the Effective Date subject to approval by the Parent's Board of Directors.

132. **"March 2003 Bar Date"** shall mean March 31, 2003, the last day for Filing a proof of Claim relating to pre-petition (i) Asbestos PD Claims (excluding ZAI Claims), (ii) non-Asbestos Claims (including all governmental claims, and all derivative asbestos claims and asbestos-related claims for contribution, indemnity, reimbursement or subrogation), and (iii) Asbestos Medical Monitoring Claims.

133. **"March 2003 Bar Date Order"** shall mean the Court's order, dated April 22, 2002, which established the March 2003 Bar Date.

134. **"Master Ballot"** shall mean a Ballot, which is cast by a representative, on behalf of a Holder or Holders of Equity Interests, pursuant to the terms and guidelines established in the Plan Documents.

135. **"Medical/Exposure Criteria"** shall mean the medical/exposure criteria for each Disease Level set forth in Section 5.2(a)(3) of the PI-SE TDP, or the medical/exposure criteria for a Qualified PI-AO Cash-Out Claim set forth in Section 5.2(a)(3) of the PI-AO TDP, as applicable.

136. **"Mesothelioma"** shall mean malignant mesothelioma diagnosed on the basis of the findings of a board certified pathologist.

137. **"Monokote-3"** or **"MK-3"** shall mean a fireproofing product used on steel structural components to prevent or delay the steel from collapsing in the event of a building fire.

138. **"Non-Debtor Affiliate"** shall mean each of the Entities designated as such in Exhibit 9 in the Exhibit Book

139. **"Non-Settling Asbestos Insurance Company"** shall mean any Asbestos Insurance Entity that is not a Resolved Asbestos Insurance Company or a Settled Asbestos Insurance Company.

15

140. **"Parent"** shall mean W. R. Grace & Co., a Delaware corporation, the first named Debtor in the caption of the Chapter 11 Cases and ultimate parent holding company of all of the other Debtors and Non-Debtor Affiliates.

141. **"Parent Common Stock"** shall mean the common stock, par value $0.01 per share, of the Parent or, if after the Effective Date, of the Reorganized Parent.

142. **"PD Account"** shall mean the account established by the Trustees under the Asbestos Trust Agreement into which the Asbestos PD Class Fund shall be placed and from which Allowed Asbestos PD Claims shall be paid as soon as practicable after the Effective Date, as further described in the Asbestos Trust Agreement and the PD TDP.

143. **"PD Trust Distribution Procedures"** or **"PD TDP"** shall mean the procedures, in the form attached as Exhibit 8 in the Exhibit Book, to be implemented by the Trustees pursuant to the terms and conditions of the Plan and the Asbestos Trust Agreement, to pay Allowed Asbestos PD Claims as set forth in such procedures.

144. **"Petition Date"** shall mean April 2, 2001, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

145. **"PI-AO Account"** shall mean the account established by the Trustees under the Asbestos Trust Agreement into which the Asbestos PI-AO Class Fund shall be placed and from which Allowed Asbestos PI-AO Claims shall be paid as soon as practicable after the Effective Date, as further described in the Asbestos Trust Agreement and the PI-AO TDP.

146. **"PI-AO Trust Distribution Procedures"** or **"PI-AO TDP"** shall mean the procedures, in the form attached as Exhibit 7 in the Exhibit Book, to be implemented by the Trustees pursuant to the terms and conditions of the Plan and the Asbestos Trust Agreement, to liquidate, determine, and pay Allowed Asbestos PI-AO Claims as set forth in such procedures.

147. **"PI-SE Account"** shall mean the account established by the Trustees under the Asbestos Trust Agreement into which the Asbestos PI-SE Class Fund shall be placed and from which Allowed Asbestos PI-SE Claims shall be paid as soon as practicable after the Effective Date, as further described in the Asbestos Trust Agreement and the PI-SE TDP.

148. **"PI-SE Trust Distribution Procedures"** or **"PI-SE TDP"** shall mean the procedures, in the form attached as Exhibit 6 in the Exhibit Book, to be implemented by the Trustees pursuant to the terms and conditions of the Plan and the Asbestos Trust Agreement, to liquidate, determine, and pay Allowed Asbestos PI-SE Claims as set forth in such procedures.

149. **"Plan"** shall mean Debtors' Plan of Reorganization under chapter 11 of the Bankruptcy Code dated as of November 13, 2004, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules to the foregoing, as the same may be in effect from time to time.

150. **"Plan Documents"** shall mean the Plan, the Plan Supplement, the Disclosure Statement, the Glossary, and all exhibits in the Exhibit Book, either in their present form or as each may be amended, supplemented, or otherwise modified from time to time.

151. **"Pre-petition Lawsuit"** shall mean any lawsuit that was filed against any of the Debtors before the Petition Date.

152. **"Previously Settled/Adjudicated Asbestos Claim"** shall mean any Claim based on a Final Order or a pre-petition settlement that is enforceable by a Debtor or Debtors and by the Claimant, if such Claim would constitute an Asbestos PD Claim or Asbestos PI Claim but for the Final Order or settlement.

16

153. **"Priority Claim"** shall mean any Claim (other than an Administrative Expense Claim or Priority Tax Claim) to the extent such Claim is entitled to priority in right of payment under Bankruptcy Code § 507.

154. **"Priority Tax Claim"** shall mean a Claim that is of a kind specified in Bankruptcy Code §§ 502(i) or 507(a)(8).

155. **"Professional"** shall mean an Entity (i) employed pursuant to a Final Order in accordance with Bankruptcy Code §§ 327, 328, 363, 524(g)(4)(B)(i) and/or 1103 and to be compensated for services rendered prior to the Confirmation Date, pursuant to Bankruptcy Code §§ 327, 328, 329, 330 and 331, or (ii) for which compensation and reimbursement have been allowed by the Bankruptcy Court pursuant to Bankruptcy Code § 503(b)(4).

156. **"Pulmonary Function Testing"** shall mean spirometry testing that is (i) in material compliance with the quality criteria established by the American Thoracic Society and (ii) performed on equipment which is in material compliance with the standards of the American Thoracic Society for technical quality and calibration.

157. **"QSF"** shall mean a qualified settlement fund as defined by Treasury Regulation Section 1.468B-1 et seq.

158. **"Qualified Asbestos PI-AO Cash-Out Claim"** shall mean an Asbestos PI-AO Cash-Out Claim that meets the Medical/Exposure Criteria set forth in Section 5.2(a)(3) of the PI-AO TDP.

159. **"Quarterly Tax Distribution Date"** shall mean the first Business Day of each calendar quarter following the Initial Distribution Date; provided that the first Quarterly Tax Distribution Date following the Initial Distribution Date shall be no less than ninety (90) days following such Initial Distribution Date.

160. **"Registry"** shall mean a list to be maintained by the Asbestos Trust for those Holders of Asbestos PI-AO Claims who choose the Registry Option.

161. **"Registry Option"** shall mean one of the three treatment options available to be chosen by the Holder of an Asbestos PI-AO Claim, as described in Section 3.2 of the Plan.

162. **"Released Matters Injunction"** shall mean the injunction described in Section 8.4 of the Plan.

163. **"Reorganized Debtor," "Reorganized Debtors"** or **"Reorganized Grace"** shall mean the Debtor(s) from and after the Effective Date.

164. **"Reorganized Parent"** shall mean the Parent from and after the Effective Date.

165. **"Representatives"** shall mean, with respect to any Entity, the past and present directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of that Entity, or any other representatives or professionals of that Entity or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents.

166. **"Resolved Asbestos Insurance Company"** shall mean each of the Asbestos Insurance Entities that has entered into an Asbestos Insurance Settlement Agreement with the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, or any of them or their predecessors pursuant to which such Asbestos Insurance Entity has fully performed all of its obligations that have arisen or that ever might arise under such Asbestos Insurance Settlement Agreement and which is listed on a list to be included in the Plan Supplement but only with respect to the portion of the Asbestos Insurance Policy (scheduled immediately therewith on a list to be included in the Plan Supplement) that is affected by any such Settlement Agreement.

17

167. **"Retained Causes of Action"** shall mean the actual and potential causes of action that the Reorganized Debtors shall retain, on and after the Effective Date, on behalf of the Debtors, to commence and pursue, as appropriate, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, whether such causes of action accrued before or after the Petition Date, including the actions listed on Exhibit 11 in the Exhibit Book.

168. **"Scheduled Value"** shall mean each Scheduled Value available under the PI-SE TDP and PI-AO TDP, respectively, to those Claimants who elect the Cash-Out Option and who are determined to meet the applicable Medical/Exposure Criteria under the procedures set forth in the PI-SE TDP or PI-AO TDP, respectively.

169. **"Schedules"** shall mean the schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors in Possession with the Bankruptcy Court, as required by Bankruptcy Code § 521 and the Bankruptcy Rules, as such schedules and statements may be amended by the Debtors in Possession from time to time in accordance with Bankruptcy Rule 1007.

170. **"Sealed Air"** shall mean Sealed Air Corporation and Cryovac, Inc.

171. **"Sealed Air Common Stock"** shall mean the voting common stock, par value $0.10 per share, of Sealed Air.

172. **"Sealed Air Indemnified Parties"** shall mean Sealed Air Corporation, Cryovac, Inc. and all of their parent corporations, subsidiary corporations, joint ventures, Affiliates, and sister corporations, and any and all of their past, present and future agents, servants, officers, directors, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries, insurers (but solely to the extent of coverage procured by Sealed Air Corporation (after March 31, 1998) or Cryovac, Inc. (after such date) of any liabilities of Sealed Air for Asbestos Claims), or any of them, including any Entity acting on behalf of or at the direction of any them, but specifically excluding (i) the Debtors, (ii) all Non-Debtor Affiliates, (iii) Fresenius (to the extent of any and all claims, damages or debts arising out of the Fresenius Transaction as defined in the Sealed Air Settlement Agreement), and (iv) any and all insurers of the Debtors or the Non-Debtor Affiliates to the extent that they have provided coverage for Asbestos Claims now or hereafter asserted or which could have been asserted at any time against the Debtors or the Non-Debtor Affiliates.

173. **"Sealed Air Payment"** shall mean the payment delivered, on or as soon as practicable following the Effective Date, for and on behalf of Sealed Air to the Asbestos Trust pursuant to the terms of the Sealed Air Settlement Agreement. The Sealed Air Payment shall consist of: (i) five hundred twelve million five hundred thousand dollars ($512,500,000) in Cash, plus interest thereon from December 21, 2002 until the Effective Date, at a rate of 5.5% per annum compounded annually and (ii) nine million (9,000,000) shares of Sealed Air Common Stock (subject to adjustment as provided in the Sealed Air Settlement Agreement).

174. **"Sealed Air Settlement Agreement"** shall mean that certain agreement, in the form attached as Exhibit 12 in the Exhibit Book, dated November 10, 2003 and Filed with the Bankruptcy Court on November 26, 2003, as amended to address the Debtors' objections thereto, or otherwise.

175. **"SEC"** shall mean the United States Securities and Exchange Commission.

176. **"Second Hand Claim"** has the meaning specified in Section 5.3(a) of the PI-SE TDP or PI-AO TDP, as applicable.

177. **"Secured Claim"** shall mean a Claim that is: (i) secured by a lien (as such term is defined in Bankruptcy Code § 101(37)) on property in which the Debtors have an interest, which lien is valid, perfected, and enforceable under applicable law or by reason of a Final Order, or (ii) entitled to setoff under Bankruptcy Code § 553, to the extent of (A) the value of the Claimant's interest in the Debtor's interest in such

18

property or (B) the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code § 506(a).

178.    **"Securities Act"** shall mean the Securities Act of 1933, as amended.

179.    **"Settled Asbestos Insurance Company"** shall mean any Asbestos Insurance Entity (other than a Resolved Asbestos Insurance Company) that has entered into an Asbestos Insurance Settlement Agreement with the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, or any of them or their predecessors, as of the Effective Date, pursuant to which such Asbestos Insurance Entity must still perform its obligations under such Asbestos Insurance Settlement Agreement and which is listed on a list to be included in the Plan Supplement, but only with respect to any Asbestos Insurance Policy scheduled immediately therewith.

180.    **"Settlors"** shall have the meaning ascribed to it on page 1 of the Asbestos Trust Agreement.

181.    **"Significant Occupational Exposure"** shall have the meaning set forth in Section 5.4(b)(2) of the PI-SE TDP.

182.    **"TAC"** shall mean the Trust Advisory Committee.

183.    **"TDPs"** shall mean the Trust Distribution Procedures.

184.    **"Termination Date"** shall have the meaning ascribed to it in Section 8.2 of the Asbestos Trust Agreement.

185.    **"Third Party Indemnification/Contribution Claim"** shall mean an Asbestos Claim that is asserted against one or more Debtors and/or the Asbestos Trust based upon theories of contribution or indemnification under applicable law. A Third Party Indemnification/Contribution Claim shall be an Asbestos PI-SE Claim if and to the extent that it arises from the payment or other satisfaction of a Claim that would have been an Asbestos PI-SE Claim if it had not been paid or otherwise satisfied. A Third Party Indemnification/Contribution Claim shall be an Asbestos PI-AO Claim if and to the extent that it arises from the payment or other satisfaction of a Claim that would have been an Asbestos PI-AO Claim if it had not been paid or otherwise satisfied. A Third Party Indemnification/Contribution Claim shall be an Asbestos PD Claim if and to the extent that it arises from the payment or other satisfaction of a Claim that would have been an Asbestos PD Claim if it had not been paid or otherwise satisfied.

186.    **"TLC"** shall mean total lung capacity, which is the total volume of air in the lung after maximal inspiration.

187.    **"Trust Advisory Committee"** or **"TAC"** shall mean the Trust Advisory Committee established pursuant to the terms of the Plan and having the powers, duties and obligations set forth in the Asbestos Trust Agreement.

188.    **"Trust By-Laws"** shall mean the by-laws of the Asbestos Trust, as authorized under Section 3.1(c)(viii) of the Asbestos Trust Agreement.

189.    **"Trust Distribution Procedures"** or **"TDPs"** shall mean, collectively, the PI-SE TDP, the PI-AO TDP, and the PD TDP.

190.    **"Trustee"** shall mean any individual confirmed by the Court to serve as a trustee of the Asbestos Trust, pursuant to the terms of the Plan, the Confirmation Order and the Asbestos Trust Agreement, or who subsequently may be appointed pursuant to the terms of the Asbestos Trust Agreement.

191.    **"Unknown Causes of Action"** shall mean any Retained Causes of Action of which the Debtors are unaware at the time Exhibit 11 in the Exhibit Book is filed, and are therefore not listed on that Exhibit.

19

192.    "**Unliquidated Claim**" shall mean:  (i) any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is sought to be fixed, or (ii) any Claim for which no Allowed Amount has been determined.

193.    "**Unsecured Creditors' Committee**" shall mean the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to Bankruptcy Code § 1102.

194.    "**Unsecured Pass-Through Employee Related Claims**" shall mean all Claims (including accrued but unpaid pension Claims from the Petition Date) for compensation and benefits related to the Debtors' employment of their current and former employees.  Workers' Compensation Claims are not included within the Class of Unsecured Pass-Through Employee Related Claims.

195.    "**Voting Agent**" shall mean Bankruptcy Management Corporation, the party to whom all Ballots and/or Master Ballots should be submitted.

196.    "**Voting Deadline**" shall mean, 4:00 P.M. Eastern Time on April 1, 2005, which is the deadline by which anyone seeking to cast a Ballot or Master Ballot must submit such Ballot and/or Master Ballot, so that it is received by the Voting Agent.

197.    "**Voting Record Date**" shall mean two (2) Business Days after the entry of the Disclosure Statement Order.

198.    "**Warrants**" shall mean the redeemable restricted warrants to purchase Parent Common Stock at an exercise price of $0.01 per share, issued to the Asbestos Trust for the benefit of the Holders of Asbestos PI-AO Claims and exercisable in accordance with the Plan Documents, pursuant to a warrant agreement substantially in the form of Exhibit 15 in the Exhibit Book.

199.    "**Workers' Compensation Claims**" shall mean any Claim:  (i) for benefits under a state-mandated workers' compensation system, which a past, present, or future employee of the Debtors or their predecessors is receiving, or may in the future have a right to receive and/or (ii) for reimbursement brought by any insurance company or state agency as a result of payments made to or for the benefit of such employees under such a system and fees and expenses incurred under any insurance policies or laws or regulations covering such employee claims.

200.    "**WRG Asbestos Trust**" shall mean the Asbestos Trust.

201.    "**WRG Asbestos Trust Agreement**" shall mean the Asbestos Trust Agreement.

202.    "**ZAI**" shall mean Zonolite Attic Insulation, which is a loose-fill, non-roll vermiculite product primarily used in home attic insulation, that may contain naturally occurring asbestos.

203.    "**ZAI Claims**" shall mean:  (i) a Claim, Demand, or remedy, including all related claims, debts, obligations, or liabilities for compensatory (including general, special, and consequential damages) and punitive damages, (ii) a cross-claim, contribution claim, subrogation claim, reimbursement claim or indemnity claim, or (iii) any debt, liability, or obligation of one or more of the Debtors or any other Asbestos Protected Party (whether or not such Claim, Demand, remedy, debt, liability, or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; whether or not the facts of or legal bases therefor are known or unknown; and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty), for, relating to, or arising out of, resulting from, or attributable to, directly or indirectly property damage, including the cost of removal, abatement, or diminution in the value thereof, or environmental damage or economic loss caused or allegedly caused, by the ZAI sold, manufactured, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors (or any of their respective past or present Affiliates, or any of the predecessors of any of the Debtors or any

20

of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable). ZAI Claims are included within the Class of Asbestos PD Claims.

Other Terms/Interpretation

    (a)    Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the other genders.

    (b)    When used in a Plan Document, the term "Claim" shall be broadly construed to include all manner and type of Claim, whenever and wherever such Claim may arise, and shall include Asbestos PI-SE Claims, Asbestos PI-AO Claims, and Asbestos PD Claims.

    (c)    Any reference in a Plan Document to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions shall mean that such document shall be substantially in such form or substantially on such terms and conditions.

    (d)    Any reference in a Plan Document to an existing document or exhibit in the Exhibit Book Filed or to be Filed shall mean the document or exhibit as it may have been or may be amended, modified or supplemented.

    (e)    Any reference to an Entity as a Holder of a Claim shall include that Entity's successors, assigns and affiliates.

    (f)    The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to a Plan Document as a whole and not to any particular section, subsection, or clause contained in a Plan Document.

    (g)    The word "including" (and, with correlative meaning, the forms of the word "include") shall mean including, without limiting the generality of any description preceding that word; and the words "shall" and "will" are used interchangeably and have the same meaning.

    (h)    Unless otherwise indicated herein, all references to dollars are to United States dollars.

    (i)    An initially capitalized term used herein that is not defined herein shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require.

    (j)    The descriptive headings contained in Plan Documents are included for convenience of reference only and are not intended to be a part of and shall not affect in any way the meaning or interpretation of Plan Documents.

    (k)    All references in Plan Documents to sections, articles, and exhibits are references to sections, articles and exhibits of or to Plan Documents unless otherwise specified.

    (l)    Unless otherwise expressly provided herein, in computing any period of time prescribed or allowed by a Plan Document, the provisions of Bankruptcy Rule 9006(a) shall apply.

    (m)    The rules of construction set forth in Bankruptcy Code § 102 shall apply.

21

# Exhibit Tab 3

Best Interests Analysis

EXHIBIT 3 TO EXHIBIT BOOK

## BEST INTERESTS ANALYSIS

The following document is the Best Interests Analysis (the "Analysis") of the Debtors. This Analysis assumes the Debtors' estates are substantively consolidated solely for the purposes of actions associated with the confirmation and consummation of the Plan, including, but not limited to, voting, confirmation and Distribution.

The purpose of the Analysis is to provide information in order that the Bankruptcy Court may determine that the Plan is in the best interests of all Classes of Claimants and Equity Interest Holders impaired by the Plan.    The Analysis was prepared to assist the Bankruptcy Court in making this determination and it should not be used for any other purpose.

The Analysis assumes that the hypothetical Chapter 7 liquidation is effected via the orderly sale of the businesses of the Debtors and Non-Debtor Affiliates as going concerns.  Because the Asbestos Channeling Injunction would not be available in a Chapter 7 liquidation, the value realized from the orderly sale of the businesses in all likelihood would be reduced as a result of a buyer's concern regarding the risk of asbestos liability in the acquisition of the assets.  Further, the lack of the Asbestos Channeling Injunction may preclude an orderly sale of the businesses as going concerns, in which case an actual liquidation of assets would be required.  In that case, values realized would be further reduced.

Conversion of the Chapter 11 Cases to Chapter 7 would likely result in additional costs to the estates.  Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee and other professionals retained by the trustee, including attorneys, financial advisors and consultants; asset disposition expenses; litigation costs related to possible fraudulent transfer actions and the resolution of asbestos and other Claims; all unpaid expenses incurred by the Debtors in the Chapter 11 Cases that are allowed in the Chapter 7 case; and Claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

The Analysis presents estimated net proceeds if the Debtors and the Non-Debtor Affiliates were liquidated under the provisions of Chapter 7 of the Bankruptcy Code and the allocation of such proceeds applied in strict priority to satisfy Claims against the Debtors.

The Analysis is limited to presenting information that is the representation of management in good faith based on assumptions believed to be reasonable.  The Analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants. The estimates and assumptions, although considered reasonable by management, are inherently subject to significant uncertainties and contingencies beyond the control of management.  Accordingly, there can be no assurance that results shown could be realized if a liquidation occurred and actual results in such case could vary materially from those presented.

All defined terms are as defined in the Glossary unless otherwise noted.    The accompanying notes are an integral part of the Analysis.

**COMPARISON OF CHAPTER 7 LIQUIDATION TO CHAPTER 11 REORGANIZATION**
(unaudited, $ in millions)

| | Note | Chapter 7 Liquidation | | Chapter 11 Reorganization | |
| --- | --- | --- | --- | --- | --- |
| | | Low | High | Low | High |
| **Calculation of estimated net proceeds available for allocation:** | A | | | | |
| Estimated value of Reorganized Debtors and Non-Debtor Affiliates | | $ 2,200 | $ 2,600 | $ 2,200 | $ 2,600 |
| Less: discount factor | | (1,100) | (1,300) | - | - |
| Less: taxes due in foreign jurisdictions | | (68) | (63) | - | - |
| Estimated proceeds from sale of businesses | | $ 1,032 | $ 1,237 | $ 2,200 | $ 2,600 |
| Plus other assets: | B | | | | |
| Cash | | 457 | 457 | 448 | 458 |
| Fresenius Payment | | - | - | 115 | 115 |
| Sealed Air Payment | | - | 827 | 985 | 985 |
| Insurance recovery | | 472 | 500 | 500 | 500 |
| Present value of projected use of tax assets | | - | - | 50 | 70 |
| Estimated net proceeds available for allocation | | $ 1,961 | $ 3,021 | $ 4,298 | $ 4,728 |
| **Allocation of estimated net proceeds to Secured, Administrative and Priority Claims:** | | | | | |
| Costs associated with Chapter 7 liquidation | C | (53) | (37) | - | - |
| Environmental Claims | | (15) | (15) | (15) | (15) |
| Tax Claims | | (84) | (84) | (232) | (232) |
| Other Claims | | (68) | (68) | (59) | (59) |
| Estimated net proceeds available for allocation to General Unsecured Claims and Equity Interests | | $ 1,742 | $ 2,818 | $ 3,992 | $ 4,422 |
| **Allocation of estimated net proceeds to General Unsecured Claims:** | | | | | |
| Bank debt, capital leases, drawn letters of credit | | (517) | (517) | (610) | (610) |
| Unsecured Pass-Through Employee Related Claims | | (191) | (191) | (191) | (191) |
| Environmental Claims | | (323) | (323) | (330) | (330) |
| Litigation Claims | | (10) | (10) | (10) | (10) |
| Trade Claims | | (32) | (32) | (35) | (35) |
| Other Claims | | (150) | (150) | (150) | (150) |
| Fresenius indemnity Claim | | (148) | (148) | - | - |
| PBGC Claim, net | D | (146) | (99) | - | - |
| Assumed asbestos liabilities | E | (1,689) | (1,689) | (1,689) | (1,689) |
| **Excess / (Shortfall)** | | $ (1,464) | $ (342) | $ 977 | $ 1,407 |
| Recovery to Holders of General Unsecured Claims | | 54% | 89% | 100%+ | 100%+ |
| Value to Holders of Equity Interests | | $ - | - | $ 977 | $ 1,407 |

### Footnotes to Best Interests Analysis

A summary of the assumptions used by Blackstone and management of the Debtors and Non-Debtor Affiliates in preparing the Analysis is set forth below.

#### Note A. *Proceeds from orderly sale of businesses*

In a Chapter 7 liquidation, it is assumed the businesses of the Debtors and Non-Debtor Affiliates would be sold as going concerns for cash to more than one buyer in a series of transactions to generate maximum value. The proceeds from these sale transactions are assumed to be equal to the Core Business Value of the Reorganized Debtors and Non-Debtor Affiliates ($2.2 billion to $2.6 billion with a midpoint of $2.4 billion, as further described in Section 2.8 of the Disclosure Statement), less a discount factor. Unlike a Chapter 11 reorganization, Chapter 7 does not provide for the issuance of the Asbestos Channeling Injunction. Notwithstanding a presumed ability to sell assets in a sale under Bankruptcy Code §363 or the availability of an injunction under Bankruptcy Code §105, the discount factor quantifies the probability that the businesses could not be sold for fair value or at all because of the perceived risk that asbestos liability would follow the assets sold.

U.S. taxes due on the gain from the orderly sale of the Debtors' and Non-Debtor Affiliates' businesses are assumed to be offset by existing tax attributes and deductions generated by payments made to Claimants in the Chapter 7 case with the exception of approximately $5 million of state taxes. It is assumed that for tax purposes, the sale of businesses in foreign countries will be structured as stock sales to take advantage of the predominant tax treaty exemptions for the payment of taxes on the gain generated by such sales. Taxes due in foreign jurisdictions represent foreign transfer taxes, withholding taxes, and estimated local taxes attributable to separating the businesses in each foreign subsidiary and taxes due on the gain from the sale of stock in those jurisdictions that do not have a tax treaty exemption.

#### Note B. *Other Assets*

Other assets include: cash assets, payments from third-party fraudulent transfer actions, asbestos insurance assets and tax assets.

Cash assets include Grace's Cash. In addition, in the Chapter 7 liquidation, Cash also includes the cash value of corporate-owned life insurance policies, which are assumed terminated in a liquidation. In the Chapter 11 reorganization, in which residual equity value is projected, Cash includes proceeds from the assumed exercise of in-the-money management and employee stock options. This amount is calculated based on the projected number of shares and fully diluted reorganization equity value per share.

Payments from third-party fraudulent transfer actions reflects the following: Grace was named in a class action suit filed in California state court alleging that Grace's 1996 reorganization transaction with Fresenius and its 1998 reorganization with Sealed Air involved fraudulent transfers and demanding repayment of such transfers. Prior to the filing of the Chapter 11 Cases, two other similar class actions were filed. In November 2002, Fresenius and Sealed Air announced that they had reached an agreement in principle to settle Asbestos Claims and fraudulent transfer Claims related to the respective transactions. Pursuant to the Fresenius Settlement Agreement and the Sealed

Air Settlement Agreement, respectively, and the provisions of the Plan, Fresenius shall make the Fresenius Payment and Sealed Air shall make the Sealed Air Payment. These agreements specifically require the existence of the Asbestos Channeling Injunction. Because the Asbestos Channeling Injunction is not available in a Chapter 7 liquidation, the Analysis assumes these settlement payments would not be made. It is assumed, however, that a Chapter 7 trustee would pursue similar fraudulent transfer actions. Because the outcome of this litigation cannot be known, a range is shown from zero, at the low end, to a level of Sealed Air proceeds equal to the Sealed Air Payment on a present value basis assuming a discount rate of 6% and a three year time period to collect, at the high end. It is assumed in a Chapter 7 liquidation scenario that Fresenius and/or Sealed Air would pay certain priority taxes directly to the IRS and file a General Unsecured Claim against the Debtors for indemnity under tax sharing agreements entered into at the time of the 1996 reorganization.

Asbestos insurance assets are calculated based on the assumed asbestos liability (see Note E). In a Chapter 7 liquidation, the low case reflects the risk that recovering this asset is delayed for one year, assuming a 6% discount rate.

Certain tax assets are projected to be utilized over time in the Chapter 11 reorganization by projected income. In a Chapter 7 liquidation, any excess tax attributes, after offsetting gains resulting from the liquidation, including gains on asset sales and cash repatriation, would expire unused.

### Note C. *Costs associated with a Chapter 7 liquidation*

Costs associated with a Chapter 7 liquidation are assumed to include fees and costs for professionals retained by the Chapter 7 trustee, including legal, financial and claims processing advisors, estimated at $500,000 per month for eighteen months, for, among other things, pursuing the fraudulent transfer actions described in Note B and resolving Asbestos Claims. In addition, it is assumed the Chapter 7 trustee would receive payments equal to 1.5% of the estimated net proceeds available for allocation. Additional brokerage fees would be necessary for the orderly sale of Grace's businesses and other costs. Brokerage fees are calculated conservatively at 0.50% of gross proceeds, for a range of $6 million to $7 million.

### Note D. *PBGC*

As of September 30, 2004, the Debtors and Non-Debtor Affiliates had fourteen funded, defined benefit pension plans, each of which is qualified under Section 401(a) of the IRC. In total, these plans were under funded by approximately $202 million. In the event a buyer chose not to assume the obligations of the underfunded defined pension liability, it is assumed that the PBGC would assume that liability. The amount represents the net difference between the assumed increase in a buyer's determination of value from saving future pension costs and the resulting estimated PBGC Claim, which is assumed to be asserted on the basis of termination of the plans.

### Note E. *Assumed asbestos liabilities*

For purposes of this analysis, asbestos liabilities are assumed to equal the sum of (x) the maximum aggregate amounts that would satisfy the conditions precedent in Section