7.6.1(v) and Section 7.6.1(w) of the Plan; plus (y) an estimate of Previously Settled/Adjudicated Asbestos Claims.

# Exhibit Tab 4

## W.R. Grace & Co. and Subsidiaries

## Historical, Pro Forma and Prospective

## Financial Information

## W. R. GRACE & CO. AND SUBSIDIARIES
### PROFORMA AND PROSPECTIVE FINANCIAL INFORMATION

The following proforma and prospective financial information (the **"Financial Information"**) was prepared for the sole purpose of evaluating the feasibility of the proposed Plan of Reorganization (as such plan may be amended or modified, the **"Plan"**) of W. R. Grace & Co. and Subsidiaries (**"Grace"**) under Chapter 11 of the United States Bankruptcy Code (the **"Bankruptcy Code"**). The Financial Information reflects Grace's estimate of its expected consolidated financial position, results of operations, and cash flows as if the Plan were adopted as proposed. The Financial Information was prepared on the basis of the global operations of Grace, which include certain domestic and international subsidiaries and affiliates that are not debtors under the Bankruptcy Code.

**WHILE GRACE BELIEVES THE ASSUMPTIONS UNDERLYING THE PROFORMA AND PROSPECTIVE FINANCIAL INFORMATION, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE IS GIVEN THAT ANY OF THE FINANCIAL RESULTS WILL BE REALIZED. THIS FINANCIAL INFORMATION SHOULD NOT BE REGARDED AS A GUARANTEE OR WARRANTY BY GRACE, OR ANY OTHER PERSON, AS TO THE ACHIEVABILITY OF THE PROFORMA OR PROSPECTIVE FINANCIAL POSITION, RESULTS OF OPERATIONS, EARNINGS PER SHARE OR CASH FLOWS. GRACE ASSUMES NO OBLIGATION OR UNDERTAKING TO UPDATE THE FINANCIAL INFORMATION, AND NO COMMENT WILL BE MADE ABOUT THE FINANCIAL INFORMATION EXCEPT AS REQUIRED BY THE BANKRUPTCY COURT.**

All estimates and assumptions underlying the Financial Information were developed by Grace. The assumptions disclosed herein are those that Grace believes are significant to the understanding and evaluation of the Financial Information. Although Grace believes the assumptions used are reasonable under the circumstances, such assumptions are subject to significant uncertainties such as: the loss of senior management and other key employees; changes in demand for Grace's products; changes in foreign currency exchange rates or interest rates; inflation that differs from that projected; changes in the business, competitive or political environment; technological breakthroughs, product innovations or competitive pricing strategies that negatively affect the profitability of a product or line of business; availability and cost of raw materials, energy and labor; and other factors affecting Grace's operations. Despite Grace's efforts to foresee and plan for the effects of changes in these circumstances, Grace cannot predict their impact with certainty. Consequently, actual financial results will likely vary from that shown in the Financial Information, and the variations could be material.

The Financial Information was prepared by Grace in conformity with guidelines promulgated by the United States Securities and Exchange Commission (**"SEC"**) and the American Institute of Certified Public Accountants (**"AICPA"**). The Financial Information has not been audited or reviewed by registered independent accountants.

## I.    FINANCIAL INFORMATION PRESENTED

The Financial Information included herein is as follows:

➢    Proforma condensed consolidated balance sheet of Grace as of September 30, 2004, reflecting the accounting effects of the Plan as if it were effective on that date, under guidance promulgated by the SEC.

➢    Proforma consolidated statements of operations and analysis of continuing operations of Grace for the year ended December 31, 2003 and for the nine months ended September 30, 2004, reflecting the accounting effects of the Plan as if it were in effect at the start of each period presented, under guidance promulgated by the SEC.

➢    Projected condensed consolidated balance sheets of Grace as of December 31, 2004, 2005 and 2006, as if the Plan were effective at December 31, 2004, under guidance promulgated by the AICPA, together with historical information as of December 31, 2001, 2002 and 2003.

➢    Projected consolidated statements of operations and analysis of continuing operations of Grace for the years ending December 31, 2004, 2005 and 2006, as if the Plan were effective on December 31, 2004, under guidance promulgated by the AICPA, together with historical information for the years ended December 31, 2001, 2002 and 2003.

➢    Projected condensed consolidated statements of cash flows of Grace for the years ending December 31, 2004, 2005 and 2006, as if the Plan were effective on December 31, 2004, under guidance promulgated by the AICPA, together with historical information for the years ended December 31, 2001, 2002 and 2003.

The Plan will be accounted for in accordance with the AICPA Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code" ("SOP 90-7"). The Financial Information has been prepared in conformity with United States Generally Accepted Accounting Principles consistent with those currently utilized by Grace in the preparation of its consolidated financial statements, except as otherwise noted. The Financial Information should be read in conjunction with the significant assumptions, qualifications and notes set forth herein and with the audited consolidated financial statements for the year ended December 31, 2003 contained in Grace's 2003 Form 10-K/A, and with Grace's third quarter 2004 Form 10-Q filed with the SEC in November, 2004. Historical financial information included herein was derived from such SEC documents. The Forms 10-K/A and 10-Q are available from Grace's website at www.grace.com or from the SEC at www.sec.gov.

3

II.   **SUMMARY OF PRINCIPAL UNDERLYING ASSUMPTIONS**

A.   *PROPOSED PLAN OF REORGANIZATION – GENERAL TERMS*

The proposed Plan is considered a "hypothetical assumption" (as defined under AICPA guidance for prospective financial presentations) until such Plan is confirmed by the Bankruptcy Court. The Plan may change significantly as proceedings under Grace's Chapter 11 case further define and measure the claims and liabilities that will be allowed and payable under a confirmed plan. This Financial Information assumes that:

➢   Grace will satisfy all unresolved asbestos-related claims as outlined in the Plan through the contribution of Grace common stock and warrants, and assets available under certain third-party agreements, to an asbestos trust established under Bankruptcy Code Section 524(g). The value of such contribution will total approximately $1,613 million, including the estimated cost of trust administration, (such amount being equal to the maximum aggregate asbestos-related liability that would satisfy the conditions precedent set forth in Sections 7.6.1(v) and (w) of the Plan). Asbestos claims subject to prepetition judgments or agreements (approximately $76 million) will be resolved as part of general unsecured claims.

➢   Grace will distribute approximately $1,000 million in cash and $131 million in Grace common stock to satisfy all non-asbestos claims payable at the effective date as follows:
   ▪   Bank debt including accrued interest - $607 million
   ▪   Environmental remediation - $238 million
   ▪   Special pension programs - $8 million
   ▪   Trade accounts payable and litigation - $78 million
   ▪   Tax claims - $152 million
   ▪   Fees and other - $48 million

➢   Grace will satisfy all other non-asbestos liabilities (estimated to be approximately $508 million as of September 30, 2004), as they become due and payable over time (**"Reinstated Liabilities"**).

➢   Grace will finance the payments noted above (which total $3,329 million) with cash on hand (approximately $150 million); newly issued Grace common stock (approximately $640 million in value); value available from Sealed Air Corporation (approximately $985 million in cash and securities) and Fresenius Medical Care (approximately $115 million in cash) under litigation settlement agreements; initial borrowings under a new debt facility (approximately $800 million); future operating cash flows (approximately $508 million); and warrants (initially approximating $130 million in value), if required, to fund costs of the asbestos trust

4

related to asymtomatic personal injury claims if and when they materialize.

The Grace equity allocated to creditor claims under the Plan approximates $770 million in value. Additional equity of approximately $354 million (based upon the mid-point of the fully-diluted reorganized equity value range) is available to the asbestos trust through the exercise of warrants, if necessary, to satisfy trust costs related to personal injury asymptomatic and other claimants beyond Grace's effective date estimate. Should the cost of the personal injury asymptomatic and other claimants exceed the total value of the warrants, Grace would be obligated to fund the additional costs with cash.

### B.    PROJECTIONS OF OPERATING RESULTS – GENERAL ASSUMPTIONS

➢ Methodology – The projections of operating performance were prepared using a strategic planning methodology by each of Grace's reportable business segments, Davison Chemicals and Performance Chemicals, which were then consolidated. Executive management of Grace reviewed the segment and consolidated results for achievability based on recent historical performance, expected economic conditions, investment plans and other relevant factors, and adjusted the strategic plans accordingly to reflect the results of operations and cash flows that are reasonably expected to be achieved over the projection period.

➢ Business Environment - The operating projections assume the continuation of a stable economic and political environment with variability in global economic activity over the projection period as experienced in a typical business cycle.

➢ Sales – Consolidated sales are projected to increase approximately 6% annually over the projection period (after taking into account added sales from acquisitions completed in 2004), consistent with Grace's experience over the most recent five-year business cycle. The projections assume that revenue growth will come from the success of Grace's operating strategies and include increasing business with existing customers, developing new customers, penetrating new markets, commercializing new products and acquiring related businesses.

➢ Gross Product Margins – Gross margin on product sales (defined as sales less cost of goods sold and depreciation) is assumed to remain relatively constant as a percentage of sales over the projection period and consistent with Grace's past performance. Selling price increases through improved product offerings and the success of productivity initiatives are assumed to offset inflation on direct production costs.

➢ Expenses – Operating expenses which include selling, general administrative and research and development costs are assumed to increase over the projection period based on factors of general inflation,

5

business strategy and specific considerations for personnel-related costs such as compensation, health care, retirement benefits and insurance.

## III.    PROPOSED PLAN OF REORGANIZATION

The proforma financial information of Grace presented herein reflects the accounting effects of the proposed Plan (1) as if it were put in effect on the date of Grace's most recent publicly reported consolidated balance sheet for September 30, 2004, and (2) as if it were in effect for the historical reporting periods for the year ended December 31, 2003 and for the nine-months ended September 30, 2004. Such proforma financial statements show how Grace's assets, liabilities, equity and income would be affected by the Plan as follows:

### A.    ADDITIONAL PRE-PETITION EXPENSE AND INSURANCE

Reflects the accrual of added asbestos and other costs necessary to adjust Grace's balance sheet to assumed allowed claim amounts, including accrued interest, as described in the Plan. Certain amounts are recorded at net payable value, which assumes funding will occur at or near the effective date. Reinstated Liabilities are recorded at estimated amounts payable over time, and on a net present value basis where appropriate. Insurance assets are recorded at the net present value of recoverable amounts from the assumed level of future payments to asbestos claimants. Tax accounts are adjusted accordingly for both added deductible liabilities and insurance income.

### B.    BORROWINGS UNDER NEW DEBT AGREEMENTS

Reflects the assumed establishment of a new $1,000 million debt facility to fund settled claims payable at the effective date (approximately $800 million) and to provide working capital (approximately $200 million) for continuing operations. Future periods reflect an assumed 7% interest rate on outstanding borrowings. No such facility currently exists but, in Grace's view based on discussions with prospective lenders, one can be established before the effective date of the Plan.

### C.    FRESENIUS AND SEALED AIR SETTLEMENTS

Reflects the value, in the form of cash and securities, expected to be realized under each litigation settlement agreement as follows: $115 million of cash from Fresenius Medical Care; and, $985 million of estimated value from Sealed Air Corporation (calculated as of September 30, 2004) in the form of $512 million of cash plus accrued interest at 5.5% from December 21, 2002, and 9 million shares of Sealed Air common stock valued at $47 per share. Tax accounts have been adjusted to reflect the satisfaction of Grace's recorded liabilities by way of these third-party agreements. The Fresenius settlement amount will be payable to Grace and will be accounted for as income. The Sealed Air settlement assets will be paid directly to the asbestos trust by Sealed Air and will be accounted for as satisfaction of a recorded liability.

6

### D.    PAYMENT OF REMAINING PRE-PETITION LIABILITIES

Reflects the accounting for the transfer of funds and securities to settle obligations payable under the Plan at the effective date. Tax accounts are adjusted to reflect the change in nature of Grace's tax assets from predominately temporary differences to predominately time-limited tax net operating losses. Non-asbestos Reinstated Liabilities of approximately $508 million are assumed to be paid in cash when due.

### E.    PROFORMA CONSOLIDATED STATEMENT OF OPERATIONS

Reflects the elimination from Grace's historical financial statements of: (1) charges and expenses directly related to Chapter 11, (2) the $50.0 million net gain from property litigation recorded in the third quarter of 2004, and (3) the addition of interest and new common shares related to the assumed financing of the Plan.

## IV.    PROJECTIONS OF OPERATING RESULTS

The operating projections consider the performance of each reportable business segment (Davison Chemicals and Performance Chemicals) over the past five years and executive management's view of the total revenue and earnings the underlying businesses can achieve over the projection period, given expectations about general economic and specific industry conditions.  The segment level projections were prepared on a basis of global business operations, which include certain domestic entities and international subsidiaries and affiliates of Grace that are not debtors under Chapter 11 of the Bankruptcy Code.

### A.    GENERAL ECONOMIC FACTORS

The Financial Information has been developed assuming that global economic and political conditions will be stable and that the overall sales growth and cost productivity achieved by Grace over the past five years will continue over the projection period. Grace's product portfolio is diversified across several end-use industries and geographic markets. This diversification provides a buffer against adverse changes in any one industry or region and, absent a period of extended recession globally, provides a reasonable basis for projecting sales growth consistent with past experience.

### B.    INDUSTRY FACTORS

In addition to general economic conditions globally, Grace's sales are affected by the demand for products used in the construction industry (primarily non-residential construction), the petroleum refining industry, the food packaging industry (particularly rigid containers), the plastics industry and, to a lesser degree, the automotive, personal care, coatings, pharmaceuticals and biotechnology industries. The average growth rates experienced by these industries over the past five-year business cycle forms the base for Grace's assumed product line growth rates over the projection period.

### C.    INVESTMENT ASSUMPTIONS

The rate of growth of Grace's sales over the past five years has been influenced by a relatively steady and consistent level of sales from the acquisition of businesses and new products that complement existing product offerings or expand geographic presence. These acquisitions and new products have generally been synergistic by way of leveraging infrastructure, better utilizing sales channels, and accessing new markets with current products.   The Financial Information assumes a continuation of this growth strategy through targeted acquisitions, self-constructed added capacity and new product commercialization similar to that which Grace has pursued in the past several years.

### D.    COST INFLATION AND PRODUCTIVITY

Inflation is projected to average approximately 2% to 3% globally over the projection period based on economic indicators from independent sources. The general increase in costs caused by inflation is assumed to be offset by a combination of sales from new product offerings and productivity improvements from Six Sigma and other cost reduction and efficiency programs, resulting in gross product margins that are consistent over the projection period with those achieved on average by Grace over the past five years.  Selling and research and development expenses are projected to increase at rates generally above that of average inflation, reflecting investments in programs that are designed to achieve projected sales growth.  General and administrative expenses are also expected to increase at an above-average inflation rate reflecting historical trends in these expenses, which includes items like insurance, pensions and professional services.

### E.    FOREIGN CURRENCY EXCHANGE RATES

Foreign currency exchange rates are assumed to remain consistent with those in effect at September 30, 2004.

### F.    DEPRECIATION AND AMORTIZATION

Depreciation is projected in two components.   Current base depreciation is reduced by about 2% annually through the projection period.  Depreciation on new capital investments, including a portion from investments in acquired businesses, is projected using an average 10-year depreciable life. Amortization of identifiable intangible assets acquired in business combinations is also assumed to be over an average 10-year economic life.

### G.    INTEREST EXPENSE AND INTEREST INCOME

The Financial Information assumes an effective interest rate of 7% on both average debt outstanding over the projection period and on Reinstated Liabilities with actual or estimated fixed and determinable payment dates. Interest expense is offset by interest income on the outstanding cash balance at an investment earnings rate of 3%.

8

### H.    CHAPTER 11 EXPENSES AND CHARGES

Chapter 11 expenses are projected in 2004 only and reflect an estimate based on past experience and level of activity. This line item also includes the added accruals for asbestos-related claims, environmental claims and other costs necessary to adjust Grace's consolidated balance sheet to reflect liability estimates under the proposed definitions of allowed claims in the Plan. Certain of these costs, such as emergence fees and financing fees, are only payable and accountable when incurred. The liability estimates in the Plan are subject to challenge both in definition and in measurement. Accordingly, Grace will adjust its recorded liabilities for such matters when definitional and measurement uncertainties are resolved by the Bankruptcy Court.

### I.    INCOME TAXES

Income tax expense is calculated at an effective global rate of 35% based on Grace's assumed split of taxable income and interest on debt of approximately 50% in the United States and 50% in the rest of the world.

## V.    SIGNIFICANT ACCOUNTING MATTERS AND ASSUMPTIONS

### A.    ACCOUNTING POLICIES

Refer to Grace's Form 10K/A for the year ended December 31, 2003 incorporated herein by reference.

### B.    CASH AND CASH EQUIVALENTS

Grace will retain a minimum of approximately $250 million in cash for ongoing business liquidity. A revolving credit facility is assumed to fund, if necessary, working capital and other operating cash requirements that fluctuate with time. For these purposes, access to approximately $200 million in revolving line-of-credit borrowings is assumed to be established as of the effective date. No borrowings under the line of credit facility are assumed during the projection period.

### C.    WORKING CAPITAL

The projections reflect an annual increase in inventories, accounts receivables and accounts payable consistent with the increase in sales. The projections assume a slight lowering of the accounts receivable days sales outstanding with inventory days on hand and accounts payable days outstanding remaining relatively stable.

### D.    PROPERTIES AND EQUIPMENT, NET

Capital expenditures, including an allocation of assets acquired in business combinations, are assumed to equal annual depreciation over the projection period.

### E.    NET CASH VALUE OF COMPANY OWNED LIFE INSURANCE ("COLI")

The Financial Information assumes a $22 million conversion of net cash value to cash in the early part of 2005 reflecting a settlement with the Internal Revenue

9

Service that would initiate the termination of Grace's broad-based COLI policies. This termination of COLI policies will also result in a tax gain and the utilization of approximately $59 million of Grace's net operating loss carryforwards for federal income tax purposes. The remaining COLI policies are assumed to increase in cash value at approximately 9% annually, consistent with policy terms and past experience.

### F.    ASBESTOS-RELATED INSURANCE

Grace is entitled to a partial cash reimbursement under existing product liability insurance policies with respect to the cost of its asbestos-related lawsuits and claims. Insurance reimbursements are collectible as the liabilities are satisfied by the asbestos trust. The asbestos-related insurance asset represents the estimated nominal value of amounts expected to be received from solvent carriers under relevant insurance policies, based on the assumed funding levels required for the asbestos trust. The amount also approximates the net present value of future insurance recoveries based on an assumed actuarial profile of future trust payouts.

### G.    DEBT

Short-term debt represents borrowings under various lines of credit and other miscellaneous borrowings that are assumed to be satisfied shortly after the effective date. Long-term debt assumes an initial $800 million borrowing to fund the Plan. The debt facility is assumed to bear interest at an average of 7% annually. It is assumed that the outstanding balance is retired as cash in excess of minimum working capital needs becomes available and from proceeds under asbestos-related insurance policies.

### H.    PENSION LIABILITIES

The underfunded defined benefit pension liability represents the net present value of the difference between the fair value of pension trust assets and the accumulated benefit obligation of the related pension plans. The projections assume that, except for 2004 where pension plan payments are governed by the Bankruptcy Court, annual pension expense, including the amortization of accumulated experience losses, will be funded in the same year as expensed.

### I.    LIABILITIES SUBJECT TO COMPROMISE THAT ARE REINSTATED

Liabilities subject to compromise will be discharged at the effective date of the Plan except for the following non-asbestos liabilities that will be reinstated and satisfied in the normal course of business:

➢ Capital lease obligations of approximately $3 million are assumed to be satisfied under contractual terms.

➢ Reserves for environmental remediation of approximately $115 million are assumed to be funded based on agreements or settlements with relevant governmental agencies and property owners.

➢ Post-retirement health and pension benefits of approximately $186 million are assumed to be funded as benefit obligations are due under the terms of such arrangements.

10

➢ Reserves for litigation and contracts of approximately $57 million are assumed to be funded under stated and/or negotiated terms and settlements.

➢ Reserves for tax and other pass-through contingencies of approximately $147 million are assumed to be funded as settlements are reached.

### J.    INCOME TAXES

It is expected that Grace will receive federal and state income tax deductions in the amount equal to the cash and securities transferred to fund asbestos-related and other tax-deductible liabilities. These income tax deductions will result in net operating loss carryforwards ("NOLs") for federal income tax purposes. It is assumed that deferred tax liabilities related to core operations will be reduced over time but will be replaced with an equal amount of originating temporary differences. For purposes of the Financial Information, it is assumed that all tax benefits are available upon the effective date, that no valuation allowance is necessary and that no restrictions on NOL utilization will apply. However, the realization of the tax benefits of NOL carryforwards depends on the amount and timing of future U.S. taxable income and the avoidance of limitation events. These projections assume that sufficient U.S. taxable income will be generated to utilize recorded tax benefits before they expire. It is further assumed that the structuring of the new debt facility will involve the recognition of significant taxable dividends from Grace's foreign subsidiaries. Depending on the timing of such dividends, it is possible that they would have the effect of exhausting some or all of Grace's NOLs and thereby limiting the financial benefit. This Financial Information assumes that the timing and structure of the Plan will be sufficiently flexible to avoid this effect on Grace's NOLs. In particular, it is assumed that foreign tax credits and/or cash repatriation incentives under the American Jobs Creation Act of 2004, rather than NOLs, will be available to offset such income thereby preserving NOLs to offset future taxable income.

### K.    STOCK OPTIONS

Grace has granted stock options that upon exercise would add 8.2 million shares to those outstanding and $103 million in conversion proceeds. For purposes of these projections, 6.4 million of options are assumed to be exercised at the effective date, generating $68 million in conversion proceeds. Also, the Financial Information assumes that Grace will replace cash-based long-term incentive compensation arrangements with a stock-based plan that will be accounted for as expense at the time of grant.

### L.    WARRANTS

Under the Plan, Grace will issue warrants to the asbestos trust that are exchangeable into voting common stock for a penny-a-share to fund, if necessary, required payments under the trust arrangements for asymptomatic asbestos claimants. The number of warrants will be equal to (when combined with the initial payment of common stock to the asbestos trust) 50.1% of the value of Grace's equity capital at the effective date after all other dilutive and issued common shares are considered. Warrants will be assumed exchanged, and

11

therefore dilutive for earnings per share calculations, at the time trust liabilities are determined to be probable and estimable. The Financial Information assumes that the net present value of the allowed amount for qualified asymptomatic asbestos personal injury claims is $130 million at the effective date. This amount, and any required funding in excess of this amount, will be satisfied with Grace common stock through the exercise of warrants as claims are paid by the asbestos trust.

### M.    COMMON STOCK

Under the Plan, Grace will issue common stock to partially satisfy certain claims and liabilities. For purposes of this Financial Information, such common stock is assumed to be valued at approximately $16 per share at the effective date based on the mid-point of the fully diluted reorganized equity value per share range included as part of the Plan of Reorganization, increasing annually by 6%.

12

**W. R. Grace & Co. and Subsidiaries**
**Proforma Condensed Consolidated Balance Sheet**
**September 30, 2004**

| *In millions* | September 30, 2004 As Reported | Additional Pre-Petition Expense and Insurance | Borrowings Under New Debt Agreements | Sealed Air/ Fresenius Settlements | Payment of Remaining Pre-Petition Liabilities | September 30, 2004 Proforma |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| **Current Assets** | | | | | | |
| Cash and cash equivalents | $ 385.1 | | $ 800.0 | $ 115.0 | $ (1,065.0) | $ 235.1 |
| Trade accounts receivable, net | 391.7 | | | | | 391.7 |
| Inventories | 237.8 | | | | | 237.8 |
| Deferred income taxes | 14.1 | | | | | 14.1 |
| Other current assets | 111.4 | | | | | 111.4 |
| **Total Current Assets** | 1,140.1 | – | 800.0 | 115.0 | (1,065.0) | 990.1 |
| | | | | | | |
| Properties and equipment, net | 623.9 | | | | | 623.9 |
| Goodwill | 87.5 | | | | | 87.5 |
| Cash value of company owned life insurance, net of policy loans | 97.1 | | | | | 97.1 |
| Deferred income taxes: | | | | | | |
| Net operating loss carryforwards | 75.0 | | | (40.0) | 200.5 | 235.5 |
| Temporary differences | 514.4 | 205.0 | | (345.0) | (188.0) | 186.4 |
| Asbestos-related insurance | 263.4 | 236.6 | | | | 500.0 |
| Other assets | 285.1 | | | | | 285.1 |
| **Total Assets** | $ 3,086.5 | $ 441.6 | $ 800.0 | $ (270.0) | $ (1,052.5) | $ 3,005.6 |
| | | | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| **Current Liabilities** | | | | | | |
| Short-term debt | $ 16.4 | | | | | $ 16.4 |
| Accounts payable | 127.7 | | | | | 127.7 |
| Income taxes payable | 25.0 | | | | 12.5 | 37.5 |
| Other current liabilities | 197.1 | | | | | 197.1 |
| **Total Current Liabilities** | 366.2 | – | – | – | 12.5 | 378.7 |
| | | | | | | |
| Long-term debt | 1.3 | | 800.0 | | | 801.3 |
| Deferred income taxes | 34.1 | | | | | 34.1 |
| Underfunded defined benefit pension liability | 295.9 | | | | | 295.9 |
| Other operating liabilities | 73.0 | | | | | 73.0 |
| **Total Liabilities Not Subject to Compromise** | 770.5 | – | 800.0 | – | 12.5 | 1,583.0 |
| | | | | | | |
| Bank debt/letters of credit/capital leases | 572.8 | 37.0 | | | (607.0) | 2.8 |
| Liability for asbestos prepetition judgments and agreements | 76.0 | | | | (76.0) | – |
| Liability for unresolved asbestos-related litigation and claims | 910.6 | 702.4 | | (985.0) | (498.0) | 130.0 |
| Liability for environmental remediation | 346.3 | 6.9 | | | (238.2) | 115.0 |
| Liability for postretirement health and special pensions | 193.8 | | | | (8.0) | 185.8 |
| Liability for accounts payable and litigation | 132.3 | 3.0 | | | (78.0) | 57.3 |
| Liability for tax claims and contingencies | 201.9 | | | | (152.0) | 49.9 |
| Other nonoperating liabilities, including Plan contingencies | – | 146.1 | | | (48.4) | 97.7 |
| **Liabilities Subject to Compromise** | 2,433.7 | 895.4 | – | (985.0) | (1,705.6) | 638.5 |
| **Total Liabilities** | 3,204.2 | 895.4 | 800.0 | (985.0) | (1,693.1) | 2,221.5 |
| | | | | | | |
| **Shareholders' Equity (Deficit)** | | | | | | |
| Share capital | 429.7 | | | | 640.6 | 1,070.3 |
| Retained earnings and other equity items | (547.4) | (453.8) | – | 715.0 | | (286.2) |
| **Total Shareholders' Equity (Deficit)** | (117.7) | (453.8) | – | 715.0 | 640.6 | 784.1 |
| **Total Liabilities and Shareholders' Equity (Deficit)** | $ 3,086.5 | $ 441.6 | $ 800.0 | $ (270.0) | $ (1,052.5) | $ 3,005.6 |

| W.R. Grace & Co. and Subsidiaries Condensed Consolidated Balance Sheets As Reported and Projected *In millions* | As Reported December 31, | | | Projected December 31, | | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004* | 2005 | 2006 |
| **ASSETS** | | | | | | |
| **Current Assets** | | | | | | |
| Cash and cash equivalents | $    192 | $    284 | $    309 | $    300 | $    250 | $    250 |
| Trade accounts receivable, net | 280 | 303 | 331 | 401 | 425 | 442 |
| Inventories | 180 | 174 | 215 | 224 | 244 | 261 |
| Deferred income taxes | 22 | 20 | 31 | 14 | 14 | 14 |
| Other current assets | 62 | 49 | 44 | 30 | 28 | 34 |
| Total Current Assets | 736 | 830 | 930 | 969 | 961 | 1,001 |
| | | | | | | |
| Properties and equipment, net | 589 | 622 | 657 | 650 | 650 | 650 |
| Goodwill | 56 | 65 | 85 | 85 | 85 | 85 |
| Cash value of company owned life insurance, net of policy loans | 75 | 83 | 91 | 75 | 59 | 65 |
| Deferred income taxes: | | | | | | |
| Net operating loss carryforwards | 100 | 108 | 75 | 212 | 226 | 219 |
| Temporary differences | 403 | 466 | 512 | 206 | 171 | 149 |
| Asbestos-related insurance | 284 | 283 | 269 | 500 | 500 | 232 |
| Other assets | 275 | 235 | 256 | 225 | 228 | 215 |
| Total Assets | $    2,518 | $    2,692 | $    2,875 | $    2,922 | $    2,880 | $    2,616 |
| | | | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| **Current Liabilities** | | | | | | |
| Short-term debt | $      6 | $      4 | $      7 | $      16 | $      - | $      - |
| Accounts payable | 86 | 100 | 102 | 115 | 127 | 135 |
| Income taxes payable | 15 | 12 | 16 | 38 | 38 | 38 |
| Other current liabilities | 126 | 131 | 130 | 126 | 141 | 153 |
| Total Current Liabilities | 233 | 247 | 255 | 295 | 306 | 326 |
| | | | | | | |
| Long-term debt | 524 | 539 | 565 | 800 | 780 | 516 |
| Deferred income taxes | 21 | 31 | 35 | 34 | 34 | 34 |
| Underfunded defined benefit pension liability | 85 | 298 | 264 | 296 | 265 | 232 |
| Liability for asbestos-related litigation | 996 | 973 | 992 | 130 | 77 | 74 |
| Liability for environmental remediation | 153 | 201 | 332 | 107 | 94 | 81 |
| Liability for postretirement health and special pensions | 242 | 222 | 204 | 186 | 164 | 142 |
| Liability for accounts payable and litigation | 112 | 88 | 89 | 57 | 32 | 7 |
| Liability for tax claims and contingencies | 217 | 228 | 218 | 50 | 30 | 10 |
| Other liabilities, including Plan contingencies | 77 | 87 | 85 | 171 | 151 | 132 |
| Total Liabilities | 2,660 | 2,914 | 3,039 | 2,126 | 1,933 | 1,554 |
| | | | | | | |
| **Shareholders' Equity (Deficit)** | | | | | | |
| Share capital | 434 | 434 | 433 | 1,070 | 1,133 | 1,140 |
| Retained earnings and other equity items | (576) | (656) | (597) | (274) | (186) | (78) |
| Shareholders' Equity (Deficit) | (142) | (222) | (164) | 796 | 947 | 1,062 |
| Total Liabilities and Shareholders' Equity (Deficit) | $    2,518 | $    2,692 | $    2,875 | $    2,922 | $    2,880 | $    2,616 |

* *Assumes plan of reorganization effective as of December 31, 2004.*

| W.R. Grace & Co. and Subsidiaries Consolidated Statements of Operations Proforma | Proforma Year Ended December 31, 2003 | | | Proforma Nine Months Ended September 30, 2004 | | |
|---|---|---|---|---|---|---|
| In millions, except per share amounts | As Reported | Proforma Adjustments | Proforma | As Reported | Proforma Adjustments | Proforma |
| Net sales | $ 1,980.5 | | $ 1,980.5 | $ 1,670.8 | | $ 1,670.8 |
| Cost of goods sold, exclusive of depreciation and amortization shown separately below | 1,289.8 | | 1,289.8 | 1,050.6 | | 1,050.6 |
| Selling, general and administrative expenses, exclusive of net pension expense shown separately below | 360.2 | | 360.2 | 321.1 | | 321.1 |
| Depreciation and amortization | 102.9 | | 102.9 | 80.4 | | 80.4 |
| Research and development expenses | 52.0 | | 52.0 | 38.8 | | 38.8 |
| Net pension expense | 58.1 | | 58.1 | 41.5 | | 41.5 |
| Interest expense and related financing costs | 15.6 | 39.7 | 55.3 | 12.3 | 28.8 | 41.1 |
| Other (income) expense | (16.7) | | (16.7) | (49.1) | 50.0 | 0.9 |
| Provision for environmental remediation | 142.5 | (142.5) | - | 20.0 | (20.0) | - |
| Provision for asbestos-related litigation | 30.0 | (30.0) | - | - | - | - |
| Total costs and expenses | 2,034.4 | (132.8) | 1,901.6 | 1,515.6 | 58.8 | 1,574.4 |
| Income (loss) before Chapter 11 expenses, income taxes and minority interest | (53.9) | 132.8 | 78.9 | 155.2 | (58.8) | 96.4 |
| Chapter 11 expenses, net | (14.8) | 14.8 | - | (11.8) | 11.8 | - |
| Provision for income taxes | 12.3 | (46.5) | (34.2) | (51.9) | 20.3 | (31.6) |
| Minority interest in consolidated entities | 1.2 | | 1.2 | (6.4) | | (6.4) |
| Net income (loss) | $ (55.2) | $ 101.1 | $ 45.9 | $ 85.1 | $ (26.7) | $ 58.4 |
| Basic earnings (loss) per common share | $ (0.84) | | $ 0.41 | $ 1.30 | | $ 0.53 |
| Weighted average number of basic shares | 65.5 | 45.2 | 110.7 | 65.7 | 45.2 | 110.9 |
| Diluted earnings (loss) per common share | $ (0.84) | | $ 0.39 | $ 1.29 | | $ 0.53 |
| Weighted average number of diluted shares | 65.5 | 53.1 | 118.6 | 66.0 | 53.1 | 119.1 |

| W.R. Grace & Co. and Subsidiaries Consolidated Statements of Operations As Reported and Projected | As Reported Year Ended December 31, | | | Projected Year Ending December 31, | | |
|---|---|---|---|---|---|---|
| In millions, except per share amounts | 2001 | 2002 | 2003 | 2004* | 2005 | 2006 |
| Net sales | $ 1,723 | $ 1,820 | $ 1,981 | $ 2,236 | $ 2,404 | $ 2,551 |
| Cost of goods sold, exclusive of depreciation and amortization shown separately below | 1,076 | 1,148 | 1,290 | 1,398 | 1,499 | 1,583 |
| Depreciation and amortization of operating assets | 89 | 95 | 103 | 111 | 121 | 131 |
| Selling, general and administrative expenses, exclusive of net pension (income) expense shown separately below | 340 | 340 | 360 | 450 | 463 | 490 |
| Research and development expenses | 50 | 51 | 52 | 52 | 56 | 63 |
| Net pension (income) expense | (6) | 25 | 58 | 61 | 65 | 67 |
| Interest expense and related financing costs | 37 | 20 | 16 | 14 | 55 | 45 |
| Provision for environmental remediation | 6 | 71 | 143 | 20 | - | - |
| Provision for asbestos-related litigation | - | - | 30 | - | - | - |
| Interest accretion of asbestos liability | - | - | - | - | 9 | 5 |
| Other (income) expense | (31) | (22) | (17) | (51) | (6) | (6) |
| Total costs and expenses | 1,561 | 1,728 | 2,035 | 2,055 | 2,262 | 2,378 |
| Income (loss) before Chapter 11 expenses, income taxes and minority interest | 162 | 92 | (54) | 181 | 142 | 173 |
| Chapter 11 expenses and charges, net | (16) | (30) | (15) | (394) | - | - |
| Provision for income taxes | (63) | (38) | 13 | (69) | (47) | (58) |
| Minority interest in consolidated entities | (4) | (2) | 1 | (6) | (7) | (7) |
| Net income (loss) | $ 79 | $ 22 | $ (55) | $ (288) | $ 88 | $ 108 |
| Basic earnings (loss) per common share | $ 1.20 | $ 0.34 | $ (0.84) | $ (4.38) | $ 0.77 | $ 0.94 |
| Weighted average number of basic shares | 65.3 | 65.4 | 65.5 | 65.7 | 114.6 | 115.0 |
| Diluted earnings (loss) per common share | $ 1.20 | $ 0.34 | $ (0.84) | $ (4.36) | $ 0.74 | $ 0.91 |
| Weighted average number of diluted shares | 65.4 | 65.5 | 65.5 | 66.0 | 119.0 | 119.2 |

* Assumes plan of reorganization effective as of December 31, 2004.

| W. R. Grace & Co. and Subsidiaries<br>Consolidated Analysis of Continuing Operations - Proforma<br>In millions | Proforma Year Ended December 31, 2003 | | | Proforma Nine Months Ended September 30, 2004 | | |
|---|---|---|---|---|---|---|
| | As Reported | Proforma Adjustments | Proforma | As Reported | Proforma Adjustments | Proforma |
| Net Sales: | | | | | | |
| Davison Chemicals | $ 1,039.9 | | $ 1,039.9 | $ 872.5 | | $ 872.5 |
| Performance Chemicals | 940.6 | | 940.6 | 798.3 | | 798.3 |
| Total Grace sales | $ 1,980.5 | $ - | $ 1,980.5 | $ 1,670.8 | $ - | $ 1,670.8 |
| Pre-tax operating income: | | | | | | |
| Davison Chemicals | $ 118.9 | | $ 118.9 | $ 112.1 | | $ 112.1 |
| Performance Chemicals | 107.9 | | 107.9 | 106.0 | | 106.0 |
| Corporate Costs: | | | | | | |
| Support functions and other | (30.2) | | (30.2) | (24.5) | | (24.5) |
| Pension and performance-related compensation | (47.9) | | (47.9) | (48.1) | | (48.1) |
| Corporate costs | (78.1) | - | (78.1) | (72.6) | - | (72.6) |
| Pre-tax income from core operations | 148.7 | - | 148.7 | 145.5 | - | 145.5 |
| Pre-tax loss from noncore activities | (190.1) | 172.5 | (17.6) | 12.6 | (30.0) | (17.4) |
| Interest expense | (15.6) | (39.7) | (55.3) | (12.3) | (28.8) | (41.1) |
| Interest income | 4.3 | | 4.3 | 3.0 | | 3.0 |
| Income (loss) before Chapter 11 expenses and income taxes | (52.7) | 132.8 | 80.1 | 148.8 | (58.8) | 90.0 |
| Chapter 11 expenses, net | (14.8) | 14.8 | - | (11.8) | 11.8 | - |
| Provision for income taxes | 12.3 | (46.5) | (34.2) | (51.9) | 20.3 | (31.6) |
| Net Income (loss) | $ (55.2) | $ 101.1 | $ 45.9 | $ 85.1 | $ (26.7) | $ 58.4 |
| Key Financial Measures: | | | | | | |
| Pre-tax income from core operations as a percentage of sales | | | | | | |
| Davison Chemicals | 11.4% | | 11.4% | 12.8% | | 12.8% |
| Performance Chemicals | 11.5% | | 11.5% | 13.3% | | 13.3% |
| Total Core Operations | 7.5% | | 7.5% | 8.7% | | 8.7% |
| Pre-tax income from core operations before depreciation and amortization | $ 251.6 | | $ 251.6 | $ 225.9 | | $ 225.9 |
| As a percentage of sales | 12.7% | | 12.7% | 13.5% | | 13.5% |

| W. R. Grace & Co.<br>Consolidated Analysis of Continuing Operations<br>As Reported and Projected<br>In millions | As Reported Year Ended December 31, | | | Projected Year Ending December 31, | | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004* | 2005 | 2006 |
| Net Sales: | | | | | | |
| Davison Chemicals | $ 868 | $ 939 | $ 1,040 | $ 1,184 | $ 1,304 | $ 1,385 |
| Performance Chemicals | 855 | 881 | 941 | 1,052 | 1,100 | 1,166 |
| Total Grace sales | 1,723 | 1,820 | 1,981 | 2,236 | 2,404 | 2,551 |
| Pre-tax operating income: | | | | | | |
| Davison Chemicals | 124 | 129 | 119 | 151 | 160 | 170 |
| Performance Chemicals | 97 | 99 | 108 | 133 | 140 | 148 |
| Corporate Costs: | | | | | | |
| Support functions and other | (38) | (31) | (30) | (47) | (57) | (58) |
| Pension and performance-related compensation | 5 | (16) | (48) | (50) | (50) | (50) |
| Corporate costs | (33) | (47) | (78) | (97) | (107) | (108) |
| Pre-tax income from core operations | 188 | 181 | 149 | 187 | 193 | 210 |
| Pre-tax loss from noncore activities | 3 | (75) | (190) | 2 | - | - |
| Interest expense | (37) | (20) | (16) | (14) | (55) | (45) |
| Interest accretion of asbestos liability | - | - | - | - | (9) | (5) |
| Interest income | 4 | 4 | 4 | - | 6 | 6 |
| Income (loss) before Chapter 11 expenses and income taxes | 158 | 90 | (53) | 175 | 135 | 166 |
| Chapter 11 expenses and charges, net of tax | (16) | (30) | (15) | (394) | - | - |
| Provision for income taxes | (63) | (38) | 13 | (69) | (47) | (58) |
| Net Income (loss) | $ 79 | $ 22 | $ (55) | $ (288) | $ 88 | $ 108 |
| Key Financial Measures: | | | | | | |
| Pre-tax income from core operations as a percentage of sales | | | | | | |
| Davison Chemicals | 14.3% | 13.7% | 11.4% | 12.8% | 12.3% | 12.3% |
| Performance Chemicals | 11.3% | 11.2% | 11.5% | 12.6% | 12.7% | 12.7% |
| Total Core Operations | 10.9% | 9.9% | 7.5% | 8.4% | 8.0% | 8.2% |
| Pre-tax income from core operations before depreciation, amortization and noncash compensation | $ 277 | $ 276 | $ 252 | $ 298 | $ 329 | $ 356 |
| As a percentage of sales | 16.1% | 15.2% | 12.7% | 13.3% | 13.7% | 14.0% |

* Assumes plan of reorganization effective as of December 31, 2004.

| W. R. Grace & Co. and Subsidiaries<br>Condensed Consolidated Statements of Cash Flows<br>As Reported and Projected<br>In millions | As Reported<br>December 31, | | | Projected<br>December 31, | | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004* | 2005 | 2006 |
| **Operating Activities** | | | | | | |
| Income (loss) before Chapter 11 expenses, income taxes and minority interest | $ 162 | $ 92 | $ (54) | $ 181 | $ 142 | $ 173 |
| Depreciation and amortization | 89 | 95 | 103 | 111 | 121 | 131 |
| Interest accrued/accreted not paid in cash | 23 | 15 | 11 | 12 | 9 | 5 |
| Loss (gain) on sales of investments and disposals of assets | (10) | (2) | 2 | - | - | - |
| Provision for environmental remediation | 6 | 71 | 143 | 20 | - | - |
| Provision for asbestos-related litigation | - | - | 30 | - | - | - |
| Total working capital changes | (64) | 22 | (42) | (23) | (31) | (21) |
| Income taxes paid, net of refunds | (28) | (32) | (28) | (32) | (25) | (29) |
| Other accruals and non-cash items | (61) | 11 | (15) | 13 | (9) | 7 |
| Proceeds from asbestos-related insurance | 79 | 11 | 13 | 6 | - | 268 |
| Cash used for non-operating liabilities: | | | | | | |
|     Expenditures/warrants for asbestos-related litigation | (110) | (13) | (10) | (8) | (62) | (7) |
|     Expenditures for environmental remediation | (29) | (21) | (11) | (11) | (13) | (13) |
|     Payments to fund postretirement health and special pensions | (22) | (22) | (13) | (22) | (22) | (22) |
|     Expenditures for retained obligations of divested businesses | (9) | (4) | (1) | (2) | (25) | (25) |
|     Payments to fund tax claims and contingencies | - | - | - | - | (20) | (20) |
|     Expenditures for nonoperating liabilities and Plan contingencies | - | - | - | - | (20) | (20) |
|     Chapter 11 expenses paid | (12) | (27) | (18) | (15) | - | - |
|     Payments of Chapter 11 liabilities with cash under the Plan | - | - | - | (1,065) | - | - |
| Net cash provided by operating activities | 14 | 196 | 110 | (835) | 45 | 427 |
| **Investing Activities** | | | | | | |
| Capital expenditures for property and equipment | (63) | (91) | (86) | (76) | (85) | (90) |
| Businesses acquired, net of cash acquired | (84) | (29) | (27) | (66) | (68) | (75) |
| Other investing activities, net | 16 | 9 | 4 | - | - | - |
| Net cash used for investing activities | (131) | (111) | (109) | (142) | (153) | (165) |
| **Financing Activities** | | | | | | |
| Net change in short term and COLI loans/investments | 34 | (5) | (3) | (14) | 15 | (6) |
| Borrowings under credit facilities, net of repayments and fees | 90 | (4) | (2) | - | - | - |
| Exercise of warrants to satisfy asbestos liability | - | - | - | - | 62 | 8 |
| Cash received from exercise of options | - | - | - | 68 | - | - |
| Borrowings (repayments) under Chapter 11 exit facility, net | - | - | - | 800 | (19) | (264) |
| Cash contributed under Chapter 11 settlement agreements | - | - | - | 115 | - | - |
| Net cash provided by (used for) financing activities | 124 | (9) | (5) | 969 | 58 | (262) |
| Effect of currency exchange rate changes on cash and cash equivalents | (7) | 16 | 29 | (1) | - | - |
| Increase (decrease) in cash and cash equivalents | - | 92 | 25 | (9) | (50) | - |
| Cash and cash equivalents, beginning of period | 192 | 192 | 284 | 309 | 300 | 250 |
| Cash and cash equivalents, end of period | $ 192 | $ 284 | $ 309 | $ 300 | $ 250 | $ 250 |

* Assumes plan of reorganization effective as of December 31, 2004.

# Exhibit Tab 5

Asbestos Trust Agreement

## THE WRG ASBESTOS TRUST AGREEMENT

This WRG Asbestos Trust Agreement (the "Asbestos Trust Agreement"), effective as of _____, 2005 (the "Effective Date"), is entered into among W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company (collectively referred to herein as the "Debtors" in case number 01-1139 (JKF) in the Bankruptcy Court), as settlors (the "Settlors") and the Future Claimants' Representative, the Trust Advisory Committee and the Trustees identified on the signature page hereof and appointed on the Confirmation Date pursuant to the Debtors' Plan.

## RECITALS

WHEREAS, at the time of the entry of the orders for relief in the Chapter 11 Cases, the Debtors were named as defendants in personal injury actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products; and

WHEREAS, at the time of the entry of the orders for relief in the Chapter 11 Cases, the Debtors were named as defendants in actions seeking recovery on account of Asbestos PD Claims; and

1

WHEREAS, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code in a case pending in the Bankruptcy Court, known as *In re W. R. Grace & Co., et al.*, Case No. 01-1139 (JKF); and

WHEREAS, the Plan filed by the Debtors has been confirmed by the Court; and

WHEREAS, the Plan Documents provide, among other things, for the creation of the Asbestos Trust; and

WHEREAS, pursuant to the Plan, the Asbestos Trust is to use its assets and income to pay Asbestos Claims as and to the extent provided for herein and in the respective TDPs; and

WHEREAS, pursuant to the Plan, the Asbestos Trust is intended to qualify as a QSF; and

WHEREAS, it is the intent of the Settlors, the Trustees, the Future Claimants' Representative and the Trust Advisory Committee that the Asbestos Trust be administered, maintained, and operated at all times as a QSF through mechanisms that provide reasonable assurance that the Asbestos Trust will value, and be in a financial position to pay, all Asbestos Claims that involve similar claims in substantially the same manner in strict compliance with the terms of this Asbestos Trust Agreement, the respective TDPs, the Plan, and the Confirmation Order; and

WHEREAS, the Plan provides, among other things, for the complete treatment of all liabilities and obligations of the Debtors with respect to Asbestos Claims; and

WHEREAS, the District Court has determined that the Asbestos Trust and the Plan satisfy all the prerequisites for the Asbestos Channeling Injunction pursuant to Bankruptcy Code Sections 105(a), 524(g) and/or 1141 or otherwise, as provided for in the Plan, and such Asbestos Channeling Injunction have been entered by the District Court.

NOW, THEREFORE, in consideration of the mutual covenants and understandings contained herein, and subject to and on the terms and conditions herein set forth, the parties hereby agree as follows:

## Article 1.
## DEFINITIONS

### 1.1    DEFINITIONS.

All capitalized terms used herein but not otherwise defined shall have the respective meanings given to such terms in the Glossary of Terms used in the Plan Documents (the "Glossary"), and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Glossary, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Bankruptcy Rules, and such definitions are incorporated herein by reference.

2

## Article 2.
## AGREEMENT OF TRUST

2.1    **CREATION AND NAME.**The Settlors hereby create a trust known as the "WRG Asbestos Trust" as a Delaware statutory trust, to be created upon entry of the Confirmation Order, effective as of the Effective Date, pursuant to the Plan. The Trustees of the Asbestos Trust may transact the business and affairs of the Asbestos Trust in the name "WRG Asbestos Trust." Contemporaneously with the execution of this Asbestos Trust Agreement, the Settlors will file a Certificate of Trust for the creation of a statutory trust with the Secretary of State of Delaware.

2.2    **PURPOSE.** The purposes of the Asbestos Trust are to:

(a)    assume the liabilities of the Debtors with respect to all Asbestos Claims (whether now existing or arising at any time hereafter),

(b)    process, liquidate, pay and satisfy all Asbestos Claims in accordance with this Asbestos Trust Agreement, the respective TDPs, the Plan, the CMO and the Confirmation Order,

(c)    use the Asbestos Trust Assets to pay holders of such Asbestos Claims in accordance with this Asbestos Trust Agreement, the respective TDPs, the Plan, and the Confirmation Order and in such a way that all holders of Asbestos Claims that involve similar claims are treated in substantially the same manner and to otherwise comply in all respects with the requirements of a trust set forth in Section 524(g)(2)(B)(i) of the Bankruptcy Code,

(d)    preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Allowed Asbestos Claims, and

(e)    otherwise carry out the provisions of this Asbestos Trust Agreement and any other agreements into which the Trustees have entered or will enter in connection with the Plan.

2.3    **TRUST DISTRIBUTION PROCEDURES.**

In furtherance of the purposes of the Asbestos Trust, as set forth above in Section 2.2, the Trustees shall be responsible for supervising and administering the respective TDPs and performing all other purposes of the Asbestos Trust. All Asbestos Claims shall be determined, liquidated, and paid, if Allowed, pursuant to this Asbestos Trust Agreement and the TDPs. All Asbestos PI-AO Claims shall be determined, liquidated, and paid, if Allowed, pursuant to this Asbestos Trust Agreement and the PI-AO Trust Distribution Procedures. All Asbestos PI-SE Claims shall be determined, liquidated, and paid, if Allowed, pursuant to this Asbestos Trust Agreement and the PI-SE Trust Distribution Procedures. All Asbestos PD Claims shall be determined, liquidated, and paid, if Allowed, pursuant to this Asbestos Trust Agreement and the PD Trust Distribution Procedures.

3

**2.4    TRANSFER OF ASSETS.** On the thirty-first (31st) day after the Effective Date, and pursuant to the Plan and the Confirmation Order, the Settlors, and any other party transferring any Asbestos Trust Asset to the Asbestos Trust, will transfer, issue or assign, as appropriate, and deliver to the Asbestos Trust all right, title and interest in and to the Asbestos Trust Assets, free and clear of all Claims, Equity Interests, Encumbrances and other interests of any Entity without any further action of any Entity. The Settlors, and any other party transferring any Asbestos Trust Asset to the Asbestos Trust, shall execute and deliver, or cause to be executed and delivered, such documents as the Trustees may reasonably request from time to time to reflect the transfer, issuance and assignment, as applicable of the Asbestos Trust Assets to the Asbestos Trust.

**2.5    ACCEPTANCE OF ASSETS AND ASSUMPTION OF LIABILITIES.** In connection with and in furtherance of the purposes of the Asbestos Trust, the Trustees, on behalf of the Asbestos Trust, hereby expressly accept the transfer, issuance and assignment, as applicable, to the Asbestos Trust of the Asbestos Trust Assets at the time and in the manner contemplated by the Plan Documents, and in accordance with the terms of this Asbestos Trust Agreement.

(b)    In furtherance of the purposes of the Asbestos Trust, the Trustees, on behalf of the Asbestos Trust, hereby expressly assume all Asbestos Claims (whether now existing or arising at any time hereafter). The Asbestos Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding Asbestos Claims that the Debtors or any successors of the Debtors have or would have had under applicable law or under any agreement related thereto.

(c)    Nothing in this Asbestos Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction or Released Matters Injunction issued in connection with the Plan or the Asbestos Trust's assumption of the Asbestos Claims as and when provided herein.

**2.6    QUALIFIED SETTLEMENT FUND.**

No provisions herein or in the TDPs shall be construed to mandate distributions on any Asbestos Claims or other actions that would contravene the Asbestos Trust's compliance with the requirements of a QSF. In the event of any conflict between the requirements of a QSF and the terms of this Asbestos Trust Agreement, the terms of this Asbestos Trust Agreement shall be construed so as to be consistent with such requirements of a QSF.

4

## Article 3.
## POWERS, TRUST ADMINISTRATION & REPORTING

**3.1    POWERS.**

(a)    Each Trustee is and shall act as a fiduciary to the Asbestos Trust in accordance with the provisions of this Asbestos Trust Agreement, the Plan, and Delaware law.  The Trustees shall, at all times, administer the Asbestos Trust in accordance with Article 3 of this Asbestos Trust Agreement.  Subject to the limitations set forth in this Asbestos Trust Agreement and the TDPs, the Trustees shall have the power to take any and all actions that, in the reasonable judgment of the Trustees, are necessary, proper or convenient to effectuate the purposes of the Asbestos Trust, including, without limitation, each power expressly granted in this Section 3.1, any power reasonably incidental thereto, and any statutory trust power now or hereafter permitted under the laws of the State of Delaware.

(b)    Except as required by applicable law or as otherwise specified herein, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section 3.1(a) above, and except as limited herein, the Trustees shall have the power to:

(i)    receive and hold the Asbestos Trust Assets, in the separate accounts described below;

(ii)    invest the monies held from time to time by the Asbestos Trust;

(iii)    sell, transfer, or exchange any or all of the Asbestos Trust Assets at such prices and upon such terms as they may consider proper, consistent with the other terms of this Asbestos Trust Agreement;

(iv)    enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the Asbestos Trust to operate;

(v)    pay liabilities and expenses of the Asbestos Trust, including Asbestos Trust Expenses;

(vi)    establish such funds, reserves and accounts in the name of the Asbestos Trust, as deemed by the Trustees to be useful in carrying out the purposes of the Asbestos Trust;

5

(vii)    sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding or legal action;

(viii)   adopt and amend by-laws of the Asbestos Trust not inconsistent with the terms hereof (the "Trust By-Laws");

(ix)    supervise and administer the Asbestos Trust in accordance with the TDPs and the terms hereof;

(x)    administer, amend, supplement, or modify the TDPs, all in accordance with the terms thereof;

(xi)    appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing and forecasting, and other consultants or alternative dispute resolution panelists, and agents as the business of the Asbestos Trust requires, and to delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of the Asbestos Trust;

(xii)   pay employees, legal, financial, accounting, investment, auditing and forecasting, and other consultants, advisors, and agents reasonable compensation, including without limitation, compensation at rates approved by the Trustees for services rendered prior to the execution hereof;

(xiii)  compensate the Trustees, the Future Claimants' Representative, the Trust Advisory Committee and their respective Representatives and reimburse all out of pocket costs and expenses incurred by such Entities in connection with the performance of their duties hereunder, including without limitation costs and expenses incurred prior to the execution hereof;

(xiv)   execute and deliver such instruments as the Trustees consider proper in administering the Asbestos Trust;

(xv)   enter into such other arrangements with third parties as are deemed by the Trustees to be useful in carrying out the purposes of the Asbestos Trust, provided, however, such arrangements do not conflict with any other provision of the Plan, the Confirmation Order, this Asbestos Trust Agreement or the TDPs;

6

(xvi)   indemnify in accordance with Section 3.5, the Entities to be indemnified under Section 3.5 to the fullest extent that a corporation or trust organized under the law of the State of Delaware is from time to time entitled to indemnify and/or insure its Representatives, and purchase insurance for the Asbestos Trust and those Entities for whom the Asbestos Trust has an indemnification obligation hereunder;

(xvii)  delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Asbestos Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Sections 5.4, 6.8 and 7.9;

(xviii) consult with Reorganized Debtors or their successors at such times and with respect to such issues relating to the conduct of the Asbestos Trust as the Trustees consider desirable;

(xix)   make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the Asbestos Trust or the name of Reorganized Debtors or any successor in interest, any claim, right, action or cause of action, included in the Asbestos Trust Assets;

(xx)    object to Asbestos Claims as provided in the Plan;

(xxi)   procure insurance policies and establish claims handling agreements and other arrangements as provided in Section 3.5 and 8.2 of this Asbestos Trust Agreement;

(xxii)  obtain a tax identification number for the Asbestos Trust, communicate with the IRS and state and local taxing authorities on behalf of the Asbestos Trust, make payment of taxes on behalf of the Asbestos Trust, and file all applicable tax returns for the Asbestos Trust; and

(xxiii) enter into an agreement with the Reorganized Debtors whereby the Asbestos Trust will provide its Asbestos Claims books and records to the Reorganized Debtors so as to fully enable the Reorganized Debtors to recover any amounts available under any Asbestos Insurance Policy as if the Reorganized Debtors were processing, litigating and/or paying the Asbestos Claims directly.

7

(d)     The Trustees shall not have the power to guarantee any debt of any other Entity.

(e)     The Trustees shall give the FCR and the TAC prompt notice of any act performed or taken pursuant to Section 3.1(c)(ii), (iii), (iv), (vi), (vii), (viii), (ix), (x), (xiii), (xv), (xviii), (xix), (xx), (xxi) and Section 3.2(h).

## 3.2    GENERAL ADMINISTRATION AND OBLIGATIONS OF THE TRUSTEES.

(a)     To the extent not inconsistent with the terms of this Asbestos Trust Agreement, the Trust By-Laws shall govern the affairs of the Asbestos Trust and each Trustee shall act in accordance with the Trust By-Laws. In the event of an inconsistency between the Trust By-Laws and this Asbestos Trust Agreement, this Asbestos Trust Agreement shall govern.

(b)     <u>Tax Returns and Reports</u>.

(i)     The Trustees shall cause to be obtained, at the cost and expense of the Asbestos Trust, a Federal Employer Identification Number ("FEIN"), and relevant state tax identification numbers, for the Asbestos Trust and shall cause such income tax and other returns and statements as are required by the applicable provisions of the IRC and the Treasury Regulations and such other state or local laws and regulations as may be applicable to be timely filed on behalf of the Asbestos Trust on the basis of a December 31 year end. The Trustees shall take all steps necessary to ensure that any tax obligations imposed upon the Asbestos Trust are paid and shall otherwise comply with Section 1.468B-2 of the Treasury Regulations and all other reporting obligations of the Asbestos Trust. The Trustees shall comply with all applicable withholding obligations as required under the applicable provisions of the IRC and such other state and local laws as may be applicable, and the regulations promulgated thereunder.

(ii)    The Trustees shall cause the Asbestos Trust to qualify and maintain qualification as a QSF.

(iii)   Within seventy-five (75) days (or earlier if required by law) after the end of each calendar year, the Asbestos Trust shall cause to be prepared and mailed such information as required by law to enable payees to complete and file each of their respective federal, state and local income and other tax returns. The Trustees also shall provide a copy of any

8

filed tax returns of the Asbestos Trust to the FCR and the TAC when such return is filed.

(c)    Reports.

(i)    The Trustees shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, but, in any event, no later than one hundred twenty (120) days following the end of each fiscal year, an annual report containing financial statements of the Asbestos Trust (including, without limitation, a balance sheet of the Asbestos Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent registered public accountants selected by the Trustees and accompanied by an opinion of such firm that such financial statements present fairly in all material respects the financial position of the Asbestos Trust as of such year end and the results of its operations as of the year then ended in conformity with accounting principles generally accepted in the United States. The Trustees shall provide a copy of such reports to the FCR, the TAC and Reorganized Debtors or their successors when such reports are filed with the Bankruptcy Court.

(ii)    Simultaneously with delivery of each set of financial statements referred to in Section 3.2(c)(i), the Trustees shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of Asbestos Claims (and the amount paid in respect of each such Asbestos Claim disposed of during the period covered by the financial statements). The Trustees shall provide a copy of such reports to the FCR and the TAC when such reports are filed.

(iii)    All materials required to be filed with the Bankruptcy Court by this Section 3.2(c) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

(d)    The Trustees, and all parties to this Asbestos Trust Agreement agree to cooperate to the maximum extent reasonably possible in conducting any matters involving taxes, including the preparation of any necessary tax returns or reports, the furnishing of information necessary to prepare tax returns or reports, the administration of any tax audit or review, and the conduct of any tax contest. If it shall become necessary to contest any disputed tax, the party primarily liable for such potential tax liability shall

9

91100-001\DOCS_DE:102548.1

be entitled to control such contest, and the other parties shall cooperate with such controlling party to the maximum extent reasonably possible.

(e)  As provided in Section 7.2.8 of the Plan, on the Effective Date or as soon thereafter as is practicable, the Trustees, on behalf of the Asbestos Trust, shall enter into a cooperation agreement with the Reorganized Debtors pursuant to which: (a) the Reorganized Debtors shall provide to the Asbestos Trust the non-privileged books and records of the Debtors and the Reorganized Debtors that pertain directly to Asbestos Claims and (b) the Asbestos Trust shall provide to the Reorganized Debtors books and records of the Asbestos Trust that pertain to Asbestos Claims so as to fully enable the Reorganized Debtors to recover any amounts available under any Asbestos Insurance Policy as if the Reorganized Debtors were processing, litigating and/or paying the Asbestos Claims directly.

(f)  The Trustees shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The Trustees shall provide a copy of the budget and cash flow to the FCR and the TAC.

(g)  The Trustees shall consult with the FCR (other than with respect to the PD TDP) and the TAC (i) on the implementation and administration of the TDPs and (ii) on the implementation and administration of the Asbestos Trust. The Trustees may consult with the FCR and the TAC with respect to any other matter affecting the Asbestos Trust. The Trustees shall meet with the FCR and the TAC not fewer than four (4) times each calendar year during the first two (2) years following the Effective Date and then two (2) times each calendar year thereafter, which shall be at a regular or special meeting of the Trustees as mutually agreed to by the Trustees, the FCR and the TAC, to discuss general matters regarding the administration of the Asbestos Trust, the review, allowance, and payment of Asbestos Claims, and the condition of the Asbestos Trust Assets.

(h)  In addition to the other provisions contained in this Asbestos Trust Agreement or in the TDPs requiring the consent of the FCR (except as it may affect Asbestos PD Claims) and the TAC, the Trustees shall be required to obtain the consent of the FCR and the consent of the TAC to:

(i)   amend any provision of this Asbestos Trust Agreement;

(ii)  terminate the Asbestos Trust pursuant to Section 8.2 hereof;

10

91100-001\DOCS_DE:102548.1

(iii)   change the number of Trustees to serve hereunder and appoint successor Trustee(s); provided, however, that in no event shall the number of Trustees authorized to serve hereunder exceed five (5);

(iv)   change the compensation of the Trustees (other than mere cost-of-living increases);

(v)   amend or modify the TDPs; or

(vi)   take any action pursuant to Section 3.1(c)(viii) or 3.1(c)(xxi).

(i)   The Trustees, upon notice from the FCR or the TAC requesting consideration of one or more issues, shall at their next regular meeting or, if appropriate, at a specially called meeting, place on their agenda and consider such issues.

**3.3   [INTENTIONALLY LEFT BLANK].CLAIMS ADMINISTRATION.**On the Effective Date, the Trustees shall promptly proceed to adopt and implement the TDPs.

**3.5   INDEMNIFICATION OF TRUSTEES AND ADDITIONAL INDEMNITEES.**The Asbestos Trust shall indemnify and defend the Trustees and the Asbestos Trust's officers and employees to the fullest extent that a corporation or trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and defend its directors, trustees, officers and employees against any and all liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties hereunder. Additionally, any Entity who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative, or arbitrative action, by reason of any act or omission of such Entity with respect to (i) the Chapter 11 Cases and any act or omission undertaken by them prior to the commencement thereof, (ii) the liquidation of any Asbestos Claims, (iii) the administration of the Asbestos Trust and the implementation of TDPs, or (iv) any and all activities in connection with this Asbestos Trust Agreement (an "Additional Indemnitee") shall be indemnified and defended by the Asbestos Trust to the fullest extent that a corporation or trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and defend its officers, directors, trustees, and employees, against reasonable expenses, costs and fees (including reasonable attorneys' fees and costs), judgments, awards, amounts paid in settlement, and liabilities of all kinds incurred by each Additional Indemnitee in connection with or resulting from such action, suit, or proceeding, if he or she acted in good faith and in a manner such Additional Indemnitee reasonably

11

believed to be in, or not opposed to, the best interests of the holders of Asbestos Claims whom the applicable Additional Indemnitee represents. Notwithstanding the foregoing, neither the Trustees nor any officer or employee of the Asbestos Trust, nor the FCR nor any member of the TAC shall be indemnified or defended in any way for any liability, expense, claim, damage, or loss for which they are ultimately liable under Sections 5.4, 6.8 or 7.9, as applicable.

(b)     Reasonable expenses, costs and fees (including reasonable attorneys' fees and costs) incurred by or on behalf of a Trustee or any Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative or arbitrative from which he or she is indemnified by the Asbestos Trust pursuant to Section 3.5(a), shall be paid by the Asbestos Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of such Trustee or Additional Indemnitee, to repay such amount in the event that it shall be determined ultimately by Final Order that such Trustee or any Additional Indemnitee is not entitled to be indemnified by the Asbestos Trust.

(c)     The Trustees shall have the power, generally or in specific cases, to cause the Asbestos Trust to indemnify the agents, advisors, or consultants of the Asbestos Trust to the same extent as provided in this Section 3.5 with respect to the Trustees.

(d)     Any indemnification under Section 3.5(c) of this Asbestos Trust Agreement shall be made by the Asbestos Trust upon a determination by the Trustees that indemnification of such Entity is proper in the circumstances.

(e)     The Trustees may purchase and maintain reasonable amounts and types of insurance on behalf of the Asbestos Trust and pay any individual who is or was a Trustee, officer, employee, agent or representative of the Asbestos Trust or an Additional Indemnitee against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, FCR, member of the TAC, officer, employee, agent or other representative.

**3.6**     ENCUMBRANCE. The Trustees and the Additional Indemnitees shall have an Encumbrance upon the Asbestos Trust Assets which shall be prior to any other Encumbrance thereon, and the Asbestos Trust hereby grants a security interest in the Asbestos Trust Assets, all proceeds thereof and all accounts into which such proceeds or the Asbestos Trust Assets are deposited or maintained to each of the Trustees and the Additional Indemnitees, to secure the payment of any amounts payable to them pursuant to Section 3.5, 5.5, 6.5 or 7.6. The Asbestos Trust shall take such actions as may be necessary or reasonably requested by any of the Trustees,

12

the FCR, the TAC or any of the other Additional Indemnitees to evidence such Encumbrance (including, without limitation, filing appropriate financing statements).

### Article 4.
### ACCOUNTS, INVESTMENTS, AND PAYMENTS

**4.1** ACCOUNTS. The Trustees may, from time to time, establish and maintain such accounts and reserves within the Asbestos Trust estate as they may deem necessary, prudent, or useful in order to provide for the payment of Asbestos Trust Expenses payable hereunder and Asbestos Claims in accordance with the TDPs, and may, with respect to any such account or reserve, restrict the use of monies therein. In addition, the Trustees shall establish, as soon as practicable after the Effective Date, four separate and distinct accounts (maintained in separate banking and/or other accounts) to be designated the "PI-SE Account," the "PI-AO Account," the "PD Account," and the "Trust Expenses Account," respectively, and none of the assets held in the PI-SE Account, the PI-AO Account, the PD Account, or, the Trust Expenses Account, respectively, shall be commingled with assets held by the Asbestos Trust in any other account. In addition, separate books and records shall be kept with respect to each of the PI-SE Account, the PI-AO Account, the PD Account, and the Trust Expenses Account (collectively, the "Asbestos Trust Accounts"). All amounts received by the Asbestos Trust in respect of the Debtors' Payment and the Sealed Air Payment, and all proceeds thereof and earnings thereon, shall be divided and held by the Asbestos Trust in the following way:

(a)     The amount received by the Asbestos Trust in respect of the Debtors' Payment and the Sealed Air Payment equal to the amount of the Asbestos PI-SE Class Fund, as determined by Bankruptcy Court, and all proceeds thereof and earnings thereon, shall be held solely in the PI-SE Account and shall be used to pay Allowed Asbestos PI-SE Claims as and to the extent provided in the PI-SE TDP, and any and all applicable tax obligations of the Asbestos Trust arising out of the assets comprising such Asbestos PI-SE Class Fund.

(b)     The amount received by the Asbestos Trust in respect of the Sealed Air Payment (to the extent any funds remain after first funding the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund) and the Debtors' Payment equal to the amount of the Asbestos PI-AO Class Fund, as determined by the Bankruptcy Court, and all proceeds thereof and earnings thereon, shall be held solely in the PI-AO Account and shall be used to pay Allowed Asbestos PI-AO Claims as and to the extent provided by the PI-AO TDP, and any and all applicable tax obligations of the Asbestos Trust arising out of the assets comprising such Asbestos PI-AO Class Fund.

(c)     The amount received by the Asbestos Trust in respect of the Debtors' Payment and the Sealed Air Payment equal to the amount of the Asbestos PD Class Fund, as determined by the Bankruptcy

13

Court, and all proceeds thereof and earnings thereon, shall be held solely in the PD Account and shall be used to pay Allowed Asbestos PD Claims as and to the extent provided in the PD TDP, and any and all applicable tax obligations of the Asbestos Trust arising out of the assets comprising such Asbestos PD Class Fund.

(d)    The amount received by the Asbestos Trust in respect of the Debtors' Payment equal to the amount of the Asbestos Trust Expenses Fund, as determined by the Bankruptcy Court, and all proceeds thereof and earnings thereon, shall be held solely in the Trust Expenses Account and shall be used to pay Asbestos Trust Expenses as and to the extent approved by the Trustees, and any and all applicable tax obligations of the Asbestos Trust arising out of the assets comprising such Asbestos Trust Expenses Fund.

**4.2    INVESTMENTS.** Investment of monies held in the Asbestos Trust shall be administered in the manner in which individuals of ordinary prudence, discretion, and judgment would act in the management of their own affairs, subject to the following limitations and provisions:

(a)    The Asbestos Trust shall not acquire, directly or indirectly, equity in any Entity or business enterprise if, immediately following such acquisition, the Asbestos Trust would hold more than 5% of the equity in such Entity or business enterprise.  The Asbestos Trust shall not hold, directly or indirectly, more than 10% of the equity in any Entity or business enterprise.

(b)    The Asbestos Trust shall not acquire or hold any long-term debt securities unless (i) such securities are rated "A" or higher by Moody's Investors Services, Inc. ("Moody's") or by Standard & Poor's Corporation ("S&P"), or (ii) such securities have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(c)    The Asbestos Trust shall not acquire or hold any commercial paper unless such commercial paper is rated "P-1" or higher by Moody's or "A-1" or higher by S&P or has been given an equivalent rating by another nationally recognized statistical rating agency.

(d)    The Asbestos Trust shall not acquire or hold any promissory note of a domestic corporation unless such note is rated "A" or higher by Moody's or S&P.

(e)    The Asbestos Trust shall not acquire or hold any foreign or domestic banker's acceptance, certificate of deposit, time deposit or note, unless that instrument is rated "A" or higher by Moody's or S&P.

14

(f)     The Asbestos Trust may acquire issue which is a direct or indirect obligation of any state, county, city or other qualifying entity. A short term issue may be rated no lower than "M1G 1" or "SP-1"; a long-term issue may be rated no lower than "A" by S&P or Moody's.

(g)     The Asbestos Trust may invest in a money market fund if the fund has minimum net assets of $550 million.

(h)     The Asbestos Trust shall not acquire or hold any common or preferred stock or convertible securities unless such stock or securities are rated "A" or higher by Moody's or "A" or higher by S&P's.

(i)     The Asbestos Trust shall not acquire any securities or other instruments issued by any Entity (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof) if, following such acquisition, the aggregate fair market value as determined in good faith by the Trustees of all securities and instruments issued by such Entity held by the Asbestos Trust would exceed 2% of the aggregate value of the Asbestos Trust. The Asbestos Trust shall not hold any securities or other instruments issued by any Entity (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof to the extent that the aggregate fair market value as determined in good faith by the Trustees of all securities and instruments issued by such Entity and held by the Asbestos Trust would exceed 5% of the aggregate value of the Asbestos Trust.

(j)     The Asbestos Trust shall not acquire or hold any certificates of deposit unless all publicly-held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 4.2(b).

(k)     The Asbestos Trust shall not acquire or hold any options or derivatives.

(l)     The Asbestos Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustees, they are adequately collateralized.

(m)     Notwithstanding the foregoing, the Asbestos Trust may (A) acquire and hold equity or debt securities or instruments of the

15

type(s) described in clauses (a) through (l) of this Section 4.2 which are issued by the Debtors, Reorganized Debtors, or any of their Affiliates, or successors, (B) may hold the Sealed Air Common Stock (but no other securities issues by Sealed Air), and (C) may acquire and hold any other property or asset included in kind in the Asbestos Trust Assets, in each case without regard to any of the limitations set forth in such clauses (a) through (l).

**4.3    SOURCE OF PAYMENTS.** All Asbestos Trust Expenses and all liabilities with respect to each of the Asbestos Claims, shall be payable by the Asbestos Trust out of the Asbestos Trust Accounts. Neither the Debtors, Reorganized Debtors, their respective Affiliates or subsidiaries, any successor in interest or the present or former stockholders, shareholders or Representatives of the Debtors, Reorganized Debtors, or their Affiliates, nor the Trustees, the FCR, the TAC or any of their Representatives shall be liable for the payment of any Asbestos Claims, Asbestos Trust Expenses or any other liability of the Asbestos Trust. Notwithstanding the above, and as described in Section 7.2.2 of the Plan, after the exhaustion of the Asbestos PI-AO Class Fund in its entirety, all Allowed PI-AO Claims shall be paid in Cash by the Asbestos Trust from funds to be paid to the Asbestos Trust by the Reorganized Debtors, such funds being in addition to the Debtors' Payment.

### 4.4    INDEMNIFICATION.

Any claim for indemnification from the Asbestos Trust and all costs and expenses associated therewith (except for an indemnification claim which is also an Asbestos Claim) shall be satisfied from the Trust Expenses Accounts. Nothing herein is intended to be, nor shall it be construed as, an admission as to the validity or enforceability of any particular claim for indemnification, including any claim for indemnification by any Holder of an Asbestos Claim.

### Article 5.
### TRUSTEES

### 5.1    NUMBER.

The initial number of Trustees shall be three (3); provided, however, that the number of Trustees may be increased or decreased in accordance with Section 3.2(h)(iii) hereof. The initial Trustees shall be nominated by the Debtors on or before the Confirmation Date. The Bankruptcy Court, after notice and opportunity for hearing, shall be asked to appoint the three individuals named by the Debtors to serve as Trustees of the Asbestos Trust effective as of the Effective Date.

**5.2    TERM OF SERVICE.** The initial Trustees shall serve from the Effective Date and each successor Trustee or Trustees named to fill a vacancy shall serve from the date of appointment until the earlier of (i) his or her death, (ii) the end of the calendar year in which he or she reaches age 70, (iii) his or her resignation pursuant to Section

16

5.2(b), (iv) his or her removal pursuant to Section 5.2(c), or (v) the termination of the Asbestos Trust pursuant to Section 8.2.

(b)    Any Trustee may resign at any time by written notice to each of the TAC and the FCR. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    Any Trustee may be removed in the event that such Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause shall be deemed to include any substantial failure to comply with Section 3.2, a consistent pattern of neglect and/or failure to perform or participate in performing the duties of a trustee hereunder, or repeated non-attendance at scheduled meetings. Such removal shall be made by the mutual decision of the TAC and the FCR, and shall take effect at such time as the TAC and the FCR jointly shall determine.

5.3    APPOINTMENT OF SUCCESSOR TRUSTEE(S).In the event of a vacancy in the position of a Trustee, the vacancy shall be filled by the joint consent of the TAC and the FCR. If such vacancy has not been filled within ninety (90) days, the Bankruptcy Court shall be asked to fill the vacancy on application of the FCR or any member of the TAC.

(b)    Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.

5.4    LIABILITY OF TRUSTEES, OFFICERS AND EMPLOYEES.No Trustee, officer, or employee of the Asbestos Trust shall be liable to the Asbestos Trust, to any Entity holding an Asbestos Claim, or to any other Entity except for such individual's gross negligence or willful misconduct. Such protection may, in the discretion of the Trustees, be extended to the agents, advisors, or consultants of the Asbestos Trust. No Trustee, officer, or employee of the Asbestos Trust shall be liable for any act or omission of any other officer, employee, agent or consultant of the Asbestos Trust, unless such Trustee, officer, employee or consultant of the Asbestos Trust, respectively, acted with gross negligence or willful misconduct in the selection or retention of such other officer, employee, agent, or consultant of the Asbestos Trust.

5.5    COMPENSATION AND EXPENSES OF TRUSTEES.Each Trustee shall receive compensation from the Asbestos Trust for his or her services as a Trustee in the amount of $_____ per annum plus a per diem allowance for meetings or other Asbestos Trust business attended

17

in the amount of $_____. The per annum compensation payable to each Trustee hereunder shall be reviewed every three (3) years and appropriately adjusted with the consent of each of the FCR and the TAC.

(b)    The Asbestos Trust shall promptly reimburse each Trustee on a monthly basis for all reasonable out-of-pocket costs and expenses incurred by each Trustee in connection with the performance of his or her duties hereunder.

(c)    The Asbestos Trust shall include a description of the amounts paid under this Section 5.5 in the report to be filed pursuant to Section 3.2(c)(i) of this Asbestos Trust Agreement.

**5.6    TRUSTEES' EMPLOYMENT OF PROFESSIONALS.**The Trustees may, but shall not be required to, retain and/or consult with counsel, accountants, appraisers, auditors and forecasters, professionals related to the litigation of Asbestos Claims including but not limited to medical professionals, and other Entities deemed by the Trustees to be qualified as experts on the matters submitted to them with the consent of each of the FCR and the TAC, and the opinion of any such Entities on any matters submitted to them by the Trustees shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustees hereunder in good faith and in accordance with the written opinion of any such Entity, in the absence of gross negligence.

**5.7    TRUSTEES' INDEPENDENCE.**No Trustee shall, during the term of his or her service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for the Reorganized Debtors or any of their successors.  No Trustee shall act as an attorney for any Entity who holds an Asbestos Claim.

**5.8    BOND.**The Trustees shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

### Article 6.
### THE FUTURE CLAIMANTS' REPRESENTATIVE

**6.1    DUTIES.**The FCR shall serve in a fiduciary capacity, for the purpose of protecting the rights of persons that might subsequently assert Claims and/or Demands channeled to the Asbestos Trust.  Where provided in this Asbestos Trust Agreement or the TDPs, certain actions of the Trustees are subject to the consent of the FCR.

**6.2    TERM OF OFFICE.**The FCR shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b), (iii) his or her removal pursuant to Section 6.2(c) or (iv) the termination of the Asbestos Trust pursuant to Section 8.2.

(b)    The FCR may resign at any time by written notice to the Trustees. Such notice shall specify a date when such resignation shall take

18

effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     The FCR may be removed in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause shall be deemed to include a consistent pattern of neglect and failure to perform or to participate in performing the duties of the FCR hereunder and under the TDPs, such as repeated non-attendance at scheduled meetings. Such removal shall be made by decision of the Trustees and the TAC, subject to an order of the Bankruptcy Court approving same, and shall take effect at such time as the Bankruptcy Court's order becomes a Final Order.

**6.3     APPOINTMENT OF SUCCESSOR.**A vacancy caused by resignation shall be filled with an individual designated by the resigning FCR.  A vacancy for any other reason, or in the absence of a designation by the former FCR, shall be filled with an individual selected by the Trustees with the consent of the TAC.

**6.4     FUTURE CLAIMANTS' REPRESENTATIVE'S EMPLOYMENT OF PROFESSIONALS.**The FCR may retain and/or consult with counsel, accountants, appraisers, auditors, forecasters, asbestos experts and other Entities deemed by the FCR to be qualified as experts on matters submitted to them, and the opinion of any such Entities on any matters submitted to them shall be full and complete authorization and protection in support of any action taken or not taken by the FCR hereunder in good faith and in accordance with the written opinion of any such Entity, and in the absence of gross negligence.  The FCR and his or her experts shall at all times have complete access to the Asbestos Trust's officers, employees and agents, and the accountants, appraisers, auditors, forecasters and other experts retained by the Asbestos Trust as well as to all information generated by them or otherwise available to the Asbestos Trust or the Trustees.

**6.5     COMPENSATION AND EXPENSES OF THE FUTURE CLAIMANTS' REPRESENTATIVE.**The FCR shall receive compensation from the Asbestos Trust for his or her services in the form of the FCR's normal hourly rate for services performed, consistent with the Bankruptcy Court's order approving his appointment, such compensation being subject to an annual review, adjustment, and approval by the Trustees.

(b)     The Asbestos Trust shall promptly reimburse, or pay directly if so instructed, the FCR for all reasonable out-of-pocket costs and expenses, including (i) fees and costs associated with the employment of professionals pursuant to Section 6.4, (ii) reasonable fees and costs incurred in connection with the performance of his or her duties hereunder, and (iii) reasonable fees and costs associated with the procurement and maintenance of insurance incurred by the FCR in connection with the performance of his or her duties hereunder.  All such reimbursements or direct

19

payments shall be subject to approval by the Trustees and shall be deemed Asbestos Trust Expenses.

**6.6    PROCEDURE FOR OBTAINING CONSENT OF THE FUTURE CLAIMANTS' REPRESENTATIVE.**In the event the consent of the FCR is required pursuant to the terms of this Asbestos Trust Agreement, the Trustees shall promptly provide the FCR and his or her counsel with notice and with all information regarding the matter in question.

(b)    The FCR must consider in good faith and in a timely fashion any request by the Trustees and may not withhold his or her consent unreasonably. If the FCR does not notify the Trustees of his or her objection to such request within 20 days or such other time period as has been approved by the Bankruptcy Court after receiving notice and information regarding such request, then the FCR's consent shall be deemed to have been affirmatively granted.

**6.7    LACK OF CONSENT OF THE FUTURE CLAIMANTS' REPRESENTATIVE.**In the event the Trustees are unable to obtain the consent of the FCR to any action or decision for which consent is required after following the procedure set forth in Section 6.6 of this Asbestos Trust Agreement, or if the Trustees and the FCR are unable to reach agreement on any matter on which such consent is required, the matter shall be submitted promptly to alternative dispute resolution if mutually agreeable to the Trustees and the FCR.

(b)    If the disagreement is not resolved by alternative dispute resolution or if the Trustees and the FCR do not agree to participate in any such alternative dispute resolution, the Trustees may apply to the Bankruptcy Court on an expedited basis for approval of such action or decision, and only if such approval is given by the Bankruptcy Court by entry of an appropriate order, shall the Trustees have the authority to implement such action or decision without the FCR's consent.

**6.8    LIABILITY OF FUTURE CLAIMANTS' REPRESENTATIVE, OFFICERS AND EMPLOYEES.**The FCR shall not be liable to the Asbestos Trust, to any Entity holding an Asbestos Claim, or to any other Entity except for such individual's own gross negligence or willful misconduct. Such protection may, in the discretion of the Trustees, be extended to the agents, advisors, or consultants of the FCR. Neither the FCR nor any officer or employee of the FCR shall be liable for any act or omission of any other Representative of the Asbestos Trust, unless the FCR, or officer or employee of the FCR, acted with gross negligence or willful misconduct in the selection or retention of such other Representative of the Asbestos Trust.

20

## Article 7.
## TRUST ADVISORY COMMITTEE

     **7.1**   FORMATION AND NUMBER.The TAC shall be formed pursuant to the Plan as of the Effective Date. The TAC shall be composed of three (3) members. The initial TAC members shall be appointed by the Bankruptcy Court pursuant to Section 7.2.7 of the Plan and named on the signature page hereof. The TAC shall have a chairperson who shall act as the TAC's liaison with the Asbestos Trust and the FCR, coordinate and schedule meetings of the TAC, and handle all administrative matters that come before the TAC.

     **7.2**   DUTIES.The TAC and its members shall serve in a fiduciary capacity representing all Holders of Asbestos Trust Claims as of the Effective Date. Where provided in this Asbestos Trust Agreement or the TDPs, certain actions by the Trustees are subject to the consent of the TAC.

     **7.3**   TERM OF OFFICE.Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 7.3(b), (iii) his or her removal pursuant to Section 7.3(c) or (iv) the termination of the Asbestos Trust pursuant to Section 8.2.

     (b)   Any member of the TAC may resign at any time by written notice to each of the remaining members of the TAC. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

     (c)   Any member of the TAC may be removed in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause shall be deemed to include a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder and under the TDPs, such as repeated non-attendance at scheduled meetings. Such removal shall be made by the majority vote of the Trustees, the FCR and the other members of the TAC, and shall take effect at such time as the Trustees', the FCR and the other members of the TAC jointly determine.

     **7.4**   APPOINTMENT OF SUCCESSORS.A vacancy in the TAC caused by resignation, death, or removal shall be filled with an individual, not a firm, approved by the majority vote of the FCR and all remaining members of the TAC.

     **7.5**   THE TAC'S EMPLOYMENT OF PROFESSIONALS.The TAC may retain and/or consult with counsel, accountants, appraisers, auditors, forecasters, asbestos experts and other Entities deemed by the TAC to be qualified as experts on matters submitted to them, and the opinion of any such Entities on any matters submitted to them shall be full and complete authorization and protection in support of any action taken or not taken by the TAC hereunder in

21

good faith and in accordance with the written opinion of any such Entity, and in the absence of gross negligence. The TAC and its experts shall at all times have complete access to the Asbestos Trust's officers, employees and agents, and the accountants, appraisers, auditors, forecasters and other experts retained by the Asbestos Trust as well as all information generated by them or otherwise available to the Asbestos Trust or the Trustees.

**7.6    COMPENSATION FOR ATTENDANCE AT MEETINGS AND EXPENSES OF THE TAC.**The members of the TAC shall be compensated for attendance at meetings in the form of a reasonable hourly rate set by the Trustees, such compensation being subject to an annual review, adjustment, and approval by the Trustees. The Asbestos Trust shall promptly reimburse, or pay directly if so instructed, the TAC and each respective TAC member for all reasonable out-of-pocket costs and expenses, including reasonable fees and costs associated with employment of professionals pursuant to Section 7.5 and the procurement and maintenance of insurance incurred by the TAC in connection with the performance of its members' duties hereunder. All such reimbursements or direct payments shall be subject to approval by the Trustees and shall be deemed Asbestos Trust Expenses.

**7.7    PROCEDURE FOR OBTAINING CONSENT OF THE TAC.**In the event the consent of the TAC is required pursuant to the terms of this Asbestos Trust Agreement, the Trustees shall promptly provide the TAC and its counsel with notice and with all information regarding the matter in question.

(b)    The TAC must consider in good faith and in a timely fashion any request by the Trustees and may not withhold its consent unreasonably. If the TAC does not notify the Trustees of its objection to such request within 20 days or such other time period as has been approved by the Bankruptcy Court after receiving notice and information regarding such request, then the TAC's consent shall be deemed to have been affirmatively granted.

(c)    Except where otherwise provided for in this Asbestos Trust Agreement, the TAC shall act in all cases by majority vote.

**7.8    LACK OF CONSENT OF THE TAC.**In the event the Trustees are unable to obtain the consent of the TAC on any action or decision for which consent of the TAC is required, after following the procedure set forth in Section 7.7 of this Asbestos Trust Agreement, or if the Trustees and the TAC are unable to reach agreement on any matter on which the TAC's consent is required, then the matter may be submitted promptly to alternative dispute resolution if mutually agreeable to the Trustees and the TAC.

(b)    If the disagreement is not resolved by alternative dispute resolution, or if the Trustees and the TAC do not agree to participate in any such alternative dispute resolution, the Trustees may apply to the Bankruptcy Court on an expedited basis for

22

approval of such action or decision, and only if such approval is given by the Bankruptcy Court by entry of an appropriate order, shall the Trustees have the authority to implement such action or decision without the TAC's consent.

**7.9     LIABILITY OF THE TAC'S, OFFICERS AND EMPLOYEES.**No member of the TAC shall be liable to the Asbestos Trust, to any Entity holding an Asbestos Claim, or to any other Entity except for such individual's gross negligence or willful misconduct. Such protection may, in the discretion of the Trustees, be extended to the agents, advisors, or consultants of the TAC. No member of the TAC, nor any officer or employee of the TAC, shall be liable for any act or omission of any other officer, employee, agent or consultant of the TAC unless the member of the TAC, or officer or employee of the TAC, acted with gross negligence or willful misconduct in the selection or retention of such other officer, employee, agent, or consultant of the Asbestos Trust.

### Article 8.
### GENERAL PROVISIONS

**8.1     IRREVOCABILITY.**The Asbestos Trust is irrevocable.

**8.2     TERMINATION.**The Asbestos Trust shall automatically terminate on the date ninety (90) days after the first to occur of the following events (the "Termination Date"):

(i)     subject to Section 3.2(h), the Trustees in their discretion decide to terminate the Asbestos Trust because (A) they deem it unlikely that new Asbestos Claims will be filed against the Asbestos Trust, and (B) Asbestos Claims duly filed with the Asbestos Trust have been Allowed and paid to the extent provided in this Asbestos Trust Agreement and the TDPs (and to the extent possible based upon the funds available through the Plan Documents), or Disallowed by a Final Order, and twelve (12) consecutive months have elapsed during which no new Asbestos Claims have been filed with the Asbestos Trust; or

(ii)     if the Trustees have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the Asbestos Trust in a manner consistent with this Asbestos Trust Agreement and the TDPs, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a Final Order.

23

91100-001\DOCS_DE:102548.1

(b)     On the Termination Date after payment of all the Asbestos Trust's liabilities, after all Demands have been provided for and after liquidation of all properties and other non-cash Asbestos Trust Assets then held by the Asbestos Trust, all monies remaining in the Asbestos Trust estate shall be given to such organization(s) exempt from federal income tax under Section 501(c)(3) of the IRC, which tax-exempt organization(s) shall be selected by the Trustees using their reasonable discretion; provided, however, that (i) if practicable, the tax-exempt organization(s) shall be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos-related lung disorders, and (ii) the tax-exempt organization(s) shall not bear any relationship to Reorganized Debtors within the meaning of Section 468B(d)(3) of the IRC.   Notwithstanding any other provision of the Plan Documents, this Section 8.2(b) cannot be modified or amended.

**8.3**     **AMENDMENTS.**The Trustees, after consultation with the FCR and the TAC, and subject to the consent of each of the FCR and the TAC to the extent provided elsewhere in this Asbestos Trust Agreement, may modify or amend this Asbestos Trust Agreement or any document annexed to it, including the TDPs (provided, however, the provisions of the TDPs, if any, regarding any such modification or amendment are also followed). Any modification or amendment made pursuant to this Section 8.3 must be done in writing. Notwithstanding anything contained in this Asbestos Trust Agreement to the contrary, neither this Asbestos Trust Agreement, the TDPs nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify the applicability of Section 524(g) of the Bankruptcy Code, the efficacy or enforceability of the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction or the Released Matters Injunction set out in the Plan, the Asbestos Trust's QSF status under Section 468B of the IRC or the rights of the Debtors or the Reorganized Debtors under the Plan Documents.

**8.4**     **MEETINGS.**The FCR, the Trustees, or a TAC member shall be deemed to have attended a meeting described in Section 3.2(g) herein in the event such person spends a substantial portion of the day conferring, by phone or in person, on Asbestos Trust matters with the FCR, the Trustees or a TAC member, as applicable. The Trustees shall have complete discretion to determine whether a meeting, as described herein, occurred for purposes of this Asbestos Trust Agreement.

**8.5**     **SEVERABILITY.**Should any provision in this Asbestos Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Asbestos Trust Agreement.

**8.6**     **NOTICES.**Notices to Entities asserting Asbestos Claims shall be given at the address of such Entity, or, where applicable, such Asbestos Trust Entity's representative, in each case as provided on such person's claim form submitted to the Asbestos Trust with respect to his or her or its Asbestos Claim or as otherwise provided to the Asbestos Trust. Any notices or other report required or permitted by this Asbestos Trust Agreement must be in (i) writing and

24

is deemed given (a) when delivered personally to the recipient, (b) when sent by facsimile before 5:00 p.m. prevailing eastern time on a Business Day with a copy of such facsimile sent on the same day to the recipient by reputable overnight courier service (charges prepaid), (c) five (5) days after deposit in the U.S. mail, mailed by registered or certified mail, return receipt requested, postage prepaid, or (d) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); and (ii) addressed to the other Entities at the addresses set forth below, or at such other address as such Entity now designates from time to time in writing in accordance with this Section 8.6.

To the Asbestos Trust through the Trustees:

> _____
> _____
> _____
> Attention: _____
> Fax: _____

To the TAC:

> _____
> _____
> _____
> Attention: _____
> Fax: _____

To the Future Claimants' Representative:

> 8260 Willow Oaks Corp. Drive
> P.O. Box 10415
> Fairfax, VA 22031
> Attention: David T. Austern
> Fax: (703) 205-6249

With a copy to:

> Swindler, Berlin, Shereff, Friedman LLP
> The Washington Harbour
> 3000 K Street, NW, Suite 300
> Washington, DC 20007
> Attention: Roger Frankel
> Fax: (202) 424-7643

To Debtors, Settlors or Reorganized Debtors:

> W. R. Grace & Co.
> 7500 Grace Drive

91100-001\DOCS_DE:102548.1

Columbia, MD 21044
Attention: Secretary
Fax: (410) 531-4545

With a copy to:

Kirkland & Ellis LLP
777 South Figueroa Street, 37th Floor
Los Angeles, CA 90017
Attention: Bennett L. Spiegel / Lori Sinanyan
Fax: (213) 680-8500

and

Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
Attention: Jonathan Friedland / Ryan Bennett
Fax: (312) 861-2200

and

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Attention: Laura Davis Jones / David W. Carickhoff, Jr.
Fax: (302) 652-4400

All such notices and communications, if delivered personally or via overnight courier or if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return electronic transmission.

26

**8.7    SUCCESSORS AND ASSIGNS.**The provisions of this Asbestos Trust Agreement shall be binding upon and inure to the benefit of the Debtors, Reorganized Debtors, the Asbestos Trust and the Trustees and their respective successors and assigns, except that neither the Debtors nor the Asbestos Trust nor the Trustees may assign or otherwise transfer any of its, or his or her rights or obligations under this Asbestos Trust Agreement, except, in the case of the Asbestos Trust and the Trustees, as contemplated by Section 3.1 and 8.2.

**8.8    LIMITATION ON CLAIM INTERESTS FOR SECURITIES LAWS PURPOSES.**Asbestos Claims and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution, (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

**8.9    ENTIRE AGREEMENT; NO WAIVER.**The entire agreement of the parties relating to the subject matter of this Asbestos Trust Agreement is contained herein and in the documents referred to herein, and this Asbestos Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity, except as otherwise provided in the Asbestos Channeling Injunction.

**8.10    HEADINGS.**The headings used in this Asbestos Trust Agreement are inserted for convenience only and neither constitute a portion of this Asbestos Trust Agreement, nor in any manner affect the construction of the provisions of this Asbestos Trust Agreement.

**8.11    GOVERNING LAW.**This Asbestos Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without regard to Delaware conflict of laws principles.

**8.12    DISPUTE RESOLUTION.**Any disputes that arise under this Asbestos Trust Agreement or under the TDPs or the Trust By-Laws shall be resolved by the Bankruptcy Court pursuant to the Plan, except as otherwise provided herein, or in the TDPs or in the Trust By-Laws. Notwithstanding anything else herein contained, to the extent any provision of this Asbestos Trust Agreement is inconsistent with any provision of the Plan, the Plan shall control.

**8.13    ENFORCEMENT AND ADMINISTRATION.**The provisions of this Asbestos Trust Agreement and the annexes hereto shall be enforced by the Bankruptcy Court pursuant to the Plan. The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustees.

**8.14    EFFECTIVENESS.**This Asbestos Trust Agreement shall not become effective until such time as it has been approved by the Bankruptcy Court and executed and delivered by all the parties hereto, and the Effective Date of the Plan has occurred.

27

**8.15    COUNTERPART SIGNATURES.**This Asbestos Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.

**8.16    NOTICES UNDER PLAN DOCUMENTS.**The Trustees shall deliver to the TAC and the FCR a copy of all written notices that the Asbestos Trust or the Trustees give or receive under any of the Plan Documents (other than the TDPs) promptly after receipt of the same.  Notices to the TAC or the FCR under the TDPs shall be governed by the provisions of the TDPs.

\* \* \* \* \*

[signature page to follow]

28

IN WITNESS WHEREOF, the parties have executed this WRG Asbestos Trust Agreement this day of _____, 2005.

**SETTLORS:**

By: _____
Name: _____
Title: _____

**TRUSTEES:**

_____
Name:

_____
Name:

_____
Name:

**FUTURE CLAIMANTS' REPRESENTATIVE**

_____
Name:

**TRUST ADVISORY COMMITTEE**

_____
Name:

_____
Name:

_____
Name:

_____

29

# Exhibit Tab 6

## PI-SE Trust Distribution Procedures

## W. R. GRACE & CO. 524(g)
## PI-SE TRUST DISTRIBUTION PROCEDURES

This set of W. R. Grace & Co. 524(g) PI-SE Trust Distribution Procedures (the "PI-SE TDP") provides for the liquidation of all Asbestos PI-SE Cash-Out Claims and for the payment of all Allowed Asbestos PI-SE Claims.

The Plan and the Asbestos Trust Agreement establish the Asbestos Trust. The Trustees of the Asbestos Trust shall implement and administer this PI-SE TDP in accordance with the Asbestos Trust Agreement.

### Section I

### Introduction

1.1    **Purpose.**  This PI-SE TDP has been adopted pursuant to the Asbestos Trust Agreement. It is designed to provide (a) fair and equitable treatment for Asbestos PI-SE Claims that may presently exist or may arise in the future in substantially the same manner as each other; and (b) the mechanism by which all Allowed Asbestos PI-SE Claims are to be paid once they have been liquidated, whether such liquidation is pursuant to the Litigation Option or the Cash-Out Option.

1.2    **Interpretation.**  Nothing in this PI-SE TDP shall be deemed to create a substantive right for any Claimant, beyond the right of a Claimant who is treated under this PI-SE TDP to enforce its terms.

1.3    **Definitions.**  Capitalized terms used herein, but not otherwise defined herein, shall have the meanings assigned to them in the Glossary. .

## Section II

### Overview

2.1    **Asbestos Trust Goals.**  A primary goal of the Asbestos Trust is to treat all Holders of Asbestos Claims equitably.  This PI-SE TDP furthers that goal by setting forth procedures for processing, Allowing or Disallowing, and paying Holders of Allowed Asbestos PI-SE Cash-Out Claims on an impartial, first-in-first-out ("FIFO") basis.  This PI-SE TDP also provides the mechanism for paying Holders of Allowed Asbestos PI-SE Claims whose Claims are liquidated through the Litigation Option.

2.2    **Claims Liquidation Procedures.**  Asbestos PI-SE Cash-Out Claims shall be processed, Allowed or Disallowed, and otherwise determined in the order of their place in the FIFO Processing Queue to be established pursuant to Sections 5.1(a) and 5.1(b) of this PI-SE TDP.

The Asbestos Trust shall liquidate and offer to pay all Asbestos PI-SE Cash-Out Claims that it in the first instance determines to meet the Medical/Exposure Criteria of Disease Levels I, II, III, IV, V, or VI, efficiently and expeditiously under the Expedited Review Process described in Section 5.2(a) of this PI-SE TDP.  An asserted Asbestos PI-SE Cash-Out Claim in Disease Level I, II, III, IV, V, or VI that the Asbestos Trust determines does not meet the Medical/Exposure Criteria for the asserted Disease Level may undergo the Individual Review Process described in Section 5.2(b) of this PI-SE TDP, if the Holder of such Claim elects.  In such a case, notwithstanding that the Asbestos Trust initially determined the asserted Asbestos PI-SE Cash-Out Claim does not meet the Medical/Exposure Criteria for the asserted Disease Level, the Asbestos Trust can offer the Claimant the Scheduled Value of the asserted Disease Level if the Asbestos Trust is satisfied, upon reconsideration pursuant to Individual Review, that its initial determination was in error.

2

Disputes over an Asbestos PI-SE Cash-Out Claim, including whether particular Medical/Exposure Criteria are satisfied, shall be subject, first to the Individual Process provided for in Section 5.2(b) of this PI-SE TDP and second, to binding arbitration, as provided for in Section 5.7 of this PI-SE TDP, both at the election of the Holder of such Claim.

## Section III

### PI-SE TDP Administration

3.1    **Trust Advisory Committee and Future Claimants' Representative.** Pursuant to the Plan and the Asbestos Trust Agreement, this PI-SE TDP will be administered by the Trustees in consultation with the TAC (which represents, among others, the interests of Holders of present Asbestos PI-SE Claims), and the Future Claimants' Representative (who represents, among others, the interests of Holders of Asbestos PI-SE Claims that may be asserted in the future). The initial members of the TAC and the initial Future Claimants' Representative are identified on the signature pages to the Asbestos Trust Agreement.

3.2    **Consent and Consultation Procedures.** In those circumstances in which consultation or consent is required hereunder, the Trustees shall provide written notice to the TAC and the Future Claimants' Representative of such action that is proposed. The Trustees shall not implement such action unless and until the parties have engaged in the consent process described in the Asbestos Trust Agreement.

## Section IV

### Offsets

4.1    **Offsets.** If an Allowed Asbestos PI-SE Claim is secured by an appeal bond or is entitled to the benefit of any other security provided by or on behalf of Grace, the Asbestos Trust shall offset against the Allowed Amount of such Asbestos PI-SE Claim an amount equal to the amount such Holder is entitled to receive from, under, or in respect of such appeal bond or other

3

K&E 9763561.25

security, and the amount the Holder of such Allowed Asbestos PI-SE Claim shall receive under this PI-SE TDP shall equal the Allowed Amount of such Claim, as reduced by such offset.

## Section V

### Resolution of Asbestos PI-SE Claims

5.1    **Ordering, Processing and Payment of Claims**

5.1(a)  **Ordering of Asbestos PI-SE Claims**

5.1(a)(1)        **Establishment of the FIFO Processing Queue.**    The Asbestos Trust will order Asbestos PI-SE Cash-Out Claims for processing and determination purposes on a FIFO basis except as otherwise provided herein (the "FIFO Processing Queue"). For all Asbestos PI-SE Cash-Out Claims that constitute Asbestos PI Pre-petition Litigation Claims, a Claimant's position in the FIFO Processing Queue shall be determined according to the date prior to the Petition Date that the specific Asbestos PI-SE Cash-Out Claim was filed against Grace in the tort system, with an earlier filing date given priority over a later filing date. For all Asbestos PI-SE Cash-Out Claims that do not constitute Asbestos PI Pre-petition Litigation Claims, a Claimant's position in the FIFO Processing Queue shall be determined according to the later of the Effective Date and the date that the Claims Materials with respect to the specific Asbestos PI-SE Cash-Out Claim were filed with the Asbestos Trust, with an earlier filing date given priority over a later filing date.  Any Asbestos PI-SE Cash-Out Claims that do not constitute Asbestos PI Pre-petition Litigation Claims and as to which the Claims Materials were filed with the Asbestos Trust prior to the Effective Date shall be deemed to have been filed on the Effective Date.

If any Claims are filed or are deemed to be filed on the same date, the Claimant's position in the FIFO Processing Queue shall be determined by the date of the diagnosis of the asbestos-related disease, with an earlier diagnosis date given priority over a later diagnosis date.

4

If any Claims are filed and diagnosed on the same date, the Claimant's position in the FIFO Processing Queue shall be determined by the Disease Level asserted by the Claimant, with higher numbered Disease Levels given priority over lower numbered Disease Levels.

5.1(a)(2)    **Effect of Statutes of Limitations and Repose.**  To be eligible for a place in the FIFO Processing Queue, an Asbestos PI-SE Cash-Out Claim must meet the following requirements, as applicable:  (i) for Claims first filed in the tort system against Grace prior to the Petition Date, such Claims must have been filed prior to the expiration of the applicable statutes of limitation and repose that were in effect at the time of the filing of the Claim in the tort system, or (ii) for Claims not filed against Grace in the tort system prior to the Petition Date, such Claims must have been filed prior to the expiration of the applicable statutes of limitation and repose that were in effect at the time of the filing with the Asbestos Trust, including any extension of such periods pursuant to Bankruptcy Code § 108(c), if applicable. However, the running of the relevant statute of limitation shall be tolled as of the earliest of (A) the actual filing of the Claim in the tort system against Grace prior to the Petition Date; (B) the filing of the Claim against another defendant in the tort system prior to the Petition Date if the Claim was tolled against Grace at the time by an agreement or otherwise; or (C) the filing of complete Claims Materials with the Asbestos Trust after the Effective Date.

Any Claims that were first diagnosed after the Petition Date, irrespective of the application of any relevant statute of limitation or repose, may be filed with the Asbestos Trust within, but not later than, three (3) years after the date of diagnosis or within, but not later than, three (3) years after the Effective Date, whichever occurs later.

5

5.1(b) **Processing of Asbestos PI-SE Cash-Out Claims.** As a general practice, the Asbestos Trust will review its Claims files on a regular basis and notify all Claimants whose Claims are likely to come up in the FIFO Processing Queue in the near future.

5.1(c) **Payment of Asbestos PI-SE Claims.** Claims shall be paid in FIFO order based on the date their liquidation became final (the "FIFO Payment Queue"), with an earlier liquidation date given priority over a later liquidation date, regardless of whether liquidation occurred under the Cash-Out Option or under the Litigation Option.

Where the Claimant is deceased or incompetent, and the settlement and payment of his or her Asbestos PI-SE Claim must be approved by a court of competent jurisdiction prior to acceptance of an offer made by the Asbestos Trust on the Claim by the Claimant's representative, such offer shall remain open so long as proceedings before that court remain pending, provided that the Asbestos Trust has been furnished with evidence that the settlement offer has been submitted to such court for approval. If the offer is ultimately approved by that court and accepted by the Claimant's representative, the Asbestos Trust shall pay the Claim in the amount so offered.

If any Claims are liquidated on the same date, each such Claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of such Claimant's asbestos-related disease, with earlier diagnosis dates given priority over later diagnosis dates. If any Claims are liquidated on the same date and the respective Holders' asbestos-related diseases were diagnosed on the same date, the position of those claims in the FIFO Payment Queue shall be determined by the Disease Level being paid, with Claims of higher numbered Disease Levels given priority over lower numbered Disease Levels.

6

5.2    **Resolution of Unliquidated Asbestos PI-SE Cash-Out Claims.**  Within six months after the establishment of the Asbestos Trust, the Trustees, with the consent of the TAC and the Future Claimants' Representative, shall adopt procedures that are consistent with this PI-SE TDP for reviewing and liquidating all unliquidated Asbestos PI-SE Cash-Out Claims, which shall include deadlines for processing such Claims.  Such procedures shall also require Claimants seeking resolution of unliquidated Asbestos PI-SE Cash-Out Claims to file Claims Materials, to the extent such Claimants did not previously file Asbestos PI Proof of Claim Forms and Asbestos PI Questionnaires during the Chapter 11 Cases.  The Asbestos Trust shall endeavor to provide an initial response to the Claimant within six months of receiving the Claims Materials.

All Asbestos PI-SE Cash-Out Claims shall be deemed to be a Claim for the highest Disease Level for which the Claim qualifies at the time of filing, with all lower Disease Levels for which the Claim then qualifies or may qualify in the future subsumed into the higher Disease Level for both processing and payment purposes.

5.2(a)  **Expedited Review Process**

5.2(a)(1)    **In General.**  The Asbestos Trust's Expedited Review Process is designed to provide a fair, expeditious, efficient, and inexpensive method for liquidating an Asbestos PI-SE Claim where the Claim can be readily verified by the Asbestos Trust as meeting the Medical/Exposure Criteria for the relevant Disease Level.  Expedited Review thus provides Holders of Asbestos PI-SE Cash-Out Claims with a substantially less burdensome process for pursuing Asbestos PI-SE Claims than does litigating such Claims.

Thus, Claims that undergo Expedited Review and meet the Medical/Exposure Criteria for the relevant Disease Level shall be assigned the Scheduled Value for such Disease Level set forth in Section 5.2(a)(3) of this PI-SE TDP.  Claims treated under the Cash-Out Option that are

7

found not to meet the Medical/Exposure Criteria for the relevant Disease Level are eligible for the Individual Review Process set forth in Section 5.2(b) of this PI-SE TDP and, subsequently, to binding arbitration as provided for in Section 5.7 of this PI-SE TDP, if the Holders of such Claims elect to pursue those options.

5.2(a)(2)    **Claims Processing under Expedited Review.**    As a particular Claimant's Claims Materials or Asbestos PI Proof of Claim Form and Asbestos PI Questionnaire, as applicable, are reached in the FIFO Processing Queue, the Asbestos Trust shall determine whether the Claim described therein meets the Medical/Exposure Criteria for one of the Disease Levels eligible for payment under Expedited Review, and shall advise the Claimant of its determination.  If the Asbestos Trust determines the Claim is eligible for payment under Expedited Review, the Asbestos Trust shall tender to the Claimant an offer of payment of the Scheduled Value for the relevant Disease Level.  If the Claimant accepts the Scheduled Value, the Claim shall be placed in the FIFO Payment Queue, in accordance with Section 5.1(c) of this PI-SE TDP, following which the Trust shall disburse payment.

5.2(a)(3)    **Disease    Levels,    Scheduled    Values,    and Medical/Exposure Criteria.**  The disease levels covered by this PI-SE TDP (each, a "Disease Level") together with the medical/exposure criteria for each such Disease Level (as applicable, the "Medical/Exposure Criteria") and the Scheduled Values for each of the Disease Levels eligible for Expedited Review (as applicable, the "Scheduled Value"), are set forth in this Section.

8

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma (Level VI) | $71,215.00 | Medical Criteria: Malignant mesothelioma diagnosed[1] on the basis of the findings of a board certified pathologist.<br><br>Exposure Criteria: Grace Exposure.[2] |
| Asbestos-Related Lung Cancer 1 (Level V) | $21,726.00 | Medical Criteria: (1) primary lung cancer diagnosed on the basis of findings by a board certified pathologist; and (2) evidence of asbestosis based on a chest x-ray reading by a certified B-reader of at least 1/1 on the ILO grade scale or asbestosis determined by pathology; and (3) supporting medical documentation establishing asbestos exposure as a substantial contributing factor in causing the cancer.<br><br>Exposure Criteria: (1) six months of Grace Exposure; and (2) Significant Occupational Exposure.[3] |
| Asbestos-Related Lung Cancer 2 (Level IV) | $7,826.00 | Medical Criteria: (1) primary lung cancer diagnosed on the basis of findings by a board certified pathologist; and (2) a diagnosis of asbestos-related nonmalignant disease based on a chest x-ray reading by a certified B-reader of at least 1/0, or blunting of either costophrenic angle and bilateral pleural plaque or bilateral pleural thickening of at least grade B2 or greater, or bilateral pleural disease of grade B2 or greater; and (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question.<br><br>Exposure Criteria: Six months of Grace Exposure and Significant Occupational Exposure. |
| Asbestos-Related Other Cancer (Level III) | $6,488.00 | Medical Criteria: (1) primary colorectal, laryngeal, esophageal, pharyngeal or stomach cancer diagnosed on the basis of findings by a board certified pathologist; and (2) evidence of asbestosis based on a chest x-ray reading by a board certified B-reader of at least 1/1 on the ILO grade scale or asbestosis determined by pathology; and (3) supporting medical documentation establishing asbestos exposure as a substantial contributing factor in causing the cancer.<br><br>Exposure Criteria: (1) six months of Grace Exposure; and (2) Significant Occupational Exposure. |

---

[1] The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this PI-SE TDP are set forth in Section 5.4(a) of this PI-SE TDP.

[2] The term "Grace Exposure" is defined in Section 5.4(b)(3).

[3] The term "Significant Occupational Exposure" is defined in Section 5.4(b)(2).

9

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| Clinically Severe Asbestosis (Level II) | $17,299.00 | Medical Criteria: (1) asbestosis diagnosed by a board certified pulmonologist or internist, and an independently replicated chest x-ray by a certified B-reader of 2/1 on the ILO grade scale, and either (a) total lung capacity less than 65% or (b) forced vital capacity less than 65% and a FEV1/FVC ratio greater than or equal to 65%; or (2) asbestosis determined by pathology.[4]<br><br>Exposure Criteria: (1) six months of Grace Exposure; and (2) Significant Occupational Exposure. |
| Asbestosis (Level I) | $4,459.00 | Medical Criteria: asbestosis diagnosed by a board certified pulmonologist or internist, and (1) an independently replicated chest x-ray reading by a certified B-reader of 1/0 on the ILO grade scale, or (2) blunting of either costophrenic angle and bilateral pleural plaque or bilateral pleural thickening of at least grade B2 or greater, or (3) bilateral pleural disease of grade B2 or greater and (a) total lung capacity less than 80% or (b) forced vital capacity less than 80% and a FEV1/FVC ratio greater than or equal to 65%.<br><br>Exposure Criteria: (1) six months of Grace Exposure; and (2) Significant Occupational Exposure. |

These Disease Levels, Scheduled Values, and Medical/Exposure Criteria shall apply to all Asbestos PI-SE Cash-Out Claims filed with the Asbestos Trust.

### 5.2(b) Individual Review Process

5.2(b)(1)    **In General.** Claimants asserting Asbestos PI-SE Cash-Out Claims shall be eligible, upon election, to seek Individual Review of the evidence supporting their alleged satisfaction of the Medical/Exposure Criteria if the Asbestos Trust in the first instance determines such Medical/Exposure Criteria not to be satisfied. Individual Review shall consist of a reconsideration by the Asbestos Trust of the Claims Materials or Asbestos PI Proof

---

[4]    The term asbestosis determined by pathology means indications of asbestosis based on the pathological grading system for asbestosis described in the Special Issues of the Archives of Pathology and Laboratory Medicine, "Asbestos-Associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982).

K&E 9763561.25

of Claim Form and Asbestos PI Questionnaire, as applicable, previously submitted by the Claimant, along with any additional information that the Claimant submits along with the Claimant's request for Individual Review. In such a case, notwithstanding that the Asbestos Trust initially determined the asserted Asbestos PI-SE Cash-Out Claim does not meet the Medical/Exposure Criteria for the asserted Disease Level, the Asbestos Trust can offer the Claimant the Scheduled Value of the asserted Disease Level if the Asbestos Trust is satisfied, upon reconsideration pursuant to Individual Review, that its initial determination was in error. The Trustees may institute procedures governing the Individual Review Process that are not inconsistent with this PI-SE TDP, the Asbestos Trust Agreement, or the Plan. A Claimant will be entitled, upon election, to seek binding arbitration under Section 5.7 of this PI-SE TDP if he or she is unsatisfied with the results of the Individual Review Process of his or her Claim.

    5.3    **Certain Derivative Claimants.**

        5.3(a)  **Second Hand Claims.** If a Claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, (a "Second Hand Claim") the Claimant may seek Individual Review of his or her Claim pursuant to Section 5.2(b) of this PI-SE TDP. In such a case, the Claimant must establish that the occupationally exposed person would have met the exposure requirements under this PI-SE TDP that would have been applicable had that person filed a direct Claim against the Asbestos Trust. In addition, the Holder of a Second Hand Claim must establish that (i) he or she is suffering from one of the compensable Disease Levels described in this PI-SE TDP; (ii) his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person experienced Grace Exposure as defined in Section 5.4(b)(3); and (iii) such Grace Exposure was a cause of the claimed disease. The Claims Materials to be provided by the

11

Asbestos Trust shall include provisions for capturing information about Second Hand Claims. All liquidation and payment rights and limitations under this PI-SE TDP shall be applicable to such Claims.

5.3(b) **Third Party Indemnity/Contribution Claims.** As set forth in the Plan, Third Party Indemnification/Contribution Claims, if any, with respect to Asbestos PI-SE Claims constitute Asbestos PI-SE Claims, but are not eligible to be treated as Asbestos PI-SE Cash-Out Claims and will be deemed to have elected the Litigation Option.

5.4    **Medical/Exposure Requirements**

5.4(a)  **Medical Evidence**

5.4(a)(1)    **In General.** All diagnoses of a Disease Level must be accompanied by either (i) a statement by the physician providing the diagnosis that at least 10 years have elapsed between the date of first Grace Exposure and the diagnosis, or (ii) a history of the Claimant's Grace Exposure sufficient to establish a 10-year latency period. A finding by a physician that a Claimant's disease is "consistent with" or "compatible with" asbestosis will not alone be treated by the Asbestos Trust as a diagnosis.

5.4(a)(1)(A)   **Disease Level I and II.** All diagnoses of non-malignant asbestos-related disease (Disease Levels I and II) shall be based upon (A) a physical examination of the Claimant by the board certified physician providing the diagnosis of the asbestos-related disease, (B) an independent, replicated X-ray reading by a certified B-reader, and (C) pulmonary function testing; provided, however, that asbestosis determined by pathology in the case of a Claimant who was deceased at the time the Claim was filed shall suffice in lieu of (A) through (C) above.

12

5.4(a)(1)(B)    **Disease Levels III, IV, V, and VI.**    Diagnoses of an asbestos-related malignancy in Disease Levels III, IV, V, or VI shall be based upon either (i) a physical examination of the Claimant by the board certified physician providing the diagnosis of the asbestos-related disease, or (ii) on a diagnosis of such a malignant Disease Level by a board-certified pathologist.    All diagnoses of Mesothelioma (Disease Level VI) shall be presumed to be based on findings that the disease involves a malignancy.    However, the Asbestos Trust may rebut such presumptions.

5.4(a)(2)    **Credibility of Medical Evidence.**    Before making any payment to a Claimant, the Asbestos Trust must have reasonable confidence that the medical evidence provided in support of the Claim is credible and consistent with recognized medical standards.    The Asbestos Trust may require the submission of x-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedure to assure that such evidence is reliable.    Medical evidence that is of a kind shown to be receivable in evidence under the Federal Rules of Evidence is presumptively reliable, although the Asbestos Trust may seek to rebut the presumption.    In addition, Claimants who otherwise meet the requirements of this PI-SE TDP for payment shall be paid irrespective of the results in any litigation at anytime between the Claimant and any other defendant in the tort system.    However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the Claimant or the Asbestos Trust in any Individual Review proceeding conducted pursuant to Section 5.2(b) of this PI-SE TDP.

13

### 5.4(b)  **Exposure Evidence**

5.4(b)(1)    **In General.**  As set forth in Section 5.2(a)(3) of this PI-SE TDP, to qualify for any Disease Level, the Claimant must demonstrate Grace Exposure. Claims based on alleged agreements between, or concerted action between, Grace and any other Entity, and that involve no Grace Exposure are not compensable under this PI-SE TDP.

5.4(b)(2)    **Significant    Occupational    Exposure.**    "Significant Occupational Exposure" means employment for a cumulative period of at least five years in an industry and an occupation in which the Claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products so that the Claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing product such that the Claimant was exposed on a regular basis to raw asbestos fibers; or (d) was employed in an industry and occupation such that the Claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).    Notwithstanding anything else in this Section 5.4(b)(2), the Significant Occupational Exposure requirement shall be deemed satisfied with respect to individuals who worked at the vermiculite mining and milling facility in Libby, Montana, or lived or worked within a 20-mile radius of Libby, Montana, for at least 12 consecutive months before December 31, 2003. Claimants under this section shall provide such supporting documentation as the Trust shall require.

5.4(b)(3)    **Grace Exposure.**    "Grace Exposure" means meaningful exposure to asbestos or asbestos-containing products for which Grace has legal responsibility. The Asbestos Trust shall consider the credible evidence presented by the Claimant, including an adequate affidavit of the Claimant, an affidavit of a co-worker or the affidavit of a family

14

member in the case of a deceased Claimant (providing the Asbestos Trust finds such evidence reasonably reliable), invoices, employment, construction or similar records, or other credible evidence. The Asbestos Trust may also require submission of other or additional evidence of exposure when it deems such evidence to be necessary.

5.5     **Claims Audit Program.** The Asbestos Trust, with the consent of the TAC and the Future Claimants' Representative, may develop methods for auditing the reliability of medical evidence, including additional reading of x-rays, CT scans and verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos for which Grace has legal responsibility. In the event that the Asbestos Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence to the Asbestos Trust or to similar trusts established in connection with other chapter 11 cases, it may decline to accept additional evidence from such provider.

Further, in the event that an audit reveals that fraudulent information has been provided to the Asbestos Trust, the Asbestos Trust may penalize any Claimant or Claimant's attorney by disallowing the Asbestos PI-SE Claim or by other means including, but not limited to, (i) requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, (ii) reordering the priority of payment of all affected Claimants' Asbestos PI-SE Claims, (iii) raising the level of scrutiny of additional information submitted from the same source or sources, (iv) refusing to accept additional evidence from the same source or sources, (v) seeking the prosecution of the Claimant or Claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152, (vi) seeking sanctions from the Bankruptcy Court, and (vii) filing complaints for disciplinary action with appropriate State Bar organizations.

15

5.6    **Second Disease (Malignancy) Claims.**    The Holder of a Claim involving Asbestosis/Pleural Disease (Level I) or Clinically Severe Asbestosis (Disease Level II) may file a new Claim for an Asbestos-Related Malignancy (Disease Levels III – VI) that is subsequently diagnosed.   Any additional payments to which such Claimant may be entitled with respect to such Asbestos-Related Malignancy, however, shall be reduced by the amount the Claimant was paid for the original non-malignant asbestos-related disease.

5.7    **Establishment of Arbitration Procedures.**    The Asbestos Trust shall institute binding arbitration procedures in accordance with the arbitration rules promulgated by the Trustees, with the consent of the TAC and the Future Claimants' Representative, for resolving disputes concerning (i) whether the Asbestos Trust's rejection or denial of an Asbestos PI-SE Claim was proper, or (ii) whether evidence concerning the Claimant's medical condition or exposure history meets the requirements of this PI-SE TDP for purposes of categorizing a Claim involving Disease Levels I, II, III, IV, V, or VI.  Such arbitration shall be available to a Claimant if the Claimant so elects.  Neither the Asbestos Trust nor any arbitrator shall have the power to make any award to any Claimant other than a determination that such Claimant has a particular Disease Level and thus is entitled to a particular Scheduled Value.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.4 of this PI-SE TDP.  The arbitration rules may be modified by the Asbestos Trust with the consent of the TAC and the Future Claimants' Representative in a manner consistent with this PI-SE TDP.  Such amendments may include adoption of mediation procedures.

5.7(a)    **Claims Eligible for Arbitration.**    In order to be eligible for arbitration, the Claimant must first complete the Individual Review Process with respect to the disputed

16

issue and elect to pursue arbitration. Individual Review will be treated as completed for these purposes when an Asbestos PI-SE Claim has been individually reviewed by the Asbestos Trust, and either (a) the Asbestos Trust has made an offer on the Claim, the Claimant has rejected such offer, and the Claimant has notified the Asbestos Trust of the rejection in writing; or (b) the Asbestos Trust has determined that the Claimant does not hold a PI-SE Claim.

## Section VI

### General Guidelines for Liquidating and Paying Claims

6.1    **Showing Required.** To establish an Allowed Asbestos PI-SE Cash-Out Claim, a Claimant must meet the requirements set forth in this PI-SE TDP. The Asbestos Trust may require the submission of x-rays, CT scans, laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence to support or verify the Asbestos PI-SE Cash-Out Claim, and may further require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable.

6.2    **Costs Considered.** Notwithstanding any contrary provisions of this PI-SE TDP, the Trustees shall always give appropriate consideration to the cost of investigating and uncovering invalid Asbestos PI-SE Cash-Out Claims. The Trustees shall also have the discretion to make judgments regarding the amount of transaction costs to be expended by the Asbestos Trust. Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the validity of any Claim against the Asbestos Trust, whatever the costs, or to decline to accept medical evidence from sources that the Trustees have determined to be unreliable pursuant to the Claims Audit Program described in Section 5.5 of this PI-SE TDP.

6.3    **Payment of Litigation Claims.** For purposes of Section 5.1(c), if and when an Asbestos PI-SE Claimant who elected the Litigation Option obtains a judgment pursuant to the

17

CMO or enters into a binding settlement with the Asbestos Trust, the Claimant's Claim shall be placed in the FIFO Payment Queue based on (a) in the case of a judgment, the date on which the judgment becomes final or (b) in the case of a settlement, (i) if no court approval of the settlement is required, the date on which all parties to the settlement have executed a written settlement agreement or (ii) if court approval is required, the date on which the order approving the settlement becomes a Final Order. In each case, an earlier date will be given priority over a later date.

6.4    **Releases.**  The Trustees shall have the discretion to determine the form and substance of the releases to be provided to the Asbestos Trust. As a condition to making any payment to a Claimant, the Asbestos Trust shall obtain a general, partial, or limited release, as appropriate, in accordance with the applicable state or other law. If allowed by state law, the endorsing of a check or draft for payment by or on behalf of a Claimant shall constitute such a release.

6.5    **Third-Party Services.**  Nothing in this PI-SE TDP shall preclude the Asbestos Trust from contracting with another asbestos claims resolution organization to provide services to the Asbestos Trust so long as decisions about the categorization of Asbestos Cash-Out PI-SE Claims are based on the relevant provisions of this PI-SE TDP, including the Medical/Exposure Criteria set forth in this PI-SE TDP.

6.6    **Asbestos Trust Disclosure of Information.**  Periodically, but not less often than once a year, the Asbestos Trust shall make available to Claimants and other interested parties the number of Claims, by Disease Levels, that have been resolved both by Individual Review and by arbitration as well as by trial, indicating the amounts of the awards and the averages of the awards by jurisdiction.

18

## Section VII

### Miscellaneous

7.1    **Amendments.**  No amendments to this PI-SE TDP shall be permitted without the written consent of the Reorganized Debtors, the TAC and the Future Claimants' Representative, and any applicable requirements of the Asbestos Trust Agreement.

7.2    **Severability.**  Should any provision contained in this PI-SE TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this PI-SE TDP.

7.3    **Governing Law.**  For all purposes, including the liquidation of Asbestos PI-SE Cash-Out Claims in the case of Individual Review or arbitration, administration of this PI-SE TDP shall be governed by, and construed in accordance with, the internal laws of the State of Delaware without regard to its conflict of laws provisions.

7.4    **Relation to Other Plan Documents.**  In the event that this PI-SE TDP conflicts with the Plan or the Asbestos Trust Agreement, the Plan or the Asbestos Trust Agreement, as applicable, shall control.

19

# Exhibit Tab 7

PI-AO Trust Distribution Procedures

## W. R. GRACE & CO. 524(g)
## PI-AO TRUST DISTRIBUTION PROCEDURES

This set of W. R. Grace & Co. 524(g) PI-AO Trust Distribution Procedures (the "PI-AO TDP") provides for the liquidation of all Asbestos PI-AO Cash-Out Claims and for the payment of all Allowed Asbestos PI-AO Claims.

The Plan and the Asbestos Trust Agreement establish the Asbestos Trust. The Trustees of the Asbestos Trust shall implement and administer this PI-AO TDP in accordance with the Asbestos Trust Agreement.

### Section I

### Introduction

1.1    **Purpose.** This PI-AO TDP has been adopted pursuant to the Asbestos Trust Agreement. It is designed to provide (a) fair and equitable treatment for Asbestos PI-AO Claims that may presently exist or may arise in the future in substantially the same manner as each other; and (b) the mechanism by which all Allowed Asbestos PI-AO Claims are to be paid once they have been liquidated, whether such liquidation is pursuant to the Litigation Option or the Cash-Out Option.

1.2    **Interpretation.** Nothing in this PI-AO TDP shall be deemed to create a substantive right for any Claimant, beyond the right of a Claimant who is treated under this PI-AO TDP to enforce its terms.

1.3    **Definitions.** Capitalized terms used herein, but not otherwise defined herein, shall have the meanings assigned to them in the Glossary.

## Section II

## Overview

2.1    **Asbestos Trust Goals.**  A primary goal of the Asbestos Trust is to treat all Holders of Asbestos Claims equitably.  This PI-AO TDP furthers that goal by setting forth procedures for processing, Allowing or Disallowing, and paying Holders of Allowed Asbestos PI-AO Cash-Out Claims on an impartial, first-in-first-out ("FIFO") basis.  This PI-AO TDP also provides the mechanism for paying Holders of Allowed Asbestos PI-AO Claims whose Claims are liquidated through the Litigation Option.

2.2    **Claims Liquidation Procedures.**  Asbestos PI-AO Cash-Out Claims shall be processed, Allowed or Disallowed, and otherwise determined in the order of their place in the FIFO Processing Queue to be established pursuant to Sections 5.1(a) and 5.1(b) of this PI-AO TDP.

The Asbestos Trust shall liquidate and offer to pay all Asbestos PI-AO Cash-Out Claims that it in the first instance determines to meet the Medical/Exposure Criteria set forth in Section 5.2(a)(3) of this PI-AO TDP, efficiently and expeditiously under the Expedited Review Process described in Section 5.2(a) of this PI-AO TDP.  An Asbestos PI-AO Cash-Out Claim that the Asbestos Trust determines does not meet the Medical/Exposure Criteria may undergo the Individual Review Process described in Section 5.2(b) of this PI-AO TDP, if the Holder of such Claim elects.  In such a case, notwithstanding that the Asbestos Trust initially determined the Asbestos PI-AO Cash-Out Claim does not meet the Medical/Exposure Criteria, the Asbestos Trust can offer the Claimant the Scheduled Value if the Asbestos Trust is satisfied, upon reconsideration pursuant to Individual Review, that its initial determination was in error.

2

Disputes over an Asbestos PI-AO Cash-Out Claim, including whether the Medical/Exposure Criteria are satisfied, shall be subject to the Individual Process provided for in Section 5.2(b) of this PI-AO TDP, at the election of the Holder of such Claim.

## Section III

## PI-AO TDP Administration

3.1    **Trust Advisory Committee and Future Claimants' Representative.** Pursuant to the Plan and the Asbestos Trust Agreement, this PI-AO TDP will be administered by the Trustees in consultation with the TAC (which represents, among others, the interests of Holders of present Asbestos PI-AO Claims), and the Future Claimants' Representative (who represents, among others, the interests of Holders of Asbestos PI-AO Claims that may be asserted in the future). The initial members of the TAC and the initial Future Claimants' Representative are identified on the signature pages to the Asbestos Trust Agreement.

3.2    **Consent and Consultation Procedures.** In those circumstances in which consultation or consent is required hereunder, the Trustees shall provide written notice to the TAC and the Future Claimants' Representative of the specific action that is proposed. The Trustees shall not take such action unless and until the parties have engaged in the consent process described in the Asbestos Trust Agreement.

## Section IV

## Offsets

4.1    **Offsets.** If an Allowed Asbestos PI-AO Claim is secured by an appeal bond or is entitled to the benefit of any other security provided by or on behalf of a Grace Entity, the Asbestos Trust shall offset against the Allowed Amount of such Asbestos PI-AO Claim an amount equal to the amount such Holder is entitled to receive from, under, or in respect of such appeal bond or other security, and the amount the Holder of such Allowed Asbestos PI-AO

3

Claim shall receive under this PI-AO TDP shall equal the Allowed Amount of such Claim, as reduced by such offset.

### Section V

### Resolution of Asbestos PI-AO Claims

5.1    **Ordering, Processing and Payment of Claims**

5.1(a)  **Ordering of Asbestos PI-AO Claims**

5.1(a)(1)   **Establishment of the FIFO Processing Queue.**  The Asbestos Trust will order Asbestos PI-AO Cash-Out Claims for processing and determination purposes on a FIFO basis except as otherwise provided herein (the "FIFO Processing Queue"). For all Asbestos PI-AO Cash-Out Claims that constitute Asbestos PI Pre-petition Litigation Claims, a Claimant's position in the FIFO Processing Queue shall be determined according to the date prior to the Petition Date that the specific Asbestos PI-AO Cash-Out Claim was filed against Grace in the tort system, with an earlier filing date given priority over a later filing date. For all Asbestos PI-AO Cash-Out Claims that do not constitute Asbestos PI Pre-petition Litigation Claims, a Claimant's position in the FIFO Processing Queue shall be determined according to the later of the Effective Date and the date that the Claims Materials with respect to the specific Asbestos PI-AO Cash-Out Claim were filed with the Asbestos Trust, with an earlier filing date given priority over a later filing date. Any Asbestos PI-AO Cash-Out Claims that do not constitute Asbestos PI Pre-petition Litigation Claims and as to which the Claims Materials were filed with the Asbestos Trust prior to the Effective Date shall be deemed to have been filed on the Effective Date.

If any Claims are filed or are deemed to be filed on the same date, the Claimant's position in the FIFO Processing Queue shall be determined by the date of the diagnosis of the asbestos-related disease, with an earlier diagnosis date given priority over a later diagnosis date.

4

5.1(a)(2)    **Effect of Statutes of Limitations and Repose.**  To be eligible for a place in the FIFO Processing Queue, an Asbestos PI-AO Cash-Out Claim must meet the following requirements, as applicable:  (i) for Claims first filed in the tort system against Grace prior to the Petition Date, such Claims must have been filed prior to the expiration of the applicable statutes of limitation and repose that were in effect at the time of the filing of the Claim in the tort system, or (ii) for Claims not filed against Grace in the tort system prior to the Petition Date, such Claims must have been filed prior to the expiration of the applicable statutes of limitation and repose that were in effect at the time of the filing with the Asbestos Trust, including any extension of such periods pursuant to Bankruptcy Code § 108(c), if applicable.  However, the running of the relevant statute of limitation shall be tolled as of the earliest of (A) the actual filing of the Claim in the tort system against Grace prior to the Petition Date; (B) the filing of the Claim against another defendant in the tort system prior to the Petition Date if the Claim was tolled against Grace at the time by an agreement or otherwise; or (C) the filing of complete Claims Materials with the Asbestos Trust after the Effective Date.

Any Claims that were first diagnosed after the Petition Date, irrespective of the application of any relevant statute of limitation or repose, may be filed with the Asbestos Trust within, but not later than, three (3) years after the date of diagnosis or within, but not later than, three (3) years after the Effective Date, whichever occurs later.

5.1(b) **Processing of Asbestos PI-AO Cash-Out Claims.**  As a general practice, the Asbestos Trust will review its Claims files on a regular basis and notify all Claimants whose Claims are likely to come up in the FIFO Processing Queue in the near future.

5.1(c) **Payment of Asbestos PI-AO Claims.**  Claims shall be paid in FIFO order based on the date their liquidation became final (the "FIFO Payment Queue"), with an earlier

liquidation date given priority over a later liquidation date, regardless of whether liquidation occurred under the Cash-Out Option or under the Litigation Option.

Where the Claimant is deceased or incompetent, and the settlement and payment of his or her Asbestos PI-AO Cash-Out Claim must be approved by a court of competent jurisdiction prior to acceptance of an offer made by the Asbestos Trust on the Claim by the Claimant's representative, such offer shall remain open so long as proceedings before that court remain pending, provided that the Asbestos Trust has been furnished with evidence that the settlement offer has been submitted to such court for approval.  If the offer ultimately is approved by that court and accepted by the Claimant's representative, the Asbestos Trust shall pay the Claim in the amount so offered.

If any Claims are liquidated on the same date, each such Claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of such Claimant's asbestos-related disease, with earlier diagnosis dates given priority over later diagnosis dates.

5.2    **Resolution of Unliquidated Asbestos PI-AO Cash-Out Claims.**  Within six months after the establishment of the Asbestos Trust, the Trustees, with the consent of the TAC and the Future Claimants' Representative, shall adopt procedures that are consistent with this PI-AO TDP for reviewing and liquidating all unliquidated Asbestos PI-AO Cash-Out Claims, which shall include deadlines for processing such Claims.  Such procedures shall also require Claimants seeking resolution of unliquidated Asbestos PI-AO Cash-Out Claims to file Claims Materials, to the extent such Claimants did not previously file Asbestos PI Proof of Claim Forms and Asbestos PI Questionnaires during the Chapter 11 Cases.  The Asbestos Trust shall endeavor to provide an initial response to the Claimant within six months of receiving the Claims Materials.

6

Upon filing of Claims Materials, the Claim shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Sections 5.1(a) and 5.1(b) of this PI-AO TDP, and shall be liquidated under the Expedited Review Process described in Section 5.2(a) of this PI-AO TDP.

### 5.2(a)  Expedited Review Process

5.2(a)(1)    **In General.**  The Asbestos Trust's Expedited Review Process is designed to provide a fair, expeditious, efficient, and inexpensive method for liquidating an Asbestos PI-AO Claim where the Claim can be readily verified by the Asbestos Trust as meeting the Medical/Exposure Criteria.  Expedited Review thus provides Holders of Asbestos PI-AO Cash-Out Claims with a substantially less burdensome process for pursuing Asbestos PI-AO Claims than does litigating such Claims.

Thus, Asbestos PI-AO Cash-Out Claims that undergo Expedited Review and meet the Medical/Exposure Criteria shall be offered the Scheduled Value set forth in Section 5.2(a)(3) of this PI-AO TDP.  Claims treated under the Cash-Out Option that are found not to meet the Medical/Exposure Criteria are eligible for the Individual Review Process set forth in Section 5.2(b) of this PI-AO TDP, if the Holders of such Claims elect to pursue that option.

5.2(a)(2)    **Claims Processing under Expedited Review.**  As a particular Claimant's Claims Materials or Asbestos PI Proof of Claim Form and Asbestos PI Questionnaire, as applicable, are reached in the FIFO Processing Queue, the Asbestos Trust shall determine whether the Claim described therein meets the Medical/Exposure Criteria, and shall advise the Claimant of its determination.  If the Asbestos Trust determines the Claim is eligible for payment under Expedited Review, the Claim shall be a "Qualified Asbestos PI-AO Cash-Out

7

Claim" and shall be placed in the FIFO Payment Queue, in accordance with Section 5.1(c) of this PI-AO TDP, following which the Trust shall disburse payment.

        5.2(a)(3)      **Scheduled Value and Medical/Exposure Criteria**. The medical/exposure criteria (the "Medical/Exposure Criteria") and the Scheduled Value (as applicable, the "Scheduled Value") for a Qualified PI-AO Cash-Out Claim are set forth in this Section.

| Scheduled Value | Medical/Exposure Criteria |
|---|---|
| $250.00 | Medical Criteria: Satisfaction of the Medical Criteria for Disease Level I, II, III, IV, or V, as set forth in the PI-SE TDP, or diagnosis[1] by a board certified pulmonologist or internist of a bilateral asbestos-related nonmalignant disease or an asbestos-related malignancy other than those that constitute Asbestos PI-SE Claims.<br><br>Exposure Criteria: Grace Exposure.[2] |

        5.2(b) **Individual Review Process.** Claimants holding Asbestos PI-AO Cash-Out Claims shall be eligible, upon election, to seek Individual Review of the evidence supporting their alleged satisfaction of the Medical/Exposure Criteria if the Trust in the first instance determines such Criteria not to be satisfied. Individual Review shall consist of a reconsideration by the Asbestos Trust of the Claims Materials or Asbestos PI Proof of Claim Form and Asbestos PI Questionnaire, as applicable, previously submitted by the Claimant, along with any additional information that the Claimant submits along with the Claimant's request for Individual Review. In such a case, notwithstanding that the Asbestos Trust initially determined the Asbestos PI-AO Cash-Out Claim does not meet the Medical/Exposure Criteria for the Scheduled Value, the

---

[1]    The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this PI-AO TDP are set forth in Section 5.4(a) of this PI-AO TDP.

[2]    The term "Grace Exposure" is defined in Section 5.4(b)(2).

Asbestos Trust can offer the Claimant the Scheduled Value if the Asbestos Trust is satisfied, upon reconsideration pursuant to Individual Review, that its initial determination was in error. The Trustees may institute procedures governing the Individual Review Process that are not inconsistent with this PI-AO TDP, the Asbestos Trust Agreement, or the Plan.

5.3    **Certain Derivative Claimants.**

5.3(a)  **Second Hand Claims.**  If a Claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, (a "Second Hand Claim") the Claimant may seek Individual Review of his or her Claim pursuant to Section 5.2(b) of this PI-AO TDP.  In such a case, the Claimant must establish that the occupationally exposed person would have met the exposure requirements under this PI-AO TDP that would have been applicable had that person filed a direct Claim against the Asbestos Trust.  In addition, the Holder of a Second Hand Claim must establish that (i) he or she meets the medical criteria described in this PI-AO TDP; (ii) his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person experienced Grace Exposure as defined in Section 5.4(b)(2); and (iii) such Grace Exposure was a cause of the claimed disease.  The Claims Materials to be provided by the Asbestos Trust shall include provisions for capturing information about Second Hand Claims.  All liquidation and payment rights and limitations under this PI-AO TDP shall be applicable to such Claims.

5.3(b)  **Third Party Indemnity/Contribution Claims.**  As set forth in the Plan, Third Party Indemnification/Contribution Claims, if any, with respect to Asbestos PI-AO Claims constitute Asbestos PI-AO Claims, but are not eligible to be treated as Asbestos PI-AO Cash-Out Claims and will be deemed to have elected the Litigation Option.

K&E 9934332.10

### 5.4    Medical/Exposure Requirements

#### 5.4(a)  Medical Evidence

5.4(a)(1)        **In General.** All diagnoses must be accompanied by either (i) a statement by the board certified physician providing the diagnosis that at least 10 years have elapsed between the date of first Grace Exposure and the diagnosis, or (ii) a history of the Claimant's Grace Exposure sufficient to establish a 10-year latency period. A finding by a physician that a Claimant's disease is "consistent with" or "compatible with" asbestosis will not alone be treated by the Asbestos Trust as a diagnosis. All diagnoses shall be based upon (A) a physical examination of the Claimant by the physician providing the diagnosis of the asbestos-related disease, <u>and</u> (B) an independent, replicated X-ray reading by a certified B-reader; provided, however, that pathological evidence of the non-malignant asbestos-related disease in the case of a Claimant who was <u>deceased</u> at the time the Claim was filed shall suffice in lieu of (A) and (B) above.

5.4(a)(2)        **Credibility of Medical Evidence.** Before making any payment to a Claimant, the Asbestos Trust must have reasonable confidence that the medical evidence provided in support of the Claim is credible and consistent with recognized medical standards. The Asbestos Trust may require the submission of x-rays, CT scans, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedure to assure that such evidence is reliable. Medical evidence that is of a kind shown to be receivable in evidence under the Federal Rules of Evidence is presumptively reliable, although the Asbestos Trust may seek to rebut the presumption. In addition, Claimants who otherwise meet the requirements of this PI-AO TDP

10

for payment shall be paid irrespective of the results in any litigation at anytime between the Claimant and any other defendant in the tort system.  However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the Claimant or the Asbestos Trust in any Individual Review proceeding conducted pursuant to Section 5.2(b) of this PI-AO TDP.

### 5.4(b)  Exposure Evidence

    5.4(b)(1)    **In General.**  As set forth in Section 5.2(a)(3) of this PI-AO TDP, to qualify for any payment under the Cash-Out Option, the Claimant must demonstrate Grace Exposure.  Claims based on alleged agreements between, or concerted action between, Grace and any other Entity, and that involve no Grace Exposure are not compensable under this PI-AO TDP.

    5.4(b)(2)    **Grace Exposure.**  "Grace Exposure" means meaningful exposure to asbestos or asbestos-containing products for which Grace has legal responsibility.  The Asbestos Trust shall consider the credible evidence presented by the Claimant, including an adequate affidavit of the Claimant, an affidavit of a co-worker or the affidavit of a family member in the case of a deceased Claimant (providing the Asbestos Trust finds such evidence reasonably reliable), invoices, employment, construction or similar records, or other credible evidence.  The Asbestos Trust may also require submission of other or additional evidence of exposure when it deems such evidence to be necessary.

    5.5    **Claims Audit Program.**  The Asbestos Trust, with the consent of the TAC and the Future Claimants' Representative, may develop methods for auditing the reliability of medical evidence, including additional reading of x-rays, CT scans and verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos for which Grace has

11

legal responsibility. In the event that the Asbestos Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence to the Asbestos Trust or to similar trusts established in connection with other chapter 11 cases, it may decline to accept additional evidence from such provider.

Further, in the event that an audit reveals that fraudulent information has been provided to the Asbestos Trust, the Asbestos Trust may penalize any Claimant or Claimant's attorney by disallowing the Asbestos PI-AO Claim or by other means including, but not limited to, (i) requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, (ii) reordering the priority of payment of all affected Claimants' Asbestos PI-AO Claims, (iii) raising the level of scrutiny of additional information submitted from the same source or sources, (iv) refusing to accept additional evidence from the same source or sources, (v) seeking the prosecution of the Claimant or Claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152, (vi) seeking sanctions from the Bankruptcy Court, and (vii) filing complaints for disciplinary action with appropriate State Bar organizations.

5.6     **Second Disease Claims.** The Holder of an Asbestos PI-AO Claim may file a new Claim for an Asbestos-Related Disease that is subsequently diagnosed and that qualifies as an Asbestos PI-SE Claim. The election by the Holder of an Asbestos PI-AO Claim of the Cash-Out Option, Registry Option, or Litigation Option with respect to such Claim shall have no effect on the right of that Holder to choose a different option with respect to the subsequent Asbestos PI-SE Claim.

12

## Section VI

## General Guidelines for Liquidating and Paying Claims

6.1     **Showing Required.** To establish a Qualified Asbestos PI-AO Cash-Out Claim, a Claimant must meet the requirements set forth in this PI-AO TDP.  The Asbestos Trust may require the submission of x-rays, CT scans, laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence to support or verify the Asbestos PI-AO Cash-Out Claim, and may further require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable.

6.2     **Costs Considered.** Notwithstanding any contrary provisions of this PI-AO TDP, the Trustees shall always give appropriate consideration to the cost of investigating and uncovering invalid Asbestos PI-AO Cash-Out Claims.   The Trustees shall also have the discretion to make judgments regarding the amount of transaction costs to be expended by the Asbestos Trust.  Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the validity of any Claim against the Asbestos Trust, whatever the costs, or to decline to accept medical evidence from sources that the Trustees have determined to be unreliable pursuant to the Claims Audit Program described in Section 5.5 of this PI-AO TDP.

6.3     **Payment of Litigation Claims.** For purposes of Section 5.1(c), if and when an Asbestos PI-AO Claimant who elected the Litigation Option obtains a judgment pursuant to the CMO or enters into a binding settlement with the Asbestos Trust, the Claimant's Claim shall be placed in the FIFO Payment Queue based on (a) in the case of a judgment, the date on which the judgment becomes final or (b) in the case of a settlement, (i) if no court approval of the settlement is required, the date on which all parties to the settlement have executed a written settlement agreement or (ii) if court approval is required, the date on which the order approving

13

the settlement becomes a Final Order. In each case, an earlier date will be given priority over a later date.

6.4    **Releases.** The Trustees shall have the discretion to determine the form and substance of the releases to be provided to the Asbestos Trust. As a condition to making any payment to a Claimant, the Asbestos Trust shall obtain a general, partial, or limited release, as appropriate, in accordance with the applicable state or other law. If allowed by state law, the endorsing of a check or draft for payment by or on behalf of a Claimant shall constitute such a release.

6.5    **Third-Party Services.** Nothing in this PI-AO TDP shall preclude the Asbestos Trust from contracting with another asbestos claims resolution organization to provide services to the Asbestos Trust so long as decisions about the categorization of Asbestos PI-AO Claims are based on the relevant provisions of this PI-AO TDP, including the Medical/Exposure Criteria set forth in this PI-AO TDP.

6.6    **Asbestos Trust Disclosure of Information.** Periodically, but not less often than once a year, the Asbestos Trust shall make available to Claimants and other interested parties the number of Claims that have been resolved both by Individual Review and by trial, indicating the amounts of the awards and the averages of the awards by jurisdiction.

**Section VII**

**Miscellaneous**

7.1    **Amendments.** No amendments to this PI-AO TDP shall be permitted without the written consent of the Reorganized Debtors, the TAC and the Future Claimants' Representative, and any applicable requirements of the Asbestos Trust Agreement.

14

7.2    **Severability.**  Should any provision contained in this PI-AO TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this PI-AO TDP.

7.3    **Governing Law.**  For all purposes, including the liquidation of Asbestos PI-AO Cash-Out Claims in the case of Individual Review, administration of this PI-AO TDP shall be governed by, and construed in accordance with, the internal laws of the State of Delaware without regard to its conflict of laws provisions.

7.4    **Relation to Other Plan Documents.**  In the event that this PI-AO TDP conflicts with the Plan or the Asbestos Trust Agreement, the Plan or the Asbestos Trust Agreement, as applicable, shall control.

15

K&E 9934332.10

# Exhibit Tab 8

## PD Trust Distribution Procedures

## W. R. GRACE & CO. 524(g)
## PD TRUST DISTRIBUTION PROCEDURES

This set of W. R. Grace & Co. 524(g) PD Trust Distribution Procedures (the "PD TDP")

provides for the payment of all Allowed Asbestos PD Claims.

The Plan and the Asbestos Trust Agreement establish the Asbestos Trust. The Trustees

of the Asbestos Trust shall implement and administer this PD TDP in accordance with the

Asbestos Trust Agreement.

### Section I

### Introduction

1.1    **Purpose.**   This PD TDP has been adopted pursuant to the Asbestos Trust

Agreement.  It is designed to provide the mechanism by which all Allowed Asbestos PD Claims

are to be paid once they have been liquidated pursuant to the CMO.

1.2    **Interpretation.**  Nothing in this PD TDP shall be deemed to create a substantive

right for any Claimant, beyond the right of an Asbestos PD Claimant with an Allowed Claim to

enforce its terms.

1.3    **Definitions.**  Capitalized terms used herein, but not otherwise defined herein,

shall have the meanings assigned to them in the Glossary.

## Section II

### Overview

2.1    **Asbestos Trust Goals.** A primary goal of the Asbestos Trust is to treat all Holders of Asbestos Claims equitably. This PD TDP furthers that goal by setting forth procedures for paying Holders of Allowed Asbestos PD Claims on an impartial, first-in-first-out ("FIFO") basis.

## Section III

### PD TDP Administration

3.1    **Trust Advisory Committee.** Pursuant to the Plan and the Asbestos Trust Agreement, this PD TDP will be administered by the Trustees in consultation with the TAC (which represents, among others, the interests of Holders of Asbestos PD Claims). The initial members of the TAC are identified on the signature pages to the Asbestos Trust Agreement.

3.2    **Consent and Consultation Procedures.** In those circumstances in which consultation or consent is required hereunder, the Trustees shall provide written notice to the TAC of the action that is proposed. The Trustees shall not take such action unless and until the parties have engaged in the consent process described in the Asbestos Trust Agreement.

## Section IV

### Offsets

4.1    **Offsets.** If an Allowed Asbestos PD Claim is secured by an appeal bond or is entitled to the benefit of any other security provided by or on behalf of a Grace Entity, the Asbestos Trust shall offset against the Allowed Amount of such Asbestos PD Claim an amount equal to the amount such Holder is entitled to receive from, under, or in respect of such appeal bond or other security, and the amount the Holder of such Allowed Asbestos PD Claim shall

2

receive under this PD TDP shall equal the Allowed Amount of such Claim, as reduced by such offset.

## Section V

### Resolution of Asbestos PD Claims

5.1    **Ordering and Payment of Claims.**  If and when an Asbestos PD Claimant obtains a judgment pursuant to the CMO or enters into a binding settlement with the Asbestos Trust, the Claimant's Claim shall be placed in the FIFO Payment Queue based on (a) in the case of a judgment, the date on which the judgment becomes final or (b) in the case of a settlement, (i) if no court approval of the settlement is required, the date on which all parties to the settlement have executed a written settlement agreement or (ii) if court approval is required, the date on which the order approving the settlement becomes a Final Order.  In each case, an earlier date will be given priority over a later date.

5.2    **Third Party Indemnification/Contribution Claims.** As set forth in the Plan, Third Party Indemnification/Contribution Claims, if any, with respect to Asbestos PD Claims constitute Asbestos PD Claims.

## Section VI

### General Guidelines for Paying Claims

6.1    **Releases.**  The Trustees shall have the discretion to determine the form and substance of the releases to be provided to the Asbestos Trust.  As a condition to making any payment to a Claimant, the Asbestos Trust shall obtain a general, partial, or limited release, as appropriate, in accordance with the applicable state or other law.  If allowed by state law, the endorsing of a check or draft for payment by or on behalf of a Claimant shall constitute such a release.

3

K&E 9934137.6

6.2    **Third-Party Services.**  Nothing in this PD TDP shall preclude the Asbestos Trust from contracting with another asbestos claims resolution organization to provide services to the Asbestos Trust.

6.3    **Asbestos Trust Disclosure of Information.**  Periodically, but not less often than once a year, the Asbestos Trust shall make available to Claimants and other interested parties the number of Claims that have been paid, indicating the amounts of the awards and the averages of the awards by jurisdiction.

**Section VII**

**Miscellaneous**

7.1    **Amendments.**  No amendments to this PD TDP shall be permitted without the written consent of the Reorganized Debtors and the TAC, and any applicable requirements of the Asbestos Trust Agreement.

7.2    **Severability.**  Should any provision contained in this PD TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this PD TDP.

7.3    **Governing Law.**  For all purposes, this PD TDP shall be governed by, and construed in accordance with, the internal laws of the State of Delaware without regard to its conflict of laws provisions.

7.4    **Relation to Other Plan Documents.**  In the event that this PD TDP conflicts with the Plan or the Asbestos Trust Agreement, the Plan or the Asbestos Trust Agreement, as applicable, shall control.

4

K&E 9934137.6

# Exhibit Tab 9

## List of Non-Debtor Affiliates

**EXHIBIT 9**

**W. R. GRACE & CO.**
**NON-CHAPTER 11 COMPANIES**

| U. S. SUBSIDIARY NAME |
| --- |
| Advanced Refining Technologies LLC |
| Alltech Associates, Inc. |
| AP Chem Incorporated |
| Construction Products Dubai, Inc. |
| Grace Asia Pacific, Inc. |
| Grace Chemicals, Inc. |
| Grace Collections, Inc. |
| Grace Foundation, Inc. |
| Grace Germany Holdings, Inc. |
| Grace Latin America, Inc. |
| Grace Management Services, Inc. |
| Grace Receivables Purchasing, Inc. |
| Ichiban Chemical Co., Inc. |
| NZ Alltech, Inc. |
| Separations Group, The |

1

| NON-U. S. SUBSIDIARY NAME |
|---|
| **ARGENTINA** |
| W. R. Grace Argentina S.A. |
| WRG Argentina, S.A. |
| **AUSTRALIA** |
| Alltech Associates (Australia) Pty. Ltd. |
| Grace Australia Pty. Ltd. |
| **BELGIUM** |
| Grace N.V. |
| Grace Silica N.V. |
| Inverco Benelux N.V. |
| Pieri Benelux N.V. |
| **BRAZIL** |
| Grace Brasil Ltda. |
| Grace Davison Ltda. |
| **CANADA** |
| GEC Divestment Corporation Ltd. |
| Grace Canada, Inc. |
| W. R. Grace Finance (NRO) Ltd. |
| **CHILE** |
| Grace Quimica Compania Limitada |
| **CHINA, PEOPLE'S REPUBLIC OF** |
| Grace China Ltd. |
| **COLOMBIA** |
| Grace Colombia S.A. |
| W. R. G. Colombia S.A. |
| **CUBA** |
| Envases Industriales y Comerciales, S.A. |
| Papelera Camagueyana, S.A. |
| **FRANCE** |
| Alltech France  [Correct Name to Come] |
| Etablissements Pieri S.A. |
| Société Civile Beau-Béton |
| W. R. Grace S.A. |
| **GERMANY** |
| Advanced Refining Technologies GmbH |
| Alltech G.m.b.H. |
| Grace Bauprodukte GmbH |
| Grace Darex GmbH |
| Grace GP G.m.b.H. |
| Grace Holding G.m.b.H. |
| Grace Management GP G.m.b.H. |
| Grace Silica GmbH |
| Grom Chromatography GmbH |
| **GREECE** |
| Grace Hellas E.P.E. |
| **HONG KONG** |
| Alltech Scientific (China) Limited |

2

| NON-U. S. SUBSIDIARY NAME |
|---|
| Alltech Applied Science Labs (HK) Limited |
| W. R. Grace (Hong Kong) Limited |
| W. R. Grace Southeast Asia Holdings Limited |
| **HUNGARY** |
| Grace Értékesito Kft. |
| **INDIA** |
| W. R. Grace & Co. (India) Private Limited |
| **INDONESIA** |
| PT. Grace Specialty Chemicals Indonesia |
| **IRELAND** |
| Amicon Ireland Limited |
| Grace Construction Products (Ireland) Limited |
| Trans-Meridian Insurance (Dublin) Ltd. |
| **ITALY** |
| Alltech Italia S.R.L. |
| W. R. Grace Italiana S.p.A. |
| **JAPAN** |
| Advanced Refining Technologies K.K. |
| Grace Chemicals K.K. |
| Grace Japan Kabushiki Kaisha |
| **KOREA** |
| Grace Korea Inc. |
| **MALAYSIA** |
| W. R. Grace (Malaysia) Sendiran Berhad |
| W. R. Grace Specialty Chemicals (Malaysia) Sdn. Bhd. |
| **MEXICO** |
| Grace Container, S. A. de C. V. |
| W. R. Grace Holdings, S. A. de C. V. |
| **NETHERLANDS** |
| Alltech Applied Science, BV |
| Amicon B.V. |
| Denac Nederland B.V. |
| Storm van Bentem en Kluyver B.V. |
| W. R. Grace B.V. |
| **NETHERLANDS ANTILLES** |
| W. R. Grace N.V. |
| **NEW ZEALAND** |
| Grace (New Zealand) Limited |
| **PHILIPPINES** |
| W. R. Grace (Philippines), Inc. |
| **POLAND** |
| Grace Sp. z o.o. |
| **RUSSIA** |
| Darex CIS LLC |

3

## NON-U. S. SUBSIDIARY NAME

| **SINGAPORE** |
| --- |
| W. R. Grace (Singapore) Private Limited |
| **SOUTH AFRICA** |
| Grace Davison (Proprietary) Limited |
| W. R. Grace Africa (Pty.) Limited |
| **SPAIN** |
| Grace, S.A. |
| Pieri Especialidades, S.L. |
| **SWEDEN** |
| Grace AB |
| Grace Catalyst AB |
| Grace Sweden AB |
| **SWITZERLAND** |
| Pieri S.A. |
| **TAIWAN** |
| W. R. Grace Taiwan, Inc. |
| **THAILAND** |
| W. R. Grace (Thailand) Limited |
| **UNITED KINGDOM** |
| A.A. Consultancy & Cleaning Company Limited |
| Alltech Associates Applied Science Limited (UK) |
| Cormix Limited |
| Borndear 1 Limited |
| Borndear 2 Limited |
| Borndear 3 Limited |
| Darex UK Limited |
| Emerson & Cuming (Trading) Ltd. |
| Emerson & Cuming (UK) Ltd. |
| Exemere Limited |
| Grace Construction Products Limited |
| Pieri U.K. Limited |
| Servicised Ltd. |
| W. R. Grace Limited |
| **VENEZUELA** |
| Grace Venezuela, S.A. |
| Inversiones GSC, S.A. |

4

| PARTNERSHIP/ JOINT VENTURE NAME |
| --- |
| Advanced Refining Technologies LP |
| Alltech Japan, Inc. |
| Alltech y Applied Science Para Mexico, S.A. de C.V. |
| Grace Kriz |
| Carbon Dioxide Slurry Systems L.P. |
| Cormix Middle East LLC |
| Emirates Chemicals LLC |
| Grace GmbH & Co. KG |
| Grace Manufacturing GmbH & Co. KG |
| Grace Offshore Turnkey |
| Grace Yapi Kimyasallari Sanayi ve Ticaret A.S. |
| Paramont Coal Company |

5

# Exhibit Tab 10

## List of Subject Asbestos Insurance Policies

11/12/2004                                    W.R. GRACE CO.

## EXHIBIT 10

### PRIMARY & EXCESS INSURANCE POLICIES THAT WERE OR ARE APPLICABLE TO ASBESTOS RELATED CLAIMS

**Policy Year**

| Begin | End | Insurer | Policy Number | Layer |
|---|---|---|---|---|
| Various | Pre-1971 | Aetna Casualty and Surety Company | Various | Primary |
| 03/31/53 | 03/31/54 | Royal Indemnity Company | RLG27635 | Primary |
| 03/31/54 | 04/01/55 | Royal Indemnity Company | RLG31840 | Primary |
| 04/01/55 | 04/01/56 | Royal Indemnity Company | RLG035805 | Primary |
| 04/01/56 | 04/01/57 | Royal Indemnity Company | RLG045762 | Primary |
| 04/01/57 | 04/01/58 | Royal Indemnity Company | RLG045836 | Primary |
| 04/01/58 | 04/01/59 | Royal Indemnity Company | RLG053959 | Primary |
| 04/01/59 | 04/01/60 | Royal Indemnity Company | RLG021629 | Primary |
| 04/01/60 | 04/01/61 | Royal Indemnity Company | RLG021620 | Primary |
| 04/01/61 | 04/01/62 | Royal Indemnity Company | RLG021621 | Primary |
| 06/01/61 | 06/01/62 | General Insurance Company of America | BLP186027 | Primary |
| 04/01/62 | 04/01/63 | Royal Indemnity Company | RLG021622 | Primary |
| 06/01/62 | 06/01/63 | General Insurance Company of America | BLP205359 | Primary |
| 06/30/62 | 06/30/63 | Maryland Casualty Company | 96-205800 | Primary |
| 06/01/63 | 06/01/64 | General Insurance Company of America | BLP221289 | Primary |
| 06/01/64 | 06/30/64 | Maryland Casualty Company | 96-224900 | Primary |
| 06/01/64 | 06/01/65 | General Insurance Company of America | BLP245115 | Primary |
| 06/01/65 | 06/30/65 | Maryland Casualty Company | 96-243400 | Primary |
| 06/01/65 | 06/01/66 | General Insurance Company of America | BLP260071 | Primary |
| 06/01/66 | 06/30/66 | Maryland Casualty Company | 96-257400 | Primary |
| 06/01/66 | 06/01/67 | General Insurance Company of America | BLP270815 | Primary |
| 06/01/67 | 06/30/67 | Maryland Casualty Company | 96-269500 | Primary |
| 06/30/67 | 06/30/68 | Maryland Casualty Company | 31-278301 | Primary |
| 06/30/68 | 06/30/69 | Maryland Casualty Company | 31-278301 | Primary |
| 06/30/69 | 06/30/70 | Maryland Casualty Company | 31-278301 | Primary |
| 06/30/70 | 06/30/71 | Maryland Casualty Company | 31-R-911051 | Primary |
| 06/30/71 | 06/30/72 | Maryland Casualty Company | 31-R-911051 | Primary |
| 06/30/72 | 06/30/73 | Maryland Casualty Company | 31-R-911051 | Primary |
| 06/30/73 | 06/30/76 | Continental Casualty Company | CCP9023670 | Primary |

**** PRIVILEGED AND CONFIDENTIAL ****

11/12/2004                          W.R. GRACE CO.

## EXHIBIT 10

### PRIMARY & EXCESS INSURANCE POLICIES THAT WERE OR ARE APPLICABLE TO ASBESTOS RELATED CLAIMS

| | | | | |
|---|---|---|---|---|
| 06/30/76 | 06/30/83 | Continental Casualty Company | CCP2483440 | Primary |
| 06/30/83 | 06/30/85 | Continental Casualty Company | CCP2483440 | Primary |
| 10/20/62 | 10/20/63 | American Employers | A-15-2127-51 | 1 |
| 10/20/62 | 10/20/63 | Home Insurance Co | HEC9543206 | 2 |
| 10/20/63 | 10/20/64 | American Employers | A-15-2127-51 | 1 |
| 10/20/63 | 10/20/64 | Home Insurance Co | HEC9543206 | 2 |
| 10/20/64 | 10/20/65 | American Employers | A-15-2127-51 | 1 |
| 10/20/64 | 10/20/65 | Home Insurance Co | HEC9543206 | 2 |
| 01/27/65 | 10/20/65 | American Employers | A-15-8138-001 | 3 |
| 01/27/65 | 10/20/65 | Fireman's Fund | XL76937 | 4 |
| 01/27/65 | 10/20/65 | American Reinsurance Co | M-6672-0001 | 5 |
| 10/20/65 | 10/20/66 | American Employers | A-16-8220-001 | 1 |
| 10/20/65 | 10/20/66 | Home Insurance Co | HEC9544498 | 2 |
| 10/20/65 | 10/20/66 | INA | XBC1834 | 3 |
| 10/20/65 | 10/20/66 | American Employers | A-16-8220-002 | 4 |
| 10/20/65 | 10/20/66 | American Home Assurance | CE351082 | 5 |
| 05/17/66 | 10/20/66 | American Reinsurance Co | M-6672-0002 | 6 |
| 05/17/66 | 10/20/66 | Fireman's Fund | XL91085 | 7 |
| 05/17/66 | 10/20/66 | World Auxiliary Ins. Corp. Ltd. | 66/180390 | 8 |
| 05/17/66 | 10/20/66 | Sphere Drake Ins. Co. Ltd. | 66/180390 | 8 |
| 05/17/66 | 10/20/66 | London & Overseas Ins. Co. Ltd. | 66/180390 | 8 |
| 05/17/66 | 10/20/66 | Swiss Union Gen. Ins. Co. Ltd. | 66/180390 | 8 |
| 05/17/66 | 10/20/66 | Minster Ins. Co. Ltd. | 66/180390 | 8 |
| 05/17/66 | 10/20/66 | Andrew Weir Ins. Co. Ltd. | 66/180390 | 8 |
| 05/17/66 | 10/20/66 | Stronghold Ins. Co. Ltd. | 66/180390 | 8 |
| 05/17/66 | 10/20/66 | St. Helens Ins. Co. Ltd. | 66/180390 | 8 |
| 05/17/66 | 10/20/66 | Orion Ins. Co. Ltd. | 66/180390 | 8 |
| 05/17/66 | 10/20/66 | British National Ins. Co. Ltd. | 66/180390 | 8 |
| 05/17/66 | 10/20/66 | English & American Ins. Co. Ltd. | 66/180390 | 8 |
| 05/17/66 | 10/20/66 | Dominion Ins. Co. Ltd. | 66/180390 | 8 |
| 05/17/66 | 10/20/66 | Lloyds Underwriters | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | American Employers | A-16-8220-001 | 1 |
| 10/20/66 | 10/20/67 | Home Insurance Co | HEC9544498 | 2 |
| 10/20/66 | 10/20/67 | INA | XBC1834 | 3 |
| 10/20/66 | 10/20/67 | American Employers | A-16-8220-002 | 4 |
| 10/20/66 | 10/20/67 | American Home Assurance | CE351082 | 5 |
| 10/20/66 | 10/20/67 | American Reinsurance Co | M-6672-0002 | 6 |
| 10/20/66 | 10/20/67 | Fireman's Fund | XL91085 | 7 |
| 10/20/66 | 10/20/67 | World Auxiliary Ins. Corp. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | Sphere Drake Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | London & Overseas Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | Minster Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | Swiss Union Gen. Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | Andrew Weir Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | Stronghold Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | St. Helens Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | Orion Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | British National Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | English & American Ins. Co. Ltd. | 66/180390 | 8 |

**** PRIVILEGED AND CONFIDENTIAL ****

11/12/2004                                W.R. GRACE CO.

## EXHIBIT 10

### PRIMARY & EXCESS INSURANCE POLICIES THAT WERE OR ARE APPLICABLE TO
### ASBESTOS RELATED CLAIMS

| | | | | |
|---|---|---|---|---|
| 10/20/66 | 10/20/67 | Dominion Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | Lloyds Underwriters | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | American Employers | A-16-8220-001 | 1 |
| 10/20/67 | 10/20/68 | Home Insurance Co | HEC9544498 | 2 |
| 10/20/67 | 10/20/68 | INA | XBC1834 | 3 |
| 10/20/67 | 10/20/68 | American Employers | A-16-8220-002 | 4 |
| 10/20/67 | 10/20/68 | American Home Assurance | CE351082 | 5 |
| 10/20/67 | 10/20/68 | American Reinsurance Co | M-6672-0002 | 6 |
| 10/20/67 | 10/20/68 | Fireman's Fund | XL91085 | 7 |
| 10/20/67 | 10/20/68 | World Auxiliary Ins. Corp. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | Sphere Drake Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | London & Overseas Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | Swiss Union Gen. Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | Minster Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | Andrew Weir Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | Stronghold Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | St. Helens Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | Orion Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | British National Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | English & American Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | Dominion Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | Lloyds Underwriters | 66/180390 | 8 |
| 10/20/68 | 10/20/69 | American Employers | A-16-8220-003 | 1 |
| 10/20/68 | 10/20/69 | Home Insurance Co | HEC9304605 | 2 |
| 10/20/68 | 10/20/69 | INA | XBC1834 | 3 |
| 10/20/68 | 10/20/69 | US Fire Insurance Co | XS2108 | 4 |
| 10/20/68 | 10/20/69 | American Reinsurance Co | M0085374 | 4 |
| 10/20/68 | 10/20/69 | Fireman's Fund | XLX1026877 | 4 |
| 10/20/68 | 10/20/69 | American Home Assurance | WRG-1 | 4 |
| 10/20/68 | 10/20/69 | British Northwestern | 411-4307 | 4 |
| 10/20/68 | 10/20/69 | Lloyds Underwriters | 914-102502 | 4 |
| 10/20/68 | 10/20/69 | American Employers | A-16-8220-004 | 4 |
| 10/20/68 | 10/20/69 | Maryland Casualty Co. | WRG-1. | 4 |
| 10/20/69 | 10/20/70 | American Employers | A-16-8220-003 | 1 |
| 10/20/69 | 10/20/70 | Home Insurance Co | HEC9304605 | 2 |
| 10/20/69 | 10/20/70 | INA | XBC1834 | 3 |
| 10/20/69 | 10/20/70 | US Fire Insurance Co | XS2108 | 4 |
| 10/20/69 | 10/20/70 | American Reinsurance Co | M0085374 | 4 |
| 10/20/69 | 10/20/70 | Fireman's Fund | XLX1026877 | 4 |
| 10/20/69 | 10/20/70 | American Home Assurance | WRG-1 | 4 |
| 10/20/69 | 11/14/69 | British Northwestern | 411-4307 | 4 |
| 10/20/69 | 10/20/70 | Lloyds Underwriters | 914-102502 | 4 |
| 10/20/69 | 10/20/70 | Maryland Casualty Co. | WRG-1. | 4 |
| 10/20/69 | 10/20/70 | American Employers | A-16-8220-004 | 4 |
| 11/14/69 | 10/20/70 | British Northwestern | 411-4307. | 4 |
| 11/14/69 | 10/20/70 | Lloyds Underwriters | 914/1/4116 | 4 |
| 10/20/70 | 06/30/71 | American Employers | A-16-8220-003 | 1 |
| 10/20/70 | 06/30/71 | Home Insurance Co | HEC9304605 | 2 |
| 10/20/70 | 06/30/71 | INA | XBC1834 | 3 |

**** PRIVILEGED AND CONFIDENTIAL ****

11/12/2004                                    W.R. GRACE CO.

### EXHIBIT 10

### PRIMARY & EXCESS INSURANCE POLICIES THAT WERE OR ARE APPLICABLE TO ASBESTOS RELATED CLAIMS

| | | | | |
|---|---|---|---|---|
| 10/20/70 | 06/30/71 | US Fire Insurance Co | XS2108 | 4 |
| 10/20/70 | 06/30/71 | American Reinsurance Co | M0085374 | 4 |
| 10/20/70 | 06/30/71 | American Home Assurance | WRG-1 | 4 |
| 10/20/70 | 06/30/71 | Fireman's Fund | XLX1026877 | 4 |
| 10/20/70 | 06/30/71 | British Northwestern | 411-4307. | 4 |
| 10/20/70 | 06/30/71 | Lloyds Underwriters | 914/1/4116 | 4 |
| 10/20/70 | 06/30/71 | Lloyds Underwriters | 914-102502 | 4 |
| 10/20/70 | 06/30/71 | Maryland Casualty Co. | WRG-1. | 4 |
| 10/20/70 | 06/30/71 | American Employers | A-16-8220-004 | 4 |
| 06/30/71 | 06/30/72 | Employers Comm'l Union | EY8220005 | 1 |
| 06/30/71 | 06/30/72 | Home Insurance Co | HEC9919945 | 2 |
| 06/30/71 | 06/30/72 | INA | XCP3745 | 3 |
| 06/30/71 | 06/30/72 | American Reinsurance Co | M0085374 | 4 |
| 06/30/71 | 06/30/72 | American Home Assurance | CE2691919 | 4 |
| 06/30/71 | 06/30/72 | Employers Comm'l Union | EY8220006 | 4 |
| 06/30/71 | 06/30/72 | Midland Insurance Co | XL1611 (WRG-2) | 4 |
| 06/30/71 | 06/30/72 | Lloyds Underwriters | 914105953 | 4 |
| 06/30/71 | 06/30/72 | Maryland Casualty Co. | WRG-2 | 4 |
| 06/30/71 | 06/30/72 | Aetna Casualty & Surety | 01XN150WCA | 4 |
| 06/30/72 | 06/30/73 | Employers Comm'l Union | EY8220005 | 1 |
| 06/30/72 | 06/30/73 | Home Insurance Co | HEC9919945 | 2 |
| 06/30/72 | 06/30/73 | INA | XCP3745 | 3 |
| 06/30/72 | 06/30/73 | American Reinsurance Co | M0085374 | 4 |
| 06/30/72 | 06/30/73 | American Home Assurance | CE2691919 | 4 |
| 06/30/72 | 06/30/73 | Employers Comm'l Union | EY8220006 | 4 |
| 06/30/72 | 06/30/73 | Midland Insurance Co | XL1611 (WRG-2) | 4 |
| 06/30/72 | 06/30/73 | Maryland Casualty Co. | WRG-2 | 4 |
| 06/30/72 | 06/30/73 | Aetna Casualty & Surety | 01XN150WCA | 4 |
| 06/30/72 | 06/30/73 | Lloyds Underwriters | 914105953 | 4 |
| 02/27/73 | 06/30/73 | Unigard Security | 1-0589 | 5 |
| 02/27/73 | 06/30/73 | Home Insurance Co | HEC4356740 | 5 |
| 06/30/73 | 06/30/74 | Employers Comm'l Union | EY8220005 | 1 |
| 06/30/73 | 06/30/74 | Home Insurance Co | HEC9919945 | 2 |
| 06/30/73 | 08/09/73 | INA | XCP3745 | 3 |
| 06/30/73 | 06/30/74 | American Reinsurance Co | M0085374 | 4 |
| 06/30/73 | 06/30/74 | American Home Assurance | CE2691919 | 4 |
| 06/30/73 | 06/30/74 | Employers Comm'l Union | EY8220006 | ·4 |
| 06/30/73 | 06/30/74 | Midland Insurance Co | XL1611 (WRG-2) | 4 |
| 06/30/73 | 06/30/74 | Maryland Casualty Co. | WRG-2 | 4 |
| 06/30/73 | 06/30/74 | Lloyds Underwriters | 914105953 | 4 |
| 06/30/73 | 06/30/74 | Aetna Casualty & Surety | 01XN150WCA | 4 |
| 06/30/73 | 06/30/74 | Home Insurance Co | HEC4356740 | 5 |
| 06/30/73 | 06/30/74 | Unigard Security | 1-0589 | 5 |
| 08/09/73 | 06/30/74 | Continental Casualty Co. | RDX8936833 | 3 |
| 06/30/74 | 06/30/75 | Unigard Security | 1-2517 | 1 |
| 06/30/74 | 06/30/75 | Continental Casualty Co. | RDX9156645 | 2 |
| 06/30/74 | 06/30/75 | American Home Assurance | 74DD662C | 3 |
| 06/30/74 | 06/30/75 | London & Edinburgh General Ins. Co. | 74DD662C | 3 |
| 06/30/74 | 06/30/75 | Bishopsgate Ins. Co. Ltd. | 74DD662C | 3 |

**** PRIVILEGED AND CONFIDENTIAL ****