# Exhibit 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**Hearing Date: December 20, 2004 at 12:00 p.m.**

## DEBTORS' REPLY TO RESPONSE FILED BY NEW ENGLAND CONSTRUCTION COMPANY, INC. TO THE FIFTH OMNIBUS OBJECTION TO CLAIMS

The Court should expunge claim number 14396 filed by New England Construction Company, Inc. ("NECC"). The Debtors are not liable for the occurrences described in the NECC claim.

### Background

1.      On April 2, 2001 (the "Petition Date"), each of the Debtors in these chapter 11 cases filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing their respective chapter 11 cases (collectively, the "Chapter 11 Cases"). The Chapter 11 Cases have been consolidated for administrative purposes

---

[1]      The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

only and, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

2.      By an order dated April 25, 2002, this Court set March 31, 2003 as the last date for filing proofs of claim for all pre-petition claims relating to asbestos property damage, non-asbestos claims (including all governmental claims) and medical monitoring claims (the "Bar Date"). A bar date has yet to be set for asbestos personal injury claims and claims related to Zonolite Attic Insulation.

3.      On or about March 31, 2003, NECC filed Claim No. 14396. Claim No. 14396 is an alleged unsecured claim asserted in the amount of $127,327.42. A copy of said claim is attached hereto and incorporated herein as Exhibit A.

## The Objection And Request For Relief

4.      On May 5, 2004, the Debtors filed their Fifth Omnibus Objection to Claims (Substantive) (the "Fifth Omnibus Objection") [Docket No. 5527] in which the Debtors sought to disallow or reduce, as appropriate, the claims set forth in the exhibits attached thereto (the "Disputed Claims"). Included on Exhibit C to the Fifth Omnibus Objection and identified as being a claim for which the Debtors have "No Liability" (as that term was defined in the Fifth Omnibus Objection), the Debtors objected to Claim No. 14396 filed by NECC.

5.      NECC filed a response to the Fifth Omnibus Objection on or about June 3, 2004 [Docket No. 5716]. NECC asserts that W.R. Grace & Co. ("Grace") is liable under the principle of indemnification for damages related to the defective condition of a building constructed by NECC in late 1997 and early 1998. NECC states that on March 27, 2002, the American Arbitration Association entered an award against NECC and in favor of Circuit Real Estate, Inc. in the amount of $127,327.42 (the "Award") for damages caused by the alleged failure of Addiment Block Plus W-10 and/or Mortar Tile masonry additive (the "Dry Block"), which was

2

manufactured by Addiment Incorporated ("Addiment"), a subsidiary of Lehigh Cement Company ("Lehigh").

6.      In its claim, NECC asserts that Addiment is the predecessor in interest to Grace and then concludes that Grace is liable for the damages resulting from the condition of the building constructed by NECC with the Dry Block.

7.      NECC's response fails to state a valid legal or equitable argument as to why the Debtors' are liable for the Award, but only summarily concludes that the Debtors are liable under the principal of indemnification.   NECC offers no legal authority and/or documentation to support this assertion.

## Argument

### The Debtors are not Liable for the Award as the Agreement to Purchase Addiment Specifically Limits the Debtor's Exposure to the Liability of Addiment or Lehigh Concrete Company

8.      As set forth above, the Claim is for indemnity with respect to the Award for damages related to the defective condition of a building constructed by NECC caused by the alleged failure of the Dry Block.  Neither W.R. Grace & Co.-Conn nor any of the other Debtors in the Chapter 11 Cases are liable for the NECC claim or the Award.

9.      Pursuant to an agreement dated March 25, 2002, W.R. Grace & Co.-Conn acquired the assets of Addiment pursuant to an asset purchase agreement (the "Agreement') between Grace, Addiment and Lehigh.   A copy of the Agreement is attached hereto and incorporated herein as Exhibit B.

10.      Sections 2.03 and 8.03 of the Agreement clearly limit and delineate the responsibilities of W.R. Grace & Co.-Conn pursuant the acquisition of the assets of Addiment. The liability asserted by NECC in Claim No. 14396 is specifically excluded by the provisions in the Agreement. Pursuant to Section 2.03(b), "Excluded Liabilities" means:

3

(iii)   liabilities of the Company [Addiment] which involve misrepresentations or breaches of warranty by the Sellers [Addiment and Lehigh] under this Agreement;...

(vii)   liabilities of the Company [Addiment] arising out of product liability or product warranty claims relating to products manufactured by or for the Company (including products in inventory at the Closing but sold by Grace after the Closing) or for services or advice rendered by the Company or its agents prior to the Closing;...

(xiii)   any and all other liabilities or obligations (whether known or unknown, absolute or contingent, liquidated or unliquidated, accrued or unaccrued, due or to become due, and whether claims with respect thereto are asserted before or after the Closing) of the Company [Addiment] which are not Transferred Liabilities.

11.   In addition, Section 8.03 of the Agreement provides that the Sellers [Addiment and Lehigh] "jointly and severally, shall indemnify Grace and save and hold Grace harmless from and against any Damages arising out of, resulting from or related to...(c) any Excluded Liabilities."

12.   Pursuant to this Agreement, Grace is not the successor in interest to Addiment. Rather, Grace purchased the assets of Addiment and specifically excluded Addiment's liabilities. In other words, in accordance with the Agreement, Addiment and/or Lehigh remain responsible for liabilities such as that asserted by NECC based on the Award and NECC should look to Addiment or Lehigh for such indemnity.

13.   Since the assertions contained in Claim No. 14396 by NECC are specifically precluded by the Agreement, the Debtors are not liable for the Award. The objection to Claim No. 14396 should be sustained and Claim No. 14396 should be expunged and disallowed for all purposes.

91100-001\DOCS_DE:103297.1

WHEREFORE, the Debtors respectfully request that the Court enter an order disallowing and expunging Claim No. 14396.

Dated: December 3, 2004

KIRKLAND & ELLIS LLP
James H.M. Sprayregen, P.C.
Janet S. Baer
Samuel L. Blatnick
200 East Randolph Drive
Chicago, IL 60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for Debtors and Debtors in Possession

# Exhibit A

03/31/03   17:36 FAX 401 455 0701          DUFFY SWEENEY LTD                              ☑002



B10 (Official Form 10) (Rev. 04/01)

| UNITED STATES BANKRUPTCY COURT<br>For the District of Delaware | PROOF OF CLAIM |
|---|---|
| In re: **W. R. Grace & Co.** | Case Number: **01-01139** |

NOTE: This claim should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**Creditor Name**
(Person or entity
debtor owes) **New England Constructin Co., Inc.**
**Address Line 1** c/o Duffy & Sweeney, Ltd.
**Address Line 2** One Turks Head Building
**Address Line 3** Suite 1200
**City, ST ZIP** Providence, RI 02903

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach Copy of statement giving particulars.

☑ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:
Check here if this claim ☐ replaces ☐ amends a previously filed claim dated:

**1. BASIS FOR CLAIM**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☑ Other (Describe Briefly)
☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (Fill out below)
Your social security No. _____
Unpaid compensation for services performed
from _____ to _____ (date) (date)

**See Attached Explanation of Claim**

**2. Date Debt Incurred: (MMDDYY)**
0 4 | | 9 8

**3. If Court Judgment, Date Obtained:**
| | | |

**4. CLASSIFICATION OF CLAIM.** Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

☐ **SECURED CLAIM**
Attach evidence of perfection of security interest.
Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle  ☐ Other (Describe briefly)
Amount of arrearage and other charges at time case filed included in secured claim above, if any $ _____

☑ **UNSECURED NONPRIORITY CLAIM**
A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

☐ **UNSECURED PRIORITY CLAIM** – Specify the priority of the claim.
☐ Wages, salaries, or contributions (up to $4,650), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(3)
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(4)
☐ Up to $2,100 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(6)
☐ Taxes or penalties of governmental units – 11 U.S.C. § 507 (a)(7)
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a) __

**5. AMOUNT OF CLAIM AT TIME CASE FILED:**

| (Secured) | (Unsecured Nonpriority) | (Unsecured Priority) |
|---|---|---|
| | 1 2 7 3 2 7 4 2 | |

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

**6. CREDITS AND SETOFFS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.

**7. SUPPORTING DOCUMENTS:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. TIME-STAMPED COPY:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

Date **3|31|03**  Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)
*Rachelle R. Green*, on behalf of New England
*Rachelle R. Green*  Construction Co., Inc.

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
MAR 31 2003
CLAIMS ADMINISTRATOR
TRUST CONSULTING, INC.

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

WR Grace     BF.48.190.9484
00014396
SR=728

03/31/03  17:37 FAX 401 455 0701          DUFFY SWEENEY LTD          ☑003



## EXPLANATION OF CLAIM

W.R. Grace & Co. ("Debtor") is indebted to New England Construction Co. ("NE") as follows:

On or about March 27, 2002, the American Arbitration Association entered an Award (the "Award") against NE in the amount of $127,327.42 for damages related to the defective condition of a building constructed by NE for Circuit Real Estate, Inc. The basis of the Award against NE was the failure of the "Dry Block"® masonry additive, manufactured by the Debtor, which NE purchased for construction of the building at issue in the arbitration. The Award was entered because the "Dry Block"® was not sufficiently impermeable to water to prevent leakage, contrary to the Debtor's representations. The Debtor is liable for the resulting condition of the building constructed by NE under the principle of indemnification.

The filing of this claim shall not be construed as a waiver by NE of any of its rights or remedies in respect of this claim, including, without limitation the right to amend this claim.

PEV1 #86006 v1



RECEIVED
MAR 3 1 2003
CLAIMS ADMINISTRATOR
RUST CONSULTING, INC.

# Exhibit B

ACQUISITION BY W.R. GRACE & CO. - CONN.

OF THE MASONRY ADMIXTURE PRODUCTS BUSINESS AND

ASSETS OF

ADDIMENT INCORPORATED

A WHOLLY OWNED

SUBSIDIARY OF LEHIGH CEMENT COMPANY

March 25, 2002

TABLE OF CONTENTS

1.    DEFINITIONS. ................................................................................4

2.    PURCHASE AND SALE OF ASSETS ...............................................8

2.01 Purchase and Sale. .................................................................8
2.02 MA Assets. ............................................................................8
2.03 Transferred Liabilities. ........................................................10
2.04 Purchase Price. ....................................................................11
2.05 Allocation of the Purchase Price. .........................................12
2.06. Payment and Proration of ad valorem Taxes..................    12

3.    CLOSING DATE; ACTIONS OF THE PARTIES AT THE CLOSING;
POST CLOSING ADJUSTMENT; FURTHER ASSURANCES.        12

3.01 Closing Date; Simultaneity         .............................    12
3.02 Conveyance of MA Assets. ...................................................13
3.03 Payment of Purchase Price. .................................................13
3.04 Other Documents and Ancillary Agreements. ........................13
3.05 Post-Closing Adjustment .....................................................14
3.06 Further Assurances. ............................................................16

4.    REPRESENTATIONS AND WARRANTIES OF THE SELLERS. .......16

4.01 Corporate Organization. ......................................................16
4.02 Incumbency and wnership...................................................    17
4.03 Ownership Interests. ...........................................................17
4.04 No Conflict; Authorization. ..................................................17
4.05 Financial Statements. .........................................................18

1

4.06  Liabilities. ...................................................................................................18
4.07  Absence of Certain Changes. .....................................................................19
4.08  Taxes. ........................................................................................................20
4.09  Real Estate. ...............................................................................................20
4.10  Personal Property. .....................................................................................20
4.11  Condition of Property. ...............................................................................21
4.12  Inventories. ...............................................................................................21
4.13  Receivables  ..............................................................................  22
414   Contracts. .................................................................................................22
4.15  Patents, Technology. .................................................................................23
4.16  Proprietary Names and Computer Software. .............................................24
4.17  Secrecy and Noncompetition Agreements. ................................................25
4.18  Governmental Licenses, Approvals, and Permits. .....................................25
4.19  Compliance with Laws. ..............................................................................25
4.20  Litigation and Claims. ...............................................................................26
4.21  Environmental Matters. .............................................................................26
4.22  Certain Transactions. ................................................................................26
4.23  Insurance. .................................................................................................26
4.24  Employee Compensation. ..........................................................................28
4.25  Labor and Employment Matters. ...............................................................28
4.26  Employee Benefits. ....................................................................................29

5.    REPRESENTATIONS AND WARRANTIES BY GRACE. ...................30

5.01  Corporate Organization. ............................................................................30
5.02  No Conflict..................................................................................  30
5.03  Authorization. ...........................................................................................30

6.    EXPENSES. ...............................................................................................30

6.01  Sellers' Expenses. ......................................................................................31
6.02  Buyers' Expenses. ......................................................................................31
6.03  Transfer Taxes. ..........................................................................................31
6.04  Bulk Sales. .................................................................................................31

7.    COVENANTS AND CERTAIN POST-CLOSING ACTIONS. ...............31

7.01  Offers of Employment. ...............................................................................31
7.02  Indemnity. .................................................................................................32
7.03  Non-Assumption of Benefit Plans. .............................................................32
7.04  Benefits Eligibility......................................................................................32
7.05  Accounts Receivable Matters......................................................................  33
7.06  Post Closing Removal Services ... ....  .......................................................33
7.07  Competitive Activities by Former Company Employees ...............  33

8.   SURVIVAL OF REPRESENTATIONS AND WARRANTIES;
INDEMNIFICATION .......................................................................34

   8.01  Survival of Representations. ...............................................34
   8.02  Definitions ...........................................................................35
   8.03  Sellers' Indemnities. ...........................................................35
   8.04  Buyers' Indemnities. ...........................................................36
   8.05  Dollar Limitations ..............................................................37
   8.06  Procedures; Defense of Third Party Claims ......................37
   8.07  Remedy; Limitations.......................................................   39

9.   NOTICES. ...................................................................................39

   9.01  Addresses for Notices..........................................................40

10.  GRACE REORGANIZATION AND SUBMISSION TO
JURISDICTION. .............................................................................41

   10.01  Grace Reorganization...................................................   41

11.  GENERAL. ..................................................................................41

   11.01  Governing Law. .................................................................41
   11.02  Entire Agreement. ............................................................41
   11.03  Successors. .........................................................................42
   11.04  Amendments and Waivers. ...............................................42
   11.05  Headings. ...........................................................................42
   11.06  Counterparts. ....................................................................42

## ACQUISITION BY W.R. GRACE & CO. - CONN. OF THE MASONRY ADMIXTURE BUSINESS AND ASSETS OF ADDIMENT INCORPORATED A WHOLLY OWNED SUBSIDIARY OF LEHIGH CEMENT COMPANY

### March 25, 2002

ASSETS PURCHASE AGREEMENT dated March 25, 2002 by and among W. R. GRACE & CO. - CONN., a Connecticut corporation, Addiment Incorporated, a Delaware corporation, and Lehigh Cement Company, a Pennsylvania corporation.

In consideration of the mutual representations, warranties, covenants and agreements herein contained, the parties hereto agree as follows:

1.    DEFINITIONS.

For purposes of this Agreement the following defined terms have the meanings set forth in this Article. All Article and Section numbers, and schedule and Exhibit references, used in this Agreement refer to Articles and Sections of this Agreement, and schedules and Exhibits annexed hereto or delivered simultaneously herewith, unless otherwise specifically described.

"Affiliate" means any corporation, partnership, or other entity which directly or indirectly Controls, is Controlled by, or is under common Control with the Company.

"Balance Sheet Date" means December 31, 2001.

"Bankruptcy Court" means Bankruptcy Court as defined in Section 5.01

"Base Balance Sheet" means the Baseline Balance Sheet as defined in Section 3.05(a).

"Buyers' Claim" has the meaning given such term in Section 8.05.

"CERCLA" means the Comprehensive Environmental Response and Liability Act, 42 U.S.C. Section 9601 et seq., as amended.

4

"Claim" has the meaning given such term in Section 8.02.

"Closing" means the actions to be carried out as described in Sections 3.02 through 3.04.

"Closing Conveyances" means the bills of sale and other instruments and documents for the transfer of the Company Assets described in Section 3.02.

"Closing Date" means the date of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means Addiment Incorporated.

"Contract" means any contract, agreement, commitment or other obligation, whether or not in writing, including any amendment, modification or supplement thereof.

"Control" of a specified entity means the possession of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities, by Contract, or otherwise, and in any event shall include ownership of voting securities of such entity having a majority of the voting power of the voting securities of such entity.

"Damages" has the meaning given such term in Section 8.02.

"Direct Claim" has the meaning given such term in Section 8.02.

"Environmental Law" means any law, regulation, rule, ordinance, or order of any Governmental Authority, that relates to or otherwise imposes liability, obligations, or standards with respect to pollution, the protection of the environment, or the protection of human health or safety.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" has the meaning given such term in Section 2.02.

"Excluded Liabilities" has the meaning given such term in Section 2.03.

"Governmental Authority" means the government of the United States of America, any state of the United States of America, or any sovereign country; any political subdivision of any of the foregoing; or any agency, board, bureau, department or commission of any of the foregoing.

"Grace Group" means, collectively, Grace, its majority-owned subsidiaries and any other entity which Controls, is Controlled by or under common control with Grace at the time of the Closing.

"Grace" means W. R. Grace & Co. - Conn., a Connecticut corporation.

"Governmental License" means a lease, license or permit granted by or obtained from a Governmental Authority.

"HZ License and Supply Agreement" has the meaning given such term in Section 4.10 (a).

"HZ Group" means, collectively, Heidelberger Zement AG, its majority-owned subsidiaries and any other entity which Controls, is Controlled by or under common control with Heidelberger Zement AG at the time of the Closing.

"Indebtedness" means accounts payable of every name and nature whether or not incurred in the ordinary course of business and all outstanding indebtedness of the Company for borrowed money, including principal and accrued interest and any other amounts payable for any reason by Company to any of its Affiliates.

"Knowledge of the Company" means the actual knowledge of the officers and directors of the Company and the following specific persons: Mr. William McHugh and Ms. Reba Pontbriand (after having made diligent inquiry as to the facts).

"Liens" means any and all liens, security interests, mortgages, pledges, encumbrances, agreements or options to buy or sell, and other rights of third parties.

"Litigation Expenses" has the meaning given such term in Section 8.02.

"MA Assets" has the meaning given such term in Section 2.02.

"MA Business" means the masonry admixtures business of the Company as the same has been conducted by the Company during the 18 month period prior to the Closing, which without limitations involves its masonry admixture products its cleaners and sealer products but excludes the Company's Microcem Business.

"MA Products" means each and every product, type and product configuration which makes up the MA Business.

Microcem Business means that portion of the business of the Company related to the sale of products sold under the tradename Microcem.

"Non-Competition Agreement(s)" means the Non-Competition Agreement of even date herewith in favor of Grace between Grace the Company and the Shareholder.

"Proprietary Name" means any trademark, servicemark, trade name, brand name, domain name or the like, whether registered or unregistered or any applications therefore.

"Purchase Price" means▬▬▬▬▬payable in the manner described in Section 3.03.

"Shareholder" means Lehigh Cement Company.

"Sellers" means the Company, and Lehigh Cement Company.

"Tax" means any tax, whether or not based on income, other governmental charges and duties (other than those payable with respect to a Governmental License), and any interest, fines or penalties payable with respect thereto.

"Third Party Claim" has the meaning given such term in Section 8.02.

"Assignment and Transfer Agreement"" means the Agreement of even date herewith among Grace, Company and Shareholder pursuant to which Grace is granted rights to use the HeidelbergerZement Technology utilized by the Company in the MA Business.

"Transaction Documents" means the Closing Conveyances, and the documents and agreements referred to in Section 3.04.

7

"Transferred Liabilities" has the meaning given such term in Section 2.03.

2.    PURCHASE AND SALE OF ASSETS.

2.01    Purchase and Sale. In reliance on the representations and warranties of the Sellers and each of them and the undertakings of Sellers and each of them set forth in this Agreement, and on the terms and subject to the conditions of this Agreement, at the Closing, the Company shall sell to Grace, and Grace shall purchase from the Company, the MA Business and the MA Assets.

2.02    MA Assets.

(a)    "MA Assets" means any and all of the Company's assets, properties and rights of every type and description used in connection with, related to, or part of the MA Business (other than the Excluded Assets), wherever located, and whether owned or controlled by the Company, its Affiliates or the Shareholder, including, but not limited to goodwill, domain names, Proprietary Names, copyrights, patents (and any applications therefor), technology and other intellectual property (including without limitation, computer programs or software developed or under development in connection with the use of MA Products or the MA Business as well as know-how and show-how for the manufacture, application and use of the MA Products); fixtures; vehicles, machinery, equipment and other operating properties, including, but not limited to, the assets listed on the Schedule to this Section 2.02; notes and accounts receivable; inventories of raw materials, work in progress, finished goods; dispensing equipment and packaging, sales and marketing literature, rights under Contracts; permits, licenses and any code body listings, certifications or approvals, to the extent transferable; customer lists and books and records and all other properties and rights of every kind and nature owned, held or controlled by the Company, its Affiliates or the Shareholder, at the time of the Closing used in connection with, related to, or part of the MA Business, whether or not specifically referred to in this Agreement.

(b)    "Excluded Assets" means:

(i)    minute books and stock records of the Company the Shareholder or its or their Affiliates;

8

(ii)     any Company, Shareholder or Affiliate Claims for refunds of Taxes and governmental charges of whatever nature;

(iii)    all of the Company's, Shareholder's or Affiliate's bank accounts, accounts held with other financial institution, or other accounts held in the name of or on behalf of the Company or the Shareholder (including without limitation, payroll checking, checking 401(k) and other similar accounts, and any and all cash, cash equivalents, securities or other instruments or amounts held therein;

(iv)    Contracts, rights and funds in connection with retirement, stock option, compensation (including but not limited to bonus plans), medical, life, disability income and other employee benefit plans;

(v)     prepaid expenses and other assets, the benefit of which cannot be effectively transferred to Grace;

(vi)    all interests in and rights to insurance contracts and policies and any prepaid insurance premiums with respect thereto and all claims under such contracts and policies relating to periods prior to the Closing.

(vii)   the Microcem Business;

(viii)  Claims of Company against third parties of whatever nature;

(ix)    Standard general and administrative "shrinkwrap" software such as Microsoft® Office;

(x)     Stock ownership interests in Patemco, Inc. or any interest in the name or business of Patemco;

(xi) all title, right and interest in and to the real property commonly known as 6555 Button Gwinnett Drive Doraville, Georgia 30346, the buildings and improvements thereon, and any and all fixtures thereon, and

(xii)   all of the assets listed on the schedule to Section 2.02 (a) which are marked as retained by Company.

2.03   <u>Transferred Liabilities</u>.

9

"Transferred Liabilities" means the obligations that otherwise would be ·performed and fulfilled subsequent to the Closing by the Company under all lawful executory Contracts of the Company relating to the MA Business which are duly and effectively assigned to Grace at the Closing but excluding in each case the Excluded Liabilities.

(b)     "Excluded Liabilities" means

(i)     liabilities of the Company to its shareholders or former shareholders whether arising out of their relationship as such shareholders or otherwise (including but not limited to accrued liabilities for distributions of dividends);

(ii)     liabilities arising out of any contract of the Company to issue capital stock or other securities;

(iii)     liabilities of the Company which involve misrepresentations or breaches of warranty by the Sellers under this Agreement;

(iv)     liabilities incurred by the Company as a result of any act performed, transaction entered into or state of facts suffered to exist in violation of any provision of this Agreement;

(v)     liabilities of the Company for any sales, excise, transfer or other similar Tax on or arising out of the sale of the MA Assets pursuant to this Agreement except subject to Section 2.06 as to proration of ad valorem taxes and Section 6.03 in the case of apportionment of transfer taxes;

(vi)     liabilities of the Company for any Taxes or deferred Tax liability except subject to Section 2.06 as to proration of ad valorem taxes and Section 6.03 in the case of apportionment of transfer taxes;

(vii)     liabilities of the Company arising out of product liability or product warranty claims relating to products manufactured by or for the Company (including products in inventory at the Closing but sold by Grace after the Closing) or for services or advice rendered by the Company or its agents prior to the Closing;

(viii)  liabilities arising out of any claims, suits, actions, investigations or proceedings relating to events, occurrences or conditions at any location owned, leased, serviced or otherwise controlled by the Company, associated directly or indirectly with the MA Business existing prior to the Closing, including but not limited to workers' compensation matters, claims by employees of the Company for compensation damages or other relief, claims for personal injury or property damage, violations or noncompliance with laws, and liabilities under CERCLA, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq., as amended, The Toxic Substances Control Act (TSCA) 15 U. S. C. Section 2601 et seq. as amended,  any state equivalent thereof, or any other Environmental Law;

(ix)   liabilities of the Company or any plan or program maintained or sponsored or contributed to by the Company or any Affiliate with respect to agreements, rights and funds in connection with retirement, stock option, compensation (including but not limited to bonus plans), disability income and other employee benefits (including but not limited to the participation of the Company's employees in the Shareholder's 401k plan or other Benefit Plans as defined in Section 4.26 );

(x)    commissions payable in respect of MA Products sold by Company prior to or on  the Closing Date;

(xi)    liabilities described in Section 6.01;

(xii)   Indebtedness; and

(xiii)  any and all other liabilities or obligations (whether known or unknown, absolute or contingent, liquidated or unliquidated, accrued or unaccrued, due or to become due, and whether claims with respect thereto are asserted before or after the Closing) of the Company which are not Transferred Liabilities.

2.04   Purchase Price.  In full consideration for the purchase of the MA Business and the MA Assets, and in full payment therefor, Grace shall, in the manner described in Article 3:

(a)     deliver to the Company ███████████ and

(b)     assume, and agree to pay and discharge in due

11

course, the Transferred Liabilities.

2.05    Allocation of the Purchase Price.

Grace and Company agree to prepare and timely file Internal Revenue Form 8594 (Asset Acquisition Statement) in accordance with Section 1060 of the Code and the regulations promulgated thereunder, to cooperate in every reasonable way with the other in the preparation of such form and to furnish the other with a copy of such form prepared in draft within a reasonable period before the due date for filing. Grace and the Company further agree to allocate the Purchase Price among the MA Assets in accordance with the Purchase Price allocation set forth in the schedule to this Section.

2.06.    Payment and Proration of ad valorem Taxes .

The Company shall be responsible for the payment of all ad valorem taxes, personal property taxes, and other similar taxes assessed against or that may create a Lien on the MA Assets for all tax periods ending before or which include the Closing Date. At the Closing, Grace shall pay to the Company the estimated pro rata amount of any such taxes applicable to the portion of the tax period from the Closing Date to the end of the tax period which includes the Closing Date. The Company shall, at least 10 days prior to the Closing Date, deliver to Grace a calculation of the estimated pro rata amount to be paid by Grace to the Company and copies of all statement and assessments reflecting such taxes for the prior tax period on which such estimated proration was based. Grace shall then have 5 days after receiving the calculation and copies with which to review and agree with the Company's calculation of the estimated pro rata amount. The Company shall pay such taxes to the appropriate taxing authorities when due, prior to becoming delinquent and shall notify and provide documentation to Grace of such payment and its amount. The proration of such taxes for the tax period including the Closing Date shall thereafter be adjusted, (i) by payment of an appropriate amount by Grace to the Company, if the amount of such taxes paid by the Company are greater than the amount for the prior tax period, or (ii) by payment of an appropriate amount by the Company to Grace if the amount of such taxes is less than the amount for the prior tax period.

3.    CLOSING DATE; ACTIONS OF THE PARTIES AT THE CLOSING; POST CLOSING ADJUSTMENT; FURTHER ASSURANCES.

3.01    Closing Date; Simultaneity. The Closing is taking place on the date hereof at 10:00 local time at the offices of Morris, Manning & Martin, LLP, 1600 Atlanta Financial Center, 3343 Peachtree Road, N. E. ,

12

Atlanta, GA.30326. All of the actions to be taken and documents to be executed or delivered at the Closing shall be deemed to be taken, executed and delivered simultaneously, and no such action, execution or delivery shall be effective until all such matters shall be completed.

3.02   Conveyance of MA Assets. At the Closing, the Company is executing and delivering to Grace:

(a)   a general bill of sale with respect to the MA Assets; and

(b)   with respect to each registered trademark, or application therefor, included in the MA Assets, an assignment suitable for filing at the United States Patent and Trademark Office, or in foreign jurisdictions as appropriate.

(c)   Assignment of Accounts Receivable

3.03   Payment of Purchase Price. At the Closing, Grace is:

(a)   paying to the Company ██████████ in immediately available funds to the Company's bank account;

(b)   executing and delivering to the Company an Assumption Agreement with respect to Transferred Liabilities and

(c)   Assignment of Accounts Receivable

3.04   Other Documents and Ancillary Agreements. At the Closing, each of the following agreements or documents shall be executed and/or delivered by the parties thereto:

(a)   Non-Competition Agreement(s) of the Company and Shareholder ;

(b)   Assignment and Transfer Agreement and Exclusive License Agreement among Grace, the Company and its Affiliates.;

(c)   Certified resolutions of the Company and the Shareholder providing for the Transactions set forth herein and certificates of incumbency;

(d)     A tax clearance certificate from the Georgia Department of Revenue dated within 10 days of the Closing stating that no sales and use taxes, including interest or penalties, are due;

(e)     Final non-appealable order of the Bankruptcy Court authorizing Grace to consummate the transactions contemplated by this Agreement;

(f)     Assignment of rights and cooperation Agreement relating to the Former Company Employees as defined in Section 7.07,

(g)     Consulting Agreement with Mr. William McHugh, and

(h)     Scott Assignment and cooperation agreement.

3.05    Post-Closing Adjustment.

(a)     Within thirty (30) days following the Closing Date, Company shall prepare and deliver to Grace a statement of the book value of the Accounts Receivable and Inventory as of the Valuation Time (the "Closing Date Working Capital Statement"). Company and its representatives shall be given reasonable access to the Accounts Receivable and Inventory records and appropriate documents for the purpose of preparing the Closing Date Working Capital Statement. The Closing Date Working Capital Statement shall be prepared using the same accounting principles and practices used by Company in the preparation of MA Products Baseline Plan Balance Sheet dated December 31, 2001 set forth in the schedule to this Section, consistently applied, (the "Baseline Balance Sheet"). Physical counts of Inventory shall be taken in accordance with the instructions set forth in the schedule to this Section.

(b)     For the purposes of this Section the following terms shall have the following meaning:

"Accounts Receivable" means the Company's trade accounts receivable (less allowance for bad debts).

"Inventory" means the Company's raw materials, work in progress, finished goods, dispensing equipment inventory, and packaging .

"Valuation Time" means 12:01 A.M. on the Closing Date.

"Base Working Capital" means $1,700,000 combined amount of trade receivables ($1,200,000) and inventories ($500,000) as at December 31, 2001.

"Closing Date Working Capital" means the Closing Date Working Capital as finally determined pursuant to this Section 3.05.

(c)     Unless Grace notifies the Company in writing within 30 days after receipt of the Closing Date Working Capital Statement that it objects to the calculation of the Closing Date Working Capital (the "Notice of Objection"), the Closing Date Working Capital Statement shall become final and binding upon the parties for purposes of this Agreement.  During the 30 day period following Grace's receipt of the Closing Date Working Capital Statement, Grace shall be permitted to review the working papers of the Company and the Company's accountants related to the Closing Date Working Capital Statement. The Notice of Objection shall specify in reasonable detail the basis for such objection.  If Grace provides such Notice of Objection to the Company within such period, Grace and the Company shall negotiate in good faith to resolve the issues set forth in the Notice of Objection during the 30 day period after the Company's receipt thereof. If Grace and the Company resolve such disputed issues such resolution shall be final and binding on the parties.  During the 30 day period following the Company's receipt of Grace's Notice of Objection, Grace shall be permitted to review the working papers of the Company and Company's accountants related to the Notice of Objection and the calculation thereof and the basis thereof.  If Grace and the Company are unable to resolve such objections within such 30-day period, the disputed matter shall be submitted to Deloitte & Touche ("the Arbitrator").  The parties shall cooperate with the Arbitrator so as to enable the Arbitrator to render its final written decision to the parties within sixty (60) days from and after its receipt of the disputed matter. The decision of the Arbitrator shall be final and binding on the parties. Nothing herein shall be construed to authorize or permit the Arbitrator to determine any question or matter whatever under or in connection with this Agreement except the determination of the Closing Date Working Capital nor require the Arbitrator to follow the rules of the American Arbitration Association or any other body in making such determination, provided that the Arbitrator shall use the same accounting principles and practices used by the Company in preparation of the Baseline Balance Sheet.

(d)     Within 10 days after the Closing Date Working Capital has been finally determined in accordance with this Section 3.05 (whether because no Notice of Objection is filed or by agreement of the parties or

decision of the Arbitrator), the excess or shortfall of the Closing Date Working Capital over or below the Base Working Capital, if any, shall be paid by Grace to the Company or by the Company to Grace, as the case may be. Any such payment as may be due shall be made by wire transfer of immediately available funds.

(e)    Grace and the Company each shall bear one-half of the fees, costs and expenses of the Arbitrator under Section 3.05(c) to resolve any dispute.

3.06    Further Assurances.

(a)    At any time and from time to time at and after the Closing for a period of five years thereafter, the Company and the Shareholder shall, at the reasonable request of Grace and at Grace's expense, execute and deliver or cause to be executed and delivered all such documents and instruments and take or cause to be taken all such other action as may be reasonably necessary or desirable in order to put Grace in actual possession and operating control of the MA Assets, or to more fully and effectively vest in Grace, or to confirm Grace's title to and possession of, the MA Assets or to assist Grace in exercising rights with respect thereto, or otherwise to carry out the intent and purposes of this Agreement.

(b)    During the three month period immediately following the Closing, Shareholder and the Company shall use reasonable efforts to help transition to Grace the MA Assets, the relationships of the MA Business with its customers, suppliers, distributors and sales representatives and facilitate the transfer to Grace of the know-how and show-how required to manufacture and use the MA Products

(c)    Grace shall have the right to use the names "Addiment" or variants thereof whether by themselves or in combination with other words for a period of six months after the Closing. Grace shall have the right to use any equipment, packaging, catalogues, sales and promotional materials, and printed forms that use such name and are included in the MA Assets as of the Closing, or have been ordered prior to the Closing for use in the MA Business, provided that (a) Grace shall use reasonable efforts to reflect that the MA Business is owned by Grace and (b) Grace shall indemnify and hold Company its Affiliates and the Shareholder harmless from any and all liability resulting from such use.

4.    REPRESENTATIONS AND WARRANTIES OF THE SELLERS.

The Sellers and each of them jointly and severally, represent and warrant to Grace as follows:

16

4.01   <u>Corporate Organization</u>. The Company is a corporation duly organized, validly existing and in good standing under the laws of Delaware, with full corporate power to carry on its business as presently conducted, and to own and operate its assets and business. The Company is licensed or qualified to do business as a foreign corporation in Georgia. The copies of the Certificate of Incorporation of the Company as amended to date (certified by the Secretary of State of its jurisdiction of incorporation) and of its by-laws as amended to date (certified by its Secretary) which have heretofore been delivered to Grace are true and complete.

4.02   <u>Incumbency and Ownership</u>. The schedule to this Section sets forth a true and complete list of the directors and officers of the Company and the Shareholder. The Company is owned 100% by the Shareholder and Shareholder is validly existing and in good standing under the laws of Pennsylvania .

4.03   <u>Ownership Interests</u>.

(a)   Neither the Company, the Shareholder or any Affiliate owns (directly or indirectly) any capital stock or other securities of, or have any proprietary interest in, any corporation or other business entity which is involved in the manufacture, sale, application, development, or use of products of the type comprising the MA Business, and does not Control (directly or indirectly) the management or policies of any such corporation or business entity, except as set forth in the schedule to this Section.

(b)   Except as set forth in the schedule to this Section, the entire MA Business is conducted by Company and Grace may continue the MA Business of Company subsequent to the Closing without need of any right, permission or property of any Affiliate of the Company whether tangible, intangible or intellectual. The Company owns or has all rights to use its properties for all operations necessary to conduct the MA Business.

4.04   <u>No Conflict; Authorization</u>.

(a)   The execution and delivery by the Sellers of this Agreement and the Transaction Documents to which it or they are a party, and the performance of obligations hereunder and thereunder, will not (i) result in the breach of any of the terms of, or constitute a default under, the charter documents or by-laws of the Company or the Shareholder or it or their affiliates, or any Contract to which the Sellers or its or their affiliates are a party or by which the MA Business or the MA Assets may be bound, or (ii) violate any order, writ, injunction or decree of any court or Governmental Authority.

17

(b)     No consent, approval, order or authorization of, or registration, declaration or filing with, any court or Governmental Authority is required as a prerequisite to the execution and delivery by the Sellers of this Agreement and the Transaction Documents to which they or their Affiliates are parties, and the performance of their obligations hereunder and thereunder.

(c)     The execution and delivery by the Company and Shareholder and their Affiliates of this Agreement and the Transaction Documents, and the performance of their obligations hereunder and thereunder, have been duly and validly authorized by their Boards of Directors, and by any other necessary corporate shareholder, or Affiliate action. This Agreement has been duly executed and delivered by the Sellers and assuming due authorization, execution and delivery by Grace is legally binding on them in accordance with its terms.

(d)     The execution and delivery by the Company of the Closing Conveyances at the Closing will effectively convey to Grace good and marketable title to all the MA Assets.

4:05   Financial Statements.

(a)     The Company has heretofore delivered to Grace complete copies of the following described financial statements: the Base Balance Sheet (a copy of which is set forth in the schedule to this Section), the balance sheets of the Company relating to the MA Business as at December 31, 2000, and December 31, 2001 and the related statements of income and changes in cash flows, for the year ended December 31, 2001 , including all notes thereto, together with any report of independent accountants with respect thereto. Each balance sheet described in this subsection presents fairly the financial position of the MA Business as at the date thereof, and each statement of income and cash flows, described in this subsection presents fairly the results of operations and cash flows of the MA Business for the period or periods which it purports to cover, and the balance sheets and each statement of income and cash flows for the years ended December 31, 1999, 2000 and 2001 were prepared in conformity with generally accepted accounting principles applied on a basis consistent with that of prior periods. The said Balance Sheets include financial information related to the Microcem Business which is excluded from the MA Assets as more particularly described in the schedule to this Section.

(b)     No review has been submitted to the Company or its Affiliates after January 1, 1998 by independent accountants in connection with any annual or interim review of the financial statements of such

18

Company in which specific comment is made to the financial results of the MA Business.

4.06   <u>Liabilities</u>. The MA Business has no debts, liabilities or obligations of any nature, whether accrued, absolute, contingent or other, and whether due or to become due, and to the Knowledge of the Company there is no basis for the assertion against the MA Business of any such debt, liability or obligation, except:

(a)   to the extent set forth on or reserved against in the Base Balance Sheet;

(b)   current liabilities incurred in the ordinary course of business since the Balance Sheet Date of the type identified as Accounts Payable or in the Base Balance Sheet; and

(c)   obligations under Contracts listed or described in the schedules to this Article, and under other Contracts entered into in the ordinary course of business and not required to be so listed or described.

4.07   <u>Absence of Certain Changes</u>.

(a)   Except as set forth in Section 7.07 there has not been since the Balance Sheet Date:

(i)   any change in the condition (financial or other), assets, liabilities, or business of the MA Business, except changes in the ordinary course of business

(ii)   any damage, destruction or loss (whether or not covered by insurance) materially and adversely affecting the assets, business of the MA Business;

(iii)   any change in the accounting methods or practices followed by the Company or any change in depreciation, amortization or inventory valuation policies or rates theretofore used by it affecting the MA Business;

(iv)   any sale, lease, or other disposition by the Company of any interest in intellectual property relating to the MA Business, or of any machinery, equipment or other operating property of the MA Business;

(v)   any material change in the payment terms or collection practices with respect to the MA Business's sales or accounts receivable, any material change in the payment terms

or practices with respect to the MA Business's accounts payable or other current liabilities, or any material change in the inventory levels of the MA Business from past periods; or

(vi)    any other occurrence, event or condition which materially adversely affects or to the Knowledge of the Company may adversely affect the assets or business of the MA Business.

(b)    Except as set forth in Section 7.07 since January 1, 2001, there has not been any change in the relationship or course of dealing between the Company and any of its suppliers, customers, applicators or sales representatives that has had or to the Knowledge of the Company could have a material adverse effect on the business of the MA Business.

(c)    Except as set forth in Section 7.07 the Company has good relationships with its customers, distributors, licensors, sales representatives, agents and suppliers and the Company does not have any information or to the Knowledge of the Company has any such customer, distributor, licensor, sales representative, agent or supplier indicated that it would not continue or renew its relationship with the MA Business from and after the Closing Date.

4.08    Taxes.

(a)    All Taxes arising out of the operation of the MA Business have been paid or the Company has made provision for their payment, and there is no basis for the assertion of a claim for Taxes in respect of the MA Business or the MA Assets.

(b)    The Company has withheld or collected from each payment made to the MA Business Employees the amount of all Taxes (including, but not limited to, federal income taxes, Federal Insurance Contribution Act taxes and state and local income, payroll and wage taxes) required to be withheld or collected therefrom and has paid the same to the proper tax receiving officers.

4.09    Real Estate.    The Company owns no real estate and leases no real estate dedicated to the use of the MA Business except that it has the right to occupy the Shareholder's premises at 6555 Button Gwinnett Drive Doraville, Georgia 30340 for the purpose of manufacturing and storing MA Products.

4.10    Personal Property.

(a)    The Company has good title to the MA Assets, including but not limited to the MA Assets reflected in the Base Balance Sheet free and clear of all Liens except to the extent that any of the MA Assets are subject to leases listed in the schedule to Section 4.10 (b) (i) or with respect to technology or intellectual property which is subject to the License and Supply Agreement between Heidelberger Baustofftechnik Gmbh successor licensor to Heidelberger Zement AG and Company dated May 29, 1984, as amended, listed in Section 4.14 (a) (vii) and delivered pursuant to Section 4.14 (b) (the "HZ License and Supply Agreement").

(b)    The schedule to this Section sets forth (i) a list of all leases of machinery, equipment, vehicles and other tangible personal property included in the MA Assets, together with all amendments and supplements thereto and modifications thereof, and a summary description of the property covered by each such lease, and (ii) a list of all other Contracts relating to the MA Business relating to any interest in tangible personal property to which the Company is a party (each such list setting forth general categories rather than specific items in the case of routine and immaterial matters). The Company has delivered to Grace complete copies of all such leases and other Contracts (or the schedule to this Section includes a description of any such item that is not in writing). Except as specified in the schedule to this Section, all of such leases and other contracts are legally valid and binding in accordance with their respective terms and in full force and effect, and there are no defaults thereunder. Except as specifically set forth in the schedule to this Section, no leasehold or other interest of the Company in tangible personal property, or other Contract of the Company relating to tangible personal property or any interest therein, is subject or subordinate to any Lien.

4.11    Condition of Property. All fixtures, machinery, equipment, vehicles and other tangible personal property owned, leased or used by the Company in the MA Business and which are included within the MA Assets are as of the Closing in good operating condition and repair, reasonable wear and tear excepted, and are adequate and sufficient for all operations conducted by it in the MA Business. The Company has the right to use its properties for all operations of the MA Business as conducted by the Company.

4.12    Inventories. The Inventories of the Company reflected in the Base Balance Sheet consist of items of a quality and quantity usable and salable in the ordinary course of the MA Business, and the values of items which are not of standard quality or quantity or are obsolete or otherwise unmarketable have been written down in the Base Balance Sheet to net realizable value, or adequate reserves have been provided therefor. The inventories of the Company relating to the MA Business acquired subsequent

21

to the Balance Sheet Date have been acquired in the ordinary course of business and the values of items which are not of standard quality or quantity or are obsolete or otherwise unmarketable have been written down in its books of account to net realizable value, or adequate reserves have been provided therefor.

4.13   <u>Receivables</u>. All Accounts Receivable of the Company relating to the MA Business have arisen in the ordinary course of business and have been collected or are collectible in the aggregate recorded amounts thereof less (a) with respect to Accounts Receivable reflected in the Base Balance Sheet, the applicable reserves in respect thereof reflected in the Base Balance Sheet, and (b) with respect to Accounts Receivable acquired subsequent to the Balance Sheet Date and outstanding as of the date hereof, reserves not in excess of an amount in the same proportion to such Accounts Receivable as the applicable reserves reflected in the Base Balance Sheet bear to the aggregate amounts of the Accounts Receivable reflected in the Base Balance Sheet.

4.14   <u>Contracts</u>.

(a)   The schedule to this Section lists each of the Contracts relating specifically to the MA Business or by which the MA Assets are bound:

(i)   each Contract for the sale or supply of products or services by the Company;

(ii)   each distributorship, sales agent, or franchise Contract;

(iii)   each sales representative Contract;

(iv)   each Contract for consulting services;

(v)   each Contract relating to proprietary information;

(vi)   each Contract for the purchase by the Company of materials, supplies or services;

(vii)   each license agreement, including without limitation any license between the Company and the Shareholder or any Affiliate;

(viii)   each non-analysis Contract;

(ix)    each loan or credit agreement, security agreement, indenture, mortgage, pledge, conditional sale or title retention agreement, equipment obligation, lease purchase agreement or other instrument involving indebtedness and the outstanding amount payable thereunder;

(x)    each guarantee, endorsement or other contract with respect to any obligations of any other person or entity, whether or not an affected party;

(xi)    each partnership, joint venture, joint development, joint operation, business acquisition or similar agreement;

(xii)    each form of warranty applicable to the sale of MA Products;

(xiii)    each Contract (other than those of the types covered by the previous subsections of this Section or by Sections 4.09, 4.10, 4.15, 4.16, 4.17, 4.22, 4.23, 4.24, 4.25 and 4.26 that (i) involves aggregate payments or receipts by the Company of $10,000 or more, or (ii) is not to be fully performed by the date of this Agreement, or (iii) otherwise materially affects the condition (financial or other), of the MA Business, MA Assets, or the business of the MA Business.

(b)    The Company has delivered to Grace complete copies of all such Contracts (or the schedule to this Section includes a description of any such item that is not in writing). All of such Contracts are legally valid and binding and in full force and effect, and there are no defaults thereunder or to the Knowledge of the Company threatened and there is no basis for default thereunder.

4.15    Patents, Technology. With respect to the MA Business:

(a)    Neither Company or any of its Affiliates own or control (in the sense of having the right to license others) any patents which relate in any way to the MA Business, and (ii) except as set forth in the HZ License and Supply Agreement there are no licenses or other Contracts with respect to any patents, patent applications, inventions, know-how or technology to which the Company or its Affiliates is a party, and by which the Company, the MA Business or any of its MA Assets is bound.

(b)    Except for the HZ License and Supply Agreement no right, license, consent or other agreement is or to the Knowledge of the

23

Company is required with respect to any patent, invention, trade secret, know-how or technology for the conduct of the MA Business.

(c)     Except as set forth in Section 7.07, to the Knowledge of the Company no infringement of any U.S. or foreign patent rights or other intellectual property rights has occurred or is involved in connection with the MA Business of the Company, and to the Knowledge of the Company no claim of any such infringement has been made or threatened.

4.16    Proprietary Names and Computer Software.

(a)     The schedule to this Section sets forth (i) in Part I, a list of all Proprietary Names, all registrations and applications for registration of such Proprietary Names, domain names, copyright registrations and applications for registration, and all proprietary computer software programs (other than standard general and administrative "shrinkwrap" software such as Microsoft® Office), that are used, owned or controlled (in the sense of having the right to license others) by the Company in the MA Business and (ii) in Part II, a list of all licenses and other Contracts relating to Proprietary Names, domain names, copyrights or computer software used in the MA Business to which the Company is a party or by which the Company or any of its MA Assets is bound.

(b)     Except as set forth on the schedule to this Section, all registrations for the Proprietary Names and copyrights listed in Part I of the schedule to this Section are valid and to the Knowledge of the Company enforceable, and all applications for such registrations are pending and in good standing, all to the Knowledge of the Company without challenge of any kind. Except as set forth in the schedule to this Section the Company has good title to all Proprietary Names, domain names, copyrights and computer software programs used in the MA Business that it purports to own, free and clear of all Liens. The Company has delivered to Grace complete copies of all applications and registrations for Proprietary Names, domain names, and copyrights listed in Part I of the schedule to this Section, and of all licenses and other Contracts listed or described in Part II of the schedule to this Section (or the schedule to this Section includes a description of any such item that is not in writing).

(c)     For the conduct of the MA Business no right, license, or other Contract is required with respect to any Proprietary Name, domain name, copyright or proprietary computer software other than those listed or described in the schedule to this Section.

(d)     To the Knowledge of the Company no infringement of any Proprietary Name, domain name, copyright or proprietary computer software

24

program has occurred or is involved in connection with the MA Business or operations, and to the Knowledge of the Company no claim of any such infringement has been made or (so far as the Sellers and each of them are aware) threatened . None of the Proprietary Names or registrations or applications to register such Proprietary Names listed in Part I of the schedule to this Section is involved in any opposition, cancellation, nullification, interference, or concurrent use proceeding, and to the Knowledge of the Company no such proceeding is threatened.  All of the licenses and other Contracts listed or described in Part II of the schedule to this Section are legally valid and binding in accordance with their terms and in full force and effect and there are no defaults thereunder.

4.17   Secrecy and Noncompetition Agreements.  Each employee and consultant of the Company or the Shareholder who has access to any proprietary technology or proprietary computer software owned or used by the Company in the MA Business except as set forth in the schedule to this section has executed a written Contract obligating such person to keep such material confidential, and each employee and consultant of the Company whose duties include the development of proprietary technology or proprietary computer software has executed a written Contract assigning the Company all rights thereto.  The schedule to this Section lists each such Contract that is not in a standard form.  The Company has delivered to Grace complete copies of all such Contracts that are not in standard form and of the standard forms used by the Company for such purposes.  All of such Contracts are in full force and effect in accordance with their terms, and there are no defaults thereunder.

4.18   Governmental Licenses, Approvals and Permits.

(a)   No Governmental Licenses and approvals from  code testing, approval or certification authorities are necessary to conduct the MA Business and to utilize the MA Products as currently used and to own and operate the MA Assets as currently owned and operated.

(b)   No U.S. Government security clearances or to the Knowledge of the Company U.S. export or import licenses or similar clearances or licenses under the laws of any foreign country are required for the conduct of the MA Business and to the Knowledge of the Company no Governmental Licenses are required to operate the MA Assets and to produce and utilize the MA Products, as currently manufactured and used.

4.19   Compliance with Laws.

(a)   Except as set forth in the schedule to this Section, the Company has materially complied in a timely manner with all laws and

25

governmental regulations and orders relating to any of the property owned, leased or used by the MA Business, or applicable to the MA Business, including, but not limited to, the labor, equal employment opportunity, occupational safety and health, and antitrust laws. Except as set forth in the schedule to this Section, no notice from any Governmental Authority has been received by the Company claiming any violation of any law or any governmental regulation or order, or calling attention to the need for, any work, repairs, alterations or installations on or in connection with the MA Business or the MA Assets which has not been complied with.

(b) To the Knowledge of the Company none of its sales representatives or other agents or representatives has given or offered to give anything of value to any governmental official, political party or candidate for government office for the purpose of obtaining sales of MA Products or retaining any part of the MA Business for the Company or has taken any action which would constitute a violation of the Foreign Corrupt Practices Act of 1977, as amended, or any similar law or has violated the U.S. Anti-Boycott Laws and the export control laws of the United States.

4.20   <u>Litigation and Claims</u>.  There is (a) no suit, action or claim, (b) no investigation or inquiry by any Governmental Authority, and (c) no legal, administrative or arbitration proceeding pending (or to the Knowledge of the Company, threatened) against the MA Business or any of the MA Assets, or to which it is a party, and to the Knowledge of the Company there is no basis for any such suit, action, claim, investigation, inquiry or proceeding, except as specifically set forth in the schedule to this Section, which schedule also specifies each suit, action, claim, investigation, inquiry or proceeding of a type referred to in this Section pending against the MA Business at any time since January 1, 1998.  Except as specifically set forth in the schedule to this Section, there is no outstanding order, writ, injunction or decree of any court, Governmental Authority or arbitration tribunal against or binding on the Company or its Affiliates relating to the MA Business or the MA Assets.

Except as set forth in the schedule to this Section, there are no warranty claims for non-conforming MA Products outstanding as of the Closing.

4.21   <u>Environmental Matters</u>.

(a)      The schedule to this Section sets forth:

(i)      a list of all studies or reports prepared by or for the Company or the Shareholder on or after January 1, 1998 with respect to any effect on animals or persons of exposure to (1) any

26

of the MA Products manufactured or handled by the Company or (2) any material used by the Company in the manufacture of any MA Product;

(ii)    a list of all documents submitted to the U.S. Environmental Protection Agency pursuant to Sections 8(d) or 8(e) of the Toxic Substances Control Act ("TSCA") by or on behalf of the Company or the Shareholder in respect of the MA Business;

(iii)    a list of the MA Products manufactured by the Company which contain chemicals known by the State of California to cause cancer or reproductive toxicity pursuant to the provisions of the Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65") and, for each such product, a copy of the label and Material Safety Data Sheets ("MSDS") for such product as sold in California;

(iv)    for each MA Product manufactured, imported or otherwise distributed by the Company, a listing of the inventory number (including without limitation the inventory number of any material used or created in the manufacture of the MA Product) assigned by the country where the MA Products are manufactured or into which the MA Products are sold, including the number assignment by the United States Environmental Protection Agency pursuant to the provisions of TSCA, and if no inventory number exists, an explanation as to the appropriate exemption applicable to such product;

(v)    a list of all filings made by the Company or the Shareholder in respect of the manufacture of the MA Products pursuant to the provisions of Title III of the Superfund Amendments Reauthorization Act of 1986 ; and

(vi)    a list of each raw material (and its MSDS) used in the manufacture of each MA Product and a list of the MSDS for each MA Product manufactured, imported or distributed by the Company.

The Company has delivered to Grace complete copies of all studies, reports and other documents listed or described in the schedule to this Section.

(b)    Since January 1, 1998, neither the Company or the Shareholder has received any notice of any violation of, or liability incurred

27

pursuant to, any Environmental Law affecting the MA Business or any person employed therein, nor to the Knowledge of the Company is any such violation or liability existing for which notice has not been received. Since January 1, 1998, except as specified in the schedule to this Section, neither the Company or the Shareholder has received any written notice of existing or potential injuries to current or former employees of the Company or any Affiliate caused by exposure to chemical substances used in the MA Business nor to the Knowledge of the Company is there any such potential injury for which notice has not been received. Such notices include, but are not limited to:

      (i)     workers' compensation claims;

      (ii)    allegations of Significant Adverse Reactions pursuant to Section 8(c) of the TSCA; and

      (iii)   notifications of Substantial Risk pursuant to Section 8(e) of the TSCA.

      (c)    The Company has provided to Grace a list of all raw materials which are used to formulate the MA Products and the formulas for the manufacture of MA Products and all such information is true and complete in all material respects.

      4.22   Certain Transactions.  During the period January 1, 1999 through and including the Closing Date there has not been submitted to the Company or the Shareholder any market survey, management study, engineering report or other special report or study concerning the MA Business or the MA Assets prepared for the Company or the Shareholder by any independent business, marketing, engineering or other consultant.

      4.23   Insurance.  The schedule to this Section lists each insurance policy (specifying the insurer, the amount of the coverage, the type of insurance, the annual premium, and any pending claims thereunder, excluding claims reasonably expected to involve less than $5,000) maintained by the Company in respect of the MA Business on its assets, business or personnel, and a list of the most recent inspection reports, if any, received from insurance underwriters as to the condition of the MA Assets owned, leased, occupied or operated by the Company for the conduct of its MA Business. The Company has delivered or made available to Grace complete copies of each such policy and inspection report and of the loss reports for the period from January 1, 1996 to the date hereof received by the Company from insurance underwriters.

4.24   <u>Employee Compensation</u>. The schedule to this Section sets forth:

(a)    the name and current annual salary (or rate of pay) and other compensation (including, but not limited to, anticipated bonus, profit sharing and other extra compensation) paid by the Company to each Continuing MA Business Employee as defined in Section 7.01;

(b)    any increase since the Balance Sheet Date in the total compensation or in the rate of total compensation payable by the Company to each such person;

(c)    any increase to become effective after the date of this Agreement in the total compensation or rate of compensation payable by the Company to each such person; and

(d)    all presently outstanding loans and advances (other than routine travel advances to be repaid or formally accounted for within 60 days and routine vacation advances) made by the Company to, or made to the Company by, any such employee and each such loan or advance made since the Balance Sheet Date and the current status thereof, whether or not presently outstanding.

4.25   <u>Labor and Employment Matters</u>. The schedule to this Section lists each of the following Contracts to which the Company is a party, or by which the Company or any of its assets are bound:

(a)    each employment, non-competition and confidentiality Contract with any person directly involved in the MA Business; and

(b)    each consulting Contract by which any person or entity that provides services to the MA Business.

The Company does not have any labor union contracts or agreements which covers any of the MA Business Employees.

The Company has delivered to Grace complete copies of all such Contracts (or the schedule to this Section includes a description of any such item that is not in writing).  All of such Contracts are valid and binding and in full force and effect, and there are no defaults thereunder.

4.26   <u>Employee Benefits</u>. The schedule to this Section sets forth a list of all "employee benefit plans" (as defined in Section 3(3) of

29

ERISA) and other profit sharing, deferred compensation, bonus, stock option, stock purchase, severance pay, and employee benefit plans and arrangements maintained or contributed to by the Company or any Affiliate in respect of the MA Business Employees (the "Benefit Plans"). The Company has delivered to Grace an accurate summary description of each Benefit Plan.


## 5. REPRESENTATIONS AND WARRANTIES BY GRACE.

Grace represents and warrants to the Company and the Shareholder as follows:

5.01  Corporate Organization.  Grace is a corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut, with full corporate power and authority to carry on its business as presently conducted and to own and operate its assets and business.  Grace filed a voluntary petition for reorganization relief pursuant to Title 11 of the United States Code, 11 U.S.C. 101 et seq., (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on April 2, 2001 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of Bankruptcy Code) as authorized by Sections 1107 and 1108 of the Bankruptcy Code since the Filing Date.

5.02  No Conflict.  The execution and delivery by Grace of this Agreement and the Transaction Documents to which it as a party, and the performance by Grace of its obligations hereunder and thereunder, will not (i) result in the breach of any of the terms of, or constitute a default under, the Certificate of Incorporation or by-laws of Grace, or any Contract to which Grace is a party or by which Grace or any of its assets are bound, or (ii) violate any order, writ, injunction or decree of any court or Governmental Authority.

5.03  Authorization.

(a)  The execution and delivery by Grace of this Agreement and the Transaction Documents to which it is a party, and the performance by Grace of its obligations hereunder and thereunder, have been duly and validly authorized by all necessary corporate action of Grace and if required by the Bankruptcy Court .  This Agreement has been duly executed and delivered by Grace, and is legally binding on Grace in accordance with its terms.

(b)  Except as set forth in this Article 5, no consent, approval, order or authorization of, or registration, declaration or filing with, any court

30

or Governmental Authority is required as a prerequisite to the execution and delivery by Grace of this Agreement and the Transaction Documents to which it is a party, or the performance by Grace of its obligations hereunder and thereunder.

6.     EXPENSES.

6.01   Sellers' Expenses.  The Sellers shall pay and discharge, and hold Grace harmless against, all liabilities and expenses incurred by or on behalf of the Company, the Shareholder, or their Affiliates in connection with the preparation, authorization, execution and performance of this Agreement, whether paid or incurred before or after the date of this Agreement, including, but not limited to, all fees and expenses of agents, representatives, counsel and accountants, and all amounts payable with respect to any claim for broker's or finder's fees or other commissions in respect of the transactions contemplated by this Agreement based in any way on any agreement, arrangement or understanding made by or on behalf of the Company, the Shareholder or their Affiliates.

6.02   Buyers' Expenses.  Grace shall pay and discharge, and hold the Sellers and their Affiliates harmless against, all liabilities and expenses incurred by or on behalf of Grace in connection with the preparation, authorization, execution and performance of this Agreement, whether paid or incurred before or after the date of this Agreement, including, but not limited to, all fees and expenses of agents, representatives, counsel and accountants, and all amounts payable with respect to any claims for broker's or finder's fees or other commissions with respect to the transactions contemplated by this Agreement based in any way on any agreement, arrangement or understanding made by Grace.

6.03   Transfer Taxes.   All sales, use, transfer and similar Taxes applicable to the sale of the MA Assets to Grace pursuant to this Agreement shall be borne 50% by the Grace and 50% by the Company.

6.04   Bulk Sales.   The consummation of the Transactions contemplated by this Agreement may constitute one or more bulk sales or bulk transfers as the term is defined in the Uniform Commercial Code. Sellers shall indemnify Grace and hold Grace and its Affiliates harmless from and against all Damages arising out of any failure to comply with the applicable bulk sales or transfer laws. The provisions of this Section are not to be construed as an admission that the Transactions set forth in this Agreement are subject to any such laws.

7.     COVENANTS AND CERTAIN POST-CLOSING ACTIONS.

7.01 <u>Offers of Employment</u>. At the Closing Grace shall extend offers of employment (which employment may commence on the date of the Closing or some later date, at Grace's option), to the two MA Business employees listed on the schedule to this Section prepared by Grace. Any of the MA Business employees listed on the schedule to this section who shall have agreed to accept employment with Grace (the "Continuing MA Business Employees") shall be eligible for coverage under the Grace employee benefit plans applicable to similarly situated employees of Grace as determined by Grace. Such benefit plan coverage shall commence upon satisfaction of the eligibility requirements of such plans subject to Section 7.04.

7.02 <u>Indemnity</u>. Sellers and each of them jointly and severally shall indemnify and hold harmless Grace with respect to any liability or obligation in respect of (i) any MA Business Employee who does not commence employment with Grace, and (ii) any event or activity that occurs before or as of the Closing related to any Company employee, including, but not limited to, the termination of employment of any MA Business Employee provided, however, that the Sellers shall not be obligated to indemnify or hold harmless Grace with respect to any liability in respect of any event or activity that commences entirely after the Closing related to any Continuing MA Business Employee, including, but not limited to, the termination of employment by Grace of any Continuing MA Business Employee (a "Post-Closing Continuing MA Business Employee Matter"), and the Grace shall indemnify and hold harmless the Sellers with respect to any liability or obligation in respect of any Post-Closing Continuing MA Business Employee Matter.

7.03 <u>Non-Assumption of Benefit Plans</u>. The parties agree that Grace does not and shall not assume the sponsorship of, or the responsibility for contributions to, or any liability in connection with, any employee benefit plan (including, but not limited to, the Shareholder's 401k plan or other Benefit Plans as defined in Section 4.26), maintained by or contributed to by Sellers for Company employees including, but not limited to MA Business Employees, former employees or their beneficiaries. In addition, with respect to MA Business Employees, the parties agree that Sellers shall offer and be liable for any continuation health coverage (including any penalties, excise taxes or interest resulting from failure to provide continuation coverage) required by section 4980B of the Code with respect to Sellers welfare plans due to qualifying events occurring as of or before the Closing.

7.04 <u>Benefits Eligibility</u>. No Continuing MA Business Employee shall be given credit for service with the Sellers for purposes of any Grace Benefit Plan or employee program except as otherwise provided in this Section 7.04. Each Continuing MA Business Employee shall be given credit for service with the Sellers (to the extent that such service is regarded as

participation and vesting service by Sellers with respect to the Sellers' Benefit Plans) for purposes of (i) eligibility under Grace's Savings & Investment Plan, (ii) eligibility and vesting (but not benefit accrual) under Grace's Salaried Retirement Plan (or any other defined benefit plan in which the Continuing MA Business Employees are eligible to participate) and (iii) vacation and sick pay benefits under the Grace vacation and Grace sick pay program applicable to the Continuing MA Business Employees . With respect to each Continuing MA Business Employees the service crediting specified herein shall be effective as of the date of Closing, or the date the Continuing MA Business Employee commences active employment with Grace (if later).  Notwithstanding the forgoing, each Continuing MA Business Employee shall be regarded as a new hire, as of the date of Closing, or the date the Continuing MA Business Employee commences active employment with Grace (if later), for purposes of any Grace retiree medical or life benefits to which those Continuing MA Business Employees may be eligible.

7.05    Accounts Receivable Matters.  With respect to the accounts receivable acquired by Grace from the Company hereunder (as set forth on the Baseline Balance Sheet), Grace agrees that after the Closing it will use its reasonable efforts to collect such accounts receivable.  If within 90 days after the Closing any such account receivable outstanding on the Closing Date, in the reasonable judgment of the Grace, is deemed uncollectible, Grace shall offer to the Company and the Company shall purchase at face value such account receivable. Upon such payment, Grace shall assign the account receivable to the Company and the Company may pursue collection thereof at its expense and retain the proceeds thereof. Grace shall provide to the Company all documentation in its possession related to the accounts which the Company will pursue for collection.

7.06    Post Closing Removal Services  During the thirty (30) day period following the Closing, Company shall cooperate with Grace and at Grace's expense provide such services and facilities as shall be reasonably required by Grace to facilitate the packaging, shipment and removal of Inventory and personal property included within the MA Assets from the Shareholder's premises at 6555 Button Gwinnett Drive Doraville, Georgia 30340 to such destination (including Grace customer locations) as Grace shall determine (the "Post Closing Removal Services").  All persons involved in the Post Closing Removal Services shall be under the supervision and control of the Company.  In connection with such activity Shareholder shall provide Grace or its designees with such assistance and access to the said premises as Grace may reasonably require. Grace shall reimburse Sellers for all their actual direct costs and expenses in providing the Post Closing Removal Services not to exceed $10,000 and Sellers shall not be required to perform

33

any services or incur any costs or expenses in excess of said amount without Grace's prior consent and agreement to reimburse.

### 7.07   Former Company Employee Matters.

(a)   Prior to the Closing, two former senior employees of the Sellers, (collectively the "Former Company Employees") resigned from their respective positions with the Shareholder and the Company.  The parties believe that the Former Company Employees are principals of, or are otherwise involved in a business relationship with a newly formed corporation ("NEWCO"). While employed by the Company and the Shareholder, the Former Company Employees had access to certain information of the Company, its Affiliates and the Shareholder, including, without limitation, certain confidential information, intellectual property, and proprietary technology (including, without limitation, formulations) (collectively, the "Information"). The parties believe that (i) the Former Company Employees, directly or indirectly through NEWCO, and possibly through the use of the Information, may have entered into competition with the Company and are selling products which may compete with the MA Products and (ii) through the foregoing actions, the Former Company Employees on or before the Closing may have succeeded in obtaining the business of a former major customer of the Company, and may have obtained or may be continuing to obtain business from other customers of the MA Business.

(b)   Grace and Company hereby acknowledge and agree that, as a consequence of their understanding set forth in the foregoing subparagraph (a), the Purchase Price reflects a discount from the price at which the MA Business previously was offered for sale. Accordingly, and in consideration for the foregoing discount, Grace hereby acknowledges and agrees, on behalf of itself and the Grace Group, that (i) it has accepted fully any and all risks that the Former Company Employees may continue to engage in the activities in which the parties believe them to be so engaged, and (ii) notwithstanding anything in this Agreement to the contrary, Grace will make no Claim against, and hereby covenants not to sue, the Company, the Shareholder or their Affiliates (whether pursuant to Article 8 hereof or otherwise) for any matter based in any way upon (y) any past, present or future loss of any customers of the MA Business to, or (z) the possession or any use or misuse of the Information at any time by the Former Company Employees, NEWCO or any other person, firm, partnership, corporation or other business organization, entity or enterprise with which the Former Company Employees may become associated, all of which Claims Grace hereby expressly waives in their entirety.

34

8.    SURVIVAL OF REPRESENTATIONS AND WARRANTIES;
INDEMNIFICATION.

      8.01    Survival of Representations.

      (a)    All representations and warranties of the Sellers and each
of them under this Agreement shall survive the Closing and the delivery of
instruments of conveyance and assignment hereunder, and shall remain
effective regardless of any investigation at any time made by or on behalf of
Grace or of any information Grace may have with respect thereto. The
representations and warranties set forth in Section 4.05 through and
including Section 4.26 shall expire and be of no further force or effect twenty
four (24) months after the Closing, except in each case with respect to Claims
Grace has asserted in writing prior to such expiration. Nothing herein
contained shall prohibit Sellers in respect of any such Claim from raising the
defense that such Claim is barred by any applicable statutory limitation
period.

      (b)    All representations and warranties of Grace set forth in
this Agreement shall survive the Closing and shall remain effective regard-
less of any investigation at any time made by or on behalf of the Company or
the Shareholder or of any information the Company or Shareholder may have
with respect thereto. Nothing herein contained shall prohibit Grace in
respect of any Claim made by Sellers from raising the defense that such
Claim is barred by any applicable statutory limitation period.

      8.02    Definitions. As used in this Article:

      (a)    "Damages" means any and all penalties, fines, damages,
liabilities, losses or costs (including reasonable Litigation Expenses incident
to Third Party Claims, but excluding Litigation Expenses incident to Direct
Claims).

      (b)    "Claim" means any claim, demand, suit, action or
proceeding.

      (c)    "Third Party Claim" means any Claim by any person or
entity other than Grace, the Sellers, or any affiliated person, which could give
rise to a right of indemnification under this Article.

      (d)    "Direct Claim" means any Claim that is not a Third Party
Claim.

      (e)    "Litigation Expenses" means attorneys' fees and other
costs and expenses incident to proceedings or investigations respecting, or the

prosecution, defense or settlement of, a Claim, whether or not an action, suit or proceeding is actually commenced.

8.03  Sellers' Indemnities.  Subject to the terms and limitations of this Article, the Sellers and each of them, jointly and severally, shall indemnify Grace and save and hold Grace harmless from and against any Damages arising out of, resulting from or related to (a) any inaccuracy in any representation or the breach of any warranty of the Sellers and each of them contained in this Agreement, (b) any failure of the Company to duly perform or observe any provision, covenant or agreement to be performed or observed pursuant to this Agreement or any Transaction Document, or (c) any Excluded Liability.  Grace shall be deemed to have suffered such Damages if the same shall have been suffered by any other member of the Grace Group, and the amount of Damages deemed to have been suffered by Grace shall be the amount of Damages suffered by such member of the Grace Group.  Sellers' indemnification obligations hereunder shall survive the Closing as follows:

(i) with respect to the matters described in Section 8.03 (a) the Sellers' indemnification obligations shall expire upon the resolution of all claims, if any, as may be asserted subject to the limitations in Section 8.01(a), and

(ii) with respect to the matters described in Sections 8.03 (b) and 8.03 (c) the Sellers' indemnification obligations shall expire upon the resolution of all Third Party Claims (if any) which may be asserted prior to the expiration of any applicable statute of limitations related to the matters which are the subject of Sections 8.03 (b) or 8.03 (c).

8.04  Buyers' Indemnities.  Subject to the terms and limitations of this Article, Grace shall indemnify the Sellers and save and hold them harmless from and against any Damages arising out of, resulting from or related to (a) any inaccuracy in any representation or the breach of any warranty of Grace contained in this Agreement, (b) any failure of Grace to duly perform or observe any provision, covenant or agreement to be performed or observed by it pursuant to this Agreement or any Transaction Document,  (c) any Transferred Liability or, (d) any liability which is the direct result of the operation by Grace after the Closing of the MA Business. Sellers shall be deemed to have suffered such Damages if the same shall have been suffered by any other member of the HZ Group, and the amount of Damages deemed to have been suffered by Sellers shall be the amount of Damages suffered by such member of the HZ Group.  Grace's indemnification obligations hereunder shall survive the Closing.

8.05  Dollar Limitations.

(a)     Grace may not assert any Claim for indemnification (a "Buyers' Claim") with respect to the breach of any representation or warranty in Section 4.05 or subsequent Sections of Article 4 unless and until the aggregate amount of such Buyers' Claims shall exceed. $50,000, in which event such persons shall be entitled to assert the full amount of all Buyers' Claims.

(b)     The dollar threshold and the indemnification limits set forth in this Section have been negotiated for the special purpose of the provision to which it relates, and is not to be taken as evidence of the level of "materiality" for purposes of any statutory or common law which may be applicable to the transactions contemplated by this Agreement under which a level of materiality might be an issue.

(c)     The indemnification obligations of Grace and Sellers for Damages under Sections 8.03 and 8.04 shall not exceed $4,000,000.

8.06   Procedures; Defense of Third Party Claims.

(a)     Grace shall notify the Sellers in writing promptly after learning of any Claim for which Grace intends to seek indemnification under this Agreement, or to have taken into account for purposes of the dollar threshold in Section 8.05. The Sellers shall notify Grace in writing promptly after learning of any Claim for which the Sellers intend to seek indemnification under this Agreement. It shall be a necessary condition for indemnification under this Agreement with respect to any Claim, or for such Claim to be taken into account for purposes of the dollar threshold under Section 8.05, that after the entity seeking indemnification or to have such Claim taken into account (the "Claimant") receives notice of such Claim, the Claimant shall notify the Sellers (if the Claimant is Grace), or Grace (if the Claimant is the Sellers), prior to the time when the notice recipient's ability to contest the Claim would be materially impaired by lack of notice. If Grace fails to give such notice of a Claim, Grace shall be deemed to have waived all rights to indemnification or payment with respect to such Claim. If Sellers fail to give such notice of a Claim, the Sellers shall be deemed to have waived all rights to indemnification with respect to such Claim.

(b)     Except as otherwise provided in subsection (d) of this Section, Grace, or any other member of the Grace Group, may undertake the defense of a Third Party Claim that the Sellers have notified Grace of, by notice to the Sellers not later than 60 calendar days after receipt by Grace of the notice of the Claim. Prior to receipt of such notice, the Sellers may take such action with respect to the Claim as they shall reasonably determine to be necessary to avoid impairing their ability, or the ability of the Grace Group, to contest such Claim; the Sellers shall be entitled to indemnification from Grace for the costs of such action to the same extent that they are enti-

37

tled to indemnification with respect to the Claim itself. Failure on the part of the Grace Group to so notify the Sellers that it will undertake such defense shall be deemed to be a waiver of the Grace Group's right to undertake such defense. If the Grace Group undertakes the defense of any Third Party Claim, it shall control the investigation and defense thereof, except that the Grace Group shall not require the Sellers, without their prior written consent, to take or refrain from taking any action in connection with such Third Party Claim, or make any public statement, which such entity or person reasonably considers to be against its interest, nor shall the Grace Group, without the prior written consent of the Sellers, consent to any settlement that requires the Sellers to make any payment that is not fully indemnified under this Agreement or to submit to any non-monetary remedy; and subject to the Grace Group's control rights, the Sellers may participate in such investigation and defense, at their own expense. If the Grace Group does not undertake the defense of a Third Party Claim, then except as otherwise provided in subsection (d) of this Section, the Sellers shall control such investigation and defense, except that the Sellers shall not require a member of the Grace Group, without its prior written consent, to take or refrain from taking any action in connection with such Third Party Claim, or make any public statement, which such entity reasonably considers to be against its interest, nor shall the Sellers, without the prior written consent of Grace, consent to any settlement; and subject to the Sellers' control rights, the Grace Group may participate in such investigation and defense, at its own expense.

      (c)    Except as otherwise provided in subsection (d) of this Section, the Sellers may undertake the defense of a Third Party Claim that Grace has notified the Sellers of, by notice to Grace not later than 60 calendar days after receipt by the Sellers of the notice of the Claim. Prior to receipt of such notice, the Grace Group may take such action with respect to the Claim as it shall reasonably determine to be necessary to avoid impairing its ability, or the ability of the Sellers to contest such Claim; Grace shall be entitled to indemnification from the Sellers for the costs of such action to the same extent that they are entitled to indemnification with respect to the Claim itself. Failure on the part of the Sellers to notify Grace that they will undertake such defense shall be deemed to be a waiver of the Sellers' right to undertake such defense. If the Sellers undertake the defense of any Third Party Claim, they shall control such investigation and defense, except that the Sellers shall not require any member of the Grace Group, without its prior written consent, to take or refrain from taking any action in connection with such Third Party Claim, or make any public statement, which such entity reasonably considers to be against its interest, nor shall the Sellers, without the prior written consent of Grace, consent to any settlement that requires any member of the Grace Group to make any payment that is not fully indemnified under this Agreement or is subject to any limitation under Section 8.05, or to submit to any non-monetary remedy; and subject to the

Sellers' control rights, the Grace Group may participate in such investigation and defense, at its own expense. If the Sellers do not undertake the defense of a tendered Third Party Claim, then except as otherwise provided in subsection (d) of this Section, the Grace Group shall control such investigation and defense, except that the Grace Group shall not require the Sellers, without its prior written consent, to take or refrain from taking any action in connection with such Third Party Claim, or make any public statement, which such entity or person reasonably considers to be against its interest, nor shall the Grace Group, without the prior written consent of the Sellers, consent to any settlement; and subject to the Grace Group's control rights, the Sellers may participate in such investigation and defense, at their own expense.

(d)     If in the good faith judgment of a party seeking indemnification for a Third Party Claim, such Claim potentially involves matters other than money damages, or if adversely determined could result in additional future Damages or other Claims for which the party seeking indemnification would not be entitled to indemnification hereunder, then the party seeking indemnification shall be entitled to retain control of the investigation and defense of the Claim, except that the party seeking indemnification shall not require any person against whom indemnification is sought, without its prior written consent, to take or refrain from taking any action in connection with such Third Party Claim, or make any public statement, which such entity reasonably considers to be against its interest, nor shall the Sellers if seeking indemnification consent, without the prior written consent of Grace, to any settlement; nor shall Grace if seeking indemnification consent, without the prior written consent of the Sellers, to any settlement. Subject to the control rights of the party seeking indemnification, the parties against whom indemnification is sought may participate in such investigation and defense, at their own expense.

(e)     If Grace is required to indemnify the Sellers with respect to a Third Party Claim the investigation and defense of which is controlled by the Sellers, it shall pay the reasonable attorneys' fees and expenses of one individual or firm representing the Sellers with respect thereto. If the Sellers are required to indemnify Grace with respect to a Third Party Claim the investigation and defense of which is controlled by Grace, it shall pay the reasonable attorneys' fees and expenses of one individual or firm representing the Grace Group with respect thereto.

(f)     Grace shall, and shall cause the other members of the Grace Group to, and the Sellers shall, make available to each other and their counsel all information and documents reasonably available to them which relate to any Third Party Claim, and otherwise cooperate as may reasonably be required in connection with the investigation and defense thereof.

8.07    Remedy; Limitation. Article 8 of this Agreement contains each indemnified party' sole and exclusive remedy for monetary compensation with respect to any Claim under this Agreement but this limitation shall not preclude any party from seeking any other remedy for monetary or equitable relief in connection with any Claim based on fraud or intentional misrepresentation.

9.    NOTICES.

9.01    Addresses for Notices. All notices, requests, demands and other communications required or permitted to be given under this Agreement shall be effective only when received, in writing, and delivered by nationally recognized courier service, by telephone facsimile transmission, or by certified mail (return receipt requested), to the following addresses:

If to Grace:

> Grace Construction Products
> W.R. Grace & Co. - Conn.
> 62 Whittemore Avenue
> Cambridge, MA 02140
> Attention: Wayne T. Smith
> Fax: (617) 234 7548

with a copy to:

> W.R. Grace & Co. - Conn.
> 7500 Grace Drive
> Columbia, MD, 21044
> Attention: Secretary
> Fax: (410) 531-4367

If to the Sellers or any of them:

> Lehigh Cement Company
> 7660 Imperial Way
> Allentown, PA 18195
> Attention: Vice President and Chief Financial Officer
> FAX: (610) 366-4689

With a Copy to:

> Lehigh Cement Company

40

7660 Imperial Way
Allentown, PA 18195
Attention: VP & General Counsel
FAX: (610) 366-4684

Grace may change the address to which such communications are to be directed to it by giving notice to the Company in the manner provided above. The Sellers may change the address to which such communications are to be directed to them by giving notice to Grace in the manner provided above.

## 10.   GRACE REORGANIZATION AND SUBMISSION TO JURISDICTION.

10.01  W. R. Grace & Co.·Conn. filed a voluntary petition for reorganization relief pursuant to Title 11 of the United States Code, 11 U.S.C. 101 et seq.,(as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware the Bankruptcy Court on April 2, 2001 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of Bankruptcy Code) as authorized by Sections 1107 and 1108 of the Bankruptcy Code since the Filing Date.

The parties agree that until the effective date of the confirmation of Grace's Plan of Reorganization or the dismissal or closing of Grace's bankruptcy case the Bankruptcy Court shall have exclusive jurisdiction to enforce the provisions of this Agreement and to decide any claims or disputes which may arise or result from or be connected with this Agreement, any breach or default hereunder, or the transaction contemplated thereby. Thereafter any claims or disputes which may arise concerning the provisions of this Agreement including the Transaction Documents may be lodged in any state or Federal Court having jurisdiction.

## 11.   GENERAL.

11.01 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, other than any conflict-of-laws provision thereof that would otherwise require the application of the law of any other jurisdiction.

11.02 <u>Entire Agreement</u>. This Agreement, including the Exhibits and schedules hereto, and the Transaction Documents set forth the entire agreement and understanding of the parties in respect of the subject matter hereof and supersede all prior agreements, arrangements and understandings relating to such subject matter, provided, that notwithstanding the

. 41

foregoing, the terms of that certain confidentiality agreement dated August 3, 2001 (the "Confidentiality Agreement"), by and between Grace and the Shareholder shall remain in effect after the Closing Date (for the remaining period of time set forth in the Confidentiality Agreement) with respect to Confidential Information (as defined in the Confidentiality Agreement) disclosed by the Sellers to Grace and not included within the MA Assets acquired by Grace pursuant to this Agreement. No representation, promise, inducement or statement of intention with respect to the transactions contemplated by this Agreement has been made by any party, or any affiliated person, which is not embodied in this Agreement or in the documents referred to herein, and no party nor any affiliated person shall be bound by or liable for any alleged representation, promise, inducement or statement of intention not so set forth.

11.03 Successors. This Agreement may be assigned by Grace only with the prior written consent of the Sellers, and by the Sellers only with the prior written consent of Grace. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

11.04 Amendments and Waivers. This Agreement may be amended, superseded or canceled, and any of the terms hereof may be waived, only by a written instrument specifically stating that it amends, supersedes or cancels this Agreement or waives any of the terms hereof, executed by all parties hereto or, in the case of a waiver, by the party waiving compliance. The failure of any party to insist upon strict compliance with any of the terms of this Agreement in one or more instances shall not be deemed a waiver of its rights to insist upon such compliance in the future, or upon compliance with other terms hereof.

11.05 Headings. The Article and Section headings contained in this Agreement are for convenient reference only, and shall not in any way affect the meaning or interpretation of this Agreement.

11.06 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute but one agreement.

IN WITNESS WHEREOF, the parties have duly executed this instrument on the date first above written.

W. R. GRACE & CO. - CONN.

By

42

ADDIMENT INCORPORATED

By

LEHIGH CEMENT COMPANY

By

Addiment.M.draft 3.20.02(ps.3.21.02)

43