# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 01-01139 (JJF) |
| W.R. GRACE & CO., *et al.*, | ) | Jointly Administered |
| | ) | **Objection Deadline: December 21, 2004** |
| Debtors. | ) | **Re: D.I. Nos.: 6896, 6924** |

## [*REDACTED*] OBJECTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS
## TO THE DEBTORS' PROPOSED DISCLOSURE STATEMENT

**CAMPBELL & LEVINE, LLC**
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:     (302) 426-1900
Telefax:          (302) 426-9947

**CAPLIN & DRYSDALE, CHARTERED**
Elihu Inselbuch
399 Park Avenue, 36th Floor
New York, NY 10022
Telephone: (212) 319-7125
Telefax:     (212) 644-6755

Peter Van N. Lockwood
Albert G. Lauber
Kimberly N. Brown
Brian A. Skretny
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone: (202) 862-5000
Telefax:     (202) 429-3301

Counsel for the Official Committee of
Asbestos Personal Injury Claimants

Date: December 21, 2004

The Official Committee of Asbestos Personal Injury Claimants ("the PI Committee")

hereby objects to the Disclosure Statement filed on November 13, 2004 by W.R. Grace & Co. *et*

*al.* ("Grace" or "the Debtors").

## PRELIMINARY STATEMENT

On November 13, 2004, the Debtors filed a proposed Plan of Reorganization ("the Plan"

or "the Proposed Plan"), accompanied by a Disclosure Statement and an Exhibit Book.  In broad

outline, this Proposed Plan envisions the pass-through of all asbestos claims to a post-bankruptcy

trust established under 11 U.S.C. § 524(g) ("the Asbestos Trust"), which would process and pay

the claims post-confirmation.  The trust distribution procedures ("TDPs") that would govern the

Asbestos Trust are set forth in the Exhibit Book as Exhibits 6, 7 and 8.

The Debtors also filed on November 13, 2004, a number of related motions that are

intended to implement the Proposed Plan.  These include the Debtors' Motion for Entry of an

Order Seeking the Estimation of Asbestos Claims and Certain Related Relief ("the Estimation

Motion"), and the Debtors' Motion for Entry of a Case Management Order Establishing

Protocols for Litigating Asbestos-Related Claims Following Plan Confirmation ("the New CMO

Motion").  It is a condition precedent to confirmation of the Proposed Plan that the Bankruptcy

Court shall have entered "the CMO in form and substance acceptable to the Debtors" and "the

Estimation Order in form and substance acceptable to the Debtors."  Proposed Plan § 7.6.2(c) &

(d).

As a general rule, objections to the details of a proposed plan of reorganization are not

considered at the disclosure statement stage.  However, when the objectionable provisions of a

proposed plan go to its very essence, and where they render the plan unconfirmable as a matter

of law, such objections may appropriately be proffered as objections to the disclosure statement.

*See* <u>In re Felicity Assocs.</u>, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("It has become standard

Chapter 11 practice that when an objection raises substantive plan issues that are normally

addressed at confirmation, it is proper to consider and rule upon such issues prior to

confirmation, where the proposed plan is arguably unconfirmable on its face.") (internal

quotations omitted); In re O'Leary, 183 B.R. 338, 338-39 (Bankr. D. Mass. 1995) ("Courts may

refuse to approve disclosure statements that describe plans that cannot be confirmed."); In re

Mkt. Square Inn, Inc., 163 B.R. 64, 68 (Bankr. W.D. Pa 1994) ("Where it is clear that a plan of

reorganization is not capable of confirmation, it is appropriate to refuse the approval of the

disclosure statement."); In re E. Maine Elec. Co-op., Inc., 125 B.R. 329, 333 (Bankr. D. Me.

1991) ("If the disclosure statement describes a plan that is so fatally flawed that confirmation is

impossible, the court should exercise its discretion to refuse to consider  the adequacy of

disclosures.") (internal quotations omitted); In re Filex, Inc., 116 B.R. 37, 41 (Bankr. S.D.N.Y.

1990) ("[T]his court will not approve a disclosure statement for an admittedly unconfirmable

plan."); In re Dakota Rail, Inc., 104 B.R. 138, 143 (Bankr. D. Minn. 1989) ("[A]llowing a

facially nonconfirmable plan to accompany a disclosure statement is both inadequate disclosure

and a misrepresentation."); In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 980 (Bankr.

N.D.N.Y. 1988) (disclosure statement "approval should be withheld if * * * it is apparent that the

plan will not comply with Code § 1129(a) * * *."); In re Atlanta W. VI, 91 B.R. 620, 622

(Bankr. N.D. Ga. 1988) ("A court may refuse to approve a disclosure statement when it is

apparent that the plan which accompanies the disclosure statement is not confirmable."); In re

Unichem Corp., 72 B.R. 95, 98 (Bankr. N.D. Ill. 1987) ("[W]here it is readily apparent that the

plan accompanying the disclosure statement could never be legally confirmed[,]" a court should

deny a disclosure statement at the disclosure statement hearing.); In re Pecht, 53 B.R. 768, 772

(Bankr. E.D. Va. 1985) ("[B]ecause the disclosure describes a plan which cannot be confirmed,

the disclosure statement should not be approved."); LAWRENCE P. KING, 7 COLLIER ON

BANKRUPTCY ¶ 1125.03[5] (15th ed. Rev. 2004) ("[M]ost courts will not approve a disclosure statement if the underlying plan is clearly unconfirmable on its face."). That is the situation here.

Grace entered Chapter 11 for the avowed purpose of resolving its crushing liabilities to its asbestos creditors. According to Grace, "[o]n the Petition Date, the Debtors were defendants in lawsuits asserting approximately 118,000 Asbestos PI claims." Disclosure Statement 14. For three and a half years, Grace and its asbestos creditors have been locked in an adversarial posture. The plan that Grace is now proposing is predicated on substantially the same elements — set forth in the Debtors' Estimation Motion, proposed TDPs, and New CMO Motion — that were contained in Grace's original CMO motion filed in 2001, to which asbestos claimants vigorously objected. Accordingly, if the Proposed Plan were put to a vote of asbestos claimants, it is a fair assumption that they would vote overwhelmingly to reject it.

Thus, the linchpin of the Proposed Plan is Grace's stunning assertion that asbestos creditors will not be entitled to vote at all. The Plan proposes to divide asbestos creditors into three classes. Class 6 would comprise asbestos personal-injury claimants who, as of the petition date, were "symptomatic" as Grace defines that term ("Asbestos PI-SE Claims"). Class 7 would comprise asbestos personal-injury claimants who, as of the petition date, were "asymptomatic" as Grace defines that term ("Asbestos PI-AO Claims"). Class 8 would comprise all asbestos property-damage claimants ("Asbestos PD Claims"). Proposed Plan §§ 3.1.6, 3.1.7 & 3.1.8; Disclosure Statement 47-49.[1]

According to Grace, all three classes of asbestos creditors "shall be paid in full" because an estimation will be conducted to determine the aggregate value of their claims, and assets

---

[1]    For the remainder of this brief, we will confine our discussion chiefly to the two classes of Asbestos PI Claimants.

(consisting of cash, stock, and warrants) assertedly of equal value will be placed in the Asbestos

Trust to pay all allowed claims in full as they arise and are resolved.  Proposed Plan §§ 3.1.6 -

3.1.8, 7.6.1(v) & (w), 7.6.2(d); Disclosure Statement 47-49.  On the basis of this premise, Grace

contends that all three classes of asbestos creditors will be "unimpaired"; that they will therefore

be conclusively presumed to have accepted the plan under 11 U.S.C. § 1126(f); and that they

accordingly will have no right to vote.  *See* Proposed Plan §§ 3.1 & 6.3; Disclosure Statement 4-

5, 6-7, 47-49.

Grace's contention is wrong for two distinct reasons.  First, both classes of Asbestos PI

Claimants would clearly be "impaired" under the Proposed Plan, and their acceptances to the

Plan must accordingly be solicited under 11 U.S.C. §§ 1125 & 1126(c).  Second, whether or not

Asbestos Claimants are afforded the right to vote under § 1126(c), their vote is affirmatively

required under § 524(g), compliance with which the Plan requires as a condition precedent to

confirmation.  Plan § 7.6.1(a); *see* 11 U.S.C. § 524(g)(2)(B)(ii)(IV) (requiring, for a channeling

injunction to issue, that each class of asbestos claimants "votes, by at least 75 percent of those

voting, in favor of the plan").  For these two independently-sufficient reasons, the affirmative

vote of asbestos claimants is required for plan confirmation.  Because Grace's Proposed Plan

would disenfranchise asbestos claimants from voting altogether, it cannot possibly be confirmed.

I.    **CLASSES 6 AND 7 ARE "IMPAIRED," AND SOLICITATION OF
      THEIR ACCEPTANCES IS THEREFORE REQUIRED**

A.    **Governing Bankruptcy Principles**

"'Impairment' is a term of art crafted by Congress to determine a creditor's standing in

the confirmation phase of bankruptcy plans."  In re PPI Enterprises (U.S.), Inc., 324 F.3d 197,

202 (3d Cir. 2003).  Section 1124 of the Bankruptcy Code defines "impairment of claims or

interests."  It provides that a class of claims or interests is impaired under a plan

> unless, with respect to each claim or interest of such class, the plan (1)
> leaves unaltered the legal, equitable, and contractual rights to which
> such claim or interest entitles the holder of such claim or interest * * *.

Thus, "impairment" is not determined on an aggregate or overall basis. The statute requires that the legal, equitable, and contractual rights of *each member* of the class be left unaltered in order for a court to deem that class of creditors unimpaired.

The Bankruptcy Code creates a presumption of impairment "so as to enable a creditor to vote on acceptance of the plan." In re PPI, 324 F.3d at 203. The relevant question under § 1124(1) is whether "the plan itself is a source of limitation on a creditor's legal, equitable, or contractual rights." *Id.* at 204. The burden is on the debtor to demonstrate otherwise and show that the plan leaves the rights of each creditor in the class unaltered. *Id.* at 203. A class is "impaired" within the meaning of § 1124(1) if the proposed plan would cause any alteration of the creditor's rights, positive or negative, no matter how minor. *See* In re L & J Anaheim Assoc., 995 F.2d 940, 943 (9th Cir. 1993); In re PPI, 324 F.3d at 202; In re Coram Healthcare Corp., 315 B.R. 321, 351 (Bankr. D.Del. 2004); In re Witt, 60 B.R. 556, 560-61 (Bankr. N.D. Iowa 1986) (creditor's claim was impaired where plan called for creditor to receive $1,600 instead of $1,675).

Claims will be treated as "unimpaired" under § 1124(1) if the plan provides for the payment of such claims in full, in cash, on the effective date of the plan. In re PPI, 324 F.3d at 206; In re New Midland Plaza Assoc., 247 B.R. 877, 896 (Bankr. S.D. Fla. 2000); In re Krebser, 91 B.R. 1001, 1002 (Bankr. S.D. Fla. 1988). However, if the plan provides for deferred payment of claims, or otherwise results in any significant delay in paying claims in full, that class of claimants is "impaired." *See* In re Valley View Shopping Center, L.P., 260 B.R. 10, 33 (Bankr. D. Kan. 2001) (class of unsecured claims was "impaired" where class was paid in full 90 days after the plan's effective date); In re Tucson Self-Storage, Inc., 166 B.R. 892, 895 n.5 (B.A.P. 9th

Cir. 1994) (class of unsecured claims was "impaired" where trade creditors had to wait 60 days after the effective date to be paid in full); In re Grandfather Mountain Ltd. P'ship, 207 B.R. 475, 485 (Bankr. M.D.N.C. 1996) (classes of unsecured creditors who would receive deferred payments under proposed plan were "impaired"); In re L.G. Salem Ltd. P'ship, 140 B.R. 932, 934 (Bankr. D. Mass. 1992) (class of unsecured creditors that would receive payment in full via four annual payments post-confirmation was "impaired" because they would not receive cash equal to allowed amount of claims on effective date).

These cases establish that a class of claimants is "impaired" where a plan proposes to pay allowed claims on a deferred basis, to pay them in less than their full dollar amount, or to pay them other than in cash. However, "impairment" is not limited to such purely financial harms, but includes any alteration of a creditor's "legal, equitable, or contractual rights." Thus, the courts have held that a class is "impaired" within the meaning of § 1124(1) where the plan would deprive a creditor of procedural mechanisms available to him under state law, limit the pool of assets from which the creditor potentially could recover, or otherwise put the creditor in a position inferior to that which he occupied pre-bankruptcy. See, e.g., In re L & J Anaheim Assoc., 995 F.2d at 943 (class was "impaired" where plan deprived creditor of opportunity to invoke procedural mechanisms available to it under state law and required that creditor's collateral be sold at public auction under procedures mandated by federal bankruptcy law); In re Keck, Mahin & Cate, 241 B.R. 583, 593-94 (Bankr. N.D. Ill. 1999) (creditor was "impaired" where plan altered his legal rights by restricting his ability to proceed against partners on a claim against a partnership); In re M.S.M. & Assoc., Inc., 104 B.R. 312, 315 (Bankr. D. Ha. 1989) (class of general unsecured creditors that might not receive any payments on claims, depending upon what claims were allowed, was "impaired"); In re Eller Bros., Inc., 53 B.R. 10, 12 (Bankr.

M.D. Tenn. 1985) (creditor was "impaired" where plan altered his legal rights by releasing

certain guarantors from potential liability).

B.       **Application of Governing Principles to the Debtors' Proposed Plan**

It is clear that no claimant in Class 6 or Class 7 will receive full payment of his claim, in

cash, on the effective date of the Proposed Plan.  The Asbestos Trust, of course, would be funded

on the effective date (Proposed Plan § 7.2.2), and the amount of such funding would be

estimated to be sufficient to pay all allowed claims in full (*id.* §§ 7.6.1 & 7.6.2).  However,

§ 1124(1) provides that "impairment" must be determined in light of the plan's effect on each

member of the class individually.  It states that a class is impaired "unless, with respect to *each*

*claim or interest of such class*," the plan leaves unaltered the legal, equitable, and contractual

rights "to which such claim or interest entitles *the holder of such claim or interest*."  Thus, the

"impairment" inquiry must focus, not on the Asbestos Trust, but on the individual holders of

Class 6 and Class 7 claims that will be paid by the Trust.

It is obvious that the Proposed Plan does not provide for payment to individual holders of

Class 6 and Class 7 claims of the full amount of their allowed claims, in cash, on the effective

date.  Claimants who elect the "Cash-Out Option" would have to wait many months while their

claims are filed with and processed by the Asbestos Trust, which would be required to evaluate

and challenge claims under stringent eligibility criteria set forth in the TDPs.  A claimant could

not expect to receive even an initial response to his claim for six months.  *See* PI-SE Trust

Distribution Procedures § 5.2 (Exhibit Book Tab 6).  If the initial response from the Trust were

negative, additional time would be consumed by "Individual Review" and binding arbitration.

*Id.* §§ 5.2(b) & 5.7.  Only after all these steps had been exhausted would an allowed claim be

forwarded to the "FIFO Processing Queue" and "FIFO Payment Queue," where it would sit until

it was eventually paid. *Id.* §§ 5.1.  Needless to say, this process could take months or years.  The courts have repeatedly held that such deferred-payment schemes result in "impairment."

Claimants who elected the "Litigation Option" would obviously wait much longer.  They would be required to litigate their claims under Grace's elaborate five-step post-confirmation CMO, which would require them to defeat numerous rounds of summary judgment motions, endure "common issue" trials, and submit their claims to mediation, all before they could even get to a jury trial.  All of these trials would be held in a single court — the federal district court in Delaware — which would have numerous other cases on its litigation docket.  Thus, it is no exaggeration to predict that claimants electing the "Litigation Option" would have to wait many years before receiving any payment on their allowed claims.

Because no claimants in Class 6 or Class 7 will be paid in full, in cash, on the effective date, these Classes could be deemed "unimpaired" under § 1124(1) only if their claims were regarded as "passed through" the bankruptcy, such that all claimants retained exactly the same legal, equitable, and contractual rights that they possessed pre-bankruptcy vis-a-vis Grace.  This plainly would not be true here.  The Proposed Plan would alter these claimants' "legal, equitable or contractual rights" in numerous respects, and it would thus result in "impairment" under 11 U.S.C. § 1124(1).

But for the Debtors' bankruptcy, claimants who secured money judgments against Grace could seek to collect their judgments from all of Grace's assets — that is, both from the assets of what will become Reorganized Grace and from the assets that the Proposed Plan would use to fund the Asbestos Trust.  Under the Proposed Plan, by contrast, Asbestos PI-SE Claimants could look only to the assets placed in the PI-SE Account within the Trust.  The assets of this Account will be some fraction of $1.483 billion (a sum that must be reduced by assets diverted to the PD

Class Fund and the Trust Expenses Fund).[2]  The value of Reorganized Grace, on the other hand, is predicted to be between $2.2 billion and $2.6 billion as of the effective date.  *See* Disclosure Statement 29.  Thus, the assets available to Asbestos PI-SE Claimants under the Proposed Plan will represent only a fraction of the assets that would have been available to these claimants absent Grace's bankruptcy.[3]

Of course, the funding of the Asbestos Trust will be, on Grace's view, an amount that is estimated to be sufficient to pay all asbestos claims — considered on an aggregate basis — in full.  But this estimate will be just an estimate, which could prove wrong for any number of reasons.  Grace explicitly recognizes as much, conceding in the Disclosure Statement that "the amount of Allowed Asbestos Claims could be significantly more than estimated by the Court," and that "[t]here is no guarantee that the value of the Sealed Air Common Stock or Parent Common Stock will not decline such that the Asbestos Trust will not be able to pay all Allowed Asbestos Claims."  Disclosure Statement 86.

For example, many PI-SE claimants could elect the Litigation Option and proceed to recover large jury verdicts.

---

[2]      *See* Proposed Plan § 3.1.6(c) ("The sole recourse of the Holder of an Asbestos PI-SE Claim * * * shall be to the PI-SE Account of the Asbestos Trust"); *id.* § 7.6.1(v) (court must find that aggregate amount of PI-SE Class Fund, PD Class Fund, and Trust Expenses Fund "is not greater than $1,483,000,000").  The vast bulk of the $1,483,000,000 of fund assets are, under the Plan, to come from Sealed Air Corporation and/or certain of its affiliates and not from the Debtors' own assets.  *See id.* § 3.1.7(b)(iii).

[3]      Of course, the PI-SE Account under the Proposed Plan would be funded solely with cash and common stock to be contributed by Sealed Air; Grace itself would contribute nothing unless the Sealed Air Payment was insufficient to reach the magic number of $1.483 billion in value.  And in that event Grace would contribute no cash, but only warrants and possibly some parent common stock.  *See* Glossary of Defined Terms ¶ 81 (Exhibit Book Tab 2).

**[REDACTED]**

**[REDACTED]**

In stark contrast, the Debtors' proposed TDPs would provide at most $250 for pleural claims and only $17,299 for the most severe asbestosis cases, with regular asbestosis claims scheduled to receive just $4,459.  *See* PI-AO TDP § 5.2(a)(3) (Exhibit Book Tab 7); PI-SE TDP § 5.2(a)(3) (Exhibit Book Tab 6).

If claimants electing the Litigation Option came even close to replicating plaintiffs' pre-bankruptcy litigation record against Grace, it is obvious that the Asbestos Trust would find itself depleted of assets in very short order.  Of critical importance here is that all PI-SE Claimants — both those who elect the Litigation Option and have their claims allowed by the court, and those who elect the Cash-Out Option and have their claims allowed by the Trust — will be paid out of the same finite pot of money, namely, the PI-SE Account within the Trust.  Thus, outsized litigation recoveries by some claimants will necessarily impair the ability of other claimants, whichever Option they elect, to receive full payment on their allowed claims.[4]

By capping the assets available to pay asbestos claims, the Proposed Plan would thus subject asbestos claimants to a much greater risk of non-payment than would be the case if all of Grace's assets were available to satisfy their claims, as was true pre-bankruptcy.  By artificially limiting in this way asbestos claimants' ability to recover on their allowed claims, the Proposed

---

[4]     Asbestos PI-AO Claimants would bear a different sort of financial risk.  After the value of the Warrants comprising the Asbestos PI-AO Account is exhausted, Reorganized Grace would be required to pay additional cash to the Trust to cover the cost of any PI-AO claims that it litigates and loses.  *See* Proposed Plan § 7.2.2; Disclosure Statement 48.  Unlike PI-SE Claimants, therefore, PI-AO Claimants can look not only to the assets of their respective Account within the Trust, but also, in limited fashion, to the assets of Reorganized Grace.  Of course, PI-AO Claimants would bear the risk that Reorganized Grace would default, a risk that the Debtors recognize is substantial.  *See* Disclosure Statement 82-84.

Plan definitely alters their "legal, equitable, or contractual rights."  11 U.S.C. § 1124(1).  *See* In re Wabash Valley Power Ass'n, Inc., 72 F.3d 1305, 1321 (7th Cir. 1995) (creditor was "impaired" because plan affected its ongoing business relationship with debtor and its settlement of other litigation between it and debtor); In re Acequia, Inc., 787 F.2d 1352, 1363 (9th Cir. 1986) (creditor was "impaired" where plan deprived him of his right to vote for directors of debtor); In re Keck, Mahin & Cate, 241 B.R. at 593-94 (creditor was "impaired" where plan altered his legal rights by restricting his ability to proceed against partners on a claim against a partnership); In re Eller Bros., 53 B.R. at 12 (creditor was "impaired" where plan altered his legal rights by releasing the debtor's guarantors from potential liability).

Besides imposing on asbestos claimants an enhanced risk of non-payment, the Proposed Plan would alter their "legal, equitable, or contractual rights" in numerous other ways.  The plan would enjoin personal injury claims against a number of corporate affiliates, insurers, and various other potentially co-liable parties with the Debtors, notwithstanding § 524(e) of the Bankruptcy Code.  Proposed Plan Art. 8.  Also, at the very outset of the process — *i.e.,* within 35 days of the bar date for filing proofs of claim in the estimation process — all Asbestos PI-SE Claimants would be required to complete and submit an "Asbestos PI Questionnaire." Disclosure Statement 47; Letter dated Nov. 13, 2004, from David Bernick to Judges Buckwalter and Fitzgerald, 6-7 (summarizing time frame).  On this Questionnaire, claimants would be required to elect either the "Litigation Option" or the "Cash-Out Option."  *See* Asbestos PI Questionnaire, Part VIII (Exhibit A to New CMO Motion).  This election would be binding and irrevocable.  *See* Proposed Plan § 3.2.1 ("If an Asbestos PI Claimant elects the Cash-Out Option, (i) his election is irrevocable * * * "); Asbestos PI Questionnaire, Part VIII (stating, in capital letters, "YOUR ELECTION IS BINDING AND NOT REVOCABLE, FOR ANY REASON").

At the point at which they would be required to make this election, asbestos claimants would lack sufficient information to make any kind of rational decision.  They would not know whether the Bankruptcy Court will approve the Debtors' New CMO Motion (or some variant thereof), which would govern allowance of their claims under the Litigation Option.  They also would not know the final claims-matrix dollar values that will be incorporated in the TDPs that are ultimately approved by the Bankruptcy Court, which would govern allowance of their claims under the Cash-Out Option.  And they additionally would have no way of knowing whether their claims would be accepted by the Trust as PI-SE claims (which could yield non-trivial payments) or would be demoted to PI-AO claims (which would be paid $250).  Requiring claimants at this juncture to make an *irrevocable election* about the procedures that will govern allowance of their claims raises obvious concerns of due process.  In any event, this aspect of the Proposed Plan plainly alters claimants' "legal, equitable, or contractual rights."

In a pre-bankruptcy state-court action against Grace, no plaintiff was ever required to make an irrevocable election between pursuing settlement and pursuing a tort recovery in litigation.  Rather, plaintiffs were free to explore settlement and, if dissatisfied with Grace's offer, pursue litigation in the hope of a better offer or (alternatively) a favorable jury award.  In the real world, the interplay between these two options is closely linked, because the imminent prospect of a jury verdict is what triggers many settlements at the courthouse door.  Under the Proposed Plan, by contrast, claimants who elect to pursue settlement under the Cash-Out Option would be precluded from ever again litigating their claims against Grace.  Forcing claimants to make an irrevocable election to this effect, at a point in time when they cannot know how their claims would actually be evaluated under the Cash-Out Option or what procedures would ultimately govern claim allowance under either Option, would plainly alter the "legal and equitable rights" these claimants possessed against Grace pre-bankruptcy.

This threshold alteration of claimants' rights, however, is but a taste of what would follow under the Proposed Plan.  Were it not for Grace's bankruptcy, asbestos claimants would have the legal right to litigate their claims against Grace in the courts of the State where they reside or in which their claims arose.  In such litigation, the procedural and evidentiary rules of that State, as well as its substantive tort law, would determine the claimants' ability to recover and the amount of their recovery.  Under the Proposed Plan, by contrast, claimants electing the Litigation Option would be barred from suing in state court and would instead be forced to litigate their claims in a single federal court — the Federal District Court for the District of Delaware.  *See* New CMO Motion ¶¶ 19(v), 31-32.  The legal rules governing the litigation and viability of their claims would thus be set by the Federal Rules of Civil Procedure and the Federal Rules of Evidence, rather than by the applicable rules of the claimant's home State.  This change in the legal rules governing litigation of their claims clearly alters the claimants' "legal rights."[5]

---

[5]      Grace nowhere addresses the question of what *substantive tort law* would apply in post-confirmation litigation under its CMO.  Normally, of course, a federal district court exercising diversity or bankruptcy jurisdiction would apply the substantive tort law of the state where the claim arose.  *See* Raleigh v. Illinois Dept. of Revenue, 530 U.S. 15, 20 (2000); Hanna v. Plumer, 380 U.S. 460, 471-72 (1965); Erie R. Co. v. Tompkins, 304 U.S. 64, 77-79 (1938).  Since there appears to be nothing in the Proposed Plan, Disclosure Statement, or New CMO Motion that would overrule this basic principle of federal jurisdiction, we assume that the Delaware Federal District Court would be required to apply, in all post-confirmation litigation under Grace's CMO, the substantive tort law of the relevant State, including its choice-of-law rules and its rules concerning the availability of punitive damages and pre-judgment interest.  However, in view of the Debtors' oft-expressed hostility to such state-law rules, the Court and the parties would benefit if Grace would confirm this explicitly.  (Grace proposes that "the internal laws of the State of Delaware without regard to its conflict of laws provisions" would apply "for all purposes" of administering the TDPs.  *See, e.g.,* PI-SE TDP § 7.3.  But the TDPs apply only to the liquidation of Cash-Out Claims and the payment of allowed Claims, whether liquidated pursuant to the Cash-Out Option or the Litigation Option.  *See id.* § 1.1.  Thus, the "Governing Law" provisions of the TDPs would not appear to have any effect on the litigation, liquidation, or allowance of claims pursuant to the Litigation Option.  Once again, the Court and the parties would benefit if Grace would confirm this explicitly.)  If the Debtors reserve the right to argue

Moreover, the litigation of these claims would be governed by the highly idiosyncratic — and intentionally defendant-friendly — five-step protocol set forth in Grace's post-confirmation CMO.  *See* New CMO Motion ¶¶ 18-32.  The first phase of this protocol would entail a series of "omnibus" summary judgment motions to be filed by the Asbestos Trust or Reorganized Grace.  The Debtors make no attempt to show that the grounds on which they seek to predicate these summary-judgment motions would ordinarily be available to a defendant in a state-court tort suit.

For example, Grace asserts that "PI Questionnaires provide an efficient mechanism for obtaining and identifying information" and demands that claimants be subjected, post-confirmation, to "omnibus claims objections" and "summary judgment adjudication" on issues raised by their PI Questionnaires.  New CMO Motion ¶¶ 22-26.  Thus, a claimant who declined to submit an Asbestos PI Questionnaire could apparently have his claim dismissed in summary fashion, and thus invalidated, at the threshold stage of the litigation.[6]  Needless to say, a plaintiff in a state-court tort action is not required to submit detailed information about his claim — on a form designed by the defendant, without any right of reciprocal discovery — at the very outset of the litigation in order to prosecute his case.  By allowing claims to be arbitrarily dismissed on this ground, the Proposed Plan would plainly alter claimants' "legal and equitable rights," both by subjecting them to a risk of forfeiture that they would not normally bear, and by shifting the litigation balance of power in Grace's favor.

---

that the law of the forum or Delaware choice of law rules should apply to cases subject to the CMO, that would be another form of impairment of the claimants' legal rights.

[6]    *See* New CMO Motion ¶ 48 ("Debtors intend to file non-substantive objections to expunge those Asbestos PI Claims for which the Asbestos PI Questionnaires [are] late-filed or lacking any supporting information"); *ibid.* ("Debtors also intend to file substantive omnibus objections to those Asbestos Claims which, based on the face of the Asbestos PI Questionnaire, * * * fail to set forth the most rudimentary facts necessary to support a cause of action against the Debtors").

Under the CMO, claimants opting to litigate against Grace post-confirmation would also have to defeat a variety of summary-judgment motions predicated on Grace's interpretation of <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993).  *See* New CMO Motion 10-11, 15-29.  According to Grace, <u>Daubert</u> will be pressed into service to resolve, in "omnibus" fashion, such central factual issues as whether a particular claimant's ILO test results and pulmonary function scores were properly computed (New CMO Motion ¶¶ 49-61); whether a particular claimant can demonstrate that a Grace product "substantially contributed to his claimed injury" (*id.* ¶ 71); and whether the claimant's overall level of asbestos exposure "was sufficient to cause disease."  *Ibid.*  Clearly, defendants in state-court tort actions would not be able to seek summary judgment on such intensely factual issues, much less to secure "omnibus" resolution of issues that are so individualized to particular claimants.

Phases 2 and 4 of the CMO would require "Common Issue Trials pursuant to Fed. R. Civ. P. 42" and "mandatory mediation."  Here again, the Debtors make no effort to show that equivalent legal requirements would apply to plaintiffs litigating their claims against Grace outside bankruptcy in state court.  And when claimants eventually got to a jury trial — Step 5 of the CMO protocol — they would have all of their cases set for trial, not in hundreds of local trial courts in the various states, but in a single Federal District Court, to which claimants would have to travel and bring their fact and expert witnesses and where claimants would have to compete for a trial calendar with the Court's usual civil docket and (worse yet) its criminal docket, which must set criminal trials on an expedited basis.  The plain intention of this drawn-out process is to

create a war of attrition, forcing claimants to incur huge costs, in time and money, if they elect to litigate their claims.[7]

In sum, by subjecting asbestos claimants to a much greater risk of non-payment than they would have faced absent Grace's bankruptcy, the Proposed Plan would clearly alter their legal rights of recovery against Grace. By imposing on asbestos claimants evidentiary and procedural hurdles that they did not face pre-bankruptcy and would not otherwise confront, the Proposed Plan would further alter the legal rules governing determinations about the validity and value of their claims. And by forcing plaintiffs to litigate their claims in a single court that Grace prefers, under an idiosyncratic defendant-friendly protocol that Grace itself has designed, the Proposed Plan would unfairly shift the balance of power in the litigation and so alter plaintiffs' equitable rights. The Proposed Plan thereby alters the "legal, equitable, or contractual rights" of claimants in Class 6 and Class 7, and these classes are therefore "impaired" classes entitled to vote under § 1126(c).

## II.    THE VOTE OF ASBESTOS CLAIMANTS IS INDEPENDENTLY REQUIRED BY § 524(g)

The Proposed Plan is premised on the establishment of a post-bankruptcy trust under 11 U.S.C. § 524(g) that would pay all allowed Asbestos PI and PD claims, while affording the

---

[7]    Apart from altering claimants' legal rights, this aspect of the CMO raises serious concerns about the Proposed Plan's feasibility. The Debtors are obviously assuming that the number of claimants who elect the Litigation Option will be small enough that a single Federal District Court will be able to handle all these cases on its litigation docket. But Grace confronts at least 118,000 pre-petition claims, with several hundred thousand additional present and future claims lurking on the horizon. If only 10% of these claimants elect the Litigation Option, that could add upwards of 30,000 cases to the District Court's trial docket. And in view of the alternative proposal, it is likely that a much higher percentage of claimants would elect the Litigation Option. Considering the very stringent eligibility criteria that Grace has put into the PI-SE TDP, and the fact that PI-AO claims would be paid only $250 by the Asbestos Trust, most claimants would have little incentive to elect the Cash-Out Option.

Debtors the benefit of a channeling injunction under § 524(g)(1).  The Proposed Plan explicitly requires, as conditions precedent to confirmation, judicial determinations (a) that "the Plan complies with all applicable sections of the Bankruptcy Code, including Bankruptcy Code § 524(g);" and (b) that "Claimants in Classes 6 through 8 shall be deemed to have voted for acceptance under the Plan in the requisite numbers and amounts required by Bankruptcy Code § 524(g) * * *."  Proposed Plan ¶ 7.6.1(a)-(b).  The Sealed Air Settlement, which is the principal source of the assets intended to fund the Asbestos Trust, independently mandates compliance with all provisions of § 524(g), because it requires as a condition precedent to payment of the Sealed Air Assets that the Court enter an injunction protecting Sealed Air under § 524(g).  *See* Sealed Air Settlement §§ II(c)(vi) & VII(i).[8]  Thus, absent compliance with all provisions of § 524(g), the Plan by its own terms could not be confirmed, and it would be unfeasible for want of assets in any event.

Section 524(g) includes an explicit voting requirement.  Specifically, it provides that a discharge entailing a channeling injunction may be granted only if each class (or classes) of asbestos claimants "votes, by at least 75 percent of those voting, in favor of the plan."  11 U.S.C. § 524(g)(2)(B)(ii)(IV).  Nowhere does Grace explain how it proposes to satisfy this 75% voting requirement through a confirmation process that would solicit no votes from any asbestos claimant whatsoever.

---

[8]    Besides a "channeling injunction" under § 524(g), the Proposed Plan separately provides for a so-called "released matters injunction" under 11 U.S.C. § 105(a).  Proposed Plan § 8.4; Disclosure Statement 62.  It is unclear whether the Bankruptcy Court could properly issue an injunction under § 105(a) to protect Grace or Sealed Air from asbestos claims in circumstances where a channeling injunction could not be issued under § 524(g).  *See* In re Combustion Eng'g, Inc., No. 03-3392, 2004 WL 2743565, at *28-31 (3d Cir. Dec. 2, 2004).  In any event, a § 105(a) injunction would not suffice under the explicit terms of the Sealed Air Settlement.

Reading between the lines, it appears that Grace will contend that the 75% voting requirement of § 524(g) will be satisfied, despite the absence of any actual voting, by the deemed-acceptance provision of § 1126(f).  *See* Proposed Plan § 3.1; Disclosure Statement 47-49.  Section 1126(f) provides:

> Notwithstanding any other provision *of this section*, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class shall not be required.

11 U.S.C. § 1126(f) (emphasis added).

As we have previously shown, § 1126(f) has no application to Asbestos PI Claimants because Class 6 and Class 7 are both "impaired."  However, even if that were not true, the deemed-acceptance provision of § 1126(f) is explicitly limited to the purposes of that section; it does not extend to the rest of the Code, including § 524(g).  It does not purport to override the express voting requirement that § 524(g) independently imposes as a precondition to issuance of a channeling injunction.

Section 1126(c) generally provides that "a class of claims has accepted a plan if such plan has been accepted by creditors * * * that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class."  Section 1126(f) sets forth an exception to this rule, providing that a class of claims that is unimpaired by the plan is presumed to have accepted the plan, so that "solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required."  This exception clearly applies only for purposes of § 1126, because it is prefaced with the phrase, "[n]otwithstanding any other provision of this section."  Had Congress intended that § 1126(f) have a broader application, it could easily have prefaced § 1126(f) with the phrase, "notwithstanding any other provision of title 11."

Whereas § 1126 applies to all Chapter 11 bankruptcies, § 524(g) applies solely to Chapter 11 bankruptcies involving asbestos-related claims.  It sets forth a unique super-majority (at least 75 percent) actual voting requirement that must be met before the channeling injunction provided in that section can be issued.  Asbestos bankruptcy cases are unique in that claims that will be held in the future by individuals who have not yet experienced an asbestos-related injury are channeled to a settlement trust together with claims held by individuals who have already been injured by exposure to the debtor's asbestos-containing products.  As a result of the channeling injunction, future as well as present asbestos-related claims are effectively discharged.  The holders of those future claims, however, cannot vote on the plan in an asbestos bankruptcy because they cannot be identified as claim holders at the time of the solicitation.

Congress thus enacted § 524(g) to protect the rights of those future claim holders by requiring both that the terms of the plan treat present and future asbestos-related claims in a substantially similar manner, and that at least 75 percent of the holders of present asbestos claims who actually participate in the balloting process cast their votes to accept the plan.  Under the § 524(g) voting regime, therefore, no plan can be adopted that binds future asbestos claimants unless present asbestos claimants, who will be subject to substantially similar plan terms, overwhelmingly vote in its favor.  The actual vote requirement of § 524(g), pursuant to which present asbestos claimants act as a surrogate for the unidentifiable individuals who will hold asbestos claims in the future, is a fundamental procedural safeguard of the rights of those future asbestos claimants.  It cannot be side-stepped or avoided by deeming present claimants to have voted to accept the plan under the voting provisions of § 1126, which are not tailored to address the due process concerns that underlie § 524(g).

Moreover, the Debtors seek to create an illusory nexus between § 1126(f) and § 524(g) by repeatedly asserting that, by virtue of § 1126(f), an unimpaired class is "deemed to have voted

to accept the Plan." *E.g.,* Proposed Plan §§ 3.1, 6.3; Disclosure Statement 48-49. That is not what § 1126(f) says. It says that an unimpaired class is presumed "to have accepted the plan" without voting. Section 524(g), by contrast, expressly requires an actual vote.

The most basic canon of statutory construction dictates that statutes, including the Bankruptcy Code, be interpreted according to the plain meaning of the statutory language. *See* <u>Lamie v. United States Trustee</u>, 124 S. Ct. 1023, 1030 (2004) ("It is well established that when the statute's language is plain, the sole function of the court — at least where the disposition required by the text is not absurd — is to enforce it according to its terms.") (internal citations omitted); <u>Sekula v. F.D.I.C</u>, 39 F.3d 448, 454 n.14 (3d Cir. 1994) ("The meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, the sole function of the courts is to enforce it according to its terms.") (internal citations omitted); 2A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 46:1 (6th ed. 2000). The meaning of § 524(g)(2)(b)(i)(IV) — which requires that asbestos claimants "vote, by at least 75% of those voting, in favor of the plan" — could hardly be plainer. That language by its terms requires an actual vote, not the sort of "deemed acceptance" that Grace endeavors to import from § 1126(f).

Other well-established canons of construction also show the error of Grace's argument. The Third Circuit recently noted "[t]he well-settled maxim that specific statutory provisions prevail over more general provisions." <u>In re Combustion Eng'g, Inc.</u>, No. 03-3392, 2004 WL 2743565, at *30 n.49 (3d Cir. Dec. 2, 2004); *see also* 2B NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 51:5 (6th ed. 2000) ("Where one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is any conflict, the latter will prevail * * *."). In <u>Combustion Eng'g</u>, the Court pointed out that, to obtain a channeling injunction, "a debtor must

satisfy the prerequisites set forth in § 524(g) *in addition to* the standard plan confirmation requirements." 2004 WL 2743565, at *28 (emphasis added). The Court went on to hold that "the explicit limitations and requirements set forth in § 524(g)" preclude the use of other Code provisions — there, § 105(a) — "to achieve a result not contemplated by the more specific provisions of § 524(g)." 2004 WL 2743565, at *30 & n.49.

Precisely the same reasoning applies here. The express voting requirement of § 524(g) is "in addition to the standard plan confirmation requirements." Combustion Eng'g, 2004 WL 2743565, at *28. Thus, the express voting requirement of § 524(g) precludes the use of a more general provision — such as the "deemed acceptance rule" of § 1126(f), which applies to confirmation of bankruptcy plans generally — to achieve a result "not contemplated by the more specific provisions of § 524(g)." Combustion Eng'g, 2004 WL 2743565, at *30.[9]

Construing § 524(g) to dispense with an actual vote by asbestos claimants — the position that Grace evidently intends to take — would be inconsistent not only with the statute's plain language and with well-settled canons of statutory construction, but also with long-established bankruptcy practice. As the Third Circuit recently noted, Congress modeled § 524(g) on the "channeling injunction" issued in the Johns-Manville bankruptcy. *See* Combustion Eng'g, 2004 WL 2743565, at *29 n.47, *citing* 140 CONG. REC. H10752, H10765 (1994) (in codifying the Manville "trust/injunction mechanism" in § 524(g), Congress set forth "explicit requirements simulating those met in the Manville case"). The Manville plan required an actual vote by asbestos claimants, even though it — like Grace's Proposed Plan — purported to provide for

---

[9]     The principle that the more specific provision prevails over the more general applies with special force where (as here) the more specific provision was enacted later in time. *See* 2B NORMAN J. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION § 51:5 (6th ed. 2000). Section 105(a) was part of the Bankruptcy Code of 1978, whereas § 524(g) was not enacted until 1994. *See* 11 U.S.C.A. §§ 105 & 524 (2004).

payment of all allowed asbestos claims at 100 cents on the dollar through a trust liquidation mechanism.  *See* <u>In re Johns-Manville Corp.</u>, 68 B.R. 618, 621, 634 (Bankr. S.D.N.Y. 1986). Thus, the legislative history of § 524(g) provides no support for Grace's apparent contention that an actual vote of asbestos claimants can be dispensed with if the plan purports to pay their claims in full.

Since the enactment of § 524(g), we are aware of no plan of reorganization in an asbestos-related bankruptcy case which has been confirmed that did not incorporate channeling injunctions under § 524(g).  In each of those cases, each class of asbestos claimants actually voted, by at least 75% of those voting, in favor of the plan.  There is nothing in any judicial opinion that has addressed the requirements of § 524(g), or in the statute's legislative history, which remotely suggests that a "deemed acceptance" by asbestos claimants, without an actual vote, could satisfy the requirements of § 524(g)(2)(B)(i)(IV).

Finally, common sense supports the conclusion that deemed acceptance of a plan under § 1126(f) cannot override the requirement of an actual vote of asbestos claimants under § 524(g). Section 1126(f) does not prohibit a vote by an unimpaired class, but simply provides that "the solicitation of acceptances * * * from the holders of claims or interests of such class *is not required.*"  Thus, members of an unimpaired class may actually vote on a plan, even though the debtor has not solicited their acceptances and their acceptance of the plan is presumed.  *Cf.* <u>In re Waterways Barge P'ship</u>, 104 B.R. 776, 783 (Bankr. N.D. Miss. 1989) (class that was to receive nothing under the plan was conclusively presumed to have rejected the plan under § 1126(g), even though class members who chose to cast ballots voted in favor of the plan).

If the Debtors' Proposed Plan were to reach a confirmation hearing, it is a fair assumption that thousands or tens of thousands of asbestos claimants, from all classes and with near unanimity, would vote against it, whether or not their acceptances were solicited by Grace.  In

that event, it could not plausibly be contended that each class of asbestos claimants had "vote[d]," by at least 75% of those voting, in favor of the plan," as is required by § 524(g).  And that would be true regardless of whether Class 6 and 7 were deemed to have accepted the plan under § 1126(f).  This shows that the Debtors' effort to engraft a "deemed acceptance" rule onto § 524(g) cannot possibly be correct.

## CONCLUSION

The Debtors' Proposed Plan is deficient in numerous respects, as the PI Committee will explain in detail if the Plan ever gets to a confirmation hearing.  For present purposes, it suffices to say that the Proposed Plan cannot possibly be confirmed because it provides that the votes of Asbestos PI Claimants will not be solicited.  Because the Proposed Plan is therefore unconfirmable as a matter of law, this Court must disapprove the Disclosure Statement.

Dated:  December 21, 2004

**CAMPBELL & LEVINE, LLC**

*/s/Mark T. Hurford*
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:     (302) 426-1900
Telefax:          (302) 426-9947

**CAPLIN & DRYSDALE, CHARTERED**
Elihu Inselbuch
399 Park Avenue, 36th Floor
New York, NY 10022
Telephone: (212) 319-7125
Telefax:    (212) 644-6755

Peter Van N. Lockwood
Albert G. Lauber
Kimberly N. Brown
Brian A. Skretny
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone: (202) 862-5000
Telefax:     (202) 429-3301

*Counsel for the Official Committee of*
*Asbestos Personal Injury Claimants*