# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 01-01139 (JJF) |
| W.R. GRACE & CO., *et al.*, | ) | Jointly Administered |
| | ) | **Objection Deadline: December 21, 2004** |
| Debtors. | ) | **Re: D.I. No.: 6899** |

## *[REDACTED]* OBJECTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER SEEKING THE ESTIMATION OF <u>ASBESTOS CLAIMS AND CERTAIN RELATED RELIEF</u>

The Official Committee of Asbestos Personal Injury Claimants ("the Committee") hereby opposes Debtors' Motion for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief ("Estimation Motion").

## PRELIMINARY STATEMENT

On November 13, 2004, Debtors filed their proposed Plan of Reorganization, which would provide for the creation of a post-confirmation 11 U.S.C. § 524(g) Trust to which all asbestos personal injury ("PI") claims would be channeled for recovery. According to Debtors, as a statutory prerequisite to the establishment of a § 524(g) Trust, this Court must value approximately 118,000 asbestos personal injury claims — as well as all future claims — pending against them. *See* Debtors' Disclosure Statement § 2.4.1. The Committee has no objection to a properly-conducted estimation. Accordingly, the Committee has proposed that estimation in this case be done in the same way that estimation has been done in every major asbestos bankruptcy since 1990 — by reference to a debtor's claims resolution history. *See* Case Management Proposal of the Official Committee of Asbestos Personal Injury Claimants ("Committee Case Management Proposal") (Docket # 2421) 8-13.

Since April of 2001, however, Debtors have eschewed estimation in favor of a self-serving procedure they call "common issues litigation," arguing that "until liability is resolved, estimation * * * puts the cart before the horse."  Debtors' Consolidated Reply (Docket # 1666) 4.  In various filings over the past three years, Debtors sought approval of an unprecedented series of extraordinarily expensive, burdensome and time-consuming bar date, proof of claim, notice and litigation protocols.  Although these proposals have morphed repeatedly as Debtors continuously retool their strategy, they possess a major common thread: each is designed to eliminate large numbers of legitimate asbestos personal injury claimants on the theory that "the threat of being taken to trial" in the tort system should not inform the basic question of "[w]hich claims should be paid" in this bankruptcy.  Debtors' Informational Brief (Docket # 6) 3.  Debtors have invented these numerous en masse "protocols" for litigating their "actual liability under the law" without grounding them in any law whatsoever.  *Ibid.*  Indeed, there is no process for collective determination of individual cases that is consistent with constitutional and statutory standards of due process and jury trial rights.  *See* Cimino v. Raymark Indus., Inc., 151 F.3d 297, 316 (5th Cir. 1998).

Debtors' quest for a platonic pronouncement of "true liability" divorced from the real world continues, albeit under the guise of "estimation."  Although as a technical matter Debtors have abandoned their objection to proceeding with estimation per se, their instant Estimation Motion is simply yet another iteration of the untenable belief that the purpose of this bankruptcy is "to determine what [Debtors'] *true* liability is," which — according to Debtors — cannot be done by "extrapolat[ing] from Grace's past, forced payment of * * * garbage claims."  Estimation Motion 21.  Contrary to Debtors' belief, the purpose of estimation is not to determine what, in a defendant's perfect world, is the amount that PI claimants "should" be paid.  Nor is the role of a

court sitting in bankruptcy to determine whether the tort system is "fair." It must determine how claims would be valued in the tort system as it exists.

Apparently recognizing that their original plan to *litigate* the question of "true liability" was problematic, Debtors cast aside their elaborate proposals for "exemplar" claims objections, Fed. R. Civ. P. 42 consolidation, omnibus summary judgment motions, Fed. R. Evid. 706 "Expert Panels," *Daubert* proceedings, "exemplar rulings," and "show cause" requirements. Instead, Debtors would now transplant those procedures to a post-confirmation Case Management Order that would govern litigation against the § 524(g) Asbestos Trust. Nonetheless, Debtors expect an "estimation expert" to predict *pre*-confirmation how that Trust will end up valuing and paying PI claims under those procedures.

Specifically, Debtors now propose: (1) a proof-of-claim process and unilateral discovery of pre-petition claims via detailed questionnaires (Estimation Motion 7); (2) the use of a claims processing agent to "compile the Claims information into a navigable database" (*id*. 31); (3) a 45-day review of the data by "estimation experts" (*ibid.*); (4) Rule 26 expert reports addressing "Debtors' actual liability for pre-petition Claims and post-petition Claims, including future Claims" (*ibid.*); (5) expert depositions (*ibid.*); and (6) an estimation hearing (*id.* 32). Debtors posit that the entire process will take place inside 6 months. *See id.* 9.

Ironically, while Debtors fine-tuned their proposed questionnaire to the minutest detail, they entirely fail to address the crux of their estimation proposal — what kind of "expert(s)" can opine on "actual liability" when this involves prediction of future litigation outcomes? How do Debtors envision an expert would determine Grace's "actual liability" to present and future claimants from a database of random facts about a subset of present PI claimants? And even if these experts could somehow extrapolate the number of present and future claims from this limited

database, Debtors are altogether silent about how the experts would attach *monetary values* to these predicted claims.

Debtors' conspicuous failure to spell out the specifics of their estimation method is justification alone for denying their motion. It is also an obvious attempt to evade the serious problems inherent in Debtors' proposal. Left to piece together snippets of Debtors' various filings to date, the Committee can only surmise that what Debtors are proposing now is a watered-down version of what they proposed before. Rather than have a court decide "exemplar" liability issues, Debtors would now feed an "expert" their opinion of what claims should not be paid based on threshold objections the Debtors believe should be dispositive. Using the Debtors' self-serving liability filters, the expert would then weed out those claimants whom Debtors believe have no right to payment. Next, the expert would extrapolate from that subset of remaining claimants the number of "valid" (according to Debtors' criteria) present and future claims against Debtors. The final but seminal step in the process — how the expert would place a value on those claims without resorting to Grace's settlement history or tort system jury verdicts — is an utter mystery. What is known, however, is that the overall liability figure could not exceed a pre-determined cap of approximately 1.5 billion, arbitrarily set by Grace for all present and future PI claimants,[1] PD claimants, and Trust administrative expenses.

Like their string of "litigation protocols," Debtors' estimation proposal hinges on the notion that "the vast majority" of claims against Grace are "invalid or of doubtful validity." Estimation Motion 21. Although no individual claim would be disallowed or capped via Debtors'

---

[1]    Present claimants subject to the cap are those holding so-called "Asbestos PI-SE Claims," that is, those claimants who were "symptomatic" (as Grace defines that term) as of the petition date. Debtors' Plan of Reorganization ("Proposed Plan") § 3.1.6; Disclosure Statement § 4.3.1.6.

estimation, the Asbestos Trust would be funded to pay only those claims that Debtors believe reflect their "true liability." The remaining claims would presumably get nothing. Yet under Debtors' proposed Plan, PI claimants would be disenfranchised altogether from voting.

Debtors' strategy reveals their proposal for what it is: a subterfuge for ratcheting down claim values and achieving through bankruptcy what Debtors could not achieve in decades of litigating cases in the tort system. Debtors' attempt yet again to use Chapter 11 to escape their liability under state tort law is a flagrant abuse of the Bankruptcy Code, and should be rejected. *See* In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999) ("[F]iling a Chapter 11 petition merely to obtain tactical litigation advantages is not within the legitimate scope of the bankruptcy laws.") (internal quotation omitted).

## ARGUMENT

## I.    DEBTORS' TIRED COMPLAINTS ABOUT "WIDESPREAD ABUSE" OF THE TORT SYSTEM ARE UNAVAILING

### A.    The Purpose of Estimation Is to Approximate Debtors' Potential Liability in the Tort System as It Exists

In asbestos bankruptcy cases, since state law "governs the substance of claims," Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15, 20 (2000), estimation entails determining the likely amounts that Debtors would, but for the bankruptcy, have had to pay to dispose of pending and future asbestos personal injury claims against it in the tort system. Accordingly, the Committee has proposed that the Court estimate Debtors' liability based on a known set of data comprised of Grace's claims resolution history.

In brief, to value Debtors' liability for claims pending on the Bankruptcy Petition Date, the expert would typically group the pending claims into disease categories (mesothelioma, lung cancer, other cancer, non-malignant asbestos disease), discount the total number of pending claims by the Grace historical percentage of claims dismissed without payment, and then multiply the

remaining "likely to be paid" claims by the average resolution amount for each particular disease category.

The methodology for projecting future claims assumes that, absent evidence to the contrary, future claiming against Grace will broadly follow its well-established historical patterns, in terms of claims against Grace relative to the continuing incidence of asbestos-related cancers in the general population,[2] the stable ratio of non-malignant to malignant claims, and with respect to amounts paid to resolve claims for different diseases. This methodology also takes account of foreseeable changes in factors affected by non-epidemiological influences — including changes in the propensity to file against Grace, the ratio of non-malignant to malignant disease claims, and the amounts paid to resolve cases.

This common-sense approach to valuing asbestos liabilities, based on a well-recognized expert methodology, has been used in every asbestos-related bankruptcy since 1990, including Eagle-Picher, National Gypsum, Celotex, Babcock & Wilcox, Oglebay-Norton, Raytech, and Armstrong. *See generally* In re Eagle-Picher Indus., 203 B.R. 256, 281 (S.D. Ohio 1996). The *Eagle-Picher* case best outlines the general considerations that should enter into the estimation of

---

[2]     To predict the ongoing incidence of asbestos-related cancers, experts typically use the seminal 1982 work of Drs. Nicholson, Perkel and Selikoff. William J. Nicholson et al., *Occupational Exposure to Asbestos: Population at Risk and Projected Mortality – 1980-2030*, AM. J. INDUS. MED. 3:259-311 (1982). This study analyzes the incidence of asbestos-related cancer deaths in a range of occupations, and projects the number of such deaths in the United States in future years. The Nicholson projections take into account differences in intensity of exposure in various occupations, and the resulting differential impact on incidence of disease. The Nicholson studies predict that, during the 1990's, the incidence of asbestos-related cancers would gradually peak and begin to go down slowly, until 2040. The accuracy of these projections of incidence for mesothelioma has been confirmed by data on actual mortality experience collected by the National Cancer Institute.

Debtors' aggregate asbestos liability.  *See* In re Eagle-Picher Indus., 189 B.R. 681, 690-91 (Bankr.

S.D. Ohio 1995).  These include the following:

> 1. The estimate should be primarily based upon the claims history of the particular company whose liability is being estimated.  This consideration does not, however, rule out the desirability of considering trends general to the industry, particularly regarding the rate of filing of claims.
>
> 2. The total number of claims to be expected should be estimated.
>
> 3. The estimation of claims should categorize them by disease and occupation, as well as other factors.
>
> 4. Valuation of claims should be based upon claim resolution values for claims close to the filing date of the bankruptcy case.

*Ibid.*

Grace's claims resolution history reflects its real-world liability.  It represents negotiated and litigated resolutions that take into account *all* of its defenses to *all* types of claims — from the strongest individual facts and legal positions to the weakest.  For those cases that were settled, it reflects the value that claimants placed on their injuries and the costs (including large jury awards) that Grace anticipated and sought to avoid.  And all settlements necessarily reflect both parties' assessments of any defenses Grace may have had.  For those relatively few cases that were litigated, it reflects the determinations of judges and juries.  In fact, Grace itself used its claims resolution history as the basis for estimating the asbestos liabilities shown in its prebankruptcy financial statements, albeit inaccurately and incorrectly.

> **B.     The Assertion That Grace Was Forced to Settle "Garbage" Claims Is Belied by Its Own Policy of Settling Only Those Claims That Were Likely to Survive Motions to Dismiss**

Debtors nonetheless complain that "an impossibly high volume of claims filings forced

Grace, like many other asbestos defendants, to settle tens of thousands of claims with *no ability* to

weed out non-meritorious claims or cases for which no liability could ever be established."
Estimation Motion 2 (emphasis added).

Although Debtors attempt to blame claimants and their lawyers for what they call
"widespread, national abuse of the asbestos claims process" (Estimation Motion 18), the asbestos
crisis that culminated in the enactment of § 524(g) resulted not from plaintiffs' settlement
strategies but from the fact that Debtors and other manufacturers created a public health
catastrophe that has killed 300,000 persons so far, is projected to kill more than half a million, and
has injured millions more.  So far only a fraction of these deaths and injuries have resulted in
lawsuits, but even this fraction has produced a very large number of claims simply because it is a
fraction of millions of persons injured and hundreds of thousands killed by Debtors and other
asbestos defendants.  *See Occupational Health Hazards Compensation Act of 1982: Hearings
Before Subcomm. on Labor Standards of the House Comm. on Educ. and Labor*, 97th Cong., 2d
Sess. 132 (1982) (statement of Harry Martens) (observing that "an independent study performed
for the Department of Labor estimated that the number of Americans significantly exposed to
asbestos is 21 million").

Moreover, Grace's assertion that it has been forced to pay meritless claims in
the tort system is controverted by its own documented claims settlement policy.
Grace followed a policy of settling only those claims that were extremely likely to
survive a motion for dismissal; it defended against the rest.

**[REDACTED]**

Grace followed this strategy because it was the *cheapest method* of resolving its asbestos liability.  It would have been much more expensive if, instead of settling virtually all cases likely to survive dismissal, Grace had litigated them to judgment.  In short, by using Grace's claims resolution history as the data set for estimation, this Court will not be unfair to the Debtors, but will favor them with the presumption that they could have continued to dispose of cases with equivalent efficiency.

II.    **DEBTORS' ESTIMATION PROPOSAL IS A TRAP FOR THE UNWARY AND THE DISENFRANCHISED**

    A.    **Although Debtors Pretend to Propose a Standard Estimation, They Continue to Seek a Pre-Estimation Analysis of Claim "Validity," but Would Now Have an "Expert" — Not a Court Sitting in Bankruptcy — Make Global "Liability" Determinations**

While the Committee favors conducting an estimation based on the foregoing well-established expert methodology, it totally opposes Debtors' unprecedented "estimation" plan. Debtors' "Estimation Motion" is a misnomer.  Debtors' proposal would not estimate Debtors' liability in the tort system as it exists.  Rather, it would attempt to *predict* the outcome of Debtors' post-consummation *litigation* procedures — procedures that are designed to unlawfully eliminate massive numbers of PI claims for failure to meet Debtors' manufactured criteria for platonic claim "validity."

Tellingly, Debtors' Estimation Motion is far from candid on this subject.  Along with their Estimation Motion, Debtors filed a Plan of Reorganization, a Motion for Entry of a Case Management Order ("New CMO Motion"), and numerous exhibits that are rife with specificity and detail on certain subjects (such as the evidentiary hurdles Debtors would require PI claimants to overcome) but virtually silent when it comes the heart of their instant motion — that is, exactly how they propose that an "expert" could approximate Debtors' overall liability from the idiosyncratic data Debtors propose to collect from a certain subset of PI claimants (those who had cases pending against Grace pre-petition).  The only way to get any sense of Debtors' estimation proposal is by spotting clues scattered throughout Debtors' recent filings and then connecting the dots.  What emerges is simply a lesser version of the various objectionable "litigation protocols" that Debtors have largely abandoned.  Rather than have the Court make across-the-board rulings regarding Grace's liability to groups of claimants, Debtors would now have an "expert" make those determinations under the pretense of estimation.

To begin with, a description of what Debtors *do* say about their estimation proposal. Debtors submit that "the central task in these Chapter 11 Cases has always been to define the Debtors' *true liability* to Asbestos Claimants." Estimation Motion 2 (emphasis added). They also purport to seek "an order determining estimates of the aggregate amounts needed to fund the Asbestos Trust to enable the Asbestos Trust to pay *in full* all Allowed Asbestos Claims and Asbestos Trust Expenses, as and when they become due." *Id.* 1-2 (emphasis added); *see also id.* 6, 9, 25.[3] Thus, as a basic proposition, Debtors would fund a Trust to pay "in full" only those claims for which *they* believe they are "truly liable."

Further, according to Debtors, "the actual estimation is the last step in a * * * process by which this Court must first facilitate the identification of the scope of the Debtors' aggregate liability for Asbestos Claims" (Estimation Motion 6) by "better understand[ing] the population of claimants with unresolved personal injury lawsuits as of the Petition Date." *Id.* 3. In other words, as a prerequisite to conducting an estimation, Debtors insist that "Asbestos PI Pre-petition Litigation Claims must first be identified, quantified and evaluated *on their merits.*" *Id.* 26 (emphasis added).

Debtors' proposal that the Court conduct some sort of merits evaluation of pre-existing PI Claims as a precondition to embarking on estimation is all-too-familiar. Rejecting the concept of

---

[3]     The "aggregate amounts" include four separate funds, an "Asbestos PI-SE Class Fund," and "Asbestos PI-AO Class Fund," an "Asbestos PD [Property Damage] Class Fund," and an "Asbestos Trust Expenses Fund." Estimation Motion 5. As a precondition to confirmation of their Plan, Debtors seek an order finding that "the Asbestos PI-SE Class Fund shall constitute the maximum amount that the Reorganized Debtors shall have to pay on account of all Allowed Asbestos PI-SE Claims," *id. 6*, and that "the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expense Fund is not greater than $1,483,000,000, *id.* 6 n.6. For the remainder of this brief, we will confine our discussion to Asbestos PI Claimants.

estimation, Debtors proposed their first "litigation protocol" in June 2001, whereby tens of

thousands of PI claimants would complete POCs that demanded more information than a plaintiff

would possess at trial; Debtors would "audit the completeness and reliability of the claims"; an

appointed "Personal Injury Litigation Committee" would represent claimants in "common issues

litigation"; Debtors would move to disallow "incomplete claims"; and then Debtors and the PI

"Litigation Committee" would engage in "omnibus" summary judgment hearings on various fact-

intensive issues, limited discovery, and Rule 42 "common issue bench trial[s]."  Debtors' Motion

for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Proof of

Claim Forms and Approval of Notice Program (Docket # 586) 2, 9-10.

     In an "Omnibus Reply" to objections to that Motion, Debtors completely shifted gears,

proposing instead: "exemplar objections" and summary judgment motions to categories of

disputed claims; individual claimants responses (without reciprocal discovery); "Rule 706 expert

work," including <u>Daubert</u> proceedings; exemplar rulings; omnibus objections and summary

judgment motions for "similarly situated claims"; and, finally, individual claimant responses

"showing cause why the Court's exemplar rulings do not govern their situations."  Debtors'

Consolidated Reply in Support of Their Motion for Entry of Case Management Order,

Establishment of a Bar Date, Approval of the Claim Forms and Approval of the Notice Program

(Docket # 1666) 41-42.

     Not satisfied with this proposal either, Debtors next filed a "Supplemental Brief" in which

they proposed that their litigation protocol be implemented twice — first as to the claims of pre-

petition litigants and, later, (following a bar date and notification program) as to all "other claims."

W.R. Grace's Supplemental Brief Regarding Procedures for the Litigation of the Common

Personal Injury Liability Issues (Docket # 2275) 39-40.  The Committee strenuously opposed each

of these proposals on various grounds that would seem self-evident under the logical limits of

existing law, not the least of which is that Debtors' schemes would extinguish thousands of personal injury claims that are perfectly valid under applicable state law simply because Debtors subjectively believe that they are unworthy of payment. *See* Committee's Opposition to Debtors' Motion for Entry of Case Management Order (Docket # 902); Committee's Opposition to Debtors' Motion for Leave to File Omnibus Reply (Docket # 1388); Committee's Case Management Proposal (Docket # 2421).

Now — in their *fourth* attempt at crafting a mechanism for discarding tens of thousands of allegedly "invalid" claims — Debtors embrace the concept of "estimation" but retain the notion that some analysis of inherent claim "validity" must precede estimation. As the "first step" in this new process, Debtors request that the Court "establish the Asbestos PI Pre-petition Litigation Bar Date as the final date by which any person or Entity holding an Asbestos PI Pre-petition Litigation Claim must file an Asbestos PI Proof of Claim Form, in order to receive a Distribution in these Chapter 11 Cases." Estimation Motion 7.

Second, Debtors would require that those same claimants file "Asbestos PI Questionnaires," (Estimation Motion 7), purportedly to "enable the parties to develop a detailed 'snapshot' of the actual medical conditions and exposure histories of the claiming population as it existed on the Petition Date," *id.* 4. Debtors contend that, "[f]rom that [Questionnaire] information, the parties can develop *meaningful* estimates of Grace's *actual liability* to these claimants for plan confirmation purposes, as well as projections of Grace's liability to future claimants." *Ibid.* (emphasis added).

Third, Debtors would set an expert discovery schedule that would allow 45 days "for the Debtors' and other interested parties' (including the various official committees') experts to review the data received in the Asbestos PI Proof of Claim Forms and Asbestos PI Questionnaires and prepare Rule 26 expert reports." Estimation Motion 9. Finally, Debtors propose that the

Court hold an evidentiary hearing "to estimate the requisite monetary allocations to the Asbestos Trust." *Id.* 5.

Importantly, Debtors provide no details as to how the Questionnaire information will be "quantified and evaluated" by the experts (Estimation Motion 26), or how an expert can possibly develop "*meaningful* estimates of "*actual* liability" from the Questionnaire data. *Id.* 4 (emphasis added). The Questionnaire is essentially a unilateral discovery request. Debtors erroneously assume that all 118,000 claimants with cases against Grace pre-petition must necessarily possess all "critical product exposure and medical information that is needed to assess the viability of the Claims." *Id.* 31. This kind of detail would only be amassed through full-blown discovery in the tort system and is certainly not a prerequisite to filing suit in state court.

The Questionnaire requires claimants generally to "provide all relevant information" relating to diagnosed conditions and "attach medical records relating to the injured party's diagnosis for any condition." Asbestos PI Questionnaire ("Questionnaire") 7 (Exhibit E to Estimation Motion). For living claimants, this means that the documents supporting a diagnosis *must* include at a minimum a physical examination by a treating physician *and* "an independent, replicated X-ray reading by a certified B-reader." *Id.* 4.

Debtors thus assume that *all* claimants can immediately produce highly particularized medical evidence and answers to specific questions regarding ILO readings, pathology tests, and pulmonary function tests. *See* Questionnaire 9-10. Debtors further expect claimants to submit trial-ready evidence of exposure to Grace products, *see id.* 7 (demanding that claimants "attach * * * medical documentation that establishes asbestos exposure as a substantial contributing factor in causing [a] cancer"); to provide impeachment material, *see id.* 8 (demanding explanation of "any financial relationship between the ILO reader and the injured party's legal counsel"); and to answer open-ended medical questions suitable only for an examining physician, *see ibid.* (asking

that claimants "explain" any reliance "upon blunting of either costrophrenic angle and bileral pleural plaque or bilateral pleural thickening").

In addition, claimants are required to provide mind-boggling detail as to their exposure to Grace products, including identification of each site of exposure, the site owner, the site address, the precise months and years of exposure to Grace products for each, the specific asbestos-containing products to which the injured party was allegedly exposed at each site, the "Basis for Identification" of each product, and the specific "Products Attributed to Other[]" asbestos defendants.  Questionnaire 13-14.  *See generally* New CMO Motion 10 n.10 (describing "a few of the general categories of information requested by the Asbestos PI Quesitonnaire" that Debtors believe "are particularly relevant for determining the Debtors' liability").

Not only is it unreasonable to expect claimants to have this detailed information at their fingertips (particularly without reciprocal discovery of Grace's own records), it is difficult — if not impossible — to conceive of how an "expert" can use a database of facts taken from completed or partially-completed Questionnaires and derive "*meaningful*" estimates of Debtors' "*actual* liability."  Estimation Motion 4.  Evidence relating to an individual's medical history and exposure to Grace products is necessarily unique and particularized and can only inform claimant-specific legal questions: Was *this* claimant exposed to Grace asbestos-containing products?  What state's law governs *this* particular claim?  Is there appropriate medical evidence that *this* injury was due to asbestos?  Is *this* evidence reliable?  As the Committee argued repeatedly in response to Debtors' many "litigation protocols," even a Federal Court cannot answer such questions by across-the-board categorization of large groups of claims, or even by sampling.

    **B.**    **No Expert Can Predict the Viability of Claims En Masse under the Laws of Fifty States, the Trust TDP, or Debtors' Post-Confirmation CMO**

Here, however, Debtors would take a court sitting in bankruptcy out of the business of making these global determinations and have an "expert" do it instead. Conspicuously, Debtors provide no hints as to how an expert is supposed to accomplish this. This is unsurprising. Such expertise is not logically or legally feasible.

Presumably, Debtors' expert would have to tailor estimation to the Asbestos Trust and Litigation CMO that Debtors would establish post-confirmation. After all, according to Debtors, "[w]hile these estimates would not be binding on any individual Asbestos PI-SE Claimant or Asbestos PD Claimant for distribution purposes, they will ultimately serve as a cap on the aggregate Distribution to the Asbestos PI-SE and Asbestos PD Classes, respectively." Estimation Motion 12. Hence, Debtors' expert would have to accurately predict the amount of money needed to pay the claims under the procedures Debtors would implement post-confirmation. Put another way, Debtors would have an expert do an estimation and set up a procedure that would determine post-confirmation if the expert was right.

Debtors' post-confirmation claims procedures are novel. Claimants would have to file Debtors' POC and, later, a PI Questionnaire. The Questionnaire requires that claimants elect either the "Litigation Option" or the "Cash-Out Option" for the processing and payment (or ultimate disallowance) of their claims. *See* Questionnaire 4.[4] Claimants electing the Cash-Out Option would be required to file claim forms with a § 524(g) Trust for payment of pre-determined

---

[4]    This election is binding and irrevocable. *See* Proposed Plan § 3.2.1; Asbestos PI Questionnaire, Part VIII. Any claimant who does not complete and return an "Asbestos PI Questionnaire" by Grace's deadline would be conclusively presumed to have elected the "Litigation Option," Proposed Plan § 3.1.6(b)(v), but apparently would be later subject to an omnibus objection and summary judgment motion for failure "to comply with the requirements for completing and submitting the * * * Asbestos PI Questionnaires." New CMO Motion 7.

amounts under stringent eligibility criteria set forth in the Trust Distribution Procedures ("TDPs").

Under the "Litigation Option," claimants would be required to litigate their claims under Grace's

elaborate five-step post-confirmation CMO, which would require them to defeat numerous rounds

of summary judgment motions, endure "common issue" trials, and submit their claims to

mediation, all before they could get to a jury trial in a single court (the Delaware Federal District

Court).

Thus, as an initial matter, Debtors' expert would have to predict how many of the 118,000

pre-petition claimants would elect the "Cash-Out Option" and how many would elect the

"Litigation Option."  Then, the expert would have to predict from a database of compiled

Questionnaire facts how many of the Cash-Out claimants would survive the TDP process —

which includes an initial Trust response to individual claim forms, "Individual Review," and

binding arbitration.  PI-SE Trust Distribution Procedures §§ 5.2 & 5.7 (Debtors' Exhibit Book Tab

6).

As for those claimants that the expert predicted would elect the Litigation Option, the

expert would also have to predict the outcome of the New CMO.  Thus, the expert would have to

predict whether the court that hears those cases will agree with any, much less all, of the Debtors'

"threshold requirements for a valid claim."  New CMO Motion 7.  According to Debtors, such

"threshold requirements" would include the failure to comply with Debtors' requirements for

completing the POC and the Questionnaire.  *Ibid.*  Thus, the expert would have to predict how

many pre-petition claimants would fail to timely file POCs, and how many of those that did file

POCs would be disallowed on "both non-substantive and substantive" omnibus bases, i.e., for

failure to timely file Questionnaires and for failure "to meet the minimum requisites for

establishing a valid Asbestos Claim." *Id*. 17.  More specifically, the expert would have to predict

how many POCs and, separately, how many Questionnaires will be "duplicative, late-filed or

lacking any supporting documentation," and how many will "fail to set forth the most rudimentary facts necessary to support a cause of action against the Debtors" by failing, e.g., to provide "*any* medical information, * * * *any* medical records, or * * * *any* exposure or work site data." *Ibid.*

Debtors' other "threshold issues" include: unreliable scientific evidence of injury or causation, statute of limitations, insufficient requisite exposure to Debtors' products, and lack of reliable evidence that Debtors' products or conduct caused the claimed disease.  New CMO Motion 7.  Because "the validity of a claim is generally a function of underlying substantive law," Raleigh, 530 U.S. at 24, the expert would have to predict whether a court would adjudicate these issues en masse in the first instance.  As the Committee argued at length in opposition to Debtors' litigation protocols, it is well-established that "under [state] substantive law causation of plaintiff's injury by defendant's product and plaintiff's resultant damages must be determined *as to 'individuals, not groups.'*" Cimino, 151 F.3d at 313 (quoting In re Fibreboard, 893 F.2d 706, 711 (5th Cir. 1990)) (emphasis added); *see also* Malcolm v. National Gypsum Co., 995 F.2d 346, 350-53 (2d Cir. 1993) (disapproving consolidation for trial of forty-eight asbestos cases because too many different individual exposures, jobs, job sites, and diseases involved).  Thus it is entirely possible — and indeed, likely — that a Federal Court would conclude that it could not lawfully do what Debtors would require of it under the New CMO.

Assuming the expert could reliably predict how a court would rule on the feasibility of Debtors' threshold summary judgment process, the expert would have to predict which states' law that court would apply to which claim or groups of claims.  Then, the expert would have to predict how the Court would rule on each of Debtors' threshold objections under those laws (taking into account any hypothetical written responses claimants might make within 30 days of service of Debtors' objections and summary judgment motions, as well as discovery — "if any").  New CMO Motion 10-11.  The expert would then have to predict how many of the Litigation Option

claimants would fall within those objections,[5] and how "the Court [would] resolve these questions * * * with respect to [the] pending Asbestos Claims." *Id*. 7-8.

Debtors make no secret of their plan to take advantage of any flaws in completing the POCs and Questionnaires to the prejudice of claimants. *See* Questionnaire 2 (stating that "[i]f a section is left blank, then it will be interpreted to mean that the injured party does not have the specified injuries, conditions, or tests addressed in that section"); *id.* 4 (requiring claimants to "attest[] and swear[] that you have not omitted any requested information, the inclusion of which would have a material effect on any right to assert an Asbestos PI Claim against the Detors' estates"). If a claimant cannot answer every question to Debtors' satisfaction, Debtors will urge the court to expunge the claim post-consummation. *See supra* notes 4, 5. Since claimants would resist such efforts to exploit the Questionnaire's complexity, the court would be required to adjudicate myriad disputes over the completeness of forms — all before even reaching Debtors' "merits" objections and summary judgment motions — and Debtors' expert will have to predict the nature and outcome of such threshold litigation as part of the estimation.

For those claims that the expert predicts would "withstand summary judgment scrutiny," the expert would have to predict the outcome of "Rule 42 common issue trials" regarding "common issues capable of resolution on an aggregate basis." New CMO Motion 8. In other words, the expert would have to predict whether a court would conclude that *aggregate* questions of fact remain after the omnibus summary judgment proceedings, what those aggregate factual questions would be, what kind of evidence would be presented a trial to resolve those questions

---

[5]     Notably, Debtors "expect that such filings will result in expunging and dismissing large numbers of similarly-situated Asbestos Claims." New CMO Motion 10.

(and whether and how much it would differ from the Questionnaire data collected at estimation), and how the court would ultimately rule.

Next, the expert would have to predict how many "individual claims or groups of claims" will "fail[] to state a claim under the court's Common Issue trial rulings."  New CMO Motion 8. Once the expert made that prediction, he would have to consider whether "any follow-on summary judgment motions" will follow, the nature and outcome of those motions, which remaining claimants will get settlement offers from "the Debtors (or the Asbestos Trust)," how much those offers would be and, finally, how many claimants would accept them, how many will go to mediation, and the outcome of mediation.  *Ibid*.  As to the remaining claimants that the expert predicts would go to trial, the expert would have to predict what law the Delaware District Court would apply to their sets of facts, and what the outcome of those trials would be.  The expert would presumably take the number of surviving claims and extrapolate how many anticipated future claims will survive similar procedures and ultimately get paid.

Finally, the expert would have to value those claims.  For the claimants expected to wind up in jury trials under the Litigation Option, the expert would have to predict how many would proceed to recover large jury verdicts.

**[REDACTED]**

Given that jury verdicts at these levels could swiftly deplete the $1.48 billion Debtors would earmark for PI-SE claims, property damage claims, and administrative Trust expenses *combined,* the expert's predictions on the number of claims that would be "dismissed and expunged" prior to this point must be pretty accurate.  New CMO Motion 11.

The non-jury verdict claims that survive the omnibus summary judgment proceedings and Rule 42 trials would be resolved by settlement or mediation.  The expert would have to predict how many will settle and how many will go to mediation.  As for how to attach monetary values to the claims, Debtors have made clear their belief that Grace's settlement history is an inappropriate basis from which to extrapolate future liability because Grace purportedly "settle[d] the Claims on a mass scale even though it knew most were of doubtful validity."  Estimation Motion 14.

The only other known data set for estimation is Grace's judgment history.  Cases surviving Debtors' threshold objections post-consummation would be most similar to the claims that survived comparable winnowing processes in the tort system — motions to dismiss, discovery, evidentiary hearings, and motions for summary judgment — and proceeded to judgment.  *See* Peterson Affidavit ("Aff.") ¶ 29 (attached as Exhibit C to Committee's Case Management Proposal).  Accordingly, even if Debtors' expert were to assume that Debtors could successfully eliminate thousands of claims post-consummation based on "threshold" objections and summary judgment motions, any estimation projected from Grace's tort-system verdict history would produce a gargantuan liability.  *See id.* ¶ 32

**[REDACTED]**

It is safe to assume that Debtors do not intend their expert to use prior jury verdicts to value the claims he predicts will survive Debtors' post-consummation litigation scheme. Rather than value the unknown by comparison to the known, therefore, Debtors must be expecting that their expert will value the unknown by comparison to nothing — or to new values manufactured by Debtors to reflect their "true liability." Either option would be illegitimate.

### C.    Debtors' Hypothetical Expert Testimony Would Be Inadmissible

In sum, the "expert" estimation Debtors envision would consist of speculation after speculation about judicial outcomes, jury verdicts, and claimant behavior. By Debtors' own account, "<u>Daubert</u> forbids analyses based on 'subjective speculation' and on data where the results have such an enormous known rate of error." New CMO Motion 21 (quoting <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S 579, 594 (1993)). *See also* <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 742 (3d Cir. 1994) (noting that <u>Daubert</u> forbids "subjective belief or unsupported speculation"); <u>Cuffari v. S-B Power Tool Co.</u>, No. 02-3763, 2003 WL 22520411, at *2 (3d Cir. Nov. 7, 2003) (finding expert testimony inadmissible because speculative and based on conjecture); <u>American Marine Rail NJ, LLC v. City of Bayonne</u>, 289 F. Supp. 2d 569, 589-90 (D.N.J. 2003) (same). It is difficult to conceive of testimony that would be more objectionable under <u>Daubert</u> than a series of predictions — that are, in turn, based on predictions — that are, in turn, based on predictions — about how courts will resolve factual and legal disputes, what choices claimants will make under various hypothetical conditions, and what evidence future claimants are likely to possess to support their future claims.

Moreover, whereas Debtors' expert would be expected to opine on Debtors' "true liability" — whatever that means — their Estimation Motion does not reveal what information the expert would use to answer that question other than Questionnaire data. Gone are the "Rule 706" and <u>Daubert</u> proceedings Debtors proposed as prerequisites to pre-estimation rulings on "exemplar"

issues such as proximate cause and legally cognizable injury.  Debtors make no mention of hiring similar experts to render opinions on "threshold" issues for purposes of informing their *estimation* expert.  (Indeed, Debtors' assurance that their entire estimation process would conclude within 6 months negates any reasonable expectation that multiple experts would be involved).  Yet in order to predict judicial outcomes, the expert would have to understand the applicable law and the medical science.

Evidently, Debtors' estimation expert would predict outcomes of post-confirmation "common issues" litigation based in large part on what Debtors' lawyers say the law and the medicine is, or should be.  But Debtors' lawyers are obviously biased and their opinions have no probative value as to Debtors' actual present and future liability to PI claimants — they are arguments, not evidence.  Debtors state in their papers, for example, that "[t]he American Thoracic Society (ATS) has set an ILO Rating of 1/1 as the minimum needed to support a diagnosis of asbestos."  New CMO Motion at 19.  This is factually incorrect.  *See* American Thoracic Society, *Diagnosis and Initial Management of Nonmalignant Diseases Related to Asbestos*, AMERICAN JOURNAL OF RESPIRATORY AND CRITICAL CARE MEDICINE, Vol. 170, 2004, at 696, 700 (indicating that dividing line for "positive" and "negative" asbestosis readings generally falls between ILO ratings of 0/1 and 1/0, but cautioning that such dividing line is not always clear).  Moreover, the ATS requires no ILO reading whatsoever to support a diagnosis of asbestosis.  *See id*. 692 tbl.1, 696-97 (explaining that asbestosis can be diagnosed using, among other things, a chest radiograph (graded on ILO rating scale), high-resolution computed tomography, or future methods based on imaging).  To the extent Debtors' estimation expert would be making predictions based on Debtors' lawyers' view of governing medicine and law, there can be no doubt that the testimony would be inadmissible.

Daubert provides that an expert's testimony is admissible only so long as the process or technique the expert used in formulating the opinion is relevant and *reliable. See* 509 U.S. at 589; *see also* Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 147 (1999). This means — for an expert proposing to testify to scientific knowledge — that the opinion must be based on the methods and procedures of science. *See* Daubert, 509 U.S. at 590; In re Paoli, 35 F.3d at 742.

Under Debtors' estimation plan, their expert would be making global determinations regarding whether information submitted by claimants on Questionnaires meets Debtors' standards for recovery, including sufficient scientific evidence of injury or causation, sufficient requisite exposure to Debtors' products, and sufficient evidence that Debtors' products or conduct caused the claimed disease. *See* New CMO Motion 7. There is no such thing as an expert who can predict the outcome of individual cases under the applicable law of 50 states on these questions based on responses to a Questionnaire — not to mention Debtors' erroneous findings on medicine and law. But even assuming arguendo that Debtors' lawyers could reliably supply the expert with the governing legal principles (which of course they cannot), no expert could possibly make reliable individual injury, causation and product identification determinations based on Questionnaires that are necessarily factually incomplete — let alone make broad judgments about the present and future population of PI claimants.

In In re Paoli, the Third Circuit affirmed the lower court's exclusion of medical expert testimony under Daubert because the experts based their conclusion that exposure to toxic chemicals caused the plaintiffs' injuries "solely on the plaintiff's self report of illness in preparation for litigation," which the court deemed "an unreliable source of information"; they failed to "either examine the patient or review the patient's medical records." 35 F.3d at 762; *see also* In re "Agent Orange" Prod. Liab. Litig., 611 F. Supp. 1223, 1234-38 (E.D.N.Y. 1985) (excluding expert testimony of medical doctor who relied upon form affidavits describing the

plaintiffs' exposure to Agent Orange and the plaintiffs' medical history to diagnose plaintiffs).  In

In re TMI Litig., 193 F.3d 613 (3d Cir. 1999), an expert's conclusion that a nuclear reactor plant

accident caused the plaintiffs' injuries was based upon the results of medical history summaries,

which were prepared by the plaintiffs' counsel, and on the claimants' responses to questions

formulated by the expert.  In affirming the exclusion of such testimony, the court observed that an

expert "cannot rely on medical summaries prepared from interviews conducted by

nonprofessionals * * * This is especially true when the nonprofessionals are aligned with counsel

for one of the litigants."  Id. at 698.  The expert "should have either reviewed her study subjects'

medical and hospital records or examined the subjects herself."  Ibid.

Clearly, Debtors' expert cannot reliably opine on whether claims are "valid" based on a

Questionnaire database and information provided by Debtors' lawyers.  After all, Debtors'

estimation is supposed to fund a Trust that Debtors claim will pay PI claims "in full," thereby

rendering claimants unimpaired and unable to vote.  See Proposed Plan § 3.1.6(b)(i).  In theory,

the estimation must approximate what claimants would recover in litigation against Grace in the

courts of the State where they reside or in which their claims arose under the applicable

substantive tort law.  See Raleigh, 530 U.S. at 20 (state law "governs the substance of claims" in

bankruptcy).  While it is unclear whether Debtors intend to employ medical experts at all in their

estimation, even if they did, Debtors surely do not intend to have doctors conduct physical exams

of 118,000 claimants.  Under Third Circuit precedent, Debtors' proposed expert testimony cannot

possibly pass muster under Daubert.

Moreover, the core concept underlying Debtors' estimation proposal — that an expert can

opine to a court on whether personal injury claims are viable as a matter of law — is

unsustainable.  Expert testimony stating legal conclusions drawn by applying the law to facts does

not assist the trier of fact.  See VIM, Inc. v. Somerset Hotel Ass'n, 19 F. Supp. 2d 422, 427 n.4

(W.D. Penn. 1998). Rather, it usurps the role of the fact-finder and attempts to substitute the

expert's opinion for that of the judge or jury. *See* United States v. Duncan, 42 F.3d 97, 101 (2d

Cir. 1994). Courts have therefore consistently held that such testimony is outside the proper scope

of expert testimony and is inadmissible. *See, e.g.,* Duncan, 42 F.3d at 101 ("In evaluating the

admissibility of expert testimony, this Court requires the exclusion of testimony which states a

legal conclusion."); Burger v. Mays, 176 F.R.D. 153, 157 (E.D. Pa. 1997) ("Expert testimony that

expresses a legal conclusion should be excluded."); Haberern v. Kaupp Vascular Surgeons Ltd.

Defined Benefit Plan, 812 F. Supp. 1376, 1378 (E.D. Pa. 1992) ("An expert may not opine legal

conclusions drawn by applying the law to the facts.").

In Haberern, 812 F. Supp. at 1376, the court refused to admit expert testimony regarding

the existence of liability in a case involving claims of breach of fiduciary duties under ERISA.

One of the issues was whether the defendants violated ERISA § 410(a) by requiring the plaintiff to

sign a general release as a condition to receiving her pension benefits. The defendants sought to

introduce an expert in labor law to testify that the release related to issues and claims beyond the

scope of ERISA. The court held that such testimony was "in essence a legal opinion that the

release * * * did not violate ERISA." *Id.* at 1378. In denying admissibility, the court held that

because "the proposed testimony * * * will take the form of an opinion on a question of law, it

will not assist the trier of fact." *Id.* at 1378-79 (internal quotations omitted). In other words, the

court refused to permit the submission of legal arguments in the "guise of expert testimony." *Id.*

at 1379.

Similarly, the expert testimony proffered by Debtors to estimate their overall liability is "in

essence" a legal argument "in the guise of expert testimony" as to the validity of 118,000 fact-

specific asbestos claims under the tort laws of numerous jurisdictions. At bottom, Debtors' expert

would be speculating as to how these claims would fare were this Court to engage in claim-by-

claim adjudication under 11 U.S.C. § 502(b).  The expert would bring no expertise recognized by Rule 702 to the estimation process.

> **D.     Debtors' Proposal Violates Fundamental Tenets of the Bankruptcy Code and Rules**

It is basic bankruptcy law that a claim based on a POC, once filed under section 501(a) of the Bankruptcy Code, is *prima facie* evidence of the validity and amount of the claims, and must be allowed unless the debtor (or another party entitled to do so) files an objection under Bankruptcy Rule 3007.  *See* Gardner v. New Jersey, 329 U.S. 565, 573 (1947).  Such an objection must meet the burden of producing enough contrary evidence to overcome the prima facie effect of the claim.  *See* 11 U.S.C. § 502(a); Fed R. Bankr. P. 3001(f); In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992); In re Pinnacle Brands, Inc., 259 B.R. 46, 50 (Bankr. D. Del. 2001).  As the Supreme Court made clear nearly a century ago, parties cannot defeat claims or even require claimants to provide further evidence by unvarnished objection.  *See* Whitney v. Dresser, 200 U.S. 532, 535 (1906); *see also, e.g.,* Lundell v. Anchor Constr. Specialists, Inc., 223 F.3d 1035, 1040-41 (9th Cir. 2000).  If the objector fails to meet this burden, the debt is considered allowed.  *See, e.g.,* In re Myrland, 209 B.R. 524, 526 (Bankr. W.D. Wash. 1997).

And even if an objection to a claim does meet the burden of controverting the POC by evidence, this does not automatically mean the claim is rejected.  Instead, a "contested matter" governed by Bankruptcy Rule 9014 would commence.  4 COLLIER ON BANKRUPTCY ¶ 3007.01[1], at 3007-2 (15th ed. 2004) [hereinafter "COLLIER"].  Under Rule 9014, in a contested proceeding, specified provisions of the Bankruptcy Rules "shall apply."  These specified provisions include discovery under Rules 7026 and 7028-7037.  *See generally* COLLIER ¶ 9014.05, at 9014-6 to 9014-7.  *Cf.* In re TransAmerican Natural Gas Corp., 978 F.2d 1409, 1416 (5th Cir. 1992).  Moreover, where there are issues of fact, 28 U.S.C. § 1411 — consistent with the Constitution — preserves in

bankruptcy proceedings "any right to trial by jury that an individual has under applicable non-bankruptcy law with regard to a personal injury or wrongful death tort claim."

Debtors' estimation proposal violates these basic bankruptcy law principles. First of all, there is no requirement under the Code that claimants file two pieces of paper in order to preserve their rights against Debtors — a POC[6] and a PI "Questionnaire." Yet Debtors would move to "expunge[] and disallow[]" post-confirmation on an omnibus basis all claims "for which the Asbestos PI Questionnaires or Court-Approved Proofs of Claim are * * * late-filed." New CMO Motion 17. Claimants who timely filed a POC but fail to file a Questionnaire "SHALL BE FOREVER BARRED, ESTOPPED AND ENJOINED FROM ASSERTING ANY SUCH CLAIMS" under Debtors' estimation plan. Asbestos PI Questionnaire Notice (Exhibit D to Estimation Motion) 4; *see also* Estimation Motion 26. Debtors cannot undo the well-established legal effects of filing a POC by inventing an additional — and much more burdensome — hurdle as a cheap way to get rid of claims.

Moreover, as explained above, Debtors would seek to "weed out" claims for failure to "meet the minimum requisites for establishing a valid Asbestos Claim" and for failure to include

---

[6]     Nothing in the Bankruptcy Code or Rules requires a POC filing as a prerequisite for having creditors' claims considered in the first instance. *See* In re Simmons, 765 F.2d 547, 551 (5th Cir. 1985) ("[N]o creditor is required to file a proof of claim."); *see also* COLLIER ¶ 501.01[1], at 501-3 ("It should be noted that the filing of a proof of claim or interest is permissive, and no creditor or interest holder is ever required to file one."). Instead, POCs are a tool to be used when they would serve some legitimate purpose in the proceeding. *See* In re Simmons, 765 F.2d at 551 ("A proof of claim should be filed only when some purpose would be served."); COLLIER ¶ 501.01[1], at 501-3 to 501-4 (quoting In re Simmons). The primary purpose of the bar date/POC process has been described as the achievement of finality in bankruptcy proceedings. *See* In re Charter Co., 876 F.2d 861, 863 (11th Cir. 1989). In this case, the final resolution of asbestos personal injury claims will occur only after the Plan becomes effective and a Trust is established. Accordingly, the bar date/POC process sought by Debtors could not serve the primary purpose contemplated by the Bankruptcy Code or Bankruptcy Rules.

"rudimentary facts necessary to support a cause of action" on the POC and Questionnaire.  New

CMO Motion 17.  The Bankruptcy Rules simply require that a POC be "a written statement setting

forth the creditor's claim" that "conform[s] substantially to the appropriate Official Form."  Fed.

R. Bankr. P. 3001(a).  The Official Form (Form 10) recognizes this principle; it is a single page,

with one page of instructions.  Except for identifying data, claim amounts, and signatures, it can

be completed entirely by checking boxes.  *See* Bankruptcy Form 10.[7]  The POC is a simple notice

of the fact that a creditor is making a claim; it is not a detailed presentation of the evidence that

would demonstrate the validity of the claim in the event it is challenged.  *See, e.g.,* In re Hooker

Invs., Inc.*, 937 F.2d 833, 840 (2d Cir. 1991) (stating that the POC "enabl[es] the parties to a

bankruptcy case to *identify* with reasonable promptness the identity of those making claims against

the bankruptcy estate and the *general amount* of the claims") (emphasis added).  It is no more

required that a bankruptcy claimant present the full evidence he would present if his claim is

challenged (along with responses to a challenger's discovery demands) than a litigant filing a

complaint must simultaneously, and irrevocably, present his full evidentiary case and rebut every

conceivable challenge to it.

　　　Consequently, Debtors cannot secure rulings "expunging and disallowing" claims because

of "substantive omnibus objections" to the contents of the POC or Debtors' one-way discovery

demand they call a "PI Questionnaire."  Even if *post*-consummation claim objections were

contemplated by the Code (which they plainly were not), the Code requires that *Debtors* submit

sufficient evidence to defeat individual claims and, if they meet *their* burden, a contested

---

[7]　　　In yet another departure from bankrupcy principles, Debtors would disallow claims filed
on the Official Form 10 simply because the claimant failed to use their one-page specialized form.
*See* Asbestos PI Proof of Claim Form (attached as Exhibit C to Estimation Motion) 2.

proceeding — including discovery and, for PI claimants, jury trials — would ensue before the claims could be disallowed.

To the extent Debtors hope to bypass the protections of the Code by posing their objections post-consummation, the Court should stop them in their tracks. At the point at which claimants would be required to complete the Questionnaire, they would not even know whether the court will approve Debtors' New CMO Motion (or some variant thereof) or what substantive requirements for claim validity will ultimately apply. Nonetheless, Debtors would seek to extinguish en masse "deficient Asbestos Claims for all purposes" without any discovery or a hearing because claimants lacked the clairvoyance to anticipate the substantive standards that would govern their claims post-consummation. New CMO Motion 17. Only in a total absence of due process — or in a fantasy world magically divorced from the Bankruptcy Code and the realities Grace faced in the tort system as it exists — could Debtors hope to avoid their overwhelming liabilities by such a proposal.

## CONCLUSION

Debtors' Motion for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief should be denied.

Dated:  December 21, 2004

**CAMPBELL & LEVINE, LLC**

*/s/Mark T. Hurford*
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:     (302) 426-1900
Telefax:        (302) 426-9947

- and -

**CAPLIN & DRYSDALE, CHARTERED**
Elihu Inselbuch
399 Park Avenue, 36th Floor
New York, NY 10022
Telephone:    (212) 319-7125
Telefax:    (212) 644-6755

Peter Van N. Lockwood
Albert G. Lauber
Kimberly N. Brown
Brian A. Skretny
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone:    (202) 862-5088
Telefax:    (202) 429-3301

Counsel for the Official Committee of
Asbestos Personal Injury Claimants