IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) ) ) ) ) ) ) ) ) | Chapter 11 |
| W. R. GRACE & CO., et al., |  | Case No. 01-01139 (JKF) |
|  |  | (Jointly Administered) |
| Debtors. |  | **Re: Docket Nos. 6896, 6898, 6899 & 6900** |
|  |  | **Hearing Date: January 21, 2005 at 9:00 a.m.** |
|  |  | **Obj. Deadline: December 22, 2004** |

**OBJECTIONS OF THE OFFICIAL COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS TO (I) DISCLOSURE STATEMENT FOR DEBTORS' PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE; (II) DEBTORS' MOTION FOR A CASE MANAGEMENT ORDER; (III) DEBTORS' MOTION FOR ESTIMATION OF ASBESTOS CLAIMS; AND (IV) DEBTORS' MOTION FOR APPROVAL OF CONFIRMATION PROCEDURES**

Dated: December 22, 2004

BILZIN SUMBERG BAENA PRICE & AXELROD
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131-5340
Telephone: (305) 374-7580

Scott L. Baena (Admitted Pro Hac Vice)
Jay M. Sakalo (Admitted Pro Hac Vice)
Allyn S. Danzeisen (Admitted Pro Hac Vice)
and

FERRY, JOSEPH & PEARCE, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, Delaware 19899
Telephone: (302) 575-1555

Theodore J. Tacconelli (Bar No. 2678)

CO-COUNSEL FOR THE OFFICIAL
COMMITTEE OF ASBESTOS PROPERTY
DAMAGE CLAIMANTS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. ii

I. INTRODUCTION .......................................................................................... 1

II. OVERARCHING PLAN OBJECTIONS .................................................... 3

    A.    The Plan Impermissibly Classifies Class 8 as Unimpaired ...................... 4

    B.    The Plan Impermissibly Limits the Debtors' Liability to Asbestos
           Claimants at the Estimated Amounts of Such Claims and Related
           Trust Expenses ........................................................................................ 9

    C.    The Plan Fails to Comply with §524(g)(2)(B)(i)(III) .............................. 11

III. DISCLOSURE STATEMENT OBJECTIONS ........................................ 13

    A.    Section 1125 of the Bankruptcy Code Governs the Approval of a
           Disclosure Statement in a Chapter 11 Reorganization Case.................... 13

    B.    The Disclosure Statement Does Not Provide "Adequate
           Information" and Contains Numerous Omissions and
           Misstatements ........................................................................................ 15

IV. OBJECTIONS TO THE CMO MOTION ................................................ 43

V. OBJECTIONS TO THE ESTIMATION MOTION .................................... 49

    A.    Traditional Asbestos Property Damage Claims...................................... 50

    B.    ZAI Asbestos Property Damage Claims ................................................. 57

VI. OBJECTIONS TO THE PROCEDURES MOTION ............................... 59

CONCLUSION............................................................................................... 61

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adalman v. Baker Watts & Co.,*
  807 F.2d 359 (4th Cir. 1986) ................................................................. 52

*Barbanti v. W.R. Grace & Co.,*
  No. 00201756-6 (Wash, Super., Dec. 19, 2000)........................................ 58

*Chemetron Corp. v. Jones,*
  72 F.3d 341 (3d. Cir. 1995) ................................................................... 59

*Dayton Independent School District, et al. v. W.R. Grace & Co. et al.*...................... 47, 49

*Erie RR Co. v. Tompkins,*
  58 S. Ct. 817 (1938).............................................................................. 9

*Grogan v. Garner,*
  498 U.S. 279 (1991)............................................................................. 53

*Hygh v. Jacobs,*
  961 F.2d 359 (2d Cir. 1992) ................................................................. 52

*Ideal World Marketing, Inc. v. Duracell, Inc.,*
  15 F.Supp.2d 239, n. 2 (E.D.N.Y. 1998) ............................................... 52

*In re A.H. Robins Company,*
  880 F.2d 709 (4th Cir. 1998) ................................................................ 10

*In re American Solar King Corp.,*
  90 B.R. 808 (Bankr. W.D. Tex. 1988).................................................... 6

*In re Combustion Engineering, Inc.,*
  2004 WL 2743565 at *36 (3d Cir. Dec. 2, 2004) ............................. 8, 10, 11

*In re Eagle-Picher Indus., Inc.,*
  189 B.R. 681 (Bankr. S.D.Ohio 1995).............................................. 11, 56

*In re Initial Public Offering Securities Litigation,*
  174 F.Supp.2d 61 ............................................................................... 52

*In re Johns-Manville Corp.,*
  68 B.R. 618 (Bankr. S.D.N.Y. 1986)...................................................... 8

MIAMI 838668.3 7481715537

## TABLE OF AUTHORITIES
### (Continued)

Page

*In re Monclova Care Ctr., Inc.,*
254 B.R. 167 (Bankr. N.D. Ohio 2000) .......................................................... 7

*In re PPI Enters. (U.S.), Inc.,*
324 F.3d 197 (3rd Cir. 2003) ................................................................. 6, 7

*In re SGL Carbon Corp.,*
200 F.3d at 163 (3d Cir. 1999)................................................................. 51

*In re Smith,*
123 B.R. 863 (Bankr. C.D. Cal. 1991)....................................................... 7

*In re Stanley Hotel. Inc.,*
13 B.R. 926 (Bankr. D. Colo. 1981) ......................................................... 15

*In re The Seasons Apartments, L.P.,* 215
B.R. 953 (Bankr. W.D. La. 1997) ............................................................. 7

*In re Unichem Corp.,*
72 B.R. 95 (Bankr. N.D. Ill. 1987) .......................................................... 9

*In re Valrico Square Limited Partnership,*
113 B.R. 794 (Bankr. S.D. Fla. 1990) ...................................................... 9

*In re Zonolite Attic Insulation Products Liability Litigation,*
MDL No. 1376 (D. Mass).......................................................................... 59

*Jacaob v. City of New York,*
315 U.S. 752 ............................................................................................. 9

*Jones v. Chemetron Corp.,*
212 F.3d 199 at 205-06 ............................................................................. 53

*Kirbyville Independent School District, et al. v. Asbestospray Corp. et al.,*
Civil Action No. 1:94CV412 (U.S.D.C. E.D. Texas, Beaumont Div.) ................. 47, 49

*Krystal Cadillac-Oldsmobile GMC Truck, Inc v. General Motors Corp.,*
337 F.3d 314 (3rd. Cir. 2003) ................................................................... 14

*Lony v. E.I. Du Pont Nemours & Co.,*
935 F.2d 604 (3d Cir. 1991) .................................................................... 9

*Marx & Co. v. Diners' Club, Inc.,*
550 F.2d 505 (2d Cir. 1977) .................................................................... 52

Matter of M. Frenville Co., Inc.,
744 F.2d 332 (3d Cir. 1984) .................................................................... 53

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Motown Productions, Inc. v. CACOMM, Inc.*,
  668 F. Supp. 285 (S.D.N.Y. 1987) ............................................................... 52

*Mullane v. Central Hanover Trust Co.*,
  339 U.S. 306 (1950) ..................................................................................... 60

*Music Sales Corp. v. Morris*,
  73 F.Supp.2d 364 (S.D.N.Y. 1999) .............................................................. 52

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
  848 F.2d 414 (3rd Cir. 1988) ....................................................................... 14

*Piper Aircraft v. Reyno*,
  454 U.S. 235 (1981) ....................................................................................... 9

*Raleigh v. Illinois Dept. of Rev.*,
  530 U.S. 15 (2000) ....................................................................................... 53

*Scioto Valley*,
  88 B.R. 168 (Bankr. S.D. Ohio 1988) .......................................................... 15

*Specht v. Jensen*,
  853 F.2d 805 (10th Cir. 1988) ..................................................................... 52

*Sure-Snap Corp. v. State St. Bank and Trust Co.*,
  948 F.2d 869 (2nd Cir. 1991) ...................................................................... 14

*The State of Hawaii v. W. R. Grace & Co.-Conn,. et al.*,
  Civil No. 93-4161-10 (1st Cir. Hawaii) ....................................................... 51

U.S. Const. Amend. VII; *Chauffers, Teamsters and Helpers, Local No. 391 v. Terry*,
  494 U.S. 558 (l990) ........................................................................................ 9

*U.S. v. Leo,*
  941 F.2d 181 (3d Cir. 1991) ......................................................................... 52

*United States v. Zipkin,*
  729 F.2d 384 (6th Cir. 1984) ....................................................................... 52

*Vanston Bondholders Protective Committee v. Green,*
  329 U.S. 156 (1946) ..................................................................................... 53

## Other Authorities

11 U.S.C. §502(c) .................................................................................... passim

11 U.S.C. §524(g) ................................................................................... passim

11 U.S.C. §1124 ..................................................................................... 4, 6, 7

## TABLE OF AUTHORITIES
### (Continued)

**Page**

11 U.S.C. §1125.............................................................................................. 14

11 U.S.C. §1126 ................................................................................................ 3

11 U.S.C. §1129 ........................................................................................ passim

*The Manville Bankruptcy: Treating Mass Tort Claims in Chapter 11 Proceedings,*
   96 Harv.L.Rev. 1121, at n. 55 (1983)............................................................. 10

The Official Committee of Asbestos Property Damage Claimants (the "PD Committee"), by and through undersigned counsel, hereby files this Objection (the "Objection") to the Disclosure Statement for Debtors' Plan of Reorganization Pursuant to Chapter 11 of the United States Code, as well as to the Debtors' Motion for Entry of a Case Management Order Establishing Protocols for Litigating Asbestos-Related Claims Following Plan Confirmation; the Debtors' Motion for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief; and, the Debtors' Motion for Entry of an Order Approving Solicitation and Confirmation Procedures and Schedule, filed by the above-referenced debtors ("Grace" or the "Debtors").  In support hereof, the PD Committee would show as follows:

## I. INTRODUCTION

1.     On April 2, 2001 (the "Petition Date"), the Debtors commenced the instant proceedings by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the Clerk of this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  On the Petition Date, the Court entered an order authorizing the joint administration of these cases for procedural purposes.  No trustee or examiner has been appointed in these cases.

2.     On April 12, 2001, the United States Trustee for the District of Delaware (the "UST") appointed the PD Committee, the Official Committee of Asbestos Personal Injury Claimants (the "PI Committee") and the Official Committee of Unsecured Creditors.  On June 18, 2001, the UST appointed the Official Committee of Equity Security Holders.  On May 24, 2004, the Court appointed David T. Austern to serve as the Future Claimants Representative.

1

3.    On November 13, 2004, the Debtors filed their Plan of Reorganization and documents and motions relating thereto, including:

- The Debtors' Plan of Reorganization [D.I. 6895] (the "Plan");

- The Disclosure Statement for Debtors' Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [D.I. 6896] (the "Disclosure Statement");[1]

- The "Exhibit Book" [D.I. 6897], which contains numerous documents related to the Debtors' Plan of Reorganization and related Disclosure Statement, including an Asbestos Trust Agreement (Exhibit 5), the PI-SE Trust Distribution Procedures (Exhibit 6), the PI-AO Trust Distribution Procedures (Exhibit 7), and the PD Trust Distribution Procedures (Exhibit 8);

- The Debtors' Motion for Entry of a Case Management Order Establishing Protocols for Litigating Asbestos-Related Claims Following Plan Confirmation [D.I. 6898] (the "CMO Motion");

- The Debtors' Motion for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief [D.I. 6899] (the "Estimation Motion"); and

- The Debtors' Motion for Entry of an Order Approving Solicitation and Confirmation Procedures and Schedule [D.I. 6900] (the "Procedures Motion;" the CMO Motion, the Estimation Motion and the Procedures Motion being collectively referred to as the "Confirmation Motions").

---

[1]    Unless otherwise defined herein, capitalized terms shall the meanings ascribed thereto in the Glossary of Terms submitted by the Debtors with the Plan and Disclosure Statement.

4.      As set forth in greater detail herein below, the Disclosure Statement fails to set forth adequate information in sufficient detail to enable creditors to make an informed judgment about the Plan.   Moreover, as also detailed below, each of the Confirmation Motions suffers from fatal features that preclude its approval.   Most significantly perhaps, while the PD Committee reserves the right to object to the confirmation of the Plan on any grounds when (and if) required to do so by the Court, there are at least *three systemic deficiencies with the Plan* that are appropriately raised at this juncture as "overarching objections" to the Disclosure Statement and the Confirmation Motions, as follows:

- Through the Plan, the Debtors seek to treat the claims of  Holders of Asbestos PD Claims (also referred to herein as "PD Claimants") as unimpaired and thus disenfranchise such claimants from the right to vote on the Plan whether under 11 U.S.C. §§1126 and 1129(a)(7), or 11 U.S.C. §524 (g).

- In addition, by the Plan and the Estimation Motion, the Debtors seek to cap their liability for Asbestos PD Claims (also referred to herein as "PD Claims") at an amount *estimated* by the Court despite the requirement of 11 U.S.C. §524 (g) that the Debtors must fund the Asbestos Trust so that it can pay the *liquidated values* of *all* asbestos claims in full.

- The Plan fails to comply with 11 U.S.C. §524 (g)(2)(B)(i)(III) which requires that the Asbestos Trust be entitled to own a majority of the voting shares of each of the Debtors, the parent of the Debtors or a subsidiary of each such Debtor that is also a Debtor.

## II.  OVERARCHING PLAN OBJECTIONS

A.    **The Plan Impermissibly Classifies Class 8 as Unimpaired**

5.    Under the Plan, the Debtors contend that Asbestos PD Claims classified in Class 8 are unimpaired. Thus, according to the Debtors, Asbestos PD Claimants are not entitled to vote on the Plan and, adding insult to injury, PD Claimants are deemed to have accepted the Plan. Nowhere does the Plan or the Disclosure Statement explain the Debtors' rationale for such unsupportable and wishful thinking except for an allusion in the Disclosure Statement to the Debtors' contention that "[t]he Plan will pay all Claimants in full and will leave most Claimants, including Holders of Asbestos Claims, unimpaired," accompanied by a footnote which essentially invites the reader to consider section 1124 of the Bankruptcy Code. *See Disclosure Statement at §1.2.1.* Additionally, the Disclosure Statement does correctly observe that "Bankruptcy Code §524 (g) further provides that any separate class or classes of the claimants whose claims are to be addressed by a section 524(g) trust must vote, by at least 75 percent of those voting, in favor of the plan." *See Disclosure Statement at §7.2.* The Plan nonetheless fails to provide Asbestos PD Claimants whose claims are to be treated by such a trust under the Plan, the right to cast any votes.

6.    By the Plan, Asbestos Claims are divided into two categories: (1) Asbestos PI Claims and (2) Asbestos PD Claims.[2] Asbestos PI Claims are further divided by the Plan into two Classes: (1) Asbestos PI-SE Claims (a/k/a Asbestos Personal Injury Symptomatic/Eligible Claims), and (2) Asbestos PI-AO Claims (a/k/a Asbestos Personal Injury Asymptomatic/Other Claims).

---

[2]    Asbestos PD Claims include claims relating to Zonolite Attic Insulation ("ZAI"), as well as traditional property damage claims relating to the Debtors' other asbestos containing products. The interests of both holders of ZAI PD Claims and non-ZAI PD Claims are represented by the PD Committee.

7.      Section 7.6 of the Plan includes several conditions precedent to Confirmation of the Plan.  Of relevance here is Section 7.6.1, which includes Findings of Fact and/or Conclusions of Law which shall be set forth in the Confirmation Order and serve as conditions to the effectiveness of the Plan, including findings by the Court, as follows:

(i)      that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1,483,000,000; and

(ii)      that the Asbestos PI-AO Class Fund is not greater than $130,000,000.[3]

8.      In addition, Section 7.6.2 of the Plan includes the Orders of the Court that must be entered prior to Confirmation of the Plan.  These, in relevant part, include:

(d)      The Court shall have entered the Estimation Order in form and substance acceptable to the Debtors, including the following findings:

(i) The Asbestos PI-SE Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PI-SE Claims;

(ii) The Asbestos PD Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay all Allowed Asbestos PD Claims; and

(iii) The Asbestos Trust Expenses Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all expenses of the Asbestos Trust.

9.      Thusly, through the Plan and the Confirmation Motions, the Debtors promote the fiction that claims of the Asbestos PD Claimants will be paid in full, based

---

[3]      The Estimation Motion "proposes procedures for estimating asbestos personal injury claims (both Asbestos PI-SE and Asbestos PI-AO Claims)."  *See Estimation Motion* at ¶5.  While the definitions of "Asbestos PI-SE Claims "and "Asbestos PI-AO Claims" in the Glossary of Terms Used in Plan Documents filed by the Debtors are inclusive of future demands, those definitions will necessarily need to be revised if the Court determines that holders of present Asbestos PI-SE and Asbestos PI-AO Claims---as well as Asbestos PD Claims---should be deemed impaired and thus, entitled to vote on the Plan, as posited by the PD Committee herein.  Should that occur the Estimation Motion also will necessarily need to be amended to provide for the estimation of future demands.

upon a capped estimation of the total asbestos PD liability and the absence of any recourse against the Reorganized Debtors if the aggregate of the liquidated values of PD Claims exceeds the estimated value thereof. As a result of the Debtors' position that Asbestos PD Claims will be paid in full, the Plan provides that the Holders of Asbestos PD Claims (as well as Holders of Asbestos PI-SE Claims and Asbestos PI-AO Claims) will be deemed unimpaired and unable to vote on the Plan. The PD Committee disputes that the Plan is confirmable because of these (and other) provisions. Moreover, the PD Committee objects to the Procedures Motion as it seeks approval of solicitation and balloting of the Plan only in respect of Class 9 General Unsecured Claims and Class 10 Equity Interests in the Parent, neglecting altogether Class 8 Asbestos PD Claims.

10. 11 U.S.C. §1124, which deals with the impairment of classes of claims under a plan, provides in pertinent part that "a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan . . . leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. §1124(a)(1). Under this broad standard, even the *slightest* alteration of a claimant's rights renders its claim "impaired" and therefore entitles the claimant to vote on a plan. *See, e.g., In re American Solar King Corp.*, 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988) ("The Bankruptcy Code defines 'impairment' broadly, thereby maximizing creditor participation in the confirmation process, i.e., *even the smallest impairment nonetheless entitles a creditor to participate in voting*.") (emphasis added).

11. The Third Circuit has held that the Bankruptcy Code creates a "presumption of impairment" to enable creditors to vote on a plan. *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 203 (3rd Cir. 2003). In recognition of this presumption, one

court noted that "if a debtor (or a trustee for the debtor) chooses to classify a creditor's claim as unimpaired so as to prevent that creditor from voting on the debtor's plan of reorganization, *then that debtor also assumes all the legal obligations to which the creditor is entitled to under their claim.*" *In re Monclova Care Ctr., Inc.,* 254 B.R. 167, 179 (Bankr. N.D. Ohio 2000) (emphasis added), *rev'd in part on other grounds*, 266 B.R. 792 (N.D. Ohio 2001); *see also In re The Seasons Apartments, L.P.*, 215 B.R. 953, 958 (Bankr. W.D. La. 1997) ("In Chapter 11, claims are presumed to be impaired (and thus generally entitled to vote on the plan) unless one of the conditions in 11 U.S.C. §1124 are met."). Accordingly, "[t]he burden is placed on the debtor to demonstrate the plan leaves the creditor's rights unaltered." *PPI Enters.*, 324 F.3d at 203.

12.     Courts have also held that a chapter 11 plan which purports to leave a claim "unimpaired" by providing that the claimant's legal, equitable, and contractual rights are unaltered, but does not provide for the full payment of that claim to the extent allowed, does not truly render the claim unimpaired under section 1124 of the Bankruptcy Code. *See, e.g, In re Smith*, 123 B.R. 863, 867 (Bankr. C.D. Cal. 1991) ("[A] plan may limit payment of claims to 'the extent allowed,' without impairing them; for until claims are allowed, or deemed allowed, the holders thereof are not entitled to distribution from the bankruptcy estate. *However, impairment results if the plan denies claimholders the right to payment to the extent their claims are ultimately allowed.*") (emphasis added).

13.     Moreover, there does not appear to be a single published decision in the asbestos or mass tort bankruptcy context in which a class of tort claimants whose recourse was channeled exclusively to a trust was designated "unimpaired" under the plan (and thereby disenfranchised). These classes not only were entitled to vote on the

plan but were treated as critical constituencies in the confirmation process.  *See, e.g.,*

*A.H. Robins Co.*, 88 B.R. 742 (E.D. Va. 1988); *In re Johns-Manville Corp.*, 68 B.R. 618

(Bankr. S.D.N.Y. 1986).  In discussing the concepts of artificial impairment of a class of

creditors under a plan and cramdown under section 1129(a)(10) of the Bankruptcy Code,

the Third Circuit in its recent decision in *In re Combustion Engineering, Inc.* provided the

following guidance which is equally applicable to "artificial unimpairment" as is

attempted by the Debtors under the Plan:

> "The purpose of [11 U.S.C. § 1129(a)(10)] is 'to provide some
> indicia of support [for a plan of reorganization] by affected creditors and
> prevent confirmation where such support is lacking.'" (*citations omitted*).
> As such, § 1129(a)(10) requires that a plan of reorganization pass muster
> in the opinion of creditors whose rights to repayment from the debtor are
> implicated by the reorganization. By providing impaired creditors the right
> to vote on confirmation, the Bankruptcy Code ensures the terms of the
> reorganization are monitored by those who have a financial stake in its
> outcome.

*In re Combustion Engineering, Inc.*, 2004 WL 2743565 at *36 (3d Cir. Dec. 2, 2004).

14.    It cannot be gainsaid that Asbestos Claimants have the largest stake in the

outcome of this chapter 11 case even after giving effect to the Debtors' proposed methods

"to define the Debtors' true liability to Asbestos Claimants" under the Confirmation

Motions.  *See Estimation Motion at ¶1.*  Indeed, per the Debtors, this bankruptcy was

filed for the sole and express purpose of "managing" their asbestos litigation and

avoiding the problems they would continue to face if forced to defend and resolve claims

in the same setting as ordinary litigants.  *See Debtors' Informational Brief*, dated April 2,

2001 [D.I. 6].  Notwithstanding, by the Plan and the Confirmation Motions, the Debtors

would deem Asbestos PD Claimants, and (other Asbestos Claimants) unimpaired despite

the channeling of all PD Claims to a 524 (g) trust; despite the abrogation of PD

Claimants' right to litigate their claims in the tort system;[4] and, despite the limitation that distributions to all PD Claimants shall not exceed the amount of the Asbestos PD Fund which is to be derived by way of an estimation---and not liquidation---of PD Claims, even if the aggregate liquidated value of all such Claims exceeds the Asbestos PD Fund. Clearly, such alterations of the legal and equitable rights of PD Claimants are more than "slight" and preclude the disenfranchisement of PD Claimants from voting on the Plan.

15.    Accordingly, the Plan cannot be confirmed so long as it does not provide for the right of Asbestos PD Claimants to vote on it and no further proceedings in respect of the Plan should be undertaken in deference to judicial economy and the preservation of the resources of the Debtors' estates.   *See In re Valrico Square Limited Partnership*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990); *In re Unichem Corp.*, 72 B.R. 95, 98 (Bankr. N.D. Ill. 1987), *aff'd*, 80 B.R. 448 (Bankr. N.D. Ill. 1987).

**B.    The Plan Impermissibly Limits the Debtors' Liability to Asbestos Claimants at the Estimated Amounts of Such Claims and Related Trust Expenses**

16.    By limiting the recoveries of Asbestos Claimants to the estimated amount of Asbestos Claims and related trust expenses, the Plan runs afoul of section 524(g) of the Bankruptcy Code which requires that a qualified asbestos settlement trust "is to be funded in whole or in part by the securities of one or more of the debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including

---

[4]    *See Piper Aircraft v. Reyno*, 454 U.S. 235, 241 (1981) ("a plaintiff's choice of forum should rarely be disturbed"); *Lony v. E.I. Du Pont Nemours & Co.*, 935 F.2d 604, 609 (3d Cir. 1991) (reversing lower court's decision dismissing action due to court's failure to give deference to plaintiff's choice of forum). See U.S. Const. Amend. VII; *Chauffers, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 578-81 (l990) (J. Brennan concurring and discussing the history of the Seventh Amendment's guarantee to the right to a jury trial); *Jacaob v. City of New York*, 315 U.S. 752, 752-753 (any attempt to curtail a civil party's right to a jury trial must be "scrutinized with the utmost care."); *Erie RR Co. v. Tompkins*, 58 S. Ct. 817, 822 (1938) (federal courts should apply substantive state law).

dividends."[5]   11 U.S.C. §524 (g)(2)(B)(i)(II).   As explained by the Third Circuit in its recent decision in *In re Combustion Engineering*:

> In theory, a debtor emerging from a Chapter 11 reorganization as a going-concern cleansed of asbestos liability will provide the asbestos personal injury trust with an "evergreen" source of funding to pay future claims.  This unique funding mechanism makes it possible for future asbestos claimants to obtain substantially similar recoveries as current claimants in a manner consistent with due process.  To achieve this relief, a debtor must satisfy the prerequisites set forth in § 524 (g) in addition to the standard plan confirmation requirements.

2004 WL 2743565 at *28 (footnotes omitted).

17.   While there is no dispute that section 502(c) of the Bankruptcy Code authorizes the estimation of contingent or unliquidated claims,  "the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case," clearly, that section was intended to be used on a *claim by claim basis*.  *See* 11 U.S.C. 502(c).  It has been noted:

> Nothing in the legislative history [of section 502(c)] indicates that Congress foresaw the predicament in which Manville placed the bankruptcy court. *(citation omitted)*. It is also noteworthy that the proposed Bankruptcy Rules contain no provision for the method of estimating claims. The drafters of the Rules, like Congress, seem to have failed to anticipate the Manville-type situation.

*The Manville Bankruptcy: Treating Mass Tort Claims in Chapter 11 Proceedings,* 96 Harv.L.Rev. 1121, at n. 55 (1983).

18.   Notwithstanding, out of practical necessity, the courts have embraced section 502(c) as a means of assigning a dollar value to the whole of a debtor's mass tort liabilities since the Fourth Circuit's opinion in *In re A.H. Robins Company,* 880 F.2d 709 (4th Cir. 1998).  We are unaware, however, of a single asbestos bankruptcy case in which

---

[5]   The Court clearly did not contemplate such a result.  Indeed, at a hearing before the Court on February 25, 2002, the Court stated: "In order to meet the confirmation standards, somebody has to show me what the hopefully close to accurate estimation of [property damage] claims will be so that I know whether the Debtor has funded appropriately to pay those claims once they are allowed." *Transcript at 81.* The Court was obviously making the distinction between the estimation of asbestos claims and the subsequent liquidation of asbestos claims, recognizing that the two may ultimately prove to be different.

a court has treated the estimation of asbestos claims as a limitation on the amount recoverable by asbestos claimants. Indeed, in *Eagle-Picher,* the court instructed that "the purposes of estimation of asbestos claims are, first, so that a proper allocation of plan funding can be made as between the unsecured creditors and the [524 (g) trust] created by the plan, and, second, whether there is any equity available for equity security holders." *See In re Eagle-Picher Indus., Inc.*, 189 B.R. 681,682 (Bankr. S.D.Ohio 1995). On that basis, the court in *Eagle-Picher* "would not decide liability or assign a permanently fixed value for such claims." *Id.*

19.    Of course, the Debtors' are free to promulgate a plan of reorganization that *conditions its effectiveness* on the estimated aggregate amount of Asbestos Claims not exceeding a prescribed value. While such a provision may serve to advance the Debtors' agenda as to the split between Asbestos Claimants and other holders of claims and interests, and may even relate to feasibility of the plan under section 1129(a)(11) of the Bankruptcy Code, it does not and cannot serve the illegitimate purpose of liquidating the amount of individual Asbestos Claims for purposes of distributions under the plan. Rather, if the Debtors wish to avail themselves of section 524(g), each Asbestos Claim must be allowed and paid by the Asbestos Trust and if the aggregate of such Claims exceed their estimated aggregate values, the Reorganized Debtors must provide a means for the payment of such excess. *See Combustion Engineering,* 2004 WL 2743565 at *28.

### C.    The Plan Fails to Comply with §524(g)(2)(B)(i)(III)

20.    By the Plan, the Asbestos PD Fund is purportedly to be funded by the Sealed Air Payment and the Debtors' Payment, which includes, in part, the Parent Common Stock. Concerning the Parent Common Stock, pursuant to section 524(g)(2)(B)(i)(III) of the Bankruptcy Code, the Asbestos Trust "is to own, or by the

exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of (aa) each such debtor; (bb) the parent corporation of each such debtor; or (cc) a subsidiary of each such debtor that is also a debtor. . . ."  However, under the terms of the Plan, the Asbestos Trust could never own a majority of the Parent Common Stock.

21.    More specifically, according to the Plan, the Asbestos Trust is to be funded as follows:

(i)    On the Effective Date, the Sealed Air Payment[6] will be made, and

(ii)    On the 31st day after the Effective Date, the Debtors shall deliver the Debtors' Payment, which is comprised of:

(a)    the difference between the value of the Sealed Air Payment and the Asbestos Trust Aggregate Fund,[7] which difference will be funded by (I) Warrants in an amount sufficient to fund the Asbestos PI-AO Class Fund,[8] and (II) Parent Common Stock, and

(b)    additional Warrants in an amount such that, upon the payment of the Sealed Air Payment and the Debtors' Payment into the Asbestos Trust, the Parent Common Stock and Warrants (*if exercised*) that make up the

---

[6]    The Sealed Air Payment is comprised of $512,500,000 in Cash, plus interest thereon at 5.5% compounded annually, from December 21, 2002 until the Effective Date, plus 9,000,000 shares of Sealed Air Common Stock (subject to certain adjustments).  Pursuant to section 2.8.2.6 of the Disclosure Statement, the Debtors attribute a value of $855,000,000 to the Sealed Air Payment, which apparently is based upon the cash value, without interest accrued thereon and the stock price at the time the settlement was reached.  Sealed Air's common stock is now trading above $50/share, which would make the value of the settlement exceed $950 million, not including accrued interest thereon.  However, in order to provide the Debtors with every benefit of the doubt to prove the illusory nature of the Warrants and their failure to comply with the requirements of section 524(g)(2)(B)(i)(III), we will utilize the valuation the Debtors place on the Sealed Air Payment.

[7]    Pursuant to Section 7.6.1(v) of the Plan, as a condition precedent to confirmation of the Plan, the Court shall enter an order that the Asbestos Trust Aggregate Fund is not greater than $1,483,000,000.

[8]    Pursuant to Section 7.6.1(w) of the Plan, as a condition precedent to confirmation of the Plan, the Court shall enter an order that the Asbestos PI-AO Class Fund is not greater than $130,000,000.

Debtors' Payment would constitute the majority of the issued and outstanding voting shares of the Reorganized Parent.

22.     According to section 2.8.2.6 of the Disclosure Statement, the fully diluted value of the Reorganized Debtors will be between $1.748 billion and $2.178 billion. For purposes of illustration, we assume the low point of the Debtors' estimated reorganized value[9] and the maximum allowable amount of estimated Asbestos Claims.

| | | |
|---|---|---|
| Sealed Air Payment | $855,000,000 | |
| Warrants for PI-AO Fund | 130,000,000 | (7.43% of outstanding equity) |
| Parent Common Stock | 498,000,000 | (28.5% of outstanding equity) |
| Asbestos Trust | | |
| Aggregate Fund | $1,483,000,000 | |

23.     By applying the foregoing values, it is clear that the Asbestos Trust will *never* exercise the Warrants due to the artificially capped Asbestos Trust Aggregate Fund.  That is, under the Plan, the Warrants will never be needed to fund the Asbestos Trust Aggregate Fund and the Warrants are, therefore, *wholly illusory*.

## III.  DISCLOSURE STATEMENT OBJECTIONS

### A.     Section 1125 of the Bankruptcy Code Governs the Approval of a Disclosure Statement in a Chapter 11 Reorganization Case

24.     Section 1125(b) of the Bankruptcy Code requires that a disclosure statement contain "adequate information."  In pertinent part, section 1125(b) of the Bankruptcy Code provides that:

---

[9]     By assuming the low point in the estimated range of values of the Reorganized Debtor, we are, again, giving the Debtors the benefit of the doubt by increasing the percentage ownership of the Asbestos Trust.

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. §1125(b).

Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan. . .

11 U.S.C. § 1125(a)(1).

25.     Precisely what constitutes adequate information must be determined by the facts and circumstances of each case.  *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3rd Cir. 1988), *cert. denied*, 488 U.S. 967 (1988).  "The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the [C]ourt.  Given this reliance, [the Court] cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'" *Oneida* at 417.

26.     To satisfy the Bankruptcy Code's standard of "adequate information," section 1125(b) requires plan proponents to "file a mandatory disclosure statement listing all 'adequate information' which would enable holders of claims to take an informed position on a proposed reorganization plan." *Sure-Snap Corp. v. State St. Bank and Trust Co.*, 948 F.2d 869, 873 (2nd Cir. 1991); *see also Krystal Cadillac-Oldsmobile GMC Truck, Inc v. General Motors Corp.*, 337 F.3d 314, 322 (3rd. Cir. 2003).  In this regard,

the disclosure statement should reveal "all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." *Scioto Valley*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988) (citing *In re Stanley Hotel. Inc.*, 13 B.R. 926, 929 (Bankr. D. Colo. 1981).

### B.   The Disclosure Statement Does Not Provide "Adequate Information" and Contains Numerous Omissions and Misstatements

27.    By any standard, the Disclosure Statement does not provide adequate information, as required by section 1125 of the Bankruptcy Code, such that voting constituencies may make an informed judgment as to whether to accept or reject the Plan. The Disclosure Statement is best characterized as being short on understandable explanations of critical aspects of the Plan and replete with omissions that are necessary to allow creditors to determine how to vote or challenge the Plan.

28.    For ease of reference, the multitudinous deficiencies of the Disclosure Statement are set forth below by way of matrix, with the defects noted in the order in which they appear in the Disclosure Statement, not necessarily in the order of their significance.

| Section | Mischaracterization/Omission/Objection |
|---|---|
| "Asbestos Trust Aggregate Fund"[10]  - - Numerous Sections of Disclosure Statement | • Per the Debtors, the linchpin of the Plan is a finding by the Court that the aggregate amount of the Asbestos PI-SE Claims, Asbestos PD Claims and Asbestos Trust Expenses Fund does not exceed $1.483 billion. This cap on the amount of all Asbestos Claims, other than Asbestos PI-AO |

[10]    The Disclosure Statement refers to the Asbestos Trust Aggregate Fund in myriad sections and, thus, for convenience, this Objection addresses the inadequacies of the disclosures with respect to the Fund at this point.

| Section | Mischaracterization/Omission/Objection |
|---|---|
| | Claims, permeates throughout the Disclosure Statement and the Plan.<br><br>• Notwithstanding, the Debtors altogether fail to explain anywhere in the Disclosure Statement how they arrived at the wholly artificial ceiling on the Asbestos Trust Aggregate Fund, leading to the conclusion that it was plucked out of thin air. The failure to explain the bases for the Fund is a fundamental omission. |
| 1.2.1<br><br>"What Claims and Interests are Affected by the Plan" | • The Disclosure Statement provides that the Plan "will leave most Claimants, including Holders of Asbestos Claims, unimpaired." However, as discussed elsewhere in greater detail, the Plan actually impairs most Claimants, including Holders of Asbestos Claims. Thus, this section is patently false and misleading. At a minimum, this section must be corrected to explain the alternative view that the Plan impairs most Claimants, which, if correct, would allow such Claimants to vote on the Plan.<br><br>• The chart provided on pages 2-5 purports to summarize "the classification and treatment of Claims and Equity Interests under the Plan." However, as explained herein, the treatment of the Holders of Asbestos Claims as unimpaired under the Plan is legally impermissible, thus |

| Section | Mischaracterization/Omission/Objection |
|---|---|
| | making the Plan patently unconfirmable on its face, which renders the chart a nullity. |
| 2.3.3<br><br>"Zonolite Attic Insulation" | • This section provides a one-sided view of one of the Debtors' asbestos containing products---Zonolite Attic Insulation ("ZAI").    The Debtors describe ZAI as "contain[ing] trace quantities of asbestos and that the "milling and expansion processes removed nearly all of the asbestos contaminants from the vermiculite ore."    In fact, ZAI has been found to contain 2-3% asbestos and, at times, even higher levels of asbestos.<br><br>• However, as the Court is well aware, ZAI has been the subject of intense litigation throughout these cases, including a summary judgment hearing concerning, among other things, the harmful nature of ZAI.  During the course of the ZAI litigation in these cases, substantial evidentiary support has been introduced that clearly contradicts the Debtors' statements in this section.  A ruling has not yet been issued on the summary judgment motions.  Thus, the Debtors should be required to include a description of the contrary evidence and arguments regarding the harmful nature of ZAI. |
| 2.4<br><br>"The Debtors' | • The Debtors' description of its historical asbestos-related |

| **Section** | **Mischaracterization/Omission/Objection** |
|---|---|
| Asbestos-Related Litigation" | litigation is grossly inadequate and fails to include any specific information or data.<br><br>• For example, the Debtors state that they "faced a substantial volume of Asbestos Claims, but were able to resolve such Claims primarily through negotiated settlements." However, the Debtors fail to provide any detail regarding their settlement and trial history with respect to Asbestos Claims. The Debtors should be required to provide a summary (at least by way of a chart) of the amounts they paid pre-petition in respect of Asbestos Claims, by category (i.e., PD Claims and PI Claims), including a breakdown of indemnity costs and defense costs.<br><br>• The summary chart will permit creditors to conduct their own assessment regarding the legitimacy of the Debtors' artificially created cap they seek to impose on the Allowed amount of Asbestos Claims, as more fully discussed in this Objection. |
| 2.4.1<br><br>"Asbestos Personal Injury Litigation" | In the last sentence of this section, the Debtors assert that they "believe that the Asbestos Trust Assets, when administered in a manner consistent with the TDPs, will be sufficient to satisfy all legitimate Asbestos PI Claims." However, the Debtors fail to |

| **Section** | **Mischaracterization/Omission/Objection** |
|---|---|
| | provide any basis for their "belief."  Moreover, the Debtors omit any discussion or comparison of the purported value of PI Claims under the relevant proposed TDPs and the estimate of such Claims in the tort system. |
| 2.4.2<br><br>"Asbestos Property Damage Litigation" | This section fails to disclose that of the eight asbestos property damage lawsuits that were pending as of the Petition Date, certain of them were class actions, involving thousands of buildings around the nation.  The Debtors should be required to describe, with specificity, the nature and extent of the class action lawsuits, including the status of each case. |
| 2.4.3<br><br>"Litigation Related to Zonolite Attic Insulation" | This section fails to disclose any information regarding the status of the ZAI class action lawsuits.  The Debtors should be required to describe, with specificity, the nature and extent of the class action lawsuits, including the status of each case. |
| 2.5.1.3<br><br>"The Settling Federal Agencies' Consent Decree" | • In describing the contemplated Consent Decree between the Debtors and the Settling Federal Agencies, the Debtors state that the Consent Decree would settle "various claims" that the Settling Federal Agencies "have asserted against the Debtors with respect to certain costs incurred or to be incurred by the Settling Federal Agencies in the course of responding to releases and threats of releases of hazardous substances into the environment for approximately 35 |

| Section | Mischaracterization/Omission/Objection |
|---------|----------------------------------------|
| | sites." <br><br> • However, the Debtors fail to disclose which sites are at issue with respect to the Consent Decree.  Moreover, as it is uncertain whether an agreement will be reached with the Settling Federal Agencies, the Debtors fail to disclose the range of possibilities of their exposure in the event an agreement is not reached.  Considering the magnitude of the Debtors' historical environmental liabilities, it is critical for the Debtors to inform their creditors of the potential liability for environmental contamination at these sites. |
| 2.5.1.6 <br><br> "Environmental Insurance Litigation" | This section states that the Debtors were a party to three environmental insurance coverage actions as of the Petition Date, all of which have been stayed as a result of the bankruptcy filing. The Debtors fail to disclose the amount of potential coverage available, what types of environmental claims are covered by such insurance policies, and the range of possible outcomes of the litigation.  Given the breadth and scope of the environmental issues facing the Debtors, and their potential impact on the Reorganized Debtors because of their "pass-through" nature under the Plan, it is essential that this information be provided. |
| 2.5.2 <br><br> "Fraudulent Transfer Litigation" | • In this section, the Debtors summarily describe the fraudulent transfer lawsuits brought by the PD Committee |

| **Section** | **Mischaracterization/Omission/Objection** |
|---|---|
| | and the PI Committee against Sealed Air and Fresenius. Significantly, however, this section omits the potential ramifications of the Debtors' objections to the Sealed Air Settlement Agreement if sustained. |

    o   First, the Debtors intervened in the Sealed Air litigation *as a defendant* and opposed the Asbestos Committees in seeking to recover on account of the fraudulent transfer. Second, after the lawsuit was settled and the Asbestos Committees and Sealed Air extensively negotiated the terms of a Settlement Agreement that would bring in excess of $1 billion into the Debtors' estates, the Debtors refused to become a party to the Settlement Agreement.

    o   The Sealed Air Payment is the linchpin to funding the Asbestos Trust under the Plan. Indeed, under the Plan, the Debtors need not make the Debtors' Payment to the Asbestos Trust if the amount of the Asbestos Trust Aggregate Fund does not exceed the Sealed Air Payment. It defies credulity that the Debtors would oppose a settlement, without which, the Plan is patently unfeasible.

    o   The Debtors should be required to describe the

| **Section** | **Mischaracterization/Omission/Objection** |
|---|---|
| | impact on the Plan if the Court does not approve the Sealed Air Settlement Agreement in its current form and Sealed Air does not agree to a reformulated settlement. Under that scenario, it is clear that *the Plan cannot be confirmed* and the Debtors should be required to include that possibility in its description of the litigation. |
| | o    Moreover, the description of the Debtors' objections to the terms of the Sealed Air Settlement Agreement simply overstates their grounds for objecting. The Debtors state the terms of the Agreement would "expos[e] the Debtors to potentially significant penalties and the Debtors' management to potential personal and criminal liability." However, the Debtors misunderstand the terms of the Settlement Agreement, as there was no complicity amongst the settling parties to cause the Debtors to commit unlawful acts. Indeed, neither of two bullet point arguments set forth by the Debtors suggests any unlawful acts that the Settlement Agreement, if approved, would cause the Debtors to commit. |

| Section | Mischaracterization/Omission/Objection |
|---------|----------------------------------------|
| | • In addition, the Disclosure Statement fails to disclose material inconsistencies between the Sealed Air Settlement Agreement and the Plan, including: <br><br> • Proper Payor <br><br>     o The payor required by the Sealed Air Settlement Agreement is different than the payor under the Proposed Plan.  Section 7.2.2. of the Plan provides that "Sealed Air shall fund the Sealed Air Payment . . . ."  Paragraph 170 of the Glossary of Defined Terms defines Sealed Air as "Sealed Air Corporation and Cryovac, Inc."  The Sealed Air Settlement Agreement, however, specifically provides that only *Cryovac, Inc.* shall make the Sealed Air Settlement Payment and that Sealed Air Corporation shall guarantee the performance of the obligation of Cryovac, Inc. to make such payment.  Further, paragraph II(c) of the Sealed Air Settlement Agreement provides that the obligation of *Cryovac, Inc.* to make the payment is conditioned upon the happening of all of the events enumerated in that paragraph.  The Disclosure Statement does not disclose these significant |

| **Section** | **Mischaracterization/Omission/Objection** |
|---|---|
| | inconsistencies between the terms of the Proposed Plan and the Sealed Air Settlement Agreement.<br><br>o  The channeling injunction under the Plan conflicts with the requirements of the Sealed Air Settlement Agreement. Various subparagraphs of paragraph II(c) of the Sealed Air Settlement Agreement require the establishment and continuation of section 524(g) trusts, and the receipt by the Sealed Air Companies of "the full benefit of an injunction under sections 524(g) and 105(a) of the Bankruptcy Code." (Paragraph II(c)(vi); *see also* II(c)(viii), (ix), (x), (xi).) Although the Disclosure Statement appears to describe injunctive relief that comports with the requirements of the Sealed Air Settlement Agreement (*see, e.g.*, Disclosure Statement paragraph 4.8.2), the Debtors' Glossary of Defined Terms, at paragraph 7, defines "Asbestos Channeling Injunction" as the "order(s) entered or affirmed by the District Court, in accordance with and pursuant to Bankruptcy Code §§ 524(g), 105(a) and/*or* 1141 *or otherwise* . . . ." (emphasis added). The use of the disjunctive term "or" in the |

| Section | Mischaracterization/Omission/Objection |
|---------|----------------------------------------|
| | definition creates the possibility that Debtors may seek an Asbestos Channeling Injunction that is not grounded in sections 524(g) **and** 105(a) of the Bankruptcy Code.  The Disclosure Statement does not disclose this significant inconsistency between the Plan and the Sealed Air Settlement Agreement. |
| | • <u>Unilateral Right to Ignore Terms of Settlement Agreement</u> |
| |    o  In the last paragraph of Section 11.6 of the Plan, the Debtors and Reorganized Debtors reserve to themselves, unilaterally, the right to take positions inconsistent with the Sealed Air Settlement Agreement if they "reasonably believe in their professional judgment that the taking of such action or the failure to take an action would expose the Debtors or the Reorganized Debtors to potential civil or criminal liability."  Stated otherwise, with the Plan, the Debtors would not bind themselves to the provisions of paragraphs VI(h), (i), (j), (k), and (l) of the Sealed Air Settlement Agreement.  Even if Debtors were to argue that the Plan somehow provides for an assumption by them of such provisions, any such assumption would be illusory. |

| Section | Mischaracterization/Omission/Objection |
|---|---|
| | The Disclosure Statement fails to disclose this inconsistency between the Proposed Plan and the Sealed Air Settlement Agreement.<br><br>• Debtors' Consent to Settlement Agreement is Illusory Because of Unilateral Right to Withdraw<br><br>    o  The first paragraph of Section 11.6 of the Plan provides, *inter alia*, that Debtors, Reorganized Debtors, and the Asbestos Trust shall treat the Sealed Air Settlement Payment as an ordinary and necessary expense of the Sealed Air Companies. Section 11.6 further (a) prohibits Debtors, Reorganized Debtors, and the Asbestos Trust from taking any "Defined Actions" (as that term is defined in paragraph I(dd) of the Sealed Air Settlement Agreement) that are inconsistent with the Sealed Air Settlement Agreement and (b) requires them to take all "Defined Actions" reasonably requested by the Sealed Air Companies, subject to certain conditions. The first paragraph of Section 11.6 also provides that tax returns of Debtors, Reorganized Debtors, and the Asbestos Trust are required to be consistent with the Sealed Air Settlement Agreement and Debtors are required |

| Section | Mischaracterization/Omission/Objection |
|---|---|
| | to use their best efforts to "structure the transactions contemplated by the Sealed Air Settlement Agreement to achieve favorable tax treatment to . . . Sealed Air." |
| | o  The second paragraph of Section 11.6 of the Plan in substance requires Debtors, Reorganized Debtors, and the Asbestos Trust to notify the Sealed Air Companies promptly of any notice of a threatened or pending challenge by any tax authority to the foregoing tax treatment, and entitles the Sealed Air Companies to participate in any such challenge. |
| | o  The third paragraph of Section 11.6 of the Plan requires Debtors to account in their books and records for the liabilities satisfied by the Sealed Air Settlement Payment and the transfer of such payment to the Asbestos Trust in a manner consistent with the Sealed Air Settlement Agreement. |
| | o  The foregoing provisions, on their face, appear to be consistent with paragraph VI of the Sealed Air Settlement Agreement (*see, e.g.,* paragraphs VI(b) and (g) regarding tax and financial reporting; VI(c) |

| Section | Mischaracterization/Omission/Objection |
|---|---|
| | regarding tax controversies; and VI(e) regarding financial reporting). |
| | o The Disclosure Statement, however, fails to disclose that the foregoing provisions in the Plan are illusory because, as noted above, in the last paragraph of Section 11.6 of the Plan, Debtors and Reorganized Debtors give themselves the unilateral right to take positions inconsistent with the Sealed Air Settlement Agreement – the last sentence of Section 11.6 is a term that Debtors tried, unsuccessfully, to negotiate into the Sealed Air Settlement Agreement before it was finalized. |
| | o The Disclosure Statement also fails to disclose that the Sealed Air Settlement Agreement already provides an objective standard for protecting Debtors and Reorganized Debtors if a tax and reporting obligation issue arises in connection with the transactions required by the Sealed Air Settlement Agreement. For example, if Debtors were to notify Sealed Air that they did not agree that the Sealed Air Settlement Payment constituted an ordinary and necessary expense of Cryovac, Inc., |

| Section | Mischaracterization/Omission/Objection |
|---------|----------------------------------------|
| | then Debtors would not have to treat the Sealed Air Settlement Payment in the manner required in the Sealed Air Settlement Agreement unless Sealed Air delivered a tax opinion, addressed to Debtors from a nationally recognized law firm (or similar writing from a nationally recognized accounting firm, in the case of financial reporting issues), to the effect that there is "substantial authority" for the position that Debtors and Reorganized Debtors are obligated to undertake (or, in the case of a financial reporting matter, "not inconsistent with generally accepted accounting principles").[11]  *See* Sealed Air Settlement Agreement, paragraph VI(b) (first and second sentences).<br><br>o Additionally, the Disclosure Statement fails to disclose that the Sealed Air Settlement Agreement includes a provision requiring Debtors to raise tax and reporting issues with Sealed Air ***prior to*** incurring the expense of obtaining a legal opinion or other written advice.  *See* Sealed Air Settlement Agreement, paragraph VI(f).  In other words, the |

---

[11]    "Substantial authority" is the standard that generally avoids the imposition of penalties for federal income tax purposes.

| Section | Mischaracterization/Omission/Objection |
|---------|----------------------------------------|
| | Sealed Air Settlement Agreement contemplates that Debtors and Sealed Air will consult with each other in order to avoid any unnecessary misunderstandings and to avoid, to the extent possible, the "dueling experts" problem that sometimes arises in these situations. |
| |  o Thus, the Disclosure Statement fails to disclose (a) the illusory nature of Debtors' consent to consistency, (b) that the approach they now proffer was previously rejected by the Sealed Air Companies, (c) that the Sealed Air Settlement Agreement provides a typical and objective standard for releasing Debtors from their obligations under that agreement, and (d) that Debtors' unilateral subjective approach is inconsistent with the Sealed Air Settlement Agreement. |
| 2.5.3.2.4<br><br>"State Income Tax Claims" | This section provides that the Debtors are subject of "significant" state income tax Claims, and that the Debtors believe such Claims "can and should" be resolved for significantly less than the amount claimed.   However, the Debtors fail to include the amounts claimed, a range of possible settlement values and a time frame for |

| Section | Mischaracterization/Omission/Objection |
|---------|----------------------------------------|
| | when they believe the Claims can be resolved.  Similar to the environmental liabilities, as these Claims are to be "passed-through" under the Plan, if these Claims are significant, they could materially impact the Reorganized Debtors. |
| 2.7.2.4<br><br>"Estimated Insurance Recoveries" | • This section, to the extent it can be understood, utterly fails to describe the impact to holders of Asbestos Claims with respect to the Debtors' asbestos related insurance and what the Plan seeks to force them to forego.  The section assumes an unwarranted level of knowledge and sophistication about insurance matters that goes well beyond the knowledge level of a hypothetical reasonable investor.  Indeed, a closer analysis reveals that the Debtors' are attempting to make an "*insurance play*" which must be fully disclosed to creditors.<br><br>• The Debtors describe that <u>they</u> will receive approximately $500 million from settled and solvent unsettled insurers if the Asbestos Trust Aggregate Fund "is determined by the Court to be the maximum amount permitted under the Plan."  Thus, under the mechanics of the Plan, the Debtors themselves will receive the proceeds of their insurance policies for payment of Asbestos Claims---which proceeds *will not be contributed to the Asbestos Trust*.  Moreover, it |

| Section | Mischaracterization/Omission/Objection |
|---|---|
| | appears, although it is not clear due to the lack of disclosure, that the Debtors will seek to recover these insurance proceeds by claiming that the Sealed Air Payment is a payment by the Debtors on account of asbestos liabilities, which entitles them to recover from the insurers.<br><br>• In addition, the Debtors fail to disclose what they intend to do with the insurance proceeds after they are recovered. Given that the Debtors are seeking to reap the rewards of the Sealed Air Payment for their own and sole benefit, they should be forced to disclose what they intend to do with the proceeds. |
| 2.7.3.1<br><br>"Preservation of Causes of Action" | This section repeatedly refers to Exhibit 11 of the Exhibit Book for a description of the potential causes of action. However, Exhibit 11 has not been filed yet with the Court. The PD Committee reserves its right to supplement this Objection upon the filing of Exhibit 11. |
| 2.8.1<br><br>"Core Business Value of the Reorganized Debtors and Non-Debtor Affiliates" | The PD Committee does not take issue with the disclosures made in this section and accompanying sections 2.8.1.1 and 2.8.1.2; however, the PD Committee reserves the right to contest the Core Business Value calculated by the Debtors and to present its own valuation with respect to the Core Business Value. The Disclosure |

| <u>Section</u> | <u>Mischaracterization/Omission/Objection</u> |
|---|---|
| | Statement should therefore note that the Debtors' valuation is subject to dispute. |
| 3.2.8.3<br><br>"Montana Grand Jury Investigation" | • This section needs to be updated to include the results of the November 15, 2004 hearing, at which the Court limited the relief sought by the Debtors to obtain approval to pay legal fees and expenses of certain current and former officers and directors in connection with the investigation.<br><br>• In addition, on November 26, 2004, Grace filed an 8-K Statement with the United States Securities & Exchange Commission, wherein they stated, "Grace understands that the investigation is at an advanced stage and that it is likely to be indicted during the first quarter of 2005, unless a resolution of this matter can be reached with the government within such timeframe." By now, the Debtors should have had an opportunity to perform a preliminary analysis, at least, of the subject matter of the investigation, and should be required to revise the Disclosure Statement to explain the findings of such review. |
| 3.2.9<br><br>"Motion for Entry of Case Management Order" | On November 24, 2004, after the filing of the Disclosure Statement, the Debtors filed their Motion Requesting the United States District Court for the District of Delaware to Refer Jurisdiction for Certain Matters to the Bankruptcy Court. As a |

| Section | Mischaracterization/Omission/Objection |
|---|---|
| | result, this section must be updated to include the potential impact of a ruling on that motion. |
| 3.3<br><br>"The Canadian Proceedings" | • This section inadequately describes the effect of the Canadian proceedings on the Debtors' cases in this Court. For example, it is unclear whether Canadian claims will ultimately be subject to allowance and payment in the United States.<br><br>• In addition, there is no discussion regarding the magnitude of Grace's potential liability for Canadian claims, nor a description of which United States Debtors may be liable for such claims. |
| 4.3.1.5<br><br>"Class 5 – Intercompany Claims" | The second sentence of this section is a *non sequitor*. In addition, this section fails to explain the interplay of the payment of Intercompany Claims and the "limited substantive consolidation" of the Debtors for purposes of payments under the Plan. As the Court is well aware, ordinarily in the context of substantive consolidation, intercompany claims are usually expunged or, in rare cases, deeply subordinated. Neither is to occur under the Plan, but the Debtors fail to explain any basis for allowing the Intercompany Claims to survive or disclose the extent of such Claims on an estate by estate basis. |
| 4.3.1.6<br><br>"Class 6 – | In the last sentence of the first paragraph of this section, the |

| **Section** | **Mischaracterization/Omission/Objection** |
|---|---|
| Asbestos PI-SE Claims" | Debtors' reference to an "amount asserted" by a Holder of an Asbestos PI-SE Claim is confusing and misleading, as it is not clear that such Holder has an obligation to assert a specific amount and there is no description of the vehicle by which such Holder would make such assertion. |
| 4.3.1.7<br><br>"Class 7 – Asbestos PI-AO Claims" | • Preserving all objections to confirmation of the Plan that arise from the proposed treatment of Asbestos Claims, it is worth observing that, in the case of Asbestos AI-PO Claims, the Plan provides that the liability for such Claims shall be passed to and assumed by the Asbestos Trust, but that the Reorganized Debtors shall retain full control over the determination of such Claims.  However, this section of the Disclosure Statement fails to clearly identify those facts, which makes the section incomplete and misleading.<br><br>• In addition, similar to section 4.3.1.6, in the last sentence of the first paragraph of this section, the Debtors' reference to an "amount asserted" by a Holder of an Asbestos PI-AO Claim is confusing and misleading, as it is not clear that such Holder has an obligation to assert a specific amount and there is no description of the vehicle by which such Holder would make such assertion. |
| 4.3.1.8<br><br>"Class 8 – | • This section obliquely states that the amount of Asbestos |

| Section | Mischaracterization/Omission/Objection |
|---|---|
| Asbestos PD Claims" | PD Claims shall be determined by the Bankruptcy Court pursuant to the Estimation Motion.  It is patently clear that the Estimation Motion, although filed as a separate document, is an integral and fundamental requirement to the approval of the Plan.   Thus, the Debtors should be required to provide adequate information with respect to the steps they intend to take to estimate the amount of Asbestos PD Claims (and all other Asbestos Claims, as well).  The Debtors cannot simply exclude the specifics of estimation from the Plan and refer the reader to a separately filed motion.[12]<br><br>• The Debtors fail to include a range of the size of the Asbestos Trust Expenses Fund.  The amount necessary for this Fund is included in the artificially capped Asbestos Trust Aggregate Fund, thereby diminishing the amount of money actually available to fund Asbestos Claims.  As a result, the Debtors should be required to disclose an estimate of the magnitude of the Asbestos Trust Expenses Fund.<br><br>• Moreover, the Debtors fail to disclose what will happen if |

---

[12]       In addition to the Estimation Motion, the Debtors also filed the CMO Motion and the Procedures Motion.  Indisputably, each of these Motions is critical to the Plan and confirmation of the Plan.  As such, the Debtors should be required to adequately disclose and explain the Confirmation Motions in the Disclosure Statement.

| Section | Mischaracterization/Omission/Objection |
|---|---|
| | the actual amount of Asbestos Trust Expenses exceed the estimated amount of such Expenses. The Debtors should be required to disclose the effect on the Asbestos Trust in the event of such an occurrence. |
| 4.3.1.9<br><br>"Class 9 – General Unsecured Claims" | • Pursuant to the Plan, Holders of General Unsecured Claims shall receive payment in full of the Allowed amount of their Claims, plus post-petition interest in certain cases. The payment shall be made 85 percent in cash and 15 percent in Parent Common Stock.<br><br>• This section fails to disclose why, despite receiving cash and stock purporting to provide a 100 percent distribution, plus interest, such Claims are considered to be impaired, while Asbestos Claims are considered to be unimpaired. |
| 4.7.1<br><br>"Corporate Governance of the Parent and Other Debtors" | • This section fails to adequately disclose the amendments to the respective Articles of Incorporation and Certificates of Incorporation for each of the Debtors that will be made as of the Effective Date. This section includes only an abbreviated list of provisions to be included in the respective corporate charters. Given the importance of the Parent Common Stock in funding the Debtors' obligations under the Plan, it is necessary for the Debtors to disclose (in the Plan, as well as in the Disclosure Statement) |

| Section | Mischaracterization/Omission/Objection |
|---|---|
|  | *everything* they propose to do in respect of the Parent Common Stock after the Effective Date. Accordingly, the Debtors should be required to include a draft of the proposed amended charter for the Parent, at a minimum.<br><br>• In addition, this section fails to disclose any of the proposed amendments to the Parent's by-laws and the purchase of D&O and fiduciary liability tail coverage under the Plan. The section only provides that "Section 7.1 of the Plan" deals with such amendments. Obviously, these are critical issues under the Plan and, thus, must be adequately disclosed in the Disclosure Statement and cannot just be cross-referenced to the Plan. |
| 4.7.2<br><br>"The Asbestos Trust" | • In describing the funding of the Asbestos Trust, the Debtors state that "[t]he Sealed Air Payment and that portion of the Debtors' Payment consisting of the Parent Common Stock, to the extent necessary, shall first fund the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund."<br><br>   o However, the Debtors fail to disclose how the Sealed Air Payment - - which is comprised of both common stock in Sealed Air Corporation and cash - - will be allocated to the various Funds in the |

| **Section** | **Mischaracterization/Omission/Objection** |
|---|---|
| | Asbestos Trust and who will make such allocation. This is a critical omission from the Disclosure Statement, as the Plan seeks to channel the recovery for all Asbestos Claims to the Asbestos Trust and there are significant timing distinctions between the processing and payment of PD Claims and PI Claims. |
| | • In addition, the Debtors refer in this section to Sections 7.2.3 through 7.2.9 of the Plan "solely by bullet points." These Sections of the Plan address, among things, (i) the transfer of assets into the Asbestos Trust, (ii) transfer of Claims and Demands to the Asbestos Trust, (iii) creation of Asbestos Trust sub-accounts, (iv) appointment and termination of Trustees, (v) creation and termination of TAC, (vi) the cooperation agreement between the Reorganized Debtors and the Asbestos Trust, and (vii) the Reorganized Debtors' sole right and authority to resolve Asbestos PI-AO Claims for which the Holder of such Asbestos PI-AO Claim elects the Litigation Option. |
| | ○ It is clearly evident that these Sections of the Plan are centerpieces to the _entire_ Plan. The Debtors cannot simply list - - in "bullet point" fashion - - |

| Section | Mischaracterization/Omission/Objection |
|---------|----------------------------------------|
| | that these critical components of the Plan are dealt with in the enumerated Sections of the Plan, without providing adequate information how each issue is being treated. |
| | o  For example, one of the matters listed in this section of the Disclosure Statement is the "cooperation agreement" between the Reorganized Debtors and the Asbestos Trust.  However, there is absolutely no further discussion regarding such a material agreement.  Therefore, the lack of disclosure makes it impossible for a creditor to determine, among other things, the rights and duties to be shared by each party under the agreement, the length of the agreement and any financial terms of the agreement.  Similar complaints exist for each of the other Plan Sections that are simply "incorporated" by bullet point into the Disclosure Statement. |
| 4.9 "Contracts" | This section, in its entirety, provides "Article 9 of the Plan sets forth provisions dealing with executory contracts, unexpired leases, letters of credit, surety bonds, guaranties, and certain indemnity agreements."  Again, the Debtors cannot be permitted to |

| Section | Mischaracterization/Omission/Objection |
|---|---|
| | simply list the topic that a particular Section of the Plan addresses. The Debtors must adequately disclose these Plan provisions in the Disclosure Statement. |
| 4.10<br><br>"Retention of Jurisdiction" | This section should be supplemented to include that under the terms of the Plan and section 524(g) of the Bankruptcy Code, the District Court retains exclusive jurisdiction over any proceeding that involves the validity, application, construction or modification of the 524(g) channeling injunction that may be issued. |
| 4.11<br><br>"Miscellaneous Provisions" | • In describing Section 11.3.2 of the Plan (Preservation of Causes of Action), the Debtors maintain that the potential causes of action currently being investigated by the Debtors "are described more fully in this Disclosure Statement." This particular disclosure would be adequate if it were true; however, as explained above in our objection to section 2.7.3.1 of the Disclosure Statement, the Debtors have not sufficiently disclosed the potential causes of action.<br><br>• The description of Section 11.9 of the Plan (Title to Assets; Discharge of Liabilities) is internally inconsistent and, therefore, misleading. The Plan and Disclosure Statement, in many different instances, refer to the fact that the Reorganized Debtors will retain an interest in prosecuting |

| Section | Mischaracterization/Omission/Objection |
|---|---|
|  | objections to Asbestos PI-AO Claims. |
| 7.1<br><br>"Bankruptcy Code §1129 Generally" | The last paragraph of this section provides that "[t]he Debtors believe that the Plan satisfies all of the statutory requirements of Bankruptcy Code §§ 1129 and 524(g)," without explaining how the Plan actually meets those requirements.  However, as explained elsewhere in this Objection, the PD Committee submits that the Plan on its face is patently unconfirmable under sections 524(g) and 1129 of the Bankruptcy Code. |
| 7.2<br><br>"Votes Required for Class Acceptance" | In this section, the Debtors correctly point out that section 524(g)(2)(B)(IV)(bb) requires that any separate class or classes of the claimants whose claims are to be addressed by the Asbestos Trust *must vote*, by at least 75 percent of those voting, in favor of the Plan.  However, the Debtors fail to explain how they can achieve this mandatory vote when the Plan does not permit Holders of Asbestos Claims to vote on the Plan.[13] |
| 7.2.1<br><br>"Cramdown" | In the last paragraph of this section, the Debtors reserve the right to seek "cramdown" of the Plan under section 1129(b).    This section should be amended to indicate that if the Debtors are unsuccessful in achieving a 75 percent vote in favor of the Plan by each class of Holders of Asbestos Claims treated by the Asbestos Trust, the Debtors cannot "cramdown" the requirements of section |

---

[13]    A fuller discussion regarding the fatal infirmities of the Plan with respect to the proposed treatment of Holders of Asbestos Claims as unimpaired and the attempt to disenfranchise them from voting on the Plan is provided elsewhere in this Objection.

| **Section** | **Mischaracterization/Omission/Objection** |
|---|---|
| | 524(g) upon the Holders of Asbestos Claims and, thus, the Debtors would not receive a 524(g) injunction and the Plan as constituted would be unconfirmable.[14] |

## IV. OBJECTIONS TO THE CMO MOTION

29.    By the CMO Motion, the Debtors seek approval of "litigation protocols" for the purported resolution of Asbestos Claims.[15]  The Debtors offer the Court the option of approving procedures contained in the Motion or in the motion filed by the Debtors in June 2001 (the "Original CMO Motion"), which was briefed but not decided by either this Court or the District Court.  Of course, the CMO Motion provides no meaningful discussion of the Original CMO Motion nor does it endeavor to respond to the numerous objections thereto which were asserted by both the PD Committee and the PI Committee. Moreover, as the Original CMO Motion was filed when this bankruptcy case was in its nascent stage, many of the proposals made therein by the Debtors have already been dealt with by further proceedings in the case (e.g., a bar date for all claims other than Asbestos PI Claims was established and, in the case of PD, a protocol was instituted by the Court for "gateway objections" to PD Claims which is well underway).  Thus, the Debtors leave it to the Court and the parties to determine just what remains to be accomplished under the Original CMO Motion and how the proposals therein would meld with the contours of the Plan. Respectfully, such an undertaking would engender a monumental waste of

---

[14]    In Section 6.4.2 of the Plan, the Debtors reserve the right to amend the Plan if it is not accepted by the requisite number and amount of the Holders of Claims and Equity Interests required to satisfy sections 524(g) and 1129 of the Bankruptcy Code.

[15]    As a result of the ongoing proceedings regarding ZAI claims, the Debtors do not seek to apply the New CMO to ZAI at this time.  Accordingly, the PD Committee reserves its detailed response to the Motion as well with respect to such Claims.

resources and too much guesswork to make it a meaningful exercise.  Thus, in the interests of economy and efficiency, we append hereto as <u>Exhibit A</u> the objections to the Original CMO Motion which were filed by the PD Committee and limit our discussion to the CMO Motion. Moreover, we limit our discussion to those aspects of the CMO Motion which principally pertain to Asbestos PD Claims.

30.     Apparently, the principal innovation of the CMO Motion is that the procedures proposed by the Debtors therein would only be applicable *post-confirmation*. Thus, as we understand the Debtors' various Confirmation Motions, *pre-confirmation* the Debtors seek to establish a bar date for PI Claims, as well as approval of a detailed PI Claims questionnaire.  Based on the proofs of claims already filed in respect of PD Claims and the proofs of claim that will be filed in respect of PI Claims, as well as the PI questionnaires, the Debtors propose to commence estimation proceedings as to both PD and PI Claims.  On the assumption that the estimated amount of all Asbestos Claims does not exceed the arbitrary and unexplicated limits set forth in the Plan, the Debtors anticipate that the Plan will be confirmed and *the Debtors* would then commence their "five step process" for allowing or disallowing individual Asbestos Claims.  Thus, the first question which emerges is why do we need to address this proposal at this juncture? If the Plan cannot be confirmed---as we suggest---or is not confirmed for any reason, the Debtors' post-confirmation case management proposals will be of no moment whatsoever.  Furthermore, if the Plan is hereafter modified as a result of the numerous objections we suspect it will occasion, or if a consensual Plan is hereafter agreed upon, the Debtors' case management proposals will likely also need to be re-engineered or altogether discarded.

31.     Another reason for not considering the CMO Motion at this time is that under the Plan, all Asbestos Claims are channeled to a 524(g) trust and, except for Asbestos PI-AO Claims, *the trust* is to administer the allowance or disallowance of Asbestos Claims, not the Debtors.  Thus, at that juncture---should we ever reach that point---the Debtors ought not be dictating how the trust goes about the business of administering Asbestos Claims, except for the promulgation of trust distribution procedures.  Indeed, we are unaware of another asbestos bankruptcy case in which the reorganized debtor retained control over the manner in which asbestos claims were determined by the ensuing 524(g) trust.

32.     As we understand the Debtors' CMO proposals, in the case of non-ZAI Asbestos PD Claims, the Debtors intend to continue to prosecute so-called "gateway objections" as authorized by this Court's order of July 19, 2004,[16] and then employ Rule 42 trials, mandatory settlement proceedings and, if necessary, trials in respect of those PD Claims that either survive or are not subject of "gateway objections."  *See CMO Motion* at ¶20.  However, the CMO Motion provides precious little detail of exactly what is proposed to occur at each level beyond the prosecution of "gateway objections".  In respect of common issue trials under Rule 42, the Debtors merely suggest that such device will be employed if "the summary judgment proceedings identify one or more disputed issues of material fact that are common to a large number of Asbestos Claims."

---

[16]     By the Court's Order on the Debtors' "gateway objections," the Debtors are required to file all "gateway objections" in respect of a particular PD Claim and may only file *one* subsequent objection to each such PD Claim for which a "gateway objection" was filed.  Given the paucity of information provided in the CMO Motion concerning just how the Debtors intend to use Rule 42 common issue trials, it is not clear whether the CMO Motion represents a departure form the Court's Order on "gateway objections."  For example, if the Debtors file an objection on several grounds to a PD Claim after unsuccessfully prosecuting a "gateway objection" to such Claim, bifurcation of those grounds for inclusion in several Rule 42 trials would appear to run afoul of the Court's Order on "gateway objections."  Thus, the PD Committee, for itself and on behalf of all PD Claimants, reserves all objections relating to the foregoing.

*See CMO* Motion at ¶27.   Thus, it is extremely difficult to even perceive how the proposal will be employed if approved.

33.   Moreover, the Debtors' proposal for the consolidation of the so-called "common threshold issues" is entirely inconsistent with the positions it has taken in at least two of the actions brought against it prior to bankruptcy.   Specifically, in *Dayton Independent School District*,[17] 82 Texas Public School Districts sought to recover the cost of abating asbestos containing material in approximately 600 public buildings. Grace vigorously opposed the schools' efforts to consolidate their claims for trial pursuant to Rule 42.   In its pleadings opposing the court's trial format to initially try the claims of just 5 school districts on certain common issues pursuant to Rule 42, Grace represented to the court as follows:

> It may prove true that for some theories, like negligence, a school in Dallas purchased MonoKote MK-3 for its building at the same time that Dayton ISD allegedly purchased that product for its school. This coincidence is now difficult to predict. It is essential to understand, however, that any judgment of liability for those coincident schools will be based upon the determination of all of the elements of negligence (e.g., duty to warn, failure to warn, demonstrated harm, proximate causation of harm, absence of intervening cause, comparative fault calculations, etc.). thus, what will be adjudicated for the claim of Dallas ISD with respect to its school that purchased MonoKote MK-3 in 1961 will differ as to liability from what will be adjudicated for the claim of Dayton ISD for its 1961 constructed school.
> Further, with respect to strict liability, the issue to be adjudicated for liability is equally fragmented over time and by specific facts developed as to each separate building….
>
> Thus, the issue of defectiveness will necessarily vary building by building even within each school district. In each building, the issues will be whether the asbestos fibers, if any, found in the air came from a ceiling product (as opposed to ambient air, pipe and boiler insulation, floor tiles, etc.) and whether they pose a detectable and <u>unreasonable</u> danger. The

---

[17]   *Dayton Independent School District, et al. v. W.R. Grace, et al.*, Civil Action No. B-81-277-CA (U.S.D.C. E.D. Texas, Beaumont Div.).

condition of the material in each building is thus essential evidence for each claim of strict liability, just as the Dayton officials believed in 1984… . Further, the elements of strict liability include as well injury and comparative causation. Building conditions and maintenance are thus conspicuously relevant. Moreover, even in a design defect claim, state of the art evidence is admissible and relevant to the technological environment as of the time of sale. (*citations omitted*). The dimension of time therefore joins the splintering of claims by building conditions even under strict liability.

\*\*\*

**It is not practical, in this procedural, legal and factual environment, to carve out artificial, theoretical questions for common resolution as those general questions will not be the basis of any liability adjudication. The creation of such general questions would resolve nothing for the five plaintiffs in the initial trial.**

Moreover, Article III of the Constitution empowers federal courts to hear and determine "cases and controversies." "The case or controversy requirement of Article III of the Constitution is fundamental, and dictates that legal issues be presented in the context of actual cases and not in the abstract." (*citation omitted*)… .

\*\*\*

**The splintering out of abstract questions as to some aspect of a claim would also defeat the Seventh Amendment requirement that interrelated issues be tried to a single jury.**

\*\*\*

It is also possible for parties to agree that a "test case" be litigated which will be treated by the parties as determinative of particular issues in other cases. This procedural device requires the agreement of the parties who thereby waive their rights to jury trial of other claims. For all of the reasons set out above, Grace and [United States Gypsum] expressly decline to treat the initial trial as a "test case." **The issues for each plaintiff and for each building are simply too fact-specific to admit of resolution in a fashion divorced from the particular facts that establish the adverse legal claims of the parties.**

Submission by W.R. Grace & Co. and United States Gypsum Company Regarding Common Issues at 7-14, *Dayton Independent School District, et al. v. W.R. Grace & Co. et al.*, attached as <u>Exhibit B,</u> (emphasis added).

34.     Likewise, in its opposition to class certification in Kirbyville Independent

School District, et al. v. Asbestospray Corporation, et al.,[18] Grace argued:

---

[18]     *Kirbyville Independent School District, et al. v. Asbestospray Corp. et al.*, Civil Action No. 1:94CV412 (U.S.D.C. E.D. Texas, Beaumont Div.).

Once the individual members of the putative class have identified the products contained in their buildings, to recover damages, they will also have to show how much of that product is present, where it is located, the condition of the product and the potential hazards posed by that product as installed in that particular building, including the friability of the asbestos as installed, and the asbestos level in the air in each building. *Whether asbestos-containing materials installed in buildings are hazardous cannot be answered in the abstract or in a vacuum. (citation omitted). Rather determining whether defendants' products pose any hazard - which is obviously an essential element of plaintiff's case - requires a site specific, building by building analysis*… .

\*\*\*

In some cases, the defenses to liability raised by the defendant have been held to raise a common issue of sufficient importance to provide a basis for class certification. (*citation omitted*). *However, in the present case, no defense raises an issue common to the class as a whole. A variety of defenses will be available to certain of the defendants in response to certain of the plaintiffs' claims, and in each case, the particular defense will depend on the particular individual facts applicable to the specific parties involved.* For example, as to all plaintiffs, many claims may be reduced or eliminated by virtue of an analysis of comparative fault or intervening cause. *Each individual member of the proposed class is likely to have had different levels of knowledge concerning asbestos that each acquired at different times.* Further, in many cases, engineers and architects participated in the decisions to install asbestos-containing materials and decided what type of asbestos-containing product to use, and in what quantities, in the various buildings to members of the proposed class. Those sophisticated agents may well be partially responsible for the damages, if any, that plaintiffs allegedly suffered.

*Issues of timing that are relevant to statutes of limitations and repose defenses are also individual in character and incapable of being decided on a class-wide basis. The date of the installation of the asbestos will differ from plaintiff to plaintiff and even from building to building. Thus, the availability of the statute of repose as a defense to plaintiffs' claims will have to be decided on an individual basis. With regard to the statute of limitations, some of the individual class members may be protected by Section 16.061 of the Texas Civil Practice and Remedies Code, which provides that the claims of certain public entities will not be barred by statutes of limitations, while others cannot rely on Section 16.061. Thus, the applicability of the statutes of limitations raises individual issues of both fact and law.*

*The "state of the art" defense is also not a predominant common question here. The precise outlines of the "state of the art" will differ*

*from defendant to defendant depending on the state of knowledge of each defendant and the time period during which asbestos-containing materials were installed in particular buildings. It is clear that the "state of the art" defense will thus be highly dependent on individual facts.*

Defendant W. R. Grace & Co.-Conn.'s Opposition to Plaintiffs' Motion For Class Certification at 33-35, *Kirbyville Independent School District, etc. v. Asbestospray Corporation, et al.,*[19] attached as Exhibit C, (emphasis added).

35.    Without further illumination, the PD Committee is unable to fully assess the CMO Motion.  At this early juncture, however, we see no compelling or pressing need to approve any of the *post-confirmation* procedures that will be employed in the determination of Asbestos Claims especially given the infirmities of the Plan.

## V.  OBJECTIONS TO THE ESTIMATION MOTION

36.    To begin, it should be noted that but two concluded asbestos bankruptcies[20] have implicated substantial asbestos property damage claims and only one of those cases implicated section 524(g).[21]   Both of those cases resulted in confirmed plans of reorganization which were obtained with the consent of the majority of the holders of asbestos property damage and asbestos personal injury claimants.  Thus, *it was not necessary in any other asbestos bankruptcy to estimate asbestos property damage claim as a contested matters*.  Moreover, of the currently pending asbestos bankruptcies in which substantial property damage claims have been asserted,[22] *this is the first case to reach the issue of estimation of asbestos property damage claims*.  It follows that, unlike in respect of asbestos personal injury claims, *there is no model for the estimation of asbestos property damage claims under section 502(c) of the Bankruptcy Code*.

---

[19]      *Id.; see also Dayton Independent School District, et al. v. W.R. Grace, et al.*, Civil Action No. B-81-277-CA (U.S.D.C. E.D. Texas, Beaumont Div.)

[20]      The Celotex Corporation and National Gypsum Company.

[21]      The Celotex Corporation.

[22]      W.R. Grace, US Gypsum and Federal-Mogul Corporation.

37.     Little is learned from previous experience with estimating asbestos personal injury claims in establishing an estimation model for Asbestos PD Claims in this case.  In fact, in the Estimation Motion, the Debtors amply document the need to revisit the estimation methodology previously used to estimate asbestos personal injury claims by virtue of what we now know to have been unfortunate pre-bankruptcy settlement experience and revelations of fraudulent personal injury claims.  *See Estimation Motion at III; see also In re Owens Corning, et al*., Case Nos. 00-3837 to 3854 (JPF), Memorandum and Order, dated Nov. 22, 2004, [D.I. 13399].  Moreover, in the case of personal injury claims, the usual objective is to estimate future claims, as well as current claims, which entails a prediction of the likely incidence and an approximation of the value of personal injury claims yet to accrue or be asserted against a debtor.  Here, however, the Debtors only seek to estimate the value of *filed* Asbestos PD Claims.[23]

### A.     Traditional Asbestos Property Damage Claims

38.     The Debtors' Estimation Motion hardly fills the void of experience with the estimation of traditional asbestos property damage claims.  As we understand it, by the Estimation Motion, the Debtors propose a three-step process: First, the Debtors intend to cull Asbestos PD Claims by prosecuting their "gateway objections"; second, they intend to file an expert report on the value of all remaining Asbestos PD Claims "in light of the Debtors' liability defenses," and expect that the PD Committee will do the same, and; third, they propose an estimation hearing be held.  *See Estimation Motion* at ¶¶86-¶90.[24]

---

[23]     The Debtors have apparently concluded that the risk of future Asbestos PD Claims is small. In its Informational Brief, Grace stated that, with respect to the property damage claims resulting from the installation of Monokote-3 (which was but one of Grace's numerous asbestos containing products which gave rise to Asbestos PD Claims), it does "not expect any additional claims to be filed," and that "those that are filed will be subject to a statute of limitations defense."  *See Informational Brief* at 6.

39.     What emerges from the Debtors' estimation proposal, when viewed in conjunction with the Plan condition that the estimated value of the Asbestos PD Fund shall constitute the maximum amount that the Reorganized Debtors shall have to pay on account of all Allowed Asbestos PD Claims, is, in fact, a process for the *liquidation* of Asbestos PD Claims.  Moreover, the Debtors exclude Holders of PD Claims from the estimation process altogether (indeed, under the Plan, Asbestos PD Claimants cannot even vote on the Plan!), fail to provide for any meaningful discovery, and attempt to convert legal determinations concerning the Debtors' purported liability defenses into a "battle of experts" whom the Debtors would have advise the Court on the law.  All this in a period of just six months![25]  *See Estimation Motion* at ¶90.  Viewed in that light, the Estimation Motion---as it relates to non-ZAI Asbestos PD Claims---cannot be approved. *See In re SGL Carbon Corp.*, 200 F.3d at 163, 168 (3d Cir. 1999)("...the Bankruptcy Code presents an inviting safe harbor for such companies.  But this lure creates the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings.").

40.     The three principal objectives of *estimating* current PD Claims are: First, to determine the universe of current PD Claims; second, to determine whether the Claims are subject to valid defenses; and third, to *approximate* the value of the Claims.  The first objective---the determination of the universe of current PD Claims---has already been accomplished by the establishment of the non-ZAI PD bar date and the requirement that non-ZAI PD Claimants file proofs of claim.  The Court previously set a March 31, 2003

---

[24]     Remarkably, but three paragraphs of the 38 page Estimation Motion deal with the estimation of non- ZAI Asbestos PD Claims.

[25]     In *The State of Hawaii v. W. R. Grace & Co.-Conn,. et al.*, Civil No. 93-4161-10 (1st Cir. Hawaii), Grace opposed a mere "20 building/complex, all issue trial," and argued that the threshold issue was product identification and that, in that case alone, the issue would entail three years of discovery.

Claims bar date for traditional PD Claims. Approximately 4200 proofs of claims were filed by that date by or on behalf of traditional PD Claimants.

41. The second objective---the determination of valid defenses---is clearly, the most complex of the tasks ahead of us. It cannot, as the Debtors propose, be simply left to "experts" or be accomplished by the adjudication of "common issues." Consistent with the position advanced by the Debtors in pre-bankruptcy litigation, defenses to PD Claims must be decided on a claim by claim basis which dictates against the exclusion of PD Claimants from the process.

42. It is simply too well-established to argue otherwise that "the expert testimony of an attorney as to an ultimate issue of domestic law or as to the legal significance of facts is inadmissible." *See U.S. v. Leo,* 941 F.2d 181, 196 (3d Cir. 1991); *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992); *In re Initial Public Offering Securities Litigation,* 174 F.Supp.2d 61, 64 ("In fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law."); *Music Sales Corp. v. Morris*, 73 F.Supp.2d 364, 381 (S.D.N.Y. 1999); *Motown Productions, Inc. v. CACOMM, Inc.,* 668 F. Supp. 285, 288 (S.D.N.Y. 1987) *rev'd on other grounds*, 849 F.2d 781 (2d Cir. 1988).*; see also Specht v. Jensen*, 853 F.2d 805, 808-810 (10th Cir. 1988); *Adalman v. Baker Watts & Co.*, 807 F.2d 359, 366 (4th Cir. 1986); *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984); *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977). Yet, by the Estimation Motion, that is precisely what the Debtors propose to do. It matters not whether such testimony is offered at the summary judgment stage or at trial. *Id.; see also Ideal World Marketing, Inc. v. Duracell, Inc*., 15 F.Supp.2d 239, n. 2 (E.D.N.Y. 1998)("such [legal expert] testimony is inadmissible whether offered at trial for the benefit of the jury or submitted with motions for the benefit of the judge").

43.    The Debtors' identify their "liability defenses" as including statute of limitations, statute of repose, laches, *res judicata*, prior settlements, incorrect or unsupported product identification,[26] assumption of risk, "and other defenses." *See Estimation Motion* at ¶89.  It is axiomatic that each and every of the identified defenses are fact specific and not susceptible to group determination.  Further, each such defense must be considered in the light of the applicable state's law governing the underlying Claim and the application of such defense.  *See Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 161 (1946) ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law."); *Grogan v. Garner*, 498 U.S. 279, 283 (1991) ("The validity of a creditor's claim is determined by rules of state law."); *Raleigh v. Illinois Dept. of Rev.*, 530 U.S. 15, 20 (2000) ("The 'basic federal rule' in bankruptcy is that state law governs the substance of claims.").[27]

44.    Thus, as consistently and vigorously argued by the Debtors in pre-bankruptcy litigation, it will be necessary to consider each defense to PD Claims on a claim by claim basis.  Moreover, given that the PD Committee cannot and does not

---

[26]    Although characterized by the Debtors as a defense, "incorrect or unsupported product identification" constitutes a "gateway objection." Thus, the Debtors' allusion to "other defenses" leaves us to wonder just what the Debtors have in store for PD Claimants.

[27]    In *Jones v. Chemetron Corp.,* 212 F.3d 199 at 205-06, the Third Circuit explained:

The parties dispute the correct standard for determining when the plaintiffs' claims arose. Chemetron contends that the question of when the plaintiffs' claims arose is not governed by state law dictating when a cause of action accrues, but rather by a federal common law of bankruptcy. Although significant authority supporting this proposition exists in other circuits, this circuit has held the reverse. In <u>Matter of M. Frenville Co., Inc.,</u> 744 F.2d 332 (3d Cir. 1984), *cert. denied,* <u>469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1895),</u> this court held that in most circumstances a "claim" arises for bankruptcy purposes at the time the underlying state law cause of action accrues. <u>Id.</u> at 337. We are cognizant of the criticism the <u>Frenville</u> decision has engendered, but it remains the law of this circuit. *(citations omitted).* Accordingly, this court must look to Ohio tort law to determine when the plaintiffs' claims accrued. *(footnote omitted).*

represent the individual interests of Asbestos PD Claimants and does not have any specific knowledge of individual PD Claims which have been filed, it is simply impossible for, and inappropriate to even expect, the PD Committee to mount a rebuttal to the Debtors' purported defenses.  Therefore, it is imperative that the PD estimation process require the participation of every holder of PD Claims in respect of which the Debtors intend to posit "liability defenses."

45.    The third objective of the estimation of PD Claims---determination of the approximate value of the Claims---requires the development of at least *two more data points*. The *first data point* is a determination or approximation of the quantity of the Debtors' asbestos containing products in each of the buildings or structures subject of a filed PD Claim.  Ironically, what is conspicuously missing from the approved PD proof of claim form is any requirement that PD Claimants apprise of the amount of the Debtors' asbestos containing products installed in the building subject of the claim form.[28]  The fact is that the debtors were so transfixed on developing a proof of claim form that assisted the Debtors in the formulation of defenses to all PD Claims that the Debtors altogether failed to ask one basic question: "How much Grace asbestos containing product do you have in your building?"  The PD Committee warned of this glaring deficiency at the February 25, 2002 hearing at which the proof of claim form was considered:

> BY MR. BAENA: Okay.  In terms of the proof of claim form itself, Your Honor, I think the threshold issue is what philosophy are we going to apply to the proof of claim form?  If the proof of claim form is merely to identify people who can participate in this proceeding, the nature of the

---

[28]    The PD proof of claim form does require PD Claimants to specify the square footage of the subject building or structure; however, such information does not serve as a proxy for the quantity of the installed asbestos containing products as it can, for example, grossly understate the amount of fireproofing present on supports, beams, trusses, perlins and other superstructures.  The determination of the quantity of fireproofing products requires the measurement of the geometric configuration of multi-sided supports, beams, etc.

proof of claim form becomes a very simple matter for us to deal with. It merely only has to identify the players. On the other hand, if the proof of claim form is somehow going to be used to value the amount of the claims, the process becomes far more cumbersome. And in our humble judgment, it becomes impossible for Claimants to clear all the hurdles that would necessarily be entailed by preparing and submitting a proof of claim form that quantifies the value of their claims against the estate.

The Debtor actually takes a position somewhere in between. *The proof of claim form that the Debtor has propounded does not quantify or even enable somebody to quantify the value of the claims that it's confronted by, although Mr. Bernick says that they are very interested in knowing that information.* And it isn't on the other end of the spectrum, a proof of claim that merely identifies people with claims. *Rather, it is a litigation device which is designed with one function, and one function only in mind. And that is to determine what defenses the Debtor could utilize to defeat property damage claims generally, and those claims specifically*. They really only seek information in respect of two things from their proof of claim forms. *They only seek to find out the whether the statute of limitations is applicable, and whether the claim itself is barred by some other notion of preclusive theory of law.*

*Transcript at pp. 73-74.* (emphasis added).

46.     Thus, the Debtors have no one to blame but themselves for the fact that in their zealous effort to develop defenses to PD Claims, they neglected to prepare---as we urged---for the inevitable task of estimating PD Claims. At this juncture, the task of quantifying the amount of asbestos containing products in every building subject of a filed PD Claim form is a daunting one as it requires discovery of every PD Claimant in accordance with the applicable Rules of Bankruptcy Procedure. The Debtors cannot be rewarded for their "ready, fire, aim" approach to the formulation of the PD proof of claim form by indulging them further in some Byzantine, but as yet unarticulated, methodology of guessing how much asbestos containing product has been, must be or will need to be removed or otherwise abated.

47.     The *second data point* which must be developed to determine the approximate value of PD Claims is the approximate value of damages which would be

awarded in the tort system as a result of the presence of the Debtors' asbestos containing products in a building or structure.[29]   The same sort of data is the cornerstone of the estimation of PI Claims.  While now there is reason to be suspect of the data employed in the PI estimation process, we are unaware of any similar criticism of the Debtors' or any other asbestos manufacturer's pre-bankruptcy tort system experience  with the resolution of asbestos property damage litigation claims.   Thus, in this context, we think it safe and sensible to borrow from the court's instruction in *Eagle-Picher*, that in conducting a section 502(c) estimation, "the estimation should be primarily based upon the claims history of the particular company whose liability is being estimated" and that "the valuation should be  based upon settlement values for claims . . . ." *See Eagle-Picher,* 189 B.R. at 691.

48.    To date, the Debtors have not provided the PD Committee with their pre-bankruptcy asbestos property damage claims history which can be used for this purpose---nor does the Estimation Motion suggest that the Debtors intend to do so.  A PD Claim estimation process must entail production of user friendly information concerning settlements, judgments and other dispositions of asbestos property damage claims sorted by product, by type of building or structure, by jurisdiction, and by date.   Indeed, we suspect that the Debtors already have developed a sophisticated claims evaluation model and that they also have a comprehensive settlement database.  It should be relatively easy to use such information to prepare a detailed database in a format useful for estimation purposes.   While there is other empirical information that may be useful in the process, such as cost models developed in other asbestos cases, an estimation of PD Claims

---

[29]      In addition to the costs of removal or abatement of the asbestos containing products, additional costs incurred may include, for example, the closing of the building at issue or the relocation of workers and communications systems from the subject building.

performed without information concerning the Debtors' historical experience would be incomplete and unreliable.[30]

49.    In sum, the Estimation Motion as it relates to non-ZAI Asbestos PD Claims suffers from the Debtors' failure to plan for the event of estimation and their superficial thinking that simply is not likely to produce any meaningful result. Despite the Debtors' bravado that the process can be completed in six months, and need not entail much more labor than the submission of "expert" reports, as aforesaid, the process is exceedingly more complex and, perhaps, more time consuming. Moreover, as this is the first asbestos bankruptcy to reach this critical point in respect of property damage claims, the effort to develop a comprehensive and reliable estimation model for such claims, which may well become the template in other cases, warrants careful consideration of the methodology to be employed in this case.

### B.    ZAI Asbestos Property Damage Claims

50.    With respect to ZAI claims, the Debtors propose that the Court set a ZAI claims bar date with a ZAI claim form and notice program. The Debtors' proposal fails to take into account both the status of the ZAI science trial and the unique nature of ZAI claims and their procedural posture.

51.    As the Court well knows, the Court conducted summary judgment hearings on October 18, 2004 in the ZAI science trial, and has to yet to rule on the same. One of the principal purposes of the commencement of the ZAI science trial was to determine whether ZAI presents a sufficient risk of harm such that ZAI claimants would

---

[30]    In the course of estimating current PD Claims, it may also become useful to develop data on Grace's share of the market during relevant periods of time. Frequently, the asbestos containing products of several manufacturers were installed in a single building or structure. Given the passage of  substantial time since asbestos was installed in buildings, and the unavailability of complete historical records concerning the identification of which manufacturers' asbestos containing products were used by a building owner, market share data facilitates, for estimation purposes, an approximation of Grace's conceivable liability to the owner of such a building or structure.

be endangered by the requirement that they file individualized proofs of claim.  That issue remains undecided and thus, the Debtors motion for the establishment of a ZAI bar date and the requirement that ZAI claimants file individual proofs of claim is not ripe for determination.  Indeed, if the Court's determinations in the ZAI science trial result in the future conclusion that class proofs of claim should be allowed, the Debtors' proposals become superfluous and unnecessary.

52.    First, unlike many traditional PD claims, the ZAI claims have already been granted class certification by the first court to consider the issue.  *Barbanti v. W.R. Grace & Co*., No. 00201756-6 (Wash, Super., Dec. 19, 2000).   This certification confirms what Grace has tacitly acknowledged in these proceedings, ZAI claims have a core commonality resulting from their nature as a commercially-advertised single product that was overwhelming sold to homeowners or their contractors for pour-in installation. Unlike traditional PD products, ZAI had no binder, involved no mixing, and was not sensitive to application temperature or preparation of the area where it was poured.

53.    Discovery in the ZAI science trial proceedings has shown that ZAI may be in one million or homes.  Further, unlike traditional PD claims where removal costs can vary with the location and type of product and removal methods, the developing database of ZAI removal costs puts them within a fairly narrow range. With this information and the commonality of product, purchasers and removal techniques, it is possible to estimate ZAI liability now within the normal range of litigation uncertainty.

54.    It is thus not necessary, and indeed would be cost and time prohibitive, to undertake a pre-confirmation, nationwide notice program trying to reach millions of unsuspecting homeowners with ZAI in their attics.  Unlike traditional PD claims, ZAI litigation was in its infancy when the Debtors filed for bankruptcy, such that an

enormously expensive, intensive and comprehensive notice campaign would be required to attempt to satisfy due process.

55.    Rather than forcing a bar date on unsuspecting ZAI claimants, some of whom might lose their rights with inevitable litigation over lack of notice,[31] the PD Committee believes that the estimation of ZAI claims can proceed based on the sales, distribution and removal cost data being developed, with the ZAI claims treated as a class.    This will both honor the existing Washington State class certification and acknowledge the national class certification motion that was pending in the ZAI MDL when Grace filed for bankruptcy.    *In re Zonolite Attic Insulation Products Liability Litigation*, MDL No. 1376 (D. Mass).    Proceeding in this manner will enable the Debtors' reorganization to move ahead, protect the rights of ZAI claimants, and permit their claims to be adjudicated within the context of a post-confirmation resolution vehicle.

56.    The PD Committee does not foreclose the possibility of a pre-confirmation resolution and take note of Grace's view that, as an alternative to endless litigation of PD claims, it is not adverse to "negotiating with respect to groups of similarly situated claims" (Debtors' Estimation Motion at ¶35).

## VI.  OBJECTIONS TO THE PROCEDURES MOTION

57.    The Procedures Motion is constructed on the invalid premise that the Debtors' characterization of Asbestos PD Claims as unimpaired for voting purposes is permissible and therefore, there is no need for solicitation and balloting of the Plan in respect of Class 8 Asbestos PD Claims.    Thus, *for the reasons more particularly described above, the Procedures Motion must be denied*.

---

[31]    *See, Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d. Cir. 1995) ("Inadequate notice is a defect which precludes discharge of a claim in bankruptcy. Due process requires notice that is 'reasonably calculated to reach all interested parties, reasonably conveys all the required information, and permits a reasonable time for a response.'").

MIAMI 838668.3 7481715537

59

58.     Additionally, the PD Committee would observe that while the Debtors propose specific dates for confirmation objections, responses thereto and a confirmation hearing, at this juncture the Court would be better advised to await the establishment of a confirmation schedule until *after* the conclusion of anticipated estimation proceedings in respect of Asbestos Claims.

59.     Furthermore, putting aside the precise dates for doing so, the deadlines proposed by the Debtors for the filing of Plan confirmation objections and the Debtors' responses thereto (i.e., 26 and 7 days before the confirmation hearing, respectively) in relation to the proposed confirmation hearing, would result in no opportunity for meaningful discovery in respect of the either the objections or the responses.

60.     Finally, by the Procedures Motion the Debtors propose to publish only the Confirmation Hearing Notice in *The Wall Street Journal* and *USA Today* and to post the same on their website.  The proper characterization of Asbestos Claims as impaired for Plan voting purposes will necessitate that the Debtors propose a fuller notice program, not only in respect of the Confirmation Hearing Notice but also in respect of the Voting Deadline. *See Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 315 (1950) (due process requires that notice be "reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their claims.").

61.     The PD Committee adopts, as if fully set forth herein, all objections to the Disclosure Statement and the Confirmation Motions asserted by other parties in interest, to the extent such objections are not inconsistent with the PD Committee's positions.

## CONCLUSION

62.    For each of the foregoing reasons, the Disclosure Statement and the Confirmation Motions must be denied.  Indeed, based upon the "overarching objections" set forth above, the Plan cannot be confirmed, which of itself is grounds for disapproval of the Disclosure Statement and denial of the Confirmation Motions.

Dated:  December 22, 2004                         Respectfully submitted,

BILZIN SUMBERG BAENA PRICE &
AXELROD
200 South Biscayne Boulevard, Suite 2500
Miami, Florida  33131-5340
Telephone:  (305) 374-7580

Scott L. Baena (Admitted Pro Hac Vice)
Jay M. Sakalo (Admitted Pro Hac Vice)
Allyn S. Danzeisen (Admitted Pro Hac Vice)
                        and

FERRY, JOSEPH & PEARCE, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, Delaware  19899
Telephone:  (302) 575-1555

By:  /s/Theodore J. Tacconelli
        Theodore J. Tacconelli (Bar No.
        2678)


CO-COUNSEL FOR THE OFFICIAL
COMMITTEE OF ASBESTOS
PROPERTY
DAMAGE CLAIMANTS