UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No. 01-1139(JKF)
                                .
                                .
  W.R. GRACE & CO., et al.,     .
                                . 5414 USX Tower Building
                                . Pittsburgh, PA 15222
                    Debtors.    .
                                . September 27, 2004
. . . . . . . . . . . . . . . . 12:02 p.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:             Kirkland & Ellis
                            By:  JANET S. BAER, ESQ.
                                 SAMUEL L. BLATNICK, ESQ.
                            200 East Randolph Dr.
                            Chicago, MS. CRUZ:  60601

                            Pachulski, Stang, Ziehl, Young,
                             Jones & Weintraub, P.C.
                            By: DAVID W. CARICKHOFF, JR.,ESQ.
                            919 Market Street
                            16th Floor
                            P.O. Box 8705
                            Wilmington, DE  19899


Audio Operator:             Cathy Younker


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Federal Insurance: | Cozen O'Connor<br>By:  SHELLEY A. KINSELLA, ESQ.<br>Chase Manhattan Centre<br>1201 North Market Street<br>Suite 1400<br>Wilmington, DE  19801 |
| For David Austern,<br>Futures Rep: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, JR., ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For ZAI Claimants: | Buchanan Ingersoll, PC<br>By:  WILLIAM O. SULLIVAN, ESQ.<br>1201 North Market Street<br>Suite 1501<br>Wilmington, DE  19801 |
| For U.S. Trustee: | Office of the U.S. Trustee<br>By: FRANK PERCH, III, ESQ.<br>601 Walnut Street, Room 950W<br>Philadelphia, PA  19106 |
| For the Trade Committee: | Duane Morris LLP<br>By:  MICHAEL R. LASTOWSKI, ESQ.<br>1100 North Market Street<br>Suite 1200<br>Wilmington, DE 19801 |
| For ACE: | White and Williams LLP<br>By: LINDA M. CARMICHAEL, ESQ.<br>824 North Market Street<br>Suite 902<br>Wilmington, DE  19801 |
| For the Equity Committee: | Kramer, Levin, Naftalis &<br> Frankel, LLP<br>By:  GARY M. BECKER, ESQ.<br>919 Third Avenue<br>New York, NY  10022 |
| For the Official Creditors | Stroock & Stroock & Lavan, LLP<br>By:  LEWIS KRUGER, ESQ.<br>180 Maiden Lane<br>New York, NY  10038 |

APPEARANCES (Cont'd.):

For FCR:                        Swidler Berlin Shereff Friedman
                                By:  ROGER FRANKEL, ESQ.
                                     RICHARD WEYRON, ESQ.
                                3000 K Street, N.W., Suite 300
                                Washington, DC

Pro Se:                         Ford Marrin Esposito Witmeyer
                                 & Gleser, L.L.P.
                                By:  ALEXANDER HEADIN, ESQ.
                                Wall Street Plaza
                                New York, NY  10005

For Evans:                      Schiffrin & Barroway, LLP
                                By:  GERALD D. WELLS III, ESQ.
                                Three Bala Plaza East, Suite 400
                                Bala Cynwyd, PA  19004

                                Lowenstein Sandler, PC
                                By:  MICHAEL ETKIN, ESQ.
                                     BRUCE SCHLANGER, ESQ.
                                65 Livingston Avenue
                                Roseland, NJ 07068

For the Asbestos P.I.           Campbell & Levine, LLC
                                By:  MARK T. HURFORD, ESQ.
                                800 N. King Street
                                Suite 300
                                Wilmington, DE  19801

                                MICHAEL BERKIN, ESQ.

For P.D. Committee:             Ferry, Joseph & Pearce, P.A.
                                By:  THEODORE J. TACCONELLI, ESQ.
                                824 Market Street
                                Suite 904
                                P.O. Box 1351
                                Wilmington, DE  19899

For Intercat:                   Seitz, Van Ogtrop & Green, P.A.
                                By:  KARL HILL, ESQ.
                                222 Delaware Avenue
                                Suite 1500
                                P.O. Box 68
                                Wilmington, DE  19899

APPEARANCES (Cont'd.):

For Intercat:                    Hogan & Hartson, LLP
                                 By:  DAVID POSNER, ESQ.
                                 555 13th Street, N.W.
                                 Washington, DC  20004-1109


                                 Reed Smith, LLP
                                 By:  JAMES J. RESTIVO, JR., ESQ.
                                     (telephonically)
                                 435 Sixth Avenue
                                 Pittsburgh, PA  15219

1           THE COURT:  Good afternoon.  This is the matter of

2  W.R. Grace, bankruptcy number 01-1139.  I'm sorry that I'm not

3  with you in Delaware.  U.S. Air canceled my flight.  They said

4  they couldn't get pilots because of the bad weather in the

5  southeast, so here I am.  So will you enter your appearance,

6  please?

7           MS. BAER:  Good afternoon, Your Honor.  Janet Baer --

8           THE COURT:  Can't hear you, Ms. Baer.  You're going

9  to have to get closer to the microphone.

10          MS. BAER:  Will do.  Janet Baer on behalf of the

11  debtors.

12          THE COURT:  Okay.  Ms. Baer, either orders have been

13  or will be entered with respect to agenda items 1, 3, 5, and 6.

14  With respect to 2 and 9, I would like to discuss some

15  modifications.  We can do that later.

16          MS. BAER:  Thank you, Your Honor.

17          THE COURT:  Okay.

18          MS. BAER:  Then, Your Honor, that takes us to item

19  number 4.  Item number 4 is the debtor's motion for approval of

20  a privileged and confidential settlement agreement with KWELMBS

21  Companies.  This, Your Honor, is to settle a claim against

22  insolvent insurance carriers in London.  Your Honor, we

23  received three objections, none of them to the merits of the

24  settlement and the amount of the allowed claim.  The objections

25  were to what we are going to do with the proceeds.

1          Your Honor, we've agreed with the objectors to

2  bifurcate the issue.  In other words, we've asked for Your

3  Honor to enter an order today approving the settlement

4  agreement which we need to immediately get to London, because

5  the bar date in that case is two days from now, and if the

6  settlement agreement is entered and approved, then we will have

7  a problem vis-a-vis the bar date, however, what we would like

8  to do is have the isssue of what happens to the money before

9  another day and a separate Court order.  We're discussing with

10 the various constituents what we should do with the money,

11 whether it just go into Grace's ordinary coffers or go into

12 some sort of a separate account, and who holds that account.

13         There's a little bit of a dispute among the

14 committees as to what should be done with the money, so we

15 would ask Your Honor today if you would enter an order

16 approving the settlement agreement which order also provides

17 that the issue of what will be done with the money will be

18 subject to separate order, and if the money comes in before a

19 separate order is entered, Grace will simply hold the money in

20 a segregated interest bearing account until that issue is

21 resolved.  We do not intend to resolve what ultimately happens

22 to the money.  That will be resolved under the Chapter 11 plan.

23 It's simply an issue of whether we hold the money in a separate

24 account or whether we simply put it into the coffers of the

25 estate.

7

1          THE COURT:  That's fine.  Do you need to submit that

2  type of an order?

3          MS. BAER:  We do, Your Honor.  We have a draft order.

4  I actually sent a colleague out to make a few copies, so we

5  could share it with constituencies in the courtroom, and your

6  Clerk indicated she can fax it to you as soon as I have it

7  back.  So perhaps by the end of this hearing, we can, in fact,

8  have the order in front of you, read the order into the record,

9  and get it entered, and we ask that a duplicate copy be stamped

10 with your signature here, so that we can immediately get it off

11 to London.

12         THE COURT:  All right.  That's fine.  Anyone wish to

13 be heard?

14         MR. KRUGER:  Good morning, Your Honor.  Lewis Kruger

15 on behalf of the Official Creditors Committee.  I don't mean to

16 quibble with the suggestion that funds be held in a separate

17 account, but I do need to quibble with that.  There seems to me

18 to be no reason why funds that come into the estate need to be

19 separately segregated into a separate account.  W.R. Grace

20 seems to have fiduciary capacity and be responsible for the

21 assets under their control.  These funds should come into the

22 estate.  They should be in Grace's accounts.  Grace will know

23 no doubt note on its books and records the source of the funds.

24 The parties, if they think the funds belong elsewhere, and we

25 will respect that in the future, but there is no reason to

1  separately segregate them.

2          What the various asbestos constituencies would like

3  to see is some ability on their part by having the funds in a

4  separate account, to have a hook on those funds for future

5  designation as part of the benefits that they will ultimately

6  receive --

7          THE COURT:  Well what --

8          MR. KRUGER:  -- from these receivables.

9          THE COURT:  It seems to me that what we ought to do

10  is put them in a segregated account but not to be determined in

11  the plan.  What should happen is this issue should just get put

12  back on the agenda for next month.  We'll decide where they go

13  at that time, but why hold up the settlement for that issue?

14          MR. KRUGER:  I'm not suggesting --

15          THE COURT:  So if they're put --

16          MR. KRUGER:  I'm sorry.

17          THE COURT:  If they're put in a separate account --

18          MR. KRUGER:  I'm not suggesting --

19          THE COURT:  -- for a month or so until we can get

20  this issue addressed, it seems to me that that's appropriate.

21  But I agree, based on the documents that are provided, since it

22  appears that these policies apply to both asbestos and non-

23  asbestos liability issues, I'm not sure why they need to be

24  segregated at all either.  But I think I would prefer to hear

25  argument on that next month, and let's segregate them until

1  them.

2          MR. KRUGER:  And the premiums, of course, are paid

3  for by the company out of its general funds.

4          THE COURT:  Yes, I understand.  So it seems to me

5  though that the issue can simply be preserved, and we can get

6  to it next month, and let's at least let the settlement get

7  through.

8          MS. BAER:  Thank you, Your Honor.  I have the order

9  in front of me, and your Clerk is faxing it to you now.  It

10  currently provides that the settlement is approved, the debtors

11  are authorized to enter into the settlement agreement, that the

12  disposition of any consideration on account of the settlement

13  shall be governed by a separate order of the Court, and it

14  provides, Your Honor, in paragraph five that to the extent the

15  debtors receive any consideration before the Court enters an

16  order concerning its disposition, the debtor shall hold the

17  consideration in a separate interest-bearing account pending

18  further order of the Court.  I can certainly add here, Your

19  Honor, or you can add when you receive the fax, a sentence

20  indicating that's continued until next month.

21          THE COURT:  Okay.  Well, go ahead and add it.  Oh,

22  it's already being faxed you're saying.

23          MS. BAER:  It is.

24          THE COURT:  Okay.  Why don't you add it to that?

25  That the issue of the -- I guess just the hearing is continued

J&J COURT TRANSCRIBERS, INC.

1  until next month.  I think it's better to get the settlement

2  approved and deal with where the money goes later.

3        I am going to want some indication though from the

4  parties who are objecting that these funds have to be held in a

5  segregated account as to why, because it does not look like

6  from reviewing the documents that are here there is a need for

7  the debtor to segregate those accounts.  So I don't know

8  whether this is going to take an evidentiary hearing or whether

9  it's just going to be a matter of argument, but I do want some

10 argument on why these are not just general operating funds of

11 the debtor.

12       MS. BAER:  Thank you, Your Honor.  I'll pass that on

13 to the parties.  I don't believe they're in court today, but I

14 will indicate to them that that will be the issue taken up at

15 next month's hearing.  I believe it's only argument.

16       THE COURT:  All right.  Thank you.

17                     (Pause)

18       THE COURT:  Go ahead, Ms. Baer.  I'm sorry.  I'm not

19 sure where they're faxing it.  If they're faxing it to my

20 staff, I'm in another courtroom, so it's going to take a while

21 to get it over here.

22       MS. BAER:  Thank you.  When Rachel comes back, we'll

23 tell her that.

24       THE COURT:  All right.

25       MS. BAER:  Your Honor, the next matter before you is

1 item number 7, which is the application of David Austern to

2 employ Swidler Berlin.  Items 8 and 9 are also related, and I

3 believe counsel is here for Mr. Austern to address those

4 issues.

5          THE COURT:  All right.

6          MR. PHILLIPS:  Good afternoon, Your Honor.  Jack

7 Phillips, local counsel.  I'd like to introduce Roger Frankel

8 to the Court of Swidler Berlin.  His motion pro hac is pending

9 before Your Honor.

10          THE COURT:  All right.  Thank you.

11          MR. FRANKEL:  Good afternoon, Your Honor.  It's Roger

12 Frankel from Swidler, Berlin, Shereff, Friedman.  With me is my

13 partner Richard Weyron of Swidler Berlin who will be addressing

14 this issue.  Also I wanted to let the Court know that Mr.

15 Austern is in the courtroom today, and Mr. Radecki from CIBC

16 World Markets is also in the courtroom today.

17          THE COURT:  All right.

18          MR. FRANKEL:  Thank you, Your Honor.

19          MR. WEYRON:  Your Honor, Richard Weyron from Swidler

20 Berlin.  This matter continues from our hearing -- the last

21 omnibus hearing where Your Honor raised several questions and

22 permitted us the opportunity to submit a supplemental brief,

23 which we have done.  I believe we've addressed Your Honor's

24 concerns.  I'm happy to walk through those issues if you wish,

25 and I'm happy to address any other questions that the Court may

1 have.

2        THE COURT:  Okay.  What I think with respect to this

3 issue I'm still concerned about is Swidler Berlin was filing

4 the proof of claim that was said to be Phillip Ryan's claim but

5 filing in Swidler's name.  Then the supplemental information

6 seems to indicate that that proof of claim will be withdrawn

7 and waived.  But then if that's the case, I don't know what

8 happens to Phillip Ryan's claim.

9        MR. WEYRON:  Your Honor, I understand that the proof

10 of claim has been withdrawn, and we have agreed not to seek

11 compensation for Mr. Ryan for the fees incurred in the matter.

12 So he owes Swidler no further funds.

13        THE COURT:  All right.  I think that addresses that

14 issue.  Let me see.  Oh, no, it doesn't, because I haven't

15 heard from K and L with respect to whether or not it has

16 implemented an ethics wall.  I understand your firm has

17 implemented an ethics wall, but I have nothing at this point

18 that indicates from K and L whether it has also implemented an

19 ethics wall, so I don't think the issue is adjudicated until I

20 get that affidavit.

21        MR. WEYRON:  I understand, Your Honor.  Ms. Baer has

22 indicated she could speak to that for a moment.

23        THE COURT:  All right.

24        MS. BAER:  Your Honor, Kirkland and Ellis has, in

25 fact, put in place a wall vis-a-vis the attorney at Kirkland

1 and Ellis who is related to the attorney at Swidler Berlin so

2 that no information will be shared with him vis-a-vis the W.R.

3 Grace case.

4          THE COURT:  All right.  Can you submit an affidavit

5 to that effect?

6          MS. BAER:  Yes, I can, Your Honor.

7          THE COURT:  All right.

8                    (Pause)

9          THE COURT:  Okay.  I've signed the order at agenda

10 number 7.

11          MR. WEYRON:  Thank you, Your Honor.

12          THE COURT:  Go ahead.

13          MR. WEYRON:  Next was matter number 8, which is the

14 application of Mr. Austern to retain CIBC as its financial

15 advisor.  Again Your Honor raised two questions.  We attempted

16 to address them in a our supplemental brief.  First was the

17 proposed engagement letter provided for payment in advance

18 instead of in arrears.  An amended engagement letter is

19 attached to the supplemental brief that provides for payment in

20 arrears subject to the compensation orders entered in the case.

21          In addition to addressing the point Your Honor

22 raised, the CIBC has indicated it will provide to the Court and

23 the fee auditor on a monthly basis a summary of the services it

24 performs and the hours that those services require.  As

25 responsive to the Court's concern about financial advisors

1  being paid on a lump sum basis, they are prepared to make that

2  report.  This is a six-month arrangement beginning in June when

3  Mr. Austern asked CIBC to begin helping him with his due

4  diligence shortly after he was appointed.  We would be back

5  before the Court in six months with a new arrangement.  We had

6  committed to the debtors that before we came to court we would

7  discuss any new arrangement with them in advance so that they

8  will at least have an opportunity to have some input depending

9  on how the case is at that point.

10         The second question Your Honor raised was about the

11 terms of CIBC's indemnity.  We addressed two points.  First,

12 the indemnity agreement excludes indemnification for actions

13 resulting from CIBC's bad faith, gross negligence, or willful

14 malfeasance.  The original engagement letter also had the word

15 solely in there which is not permitted under United Artists.

16 We've taken that out in the amended engagement letter.  So I

17 think the Court's concern about the scope of indemnification is

18 consistent now with United Artists and the other decisions.

19         Secondly, you were --

20         THE COURT:  Pardon me.  Does it include gross

21 negligence, too?

22         MR. WEYRON:  It carves out bad faith, gross

23 negligence, or willful malfeasance.

24         THE COURT:  All right.  Thank you.

25         MR. WEYRON:  The second point Your Honor raised was

1 who should provide the indemnity.  We not only addressed it in

2 our brief but also provided an appendix of other cases where

3 the indemnification of financial advisors during the pendency

4 of a case financial advisors for committees, for the debtors,

5 and for other futures reps is provided by the debtor -- by the

6 estate during the course of the case.  Your Honor's question

7 was whether at some point in the future if there is a 524(g)

8 trust, whether that trust might be the appropriate ultimate

9 indemnitor.

10         That's not an issue we can answer today.  There is no

11 trust, and certainly the Futures Rep alone doesn't control

12 what that trust might say.  So as with the other asbestos cases

13 pending before the Court, during the pendency of the case and

14 prior to confirmation such indemnification is provided by the

15 estate.  I think we've established that this is consistent not

16 only with the case law but with the practice in other cases,

17 and we would ask Your Honor to enter this order as well.

18         THE COURT:  All right.  Are there any objections left

19 to this order?

20         MR. WEYRON:  I believe there are not, Your Honor.

21 The only objection that was filed was one by the Property

22 Damage Committee that noted that they then had a pending appeal

23 of Mr. Austern's appointment.  We changed the language of the

24 order to reflect that the appointment of CIBC would be

25 effective only for so long as Mr. Austern serves as Futures

1  Rep.  In the interim the PD Committee has withdrawn its appeal,

2  so I believe that issue is completely resolved.

3          THE COURT:  All right.

4          MR. BAER:  Your Honor, Janet Baer on behalf of the

5  debtor.  Your Honor, the parties questioned the indemnity and

6  whether or not in this Chapter 11 case it's consistent with

7  what has been entered by the Court previous, and the debtor

8  feels compelled to point out to the Court that with respect to

9  Blackstone, which is the debtors' financial consultant, the

10 indemnity that is similar to this one does exist.  However,

11 with respect to Conway Del Genio, who is the financial

12 consultant for the Asbestos Property Damage Committee, the

13 order entered by Judge Farnan approving that application

14 specifically excluded the indemnity provision vis-a-vis Conway

15 Del Genio.  So the precedent that in this case, Your Honor, is

16 I guess fixed.

17         THE COURT:  Well, I have some concern about what

18 parties are getting indemnities up front in these cases where

19 the whole purpose for providing their services is, because

20 they're supposed to provide some expertise.  If they don't have

21 the expertise, I don't know why they're being hired.  And if

22 they do have the expertise, I don't know why the estate's

23 providing an indemnity.  So I am really somewhat concerned

24 about that issue.

25         MR. WEYRON:  Your Honor, I think for this purpose I'm

1  looking now at CIBC's.  I want to double check, but my

2  recollection is the indemnity is subject to review by a court.

3  There's nothing automatic about it.  So that if an indemnity

4  claim were ever asserted, there would be an opportunity for

5  judicial review at that time in terms of propriety.

6        THE COURT:  All right.  Well, if it's subject to

7  judicial review, it seems to me that that at least -- I'm not

8  sure that's as appropriate as having the same type of indemnity

9  that comes forward with respect to any other party through a

10 confirmed plan, but nonetheless, it's at least better than just

11 having it automatic.  So is that part of the engagement letter?

12 I'm sorry.  I probably knew that once, but I don't know now.

13        MR. WEYRON:  Your Honor, I'm in exactly the same

14 position.  I knew it once, and I believe it is, but I would

15 have to find the language quickly.

16        THE COURT:  All right.  If you can assure me that it

17 is, then I'll sign this order.  If not, I want to modify the

18 order to say that it's subject to judicial review.

19        MR. WEYRON:  All right.  Your Honor, if I could just

20 have a moment --

21        THE COURT:  Yes.

22        MR. WEYRON:  -- and not hold up the hearing, I'll get

23 that message back to chambers.

24        THE COURT:  All right.  Thank you.

25        MR. WEYRON:  Thank you.

1          THE COURT:  Okay.  With respect to item 9, I did

2   receive the supplemental information that was submitted, and I

3   apologize.  When I was looking at this issue, I had forgotten

4   that Judge Farnan is, in fact, not the District Court Judge who

5   is assigned to this case now.  So it seems to me as long as he

6   is not the District Court Judge assigned to this case and as

7   long as there is an ethics wall that prohibits his sons from

8   working on this case in the event that he is at some point --

9   again becomes the court, but also based on the fact that he was

10  the judge assigned, I believe they are conflicted and cannot

11  work on this case.  If I have a representation that there is an

12  ethics wall, that they have not and will not work on this case,

13  then I think that item 9 can be addressed, too.

14          MR. PHILLIPS:  Fine, Your Honor.  Jack Phillips on

15  behalf of Phillips, Goldman, and Spence, whose supplemental

16  brief is what you have before you.  I can represent to the

17  Court that they had not worked on this case to date.  I will

18  further represent to the Court that there will be an ethics

19  wall which will prohibit them from working on this case.  That

20  was one of three concerns raised by Your Honor.

21          I believe my supplemental brief addressed the other

22  two concerns.  That is that Phillips, Goldman, and Spence will

23  withdraw its claim against the debtor.  And the third and final

24  concern was the Court felt that the language in my original

25  declaration was not sufficient, and I believe I've cured that

1 language, also, Your Honor, in the proposed supplemental

2 declaration.

3          THE COURT:  Okay.  Now for this one, is the order

4 that was attached to --

5          MR. PHILLIPS:  The same change was made, Your Honor.

6 That is that there had been an objection to the original order

7 submitted, and the order was changed to reflect that Phillips,

8 Goldman, and Spence would act as local Delaware counsel for

9 David Austern only so long as Mr. Austern serves the future

10 plaintiff's representation.  As a consequence, the objection

11 was withdrawn.

12          There had also been an objection filed by the U.S.

13 Trustee's Office, Your Honor.  That was on the basis of the

14 existence of the PG&S claim against the debtor.  That claim

15 will be withdrawn.  That will resolve that objection.

16          THE COURT:  All right.

17                    (Pause)

18          THE COURT:  Okay, then I've signed the order on

19 agenda 9.

20          MR. PHILLIPS:  Thank you, Your Honor.

21          MR. WEYRON:  Your Honor, Richard Weyron for the

22 Futures Rep.  If I could ask the Court to go back to matter 8

23 for just a moment --

24          THE COURT:  Yes, sir.

25          MR. WEYRON:  -- which was the CIBC question?

1           THE COURT:  Yes.

2           MR. WEYRON:   The amended engagement letter has Annex

3  A on indemnification.   Subpart (d) contains language as

4  follows.   There's a long opening paragraph that says if CIBC

5  believes its entitled to indemnification before the entry of an

6  order confirming the plan or the entry of an order closing the

7  case, whichever occurs first, that they must file an

8  application with the Bankruptcy Court, and the company may not

9  pay such amounts to CIBC before the entry of an order by the

10 Bankruptcy Court approving payment.

11          THE COURT:  All right.  That's fine.

12          MR. WEYRON:   The issue would come back to the Court.

13 Thank you, Your Honor.

14          THE COURT:  Okay.  That order is entered then.  Thank

15 you.  Ms. Baer.

16          MS. BAER:  Your Honor, that brings us to item number

17 10 on the agenda, the motion of Intercat for leave to file a

18 late proof of claim.  The debtors filed an objection to the

19 motion of Interact, Your Honor.  It's the debtors' position

20 that excusable negligent has not been argued here, and that a

21 conscious decision was made not to file a proof of claim, and

22 there is no reason at this point in time to allow it.  I

23 believe counsel for Intercat is here.

24          THE COURT:  Good afternoon.

25          MR. HILL:  Good afternoon, Your Honor.  I'm Karl

1  Hill, local counsel for Interact.  With Your Honor's

2  permission, David Posner from the Hogan and Hartson firm of New

3  York City would like to address Your Honor.  I did file his

4  admission papers on Friday of last week.

5          THE COURT:  All right.

6          MR. HILL:  Thank you.

7          MR. POSNER:  Good afternoon, Your Honor.  David

8  Posner of Hogan and Hartson for Interact, Inc.  As Ms. Baer

9  indicated, this is a motion to file a late proof of claim.

10  Your Honor, this is not a typical creditor in the sense that

11  there's a particular complex history between the debtor and

12  this creditor.  It perhaps makes the motion a little bit less

13  like a typical late claim motion, and with the Court's

14  indulgence I'd like to give you just a bit of history that may

15  help put this motion in perspective, because I submit that this

16  isn't merely about the debtors' concerns about the proverbial

17  floodgates, and that the debtor is really prejudiced by this

18  application.

19          Intercat, Your Honor, is a company based in Sea Girt,

20  New Jersey with a manufacturing facility in Savannah, Georgia.

21  They manufacture catalysts -- additives that they've added in

22  the refining process that help make petroleum and other

23  gasoline products, and they manufacture a unit called an FCC

24  Unit, which is a piece of apparatus which gets added onto the

25  refiner's equipment that helps to put the additives or

**J&J COURT TRANSCRIBERS, INC.**

1  catalysts into the refining process, and that's called an FCC

2  Unit.

3          Intercat has 15 percent of the worldwide market in

4  additives, and they obviously do a large business in these FCC

5  Units.  Grace, as you might imagine, Your Honor, is the

6  dominant player in this field.  They have a lion's share of the

7  balance of the world market in the catalyst or additive market.

8  It is, however, the central focus of Intercat's business.

9  Intercat is a relatively small company, a 30 to 50 million

10 dollar a year business.

11         Grace and Intercat have a fairly long history as

12 competitors and fierce competitors at that.  Grace and Intercat

13 have been involved in a patent infringement suit in the past

14 over one of the catalysts that Intercat manufactures.  Grace,

15 in the late 1990s, commenced a patent infringement suit and

16 ultimately obtained a judgment against Intercat for $30 million

17 based on triple damages.  As a result of that judgment, it got

18 confirmed on appeal, Intercat themselves were a Chapter 11

19 debtor down in Savannah, Georgia from 1999 to 2002 when they

20 emerged from Chapter 11.  My firm was debtor's counsel in that

21 proceeding, Your Honor.

22         Grace was the largest single creditor in that Chapter

23 11 case, and together with Mobile -- Exxon Mobile was the other

24 large creditor in that case, and they teamed up on a number of

25 different issues in that Chapter 11 case, and I'm not going to

1 rehash the history of that Chapter 11, but I will point out

2 that they did have a Trustee appointed in the Chapter 11 case

3 down in Savannah.  It resulted in a pretty interesting

4 published decision on a Chapter 11 Trustee.  Ultimately,

5 however, Intercat confirmed the case and emerged from Chapter

6 11 in March of 2002.  But even during the Chapter 11 there was,

7 you know, fierce contention among the parties, as you might

8 imagine, including a dispute which was ultimately settled about

9 Grace's dissemination of certain information in the marketplace

10 about Intercat's catalysts.

11        In October of -- November of 2002 Intercat commenced

12 the patent infringement suit out in Chicago, ultimately

13 transferred to Minnesota, against Multech, which is the subject

14 of the late claim motion.  Again, it was a patent infringement

15 case.  This case centered around the FCC Unit that I described

16 to Your Honor.  The unit that Intercat has, what we call a 236

17 patent, that gets attached to the refinery equipment and

18 injects the catalyst into the refining process.

19        In that original lawsuit there wasn't any mention of

20 Grace.  I think Grace attached the original complaint to their

21 objection to our motion.  In March of 2003 -- March 4th, as

22 Grace points out in their objection -- a little under a month

23 before the bar date in this case -- Grace makes a motion to

24 intervene in that lawsuit now pending out in Minnesota.  That

25 motion to intervene actually wasn't granted, Your Honor,

**J&J COURT TRANSCRIBERS, INC.**

1   although Grace is correct.  It wasn't opposed by all the

2   parties concerned.  That motion wasn't granted until after the

3   bar date.  It was granted on May 8th of 2003 after the bar date

4   passed.

5        Clearly, Your Honor, the complaint in the patent

6   infringement case acted an informal proof of claim.  Clearly,

7   Grace was on notice that its conduct may give rise to some sort

8   of liability.  It felt the need to intervene as a defendant in

9   the case and defend the action, however, at the time they

10  intervened, while Intercat knew that Multech was putting the

11  FCC Unit that we claimed was infringing, into the marketplace,

12  we didn't know the extent to which it was in the marketplace,

13  and we didn't know whether and where Grace may have put the

14  units in place, and we didn't know where else the unit was in

15  place.  We didn't have any specified knowledge at that point in

16  time.

17       It wasn't until discovery got under way in the patent

18  infringement case did we learn that Grace was aiding and

19  abetting the alleged infringement, and that there were numerous

20  units that were put in place by Grace at certain refineries.

21  And that discovery has been ongoing.  We didn't learn about the

22  specific nature of the units that were put in place the first

23  time until December 22nd, 2003 when Grace actually finally

24  answered the interrogatories that were interposed in the patent

25  infringement case.  We didn't submit, because there's a

1 confidentiality order in place in that patent infringement

2 case, and I'm not at liberty, but I believe a court in

3 Minnesota would submit the discovery responses.

4        The discovery has been ongoing indeed, even after

5 that first submission in December of -- late December of '03

6 when we first had an inquiry.  They were being put into place

7 by Grace, then depositions commenced, and indeed Grace has

8 supplemented their interrogatory responses at least twice, most

9 recently about 60 or 90 days ago, and that was -- at that point

10 in time we really began to understand the true nature and

11 extent of the possible infringement, and that's when we were

12 contacted about making the late proof of claim motion.

13        Your Honor, I think that Grace has been actively

14 engaged in this litigation for some time.  I'm advised -- I'm

15 not obviously, nor is my firm, patent infringement counsel.

16 There's a firm in Chicago.  I'm advised that the parties have

17 spent well over a million dollars defending this lawsuit.  It's

18 supposed to go to trial some time next year in Minnesota.  Even

19 at this juncture, Your Honor, any proof of claim that Intercat

20 would file would be a contingent unliquidated proof of claim.

21 While we obviously have a theory as to what we think the nature

22 of the liability is, that will depend obviously on the full

23 extent of the infringement theory that gets accepted by the

24 Court in Minnesota and any other measure of damages, including

25 trebling which is possible in patent infringement cases.

1          With respect to Grace's claims that this is going to

2    open the floodgate or somehow they've been prejudiced, again,

3    in part, Your Honor, this is a patent infringement case.  We're

4    not talking about some other type of creditor.  I think, Your

5    Honor, that what's happening here is that Grace is trying to

6    use the bar date as a shield to shield their own conduct.  They

7    best know what their conduct is and the extent to which it

8    maybe applies to liability, and they've known for a long time

9    obviously since they're actively engaged in the litigation in

10   Minnesota, and they've been actively defending this suit.

11          There is no plan on file.  I know that the debtor has

12   represented that they're in the process of negotiating a plan,

13   but it's not on file now.  Any liability that may be determined

14   in favor of Intercat I would submit, Your Honor, is not going

15   to change the distributions.  That claim would be an unsecured

16   claim in any event and probably wouldn't change the formulation

17   or prejudice the debtor in the revelation of their plan.

18          To give Your Honor just an idea of what Intercat

19   believes the potential damages are, and again all subject to

20   proof and prevailing in Minnesota, Intercat believes that the

21   measure of damages is somewhere in the order of about five

22   million dollars.  That's what they believe the infringement

23   would be.  So based on all of that, Your Honor, we don't

24   believe that the debtor is prejudiced.  We believe, you know,

25   we acted as promptly as we could based on information that came

1  to light in discovery in the action in Minnesota and sought to

2  file a late proof of claim.  Thank you.

3          THE COURT:  Ms. Baer.

4          MS. BAER:  Your Honor, as counsel for Intercat

5  eloquent put it, Grace and Intercat have been involved in many,

6  many different matters over the past number of years.  They are

7  not strangers to each other, and Intercat was not only well

8  aware that Grace was in Chapter 11 and a bar date had been set,

9  but Intercat got actual notice of the bar date.  Your Honor,

10 when determining whether or not a late proof of claim should be

11 allowed, Your Honor has to use an exclusive excusable neglect

12 standard.

13         Here Intercat was well aware of the last bar date,

14 well aware of the relationships between and among the parties,

15 including the relationships that are involved in this

16 litigation that's ongoing, and made a conscious decision not to

17 file a proof of claim they now seek to file.  The lawsuit was

18 pending many months before the Chapter 11 bar date passed.  As

19 you'll recall, Your Honor, that bar date had a nine-month

20 window.  In other words, Intercat knew for nine months that

21 Grace had a bar date coming up at the end of March.  Grace

22 moved prior to the expiration of the bar date to intervene in

23 the action -- the Multech action at issue here, and although

24 the Court did not enter the order permitting the intervention

25 until after the bar date, again Intercat was well aware of

1  Grace's involvement and well aware of the Grace bar date.

2          Your Honor, the case law, Best Products and TWA as

3  examples, suggest that ignorance of one's own claim does not

4  constitute excusable neglect.  This is not a situation where

5  counsel didn't know Grace was in bankruptcy.  It's not a

6  situation where counsel did not proof of a bar date notice

7  because of lack of proper address or counsel that was

8  unsophisticated.  This is a situation where Multech simply made

9  the decision not to file a claim and now in hindsight, another

10 year having past and more litigation having progressed, has

11 decided it would have been a good idea to have filed a claim by

12 the bar date.

13         Your Honor, we spent four million dollars.  We had

14 nine months, and we did actual notice to hundreds of thousands

15 of parties.  It is not appropriate in this circumstance to give

16 one of those parties who not only got notice but was well aware

17 of its various interrelationships in claims -- potential claims

18 against Grace to come in a year after the bar date expires and

19 ask this Court to allow them to file a late proof of claim.

20         THE COURT:  All right.  How is the debtor prejudiced

21 if this proof of claim is permitted?

22         MS. BAER:  Your Honor, the major prejudice is that it

23 whittles away at a bar date which was set by this Court at

24 great expense to the debtor to notice parties -- give actual

25 notice as well as do publication notice, and each time somebody

1   comes in and has their own unique circumstance, which everybody

2   will always argue, the bar date becomes less and less final.

3   Your Honor, we're in the process of doing claims objections.

4   We're in the process of getting cases prepared to be sent to an

5   ADR.  The train has moved considerably from where it was

6   several years ago, Your Honor, and to allow people to come in

7   and file late proofs of claim, frankly, the standard has to be

8   extremely high, and Intercat does not meet that standard here.

9           THE COURT:  Did Intercat have actual notice?

10          MS. BAER:  Yes, Your Honor.  We have attached to our

11  pleading a certificate of service indicating Intercat was

12  noticed and giving the address of the person it was sent to.

13          MR. POSNER:  Your Honor, about three points really

14  quick.  I will answer the Court's question.  I can't dispute

15  that James Sylvester, the General Counsel of Intercat, was on

16  the bar date notice, and I don't think if he were here today he

17  would dispute that he didn't get it, or he would dispute the

18  non-receipt of the bar date notice.

19          First, Your Honor, just the confidentiality

20  provisions and order in the patent infringement Multech case

21  has been in place since its inception.  Second, we didn't bring

22  Grace into the lawsuit originally, because we didn't realize or

23  know that we had a claim against them.  They were the ones who

24  fought to intervene.  And addressing the issues of prejudice, I

25  checked the docket, and I think the debtor made this point.  I

1 think there's been only one other motion to file a late proof

2 of claim, so again, unless there's a lot of people waiting in

3 the wings to file a late proof of claim in these motions, I --

4        THE COURT:  Yes, but if Intercat had actual notice of

5 the bar date and has had these issues with the debtor in the

6 past, then it seems to me it must have elected not to file a

7 proof of claim, and making that conscious choice is not

8 neglect.  It's a choice, so I mean I -- the standard is

9 excusable neglect.  If there's no neglect at all, then I never

10 get to the question of whether it's excusable.

11        MR. POSNER:  I understand, Your Honor, and I

12 obviously can't speak for, you know, what Mr. Sylvester did or

13 didn't do other than to say that I think as soon as facts came

14 to light from discovery in the patent infringement case, that,

15 you know, made him believe that he had such significant issues

16 on his hand with Grace.  You know, he contacted us about making

17 a motion, and that was, you know, approximately, you know, 90

18 to 120 days ago, as the interrogatories and discovery got

19 supplemented.  And then, like I said, Your Honor, discovery is

20 ongoing.  In the last week they were in Chicago on depositions

21 in this matter.

22        THE COURT:  Okay.  Well, it seems to me that without

23 some evidence that, in fact, there was neglect at all, I don't

24 have the authority to grant a late proof of claim.  To the

25 extent that it's discretionary, it seems to me that the

1 standard is excusable neglect, and, therefore, I need some

2 evidence of neglect, and I don't see it on this record where

3 Intercat had notice of the bar date and simply didn't file and

4 in addition to the notice of the bar date had Grace intervening

5 in an action that Intercat did not commence against Grace to

6 start with.  That surely should've prompted somebody to either

7 ask what was going on or to get an extension of time to file a

8 proof of claim.  So I don't at this point see that there is

9 neglect.  It appears to have been a choice.

10         For that reason, I'm going to deny the motion to file

11 the late proof of claim.  If you've got some motion for

12 reconsideration, you can certainly file it if you've got some

13 evidence that indicates that the facts that I am assuming to be

14 correct are not the same.  But based on this record, I have no

15 basis on which to determine that there was any neglect let

16 alone excusable neglect.

17         MR. POSNER:  Thank you, Your Honor.

18         THE COURT:  If you will submit an order, Ms. Baer,

19 that denies this motion as I've stated on the record, I will

20 sign that order.

21         MS. BAER:  We will do so, Your Honor, with

22 certificate of counsel.

23         THE COURT:  All right.

24         MS. BAER:  Your Honor, that takes us to item number

25 11, which is the motion to lift stay filed by David Slaughter.

1  Counsel for Slaughter contacted our local counsel a couple of

2  days ago and asked that this matter be continued to the October

3  25th omnibus hearing.

4          THE COURT:  All right.

5          MS. BAER:  Your Honor, item number 12 on the agenda

6  is the interim applications of counsel for fees which I believe

7  you indicated was already entered.  That's the same I think as

8  item number 6 on the agenda.

9          THE COURT:  Okay.  I'm sorry.  That's 12 is the same

10  as 6?

11         MS. BAER:  It is, Your Honor.  It's listed as both

12  uncontested and contested not knowing where it would ultimately

13  come out.  It came out as an uncontested matter, and a

14  certificate of counsel was filed.

15         THE COURT:  Okay.  In the future don't give me

16  duplicate motions.  Just give me one.  If it turns out that

17  they're listed as uncontested and they're contested, you'll put

18  something in the agenda, and I'll see it.  You won't file a CNO

19  or a COC, and I won't do an order.  Or if you have a contested

20  and it turns out that it's uncontested, then you will file a

21  COC or a CNO and probably get an order.  So don't give me

22  duplicates.  It's too confusing.

23         MS. BAER:  Thank you, Your Honor.

24         THE COURT:  Okay.  Thank you.

25         MS. BAER:  Understood.  Your Honor, that moves us to

1    item number 13.  Your Honor, item number 13 is the debtors'

2    motion to have the Court essentially direct the plaintiffs in

3    an action called Kerry Evans, et al against various members of

4    W.R. Grace's Board of Directors and Officers for alleged

5    violations of ERISA laws vis-a-vis the Grace 401k plan.  Your

6    Honor, it's the debtors' motion to essentially enforce the

7    preliminary injunction that was entered by this Court.  The

8    preliminary injunction clearly unequivocally, with no question,

9    enjoins this action.

10          Paragraph 10(e) of the preliminary injunction states

11   that "Actions against current or former officers, directors, or

12   employees of debtors arising out of such officers', employees',

13   or directors' employment or relationship with the debtor are

14   stayed."  Your Honor, there is no issue here.  The terms of

15   this injunction cover this action, and this is exactly the kind

16   of action that the injunction was meant to provide for.  This

17   is an action that does arise out of the Board of Directors'

18   relationship with the debtor and out of the officers' and

19   employees' employment with the debtors.  And, Your Honor, all

20   but one of the defendants are current Board of Director

21   members, officers, or employees.  The very people who are

22   making decisions on a day-to-day basis of this company and

23   about the Chapter 11 plan we are about to file are the very

24   people who are named as defendants in this action.

25          Your Honor, I remind the Court of why we got the

**J&J COURT TRANSCRIBERS, INC.**

1  preliminary injunction in the first place.  If you look at

2  paragraph one in the findings on the January 22nd, 2002

3  preliminary injunction order, it indicates that, "Without the

4  injunctive relief sought the debtors would suffer the risk of

5  irreparable harm including potential diminution of estate

6  property."  Your Honor, there's no question here that this

7  action will, in fact, cause irreparable harm and will, in fact,

8  result in diminution of property or diminution of estate

9  property.

10        Your Honor, under the bylaws of W.R. Grace the debtor

11  has agreed to indemnify his directors, officers, and employees

12  for actions that may arise, "including service with respect to

13  employee benefit plans maintained or sponsored by the company."

14  And that's Exhibit L to our motion, Your Honor, paragraph 6.7.

15  Your Honor, under that provision Grace has to defend the

16  directors, officers, and employees, and indemnify them for any

17  expenses and damages related to the action.

18        Number two, Your Honor, even if our fiduciary

19  liability insurance may cover this action, it still has an

20  impact on the debtors' estates.  Number one, of course, there's

21  a deductible, and that, of course, will come out of pocket by

22  the debtor immediately to defend the directors, officers, and

23  employees.  Number two, this fiduciary insurance coverage is an

24  asset of the debtors' estate.  Its property of the debtors'

25  estate that will be depleted if this action would go forward

1  against the directors, officers, and employees.  And, Your

2  Honor, it's not D and O insurance.  It's fiduciary liability

3  insurance, and it is somewhat different in that it is not just

4  insurance that is there for the benefit of directors and

5  officers.  It's also there for the benefit of the debtor, and,

6  in fact, Your Honor had the debtor not had the Chapter 11,

7  we're certain that the debtor would have been named in this

8  action.  We're also certain that a modification of the -- a

9  request for modifying the automatic stay could come at some

10  point in time to name the debtor.  This insurance is for the

11  debtor as well as the directors, officers, and employees, and

12  if the matter were to go forward against them, it would be

13  depleted, therefore, depleting property of the estate.

14       Your Honor, the preliminary injunction was also

15  entered just as important to protect against the conversion of

16  the debtors' assets and its key personnel.  As indicated, these

17  are the key decision makers for the company.  Its Board of

18  Directors is involved every step of the way in developing the

19  Chapter 11 plan, the disclosure statement, and the documents

20  that go with it that are all due to be filed with this Court on

21  October 14th.

22       Our Chief Executive Officer's main duty is to see

23  this plan go forward through this Chapter 11 case.  Your Honor,

24  in fact, the Chief Executive Officer focuses there are our

25  President focuses much more on operations today in order to

1 make sure that both very key aspects of this company move

2 forward at the same time.  Equally so is the importance of our

3 senior executives who are named as parties to this lawsuit.

4 It's naive to say that there would be no irreparable harm.

5 There is an impact.

6       I don't think it takes too much to figure out that

7 having your Board of Directors and your current chief

8 executives sued personally for liability is a tremendous

9 diversion of time and energy at a key time in this Chapter 11

10 case, Your Honor.  As we've indicated, the Chapter 11 plan is

11 due to be filed, and these parties have daily involvement in

12 that situation.

13       Also, Your Honor, the preliminary injunction was

14 entered using the <u>Manville</u> precedent to avoid the potential of

15 collateral estoppel this year.  While Grace is not named, if

16 this action were to proceed, Grace would absolutely have to be

17 there.  This relates to the Grace 401k plan.  This relates to

18 essentially actions that are taken at the company.  It's making

19 accusations with respect to matters that are going on within

20 the company vis-a-vis its asbestos and other claims, and

21 there's a tremendous risk, Your Honor, if the action were to go

22 forward of either collateral estoppel or at the least evidence

23 taint.  Once the bell is rung you cannot unring it, Your Honor.

24 If this action goes forward, if discovery goes forward, not

25 only would Grace have to participate, but Grace is then also at

**J&J COURT TRANSCRIBERS, INC.**

1  risk vis-a-vis whatever discovery is taken and the context in

2  which it is used.  The <u>Manville</u> standard, Your Honor, is not

3  actual collateral estoppel.  It's the risk of collateral

4  estoppel which clearly is involved in this situation.

5       Your Honor, in the response to our motion plaintiff's

6  counsel has questioned why this was brought a rule to show

7  cause.  Your Honor, it was very clear why it was brought that

8  way.  The preliminary injunction language is clear, and

9  counsel, myself, on four separate occasions sent letters asking

10  for the plaintiffs to honor the preliminary injunction or

11  indicate what they intended to do.  I received one written

12  response which said we need more time.  That time passed.

13  Nothing happened.  I sent another letter.  I then did have a

14  telephone conversation with one of the counsel for plaintiffs

15  who indicated he did not believe the preliminary injunction

16  applied here, thought that it only applied to asbestos actions,

17  and would not agree that they were not permitted under the

18  preliminary injunction to proceed with this action.

19       Your Honor, I sent yet another letter, and then our

20  members of the Board were served, and I sent yet another letter

21  saying what are you going to do, will you honor the preliminary

22  injunction, and I was responded with silence.  Under those

23  circumstances, Your Honor, we felt there was no option but to

24  file this motion in the manner in which we filed it to bring it

25  to the Court's attention.  Not until the plaintiffs filed the

1  plaintiffs filed their response to our motion did we hear for

2  the first time, "Oh, of course, we were going to come to the

3  Bankruptcy Court and make sure before it went forward."  That's

4  not the way it looked to the company, Your Honor, and we did

5  not want our directors, officers, and employees to face having

6  to all hire separate counsel and defend themselves in the

7  action without it being made very, very clear that the

8  preliminary injunction applied here, and that was not

9  necessary.  We certainly could not take the risk of standing on

10 the preliminary injunction and not filing answers in the end.

11      Your Honor, I go back to one of the comments that was

12 made by the plaintiffs in one conversation I did have with

13 them, and that is the purpose of the preliminary injunction.

14 And I remind Your Honor that it's been a very long time.  I

15 actually read the transcripts myself to refresh my recollection

16 on all the details.  The preliminary injunction was modified.

17 It was originally entered as a temporary restraining order and

18 then actually pared back slightly when it was entered as a

19 preliminary injunction in May of 2001.

20      In June of 2001 the debtors moved to modify the

21 injunction, to broaden it, actually back to the way in which it

22 originally existed as a TRO.  The reasons for the broadening

23 were the following, Your Honor.  Number one, to alleviate the

24 substantial time and distraction involved in defending against

25 collateral litigation against present and former directors,

1 officers, and employees.  That is stated clearly and

2 unequivocally in the memorandum in support of the motion to

3 modify the preliminary injunction.

4       Number two, Your Honor, it was to shut down non-

5 asbestos cases where the debtor had indemnity obligations,

6 because indemnity obligations, of course, are then, in fact,

7 actions against the debtor.  Here, Your Honor, it's very clear

8 that the bylaws provide that we are, in fact -- we meaning

9 Grace, is, in fact, required to indemnify against these kind of

10 actions.  And again that was made clear and unequivocal in the

11 motion to modify and broaden, if you will, the preliminary

12 injunction.  The same allegations were also made in the amended

13 complaint that was filed at the time.

14       The whole purpose of the amended preliminary

15 injunction was to shut down the collateral litigation against

16 directors, officers, and employees, to shut down third party

17 litigation where Grace had indemnity obligations, and to shut

18 down future actions while the Chapter 11 case was pending

19 rather than have to come back to this court each and every time

20 somebody sued an affiliated  party or a director, officer,

21 employee, and the like.  It's clear, and it's unambiguous, Your

22 Honor.

23       Turning now to a moment away from the directors,

24 officers, and employees, we also have State Street and

25 Fidelity.  State Street and Fidelity were fiduciaries hired by

1 Grace to be involved in the 401k plan.  State Street, in fact,

2 Your Honor, is a new party to the proceedings which Your Honor

3 approved the appointment of approximately nine months ago.

4 Your Honor, the injunction is intended under Section 105 to

5 enjoin actions against affiliated entities which are

6 essentially actions against the debtor.  Your Honor, the

7 language of Paycor is very, very clear here.  Whether the

8 outcome of the action could conceivably have any affect on the

9 estate is a standard that's used to determine whether or not,

10 for example, jurisdiction under 1334 would permit and, in fact,

11 allow the Court to enter a preliminary injunction, however,

12 Your Honor, we actually don't need 1334 here, because also have

13 105.  The adversary complaint was filed in this case, and under

14 105 an injunction was requested and issued that enjoins actions

15 against third parties where, in fact, the debtors' estate would

16 be implicated.  Certain third parties were specifically named.

17 The idea was to protect where the debtor had a contractual

18 indemnity provision, and here, Your Honor, is where we get to

19 Fidelity and State Street.

20          In both the cases Fidelity, and in the Court's case

21 of State Street, there are contractual indemnities here which

22 obligate Grace to indemnify State Street and Fidelity who are

23 the very kinds of actions that are being alleged here in the

24 complaint against State Street and Fidelity.  And, Your Honor,

25 State Street has tendered its defense of these actions to

1  Grace, and Grace would be in a position where it will have to

2  pay for State Street's defense if the matter would go forward

3  against them, and, of course, have to then participate in the

4  litigation as this relates to again matters that were taken --

5  matters that dealt with what happened at W.R. Grace and will

6  affect W.R. Grace.  By permitting the action to go forrad

7  against State Street and Fidelity, it would defeat the very

8  purpose of the preliminary injunction as well as the --

9       THE COURT:  I'm confused.  If I just approve them

10  post-petition, then why -- and the actions alleged in the

11  underlying ERISA litigation are post-petition actions, then why

12  shouldn't they go forward?  If they're pre-petition, I think

13  they're clearly covered by the injunction.  But, you know, the

14  debtors' not going to forever be able to avoid litigation for

15  all post-petition activity that takes place.  Is it?

16       MS. BAER:  Your Honor, we certainly can't avoid it

17  forever, though we are, in fact, formulating and will file a

18  Chapter 11 plan, and one of the beauties of Chapter 11 is the

19  ability to take care of everything in one neat, clean package,

20  and it's the hope here, Your Honor, that we would take care of

21  this under the Chapter 11 plan.

22       THE COURT:  Well, all right.

23       MS. BAER:  The allegation --

24       THE COURT:  The debtor is clearly entitled to get a

25  discharge for I guess claims that arise before the date of

1  confirmation.  So in that sense I suppose even if this arose

2  post-petition but pre-confirmation, it could be encompassed

3  within that type of standard.  But I mean it's been a very long

4  time.  The debtor has been hiding behind this injunction for a

5  very long time.  I think it's time to get this case done.

6         MS. BAER:  Your Honor, we agree with you, and we're

7  going to meet your deadline of October 14th to file a plan and

8  file a disclosure statement.  It is our intention to deal with

9  these kind of actions, and all of the other actions, Your

10 Honor, vis-a-vis the Chapter 11 plan is precisely what it's

11 meant to do and to deal with the discharge issues.

12        THE COURT:  All right.  Is counsel for the other side

13 there?

14        MS. BAER:  I believe, Your Honor, he is.

15        MR. ETKIN:  Good afternoon, Your Honor.  Michael

16 Etkin, Lowenstein Sandler, bankruptcy counsel for Ms. Evans and

17 the punitive class.  Your Honor, I was retained by class

18 counsel once this issue and initial exchange of letters came to

19 the forum.  What strikes me, Your Honor, with respect to the

20 debtors' position -- and I'll get to the issue of the

21 applicability of the modified preliminary injunction in a

22 moment.  But what strikes me is that what the debtor is

23 essentially asking this Court to do is frankly unprecedented.

24 They're asking this Court to enjoin any litigation that

25 involves claims against directors and officers of this company

1  merely by virtue of the status of these individuals as

2  directors and officers or former directors and officers, and

3  frankly, nothing more.

4           And if you look at the case law, and you look at

5  Manville, and you look at the Robbins cases, all cases that the

6  debtor relief upon in connection with obtaining the injunctive

7  relief that it did with respect to the asbestos claims -- and

8  I'm not going to comment on the propriety of that, Your Honor,

9  but this is not A.H. Robbins.  This is not Johns Manville.

10  There's not a proliferation of ERISA litigation.  There is one

11  case.  This is not a case, as the modified injunction states,

12  where the directors and officers are being sued by virtue of

13  their employment as directors and officers of Grace.  They are

14  being sued plainly and simply by virtue of the fiduciary duties

15  that they owe to the participants in the ERISA plan.  These are

16  independent fiduciary duties that these defendants owe, and by

17  virtue of the breach of those fiduciary duties, they are

18  defendants in this litigation.

19           THE COURT:  Well, they never would've been in that

20  position but for their employment with Grace.  I mean it's

21  clearly -- they're being sued clearly because of actions that

22  they've taken in the course of their employment with Grace or

23  their relationship with Grace.

24           MR. ETKIN:  Your Honor, if we broaden it to that

25  point, Your Honor, perhaps, you know, we can take that leap,

1 but I don't believe that's what the modified preliminary

2 injunction states, and if you look at the genesis of the

3 modified preliminary injunction, which are additional lawsuits

4 not asbestos related, some product liability cases, but

5 fundamentally there were two employment discrimination cases

6 which were specifically named in connection with the modified

7 injunction, and the one paragraph in those pleadings that dealt

8 with extending the injunction to the point that the debtors

9 wish to extend this injunction to now, they were employment

10 discrimination cases.  Again, cases that were brought against

11 these individuals based upon their status as employees or

12 officers of the company.  Literally the same thing.

13        THE COURT:  For which the debtor has an indemnity

14 obligation.

15        MR. ETKIN:  Let's talk about that for a moment, Your

16 Honor, and I'm not going to rehash the arguments set forth in

17 our opposition papers which state and the case law even in this

18 Circuit is that indemnification obligations alone do not form

19 the basis for this extraordinary injunction relief under 105.

20        THE COURT:  Well, let's talk about one individual in

21 particular, and that is the CEO of the company who at this

22 point is apparently the Chief Restructuring Officer with a plan

23 due in approximately three weeks.

24        MR. ETKIN:  Your Honor, if you want to talk about him

25 in particular, number one, we haven't seen any evidence, Your

1 Honor, but for an affidavit that was hastily drawn up and

2 served as a reply, because there was no evidentiary support

3 submitted with the initial motion papers.  So we see that four-

4 page affidavit with conclusory allegations about these

5 responsibilities.  Of course, Your Honor, I'm a bankruptcy

6 practitioner.  I understand the responsibilities of these

7 individuals with respect to the plan.  The fact is by virtue of

8 this case going forward in terms of where the case is, the

9 status of the case, what can and can't be done, will that

10 impact these individuals on the short term?  Will that distract

11 these individuals in the short term?  We have a stipulation on

12 file, Your Honor, that says that these defendants don't even

13 have to answer the complaint until 30 days after this Court

14 issues an order, which is well beyond the date that the plan

15 has to be filed.

16        We're not in the throws of discovery here, Your

17 Honor.  These individuals haven't even responded, and I would

18 suggest that one alternative is probably a motion to dismiss --

19 all the lawyer-generated activity, Your Honor, not the kind of

20 activity that directors and officers have to spend their -- all

21 their waking hours being involved in.

22        Your Honor, as to the indemnity -- excuse me for one

23 moment.

24                        (Pause)

25        MR. ETKIN:  As to the indemnity, Your Honor, I too

1  read the transcript from the prior hearing, and Your Honor

2  pointed out, as the case law does suggest, that the existence

3  of an indemnity does not in and of itself entitled a non-debtor

4  or the debtor to such extraordinary relief, and I think the

5  Court framed the issue as to whether the indemnity was absolute

6  or not.  That issue was discussed on the transcript as to the

7  officers and directors, and the fact that the bylaws did not

8  provide an absolute indemnity to the officers and directors,

9  and Judge McKelvey in his decision in <u>Reliance</u> even indicated

10  that an indemnification in and of itself is not sufficient for

11  this type of injunctive relief.

12          As to State Street and Fidelity, Your Honor, I've

13  read the indemnifications, and those indemnifications do not

14  apply to Fidelity or State Street's own negligence, gross

15  negligence, breach of fiduciary duty, so those indemnifications

16  are far from absolute with respect to those entities, Your

17  Honor, who most certainly aren't covered by the prior

18  injunction.  And to the extent that, again, they have

19  independent responsibility based upon their own conduct or

20  failure to act in connection with these ERISA claims, they're

21  responsible, and the debtor is not absolutely responsible to

22  indemnify them.

23          And, in any event, Your Honor, you're really talking

24  about putting off the inevitable.  These indemnification claims

25  are going to play themselves out one way or the other in this

1  case.  Right now they're contingent unliquidated claims.  Maybe

2  their subject to expungement under 502(e).  We don't know.  We

3  just don't know.  The fact that the -- the actual fact, Your

4  Honor, is that Grace is not a defendant, and the plaintiffs in

5  this case did not file a proof of claim.  So all this talk

6  about collateral estoppel really is very much pie in the sky at

7  this point.  These claims are going forward against non-debtors

8  that are covered by insurance, and, Your Honor, I think it's

9  important to point out that 11th hour affidavit that was

10 submitted in the reply together with the debtors' papers --

11 initial papers talked about these insurance policies, but we

12 haven't seen them.  They haven't been appended as an exhibit.

13 We don't know what they say and what they don't say.  For

14 certain, Your Honor, just because the Fidelity insurance

15 provides for indemnification rights of the debtor to the extent

16 that they indemnify the individuals, it's precisely the same as

17 a D and O policy.

18        We're not talking about liability policies which are

19 the crux of the personal injury claims in this case and why

20 this debtor filed in the first instance.  D and O policies,

21 fiduciary policies, very different creatures, Your Honor.  The

22 policies themselves may be property of the estate, but the

23 proceeds most certainly are not.  They're there to indemnify

24 and pay for the claims that the debtor is so concerned that it

25 will have to go out of pocket for.  That's what the insurance

1  is there for.  We don't know what it says.  We haven't been

2  provided a copy nor has the Court, but the insurance is there

3  for that purpose and essentially that purpose alone.

4       The debtor talks about other potential claims.  Your

5  Honor, there haven't been any other potential claims.  That's

6  all hypothetical, and to have these hypothetical allegations in

7  a situation where the debtor itself is not named, where no

8  proof of claim has been filed against the debtor, where the

9  indemnifications are far from absolute, where if you look at

10 the history and the colloquy and the papers leading up to that

11 supplemental preliminary injunction that the Court signed in

12 January of I believe it was two thousand -- one moment, Your

13 Honor.  I'm sorry.  January of 2002, that was even prior to

14 this ERISA action being commenced.

15      Let's leave aside the procedural problems of

16 enjoining non-existent litigation.  We were never served with a

17 complaint.  The complaint does not contain the types of

18 allegations that one would expect when seeking the kind of

19 extraordinary injunctive relief that the debtors are seeking

20 here.  Your Honor, this isn't a situation where the liability

21 of the individual directors and officers is derivative of the

22 debtors' liability, such as the asbestos litigation, such as

23 the discrimination claims, such as other types of product

24 liability claims.  This lawsuit, this one lawsuit that the

25 debtor now seeks to lump into all of this other litigation,

1   seeks a remedy for the direct conduct of the individuals

2   involved as fiduciaries, whether they were employees or

3   directors or officers or not.

4          Yes, Your Honor, if you want to make the -- take the

5   analysis to the point that they would never have been

6   fiduciaries if they weren't directors and officers, well, of

7   course, that's the case.  I couldn't argue against that, but if

8   you really look at what this was all about in terms of

9   extending the stay back in January of 2002, it dealt with

10  situations where the claims were made against individual

11  directors and officers by virtue of the fact that they are

12  being sued solely because they're employees or they're

13  directors or they're officers.  That was the genesis of it.

14         The papers say no different, and to now take that and

15  extend it to the point where no litigation can proceed if it

16  names directors and officers, that's not the law.  That's not

17  how these types of cases and injunctions under 105 have evolved

18  over the years.  And, in fact, Your Honor, taking it up to the

19  present day, and as we've indicated in our papers, cases that

20  are even larger and more complicated than this one have

21  proceeded to confirmation and have been confirmed despite

22  ongoing ERISA litigation throughout the existence of those

23  Chapter 11 proceedings, and specifically, I refer to the

24  WorldCom case, the Enron case, Global Crossings is another one.

25  All three of those cases, very complicated in their own right.

1  Very significant Chapter 11s managed to go forward to

2  confirmation without the type of extraordinary relief that the

3  debtor is seeking in connection with this one piece of ERISA

4  litigation.

5          MS. BAER:  Your Honor, briefly.  Number one, this

6  isn't <u>WorldCom</u>.  This isn't <u>Enron</u>.  This is our current board,

7  our current directors and officers who are making day-to-day

8  decisions about a Chapter 11 plan that is due to be filed in a

9  couple of weeks.  Your Honor, the preliminary injunction that

10 you entered on January 22nd, 2002 specifically, clearly, and

11 unequivocally enjoins actions against current and former

12 directors, officers, and employees arising from their

13 employment or relationship with the debtor.

14         Your Honor, this is precisely what you intended to

15 do.  It's not limited to the two cases that were named, because

16 they were the only ones pending at the time.  In fact, there

17 was a long discussion about whether it also involves future

18 actions.

19         THE COURT:  Ms. Baer, let me cut this off, because it

20 seems to me that this is a -- there's a very simply solution to

21 this.  I believe I can extend the preliminary injunction for a

22 finite period of time to make sure that to the extent the Board

23 is, in fact, and the officers are, in fact, engaged with the

24 debtor in getting this plan filed, and the plan is due in three

25 weeks.  It seems to me that I can extend this preliminary

1   injunction for a short period of time, and I'm willing to do

2   that, but it is for a short period of time.

3         It seems to me, both counsel, if I extend this

4   injunction through the end of this year -- December 31st -- by

5   that time, frankly, the officers and directors ought to be well

6   free of this case or day-to-day involvement perhaps with the

7   sole exception of the CEO.  But I agree with counsel for Ms.

8   Edwards that at the initial pleading stages of the case it's

9   undoubtedly going to be primarily legal issues that will be

10  addressed.  Do the lawyers need to meet with their clients?

11  Yes, of course, they do, but will it be so distracting that

12  nothing can go forward in this case while there is that type of

13  analysis being made by their lawyers?  No, I don't think it is.

14        And I did not intend to enjoin all litigation for all

15  time against the officers and directors of this company to the

16  extent that they have independent fiduciary duties for other

17  reasons.  So it seems to me that if I keep the injunction or

18  say that this injunction will cover these employees through the

19  end of the year, that should be well sufficient for Grace and

20  its officers and directors to essentially get through the

21  filing of the plan issue.  Is that agreeable to Ms. Edwards?

22        MR. ETKIN:  If that's the Court's inclination, we'll

23  wait until the end of the year.  Obviously, we think the case

24  can and should go forward now and will have no real impact on

25  these officers and directors, but, you know, in order to

**J&J COURT TRANSCRIBERS, INC.**

1  prevent that to a certainty, you know, we're, we're inclined to

2  follow the Court's lead.  But again, I think I made my points

3  in argument with respect to the distinctions --

4          THE COURT:  All right.

5          MR. ETKIN:  -- that evolved in this case.

6          THE COURT:  All right.  I will take an order then

7  that simply imposes this injunction against the defendants in

8  this action who are officers and directors of Grace through

9  December 31st, 2004 only.

10         MS. BAER:  Your Honor, with respect to State Street

11 and Fidelity, I would ask for the same relief.  Your Honor, if

12 it proceeds against State Street and Fidelity, given our

13 directors, officers, and employees are named --

14         THE COURT:  Well, Ms. Edwards --

15         MS. BAER:  -- they will have --

16         THE COURT:  Ms. Edwards probably doesn't want it to

17 go forward with respect to State Street and Fidelity without

18 the rest either.  Does she?  I would assume that it would make

19 sense simply to put them all together, so that the litigation

20 stays on track.

21         MR. ETKIN:  If I could just have a moment, Your

22 Honor?

23         THE COURT:  Yes.

24                        (Pause)

25         MR. ETKIN:  Your Honor, we will be willing to go

1  along with that, but we do have one request which is a very

2  limited request, so that we at least have the benefit of some

3  fundamental documentation over the next three-month period, and

4  that is we would like the debtor to supply us with the ERISA

5  plan documents as well as a copy of the fiduciary policy or

6  policies that they've referred to in their papers before the

7  Court today.

8          THE COURT:  All right.  Ms. Baer, is that possible?

9          MS. BAER:  Your Honor, I'm certain that there are

10  confidentiality restrictions that would have to be worked out,

11  but subject to appropriate confidentiality agreements being

12  signed, I'm certain that the debtors can comply.

13          THE COURT:  All right.  As soon as the

14  confidentiality agreements are signed, the debtor is to produce

15  those policies within 20 days thereafter.  But other than that,

16  the litigation is stayed as to the officers, directors, State

17  Street, and Fidelity through December 31st of 2004.  This

18  injunction lifts automatically, as to those parties only, on

19  January 1st of 2005.

20          MS. BAER:  Your Honor, with respect to your last

21  remark, I would ask that Your Honor instead consider putting

22  this on for status before you at the January omnibus hearing.

23  Your Honor, I don't know where we will be in the plan process

24  at that point.  I would love for us to be in a confirmation

25  process, but that may be a little --

1          THE COURT:  Ms. Baer, that's long enough.  That's

2   long enough.  I can't see how at that point in time the

3   officers and directors are going to be that intimately involved

4   with the reorganization.  That should be long enough.  If the

5   debtor needs some extension, the debtor is here asking for this

6   relief, I guess it'll ask for it, but my inclination is now to

7   say no, that's long enough.  So I'm going to want some

8   significant cause to do any further extension.

9          MS. BAER:  Thank you, Your Honor.  We understand.

10          MR. ETKIN:  Your Honor, I'm sorry.  One more point,

11   so that we close the book on this at least for the time being.

12   I didn't hear the debtor further any argument with respect to

13   its request for sanctions or hold counsel in contempt.  I'm not

14   going to repeat the arguments that we in our papers.

15          THE COURT:  I'm not granting sanctions or holding

16   somebody in contempt at this stage of these proceedings.  In

17   the event that action is taken between now and December 31st,

18   other than to, you know, get the copies of the documents I've

19   ordered, then I will impose sanctions, but I will not do it

20   now.

21          MR. ETKIN:  We understand that, Your Honor, because

22   now it's clear.  Thank you.

23          THE COURT:  All right.

24                    (Pause)

25          THE COURT:  Ms. Baer.

1        MS. BAER:  Your Honor, just as a point of

2   clarification, this now enjoins the action against all

3   defendants, directors, officers, employees, State Street, and

4   Fidelity.

5        THE COURT:  Correct.

6        MS. BAER:  Your Honor, we're clear.  Thank you.

7        THE COURT:  All right.  Ms. Baer, hopefully, we'll be

8   all right.

9        MS. BAER:  Thank you, Your Honor.  As I indicated, I

10  just wanted to clarify that is all defendants in the action,

11  directors, officers, employees, State Street, and Fidelity.

12       THE COURT:  That's correct.

13       MS. BAER:  Thank you, Your Honor.  Your Honor, the

14  next matter before you is item number -- actually, items number

15  13, 14, 15, and 16, those are all the debtors omnibus claims

16  objections.  In each case, Your Honor, we have an order we'd

17  like you to enter doing the following:  (1) resolving a couple

18  more claims that we've resolved, (2) to the extent that there

19  are defaults and objection where the people have not answered

20  them, asking for those claims to be -- asking for the relief

21  that we requested in the objection -- disallowance,

22  reclassification, whatever it is, and (3) continuing the

23  contested claims to the next omnibus hearing which is October

24  25th.

25       THE COURT:  All right.  I don't have those orders

1  here I believe.  Correct?

2          MS. BAER:  Your Honor, we have copies here.  They've

3  been tendered to your Clerk.

4          THE COURT:  Okay.

5          MS. BAER:  We will tender them to the Clerk after the

6  hearing.

7          THE COURT:  All right.  All right.  I think you said

8  13, but I believe that's really 14, 15, and 16.  Isn't it?

9          MS. BAER:  Yes, Your Honor, my agenda has number 13.

10          THE COURT:  Okay.

11          MS. BAER:  But it's 14, 15, 16, and 17.

12          THE COURT:  All right.  I will take a look at those

13  orders after court today, and I assume at the moment that there

14  is no problem with them, and that they will be entered.

15          MS. BAER:  Thank you, Your Honor.  Your Honor, that

16  brings us I believe item number 18 on the agenda which was

17  promoted by Your Honor's comments last time when the CIBC

18  matter came up.  You had asked for all financial consultants,

19  financial advisors who were retained on a flat fee basis to

20  submit to Your Honor documentation supporting the continuance

21  of the flat fee arrangements.  Two matters were filed, Your

22  Honor, one by Blackstone Group and the other by Conway Del

23  Genio.  Those are the only two of the professionals retained in

24  the case who are being paid by the debtors on a flat fee

25  arrangement.

1            Your Honor, from the debtors' perspective, we support

2    the continuing arrangement as it currently exists.  While there

3    may have been some months where we were paying perhaps a little

4    more than services were being provided, if you look at the

5    hourly basis, now is the time when a tremendous amount of time

6    and expense and services will be required by these various

7    consultants as we will get to the Chapter 11 case.  Under those

8    circumstances, Your Honor, we believe that the arrangements

9    that were approved by this Court are sound arrangements that

10   should continue to be in place in this case.  I turn the

11   microphone over to Blackstone or Conway Del Genio if they wish

12   to address the Court.

13            MR. BLECHMAN:  Your Honor, David Blechman with the

14   Blackstone Group.  I have nothing further on our behalf in

15   addition to what we filed.  That's our statement with the

16   Court.

17            THE COURT:  All right.  Oh, I'm sorry.

18            MR. BOYER:  This is, Your Honor, Gregory Boyer with

19   Conway, Del Genio, Gries.  We filed our statement, and we

20   believe it represents services we've provided and justifies our

21   fees.

22            THE COURT:  All right.  At this point, frankly,

23   having seen them, I think that Ms. Baer is correct.  This

24   probably will be the time when the services will be required at

25   a heavier level than has been existing in the past, so I really

1  -- no one has objected.  I don't see a need to change the fee

2  arrangements at the moment, and I don't believe you need an

3  order.  Do you?

4          MS. BAER:  No, Your Honor.

5          THE COURT:  All right.  What happened to item 17, or

6  is that 17?  I'm sorry.

7          MS. BAER:  That was Blackstone.  There was some error

8  in the numbering, so depending on which agenda you're looking

9  at, item 17 was the additional matters, last item, which was

10  the Blackstone Group matter.

11          THE COURT:  Okay.  All right.  Thank you.

12          MS. BAER:  Your Honor, that --

13          THE COURT:  I needed to address item 2 I believe.

14          MS. BAER:  Right.  That's where I was going.

15          THE COURT:  Okay.  With respect to item 2, my -- this

16  is the ZAI budget.  Correct?  I want to make sure I'm on the

17  same page as everyone else.

18          MS. BAER:  Yes, Your Honor, that's correct.

19          THE COURT:  Okay.  I guess, first of all, I'd like a

20  little bit of a status report to find out what's happening with

21  that litigation and whether the dates that I had set aside

22  either for summary judgment or trial -- I'm not really sure

23  which -- at this point later or in October are actually going

24  forward, and then I'll address the budget issue after that.

25  Mr. Restivo is here in Pittsburgh.

1          MS. BAER:  That clears the mystery from this end.

2          THE COURT:  Good afternoon.

3          MR. RESTIVO:  Good afternoon, Your Honor.  Currently,

4    the Court set aside October 18 and 19 for arguments on the

5    various summary judgment motions, motions in limine, and the

6    other materials in 13 three-ring binders that were given to the

7    Court earlier.  At the present time we believe we are going

8    forward with those arguments.  Whether or not the filing of the

9    plan and discussions that are ongoing will cause us to ask the

10   Court for different dates, I frankly don't know today.  I did

11   talk to Mr. Westbrook this morning.  Because of the inability

12   to call in, he wasn't able to participate.  He and I have

13   agreed that we are going to check back with our clients,

14   determine the status, and then we would like to give the Court

15   a telephonic status report based upon where we stand, and if we

16   are going forward with the argument, based upon how we would

17   propose to allocate the time.

18          THE COURT:  Yes, Mr. Restivo.  The first -- when

19   those documents were filed over a year ago, I started through

20   them.  I haven't looked at them since.  I'm totally unfamiliar

21   with them.  They take up several shelves on my library space,

22   and as a result, if you're going forward, I really do need some

23   preparation time.

24          MR. RESTIVO:  We appreciate that, Your Honor.

25          THE COURT:  All right.  With respect to the increase

1  in budget, Mr. Restivo, what's causing this increase?  I

2  thought it was a pretty generous budget the first time I

3  approved it, and I've already approved one increase.

4         MR. RESTIVO:  One thing, Your Honor, is the parties

5  have worked very hard and very diligent to get the case ready

6  to be argued.  Secondly, Mr. Westbrook asked me to report to

7  the Court the information that with respect to the ZAI

8  claimants, Your Honor, they, in fact, are about $200,000 over

9  the budget with respect to services already rendered but not

10  paid.  I believe on our side we are not over the budget but are

11  right at the top of the budget, and I think that in the motion

12  it spells out the voluminous documents that have been looked

13  at, depositions taken, experts retained, experts deposed, and

14  you know what the parties have filed, and basically, it has

15  just simply been an awful lot of work to get this case ready to

16  argue.

17         THE COURT:  All right.  Well, based on the fact that

18  the -- well, let me ask this question.  The last time we had a

19  telephonic status conference you were trying to enter into at

20  least some stipulations.  Has any of that happened?

21         MR. RESTIVO:  Your Honor, I don't know whether -- I

22  don't recall that, Your Honor, with respect to this case.  We

23  certainly have from the beginning reached agreements with

24  respect to discovery, with respect to documents.  We have not

25  come to the Court in terms of disputes.  The thing that we do

**J&J COURT TRANSCRIBERS, INC.**

1  need to do is to allocate the time the Court has given us, the

2  issues, so we're arguing the same issues.  We can tell the

3  Court what volume to look at.  I don't know that other than

4  that there are any stipulations that the parties have been

5  talking about.

6          THE COURT:  All right.  Well, I thought that there

7  were some issues about, for example, the number of homes that

8  were involved.  I thought there were some factual premises that

9  you folks were attempting to stipulate to.  Maybe it's too

10  early if you're doing the summary judgment arguments, but I'm

11  not sure how I'm going to get to summary judgment arguments,

12  unless it's going to be on the law that applies without some

13  factual premise behind it.

14          MR. RESTIVO:  Your Honor, I think the issue as set up

15  by the Court is whether or not ZAI poses a hazard to someone

16  who has it in their home.  It is true, with respect to other

17  discussions and attempts to see if this case can't be resolved,

18  that there have been discussions as to the number of homes

19  involved and things of that nature, but they really, Your

20  Honor, go more towards compromised discussions, maybe damages.

21  The number of homes really don't go to the scientific issue the

22  Court has set for briefing and trial.

23          THE COURT:  All right.

24                  (Pause)

25          THE COURT:  Okay, Mr. Restivo.  I've signed this

1 order that increases this budget, but this pretty much doubles

2 the initial budget that was set, so I am going to look very

3 hard at whether I'll increase it again.  For now I've increased

4 it.  Hopefully, this will do it.

5           MR. RESTIVO:  Thank you, Your Honor.

6           THE COURT:  Ms. Baer, anything further?

7           MS. BAER:  Yes, Your Honor, a few things.  If we

8 could go back first to agenda item number 4, which is the

9 KWELMBS Company element.

10           THE COURT:  Yes.

11           MS. BAER:  Did you get that order?

12           THE COURT:  I did, and I've signed it.  I have added

13 to it a paragraph seven which states, "Argument on the use of

14 proceeds is continued to the October 25th, 2004 omnibus

15 hearing."

16           MS. BAER:  Your Honor, if I may, I'd like to submit

17 to your Clerk here in Delaware, so we can take a signed copy

18 with us.

19           THE COURT:  That's fine.  Mr. Restivo --

20           MS. BAER:  Thank you, Your Honor.

21           THE COURT:  -- can you stay for a minute?  Okay.

22           MS. BAER:  Your Honor, a couple of miscellaneous

23 orders are out there that had not been entered.  We wanted to

24 bring it to the Court's attention.

25           THE COURT:  All right.

1          MS. BAER:  Two of them were actually submitted at the

2  August 23rd hearing.  Docket number 5983 and 5990 which were on

3  the granting of extension of removal and the granting --

4          THE COURT:  I'm sorry.  Granting of what?

5          MS. BAER:  The extension of a removal period with

6  respect to certain actions.

7          THE COURT:  Okay.  I signed those orders in court I

8  think.

9          MS. BAER:  Your Honor, they have not appeared on the

10  docket as signed orders.

11          THE COURT:  All right.  Do you have duplicate copies

12  there?

13          MS. BAER:  Yes, Your Honor, we do.

14          THE COURT:  Yes, if you'd present them to Rachel,

15  they can be stamped.

16          MS. BAER:  We will do that, Your Honor, with both of

17  those orders.  Then, Your Honor, there's one that we submitted

18  on a certificate of counsel on September 10th, and that is the

19  order granting our request to establish ADR procedures.

20          THE COURT:  I have not seen that --

21          MS. BAER:  That was --

22          THE COURT:  I have not seen that order.

23          MS. BAER:  We will make sure that it gets submitted

24  -- another copy.  I'll have our Delaware counsel work with your

25  Clerk.  That was submitted with a black line also, so you could

**J&J COURT TRANSCRIBERS, INC.**

1   see the changes from when Your Honor previously reviewed it.

2          THE COURT:  Was it e-mailed to Ms. Fellow?

3          MS. BAER:  We'll have to verify.  Delaware counsel

4   can't verify it right now, but we will work with her to get

5   that done.

6          THE COURT:  All right.

7          MS. BAER:  Your Honor, that concludes the matters on

8   our agenda for today.

9          THE COURT:  Okay.  I have one.  I have been getting

10   from Baron and Budd in all of the pending asbestos cases

11   requests that I amend the amendatory order concerning Rule 2019

12   statements.  I worked through some of the issues that had been

13   raised during the Pittsburgh Corning, NARCO, and GIT cases here

14   in Pittsburgh last week.  An order has not yet been submitted,

15   but I did work out some of the details.

16          I think that the order that has been agreed upon here

17   -- well, I don't know that agreed upon is quite right -- that

18   I've worked out here may eliminate most of the issues in Baron

19   and Budd's applications in Delaware.  I would, however, like to

20   have argument on all of the cases at one time.  It doesn't make

21   sense that I redo three hours' worth of argument in each of

22   these separate cases.  So I'm suggesting that October the 6th

23   here in Pittsburgh at noon would be the time to do it with

24   objections due October the 2nd at noon eastern time.

25          What I had offered to Mr. Pernick today, since I

1 don't have the orders submitted yet by counsel in Pittsburgh

2 cases, is to send him -- and I would do the same for you, Ms.

3 Baer, if that would help -- a copy of my notes from the

4 hearings here in Pittsburgh to show what had been worked out,

5 and then when the order is submitted, if it's in time to be

6 circulated for the Delaware counsel, to have that order

7 circulated as well, because it may not eliminate everything.  I

8 don't know, but it may go a long way to eliminating some of the

9 objections that have been raised.  So the question is, is

10 October 6th at noon possible?

11          MR. KRUGER:  Your Honor, it's Lewis Kruger.  At the

12 OWC hearing you mentioned October 4th at noon not October 2nd

13 as a time for responses of --

14          THE COURT:  Oh, I'm sorry.  Thank you.  October 4th

15 at noon is the response date.  I apologize.

16          MS. BAER:  Your Honor, I would simply if our counsel

17 appear by telephone.  I'm not sure the debtors would have a say

18 in, you know, argument with respect to this particular issue.

19          THE COURT:  That's okay as long -- I can only get one

20 phone line in, and that means they're going to be I think six

21 cases being argued at one time.  So someone will have to

22 coordinate everybody calling in.  I'm not going to take entries

23 of appearance.  It'll take me longer to do that than it will to

24 get the argument done.  So if people want to call in, and you

25 want to make those arrangements, Ms. Baer, with all of the

1  cases that would be settled, that's fine with me.  But my -- at

2  the moment it seems to me you either are here, or you're not

3  interested enough, and that -- and you live with the

4  consequences.

5          MS. BAER:  I understand, Your Honor.  We'll --

6          THE COURT:  I simply don't know how to, you know,

7  facilitate that with so many cases at one time.

8          MS. BAER:  We'll take care of it on our end.  I'm

9  sure we can have somebody appear if that appears appropriate

10  with the debtors.

11          THE COURT:  All right.

12              (Another matter discussed at this time.)

13          THE COURT:  Okay.  Ms. Baer, I will send you the same

14  notes that I am sending around with respect to the -- to Mr.

15  Pernick with respect to what, as I said, my notes say, to see

16  whether that will be of assistance.  And then since Mr. Restivo

17  is still here, and he was present for that argument -- Mr.

18  Restivo, do you have any idea when the order will actually be

19  submitted?

20          MR. RESTIVO:  Your Honor, I know that David Ziegler

21  of our office is working on it with counsel for the other --

22          THE COURT:  Mr. Esserman.

23          MR. RESTIVO:  Mr. Esserman, and when I go back to the

24  office, I will ask Mr. Ziegler to give Ms. Baer a call.  Maybe

25  he can share his notes, too.

1          THE COURT:  Okay.  He'll probably be getting calls

2 from Mr. Pernick and Ms. Baer and several other counsel to try

3 to coordinate this.

4          MR. RESTIVO:  I know Mr. Ziegler can handle that,

5 Your Honor.

6          THE COURT:  Okay.  All right, Ms. Baer, then could we

7 have your e-mail address, please, so that I can forward this

8 series of my notes to you by e-mail?

9          MS. BAER:  Yes, Your Honor.

10          THE COURT:  And you can attach them to the notice

11 that you create, so everybody can see them, but, you know, it's

12 just my shorthand way of what I'm expecting to come in by way

13 of the order.

14          MS. BAER:  Yes, Your Honor.  The e-mail address is

15 jbaer@kirkland.com.

16          THE COURT:  Okay.  That will go out probably late

17 this evening when I'm finished with the rest of the cases.

18          MS. BAER:  Your Honor, you mentioned something about

19 notice.  Are you asking the debtors to notify all parties of

20 this hearing?

21          THE COURT:  Yes, please.  Right now, Ms. Baer, I'm

22 not sure in this case when that issue is scheduled.  In most of

23 the cases it's scheduled for the October 25th omnibus, so this

24 actually is having the argument earlier than that hearing date.

25          MS. BAER:  I understand.  I think that's the case

**J&J COURT TRANSCRIBERS, INC.**

1  with this one, also.

2          THE COURT:  Okay.  Any other matters in Grace?

3          MS. BAER:  No, Your Honor.

4          THE COURT:  Okay.  We're adjourned.  Thank you.

5          MS. BAER:  Thank you.

6                      *  *  *  *  *

7                      **CERTIFICATION**

8          I, PATRICIA C. REPKO, court approved transcriber,

9  certify that the foregoing is a correct transcript from the

10 official electronic sound recording of the proceedings in the

11 above-entitled matter.

12

13 _____          Date:  January 5, 2005
14 PATRICIA C. REPKO
15 J&J COURT TRANSCRIBERS, INC.