IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## DEBTORS' BRIEF REGARDING CERTAIN CONFIRMATION ISSUES

### Introduction

The Debtors' Plan[1] and related motions reflect an integrated, legal and practical vision of how Grace can (i) emerge from Chapter 11 within a reasonable period of time; (ii) preserve its ability to pay all of its allowed disputed claims in full; and (iii) pay all undisputed claims upon emergence.

The only viable and legal alternative to the process set forth in the Debtors' Plan and related motions is to liquidate all disputed asbestos claims pre-confirmation, a path that Grace has sought to pursue from the first day of this case, <u>and a path which it remains ready to pursue today</u>. However, in response to this Court's direction, Grace has crafted the proposed procedures now before the Court that make an earlier exit from bankruptcy feasible.

This Brief addresses the three confirmation issues highlighted during the hearing on December 20, 2004:  impairment, voting rights of unimpaired claimants under § 524(g), and estimation.  The three sections of this Brief address each of the issues as follows:

1.  The Debtors' Plan does not impair disputed asbestos claimants, because it will pay them 100% of any allowed claims on the later of the effective date or when allowed;

---

[1]  Capitalized terms not defined herein shall have the same meaning as in the Glossary filed on November 13, 2004.

2.      Unimpaired claimants are not entitled to vote to accept or reject a plan under Bankruptcy Code § 1126, a rule that is unchanged by § 524(g); and

3.      The Court has the power to confirm the Plan based on its estimation of the aggregate dollar amount of allowed claims in the asbestos personal injury and property damage classes.

Two preliminary notes are in order:

First, the relief sought in the Estimation Motion raises no confirmation issue.[2]  That motion seeks resolution of a factual issue that both the Asbestos PI Committee and the Asbestos PD Committee agree is required in this case, namely the aggregate value of claims in the asbestos personal injury and asbestos property damages classes.  The Debtors have moved to commence the estimation now because estimation will:  (i) take time, (ii) supply important factual predicates for the financial structure of the plan, and (iii)  inform numerous matters in this case, regardless of the success of the Plan.

Second, the three confirmation issues identified by the Court necessarily overlap with the pending New CMO Motion, Estimation Motion, Confirmation Procedures Motion, and request for Disclosure Statement approval, because each of these matters is predicated upon an integrated vision for how to fairly and legally resolve this case.  Therefore, while this Brief fully addresses the three issues delineated above, all other issues regarding each of the foregoing related motions are addressed in the respective separate replies filed contemporaneously with this Brief.

---

[2]     Moreover, the question presented at this time is not whether the Plan is certain to be confirmed.  Rather, in order to proceed down the path the Debtors suggest, the Court needs only to decide that the disclosure statement does not describe a plan of reorganization that is patently unconfirmable.  E.g., In re Cardinal Congregate I, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) (holding that plan of reorganization was not "patently nonconfirmable" and, therefore, the court would consider the adequacy of the associated disclosure statement).

2

## Discussion

**I.    Asbestos Claimants are Unimpaired Under the Plan**

A claimant may not recover more than 100% of the value of its claim. <u>See</u> 7 Collier on Bankruptcy § 1129.04[4][a] (Lawrence P. King ed., 15th ed. rev. 1999) (citing H.R. Rep. 95-595, at 414 (1977)). This is a bedrock principle of bankruptcy law, and it lies at the heart of the Plan. As discussed below, as long as the Bankruptcy Code-mandated procedures for determining the validity and value (i.e., the allowed amount) of disputed claims are followed and a plan provides that claimants will receive 100% of any allowed claim on the later of the effective date of the plan or as soon as the allowed amount of the claim is determined, the claim is unimpaired. The Debtors' Plan does not impair, but rather pays 100% of, all <u>allowed</u> asbestos-related claims.

This same principle completely answers the argument that disputed asbestos claims are impaired by the legal procedures set forth in the pending New CMO Motion. The Bankruptcy Code provisions regarding impairment assure only that claimants can vote against a plan that does not call for payment of 100% of allowed value on the effective date or when otherwise allowed. The allowance process is established by the law and "impairs" no rights. It is only the finally allowed claim against which impairment can be measured, not the asserted claim and not the Bankruptcy Code-driven process for determining the allowed amount of an asserted claim. Any other result would allow claimants to claim impairment (and thereby obtain leverage) even where legally available procedures are used to determine claim values and allowed claims are paid in full. Put simply, any other result would facilitate a claimant's ability to bargain for more than 100% of its claim's value by impeding the resolution of the case.

3

A.    **Bankruptcy Code-Driven Procedures For Claim Allowance Do Not Even Implicate Principles of Impairment**

It is generally recognized that the question of whether a class of claims is impaired only applies to the "allowed" amount of the claims in the class. Where a plan will pay an allowed amount in full, <u>once that amount is determined</u>, the claimant's rights are not impaired. Thus, in In re Limited Gaming of America, Inc., 228 B.R. 275 (Bankr. N.D. Okla. 1998), the court held that:

> . . . [C]laims of creditors are [not] impaired by a plan which provides for full payment of those claims <u>after their final determination by a court of competent jurisdiction</u>. <u>See</u> <u>In re Smith</u>, 123 B.R. 863, 867 (Bankr. C.D. Cal. 1991) (". . . a plan may limit payment of claims to 'the extent allowed,' without impairing them; for until claims are allowed, or deemed allowed, the holders thereof are not entitled to distribution from the bankruptcy estate. However, impairment results if the plan denies claimholders the right to payment to the extent their claims are ultimately allowed.").

<u>Id</u>. at 290 (emphasis added).

The Third Circuit, in In re PPI Enterprises (U.S.), Inc., 324 F.3d 197, 204 (3d Cir. 2003), adopted this same approach. Specifically, in <u>PPI Enterprises</u> the Third Circuit held that creditors who, under a proposed plan, receive cash equal to their "allowed claims" are not "impaired." <u>Id</u>. at 206 (interpreting the legislative history to provide for such an application of Bankruptcy Code § 1124).[3]

---

[3]  The Asbestos PI Committee misleadingly asserts that the Debtors' "deferred payment scheme" constitutes impairment. (Obj. of Asbestos PI Committee, at 8-9)  First, by definition, there is no deferred payment scheme here.  If no allowed amount has been determined, it cannot be paid. <u>See</u> <u>PPI Enters.</u>, 324 F.2d at 206, <u>Limited Gaming</u>, 228 B.R. at 290, and discussion, <u>infra</u>.  Second, claimants who choose the Settlement Option and whose claims are treated in accordance with the resulting settlements are not impaired. <u>See</u>, <u>e.g.</u>, <u>In re Huckabee Auto. Co.</u>, 33 B.R. 141, 147 n.3 (Bankr. M.D. Ga. 1981) (since the legal rights between the debtors and one of their creditors were established by a settlement agreement, and since the debtor's plan did not alter the rights established therein, the
(Continued...)

PPI Enterprises is particularly relevant to the Debtors' Plan. In that case, the plan treated a former landlord's claim for damages resulting from the debtor's termination of its lease as unimpaired, because the landlord-creditor was to be paid 100 cents on the dollar for the allowed amount of his damages claim, which amount was established by the statutory limitation on rent claims imposed by Bankruptcy Code § 502(b)(6). Id. at 202, 204-05. The creditor contended that the cap on its claim imposed by Bankruptcy Code § 502(b)(6) itself constituted impairment. Id. at 202-03. The Third Circuit in PPI Enterprises rejected this contention, finding that impairment is not determined by reference to a creditor's claim outside of bankruptcy, but rather by examining whether the creditor's rights are limited by the plan itself. Id. at 205. Because the debtor's plan intended to pay the creditor his "legal entitlement" and provide him "full and

---

creditor's claim was unimpaired by the debtors' plan). Third, the Future Claims Representative erroneously states that the Plan does not provide postpetition interest for asbestos claimants. Contrary to this assertion, asbestos claimants who choose the Settlement Option, as noted above, will be unimpaired because these amounts settle all claims, including claims for principal and interest. Asbestos claimants who choose the Litigation Option will be paid under the New CMO, which in appropriate cases will provide for post-petition interest. Finally, the cases cited by the Asbestos PI Committee in support of its argument are readily distinguishable from the situation here, where the Asbestos PI Claims are unliquidated personal injury claims that are disputed by the Debtors with respect to both their validity and amount. Without exception, every decision cited by the Asbestos PI Committee involved creditors whose claims were plainly allowable and undisputed as to their amount. See In re PPI Enters., 228 B.R. 339, 344-55 (Bankr. D. Del. 1998) (landlord-creditor unimpaired where debtor did not dispute allowability of claim and where amount of claim was altered by operation of Bankruptcy Code provision). See also In re Tucson Self-Storage, Inc., 166 B.R. 892, 892-900 (B.A.P. 9th Cir. 1994) (neither the validity nor amount of trade creditors' claims were disputed by the debtor); In re Valley View Shopping Ctr., L.P., 260 B.R. 10, 10-40 (Bankr. D. Kan. 2001) (amount owed to class of allowed unsecured claims of non-insiders was not in question); In re New Midland Plaza Assoc., 247 B.R. 877, 877-98 (Bankr. S.D. Fla. 2000) (claims of general unsecured creditors were not in dispute as to allowability or amount); In re Krebser, 91 B.R. 1001, 1001-02 (Bankr. S.D. Fla. 1988) (class found to be unimpaired); In re Grandfather Mountain Ltd. P'ship, 207 B.R. 475, 475-95 (Bankr. M.D.N.C. 1996) (debtor did not dispute the validity nor amount of claims filed by tenant in its shopping center and attorney who had rendered services pre-petition); In re L.G. Salem Ltd. P'ship, 140 B.R. 932, 932-35 (Bankr. D. Mass. 1992) (claimant was a mortgagor whose claim was not disputed by the debtor as to its validity or amount).

5

complete satisfaction" of his allowed claim, the creditor was not impaired. Id. "[A] creditor's rights outside of bankruptcy is not the relevant barometer for impairment; we must examine whether the plan itself is a source of limitation on a creditor's legal, equitable or contractual rights." Id. at 203-04.

Thus, PPI Enterprises makes clear the fundamental distinction between limitations on the allowed amount of claims that arise from operation of law under the Bankruptcy Code and limitations that arise by operation of a proposed plan. See also In re Am. Solar King Corp., 90 B.R. 808, 819-20 (Bankr. W.D. Tex. 1988) (finding that claim was unimpaired, despite mandatory subordination pursuant to Bankruptcy Code § 510(b), because such treatment was an operation of bankruptcy law rather than of the debtor's plan). This focus, on whether a particular change in rights occurs under a plan, is no mere technical argument. Rather, it serves the practical function of distinguishing between the law to be applied in arriving at the allowed amount of a claim and the actual treatment of the claim under a plan once allowed.

**B.      Claims Allowance Litigation Under the New CMO Does Not Constitute Impairment**

Consistent with these principles, the New CMO Motion does not seek to affect any existing rights of asbestos claimants to litigate the amount of their claims that are not already modified by operation of bankruptcy law and the existing federal rules of procedure and evidence.

In particular, 28 U.S.C. § 157(b)(5) specifically provides that "[t]he district court [presiding over the bankruptcy case] shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending." Thus, once a debtor files a Chapter 11 case, all personal injury

6

tort claims against that debtor are susceptible to being tried in federal court under the federal rules of evidence and procedure. All the New CMO Motion seeks to do is have the District Court, by appropriate reference to this Court, invoke this authority to set forth an efficient and fair process for allowing disputed Asbestos Claims post-confirmation.

There is no question that were the holders of Asbestos Claims to have their claims adjudicated pre-confirmation, under the procedures proposed by the New CMO Motion, such adjudication would not constitute impairment. The Bankruptcy Code clearly specifies the procedures for claim allowance and disallowance. These procedures provide for the filing of proofs of claims (Bankruptcy Code § 501), filing objections to claims allowance (Bankruptcy Code § 502(b)), and conducting claims allowance litigation according to certain rules taken from the Federal Rules of Civil Procedure and the Federal Rules of Evidence (Fed. R. Bankr. P. 9014 and 9017). The litigation is purely federal, as the federal courts have exclusive jurisdiction over the bankruptcy case.

Under the law set forth above, impairment has no application to the implementation of these rules for claim determination. No one could complain during a bankruptcy case that their claim was impaired merely because it was litigated in accordance with the Bankruptcy Code. The New CMO Motion only calls for the same procedures to be applied by the same court post-confirmation, pursuant to its continuing jurisdiction over the Chapter 11 Cases. The purported claimant neither gains nor loses any rights from its pre-confirmation baseline position. Simply put, if pre-confirmation adjudication in federal court in accordance with the Federal Rules of

Civil Procedure and the Federal Rules of Evidence does not impair claims, then adjudication in federal court post-confirmation cannot impair claims.[4]

Adoption of any broader ambit for impairment effectively would permit claimants to insist upon the completion of all claims allowance litigation pre-confirmation. If this must be so, Grace is prepared to pursue this path, but then Grace also is entitled to insist upon the completion of all such litigation prior to confirmation.

### C.    Pre-Confirmation Estimation Does Not Constitute Impairment

Specifically recognizing that full scale claims allowance litigation may unduly impede the progress of a Chapter 11 case, the Bankruptcy Code provides an alternative method for quantifying disputed claims -- estimation. The Debtors have called for application of the Court's power to estimate the aggregate amount of asbestos claims against them with respect to three matters:

- Estimation of the aggregate amount of certain personal injury claims to determine that the fund which will be provided under the Plan to pay such claims, when allowed, will be adequate for such purpose;

- Estimation of the aggregate amount of other personal injury claims to be used for purposes of determining plan feasibility; and

- Estimation of the aggregate amount of traditional property and ZAI property claims to determine that the fund which will be provided under the Plan to pay such claims, when allowed, will be adequate for such purpose.

---

[4]    Further, the New CMO will not result from or be established by the Plan itself, but rather by separate orders of the Court, entered in the exercise of its powers that are independent from the power to enter a confirmation order. See PPI Enters., 324 F.3d at 203-04; Solar King, 90 B.R. at 819-20. Specifically, the New CMO will be established pursuant to the Court's powers under §§ 157(b)(5), 502(b), Fed. R. Bankr. P. 9014 (incorporating the Federal Rules of Civil Procedure) and Fed. R. Bankr. P. 9017 (incorporating the Federal Rules of Evidence.). Accordingly, the New CMO will not constitute a change of rights "under a plan," and thus cannot constitute impairment under § 1124.

Different aspects of the three proposed estimation procedures are addressed in the various motions pending before the Court.  What is discussed in this Section I.C is whether estimation conducted in accordance with the Bankruptcy Code can constitute impairment.  The use of estimation to determine the aggregate dollar amount of allowed claims in a class is addressed in Section III below.  The details of the estimation procedure are addressed in the Estimation Motion, and any objection to the procedure itself can be resolved in connection with that Motion.

The Debtors' proposed estimation cannot create impairment for the same reason that any other Bankruptcy Code-mandated rule for determining the allowed amount of a claim cannot constitute impairment.  Estimation is an alternative methodology provided by the Bankruptcy Code for determining the allowed amount of a claim.  See 11 U.S.C. § 502(c).  In the case of personal injury claims, it cannot include the allowance or disallowance of individual claims where there are factual issues to be tried to a jury.  See 28 U.S.C. § 157(b)(2)(B).  Here, the Debtors are not seeking to have this Court estimate the allowed amount of any particular asbestos claim.  Rather, the Debtors are seeking a determination through the use of the estimation process that the funds they agreed to set aside in their Plan for the payment of such claims will be adequate for that purpose.[5]

So long as the estimation is in accordance with the Bankruptcy Code, there is no impairment.  Rather, estimation is the method for determining the allowed amount of a claim whose treatment under a plan can only then be assessed for impairment.

The Asbestos PI Committee argues that the Plan impairs asbestos personal injury claimants to the extent that their claims are channeled to a fund that was previously capped

---

[5]    In the case of asbestos property damage claims, the estimation can proceed further, and individual claims themselves can be resolved through estimation, inasmuch as there is no right to jury trial.

9

pursuant to an estimate. (Obj. of Asbestos PI Committee, at 12) The specific objection centers on the risk that individual claimants may ultimately recover less than 100% of their allowed claims because the class estimate ultimately proves to be wrong. (Id.) The Debtors acknowledge that such a shortfall is theoretically possible. But this possibility is not impairment "under a plan." PPI Enters., 324 F.3d at 205. Rather, it would be the result of the exercise of the Bankruptcy Court's estimation powers as discussed below, which includes the inherent risk that estimation may be less than precise. In particular, just as in PPI Enterprises, in which the Court held that the ordinary application of § 502(b)(6) can limit the amount of an allowed claim without causing that claim to be impaired under § 1124, so too can the ordinary application of the Court's estimation powers limit the amount of an allowed claim without causing that claim to be impaired under § 1124.

### D.   Channeling Claims to a Trust Does Not Constitute Impairment

We come then to the contention that channeling claims to a post-confirmation trust constitutes impairment. Both the Future Claims Representative and the Asbestos PD Committee argue that the mere channeling to a § 524(g) trust constitutes impairment.[6]   (Obj. of Future Claims Representative, at 2); (Obj. of Asbestos PD Committee ¶14). However, the mere use of the trust does not impair claimants, provided that claimants will be paid 100% of their allowed claims on the effective date or when allowed. Indeed, the use of liquidating trusts as a post-confirmation distribution vehicle is routine, as is the ability of a liquidating trust to object to disputed claims. Perhaps the Objectors' argument really goes to the procedures to be utilized in

---

[6]   Since future claimants are not entitled to vote on a plan, the Future Claims Representative lacks standing to argue impairment for purposes of voting. See, e.g., In re Applied Safety, Inc., 200 B.R. 576, 587 (Bankr. E.D. Pa. 1996) ("[A] party cannot successfully object to plan provisions that have no effect on that party's rights and interests thereunder.").

91100-001\DOCS_DE:104402.1

connection with such claims allowance litigation. These are discussed in Section I, supra. Finally, and critically, the trust mechanism is authorized (indeed, mandated) by Bankruptcy Code § 524(g). See PPI Enters., 324 F.3d at 203-04 (impairment did not result where the creditor's rights under nonbankruptcy law were altered by operation of a Bankruptcy Code provision). See also Solar King, 90 B.R. at 819 ("[a] plan which leaves a claimant subject to other applicable provisions of the Bankruptcy Code does no more to alter a claimant's legal rights than does a plan which leaves a claimant vulnerable to a given state's usury laws or to federal environmental laws").

None of the cases cited by either the Future Claims Representative or the Asbestos PD Committee stands for the proposition that the channeling of claims to a § 524(g) trust constitutes impairment. In fact, none of the cases cited even deals with the channeling of claims to a § 524 trust. Moreover, none of the cases cited by the Future Claims Representative or the Asbestos PD Committee involved a situation in which a claimant's rights were altered by application of a Bankruptcy Code provision -- the central issue with respect to whether the claimants here are impaired by virtue of their claims being channeled to a § 524(g) trust. Therefore, none is responsive to the principle, explicated in PPI Enterprises and Solar King, that when claimants' rights are altered by operation of a Bankruptcy Code provision, such alteration does not constitute impairment. Here, any alterations of claimants' rights that might stem from application of Bankruptcy Code § 524(g) do not constitute impairment under the Debtors' Plan, as such alterations arise from the application of the Bankruptcy Code rather than from the Plan itself.

11

II.    **Bankruptcy Code § 524(g) Does Not Change the Law of Impairment and Create an Absolute and Unreviewable Right to Block 100% Plans**

The Bankruptcy Code does not require an affirmative vote for a Chapter 11 plan from an unimpaired class. Under Bankruptcy Code § 1126(f), unimpaired claimants are "conclusively presumed to have accepted the plan." 11 U.S.C. § 1126(f). This is consistent with, and designed to effect, the fundamental rule that claimants are not entitled to recover more than 100% of their allowed claims (and thus, should not have leverage through the voting process to obtain a premium over that amount). Bankruptcy Code § 1129(b) further illustrates this rule by providing that treatment of a dissenting class of impaired creditors be "fair and equitable"-- no premiums are allowed. 11 U.S.C. § 1129(b). As explained by a leading commentator:

> [A] major component of the 'fair and equitable' requirement [of § 1129(b)] is that no creditor or interest holder be paid a 'premium' over the allowed amount of its claim. Once the participant receives or retains property equal to its claim, it may receive no more.
>
> ***
>
> With respect to this part of section 1129(b), the House Report provided that 'one requirement applies generally to all classes before the court may confirm under this subsection. No class may be paid more than in full.'

Collier on Bankruptcy, supra, at § 1129.04[4][a] (footnotes omitted) (citing H.R. Rep. 95-595, at 414 (1977)).

The basic tenet that unimpaired claimants cannot stand in the way of confirmation remains unchanged by § 524(g). The 75% requirement of § 524(g) only increases the voting requirement set forth in § 1126 (i.e. greater than 50% of claims voting) such that impaired claimants who are otherwise entitled to vote must do so by a greater number than is required outside of the asbestos context.    Compare 11 U.S.C. § 524(g)(2)(B)(ii)(IV) with 11 U.S.C. § 1126(c).    See Collier on Bankruptcy, supra, at § 524.07[2] (reasoning that the heightened voting requirement is so "the Court [approving the injunction] will presumably ensure that a

12

consenting class of such claims is not unfairly gerrymandered"). It does not, however, give unimpaired claimants a right to vote. Indeed, there is nothing in the language of the provision nor is there legislative history suggesting -- even remotely -- that Congress intended to give them such a right. See 11 U.S.C. §§ 524(g)(2)(B)(ii)(IV), 1126(c).

A technical argument has been raised that § 524(g) uses the term "vote" rather than "accept," and that an actual, affirmative vote of a class therefore is required. (Obj. of FCR, at 11-13); (Obj. of Asbestos PI Committee, at 20-25). This argument is without merit.

The Bankruptcy Code, the legislative history of the Bankruptcy Code, the Bankruptcy Rules, the Official Bankruptcy Forms, and Bankruptcy Courts often use the words "vote" and "accept" interchangeably:

- Bankruptcy Rule 3017(c), titled "Dates Fixed for Voting on Plan and Confirmation," requires that on or before approval of the disclosure statement, "the court shall fix a time within which the holders of claims and interests may accept or reject the plan . . ." Fed. R. Bankr. P. 3017(c) (emphasis added).

- Bankruptcy Rule 3017(d) requires that, upon approval of a disclosure statement, "the debtor in possession, trustee, proponent of the plan, or clerk as the court orders shall mail to [certain parties] . . . notice of the time within which acceptances and rejections of the plan may be filed . . . " Fed. R. Bankr. P. 3017(d) (emphasis added).

- Official Bankruptcy Form 14, titled "Ballot for Accepting or Rejecting Plan," instructs claimants that the Disclosure Statement "provides information to assist [them] in deciding how to vote [their ballots]." (emphasis added). However, Form 14 then cautions that if a claimant's ballot is not received on or before a particular date, its "vote will not count as either an acceptance or rejection of the Plan." Off. Bankr. Form 14 (emphasis added).

- The legislative history of § 1124 is also instructive. In discussing § 1124 and the decision in In re New Valley Corp., 168 B.R. 73 (Bankr. D. N.J. 1994), which held that § 1124(3) allowed a solvent debtor to pay the allowed claims of unsecured creditors in full, excluding postpetition interest, without risking impairment, Representative Brooks did not use the term "accept" in discussing the rights of such creditors, but rather stated that an unimpaired class "is not entitled to vote" and that "the class would be impaired entitling creditors to vote for or against the plan of reorganization." 140 Cong. Rec. 10,768 (1994) (statement of Rep. Brooks) (emphasis added).

13

- The legislative history of § 1126 is similarly instructive. Various reports concerning that section use the terms "vote" and "accept" interchangeably as well:

  - "Subsection (c) specifies the required amount and number of <u>acceptances</u> for a class of creditors. A class of creditors has <u>accepted</u> a plan if at least two-thirds in amount and more than one-half in number of the allowed claims of the class that are <u>voted</u> are cast in favor of the plan. The amount and number are computed on the basis of claims actually <u>voted</u> for or against the plan, not as under Chapter X on the basis of the allowed claims in the class." H.R. Rep. No. 95-595, at 245 (1977) (emphasis added) (discussing § 1126 Acceptance of Plan) and S. Rep. 95-989, at 123 (1978) (emphasis added) (same).

  - "Subsection (d) provides similar treatment for classes of equity securities, but dispenses with the one-half in number required. A class of equity securities has <u>accepted</u> a plan if at least two-thirds in amount of the outstanding securities actually <u>voted</u> are <u>voted</u> for the plan." H.R. Rep. No. 95-595, at 410 (1977) (emphasis added) (discussing § 1126 Acceptance of Plan).

  - "Under subsection (d), with respect to a class of equity securities, it is sufficient for <u>acceptance</u> of the plan if the amount of securities <u>voting</u> for the plan is at least two-thirds of the total actually voted." S. Rep. 95-989, at 123 (1978) (emphasis added) (discussing § 1126 Acceptance of Plan).

  - "Subsection (g) provides that any class denied participation under the plan is conclusively deemed to have <u>rejected</u> the plan. There is obviously no need to submit a plan for a <u>vote</u> by a class that is to receive nothing. But under subsection (g) the excluded class is like a class that has not <u>accepted</u>, and is a dissenting class for purposes of confirmation under section 1130." S. Rep. 95-989, at 123-24 (1978) (emphasis added) (discussing § 1126 Acceptance of Plan).

- The legislative history of § 1127 also provides support:

  - "After a plan has been confirmed, but before its substantial consummation, a plan may be modified by leave of court, which subsection (d) provides shall be granted for good cause. . . It provides that a creditor or stockholder who <u>voted for or against a plan</u> is deemed to have <u>accepted</u> or rejected the modifying proposal. But if the modification materially or adversely affects any of their interests, they must be afforded an opportunity to change their <u>vote in accordance with the disclosure and solicitation requirements of section 1125</u>." S. Rep. 95-989, at 124 (1978) (emphasis added) (discussing § 1127 Modification of Plan).

- Finally, case law provides a number of examples in which courts have used the terms "vote" and "accept" interchangeably. In <u>In re Hillsborough Holdings Corp. v. Celotex</u>, 197 B.R. 372 (Bankr. M.D. Fla. 1996), the court referred to the 75% vote requirement of § 524(g) as a "75% acceptance requirement." <u>Id.</u> at 377. Similarly, the court in <u>In re Shin</u>, 306 B.R. 397 (Bankr. D.C. 2004) used the word "vote" interchangeably with the word "accepted" with respect to § 1141(d)(1)(A)(iii), <u>id.</u> at

14

401-02, and the court in In re Marshall, 298 B.R. 670 (Bankr. C.D. Cal. 2003) used the word "vote" interchangeably with the word "accepted" with respect to § 1129(a)(7)(A)(i), id. at 680.

Thus, the interchangeable use of the words "vote" and "accept" is ubiquitous in the Bankruptcy Code, the legislative history of the Bankruptcy Code, the Official Bankruptcy Forms, and the decisions of bankruptcy courts.  The argument that § 524(g)'s use of the term "vote" rather than "accept" demands that § 524(g) be read as requiring an actual, affirmative vote where that vote is not otherwise required under the Bankruptcy Code is simply not persuasive.[7]

---

[7]  Nor is the proposition that statutes should be interpreted according to the plain meaning of the statutory language dispositive of this issue.  (Obj. of Asbestos PI Committee, at 21) While it is true that "[t]he meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, the sole function of the courts is to enforce it according to its terms," Sekula v. F.D.I.C., 39 F.3d 448, 454 n.14 (3d Cir. 1994), the Supreme Court has cautioned that "[i]n expounding a statute, [courts] must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."  Kelly v. Robinson, 479 U.S. 36, 43 (1986) (quoting Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 222 (1986) (in turn quoting Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 285 (1956))).  See also Albert v. Abramson's Enters., Inc., 790 F.2d 380, 381 (3d Cir. 1986) (in interpreting the provisions of any statute, while the court presumes that the legitimate legislative purpose is expressed by the ordinary meaning of the words used, the court also looks to the entire statute as well as to its object and policy).

Additionally, "[w]here the literal reading of a statutory term would 'compel an odd result,' [the Court] must search for other evidence of congressional intent to lend the term its proper scope."  Public Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 454 (1989).  Moreover, the Supreme Court "has been reluctant to accept arguments that would interpret the [Bankruptcy] Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history."  Dewsnup v. Timm, 502 U.S. 410, 419 (1992).  In Dewsnup, the Court stated that "to attribute to Congress the intention to grant a debtor the [new ability to 'strip down' a creditor's lien on real property to the value of the collateral when that value is less than the amount of the claim secured by the lien]  without [this] new remedy's being mentioned somewhere in the Code itself or in the annals of Congress is not plausible . . . and is contrary to basic bankruptcy principles."  Id. at 420.

Here, the Asbestos PI Committee would have the Court read § 524(g) in such a fashion as to create for asbestos claimants the extraordinary right to veto a plan even if that plan calls for 100% payment of the value of their claims on the effective date or when allowed.  Given (i) the absence of any evidence of congressional intent to alter the basic principle that claimants

(Continued...)

91100-001\DOCS_DE:104402.1

Moreover, if the Court were to conclude that unimpaired asbestos claimants must vote to accept a plan by at least 75% in number, the result would be that no company trying to resolve its asbestos liabilities though bankruptcy could do so, even as here where the Plan calls for paying asbestos claimants in full, unless 75% of those claimants vote to accept the Plan. Such parsing of the statute would effectively grant such claimants a veto power over the plan, regardless of the full satisfaction of their rights. Bankruptcy Code § 524(g) simply was not enacted to give asbestos claimants such a veto over a plan that leaves them unimpaired. Its primary purpose, as explained below in Section III, _infra_, was to preserve the total enterprise value for all constituents by removing the "asbestos overhang" from reorganized companies.

Counsel for the Asbestos PI Committee previously has acknowledged that § 524(g) was not intended to put asbestos claimants in a position from which they could block a plan that leaves them unimpaired. At a June 3, 2004 hearing before the Third Circuit in the case of In re Combustion Engineering, Inc., Mr. Inselbuch stated:

> [W]hile one of counsel assumes that the 75 percent vote provision was driven by the claimants, that was not the case. That was insisted on by organized labor in order to protect the claimants from what they feared would be lawyers representing claimants only having to get a majority vote.

(Tr. of June 3, 2004 Hr'g at 289) Thus, in speaking to the purpose of § 524(g), Mr. Inselbuch agreed that § 524(g)'s 75% voting requirement was intended primarily to prevent powerful plaintiffs' attorneys who effectively controlled a large number of votes from marshalling those

---

are not entitled to recover more than 100% of their allowed claims, or to give asbestos claimants the leverage to veto a plan that pays them 100% of their allowed claims on the effective date or when allowed, and (ii) the frequency with which the terms "vote" and "accept" are used interchangeably by nearly every legal authority, the Court should not read § 524(g) as establishing an unprecedented new power for asbestos claimants simply because § 524(g) uses the term "vote" rather than "accept."

votes in order to push through a plan that did not reflect the interests of a supermajority of claimants.

In summary, unimpaired claimants, including unimpaired asbestos claimants, are not entitled to vote, and § 524(g) does not change this fact. Congress did not contemplate that it was creating a right to vote for unimpaired claimants when it enacted § 524(g) and heightened the numerosity requirement set forth in § 1126, and § 524(g) should not be allowed to be misused by asbestos claimants to veto a plan that leaves them unimpaired.[8]

## III.   Under The Bankruptcy Code, Estimation Can Be Used To Determine The Aggregate Dollar Amount Of Allowed Claims In A Class

The use of estimation to determine funding for a class of claims is not in dispute. This is not surprising, since estimation for such purposes is not only authorized by Bankruptcy Code § 502(c), but is a necessary step in the confirmation of a plan that contemplates a § 524(g) trust.

Section 524(g) provides for the establishment of a trust into which all present and future asbestos-related claims are channeled. The number and amount of future asbestos claims <u>must</u> be established through estimation because the actual amount and number of these claims are, by

---

[8]   The Asbestos PI Committee contends that § 524(g) requires an actual vote by asbestos claimants because Congress modeled § 524(g) on the channeling injunction issued in the Johns-Manville bankruptcy, a case in which the debtor's plan required an actual vote by asbestos claimants even though it purported to provide for payment of all allowed asbestos claims at 100 cents on the dollar through a trust liquidation mechanism. (Obj. of Asbestos PI Committee, at 22-23) This argument does not speak to the issue presently before the Court, namely whether unimpaired claimants are entitled to vote under § 524(g). In the Johns-Manville bankruptcy, both classes of asbestos claims (i.e. the property claims and asbestos health claims) were explicitly impaired under the plan. Thus, while it may be true that Congress modeled § 524(g) on the channeling injunction issued in the Johns-Manville bankruptcy, the fact that the impaired Johns-Manville claimants actually voted on that plan is irrelevant with respect to congressional intent regarding unimpaired claimants, such as those in the present case.

definition, unknown. <u>See</u> 11 U.S.C. § 524(g)(2)(B)(ii)(II) ("the actual amounts, numbers, and time of such future demands cannot be determined.")

Indeed, estimation of the aggregate value of claims under § 502(c) and other provisions of the Bankruptcy Code has been used in other mass tort cases even in the absence of § 524(g). <u>See</u> <u>In re Eagle-Picher Indus., Inc.</u>, 189 B.R. 681, 682, 692 (Bankr. S.D. Ohio 1995) (the bankruptcy court estimated and fixed the total value for asbestos personal injury claims at $2,502,511,000). <u>See also</u> <u>Kane v. Johns-Manville Corp.</u>, 843 F.2d 636 (2d Cir. 1988) (affirming reorganization plan that contemplated estimate of number and amount of asbestos claims); <u>In re A.H. Robins Co., Inc.</u>, 88 B.R. 742, 747 (E.D. Va. 1988) (the district court confirmed the debtor's plan, estimating and capping a class of mass tort personal injury claims at $2.475 billion, which figure was established at a prior estimation hearing; the court found that this sum was "sufficient to pay in full all Dalkon Shield personal injury claims"). Although these latter two cases did not involve § 524(g), they too stand for the proposition that § 502(c) estimates may be used for this purpose.

Significantly, the Court's authority to engage in the estimation proposed by the Debtors is grounded in provisions of the Bankruptcy Code in addition to the specific estimation power conferred by § 502(c). Thus, a court may estimate a claim solely for the purpose of determining a creditor's ability to vote on a plan of reorganization or solely for the purpose of determining feasibility of a plan. <u>See</u> <u>e.g.</u>, <u>In re Pizza of Hawaii, Inc.</u>, 761 F.2d 1374, 1382 (9th Cir. 1985) (finding estimation to be necessary for a determination of plan feasibility). As stated by the Fourth Circuit in <u>A.H. Robins Co. v. Piccinin</u>:

> It will be observed ... that the statute denies authority to the bankruptcy court to estimate contingent claims only if the purpose is to make a "distribution" of the assets of the debtor; the statute does not in express terms deny to the bankruptcy court the

18

> authority, or relieve it of the duty, to estimate the contingent "personal injury" claims for purposes of determining the feasibility of a reorganization. And such has been the construction of the statute which has been adopted by the courts which have had to face the issue, the two leading cases being proceedings arising out of the asbestos litigation. Roberts v. Johns-Manville Corp., 45 B.R. 823, 825-26 (S.D.N.Y. 1984); In re UNR Industries, Inc., 45 B.R. 322, 326-27 (N.D. Ill 1984). Both of these cases hold that estimations of the debtors' potential personal injury tort liabilities as an incident of the development of a plan of reorganization are core proceedings within the bankruptcy court's jurisdiction and that such estimations are not foreclosed.

788 F.2d 994, 1005-12 (4th Cir. 1986) (emphasis added).

Moreover, the Court's ability to engage in the kind of estimation proposed by the Debtors is particularly apparent in the context of an asbestos plan such as is proposed here, which seeks to invoke Bankruptcy Code § 524(g). Among other things, § 524(g)(2)(B)(ii) requires the Court to "determine" that:

- the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction;

- the actual amounts, numbers, and timing of such future demands cannot be determined;

- pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands; [and]

- . . . the trust will value and be in a financial position to pay present claims and future demands that involve similar claims in substantially the same manner.

11 U.S.C. § 524(g)(2)(B)(ii).

Similarly, § 524(g)(4)(B)(ii) requires that in order to permit the channeling injunction to apply to certain third parties, the Court "determine" that the requisite contributions made by or on behalf of such third party be "fair and equitable" with respect to persons who might assert future demands.

All of these provisions of § 524(g) will require the Court to engage in an assessment of the aggregate value of the Debtors' current asbestos liability and potential future asbestos exposure. The Court will necessarily have to engage in precisely the exercise that is contemplated by the Estimation Motion in order to make such assessments. Thus, it is beyond question that the Court is empowered to estimate the aggregate value of the Debtors' current and future asbestos liability, as requested by the Estimation Motion, both by § 502(c) itself, and also under other relevant provisions of the Bankruptcy Code.

In light of this clear authority allowing the Court to estimate the aggregate value of the claims in the asbestos classes for purposes of confirming a plan, it is not surprising that the objectors' argument concerning estimation is confined to (i) the methodology for estimating claims and (ii) whether the estimation of claims constitutes impairment. The required estimation methodology is addressed in the Estimation Reply, and the issue of whether estimation constitutes impairment has previously been addressed in Section I.A., <u>supra</u>.

### Conclusion

In light of all of the foregoing, this Court should conclude: (i) the Debtors' Plan does not impair disputed asbestos claimants; (ii) the rule that unimpaired claimants are not entitled to vote to accept or reject a plan is unchanged by Section 524(g); and (iii) the Court has the power to confirm the Plan based on its estimation of the aggregate dollar amount of allowed claims in the asbestos personal injury and property damage classes. Consistent with that conclusion, the Court should immediately turn its attention to the Debtors' request for approval of the Disclosure Statement, the Estimation Motion, the New CMO Motion, and the Confirmation Procedures Motion in order that these Chapter 11 cases move toward a just and speedy conclusion.

91100-001\DOCS_DE:104402.1

Dated:    January 7, 2005

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Jonathan P. Friedland
200 East Randolph Drive
Chicago, IL 60601
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

KIRKLAND & ELLIS LLP
Theodore L. Freedman
Citigroup Center
153 East 53rd Street
New York, NY  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

KIRKLAND & ELLIS LLP
Bennett L. Spiegel
777 South Figueroa Street
Los Angeles, CA  90017
Telephone:    (213) 680-8400
Facsimile:    (213) 680-8500
-and-

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession