**EXHIBIT 1**

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE COURT**

This proposed Disclosure Statement is not a solicitation of acceptance or rejection of the Debtors' Chapter 11 Plan of Reorganization. Acceptances or rejections may not be solicited until the Court has approved this Disclosure Statement under Bankruptcy Code § 1125. This proposed Disclosure Statement is being submitted for approval only, and it has not yet been approved by the Court.

Further, the Debtors provide no assurance that the Disclosure Statement, including any Exhibits to the Disclosure Statement, that is ultimately approved in the Chapter 11 Cases (1) will contain any of the terms in the current document or (2) will not contain different, additional, material terms that do not appear in the current document. Therefore, making investment decisions based upon the information contained in this Disclosure Statement, the Plan and the Exhibits in the Exhibit Book is *highly speculative,* and the documents should not be relied upon in making such investment decisions with respect to (1) the Debtors or (2) any other parties that may be affected by the Chapter 11 Cases.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO., et al.,**[1] | ) | **Case No. 01-1139 (JKF)** |
| | ) | **(Jointly Administered)** |
| Debtors. | ) | |
| | ) | |

## DISCLOSURE STATEMENT FOR DEBTORS' PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

### IMPORTANT DATES

- Date by which Ballots must be received: [      ], 2005
- Date by which objections to the Plan must be filed and served: [      ], 2005
- Hearing on Confirmation of the Plan: [      ], 2005

| | |
|---|---|
| KIRKLAND & ELLIS LLP | PACHULSKI, STANG, ZIEHL, YOUNG, JONES & |
| David M. Bernick, P.C. | WEINTRAUB P.C. |
| Janet S. Baer | Laura Davis Jones (Bar No. 2436) |
| Jonathan P. Friedland | David W. Carickhoff, Jr. (Bar No. 3715) |
| Samuel L. Blatnick | 919 North Market Street, 16th Floor |
| 200 East Randolph Drive | P.O. Box 8705 |
| Chicago, Illinois 60601 | Wilmington, Delaware 19899-8705 (Courier 19801) |
| Telephone: (312) 861-2000 | Telephone: (302) 652-4100 |

and

Bennett L. Spiegel
Lori Sinanyan
777 South Figueroa Street
Los Angeles, California 90017
Telephone: (213) 680-8400

- Co-Counsel for the Debtors and Debtors in Possession -
Dated: November 13, 2004

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE COURT**

---

[1]   The "Debtors," and all capitalized terms not defined in this Disclosure Statement, are defined in the Glossary. The Glossary is included as Exhibit 2 to the Exhibit Book. The Exhibit Book (and each Exhibit thereto) is incorporated by reference into this Disclosure Statement.

## NOTICE TO HOLDERS OF CLAIMS AND/OR EQUITY INTERESTS AND GENERAL DISCLAIMERS WITH RESPECT TO THIS DISCLOSURE STATEMENT

### PLEASE READ THIS IMPORTANT INFORMATION

The Bankruptcy Code requires that a party proposing a chapter 11 plan of reorganization prepare and file a document with the Bankruptcy Court called a "Disclosure Statement." This document is the proposed Disclosure Statement for the Debtors' Chapter 11 Plan of Reorganization. All Exhibits to this Disclosure Statement are incorporated into and made a part of this Disclosure Statement as if set forth in full herein.

The Debtors are providing the information in this Disclosure Statement solely for the purposes of providing information concerning the Plan to Holders of Claims against or Equity Interests in the Debtors so that those who are entitled to vote on the Plan can make an informed decision with respect to voting on acceptance or rejection of the Plan.

No one is authorized to provide to any other party information concerning the Plan other than the contents of this Disclosure Statement. Except as set forth in this Disclosure Statement, no representations concerning the Debtors, their assets, past or future business operations, the financial information or the Plan are authorized, nor should any such representations be relied upon in arriving at a decision with respect to the Plan. Holders of Claims or Equity Interests should not rely on any information, representations, or inducements made to obtain acceptance or rejection of the Plan that are other than, or inconsistent with, the information contained herein and in the Plan. Any representations made to secure acceptance or rejection of the Plan other than those contained in this Disclosure Statement should be reported to counsel for the Debtors. The statements and information about the Debtors, including all Financial Information and information regarding Claims or Equity Interests contained herein, have been prepared from documents and information prepared by the Debtors or their Professionals.

Nothing contained in the Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the Debtors for purposes of any pending or future litigation matter or proceeding. Moreover, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact or liability, a stipulation, or a waiver. Instead, this Disclosure Statement should be construed as a statement made in settlement negotiations related to contested matters, adversary proceedings and other pending or threatened litigation or actions.

The description herein of the Plan only is a summary, and Holders of Claims and/or Equity Interests are urged to review the entire Plan, which is included as Exhibit 1 to the Exhibit Book. In the event that there is any inconsistency or conflict between this Disclosure Statement and the Plan, the terms of the Plan shall control.

This Disclosure Statement also summarizes Financial Information and other documents. The Financial Information and other documents incorporated by reference herein are qualified in their entirety by reference to those documents. In the event there is any inconsistency or discrepancy between a description in this Disclosure Statement and the Financial Information or other documents so described, the underlying Financial Information or other documents, as the case may be, shall govern for all purposes.

Further, each Holder of a Claim and/or Equity Interest that is entitled to vote is encouraged to seek the advice of its own counsel before casting a Ballot and/or Master Ballot, as applicable.

Although certain of the attorneys, accountants, advisors and other Professionals retained and/or employed by the Debtors have assisted in preparing this Disclosure Statement, which is based upon factual information and assumptions respecting financial, business and accounting data found in the books and records of the Debtors, they have not independently verified such information. The attorneys, accountants, advisors, and other Professionals retained and/or employed by the Debtors do not provide any warranty, representation or guaranty regarding the accuracy of any information contained in the Disclosure Statement or any of the Plan Documents and shall have no liability for any inaccurate, untrue or incomplete information contained in this Disclosure Statement or any of the Plan Documents.

Further, there has been no independent audit of the proforma or prospective financial information contained in this Disclosure Statement, and no fairness opinion has been obtained regarding the value of the Debtors' assets and the amount of their liabilities. The factual information regarding the Debtors and their assets and liabilities has been provided by the Debtors or otherwise derived from the Debtors' schedules, available public records, pleadings, reports on file with the Court, the Debtors' internal documents and related documents specifically identified herein. While the Debtors have endeavored to provide accurate information herein, the Debtors cannot, and do not, warrant or represent that the information contained in this Disclosure Statement does not contain any material inaccuracy.

The Debtors and their Professionals have also endeavored to identify in this Disclosure Statement and the Plan certain pending litigation claims and potential causes of action and objections to Claims. However, no reliance should be placed on the fact that a particular litigation claim or potential cause of action or objection to a Claim is, or is not, identified in this Disclosure Statement, the Plan, or any Plan Document. The Debtors, the Reorganized Debtors, or the Asbestos Trust, as applicable may seek to investigate, file and prosecute litigation claims and projected causes of action and objections to Claims after the Effective Date of the Plan, irrespective of whether this Disclosure Statement, the Plan or any Plan Document identifies any such claims, causes of action, or objections to Claims.

The Court's approval of this Disclosure Statement does not constitute the Court's approval of the merits of the Plan, an endorsement of the Plan or a guarantee of the accuracy or completeness of the information contained herein.

This Disclosure Statement has not been approved or disapproved by the SEC or any other federal or state regulatory authority, nor has the SEC or any other federal or state regulatory authority passed upon the accuracy or adequacy of the statements contained herein. The securities described herein will be issued in reliance on the exemptions set forth in Bankruptcy Code § 1145 and without registration under the Securities Act, or any similar federal, state or local law. The Debtors recommend that potential recipients of any securities pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

This Disclosure Statement may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statements other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "believe," "anticipate," "project," "assume," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements, including proforma and prospective financial information, are necessarily speculative, and there are risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analyses, proforma and prospective financial information, and other information are estimates only, and the timing and amounts of actual distributions to Claimants may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or recovery projections may or may not prove to be accurate, and the Debtors provide no assurance that these projections or estimates will be correct.

The Debtors make the statements and provide the Financial Information contained herein as of the date hereof unless otherwise specified. Holders of Claims and/or Equity Interests reviewing this Disclosure Statement should not infer at the time of such review that the facts set forth herein have not changed since the date hereof unless so specified. Each Holder of an impaired Claim or Equity Interest that is entitled to vote should therefore carefully review all of the Plan Documents. See Article 8 of this Disclosure Statement for a discussion of various considerations and risk factors to be considered in deciding whether to accept the Plan.

This Disclosure Statement does not constitute legal, business, securities, financial or tax advice. All Entities desiring such advice or any other advice should consult with their own advisors. Further, neither this Disclosure Statement (including the Plan and all of the Exhibits in the Exhibit Book) nor any of the Plan Documents should be relied upon in making any investment decisions with respect to Grace or any other parties that may be affected by the Plan.

No party is authorized to provide to any other party any information concerning the Plan other than the contents of this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than those set forth in this Disclosure Statement. Holders of Claims or Equity Interests should not rely on any information or representations made elsewhere when deciding whether to vote to accept or reject the Plan.

A vote by a Claimant or Holder of an Equity Interest - whether for or against the Plan - does not constitute a waiver or release of any claims or rights of the Debtors (or any party in interest) to object to that Claimant's Claim or Holder's Equity Interest of estate assets, regardless of whether any claims of the Debtors or their respective estates are specifically or generally identified herein.

## TABLE OF CONTENTS

Page

1. EXECUTIVE SUMMARY .............................................................................................1
   1.1   The Disclosure Statement .................................................................................1
   1.2   The Plan............................................................................................................1
         1.2.1   What Claims and Equity Interests Are Affected by the Plan? ................1
         1.2.2   How Will Asbestos Claims be Treated? ..................................................6
         1.2.3   How Will General Unsecured Claims be Treated Under the
                 Plan? ........................................................................................................7
         1.2.4   How Will Equity Interests be Treated Under the Plan? ..........................7
         1.2.5   How Will the Treatment of Asbestos Claims be Effectuated?................7
         1.2.6   How Will the Plan be Funded? ................................................................8

2. DESCRIPTION OF THE DEBTORS .........................................................................9
   2.1   General Overview of the Debtors ....................................................................9
   2.2   The Debtors' Current Businesses.....................................................................9
         2.2.1   Davison Chemicals..................................................................................9
                 2.2.1.1   Refining Technologies ............................................................9
                 2.2.1.2   Specialty Materials................................................................10
                           2.2.1.2.1   Silicas .......................................................10
                           2.2.1.2.2   Zeolites .....................................................10
                 2.2.1.3   Polyolefin and Other Catalysts ...........................................11
                 2.2.1.4   Other Information ..................................................................11
         2.2.2   Performance Chemicals.........................................................................11
                 2.2.2.1   Construction Chemicals and Building Materials ...............11
                 2.2.2.2   Sealants and Coatings ..........................................................12
                 2.2.2.3   Other Information ..................................................................12
   2.3   Genesis of the Debtors' Asbestos Liabilities .................................................12
         2.3.1   Asbestos-Added Products .....................................................................12
         2.3.2   Libby Vermiculite .................................................................................13
         2.3.3   Zonolite Attic Insulation.......................................................................13
   2.4   The Debtors' Asbestos-Related Litigation.....................................................13
         2.4.1   Asbestos Personal Injury Litigation .....................................................14
         2.4.2   Asbestos Property Damage Litigation...................................................14
         2.4.3   Litigation Related to Zonolite Attic Insulation.....................................14
         2.4.4   Asbestos Medical Monitoring Claims ...................................................15
   2.5   The Debtors' Other Litigation........................................................................15
         2.5.1   Environmental Proceedings and Environmental Insurance
                 Litigation................................................................................................15
                 2.5.1.1   Libby and Vermiculite-Related Remediation......................15
                           2.5.1.1.1   Libby, Montana .........................................15
                           2.5.1.1.2   Libby Property Owners ..............................16
                           2.5.1.1.3   Former Grace Plant in Minneapolis,
                                      Minnesota....................................................16

i

|  |  | 2.5.1.1.4 | Other Current and Former Vermiculite Expansion Plants .....................16 |
|  | 2.5.1.2 | Proceedings in Which Grace is a Potentially Responsible Party.............................................17 |
|  | 2.5.1.3 | The Settling Federal Agencies' Consent Decree ...............17 |
|  | 2.5.1.4 | Other Significant Environmental Legal Proceedings and Claims...............................................17 |
|  |  | 2.5.1.4.1 | Cape Cod Pipeline Remediation.................18 |
|  |  | 2.5.1.4.2 | Jersey City Chromium Contamination Remediation.........................18 |
|  | 2.5.1.5 | Plan Treatment of Environmental Claims.........................19 |
|  | 2.5.1.6 | Environmental Insurance Litigation..................................19 |
| 2.5.2 | Fraudulent Transfer Litigation...............................................19 |
| 2.5.3 | Tax Claims ............................................................................20 |
|  | 2.5.3.1 | IRS Proposed 1993-96 Tax Adjustments...........................20 |
|  | 2.5.3.2 | Other Disputed Tax Claims ..............................................21 |
|  |  | 2.5.3.2.1 | Temporary Health Care Staffing Business ........................................21 |
|  |  | 2.5.3.2.2 | Bekaert Textiles N.V. ....................21 |
|  |  | 2.5.3.2.3 | Remedium Joint Venture ................21 |
|  |  | 2.5.3.2.4 | State Income Tax Claims................22 |
| 2.6 | Liabilities other than Litigation Claims .............................................22 |
| 2.6.1 | Current Liabilities not Subject to Compromise Under the Bankruptcy Code.......................................22 |
| 2.6.2 | Non-Current Liabilities not Subject to Compromise Under the Bankruptcy Code...................................22 |
| 2.6.3 | Liabilities Subject to Compromise Under the Bankruptcy Code..........22 |
|  | 2.6.3.1 | Debt and Accrued Interest..................................................22 |
|  | 2.6.3.2 | Income Taxes ......................................................................23 |
|  | 2.6.3.3 | Post-Retirement Benefits Other than Pensions .................23 |
|  | 2.6.3.4 | Unfunded Special Pension Arrangements .........................23 |
|  | 2.6.3.5 | Accounts Payable ...............................................................23 |
|  | 2.6.3.6 | Other Accrued Liabilities...................................................23 |
| 2.7 | Assets and other Rights.......................................................................24 |
| 2.7.1 | Excess Real Property.............................................................24 |
| 2.7.2 | Insurance Rights....................................................................24 |
|  | 2.7.2.1 | Overview ............................................................................24 |
|  | 2.7.2.2 | Primary Insurance Coverage ..............................................24 |
|  | 2.7.2.3 | Excess Insurance Coverage ................................................24 |
|  | 2.7.2.4 | Estimated Insurance Recoveries ........................................25 |
| 2.7.3 | Debtors' Retained Causes of Action.......................................25 |
|  | 2.7.3.1 | Preservation of Causes of Action.......................................25 |
|  | 2.7.3.2 | Maintenance of Causes of Action.......................................27 |
|  | 2.7.3.3 | Avoidance Actions .............................................................28 |

ii

|  |  |  | 2.7.3.4 | Preservation of All Causes of Action not Expressly Settled or Released | 28 |
| 2.8 |  | Estimated Value of the Reorganized Debtors and Non-Debtor Affiliates | 29 |
|  | 2.8.1 | Core Business Value of the Reorganized Debtors and Non-Debtor Affiliates | 29 |
|  |  | 2.8.1.1 | Comparable Public Company Analysis | 29 |
|  |  | 2.8.1.2 | The Precedent Transaction Analysis | 30 |
|  | 2.8.2 | Calculation of Fully Diluted Reorganized Equity Value | 31 |
|  |  | 2.8.2.1 | Insurance | 31 |
|  |  | 2.8.2.2 | Tax Assets | 31 |
|  |  | 2.8.2.3 | Non-Core Liabilities | 32 |
|  |  | 2.8.2.4 | Net Debt | 32 |
|  |  | 2.8.2.5 | Proceeds of Options | 32 |
|  |  | 2.8.2.6 | Summary | 32 |

3.  THE CHAPTER 11 FILINGS AND RELATED CANADIAN PROCEEDINGS .......... 34
3.1  Overview of Chapter 11 .......... 34
3.2  Significant Events During the Course of the Chapter 11 Cases .......... 34
  3.2.1  First Day Motions .......... 35
    3.2.1.1  Retention and Employment of Professionals By the Debtors .......... 35
    3.2.1.2  Financing and Critical Trade Motions .......... 35
    3.2.1.3  Operational Motions .......... 35
  3.2.2  Motions to Assume Pre-Petition Executory Contracts and Leases .......... 35
  3.2.3  Appointment of Official Committees of Creditors, the Official Equity Committee and the Future Claims Representative .......... 36
    3.2.3.1  Official Committees of Creditors .......... 36
      3.2.3.1.1  Unsecured Creditors' Committee .......... 36
      3.2.3.1.2  Asbestos PI Committee .......... 36
      3.2.3.1.3  Asbestos PD Committee .......... 36
    3.2.3.2  Official Equity Committee .......... 36
    3.2.3.3  Representative for Future Asbestos Claimants .......... 37
  3.2.4  Section 341(a) Meeting of Creditors .......... 37
  3.2.5  Selected Adversary Proceedings .......... 37
    3.2.5.1  Stay of Asbestos-Related Litigation Against Various Affiliates .......... 37
    3.2.5.2  Enjoining Bond Payments by National Union .......... 38
  3.2.6  Extension of Exclusivity Period and Termination of Exclusivity Period .......... 38
  3.2.7  Motions to Lift the Automatic Stay .......... 39
  3.2.8  Certain Post-Petition Litigation Matters .......... 39
    3.2.8.1  Litigation Related to Grace's Savings and Investment Plan .......... 39
    3.2.8.2  The Scotts Company Litigation .......... 40
    3.2.8.3  Montana Grand Jury Investigation .......... 40

iii

|       | 3.2.9   | Motion for Entry of Case Management Order | 41 |
|       | 3.2.10  | Debtors' Bar Date for Asbestos PD Claims (Excluding ZAI Claims), Non-Asbestos Claims, and Asbestos Medical Monitoring Chims | 41 |
|       | 3.2.11  | The ADR Program | 41 |
|       | 3.2.12  | The Judge Wolin Mandamus and Recusal Proceedings | 42 |
|       | 3.2.13  | Negotiations with the Various Committees and the FCR | 42 |
|       | 3.2.14  | Motion to Protect Tax Benefits | 42 |
| 3.3   | The Canadian Proceedings | | 43 |
|       | 3.3.1   | General Information | 43 |
|       | 3.3.2   | Notice of the Canadian Proceedings | 43 |
|       | 3.3.3   | Quarterly Reports | 43 |
|       | 3.3.4   | Court Orders in the Canadian Proceedings | 43 |
|       |         | 3.3.4.1 Orders Extending the Stay of Proceedings in Canada | 43 |
|       |         | 3.3.4.2 Recognition of the Debtors' March 2003 Bar Date Order | 44 |
|       |         | 3.3.4.3 The Corporate Reorganization Order | 44 |
|       | 3.3.5   | Post-Petition Canadian Lawsuits | 44 |

| 4.    | SUMMARY OF THE PLAN | | 45 |
| 4.1   | Overview of the Chapter 11 Plan | | 45 |
| 4.2   | PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS | | 45 |
| 4.3   | CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS | | 46 |
|       | 4.3.1   | Summary | 46 |
|       |         | 4.3.1.1 Class 1. Priority Claims | 46 |
|       |         | 4.3.1.2 Class 2. Secured Claims | 46 |
|       |         | 4.3.1.3 Class 3. Unsecured Pass-Through Employee Related Claims | 47 |
|       |         | 4.3.1.4 Class 4. Workers' Compensation Claims | 47 |
|       |         | 4.3.1.5 Class 5. Intercompany Claims | 47 |
|       |         | 4.3.1.6 Class 6. Asbestos PI-SE Claims | 47 |
|       |         | 4.3.1.7 Class 7. Asbestos PI-AO Claims | 48 |
|       |         | 4.3.1.8 Class 8. Asbestos PD Claims | 49 |
|       |         | 4.3.1.9 Class 9. General Unsecured Claims | 49 |
|       |         | 4.3.1.10 Class 10. Equity Interests in the Parent | 50 |
|       |         | 4.3.1.11 Class 11. Equity Interests in the Debtors other than the Parent | 50 |
|       | 4.3.2   | Effect of Asbestos PI Claimant Electing Various Options | 50 |
|       |         | 4.3.2.1 Cash-Out Option | 50 |
|       |         | 4.3.2.2 Litigation Option | 51 |
|       |         | 4.3.2.3 Registry Option | 51 |
| 4.4   | MODIFICATION OR WITHDRAWAL OF THE PLAN | | 51 |

iv

| | | | |
|---|---|---|---|
| 4.5 | | PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS AND ASBESTOS CLAIMS GENERALLY | 51 |
| | 4.5.1 | Objections to Claims (other than Asbestos Claims); Prosecution of Disputed Claims | 51 |
| | 4.5.2 | Distribution on Account of Disputed Claims | 51 |
| | 4.5.3 | Resolution of Asbestos Claims | 51 |
| 4.6 | | ACCEPTANCE OR REJECTION OF THE PLAN | 52 |
| 4.7 | | IMPLEMENTATION OF THE PLAN | 53 |
| | 4.7.1 | Corporate Governance of the Parent and the Other Debtors | 53 |
| | 4.7.2 | The Asbestos Trust | 53 |
| | 4.7.3 | Payments and Distributions Under the Plan | 55 |
| | 4.7.4 | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 55 |
| | 4.7.5 | Payments under the Plan | 55 |
| | 4.7.6 | Occurrence of the Confirmation Date | 55 |
| | 4.7.7 | Conditions to Occurrence of the Effective Date | 56 |
| | 4.7.8 | Management of the Reorganized Debtors | 56 |
| | 4.7.9 | Corporation Action | 56 |
| | 4.7.10 | Effectuating Documents and Further Transactions | 56 |
| | 4.7.11 | Allocation of Plan Distributions Between Principal and Interest | 56 |
| | 4.7.12 | No Successor Liability | 56 |
| | 4.7.13 | Deemed Consolidation of the Debtors for Plan Purposes Only | 57 |
| 4.8 | | Injunctions, Releases and Discharge | 57 |
| | 4.8.1 | Discharge | 58 |
| | 4.8.2 | The Asbestos Channeling Injunction | 59 |
| | 4.8.3 | Asbestos Insurance Entity Injunction | 60 |
| | 4.8.4 | Released Matters Injunction | 62 |
| | 4.8.5 | Term of Certain Injunctions and Automatic Stay | 63 |
| | 4.8.6 | Additional Releases and Indemnification | 64 |
| 4.9 | | CONTRACTS | 66 |
| 4.10 | | RETENTION OF JURISDICTION | 66 |
| 4.11 | | MISCELLANEOUS PROVISIONS | 66 |
| 5. | | LIMITED SUBSTANTIVE CONSOLIDATION | 69 |
| 6. | | VOTING AND CONFIRMATION PROCEDURES | 71 |
| 6.1 | | Voting Procedures | 71 |
| | 6.1.1 | Voting Instructions and Deadline | 71 |
| 6.2 | | Confirmation Procedures | 72 |
| | 6.2.1 | Confirmation Hearing | 72 |
| | 6.2.2 | Objections to Confirmation of the Plan | 72 |
| | 6.2.3 | Questions About the Disclosure Statement, Plan, or Ballots and Master Ballots | 73 |
| 7. | | REQUIREMENTS FOR CONFIRMATION OF THE PLAN | 74 |
| 7.1 | | Bankruptcy Code § 1129 Generally | 74 |

v

|  |  |  |  |
|---|---|---|---|
| 7.2 | | Vote Required for Class Acceptance | 76 |
| | 7.2.1 | Cramdown | 76 |
| 7.3 | | Feasibility of the Plan | 78 |
| 7.4 | | Best Interests Test | 79 |
| 7.5 | | Information about Corporate Governance, Officers, and Directors of the Reorganized Debtors, and the Management of the Debtors | 79 |
| | 7.5.1 | Corporate Governance; Limitation of Director Liability | 79 |
| | 7.5.2 | Management Compensation and Incentive Program | 80 |
| | 7.5.3 | Prospective Officer and Director Insurance | 80 |
| **8.** | | **IMPORTANT CONSIDERATIONS AND RISK FACTORS** | 81 |
| 8.1 | | General | 81 |
| 8.2 | | Certain Bankruptcy and Mass Tort Law Considerations | 81 |
| | 8.2.1 | Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests | 81 |
| | 8.2.2 | A Delay in Plan Confirmation May Disrupt Grace's Operations and Have Potential Adverse Effects of Prolonged Confirmation Process | 81 |
| | 8.2.3 | The Debtors May Not Be Able to Secure Confirmation or Consummation of the Plan | 81 |
| | 8.2.4 | There is a Risk of Post-Confirmation Default | 82 |
| | 8.2.5 | The Debtors May Object to the Amount or Classification of a Claim | 82 |
| | 8.2.6 | The Potential Impact of Pending Asbestos Legislation Is Uncertain | 82 |
| | 8.2.7 | Exemption from Registration Requirements of Applicable Federal Securities Laws May Not Be Available | 82 |
| 8.3 | | Factors Affecting the Distributions to Holders of Allowed Claims After the Effective Date | 82 |
| | 8.3.1 | The Debtors Disclaim Accuracy of Financial Information Provided | 82 |
| | 8.3.2 | Variance from the Proforma and Prospective Financial Information | 83 |
| | 8.3.3 | Risk that Amounts of Allowed Claims Will Exceed the Debtors' Projections | 83 |
| | 8.3.4 | Risk Regarding the Solvent Insurance Carriers | 83 |
| 8.4 | | Factors Affecting the Parent Common Stock | 83 |
| | 8.4.1 | The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results | 84 |
| | 8.4.2 | The Reorganized Debtors May Not Be Able to Meet Post-Reorganization Debt Obligations and Finance All Operating Expenses, Working Capital Needs and Capital Expenditures | 84 |
| | 8.4.3 | Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors | 84 |
| 8.5 | | Factors Associated with the Business | 84 |

vi

| | 8.5.1 | Reorganized Grace May Not Obtain Post-Confirmation Financing | 85 |
| 8.6 | | Factors Affecting the Asbestos Trust | 85 |
| | 8.6.1 | Risk that the Asbestos Trust Will not be Able to Pay All Allowed Claims | 85 |
| | 8.6.2 | Risk of Appointing Different Trustees for the Asbestos Trust | 86 |
| 8.7 | | Risk that the Information in this Disclosure Statement May be Inaccurate | 86 |
| **9.** | | **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** | **87** |
| 9.1 | | Continuation of the Chapter 11 Cases | 87 |
| 9.2 | | Alternative Plans of Reorganization | 87 |
| 9.3 | | Chapter 7 Liquidation | 87 |
| **10.** | | **FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | **88** |
| 10.1 | | Federal Income Tax Consequences to the Debtors | 89 |
| | 10.1.1 | General Discussion | 89 |
| | 10.1.2 | Deduction of Amounts Transferred to Satisfy Asbestos Claims | 90 |
| | 10.1.3 | Cancellation of Debt Income | 91 |
| | 10.1.4 | Net Operating Losses | 91 |
| 10.2 | | Federal Income Tax Consequences to Holders of Claims and the Asbestos Trust | 93 |
| | 10.2.1 | Holders of Asbestos Claims | 93 |
| | 10.2.2 | Treatment of the Asbestos Trust | 93 |
| | 10.2.3 | Consequences to Holders of General Unsecured Claims | 94 |
| | | 10.2.3.1    Accrued Interest | 95 |
| | | 10.2.3.2    Market Discount | 95 |
| | 10.2.4 | Consequences to Holders of Equity Interests | 95 |
| 10.3 | | Backup Withholding | 96 |
| **11.** | | **SECURITIES IMPLICATIONS OF THE PLAN** | **96** |
| 11.1 | | The Issuance of Securities Pursuant to the Plan | 96 |
| **12.** | | **CONCLUSION AND RECOMMENDATION** | **97** |

K&E 9907839.25

# 1. EXECUTIVE SUMMARY

The following is a brief summary of this Disclosure Statement, and of the Plan. This summary is just that - a summary. It is incomplete by definition and is qualified in its entirety by reference to the more detailed information appearing elsewhere in this Disclosure Statement, in the Plan, and in the other Plan Documents.

## 1.1    The Disclosure Statement

This Disclosure Statement describes the Debtors (in Article 2), discusses the events leading to the filing of the Chapter 11 Cases (in Article 2), describes the main events that have occurred in the Chapter 11 Cases (in Article 3) including the related international proceedings (in Section 3.3) and proposed limited substantive consolidation (in Article 5).

This Disclosure Statement goes on to summarize the Plan's contents (in Article 4), describe the Chapter 11 voting procedures (in Article 6), and the process the Court will follow in determining whether to confirm the Plan (in Articles 6, 7). This Disclosure Statement then outlines risk factors associated with the Plan (in Article 8), alternatives to the Plan (in Article 9), certain potential federal income tax consequences (in Article 10), and securities implications of the Plan (Article 11). Finally, this Disclosure Statement makes clear that the Debtors recommend that Holders of Claims and Equity Interests who are eligible to vote on the Plan vote to accept the Plan (in Article 12).

## 1.2    The Plan

### 1.2.1    What Claims and Equity Interests Are Affected by the Plan?

The Plan will pay all Claimants in full and will leave most Claimants, including Holders of Asbestos Claims, unimpaired.[2] Holders of General Unsecured Claims (Class 9) and Holders of Equity Interests in the Parent (Class 10) are impaired under the Plan.

The following table summarizes the classification and treatment of Claims and Equity Interests under the Plan. The figures in the column entitled "Estimated Amount of Allowed Claims" are consistent with the Debtors' books and records and include the Debtors' estimates for certain Claims that are disputed, which Claims may ultimately be determined to be significantly higher or lower.

---

[2]    Bankruptcy Code § 1124 explains the circumstances under which a plan's treatment of a class of claims or equity interests constitutes impairment of those claims or equity interests. Broadly stated, any alteration of a creditor's or equity interest holder's legal rights that occurs under a plan constitutes impairment.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| N/A | Administrative Expense Claims | N/A | Each Holder of an Allowed Administrative Expense Claim shall be paid the Allowed Amount of its Claim either (i) in full, in Cash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) on such less favorable terms as may be agreed to by such holder. Ordinary course of business claims and claims of Professionals shall be paid as described in the Plan. | $75 million | 100% |
| N/A | Priority Tax Claims | N/A | Each Holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Priority Tax Claim, at the option of the Reorganized Debtors, either (i) in full, in Cash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) on such less favorable terms as may be agreed to by such holder, or (iii) in equal quarterly Cash payments on the Initial Distribution Date and, thereafter, on each Quarterly Tax Distribution Date in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at 3.5% per annum, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim, or upon such other terms determined by the Bankruptcy Court, which will provide the Holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim. | $232 million | 100% |
| Class 1 | Priority Claims | No | Each Holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim either (i) in full, in Cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Priority Claim becomes an Allowed Priority Claim, or as soon as practicable thereafter, or (ii) on such less favorable terms as may be agreed to by such holder. | $0 | 100% |
| Class 2 | Secured Claims | No | Each Holder of an Allowed Secured Claim shall be paid the Allowed Amount of its Allowed Secured Claim at the option of the Reorganized Debtors, either (i) in full, in Cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Secured Claim becomes an Allowed Secured Claim, or as soon as practicable thereafter; (ii) on such less favorable terms as may be agreed to by such holder; (iii) by the surrender to the Holder or Holders of any Allowed Secured Claim of the property securing such Claim; or (iv) notwithstanding any contractual provision or applicable law that entitles the Holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Bankruptcy Code § 1124(2)(A)-(D). | $0 | 100% |

2

K&E 9907839.25

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| Class 3 | Unsecured Pass-Through Employee Related Claims | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. | Most Allowed Claims have already been paid pursuant to first day orders of this Court and continue to be paid in the ordinary course as they become due; $191 million of Claims are estimated to be Allowed and outstanding. | 100% |
| Class 4 | Workers' Compensation Claims | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. | Allowed Claims have already been paid pursuant to first day orders of this Court and continue to be paid in the ordinary course as they become due. | 100% |
| Class 5 | Intercompany Claims | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. | For proforma cash flow purposes all Claims will have no impact upon the Plan as all payments under the Plan are based upon the Debtors and Non-Debtor Affiliates as consolidated. | 100% |

3

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| Class 6 | Asbestos PI-SE Claims | No | All Allowed Class 6 Claims shall be paid in full by the Asbestos Trust out of the Asbestos PI-SE Class Fund and shall be processed and paid in accordance with the Asbestos Trust Agreement and the PI-SE TDP.  Each Holder of an Asbestos PI-SE Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect:  (A) the Litigation Option or (B) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim shall be conclusively presumed to have elected the Litigation Option.  Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option.  A Holder may also be treated on such less favorable terms as may be agreed to by such Holder. | An amount to be determined by the Bankruptcy Court pursuant to the Estimation Motion[3] | 100% |
| Class 7 | Asbestos PI-AO Claims | No | All Allowed Class 7 Claims shall be paid in full initially by the Asbestos Trust out of the Asbestos PI-AO Class Fund and then in Cash by the Asbestos Trust from funds to be paid to the Asbestos Trust by the Reorganized Debtors.  All Allowed Class 7 Claims shall be processed and paid in accordance with the Asbestos Trust Agreement and the PI-AO TDP.  In accordance with the terms of the Asbestos Trust Agreement and the PI-AO TDP, each Holder of an Asbestos PI-AO Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect:  (A) the Litigation Option, (B) the Cash-Out Option; or (C) the Registry Option, provided, however, that a Holder of a Third Party Indemnification/Contribution Claim shall be conclusively presumed to have elected the Litigation Option.  Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option.  A Holder may also be treated on such less favorable terms as may be agreed to by such Holder. | An amount to be determined by the Bankruptcy Court pursuant to the Estimation Motion[4] | 100% |

---

[3]  As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1,483,000,000.

[4]  As a condition precedent to confirmation of the Plan, the Court shall have found that the Asbestos PI-AO Class Fund is not greater than $130,000,000.

4

K&E 9907859.15

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| Class 8 | Asbestos PD Claims | No | All Allowed Class 8 Claims shall be paid in full and processed and paid in accordance with the Asbestos Trust Agreement and the PD TDP. A holder may also be treated on such less favorable terms as may be agreed to by such holder. | An amount to be determined by the Bankruptcy Court pursuant to the Estimation Motion[5] | 100% |
| Class 9 | General Unsecured Claims | Yes | Each Holder of an Allowed General Unsecured Claim shall be paid the Allowed Amount of its General Unsecured Claim on the GUC Distribution Date. Such payment shall be paid in full, plus post-petition interest, for those Claimants who, but for the Filing of the Chapter 11 Cases, would be entitled to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law, such payment to be 85% in Cash and 15% in Parent Common Stock, such Parent Common Stock being subject to, among other things, the transactions described in Section 7.2.2 of the Plan, and the Management Stock Incentive Plan. A holder may also be treated on such less favorable terms as may be agreed to by such holder. | $951 million as of 9/30/04, plus accrued interest through the payment date | 100% |
| Class 10 | Equity Interests in the Parent | Yes | On the Effective Date, Holders of Class 10 Equity Interests in the Parent shall retain such interests; provided that such Equity Interests shall: (i) be subject, among other things, to the transactions described in Section 7.2.2 of the Plan, and the Management Stock Incentive Plan and (ii) be restricted as described in Section 7.1.1 of the Plan. | N/A | N/A |
| Class 11 | Equity Interests in Debtors Other than the Parent | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Equity Interest entitles the Holder of such Equity Interest. | N/A | 100% |

[5]    As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1,483,000,000.

5

K&E 9907859.25

### 1.2.2    How Will Asbestos Claims be Treated?

The Plan divides Asbestos Claims into two categories: (1) Asbestos PI Claims and (2) Asbestos PD Claims (a.k.a. Asbestos Property Damage Claims) (Class 8). The Plan further divides Asbestos PI Claims into two Classes: (a) Asbestos PI-SE Claims (a.k.a. Asbestos Personal Injury Symptomatic/Eligible Claims) (Class 6) and (b) Asbestos PI-AO Claims (a.k.a. Asbestos Personal Injury Asymptomatic/Other Claims) (Class 7). All Asbestos Claims will be channeled to the Asbestos Trust (the Asbestos Trust is described below).

A key goal of the Plan is to set up a structure under which Holders of Asbestos PI Claims are able to settle with the Asbestos Trust in a fair, efficient, and expedient manner. The Debtors believe that this will allow Asbestos PI Claimants to recover the full value of their respective Claims as quickly as possible. To this end, most Asbestos PI Claimants will be able to elect to enter into a settlement with the Asbestos Trust instead of litigating against it, as described below.

Each and every Holder of an Asbestos PI Claim will have the option to retain his right to litigate his Claim against the Asbestos Trust and to recover the full amount of his Allowed Claim against the Asbestos Trust. This is referred to in the Plan as the "Litigation Option." If an Asbestos PI Claimant elects, or is deemed to elect, the Litigation Option, his Claim will be litigated against the Asbestos Trust and he will be precluded from seeking any further recovery against any party protected and/or released under the Plan on account of such Claim.

Holders of Asbestos PI Claims may also generally elect to have their Claims resolved through the "Cash-Out Option" instead of the Litigation Option. If an Asbestos PI Claimant elects the Cash-Out Option, his Claim will be treated under the terms of the applicable TDP (a.k.a. Trust Distribution Procedures) and he will be precluded from seeking any further recovery against any party protected and/or released under the Plan on account of such Claim. The amounts available under the Cash-Out Option vary depending on the Class of the Asbestos PI Claimant. The Cash-Out Option offered to Asbestos PI-AO Claimants who meet certain minimal requirements, as set forth in the PI-AO TDP, is a payment of $250. In contrast, the PI-SE TDP sets forth a matrix of significant settlement amounts (ranging from $4,459 for Asbestosis (Level I) to $71,215 for Mesothelioma (Level VI)) that is based on the type of asbestos-related disease, level of functional impairment and level of exposure to asbestos from Grace products that an Asbestos PI-SE Claimant is able to prove.

Asbestos PI-SE Claims are those Asbestos PI Claims (other than those Asbestos Claims that have been previously settled or adjudicated) that meet the Asbestos PI-SE Eligibility Requirements. These requirements, stated very summarily, are that the Asbestos PI Claimant provide appropriate evidence of (1) exposure to asbestos related to Grace and (2) current symptoms of asbestos-related disease. As described above, the Holders of Asbestos PI-SE Claims may generally choose either the Litigation Option or the Cash-Out Option.

Asbestos PI Claims (other than those Asbestos Claims that have been previously settled or adjudicated) that do not currently meet the Asbestos PI-SE Eligibility Requirements are Asbestos PI-AO Claims. As described above, the Holders of Asbestos PI-AO Claims may also

6

generally choose either the Litigation Option or the Cash-Out Option, but the Holders of Asbestos PI-AO Claims also have a third option, the "Registry Option."

If an Asbestos PI-AO Claimant chooses the Registry Option, he will (1) register his name on the Registry, (2) be precluded from seeking any further recovery against any party protected and/or released under the Plan on account of such Claim, (3) have the statute of limitations be deemed to be tolled to the extent that he becomes an Asbestos PI-SE Claimant, and (4) be entitled to seek further recovery (in accordance with the provisions of the Plan) against the Asbestos Trust if he becomes an Asbestos PI-SE Claimant.

Each Holder of a Class 8 Asbestos PD Claim will retain his right to litigate his Claim against the Asbestos Trust and to recover the full amount of his Allowed Claim against the Asbestos Trust.

### 1.2.3    How Will General Unsecured Claims be Treated Under the Plan?

The Plan provides that all Holders of General Unsecured Claims will be paid the value of their Allowed Claims, 85% in Cash and 15% in Parent Common Stock.

Grace will satisfy certain other non-asbestos related liabilities, including environmental, tax, workers' compensation, employee-related benefits, pension and retirement medical obligations, and Intercompany Claims, as they become due and payable over time. In essence, these claims will "pass through" confirmation and be paid by the Reorganized Debtors in the ordinary course of their business.

### 1.2.4    How Will Equity Interests be Treated Under the Plan?

The Plan provides that Parent Common Stock will remain outstanding. However, the interests of existing shareholders will be subject to dilution by, among other things, additional shares of Parent Common Stock issued under the Plan and possible exercise of the Warrants issued under the Plan.

In addition, in order to preserve significant net operating loss carryforwards, which are subject to elimination or limitation in the event of a change in control (as defined by the Internal Revenue Code), the Plan places restrictions on the purchases of Parent Common Stock. The restrictions would prohibit, for a period of three years, a person or entity from acquiring more than 4.75% of the outstanding common stock or prohibit those persons already holding more than 4.75% from increasing their holdings.

### 1.2.5    How Will the Treatment of Asbestos Claims be Effectuated?

The Asbestos Trust will, among other things, (1) assume liability for all Asbestos Claims (whether now existing or arising at any time in the future), (2) process and liquidate all Asbestos Claims (whether through the Cash-Out Option, the Litigation Option, or the Registry Option, as applicable), and (3) pay all Asbestos Claims in accordance with the Plan and the Plan Documents. The Reorganized Debtors, however, will have significant ongoing rights and obligations vis-à-vis the Asbestos Trust after the Effective Date. For example, all Asbestos PI-AO Claims whose Holders elect the Litigation Option will be litigated by the Reorganized

Debtors in the name of the Asbestos Trust, initially at the expense of the Asbestos Trust out of the Asbestos PI-AO Class Fund. After the exhaustion of the Asbestos PI-AO Class Fund in its entirety, all Allowed PI-AO Claims will be paid in Cash by the Asbestos Trust from funds to be paid to the Asbestos Trust by the Reorganized Debtors, such funds being in addition to the Debtors' Payment.

The Asbestos Trust will be the only Entity that a Holder of an Asbestos Claim may look to for recovery on account of such a Claim. Article 8 of the Plan (Injunctions, Releases & Discharge) makes this clear. The Asbestos Trust Agreement and the respective TDPs (there are three TDPs, one for each of Classes 6, 7, and 8) govern more specifically the operation of the Asbestos Trust and how Asbestos Claims whose Holders elect the Cash-Out Option will be dealt with.

### 1.2.6   How Will the Plan be Funded?

The Debtors have filed the Estimation Motion which seeks an order, among other things, estimating the total amount that needs to be contributed to the Asbestos Trust to fully satisfy Classes 6, 7, and 8 as well as the expenses of the Asbestos Trust. In the case of Classes 6 and 8 and the expenses of the Asbestos Trust, such estimated amounts will constitute the maximum amount that the Reorganized Debtors will be required to pay (in addition to the Sealed Air Payment) in order to fully satisfy all Allowed Asbestos PI-SE Claims, Allowed Asbestos PD Claims and Asbestos Trust Expenses, respectively. The Debtors intend to use these estimates in support of the feasibility of the Plan and in support of the other factual findings that must be made to confirm the Plan. The only alternative would be to individually litigate hundreds of thousands of Claims prior to confirmation - an expensive and unwieldy proposition that could delay distributions for years.

Funding of the Asbestos Trust in an amount equal to the estimates obtained under the Estimation Motion will come from several sources, including (1) the Debtors' Payment and (2) the Sealed Air Payment. The Sealed Air Payment -- comprised of a combination of Cash in the amount of $512.5 million plus interest and 9 million shares of common stock of Sealed Air -- is an integral part of the Plan. Such payment, however, is dependent on resolution of the Debtors' objections to the Sealed Air Settlement Agreement as further elaborated in Section 2.5.2 herein.

The Reorganized Debtors will fund distributions to all other Classes directly, with funds from a number of sources including (1) the Exit Financing, (2) the Fresenius Settlement Agreement, (3) insurance proceeds, (4) cash flow from future operations, and (5) Parent Common Stock.

Specifically, all Asbestos PI-SE Claims whose Holders elect the Litigation Option shall be (1) litigated by, and at the expense of, the Asbestos Trust in the name of the Asbestos Trust and (2) paid by the Asbestos Trust out of the Asbestos PI-SE Class Fund, which shall be funded solely by the Sealed Air Payment and the Parent Common Stock component of the Debtors' Payment, if necessary. In contrast, all Asbestos PI-AO Claims whose Holders elect the Litigation Option shall be litigated by the Reorganized Debtors in the name of the Asbestos Trust, initially at the expense of the Asbestos Trust out of the Asbestos PI-AO Class Fund. All

8

Allowed PI-AO Claims shall be paid initially by the Asbestos Trust out of the Asbestos PI-AO Class Fund, which shall be funded by the Sealed Air Payment (to the extent any funds remain after first funding the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund) and the Warrants. After the exhaustion of the Asbestos PI-AO Class Fund in its entirety, all Allowed PI-AO Claims shall be paid in Cash by the Asbestos Trust from funds to be paid to the Asbestos Trust by the Reorganized Debtors, such funds being in addition to the Debtors' Payment.

## 2.   DESCRIPTION OF THE DEBTORS

### 2.1    General Overview of the Debtors

The Debtors are engaged in specialty chemicals and materials businesses, operating on a worldwide basis, predominantly through two business segments: Davison Chemicals ("Davison"), which manufactures and sells catalysts and silica-based products; and Performance Chemicals, which manufactures and sells construction chemicals, building materials, sealants and coatings.

W. R. Grace & Co. (the "Parent") is a global holding company that conducts substantially all of its business through a direct, wholly owned subsidiary, W. R. Grace & Co. - Conn. ("Grace-Conn"). Grace-Conn, which was incorporated in 1899, owns substantially all of the Grace assets, properties, and rights in the United States. It has 77 domestic subsidiaries and Affiliates, 60 of which are Debtors in the Chapter 11 Cases. Grace's non-U.S. operations are conducted through 93 Non-Debtor Affiliates. (As used within Article 2 of this Disclosure Statement, "Grace" means either the Debtors, or the business of the Parent and its subsidiaries in general, as the context requires). The Debtors and their Non-Debtor Affiliates employ approximately 6,400 employees.

Grace-Conn has operated and divested itself of, or otherwise ceased operating, a substantial number of businesses over the years. The Plan provides for the reorganization of all Debtors. However, because many of the Debtors conduct no business today, certain of the Debtors may be dissolved after the Effective Date.

### 2.2    The Debtors' Current Businesses

#### 2.2.1    Davison Chemicals

Davison consists of two primary product groups: (1) refining technologies and (2) specialty materials. These product groups principally apply silica, alumina and zeolite technology in the design and manufacture of products to meet the varying specifications of such diverse customers as major oil refiners, plastics and chemical manufacturers, consumer products manufacturers, and pharmaceutical/nutraceutical companies.

##### 2.2.1.1 Refining Technologies

Davison produces refinery catalysts, including (1) fluid cracking catalysts ("FCC") used by petroleum refiners to convert distilled crude oil into transportation fuels (such as gasoline and diesel fuels) and other petroleum-based products, and (2) hydroprocessing catalysts that upgrade

9

heavy oils and remove certain impurities (such as nitrogen, sulfur and heavy metals). Davison operates its hydroprocessing catalyst business through Advanced Refining Technologies LLC, a joint venture between Grace and Chevron Texaco Products Company. Davison also develops and manufactures FCC additives used for enhanced petrochemical production and reduction of emissions of sulfur oxides, nitrogen oxides and carbon monoxide from the refining unit. Davison has recently introduced new catalyst/additive technologies for sulfur reduction in gasoline and, as an alternative technology, membranes which, when employed in a pervaporation system, will remove sulfur from refinery streams.

### 2.2.1.2 Specialty Materials

Davison's specialty materials include various silicas, zeolite adsorbents, and polyolefin and other chemical catalysts that are used in a wide variety of industrial, consumer, biotechnology, and pharmaceutical applications.

#### 2.2.1.2.1   Silicas

Davison manufactures (i) silica gels, (ii) colloidal silicas, and (iii) precipitated silicas. These silicas have different physical properties, such as particle size, surface area, porosity, and surface chemistry, which give each type of silica unique characteristics that make it appropriate for specific applications.

Silica gels are used in coatings as matting (gloss-reducing) agents, in plastics to improve handling, in pharmaceuticals as a formulating agent, in toothpastes as abrasives and whiteners, in foods to carry flavors and prevent caking, in the purification of edible oils, and in beer stabilization.

Davison's colloidal silicas are used primarily as binders in precision investment casting and refractory applications. They have also recently been introduced for use in ink jet printing of digital media, such as digital photographs. Precipitated silicas are used predominantly in the manufacture of tires and other industrial rubber goods such as belts, hoses and footwear. Davison is leveraging its materials science expertise, both internally and through acquisitions, to develop and introduce new silica materials and technologies, particularly for the higher-growth segments of digital media, industrial coatings, and biotechnology separations applications.

Davison is levering its material science expertise, both internally and through acquisitions, to develop and introduce new silica materials and technologies, particularly for the higher growth segments of digital media, industrial coatings, and biotechnology separations applications. Davison has recently focused on expanding its separations business to take advantage of higher growth opportunities in drug discovery, purification and manufacturing processes.

#### 2.2.1.2.2   Zeolites

Zeolites, while not silica-based products, are based on related silica/alumina technology. Zeolite adsorbents are used between the two panes of insulating glass to adsorb moisture and are also used in process applications to adsorb water and separate certain chemical components from mixtures.

10

### 2.2.1.3 Polyolefin and Other Catalysts

Davison is also a major producer of polyolefin catalysts and silica-based catalyst supports, essential components in the manufacture of high density and linear low density polyethylene resins, and polypropylene resins, which are used in products such as plastic film, high-performance plastic pipe and plastic household containers.

### 2.2.1.4 Other Information

As of September 30, 2004, Davison employed approximately 3,200 people worldwide in 20 facilities. Davison has a direct sales force and distributes most of its products directly to approximately 12,000 customers, the largest of which accounted for approximately 4% of Davison's 2003 sales.

### 2.2.2   Performance Chemicals

Performance Chemicals' businesses include (1) specialty construction chemicals and building materials, in which Grace is a leading supplier to the nonresidential (commercial and infrastructure) construction industry, and also to the residential construction and repair segment; and (2) a sealant and coating product-line operated under the Darex® brand.

### 2.2.2.1 Construction Chemicals and Building Materials

Specialty construction chemicals (principally concrete admixtures, cement additives and additives for masonry products) improve durability and enhance the handling and application of concrete, improve the manufacturing efficiency and performance of cement, and improve the water resistance and other qualities of masonry wall and paving systems.

Performance Chemicals has introduced a number of new construction chemical products and product enhancements in recent years. These include: (1) an additive that improves cement processing efficiency and product quality, (2) new polymeric fiber reinforcements for concrete that can substitute for secondary metal reinforcements, (3) an automated system to improve the reliability and accuracy of adding fibers to concrete production, (4) an admixture system for producing self-consolidating concrete (which improves the concrete's conformity to the shape of a structure), and (5) a liquid pigment admixture and dispensing system for concrete. Grace continually seeks to improve and adapt these products for different applications. Grace's strategy includes extending its product portfolio and geographic reach through acquisitions.

Specialty building materials prevent structural water damage (for example, water-and ice-barrier products for residential use and waterproofing systems for commercial structures), and protect structural steel against collapse caused by fire. In North America, the specialty building materials product line also manufactures and distributes vermiculite products used in insulation and other applications. Recent product developments include liquid-applied waterproofing products and new roof underlayments that provide protection from ice and wind-driven rain; and enhancements to spray-on fireproofing products that improve applicator productivity.

11

### 2.2.2.2 Sealants and Coatings

The Darex® sealants and coatings business consists primarily of four product lines: (1) can sealants for rigid containers, (2) sealants for metal and plastic bottle closures, (3) coatings for metal packaging, and (4) specialty barrier coatings for flexible packaging. These products are used to assure the quality of packaging and to preserve container contents. Can sealants ensure a hermetic seal between the lid and the body of beverage, food, aerosol and other containers. Closure sealants are used to seal pry-off and twist-off metal crowns, as well as roll-on pilfer-proof and plastic closures for glass and plastic bottles and jars used in beverage and food applications. Coatings are used in the manufacture of cans and closures to protect the metal against corrosion, protect the contents against the influences of metal, ensure proper adhesion of sealing compounds to metal surfaces, and provide base coats for inks and for decorative purposes. These products are sold principally to container manufacturers. Specialty barrier coatings are used to improve the gas and/or vapor barrier performance of various packaging materials. They are sold principally to manufacturers of oriented polypropylene films for food packaging.

### 2.2.2.3 Other Information

At year-end 2003, Performance Chemicals employed approximately 3,000 people at 62 facilities. Most of Performance Chemicals' sales are direct sales to the customer. Performance Chemicals' capital expenditures tend to be relatively lower, and sales and marketing expenditures tend to be relatively higher, than those of Davison Chemicals.

### 2.3    Genesis of the Debtors' Asbestos Liabilities

The Chapter 11 Cases were the result of a precipitous increase, beginning around 2000, in the number of claims asserted against Grace alleging personal injury from exposure to asbestos in certain products that it had previously manufactured. This increase seriously threatened the Debtors' core business operations, and the Debtors concluded that there was no way to define and resolve their asbestos liabilities while preserving the value and viability of their core business operations, other than to reorganize under Chapter 11 of the Bankruptcy Code.

Grace's involvement with asbestos began in 1963, when its construction products unit, now part of Performance Chemicals, purchased the Zonolite Company ("Zonolite"). Zonolite purchased asbestos from commercial suppliers and incorporated it in certain building products. It also mined and processed vermiculite from its mines in South Carolina and near Libby, Montana. The vermiculite product from the Libby mine contained small amounts of asbestos, as more fully described below. Grace ended U.S. manufacture of asbestos-added products in 1973, and closed the Libby facility in 1990.

### 2.3.1    Asbestos-Added Products

The principal asbestos-added products produced by Grace were spray-on fireproofing, acoustical plasters and textured ceiling finishes. They consisted of binders, insulating materials (gypsum, cement, clay, vermiculite), and added asbestos purchased from asbestos producers. The fireproofing product, Monokote-3 ("MK-3"), was sprayed on steel structural components of buildings to prevent or delay the steel from collapsing in the event of a fire.

12

### 2.3.2   Libby Vermiculite

Vermiculite is a mineral that expands into popcorn-like, low-density pieces when heated. This exfoliated or expanded vermiculite is lightweight and fire-resistant, and thus can be used for insulation, fireproofing, potting soil and other applications. Vermiculite is itself an inert mineral that is not a form of asbestos and has no known toxic properties.

Vermiculite ore from the Libby mine contained numerous secondary minerals, including a form of asbestos known as fibrous asbestiform tremolite.[6] The Libby facility milled the mined ore into a concentrate through a crushing, screening, washing and flotation separation process that removed most impurities, including tremolite. After milling, the vermiculite concentrate contained 1-3% and generally less than 1% asbestos. At Grace's "expansion plants" throughout the country, the concentrate was passed through furnaces at temperatures approaching 2,000 degrees Fahrenheit, which resulted in the further reduction of asbestos content. The expanded vermiculite – with asbestos content that was typically a fraction of 1% – was bagged and sold under the Zonolite trade name.

After acquiring the Libby mine, Grace implemented a series of changes that dramatically reduced asbestiform tremolite dust levels at the Libby facilities. With these improvements, Grace lowered asbestiform tremolite dust levels from approximately 50 fibers per cubic centimeter of air ("fibers/cc") in 1963, to less than 1 fiber/cc in 1975 and down to 1/15 fiber/cc in 1985, which was many times lower than required under then-applicable government standards. Grace also implemented a medical program to educate employees about the hazards of asbestiform tremolite and to monitor their exposure levels and health.

### 2.3.3   Zonolite Attic Insulation

One of Grace's principal commercial vermiculite products was Zonolite Attic Insulation ("ZAI"). ZAI was expanded loose-fill vermiculite that was poured into attics in homes and other buildings. Like other expanded Libby vermiculite, ZAI often contained trace quantities of asbestos. Asbestos was not added to ZAI, and, as noted above, the milling and expansion processes removed nearly all asbestos contaminants from the vermiculite ore. Because the asbestos impurities were reduced to trace levels, ZAI is not an asbestos-containing product as defined in federal regulations.[7]

### 2.4   The Debtors' Asbestos-Related Litigation

The pre-Chapter 11 litigation and Claims against the Debtors alleging asbestos-related injuries and damages ("Asbestos Claims," as defined more fully in the Glossary) are primarily

---

[6]   Fibrous asbestiform tremolite impurities in vermiculite are atypical and not characteristic of most vermiculite deposits. It is believed that the amount of impurities is related to the extreme depth of the ore deposit in Libby. Most vermiculite deposits – such as those at Grace's Enoree, South Carolina mine – are relatively shallow.

[7]   Under federal regulations, "materials" containing less than 1% asbestos by weight are not defined as asbestos-containing "materials." See, e.g., 40 Code of Federal Regulations §§ 61.141 and 763.83.

13

the following: claims for personal injury from asbestos exposure; asbestos-related property damage claims; and ZAI claims.

For many years, the Debtors faced a substantial volume of Asbestos Claims, but were able to resolve such Claims primarily through negotiated settlements. Although the Debtors believed that a high percentage of these Claims were without merit, they agreed to settle most of these Claims rather than incur the significant costs and practical difficulties associated with simultaneously litigating thousands of independent Claims in multiple jurisdictions nationwide. This strategy of negotiated settlements was initially successful, as the amounts and number of Claims were manageable, and the funds required to satisfy such Claims were fairly predictable. However, beginning in the year 2000, the Debtors experienced a precipitous increase in the number of personal injury Claims and the amount of money required to resolve such Claims. This led to the Debtors' bankruptcy filing.

### 2.4.1   Asbestos Personal Injury Litigation

Asbestos PI Claims allege adverse health effects from exposure to Grace's asbestos-containing products. On the Petition Date, the Debtors were defendants in lawsuits asserting approximately 118,000 Asbestos PI Claims. In the Debtors' view, only a small portion of the Asbestos PI Claims allege even a *prima facie* case of any functional impairment attributable to exposure to the Debtors' products. The Debtors, therefore, intend to vigorously contest all or most of the Asbestos PI Claims through a number of defenses, as outlined in more detail in their Case Management Motion (which was filed simultaneously with the Plan and Disclosure Statement). Although the Asbestos PI Committee has asserted that the value of the current asbestos personal injury claims, alone, exceed the Debtors' consolidated enterprise value, the Debtors believe that the Asbestos Trust Assets, when administered in a manner consistent with the TDPs, will be sufficient to satisfy all legitimate Asbestos PI Claims.

### 2.4.2   Asbestos Property Damage Litigation

Asbestos PD Claims generally purport to seek payment for the cost of removing or containing asbestos in buildings. On the Petition Date, there were eight asbestos property damage lawsuits (not including the ZAI lawsuits described immediately below) pending against the Debtors. However, approximately 4,300 Asbestos PD Claims were submitted prior to the March 2003 Bar Date. The Debtors have examined these Claims, and intend to object to all or almost all of them on a number of different grounds. Such grounds may include: insufficient or lack of supporting documentation; lack of product identification; statute of limitations, statute of repose, and laches; lack of negligence; inapplicability of strict liability; lack of causation; and improper calculation of damages. Under the Plan, those Asbestos PD Claims not disallowed through the objection process will be channeled to the Asbestos Trust, the assets of which the Debtors believe will be sufficient to satisfy all legitimate Asbestos PD Claims.

### 2.4.3   Litigation Related to Zonolite Attic Insulation

ZAI claims are part of the Asbestos PD Claims. In 2000 and 2001, prior to the Petition Date, nine lawsuits (one of which has since been dismissed) styled as class actions were filed in various jurisdictions on behalf of owners of homes containing ZAI, seeking damages and other relief, including removal of the attic insulation, because of its alleged asbestos content. In

14

October 2004, two additional class action lawsuits were filed in Canada. The plaintiffs allege that ZAI is in millions of homes and that removal would cost several thousand dollars per home.

In April 2002, the Debtors filed ten proofs of Claim on behalf of individual Claimants for Claims relating to ZAI and subsequently filed objections thereto to establish a forum for determining whether ZAI creates an unreasonable risk of harm (the "ZAI Science Trial"). The ZAI Claims and objections, and subsequent responses and summary judgment motions, form the basis for the ZAI Science Trial. The ZAI Science Trial issues are fully briefed and ready to proceed. The Bankruptcy Court held a hearing on the ZAI Science Trial motions on October 18, 2004 and has taken the motions under advisement. The Court has indicated it may need to have further proceedings with respect to the matters addressed in the motions.

### 2.4.4    Asbestos Medical Monitoring Claims

Approximately 1,000 proofs of Claim for asbestos medical monitoring based on alleged asbestos exposure were filed against the Debtors prior to the March 2003 Bar Date. However, a substantial number of those Claims were for actual personal injury. Under the Plan, Asbestos Medical Monitoring Claims are included within the Class of Asbestos PI-AO Claims (Class 7).

### 2.5    The Debtors' Other Litigation

The Debtors are also parties to a number of pre-petition legal proceedings that do not involve Claims for personal injury arising out of exposure to asbestos, or property damage arising out of the installation of asbestos-containing products in buildings. Except as otherwise indicated, Claims with respect to such litigation will be treated as Class 9 General Unsecured Claims. Based on the amount that the Debtors reasonably believe to be involved, the following are the significant legal proceedings to which the Debtors are subject.

### 2.5.1    Environmental Proceedings and Environmental Insurance Litigation

The Debtors' estimate, at September 30, 2004, of their total liability for vermiculite-related remediation is $205.3 million. This estimate is based on public comments regarding the spending plans of the U.S. Environmental Protection Agency ("EPA"), discussions of spending forecasts with EPA representatives, and analysis of other information made available from the EPA. However, the EPA's cost estimates have increased substantially over the course of its cleanup. Consequently, the Debtors' estimate may change materially as more information becomes available. Any such additional information could have a material effect on the Debtors' liability for these matters.

#### 2.5.1.1 Libby and Vermiculite-Related Remediation

##### 2.5.1.1.1   Libby, Montana

In March 2001, the EPA filed a lawsuit in the U.S. District Court for the District of Montana seeking recovery of costs allegedly incurred in response to the release or threatened release of asbestos in the Libby area relating to former vermiculite mining activities. In August 2003, the Montana court issued a ruling in favor of the United States that requires Grace to reimburse the EPA for $54.5 million (plus interest) in costs expended through December 2001,

15

and for all appropriate future costs to complete the cleanup. Grace has appealed the Montana court's ruling to the Ninth Circuit Court of Appeals.

### 2.5.1.1.2   Libby Property Owners

A class-action lawsuit was filed against Grace in the U.S. District Court for the District of Montana in February 2000 on behalf of all owners of improved private real property situated within 12 miles of Libby. The complaint alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing operations, and seeks remediation, property damages and punitive damages. This case has been stayed as a result of the Chapter 11 Cases. However, as described above, the EPA has been conducting remediation activities in and around Libby that includes the remediation of private real property. While investigation of the Claims has not been completed, Grace has no reason to believe that it will incur material liability in addition to the amount of the EPA's recoverable costs for cleanup activities around Libby.

### 2.5.1.1.3   Former Grace Plant in Minneapolis, Minnesota

A class action lawsuit was filed in the U.S. District Court for the District of Minnesota in October 2000, alleging loss of property values in the vicinity of a former Grace plant in Minneapolis that expanded vermiculite from the Libby mine. This case has been stayed as a result of the Chapter 11 Cases. In addition, the EPA is engaged in a program of removing suspected vermiculite expansion by-products from the yards and driveways of houses near the former Minneapolis plant. As of September 30, 2004, the EPA had spent $3.4 million on these residential cleanup actions. The EPA also has remediated industrial property in the area, including the former vermiculite processing plant, at a cost of $650,000. The EPA has submitted proofs of Claim for $10.9 million for the past and projected future costs (including indirect costs) of remediation of the residential and industrial properties at or around the former expansion plant site.

### 2.5.1.1.4   Other Current and Former Vermiculite Expansion Plants

The EPA also has compiled for investigation a list of 245 facilities that at one time used, stored, or processed vermiculite that originated from the Libby mine. Included in this list are 50 vermiculite expansion plants currently or formerly operated by Grace, of which the EPA has listed 17 as requiring additional action. Corrective actions or investigations have been conducted at 6 of these sites.

The EPA has submitted proofs of Claim for 10 of such 50 sites, and for 3 other sites never owned or operated by Grace. The amount claimed with respect to these 13 sites is $26 million. In addition, the Agency for Toxic Substances and Disease Registry ("ATSDR") has commenced a separate investigation at 28 of the 245 facilities, 22 of which are currently or were formerly operated by Grace.

16

### 2.5.1.2 Proceedings in Which Grace is a Potentially Responsible Party

The EPA has designated Grace (together, in most cases, with many other companies) as a "potentially responsible party" ("PRP") for paying the costs of investigating and remediating pollution at various sites under the jurisdiction of federal, state and/or local authorities. At December 31, 2003, proceedings were pending with respect to approximately 30 such sites nationally. Applicable law provides that all PRPs for a site may be held jointly and severally liable for the costs of investigating and remediating the site – that is, any one or more of the PRPs may be required to pay for all the costs. During the Chapter 11 Cases, the Debtors have not been participating (except in a limited number of special cases) in the joint funding of investigation and remediation at non-owned sites where any of them is a PRP. Grace's expected liability, estimated at September 30, 2004, for environmental remediation at such PRP sites and other sites (excluding liability related to Grace's former vermiculite mining and processing activities as described above) is estimated at $141.0 million. Some of these Claims may be resolved by the proposed Consent Decree described immediately below.

### 2.5.1.3 The Settling Federal Agencies' Consent Decree

The Debtors and the EPA, the United States Department of Agriculture, the United States Department of the Interior, and the United States Army Corps of Engineers (collectively, the "Settling Federal Agencies") currently are negotiating the terms of a Consent Decree (the "Consent Decree") to settle the various claims that the Settling Federal Agencies have asserted against the Debtors with respect to certain costs incurred or to be incurred by the Settling Federal Agencies in the course of responding to releases and threats of releases of hazardous substances into the environment for approximately 35 sites, including the Libby site (the "Settlement Sites").

The Consent Decree will provide for: (1) the allowance of certain General Unsecured Claims with respect to the Settlement Sites, (2) treatment of Claims regarding the ATSDR's nationwide investigation of former vermiculite expansion sites, (3) treatment of Claims regarding certain other Debtor-owned sites, and (4) the treatment, as Administrative Expense Claims, of certain Comprehensive Environmental Response, Compensation, and Liability Act ("Superfund") response costs incurred post-petition at certain Debtor-owned sites. The Consent Decree will also resolve the claims of certain PRP groups and establish a protocol for addressing the liability and obligations of the Debtors to the Settling Federal Agencies with respect to additional non-owned sites not currently addressed in the Consent Decree.

The Debtors and the Settling Federal Agencies currently are conducting investigation in order to reach agreement about the allowed amount of the Claims on many of the sites that will be included in the Consent Decree. It is not known at this time when the Consent Decree will be finalized, what properties it will cover, and at what Allowed Amount.

### 2.5.1.4 Other Significant Environmental Legal Proceedings and Claims

Grace is a party to other legal proceedings and Claims involving federal, state and/or local government agencies and private parties regarding Grace's responsibility for alleged noncompliance with environmental laws and regulations. In addition, Grace may incur material

17

liability in connection with future actions of governmental agencies or private parties relating to Grace's past or future practices with respect to the generation, storage, handling, discharge, disposition or stewardship of hazardous wastes and other materials. The two such proceedings that are significant are discussed immediately below.

#### 2.5.1.4.1   Cape Cod Pipeline Remediation

Grace is involved in disputes over the remediation of an abandoned jet fuel pipeline on Cape Cod, Massachusetts. In 1993, Grace Energy Corporation ("Grace Energy"), a Debtor, sold certain of its subsidiaries, one of which then owned the Cape Cod pipeline, to Kaneb Pipe Line Operating Partnership L.P. ("Kaneb"). In 1995 and 1997, respectively, the Massachusetts Department of Environmental Protection and the U.S. Department of Justice made cleanup demands related to alleged pipeline leaks, and the EPA is engaged in extensive cleanup of the pipeline site. Federal officials have estimated that the remediation may cost as much as $100 million.

In 1997, Grace Energy brought an action in Texas state court against Kaneb to: (a) determine the ownership of, and responsibility for, the pipeline, and (b) seek indemnification for cleanup costs. The Texas state court held that the pipeline had been transferred to the defendants and that Grace Energy does not owe indemnity to Kaneb for the pipeline cleanup costs. The Texas state court awarded Grace Energy approximately $1.8 million in attorneys' fees, but also found that Grace Energy was not entitled to indemnification. Both sides appealed shortly before the action was stayed by the Chapter 11 Cases and the modified preliminary injunction that was subsequently entered by the Bankruptcy Court.

Kaneb filed a proof of Claim for amounts relating to the above-referenced litigation. The Debtors objected on grounds that any obligation to indemnify Kaneb for amounts related to the pipeline had expired. Kaneb was served with a copy of the objection, and failed to respond, and its Claim was expunged in July 2004.

In addition, on the basis of indemnification agreements entered into by Grace, Samson Hydrocarbons, a buyer of one of the Debtors' former businesses, has filed proofs of Claim for indemnification of past and future remediation expenses related to the pipeline and six other remediation sites. The Massachusetts Department of Environmental Protection has also filed proofs of Claim against Grace for obligations to continue to perform assessment, containment and removal activities at the Cape Cod pipeline site. Grace may incur material liability in connection with the Cape Cod pipeline remediation controversy.

#### 2.5.1.4.2   Jersey City Chromium Contamination Remediation

Beginning in 1995, citizens groups brought suit in the U.S. District Court for the District of New Jersey against Honeywell International Inc. ("Honeywell"), Grace, and another Debtor for injunctive relief requiring the remediation of chromium contamination of certain property in Jersey City, New Jersey. Grace asserted cross-claims against Honeywell to recover all past and future costs and damages, and for injunctive relief requiring Honeywell to remediate the site. In May 2003, the New Jersey district court found in favor of the plaintiff and Grace.

18

Honeywell appealed the judgment to the U.S. Court of Appeals for the Third Circuit. The parties entered into a settlement agreement which was approved by the Bankruptcy Court on October 13, 2004, which agreement provides for settlement of the litigation, transfer of the Jersey City property to Honeywell, and payment to the Debtors of $62.5 million. The Debtors expect to receive net Cash proceeds of $52 million after legal expenses and transfer taxes.

### 2.5.1.5 Plan Treatment of Environmental Claims

The Plan provides for varying treatment of Allowed environmental Claims. With respect to environmental Claims that constitute Allowed Administrative Expense Claims (primarily post-petition remediation costs of Debtor-owned properties), the Claimants will be paid in Cash in full on the Effective Date or as soon as practicable thereafter or upon such other terms as may be agreed upon by the Holders of such Claims; provided, however, that such Allowed Administrative Expense Claims not yet due on the Effective Date will be paid as they become due.

The Plan provides that Allowed environmental Claims that constitute Allowed Class 9 General Unsecured Claims (primarily pre-petition remediation costs for both owned and non-owned properties and post-petition remediation costs for pre-petition contamination on non-owned properties), will be paid in the same manner as all other General Unsecured Claims.

### 2.5.1.6 Environmental Insurance Litigation

Grace is a party to three pending environmental insurance coverage actions with insurance companies, all of which have been stayed as a result of the Chapter 11 Cases. Settlement discussions are ongoing in one of the cases. The outcome of the cases, as well as the amount of any Grace recovery, is presently uncertain.

### 2.5.2    Fraudulent Transfer Litigation

In September 2000, Grace was named in a class action suit that was filed in California state court. The suit alleged that Grace's (1) 1996 reorganization transaction with Fresenius and (2) 1998 reorganization transaction with Sealed Air involved fraudulent transfers. Two similar class actions were also filed prior to the Petition Date.

In November 2002, Fresenius and Sealed Air announced that they had reached agreements in principle to settle asbestos and fraudulent conveyance claims related to the respective transactions.

In July 2003, the Fresenius Settlement Agreement was approved by the Bankruptcy Court. Subject to certain conditions, Fresenius will pay $115.0 million to the Debtors' estates as directed by the Bankruptcy Court upon confirmation of the Plan.

Under the terms of the proposed Sealed Air Settlement Agreement, subject to certain conditions, Sealed Air will make the Sealed Air Payment as directed by the Bankruptcy Court upon confirmation of the Plan. The Debtors find certain provisions of the Sealed Air Settlement Agreement objectionable, including the issues outlined below:

19

The Sealed Air Settlement Agreement, as proposed, would restrict the ability of the Debtors' management to fulfill their legal obligations to file accurate and complete tax returns and financial statements as required by the IRS and the SEC, respectively, thereby exposing the Debtors to potentially significant penalties and the Debtors' management to potential personal and criminal liability;

- The Sealed Air Settlement Agreement, as proposed, would provide for the transfer of $512.5 million plus accrued interest in Cash and 9 million shares of Sealed Air Common Stock for the benefit of Holders of Asbestos Claims, while potentially exposing the Debtors and non-asbestos Claimants to both (1) liability for associated taxes, interest and penalties thereon and (2) the obligation to pay Sealed Air approximately $146 million for tax benefits prior to their realization; and

- The Sealed Air Settlement Agreement, as proposed, fails to define the meaning of "best efforts" with sufficient clarity to enable the Debtors to effectively manage federal, state and local income tax audits.

The Plan assumes that these objections will be addressed by the Bankruptcy Court in an acceptable manner and that the Sealed Air Settlement Agreement, as modified to address the Debtors' objections, will be approved. See Plan §7.7(e). The Plan provides that Sealed Air will pay the settlement proceeds to the Asbestos Trust to fund payments to Asbestos PI-SE Claimants and Asbestos PD Claimants.

### 2.5.3    Tax Claims

#### 2.5.3.1 IRS Proposed 1993-96 Tax Adjustments

The IRS has asserted approximately $114.0 million of proposed tax adjustments against Grace, including accrued interest, for tax periods 1993 through 1996. Grace's federal tax returns for 1997 and subsequent periods are either under examination by the IRS or open for future examination. As a consequence of any finally determined federal tax adjustments, Grace may be liable for additional state taxes plus accrued interest.

The most significant contested issue for the 1993-1996 tax periods concerns corporate-owned life insurance ("COLI") policies. In 1988 and 1990, Grace acquired COLI policies as part of a strategy to fund the cost of postretirement health care benefits and other long-term liabilities. COLI premiums were funded in part by loans issued against the cash surrender value of the COLI policies. The IRS is challenging deductions of interest on loans secured by COLI policies for years prior to 1999. In 2000, Grace paid $21.2 million of tax and interest related to this issue for tax years 1990 through 1992. Subsequently, Grace deducted approximately $163.2 million in interest attributable to COLI policy loans.

Grace has agreed with the Department of Justice and the IRS on a settlement amount and certain other terms pertaining to this matter (the "COLI Settlement"). The Bankruptcy Court entered an order authorizing the Debtors to enter into the COLI Settlement (the "COLI Order") on October 13, 2004. Pursuant to the COLI Settlement, the federal government would allow Grace to claim approximately (1) $42.2 million, or 20%, of the approximately $211.2 million in

20

COLI interest deductions claimed from 1989 through 1996, and (2) $8.2 million, or 20%, of the approximately $41.1 million in COLI interest deductions claimed in 1997 and 1998. The COLI Settlement further provides that Grace must allocate a portion of the permitted COLI interest deductions against foreign source income for purposes of determining the availability of foreign tax credits in each of the tax years at issue. This effectively would decrease the amount of foreign tax credits that Grace may apply to reduce U.S. taxes on foreign source income. The COLI Order also approves termination of the COLI policies. Upon termination of the policies, the COLI Settlement provides that Grace will only have to recognize 20% of the gain as taxable income. Grace expects to apply its net operating loss ("NOL") carryforwards to offset this income. However, since NOL carryforwards cannot fully offset a corporation's alternative minimum taxable income, the recognition of this income may result in some degree of tax liability if Grace is subject to paying the alternative minimum tax in that year. As part of terminating the COLI policies at issue, Grace anticipates receiving cash proceeds from its insurers. Assuming a termination date of September 30, 2004, Grace would have received approximately $20 million in proceeds. This amount will likely fluctuate until the actual termination date, which is expected to be in the first quarter of 2005.

### 2.5.3.2 Other Disputed Tax Claims

#### 2.5.3.2.1    Temporary Health Care Staffing Business

The IRS has asserted approximately $62 million of additional federal income tax withholding and Federal Insurance Contributions Act (FICA) taxes plus interest and related penalties against a Grace subsidiary that operated a temporary health care staffing business until its sale in 1999. The IRS contends that certain per diem reimbursements made by the business should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that the per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS. The matter is currently pending in the U.S. Court of Claims. The parties are in settlement negotiations on this matter.

#### 2.5.3.2.2    Bekaert Textiles N.V.

Under an indemnification agreement, Grace is also responsible for defense costs and payment of any tax assessments levied by the Belgian government on a former Grace subsidiary, Bekaert Textiles N.V. ("Bekaert"), in connection with foreign bond transactions in 1989 and 1990. Shortly after receipt of the assessments, Bekaert filed tax protests with the Belgian taxing authority, which failed to act on the protests. To stop the running of interest, Bekaert commenced litigation in 2001 against the Belgian government on the issue, which is pending. The total amount allegedly owed for taxes and interest is approximately $14 million.

#### 2.5.3.2.3    Remedium Joint Venture

In 1999, Grace and de maximis, inc. ("de maximis"), an environmental project management company, formed a special purpose environmental remediation management joint venture, Remedium Group, Inc. ("Remedium"), to centralize, manage and minimize environmental expenditures associated with certain Grace remediation sites. The joint venture was created by virtue of de maximis acquiring Remedium Class B stock. Grace reported a

21

$128.6 million capital loss from that sale. In September 2004, the IRS concluded that Grace's capital loss should be disallowed but that no penalties should be imposed. Grace contends that the Remedium joint venture was formed for several valid business reasons and that the capital loss was properly claimed and reported. If the 1999 capital loss were disallowed, the result would be a reduction in Grace's NOLs, which could cost Grace up to $45 million, plus any applicable state taxes, interest or penalties. Because of the potential magnitude of this issue on Grace's available NOLs and, as a consequence, its importance in developing the Plan, Grace has requested and the IRS has agreed to review this issue on an accelerated basis. Grace is also considering petitioning the Bankruptcy Court to assume jurisdiction to resolve this matter.

#### 2.5.3.2.4    State Income Tax Claims

Certain state income tax Claims relating to past tax years may involve significant amounts. However, Grace believes that these Claims can and should be resolved for significantly less than the amounts claimed.

### 2.6    Liabilities other than Litigation Claims

#### 2.6.1    Current Liabilities not Subject to Compromise Under the Bankruptcy Code

As of September 30, 2004, the Debtors had approximately $366.2 million in current liabilities not subject to compromise under the Bankruptcy Code. This amount represents the sum of short-term debt, income taxes, and trade and other operating liabilities that are due or will become payable within one year after September 30, 2004. These liabilities are expected to be satisfied in accordance with their terms.

#### 2.6.2    Non-Current Liabilities not Subject to Compromise Under the Bankruptcy Code

As of September 30, 2004, the Debtors had approximately $404.3 million in non-current liabilities not subject to compromise under the Bankruptcy Code. This amount consists of $34.1 million of deferred income taxes, $295.9 million of liabilities related to Grace's defined-benefit pension plans, $73.0 million in other non-current liabilities, and $1.3 million in long-term debt. These liabilities relate to obligations that arose subsequent to the Debtors' Chapter 11 Cases and will be satisfied in accordance with their terms.

#### 2.6.3    Liabilities Subject to Compromise Under the Bankruptcy Code

#### 2.6.3.1 Debt and Accrued Interest

As of September 30, 2004, there was outstanding approximately $572.8 million of principal and interest accrued at the pre-petition rate under the Debtors' pre-petition credit facilities. The Plan provides for interest at the alternative base rate under the Debtors' pre-petition credit facilities. These liabilities will be paid as General Unsecured Claims under the Plan. In addition, certain capital leases will be reinstated and paid in accordance with their terms.

22

### 2.6.3.2 Income Taxes

As of September 30, 2004, the Debtors have established approximately $201.9 million in reserves, for financial reporting purposes, for potential income taxes and related statutory interest including those described in Section 2.5.3 above. This amount reflects the Debtors' estimated liability for a number of contested income tax matters. Of this amount, approximately $152 million is expected to be paid on or before the Effective Date in settlement of assessed or asserted income tax claims. The remainder will be satisfied as Priority Tax Claims under the Plan or as otherwise agreed with the relevant taxing authorities.

### 2.6.3.3 Post-Retirement Benefits Other than Pensions

As of September 30, 2004, the Debtors had $122.9 million in liabilities relating to post-retirement benefits other than pensions. This amount represents the present value of the Debtors' estimated future annual obligations under their retiree medical program. This liability is being funded currently, and will pass through as a continuing obligation of the Reorganized Debtors under the Plan.

### 2.6.3.4 Unfunded Special Pension Arrangements

As of September 30, 2004, the Debtors had approximately $70.9 million of unfunded special pension arrangements. This amount represents the present value of various non-qualified, unfunded special pension arrangements with both current and former employees of the Debtors. Approximately $8 million of this amount relates to due but unpaid amounts since the Petition Date as a result of funding limits set by the Bankruptcy Court, and will be paid on the Effective Date or as soon as practicable thereafter. Pursuant to the Plan, the remainder will be re-instated as continuing obligations of the Reorganized Debtors and will be satisfied in accordance with their terms.

### 2.6.3.5 Accounts Payable

As of September 30, 2004, the Debtors had $31.4 million in liabilities to suppliers and other service providers that were due and payable as of the Petition Date. These liabilities will be paid as General Unsecured Claims under the Plan with post-petition interest for those Claimants who, but for the Filing of the Chapter 11 Cases, would be entitled to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law.

### 2.6.3.6 Other Accrued Liabilities

As of September 30, 2004, the Debtors had $100.9 million in other accrued liabilities. This amount represents contractual obligations and estimates of costs to resolve pre-petition contingencies. Of this amount, $10 million will be satisfied as General Unsecured Claims under the Plan, $30 million will be satisfied as Priority Tax Claims under the Plan, and $3 million will be paid as Administrative Expense Claims. The remainder will be re-instated and satisfied in accordance with their terms.

23

### 2.7    Assets and other Rights

#### 2.7.1    Excess Real Property

Grace owns many parcels of excess real property, most of which were used in previously divested business operations and are not necessary for the Debtors' current operations. Grace is actively engaged in selling those properties that are considered marketable. Some of the excess property is undergoing environmental remediation. If such properties were to be cleaned up, it would have potential to be developed or sold for commercial or residential use.

#### 2.7.2    Insurance Rights

##### 2.7.2.1 Overview

Grace previously purchased insurance policies that provide coverage for the 1962 – 1985 period with respect to asbestos-related lawsuits and Claims. Since 1985, however, insurance coverage for asbestos-related liabilities has not been commercially available to Grace. Insurance policies that were purchased by Grace prior to 1962 were determined by the courts to be inapplicable because they were purchased prior to the year in which Grace acquired the Zonolite Company, through which Grace began producing asbestos containing products. However, as part of the Zonolite acquisition, Grace obtained all rights under the insurance policies purchased by Zonolite.

##### 2.7.2.2 Primary Insurance Coverage

Grace's primary insurance coverage for 1962 – 1985 is in the amount of $1 million per occurrence with annual aggregate product-liability limits ranging from $1 to $2 million. With one exception, coverage disputes regarding the Grace and Zonolite primary policies have been settled, and the settlement amounts paid in full. The only unsettled primary coverage is that of Continental Casualty Company ("CNA") for 1973 – 1985. In a pending declaratory judgment action in U.S. District Court for the Southern District of New York, Grace asserts that this coverage is still available to pay asbestos-related Claims that are not based on product liability, such as Claims made by certain Libby residents. This action is currently stayed due to the filing of the Chapter 11 Cases.

##### 2.7.2.3 Excess Insurance Coverage

Grace's excess coverage is for levels of loss above certain levels. The levels vary from policy to policy, creating "layers" of excess coverage, some of which are triggered before others. As of May 31, 2004, after subtracting previous reimbursements by insurers and allowing for discounts pursuant to certain settlement agreements, there remains $978 million of excess coverage from more than 30 presently solvent insurers.

Grace has entered into settlement agreements with various excess insurance carriers. These settlements involve amounts paid and to be paid to Grace. One such settlement agreement provides for reimbursement of a specified percentage of each dollar spent by Grace or the Non-Debtor Affiliates to settle or defend asbestos-related Claims. Under this agreement, a group of carriers has agreed to reimburse Grace for 20% of each dollar spent to settle or defend personal injury or property damage Claims, up to a remaining maximum reimbursement of approximately

24

$78 million. The other settlement agreements would be available to pay asbestos-related personal injury Claims. The remaining maximum aggregate amount available under these other settlement agreements is approximately $417 million. With respect to asbestos-related personal injury Claims, the settlement agreements generally require that the Claims be spread over the Claimant's exposure period and that each insurer pay a pro rata portion of each Claim based on the amount of coverage provided during each year of the total exposure period.

Presently, Grace has no agreements in place with insurers with respect to approximately $483 million of excess coverage, which is at layers of coverage that have not yet been triggered by the value of claims submitted by Grace.

Grace believes that the ZAI Claims also are covered under the settlement agreements and unsettled policies discussed above to the extent they relate to installations of ZAI occurring after July 1, 1973.

Grace has $355 million of excess coverage with insolvent or non-paying insurance carriers. (Non-paying carriers are those that, although technically not insolvent, are not currently meeting their obligations to pay claims.) Grace has filed and continues to file claims in the insolvency proceedings of insolvent carriers. Grace is currently receiving distributions from some of these insolvent carriers and expects to receive distributions in the future.

### 2.7.2.4 Estimated Insurance Recoveries

Grace's total reimbursement percentage for asbestos-related personal injury Claims will vary based on the total amount of asbestos-related liability. Grace estimates that it would receive $500 million from settled and solvent unsettled insurance carriers if the Asbestos Trust Aggregate Fund is determined by the Court to be the maximum permitted under the Plan. (Coverage for property damage Claims is available only under the settlement agreement referred to above that has a maximum remaining reimbursement of approximately $78 million and, therefore, any amounts paid in respect of such property damage Claims would reduce the amount payable for personal injury Claims.) Generally, the reimbursement percentage decreases at higher levels of liability. At $1 billion and $2 billion of estimated personal injury liability, the reimbursement percentages would be approximately 34% and 28%, respectively. The prospective financial information assumes that there will be no recoveries from insolvent carriers.

Grace's ultimate recovery of insurance proceeds may be affected by the financial status of the remaining solvent insurance carriers and the number, nature and amount of individual Allowed Asbestos Claims.

### 2.7.3  Debtors' Retained Causes of Action

### 2.7.3.1 Preservation of Causes of Action

The Debtors are currently investigating whether to pursue potential causes of action against any Claimants or Entities. The investigation has not been completed. Under the Plan, the Reorganized Debtors are retaining the Debtors' rights to commence and pursue any and all Retained Causes of Action. The Debtors may pursue them before the Effective Date. Otherwise,

25

the Reorganized Debtors may pursue them after the Effective Date. The potential causes of action include the following:

- All actual actions or potential actions, whether legal, equitable or statutory in nature, for, or in any way involving, the collection of accounts receivable or general ledger items that are due and owing to the Debtors, including trade receivables, rent and other lease and sublease charges, franchise and/or license fees, payments due under equipment leases and licenses, or other miscellaneous charges;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against customers, including those customers listed in Exhibit 11 in the Exhibit Book, for accounts receivable, improper setoff, overpayment, or any other claim arising out of the customer relationship;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against vendors, including those vendors listed on Exhibit 11 in the Exhibit Book, for overpayment, improper setoff, warranty, indemnity, or any other claim arising out of the vendor relationship;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against Entities, including vendors with respect to pre-petition violations of applicable federal or state securities laws;

- All actual actions or potential breach of contract actions against any customers, vendors or Entities who violated the automatic stay after the Petition Date, including those customers or vendors listed on Exhibit 11 in the Exhibit Book;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against landlords, lessees, sublessees, or assignees arising from various leases, subleases and assignment agreements relating thereto, including actions for unpaid rent, overcharges relating to taxes, common area maintenance and other similar charges, including those claims identified on Exhibit 11 in the Exhibit Book;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against the Debtors' current or former insurance carriers to recover unpaid reimbursements and claims, overpayment of premiums and fees, claims for breach of contract, indemnity obligations or coverage or similar causes of action, including those insurers listed on Exhibit 11 in the Exhibit Book;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against purchasers of assets from the Debtors relating to breach of the purchase agreement or unpaid compensation thereunder, including those purchasers listed on Exhibit 11 in the Exhibit Book;

- Any and all rights to payment against any taxing authority or other potentially liable party, including parties other than the government for reimbursement of taxes and tax payments, listed on Exhibit 11 in the Exhibit Book for any tax refunds, credits,

K&E 9907839.25

overpayments or offsets that may be due and owing to the Debtors for taxes that the Debtors may have paid to any such taxing authority;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, relating to deposits or other amounts owed by any creditor, lessor utility, supplier, vendor, landlord, sub-lessee, assignee or other Entity;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, relating to environmental and product liability matters;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, arising out of, or relating to, the Debtors' intellectual property rights;

- Any litigation or lawsuit initiated by any of the Debtors that is currently pending, whether in the Bankruptcy Court, before the American Arbitration Association, or any other court or tribunal or initiated against the Debtors after the Petition Date for which the Debtors may have counterclaims or other rights, including those actions listed on Exhibit 11 in the Exhibit Book;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against any of the Debtors' former Professionals, except the Asbestos Protected Parties, for breach of fiduciary duty, breach of contract, negligence or professional misconduct or malpractice, or other tortuous conduct, including those former Professionals listed on Exhibit 11 in the Exhibit Book;

- All actual or potential contract and tort actions that may exist or may subsequently arise; and

- All actual actions or potential actions whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' business or operations, except actions against the Asbestos Protected Parties to the extent they are released by the Plan.

The above categories of Retained Causes of Action will not be limited in any way by reference to the Exhibits nor are the categories intended to be mutually exclusive.

In addition, it is possible that there are numerous Unknown Causes of Action. The failure to list any such Unknown Causes of Action above, or in Exhibit 11 in the Exhibit Book, is not intended to limit the rights of the Reorganized Debtors to pursue any of these actions to the extent the facts underlying such Unknown Causes of Action become known to the Debtors.

### 2.7.3.2 Maintenance of Causes of Action

Except as otherwise provided in the Plan, the Reorganized Debtors are retaining all of the Debtors' rights, to commence and pursue, as appropriate, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, any and all causes of action, whether such causes of action accrued before or after the Petition Date, including those Retained Causes of Action listed in Exhibit 11 in the Exhibit Book.

27

Except as otherwise provided in the Plan, in accordance with Bankruptcy Code § 1123(b)(3), any Claims, rights, and causes of action, including the Retained Causes of Action, that the respective Debtors may hold against any Entity will vest in the Reorganized Debtors, and the Reorganized Debtors will retain and may exclusively enforce any and all such Claims, rights or causes of action, including Retained Causes of Action, and commence, pursue and settle the causes of action in accordance with the Plan. The Reorganized Debtors will have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims, rights, and causes of action, including Retained Causes of Action, without the consent or approval of any third party and without any further order of the Court.

### 2.7.3.3 Avoidance Actions

The Debtors do not possess any causes of action for "Avoidance Actions" (actions or proceedings under Bankruptcy Code §§ 544, 545, 547, 548 or 553). Pursuant to Bankruptcy Code § 546(a), a debtor has two years after entry of the order for relief to bring Avoidance Actions. The Debtors' order for relief was entered on April 2, 2001; thus the deadline to bring Avoidance Actions was April 2, 2003. The Debtors analyzed potential Avoidance Actions and concluded that none should be commenced. The Debtors then provided their analysis to counsel for the Equity Committee and the various creditors' committees so that they could also determine whether there were any Avoidance Actions. No Avoidance Actions were brought by any party prior to the deadline. The Unsecured Creditors' Committee filed a motion seeking to extend the time within which the Avoidance Actions could be commenced but the Bankruptcy Court denied the motion.

### 2.7.3.4 Preservation of All Causes of Action not Expressly Settled or Released

Unless a Claim or Retained Cause of Action against a Claimant or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such Claim or Retained Cause of Action (including any Unknown Causes of Action) for later adjudication by the Reorganized Debtors. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or other) or laches will apply to such Claims or Retained Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on this Disclosure Statement, the Plan or the Confirmation Order, except where such Claims or Retained Causes of Action have been expressly released in the Plan or other Final Order. In addition, the Debtors, the Reorganized Debtors, and their successors expressly reserve the right to pursue or adopt any Claim alleged in any lawsuit in which the Debtors are defendants or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.

Any Entity that has incurred an obligation to the Debtors (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Debtors or the Reorganized Debtors, and may, if appropriate, be the subject of an action after the Effective Date, whether or not (1) such Entity has filed a proof of Claim against the Debtors in the Chapter 11 Cases, (2) such Claimant's proof of Claim

28

has been objected to, (3) such Claimant's Claim was included in the Debtors' Schedules, or (4) such Claimant's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as a Disputed Claim, a Contingent Claim, or an Unliquidated Claim.

## 2.8    Estimated Value of the Reorganized Debtors and Non-Debtor Affiliates

The Debtors have been advised by Blackstone with respect to the reorganization value of the Reorganized Debtors and Non-Debtor Affiliates. For purposes of this analysis, the Effective Date is assumed to be December 31, 2004. The reorganized enterprise value is calculated as the value of core operations ("Core Business Value") plus the value of the assumed insurance receivable (based on the assumed asbestos liabilities[8]), plus the present value of the projected use of tax assets and the proceeds from the assumed exercise of in-the-money stock options. To determine the equity value for the Reorganized Debtors and Non-Debtor Affiliates, estimates for net debt and non-core liabilities proforma for the implementation of the Plan are subtracted from the reorganized enterprise value. Further adjustments are made for share dilution to calculate fully diluted reorganized equity value per share.

### 2.8.1    Core Business Value of the Reorganized Debtors and Non-Debtor Affiliates

Two valuation methodologies were used to determine Core Business Value: (i) an analysis of public market value as a multiple of various operating statistics for selected similar public companies and (ii) an analysis of transaction value as a multiple of various operating statistics for selected similar public merger and acquisition transactions. Both methodologies rely upon the Financial Information prepared by management attached as Exhibit 4 in the Exhibit Book.

Based on these two methodologies, the estimated Core Business Value at the Effective Date is approximately $2.2 billion to $2.6 billion, with $2.4 billion as the midpoint estimate. A third methodology was considered: a calculation of the present value of the free cash flows under the prospective financial information, including assumptions for a terminal value; however, that methodology was not used because it was concluded that the resultant reorganized value would not be meaningful based on the prospective period of two years.

#### 2.8.1.1 Comparable Public Company Analysis

The comparable public company analysis ("Comparable Public Company Analysis") estimates value based on a comparison of financial statistics of the Reorganized Debtors and Non-Debtor Affiliates with the financial statistics of similar public companies using common variables such as revenues and earnings before interest, taxes, depreciation and amortization ("EBITDA").

---

[8]    For purposes of this analysis, asbestos liabilities are assumed to equal the sum of (i) the maximum aggregate amounts that would satisfy the conditions precedent in Section 7.6.1(v) and (w) of the Plan; plus (ii) an estimate of Previously Settled/Adjudicated Asbestos Claims.

29

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtors and Non-Debtor Affiliates. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of business, business risks, target market segments, growth prospects, maturity of businesses, market presence, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation.

The Comparable Public Company Analysis includes companies similar to the Reorganized Debtors and Non-Debtor Affiliates' two business segments: Davison and Performance Chemicals.

The publicly traded companies deemed generally comparable to Davison Chemicals, in some or all of the aforementioned factors are Albermarle Corp., Engelhard Corp., Great Lakes Chemical Corp., Johnson Matthey plc, and Lubrizol Corp.

The publicly traded companies deemed generally comparable to Performance Chemicals, in some or all of the aforementioned factors, are Crown Holdings, Inc., ElkCorp, Ferro Corp., H.B. Fuller Corp., Lafarge North America Inc., RPM International Inc., Silgan Holdings Inc., Texas Industries, Inc., Valspar Corp. and Vulcan Materials Co.

The Comparable Public Company Analysis determines the multiple of each comparable company's current enterprise value divided by (i) its calendar year 2004 estimated revenue and EBITDA and (ii) its calendar year 2005 estimated EBITDA. The calendar year 2004 estimated revenue and EBITDA, as well as the calendar year 2005 estimated EBITDA, for comparable companies are based on projections by equity research analysts of third-party financial institutions.

The calendar year 2004 enterprise value to revenue, and enterprise value to EBITDA multiples for comparable companies are in the ranges of $0.8x - 1.1x$ and $7.5x - 9.0x$, respectively. Applied to the Reorganized Debtors and Non-Debtor Affiliates' 2004 estimated revenue of $2.236 billion and EBITDA of $298 million, respectively, these multiples indicate a Core Business Value in a range of $2.2 billion to $2.7 billion. The calendar year 2005 enterprise value to EBITDA multiple for comparable companies ranges from $6.5x - 8.0x$. Applied to the Reorganized Debtors and Non-Debtor Affiliates' estimated 2005 EBITDA of $314 million, these multiples indicate a Core Business Value in a range of $2.0 billion to $2.5 billion.

### 2.8.1.2 The Precedent Transaction Analysis

The precedent transaction analysis ("Precedent Transaction Analysis") estimates value by examining selected public merger and acquisition transactions. An analysis of a company's disclosed transaction value as a multiple of various operating statistics provides valuation multiples for companies in similar lines of business. Multiples for selected precedent transactions were calculated based on the purchase price (including any debt assumed) paid. These multiples were then applied to the key operating statistics of the Reorganized Debtors and Non-Debtor Affiliates to determine the reorganized value to a potential buyer.

Valuation conclusions cannot be based solely upon quantitative results. The reasons for, and circumstances surrounding, each acquisition transaction are specific to such acquisition, and

K&B 9907839.25

there are inherent differences between the businesses, operations and prospects of each. Qualitative judgments must be made concerning the differences among the characteristics of these reorganizations and transactions and other factors and issues, which could affect the target's value. Therefore, each of the multiples based on precedent transactions was evaluated and judgments were made as to their relative significance in determining reorganized value.

Multiples of various financial results to the transaction values of these companies were calculated and analyzed. Emphasis was placed on multiples based upon revenue and EBITDA. On the basis of enterprise value as a multiple of revenues, the precedent transactions indicated an approximate range of 1.1x – 1.3x. On the basis of enterprise value as a multiple of EBITDA, the precedent transactions indicated an average of 7.5x – 9.5x. As discussed above, the determination of these multiple ranges accounts for a variety of factors, both quantitative and qualitative. In addition, due to the fact that the results of a Precedent Transaction Analysis often reflect a control premium, or are impacted by a competitive dynamic due to multiple bidders, the valuation multiples indicate aspects of value not necessarily present in a reorganization. Applied to the Reorganized Debtors and Non-Debtor Affiliates' 2004 estimated revenue of $2.236 billion and EBITDA of $298 million, these multiples indicate a Core Business Value in a range of $2.2 billion to $2.8 billion.

### 2.8.2    Calculation of Fully Diluted Reorganized Equity Value

The Core Business Value is adjusted by the following amounts to determine the fully diluted reorganized equity value of the Reorganized Debtors and Non-Debtor Affiliates: (i) assumed insurance receivable, (ii) the present value of the projected use of tax assets, (iii) non-core liabilities, (iv) net debt, (v) proceeds from the exercise of assumed in-the-money options, and (vi) share dilution as set forth in the summary in Section 2.8.2.6.

#### 2.8.2.1 Insurance

According to management's estimate, the assumed insurance receivable has a book value of $500 million based on the assumed asbestos liabilities.[9] There exists significant variability around the ultimate amount and timing of receipt of this amount.

#### 2.8.2.2 Tax Assets

Tax assets result from prior losses, foreign taxes paid, and deductions as a result of the implementation of the Plan. The future use of tax assets is quantified based on projected annual tax savings. The present value of the projected use of tax assets is calculated at a discount range of 13% to 23%, which represents levered cost of equity. Estimated cost of equity was derived using the capital asset pricing model, which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return of the overall market. The analysis assumes a risk-free rate of 4.2% based on the

---

[9]    For purposes of this analysis, asbestos liabilities are assumed to equal the sum of (i) the maximum aggregate amounts that would satisfy the conditions precedent in Section 7.6.1(v) and (w) of the Plan; plus (ii) an estimate of Previously Settled/Adjudicated Asbestos Claims.

31

November 8, 2004 yield of the ten-year U.S. Treasury Note. Levered beta of 1.19 for the Reorganized Debtors and Non-Debtor Affiliates is based on (i) an average un-levered beta of 0.72 for the companies identified in Section 2.8.1.1 herein (the Comparable Public Company Analysis) and (ii) an assumed debt/equity ratio of approximately 50% as of the Effective Date.

The present value of the projected use of tax assets is calculated in the approximate range of $50 million to $70 million with a midpoint estimate of $60 million. There exists significant variability around the ultimate value of this asset because it depends on, among other things, proforma capital structure and limitations on the use of tax assets that could result from activities outside of the control of the Reorganized Debtors and Non-Debtor Affiliates.

### 2.8.2.3 Non-Core Liabilities

The projected book value of non-core liabilities, as of December 31, 2004, is $501 million. This amount consists of the following obligations: $186 million of post-retirement and pension benefits (not including the qualified pension plan), $107 million of unliquidated environmental Claims, $50 million of Priority Tax Claims paid over time and other tax contingencies, $57 million of other non-core accrued liabilities, $3 million of capital leases, and $98 million for other unliquidated Claims. The value of these non-core liabilities could be higher or lower, depending on, among other things, the resolution of Claims, the timing of certain payments, and the use of contingency.

### 2.8.2.4 Net Debt

The estimated net debt, as of December 31, 2004, is based on management's projections of $800 million of debt and $300 million of cash. Projected cash includes proceeds from the assumed exercise of in-the-money options. Net debt could ultimately be higher or lower than this estimate, depending on actual cash funding requirements for the Plan and free cash flow generation before emergence.

### 2.8.2.5 Proceeds of Options

The Reorganized Debtors and Non-Debtor Affiliates have employee and management options outstanding representing 8.2 million shares at a wide range of strike prices. Based on the assumed fully diluted reorganization equity value per share, options that would be in the money are assumed to be exercised. The proceeds from the assumed exercise of in-the-money options are added to fully diluted equity value and the shares issued are included in the calculation of the fully diluted price per share. The proceeds from the assumed exercise of in-the-money options are $66 million to (6.3 million shares), $68 million (6.4 million shares) and $76 million (6.9 million shares), respectively, based on the range of fully diluted reorganization equity value per share.

### 2.8.2.6 Summary

Based on the above assumptions, the calculated fully diluted reorganized equity value is a range of $1.748 billion to $2.178 billion at the assumed Effective Date.

32

To calculate the fully diluted reorganized equity value per share, fully diluted shares must be calculated by adding: (1) basic shares of Parent Common Stock outstanding, (2) the shares of Parent Common Stock underlying in-the-money options, as more fully described above; (3) the shares of Parent Common Stock to be issued in respect of Class 9, equal to 15% of the Allowed Class 9 Claims, which amount is assumed to represent approximately $143 million; (4) the shares of Parent Common Stock expected to be issued to the Asbestos Trust, which amount is assumed to represent approximately $498 million based on the maximum aggregate amount that would satisfy the conditions precedent in Section 7.16(v) of the Plan; and (5) the shares of Parent Common Stock underlying the Warrants which are issued to the Asbestos Trust to fund assumed Class 7 liability of $130 million based on the maximum aggregate amount that would satisfy the conditions precedent in Section 7.6.1(w) of the Plan. Based on the foregoing assumptions, the range of fully diluted shares varies with the range of calculated equity values and is 128.8 million shares at the low end of the reorganized equity value range and 112.4 million shares at the high end of such range (a higher equity value implies that fewer shares would be required to fund items (3), (4) and (5) above), with a midpoint estimate of 118.9 million shares. The calculated fully diluted reorganized equity value per share is in the approximate range of $13.57 to $19.38, with a midpoint estimate of $16.48.

The Reorganized Debtors and Non-Debtor Affiliates' fully diluted reorganized equity value could be materially lower if the Asbestos PI-AO Claims liability exceeds the $130 million (plus expenses) assumed as the maximum estimated liability that would satisfy the Asbestos PI-AO Claims. The theoretical dilution to equity value is not limited to the Warrants exercisable by the Asbestos Trust, but also could be impacted by future payments by Reorganized Grace.

The estimates of reorganized value do not purport to be appraisals, liquidation values or estimates of the actual market value that may be realized if assets are sold. The estimates of reorganized value, fully diluted reorganized equity value, and fully diluted reorganized equity value per share represent hypothetical values developed solely for purposes of the Plan and should not be relied upon in making investment decisions to purchase or sell Parent Common Stock at any time, now or in the future.

The estimates of reorganized value, fully diluted reorganized equity value, and fully diluted reorganized equity value per share are highly dependent upon achieving the future financial results set forth in the proforma and prospective financial information as well as the realization of certain other assumptions which are not guaranteed, in particular, assumptions regarding the value of all Asbestos Claims and estimates presented herein regarding insurance, tax and Cash assets as well as net debt and other liabilities. Because such estimates are inherently subject to uncertainties, neither the Debtors, the Reorganized Debtors and Non-Debtor Affiliates, Blackstone, nor any other person assumes responsibility for their accuracy.

The Parent Common Stock of Grace is traded on the New York Stock Exchange (TICKER: GRA). The estimates of the range of fully diluted reorganized equity value do not purport to be an estimate of the pre- or post-reorganization trading value of the Parent Common Stock and the estimate of the fully diluted reorganized equity value per share may not correlate with actual trading prices on the New York Stock Exchange. The estimated values set forth herein represent estimated reorganized values and estimated fully diluted reorganized equity values and do not necessarily reflect values that could be attainable in public or private markets.

33

K&E 9907839.25

The values set forth herein do not consider market trading characteristics, trading limitations possibly imposed on the Parent Common Stock or perceptions in public or private markets about the Reorganized Debtors and Non-Debtor Affiliates or the value of the Parent Common Stock. The trading value of the Parent Common Stock, if any, may be materially different from the estimates set forth in this Estimated Value of the Reorganized Debtors and Non-Debtor Affiliates.

## 3.    THE CHAPTER 11 FILINGS AND RELATED CANADIAN PROCEEDINGS

### 3.1    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 authorizes a debtor to reorganize its business for its benefit and its stakeholders' benefit, whether those stakeholders are its creditors or equity interest holders. In addition to permitting a debtor to rehabilitate itself, chapter 11 also requires that any distributions to stakeholders ensure equality of treatment for similarly situated creditors and similarly situated equity interest holders.

Commencing a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The principal objective of a chapter 11 case is to consummate a plan of reorganization. A plan of reorganization sets forth the means for satisfying claims against and equity interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court binds a debtor, any issuer of securities thereunder, any person acquiring property under the plan and any creditor or equity interest holder of that debtor to the terms of the plan. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan, and substitutes therefor the obligations specified in the confirmed plan.

### 3.2    Significant Events During the Course of the Chapter 11 Cases

Many pleadings have been filed with the Bankruptcy Court and District Court during the course of the Chapter 11 Cases, and many hearings have been conducted in connection with those pleadings.[10] In order to obtain a comprehensive listing of the pleadings and events that have been filed in the Chapter 11 Cases, the docket for each case should be consulted. The relevant pleadings referenced below may be obtained and reviewed from the Bankruptcy Court or District Court, as applicable. The following is a general description of the more significant pleadings that have been filed during the Chapter 11 Cases:

---

[10] All docket numbers refer to Case No. 01-1139 unless otherwise stated.

34

K&E 9907839.25

### 3.2.1    First Day Motions

#### 3.2.1.1 Retention and Employment of Professionals By the Debtors

The Bankruptcy Court approved the Debtors' request to retain certain professionals to represent them and assist them in connection with the Chapter 11 Cases on May 3, 2001. These professionals include: (a) Kirkland & Ellis LLP and Pachulski, Stang, Ziehl, Young, Jones & Weintraub, P.C. as bankruptcy counsel (Docket Nos. 180 and 181, respectively), (b) The Blackstone Group L.P. ("Blackstone") as Financial Advisors (Docket No. 182), (c) Kekst & Company Incorporated as public relations consultant (Docket No. 183), (d) R.R. Donnelley & Sons Company as the notice agent (Docket No. 15), and (e) Wachtell, Lipton, Rosen & Katz as special corporate counsel (Docket No. 184). The Debtors were also authorized to retain and employ and compensate certain Professionals utilized in the ordinary course of the Debtors' businesses (Docket No. 197).

#### 3.2.1.2 Financing and Critical Trade Motions

The Debtors filed their "Emergency Motion for Interim and Final Orders under 11 U.S.C. §§ 105, 362, 363 and 364 Approving Post-Petition Financing and Related Relief and Setting Final Hearing Pursuant to Bankruptcy Rule 4001(c)" (the "Financing Motion") (Docket No. 26) on the Petition Date whereby the Debtors sought authority to enter into a post-petition credit agreement. The Court granted the emergency relief and subsequently, on May 3, 2001, granted final relief in connection with the Financing Motion (Docket No. 194). Pursuant to the loan agreements, the Debtors have available up to $250,000,000 in post-petition financing. The Court extended the Debtors' post-petition credit facility on May 14, 2003 until the earlier of (1) April 1, 2006 or (2) the Debtors' emergence from bankruptcy (Docket No. 3512).

The Debtors also were granted authority to pay in the ordinary course of business the pre-petition claims of essential trade creditors up to the sum of $4.5 million (Docket No. 195).

#### 3.2.1.3 Operational Motions

The Debtors were granted authority to (1) pay certain pre-petition obligations, including certain sales, use and franchise taxes, as well as charges relating to shipping and most employee benefits and (2) maintain their existing bank accounts, business forms, Cash management systems, and intercompany agreements (Docket Nos. 18 and 21 respectively). Additionally, the Debtors sought, and the Court granted, authority to honor certain pre-petition obligations to customers and otherwise continue in the ordinary course of business certain customer programs and practices (Docket No. 19).

### 3.2.2    Motions to Assume Pre-Petition Executory Contracts and Leases

On April 3, 2001, the Debtors moved the Court (Docket No. 20) for authority to assume the existing employment contracts with the following key-employees: (1) Paul J. Norris (Chairman, President and Chief Executive Officer), (2) David B. Siegel (Senior Vice President and General Counsel), (3) Robert M. Tarola (Senior Vice President and Chief Financial Officer), (4) William D. Corcoran (Vice President, Public and Regulatory Affairs), (5) Wayne T. Smith (Vice President and General Manager of Grace Performance Chemicals), (6) Ann. E. MacDonald

K&E 9907839.25

(Sales and Marketing Manager), and (7) Johnny P. Forehand, Jr. (Vice President, Operations). The Court granted the Debtors' motion on June 22, 2001 (Docket No. 560).

The Debtors have also periodically sought, and received, authority from the Court to assume and/or assign certain leases.

### 3.2.3  Appointment of Official Committees of Creditors, the Official Equity Committee and the Future Claims Representative

#### 3.2.3.1 Official Committees of Creditors

##### 3.2.3.1.1    Unsecured Creditors' Committee

The Unsecured Creditors' Committee was formed on April 13, 2001 when the United States Trustee issued and filed an amended notice of appointment of the official committee of unsecured creditors (Docket No. 94). Subsequently, the Unsecured Creditors' Committee sought and received Bankruptcy Court approval to employ (a) Stroock & Stroock & Lavan LLP, as counsel (Docket Nos. 177 and 340), (b) Duane, Morris & Heckscher LLP, as local counsel (Docket Nos. 288 and 550), (c) FTI Pelicano Manzo, as financial advisors (Docket Nos. 287 and 549), and (d) Capstone Corporate Recovery, LLC to replace FTI Pelicano Manzo as financial advisors (Docket No. 5758) except with respect to tax related services.

##### 3.2.3.1.2    Asbestos PI Committee

The Asbestos PI Committee was formed on April 13, 2001 when the United States Trustee issued and filed a notice of appointment of an official committee of asbestos personal injury claimants (Docket No. 95). Subsequently, the Asbestos PI Committee sought and received Bankruptcy Court approval to employ (a) Legal Analysis Systems, Inc., as consultants (Docket No. 206), (b) Caplin & Drysdale, Chartered, as counsel (Docket No. 208), (c) L. Tersigni Consulting, P.C., as financial advisors (Docket No. 209), (d) Ashby & Geddes, P.A., as local counsel for the period from April 12, 2001 through June 15, 2001 (Docket No. 697), and (e) Campbell & Levine, LLC, as local counsel beginning June 16, 2001 (Docket No. 698).

##### 3.2.3.1.3    Asbestos PD Committee

The Asbestos PD Committee was formed on May 11, 2001 when the United States Trustee issued and filed an amended notice of appointment of an official committee of asbestos property damage claimants (Docket No. 252). Subsequently, the Asbestos PD Committee sought and received Bankruptcy Court approval to employ: (a) Bilzin Sumburg Dunn Baena Price & Axelrod LLP, as counsel (Docket Nos. 298 and 551), (b) Ferry & Joseph, P.A., as local counsel (Docket Nos. 299 and 553), (c) Conway, Del Genio, Gries & Co., as financial advisor and investment banker (Docket No. 1027), and (d) Hamilton, Rabinovitz & Aschuler, Inc. (Docket Nos. 1568 and 1735) and  W.D. Hilton, Jr. (Docket Nos. 1567 and 1736), as consultants.

#### 3.2.3.2 Official Equity Committee

The Equity Committee was formed on June 18, 2001 when the United States Trustee issued and filed a notice of appointment of the official committee of equity security holders (Docket No. 532). The Equity Committee sought and received Bankruptcy Court approval to

36

employ: (a) Kramer Levin Naftalis & Frankel LLP, as counsel (Docket Nos. 787 and 985), (b) Klett Rooney Lieber & Schorling, P.C., as co-counsel (Docket Nos. 1059 and 1275).

### 3.2.3.3 Representative for Future Asbestos Claimants

The Debtors filed an application for appointment of a legal representative for the future Asbestos Claimants on April 19, 2004 (Docket No. 5460). The Court entered an order appointing David T. Austern as the Future Claimants' Representative (Docket No. 5645). Federal Insurance Company, Royal Indemnity Company, and the Asbestos PD Committee appealed the Court's order appointing Mr. Austern. The Asbestos PD Committee subsequently withdrew its appeal. The insurance companies' appeals are pending before the District Court.

### 3.2.4   Section 341(a) Meeting of Creditors

On May 18, 2001, the United States Trustee's office conducted the meeting of creditors required by Bankruptcy Code § 341(a). Representatives of the Debtors, as well as the Debtors' counsel, appeared at the Section 341(a) meeting and responded to inquiries from the U.S. Trustee and creditors.

### 3.2.5   Selected Adversary Proceedings

#### 3.2.5.1 Stay of Asbestos-Related Litigation Against Various Affiliates

Contemporaneously with the filings of their Chapter 11 petitions, the Debtors filed the adversary proceeding entitled W. R. Grace & Co., et al. v. Margaret Chakarian, et al. and John Does 1-1000, Case No. A-01-771. A temporary restraining order was initially entered on April 2, 2001 and on May 3, 2001, the Court issued a preliminary injunction. On January 22, 2002, the Court entered an "Order Granting Modified Preliminary Injunction" (Case No. A-01-771, Docket No. 87) which, among other things, enjoined the commencement or continuation of certain actions against non-debtor third-parties, including actions: (1) that arise from alleged exposure to asbestos, indirectly or directly, allegedly caused by the Debtors, against (a) Fresenius, (b) Sealed Air, (c) Merrill Lynch, (d) Credit Suisse First Boston, (e) certain of the Debtors' insurance carriers, (f) Affiliates of the Debtors that are not filing entities for purposes of the Chapter 11 Cases, or (g) present and former officers, directors and employees of the Debtors; (2) for which there may be coverage under certain of the Debtors' insurance policies; (3) brought against certain of the Debtors' insurance carriers, which allege coverage for asbestos-related liabilities; or (4) against current and former officers, directors or employees of the Debtors that arise out of such officer's, director's or employee's employment or relationship with the Debtors.

On February 4, 2002, certain Claimants filed a motion to clarify the scope of the preliminary injunction or to modify the preliminary injunction (Case No. A-01-771, Docket No. 86). Specifically, the Claimants sought entry of an order stating that, to the extent their asserted causes of action against Maryland Casualty Company ("MCC"), one of the Debtors' insurers, were based upon MCC's own, independent tortious conduct, the preliminary injunction did not stay such litigation. The Bankruptcy Court denied the motion for clarification (Case No. A-01-771, Docket No. 96). The Claimants appealed the Bankruptcy Court's decision to the District Court, and, on July 16, 2003, the District Court vacated the Bankruptcy Court's order. MCC appealed the District Court's decision, and, on October 28, 2004, the Third Circuit vacated

37

the District Court's order and affirmed the Bankruptcy Court's decision that the modified preliminary injunction stayed the litigation with respect to MCC. As a result, the Claimant's lawsuits against MCC are presently stayed pursuant to the Debtors' modified preliminary injunction.

### 3.2.5.2 Enjoining Bond Payments by National Union

The Debtors filed the adversary proceeding entitled W. R. Grace & Co.-Conn v. National Union Fire Insurance Company of Pittsburgh, P.A., et al., Case No. 02-01657 (Bankr. D. Del.), on January 18, 2002, which sought to enjoin National Union, the issuer of surety bonds to Grace, from making any payment under the bonds in connection with two settlement protocols relating to certain asbestos personal injury litigation. On May 13, 2002, the Court approved an interim settlement agreement, under which: (1) payment under one of the bonds was permanently enjoined, (2) a single payment of $9,729,720.00 was authorized under the second bond, (3) and a letter of credit draw by National Union in that same amount, under a letter of credit obtained by the Debtors to secure the bonds, was authorized. The Court retained jurisdiction concerning the remainder of this dispute. National Union then paid $9,729,720.00, and it drew that same amount from the Debtors' letter of credit.

On December 22, 2002, National Union filed a motion for summary judgment and a corresponding brief in support of the motion, which sought a declaratory judgment that the remaining Claims asserted by the Claimants were not owed by National Union to the Claimants. Specifically, National Union requested a determination that no further sums are due to the Claimants on account of the "Aggregate Submission Provisions" of the settlement protocols. In the alternative to summary judgment, National Union sought an order deferring determination of amounts due under its surety bonds until the outcome of procedures for defining "asbestos personal injury" had been established for the Chapter 11 Cases.

The Claimants opposed the National Union Summary Judgment Motion, and responded on September 10, 2003 by filing their own motion for summary judgment and a related brief in support (Case No. 02-01657, Docket No. 39).

The Court heard the summary judgment motions on March 26, 2004. The Court denied National Union's summary judgment motion. However, the Court held that, pursuant to Bankruptcy Code § 362, the Debtors have the right to review all Claims (1) that were submitted pursuant to either settlement protocol during the 60-day period prior to April 2, 2001 or (2) on, or after, April 2, 2001, to determine whether any of those Claims lack adequate qualifying materials, as required in the applicable settlement protocol. Similarly, the Court granted National Union the right to review all Claims that were submitted at any time prior to April 2, 2001 (1) for which payment has not already been made, and (2) for which the Debtors failed previously to formally object pursuant to the provisions of the applicable settlement protocol. A formal order has yet to be entered.

### 3.2.6 Extension of Exclusivity Period and Termination of Exclusivity Period

The Court has entered several orders extending the Debtors' exclusive periods to file and solicit acceptances of a Chapter 11 plan. By order of the Court entered on June 16, 2004 (Docket

38

No. 5820), the Court had granted the Debtors (i) an exclusive period to file a reorganization plan (or plans) through November 24, 2004 and (ii) an exclusive solicitation period through and including January 24, 2005. However, the Court had ordered that the Debtors file their plan and disclosure statement no later than October 14, 2004. The Debtors were prepared to file such plan and disclosure statement on October 14, 2004, but at the request of the FCR, the Asbestos PI Committee and the Asbestos PD Committee, sought a further extension to permit all parties to negotiate a consensual plan. Elliot International, L.P. (a significant holder of Parent Common Stock) objected. On October 25, 2004 (Docket No. 6734), the Court extended the Debtors' time to file a reorganization plan through November 15, 2004.

### 3.2.7   Motions to Lift the Automatic Stay

Throughout the Chapter 11 Cases, various parties have filed motions to lift the Debtors' automatic stay. The Debtors have successfully opposed efforts to modify the stay where the respective Claims would be payable out of assets that would otherwise be available for the payment of Claims. In certain situations, the Debtors have consented to modifications of the stay to (1) establish the amount of certain Claims, or (2) where the Claimants sought to proceed only against the Debtors' insurance, and, in the Debtors' estimation, any potential recovery from such insurance would not affect the amount of insurance available to pay other Claimants.

### 3.2.8   Certain Post-Petition Litigation Matters

#### 3.2.8.1 Litigation Related to Grace's Savings and Investment Plan

In June 2004, a purported class action complaint was filed in U.S. District Court for the District of Massachusetts against the Parent's Board of Directors, certain current and former Grace officers and employees, and others, relating to Grace's 401(k) Savings and Investment Plan (the "S&I Plan"). The complaint alleges that the decline in the price of Parent Common Stock from July 1999 through February 2004 resulted in significant losses to S&I Plan participants. The complaint further alleges that the defendants breached their fiduciary duties under the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") by failing to sell or take other appropriate action with regard to Parent Common Stock held by the S&I Plan during that period, and failed to disclose to S&I Plan participants the risk of investing in Parent Common Stock. The complaint seeks compensatory damages for the S&I Plan from the defendants. The Bankruptcy Court has stayed this action with respect to all defendants through and including December 31, 2004.

On October 26, 2004, a purported class-action complaint was filed in the U.S. District Court for the Eastern District of Kentucky, on behalf of present and former participants in the S&I Plan, against W. R. Grace & Co., the W. R. Grace Investment and Benefits Committee, the Parent's Board of Directors, certain current and former Grace officers and employees, and others. The complaint alleges that Grace and its investment advisors breached fiduciary duties under ERISA by selling Parent Common Stock from the S&I Plan at a "distressed price." The complaint further alleges that Grace breached fiduciary duties under ERISA by hiring State Street Bank and Trust Company, the investment manager for the S&I Plan that was retained by the Debtors in December 2003 (pursuant to a Court order authorizing such retention), to "rapidly liquidate" all of the employees' Parent Common Stock investment at an "artificially low" sales

39

price. To date, no party has answered this complaint, and the Debtors expect to seek a stay of the action.

Grace likely would have an obligation to indemnify the defendants for any liability arising out of either of these lawsuits. However, Grace believes that the allegations in both lawsuits are without merit and that any liability arising therefrom would in any event be covered by its fiduciary liability insurance.

Under the Plan, the Debtors propose to (1) provide their current and former directors, officers, and other employees who are defendants in the above-referenced S&I Plan lawsuits, with a full and complete release of all liability associated with any such litigation, and (2) to indemnify such defendants for any costs and/or expenses associated with any such litigation.

### 3.2.8.2 The Scotts Company Litigation

On September 2, 2004, the Scotts Company ("Scotts"), a former Grace vermiculite customer, filed an adversary proceeding in the Bankruptcy Court seeking declaratory relief with respect to its entitlement under the Grace liability insurance policies. Scotts alleges that it is currently defending 76 asbestos-related bodily injury cases (involving approximately 4,192 plaintiffs) that were filed against Scotts after the Petition Date. Grace presently does not have the information necessary to assess the potential impact these allegations may have on its potential insurance recoveries.

### 3.2.8.3 Montana Grand Jury Investigation

On or about October 27, 2004, the United States Department of Justice, District of Montana, sent a letter (the "Target Letter") to counsel for the Debtors, which states, "a Federal Grand Jury is currently conducting an investigation into whether your client, W. R. Grace & Co., was involved in obstructing agency proceedings, violating federal environmental laws, and conspiring with others to violate federal law." Grace is aware that similar letters were also sent to (i) three current officers, and/or employees of Grace and (ii) four former officers, and/or employees of Grace. These individuals include persons who possess important management positions with Performance Chemicals or who held key management positions in Grace's construction products business.

Grace believes that the grand jury investigation is related to its former vermiculite mining and processing activities in Libby, Montana. The Target Letter, however, does not specifically articulate the scope or purpose of the federal grand jury investigation, and Grace has not otherwise been advised of any details concerning the possible violations. Therefore, Grace is presently unable to assess whether the results of this investigation may be material to Grace. Grace has filed a motion seeking Bankruptcy Court approval to pay legal expenses in connection with the grand jury investigation for the current and former officers and employees that have received the Target Letter. The Bankruptcy Court has scheduled the matter for hearing on November 15, 2004.

40

### 3.2.9    Motion for Entry of Case Management Order

The Debtors filed their motion seeking entry of a case management order, establishment of bar date, approval of proofs of Claim forms, and approval of notice program (the "Original CMO Motion") on June 27, 2001 (Docket No. 586). The Original CMO Motion outlined the Debtors' proposal for resolution of all of the various key issues facing the Debtors, including issues relating to Asbestos PI Claims. The matter was fully briefed and set to be tried before District Judge Farnan on November 21, 2001 when the Court of Appeals for the Third Circuit reassigned the Chapter 11 Cases, along with the asbestos bankruptcy cases of four other debtors pending in Delaware, to the Honorable Judge Alfred M. Wolin.

Judge Wolin (1) retained the asbestos personal injury issues and the fraudulent transfer lawsuit (described in detail in Section 2.5.2 in this Disclosure Statement) and (2) referred all other matters to the Bankruptcy Court. Judge Wolin first addressed the fraudulent transfer lawsuit. After extensive briefing and negotiations, the matter was resolved in principle by the parties in November of 2002 and will potentially result in the recovery of approximately $1 billion for the Debtors' estates.

Judge Wolin did not immediately address the Debtors' potential liability for asbestos personal injury. Instead, he had the parties re-brief these issues and put the matter on hold pending resolution of the fraudulent transfer lawsuit. On June 21, 2002, the Debtors filed a supplemental brief regarding procedures for the litigation of the common personal injury liability issues (Docket No. 2275). This supplemental brief provided a detailed summary of the Debtors' proposal concerning (1) the level of impairment that should be necessary for a party to assert an asbestos personal injury claim against the Debtors' estates and (2) procedures for implementing, and the need for the implementation of, a bar date covering asbestos personal injury claims. The District Court never considered the matter. In lieu of the procedures outlined in the Original CMO Motion, the Plan Documents establish a process for parties to file Asbestos PI Claims against the Debtors' estates.

### 3.2.10    Debtors' Bar Date for Asbestos PD Claims (Excluding ZAI Claims), Non-Asbestos Claims, and Asbestos Medical Monitoring Claims

By an order dated April 22, 2002, the Court established the March 2003 Bar Date as the last date for Filing proofs of Claim for all pre-petition Claims relating to (1) Asbestos PD Claims (excluding ZAI Claims), (2) non-Asbestos Claims (including all governmental Claims), and (3) Asbestos Medical Monitoring Claims (Docket No. 1963). A bar date was not set for Asbestos PI Claims and ZAI Claims.

Pursuant to the March 2003 Bar Date, approximately 15,438 proofs of Claim were filed against the Debtors' estates. The Debtors believe that many of the proofs of Claim are illegitimate, duplicative, or otherwise grossly overstated in amount. The Debtors currently are pursuing a series of omnibus Claims objections to deal with many of these proofs of Claim.

### 3.2.11    The ADR Program

On June 12, 2004, the Debtors filed a Motion for the entry of an order establishing an alternative dispute resolution ("ADR") program to liquidate certain pre-petition Claims that were

41

submitted pursuant to the order setting the March 2003 Bar Date. On November 9, 2004, the Court entered an order approving the Debtors' ADR program, as amended to address concerns raised by the Court and other parties. The ADR program establishes procedures for resolving certain contested non-asbestos Claims through negotiation and then, if necessary, through mediation.

### 3.2.12 The Judge Wolin Mandamus and Recusal Proceedings

Certain creditors of Owens Corning Corporation moved to have Judge Wolin recused from any further participation in the Owens Corning bankruptcy cases that were pending before him in the District Court on October 10, 2003. Shortly thereafter, certain creditors of the Debtors filed a similar motion. The Third Circuit issued an order that stayed all matters before Judge Wolin in each of the five asbestos cases before him, including matters pertaining to the Debtors' Chapter 11 Cases, on October 30, 2003. The cases before Judge Wolin remained stayed, pending resolution of the Wolin recusal matters. The Third Circuit issued a Writ of Mandamus on May 17, 2004 which (1) ordered Judge Wolin to recuse himself from the five asbestos cases before him, including the Debtors' Chapter 11 Cases, and (2) lifted the stay of all matters before Judge Wolin. The Honorable Ronald E. Buckwalter was assigned all matters in the Chapter 11 Cases that were previously pending before Judge Wolin on May 27, 2004 (Docket No. 5652).

### 3.2.13 Negotiations with the Various Committees and the FCR

At various times during the course of the Chapter 11 Cases, the Debtors have met with the FCR and representatives of the Asbestos PI Committee, the Asbestos PD Committee, the Equity Committee and the Unsecured Creditors' Committee and presented alternatives to the Plan in an effort to achieve a consensual plan of reorganization. Such alternatives included proposals for a plan of reorganization under which a trust would be established in compliance with Bankruptcy Code § 524(g) to assume all Asbestos Claims and would be funded by an amount sufficient to preclude any contingent contributions to the trust after the effective date of such plan. The most recent of these meetings took place during October and November 2004. The Debtors were unable to obtain agreement to any of these alternatives.

### 3.2.14 Motion to Protect Tax Benefits

In order to limit the trading of its shares to prevent a change in control of the Parent for tax purposes, Grace filed a motion seeking an order to require notice and waiting periods on transfers of Parent Common Stock to give Grace time to review the purchases for tax purposes. The order imposes notice requirements and potential restrictions on stock acquisitions by those persons or entities that (i) currently own 4.75% or more of Parent Common Stock or (ii) seek to acquire 4.75% or more of Parent Common Stock. A change in control of the Parent would severely limit Grace's ability to use its net operating losses to offset taxes on future income. Under the order, Grace has the right to object in Bankruptcy Court to those persons or entities acquiring Parent Common Stock if the acquisition poses a material risk of adversely affecting Grace's ability to use its net operating losses. The request was granted on an interim basis on October 23, 2004 and a hearing on final approval is scheduled for December 20, 2004.

42

### 3.3    The Canadian Proceedings

#### 3.3.1    General Information

Although Grace's Canadian operating subsidiary Grace Canada, Inc. ("Grace Canada") is not a Debtor, Grace believed that Grace Canada could potentially become subject to asbestos-related Claims. Accordingly, the Debtors sought and obtained ancillary relief in Canada with respect to Grace Canada.

On April 4, 2001, the Ontario Superior Court of Justice (the "Canadian Court") granted Grace Canada an order (the "Canadian Order"), pursuant to Section 18.6 of the Canadian Companies' Creditors Arrangement Act, which, among other things (1) recognized the Chapter 11 Cases in Canada, (2) prohibited the commencement of any asbestos related suits against Grace Canada, and (3) appointed Pierre Le Bourdais as Grace Canada's Information Officer. The Information Officer is responsible for submitting certain interim information reports concerning the Chapter 11 Cases and Grace Canada to the Canadian Court.

#### 3.3.2    Notice of the Canadian Proceedings

In accordance with the terms of the Canadian Order, Grace Canada published notice of the Canadian proceedings in newspapers of national circulation in Canada on each of April 11, 2001 and April 12, 2001. These notices (1) advised Entities of the Chapter 11 Cases and the Canadian proceedings, (2) stated that Grace Canada could seek further relief from the Canadian Court to ensure fair and equal access for Canadians with Asbestos Claims against Grace Canada, and (3) instructed any Entity who wished to be made a party to the Canadian proceedings to contact counsel to Grace Canada. To date, the only party who has requested to be added this service list is counsel involved in the fraudulent transfer litigation.

#### 3.3.3    Quarterly Reports

In accordance with the terms of the Canadian Order, the Information Officer has filed thirteen (13) quarterly reports with the Canadian Court. These reports have provided the Canadian Court with a description of matters affecting Grace Canada, as well as provided a summary of all material events taking place in the Chapter 11 Cases. Through these reports, the Information Officer has kept the Canadian Court informed as to the Debtors' reorganization process.

#### 3.3.4    Court Orders in the Canadian Proceedings

Since the date of the Canadian Order, Grace Canada has appeared before the Canadian Court on numerous occasions and has received approval or recognition of a number of Orders granted in the United States in connection with the Chapter 11 Cases. The following represents a summary of material matters approved by the Canadian Court:

##### 3.3.4.1    Orders Extending the Stay of Proceedings in Canada

The stay of proceedings granted in the Canadian Order was originally set to expire on October 1, 2001. The Canadian Court has extended this deadline. The current stay of proceedings will expire on April 1, 2005, unless extended prior to that date.

43

### 3.3.4.2 Recognition of the Debtors' March 2003 Bar Date Order

On December 5, 2002, in order to give effect to the March 2003 Bar Date Order, the Canadian Court ordered that the order setting the March 2003 Bar Date be recognized and implemented in Canada in accordance with its terms.

### 3.3.4.3 The Corporate Reorganization Order

On April 14, 2004, Grace Canada applied for, and the Canadian Court granted, an Order (the "Canadian Reorganization Order") approving a corporate reorganization involving Grace Canada and certain of the Debtors. The proposed reorganization contemplated, *inter alia*, that Grace Canada would acquire, for valuable consideration, shares or debt in a number of the Debtors' Latin American subsidiaries. The Canadian Reorganization Order was to be effective subject to the filing of a certificate of the directors of Grace Canada that they were satisfied that Grace Canada was receiving true value on a reasonable and realistic basis in respect of the assets being acquired. Grace Canada has now received the results of the appraisals for the property to be acquired and is in the process of reviewing and considering the results. The certificate of the directors of Grace Canada has not yet been filed and, accordingly, the Canadian Reorganization Order is not yet effective.

### 3.3.5    Post-Petition Canadian Lawsuits

On October 25, 2004, Raven Thundersky and Rebecca Bruce filed a complaint with the Queens' Bench for Winnipeg Centre against certain of the Debtors, certain of the Debtors' former Canadian subsidiaries, the Attorney General of Canada, and others. The complaint is styled as a purported class-action and seeks recovery for alleged injuries suffered by any Canadian resident as a result of Grace's marketing, selling, processing, manufacturing, distributing and/or delivering asbestos or asbestos-containing products in Canada.

On October 29, 2004, a Motion for Authorization to Institute a Class Action and to Obtain the Status of Representative was filed by the Association des Consummateurs Pour la Qualite Dans La Construction and Jean-Charles Dextras in the Superior Court for the Province of Quebec, District of Montreal. The motion seeks authorization to institute a class-action lawsuit against Grace Canada, Inc. and the Attorney General of Canada on behalf of (1) every person who is the owner of a building insulated with vermiculite that was marketed under the brand name Zonolite Attic Insulation and (2) every person (or their heirs and successors, if applicable) who lives or has lived in a building insulated with Zonolite Attic Insulation and who has suffered, is suffering or will suffer from asbestosis, mesothelioma, or cancer of the lung.

44

## 4.  SUMMARY OF THE PLAN[11]

### 4.1    Overview of the Chapter 11 Plan

THE DISCUSSION OF THE PLAN SET FORTH BELOW IS MORE DETAILED THAN THE EXECUTIVE SUMMARY CONTAINED IN ARTICLE 1 OF THIS DISCLOSURE STATEMENT, BUT IT IS NOT A COMPLETE RECITATION OF THE TERMS OF THE PLAN. MOREOVER, CERTAIN KEY ASPECTS OF THE PLAN ARE HIGHLIGHTED IN THE EXECUTIVE SUMMARY BUT ARE NOT REPEATED IN THIS SECTION.

THE DEBTORS HAVE ATTEMPTED TO SUMMARIZE IN THIS DISCLOSURE STATEMENT, THE KEY PROVISIONS OF THE PLAN, BUT SUCH A SUMMARY IS BY ITS VERY NATURE HIGHLY SUBJECTIVE AND PRONE TO DISPUTE. THEREFORE, THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN AND THE EXHIBITS IN THE EXHIBIT BOOK, THE TERMS OF WHICH ARE CONTROLLING.

A TRUE AND CORRECT COPY OF THE PLAN IS ATTACHED AS EXHIBIT 1 IN THE EXHIBIT BOOK. HOLDERS OF CLAIMS OR EQUITY INTERESTS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

### 4.2    PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

Article 2 of the Plan deals with unclassified Claims. In accordance with Bankruptcy Code § 1123(a)(1), Administrative Expense Claims and Priority Tax Claims are not classified and are excluded from the Classes set forth in Article 3 of the Plan. These Claims are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code or upon such other less favorable terms as may be mutually agreed upon between the Holder of such unclassified Claim and the Reorganized Debtors or otherwise established pursuant to an order of the Bankruptcy Court.

The Debtors estimate the total of all Allowed Administrative Expense Claims on the Effective Date to be approximately $75 million and the total of all Allowed Priority Tax Claims on the Effective Date to be approximately $232 million.[12]

---

[11] The section number references in this Article 4 match up one-to-one with the section numbers of the Plan. For example, Section 4.3.1 of this Disclosure Statement correlates to Section 3.1 of the Plan; Section 4.5.1 of this Disclosure Statement correlates to Section 5.1 of the Plan.

[12] Each of these figures are consistent with the Debtors' books and records and includes the Debtors' estimates for certain Claims that are disputed, which Claims may ultimately be determined to be significantly higher or lower.

The remainder of Article 2 of the Plan delineates in detail the treatment of these unclassified Claims, including treatment of liabilities incurred in the ordinary course of business, fee applications by Professionals and payment of interest to Holders of Priority Tax Claims paid out over time.

### 4.3    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

Article 3 of the Plan deals with classification and treatment of Claims and Equity Interest.

#### 4.3.1    Summary

Claims and Equity Interests are classified for all purposes, including voting, confirmation, and Distribution pursuant to the Plan and pursuant to Bankruptcy Code §§ 1122 and 1123(a)(1), as follows:

##### 4.3.1.1 Class 1.        Priority Claims

Class 1 consists of all Priority Claims against the Debtors. Each Holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim either (i) in full, in Cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Priority Claim becomes an Allowed Priority Claim, or as soon as practicable thereafter, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Priority Claim and the Reorganized Debtors. The Debtors estimate that there are no Allowed Priority Claims as of the Effective Date. Class 1 is unimpaired. The Holders of the Allowed Priority Claims in Class 1 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

##### 4.3.1.2 Class 2.        Secured Claims

Class 2 consists of all Secured Claims against the Debtors. Each Holder of an Allowed Secured Claim shall be paid the Allowed Amount of its Allowed Secured Claim at the option of the Reorganized Debtors, either (i) in full, in Cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Secured Claim becomes an Allowed Secured Claim, or as soon as practicable thereafter; (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Secured Claim and the Reorganized Debtors; (iii) by the surrender to the Holder or Holders of any Allowed Secured Claim of the property securing such Claim; or (iv) notwithstanding any contractual provision or applicable law that entitles the Holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Bankruptcy Code § 1124(2)(A)-(D). The Debtors estimate that there are no Allowed Secured Claims as of the Effective Date. The Holders of the Allowed Secured Claims in Class 2 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

46

### 4.3.1.3 Class 3.    Unsecured Pass-Through Employee Related Claims

Class 3 consists of all Unsecured Pass-Through Employee Related Claims. The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. The Debtors estimate the total of all Allowed Unsecured Pass-Through Employee Related Claims on the Effective Date to be approximately $191 million.[13] All other Allowed Unsecured Pass-Through Employee Related Claims have already been paid pursuant to first day orders of this Court or will be paid in the ordinary course as they become due. Class 3 is unimpaired. The Holders of the Unsecured Pass-Through Employee Related Claims in Class 3 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 4.3.1.4 Class 4.    Workers' Compensation Claims

Class 4 consists of all Workers' Compensation Claims against the Debtors. The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. All Allowed Workers' Compensation Claims have been paid pursuant to first day orders or will be paid in the ordinary course as they become due. Class 4 is unimpaired. The Holders of the Workers' Compensation Claims in Class 4 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 4.3.1.5 Class 5.    Intercompany Claims

Class 5 consists of all Intercompany Claims. The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. For proforma cash flow purposes, all Intercompany Claims will have no impact upon the Plan as all payments under the Plan are based upon the Debtors and Non-Debtor Affiliates as consolidated. Class 5 is unimpaired. The Holders of Intercompany Claims in Class 5 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 4.3.1.6 Class 6.    Asbestos PI-SE Claims

Class 6 consists of all Asbestos PI-SE Claims against the Debtors.

All Allowed Class 6 Claims shall be paid in full. All Allowed Class 6 Claims shall be processed and paid in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement and the PI-SE TDP. All Allowed Class 6 Claims shall be paid by the Asbestos Trust out of the Asbestos PI-SE Class Fund, which shall be funded solely by the Sealed Air Payment and the Parent Common Stock component of the Debtors' Payment, if necessary. In accordance with the terms of the Asbestos Trust Agreement and the PI-SE TDP, each Holder of an Asbestos PI-SE Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as

---

[13] This figure is consistent with the Debtors' books and records and includes the Debtors' estimates for certain Claims that are disputed, which Claims may ultimately be determined to be significantly higher or lower.

applicable, and have the option to elect: (A) the Litigation Option or (B) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim shall be conclusively presumed to have elected the Litigation Option. Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option. Notwithstanding the foregoing, nothing shall prevent the Holder of an Asbestos PI-SE Claim that has not yet been Allowed from agreeing with the Entity against whom the Claim is asserted (or after the Effective Date, with the Asbestos Trust) for such Claim to be liquidated and paid in an amount lower than if the Claim were to be Allowed in the amount asserted.

The sole recourse of the Holder of an Asbestos PI-SE Claim on account of such Claim shall be to the PI-SE Account of the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Asbestos Trust Agreement, and the PI-SE TDP.

The Bankruptcy Court, pursuant to the Estimation Motion, shall determine the amount of the Asbestos PI-SE Claims. As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1.483 billion.

Class 6 is unimpaired. The Holders of the Allowed Asbestos PI-SE Claims in Class 6 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 4.3.1.7 Class 7.    Asbestos PI-AO Claims

Class 7 consists of all Asbestos PI-AO Claims against the Debtors.

All Allowed Class 7 Claims shall be paid in full. All Allowed Class 7 Claims shall be processed and paid in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement and the PI-AO TDP. All Allowed Class 7 Claims shall be paid initially by the Asbestos Trust out of the Asbestos PI-AO Class Fund which shall be funded by the Sealed Air Payment (to the extent any funds remain after first funding the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund) and the Warrants. After the exhaustion of the Asbestos PI-AO Class Fund in its entirety, all Allowed PI-AO Claims shall be paid in Cash by the Asbestos Trust from funds to be paid to the Asbestos Trust by the Reorganized Debtors, such funds being in addition to the Debtors' Payment. In accordance with the terms of the Asbestos Trust Agreement and the PI-AO TDP, each Holder of an Asbestos PI-AO Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Litigation Option, (B) the Registry Option, or (C) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim shall be conclusively presumed to have elected the Litigation Option. Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option. Notwithstanding the foregoing, nothing shall prevent the Holder of an Asbestos PI-AO Claim that has not yet been Allowed from agreeing with the Reorganized Debtors for such Claim to be liquidated and paid in an amount lower than if the Claim were to be Allowed in the amount asserted.

48