# EXHIBIT 1-A

The sole recourse of the Holder of an Asbestos PI-AO Claim on account of such Claim shall be to the PI-AO Account of the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Asbestos Trust Agreement, and the PI-AO TDP.

The Bankruptcy Court, pursuant to the Estimation Motion, shall determine the amount of the Asbestos PI-AO Claims. As a condition precedent to confirmation of the Plan, the Court shall have found that the Asbestos PI-AO Class Fund is not greater than $130 million.

Class 7 is unimpaired. The Holders of the Allowed Asbestos PI-AO Claims in Class 7 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 4.3.1.8 Class 8.    Asbestos PD Claims

Class 8 consists of all Asbestos PD Claims against the Debtors.

All Allowed Class 8 Claims shall be paid in full. All Allowed Class 8 Claims shall be processed and paid out of the Asbestos PD Class Fund (funded solely by the Sealed Air Payment and the Parent Common Stock component of the Debtors' Payment, if necessary) in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement and the PD TDP. Notwithstanding the foregoing, nothing shall prevent the Holder of an Asbestos PD Claim that has not yet been Allowed from agreeing with the Entity against whom the Claim is asserted (or after the Effective Date, with the Asbestos Trust) for such Claim to be liquidated and paid in an amount lower than if the Claim were to be Allowed in the amount asserted.

The sole recourse of the Holder of an Asbestos PD Claim on account of such Claim shall be to the PD Account of the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Asbestos Trust Agreement, and the PD TDP.

The Bankruptcy Court, pursuant to the Estimation Motion, shall determine the amount of the Asbestos PD Claims. As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1.483 billion.

Class 8 is unimpaired. The Holders of the Asbestos PD Claims in Class 8 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 4.3.1.9 Class 9.    General Unsecured Claims

Class 9 consists of all General Unsecured Claims against the Debtors.

Each Holder of an Allowed General Unsecured Claim shall be paid the Allowed Amount of its General Unsecured Claim on the GUC Distribution Date. Such payment shall be either (i) in full, plus post-petition interest, for those Claimants who, but for the Filing of the Chapter 11 Cases, would be entitled to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law, such payment to be 85% in Cash and 15% in Parent Common Stock, such Parent Common Stock being subject to, among other things, the transactions described in Section 7.2.2 of the Plan, and the Management Stock

49

Incentive Plan, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed General Unsecured Claim and the Reorganized Debtors.

The Parent Common Stock paid to the Holders of Allowed General Unsecured Claims in accordance with Section 3.1.10(b) of the Plan shall be valued at the average of the closing prices on The New York Stock Exchange for the trading days within the thirty (30) calendar days immediately preceding the GUC Distribution Date.

The Debtors estimate the total of all Allowed General Unsecured Claims to be approximately $951 million as of September 30, 2004.[14]

Class 9 is impaired. The Debtors are soliciting the votes of Holders of the General Unsecured Claims in Class 9 to accept or reject the Plan in the manner and to the extent provided in the Confirmation Procedures Order.

### 4.3.1.10      Class 10.      Equity Interests in the Parent

Class 10 consists of Equity Interests in the Parent. On the Effective Date, Holders of Class 10 Equity Interests in the Parent shall retain such interests; provided that such Equity Interests shall: (i) be subject, among other things, to the transactions described in Section 7.2.2 of the Plan, and the Management Stock Incentive Plan and (ii) be restricted as described in Section 7.1.1 of the Plan. Class 10 is impaired. The Debtors are soliciting the votes of Holders of the Allowed Equity Interests in the Parent in Class 10 to accept or reject the Plan in the manner and to the extent provided in the Confirmation Procedures Order.

### 4.3.1.11      Class 11.      Equity Interests in the Debtors other than the Parent

Class 11 consists of Equity Interests in the Debtors other than the Parent. The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Equity Interest entitles the Holder of such Equity Interest. Class 11 is unimpaired. The Holders of the Equity Interests in the Debtors other than the Parent in Class 11 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 4.3.2   Effect of Asbestos PI Claimant Electing Various Options

#### 4.3.2.1 Cash-Out Option

If an Asbestos PI Claimant elects the Cash-Out Option, (i) his election is irrevocable, (ii) his Claim will be treated under the terms of the PI-SE TDP or PI-AO TDP, as applicable, and (iii) he shall be precluded, pursuant to the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction, from seeking any further

---

[14]  This figure is consistent with the Debtors' books and records and includes the Debtors' estimates for certain Claims that are disputed, which Claims may ultimately be determined to be significantly higher or lower.

50

recovery against an Asbestos Protected Party, any Asbestos Insurance Entity or any Entity released under any provision of this Plan on account of such Claim.

### 4.3.2.2 Litigation Option

If an Asbestos PI Claimant elects, or is deemed to elect, the Litigation Option, (i) his Claim will be litigated against the Asbestos Trust and (ii) he shall be precluded, pursuant to the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction, from seeking any further recovery against an Asbestos Protected Party, any Asbestos Insurance Entity or any Entity released under any provision of the Plan on account of such Claim.

### 4.3.2.3 Registry Option

If an Asbestos PI-AO Claimant chooses the Registry Option, he shall (i) register his name on the Registry, (ii) be precluded, pursuant to the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction, from seeking any further recovery against an Asbestos Protected Party, any Asbestos Insurance Entity or any Entity released under any provision of the Plan, (iii) have the statute of limitations be deemed to be tolled to the extent that such Claimant becomes an Asbestos PI-SE Claimant and (iv) be entitled to seek further recovery, in accordance with the provisions of the Plan, against the Asbestos Trust if such Holder becomes an Asbestos PI-SE Claimant.

### 4.4    MODIFICATION OR WITHDRAWAL OF THE PLAN

Article 4 of the Plan sets forth the Debtors' right to modify, amend or withdraw the Plan, and/or the Plan Documents and the effect of any such withdrawal.

### 4.5    PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS AND ASBESTOS CLAIMS GENERALLY

#### 4.5.1    Objections to Claims (other than Asbestos Claims); Prosecution of Disputed Claims

Section 5.1 of the Plan sets forth the Debtors' or Reorganized Debtors', as applicable, right to object to the allowance of any Administrative Expense Claims, Priority Tax Claims, Class 1 Claims, Class 2 Claims, Class 3 Claims, Class 4 Claims, Class 5 Claims and Class 9 Claims. It also delineates the ways in which such objections may be resolved.

#### 4.5.2    Distribution on Account of Disputed Claims

Section 5.2 of the Plan provides for the timing and extent of Distributions for Disputed Claims which become Allowed.

#### 4.5.3    Resolution of Asbestos Claims

Section 5.3 of the Plan sets forth the way in which Asbestos Claims will be Allowed or Disallowed, and paid if Allowed. The Allowed Amount of Asbestos Claims shall be determined in accordance with the Bankruptcy Code, the Bankruptcy Rules, the applicable TDP, and the

51

CMO. If any Asbestos Claim becomes Allowed, it shall be satisfied from the Asbestos Trust in accordance with the Asbestos Trust Agreement and the applicable TDPs.

The Asbestos Trust shall have the sole right and authority to resolve all Asbestos PI-SE Claims and Asbestos PD Claims. All Asbestos PI-SE Claims whose Holders elect the Litigation Option shall be litigated by, and at the expense of, the Asbestos Trust in the name of the Asbestos Trust.

The Asbestos Trust shall also have the sole right and authority to resolve all Asbestos PI-AO Claims to the extent the Holder of an Asbestos PI-AO Claim elects the Registry Option or the Cash-Out Option.

If the Holder of an Asbestos PI-AO Claim elects the Litigation Option, the Reorganized Debtors shall have the sole right and authority to resolve all such Asbestos PI-AO Claims. All Asbestos PI-AO Claims whose Holders elect the Litigation Option shall be litigated by the Reorganized Debtors in the name of the Asbestos Trust, initially at the expense of the Asbestos Trust out of the Asbestos PI-AO Class Fund.

The subsections of Section 5.3 of the Plan deal with:

- Making of an Election by Asbestos PI Claimants;

- Claims Materials for Asbestos PI Claimants;

- Information Obtained by the Asbestos Trust or Reorganized Debtors Regarding Asbestos PI Claims; and

- Withdrawal of Claims.

## 4.6    ACCEPTANCE OR REJECTION OF THE PLAN

Article 6 of the Plan discusses which Classes are impaired and which are not. Each Holder of a Claim or Equity Interest in an impaired Class is entitled to vote to accept or reject the Plan to the extent and in the manner provided in the Plan, the Confirmation Procedures Order and/or the Bankruptcy Code.

Classes 1, 2, 3, 4, 5, 6, 7, 8 and 11 of Claims and Equity Interests are unimpaired. Under Bankruptcy Code § 1126(f), the Holders of Claims and Equity Interests in such Classes are conclusively presumed to have voted to accept the Plan.

Section 6.4.1 of the Plan deals with confirmation in the event an impaired Class rejects the Plan. Impaired Equity Interests and/or impaired Classes of Claims that fail to accept the Plan may be "crammed down" in accordance with Bankruptcy Code § 1129(b). See also Section 7.2.1 of this Disclosure Statement for further discussion.

Section 6.4.2 of the Plan provides that if the Plan fails to be accepted by the requisite number and amount of the Holders of Claims and Equity Interests required to satisfy Bankruptcy

Code §§ 524(g) and 1129, then, notwithstanding any other provision of the Plan to the contrary, the Debtors reserve the right to amend the Plan.

## 4.7    IMPLEMENTATION OF THE PLAN

### 4.7.1    Corporate Governance of the Parent and the Other Debtors

Section 7.1 of the Plan provides that the Certificates of Incorporation or Articles of Incorporation, as applicable, of each of the Debtors that is a corporation shall be amended as of the Effective Date. The amended Certificates of Incorporation or Articles of Incorporation, as applicable, of the Debtors shall, among other things: (i) prohibit the issuance of nonvoting equity securities, (ii) as to any classes of securities possessing voting power, provide for an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in payment of such dividends, (iii) include, in the case of the Parent, restrictions on the transfer of the Parent Common Stock as necessary to protect the Reorganized Debtors' tax position, and (iv) effectuate any other provisions of the Plan.

Section 7.1 of the Plan also deals with amendments to the Parent's bylaws and the purchase of D&O and fiduciary liability tail coverage.

### 4.7.2    The Asbestos Trust

Section 7.2 of the Plan deals with the Asbestos Trust. It provides generally for the creation and funding of the Asbestos Trust, transfer of assets, Claims and Demands into the Asbestos Trust, appointment and termination of the Trustee and the TAC, and other administrative matters.

#### *Plan § 7.2.1    Creation of the Asbestos Trust*

Upon the entry of the Confirmation Order, effective as of the Effective Date, the Asbestos Trust shall be created as a "qualified settlement fund" in accordance with the Plan Documents.

The purpose of the Asbestos Trust shall be to, among other things: (i) assume the liabilities of the Debtors with respect to all Asbestos Claims (whether now existing or arising at any time hereafter), (ii) process, liquidate, pay and satisfy all Asbestos Claims in accordance with the Plan, the Asbestos Trust Agreement, the respective TDPs, the CMO, and the Confirmation Order and in such a way that provides reasonable assurance that the Asbestos Trust will value and be in a position to pay, present and future Asbestos Claims and to otherwise comply with Bankruptcy Code § 524(g)(2)(B)(i); (iii) preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Allowed Asbestos Claims; and (iv) otherwise carry out the provisions of the Asbestos Trust Agreement and any other agreements into which the Trustees have entered or will enter in connection with the Plan

53

*Plan § 7.2.2    Funding of the Asbestos Trust*

Effective on the Effective Date, Sealed Air shall fund the Sealed Air Payment into the Asbestos Trust in accordance with the Plan and the provisions of the Sealed Air Settlement Agreement. Effective on the thirty-first (31st) day after the Effective Date, the Parent shall transfer or cause the transfer of the Debtors' Payment into the Asbestos Trust in accordance with the Plan.

The Sealed Air Payment and that portion of the Debtors' Payment consisting of the Parent Common Stock, to the extent necessary, shall first fund the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund. The remainder of the Sealed Air Payment, if any, and the Warrants included as part of the Debtors' Payment shall fund the Asbestos PI-AO Class Fund.

In addition, in the event that the proceeds of the sale of Parent Common Stock following exercise of all of the Warrants are insufficient to pay all Allowed Asbestos PI-AO Claims in full, the Reorganized Debtors shall pay the Asbestos Trust in full and in Cash for the benefit of the Holders of such Claims, such payment to be made by the Reorganized Debtors on the first Business Day of the next calendar quarter after the date upon which the Asbestos PI-AO Claim becomes Allowed, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of such next calendar quarter, in which case the payment date shall be the first Business Day of the next succeeding calendar quarter.

Sections 7.2.3 through 7.2.9 of the Plan deal with:

- Transfer of assets into the Asbestos Trust;

- Transfer of Claims and Demands to the Asbestos Trust;

- Creation of Asbestos Trust sub-accounts;

- Appointment and termination of Trustees;

- Creation and termination of the TAC;

- The cooperation agreement between the Reorganized Debtors and the Asbestos Trust;

- Institution and maintenance of legal and other proceedings by the Asbestos Trust; and

- The Reorganized Debtors' sole right and authority to resolve Asbestos PI-AO Claims for which the Holder of such Asbestos PI-AO Claim elects the Litigation Option.

54

### 4.7.3  Payments and Distributions Under the Plan

Section 7.3 of the Plan sets forth the mechanics of Asbestos Trust payments and Plan Distributions. Among other things Section 7.3 provides that payments to Holders of Allowed Asbestos Claims shall be made by the Asbestos Trust in accordance with the Asbestos Trust Agreement, the respective TDPs and the CMO. All Distributions or payments required or permitted to be made under the Plan (other than to Professionals) shall be made by the Reorganized Debtors in accordance with the treatment specified for each such Holder as specified in the Plan (unless otherwise ordered by the Bankruptcy Court).

### 4.7.4  Delivery of Distributions and Undeliverable or Unclaimed Distributions

Section 7.4 of the Plan provides that payments by the Asbestos Trust to Holders of Allowed Asbestos Claims shall be made in accordance with the Asbestos Trust Agreement and the respective TDPs, while other Distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Claim as set forth on the Schedules unless superseded. Section 7.4 of the Plan also provides for a mechanism to deal with undeliverable Distributions.

### 4.7.5  Payments under the Plan

Section 7.5 of the Plan deals with the manner of payments under the Plan and provides a mechanism to deal with fractional payments.

### 4.7.6  Occurrence of the Confirmation Date

Section 7.6 of the Plan sets forth conditions precedent to confirmation of the Plan. The Court must make all of the findings of fact and/or conclusions of law listed in Section 7.6.1 before confirmation of the Plan. Among other things, these findings of fact and/or conclusions of law relate to: (1) the Court having found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than one billion, four hundred eighty three million dollars ($1,483,000,000), (2) the Court having found the Asbestos PI-AO Class Fund is not greater than one hundred thirty million dollars ($130,000,000), (3) compliance with all applicable subsections of Bankruptcy Code § 524(g), (4) effectiveness of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, (5) the unimpaired status of the classes of Asbestos Claims, (6) the effectiveness of the various injunctions provided for in the Plan, (7) insurance matters, and (8) the lack of preclusive effect of certain asbestos-related litigation.

Section 7.6.2 of the Plan requires certain orders - including the Confirmation Order, the CMO and an order approving the Sealed Air Settlement Agreement - all in form and substance acceptable to the Debtors be entered prior to or in conjunction with Plan confirmation. In addition, the Court shall have entered the Estimation Order in form and substance acceptable to the Debtors, including the following findings:

- the Asbestos PI-SE Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PI-SE Claims;

55

- the Asbestos PD Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PD Claims; and

- the Asbestos Trust Expenses Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all expenses of the Asbestos Trust.

### 4.7.7    Conditions to Occurrence of the Effective Date

Section 7.7 of the Plan sets forth conditions precedent to the Effective Date of the Plan, including entry of the Confirmation Order as specified, affirmation of the various injunctions specified in the Plan, filing of the necessary corporate documents, obtaining the necessary exit financing, and obtaining other various documents or agreements.

### 4.7.8    Management of the Reorganized Debtors

Section 7.8 of the Plan sets forth the post-confirmation governance of the Reorganized Debtors, including specifications relating to the Board of Directors of the Reorganized Parent.

### 4.7.9    Corporation Action

Section 7.9 of the Plan details corporate actions that must be taken in connection with the Plan.

### 4.7.10    Effectuating Documents and Further Transactions

Section 7.10 of the Plan authorizes each of the officers of the Debtors and the Reorganized Debtors to execute, deliver, file, or record such agreements or documents and to take such actions as may be necessary or appropriate, for and on behalf of the Debtors and the Reorganized Debtors, to effectuate the Plan.

### 4.7.11    Allocation of Plan Distributions Between Principal and Interest

Section 7.11 of the Plan allocates Plan Distributions between principal and interest.

### 4.7.12    No Successor Liability

Section 7.12 of the Plan provides the following: except as otherwise expressly provided in the Plan, the Debtors, the Reorganized Debtors, the Asbestos PI Committee, the Asbestos PD Committee, the FCR, and the Asbestos Protected Parties will not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any of the Debtors' past or present Affiliates, as such liabilities or obligations may relate to or arise out of the operations of or assets of the Debtors or any of the Debtors' past or present Affiliates or any of their respective successors, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date. Neither the Asbestos Protected Parties, the Reorganized Debtors, nor the Asbestos Trust is, or shall be, a successor to the Debtors or any of the Debtors' past or present Affiliates by reason of any theory of law or equity, and none shall

56

have any successor or transferee liability of any kind or character, except that the Reorganized Debtors and the Asbestos Trust shall assume the obligations specified in the Plan and the Confirmation Order.

Except as otherwise expressly provided in the Plan, effective automatically on the Effective Date, the Asbestos Protected Parties and their respective Representatives shall be unconditionally, irrevocably and fully released from any and all Claims and causes of action, including Claims and causes of action arising under Chapter 5 of the Bankruptcy Code or similar Claims or causes of action arising under state or any other law, including, if applicable, claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego-type claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtors (or any of their predecessors) or any of their respective businesses or operations that occurred or existed prior to the Effective Date.

### 4.7.13  Deemed Consolidation of the Debtors for Plan Purposes Only

Section 7.13 of the Plan provides for the substantive consolidation of the Debtors as follows: subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under the Plan for Plan purposes only. Each and every Claim Filed or to be Filed against any of the Debtors shall be deemed Filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors.

Such deemed consolidation, however, shall not (other than for purposes related to funding Distributions under the Plan and as set forth above in Section 7.13 of the Plan) affect: (i) the legal and organizational structure of the Debtors; (ii) any Encumbrances that are required to be maintained under the Plan (A) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed, (B) pursuant to the Plan, or (C) in connection with any Exit Financing; (iii) the Sealed Air Settlement Agreement; and (iv) the Fresenius Settlement Agreement.

Notwithstanding anything contained in the Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on any of the Claims (other than Asbestos Claims) being reinstated and left unimpaired under the Plan, and the legal, equitable, and contractual rights to which the Holders of any such Claims (other than Asbestos Claims) are entitled shall be left unaltered by the Plan.

### 4.8    Injunctions, Releases and Discharge

Section 7.12 and Article 8 of the Plan work together to shield the Debtors and certain other parties from any liability for any Claims dealt with under the Plan.

Article 8 of the Plan provides the following:

57

### 4.8.1  Discharge

#### *Plan § 8.1.1    Discharge of the Debtors and Related Discharge Injunction*

The rights afforded in the Plan and the treatment of all Claims, Demands and Equity Interests in the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims, Demands and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against the Debtors and the Debtors in Possession, or their assets, properties, or interests in property. Except as otherwise provided in the Plan, on the Effective Date, all Claims, Demands against, and Equity Interests in the Debtors and the Debtors in Possession shall be satisfied, discharged, and released in full. The Reorganized Debtors shall not be responsible for any obligations of the Debtors or the Debtors in Possession except those expressly assumed by the Reorganized Debtors pursuant to the Plan. All Entities shall be precluded and forever barred from asserting against the Debtors and the Reorganized Debtors, or their assets, properties, or interests in property any other or further Claims or Demands based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date, except as expressly provided in the Plan.

With respect to any debts discharged by operation of law under Bankruptcy Code §§ 524(a) and 1141, the discharge of the Debtors operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover, or offset any such debt as a personal liability of the Debtor, whether or not the discharge of such debt is waived.

#### *Plan § 8.1.2    Discharge of Liabilities to Holders of Asbestos Claims*

The transfer to, vesting in, and assumption by the Asbestos Trust of the Asbestos Trust Assets as contemplated by the Plan, among other things, shall (i) discharge the Debtors, the Reorganized Debtors and their Representatives for and in respect of all Asbestos Claims and (ii) discharge, release, and extinguish all obligations and liabilities of the Asbestos Protected Parties and Asbestos Insurance Entities for and in respect of all Asbestos Claims, subject to the reservations listed in Section 8.3.2 in the Plan. On the Effective Date, the Asbestos Trust shall assume the liabilities of the Debtors with respect to all Asbestos Claims and shall pay the Allowed Asbestos Claims in accordance with the Asbestos Trust Agreement and the appropriate TDPs.

#### *Plan § 8.1.3    Disallowed Claims and Disallowed Equity Interests*

On and after the Effective Date, the Debtors, the Reorganized Debtors and their Representatives shall be fully and finally discharged of any liability or obligation on a Disallowed Claim or Disallowed Equity Interest, and any order creating a Disallowed Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to Bankruptcy Code § 502 or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided in the Plan, or unless the Court orders otherwise, shall constitute an order disallowing all Claims (other than Asbestos Claims) to the

58

extent such Claims are not allowable under any provision of Bankruptcy Code § 502, including time-barred Claims, and Claims for unmatured interest.

*Plan § 8.1.4    Non-Dischargeable ERISA Liability*

The Parent is a controlled group member within the meaning of 29 U.S.C. § 1301(a)(14) and may also be a contributing sponsor of one or more ongoing, defined benefit pension plans to which Title IV of the Employee Retirement Income Security Act ("ERISA") applies (the "Pension Plans"). Nothing contained in the Plan, Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases shall be construed to discharge, release or relieve the Debtors, or any other party, in any capacity, from any liability or responsibility to the Pension Benefit Guaranty Corporation ("PBGC") with respect to the Pension Plans under any law, governmental policy, or regulatory provision. The PBGC shall not be enjoined or precluded from enforcing such liability or responsibility, as a result of any of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims), the Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases. Notwithstanding the foregoing, neither the PBGC nor any other Entity shall assert any liability or responsibility with respect to the Pension Plans under any law, governmental policy or regulatory provisions against, and such liability or responsibility shall not attach to, the Asbestos Trust or any of the Asbestos Trust Assets.

### 4.8.2    The Asbestos Channeling Injunction

In order to supplement, where necessary, the injunctive effect of the discharge provided by Bankruptcy Code §§ 1141, 524(a) and 105 and as described in Article 8 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code §§ 524(g) and 105(a), the Confirmation Order shall provide for issuance of the Asbestos Channeling Injunction to take effect as of the Effective Date. On and after the Effective Date, the sole recourse of the Holder of an Asbestos Claim on account of such Claim shall be to the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction and the appropriate TDPs and such Holder shall have no right whatsoever at any time to assert its Asbestos Claim against the Debtors, Reorganized Debtors, any other Asbestos Protected Party, or any property or interest (including any Distributions made pursuant to this Plan) in property of the Debtors, the Reorganized Debtors, or any other Asbestos Protected Party. Without limiting the foregoing, from and after the Effective Date, the Asbestos Channeling Injunction shall apply to all present and future Holders of Asbestos Claims, and all such Holders permanently and forever shall be stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Claims other than from the Asbestos Trust in accordance with the Asbestos Channeling Injunction and pursuant to the Asbestos Trust Agreement and the appropriate TDPs, including:

(a)    commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

59

(b)    enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(c)    creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(d)    setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party; and

(e)    proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the Asbestos Trust, except in conformity and compliance with the Asbestos Trust Agreement and the appropriate TDPs.

Notwithstanding anything to the contrary above, this Asbestos Channeling Injunction shall not enjoin the rights of Entities to the treatment accorded them under Article 3 of the Plan, as applicable, including the rights of Entities with Asbestos Claims to assert such Asbestos Claims in accordance with the appropriate TDPs.

Except as otherwise expressly provided in the Plan, the Sealed Air Settlement Agreement, or the Fresenius Settlement Agreement, nothing contained in the Plan shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtors, the Reorganized Debtors, or the Asbestos Trust may have against any Entity in connection with or arising out of or related to any Asbestos Claim.

### 4.8.3   Asbestos Insurance Entity Injunction

Pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code § 105(a), the Confirmation Order shall provide for issuance of the Asbestos Insurance Entity Injunction to take effect as of the Effective Date.

*Plan § 8.3.1   Injunction*

(a)    All Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim, Demand, or cause of action, against any Asbestos Insurance Entity, based upon, relating to, arising out of, or in any way connected with any Claim, Demand, Asbestos Insurance Rights, Asbestos Insurance Policies, or Asbestos Insurance Settlement Agreements, whenever and wherever arisen or asserted (including all Claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty) shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Claim, Demand, or cause of action, including:

60

K&E 9907839.25

(i)      commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

(ii)     enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

(iii)    creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

(iv)     setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity; and

(v)      proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the Asbestos Trust, except in conformity and compliance with the Asbestos Trust Agreement, the appropriate TDPs, and the appropriate Asbestos Insurance Settlement Agreements.

(b)      The Reorganized Debtors shall have the sole and exclusive authority at any time to terminate, reduce or limit the scope of, the Asbestos Insurance Entity Injunction as it may apply to any Asbestos Insurance Entity upon express written notice to that Asbestos Insurance Entity; and

(c)      The Asbestos Insurance Entity Injunction is not issued for the benefit of any Asbestos Insurance Entity, and no Asbestos Insurance Entity is or may become a third-party beneficiary of the Asbestos Insurance Entity Injunction.

*Plan § 8.3.2    Reservations from the Asbestos Insurance Entity Injunction*

Notwithstanding anything to the contrary above, the Asbestos Insurance Entity Injunction shall not enjoin:

(a)      the rights of any Entity to the treatment accorded it under the Plan;

(b)      the rights of any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to prosecute any cause of action or to assert any Claim, Demand, debt, obligation, or liability for payment against any Entity, including any Asbestos Insurance Entity, based on or arising from the Asbestos Insurance

61

Rights for the Debtors', Reorganized Debtors' or the Non-Debtor Affiliates' benefit; and

(c)     the rights of any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to receive any settlement, award, payment of Cash or other property of any kind whatsoever from any Entity, including any Asbestos Insurance Entity, in satisfaction of any Asbestos Insurance Rights that any of the Debtors, the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, may have against any of the foregoing.

### 4.8.4   Released Matters Injunction

Pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code § 105(a), the Confirmation Order shall provide for issuance of the Released Matters Injunction to take effect as of the Effective Date.

#### *Plan § 8.4.1   Injunction*

(a)     All Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim, Demand, or cause of action, against any Entity released under any provision of the Plan, shall be enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery on account of such released matters, including:

(i)     commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Entity released under any provision of the Plan, or any property or interest in property of any such released Entity;

(ii)     enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Entity released under any provision of the Plan, or any property or interest in property of any such released Entity;

(iii)     creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Entity released under any provision of the Plan, or any property or interest in property of any such released Entity; and

(iv)     setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Entity released under any provision of the Plan, or any property or interest in property of any such released Entity.

62

### *Plan § 8.4.2    Reservations from the Released Matters Injunction*

Notwithstanding anything to the contrary above, the injunction provided in Section 8.4.1 of the Plan shall not enjoin:

(a)    the rights of any Entity to the treatment accorded it under the Plan;

(b)    the rights of any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to prosecute any cause of action or to assert any Claim, Demand, debt, obligation, or liability for payment against any Entity, including any Asbestos Insurance Entity, based on or arising from the Asbestos Insurance Rights for the Debtors', Reorganized Debtors' or the Non-Debtor Affiliates' benefit; and

(c)    the rights any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to receive any settlement, award, payment of Cash or other property of any kind whatsoever from any Entity, including any Asbestos Insurance Entity in satisfaction of any Asbestos Insurance Rights that any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, may have against any of the foregoing.

#### 4.8.5    Term of Certain Injunctions and Automatic Stay

### *Plan § 8.5.1    Injunctions and/or Automatic Stays in Existence Immediately prior to Confirmation*

All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Cases, whether pursuant to Bankruptcy Code §§ 105, 362, or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to the Confirmation Date shall remain in full force and effect until the injunctions set forth in the Plan become effective, and thereafter if so provided by the Plan, the Confirmation Order, or by their own terms. In addition, on and after the Confirmation Date, the Reorganized Debtors may seek such further orders as they may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

### *Plan § 8.5.2    Injunctions Provided for in the Plan*

Each of the injunctions provided for in the Plan shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan. Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by such injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

63

#### 4.8.6    Additional Releases and Indemnification

##### *Plan § 8.6.1    Representatives of the Debtors*

###### *Plan § 8.6.1.1 Release of Representatives of the Debtors*

For good and valuable consideration, the receipt and sufficiency of which is acknowledged in the Plan, all Representatives of the Debtors will be released, as of the Effective Date, from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that any Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date for Claims or liabilities resulting from their services as Representatives of the Debtors or any of the Non-Debtor Affiliates to the extent such Claims or liabilities relate to the business, operations, or management of any of the Debtors prior to the Effective Date or any of the matters referred to in Section 11.8.  These releases are conditioned on the released Representatives giving a mutual release, except that such Representatives are not releasing Claims with respect to commercial obligations of the Debtors, any Claims for indemnification in favor of the released Representatives, or Claims for wages, fees, benefits, commissions and expenses.  Further, these releases are not intended to, and shall not, alter in any way the rights of the present and/or former officers and/or directors of the Parent, or of any of the other Debtors or Non-Debtor Affiliates, under the Parent's by-laws and/or certificate of incorporation, or any of the other Debtors' or Non-Debtor Affiliates' applicable bylaws and/or certificates of incorporation, whatever those rights, if any, may be.

###### *Plan § 8.6.1.2 Indemnification of Representatives of the Debtors and Non-Debtor Affiliates*

The Reorganized Debtors will defend, indemnify, and hold harmless to the fullest extent permitted by applicable law, all Representatives of the Debtors, and all Representatives of the Non-Debtor Affiliates, on and after the Effective Date for all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever that are purported to be released pursuant to Section 8.6.1(a) in the Plan.

##### *Plan § 8.6.2    Release of Sealed Air Indemnified Parties*

Upon receipt of the Sealed Air Payment (i) the Debtors, the Asbestos PD Committee and the Asbestos PI Committee shall execute and deliver the Release; (ii) the Government Plaintiff shall execute and deliver the Government Release; and (iii) the Asbestos PI Committee and the Asbestos PD Committee shall deliver the Fresenius Release, all as provided for and defined in the Sealed Air Settlement Agreement.  In addition, each of the Non-Debtor Affiliates shall irrevocably release, acquit, and forever discharge the Sealed Air Indemnified Parties from any and all Asbestos Claims and any and all Claims, on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, as that term is defined in the Sealed Air Settlement Agreement, that have accrued or been asserted or that hereafter might accrue or be asserted against the Sealed Air Indemnified Parties, and that each Non-Debtor

64

Affiliate shall not institute, participate in, maintain, maintain a right to or assert against the Sealed Air Indemnified Parties, either directly or indirectly, on its own behalf, derivatively, or on behalf of any other person any and all Asbestos Claims, and any and all Claims on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, as that term is defined in the Sealed Air Settlement Agreement.

The Debtors, the Reorganized Debtors and the Asbestos Trust shall defend, indemnify, and hold harmless each of the Sealed Air Indemnified Parties as provided in, and to the extent set forth in the Sealed Air Settlement Agreement, and the indemnification provisions set forth in the Sealed Air Settlement Agreement shall be binding on the Asbestos Trust with the same force and effect as if the Asbestos Trust was a party to the Sealed Air Settlement Agreement.

### Plan § 8.6.3    Release of Fresenius Indemnified Parties

Upon receipt of the Fresenius Payment, the Debtors, the Reorganized Debtors, the Asbestos PI Committee and the Asbestos PD Committee will fully, finally and forever release, relinquish and discharge each and every Fresenius Indemnified Party from any and all Grace-Related Claims, as that term is defined in the Fresenius Settlement Agreement, that the Debtors, the Reorganized Debtors, the Asbestos PI Committee or the Asbestos PD Committee have asserted or could have asserted in the Bankruptcy Court or any other forum against any of the Fresenius Indemnified Parties and the release that is attached as Appendix B to the Fresenius Settlement Agreement shall become effective.  Upon receipt of the Fresenius Payment, the Debtors and the Reorganized Debtors shall indemnify, defend and hold harmless the Fresenius Indemnified Parties as provided in and to the extent set forth in the Fresenius Settlement Agreement.

### Plan § 8.6.4    Specific Releases by Holders of Claims

Without limiting any other provisions of the Plan, each Holder of a Claim or Equity Interest who votes in favor of the Plan or receives or retains any property under the Plan shall be deemed to unconditionally have released the Asbestos Protected Parties, the Asbestos Insurance Entities, the Unsecured Creditors' Committee, the Asbestos PI Committee, the Asbestos PD Committee, the Equity Committee and the FCR, and each party's Representatives, as of the Effective Date from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date in any way relating or pertaining to, the Debtors or the Reorganized Debtors, the Chapter 11 Cases, or the negotiation, formulation, and preparation of the Plan or any related agreements, instruments, or other documents.

### Plan § 8.6.5    Approval of Sealed Air Settlement Agreement

The Confirmation Order shall constitute an order approving, as a compromise and settlement pursuant to Bankruptcy Code § 1123(b)(3)(A), the release of Sealed Air, the respective releases of each of the Reorganized Debtors and the Asbestos Trust contained in the

65

Sealed Air Settlement Agreement, and the execution and delivery of the Sealed Air Settlement Agreement which contains the foregoing releases.

### 4.9    CONTRACTS

Article 9 of the Plan sets forth provisions dealing with executory contracts, unexpired leases, letters of credit, surety bonds, guaranties, and certain indemnity agreements.

### 4.10    RETENTION OF JURISDICTION

Article 10 of the Plan provides that the Bankruptcy Court will retain exclusive jurisdiction over any matter (i) arising under the Bankruptcy Code, (ii) arising in or related to the Chapter 11 Cases or the Plan, or (iii) that relates to the matters enumerated in Article 10 provided that the District Court shall retain jurisdiction for such matters to which the automatic reference to the Bankruptcy Court has been withdrawn.

### 4.11    MISCELLANEOUS PROVISIONS

Article 11 of the Plan deals with a variety of miscellaneous matters including:

- authority of the Debtors
- payment of statutory fees
- provisions that must be included in the Plan according to the Fresenius Settlement Agreement and the Sealed Air Settlement Agreement
- dissolution of the Unsecured Creditors' Committee, the Asbestos PI Committee, the Asbestos PD Committee and the Equity Committee
- continued retention of the Future Claimants' Representative
- headings
- governing law
- filing of additional documents
- compliance with tax requirements
- further assurances
- further authorizations

The more significant sections of Article 11 of the Plan are:

*Plan § 11.3    Retained Causes of Action*

*Plan § 11.3.1    Maintenance of Causes of Action*

Nothing in Section 11.3 of the Plan shall be deemed to be a transfer by the Debtors and the Reorganized Debtors of any Claims, causes of action, or defenses relating to assumed executory contracts or otherwise which are required by the Reorganized Debtors to conduct their businesses in the ordinary course subsequent to the Effective Date. Moreover, except as

66

otherwise expressly contemplated by the Plan, the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement or other Plan Documents, from and after the Effective Date, the Reorganized Debtors shall have and retain any and all rights to commence and pursue any and all Claims, causes of action, including the Retained Causes of Action, or defenses against any parties, including Claimants and Holders of Equity Interests, whether such causes of action accrued before or after the Petition Date, including those Retained Causes of Action listed on Exhibit 11 in the Exhibit Book.

The Reorganized Debtors shall retain and may exclusively enforce any and all such Claims, rights or causes of action, including Retained Causes of Action, and commence, pursue and settle the causes of action in accordance with the Plan. The Reorganized Debtors shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and causes of action, including Retained Causes of Action, without the consent or approval of any third party and without any further order of the Court.

### Plan § 11.3.2  Preservation of Causes of Action

The Debtors are currently investigating whether to pursue potential causes of action against any Claimants or Entities. The investigation has not been completed to date, and, under the Plan, the Reorganized Debtors retain the right on behalf of the Debtors to commence and pursue any and all Retained Causes of Action. The potential causes of action currently being investigated by the Debtors, which may, but need not, be pursued by the Debtors before the Effective Date or by the Reorganized Debtors, after the Effective Date are described more fully in this Disclosure Statement. In addition, there may be numerous Unknown Causes of Action. The failure to list any such Unknown Causes of Action in the Plan, or on Exhibit 11 in the Exhibit Book, is not intended to limit the rights of the Reorganized Debtors to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtors.

### Plan § 11.3.3  Preservation of All Causes of Action not Expressly Settled or Released

Unless a Claim or cause of action against a Claimant or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such Claim or Retained Cause of Action (including any Unknown Causes of Action) for later adjudication by the Reorganized Debtors, as applicable. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Retained Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on this Disclosure Statement, the Plan or the Confirmation Order, except where such Claims or Retained Causes of Action have been released in the Plan or other Final Order. In addition, the Debtors, the Reorganized Debtors, and the successor entities under the Plan expressly reserve the right to pursue or adopt any Claim alleged in any lawsuit in which the Debtors are defendants or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.

K&E 9907839.25

Any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Debtors or the Reorganized Debtors, and may, if appropriate, be the subject of an action after the Effective Date, whether or not (i) such Entity has filed a proof of Claim against the Debtors in the Chapter 11 Cases; (ii) such Claimant's proof of Claim has been objected to; (iii) such Claimant's Claim was included in the Debtors' Schedules; or (iv) such Claimant's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as a Disputed Claim, a Contingent Claim, or an Unliquidated Claim.

### Plan § 11.4    Third-Party Agreements

The Distributions to the various classes of Claims in the Plan will not affect the right of any Entity to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto will remain in full force and effect.

### Plan § 11.8    Exculpation

None of the Reorganized Debtors, the Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties, the Trustees of the Asbestos Trust, the Asbestos Trust Advisory Committee, the Asbestos PI Committee, the Asbestos PD Committee, the Unsecured Creditors' Committee, the Equity Committee, the FCR, or any of their respective Representatives are to have or incur any liability to any Entity for any act or omission in connection with or arising out of the negotiation of the Plan or the settlement provided in the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, the pursuit of confirmation of the Plan, the consummation of the Plan or the settlement provided in the Sealed Air Settlement Agreement or Fresenius Settlement Agreement, or the administration of the Plan or the property to be distributed under the Plan. In all respects, they will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

### Plan § 11.9    Title to Assets; Discharge of Liabilities

Upon the transfer of the Sealed Air Payment into the Asbestos Trust, and the transfer of the Debtors' Payment into the Asbestos Trust, each such transfer shall be vested in the Asbestos Trust free and clear of all Claims, Equity Interests, Encumbrances, and other interests of any Entity. Except as otherwise provided in the Plan and in accordance with Bankruptcy Code § 1123(b)(3), on the Effective Date, title to all of the Debtors' assets and properties and interests in property, including the Retained Causes of Action, shall vest in the Reorganized Debtors free and clear of all Claims, Equity Interests, Encumbrances, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors.

### Plan § 11.10    Notices

Any notices, statements, requests, and demands required or permitted to be provided under the Plan, in order to be effective, must be: (i) in writing (including by facsimile

68

transmission), and unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made (A) if personally delivered or if delivered by facsimile or courier service, when actually received by the Entity to whom notice is sent, (B) if deposited with the United States Postal Service (but only when actually received), at the close of business on the third business day following the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, or (C) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid) (but only when actually received) and (ii) addressed to the appropriate Entity or Entities to whom such notice, statement, request or demand is directed (and, if required, its counsel), at the address of such Entity or Entities set forth in the Plan (or at such other address as such Entity may designate from time to time by written notice to all other Entities listed below in accordance with Section 11.10 of the Plan).

#### Plan § 11.15    Exemption from Transfer Taxes

Pursuant to Bankruptcy Code § 1146(c), the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan shall be exempt from all taxes as provided in Bankruptcy Code § 1146(c).

## 5.    LIMITED SUBSTANTIVE CONSOLIDATION

On the Effective Date, each of the Debtors' estates will be substantively consolidated pursuant to Bankruptcy Code § 105(a) for the limited purposes of allowance, treatment and Distribution under the Plan. As a result of the substantive consolidation, on the Effective Date, all property, rights and Claims of the Debtors will be deemed pooled for purposes of allowance, treatment and Distributions under the Plan.

As set forth in Section 7.13 of the Plan, the Plan does not contemplate the merger or dissolution of any Debtor which is currently operating or which currently owns operating assets or the transfer between Debtors or commingling of any assets of any Debtor. Such limited substantive consolidation will not affect (other than for Plan voting, treatment and/or Distribution purposes) (1) the legal and corporate structures of any Reorganized Debtor or (2) Equity Interests in Debtors other than the Parent.

As a result of substantive consolidation, a Holder of Claims against two or more of the Debtors arising from or relating to the same underlying debt that would otherwise constitute Allowed Claims against two or more Debtors, including Claims based on joint and several liability, contribution, indemnity, subrogation, reimbursement, surety, guaranty, co-maker and similar concepts, will have only one Allowed Claim on account of such Claims.

The Debtors believe that substantive consolidation is in the best interests of the Debtors' estates and will promote a more expeditious and streamlined distribution and recovery process for Claimants. In particular, substantive consolidation of the Debtors' estates will result in (1) the deemed consolidation of the assets and liabilities of the Debtors, (2) the deemed elimination of multiple and duplicative creditor Claims and joint and several liability Claims, and (3) the payment of Allowed Claims from a common pool of assets. Substantive consolidation

69

will relieve the Debtors from having to litigate creditor Claims against multiple Debtors on the same liability, as only one Claim will be deemed allowed and payable from one common pool of assets. The Debtors estimate that there have been 1,032 duplicate proofs of Claim filed against the Debtors' estates.

Substantive consolidation is an equitable doctrine that permits the Court to merge the assets and liabilities of affiliated entities so that the combined assets and liabilities are treated as though held by one entity. It is well established that Bankruptcy Code § 105(a), which provides, in pertinent part, that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," empowers a bankruptcy court to authorize substantive consolidation. The Bankruptcy Code also contemplates consolidation in aid of reorganization. See 11 U.S.C. § 1123(a)(5).

The Debtors have reviewed in detail the factors relevant to substantive consolidation and believe that the facts in the Chapter 11 Cases warrant substantive consolidation. Substantive consolidation is appropriate because Grace-Conn is the only Debtor that has substantial business, revenues and assets. The Debtors believe that the facts supporting substantive consolidation of the Debtors based on Debtors' corporate and management structure include, but are not limited to, the following: (i) the Parent is the ultimate parent and Grace-Conn is the operating parent company for the other Debtors as well as for the Non-Debtor Affiliates, and Grace-Conn directly or indirectly owns 100% of the Capital Stock of almost all of the Debtors; (ii) almost all of the directors and officers of the Debtors are directors, officers and/or employees of Grace-Conn.; (iii) under internal Grace guidelines, most major non-ordinary course transactions by the Debtors must be approved by the Parent's Board of Directors or members of senior management as well as by the other Debtors' Board of Directors; (iv) the Debtors file consolidated federal tax returns, and joint or combined tax returns in a number of states; and (v) the Debtors and the Non-Debtor Affiliates prepare and file consolidated financial statements and SEC filings.

Substantive consolidation is also appropriate because Grace-Conn manages the Debtors and Non-Debtor Affiliates, performs substantially all work related to the other Debtors and their assets, and pays substantially all their expenses. The Debtors believe that the facts supporting substantive consolidation of the Debtors based on Debtors' business operations include, but are not limited to, the following: (i) Grace-Conn owns substantially all of the assets, conducts substantially all of the business, and realizes substantially all of the revenues and earnings of the Debtors; (ii) most of the Debtors are corporations whose assets were sold and whose operations were terminated before the Petition Date; (iii) some of the Debtors own real property and immaterial amounts of other property; but only a few Debtors conduct any business or have their own employees or bank accounts; (iv) substantially all the administrative work done with respect to the Debtors (for example, maintenance of property, sale of assets, payment of taxes and other governmental fees and charges, accounting and legal services) are provided by Grace-Conn employees; and (iv) with the exception of a few Debtors with Cash on hand or revenue from business operations, leases, sales of property or intercompany loans, substantially all the expenses of the Debtors are paid by Grace-Conn.

Based upon the foregoing, the Debtors believe that the Parent and all of the other Debtors should be consolidated for Plan purposes.

70

## 6.    VOTING AND CONFIRMATION PROCEDURES

### 6.1    Voting Procedures

The voting procedures summarized in this Article 6 were established in the Confirmation Procedures Order.  You should carefully read the Confirmation Procedures Order.  It establishes, among other things: (1) the deadlines, procedures and instructions for voting to accept or reject the Plan, (2) the applicable standards for tabulating Ballots and Master Ballots, (3) the deadline for filing objections to confirmation of the Plan, and (4) the date and time of the Confirmation Hearing.

The Confirmation Procedures Order should be referred to if you have any questions concerning the procedures described herein.  If there are any inconsistencies or ambiguities between this Disclosure Statement and the Confirmation Procedures Order, the Confirmation Procedures Order will control.

#### 6.1.1    Voting Instructions and Deadline

If one or more of your Claims and/or Equity Interests is in a voting Class, you have obtained, or the Debtors' Voting Agent has sent you one or more Ballot(s) and/or Master Ballot(s) with return envelopes (WITHOUT POSTAGE ATTACHED) for voting to accept or reject the Plan.  The Debtors urge you to accept the Plan by completing, signing and returning the enclosed Ballot(s) in the return envelope(s) (WITH POSTAGE AFFIXED BY YOU) to the Voting Agent as follows:

**If by hand delivery/courier:**                          **If by U.S. mail:**

Bankruptcy Management Corporation            Bankruptcy Management Corporation
1330 E. Franklin Avenue                               P.O. Box 913
El Segundo, CA  90245                                 El Segundo, CA  90245-0913
Attn:  Grace Voting Agent                            Attn:  Grace Voting Agent

- TO BE COUNTED, THE VOTING AGENT MUST RECEIVE YOUR COMPLETED BALLOT AND/OR MASTER BALLOT <u>NO LATER THAN 4:00 P.M., EASTERN TIME, ON</u> [                    ], 2005 (THE "VOTING DEADLINE").  IF THE COURT EXTENDS OR WAIVES THE PERIOD DURING WHICH VOTES WILL BE ACCEPTED BY THE DEBTORS, THE TERM "VOTING DEADLINE" FOR SUCH SOLICITATION SHALL MEAN THE LAST TIME AND DATE TO WHICH SUCH SOLICITATION IS EXTENDED.

- ANY EXECUTED BALLOT OR COMBINATION OF BALLOTS REPRESENTING CLAIMS OR EQUITY INTERESTS IN THE SAME CLASS HELD BY THE SAME HOLDER THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN SHALL NOT BE COUNTED.

- ANY BALLOT OR MASTER BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED.

71

Detailed voting instructions are printed on and/or accompany each Ballot and/or Master Ballot. Any unsigned Ballot or Master Ballot, or any Ballot or Master Ballot without an original signature, including any Ballot or Master Ballot received by facsimile or other electronic means, or any Ballot or Master Ballot with only a photocopy of a signature, will not be counted. Any Ballot or Master Ballot that is properly completed and timely received will not be counted if such Ballot or Master Ballot was sent in error to, or by, the voting party, because the voting party did not have a Claim or Equity Interest that was entitled to be voted in the relevant voting Class as of the Voting Record Date.

Whenever a Holder of a Claim or Equity Interest casts more than one Ballot or Master Ballot voting the same Claim prior to the Voting Deadline, the last valid Ballot or Master Ballot physically received by the Voting Agent prior to the Voting Deadline will be deemed to reflect the voter's intent and thus will supersede and replace any prior cast Ballot(s) or Master Ballot(s) and any prior cast Ballot(s) or Master Ballot(s) will not be counted. The Debtors, without notice, subject to contrary order of the Court, may waive any defect in any Ballot or Master Ballot at any time, either before or after the close of voting, and without notice. Such determinations will be disclosed in the voting report and any such determination by the Debtors will be subject to de novo review by the Court.

### 6.2    Confirmation Procedures

#### 6.2.1    Confirmation Hearing

Bankruptcy Code § 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Bankruptcy Code § 1128(b) provides that any party-in-interest may object to confirmation of the Plan.

The Bankruptcy Court has set the Confirmation Hearing for [____:____ ___. m.], Eastern Time on [_____, 2005], in the United States Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned, from time to time, without notice, other than an announcement of an adjourned date at such hearing or an adjourned hearing, or by posting such continuance on the Bankruptcy Court's docket.

#### 6.2.2    Objections to Confirmation of the Plan

Any objections to confirmation of the Plan must be in writing (with proposed changes to the Plan being marked for changes, i.e., blacklined against the Plan), and must be filed with the Clerk of the Bankruptcy Court with a copy to the Bankruptcy Court's chambers, together with a proof of service thereof, and served on counsel for the Debtors and the Office of the United States Trustee ON OR BEFORE [_____] at 5:00 P.M., Eastern Time. Bankruptcy Rule 3020 governs the form of any such objection.

72

**Counsel on whom objections must be served are:**

**Counsel for the Debtors:**
Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, Illinois 60601
Attn:   Jonathan Friedland
        Ryan B. Bennett
and

Kirkland & Ellis LLP
777 South Figueroa Street, 37th Floor
Los Angeles, California 90017
Attn:   Bennett L. Spiegel
        Lori Sinanyan

**Co-Counsel for the Debtors:**
Pachulski, Stang, Ziehl, Young, Jones &
Weintraub P.C.
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (courier 19801)
Attn:   Laura Davis Jones
        David W. Carickhoff, Jr.

**Counsel for Asbestos PD Committee:**
Bilzin Sumberg Baena Price & Axelrod LLP
200 South Biscayne Blvd., Suite 2500
Miami, FL 33131-2336
Attn:   Scott L. Baena
        Jay Sackalo

**Counsel for the United States Trustee:**
Office of the United States Trustee
844 N. King Street, Second Floor
Wilmington, Delaware 19801
Attn:   Frank Perch

**Counsel for Equity Committee:**
Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, NY 10022
Attn:   Phillip Bentley
        Gary M. Becker

**Counsel for Unsecured Creditors'
Committee:**
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982
Attn:   Lewis Kruger
        Arlene Krieger
        Kenneth Pasquale

**Counsel for Asbestos PI Committee:**
Caplin & Drysdale, Chartered
One Thomas Circle NW, Suite 1100
Washington, D.C. 20005
Attn:   Peter Van N. Lockwood

**Counsel for Future Claimants' Representative:**
Swidler, Berlin, Shereff, Friedman LLP
The Washington Harbour
3000 K Street, NW, Suite 300
Washington, DC 20007
Attn:   Roger Frankel

UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED UPON THE
DEBTORS AND PROPERLY FILED WITH THE BANKRUPTCY COURT, IT WILL NOT
BE CONSIDERED BY THE BANKRUPTCY COURT.

### 6.2.3    Questions About the Disclosure Statement, Plan, or Ballots and Master Ballots

You may address any questions you have about this Disclosure Statement, the Plan or
your Ballot(s) to general bankruptcy counsel for the Debtors:

73

| Jonathan | | P. | Friedland |
|----------|---|----|-----------|
| Ryan B. Bennett | | | |
| Kirkland & | | Ellis | LLP |
| 200 | E. | Randolph | Drive |
| Chicago, | | Illinois | 60601 |
| Tel.:   (312) | | | 861-2000 |
| Fax:   (312) | | | 861-2200 |

## 7.   REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### 7.1    Bankruptcy Code § 1129 Generally

At the Confirmation Hearing, the Court will determine whether the confirmation requirements of Bankruptcy Code § 1129 have been satisfied. If so, the Court will enter the Confirmation Order. The Debtors believe that the Plan satisfies or will satisfy the applicable requirements for confirmation, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code. See 11 U.S.C. § 1129(a)(1).

- The Debtors, as proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code. See 11 U.S.C. § 1129(a)(2).

- The Plan has been proposed in good faith and not by any means forbidden by law. See 11 U.S.C. § 1129(a)(3).

- Any payment made or promised by the Debtors, or by an Entity acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Court as reasonable. See 11 U.S.C. § 1129(a)(4).

- The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of Claimants and Equity Holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider. See 11 U.S.C. § 1129(a)(5).

- With respect to each Class of impaired Claims or Equity Interests, either each Holder of a Claim or Equity Interest of such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated on such date under chapter 7

74

of the Bankruptcy Code; or if Bankruptcy Code § 1111(b)(2) applies to the Claims of such Class, each Holder of a Claim will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such Holder's interest in the Debtors' estates' interest in the property that secures such Claims. See 11 U.S.C. §1129(a)(7).

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code. (See Disclosure Statement Sections 7.7.1 & 7.2.1.) See 11 U.S.C. § 1129(a)(8).

- Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Administrative Expense Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as reasonably practicable thereafter, and that Allowed Priority Tax Claims will receive, on account of such Allowed Claims, payment in full on the Effective Date or as reasonably practicable thereafter, or deferred Cash payments plus interest, over a period not exceeding six years after the date of assessment of such Claim, of a value, as of the Effective Date, equal to the Allowed amount of such Claim. See 11 U.S.C. § 1129(a)(9).

- At least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class. See 11 U.S.C. § 1129(a)(10).

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See 11 U.S.C. § 1129(a)(11).

- The Plan must provide that the quarterly fees required under 28 U.S.C. § 1930 have been paid or that they will be paid on the Effective Date of the Plan. See 11 U.S.C. § 1129(a)(12).

- The Plan must provide for the continuation after the Effective Date of payment of all retiree benefits (as that term is defined in Bankruptcy Code § 1114) at the level established pursuant to Bankruptcy Code § 1114(e)(1)(B) or § 1114(g), at any time prior to confirmation of the Plan, for the duration of the period the Debtor has obligated itself to provide such benefits. See 11 U.S.C. § 1129(a)(13).

Bankruptcy Code § 524(g) further provides that, in order for the Asbestos Channeling Injunction to be enforceable, the Plan must provide for a section 524(g) trust that will, among other things:

- assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property damage

75

actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products; <u>see</u> Bankruptcy Code § 524(g)(2)(B)(i)(I)

- be funded in whole or in part by the securities of one (1) or more debtors involved in the Plan and by the obligation of such debtor or debtors to make future payments, including dividends; <u>see</u> Bankruptcy Code § 524(g)(2)(B)(i)(II)

- own, or by the exercise of rights granted under the Plan would be entitled to own if specified contingencies occur, a majority of the voting shares of -

  - each such debtor;

  - the parent corporation of each such debtor; or

  - a subsidiary of each such debtor that is also a debtor; <u>see</u> Bankruptcy Code § 524(g)(2)(B)(i)(III) and

- is to use its assets or income to pay Claims and Demands; <u>see</u> Bankruptcy Code § 524(g)(2)(B)(i)(IV).

The Debtors believe that the Plan satisfies all of the statutory requirements of Bankruptcy Code §§ 1129 and 524(g).

### 7.2    Vote Required for Class Acceptance

The Bankruptcy Code defines acceptance of a plan by a class of *claims* as acceptance by holders of two-thirds in dollar amount and more than one-half in number of the claims of that class which actually cast ballots for acceptance or rejection of the plan, i.e., acceptance takes place only if two-thirds in amount and a majority in number of the holders of claims in a given class actually voting cast their ballots in favor of acceptance. The Bankruptcy Code defines acceptance of a plan by a class of *equity interest holders* as acceptance by holders of two-thirds in amount of the interests of that class which actually cast ballots for acceptance or rejection of the plan.

Bankruptcy Code § 524(g) further provides that any separate class or classes of the claimants whose claims are to be addressed by a section 524(g) trust must vote, by at least 75 percent of those voting, in favor of the plan.

If a plan is confirmed, then holders of Claims against, or equity interests in, the debtor, whether voting or non-voting and, if voting, whether accepting or rejecting the Plan, are bound by the terms of the plan, including any injunction(s) under Bankruptcy Code §§ 524(g) and/or 105(a).

### 7.2.1   Cramdown

Generally, under the Bankruptcy Code, a plan of reorganization must be approved by each impaired class of creditors. The Court, however, may confirm a plan that has not been

76

approved by each impaired class if at least one impaired class accepts the plan by the requisite vote and the Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to each class that is impaired and has not accepted the plan. This is often referred to as "cramming down" on a Class.

A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if each dissenting class is treated equally with other classes of equal rank. The phrase "fair and equitable" has different meanings depending on whether it is being used with respect to the treatment of secured Claims, unsecured Claims and equity interests.

As set forth in Bankruptcy Code § 1129(b)(2), the condition that a plan of reorganization be fair and equitable with respect to a class includes the following requirements:

(A)     With respect to a class of secured claims, the plan provides—

    (i)     (I)     that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

        (II)     that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

    (ii)     for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

    (iii)     for the realization by such holders of the indubitable equivalent of such claims.

(B)     With respect to a class of unsecured claims—

    (i)     The plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

    (ii)     The holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

(C)     With respect to a class of interests—

    (i)     The plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of

77

the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(ii)     The holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

In the event one or more Classes of impaired Claims or Equity Interests rejects the Plan, the Debtors reserve the right to proceed with confirmation pursuant to Bankruptcy Code § 1129(b), and the Court will determine, at the Confirmation Hearing, whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired Class of Claims or Equity Interests.

### 7.3     Feasibility of the Plan

To confirm the Plan, the Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by Bankruptcy Code § 1129(a)(11) and is referred to as the "feasibility" requirement. The Debtors believe that they will be able to timely perform all obligations described in the Plan and, therefore, that the Plan is feasible.

The Debtors filed their original Schedules and Statements of Financial Affairs on June 1, 2001 (the "SOFA"). The Debtors filed amendments and supplements to the SOFA on August 19, 2001, September 3, 2002 and February 11, 2003.

The Debtors have filed Monthly Operating Reports since the Petition Date and the Parent regularly files form 10-Ks, 10-Qs, and 8-Ks with the SEC which are available at www.grace.com or www.sec.gov. Summary Financial Information of Grace for the fiscal years ended December 31, 2001, December 31, 2002 and December 31, 2003 is included in the Exhibit Book as part of the Financial Information. This summary Financial Information reflects, on a consolidated basis, the activities of the Debtors and certain Non-Debtor Affiliates.

To demonstrate the feasibility of the Plan, the Debtors have prepared the proforma and prospective financial information for the Reorganized Debtors and the Non-Debtor Affiliates that is outlined in Exhibit 4 in the Exhibit Book, with such information presented on a consolidated basis for the fiscal years 2004, 2005 and 2006 taking into account the anticipated financial impact of the Plan. Claimants are advised to review these documents to fully understand the assets and liabilities of the Reorganized Debtors and the Non-Debtor Affiliates. The Reorganized Debtors and the Non-Debtor Affiliates have used their books and records, knowledge and experience, and opinions of accountants and counsel to provide the financial and other business-related information set forth in this Disclosure Statement.

As explained more fully in Article 5 herein, each of the Debtors' estates will be substantively consolidated pursuant to Bankruptcy Code § 105(a) for the limited purposes of allowance, treatment and distributions under the Plan. As a result of the substantive

78

consolidation, on the Effective Date, all property, rights and Claims of the Debtors will be deemed pooled for purposes of allowance, treatment and Distributions under the Plan.

The Financial Information has been prepared in conformity with U.S. generally accepted accounting principles ("GAAP") consistent with those currently utilized by Grace in the preparation of its consolidated financial statements except as otherwise noted. However, the proforma and prospective financial information has not been audited by registered independent public accountants.

The proforma and prospective financial information are based upon a variety of assumptions subject to significant business, economic and competitive uncertainties, contingencies and risks, many of which are beyond the control of the Debtors. Consequently, the proforma and prospective financial information should not be regarded as a representation or warranty by the Debtors or by any other Entity that the proforma or prospective financial information or measures will be realized. Such information should not be relied upon in making any investment decisions with respect to Parent Common Stock or otherwise. Actual results may vary materially from those presented and the variations may be adverse.

### 7.4    Best Interests Test

Bankruptcy Code § 1129(a)(7) requires that even if a plan is accepted by a class of creditors or equity interest holders, the Bankruptcy Court must nonetheless determine that the plan is in the "best interests" of any class of creditors or equity interest holders that are impaired by the plan. The "best interests" test requires that the Bankruptcy Court find either that (i) all members of an impaired class have accepted the plan or (ii) the plan will provide the holder of a Claim or Equity Interest in such class a distribution of a value, as of the effective date of the plan, that is at least equal to what such holder would receive in a hypothetical liquidation of the debtor under Chapter 7 of the Bankruptcy Code. The Best Interests Analysis can be found in Exhibit 3 in the Exhibit Book and shows that Holders of General Unsecured Claims would receive an estimated Distribution of 54% - 89% on their Claims under a Chapter 7 liquidation while such Holders would receive an estimated 100% Distribution under Chapter 11.

### 7.5    Information about Corporate Governance, Officers, and Directors of the Reorganized Debtors, and the Management of the Debtors

#### 7.5.1    Corporate Governance; Limitation of Director Liability

The Certificate of Incorporation or Articles of Incorporation, as applicable, of each of the Debtors that is a corporation will be amended as of the Effective Date to among other things, (i) prohibit the issuance of nonvoting equity securities as required by Bankruptcy Code § 1123(a)(6), and be subject to further amendment as permitted by applicable law, (ii) as to any classes of securities possessing voting power, provide for an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in payment of such dividends, (iii) include, in the case of the Parent, restrictions on the transfer of Parent Common Stock as necessary to protect the Reorganized Debtors' tax position, and (iv) effectuate any other provisions of the Plan. The amended Certificates of Incorporation or Articles of

79

Incorporation, as applicable, will be filed with the Secretary of State or equivalent official in their respective jurisdictions of incorporation on or prior to the Effective Date and be in full force and effect without any further amendment as of the Effective Date.

The restrictions on stock transfers in order to protect the Reorganized Debtors' tax position will include a three (3) year prohibition, waivable by the Parent's Board of Directors, on (i) any Entity other than the Asbestos Trust acquiring after the Effective Date an amount of shares of the Parent Common Stock that would cause such Entity to become a Holder of 4.75% or more of the Parent Common Stock, and (ii) any Entity that as of the Effective Date holds 4.75% or more of the Parent Common Stock from increasing its ownership of the Parent Common Stock. In addition, any Parent Common Stock held by the Asbestos Trust will not be transferable for a period of at least three (3) years after the Effective Date. Other restrictions will apply with respect to the Warrants held by the Asbestos Trust, including a prohibition on the Asbestos Trust exercising an amount of Warrants greater than 50% of its total Warrants for a period of at least three (3) years after the Effective Date.

### 7.5.2  Management Compensation and Incentive Program

Pursuant to Bankruptcy Code § 1129(a)(5), the Debtors will disclose, prior to the Confirmation Hearing, the identity of any individuals proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors and, if that person is an insider, the nature of any compensation for such insider.

Currently, the total compensation package that the Debtors' directors, officers and key employees receive includes base salary, annual bonus opportunities, long-term Cash incentives and other benefits. Certain officers and employees are also beneficiaries of a key employee retention program.

It is anticipated that the total compensation for the Debtors' directors, officers and key employees after confirmation will continue to include base salary, annual bonus and long term stock and Cash incentives and other benefits in accordance with the ordinary business policies of the Debtors.

In addition, the Reorganized Debtors will institute a Management Stock Incentive Program that will offer certain directors, officers, and key management employees benefits, which will become payable upon specified events. The terms of the anticipated Management Stock Incentive Program are outlined in Exhibit 16 in the Exhibit Book.

### 7.5.3  Prospective Officer and Director Insurance

Pursuant to the Section 7.1.3 of the Plan, the Reorganized Debtors will obtain sufficient tail coverage for a maximum period of six years under both directors' and officers' insurance policies and fiduciary liability policies, which will cover the Debtors, as well as the Debtors' current and former officers, directors, and employees. The Debtors have determined that this insurance is necessary to protect the releases provided in the Plan. Further, pursuant to Section 8.5.1 of the Plan, the Reorganized Debtors have an obligation to indemnify these parties for certain payments covered by the tail insurance. Therefore, without such insurance, if the

80

Debtors' current and/or former directors, officers and/or employees were sued after the Effective Date, the Reorganized Debtors could be required to satisfy such indemnification claims.

## 8.   IMPORTANT CONSIDERATIONS AND RISK FACTORS

### 8.1   General

The following provides a summary of various important considerations and risk factors associated with the Plan. However, it is not exhaustive. In considering whether to vote for or against the Plan, Holders of Claims or Equity Interests should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced in this Disclosure Statement.

### 8.2   Certain Bankruptcy and Mass Tort Law Considerations

#### 8.2.1   Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests

Bankruptcy Code § 1122 provides that a plan of reorganization may place a class or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created eleven classes of Claims and Equity Interests, each encompassing Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such class. For example, Class 1 comprises all Claims accorded priority in right to payment under Bankruptcy Code § 507(a) other than Priority Tax Claims or Administrative Claims. There can be no assurance, however, that the Bankruptcy Court will reach the same conclusion.

#### 8.2.2   A Delay in Plan Confirmation May Disrupt Grace's Operations and Have Potential Adverse Effects of Prolonged Confirmation Process

A prolonged confirmation process could adversely affect the Debtors' relationships with their customers, suppliers, and employees, which, in turn, could adversely affect the Debtors' competitive position, financial condition, and results of operations. Such developments could, in turn, adversely affect the price of the Parent Common Stock, and hence the value to Holders of Equity Interests and the value of assets available to satisfy Holders of Allowed Claims.

#### 8.2.3   The Debtors May Not Be Able to Secure Confirmation or Consummation of the Plan

There can be no assurance that the Plan will be accepted by the required number of Claimants who hold a sufficient amount of Claims and Equity Interests. Although the Debtors believe that the Plan will satisfy all requirements necessary for Confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes. There is no assurance that the Court will approve the Plan as satisfying the requirements of Bankruptcy Code § 1129.

81

Notwithstanding Court approval, it is possible that the Plan may not be consummated because of other external factors that may adversely affect the implementation of the Plan.

### 8.2.4    There is a Risk of Post-Confirmation Default

At the Confirmation Hearing, the Court will be required to make a judicial determination that the Plan is feasible, but that determination does not serve as any guarantee that there will not be any post-confirmation defaults. The Debtors believe that the cash flow generated from operations and insurance proceeds will be sufficient to meet Reorganized Grace's operating requirements, its obligations under the Exit Financing, and other post-confirmation obligations under the Plan. Reorganized Grace's projected operating cash flow is set forth in the Debtors' prospective financial information that is included as Exhibit 4 in the Exhibit Book.

### 8.2.5    The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan and the Final DIP Order (Docket No. 194), the Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest deemed Allowed under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is subject to an objection. Any Holder of a Claim may not receive its specified share of the estimated distributions described in this Disclosure Statement.

### 8.2.6    The Potential Impact of Pending Asbestos Legislation Is Uncertain

Legislation currently is pending before the United States Congress that, if enacted, could affect the rights and obligations of companies with asbestos liabilities. The exact terms of the legislation are still the subject of negotiation, however, and it is uncertain how, if at all, such legislation would impact the Debtors, Holders of Claims, Holders of Equity Interests, or any other parties that may be affected by the Chapter 11 Cases.

### 8.2.7    Exemption from Registration Requirements of Applicable Federal Securities Laws May Not Be Available

There are several securities law considerations that parties should bear in mind. These are discussed at length in Article 11 of this Disclosure Statement.

### 8.3    Factors Affecting the Distributions to Holders of Allowed Claims After the Effective Date

### 8.3.1    The Debtors Disclaim Accuracy of Financial Information Provided

Although the Debtors have used their reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, some of the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

82

### 8.3.2   Variance from the Proforma and Prospective Financial Information

The Debtors' management currently believes that (i) the proforma financial information included as Exhibit 4 in the Exhibit Book is a reasonable presentation of the accounting effects of the Plan, as if the Plan were in effect at the end of, and for, the periods presented; and (ii) the prospective financial information included in the Exhibit Book is a reasonable estimate of the collective future of the Reorganized Debtors and the Non-Debtor Affiliates. Unanticipated events and circumstances occurring subsequent to the preparation of the Reorganized Debtors' and the Non-Debtor Affiliates' collective proforma and prospective financial information may affect the actual accounting effects of the Plan and/or the actual financial results of Reorganized Grace. Although the Debtors' management believes that the accounting effects of the Plan reflected in Reorganized Grace's proforma financial information, and the performance reflected in Reorganized Grace's prospective financial information, are reasonable and attainable, some or all of the estimates may differ from actual results, and the actual proforma effects, and/or the actual future financial results, may be materially worse than the estimated effects and results.

In particular, the proforma and prospective financial information included in the Exhibit Book are each based upon numerous assumptions regarding (1) the confirmation and consummation of the Plan in accordance with its terms, (2) the anticipated future performance of Reorganized Grace, (3) the tax consequences of the Plan, (4) general business and economic conditions, (5) certain other matters, many of which are beyond the control of the Debtors. There is no assurance that such assumptions will prove to be valid. The effect of any variance from the proforma and prospective financial information may be material and adverse.

### 8.3.3   Risk that Amounts of Allowed Claims Will Exceed the Debtors' Projections

The Allowed Amount of Administrative Expense Claims, Priority Tax Claims, and Claims in Class 1, Class 2, Class 3, Class 4, Class 5, and Class 9 could be more than projected, which, in turn, would impair the value of Parent Common Stock.

### 8.3.4   Risk Regarding the Solvent Insurance Carriers

Grace's ultimate recovery of insurance proceeds may be effected by the financial status of the remaining solvent insurance carriers and the number, nature and amount of individual Allowed Asbestos Claims.

### 8.4   Factors Affecting the Parent Common Stock

The Parent Common Stock is traded on the New York Stock Exchange (Ticker: GRA). Pursuant to the provisions of the Plan, that common stock will not be cancelled and will remain outstanding (although Equity Interests will be impaired by the issuance of additional shares and Warrants, and will thus be entitled to vote on the Plan).

The estimate of the range of the reorganized equity value set forth in Section 2.8 (Estimated Value of the Reorganized Debtors and Non-Debtor Affiliates) of this Disclosure Statement or elsewhere in the Plan Documents does not purport to be an estimate reflective of the pre- or post-reorganization trading value of the Parent Common Stock. The estimate

83

reflective of the range of the fully diluted reorganized equity value per share ascribed herein, or elsewhere in the Plan Documents, may or may not correlate with the actual trading price (if any) of Parent Common Stock on the New York Stock Exchange. It represents hypothetical reorganized values based on numerous assumptions. The estimated values set forth herein do not necessarily reflect values that could be attainable in public or private markets, and do not consider market trading characteristics, trading limitations possibly imposed on the Parent Common Stock, or perceptions in public or private markets about the Reorganized Debtors and/or Non-Debtor Affiliates that may affect the trading price of Parent Common Stock.

### 8.4.1    The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results

The Reorganized Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that they have assumed in projecting future business prospects. If the Reorganized Debtors do not achieve these projected revenue or cash flow levels, they may lack sufficient liquidity to continue operating as planned after the Effective Date. The Debtors' financial projections represent management's view based on current known facts and hypothetical assumptions about the Reorganized Debtors' future operations. However, the Projections set forth herein do not guarantee the Reorganized Debtors' future financial performance.

### 8.4.2    The Reorganized Debtors May Not Be Able to Meet Post-Reorganization Debt Obligations and Finance All Operating Expenses, Working Capital Needs and Capital Expenditures

To the extent the Reorganized Debtors are unable to meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may be unable to service their debt obligations as they come due or to meet the Reorganized Debtors' operational needs. Such a failure may preclude the Reorganized Debtors from developing or enhancing their products, taking advantage of future opportunities, growing their business or responding to competitive pressures.

### 8.4.3    Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors

Holders of Claims should carefully review Article 10 (Federal Income Tax Consequences of the Plan) to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Reorganized Debtors.

### 8.5    Factors Associated with the Business

There are many business factors that create risks for the Debtors' current business operations, as well as Reorganized Grace's future operations. These risks include the following:

- loss of senior management and other key employees;

- greater than expected liabilities for environmental remediation;

84

- a decline in worldwide oil consumption or the development of new methods of oil refining;

- increases in the price of raw materials and energy costs;

- consolidation of major customers, which could increase customer purchasing power, thereby putting pressure on operating profits;

- inability to gain customer acceptance, or slower than anticipated acceptance, of new products or product enhancements;

- changes in environmental regulations or societal pressures that make Grace's business operations more costly or that change the types of products used by customers, especially petroleum-based products;

- slower than anticipated economic advances in less developed countries;

- foreign currency devaluations in developing countries or other adverse changes in currency exchange rates (in particular, the U.S. dollar to Euro exchange rate);

- technological breakthroughs rendering a product, a class of products, or a line of business obsolete;

- inability to adapt to continuing technological improvements or operating strategies by competitors or customers;

- inability to adapt to other improvements made by direct or indirect competitors;

- acquisition (through theft or other unlawful means) or use by others of Grace's proprietary technology and other know-how; and

- an adverse change in relations with employees and/or labor unions.

### 8.5.1   Reorganized Grace May Not Obtain Post-Confirmation Financing

The Plan envisions that Reorganized Grace will obtain Exit Financing. There is no guarantee that Reorganized Grace will be able to obtain such Exit Financing, or obtain it on the terms contemplated by the proforma and prospective financial information.

## 8.6   Factors Affecting the Asbestos Trust

### 8.6.1   Risk that the Asbestos Trust Will not be Able to Pay All Allowed Claims

Even if the Plan is confirmed and consummated, Claimants and Holders of Equity Interests should be aware of certain risks associated with confirmation and the ability of the Debtors to perform under the Plan. The Plan provides that the Asbestos Trust will pay all Allowed Asbestos Claims. The Plan further provides that the Asbestos Trust will be funded by:

85

(1) $512.5 million in Cash, plus interest thereon from December 21, 2002 until the Effective Date, at a rate of 5.5% per annum compounded annually, from Sealed Air, (2) 9 million shares of Sealed Air Common Stock (subject to antidilution adjustments outlined in the Sealed Air Settlement Agreement), (3) Parent Common Stock in an amount to be determined, and (4) Warrants exercisable for additional Parent Common Stock, which, together with the Parent Common Stock being issued under the Plan, could represent, up to an aggregate of 50.1% of the voting shares of the Parent. There is no guarantee that the value of Sealed Air Common Stock or Parent Common Stock will not decline such that the Asbestos Trust will not be able to pay all Allowed Asbestos Claims, as provided in the Plan. Finally, the amount of Allowed Asbestos Claims could be significantly more than estimated by the Court.

### 8.6.2   Risk of Appointing Different Trustees for the Asbestos Trust

At the Confirmation Hearing, the Debtors will request that the Court appoint certain individuals to be designated prior to the Confirmation Hearing as the three initial Trustees of the Asbestos Trust. However, the Court may reject one or more of the proposed Trustees. If the Court rejects the nomination of a Trustee, another person would need to be designated, which may delay the Effective Date of the Plan. The selection of different Trustees also could impact administration of the Asbestos Trust.

### 8.7    Risk that the Information in this Disclosure Statement May be Inaccurate

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein. The Debtors may subsequently update the information in this Disclosure Statement, but they have no duty to update this Disclosure Statement unless ordered to do so by the Court. Further, the proforma and prospective financial information contained herein, unless otherwise expressly indicated, is unaudited. Finally, neither the SEC nor any other governmental authority has passed upon the accuracy or adequacy of this Disclosure Statement, the Plan, or any Exhibits in the Exhibit Book.

This financial information contains certain statements that are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements are subject to a number of assumptions, risks and uncertainties, many of which are beyond the control of the Debtors, including the implementation of the Plan, existing and future governmental regulations, the continuing availability of sufficient borrowing capacity or other financing to fund operations, currency exchange rate fluctuations, natural disasters, terrorist actions or acts of war, operating efficiencies, labor relations, actions of governmental bodies and other market and competitive conditions. Holders of Claims and/or Equity Interests are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements and the Debtors undertake no obligation to update any such statements.

86

## 9.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords the Holders of Claims and Equity Interests the potential for the greatest realization on their Claims and Equity Interests and, therefore, is in the best interest of such Holders. If the Plan is not confirmed, however, the theoretical alternatives include (1) continuation of the pending Chapter 11 Cases, (2) alternative plans of reorganization, or (3) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### 9.1   Continuation of the Chapter 11 Cases

If the Debtors remain in Chapter 11 and the Plan, as currently proposed, is not confirmed within the time period projected, the Debtors could continue to operate their businesses and manage their properties as Debtors in Possession. However, the value of assets and cash flow could be affected by the expenses of operating under Chapter 11 of the Bankruptcy Code for a further extended period of time. Such delay may significantly reduce the recoveries received by Claimants and Equity Interest Holders under any future plan of reorganization.

### 9.2   Alternative Plans of Reorganization

If the Plan is not confirmed, it is possible that any other party in interest in the Chapter 11 Cases could attempt to formulate and propose a different plan or plans on such terms, as they may desire. Such alternative plan would still have to meet the requirements of confirmation. The Debtors believe that the Plan proposed by the Debtors provides the best potential return to both the Debtors' Claimants and Equity Interest Holders.

### 9.3   Chapter 7 Liquidation

Bankruptcy Code § 1129(a)(7) requires that even if a plan is accepted by a class of creditors or equity interest holders, the Bankruptcy Court must nonetheless determine that the plan is in the "best interests" of any class of creditors or equity interest holders that are impaired by the plan. The "best interests" test requires that Bankruptcy Court find either that (i) all members of an impaired class have accepted the plan or (ii) the plan will provide the holder of a Claim or Equity Interest in such class a distribution of a value, as of the effective date of the plan, that is at least equal to what such holder would receive in a hypothetical liquidation of the debtor under Chapter 7 of the Bankruptcy Code.

In a hypothetical liquidation of the Debtors under Chapter 7, a trustee would be elected or appointed to liquidate the assets of the Debtors and the Non-Debtor Affiliates. This "liquidation value" would consist primarily of the proceeds from a sale of the assets of the Debtors and Non-Debtor Affiliates. The amount of the liquidation value available would be distributed first to secured Claimants, to the extent of the value of their collateral. Thereafter, any remaining funds would be distributed in accordance with the priorities of the Bankruptcy Code. The estimate of liquidation value available to Claimants and Equity Interest Holders would be further reduced by (i) the costs and expenses incurred as a result of the Chapter 7 liquidation, and (ii) Administrative Expense Claims and Priority Claims incurred in the Chapter 11 Cases allowed in the Chapter 7 case.

87

The Best Interests Analysis requires estimates of the net proceeds that may be generated as a result of a hypothetical Chapter 7 liquidation. Any such liquidation would necessarily take place in the future under circumstances that cannot be predicted; the amount of such proceeds is therefore highly speculative and could be significantly impacted as a result of the uncertainty that exists as to whether a Chapter 7 trustee could sell the assets free and clear of any Claims that could be asserted against the Debtors. The amount of proceeds available from the liquidation of other assets is an estimate that assumes conditions that may not be present at the time of the Chapter 7 liquidation.

The Debtors' liquidation analysis is included as a component of the "Best Interests Analysis," attached as Exhibit 3 in the Exhibit Book, was prepared by the Debtors with the assistance of Blackstone. Reference is made to the Best Interests Analysis for estimates of liquidation value, costs and expenses and claims amounts, and for a description of the procedures followed, the factors considered, and the assumptions made in preparing the analysis. In preparing the Best Interests Analysis, the Debtors have projected a range for the Amount of Allowed Claims based on a review of their Schedules and Filed proofs of claim. No order or finding has been entered estimating or fixing the amount of Claims. The actual amount of Claims against the estate could vary significantly from the Debtors' estimates. For all of the foregoing reasons, the actual net proceeds available to Holders of Allowed General Unsecured Claims and Holders of Equity Interests in the Parent could vary materially from the amounts in the Best Interests Analysis. The Best Interests Analysis can be found in Exhibit 3 in the Exhibit Book and shows that Holders of General Unsecured Claims would receive an estimated Distribution of 54% - 89% on their Claims under a Chapter 7 liquidation while such Holders would receive an estimated 100% Distribution under Chapter 11.

Based on its Best Interests Analysis, the Debtors believe that they have complied with the best interests test. Creditors and Holders of Equity Interests in the Parent are expected to receive under the Plan a distribution that is at least as much as they would receive in a hypothetical liquidation under Chapter 7 of the Bankruptcy Code.

## 10. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtors, the Reorganized Debtors, the Asbestos Trust, the Holders of Claims and the Holders of Equity Interests based upon the IRC, judicial authorities and current administrative rulings and practices now in effect, all of which are subject to change at any time by legislative, judicial or administrative action. Any such change could be retroactively applied in a manner that could adversely affect the Debtors, the Reorganized Debtors, the Asbestos Trust, Holders of Claims and Holders of Equity Interests. In particular, some of the consequences discussed herein are based on United States Department of Treasury regulations or IRS notices that have been proposed but not finalized, which regulations are particularly susceptible to change at any time.

The tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below. The Debtors have not requested a tax ruling from the IRS. The Debtors may obtain either (a) a private letter ruling establishing that the Asbestos Trust is a "qualified settlement fund" pursuant to Section 468B of the IRC, or (b) an opinion of counsel

88

regarding the tax consequences satisfactory to the Debtors and Sealed Air. However, there can be no assurance that the treatment set forth in the following discussion will be accepted by the IRS. Further, the federal income tax consequences to the Debtors, the Reorganized Debtors, the Asbestos Trust, and Holders of Claims and/or Equity Interests may be affected by matters not discussed below. For example, the following discussion does not address state, local or foreign tax considerations that may be applicable; further, it does not address the tax consequences of the Plan to certain types of Holders of Claims or Equity Interests, creditors and stockholders (including foreign persons, financial institutions, life insurance companies, tax-exempt organizations and taxpayers who may be subject to the alternative minimum tax) who may be subject to special rules not addressed herein.

The discussion set forth below is included for general information only. The Debtors and their counsel and financial advisors are not making any representations regarding the particular tax consequences of confirmation and consummation of the Plan, nor are they rendering any form of legal or tax advice on such tax consequences. The tax laws applicable to corporations in bankruptcy are extremely complex, and the following summary is not exhaustive. Holders of Claims and/or Equity Interests are strongly urged to consult their tax advisors regarding tax consequences of the Plan, including U.S. federal, state and local, and foreign tax consequences.

Except where essential to the context, references to the "Debtors" in Article 10 herein refer to both the Debtors and the Reorganized Debtors, collectively.

### 10.1    Federal Income Tax Consequences to the Debtors

#### 10.1.1  General Discussion

In general, the Debtors do not expect to incur any substantial tax liability as a result of implementation of the Plan, and do not expect to realize any significant amount of cancellation of indebtedness income. Upon consummation of the Plan, the Debtors expect to have an NOL available to offset future taxable income. The amount of that NOL is uncertain at this point, but is currently estimated to be approximately $348 million as of December 31, 2003. As discussed in Section 10.1.2 below, this NOL should be increased by the tax deductions received by the Debtors upon consummation of the Plan, which deductions should be based on the value of the consideration transferred by the Debtors in satisfaction of their tort, environmental and other liabilities. The actual amount of the NOL available to the Debtors after consummation of the Plan will depend on the value of those deductions, as well as the outcome of certain unresolved past tax liabilities and the mechanism by which the Debtors finance their bankruptcy emergence. As discussed in Section 2.5.3.2 of this Disclosure Statement, approximately one-third of the NOLs are currently subject to challenge by the IRS. The utilization of those NOLs may also be subject to certain annual limitations, as discussed in more detail below.

In order to ensure that the Debtors' NOL will continue to be available following emergence from bankruptcy, certain restrictions will be placed upon transfers of Parent Common Stock. In particular, without the consent of the Parent for a period of three years after emergence from bankruptcy, any Entity (other than the Asbestos Trust) who currently owns or controls more than 4.75% of the Parent Common Stock will be prohibited from increasing their ownership percentage, and any Entities (other than the Asbestos Trust) who do not own any Parent Common Stock or own or control less than 4.75% of the Parent Common Stock, will be

89

prohibited from increasing their ownership percentage of the Parent Common Stock to an amount equal to or greater than 4.75%. Further, the Asbestos Trust will be prohibited from selling the Parent Common Stock contributed to the Asbestos Trust for a period of three years after the Effective Date.

Certain restrictions will also be imposed on the exercise of the Warrants that the Debtors will contribute to the Asbestos Trust. The amount of Warrants that the Asbestos Trust will be able to exercise, for a period of three years after emergence, will be limited to approximately 1/2 of the Asbestos Trust's total Warrants. In addition, the Debtors will have the right, as necessary to protect the utilization of their NOLs, and to purchase Warrants from the Asbestos Trust for their fair market value, in lieu of permitting the exercise of such Warrants.

In connection with obtaining adequate capital to fund its operations upon emergence from bankruptcy, the Debtors may be required to take capital as a dividend from certain of its foreign subsidiaries. The receipt of these dividends would be taxable to the Debtors for U.S. income tax purposes, and could therefore have an adverse impact on the Debtors' tax planning. In addition, the Debtors or their Non-Debtor Affiliates may be forced to pledge some or all of their foreign assets as security in order to obtain Exit Financing, which may be treated as a deemed dividend for U.S. income tax purposes. Either of these actions could result in the Debtors being forced to realize a significant charge to earnings.

### 10.1.2 Deduction of Amounts Transferred to Satisfy Asbestos Claims

The tax treatment of transfers of property by the Debtors to the Asbestos Trust will vary depending on the characterization of the trust, e.g., as a "grantor trust" as defined by Section 671 et seq. of the IRC, or as a "qualified settlement fund" ("QSF") as defined by Treasury Regulation Section 1.468B-1 et seq. The Debtors currently expect that the Asbestos Trust will be treated as a QSF for federal income tax purposes, meaning that the Debtors should be entitled to an immediate deduction for the fair market value of any property contributed by the Debtors to the Asbestos Trust.

Any transfer of Parent Common Stock by the Debtors to the Asbestos Trust should be deductible by the Debtors in an amount equal to the fair market value of such stock. No gain or loss should be recognized by the Debtors with respect to this stock. The transfer of Cash, if any, to the Asbestos Trust should be deductible by the Debtors in an amount equal to the amount of such Cash.

The IRS has not provided any specific guidance as to whether the transfer of Warrants to the Asbestos Trust will constitute the transfer of property that gives rise to an immediate deduction. The Debtors expect to take the position that the transfer of Warrants to the Asbestos Trust does not constitute the transfer of property, and that only the exercise of the Warrants will constitute a deductible transfer. If so, the Debtors will be entitled to a deduction equal to the fair market value of the Parent Common Stock upon exercise, less the exercise price of such Warrants. The IRS may, however, later disagree with that conclusion and take the position that the transfer of the Warrants themselves constitutes the transfer of property. In that case, the Debtors' tax deduction would be accelerated and the amount of such deduction may be materially different.

90

K&E 9907839.25

### 10.1.3  Cancellation of Debt Income

Under the IRC, a taxpayer generally recognizes gross income to the extent that indebtedness of the taxpayer is cancelled for less than the amount owed by the taxpayer, subject to certain judicial or statutory exceptions.  The most significant of these exceptions with respect to the Debtors is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not required to recognize such income.  In that case, however, the taxpayer must reduce its tax attributes, such as its NOLs, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the cancellation of indebtedness income ("CODI") avoided.

The Debtors do not expect to realize any significant CODI upon consummation of the Plan, since the Debtors expect that Claimants entitled to Distributions under the Plan will receive an amount of consideration that should equal the total amount of their Claims (including accrued but unpaid interest).  In order to ensure that Claimants receive full consideration for their Claims, the value of the Parent Common Stock transferred to the Claimants will be determined based on the average of the closing prices of such stock on the trading days during the 30 days beginning on the Effective Date.

### 10.1.4  Net Operating Losses

As a result of existing NOLs and additional deductions that will be generated by the resolution of tort, environmental and other claims upon emergence from bankruptcy, the Debtors expect to have an NOL after emerging from bankruptcy.  The amount of the NOL may be reduced somewhat by any CODI realized upon emerging from bankruptcy, although as stated above the Debtors do not expect that there will be CODI realized upon emergence.

The extent to which the Debtors will be able to utilize their NOL after emerging from bankruptcy will depend on Section 382 of the IRC, which generally imposes an annual limitation on a corporation's use of its NOLs (and may limit a corporation's use of certain built-in losses if such built-in losses are recognized within a five-year period following an "ownership change," as defined below) if a corporation undergoes an ownership change.  This discussion describes the limitation determined under Section 382 of the IRC in the case of an ownership change as the "Section 382 Limitation."  The annual Section 382 Limitation on the use of pre-change losses (the NOLs and built-in losses recognized within the five year post-ownership change period) in any "post-change year" is generally equal to the product of the fair market value of the loss corporation's outstanding stock immediately before the ownership change multiplied by the long-term tax-exempt rate in effect for the month in which the ownership change occurs.  The long-term tax-exempt rate is published monthly by the IRS and is intended to reflect current interest rates on long-term tax-exempt debt obligations.  It is presently approximately 4.5%.  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  As discussed below, however, a special exception from these rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

In general, an ownership change occurs when the percentage of the corporation's stock owned by certain "5 percent shareholders" increases by more than 50 percentage points in the aggregate over the lowest percentage owned by them at any time during the applicable "testing period" (generally, the shorter of (a) the 36-month period preceding the testing date or (b) the period of time since the most recent ownership change of the corporation).  Although the Debtors

91

K&E 9907839.25

will be giving Parent Common Stock under the Plan to certain of its Claimants, the Debtors are not certain whether the amount of such Parent Common Stock will be sufficient to constitute an ownership change under Section 382 of the IRC. Consequently, the Debtors do not know whether their ability to utilize their NOL following emergence from bankruptcy will be subject to the Section 382 Limitation.

The uncertainty regarding whether an ownership change will occur is increased by the presence of the Warrants in the Asbestos Trust. As the Asbestos Trust exercises Warrants over the three-year period following emergence from bankruptcy, it is possible that the combination of such exercises, coupled with certain other transactions that occurred prior to emergence from bankruptcy or that may occur after bankruptcy emergence, could give rise to an ownership change within the meaning of Section 382 of the IRC. However, the existence of such ownership change may not give rise to any limitation on the Debtors' ability to use their NOLs. In particular, Section 382(l)(5) of the IRC provides a special rule applicable in the case of a bankruptcy reorganization (the "Section 382(l)(5) Exception"). If a corporation qualifies for the Section 382(l)(5) Exception, the annual Section 382 Limitation will not apply to the corporation's NOL on account of an ownership change occurring as a result of the bankruptcy reorganization. The Section 382(l)(5) Exception does, however, require that the corporation's NOL and credit carryovers be computed without taking into account the aggregate amount of all interest deductions in respect of debt exchanged for the corporation's stock during the three prior taxable years and the portion of the current taxable year ending on the date of the ownership change.

A corporation will qualify under the Section 382(l)(5) Exception if the corporation's pre-bankruptcy shareholders and holders of certain debt ("Qualifying Debt") own at least 50% of the stock of the corporation after the bankruptcy reorganization, and the corporation does not "elect out" of the Section 382(l)(5) Exception. Qualifying Debt is a claim which (i) was held by the same creditor for at least 18 months prior to the bankruptcy filing or (ii) arose in the ordinary course of a corporation's trade or business and has been owned, at all times, by the same creditor. Indebtedness will be treated as arising in the ordinary course of a corporation's trade or business if such indebtedness is incurred by the corporation in connection with the normal, usual or customary conduct of the corporation's business. While not free from doubt, the Debtors expect that Asbestos Claims will qualify as Qualifying Debt, and that the stock acquired by the Asbestos Trust upon exercise of the Warrants will be treated as stock acquired in exchange for Qualifying Debt within the meaning of the Section 382(l)(5) Exception. In addition, any debt held by a creditor who receives an amount of stock representing less than 5.0% of the equity interests in the Debtors upon emerging from bankruptcy will also be treated as Qualifying Debt, unless such creditor actively participated in formulating the Debtors' bankruptcy plan and in doing so made it clear to the Debtors that its debt was not Qualified Debt.

If an ownership change occurs and the Debtors do not qualify for the Section 382(l)(5) Exception, the Debtors would then be subject to an annual Section 382 Limitation. Under Section 382(l)(6) of the IRC, if a corporation is otherwise not eligible for the Section 382(l)(5) Exception (or if it elects out of Section 382(l)(5)), then the annual Section 382 Limitation is calculated by taking into account the increase in equity value resulting from the issuance of equity upon emergence in exchange for debt claims.

92

The Debtors expect at this point that, if an ownership change occurs, it would be likely that the Debtors would qualify for a Section 382(l)(5) Exception. However, Section 382 of the IRC provides that if a company that utilizes the Section 382(l)(5) Exception undergoes another ownership change within two years, that company's NOL is reduced to zero. For that reason, the Parent Common Stock, upon emergence, will be subject to certain transfer restrictions in order to ensure that another ownership change does not occur after emergence. Those restrictions were discussed above under Section 10.1.1 (General Discussion). The general effect of these restrictions is to ensure that no Entity acquires an amount of Parent Common Stock after emerging from bankruptcy that would cause such Entity to hold more than 4.75% of the Parent's equity value, without the consent of the Parent's Board of Directors, and to ensure that no shareholder who owns more than 4.75% of the Parent's equity value after emergence buys additional Parent Common Stock. The amount of Warrants that the Asbestos Trust will be able to exercise within the three years after emergence will also be limited to an amount equal to approximately 50% of the Asbestos Trust's total Warrants.

These transfer restrictions will generally not impose any limitations on a Claimant or other Entity that holds less than 4.75% of the Parent Common Stock after emergence to either buy or sell stock on the open market, so long as such purchase or sale does not cause the Claimant or other Entity to then hold more than 4.75% of the Parent Common Stock.

## 10.2    Federal Income Tax Consequences to Holders of Claims and the Asbestos Trust

### 10.2.1  Holders of Asbestos Claims

To the extent that payments from the Asbestos Trust to Claimants constitute damages received by such Claimants on account of personal injuries, such payments should not constitute gross income to such Claimants, except to the extent that such payments are attributable to medical expense deductions allowed under Section 213 of the IRC for a prior taxable year.

To the extent that payments from the Asbestos Trust to Claimants constitute compensatory damages for destruction or damage to property, and such payments do not exceed the Claimant's tax basis in its property, such payments should not be included in taxable income. Instead, such payments would be treated as a return of capital to such Claimant, reducing the holder's tax basis in the property. Any amounts received in excess of the Claimant's tax basis should be treated as gain from the disposition of the property, and would therefore give rise to capital gain assuming that the Claimant held such property as a capital asset.

### 10.2.2  Treatment of the Asbestos Trust

The Debtors expect that the Asbestos Trust will be a QSF for federal income tax purposes. As a QSF, the Asbestos Trust will be subject to a separate entity level tax on its income at the maximum rate applicable to trusts and estates. In determining the taxable income of the Asbestos Trust, (a) any amounts contributed to the Asbestos Trust will not be treated as taxable income, (b) any sale, exchange or distribution of property by the Asbestos Trust will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of the sale, exchange or distribution and the adjusted tax basis of such property, (c) interest income and dividend income will be treated as taxable

93

income, and (d) administrative costs (including state and local taxes) will be deductible. In general, the adjusted tax basis of property received by the Asbestos Trust will be its fair market value at the time of receipt. As discussed above, the Debtors believe that the transfer of Warrants to the Asbestos Trust will not be treated as a transfer of property until such time as the Warrants are exercised. For that reason, the Debtors believe that the Asbestos Trust will not recognize any income or gain upon exercise of the Warrants. This result is not free from doubt, however, and it is possible that the IRS would take the position that the exercise of such Warrants should be treated as taxable income or gain to the Asbestos Trust.

### 10.2.3 Consequences to Holders of General Unsecured Claims

Pursuant to the Plan, each Holder of a General Unsecured Claim will receive, in full satisfaction and discharge of its Allowed Claim, a combination of Cash and Parent Common Stock. The federal income tax consequences of the Plan to a Holder of a General Unsecured Claim depend, in part, on whether such Claim constitutes a "security" for federal income tax purposes.

Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.

In general, the Debtors believe that the General Unsecured Claims do not qualify as "securities" for federal income tax purposes. If a debt instrument constituting a surrendered Allowed General Unsecured Claim is not treated as a security, the Holder of such a Claim should be treated as exchanging its Allowed General Unsecured Claim for Parent Common Stock and Cash in a fully taxable exchange. The Holder of an Allowed General Unsecured Claim who is subject to fully taxable exchange treatment should recognize gain or loss equal to the difference between (i) the fair market value of the Parent Common Stock as of the Effective Date plus the Cash received that is not allocable to accrued interest, and (ii) the Holder's basis in the debt instrument constituting the surrendered Allowed General Unsecured Claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debt constituting the surrendered Allowed General Unsecured Claim were held for more than one year. To the extent that a portion of the Parent Common Stock or Cash received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income. See Section 10.2.3.1 (Accrued Interest). A Holder's tax basis in the Parent Common Stock received should equal the fair market value of the Parent Common Stock as of the date received. A Holder's holding period for the Parent Common Stock should begin on the day following the Effective Date.

94

### 10.2.3.1        Accrued Interest

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued interest that was not previously included in the Holder's gross income, such amount should be taxable to the Holder as interest income. Conversely, a holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Pursuant to the Plan, all Distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Claim, to the extent otherwise permitted and as determined for federal income tax purposes, and thereafter to the remaining portion of such Claim, if any. However, there can be no assurance that the IRS will respect this allocation.

### 10.2.3.2        Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of the gain realized by a Holder of a debt instrument constituting an Allowed Claim who exchanges the debt instrument for other property on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with an original-issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of surrendered debts (determined as described above) that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### 10.2.4  Consequences to Holders of Equity Interests

Pursuant to the Plan, each Holder of an Allowed Equity Interest in the Debtors will retain their Allowed Equity Interest, subject to dilution on account of, among other things, Parent Common Stock issued (i) under the Management Stock Incentive Plan, (ii) to other Holders of Allowed Claims, or (iii) to the Asbestos Trust upon exercise of Warrants. Holders of Allowed Equity Interests will therefore recognize neither gain nor loss with respect to the reorganization.

95

Such Holders will retain their existing tax basis and holding period in their Allowed Equity Interests.

### 10.3    Backup Withholding

Debtors will withhold any amounts required by law to be withheld from payments of interest and dividends and will comply with all applicable reporting requirements of the IRC.

## 11.  SECURITIES IMPLICATIONS OF THE PLAN

### 11.1    The Issuance of Securities Pursuant to the Plan

The Debtors will be relying on an exemption from registration under the Securities Act and applicable provisions of applicable state securities or "blue sky" laws with respect to the issuance of shares of the Parent Common Stock pursuant to the Plan.

The Debtors intend to rely upon the exemption from the registration requirements of the Securities Act (and of equivalent state securities or "blue sky" laws) provided by Bankruptcy Code § 1145(a)(1).  Generally, Bankruptcy Code § 1145(a)(1) exempts the offer and sale of securities pursuant to a plan of reorganization from the registration requirements of the Securities Act and equivalent state securities and "blue sky" laws if the following conditions are satisfied (1) the securities are issued by a debtor (or its affiliate or successor) or plan sponsor under a plan of reorganization, (2) the recipients of the securities hold a claim against, and interest in, or a claim for an administrative expense against, the debtor, and (3) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" for Cash or property.  The Debtors believe that the exchange of the Parent Common Stock for Claims satisfies such requirements.

The Parent Common Stock issued to Holders of Claims pursuant to the Plan may be resold by such Entities without restriction unless, as more fully described below, any such Holder is deemed to be an "underwriter" with respect to such securities, as defined in Bankruptcy Code § 1145(b)(1).  Generally, Bankruptcy Code § 1145(b)(1) defines an "underwriter" as any party who (1) purchases a claim against, or equity interest in, the debtor in a bankruptcy case, with a view towards the distribution of any security to be received in exchange for such claim or equity interest, (2) offers to sell securities issued under a bankruptcy plan on behalf of the holders of such securities, (3) offers to buy securities issued under a bankruptcy plan from parties receiving such securities, if the offer to buy is made with a view towards distribution of such securities, or (4) is an "issuer," as such term is defined in Section 2(11) of the Securities Act.

The reference contained in Bankruptcy Code § 1145(b)(1)(D) to Section 2(11) of the Securities Act would include as "underwriters" all parties who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a party, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor (or its affiliate or successor) under a plan of reorganization may be deemed to "control" such

96

debtor (and therefore be an underwriter for purposes of Bankruptcy Code § 1145), particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or affiliate's or successor's) voting securities. In addition, the legislative history of Bankruptcy Code § 1145 suggests that a creditor with at least 10% of the securities of a debtor could be deemed a "control" person.

Holders may, under certain circumstances, be able to sell their securities pursuant to the safe harbor resale provisions of Rule 144 under the Securities Act. Generally, Rule 144 provides that if certain conditions are met (e.g. one-year holding period with respect to "restricted securities," volume limitations, manner of sale, availability of current information about the issuer, etc.), specified persons who (1) resell "restricted securities" or (2) resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in Section 2(11) of the Securities Act. Under paragraph (k) of Rule 144, the aforementioned conditions to resale will no longer apply to restricted securities sold for the account of a Holder who is not an affiliate of the Debtors at the time of such resale and who has not been such during the three-month period next preceding such resale, so long as a period of at least two years has elapsed since the later of (1) the Effective Date and (2) the date on which such holder acquired his or its securities from an affiliate of the Debtors. The SEC has taken the position in no-action letters that the holding period requirement set forth in Rule 144(d) is not applicable to holders of securities issued pursuant to Bankruptcy Code § 1145.

Under Bankruptcy Code § 1145(a)(4), stockbrokers are required to deliver a copy of this Disclosure Statement (and supplements hereto, if any, if ordered by the Court) at or before the time of delivery of securities issued under the Plan to their customers for the first 40 days after the Effective Date. This requirement specifically applies to trading and other aftermarket transactions in such securities.

The foregoing summary discussion is general in nature and has been included in this Disclosure Statement solely for information purposes. The Debtors do not make any representations concerning, and do not provide an opinion or advice with respect to, the securities law and bankruptcy law matter described above. The Debtors encourage each Entity who is to receive Parent Common Stock pursuant to the Plan to consider carefully and consult with their own legal advisor(s) with respect to such (and any related) matters in view of the uncertainty concerning the availability of exemptions from the registration requirements of the Securities Act and equivalent state securities and "blue sky" laws to a recipient of Parent Common Stock, who may be deemed to be an "underwriter" (within the meaning of Bankruptcy Code § 1145(B)(1) and/or an "affiliate of" or a person who exercised "control" over Grace under applicable federal and state securities laws.

## 12. CONCLUSION AND RECOMMENDATION

Your vote on the Plan is important. The Debtors strongly recommend that you vote in favor of the Plan.

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to Holders

K&E 9907839.25

of Claims and Equity Interests.  Nonacceptance of the Plan may result in protracted delays, uncertainty, substantial additional administrative costs, a chapter 7 liquidation, or the confirmation of another less favorable Chapter 11 plan.  These alternatives may not provide for distribution or retention of as much value to Holders of Allowed Claims and/or Equity Interests as does the Plan.  Further, the Debtors believe that the Plan, as a whole, is in the best interests of all of their Claimants and Holders of Equity Interests.  **Therefore, the Debtors recommend that all Holders of Claims and Equity Interests entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan**

98

Dated: November 13, 2004

Respectfully submitted,

**W. R. GRACE & CO., et al.**
(on behalf of the Debtors and Debtors In
Possession)

By:

Name: David B. Siegel
Title:  Senior Vice President, General Counsel &
        Chief Restructuring Officer

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

## EXHIBIT BOOK

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this exhibit book (the "Exhibit Book") in conjunction with the filing of the Debtors' chapter 11

plan and accompanying disclosure statement.    The Exhibit Book includes the following

documents:

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

| Document Title | Exhibit/ Tab No. |
|---|---|
| Debtors' Plan of Reorganization | 1 |
| Glossary of Defined Terms | 2 |
| Best Interests Analysis | 3 |
| W. R. Grace & Co. and Subsidiaries, Historical, Pro Forma and Prospective Financial Information | 4 |
| Asbestos Trust Agreement | 5 |
| PI-SE Trust Distribution Procedures | 6 |
| PI-AO Trust Distribution Procedures | 7 |
| PD Trust Distribution Procedures | 8 |
| List of Non-Debtor Affiliates | 9 |
| List of Subject Asbestos Insurance Policies | 10 |
| Retained Causes of Action | 11 [To Follow] |
| Sealed Air Settlement Agreement | 12 |
| Fresenius Settlement Agreement | 13 |
| Case Management Order (CMO) | 14 [To Follow] |
| Description of Warrants | 15 [To Follow] |
| Management Stock Incentive Plan Term Sheet | 16 [To Follow] |

2

# Exhibit Tab 1

Debtors' Plan of Reorganization

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.,[1] | ) Case No. 01-1139 (JKF) |
| | ) (Jointly Administered) |
| Debtors. | ) |

## DEBTORS' PLAN OF REORGANIZATION

**THIS PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF
INJUNCTIONS UNDER BANKRUPTCY CODE §§ 105 AND 524(g) THAT RESULT IN
THE CHANNELING OF ALL ASBESTOS-RELATED LIABILITIES OF W. R. GRACE
& CO. AND THE ASBESTOS PROTECTED PARTIES (AS DEFINED HEREIN) INTO
A TRUST AS MORE FULLY DESCRIBED HEREIN.**

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Jonathan P. Friedland
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB P.C.
Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100

and

Bennett L. Spiegel
Lori Sinanyan
777 South Figueroa Street
Los Angeles, California 90017
Telephone: (213) 680-8400

- Co-Counsel for the Debtors and Debtors in Possession -

Dated: November 13, 2004

---

[1]    Debtors are defined in the Glossary.

## TABLE OF CONTENTS

**Article 1.**   DEFINITIONS, CONSTRUCTION OF TERMS, EXHIBITS  AND
                 ANCILLARY DOCUMENTS.................................................................... 1
   1.1   Defined Terms............................................................................................ 1
   1.2   Other Terms/Interpretation....................................................................... 1
   1.3   The Plan Documents ................................................................................. 2
   1.4   Ancillary Documents................................................................................. 3

**Article 2.**   PROVISIONS FOR PAYMENT OF ADMINISTRATIVE
                 EXPENSES AND PRIORITY TAX CLAIMS ......................................... 3
   2.1   Unclassified Claims.................................................................................. 3
   2.2   Payment of Allowed Administrative Expense Claims.............................. 3
   2.3   Priority Tax Claims .................................................................................. 3

**Article 3.**   CLASSIFICATION AND TREATMENT OF CLAIMS AND
                 EQUITY INTERESTS....................................................................... 4
   3.1   Summary ................................................................................................... 4
      3.1.1   Class 1. Priority Claims................................................... 4
      3.1.2   Class 2. Secured Claims .................................................. 5
      3.1.3   Class 3. Unsecured Pass-Through Employee Related Claims ................. 5
      3.1.4   Class 4. Workers' Compensation Claims.................................. 6
      3.1.5   Class 5. Intercompany Claims.......................................... 6
      3.1.6   Class 6. Asbestos PI-SE Claims........................................ 6
      3.1.7   Class 7. Asbestos PI-AO Claims ...................................... 7
      3.1.8   Class 8. Asbestos PD Claims ........................................... 8
      3.1.9   Class 9. General Unsecured Claims .................................. 9
      3.1.10   Class 10. Equity Interests in the Parent............................ 9
      3.1.11   Class 11. Equity Interests in the Debtors other than the Parent ............ 10
   3.2   Effect of Asbestos PI Claimant Electing Various Options .................... 10
      3.2.1   Cash-Out Option ............................................................ 10
      3.2.2   Litigation Option ............................................................ 10
      3.2.3   Registry Option .............................................................. 11

**Article 4.**   MODIFICATION OR WITHDRAWAL OF THIS PLAN............................ 11
   4.1   Modification of this Plan; Amendment of Plan Documents .................... 11
      4.1.1   Modification of this Plan. ................................................ 11
      4.1.2   Amendment of Plan Documents. ..................................... 11
   4.2   Withdrawal of this Plan........................................................................... 11
      4.2.1   Right to Withdraw this Plan ............................................ 11
      4.2.2   Effect of Withdrawal ...................................................... 11

**Article 5.**   PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS  AND
                 ASBESTOS CLAIMS GENERALLY ................................................ 12
   5.1   Objections to Claims (other than Asbestos Claims); Prosecution of
                 Disputed Claims ..................................................................................... 12
   5.2   Distribution on Account of Disputed Claims.......................................... 12

i

|     | 5.3   | Resolution of Asbestos Claims | 12 |
|     | 5.3.1 | Making of an Election by Asbestos PI Claimants | 13 |
|     | 5.3.2 | Claims Materials for Asbestos PI Claimants | 13 |
|     | 5.3.3 | Information Obtained by the Asbestos Trust or Reorganized Debtors Regarding Asbestos PI Claims | 13 |
|     | 5.3.4 | Withdrawal of Claims | 13 |

**Article 6.    ACCEPTANCE OR REJECTION OF THIS PLAN ........ 14**

|     | 6.1 | Impaired Classes to Vote | 14 |
|     | 6.2 | Acceptance by Impaired Classes of Claims | 14 |
|     | 6.3 | Presumed Acceptance of this Plan | 14 |
|     | 6.4 | Nonconsensual Confirmation | 14 |
|     | 6.4.1 | Cramdown | 14 |
|     | 6.4.2 | General Reservation of Rights | 14 |

**Article 7.    IMPLEMENTATION OF THIS PLAN .......... 15**

|     | 7.1 | Corporate Governance of the Parent and the Other Debtors | 15 |
|     | 7.1.1 | Amendment of Certificates of Incorporation or Articles of Incorporation of the Debtors | 15 |
|     | 7.1.2 | Amendment of By-Laws of the Parent | 15 |
|     | 7.1.3 | D&O and Fiduciary Liability Tail Coverage Policies | 15 |
|     | 7.2 | The Asbestos Trust | 16 |
|     | 7.2.1 | Creation of the Asbestos Trust | 16 |
|     | 7.2.2 | Funding of the Asbestos Trust | 16 |
|     | 7.2.3 | Transfer of Assets into the Asbestos Trust | 16 |
|     | 7.2.4 | Transfer of Claims and Demands to the Asbestos Trust | 17 |
|     | 7.2.5 | Creation of Asbestos Trust Sub-Accounts | 17 |
|     | 7.2.6 | Appointment and Termination of Trustees | 17 |
|     | 7.2.7 | Creation and Termination of the TAC | 17 |
|     | 7.2.8 | Cooperation Agreement | 17 |
|     | 7.2.9 | Institution and Maintenance of Legal and other Proceedings | 18 |
|     | 7.3 | Payments and Distributions Under this Plan | 18 |
|     | 7.3.1 | Asbestos Trust Payments and Plan Distributions | 18 |
|     | 7.3.2 | Timing of Plan Distributions | 18 |
|     | 7.4 | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 18 |
|     | 7.4.1 | Delivery by the Reorganized Debtors of Distributions in General | 18 |
|     | 7.4.2 | Undeliverable Distributions by the Reorganized Debtors | 19 |
|     | 7.5 | Payments under this Plan | 19 |
|     | 7.5.1 | Manner of Payments under this Plan | 19 |
|     | 7.5.2 | Fractional Payments under this Plan | 19 |
|     | 7.6 | Occurrence of the Confirmation Date | 19 |
|     | 7.6.1 | Findings of Fact and/or Conclusions of Law | 19 |
|     | 7.6.2 | Orders of this Court | 24 |
|     | 7.7 | Conditions to Occurrence of the Effective Date | 24 |
|     | 7.8 | Management of the Reorganized Debtors | 26 |
|     | 7.9 | Corporate Action | 26 |
|     | 7.10 | Effectuating Documents and Further Transactions | 27 |

ii

| | | |
|---|---|---|
| 7.11 | Allocation of Plan Distributions Between Principal and Interest | 27 |
| 7.12 | No Successor Liability | 27 |
| 7.13 | Deemed Consolidation of the Debtors for Plan Purposes Only | 28 |

**Article 8.    INJUNCTIONS, RELEASES & DISCHARGE ... 28**

| | | | |
|---|---|---|---|
| 8.1 | Discharge | | 28 |
| | 8.1.1 | Discharge of the Debtors and Related Discharge Injunction | 28 |
| | 8.1.2 | Discharge of Liabilities to Holders of Asbestos Claims | 29 |
| | 8.1.3 | Disallowed Claims and Disallowed Equity Interests | 29 |
| | 8.1.4 | Non-Dischargeable ERISA Liability | 29 |
| 8.2 | The Asbestos Channeling Injunction | | 29 |
| 8.3 | Asbestos Insurance Entity Injunction | | 31 |
| | 8.3.1 | Injunction | 31 |
| | 8.3.2 | Reservations from the Asbestos Insurance Entity Injunction | 32 |
| 8.4 | Released Matters Injunction | | 32 |
| | 8.4.1 | Injunction | 32 |
| | 8.4.2 | Reservations from the Released Matters Injunction | 33 |
| 8.5 | Term of Certain Injunctions and Automatic Stay | | 34 |
| | 8.5.1 | Injunctions and/or Automatic Stays in Existence Immediately prior to Confirmation | 34 |
| | 8.5.2 | Injunctions Provided for in this Plan | 34 |
| 8.6 | Additional Releases and Indemnification | | 34 |
| | 8.6.1 | Representatives of the Debtors | 34 |
| | 8.6.2 | Release of Sealed Air Indemnified Parties | 35 |
| | 8.6.3 | Release of Fresenius Indemnified Parties | 35 |
| | 8.6.4 | Specific Releases by Holders of Claims | 36 |
| | 8.6.5 | Approval of Sealed Air Settlement Agreement | 36 |

**Article 9.    EXECUTORY CONTRACTS, UNEXPIRED LEASES, GUARANTIES, AND INDEMNITY AGREEMENTS ... 36**

| | | |
|---|---|---|
| 9.1 | Assumption of Executory Contracts and Unexpired Leases | 36 |
| 9.2 | Letters of Credit, Surety Bonds, Guaranties, and Certain Indemnity Agreements | 37 |
| 9.3 | Compensation and Benefits Program | 38 |

**Article 10.    RETENTION OF JURISDICTION ... 39**

| | | |
|---|---|---|
| 10.1 | Plan Documents | 39 |
| 10.2 | Executory Contracts and Unexpired Leases | 39 |
| 10.3 | Disputed Claims Allowance/Disallowance | 39 |
| 10.4 | Enforcement/Modification of this Plan | 39 |
| 10.5 | Compensation of Professionals | 40 |
| 10.6 | Settlements | 40 |
| 10.7 | Taxes | 40 |
| 10.8 | Specific Purposes | 41 |
| 10.9 | Insurance Matters | 41 |

iii

**Article 11.**     MISCELLANEOUS PROVISIONS ................................................................. 41
    11.1    Authority of the Debtors ...................................................................... 41
    11.2    Payment of Statutory Fees.................................................................... 41
    11.3    Retained Causes of Action .................................................................. 41
           11.3.1    Maintenance of Causes of Action ....................................... 41
           11.3.2    Preservation of Causes of Action ........................................ 42
           11.3.3    Preservation of All Causes of Action not Expressly Settled or
                     Released ............................................................................ 42
    11.4    Third-Party Agreements........................................................................ 42
    11.5    Purpose of the Fresenius Payment and Consistency of Treatment ...................... 43
    11.6    Purpose of the Sealed Air Payment and Consistency of Treatment...................... 43
    11.7    Dissolution of the Unsecured Creditors' Committee, the Asbestos PI
           Committee, the Asbestos PD Committee and the Equity Committee;
           Continued Retention of the Future Claimants' Representative.............................. 44
    11.8    Exculpation.......................................................................................... 45
    11.9    Title to Assets; Discharge of Liabilities ................................................ 45
    11.10   Notices  45
    11.11   Headings.............................................................................................. 47
    11.12   Governing Law..................................................................................... 47
    11.13   Filing of Additional Documents............................................................ 47
    11.14   Compliance with Tax Requirements ..................................................... 48
    11.15   Exemption from Transfer Taxes ........................................................... 48
    11.16   Further Assurances............................................................................... 48
    11.17   Further Authorizations ........................................................................ 49

91100-001\DOCS_DE:102550.1

W. R. Grace & Co. and the above-captioned debtors and debtors in possession (collectively, "Grace" or the "Debtors") hereby propose the following Plan of Reorganization pursuant to the provisions of chapter 11 of title 11 of the United States Code. Reference is made to the Disclosure Statement (as defined herein) distributed contemporaneously herewith for, among other things, a discussion of the history, businesses, properties, results of operations, projections for future operations of the Debtors, and risks associated with this Plan.

### Article 1.
### DEFINITIONS, CONSTRUCTION OF TERMS, EXHIBITS
### AND ANCILLARY DOCUMENTS

#### 1.1 DEFINED TERMS

All capitalized terms used herein shall have the respective meanings specified herein or in the Glossary for this Plan listed as Exhibit 2 in the Exhibit Book, unless the context otherwise requires.

#### 1.2 OTHER TERMS/INTERPRETATION

(a) Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the other genders.

(b) When used in this Plan, the term "Claim" shall be broadly construed to include all manner and type of Claim, whenever and wherever such Claim may arise, and shall include Asbestos PI-SE Claims, Asbestos PI-AO Claims, and Asbestos PD Claims.

(c) Any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions shall mean that such document shall be substantially in such form or substantially on such terms and conditions.

(d) Any reference in this Plan to an existing document or exhibit in the Exhibit Book Filed or to be Filed shall mean the document or exhibit as it may have been or may be amended, modified or supplemented.

(e) Any reference to an Entity as a Holder of a Claim shall include that Entity's successors, assigns and affiliates.

(f) The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan.

(g) The word "including" (and, with correlative meaning, the forms of the word "include") shall mean including, without limiting the generality

1