# EXHIBIT 1-C

86.     **"Disputed Claim"** shall mean a Claim that is neither Allowed nor Disallowed.

87.     **"Distribution"** shall mean the payment, distribution, or assignment under the Plan by the Reorganized Debtors of property or interests in property to: (i) any Holder of an Allowed Claim (other than an Asbestos Claim) or Allowed Equity Interest; and (ii) the Asbestos Trust.

88.     **"District Court"** shall mean the United States District Court for the District of Delaware.

89.     **"Effective Date"** shall mean the first Business Day after the date on which all of the conditions precedent to the effectiveness of the Plan specified in Section 7.7 thereof shall have been satisfied or waived or, if a stay of the Confirmation Order is in effect on such date, the first Business Day after the expiration, dissolution, or lifting of such stay.

90.     **"Encumbrance"** shall mean with respect to any property or asset (whether real or personal, tangible or intangible), any mortgage, lien, pledge, charge, security interest, assignment as collateral, or encumbrance of any kind or nature in respect of such property or asset (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction) to secure payment of a debt or performance of an obligation.

91.     **"Entity"** shall mean any person, individual, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, the United States Trustee or any Governmental Unit or any political subdivision thereof.

92.     **"Equity Committee"** shall mean the Official Committee of Equity Security Holders appointed in the Chapter 11 Cases.

93.     **"Equity Interest"** shall mean any interest in any of the Debtors pursuant to an "equity security" within the meaning of Bankruptcy Code § 101(16).

94.     **"Estimated Amount"** shall mean (except with respect to Asbestos Claims) the estimated dollar value of an unliquidated Claim, Disputed Claim, or Contingent Claim pursuant to Bankruptcy Code § 502(c); provided that, in the event the Court shall estimate one or more unliquidated Claims, Disputed Claims, or Contingent Claims for purposes of allowance, such estimate shall constitute and represent the maximum amount in which such Claims may ultimately become Allowed Claims.

95.     **"Estimation Motion"** shall mean a motion Filed or to be Filed with the Court in the Chapter 11 Cases, which seeks, among other things, to:

      (a)     implement procedures to be used in establishing the amount of the Asbestos PI-SE Class Fund, the Asbestos PI-AO Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund;

      (b)     establish the Asbestos PI-SE Class Fund, the Asbestos PI-AO Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund; and

      (c)     set the Asbestos PI Pre-petition Litigation Bar Date.

96.     **"Estimation Order"** shall mean the order by which the Court would establish the Asbestos PI-SE Class Fund, the Asbestos PI-AO Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund, pursuant to the Estimation Motion.

97.     **"Estimation Procedures Order"** shall mean the order by which the Court would implement procedures to be used in establishing the amount of the Asbestos PI-SE Class Fund, the Asbestos PI-AO Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund; and set the Asbestos PI Pre-petition

12

Litigation Bar Date, both pursuant the Estimation Motion. A proposed form of Estimation Procedures Order is Exhibit A to the Estimation Motion.

98.     **"Exhibit Book"** shall mean the exhibits to the Disclosure Statement or the Plan, as filed contemporaneously with the Disclosure Statement and Plan, as such exhibits may be amended, supplemented, or modified from time to time.

99.     **"Exhibit Book Supplement"** shall mean a supplement of Plan related documents, as amended from time to time, which shall include: (i) the Certificate of Incorporation of the Parent, as to be amended pursuant to the Plan; (ii) the By-Laws of the Parent, as to be amended pursuant to the Plan; (iii) an opinion of counsel regarding whether the Asbestos Trust qualifies as a "qualified settlement fund" pursuant to Section 468B of the IRC; (iv) the list of rejected contracts as of the Effective Date; (v) the list of letters of credit, surety bonds, guaranties, and certain indemnity agreements not to be assumed pursuant to Section 9.2 of the Plan; (vi) the Management Stock Incentive Plan; (vii) a list of certain key members of current management who shall continue with the Reorganized Debtors; (viii) a list of the Resolved Asbestos Insurance Companies, which list may be supplemented, at the sole discretion of the Reorganized Debtors, by Filing a notice with the Bankruptcy Court; and (ix) a list of the Settled Asbestos Insurance Companies.

100.    **"Exit Financing"** shall mean such financing agreement(s) or commitment(s) as the Debtors shall obtain to provide the Reorganized Debtors with appropriate credit availability.

101.    **"Expedited Review"** shall mean a review pursuant to the Expedited Review Process.

102.    **"Expedited Review Process"** shall mean the process employed to liquidate Asbestos PI-SE Cash-Out Claims, as set forth in Section 5.2(a) of the PI-SE TDP and the process employed to liquidate Asbestos PI-AO Cash-Out Claims, as set forth in Section 5.2(a) of the PI-AO TDP.

103.    **"FCR"** shall mean Future Claimants' Representative.

104.    **"FEV1"** shall mean forced expiratory volume (1 second), which is the maximal volume of air expelled in 1 second during performance of the spirometric test for forced vital capacity.

105.    **"FIFO"** shall have the meaning set forth in Section 2.1 of each of the TDPs.

106.    **"FIFO Payment Queue"** shall have the meaning set forth in Section 5.1(c) of the PI-SE TDP, Section 5.1(c) PI-AO TDP, or Section 5.1 of the PD-TDP, as applicable.

107.    **"FIFO Processing Queue"** shall have the meaning set forth in Section 5.1(a)(1) of the PI-SE TDP, as applicable.

108.    **"File" or "Filed"** shall mean file or filed with the Court in the Chapter 11 Cases.

109.    **"Final Order"** shall mean an order as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing by all Entities possessing such right, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or from which reargument or rehearing was sought or certiorari has been denied, and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; provided that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a Final Order.

13

110.    **"Financial Information"** shall mean the historical, proforma and prospective financial information included as, or incorporated by reference into, Exhibit 4 to the Disclosure Statement entitled "W. R. Grace & Co. and Subsidiaries, Historical, Proforma and Prospective Financial Information."

111.    **"Fresenius"** shall mean Fresenius Medical Care Holdings, Inc. and National Medical Care, Inc.

112.    **"Fresenius Indemnified Parties"** shall mean Fresenius and each of their respective present and former subsidiaries, parents, affiliates, officers, directors, employees, partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and assigns, including Fresenius Medical Care AG and Fresenius AG, but not including the Debtors, the Reorganized Debtors and Sealed Air.

113.    **"Fresenius Payment"** shall mean the $115,000,000 consideration to be paid by Fresenius to the Debtors pursuant to the terms of the Fresenius Settlement Agreement.

114.    **"Fresenius Settlement Agreement"** shall mean that certain settlement agreement and release of claims dated February 6, 2003 by and among the Parent, Grace-Conn, Fresenius, the Asbestos PI Committee, and the Asbestos PD Committee, in the form attached as Exhibit 13 in the Exhibit Book, as such agreement may be amended from time to time.

115.    **"Future Claimants' Representative"** or **"FCR"** shall mean David T. Austern (or any court-appointed successor), appointed as the legal representative for future asbestos-related personal injury Claimants in the Chapter 11 Cases for the purpose of protecting the interests of persons that may subsequently assert Demands channeled to the Asbestos Trust.

116.    **"FVC"** shall mean forced vital capacity, which is the maximal volume of air expired with a maximally forced effort from a position of maximal inspiration.

117.    **"General Unsecured Claim"** shall mean any Claim in the Chapter 11 Cases that is not an Administrative Expense Claim, Priority Tax Claim, Priority Claim, Secured Claim, Unsecured Pass-Through Employee Related Claim, Workers' Compensation Claim, Intercompany Claim, Asbestos PI-SE Claim, Asbestos PI-AO Claim, or Asbestos PD Claim.

118.    **"Glossary"** shall mean this Glossary of Terms for the Plan Documents, as this document may be modified from time to time.

119.    **"Grace"** shall mean the Debtors.

120.    **"Grace-Conn"** shall mean W. R. Grace & Co.-Conn., one of the Debtors in these Chapter 11 Cases.

121.    **"Grace Exposure"** shall have the meaning as set forth in Section 5.4(b)(3) of the PI-SE TDP and Section 5.4(b)(2) of the PI-AO TDP.

122.    **"GUC Distribution Date"** shall mean: (a) when used with respect to a General Unsecured Claim that is Allowed prior to the Effective Date, the Effective Date or as soon as practicable thereafter; and (b) when used with respect to a General Unsecured Claim that is not Allowed prior to the Effective Date, the first Business Day of the next calendar quarter after the date upon which the Claim becomes Allowed, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of such next calendar quarter, in which case the Distribution Date shall be the first Business Day of the next succeeding calendar quarter.

123.    **"Holder"** shall mean any Entity holding any Claim or Equity Interest and, with respect to a vote on the Plan, shall mean the beneficial holders on the voting record date or any authorized signatory who has completed and executed a Ballot or on whose behalf a Master Ballot has been properly completed and executed.

14

124. **"ILO Grade"** shall mean the radiological ratings for the presence of lung changes as determined from a chest x-ray, all as established from time to time by the International Labor Organization.

125. **"Individual Review Process"** shall mean the individual review process described in Section 5.2(b) of the PI-SE TDP or 5.2(b) of the PI-AO TDP, as applicable.

126. **"Initial Distribution Date"** shall mean: (i) a date within the first sixty (60) days after the Effective Date selected by the Reorganized Debtors, or (ii) such later date as the Bankruptcy Court may establish, upon request by the Reorganized Debtors, for cause shown.

127. **"Intercompany Claim"** shall mean: (a) any Claim that arose prior to the Effective Date by: (i) any Debtor against any other Debtor, or (ii) a Non-Debtor Affiliate against any Debtor; or (b) any claim that arose prior to the Effective Date by any Debtor against any Non-Debtor Affiliate,.

128. **"IRC"** shall mean the Internal Revenue Code of 1986, as amended, and any applicable regulations (including temporary and proposed regulations) promulgated thereunder by the United States Treasury Department.

129. **"IRS"** shall mean the United States Internal Revenue Service.

130. **"Litigation Option"** shall mean one of the treatment options available to be chosen by Holders of Asbestos PI Claims, as described in Section 3.2 of the Plan.

131. **"Management Stock Incentive Plan"** shall mean the W. R. Grace Stock Incentive Plans under which stock options exercisable for up to 8.2 million shares of Parent Common Stock have been issued to the management of Grace and the Non-Debtor Affiliates, which options will remain outstanding under the Plan, and any additional stock incentive plans which may be implemented on or after the Effective Date subject to approval by the Parent's Board of Directors.

132. **"March 2003 Bar Date"** shall mean March 31, 2003, the last day for Filing a proof of Claim relating to pre-petition (i) Asbestos PD Claims (excluding ZAI Claims), (ii) non-Asbestos Claims (including all governmental claims, and all derivative asbestos claims and asbestos-related claims for contribution, indemnity, reimbursement or subrogation), and (iii) Asbestos Medical Monitoring Claims.

133. **"March 2003 Bar Date Order"** shall mean the Court's order, dated April 22, 2002, which established the March 2003 Bar Date.

134. **"Master Ballot"** shall mean a Ballot, which is cast by a representative, on behalf of a Holder or Holders of Equity Interests, pursuant to the terms and guidelines established in the Plan Documents.

135. **"Medical/Exposure Criteria"** shall mean the medical/exposure criteria for each Disease Level set forth in Section 5.2(a)(3) of the PI-SE TDP, or the medical/exposure criteria for a Qualified PI-AO Cash-Out Claim set forth in Section 5.2(a)(3) of the PI-AO TDP, as applicable.

136. **"Mesothelioma"** shall mean malignant mesothelioma diagnosed on the basis of the findings of a board certified pathologist.

137. **"Monokote-3"** or **"MK-3"** shall mean a fireproofing product used on steel structural components to prevent or delay the steel from collapsing in the event of a building fire.

138. **"Non-Debtor Affiliate"** shall mean each of the Entities designated as such in Exhibit 9 in the Exhibit Book

139. **"Non-Settling Asbestos Insurance Company"** shall mean any Asbestos Insurance Entity that is not a Resolved Asbestos Insurance Company or a Settled Asbestos Insurance Company.

15

140.    "**Parent**" shall mean W. R. Grace & Co., a Delaware corporation, the first named Debtor in the caption of the Chapter 11 Cases and ultimate parent holding company of all of the other Debtors and Non-Debtor Affiliates.

141.    "**Parent Common Stock**" shall mean the common stock, par value $0.01 per share, of the Parent or, if after the Effective Date, of the Reorganized Parent.

142.    "**PD Account**" shall mean the account established by the Trustees under the Asbestos Trust Agreement into which the Asbestos PD Class Fund shall be placed and from which Allowed Asbestos PD Claims shall be paid as soon as practicable after the Effective Date, as further described in the Asbestos Trust Agreement and the PD TDP.

143.    "**PD Trust Distribution Procedures**" or "**PD TDP**" shall mean the procedures, in the form attached as Exhibit 8 in the Exhibit Book, to be implemented by the Trustees pursuant to the terms and conditions of the Plan and the Asbestos Trust Agreement, to pay Allowed Asbestos PD Claims as set forth in such procedures.

144.    "**Petition Date**" shall mean April 2, 2001, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

145.    "**PI-AO Account**" shall mean the account established by the Trustees under the Asbestos Trust Agreement into which the Asbestos PI-AO Class Fund shall be placed and from which Allowed Asbestos PI-AO Claims shall be paid as soon as practicable after the Effective Date, as further described in the Asbestos Trust Agreement and the PI-AO TDP.

146.    "**PI-AO Trust Distribution Procedures**" or "**PI-AO TDP**" shall mean the procedures, in the form attached as Exhibit 7 in the Exhibit Book, to be implemented by the Trustees pursuant to the terms and conditions of the Plan and the Asbestos Trust Agreement, to liquidate, determine, and pay Allowed Asbestos PI-AO Claims as set forth in such procedures.

147.    "**PI-SE Account**" shall mean the account established by the Trustees under the Asbestos Trust Agreement into which the Asbestos PI-SE Class Fund shall be placed and from which Allowed Asbestos PI-SE Claims shall be paid as soon as practicable after the Effective Date, as further described in the Asbestos Trust Agreement and the PI-SE TDP.

148.    "**PI-SE Trust Distribution Procedures**" or "**PI-SE TDP**" shall mean the procedures, in the form attached as Exhibit 6 in the Exhibit Book, to be implemented by the Trustees pursuant to the terms and conditions of the Plan and the Asbestos Trust Agreement, to liquidate, determine, and pay Allowed Asbestos PI-SE Claims as set forth in such procedures.

149.    "**Plan**" shall mean Debtors' Plan of Reorganization under chapter 11 of the Bankruptcy Code dated as of November 13, 2004, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules to the foregoing, as the same may be in effect from time to time.

150.    "**Plan Documents**" shall mean the Plan, the Plan Supplement, the Disclosure Statement, the Glossary, and all exhibits in the Exhibit Book, either in their present form or as each may be amended, supplemented, or otherwise modified from time to time.

151.    "**Pre-petition Lawsuit**" shall mean any lawsuit that was filed against any of the Debtors before the Petition Date.

152.    "**Previously Settled/Adjudicated Asbestos Claim**" shall mean any Claim based on a Final Order or a pre-petition settlement that is enforceable by a Debtor or Debtors and by the Claimant, if such Claim would constitute an Asbestos PD Claim or Asbestos PI Claim but for the Final Order or settlement.

16

153. **"Priority Claim"** shall mean any Claim (other than an Administrative Expense Claim or Priority Tax Claim) to the extent such Claim is entitled to priority in right of payment under Bankruptcy Code § 507.

154. **"Priority Tax Claim"** shall mean a Claim that is of a kind specified in Bankruptcy Code §§ 502(i) or 507(a)(8).

155. **"Professional"** shall mean an Entity (i) employed pursuant to a Final Order in accordance with Bankruptcy Code §§ 327, 328, 363, 524(g)(4)(B)(i) and/or 1103 and to be compensated for services rendered prior to the Confirmation Date, pursuant to Bankruptcy Code §§ 327, 328, 329, 330 and 331, or (ii) for which compensation and reimbursement have been allowed by the Bankruptcy Court pursuant to Bankruptcy Code § 503(b)(4).

156. **"Pulmonary Function Testing"** shall mean spirometry testing that is (i) in material compliance with the quality criteria established by the American Thoracic Society and (ii) performed on equipment which is in material compliance with the standards of the American Thoracic Society for technical quality and calibration.

157. **"QSF"** shall mean a qualified settlement fund as defined by Treasury Regulation Section 1.468B-1 et seq.

158. **"Qualified Asbestos PI-AO Cash-Out Claim"** shall mean an Asbestos PI-AO Cash-Out Claim that meets the Medical/Exposure Criteria set forth in Section 5.2(a)(3) of the PI-AO TDP.

159. **"Quarterly Tax Distribution Date"** shall mean the first Business Day of each calendar quarter following the Initial Distribution Date; provided that the first Quarterly Tax Distribution Date following the Initial Distribution Date shall be no less than ninety (90) days following such Initial Distribution Date.

160. **"Registry"** shall mean a list to be maintained by the Asbestos Trust for those Holders of Asbestos PI-AO Claims who choose the Registry Option.

161. **"Registry Option"** shall mean one of the three treatment options available to be chosen by the Holder of an Asbestos PI-AO Claim, as described in Section 3.2 of the Plan.

162. **"Released Matters Injunction"** shall mean the injunction described in Section 8.4 of the Plan.

163. **"Reorganized Debtor," "Reorganized Debtors"** or **"Reorganized Grace"** shall mean the Debtor(s) from and after the Effective Date.

164. **"Reorganized Parent"** shall mean the Parent from and after the Effective Date.

165. **"Representatives"** shall mean, with respect to any Entity, the past and present directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of that Entity, or any other representatives or professionals of that Entity or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents.

166. **"Resolved Asbestos Insurance Company"** shall mean each of the Asbestos Insurance Entities that has entered into an Asbestos Insurance Settlement Agreement with the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, or any of them or their predecessors pursuant to which such Asbestos Insurance Entity has fully performed all of its obligations that have arisen or that ever might arise under such Asbestos Insurance Settlement Agreement and which is listed on a list to be included in the Plan Supplement but only with respect to the portion of the Asbestos Insurance Policy (scheduled immediately therewith on a list to be included in the Plan Supplement) that is affected by any such Settlement Agreement.

17

167. **"Retained Causes of Action"** shall mean the actual and potential causes of action that the Reorganized Debtors retain, on and after the Effective Date, on behalf of the Debtors, to commence and pursue, as appropriate, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, whether such causes of action accrued before or after the Petition Date, including the actions listed on Exhibit 11 in the Exhibit Book.

168. **"Scheduled Value"** shall mean each Scheduled Value available under the PI-SE TDP and PI-AO TDP, respectively, to those Claimants who elect the Cash-Out Option and who are determined to meet the applicable Medical/Exposure Criteria under the procedures set forth in the PI-SE TDP or PI-AO TDP, respectively.

169. **"Schedules"** shall mean the schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors in Possession with the Bankruptcy Court, as required by Bankruptcy Code § 521 and the Bankruptcy Rules, as such schedules and statements may be amended by the Debtors in Possession from time to time in accordance with Bankruptcy Rule 1007.

170. **"Sealed Air"** shall mean Sealed Air Corporation and Cryovac, Inc.

171. **"Sealed Air Common Stock"** shall mean the voting common stock, par value $0.10 per share, of Sealed Air.

172. **"Sealed Air Indemnified Parties"** shall mean Sealed Air Corporation, Cryovac, Inc. and all of their parent corporations, subsidiary corporations, joint ventures, Affiliates, and sister corporations, and any and all of their past, present and future agents, servants, officers, directors, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries, insurers (but solely to the extent of coverage procured by Sealed Air Corporation (after March 31, 1998) or Cryovac, Inc. (after such date) of any liabilities of Sealed Air for Asbestos Claims), or any of them, including any Entity acting on behalf of or at the direction of any them, but specifically excluding (i) the Debtors, (ii) all Non-Debtor Affiliates, (iii) Fresenius (to the extent of any and all claims, damages or debts arising out of the Fresenius Transaction as defined in the Sealed Air Settlement Agreement), and (iv) any and all insurers of the Debtors or the Non-Debtor Affiliates to the extent that they have provided coverage for Asbestos Claims now or hereafter asserted or which could have been asserted at any time against the Debtors or the Non-Debtor Affiliates.

173. **"Sealed Air Payment"** shall mean the payment delivered, on or as soon as practicable following the Effective Date, for and on behalf of Sealed Air to the Asbestos Trust pursuant to the terms of the Sealed Air Settlement Agreement. The Sealed Air Payment shall consist of: (i) five hundred twelve million five hundred thousand dollars ($512,500,000) in Cash, plus interest thereon from December 21, 2002 until the Effective Date, at a rate of 5.5% per annum compounded annually and (ii) nine million (9,000,000) shares of Sealed Air Common Stock (subject to adjustment as provided in the Sealed Air Settlement Agreement).

174. **"Sealed Air Settlement Agreement"** shall mean that certain agreement, in the form attached as Exhibit 12 in the Exhibit Book, dated November 10, 2003 and Filed with the Bankruptcy Court on November 26, 2003, as amended to address the Debtors' objections thereto, or otherwise.

175. **"SEC"** shall mean the United States Securities and Exchange Commission.

176. **"Second Hand Claim"** has the meaning specified in Section 5.3(a) of the PI-SE TDP or PI-AO TDP, as applicable.

177. **"Secured Claim"** shall mean a Claim that is: (i) secured by a lien (as such term is defined in Bankruptcy Code § 101(37)) on property in which the Debtors have an interest, which lien is valid, perfected, and enforceable under applicable law or by reason of a Final Order, or (ii) entitled to setoff under Bankruptcy Code § 553, to the extent of (A) the value of the Claimant's interest in the Debtor's interest in such

18

property or (B) the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code § 506(a).

178. **"Securities Act"** shall mean the Securities Act of 1933, as amended.

179. **"Settled Asbestos Insurance Company"** shall mean any Asbestos Insurance Entity (other than a Resolved Asbestos Insurance Company) that has entered into an Asbestos Insurance Settlement Agreement with the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, or any of them or their predecessors, as of the Effective Date, pursuant to which such Asbestos Insurance Entity must still perform its obligations under such Asbestos Insurance Settlement Agreement and which is listed on a list to be included in the Plan Supplement, but only with respect to any Asbestos Insurance Policy scheduled immediately therewith.

180. **"Settlors"** shall have the meaning ascribed to it on page 1 of the Asbestos Trust Agreement.

181. **"Significant Occupational Exposure"** shall have the meaning set forth in Section 5.4(b)(2) of the PI-SE TDP.

182. **"TAC"** shall mean the Trust Advisory Committee.

183. **"TDPs"** shall mean the Trust Distribution Procedures.

184. **"Termination Date"** shall have the meaning ascribed to it in Section 8.2 of the Asbestos Trust Agreement.

185. **"Third Party Indemnification/Contribution Claim"** shall mean an Asbestos Claim that is asserted against one or more Debtors and/or the Asbestos Trust based upon theories of contribution or indemnification under applicable law. A Third Party Indemnification/Contribution Claim shall be an Asbestos PI-SE Claim if and to the extent that it arises from the payment or other satisfaction of a Claim that would have been an Asbestos PI-SE Claim if it had not been paid or otherwise satisfied. A Third Party Indemnification/Contribution Claim shall be an Asbestos PI-AO Claim if and to the extent that it arises from the payment or other satisfaction of a Claim that would have been an Asbestos PI-AO Claim if it had not been paid or otherwise satisfied. A Third Party Indemnification/Contribution Claim shall be an Asbestos PD Claim if and to the extent that it arises from the payment or other satisfaction of a Claim that would have been an Asbestos PD Claim if it had not been paid or otherwise satisfied.

186. **"TLC"** shall mean total lung capacity, which is the total volume of air in the lung after maximal inspiration.

187. **"Trust Advisory Committee"** or **"TAC"** shall mean the Trust Advisory Committee established pursuant to the terms of the Plan and having the powers, duties and obligations set forth in the Asbestos Trust Agreement.

188. **"Trust By-Laws"** shall mean the by-laws of the Asbestos Trust, as authorized under Section 3.1(c)(viii) of the Asbestos Trust Agreement.

189. **"Trust Distribution Procedures"** or **"TDPs"** shall mean, collectively, the PI-SE TDP, the PI-AO TDP, and the PD TDP.

190. **"Trustee"** shall mean any individual confirmed by the Court to serve as a trustee of the Asbestos Trust, pursuant to the terms of the Plan, the Confirmation Order and the Asbestos Trust Agreement, or who subsequently may be appointed pursuant to the terms of the Asbestos Trust Agreement.

191. **"Unknown Causes of Action"** shall mean any Retained Causes of Action of which the Debtors are unaware at the time Exhibit 11 in the Exhibit Book is filed, and are therefore not listed on that Exhibit.

19

192.   "**Unliquidated Claim**" shall mean:  (i) any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is sought to be fixed, or (ii) any Claim for which no Allowed Amount has been determined.

193.   "**Unsecured Creditors' Committee**" shall mean the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to Bankruptcy Code § 1102.

194.   "**Unsecured Pass-Through Employee Related Claims**" shall mean all Claims (including accrued but unpaid pension Claims from the Petition Date) for compensation and benefits related to the Debtors' employment of their current and former employees.  Workers' Compensation Claims are not included within the Class of Unsecured Pass-Through Employee Related Claims.

195.   "**Voting Agent**" shall mean Bankruptcy Management Corporation, the party to whom all Ballots and/or Master Ballots should be submitted.

196.   "**Voting Deadline**" shall mean, 4:00 P.M. Eastern Time on April 1, 2005, which is the deadline by which anyone seeking to cast a Ballot or Master Ballot must submit such Ballot and/or Master Ballot, so that it is received by the Voting Agent.

197.   "**Voting Record Date**" shall mean two (2) Business Days after the entry of the Disclosure Statement Order.

198.   "**Warrants**" shall mean the redeemable restricted warrants to purchase Parent Common Stock at an exercise price of $0.01 per share, issued to the Asbestos Trust for the benefit of the Holders of Asbestos PI-AO Claims and exercisable in accordance with the Plan Documents, pursuant to a warrant agreement substantially in the form of Exhibit 15 in the Exhibit Book.

199.   "**Workers' Compensation Claims**" shall mean any Claim:  (i) for benefits under a state-mandated workers' compensation system, which a past, present, or future employee of the Debtors or their predecessors is receiving, or may in the future have a right to receive and/or (ii) for reimbursement brought by any insurance company or state agency as a result of payments made to or for the benefit of such employees under such a system and fees and expenses incurred under any insurance policies or laws or regulations covering such employee claims.

200.   "**WRG Asbestos Trust**" shall mean the Asbestos Trust.

201.   "**WRG Asbestos Trust Agreement**" shall mean the Asbestos Trust Agreement.

202.   "**ZAI**" shall mean Zonolite Attic Insulation, which is a loose-fill, non-roll vermiculite product primarily used in home attic insulation, that may contain naturally occurring asbestos.

203.   "**ZAI Claims**" shall mean:  (i) a Claim, Demand, or remedy, including all related claims, debts, obligations, or liabilities for compensatory (including general, special, and consequential damages) and punitive damages, (ii) a cross-claim, contribution claim, subrogation claim, reimbursement claim or indemnity claim, or (iii) any debt, liability, or obligation of one or more of the Debtors or any other Asbestos Protected Party (whether or not such Claim, Demand, remedy, debt, liability, or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; whether or not the facts of or legal bases therefor are known or unknown; and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty), for, relating to, or arising out of, resulting from, or attributable to, directly or indirectly property damage, including the cost of removal, abatement, or diminution in the value thereof, or environmental damage or economic loss caused or allegedly caused, by the ZAI sold, manufactured, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors (or any of their respective past or present Affiliates, or any of the predecessors of any of the Debtors or any

20

of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable).  ZAI Claims are included within the Class of Asbestos PD Claims.

Other Terms/Interpretation

(a)     Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the other genders.

(b)     When used in a Plan Document, the term "Claim" shall be broadly construed to include all manner and type of Claim, whenever and wherever such Claim may arise, and shall include Asbestos PI-SE Claims, Asbestos PI-AO Claims, and Asbestos PD Claims.

(c)     Any reference in a Plan Document to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions shall mean that such document shall be substantially in such form or substantially on such terms and conditions.

(d)     Any reference in a Plan Document to an existing document or exhibit in the Exhibit Book Filed or to be Filed shall mean the document or exhibit as it may have been or may be amended, modified or supplemented.

(e)     Any reference to an Entity as a Holder of a Claim shall include that Entity's successors, assigns and affiliates.

(f)     The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to a Plan Document as a whole and not to any particular section, subsection, or clause contained in a Plan Document.

(g)     The word "including" (and, with correlative meaning, the forms of the word "include") shall mean including, without limiting the generality of any description preceding that word; and the words "shall" and "will" are used interchangeably and have the same meaning.

(h)     Unless otherwise indicated herein, all references to dollars are to United States dollars.

(i)     An initially capitalized term used herein that is not defined herein shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require.

(j)     The descriptive headings contained in Plan Documents are included for convenience of reference only and are not intended to be a part of and shall not affect in any way the meaning or interpretation of Plan Documents.

(k)     All references in Plan Documents to sections, articles, and exhibits are references to sections, articles and exhibits of or to Plan Documents unless otherwise specified.

(l)     Unless otherwise expressly provided herein, in computing any period of time prescribed or allowed by a Plan Document, the provisions of Bankruptcy Rule 9006(a) shall apply.

(m)     The rules of construction set forth in Bankruptcy Code § 102 shall apply.

21

# Exhibit Tab 3

### Best Interests Analysis

EXHIBIT 3 TO EXHIBIT BOOK

### BEST INTERESTS ANALYSIS

The following document is the Best Interests Analysis (the "Analysis") of the Debtors. This Analysis assumes the Debtors' estates are substantively consolidated solely for the purposes of actions associated with the confirmation and consummation of the Plan, including, but not limited to, voting, confirmation and Distribution.

The purpose of the Analysis is to provide information in order that the Bankruptcy Court may determine that the Plan is in the best interests of all Classes of Claimants and Equity Interest Holders impaired by the Plan. The Analysis was prepared to assist the Bankruptcy Court in making this determination and it should not be used for any other purpose.

The Analysis assumes that the hypothetical Chapter 7 liquidation is effected via the orderly sale of the businesses of the Debtors and Non-Debtor Affiliates as going concerns. Because the Asbestos Channeling Injunction would not be available in a Chapter 7 liquidation, the value realized from the orderly sale of the businesses in all likelihood would be reduced as a result of a buyer's concern regarding the risk of asbestos liability in the acquisition of the assets. Further, the lack of the Asbestos Channeling Injunction may preclude an orderly sale of the businesses as going concerns, in which case an actual liquidation of assets would be required. In that case, values realized would be further reduced.

Conversion of the Chapter 11 Cases to Chapter 7 would likely result in additional costs to the estates. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee and other professionals retained by the trustee, including attorneys, financial advisors and consultants; asset disposition expenses; litigation costs related to possible fraudulent transfer actions and the resolution of asbestos and other Claims; all unpaid expenses incurred by the Debtors in the Chapter 11 Cases that are allowed in the Chapter 7 case; and Claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

The Analysis presents estimated net proceeds if the Debtors and the Non-Debtor Affiliates were liquidated under the provisions of Chapter 7 of the Bankruptcy Code and the allocation of such proceeds applied in strict priority to satisfy Claims against the Debtors.

The Analysis is limited to presenting information that is the representation of management in good faith based on assumptions believed to be reasonable. The Analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants. The estimates and assumptions, although considered reasonable by management, are inherently subject to significant uncertainties and contingencies beyond the control of management. Accordingly, there can be no assurance that results shown could be realized if a liquidation occurred and actual results in such case could vary materially from those presented.

All defined terms are as defined in the Glossary unless otherwise noted. The accompanying notes are an integral part of the Analysis.

**COMPARISON OF CHAPTER 7 LIQUIDATION TO CHAPTER 11 REORGANIZATION**
(unaudited, $ in millions)

| | Note | Chapter 7 Liquidation | | Chapter 11 Reorganization | |
| --- | --- | --- | --- | --- | --- |
| | | Low | High | Low | High |
| **Calculation of estimated net proceeds available for allocation:** | A | | | | |
| Estimated value of Reorganized Debtors and Non-Debtor Affiliates | | $ 2,200 | $ 2,600 | $ 2,200 | $ 2,600 |
| Less: discount factor | | (1,100) | (1,300) | - | - |
| Less: taxes due in foreign jurisdictions | | (68) | (63) | - | - |
| Estimated proceeds from sale of businesses | | $ 1,032 | $ 1,237 | $ 2,200 | $ 2,600 |
| | | | | | |
| **Plus other assets:** | B | | | | |
| Cash | | 457 | 457 | 448 | 458 |
| Fresenius Payment | | - | - | 115 | 115 |
| Sealed Air Payment | | - | 827 | 985 | 985 |
| Insurance recovery | | 472 | 500 | 500 | 500 |
| Present value of projected use of tax assets | | - | - | 50 | 70 |
| Estimated net proceeds available for allocation | | $ 1,961 | $ 3,021 | $ 4,298 | $ 4,728 |
| | | | | | |
| **Allocation of estimated net proceeds to Secured, Administrative and Priority Claims:** | | | | | |
| Costs associated with Chapter 7 liquidation | C | (53) | (37) | - | - |
| Environmental Claims | | (15) | (15) | (15) | (15) |
| Tax Claims | | (84) | (84) | (232) | (232) |
| Other Claims | | (68) | (68) | (59) | (59) |
| Estimated net proceeds available for allocation to General Unsecured Claims and Equity Interests | | $ 1,742 | $ 2,818 | $ 3,992 | $ 4,422 |
| | | | | | |
| **Allocation of estimated net proceeds to General Unsecured Claims:** | | | | | |
| Bank debt, capital leases, drawn letters of credit | | (517) | (517) | (610) | (610) |
| Unsecured Pass-Through Employee Related Claims | | (191) | (191) | (191) | (191) |
| Environmental Claims | | (323) | (323) | (330) | (330) |
| Litigation Claims | | (10) | (10) | (10) | (10) |
| Trade Claims | | (32) | (32) | (35) | (35) |
| Other Claims | | (150) | (150) | (150) | (150) |
| Fresenius indemnity Claim | | (148) | (148) | - | - |
| PBGC Claim, net | D | (146) | (99) | - | - |
| Assumed asbestos liabilities | E | (1,689) | (1,689) | (1,689) | (1,689) |
| | | | | | |
| **Excess / (Shortfall)** | | $ (1,464) | $ (342) | $ 977 | $ 1,407 |
| | | | | | |
| Recovery to Holders of General Unsecured Claims | | 54% | 89% | 100%+ | 100%+ |
| Value to Holders of Equity Interests | | $ - | - | $ 977 | $ 1,407 |

### Footnotes to Best Interests Analysis

A summary of the assumptions used by Blackstone and management of the Debtors and Non-Debtor Affiliates in preparing the Analysis is set forth below.

**Note A. *Proceeds from orderly sale of businesses***

In a Chapter 7 liquidation, it is assumed the businesses of the Debtors and Non-Debtor Affiliates would be sold as going concerns for cash to more than one buyer in a series of transactions to generate maximum value.  The proceeds from these sale transactions are assumed to be equal to the Core Business Value of the Reorganized Debtors and Non-Debtor Affiliates ($2.2 billion to $2.6 billion with a midpoint of $2.4 billion, as further described in Section 2.8 of the Disclosure Statement), less a discount factor.  Unlike a Chapter 11 reorganization, Chapter 7 does not provide for the issuance of the Asbestos Channeling Injunction.  Notwithstanding a presumed ability to sell assets in a sale under Bankruptcy Code §363 or the availability of an injunction under Bankruptcy Code §105, the discount factor quantifies the probability that the businesses could not be sold for fair value or at all because of the perceived risk that asbestos liability would follow the assets sold.

U.S. taxes due on the gain from the orderly sale of the Debtors' and Non-Debtor Affiliates' businesses are assumed to be offset by existing tax attributes and deductions generated by payments made to Claimants in the Chapter 7 case with the exception of approximately $5 million of state taxes.  It is assumed that for tax purposes, the sale of businesses in foreign countries will be structured as stock sales to take advantage of the predominant tax treaty exemptions for the payment of taxes on the gain generated by such sales.  Taxes due in foreign jurisdictions represent foreign transfer taxes, withholding taxes, and estimated local taxes attributable to separating the businesses in each foreign subsidiary and taxes due on the gain from the sale of stock in those jurisdictions that do not have a tax treaty exemption.

**Note B. *Other Assets***

Other assets include: cash assets, payments from third-party fraudulent transfer actions, asbestos insurance assets and tax assets.

Cash assets include Grace's Cash.  In addition, in the Chapter 7 liquidation, Cash also includes the cash value of corporate-owned life insurance policies, which are assumed terminated in a liquidation.  In the Chapter 11 reorganization, in which residual equity value is projected, Cash includes proceeds from the assumed exercise of in-the-money management and employee stock options.  This amount is calculated based on the projected number of shares and fully diluted reorganization equity value per share.

Payments from third-party fraudulent transfer actions reflects the following: Grace was named in a class action suit filed in California state court alleging that Grace's 1996 reorganization transaction with Fresenius and its 1998 reorganization with Sealed Air involved fraudulent transfers and demanding repayment of such transfers.  Prior to the filing of the Chapter 11 Cases, two other similar class actions were filed.  In November 2002, Fresenius and Sealed Air announced that they had reached an agreement in principle to settle Asbestos Claims and fraudulent transfer Claims related to the respective transactions.  Pursuant to the Fresenius Settlement Agreement and the Sealed

Air Settlement Agreement, respectively, and the provisions of the Plan, Fresenius shall make the Fresenius Payment and Sealed Air shall make the Sealed Air Payment. These agreements specifically require the existence of the Asbestos Channeling Injunction. Because the Asbestos Channeling Injunction is not available in a Chapter 7 liquidation, the Analysis assumes these settlement payments would not be made. It is assumed, however, that a Chapter 7 trustee would pursue similar fraudulent transfer actions. Because the outcome of this litigation cannot be known, a range is shown from zero, at the low end, to a level of Sealed Air proceeds equal to the Sealed Air Payment on a present value basis assuming a discount rate of 6% and a three year time period to collect, at the high end. It is assumed in a Chapter 7 liquidation scenario that Fresenius and/or Sealed Air would pay certain priority taxes directly to the IRS and file a General Unsecured Claim against the Debtors for indemnity under tax sharing agreements entered into at the time of the 1996 reorganization.

Asbestos insurance assets are calculated based on the assumed asbestos liability (see Note E). In a Chapter 7 liquidation, the low case reflects the risk that recovering this asset is delayed for one year, assuming a 6% discount rate.

Certain tax assets are projected to be utilized over time in the Chapter 11 reorganization by projected income. In a Chapter 7 liquidation, any excess tax attributes, after offsetting gains resulting from the liquidation, including gains on asset sales and cash repatriation, would expire unused.

Note C. *Costs associated with a Chapter 7 liquidation*

Costs associated with a Chapter 7 liquidation are assumed to include fees and costs for professionals retained by the Chapter 7 trustee, including legal, financial and claims processing advisors, estimated at $500,000 per month for eighteen months, for, among other things, pursuing the fraudulent transfer actions described in Note B and resolving Asbestos Claims. In addition, it is assumed the Chapter 7 trustee would receive payments equal to 1.5% of the estimated net proceeds available for allocation. Additional brokerage fees would be necessary for the orderly sale of Grace's businesses and other costs. Brokerage fees are calculated conservatively at 0.50% of gross proceeds, for a range of $6 million to $7 million.

Note D. *PBGC*

As of September 30, 2004, the Debtors and Non-Debtor Affiliates had fourteen funded, defined benefit pension plans, each of which is qualified under Section 401(a) of the IRC. In total, these plans were under funded by approximately $202 million. In the event a buyer chose not to assume the obligations of the underfunded defined pension liability, it is assumed that the PBGC would assume that liability. The amount represents the net difference between the assumed increase in a buyer's determination of value from saving future pension costs and the resulting estimated PBGC Claim, which is assumed to be asserted on the basis of termination of the plans.

Note E. *Assumed asbestos liabilities*

For purposes of this analysis, asbestos liabilities are assumed to equal the sum of (x) the maximum aggregate amounts that would satisfy the conditions precedent in Section

7.6.1(v) and Section 7.6.1(w) of the Plan; plus (y) an estimate of Previously Settled/Adjudicated Asbestos Claims.

# Exhibit Tab 4

W.R. Grace & Co. and Subsidiaries

Historical, Pro Forma and Prospective

Financial Information

## W. R. GRACE & CO. AND SUBSIDIARIES
## PROFORMA AND PROSPECTIVE FINANCIAL INFORMATION

The following proforma and prospective financial information (the "**Financial Information**") was prepared for the sole purpose of evaluating the feasibility of the proposed Plan of Reorganization (as such plan may be amended or modified, the "**Plan**") of W. R. Grace & Co. and Subsidiaries ("**Grace**") under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**"). The Financial Information reflects Grace's estimate of its expected consolidated financial position, results of operations, and cash flows as if the Plan were adopted as proposed. The Financial Information was prepared on the basis of the global operations of Grace, which include certain domestic and international subsidiaries and affiliates that are not debtors under the Bankruptcy Code.

**WHILE GRACE BELIEVES THE ASSUMPTIONS UNDERLYING THE PROFORMA AND PROSPECTIVE FINANCIAL INFORMATION, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE IS GIVEN THAT ANY OF THE FINANCIAL RESULTS WILL BE REALIZED. THIS FINANCIAL INFORMATION SHOULD NOT BE REGARDED AS A GUARANTEE OR WARRANTY BY GRACE, OR ANY OTHER PERSON, AS TO THE ACHIEVABILITY OF THE PROFORMA OR PROSPECTIVE FINANCIAL POSITION, RESULTS OF OPERATIONS, EARNINGS PER SHARE OR CASH FLOWS.   GRACE ASSUMES NO OBLIGATION OR UNDERTAKING TO UPDATE THE FINANCIAL INFORMATION, AND NO COMMENT WILL BE MADE ABOUT THE FINANCIAL INFORMATION EXCEPT AS REQUIRED BY THE BANKRUPTCY COURT.**

All estimates and assumptions underlying the Financial Information were developed by Grace. The assumptions disclosed herein are those that Grace believes are significant to the understanding and evaluation of the Financial Information. Although Grace believes the assumptions used are reasonable under the circumstances, such assumptions are subject to significant uncertainties such as: the loss of senior management and other key employees; changes in demand for Grace's products; changes in foreign currency exchange rates or interest rates; inflation that differs from that projected; changes in the business, competitive or political environment; technological breakthroughs, product innovations or competitive pricing strategies that negatively affect the profitability of a product or line of business; availability and cost of raw materials, energy and labor; and other factors affecting Grace's operations. Despite Grace's efforts to foresee and plan for the effects of changes in these circumstances, Grace cannot predict their impact with certainty.  Consequently, actual financial results will likely vary from that shown in the Financial Information, and the variations could be material.

The Financial Information was prepared by Grace in conformity with guidelines promulgated by the United States Securities and Exchange Commission ("**SEC**") and the American Institute of Certified Public Accountants ("**AICPA**"). The Financial Information has not been audited or reviewed by registered independent accountants.

2

## I.    FINANCIAL INFORMATION PRESENTED

The Financial Information included herein is as follows:

➢    Proforma condensed consolidated balance sheet of Grace as of September 30, 2004, reflecting the accounting effects of the Plan as if it were effective on that date, under guidance promulgated by the SEC.

➢    Proforma consolidated statements of operations and analysis of continuing operations of Grace for the year ended December 31, 2003 and for the nine months ended September 30, 2004, reflecting the accounting effects of the Plan as if it were in effect at the start of each period presented, under guidance promulgated by the SEC.

➢    Projected condensed consolidated balance sheets of Grace as of December 31, 2004, 2005 and 2006, as if the Plan were effective at December 31, 2004, under guidance promulgated by the AICPA, together with historical information as of December 31, 2001, 2002 and 2003.

➢    Projected consolidated statements of operations and analysis of continuing operations of Grace for the years ending December 31, 2004, 2005 and 2006, as if the Plan were effective on December 31, 2004, under guidance promulgated by the AICPA, together with historical information for the years ended December 31, 2001, 2002 and 2003.

➢    Projected condensed consolidated statements of cash flows of Grace for the years ending December 31, 2004, 2005 and 2006, as if the Plan were effective on December 31, 2004, under guidance promulgated by the AICPA, together with historical information for the years ended December 31, 2001, 2002 and 2003.

The Plan will be accounted for in accordance with the AICPA Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code" ("**SOP 90-7**"). The Financial Information has been prepared in conformity with United States Generally Accepted Accounting Principles consistent with those currently utilized by Grace in the preparation of its consolidated financial statements, except as otherwise noted. The Financial Information should be read in conjunction with the significant assumptions, qualifications and notes set forth herein and with the audited consolidated financial statements for the year ended December 31, 2003 contained in Grace's 2003 Form 10-K/A, and with Grace's third quarter 2004 Form 10-Q filed with the SEC in November, 2004. Historical financial information included herein was derived from such SEC documents. The Forms 10-K/A and 10-Q are available from Grace's website at www.grace.com or from the SEC at www.sec.gov.

3

II.     SUMMARY OF PRINCIPAL UNDERLYING ASSUMPTIONS

A.      *PROPOSED PLAN OF REORGANIZATION – GENERAL TERMS*

The proposed Plan is considered a "hypothetical assumption" (as defined under
AICPA guidance for prospective financial presentations) until such Plan is
confirmed by the Bankruptcy Court. The Plan may change significantly as
proceedings under Grace's Chapter 11 case further define and measure the claims
and liabilities that will be allowed and payable under a confirmed plan. This
Financial Information assumes that:

➤       Grace will satisfy all unresolved asbestos-related claims as outlined in the
        Plan through the contribution of Grace common stock and warrants, and
        assets available under certain third-party agreements, to an asbestos trust
        established under Bankruptcy Code Section 524(g). The value of such
        contribution will total approximately $1,613 million, including the
        estimated cost of trust administration, (such amount being equal to the
        maximum aggregate asbestos-related liability that would satisfy the
        conditions precedent set forth in Sections 7.6.1(v) and (w) of the Plan).
        Asbestos claims subject to prepetition judgments or agreements
        (approximately $76 million) will be resolved as part of general unsecured
        claims.

➤       Grace will distribute approximately $1,000 million in cash and $131
        million in Grace common stock to satisfy all non-asbestos claims payable
        at the effective date as follows:
        ▪       Bank debt including accrued interest - $607 million
        ▪       Environmental remediation - $238 million
        ▪       Special pension programs - $8 million
        ▪       Trade accounts payable and litigation - $78 million
        ▪       Tax claims  - $152 million
        ▪       Fees and other - $48 million

➤       Grace will satisfy all other non-asbestos liabilities (estimated to be
        approximately $508 million as of September 30, 2004), as they become
        due and payable over time (**"Reinstated Liabilities"**).

➤       Grace will finance the payments noted above (which total $3,329 million)
        with cash on hand (approximately $150 million); newly issued Grace
        common stock (approximately $640 million in value); value available
        from Sealed Air Corporation (approximately $985 million in cash and
        securities) and Fresenius Medical Care (approximately $115 million in
        cash) under litigation settlement agreements; initial borrowings under a
        new debt facility (approximately $800 million); future operating cash
        flows (approximately $508 million); and warrants (initially approximating
        $130 million in value), if required, to fund costs of the asbestos trust

4

related to asymtomatic personal injury claims if and when they materialize.

The Grace equity allocated to creditor claims under the Plan approximates $770 million in value. Additional equity of approximately $354 million (based upon the mid-point of the fully-diluted reorganized equity value range) is available to the asbestos trust through the exercise of warrants, if necessary, to satisfy trust costs related to personal injury asymptomatic and other claimants beyond Grace's effective date estimate. Should the cost of the personal injury asymptomatic and other claimants exceed the total value of the warrants, Grace would be obligated to fund the additional costs with cash.

**B.    PROJECTIONS OF OPERATING RESULTS – GENERAL ASSUMPTIONS**

➢    Methodology – The projections of operating performance were prepared using a strategic planning methodology by each of Grace's reportable business segments, Davison Chemicals and Performance Chemicals, which were then consolidated. Executive management of Grace reviewed the segment and consolidated results for achievability based on recent historical performance, expected economic conditions, investment plans and other relevant factors, and adjusted the strategic plans accordingly to reflect the results of operations and cash flows that are reasonably expected to be achieved over the projection period.

➢    Business Environment - The operating projections assume the continuation of a stable economic and political environment with variability in global economic activity over the projection period as experienced in a typical business cycle.

➢    Sales – Consolidated sales are projected to increase approximately 6% annually over the projection period (after taking into account added sales from acquisitions completed in 2004), consistent with Grace's experience over the most recent five-year business cycle. The projections assume that revenue growth will come from the success of Grace's operating strategies and include increasing business with existing customers, developing new customers, penetrating new markets, commercializing new products and acquiring related businesses.

➢    Gross Product Margins – Gross margin on product sales (defined as sales less cost of goods sold and depreciation) is assumed to remain relatively constant as a percentage of sales over the projection period and consistent with Grace's past performance. Selling price increases through improved product offerings and the success of productivity initiatives are assumed to offset inflation on direct production costs.

➢    Expenses – Operating expenses which include selling, general administrative and research and development costs are assumed to increase over the projection period based on factors of general inflation,

5

business strategy and specific considerations for personnel-related costs such as compensation, health care, retirement benefits and insurance.

## III.    PROPOSED PLAN OF REORGANIZATION

The proforma financial information of Grace presented herein reflects the accounting effects of the proposed Plan (1) as if it were put in effect on the date of Grace's most recent publicly reported consolidated balance sheet for September 30, 2004, and (2) as if it were in effect for the historical reporting periods for the year ended December 31, 2003 and for the nine-months ended September 30, 2004. Such proforma financial statements show how Grace's assets, liabilities, equity and income would be affected by the Plan as follows:

### A.    ADDITIONAL PRE-PETITION EXPENSE AND INSURANCE

Reflects the accrual of added asbestos and other costs necessary to adjust Grace's balance sheet to assumed allowed claim amounts, including accrued interest, as described in the Plan. Certain amounts are recorded at net payable value, which assumes funding will occur at or near the effective date. Reinstated Liabilities are recorded at estimated amounts payable over time, and on a net present value basis where appropriate.  Insurance assets are recorded at the net present value of recoverable amounts from the assumed level of future payments to asbestos claimants. Tax accounts are adjusted accordingly for both added deductible liabilities and insurance income.

### B.    BORROWINGS UNDER NEW DEBT AGREEMENTS

Reflects the assumed establishment of a new $1,000 million debt facility to fund settled claims payable at the effective date (approximately $800 million) and to provide working capital (approximately $200 million) for continuing operations. Future periods reflect an assumed 7% interest rate on outstanding borrowings. No such facility currently exists but, in Grace's view based on discussions with prospective lenders, one can be established before the effective date of the Plan.

### C.    FRESENIUS AND SEALED AIR SETTLEMENTS

Reflects the value, in the form of cash and securities, expected to be realized under each litigation settlement agreement as follows: $115 million of cash from Fresenius Medical Care; and, $985 million of estimated value from Sealed Air Corporation (calculated as of September 30, 2004) in the form of $512 million of cash plus accrued interest at 5.5% from December 21, 2002, and 9 million shares of Sealed Air common stock valued at $47 per share. Tax accounts have been adjusted to reflect the satisfaction of Grace's recorded liabilities by way of these third-party agreements. The Fresenius settlement amount will be payable to Grace and will be accounted for as income. The Sealed Air settlement assets will be paid directly to the asbestos trust by Sealed Air and will be accounted for as satisfaction of a recorded liability.

6

**D.    PAYMENT OF REMAINING PRE-PETITION LIABILITIES**

Reflects the accounting for the transfer of funds and securities to settle obligations payable under the Plan at the effective date. Tax accounts are adjusted to reflect the change in nature of Grace's tax assets from predominately temporary differences to predominately time-limited tax net operating losses. Non-asbestos Reinstated Liabilities of approximately $508 million are assumed to be paid in cash when due.

**E.    PROFORMA CONSOLIDATED STATEMENT OF OPERATIONS**

Reflects the elimination from Grace's historical financial statements of: (1) charges and expenses directly related to Chapter 11, (2) the $50.0 million net gain from property litigation recorded in the third quarter of 2004, and (3) the addition of interest and new common shares related to the assumed financing of the Plan.

## IV.    PROJECTIONS OF OPERATING RESULTS

The operating projections consider the performance of each reportable business segment (Davison Chemicals and Performance Chemicals) over the past five years and executive management's view of the total revenue and earnings the underlying businesses can achieve over the projection period, given expectations about general economic and specific industry conditions.  The segment level projections were prepared on a basis of global business operations, which include certain domestic entities and international subsidiaries and affiliates of Grace that are not debtors under Chapter 11 of the Bankruptcy Code.

**A.    GENERAL ECONOMIC FACTORS**

The Financial Information has been developed assuming that global economic and political conditions will be stable and that the overall sales growth and cost productivity achieved by Grace over the past five years will continue over the projection period.  Grace's product portfolio is diversified across several end-use industries and geographic markets.  This diversification provides a buffer against adverse changes in any one industry or region and, absent a period of extended recession globally, provides a reasonable basis for projecting sales growth consistent with past experience.

**B.    INDUSTRY FACTORS**

In addition to general economic conditions globally, Grace's sales are affected by the demand for products used in the construction industry (primarily non-residential construction), the petroleum refining industry, the food packaging industry (particularly rigid containers), the plastics industry and, to a lesser degree, the automotive, personal care, coatings, pharmaceuticals and biotechnology industries. The average growth rates experienced by these industries over the past five-year business cycle forms the base for Grace's assumed product line growth rates over the projection period.

7

## C.    INVESTMENT ASSUMPTIONS

The rate of growth of Grace's sales over the past five years has been influenced by a relatively steady and consistent level of sales from the acquisition of businesses and new products that complement existing product offerings or expand geographic presence. These acquisitions and new products have generally been synergistic by way of leveraging infrastructure, better utilizing sales channels, and accessing new markets with current products. The Financial Information assumes a continuation of this growth strategy through targeted acquisitions, self-constructed added capacity and new product commercialization similar to that which Grace has pursued in the past several years.

## D.    COST INFLATION AND PRODUCTIVITY

Inflation is projected to average approximately 2% to 3% globally over the projection period based on economic indicators from independent sources. The general increase in costs caused by inflation is assumed to be offset by a combination of sales from new product offerings and productivity improvements from Six Sigma and other cost reduction and efficiency programs, resulting in gross product margins that are consistent over the projection period with those achieved on average by Grace over the past five years. Selling and research and development expenses are projected to increase at rates generally above that of average inflation, reflecting investments in programs that are designed to achieve projected sales growth. General and administrative expenses are also expected to increase at an above-average inflation rate reflecting historical trends in these expenses, which includes items like insurance, pensions and professional services.

## E.    FOREIGN CURRENCY EXCHANGE RATES

Foreign currency exchange rates are assumed to remain consistent with those in effect at September 30, 2004.

## F.    DEPRECIATION AND AMORTIZATION

Depreciation is projected in two components. Current base depreciation is reduced by about 2% annually through the projection period. Depreciation on new capital investments, including a portion from investments in acquired businesses, is projected using an average 10-year depreciable life. Amortization of identifiable intangible assets acquired in business combinations is also assumed to be over an average 10-year economic life.

## G.    INTEREST EXPENSE AND INTEREST INCOME

The Financial Information assumes an effective interest rate of 7% on both average debt outstanding over the projection period and on Reinstated Liabilities with actual or estimated fixed and determinable payment dates. Interest expense is offset by interest income on the outstanding cash balance at an investment earnings rate of 3%.

8

### H.    CHAPTER 11 EXPENSES AND CHARGES

Chapter 11 expenses are projected in 2004 only and reflect an estimate based on past experience and level of activity. This line item also includes the added accruals for asbestos-related claims, environmental claims and other costs necessary to adjust Grace's consolidated balance sheet to reflect liability estimates under the proposed definitions of allowed claims in the Plan. Certain of these costs, such as emergence fees and financing fees, are only payable and accountable when incurred. The liability estimates in the Plan are subject to challenge both in definition and in measurement. Accordingly, Grace will adjust its recorded liabilities for such matters when definitional and measurement uncertainties are resolved by the Bankruptcy Court.

### I.    INCOME TAXES

Income tax expense is calculated at an effective global rate of 35% based on Grace's assumed split of taxable income and interest on debt of approximately 50% in the United States and 50% in the rest of the world.

## V.    SIGNIFICANT ACCOUNTING MATTERS AND ASSUMPTIONS

### A.    ACCOUNTING POLICIES

Refer to Grace's Form 10K/A for the year ended December 31, 2003 incorporated herein by reference.

### B.    CASH AND CASH EQUIVALENTS

Grace will retain a minimum of approximately $250 million in cash for ongoing business liquidity. A revolving credit facility is assumed to fund, if necessary, working capital and other operating cash requirements that fluctuate with time. For these purposes, access to approximately $200 million in revolving line-of-credit borrowings is assumed to be established as of the effective date. No borrowings under the line of credit facility are assumed during the projection period.

### C.    WORKING CAPITAL

The projections reflect an annual increase in inventories, accounts receivables and accounts payable consistent with the increase in sales. The projections assume a slight lowering of the accounts receivable days sales outstanding with inventory days on hand and accounts payable days outstanding remaining relatively stable.

### D.    PROPERTIES AND EQUIPMENT, NET

Capital expenditures, including an allocation of assets acquired in business combinations, are assumed to equal annual depreciation over the projection period.

### E.    NET CASH VALUE OF COMPANY OWNED LIFE INSURANCE ("COLI")

The Financial Information assumes a $22 million conversion of net cash value to cash in the early part of 2005 reflecting a settlement with the Internal Revenue

9

Service that would initiate the termination of Grace's broad-based COLI policies. This termination of COLI policies will also result in a tax gain and the utilization of approximately $59 million of Grace's net operating loss carryforwards for federal income tax purposes. The remaining COLI policies are assumed to increase in cash value at approximately 9% annually, consistent with policy terms and past experience.

### F.    ASBESTOS-RELATED INSURANCE

Grace is entitled to a partial cash reimbursement under existing product liability insurance policies with respect to the cost of its asbestos-related lawsuits and claims. Insurance reimbursements are collectible as the liabilities are satisfied by the asbestos trust. The asbestos-related insurance asset represents the estimated nominal value of amounts expected to be received from solvent carriers under relevant insurance policies, based on the assumed funding levels required for the asbestos trust. The amount also approximates the net present value of future insurance recoveries based on an assumed actuarial profile of future trust payouts.

### G.    DEBT

Short-term debt represents borrowings under various lines of credit and other miscellaneous borrowings that are assumed to be satisfied shortly after the effective date. Long-term debt assumes an initial $800 million borrowing to fund the Plan. The debt facility is assumed to bear interest at an average of 7% annually. It is assumed that the outstanding balance is retired as cash in excess of minimum working capital needs becomes available and from proceeds under asbestos-related insurance policies.

### H.    PENSION LIABILITIES

The underfunded defined benefit pension liability represents the net present value of the difference between the fair value of pension trust assets and the accumulated benefit obligation of the related pension plans. The projections assume that, except for 2004 where pension plan payments are governed by the Bankruptcy Court, annual pension expense, including the amortization of accumulated experience losses, will be funded in the same year as expensed.

### I.    LIABILITIES SUBJECT TO COMPROMISE THAT ARE REINSTATED

Liabilities subject to compromise will be discharged at the effective date of the Plan except for the following non-asbestos liabilities that will be reinstated and satisfied in the normal course of business:

- ➢    Capital lease obligations of approximately $3 million are assumed to be satisfied under contractual terms.
- ➢    Reserves for environmental remediation of approximately $115 million are assumed to be funded based on agreements or settlements with relevant governmental agencies and property owners.
- ➢    Post-retirement health and pension benefits of approximately $186 million are assumed to be funded as benefit obligations are due under the terms of such arrangements.

10

➢  Reserves for litigation and contracts of approximately $57 million are assumed to be funded under stated and/or negotiated terms and settlements.

➢  Reserves for tax and other pass-through contingencies of approximately $147 million are assumed to be funded as settlements are reached.

## J.  INCOME TAXES

It is expected that Grace will receive federal and state income tax deductions in the amount equal to the cash and securities transferred to fund asbestos-related and other tax-deductible liabilities. These income tax deductions will result in net operating loss carryforwards ("NOLs") for federal income tax purposes. It is assumed that deferred tax liabilities related to core operations will be reduced over time but will be replaced with an equal amount of originating temporary differences. For purposes of the Financial Information, it is assumed that all tax benefits are available upon the effective date, that no valuation allowance is necessary and that no restrictions on NOL utilization will apply. However, the realization of the tax benefits of NOL carryforwards depends on the amount and timing of future U.S. taxable income and the avoidance of limitation events. These projections assume that sufficient U.S. taxable income will be generated to utilize recorded tax benefits before they expire. It is further assumed that the structuring of the new debt facility will involve the recognition of significant taxable dividends from Grace's foreign subsidiaries.  Depending on the timing of such dividends, it is possible that they would have the effect of exhausting some or all of Grace's NOLs and thereby limiting the financial benefit. This Financial Information assumes that the timing and structure of the Plan will be sufficiently flexible to avoid this effect on Grace's NOLs.  In particular, it is assumed that foreign tax credits and/or cash repatriation incentives under the American Jobs Creation Act of 2004, rather than NOLs, will be available to offset such income thereby preserving NOLs to offset future taxable income.

## K.  STOCK OPTIONS

Grace has granted stock options that upon exercise would add 8.2 million shares to those outstanding and $103 million in conversion proceeds. For purposes of these projections, 6.4 million of options are assumed to be exercised at the effective date, generating $68 million in conversion proceeds. Also, the Financial Information assumes that Grace will replace cash-based long-term incentive compensation arrangements with a stock-based plan that will be accounted for as expense at the time of grant.

## L.  WARRANTS

Under the Plan, Grace will issue warrants to the asbestos trust that are exchangeable into voting common stock for a penny-a-share to fund, if necessary, required payments under the trust arrangements for asymptomatic asbestos claimants. The number of warrants will be equal to (when combined with the initial payment of common stock to the asbestos trust) 50.1% of the value of Grace's equity capital at the effective date after all other dilutive and issued common shares are considered. Warrants will be assumed exchanged, and

11

therefore dilutive for earnings per share calculations, at the time trust liabilities are determined to be probable and estimable. The Financial Information assumes that the net present value of the allowed amount for qualified asymptomatic asbestos personal injury claims is $130 million at the effective date. This amount, and any required funding in excess of this amount, will be satisfied with Grace common stock through the exercise of warrants as claims are paid by the asbestos trust.

## M.   COMMON STOCK

Under the Plan, Grace will issue common stock to partially satisfy certain claims and liabilities. For purposes of this Financial Information, such common stock is assumed to be valued at approximately $16 per share at the effective date based on the mid-point of the fully diluted reorganized equity value per share range included as part of the Plan of Reorganization, increasing annually by 6%.

12

| W. R. Grace & Co. and Subsidiaries Proforma Condensed Consolidated Balance Sheet September 30, 2004 | | Proforma Adjustments | | | | |
|---|---|---|---|---|---|---|
| | September 30, 2004 As Reported | Additional Pre-Petition Expense and Insurance | Borrowings Under New Debt Agreements | Sealed Air/ Fresenius Settlements | Payment of Remaining Pre-Petition Liabilities | September 30, 2004 Proforma |
| In millions | | | | | | |
| **ASSETS** | | | | | | |
| **Current Assets** | | | | | | |
| Cash and cash equivalents | $        385.1 | | $     800.0 | $     115.0 | $     (1,065.0) | $      235.1 |
| Trade accounts receivable, net | 391.7 | | | | | 391.7 |
| Inventories | 237.8 | | | | | 237.8 |
| Deferred income taxes | 14.1 | | | | | 14.1 |
| Other current assets | 111.4 | | | | | 111.4 |
| Total Current Assets | 1,140.1 | - | 800.0 | 115.0 | (1,065.0) | 990.1 |
| Properties and equipment, net | 623.9 | | | | | 623.9 |
| Goodwill | 87.5 | | | | | 87.5 |
| Cash value of company owned life insurance, net of policy loans | 97.1 | | | | | 97.1 |
| Deferred income taxes: | | | | | | |
| Net operating loss carryforwards | 75.0 | | | (40.0) | 200.5 | 235.5 |
| Temporary differences | 514.4 | 205.0 | | (345.0) | (188.0) | 186.4 |
| Asbestos-related insurance | 263.4 | 236.6 | | | | 500.0 |
| Other assets | 285.1 | | | | | 285.1 |
| Total Assets | $    3,086.5 | $    441.6 | $    800.0 | $     (270.0) | $     (1,052.5) | $    3,005.6 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| **Current Liabilities** | | | | | | |
| Short-term debt | $          16.4 | | | | | $        16.4 |
| Accounts payable | 127.7 | | | | | 127.7 |
| Income taxes payable | 25.0 | | | | 12.5 | 37.5 |
| Other current liabilities | 197.1 | | | | | 197.1 |
| Total Current Liabilities | 366.2 | - | - | - | 12.5 | 378.7 |
| Long-term debt | 1.3 | | 800.0 | | | 801.3 |
| Deferred income taxes | 34.1 | | | | | 34.1 |
| Underfunded defined benefit pension liability | 295.9 | | | | | 295.9 |
| Other operating liabilities | 73.0 | | | | | 73.0 |
| Total Liabilities Not Subject to Compromise | 770.5 | - | 800.0 | - | 12.5 | 1,583.0 |
| Bank debt/letters of credit/capital leases | 572.8 | 37.0 | | | (607.0) | 2.8 |
| Liability for asbestos prepetition judgments and agreements | 76.0 | | | | (76.0) | - |
| Liability for unresolved asbestos-related litigation and claims | 910.6 | 702.4 | | (985.0) | (498.0) | 130.0 |
| Liability for environmental remediation | 346.3 | 6.9 | | | (238.2) | 115.0 |
| Liability for postretirement health and special pensions | 193.8 | | | | (8.0) | 185.8 |
| Liability for accounts payable and litigation | 132.3 | 3.0 | | | (78.0) | 57.3 |
| Liability for tax claims and contingencies | 201.9 | | | | (152.0) | 49.9 |
| Other nonoperating liabilities, including Plan contingencies | - | 146.1 | | | (48.4) | 97.7 |
| Liabilities Subject to Compromise | 2,433.7 | 895.4 | | (985.0) | (1,705.6) | 638.5 |
| Total Liabilities | 3,204.2 | 895.4 | 800.0 | (985.0) | (1,693.1) | 2,221.5 |
| **Shareholders' Equity (Deficit)** | | | | | | |
| Share capital | 429.7 | | | | 640.6 | 1,070.3 |
| Retained earnings and other equity items | (547.4) | (453.8) | - | 715.0 | - | (286.2) |
| Total Shareholders' Equity (Deficit) | (117.7) | (453.8) | - | 715.0 | 640.6 | 784.1 |
| Total Liabilities and Shareholders' Equity (Deficit) | $    3,086.5 | $    441.6 | $    800.0 | $     (270.0) | $     (1,052.5) | $    3,005.6 |

| W.R. Grace & Co. and Subsidiaries Condensed Consolidated Balance Sheets As Reported and Projected *In millions* | As Reported December 31, | | | Projected December 31, | | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004* | 2005 | 2006 |
| **ASSETS** | | | | | | |
| Current Assets | | | | | | |
| Cash and cash equivalents | $ 192 | $ 284 | $ 309 | $ 300 | $ 250 | $ 250 |
| Trade accounts receivable, net | 280 | 303 | 331 | 401 | 425 | 442 |
| Inventories | 180 | 174 | 215 | 224 | 244 | 261 |
| Deferred income taxes | 22 | 20 | 31 | 14 | 14 | 14 |
| Other current assets | 62 | 49 | 44 | 30 | 28 | 34 |
| Total Current Assets | 736 | 830 | 930 | 969 | 961 | 1,001 |
| | | | | | | |
| Properties and equipment, net | 589 | 622 | 657 | 650 | 650 | 650 |
| Goodwill | 56 | 65 | 85 | 85 | 85 | 85 |
| Cash value of company owned life insurance, net of policy loans | 75 | 83 | 91 | 75 | 59 | 65 |
| Deferred income taxes: | | | | | | |
| Net operating loss carryforwards | 100 | 108 | 75 | 212 | 226 | 219 |
| Temporary differences | 403 | 466 | 512 | 206 | 171 | 149 |
| Asbestos-related insurance | 284 | 283 | 269 | 500 | 500 | 232 |
| Other assets | 275 | 235 | 256 | 225 | 228 | 215 |
| Total Assets | $ 2,518 | $ 2,692 | $ 2,875 | $ 2,922 | $ 2,880 | $ 2,616 |
| | | | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| Current Liabilities | | | | | | |
| Short-term debt | $ 6 | $ 4 | $ 7 | $ 16 | $ - | $ - |
| Accounts payable | 86 | 100 | 102 | 115 | 127 | 135 |
| Income taxes payable | 15 | 12 | 16 | 38 | 38 | 38 |
| Other current liabilities | 126 | 131 | 130 | 126 | 141 | 153 |
| Total Current Liabilities | 233 | 247 | 255 | 295 | 306 | 326 |
| | | | | | | |
| Long-term debt | 524 | 539 | 565 | 800 | 780 | 516 |
| Deferred income taxes | 21 | 31 | 35 | 34 | 34 | 34 |
| Underfunded defined benefit pension liability | 85 | 298 | 264 | 296 | 265 | 232 |
| Liability for asbestos-related litigation | 996 | 973 | 992 | 130 | 77 | 74 |
| Liability for environmental remediation | 153 | 201 | 332 | 107 | 94 | 81 |
| Liability for postretirement health and special pensions | 242 | 222 | 204 | 186 | 164 | 142 |
| Liability for accounts payable and litigation | 112 | 88 | 89 | 57 | 32 | 7 |
| Liability for tax claims and contingencies | 217 | 228 | 218 | 50 | 30 | 10 |
| Other liabilities, including Plan contingencies | 77 | 87 | 85 | 171 | 151 | 132 |
| Total Liabilities | 2,660 | 2,914 | 3,039 | 2,126 | 1,933 | 1,554 |
| | | | | | | |
| Shareholders' Equity (Deficit) | | | | | | |
| Share capital | 434 | 434 | 433 | 1,070 | 1,133 | 1,140 |
| Retained earnings and other equity items | (576) | (656) | (597) | (274) | (186) | (78) |
| Shareholders' Equity (Deficit) | (142) | (222) | (164) | 796 | 947 | 1,062 |
| Total Liabilities and Shareholders' Equity (Deficit) | $ 2,518 | $ 2,692 | $ 2,875 | $ 2,922 | $ 2,880 | $ 2,616 |

* *Assumes plan of reorganization effective as of December 31, 2004.*

| W.R. Grace & Co. and Subsidiaries Consolidated Statements of Operations Proforma | Proforma Year Ended December 31, 2003 | | | Proforma Nine Months Ended September 30, 2004 | | |
|---|---|---|---|---|---|---|
| In millions, except per share amounts | As Reported | Proforma Adjustments | Proforma | As Reported | Proforma Adjustments | Proforma |
| Net sales | $ 1,980.5 | | $ 1,980.5 | $ 1,670.8 | | $ 1,670.8 |
| Cost of goods sold, exclusive of depreciation and amortization shown separately below | 1,289.8 | | 1,289.8 | 1,050.6 | | 1,050.6 |
| Selling, general and administrative expenses, exclusive of net pension expense shown separately below | 360.2 | | 360.2 | 321.1 | | 321.1 |
| Depreciation and amortization | 102.9 | | 102.9 | 80.4 | | 80.4 |
| Research and development expenses | 52.0 | | 52.0 | 38.8 | | 38.8 |
| Net pension expense | 58.1 | | 58.1 | 41.5 | | 41.5 |
| Interest expense and related financing costs | 15.6 | 39.7 | 55.3 | 12.3 | 28.8 | 41.1 |
| Other (income) expense | (16.7) | | (16.7) | (49.1) | 50.0 | 0.9 |
| Provision for environmental remediation | 142.5 | (142.5) | - | 20.0 | (20.0) | - |
| Provision for asbestos-related litigation | 30.0 | (30.0) | - | - | - | - |
| Total costs and expenses | 2,034.4 | (132.8) | 1,901.6 | 1,515.6 | 58.8 | 1,574.4 |
| Income (loss) before Chapter 11 expenses, income taxes and minority interest | (53.9) | 132.8 | 78.9 | 155.2 | (58.8) | 96.4 |
| Chapter 11 expenses, net | (14.8) | 14.8 | - | (11.8) | 11.8 | - |
| Provision for income taxes | 12.3 | (46.5) | (34.2) | (51.9) | 20.3 | (31.6) |
| Minority interest in consolidated entities | 1.2 | | 1.2 | (6.4) | | (6.4) |
| Net income (loss) | $ (55.2) | $ 101.1 | $ 45.9 | $ 85.1 | $ (26.7) | $ 58.4 |
| Basic earnings (loss) per common share | $ (0.84) | | $ 0.41 | $ 1.30 | | $ 0.53 |
| Weighted average number of basic shares | 65.5 | 45.2 | 110.7 | 65.7 | 45.2 | 110.9 |
| Diluted earnings (loss) per common share | $ (0.84) | | $ 0.39 | $ 1.29 | | $ 0.49 |
| Weighted average number of diluted shares | 65.5 | 53.1 | 118.6 | 66.0 | 53.1 | 119.1 |

| W.R. Grace & Co. and Subsidiaries Consolidated Statements of Operations As Reported and Projected | As Reported Year Ended December 31, | | | Projected Year Ending December 31, | | |
|---|---|---|---|---|---|---|
| In millions, except per share amounts | 2001 | 2002 | 2003 | 2004* | 2005 | 2006 |
| Net sales | $ 1,723 | $ 1,820 | $ 1,981 | $ 2,236 | $ 2,404 | $ 2,551 |
| Cost of goods sold, exclusive of depreciation and amortization shown separately below | 1,076 | 1,148 | 1,290 | 1,398 | 1,499 | 1,583 |
| Depreciation and amortization of operating assets | 89 | 95 | 103 | 111 | 121 | 131 |
| Selling, general and administrative expenses, exclusive of net pension (income) expense shown separately below | 340 | 340 | 360 | 450 | 463 | 490 |
| Research and development expenses | 50 | 51 | 52 | 52 | 56 | 63 |
| Net pension (income) expense | (6) | 25 | 58 | 61 | 65 | 67 |
| Interest expense and related financing costs | 37 | 20 | 16 | 14 | 55 | 45 |
| Provision for environmental remediation | 6 | 71 | 143 | 20 | - | - |
| Provision for asbestos-related litigation | - | - | 30 | - | - | - |
| Interest accretion of asbestos liability | - | - | - | - | 9 | 5 |
| Other (income) expense | (31) | (22) | (17) | (51) | (6) | (6) |
| Total costs and expenses | 1,561 | 1,728 | 2,035 | 2,055 | 2,262 | 2,378 |
| Income (loss) before Chapter 11 expenses, income taxes and minority interest | 162 | 92 | (54) | 181 | 142 | 173 |
| Chapter 11 expenses and charges, net | (16) | (30) | (15) | (394) | - | - |
| Provision for income taxes | (63) | (38) | 13 | (69) | (47) | (58) |
| Minority interest in consolidated entities | (4) | (2) | 1 | (6) | (7) | (7) |
| Net income (loss) | $ 79 | $ 22 | $ (55) | $ (288) | $ 88 | $ 108 |
| Basic earnings (loss) per common share | $ 1.20 | $ 0.34 | $ (0.84) | $ (4.38) | $ 0.77 | $ 0.94 |
| Weighted average number of basic shares | 65.3 | 65.4 | 65.5 | 65.7 | 114.6 | 115.0 |
| Diluted earnings (loss) per common share | $ 1.20 | $ 0.34 | $ (0.84) | $ (4.36) | $ 0.74 | $ 0.91 |
| Weighted average number of diluted shares | 65.4 | 65.5 | 65.5 | 66.0 | 119.0 | 119.2 |

* Assumes plan of reorganization effective as of December 31, 2004.

| W. R. Grace & Co. and Subsidiaries<br>Consolidated Analysis of Continuing Operations - Proforma<br>In millions | Proforma<br>Year Ended<br>December 31, 2003 | | | Proforma<br>Nine Months Ended<br>September 30, 2004 | | |
|---|---|---|---|---|---|---|
| | As Reported | Proforma Adjustments | Proforma | As Reported | Proforma Adjustments | Proforma |
| Net Sales: | | | | | | |
| Davison Chemicals | $ 1,039.9 | | $ 1,039.9 | $ 872.5 | | $ 872.5 |
| Performance Chemicals | 940.6 | | 940.6 | 798.3 | | 798.3 |
| Total Grace sales | $ 1,980.5 | $ - | $ 1,980.5 | $ 1,670.8 | $ - | $ 1,670.8 |
| Pre-tax operating income: | | | | | | |
| Davison Chemicals | $ 118.9 | | $ 118.9 | $ 112.1 | | $ 112.1 |
| Performance Chemicals | 107.9 | | 107.9 | 106.0 | | 106.0 |
| Corporate Costs: | | | | | | |
| Support functions and other | (30.2) | | (30.2) | (24.5) | | (24.5) |
| Pension and performance-related compensation | (47.9) | | (47.9) | (48.1) | | (48.1) |
| Corporate costs | (78.1) | - | (78.1) | (72.6) | - | (72.6) |
| Pre-tax income from core operations | 148.7 | - | 148.7 | 145.5 | - | 145.5 |
| Pre-tax loss from noncore activities | (190.1) | 172.5 | (17.6) | 12.6 | (30.0) | (17.4) |
| Interest expense | (15.6) | (39.7) | (55.3) | (12.3) | (28.8) | (41.1) |
| Interest income | 4.3 | | 4.3 | 3.0 | | 3.0 |
| Income (loss) before Chapter 11 expenses and income taxes | (52.7) | 132.8 | 80.1 | 148.8 | (58.8) | 90.0 |
| Chapter 11 expenses, net | (14.8) | 14.8 | - | (11.8) | 11.8 | - |
| Provision for income taxes | 12.3 | (46.5) | (34.2) | (51.9) | 20.3 | (31.6) |
| Net income (loss) | $ (55.2) | $ 101.1 | $ 45.9 | $ 85.1 | $ (26.7) | $ 58.4 |
| Key Financial Measures: | | | | | | |
| Pre-tax income from core operations as a percentage of sales | | | | | | |
| Davison Chemicals | 11.4% | | 11.4% | 12.8% | | 12.8% |
| Performance Chemicals | 11.5% | | 11.5% | 13.3% | | 13.3% |
| Total Core Operations | 7.5% | | 7.5% | 8.7% | | 8.7% |
| Pre-tax income from core operations before depreciation and amortization | $ 251.6 | | $ 251.6 | $ 225.9 | | $ 225.9 |
| As a percentage of sales | 12.7% | | 12.7% | 13.5% | | 13.5% |

| W. R. Grace & Co.<br>Consolidated Analysis of Continuing Operations<br>As Reported and Projected<br>In millions | As Reported<br>Year Ended December 31, | | | Projected<br>Year Ending December 31, | | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004* | 2005 | 2006 |
| Net Sales: | | | | | | |
| Davison Chemicals | $ 868 | $ 939 | $ 1,040 | $ 1,184 | $ 1,304 | $ 1,385 |
| Performance Chemicals | 855 | 881 | 941 | 1,052 | 1,100 | 1,166 |
| Total Grace sales | 1,723 | 1,820 | 1,981 | 2,236 | 2,404 | 2,551 |
| Pre-tax operating income: | | | | | | |
| Davison Chemicals | 124 | 129 | 119 | 151 | 160 | 170 |
| Performance Chemicals | 97 | 99 | 108 | 133 | 140 | 148 |
| Corporate Costs: | | | | | | |
| Support functions and other | (38) | (31) | (30) | (47) | (57) | (58) |
| Pension and performance-related compensation | 5 | (16) | (48) | (50) | (50) | (50) |
| Corporate costs | (33) | (47) | (78) | (97) | (107) | (108) |
| Pre-tax income from core operations | 188 | 181 | 149 | 187 | 193 | 210 |
| Pre-tax loss from noncore activities | 3 | (75) | (190) | 2 | - | - |
| Interest expense | (37) | (20) | (16) | (14) | (55) | (45) |
| Interest accretion of asbestos liability | - | - | - | - | (9) | (5) |
| Interest income | 4 | 4 | 4 | - | 6 | 6 |
| Income (loss) before Chapter 11 expenses and income taxes | 158 | 90 | (53) | 175 | 135 | 166 |
| Chapter 11 expenses and charges, net of tax | (16) | (30) | (15) | (394) | - | - |
| Provision for income taxes | (63) | (38) | 13 | (69) | (47) | (58) |
| Net income (loss) | $ 79 | $ 22 | $ (55) | $ (288) | $ 88 | $ 108 |
| Key Financial Measures: | | | | | | |
| Pre-tax income from core operations as a percentage of sales | | | | | | |
| Davison Chemicals | 14.3% | 13.7% | 11.4% | 12.8% | 12.3% | 12.3% |
| Performance Chemicals | 11.3% | 11.2% | 11.5% | 12.6% | 12.7% | 12.7% |
| Total Core Operations | 10.9% | 9.9% | 7.5% | 8.4% | 8.0% | 8.2% |
| Pre-tax income from core operations before depreciation, amortization and noncash compensation | $ 277 | $ 276 | $ 252 | $ 298 | $ 329 | $ 356 |
| As a percentage of sales | 16.1% | 15.2% | 12.7% | 13.3% | 13.7% | 14.0% |

* Assumes plan of reorganization effective as of December 31, 2004.

| W. R. Grace & Co. and Subsidiaries<br>Condensed Consolidated Statements of Cash Flows<br>As Reported and Projected<br>In millions | As Reported<br>December 31, | | | Projected<br>December 31, | | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004* | 2005 | 2006 |
| **Operating Activities** | | | | | | |
| Income (loss) before Chapter 11 expenses, income taxes and minority interest | $ 162 | $ 92 | $ (54) | $ 181 | $ 142 | $ 173 |
| Depreciation and amortization | 89 | 95 | 103 | 111 | 121 | 131 |
| Interest accrued/accreted not paid in cash | 23 | 15 | 11 | 12 | 9 | 5 |
| Loss (gain) on sales of investments and disposals of assets | (10) | (2) | 2 | - | - | - |
| Provision for environmental remediation | 6 | 71 | 143 | 20 | - | - |
| Provision for asbestos-related litigation | - | - | 30 | - | - | - |
| Total working capital changes | (64) | 22 | (42) | (23) | (31) | (21) |
| Income taxes paid, net of refunds | (28) | (32) | (28) | (32) | (25) | (29) |
| Other accruals and non-cash items | (61) | 11 | (15) | 13 | (9) | 7 |
| Proceeds from asbestos-related insurance | 79 | 11 | 13 | 6 | - | 268 |
| Cash used for non-operating liabilities: | | | | | | |
| Expenditures/warrants for asbestos-related litigation | (110) | (13) | (10) | (8) | (62) | (7) |
| Expenditures for environmental remediation | (29) | (21) | (11) | (11) | (13) | (13) |
| Payments to fund postretirement health and special pensions | (22) | (22) | (13) | (22) | (22) | (22) |
| Expenditures for retained obligations of divested businesses | (9) | (4) | (1) | (2) | (25) | (25) |
| Payments to fund tax claims and contingencies | - | - | - | - | (20) | (20) |
| Expenditures for nonoperating liabilities and Plan contingencies | - | - | - | - | (20) | (20) |
| Chapter 11 expenses paid | (12) | (27) | (18) | (15) | - | - |
| Payments of Chapter 11 liabilities with cash under the Plan | - | - | - | (1,065) | - | - |
| Net cash provided by operating activities | 14 | 196 | 110 | (835) | 45 | 427 |
| **Investing Activities** | | | | | | |
| Capital expenditures for property and equipment | (63) | (91) | (86) | (76) | (85) | (90) |
| Businesses acquired, net of cash acquired | (84) | (29) | (27) | (66) | (68) | (75) |
| Other investing activities, net | 16 | 9 | 4 | - | - | - |
| Net cash used for investing activities | (131) | (111) | (109) | (142) | (153) | (165) |
| **Financing Activities** | | | | | | |
| Net change in short term and COLI loans/investments | 34 | (5) | (3) | (14) | 15 | (6) |
| Borrowings under credit facilities, net of repayments and fees | 90 | (4) | (2) | - | - | - |
| Exercise of warrants to satisfy asbestos liability | - | - | - | - | 62 | 8 |
| Cash received from exercise of options | - | - | - | 68 | - | - |
| Borrowings (repayments) under Chapter 11 exit facility, net | - | - | - | 800 | (19) | (264) |
| Cash contributed under Chapter 11 settlement agreements | - | - | - | 115 | - | - |
| Net cash provided by (used for) financing activities | 124 | (9) | (5) | 969 | 58 | (262) |
| Effect of currency exchange rate changes on cash and cash equivalents | (7) | 16 | 29 | (1) | - | - |
| Increase (decrease) in cash and cash equivalents | - | 92 | 25 | (9) | (50) | - |
| Cash and cash equivalents, beginning of period | 192 | 192 | 284 | 309 | 300 | 250 |
| Cash and cash equivalents, end of period | $ 192 | $ 284 | $ 309 | $ 300 | $ 250 | $ 250 |

*Assumes plan of reorganization effective as of December 31, 2004.*

# Exhibit Tab 5

Asbestos Trust Agreement

## THE WRG ASBESTOS TRUST AGREEMENT

This WRG Asbestos Trust Agreement (the "Asbestos Trust Agreement"), effective as of _____, 2005 (the "Effective Date"), is entered into among W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company (collectively referred to herein as the "Debtors" in case number 01-1139 (JKF) in the Bankruptcy Court), as settlors (the "Settlors") and the Future Claimants' Representative, the Trust Advisory Committee and the Trustees identified on the signature page hereof and appointed on the Confirmation Date pursuant to the Debtors' Plan.

## RECITALS

WHEREAS, at the time of the entry of the orders for relief in the Chapter 11 Cases, the Debtors were named as defendants in personal injury actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products; and

WHEREAS, at the time of the entry of the orders for relief in the Chapter 11 Cases, the Debtors were named as defendants in actions seeking recovery on account of Asbestos PD Claims; and

1

WHEREAS, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code in a case pending in the Bankruptcy Court, known as *In re W. R. Grace & Co., et al.*, Case No. 01-1139 (JKF); and

WHEREAS, the Plan filed by the Debtors has been confirmed by the Court; and

WHEREAS, the Plan Documents provide, among other things, for the creation of the Asbestos Trust; and

WHEREAS, pursuant to the Plan, the Asbestos Trust is to use its assets and income to pay Asbestos Claims as and to the extent provided for herein and in the respective TDPs; and

WHEREAS, pursuant to the Plan, the Asbestos Trust is intended to qualify as a QSF; and

WHEREAS, it is the intent of the Settlors, the Trustees, the Future Claimants' Representative and the Trust Advisory Committee that the Asbestos Trust be administered, maintained, and operated at all times as a QSF through mechanisms that provide reasonable assurance that the Asbestos Trust will value, and be in a financial position to pay, all Asbestos Claims that involve similar claims in substantially the same manner in strict compliance with the terms of this Asbestos Trust Agreement, the respective TDPs, the Plan, and the Confirmation Order; and

WHEREAS, the Plan provides, among other things, for the complete treatment of all liabilities and obligations of the Debtors with respect to Asbestos Claims; and

WHEREAS, the District Court has determined that the Asbestos Trust and the Plan satisfy all the prerequisites for the Asbestos Channeling Injunction pursuant to Bankruptcy Code Sections 105(a), 524(g) and/or 1141 or otherwise, as provided for in the Plan, and such Asbestos Channeling Injunction have been entered by the District Court.

NOW, THEREFORE, in consideration of the mutual covenants and understandings contained herein, and subject to and on the terms and conditions herein set forth, the parties hereby agree as follows:

## Article 1.
## DEFINITIONS

### 1.1   DEFINITIONS.

All capitalized terms used herein but not otherwise defined shall have the respective meanings given to such terms in the Glossary of Terms used in the Plan Documents (the "Glossary"), and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Glossary, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Bankruptcy Rules, and such definitions are incorporated herein by reference.

2

## Article 2.
## AGREEMENT OF TRUST

2.1     CREATION AND NAME. The Settlors hereby create a trust known as the "WRG Asbestos Trust" as a Delaware statutory trust, to be created upon entry of the Confirmation Order, effective as of the Effective Date, pursuant to the Plan. The Trustees of the Asbestos Trust may transact the business and affairs of the Asbestos Trust in the name "WRG Asbestos Trust." Contemporaneously with the execution of this Asbestos Trust Agreement, the Settlors will file a Certificate of Trust for the creation of a statutory trust with the Secretary of State of Delaware.

2.2     PURPOSE. The purposes of the Asbestos Trust are to:

(a)     assume the liabilities of the Debtors with respect to all Asbestos Claims (whether now existing or arising at any time hereafter),

(b)     process, liquidate, pay and satisfy all Asbestos Claims in accordance with this Asbestos Trust Agreement, the respective TDPs, the Plan, the CMO and the Confirmation Order,

(c)     use the Asbestos Trust Assets to pay holders of such Asbestos Claims in accordance with this Asbestos Trust Agreement, the respective TDPs, the Plan, and the Confirmation Order and in such a way that all holders of Asbestos Claims that involve similar claims are treated in substantially the same manner and to otherwise comply in all respects with the requirements of a trust set forth in Section 524(g)(2)(B)(i) of the Bankruptcy Code,

(d)     preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Allowed Asbestos Claims, and

(e)     otherwise carry out the provisions of this Asbestos Trust Agreement and any other agreements into which the Trustees have entered or will enter in connection with the Plan.

2.3     TRUST DISTRIBUTION PROCEDURES.

In furtherance of the purposes of the Asbestos Trust, as set forth above in Section 2.2, the Trustees shall be responsible for supervising and administering the respective TDPs and performing all other purposes of the Asbestos Trust. All Asbestos Claims shall be determined, liquidated, and paid, if Allowed, pursuant to this Asbestos Trust Agreement and the TDPs. All Asbestos PI-AO Claims shall be determined, liquidated, and paid, if Allowed, pursuant to this Asbestos Trust Agreement and the PI-AO Trust Distribution Procedures. All Asbestos PI-SE Claims shall be determined, liquidated, and paid, if Allowed, pursuant to this Asbestos Trust Agreement and the PI-SE Trust Distribution Procedures. All Asbestos PD Claims shall be determined, liquidated, and paid, if Allowed, pursuant to this Asbestos Trust Agreement and the PD Trust Distribution Procedures.

3

2.4    TRANSFER OF ASSETS. On the thirty-first (31st) day after the Effective Date, and pursuant to the Plan and the Confirmation Order, the Settlors, and any other party transferring any Asbestos Trust Asset to the Asbestos Trust, will transfer, issue or assign, as appropriate, and deliver to the Asbestos Trust all right, title and interest in and to the Asbestos Trust Assets, free and clear of all Claims, Equity Interests, Encumbrances and other interests of any Entity without any further action of any Entity. The Settlors, and any other party transferring any Asbestos Trust Asset to the Asbestos Trust, shall execute and deliver, or cause to be executed and delivered, such documents as the Trustees may reasonably request from time to time to reflect the transfer, issuance and assignment, as applicable of the Asbestos Trust Assets to the Asbestos Trust.

2.5    ACCEPTANCE OF ASSETS AND ASSUMPTION OF LIABILITIES. In connection with and in furtherance of the purposes of the Asbestos Trust, the Trustees, on behalf of the Asbestos Trust, hereby expressly accept the transfer, issuance and assignment, as applicable, to the Asbestos Trust of the Asbestos Trust Assets at the time and in the manner contemplated by the Plan Documents, and in accordance with the terms of this Asbestos Trust Agreement.

(b)    In furtherance of the purposes of the Asbestos Trust, the Trustees, on behalf of the Asbestos Trust, hereby expressly assume all Asbestos Claims (whether now existing or arising at any time hereafter). The Asbestos Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding Asbestos Claims that the Debtors or any successors of the Debtors have or would have had under applicable law or under any agreement related thereto.

(c)    Nothing in this Asbestos Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction or Released Matters Injunction issued in connection with the Plan or the Asbestos Trust's assumption of the Asbestos Claims as and when provided herein.

2.6    QUALIFIED SETTLEMENT FUND.

No provisions herein or in the TDPs shall be construed to mandate distributions on any Asbestos Claims or other actions that would contravene the Asbestos Trust's compliance with the requirements of a QSF. In the event of any conflict between the requirements of a QSF and the terms of this Asbestos Trust Agreement, the terms of this Asbestos Trust Agreement shall be construed so as to be consistent with such requirements of a QSF.

4

## Article 3.
## POWERS, TRUST ADMINISTRATION & REPORTING

**3.1   POWERS.**

(a)   Each Trustee is and shall act as a fiduciary to the Asbestos Trust in accordance with the provisions of this Asbestos Trust Agreement, the Plan, and Delaware law.   The Trustees shall, at all times, administer the Asbestos Trust in accordance with Article 3 of this Asbestos Trust Agreement.   Subject to the limitations set forth in this Asbestos Trust Agreement and the TDPs, the Trustees shall have the power to take any and all actions that, in the reasonable judgment of the Trustees, are necessary, proper or convenient to effectuate the purposes of the Asbestos Trust, including, without limitation, each power expressly granted in this Section 3.1, any power reasonably incidental thereto, and any statutory trust power now or hereafter permitted under the laws of the State of Delaware.

(b)   Except as required by applicable law or as otherwise specified herein, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)   Without limiting the generality of Section 3.1(a) above, and except as limited herein, the Trustees shall have the power to:

   (i)   receive and hold the Asbestos Trust Assets, in the separate accounts described below;

   (ii)   invest the monies held from time to time by the Asbestos Trust;

   (iii)   sell, transfer, or exchange any or all of the Asbestos Trust Assets at such prices and upon such terms as they may consider proper, consistent with the other terms of this Asbestos Trust Agreement;

   (iv)   enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the Asbestos Trust to operate;

   (v)   pay liabilities and expenses of the Asbestos Trust, including Asbestos Trust Expenses;

   (vi)   establish such funds, reserves and accounts in the name of the Asbestos Trust, as deemed by the Trustees to be useful in carrying out the purposes of the Asbestos Trust;

5

(vii)   sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding or legal action;

(viii)  adopt and amend by-laws of the Asbestos Trust not inconsistent with the terms hereof (the "Trust By-Laws");

(ix)    supervise and administer the Asbestos Trust in accordance with the TDPs and the terms hereof;

(x)     administer, amend, supplement, or modify the TDPs, all in accordance with the terms thereof;

(xi)    appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing and forecasting, and other consultants or alternative dispute resolution panelists, and agents as the business of the Asbestos Trust requires, and to delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of the Asbestos Trust;

(xii)   pay employees, legal, financial, accounting, investment, auditing and forecasting, and other consultants, advisors, and agents reasonable compensation, including without limitation, compensation at rates approved by the Trustees for services rendered prior to the execution hereof;

(xiii)  compensate the Trustees, the Future Claimants' Representative, the Trust Advisory Committee and their respective Representatives and reimburse all out of pocket costs and expenses incurred by such Entities in connection with the performance of their duties hereunder, including without limitation costs and expenses incurred prior to the execution hereof;

(xiv)   execute and deliver such instruments as the Trustees consider proper in administering the Asbestos Trust;

(xv)    enter into such other arrangements with third parties as are deemed by the Trustees to be useful in carrying out the purposes of the Asbestos Trust, provided, however, such arrangements do not conflict with any other provision of the Plan, the Confirmation Order, this Asbestos Trust Agreement or the TDPs;

6

(xvi)   indemnify in accordance with Section 3.5, the Entities to be indemnified under Section 3.5 to the fullest extent that a corporation or trust organized under the law of the State of Delaware is from time to time entitled to indemnify and/or insure its Representatives, and purchase insurance for the Asbestos Trust and those Entities for whom the Asbestos Trust has an indemnification obligation hereunder;

(xvii)  delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Asbestos Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Sections 5.4, 6.8 and 7.9;

(xviii) consult with Reorganized Debtors or their successors at such times and with respect to such issues relating to the conduct of the Asbestos Trust as the Trustees consider desirable;

(xix)   make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the Asbestos Trust or the name of Reorganized Debtors or any successor in interest, any claim, right, action or cause of action, included in the Asbestos Trust Assets;

(xx)    object to Asbestos Claims as provided in the Plan;

(xxi)   procure insurance policies and establish claims handling agreements and other arrangements as provided in Section 3.5 and 8.2 of this Asbestos Trust Agreement;

(xxii)  obtain a tax identification number for the Asbestos Trust, communicate with the IRS and state and local taxing authorities on behalf of the Asbestos Trust, make payment of taxes on behalf of the Asbestos Trust, and file all applicable tax returns for the Asbestos Trust; and

(xxiii) enter into an agreement with the Reorganized Debtors whereby the Asbestos Trust will provide its Asbestos Claims books and records to the Reorganized Debtors so as to fully enable the Reorganized Debtors to recover any amounts available under any Asbestos Insurance Policy as if the Reorganized Debtors were processing, litigating and/or paying the Asbestos Claims directly.

7

(d) The Trustees shall not have the power to guarantee any debt of any other Entity.

(e) The Trustees shall give the FCR and the TAC prompt notice of any act performed or taken pursuant to Section 3.1(c)(ii), (iii), (iv), (vi), (vii), (viii), (ix), (x), (xiii), (xv), (xviii), (xix), (xx), (xxi) and Section 3.2(h).

**3.2    GENERAL ADMINISTRATION AND OBLIGATIONS OF THE TRUSTEES.**

(a) To the extent not inconsistent with the terms of this Asbestos Trust Agreement, the Trust By-Laws shall govern the affairs of the Asbestos Trust and each Trustee shall act in accordance with the Trust By-Laws. In the event of an inconsistency between the Trust By-Laws and this Asbestos Trust Agreement, this Asbestos Trust Agreement shall govern.

(b) <u>Tax Returns and Reports.</u>

　　(i) The Trustees shall cause to be obtained, at the cost and expense of the Asbestos Trust, a Federal Employer Identification Number ("FEIN"), and relevant state tax identification numbers, for the Asbestos Trust and shall cause such income tax and other returns and statements as are required by the applicable provisions of the IRC and the Treasury Regulations and such other state or local laws and regulations as may be applicable to be timely filed on behalf of the Asbestos Trust on the basis of a December 31 year end. The Trustees shall take all steps necessary to ensure that any tax obligations imposed upon the Asbestos Trust are paid and shall otherwise comply with Section 1.468B-2 of the Treasury Regulations and all other reporting obligations of the Asbestos Trust. The Trustees shall comply with all applicable withholding obligations as required under the applicable provisions of the IRC and such other state and local laws as may be applicable, and the regulations promulgated thereunder.

　　(ii) The Trustees shall cause the Asbestos Trust to qualify and maintain qualification as a QSF.

　　(iii) Within seventy-five (75) days (or earlier if required by law) after the end of each calendar year, the Asbestos Trust shall cause to be prepared and mailed such information as required by law to enable payees to complete and file each of their respective federal, state and local income and other tax returns. The Trustees also shall provide a copy of any

8

filed tax returns of the Asbestos Trust to the FCR and the TAC when such return is filed.

(c)  Reports.

(i)  The Trustees shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, but, in any event, no later than one hundred twenty (120) days following the end of each fiscal year, an annual report containing financial statements of the Asbestos Trust (including, without limitation, a balance sheet of the Asbestos Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent registered public accountants selected by the Trustees and accompanied by an opinion of such firm that such financial statements present fairly in all material respects the financial position of the Asbestos Trust as of such year end and the results of its operations as of the year then ended in conformity with accounting principles generally accepted in the United States. The Trustees shall provide a copy of such reports to the FCR, the TAC and Reorganized Debtors or their successors when such reports are filed with the Bankruptcy Court.

(ii)  Simultaneously with delivery of each set of financial statements referred to in Section 3.2(c)(i), the Trustees shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of Asbestos Claims (and the amount paid in respect of each such Asbestos Claim disposed of during the period covered by the financial statements). The Trustees shall provide a copy of such reports to the FCR and the TAC when such reports are filed.

(iii)  All materials required to be filed with the Bankruptcy Court by this Section 3.2(c) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

(d)  The Trustees, and all parties to this Asbestos Trust Agreement agree to cooperate to the maximum extent reasonably possible in conducting any matters involving taxes, including the preparation of any necessary tax returns or reports, the furnishing of information necessary to prepare tax returns or reports, the administration of any tax audit or review, and the conduct of any tax contest. If it shall become necessary to contest any disputed tax, the party primarily liable for such potential tax liability shall

9

91100-001\DOCS_DE:102548.1

be entitled to control such contest, and the other parties shall cooperate with such controlling party to the maximum extent reasonably possible.

(e)     As provided in Section 7.2.8 of the Plan, on the Effective Date or as soon thereafter as is practicable, the Trustees, on behalf of the Asbestos Trust, shall enter into a cooperation agreement with the Reorganized Debtors pursuant to which: (a) the Reorganized Debtors shall provide to the Asbestos Trust the non-privileged books and records of the Debtors and the Reorganized Debtors that pertain directly to Asbestos Claims and (b) the Asbestos Trust shall provide to the Reorganized Debtors books and records of the Asbestos Trust that pertain to Asbestos Claims so as to fully enable the Reorganized Debtors to recover any amounts available under any Asbestos Insurance Policy as if the Reorganized Debtors were processing, litigating and/or paying the Asbestos Claims directly.

(f)     The Trustees shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The Trustees shall provide a copy of the budget and cash flow to the FCR and the TAC.

(g)     The Trustees shall consult with the FCR (other than with respect to the PD TDP) and the TAC (i) on the implementation and administration of the TDPs and (ii) on the implementation and administration of the Asbestos Trust. The Trustees may consult with the FCR and the TAC with respect to any other matter affecting the Asbestos Trust. The Trustees shall meet with the FCR and the TAC not fewer than four (4) times each calendar year during the first two (2) years following the Effective Date and then two (2) times each calendar year thereafter, which shall be at a regular or special meeting of the Trustees as mutually agreed to by the Trustees, the FCR and the TAC, to discuss general matters regarding the administration of the Asbestos Trust, the review, allowance, and payment of Asbestos Claims, and the condition of the Asbestos Trust Assets.

(h)     In addition to the other provisions contained in this Asbestos Trust Agreement or in the TDPs requiring the consent of the FCR (except as it may affect Asbestos PD Claims) and the TAC, the Trustees shall be required to obtain the consent of the FCR and the consent of the TAC to:

(i)     amend any provision of this Asbestos Trust Agreement;

(ii)    terminate the Asbestos Trust pursuant to Section 8.2 hereof;

10

(iii)    change the number of Trustees to serve hereunder and appoint successor Trustee(s); provided, however, that in no event shall the number of Trustees authorized to serve hereunder exceed five (5);

(iv)    change the compensation of the Trustees (other than mere cost-of-living increases);

(v)    amend or modify the TDPs; or

(vi)    take any action pursuant to Section 3.1(c)(viii) or 3.1(c)(xxi).

(i)    The Trustees, upon notice from the FCR or the TAC requesting consideration of one or more issues, shall at their next regular meeting or, if appropriate, at a specially called meeting, place on their agenda and consider such issues.

3.3    [INTENTIONALLY LEFT BLANK].CLAIMS ADMINISTRATION.On the Effective Date, the Trustees shall promptly proceed to adopt and implement the TDPs.

3.5    INDEMNIFICATION OF TRUSTEES AND ADDITIONAL INDEMNITEES.The Asbestos Trust shall indemnify and defend the Trustees and the Asbestos Trust's officers and employees to the fullest extent that a corporation or trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and defend its directors, trustees, officers and employees against any and all liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties hereunder. Additionally, any Entity who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative, or arbitrative action, by reason of any act or omission of such Entity with respect to (i) the Chapter 11 Cases and any act or omission undertaken by them prior to the commencement thereof, (ii) the liquidation of any Asbestos Claims, (iii) the administration of the Asbestos Trust and the implementation of TDPs, or (iv) any and all activities in connection with this Asbestos Trust Agreement (an "Additional Indemnitee") shall be indemnified and defended by the Asbestos Trust to the fullest extent that a corporation or trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and defend its officers, directors, trustees, and employees, against reasonable expenses, costs and fees (including reasonable attorneys' fees and costs), judgments, awards, amounts paid in settlement, and liabilities of all kinds incurred by each Additional Indemnitee in connection with or resulting from such action, suit, or proceeding, if he or she acted in good faith and in a manner such Additional Indemnitee reasonably

11

believed to be in, or not opposed to, the best interests of the holders of Asbestos Claims whom the applicable Additional Indemnitee represents. Notwithstanding the foregoing, neither the Trustees nor any officer or employee of the Asbestos Trust, nor the FCR nor any member of the TAC shall be indemnified or defended in any way for any liability, expense, claim, damage, or loss for which they are ultimately liable under Sections 5.4, 6.8 or 7.9, as applicable.

(b)    Reasonable expenses, costs and fees (including reasonable attorneys' fees and costs) incurred by or on behalf of a Trustee or any Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative or arbitrative from which he or she is indemnified by the Asbestos Trust pursuant to Section 3.5(a), shall be paid by the Asbestos Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of such Trustee or Additional Indemnitee, to repay such amount in the event that it shall be determined ultimately by Final Order that such Trustee or any Additional Indemnitee is not entitled to be indemnified by the Asbestos Trust.

(c)    The Trustees shall have the power, generally or in specific cases, to cause the Asbestos Trust to indemnify the agents, advisors, or consultants of the Asbestos Trust to the same extent as provided in this Section 3.5 with respect to the Trustees.

(d)    Any indemnification under Section 3.5(c) of this Asbestos Trust Agreement shall be made by the Asbestos Trust upon a determination by the Trustees that indemnification of such Entity is proper in the circumstances.

(e)    The Trustees may purchase and maintain reasonable amounts and types of insurance on behalf of the Asbestos Trust and pay any individual who is or was a Trustee, officer, employee, agent or representative of the Asbestos Trust or an Additional Indemnitee against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, FCR, member of the TAC, officer, employee, agent or other representative.

3.6    ENCUMBRANCE.The Trustees and the Additional Indemnitees shall have an Encumbrance upon the Asbestos Trust Assets which shall be prior to any other Encumbrance thereon, and the Asbestos Trust hereby grants a security interest in the Asbestos Trust Assets, all proceeds thereof and all accounts into which such proceeds or the Asbestos Trust Assets are deposited or maintained to each of the Trustees and the Additional Indemnitees, to secure the payment of any amounts payable to them pursuant to Section 3.5, 5.5, 6.5 or 7.6. The Asbestos Trust shall take such actions as may be necessary or reasonably requested by any of the Trustees,

12

the FCR, the TAC or any of the other Additional Indemnitees to evidence such Encumbrance (including, without limitation, filing appropriate financing statements).

## Article 4.
## ACCOUNTS, INVESTMENTS, AND PAYMENTS

     **4.1**   ACCOUNTS.The Trustees may, from time to time, establish and maintain such accounts and reserves within the Asbestos Trust estate as they may deem necessary, prudent, or useful in order to provide for the payment of Asbestos Trust Expenses payable hereunder and Asbestos Claims in accordance with the TDPs, and may, with respect to any such account or reserve, restrict the use of monies therein. In addition, the Trustees shall establish, as soon as practicable after the Effective Date, four separate and distinct accounts (maintained in separate banking and/or other accounts) to be designated the "PI-SE Account," the "PI-AO Account," the "PD Account," and the "Trust Expenses Account," respectively, and none of the assets held in the PI-SE Account, the PI-AO Account, the PD Account, or, the Trust Expenses Account, respectively, shall be commingled with assets held by the Asbestos Trust in any other account. In addition, separate books and records shall be kept with respect to each of the PI-SE Account, the PI-AO Account, the PD Account, and the Trust Expenses Account (collectively, the "Asbestos Trust Accounts"). All amounts received by the Asbestos Trust in respect of the Debtors' Payment and the Sealed Air Payment, and all proceeds thereof and earnings thereon, shall be divided and held by the Asbestos Trust in the following way:

     (a)   The amount received by the Asbestos Trust in respect of the Debtors' Payment and the Sealed Air Payment equal to the amount of the Asbestos PI-SE Class Fund, as determined by Bankruptcy Court, and all proceeds thereof and earnings thereon, shall be held solely in the PI-SE Account and shall be used to pay Allowed Asbestos PI-SE Claims as and to the extent provided in the PI-SE TDP, and any and all applicable tax obligations of the Asbestos Trust arising out of the assets comprising such Asbestos PI-SE Class Fund.

     (b)   The amount received by the Asbestos Trust in respect of the Sealed Air Payment (to the extent any funds remain after first funding the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund) and the Debtors' Payment equal to the amount of the Asbestos PI-AO Class Fund, as determined by the Bankruptcy Court, and all proceeds thereof and earnings thereon, shall be held solely in the PI-AO Account and shall be used to pay Allowed Asbestos PI-AO Claims as and to the extent provided by the PI-AO TDP, and any and all applicable tax obligations of the Asbestos Trust arising out of the assets comprising such Asbestos PI-AO Class Fund.

     (c)   The amount received by the Asbestos Trust in respect of the Debtors' Payment and the Sealed Air Payment equal to the amount of the Asbestos PD Class Fund, as determined by the Bankruptcy

13

Court, and all proceeds thereof and earnings thereon, shall be held solely in the PD Account and shall be used to pay Allowed Asbestos PD Claims as and to the extent provided in the PD TDP, and any and all applicable tax obligations of the Asbestos Trust arising out of the assets comprising such Asbestos PD Class Fund.

(d)     The amount received by the Asbestos Trust in respect of the Debtors' Payment equal to the amount of the Asbestos Trust Expenses Fund, as determined by the Bankruptcy Court, and all proceeds thereof and earnings thereon, shall be held solely in the Trust Expenses Account and shall be used to pay Asbestos Trust Expenses as and to the extent approved by the Trustees, and any and all applicable tax obligations of the Asbestos Trust arising out of the assets comprising such Asbestos Trust Expenses Fund.

4.2     **INVESTMENTS.**Investment of monies held in the Asbestos Trust shall be administered in the manner in which individuals of ordinary prudence, discretion, and judgment would act in the management of their own affairs, subject to the following limitations and provisions:

(a)     The Asbestos Trust shall not acquire, directly or indirectly, equity in any Entity or business enterprise if, immediately following such acquisition, the Asbestos Trust would hold more than 5% of the equity in such Entity or business enterprise. The Asbestos Trust shall not hold, directly or indirectly, more than 10% of the equity in any Entity or business enterprise.

(b)     The Asbestos Trust shall not acquire or hold any long-term debt securities unless (i) such securities are rated "A" or higher by Moody's Investors Services, Inc. ("Moody's") or by Standard & Poor's Corporation ("S&P"), or (ii) such securities have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(c)     The Asbestos Trust shall not acquire or hold any commercial paper unless such commercial paper is rated "P-1" or higher by Moody's or "A-1" or higher by S&P or has been given an equivalent rating by another nationally recognized statistical rating agency.

(d)     The Asbestos Trust shall not acquire or hold any promissory note of a domestic corporation unless such note is rated "A" or higher by Moody's or S&P.

(e)     The Asbestos Trust shall not acquire or hold any foreign or domestic banker's acceptance, certificate of deposit, time deposit or note, unless that instrument is rated "A" or higher by Moody's or S&P.

14

(f)    The Asbestos Trust may acquire issue which is a direct or indirect obligation of any state, county, city or other qualifying entity. A short term issue may be rated no lower than "M1G 1" or "SP-1"; a long-term issue may be rated no lower than "A" by S&P or Moody's.

(g)    The Asbestos Trust may invest in a money market fund if the fund has minimum net assets of $550 million.

(h)    The Asbestos Trust shall not acquire or hold any common or preferred stock or convertible securities unless such stock or securities are rated "A" or higher by Moody's or "A" or higher by S&P's.

(i)    The Asbestos Trust shall not acquire any securities or other instruments issued by any Entity (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof) if, following such acquisition, the aggregate fair market value as determined in good faith by the Trustees of all securities and instruments issued by such Entity held by the Asbestos Trust would exceed 2% of the aggregate value of the Asbestos Trust. The Asbestos Trust shall not hold any securities or other instruments issued by any Entity (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof to the extent that the aggregate fair market value as determined in good faith by the Trustees of all securities and instruments issued by such Entity and held by the Asbestos Trust would exceed 5% of the aggregate value of the Asbestos Trust.

(j)    The Asbestos Trust shall not acquire or hold any certificates of deposit unless all publicly-held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 4.2(b).

(k)    The Asbestos Trust shall not acquire or hold any options or derivatives.

(l)    The Asbestos Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustees, they are adequately collateralized.

(m)    Notwithstanding the foregoing, the Asbestos Trust may (A) acquire and hold equity or debt securities or instruments of the

15

type(s) described in clauses (a) through (l) of this Section 4.2 which are issued by the Debtors, Reorganized Debtors, or any of their Affiliates, or successors, (B) may hold the Sealed Air Common Stock (but no other securities issues by Sealed Air), and (C) may acquire and hold any other property or asset included in kind in the Asbestos Trust Assets, in each case without regard to any of the limitations set forth in such clauses (a) through (l).

**4.3     SOURCE OF PAYMENTS.**All Asbestos Trust Expenses and all liabilities with respect to each of the Asbestos Claims, shall be payable by the Asbestos Trust out of the Asbestos Trust Accounts. Neither the Debtors, Reorganized Debtors, their respective Affiliates or subsidiaries, any successor in interest or the present or former stockholders, shareholders or Representatives of the Debtors, Reorganized Debtors, or their Affiliates, nor the Trustees, the FCR, the TAC or any of their Representatives shall be liable for the payment of any Asbestos Claims, Asbestos Trust Expenses or any other liability of the Asbestos Trust. Notwithstanding the above, and as described in Section 7.2.2 of the Plan, after the exhaustion of the Asbestos PI-AO Class Fund in its entirety, all Allowed PI-AO Claims shall be paid in Cash by the Asbestos Trust from funds to be paid to the Asbestos Trust by the Reorganized Debtors, such funds being in addition to the Debtors' Payment.

**4.4     INDEMNIFICATION.**

Any claim for indemnification from the Asbestos Trust and all costs and expenses associated therewith (except for an indemnification claim which is also an Asbestos Claim) shall be satisfied from the Trust Expenses Accounts. Nothing herein is intended to be, nor shall it be construed as, an admission as to the validity or enforceability of any particular claim for indemnification, including any claim for indemnification by any Holder of an Asbestos Claim.

## Article 5.
## TRUSTEES

**5.1     NUMBER.**

The initial number of Trustees shall be three (3); provided, however, that the number of Trustees may be increased or decreased in accordance with Section 3.2(h)(iii) hereof. The initial Trustees shall be nominated by the Debtors on or before the Confirmation Date. The Bankruptcy Court, after notice and opportunity for hearing, shall be asked to appoint the three individuals named by the Debtors to serve as Trustees of the Asbestos Trust effective as of the Effective Date.

**5.2     TERM OF SERVICE.**The initial Trustees shall serve from the Effective Date and each successor Trustee or Trustees named to fill a vacancy shall serve from the date of appointment until the earlier of (i) his or her death, (ii) the end of the calendar year in which he or she reaches age 70, (iii) his or her resignation pursuant to Section

16

5.2(b), (iv) his or her removal pursuant to Section 5.2(c), or (v) the termination of the Asbestos Trust pursuant to Section 8.2.

(b) Any Trustee may resign at any time by written notice to each of the TAC and the FCR. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c) Any Trustee may be removed in the event that such Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause shall be deemed to include any substantial failure to comply with Section 3.2, a consistent pattern of neglect and/or failure to perform or participate in performing the duties of a trustee hereunder, or repeated non-attendance at scheduled meetings. Such removal shall be made by the mutual decision of the TAC and the FCR, and shall take effect at such time as the TAC and the FCR jointly shall determine.

5.3    APPOINTMENT OF SUCCESSOR TRUSTEE(S). In the event of a vacancy in the position of a Trustee, the vacancy shall be filled by the joint consent of the TAC and the FCR. If such vacancy has not been filled within ninety (90) days, the Bankruptcy Court shall be asked to fill the vacancy on application of the FCR or any member of the TAC.

(b) Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.

5.4    LIABILITY OF TRUSTEES, OFFICERS AND EMPLOYEES. No Trustee, officer, or employee of the Asbestos Trust shall be liable to the Asbestos Trust, to any Entity holding an Asbestos Claim, or to any other Entity except for such individual's gross negligence or willful misconduct. Such protection may, in the discretion of the Trustees, be extended to the agents, advisors, or consultants of the Asbestos Trust. No Trustee, officer, or employee of the Asbestos Trust shall be liable for any act or omission of any other officer, employee, agent or consultant of the Asbestos Trust, unless such Trustee, officer, employee or consultant of the Asbestos Trust, respectively, acted with gross negligence or willful misconduct in the selection or retention of such other officer, employee, agent, or consultant of the Asbestos Trust.

5.5    COMPENSATION AND EXPENSES OF TRUSTEES. Each Trustee shall receive compensation from the Asbestos Trust for his or her services as a Trustee in the amount of $_____ per annum plus a per diem allowance for meetings or other Asbestos Trust business attended

17

in the amount of $\_\_\_\_\_. The per annum compensation payable to each Trustee hereunder shall be reviewed every three (3) years and appropriately adjusted with the consent of each of the FCR and the TAC.

(b) The Asbestos Trust shall promptly reimburse each Trustee on a monthly basis for all reasonable out-of-pocket costs and expenses incurred by each Trustee in connection with the performance of his or her duties hereunder.

(c) The Asbestos Trust shall include a description of the amounts paid under this Section 5.5 in the report to be filed pursuant to Section 3.2(c)(i) of this Asbestos Trust Agreement.

**5.6** TRUSTEES' EMPLOYMENT OF PROFESSIONALS. The Trustees may, but shall not be required to, retain and/or consult with counsel, accountants, appraisers, auditors and forecasters, professionals related to the litigation of Asbestos Claims including but not limited to medical professionals, and other Entities deemed by the Trustees to be qualified as experts on the matters submitted to them with the consent of each of the FCR and the TAC, and the opinion of any such Entities on any matters submitted to them by the Trustees shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustees hereunder in good faith and in accordance with the written opinion of any such Entity, in the absence of gross negligence.

**5.7** TRUSTEES' INDEPENDENCE. No Trustee shall, during the term of his or her service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for the Reorganized Debtors or any of their successors. No Trustee shall act as an attorney for any Entity who holds an Asbestos Claim.

**5.8** BOND. The Trustees shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

### Article 6.
### THE FUTURE CLAIMANTS' REPRESENTATIVE

**6.1** DUTIES. The FCR shall serve in a fiduciary capacity, for the purpose of protecting the rights of persons that might subsequently assert Claims and/or Demands channeled to the Asbestos Trust. Where provided in this Asbestos Trust Agreement or the TDPs, certain actions of the Trustees are subject to the consent of the FCR.

**6.2** TERM OF OFFICE. The FCR shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b), (iii) his or her removal pursuant to Section 6.2(c) or (iv) the termination of the Asbestos Trust pursuant to Section 8.2.

(b) The FCR may resign at any time by written notice to the Trustees. Such notice shall specify a date when such resignation shall take

18

effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The FCR may be removed in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause shall be deemed to include a consistent pattern of neglect and failure to perform or to participate in performing the duties of the FCR hereunder and under the TDPs, such as repeated non-attendance at scheduled meetings. Such removal shall be made by decision of the Trustees and the TAC, subject to an order of the Bankruptcy Court approving same, and shall take effect at such time as the Bankruptcy Court's order becomes a Final Order.

**6.3**    APPOINTMENT OF SUCCESSOR. A vacancy caused by resignation shall be filled with an individual designated by the resigning FCR. A vacancy for any other reason, or in the absence of a designation by the former FCR, shall be filled with an individual selected by the Trustees with the consent of the TAC.

**6.4**    FUTURE CLAIMANTS' REPRESENTATIVE'S EMPLOYMENT OF PROFESSIONALS. The FCR may retain and/or consult with counsel, accountants, appraisers, auditors, forecasters, asbestos experts and other Entities deemed by the FCR to be qualified as experts on matters submitted to them, and the opinion of any such Entities on any matters submitted to them shall be full and complete authorization and protection in support of any action taken or not taken by the FCR hereunder in good faith and in accordance with the written opinion of any such Entity, and in the absence of gross negligence. The FCR and his or her experts shall at all times have complete access to the Asbestos Trust's officers, employees and agents, and the accountants, appraisers, auditors, forecasters and other experts retained by the Asbestos Trust as well as to all information generated by them or otherwise available to the Asbestos Trust or the Trustees.

**6.5**    COMPENSATION AND EXPENSES OF THE FUTURE CLAIMANTS' REPRESENTATIVE. The FCR shall receive compensation from the Asbestos Trust for his or her services in the form of the FCR's normal hourly rate for services performed, consistent with the Bankruptcy Court's order approving his appointment, such compensation being subject to an annual review, adjustment, and approval by the Trustees.

(b)    The Asbestos Trust shall promptly reimburse, or pay directly if so instructed, the FCR for all reasonable out-of-pocket costs and expenses, including (i) fees and costs associated with the employment of professionals pursuant to Section 6.4, (ii) reasonable fees and costs incurred in connection with the performance of his or her duties hereunder, and (iii) reasonable fees and costs associated with the procurement and maintenance of insurance incurred by the FCR in connection with the performance of his or her duties hereunder. All such reimbursements or direct

19

payments shall be subject to approval by the Trustees and shall be deemed Asbestos Trust Expenses.

**6.6    PROCEDURE FOR OBTAINING CONSENT OF THE FUTURE CLAIMANTS' REPRESENTATIVE.**In the event the consent of the FCR is required pursuant to the terms of this Asbestos Trust Agreement, the Trustees shall promptly provide the FCR and his or her counsel with notice and with all information regarding the matter in question.

(b)    The FCR must consider in good faith and in a timely fashion any request by the Trustees and may not withhold his or her consent unreasonably. If the FCR does not notify the Trustees of his or her objection to such request within 20 days or such other time period as has been approved by the Bankruptcy Court after receiving notice and information regarding such request, then the FCR's consent shall be deemed to have been affirmatively granted.

**6.7    LACK OF CONSENT OF THE FUTURE CLAIMANTS' REPRESENTATIVE.**In the event the Trustees are unable to obtain the consent of the FCR to any action or decision for which consent is required after following the procedure set forth in Section 6.6 of this Asbestos Trust Agreement, or if the Trustees and the FCR are unable to reach agreement on any matter on which such consent is required, the matter shall be submitted promptly to alternative dispute resolution if mutually agreeable to the Trustees and the FCR.

(b)    If the disagreement is not resolved by alternative dispute resolution or if the Trustees and the FCR do not agree to participate in any such alternative dispute resolution, the Trustees may apply to the Bankruptcy Court on an expedited basis for approval of such action or decision, and only if such approval is given by the Bankruptcy Court by entry of an appropriate order, shall the Trustees have the authority to implement such action or decision without the FCR's consent.

**6.8    LIABILITY OF FUTURE CLAIMANTS' REPRESENTATIVE, OFFICERS AND EMPLOYEES.**The FCR shall not be liable to the Asbestos Trust, to any Entity holding an Asbestos Claim, or to any other Entity except for such individual's own gross negligence or willful misconduct. Such protection may, in the discretion of the Trustees, be extended to the agents, advisors, or consultants of the FCR. Neither the FCR nor any officer or employee of the FCR shall be liable for any act or omission of any other Representative of the Asbestos Trust, unless the FCR, or officer or employee of the FCR, acted with gross negligence or willful misconduct in the selection or retention of such other Representative of the Asbestos Trust.

20

## Article 7.
## TRUST ADVISORY COMMITTEE

**7.1**    FORMATION AND NUMBER.The TAC shall be formed pursuant to the Plan as of the Effective Date. The TAC shall be composed of three (3) members. The initial TAC members shall be appointed by the Bankruptcy Court pursuant to Section 7.2.7 of the Plan and named on the signature page hereof. The TAC shall have a chairperson who shall act as the TAC's liaison with the Asbestos Trust and the FCR, coordinate and schedule meetings of the TAC, and handle all administrative matters that come before the TAC.

**7.2**    DUTIES.The TAC and its members shall serve in a fiduciary capacity representing all Holders of Asbestos Trust Claims as of the Effective Date. Where provided in this Asbestos Trust Agreement or the TDPs, certain actions by the Trustees are subject to the consent of the TAC.

**7.3**    TERM OF OFFICE.Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 7.3(b), (iii) his or her removal pursuant to Section 7.3(c) or (iv) the termination of the Asbestos Trust pursuant to Section 8.2.

(b)    Any member of the TAC may resign at any time by written notice to each of the remaining members of the TAC. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    Any member of the TAC may be removed in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause shall be deemed to include a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder and under the TDPs, such as repeated non-attendance at scheduled meetings. Such removal shall be made by the majority vote of the Trustees, the FCR and the other members of the TAC, and shall take effect at such time as the Trustees', the FCR and the other members of the TAC jointly determine.

**7.4**    APPOINTMENT OF SUCCESSORS.A vacancy in the TAC caused by resignation, death, or removal shall be filled with an individual, not a firm, approved by the majority vote of the FCR and all remaining members of the TAC.

**7.5**    THE TAC'S EMPLOYMENT OF PROFESSIONALS.The TAC may retain and/or consult with counsel, accountants, appraisers, auditors, forecasters, asbestos experts and other Entities deemed by the TAC to be qualified as experts on matters submitted to them, and the opinion of any such Entities on any matters submitted to them shall be full and complete authorization and protection in support of any action taken or not taken by the TAC hereunder in

21

good faith and in accordance with the written opinion of any such Entity, and in the absence of gross negligence. The TAC and its experts shall at all times have complete access to the Asbestos Trust's officers, employees and agents, and the accountants, appraisers, auditors, forecasters and other experts retained by the Asbestos Trust as well as all information generated by them or otherwise available to the Asbestos Trust or the Trustees.

**7.6** **COMPENSATION FOR ATTENDANCE AT MEETINGS AND EXPENSES OF THE TAC.**The members of the TAC shall be compensated for attendance at meetings in the form of a reasonable hourly rate set by the Trustees, such compensation being subject to an annual review, adjustment, and approval by the Trustees. The Asbestos Trust shall promptly reimburse, or pay directly if so instructed, the TAC and each respective TAC member for all reasonable out-of-pocket costs and expenses, including reasonable fees and costs associated with employment of professionals pursuant to Section 7.5 and the procurement and maintenance of insurance incurred by the TAC in connection with the performance of its members' duties hereunder. All such reimbursements or direct payments shall be subject to approval by the Trustees and shall be deemed Asbestos Trust Expenses.

**7.7** **PROCEDURE FOR OBTAINING CONSENT OF THE TAC.**In the event the consent of the TAC is required pursuant to the terms of this Asbestos Trust Agreement, the Trustees shall promptly provide the TAC and its counsel with notice and with all information regarding the matter in question.

(b) The TAC must consider in good faith and in a timely fashion any request by the Trustees and may not withhold its consent unreasonably. If the TAC does not notify the Trustees of its objection to such request within 20 days or such other time period as has been approved by the Bankruptcy Court after receiving notice and information regarding such request, then the TAC's consent shall be deemed to have been affirmatively granted.

(c) Except where otherwise provided for in this Asbestos Trust Agreement, the TAC shall act in all cases by majority vote.

**7.8** **LACK OF CONSENT OF THE TAC.**In the event the Trustees are unable to obtain the consent of the TAC on any action or decision for which consent of the TAC is required, after following the procedure set forth in Section 7.7 of this Asbestos Trust Agreement, or if the Trustees and the TAC are unable to reach agreement on any matter on which the TAC's consent is required, then the matter may be submitted promptly to alternative dispute resolution if mutually agreeable to the Trustees and the TAC.

(b) If the disagreement is not resolved by alternative dispute resolution, or if the Trustees and the TAC do not agree to participate in any such alternative dispute resolution, the Trustees may apply to the Bankruptcy Court on an expedited basis for

22

91100-001\DOCS_DE:102548.1

approval of such action or decision, and only if such approval is given by the Bankruptcy Court by entry of an appropriate order, shall the Trustees have the authority to implement such action or decision without the TAC's consent.

**7.9    LIABILITY OF THE TAC'S, OFFICERS AND EMPLOYEES.**No member of the TAC shall be liable to the Asbestos Trust, to any Entity holding an Asbestos Claim, or to any other Entity except for such individual's gross negligence or willful misconduct. Such protection may, in the discretion of the Trustees, be extended to the agents, advisors, or consultants of the TAC. No member of the TAC, nor any officer or employee of the TAC, shall be liable for any act or omission of any other officer, employee, agent or consultant of the TAC unless the member of the TAC, or officer or employee of the TAC, acted with gross negligence or willful misconduct in the selection or retention of such other officer, employee, agent, or consultant of the Asbestos Trust.

## Article 8.
## GENERAL PROVISIONS

**8.1    IRREVOCABILITY.**The Asbestos Trust is irrevocable.

**8.2    TERMINATION.**The Asbestos Trust shall automatically terminate on the date ninety (90) days after the first to occur of the following events (the "Termination Date"):

(i)    subject to Section 3.2(h), the Trustees in their discretion decide to terminate the Asbestos Trust because (A) they deem it unlikely that new Asbestos Claims will be filed against the Asbestos Trust, and (B) Asbestos Claims duly filed with the Asbestos Trust have been Allowed and paid to the extent provided in this Asbestos Trust Agreement and the TDPs (and to the extent possible based upon the funds available through the Plan Documents), or Disallowed by a Final Order, and twelve (12) consecutive months have elapsed during which no new Asbestos Claims have been filed with the Asbestos Trust; or

(ii)    if the Trustees have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the Asbestos Trust in a manner consistent with this Asbestos Trust Agreement and the TDPs, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a Final Order.

23

(b) On the Termination Date after payment of all the Asbestos Trust's liabilities, after all Demands have been provided for and after liquidation of all properties and other non-cash Asbestos Trust Assets then held by the Asbestos Trust, all monies remaining in the Asbestos Trust estate shall be given to such organization(s) exempt from federal income tax under Section 501(c)(3) of the IRC, which tax-exempt organization(s) shall be selected by the Trustees using their reasonable discretion; provided, however, that (i) if practicable, the tax-exempt organization(s) shall be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos-related lung disorders, and (ii) the tax-exempt organization(s) shall not bear any relationship to Reorganized Debtors within the meaning of Section 468B(d)(3) of the IRC.   Notwithstanding any other provision of the Plan Documents, this Section 8.2(b) cannot be modified or amended.

**8.3** AMENDMENTS.The Trustees, after consultation with the FCR and the TAC, and subject to the consent of each of the FCR and the TAC to the extent provided elsewhere in this Asbestos Trust Agreement, may modify or amend this Asbestos Trust Agreement or any document annexed to it, including the TDPs (provided, however, the provisions of the TDPs, if any, regarding any such modification or amendment are also followed).  Any modification or amendment made pursuant to this Section 8.3 must be done in writing.  Notwithstanding anything contained in this Asbestos Trust Agreement to the contrary, neither this Asbestos Trust Agreement, the TDPs nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify the applicability of Section 524(g) of the Bankruptcy Code, the efficacy or enforceability of the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction or the Released Matters Injunction set out in the Plan, the Asbestos Trust's QSF status under Section 468B of the IRC or the rights of the Debtors or the Reorganized Debtors under the Plan Documents.

**8.4** MEETINGS.The FCR, the Trustees, or a TAC member shall be deemed to have attended a meeting described in Section 3.2(g) herein in the event such person spends a substantial portion of the day conferring, by phone or in person, on Asbestos Trust matters with the FCR, the Trustees or a TAC member, as applicable.  The Trustees shall have complete discretion to determine whether a meeting, as described herein, occurred for purposes of this Asbestos Trust Agreement.

**8.5** SEVERABILITY.Should any provision in this Asbestos Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Asbestos Trust Agreement.

**8.6** NOTICES.Notices to Entities asserting Asbestos Claims shall be given at the address of such Entity, or, where applicable, such Asbestos Trust Entity's representative, in each case as provided on such person's claim form submitted to the Asbestos Trust with respect to his or her or its Asbestos Claim or as otherwise provided to the Asbestos Trust.  Any notices or other report required or permitted by this Asbestos Trust Agreement must be in (i) writing and

24

is deemed given (a) when delivered personally to the recipient, (b) when sent by facsimile before 5:00 p.m. prevailing eastern time on a Business Day with a copy of such facsimile sent on the same day to the recipient by reputable overnight courier service (charges prepaid), (c) five (5) days after deposit in the U.S. mail, mailed by registered or certified mail, return receipt requested, postage prepaid, or (d) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); and (ii) addressed to the other Entities at the addresses set forth below, or at such other address as such Entity now designates from time to time in writing in accordance with this Section 8.6.

To the Asbestos Trust through the Trustees:

> _____
> _____
> _____
> Attention: _____
> Fax: _____

To the TAC:

> _____
> _____
> _____
> Attention: _____
> Fax: _____

To the Future Claimants' Representative:

> 8260 Willow Oaks Corp. Drive
> P.O. Box 10415
> Fairfax, VA 22031
> Attention: David T. Austern
> Fax: (703) 205-6249

With a copy to:

> Swindler, Berlin, Shereff, Friedman LLP
> The Washington Harbour
> 3000 K Street, NW, Suite 300
> Washington, DC 20007
> Attention: Roger Frankel
> Fax: (202) 424-7643

To Debtors, Settlors or Reorganized Debtors:

> W. R. Grace & Co.
> 7500 Grace Drive

25

Columbia, MD 21044
Attention: Secretary
Fax: (410) 531-4545

With a copy to:

Kirkland & Ellis LLP
777 South Figueroa Street, 37th Floor
Los Angeles, CA 90017
Attention: Bennett L. Spiegel / Lori Sinanyan
Fax: (213) 680-8500

and

Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
Attention: Jonathan Friedland / Ryan Bennett
Fax: (312) 861-2200

and

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Attention: Laura Davis Jones / David W. Carickhoff, Jr.
Fax: (302) 652-4400

All such notices and communications, if delivered personally or via overnight courier or if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return electronic transmission.

26