# TAB 20

**NOTICE TO HOLDERS OF CLAIMS AND/OR EQUITY INTERESTS AND GENERAL
DISCLAIMERS WITH RESPECT TO THIS DISCLOSURE STATEMENT**

**PLEASE READ THIS IMPORTANT INFORMATION**

The Bankruptcy Code requires that a party proposing a chapter 11 plan of reorganization prepare and file a document with the Bankruptcy Court called a "Disclosure Statement." This document is the proposed Disclosure Statement for the Debtors' Chapter 11 Plan of Reorganization. All Exhibits to this Disclosure Statement are incorporated into and made a part of this Disclosure Statement as if set forth in full herein.

The ~~Debtors~~**Plan Proponents** are providing the information in this Disclosure Statement solely for the purposes of providing information concerning the Plan to Holders of Claims against or Equity Interests in the Debtors so that those who are entitled to vote on the Plan can make an informed decision with respect to voting on acceptance or rejection of the Plan.

No one is authorized to provide to any other party information concerning the Plan other than the contents of this Disclosure Statement. Except as set forth in this Disclosure Statement, no representations concerning the Debtors, their assets, past or future business operations, the financial information or the Plan are authorized, nor should any such representations be relied upon in arriving at a decision with respect to the Plan. Holders of Claims or Equity Interests should not rely on any information, representations, or inducements made to obtain acceptance or rejection of the Plan that are other than, or inconsistent with, the information contained herein and in the Plan. Any representations made to secure acceptance or rejection of the Plan other than those contained in this Disclosure Statement should be reported to counsel for the Debtors. The statements and information about the Debtors, including all Financial Information and information regarding Claims or Equity Interests contained herein, have been prepared from documents and information prepared by the Debtors or their Professionals.

Nothing contained in the~~is~~ Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the ~~Debtors~~**Plan Proponents** for purposes of any pending or future litigation matter or proceeding. Moreover, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact or liability, a stipulation, or a waiver. Instead, this Disclosure Statement should be construed as a statement made in settlement negotiations related to contested matters, adversary proceedings and other pending or threatened litigation or actions.

The description herein of the Plan only is a summary, and Holders of Claims and/or Equity Interests are urged to review the entire Plan, which is included as Exhibit 1 to the Exhibit Book. In the event that there is any inconsistency or conflict between this Disclosure Statement and the Plan, the terms of the Plan shall control.

This Disclosure Statement also summarizes Financial Information and other documents. The Financial Information and other documents incorporated by reference herein are qualified in their entirety by reference to those documents. In the event there is any inconsistency or discrepancy between a description in this Disclosure Statement and the Financial Information or

other documents so described, the underlying Financial Information or other documents, as the case may be, shall govern for all purposes.

Further, each Holder of a Claim and/or Equity Interest that is entitled to vote is encouraged to seek the advice of its own counsel before casting a Ballot and/or Master Ballot, as applicable.

Although certain of the attorneys, accountants, advisors and other Professionals retained and/or employed by the ~~Debtors~~**Plan Proponents** have assisted in preparing this Disclosure Statement, which is based upon factual information and assumptions respecting financial, business and accounting data found in the books and records of the Debtors, they have not independently verified such information. The attorneys, accountants, advisors, and other Professionals retained and/or employed by the ~~Debtors~~**Plan Proponents** do not provide any warranty, representation or guaranty regarding the accuracy of any information contained in the~~is~~ Disclosure Statement or any of the Plan Documents and shall have no liability for any inaccurate, untrue or incomplete information contained in this Disclosure Statement or any of the Plan Documents.

Further, there has been no independent audit of the proforma or prospective financial information contained in this Disclosure Statement, and no fairness opinion has been obtained regarding the value of the Debtors' assets and the amount of their liabilities. The factual information regarding the Debtors and their assets and liabilities has been provided by the Debtors or otherwise derived from the Debtors' schedules, available public records, pleadings, reports on file with the Court, the Debtors' internal documents and related documents specifically identified herein. While the ~~Debtors have~~**Plan Proponents** endeavored to provide accurate information herein, the ~~Debtors~~**Plan Proponents** cannot, and do not, warrant or represent that the information contained in this Disclosure Statement does not contain any material inaccuracy.

The ~~Debtors~~**Plan Proponents** and their Professionals have also endeavored to identify in this Disclosure Statement and the Plan certain pending litigation claims and potential causes of action and objections to Claims. However, no reliance should be placed on the fact that a particular litigation claim or potential cause of action or objection to a Claim is, or is not, identified in this Disclosure Statement, the Plan, or any Plan Document. The Debtors, the Reorganized Debtors, or the Asbestos Trust, as applicable may seek to investigate, file and prosecute litigation claims and projected causes of action and objections to Claims after the Effective Date of the Plan, irrespective of whether this Disclosure Statement, the Plan or any Plan Document identifies any such claims, causes of action, or objections to Claims.

The Court's approval of this Disclosure Statement does not constitute the Court's approval of the merits of the Plan, an endorsement of the Plan or a guarantee of the accuracy or completeness of the information contained herein.

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY OTHER FEDERAL OR STATE REGULATORY AUTHORITY, NOR HAS THE SEC OR ANY OTHER FEDERAL OR STATE REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR**

**ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. ANY**
**REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

~~This Disclosure Statement has not been approved or disapproved by the SEC or any other federal or state regulatory authority, nor has the SEC or any other federal or state regulatory authority passed upon the accuracy or adequacy of the statements contained herein.~~ The securities described herein will be issued in reliance on the exemptions set forth in Bankruptcy Code § 1145 and without registration under the Securities Act, or any similar federal, state or local law. The ~~Debtors~~**Plan Proponents** recommend that potential recipients of any securities pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

This Disclosure Statement may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statements other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "believe," "anticipate," "project," "assume," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements, including proforma and prospective financial information, are necessarily speculative, and there are risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analyses, proforma and prospective financial information, and other information are estimates only, and the timing and amounts of actual distributions to Claimants may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or recovery projections may or may not prove to be accurate, and the ~~Debtors~~**Plan Proponents** provide no assurance that these projections or estimates will be correct.

The Debtors make the statements and provide the Financial Information contained herein as of the date hereof unless otherwise specified. Holders of Claims and/or Equity Interests reviewing this Disclosure Statement should not infer at the time of such review that the facts set forth herein have not changed since the date hereof unless so specified. Each Holder of an impaired Claim or Equity Interest that is entitled to vote should therefore carefully review all of the Plan Documents. See Article 8 of this Disclosure Statement for a discussion of various considerations and risk factors to be considered in deciding whether to accept the Plan.

This Disclosure Statement does not constitute legal, business, securities, financial or tax advice. All Entities desiring such advice or any other advice should consult with their own advisors. Further, neither this Disclosure Statement (including the Plan and all of the Exhibits in the Exhibit Book) nor any of the Plan Documents should be relied upon in making any investment decisions with respect to Grace or any other parties that may be affected by the Plan.

~~No party is authorized to provide to any other party any information concerning the Plan other than the contents of this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than those set forth in this Disclosure Statement. Holders of Claims or Equity Interests should not rely on any information or representations made elsewhere when deciding whether to vote to accept or reject the Plan.~~

A vote by a Claimant or Holder of an Equity Interest - whether for or against the Plan - does not constitute a waiver or release of any claims or rights of the Debtors (or any party in interest) to object to that Claimant's Claim or Holder's Equity Interest of estate assets, regardless of whether any claims of the Debtors or their respective estates are specifically or generally identified herein.

# TAB 21

### 1.2.3   How Will General Unsecured Claims be Treated Under the Plan?

The Plan provides that all Holders of General Unsecured Claims will be paid the value of their Allowed Claims, including interest at the specified rate, such payment to be 85% in Ccash and 15% in Parent Common Stock. However, Fresenius Indemnified Taxes will be paid in cash by the Reorganized Debtors in the ordinary course of their business, in accordance with the Fresenius Settlement Order.

Grace will satisfy certain other non-asbestos related liabilities, including environmental, tax, workers' compensation, employee-related benefits, pension and retirement medical obligations, and Intercompany Claims, as they become due and payable over time. In essence, these claims will "pass through" confirmation and be paid by the Reorganized Debtors in the ordinary course of their business.

### 4.3.1.9 Class 9.        General Unsecured Claims

Class 9 consists of all General Unsecured Claims against the Debtors.

Each Holder of an Allowed General Unsecured Claim shall be paid the Allowed Amount of its General Unsecured Claim on the GUC Distribution Date.  Such payment shall be either (i) in full, plus post-petition interest, ~~for those Claimants who, but for the Filing of the Chapter 11 Cases, would be entitled to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law,~~ such payment to be 85% in ~~C~~cash and 15% in Parent Common Stock, such Parent Common Stock being subject to, among other things, the transactions described in Section 7.2.2 of the Plan, and the Management Stock Incentive Plan, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed General Unsecured Claim and the Reorganized Debtors. __Notwithstanding the foregoing, each Holder of a Claim for Fresenius Indemnified Taxes shall be paid promptly in full in cash by the Reorganized Debtors as such Fresenius Indemnified Taxes become due and payable.__

__Post-petition interest shall accrue from the Petition Date through the date of payment and shall be (i) for the Holders of Claims under the Debtors' pre-petition bank credit facilities, at a rate of 6.09% per annum, compounded quarterly, (ii) for the Holders of Claims__ _who, but for the Filing of the Chapter 11 Cases_ __would be entitled under a contract or otherwise__ _to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law,_ __the rate provided in the contract between a Debtor(s) and the Claimant or such rate as may otherwise apply under applicable non-bankruptcy law, or (iii) for all other Holders of Class 9 Claims, at a rate of 4.19% per annum (the federal judgment rate as of the Petition Date), compounded annually.[18]__

The Parent Common Stock paid to the Holders of Allowed General Unsecured Claims in accordance with Section ~~3.1.10~~__3.1.9__(b) of the Plan shall be valued at the average of the closing prices on The New York Stock Exchange for the trading days within the thirty (30) calendar days immediately preceding the GUC Distribution Date.__  The trading price on the GUC Distribution Date could be higher or lower than such average.  The Parent Common Stock__

---

[18] __In consideration for the treatment provided to Class 9 Claims, the Unsecured Creditors' Committee has agreed to be a Plan Proponent of the Debtors' Amended Joint Plan filed on or about January 13, 2005 as the same may be amended from time to time with the consent of the Unsecured Creditors' Committee (the "Plan").  The Unsecured Creditors' Committee and the Debtors have agreed that the Unsecured Creditors' Committee has the right to withdraw as a Plan Proponent on the occurrence of any of the following circumstances: (i) failure of the Court to approve the Disclosure Statement incorporating the Plan no later than November 30, 2005; (ii) determination by the Court that the Plan is not confirmable and the failure to file an amended Plan within 60 days; (iii) determination by the Court that the Debtors are insolvent; (iv) termination of the Debtors' exclusive period; (v) withdrawal of the Plan by the Plan Proponents and the failure of the Plan Proponents to file a new Plan within 60 days; or (vi) failure of the Plan to become effective on or before January 1, 2007.  This agreement does not commit any member of the Unsecured Creditors' Committee or any creditor to vote for the Plan.  The parties intend to memorialize their agreement in a plan support agreement.  In consideration for the treatment provided to Class 9 Claims, certain substantial Claimants have also agreed to support the Plan.__

may be subject to material price volatility and may trade up or down after the GUC Distribution Date.

The Debtors estimate the total of all Allowed General Unsecured Claims to be approximately $951~~1,175~~ million as of September 30, 2004.~~19~~ **This amount consists of $500 million of principal and approximately $121 million of accrued interest under the Debtors' pre-petition bank credit facilities, approximately $223 million of environmental Claims, approximately $14 million of amounts drawn under drawn letters of credit (including accrued interest), $36 million of accounts payable including accrued interest, $87 million of asbestos Claims subject to pre-petition judgments or agreements (including accrued interest), $10 million of insurance and other Claims, and $198 million of other unliquidated liabilities (including $72 million of unliquidated environmental), which are conservatively estimated to be Class 9 Claims when and if Allowed. These unliquidated liabilities are not projected to be Allowed General Unsecured Claims at the Effective Date.**

Class 9 is impaired **as Class 9 Claimants are to received 15% of the Allowed Amount of their Claims in the form of stock, the value of which may be volatile and cannot be guaranteed**. The Debtors are soliciting the votes of Holders of the General Unsecured Claims in Class 9 to accept or reject the Plan in the manner and to the extent provided in the Confirmation Procedures Order.

---

~~11~~19    This figure is consistent with the Debtors' books and records and includes the Debtors' estimates for certain Claims that are disputed, which Claims may ultimately be determined to be significantly higher or lower.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| N/A | Administrative Expense Claims | N/A | Each Holder of an Allowed Administrative Expense Claim shall be paid the Allowed Amount of its Claim either (i) in full, in Ccash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) on such less favorable terms as may be agreed to by such hHolder. Ordinary course of business eClaims and eClaims of Professionals shall be paid as described in the Plan. | $~75138 million[3] | 100% |
| N/A | Priority Tax Claims | N/A | Each Holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Priority Tax Claim, at the option of the Reorganized Debtors, either (i) in full, in Ccash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) on such less favorable terms as may be agreed to by such hHolder, or (iii) in equal quarterly Ccash payments on the Initial Distribution Date and, thereafter, on each Quarterly Tax Distribution Date in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at 3.5% per annum, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim, or upon such other terms determined by the Bankruptcy Court, which will provide the Holder of such Allowed Priority Tax Claim deferred Ccash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim; provided, however, that each Holder of a Claim which by operation of the Fresenius Settlement Agreement is an obligation for Indemnified Taxes promptly shall be paid in full in cash as such Fresenius Indemnified Taxes become due and payable. | $232 million | 100% |
| Class 1 | Priority Claims | No | Each Holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim either (i) in full, in Ccash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Priority Claim becomes an Allowed Priority Claim, or as soon as practicable thereafter, or (ii) on such less favorable terms as may be agreed to by such hHolder. | $0 | 100% |

---

[3] Includes amounts classified as liabilities subject to compromise which are expected to be paid on the Effective Date, or as soon as practicable thereafter (approximately $76 million), and after the Effective Date in accordance with their terms (approximately $62 million).

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED +PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| Class 2 | Secured Claims | No | Each Holder of an Allowed Secured Claim shall be paid the Allowed Amount of its Allowed Secured Claim at the option of the Reorganized Debtors, either (i) in full, in Ccash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Secured Claim becomes an Allowed Secured Claim, or as soon as practicable thereafter; (ii) on such less favorable terms as may be agreed to by such hHolder; (iii) by the surrender to the Holder or Holders of any Allowed Secured Claim of the property securing such Claim; or (iv) notwithstanding any contractual provision or applicable law that entitles the Holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Bankruptcy Code § 1124(2)(A)-(D). | $090,000 plus interest at the applicable rate, if any | 100% |
| Class 3 | Unsecured Pass-Through Employee Related Claims | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. | Most Allowed Claims have already been paid pursuant to first day orders of this Court and continue to be paid in the ordinary course as they become due; $191190 million of Claims[4] are estimated to be Allowed and outstanding. | 100% |
| Class 4 | Workers' Compensation Claims | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. | Allowed Claims have already been paid pursuant to first day orders of this Court and continue to be paid in the ordinary course as they become due. | 100% |
| Class 5 | Intercompany | No | The Plan leaves unaltered the legal, equitable, and contractual rights | For proforma cash flow | 100% |

[4] Includes approximately $123 million of post-retirement benefits other than pensions classified pursuant to Section 2.6.3.3, approximately $63 million of unfunded special pension arrangements classified pursuant to Section 2.6.3.4, and approximately $5 million of deferred compensation classified pursuant to Section 2.6.3.6.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED +PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| | Claims | | to which each such Claim entitles the Holder of such Claim. | purposes all Claims will have no impact upon the Plan as all payments under the Plan are based upon the Debtors and Non-Debtor Affiliates as consolidated. | |
| Class 6 | Asbestos PI-SE Claims | No | All Allowed Class 6 Claims shall be paid in full by the Asbestos Trust out of the Asbestos PI-SE Class Fund and shall be processed and paid in accordance with the Asbestos Trust Agreement and the PI-SE TDP. Each Holder of an Asbestos PI-SE Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Litigation Option or Canadian Litigation Option as applicable or (B) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim shall be conclusively presumed to have elected the Litigation Option or Canadian Litigation Option as applicable. Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option or Canadian Litigation Option as applicable. A Holder may also be treated on such less favorable terms as may be agreed to by such Holder. | An amount to be determined by the Bankruptcy Court pursuant to the Estimation Motion[35] | 100% |
| Class 7 | Asbestos PI-AO Claims | No | All Allowed Class 7 Claims shall be paid in full initially by the Asbestos Trust out of the Asbestos PI-AO Class Fund and then in Cqash by the Asbestos Trust from funds to be paid to the Asbestos Trust by the Reorganized Debtors. All Allowed Class 7 Claims shall be processed and paid in accordance with the Asbestos Trust Agreement and the PI-AO TDP. In accordance with the terms of the Asbestos Trust Agreement and the PI-AO TDP, each Holder of an | An amount to be determined by the Bankruptcy Court pursuant to the Estimation Motion[46] | 100% |

[35] As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1,483,000,000.

[46] As a condition precedent to confirmation of the Plan, the Court shall have found that the Asbestos PI-AO Class Fund is not greater than $130,000,000.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED +PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| | | | Asbestos PI-AO Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Litigation Option or Canadian Litigation Option as applicable, (B) the Cash-Out Option; or (C) the Registry Option, provided, however, that a Holder of a Third Party Indemnification/Contribution Claim shall be conclusively presumed to have elected the Litigation Option or Canadian Litigation Option as applicable. Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option or Canadian Litigation Option as applicable. A Holder may also be treated on such less favorable terms as may be agreed to by such Holder. | | |
| Class 8 | Asbestos PD Claims | No | All Allowed Class 8 Claims shall be paid in full and processed and paid in accordance with the Asbestos Trust Agreement and the PD TDP. A hHolder may also be treated on such less favorable terms as may be agreed to by such hHolder. | An amount to be determined by the Bankruptcy Court pursuant to the Estimation Motion[57] | 100% |
| Class 9 | General Unsecured Claims | Yes | Each Holder of an Allowed General Unsecured Claim shall be paid the Allowed Amount of its General Unsecured Claim on the GUC Distribution Date. Such payment shall be paid-in full, plus post-petition interest, for these Claimants who, but for the filing of the Chapter 11 Cases, would be entitled to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law, such payment to be 85% in Ccash and 15% in Parent Common Stock, such Parent Common | $9541,175 million as of 9/30/04, plus accrued interest through the payment date[8] | 100% |

---

[57] As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1,483,000,000.

[8] Includes unliquidated liabilities, estimated at approximately $185 million, that would be Class 9 Claims if and when Allowed. These unliquidated liabilities are not expected to be Allowed General Unsecured Claims at the Effective Date.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED +PERCENTAG E RECOVERY |
|---|---|---|---|---|---|
| | | | Stock being subject to, among other things, the transactions described in Section 7.2.2 of the Plan, and the Management Stock Incentive Plan. A holderEach Holder of a Claim which by operation of the Fresenius Settlement Agreement is an obligation for Indemnified Taxes promptly shall be paid in full in cash as such Fresenius Indemnified Taxes become due and payable. A Holder may also be treated on such less favorable terms as may be agreed to by such holderHolder. <br><br> Post-petition Interest shall accrue from the Petition Date through the date of payment and shall be (i) for the Holders of the Debtors' pre-petition bank credit facilities, at a rate of 6.09% per annum, compounded quarterly, (ii) for the Holders of Claims who, but for the Filing of the Chapter 11 Cases would be entitled under a contract or otherwise to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law, the rate provided in the contract between a Debtor(s) and the Claimant or such rate as may otherwise apply under applicable non-bankruptcy law, or (iii) for all other Holders of Class 9 Claims, at a rate of 4.19% per annum (the federal judgment rate as of the Petition Date), compounded annually. | | |
| Class 10 | Equity Interests in the Parent | Yes | On the Effective Date, Holders of Class 10 Equity Interests in the Parent shall retain such interests; provided that such Equity Interests shall: (i) be subject, among other things, to the transactions described in Section 7.2.2 of the Plan, and the Management Stock Incentive Plan and (ii) be restricted as described in Section 7.1.1 of the Plan. | N/A | N/A |
| Class 11 | Equity Interests in Debtors Other than the Parent | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Equity Interest entitles the Holder of such Equity Interest. | N/A | 100% |

### 3.1.9   Class 9.          General Unsecured Claims

(a) Classification

Class 9 consists of all General Unsecured Claims against the Debtors.

(b) Treatment

Each Holder of an Allowed General Unsecured Claim shall be paid the Allowed Amount of its General Unsecured Claim on the GUC Distribution Date.  Such payment shall be either (i) in full, plus post-petition interest, ~~for those Claimants who, but for the Filing of the Chapter 11 Cases, would be entitled to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law,~~ such payment to be 85% in ~~C~~cash and 15% in Parent Common Stock, such Parent Common Stock being subject to, among other things, the transactions described in Section 7.2.2 of this Plan, and the Management Stock Incentive Plan, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed General Unsecured Claim and the Reorganized Debtors**.** *Notwithstanding the foregoing,* **each Holder of a Claim which by operation of the Fresenius Settlement Agreement is an obligation for Indemnified Taxes promptly shall be paid in full in cash as such Fresenius Indemnified Taxes become due and payable.**

**Post-petition interest shall accrue from the filing date through the date of payment and shall be (i) for the Holders of the Debtors' pre-petition bank credit facilities, at a rate of 6.09% per annum, compounded quarterly, (ii) for the Holders of Claims** *who, but for the Filing of the Chapter 11 Cases* **would be entitled under a contract or otherwise** *to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law,* **the rate provided in the contract between a Debtor(s) and the Claimant or such rate as may otherwise apply under applicable non-bankruptcy law, or (iii) for all other Holders of Class 9 Claims, at a rate of 4.19% per annum (the federal judgment rate as of the Petition Date), compounded annually.**

The Parent Common Stock paid to the Holders of Allowed General Unsecured Claims in accordance with this Section 3.1.9(b) shall be valued at the average of the closing prices on The New York Stock Exchange for the trading days within the thirty (30) calendar days immediately preceding the GUC Distribution Date.

(c) Impairment and Voting

Class 9 is impaired.  The Debtors are soliciting the votes of Holders of the General Unsecured Claims in Class 9 to accept or reject this Plan in the manner and to the extent provided in the Confirmation Procedures Order.

# TAB 22

### 2.3.2 Libby Vermiculite

Vermiculite is a mineral that expands into popcorn-like, low-density pieces when heated. This exfoliated or expanded vermiculite is lightweight and fire-resistant, and thus can be used for insulation, fireproofing, potting soil and other applications. Vermiculite is itself an inert mineral that is not a form of asbestos and has no known toxic properties.

Vermiculite ore from the Libby mine contained numerous secondary minerals, including a form of asbestos known as fibrous asbestiform tremolite.[62] The Libby facility milled the mined ore into a concentrate through a crushing, screening, washing and flotation separation process that removed most impurities, including tremolite. After milling, the vermiculite concentrate contained 1-3% and generally less than 1% asbestos. At Grace's "expansion plants" throughout the country, the concentrate was passed through furnaces at temperatures approaching 2,000 degrees Fahrenheit, which resulted in the further reduction of asbestos content. The expanded vermiculite – with asbestos content that was typically a fraction of 1% – was bagged and sold under the Zonolite trade name.

After acquiring the Libby mine, Grace implemented a series of changes that dramatically reduced asbestiform tremolite dust levels at the Libby facilities. With these improvements, Grace lowered asbestiform tremolite dust levels from approximately 50 fibers per cubic centimeter of air ("fibers/cc") in 1963, to less than 1 fiber/cc in 1975 and down to 1/15 fiber/cc in 1985, which was many times lower than required under then-applicable government standards. Grace also implemented a medical program to educate employees about the hazards of asbestiform tremolite and to monitor their exposure levels and health.

---

[62] Fibrous asbestiform tremolite impurities in vermiculite are atypical and not characteristic of most vermiculite deposits. It is believed that the amount of impurities is related to the extreme depth of the ore deposit in Libby. Most vermiculite deposits – such as those at Grace's Enoree, South Carolina mine – are relatively shallow.

### 2.5.1.1 Libby and Vermiculite-Related Remediation

#### 2.5.1.1.1  Libby, Montana

In March 2001, the EPA filed a lawsuit in the U.S. District Court for the District of Montana seeking recovery of costs allegedly incurred in response to the release or threatened release of asbestos in the Libby area relating to former vermiculite mining activities.  In August 2003, the Montana court issued a ruling in favor of the United States that requires Grace to reimburse the EPA for $54.5 million (plus interest) in costs expended through December 2001, and for all appropriate future costs to complete the cleanup.  Grace has appealed the Montana court's ruling to the Ninth Circuit Court of Appeals.

# TAB 23

### 2.3.3   Zonolite Attic Insulation

One of Grace's principal commercial vermiculite products was Zonolite Attic Insulation ("ZAI"). ZAI was expanded loose-fill vermiculite that was poured into attics in homes and other buildings. Like other expanded Libby vermiculite, ZAI often contained trace quantities of asbestos. Asbestos was not added to ZAI, and, as noted above, the milling and expansion processes removed nearly all asbestos contaminants from the vermiculite ore. Because the asbestos impurities were reduced to trace levels, ZAI is not an asbestos-containing product as defined in federal regulations.[710] Although the Asbestos PD Committee asserts that ZAI has been found to contain more than 1% asbestos, the Debtors contend that such samples are exceedingly rare and have no significance on the question of whether ZAI poses an unreasonable risk of harm.

---

[710] Under federal regulations, "materials" containing less than 1% asbestos by weight are not defined as asbestos-containing "materials." See, e.g., 40 Code of Federal Regulations §§ 61.141 and 763.83.

# TAB 24

### 2.4 The Debtors' Asbestos-Related Litigation

The pre-Chapter 11 litigation and Claims against the Debtors alleging asbestos-related injuries and damages ("Asbestos Claims," as defined more fully in the Glossary) are primarily the following: eClaims for personal injury from asbestos exposure; asbestos-related property damage eClaims; and ZAI eClaims.

For many years, the Debtors faced a substantial volume of Asbestos Claims, but were able to resolve such Claims primarily through negotiated settlements. Although the Debtors believed that a high percentage of these Claims were without merit, they agreed to settle most of these Claims rather than incur the significant costs and practical difficulties associated with simultaneously litigating thousands of independent Claims in multiple jurisdictions nationwide. This strategy of negotiated settlements was initially successful, as the amounts and number of Claims were manageable, and the funds required to satisfy such Claims were fairly predictable. However, beginning in the year 2000, the Debtors experienced a precipitous increase in the number of personal injury Claims and the amount of money required to resolve such Claims. This led to the Debtors' bankruptcy filing.

### 4.7.6   Occurrence of the Confirmation Date

Section 7.6 of the Plan sets forth conditions precedent to confirmation of the Plan. The Court must make all of the findings of fact and/or conclusions of law listed in Section 7.6.1 before confirmation of the Plan. Among other things, these findings of fact and/or conclusions of law relate to:  (1) the Court having found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than one billion, four hundred eighty three million dollars ($1,483,000,000), (2) the Court having found the Asbestos PI-AO Class Fund is not greater than one hundred thirty million dollars ($130,000,000), (3) compliance with all applicable subsections of Bankruptcy Code § 524(g), (4) effectiveness of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, (5) <u>a finding that the Reorganized Debtors have the ability to pay and satisfy in the ordinary course of business all of their respective obligations and liabilities as required by the Plan, the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, (6)</u> the unimpaired status of the classes of Asbestos Claims, (6<u>7</u>) the effectiveness of the various injunctions provided for in the Plan, (7<u>8</u>) insurance matters, and (8<u>9</u>) the lack of preclusive effect of certain asbestos-related litigation.

Section 7.6.2 of the Plan requires certain orders - including the Confirmation Order, the CMO and an order approving the Sealed Air Settlement Agreement - all in form and substance acceptable to the Debtors be entered prior to or in conjunction with Plan confirmation.  <u>The Confirmation Order and the Sealed Air Settlement Agreement shall also be in a form and substance acceptable to the other Plan Proponents.</u>  In addition, the Court shall have entered the Estimation Order in form and substance acceptable to the ~~Debtors~~<u>Plan Proponents</u>, including the following findings:

- the Asbestos PI-SE Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PI-SE Claims;

- the Asbestos PD Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PD Claims; and

- the Asbestos Trust Expenses Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all expenses of the Asbestos Trust.

<u>Assuming that other conditions precedent under the Plan are fulfilled, the Debtors would be willing to have the Plan confirmed if the Court finds that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1,483,000,000, and that the Asbestos PI-AO Class Fund is not greater than $130,000,000.  However, such amounts do not represent the Debtors' estimate of their asbestos-related liabilities.  In fact, through the use of the estimation process provided for under the Estimation Motion, the Debtors believe their actual asbestos-related liabilities may be significantly lower.</u>

# TAB 25

### 2.4.2   Asbestos Property Damage Litigation

Asbestos PD Claims generally purport to seek payment for the cost of removing or containing asbestos in buildings.  On the Petition Date, there were eight asbestos property damage lawsuits (not including the ZAI lawsuits described immediately below) pending against the Debtors.[11]  However, approximately 4,300 Asbestos PD Claims were submitted prior to the March 2003 Bar Date.  The Debtors have examined these Claims, and intend to object to all or almost all of them on a number of different grounds.  Such grounds may include: insufficient or lack of supporting documentation; lack of product identification; statute of limitations, statute of repose, and laches; lack of negligence; inapplicability of strict liability; lack of causation; and improper calculation of damages.  Under the Plan, those Asbestos PD Claims not disallowed through the objection process will be channeled to the Asbestos Trust, the assets of which the Debtors believe will be sufficient to satisfy all legitimate Asbestos PD Claims.

---

[11]  Plaintiffs in these eight lawsuits are seeking damages allegedly arising from the presence of Grace's asbestos-containing acoustical plaster as well as Monokote-3 fireproofing in their buildings.  Debtors are aware of approximately 300 buildings involved.  Two cases are currently on appeal (Solow -- judgment against Grace of approximately $11.6 million -- and Ohio Hospital -- summary judgment granted for Grace); one case has been stayed since 1990 (Jefferson Parish); Grace was dismissed at the trial level in another case (District of Columbia -- not a final order); and a proof of Claim has been filed in Pacific Freeholds.  Three cases are pending:  Anderson Memorial (motion to certify the class granted as to the other defendants but stayed with respect to Grace as motion was pending as of the Petition Date), Orange County (putative class action served), and Prudential; proofs of Claim have also been filed in each of these three cases.

# TAB 26

### 2.4.3   Litigation Related to Zonolite Attic Insulation

ZAI claims are part of the Asbestos PD Claims. In 2000 and 2001, prior to the Petition Date, nine lawsuits (one of which has since been dismissed) styled as class actions were filed in various jurisdictions on behalf of owners of homes containing ZAI, seeking damages and other relief, including removal of the attic insulation, because of its alleged asbestos content. Some of the lawsuits were filed on behalf of residents of particular states while others purport to be nationwide in scope. As of the Petition Date, many of the lawsuits had not proceeded beyond the initial pleadings. Four of the federal class actions were consolidated for pretrial purposes in a multi-district litigation proceeding; a motion for class certification was pending in this proceeding as of the Petition Date. A statewide class was certified in a Washington state case. None of the cases reached a decision on the merits, although the Washington state court denied a motion seeking a preliminary injunction that would have required the Debtors to warn all state residents of the alleged hazards of ZAI. In October 2004, two additional class action lawsuits were filed in Canada. The plaintiffs allege that ZAI is in millions of homes and that removal would cost several thousand dollars per home.

In April 2002, the Debtors filed ten proofs of Claim on behalf of individual Claimants for Claims relating to ZAI and subsequently filed objections thereto to establish a forum for determining whether ZAI creates an unreasonable risk of harm (the "ZAI Science Trial"). The ZAI Claims and objections, and subsequent responses and summary judgment motions, form the basis for the ZAI Science Trial. The ZAI Science Trial issues are fully briefed and ready to proceed. The Bankruptcy Court held a hearing on the ZAI Science Trial motions on October 18, 2004 and has taken the motions under advisement. The Court has indicated it may need to have further proceedings with respect to the matters addressed in the motions.

# TAB 27

### 2.5.1.1.3   State of Montana's Claims Against the Debtors

After the Petition Date, certain of the residents of Libby, Montana filed an action captioned *Orr v. State of Mont.*, suing the state of Montana alleging that the state negligently failed to warn them of the hazardous conditions at the mine, as a result of which they suffered grave injuries. The district court dismissed the lawsuit but, on December 14, 2004, the Montana Supreme Court reversed the district court ruling and held that once the state was aware of the dangerously high asbestos levels in the Libby mine, it was required by law to protect the miners by warning them of the known hazards of working in the mine. The state of Montana has filed a proof of Claim in an unliquidated amount seeking indemnification from the Debtors for this lawsuit. To the extent that the Claim is Allowed, it will be treated as a General Unsecured Claim. However, Grace maintains that it has no indemnification obligation as the lawsuit relates to the state's own duty to warn.

The state of Montana has also filed two proofs of claim against the Debtors in the approximate amount of $15.6 million for the cost of future and past Medicaid reimbursement. The state alleges that the Debtors are responsible for such reimbursement. To the extent that the Claim is Allowed, it will be treated as a General Unsecured Claim. However, Grace maintains that it has no such reimbursement obligation.

The State of Montana has filed an objection stating that, in the event the State of Montana is classified as a General Unsecured Claimant, it cannot receive stock as a form of payment on an indebtedness. The Debtors and the State of Montana are working to resolve this issue before Plan confirmation.

# TAB 28

### 2.5.1.3 The Settling Federal Agencies' Consent Decree

The Debtors and the EPA, the United States Department of Agriculture, the United States Department of the Interior, and the United States Army Corps of Engineers (collectively, the "Settling Federal Agencies") currently are negotiating the terms of a Consent Decree (the "Consent Decree") to settle the various claims that the Settling Federal Agencies have asserted against the Debtors with respect to certain costs incurred or to be incurred by the Settling Federal Agencies in the course of responding to releases and threats of releases of hazardous substances into the environment for ~~approximately 35~~certain sites, including the Libby site ~~(the "Settlement Sites")~~.  **The sites that are currently contemplated are the following 26 sites:**

1.     **Aqua Tech Site in Greer, South Carolina**
2.     **Blackburn and Union Privileges Site in Walpole, Massachusetts**
3.     **Casmalia Resources Site in Santa Barbara, California**
4.     **Central Chemical Site in Hagerstown, Maryland**
5.     **Elwood City Zonolite Site in Ellwood City, Pennsylvania**
6.     **Galaxy/Spectron Site in Elkton, Maryland**
7.     **Green River Site in Maceo, Kentucky**
8.     **Harrington Tools Site in Glendale, California**
9.     **Intermountain Insulation Site in Salt Lake City, Utah**
10.     **Li Tungsten Site in Glen Cove, New York**
11.     **Malone Services Co. Site in Texas County, Texas**
12.     **N-Forcer Site in Dearborn, Michigan**
13.     **Operating Industries Site in Monterey Park, California**
14.     **Prince George's County Zonolite Site in Beltsville, Maryland**
15.     **R&H Oil/Tropicana Site in San Antonio, Texas**
16.     **RAMP Industries Site in Denver, Colorado**
17.     **Reclamation Oil Site in Detroit, Michigan**
18.     **Robinson Insulation Site in Minot, North Dakota**
19.     **Solvents Recovery Service of New England Site in Southington, Connecticut**
20.     **Vermiculite Intermountain Site in Salt Lake City, Utah**
21.     **Vermiculite Northwest Site in Spokane, Washington**
22.     **Watson Johnson Landfill Site in Richland Township, Pennsylvania**
23.     **Western Minerals Processing Site in Denver, Colorado**
24.     **Western Minerals Products Site in Minneapolis, Minnesota**
25.     **Zonolite/Grace Site in Hamilton Township, New Jersey**
26.     **Zonolite/Grace Site in Wilder, Kentucky**

**In addition, the Consent Decree addresses treatment of rights and claims regarding access to the Libby, Montana Site, treatment of the claim regarding the ATSDR nationwide investigation of the Libby Site material, and treatment of claims and expenses regarding the following Debtor-owned sites:**

1.     **Acton Plant Site in Acton, Massachusetts**
2.     **Cambridge Plant in Cambridge, Massachusetts**
3.     **Curtis Bay Site in Curtis Bay, Maryland**
4.     **Kootenai Bluffs and Kootenai Flyway Properties in Libby, Montana**

**5.** **Wells G&H Site in Woburn, Massachusetts**
**6.** **Zonolite/Grace Site in New Castle, Pennsylvania**

The Consent Decree will provide for: (1) the allowance of certain General Unsecured Claims with respect to ~~the Settlement Sites~~**certain sites**, (2) treatment of Claims regarding the ATSDR's nationwide investigation of former vermiculite expansion sites, (3) treatment of Claims regarding certain other Debtor-owned sites, and (4) the treatment, as Administrative Expense Claims, of certain Comprehensive Environmental Response, Compensation, and Liability Act ~~("Superfund")~~ response costs incurred post-petition at certain Debtor-owned sites. The Consent Decree will also resolve the claims of certain PRP groups and establish a protocol for addressing the liability and obligations of the Debtors to the Settling Federal Agencies with respect to additional non-owned sites not currently addressed in the Consent Decree.

The Debtors and the Settling Federal Agencies currently are conducting investigation in order to reach agreement about the allowed amount of the Claims on many of the sites that will be included in the Consent Decree. It is not known at this time when the Consent Decree will be finalized, what properties it will cover, and at what Allowed Amount. **The EPA has filed numerous Claims against the Debtors as outlined above. While the Debtors believe the Consent Decree will ultimately be finalized, in the event that it is not, the EPA Claims will be addressed through the traditional Claims objection process. As outlined herein, the Debtors' estimates and projections are not based on entry of the Consent Decree but many of the Allowed amounts provided for in the Consent Decree are consistent with the Debtors' estimates and projections which are based on public comments regarding the spending plans of the EPA, discussions of spending forecasts with EPA representatives, analysis of other information made available from the EPA, previous consent decrees and agreements, actual outstanding invoices, and historical costs.**

# TAB 29

## 2.5.1.6 Environmental Insurance Litigation

~~Grace is a party to three pending environmental insurance coverage actions with insurance companies, all of which have been stayed as a result of the Chapter 11 Cases. Settlement discussions are ongoing in one of the cases. The outcome of the cases, as well as the amount of any Grace recovery, is presently uncertain.~~

Grace is a party to three pending environmental insurance coverage actions with insurance companies, all of which have been stayed as a result of the Chapter 11 Cases. Two of the three pending environmental insurance coverage actions have been settled between Grace and Continental Casualty Company, the only insurance carrier involved in those actions but await Bankruptcy Court approval. The two settled actions are captioned *Maryland Casualty Co. v. W. R. Grace & Co.*, 88 CIV 4337, filed in 1988, and *Continental Casualty Company v. W. R. Grace & Co. and W. R. Grace & Co. Conn.*, 00 CIV 4524, filed in 2000. The *Maryland Casualty* action involved approximately 200 claims arising from environmental contamination of sites owned or once owned by Grace and off-site, un-owned disposal sites. The *Continental Casualty* action involved approximately 45 claims of the same nature, including Grace's claims for coverage regarding certain claims involving former vermiculite mining operations in Libby, Montana. The confidential settlement agreement between Grace and Continental Casualty Company, which will result in the dismissal of the Maryland Casualty and Continental Casualty actions, was finalized in December 2004 and will be submitted for the Bankruptcy Court's approval. The third pending environmental insurance coverage action is captioned *Unigard Security Ins. Co. v. W. R. Grace & Co.-Conn. and W. R. Grace & Co.*, 97 CIV 8941, and was filed in 1997. In this suit, Unigard seeks a declaration of no liability regarding potential bodily injury claims against Grace arising from environmental contamination at four sites formerly owned by Grace. The Unigard action is stayed as a result of the bankruptcy. The Unigard policy at issue is a first-layer excess policy that was in effect from June 30, 1974 to June 30, 1975, with limits of $10,000,000. No personal injury claims have been identified regarding the four sites identified by Unigard. Additionally, in June 2003, the Second Circuit Court of Appeals, while interpreting coverage under the Continental Casualty Policy underlying the Unigard policy, held that Section 46 of the New York Insurance Law, which was in effect from 1971 to 1982, prohibits coverage for claims arising from gradual pollution.

# TAB 30

### 2.5.3.2.4    State Income Tax Claims

Certain state income tax Claims relating to past tax years may involve significant amounts. ~~However, Grace believes that these Claims can and should be resolved for significantly less than the amounts claimed~~**Although state income tax proofs of claim have been filed against Grace in the amount of approximately $57 million, Grace estimates that it will have to pay out approximately $10 million with respect to these Claims. Grace also estimates that it will be required to pay out additional state taxes and interest to reflect the state impact of IRS federal audit adjustments. The Debtors estimate such liability at approximately $37 million through the Petition Date. To the extent the state tax obligations are sustained, however, and they result in Fresenius Indemnified Taxes, the Fresenius Indemnified Taxes are obligations that the Debtors are obligated under the Fresenius Settlement Agreement promptly to pay in full in cash when due and payable**.

# TAB 31

### 2.7.3 Debtors' Retained Causes of Action

### 2.7.3.1 Preservation of Causes of Action

The Debtors are currently investigating whether to pursue potential causes of action against any Claimants or Entities. The investigation has not been completed. Under the Plan, the Reorganized Debtors are retaining the Debtors' rights to commence and pursue any and all Retained Causes of Action. The Debtors may pursue them before the Effective Date. Otherwise, the Reorganized Debtors may pursue them after the Effective Date. The potential causes of action include the following:

- All actual actions or potential actions, whether legal, equitable or statutory in nature, for, or in any way involving, the collection of accounts receivable or general ledger items that are due and owing to the Debtors, including trade receivables, rent and other lease and sublease charges, franchise and/or license fees, payments due under equipment leases and licenses, or other miscellaneous charges;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against customers, including those customers listed in Exhibit 11 in the Exhibit Book, for accounts receivable, improper setoff, overpayment, or any other claim arising out of the customer relationship;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against vendors, including those vendors listed on Exhibit 11 in the Exhibit Book, for overpayment, improper setoff, warranty, indemnity, or any other claim arising out of the vendor relationship;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against Entities, including vendors with respect to pre-petition violations of applicable federal or state securities laws;

- All actual actions or potential breach of contract actions against any customers, vendors or Entities who violated the automatic stay after the Petition Date, including those customers or vendors listed on Exhibit 11 in the Exhibit Book;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against landlords, lessees, sublessees, or assignees arising from various leases, subleases and assignment agreements relating thereto, including actions for unpaid rent, overcharges relating to taxes, common area maintenance and other similar charges, including those claims identified on Exhibit 11 in the Exhibit Book;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against the Debtors' current or former insurance carriers to recover unpaid reimbursements and claims, overpayment of premiums and fees, claims for breach of contract, indemnity obligations or coverage or similar causes of action, including those insurers listed on Exhibit 11 in the Exhibit Book;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against purchasers of assets from the Debtors relating to breach of the purchase agreement or unpaid compensation thereunder, including those purchasers listed on Exhibit 11 in the Exhibit Book;

- Any and all rights to payment against any taxing authority or other potentially liable party, including parties other than the government for reimbursement of taxes and tax payments, listed on Exhibit 11 in the Exhibit Book for any tax refunds, credits, overpayments or offsets that may be due and owing to the Debtors for taxes that the Debtors may have paid to any such taxing authority;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, relating to deposits or other amounts owed by any creditor, lessor utility, supplier, vendor, landlord, sub-lessee, assignee or other Entity;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, relating to environmental and product liability matters;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, arising out of, or relating to, the Debtors' intellectual property rights;

- Any litigation or lawsuit initiated by any of the Debtors that is currently pending, whether in the Bankruptcy Court, before the American Arbitration Association, or any other court or tribunal or initiated against the Debtors after the Petition Date for which the Debtors may have counterclaims or other rights, including those actions listed on Exhibit 11 in the Exhibit Book;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against any of the Debtors' former Professionals, except the Asbestos Protected Parties, for breach of fiduciary duty, breach of contract, negligence or professional misconduct or malpractice, or other tortuous conduct, including those former Professionals listed on Exhibit 11 in the Exhibit Book;

- All actual or potential contract and tort actions that may exist or may subsequently arise; and

- All actual actions or potential actions whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' business or operations, except actions against the Asbestos Protected Parties to the extent they are released by the Plan.

The above categories of Retained Causes of Action will not be limited in any way by reference to the Exhibits nor are the categories intended to be mutually exclusive.

In addition, it is possible that there are numerous Unknown Causes of Action. The failure to list any such Unknown Causes of Action above, or in Exhibit 11 in the Exhibit Book, is

not intended to limit the rights of the Reorganized Debtors to pursue any of these actions to the extent the facts underlying such Unknown Causes of Action become known to the Debtors.

### 2.7.3.2 Maintenance of Causes of Action

Except as otherwise provided in the Plan, the Reorganized Debtors are retaining all of the Debtors' rights, to commence and pursue, as appropriate, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, any and all causes of action, whether such causes of action accrued before or after the Petition Date, including those Retained Causes of Action listed in Exhibit 11 in the Exhibit Book.

Except as otherwise provided in the Plan, in accordance with Bankruptcy Code § 1123(b)(3), any Claims, rights, and causes of action, including the Retained Causes of Action, that the respective Debtors may hold against any Entity will vest in the Reorganized Debtors, and the Reorganized Debtors will retain and may exclusively enforce any and all such Claims, rights or causes of action, including Retained Causes of Action, and commence, pursue and settle the causes of action in accordance with the Plan. The Reorganized Debtors will have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims, rights, and causes of action, including Retained Causes of Action, without the consent or approval of any third party and without any further order of the Court.

### 2.7.3.3 Avoidance Actions

The Debtors do not possess any causes of action for "Avoidance Actions" (actions or proceedings under Bankruptcy Code §§ 544, 545, 547, 548 or 553). Pursuant to Bankruptcy Code § 546(a), a debtor has two years after entry of the order for relief to bring Avoidance Actions. The Debtors' order for relief was entered on April 2, 2001; thus the deadline to bring Avoidance Actions was April 2, 2003. The Debtors analyzed potential Avoidance Actions and concluded that none should be commenced. The Debtors then provided their analysis to counsel for the Equity Committee and the various creditors' committees so that they could also determine whether there were any Avoidance Actions. No Avoidance Actions were brought by any party prior to the deadline. The Unsecured Creditors' Committee filed a motion seeking to extend the time within which the Avoidance Actions could be commenced but the Bankruptcy Court denied the motion.

### 2.7.3.4 Preservation of All Causes of Action not Expressly Settled or Released

Unless a Claim or Retained Cause of Action against a Claimant or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such Claim or Retained Cause of Action (including any Unknown Causes of Action) for later adjudication by the Reorganized Debtors. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or other) or laches will apply to such Claims or Retained Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on this Disclosure Statement, the Plan or the Confirmation Order, except where such Claims or Retained Causes of Action have been expressly released in the Plan or other Final Order. In addition, the Debtors, the Reorganized Debtors, and their successors expressly reserve

the right to pursue or adopt any Claim alleged in any lawsuit in which the Debtors are defendants or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.

Any Entity that has incurred an obligation to the Debtors (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Debtors or the Reorganized Debtors, and may, if appropriate, be the subject of an action after the Effective Date, whether or not (1) such Entity has filed a proof of Claim against the Debtors in the Chapter 11 Cases, (2) such Claimant's proof of Claim has been objected to, (3) such Claimant's Claim was included in the Debtors' Schedules, or (4) such Claimant's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as a Disputed Claim, a Contingent Claim, or an Unliquidated Claim.

### 4.11   MISCELLANEOUS PROVISIONS

Article 11 of the Plan deals with a variety of miscellaneous matters including:

- authority of the Debtors
- payment of statutory fees
- provisions that must be included in the Plan according to the Fresenius Settlement Agreement and the Sealed Air Settlement Agreement
- dissolution of the Unsecured Creditors' Committee, the Asbestos PI Committee, the Asbestos PD Committee and the Equity Committee
- continued retention of the Future Claimants' Representative
- headings
- governing law
- filing of additional documents
- compliance with tax requirements
- further assurances
- further authorizations

The more significant sections of Article 11 of the Plan are:

~~*Plan § 11.3    Retained Causes of Action*~~

~~*Plan §*~~**Section** 11.3.1 **of the Plan -** Maintenance of Causes of Action: Nothing in Section 11.3 of the Plan shall be deemed to be a transfer by the Debtors and the Reorganized Debtors of any Claims, causes of action, or defenses relating to assumed executory contracts or otherwise which are required by the Reorganized Debtors to conduct their businesses in the ordinary course subsequent to the Effective Date.  Moreover, except as otherwise expressly contemplated by the Plan, the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement or other Plan Documents, from and after the Effective Date, the Reorganized Debtors shall have and retain any and all rights to commence and pursue any and all Claims, causes of action, including the Retained Causes of Action, or defenses against any parties, including Claimants and Holders of Equity Interests, whether such causes of action accrued before or after the Petition Date, including those Retained Causes of Action listed on Exhibit 11 in the Exhibit Book.

The Reorganized Debtors shall retain and may exclusively enforce any and all such Claims, rights or causes of action, including Retained Causes of Action, and commence, pursue and settle the causes of action in accordance with the Plan.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and causes of action, including Retained Causes of Action, without the consent or approval of any third party and without any further order of the Court.

~~Plan §~~**Section 11.3.2** **of the Plan -** Preservation of Causes of Action: The Debtors are currently investigating whether to pursue potential causes of action against any Claimants or Entities. The investigation has not been completed to date, and, under the Plan, the Reorganized Debtors retain the right on behalf of the Debtors to commence and pursue any and all Retained Causes of Action. The potential causes of action currently being investigated by the Debtors, which may, but need not, be pursued by the Debtors before the Effective Date or by the Reorganized Debtors, after the Effective Date are described more fully in this Disclosure Statement. In addition, there may be numerous Unknown Causes of Action. The failure to list any such Unknown Causes of Action in the Plan, or on Exhibit 11 in the Exhibit Book, is not intended to limit the rights of the Reorganized Debtors to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtors.

~~Plan §~~**Section 11.3.3** **of the Plan -** Preservation of All Causes of Action not Expressly Settled or Released: Unless a Claim or cause of action against a Claimant or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such Claim or Retained Cause of Action (including any Unknown Causes of Action) for later adjudication by the Reorganized Debtors, as applicable. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Retained Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on this Disclosure Statement, the Plan or the Confirmation Order, except where such Claims or Retained Causes of Action have been released in the Plan or other Final Order. In addition, the Debtors, the Reorganized Debtors, and the successor entities under the Plan expressly reserve the right to pursue or adopt any Claim alleged in any lawsuit in which the Debtors are defendants or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.

Any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Debtors or the Reorganized Debtors, and may, if appropriate, be the subject of an action after the Effective Date, whether or not (i) such Entity has filed a proof of Claim against the Debtors in the Chapter 11 Cases; (ii) such Claimant's proof of Claim has been objected to; (iii) such Claimant's Claim was included in the Debtors' Schedules; or (iv) such Claimant's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as a Disputed Claim, a Contingent Claim, or an Unliquidated Claim.

~~Plan §~~**Section 11.4** **of the Plan -** Third-Party Agreements: The Distributions to the various classes of Claims in the Plan will not affect the right of any Entity to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto will remain in full force and effect.

~~Plan §~~**Section 11.8 of the Plan -** Exculpation: None of the Reorganized Debtors, the Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties, the Trustees of the Asbestos Trust, the Asbestos Trust Advisory Committee, the Asbestos PI Committee, the Asbestos PD Committee, the Unsecured Creditors' Committee, the Equity Committee, the FCR, or any of their respective Representatives are to have or incur any liability to any Entity for any **pre- or post-Petition Date** act or omission in connection with**, related to,** or arising out of the negotiation of the Plan or the settlement provided in the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, the pursuit of confirmation of the Plan, the consummation of the Plan or the settlement provided in the Sealed Air Settlement Agreement or Fresenius Settlement Agreement, or the administration of the Plan or the property to be distributed under the Plan **so long as, in each case such action, or failure to act, did not constitute willful misconduct.** In all respects, they will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. **Any act or omission taken with the approval of the Bankruptcy Court will be conclusively deemed not to constitute willful misconduct. This section is not intended to preclude a governmental entity from enforcing its police and regulatory powers.**

~~Plan §~~**Section 11.9 of the Plan -** Title to Assets; Discharge of Liabilities: Upon the transfer of the Sealed Air Payment into the Asbestos Trust, and the transfer of the Debtors' Payment into the Asbestos Trust, each such transfer shall be vested in the Asbestos Trust free and clear of all Claims, Equity Interests, Encumbrances, and other interests of any Entity. Except as otherwise provided in the Plan and in accordance with Bankruptcy Code § 1123(b)(3), on the Effective Date, title to all of the Debtors' assets and properties and interests in property, including the Retained Causes of Action, shall vest in the Reorganized Debtors free and clear of all Claims, Equity Interests, Encumbrances, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors.

~~Plan §~~**Section 11.10 of the Plan -** Notices: Any notices, statements, requests, and demands required or permitted to be provided under the Plan, in order to be effective, must be: (i) in writing (including by facsimile transmission), and unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made (A) if personally delivered or if delivered by facsimile or courier service, when actually received by the Entity to whom notice is sent, (B) if deposited with the United States Postal Service (but only when actually received), at the close of business on the third business day following the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, or (C) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid) (but only when actually received) and (ii) addressed to the appropriate Entity or Entities to whom such notice, statement, request or demand is directed (and, if required, its counsel), at the address of such Entity or Entities set forth in the Plan (or at such other address as such Entity may designate from time to time by written notice to all other Entities listed below in accordance with Section 11.10 of the Plan).

~~Plan §~~**Section 11.15 of the Plan -** Exemption from Transfer Taxes: Pursuant to Bankruptcy Code § 1146(c), the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument

of transfer under, in furtherance of, or in connection with the Plan shall be exempt from all taxes as provided in Bankruptcy Code § 1146(c).

# TAB 32

### 2.8    Estimated Value of the Reorganized Debtors and Non-Debtor Affiliates

The Debtors have been advised by Blackstone with respect to the reorganization value of the Reorganized Debtors and Non-Debtor Affiliates. For purposes of this analysis, the Effective Date is assumed to be December 31, 2004. The reorganized enterprise value is calculated as the value of core operations ("Core Business Value") plus the value of the assumed insurance receivable (based on the assumed asbestos liabilities[12]), plus the present value of the projected use of tax assets and the proceeds from the assumed exercise of in-the-money stock options. To determine the equity value for the Reorganized Debtors and Non-Debtor Affiliates, estimates for net debt and non-core liabilities proforma for the implementation of the Plan are subtracted from the reorganized enterprise value. Further adjustments are made for share dilution to calculate fully diluted reorganized equity value per share. The Asbestos PD Committee has indicated it reserves its right to contest the Core Business Value calculated by the Debtors and to present its own valuation with respect to the Core Business Value.

---

[12]    For purposes of this analysis, asbestos liabilities are assumed to equal the sum of (i) the maximum aggregate amounts that would satisfy the conditions precedent in Section 7.6.1(v) and (w) of the Plan; plus (ii) an estimate of Previously Settled/Adjudicated Asbestos Claims.