# TAB 33

### 2.8.2    Calculation of Fully Diluted Reorganized Equity Value

The Core Business Value is adjusted by the following amounts to determine the fully diluted reorganized equity value of the Reorganized Debtors and Non-Debtor Affiliates: (i) assumed insurance receivable, (ii) the present value of the projected use of tax assets, (iii) non-core liabilities, (iv) net debt, (v) proceeds from the exercise of assumed in-the-money options, and (vi) share dilution as set forth in the summary in Section 2.8.2.6.

#### 2.8.2.1 Insurance

According to management's estimate, the assumed insurance receivable has a book value of $500 million based on the assumed asbestos liabilities.[913] There exists significant variability around the ultimate amount and timing of receipt of this amount.

#### 2.8.2.2 Tax Assets

Tax assets result from prior losses, foreign taxes paid, and deductions as a result of the implementation of the Plan. The future use of tax assets is quantified based on projected annual tax savings. The present value of the projected use of tax assets **over a nine year period** is calculated at a discount range of **approximately** 13% to 23%, which represents levered cost of equity. Estimated cost of equity was derived using the capital asset pricing model, which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return of the overall market. The analysis assumes a risk-free rate of 4.2% based on the November 8, 2004 yield of the ten-year U.S. Treasury Note. Levered beta of 1.19 for the Reorganized Debtors and Non-Debtor Affiliates is based on (i) an average un-levered beta of 0.72 for the companies identified in Section 2.8.1.1 herein (the Comparable Public Company Analysis) and (ii) an assumed debt/equity ratio of approximately 50% as of the Effective Date.

The present value of the projected use of tax assets is calculated in the approximate range of $50**75** million to $70**120** million with a midpoint estimate of $60**98** million. There exists significant variability around the ultimate value of this asset **and the tax asset remaining at the end of the measurement period** because it depends on, among other things, proforma capital structure and limitations on the use of tax assets that could result from activities outside of the control of the Reorganized Debtors and Non-Debtor Affiliates.

#### 2.8.2.3 Non-Core Liabilities

The projected book value of non-core liabilities, **estimated** as of December 31, 2004, is $50+**approximately $487** million. This amount consists of the following obligations: $186**190** million of post-retirement and**,** pension benefits (not including the qualified pension plan)**, and other employee liabilities,** $107 million of unliquidated environmental Claims, $50 million of Priority Tax Claims paid over time **(unless there are obligations for Fresenius Indemnified Taxes in which case they will be paid promptly in full in cash as they become due and**

---

[913]    For purposes of this analysis, asbestos liabilities are assumed to equal the sum of (i) the maximum aggregate amounts that would satisfy the conditions precedent in Section 7.6.1(v) and (w) of the Plan; plus (ii) an estimate of Previously Settled/Adjudicated Asbestos Claims.

payable) and other tax contingencies, $5737 million of other non-core accrued liabilities, $3 million of capital leases, and $98100 million for other unliquidated Claims. The value of these non-core liabilities could be higher or lower, depending on, among other things, the resolution of Claims, the timing of certain payments, and the use of contingency.

### 2.8.2.4 Net Debt

The estimated net debt, as of December 31, 2004, is based on management's projections of $800 million of debt and $300 million of cash. Projected cash includes proceeds from the assumed exercise of in-the-money options. Net debt could ultimately be higher or lower than this estimate, depending on actual cash funding requirements for the Plan and free cash flow generation before emergence. **As presented in the Financial Information in Exhibit 4 in the Exhibit Book, cash is projected to decline to $250 million in 2005, which is approximately the minimum level of operating cash required by the Reorganized Debtors and the Non-Debtor Affiliates.**

### 2.8.2.5 Proceeds of Options

The Reorganized Debtors and Non-Debtor Affiliates have employee and management options outstanding representing 8.2 million shares at a wide range of strike prices. Based on the assumed fully diluted reorganization equity value per share, options that would be in -the -money are assumed to be exercised. The proceeds from the assumed exercise of in-the-money options are added to fully diluted equity value and the shares issued are included in the calculation of the fully diluted price per share. The proceeds from the assumed exercise of in-the-money options are $66 million to (6.3 million shares), $6875 million (6.46.8 million shares) and $76102 million (6.98.2 million shares), respectively, based on the **low, medium and high value** range of fully diluted reorganization equity value per share.

### 2.8.2.6 Summary

Based on the above assumptions, the calculated fully diluted reorganized equity value is a range of $1.7481.779 billion to $2.1782.260 billion at the assumed Effective Date.

To calculate the fully diluted reorganized equity value per share, fully diluted shares must be calculated by adding: (1) basic shares of Parent Common Stock outstanding, (2) the shares of Parent Common Stock underlying in-the-money options, as more fully described above; (3) the shares of Parent Common Stock to be issued in respect of Class 9, equal to 15% of the Allowed Class 9 Claims, which amount is assumed to represent approximately $143149 million; (4) the shares of Parent Common Stock expected to be issued to the Asbestos Trust, which amount is assumed to represent approximately $498 million based on the maximum aggregate amount that would satisfy the conditions precedent in Section 7.16(v) of the Plan; and (5) the shares of Parent Common Stock underlying the Warrants which are issued to the Asbestos Trust to fund assumed Class 7 liability of $130 million based on the maximum aggregate amount that would satisfy the conditions precedent in Section 7.6.1(w) of the Plan. Based on the foregoing assumptions, the range of fully diluted shares varies with the range of calculated equity values and is 128.8127.8 million shares at the low end of the reorganized equity value range and 112.4112.7 million shares at the high end of such range (a higher equity value implies that fewer shares would be required to fund items (3), (4) and (5) above), with a midpoint estimate of 118.9118.2 million

shares. The calculated fully diluted reorganized equity value per share is in the approximate range of $13.57~~13.92~~ to $19.38,~~20.06,~~ with a midpoint estimate of $16.48.~~17.01.~~

The Reorganized Debtors and Non-Debtor Affiliates' fully diluted reorganized equity value could be materially lower if the Asbestos PI-AO Claims liability exceeds the $130 million (plus expenses) assumed as the maximum estimated liability that would satisfy the Asbestos PI-AO Claims. The~~If all Warrants were immediately exercised by the Asbestos Trust, fully diluted reorganized equity value per share would be in the approximate range of $10.76 to $13.89, with a midpoint estimate of $12.37. However, the~~ theoretical dilution to equity value is not limited to the Warrants exercisable by the Asbestos Trust, but also could be impacted by future payments by Reorganized Grace.

The estimates of reorganized value do not purport to be appraisals, liquidation values or estimates of the actual market value that may be realized if assets are sold. The estimates of reorganized value, fully diluted reorganized equity value, and fully diluted reorganized equity value per share represent hypothetical values developed solely for purposes of the Plan and should not be relied upon in making investment decisions to purchase or sell Parent Common Stock at any time, now or in the future.

The estimates of reorganized value, fully diluted reorganized equity value, and fully diluted reorganized equity value per share are highly dependent upon achieving the future financial results set forth in the proforma and prospective financial information as well as the realization of certain other assumptions which are not guaranteed, in particular, assumptions regarding the value of all Asbestos Claims and estimates presented herein regarding insurance, tax and ~~C~~cash assets as well as net debt and other liabilities. Because such estimates are inherently subject to uncertainties, neither the Debtors, the Reorganized Debtors and Non-Debtor Affiliates, Blackstone, nor any other person assumes responsibility for their accuracy.

The Parent Common Stock of Grace is traded on the New York Stock Exchange (TICKER: GRA). The estimates of the range of fully diluted reorganized equity value do not purport to be an estimate of the pre- or post-reorganization trading value of the Parent Common Stock and the estimate of the fully diluted reorganized equity value per share may not correlate with actual trading prices on the New York Stock Exchange. The estimated values set forth herein represent estimated reorganized values and estimated fully diluted reorganized equity values and do not necessarily reflect values that could be attainable in public or private markets. The values set forth herein do not consider market trading characteristics, trading limitations possibly imposed on the Parent Common Stock or perceptions in public or private markets about the Reorganized Debtors and Non-Debtor Affiliates or the value of the Parent Common Stock. The trading value of the Parent Common Stock, if any, may be materially different from the estimates set forth in this Estimated Value of the Reorganized Debtors and Non-Debtor Affiliates.

The table set forth below illustrates the number of shares to be distributed to, or retained by, each class of Creditors or
Holders of Equity Interests pursuant to the Plan at the low, mid and high value of reorganized equity.

The actual number of shares to be distributed will be based on the price of the Parent Common Stock measured in accordance with the provisions of the Plan.

*(in millions)*

|  | Low | Mid | High |
|---|---|---|---|
| Fully Diluted Reorganized Equity Value (1) | $  1,779 | $  2,011 | $  2,260 |
| | | | |
| **Distribution of Shares** | | | |
| | | | |
| Shares issued to Class 6 and Class 8 (2) | 35.8 | 29.3 | 24.8 |
| Shares underlying Warrants issued to Class 7 | 9.3 | 7.6 | 6.5 (4) |
| Shares issued to Class 9 (3) | 10.7 | 8.7 | 7.4 |
| Shares held by Holders of Equity Interests | 65.8 | 65.8 | 65.8 |
| Shares pursuant to management options (1) | 6.3 | 6.8 | 8.2 |
| Shares outstanding post-emergence | 127.8 | 118.2 | 112.7 |

In addition to the Warrants set forth in the table above, Warrants shall be issued to Class 7 in an amount such that, upon the payment of the Sealed Air Payment and the Debtors' Payment into the Asbestos Trust, the Parent Common Stock and Warrants (if exercised) that make up the Debtors' Payment would constitute a majority of the issued and outstanding voting shares of the Reorganized Parent. The numbers of Warrants that may be exercised is dependent on the difference, if any, between the Asbestos PI-AO Class Fund and the amount of Class 7 Allowed Claims.

**Additional Shares if all Additional Warrants were Exercised**

| | | | |
|---|---|---|---|
| Shares underlying Class 7 additional Warrants | 37.6 | 44.4 | 50.1 |
| Shares outstanding post-emergence | 165.4 | 162.6 | 162.7 |

**Notes:**

(1)  Assumes the exercise of existing in-the-money management options.

(2)  Based on amount requested in the Estimation Motion filed on November 13, 2004.  As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund is not greater than $1.483 billion and that the Asbestos PI-AO Class Fund is not greater than $130.0 million.

(3)  Assumes the estimated amount of Allowed Claims for Class 9 is $1.175 million, including unliquidated liabilities, estimated at approximately $185 million, that would be Class 9 Claims if and when Allowed.

(4)  In connection with $130 million Asbestos PI-AO Class Fund

# TAB 34

### 2.8.2.6 Summary

Based on the above assumptions, the calculated fully diluted reorganized equity value is a range of $~~1.748~~**1.779** billion to $~~2.178~~**2.260** billion at the assumed Effective Date.

To calculate the fully diluted reorganized equity value per share, fully diluted shares must be calculated by adding: (1) basic shares of Parent Common Stock outstanding, (2) the shares of Parent Common Stock underlying in-the-money options, as more fully described above; (3) the shares of Parent Common Stock to be issued in respect of Class 9, equal to 15% of the Allowed Class 9 Claims, which amount is assumed to represent approximately $~~143~~**149** million; (4) the shares of Parent Common Stock expected to be issued to the Asbestos Trust, which amount is assumed to represent approximately $498 million based on the maximum aggregate amount that would satisfy the conditions precedent in Section 7.16(v) of the Plan; and (5) the shares of Parent Common Stock underlying the Warrants which are issued to the Asbestos Trust to fund assumed Class 7 liability of $130 million based on the maximum aggregate amount that would satisfy the conditions precedent in Section 7.6.1(w) of the Plan. Based on the foregoing assumptions, the range of fully diluted shares varies with the range of calculated equity values and is ~~128.8~~**127.8** million shares at the low end of the reorganized equity value range and ~~112.4~~**112.7** million shares at the high end of such range (a higher equity value implies that fewer shares would be required to fund items (3), (4) and (5) above), with a midpoint estimate of ~~118.9~~**118.2** million shares. The calculated fully diluted reorganized equity value per share is in the approximate range of $~~13.57~~**13.92** to $~~19.38,~~**20.06,** with a midpoint estimate of $~~16.48.~~**17.01.**

The Reorganized Debtors and Non-Debtor Affiliates' fully diluted reorganized equity value could be materially lower if the Asbestos PI-AO Claims liability exceeds the $130 million (plus expenses) assumed as the maximum estimated liability that would satisfy the Asbestos PI-AO Claims. The~~If all Warrants were immediately exercised by the Asbestos Trust, fully diluted reorganized equity value per share would be in the approximate range of $10.76 to $13.89, with a midpoint estimate of $12.37. However, the~~ theoretical dilution to equity value is not limited to the Warrants exercisable by the Asbestos Trust, but also could be impacted by future payments by Reorganized Grace.

The estimates of reorganized value do not purport to be appraisals, liquidation values or estimates of the actual market value that may be realized if assets are sold. The estimates of reorganized value, fully diluted reorganized equity value, and fully diluted reorganized equity value per share represent hypothetical values developed solely for purposes of the Plan and should not be relied upon in making investment decisions to purchase or sell Parent Common Stock at any time, now or in the future.

The estimates of reorganized value, fully diluted reorganized equity value, and fully diluted reorganized equity value per share are highly dependent upon achieving the future financial results set forth in the proforma and prospective financial information as well as the realization of certain other assumptions which are not guaranteed, in particular, assumptions regarding the value of all Asbestos Claims and estimates presented herein regarding insurance, tax and ~~c~~cash assets as well as net debt and other liabilities. Because such estimates are inherently subject to uncertainties, neither the Debtors, the Reorganized Debtors and Non-Debtor Affiliates, Blackstone, nor any other person assumes responsibility for their accuracy.

The Parent Common Stock of Grace is traded on the New York Stock Exchange (TICKER: GRA). The estimates of the range of fully diluted reorganized equity value do not purport to be an estimate of the pre- or post-reorganization trading value of the Parent Common Stock and the estimate of the fully diluted reorganized equity value per share may not correlate with actual trading prices on the New York Stock Exchange. The estimated values set forth herein represent estimated reorganized values and estimated fully diluted reorganized equity values and do not necessarily reflect values that could be attainable in public or private markets. The values set forth herein do not consider market trading characteristics, trading limitations possibly imposed on the Parent Common Stock or perceptions in public or private markets about the Reorganized Debtors and Non-Debtor Affiliates or the value of the Parent Common Stock. The trading value of the Parent Common Stock, if any, may be materially different from the estimates set forth in this Estimated Value of the Reorganized Debtors and Non-Debtor Affiliates.

The table set forth below illustrates the number of shares to be distributed to, or retained by, each class of Creditors or
Holders of Equity Interests pursuant to the Plan at the low, mid and high value of reorganized equity.

The actual number of shares to be distributed will be based on the price of the Parent Common Stock measured in accordance with the provisions of the Plan.

*(in millions)*

| | Low | Mid | High |
|---|---|---|---|
| **Fully Diluted Reorganized Equity Value (1)** | **$ 1,779** | **$ 2,011** | **$ 2,260** |

**Distribution of Shares**

| | Low | Mid | High |
|---|---|---|---|
| Shares issued to Class 6 and Class 8 (2) | 35.8 | 29.3 | 24.8 |
| Shares underlying Warrants issued to Class 7 | 9.3 | 7.6 | 6.5 (4) |
| Shares issued to Class 9 (3) | 10.7 | 8.7 | 7.4 |
| Shares held by Holders of Equity Interests | 65.8 | 65.8 | 65.8 |
| Shares pursuant to management options (1) | 6.3 | 6.8 | 8.2 |
| Shares outstanding post-emergence | 127.8 | 118.2 | 112.7 |

In addition to the Warrants set forth in the table above, Warrants shall be issued to Class 7 in an amount such that, upon the payment of the Sealed Air Payment and the Debtors' Payment into the Asbestos Trust, the Parent Common Stock and Warrants (if exercised) that make up the Debtors' Payment would constitute a majority of the issued and outstanding voting shares of the Reorganized Parent. The numbers of Warrants that may be exercised is dependent on the difference, if any, between the Asbestos PI-AO Class Fund and the amount of Class 7 Allowed Claims.

**Additional Shares if all Additional Warrants were Exercised**

| | Low | Mid | High |
|---|---|---|---|
| Shares underlying Class 7 additional Warrants | 37.6 | 44.4 | 50.1 |
| Shares outstanding post-emergence | 165.4 | 162.6 | 162.7 |

**Notes:**

(1)  Assumes the exercise of existing in-the-money management options.

(2)  Based on amount requested in the Estimation Motion filed on November 13, 2004. As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund is not greater than $1.483 billion and that the Asbestos PI-AO Class Fund is not greater than

$130.0 million.

(3)  Assumes the estimated amount of Allowed Claims for Class 9 is $1,175 million, including unliquidated liabilities, estimated at approximately $185 million, that would be Class 9 Claims if and when Allowed.

(4)  In connection with $130 million Asbestos PI-AO Class Fund

# TAB 35

### 3.2.8.1 Litigation Related to Grace's Savings and Investment Plan

In June 2004, a purported class action complaint was filed in U.S. District Court for the District of Massachusetts against the Parent's Board of Directors, certain current and former Grace officers and employees, and others, relating to Grace's 401(k) Savings and Investment Plan (the "S&I Plan"). The complaint alleges that the decline in the price of Parent Common Stock from July 1999 through February 2004 resulted in significant losses to S&I Plan participants. The complaint further alleges that the defendants breached their fiduciary duties under the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") by failing to sell or take other appropriate action with regard to Parent Common Stock held by the S&I Plan during that period, and failed to disclose to S&I Plan participants the risk of investing in Parent Common Stock. The complaint seeks compensatory damages for the S&I Plan from the defendants. The Bankruptcy Court has stayed this action with respect to all defendants through and including December 31, 2004.

On October 26, 2004, a purported class-action complaint was filed in the U.S. District Court for the Eastern District of Kentucky, on behalf of present and former participants in the S&I Plan, against W. R. Grace & Co., the W. R. Grace Investment and Benefits Committee, the Parent's Board of Directors, certain current and former Grace officers and employees, and others. The complaint alleges that Grace and its investment advisors breached fiduciary duties under ERISA by selling Parent Common Stock from the S&I Plan at a "distressed price." The complaint further alleges that Grace breached fiduciary duties under ERISA by hiring State Street Bank and Trust Company, the investment manager for the S&I Plan that was retained by the Debtors in December 2003 (pursuant to a Court order authorizing such retention), to "rapidly liquidate" all of the employees' Parent Common Stock investment at an "artificially low" sales price. To date, no party has answered this complaint, and the Debtors expect to seek a stay of the action**This case was stayed by agreement of the parties through and including December 31, 2004. The Defendants currently have until January 31, 2005 to answer or otherwise plead**.

Grace likely would have an obligation to indemnify the defendants**Pursuant to Grace's Certificate of Incorporation and By-Laws, Grace is required to indemnify its directors, officers and employees** for any liability arising out of either of these lawsuits**. Grace also has certain contractual indemnity obligations that may be triggered**. However, Grace believes that the allegations in both lawsuits are without merit and that any liability arising therefrom would in any event be covered by its fiduciary liability insurance.

Under**Pursuant to Section 8.7 of** the Plan, the Debtors propose to (1) provide their current and former directors, officers, and other employees who are defendants in the above-referenced S&I Plan lawsuits, with a full and complete release of all liability associated with any such litigation, and (2) to indemnify such defendants for any costs and/or expenses associated with any such litigation**. However, to the extent that plaintiffs in the lawsuits have valid Claims against the Debtors, their pre-petition Claims will be treated as Class 9 General Unsecured Claims and their post-petition Claims will be treated as Administrative Expense Claims under the Plan.**

**The named Plaintiff in the Massachusetts lawsuit outlined above has raised an objection to the releases provided by Section 8.7 of the Plan, alleging that they go beyond**

the scope of permissible releases under applicable law. The Debtors disagree. The parties reserve their rights with respect to the release objections until the hearing on confirmation of the Plan.

# TAB 36

### 3.2.8.3 Montana Grand Jury Investigation

On ~~or about October 27, 2004, the United States Department of Justice, District of Montana, sent a letter (the "Target Letter") to counsel for the Debtors, which states, "a Federal Grand Jury is currently conducting an investigation into whether your client, W. R. Grace & Co., was involved in obstructing agency proceedings, violating federal environmental laws, and conspiring with others to violate federal law." Grace is aware that similar letters were also sent to (i) three current officers, and/or employees of Grace and (ii) four former officers, and/or employees of Grace. These individuals include persons who possess important management positions with Performance Chemicals or who held key management positions in~~ *Grace's construction products business.*~~Grace believes that the grand jury investigation is related to its former vermiculite mining and processing activities in Libby, Montana. The Target Letter, however, does not specifically articulate the scope or purpose of the~~ *federal grand jury investigation,* ~~and Grace has not otherwise been advised of any details concerning the possible violations. Therefore, Grace is presently unable to assess whether the results of this investigation may be material to Grace. Grace has filed a motion seeking Bankruptcy Court approval to pay legal expenses in connection with the grand jury investigation for the current and former officers and employees that have received the Target Letter. The Bankruptcy Court has scheduled the matter for hearing on November 15, 2004.~~**October 29, 2004, Grace received a letter from the U.S. Attorney for the District of Montana informing the company that it has been named as a target of a** *federal grand jury investigation* **involving possible obstruction of federal agency proceedings, violations of federal environmental laws, and conspiring with others to violate federal environmental laws. This investigation relates to Grace's former vermiculite mining and processing activities in Libby, Montana. By designating Grace as a "target" of the investigation, the U.S. Attorney is asserting that it has substantial evidence linking the company to the commission of a crime. Grace understands that the investigation is at an advanced stage and that it may be indicted during the first half of 2005, unless a resolution of this matter can be reached with the U.S. Attorney within such timeframe.**

**Several current and former senior level employees associated with** *Grace's construction products business* **also have been named as targets of the investigation. On November 15, 2004, the Bankruptcy Court granted Grace's request to advance legal and defense costs to the employees, subject to a reimbursement obligation if it is later determined that the employees did not meet the standards for indemnification set forth under state corporate law (Docket Nos. 6829 and 7143).**

**Grace is unable to assess whether the investigation, an indictment resulting therefrom, or any resolution thereof or conviction resulting therefrom, will have a material adverse effect on the results of operations or financial condition of Grace or affect Grace's bankruptcy proceedings.**

# TAB 37

### 3.2.9    Motion for Entry of Case Management Order

The Debtors filed their motion seeking entry of a case management order, establishment of bar date, approval of proofs of Claim forms, and approval of notice program (the "Original CMO Motion") on June 27, 2001 (Docket No. 586). The Original CMO Motion outlined the Debtors' proposal for resolution of all of the various key issues facing the Debtors, including issues relating to Asbestos PI Claims. The matter was fully briefed and set to be tried before District Judge Farnan on November 21, 2001 when the Court of Appeals for the Third Circuit reassigned the Chapter 11 Cases, along with the asbestos bankruptcy cases of four other debtors pending in Delaware, to the Honorable Judge Alfred M. Wolin.

Judge Wolin (1) retained the asbestos personal injury issues and the fraudulent transfer lawsuit (described in detail in Section 2.5.2 in this Disclosure Statement) and (2) referred all other matters to the Bankruptcy Court. Judge Wolin first addressed the fraudulent transfer lawsuit. After extensive briefing and negotiations, the matter was resolved in principle by the parties in November of 2002 and will potentially result in the recovery of approximately $1 billion for the Debtors' estates.

Judge Wolin did not immediately address the Debtors' potential liability for asbestos personal injury. Instead, he had the parties re-brief these issues and put the matter on hold pending resolution of the fraudulent transfer lawsuit. On June 21, 2002, the Debtors filed a supplemental brief regarding procedures for the litigation of the common personal injury liability issues (Docket No. 2275). This supplemental brief provided a detailed summary of the Debtors' proposal concerning (1) the level of impairment that should be necessary for a party to assert an asbestos personal injury claim against the Debtors' estates and (2) procedures for implementing, and the need for the implementation of, a bar date covering asbestos personal injury claims. The District Court never considered the matter. In lieu of the procedures outlined in the Original CMO Motion, the Plan Documents establish a process for parties to file Asbestos PI Claims against the Debtors' estates.

On November 24, 2004, the Debtors filed a motion with the District Court requesting that it refer jurisdiction over the Debtors' amended motion for entry of a CMO (Docket No. 7036). The District Court has ordered that all objections and responses to the Debtors' motion be filed by January 5, 2005, the Debtors' Reply to any objection or response be filed by January 12, 2005 and a hearing on the Referral Motion be held on January 18, 2005 (Docket No. 7326).

# TAB 38

### 3.3.6    Canadian Claims

**Upon confirmation, Canadian Claims shall be transferred to the Asbestos Trust along with all Asbestos Claims. Any Allowed Canadian Claims will be paid by the Asbestos Trust.**

# TAB 39

### 4.3.1.2 Class 2.        Secured Claims

Class 2 consists of all Secured Claims against the Debtors. Each Holder of an Allowed Secured Claim shall be paid the Allowed Amount of its Allowed Secured Claim at the option of the Reorganized Debtors, either (i) in full, in ~~C~~cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Secured Claim becomes an Allowed Secured Claim, or as soon as practicable thereafter; (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Secured Claim and the Reorganized Debtors; (iii) by the surrender to the Holder or Holders of any Allowed Secured Claim of the property securing such Claim; or (iv) notwithstanding any contractual provision or applicable law that entitles the Holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Bankruptcy Code § 1124(2)(A)-(D). ~~The Debtors estimate that there are no Allowed Secured Claims as of the Effective Date~~**Although certain Claimants have asserted Secured Claims against the Debtors, including an approximately $3.7 million Claim alleged by the Town of Acton, Massachusetts, the Debtors estimate the total of all Allowed Secured Claims on the Effective Date to be approximately $90,000 plus interest at the applicable rate, if any. To the extent an asserted Secured Claim is Allowed as a Secured Claim, it will be treated as a Secured Claim under the Plan.** The Holders of the Allowed Secured Claims in Class 2 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

# TAB 40

### 4.3.1.2 Class 2.    Secured Claims

Class 2 consists of all Secured Claims against the Debtors. Each Holder of an Allowed Secured Claim shall be paid the Allowed Amount of its Allowed Secured Claim at the option of the Reorganized Debtors, either (i) in full, in ~~C~~cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Secured Claim becomes an Allowed Secured Claim, or as soon as practicable thereafter; (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Secured Claim and the Reorganized Debtors; (iii) by the surrender to the Holder or Holders of any Allowed Secured Claim of the property securing such Claim; or (iv) notwithstanding any contractual provision or applicable law that entitles the Holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Bankruptcy Code § 1124(2)(A)-(D). ~~The Debtors estimate that there are no Allowed Secured Claims as of the Effective Date__Although certain Claimants have asserted Secured Claims against the Debtors, including an approximately $3.7 million Claim alleged by the Town of Acton, Massachusetts, the Debtors estimate the total of all Allowed Secured Claims on the Effective Date to be approximately $90,000 plus interest at the applicable rate, if any. To the extent an asserted Secured Claim is Allowed as a Secured Claim, it will be treated as a Secured Claim under the Plan__. The Holders of the Allowed Secured Claims in Class 2 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED pPERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| N/A | Administrative Expense Claims | N/A | Each Holder of an Allowed Administrative Expense Claim shall be paid the Allowed Amount of its Claim either (i) in full, in Ccash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) on such less favorable terms as may be agreed to by such hHolder. Ordinary course of business eClaims and eClaims of Professionals shall be paid as described in the Plan. | $75138 million[3] | 100% |
| N/A | Priority Tax Claims | N/A | Each Holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Priority Tax Claim, at the option of the Reorganized Debtors, either (i) in full, in Ccash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) on such less favorable terms as may be agreed to by such hHolder, or (iii) in equal quarterly Ccash payments on the Initial Distribution Date and, thereafter, on each Quarterly Tax Distribution Date in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at 3.5% per annum, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim, or upon such other terms determined by the Bankruptcy Court, which will provide the Holder of such Allowed Priority Tax Claim deferred Ccash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim, provided, however, that each Holder of a Claim which by operation of the Fresenius Settlement Agreement is an obligation for Indemnified Taxes promptly shall be paid in full in cash as such Fresenius Indemnified Taxes become due and payable. | $232 million | 100% |
| Class 1 | Priority Claims | No | Each Holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim either (i) in full, in Ccash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Priority Claim becomes an Allowed Priority Claim, or as soon as practicable thereafter, or (ii) on such less favorable terms as may be agreed to by such hHolder. | $0 | 100% |

---

[3]  Includes amounts classified as liabilities subject to compromise which are expected to be paid on the Effective Date, or as soon as practicable thereafter (approximately $76 million), and after the Effective Date in accordance with their terms (approximately $62 million).

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED ~~PERCENTAG E~~ RECOVERY |
|---|---|---|---|---|---|
| Class 2 | Secured Claims | No | Each Holder of an Allowed Secured Claim shall be paid the Allowed Amount of its Allowed Secured Claim at the option of the Reorganized Debtors, either (i) in full, in ~~C~~cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Secured Claim becomes an Allowed Secured Claim, or as soon as practicable thereafter; (ii) on such less favorable terms as may be agreed to by such ~~h~~Holder; (iii) by the surrender to the Holder or Holders of any Allowed Secured Claim of the property securing such Claim; or (iv) notwithstanding any contractual provision or applicable law that entitles the Holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Bankruptcy Code § 1124(2)(A)-(D). | $990,000 plus interest at the applicable rate, if any | 100% |
| Class 3 | Unsecured Pass-Through Employee Related Claims | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. | Most Allowed Claims have already been paid pursuant to first day orders of this Court and continue to be paid in the ordinary course as they become due; $~~19~~190 million of Claims[4] are estimated to be Allowed and outstanding. | 100% |
| Class 4 | Workers' Compensation Claims | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. | Allowed Claims have already been paid pursuant to first day orders of this Court and continue to be paid in the ordinary course as they become due. | 100% |
| Class 5 | Intercompany | No | The Plan leaves unaltered the legal, equitable, and contractual rights | For proforma cash flow | 100% |

[4] Includes approximately $123 million of post-retirement benefits other than pensions classified pursuant to Section 2.6.3.3, approximately $63 million of unfunded special pension arrangements classified pursuant to Section 2.6.3.4, and approximately $5 million of deferred compensation classified pursuant to Section 2.6.3.6.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED +PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| | Claims | | to which each such Claim entitles the Holder of such Claim. | purposes all Claims will have no impact upon the Plan as all payments under the Plan are based upon the Debtors and Non-Debtor Affiliates as consolidated. | |
| Class 6 | Asbestos PI-SE Claims | No | All Allowed Class 6 Claims shall be paid in full by the Asbestos Trust out of the Asbestos PI-SE Class Fund and shall be processed and paid in accordance with the Asbestos Trust Agreement and the PI-SE TDP. Each Holder of an Asbestos PI-SE Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Litigation Option or Canadian Litigation Option as applicable or (B) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim shall be conclusively presumed to have elected the Litigation Option or Canadian Litigation Option as applicable. Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option or Canadian Litigation Option as applicable. A Holder may also be treated on such less favorable terms as may be agreed to by such Holder. | An amount to be determined by the Bankruptcy Court pursuant to the Estimation Motion[35] | 100% |
| Class 7 | Asbestos PI-AO Claims | No | All Allowed Class 7 Claims shall be paid in full initially by the Asbestos Trust out of the Asbestos PI-AO Class Fund and then in €cash by the Asbestos Trust from funds to be paid to the Asbestos Trust by the Reorganized Debtors. All Allowed Class 7 Claims shall be processed and paid in accordance with the Asbestos Trust Agreement and the PI-AO TDP. In accordance with the terms of the Asbestos Trust Agreement and the PI-AO TDP, each Holder of an | An amount to be determined by the Bankruptcy Court pursuant to the Estimation Motion[46] | 100% |

[35] As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1,483,000,000.

[46] As a condition precedent to confirmation of the Plan, the Court shall have found that the Asbestos PI-AO Class Fund is not greater than $130,000,000.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED ¶PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| | | | Asbestos PI-AO Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Litigation Option or Canadian Litigation Option as applicable, (B) the Cash-Out Option; or (C) the Registry Options, provided, however, that a Holder of a Third Party Indemnification/Contribution Claim shall be conclusively presumed to have elected the Litigation Option or Canadian Litigation Option as applicable. Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option or Canadian Litigation Option as applicable. A Holder may also be treated on such less favorable terms as may be agreed to by such Holder. | | |
| Class 8 | Asbestos PD Claims | No | All Allowed Class 8 Claims shall be paid in full and processed and paid in accordance with the Asbestos Trust Agreement and the PD TDP. A ~~h~~Holder may also be treated on such less favorable terms as may be agreed to by such ~~h~~Holder. | An amount to be determined by the Bankruptcy Court pursuant to the Estimation Motion[57] | 100% |
| Class 9 | General Unsecured Claims | Yes | Each Holder of an Allowed General Unsecured Claim shall be paid the Allowed Amount of its General Unsecured Claim on the GUC Distribution Date. Such payment shall be paid~~in full, plus post-petition interest, for those Claimants who, but for the Filing of the Chapter 11 Cases, would be entitled to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law,~~ such payment to be 85% in ~~c~~cash and 15% in Parent Common Stock, such Parent Common | $95~~1~~1,175 million as of 9/30/04, plus accrued interest through the payment date[8] | 100% |

[57] As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1,483,000,000.

[8] Includes unliquidated liabilities, estimated at approximately $185 million, that would be Class 9 Claims if and when Allowed. These unliquidated liabilities are not expected to be Allowed General Unsecured Claims at the Effective Date.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| | | | Stock being subject to, among other things, the transactions described in Section 7.2.2 of the Plan, and the Management Stock Incentive Plan. ~~A holder~~Each Holder of a Claim which by operation of the Fresenius Settlement Agreement is an obligation for Indemnified Taxes promptly shall be paid in full in cash as such Fresenius Indemnified Taxes become due and payable. A Holder may also be treated on such less favorable terms as may be agreed to by such holder/Holder.<br><br>Post-petition interest shall accrue from the Petition Date through the date of payment and shall be (i) for the Holders of the Debtors' pre-petition bank credit facilities, at a rate of 6.09% per annum, compounded quarterly, (ii) for the Holders of Claims *who, but for the filing of the Chapter 11 Cases* would be entitled under a contract or otherwise *to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law,* the rate provided in the contract between a Debtor(s) and the Claimant or such rate as may otherwise apply under applicable non-bankruptcy law, or (iii) for all other Holders of Class 9 Claims, at a rate of 4.19% per annum (the federal judgment rate as of the Petition Date), compounded annually. | | |
| Class 10 | Equity Interests in the Parent | Yes | On the Effective Date, Holders of Class 10 Equity Interests in the Parent shall retain such interests; provided that such Equity Interests shall: (i) be subject, among other things, to the transactions described in Section 7.2.2 of the Plan, and the Management Stock Incentive Plan and (ii) be restricted as described in Section 7.1.1 of the Plan. | N/A | N/A |
| Class 11 | Equity Interests in Debtors Other than the Parent | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Equity Interest entitles the Holder of such Equity Interest. | N/A | 100% |

# TAB 41

#### 4.3.1.6 Class 6. Asbestos PI-SE Claims

Class 6 consists of all Asbestos PI-SE Claims against the Debtors and the Canadian Affiliates.

All Allowed Class 6 Claims shall be paid in full. All Allowed Class 6 Claims shall be processed and paid in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement and the PI-SE TDP. All Allowed Class 6 Claims shall be paid by the Asbestos Trust out of the Asbestos PI-SE Class Fund, which shall be funded solely by the Sealed Air Payment and the Parent Common Stock component of the Debtors' Payment, if necessary. In accordance with the terms of the Asbestos Trust Agreement and the PI-SE TDP, each Holder of an Asbestos PI-SE Claim that is not a Canadian Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Litigation Option or (B) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim that is not a Canadian Claim shall be conclusively presumed to have elected the Litigation Option. In accordance with the terms of the Asbestos Trust Agreement and the PI-SE TDP, each Holder of an Asbestos PI-SE Claim that is a Canadian Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Canadian Litigation Option or (B) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim that is a Canadian Claim shall be conclusively presumed to have elected the Canadian Litigation Option. Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option or the Canadian Litigation Option, as applicable. Notwithstanding the foregoing, nothing shall prevent the Holder of an Asbestos PI-SE Claim that has not yet been Allowed from agreeing with the Entity against whom the Claim is asserted (or after the Effective Date, with the Asbestos Trust) for such Claim to be liquidated and paid in an amount lower than if the Claim were to be Allowed in the amount asserted. Claimants may assert their Claims on the Asbestos PI Proof of Claim Form included with the Claims Materials.

The sole recourse of the Holder of an Asbestos PI-SE Claim on account of such Claim shall be to the PI-SE Account of the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Asbestos Trust Agreement, and the PI-SE TDP.

The Bankruptcy Court, pursuant to the Estimation Motion, shall determine the amount of the Asbestos PI-SE Claims. As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1.483 billion.

Class 6 is unimpaired. The Holders of the Allowed Asbestos PI-SE Claims in Class 6 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

# TAB 42

### 4.5.1   Objections to Claims (other than Asbestos Claims); Prosecution of Disputed Claims

Section 5.1 of the Plan sets forth the right of the Debtors' or Reorganized Debtors', as applicable, right the United States Trustee and any other party-in-interest to object to the allowance of any Administrative Expense Claims, Priority Tax Claims, Class 1 Claims, Class 2 Claims, Class 3 Claims, Class 4 Claims, Class 5 Claims, and Class 9 Claims.  It also delineates the ways in which such objections may be resolved.

**5.1 OBJECTIONS TO CLAIMS (OTHER THAN ASBESTOS CLAIMS); PROSECUTION OF DISPUTED CLAIMS**

The Debtors or Reorganized Debtors, as applicable, the United States Trustee and any other party-in-interest may object to the allowance of any Administrative Expense Claims, Priority Tax Claims, Class 1 Claims, Class 2 Claims, Class 3 Claims, Class 4 Claims, Class 5 Claims, and Class 9 Claims Filed with the Bankruptcy Court or to be otherwise resolved by the Debtors or Reorganized Debtors pursuant to any provisions of this Plan with respect to which the they dispute liability, in whole or in part. The Debtors' pending objections to any Claims not channeled to and assumed by the Asbestos Trust shall be transferred to the Reorganized Debtors for final resolution.

All objections that are Filed and prosecuted by the Reorganized Debtors as provided herein may be: (i) compromised and settled in accordance with the business judgment of the Reorganized Debtors without approval of the Bankruptcy Court or (ii) litigated to Final Order by the Reorganized Debtors. Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by the Reorganized Debtors to Claims shall be served and Filed no later than one (1) year after the Effective Date, subject to any extensions granted pursuant to a further order of the Bankruptcy Court. Such further order may be obtained by the Reorganized Debtors without a hearing or notice. The Debtors reserve the right to designate, upon notice to the Holders of such Claim, any Claim as a Disputed Claim on or before the Confirmation Date.

To the extent that the Court enters an alternative dispute resolution order which contemplates that an order shall survive confirmation of this Plan, such order shall be controlling.

K&E ....... ...713202.25

# TAB 43

### 4.5.3   Resolution of Asbestos Claims

Section 5.3 of the Plan sets forth the way in which Asbestos Claims will be Allowed or Disallowed, and paid if Allowed.  The Allowed Amount of Asbestos Claims (except for Canadian Claims that are filed by Claimants (i) with Asbestos PI Claims who elect the Canadian Litigation Option or (ii) with Asbestos PD Claims) shall be determined in accordance with the Bankruptcy Code, the Bankruptcy Rules, the applicable TDP, and the CMO.  If any Asbestos Claim becomes Allowed, it shall be satisfied from the Asbestos Trust in accordance with the Asbestos Trust Agreement and the applicable TDPs.

The Allowed Amount of Canadian Claims that are filed by Claimants (i) with Asbestos PI Claims who elect the Canadian Litigation Option or (ii) with Asbestos PD Claims shall be determined in accordance with the Canadian Litigation Procedure and the applicable TDP.

The Asbestos Trust shall have the sole right and authority to resolve all Asbestos PI-SE Claims and Asbestos PD Claims.  All Asbestos PI-SE Claims whose Holders elect the Litigation Option or the Canadian Litigation Option, as applicable, shall be litigated by, and at the expense of, the Asbestos Trust in the name of the Asbestos Trust.

The Asbestos Trust shall also have the sole right and authority to resolve all Asbestos PI-AO Claims to the extent the Holder of an Asbestos PI-AO Claim elects the Registry Option or the Cash-Out Option.

If the Holder of an Asbestos PI-AO Claim elects the Litigation Option or the Canadian Litigation Option, as applicable, the Reorganized Debtors shall have the sole right and authority to resolve all such Asbestos PI-AO Claims.  All Asbestos PI-AO Claims whose Holders elect the Litigation Option or the Canadian Litigation Option, as applicable, shall be litigated by the Reorganized Debtors or the Canadian Affiliates, as applicable, in the name of the Asbestos Trust, initially at the expense of the Asbestos Trust out of the Asbestos PI-AO Class Fund as it is the estate that remains liable for funding of Asbestos PI-AO Claims.

Any court proceeding related to the resolution of Canadian Claims shall be resolved by the Canadian Court in the context of the Canadian Proceedings.

The subsections of Section 5.3 of the Plan deal with:

- Making of an Election by Asbestos PI Claimants;

- Claims Materials for Asbestos PI Claimants;

- Information Obtained by the Asbestos Trust or Reorganized Debtors Regarding Asbestos PI Claims; and

- Withdrawal of Claims.

# TAB 44

### 4.7.1    Corporate Governance of the Parent and the Other Debtors

Section 7.1 of the Plan provides that the Certificates of Incorporation or Articles of Incorporation, as applicable, of each of the Debtors that is a corporation shall be amended as of the Effective Date. The form of the Certificate of Incorporation or Articles of Incorporation shall be filed as part of the Plan Supplement. The amended Certificates of Incorporation or Articles of Incorporation, as applicable, of the Debtors shall, among other things:  (i) prohibit the issuance of nonvoting equity securities, (ii) as to any classes of securities possessing voting power, provide for an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in payment of such dividends, (iii) include, in the case of the Parent, restrictions on the transfer of the Parent Common Stock as necessary to protect the Reorganized Debtors' tax position, and (iv) effectuate any other provisions of the Plan.

Section 7.1 of the Plan also deals with amendments to the Parent's by-laws by-laws and the purchase of D&O and fiduciary liability tail coverage. The form of the Parent's by-laws shall be filed as part of the Plan Supplement.

# TAB 45

### 4.7.2   The Asbestos Trust

**Section 7.2 of the Plan deals with the Asbestos Trust.  It provides generally for the creation and funding of the Asbestos Trust,; transfer of assets, Claims and Demands into the Asbestos Trust,; appointment and termination of the Trustee and the TAC,; and other administrative matters.**

#### 4.7.2.1 ~~Plan § 7.2.1~~   Creation of the Asbestos Trust

Upon the entry of the Confirmation Order, effective as of the Effective Date, the Asbestos Trust shall be created as a "qualified settlement fund" in accordance with the Plan Documents.

The purpose of the Asbestos Trust shall be to, among other things:  (i) assume the liabilities of the Debtors **and the Canadian Affiliates** with respect to all Asbestos Claims (whether now existing or arising at any time hereafter), (ii) process, liquidate, pay and satisfy all Asbestos Claims in accordance with the Plan, the Asbestos Trust Agreement, the respective TDPs, the CMO, **the Canadian Litigation Procedure** and the Confirmation Order and in such a way that provides reasonable assurance that the Asbestos Trust will value and be in a position to pay, present and future Asbestos Claims and to otherwise comply with Bankruptcy Code § 524(g)(2)(B)(i); (iii) preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Allowed Asbestos Claims; and (iv) otherwise carry out the provisions of the Asbestos Trust Agreement and any other agreements into which the Trustees have entered or will enter in connection with the Plan.

#### 4.7.2.2 ~~Plan § 7.2.2~~   Funding of the Asbestos Trust

Effective on the Effective Date, **and conditioned upon the fulfillment of events enumerated in the** Sealed Air **Settlement Agreement, Cryovac, Inc.** shall fund the Sealed Air Payment into the Asbestos Trust in accordance with the Plan and the provisions of the Sealed Air Settlement Agreement.  Effective on the thirty-first (31st) day after the Effective Date, the Parent shall transfer or cause the transfer of the Debtors' Payment into the Asbestos Trust in accordance with the Plan.

The Sealed Air Payment and that portion of the Debtors' Payment consisting of the Parent Common Stock, to the extent necessary, shall first fund the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund.  The remainder of the Sealed Air Payment, if any, and the Warrants included as part of the Debtors' Payment shall fund the Asbestos PI-AO Class Fund.

In addition, in the event that the proceeds of the sale of Parent Common Stock following exercise of all of the Warrants are insufficient to pay all Allowed Asbestos PI-AO Claims in full, the Reorganized Debtors shall pay the Asbestos Trust in full and in ~~C~~cash for the benefit of the Holders of such Claims, such payment to be made by the Reorganized Debtors on the first Business Day of the next calendar quarter after the date upon which the Asbestos PI-AO Claim becomes Allowed, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of such next calendar quarter, in which case the payment date shall be the first Business Day of the next succeeding calendar quarter.

### 4.7.2.3 Sections 7.2.3 through 7.2.9 of the Plan

Sections 7.2.3 through 7.2.9 of the Plan deal with:

- Transfer of assets into the Asbestos Trust;

- Transfer of Claims and Demands to the Asbestos Trust;

- Creation of Asbestos Trust sub-accounts;

- Appointment and termination of Trustees;

- Creation and termination of the TAC;

- The cooperation agreement between the Reorganized Debtors and the Asbestos Trust;

- Institution and maintenance of legal and other proceedings by the Asbestos Trust; and

- The Reorganized Debtors' sole right and authority to resolve Asbestos PI-AO Claims for which the Holder of such Asbestos PI-AO Claim elects the Litigation Option **or the Canadian Litigation Option, as applicable**.

# TAB 46

### 4.7.13  Deemed Consolidation of the Debtors for Plan Purposes Only

Section 7.13 of the Plan provides for the substantive consolidation of the Debtors as follows: subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under the Plan for Plan purposes only. Each and every Claim Filed or to be Filed against any of the Debtors shall be deemed Filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors.

Such deemed consolidation, however, shall not (other than for purposes related to funding Distributions under the Plan and as set forth above in Section 7.13 of the Plan) affect:  (i) the legal and organizational structure of the Debtors; (ii) any Encumbrances that are required to be maintained under the Plan (A) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed, (B) pursuant to the Plan, or (C) in connection with any Exit Financing; (iii) the Sealed Air Settlement Agreement; and (iv) the Fresenius Settlement Agreement.

Notwithstanding anything contained in the Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on any of the Claims (other than Asbestos Claims) being reinstated and left unimpaired under the Plan, and the legal, equitable, and contractual rights to which the Holders of any such Claims (other than Asbestos Claims) are entitled shall be left unaltered by the Plan.

Such limited substantive consolidation will have no economic impact on recovery to Claimants as the Debtors are paying all Claims in full. Forgiveness of Intercompany Claims, therefore, would not result in an increased recovery to the Debtors' creditors.

# TAB 47

### 4.8.1.3 *Plan § 8.1.3* Disallowed Claims and Disallowed Equity Interests

On and after the Effective Date, the Debtors, the Reorganized Debtors and their Representatives shall be fully and finally discharged of any liability or obligation on a Disallowed Claim or Disallowed Equity Interest, and any order creating a Disallowed Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to Bankruptcy Code § 502 or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. ~~The Confirmation Order, except as otherwise provided in the Plan, or unless the Court orders otherwise, shall constitute an order disallowing all Claims (other than Asbestos Claims) to the extent such Claims are not allowable under any provision of Bankruptcy Code § 502, including time-barred Claims, and Claims for unmatured interest.~~

### 8.1.3   Disallowed Claims and Disallowed Equity Interests

On and after the Effective Date, the Debtors, the Reorganized Debtors and their Representatives shall be fully and finally discharged of any liability or obligation on a Disallowed Claim or Disallowed Equity Interest, and any order creating a Disallowed Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to Bankruptcy Code § 502 or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. ~~The Confirmation Order, except as otherwise provided herein, or unless the Court orders otherwise, shall constitute an order disallowing all Claims (other than Asbestos Claims) to the extent such Claims are not allowable under any provision of Bankruptcy Code § 502, including time-barred Claims, and Claims for unmatured interest.~~

# TAB 48

### 4.8.1.4 <s>Plan § 8.1.4</s> Non-Dischargeable ERISA Liability

The Parent is a controlled group member within the meaning of 29 U.S.C. § 1301(a)(14) and may also be a contributing sponsor of one or more ongoing, defined benefit pension plans to which Title IV of <s>the Employee Retirement Income Security Act</s> ("ERISA") applies (the "Pension Plans"). **The Debtors intend, and the Plan contemplates, that the Reorganized Debtors will continue to be the contributing sponsor of all the Pension Plans that they currently sponsor. Each of the Pension Plans is a defined benefit pension plan insured by the** *Pension Benefit Guaranty Corporation ("PBGC")* **under ERISA. The Pension Plans are subject to minimum funding requirements of ERISA and Section 412 of the IRC. The PBGC believes the Pension Plans to be underfunded on a termination basis. As of their April 2004 Form 4010 Filings with the PBGC, the Debtors Actuarial Information Certification indicates the total unfunded status of the Pension Plans was $394.2 million as of December 31, 2003. An underfunded pension plan can terminate only in either a distress termination or PBGC-initiated termination under Title IV of ERISA. Should the Pension Plans terminate, the PBGC may assert claims for the underfunding, for any unpaid minimum funding contributions owed the Pension Plan, and for any unpaid premiums owed the PBGC. The PBGC further asserts that portions of those claims would be entitled to priority status.**

Nothing contained in the Plan, Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases shall be construed to discharge, release or relieve the Debtors, or any other party, in any capacity, from any liability or responsibility to the *Pension Benefit Guaranty Corporation ("PBGC")* **PBGC** with respect to the Pension Plans under any law, governmental policy, or regulatory provision. The PBGC shall not be enjoined or precluded from enforcing such liability or responsibility, as a result of any of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims), the Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases. Notwithstanding the foregoing, neither the PBGC nor any other Entity shall assert any liability or responsibility with respect to the Pension Plans under any law, governmental policy or regulatory provisions against, and such liability or responsibility shall not attach to, the Asbestos Trust or any of the Asbestos Trust Assets.

### 8.1.4  Non-Dischargeable ERISA Liability

The Parent is a controlled group member within the meaning of 29 U.S.C. § 1301(a)(14) and may also be a contributing sponsor of one or more ongoing, defined benefit pension plans to which Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA") applies (the "Pension Plans"). **The Debtors intend, and this Plan contemplates, that the Reorganized Debtors will continue to be the contributing sponsor of all the Pension Plans that it currently sponsors. Each of the Pension Plans is a defined benefit pension plan insured by the** *Pension Benefit Guaranty Corporation ("PBGC")* **under ERISA. The Pension Plans are subject to minimum funding requirements of ERISA and Section 412 of the IRC. The PBGC believes the Pension Plans to be underfunded on a termination basis. As of their April 2004 Form 4010 Filings with the PBGC, the Debtors Actuarial Information Certification indicates the total unfunded status of the Pension Plans was $394.2 million as of December 31, 2003. An underfunded pension plan can terminate only in either a distress termination or PBGC-initiated termination under Title IV of ERISA. Should the Pension Plans terminate, the PBGC may assert claims for the underfunding, for any unpaid minimum funding contributions owed the Pension Plan, and for any unpaid premiums owed the PBGC. The PBGC further asserts that portions of those claims would be entitled to priority status.**

Nothing contained in this Plan, Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases shall be construed to discharge, release or relieve the Debtors, or any other party, in any capacity, from any liability or responsibility to the ~~Pension Benefit Guaranty Corporation ("PBGC")~~**PBGC** with respect to the Pension Plans under any law, governmental policy, or regulatory provision. The PBGC shall not be enjoined or precluded from enforcing such liability or responsibility, as a result of any of the provisions of this Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims), the Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases. Notwithstanding the foregoing, neither the PBGC nor any other Entity shall assert any liability or responsibility with respect to the Pension Plans under any law, governmental policy or regulatory provisions against, and such liability or responsibility shall not attach to, the Asbestos Trust or any of the Asbestos Trust Assets.

# TAB 49

### 4.9    CONTRACTS

Article 9 of the Plan sets forth provisions dealing with executory contracts, unexpired leases, letters of credit, surety bonds, guaranties, and certain indemnity agreements.

# TAB 50

### 8.2.5   The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan and the Final DIP Order (Docket No. 194), the Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest deemed Allowed under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is subject to an objection.  Any Holder of a Claim may not receive its specified share of the estimated distributions described in this Disclosure Statement.

### 8.3.3 Risk that Amounts of Allowed Claims Will Exceed the Debtors' Projections

The Allowed Amount of Administrative Expense Claims, Priority Tax Claims, and Claims in Class 1, Class 2, Class 3, Class 4, Class 5, and Class 9 could be more than projected, which, in turn, would impair the value of Parent Common Stock.

# TAB 51

### 2.8.2.6 Summary

Based on the above assumptions, the calculated fully diluted reorganized equity value is a range of $1.748**1.779** billion to $2.178**2.260** billion at the assumed Effective Date.

To calculate the fully diluted reorganized equity value per share, fully diluted shares must be calculated by adding: (1) basic shares of Parent Common Stock outstanding, (2) the shares of Parent Common Stock underlying in-the-money options, as more fully described above; (3) the shares of Parent Common Stock to be issued in respect of Class 9, equal to 15% of the Allowed Class 9 Claims, which amount is assumed to represent approximately $143**149** million; (4) the shares of Parent Common Stock expected to be issued to the Asbestos Trust, which amount is assumed to represent approximately $498 million based on the maximum aggregate amount that would satisfy the conditions precedent in Section 7.16(v) of the Plan; and (5) the shares of Parent Common Stock underlying the Warrants which are issued to the Asbestos Trust to fund assumed Class 7 liability of $130 million based on the maximum aggregate amount that would satisfy the conditions precedent in Section 7.6.1(w) of the Plan. Based on the foregoing assumptions, the range of fully diluted shares varies with the range of calculated equity values and is 128.8**127.8** million shares at the low end of the reorganized equity value range and 112.4**112.7** million shares at the high end of such range (a higher equity value implies that fewer shares would be required to fund items (3), (4) and (5) above), with a midpoint estimate of 118.9**118.2** million shares. The calculated fully diluted reorganized equity value per share is in the approximate range of $13.57**13.92** to $19.38**20.06**, with a midpoint estimate of $16.48**17.01**.

The Reorganized Debtors and Non-Debtor Affiliates' fully diluted reorganized equity value could be materially lower if the Asbestos PI-AO Claims liability exceeds the $130 million (plus expenses) assumed as the maximum estimated liability that would satisfy the Asbestos PI-AO Claims. The**If all Warrants were immediately exercised by the Asbestos Trust, fully diluted reorganized equity value per share would be in the approximate range of $10.76 to $13.89, with a midpoint estimate of $12.37. However, the** theoretical dilution to equity value is not limited to the Warrants exercisable by the Asbestos Trust, but also could be impacted by future payments by Reorganized Grace.

The estimates of reorganized value do not purport to be appraisals, liquidation values or estimates of the actual market value that may be realized if assets are sold. The estimates of reorganized value, fully diluted reorganized equity value, and fully diluted reorganized equity value per share represent hypothetical values developed solely for purposes of the Plan and should not be relied upon in making investment decisions to purchase or sell Parent Common Stock at any time, now or in the future.

The estimates of reorganized value, fully diluted reorganized equity value, and fully diluted reorganized equity value per share are highly dependent upon achieving the future financial results set forth in the proforma and prospective financial information as well as the realization of certain other assumptions which are not guaranteed, in particular, assumptions regarding the value of all Asbestos Claims and estimates presented herein regarding insurance, tax and C**c**ash assets as well as net debt and other liabilities. Because such estimates are inherently subject to uncertainties, neither the Debtors, the Reorganized Debtors and Non-Debtor Affiliates, Blackstone, nor any other person assumes responsibility for their accuracy.

The Parent Common Stock of Grace is traded on the New York Stock Exchange (TICKER: GRA).  The estimates of the range of fully diluted reorganized equity value do not purport to be an estimate of the pre- or post-reorganization trading value of the Parent Common Stock and the estimate of the fully diluted reorganized equity value per share may not correlate with actual trading prices on the New York Stock Exchange.  The estimated values set forth herein represent estimated reorganized values and estimated fully diluted reorganized equity values and do not necessarily reflect values that could be attainable in public or private markets. The values set forth herein do not consider market trading characteristics, trading limitations possibly imposed on the Parent Common Stock or perceptions in public or private markets about the Reorganized Debtors and Non-Debtor Affiliates or the value of the Parent Common Stock. The trading value of the Parent Common Stock, if any, may be materially different from the estimates set forth in this Estimated Value of the Reorganized Debtors and Non-Debtor Affiliates.

The table set forth below illustrates the number of shares to be distributed to, or retained by, each class of Creditors or
Holders of Equity Interests pursuant to the Plan at the low, mid and high value of reorganized equity.

The actual number of shares to be distributed will be based on the price of the Parent Common Stock measured in accordance with the provisions of the Plan.

*(in millions)*

| | Low | Mid | High |
|---|---|---|---|
| Fully Diluted Reorganized Equity Value (1) | $ 1,779 | $ 2,011 | $ 2,260 |
| | | | |
| **Distribution of Shares** | | | |
| | | | |
| Shares issued to Class 6 and Class 8 (2) | 35.8 | 29.3 | 24.8 |
| Shares underlying Warrants issued to Class 7 | 9.3 | 7.6 | 6.5 (4) |
| Shares issued to Class 9 (3) | 10.7 | 8.7 | 7.4 |
| Shares held by Holders of Equity Interests | 65.8 | 65.8 | 65.8 |
| Shares pursuant to management options (1) | 6.3 | 6.8 | 8.2 |
| Shares outstanding post-emergence | 127.8 | 118.2 | 112.7 |

In addition to the Warrants set forth in the table above, Warrants shall be issued to Class 7 in an amount such that, upon the payment of the Sealed Air Payment and the Debtors' Payment into the Asbestos Trust, the Parent Common Stock and Warrants (if exercised) that make up the Debtors' Payment would constitute a majority of the issued and outstanding voting shares of the Reorganized Parent.  The numbers of Warrants that may be exercised is dependent on the difference, if any, between the Asbestos PI-AO Class Fund and the amount of Class 7 Allowed Claims.

Additional Shares if all Additional Warrants were Exercised

| | | | |
|---|---|---|---|
| Shares underlying Class 7 additional Warrants | 37.6 | 44.4 | 50.1 |
| Shares outstanding post-emergence | 165.4 | 162.6 | 162.7 |

Notes:

(1)  Assumes the exercise of existing in-the-money management options.

(2)  Based on amount requested in the Estimation Motion filed on November 13, 2004.  As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund is not greater than $1.483 billion and that the Asbestos PI-AO Class Fund is not greater than

$130.0 million.

(3)  Assumes the estimated amount of Allowed Claims for Class 9 is $1,175 million, including unliquidated liabilities, estimated at approximately $185 million, that would be Class 9 Claims if and when Allowed.

(4)  In connection with $130 million Asbestos PI-AO Class Fund

### 8.4    Factors Affecting the Parent Common Stock

The Parent Common Stock is traded on the New York Stock Exchange (Ticker: GRA). Pursuant to the provisions of the Plan, that common stock will not be cancelled and will remain outstanding (although Equity Interests will be impaired by the issuance of additional shares and Warrants, and will thus be entitled to vote on the Plan).

The estimate of the range of the reorganized equity value set forth in Section 2.8 (Estimated Value of the Reorganized Debtors and Non-Debtor Affiliates) of this Disclosure Statement or elsewhere in the Plan Documents does not purport to be an estimate reflective of the pre- or post-reorganization trading value of the Parent Common Stock. The estimate reflective of the range of the fully diluted reorganized equity value per share ascribed herein, or elsewhere in the Plan Documents, may or may not correlate with the actual trading price (if any) of Parent Common Stock on the New York Stock Exchange. It represents hypothetical reorganized values based on numerous assumptions. The estimated values set forth herein do not necessarily reflect values that could be attainable in public or private markets, and do not consider market trading characteristics, trading limitations possibly imposed on the Parent Common Stock, or perceptions in public or private markets about the Reorganized Debtors and/or Non-Debtor Affiliates that may affect the trading price of Parent Common Stock.

<u>Holders' interests in the Parent Common Stock are subject to dilution by, among other things, additional shares of Parent Common Stock issued under the Plan and possible exercise of the Warrants issued under the Plan, and may be further impacted by future payments by Reorganized Grace.</u>

# TAB 52

**10.4   ENFORCEMENT/MODIFICATION OF THIS PLAN**

(a) To issue such orders in aid of execution of this Plan to the extent authorized or contemplated by Bankruptcy Code § 1142;

(b) To consider and approve any modifications of this Plan or Plan Documents, remedy any defect or omission, or reconcile any inconsistency in any order of the Court, including the Confirmation Order;

(c) To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with this Plan or any other Plan Documents or their interpretation, implementation, enforcement, or consummation;

(d) To hear and determine all objections to the termination of the Asbestos Trust;

(e) To determine such other matters that may be set forth in, or that may arise in connection with, this Plan, the Confirmation Order, the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, the Released Matters Injunction, or the Asbestos Trust Agreement;

(f) To hear and determine any proceeding that involves the validity, application, construction, enforceability, or modification of the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, or the Released Matters Injunction;

(g) To enter an order or final decree closing the Chapter 11 Cases;

(h) To hear and determine any other matters related hereto, including matters related to the implementation and enforcement of all orders entered by the Court in the Chapter 11 Cases;

(i) To enter such orders as are necessary to implement and enforce the injunctions described herein; and

(j) To enter orders authorizing immaterial modifications to this Plan which are necessary to comply with Section 468B of the IRC.

# TAB 53

**11.9    TITLE TO ASSETS; DISCHARGE OF LIABILITIES**

Upon the transfer of the Sealed Air Payment into the Asbestos Trust, and the transfer of the Debtors' Payment into the Asbestos Trust, each such transfer shall be vested in the Asbestos Trust free and clear of all Claims, Equity Interests, Encumbrances, and other interests of any Entity. Except as otherwise provided in this Plan and in accordance with Bankruptcy Code § 1123(b)(3), on the Effective Date, title to all of the Debtors' assets and properties and interests in property, including the Retained Causes of Action, shall vest in the Reorganized Debtors free and clear of all Claims, Equity Interests, Encumbrances, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors.

# TAB 54

16.    **"Asbestos PD Claim"** shall mean:  (i) a Claim, Demand, or remedy, including all related claims, debts, obligations, or liabilities for compensatory (including general, special, and consequential damages) and punitive damages, (ii) a cross-claim, contribution claim, subrogation claim, reimbursement claim or indemnity claim, or (iii) any debt, liability, or obligation of one or more of the Debtors or any other Asbestos Protected Party, including the Canadian Affiliates (whether or not such Claim, Demand, remedy, debt, liability, or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; whether or not the facts of or legal bases therefor are known or unknown; and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty):

(a)    arising directly from acts or omissions of one or more of the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable); and

(b)    for, relating to, or arising out of, resulting from, or attributable to, directly or indirectly, the cost of removal, abatement, diminution of property value, environmental damage, or economic loss caused or allegedly caused:

(i)    by asbestos in products or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable); or

(ii)    · from vermiculite mined, milled, or processed by the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable).

Notwithstanding anything to the contrary, Previously Settled/Adjudicated Asbestos Claims and claims of governmental and private entities under the Comprehensive Environmental Response Compensation and Liabilities Act, 42 USC § 9601 et seq., or analogous state laws for liability related to the release of a hazardous substance into the environment are not included within the Class of Asbestos PD Claims. ZAI Claims are included within the Class of Asbestos PD Claims.

# TAB 55

# W. R. GRACE & CO. AND SUBSIDIARIES
# PROFORMA AND PROSPECTIVE
# FINANCIAL INFORMATION

## W. R. GRACE & CO. AND SUBSIDIARIES
## PROFORMA AND PROSPECTIVE FINANCIAL INFORMATION

The following proforma and prospective financial information (the **"Financial Information"**) was prepared for the sole purpose of evaluating the feasibility of the proposed Plan of Reorganization (as such plan may be amended or modified, the "**Plan**") of W. R. Grace & Co. and Subsidiaries ("**Grace**") under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**"). The Financial Information reflects Grace's estimate of its expected consolidated financial position, results of operations, and cash flows as if the Plan were adopted as proposed. The Financial Information was prepared on the basis of the global operations of Grace, which include certain domestic and international subsidiaries and affiliates that are not debtors under the Bankruptcy Code.

**WHILE GRACE BELIEVES THE ASSUMPTIONS UNDERLYING THE PROFORMA AND PROSPECTIVE FINANCIAL INFORMATION, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE IS GIVEN THAT ANY OF THE FINANCIAL RESULTS WILL BE REALIZED. THIS FINANCIAL INFORMATION SHOULD NOT BE REGARDED AS A GUARANTEE OR WARRANTY BY GRACE, OR ANY OTHER PERSON, AS TO THE ACHIEVABILITY OF THE PROFORMA OR PROSPECTIVE FINANCIAL POSITION, RESULTS OF OPERATIONS, EARNINGS PER SHARE OR CASH FLOWS. GRACE ASSUMES NO OBLIGATION OR UNDERTAKING TO UPDATE THE FINANCIAL INFORMATION, AND NO COMMENT WILL BE MADE ABOUT THE FINANCIAL INFORMATION EXCEPT AS REQUIRED BY THE BANKRUPTCY COURT.**

All estimates and assumptions underlying the Financial Information were developed by Grace. The assumptions disclosed herein are those that Grace believes are significant to the understanding and evaluation of the Financial Information. Although Grace believes the assumptions used are reasonable under the circumstances, such assumptions are subject to significant uncertainties such as: the loss of senior management and other key employees; changes in demand for Grace's products; changes in foreign currency exchange rates or interest rates; inflation that differs from that projected; changes in the business, competitive or political environment; technological breakthroughs, product innovations or competitive pricing strategies that negatively affect the profitability of a product or line of business; availability and cost of raw materials, energy and labor; and other factors affecting Grace's operations. Despite Grace's efforts to foresee and plan for the effects of changes in these circumstances, Grace cannot predict their impact with certainty. Consequently, actual financial results will likely vary from that shown in the Financial Information, and the variations could be material.

The Financial Information was prepared by Grace in conformity with guidelines promulgated by the United States Securities and Exchange Commission ("SEC") and the American Institute of Certified Public Accountants ("AICPA"). The Financial Information has not been audited or reviewed by registered independent accountants.

## I.    FINANCIAL INFORMATION PRESENTED

The Financial Information included herein is as follows:

➢    Proforma condensed consolidated balance sheet of Grace as of September 30, 2004, reflecting the accounting effects of the Plan as if it were effective on that date, under guidance promulgated by the SEC.

➢    Proforma consolidated statements of operations and analysis of continuing operations of Grace for the year ended December 31, 2003 and for the nine months ended September 30, 2004, reflecting the accounting effects of the Plan as if it were in effect at the start of each period presented, under guidance promulgated by the SEC.

➢    Projected condensed consolidated balance sheets of Grace as of December 31, 2004, 2005 and 2006, as if the Plan were effective at December 31, 2004, under guidance promulgated by the AICPA, together with historical information as of December 31, 2001, 2002 and 2003.

➢    Projected consolidated statements of operations and analysis of continuing operations of Grace for the years ending December 31, 2004, 2005 and 2006, as if the Plan were effective on December 31, 2004, under guidance promulgated by the AICPA, together with historical information for the years ended December 31, 2001, 2002 and 2003.

➢    Projected condensed consolidated statements of cash flows of Grace for the years ending December 31, 2004, 2005 and 2006, as if the Plan were effective on December 31, 2004, under guidance promulgated by the AICPA, together with historical information for the years ended December 31, 2001, 2002 and 2003.

The Plan will be accounted for in accordance with the AICPA Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code" ("**SOP 90-7**"). The Financial Information has been prepared in conformity with United States Generally Accepted Accounting Principles consistent with those currently utilized by Grace in the preparation of its consolidated financial statements, except as otherwise noted. The Financial Information should be read in conjunction with the significant assumptions, qualifications and notes set forth herein and with the audited consolidated financial statements for the year ended December 31, 2003 contained in Grace's 2003 Form 10-K/A, and with Grace's third quarter 2004 Form 10-Q filed with the SEC in November, 2004.  Historical financial information included herein was derived from such SEC documents. The Forms 10-K/A and 10-Q are available from Grace's website at www.grace.com or from the SEC's **EDGAR system** at www.sec.gov.

## II.    SUMMARY OF PRINCIPAL UNDERLYING ASSUMPTIONS

### A.    *PROPOSED PLAN OF REORGANIZATION – GENERAL TERMS*

The proposed Plan is considered a "hypothetical assumption" (as defined under AICPA guidance for prospective financial presentations) until such Plan is confirmed by the Bankruptcy Court. The Plan may change significantly as proceedings under Grace's Chapter 11 case further define and measure the claims and liabilities that will be allowed and payable under a confirmed plan. This Financial Information assumes that:

➢    Grace will satisfy all unresolved asbestos-related claims as outlined in the Plan through the contribution of Grace common stock and warrants, and assets available under certain third-party agreements, to an asbestos trust established under Bankruptcy Code Section 524(g). The value of such contribution will total approximately $1,613 million, including the estimated cost of trust administration, (such amount being equal to the maximum aggregate asbestos-related liability that would satisfy the conditions precedent set forth in Sections 7.6.1(v) and (w) of the Plan). Asbestos claims subject to ~~prepetition~~**pre-petition** judgments or agreements (approximately $~~76~~**87** million) will be resolved as part of general unsecured claims.

➢    Grace will distribute approximately $~~1,000~~**1,100** million in cash and $~~131~~**149** million in Grace common stock to satisfy all ~~non-asbestos~~**Administrative, Priority Tax and Class 9** claims payable at the effective date as follows:
  ▪    Bank debt including accrued interest –$~~607~~**as of September 30, 2004- $634** million
  ▪    Environmental remediation - $238 million
  ▪    Special pension programs - $8 million
  ▪    Trade accounts payable and litigation - $~~78~~**49 million – including:**
    ▪    **Class 9 claims - $46 million**
    ▪    **Administrative claims - $3** million
  ▪    Tax claims - $~~152~~**182** million
  ▪    Fees and other - $~~48~~**50 million**
  ▪    **Asbestos claims subject to pre-petition judgments or agreements - $87** million

➢    Grace will satisfy all other non-asbestos liabilities (estimated to be approximately $~~508~~**495** million as of September 30, 2004 **and $487 million as of December 31, 2004**), as they become due and payable over time ("**Reinstated Liabilities**").

➢    Grace will finance the payments noted above **assumed to be as of December 31, 2004** (which total $~~3,329~~**3,349** million) with cash on hand (approximately $~~150~~**184** million); newly issued Grace common stock

4

(approximately $640647 million in value); value available from Sealed Air Corporation (approximately $985 million in cash and securities) and Fresenius Medical Care (approximately $115 million in cash) under litigation settlement agreements; initial borrowings under a new debt facility (approximately $800 million **drawn**); future operating cash flows (approximately $508487 million); and warrants (initially approximating $130 million in value), if required, to fund costs of the asbestos trust related to asymptomatic personal injury claims if and when they materialize.

~~The Grace equity allocated to creditor claims under the Plan approximates $770 million in value. Additional equity of approximately $354 million (based upon the mid-point of the fully-diluted reorganized equity value range) is available to the asbestos trust through the exercise of warrants, if necessary, to satisfy trust costs related to personal injury asymptomatic and other claimants beyond Grace's effective date estimate. Should the cost of the personal injury asymptomatic and other claimants exceed the total value of the warrants, Grace would be obligated to fund the additional costs with cash.~~

### B.  PROJECTIONS OF OPERATING RESULTS – GENERAL ASSUMPTIONS

➢  Methodology – The projections of operating performance were prepared using a strategic planning methodology by each of Grace's reportable business segments, Davison Chemicals and Performance Chemicals, which were then consolidated. Executive management of Grace reviewed the segment and consolidated results for achievability based on recent historical performance, expected economic conditions, investment plans and other relevant factors, and adjusted the strategic plans accordingly to reflect the results of operations and cash flows that are reasonably expected to be achieved over the projection period.

➢  Business Environment - The operating projections assume the continuation of a stable economic and political environment with variability in global economic activity over the projection period as experienced in a typical business cycle.

➢  Sales – Consolidated sales are projected to increase approximately 6% annually over the projection period (after taking into account added sales from acquisitions completed in 2004), consistent with Grace's experience over the most recent five-year business cycle. The projections assume that revenue growth will come from the success of Grace's operating strategies and include increasing business with existing customers, developing new customers, penetrating new markets, commercializing new products and acquiring related businesses.

➢  Gross Product Margins – Gross margin on product sales (defined as sales less cost of goods sold and depreciation) is assumed to remain relatively constant as a percentage of sales over the projection period and consistent with Grace's past performance. Selling price increases through improved

product offerings and the success of productivity initiatives are assumed to offset inflation on direct production costs.

➢ Expenses – Operating expenses which include selling, general administrative and research and development costs are assumed to increase over the projection period based on factors of general inflation, business strategy and specific considerations for personnel-related costs such as compensation, health care, retirement benefits and insurance.

## III.   PROPOSED PLAN OF REORGANIZATION

The proforma financial information of Grace presented herein reflects the accounting effects of the proposed Plan (1) as if it were put in effect on the date of Grace's most recent publicly reported consolidated balance sheet for September 30, 2004, and (2) as if it were in effect for the historical reporting periods for the year ended December 31, 2003 and for the nine-months ended September 30, 2004. Such proforma financial statements show how Grace's assets, liabilities, equity and income would be affected by the Plan as follows:

### A.   ADDITIONAL PRE-PETITION EXPENSE AND INSURANCE

Reflects the accrual of added asbestos and other costs necessary to adjust Grace's balance sheet to assumed allowed claim amounts, including accrued interest, as described in the Plan. Certain amounts are recorded at net payable value, which assumes funding will occur at or near the effective date. Reinstated Liabilities are recorded at estimated amounts payable over time, and on a net present value basis where appropriate. Insurance assets are recorded at the net present value of recoverable amounts from the assumed level of future payments to asbestos claimants. Tax accounts are adjusted accordingly for both added deductible liabilities and insurance income.

### B.   BORROWINGS UNDER NEW DEBT AGREEMENTS

Reflects the assumed establishment of a new $1,000 million debt facility to fund settled claims payable at the effective date (approximately $800 million) and to provide working capital **and letters of credit** (approximately $200 million) for continuing operations. Future periods reflect an assumed 7% interest rate on outstanding borrowings. No such facility currently exists but, in Grace's view based on discussions with prospective lenders, one can be established before the effective date of the Plan.

### C.   FRESENIUS AND SEALED AIR SETTLEMENTS

Reflects the value, in the form of cash and securities, expected to be realized under each litigation settlement agreement as follows: $115 million of cash from Fresenius Medical Care; and, $985 million of estimated value from Sealed Air Corporation (calculated as of September 30, 2004) in the form of $512 million of cash plus accrued interest at 5.5% from December 21, 2002, and 9 million shares of Sealed Air common stock valued at $47 per share. Tax accounts have been adjusted to reflect the satisfaction of Grace's recorded liabilities by way of these

third-party agreements. The Fresenius settlement amount will be payable to Grace and will be accounted for as income. The Sealed Air settlement assets will be paid directly to the asbestos trust by Sealed Air and will be accounted for as satisfaction of a recorded liability.

**D.    PAYMENT OF REMAINING PRE-PETITION LIABILITIES**

Reflects the accounting for the transfer of funds and securities to settle obligations payable under the Plan at the effective date. Tax accounts are adjusted to reflect the change in nature of Grace's tax assets from predominately temporary differences to predominately time-limited tax net operating losses. Non-asbestos Reinstated Liabilities of approximately $~~508~~**495** million **estimated as of September 30, 2004 and $487 million as of December 31, 2004** are assumed to be paid in cash when due.

**E.    PROFORMA CONSOLIDATED STATEMENT OF OPERATIONS**

Reflects the elimination from Grace's historical financial statements of: (1) charges and expenses directly related to Chapter 11, (2) the $50.0 million net gain from property litigation recorded in the third quarter of 2004, and (3) the addition of interest and new common shares related to the assumed financing of the Plan.

## IV.    PROJECTIONS OF OPERATING RESULTS

The operating projections consider the performance of each reportable business segment (Davison Chemicals and Performance Chemicals) over the past five years and executive management's view of the total revenue and earnings the underlying businesses can achieve over the projection period, given expectations about general economic and specific industry conditions.   The segment level projections were prepared on a basis of global business operations, which include certain domestic entities and international subsidiaries and affiliates of Grace that are not debtors under Chapter 11 of the Bankruptcy Code.

**A.    GENERAL ECONOMIC FACTORS**

The Financial Information has been developed assuming that global economic and political conditions will be stable and that the overall sales growth and cost productivity achieved by Grace over the past five years will continue over the projection period. Grace's product portfolio is diversified across several end-use industries and geographic markets. This diversification provides a buffer against adverse changes in any one industry or region and, absent a period of extended recession globally, provides a reasonable basis for projecting sales growth consistent with past experience.

**B.    INDUSTRY FACTORS**

In addition to general economic conditions globally, Grace's sales are affected by the demand for products used in the construction industry (primarily non-residential construction), the petroleum refining industry, the food packaging industry (particularly rigid containers), the plastics industry and, to a lesser degree, the automotive, personal care, coatings, pharmaceuticals and

biotechnology industries. The average growth rates experienced by these industries over the past five-year business cycle forms the base for Grace's assumed product line growth rates over the projection period.

### C.   *INVESTMENT ASSUMPTIONS*

The rate of growth of Grace's sales over the past five years has been influenced by a relatively steady and consistent level of sales from the acquisition of businesses and new products that complement existing product offerings or expand geographic presence. These acquisitions and new products have generally been synergistic by way of leveraging infrastructure, better utilizing sales channels, and accessing new markets with current products. The Financial Information assumes a continuation of this growth strategy through targeted acquisitions, self-constructed added capacity and new product commercialization similar to that which Grace has pursued in the past several years.

### D.   *COST INFLATION AND PRODUCTIVITY*

Inflation is projected to average approximately 2% to 3% globally over the projection period based on economic indicators from independent sources. The general increase in costs caused by inflation is assumed to be offset by a combination of sales from new product offerings and productivity improvements from Six Sigma and other cost reduction and efficiency programs, resulting in gross product margins that are consistent over the projection period with those achieved on average by Grace over the past five years. Selling and research and development expenses are projected to increase at rates generally above that of average inflation, reflecting investments in programs that are designed to achieve projected sales growth. General and administrative expenses are also expected to increase at an above-average inflation rate reflecting historical trends in these expenses, which includes items like insurance, pensions and professional services.

### E.   *FOREIGN CURRENCY EXCHANGE RATES*

Foreign currency exchange rates are assumed to remain consistent with those in effect at September 30, 2004.

### F.   *DEPRECIATION AND AMORTIZATION*

Depreciation is projected in two components. Current base depreciation is reduced by about 2% annually through the projection period. Depreciation on new capital investments, including a portion from investments in acquired businesses, is projected using an average 10-year depreciable life. Amortization of identifiable intangible assets acquired in business combinations is also assumed to be over an average 10-year economic life.

### G.   *INTEREST EXPENSE AND INTEREST INCOME*

The Financial Information assumes an effective interest rate of 7% on both average debt outstanding over the projection period and on Reinstated Liabilities with actual or estimated fixed and determinable payment dates. Interest expense is

offset by interest income on the outstanding cash balance at an investment earnings rate of 3%.

### H.   CHAPTER 11 EXPENSES AND CHARGES

Chapter 11 expenses are projected in 2004 only and reflect an estimate based on past experience and level of activity. This line item also includes the added accruals for asbestos-related claims, environmental claims and other costs necessary to adjust Grace's consolidated balance sheet to reflect liability estimates under the proposed definitions of allowed claims in the Plan. Certain of these costs, such as emergence fees and financing fees, are only payable and accountable when incurred. The liability estimates in the Plan are subject to challenge both in definition and in measurement. Accordingly, Grace will adjust its recorded liabilities for such matters when definitional and measurement uncertainties are resolved by the Bankruptcy Court.

### I.   INCOME TAXES

Income tax expense is calculated at an effective global rate of 35% based on Grace's assumed split of taxable income and interest on debt of approximately 50% in the United States and 50% in the rest of the world.

## V.   SIGNIFICANT ACCOUNTING MATTERS AND ASSUMPTIONS

### A.   ACCOUNTING POLICIES

Refer to Grace's Form 10K/A for the year ended December 31, 2003 incorporated herein by reference.

### B.   CASH AND CASH EQUIVALENTS

Grace will retain a minimum of approximately $250 million in cash for ongoing business liquidity. A revolving credit facility is assumed to fund, if necessary, working capital and other operating cash requirements that fluctuate with time. For these purposes, access to approximately $200 million in revolving line-of-credit borrowings is assumed to be established as of the effective date. No borrowings under the line of credit facility are assumed during the projection period.

### C.   WORKING CAPITAL

The projections reflect an annual increase in inventories, accounts receivables and accounts payable consistent with the increase in sales. The projections assume a slight lowering of the accounts receivable days sales outstanding with inventory days on hand and accounts payable days outstanding remaining relatively stable.

### D.   PROPERTIES AND EQUIPMENT, NET

Capital expenditures, including an allocation of assets acquired in business combinations, are assumed to equal annual depreciation over the projection period.

### E.    NET CASH VALUE OF COMPANY OWNED LIFE INSURANCE ("COLI")

The Financial Information assumes a $22 million conversion of net cash value to cash in the early part of 2005 reflecting a settlement with the Internal Revenue Service that would initiate the termination of Grace's broad-based COLI policies. This termination of COLI policies will also result in a tax gain and the utilization of approximately $59 million of Grace's net operating loss carryforwards for federal income tax purposes. The remaining COLI policies are assumed to increase in cash value at approximately 9% annually, consistent with policy terms and past experience.

### F.    ASBESTOS-RELATED INSURANCE

Grace is entitled to a partial cash reimbursement under existing product liability insurance policies with respect to the cost of its asbestos-related lawsuits and claims. Insurance reimbursements are collectible as the liabilities are satisfied by the asbestos trust. The asbestos-related insurance asset represents the estimated nominal value of amounts expected to be received from solvent carriers under relevant insurance policies, based on the assumed funding levels required for the asbestos trust. The amount also approximates the net present value of future insurance recoveries based on an assumed actuarial profile of future trust payouts.

### G.    DEBT

Short-term debt represents borrowings under various lines of credit and other miscellaneous borrowings that are assumed to be satisfied shortly after the effective date. Long-term debt assumes an initial $800 million borrowing to fund the Plan **including the replacement of all undrawn letters of credit including letters of credit outstanding under the pre-petition facilities**. The debt facility is assumed to bear interest at an average of 7% annually. It is assumed that the outstanding balance is retired as cash in excess of minimum working capital needs becomes available and from proceeds under asbestos-related insurance policies.

### H.    PENSION LIABILITIES

The underfunded defined benefit pension liability represents the net present value of the difference between the fair value of pension trust assets and the accumulated benefit obligation of the related pension plans. The projections assume that, except for 2004 where pension plan payments are governed by the Bankruptcy Court, annual pension expense, including the amortization of accumulated experience losses, will be funded in the same year as expensed.

### I.    LIABILITIES SUBJECT TO COMPROMISE THAT ARE REINSTATED

Liabilities subject to compromise will be discharged at the effective date of the Plan except for the following non-asbestos liabilities that will be reinstated and satisfied in the normal course of business:

➤    Capital lease obligations of approximately $3 million are assumed to be satisfied under contractual terms.

> Reserves for environmental remediation of approximately $115 million **as of September 30, 2004 and $107 million as of December 31, 2004** are assumed to be funded based on agreements or settlements with relevant governmental agencies and property owners.

> Post-retirement health and pension benefits of approximately $186 million are assumed to be funded as benefit obligations are due under the terms of such arrangements.

> Reserves for litigation and contracts of approximately $~~57~~**41** million are assumed to be funded under stated and/or negotiated terms and settlements.

> Reserves for tax and other pass-through contingencies of approximately $~~147~~**150** million are assumed to be funded as settlements are reached.

### J.    INCOME TAXES

It is expected that Grace will receive federal and state income tax deductions in the amount equal to the cash and securities transferred to fund asbestos-related and other tax-deductible liabilities. These income tax deductions will result in net operating loss carryforwards ("NOLs") for federal income tax purposes. It is assumed that deferred tax liabilities related to core operations will be reduced over time but will be replaced with an equal amount of originating temporary differences. For purposes of the Financial Information, it is assumed that all tax benefits are available upon the effective date, that no valuation allowance is necessary and that no restrictions on NOL utilization will apply. However, the realization of the tax benefits of NOL carryforwards depends on the amount and timing of future U.S. taxable income and the avoidance of limitation events. These projections assume that sufficient U.S. taxable income will be generated to utilize recorded tax benefits before they expire. It is further assumed that the structuring of the new debt facility will involve the recognition of significant taxable dividends from Grace's foreign subsidiaries.   Depending on the timing of such dividends, it is possible that they would have the effect of exhausting some or all of Grace's NOLs and thereby limiting the financial benefit. This Financial Information assumes that the timing and structure of the Plan will be sufficiently flexible to avoid this effect on Grace's NOLs.   In particular, it is assumed that foreign tax credits and/or cash repatriation incentives under the American Jobs Creation Act of 2004, rather than NOLs, will be available to offset such income thereby preserving NOLs to offset future taxable income.

### K.    STOCK OPTIONS

Grace has granted stock options that upon exercise would add 8.2 million shares to those outstanding and $103 million in conversion proceeds.  For purposes of these projections, ~~6.4~~**6.8** million of options are assumed to be exercised at the effective date, generating $~~68~~**75** million in conversion proceeds. Also, the Financial Information assumes that Grace will replace cash-based long-term incentive compensation arrangements with a stock-based plan that will be accounted for as expense at the time of grant.

### L.  WARRANTS

Under the Plan, Grace will issue warrants to the asbestos trust that are exchangeable into voting common stock for a penny-a-share to fund, if necessary, required payments under the trust arrangements for asymptomatic asbestos claimants. The number of warrants will be equal to (when combined with the initial payment of common stock to the asbestos trust) 50.1% of the value of Grace's equity capital at the effective date after all other dilutive and issued common shares are considered. Warrants will be assumed exchanged, and therefore dilutive for earnings per share calculations, at the time trust liabilities are determined to be probable and estimable. The Financial Information assumes that the net present value of the allowed amount for qualified asymptomatic asbestos personal injury claims is $130 million at the effective date. This amount, and any required funding in excess of this amount, will be satisfied with Grace common stock through the exercise of warrants as claims are paid by the asbestos trust.

### M.  COMMON STOCK

Under the Plan, Grace will issue common stock to partially satisfy certain claims and liabilities. For purposes of this Financial Information, such common stock is assumed to be valued at approximately $~~16~~17 per share at the effective date based on the mid-point of the fully -diluted reorganized equity value per share range included as part of the Plan of Reorganization, increasing annually by 6%.

# TAB 56

#### 4.3.1.9 Class 9.        General Unsecured Claims

Class 9 consists of all General Unsecured Claims against the Debtors.

Each Holder of an Allowed General Unsecured Claim shall be paid the Allowed Amount of its General Unsecured Claim on the GUC Distribution Date. Such payment shall be either (i) in full, plus post-petition interest, ~~for those Claimants who, but for the Filing of the Chapter 11 Cases, would be entitled~~ ~~*to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law,*~~ such payment to be 85% in ~~C~~cash and 15% in Parent Common Stock, such Parent Common Stock being subject to, among other things, the transactions described in Section 7.2.2 of the Plan, and the Management Stock Incentive Plan, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed General Unsecured Claim and the Reorganized Debtors. **Notwithstanding the foregoing, each Holder of a Claim which by operation of the Fresenius Settlement Agreement is an obligation for Indemnified Taxes promptly shall be paid in full in cash as such Fresenius Indemnified Taxes become due and payable.**

**Post-petition interest shall accrue from the Petition Date through the date of payment and shall be (i) for the Holders of Claims under the Debtors' pre-petition bank credit facilities, at a rate of 6.09% per annum, compounded quarterly, (ii) for the Holders of Claims who, but for the Filing of the Chapter 11 Cases would be entitled under a contract or otherwise** *to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law,* **the rate provided in the contract between a Debtor(s) and the Claimant or such rate as may otherwise apply under applicable non-bankruptcy law, or (iii) for all other Holders of Class 9 Claims, at a rate of 4.19% per annum (the federal judgment rate as of the Petition Date), compounded annually.[18]**

The Parent Common Stock paid to the Holders of Allowed General Unsecured Claims in accordance with Section ~~3.1.10~~**3.1.9**(b) of the Plan shall be valued at the average of the closing prices on The New York Stock Exchange for the trading days within the thirty (30) calendar days immediately preceding the GUC Distribution Date. **The trading price on the GUC Distribution Date could be higher or lower than such average. The Parent Common Stock**

---

[18] **In consideration for the treatment provided to Class 9 Claims, the Unsecured Creditors' Committee has agreed to be a Plan Proponent of the Debtors' Amended Joint Plan filed on or about January 13, 2005 as the same may be amended from time to time with the consent of the Unsecured Creditors' Committee (the "Plan"). The Unsecured Creditors' Committee and the Debtors have agreed that the Unsecured Creditors' Committee has the right to withdraw as a Plan Proponent on the occurrence of any of the following circumstances: (i) failure of the Court to approve the Disclosure Statement incorporating the Plan no later than November 30, 2005; (ii) determination by the Court that the Plan is not confirmable and the failure to file an amended Plan within 60 days; (iii) determination by the Court that the Debtors are insolvent; (iv) termination of the Debtors' exclusive period; (v) withdrawal of the Plan by the Plan Proponents and the failure of the Plan Proponents to file a new Plan within 60 days; or (vi) failure of the Plan to become effective on or before January 1, 2007. This agreement does not commit any member of the Unsecured Creditors' Committee or any creditor to vote for the Plan. The parties intend to memorialize their agreement in a plan support agreement. In consideration for the treatment provided to Class 9 Claims, certain substantial Claimants have also agreed to support the Plan.**

**may be subject to material price volatility and may trade up or down after the GUC Distribution Date.**

The Debtors estimate the total of all Allowed General Unsecured Claims to be approximately $~~951~~**1,175** million as of September 30, 2004.[~~14~~19] **This amount consists of $500 million of principal and approximately $121 million of accrued interest under the Debtors' pre-petition bank credit facilities, approximately $223 million of environmental Claims, approximately $14 million of amounts drawn under drawn letters of credit (including accrued interest), $36 million of accounts payable including accrued interest, $87 million of asbestos Claims subject to pre-petition judgments or agreements (including accrued interest), $10 million of insurance and other Claims, and $198 million of other unliquidated liabilities (including $72 million of unliquidated environmental), which are conservatively estimated to be Class 9 Claims when and if Allowed. These unliquidated liabilities are not projected to be Allowed General Unsecured Claims at the Effective Date.**

Class 9 is impaired **as Class 9 Claimants are to received 15% of the Allowed Amount of their Claims in the form of stock, the value of which may be volatile and cannot be guaranteed.** The Debtors are soliciting the votes of Holders of the General Unsecured Claims in Class 9 to accept or reject the Plan in the manner and to the extent provided in the Confirmation Procedures Order.

---

[~~14~~19]   This figure is consistent with the Debtors' books and records and includes the Debtors' estimates for certain Claims that are disputed, which Claims may ultimately be determined to be significantly higher or lower.

### 1.2.1   What Claims and Equity Interests Are Affected by the Plan?

The Plan will pay all Claimants in full and will leave most Claimants, including Holders of Asbestos Claims, unimpaired.[2]  Holders of General Unsecured Claims (Class 9) and Holders of Equity Interests in the Parent (Class 10) are impaired under the Plan. Specifically, Holders of Class 9 Claims are impaired as they are to receive 15% of the Allowed Amount of their Claims in the form of stock, the value of which may be volatile and cannot be guaranteed.

The following table summarizes the classification and treatment of Claims and Equity Interests under the Plan.  The figures in the column entitled "Estimated Amount of Allowed Claims" are consistent with the Debtors' books and records and include the Debtors' estimates for certain Claims that are disputed, which Claims may ultimately be determined to be significantly higher or lower.

---

[2]   Bankruptcy Code § 1124 explains the circumstances under which a plan's treatment of a class of claims or equity interests constitutes impairment of those claims or equity interests.  Broadly stated, any alteration of a creditor's or equity interest holder's legal rights that occurs under a plan constitutes impairment.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED pPERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| N/A | Administrative Expense Claims | N/A | Each Holder of an Allowed Administrative Expense Claim shall be paid the Allowed Amount of its Claim either (i) in full, in Ccash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) on such less favorable terms as may be agreed to by such hHolder.  Ordinary course of business eClaims and eClaims of Professionals shall be paid as described in the Plan. | $7538 million[3] | 100% |
| N/A | Priority Tax Claims | N/A | Each Holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Priority Tax Claim, at the option of the Reorganized Debtors, either (i) in full, in Ccash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) on such less favorable terms as may be agreed to by such hHolder, or (iii) in equal quarterly Ccash payments on the Initial Distribution Date and, thereafter, on each Quarterly Tax Distribution Date in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at 3.5% per annum, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim, or upon such other terms determined by the Bankruptcy Court, which will provide the Holder of such Allowed Priority Tax Claim deferred Ccash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim; provided, however, that each Holder of a Claim which by operation of the Fresenius Settlement Agreement is an obligation for Indemnified Taxes promptly shall be paid in full in cash as such Fresenius Indemnified Taxes become due and payable. | $232 million | 100% |
| Class 1 | Priority Claims | No | Each Holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim either (i) in full, in Ccash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Priority Claim becomes an Allowed Priority Claim, or as soon as practicable thereafter, or (ii) on such less favorable terms as may be agreed to by such hHolder. | $0 | 100% |

[3]  Includes amounts classified as liabilities subject to compromise which are expected to be paid on the Effective Date, or as soon as practicable thereafter (approximately $76 million), and after the Effective Date in accordance with their terms (approximately $62 million).

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| Class 2 | Secured Claims | No | Each Holder of an Allowed Secured Claim shall be paid the Allowed Amount of its Allowed Secured Claim at the option of the Reorganized Debtors, either (i) in full, in €cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Secured Claim becomes an Allowed Secured Claim, or as soon as practicable thereafter; (ii) on such less favorable terms as may be agreed to by such hHolder; (iii) by the surrender to the Holder or Holders of any Allowed Secured Claim of the property securing such Claim; or (iv) notwithstanding any contractual provision or applicable law that entitles the Holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Bankruptcy Code § 1124(2)(A)-(D). | $9090,000 plus interest at the applicable rate, if any | 100% |
| Class 3 | Unsecured Pass-Through Employee Related Claims | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. | Most Allowed Claims have already been paid pursuant to first day orders of this Court and continue to be paid in the ordinary course as they become due; $194190 million of Claims4 are estimated to be Allowed and outstanding. | 100% |
| Class 4 | Workers' Compensation Claims | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. | Allowed Claims have already been paid pursuant to first day orders of this Court and continue to be paid in the ordinary course as they become due. | 100% |
| Class 5 | Intercompany | No | The Plan leaves unaltered the legal, equitable, and contractual rights | For proforma cash flow | 100% |

4   Includes approximately $123 million of post-retirement benefits other than pensions classified pursuant to Section 2.6.3.3, approximately $63 million of unfunded special pension arrangements classified pursuant to Section 2.6.3.4, and approximately $5 million of deferred compensation classified pursuant to Section 2.6.3.6.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| | Claims | | to which each such Claim entitles the Holder of such Claim. | purposes all Claims will have no impact upon the Plan as all payments under the Plan are based upon the Debtors and Non-Debtor Affiliates as consolidated. | |
| Class 6 | Asbestos PI-SE Claims | No | All Allowed Class 6 Claims shall be paid in full by the Asbestos Trust out of the Asbestos PI-SE Class Fund and shall be processed and paid in accordance with the Asbestos Trust Agreement and the PI-SE TDP. Each Holder of an Asbestos PI-SE Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Litigation Option or Canadian Litigation Option as applicable or (B) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim shall be conclusively presumed to have elected the Litigation Option or Canadian Litigation Option as applicable. Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option or Canadian Litigation Option as applicable. A Holder may also be treated on such less favorable terms as may be agreed to by such Holder. | An amount to be determined by the Bankruptcy Court pursuant to the Estimation Motion[35] | 100% |
| Class 7 | Asbestos PI-AO Claims | No | All Allowed Class 7 Claims shall be paid in full initially by the Asbestos Trust out of the Asbestos PI-AO Class Fund and then in Ccash by the Asbestos Trust from funds to be paid to the Asbestos Trust by the Reorganized Debtors. All Allowed Class 7 Claims shall be processed and paid in accordance with the Asbestos Trust Agreement and the PI-AO TDP. In accordance with the terms of the Asbestos Trust Agreement and the PI-AO TDP, each Holder of an | An amount to be determined by the Bankruptcy Court pursuant to the Estimation Motion[46] | 100% |

[35] As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1,483,000,000.

[46] As a condition precedent to confirmation of the Plan, the Court shall have found that the Asbestos PI-AO Class Fund is not greater than $130,000,000.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED *PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| | | | Asbestos PI-AO Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Litigation Option or Canadian Litigation Option as applicable, (B) the Cash-Out Option; or (C) the Registry Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim shall be conclusively presumed to have elected the Litigation Option or Canadian Litigation Option as applicable. Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option or Canadian Litigation Option as applicable. A Holder may also be treated on such less favorable terms as may be agreed to by such Holder. | | |
| Class 8 | Asbestos PD Claims | No | All Allowed Class 8 Claims shall be paid in full and processed and paid in accordance with the Asbestos Trust Agreement and the PD TDP. A hHolder may also be treated on such less favorable terms as may be agreed to by such hHolder. | An amount to be determined by the Bankruptcy Court pursuant to the Estimation Motion[57] | 100% |
| Class 9 | General Unsecured Claims | Yes | Each Holder of an Allowed General Unsecured Claim shall be paid the Allowed Amount of its General Unsecured Claim on the GUC Distribution Date. Such payment shall be paid-in full, plus post-petition interest, for those Claimants who, but for the Filing of the Chapter 11 Cases, would be entitled to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law, such payment to be 85% in Ccash and 15% in Parent Common Stock, such Parent Common | $95~~41,175~~ million as of 9/30/04, plus accrued interest through the payment date[8] | 100% |

<hr>

[57] As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1,483,000,000.

[x] Includes unliquidated liabilities, estimated at approximately $185 million, that would be Class 9 Claims if and when Allowed. These unliquidated liabilities are not expected to be Allowed General Unsecured Claims at the Effective Date.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| | | | Stock being subject to, among other things, the transactions described in Section 7.2.2 of the Plan, and the Management Stock Incentive Plan. A holder Each Holder of a Claim which by operation of the Fresenius Settlement Agreement is an obligation for Indemnified Taxes promptly shall be paid in full in cash as such Fresenius Indemnified Taxes become due and payable. A Holder may also be treated on such less favorable terms as may be agreed to by such holder Holder. Post-petition interest shall accrue from the Petition Date through the date of payment and shall be (i) for the Holders of the Debtors' pre-petition bank credit facilities, at a rate of 6.09% per annum, compounded quarterly, (ii) for the Holders of Claims who, but for the Filing of the Chapter 11 Cases would be entitled under a contract or otherwise to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law, the rate provided in the contract between a Debtor(s) and the Claimant or such rate as may otherwise apply under applicable non-bankruptcy law, or (iii) for all other Holders of Class 9 Claims, at a rate of 4.19% per annum (the federal judgment rate as of the Petition Date), compounded annually. | | |
| Class 10 | Equity Interests in the Parent | Yes | On the Effective Date, Holders of Class 10 Equity Interests in the Parent shall retain such interests; provided that such Equity Interests shall: (i) be subject, among other things, to the transactions described in Section 7.2.2 of the Plan, and the Management Stock Incentive Plan and (ii) be restricted as described in Section 7.1.1 of the Plan. | N/A | N/A |
| Class 11 | Equity Interests in Debtors Other than the Parent | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Equity Interest entitles the Holder of such Equity Interest. | N/A | 100% |

# TAB 57

### 4.7.6  Occurrence of the Confirmation Date

Section 7.6 of the Plan sets forth conditions precedent to confirmation of the Plan. The Court must make all of the findings of fact and/or conclusions of law listed in Section 7.6.1 before confirmation of the Plan. Among other things, these findings of fact and/or conclusions of law relate to: (1) the Court having found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than one billion, four hundred eighty three million dollars ($1,483,000,000), (2) the Court having found the Asbestos PI-AO Class Fund is not greater than one hundred thirty million dollars ($130,000,000), (3) compliance with all applicable subsections of Bankruptcy Code § 524(g), (4) effectiveness of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, (5) <u>a finding that the Reorganized Debtors have the ability to pay and satisfy in the ordinary course of business all of their respective obligations and liabilities as required by the Plan, the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, (6)</u> the unimpaired status of the classes of Asbestos Claims, (<s>6</s><u>7</u>) the effectiveness of the various injunctions provided for in the Plan, (<s>7</s><u>8</u>) insurance matters, and (<s>8</s><u>9</u>) the lack of preclusive effect of certain asbestos-related litigation.

Section 7.6.2 of the Plan requires certain orders - including the Confirmation Order, the CMO and an order approving the Sealed Air Settlement Agreement - all in form and substance acceptable to the Debtors be entered prior to or in conjunction with Plan confirmation. <u>The Confirmation Order and the Sealed Air Settlement Agreement shall also be in a form and substance acceptable to the other Plan Proponents.</u> In addition, the Court shall have entered the Estimation Order in form and substance acceptable to the <s>Debtors</s><u>Plan Proponents</u>, including the following findings:

- the Asbestos PI-SE Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PI-SE Claims;

- the Asbestos PD Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PD Claims; and

- the Asbestos Trust Expenses Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all expenses of the Asbestos Trust.

<u>Assuming that other conditions precedent under the Plan are fulfilled, the Debtors would be willing to have the Plan confirmed if the Court finds that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1,483,000,000, and that the Asbestos PI-AO Class Fund is not greater than $130,000,000. However, such amounts do not represent the Debtors' estimate of their asbestos-related liabilities. In fact, through the use of the estimation process provided for under the Estimation Motion, the Debtors believe their actual asbestos-related liabilities may be significantly lower.</u>

# TAB 58

### 2.5.1.1.3    State of Montana's Claims Against the Debtors

After the Petition Date, certain of the residents of Libby, Montana filed an action captioned *Orr v. State of Mont.*, suing the state of Montana alleging that the state negligently failed to warn them of the hazardous conditions at the mine, as a result of which they suffered grave injuries. The district court dismissed the lawsuit but, on December 14, 2004, the Montana Supreme Court reversed the district court ruling and held that once the state was aware of the dangerously high asbestos levels in the Libby mine, it was required by law to protect the miners by warning them of the known hazards of working in the mine. The state of Montana has filed a proof of Claim in an unliquidated amount seeking indemnification from the Debtors for this lawsuit. To the extent that the Claim is Allowed, it will be treated as a General Unsecured Claim. However, Grace maintains that it has no indemnification obligation as the lawsuit relates to the state's own duty to warn.

The state of Montana has also filed two proofs of claim against the Debtors in the approximate amount of $15.6 million for the cost of future and past Medicaid reimbursement. The state alleges that the Debtors are responsible for such reimbursement. To the extent that the Claim is Allowed, it will be treated as a General Unsecured Claim. However, Grace maintains that it has no such reimbursement obligation.

The State of Montana has filed an objection stating that, in the event the State of Montana is classified as a General Unsecured Claimant, it cannot receive stock as a form of payment on an indebtedness. The Debtors and the State of Montana are working to resolve this issue before Plan confirmation.

### 4.3.1.9 Class 9.     General Unsecured Claims

Class 9 consists of all General Unsecured Claims against the Debtors.

Each Holder of an Allowed General Unsecured Claim shall be paid the Allowed Amount of its General Unsecured Claim on the GUC Distribution Date. Such payment shall be either (i) in full, plus post-petition interest, ~~for those Claimants who, but for the Filing of the Chapter 11 Cases, would be entitled~~ ~~*to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law,*~~ such payment to be 85% in ~~C~~cash and 15% in Parent Common Stock, such Parent Common Stock being subject to, among other things, the transactions described in Section 7.2.2 of the Plan, and the Management Stock Incentive Plan, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed General Unsecured Claim and the Reorganized Debtors. **Notwithstanding the foregoing, each Holder of a Claim which by operation of the Fresenius Settlement Agreement is an obligation for Indemnified Taxes promptly shall be paid in full in cash as such Fresenius Indemnified Taxes become due and payable.**

**Post-petition interest shall accrue from the Petition Date through the date of payment and shall be (i) for the Holders of Claims under the Debtors' pre-petition bank credit facilities, at a rate of 6.09% per annum, compounded quarterly, (ii) for the Holders of Claims who, but for the Filing of the Chapter 11 Cases would be entitled under a contract or otherwise** *to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law,* **the rate provided in the contract between a Debtor(s) and the Claimant or such rate as may otherwise apply under applicable non-bankruptcy law, or (iii) for all other Holders of Class 9 Claims, at a rate of 4.19% per annum (the federal judgment rate as of the Petition Date), compounded annually.**[18]

The Parent Common Stock paid to the Holders of Allowed General Unsecured Claims in accordance with Section ~~3.1.10~~**3.1.9**(b) of the Plan shall be valued at the average of the closing prices on The New York Stock Exchange for the trading days within the thirty (30) calendar days immediately preceding the GUC Distribution Date. **The trading price on the GUC Distribution Date could be higher or lower than such average. The Parent Common Stock**

---

[18]  **In consideration for the treatment provided to Class 9 Claims, the Unsecured Creditors' Committee has agreed to be a Plan Proponent of the Debtors' Amended Joint Plan filed on or about January 13, 2005 as the same may be amended from time to time with the consent of the Unsecured Creditors' Committee (the "Plan"). The Unsecured Creditors' Committee and the Debtors have agreed that the Unsecured Creditors' Committee has the right to withdraw as a Plan Proponent on the occurrence of any of the following circumstances: (i) failure of the Court to approve the Disclosure Statement incorporating the Plan no later than November 30, 2005; (ii) determination by the Court that the Plan is not confirmable and the failure to file an amended Plan within 60 days; (iii) determination by the Court that the Debtors are insolvent; (iv) termination of the Debtors' exclusive period; (v) withdrawal of the Plan by the Plan Proponents and the failure of the Plan Proponents to file a new Plan within 60 days; or (vi) failure of the Plan to become effective on or before January 1, 2007. This agreement does not commit any member of the Unsecured Creditors' Committee or any creditor to vote for the Plan. The parties intend to memorialize their agreement in a plan support agreement. In consideration for the treatment provided to Class 9 Claims, certain substantial Claimants have also agreed to support the Plan.**

may be subject to material price volatility and may trade up or down after the GUC Distribution Date.

The Debtors estimate the total of all Allowed General Unsecured Claims to be approximately $951**1,175** million as of September 30, 2004.~~11~~**19**  **This amount consists of $500 million of principal and approximately $121 million of accrued interest under the Debtors' pre-petition bank credit facilities, approximately $223 million of environmental Claims, approximately $14 million of amounts drawn under drawn letters of credit (including accrued interest), $36 million of accounts payable including accrued interest, $87 million of asbestos Claims subject to pre-petition judgments or agreements (including accrued interest), $10 million of insurance and other Claims, and $198 million of other unliquidated liabilities (including $72 million of unliquidated environmental), which are conservatively estimated to be Class 9 Claims when and if Allowed.  These unliquidated liabilities are not projected to be Allowed General Unsecured Claims at the Effective Date.**

Class 9 is impaired **as Class 9 Claimants are to received 15% of the Allowed Amount of their Claims in the form of stock, the value of which may be volatile and cannot be guaranteed**.  The Debtors are soliciting the votes of Holders of the General Unsecured Claims in Class 9 to accept or reject the Plan in the manner and to the extent provided in the Confirmation Procedures Order.

---

~~11~~**19**    This figure is consistent with the Debtors' books and records and includes the Debtors' estimates for certain Claims that are disputed, which Claims may ultimately be determined to be significantly higher or lower.