# Redline of the following Exhibit Book Tabs:

# (11/13/04 version against 1/13/05 version)

Exhibit Book Tab 2 – Glossary of Defined Terms

Exhibit Book Tab 3 – Best Interest Analysis

Exhibit Book Tab 4 – W.R. Grace & Co. and Subsidiaries Historical,

Pro Forma and Prospective Financial Information

# Redline of Exhibit Book Tab 2

# Glossary of Defined Terms

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.   R.   GRACE   &   CO., et al.[1] | ) | Case No. 01-1139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## GLOSSARY OF TERMS USED IN PLAN DOCUMENTS

Terms defined herein apply to the Plan, the Disclosure Statement and all other Plan Documents except where specifically provided for otherwise.

---

[1]     The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

Exhibit Book - Exhibit 2 - Plan Consolidated Glossary (filed 11-13-04 on 1_13_05).DOC

1.     **"Additional Indemnities"** shall have the meaning ascribed to it in Section 3.5 of the Asbestos Trust Agreement.

2.     **"Administrative Expense Claim"** shall mean:   (i) any Claim constituting a cost or expense of administration in the Chapter 11 Cases, on or after the Petition Date but prior to the Effective Date, under Bankruptcy Code §§ 503(b), 507(a)(1), 507(b) or 1114(e)(2), including: (a) any actual and necessary costs and expenses of preserving the estates of the Debtors, (b) any actual and necessary costs and expenses of operating the businesses of the Debtors, (c) any indebtedness or obligation incurred or assumed by the Debtors (including any executory contracts of the Debtors assumed pursuant to Bankruptcy Code § 365 by order of the Bankruptcy Court or the Plan) in connection with the conduct of their businesses or for the acquisition or lease of property or the rendition of services, and (d) any allowed compensation or reimbursement of expenses awarded or allowed under Bankruptcy Code §§ 330(a), 331 or 503, and (ii) any fees or charges assessed against the estates of the Debtors under 28 U.S.C. § 1930.

3.     **"Affiliate"** shall mean as to any specified Entity: (i) any other Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by, or is under common control with, the specified Entity, and (ii) any Entity that is an "affiliate" (within the meaning of Bankruptcy Code § 101(2)) of the specified Entity.  As used in clause (i) of this definition, "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an Entity (whether through ownership of Capital Stock of that Entity, by contract, or otherwise).

4.     **"Allowed"** shall mean:

     (a)     With respect to Asbestos Claims, **except for Canadian Claims made by Asbestos PD Claimants or made by Asbestos Claimants who elect the Canadian Litigation Option,** in such amount as is determined pursuant to the procedures set forth in the respective TDPs or the CMO, as applicable.

     (b)     **With respect to Canadian Claims made by Asbestos PD Claimants or made by Asbestos Claimants who elect the Canadian Litigation Option, in such amount as is determined pursuant to the Canadian Litigation Procedure.**

     (c)     ~~(b)~~ With respect to any Claim other than an Administrative Expense Claim or Asbestos Claim, as to which a proof of Claim was Filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Court, (i) as to which no objection to the allowance thereof has been interposed within the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, or (ii) as to which an objection to the allowance thereof has been interposed within such time as is set by the Bankruptcy Court pursuant to the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, such Claim to the extent that such objection has been (A) overruled in whole or in part by a Final Order of the Bankruptcy Court, or (B) resolved by agreement of the relevant parties, or (C) resolved via settlement, mediation, litigation, or otherwise pursuant to the terms of any alternative dispute resolution program that is implemented in the Chapter 11 Cases.

     (d)     ~~(c)~~ With respect to any Claim other than an Administrative Expense Claim or Asbestos Claim, as to which no proof of Claim was Filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, such Claim to the extent that it has been listed by the Debtors in their Schedules as liquidated in amount and not disputed or contingent and not otherwise subject to an objection Filed within such time as is set by the Bankruptcy Court pursuant to the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court;

(e)    (d) With respect to any Equity Interest in Parent, any Equity Interest registered in the stock register maintained by or on behalf of the Debtors as of the Voting Record Date; and

(f)    (e) With respect to any Claim that is asserted to constitute an Administrative Expense Claim:

    (i)    that represents a Claim of a Professional to the extent it is allowed in whole or in part by a Final Order of the Bankruptcy Court; or

    (ii)    other than with respect to a Claim of a Professional, (X) a Claim to the extent that the Debtors or the Reorganized Debtors determine it to constitute an Administrative Expense Claim, or (Y) a Claim to the extent it is allowed in whole or in part by a Final Order of the Bankruptcy Court and only to the extent that such allowed portion is deemed, pursuant to a Final Order of the Bankruptcy Court, to constitute a cost or expense of administration under Bankruptcy Code §§ 503 or 1114.

5.    **"Allowed Amount"** shall mean the lesser of: (i) the dollar amount of an Allowed Claim; or (ii) the Estimated Amount of a Claim, but only to the extent that the Court has expressly estimated such Claim for purposes of distribution.

6.    **"Articles of Incorporation"** shall mean Certificate of Incorporation.

7.    **"Asbestos Channeling Injunction"** shall mean the order(s) entered or affirmed by the District Court, in accordance with and pursuant to Bankruptcy Code §§ 524(g), 105(a) and/or 1141 or otherwise, permanently and forever staying, restraining, and enjoining any Entity from taking any action against any Asbestos Protected Party (except as may be specifically provided in such order(s)) for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Claims, all of which shall be channeled to the Asbestos Trust for resolution as set forth in the appropriate TDPs (other than actions brought to enforce any right or obligation under the Plan or any agreement or instrument between the Debtors or the Reorganized Debtors, on the one hand, and the Asbestos Trust, on the other hand, entered into pursuant to the Plan). The Asbestos Channeling Injunction is further described in Section 8.2 of the Plan.

8.    **"Asbestos Claims"** shall mean all Asbestos PI Claims and Asbestos PD Claims.

9.    **"Asbestos Insurance Action"** shall mean any claim, cause of action, or right of any Debtor or Reorganized Debtor, as the case may be, against any Asbestos Insurance Entity, arising from or related to: (i) any such Asbestos Insurance Entity's failure to provide coverage, pay or agree to pay a Claim under an Asbestos Insurance Policy; (ii) the refusal of any such Asbestos Insurance Entity to compromise or settle any Asbestos Claim under or pursuant to any Asbestos Insurance Policy; or (iii) the interpretation or enforcement of the terms of any Asbestos Insurance Policy with respect to any Asbestos Claim.

10.    **"Asbestos Insurance Entity"** shall mean any Entity (other than the Debtors and the Non-Debtor Affiliates), including any insurance company, broker, or guaranty association, that has issued, or that has actual or potential liability, duties or obligations with respect to, any Asbestos Insurance Policy.

11.    **"Asbestos Insurance Entity Injunction"** shall mean the injunction described in Section 8.3 of the Plan.

12.    **"Asbestos Insurance Policy"** shall mean any insurance policy, whether known or unknown, including the policies listed on the schedule attached as Exhibit 10 in the Exhibit Book, that actually or potentially provides insurance coverage for any Asbestos Claim; provided that an Asbestos Insurance Policy shall not include any rights or obligations under any insurance policy or settlement agreement to which any of the Debtors are a party insofar as the insurance policy or settlement agreement relates to Workers' Compensation Claims.

13. **"Asbestos Insurance Rights"** shall mean any and all rights, titles, privileges, interests, claims, demands or entitlements to any proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, causes of action, and choses in action related to any of the Asbestos Insurance Policies and/or the Asbestos Insurance Settlement Agreements, whether now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including:

    (a)    any and all rights to pursue or receive payments with respect to Asbestos Claims under any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement, whether for liability, defense, or otherwise;

    (b)    any and all rights to pursue or receive payments related to any Asbestos Insurance Policy and/or any Asbestos Insurance Settlement Agreement that was entered into by any domestic or foreign insolvent insurance company, whether in receivership, liquidation, rehabilitation, run-off, scheme of arrangement, or any other form of proceeding; and

    (c)    any and all rights to pursue or receive payments related to any Asbestos Insurance Policy and/or any Asbestos Insurance Settlement Agreement from any insurance guaranty association of a Governmental Unit in connection with any insurance guaranty association statute of any Governmental Unit;

provided that Asbestos Insurance Rights shall not include any rights or obligations under any insurance policy or settlement agreement to which any of the Debtors are a party insofar as the insurance policy or settlement agreement relates to Workers' Compensation Claims.

14. **"Asbestos Insurance Settlement Agreement"** shall mean any settlement agreement between or among any of the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, or any of them or their predecessors, and a Resolved Asbestos Insurance Company or a Settled Asbestos Insurance Company relating to any Asbestos Claim or any Asbestos Insurance Action.

15. **"Asbestos Medical Monitoring Claim"** shall mean: (i) a Claim, Demand, or remedy, including all related claims, debts, obligations, or liabilities for compensatory (including general, special, and consequential damages) and punitive damages, (ii) a cross-claim, contribution claim, subrogation claim, reimbursement claim or indemnity claim, or (iii) any debt, liability, or obligation of one or more of the Debtors or any other Asbestos Protected Party (whether or not such Claim, Demand, remedy, debt, liability, or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; whether or not the facts of its legal bases therefor are known or unknown; and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty), for, relating to, or arising out of, resulting from, or attributable to, directly or indirectly:

    (a)    personal injuries or damages by or on behalf of those who have not, as of the Petition Date, suffered any personal injury but who are alleging that:

        (i)    the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable) wrongfully caused them to be significantly exposed to hazardous asbestos fibers,

        (ii)    this exposure significantly increased the Claimant's risk of contracting a serious latent disease,

(iii)    medical monitoring could reasonably be expected to result in early detection of the onset and mitigation of the severity of such disease, and

(iv)    because of this exposure it is necessary for the Claimant to be examined by a physician or receive medical testing more often that he or she otherwise would.

Asbestos Medical Monitoring Claims are included within the Class of Asbestos PI-AO Claims.

16.    **"Asbestos PD Claim"** shall mean:  (i) a Claim, Demand, or remedy, including all related claims, debts, obligations, or liabilities for compensatory (including general, special, and consequential damages) and punitive damages, (ii) a cross-claim, contribution claim, subrogation claim, reimbursement claim or indemnity claim, or (iii) any debt, liability, or obligation of one or more of the Debtors or any other Asbestos Protected Party, including the Canadian Affiliates (whether or not such Claim, Demand, remedy, debt, liability, or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; whether or not the facts of or legal bases therefor are known or unknown; and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty):

(a)    arising directly from acts or omissions of one or more of the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable); and

(b)    for, relating to, or arising out of, resulting from, or attributable to, directly or indirectly, the cost of removal, abatement, diminution of property value, environmental damage, or economic loss caused or allegedly caused:

(i)    by asbestos in products or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable); or

(ii)    from vermiculite mined, milled, or processed by the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable).

Notwithstanding anything to the contrary, Previously Settled/Adjudicated Asbestos Claims and claims of governmental and private entities under the Comprehensive Environmental Response Compensation and Liabilities Act, 42 USC § 9601 et seq., or analogous state laws for liability related to the release of a hazardous substance into the environment are not included within the Class of Asbestos PD Claims. ZAI Claims are included within the Class of Asbestos PD Claims.

17.    **"Asbestos PD Claimant"** shall mean the Holder of an Asbestos PD Claim.

18.    **"Asbestos PD Class Fund"** shall mean the aggregate dollar amount, as determined by the Court in the Estimation Order, that must be funded into the Asbestos Trust (on or within thirty-one (31) days of the Effective Date) so as to enable all Allowed Claims in the Class of Asbestos PD Claims to be paid in full by the Asbestos Trust as, or as soon as practicable after, they become Allowed Claims.

19.    **"Asbestos PD Committee"** shall mean the Official Committee of Asbestos Property Damage Claimants appointed in the Chapter 11 Cases.

20.    **"Asbestos Personal Injury Claim"** shall mean an Asbestos PI Claim.

21.    **"Asbestos Personal Injury-Asymptomatic / Other Claim"** shall mean an Asbestos PI-AO Claim.

22.    **"Asbestos Personal Injury-Symptomatic / Eligible Claim"** shall mean an Asbestos PI-SE Claim.

23.    **"Asbestos PI Claim"** shall mean: (i) a Claim, Demand, or remedy, including all related claims, debts, obligations, or liabilities for compensatory (including general, special, and consequential damages) and punitive damages, (ii) a cross-claim, contribution claim, subrogation claim, reimbursement claim or indemnity claim, or (iii) any debt, liability, or obligation of one or more of the Debtors or any other Asbestos Protected Party, including the Canadian Affiliates (whether or not such Claim, Demand, remedy, debt, liability, or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; whether or not the facts of or legal bases therefor are known or unknown; and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty), for, relating to, or arising out of, resulting from, or attributable to, directly or indirectly:

   (a)    death, wrongful death, personal or bodily injury (whether physical, emotional, or otherwise), sickness, disease, loss of consortium, survivorship, medical monitoring, or other personal injuries or other damages caused, or allegedly caused, and arising or allegedly arising, from acts or omissions of one or more of the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable); and

   (b)    exposure to:

      (i)    any products or materials containing asbestos that were manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors (or any of their respective past or present Affiliates, or any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable); or

      (ii)   vermiculite mined, milled or processed by the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable).

   Notwithstanding anything to the contrary, neither Workers' Compensation Claims nor Previously Settled/Adjudicated Asbestos Claims are included within the Class of Asbestos PI Claims.

24.    **"Asbestos PI Claimant"** shall mean the Holder of an Asbestos PI Claim.

25.    **"Asbestos PI Committee"** shall mean the Official Committee of Asbestos Personal Injury Claimants appointed in the Chapter 11 Cases.

26.    **"Asbestos PI Pre-petition Litigation Bar Date"** shall mean the date that the Court establishes, by the Estimation Procedures Order or other order of the Court, as the last day for Filing Asbestos PI Pre-petition Litigation Claims.

27.    **"Asbestos PI Pre-petition Litigation Claim"** shall mean any Asbestos PI Claim that is based upon either (i) a Pre-petition Lawsuit for which no judgment or enforceable settlement was reached before the Petition Date, or (ii) to the extent that a final judgment was rendered or an enforceable settlement was reached, and

the settlement or judgment, as applicable, places any obligation(s) upon any Debtor(s) or either of the Canadian Affiliates, such Debtor(s) has or Canadian Affiliates have not satisfied its obligations pursuant to the judgment or settlement.

28. **"Asbestos PI Proof of Claim Form"** shall mean the proof of claim form, as it may be modified from time to time, that each Holder of an Asbestos PI Claim must file, either pursuant to the terms of the Debtors' proposed Estimation Procedures Order or pursuant to the Plan and the applicable TDP, in order to receive a distribution in these Chapter 11 Cases.

29. **"Asbestos PI Questionnaire"** shall mean the questionnaire, as it may be modified from time to time, that each Holder of an Asbestos PI Claim must complete and submit, either pursuant to the terms of the Debtors' proposed Estimation Procedures Order or pursuant to the Plan and the applicable TDP, in order to receive a distribution in these Chapter 11 Cases.

30. **"Asbestos PI-AO Cash-Out Claim"** shall mean an Asbestos PI-AO Claim that is eligible for the Cash-Out Option under the Plan and the Holder of which has elected such Cash-Out Option.

31. **"Asbestos PI-AO Claim"** or **"Asbestos Personal Injury-Asymptomatic / Other Claim"** shall mean any Asbestos PI Claim that is not an Asbestos PI-SE Claim and is not a Previously Settled/Adjudicated Asbestos Claim.

32. **"Asbestos PI-AO Claimant"** shall mean the Holder of an Asbestos PI-AO Claim.

33. **"Asbestos PI-AO Class Fund"** shall mean the aggregate dollar amount, as determined by the Court in the Estimation Order, that must be funded into the Asbestos Trust (on or within thirty-one (31) days of the Effective Date) so as to enable all Allowed Claims in the Class of Asbestos PI-AO Claims to be paid in full by the Asbestos Trust as, or as soon as practicable after, they become Allowed Claims.

34. **"Asbestos PI-SE Cash-Out Claim"** shall mean an Asbestos PI-SE Claim that is eligible for the Cash-Out Option under the Plan and the Holder of which has elected such Cash-Out Option.

35. **"Asbestos PI-SE Claim"** or **"Asbestos Personal Injury-Symptomatic Eligible Claim"** shall mean an Asbestos PI Claim that is not a Previously Settled/Adjudicated Asbestos Claim, and whose Holder meets the Asbestos PI-SE Eligibility Requirements.

36. **"Asbestos PI-SE Claimant"** shall mean the Holder of an Asbestos PI-SE Claim.

37. **"Asbestos PI-SE Class Fund"** shall mean the aggregate dollar amount, as determined by the Court in the Estimation Order, that must be funded into the Asbestos Trust (on or within thirty-one (31) days of the Effective Date) so as to enable all Allowed Claims in the Class of Asbestos PI-SE Claims to be paid in full by the Asbestos Trust as, or as soon as practicable after, they become Allowed Claims.

38. **"Asbestos PI-SE Eligibility Requirements"** shall mean the Medical/Exposure Criteria for any of Disease Levels I, II, III, IV, V or VI under the PI-SE TDP.

39. **"Asbestos Property Damage Claim"** shall mean an Asbestos PD Claim.

40. **"Asbestos Protected Party"** shall mean any of the following parties:

    (a)    the Debtors;

    (b)    the Reorganized Debtors;

(c)      the Non-Debtor Affiliates;

(d)      predecessors of the Debtors and the Non-Debtor Affiliates;

(e)      the Resolved Asbestos Insurance Companies;

(f)      the Sealed Air Indemnified Parties;

(g)      the Fresenius Indemnified Parties;

(h)      any Entity that, pursuant to the Plan or otherwise on or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any of the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, or the Fresenius Indemnified Parties, or any of their respective assets (but only to the extent that any liability is asserted to exist as a result of its becoming such a transferee or successor);

(i)      any Entity that, pursuant to the Plan or otherwise on or after the Effective Date, makes a loan to any of the Reorganized Debtors, the Non-Debtor Affiliates, the Asbestos Trust, or to a successor to, or transferee of any of the respective assets of, the Debtors, the Non-Debtor Affiliates, the Reorganized Debtors, the Non-Debtor Affiliates, or the Asbestos Trust (but only to the extent that any liability is asserted to exist as a result of its becoming such a lender or to the extent any Encumbrance of assets made in connection with such a loan is sought to be invalidated, upset or impaired in whole or in part as a result of its being such a lender);

(j)      each of the respective present and future Affiliates of each of the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties, and the Resolved Asbestos Insurance Companies (but only to the extent that any liability is asserted to exist as a result of its becoming such an Affiliate); or

(k)      each of the respective Representatives of each of the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties, and the Resolved Asbestos Insurance Companies.

41.      **"Asbestos-Related Lung Cancer 1"** shall mean a Claim that meets the Medical/Exposure Criteria for Disease Level V under the PI-SE TDP.

42.      **"Asbestos-Related Lung Cancer 2"** shall mean a Claim that meets the Medical/Exposure Criteria for Disease Level IV under the PI-SE TDP.

43.      **"Asbestos-Related Other Cancer"** shall mean a Claim that meets the Medical/Exposure Criteria for Disease Level III under the PI-SE TDP.

44.      **"Asbestos Trust"** shall mean the WRG Asbestos Trust, a Delaware statutory trust, established in accordance with the Asbestos Trust Agreement, created upon entry of the Confirmation Order and effective on the Effective Date.

45.      **"Asbestos Trust Accounts"** shall have the meaning ascribed to it in Section 4.1 of the Asbestos Trust Agreement.

46.      **"Asbestos Trust Aggregate Fund"** shall mean the sum of the Asbestos PI-SE Class Fund, the Asbestos PI-AO Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund.

47.      **"Asbestos Trust Agreement"** shall mean the agreement, effective as of the Effective Date, substantially in the form of Exhibit 5 in the Exhibit Book, to be entered into by and among the Debtors, the Canadian

__Affiliates,]__ the Future Claimants' Representative, the TAC and the Trustees in connection with the formation of the Asbestos Trust.

48.  **"Asbestos Trust Assets"** shall mean the Debtors' Payment and the Sealed Air Payment, and any proceeds thereof.

49.  **"Asbestos Trust Expenses"** are all costs, tax obligations arising out of the assets comprising the Asbestos Trust Expenses Fund, and expenses of or imposed on the Asbestos Trust, including: (i) compensation of the Trustees, the FCR, the TAC and each of their professionals; (ii) insurance premiums; (iii) legal, accounting and other Professional fees and expenses; (iv) overhead; and (v) disbursements and expenses relating to the implementation of the TDPs, but excluding (A) payments to the Holders of Asbestos Claims on account of such Claims and (B) the cost of litigating any Asbestos PI-AO Claims whose Holders elect the Litigation Option.

50.  **"Asbestos Trust Expenses Fund"** shall mean the aggregate dollar amount, as determined by the Court in the Estimation Order, that must be funded into the Asbestos Trust (on or within thirty-one (31) days of the Effective Date) so as to enable the Asbestos Trust Expenses to be paid in full as, or as soon as practicable after, they become due.

51.  **"Asbestosis"** shall mean a Claim that meets the Medical/Exposure Criteria for Disease Level I under the PI-SE TDP.

52.  **"Ballot"** shall mean the form or forms distributed to certain Holders of Claims and Equity Interests by which such parties may indicate acceptance or rejection of the Plan.

53.  **"Bankruptcy Code"** shall mean title 11 of the United States Code, as set forth in §§ 101 __et seq.__, and applicable portions of titles 18 and 28 of the United States Code.

54.  **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the District of Delaware.

55.  **"Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure, as amended, as applicable to the Chapter 11 Cases, including the Local Rules of the Bankruptcy Court.

56.  **"Blackstone"** shall mean The Blackstone Group L.P., the financial advisors to the Debtors.

57.  **"Board of Directors"** shall mean the Board of Directors of any of the Debtors, or any of the Reorganized Debtors, as the case may be, as it may exist from time to time.

58.  **"Business Day"** shall mean any day other than a Saturday, Sunday or legal holiday (as defined in Bankruptcy Rule 9006(a)) in the United States of America.

59.  **"By-Laws"** shall mean the by-laws of any of the specified Debtors, as amended as of the Effective Date or thereafter.

60.  **"Canadian Affiliates"** shall mean Grace Canada, Inc. and Sealed Air (Canada) Co.

61.  **"Canadian Claim"** shall mean any Claim or Demand against any of the Debtors or the Canadian Affiliates relating to exposure or use of asbestos products in Canada.

62.  **"Canadian Court"** shall mean the Ontario Superior Court of Justice, Ontario Court of Appeal or the Supreme Court of Canada.

63.  **"Canadian Litigation Option"** shall mean one of the treatment options available to be chosen by the Holder of an Asbestos PI Claim that is a Canadian Claim in Section 3.2 of the Plan.

64. **"Canadian Litigation Procedure"** shall mean the procedures to be approved by the Canadian Court for the adjudication of Canadian Claims (other than for Holders of Canadian Claims who elect the Cash-Out Option) and designated by the Canadian Court as the "Canadian Litigation Procedure" for purposes of the Plan.

65. **"Canadian Proceedings"** shall mean the proceedings commenced by Grace Canada Inc. pursuant to Section 18.6 of the *Companies' Creditors Arrangement Act* (Canada) bearing court file number 01-CL-4081.

66. 60. **"Capital Stock"** shall mean, with respect to: (i) any corporation, any share, or any depositary receipt or other certificate representing any share, of equity interest in that corporation; and (ii) any other Entity, any share, membership, or percentage interest, unit of participation, or other equivalent (however designated) in or of equity interest in that Entity.

67. 61. **"Case Management Motion"** shall mean a motion Filed or to be Filed with the Court in the Chapter 11 Cases, which will seek, among other things, to establish the procedural framework for the post-Confirmation Date adjudication of Asbestos Claims.

68. 62. **"Case Management Order"** or **"CMO"** shall mean the contemplated order by which the relief sought in the Case Management Motion shall be effectuated.

63. ~~"Cash" shall mean lawful currency of the United States of America.~~

69. 64. **"Cash-Out Option"** shall mean one of the treatment options available to be chosen by the Holders of Asbestos PI Claims, as described in Section 3.2 of the Plan.

70. 65. **"Certificate of Incorporation"** or **"Articles of Incorporation"** shall mean the Certificate or Articles of Incorporation or equivalent document of any of the Debtors, as applicable, as amended as of the Effective Date or thereafter.

71. 66. **"Chapter 11 Cases"** shall mean the cases commenced by the Filing, on the Petition Date, by the Debtors of voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

72. 67. **"Claim"** shall mean a claim (as defined in Bankruptcy Code § 101(5)) against a Debtor or either of the Canadian Affiliates, including any right to: (i) payment from any of the Debtors or the Canadian Affiliates, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtors or the Canadian Affiliates, whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.

73. 68. **"Claimant"** shall mean the Holder of a Claim.

74. 69. **"Claims Materials"** shall mean the Claims materials prepared by the Asbestos Trust for use by Claimants as described in Section 5.3.2 of Plan.

75. 70. **"Class"** shall mean any group of Claims or Equity Interests classified by the Plan pursuant to Bankruptcy Code § 1122(a)(1).

76. 71. **"Clinically Severe Asbestosis"** shall mean a Claim that meets the Medical/Exposure Criteria for Disease Level II under the PI-SE TDP.

77. 72. **"CMO"** shall mean the Case Management Order.

**78.** ~~73.~~ "**Confirmation Date**" shall mean the date the clerk of the District Court enters on the docket an order entering or affirming the Confirmation Order.

**79.** ~~74.~~ "**Confirmation Hearing**" shall mean the hearing that the Court conducts to consider confirmation of the Plan pursuant to Bankruptcy Code § 1129, as such hearing may be adjourned or continued from time to time.

**80.** ~~75.~~ "**Confirmation Order**" shall mean the order(s) entered by the District Court on the Confirmation Date confirming the Plan.

**81.** ~~76.~~ "**Confirmation Procedures Order**" shall mean the order(s) of the Bankruptcy Court (i) approving procedures relating to the solicitation and tabulation of votes with respect to the Plan; and (ii) providing or establishing the basis for calculating the amount of any Claim or Equity Interest for voting purposes.

**82.** ~~77.~~ "**Contingent Claim**" shall mean any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened, or been triggered, as of the date on which such Claim is sought to be estimated or an objection to such Claim is Filed, whether or not such event is within the actual or presumed contemplation of the Holder of such Claim and whether or not a relationship between the Holder of such Claim and ~~the~~a Debtor_or either of the Canadian Affiliates now or hereafter exists or previously existed.

**83.** ~~78.~~ "**Court**" shall mean either the Bankruptcy Court or the District Court, as appropriate.

**84.** ~~79.~~ "**Debtor in Possession**" or "**Debtors in Possession**" shall mean one or more of the Debtors, each in its capacity as a debtor in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

**85.** ~~80.~~ "**Debtors**" or "**Grace**" shall mean, collectively, W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**86.** ~~81.~~ "**Debtors' Payment**" shall mean the consideration delivered on the thirty-first (31st) day after the Effective Date, by or on behalf of the Debtors or the Reorganized Debtors, on account of the Asbestos Claims to the Asbestos Trust pursuant to Section 7.2.2 of the Plan. The Debtors' Payment shall be comprised of:

(a)    the positive difference, if any, between the Asbestos Trust Aggregate Fund and the Sealed Air Payment, with such difference to be funded by:

    (i)    Warrants in an amount sufficient to fund the Asbestos PI-AO Class Fund; and

    (ii)    Parent Common Stock valued at the average of the closing prices on The New York Stock Exchange for the trading days within the thirty (30) calendar days beginning on the Effective Date, such Parent Common Stock being subject to, among other things, the transactions described in Section 7.2.2 of the Plan; and

(b)    additional Warrants in an amount such that, upon the payment of the Sealed Air Payment and the Debtors' Payment into the Asbestos Trust, the Parent Common Stock and Warrants (if exercised) that make up the Debtors' Payment would constitute the majority of the issued and outstanding voting shares of the Reorganized Parent.

For purposes of determining the Debtors' Payment, the Sealed Air Common Stock shall be valued at the average of the closing prices on The New York Stock Exchange for the trading days within the thirty (30) calendar days beginning on the Effective Date.

**87.** ~~82.~~ **"Demand"** shall mean a present or future demand for payment that (i) was not a Claim in the Chapter 11 Cases prior to the Effective Date; (ii) arises out of the same or similar conduct or events that gave rise to the Claims addressed by the Asbestos Channeling Injunction; and (iii) pursuant to the Plan, shall be dealt with by the Asbestos Trust.

**88.** ~~83.~~ **"Disallowed"** shall mean (a) with respect to a Claim or Equity Interest, disallowed in its entirety by a Final Order of the Bankruptcy Court, District Court, or another court of competent jurisdiction; or (b) with respect to an Asbestos PI Claim whose Holder elects the Cash-Out Option, determined not to be entitled to a payment pursuant to the terms of the PI-SE TDP or PI-AO TDP, as applicable.

**89.** ~~84.~~ **"Disclosure Statement"** shall mean the disclosure statement relating to the Plan, including all exhibits, appendices and schedules thereto, approved by order of the Bankruptcy Court in connection with the Plan pursuant to Bankruptcy Code § 1125, together with any amendments and supplements thereto.

**90.** ~~85.~~ **"Disease Levels"** shall mean the asbestos-related disease levels specified in Section 5.2(a)(3) of the PI-SE TDP.

**91.** ~~86.~~ **"Disputed Claim"** shall mean a Claim that is neither Allowed nor Disallowed.

**92.** ~~87.~~ **"Distribution"** shall mean the payment, distribution, or assignment under the Plan by the Reorganized Debtors of property or interests in property to: (i) any Holder of an Allowed Claim (other than an Asbestos Claim) or Allowed Equity Interest; and (ii) the Asbestos Trust.

**93.** ~~88.~~ **"District Court"** shall mean the United States District Court for the District of Delaware.

**94.** ~~89.~~ **"Effective Date"** shall mean the first Business Day after the date on which all of the conditions precedent to the effectiveness of the Plan specified in Section 7.7 thereof shall have been satisfied or waived or, if a stay of the Confirmation Order is in effect on such date, the first Business Day after the expiration, dissolution, or lifting of such stay.

**95.** ~~90.~~ **"Encumbrance"** shall mean with respect to any property or asset (whether real or personal, tangible or intangible), any mortgage, lien, pledge, charge, security interest, assignment as collateral, or encumbrance of any kind or nature in respect of such property or asset (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement

under the Uniform Commercial Code or comparable law of any jurisdiction) to secure payment of a debt or performance of an obligation.

**96.** 91. **"Entity"** shall mean any person, individual, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, the United States Trustee or any Governmental Unit or any political subdivision thereof.

**97.** 92. **"Equity Committee"** shall mean the Official Committee of Equity Security Holders appointed in the Chapter 11 Cases.

**98.** 93. **"Equity Interest"** shall mean any interest in any of the Debtors pursuant to an "equity security" within the meaning of Bankruptcy Code § 101(16).

**99.** 94. **"Estimated Amount"** shall mean (except with respect to Asbestos Claims) the estimated dollar value of an unliquidated Claim, Disputed Claim, or Contingent Claim pursuant to Bankruptcy Code § 502(c); provided that, in the event the Court shall estimate one or more unliquidated Claims, Disputed Claims, or Contingent Claims for purposes of allowance, such estimate shall constitute and represent the maximum amount in which such Claims may ultimately become Allowed Claims.

**100.** 95. **"Estimation Motion"** shall mean a motion Filed or to be Filed with the Court in the Chapter 11 Cases, which seeks, among other things, to:

    (a)    implement procedures to be used in establishing the amount of the Asbestos PI-SE Class Fund, the Asbestos PI-AO Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund;

    (b)    establish the Asbestos PI-SE Class Fund, the Asbestos PI-AO Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund; and

    (c)    set the Asbestos PI Pre-petition Litigation Bar Date.

**101.** 96. **"Estimation Order"** shall mean the order by which the Court would establish the Asbestos PI-SE Class Fund, the Asbestos PI-AO Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund, pursuant to the Estimation Motion.

**102.** 97. **"Estimation Procedures Order"** shall mean the order by which the Court would implement procedures to be used in establishing the amount of the Asbestos PI-SE Class Fund, the Asbestos PI-AO Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund; and set the Asbestos PI Pre-petition Litigation Bar Date, both pursuant to the Estimation Motion. A proposed form of Estimation Procedures Order is Exhibit A to the Estimation Motion.

**103.** 98. **"Exhibit Book"** shall mean the exhibits to the Disclosure Statement or the Plan, as filed contemporaneously with the Disclosure Statement and Plan, as such exhibits may be amended, supplemented, or modified from time to time.

99. ~~**"Exhibit Book Supplement"** shall mean a supplement of Plan related documents, as amended from time to time, which shall include: (i) the Certificate of Incorporation of the Parent, as to be amended pursuant to the Plan; (ii) the By-Laws of the Parent, as to be amended pursuant to the Plan; (iii) an opinion of counsel regarding whether the Asbestos Trust qualifies as a "qualified settlement fund" pursuant to Section 468B of the IRC; (iv) the list of rejected contracts as of the Effective Date; (v) the list of letters of credit, surety bonds, guaranties, and certain indemnity agreements not to be assumed pursuant to Section 9.2 of the Plan; (vi) the Management Stock Incentive Plan; (vii) a list of certain key members of current management who shall continue with the Reorganized Debtors; (viii) a list of the Resolved Asbestos Insurance Companies, which list may be supplemented, at the sole discretion of the Reorganized Debtors, by Filing a notice with the Bankruptcy Court; and (ix) a list of the Settled Asbestos Insurance Companies.~~

104.    ~~100.~~ **"Exit Financing"** shall mean such financing agreement(s) or commitment(s) as the Debtors shall obtain to provide the Reorganized Debtors with appropriate credit availability.

105.    ~~101.~~ **"Expedited Review"** shall mean a review pursuant to the Expedited Review Process.

106.    ~~102.~~ **"Expedited Review Process"** shall mean the process employed to liquidate Asbestos PI-SE Cash-Out Claims, as set forth in Section 5.2(a) of the PI-SE TDP and the process employed to liquidate Asbestos PI-AO Cash-Out Claims, as set forth in Section 5.2(a) of the PI-AO TDP.

107.    ~~103.~~ **"FCR"** shall mean Future Claimants' Representative.

108.    ~~104.~~ **"FEV1"** shall mean forced expiratory volume (1 second), which is the maximal volume of air expelled in 1 second during performance of the spirometric test for forced vital capacity.

109.    ~~105.~~ **"FIFO"** shall have the meaning set forth in Section 2.1 of each of the TDPs.

110.    ~~106.~~ **"FIFO Payment Queue"** shall have the meaning set forth in Section 5.1(c) of the PI-SE TDP, Section 5.1(c) PI-AO TDP, or Section 5.1 of the PD-TDP, as applicable.

111.    ~~107.~~ **"FIFO Processing Queue"** shall have the meaning set forth in Section 5.1(a)(1) of the PI-SE TDP, as applicable.

112.    ~~108.~~ **"File"** or **"Filed"** shall mean file or filed with the Court in the Chapter 11 Cases.

113.    ~~109.~~ **"Final Order"** shall mean an order as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing by all Entities possessing such right, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or from which reargument or rehearing was sought or certiorari has been denied, and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; provided that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a Final Order.

114.    ~~110.~~ **"Financial Information"** shall mean the historical, proforma and prospective financial information included as, or incorporated by reference into, Exhibit 4 to the Disclosure Statement entitled "W. R. Grace & Co. and Subsidiaries, Historical, Proforma and Prospective Financial Information."

115.    **"Fraudulent Conveyance Adversary Proceedings"** shall mean those certain Adversary Proceedings commenced by the Asbestos PD Committee and the Asbestos PI Committee on behalf of the Debtors' Estates against Sealed Air and Fresenius, identified as case nos. 02-2210 and 02-2211.

116.    ~~111.~~ **"Fresenius"** shall mean Fresenius Medical Care Holdings, Inc. and National Medical Care, Inc.

117.    ~~112.~~ **"Fresenius Indemnified Parties"** shall mean Fresenius and each of their respective present and former subsidiaries, parents, affiliates, officers, directors, employees, partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and assigns, including Fresenius Medical Care AG and Fresenius AG, but not including the Debtors, the Reorganized Debtors and Sealed Air.

118.    **"Fresenius Indemnified Taxes"** shall mean all Taxes for or attributable to Tax Periods ending on or before December 31, 1996 other than NMC Indemnified Taxes, all as defined in the Fresenius Settlement Agreement, which is attached as part of Exhibit 13 in the Exhibit Book.

**119.** ~~113.~~ **"Fresenius Payment"** shall mean the $115,000,000 consideration to be paid by Fresenius to the Debtors pursuant to the terms of the Fresenius Settlement Agreement.

**120.** ~~114.~~ **"Fresenius Settlement Agreement"** shall mean that certain settlement agreement and release of claims dated February 6, 2003 by and among the Parent, Grace-Conn., Fresenius, the Asbestos PI Committee, and the Asbestos PD Committee, in the form attached as Exhibit 13 in the Exhibit Book, as such agreement may be amended from time to time.

**121.** **"Fresenius Settlement Order" shall mean the Order Authorizing, Approving and Implementing Settlement Agreement By and Among Plaintiffs, the Official Committee of Asbestos Property Damage Claimants And the Official Committee of Asbestos Personal Injury Claimants, the Debtors, And Defendants Fresenius Medical Holdings, Inc. and National Medical Care, Inc., entered by the District Court on June 25, 2003 in the Fraudulent Conveyance Adversary Proceedings, attached as part of Exhibit 13 in the Exhibit Book.**

**122.** ~~115.~~ **"Future Claimants' Representative"** or **"FCR"** shall mean David T. Austern (or any court-appointed successor), appointed as the legal representative for future asbestos-related personal injury Claimants in the Chapter 11 Cases for the purpose of protecting the interests of persons that may subsequently assert Demands channeled to the Asbestos Trust.

**123.** ~~116.~~ **"FVC"** shall mean forced vital capacity, which is the maximal volume of air expired with a maximally forced effort from a position of maximal inspiration.

**124.** ~~117.~~ **"General Unsecured Claim"** shall mean any Claim in the Chapter 11 Cases that is not an Administrative Expense Claim, Priority Tax Claim, Priority Claim, Secured Claim, Unsecured Pass-Through Employee Related Claim, Workers' Compensation Claim, Intercompany Claim, Asbestos PI-SE Claim, Asbestos PI-AO Claim, or Asbestos PD Claim.

**125.** ~~118.~~ **"Glossary"** shall mean this Glossary of Terms for the Plan Documents, as this document may be modified from time to time.

**126.** ~~119.~~ **"Grace"** shall mean the Debtors.

**127.** ~~120.~~ **"Grace-Conn."** shall mean W. R. Grace & Co.-Conn., one of the Debtors in these Chapter 11 Cases.

**128.** ~~121.~~ **"Grace Exposure"** shall have the meaning as set forth in Section 5.4(b)(3) of the PI-SE TDP and Section 5.4(b)(2) of the PI-AO TDP.

**129.** ~~122.~~ **"GUC Distribution Date"** shall mean: (a) when used with respect to a General Unsecured Claim that is Allowed prior to the Effective Date, the Effective Date or as soon as practicable thereafter; and (b) when used with respect to a General Unsecured Claim that is not Allowed prior to the Effective Date, the first Business Day of the next calendar quarter after the date upon which the Claim becomes Allowed, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of such next calendar quarter, in which case the Distribution Date shall be the first Business Day of the next succeeding calendar quarter.

**130.** ~~123.~~ **"Holder"** shall mean any Entity holding any Claim or Equity Interest and, with respect to a vote on the Plan, shall mean the beneficial holders on the voting record date or any authorized signatory who has completed and executed a Ballot or on whose behalf a Master Ballot has been properly completed and executed.

**131.** ~~124.~~ **"ILO Grade"** shall mean the radiological ratings for the presence of lung changes as determined from a chest x-ray, all as established from time to time by the International Labor Organization.

**132.** ~~125.~~ **"Individual Review Process"** shall mean the individual review process described in Section 5.2(b) of the PI-SE TDP or 5.2(b) of the PI-AO TDP, as applicable.

**133.** ~~126.~~ **"Initial Distribution Date"** shall mean: (i) a date within the first sixty (60) days after the Effective Date selected by the Reorganized Debtors, or (ii) such later date as the Bankruptcy Court may establish, upon request by the Reorganized Debtors, for cause shown.

**134.** ~~127.~~ **"Intercompany Claim"** shall mean: (a) any Claim that arose prior to the Effective Date by: (i) any Debtor against any other Debtor, or (ii) a Non-Debtor Affiliate against any Debtor; or (b) any claim that arose prior to the Effective Date by any Debtor against any Non-Debtor Affiliate,.

**135.** ~~128.~~ **"IRC"** shall mean the Internal Revenue Code of 1986, as amended, and any applicable regulations (including temporary and proposed regulations) promulgated thereunder by the United States Treasury Department.

**136.** ~~129.~~ **"IRS"** shall mean the United States Internal Revenue Service.

**137.** **"LIBOR" shall mean London InterBank Offered Rate.**

**138.** ~~130.~~ **"Litigation Option"** shall mean one of the treatment options available to be chosen by Holders of Asbestos PI Claims, as described in Section 3.2 of the Plan.

**139.** ~~131.~~ **"Management Stock Incentive Plan"** shall mean the W. R. Grace Stock Incentive Plans under which stock options exercisable for up to 8.2 million shares of Parent Common Stock have been issued to the management of Grace and the Non-Debtor Affiliates, which options will remain outstanding under the Plan, and any additional stock incentive plans which may be implemented on or after the Effective Date subject to approval by the Parent's Board of Directors.

**140.** ~~132.~~ **"March 2003 Bar Date"** shall mean March 31, 2003, the last day for Filing a proof of Claim relating to pre-petition (i) Asbestos PD Claims (excluding ZAI Claims), (ii) non-Asbestos Claims (including all governmental claims, and all derivative asbestos claims and asbestos-related claims for contribution, indemnity, reimbursement or subrogation), and (iii) Asbestos Medical Monitoring Claims.

**141.** ~~133.~~ **"March 2003 Bar Date Order"** shall mean the Court's order, dated April 22, 2002, which established the March 2003 Bar Date.

**142.** ~~134.~~ **"Master Ballot"** shall mean a Ballot, which is cast by a representative, on behalf of a Holder or Holders of Equity Interests, pursuant to the terms and guidelines established in the Plan Documents.

**143.** ~~135.~~ **"Medical/Exposure Criteria"** shall mean the medical/exposure criteria for each Disease Level set forth in Section 5.2(a)(3) of the PI-SE TDP, or the medical/exposure criteria for a Qualified PI-AO Cash-Out Claim set forth in Section 5.2(a)(3) of the PI-AO TDP, as applicable.

**144.** ~~136.~~ **"Mesothelioma"** shall mean malignant mesothelioma diagnosed on the basis of the findings of a board certified pathologist.

**145.** ~~137.~~ **"Monokote-3"** or **"MK-3"** shall mean a fireproofing product used on steel structural components to prevent or delay the steel from collapsing in the event of a building fire.

**146.** ~~138.~~ **"Non-Debtor Affiliate"** shall mean each of the Entities designated as such in Exhibit 9 in the Exhibit Book **including the Canadian Affiliates.**

**147.** ~~139.~~ **"Non-Settling Asbestos Insurance Company"** shall mean any Asbestos Insurance Entity that is not a Resolved Asbestos Insurance Company or a Settled Asbestos Insurance Company.

**148.**    ~~140.~~ **"Parent"** shall mean W. R. Grace & Co., a Delaware corporation, the first named Debtor in the caption of the Chapter 11 Cases and ultimate parent holding company of all of the other Debtors and Non-Debtor Affiliates.

**149.**    ~~141.~~ **"Parent Common Stock"** shall mean the common stock, par value $0.01 per share, of the Parent or, if after the Effective Date, of the Reorganized Parent.

**150.**    ~~142.~~ **"PD Account"** shall mean the account established by the Trustees under the Asbestos Trust Agreement into which the Asbestos PD Class Fund shall be placed and from which Allowed Asbestos PD Claims shall be paid as soon as practicable after the Effective Date, as further described in the Asbestos Trust Agreement and the PD TDP.

**151.**    ~~143.~~ **"PD Trust Distribution Procedures"** or **"PD TDP"** shall mean the procedures, in the form attached as Exhibit 8 in the Exhibit Book, to be implemented by the Trustees pursuant to the terms and conditions of the Plan and the Asbestos Trust Agreement, to pay Allowed Asbestos PD Claims as set forth in such procedures.

**152.**    ~~144.~~ **"Petition Date"** shall mean April 2, 2001, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

**153.**    ~~145.~~ **"PI-AO Account"** shall mean the account established by the Trustees under the Asbestos Trust Agreement into which the Asbestos PI-AO Class Fund shall be placed and from which Allowed Asbestos PI-AO Claims shall be paid as soon as practicable after the Effective Date, as further described in the Asbestos Trust Agreement and the PI-AO TDP.

**154.**    ~~146.~~ **"PI-AO Trust Distribution Procedures"** or **"PI-AO TDP"** shall mean the procedures, in the form attached as Exhibit 7 in the Exhibit Book, to be implemented by the Trustees pursuant to the terms and conditions of the Plan and the Asbestos Trust Agreement, to liquidate, determine, and pay Allowed Asbestos PI-AO Claims as set forth in such procedures.

**155.**    ~~147.~~ **"PI-SE Account"** shall mean the account established by the Trustees under the Asbestos Trust Agreement into which the Asbestos PI-SE Class Fund shall be placed and from which Allowed Asbestos PI-SE Claims shall be paid as soon as practicable after the Effective Date, as further described in the Asbestos Trust Agreement and the PI-SE TDP.

**156.**    ~~148.~~ **"PI-SE Trust Distribution Procedures"** or **"PI-SE TDP"** shall mean the procedures, in the form attached as Exhibit 6 in the Exhibit Book, to be implemented by the Trustees pursuant to the terms and conditions of the Plan and the Asbestos Trust Agreement, to liquidate, determine, and pay Allowed Asbestos PI-SE Claims as set forth in such procedures.

**157.**    ~~149.~~ **"Plan"** shall mean ~~Debtors'~~the Joint Plan of Reorganization under chapter 11 of the Bankruptcy Code dated as of November 13, 2004, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules to the foregoing, as the same may be in effect from time to time.

**158.**    ~~150.~~ **"Plan Documents"** shall mean the Plan, the Plan Supplement, the Disclosure Statement, the Glossary, and all exhibits in the Exhibit Book, either in their present form or as each may be amended, supplemented, or otherwise modified from time to time.

**159.**    **"Plan Proponents" shall mean the Debtors, the Unsecured Creditors Committee and the Equity Committee.**

**160.**    *"Plan Supplement" shall mean a supplement of Plan related documents, as amended from time to time, which shall include: (i) the Certificate of Incorporation of the Parent, as to be amended pursuant to the Plan; (ii) the By-Laws of the Parent, as to be amended pursuant to the Plan; (iii) an opinion of counsel*

~~18~~
**18**

*regarding whether the Asbestos Trust qualifies as a "qualified settlement fund" pursuant to Section 468B of the IRC; (iv) the list of rejected contracts as of the Effective Date; (v) the list of letters of credit, surety bonds, guaranties, and certain indemnity agreements not to be assumed pursuant to Section 9.2 of the Plan; (vi) the Management Stock Incentive Plan; (vii) a list of certain key members of current management who shall continue with the Reorganized Debtors; (viii) a list of the Resolved Asbestos Insurance Companies, which list may be supplemented, at the sole discretion of the Reorganized Debtors, by Filing a notice with the Bankruptcy Court; (ix) a list of the Settled Asbestos Insurance Companies;* **and (x) a list of Allowed General Unsecured Claims as of the Effective Date.**

__161.__  151. **"Pre-petition Lawsuit"** shall mean any lawsuit that was filed against any of the Debtors before the Petition Date.

__162.__  152. **"Previously Settled/Adjudicated Asbestos Claim"** shall mean any Claim based on a Final Order or a pre-petition settlement that is enforceable by a Debtor or Debtors and by the Claimant, if such Claim would constitute an Asbestos PD Claim or Asbestos PI Claim but for the Final Order or settlement.

__163.__  153. **"Priority Claim"** shall mean any Claim (other than an Administrative Expense Claim or Priority Tax Claim) to the extent such Claim is entitled to priority in right of payment under Bankruptcy Code § 507.

__164.__  154. **"Priority Tax Claim"** shall mean a Claim that is of a kind specified in Bankruptcy Code §§ 502(i) or 507(a)(8).

__165.__  155. **"Professional"** shall mean an Entity (i) employed pursuant to a Final Order in accordance with Bankruptcy Code §§ 327, 328, 363, 524(g)(4)(B)(i) and/or 1103 and to be compensated for services rendered prior to the Confirmation Date, pursuant to Bankruptcy Code §§ 327, 328, 329, 330 and 331, or (ii) for which compensation and reimbursement have been allowed by the Bankruptcy Court pursuant to Bankruptcy Code § 503(b)(4).

__166.__  156. **"Pulmonary Function Testing"** shall mean spirometry testing that is (i) in material compliance with the quality criteria established by the American Thoracic Society and (ii) performed on equipment which is in material compliance with the standards of the American Thoracic Society for technical quality and calibration.

__167.__  157. **"QSF"** shall mean a qualified settlement fund as defined by Treasury Regulation Section 1.468B-1 *et seq*.

__168.__  158. **"Qualified Asbestos PI-AO Cash-Out Claim"** shall mean an Asbestos PI-AO Cash-Out Claim that meets the Medical/Exposure Criteria set forth in Section 5.2(a)(3) of the PI-AO TDP.

__169.__  159. **"Quarterly Tax Distribution Date"** shall mean the first Business Day of each calendar quarter following the Initial Distribution Date; provided that the first Quarterly Tax Distribution Date following the Initial Distribution Date shall be no less than ninety (90) days following such Initial Distribution Date.

__170.__  **"Recognition Order" shall mean the order of the Canadian Court in the context of the Canadian Proceedings recognizing the Confirmation Order and giving effect to the Plan in Canada including the injunctions outlined therein.**

__171.__  160. **"Registry"** shall mean a list to be maintained by the Asbestos Trust for those Holders of Asbestos PI-AO Claims who choose the Registry Option.

__172.__  161. **"Registry Option"** shall mean one of the three treatment options available to be chosen by the Holder of an Asbestos PI-AO Claim, as described in Section 3.2 of the Plan.

__173.__  162. **"Released Matters Injunction"** shall mean the injunction described in Section 8.4 of the Plan.

**174.**    ~~163.~~ **"Reorganized Debtor," "Reorganized Debtors"** or **"Reorganized Grace"** shall mean the Debtor(s) from and after the Effective Date.

**175.**    ~~164.~~ **"Reorganized Parent"** shall mean the Parent from and after the Effective Date.

**176.**    ~~165.~~ **"Representatives"** shall mean, with respect to any Entity, the past and present directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of that Entity, or any other representatives or professionals of that Entity or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents.

**177.**    ~~166.~~ **"Resolved Asbestos Insurance Company"** shall mean each of the Asbestos Insurance Entities that has entered into an Asbestos Insurance Settlement Agreement with the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, or any of them or their predecessors pursuant to which such Asbestos Insurance Entity has fully performed all of its obligations that have arisen or that ever might arise under such Asbestos Insurance Settlement Agreement and which is listed on a list to be included in the Plan Supplement but only with respect to the portion of the Asbestos Insurance Policy (scheduled immediately therewith on a list to be included in the Plan Supplement) that is affected by any such Settlement Agreement.

**178.**    ~~167.~~ **"Retained Causes of Action"** shall mean the actual and potential causes of action that the Reorganized Debtors shall retain, on and after the Effective Date, on behalf of the Debtors, to commence and pursue, as appropriate, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, whether such causes of action accrued before or after the Petition Date, including the actions listed on Exhibit 11 in the Exhibit Book.

**179.**    ~~168.~~ **"Scheduled Value"** shall mean each Scheduled Value available under the PI-SE TDP and PI-AO TDP, respectively, to those Claimants who elect the Cash-Out Option and who are determined to meet the applicable Medical/Exposure Criteria under the procedures set forth in the PI-SE TDP or PI-AO TDP, respectively.

**180.**    ~~169.~~ **"Schedules"** shall mean the schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors in Possession with the Bankruptcy Court, as required by Bankruptcy Code § 521 and the Bankruptcy Rules, as such schedules and statements may be amended by the Debtors in Possession from time to time in accordance with Bankruptcy Rule 1007.

**181.**    ~~170.~~ **"Sealed Air"** shall mean Sealed Air Corporation and Cryovac, Inc.

**182.**    ~~171.~~ **"Sealed Air Common Stock"** shall mean the voting common stock, par value $0.10 per share, of Sealed Air.

**183.**    ~~172.~~ **"Sealed Air Indemnified Parties"** shall mean Sealed Air Corporation, Cryovac, Inc. and all of their parent corporations, subsidiary corporations, joint ventures, Affiliates, and sister corporations, and any and all of their past, present and future agents, servants, officers, directors, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries, insurers (but solely to the extent of coverage procured by Sealed Air Corporation (after March 31, 1998) or Cryovac, Inc. (after such date) of any liabilities of Sealed Air for Asbestos Claims), or any of them, including any Entity acting on behalf of or at the direction of any them, but specifically excluding (i) the Debtors, (ii) all Non-Debtor Affiliates, (iii) Fresenius (to the extent of any and all claims, damages or debts arising out of the Fresenius Transaction as defined in the Sealed Air Settlement Agreement), and (iv) any and all insurers of the Debtors or the Non-Debtor Affiliates to the extent that they have provided coverage for Asbestos Claims now or hereafter asserted or which could have been asserted at any time against the Debtors or the Non-Debtor Affiliates.

**184.**    ~~173.~~ **"Sealed Air Payment"** shall mean the payment delivered, on or as soon as practicable following the Effective Date, for and on behalf of Sealed Air to the Asbestos Trust pursuant to the terms of the Sealed Air Settlement Agreement.   The Sealed Air Payment shall consist of:  (i) five hundred twelve million five

hundred thousand dollars ($512,500,000) in ~~C~~cash, plus interest thereon from December 21, 2002 until the Effective Date, at a rate of 5.5% per annum compounded annually and (ii) nine million (9,000,000) shares of Sealed Air Common Stock (subject to adjustment as provided in the Sealed Air Settlement Agreement).

**185.** ~~174.~~ **"Sealed Air Settlement Agreement"** shall mean that certain agreement, in the form attached as Exhibit 12 in the Exhibit Book, dated November 10, 2003 and Filed with the Bankruptcy Court on November 26, 2003, as amended to address the Debtors' objections thereto, or otherwise.

**186.** ~~175.~~ **"SEC"** shall mean the United States Securities and Exchange Commission.

**187.** ~~176.~~ **"Second Hand Claim"** has the meaning specified in Section 5.3(a) of the PI-SE TDP or PI-AO TDP, as applicable.

**188.** ~~177.~~ **"Secured Claim"** shall mean a Claim that is: (i) secured by a lien (as such term is defined in Bankruptcy Code § 101(37)) on property in which the Debtors have an interest, which lien is valid, perfected, and enforceable under applicable law or by reason of a Final Order, or (ii) entitled to setoff under Bankruptcy Code § 553, to the extent of (A) the value of the Claimant's interest in the Debtor's interest in such property or (B) the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code § 506(a).

**189.** ~~178.~~ **"Securities Act"** shall mean the Securities Act of 1933, as amended.

**190.** ~~179.~~ **"Settled Asbestos Insurance Company"** shall mean any Asbestos Insurance Entity (other than a Resolved Asbestos Insurance Company) that has entered into an Asbestos Insurance Settlement Agreement with the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, or any of them or their predecessors, as of the Effective Date, pursuant to which such Asbestos Insurance Entity must still perform its obligations under such Asbestos Insurance Settlement Agreement and which is listed on a list to be included in the Plan Supplement, but only with respect to any Asbestos Insurance Policy scheduled immediately therewith.

**191.** ~~180.~~ **"Settlors"** shall have the meaning ascribed to it on page 1 of the Asbestos Trust Agreement.

**192.** ~~181.~~ **"Significant Occupational Exposure"** shall have the meaning set forth in Section 5.4(b)(2) of the PI-SE TDP.

**193.** ~~182.~~ **"TAC"** shall mean the Trust Advisory Committee.

**194.** ~~183.~~ **"TDPs"** shall mean the Trust Distribution Procedures.

**195.** ~~184.~~ **"Termination Date"** shall have the meaning ascribed to it in Section 8.2 of the Asbestos Trust Agreement.

**196.** ~~185.~~ **"Third Party Indemnification/Contribution Claim"** shall mean an Asbestos Claim that is asserted against one or more Debtors, the Canadian Affiliates and/or the Asbestos Trust based upon theories of contribution or indemnification under applicable law. A Third Party Indemnification/Contribution Claim shall be an Asbestos PI-SE Claim if and to the extent that it arises from the payment or other satisfaction of a Claim that would have been an Asbestos PI-SE Claim if it had not been paid or otherwise satisfied. A Third Party Indemnification/Contribution Claim shall be an Asbestos PI-AO Claim if and to the extent that it arises from the payment or other satisfaction of a Claim that would have been an Asbestos PI-AO Claim if it had not been paid or otherwise satisfied. A Third Party Indemnification/Contribution Claim shall be an Asbestos PD Claim if and to the extent that it arises from the payment or other satisfaction of a Claim that would have been an Asbestos PD Claim if it had not been paid or otherwise satisfied.

**197.** ~~186.~~ **"TLC"** shall mean total lung capacity, which is the total volume of air in the lung after maximal inspiration.

**198.** ~~187.~~ **"Trust Advisory Committee"** or **"TAC"** shall mean the Trust Advisory Committee established pursuant to the terms of the Plan and having the powers, duties and obligations set forth in the Asbestos Trust Agreement.

**199.** ~~188.~~ **"Trust By-Laws"** shall mean the by-laws of the Asbestos Trust, as authorized under Section 3.1(c)(viii) of the Asbestos Trust Agreement.

**200.** ~~189.~~ **"Trust Distribution Procedures"** or **"TDPs"** shall mean, collectively, the PI-SE TDP, the PI-AO TDP, and the PD TDP.

**201.** ~~190.~~ **"Trustee"** shall mean any individual confirmed by the Court to serve as a trustee of the Asbestos Trust, pursuant to the terms of the Plan, the Confirmation Order and the Asbestos Trust Agreement, or who subsequently may be appointed pursuant to the terms of the Asbestos Trust Agreement.

**202.** ~~191.~~ **"Unknown Causes of Action"** shall mean any Retained Causes of Action of which the Debtors **and the Canadian Affiliates** are unaware at the time Exhibit 11 in the Exhibit Book is filed, and are therefore not listed on that Exhibit.

**203.** ~~192.~~ **"Unliquidated Claim"** shall mean:  (i) any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is sought to be fixed, or (ii) any Claim for which no Allowed Amount has been determined.

**204.** ~~193.~~ **"Unsecured Creditors' Committee"** shall mean the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to Bankruptcy Code § 1102.

**205.** ~~194.~~ **"Unsecured Pass-Through Employee Related Claims"** shall mean all Claims (including accrued but unpaid pension Claims from the Petition Date) for compensation and benefits related to the Debtors' employment of their current and former employees.  Workers' Compensation Claims are not included within the Class of Unsecured Pass-Through Employee Related Claims.

**206.** ~~195.~~ **"Voting Agent"** shall mean Bankruptcy Management Corporation, the party to whom all Ballots and/or Master Ballots should be submitted.

**207.** ~~196.~~ **"Voting Deadline"** shall mean, 4:00 P.M. Eastern Time on April 1, 2005, which is the deadline by which anyone seeking to cast a Ballot or Master Ballot must submit such Ballot and/or Master Ballot, so that it is received by the Voting Agent.

**208.** ~~197.~~ **"Voting Record Date"** shall mean two (2) Business Days after the entry of the Disclosure Statement Order.

**209.** ~~198.~~ **"Warrants"** shall mean the redeemable restricted warrants to purchase Parent Common Stock at an exercise price of $0.01 per share, issued to the Asbestos Trust for the benefit of the Holders of Asbestos PI-AO Claims and exercisable in accordance with the Plan Documents, pursuant to a warrant agreement substantially in the form of Exhibit 15 in the Exhibit Book.

**210.** ~~199.~~ **"Workers' Compensation Claims"** shall mean any Claim:  (i) for benefits under a state-mandated workers' compensation system, which a past, present, or future employee of the Debtors or their predecessors is receiving, or may in the future have a right to receive and/or (ii) for reimbursement brought by any insurance company or state agency as a result of payments made to or for the benefit of such employees under such a system and fees and expenses incurred under any insurance policies or laws or regulations covering such employee claims.

**211.** ~~200.~~ **"WRG Asbestos Trust"** shall mean the Asbestos Trust.

**212.** ~~201.~~ "**WRG Asbestos Trust Agreement**" shall mean the Asbestos Trust Agreement.

**213.** ~~202.~~ "**ZAI**" shall mean Zonolite Attic Insulation, which is a loose-fill, non-roll vermiculite product primarily used in home attic insulation, that may contain naturally occurring asbestos.

**214.** ~~203.~~ "**ZAI Claims**" shall mean: (i) a Claim, Demand, or remedy, including all related claims, debts, obligations, or liabilities for compensatory (including general, special, and consequential damages) and punitive damages, (ii) a cross-claim, contribution claim, subrogation claim, reimbursement claim or indemnity claim, or (iii) any debt, liability, or obligation of one or more of the Debtors or any other Asbestos Protected Party, including the Canadian Affiliates (whether or not such Claim, Demand, remedy, debt, liability, or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; whether or not the facts of or legal bases therefor are known or unknown; and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty), for, relating to, or arising out of, resulting from, or attributable to, directly or indirectly property damage, including the cost of removal, abatement, or diminution in the value thereof, or environmental damage or economic loss caused or allegedly caused, by the ZAI sold, manufactured, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors (or any of their respective past or present Affiliates, or any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable). ZAI Claims are included within the Class of Asbestos PD Claims.

Other Terms/Interpretation

(a)   Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the other genders.

(b)   When used in a Plan Document, the term "Claim" shall be broadly construed to include all manner and type of Claim, whenever and wherever such Claim may arise, and shall include Asbestos PI-SE Claims, Asbestos PI-AO Claims, and Asbestos PD Claims.

(c)   Any reference in a Plan Document to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions shall mean that such document shall be substantially in such form or substantially on such terms and conditions.

(d)   Any reference in a Plan Document to an existing document or exhibit in the Exhibit Book Filed or to be Filed shall mean the document or exhibit as it may have been or may be amended, modified or supplemented.

(e)   Any reference to an Entity as a Holder of a Claim shall include that Entity's successors, assigns and affiliates.

(f)   The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to a Plan Document as a whole and not to any particular section, subsection, or clause contained in a Plan Document.

(g)   The word "including" (and, with correlative meaning, the forms of the word "include") shall mean including, without limiting the generality of any description preceding that word; and the words "shall" and "will" are used interchangeably and have the same meaning.

(h)   Unless otherwise indicated herein, all references to dollars are to United States dollars.

(i)     An initially capitalized term used herein that is not defined herein shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require.

(j)     The descriptive headings contained in Plan Documents are included for convenience of reference only and are not intended to be a part of and shall not affect in any way the meaning or interpretation of Plan Documents.

(k)     All references in Plan Documents to sections, articles, and exhibits are references to sections, articles and exhibits of or to Plan Documents unless otherwise specified.

(l)     Unless otherwise expressly provided herein, in computing any period of time prescribed or allowed by a Plan Document, the provisions of Bankruptcy Rule 9006(a) shall apply.

(m)    The rules of construction set forth in Bankruptcy Code § 102 shall apply.

# Redline of Exhibit Book Tab 3

# Best Interest Analysis

EXHIBIT 3 TO EXHIBIT BOOK

## BEST INTERESTS ANALYSIS

The following document is the Best Interests Analysis (the "Analysis") of the Debtors. This Analysis assumes the Debtors' estates are substantively consolidated solely for the purposes of actions associated with the confirmation and consummation of the Plan, including, but not limited to, voting, confirmation and Distribution.

The purpose of the Analysis is to provide information in order that the Bankruptcy Court may determine that the Plan is in the best interests of all Classes of Claimants and Equity Interest Holders impaired by the Plan. The Analysis was prepared to assist the Bankruptcy Court in making this determination and it should not be used for any other purpose.

The Analysis assumes that the hypothetical Chapter 7 liquidation is effected via the orderly sale of the businesses of the Debtors and Non-Debtor Affiliates as going concerns. Because the Asbestos Channeling Injunction would not be available in a Chapter 7 liquidation, the value realized from the orderly sale of the businesses in all likelihood would be reduced as a result of a buyer's concern regarding the risk of asbestos liability in the acquisition of the assets. Further, the lack of the Asbestos Channeling Injunction may preclude an orderly sale of the businesses as going concerns, in which case an actual liquidation of assets would be required. In that case, values realized would be further reduced.

Conversion of the Chapter 11 Cases to Chapter 7 would likely result in additional costs to the estates. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee and other professionals retained by the trustee, including attorneys, financial advisors and consultants; asset disposition expenses; litigation costs related to possible fraudulent transfer actions and the resolution of asbestos and other Claims; all unpaid expenses incurred by the Debtors in the Chapter 11 Cases that are allowed in the Chapter 7 case; and Claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

The Analysis presents estimated net proceeds if the Debtors and the Non-Debtor Affiliates were liquidated under the provisions of Chapter 7 of the Bankruptcy Code and the allocation of such proceeds applied in strict priority to satisfy Claims against the Debtors.

The Analysis is limited to presenting information that is the representation of management in good faith based on assumptions believed to be reasonable. The Analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants. The estimates and assumptions, although considered reasonable by management, are inherently subject to significant uncertainties and contingencies beyond the control of management. Accordingly, there can be no assurance that results shown could be realized if a liquidation occurred and actual results in such case could vary materially from those presented.

All defined terms are as defined in the Glossary unless otherwise noted. The accompanying notes are an integral part of the Analysis.

**COMPARISON OF CHAPTER 7 LIQUIDATION TO CHAPTER 11 REORGANIZATION**
(unaudited, $ in millions)

| | Note | Chapter 7 Liquidation | | | | Chapter 11 Reorganization | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Low | | High | | Low | | High | |
| Calculation of eEstimated nNet pProceeds aAvailable for aAllocation: | A | | | | | | | | |
| Estimated vValue of Reorganized Debtors and Non-Debtor Affiliates | | | $ 2,200 | | $ 2,600 | | $ 2,200 | | $ 2,600 |
| Less: dDiscount fFactor | | | (1,100) | | (1,300) | | - | | - |
| Less: tTaxes dDue in fForeign jJurisdictions | | | (68) | | (63) | | - | | - |
| Estimated pProceeds from sSale of bBusinesses | | | $ 1,032 | | $ 1,237 | | $ 2,200 | | $ 2,600 |
| | | | | | | | | | |
| Plus oOther aAssets: | B | | | | | | | | |
| Cash | | 457 | 485 | 457 | 485 | 448 | 476 | 458 | 512 |
| Fresenius Payment | | | - | | - | | 115 | | 115 |
| Sealed Air Payment | | | - | | 827 | | 985 | | 985 |
| Insurance rRecovery | | | 472 | | 500 | | 500 | | 500 |
| Present vValue of pProjected uUse of tTax aAssets | | | - | | - | 50 | 75 | 70 | 120 |
| Estimated nNet pProceeds aAvailable for aAllocation | | $1,961 | $ 1,989 | $3,021 | $ 3,049 | $4,208 | $ 4,351 | $4,728 | $ 4,832 |
| | | | | | | | | | |
| Allocation of eEstimated nNet pProceeds to Secured, Administrative and Priority Claims: | | | | | | | | | |
| Costs aAssociated with Chapter 7 lLiquidation | C | (53) | (52) | | (37) | | - | | - |
| Environmental Claims | | (15) | (50) | (15) | (50) | (15) | (50) | (15) | (50) |
| Tax Claims | | | (84) | | (84) | | (232) | | (232) |
| Other Administrative Claims | | (68) | (96) | (68) | (96) | (59) | (85) | (59) | (85) |
| Estimated nNet pProceeds aAvailable for aAllocation to General Unsecured Claims and Equity Interests | | $1,742 | $ 1,706 | $2,818 | $ 2,781 | $3,982 | $ 3,984 | $4,422 | $ 4,465 |
| | | | | | | | | | |
| Allocation of eEstimated nNet pProceeds to General Unsecured Claims: | | | | | | | | | |
| Bank dDebt, eCapital lLeases, dDrawn lLetters of cCredit | | (517) | (515) | (517) | (515) | (610) | (637) | (610) | (637) |
| Unsecured Pass-Through Employee Related Claims | | (191) | (190) | (191) | (190) | (191) | (190) | (191) | (190) |
| Environmental Claims | | (323) | (286) | (323) | (286) | (330) | (295) | (330) | (295) |
| Litigation Claims | | (10) | | (10) | | (10) | | (10) | |
| Trade Claims | | (32) | (31) | (32) | (31) | (35) | (36) | (35) | (36) |
| Other General Unsecured Claims | | (150) | (123) | (150) | (123) | (150) | (123) | (150) | (123) |
| Fresenius iIndemnity Claim | | | (148) | | (148) | | - | | - |
| PBGC Claim, nNet | D | (146) | (136) | (90) | 0 | | - | | - |
| Assumed aAsbestos lLiabilities | E | (1,689) | (1,700) | (1,689) | (1,700) | (1,689) | (1,700) | (1,689) | (1,700) |
| | | | | | | | | | |
| Excess / (Shortfall) | | $(1,464) | $ 1,424 | $(342) | $ (213) | $977 | $ 1,003 | $1,407 | $ 1,484 |
| | | | | | | | | | |
| Recovery to Holders of General Unsecured Claims | | 54% | 55% | 89% | 93% | | 100%+ | | 100%+ |
| _Value to Holders of Equity Interests_ | | | $ - | | - | $977 | $ 1,003 | $1,407 | $ 1,484 |

## Footnotes to Best Interests Analysis

A summary of the assumptions used by Blackstone and management of the Debtors and Non-Debtor Affiliates in preparing the Analysis is set forth below.

### Note A. *Proceeds from orderly sale of businesses*

In a Chapter 7 liquidation, it is assumed the businesses of the Debtors and Non-Debtor Affiliates would be sold as going concerns for cash to more than one buyer in a series of transactions to generate maximum value. The proceeds from these sale transactions are assumed to be equal to the Core Business Value of the Reorganized Debtors and Non-Debtor Affiliates ($2.2 billion to $2.6 billion with a midpoint of $2.4 billion, as further described in Section 2.8 of the Disclosure Statement), less a discount factor. Unlike a Chapter 11 reorganization, Chapter 7 does not provide for the issuance of the Asbestos Channeling Injunction. Notwithstanding a presumed ability to sell assets in a sale under Bankruptcy Code §363 or the availability of an injunction under Bankruptcy Code §105, the discount factor quantifies the probability that the businesses could not be sold for fair value or at all because of the perceived risk that asbestos liability would follow the assets sold.

U.S. taxes due on the gain from the orderly sale of the Debtors' and Non-Debtor Affiliates' businesses are assumed to be offset by existing tax attributes and deductions generated by payments made to Claimants in the Chapter 7 case with the exception of approximately $5 million of state taxes. It is assumed that for tax purposes, the sale of businesses in foreign countries will be structured as stock sales to take advantage of the predominant tax treaty exemptions for the payment of taxes on the gain generated by such sales. Taxes due in foreign jurisdictions represent foreign transfer taxes, withholding taxes, and estimated local taxes attributable to separating the businesses in each foreign subsidiary and taxes due on the gain from the sale of stock in those jurisdictions that do not have a tax treaty exemption.

### Note B. *Other Assets*

Other assets include: cash assets, payments from third-party fraudulent transfer actions, asbestos insurance assets and tax assets.

Cash assets include Grace's Cash. In addition, in the Chapter 7 liquidation, Cash also includes the cash value of corporate-owned life insurance policies, which are assumed terminated in a liquidation. In the Chapter 11 reorganization, in which residual equity value is projected, Cash includes proceeds from the assumed exercise of in-the-money management and employee stock options. This amount is calculated based on the projected number of shares and fully diluted reorganization equity value per share.

Payments from third-party fraudulent transfer actions reflects the following: Grace was named in a class action suit filed in California state court alleging that Grace's 1996 reorganization transaction with Fresenius and its 1998 reorganization with Sealed Air involved fraudulent transfers and demanding repayment of such transfers. Prior to the filing of the Chapter 11 Cases, two other similar class actions were filed. In November 2002, Fresenius and Sealed Air announced that they had reached an agreement in principle to settle Asbestos Claims and fraudulent transfer Claims related to the respective transactions. Pursuant to the Fresenius Settlement Agreement and the Sealed

Air Settlement Agreement, respectively, and the provisions of the Plan, Fresenius shall make the Fresenius Payment and Sealed Air shall make the Sealed Air Payment. These agreements specifically require the existence of the Asbestos Channeling Injunction. Because the Asbestos Channeling Injunction is not available in a Chapter 7 liquidation, the Analysis assumes these settlement payments would not be made. It is assumed, however, that a Chapter 7 trustee would pursue similar fraudulent transfer actions. Because the outcome of this litigation cannot be known, a range is shown from zero, at the low end, to a level of Sealed Air proceeds equal to the Sealed Air Payment on a present value basis assuming a discount rate of 6% and a three year time period to collect, at the high end. It is assumed in a Chapter 7 liquidation scenario that Fresenius and/or Sealed Air would pay certain priority taxes directly to the IRS and file a General Unsecured Claim against the Debtors for indemnity under tax sharing agreements entered into at the time of the 1996 reorganization.

Asbestos insurance assets are calculated based on the assumed asbestos liability (see Note E). In a Chapter 7 liquidation, the low case reflects the risk that recovering this asset is delayed for one year, assuming a 6% discount rate.

Certain tax assets are projected to be utilized over time in the Chapter 11 reorganization by projected income. In a Chapter 7 liquidation, any excess tax attributes, after offsetting gains resulting from the liquidation, including gains on asset sales and cash repatriation, would expire unused.

### Note C. *Costs associated with a Chapter 7 liquidation*

Costs associated with a Chapter 7 liquidation are assumed to include fees and costs for professionals retained by the Chapter 7 trustee, including legal, financial and claims processing advisors, estimated at $500,000 per month for eighteen months, for, among other things, pursuing the fraudulent transfer actions described in Note B and resolving Asbestos Claims. In addition, it is assumed the Chapter 7 trustee would receive payments equal to 1.5% of the estimated net proceeds available for allocation. Additional brokerage fees would be necessary for the orderly sale of Grace's businesses and other costs. Brokerage fees are calculated conservatively at 0.50% of gross proceeds, for a range of $6 million to $7 million.

### Note D. *PBGC*

As of September 30, 2004, the Debtors and Non-Debtor Affiliates had fourteen funded, defined benefit pension plans, each of which is qualified under Section 401(a) of the IRC. In total, these plans were under funded by approximately $202 million. In the event a buyer chose not to assume the obligations of the underfunded defined pension liability, it is assumed that the PBGC would assume that liability. The amount represents the net difference between the assumed increase in a buyer's determination of value from saving future pension costs and the resulting estimated PBGC Claim, which is assumed to be asserted on the basis of termination of the plans. The termination liability is assumed to be approximately $394 million, which is consistent with the Debtors' April 2004 filing with the PBGC and further described in Plan § 8.1.4 - Non-Dischargeable ERISA Liability.

**Note E.** *Assumed asbestos liabilities*

For purposes of this analysis, asbestos liabilities are assumed to equal the sum of (x) the maximum aggregate amounts that would satisfy the conditions precedent in Section 7.6.1(v) and Section 7.6.1(w) of the Plan; plus (y) an estimate of Previously Settled/Adjudicated Asbestos Claims.

# Redline of Exhibit Book Tab 4

## W.R. Grace & Co. and Subsidiaries Historical, Pro Forma and Prospective Financial Information

# W. R. GRACE & CO. AND SUBSIDIARIES
## PROFORMA AND PROSPECTIVE
## FINANCIAL INFORMATION

## W. R. GRACE & CO. AND SUBSIDIARIES
### PROFORMA AND PROSPECTIVE FINANCIAL INFORMATION

The following proforma and prospective financial information (the **"Financial Information"**) was prepared for the sole purpose of evaluating the feasibility of the proposed Plan of Reorganization (as such plan may be amended or modified, the **"Plan"**) of W. R. Grace & Co. and Subsidiaries (**"Grace"**) under Chapter 11 of the United States Bankruptcy Code (the **"Bankruptcy Code"**). The Financial Information reflects Grace's estimate of its expected consolidated financial position, results of operations, and cash flows as if the Plan were adopted as proposed. The Financial Information was prepared on the basis of the global operations of Grace, which include certain domestic and international subsidiaries and affiliates that are not debtors under the Bankruptcy Code.

**WHILE GRACE BELIEVES THE ASSUMPTIONS UNDERLYING THE PROFORMA AND PROSPECTIVE FINANCIAL INFORMATION, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE IS GIVEN THAT ANY OF THE FINANCIAL RESULTS WILL BE REALIZED. THIS FINANCIAL INFORMATION SHOULD NOT BE REGARDED AS A GUARANTEE OR WARRANTY BY GRACE, OR ANY OTHER PERSON, AS TO THE ACHIEVABILITY OF THE PROFORMA OR PROSPECTIVE FINANCIAL POSITION, RESULTS OF OPERATIONS, EARNINGS PER SHARE OR CASH FLOWS.    GRACE ASSUMES NO OBLIGATION OR UNDERTAKING TO UPDATE THE FINANCIAL INFORMATION, AND NO COMMENT WILL BE MADE ABOUT THE FINANCIAL INFORMATION EXCEPT AS REQUIRED BY THE BANKRUPTCY COURT.**

All estimates and assumptions underlying the Financial Information were developed by Grace.  The assumptions disclosed herein are those that Grace believes are significant to the understanding and evaluation of the Financial Information. Although Grace believes the assumptions used are reasonable under the circumstances, such assumptions are subject to significant uncertainties such as: the loss of senior management and other key employees; changes in demand for Grace's products; changes in foreign currency exchange rates or interest rates; inflation that differs from that projected; changes in the business, competitive or political environment; technological breakthroughs, product innovations or competitive pricing strategies that negatively affect the profitability of a product or line of business; availability and cost of raw materials, energy and labor; and other factors affecting Grace's operations. Despite Grace's efforts to foresee and plan for the effects of changes in these circumstances, Grace cannot predict their impact with certainty.  Consequently, actual financial results will likely vary from that shown in the Financial Information, and the variations could be material.

The Financial Information was prepared by Grace in conformity with guidelines promulgated by the United States Securities and Exchange Commission ("SEC") and the

2

American Institute of Certified Public Accountants ("**AICPA**"). The Financial Information has not been audited or reviewed by registered independent accountants.

## I.    FINANCIAL INFORMATION PRESENTED

The Financial Information included herein is as follows:

- Proforma condensed consolidated balance sheet of Grace as of September 30, 2004, reflecting the accounting effects of the Plan as if it were effective on that date, under guidance promulgated by the SEC.

- Proforma consolidated statements of operations and analysis of continuing operations of Grace for the year ended December 31, 2003 and for the nine months ended September 30, 2004, reflecting the accounting effects of the Plan as if it were in effect at the start of each period presented, under guidance promulgated by the SEC.

- Projected condensed consolidated balance sheets of Grace as of December 31, 2004, 2005 and 2006, as if the Plan were effective at December 31, 2004, under guidance promulgated by the AICPA, together with historical information as of December 31, 2001, 2002 and 2003.

- Projected consolidated statements of operations and analysis of continuing operations of Grace for the years ending December 31, 2004, 2005 and 2006, as if the Plan were effective on December 31, 2004, under guidance promulgated by the AICPA, together with historical information for the years ended December 31, 2001, 2002 and 2003.

- Projected condensed consolidated statements of cash flows of Grace for the years ending December 31, 2004, 2005 and 2006, as if the Plan were effective on December 31, 2004, under guidance promulgated by the AICPA, together with historical information for the years ended December 31, 2001, 2002 and 2003.

The Plan will be accounted for in accordance with the AICPA Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code" ("**SOP 90-7**"). The Financial Information has been prepared in conformity with United States Generally Accepted Accounting Principles consistent with those currently utilized by Grace in the preparation of its consolidated financial statements, except as otherwise noted. The Financial Information should be read in conjunction with the significant assumptions, qualifications and notes set forth herein and with the audited consolidated financial statements for the year ended December 31, 2003 contained in Grace's 2003 Form 10-K/A, and with Grace's third quarter 2004 Form 10-Q filed with the SEC in November, 2004.  Historical financial information included herein was derived from such SEC documents. The Forms 10-K/A and 10-Q are available from Grace's website at www.grace.com or from the SEC's **EDGAR system** at www.sec.gov.

4

## II.   SUMMARY OF PRINCIPAL UNDERLYING ASSUMPTIONS

### A.   PROPOSED PLAN OF REORGANIZATION – GENERAL TERMS

The proposed Plan is considered a "hypothetical assumption" (as defined under AICPA guidance for prospective financial presentations) until such Plan is confirmed by the Bankruptcy Court. The Plan may change significantly as proceedings under Grace's Chapter 11 case further define and measure the claims and liabilities that will be allowed and payable under a confirmed plan. This Financial Information assumes that:

●     Grace will satisfy all unresolved asbestos-related claims as outlined in the Plan through the contribution of Grace common stock and warrants, and assets available under certain third-party agreements, to an asbestos trust established under Bankruptcy Code Section 524(g). The value of such contribution will total approximately $1,613 million, including the estimated cost of trust administration, (such amount being equal to the maximum aggregate asbestos-related liability that would satisfy the conditions precedent set forth in Sections 7.6.1(v) and (w) of the Plan). Asbestos claims subject to ~~prepetition~~**pre-petition** judgments or agreements (approximately $~~76~~**87** million) will be resolved as part of general unsecured claims.

●     Grace will distribute approximately $~~1,000~~**1,100** million in cash and $~~131~~**149** million in Grace common stock to satisfy all ~~non-asbestos~~**Administrative, Priority Tax and Class 9** claims payable at the effective date as follows:
   ●     Bank debt including accrued interest – ~~$607~~**as of September 30, 2004- $634** million
   ●     Environmental remediation - $238 million
   ●     Special pension programs - $8 million
   ●     Trade accounts payable and litigation - $~~78~~**49 million – including:**
      ●     **Class 9 claims - $46 million**
      ●     **Administrative claims - $3** million
   ●     Tax claims - $~~152~~**182** million
   ●     Fees and other - $~~48~~**50 million**
   ●     **Asbestos claims subject to pre-petition judgments or agreements - $87** million

●     Grace will satisfy all other non-asbestos liabilities (estimated to be approximately $~~508~~**495** million as of September 30, 2004**_ and $487 million as of December 31, 2004_**), as they become due and payable over time (**"Reinstated Liabilities"**).

●     Grace will finance the payments noted above **assumed to be as of December 31, 2004** (which total $~~3,329~~**3,349** million) with cash on hand

5

(approximately $~~150~~184 million); newly issued Grace common stock (approximately $~~640~~647 million in value); value available from Sealed Air Corporation (approximately $985 million in cash and securities) and Fresenius Medical Care (approximately $115 million in cash) under litigation settlement agreements; initial borrowings under a new debt facility (approximately $800 million drawn); future operating cash flows (approximately $~~508~~487 million); and warrants (initially approximating $130 million in value), if required, to fund costs of the asbestos trust related to asymptomatic personal injury claims if and when they materialize.

~~The Grace equity allocated to creditor claims under the Plan approximates $770 million in value. Additional equity of approximately $354 million (based upon the mid-point of the fully-diluted reorganized equity value range) is available to the asbestos trust through the exercise of warrants, if necessary, to satisfy trust costs related to personal injury asymptomatic and other claimants beyond Grace's effective date estimate. Should the cost of the personal injury asymptomatic and other claimants exceed the total value of the warrants, Grace would be obligated to fund the additional costs with cash.~~

### B.   PROJECTIONS OF OPERATING RESULTS – GENERAL ASSUMPTIONS

- Methodology – The projections of operating performance were prepared using a strategic planning methodology by each of Grace's reportable business segments, Davison Chemicals and Performance Chemicals, which were then consolidated. Executive management of Grace reviewed the segment and consolidated results for achievability based on recent historical performance, expected economic conditions, investment plans and other relevant factors, and adjusted the strategic plans accordingly to reflect the results of operations and cash flows that are reasonably expected to be achieved over the projection period.

- Business Environment - The operating projections assume the continuation of a stable economic and political environment with variability in global economic activity over the projection period as experienced in a typical business cycle.

- Sales – Consolidated sales are projected to increase approximately 6% annually over the projection period (after taking into account added sales from acquisitions completed in 2004), consistent with Grace's experience over the most recent five-year business cycle. The projections assume that revenue growth will come from the success of Grace's operating strategies and include increasing business with existing customers, developing new customers, penetrating new markets, commercializing new products and acquiring related businesses.

- Gross Product Margins – Gross margin on product sales (defined as sales less cost of goods sold and depreciation) is assumed to remain relatively constant as a percentage of sales over the projection period and consistent

6

with Grace's past performance. Selling price increases through improved product offerings and the success of productivity initiatives are assumed to offset inflation on direct production costs.

- Expenses – Operating expenses which include selling, general administrative and research and development costs are assumed to increase over the projection period based on factors of general inflation, business strategy and specific considerations for personnel-related costs such as compensation, health care, retirement benefits and insurance.

## III.    PROPOSED PLAN OF REORGANIZATION

The proforma financial information of Grace presented herein reflects the accounting effects of the proposed Plan (1) as if it were put in effect on the date of Grace's most recent publicly reported consolidated balance sheet for September 30, 2004, and (2) as if it were in effect for the historical reporting periods for the year ended December 31, 2003 and for the nine-months ended September 30, 2004. Such proforma financial statements show how Grace's assets, liabilities, equity and income would be affected by the Plan as follows:

### A.    ADDITIONAL PRE-PETITION EXPENSE AND INSURANCE

Reflects the accrual of added asbestos and other costs necessary to adjust Grace's balance sheet to assumed allowed claim amounts, including accrued interest, as described in the Plan. Certain amounts are recorded at net payable value, which assumes funding will occur at or near the effective date. Reinstated Liabilities are recorded at estimated amounts payable over time, and on a net present value basis where appropriate.  Insurance assets are recorded at the net present value of recoverable amounts from the assumed level of future payments to asbestos claimants. Tax accounts are adjusted accordingly for both added deductible liabilities and insurance income.

### B.    BORROWINGS UNDER NEW DEBT AGREEMENTS

Reflects the assumed establishment of a new $1,000 million debt facility to fund settled claims payable at the effective date (approximately $800 million) and to provide working capital **and letters of credit** (approximately $200 million) for continuing operations. Future periods reflect an assumed 7% interest rate on outstanding borrowings. No such facility currently exists but, in Grace's view based on discussions with prospective lenders, one can be established before the effective date of the Plan.

### C.    FRESENIUS AND SEALED AIR SETTLEMENTS

Reflects the value, in the form of cash and securities, expected to be realized under each litigation settlement agreement as follows: $115 million of cash from Fresenius Medical Care; and, $985 million of estimated value from Sealed Air Corporation (calculated as of September 30, 2004) in the form of $512 million of cash plus accrued interest at 5.5% from December 21, 2002, and 9 million shares of Sealed Air common stock valued at $47 per share. Tax accounts have been

7

adjusted to reflect the satisfaction of Grace's recorded liabilities by way of these third-party agreements. The Fresenius settlement amount will be payable to Grace and will be accounted for as income. The Sealed Air settlement assets will be paid directly to the asbestos trust by Sealed Air and will be accounted for as satisfaction of a recorded liability.

### D.   PAYMENT OF REMAINING PRE-PETITION LIABILITIES

Reflects the accounting for the transfer of funds and securities to settle obligations payable under the Plan at the effective date. Tax accounts are adjusted to reflect the change in nature of Grace's tax assets from predominately temporary differences to predominately time-limited tax net operating losses. Non-asbestos Reinstated Liabilities of approximately $~~508~~495 million **estimated as of September 30, 2004 and $487 million as of December 31, 2004** are assumed to be paid in cash when due.

### E.   PROFORMA CONSOLIDATED STATEMENT OF OPERATIONS

Reflects the elimination from Grace's historical financial statements of: (1) charges and expenses directly related to Chapter 11, (2) the $50.0 million net gain from property litigation recorded in the third quarter of 2004, and (3) the addition of interest and new common shares related to the assumed financing of the Plan.

## IV.   PROJECTIONS OF OPERATING RESULTS

The operating projections consider the performance of each reportable business segment (Davison Chemicals and Performance Chemicals) over the past five years and executive management's view of the total revenue and earnings the underlying businesses can achieve over the projection period, given expectations about general economic and specific industry conditions.   The segment level projections were prepared on a basis of global business operations, which include certain domestic entities and international subsidiaries and affiliates of Grace that are not debtors under Chapter 11 of the Bankruptcy Code.

### A.   GENERAL ECONOMIC FACTORS

The Financial Information has been developed assuming that global economic and political conditions will be stable and that the overall sales growth and cost productivity achieved by Grace over the past five years will continue over the projection period.  Grace's product portfolio is diversified across several end-use industries and geographic markets.  This diversification provides a buffer against adverse changes in any one industry or region and, absent a period of extended recession globally, provides a reasonable basis for projecting sales growth consistent with past experience.

### B.   INDUSTRY FACTORS

In addition to general economic conditions globally, Grace's sales are affected by the demand for products used in the construction industry (primarily non-residential construction), the petroleum refining industry, the food packaging

8

industry (particularly rigid containers), the plastics industry and, to a lesser degree, the automotive, personal care, coatings, pharmaceuticals and biotechnology industries. The average growth rates experienced by these industries over the past five-year business cycle forms the base for Grace's assumed product line growth rates over the projection period.

## C.   INVESTMENT ASSUMPTIONS

The rate of growth of Grace's sales over the past five years has been influenced by a relatively steady and consistent level of sales from the acquisition of businesses and new products that complement existing product offerings or expand geographic presence.  These acquisitions and new products have generally been synergistic by way of leveraging infrastructure, better utilizing sales channels, and accessing new markets with current products.  The Financial Information assumes a continuation of this growth strategy through targeted acquisitions, self-constructed added capacity and new product commercialization similar to that which Grace has pursued in the past several years.

## D.   COST INFLATION AND PRODUCTIVITY

Inflation is projected to average approximately 2% to 3% globally over the projection period based on economic indicators from independent sources. The general increase in costs caused by inflation is assumed to be offset by a combination of sales from new product offerings and productivity improvements from Six Sigma and other cost reduction and efficiency programs, resulting in gross product margins that are consistent over the projection period with those achieved on average by Grace over the past five years.  Selling and research and development expenses are projected to increase at rates generally above that of average inflation, reflecting investments in programs that are designed to achieve projected sales growth.  General and administrative expenses are also expected to increase at an above-average inflation rate reflecting historical trends in these expenses, which includes items like insurance, pensions and professional services.

## E.   FOREIGN CURRENCY EXCHANGE RATES

Foreign currency exchange rates are assumed to remain consistent with those in effect at September 30, 2004.

## F.   DEPRECIATION AND AMORTIZATION

Depreciation is projected in two components.  Current base depreciation is reduced by about 2% annually through the projection period.  Depreciation on new capital investments, including a portion from investments in acquired businesses, is projected using an average 10-year depreciable life. Amortization of identifiable intangible assets acquired in business combinations is also assumed to be over an average 10-year economic life.

## G.   INTEREST EXPENSE AND INTEREST INCOME

The Financial Information assumes an effective interest rate of 7% on both average debt outstanding over the projection period and on Reinstated Liabilities

9

with actual or estimated fixed and determinable payment dates. Interest expense is offset by interest income on the outstanding cash balance at an investment earnings rate of 3%.

### H.   CHAPTER 11 EXPENSES AND CHARGES

Chapter 11 expenses are projected in 2004 only and reflect an estimate based on past experience and level of activity. This line item also includes the added accruals for asbestos-related claims, environmental claims and other costs necessary to adjust Grace's consolidated balance sheet to reflect liability estimates under the proposed definitions of allowed claims in the Plan. Certain of these costs, such as emergence fees and financing fees, are only payable and accountable when incurred. The liability estimates in the Plan are subject to challenge both in definition and in measurement. Accordingly, Grace will adjust its recorded liabilities for such matters when definitional and measurement uncertainties are resolved by the Bankruptcy Court.

### I.   INCOME TAXES

Income tax expense is calculated at an effective global rate of 35% based on Grace's assumed split of taxable income and interest on debt of approximately 50% in the United States and 50% in the rest of the world.

## V.   SIGNIFICANT ACCOUNTING MATTERS AND ASSUMPTIONS

### A.   ACCOUNTING POLICIES

Refer to Grace's Form 10K/A for the year ended December 31, 2003 incorporated herein by reference.

### B.   CASH AND CASH EQUIVALENTS

Grace will retain a minimum of approximately $250 million in cash for ongoing business liquidity. A revolving credit facility is assumed to fund, if necessary, working capital and other operating cash requirements that fluctuate with time. For these purposes, access to approximately $200 million in revolving line-of-credit borrowings is assumed to be established as of the effective date. No borrowings under the line of credit facility are assumed during the projection period.

### C.   WORKING CAPITAL

The projections reflect an annual increase in inventories, accounts receivables and accounts payable consistent with the increase in sales. The projections assume a slight lowering of the accounts receivable days sales outstanding with inventory days on hand and accounts payable days outstanding remaining relatively stable.

### D.   PROPERTIES AND EQUIPMENT, NET

Capital expenditures, including an allocation of assets acquired in business combinations, are assumed to equal annual depreciation over the projection period.

10

### E.   NET CASH VALUE OF COMPANY OWNED LIFE INSURANCE ("COLI")

The Financial Information assumes a $22 million conversion of net cash value to cash in the early part of 2005 reflecting a settlement with the Internal Revenue Service that would initiate the termination of Grace's broad-based COLI policies. This termination of COLI policies will also result in a tax gain and the utilization of approximately $59 million of Grace's net operating loss carryforwards for federal income tax purposes. The remaining COLI policies are assumed to increase in cash value at approximately 9% annually, consistent with policy terms and past experience.

### F.   ASBESTOS-RELATED INSURANCE

Grace is entitled to a partial cash reimbursement under existing product liability insurance policies with respect to the cost of its asbestos-related lawsuits and claims. Insurance reimbursements are collectible as the liabilities are satisfied by the asbestos trust. The asbestos-related insurance asset represents the estimated nominal value of amounts expected to be received from solvent carriers under relevant insurance policies, based on the assumed funding levels required for the asbestos trust. The amount also approximates the net present value of future insurance recoveries based on an assumed actuarial profile of future trust payouts.

### G.   DEBT

Short-term debt represents borrowings under various lines of credit and other miscellaneous borrowings that are assumed to be satisfied shortly after the effective date. Long-term debt assumes an initial $800 million borrowing to fund the Plan **including the replacement of all undrawn letters of credit including letters of credit outstanding under the pre-petition facilities**. The debt facility is assumed to bear interest at an average of 7% annually. It is assumed that the outstanding balance is retired as cash in excess of minimum working capital needs becomes available and from proceeds under asbestos-related insurance policies.

### H.   PENSION LIABILITIES

The underfunded defined benefit pension liability represents the net present value of the difference between the fair value of pension trust assets and the accumulated benefit obligation of the related pension plans. The projections assume that, except for 2004 where pension plan payments are governed by the Bankruptcy Court, annual pension expense, including the amortization of accumulated experience losses, will be funded in the same year as expensed.

### I.   LIABILITIES SUBJECT TO COMPROMISE THAT ARE REINSTATED

Liabilities subject to compromise will be discharged at the effective date of the Plan except for the following non-asbestos liabilities that will be reinstated and satisfied in the normal course of business:

- Capital lease obligations of approximately $3 million are assumed to be satisfied under contractual terms.

11

- Reserves for environmental remediation of approximately $115 million ~~as of September 30, 2004 and $107 million as of December 31, 2004~~ are assumed to be funded based on agreements or settlements with relevant governmental agencies and property owners.
- Post-retirement health and pension benefits of approximately $186 million are assumed to be funded as benefit obligations are due under the terms of such arrangements.
- Reserves for litigation and contracts of approximately $~~57~~**41** million are assumed to be funded under stated and/or negotiated terms and settlements.
- Reserves for tax and other pass-through contingencies of approximately $~~147~~**150** million are assumed to be funded as settlements are reached.

## J.  INCOME TAXES

It is expected that Grace will receive federal and state income tax deductions in the amount equal to the cash and securities transferred to fund asbestos-related and other tax-deductible liabilities. These income tax deductions will result in net operating loss carryforwards ("NOLs") for federal income tax purposes. It is assumed that deferred tax liabilities related to core operations will be reduced over time but will be replaced with an equal amount of originating temporary differences. For purposes of the Financial Information, it is assumed that all tax benefits are available upon the effective date, that no valuation allowance is necessary and that no restrictions on NOL utilization will apply. However, the realization of the tax benefits of NOL carryforwards depends on the amount and timing of future U.S. taxable income and the avoidance of limitation events. These projections assume that sufficient U.S. taxable income will be generated to utilize recorded tax benefits before they expire. It is further assumed that the structuring of the new debt facility will involve the recognition of significant taxable dividends from Grace's foreign subsidiaries. Depending on the timing of such dividends, it is possible that they would have the effect of exhausting some or all of Grace's NOLs and thereby limiting the financial benefit. This Financial Information assumes that the timing and structure of the Plan will be sufficiently flexible to avoid this effect on Grace's NOLs. In particular, it is assumed that foreign tax credits and/or cash repatriation incentives under the American Jobs Creation Act of 2004, rather than NOLs, will be available to offset such income thereby preserving NOLs to offset future taxable income.

## K.  STOCK OPTIONS

Grace has granted stock options that upon exercise would add 8.2 million shares to those outstanding and $103 million in conversion proceeds. For purposes of these projections, ~~6.4~~**6.8** million of options are assumed to be exercised at the effective date, generating $~~68~~**75** million in conversion proceeds. Also, the Financial Information assumes that Grace will replace cash-based long-term incentive compensation arrangements with a stock-based plan that will be accounted for as expense at the time of grant.

12

### L.    *WARRANTS*

Under the Plan, Grace will issue warrants to the asbestos trust that are exchangeable into voting common stock for a penny-a-share to fund, if necessary, required payments under the trust arrangements for asymptomatic asbestos claimants. The number of warrants will be equal to (when combined with the initial payment of common stock to the asbestos trust) 50.1% of the value of Grace's equity capital at the effective date after all other dilutive and issued common shares are considered. Warrants will be assumed exchanged, and therefore dilutive for earnings per share calculations, at the time trust liabilities are determined to be probable and estimable. The Financial Information assumes that the net present value of the allowed amount for qualified asymptomatic asbestos personal injury claims is $130 million at the effective date. This amount, and any required funding in excess of this amount, will be satisfied with Grace common stock through the exercise of warrants as claims are paid by the asbestos trust.

### M.    *COMMON STOCK*

Under the Plan, Grace will issue common stock to partially satisfy certain claims and liabilities. For purposes of this Financial Information, such common stock is assumed to be valued at approximately $~~16~~17 per share at the effective date based on the mid-point of the fully -diluted reorganized equity value per share range included as part of the Plan of Reorganization, increasing annually by 6%.

13