UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No.  01-01139
                                .
  W. R. GRACE & CO., et al,     .
                                . 5414 USX Tower Building
                 Debtors,  . Pittsburgh, PA 15222
                                . December 20, 2004
. . . . . . . . . . . . . . . . 12:09 p.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              Kirkland & Ellis LLP
                             By:  JANET S. BAER, ESQ.
                             200 Randolph Drive
                             Chicago, IL 60601


For the Debtor:              Pachulski, Stang, Ziehl, Young,
                                 Jones & Weintraub, P.C.
                             By:  DAVID W. CARICKHOFF, ESQ.
                             919 N. Market St., 16th Floor
                             P. O. Box 8705
                             Wilmington, DE 19899-8705


For the Official Committee   Kramer Levin Naftalis & Frankel
of Equity Security Holders:     LLP
                             By:  PHILIP BENTLEY, ESQ.
                             919 Third Avenue
                             New York, NY 10022


Audio Operator:              Janet Kozloski

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-Mail:  jjcourt@optonline.net**
**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCE CONT'D:


For Scotts:                         Vorys, Sater, Seymour & Pease,
                                        LLP
                                    By:  ROBERT J. SIDMAN, ESQ.
                                         TIFFANY S. COBB, ESQ.
                                    52 E. Gay Street
                                    Columbus, OH 43216-1008


For Simmons Cooper                  Simmons Cooper, LLC
Claimants:                              By:  ROBERT PHILLIPS, ESQ.
                                    East Alton, IL


For Lanier Claimants:               The Lanier Law Firm, PC
                                    By:  PATRICK HAINES, ESQ.
                                    6810 FM 1960 West
                                    Houston, TX 77069


For Sealed Air:                     Skadden Arps Slate Meagher &
                                        Flom, LLP
                                    By:  DAVID R. HURST, ESQ.
                                    One Rodney Square
                                    Wilmington, DE 19801


For the BPA:                        U.S. Department of Justice
                                    By:  MATTHEW TROY, ESQ.
                                    Washington, DC


For the EPA, DOI, NOAA:             U.S. Department of Justice
                                    By:  ALAN TENEBAUM, ESQ.
                                    Washington, DC


For Unofficial Committee:           Montgomery McCracken Walker &
                                        Rhoads, LLP
                                    By:  NATALIE RAMSEY, ESQ.
                                    300 Delaware Ave., Ste. 750
                                    Wilmington, DE 19801


For Select Asbestos                 Bilzin Sumberg Baena Price &
Claimants & PD Committee:               Axelrod, LLP
                                    By:  SCOTT L. BAENA, ESQ.
                                         JAY M. SAKALO, ESQ.
                                    200 S. Biscayne Blvd., Ste. 2500
                                    Miami, FL 33131-5340

APPEARANCES CONT'D:

| | |
|---|---|
| For the Official Committee: | Stroock, Stroock & Lavan, LLP<br>By:  LEWIS KRUGER, ESQ.<br>        KENNETH PASQUALE, ESQ.<br>180 Maiden Lane<br>New York, NY 10038-4982 |
| For ACC: | Campbell & Levine<br>By:  MARLA R. ESKIN, ESQ.<br>800 N. Kings St., Ste. 300<br>Wilmington, DE 19801 |
| For the Futures<br>Representative: | Swidler Berlin Shereff Friedman,<br>        LLP<br>By:  RICHARD H. WYRON, ESQ.<br>3000 K Street, N.W., Suite 300<br>Washington, D.C. 20007 |
| | Caplin & Drysdale<br>By:  PETER VAN N. LOCKWOOD, ESQ.<br>One Thomas Circle, N.W.<br>Washington, DC 10005 |
| Local Counsel for ZAI<br>Claimants: | TIMOTHY PALMER, ESQ. |
| For John& Judith Webber,<br>the Simmons and Cooper<br>Claimants and the Lanier<br>Law Firm Claimants | Fox Rothschild LLP<br>By:  BERNARD G. CONAWAY, ESQ.<br>Citizens Bank Center<br>919 N. Market St., Ste. 1300<br>Wilmington, DE 19899-2323 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For Grace Shareholders: | KR Capital Advisors<br>By:  DAVID PINCUS |
| For Spaulding & Slye: | Bernkopf Goodman LLP<br>By:  BRUCE LEVIN, ESQ.<br>125 Summer Street<br>Boston, MA 02110-1621 |
| For David Austern & Future<br>  Claimants: | Phillips Goldman & Spence<br>By:  JOHN C. PHILLIPS, JR., ESQ.<br>1200 N. Broom Street<br>Wilmington, DE 19806 |

TELEPHONIC APPEARANCES CONT'D:

For Allstate:                    Cuyler Burk, LLP
                                 By: STEFANO CALOGERO, ESQ.
                                 Parsippany Corporate Center
                                 Four Century Drive
                                 Parsippany, NJ 07054-4663

For Century Indemnity:           White & Williams LLP
                                 By:  LINDA M. CARMICHAEL, ESQ.
                                 824 North Market Street
                                 Wilmington, DE 19801-4938

For Mt. McKinley Insurance       Crowell & Moring LLP
Company:                         By:  LESLIE A. EPLEY, ESQ.
                                 1001 Pennsylvania Avenue, N.W.
                                 Washington, DC 20004-2595

For Federal Ins. Co.,            Zeichner Ellman & Krause LLP
American International            By:  MICHAEL S. DAVIS, ESQ.
Underwriters Co., American        575 Lexington Avenue
Home Assurance Co.,              New York, NY 10022
Birmingham Fire Ins. Co of
Pennsylvania, Granite State
Ins. Co., Ins. Co. of the
State of Pennsylvania,
Lexington Ins. Co., National
Union Fire Ins. Co. of
Pittsburgh, PA:

For ZAI Claimants:               Richardson, Patrick, Westbrook &
                                     Brickman, LLC
                                 By:  EDWARD J. WESTBROOK, ESQ.
                                 127 East Bay Street
                                 Charleston, SC 29401

For ZAI Claimants:               WILLIAM SULLIVAN, ESQ.

For Maryland Casualty:           Connolly Bove Lodge & Hutz LLP
                                 By:  JEFFERY C. WISLER, ESQ.
                                 The Nemours Building
                                 1007 North Orange Street
                                 Wilmington, DE 19801

For the State of MT:             Monzack & Monaco, P.A.
                                 By:  FRANK A. MONACO, ESQ.
                                 1201 North Orange Street
                                 Suite 400
                                 P.O. Box 2031
                                 Wilmington, DE 19899-2031

TELEPHONIC APPEARANCES CONT'D:

For the PD Committee:          Ferry, Joseph & Pearce, P.A.
                               By:  THEODORE J. TACCONELLI, ESQ.
                               824 Market Street, Suite 904
                               P.O. Box 1351
                               Wilmington, DE 19899

Co-counsel for the Official    Duane Morris LLP
Committee of Unsecured         By:  MICHAEL R. LASTOWSKI, ESQ.
Creditors:                     1100 North Market Street
                               Suite 1200
                               Wilmington, DE 19801-1246

For London Market Insurers:    Linklaters
                               By:  BRENDA DiLUIGI, ESQ.
                               New York, NY

                               DARRELL SCOTT, ESQ.

                               Landis Roth & Cobb LLP
                               By:  KERRI K. MUMFORD, ESQ.
                                    JAMES S. GREEN, JR., ESQ.
                                    CHRIS CANNON, ESQ.
                               919 Market Street, Suite 500
                               Wilmington, DE 19801

                               Cozen O'Connor, P.C.
                               By:  SHELLEY A. KINSELLA, ESQ.
                               Chase Manhattan Centre
                               1201 North Market Street
                               Suite 1400
                               Wilmington, DE 19801

                               Fee Auditor
                               WARREN SMITH

1          THE COURT:  This is the matter of W. R. Grace,

2  bankruptcy number 01-1139.

3          MS. BAER:  Good morning, Your Honor.  Janet Baer on

4  behalf of W. R. Grace.

5          THE COURT:  Good morning.  Go ahead, Ms. Baer.

6          MS. BAER:  Your Honor, agenda item number one is the

7  application of Deloitte Touche LLP to provide tax services to

8  the debtor.  A certificate of no objection was filed, your

9  Honor, and we'd ask for entry of that order.

10          THE COURT:  I instructed my staff to enter those

11  orders last week, Ms. Baer.  I apologize.  I haven't had a

12  chance to check the docket so I'm not sure whether they have

13  actually been entered or not.

14          MS. BAER:  We have not seen them on the docket, Your

15  Honor.

16          THE COURT:  Okay.  It should be entered.

17          MS. BAER:  Thank you.  Your Honor, item number two,

18  the application of David Austern to appoint Tillinghast as

19  actuarial consultant, a certificate of no objection was also

20  filed on that.

21          THE COURT:  Same ruling.

22          MS. BAER:  Your Honor, item number three is the

23  application of the Official Committee of Equity Security

24  Holders for an order appointing Lexecon as its asbestos claims

25  consultant.  Your Honor, the debtor does not object to this

1 application but there are other objections, and I'll turn the

2 podium over to the futures -- or, the Official Committee's

3 representative.

4          THE COURT:  Good morning.

5          MR. BENTLEY:  Good morning, Your Honor.  Philip

6 Bentley of Kramer Levin for the Equity Committee.  I'm hear,

7 Your Honor, on the application to retain Lexecon LLC as our

8 asbestos claims consultant.  As the Court may be aware, Lexecon

9 is a distinguished consulting firm that has extensive

10 experience in doing sophisticated economic and statistical

11 analysis in a variety of fields, including the field of

12 asbestos claims estimation.

13          As Ms. Baer mentioned, the debtor does not object.

14 Indeed, we understand the debtor supports this application.  We

15 understand the U.S. Trustee also does not object.  Two

16 objections, though, have been filed to the application by the

17 PI Committee and the PD Committee, and I'd like to address

18 those, Your Honor.

19          The basis for the objection that's been stated, Your

20 Honor, is that the debtor has filed a plan that preserves most

21 of the value for the equity.  And indeed, Your Honor, as you'll

22 hear from Ms. Baer later today, that is a plan that we very

23 much support, and we expect to be co-proponents of that plan,

24 as we understand the Commercial Committee expects as well.  The

25 fact, though, Your Honor, that we support the debtor's plan we

1  submit is no reason whatsoever that we should not have the

2  right to be adequately advised by an expert asbestos claims

3  consultant, no more than it would be a reason to deprive the

4  Commercial Committee of the right to have such an expert, and

5  Your Honor may be aware they have had such an expert throughout

6  the case, as well as a financial advisor.  If anything, Your

7  Honor, if there is a fulcrum security in this case, a security

8  whose recovery is most in dispute, it would be us, the equity.

9  The Court may be aware that the market is giving very

10 substantial value to the equity, and the debtor's plan gives

11 very substantial value to the equity.  But the asbestos

12 plaintiffs' lawyers of course dispute that and think the equity

13 should be entitled to nothing.

14         We have a security that this case is going to be

15 about, Your Honor, and that, as Your Honor very well aware is,

16 is different from the usual case in an asbestos bankruptcy.

17 It's not uncommon for the equity to get nothing.  But in this

18 case we are the -- we are the security that the fight is all

19 about.

20         Now, are the debtor's interests aligned with our in

21 many respects?  No doubt, Your Honor.  They at present are

22 fighting the same fight that we would like to fight and the

23 same type that the Commercial Committee will be joining them

24 on.  But that doesn't mean, your Honor, that the debtor doesn't

25 have the duties to other constituencies.  The reason the U.S.

1 Trustee appointed us an Official Committee in this case is

2 precisely because the debtor is required to balance its duties

3 to the equity with its duties to creditors, its duties to

4 employees, and perhaps other constituencies as well.

5 We've been very focused throughout this case, Your

6 Honor, in minimizing expense, and we will continue to minimize

7 expense, but we think that now that the activity in the case

8 has gotten much more substantial than it had been, and now that

9 Your Honor has made very clear that this case will be moving

10 forward toward confirmation of a plan, either the debtor's

11 plan, as we hope, or some other plan, it's critical that we

12 have an expert asbestos estimation expert to advise us in a

13 number of different contexts, Your Honor.

14 In the first place, Your Honor may recall we were --

15 we were here before Your Honor in late October, after the

16 debtor had had intensive and last-minute negotiations with the

17 plaintiffs that almost resulted in an agreement between the

18 debtor and the plaintiffs on a plan of reorganization.  Your

19 Honor will recall I was here and advised you -- and advised the

20 Court that we had not been invited to participate in those

21 negotiations, and I said then and repeat now, we don't fault

22 the debtor for not having brought us into the negotiations

23 because nobody expected that at the last minute the plaintiffs

24 were going to come forward and have very serious talks that

25 might lead to a plan.  But, as I said back in late October, we

1  very much want to be part of the negotiations going forward,

2  and I believe Your Honor indicated that you think that's

3  appropriate, and we intend to be part of the negotiations.

4          Now, in order to meaningfully participate in

5  negotiations, your Honor, we obviously need to get fully up to

6  speed on the issues, and that's why we retained Lexecon,

7  because we need that expertise, so that we can understand the

8  issues and understand -- and be able to make our own

9  determination whether we agree with the debtor's judgment as to

10 whether a plan that's been proposed is acceptable or not.  Your

11 Honor will recall we almost came to a spot two months ago where

12 the debtor might have supported a plant that we were not nearly

13 as comfortable with.  If that were to happen, Your Honor, then

14 we have another context where we would critically need our own

15 estimation adviser, and that would be if the debtor and the

16 plaintiffs were to reach a settlement that we didn't support.

17 Then we would need to set forward and engage in vary

18 substantial litigation, and we'd need to be prepared to do

19 that.

20         So for all of those reasons, Your Honor, we submit

21 there shouldn't be a serious dispute as to our entitlement to

22 retain an asbestos estimation advisor.  We submit that Lexecon

23 is a very appropriate party to assist us in that regard, and

24 one that we believe could be very helpful to the Court down the

25 road if this matter ultimately gets litigated before Your

1 Honor.  If Your Honor has no questions, that's all I have.

2            THE COURT:  All right.  Thank you.  Mr. Lockwood?

3            MR. LOCKWOOD:  Good morning, Your Honor.  The issue

4 here we submit is mostly a matter of timing and in connection

5 with contingencies.  This motion was originally brought on by

6 the Equity Committee on the urgent need for them to review some

7 purported proposed settlement between the asbestos and the

8 debtor that was going to resolve matters in a way that might be

9 adverse to equity.  Putting aside whether or not they "almost"

10 succeeded, for the moment, the fact is that they didn't and

11 that what we've now got on the table is a plan by which the

12 debtors intend, as you will hear in more detail later this

13 morning, to cram down a plan on the asbestos interests,

14 property damage, personal injury, future, without even giving

15 them a vote.  And this is part of the debtor's, to quote

16 counsel's performance of their duty to other creditors.

17            Frankly, I think it's pretty clear here that the

18 debtors have consistently regarded their duties in this case as

19 extending to -- only to their equity holders.  They've

20 consistently taken the position that this bankruptcy case is a

21 vehicle not for a consensual plan but to litigate their way out

22 of their asbestos liabilities, PI and PD.  They're plan that

23 they've now drafted and the associated motions that go with it

24 are instrumental in attempting to accomplish just exactly that

25 sort of litigated end.  And the idea that equity is somehow or

1 another is desperately needing to preserve its own interests by

2 piling yet another set of experts on the table is, shall I say,

3 at least premature.

4 　　　　Having said that, I have to acknowledge that one of

5 the things that the debtors have put on the table is a proposed

6 estimation.  And depending on how the Court ultimately -- or,

7 Courts, because I guess Judge Buckwalter is going to be

8 involved in this in some way, decide to proceed forward on that

9 estimation, and depending on how this Court envisages the

10 debtor sort of taking the lead, there may or may not be a role

11 for equity to have an expert who presumably is going to be

12 doing exactly the same thing as the debtor's expert, which is

13 attempting to estimate the asbestos viabilities, property

14 damage and personal injury, at the lowest possible number.  So

15 essentially what you're going to have is doubling up of experts

16 that -- for that purpose.  The idea that somehow or another the

17 Equity Committee needs some expert to come in here and kind of

18 do something that the debtor's not planning on doing, i.e.,

19 coming in with a low-ball asbestos numbers, is a bit

20 incredible.

21 　　　　But again, I guess my view on all of this is that at

22 the bottom line this motion is probably premature and it ought

23 to -- the Court's decision on this ought to abide the

24 determination of where we're going with estimation and what

25 role the Equity Committee is going to have as a litigant, if

1 you will, in that procedure vis a vis what role the debtor is

2 going to have in that.  So that's our view on the subject, Your

3 Honor.  Thank you.

4          THE COURT:  All right.  Mr. Baena?

5          MR. BAENA:  I'd only be duplicating the argument,

6 Your Honor.

7          THE COURT:  Well, I am a little confused, since there

8 is no settlement on the table and we're not close I think yet

9 to determining where and how the estimation process is actually

10 going to take place, as to why the Equity Committee needs an

11 expert now.  I'm not sure that the interests of equity and the

12 debtor or not aligned in this issue of the estimation.  It may

13 turn out they're not, and what I'm not clear about is is that

14 what you're trying to determine, meaning do you have had access

15 to the debtor's information, is there something about it that

16 you challenge?

17          MR. BENTLEY:  Does this microphone work, Your Honor?

18          THE COURT:  Yes.

19          MR. BENTLEY:  Yes.  Okay.  Your Honor, the reason

20 what crystallized in our minds the need for an expert now was

21 what happened in late October, and that was with no expectation

22 on anybody's part, I think that it -- that this would happen

23 the debtors apparently came extremely close to a settlement

24 with the tort claimants.

25          THE COURT:  Well, if that's the case, why are we

1   here, why are we not back before a mediator and why aren't you

2   banging each other's heads together until one is actually

3   negotiated?  That would be a whole lot more productive.

4            MR. BENTLEY:  Well, from our standpoint, Your Honor,

5   we -- as I said in late October, we were concerned about the

6   substance of the settlement.  The debtor did share with us

7   exactly where they were with the plaintiffs.  We were very

8   concerned, and we concluded that it was critical that we get

9   fully up to speed, and therefore we did go out, we retained

10  Lexecon.  They have -- Lexecon has had access to the debtor's

11  claims database.  They have been analyzing that, and the

12  objective, Your Honor, is that we can fully understand all the

13  issues, that we can appreciate the reasons the debtors would

14  have to settle, and make our own evaluation, because as the

15  Court knows, our conclusion could be different than the

16  debtor's, legitimately so.  And there simply would not have

17  been enough time had the debtors wanted to wrap up that

18  negotiation back in October for us to run out and do the

19  analysis.

20            It's not an analysis that can be done in two weeks,

21  Your Honor.  We've been working on it now.  We've made a lot hf

22  headway, and the debtor has been very helpful in helping us get

23  up to speed.  But we simply could not -- the equity would have

24  to be part for a settlement to be meaningful and to enable the

25  Court to get this case out of bankruptcy.  The settlement would

1  have to include the equity.  But for that to happen we need to

2  be up to speed in advance, Your Honor.

3           THE COURT:  Okay.  Well, so you want to -- you're

4  really looking at this as an estimation issue, not as a voting

5  on the plan issue?  Because I'm frankly a little bit confused

6  about the debtor's structure for this plan that's going to cram

7  down information against unsecured creditors but still devolve

8  something to equity.  I'm a little confused as to how that all

9  is going to work.  But so you're not looking at this as

10  confirmation, you're looking at this as estimation for the --

11           MR. BENTLEY:  We're looking at it from a variety of

12  standpoints, Your Honor.  As I said, one critical standpoint is

13  settlement, that is, there could be settlement talks at any

14  time.  Beyond that, though, estimation is a critical part of

15  this, Your Honor.  We don't expect that -- as Your Honor knows,

16  there's not a vote in support of -- there's not a vote on the

17  plan by the plaintiffs, so this will have to be resolved by the

18  Court looking at the claims and making a ruling on the merits.

19           THE COURT:  Wait, say that again?  There is not a

20  vote?

21           MR. BENTLEY:  The debtor's plan does not provide for

22  a vote by the plaintiffs, as Your Honor --

23           THE COURT:  I understand that.

24           MR. BENTLEY:  -- as Your Honor indicated, and

25  therefore we do expect Your Honor will have to look at the

1   merits of the claims, and we would think that if we were to go

2   in the litigation direction rather than the settlement

3   direction we think it's critical that in either scenario we be

4   prepared and we have a chance to participate meaningfully.  Mr.

5   Lockwood said, well, gee, the equity would simply be saying the

6   same thing as the debtor.  Well, we'd be saying the same thing

7   in once sense, but it's the same respect in which the Credit

8   Committee would be saying the same thing.

9          THE COURT:  Well, you may have a different -- your

10  expert may have a different valuation possibly.  I mean,

11  experts tend to have different numbers because they think

12  that's what they're paid to do, even if they might like

13  somebody else's number it'll be a little different or the

14  analysis will be, because otherwise why hire them?  So to that

15  extent I don't know whether there's duplication or not.  To the

16  extent that they're actually taking a fresh look at this on

17  behalf of an Equity Committee, you know, their marching orders

18  will be somewhat different probably from the debtor's, and

19  likely is that they would come up with a different set of

20  numbers.  But whether or not it's a meaningfully different set

21  of numbers so that you can't support a settlement is a

22  different issue.  Hopefully these experts are getting you

23  towards settlement, not away from settlement.

24          MR. BENTLEY:  We're hopeful of that, Your Honor.

25          THE COURT:  All right.  Does Lexecon have a budget?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BENTLEY:  We have not asked them to provide a

2 budget yet.  We can, Your Honor.

3          THE COURT:  I'd like a budget.

4          MR. BENTLEY:  Okay.  We'll come up with --

5          THE COURT:  Because I think part of this and whether

6 or not it's premature is going to be driven by how much this is

7 going to cost the estate, and I just don't know at this point,

8 since we're pretty far from estimation, and I'm not aware of

9 settlement talks.  Am I the last to know?

10          MS. BAER:  Your Honor, with respect to the Asbestos

11 Committees there has been no substantial progress since last we

12 were here.  With respect to equity and the unsecured, we do

13 have in fact a joint Chapter 11 plan we're about to prepare and

14 file.

15          MR. LOCKWOOD:  Those sort of settlement talks, Your

16 Honor, can best be characterized by the old phrase about

17 kissing your sister.

18          THE COURT:  Well, the issue, though, is if you're

19 actually going to have a settlement with the Equity Committee

20 do you need a separate estimation issue?  I mean, if you're

21 going to be co-proponents aren't you going to use the same

22 experts?

23          MS. BAER:  Your Honor, for example, we actually had

24 meetings last week with equity and with the unsecureds to go

25 through with them what we believe are the appropriate ways to

1  approach estimation, what we believe the claims are and the

2  like with the idea that they become educated with us and they

3  needed their own experts to review our information to see

4  whether or not they were on the same page.  So already they

5  have actually had their experts involved and needed that help.

6        THE COURT:  Is this new plan going to have a 524(g)

7  injunction in it?

8        MS. BAER:  Yes, Your Honor.  The only change is in

9  the plan, the joint plan that we would anticipate filing very

10 shortly, is some changes in details vis a vis interest rates

11 and the like.  It is still base -- the same basic structure of

12 the plan that was filed in November.

13        THE COURT:  When is the disclosure statement coming

14 up?

15        MS. BAER:  Your Honor, the disclosure statement

16 hearing is set for January 21st, but as part of the protocol we

17 filed last week we're actually asking for that to be continued

18 for 60 days so we can concentrate on estimation and case

19 management, and also are going to be asking to add to the

20 estimation a potential ZAI bar date.  That's what we'd like to

21 take up at the end of January.

22        THE COURT:  Okay.  Well, just on the issue of the

23 disclosure statement for my education for a moment, how is the

24 debtor going to cram down a plan, get a 524(g) injunction and

25 still meet the 75 percent voting requirement?

1          MS. BAER:  Well, Your Honor, we don't believe that if

2  the asbestos creditors are unimpaired they need to vote.  We

3  will in effect have an unimpaired class who would be entitled

4  to -- and we would be entitled to the 524(g) injunction.  Your

5  Honor, it all comes back to, and the key is, estimation and

6  estimating the claims of what we believe is appropriate.  And

7  if it's estimated the way we believe it's appropriate we can

8  then in fact pay them in full and they are unimpaired.

9          THE COURT:  Well --

10          MR. LOCKWOOD:  Your Honor, we're going to be

11 addressing this issue when we get to the protocol.  I mean, for

12 present purposes suffice it to say that the asbestos PI and I

13 believe PD view the debtor's plan as, A, ludicrous, and B, dead

14 on arrival for the reasons that Your Honor just stated.  But

15 probably we ought to get to the protocol issue and deal with

16 that rather than --

17          THE COURT:  Yes --

18          MR. LOCKWOOD:  -- do it in connection with Lexecon.

19          THE COURT:  I agree with that.  I just simply wanted

20 to know for my own purposes how that was going to happen, but I

21 see what it is.  It's 75 percent of those voting in favor of

22 the plan, that's what the debtor is talking about.  All right.

23          MR. LOCKWOOD:  No, that's not what the debtor's

24 talking about because there's zero voting in favor of the plan.

25          THE COURT:  Well, you don't need to vote if you're

1  unimpaired.

2          MR. LOCKWOOD:  Under --

3          THE COURT:  That's what the --

4          MR. LOCKWOOD:  You're right.

5          THE COURT:  -- that's what the debtor is looking at.

6          MR. LOCKWOOD:  That's -- they're looking at 1126 --

7          THE COURT:  Yes.

8          MR. LOCKWOOD:  -- not 524.

9          THE COURT:  Okay.  Anyway, back to this.  It seems to

10 me that to the extent that what the Equity Committee does is

11 wants an opportunity to make sure that its support of the plan

12 is appropriate for its own constituency.  This is probably

13 appropriate, but it has to be within reasonable limits, because

14 I am not seeing how the debtor and the Equity Committee's

15 interests are at such a variance that the Equity Committee

16 needs its own expert for this estimation purpose.  I may be

17 convinced otherwise if your expert comes in and says the

18 debtor's experts did this, this, this and this wrong and

19 therefore we need to redo the information, but if they're

20 basically going to say, yes, the analysis is appropriate, and

21 you simply need an opportunity to say, yes, we agree, or no, we

22 don't, at least for that limited purpose I'm provided to permit

23 the Committee to retain an expert right now.  Whether you need

24 one after that I'm not convinced yet.

25          MR. BENTLEY:  Understood, Your Honor.  Our objective

1 is to work as closely with the debtor as possible to avoid

2 duplication and to be quite reasonable and efficient, as I

3 believe we have been in this case with all of our fees.  We've

4 never had any objections to our fees in this case, Your Honor.

5          THE COURT:  All right.  I will take an order on a

6 certification of counsel, but I want a budget attached to it,

7 and I reserve the right to determine when I see it, because I

8 haven't, whether the budget is or isn't reasonable.  If I think

9 it isn't then I'll simply contact debtor's counsel and tell you

10 to put it back on the agenda for the next one.  Otherwise

11 you'll get an order on the certification of counsel.

12          A SPEAKER:  Thank you --

13          THE COURT:  That will approve it for the limited

14 purpose of at least analyzing for settlement purposes and for

15 joinder in the plan negotiation process, whether the Equity

16 Committee will support the debtor's expert or whether you need

17 to go further.  So I'll approve it for that limited purpose for

18 now.

19          MS. BAER:  Thank you, Your Honor.  Your Honor, that

20 moves us to agenda item number four, which is the motion of the

21 ZAI claimants to modify orders with regard to certain quarterly

22 fee applications.  No objections have been filed to that

23 motion.  I believe counsel is on the phone.

24          THE COURT:  Good afternoon.  Mr. Sullivan?

25          MR. SULLIVAN:  Yes.

1          THE COURT:  Are you -- do you wish to be heard on

2   item number four?  I think -- I believe that a CNO was filed

3   with respect to that, but very late.

4          MS. BAER:  I have not seen one, Your Honor, but I

5   think it's appropriate.  Again, there are no objections, so I

6   would then ask that the order be entered.

7          THE COURT:  Well, actually I think the indication was

8   that I was going to be getting an order in court.

9          MR. PALMER:  Good afternoon, Your Honor.  Timothy

10  Palmer on behalf of -- local counsel for ZAI claimants.  I have

11  an CNO right here.

12         THE COURT:  Has it been filed?

13         MR. PALMER:  I believe it was filed Friday --

14         THE COURT:  Friday.

15         MR. PALMER:  -- Your Honor.

16         THE COURT:  Yes.  Folks, you know, there is a case

17  management order.  There's a reason for the case management

18  order.  This is the last month in which I am considering

19  anything, even with late CNOs.  The debtor's instructed in the

20  future, don't send me these supplementals, I don't want them,

21  I'm not going to see them, automatically put them on the next

22  list.  If there's not an emergency I am not shortening time.  I

23  am not entering orders where late CNOs are filed, put them on

24  the next agenda.  We're going to get things in some fashion so

25  that I don't deal with all these supplemental matters that all

1 have come in in the last two days, including the package that

2 arrived this morning in another case.  So this is it, I'm not

3 doing it again.

4         MR. PALMER:  Understood.

5         THE COURT:  All right, Mr. Palmer.

6         MR. PALMER:  Thank you, Your Honor.

7         MR. SULLIVAN:  Your Honor?

8         THE COURT:  Yes.

9         MR. SULLIVAN:  I'm sorry.  This is Bill Sullivan.  I

10 was having a problem with my mute button.  I just want to alert

11 Your Honor that we did file one on December 6th, a CNO, and it

12 just wasn't picked up, and that's why we refiled it.  I

13 apologize for that --

14         THE COURT:  Okay.  All right.  Thank you --

15         MR. SULLIVAN:  -- for the confusion.

16         THE COURT:  I've signed the order as it's been

17 presented.  Thank you.

18         MR. SULLIVAN:  Thank you, Your Honor.

19         THE COURT:  Okay.  This order does not -- Mr. Palmer,

20 this order does not comply with my case management order.  Now,

21 folks, how old is this case and how long have case management

22 orders been in place?  In the --

23         MR. SULLIVAN:  Your Honor, this is -- this is Bill

24 Sullivan.  Mr. Palmer was just handed that order by my office,

25 so I'm the one who prepared it.

24

1          THE COURT:  All right, then, Mr. Sullivan, I'll yell

2   at you.  How long has this case management order been in place?

3          MR. SULLIVAN:  Several years, Your Honor.

4          THE COURT:  Okay.  Then in the future I am not going

5   to sign an order that doesn't literally comply with the case

6   management order.  What agenda number does this relate to?

7          MR. SULLIVAN:  6824, Your Honor.

8          THE COURT:  No, that's the docket index number.  This

9   is agenda number four on today's hearing list.  That's supposed

10  to be on here.  Please put it on in the future.

11         MR. SULLIVAN:  I'm sorry, Your Honor, I think this

12  was all filed before the agenda was created.  That's -- it was

13  filed back on the 6th.  That's why it wasn't on there.

14         THE COURT:  Well, the one I'm looking at was just

15  dated December 17th, so it couldn't have been filed on the 6th.

16         MR. SULLIVAN:  Well, what happened was because it

17  wasn't picked up by the debtors we went to refile it, and then

18  we realized that it was filed, and my paralegal left on

19  December 10th, and so there was a little confusion as to when

20  it was filed.

21         THE COURT:  Okay.  Mr. Sullivan, regardless, the

22  point is this.  In the future you're going to be redoing these

23  because I'm not taking them if they're not literally in

24  compliance with the case management order.  I've signed this

25  one, enough said.  Thank you.

1          MR. SULLIVAN:  Thank you, Your Honor.

2          MS. BAER:  Your Honor, agenda item number five is the

3   debtor's motion for entry of an order authorizing the

4   appointment of Raymond G. Thieme as our mediator for the

5   debtor's ADR program, and, Your Honor, we filed a certificate

6   of no objection on that matter.

7          THE COURT:  All right.  That order will be entered.

8          MS. BAER:  Your Honor, I have duplicates of all of

9   the orders where we filed certificates of no objection.  If

10  you'd like I can hand those up, or if you've already done so

11  then --

12         THE COURT:  I --

13         MS. BAER:  -- I don't want to confuse the record.

14         THE COURT:  That's the problem, since I was doing

15  this from home I don't know where they stand, Ms. Baer.  Maybe

16  at the end of the hearing you can give us orders.  If they

17  haven't been entered I can take them, but I believe they all

18  should be entered at some point in time today or tomorrow at

19  the latest.

20                         (Pause)

21         THE COURT:  It'll just make it confusing.

22                         (Pause)

23         THE COURT:  Yes.

24         MS. BAER:  Right.

25         THE COURT:  I think we'll be better off without

1  duplicate copies since I have instructed my staff to enter

2  them.

3         MS. BAER:  Okay.

4         THE COURT:  Okay?

5         MS. BAER:  Thank you, Your Honor.

6         THE COURT:  Thank you.

7         MS. BAER:  Your Honor, the next matter on the agenda,

8  item number six, was the debtor's motion with respect to the

9  KWELMBS settlement.  A couple of months ago you approved the

10 settlement, and the only issue is what happens with the

11 settlement proceeds.  Very recently the two objections were

12 withdrawn.  The futures representative and the Asbestos

13 Property Damage Committee both withdrew their objections.  As a

14 result I think this matter is now moot.  The money will come in

15 and simply go into the debtor's estate.

16        Your Honor, that moves us to --

17        THE COURT:  Wait.

18        MS. BAER:  I'm sorry.

19        THE COURT:  Okay.  Are you going to file something

20 that moots this or withdraws it or --

21        MS. BAER:  I can certainly do that.

22        THE COURT:  -- grants --

23        MS. BAER:  The motion was already granted.  The order

24 had a provision that provided it would be continued for this,

25 so I'll submit some sort of an order on a certificate of

1  counsel indicating that it's moot.

2          THE COURT:  All right.  Thank you.  Okay.

3          MS. BAER:  Your Honor, the next matter on your

4  agenda, actually the next two matters, the debtor's fourth and

5  fifth omnibus objections, there are no objections that are

6  going forward today and the matters that are continued to be

7  contested are going to be continued to the January 24th

8  hearing.

9          THE COURT:  All right.

10         MS. BAER:  I do have orders on those which you do not

11 have.

12                         (Pause)

13         THE COURT:  Thank you.  All right.  I've signed item

14 seven.  And I've signed the order on item eight.

15         MS. BAER:  Thank you, Your Honor.  With respect to

16 agenda item number one, this is the debtor's sixth omnibus

17 objection to claims.  Again, some matters are being continued

18 to January 24th.  One matter has been resolved with a

19 stipulation which is attached.

20         THE COURT:  Thank  you.  On item nine, this is -- I'm

21 signing that order as well.  Thank you.

22         MS. BAER:  And, Your Honor, and actually on item

23 number nine, that is the last claim that was outstanding on the

24 sixth omnibus, so that will no longer be on the agenda.

25         THE COURT:  Okay.  Thank you.

1          MS. BAER:  And, Your Honor, item number 10 is the

2    status on the debtor's objection to the Massachusetts

3    Department of Environmental Protection claim.  As you may

4    recall, Your Honor, this actually came up with respect to a

5    motion Massachusetts filed on a setoff matter.  Your Honor

6    directed us to immediately proceed to determine what might the

7    claim be that would set off.  We have done some discovery with

8    Massachusetts.  I believe we will ultimately be able to do a

9    stipulation with respect to the allowed amount of the unsecured

10   portion of the claim.  The other portions of the claim that

11   were filed were really not claims, they were more of a notice

12   to the Court of future potential claims as well as a notice to

13   the Court of potential administrative claims.  I would hope

14   that we can work out with Massachusetts a stipulation that

15   resolves the claim portion of this issue, and then we will get

16   back to the setoff issue which I would suggest we can put back

17   on the agenda so Your Honor can refresh your recollection and

18   we can figure out where do we go from here.

19         THE COURT: All right.  That's fine.  So it's just

20   continued for my purposes?

21         MS. BAER:  Yes, Your Honor.  And hopefully by the

22   January hearing we'll have a stipulation for you.

23         THE COURT:  All right.

24         MS. BAER:  Your Honor, agenda item number 11 was the

25   complaint of the Scotts Company.  This is the matter --

1  adversary proceeding with respect to shared insurance.  This is

2  actually being continued until the January hearing.  We are

3  discussing whether or not we can come to a stipulation on a

4  timing with respect to this matter.

5         THE COURT:  All right.

6         MS. BAER:  Your Honor, that takes us to agenda item

7  number 12, which is the Libby claimants' limited motion to

8  adjust an order vis a vis Montana Vermiculite Company.  The

9  debtor had no objections to that motion.

10        THE COURT:  Does anyone?  Did I get a CNO on this

11 one?

12        MS. BAER:  Your Honor, my information does show that

13 you got a CNO on November 19th.

14        THE COURT:  Okay.  That order will be entered, too,

15 then.   Thank you.

16        MS. BAER:  Your Honor, that takes us to agenda item

17 number 13, which is the joint motion of the debtors and the

18 Scotts Company for a temporary restraining order vis a vis

19 litigation proceeding against Scotts.  Your Honor, this is not

20 the first time you've heard matters with respect to Scotts, but

21 the landscape from the debtor's perspective has changed quite a

22 bit.

23        When we were first before you in July Scotts was

24 asking that the preliminary injunction be extended to enjoin

25 actions against Scotts, and at that point in time, Your Honor,

1  the debtor's concern was shared insurance, that these cases may

2  in fact relate to the debtors because there could be shared

3  insurance.  At that point, Your Honor, you directed that, first

4  of all, the insurance companies not pay anything.  Second of

5  all -- at this time.  Second of all you indicated that Scotts

6  really needed to have the issue of shared insurance taken up

7  and adjudicated by an appropriate Court, and Scotts then in

8  fact did file a matter, an adversary proceeding in this Court.

9          Thirdly, Your Honor, you directed that the debtors

10  did not have to participate in any discovery with respect to

11  the Scotts matters.  Since that time, Your Honor, it has been

12  brought to the debtor's attention that discovery is proceeding,

13  and while that discovery may not technically be against the

14  debtors that discovery is very much against the debtors.

15  Several things have happened, Your Honor.  Number one, experts

16  have been identified that include former Grace employees.

17  Discovery depositions have gone forward where totally and

18  completely the issue of Grace's Vermiculite, Graces Libby

19  mining operations, the safety of the product, the safety of the

20  operations are at issue.  And thirdly, your Honor, some of

21  Grace's own experts have been designated as experts in these

22  cases, and those experts are being asked pointed questions

23  about Graces Vermiculite and the Libby operations, and those

24  experts are also being asked to provide documentation with

25  respect to their testing of the Grace product.

1          Under these circumstances, Your Honor, we simply

2   cannot stand by and let this litigation go forward vis a vis

3   the Libby Vermiculite.  To the extent that these cases have

4   many other defendants, to the extent that the plaintiffs have

5   cases against Scotts other than with respect to Libby

6   Vermiculite, certainly we're not asking for those matters to be

7   enjoined, but when it comes to the Libby Vermiculite we have to

8   ask, Your Honor, that a temporary restraining order be put in

9   place.

10          What's happening is discovery is progressing against

11  the debtor.  Testimony is being taken with respect to the

12  debtor.  The debtor is not there.  The debtor is not in a

13  position to be there, and its product is being put on trial.

14  Under those circumstances, Your Honor, we had a serious record

15  taint problem vis a vis the <u>Mannville</u> case, also consistent

16  with Your Honor's order in the <u>Maryland Casualty Gerard</u> derived

17  litigation here, which was recently sustained, if you will, by

18  the Third Circuit when they overturned District Judge Woland.

19          We believe that this is a classic case of a situation

20  where the debtor is being put on trial without being there, and

21  it would be appropriate at this time to enter a temporary stay,

22  and hopefully the merits of claims against the debtor and

23  claims against Libby Vermiculite will ultimately be taken care

24  of vis a vis the 524(g) injunction, our Chapter 11 plan and our

25  various protocols for litigating claims against Grace.  And,

1  Your Honor, I believe counsel for Scotts is here and would also

2  like to be heard on the matter.

3          THE COURT:  All right.  Good afternoon.

4          MR. SIDMAN:  Good afternoon, Your Honor.  Robert

5  Sidman of the firm of Vorys, Sater, Seymour and Pease,

6  representing the Scotts Company.  Your Honor, we're here before

7  you today on a joint motion filed by both the debtors and

8  Scotts because of an ever evolving reality that lawsuits now

9  pending in state courts and probably to be filed in state

10 courts against Scotts and others will inevitably implicate W.

11 R. Grace and its products to the detriment of the W. R. Grace

12 reorganization.  We seek a temporary halt of those lawsuits

13 until W. R. Grace can seek and obtain confirmation of a plan of

14 reorganization that will hopefully resolve all issues regarding

15 its liability to the plaintiffs and potentially resolve the

16 alleged liability of Scotts as well.

17         Scotts's position can be simply stated and proven.

18 The state actions name Scotts as a party defendant in and in

19 some cases a new party defendant only recently because first of

20 all, W. R. Grace is in bankruptcy and it cannot be directly

21 named, and importantly, but for the presence of W. R. Grace

22 vermiculite in the Scotts products Scotts would not be named in

23 these lawsuits.  An examination of recent events occurring

24 relative to these lawsuits clearly shows how closely W. R.

25 Grace and its products are involved.

1        First of all, plaintiff's counsel has affirmatively

2  represented that any trial of these lawsuits would be tried as

3  a case against W. R. Grace.  Secondly, recent discovery has

4  revealed a former Grace employee has been designated as an

5  expert witness for trial purposes and his testimony focuses

6  exclusively, as it must, because he only knew about W. R.

7  Grace, it focuses exclusively on W. R. Grace and does not

8  mention Scotts.  Recent discovery of other experts, including a

9  Dr. Lee and a Dr. Frank, make it clear that plaintiffs are

10 largely interested in the alleged contamination of W. R. Grace

11 vermiculite.  And four, pleadings filed by plaintiffs in the

12 state court actions focus almost exclusively on W. R. Grace

13 vermiculite.

14        In addition, the peculiar behavior of the Rand Webber

15 plaintiffs confirm the intent of the state court plaintiffs to

16 make W. R. Grace the centerpiece of any state court trial.

17 This Court may recall that at our last hearing on this issue it

18 determined that an affidavit of plaintiff's counsel would help

19 clear up exactly whose produce would be on trial in the state

20 court lawsuits, and you orally asked plaintiff's counsel in

21 that case to file an affidavit to that effect.  As the initial

22 date for the filing of that affidavit approached the Rand

23 Webber plaintiffs agreed to postpone the then scheduled state

24 court trial.  After some subsequent haggling over the terms of

25 an order on this issue this Court eventually issued a November

1 22nd order requiring that affidavit of the Rand Webber

2 plaintiffs to be filed.  That date has come and gone, and

3 rather than filing the affidavit the Rand Webber plaintiff have

4 now appealed the November 22nd order.  The implication is

5 obvious and confirms that the state court plaintiffs will put

6 W. R. Grace and/or its products on trial in the state court

7 actions.  I should also mention for the record, Your Honor,

8 that the Rand Webber trial is now set for February 14th, 2005.

9          THE COURT:  So I have nothing affirmative now on

10 record.  I believe I had a statement on the record earlier that

11 it was not going to focus on Grace's product, that's why I

12 asked for the affidavit, and I now do not have such an

13 affidavit.

14          MR. SIDMAN:  That's correct, Your Honor.

15          THE COURT:  Okay

16          MR. SIDMAN:  Your Honor, the opposition to this joint

17 motion rests upon two basic grounds.  One is lack of

18 jurisdiction and the other is lack of evidence.  I would

19 suggest that none of the objectors on the evidentiary side

20 could possibly dispute that their recovery against Scotts

21 depends upon bad vermiculite, and that they plan to show at

22 trial that W. R. Grace was the source of that vermiculite.

23          With respect to jurisdictional issues, obviously

24 we're not talking about a 524(g) issue at the moment, we're

25 talking about 541 issues, property of the estate.  We're

1  talking about 362 issues and we're talking about the operation

2  of your preliminary injunction of January, 2002, meant to keep

3  people in a status quo pending confirmation.  I don't believe

4  the jurisdictional arguments go to any of those points.

5         Your Honor, I could talk about <u>Combustion</u>

6  <u>Engineering</u>.  I don't think it's relevant and I'd like to save

7  some rebuttal time in case the opposing parties believe it is

8  relevant to the Court's ruling.  But let me make one thing

9  clear before I retire.  If the state court -- if a state court

10 plaintiff can try a case against Scotts without W. R. Grace

11 discovery or use of any W. R. Grace facts at trial Scotts

12 necessarily will have to defend and it will defend.  It is only

13 the ghost trial that will require Scotts to defend itself and

14 expose W. R. Grace in absentia that we seek to prevent today.

15 Thank you, Your Honor.

16        THE COURT:  Who wants to argue on the other side?

17 Oh, Mr. Lockwood, did you -- something first?

18        MR. LOCKWOOD:  Your Honor, the individual plaintiff's

19 counsel here will address the specific facts of their specific

20 cases that are the subject of the motion.  I would like to say

21 a bit of an overview.  The motion is drafted as not limited to

22 the specific cases that have been talked about here, the Rand

23 Webber cases and others.  It basically would enjoin every

24 potential plaintiff in the United States, or indeed, the world,

25 from suing Scotts based on the facts that allegedly in respect

1  to two or three or four plaintiffs those plaintiffs have

2  selected certain witnesses and said certain things about the

3  way they're going to try their cases, and whatever else it

4  seems to be can be said, at a minimum the showing that's been

5  made here other than the basic proposition that because at

6  least a chunk of Scotts products have vermiculite in them and

7  Grace manufactured the vermiculate, that's about the only sort

8  of global fact that's been presented here, and even that has

9  been focused on the particular facts of the four cases.  So I

10 think for openers the relief that they're seeking is not

11 supported by the evidence that they've put on, because they've

12 only put on evidence with respect to a limited number of cases.

13        More importantly, however, the proposition that they

14 are asserting here is not only inconsistent with Combustion

15 Engineering, which as Your Honor knows there's a petition for

16 rehearing pending, so that is still a little bit subject to

17 question, but also is inconsistent with the Federal Mogul case,

18 which was affirmed by the Third circuit.  What you got here is

19 two -- what you got here is Scotts is a non-debtor.  It is

20 being sued for its product.  It -- so on the face of it there's

21 no basis under Combustion Engineering or Federal Mogul for the

22 injunction protecting it.

23        Now, why -- what are the grounds that are asserted to

24 justify that protection of this non-debtor being sued for its

25 independent viability?  Two of them have been raised, albeit

1  one of them by the debtor in a footnote at this juncture.  The

2  first one, the footnote, is shared insurance.  Unlike

3  Combustion Engineering, where the Third Circuit questioned

4  whether shared insurance would be enough to justify a 105

5  injunction, if not outright suggested that it wouldn't, it at

6  least --

7          THE COURT:  I don't really read Combustion that way,

8  but okay, I think Combustion has some other caveats with it,

9  but --

10         MR. LOCKWOOD:  Well, there are -- there are a number

11  of caveats, but at a minimum the Court didn't say shared

12  insurance is a basis for a 105 injunction by itself.  And in --

13         THE COURT:  And as a permanent plan injunction

14  getting jurisdiction over the non-debtors for non-shared

15  insurance liability, yes, but not with respect to something

16  that my implicate the debtor and the debtor's insurance, I

17  think.  I will look at it again --

18         MR. LOCKWOOD:  Well --

19         THE COURT:  -- Mr. Lockwood, but I'm not sure the

20  Combustion applies to this circumstance.  We're not at a 524 or

21  105 type injunction as a permanent matter here.

22         MR. LOCKWOOD:  Yeah, but we are at a 105 injunction

23  that is somehow or another going to be related to the plan,

24  which I want to get to --

25         THE COURT:  Yes.

1      MR. LOCKWOOD: -- in a minute, but the point I wanted

2  to make about CE is that in CE the debtor agreed with the non-

3  debtors that there was shared insurance.  Your Honor found that

4  there was shared insurance, and what CE said was, well, maybe

5  there wasn't enough evidentiary facts of record and that --

6  possibly there should be a remand, except that it was mooted by

7  the 105 injunction you didn't -- the holding as a whole that of

8  the independent liability, so that they flat reversed the 105

9  injunction.  They didn't remand for further findings on the

10  shared insurance, at least so far.

11      Here, in contrast, the debtor and the insurers

12  vigorously deny that there's any shared insurance, and that's

13  why the debtor's statement on this thing is buried in a

14  footnote some -- in its reply brief.  They're not prepared to

15  stand behind Scotts and say, yeah, we agree there's shared

16  insurance here.  So under Combustion Engineering at an absolute

17  minimum if Your Honor was going to base a 105 injunction on

18  shared insurance there would have to be an evidentiary hearing

19  addressing the question of shared insurance.  Now, there is in

20  fact an adversary action that's been filed by Scotts, and

21  depending upon when that action gets resolved by Your Honor and

22  in what form, maybe Your Honor will decide that there is --

23  shared insurance over the what appear to be strenuous

24  objections of the debtor and its insurers, and at that time

25  there might be a predicate for addressing the question of

1  whether shared insurance was enough.  But right now there is no

2  predicate.  All there is some person alleging that there's

3  shared insurance and other people disputing it.

4       The second point has to do with what Ms. Baer

5  characterized as record taint and what counsel for Scotts

6  characterized as putting Scott as Grace's vermiculate on trial.

7  The -- if you think about that proposition and you go back to

8  the beginning of asbestos litigation and the <u>Johns-Mannville</u>

9  bankruptcy, probably every asbestos case in this country could

10  have been enjoined from proceeding against defendants other

11  than Mannville because Mannville produced somewhere in excess

12  of 30 percent of all the asbestos, and its prevalence was

13  ubiquitous and the products of most manufacturers included

14  Mannville asbestos even if they included asbestos from

15  somewhere else.  And one of the issues that was involved in the

16  first asbestos litigation was the so-called state of the art

17  defense, which was essentially, oh, we didn't know enough about

18  the dangers of asbestos to put warnings on products that were

19  manufactured with it.  And so every time anybody went to trial

20  with a case against somebody other than Mannville they were in

21  effect trying the state of the art defense.  They were trying

22  in effect the case against Mannville, because that was one of

23  Mannville's primary defenses, both as a producer of asbestos

24  fiber itself and as a manufacturer-distributor of asbestos

25  containing products.

1          Historically in this country you don't get to say

2   that, well, I'm a manufacturer of a product that contains some

3   sort of toxic substance and the manufacturer of the toxic

4   substance is bankruptcy, so you can't sue me for my product

5   because both I and the manufacturer want to argue that it's not

6   toxic.  As long as there is no collateral estoppel effect,

7   which there wouldn't be with Scott, Grace is not in privity

8   with Scott, it doesn't own it, it's not affiliated with it, it

9   has no ability to control it, the worst thing that happens is

10  that Scott some Jury somewhere decides that vermiculite is a

11  dangerous product and it was in Scotts' own product and that it

12  injured the plaintiff.  For that binding -- that finding under

13  the use of collateral estoppel in this country Jury verdicts

14  for plaintiffs is not collateral estoppel on Grace.  Indeed,

15  it's not even collateral estoppel on Scotts.  Every single

16  plaintiff is going to have to prove with respect to Scotts that

17  the vermiculite in that product was a dangerous substance that

18  there was enough tremolite in that vermiculite to give rise to

19  that plaintiff's disease, and if they win or if they lose the

20  outcome is not going to be subject to collateral estoppel or

21  res judicata against the defendant.  And there has been

22  absolutely no showing made by Scotts or by the debtor to the

23  contrary here.  All they want to talk about is witnesses,

24  seizing on some snippet of Judge Liflin's opinion in the

25  Mannville case which talked about how a witness gets his story

1  down and, gee, you know, once he's locked down, you know, he

2  can't change it.  They catapult from that into the notion that,

3  well, basically if there's some witness out there who might

4  testify in a case who Grace would want to use in Grace's case,

5  that case shouldn't go forward because once the witness

6  testifies his store is of record somewhere.  Well, that's not a

7  basis for enjoining unrelated cases against non-debtor

8  defendants.  If that were the rule I don't know -- I mean, I

9  can't imagine the havoc it would wreak in the tort system about

10 when companies unrelated to bankrupts would be able to go

11 forward with litigation.  I mean, witnesses -- expert

12 witnesses, they talk about expert witnesses, these expert

13 witnesses are experts for a multiplicity of defendant -- Dr.

14 Lee, he's an expert in a lot of cases.  Why is Dr. Lee even

15 testifying in the Scotts case?  If Grace isn't a defendant and

16 he's Grace's expert, why is he there?  Well, he must have -- he

17 agreed to be hired by Scotts.  Well, if Grace let's Scotts hire

18 him or if Grace couldn't prohibit Scotts from hiring him, why

19 should the plaintiffs somehow or another be barred from putting

20 on a case because Scotts chose to use the same expert -- Grace?

21 I don't know the facts.  I doubt very much, however, that Dr.

22 Lee is the plaintiff's expert.  Maybe the plaintiff's counsel

23 here can address that.

24        But, I mean, when you get down to it, the entire

25 pitch here is incredibly broad.  Let's go back to <u>Federal</u>

42

1  Mogul.  When the auto manufacturers -- represented, I might

2  add, by Kirkland and Ellis -- came into court, they made

3  virtually the same kind of arguments about witness present

4  prejudice and the possibility of collateral estoppel because

5  they said that the brakes that they put in their cars that they

6  were being sued -- or in trucks were being sued for had been

7  manufactured by Federal Mogul, and that therefore they were in

8  effect having to put on a defense of Federal Mogul's brakes in

9  their cases.  And the Court and the Third Circuit said, that's

10 not good enough.  And they said, that's not good enough even

11 though there was a claim for indemnity that was asserted by at

12 least Chrysler.

13        Here there's not one word of any indemnity claim over

14 from Scotts against Grace in any of the papers that have been

15 submitted to your Court -- I mean, to Your Honor.  And I

16 suggest to you that Grace will vigorously deny having any

17 indemnity liability, but if they do it would be more of a kind

18 of a, I don't know, contributory -- it would be something that

19 in the words of Federal Mogul and Pacor Scotts would have to

20 assert, litigate and prove, and that's not a basis for related

21 to jurisdiction.  Only automatic indemnity, so-called

22 contractual, automatic indemnity has so far in the Third

23 Circuit been held to be a basis for related to jurisdiction for

24 these purposes.  And CE reiterates that proposition, and

25 there's been no showing here that there was any such kind of

1  indemnity here.  So the bottom line is that apart from whatever

2  the peculiarities of these three or four cases that Your Honor

3  will get to hear from plaintiff's counsel from in a second,

4  apart from that the general sweep of their argument here

5  against all the plaintiffs in the world as to why they can't

6  sue Scotts is grossly over broad.

7         The final point I would like to make has to do with

8  the 524(g).  Maybe I missed it, but we've got a proposed 524(g)

9  on plan here -- plan on file here?  And I don't think it's

10 confirmable, but that's not really the issue.  I don't see

11 anything in that plan that purports to afford Scotts any

12 protection from a 524(g) injunction.  And moreover, under the

13 CE decision I don't know how they could give Scotts protection,

14 because Scotts is Basic and Lummus as far as this case is

15 concerned, except it's not even affiliated.  Basic and Lummus

16 were closer to CE.  They were brother-sister corporations.

17 Scotts is totally unrelated.

18        So the notion that somehow we're using 105 as an

19 interim protective measure to preserve the ability to have a

20 524(g) plan that would approve -- that would include Scotts, if

21 that's one of the grounds that's being asserted here is --

22        THE COURT:  Oh, that's not what I understood the

23 argument to mean.  I thought the argument was that through the

24 524 or some other means in the plan the debtor would figure out

25 its liabilities to creditors, one of which may be Scotts.  And

1  if in fact there's liability to Scotts that may take care of

2  Scotts' liabilities to its plaintiffs, not that there would be

3  a 524(g) injunction, just that in the chain of events that's

4  may how it -- might be how it would shake out.

5      MR. LOCKWOOD:  I don't -- I mean, look, under 524(e)

6  of the Code if Scotts and the debtor are jointly liable for the

7  Scotts product containing vermiculite, Scotts remains liable

8  despite the debtor's discharge.  524(g) only enters the picture

9  if Scotts is the beneficiary of a channeling injunction, and to

10 do that Scotts would have to make contribution to the asbestos

11 trust, the plaintiffs would have to in some manner or another,

12 I believe by actual vote, vote to approve that.  And whatever

13 else you can say, this plan as yet doesn't provide that, and I

14 don't see how it could provide it.  So the bottom line, Your

15 Honor, is that there's just really no basis for this Court to

16 assert related to jurisdiction here based on the allegations

17 and evidence, what there is of it, that's been presented here.

18     THE COURT:  All right.  What about the three or four

19 cases that have specifically -- I mean, I did order an

20 affidavit, Mr. Lockwood, and it somewhat troubles me that I

21 have a representation that it's not the debtor's product that's

22 at issue, so I say, fine, put it in writing, and I can't get it

23 in writing.

24     MR. LOCKWOOD:  Your Honor, I can only defer to the

25 counsel whose case that is to answer that question, but I will

1  -- I will -- myself by saying that again, Scott -- Grace is

2  <u>Mannville</u> as far as vermiculite is concerned.  It can't fairly

3  say, Scotts can't say that nobody in the United States --

4  remember, Scotts isn't the only potential company, there's -- I

5  mean, Graces vermiculite could be in the products of dozens of

6  manufacturers.  I have no idea what it was -- the full extent

7  of its use, as --

8          THE COURT:  But these --

9          MR. LOCKWOOD:  -- insulating material, there can --

10         THE COURT:  -- but the issue is --

11         MR. LOCKWOOD:  -- premises liability --

12         THE COURT:  -- but the issue as I understand it with

13  the vermiculite, and please, correct me if I'm wrong, is that

14  vermiculite at least to know has not been proven to be a

15  dangerous product in and of itself.  The issue is, I thought,

16  in the lawsuits that are pending against Scotts, the fact that

17  this particular vermiculite came from Libby and may be

18  contaminated somehow because of the fact that it came from

19  Libby, and therefore has some tremolite component to it,

20  allegedly.

21         MR. LOCKWOOD:  I cannot say, Your Honor, whether

22  there has ever been a judgment against Grace based on the

23  proposition that vermiculite is contaminated by Libby tremolite

24  or not.  I don't know the answer to that, I suspect Grace does.

25  But even there hasn't been any there's got to be a first time,

1  and Grace doesn't have the right to assert that the first time

2  can only occur in a case in which Grace is a defendant.  I

3  mean, again, if --

4          THE COURT:  Why not?  I mean, if it's Grace's product

5  that's at issue why isn't Grace --

6          MR. LOCKWOOD:  It's Scotts' product.  Scotts treated

7  the product --

8          THE COURT:  Oh, I see.

9          MR. LOCKWOOD:  -- Scott sold the product.  Scott is

10  not being sued as the alter ego of Grace, although it would

11  have you believe that that's the case, it's being sued as

12  somebody who made its own product utilizing the vermiculite.

13  It is true that it may well occur that in order to win the case

14  against Scotts the plaintiff would have to prove that there was

15  an asbestos containing tremolite in the Scotts vermiculite, and

16  it may well also be true that only the Libby mine could be the

17  source of that product.  But the fact remains that the -- that

18  the suit is still against Scotts and it's -- and it's Scotts

19  who's going to have the defense about whatever it did to that

20  product, both in terms of determining whether it had tremolite

21  in it before it distributed it, its knowledge of whether it had

22  it, whether the treatment and processing that it did of the

23  vermiculite to make it into a Scotts fertilizer somehow or

24  another operated to make the product less dangerous than it

25  would have been in the pure form as it left the Libby mine, all

1 of those things are going to be something involving Scott.  And

2 the only thing that Grace is asserting here is that we want to

3 be the right to control the venue of the -- of any Court that

4 was asked to decide in front of a Jury whether or not, A, the

5 -- our vermiculite contained tremolite, and B, whether there

6 was enough tremolite in it after the processing that it went

7 through to give rise to an asbestos related disease on the part

8 of the plaintiff.  And while I understand that they'd like to

9 do that I don't believe the law empowers them through the use

10 of a 105 injunction in a bankruptcy case to say that you can --

11 the Bankruptcy Court can enjoin all lawsuits against all

12 defendants other than Grace where that issue might be

13 presented, and where there's not automatic indemnity, and where

14 there's no collateral estoppel on Grace.  Thank you, Your

15 Honor.

16         MR. CONAWAY:  Good morning, Your Honor.  Bernard

17 Conaway on behalf of Donald and Judith Webber, on behalf of the

18 Simmons and Cooper claimants, and the Lanier Law Firm

19 claimants.  I don't want to repeat Mr. Lockwood's remarks,

20 simply summarize them and answer questions that the Court may

21 have.  I think the record will reflect that there is no

22 corporate relationship between W. R. Grace and Scotts

23 Corporation.  There is no clear or unequivocal right to the

24 insurance proceeds that Scotts now seeks to try to avail itself

25 of.  There will be no trial on W. R. Grace's product.  The

48

product that is on trial in these cases is Scotts' and what
Scotts did to that product.

THE COURT:  Well, why can't I get an affidavit to
that effect?

MR. CONAWAY:  I think if I understood what Your Honor
wanted was an affidavit that the plaintiffs would not use or
would not introduce evidence or would introduce evidence that
it used other suppliers.  The parties reached an agreement,
Scotts and the plaintiffs.  The Court signed a different order.
That affidavit was never entered.  We have since appealed that
order.  But the fact of the matter is that even if it is true
that Scotts only used W. R. Grace's product, that in and of
itself does not preclude, A, liability against Scotts on the
basis of what it did with that product, or B, implicate W. R.
Grace's product for whatever problems it may have, or whatever
hazards in and of itself it may create.

THE COURT:  Why not?  Because there may be evidence
that Scotts didn't do anything to the product.  I don't know
what the evidence is going to show.  But how can you start with
Grace's product and say that the trial doesn't somehow impact
Grace's product?

MR. CONAWAY:  Because the trial here is a function of
what it is Scotts did with W. R. Grace's product.  They have
independent tort liability for their handling or failure to
handle, and then for failure or their warning of the -- how to

1  handle that product.  Whether they did that or not is what is

2  the subject of their liability, not necessarily what W. R.

3  Grace's product had or did not have in it.  As a predicate it

4  will be necessary to show that W. R. Grace's product had some

5  asbestos in it.  I don't think that's a mystery here.  Does

6  anyone in this courtroom believe that that isn't true?

7        THE COURT:  I don't know whether it's true or not.

8        MR. CONAWAY:  Is anyone arguing to the contrary?

9        THE COURT:  I don't know that.

10        MR. CONAWAY:  The Third --

11        THE COURT:  --  I'm not involved in that trial.

12        MR. CONAWAY:  -- the Third Circuit has said in its

13  most recent pronunciation on this case that, sure enough, that

14  vermiculite was contaminated with tremolite.  I don't think

15  we're arguing over a mystery here.  We all know what was in the

16  product.  The question isn't W. R. Grace's asbestos, the

17  question is, what did Scotts do, if anything, to deal with

18  that, and did they warn anyone?

19        I have here Patrick Haines from the Lanier Law Firm,

20  and I asked him to come up.  His admission has been moved, Your

21  Honor.  I have the order.  It was not signed, and I can present

22  it to the Court.  I'd like Mr. Haines to talk to the Court and

23  explain to the Court the nature of the allegations as they are

24  made against Scotts.  And it will be important to understand

25  that the difference between what those allegations are as

1 between Scotts and what they might have been against W. R.

2 Grace.  I also point out that in each of the cases that we're

3 talking about here, Your Honor, W. R. Grace's name shows up

4 nowhere.  They are not a party to the litigation.  And the fact

5 that we are using, or some of their experts show up, are

6 absolutely correct.  W. R. -- excuse me, Scotts has hired these

7 people.  And to now complain that we are deposing them?  What

8 logic does that make?  We should not depose them?  Is that what

9 I understand that to mean?

10       Your Honor, just to wrap up a few points before Mr.

11 Haines speaks, there are no indemnity rights here.  There is no

12 right for W. R. Grace -- or, excuse me, Scotts to impede or

13 encroach upon the debtor's assets.  It simply is not there.

14 None of the case law to date would support this Court taking

15 this action on the basis of that.  There is no derivative

16 liability here.  There's no corporate relationship between

17 Scotts or W. R. Grace for which this Court would be rightly

18 concerned that the assets of the estate would somehow be

19 affected.  There is no corporate affiliation between W. R.

20 Grace and Scotts, none whatsoever.  They are separate entities,

21 always have been and likely always will be.

22       Your Honor, if I could indulge you I'd ask to bring

23 Mr. Haines up so that he might --

24       THE COURT:  All right.

25       MR. CONAWAY:  If Your Honor would like I could pass a

1 copy of the pro hac order up.

2          THE COURT:  All right.  I'll take it.

3          MR. CONAWAY:  It was filed.  If I might approach,

4 Your Honor?

5          THE COURT:  Yes, thank you.  This was filed, sir?

6          MR. CONAWAY:  Yes, it was, Your Honor --

7          THE COURT:  All right.

8          MR. CONAWAY:  -- on December -- I believe December

9 15th.  We have the docket number that appears at the bottom.

10 My understanding was that we did turn it over to chambers for

11 signature.  I think in the holiday rush things have not moved

12 as smoothly as we would like or --

13          THE COURT:  All right.  That order is entered.  Thank

14 you.  I have to ask this question for the record.  Mr. Haines,

15 I have never as far as I know laid eyes on you, but I have a

16 first cousin whose name is Patrick Haines and I need to make

17 sure that you're in fact not related to him, since it's spelled

18 exactly the same way.

19          MR. HAINES:  Where does your cousin live?

20          THE COURT:  In Florida.

21          MR. HAINES:  No, never been to -- I don't have any

22 relatives in Florida.  That's a first on me, Judge.

23          THE COURT:  All right --

24          MR. HAINES:  I actually have appeared before you in

25 the Pittsburgh Corning context.  I'm a member of the Committee

52

1  for _Pittsburgh Corning_ bankruptcy case, so.

2           THE COURT:  Okay.  Thank you.

3           MR. HAINES:  May it please the Court, I appreciate

4  the opportunity to come up here and visit with you, Judge.  We

5  were some of the first lawyers I guess in the country to file

6  complaints against Scotts.  We represent probably close to a

7  hundred mesothelioma victims, I guess at this point, that have

8  named Scotts in their complaint.  In those complaints no

9  allegation is made that it's in any way derivative of W. R.

10  Grace, that W. R. Grace is somehow tied into the case.

11  Frankly, from our point of view I don't really care where

12  Scotts got the asbestos they put in their product.  The

13  important thing to me in the litigation of this case is the

14  fact that Scotts sold the product that exposed my clients to

15  asbestos that they could breathe in that was a causing factor

16  of their disease, and that's what I'll have to prove at trial.

17  Where they got that asbestos from really does not matter to me,

18  frankly.  I just have to prove that there's asbestos in the

19  product, that my client was exposed to it and it was the cause

20  of his disease.  So I think that's why I haven't really focused

21  on whether it was Grace vermiculite or whether it was from

22  North Carolina or whether it was from Africa or wherever in the

23  world.

24           It really doesn't matter to me.  It's a raw component

25  that went into fertilizer, product that Scotts made, and we all

1  know fertilizer and we know most of us have seen Scotts.  It's

2  a product that for many, many, many years was on the market and

3  never bore any indication that it contained asbestos.  Scotts

4  after a certain period of time in the 1970s was certainly aware

5  that they were using a product that was contaminated with

6  asbestos.  They chose not to substitute with some other type of

7  ingredient.  They chose not to warn their -- put a warning

8  label on their product.  And that's what I'm seeking to hold

9  them liable for.

10       I'm not going to call people from Libby Montana.

11  That frankly has nothing to do with my case.  I think what

12  happened in that one instance where Thomas Adkins was listed as

13  a witness, I worked at Baron and Budd, Your Honor, for about

14  six years, and we created most of the witness lists which are

15  in existence in the State of Texas, including I think the one

16  that's at issue in that case.  They just get copied and they

17  get used, and they have a life of their own.  And even after

18  companies go bankrupt people continue to use them.  If those

19  lawyers were seriously going to call Mr. Adkins as a witness I

20  can't fathom why.  I don't know what relevance his testimony

21  would have.  Any former employee of Grace that worked in the

22  mine, I have no idea what relevance that would have.

23       My case is simply to prove asbestos caused my

24  clients' injury.  We had been to the Scotts repository.  We've

25  looked at their documents.  We're in the process of going

54

1  through those.  We would hopefully soon depose the Scotts

2  corporate representative on these matters.  I'll depose

3  whatever experts Scotts designates, and that's how I'm going to

4  try my case, Judge, based off the documents that Scotts has,

5  the experts that they call, the experts that I designate,

6  that's -- and my client who identifies the product.  And none

7  of that has anything to do with W. R. Grace.

8          Their biggest complaint I guess is that they don't

9  have Grace in the courtroom with them.  That happens every time

10 you have a bankrupt defendant, Judge.  That's happened since

11 1982 when Mannville went down.  Everybody had to -- had to deal

12 with that.  The question that will be submitted to the Jury, at

13 least in Texas, where I'm from, is going to say, was the Scotts

14 product defective?  It's not going to have anything on there

15 about W. R. Grace.  It's not going to say anything about

16 vermiculite.  It's going to talk about Scotts and the turf

17 builder or whatever the product is my client identified, and

18 was that product defective, was there a failure to warn, was it

19 a cause of the injury to my client.  And whatever the finding

20 of the Jury on that issue, yes, no or I don't know, that's not

21 going to have anything to do with W. R. Grace, Judge.  And I'm

22 happy to answer any questions you might have about the

23 vermiculite process, or I don't want to get tied down into a

24 bunch of stuff that I don't think really matters because at the

25 bottom -- the bottom line, Judge, is we want to proceed against

1  Scotts because they made a product that has asbestos in it.

2  And frankly, I don't see any way W. R. Grace factors into that

3  trial.  I'm not going to get up and make in my opening

4  statements that these are the agents or the -- or the --

5  working for Grace.  That doesn't really matter to me, Judge.

6         THE COURT:  Well, I understand it may to you.  I

7  don't know whether it will to somebody else, and I guess that's

8  the issue that they're asking me to address.  But --

9         MR. HAINES:  And I would just hope --

10        THE COURT:  -- I get your point.

11        MR. HAINES:  -- my case that doesn't get stayed

12 because of their theory, and -- because that's not they way

13 we're going, Judge, and I just would like the opportunity for

14 the folks that I represent, Dr. Williams, whose case I'm hoping

15 to set for trial next spring, is a person who is not one of

16 those cases where he's got 60 defendants -- that we've

17 identified exposure to.  Scotts is pretty close the only

18 exposure he has.  And he's a living mesothelioma case.  He's a

19 pathologist from Duke University.  He's got a huge loss of

20 income, and I want to try his case, and I want -- and I want to

21 get it -- get him up there while he's still alive.  And I don't

22 -- I don't see that there's anything here that I could explain

23 to him when he asks me, why did my case not go forward, I don't

24 see how W. R. Grace -- how do I explain to him that W. R. Grace

25 stopped his case from going forward when all he sued is sued is

1  Scotts.  Thank you, Judge.

2       THE COURT:  All right.  Thank you.

3       MR. CONAWAY:  Your Honor, if I could indulge you for

4  just a few moments, I want to draw your attention to page three

5  of the Lanier response.  I point out that it goes through what

6  I think is some fairly significant detail about the product

7  that Scotts is being sued for.  It talks about the vermiculite,

8  how it was used, and the things that Scotts did to that

9  product, separate and apart from what was delivered to it by W.

10 R. Grace.  That I think is important for a couple of reasons.

11      One, it clearly shows that the fundamental foundation

12 for liability here is Scott's processing and handling of its

13 own product.  It also goes clearly to the heart of the argument

14 that there is insurance coverage here.  The insurance carriers

15 have consistently maintained their objection to coverage here

16 in part based on the premise that the coverage as it's written

17 does not apply to those who repackage, rebrand and reprocess.

18 And that is clearly what has happened here.

19      Lastly, Your Honor, and I thank you for indulging us,

20 I ask that Your Honor not consider the affidavits that Scotts

21 has attached to its motion.  These are at best whispers between

22 lawyers.  They have cut snippets and pasted parts from pieces

23 of documents, none of which are before this Court.  Thank you,

24 Your Honor.

25      THE COURT:  Anyone else wish to speak to the motion

1  before I ask Scotts' counsel back?  Okay.  Thank you.

2          MR. SIDMAN:  Thank you, Your Honor.  I'll make

3  several hopefully brief points.  First thing I'd like to do,

4  Your Honor, is point out that on page two of I believe the

5  Lanier papers in opposition to the joint motion, the following

6  statement is made, and I want to read it carefully and slowly.

7  It says, the sole legal and factual issue in the state court

8  actions against Scotts will be whether or not Scotts extensive

9  processing and trianizing of the vermiculite eliminated the

10 possibility of asbestos exposure to the consumer.  The word,

11 eliminated, necessarily means that what Scotts got from its

12 suppliers was in some contaminated, and that, no matter what

13 the plaintiffs' counsel say, they cannot assure this Court,

14 they will not assure this Court because they've refused to do

15 it, that W. R. Grace's vermiculite will not be on trial in the

16 state court actions.  Scotts' as a matter of fact position if

17 required to defend it is that they made the product safer with

18 their processes, but the premise of their liability has to be

19 that there's something bad about the product, and the bad came

20 potentially from W. R. Grace.

21         THE COURT:  Well, I recognize that that's the case,

22 and I also recognize that that's why Scotts would like W. R.

23 Grace in the case and/or not to have to go forward without W.

24 R. Grace, but frankly, I still think this is so attenuated.  I

25 do not see a basis to extend the injunction.  I really just

1 don't see it.  I don't think this is any different -- well, I

2 shouldn't say any, I guess that's a bit of an exaggeration.

3 This isn't substantially different from the <u>Federal Mogul</u>

4 issue.  I think it is different from the <u>Combustion Engineering</u>

5 case, but I do not think it's much different from <u>Federal</u>

6 <u>Mogul</u>, and these are exactly the same arguments that were

7 raised in <u>Federal Mogul</u>.  Jurisdiction was clearly refused in

8 that case.  Now, it was a difference because the issue was

9 whether or not some state court action should be taken into the

10 federal system and prosecuted there as opposed to whether or

11 not an injunction should issue against those state court

12 actions, but I really have some difficulty seeing the basis for

13 jurisdiction.  This is not in my mind the same as the <u>Maryland</u>

14 <u>Casualty Gerard</u> issue.  That seemed to be a direct attack

15 against Grace.  This doesn't.  This seems to be an attack

16 against Scotts where Scotts may like a liability over theory

17 against Grace, and that may be the only defense that you have

18 in the case without Grace there.  That's all possible, but I

19 don't think that that's a basis on which to enjoin the actions

20 going forward against Scotts.  Unfortunately it may mean that

21 there's additional litigation against Grace down the road, but

22 I just don't see that that's a basis for extending the

23 injunction that far.

24         MR. SIDMAN:  Your Honor, let me make two points, if I

25 would.  I think someone made the claim that Scotts has not said

1  it has an indemnity claim, and if that was an omission I should

2  have stated that we do.  And if we lose a state court case

3  based upon, as we can show, that the W. R. Grace vermiculite

4  was bad, we have an indemnity claim in this case, and we

5  believe it's a post-petition indemnity claim.

6          THE COURT:  Well, on what basis?

7          MR. SIDMAN:  On the basis that their product was the

8  one that caused the damage --

9          THE COURT:  Oh, well, I mean --

10          MR. SIDMAN:  -- not our processes.

11          THE COURT:  -- you always have that.  That's not an

12  indemnity claim.  That may be a lawsuit over against Grace for

13  selling you a defective product, but that's not an indemnity.

14  If you don't have a contract whereby Grace says, look, I'll

15  indemnify you if you purchase my product and spread it on

16  everybody's lawns, that's a different -- that's a different

17  issue.  I --

18          MR. SIDMAN:  Your Honor -- Your Honor, I beg to

19  differ.  I think there is common law indemnity that would exist

20  in this case.

21          THE COURT:  Well, whether or not there is I think Mr.

22  Lockwood's quite correct.  The Circuit has been very explicit

23  that that's not enough to assert jurisdiction over a claim,

24  because it's so far attenuated.  You've got so many steps

25  before you can go forward proving that type of an indemnity

1  against the debtor that at this stage of these proceedings

2  that's really not worth the paper it's printed on.  It may be

3  at some point but it isn't right now.

4       MR. SIDMAN:  Your Honor, then I'd like to suggest

5  that if indeed these actions are allowed to proceed that they

6  must include the ability of W -- of Scotts to defend itself,

7  which means discovery from W. R. Grace and being able to

8  introduce evidence about W. R. Grace in the trials.  Otherwise

9  we're hamstrung.  And the order that you issued earlier, which

10 has now expired, suggested that somehow we could try these

11 cases and defend ourselves without W. R. Grace, and I don't

12 think we can.

13      THE COURT:  I'm not lifting the injunction to let you

14 bring -- the automatic stay -- let you bring Grace in.  I mean,

15 I indicated early in these proceedings if Grace was intent on

16 joining this action on its own it certainly can do that.  I'm

17 not prohibiting Grace from doing it, but the automatic stay

18 protects suits against Grace and I'm not lifting the stay to

19 let Grace be sued.  If Grace has an interest in participating

20 in the discovery and defending its products it'll show up, and

21 if it doesn't it won't.  I can't see that there's a collateral

22 estoppel consequence to the debtor provided that it doesn't

23 show up in the case and doesn't take actions to litigate.  It's

24 not named.  It's product's not directly involved in this suit

25 because of the fact that the theory is that Scott did something

61

1 else to the product and repackaged it and distributed it, so I

2 just think it's too attenuated.

3      MR. SIDMAN:  Your Honor, do I understand, however,

4 that your prior injunction against discovery from W. R. Grace

5 is now expired and we can secure discovery from W. R. Grace in

6 these trials?  Because we're going to need it to defend

7 ourselves.

8      THE COURT:  Well, I don't know.  I need to here from

9 the debtor about that.  So far as I know at this point in time

10 I don't have motions for discovery against the debtor.  And

11 frankly, I don't recall what I said about the discovery.  It

12 was too long ago.  So maybe you can refresh my recollection.

13      MR. SIDMAN:  Your Honor, you said in July that you

14 would not require W. R. Grace to participate in discovery --

15      THE COURT:  Right.

16      MR. SIDMAN:  -- the state court suits, and that would

17 -- that prohibition would last until the plan was filed,

18 presumably then in October, now it turned out to be November.

19 But that was the duration of that alleged order that said, you

20 can't make W. R. Grace participate in the discovery.  Our

21 position is that expired by its terms, and we would intend, as

22 we must, to defend ourselves by involving W. R. Grace in

23 discovery.

24      THE COURT:  Ms. Baer?  I mean, at this point in time

25 the debtor apparently is going to propose a different plan, but

1  the extensions that I gave the debtor to get a plan on the

2  table have come and gone and the debtor seems to be moving in

3  the direction of confirmation, so --

4      MS. BAER:  Your Honor, we -- Your Honor, we are

5  moving in the direction of confirmation, but as I understand it

6  there are something like, I think it's 90 lawsuits that are

7  currently pending against Scotts.  If Grace is forced to -- to

8  get involved and participate and defend itself in discovery, at

9  this critical junction in the Chapter 11 case we're going to

10  have a lot of matters that are going forward that are

11  specifically and completely the reason why we have a Section

12  362 automatic stay and why we have a 105 injunction.  The

13  debtor can't be expected to be defending itself in cases with

14  respect to Libby vermiculite.  That's why we have the automatic

15  stay and the injunction.  And at this critical juncture, when

16  we're going forward in the hopes of confirming a plan, setting

17  up estimations and setting up case management and a way to

18  litigate asbestos related claims against Grace in the Grace

19  case, Your Honor, I would have to ask --

20      THE COURT:  But I don't think you're being asked to

21  defend yourself.  I'm specifically not permitting you to be --

22  to -- I'm specifically not lifting the stay at this stage to

23  let you be joined.  The question is whether you have

24  information in the debtor's possession that's relevant to

25  somebody else, and if so, why doesn't -- why can't it be

1  produced --

2          MS. BAER:  Well, Your Honor --

3          THE COURT:  -- I mean, just like any other entity has

4  to produce it?

5          MS. BAER:  Your Honor, you sound like it's a minor

6  thing, but you're talking about discovery vis a vis the Libby

7  vermiculite --

8          THE COURT:  Well --

9          MS. BAER:  -- very significant discovery, rooms full

10 of documents --

11         THE COURT:  Well, if they're together --

12         MS. BAER:  -- that have essentially been shut down

13 during the course of this Chapter 11 case.

14         THE COURT:  Well, I'm not sure why they need to be

15 permanently shut down.  I mean, at some point in time this --

16 these cases are going to go forward.  This case was filed in

17 2001.  It's been here a long time to stop people from doing

18 anything against the debtor.  How the debtor's made use of its

19 time, that's kind of up to the debtor.  It seems that the

20 debtor at this point's on track toward at least trying to get

21 some plan together, but I'm really not at all sure why the

22 debtor shouldn't have to come up with at least a document

23 production plan.  To the extent that they want to take

24 depositions of current officers and directors who are involved

25 in the reorganization, that's probably going too far, but to

1 the extent that they want to take depositions of former

2 employees who don't even work for the debtor anymore, I don't

3 see how that's going to impact the reorganization at this

4 stage.

5       MS. BAER:  Well, again, Your Honor, it's a matter of

6 personnel.  It's a matter of the people who are actually very

7 involved in this Chapter 11 reorganization working with us to

8 put together the TDPs, the trust plan and the procedure for

9 moving forward to litigate asbestos claims are the very same

10 people that -- attention will be diverted if they have to

11 respond to discovery from Scotts if they have to participate in

12 or at least be at the depositions, be at discovery production,

13 in order to control and produce and help with, if you will,

14 information vis a vis the Libby vermiculite.

15       THE COURT:  Well, at the moment I don't know that I

16 have -- if I do I apologize -- I don't think I have before me

17 some motion directed to the debtor which the debtor has

18 contested in the way of discovery in those suits, so I suppose

19 it'll come up in the normal course and I'll deal with it when

20 it comes up, if that's the case.  But I really do not see a

21 basis to extend this injunction to Scotts.  I just can't see

22 it.

23       MS. BAER:  Your Honor, my concern is you have tried

24 so many times here to limit this, to make sure that Grace is

25 not forced to do --

1          THE COURT:  Yes.

2          MS. BAER:  -- things that Grace's product is on

3   trial, and unfortunately we've all failed.  The fact of the

4   matter is the discovery that is going forward is about the

5   Grace product.  If you're going to prove that Scotts did or did

6   not do something, you get into what did Scotts have in the

7   first place, what was it working with, and that goes right back

8   to the Libby mine, the Libby mining operations.  Grace's

9   failure to warn has been put at issue in the discovery.  Every

10  single time we try to limit it they go back, and the next thing

11  you know is question number two after question number one

12  sounds okay is something vis a vis details of Grace's

13  operations, Grace's product.

14          THE COURT:  Well, I don't think Grace has to, and in

15  fact I don't think Grace can be at this point compelled to do

16  anything in the way of what would be a liability overclaim.  I

17  mean, there is a bar date in the case.  People file claims.

18  That's how we litigate claims against the debtor, not in some

19  state court action.  But the debtor may have documents,

20  witnesses and other things that are relevant to cases beyond

21  matters that apply to the debtor.  And I think the law is

22  pretty clear that just because the debtor is in bankruptcy

23  doesn't forever bar the debtor from having to comply with

24  legitimate discovery requests.  So I think what I need to do is

25  get the discovery requests filed.  If the debtor objects to

1  them I'm sure I'll have a hearing, and I'll reserve

2  jurisdiction so that I can determine whether or not it's an

3  unreasonable burden on the debtor to have to comply.  To the

4  extent the debtor has document production rooms available I

5  don't know how difficult that's going to be, to let Scotts have

6  access to document production rooms.  I mean, I think whoever

7  made the point about, you know, Libby asbestos, not necessarily

8  vermiculite, is probably correct.  So I really don't at this

9  stage know what all is going to be involved for the debtor.  I

10 don't intend to let it get out of hand so that the debtor

11 cannot go forward with the reorganization.  But if there are

12 reasonable discovery requests I think the debtor ought to

13 comply.  But the question's whether they're reasonable.  I

14 certainly will not permit ongoing depositions of current

15 officers and directors who are involved in the reorganization.

16 I think that's outside the scope.  There may be a way where,

17 you know, ten interrogatories may be appropriate to answer.

18 Starting to get to 20, that might be excessive.  So there are

19 some parameters that may apply.  But I think what should happen

20 is that if in fact somebody wants discovery from the debtor

21 they ought to file an appropriate discovery request from the

22 debtor and have the debtor object to it.  But I reserve

23 jurisdiction, because of the nexus with the bankruptcy and the

24 reorganization issues, to hear those matters.

25          MS. BAER:  Thank you, Your Honor.  I suspect you'll

1  be seeing us again, and we'll take it one step at a time.

2          THE COURT:  All right.  I need an order, I think,

3  that puts this issue to bed and denies the request to extend

4  the injunction.

5          MR. CONAWAY:  Your Honor, if you would like, we'll

6  prepare one, circulate it among counsel and submit it under a

7  certification.

8          THE COURT:  All right.  That's fine.

9          MR. CONAWAY:  Thank you, Your Honor.  With your

10  permission, may we be excused?

11          THE COURT:  Yes, sir.  Thank you.

12          MR. CONAWAY:  Thank you.

13          THE COURT:  Ms. Baer?

14          MS. BAER:  Your Honor, that takes us to item number

15  14, which is somewhat related.  With respect to the adversary

16  proceeding filed against Scotts, they filed a motion to lift

17  the preliminary injunction so that the adversary proceeding

18  would not be a violation of it.  This matter has been continued

19  to January 24th.  We are in discussions with respect to

20  procedurally how this should move forward and would want to

21  take it up in January.

22          THE COURT:  All right.

23          MS. BAER:  Your Honor, item number 15 on your agenda

24  is the thirteenth quarterly interim application of counsel for

25  attorneys' fees and expenses.  I believe certificates of

1  counsel have been filed.

2          THE COURT:  All right.  Those order will undoubtedly

3  be entered.

4          MS. BAER:  Your Honor, that takes us to the last item

5  on the agenda, which is basically speaking a status vis a vis

6  the Grace Chapter 11 plan disclosure statement and related

7  items.  Your Honor, as you may recall, on November 13th the

8  debtors filed a plan, a disclosure statement, an estimation

9  motion, a new case management motion and solicitation

10 procedures.  You have set the disclosure statement, estimation,

11 case management to the extent you have jurisdiction all for

12 hearing on January 21st.  You set solicitation for January

13 24th.  Objections to all of these matters are currently due

14 tomorrow, December 21st.

15         Since that time, Your Honor, we've done a great deal

16 of discussing among our various constituency.  We've also done

17 a great deal of thinking vis a vis the best way to approach and

18 usefully use the time that you've allotted for us to begin this

19 process.  In that respect, Your Honor, I'm please to announce

20 that the Equity Committee, the Unsecured Creditors Committee

21 and the debtors have in fact come to terms and will be shortly

22 filing a joint Chapter 11 plan and will shortly be filing an

23 amended disclosure statement that reflects the agreements that

24 they have reached, and also the amended disclosure statement

25 will reflect further changes that have been suggested to us by

1 various people, like the SEC, the PPGC, people who have

2 contacted us already about potential changes.

3          Your Honor, as a result of that we suggest in a

4 protocol that we filed last week a way to approach the January

5 hearings that will in fact delay the hearing on the disclosure

6 statement for 60 days.  It was our feeling, Your Honor, that

7 estimation here is the key to moving forward with this case.

8 And estimation and the estimation motion that we have filed

9 clearly will take a great deal of this Court's time as we

10 decide how to move forward, both with respect to the asbestos

11 personal injury as well as asbestos property damage and ZAI.

12 Under those circumstances, Your Honor, we don't think we will

13 get to disclosure in time.  And frankly, we don't think we

14 necessarily should because until these matters are really

15 resolved, or at least the procedure for how they're resolved

16 have been decided, the disclosure statement really cannot

17 reflect exactly where we go next.  So under those

18 circumstances, Your Honor, we notified the various committees

19 last week that we were going to ask that the disclosure

20 statement part of the hearings in January be continued for 60

21 days and that correspondingly the response deadline on

22 disclosure statement objections that's now set for tomorrow, as

23 well as on solicitation procedures that's now set for tomorrow,

24 be in fact continued so that we can all focus on estimation and

25 case management.

1          THE COURT:  Well, it doesn't make much sense to get

2   objections to a disclosure statement if you're -- if you're

3   going to modify it.  I might as well, I suppose, wait for that.

4   With respect to solicitation, though, is that going to change?

5          MS. BAER:  Your Honor, I think that it's not

6   necessarily going to change but until we get to the point of

7   the disclosure statement being ready to approve, it doesn't

8   really much matter whether you take up solicitation in January

9   or you wait a couple of months to take it up.  And again,

10  wanting to use people's time usefully and not have them have to

11  spend a great deal of time preparing for things that don't

12  necessarily need to be taken up in January it was our thought

13  that they sort of go together and they would be continued.

14          THE COURT:  All right.

15          MS. BAER:  That turns us, Your Honor, to the

16  protocol, and I simply want to suggest to the Court that it's

17  the debtor's position that estimation should go forward, should

18  be the primary and first matter on the agenda in January.  In

19  addition, Your Honor, we're filing a supplement to the

20  estimation motion today that requests a ZAI bar date and very

21  simple proof of claim form for ZAI.  The estimation motion that

22  was filed concentrates primarily on personal injury.  And in

23  retrospect in thinking about going forward, it seemed to us

24  that it was logical, and we did not have to hold up proceeding

25  with respect to ZAI and could in fact go forward and ask for a

1  bar date there.  So again, that matter is being filed today.

2  We would suggest, Your Honor, and request that that matter be

3  taken up at the same time as the estimation motion itself on

4  January 21st.

5       With respect to case management, Your Honor, as we've

6  indicated in our -- in our protocol papers as well as a copy of

7  a motion you should have received, we've asked Judge Buckwalter

8  to transfer back to you or refer back to you the old case

9  management papers we filed a couple of years ago.  We filed for

10 you as well as Judge Buckwalter the new case management papers.

11 Your Honor, in going back and reviewing the record, it's very

12 clear that you do have jurisdiction over and can hear the new

13 case management orders.  Judge Woland did not withdraw the

14 reference of all asbestos personal injury matters in this case.

15      What happened, Your Honor, was you transferred to him

16 specific pleadings.  The specific pleadings you transferred to

17 him are the old CMO pleadings.  We would like to go forward

18 with a new CMO.  We'd like to go forward with the new CMO in

19 the January hearings.  We're giving Your Honor a choice.  The

20 new CMO is a litigation protocol and procedure for post-

21 confirmation litigation.  The old CMO was a litigation

22 procedure for pre-confirmation litigation.  Given how many

23 years have now passed and where we are in this case we believe

24 the new CMO motion is the way to go to logically get this case

25 concluded in the shortest amount of time.  But, Your Honor, we

1 believe you should have the choice.  That was the reason we

2 asked Judge Buckwalter to transfer back to you the old CMO.  We

3 have been in contact with his chambers on numerous occasions.

4 He has yet to set any briefing schedule, any hearing date or

5 rule on our request to transfer back to you, but we do not

6 believe that that needs to delay anything vis a vis going

7 forward in the January hearings.

8          THE COURT:  Okay.

9          MS. BAER:  So, Your Honor, we're not really asking

10 for any relief from you at this time.  We're suggesting a

11 protocol, and then we are asking that the disclosure statement

12 hearing and the deadlines for objection to the disclosure

13 statement, the response and the objection charts be delayed.

14          THE COURT:  All right.  Well, with respect to the

15 estimation, are you convinced at this point that I can go

16 forward with the estimation?

17          MS. BAER:  Yes, Your Honor.  We don't think there's

18 any issue vis a vis jurisdiction there.

19          THE COURT:  Okay.  Thank you.

20          MS. BAER:  Your Honor, I assume others would like to

21 be heard.

22          THE COURT:  I imagine.  Mr. Baena?

23          MR. BAENA:  I'm glad counsel -- may it please the

24 Court, Scott Baena on behalf of the Property Damage Committee.

25 Good afternoon, Your Honor.  I'm glad counsel pointed out that

1 the proposed protocol was announced last week.  Indeed, it was

2 late last week, as all the other constituencies, I suspect,

3 were cobbling together their objections to the disclosure

4 statement and the variety, the wide variety of documents that

5 were filed by the debtors.  And it sort of took us by

6 surprise, as does the news this afternoon that a new plan yet

7 is going to be filed.  And it may even take some of the wind

8 out of our sails to some extent.

9        Let me say on behalf of the Property Damage Committee

10 -- and I'm only going to address property damage if I may,

11 Judge -- first, our estimation issues are a lot different than

12 everybody else's.  They're different for two different reasons.

13 In the case of traditional property damage there's never been

14 an estimation process or model that's been approved by a Court

15 in another proceeding.  And so what we need to do in respect of

16 property damage is altogether new.  It's a new experience.

17 It's been done consensually before but not through the

18 intervention of the Court.  And so it engenders different

19 concepts than personal injury.  It factually is different than

20 personal injury because we have proof of claims.  We had a bar

21 date.  We had a proof of claim form.  And we do believe we have

22 to address how we're going to go about estimating traditional

23 claims, and we're prepared to do so.

24        The motion that was filed by the debtor in that

25 regard, Judge, told us exceedingly little about how they would

1  go about the process in regard to traditional property damage.

2  And we would wish to fill out that agenda for you at the next

3  hearing.  By no means are we going to be an impediment to going

4  forward with that process.  You've made it clear you want to do

5  it.  We wish to do it, too, but we wish to do it in a sensible

6  way, and the debtor hasn't offered up that proposal.

7          On Zonolite it's hard for me to comment because we

8  just learned from this late filed, whatever this pleading is,

9  regarding our proposed protocol that there's going to yet be

10 another filing made of a estimation motion with respect of

11 Zonolite.  That's interesting.  It's interesting because we can

12 only speculate what it says.  And it's also interesting because

13 it sounds like we're going to throw away about five million

14 dollars of effort and a pending decision that Your Honor I

15 thought was going to make as a result of summary judgment

16 motions that were filed and heard by you.  And I gather that

17 we're just going to scuttle this whole process now because the

18 debtor heard enough during the course of all of that to

19 conclude for itself that you can have now proof of claim forms

20 for every Zonolite claimant regardless of the risk of harm that

21 started that whole process two years ago.  All I can say is

22 we'll comment on it when we see it, but I sure don't think,

23 Judge, that we've heard an explanation why or how we can

24 proceed with Zonolite while the other matter is still under

25 consideration by the Court.

1          In regard to the case management motion, that's where

2    we do have a bit of a disconnect.  As Mr. Lockwood has alluded

3    to at least twice so far today, the plan that was filed by the

4    debtor, Judge, you don't have to read 524(g) too long to come

5    to the conclusion that by virtue of it and by virtue of 1129

6    that plan is dead on arrival.  So it's good news that they're

7    going to file a new plan, but it doesn't like they're going to

8    correct any of the problems that they have with the existing

9    plan.  It seems to me that designing a post-confirmation case

10   management procedure in the context of a plan that is dead on

11   arrival, or a plan that has not even yet been filed, is a

12   fool's errand.  What are we -- what are we planning for until

13   we've had an opportunity to vet and discuss and consider

14   whether we're even going to object to the plan that has yet to

15   be filed?  So the sequence of events here are very odd as

16   they're proposing it.  We should argue at the next hearing

17   about the case management procedures that would be used by the

18   debtor and its confederates under a plan that we haven't even

19   seen.  How could we possibly agree to that?  How could you

20   possibly force us to undertake such a ridiculous scheme of

21   things?

22          THE COURT:  Well, I don't know about forcing you to

23   undertake something that's in a ridiculous scheme of things,

24   but it seems to me that that is something that is worthy of

25   consideration, that is, to consider whether or not some of the

1  claims that may be disputed could in fact be litigated in a

2  post-confirmation format in a structure that the parties agree

3  to, which may be, you know, mediation, arbitration, it may not,

4  may actually be claims litigation.  It may be worth your folks

5  talking about whether that's a structure that will get you

6  toward -- further toward confirmation.

7          MR. BAENA:  Happy to talk about it, Judge, but when

8  you read the case management motion that was already filed you

9  -- what really strikes you is how little it says after you get

10 past the point of proof of claim forms and objections to

11 claims, which is really the guts of the CMO proposal.  They

12 say, we're going to use Rule 42, common issue trials.  Well,

13 that's fine.  About what?  Well, some common issues that may

14 emerge if our objections aren't sustained.  Judge, there's not

15 an awful lot to discuss.  I don't even know that you have to

16 enter an order that basically says, well, the rules say you

17 have that right, and we really mean it.  When we get there

18 we'll get there.  I think the important point also is that

19 they'd like you to have a choice between this new construct,

20 which is post confirmation, and their old construct, which is

21 now four years old.  However, I don't think you can make that

22 choice at this point in time because the old construct is still

23 in front of Judge Buckwalter.  He has not referred it back to

24 you.  And I really do think as far as case management

25 procedures are concerned we may be biting off a little bit more

1 than we can chew on because, A, I don't think it's before you,

2 and B, we shouldn't be addressing procedures that are not

3 connected to a plan that we've even had an opportunity to

4 examine.

5          THE COURT:  Well, I have to agree that I don't think

6 I'm in a position to making a choice, because I don't think the

7 issue of the pre-petition case management at this point's

8 before me.  You know, if Judge Buckwalter does send it here

9 then I suppose it will be before me, but as far as I know it's

10 on his docket and he'll decide what he wants to do with it, so

11 unless and until it's sent back I don't think that's "a

12 choice."  I suppose in terms of looking at whether or not a

13 post-confirmation litigation structure makes sense as part of a

14 confirmation issue rather than doing it pre-confirmation, the

15 debtor could probably put that into a disclosure statement and

16 plan concept and it would work.  I don't know why it has to be

17 done pre-confirmation in all instances.  I think the debtor

18 could choose to do it that way, and that may obviate the need

19 for Judge Buckwalter to do anything with the pre-confirmation

20 one.

21          MR. BAENA:  Except that the debtor has said again

22 that the next plan, too, will be a 524(g) plan.  And so is the

23 debtor going to design the case management procedures that may

24 be applicable in the case of a trust?  I think we can't get too

25 far ahead to --

1      THE COURT:  Until the plan is filed.

2      MR. BAENA:  -- speculate --

3      THE COURT:  Yes, I --

4      MR. BAENA:  -- yeah.

5      THE COURT:  -- and I tend to agree with that, too.  I

6  think, as I said earlier, in theory, I think in theory it's all

7  right.  I'm not overly familiar with that kind of a concept,

8  but I have seen issues which have been litigated post

9  confirmation before that, you know, the plans can get confirmed

10 subject to the outcome about litigation.  I don't see that as a

11 confirmation problem.

12     MR. BAENA:  Right.  I'm just afraid that we're going

13 to design a system that's going to always be applied by

14 exception.  Until we identify what it is that happens post

15 confirmation we're going to create a set of rules that may not

16 really work because they didn't anticipate what it was we were

17 doing post confirmation.  But what does also concern me about

18 the proposal that we put everything off, Judge, is sort of a

19 little bit more subtle, but when you say the word it becomes

20 very obvious.  What the debtor is doing now by truncating, or

21 proposing this truncation, is that they're getting the benefit

22 of the exclusivity for some untold period of time as a result

23 of all this.  They've agreed that the plan that we all had been

24 working with is not going to go forward.  They assert that

25 they're going to amend that plan and join other proponents.  I

1 don't know when that's happening.  But --

2      THE COURT:  Well, I think we're going to set some

3 deadlines for that because at this point, frankly, I'm not too

4 inclined to postpone anything.  So if --

5      MR. BAENA:  Well, Judge, I will say that if they file

6 another plan that is likewise constructed around these

7 implausible applications of 1129, 1126 and 524(g) that we

8 shouldn't be held captive here till the end of the day,

9 confirmation hearing, to find out that that plan is really

10 dead.  And we ought to get to the -- to the heart of those

11 problems with those plans which make them unconformable so that

12 we aren't stuck with exclusivity in, you know, with the debtor

13 having exclusive right to file and now to solicit ballots in

14 respect of a plan that's just never going to make it.

15      THE COURT:  Well, I think one of the issues that I am

16 going to want briefed if the next disclosure statement and plan

17 also provide that the tort claimants are not going to have a

18 vote because they're going to be paid in full and their claims

19 aren't impaired is, number one, what the legal basis for that

20 is under 524, if there's going to be an injunction; and number

21 two, I want to know what evidence the debtor is going to show

22 me that those claims are going to be paid in full on the

23 effective date, because otherwise they're impaired.  So it may

24 be a moot issue.  And I don't want to wait -- await the plan

25 confirmation for that.  That seems to me to be an issue that

1  should be litigated in connection with the disclosure statement

2  hearing because if the debtor --

3          MR. BAENA:  We actually perceive other overarching

4  problems --

5          THE COURT:  -- may be.

6          MR. BAENA:  -- with the plan that they've filed, any

7  one of which would end the prospect for confirmation of the

8  plan.  And maybe what we need to do, Judge, at this point is

9  wait for their plan to get filed, give us an opportunity to

10  identify what we consider to be overarching objections to

11  confirmation, don't make us go through this whole plan

12  confirmation process so that we can't argue to you those points

13  until the end of the day.  Let us bring that before you even if

14  it's on a disclosure statement hearing.  Let us bring those

15  overarching objections to you.

16          THE COURT:  Yes, I think the legal issues can be

17  briefed -- and I think those are legal issues -- can be briefed

18  in connection with the disclosure statement.  There is no point

19  going out with a plan that is not confirmable if that can be

20  identified early on.  So I think with respect to legal issues

21  that's probably a good idea, and what we need are some dates.

22  With respect to the Zonolite issue, I'm -- I haven't seen the

23  motion to set a bar date, so I really don't know how it affects

24  what I've got by way of summary judgment.  I was hoping that

25  maybe the motion itself would articulate that, but --

1           MR. BAENA:  Well, according to the motions that were

2    filed, according to the debtor the summary judgment proceeding

3    made it absolutely clear that there's no impediment to sending

4    out proof of claim forms.  Don't know how that happened, don't

5    know what order they got that came to that conclusion, but

6    they're ready to forego your opinion.  We're not.

7           THE COURT:  Well, I think -- I guess the question is

8    if a bar date can be set if in fact -- excuse me -- I'm sorry.

9    If in fact the Zonolite, I'll call it locations for a moment,

10   can be identified in some reasonable fashion so that notice can

11   be given, and I understand some of it's going to be by

12   publication, so that a bar date could in fact be set, I don't

13   know that it's not -- that it's a bad idea to set a bar date.

14   I thought what I was being asked to do was to determine whether

15   there is such an unreasonable risk of harm that some sort of

16   class action type of proof of claim could be filed instead,

17   but, you know, of course we've done it both ways.  And frankly,

18   to see what the universe of Zonolite claims is that actually

19   exists may not be a bad thing, because it may lead toward a

20   settlement with the property damage.

21          MR. BAENA:  Well, Judge, first, I of course don't

22   think that the special counsel for Zonolite expected this

23   argument today because --

24          THE COURT:  Well, I'm not really --

25          MR. BAENA:  -- they didn't expect --

1            THE COURT:  -- having an argument.

2            MR. BAENA:  -- a supplemental motion.

3            THE COURT:  Yes.

4            MR. BAENA:  So I wouldn't want us to foreclose the

5    opportunity for them to argue --

6            THE COURT:  Certainly not.

7            MR. BAENA:  -- again about the class proof of claim.

8    In terms of, well, maybe we can have, you know, two columns, if

9    we come down to a conclusion that it's harmful and a class

10   proof of claim form would be appropriate, it's okay that we wen

11   through this other effort.  I would only point out that the

12   debtor has taken a very odd turn in its papers as to what it

13   would entail to have such an undertaking.  The papers that

14   they've filed so far they say, all we have to do is file a

15   notice in the Wall Street Journal and in, I think it was USA

16   Today, of the bar date and we're all set to go.  Well, Judge, I

17   hope we don't have to bring their expert in again to show that

18   they're wrong.  It's a much more ambitious notice program, as

19   you will know, and the program we used for the last bar date

20   was streamlined because we took Zonolite out of it.  That

21   program required television spots and a whole variety of

22   things.

23           So the only point I would make to discourage you from

24   the two columns is that there's enormous expense attendant to a

25   Zonolite bar date under column A.  That program I believe cost

1 three or four million dollars last time.  And to launch that,

2 to get people calling us incessantly about how his applies to

3 them, helping them fill out proof of claim forms, just the

4 overload on resources and the expenditures would seem to me to

5 be improvident unless we've gotten to the point where you've

6 concluded that a class proof of claim can't be used.

7        THE COURT:  Well, I think the issue is whether or not

8 Zonolite presents such an reasonable risk of harm that that

9 kind of specific notice so that a class can be certified goes

10 out.  I don't know that they're inconsistent, Mr. Baena, but

11 again, I haven't seen the motion so maybe I'd better wait to

12 address this until I get the motion and the objection period

13 in.  I'm not sure that they can't go out on parallel tracks,

14 but the expense may be a reason not to do it.  I'm just not

15 totally sure they're exactly one issue.

16        MR. BAENA:  Well, I don't wish to argue it today.  I

17 can -- I can conceive of reasons, Judge, the easiest of which

18 is if you start telling people that there's a bar date you'd

19 better advertise well that maybe they don't have to comply with

20 it or else you're going to have the problem that you were

21 trying to avert occur.  And it just seems to me --

22        THE COURT:  Well, I'm hoping that as soon as the New

23 Year is done Zonolite gets to the top of my list for

24 examination, so maybe it won't take all that long to get it

25 figured out anyway.

1          MR. BAENA:  Okay.  Thank you, Judge.

2          THE COURT:  Mr. Lockwood?

3          MR. LOCKWOOD:  Your Honor, I must say I find this

4   protocol mind boggling, really.  The debtors originally filed

5   these motions.  They wanted to have the disclosure statement

6   hearing today.  Then they said, when Your Honor -- when we

7   said, gee, that's a little quick, they said, well, okay, we'll

8   put it off till January.  We all worked like beavers for a

9   month to get ready to file these pleadings tomorrow.

10  Nonchalantly on Friday the debtors show up and say, well, gee,

11  you know, why don't we put off two of the four things that we

12  had on the agenda for 60 days and we'll just deal with one of

13  them first, and then if we have time maybe we'll get to the

14  second.

15          Well, number one, estimation, we accept the notion

16  that an estimation of the PI claims, I'm not going to speak for

17  Mr. Baena's constituency, but the PI claims is appropriate.  We

18  don't think the way the debtor proposes to do it is appropriate

19  but we're prepared to deal with that on January the 21st and

20  we'll file or response to that tomorrow.  The suggestion,

21  however, that the case management order is appropriate for

22  January 21st when the disclosure statement hearing is not is

23  just preposterous.  I mean, we hadn't -- the draft that we are

24  proposing to file tomorrow on the case management order

25  basically says it's premature because we're -- it's predicated

1 on the notion that the plan of which it is simply a part will

2 be confirmed.

3          THE COURT:  Yeah, I agree --

4          MR. LOCKWOOD:  And we have disclosure statement

5 objections that we are, unless Your Honor tells us not to,

6 we'll file tomorrow.

7          THE COURT:  Well, i think you ought to file them

8 because it seems to me --

9          MR. LOCKWOOD:  And it will raise the two issues that

10 Your Honor -- in fact, it will only raise the two issues that

11 Your Honor wants briefed, because we took the position that

12 although we agree with Mr. Baena that the plan and the

13 disclosure statement are full of unconfirmable provisions, the

14 basic notion here -- and they don't -- nothing Ms. Baer has

15 said here indicates that they propose to change the voting

16 provisions, all they're doing is fiddling around with their

17 sisters, the Equity and the Unsecured Creditors Committee --

18 the unsecured I guess are going to get some more interest and,

19 you know, I don't know what the equity are going to get, but

20 I'm sure it'll be good for them, too -- but they're still going

21 forward with a plan that is premised on the notion that they

22 can get both a confirmation under 1129 and a 524(g) injunction

23 with no vote by asbestos PI ans asbestos PD.  And that's just

24 poppycock.  I mean, the PI claims are impaired, and indeed one

25 of the reasons they're impaired is because of the case

1 management order.  And even if they weren't impaired 1126(f)

2 doesn't apply to 11 -- 524(g).  As far as we can figure out,

3 reading between the lines in their plan, they seem to have the

4 idea that if they say they're unimpaired and therefore they're

5 deemed to, in the language of 1126(f), accepted the plan for

6 1129 purposes, that that's the same thing as voting by 75

7 percent in favor of the plan --

8          THE COURT:  Well, regardless --

9          MR. LOCKWOOD:  -- different terminology in a

10 different section with different legislative history.  Now --

11          THE COURT:  Regardless of that, it seems to me that

12 here's the issue.  If the debtor is going to be filing an

13 amended disclosure statement and plan, if you've got the

14 objections to the disclosure statement now ready to go,

15 frankly, I think you ought to file them, because the debtor can

16 then at least see them, have a little bit of time to consider

17 them, maybe be able to resolve some of them.  They -- maybe not

18 all of the major ones, but some of the minor things may be able

19 to be resolved.

20          MR. LOCKWOOD:  Well, we don't have any minor things.

21 That was what I was -- you had -- you had suggested earlier

22 that we brief the voting issue?

23          THE COURT:  Yes.

24          MR. LOCKWOOD:  That's what our disclosure statement

25 objections are going to tee up.  That's all we've objected to,

1  because remember, if we can't vote we don't really care what's

2  in the -- I mean, the disclosure statement as it's presently

3  written is aimed at the unsecured creditors and the equity.  We

4  don't -- we're sort of out there.  I mean, what's the

5  disclosure statement to us?  Why do we care?  I mean, it's

6  their plan, they, you know, they don't need us.  So --

7         THE COURT:  I wonder what the Wall Street Journal,

8  since I got promoted to District Judge but also learned a

9  lesson from <u>Combustion</u> that the unimpaireds should not vote

10  overwhelmingly about something that the impaireds should do

11  would think about the exact opposite situation when nobody gets

12  to vote?

13        MR. LOCKWOOD:  Well, moreover, they're using

14  unimpaired in the non -- in a medical sense, and here we're

15  using unimpaired in the sense Your Honor mentioned earlier,

16  which is entitled to be paid in full in cash on the effective

17  date or passed through, neither of which this plan does.  But I

18  guess what I'm saying is I believe that we can kill two birds

19  with one stone, if you will, where by we will at least file our

20  disclosure statement objections which -- address the two issues

21  that Your Honor thought would be appropriately briefed.  The

22  debtors can reply, and we can -- we can have that issue argued

23  on the 21st because, I mean --

24        THE COURT:  Well, let me ask, Mr. Lockwood.  Ms.

25  Baer, is the amended disclosure statement and plan going to

1  change this voting issue?  Because if not, I might as well get

2  that teed up now.

3         MS. BAER:  No, Your Honor, it does not change it.

4         THE COURT:  All right.  Then why don't we just file

5  the objections and at least use the 21st of January

6  productively for that purpose?  Mr. Baena?

7         MS. BAER:  Your --

8         MR. BAENA:  -- ask also whether they changed the cap

9  on payments to --

10         MS. BAER:  No, Your Honor.

11         MR. BAENA:  -- asbestos funds?

12         MS. BAER:  No, we have not.

13         MR. LOCKWOOD:  That'd be fine, Your Honor.  I think,

14  though, I think that'll make the January 21st hearing

15  considerably more productive, and we will accept the notion

16  that since they're going to file an amended plan and disclosure

17  statement we may well be back at a future date, but at least we

18  can get these overarching issues out and Your Honor can speak

19  to them, and I think that'll be useful guidance for everybody

20  in the process.

21         THE COURT:  All right.  With respect to the case

22  management order, I also am concerned about how I can actually

23  meaningfully address it until I know what the plan is that's

24  going to be of record.  I don't know what issues will have to

25  be adjudicated post confirmation.  I can take a guess at some

1 of them but --

2          MR. LOCKWOOD:  Well, to some extent, Your Honor, our

3 objection on the impairment point addresses the case management

4 order from the perspective of what it does by way of impairing

5 claims.  And my own view of the matter is that when you think

6 about what the case management order is, I mean, normally a

7 case management order is something that Your Honor puts in

8 because it's -- she wants a case management in the case right

9 now that she's going to organize.  This case management order

10 would control proceedings in front of the District Court, not

11 this Court, the District Court, post consummation.  I mean, for

12 the -- I mean, I can understand why Your Honor might say, oh,

13 that's, hey, but I think the District Court might, for example,

14 have some ideas about whether or not based on estimation it

15 wants to have consolidated issue trial of 100,000 claims

16 directed at this trust, for example, but --

17          THE COURT:  Well, that's why I'm not sure that if

18 there's going to be something post confirmation it shouldn't be

19 part of a plan like a protocol that --

20          MR. LOCKWOOD:  In fact, that's what I believe this

21 case management order effectively is.  It is -- it is part of

22 the TDP.  If you look at their plan they've got a trust

23 distribution process which is -- which really is broken into

24 two pieces.  One is what they call the cash option in which you

25 make an election, interestingly enough, back when you file your

1   questionnaire for purposes of estimation, but you make an

2   election as to whether you want to settle under the matrix set

3   forth in the TDP or whether you want to litigate.  If you want

4   to litigate the case management order kicks in.  So there

5   really -- its TPD -- in the normal sense they'd be the same

6   document.  The litigation option and the settlement option

7   would be a single thing, it'd be called trust distribution

8   procedures.  They've split it them in two, put a label called

9   case management order on the second piece, which, as I say,

10  governs in the District Court litigation post consummation, and

11  now want Your Honor to pass on that in some way or another

12  totally divorced from whether the plan that justifies its

13  creation in the first place will ever get confirmed.  And we

14  just think that's preposterously premature at this point, that

15  Your Honor couldn't appropriately consider the issue outside

16  the context of the plan much less outside the context of what

17  the District Court may or may not decide to do with the

18  alternative, because the CMO, as Ms. Baer said, posits two

19  alternatives for you.  One is to approve the post-consummation

20  litigation option.  The other is to approve their pre-

21  confirmation litigation option, which when last seen was

22  sitting in the District Court awaiting the ruling by Judge

23  Woland and which is now presumptively in front of Judge

24  Buckwalter until he says differently.

25            THE COURT:  Well, with respect to the concept that,

1  you know, the District Court -- obviously I can't control the

2  District Court's calendar and schedule, but with respect to the

3  fact that a process can be set up, either through a CMO,

4  through a TDP, whatever you want to call it, but a post-

5  consummation -- confirmation process in the District Court, the

6  District Court, to the extent that there's going to be a 524(g)

7  injunction request, it has to sign off on the order anyway.  So

8  the District Court, even though all I'd be doing is making

9  recommendations, would still be controlling that end process.

10  I can assure you I'm not going to be signing something by way

11  of a final order that purports to tell a District Court Judge

12  how to try a case, so.

13          MR. LOCKWOOD:  Right, and that CMO piece of the TDP

14  would come before --

15          THE COURT:  Right.

16          MR. LOCKWOOD:  -- the District Court once this Court

17  rules on confirmation of the plan, which is a long way down the

18  road, so why are we talking about the CMO which is in effect

19  effectively a part of that now, that --

20          THE COURT:  All right.  So for the 21st think we

21  should go forward with at least these couple of issues on the

22  disclosure statement.  I think the objections maybe should be

23  filed simply so that to the extent they raise legal issues and

24  the amended documents are not changing that concept, then at

25  least we can get past those issues.  I'm willing to hear the

1  ZAI motion, then, too, I haven't seen it, if parties can get

2  that teed up.  I simply don't know at this point what it says

3  or --

4         MS. BAER:  Your Honor, if I might kind of direct this

5  back, the first thing that we think absolutely has to be taken

6  up, and I don't think anybody on that side disagrees, is

7  estimation.  Estimation with respect to PD, estimation with

8  respect to PI and estimation with respect to ZAI, the process,

9  getting the bar dates, approving the claim form, approving the

10 PI questionnaire, that's the first and foremost thing that has

11 to be taken up, no matter what plan we ultimately have in this

12 case.

13        THE COURT:  Okay.  That's fine.

14        MS. BAER:  And that's the first thing we're asking

15 get heard on the 21st.

16        THE COURT:  Anybody object to that?

17        MR. LOCKWOOD:  No, Your Honor, but I would point out

18 that --

19        THE CLERK:  Speak into a mike, please.

20        MR. LOCKWOOD:  -- I would point out that with respect

21 to the PI part of the estimation many of the objections to the

22 process are aimed at issues that are also related to the plan,

23 i.e. what sort of elections you have to make.  But in

24 principle, in terms of teeing up the issue of estimation, we

25 agree with Ms. Baer that we should start on the process.  My

1   guess is the Court will determine that the issues are

2   sufficiently complex on the 21st that other than sort of moving

3   forward with the idea of an estimation and deciding whether you

4   versus Judge Buckwalter is the appropriate person to do it, it

5   may require some more scheduling discussion but --

6           THE COURT:  Well, I don't expect to do an evidentiary

7   -- I'm not starting --

8           MR. LOCKWOOD:  -- but we should --

9           THE COURT:  -- an evidentiary hearing on estimation,

10  but --

11          MR. LOCKWOOD:  -- but right --

12          THE COURT:  -- to discuss the process --

13          MR. LOCKWOOD:  -- but --

14          MS. BAER:  Your Honor, it's just the process.

15          THE COURT:  Yes.

16          MS. BAER:  You can't.  We're asking for a bar date.

17  We're asking for a bar date notice to go out.  We're asking for

18  the kind of publication we want to do to get approved.  On ZAI

19  it's the same thing, Your Honor.  It's just the process.  We're

20  asking for a simple bar date, a simple proof of claim form.  We

21  will have a publication notice program attached to it.  That's

22  what we're asking for you to consider at the hearing.

23          THE COURT:  I'll look at it and see what responses

24  come in, but that one, until I get through the summary judgment

25  process and decide whether class proof of claims are actually

1  appropriate, I just don't know about.  I'm not convinced that

2  they're inconsistent, but --

3        MS. BAER:  Your Honor, we don't think they are at

4  all, and we simply are trying to move the process along as

5  quickly as we can, and by getting that bar date and getting

6  that notice out there at least we can get in people who are in

7  fact interested here.  Your ruling will be very key with

8  respect to what happens to those claims, the allowability of

9  the claims, the value of the claims, which again is key to

10  estimation, but there's no reason not to get the process

11  started now --

12        THE COURT:  All right.

13        MS. BAER:  -- and that's what we're going to on that

14  one.

15        THE COURT:  Okay.  Folks, we've got to move.  I'm way

16  behind.  So let's go.  Let's get rid of this issue.  It's

17  enough.  It's for January 21st.  Mr. Baena?

18        MR. BAENA:  Is counsel suggesting that this new

19  motion is going to have a notice program in it?  We have to vet

20  that notice program by the 21st?

21        MS. BAER:  We will have a notice program in it, Your

22  Honor.

23        MR. BAENA:  Judge, I have a notice expert, too, and

24  we haven't spoken to him since the last time we did notice.

25  You know, Judge, today is the 20th.

1          THE COURT:  Well, that's a month.

2          MR. BAENA:  And we've got holidays in between.

3          THE COURT:  Mr. Baena, that's a month.  Lawyers work

4 over the holidays all the time.

5          MR. BAENA:  Well, Judge --

6          THE COURT:  They tell me that.  I read their fee

7 applications

8          MR. BAENA:  But how do I know that my notice expert

9 is working all that month?  I know I'm not --

10          THE COURT:  Because he wants to get paid, too.

11          MR. BAENA:  -- I'm not -- Judge, that's a very

12 ambitious agenda, and I'm not the spokesperson, as you know,

13 for the folks that are involved in the trial before you, so

14 it's particularly difficult for me to sit here and nod

15 affirmatively about this proposal.

16          THE COURT:  Well, I think what we ought to do is get

17 the motions filed, get the response dates and, Mr. Baena, if

18 people haven't had an adequate time because of the holidays

19 then maybe it's just going to have to be pushed off, but let's

20 at least get it on for a status conference, see what objections

21 can come in or what agreements come in, because the process has

22 to start somewhere, and this is as good a place to start as

23 any.

24          MR. BAENA:  I understand, Judge, and I'm not pushing

25 back on anything other than the Zonolite notice program and --

1        THE COURT:  Well, I --

2        MR. BAENA:  -- proof of claim form and --

3        THE COURT:  -- I'll take that third out of the three

4   of the notice programs that we're going to look at and see

5   where it goes.  I don't know, since I haven't seen the motions,

6   what's going to be involved.  Frankly, at this point I'm more

7   interested in getting the disclosure statements, these couple

8   of issues under way, because if this plan's not confirmable I

9   want the debtor to know that up front so that it gets modified

10  in time to have a meaningful plan, and the estimation issues

11  will, I think, take some time longer than amending the

12  disclosure statement.  So we ought to start on the estimation

13  and getting something teed up, and we ought to get the

14  disclosure statement issues set, I think.

15       MR. BAENA:  Judge --

16       MS. BAER:  -- Your Honor, the concern I have is the

17  estimation vis a vis PI/PD/ZAI itself is going to take up the

18  time and the focus in January.  Does it really make sense for

19  everybody to be briefing these issues vis a vis disclosure

20  statement addressing those at the same time?

21       THE COURT:  If they're telling me that they're not

22  going to be prepared because the motions haven't been filed yet

23  to address them in January but they are prepared to address the

24  disclosure statement issues because the disclosure statement

25  has been filed and their objections are ready, I'm going to

1  hear the disclosure statement issues and we'll push off the

2  estimation issues.

3       MS. BAER:  Then, Your Honor, what I'd ask for is a

4  little guidance.  We're expected, unless Your Honor extends the

5  deadline, to get a lot of objections to the disclosure

6  statement that do not go to the core issues.  They're the basic

7  disclosure statement objections.  And we're getting constant --

8  bombarded, as you can imagine, by requests from people for

9  additional time, and my response is if Your Honor continues the

10 deadline then I can continue it, otherwise we're in the

11 position of having to respond to all of those by January 4th.

12      THE COURT:  It seems to me they ought to be filed.

13 The objections ought to be filed so that the debtor can see

14 which ones you can resolve in an amended disclosure statement

15 without needing to go forward.  If you're going to amend the

16 disclosure statement anyway there may be numerous objections

17 that you will agree you can correct or add to or whatever

18 without litigation, and then you can do it.  Your response

19 simply can be that, you know, we'll take care of this in an

20 amended disclosure statement.  But with respect to these big

21 issues I really think they ought to be teed up.  We should just

22 get them argued in January.

23      So with respect to the debtor's time to respond to

24 them I am more concerned at this point about getting responses

25 in to the voting issues than I am to anything else.  With

1  respect to smaller things that you think will be corrected in

2  an amended disclosure statement I think it would be

3  satisfactory to say the debtor, you know, hopes to cure this in

4  an amended disclosure statement and let it go at that.  And I

5  don't expect to argue every issue.  I expect to argue the

6  couple of issues I've raised on the record today on January

7  21st.  I'm not going to get into the nitty gritty substance of

8  the disclosure statement when the debtor's telling me you're

9  going to change it.

10        MS. BAER:  -- Your Honor, it was our intention to

11  file an amended plan and disclosure statement just vis a vis

12  the matters that changed because of the Unsecured Creditors

13  Committee, Equity Committee joining us.  None of these other

14  matters will change in the -- in the plan and disclosure

15  statement at all.

16        THE COURT:  Oh, well, then let's just do the

17  objections and get them teed up.  I mean, if that's -- if there

18  is not going to be a significant change in the disclosure

19  statement but you've resolved something with the Equity

20  Committee for its distribution and the unsecured creditors,

21  then I think you can do a supplemental that says, you know,

22  we're going to amend it to say that the Equity Committee's

23  going to get, I'll make this up, a hundred shares of stock, you

24  know, and that unsecured creditors are going to get six percent

25  interest, then life will go on.  We don't need to worry about

1  those issues.  But if there -- there are some structural issues

2  in this disclosure statement and plan that are unlike other

3  cases that I've seen.  I'm sure people want to be heard about

4  them, and I want to hear the arguments about them.  So let's

5  just stick to the deadline the way it's crafted, then.

6         MS. BAER:  And, Your Honor, I believe there are also

7  likewise deadlines on the case management order request and on

8  the solicitation order.  Again, all the deadlines for responses

9  are tomorrow, and I think our reply is the 6th or the 4th, I

10  can't recall.

11         THE COURT:  Well, if you want them -- if you want

12  them even for a status conference on the 21st we ought to stick

13  to those deadlines, although on the case management order I'm

14  really not sure how I'm going to be able to enter anything on

15  that till I know what the plan and disclosure statement are.

16  So it would seem to me that the order ought to be the

17  disclosure statement issues, then the estimation issues.  We

18  could push off the solicitation issues and the case management

19  issues until after there's a ruling on the others, I think,

20  because you need rulings, but I don't think you need them now.

21         MS. BAER:  Well, Your Honor, we've been trying to get

22  a case management order since day one of this case.  It's

23  always been possible to get those procedures going again no

24  matter what the plan and disclosure statement say.  We come

25  back to the same thing today.  Once again we're trying to get

1  case management order -- case management procedures in place,

2  and once again it's being delayed.  It does not have to wait

3  for the disclosure statement and plan to be approved.

4          THE COURT:  But it does because Judge Buckwalter has

5  it.  I can assure you --

6          MS. BAER:  He has the old one.

7          THE COURT:  Well --

8          MS. BAER:  He has the old one.

9          THE COURT:  -- but what can I do when he's got one?

10 You know, get it back here.  I assure you I'll be happy to hear

11 it.  I'd like to get a case management order in place.  Whether

12 it's pre or post confirmation, I don't care.  I just want to

13 get one so that we can move this case along.  So get it back in

14 front of me and I'll run with the ball.  But until it's --

15         MS. BAER:  We're trying.

16         THE COURT:  -- here I don't have a ball to run with.

17         MS. BAER:  We're trying, Your Honor.

18         MR. BAENA:  Judge, may I ask for the Court's

19 indulgence?  Given that we are -- we're actually -- we're here

20 through tomorrow because of US Gypsum and we're meeting with

21 Judge Conte tomorrow, could we have until Wednesday to file

22 this so that I have an opportunity to go back to my office and

23 fix our presentation in accordance with the discussion today?

24         THE COURT:  How much extra time will the debtor need

25 to respond?

1             A SPEAKER:  The debtor was --

2             MS. BAER:  Your Honor, we --

3             A SPEAKER:  Your Honor --

4             MS. BAER:  -- the schedule --

5             A SPEAKER:  -- the debtor was --

6             MS. BAER:  -- is as it is.  It would be unfair for me

7  to say -- frankly, I'd like a lot more time but, I mean, we

8  don't have a great deal of time here in order to get ready for

9  the 21st.  If Mr. Baena wants a few more days and we can have a

10 few more days, I mean, that's certainly acceptable.

11            MR. LOCKWOOD:  Your Honor, the PI Committee will file

12 their papers tomorrow, all of them, the case management --

13            THE COURT:  Yes --

14            MR. LOCKWOOD:  -- confirmation --

15            THE COURT:  -- Mr. Baena --

16            MR. BAENA:  We're probably -- we're probably in a

17 position --

18            MR. LOCKWOOD:  -- et cetera.

19            MR. BAENA:  -- to do that as well, Judge, but --

20            THE COURT:  Yes, you can have until Wednesday.

21            MR. BAENA:  -- like to go through them just based on

22 this conversation.

23            THE COURT:  You can have until Wednesday, and --

24                        (Pause)

25            THE COURT:  Mona, what is -- am I in town on the 7th?

1                         (Pause)

2         THE COURT:  Okay.  The debtor can have until Friday

3   the 7th, our close of business -- let's say 4:30, eastern time,

4   to file the responses.  Now, that pushes your agendas to me

5   back, because I won't get it over that weekend.  Mona, I need

6   to get what's going to be filed by the parties by Friday.  I

7   have to have it that weekend.  So -- can -- only in this one

8   instance, Mr. Baena, when you file your documents would you

9   notify my office directly that it's been filed, and I will

10  print it off the docket.  I do not regularly do docket searches

11  because I end up with duplicates and triplicate copies and it

12  drives me nuts, so I don't do that, but in this instance if you

13  will notify me of the docket number then we'll print your

14  pleadings off the docket.  And, Ms. Baer, if you will notify me

15  of your response docket number we'll print that off the docket.

16  And I guess, Mr. Lockwood, if you're filing yours tomorrow

17  you'd better do the same thing.

18         MR. BAENA:  Judge, on another occasion I believe that

19  we actually e-mailed to you here in Pittsburgh our documents

20  separate and apart from the filing.

21         THE COURT:  You know, that would actually even be

22  better.  I can print it more easily that way.  But then the

23  binders, if I get those three sets of documents, which I think

24  will probably be the principal issues, I'm assuming, is anybody

25  else -- well, you probably won't be filing objections at this

1 point, correct?

2        MR. PASQUALE:  We'll be filing some papers, Your

3 Honor, but we can meet the schedule.

4        THE CLERK:  Your name?

5        MR. PASQUALE:  Ken Pasquale from Stroock, I

6 apologize.

7        MR. WYRON:  Your Honor, Richard Wyron for the futures

8 rep.  We'll be filing one consolidated objection.  If we could

9 also have until Wednesday we can send that to Your Honor

10 however it best suits Your Honor.

11        THE COURT:  All right.  On this instance only and

12 never again, and as soon as you do it you forget my e-mail

13 address, send me a copy via e-mail of what you're filing, those

14 of you who are filing either tomorrow or Wednesday or Friday.

15 And then, Ms. Baer, the binders can come --

16        A SPEAKER:  Judge, we --

17        THE COURT:  The -- we're talking --

18        A SPEAKER:  -- 24th --

19        THE COURT:  -- the 7th of January.  Yes, I should

20 state for the record, I'm talking about -- maybe I am not

21 correct.

22        MS. BAER:  No, Your Honor, we are talking about

23 Friday, January 7th --

24        THE COURT:  7th, okay.

25        MS. BAER:  -- for the -- for the --

1         THE COURT:  Debtor's response, yes.

2         MS. BAER:  -- response papers.  Right.  But I --

3         A SPEAKER:  Your Honor, very small matter, we have an

4  e-mail address for Your Honor as well as for Ms. Baer.  Where

5  do you want it to go?

6                     (Pause)

7         A SPEAKER:  Okay.  Thank you.

8         A SPEAKER:  -- not here.

9         A SPEAKER:  Thank you.

10        A SPEAKER:  -- my --

11        THE COURT:  The address is jkf@pawb.uscourts.gov.  So

12  it's not mine, it's not Ms. Baker's, it's my Delaware box.

13        A SPEAKER:  Thank you.

14        THE COURT:  All right.  So for the record, I'm

15  talking about tomorrow or the next day, Wednesday, or Friday,

16  January 7th, those are the three dates which have now been

17  impacted.  Everyone who can file tomorrow, please do.  Those of

18  you who can't, you have an extension till Wednesday.  The

19  debtor has till January 7th.  Now, the binders, Ms. Baer, I

20  still need the binder.  Mona, am I in town on the 14th?

21                     (Pause)

22        THE COURT:  Okay.  Can I get the binders from you by

23  the 14th of January?

24        MS. BAER:  Yes, Your Honor.

25        THE COURT:  Okay. That's fine.  We'll make that work.

1  All right.  So my view is then we'll start with the disclosure

2  statement issues, then we will go to estimation.  If we get as

3  far as solicitation and the CMO we will, otherwise those are

4  the two things that will be put off.  The likelihood is I think

5  they'll be put off.

6          MS. BAER:  And, your Honor, since we're filing the

7  ZAI bar date request today but want it on the same schedule

8  you'd actually be shortening the time period by three days to

9  get it here on the 21st, which is the 24th?  It's timely for

10  the 24th.

11          THE COURT:  It's fine to do it on the 21st.  I'm not

12  sure exactly how far we're going to get with those anyway,

13  because the argument's on the disclosure statement, but we'll

14  start down those -- down that path.  And if it needs to be

15  continued it'll be continued till the 24th.

16          MS. BAER:  I understand that, Your Honor.

17          THE COURT:  All right.

18          MR. KRUGER:  Your Honor, Lewis Kruger.  Just a minor

19  scheduling question.  What time are you starting on the 21st?

20          THE COURT:  I have no idea.  Nine o'clock?

21          A SPEAKER:  Nine a.m.

22          THE COURT:  Nine o'clock?

23          THE CLERK:  Your name, sir?

24          MR. KRUGER:  Oh, it's Lewis Kruger from Stroock --

25          THE COURT:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. BAER:  Your Honor, I believe that concludes the

2  agenda for today.

3          MR. WYRON:  Your Honor, one -- if I might, Richard

4  Wyron for the futures rep -- I wanted to alert Your Honor to

5  one issue, and it's in answer to Your Honor's question about

6  whether anyone opposes estimation.  To the extent Ms. Baer is

7  talking about bar dates and notices, she's talking about

8  present asbestos claimants, and we agree with Mr. Lockwood and

9  the parties will sort that out.  To the extent the debtor is

10  trying to use 502(c) to estimate demands instead of claims,

11  then we do oppose that.  Our papers tomorrow will address that,

12  and I just wanted for the sake of completeness to answer Your

13  Honor's question, but that is an issue you will see and will

14  hear on the 21st.

15          THE COURT:  All right.

16          MR. WYRON:  Thank you.

17          MS. BAER:  Thank you, Your Honor.

18          THE COURT:  Anyone have any housekeeping matters?

19  All right.  We're adjourned.  Thank you.

20                    (Hearing adjourned)

21                    *  *  *  *  *

22

23

24

25

# **C E R T I F I C A T I O N**

I, BEATRICE A. CREAMER, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____     <u>January 2, 2005</u>
BEATRICE A. CREAMER                  Date
J&J COURT TRANSCRIBERS, INC.