UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .    Case No.  01-01139
                                .
                                .
 W. R. GRACE & CO., et al,      .    5490 USX Tower
                                .    600 Grant Street
                                .    Pittsburgh, PA 15219
             Debtors.           .
                                .    January 21, 2005
. . . . . . . . . . . . . . . .      9:00 a.m.

TRANSCRIPT OF AGENDA MATTERS
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:                 Kirkland & Ellis, LLP
                                By:  DAVID M. BERNICK, ESQ.
                                     THEODORE L. FREEDMAN, ESQ.
                                     JANET S. BAER, ESQ.
                                200 Randolph Drive
                                Chicago, IL  60601

                                Pachulski, Stang, Ziehl, Young,
                                  Jones, & Weintraub, PC
                                By:  DAVID W. CARICKHOFF, ESQ.
                                919 N. Market Street
                                16th Floor
                                P. O. Box 8705
                                Wilmington, DE  19899-8705

For the Official Committee      Kramer, Levin, Naftalis,
of Equity Security Holders:       & Frankel, LLP
                                By:  PHILIP BENTLEY, ESQ.
                                919 Third Avenue
                                New York, NY  10022


Audio Operator:                 Janet Kozloski

Proceedings recorded by electronic sound recording, transcript
             produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-Mail:  jjcourt@optonline.net**
**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.):

For Sealed Air:                 Skadden, Arps, Slate, Meagher, &
                                   Flom, LLP
                                By:  MARK S. CHEHI, ESQ.
                                One Rodney Square
                                P.O. Box 636
                                Wilmington, DE  19899-0636

                                Skadden, Arps, Slate, Meagher, &
                                   Flom, LLP
                                By:  BERT L. WOLFF, ESQ.
                                     HENRY P. WASSERSTEIN, ESQ.
                                Four Times Square
                                New York, NY  10036-6522

For Select Asbestos             Bilzin, Sumberg, Baena, Price, &
Claimants and the Property        Axelrod, LLP
Damage Committee:               By:  SCOTT L. BAENA, ESQ.
                                     JAY M. SAKALO, ESQ.
                                     ALLYN S. DANZEISON, ESQ.
                                200 S. Biscayne Boulevard
                                Suite 2500
                                Miami, FL  33131-5340

For the Official Creditors'     Stroock & Stroock & Lavan, LLP
Committee:                      By:  LEWIS KRUGER, ESQ.
                                     KENNETH PASQUALE, ESQ.
                                180 Maiden Lane
                                New York, NY  10038-4982

For the ACC:                    Campbell & Levine, LLC
                                By:  MARLA R. ESKIN, ESQ.
                                800 Kings Street
                                Suite 300
                                Wilmington, DE  19801

                                Caplin & Drysdale, Chartered
                                By:  PETER VAN N. LOCKWOOD, ESQ.
                                One Thomas Circle, N.W.
                                Washington, DC  10005

For Unigard and                 Drinker, Biddle, & Reath, LLP
Commercial Union:               By:  MICHAEL F. BROWN, ESQ.
                                One Logan Square
                                18th & Cherry Streets
                                Philadelphia, PA  19103-6996

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Allstate Insurance Company: | Cuyler Burk, LLP<br>By:  ANDREW K. CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054-4663 |
| For the Future Claims Representative: | Swidler, Berlin, Shereff,<br>  Friedman, LLP<br>By:  RICHARD H. WYRON, ESQ.<br>    ROGER FRANKEL, ESQ.<br>3000 K Street, N.W.<br>Suite 300<br>Washington, DC  20007<br><br>Law Offices of Jack Phillips<br>By:  JACK PHILLIPS, ESQ. |
| For Royal Sun Alliance: | Wilson, Elser, Moskowitz,<br>  Edelman, & Dicker, LLP<br>By:  CARL J. PERNICONE, ESQ.<br>150 East 42nd Street<br>New York, NY  10017-5639 |
| For Fireman's Fund: | White & Williams, LLP<br>By:  LINDA M. CARMICHAEL, ESQ.<br>824 North Market Street<br>P.O. Box 709<br>Wilmington, DE  19899-0709 |
| For Maryland Casualty and Zurich Insurance: | Connolly, Bove, Lodge, &<br>  Hutz, LLP<br>By:  JEFFERY C. WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19801 |
| For Maryland Casualty: | Eckert, Seamans, Cherin, &<br>  Mellott, LLC<br>By:  EDWARD J. LONGOSZ, II, ESQ.<br>    LAURA G. STOVER, ESQ.<br>1747 Pennsylvania Avenue, N.W.<br>Suite 1200<br>Washington, DC  20006 |

APPEARANCES (Cont'd.):

For London Market Insurers:    Linklaters
                                      By: MARY K. WARREN, ESQ.
                                      1345 Avenue of the Americas
                                      19th Floor
                                      New York, NY  10105

For Federal Insurance
Company:                      Law Offices of Jacob Cohen
                                      By: JACOB COHEN, ESQ.

For Continental Casualty:    Law Offices of Elizabeth
                                        D'Christofaro
                                    By: ELIZABETH D'CHRISTOFARO

                                    Law Offices of Bob Fishman
                                    By: BOB FISHMAN, ESQ.

For the Unofficial Committee  Montgomery, McCracken, Walker, &
of Select Asbestos              Rhoads, LLP
Claimants:                    By: NATALIE RAMSEY, ESQ.
                                    300 Delaware Avenue
                                    Suite 750
                                    Wilmington, DE  19801
                                    (Telephonic Appearance)

For the State of MT:        Monzack & Monaco, PA
                                    By: FRANCIS A. MONACO, ESQ.
                                    1201 North Orange Street
                                    Suite 400
                                    P.O. Box 2031
                                    Wilmington, DE  19899-2031
                                    (Telephonic Appearance)

For the PD Committee:        Ferry, Joseph, & Pearce, PA
                                    By: THEODORE J. TACCONELLI, ESQ.
                                    824 Market Street
                                    Suite 904
                                    P.O. Box 1351
                                    Wilmington, DE  19899
                                    (Telephonic Appearance)

Co-counsel for the Official   Duane Morris LLP
Committee of Unsecured        By: MICHAEL R. LASTOWSKI, ESQ.
Creditors:                    1100 North Market Street
                                    Suite 1200
                                    Wilmington, DE  19801-1246
                                    (Telephonic Appearance)

APPEARANCES (Cont'd.):

For Scotts:                     Vorys, Sater, Seymour & Pease,
                                  LLP
                                By:  TIFFANY S. COBB, ESQ.
                                52 E. Gay Street
                                Columbus, OH  43216-1008
                                (Telephonic Appearance)

For the United States           Office of United States Trustee
Trustee:                        By:  MARGARET HARRISON, ESQ.
                                     for FRANK J. PERCH, III, ESQ.
                                844 King Street
                                Suite 2207
                                Wilmington, DE  19801
                                (Telephonic Appearance)

For Grace Shareholders:         KR Capital Advisors
                                By:  DAVID PINCUS
                                (Telephonic Appearance)

For Certain Interested          Drinker, Biddle, & Reath, LLP
Parties:                        By:  ANDREA L. D'AMBRA, ESQ.
                                One Logan Square
                                18th & Cherry Streets
                                Philadelphia, PA  19103-6996
                                (Telephonic Appearance)

                                Lukins & Annis, PS
                                By:  DARRELL SCOTT, ESQ.
                                1600 Washington Trust Financial
                                  Center
                                West 717 Sprague Avenue
                                Spokane, WA  99201-0466
                                (Telephonic Appearance)

                                Zeichner, Ellman, & Krause LLP
                                By:  MICHAEL S. DAVIS, ESQ.
                                575 Lexington Avenue
                                New York, NY  10022
                                (Telephonic Appearance)

                                Swidler, Berlin, Shereff,
                                  Friedman, LLP
                                By:  DEBRA LESSIN FELDER, ESQ.
                                3000 K Street, N.W.
                                Suite 300
                                Washington, DC  20007
                                (Telephonic Appearance)

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For Certain Interested              Stutzman, Bromberg, Esserman,
Parties:                              & Plifka, PC
                                    By:  SANDER L. ESSERMAN, ESQ.
                                         DAVID J. PARSONS, ESQ.
                                    2323 Bryan Street
                                    Suite 2200
                                    Dallas, TX  75201
                                    (Telephonic Appearance)

                                    Steptoe & Johnson
                                    By:  MARCH D. COLEMAN, ESQ.
                                    1330 Connecticut Avenue, N.W.
                                    Washington, DC  20036
                                    (Telephonic Appearance)

                                    Lynberg & Watkins, PC
                                    By:  R. JEFF CARLISLE, ESQ.
                                    Sixteenth Floor International
                                      Tower Plaza
                                    888 South Figueroa Street
                                    Los Angeles, CA  90017-5465
                                    (Telephonic Appearance)

                                    Cohn & Whitesell, LLP
                                    By:  DANIEL C. COHN, ESQ.
                                    101 Arch Street
                                    Boston, MA  02110
                                    (Telephonic Appearance)

                                    Zuckerman Spaeder, LLP
                                    By:  THOMAS G. MACAULEY, ESQ.
                                    919 Market Street, Suite 1705
                                    Wilmington, DE  19899
                                    (Telephonic Appearance)

                                    White and Williams, LLP
                                    By:  LEONARD P. GOLDBERGER, ESQ.
                                    1800 One Liberty Place
                                    Philadelphia, PA  19103-7395
                                    (Telephonic Appearance)

                                    Stroock & Stroock & Lavan, LLP
                                    By:  DENISE K. WILDES, ESQ.
                                    180 Maiden Lane
                                    New York, NY  10038-4982
                                    (Telephonic Appearance)

APPEARANCES (Cont'd.):

For Certain Interested          King Street Capital
Parties:                        By:  MITCH SOCKETT
                                (Telephonic Appearance)

                                Law Offices of Katharine Mayer
                                By:  KATHARINE MAYER, ESQ.
                                (Telephonic Appearance)

                                Magner Law
                                By:  ELIZABETH MAGNER, ESQ.
                                (Telephonic Appearance)

                                Law Offices of Dan Chandra
                                By:  DAN CHANDRA, ESQ.
                                (Telephonic Appearance)

8

1          THE COURT:  I just want you to know, we had all this

2    equipment tested out last night and it worked fine.  So, I

3    don't know what happened between last night and this morning,

4    but something obviously did.

5          This is the matter of W. R. Grace, Bankruptcy Number

6    01-1139.  This is the time set for going over some objections

7    to the disclosure statement.

8          I have participating by phone, David Pincus, Michael

9    Davis, Ted Tacconelli, Tiffany Cobb, Michael Brown, Andrea

10   D'Ambra, Debbie Felder, Sander Esserman, David Parsons, Mark

11   Coleman, Jeff Carlisle, Frank Perch, Daniel Cohn, Katharine

12   Mayer, Michael Lastowski, Lewis Kruger, Kenneth Pasquale,

13   Denise Wildes, Elizabeth Magner, Dan Chandra, Natalie Ramsey,

14   Mitch Sockett, Darrell Scott, Thomas Macauley, Francis Monaco,

15   Leonard Goldberger, and Linda Carmichael.

16          I'll take entries of appearances in court.  Please,

17   if we can do it very quickly.  Just stand and tell me your name

18   -- that -- and who you represent.  Don't give me law firm

19   information.  Your name and the party, period.  Thank you.

20   Good morning.

21          MR. BERNICK:  I'll do my best, Your Honor.  David

22   Bernick, for the debtors.

23          MR. FREEDMAN:  Theodore Freedman, for the debtors.

24          MR. KRUGER:  Lewis Kruger and Ken Pasquale, for the

25   Official Creditor's Committee.

1          MR. BENTLEY:  Philip Bentley, for the Equity

2  Committee.

3          MR. LOCKWOOD:  Peter Lockwood, for the --

4          THE COURT:  I'm sorry, just a second.  I'm sorry.

5  Okay, Mr. --

6          MR. LOCKWOOD:  Peter Lockwood, for the ACC.

7          MS. ESKIN:  Marla Eskin, for the ACC.

8          MR. BAENA:  Scott Baena, for the Property Damage

9  Committee.

10          THE COURT:  Just a minute.  Okay.

11          MR. SAKALO:  Jay Sakalo, for the Property Damage

12 Committee.

13          MR. WASSERSTEIN:  Henry Wasserstein, Sealed Air

14 Corporation.

15          THE COURT:  Just a minute.  Could you pick him up,

16 Jan?

17          THE CLERK:  Yes.

18          THE COURT:  I'm sorry.  Those of you in the back, I

19 lied.  You'll have to use the microphone.  If you could just

20 line up, please, and tell me if you're going to enter an

21 appearance.

22          MR. FRANKEL:  Roger Frankel and Rick Wyron, for the

23 Future Claims Representative.

24          THE COURT:  Good morning.

25          MR. WASSERSTEIN:  Henry Wasserstein and Mark Chehi,

1  for Sealed Air Corporation.

2          MS. CARMICHAEL:  Linda Carmichael, for Fireman's

3  Fund.

4          MR. BROWN:  Michael Brown, for Unigard and Commercial

5  Union.

6          MR. PHILLIPS:  Jack Phillips, for the Future Claims

7  Representative.

8          MR. COHEN:  Jacob Cohen, for Federal Insurance

9  Company.

10          MS. WARREN:  Mary Warren, for London Market Insurers.

11          MR. SCOTT:  Good morning, Your Honor.  Darrell Scott,

12  Zonolite, claimants.

13          MR. WISLER:  Good morning, Your Honor.  Jeff Wisler,

14  on behalf of Maryland Casualty and Zurich Insurance.

15          MR. LONGOSZ:  Ed Longosz, on behalf of Maryland

16  Casualty.

17          MR. PERNICONE:  Carl Pernicone, Your Honor, for Royal

18  Sun Alliance.

19          THE COURT:  I'm sorry.  What was your last name?

20          MR. PERNICONE:  Pernicone.

21          MS. D'CHRISTOFARO:  Elizabeth D'Christofaro

22  (phonetic), for Continental Casualty.

23          MR. CRAIG:  Andrew Craig, for Allstate Insurance

24  Company.

25          MR. FISHMAN:  Bob Fishman (phonetic), for Continental

1  Casualty.

2          THE COURT:  Mr. Bernick?

3          MR. BERNICK:  Yes, Your Honor.

4                      (Pause)

5          THE COURT:  Good morning.

6          MR. BERNICK:  Good morning.  Obviously there are a

7  number of matters that have -- interrelationships here, and I

8  thought what might be best, in order to proceed here smoothly,

9  is to lay out what we believe to be a good road map for the

10 issues that are now before the Court and point out their

11 relationships.

12         And then, if it would be appropriate, I would be

13 prepared -- in the sense -- go through our analysis of all of

14 those issues.  And I will begin with the plan confirmation

15 issue that's been raised, which is impairment, but then bring

16 in the estimation motion and some aspects -- only some aspects

17 of the CMO.  But, I'll speak my piece and then maybe we can

18 proceed, sequentially, through the other constituencies.

19         I'm a little concerned that if we go issue by issue,

20 or motion by motion, we're going to get -- end up talking about

21 -- things and different parts of the briefing process, and this

22 might make it a little bit easier.  But I'm obviously at the

23 Courts disposal.

24         THE COURT:  Okay.  Well, I think we should get

25 through the question of impairment, because I believe that's an

1  issue, before the plan voting can go out, we need to address.

2          With respect to the case management order, until we

3  get an approved disclosure statement, frankly, I think that's

4  something that can wait.  I think we need to see whether or not

5  we can get an approved disclosure statement, and I don't know

6  whether you're prepared today.

7          But, maybe it would be better to deal with the issues

8  that are not yet resolved.  I don't care about the issues that

9  are resolved.

10          The debtor is obviously going to have to amend the

11  disclosure statement.  If they're resolved, you'll put them in

12  the amended disclosure statement and if somebody objects I'll

13  deal with them then.

14          MR. BERNICK:  Right.

15          THE COURT:  But, to the extent they're not resolved,

16  maybe -- I can get some rulings and if we can get some rulings,

17  maybe we can get to an amended disclosure statement.

18          MR. BERNICK:  Okay.  Well, let me do this, Your

19  Honor.  Let me make -- kind of put my little chart out.  I'm --

20  obviously going to focus first and foremost on impairment.  And

21  then let me just layout how I think some of the other things

22  that have been raised relate to impairment and then, in a

23  sense, draw a line for what may not relate to impairment and

24  just ask whether Your Honor wants to hear those things now, or

25  later.

1        But, if -- maybe if I can chart it out so we see what

2  it looks like --

3        THE COURT:  All right.

4        MR. BERNICK:  -- that would make sense.

5        If you take a look at the three issues that are

6  addressed in our brief, relating to selected confirmation

7  issues, obviously the most -- the clearest issue that's a plan

8  confirmation issue is the impairment issue.

9        And in fact, the other -- there were three questions,

10  I think, our brief addressed.  One is whether there's

11  impairment under the code, setting aside 524(g).  The second

12  question is whether 524(g) changes the analysis that would

13  otherwise take place under the code.  So, those are obviously

14  both tied to impairment.

15        The third question relates to estimation.  And both

16  -- with respect to estimation and with respect to the CMO,

17  there are aspects of the CMO and the estimation that, in broad

18  terms, implicate impairment.  And the others -- the other

19  people -- people who have objected, saying that there is

20  impairment, point to aspects of the estimation process that we

21  proposed and they point to aspects of the CMO, in saying that

22  there is impairment.

23        So, for example, with respect to the CMO, they say

24  that personal injury claims in particular say, my gosh, you are

25  consigning us to Federal litigation.  Federal, then you,

1 litigation.  That's an impairment of our rights.

2          Likewise, with respect to estimation, the position

3 taken by both the property damage claimants and the personal

4 injury claimants is that -- at least our brand of estimation,

5 in particular, because we seek an aggregate number to be

6 established -- maybe that creates impairment.

7          Even the channeling aspect of our plan is suggested

8 by the futures claimant to create some kind of impairment.

9          So, what I thought I would do is address impairment,

10 as a concept, deal with the issue of whether by calling for

11 Federal litigation the contemplated CMO would create

12 impairment, deal with the questions of whether estimation of

13 aggregate liability would constitute impairment, deal with the

14 question of the channeling injunction and whether it

15 constitutes impairment.

16          I distinguish those issues from the other issues that

17 have been raised -- and this is where Your Honor may wish to

18 defer these issues, for now -- what I'll call the

19 implementation, or execution issues.

20          And to be more specific, which respect to the

21 personal injury claims, they object to the bar date, they

22 object to the use of questionnaires, and they basically call

23 for an estimation that's simply a settlement-based estimation.

24 And because ours is not, they quarrel with that.

25          With respect to the traditional property damage

1  claimants, there's already been a bar date, there have already

2  been questionnaires.  The principal issue that they raged --

3  raise, is the issue of whether in fact estimation really can be

4  done in the aggregate.  Should it be an aggregate estimation or

5  should it be claim by claim?

6          With respect to ZAI, we don't have a bar date yet,

7  and the issue that's raised by the ZAI claimants is, why don't

8  we get the science issue resolved first?  What happened to that

9  and why do we really need to have a bar date?

10         And, of course, our position is that we need a bar

11 date so that we can move forward to making whatever

12 determination Your Honor reaches with regard to the science,

13 have it actually have impact on the bankruptcy process itself,

14 including who are the claimants who are at issue, and what

15 should happen with respect to their claims.

16         So, I'm happy to go through the impairment issue, but

17 then take up these questions, as well.  Also happy to go

18 through the impairment issue and hold off on these questions,

19 although I suspect that my brethren, when they stand to address

20 the Court and talk about impairment, may disagree with how I've

21 drawn this line.  And they may regard some of these

22 implementation issues as impairment issues.  So, that's why

23 I've laid it all out.

24         I can -- I could, either way, and whatever Your Honor

25 believes is appropriate, I'm prepared to proceed in that

1  fashion.

2          THE COURT:  Well, let's start with the legal issue,

3  with respect to the classification of impairment, before we get

4  to the implementation side --

5          MR. BERNICK:  Okay.

6          THE COURT:  -- and start in that fashion.

7          MR. BERNICK:  Okay.  The procedural posture of that

8  issue, I think, is fairly straight forward.  We bear the burden

9  of demonstrating that there is no impairment.  I think that

10  that's relatively clear.

11          And yet, at the same time, it is also clear that

12  because of the stage that we're at in this process, which is

13  the disclosure statement hearing, the only issue before the

14  Court is whether there is -- whether impairment constitutes a

15  -- creates a patently unconfirmable plan, or a facially

16  unconfirmable plan.  So, the standard of proof here is not the

17  same as it would be in the context of the confirmation hearing

18  itself.

19          Now, that's not to say that it is, by virtue of that,

20  an easy task, that is, because of the posture of the issue

21  today.  But, I believe it is in fact an easy task to

22  demonstrate that impairment does not constitute that kind of

23  issue today, for two reasons.

24          One, is that we all know that in this business almost

25  nothing is patently obvious and almost nothing is facial.

1  There are always wrinkles and this is a complicated area and

2  that, in and of itself, would caution against the idea of

3  saying, gee, we now know, today, that in fact there is

4  impairment, and it's quite clear, and therefore this plan

5  should not go forward.

6         But, the other reason why I believe it's going to be

7  easy for the debtors to satisfy their burden in this respect,

8  is that in this case, on this issue, before this Court, at this

9  time, God bless, I've got clear Third Circuit authority that

10 supports my position.  We don't have to create any new law.

11 And that, obviously, is the PPI Industries case.

12        Now let me put the Third Circuit's ruling in that

13 case a little bit in context.  The code does create exceptions,

14 where if you meet with the exception -- meet the exception, you

15 can demonstrate non-impairment.  And the one that most

16 frequently is discussed is 1124(1), which basically requires

17 that the plan leave "unaltered" the legal, equitable, and

18 contractual rights of the creditor or claimant.

19        And it would seem, on the face of it, that that's a

20 hair-trigger test.  It's extremely difficult to craft a

21 provision or plan that, in some fashion, doesn't alter or

22 affect those rights.

23        In the sense, the driving concept we see, that that

24 language seems to implicate and that, in fact, is advocated

25 very strongly, is that essentially anything that you do that

**J&J COURT TRANSCRIBERS, INC.**

1  has any kind of impact whatsoever, on those rights, constitutes

2  impairment.

3        The law, however, I think, has become much more

4  sophisticated than that.  If you go back to the list of what

5  we're talking about, which are these rights, legal,

6  contractual, equitable rights, those rights are defined by the

7  law.

8        And the simple answer to all of the contentions that

9  have been made regarding impairment, is that they grossly

10  overstate what legal rights really are.

11        All legal rights carry with them a series of very

12  complex and important constraints.  There's no such thing as an

13  absolute legal right.  So, when you read the word rights, be

14  they legal, equitable, contractual rights, all of those rights

15  have inherent in them limitations.

16        And the limitations on those rights cannot constitute

17  impairment.  The concept is really that simple.  Those

18  limitations that are implicit or explicit in those rights vary

19  in significance depending upon where the claim stands, what its

20  status is, in the bankruptcy process.

21        And I tried to think of a simple way to illustrate

22  this and maybe it's too simple, but I'll try it anyhow.

23        This is intended not to be a target with a bull's-eye

24  on it -- although I know that my objectors will feel that way

25  -- but it's designed to create a spectrum.

1          In the center, we have allowable claims.  And

2   clearly, with respect to allowable claims, which is a very

3   conscribed term, the ability to limit those claims is very,

4   very much -- is very, very narrow.

5          You have to provide for -- you can't provide for

6   payment -- you can't pay them less than what they are and you

7   have to provide for their payment.  You can't simply say, well,

8   they're out there and they'll get -- they'll get paid at some

9   point.  You have to provide for the payment of those claims,

10  otherwise you have an impairment problem.  But, those are

11  allowable claims.

12         Very different -- in the broadest circle, are claims.

13  Claims are very broadly defined.  And where you have claims

14  that are asserted claims, but they're unliquidated and they're

15  disputed, limitations on those claims do not give rise to

16  impairment, provided that those limitations emanate from the

17  law -- from the legal process itself.

18         And this was made very clear in the decision that was

19  reached in the <u>American Solar King Corp.</u> case, where the Court

20  pointed out, in the following language, and adopted the -- or

21  the word called impairment by statute.

22         The Court pointed out, in this language, the

23  following.  I'll see if I can zero in on it.

24         The mere filing of bankruptcy does not operate as

25  impairment, under Section 1124, which speaks in terms of the

1 legal rights of a claim, itself a term of art referring to the

2 call on estate assets that a creditor or interest voter holds

3 as of the date of the filing.  And there's a cite.  It is the

4 Bankruptcy Code itself which creates the concept of claims,

5 according broader legal rights in some ways and restricting

6 legal rights in other ways.

7         And it was in this decision that used that -- that

8 really drove that distinction and labeled the latter -- that

9 was the limitations of the code, impairment by statute.  The

10 concept being that the claim itself is highly constrained.

11 There are many different limitations, all of which are imposed

12 by law, none of which are -- constitute impairment.

13         This language, and this approach, was adopted by the

14 circuit in -- the Third Circuit, in the PPI Industries case,

15 where Solow, who was the plaintiff in the case -- the world's a

16 small world.  I litigated a case against Mr. Solow in State

17 Court in Manhattan many years ago and in fact, this actually

18 emanated from a different part of that case, that you're not

19 involved in.  But, Solow took the position that impairment

20 really had to be judged against the touchstone of whether it

21 affected the claim.

22         And in fact, the Third Circuit, in the opinion,

23 pointed this out saying Solow contends a broad definition of

24 claim requires a finding of impairment, whether the source of

25 impairment is the plan or the statute.  Essentially, he took on

1  the question of whether Solar King ought to be the law.

2        The Third Circuit, as the discussion in PPI then goes

3  on to point out, adopts the reasoning of the Solar King case,

4  adopts the distinction of impairment by plan versus impairment

5  by statute, and makes the following observation.

6        Generally, we agree with the Solar King analysis.

7  The relevant impairment language requires bankruptcy plans to

8  leave unaltered, et cetera, et cetera.

9        In other words it concludes, a creditor's claim,

10  outside of bankruptcy, is not the relevant barometer for

11  impairment.  We must examine whether the plan itself is a

12  source of limitation on a creditor's legal, equitable, or

13  contractual rights.

14        The entire legal process is part of the right.  It is

15  a constraint on that right.  The claim is not the touchstone.

16  The claim is simply the beginning of the process.

17        Again and again, in the papers, the objectors here

18  fail to recognize this fundamental point and they again, and

19  again, advocate that -- the position that the touchstone should

20  be, well, what would happen in the tort system?  What would

21  happen to claims in the tort system, as they were being dealt

22  with pre-bankruptcy?

23        That's the wrong measure.  That's the measure that

24  was expressly rejected in the PPI case.

25        This is an example from the personal injury

1  claimants' brief, at Page 14, where they insist, after talking

2  about some other alteration, they insist, were it not for

3  Grace's bankruptcy asbestos claimants would have the legal

4  right to litigate their claims against Grace in the courts of

5  the State where they reside or which their claims arose.

6       Nothing to do with impairment.  That is just not

7  relevant for impairment purposes.  The Third Circuit already

8  has squarely resolved that issue.

9       So, what is it then that -- how else do we then fill

10  in this chart?  What are the limitations that are imposed upon

11  claims in the process by which claims are then reduced to

12  allowable claims?

13       Well, first of all you have a legal process called

14  allowance.  To put claims through a process, or allowance or

15  disallowance, is not impairment.  It is what the code calls

16  for.  It is a legal constraint.  And the -- some of the

17  objectors own citations reveal this.

18       In re Geraldine Becker Smith made it quite clear that

19  impairment only was a doctrine that applied after the

20  conclusion of the legal process, or allowance or disallowance.

21  Having to go through that process was not impairment.

22       So, where does this kind of approach leave us?  It

23  says, once you have legal process you're partway down, but

24  there are further limitations.  For example, there are

25  substantive bankruptcy limits.

1          That is to say, as the Court in <u>Solar King</u>

2  recognized, that a claim, before it gets to bankruptcy, if it

3  is -- which we'll talk about in a minute -- has legal

4  constraints.  But, once it gets into bankruptcy, even beyond

5  the process of bankruptcy, there are substantive limitations.

6  Caps, for example, on recovery and the like, those also are

7  limitations that limit the claim, limit the right, that do not

8  constitute impairment.

9          And, finally, you have State and Federal substantive

10  law.  What are the defenses for the claim?  So, so long as in a

11  plan -- or in a plan, all of the constraints or limitations are

12  driven by the law, that is they're what the law requires by way

13  of legal process, substantive bankruptcy limitations, or

14  substantive law determinations that are applicable to those

15  claims, none of that's impairment.

16          It is only with respect to claims that clear that

17  process, and clear the bankruptcy and substantive law

18  limitations and become allowable claims, that we really have

19  the benchmark and litmus test for whether there is impairment.

20          Now, we get back then to the three things that I have

21  up here.  We have a CMO that calls for Federal litigation.  We

22  call for a channeling injunction, under 524(g), to a trust.

23  And we then have an estimation process that's designed to

24  determine an aggregate amount of liability.

25          Where do all those fall?  They all fall as part of

1 legally driven and required processes.  Estimation is such a

2 process, under 502(c).  Litigation is such a process, and there

3 are rules that we'll talk about that apply to the litigation --

4 the litigation process for claims allowance and disallowance.

5 And, obviously, channeling is a feature that's called out by

6 524(g) itself.

7          So, all of these processes are completely within the

8 realm of statutorily driven limitations that do not constitute

9 impairment.

10          What about the particulars, for example, estimation

11 of aggregate liability.  Is that something where, in the sense,

12 we have deviated from what the code requires?  Does the code

13 allow for estimation of the aggregate?  And it clearly does.

14 502(c) calls out for estimation, specifically, as an

15 alternative to litigation.

16          And, repeatedly, it's been recognized that the Court

17 has the power, under 502(c), to aggregate -- to estimate

18 liabilities in the aggregate.

19          That was recognized in the Manville case, it was

20 recognized in the UNR decision, and there's a very extensive

21 discussion of exactly that process, by the Fourth Circuit, in

22 the A. H. Robins case.  And I would urge the Court to take a

23 look at the discussion there, because it's probably the most

24 detailed discussion.

25          What about Federal litigation?  There is no

1 entitlement to a State Court venue.  In fact State Court venue

2 is specifically precluded under the code.  5 -- 157(b)(5)

3 specifically calls out and says that the litigation of claims,

4 including to a Jury, would take place in Federal District

5 Court.

6          The limitation to Federal -- to a Federal venue,

7 again has been repeatedly recognized.  It's recognized in <u>UNR</u>,

8 it was recognized in <u>Manville</u>, it was recognized in the <u>Dow</u>

9 <u>Corning</u> case.

10          And, obviously, the channeling injunction is

11 something that we don't have to spend very much time on.  It's

12 specifically called out in 524(g).

13          So, at the end of the day, we have scrupulously

14 deployed, in this particular plan, devices and processes that

15 are specifically code driven and are recognized in the case law

16 as being code driven.

17          And, as a consequence, all of these fall on the right

18 side of the <u>PPI</u> decision.  Third Circuit law is absolutely

19 clear that none of these constitute impairment.  They're not a

20 question of a plan provision.  They're a question of what the

21 law requires.

22          The insistence that's being made by the objectors

23 here, that says, they are still impaired, they are entitled to

24 vote against, therefore becomes very apparent, in terms of its

25 implications.

1          They're not looking for a preservation of their

2    rights.  They're looking for an enhancement of their rights.

3    They're saying, we're entitled to vote, even though all of the

4    different processes which you say are appropriate to apply to

5    our claims come from the law, we're still able to vote against

6    this plan, because we don't like those procedures.  We don't

7    want to be constrained by those procedures.  We'd rather go

8    back to the State Courts.

9          Well, that is an enhancement of their rights and the

10   effect of it is quite obvious, which is that if they don't like

11   the way that the law is being applied, they say, we're going to

12   vote against.  We don't want to be limited by the law.  We'd

13   rather have something else.

14         That is just a nonstarter.  It certainly is not

15   something that is patently obvious, or facially obvious from

16   the cases and the decisions.  To the contrary.

17         And, therefore, they cannot begin to meet the test

18   for opposing the plan, at this stage, on the grounds that it's

19   facially deficient.

20         What about 524(g)?  Does 524(g) change any of this?

21   We think it's quite clear that it does not.  524(g) increased

22   the voting requirement to 75 percent.  That's a numerical

23   change.  It didn't change anything about what constitutes a

24   vote, who's entitled to vote, or impairment.

25         It calls for a channeling injunction.  That didn't

1 change anything.

2          There's nothing in 524(g), at all, that speaks to the

3 question of who is entitled to vote or what's impairment.  And

4 that's not different from any other aspects of 524(g).  524(g)

5 is not a stand-alone provision of the code.  It is parasitic on

6 the rest of the code and it's dependant on the rest of the

7 code, when it comes to a whole series of different issues, it

8 depends on the rest of the code.

9          For example, estimation.  Estimation is called for,

10 basically, under -- it's required, really, in order to execute

11 524(g).  But, the provision relating to estimation was -- it's

12 a different part of the code, and the case law is under 502(c),

13 before 524(g) ever was passed.

14          So, what they're arguing for when they say -- and

15 somehow 524(g) changes the analysis -- is they're saying,

16 there's something about 524(g) that even though it doesn't call

17 out for any different set of rules, requires that there be a

18 different set of rules.

19          I'm sorry.  You can't find that in the statute, you

20 can't find that in the legislative history, you can't find that

21 anywhere.

22          And what's the consequence?  Well, the consequence

23 would be, if they're right, that now that we're in 524(g) land,

24 all of the protections and all of the limitations, which are

25 inherent in their rights and in their claims, as a matter of

1 law, get thrown out the window.

2          But, because we're in 524(g) land and they say that

3 the typical rules of impairment do not apply, you can agree to

4 pay claimants hundred cent dollars, or you can require that

5 claimants go through a process of claim's allowance and

6 disallowance, or estimation, as they -- well, that may be the

7 law elsewhere, but we're in 524(g) land.  We don't like that

8 kind of stuff.  We're going to vote against the plan.  And if

9 you don't have our vote, guess what, you're not going to have a

10 plan.

11          524(g) was not designed to put claimants in the

12 position of unilaterally determining what the law was going to

13 provide as to their claims.  524(g) sits within a broad network

14 of code provisions, all of which are critical to the execution

15 of the purpose of 524(g).

16          Otherwise, 524(g) would simply be a process of

17 claimants kind of sitting back and saying, well, you're kind of

18 getting there.  We're almost high enough.  We're not quite

19 there.  Or, gee, you know, I know my clients aren't really

20 terrific, but I don't want to put them through a claim's

21 allowance process because, you know what, if you make me do

22 that, I'm not going to vote in favor of the plan.

23          So, from our point of view, Your Honor, the

24 impairment issue is not -- is, in a sense, simple.  It's simple

25 though, in a fundamentally different way from the way that it's

1 cast by the objectors.  The objectors make it a hypersensitive

2 test.  And to a certain extent, and certain context, it can be.

3        But, impairment is not a reason why these claimants,

4 all of whom have got disputed, unliquidated claims, don't have

5 to abide by both the substantive and procedural law that would

6 otherwise govern whether their claims should be paid.

7        So, Your Honor, that's -- those are my remarks

8 concerning impairment.  I'm happy to go through -- I think it

9 would probably take me another half-hour to cover the rest, but

10 I'm really at the Court's pleasure.

11        THE COURT:  Well, why don't you finish, and then I'll

12 just hear from whoever wants to oppose the legal argument on

13 impairment.

14        But, I would like to get all of that done before the

15 lunch hour.  I want to get to the disclosure statement issues

16 today.  So --

17        MR. BERNICK:  Okay.

18        THE COURT:  -- I hope to run through it.

19        And I want everybody out of here, in time to get

20 home.  We're supposed to get -- be getting very nasty storms,

21 so expectation is, by 3:00 or 3:30 today, so that all of you

22 can make your flights, we're going to be finished.  I realize

23 we won't get done.  We'll adjourn this to another date, but

24 that's going to be it for today.  So.

25        MR. BERNICK:  I think that you probably will have

1  unanimous support --

2                          (Laughter)

3          MR. BERNICK:  -- in that, here, Your Honor.

4          THE COURT:  No, no.

5          MR. BERNICK:  Let's talk a little bit about the

6  implementation issues.  And the implementation issues are, in a

7  sense I guess, a little bit more into the guts of the case.

8          This is a nice change.  I spend most of my time these

9  days in the Federal Courthouse in Washington where they still

10  -- the GSA still hasn't figured out how to put in controls like

11  that.

12          THE COURT:  Well, yes.  They're not -- yes.  It's

13  just another one of those government things.

14          MR. BERNICK:  Personal injury claimants, on

15  estimation, agree that we need estimation.  In fact, everybody

16  in the case agrees that we need to have an estimation, but they

17  only want to do that estimation their own way, which is a

18  process of extrapolation.

19          And Your Honor, I think, is probably familiar with

20  the basic dynamics of it.  It's really all in one curve, which

21  is they take a look -- if this is today, or the filing date,

22  they take a look at the claim settlement history -- what's been

23  the flow and cost of claims.  They take a piece of that, say

24  three or four years.  They say that during this period of time,

25  in relationship to the total number of disease -- the total

1 disease incidence, or prevalence, over that period of time --

2 take Mesothelioma.

3      If Mesothelioma claims, in the last three or four

4 years, represented 25 percent of total Mesothelioma claims,

5 then let's assume that that will be true forever, so they then

6 extrapolate this curve.  And by Mesothelioma claims, they mean

7 any claim that's been settled, whether or not it was shown to

8 be a valid claim in Court.

9      And that effect of this, of course, is that you have

10 -- the past history becomes dispositive of the future and you

11 get these enormous numbers, all predicated on extrapolation

12 from settlements.

13      And obviously this perpetuates -- this serves to

14 perpetuate the pre-bankruptcy tort system.  The pre-bankruptcy

15 tort system become dispositive of actual liability estimates.

16 There's many, many problems with that, from a _Prudential_ point

17 of view.

18      We all know today -- everybody knows, even the

19 plaintiffs' bar recognizes today, that that tort system is

20 broken.  Their own experts have written letters saying that

21 bogus claims are presented on a routine basis, that all kinds

22 of people are getting paid who should not be paid, because

23 they're not sick.

24      Everybody in the world knows it, yet we're sitting

25 here in this Court, and they're still going to stand up and

1 tell you, yes, that's the way it should be and that should be

2 dispositive here in bankruptcy.

3        Well, if it's dispositive in bankruptcy, why does

4 anyone file for bankruptcy?  If all that's going to happen is

5 that we're going to have the same tort system, that's messed

6 up, be used to actually define what the liability is, why go

7 into bankruptcy at all.  And of course, the answers, somewhat

8 cynically, will come from the personal injury bar, well, the

9 real purpose of bankruptcy is simply to have you pay out all

10 that you've got.

11        Well, bankruptcy means much more than that.  What is

12 that that it means?  Well, the bankruptcy process does not

13 require that approach.  Indeed, it actually precludes this

14 approach.

15        And the -- the only reason that this is at all

16 controversial is that there are so many cases where this

17 extrapolation methodology has been used, on a consensual basis,

18 where it's not been contested.

19        The counsel will stand up and talk about all these

20 different cases in which this has been used, why should we be

21 different?  And the answer is, because the law has not actually

22 been litigated in those prior cases, on this issue.

23        And it's been very difficult, as I know Your Honor

24 appreciates -- it's been very difficult to get these issues

25 framed and resolved, and that's best evidenced in this case.

1 Because, in this case, the debtors have diligently, ever since

2 the beginning of the case, sought to get these matters actually

3 resolved.

4        What does the Third Circuit law say on this matter?

5 The Third Circuit law, again, is clear.  We have the <u>Bitner v.</u>

6 <u>Warren Chemical</u> case, where the Court talked about the latitude

7 that exists for how estimations should be conducted.  But, it

8 was presented with a situation where the Bankruptcy Court

9 actually did an estimation on the merits.  It didn't simply

10 say, well, what's the probability of success?  Didn't simply

11 say, what's the statistical analysis?  I want to know what the

12 merits are.

13        And there's actually a long line of cases that --

14 that's exactly what estimation is supposed to be.  It's

15 supposed to be a merit's consideration.  You may have a

16 streamlined process, but it's supposed to be merit's oriented.

17        And the Bankruptcy Court came out with a zero

18 estimate for a claim, shocking as that might seem, based upon

19 the merits.  And the Court of Appeals -- the Circuit said, in

20 very clear terms, yes, there's a lot of latitude.

21        But, one thing is quite clear, and it is emphasized

22 by the Court, and I have written it down -- I've underlined it.

23 In so doing, that is in doing the estimate, by the Bankruptcy

24 Judge, the Court is bound by the legal rules which may govern

25 the ultimate value of the claim.

1          So, in determining how to do an estimate, you have to

2 follow the legal rules.  The issue then becomes pretty simple.

3 Do you do an -- does a settlement driven estimation comply with

4 the legal rules?

5          And this is not something that requires parsing a lot

6 of case law.  All you've got to do is read the rules and they

7 are crystal clear.  What the rules say is that you go through a

8 process for determining liability.

9          First, you acquire jurisdiction over the claimants

10 for a notice and bar date process.  You then join issue for --

11 with objections.  And once there is an objection, once issue

12 has been joined, the matter becomes a contested matter.  And

13 the Bankruptcy Rules specifically call out what rules apply in

14 the event of a contested matter.

15          And guess what?  The Federal Rules of Evidence

16 control all issues that are raised in a contested matter.  We

17 are -- Federal Rule of Evidence.  What does the Federal Rules

18 of Evidence say about settlement evidence?  It doesn't come in.

19 It's just not part of the equation.

20          What about the Civil Rules of Procedure?  Certain

21 Civil Rules also are incorporated.

22          So, you've got a standard of liability that is State

23 or Federal substantive law, but you have the rules of evidence,

24 you have the rules of procedure, specifically identified rules.

25 Those govern whether you do an estimate or whether you do

1  litigation, for purposes of liquidating the claims.

2        Who's the trier of fact?  Obviously, in an estimation

3  it is the Court.  In the case of litigation it can be a Jury.

4  In the case of personal injury claims, it must be a Jury.

5        How does the plaintiff -- how do the objector's

6  extrapolation methodologies fair under the standard?  They

7  don't follow any of those rules.  Not a single one of those

8  rules.  It's kind of free-form estimation.  This is what we

9  would like to do.  And it should be done, because, you know

10  what, a lot of other Courts have done it, even though those

11  other Courts haven't had to confront the law.

12        What's the net effect?  Extrapolation, their

13  approach, abrogates all liability standards, abrogates the

14  Federal Evidence Rules, ignores our Jury trial right, there is

15  no Jury trial, and it's not -- it's not a 502(c) estimation at

16  all.

17        In the starkness of this contrast between what it is

18  that's actually required, in order to follow the rules that are

19  established under the code, and in their approach, is best

20  illustrated through, just -- I'll give you only a couple

21  excerpts.

22        We did this -- we litigated this issue, in part, in

23  the Babcock case.  And their expert in the Babcock case, that

24  is the claimant's expert, was Mark Peterson.  Mark Peterson has

25  done these estimates in all kinds of cases.

1        And to show how dramatic the contrast is between Dr.

2   Petersons's world and the world of settlement extrapolations on

3   the one hand, and what ordinarily would be the rules of

4   liability on the other, I just got a couple quotes.  I said,

5        "Q   Let's talk about dose.  I've looked through your

6   expert report, and nowhere do I see you have determined the

7   dose of asbestos exposure that any of these claimants have from

8   Babcock and Wilcox asbestos.  Isn't that true, it's nowhere in

9   your report?

10       "A   No.  It's nowhere in my report.

11       "Q   Well, what about -- does anyone -- have you

12  determined whether anyone actually got sick from Babcock and

13  Wilcox asbestos -- not just asbestos, but Babcock?  Have you

14  done that?  Can you tell us how many people?  Is it true that

15  you have nowhere determined whether and how much malignant

16  disease was actually caused by exposure to Babcock and Wilcox

17  products?

18       "A   No.  I've not determined that."

19       Plain as day.  Now, when it got time for trial, Dr.

20  Peterson was a little bit -- a little bit less cooperative.

21       "Q   Let me make it clear, isn't it true that you've

22  nowhere determined whether and how much malignant disease was

23  actually caused by exposure to --"

24       He didn't say, no, I have not, he says,

25       "A   No one can determine that.  Only God knows that.

1 Okay.  'And then he says,' no.

2     "Q   You've not determined that <u>Babcock and Wilcox</u> caused

3 any of that Mesothelioma?

4     "A   I've not been -- I've been unable to determine, on a

5 case by case basis, which -- whose asbestos cause it.  No one

6 can do that."

7          Well, originally is was God.  Now, it's no one.  But,

8 that's what we have Juries for.  So, it's not God, it's not --

9 only a Jury can figure out the answer to that question.  He

10 certainly has not done that.

11          And I then got him to admit what he admitted in his

12 deposition.  Polls apart.

13          Liability rules require that a defendant be

14 implicated, that there be a causal connection, that there's

15 actually liability.  Legal liability is not part of this

16 equation, at all.  It is squarely contrary to the rules.

17          We have called for an estimation that complies 100

18 percent with the rules.  What is that estimation process, if

19 you follow the rules?  First, we've got to bring the claimants

20 before the Court and we bring them before the Court through a

21 bar date.

22          They oppose a bar date.  They say you don't need a

23 bar date, but that's the only way that you can acquire

24 jurisdiction over individual claimants for purposes of

25 analyzing the merits of claims.  If you don't have merits of

1 claims before the Court, you're not going to make very much

2 progress in an estimate.

3       The importance of establishing a bar date, for

4 estimation purposes, was specifically recognized in the

5 Eagle-Picher case, and much more recently in the Babcock and

6 Wilcox case, by Judge Vance.  So, we need a bar date.

7       Number two, we have to fill out questionnaires, just

8 as was done in the case of the property damage claimants.

9 Questionnaires are justifiable in two different ways.

10       Number one, they can be justified as part of the

11 claims allowance and disallowance process.  This was the

12 justification that was used by the Court in the A. H. Robins

13 case.  In A. H. Robins people, first of all had to say, in

14 response to a notice, that yes, they were claimants.

15       They then were given a followup questionnaire to fill

16 out.  And the objection was made, well, why should we have to

17 fill out a questionnaire?  And the Court said, this is a

18 question of establishing what the basis of liability is and

19 that's a requirement for a claim.  It has to set out a basis of

20 liability.  A questionnaire is the right way to go.

21       We could do exactly the same thing.  We could do what

22 we did in the case of the property damage claimants.  We can

23 say, you've got to file a claim form by the bar date.  Totally

24 justifiable.  But, is it justifiable for an additional reason,

25 which is it's part of the discovery process?  It's an efficient

1  way to conduct discovery.

2         If you talk about the personal injury claimants, in

3  particular, we have conscribed what we're asking for be a bar

4  date, with respect to those people who already had pre-petition

5  litigation, so they're represented by counsel, they presumably

6  have information to establish the basis of their claim.

7         And we've gone one step further than what -- where we

8  were with the property damage claimant.  Instead of making them

9  fill out that questionnaire by the time of the bar date, we

10  have a much simpler form to use in making the claim.  We then,

11  if they -- so that there's no burden associated with meeting

12  that bar date.

13         We then say, okay, now fill out the questionnaire,

14  because you've said that you want to be part of this case.

15  It's a very conservative approach.  It's a very -- it's

16  sensitive to the issue of whether people are being overly

17  burdened at the time that they say that they want to be part of

18  this process.

19         So, we have a bar date, we have a questionnaire

20  process, and then we identify common issues and what their

21  impact is, in order to define a smaller population of people

22  who may have sustainable claims.

23         Now, that all sounds very abstract, but in point of

24  fact it's already been done in the Babcock case, which is

25  actually a fairly good example.

1         In the _Babcock_ case there was a claim form that was

2 used.  We gathered all the data, and we mustered that data to

3 show the Court what kinds of claims were being filed.

4         And just to give you an example, people had claims

5 for asbestosis in that case, they filed, and we had 18% of

6 people who said that they were claimants didn't have a score at

7 all.  Fifty-one percent had an ILO score of less than 1 -- 1/0

8 or less, which is a borderline score.  Only a very small

9 portion had ILO scores that were 1/1 or above.

10        Interestingly, ILO scores, under the procedures

11 themselves, ILO procedures, have to be read independently and

12 they have to be replicated.  None of that was done with respect

13 -- as we saw it, with respect to any of these different proofs

14 of claim.

15        But, the issues that we were able to isolate were not

16 confined -- were not confined to ILO scores and medical

17 results.  We were able to establish a predicate for a whole

18 series of liability defenses.

19        So, we basically took over 200,000 claims and were

20 able to demonstrate the different strata of those claims, that

21 were sorted out either by medical data or by facts that drove

22 liability determinations.

23        If you take a look at the Grace case, we think that

24 the Grace case is going to be similarly amenable to exactly the

25 same kind of process.

1           In Grace, Your Honor is familiar that personal injury

2 claims were on the decline, and all of a sudden, in the year

3 2000, not as a function of any scientific principle, any

4 disease process, anything other than the fact that somebody

5 decided to make Grace an even more prominent target, the claims

6 skyrocketed.

7           We actually did a little bit of sampling, with

8 respect to these claims and we now know that with respect to

9 the claims, overwhelmingly, they're claims of people who do not

10 have any malignant disease.

11          With respect to the diagnostic test results of the

12 people who are claiming non-malignant disease, even a tiny,

13 tiny fraction that have -- been demonstrated to have ILO scores

14 of 1/1 or above, or PFT's meeting the AMA mild impairment

15 standards.

16          Now, we're not going to rely on the AMA standards in

17 connection with this case.  We don't have to.  The point of

18 this is to establish that an overwhelming number of the

19 claimants against W. R. Grace, in this case, are exactly the

20 kinds of claimants where people have now testified before

21 Congress, on behalf of the plaintiffs' bar, that the claims are

22 junk claims.  They're bogus claims.

23          One of our major tasks in this case is to sort out

24 those claims using the claim form process.  But, it's not

25 confined to that problem either.

1          In order to get that enormous spike, we not only got

2 all of these non-malignant claims, we got claims from people in

3 all kinds of industries.  Grace's asbestos was used in the

4 construction industry, but look at all these other industries

5 that are represented by the sampling of claims that we looked

6 at.  The railroad industry, auto maintenance, tire and rubber

7 manufacturing.  What is the connection?  There is no

8 connection.

9          So the process that we want to follow here is a basic

10 process that's called out in the code, it's been used before,

11 it's highly efficient, and we believe we can get to an

12 aggregate estimate promptly.

13          One other point that I -- a couple points that I want

14 to take up that have been raised in the briefs, and are simply

15 erroneous.

16          The claim is made, there's no process for collective

17 determination of individual cases that is consistent with

18 constitutional and statutory standards of due process, citing

19 Cimino.  That is a total red herring.

20          What we have done here, first of all, we're doing an

21 estimate.  Cimino was not an estimate case.  Cimino, therefore,

22 had to protect the individual rights of each person, for

23 purposes of liquidating their claims.  In estimation we're

24 looking for an aggregate value.  That's not what we have to do.

25          In connection with the CMO, we also have to call for

1 common issue litigation, but that common issue litigation,

2 which was done in _Cimino_, does not involve extrapolation.  The

3 common issue litigation simply aggregates all the claims that

4 are pending, looks for a common issue between them, and does

5 absolutely no extrapolation.

6         The futures representative says, well, you can't

7 estimate the demands.  We're not seeking to estimate the

8 demands.  What we're seeking to do is to estimate the future

9 flow of claims.  And that is part and parcel of 524(g).

10         524(g) specifically was designed to create a future

11 -- a trust for benefit of futures.  And, obviously, you have to

12 do an estimate in order to figure out how to fund that trust.

13         The futures representative says, well, gee, under

14 524(g) you're not going to have an aggregate estimate because

15 it requires that the actual number be indeterminate, or the

16 claim -- what is it -- the language be -- actual amount,

17 numbers, and timing of future claims cannot be determined.

18         They can't be determined in a fashion that is

19 dispositive with respect to each individual claim, but they

20 have to be determined for purposes of figuring out how to fund

21 the trust.  Otherwise, you can't assure the futures are going

22 to be paid at all.

23         And then, finally, the futures claimants say, well,

24 in State Court tort actions you would not be able to seek

25 summary judgment on such factually -- State tort litigation is

1 irrelevant to this process.  What you're doing is you're

2 estimating what the liability will be.  The liability for PI

3 claims will be determined in Federal Court, not in the State

4 Court.  That, again, completely misses the issue.

5        In the interests of time, Your Honor, I want to move

6 on to talk about the traditional property claims, and the ZAI

7 claims.  But, the bottom line, with respect to the personal

8 injury claims, is we're doing it exactly as the code requires

9 and the only answer is, gee, we don't want to abide by what the

10 code requires.

11        With respect to the traditional property claims, Your

12 Honor obviously is very familiar with those, but I want to put

13 them also into a little bit of historical perspective.

14        Recall, Your Honor, that before this case was filed,

15 dating back to 1990, the whole phenomenon of property damage

16 claims against W. R. Grace was all but a thing of the past.

17 You can see what the trend is.  You've got a vanishingly small

18 number of cases being filed by the time this filing took place.

19 The trend line is unequivocal.

20        We then said, well, gee, you've got to have -- we

21 have to be definite here.  Let's find out who else is out

22 there.  And all of a sudden, out of nowhere, comes no less than

23 4,200 claims.  Well, for some reason, that's not what the trend

24 was.  And obviously, that would indicate that we have a real

25 problem that we've got to sort out.

1          We urged that the Court require the special claim

2 forms to be filled out.  They were.  And we now know what the

3 source of the problem is.  We've analyzed the claim forms and

4 this again is proof of the pudding that the claim form process

5 works.  We've taken each claim form, which had those set

6 questions, and we've analyzed them to look for particular key

7 facts and key issues.

8          Has the statute of repose expired -- which can be

9 ascertained from a very small number of facts?  Has the statute

10 of limitations expired?  You don't need to know an awful lot to

11 do that.  Constructive notice will do the job.  When did these

12 folks know that they had Grace asbestos in their building?  Was

13 it at a point in time when people were on constructive notice

14 that asbestos created potential problems?  Very easy to

15 ascertain from the forms.

16          As an example, we have -- with respect to a couple

17 claim forms here, we have the following question.  This is a

18 claim form that was filled out by -- for CBS Broadcasting.

19     "Q   When did you first know of the presence of asbestos

20 in the property of the Grace product for which you are making

21 this claim?

22     "A   1988."

23          Well, was there constructive notices of 1988?  The

24 Prudential decision, which went through basic facts that are

25 going to be the same in all of the cases, decided that

1 constructive notice arose with respect to property owners and

2 asbestos in 1983.

3       So, we take -- we'll take the history of what was

4 known about asbestos, with respect to property owners, that's

5 unitary.  That's the same.  We go to this claim and say, Your

6 Honor, constructive notice is 1983.  We go to this claim form,

7 1988.  Well, the statute of limitations was triggered by 1988,

8 when did they file their claim?  It's long barred by the

9 statute of limitations.

10     "Q   When did you first learn that the Grace product for

11 which you are making this claim contained asbestos?

12     "A   1988."

13       The statute of limitations has passed for this

14 claimant, long ago.  Here's another one.  1992, is when they

15 learned --

16     "Q   First presence of asbestos in the property?

17     "A   1964.

18     "Q   When learned that it was a Grace product?

19     "A   1992."

20       Again, the statute of limitations has passed.

21       Another area where we can easily ascertain whether

22 there is a defense or not, is product ID, because we asked for

23 product ID in these claim forms.  Now, this is a claim form

24 that was filed, I guess, by Mr. Speights, on behalf of -- this

25 is kind of anomalous.  The client, or the claimant listed here,

1 is not an individual, or even a company, it's an address in the

2 -- on the street.  That's apparently who the claimant is, is a

3 street address.

4      "Q   And what's the claim for?"

5          It says -- well, we gave an opportunity for them to

6 say Monoco 3, which is a Grace product.  It says,

7      "A   Other.  Surface treatment."

8          There is no Grace product that's specifically

9 identified.  There's no name, there's no nothing.  It's simply

10 surface treatment.  Well, that's not appropriate product ID.

11 You can't file a claim against a defendant, saying, well, I get

12 surface treatment on my property, you made surface treatment at

13 some point in time, therefore, it must have been yours.

14          That's not how the law works.  We've got dozens of

15 other examples that are similar.  And that's why, when we come

16 back and we take a look at these common issues, that is issues

17 that we're able to resolve on the basis of the claim forms, you

18 can see that, overwhelmingly, this claiming population is going

19 to shrink dramatically.

20          One of the things I should point out is that, again,

21 under the Federal Rules, Daubert applies.  And, Your Honor, I'm

22 -- probably is aware that in the Armstrong case all property

23 damage claims were subject to a bar date.  The claims came in

24 and we then litigated on a common basis for all the claims, the

25 question of whether air sampling or dust sampling, which was

48

1 appropriate?  Could dust sampling suffice?  Because, most of

2 the claims were based upon dust sampling.  And we litigated

3 that as a <u>Daubert</u> proceeding.

4        Judge Newsome, who I think started out being

5 skeptical of the entire enterprise, ultimately concluded that

6 the -- so-called indirect method did not satisfy <u>Daubert</u>

7 standards.  All of those claims, therefore, were going to pass

8 by the way, because they didn't clear <u>Daubert</u>.

9        Very simple, hundreds of claims resolved at the

10 stroke of a pen.

11        If you take a look at what the air sampling is going

12 to show -- what the air sampling, not the dust sampling, but

13 the air sampling is going to show, with respect to probably all

14 of these buildings that are being litigated, is that the dust

15 concentrations are so small as to be totally inconsequential.

16        We will -- we believe we'll be highly successful in

17 bringing to bear exactly the same analysis that drove the

18 dismissal of -- drove the <u>Daubert</u> determination, with respect

19 to all the property damage claims in the <u>Armstrong</u> case.

20        What's the answer that the property damage claimants

21 bring to bear here?  They say, you've got to do it claim by

22 claim.  You can't to it in the aggregate.  I'm sorry.  There is

23 nothing in the estimation case law that says that.  Nothing

24 whatsoever.

25        In fact, if you look for the authority that they

1 cite, all they can cite is a law review article, whereas, in

2 fact, estimation has been done on an aggregated basis,

3 repeatedly.  So, there's no legal impediment here.

4         With respect to ZAI, I want to talk very briefly

5 about ZAI.  Your Honor, I know, is intimately familiar with

6 ZAI.  Probably more than you ever wanted to be, but I want to

7 go back to an argument that we actually had in Delaware, in

8 March of 2002.

9         And I remember that argument very well.  We talked

10 about class action procedure, class proofs of claim.  We talked

11 about whether -- who -- people who picked up ZAI in their

12 attics were all of a sudden going to get sick, and the like.

13         And at the end of the day, Your Honor said, look, I

14 would like to know more about the science before I

15 irretrievably go down this road.  I'd like to know more about

16 the science and, therefore, is there some way we can tee up the

17 scientific issue first, so that on the basis of what I then

18 learn, we can be more intelligent about whether we want to go

19 out and talk about a class action that involves hundreds of

20 thousands of people.

21         So, we went down that road and we did the science

22 trial.  And the science trial's now under submission to Your

23 Honor.  The suggestion has been made that somehow we're walking

24 away from all of that.  And we are absolutely not walking away

25 from any of it.

1          When Your Honor determines what should happen in

2 connection with the science trial, that's fine.  What we want

3 to do is to start to go down the road to create the bankruptcy

4 process that will then serve as the vehicle to give affect to

5 whatever it is that Your Honor determines.

6          And what is that process?  We need a bar date. We

7 need to find out who actually is going to assert a claim.

8 Until we've got those people, you can't even think about taking

9 a vote.

10          They say, well, let's just do a claim form on behalf

11 of everybody and then we'll estimate how many people there are.

12 Well, you don't estimate a vote.  You don't estimate a number

13 of dismissals.  You need the claimants there.

14          Once you have the claimants there, you can do all of

15 the different things that are necessary.  You can determine

16 who's going to be bound by the estimate.  You can determine

17 whether claims should be dismissed.  You can determine whether,

18 in fact, people are entitled to vote and if so, who they are.

19          So, we need a bar date, Your Honor.  We need a bar

20 date, first and foremost, in connection with the ZAI case.

21          And in that regard, we've changed the claim form that

22 we're prepared to submit -- the initial claim form, so that it

23 requires minimal information.  In other words, people don't

24 have to go up to their attics and rummage around in whatever

25 their insulation in their attics might be.  All they have to do

1 is to say they are making a ZAI claim.

2         So, we've got a process that should be very, very

3 easy.  You know, there's no issue of risk, even though, as

4 we've pointed out to Your Honor in connection with the ZAI

5 science trial, the EPA itself has declined to find that there's

6 a linkage between ZAI and any health effects.

7         But, be that as it may, we don't have to reach those

8 issues.  We just have to go forward and create a bar date, in

9 order to move forward.

10         So, we think that we very responsibly crafted these

11 motions to adhere to the letter of the rules, so that we can go

12 forward with this case.

13         And while Your Honor, I know, is focused on these

14 threshold issues, and it may be that some of these

15 implementation issues can wait, the issues that can't wait are

16 to get that bar date going with respect to personal injury.

17 That's going to take time, to get the ZAI bar date.  We've got

18 to get that done.

19         And with respect to -- property claims, we're poised

20 to now get yield and benefit from the work that's been done.

21 The proofs of claim have all been analyzed and we're prepared

22 to proceed.

23         And that's all that I have, Your Honor, this morning.

24         THE COURT:  All right.  Why don't we take a

25 ten-minute recess and we'll reconvene with anyone who wants to

1 start, in whatever form you've decided.

2          THE CLERK:  Folks on the phone, there's someone who

3 does not have a mute button on.  Please mute.

4                    (Recess)

5          THE COURT:  All right.  We're back on the record.

6 Have you folks set up an order of who's going to discuss your

7 objections first?  Mr. Lockwood?

8          MR. LOCKWOOD:  Yes, we have, Your Honor.  And we'd

9 also like to propose that, on this side at least, we address

10 the voting issues and disclosure statement, collectively first,

11 and then deal with the estimation issues, so that we don't wind

12 up with people going on and on.

13          It's easier for, we think, for the Court to focus on

14 one issue at a time, rather than sort of a stream of

15 consciousness all the way through, if that's acceptable --

16          THE COURT:  Well, I think that's true.

17          MR. LOCKWOOD:  -- to the Court.

18          THE COURT:  Yes.  That's fine.  But, I'm not sure

19 about the voting issues.  I mean, the debtor hasn't really

20 addressed that, or are you talking about with respect to

21 estimation and --

22          MR. LOCKWOOD:  I'm talking about impairment, Your

23 Honor.

24          THE COURT:  In the impairment.  Okay.

25          MR. LOCKWOOD:  And in 524(g).

                    **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.

2          MR. LOCKWOOD:  Your Honor, I think one of the things

3 that is critical for us to focus on, because it's really --

4 demonstrates that basic fallacy of the debtor's argument here,

5 is the -- the interpretation or description of the <u>PPI</u> case,

6 which, I must say, we agree with.

7          The <u>PPI</u> case said that a limitation on a claim that

8 is created by the Bankruptcy Code itself, is not impairment,

9 and contrasted that with limitations that are created by the

10 plan of the debtor.

11          The debtor would have you believe that there's

12 nothing in its plan that affects the rights of claimants,

13 because everything that the debtor is proposing to do here is

14 in some way or another mandated -- mandated by the code.  That

15 is simply and blatantly false.

16          And it can be just, I think, best illustrated by

17 thinking about what I -- unimpaired tort claim, in a regular

18 old bankruptcy case, frequently involves.  And that's a pass

19 through.  A plan can pass through tort claims, in which event

20 they get litigated post-confirmation, in the State tort system,

21 and the reorganized debtor pays whatever the outcome of that

22 is.  That's unimpaired.

23          Here, the debtor has chosen, in its plan, not because

24 the law says they can't pass through claims, but they have

25 chosen to create a trust, which they are going to channel the

1  existing and future asbestos claims to, and they are going to

2  ask this Court to do an estimation, for the express purpose of

3  limiting the amount of dollars that will be available to the

4  claimants whose claims are going to be channeled to that trust.

5        They -- and their proposed case management order,

6  with respect to those claims, has two pieces to it.  One's

7  their so-called settlement option and the other is the

8  so-called litigation option.

9        The Court's estimation process is supposed to predict

10 the outcome of both of those procedures.  How many people will

11 settle for the settlement values and how many will qualify and

12 settle for the settlement values.

13       And, then, how many people will litigate and what the

14 outcome of that litigation will be in the context of which, as

15 the debtor has acknowledged, the litigation option provides no

16 limitations on what any claimant can recover on their

17 individual claim.  They can get punitive damages, they can get

18 pre and post-judgment interest, and they can get very, very

19 large numbers of compensatory damages.

20       And at Page 21 of our brief, we list some of Grace's

21 pre-petition history -- in the estimation brief.  We list some

22 of the debtor's pre-petition history, which shows verdicts in

23 the millions, or hundreds of thousands of dollars.

24       So, there's nothing in their plan that prevents the

25 trust from running out of money, no matter what the Court does

1 by way of an estimation.

2        They acknowledge an estimation is just that, it's an

3 estimation.  It's a prediction.  It is not an allowance.

4        The Court will not have gone through and allowed each

5 and every present and future claim, and have those claims

6 fixed.  No claim, not one, is supposedly being allowed as part

7 of this process.

8        So, what -- how is any of that mandated by the

9 Bankruptcy Code?  This is all a carefully crafted, I think --

10 at one point, the debtor uses the phrase, integrated vision, to

11 describe this.  It's their plan.

12        The CMO is not something that the Court has proposed

13 that we create, so that we can litigate, in a claims allowance

14 procedure in this case, individual claims for allowance

15 purposes.  It's -- it's basically what ought to be part of the

16 TEP, and in -- functionally, that's exactly what it is.

17        Because, what the case management order does is it

18 tells everybody how the people that exercise the litigation

19 option, under the plan, will then have the trust liquidate and

20 pay their claims.  It's not a bankruptcy process, at all.

21        So, the notion that -- I mean, it may well be that

22 the various procedures that are reflected in various provisions

23 of this plan are permitted under the Bankruptcy Code, but

24 they're permitted only with respect to people who choose to

25 utilize them.

1          And certainly the creation of a trust, and the

2 proposal of a post-confirmation claims management process, is

3 something that isn't mandated by the code and it is a

4 limitation.

5          For people who -- if the trust in fact runs out of

6 money, what the plan will do, just among other things, is it

7 will prevent them from suing not only Grace, which is at least

8 somewhat typical of what a bankruptcy plan does, but it will

9 prevent them from suing people who they could normally sue

10 under 524(e) of the code.  Namely, co-obligors.

11          And that's a provision that's in the plan.  There's

12 the --

13          THE COURT:  Well, _Manville's_ run out of money --

14          MR. LOCKWOOD:  -- if anything, it's an override of

15 the code.

16          THE COURT:  Well, wait.  _Manville's_ run out of money

17 several times, and yet what continually happens is they go back

18 to Court, they say it's out of money, and something happens and

19 it gets refunded.  Why would that be any different if Grace ran

20 out of money -- in the trust?

21          MR. LOCKWOOD:  _Manville_, the people voted on the --

22 we are discussing, Your Honor, not whether or not the plan, in

23 some abstract sense could, if it was appropriately confirmed,

24 have a fund which might prove to be insufficient.  That's a no

25 brainer.

1          We accept the proposition that in any properly

2 confirmed 524(g) case with a trust, there's always the risk

3 that the trust is going -- out of money.  And it's that risk

4 that creates the impairment here, because absent the plan,

5 which it lacks, to create the trust, and channel the claims,

6 and provide for limited funding, that risk, where the claims

7 pass through, would not exist.

8          People would be able to sue whoever they could sue,

9 and get whatever they got, and there wouldn't be any limitation

10 to a single fund, in a single place, and a single entity.

11          THE COURT:  But, surely, that's what 524(g)

12 specifically was put into the code to do.

13          MR. LOCKWOOD:  It was put into the code to permit

14 debtors --

15          THE COURT:  Right.

16          MR. LOCKWOOD:  -- to propose plans that would do

17 that.  But, it wasn't put into the code to require debtors to

18 -- remember what the argument, going back to PPI --

19          THE COURT:  But, wait.

20          MR. LOCKWOOD:  -- is, Your Honor.

21          THE COURT:  Wait.  I don't want to leave this for a

22 second.  524(g), to the extent that the debtor chooses to use

23 it and the creditors vote so that the plan is confirmable -- or

24 in the debtor's viewpoint, I guess, unimpaired creditors don't

25 have a chance to vote -- if that's true -- let me just assume

1 for the moment that it's true -- however the plan gets

2 confirmed, with a 524(g) trust in it, Congress has said that

3 the impairment, as you describe it, of the tort claimants, is

4 appropriate.  That those claims can be channeled to the trust

5 and that the injunction provided by the trust can be extended

6 to certain contributors to that trust.

7             MR. LOCKWOOD:  The -- but Section 524(g) doesn't tell

8 you how much money the debtor's got to put into the trust.

9             THE COURT:  No, it doesn't.

10             MR. LOCKWOOD:  The debtor, here, is the one that's

11 proposing the plan that involves that, and moreover, the -- one

12 of the problems with the debtor's CMO, for example -- I mean

13 this is -- since we're talking about 524(g) we've gotten a

14 little bit of a tangent.

15             But, for example, how, under the debtor's plan, are

16 you going to ensure that present claimants and future claimants

17 get treated substantially the same --

18             THE COURT:  You do an evidentiary hearing.

19             MR. LOCKWOOD:  -- if the present --

20             THE COURT:  Oh.

21             MR. LOCKWOOD:  -- if the present claimants run

22 through all of the money.

23             THE COURT:  Well --

24             MR. LOCKWOOD:  Remember, what they're proposing is a

25 capped plan.  We don't know how much of the billion four

1  hundred and eighty-three million that they're proposing to put

2  in the fund, for what they call the symptomatic eligible

3  claims, is.  But, that's a capped piece of it.

4        And the litigation option is available to every

5  single present and future claimant.  If people don't find the

6  settlement option matrix attractive -- and that matrix is a

7  take it or leave it option, you either qualify and take the

8  exact dollars there, or you litigate.

9        There's no way of -- unlike typical matrixes where

10 you have individual review and this, that, and the other thing,

11 there's no way of varying it.  It's just a pure -- open-ended

12 settlement offer.

13       So, there's no assurance that anybody is going to

14 take it, but one would suspect, looking at it from an economic

15 point of view, that the people who take it would be the people

16 who had what they -- who considered they had less valuable

17 claims, because the numbers are quite low.

18       I mean the dollars for a Mesothelioma claim are

19 $70,000.00, for example.  I'm sure --

20       THE COURT:  Well, isn't that something that could be

21 handled in the voting process, to find out, you know, put on

22 the plan form, will you accept a settlement option?  And if the

23 --

24       MR. LOCKWOOD:  Well, that's what they've --

25       THE COURT:  Yes.

1          MR. LOCKWOOD:  That's what they've proposed to do in

2 the questionnaire.  I mean, again, we're getting a little bit

3 far -- the problem with that is that people are being compelled

4 to make the election of whether they'll take the settlement --

5 the litigation option, without knowing whether they'll qualify.

6          THE COURT:  Oh, no.

7          MR. LOCKWOOD:  Because, the settlement option is not,

8 if you do X, Y, and Z, I'll pay you the money.  It's, if you

9 come in and provide me with certain types of medical evidence

10 and exposure criteria, which the trust --

11          THE COURT:  No.  Wait.

12          MR. LOCKWOOD:  -- is going to review --

13          THE COURT:  Let's stop a minute.  We're getting way

14 afar afield.

15          MR. LOCKWOOD:  Oh, yes.  We are.

16          THE COURT:  With respect to the issue of the voting,

17 I think that the question could be put on the plan vote, you

18 know, do you intend to apply for the settlement option.  It's

19 not whether you'll qualify.  You still have to go through.

20          But, for figuring out whether the -- trust is

21 adequately funded, certainly somebody's estimate that they will

22 or won't accept the settlement option, goes along way toward

23 deciding how many people will, and how many people won't, and

24 how many are going to go into the tort system to litigate.  I

25 think --

1          MR. LOCKWOOD:  Well --

2          THE COURT:  -- that issue can be addressed --

3          MR. LOCKWOOD:  Let me --

4          THE COURT:  -- in the vote.  The choice can be

5 addressed in the vote.

6          MR. LOCKWOOD:  But, they're not proposing to have

7 people vote, so their -- under their plan, then, that issue

8 wouldn't be addressed.

9          THE COURT:  Well, then, how -- if their case

10 management order is approved, then it would come into the

11 questionnaire that goes out.  So, I mean --

12          MR. LOCKWOOD:  Well, let's keep in mind, their case

13 management order addresses only the post-confirmation handling

14 of claims by the trust.  What they have tied it into is their

15 estimation procedures motion, which as the chart over there

16 points, under -- after the bar date, has a questionnaire.  They

17 want to use a questionnaire as part of the estimation process.

18          THE COURT:  Well, that's okay, too.  I mean --

19          MR. LOCKWOOD:  And, you know, we can -- we'll speak

20 to the estimation process when -- separately.  I'm still trying

21 to focus on the vote.  Right now, there's no vote and so,

22 whether you get help on your estimation, from a questionnaire,

23 is a separate thing.

24          But, the fact remains that the plan caps the amount

25 of funds available to people.

62

1          THE COURT:  That's what I am troubled by in -- with

2  respect to impairment, quite frankly.  That without a claim by

3  claims analysis -- and I don't know that you need one, in

4  bankruptcy, for purpose of figuring out what the estimated

5  amounts of claims are and the plan funding.  I don't think you

6  need to do a claim by claim.

7          But, for allowance purposes, for a post-confirmation

8  payout, clearly you have to have some indication that the claim

9  is not just allowable, but allowed in a bankruptcy sense.  And

10 that's what I'm trouble by.

11         The fact that if the claim is "allowed", at an amount

12 that's different from the payout, there is impairment.  You're

13 not getting paid what you're entitled to on the effective date

14 of confirmation.  That's impairment.

15         MR. LOCKWOOD:  Well, in particular, Your Honor, if

16 you look at the definition of who gets to vote, under 1126, it

17 says that -- in 1126(a), the holder of a claim or interest

18 allowed under Section 502 of this title may accept or reject a

19 plan.

20         They don't propose to allow any claims, as part of

21 this process.  They're going to have that done under the case

22 management order, post-confirmation.  So, in theory, they would

23 -- they -- 1126 doesn't even enter the picture for people that

24 don't have allowed claims.

25         As, Your Honor is aware, the way that problem has

1 been usually handled is by temporary allowance of claims, for

2 voting purposes, with no particular effort beyond, you know, do

3 you have a facial claim to do so.  Because, it would take

4 forever if you had to allow claims.

5        Here, of course, they say, we don't have to worry

6 about this process, because we're not going to allow them to

7 vote anyway, so it doesn't matter.  And so that takes you back

8 into the notion of, under <u>PPI</u>, does the plan create a different

9 legal environment -- legal rights, than what would be the case

10 in the absence of the plan, under the Bankruptcy Code, or

11 whatever?

12        The <u>PPI</u> case dealt with the provision that said, with

13 respect to lessor's damages, you shall compute them in a

14 particular way, and that's what the statute says.

15        I challenge Mr. Bernick to cite to the Court any

16 provision, in 524(g), or anywhere else in the Bankruptcy Code,

17 that tells us that you can't do a pass through of tort claims.

18        THE COURT:  Well, you can, but you don't -- maybe you

19 don't have to.

20        MR. LOCKWOOD:  I agree, but --

21        THE COURT:  Okay.

22        MR. LOCKWOOD:  -- if you don't have to, it's because

23 you're given the election to -- to propose a plan which --

24        THE COURT:  But, that's statutory --

25        MR. LOCKWOOD:  -- creates a trust.

1          THE COURT:  But, that's statutory, because the

2  provision of 157, of Title 28, provides that when you have a

3  tort claim that is adjudicated in the plan, the forum is the

4  District Court.  The District Court can elect to send it

5  elsewhere into the State Court, if it chooses.  But, the forum

6  is the District Court.

7          There's nothing about that fact that the debtor says

8  that if you choose litigation, you're going to do it in the

9  District Court where the case is pending.  In my view, that

10 creates an impairment.  It's a specific permission by the code.

11         MR. LOCKWOOD:  I'm -- well, first --

12         THE COURT:  And there is Federal preemption that

13 still applies and it -- in my view, that's the statute.

14         MR. LOCKWOOD:  The debtor has cited no case where

15 157(d) has been held to provide post-confirmation jurisdiction

16 to a Federal Court to -- in -- to preside over litigation

17 between a trust and claimants who have State Law claims.  What

18 157(d) --

19         THE COURT:  Oh.

20         MR. LOCKWOOD:  -- does is apply during the pendency

21 of the bankruptcy case.

22         THE COURT:  That's right.

23         MR. LOCKWOOD:  And their CMO does not apply during

24 the pendency of the bankruptcy case, it applies

25 post-confirmation.

1          THE COURT:  Well, I'm not -- I'm not sure with

2 respect to some of the things in the CMO.

3          For example, that this Court -- or the District Court

4 that has to approve an injunction, if we get that far, would

5 agree to undertake the litigation of all claims against the

6 trust, in any event.

7          But, that doesn't mean that it can't be done in an

8 objection to claim process, pre-confirmation.

9          MR. LOCKWOOD:  That's true.

10          THE COURT:  Okay.

11          MR. LOCKWOOD:  And the debtor has consistently

12 threatened, in its papers, that if this Court won't approve the

13 case management order now, not withstanding that it's the

14 District Court's docket that's going to get hit with the

15 118,000 present, plus, umpty-ump future claims, that they will

16 revert to their original proposal, way back when, about trying

17 to go through and litigate the claims.

18          And, you know, if that's where this proceeds, we can

19 address that.

20          But, again, you know, the code permits you to do all

21 kinds of things in a plan.  It permits you to cram down

22 dissenting creditors, for example, who have voted against the

23 plan.

24          But, that's not the same thing as saying, if you

25 provide, in a plan, that you're going to cram down people that

**J&J COURT TRANSCRIBERS, INC.**

1 vote against it, that somehow or another that it's mandated,

2 that you're not impaired, if they do that to you.  I mean, the

3 debtors --

4          THE COURT:  No.  In fact, the --

5          MR. LOCKWOOD:  -- argument basically says, anything

6 that's permitted under the code, I can do to you.  And if I do

7 it because it's permitted by the code, I -- when I do it to

8 you, you're not impaired.  That's got to be a tautology.

9          THE COURT:  Well, it is a tautology, because the code

10 defines impairment and I -- in some fashion, what you've just

11 described, a cram down, could nonetheless constitute an

12 impairment, and a creditor can vote.

13          The concept of impairment, as I understand what we're

14 trying to address, today, is simply to determine whose claims

15 may be -- I'll use the words, adversely affected.  That's a bit

16 too broad, but adversely affected by the plan in a way that

17 creates an impairment of that claim, so that they can vote.

18 That's all.

19          MR. LOCKWOOD:  Right.

20          THE COURT:  I think the best argument you have is the

21 one you've already raised, which is that, at this point in

22 time, we don't know that those claims, as allowed, will be paid

23 100 cents on the dollar, and if they're not, I think it's

24 impaired.

25          MR. LOCKWOOD:  And since we will never know, prior to

1 the time there's a vote --

2          THE COURT:  Well, we may.

3          MR. LOCKWOOD:  No.  Because, even if the Court does

4 the estimation, that's still only an estimate.  And it -- and

5 as we've discussed, the plan doesn't -- the plan uses that

6 estimate to cap what goes into the trust, but the claims can,

7 under the process, exceed, when they're allowed, the total

8 amount of assets that are in the trust to pay them.  So --

9          THE COURT:  Well, then you --

10          MR. LOCKWOOD:  -- that creates a potential less than

11 100 cent --

12          THE COURT:  Right.  So, then you'll know you can

13 vote.

14          MR. LOCKWOOD:  Remember, to be unimpaired they have

15 to --

16          THE COURT:  But, then you'll know you can vote.

17          MR. LOCKWOOD:  Well, that's true.

18          THE COURT:  That's the whole point.  Okay.

19          MR. LOCKWOOD:  But --

20          THE COURT:  So, the estimation process can indeed

21 determine who will vote, because --

22          MR. LOCKWOOD:  No.

23          THE COURT:  Well, sure it can.

24          MR. LOCKWOOD:  I don't think so, Your Honor, because

25 the estimation process, by hypothesis, is not a claim by claim.

1          THE COURT:  That's right.

2          MR. LOCKWOOD:  And what 1126 says is that each claim

3 holder has to be unimpaired, if they're not going to vote.

4          THE COURT:  If -- well, it says that -- right.  Every

5 person who is entitled to vote has to be unimpaired.

6          MR. LOCKWOOD:  Has to be unimpaired.

7          THE COURT:  Right.  So --

8          MR. LOCKWOOD:  And so if there are -- if there's a

9 possibility that --

10          THE COURT:  Any one.

11          MR. LOCKWOOD:  Let's go back to _Manville_.

12          THE COURT:  Look, the issue for this is, if there's a

13 possibility that any one claim within that class is impaired,

14 the whole class gets to vote, under the plan.

15          MR. LOCKWOOD:  Exactly.

16          THE COURT:  Because, you're not separating out

17 unimpaireds from impaireds.  So, okay.

18          MR. LOCKWOOD:  And my point is that an estimation

19 cannot guarantee you that everybody will get paid 100 cents on

20 the dollar, because the estimation is an aggregate estimation.

21 And it's just that.

22          Remember what happened in _Manville_ --

23          THE COURT:  Yes, but look at it the other way.  It

24 can, in fact, determine whether or not you won't be paid 100

25 cents on a dollar, and if that's what the conclusion is, then

1 you vote.

2         So, it's still worthwhile going through that process,

3 because if there is sufficient evidence to show what the

4 aggregate claims are, and the cap isn't big enough to cover

5 those aggregate claims, than either the plan has to be amended

6 to make sure that it is enough to cover those aggregate claims,

7 or everybody votes.

8         MR. LOCKWOOD:  Well --

9         THE COURT:  And, frankly, I'm very uncomfortable with

10 a process that imposes a 524(g) injunction that doesn't permit

11 creditors to vote anyway.

12         MR. LOCKWOOD:  Well, I would like to address that.

13 Mr. Bernick went on, at some length, about how 524(g) is just

14 a, sort of a little add-on -- parasitic, I think the phrase he

15 used -- and so you should treat 524(g)'s voting requirement as

16 though it was 1126.  The fact of the matter is that that's just

17 dead wrong.

18         For example, the -- 524(g), it effectively redefines

19 the term claim, under 1015.  Because, that's what demands are.

20         THE COURT:  No.  It says --

21         MR. LOCKWOOD:  524(g) --

22         THE COURT:  -- specifically, it's not a claim

23 entitled to vote.

24         MR. LOCKWOOD:  I understand.

25         THE COURT:  Okay.

1          MR. LOCKWOOD:  The point I'm making though is that

2 524(g) is the only section of the Bankruptcy Code that

3 specifically empowers this Court to deal with things that

4 aren't claims.

5          THE COURT:  Well --

6          MR. LOCKWOOD:  Demands, by definition are --

7          THE COURT:  Oh, by demands.  Right.

8          MR. LOCKWOOD:  -- defined as not being claims --

9          THE COURT:  Claims.

10          MR. LOCKWOOD:  -- in the case.

11          THE COURT:  Right.

12          MR. LOCKWOOD:  And so 524(g) isn't just some, you

13 know, oh, gee, we'll have a super-majority vote, but otherwise

14 it's the same as any regular commercial plan.

15          THE COURT:  But the demand holders don't vote.

16          MR. LOCKWOOD:  I understand.

17          THE COURT:  Okay.

18          MR. LOCKWOOD:  But, I'm addressing the question of

19 whether 524(g) is merely a little bit of a change in the voting

20 requirement, which is what Mr. Bernick tried to portray it --

21          THE COURT:  Oh, the numerical change.

22          MR. LOCKWOOD:  -- or whether it's actually a stand

23 alone provision.

24          It's an exception to 524(e), because it allows you to

25 protect non-debtor affiliates.  It specifically says it's an

1 exception of 524(e).  It deals with demands that aren't claims

2 under the code and it also deals with -- who does it say is

3 entitled to vote?  It's not merely 75 percent.

4        If you look at the statute, it says that the people

5 who get to vote are claimants.  And who are the claimants?

6 They are people who -- a separate -- this is 524(g)(2) -- boy

7 this is hard to read -- (B)(IV)(bb).  It says a separate class

8 of the -- or classes of the claimants whose claims are to be

9 addressed by a trust.

10       You'll notice it doesn't use the word allowed, there,

11 while 1126(a) does use the term allowed.  And that's who gets

12 to vote, is the holders of allowed claims.

13       So, not only does it change the percentage, and

14 eliminate for at -- or ignore the amount requirement -- in a

15 524(g) plan there is no requirement for two-thirds in and out,

16 that's back in 1126.  But, it also effectively eliminates the

17 requirement that the people that get to vote have allowed

18 claims.

19       And in deed, in -- it's -- because 524(g)

20 contemplates that you can channel claims to a trust, not only

21 future claims, but present claims, and allow them to be

22 resolved, post-confirmation by the trust, by hypothesis you

23 don't need to allow claims in a 524(g) case.  You can just

24 channel them.

25       And so, if you limited yourself to -- who is entitled

1  to vote under 1126, nobody would be entitled to vote, whether

2  or not the 524(g) trust impaired people's claims or not.

3  Because, nobody would have an allowed claim.  So --

4          THE COURT:  But, they will if we have proofs of

5  claim, because we can determine it through that process.

6          MR. LOCKWOOD:  Or if we have a ballot --

7          THE COURT:  Or a ballot.

8          MR. LOCKWOOD:  -- that performs the same function --

9          THE COURT:  Right.

10          MR. LOCKWOOD:  -- which we've had in a number of

11  cases.  So, it's just -- to say that because in the legislative

12  history -- I mean, there's much made in their papers about how

13  the term vote and accept is used interchangeably.  They -- and

14  indeed, at one point, they say -- they give you a litany -- the

15  code, the legislative history in the cases.  Well, in fact,

16  they don't cite a single code provision that equate accept with

17  vote.

18          What they cite are one of the Bankruptcy Rule

19  provisions where the two terms are used somewhat

20  interchangeably, and then some statements from people on the

21  floor, who were dealing with the definition of impairment, when

22  that was changed in the '78 code, and weren't even speaking

23  about 524(g) at all.

24          They don't have a single quote, from anybody in the

25  legislative history of 524(g,) saying that somehow or another

1 524(g) is just an increase in the acceptance requirement under

2 1126.  And there's nothing in 524(g) that even cross references

3 1126.

4         And as I just said a few minutes ago, the universe of

5 people that are entitled to vote is broader, because it's not

6 limited to -- by its terms, at least, it's not limited to

7 people with -- who hold allowed claims.

8         So, the -- in sum, what you've got here is a

9 situation where the debtor's plan provides for a -- not for a

10 pass through, but a limited capped fund, which could run out,

11 as _Manville_ did in fact do, and result in people not getting

12 paid 100 cents, which limits peoples' rights to sue

13 non-debtors.

14         Again, 524(g) is permissive.  There's nothing in

15 524(g) that mandates that there be anybody other than the

16 debtor --

17             THE COURT:  Well, tell me --

18             MR. LOCKWOOD:  -- that's freed from future liability.

19             THE COURT:  Tell me, in your view, at what point I

20 have to determine impairment.  Is it as of the time of the

21 vote?  Or is it as of the time of the effective date of the

22 plan?  What is the date by which impairment is determined?

23             MR. LOCKWOOD:  Well, since people only get to vote,

24 under the debtor's analysis, if they're impaired -- let's put

25 aside the 524(g) issue, because there really are two issues --

74

1 all -- because this is a 524(g) plan, they tend to merge, but

2 there's an 1126 issue -- and then, if you decide they're

3 unimpaired under 1126, you still have to decide whether that

4 applies in a 524(g) context.

5 　　　　But, going back to the 1126 issue, since you have to

6 decide who gets sent ballots when you approve the voting -- the

7 disclosure statement.  That's why we're here.  They've

8 proffered up a disclosure statement and they've got -- want to

9 send it out for a vote.

10 　　　　So, we have to determine, now, whether or not the --

11 under their plan, and applicable law, the people who -- whose

12 -- are in Classes 6, 7, and 8, the PI and PD claimants, are

13 impaired under their plan.  We have to determine that before

14 the vote is done.  And that's why we're here.

15 　　　　I mean, Mr. Bernick made some comment about, well,

16 gee, Judge, this is a complex issue and we have to decide, you

17 know, you shouldn't, in effect, ever rule that something's

18 patently unconfirmable --

19 　　　　THE COURT:  Well, wait.  Let me stop you again.

20 Because it seems to me that maybe it is simple.  How is it that

21 if I permit the claimants to vote and it turns out that the

22 claimants are in fact unimpaired or somehow ineligible to vote,

23 under 524(g), I can simply then disallow those votes.

24 　　　　MR. LOCKWOOD:  Exactly.

25 　　　　THE COURT:  Right.  So, why do I take this issue on?

1 Why don't I just say --

2          MR. LOCKWOOD:  Because --

3          THE COURT:  -- fine, they can vote.

4          MR. LOCKWOOD:  It seems perfectly sensible to me.

5          THE COURT:  Me too.  So, that's the ruling.  They can

6 vote.  Now, whether they're impaired or not, I'm not deciding

7 now, but they can vote.

8          MR. LOCKWOOD:  That could be a confirmation issue,

9 because the debtor could, in effect, attempt to --

10          THE COURT:  Right.

11          MR. LOCKWOOD:  -- confirm the plan over the adverse

12 vote, and then we would have a determination of whether or not

13 -- it wouldn't be a cram down, per se, but it'd be the

14 equivalent of a cram down.

15          THE COURT:  My concern is, in this case, simply that

16 I don't know, given past history of trusts, how to determine in

17 advance that a trust is going to be adequately funded to pay

18 all claims 100 percent, whether they're allowed in the

19 bankruptcy sense, before that plan is funded, or whether they

20 file claims against the plan, in a trust sense -- file claims

21 against the trust, in a trust sense, and the trust is

22 sufficient to pay those claims, as the plan provides, 100 cents

23 on the dollar.

24          And unless I can make that determination, it seems to

25 me I have to err on the side of letting claimants vote, and

1 with the view that they're probably impaired because the plan

2 probably will not provide for a trust that pays all claims 100

3 cents on the dollar, either in the allowed sense, or in the

4 sense that they're filed against the trust.

5          And rather than send out a plan for a vote that

6 ignores that issue, it seems to me we're better off permitting

7 people to vote and then dealing, in the plan context, whether

8 or not that trust is adequately funded, which is a confirmation

9 issue.  And I think that's where the focus belongs.

10          So, it seems to me that all claimants -- the -- I'm

11 talking about the personal injury claimants, at the moment,

12 ought to be able to vote.  How we go about that process, maybe

13 is something that can be determined at a later date, but I

14 think it's better to send it out for vote and deal with whether

15 it was proper at the plan hearing.

16          MR. BERNICK:  May I be heard on that, Your Honor?

17          THE COURT:  Yes.

18          MR. BERNICK:  Let me make a couple preliminary

19 comments and then get back to that question, because it has --

20 I want to -- obviously, we're struggling with a practical

21 problem, which is how to move this case forward where we don't

22 really know how much the liability is.  That's been the problem

23 since the beginning of the case.

24          The argument is made that the only way to argue for,

25 in a sense, statutory impairment as opposed to plan impairment,

1 is if the statute mandates a particular result.

2        THE COURT:  Well, I don't know that that's the case

3 and I'm not sure I accept that proposition.  I'm not looking at

4 the issue of the legal impairment.  I'm looking at the

5 practical issue that if creditors are not paid what they're

6 entitled to in a liquidation analysis, on the effective date of

7 the plan, then they're impaired.

8        So, we have to go through, A --

9        MR. BERNICK:  Well, but, yes.  Well, but now let's

10 just deal with the practicality of just that dynamic, because

11 that's what -- that's exactly what we're trying to solve

12 through this plan.

13        We started out by saying that pre-confirmation you

14 had to litigate.  And no one can quarrel with our entitlement

15 to do that.  We're entitled to litigate and that matter is

16 still pending before the Court.  We're still prepared to go

17 ahead and do that.

18        The argument, though, against going forward on that

19 basis, the practical impediment is, how can you ever get to the

20 point where you're going to litigate down to each and every

21 last claim?

22        And if you follow through on what Mr. Lockwood is

23 urging upon you, at the end of the day, who knows, even if

24 you're down to a population that's a very small number of

25 people, you will still never know that those claims will -- how

1 much they're really worth, until you actually go forward and

2 liquidate them.  So, we can --

3       THE COURT:  Well, it can be done a different way.  I

4 mean, if you really want to do it, it can be done a different

5 way.

6       We can figure out what the value of Grace is.  We can

7 figure out how much Grace, on a liquidation alternative basis

8 would have to fund to put into the payment of the claims,

9 through its trust.  And if Grace, in fact, can provide that

10 amount to the creditors, on the effective date, so that they

11 would get everything they're entitled to through the Chapter 7,

12 then those creditors who get paid in full would not be impaired

13 and those creditors who wouldn't be paid, will be impaired.

14       MR. BERNICK:  That's --

15       THE COURT:  Now, it seems to me that the issue --

16 now, I'm not saying that's the means all and end all for trust

17 funding.  I'm trying to get the issue -- to the issue of what

18 the minimum amount that has to go to payment of creditors

19 through the plan is -- minimum amount -- and with that minimum

20 amount, where the impairment will lie.  It seems to me we can

21 get there.

22       Probably what Judge Wolin had set up in some other

23 case, at the outset, might even be the way to do it.  Estimate

24 the Mesothelioma claims first.

25       MR. BERNICK:  Okay.  Well, here, let's begin with

1 that, because -- I'm going to draw a line here and talk about

2 75 percent, in a moment.

3       But, we've proposed here, and in fact we proposed to

4 Judge Wolin, himself, that we take the population of present

5 claimants, as people who actually have claims that are pending,

6 and that we value precisely that population of people.

7       THE COURT:  Okay.

8       MR. BERNICK:  Okay.  And if you're saying for -- if

9 what you're saying is if we went ahead and did that, and we

10 came out with a dollar amount, and we provided for that in the

11 plan, then these people no longer can complain that they're

12 impaired, because we're going to pay them 100 cent dollars on

13 the effective date.  It seems plain.

14       The issue becomes, how do you go ahead and do it?  Do

15 you do it through an estimation process, where you gather up

16 information with regard to the present claims, through a claim

17 form, and come up with an aggregate number, or do you do it

18 through a litigation process, where you submit exactly the same

19 claim form, but you then determine, for ultimate allowance and

20 disallowance purposes, which claims are valid, and for how

21 much?

22       Now, to the extent that you're asking for the claim

23 form information, they're the same -- to the extent that you're

24 following the evidentiary and Civil Procedure Rules, they're

25 still the same.  But, this gives you the flexibility of coming

1 up with what that overall dollar amount is.

2        Whereas this, they're going to tell you, requires

3 that ultimately -- even though we may strip away, let's say 50

4 percent of the claims, on the basis of common issues, that

5 there are still some other claims which are not stripped away

6 that seem to have some survivability.  And they're going to

7 tell you, we don't know how much they're worth until they get a

8 Jury trial.

9        THE COURT:  But, you're focusing on the claims and

10 I'm focusing on the enterprise.  It seems to me that, for the

11 liquidation alternative, the first thing you have to do is

12 value the enterprise.

13        MR. BERNICK:  That would be relatively

14 non-controversial, but I don't think that that's going to solve

15 -- that's not going to solve the problem.

16        And the fact that we went through this in connection

17 with the fraudulent conveyance litigation, you know, we can

18 value Grace and what Grace is worth, that's not the issue.  The

19 issue is defining what the liability is.

20        And yes, we can define the liability of this group of

21 claims, and we can set that dollar amount aside, we would love

22 to do that.  That's the whole purpose of exactly what it is

23 that we propose.

24        But, issue one is, do you do it through estimation or

25 litigation?  We'll take it either way.  Anyway that you want to

1 get to that dollar amount is fine.

2         But, they will tell you that the estimation is not
3 binding on the individuals.  That -- that dollar amount is not
4 enough to get us there.  502(c) is not an answer.  It can't be
5 binding on them.  This can't be a capped amount.  They'll
6 reject all of that.

7         And in doing so they'll do ultimate violence to the
8 code.  The code specifically called out, in 502(c), that if
9 litigation was going to take too long, estimation was the way
10 to go.  That is not an impairment.  Especially in this case,
11 where we've been prepared to litigate.

12         We've been wanting to litigate for the last two or
13 three years.  As a practical matter, the Courts have told us,
14 you can't do that.  You've got no choice, you must estimate.

15         So, we say, okay, we'll estimate.  And they then say,
16 well, you can't estimate either, because that's not going to be
17 binding on it.  So, I'm shot.

18         The law has got to provide a way for determining what
19 these claims are worth, so that A, we can figure out whether
20 they're entitled to vote and B, we can fund the trust.  There
21 has to be a way.

22         And it's not impairment, if we choose the two
23 methods, and we present to the Court as an alternative, tell us
24 which one you want.

25         Now, in point of fact, they don't want any of it.

1 They don't -- and the reason that they're arguing impairment

2 has nothing to do with any of that.  What they want to do is to

3 exercise what they believe's their absolute right to vote, in

4 order to block anything that we do.  Nothing -- under their

5 analysis, nothing that we do enables them not to vote.

6          And as soon as they have to vote, they'll always vote

7 against the plan that doesn't give them the money that they

8 think they're entitled to.

9          So, what they're really saying to the Court is, this

10 is a 524(g) case, Third Circuit said 524(g) is the only way to

11 go, we get to vote, we absolutely get to vote, you can't impair

12 us, at all, and without liquidating every single one of our

13 claims to find out if they're valid or not, we get to vote and

14 we're always going to vote against you.

15          That is not the code.  If that's the code, we're all

16 kidding ourselves for being -- we may as well go home.

17          THE COURT:  If that's the code, then the alternative

18 is that the debtor liquidates.  I mean, and if somebody thinks

19 that that's the best alternative, with a company that appears

20 to be viable, I guess I'd like to hear it.  But, that's the

21 alternative.

22          MR. BERNICK:  Well, I don't think we even have to do

23 that.  I think that there is an alternative.  The alternative

24 is twofold.

25          One, we are happy to go down this road and litigate.

1 We are not prepared to give up the enterprise value, because

2 we're being held hostage by a false interpretation of 524(g).

3        If the newspapers read out tomorrow -- if Congress

4 were in tomorrow, then this Court -- the Courts are announcing

5 that 524(g) means that no matter what's been said about whether

6 these claims are valid or invalid, when their experts -- when

7 the lawyers stand up and say, these are bogus -- that everybody

8 in the world knows that these claims are bogus.  The only way

9 that -- only reason we're debating it here is because we have

10 counsel who are showing up and saying, we don't really know if

11 they're bogus or not, that all has to be determined down to the

12 last detail.

13        If the rule coming out of this Court is that all

14 those bogus votes get to vote, and they are absolutely entitled

15 to do so, and it's a blocker, then we're saying, well, what are

16 we doing here?  There's just no point in --

17        THE COURT:  Let's go back to Congress.  Will that be

18 enough to get the legislation passed?

19                      (Laughter)

20        MR. BERNICK:  Well, I think if -- I think Mr.

21 Lockwood's clients are counting on being able to have it a

22 little bit both ways.  They don't want this process to be a

23 viable way of deciding liability.  They don't want the

24 legislation to pass.  And the consequence of which is, guess

25 what, the tort system, as it stands today, is just fine.

1          But, Your Honor, I don't think we have to reach that,

2 because --

3          THE COURT:  But --

4          MR. BERNICK:  -- this is such an extreme

5 interpretation of --

6          THE COURT:  Wait.  Let's --

7          MR. BERNICK:  -- 524(g).

8          THE COURT:  Let's go back, for a second, to the

9 litigation process that you're proposing, and the estimation.

10 Define for me what the difference is, in the debtor's view,

11 between the estimation and aggregate and the litigation process

12 that you want.

13          MR. BERNICK:  Okay.  I will do precisely that.  Let's

14 assume that we have a population of claims that is -- I'll draw

15 it as a bar -- that was filed pre-filing.  So, they're all

16 sitting out there.  They're --

17          THE COURT:  You mean in the tort system?  Their --

18          MR. BERNICK:  In the --

19          THE COURT:  -- their own claims.

20          MR. BERNICK:  Yes.  They were in the tort system,

21 that's correct.  We'll say there are, I don't know, 50/75,000,

22 whatever they are.  We'll say 75,000 claims.

23          We establish a bar date for these claims -- these

24 claims.  What does that mean?  That means that everybody who is

25 there has now got to come in by the bar date and assert their

1 claim.  So, we have bar date.

2          We then say, you've got to do the claim form.  So,

3 the claim form will then be sent out and we will then get back

4 information.  And we will identify, in this population of

5 people, claims that are subject to various defenses, including

6 Daubert types of review, to -- for example, all these medical

7 records that come in from the screeners, should they even be --

8 are they a proper basis for asserting a medical condition, at

9 all, to begin with?  The --

10          THE COURT:  And then you'll do omnibus objections to

11 claims?

12          MR. BERNICK:  I'm sorry?

13          THE COURT:  And then you'll do -- the equivalent of

14 an omnibus objection to claim?

15          MR. BERNICK:  Right.  And we did this in Babcock and

16 Wilcox and we ended up with kind of what we called a road map.

17          And in Babcock we said, we want -- we're going to

18 move for a summary judgment on all these things, because that

19 was the case where we were just saying, let's go ahead and

20 litigate.

21          Now, here's where there's the fork in the road.

22 You've got, now, a population of claims.  They're all

23 stratified.  You've got tons of information.  What is the

24 methodology that you now use, with respect to the same

25 information?  Because, remember, under the rules, you've got to

1 use the same evidence.  The rules of evidence apply.

2        So, whether you're talking about litigation, or

3 whether you're talking about estimation, the facts, the data,

4 the evidence, they're all going to be the same.  The difference

5 is that, in the context of an estimate, you may be able to say,

6 look, on the basis of this information I believe that X number

7 of claims are going to be dismissed by reason of this, Y number

8 of claims by reason of this, and you'll then end up with a

9 smaller population, that you'll then estimate the value of, in

10 the aggregate.

11        That will result in dismissing not a single claim.

12 The claims will all still be there.  Will you be able to take

13 this filtering process down to the individual claim?  Yes, you

14 will.  Because, all of those claims are present before the

15 Court, in the form of claims forms that have been completed.

16 They've all met the bar date.  They're all here.

17        So, if you wanted to, you could take up the question

18 of each claim.  Do you dismiss it or not?  Does it get to vote

19 or not?  You could do that.  But, you don't have to.  Because,

20 all that you really have to do in the estimate is to come up

21 with the overall dollar figure.  You don't have to do anything

22 else and you don't have to go through a process where you're

23 bringing each individual claimant before the Court for the

24 motion practice.  You just -- you don't have to do that.

25 Estimation gives you that kind of flexibility.

1          So, it's the same process all the way, but because
2 the output is not the actual entry of an order dismissing or
3 not dismissing a claim, you don't have to go through that
4 aspect of the procedural process.  You've got more flexibility.

5          There's also something else you can do.  You can
6 then, in estimation, take this result, which you've now got
7 here, and you can figure out overall claim value.

8          So, you've got a population.  You've got a snapshot.
9 Remember, here you are, filing date, you're at a point and time
10 in the history of the claims process and all these settlements.
11 We take the date of filing and we take this population of
12 people.  That's who we just got all the information from.

13          You now know, from the estimation process, that only
14 25 percent of those claims are really -- have got anything to
15 them.  Or, put differently, that 75 percent are just never
16 going to make it.  We don't know that the 25 percent are
17 either, but the 75 percent, certainly are not.

18          Well, then you have a basis.  On the basis of -- you
19 can either take an epidemiological curve, you can take a claims
20 filing trend curve, whatever you want.  You can then, with a --
21 on a statistical basis say, this is how it's going to be in the
22 future.  Not because there won't be more claims, but because
23 the rulings that you've made, that are these threshold rulings,
24 are going to be binding on people as they come forward in the
25 future.

1        You, therefore, have a present value of a current

2 claimant population, and you have a future claim population.

3 So, you've got the ability to determine an overall funding

4 level for the future.

5        So, the estimate both makes it easier to determine

6 who among the current claimants really has a claim that's worth

7 anything and also enables you to go from the current, all the

8 way to the ultimate question of how much money should be in the

9 trust.

10        Now, we would say that this is exactly what was

11 contemplated about with 502(c), particularly in a 524(g) case.

12 In a 524(g) case, this is exactly what you have to do to figure

13 out how much money to set aside.  That's exactly what's

14 contemplated.

15        They will say, no, you can't use the estimate for

16 that purpose, because at the end of the day, it may turn out

17 that the money -- there's not enough money there.

18        And Your Honor says, yes, isn't that impairment?

19 Well, if you -- if you stuck by that model, the model that

20 says, so long as you can't guarantee that each claim will be

21 paid his full value, as of the effective date, there is

22 impairment, there is only one way to satisfy that test.  Only

23 one, which is to litigate.

24        They will say, each and every claim.  That is not

25 what the code says.  The code says you estimate.  524(g) says,

1 you use estimates for purposes of determining what's going to

2 happen with respect to future claimants.

3        And the interesting part about all this is -- I'll

4 say this as an aside -- is that if you didn't go -- if this

5 were not enough, and you did liquidate, and there weren't

6 enough money in Grace, the future would get nothing.  I mean,

7 from the point of view of what's the actual liability, there is

8 no actual liability for future claims.  They're not entitled to

9 be paid.

10        But, in 524(g), as a trade for the channeling

11 injunction, you have to provide for them.

12        So, you read 524(g), together with 502(c), they

13 create an alternative path.  And it is the only path that we

14 can follow, where -- unless you want to go down the litigation

15 road -- but the only issue for today really is an impairment

16 issue.  And I think that that actually is a simpler one.

17        Whether or not Your Honor uses the estimate or the

18 litigation, for purposes of determining this dollar number, and

19 for that matter, the future dollar number -- whether or not you

20 use that, either way you go, it has to be the case that once

21 you have set aside that money, that they cannot use their vote

22 as a blocking position to say, I'm sorry, it's not enough.

23        If that's the law, then 524(g) abrogates 502(c), it

24 abrogates the litigation process, and it creates a

25 strangle-hold.

1        And who are those 75 percent who are voting?  They're

2 people that all they have is a claim.  That's whose -- that's

3 who you're taking the vote from, is anybody who's got a claim.

4 They're not allowable claims.  They are not allowed claims.

5 So, you're saying, there is impairment on the basis of a claim.

6 That is just directly contrary to the PPI case.

7        The PPI case says, no, until you go through this

8 entire process, you do not have the ability to say, I'm

9 impaired.  You don't have it.

10        And all that we're saying here is, take us through

11 one of these processes.  Any one of the processes.  We'll work

12 with any one of them.

13        But, you cannot allow people who have simply got

14 claims, who are not entitled to the benefit of the impairment

15 doctrine, to then maintain their vote and then say, unless we

16 agree 75 percent, you're out of luck and you've got to litigate

17 -- or liquidate.

18        THE COURT:  Okay.  Take me through your litigation

19 model.

20        MR. BERNICK:  On the litigation model, you start out

21 with the same process of beginning with these claims here, the

22 same bar date, to bring them forward, the same claim forms, or

23 questionnaires, the same stratification, the same road map, but

24 you would then have to take that road map and reduce this

25 population down to a certain number of claimants, and disallow

1 all the others.

2       And we obviously know what that means.  If we had all

3 the motions, we could probably, in a litigation committee, you

4 could probably do it, in something like <u>Cimino</u>, except that you

5 couldn't extrapolate within the group.  You'd have to take each

6 one through.  That's why we came up with the claim forms.

7       So long as you've got the common issues, you can do

8 it under Rule 42, but you can't extrapolate from one claim to

9 the other.  They have to be genuinely a common issue.  You then

10 sort out this population, so that it's no more than, let's say

11 it's this.

12       The other side would then say, that's still not

13 something which you can put a binding dollar figure on.  We now

14 have to either settle those claims, or we have to litigate them

15 to verdict in a Jury trial.  Because, unless we do that, you

16 don't know whether -- what the actual allowable amount is and,

17 therefore, you don't know whether we can vote or not.  That's

18 limitation number one.

19       Limitation number two is that they'll say, well,

20 we'll take this estimate here, we're happy to do that, but it's

21 not binding on us.  If the estimate shows that there's not

22 enough money in the debtor to pay, it's binding on the debtor,

23 the debtor's out of luck.

24       But, if you're going to tell us that the outcome is

25 binding on us, that it produces a hard cap, no, no, no.  You

1 can't give us a hard cap.  We're entitled absolutely to that

2 Jury trial.  We've got to liquidate them claim by claim.

3        So, effectively, you can never produce a future

4 estimate for any purpose other than to wipe out equity.  You

5 cannot produce it on a basis that will be binding on those

6 individual claimants.  And they then also will -- can say, that

7 all these people are still entitled to vote and they'll vote

8 against the plan.

9        THE COURT:  But they're futures.

10        MR. BERNICK:  No.  The presents are entitled to vote.

11        THE COURT:  Oh.  Well --

12        MR. BERNICK:  And they'll vote against the plan.

13        THE COURT:  Well.

14        MR. BERNICK:  So, the difficulty is that if you look

15 to the -- if you adopt a viewpoint that says, we're going to

16 ignore 502(c), we're only going to have straight litigation,

17 you can never extrapolate, you've got to take each case down to

18 verdict before you can say that the claim has got a fixed

19 dollar amount, and you can't have post-confirmation litigation,

20 because you'll never get to post-confirmation litigation.

21        Now, all of this -- I mean, they say, there's not

22 precedent for having post-confirmation litigation in Federal

23 Court.  That's absolutely false.

24        In the Dow Corning case, we have a whole trust that's

25 been set up for settlement purposes.  We have a litigation

1 facility that's been set up.  The litigation's all in Federal

2 Court, unless by agreement it goes down to State Court, and the

3 Federal Court has jurisdiction -- continuing jurisdiction.  And

4 the operative statute is -- in fact, 157(b)(5).

5        So, you can certainly do it.  And that's really what

6 we proposed.  We've said, postpone the case by case litigation

7 until later.  We're okay with that.  We don't have to do it

8 now.  But, then if you're going to do that, you need 502(c) to

9 be able to set up the estimate such as you can go forward.  Any

10 other result would mean you -- you really can't emerge.

11        If you say, well, gee, that's a soft cap, not a hard

12 cap, then the financial world will look at this company and

13 say, oh, who knows whether we can finance it, who knows what we

14 can do with it, we don't know what the liability is worth.

15        The whole purpose of 524(g) and the whole purpose of

16 being able to set up the estimate, is precisely to create a cap

17 so that the company then can emerge with good equity.

18        Is there a risk that people will not ultimately get

19 paid hundred cent dollars?  Yes, there is.  That risk is always

20 there in 502(c).  You -- it is implicit in 502(c) that there's

21 a risk for an individual not to get paid in full.

22        But, no individual has the absolute right to get paid

23 in full, unless we went through the whole litigation route, or

24 unless we go through the estimation route and the estimation

25 says that there's enough to pay them in full.

94

1          Your Honor is adopting, I think, in a sense, the

2 first blush reaction that people have to this impairment issue.

3 It says, oh, I understand impairment, if they -- you know, I

4 understand that their claims have got to be allowed, but if

5 they're ultimately allowed and they don't get 100 cent dollars

6 on the effective date, they're impaired.

7          And that's -- that is exactly the argument that --

8 with respect to the Court, was specifically rejected in the

9 Third Circuit in the PPI case.  The Third Circuit said, you

10 cannot say that with regard to claims.  Claims have got to go

11 through this process.  It's only allowable claims that get

12 treated that way.

13          In the context of asbestos, in 524(g), you've got two

14 paths to get there.  And impairment doesn't say, oh, it's only

15 one path that's legitimate.  The doctrine of impairment says,

16 look, if you're going according to the code, and estimation is

17 the way to go, you're not impaired.  Otherwise what's the point

18 in having an estimate?

19          See, what they want to do is take the estimate and

20 make it a one-way street.

21          THE COURT:  Well --

22          MR. BERNICK:  If the estimate's unfavorable to us,

23 you know, there's no equity, but they don't want be bound by

24 the estimate.

25          THE COURT:  Is there a -- an asbestos, or silica,

**J&J COURT TRANSCRIBERS, INC.**

1 some mass-tort case, it doesn't even have to be one of those,

2 in which the Court has done the estimation hearing for purposes

3 of allowance and distribution?  Because, it happens in

4 non-asbestos cases.  I'm not sure why it can't happen in a

5 mass-tort case.  Has it happened in a mass-tort case?

6          MR. BERNICK:  Here's what's happened in a mass --

7 there are.  There's asbestos -- there's Dalkon Shields, there

8 is Dow Corning.  And in Dalkon Shields what happened was that

9 prior to the plan being approved, there was an estimation done.

10 It was done using specialized questionnaires.

11          The information that came in and a -- you know, it

12 was -- a rubric was developed, of information.  They then had

13 estimates and the estimates came in at a -- on a wide range.

14 And the estimate was done.  And the estimate was for purposes

15 of determining the total funding for the A. H. Robins

16 claimants, not on a claim by claim basis.  Total funding for

17 all the claimants.

18          THE COURT:  But, the difference in A. H. Robins, I

19 think, is that there shouldn't have been a future class.  I

20 mean, women knew whether you had a Dalkon Shield or not.

21          MR. BERNICK:  Well, it -- that's true.  You -- you

22 may have a future's class, but it's not a pure future's class.

23 They may not have a claim now, they -- you didn't have an

24 indeterminate population.

25          THE COURT:  Right.

1          MR. BERNICK:  You knew what the population was, but

2 with respect to the arguments we've just gone through, it's

3 absolutely apples and apples.  That is, we're talking about

4 whether you can, through estimation, reach a hard cap that is

5 binding, without litigating each and every claim.

6          And that's exactly what was done in A. H. Robins.  It

7 was a hard cap.  It was a hard cap, because that's all the

8 money that was going to be there.  And the money funded because

9 they were able to sell the company for a number that was

10 roughly the same amount as the estimate.

11          So, you have an estimate that is used to establish

12 the total hard cap funding, without liquidating each and every

13 claim, through litigation.  It was done through estimation, and

14 it was absolutely binding.  It turns out the estimate was high.

15 So, people got more money distributed to them, later on, when

16 it turns out that there was more than enough money to pay the

17 claims.

18          All the claims were then resolved post-confirmation,

19 through a litigation process that was agreed to as part of the

20 plan.  But, at the time that the estimate was done, there was

21 no agreement.  There was no plan.  There was -- the estimate

22 was done for purposes of determining what the bogey was, so

23 that the plan could be developed.

24          And that's exactly why you have the estimation

25 procedure.  Otherwise, you're litigating forever.

97

1          In the <u>Dow Corning</u> case, an estimate was done for

2 purposes of determining the ultimate funding for a

3 post-bankruptcy trust.  <u>Dow Corning</u> was a consensual plan.

4 <u>A. H. Robins</u> was a consensual plan.

5          In the <u>Dow Corning</u> case, the estimate was done after

6 the vote already was taken.  There was objection -- there were

7 objections to it though.  There was a contested hearing on

8 estimation.  The estimation was, in fact, used to demonstrate

9 the validity of a hard cap.

10          <u>Dow Corning</u> is a double hard capped case.  The hard

11 cap was confirmed on the basis of an estimate.  Claims will now

12 be settled, post-confirmation, and they will be litigated

13 post-confirmation.  The settlement option is an option that

14 people had to make an election to, up front.  That's where we

15 got the whole idea here.

16          So, you've two different cases where estimation was

17 used to develop a hard cap without the need for litigating each

18 and every claim.

19          In the 524(g) context, you'd say that the

20 circumstances driving that same result are even more

21 compelling, because you do have to provide for futures and the

22 only way to provide for futures is estimation.  So, you come

23 back, all the way to the same thing.

24          We can either go down the litigation path and they'll

25 be happy, because they'll get to try all their cases to a Jury,

1 if they want.  We'll never emerge from Chapter 11.  And until

2 that final result is in, they'll say that everybody shy of a

3 judgment gets to vote and you will never get 75 percent in,

4 because, even at the end of the day, the people whose claims

5 are successful and are going to get paid in full, if they have

6 the -- they'll still vote against.  They'll always vote

7 against.  These people will block vote against.

8        Or you can go down the estimation road -- completely

9 consistent with 524 -- 502(c).  You get your overall estimate

10 in accordance with the rules, maybe like -- then by then, God

11 bless, we'll have a consensual plan.  But, the idea that in all

12 of this, at the end of the day, all these people get to vote,

13 goes back to the proposition that if you've got a claim, unless

14 there's a final judgment saying that claim is disallowed, and

15 it's final, not -- any appeal, they get to vote.

16        That is directly contrary to the PPI, and would

17 render this case in -- the headline coming out of this Court

18 will be, it is unbelievable -- and maybe this will drive the

19 legislation -- but today, still, the Courts failed to come to

20 grips with what everybody knows, is the same mass-screening

21 claims are able now to force a company into liquidation,

22 because there's no alternative.

23        THE COURT:  Well --

24        MR. BERNICK:  If that's what the law is, that's what

25 the law is.

1          THE COURT:  524 really doesn't talk about

2 classification of claims either.  And the debtor has some

3 flexibility, perhaps, with respect to classification of those

4 claims, so that maybe the votes in certain classes can be

5 taken, and if it turns out that certain classes were in fact

6 unimpaired, those votes can, at that point, be disallowed, if

7 they're against the plan, because they'd conclusively be

8 presumed to have voted in favor of the plan.

9          So, although typically there is a trust that deals

10 with claims, and the classification comes up in the trust

11 process, I'm not sure you're prohibited from doing it in the

12 524 vote process.

13          MR. BERNICK:  Well, what the -- yes.  Let's play

14 around with that.  I'm not -- we're not averse to -- I mean, if

15 you wanted to reserve on the issue of whether there's

16 impairment, until we go further down the road and see where we

17 are -- you know, we have -- that's essentially what we said

18 today.  We have no quarrel with that whatsoever.

19          We think it's vital to go down these paths to get

20 more information to find out, you know, who the real claimants

21 are.  And we'd be perfectly happy to defer the impairment

22 issue.

23          But, in point of fact, you know, if at the end of the

24 day they're going to say, you know, 75 percent of all people

25 got a claim, we're kidding ourselves.  We're never going to

1 solve that problem, except if we recognize the impact of the

2 impairment rules.

3        Let's talk about different classifications.  We do

4 have different classifications we tried to figure out perfectly

5 consistent with what everybody in the outside world knows about

6 these claims.

7        There are certain kinds of people who are really sick

8 and there are certain kinds of people who aren't sick.  Okay.

9 So, we said, with respect to the people who are not sick, let's

10 separately classify them.

11        Or people who can't really demonstrate that they've

12 got any significant exposure to Grace product.  In other words,

13 the wrong industry people.  We'll separately classify them.

14        We'll say, with respect to the people who are sick,

15 and really do have a nexus to Grace, you know what, let's

16 classify them separately and let's provide them with money.

17 So, we did that classification.  But, it's then got to be a

18 hard cap.  Why?  Because, we could never emerge from

19 bankruptcy, with this group of claimants, without having a

20 marketplace see that there is an outer parameter.

21        And the case is completely -- they even recognize

22 that equity can be preserved in exactly this fashion.  And

23 that's what the estimate is designed to do.  It's designed to

24 enable you to go on with life.

25        With respect to the asymptomatics, we've not asked

1 for any hard cap.  We've asked for an estimate and we've said

2 that we'll fund the trust with that estimate, and the estimate

3 can't exceed a certain amount.  But, we've not asked for a hard

4 cap there.  And these people, if they prevail, ultimately could

5 get access to Grace's ongoing equity.

6        So, we have created through the classification

7 scheme, with respect to these people, you know, I don't know

8 what the argument is.  I mean, they're getting access to Grace

9 equity.  All that happens is that they get litigated in Federal

10 Court, which we've demonstrated is entirely appropriate under

11 the code.  But there's no cap.

12        With these people, we have to use the estimate to get

13 a cap, because there's no alternative.  We can't emerge from

14 bankruptcy without it.

15        Now, these people, again, you'll find, that even if

16 we litigate their claims down to the last claim, we spend the

17 next ten years doing it, they'll still vote against the plan.

18 They'll say, oh, Your Honor, I understand that they -- Grace

19 has set aside enough to pay everything, but, you know what,

20 it's not a final judgment, and we've still got concerns, and

21 we're voting against.

22        MR. LOCKWOOD:  Your Honor, I don't know who appointed

23 Mr. Bernick, God, but he sat here all morning long and told us

24 about how, no matter what this Court does, the plaintiffs are

25 going to vote against the plan if the Court acknowledges that

1 they're impaired and have a right to vote.

2        He cites two cases where he says they were examples

3 of hard caps.  In both of those cases the plaintiffs got to

4 vote, and they voted for the plan.  Why's that?  By Mr.

5 Bernick's logic, if they got to vote, and they didn't like the

6 estimation, they should have voted against the plan and they

7 would have been in exactly the posture that Mr. Bernick is

8 running around and ranting about.

9        This can't possibly be true.  The code can't possibly

10 allow this to happen, et cetera, et cetera.  The code was not

11 drafted with mass torts in mind.  Section 502(c) was not

12 drafted with mass torts in mind.

13        Indeed, the literal language of Section 502(c) talks

14 about estimating a claim, for purposes of allowance.  That's

15 what it talks about.  It doesn't say anything about estimating

16 aggregate claims, much less estimating aggregate claims for

17 purposes other than allowance.

18        If you go back and read their briefs, they spent a

19 lot of time darting around the question of what this estimation

20 really is for.  They don't have the temerity to argue that the

21 aggregate estimation is for purposes of allowance, because the

22 aggregate estimation doesn't tell you anything about which

23 creditor is going to get paid what.

24        All it is is a big number and most people regard it

25 as feasibility.  Feasibility -- what does feasibility mean?

1 Feasibility, under 1129(a)(7) is it means that the debtor isn't

2 going to wind up going into Chapter 11, or as they call it,

3 Chapter 22, within a near term.

4       It has nothing to do with allowing the debtor's

5 equity holders, which is what Mr. Bernick is shilling for,

6 let's make no -- this is not a situation unlike what's going

7 on, for example, in <u>Owens Corning</u>, right now, in front of Judge

8 Fullham, where there's a contested estimation hearing between

9 two groups of creditors over the provisions of a plan in which

10 everybody's going to get to vote over what the relative shares

11 of those creditor groups are.

12      What this is, is Mr. Bernick running around selling

13 the proposition to Grace, and others, that I'm going to save

14 your -- your equity here, because I've got all these great

15 novel ideas about how I'm going to change the Bankruptcy Law to

16 convert what was created to be a mechanism for debtors and

17 creditors to work out their respective claims, into a

18 litigation vehicle which will enable me to defeat creditor

19 claims on a mass basis and preserve equity.  That's what this

20 is about.

21      And the idea that this particular company is the

22 poster child for this, and we're going to hear headlines about

23 Grace, the last headline of which we heard was that they got

24 most of their executives indicted, that somehow or another that

25 if this Court says that the -- a statute that gives creditors

1 the right to vote means what it says, that the sky is going to

2 -- fall, is poppy-cock.

3        We have listened -- I have had -- sat here and

4 listened to more misrepresentations from Mr. Bernick, in the

5 last half hour, than I know what to start with.

6        For example, he cites the -- he has now cited in his

7 original remarks and his second remarks, the <u>Babcock and Wilcox</u>

8 road map approach, and he starts -- and he give you these

9 charts about the threshold, et cetera, et cetera.  He said this

10 is what we did and here's what the outcome of it was.

11        What he neglects to mention is two things.  Number

12 one, Judge Vance, when he -- she heard what he proposed to do

13 with these omnibus objections, summary judgment motions, Rule

14 42 consolidated trials, concluded that she was going to spend

15 the rest of her life handling stuff for Mr. Bernick's client

16 and she didn't really have any interest in doing that, because

17 she didn't think it was practical.  And she told him so.

18        And Judge Brown lifted exclusivity and the next thing

19 we had was a consensual plan -- low and behold.

20        And as for the results of their great bar date

21 process, sure, we have a lot of self serving assertions by Mr.

22 Bernick that were never tested.  We never litigated the truth

23 of this.

24        If I have to sit here and listen to him tell me about

25 how everybody in the world knows that all these claims are

1 bogus, one more time -- he's not testifying here.  This isn't

2 evidence.

3        The fact that one disgruntled MISO lawyer, Steve

4 Kazin (phonetic), makes some speeches in Congress about the

5 kinds of claims he doesn't handle, namely non-malignancy

6 claims, does not mean that somehow or another it has been

7 proven, anywhere in the country, that you can't win a Jury

8 verdict, and get it upheld on appeal, if for example, all you

9 have is a 1 over -- /0 ILO reading in an asbestosis case.

10        Mr. Bernick and his crew have made up all of these

11 great issues that they want to come in here and get you to rule

12 on, categorically.  They are so over simplifying the process.

13        The Bankruptcy Code gives people rights, as

14 creditors, just as much as Mr. Bernick seems to think they give

15 the debtor rights to run around and try and defeat claims.  And

16 among those rights are, if you want to disallow my claim,

17 you've got to treat it as a contested matter.  I get discovery

18 against you, you don't just get discovery against me.  The

19 discovery is by rule.

20        There's nothing in the Federal Rules of Evidence or

21 Civil Procedure, which he says are controlling here, that we

22 have to do everything by, that -- has a questionnaire.

23 You can do interrogatories, but they're limited in number and

24 you get the answers that you -- and if you don't like the

25 answers in the -- interrogatories, you can compel better

1 answers.

2        But, you don't get to categorically deny claims if

3 you don't happen to like the answers to some interrogatory.

4 They're just making most of this stuff up -- this process.

5        Maybe he managed to get it done in <u>Dow Corning</u>, I

6 don't know.  All I know is, ultimately, whatever happened

7 there, people agreed to it.

8        And what he's trying to do here today is to say, I

9 want to propose a scenario of simultaneous -- he's not willing

10 to wait until the estimation is completed, so we know whether

11 this -- if you want to use the term bogus -- bogus number that

12 they've come up with of a billion four hundred and eighty-three

13 million dollars to cover the symptomatic claims, and the PD

14 claims, and the trust expenses, is any more than something they

15 put out -- pulled out of their ear.

16        They litigated in the tort system for 20 years before

17 they went into bankruptcy.  All this stuff about unimpaired

18 sick people versus non-sick people, they had plenty of time if

19 they wanted to bring cases into State Court to get rulings from

20 State Courts -- Supreme Courts that unimpaired, or non-sick, or

21 asymptomatic people don't have causes of action.

22        The idea that there's a difference between sick and

23 non-sick is not something that appeared on the radar screen for

24 the first time in the year 2000.  That's just ridiculous.  They

25 can -- they had the opportunity to litigate whether or not you

1 had adequate doses.

2       The fact of the matter is that -- the reason Peterson

3 gave the testimony that Mr. Bernick helpfully quoted for the

4 Babcock case was that the question was, how much of a dose,

5 from Babcock and Wilcox products, did you get?  And how much of

6 a dose from -- and how could you show that exposure to a

7 Babcock and Wilcox product caused your disease.

8       The fact is, that since Burrell, in the Fifth Circuit

9 in the 1970's, it's been the law in every jurisdiction in this

10 country that you don't have to prove specific causation by

11 showing you got a dose of one defendant's product that, by

12 itself, was enough to cause your asbestos related disease.  All

13 you have to show is that the amount of the dose that you got

14 from this, among many other doses from many other defendants,

15 was what's called in tort law, substantial contributing factor.

16       And it's up to a Jury to decide what -- how much that

17 is.  It's not up to Mr. Bernick and his experts to come in here

18 and act like Judges.

19       As we pointed out in our response to the estimation

20 process, which I thought we were going to get to separately,

21 and I still hope we do, Mr. Bernick's proposal up here, for

22 this estimation and how they're going to lower the number, he's

23 going to turn -- he's got some expert in mind that he's going

24 to make a Judge.

25       Because, what's going to happen is they're going to

1 take these questionnaires, and this expert is going to review

2 the questionnaires, and the expert's going to decide what

3 claims are valid, what claims have factual validity, and what

4 claims have legal validity.

5        I don't know about you, Your Honor, but the last time

6 I looked, that was a role for a Judge, and maybe a Jury, but it

7 sure wasn't a role for some expert to come in here.

8        And the idea that he's going to get his number down

9 to 25 percent, you know, that's just him.  He's just saying

10 that.  I disagree with it.  I think he's smoking something that

11 ought to be a controlled substance, if it isn't.  But it's

12 certainly not something that your -- this -- Your Honor should

13 be taking as though it was a proven fact in this courtroom.

14        THE COURT:  I'm not taking anything as proven facts,

15 Mr. Lockwood.  I'm only trying to figure out how to get this

16 case out of this process and get money to the people who are

17 supposed to get it.

18        MR. LOCKWOOD:  Well --

19        THE COURT:  That's what I'd like to do.

20        MR. LOCKWOOD:  I would respectfully suggest, Your

21 Honor, that your -- the original suggestion that you had was

22 the right way to go.

23        There's nothing in the Bankruptcy Code, or in the way

24 these cases run, that indicate that we need to have a

25 simultaneous estimation proceeding and dissemination of a

1 disclosure statement for a plan that's conditioned on the

2 outcome of the estimation proceeding.

3       Right now, as the disclosure statement says, if they

4 don't get an aggregate estimation from you that the symptomatic

5 claims, and the property damage claims, and the future trust

6 expenses are going to be less than a billion four hundred and

7 eighty-three million dollars, they don't have a confirmable

8 plan by their own terms, although they -- I guess they could

9 waive it, depending on how much over a billion four

10 eighty-three it is.

11       But, right now, that's conditioned on that

12 estimation.  And I see no reason why we can't go ahead with an

13 estimation proceeding -- I dispute mightily the nature of it,

14 that they propose -- but, I don't see why we can't go ahead

15 with an estimation proceeding and try and move these balls

16 forward.  And we can --

17       THE COURT:  So, what's your view about what the

18 estimation proceeding should be?

19       MR. LOCKWOOD:  Well, we had this fight in <u>Owens</u>

20 <u>Corning</u>, in which the dissenting creditors wanted to have the

21 same kind of elaborate process for evaluating claims, and

22 filing, and bar dates, et cetera.

23       And Judge Fullham took the position that, I believe

24 that you can do this through competing experts.  I'll go ahead,

25 I'll have a trial on the expert front, and if I decide that we

1 need more evidence, whether it be by bar date, or whatever,

2 after I've heard the experts, I'll decide which ones I believe

3 and I'll either conclude that the experts gave me enough to

4 come up with an estimation, or I'll move on and we'll do some

5 additional steps.

6       THE COURT:  All right.  But what's the purpose for

7 the estimation then?

8       MR. LOCKWOOD:  The purpose for the estimation, here,

9 would be to give all of the parties to this bankruptcy some

10 idea of what, for the trust, is likely going to have in the way

11 of claims, for purposes of determining what kind of a plan.

12       Right now, the debtor's view of the world and the

13 asbestos claimant's view of the world is widely divergent on

14 the value of the future claims.  And the only way anybody's

15 ever going to get over that gap is to have some Court referee

16 that dispute.

17       THE COURT:  Well, I'm willing to do that.  I just

18 want to know what the process ought to be to do it.  I've been

19 saying since the -- since I got assigned this case, that if in

20 fact I have the capability of doing it, I'd move it.  I now

21 have that capability, so let's go to it.  But how?

22       MR. LOCKWOOD:  Well, Mr. Bernick -- let me back up a

23 minute.  I, again, we're sort of jumping ahead to estimation

24 and my brethren over here haven't had an opportunity to speak

25 to the impairment issue at all, and -- I -- do you want to go

1 ahead with that right now, or should --

2          THE COURT:  I'd like to try to figure out what pieces

3 we need to do, and in what order, to get a plan proposed that,

4 hopefully, will be a consensual plan.  I'm not minimizing what

5 the debtor has now, but it's obviously not a consensual plan.

6          So, if an estimation is going to do it, let's tee up

7 an estimation hearing.  Because, perhaps at the point in time

8 when everybody gets at least some numbers from a Court that

9 looks at it, subject to how ever many appeals you're going to

10 take, nonetheless, at least you'll have somebody's view of what

11 the -- that estimated number is going to be.

12          MR. LOCKWOOD:  Well, right now Mr. Bernick wants you,

13 essentially, to take his word for what the evidence ought to be

14 in an estimation proceeding.

15          I mean, he's basically said -- he got up, and he drew

16 his graphs, and he described Mark Peterson's methodology of

17 going about estimating claims, and he says, that's ridiculous,

18 because everybody knows the tort system is broken.

19          THE COURT:  I know what he wants me to do.  I had him

20 go over it, very specifically, so I had no doubt about what he

21 wanted me to do.  What do you want me to do?

22          MR. LOCKWOOD:  What I want you to do is to be -- is

23 to tell the parties to meet and confer about having a case

24 management procedure for the estimation proceeding, not for

25 post-confirmation litigation, and have that teed up as the

1 battle of experts.

2         I mean, Mr. -- he -- Mr. Bernick's expert that's

3 going to come in here and testify about how the torts -- if he

4 wants to try and convince the -- you, that you need a bar date,

5 and you need individual claims evaluation through

6 questionnaires, et cetera, he ought to have an expert compete

7 with our expert, over whether or not, as he incessantly says in

8 a non-evidentiary concept, somehow or another Grace could

9 actually prove that for 20 years in the tort system it was

10 defrauded, routinely and regularly, into settling claims that

11 had no value.

12         Because, if you think about what a real estimation

13 would be like, in a regular tort claim, what you'd be

14 estimating would be the ultimate resolution, after litigation,

15 of the judgment or verdict that would result from that tort

16 claim.  That's what you'd estimate if you were sitting here

17 looking at, you know, a big claim.  We wouldn't be estimating

18 what it could be settled for.

19         Why then do we talk about settlements in these

20 estimation proceedings?

21         And I might add that Mr. Bernick's Rule 408 argument

22 is wrong.  It was rejected in <u>Babcock</u> and I can explain how, if

23 the Court wants to hear it.  But, the reason they do it is

24 because it is perceived, generally speaking, to be more

25 economically sensible.

1          The fact is that pre-petition and presumably

2  post-petition, if you hadn't gone into bankruptcy, Grace, like

3  everybody else in the world -- slightly less than <u>Owens</u>

4  <u>Corning</u>, which tried to get -- litigate its way in the tort

5  system and got hammered in the process -- but virtually

6  everybody else like Grace, settled.

7          UNIDENTIFIED TELEPHONIC MALE ATTORNEY:  -- in the

8  Court.  Yes --

9          THE COURT:  Pardon me.

10         UNIDENTIFIED TELEPHONIC MALE ATTORNEY:  You're not

11 going to get a plan.

12         THE COURT:  Pardon me.  Somebody is speaking and we

13 can hear your conversation.  Quite frankly, I'm not interested.

14 Please put your mute buttons on.

15         I'm sorry, Mr. Lockwood.

16         MR. LOCKWOOD:  I lost where I was.

17         THE COURT:  <u>Owens</u>.

18         MR. LOCKWOOD:  Oh, oh, oh.  They routinely settled

19 cases in the tort system and they did it because it was cheap.

20 They found that, to the extent that they tried to litigate

21 claims in the tort system, while they won a lot more than they

22 got dismissed voluntarily in the settlement negotiations, the

23 cost of defending the claims, coupled with the very large

24 judgments, including very large non-malignancy judgments that

25 routinely resulted in those cases, made it much more expensive

1 to try and litigate your way out of these claims, than to

2 settle them.

3          THE COURT:  Well, that may be, but --

4          MR. LOCKWOOD:  So --

5          THE COURT:  -- it seems to me if Grace's expert

6 doesn't want to look at the settlement history and --

7          MR. LOCKWOOD:  No.  That's right -- he -- Grace's

8 expert can do anything he wants to.

9          My -- the point I'm trying to make is that we should,

10 at a minimum try, as Judge Fullham is trying, to see if you

11 could actually have an estimation based on a battle of experts.

12 And if that -- if Grace succeeds in -- through its experts and

13 other evidence that it wants to put on, in convincing this

14 Court that that is an inadequate method for arriving at an --

15 at a good estimation, because they actually prove that somehow

16 or another their settlement history is not a reliable basis for

17 trying to figure out what their liability would have been had

18 they not gone into bankruptcy.

19          Which is what this is all about.  I mean, that's what

20 we're -- we're not estimating here what the -- what would

21 happen if Grace's TEP were approved, or something.  That's not

22 what you do.  You -- determining the claim, you look at the

23 value of the claim as it comes into the bankruptcy case, not as

24 it goes out of the bankruptcy case.

25          And so we would propose to -- they can take their

1 best shot at showing it.  But, what we don't think is fair, is

2 for them to come in here and basically make all these

3 assertions about bogus claims, and the tort system is broken,

4 and our experts are all relying on ridiculous assumptions about

5 tort history, and get the Court to buy into what we think is a

6 wrong and unworkable estimation methodology of their own.

7         Because, again, if you look at what they propose to

8 do, when you get past the bar date and the questionnaire, and

9 you look at what they have to -- what they're going to do is

10 have experts.

11        And all of their experts are going to do, is they're

12 going to sit there and they're going to say, I've reviewed

13 118,000 questionnaires, which is how many claims there --

14 supposedly were filed, according to their disclosure statement

15 -- and I'm going to look at those -- those things, and I'm

16 going to assume that that questionnaire has all the evidence

17 available, and in it, that that plaintiff would be able to put

18 in a trial of that case -- because that's what they're

19 estimating, is the outcome of litigation, in the -- under their

20 CMO, or otherwise -- and I will tell the Court how many of

21 those claims are "valid".  And then, I will value them.

22        How are they going to value those claims?  They've

23 never told us how they're going to value those claims.

24        THE COURT:  Well, I don't know the answer to that,

25 but that's essentially what the experts do in any estimation

1 hearing.  They don't necessarily look at questionnaires, but

2 they take a look at something -- settlement history, with the

3 case files that go with it.

4 　　　　　MR. LOCKWOOD:  If Mr. Bernick can make

5 representations to this Court that 75 percent of all the claims

6 are bogus, he doesn't need to have a hundred and eighteen

7 thousand questionnaires presented to some expert so the expert

8 can agree with him.

9 　　　　　He's already got some factual expert basis for making

10 those assertions, I assume, unless he's just making them up.

11 If he's got them, he can put them on, we can -- he can prove

12 them.

13 　　　　　And if he can persuade -- I mean, this whole business

14 about sick versus non-sick, for example.  The fact of the

15 matter is that in virtually every State you can bring a case on

16 an unimpaired claim where you -- where you show exposure to

17 product and you've got some x-rays that show that you've got

18 scarring in your lungs.

19 　　　　　The fact that the person is not, in his definition,

20 sick, is, under the Raleigh case, irrelevant.  He doesn't get

21 to make up the rules.

22 　　　　　THE COURT:  The issue, at this point in time, is not

23 whether somebody's sick, or not sick, or whether they have a

24 claim in the State law system.

25 　　　　　The issue that I, at some point need to get to, is

1 what are those claims worth, for purposes of funding a trust.

2          MR. LOCKWOOD:  I agree with that.

3          THE COURT:  Okay, so --

4          MR. LOCKWOOD:  And what I'm --

5          THE COURT:  -- let's figure out --

6          MR. LOCKWOOD:  -- suggesting is that round one --

7 round one, which may hopefully also be round ten, would be a

8 battle of experts as to how you can do this estimation and

9 whether you in fact need to go through with the procedure of a

10 questionnaire and -- remember, because they've said

11 inconsistent things about the questionnaire and their citation

12 to _Robins_ is misleading.

13          In _Robins_ the -- the 50-page questionnaire, as

14 opposed to the two-page proof of claim questionnaire, only went

15 out to a very small number of the claimants.  It didn't go out

16 to everybody.  It was a sort of a sampling process that

17 resulted in that.

18          THE COURT:  Well, if we can work out some discovery

19 plan that makes sense --

20          UNIDENTIFIED TELEPHONIC MALE ATTORNEY:  -- Scott --

21          THE COURT:  I'm not necessarily opposed to the

22 concept of using the questionnaire.  I don't know that we need

23 a bar date, and maybe it can go to counsel, if that's an

24 appropriate way to get discovery done.

25          You folks are going to need discovery, whether I go

1 through Mr. Bernick's process or the traditional type

2 estimation hearing that you're proposing.  So --

3          MR. LOCKWOOD:  I don't know, I mean, Mr. Bernick says

4 he was able to look at 1997 and 2000 claims and reach all kinds

5 of conclusions about their invalidity.  He didn't need any

6 discovery to do that.

7          THE COURT:  Well that was --

8          MR. LOCKWOOD:  What does he need --

9          THE COURT:  -- Grace's claims.  I mean --

10          MR. LOCKWOOD:  Well, that's why we're here.

11          THE COURT:  Right.  But have --

12          MR. LOCKWOOD:  Those --

13          THE COURT:  -- you had access?  Or don't you care to

14 have access?

15          MR. LOCKWOOD:  No.  I mean, we'd like to have access

16 to it, but I guess what I'm saying is I don't see how he needs

17 any more access to what the claims involve --

18          THE COURT:  Oh, wait.

19          MR. LOCKWOOD:  -- for purposes of this --

20          THE COURT:  No, Mr. Lockwood.

21          MR. LOCKWOOD:  -- estimation.

22          THE COURT:  Just like you said earlier, that

23 discovery's a two-way street and the Federal Rules of Evidence

24 apply both ways.  I wholly endorse that concept and if there is

25 additional discovery needed, I assure you, they're going to get

1 it.  Now what it is, I don't know at this process.

2       I like your concept of requiring you folks to be

3 locked up in my attorney conference room until you hammer out a

4 case management process for estimation.  That sounds like a

5 very good idea and if you're not able to, then I guess I'll

6 come up with one on my own.

7       But, I'm not sure that there is still a fundamental

8 agreement about how it ought to go.  I'm not sure Mr. Bernick,

9 frankly, that you need a bar date before we get to this

10 estimation process.

11       It -- the -- it seems to me that the difficulty with

12 not having either a bar date, or some method by which the

13 debtor knows who is actually asserting claims against it, is

14 that I'm not sure what the estimation process is going to do.

15       You can certainly take a look at the pre-petition

16 experience and whatever claims have been filed.  But, I don't

17 know that that's going to give you the universe of claims.

18       MR. BERNICK:  Yes.  I -- it -- I think it's

19 relatively -- it really shouldn't be that difficult.

20       I don't know that locking us up is going to get

21 there, except that we get along --

22       THE COURT:  I have the only key.

23       MR. BERNICK:  You can see --

24                     (Laughter)

25       MR. BERNICK:  You can see we get along, so well.

**J&J COURT TRANSCRIBERS, INC.**

1                              (Laughter)

2          MR. LOCKWOOD:  Actually, outside of Court, we do get

3 along, pretty well.

4                              (Laughter)

5          MR. BERNICK:  Well, outside of Court we manage to

6 avoid the dichotomies, unless it's in humor.

7                              (Laughter)

8          MR. BERNICK:  But, I think that the problem with not

9 having a bar date -- and maybe it's a solvable problem -- is

10 literally getting process over the claimants whose information

11 we need in order to --

12          THE COURT:  I'm not concerned about that.  It seems

13 to me that there is enough of a history of mass-tort cases,

14 specifically asbestos cases, in which the ballot, at this point

15 in time, is sufficient process to get somebody into this

16 system.

17          Not to mention, at this point, that I have a

18 gazillion 2019 Statements, so that the debtor ought to have

19 access to information as to who the tort claims are that have

20 been -- that are likely to be filed against it.

21          MR. BERNICK:  Yes.  I just --

22          THE COURT:  So, I think in terms of --

23          MR. BERNICK:  Just bear with me for one minute on

24 that, because this gets to be a tricky process.  And I think

25 that these people here, that famous 25 percent where I -- with

1 due respect to counsel, I said let's say it's 25 percent.

2 You've really got to be able, if you're going to do an

3 estimate, you can't just -- A, it's got to be -- it really has

4 to represent these people, in a sound statistical fashion.

5          THE COURT:  But, you know who the pre-petition claim

6 holders are.

7          MR. BERNICK:  We know who they are.

8          THE COURT:  Okay.

9          MR. BERNICK:  We know who they are, but then if you

10 wanted to use it -- if you don't take that snapshot -- and

11 here's the pre-petition people -- and say, would we be content

12 with sending out the claim -- you know, the questionnaires, or

13 whatever it is that we're going to use -- it could be

14 questionnaires, to gather information on a consistent basis,

15 same questions, et cetera, et cetera, then use for purposes of

16 the analysis.

17          Yes, we could do that if we had assurance A, they all

18 return the questionnaires and B, that they understood that

19 unless they did return the questionnaires, their claims were

20 not going to be allowed --

21          THE COURT:  Well --

22          MR. BERNICK:  -- and it's -- and --

23          THE COURT:  -- doesn't it -- I think for estimation,

24 that's not really the issue.  I mean, if I determine --

25          MR. BERNICK:  Let me just --

1          THE COURT:  If I determine what the likely claims are

2  to be filed against the trust, which the debtor would fund --

3          MR. BERNICK:  Yes.

4          THE COURT:  -- isn't that the purpose?  I need to

5  know the value of the claims that are likely to be filed

6  against the trust.

7          MR. BERNICK:  Right.

8          THE COURT:  Okay.

9          MR. BERNICK:  But the only way that you can get to

10 the trust, going forward, is to be able to have some basis of

11 saying, here's what the claim's exposure is as time goes

12 forward.

13         THE COURT:  But, it's been done by -- at least ten,

14 maybe more, in Bankruptcy Courts, without proofs of claim

15 before.

16         MR. BERNICK:  No, no, no.  Because, that's all

17 because they used --

18         THE COURT:  It's being done in Owens, right now.

19         MR. BERNICK:  That's all because they used this

20 historical extrapolation from settlement.

21         THE COURT:  Well, that's what Mr. Lockwood's going to

22 use.

23         MR. BERNICK:  I know that's what Mr. Lockwood wants.

24         THE COURT:  Okay.

25         MR. BERNICK:  And there's no question, let's just be

1 very --

2          THE COURT:  Well, surely the debtor knows what it's

3 own non-settlement history is.  I mean, you've got the records

4 of the cases that you actually litigated.

5          MR. BERNICK:  No.  See that's not -- it's again, Your

6 Honor, apples and oranges.  This history is all born of a

7 process that is in the State Court tort system.

8          THE COURT:  But, those are non-judgment creditors.

9          MR. BERNICK:  What?

10          THE COURT:  These -- this creditor group,

11 pre-petition -- pre-filing creditor group that you're talking

12 about are non -- are creditors who have not yet attained

13 judgments.

14          MR. BERNICK:  I understand.  But, let me --

15          THE COURT:  Okay.  So --

16          MR. BERNICK:  Let's be concrete about it.  In a given

17 year, Grace gets 20,000 claims.

18          THE COURT:  Right.

19          MR. BERNICK:  Okay.  Notwithstanding what Mr.

20 Lockwood says, since the last, at least the last five years,

21 overwhelmingly, those claims were settled on an inventory

22 basis.  They never even make their way onto a docket.

23          THE COURT:  Okay.

24          MR. BERNICK:  Okay.  So, if Grace gets 20,000 claims,

25 it then makes arrangements with a bunch of different law firms

1 that say, I will pay X-number of your claims, or Y-dollars of

2 your claims, if you provide me the following.

3          And what the plaintiffs are willing to agree to, as

4 part of that inventory deal, in terms of what they provide,

5 varies widely, but by and large it is minimal, and in our view,

6 totally unreliable.

7          It's not a question of being defrauded.  The better

8 word is extorted.  We didn't have any choice but to do it.

9          THE COURT:  Now, wait.  Not --

10          MR. BERNICK:  No -- I'm sorry.

11          THE COURT:  Both of you stop.

12          MR. BERNICK:  Okay.

13          THE COURT:  We're not talking fraud.  We're not

14 talking extortion.  We're talking --

15          MR. BERNICK:  That's --

16          THE COURT:  -- a business decision --

17          MR. BERNICK:  It --

18          THE COURT:  -- by an operating company, to settle a

19 claim, rather than going into litigation --

20          MR. BERNICK:  Your Honor, respectfully --

21          THE COURT:  -- end of story.

22          MR. BERNICK:  Respectfully, Your Honor, I would have

23 to tell you that that is not the reality.  Yes, it's a business

24 decision.

25          THE COURT:  They didn't agree to the settlements?

1          MR. BERNICK:  Hold on.  It is a business decision.

2          THE COURT:  They didn't agree to the settlement?

3          MR. BERNICK:  No.  No.  They agreed to the --

4          THE COURT:  Okay.  End of story.

5          MR. BERNICK:  No.  Well, I hate to push you on a

6 little bit, but I really have to.

7          There was no choice but to enter into those

8 settlements.  None whatsoever.  You can't litigate 20,000

9 claims.  You can't even litigate 1,000 claims a year.

10          THE COURT:  But, you're asking me to litigate

11 118,000.

12          MR. BERNICK:  That's because we are -- that's -- that

13 is the basic problem that we have, is that we have no choice in

14 this case, under the law, but to abandon this system.  This

15 system does not apply in this Court.  It does not.

16          And what -- the only -- what they're saying that the

17 estimate has to be is, basically take the data that resulted

18 from this system and say, that is the data that is dispositive

19 of now -- of what the claim is worth in this Court.  If Your

20 Honor rules that way, that's fine.

21          We believe that that's completely contrary to the law

22 and would have no -- it would mean that this bankruptcy is

23 meaningless.

24          There's no question but that, if you take the

25 experience in the tort system, having to pay all that we did,

1 and you extrapolate it, of course we -- we're out of money.

2 There's no question about that.

3       Why is it that we filed in the Bankruptcy Court to

4 begin with?  It was to escape the system that didn't work.  And

5 we'll be able to demonstrate that it didn't work.  Because,

6 there's no question about it.  We followed the rules, the rules

7 of evidence and the rules of discovery.

8       We don't have to be content with this process and the

9 data that results from the process, which doesn't answer the

10 questions that we have.

11       THE COURT:  But look.  Here's the problem with the

12 bar date.  Let's just assume, for a moment, that we set a bar

13 date for pre-petition asbestos creditors.  Okay?

14       MR. BERNICK:  Right.

15       THE COURT:  And you get in your -- a perfect world,

16 all 118,000 pre-petition creditors file a claim and

17 traditionally three percent of them are current Mesothelioma

18 victims, you know, another ten percent has some other form of

19 cancer, right down the statistical charts.  It all fits

20 perfectly according to everything that -- the published

21 statistics.  Just for purposes getting to this analogy.  Okay.

22       I still have a large, in your view, asymptomatic

23 base.

24       MR. BERNICK:  Right.

25       THE COURT:  It still has to be valued.  How's it

1 going to be valued?

2          MR. BERNICK:  Well, the way that it's going to be

3 valued is that we, and now kind of getting into the filters

4 when we say, I don't think it's going to be that hard to get

5 that information, under these questionnaires.  They fill out

6 the questionnaires.  They've got to fill out questionnaires all

7 the time.

8          THE COURT:  Okay.  But, let --

9          MR. BERNICK:  Let's assume that --

10          THE COURT:  Let's stick to the subject.

11          MR. BERNICK:  -- that we got all that.  Okay.

12          We then have to break out the questions.  We're going

13 to have questions just like the questions that were asked of

14 the PD claimants.  Tell me what particular product you were

15 exposed to and where you were exposed to it?  A lot of these

16 people won't be able to do that appropriately.

17          And they won't be able to identify -- they get washed

18 out right away.  They won't even -- they shouldn't even be

19 making claims at all.

20          A huge number of people, we believe, will be wiped

21 out because the medical data that we would ask to be submitted,

22 to support their claim, doesn't meet the basic requirements

23 that are set forth in the medical screening procedures

24 themselves.

25          Now, to give you an example, all those non-malignant

1 claims, they rely on "B" Readers.  "B" Readers that are hired

2 by the plaintiffs --

3         THE COURT:  Okay.  But, this process that you're

4 talking about, essentially requires what I said earlier, an

5 omnibus objection to claim procedures, whereby I am actually

6 going to be determining the allowance.  Not necessarily the

7 value, but the allowance of each specific claim.

8         Then, we get this database of existing pre-petition

9 claims.  That exact database, however, is not Grace's entire

10 pre-petition history, to show what, going forward, the likely

11 future claims against the debtor will be.  It may set the value

12 that Grace has to put in to satisfy --

13         MR. BERNICK:  Well, I'm --

14         THE COURT:  -- existing claims.

15         MR. BERNICK:  I'm -- we're on the seventh --

16         THE COURT:  So, it's irrelevant to the estimation

17 process.

18         MR. BERNICK:  No.  That's how you get there.  The

19 only way to be able to extrapolate to the future is to have a

20 baseline from which you extrapolate.

21         THE COURT:  You do have a baseline.  You've got a

22 20-year history.

23         MR. BERNICK:  No, no.  But, the -- you've got a

24 baseline, but the baseline includes a lot of stuff that's not

25 useable in this Court, for purposes of the projection.

1          But, Your Honor, let's -- like you would --

2          THE COURT:  You know the reason I think it may be

3 useful, Mr. Bernick?  It has nothing to do with the rules of

4 evidence, it has to do with the practicality of a plan

5 confirmation process.

6          The reality is that some of these people will have

7 claims -- in the tort system, will have claims that will

8 sustain a judgment.  I mean, it's happened in the past.

9          MR. BERNICK:  Right.

10          THE COURT:  So, it likely will happen in the future,

11 if you ever get back into the tort system.

12          MR. BERNICK:  Your Honor, hear me --

13          THE COURT:  And so the settlement numbers that the

14 debtor, in it's business judgment, whether it views that it was

15 extorted into that process or not, set some parameters within

16 which people who have similar claims in the future may realize

17 that they're not going to be able to get much higher of a

18 distribution through the trust, because that's all the debtor

19 was willing to pay before the bankruptcy hit.

20          MR. BERNICK:  I completely agree with that.  I mean,

21 that's why the sequence is, I think, is exactly as I indicated.

22 The issue is not whether there's any -- it's not whether

23 there's no relevance to this.  There is some relevance.

24          But, the issue is, at what point do you apply it.

25 And what we're saying is, that under the rules, you apply these

130

1 filters to end up with a population that's a subset of the

2 population that historically has been claiming against the

3 company.

4        Figure out, then, how many people will be added to it

5 in the future.  Maybe you can use an epidemiological curve.

6 Maybe you can use past trends.  But, you're working with a

7 smaller population, whose claims do not have a fundamental

8 legal problem.

9        And that's a very, very important thing to do, is to

10 get to that point.  That's the whole reason that we want the

11 questionnaires, is to end up with that sub-population.

12        How then do we value each of those claims?  I think

13 that there probably is relevance from past history, in terms of

14 how you value those claims, those individual claims.

15        How do you move going forward?  You're going to have

16 to do some kind of extrapolation.  We don't quarrel with that.

17 What we quarrel with is that, for purposes of establishing the

18 liability, that the rules that apply to liability get thrown

19 out the door.  They can't be thrown out the door.

20        The whole purpose of the bar date is to get

21 information on a claim form, and the information on the claim

22 form then to sort out the wheat from the chaff of people who

23 may in fact have a claim.

24        We're not saying there aren't people that have

25 claims.  There are people that got Mesothelioma from exposure

1 to Grace asbestos.  There are people who got asbestosis.  There
2 are people that got lung cancer.  What we're trying to do is
3 find out who they are and what subset of the population they
4 are.

5        You then have a -- isolated them, and you've got to
6 do it in a representative and sound way, and get the data in a
7 sound fashion.  You then can go forward to extrapolate, in the
8 future, how many people are going to be coming into the system
9 and you can also develop values on the basis of prior
10 settlement experience.

11        The only way that -- the only reason that Mr.
12 Lockwood and I disagree is that he wants to include, in this
13 process, this big -- from here, of people who made it through
14 the system before, because it was what it was.

15        Whereas, what we're saying is, no.  Now the rules
16 have to apply, we've got to do a filter to find out the real
17 claimants.

18        That is why, incidentally, we provided in the plan
19 this class of people.  These are the class of people that we
20 expect to pay.  These are the people who we want to fund.  The
21 way that we differentiate these folks from these folks is
22 through the questionnaires.

23        THE COURT:  Well --

24        MR. BERNICK:  So, we're going to estimate.  We're
25 going to estimate using the models.  You know, there are things

1 that can be done.

2        But, by and large, the big difference is that we

3 don't want to pay people that we're not legally obliged to pay,

4 because of the fact that -- have to pay them simply because

5 they would have gotten paid before.  That is the problem that

6 we have to solve in this case.

7        THE COURT:  Well, Mr. Lockwood, it seems to me that I

8 can sort of compromise between these two approaches and get to

9 a legitimate estimation hearing.

10       It seems to me that if the debtor thinks that it has

11 some value to do a questionnaire, and you know, the form of

12 discovery, I think, is somewhat within the discretion of the

13 Court and we could treat it as though it's a series of

14 interrogatories.

15       It's not going to be any 50 pages, I assure you.

16 But, coming down to a reasonable type of questionnaire to get

17 some information, so that the debtor's experts can decide what

18 the debtor thinks is a proper valuation, it may have relevance

19 to the committee.  The committee may choose to use it for

20 different purposes, I don't know.  But, I'm not sure that it

21 hurts to get that step done.

22       But, I do agree with you, that the appropriate way to

23 do this is through a battle of experts.  So, whatever spin the

24 experts put on the questionnaire, maybe they'll be the same

25 spin.  Maybe it won't be the same spin.  I don't know.  But, I

1 think that should be an expert analysis function that goes

2 forward.

3          MR. LOCKWOOD:  Well, we can certainly try and work

4 with the debtor on the questionnaire, in terms of -- to sample

5 118,000 people, you don't need to have 118,000 questionnaires.

6 I mean, Mr. Bernick has been tossing around statistical

7 references for extrapolating things, and you don't need 100

8 percent of the presents, to extrapolate to the futures.

9          You need whatever the experts would tell you would be

10 a sufficient sample to get -- have it be representative --

11          THE COURT:  Well, maybe --

12          MR. LOCKWOOD:  -- but the one thing I --

13          THE COURT:  I'm not sure it hurts to send it out to

14 all 118,000.

15          MR. LOCKWOOD:  Well, it depends --

16          THE COURT:  In fact --

17          MR. LOCKWOOD:  -- on what the sanctions are for not

18 responding to it.

19          THE COURT:  Well, if there's a bar date, it'll be a

20 --

21          MR. LOCKWOOD:  Well, that's --

22          THE COURT:  -- disallowance of claim.

23          MR. LOCKWOOD:  -- the point.

24          THE COURT:  I mean --

25          MR. LOCKWOOD:  So, then you're basically putting us

134

1 in an allowance disallowance position.

2          And let me just address something on Mr. Bernick's

3 chart, if I might, Your Honor, so that we understand exactly

4 what's going on here.

5          THE COURT:  Well, there may be another way to do it,

6 Mr. Lockwood, without requiring a bar date.

7          MR. LOCKWOOD:  I can't find it.

8          THE COURT:  It -- I take it that most of the 118,000

9 are represented by counsel.

10          MR. LOCKWOOD:  I assume so, and --

11          THE COURT:  And it seems to me that what we can do,

12 perhaps, is get each counsel to contact each client and make

13 sure that, in fact, that client understands that whatever the

14 estimation numbers are, will be binding on them.

15          And if they choose to file their own questionnaire,

16 fine.  And if they don't, fine.  But, there will have to be

17 some representative sample.

18          Experts can probably predict what that number has to

19 be.  And if we don't get it, then I will do some sort of an

20 order that imposes a bar date.

21          But, it seems to me that if the attorneys are willing

22 to go back to their clients and file something that says my

23 client understands that there is going to be an estimation

24 hearing and that they will be bound, maybe I don't need a bar

25 date.

**J&J COURT TRANSCRIBERS, INC.**

1         MR. LOCKWOOD:  Well, let me --

2         MR. BERNICK:  Anyway that we can get reliable

3 information, is fine.  But, we're real skeptical of the idea

4 that you can just rely upon the claimant.  There has to be

5 something issuing from this Court that does create a need for

6 them to respond.  If you have dropout from this process, then

7 it starts to create bias issues.

8         THE COURT:  Oh.  All right.  We -- I think we can

9 handle that issue, because I may not be able to impose

10 something directly on the claimant.

11        But, as I indicated about the 2019 Statements, I have

12 lots of counsel who are currently subject, as officers to this

13 Court, to my orders.  So, I think I can deal through counsel,

14 if need be.

15        MR. LOCKWOOD:  Your Honor --

16                    (Pause)

17        MR. LOCKWOOD:  Your Honor, we should be clear about

18 what the debtor wants this estimation process to entail, from

19 the debtor's side.

20        This thing over -- this line over here, liability

21 filters, with the boxes.  The debtor, without ever actually

22 presenting this to Your Honor for resolution, asserts that

23 there are various legal defenses which they will be able to

24 assert for -- across the board on cases, which will reduce the

25 number to Mr. Bernick's 25 percent.

1          Some of those legal defenses we could actually tee

2 up, even in advance of an estimation hearing.  For example, the

3 proposition that in this estimation process the Bankruptcy

4 Court could determine that people that didn't have a certain

5 level of impairment did not have a State Law right to payment,

6 for example.

7          Because, what Mr. Bernick really is trying to do

8 here, at the end of the day, in violation frankly, of <u>SGL</u>

9 <u>Carbon</u>, is to use this bankruptcy case as a mechanism for

10 trying to litigate his way out of a problem that he was unable

11 to --

12          THE COURT:  No.

13          MR. LOCKWOOD:  -- litigate his way out of in the

14 torts.

15          THE COURT:  No.  Let's stop.  All I'm trying to get

16 to is an estimation process.  It seems to me that experts may

17 disagree about the appropriate methodology to use.  That will

18 be a <u>Daubert</u> issue.

19          I can determine whether the methodology was

20 appropriate in a simple -- well, I don't know that the --

21          MR. LOCKWOOD:  In --

22          THE COURT:  -- evidence will be simple, but a motion

23 will be simple with respect to <u>Daubert</u>.  We can deal with all

24 that down the road.

25          But, getting the information, at the outset, seems to

1 me to be a legitimate --

2          MR. LOCKWOOD:  <u>Daubert</u> doesn't speak to the

3 qualifications of an expert who would take a large number of

4 claims, whether it's 118,000, or 10,000 --

5          THE COURT:  No.  It speaks to the methodology.

6          MR. LOCKWOOD:  -- (indiscernible) who would review

7 those claims and tell a Court which ones were legally and

8 factually valid.

9          THE COURT:  Right.  And so you'll argue that you

10 can't --

11          MR. LOCKWOOD:  There is no <u>Daubert</u> expert of that

12 sort.  I mean, that's not --

13          THE COURT:  Well, we'll see.

14          MR. LOCKWOOD:  Because, it's a matter of law.

15          THE COURT:  Well --

16          MR. LOCKWOOD:  Typically speaking, he --

17          MR. BERNICK:  With respect, I think that we're

18 talking a little bit at cross purposes.

19          We are not going to have experts who will opine as to

20 legal issues.  You and I will argue legal issues to the Court.

21 We're not going to have an expert say, gee, in Alabama you can

22 recover for exposure.  What we would do is we would argue the

23 legal issues, but the experts would translate our arguments

24 into what claims, or what groups of claims are picked up by the

25 arguments.

1          A second thing, the <u>Daubert</u> dimension of this, you

2 give the example of, you know, who's impaired, you know, what

3 does impairment mean under State Law.  That's one dimension of

4 this, but that's not the principal dimension that will animate

5 this process.

6          The <u>Daubert</u> issue goes to the reliability of the

7 methodology that was used in gathering medical information.  In

8 exactly the same fashion as before Judge Newsome, we litigated,

9 on <u>Daubert</u> grounds, whether dust sampling was an appropriate

10 methodology, and that methodology had been used for all of the

11 property claims, and he found it was not an appropriate

12 methodology.

13          We're going to litigate on <u>Daubert</u> grounds whether

14 the mass screening is an appropriate methodology, under the ILO

15 standards themselves --

16          THE COURT:  Well, okay.  We're going to get to that

17 issue when we get there, for today.

18          MR. BERNICK:  Yes.

19          THE COURT:  Because, I'm ready to move past this.

20 So, finish your remarks --

21          MR. LOCKWOOD:  Well --

22          THE COURT:  -- Mr. Lockwood.

23          MR. LOCKWOOD:  The point I'm trying to make is that,

24 for example, on this methodology, in the State tort system, no

25 State has adopted the ATS Standards for determining what is

1 impairment.

2          No State has adopted the proposition that some kind

3 of "B" Reader isn't a good enough kind of "B" Reader.  They

4 cite statistics that the plaintiffs have got favored "B" Reader

5 doctors, that some other experts of theirs think over read, by

6 orders of magnitude, x-rays favorable to plaintiffs.

7          That sort of issue is decided when that expert is

8 tendered to testify in a particular case and the opposing

9 expert is tendered to testify, and the two experts testify.

10          All these doctors, for example, that they criticize

11 and that they say we need to have a bankruptcy proceeding to

12 deal with, number one, those doctors were first identified as

13 issues in <u>Manville</u>, in the mid-1990's, and not one of them, to

14 my knowledge, has been yet disqualified, from a Federal or a

15 State --

16          THE COURT:  But --

17          MR. LOCKWOOD:  -- Court --

18          THE COURT:  But, regardless --

19          MR. LOCKWOOD:  -- on the grounds that they don't meet

20 <u>Daubert</u>.

21          THE COURT:  But, regardless, the information that the

22 debtor wants, I think, is appropriate for an expert to take a

23 look at.

24          Whether I'm going to consider it, what value I'll

25 place on it, whether it meets <u>Daubert</u> or not, I think is an

1 issue down the road.

2        What the debtor intends to do seems to me, in an

3 estimation process, to be calculated to lead the relevant

4 admissible evidence.  And for a discovery on an estimation

5 process, that's all I need.

6        I am going to direct you two, you and Mr. Bernick,

7 Mr. Lockwood, to work out some mechanism, by which, if we don't

8 have a bar date, because I'm -- for other purposes, I don't

9 really see the need for a bar date.  I'm not sure I see the

10 need for one here.

11        But, I do need to make sure that we have some handle

12 on whatever the appropriate sampling of the questionnaires to

13 go out and get returned is, that we will have a legitimate

14 across the board sample, number one.

15        And number two, that counsel for all of the present

16 claimants understands that this estimation process is going

17 forward, so if they want to submit that kind of questionnaire

18 and have their own client's medical information included in it,

19 they have the opportunity to do that, because they will be

20 bound by the outcome of the estimation hearing.

21        So, that, I think, is what we need to do.

22        MR. LOCKWOOD:  Okay.  But -- let me just say one

23 thing about this questionnaire process, Your Honor.  Actually,

24 two.

25        First, one of the problems with 118,000, is timing.

1  While Mr. Bernick facilely suggested these law firms, if they

2  file lawsuits, have at their fingertips the information

3  necessary to answer a questionnaire, that's simply not

4  necessarily true.  You're not required --

5           THE COURT:  Look, the trusts have been able to do it,

6  and the pre -- have been able to do it --

7           MR. LOCKWOOD:  The question is --

8           THE COURT:  -- within a matter of --

9           MR. LOCKWOOD:  Yes.  The question is time.

10          THE COURT:  -- several months.

11          MR. LOCKWOOD:  How much time?

12          THE COURT:  Okay.

13          MR. LOCKWOOD:  Because --

14          THE COURT:  Well, I think you two can --

15          MR. LOCKWOOD:  -- you know, if you've got 10,000

16 claimants, or 5,000 claimants that you have to fill out a

17 multi-page questionnaire --

18          THE COURT:  Yes.

19          MR. LOCKWOOD:  -- for each one, that's a whole lot of

20 work and it doesn't get done over night.

21          THE COURT:  Yes.

22          MR. LOCKWOOD:  The second point has to do with what

23 the kinds of things that individual claimants know.

24          For example, product ID.  Typically speaking in tort

25 -- in the tort system of cases, you prove product ID not merely

1 by the plaintiff's own recollection of where he worked and what

2 he worked with, but co-worker depositions, invoices from the

3 manufacturer showing product was delivered to a site where the

4 worker worked, et cetera.

5        So, if a claimant is asked, you know, exactly how do

6 you know that you were exposed to Grace asbestos and where,

7 that information might be available not through the claimant,

8 but by the lawyer, when he works up the case --

9        THE COURT:  Well, that can be --

10       MR. LOCKWOOD:  -- and gets --

11       THE COURT:  Wait.

12       MR. LOCKWOOD:  -- discovery from the debtor showing

13 where its products were shipped to.

14       THE COURT:  We're getting way ahead.  Because, it

15 seems to me that the debtor has certain information that can go

16 onto the claim form at the outset, which is, what the debtor's

17 products were, where they were delivered, and what period of

18 time they were used in specific locations.  And if a claimant

19 doesn't fit within one of those locations, that's --

20       MR. BERNICK:   And Your Honor, these are exactly the

21 kinds of issues -- I actually am looking forward to this sit

22 down session.  I only ask that we both have a martini

23 beforehand.  And please --

24       THE COURT:  Just one?

25                    (Laughter)

1          MR. BERNICK:  And don't lock the door, because I've

2 now turned 50, and I know Mr. Lockwood's over 50, and we may

3 have to use the facilities during the course of this meeting.

4                     (Laughter)

5          MR. BERNICK:  But, this is exactly the kind of thing

6 that we ought to be able to take up, in the context of that

7 conversation, rather than right now.

8          THE COURT:  All right.

9          MR. BERNICK:  For everything he says, I'm going to

10 have an answer, and it's just not worth it.

11          THE COURT:  In terms of using the facilities, why

12 don't we take a ten-minute break and do just that.

13          And then I'll come back and we'll -- I'll hear from

14 the other parties before I make final rulings on this, and --

15 after a ten-minute recess.

16                     (Recess)

17          MR. BERNICK:  Your Honor, if I could raise a -- I'm

18 sorry.

19          THE COURT:  Wait just a minute, Mr. Bernick.

20          MR. BERNICK:  Sure.

21          THE COURT:  Gentlemen, we have a substitute court

22 reporter, since the other one is at lunch.  So, when you speak,

23 would you please identify yourself --

24          MR. BERNICK:  Sure.

25          THE COURT:  -- since she will not know who you are.

1 Okay.  Thank you.

2        MR. BERNICK:  I'm David Bernick and I represent the

3 debtors.

4        Your Honor, just as a preliminary matter, I have said

5 -- I've had a couple of conversations here and I know that the

6 time is shortening.  A couple things.

7        One, we spent all of our time this morning --

8        THE COURT:  Yes.

9        MR. BERNICK:  -- talking about personal injury.

10        And we're -- the debtors are very, very focused on

11 also talking about moving forward with the traditional property

12 damage claims, as well as the ZAI claims, where there has been

13 no bar date.

14        And I don't know what it is that Mr. Baena and his

15 colleagues had intended to address, but if we could make sure

16 that we also address those things that are important, in order

17 to keep those processes under way, that would be terrific.

18 Second --

19        THE COURT:  Well, I don't know we're going to get

20 through all of those issues today, so maybe we ought to figure

21 out which ones you want to focus on, because I have my doubts

22 that we'll get done with all that.

23        MR. BERNICK:  Okay.  Well, with respect to the

24 traditional property damage claims, we already have the claim

25 forms in and it's simply a question of them really moving

1 forward to establish, I think, a -- some kind of pre-trial

2 schedule for the estimation that's associated with the

3 traditional property damage claims.

4       You know, we've made a proposal along those lines.

5 If Mr. Baena doesn't believe we should have the estimation,

6 maybe that's an issue that he can address now.

7       And then to the extent that we are going to have the

8 estimation, maybe that's something else that we can lock

9 ourselves up in a room to talk about in more detail, which is

10 the timing and substance of what we'd actually do on the

11 pre-trial basis, for the estimation.

12       For ZAI, the big issue is establishing a bar date, so

13 we can find out -- what that claimant population is.

14       THE COURT:  Well, I don't think I want to go to the

15 ZAI one yet, Mr. Bernick, and it's for this reason.  I -- I'm

16 really not yet much involved, even in the issue of the science

17 trial.

18       And I thought the whole purpose for going through the

19 science trial was to see whether or not a class proof of claim,

20 if any claim, is appropriate.  Whether a class proof of claim

21 would be the way to go, as opposed to having individual

22 claimants file.

23       So, if I set a bar date, and then notify -- I'm not

24 even sure who we'll notify, at this point in time, because I

25 haven't gotten through that evidentiary premise.

1        But, it seems to me that that issue ought to wait

2 until at least the science trial is decided and we see A,

3 whether there is some scientific support for the fact that

4 there's property damage, at all, and B, if there is, whether it

5 should be adjudicated in a class format.

6        MR. BERNICK:  Yes.  Here's the problem.  And the

7 reason that we're so focused on this is that right now, if Your

8 Honor's focused on, you know, what does it take to get to a

9 consensual plan until we have a claimant population, we have no

10 clue.

11        They will say that there are a million people, a

12 million homes out there.  We'll say there's 100,000.  And

13 you've got an order of magnitude difference, just in what the

14 size of the claimant population is.

15        We may find out that when it comes to people who are

16 going to step forward and actually make a claim that there are

17 very, very few of them.  We think that that's exactly what's

18 going to happen.

19        But, until you fix the population -- the number of

20 claimants, it is almost impossible to talk about ZAI, unless

21 Your Honor rules, that from a scientific point of view, the

22 claims are going nowhere.

23        Instead of -- we thought about this and we said,

24 well, why don't we ask that the Court rule on that issue and

25 then we can go ahead, if we don't prevail, or if we prevail in

1 part, to then craft a bar date in the claim form.  And the

2 problem then is that more time passes before we find out who is

3 a claimant.

4          So, what we thought we would do is ask for the bar

5 date, but instead of having a detailed claim form like we were

6 asking for before, we have a much simpler claim form that

7 doesn't pose, in a sense, the risk of people going up and being

8 required to scoop out stuff from their attic.  So, we at least

9 would get a claimant population.

10          We then would delay sending out the questionnaire,

11 until Your Honor determined what you wanted to do, in terms of

12 getting information from people and the like, what you thought

13 the science trial was going to yield.

14          But, at least that way we're not holding off on

15 advancing the cause, to find out this critical piece.  We're

16 going to need to know, at the end of the day, who the people

17 are who are making a claim to begin with.  Even if there's a --

18 if a class certified, we wouldn't know how to resolve that

19 class, or we wouldn't know how to resolve the case, until we

20 knew who was actually going to make a claim.

21          So, we really need to know who's going to make a

22 claim.  So, that's exactly what we've done, is we've asked for

23 a bar date, we've watered down the claim form, and it's very,

24 very urgent, from our point of view, that we get this critical

25 piece of data put in place.  Because, otherwise, I don't know

1 how we resolve the ZAI claim consensually.

2          THE COURT:  Well, I don't know how, until we get the

3 notice out -- I thought the purpose for the science trial was

4 to find out whether there was sufficient scientific evidence

5 that there is actually going to be some form of property damage

6 and, therefore, to craft a claim form around that outcome.

7          MR. BERNICK:  Yes.

8          THE COURT:  I don't know how you craft a claim form

9 until that issue's determined, unless you want to say, assume,

10 for -- without deciding right now, that there is damage to your

11 home if you were subject to ZAI, then file a claim.

12          MR. BERNICK:  Well -- and most claim forms -- and I

13 think this is -- I believe -- I know this is accurate.  Most

14 claim forms -- most notices don't -- are neutral.  And they're

15 required to be neutral.

16          You -- it simply says, do you have this product in

17 your house and if you do, are you making a claim for it.  And

18 they're not required to know the nature of the claim, or

19 anything.  They're just told, you know, if you have a claim,

20 here it is.

21          We might even be able to craft something that says,

22 it is claimed that this product does X, or Y, or Z, and

23 provided that it's not argumentative, it's simply informational

24 well, that's something else that -- there's no reason why we

25 can't work that out.

1          But, the criticality of being able to find out who's

2  going to make a claim is so overwhelming here, because of the

3  inability to know what the population is that we're dealing

4  with, that we think it's -- is that critical.

5          That we're -- we prepared -- be prepared to spend the

6  time to craft the notice.  We just want to get it out the door

7  in a way that enables us to move forward and identify the

8  population.  If you do it by way of class, then you're

9  guaranteed to delay understanding that critical piece of

10  information until later.  It's really the cart before the

11  horse.

12          Let's find -- even in the <u>First</u> -- there's a New

13  Jersey case, <u>First Interregional Equity</u> or something like that,

14  where they ultimately decided to use a claim form that was done

15  in the context of having established a bar date -- a class

16  claim form, then you establish a bar date, and having the

17  people come in.  And at least there they knew that there were

18  2,000 people who actually made a claim.

19          So, you know, that's the kind of information that we

20  need.  But, maybe if that could be addressed.

21          Second point is I had a brief conversation with Mr.

22  Lockwood about, you know, where are things really going on

23  Monday, and the like, and I suppose if we don't finish this

24  afternoon, talking about just the things that we've talked

25  about, that'll spill over.

1           But, beyond that the two things that were up for

2  Monday were the exclusivity issue and then also the

3  confirmation procedures.  And I think that we at least don't

4  see an urgency, right now, to resolve the confirmation

5  procedures.

6           With respect to exclusivity, I think there's only

7  been one objection, which comes from my dear friends over here

8  representing the futures representative.  I don't know that it

9  makes sense, if we finish other things, to bring everybody back

10 on Monday for that, as an in-person hearing.

11          Although, obviously, we're prepared to come back if

12 that makes sense.

13          THE COURT:  Well --

14          MR. BERNICK:  And all that really means is that if we

15 can vote --

16          THE COURT:  I don't think we need to get to the

17 confirmation procedures.  I'm having enough trouble getting to

18 the disclosure statement procedures, so --

19                         (Laughter)

20          MR. BERNICK:  Right.

21          THE COURT:  -- let's knock them down one at a time.

22          So, the confirmation procedures, at this point, I

23 think, can be deferred.

24          If you want to talk about the objection to

25 exclusivity, today, I've read the stuff, I'll hear it, if

**J&J COURT TRANSCRIBERS, INC.**

1 that's what you want to do.  But, I really do think it would be

2 a good idea for me to let you folks out early, although I

3 understand they're now saying that this four to eight inches

4 here, and twelve in Philadelphia, may not start until early in

5 the morning.  But, it seems to be a moving --

6         MR. BERNICK:  Well, I think we still want to get out

7 --

8                    (Laughter)

9         MR. BERNICK:  We still want to get out of here.

10                    (Laughter)

11         THE COURT:  You don't want to stay and see the

12 Steeler game here?

13         MR. BERNICK:  I didn't listen to the weather.

14                    (Laughter)

15         THE COURT:  That's what I mean.

16         MR. BERNICK:  But, let's -- on this -- there's some

17 options.  I think we just have to stay on course and I think

18 that if we can focus on those two groups of people, that would

19 be terrific.

20         THE COURT:  All right.  Mr. Kruger?

21         MR. KRUGER:  Lewis Kruger, for the Official Unsecured

22 Creditor's Committee.  Your Honor, while this morning Mr.

23 Bernick and Mr. Lockwood appeared to dominate the conversation

24 about bar dates, and questionnaires, and the like, the reality

25 of it is that our clients, our commercial creditors are the

1 ones who'll be most impacted by what may be the end result of

2 an estimation process here.

3       We find that we're obliged to file proofs of claim in

4 this Court.  We have to demonstrate that W. R. Grace owes us

5 money, either for money loaned, for goods and services pursuant

6 to contracts, or otherwise.  We need to identify why they owe

7 us that money, how much they owe us, and the like.

8       It doesn't strike me as inappropriate for there to be

9 a bar date for those who claim any claim against W. R. Grace,

10 and it doesn't strike me as inappropriate for them, to me, to

11 demonstrate why they believe they have a claim compensable by

12 W. R. Grace.

13       That's not to say that ultimately the Court will

14 determine what is indeed an appropriate level of information

15 for them to provide, or whether or not the claims they assert

16 are indeed compensable.  But, it seems to me, as a threshold

17 matter, particularly since all creditors are entitled to object

18 to other creditor claims, that we have a standard to maintain,

19 which is that there ought to be a bar date, there ought to be

20 information provided, there ought to be questionnaires.

21       People should not really be able to -- sort of lie

22 back in the weeds and say, some estimation process will take

23 care of me.

24       We're entitled to know who are the creditors, who are

25 the claimants, what is the nature of their claim, and why they

1 believe that they have some compensable injury which needs to

2 be compensated by W. R. Grace.

3        THE COURT:  Okay.  Well, I appreciate that view

4 point.  It does seem to me, however, that 524 really does not

5 require proofs of claim to be filed by tort claimants.  And I

6 think there is some reason for that.

7        Number one, not everyone knows that they have an

8 existing claim, at the time.  That's why they can be put into a

9 future demand category.  And number two, it doesn't necessarily

10 make sense to look at an estimation process for purposes of

11 allowance of the claim, in the pre-confirmation phase, at least

12 if there's a consensual plan.

13        It seems to me that we can work out some kind of

14 compromise that still provides the information that you are

15 requesting, which I think is legitimate, i.e. who are the tort

16 claims, who -- or at least in global terms, who are the tort

17 claimants, who will be coming forward at a level that the

18 debtor is going to have to recognize in the trust, and what

19 does that do to the underlying unsecured creditor distribution.

20        I think, at this stage, to get a plan on the table,

21 that's really all I need.  Now, to get through confirmation, I

22 don't know, maybe something more will be needed.  But, I think

23 at this stage, if we can at least estimate those numbers, we'll

24 get a lot closer toward a consensual plan from all groups.  So

25 --

1          MR. KRUGER:  Maybe.

2          THE COURT:  -- I want to move forward on the

3 estimation side.  I'm not saying that at some point I don't

4 think a bar date might be appropriate, I'm just not sure we

5 need it here, now.

6          MR. KRUGER:  But, for those who certainly believe

7 they had claims prior to the commencement of the Grace

8 proceeding, now more than three years ago, since that, I don't

9 understand any reason why they should not be obliged to file

10 claims.

11          THE COURT:  Well --

12          MR. KRUGER:  They did assert a claim.  Why are they

13 not entitled to file a claim, like everybody else does?

14          And I don't know that it makes a difference that

15 you're a tort claimant.  There's nothing special about being a

16 tort claimant.  You're just another kind of creditor of this

17 estate.  And other creditors are entitled to look at your

18 claim, and have a view as to whether or not that claim is an

19 appropriate one to be compensated by Grace.

20          THE COURT:  Well, I'm not sure that's the case,

21 because of the fact that the claims are channeled to the trust

22 and once the trust is --

23          MR. KRUGER:  Futures may be.

24          THE COURT:  Well, the -- the presents can be too.

25          MR. KRUGER:  Possibly.

1          THE COURT:  And to the extent that the presents are

2 channeled to the trust, they essentially waive the claim

3 against the debtor's estate, in favor of what the trust is

4 going to pay them.

5          MR. KRUGER:  Well, but that -- but, Your Honor,

6 that's an illusion.  Those funds come from the debtor's estate,

7 so therefore creditors -- other creditors are entitled to look

8 to see --

9          THE COURT:  I don't --

10          MR. KRUGER:  -- whether the funds that are going into

11 that trust are appropriate.

12          THE COURT:  I don't think the Court's view that as an

13 illusion.  I think they view it as a statutory requirement

14 under 524.

15          But, I agree with you with your ultimate conclusion,

16 which is creditors have the right to determine whether the

17 distributions are fair and reasonable with -- coming either

18 from the -- that the debtor would put into the trust, on the

19 one hand, versus what the debtor would be paying to other

20 creditors whose claims don't go into the trust, on the other.

21          But, I think the first piece of that is the

22 estimation process.

23          MR. KRUGER:  And a questionnaire of some kind.

24          THE COURT:  Well, yes.  I'm -- I think the

25 questionnaire's a good idea, but it's not going to be 50 pages.

1          MR. KRUGER:  Okay.  That may be.

2          THE COURT:  In fact, it's probably not going to be

3 ten pages, so --

4                         (Laughter)

5          UNIDENTIFIED MALE ATTORNEY:  How long was Mr. Baena's

6 questionnaire?

7          THE COURT:  I don't know.

8          MR. BAENA:  How long was my question?

9          UNIDENTIFIED MALE ATTORNEY:  Yes.

10          UNIDENTIFIED MALE ATTORNEY:  Your questionnaire.

11          UNIDENTIFIED MALE ATTORNEY:  Your questionnaire.

12          UNIDENTIFIED MALE ATTORNEY:  How many pages?

13          MR. BAENA:  It was very long.

14                         (Laughter)

15          MR. BAENA:  And most of it was unnecessary.

16                         (Laughter)

17          THE COURT:  Okay.  You --

18          MR. BAENA:  I think it was six or seven pages.

19          THE COURT:  But, does anybody -- before I turn to the

20 issue of the property damage and the ZAI, does anybody else

21 wish to be heard on the nature of the personal injury

22 estimation hearing?  Mr. Baena?

23          MR. BAENA:  Judge, the only thing I would say in that

24 regard is, and I think Mr. Kruger alluded to it in respect to

25 his constituency -- forgive me, Scott Baena, on behalf of the

1 Property Damage Committee -- is that, for at least two reasons,

2 we believe we need to be involved in this process that defines

3 the contours of the estimation.

4          The first is, I think it's always amusing to be in

5 the same room with Mr. Lockwood and Mr. Bernick, particularly

6 when there's no Judge imposing any form of good conduct upon

7 them --

8          UNIDENTIFIED MALE ATTORNEY:  I'm going to delegate

9 that job to somebody else in my firm.

10                              (Laughter)

11          MR. BAENA:  And secondly, of course, as Mr. Kruger

12 alludes to, the value of those claims has a profound affect --

13          THE COURT:  Yes.

14          MR. BAENA:  -- on every constituency, and we're all

15 going to be involved in -- on one side or the other, of that

16 process.

17          So, I'm not asking to be locked in the same room, but

18 I am asking that we have a point of entry --

19          THE COURT:  Oh, sure.

20          MR. BAENA:   -- before the hearing, so it's not a

21 fete accompli.

22          THE COURT:  Oh, I didn't mean to suggest that it

23 wouldn't be circulated to everybody else for comments, Mr.

24 Baena.

25          But, I think that the two critical groups who will --

**J&J COURT TRANSCRIBERS, INC.**

1 who will likely be presenting evidence, I mean, maybe others

2 will too, but the likely two groups that will be presenting

3 evidence -- or three, possibly, will be the debtor, the

4 asbestos committee, and the futures rep.

5        And yes, if anybody else who's a recognized

6 committee, you know, has some issue, you're entitled to be

7 heard, and I'd certainly hear it, and, yes, I would agree that

8 your -- you have to participate at some level in the process,

9 setting up that estimation process.

10        But, I think the lion's share of the work should come

11 from Mr. Bernick, Mr. Lockwood, and somebody representing the

12 futures rep, because I think they will be taking the lead.

13        Am I incorrect?  Does somebody else expect, at this

14 point, to be presenting major substantive evidence, at the

15 estimation hearing, on the personal injury tort liability and

16 numbers.  Okay.

17        So, yes, I expect the three of -- I didn't address

18 the futures rep, because they've been over there very silent,

19 but actually, I do include the futures rep in that process.  I

20 think the three of them need to take that -- to start that,

21 getting an order together, and then circulate it to everyone,

22 before it's presented to me.

23        If there are areas of disagreement, I'll hear those

24 areas of disagreement.  In all probability there aren't likely

25 to be.  Okay.  Yes.  Good afternoon.

1          MS. WARREN:  Good afternoon, Your Honor.  Mary

2  Warren, for London Market Insurers.

3          Your Honor, I wanted to draw your attention, briefly,

4  to something, before you move on to other subjects, in

5  connection with the estimation procedures, or hearing.

6          Certain insurers of Grace, in this matter, interposed

7  a limited objection to estimation motion and the case

8  management motion, on the following grounds.

9          The thrust of our objection is to make sure that

10 insurance neutrality is enforced, in connection with any

11 estimation that emerges from the proceedings that the parties

12 are going to work on together.  Likewise, if anything is

13 litigated, pursuant to the case management procedures, we want

14 to make sure that insurance neutrality is enforced in that

15 context as well.

16          The certain insurers generally support what the

17 debtors are trying to do here, in terms of their plan.

18 However, Mr. Bernick and Mr. Lockwood told you a story earlier

19 today, about the Babcock proceedings, in which the plan started

20 out as being somewhat along the lines of what the debtors are

21 proposing now.

22          Later on, that plan was withdrawn and became an

23 assignment of insurance rights plan, a purported adjudication

24 of insurance rights plan, and that was done despite the debtors

25 best intentions earlier on in the proceeding.

1          We make no aspersions on the debtor's theories here,

2  but the same thing could happen.  And, therefore, the reason

3  why we ask now, for insurance neutrality to be enforced, is

4  because Your Honor seems to be contemplating that estimation

5  will happen early on, will help set the framework for what

6  happens later, who votes, et cetera.

7          We want to make sure that insurance neutrality

8  language is included in any estimation order, any case

9  management proceeding order --

10          THE COURT:  I don't know about that.  I don't know

11  what the issues are, at this point in time.  I don't know

12  whether the debtor's going to propose a plan that does not

13  impair insurance company rights, if in fact that's the kind of

14  plan that we get to, ultimately.

15          The one thing that Combustion Engineering did do, is

16  state what language has to be put in for insurance neutrality.

17  It's not an issue I ever have to look at again.  I'm going to

18  use that language, period, end of story.  So, if it's to be an

19  insurance neutral plan, that language worked, that's the

20  language we're going to use in this and every other case that

21  has an insurance neutrality plan, until the Third Circuit or

22  the Supreme Court say no.  So, okay.

23          But, I don't know what the context of the plan will

24  be yet, so if you think you have an interest in participating

25  in the estimation, then just simply join in that process.

1          MS. WARREN:  Well, Your Honor, an alternative to that

2 is to make sure that we are protected by having -- and exactly

3 what Your Honor has in mind, is what we would propose here, is

4 having that <u>Combustion Engineering</u> approved language included,

5 by order of Your Honor, in any estimation order, any case

6 management order that might emerge.

7          And Your Honor's -- is correct, the plan might

8 evolve, but from what I'm hearing, estimation might evolve

9 before the final plan is put in place.

10          THE COURT:  I have no idea how insurance neutrality

11 is somehow impacted by the estimation of the tort liability.

12          MS. WARREN:  Well, Your Honor, let's say an

13 estimation number is agreed -- let's say an aggregate number --

14          THE COURT:  Yes.

15          MS. WARREN:  -- is arrived at.  You don't know

16 whether later on, the debtor will, pursuant to a different

17 plan, assert that that creates a <u>UNR</u> kind of result against

18 insurers.

19          THE COURT:  The only way to protect yourself is to

20 join in the estimation process.  I mean, at this stage of the

21 game, that's the only thing I can tell you to do, so join in

22 the estimation process.

23          In other cases I haven't had to go through it, so I

24 haven't had to worry about binding the insurance companies.  I

25 do have to go through it in this case, so join.

**J&J COURT TRANSCRIBERS, INC.**

1       If you're concerned about the consequences, join in

2 the process.

3       MS. WARREN:  Your Honor, I understand what you're

4 saying, but when there's an opportunity to insert protective

5 language in an estimation order, that we know the Third Circuit

6 has already approved --

7       THE COURT:  If the other parties are willing to do

8 it, it's fine with me.  But, I don't know, at this point, that

9 there is consensus on insurance neutrality in this plan.  If

10 there is, fine.  If there isn't, join in the process.

11       I am not prejudging plan confirmation issues and

12 insurance neutrality is definitely a plan confirmation issue.

13       To the best of my recollection, it hasn't even come

14 up in this case until now.

15       MR. BERNICK:  It's very simple.  Combustion

16 Engineering was prepared to agree to insurance neutrality in

17 the case.  And the only issue was, what did neutrality mean?

18 How did you word it, what impact it would have?

19       That is not the case in this case.  We have not made

20 a commitment to be insurance neutral here.  I am -- as a

21 consequence, I would endorse what Your Honor said, which is

22 that if they want to participate, they can participate.

23       THE COURT:  If --

24       MR. BAENA:  Your Honor --

25       THE COURT:  Yes, Mr. --

1          MR. BAENA:  If I may, Scott Baena, on behalf of the

2  property damage -- I -- by saying they can participate,

3  obviously we weren't prepared to argue this today, we wouldn't

4  concede their standing to participate, at this moment in time.

5  And I hope by your direction -- or suggestion, perhaps is a

6  better way to put it -- you're not conceding, or directing that

7  they do have.

8          THE COURT:  Mr. Baena, I haven't heard a word in this

9  case, to the best of my recollection, about insurance

10 neutrality, until this proceeding happened today.  I'm not

11 prepared to make any rulings on insurance neutrality, or

12 insurance standing.

13         MR. BAENA:  Right.

14         THE COURT:  What I'm suggesting is that if they think

15 they're going to be prejudiced, then they better take

16 appropriate steps, whatever they are, to join in the process,

17 because I'm not going to enforce an insurance neutrality

18 provision.

19         That was something that in <u>Combustion</u> was somewhat

20 agreed to, and in other cases has come up as an -- a

21 representation by the debtors that the plans were intended to

22 be insurance neutral.

23         When the debtor said that the plans are intended to

24 be insurance neutral, so that the insurers have no claims

25 against the debtor and are not entitled to vote, then I'm

1 willing to make sure that the plan is "insurance neutral."

2        But, I don't think I have that in this case, so I'm

3 not prejudging plan issues and if you think you need to protect

4 yourself in some other way, all I'm suggesting is that you take

5 whatever steps you think you need to take.

6        MS. WARREN:  Well, Your Honor, respectfully, I think

7 we're hearing exactly why it would be useful to get this

8 language in the plan early.  The debtors have just told you

9 they're not going to agree to it.  Mr. Baena has just told you

10 that we might not have standing.

11        So, we're already getting caught between a rock and a

12 hard place, and one way to enforce insurance neutrality is to

13 start enforcing it now.

14        THE COURT:  But, I'm -- I'm not in a position of

15 enforcing it unless the plan says, this is going to be an

16 insurance neutral plan, in which case I will do my best to

17 write an order that makes sure that the plan is, in fact,

18 carrying out insurance neutrality.

19        But, if the debtor isn't committing not to change

20 some rights or obligations of the insurance company, I'm not

21 going to give an insurance neutral plan.  That may give you

22 voting rights that you don't have in other cases, so if that's

23 the case, exercise them.

24        But, I'm not prejudging plan issues.  I'm getting to

25 one thing and one thing only, and that's the estimation of the

1 personal injury tort liability, period.  And possibly value,

2 not just the liability, but the value.

3          MS. WARREN:  And we'd like to make sure that that

4 estimation does not veer into areas that I believe Your Honor

5 has opined, in other cases, that you don't want to get into.

6          My understanding is that you don't consider this a

7 proper forum to determine State Law coverage issues.

8          THE COURT:  There aren't going to be any coverage

9 issues in the estimation hearing.  The debtor may very well say

10 this is what the level of my insurance assets are, and this is

11 how I propose to use them.  I mean, that's something that may

12 happen.

13          But, in terms of State Law coverage, I'm not getting

14 into insurance issues in this hearing.  If I'm asked to in some

15 other context, I'll deal with it then, but that's not the

16 purpose of this estimation hearing.

17          MR. BERNICK:  I think in order to maybe cut to the

18 chase, I think what counsel's concerned with is that the record

19 would then be usable in connection with some subsequent

20 insurance action.  Obviously, the issue of insurance coverage

21 is not, from our point of view, going to be teed up in the

22 estimation, but the record is going to be whatever it's going

23 to be.

24          THE COURT:  It is.

25          MR. BERNICK:  And we are not agreeing that the record

1 cannot later be used for whatever purpose the law dictates.

2        THE COURT:  Then, you know, if that's the case, in

3 all probability, the insurers may have standing and they may

4 participate, because there will be some prejudice to the --

5 potential -- not actual prejudice, to the insurer's rights.

6        So, all I can tell you is take whatever steps you

7 think are appropriate, but I'm not going to write insurance

8 neutrality into a plan that doesn't provide for it.

9        MS. WARREN:  Well, Your Honor, we will work with the

10 debtors to see if we can reach any agreement.  If not, you can

11 probably expect us -- to see us quite a bit.  Thank you.

12        THE COURT:  Okay.  All right.  Anybody else?  Okay.

13 Yes?

14        MR. CHEHI:  Your Honor, Mark Chehi, of Skadden Arps,

15 for Sealed Air, on this very specific point.

16        And that is it goes to the proof of claim issue

17 raised by committee counsel.  I think we have a concern, or are

18 just going to reserve rights and perhaps make a presentation to

19 the Court at a later date on, perhaps, the need for a proof of

20 claim process to ensure that we've identified all the claimants

21 and they're all getting adequate notice of the proceedings, for

22 purposes of a plan confirmation, objection, and voting, and the

23 like.

24        And that's important to us and to other parties who

25 would be protected by the 524(g) and 105 injunctions, to make

1 sure that they've had their opportunity, have notice of those

2 injunctions issuing, and take objection before they issue.

3          THE COURT:  Okay.  Well, some process is going to

4 have to be employed for that end, Mr. Chehi, and whether it's a

5 bar date, or something on the ballots, if in fact they vote, is

6 a different issue.

7          So, I'm not in the process of disallowing claims, if

8 I don't have a ballot process.  I'm probably also in the

9 position of permitting votes, if I don't have some disallowance

10 of claims.  So, it's something that we'll have to address

11 later.

12          MR. CHEHI:  And our concern, again, is just

13 identifying the folks who are entitled to vote and have an

14 opportunity to be heard among the asbestos claimants creditor

15 group, to the extent they have -- there's not been a bar date

16 notice, it's hard to determine exactly who they all are.

17          THE COURT:  It's been done in every other asbestos

18 case that's been pending in the United States since Manville,

19 so I don't think it's going to be an issue for this one.

20          MR. CHEHI:  Okay.  Thank you, Your Honor.

21          THE COURT:  We'll figure out the notice.  Thank you.

22 All right.  Anybody else on the personal injury issue?  Okay.

23          Then, the futures rep, the asbestos committee, and

24 the debtor, are to meet and draft a case management order for

25 estimation of personal injury actions -- personal injury

1 matters -- and then, circulate it to all -- I'll just call them

2 parties in interest, which include the insurance companies.

3         Can we get to this issue in the February omnibus?

4 Can you folks get something together in time to circulate it

5 prior to the February omnibus, so that I can deal with it then?

6         MR. LOCKWOOD:  We can certainly strive to do that,

7 Your Honor, and I don't see any reason, right now, why we

8 couldn't succeed.

9         THE COURT:  All right.  The debtor's to put it on the

10 agenda for the February omnibus, if possible, and the March

11 omnibus at the -- at the very latest.

12         I think that should give you enough flexibility to

13 get everybody together, if it's agreed upon by all parties in

14 interest, then you can file -- put it into the appropriate

15 evidentiary -- or, pardon me, hearing binder, and give me a CNO

16 and I'll sign it, in all probability.  I obviously reserve the

17 right to make sure that I agree with the dates and can schedule

18 the hearings on my own calendar, but in all probability, I'll

19 agree to the substance of it.

20         If you can't agree, then it should go forward along

21 the normal objection process period, so that I have contested

22 matters set for that omnibus, which is why I don't know if

23 you'll make the February hearing.

24         All right.  Mr. Baena, on the property damage?

25                         (Pause)

                J&J COURT TRANSCRIBERS, INC.

1        MR. BAENA:  Judge, before I get into the estimation

2 issues, if I may, I -- in -- for 200 years I think Courts

3 entered orders and people obeyed them, but in this case the

4 Court orders something and then we argue about it.

5        And about two and a half hours ago, I think you

6 ordered that asbestos claimants are going to have a right to

7 vote, under this plan.  And then we argued again, well Mr.

8 Lockwood and Mr. Bernick argued again.

9        I just want to ensure that we're past that issue,

10 nothing happened in the course of that argument that changed

11 the Court's ruling.

12        THE COURT:  Well, I don't know where we stand on the

13 issue of the right to vote.  I think what we're doing is

14 looking at an estimation hearing, and the outcome of that

15 estimation hearing will probably govern whether there is or is

16 not impairment in the financial sense, that I was getting to

17 earlier.

18        MR. BAENA:  Well, Judge, as Mr. Lockwood pointed out,

19 there are two sides of the voting issue.  We've got the 1126

20 side and, frankly, I think the issue that you just framed and

21 your discussion earlier today, really went to the 1126 issue.

22        But, then we also have the 524(g) voting issue, and I

23 don't think it's affected by any of the processes that we're

24 talking about.  And I also don't think it's really highly

25 debatable about the fact that 524(g) gives people who are going

1 to have their claims channeled to this trust a right to vote.

2        If the Court isn't past that, I would like, before I

3 discuss estimation, to at least address those issues, if you're

4 taking the matter under advisement.

5        MR. BERNICK:  Your Honor, if -- as a point of

6 process, a -- if we are now going back to revisit those issues,

7 I'm happy to do it.  But, we are then probably not going to get

8 to any of the remaining issues.

9        Mr. Baena's clients are in a fundamentally different

10 position, with respect to impairment, than are the personal

11 injury client.  And I'm happy to take that up.

12        But, to have more than one counsel now stand up and

13 address what 524(g) means, what 1126(1) means, or (f) means, or

14 whatever it is, means, is basically going over exactly the same

15 ground.  And we think it's critical today, that we reach some

16 of these other issues.

17        THE COURT:  Well, Mr. Baena, with respect to whether

18 or not the personal injury claimants can vote, how is that

19 relevant to your constituency?

20        MR. BAENA:  Judge, we also objected to the

21 confirmability of the plan, on the grounds that it stripped all

22 asbestos claimants, be they personal injury or property damage

23 claimants, from the right to vote.  That plan doesn't

24 anticipate our vote either.

25        THE COURT:  Okay.  Well, on that issue, I think I'd

1 like to hear from you.  All I was addressing today, the --

2 earlier, when Mr. Lockwood and Mr. Bernick were arguing, was

3 personal injury.  I took Mr. Bernick at his word that we are

4 segregating these issues according to the three categories that

5 he put on the chart.

6        MR. BAENA:  I don't believe, Judge, that --

7        MR. LOCKWOOD:  Excuse me, Scott.  Your Honor, I had

8 thought that basically we pretermitted the voting issue until

9 after --

10        THE COURT:  We did.

11        MR. LOCKWOOD:  -- the estimation took place, such

12 that when the debtor then came back with an idea of circulating

13 a disclosure statement, we would, in effect, revisit it.

14        THE COURT:  We did, as to the personal injury.

15        MR. LOCKWOOD:  If that's the case, then Mr. Baena

16 could revisit it then, as well, because Your Honor is not in

17 fact taking it under advisement, in the sense that he asked the

18 question.

19        THE COURT:  I'm not taking that issue under

20 advisement, but I understood the remarks to be related to the

21 personal injury component, not to the property damage

22 component.  I'm happy to have that same issue deferred, if in

23 fact we're going to do an estimation hearing on property

24 damage, or some objection to claim process on property damage.

25        MR. BAENA:  I'm happy to defer it, as well, Your

1 Honor.  But, let me just make sure that there's no

2 misapprehension.  Property damage is vitally interested.  It

3 has raised the same issue, as an overarching objection to

4 confirmation, in respect of its class, under the plan --

5          THE COURT:  All right.

6          MR. BAENA:   -- which is also denied the right to

7 vote.

8          THE COURT:  Okay.  I am not taking that under

9 advisement.  I will simply ask the debtor, once we get through

10 the estimation processes, or objection to claim processes,

11 whichever they are, to put that issue back on the agenda, and

12 I'll deal with it then.

13          MR. BAENA:  That's fine.  I appreciate that, Judge.

14 And by that issue, Judge -- just forgive me.  By that issue,

15 again, it's both forms of voting, under 1126 and 524(g)?

16          THE COURT:  Yes.  All vote -- any vote.

17          MR. BAENA:  Very well, Judge, then, I -- I'd like to

18 move then to the estimation of traditional property damage

19 claims, if I can start there, and then I'll go to ZAI.

20          THE COURT:  All right.

21          MR. BAENA:  Before I spend 30 or 40 minutes talking

22 about a process for estimation, first let me disabuse any

23 misapprehension on the subject.

24          While we have complained in the past about the

25 process of estimation, in the case of property damage, we lost

1 that argument and we recognized it, we complained about the

2 proof of claim form, we lost that argument, and we participated

3 in the process of formulating a perfect claim form, and that

4 has gone out.

5        And at this point in time, we understand it to be

6 beyond our ability to object to the notion of an estimation

7 process.  You've made it abundantly clear we're going forward,

8 we're estimating property damage.

9        And we have moved from that position.  That's where

10 we start.  We assume that that process is going to be

11 undertaken.

12       And I -- and what I find particularly surprising

13 about Mr. Bernick asking whether or not we were opposing

14 estimation, is because not only did we come to understand that

15 the Court was going to require it, so we need to just accept

16 that fact, but in our response to the debtor's motion on

17 estimation, we actually tried to help the Court develop the

18 process.

19       And I don't appreciate the fact that, not only is our

20 effort to improve the process not being recognized, but the

21 suggestion is that that effort somehow may be even

22 characterized as one which would preclude the process from

23 going forward.

24       Judge, we're not going to obstruct that process.

25 We're trying, for one very important reason, to be helpful in

1 constructing this process.  And that reason is that, unlike

2 personal injury, it's never been done before, in respect to

3 property damage.

4         Everything we may read about estimation in the case

5 law, affecting asbestos cases, has nothing to do, in large

6 part, with property damage.  We are painting on a clean easel,

7 for property damage.  And the reason for that is easy to

8 explain.

9         First of all, in terms of 524(g) cases, there's only

10 been two that have materially implicated property damage claims

11 that have been confirmed.  And most importantly, in those cases

12 there was a consensual plan and the parties were able to

13 resolve, consensually, the extent of the asbestos liabilities,

14 personal injury as well as property damage.

15         And so, what we have here is the first time that

16 we're approaching it on a non-consensual basis and, more

17 importantly not the last.  Because, as you well know, we're

18 going to probably address this same issue, if we're

19 unsuccessful in amicable resolutions in USG.  We're going to

20 have that problem there.  Property damage is implicated in the

21 Federal-Mogul case, that I'm not involved in that case, but it

22 may affect the outcome in that case.

23         So, we're real anxious about this process, not to

24 obstruct it, but to ensure that what we create in the course of

25 this case is a useable process, a process that's efficient, and

1 a process that can be replicated again, in future cases.

2      And so, we really spent a lot of time trying, in our

3 papers, to point out what was wrong with the process that the

4 debtor was advocating.  And when I say what's wrong with what

5 the debtor was advocating, that may be a poor choice of words.

6 Because, the problem we had with the debtor -- the debtor's

7 motion for estimation of PD, is that is was like some cosmic

8 sweep of procedures that were only laid out as we complained.

9      In a nutshell, there is no process that they describe

10 in their papers for the estimation of property damage.  We

11 don't even have these pictures in these papers, that might have

12 been a little bit helpful.  All it says is -- there are really

13 three pieces to this, according to the debtor.

14      The first piece is already underway.  The Court

15 approved the gateway objection order, which permitted the

16 debtor to tee up, without having to bring on objections on any

17 other substantive basis, these so-called gateway objections.

18 And there was a finite number of them.  Inadequate proof of

19 claim form, statute of limitations was in the -- and things of

20 that sort.

21      And the Court created a process that required them to

22 give a notice of their intention to bring on these gateway

23 objections.  The Court said that we'd give them relief from the

24 local rule that limited them to doing more than 150 of those

25 kinds of objections in a single pleading.  And the Court gave

1 them relief from the requirement that they put all their

2 substantive objections up front.

3      And when they asked for that permission, they did so

4 on the grounds that, they claim, some of the proof of claims

5 forms are so materially deficient they can't even figure out

6 what the substantive objections are until they get some more

7 basic information.  And that process is underway.

8      And that's a process I would point out, that

9 obviously very much implicates property damage claimants.

10 Those notices are being sent to them and my expectation, by the

11 virtue of the Court's order is, if people don't comply they

12 will file objections and those objections will be directed to

13 those property damage claimants that failed to comply.  They're

14 very much in that process.

15      On the other end, the third piece -- I'm going to

16 leave the second piece for last -- the third piece of their

17 estimation process, and I use that word generously, the third

18 piece is that they'll hire an expert, and we'll hire an expert,

19 and those experts will each file a report, and then we'll have

20 a hearing.

21      Well, that's it.  That's all it says, Judge.  I

22 promise you I'm not embellishing, I'm not making it up, that's

23 what they say.  What they're going to file a report on is,

24 presumably, the value of the remaining claims.  But, you know,

25 the detail that's missing sort of makes implications, as well.

1            And as we read this very ill-defined program, it

2 sounded like what they really wanted to do was sort of like

3 reduce -- find as many processes as possible to reduce the

4 number of property damage claims, and then lets put a value on

5 the ones that remain, just for purposes of feasibility, not for

6 allowance.

7            And the values of -- that they're going to associate

8 with those claims, are going to relate to the remaining

9 substantive defenses that they have to those claims.

10           And so we say, well how are they going to put on this

11 proof?  And we surmise that they'll put on a lawyer, or

12 somebody to say, you know all these claims -- I've reviewed

13 them, there's a finite amount of them, and this number of

14 claims is subject to this defense, and this number of claims is

15 subject to that defense, and I think those defenses are

16 overwhelmingly good, on behalf of the debtor, and there's no

17 value to those claims.

18           Well, that's not an estimation process.  And so we

19 said, you know, let's revisit how this is done.

20           Now, the second piece is the piece that I don't

21 understand at all, to be honest with you.  And if we had the

22 opportunity, in Delaware, to file an unlimited number of

23 objections, responses, and replies, I might get the answer to

24 it, because it sort of leaks out in Grace's papers.

25           As they describe the second part, they're going to

1 use common issue trials, they're going to use summary judgment

2 proceedings, they're going to use -- generically use litigation

3 devices, but it doesn't really describe, altogether, what those

4 issues are.

5        The one example that they use is the worst example

6 they could have used, which was the statute of limitations,

7 because we know how individualized those determinations

8 ordinarily are.

9        And they don't really tell us much about how that

10 process works, but what they do implicate in their most recent

11 response is, that's not a process the claimants are going to be

12 involved in.  That's a process that will probably be somebody

13 representing their interests, maybe a committee.

14        And what we intend to do, they suggest by implication

15 in their papers, is we're going to take those rulings that we

16 get out of these processes, and we're going to try to apply

17 them by orders to show cause, or by way of the Court just

18 taking notice of the law of the case, to individual claims, to

19 get rid of them.

20        It's not a process.  That's not a process.  That's

21 not even a process they've been bold enough to imply, or imply

22 could be used in respect to personal injury.

23        Now, a couple of observations.  First, if you believe

24 everything that Mr. Bernick's papers say about property damage

25 claims, I think there's like just a couple of them that are

1 going to remain, after he gets finished with the gateway

2 objections, and this middle piece.  And so why it becomes so

3 difficult to deal with those remaining claims, as we would

4 ordinarily take care of claims in the bankruptcy process,

5 begins to escape.  So, I guess it's a bit, adult in suspenders,

6 or maybe he's not so confident about the outcome of all of his

7 objections.

8        In any event, whatever's left at the end of the day

9 has to be processed by Your Honor, for purposes of value.  And

10 the first thought that occurs to me, Judge, is we use too much

11 shorthand in all these cases, and maybe we're doing a grave

12 disservice to you by using shorthand.

13        We talk about property damage claims like everybody

14 knows it to be a household word.  What is a property damage

15 claim?  Well, if we -- we -- if we accept the debtor's

16 definition, and this is very meaningful in the terms of how we

17 create a process -- under the debtor's glossary, which

18 accompanies their plan documents, they describe a property

19 damage claim as any claim arising in the nature of, or a

20 sounding in tort, or under contract, warranty, guarantee,

21 contribution, joint and several liabilities, subrogation,

22 reimbursement, or indemnity, or any other theory of law,

23 equity, or admiralty.

24        And, in fact, if you look at the plans that were

25 confirmed in other cases, well, they use litanies like that,

1 but they go on to actually describe the kinds of causes of

2 action that property damage claimants have historically

3 brought, and it's meaningful.

4        In some jurisdictions, you can sue for the mere

5 installation of the asbestos product.  Not many jurisdictions,

6 but in some.  In more -- more often it's the case that the

7 claims are brought on fraud, trespass, continuing nuisance,

8 regular nuisance, conspiracy, concert of action, negligence,

9 strict liability, restitution, indemnification, contribution,

10 guarantee, breach of warranty, or for fitness and

11 merchantability.  It's a wide range of claims that they seek to

12 get a discharge from in the course of this bankruptcy, and

13 channel to a trust.

14        And the reason this is significant, Judge, is because

15 when they say, oh, we're going to blow through a lot of claims

16 on statute of limitations, just try to conceive of what the

17 process is like.  Because, what statute of limitations are we

18 talking about?  What jurisdiction are we talking about?  What

19 are the rules of discovery in that jurisdiction?

20        And the analysis could entail tens of thousands, if

21 not hundreds of thousands of decisions that you'll have to make

22 in respect of claims -- property damage claims, because of the

23 wide variety of claims that those claimants could bring.

24        Our view is that common issue, just as the debtor

25 argued all the time, in pre-petition litigation, that middle

1 piece of their process, isn't a very -- first of all, isn't

2 subject to common issue treatment under Rule 42, because of the

3 individualized and particularized nature of property damage

4 claims.  That's what they always argued.

5        There's no Court that ever held a Rule 42 common

6 issue trial, pre-petition, in respect to property damage

7 claims.  Particularly in those cases where they argued against

8 it, and it's for that very reason.  There's just too much

9 that's implicated by each and every one of these claims.

10        We view the process of estimation of property damage

11 claims as being really very, very simple, believe it or not.

12        As we point out in our papers, the first thing you

13 have to do, remarkably similar to what we've heard in other

14 contexts today, is determine the universe of the PD claims.

15 We've done it.  We're done with that.  Proofs of claims were

16 filed.  We know it.

17        The second is to determine whether those claims are

18 subject to valid defenses.  And then the third is to

19 approximate the value of those claims that are conceivably

20 allowable, after confirmation, by the trust.

21        We believe that the determination of their defenses

22 is where we have the most complex part of this process.  And,

23 Judge, if you visualize this process, I think it's easy to

24 recognize that there is only one counter-party to the process

25 that can provide all the answers that we -- you would need to

1 have answered, or you would need to have, in order to come to

2 any conclusions about what claims are likely to be allowed and

3 what claims are not likely to be allowed, at the end of the

4 day.  And that's the property damage claimants.

5        We don't view the property damage committee as the

6 appropriate proxy in respect to that.  We'll lose every time.

7        How do I argue when the -- what action that claimant

8 would have brought, what the statute of limitations would be in

9 respect of that, what the nature of the product was that was

10 installed, how ubiquitous that product was in the building, how

11 many other installations of other products that they have in

12 the building, whether or not there was contamination, when it

13 occurred?  I mean, Judge, it just goes on and on.  The types of

14 determinations.

15        And so, where we have this major difference of

16 opinion is the involvement of property damage claims.  And we

17 don't believe that their process of excluding them from that

18 part of the process is appropriate, either under principles of

19 due process, or to get to an estimation.

20        And we don't believe that a lawyer can stand up and

21 tell Your Honor what defenses are going to get blown away in

22 the course of the administration of those claims,

23 post-confirmation.  That -- that's not in the purview of a

24 lawyer to argue.

25        Now, as for the determination of the value of the

1 claims, we have argued and proposed that we really don't have

2 the right data before us to make those -- that determination.

3 The ultimate determination that you want to make here is, how

4 much.

5        And the reason we don't, we complained about the

6 form, and we set forth in our papers the colloquy I had with

7 you, Judge, when you were approving this proof of claim form

8 for property damage, and I told you, Judge, one of the biggest

9 problems with what they're proposing is it doesn't advance

10 estimation.  It just doesn't advance it.

11        There's one basic question that's missing.  How much

12 asbestos do you have in the building?  They don't ask it.

13        Of course, they reply, well, why didn't you bring it

14 up at the time?  Well, I put forward the colloquy that took

15 place between you and I.  I did bring it up at the time.

16        And then they say, it doesn't matter, because, you

17 know, we asked for supporting documents and we anticipate -- we

18 anticipated that the supporting documents would include

19 surveys, asbestos removal surveys, and things like that, which

20 would include the square footage.  Well, what if it doesn't?

21 And guess what?  Some of it doesn't.

22        And we say that there's a data point that you have to

23 have.  You have to have it.  And that is, you need to know how

24 much property damage there is out there.

25        They asked, on the other hand, how big is the

1 building?  That's not a proxy for anything in product --

2 property damage.  You might have a two million square foot

3 building, and you might have two square feet of asbestos, or

4 you may have five million square feet of asbestos, in that two

5 million square foot building, because of the way it's applied,

6 because of the nature of the product.

7           And so we said, we've got to make that data point.

8 And there's only one way to make that data point.

9           I'm not arguing for a claims by claims allowance

10 process, Judge.  I'm arguing that the claimants have got to be

11 involved in this process.  How do we -- how do we make that

12 determination, unless there is discovery, at the very least,

13 discovery of the claims?

14           And we said, that data point the Court needs.  We

15 said, as well, that there's a second data point that you need.

16           Now, given that you don't know what cause of action

17 these people could have, or would have brought, given that you

18 don't know whether in -- whether remediation is required now,

19 given that you don't know what incidental expenses may have

20 been incurred in the course of remediation, given all that, we

21 do have to create some data as to how you value a property

22 damage claim.  It seems fundamental to me.

23           And so, we proposed that we create the data point,

24 for the remediation.  And what we said was the place to start

25 -- the place to start that analysis is with their own records,

1 because we haven't heard anything about bogus, fraudulent, junk

2 claims having been filed, pre-petition, by property damage

3 claimants.  We haven't heard about junk lawsuits.  We haven't

4 heard about junk settlements.  We haven't heard any of that

5 about property damage.

6         So, the information, just as in, I believe it was

7 Babcock and Wilcox, where the Court said, you know, let -- or

8 Eagle-Picher, I should say -- let's start the analysis with

9 pre-petition settlement history.

10         We think that that's very, very important information

11 to have.  We're not saying it's the exclusive place to start

12 the analysis, or to end the analysis.  There are other things

13 out there that we can look at too, like cost models that we

14 used in other cases.

15         But, you know, the debtor has got to create this

16 settlement database.  We can't.  We don't have that

17 information.  And we've said the first place to start this

18 process if for them to develop -- that database.

19         As for expert reports, which is the last piece of

20 their puzzle, we say, okay fine, we'll have expert reports, but

21 let's give ourselves enough time that we can fill in all these

22 blanks, all this information we don't have.

23         They're suggesting a process, I think it was like, in

24 three months people will file expert reports, in six months

25 we'll go to trial.

1          After what I've just described to you, Judge, there's

2 at least got to be a common understanding that even if

3 claimants aren't directly involved, we're going to have to go

4 to the claims.  And that's not an easy job and we need time to

5 do that.

6          And three months to file a report, that's ridiculous.

7 That's absolutely ridiculous, when nobody has ever done this

8 before and when we have no basic information to facilitate the

9 analysis for newfound experts.

10          And I don't say that critically, because the process

11 has never been done, Judge.  There isn't any expert who could

12 pass <u>Daubert</u>, as having a recognized model for the estimation

13 of property damage claims.  We need to create the expertise to

14 do this process and the debtor just, you know, reminding us in

15 every other sentence, you know, this will also facilitate

16 settlement.

17          The debtor is pushing the hammer to make this a very

18 quick process and --

19          THE COURT:  How many property damage claims were

20 filed?

21          MR. BAENA:  Forty-two hundred, Your Honor.

22          THE COURT:  And where is the debtor, in the process

23 of filing, and the committee -- or the claimants, in the

24 process of responding to these gatekeeping objections?

25          MR. BAENA:  The debtor sent out about 3,000 notices

1 of intent to object to the gateway objections.  I don't know

2 what their success record is on replies, but we do have set for

3 hearing, on Monday, a motion by the property damage committee

4 complaining about that notice.

5       We complained about it for a couple of reasons.

6 First of all, you very clearly said, before they send a notice

7 out they were to run it by us, and they never did that.  And

8 secondly, they used an omnibus notice and didn't tell anybody

9 what was wrong with their claims, and we're going to complain

10 about that on Monday.

11       So, the relief we seek, just to answer your question,

12 is that they get it right the next time and do it over, which

13 would put another 60 days, unless the Court believes it ought

14 to shorten the period of time on the next notice.  It's

15 somewhere up to 60 days before that will be before the Court,

16 or at least they can file objections.

17       If they file objections, as I indicated earlier, it

18 appears that, beyond filing the objections -- by their response

19 to our objections -- it appears that beyond filing the

20 objections, they then want to stop that process and get into

21 these common issue trials, and stuff like that, and then come

22 back to the gateway objections.  But, it's really ill-defined,

23 Judge.

24       I'm happy to get into a room with Mr. Bernick -- I

25 too like him a lot, I respect him an awful lot -- and see if we

1 can work something out, Judge.

2         But, the bottom line is, for something that hasn't

3 been done before, unlike everything else that we do believe has

4 been thoughtfully considered by the debtor, this one really got

5 short shrift.  This one just didn't get enough attention, in

6 terms of how to proceed.

7         So, we think we've got to go back to the drawing

8 board.  And we're happy to help, as I indicated earlier.  And

9 if that means getting in the room, I'm happy to do that.

10         THE COURT:  All right.

11         MR. BAENA:  Do you want me to talk about Zonolite

12 next, or --

13         THE COURT:  Go ahead.

14         MR. BAENA:  -- do you want a response to any of --

15         THE COURT:  No.  That's fine.

16                        (Pause)

17         THE COURT:  I don't know if it will help you, Mr.

18 Baena, but that tray that's beneath the main ledge pulls out.

19         MR. BAENA:  Oh.  Thank you, Judge.

20                        (Pause)

21         MR. BAENA:  Judge, as you've already heard, in

22 respect to Zonolite, the debtor's principal focus today is on

23 the establishment of a bar date and the approval of a proof of

24 claim form.  That was precisely the debtor's focus in 2002 --

25         THE COURT:  Yes, it was.

1       MR. BAENA:  That's exactly what they told you we

2  needed to do, and that's exactly what prompted you, after

3  hearing enough to be at least, if not curious, concerned about

4  taking any bold step such as this, before the science issue was

5  vetted.

6       Then we spent four or five million dollars on the

7  science issue.  And now the suggestion is that this proof of

8  claim form and this bar date have been manufactured, and

9  engineered, and architected in such a way that it really

10 doesn't implicate any of the concerns you had two years ago.

11 And for the life of me, Judge, I can't imagine what the basis

12 for those statements are.

13      And I will remind the Court that when we were last

14 talking about this and decided to go the science trial route,

15 the debtor also proposed the notice program, propounded by the

16 same exact notice expert, Ms. Consella (phonetic), and her

17 staff, to do the same exact thing that they intend to do here,

18 and that is to tell people, through various media, that they

19 need to file a proof of claim, by a bar date, or they'll lose

20 that claim.

21      And we complained bitterly about that and, I think in

22 large part, that's what resulted in the defoul of the matter,

23 until the science issue was determined.

24      The -- the funny thing is, Judge, not only hasn't the

25 reason for going forward as articulated then, and now, not

1 changed, all of the thinking, all of the architecting of the

2 notice program, has not changed either.  And if it has changed,

3 it's changed for the worse.

4        When Consella first rolled out the last program, one

5 of the things we complained about was, gee, you know, a lot of

6 people don't know they have this stuff, they certainly don't

7 know it's dangerous, and yet your program doesn't even suggest

8 that there's danger that may be inherent.  And that's how that

9 whole conversation started.

10        And indeed, when we deposed Consella back in November

11 of 2001, Consella said, you know, I didn't do anything about

12 the science issue, because nobody's ever determined the science

13 issue.  In fact, she said, if the scientific issues had been

14 fully litigated, and they were determinative, I would have

15 taken that into account, in formulating my program.

16        But, she goes on to describe that the folks at

17 Kirkland and Ellis told her to forget about that stuff.  Don't

18 even intimate that there may be some problem.  And now we roll

19 forward, four years, it's the same notice.  The same lack of

20 consideration or sensitivity.

21        And worse than that, if you take a look at the notice

22 that they're proposing, Judge, they now have a picture of

23 somebody holding Zonolite in their hands.  They never even

24 suggest in the headline, in the content, that this Zonolite may

25 contain the vermiculite.  They just allude to the fact that

1 Grace used to mine vermiculite.

2       They are doing everything today -- they would propose

3 you to order them -- allow them to do today, exactly what

4 concerned you, and more so today, back then.  Nothing has

5 changed.

6       THE COURT:  Well, Mr. Baena, frankly, I don't think I

7 need to hear anything on the Zonolite issue, because until I

8 get through the science trial, I really don't think I'm

9 prepared to address this.

10      I -- I think, I simply have the same concerns I had

11 at the time.  I don't know the type of notice.  I don't know

12 whether a class proof of claim is going to be appropriate.

13      I'm not necessarily opposed, I'll have to tell you,

14 to a bar date, for all Zonolite claimants, before we get into

15 the class issue, but I haven't decided that.  That's something

16 I deferred until I get through the science trial.

17      But, if there is an unreasonable risk of harm, I

18 think the notice has to be much different than it does if there

19 isn't, and I'm not going to have that notice go out until I

20 make that decision.

21      So, I'm happy to hear your arguments, but I think I

22 need to hear them later, after I get this issue decided.

23      MR. BAENA:  Well, Judge, I -- I'm happy.  I won't say

24 another word.  I'll --

25                    (Laughter)

1          MR. BAENA:  -- probably be making a mistake.

2          THE COURT:  All right.

3          MR. BAENA:  Thank you, Your Honor.

4          THE COURT:  Okay.  Anyone else wish to address either

5 the property damage or Zonolite, before I turn back to the

6 debtor?

7          Okay.  Mr. Bernick?

8          MR. BERNICK:  With respect to Zonolite, I won't

9 address it further either, except that -- just to underscore

10 that this is one of those areas where it's very difficult to

11 figure out how to resolve it.

12          THE COURT:  Yes.  I understand, because the -- I

13 understand that the nature of the claim -- claimants, the

14 number of claimants could be huge and that the debtor has to

15 have a determination of that issue before it can propose a

16 plan, at least on some non-consensual basis.

17          That's another reason why I hope you will go back to

18 the good offices that you started many years ago, at this

19 point, and see if you can't get this resolved while I'm

20 deciding the issue.  Because, I still think that's the best way

21 to try to do this.

22          But, I am not going to create a notice which may in

23 -- by nature of the fact that it goes out without some alerts

24 to danger -- cause more problems than have already been

25 created.  Conversely, if there is no danger, I don't know that

1 I see a need for a notice at all.

2        So, I think it would be a waste of the debtor's

3 resources to go out with a notice, right now.  Because, A, it

4 may not be necessary, but B, if it is necessary, then the form

5 of notice may have to change and the debtor may have to do it

6 again.

7        MR. BERNICK:  Your Honor, I understand that, and I

8 appreciate that, and I wasn't really urging that Your Honor

9 reconsider that, because we've been through all of this before.

10        I wanted, maybe somewhat opaquely and indirectly, to

11 suggest that if we are unable to reach consensus, because we

12 just don't know this big question of how many people are out

13 there, it does become fairly important that we hear something

14 from Your Honor that whenever you can get to it --

15        THE COURT:  Mr. Bernick, you --

16        MR. BERNICK:  -- and I say that -- I know how awful

17 and terrible your schedule is --

18        THE COURT:  You folks are going to be busy enough,

19 with the discovery plans that I'm going to be giving you on the

20 personal injury and property damage, that by the time you get

21 done with all that, and try it if necessary, I'll have the ZAI

22 issue determined, and then we can deal with it.

23        MR. BERNICK:  Yes.

24                    (Laughter)

25        THE COURT:  And in my expectation, that gives me a

1 year.

2          MR. BERNICK:  Yes.

3                              (Laughter)

4          MR. BERNICK:  Well, the irony is, of course, that if

5 lighting should strike --

6          THE COURT:  And you settle, that would be wonderful.

7          MR. BERNICK:  No, but, no.  If lightening should

8 strike, and the ideal mix of personalities that you observed

9 today between myself and Mr. Lockwood, actually manages to

10 produce --

11                             (Laughter)

12         MR. BERNICK:  -- some kind of consensual arrangement,

13 then the obstacle that will be left here, I don't want to say

14 obstacle, the remaining matter to be resolved here really is

15 the PD, at the end of the day.

16         And it's one that probably is, from a point of view

17 of getting through it, far easier than the personal injury

18 side.

19         THE COURT:  By the time you're prepared to announce a

20 settlement with Mr. Lockwood, if you will give me 30-days

21 notice, I'll get a ZAI opinion out.

22         MR. BERNICK:  Okay.

23                             (Laughter)

24         MR. BERNICK:  Okay.  Let me talk about --

25         THE COURT:  Are you announcing it today?

1                          (Laughter)

2          MR. BERNICK:  I'd like to talk a little bit about the

3  traditional property damage claims and I want to go back, for

4  just a moment, to the chart that I showed at the outset, which

5  was the history here, because the history speaks pretty clearly

6  to a point that Mr. Baena made at the end, and where we're now

7  at in this process, which Your Honor inquired about.

8          The history says that this was a dying, if not

9  fossilized area of litigation.  And we then filed for Chapter

10  11, and people got involved, and now we have 4,000 claims

11  which, you know, dwarfs the prior ten years of claims.

12          So, while we didn't make the suggestion, at least in

13  my opening remarks, that there was a problem with bogus claims

14  like we had in the case of personal injury, there's certainly

15  room for a tremendous amount of suspicion about what's going

16  on, where 4,200 claims, against the backdrop of this history

17  where apparently none of those claims were worth enough to

18  warrant the initiation of a lawsuit.

19          So, then what do we do?  Well, we proposed to have

20  this estimation process.  Mr. Baena is correct, that after Your

21  Honor determined that there was going to be a bar date, and the

22  claim form, and after they exhausted their rights that they can

23  appeal, and the appeal was denied, that I have no indication

24  from Mr. Baena that he is not prepared to cooperate in the

25  effort of moving forward here.  I'm not -- didn't intend to

1 suggest that.

2        But, the essence of his remarks, therefore, has to be
3 judged on kind of a, you know, a -- it either is or isn't kind
4 of basis.  If he says, or he believes that we really can do the
5 estimation, it's just a question of how, then I understand that
6 and we can all work together.

7        But, then the only issue for today is, you know, in a
8 sense there is no issue for today.  We ought to be able to go
9 back and work out, more specifically, how this estimation is
10 going to take place.

11        If, by contrast what he's saying is that we can't
12 move forward, because there is some threshold obstacle and we
13 can't do the estimation, then that is relevant for today.

14        So, of all the different remarks that he made, he
15 made about eight remarks, the question is, well, are any of
16 these show stoppers?  Do any of these say we can't move forward
17 with the estimation?

18        Now, he says, number one, that, gee, we're going to
19 have experts opining as to a whole bunch of matters as to which
20 they should not opine.  It's the same issue that Mr. Lockwood
21 raised and really misapprehends what's going on here.

22        The experts are not going to address or call odds on
23 legal issues.  The lawyer's going to talk about the legal
24 issues and the experts will then translate how those legal
25 issues link to particular claims, based upon how the lawyers

1 tell them the linkage works.

2       For example, if we were to convince Your Honor that

3 there's something called a statue of repose, and the critical

4 fact in the statute of repose is, when was the asbestos

5 installed, and we were to say, Your Honor, that's what the law

6 is, et cetera, et cetera, you buy that.  The expert would then

7 look to the claims forms to see the date of installation and

8 would then say, okay there are the following 400 claims where

9 there's a date of installation of, you know, 1988, 1987, 1986,

10 including the State, and we would then have the expert be able

11 to marry the data to what Your Honor's determined is a

12 dispositive fact based upon the applicable law.

13       It's very simple.  We're not talking about a lot of

14 operative facts.  If we were, we wouldn't be proposing this

15 procedure.

16       So, the experts are going to stay within their

17 purview of expertise, the lawyers are going to make the

18 arguments, but the experts will link those arguments, based

19 upon instructions from the lawyers, to the database.  Not very

20 complicated.

21       Number two, he says, well, this common issue

22 procedure has never been done and, you know, Rule 42 doesn't

23 eliminate all the issues in the case.  We're not saying that it

24 does.

25       Rule 42 is here because rule 42 enables you to

1  isolate particular issues.  There may be dozens of individual

2  issues, but if there are particular issues that are dispositive

3  issues, Rule 42 is there to pick them up, if they are common,

4  and permit the Court to rule.

5          As for example, take the statute of limitations.

6  There's something called constructive notice.  Constructive

7  notice doesn't depend upon the actual facts of what an

8  individual claimant knew, they depend upon what was reasonably

9  ascertainable to a building owner at a given point in time.

10 That's a common fact.

11         Constructive notice doesn't have to be resolved on a

12 case by case basis.

13         THE COURT:  But, these are the gateway issues that we

14 were -- gatekeeping issues that we were talking about earlier.

15 I think we can deal with those in the other -- in a different

16 context, in separate proceedings, as you file the objections --

17 each gateway objection.

18         I don't know that that has, at this point, anything

19 to do with the estimation hearing --

20         MR. BERNICK:  And the two things --

21         THE COURT:  -- because they'll be disallowed.

22         MR. BERNICK:  Well, the two --

23         THE COURT:  If there -- you know, if there's a

24 ruling, as you say, that there's a statute of repose and the

25 claim fits within it, that's what I meant, then it would be

1 disallowed.

2         MR. BERNICK:  That's my point, is that in the

3 estimation we would be picking back on whatever happens from

4 the objection process, with respect to the gateway objections.

5 That really is what the estimation is about.

6         We now have a -- it's different from personal injury.

7 We have defined population of people, we have claim forms from

8 every single one of those people.  Your Honor can either use

9 litigation to disallow claims, or you can use estimation, in

10 the event that you don't want to go through every step of the

11 process all the way through a bench trial.

12         Estimation works with the same evidence, but enables

13 Your Honor to streamline the process of cutting to the chase

14 and getting to the end of the process.

15         But, we're talking about the same facts.  We're not

16 talking about a whole bunch of additional facts.  The gateway

17 objections are the key objections.

18         Now, to the extent that you have particular cases, at

19 the end of the line, where you don't have a gateway objection,

20 then you are into more of an individual case by case process.

21         But, we want to get rid of all the other stuff that's

22 common, be left then with the -- what we think to be a

23 relatively modest number of claims, and then, we do get into

24 things like, you know, square footage, et cetera, et cetera.

25         But, the first part of the estimation process really

1 works with the same issues that have been raised by the gateway

2 objections.  And they certainly can be done on a common issue

3 basis.

4        The issue of _Daubert_, the _Daubert_ issue here, on a

5 dust sampling versus air sampling, is a very, very important

6 issue.  And that is a general issue.  It pertains to all the

7 claims that they're -- that rest upon that kind of data.  That

8 also can be done in the context of estimation.

9        So, you then get to a couple of the other objections.

10 He says, well, I don't know that the committee can do this.

11 This has to be done with claimant participation.  First of all,

12 if you're talking about an estimate, you don't have to have

13 claimant participation.  If the estimate is done to create an

14 overall aggregate amount, you don't have to have claimant

15 participation, because it's not dispositive of their particular

16 claims.

17        If we want to estimate the claims for allowance

18 purposes, the claimant has to be involved.  What does that

19 mean?  Well, Mr. Baena didn't share with you, but we have 4,000

20 odd total claimants.  Three thousand of them are represented by

21 Mr. Speights.  A hundred and fifty of them are represented by

22 Mr. Dies.

23        So, the whole idea that we've got passels upon

24 passels of claimants that are going to come streaming in, one

25 by one, as part of the 4,000, I don't think that's right and

201

1 certainly is part of an estimation process.

2      If we can dispose of all but a few hundred claims, I

3 don't think we're going to have a problem in reaching a

4 resolution with respect to this case.

5      Square footage. Do we need square footage? Yes, we

6 need square footage. Do we not have the information? Yes, we

7 do have the information. We didn't ask for it as a question,

8 but the documentation that was required to be supplied in the

9 claim form includes square footage information. And we had no

10 problem identifying the square footages, where it appears in

11 the documentation.

12      Mr. Dyes, is an example in submitting his claim forms

13 and has attached the appropriate documentation. And we can

14 tell the square footage right off the bat.

15      THE COURT: When you're talking about square footage,

16 do you mean the -- the square footage of asbestos in the

17 building?

18      MR. BERNICK: Asbestos, yes.

19      THE COURT: Okay.

20      MR. BERNICK: The kind of asbestos, and the location

21 of the asbestos, and the square footage of the asbestos.

22      So, at the present time, the omnibus objection

23 process overlaps with the first part of what would be the

24 estimation. We don't have to do any retooling. We just have

25 to continue on this process.

1        And I think that the amount of work that really has

2 to be done, as a result, to prepare these cases for an

3 aggregate value estimation, it's very modest.  And that's why

4 we proposed a relatively tight time table.

5        However, we're happy to sit down and try to work out

6 the mechanics of what the timing should be.

7        Question here for today is, is there some insuperable

8 obstacle that says this can't take place?  And I haven't really

9 heard that yet.  If it's there, that I think is what we should

10 really be focusing on, because in all other areas we are well

11 on the way to having the ability to have this estimation trial.

12        THE COURT:  Well, the only other issue, beside the

13 square footage that Mr. Baena argued today, had to do with the

14 cost of remediation.  And he suggested the debtor should have

15 some sort of database, if it's done remediation, so --

16        MR. BERNICK:  But, I think that that information is

17 in fact available to us.  We do intend to rely upon that.

18        THE COURT:  Well --

19        MR. BERNICK:  And the lawyers on the committee who

20 are participating in this process, like Mr. Dies and Mr.

21 Speights, they're the same people that we settled with for all

22 these years.  I mean, folks know what these cases have been

23 worth in the past.  I don't think that that is going to be a

24 problem.

25        And to the extent that there's relevant information,

**J&J COURT TRANSCRIBERS, INC.**

1 we're more than prepared to supply it.

2          THE COURT:  All right.  Well, work out something in

3 this -- in the procedure that will provide that form of

4 discovery without further notice.  Or if there's some specific

5 thing that Mr. Baena, or the other claimants want, that's fine.

6          MR. BAENA:  May it please the Court.  Judge, I feel

7 constrained to just quickly respond, because all too often,

8 when you don't, you see this in a future motion and it's

9 characterized as not -- no response having been made by the PD.

10          I just want to point out that the graph that we've

11 been suffering with, from the beginning of this case, depicts

12 the number of lawsuits that were filed over a period of time.

13 I presume that's -- that it's accurate.  We've had no ability

14 to test it and I don't believe Mr. Bernick is a witness.

15          But, it's materially different than the number of

16 buildings in respect of which claims have been made for

17 property damage.

18          THE COURT:  Oh, sure.

19          MR. BAENA:  And so when he shows you the picture, or

20 the number of lawsuits, he doesn't show you the number of

21 buildings.

22          And the 4,200 isn't some, you know, mysterious number

23 that floated in out of thin air.  There were class actions

24 involved.  It represents the number of buildings that are

25 seeking property damage claims against this estate.

1         So, maybe we don't have to see the graph anymore,

2 ever again.

3                         (Laughter)

4         MR. BAENA:  Now, I want to comment on the square

5 footage issue.  Mr. Bernick has so much confidence about this

6 that I'll look forward to seeing what it is that gives him this

7 confidence.  I don't want the impression to be left though,

8 Judge, that the proof of claim form required the claimant to

9 set forth the amount of their contamination --

10        THE COURT:  No, it didn't.

11        MR. BAENA:  -- installation, or any -- it did not.

12 It didn't require the supporting documents to have it in it,

13 and if he's got it, it's got to be episodic, not in respect of

14 all the claims.

15        THE COURT:  Well, you'll know that.  You can ask him

16 to see them.  I mean --

17        MR. BAENA:  I understand.

18        THE COURT:  -- the proofs of claim --

19        MR. BAENA:  But, I just want to make sure we're not

20 -- next hearing, that, well, they didn't have it, even in their

21 supporting documents, so they don't have a proof of claim.

22        THE COURT:  Look, you're going to build a discovery

23 period in for this, so if you need to contact the claimants

24 directly, to get that information, contact the claimants.

25        I mean, they're creditors.  They're subject to the

1 jurisdiction of the Court.  If you need them, then contact

2 them.

3          MR. BAENA:  Well, Judge, you know, Mr. Bernick quite

4 rightly asked, am I raising some insuperable obstacle to the

5 process?

6          THE COURT:  Not for 4,200 claims.  No.

7          MR. BAENA:  I'm not.  I'm not at all.  But, what I'm

8 saying is, there are limitations that are imposed on the

9 process, if it doesn't include claimants.

10          And, you know, we're just a committee.  Well, yes.

11 Well, our committee members have claims.  But, there are lots

12 of buildings out there that they do not represent.  And they

13 are just as much implicated in this process.  They may be

14 bigger, who knows -- than the -- than the buildings of the

15 people on the committee --

16          THE COURT:  Mr. Baena, I suggest that we will handle

17 it the same way that we handled the issue with respect to Mr.

18 Lockwood's objection, but not because of a proof of claim

19 matter, because in this instance, of course, we have it.

20          Notify everybody that an estimation hearing's going

21 to take place, they're going to be bound by it, and if they

22 want to participate they can.

23          Otherwise, I think we need lead counsel.  In my view,

24 the committee has a fiduciary obligation to represent all of

25 the constituents of that committee.  That happens to be you,

1 and I think you're going to be lead counsel.

2          So, whatever you need to get ready to prepare for

3 this estimation hearing, if it includes information from

4 claimants, you'll have a discovery period.  Get it.  Subpoena

5 it.

6          And if in fact they want to participate directly,

7 they're creditors, they can show up.  And if we have 4,200

8 claimants in Court, then I'll need a bigger courtroom.

9          MR. BAENA:  Okay.  The last response I'd want to

10 make, Judge, just so it doesn't leave an indelible impression,

11 because he said it twice and it scares me when he says

12 something twice.  Daubert -- keeps coming back to what Judge

13 Newsome did in Armstrong.

14          There are no claims for property damage in this case,

15 of the sort that were implicated in the Armstrong case.  That

16 was floor tile.  The asbestos was imbedded in the cementitious

17 product that was considered to be tile.  It's different.

18          There is no question about the fact that Monoco

19 releases -- fiber.  That's the principal product that they

20 manufacture.  It's different than floor tile, where there was a

21 substantial question as to whether or not there was a release,

22 and if so, under what conditions.  Different Daubert decision.

23          Dust sample.  Different reason for going after dust

24 samples.  And I just would point out, other than saying that

25 there was a Daubert hearing in that case, on the issue, that's

1 the only relevance.

2          THE COURT:  So, both of you agree that it's air

3 sampling?

4          MR. BAENA:  No, no, no.

5          THE COURT:  No.

6          MR. BAENA:  No.  We don't agree on anything in that

7 regard, Judge.

8                    (Laughter)

9          MR. BAENA:  I don't agree at all.  What I'm saying

10 is, what we got out of Armstrong has no instructive value in

11 this case.  It's a different kind of product.  There's a

12 difference on the science.  There's a difference on the dispute

13 about release.

14          THE COURT:  Okay.

15          MR. BAENA:  It has nothing to do with it.

16          THE COURT:  I understand the point you're making.  I

17 guess my question is, in the buildings that I -- and I'm not

18 trying to take personal experience into account, except that I

19 need to in order to ask these questions.

20          For example, the Federal Building in Pittsburgh was

21 remediated from asbestos.  We were tenants in the building at

22 the time.  They used air sampling.  I've never seen dust

23 sampling.  Are there in fact cases in which dust sampling has

24 been used, as opposed to air sampling, in dealing with issues

25 of the cost of remediation and what it takes to remediate?

1          MR. BAENA:  I certainly can't provide the Court with

2  that answer.  I don't know that anybody in the courtroom could

3  -- could answer that.

4          THE COURT:  Well, let's start with that, in terms of

5  determining what the applicable standard's going to be.  And

6  the only reason I say that I use that experience is because I

7  saw it.  So, I know it was air sampling.  Other than that, I

8  don't have any idea what they were doing, I just know that it

9  was an air sampling test.

10          MR. BAENA:  Well --

11          MR. BERNICK:  Mr. Baena's clients can make their

12  claims on the basis of air sampling, whatever the nature of the

13  asbestos is, then there may not be a Daubert issue.

14          There was not just floor tile in Armstrong, there

15  were other kinds of asbestos material including ceiling tile.

16          But, the issue was not the nature of the product, the

17  issue was the scientific reliability of sampling.  And we said

18  that the air sampling was the only -- was the only recognized

19  methodology that fit with the issue of risk and, therefore,

20  remediation.  And the other side said, no, we can rely on dust

21  samples.  And almost all their claims relied upon dust sampling

22  data.  And so a Daubert hearing was held.  The dust sampling

23  was excluded.  And that was fatal to their claims.

24          THE COURT:  Okay.

25          MR. BERNICK:  Now, if your all's claims don't depend

1 upon dust sampling, then we won't have an issue.

2          THE COURT:  All right.  Well, if they do, then I

3 guess I'm going to have to determine it in the context of this

4 case.  To the extent that the -- not only is the factual

5 circumstance different, but the product's different, then, you

6 know, it -- what's reliable in one circumstance, may or may not

7 be in another.  I don't know.

8          MR. BAENA:  Yes.

9          THE COURT:  I'm not making rulings, I was only asking

10 --

11          MR. BAENA:  Okay.  I appreciate that.

12          THE COURT:  -- the question.  Because, if --

13          MR. BAENA:  And I don't think the property damage

14 claims in that case were as a result of ceiling tile.  I think

15 they were floor tile claims, predominantly.

16          THE COURT:  Well, regardless.  If in fact there is no

17 evidence that anybody's ever used any dust sampling for this,

18 and there may be, I really do not know, then are we going to go

19 trudging down the dust sampling road, or are we going to use

20 air sampling.

21          If we're using air sampling then I think this will

22 probably be a much quicker tort resolution matter, because we

23 won't have a <u>Daubert</u> issue.

24          Okay.  On the property damage, then.  The same order

25 that I made with respect to the personal injury.  The property

1 damage committee members, and the debtor, and anybody else who

2 thinks that they're going to be presenting direct evidence in

3 the property damage estimation hearing -- is there anyone?

4      No one's replying, Mr. Baena, so you and Mr. Bernick

5 get together and work out, if you can, the terms of the case

6 management issue, and that's -- for the estimation of the

7 property damage, along the same lines and within the same time

8 frame.  February, if possible, March, if not, for the omnibus

9 hearing, so that I can get to these issues and we can get a

10 schedule going.

11      I want the debtor to voluntarily release whatever

12 information the committee wants with respect to the cost of

13 remediation -- not privileged, but relevant information to the

14 discovery, without having to go through some sort of formal

15 request process.

16      If you can work it out in this case management

17 conference -- because I want to get this issue tried -- this

18 one ought to be pretty simple.  It shouldn't take as long,

19 possibly, as getting your experts together on the personal

20 injury.  We need to start somewhere.  We're going to start with

21 this.

22      MR. BERNICK:  That's terrific.  With respect to --

23 the information, I'd like to have the opportunity to have some

24 dialogue with Mr. Baena, so that we can figure out what it is

25 that the committee really wants and needs, so I can at least be

1 more intelligent in taking that back to the client.

2         THE COURT:  That's fine.  I mean, you can do it

3 formally, if you like.  My concern is, if you --

4         MR. BERNICK:  No, I --

5         THE COURT:  -- really want to get it expedited --

6         MR. BERNICK:  I --

7         THE COURT:  -- I think this is something that can be

8 expedited.

9         MR. BERNICK:  Not a question of formality, I just

10 want to make sure that Your Honor would permit us to have that

11 dialogue, in advance, so --

12         THE COURT:  You are always permitted to have

13 dialogues.

14                         (Laughter)

15         THE COURT:  In fact you are encouraged to have

16 dialogues.

17                         (Laughter)

18         THE COURT:  Preferably preceded by a martini, if that

19 makes it helpful.

20                         (Laughter)

21         THE COURT:  Okay.  What else with respect to the

22 debtor's implementation and estimation issues today?

23         MR. BERNICK:  I think that we've probably covered

24 that waterfront and I think that -- Ms. Baer informs me that

25 she can deal with the disclosure issues.  It's a very, very

1 short report.

2        And maybe if she can make that report, Your Honor can

3 determine whether you really want to hear anything more about

4 that.  And then, maybe we've reached an appropriate point to

5 make haste to the airport.

6        THE COURT:  Well, do you want to deal with the issue,

7 or do you want to wait until Monday, of the exclusivity?

8        MR. BERNICK:  Well, if we can hear that -- if we can,

9 I guess, if we can hear it in a calm fashion today, we should

10 -- do it today.

11        MR. FRANKEL:  Your Honor, Roger Frankel, for the

12 Futures Claim Representative, Mr. Ostern (phonetic).

13        In light of the rulings today, Your Honor, and the

14 process that we're going to embark upon, we're prepared to

15 withdraw the objection to exclusivity.

16        THE COURT:  That was quick.  Thank you, Mr. Frankel.

17 All right.

18                    (Laughter)

19        THE COURT:  I will then simply -- sign the order

20 that's been presented in the motion, extending the debtor's

21 exclusivity period.  I don't happen to have that agenda with

22 me, so I don't know the number on the agenda right now, but I

23 will have that order entered.

24        And then I think there is no need, on Monday, for any

25 -- because I don't -- I see no benefit to getting into the plan

1 confirmation process, at this point.

2          UNIDENTIFIED MALE ATTORNEY:  Right.

3          THE COURT:  Okay.  Ms. Baer?

4          MS. BAER:  Your Honor, I think I can do it in five

5 minutes.  I can't guarantee the other side, but -- Your Honor,

6 we submitted to you, on I think it was -- the 13th of January,

7 a booklet of all the objections and all of the resolutions.

8          There were a total of 17 formal objections and two

9 letters, the letters being the SAC and the PDGC.  Both letters

10 were resolved.  All of the issues were resolved.  Nine of the

11 17 formal objections were resolved and we have either a letter

12 withdrawing, a formal pleading withdrawing, or an e-mail

13 saying, the issue's resolved, they're happy with our language.

14          The four core confirmation issue matters got kind of

15 interrelated with the disclosure statement.  That's the PD's

16 objection, the PI's objection, the future representative, and

17 the Libby claimants.

18          The PI representative really did not, or -- and the

19 futures representative didn't really take up any issues, per

20 se, in other things in the disclosure statement.

21          The Property Damage Committee raised a number of

22 issues to the disclosure statement, not related to confirmation

23 issues.  We believe we have addressed each and everyone of

24 them, and we have given the Property Damage Committee all of

25 our changes.  We have asked them whether or not we've met any

1 of their objections.  They have not responded.

2       I would suggest that we have always been able to work

3 out the -- these kinds of things with them, and I'd be very

4 happy to go through and try to see if all of the

5 non-confirmation related matters have been met, or to add

6 additional language to meet them.  They weren't whole heartedly

7 unreasonable and I thought we did a pretty good job of meeting

8 their matters.

9       With respect to Libby, Your Honor, most of their

10 objections did relate to core confirmation issues and I think

11 the core confirmation issue concerns really flopped over into

12 their disclosure objections.  I'm not sure what, if anything,

13 is left that can be resolved, or should be resolved, pending

14 what's going to happen in terms of the plan itself.

15       That leaves three objections, Your Honor.  Sealed

16 Air, Maryland Casualty, and United States Trustee.

17       Sealed Air raised objections.  Obviously, the Sealed

18 Air contribution is a significant way in which this plan is

19 being funded, the trusts are being funded.  We made a lot of

20 changes to the disclosure statement, the most significant of

21 which is to state, on the record, that the debtors do not

22 intend to object to the Sealed Air settlement agreement.

23       We believe that we have met the concerns that Sealed

24 Air had and made the appropriate disclosures.  We have had

25 discussions with Sealed Air, as recently as yesterday, and this

1 morning.  I believe that we have gone a long way, but they have

2 identified some further issues that they have raised.  We have

3 pledged to each other to continue to talk to try to come to a

4 resolution on all the issues.

5          With respect to Maryland Casualty, we have one issue

6 left.  It's very complicated only in sort of a theoretical

7 concept.  It's a simple issue with respect to worker's comp and

8 how it fits into the injunction.  I'm confident that Maryland

9 and the debtor can work this out.

10         The last objection is the United States Trustee's

11 objection.  Two key matters left.  Number one is releases and

12 number two is exculpation.  I believe, Your Honor, both of

13 those are really confirmation issues.

14         We have made some changes to meet his objections.  We

15 have not made all of the changes.  He still has problems with

16 some of our exculpation language and some of our release

17 language.  We're happy to continue that dialogue, but again,

18 Your Honor, we don't think it's really a disclosure objection

19 and we can -- insert into the disclosure statement whatever

20 appropriate language there would be to explain to everybody

21 what the issue is, what we're doing versus what other parties

22 believe should be done.

23         And, again, we're happy to continue that dialogue and

24 try to resolve that.  And if not, I truly believe that's a

25 confirmation issue.

1        And that's where we are.

2        THE COURT:  Okay.  If you're still talking to

3 everyone with whom you haven't yet resolved all of the issues,

4 I'm wondering whether there's any benefit to try to go over

5 objections, until I see what you actually have left.

6        Maybe the U.S. Trustee issues, if you're not making

7 any further movement, and the Libby issues, if we have to get

8 into those, if you're not making further changes.

9        But, it seems to me I'd rather get another draft then

10 -- of the disclosure statement, and find out where we are, then

11 spend time addressing things that may be moot.

12       MS. BAER:  Your Honor, I think that makes perfect

13 sense, unless I'm overruled here.

14       UNIDENTIFIED MALE ATTORNEY:  No.  I know better --

15       MR. COHEN:  Your Honor, this is Daniel Cohen, for the

16 Libby claimants.

17       THE COURT:  Yes, sir?

18       MR. COHEN:  There is one aspect of our objections

19 that is a disclosure issue, not a confirmation issue, and that

20 has to do with the history of exposure at the Libby site.

21       But, what I would propose is that Ms. Baer and I just

22 work on language of a sort of -- the Libby claimants' claim and

23 Grace claims, you know, that kind of language, since I don't

24 think we're ever going to end up agreeing on the substance of

25 it.  But, we could certainly -- we certainly should be able to

1 agree on disclosure, in that form.

2          THE COURT:  All right.

3          MS. BAER:  Your Honor, I think that's fine.

4          MS. HARRISON:  And Your Honor, this is Margaret

5 Harrison, for the United States Trustee.

6          THE COURT:  Yes?

7          MS. HARRISON:  Appearing for Frank Perch.

8          THE COURT:  Go ahead.

9          MS. HARRISON:  We had one main concern, a very

10 important concern in the disclosure statement, that concerns

11 the opt out from the third-party releases.  There's no language

12 that says a party can vote for the plan, but opt out of the

13 releases.  And there needs to be something in the disclosure

14 statement that allows that.

15          THE COURT:  Ms. Harrison, I'm sorry, but you're

16 fading out.  Are you on a speaker phone?

17          MS. HARRISON:  I'm -- I have my hand-held in my hand,

18 but your -- your connection is really bad, where I am.  It's

19 like listening to strobe lights.

20          THE COURT:  Ooh.

21          MS. HARRISON:  It goes in and out.

22          THE COURT:  Well, that's what's happening here.

23          MS. HARRISON:  And it's -- but it's been like that

24 all day.

25          THE COURT:  Okay.

1          MS. HARRISON:  So, it's been like this all day with

2 me.

3          So, to the extent that we can work this out and are

4 we anticipating getting another disclosure statement draft out?

5 Is that what you're saying?

6          THE COURT:  Yes.  That's what I'm suggesting.

7          MS. HARRISON:  Okay.  That would work well for us,

8 too.  We need to resolve the one third-party release issue and

9 then we'll continue to work on our other issues.

10          THE COURT:  Okay.

11          MS. BAER:  That's fine, Your Honor.  What I would

12 suggest is we continue to work on these unresolved issues and

13 perhaps it makes sense to continue the approval of the

14 disclosure statement to the next omnibus hearing.  The February

15 -- I believe it's a 28th hearing.

16          THE COURT:  I think that's definitely going to have

17 to be the case.  I think the real problem with the approval of

18 the disclosure statement is I'm not sure how we're getting it

19 out until I know what the estimation numbers are anyway.

20          MR. BERNICK:  Well --

21          THE COURT:  Because -- why?  Because --

22          MR. BERNICK:  -- we agree.

23          THE COURT:  Oh.

24          MR. BERNICK:  I think that, you know, to the extent

25 that it sounds like a tremendous amount of progress has been

1 made --

2      THE COURT:  Yes.

3      MR. BERNICK:  -- I don't think anybody believes that

4 we're not going to have some holes in it, at the end of the

5 day, because of what Your Honor indicated.  At least we can tie

6 down that --

7      THE COURT:  I agree.

8      MR. BERNICK:  -- we have a disclosure statement in

9 all other respects, that's why we press forward and I think

10 we'd like to just seize the fact that people are into a

11 document, understand the document, see if we can resolve it

12 except for the things that are going to be left blank.  And if

13 we can't then to -- get Your Honor to sign off on the balance.

14      THE COURT:  Yes.  I think that makes good sense,

15 because that way we can let the pieces go that need to be left

16 till the end, but everything else can be tied down.

17      MS. BAER:  Right.

18      THE COURT:  So, that's fine.  All right.  The --

19 anyone object to continuing the disclosure statement hearing

20 until the February omnibus, which will give the debtor an

21 opportunity to circulate another version of it?  Okay.  That's

22 fine then.  Thank you.

23      MS. BAER:  Thank you, Your Honor.

24      THE COURT:  Anything else, today?  Anyone?  Mr.

25 Baena?

220

1          MR. BERNICK:  Mr. Baena's flight's not until six

2 o'clock our time.

3                    (Laughter)

4          MR. BAENA:  It's worse than that.  This is actually a

5 point of personal privilege.  It's about Monday's hearing,

6 Judge.  Just the, I guess, sometime this week we found out

7 Monday's hearing is going to be here in Pittsburgh.

8          THE COURT:  I think -- I thought the hearing was no

9 longer needed, Monday.

10          MR. BAENA:  Well, there are other matters that are

11 set for Monday and --

12          THE COURT:  Oh.

13          MR. BAENA:  -- we have one other motion in this case,

14 with you.  There's also the U.S. Gypsum case.  And the problem

15 is, there's a rumor that there is some sporting event --

16                    (Laughter)

17          MR. BAENA:  -- on Sunday night.

18          THE COURT:  Which a certain Judge is staying in

19 Pittsburgh to see.

20                    (Laughter)

21          MR. BAENA:  And apparently --

22                    (Laughter)

23          MR. BAENA:  And apparently 70,000 other people are

24 coming to watch and there's no hotel rooms Sunday night, in

25 Pittsburgh.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Well, I thought I provided the video

2   conference capability from Delaware for that reason, Mr. Baena.

3   Because, I had no way of knowing when this game was going to be

4   scheduled.

5          MR. BAENA:  I know you did and I was going to ask you

6   --

7          THE COURT:  But, I've also heard rumor --

8          MR. BAENA:  -- in the first instance, is it going to,

9   you know, upset you if I appear --

10          THE COURT:  Yes.

11          MR. BAENA:  -- in Delaware.

12          THE COURT:  Oh, it will upset me terribly.

13                         (Laughter)

14          MR. BAENA:  Is that -- will --

15                         (Laughter)

16          MR. BAENA:  Judge, I must say that it's --

17                         (Laughter)

18          MR. BAENA:  It probably won't upset you as much as it

19   would upset me to fly to Delaware to be on a TV in Pittsburgh.

20                         (Laughter)

21          THE COURT:  Mr. Baena, what I'm hearing, at the

22   moment, is that they're expecting 12 inches of snow in

23   Delaware.  And it's possible that we're not going to have any

24   hearings -- on Monday.  So, I really think this has to be a

25   flexible target.

1          If you can call in -- make the arrangements to dial

2 into the system, I have no problem with anybody participating

3 by telephone.

4          MR. BAENA:  Including argument, Judge?

5          THE COURT:  Yes.  Including argument.  Under these

6 circumstances it, you know, it may not be possible for anybody

7 to get either to Pittsburgh or to Delaware.  I just don't know.

8 And I would prefer to have, you know, a dial-in for everybody

9 who's going to participate, then have you fly and get stuck

10 somewhere.  It's not fun.

11          MR. BAENA:  Okay.  And if they're going to use

12 charts, maybe they could sent it to us --

13                    (Laughter)

14          THE COURT:  No charts.

15          MS. BAER:  Your Honor, we won't have any charts.  In

16 fact, I'm looking over the agenda and there really isn't very

17 much on it.

18          THE COURT:  No.

19          MS. BAER:  The most -- the only significant matter

20 left is the matter of the -- well, is the motion to strike our

21 notice on insufficient documentation.  And then a couple

22 miscellaneous matters.

23          I am planning on coming in, in person, for the

24 hearing.  If the weather doesn't cooperate, I don't think it's

25 a major problem if people are on the telephone.

1          THE COURT:  Okay.  I really think we ought to just

2 set up a phone call.  I mean, you're welcome to be either here,

3 or in Delaware, but I -- you know, I don't know how reliable

4 the weather service is, but they've been talking about it for

5 two days, so --

6          MS. ESKIN:  We do have a dial-in set up, already.

7          THE COURT:  Okay.  So, just participate in the

8 dial-in.  My normal rule about the fact that you have to make

9 those arrangements in advance is abrogated.  So, call in.  Now,

10 go home, so you can get home.

11          UNIDENTIFIED FEMALE ATTORNEY:  Thank you, Your Honor.

12          THE COURT:  Okay.  Thank you.

13          UNIDENTIFIED MALE ATTORNEY:  Thank you.

14          UNIDENTIFIED MALE ATTORNEY:  Thank you, Your Honor.

15          THE COURT:  We're adjourned.

16                    *  *  *  *  *

17               C E R T I F I C A T I O N

18          I, MELISSA HYNES, court approved transcriber, certify

19 that the foregoing is a correct transcript from the official

20 electronic sound recording of the proceedings, in the

21 above-entitled matter, to the best of my ability.

22

23 _____

24 MELISSA HYNES

25 J&J COURT TRANSCRIBERS, INC.          DATE:  January 31, 2005