# EXHIBIT A

# WR Grace

### Bankruptcy Form 10

### Index Sheet

SR00000528

| Claim Number: | 00007031 | | Receive Date: | 03/27/2003 |
|---|---|---|---|---|

## Multiple Claim Reference

Claim Number _____

- ☐ MMPOC — Medical Monitoring Claim Form
- ☐ PDPOC — Property Damage
- ☐ NAPO — Non-Asbestos Claim Form
- ☐ Amended

Claim Number _____

- ☐ MMPOC — Medical Monitoring Claim Form
- ☐ PDPOC — Property Damage
- ☐ NAPO — Non-Asbestos Claim Form
- ☐ Amended

## Attorney Information

| Firm Number: | 00272 | Firm Name: | Segal Stewart Cutler Lindsay Janes & Berry PLLC |
|---|---|---|---|
| Attorney Number: | 00143 | Attorney Name: | Dennis F Janes |

Zip Code: 40202-4251

Cover Letter Location Number: SR00000528

| Attachments Medical Monitoring | Attachments Property Damage | Non-Asbestos |
|---|---|---|
| ☐ TBD | ☐ TBD | ☒ Other Attachments |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| | ☐ Other Attachments | |

| Other | |
|---|---|
| | ☐ Non-Standard Form |
| | ☐ Amended |
| | ☐ Post-Deadline Postmark Date |

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF Delaware

**GRACE NON-ASBESTOS PROOF OF CLAIM FORM**

Name of Debtor:[1] W.R. GRACE & CO.

Case Number 01-01139

NOTE: Do not use this form to assert an Asbestos Personal Injury Claim, a Settled Asbestos Claim or a Zonolite Attic Insulation Claim. Those claims will be subject to a separate claims submission process. This form should also not be used to file a claim for an Asbestos Property Damage Claim or Medical Monitoring Claim. A specialized proof of claim form for each of these claims should be filed.

Name of Creditor (The person or other entity to whom the Debtor owes money or property): The International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers &Helpers, Local Lodge 726

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☒ Check box if you have never received any notices from the bankruptcy court in this case.

THIS SPACE IS FOR COURT USE ONLY

Name and address where notices should be sent:

Dennis F. Janes
Segal Stewart Cutler Lindsay Janes & Berry, PLLC
1400-B Waterfront Plaza, 325 W. Main Street
~~Louisville, KY  40202~~

☐ Check box if the address differs from the address on the envelope sent to you by the court.

Account or other number by which creditor identifies Debtor:

Check here ☐ replaces
if this claim ☐ amends a previously filed claim, dated:_____

Corporate Name, Common Name, and/or d/b/a name of specific Debtor against whom the claim is asserted:

W.R. Grace & Co.

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Environmental liability
- ☐ Money loaned
- ☐ Non-asbestos personal injury/wrongful death
- ☐ Taxes
- ☒ Other Employee insurance and retirement benefits

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below).

Your SS #:_____
Unpaid compensation for services performed
from _____ to _____ (date)

Retirement Plan of W.R. Grace & Co. —Conn Chemical Group (Owensboro Plant)
Labor Agreement effective 4-5-1993

**2. Date debt was incurred:** 11-18-1994

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $ Not capable of precise calculation because all records are in possession of debtor.

If all or part of your claim is secured or entitled to priority, also complete Item 5 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Classification of Claim.** Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured Nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

☐ SECURED CLAIM (check this box if your claim is secured by collateral, including a right of setoff.)

Brief Description of Collateral:

☐ Real Estate       ☐ Other (Describe briefly)

Amount of arrearage and other charges at time case filed included in secured claim above, if any: $_____

Attach evidence of perfection of security interest

☒ UNSECURED NONPRIORITY CLAIM

A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

☒ UNSECURED PRIORITY CLAIM - Specify the priority of the claim.

☐ Wages, salaries, or commissions (up to $4650), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).

☒ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties of governmental units - 11 U.S.C. § 507(a)(7).

☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a(____).

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

This Space is for Court Use Only

**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Acknowledgement:** Upon receipt and processing of this Proof of Claim, you will receive an acknowledgement card indicating the date of filing and your unique claim number. If you want a file stamped copy of the Proof of Claim form itself, enclose a self addressed envelope and copy of this proof of claim form.

Date
3/25/03

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):

*[signature]*

DENNIS F. JANES, ATTORNEY AT LAW

RECD MAR 2 7 2003

WR Grace    BF.28.111.5503
00007031
SR=528

[1] See General Instructions and Claims Bar Date Notice and its exhibits for names of all Debtors and "other names" used by the Debtor.

# SPECIFIC INSTRUCTIONS FOR COMPLETING
# GRACE NON-ASBESTOS PROOF OF CLAIM FORMS

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances, there may be exceptions to these general rules.*

This Proof of Claim form is for Creditors who have Non-Asbestos Claims against any of the Debtors. Non-Asbestos Claims are any claims against the Debtors as of a time immediately preceding the commencement of the Chapter 11 cases on April 2, 2001 other than Asbestos Personal Injury Claims, Asbestos Property Damage Claims, Zonolite Attic Insulation Claims, Settled Asbestos Claims or Medical Monitoring Claims, as defined on the enclosed General Instructions. More specifically, Non-Asbestos Claims are those claims against one or more of the Debtors, whether in the nature of or sounding in tort, contract, warranty or any other theory of law or equity for, relating to or arising by reason of, directly or indirectly, any injury, damage or economic loss caused or allegedly caused directly or indirectly by any of the Debtors or any products or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors and arising or allegedly arising directly or indirectly, from acts or omissions of one or more of the Debtors, including, but not limited to, all claims, debts, obligations or liabilities for compensatory and punitive damages.

**Administrative Expenses:** Those claims for, among other things, the actual, necessary costs and expenses of preserving the estate as defined in Section 503 of the Bankruptcy Code that arose after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to Section 503 of the Bankruptcy Code. This form should not be used to make a claim for an administrative expense.

**Secured Claim:** A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property. Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right to setoff), the creditor's claim may be a secured claim. (See also Unsecured Claim.)

**Unsecured Claim:** If a claim is not a secured claim, it is an unsecured claim. Unsecured claims are those claims for which a creditor has no lien on the debtor's property or the property on which a creditor has a lien is not worth enough to pay the creditor in full.

**Unsecured Nonpriority Claim:** Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as Unsecured Nonpriority Claims.

**Information about Creditor:** Complete this section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the court which sent notice, or if this proof of claim replaces or amends a proof of claim that was already filed, check the appropriate box on the form.

1.    **Basis for Claim:** Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

2.    **Date Debt Incurred:** Fill in the date the debt was first owed by the debtor.

3.    **Court Judgments:** If you have a court judgment for this debt, state the date the court entered the judgment.

4.    **Amount of Claim:** Insert the amount of claim at the time the case was filed in the appropriate box based on your selected Classification of Claim in item 5. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

5.    **Classification of Claim:** Check either Secured, Unsecured Nonpriority or Unsecured Priority as appropriate. (See Definitions above.)

      **Unsecured Priority Claim:** Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See Definitions, above.) A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

6.    **Credits:** By signing this proof of claim, you are stating under oath that in calculating the amount of your claim, you have given the debtor credit for all payments received from the debtor.

7.    **Supporting Documents:** You must attach to this proof of claim form, copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

*Be sure to date the claim and place original signature of claimant or person making claim for creditor where indicated at the bottom of the claim form. Please type or print name of individual under the signature. Be sure all items are answered on the claim form. If not applicable, insert "Not Applicable".*

RETURN CLAIM FORM (WITH ATTACHMENTS, IF ANY) TO THE FOLLOWING CLAIMS AGENT FOR THE DEBTORS:

> Claims Processing Agent
> Re: W. R. Grace & Co. Bankruptcy
> P.O. Box 1620
> Faribault, MN 55021-1620

**The Bar Date for filing all NON-ASBESTOS CLAIMS against the Debtors is March 31, 2003 at 4:00 p.m. Eastern Time.**

## ATTACHMENT TO PROOF OF CLAIM FORM

NAME OF DEBTOR: W. R. GRACE & CO.

CASE NUMBERS: 01-01139 and 01-01179

This claim filed on behalf of current, former, and retired members of Local Lodge 726 who are or were employed by the Debtor.





## INDEX

|  | Paragraph No. |
|---|---|
| Access to Plant | 110 |
| Arbitration | 27-34 |
| Bulletin Boards | 109 |
| Call and Reporting Pay | 89 |
| Check Off | 14-16 |
| Continuous Four-Shift Operations | 71-75, Exhibit C |
| Definition of Employee | 4 |
| Deductions | 56 |
| Discharges | 5, 23, 27, 89 |
| Duration of Agreement | 112 |
| Employment Contracts | 106 |
| Funeral Pay | 45 |
| General Conditions | 103-105 |
| Grievance Procedure | 17-26 |
| Holidays | 76-81 |
| Hours of Work | 58-63 |
| Injury While at Work | 100 |
| Insurance | Exhibit B  51 (?) |
| Jobs Outside the Bargaining Unit | 102 |
| Jury Duty | 49, 50 |
| Layoffs and Recall | Exhibit E |
| Laboratory Progression | 40-44 |
| Leave of Absence | Exhibit D |
| Maintenance Progression | Exhibit A |
| Maintenance Rates | 9, 10 |
| Management Rights | 111 |
| Miscellaneous | 11 |
| Non-Discrimination | 64, 70 |
| Overtime and Premium Payments | 64 |
| Daily, Weekly | 65, 66 |
| Saturday, Sunday | 67 |
| Holiday | 70 |
| Non-Promoting of | Exhibit F |
| Policy on Drugs & Alcohol | 55 |
| Posting of Openings | |

## 1993 - 1996
## AGREEMENT

Agreement between the Battery Separators division doing business in behalf of W. R. Grace & Co-Conn, with a place of business in Owensboro, Kentucky, (hereinafter called the Company), and the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, and its Local Lodge 726 (hereinafter together called the Union).

## SCOPE AND CONDITIONS

(1) This Agreement contains all the conditions agreed upon and effective between the Company and the Union. It supersedes all previous Agreements, collectively or individually, between the Company and the Union. No agent or representative of either party has the authority to alter or modify it. No modifications shall be made, except by mutual consent of the parties in writing, nor shall either party be obligated to discuss or negotiate changes in or additions to its terms.

(2) The waiver of any breach of condition of the Agreement by either the Company or the Union shall not constitute a precedent for any further breach or condition.

(3) Any part of this Agreement which is or may become in violation of, or in conflict with the laws of the United States or of the Commonwealth of Kentucky, shall be null and void and shall be made to conform to such laws without voiding any other part. Masculine pronouns used herein shall refer to men and women or both and nouns and pronouns when stated in the singular shall include the plural and when stated in the plural shall include the singular, wherever appropriate.

| | Paragraph No. |
|---|---|
| Probationary Employee, Definition of | 5 |
| Probationary Period | 5, 6, 7 |
| Probationary Rates | 57 |
| Promotions and Transfers | 55-57 |
| Rates, Establishment of | 96 |
| Recognition | 8 |
| Retired Employee | 7 |
| Reporting Early | 60 |
| Retirement Plan | 101 |
| Scope and Conditions | 1-3 |
| Seniority | 44-54 |
| Definition of | 46 |
| President and Negotiating Committee | 53 |
| Groups | 47 |
| Lists | 44, 52, 54 |
| Loss of | 51 |
| Safety and Health | 107 |
| Shift Premiums | 94, 95 |
| Shifts, Number of | 62 |
| Strikes and Lockouts | 35-39 |
| Temporary Assignments, Rates for | 98-99 |
| Union Membership | 12, 13 |
| Vacations | 82-92 |
| Voting | 108 |
| Wages | 93-100 |
| Wage Rates | EXHIBIT A |
| Work by Excluded Persons | 103 |

## DEFINITION OF EMPLOYEE

(4) The Terms "employee" or "employees" refer only to an employee or employees of the Company's Owensboro plant for whom the Union is exclusive bargaining agent.

## PROBATIONARY EMPLOYEE

(5) The term "probationary employee" refers only to a production employee who has not completed fifty-five (55) calendar days or a maintenance employee or a control laboratory technician who has not completed fifty-five (55) calendar days since the date of his most recent hiring. A probationary employee may be laid off or discharged by the Company, and such layoff or discharge shall not be the subject of any claim or grievance against the Company.

(6) The probationary period that an employee has served shall be cumulative if said employee is rehired within six (6) months or less.

(7) If a former employee is rehired after having once been an employee for a period of at least one (1) year and then having terminated his employment not more than two (2) years before the date of being rehired, he shall be a probationary employee only until he has completed at least twenty (20) days of work since the date of being rehired.

## RECOGNITION

(8) The Company recognizes the Union as the sole and exclusive bargaining agent for all production and maintenance

-2-

employees and control laboratory technicians of the Company at its Owensboro, Kentucky plant, including shipping and receiving employees with respect to wages, rates of pay, hours of pay, hours of work and other conditions of employment except and excluding all office employees and plant clerical employees, professional employees, salesmen, sales engineers, sales servicemen, draftsmen, chemists, executives, foremen, guards, and all supervisors as defined in the Labor Management Relations Act, 1947.

## MANAGEMENT RIGHTS

(9) The Management of the Company and the direction of the working force, including the right to hire, suspend, transfer, promote, discharge, or discipline for just cause, and to maintain discipline and efficiency of its employees and the right to layoff employees because of lack of work; the right to determine the extent to which the Plant shall be operated, and to change methods or processes, or to use new equipment; the right to determine types and quantities of products to be manufactured, to introduce new or improved products, methods, or facilities, and to extend, limit or curtail its operations, is vested exclusively in the Company.

(10) In no case shall the exercise of the above or any other rights of Management be in contradiction of terms and conditions expressed elsewhere in this Agreement.

-3-

## NON-DISCRIMINATION

(11) The Company and the Union each agree to comply with applicable laws prohibiting discrimination against any employee because of Union membership, race, color, religion, sex or national origin, and both agree not to discriminate in the application of the terms and provisions of this Agreement.

## UNION MEMBERSHIP

(12) All employees, except probationary employees, are entitled to become members of the Union upon the same terms except as to initiation fees and dues, as those upon which the original members were admitted. Probationary employees and persons in the excepted classifications are not eligible to become or to remain members of the Union.

(13) All employees as specified in (a) and (b) below shall be required to join the Union, and having joined shall, except as otherwise provided by law, remain members in good standing in the Union as a condition of employment within the bargaining unit:

(a) Employees who are not probationary employees - after the expiration of thirty-one (31) days from the date this Agreement becomes effective;

(b) Probationary employees - upon the expiration of their probationary period or after the expiration of thirty-one (31) days from the date this Agreement becomes effective, whichever occurs later.

## VOLUNTARY CHECKOFF OF UNION DUES

(14) On the first pay day of each month, the Company will deduct the monthly dues, in an amount as certified by the Secretary-Treasurer of Local Lodge 726, from the pay, if any, then due to employees who are members of the Union and whose written authorization therefore, in the form attached to this Agreement and marked Appendix A, has been submitted to the Company by the twentieth day of the month preceding the month in which such deductions are to begin. The Company shall remit, no later than the Tuesday next following such pay day, to the Secretary-Treasurer of Local Lodge 726 the sums thus deducted and the names of the employees for whom deductions were made.

(15) All such written authorizations or written revocations shall become effective the month next following the month in which the Company receives such written authorization or such written revocation.

(16) The Union shall indemnify the Company and save it harmless against any and all claims, demands, suits, penalties, or other forms of liability that shall or may arise out of the deductions, heretofore or hereafter made from the wages of employees, for Union dues or assessments, or that shall arise out of or by reason of action taken or not taken by the Company in reliance upon or in reference to checkoff authorizations furnished by the Union, or for the purpose of complying with any of the provisions of this Article.

## GRIEVANCE PROCEDURE

(17) A grievance is defined as any controversy between the Company and Union, or between the Company and any of its employees, involving an alleged violation of this Agreement. An earnest effort shall be made to initiate settlement of grievances as quickly as circumstances permit.

(18) The Union will designate Stewards who shall attempt to adjust grievances in accordance with the grievance procedure outlined below. The Union Stewards shall consist of (a) one (1) employee in each of the seniority groups defined in Paragraph (47) and working on the day shift, plus (b) one (1) employee working on the evening shift and one (1) employee working on the night shift for each Foreman currently assigned to those respective shifts. The President of the Local Lodge 726 will keep the Company advised of the names of the current Union Stewards, and his appointed representative (grievance hearings only) for each area. These designated Union officials, provided they have first obtained the permission of their Foreman, may leave their job to handle a grievance or conduct necessary Union business. They will be paid only for such time as is spent in processing or investigating grievances in accordance with the terms of this Agreement and which time occurs during their regularly scheduled working hours.

(19) In no event may the Company or any of its representatives make a settlement with one or more employees pertaining to the terms and conditions of this Agreement without giving a Union Steward, or other authorized representative of the Union, an opportunity to be present.

-7-

---

## APPENDIX A
### AUTHORIZATION FOR
### CHECK-OFF FROM WAGES

I hereby authorize W. R. Grace & Co.-Conn. to deduct from any wages earned or to be earned by me, as your employee, and assign to Local Lodge No. 726 of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, the sum of $_____ per month in payment of membership dues, or such amount as may hereafter be established by the Union, in accordance with its Constitution and By-Laws, and become due to it as my membership dues in said Union.

This assignment, authorization and direction shall be irrevocable for the period of one (1) year, or until the termination of the current agreement between the Employer and the Union, whichever occurs sooner; and I agree and direct that this assignment, authorization and direction shall be automatically renewed and shall be irrevocable for successive periods of one (1) year, each or for the period of each succeeding applicable agreement between the Employer and the Union, whichever shall be shorter, unless written notice is given by me to the Employer not more than twenty (20) days and not less than ten (10) days prior to the expiration of each period of one (1) year, or of each applicable collective agreement between the Employer and the Union, whichever occurs sooner.

Executed at _____ this _____ day of _____ 19___

_____
Employee's Signature

_____
Employee's Clock Number

-6-

(20) Nothing in this Section precludes the informal settlement of minor matters between an employee, or one or more Union Stewards, and a Company representative, so long as the settlement does not pertain to the terms and conditions of this Agreement.

(21) If an employee believes that the Company has violated any provision of this Agreement, he will discuss the matter with the appropriate Foreman within three (3) working days after the incident occurred. If a number of employees have a common grievance and wish to discuss it with the Company, one (1) of them shall act as the aggrieved employee and report the matter to the Foreman. If no settlement is reached, then the aggrieved employee will meet with his Union Steward and the Foreman within three (3) working days after the incident occurred and make an earnest effort to settle the matter informally.

For purposes of Paragraph (21) and (22), the term "working day" shall be defined to mean a day in which the aggrieved employee is scheduled to work his regular shift. A working day does not include any day in which the aggrieved employee does not work for any reason including sickness, vacation, holidays, leave of absence, or a day he is not scheduled to work.

(22) Step 1: Any matter not so settled within five (5) working days after the incident occurred shall be submitted to the Foreman in writing on a grievance form provided by the Company listing all the important known facts pertaining to the grievance. Upon receipt of the written grievance, the Foreman shall have up to two (2) working days to meet with the employee (or the representative of the aggrieved employees) and the Union Steward, and give his written reply. The Foreman will also submit two (2) copies of his reply to the President of the Local (or his appointed representative).

Step 2: If the Union wishes to process the grievance further, the appropriate Department Manager shall be notified in writing within two (2) working days after receipt of the Foreman's Step 1 decision. Within one (1) working day thereafter, the Department Manager (or his appointed representative), the Foreman, and the Union Steward, the President of the Local (or his appointed representative), and the aggrieved employee (or the representative of the aggrieved employees) will meet and attempt to settle the grievance. The Department Manager (or his appointed representative) will give his decision in writing to the Union within two (2) working days after the close of the discussions.

Step 3: If the Union wishes to process the grievance further, the Union may initiate Step 3 proceedings by notifying the appropriate Department Manager in writing of its intentions within two (2) working days after receipt of the Step 2 decision. Within two (2) working days after such notice to the Department Manager, the Union and the Department Manager will simultaneously exchange and submit to the Plant Manager copies of brief stating:

(a) The issue of the case
(b) The important known facts

(c) The terms of the Agreement involved
(d) Arguments
(e) The action desired

Within two (2) working days after receiving the above briefs the Plant Manager (or his appointed representative), the Department Manager, and the Foreman will meet with the President of the Local (or his appointed representative) and up to four (4) other members of the Negotiation Committee, and/or the Union Steward, and/or the aggrieved employee (or the representative of the aggrieved employee), and/or a representative of the International Union and attempt to settle the grievance. Within five (5) working days after the termination of discussions the Plant Manager (or his appointed representative will give his decision in writing to the President of the Local.

(23) In case of a grievance concerning a discharge, the term "aggrieved employee" as used in this Section shall mean the person discharged.

(24) Should the Company have any grievance, an earnest effort will be made to settle the grievances in the following manner:

Step 1: By discussion between representatives of the Company and an authorized representative of the Union.

Step 2: By discussion between a representative of the Company and a representative of the International Union, if the grievance is not settled within fifteen (15) working days by Step 1 procedure and if the grievance is presented to the Union within five (5) working days after Step 1 proceedings have been exhausted.

-10-

(25) Neither party shall be obligated to discuss or consider a grievance which is not submitted within the appropriate time limits specified in Paragraphs (21), (22), (24), or (27), except where an extension of time has been agreed upon in writing by the President of the Local and the Company, in which event failure to pursue the grievance within the extended time shall likewise relieve both parties of any obligation. Failure of the Company to meet any applicable time limit specified in Paragraph (22), or proper extension thereof mutually agreed upon in writing, will allow the grievance automatically to proceed to the next step in the grievance procedure, if any.

(26) After a warning of any kind has been in an employee's record for a period of fourteen (14) months, it shall automatically be removed.

## ARBITRATION

(27) If the grievance is not adjusted satisfactorily in Step 2 or 3 of the applicable grievance procedure, then the matter in dispute may be referred to arbitration by either party notifying the other party in writing within fourteen (14) calendar days thereafter, stating the matter to be arbitrated. Any grievance which is arbitrable under the terms of the Agreement which is properly appealed to arbitration shall be arbitrated by an arbitrator from a five-person panel of permanent arbitrators as selected by the Company and Union. Arbitrations under this Agreement shall be alternated between said arbitrators in the order named, each such arbitrator acting as the sole arbitrator in each case assigned to him. In any case where the arbitrator is unable or unwilling to act, then the Company and the Union may mutually agree to proceed with the next arbitrator in rotation,

-11-

and then return to the by-passed arbitrator for the next successive case. In any case where all said arbitrators are unable or unwilling to act, then the arbitrator for that case will be selected by the parties requesting the Federal Mediation and Conciliation Service to submit the names of five (5) persons qualified to act as arbitrator. Within five (5) working days after these names are submitted, the arbitrator shall be chosen by the Union and the Company alternately striking one name from the list until only one name remains.

(28) The arbitrator shall give hearing to the parties after reasonable opportunity to make appropriate investigations and prepare evidence, and shall thereafter render his decision in writing to the parties hereto. The hearing shall be conducted by the arbitrator within sixty (60) days after he accepts the arbitration assignment, and under the Voluntary Arbitration Rules, then obtaining, of the American Arbitration Association insofar as those rules relate specifically to the conduct of the hearing.

(29) The expenses and fee of the arbitrator shall be borne and paid one-half (1/2) by the Union and one-half (1/2) by the Company.

(30) Except as expressly provided in this Agreement, a decision of the arbitrator in respect to any grievance which shall properly be submitted to him shall in no case be made retroactive to a date prior to the date on which such grievance shall have been first presented under Step 1 of the applicable grievance procedure.

-12-

(31) A decision or award by the arbitrator duly rendered in accordance with the law shall be final and conclusively binding upon the parties hereto and on any employee or employees affected thereby.

(32) Nothing herein shall prevent the Union and the Company from settling the matter at any time up to final decision by the arbitrator, in which event prompt notices of such settlement shall be given in writing to the arbitrator by the parties hereto.

(33) Only a single grievance, or multiple grievances involving the same issue, may be included in any demand for arbitration unless otherwise expressly agreed to in writing by the parties.

(34) Only claims or disputes involving the meaning or application of this Agreement or actions alleged to be in violation thereof shall constitute grievances which shall be subject to arbitration.

## STRIKES AND LOCKOUTS

(35) The Union agrees there shall be no stoppage of work, strikes, sit-downs, slow-downs, picketing, embargoes, refusals to deliver, to handle, or ship materials and supplies, or any other suspension or cessation of work in the Company's Owensboro plant during the term of this Agreement, unless the Company shall first have refused to arbitrate when obligated to do so, or have failed to abide by the terms of an arbitrator's decision or award made pursuant to Paragraph (31) hereof, and the Company agrees that there shall be no lockout, unless the Union shall first have refused to arbitrate when obligated to do so.

-13-

(36) If any of the acts prohibited by Paragraph (35) should occur or be threatened, the Union will promptly, upon written notice from the Company that the prohibited acts, are occurring or threatened, publicly declare that such action is unauthorized and order the employee or employees engaging or participating therein, or threatening to do so, to refrain from doing so and will use all effective means at its command to secure compliance with its order, regardless of the existence of any picket line.

(37) The Company may discharge any employee or employees engaging or participating in such acts, and discharge pursuant to this provision shall not be subject to grievance proceedings, nor shall the Union question the unqualified right of the Company to make such discharges. The failure of the Company to exercise this right in any instance shall not be deemed a waiver of the right in any other instance.

(38) The Union shall not be liable to the Company in damages for breach of contract in the event an unauthorized strike occurs and the Union shall have complied with the provisions of Paragraph (36).

(39) An issue of fact as to whether or not any particular employee has engaged in, participated in, or encouraged any such violation, may be subject to grievance proceedings and arbitration.

## LEAVE OF ABSENCE

(40) Leaves of absence without pay shall be granted by the Company to employees in case of bona fide sickness or injury

requiring the employee to be absent from work. Such leave shall be for the period the employee is unable to work, provided such inability to work is certified by a duly qualified physician and further provided that the combined leaves and extensions thereof shall not exceed forty-two (42) consecutive months. Except Union Officials in full-time position with International (for seniority purposes only).

(41) A leave of absence without pay for unusual circumstances may be granted an employee if justified and if approved by the Company. Ninety (90) days shall be the maximum period of time for which such leave of absence is granted. If an extension is desired, evidence satisfactory to the Company must be submitted before the ninety (90) day period expires.

(42) For the purpose of enabling them to transact Union business requiring their absence, the Company will grant leaves of absence without pay to employees selected by Local Lodge 726, to represent it in the transaction of such Union business provided:

(a) The Company is given at least three (3) working days notice in writing of the desired leave of absence;

(b) That no more than five (5) employees will be granted such leave at the same time; and

(c) That no more than one (1) employee from any one job classification or five (5) employees from any one seniority group will be granted such leave at the same time. However, should the Company be able to schedule

plant operations in a satisfactory manner and allow a higher number of employees from any one job classification to be off, they will make a reasonable effort to do so. Union leave takes preference.

If the reason for such leave of absence is to negotiate a future Agreement, the limitation in sub-paragraph (a) shall be one (1) working day instead of three (3) working days.

If the reason for such leave of absence is to participate in a one-day, or two-day training program sponsored by the International Brotherhood for training Stewards, the limitation in sub-paragraph (b) and (c) above shall not apply.

(43) The Company reserves the right to refuse to extend such a leave of absence beyond one (1) month or to grant more than two (2) such leaves of absence to one (1) employee in any period of twelve (12) consecutive months if such leave of absence would significantly hamper plant operations. The Union agrees that it will not abuse, nor allow any of its members to abuse, the provisions concerning such leaves of absence.

(44) Request for any leave of absence shall be in writing and shall specify the reasons therefor, except that no written request is required in the case of an absence caused by bona fide sickness or injury. Leave of absence or extension will be granted only in writing by the Company. A copy of all written leave of absence requests and approvals will be forwarded by the Company to the Secretary-Treasurer of the Union.

## FUNERAL LEAVE

(45) If an employee, other than a probationary employee, is absent on a day he otherwise would have worked and such absence is caused by a death in his immediate family, he shall be granted up to three (3) working days off, ending with the day after the funeral and on condition that he attends the funeral. The employee shall be entitled to receive eight (8) times his straight time hourly rate of pay for each such day of funeral leave. For the purpose of this paragraph, immediate family shall include only the employee's spouse, child, stepchild, father or mother, brother or sister, father-in-law or mother-in-law, grandparents and grandchildren. Also, one (1) paid working day shall be granted in the event of the death of a son-in-law and daughter-in-law, to be taken on the day of the funeral. The employee shall be entitled to receive eight (8) hours straight time hourly rate of pay for this one day.

When funeral leave and vacation days fall on the same day or days, funeral leave will supersede vacation leave. The vacation days will be rescheduled at a mutually agreed time.

## SENIORITY

(46) The word "seniority" means the length of continuous service in the Plant since the date of most recent hiring.

(47) Employees will be divided into the following separate seniority groups:

(a) Production employees in the Industrial Daramic and Battery Separator Plant, plus all employees assigned as General Manufacturing Helpers;

(b) Production employees in the Shipping & Receiving Department, plus all employees assigned as General Manufacturing Helpers;

(c) Production employees in the Paper Plant, plus all employees assigned as General Manufacturing Helpers;

(d) Production employees in the Daramic Automotive Plant, plus all employees assigned as General Manufacturing Helpers;

(e) Maintenance Department;

(f) Control laboratory technicians.

-18-

## ATTACHMENT A

## JOB CLASSIFICATION DETAILS

JOB CLASSIFICATIONS FOR THE DARAMIC AUTOMOTIVE & INDUSTRIAL DARAMIC/BATTERY SEPARATOR SENIORITY GROUPS ARE AS FOLLOWS:

| DARAMIC AUTOMOTIVE PLANT | INDUSTRIAL DARAMIC/ BATTERY SEPARATOR PLANT |
|---|---|
| Extractor 3 Operator | Extractor 1 Operator |
| Extractor 2 Operator | Impregnating Line Operator |
| Extruder Operator 2 | Conditioning Line Operator |
| Slit/Rewind Operator | Extruder Operator |
| Extractor 3 Helper | Finishing Line Operator |
| Extractor 2 Helper | Pelletizer Operator |
| Slit/Rewind Inspector | Finishing Line Inspector |
| Bulk Handler | Extractor 1 Helper |
| Slit/Rewind Inspector Helper | Mixer - Daramic |
| Re-Inspect Operator | Impregnating Line Helper |
| DMH | Quality Audit Daramic |
| Slit/Rewind Helper | Conditioning Line Helper |
| GMH | Round Cell Operator |
| | DMH |
| | Utility B |
| | GMH |
| | Re-Inspect Finish |
| | Operator (E-Rate) |
| | Daramic Inventory Clerk |

(48) When a probationary production employee has completed fifty-five (55) calendar days or a probationary maintenance employee or a probationary control laboratory technician has completed fifty-five (55) calendar days with the Company since the date of his most recent hiring (or) twenty (20) days if covered by Paragraph (7), his name shall be placed on the seniority list and his seniority shall be computed from the date of his most recent hiring (which date shall then become his "seniority date").

-19-

(49) Layoff of production employees will be made by laying off the least senior production employees in the plant, providing the remaining employees can do the required work after a reasonable period of training and further provided the layoff is expected to last more than one (1) week.

Layoffs expected to last one (1) week or less will be effected by laying off the least senior employees assigned to the seniority group concerned, excluding GME's assigned elsewhere in the plant, and retaining the more senior man if he is able to do a same, or lower rated job within the seniority group without training. If a one week layoff or less accumulates up to ten (10) days per calendar year for a seniority group, any additional layoffs for that seniority group within that calendar year will be made as if the layoff is expected to last more than one (1) week.

When equipment cannot be operated for reasons beyond the Company's control, it is recognized that departments may shut down for up to twenty-four (24) hours without it being considered a layoff. This is not to exceed two (2) times per year. Any amount of hours up to twenty-four (24) hours counts as one (1) of the two (2) times.

Layoff of Maintenance employees or Control Laboratory Technicians will be made by laying off the least senior employee in the Maintenance Department or Control Laboratory, providing the remaining employees can do the required work after a reasonable period of training. If a one (1) week layoff or less accumulates up to ten (10) days per calendar year for a seniority

group, any additional layoffs for that seniority group within that calendar year will be made as if the layoff is expected to last more than one (1) week. Those affected employees may, on the basis of prior production seniority, displace the least senior production employee then permanently assigned to a job in Rate Classification B or displace the least senior production employee then permanently assigned to a job in Rate Classification A.

Recalls will be made by recalling first the most senior production employee then on layoff, in the case of production openings, or senior Maintenance Department employee then displaced, in the case of maintenance openings, or the most senior control laboratory technician then displaced, in the case of control laboratory technician openings, provided that the employees in the plant can do the required work after a reasonable period of training.

No later than the first day that recalled employees return to work, the Company shall give the Union a written list containing the names of all employees recalled.

(50) The Company will either give four (4) working days notice in writing to employees who are to be laid off or will give pay in lieu of such notice. This requirement will be waived if the Company notifies the Union that causes beyond its control prevent notice or if the Company notifies the Union that a one (1) or two (2) day layoff is necessary in a seniority group.

The Company will be obligated to give three (3) working days notice in those cases where the layoff is required in order to recall more senior employees as outlined in Paragraph (49).

(51) An employee shall lose his seniority and re-employment rights only under the following conditions:

(a) He quits his employment:

   (1) If an employee fails to report to work on five (5) successive working days, unless prevented by sickness or some other justifiable cause, he shall be considered to have quit his employment.

(b) He is discharged for proper cause;

(c) He fails to report for work within three (3) working days of the date of notification of recall, delivered by telegram, registered mail, or certified mail to his last address of record with the Company unless prevented by sickness or some other justifiable cause, in which case he must request a leave of absence, during said three (3) working days. In case the employee is working elsewhere at the time of recall, the employee may give notice to the Company within said three (3) working days of his intention to return to work, and must return within five (5) working days thereafter;

(d) He has not worked for the Company by reason of sickness or layoff for the period of forty-two (42) consecutive months or the length of his seniority as of his last day of work, whichever period is shorter.

Exempt Union Officials in full-time position with International (for seniority purposes only).

(e) He fails to return to work upon expiration of a leave of absence.

(f) He transfers from a position within the Bargaining Unit to a position outside the Bargaining Unit.

(52) Relative seniority among employees with the same seniority date shall be determined by drawing lots. The results of such drawing shall be final and shall be indicated on the seniority list.

(53) The President of the Local, Vice-President, the Financial Secretary and Treasurer, and the Negotiating Committee shall have top seniority with the Bargaining Unit with respect to layoff and recall during the term of their service and shall revert to their normal place of seniority when they shall cease serving in such capacity. The President of the Local shall be assigned to an existing day-shift job at his regular rate. He will be able to advance in rate according to the terms of this Agreement. At the end of his term as Union President, he will revert to his regularly assigned position.

(54) The Company will post on all bulletin boards used for posting job openings a copy of the seniority list and will bring the list up-to-date at least once each three (3) months. A copy of such revised lists will be furnished to the President and Secretary-Treasurer of the Local Union. An employee may call any error on the seniority list to the attention of the Company by filing a written objection with the Company with a copy to the

Secretary-Treasurer of the Local. The Company will correct the error when so notified, but shall have no obligation to make any retroactive adjustments because of an action taken on the basis of that error.

## PROMOTIONS AND TRANSFERS

(65) When an opening is for a period of less than one (1) month, it may be filled by the Company without posting and bidding. If no qualified employee desires transfer or promotion, the temporary vacancy will be filled by transferring or promoting the least senior qualified employee in the seniority group concerned. The Company and the Union may agree to the extension of any temporary transfer or promotion. When an opening on other than Maintenance jobs, Control laboratory Technician jobs, or jobs in Rate Classification A is for a period of longer than one (1) month, it will be posted for bidding. The job opening will be posted for a 72 hour period not including the hours between 12:01 A.M., Saturday to 12:01 A.M., Monday. Bidders may apply in writing, in duplicate, with a copy for the Union, and will be considered in the following order:

(a) Promotions to jobs in Rate Classification B will be based primarily on seniority provided the senior bidder is capable of performing the job satisfactorily after a reasonable period of training.

(b) Promotions to jobs in Rate Classification C and above will be based primarily on merit and ability, but where those are equal among two (2) or more employees, the

-24-

employee having the greatest seniority shall receive the preference. The order of preference will be as follows:

(1) Those who have been demoted from the posted job because of a cutback in operations within the past twelve (12) months and have not since declined to return to the job that is posted.

(2) Those production employees currently assigned to other rated jobs in the plant. A production employee may are voluntarily bid down to a lower rated job more than one time in any six (6) month period.

The Company will post its selection from among the bidders within three (3) working days after the close of the period allowed for bidding. If the successful bidder is not the bidder with the greatest seniority, the Company will inform the Union Official or Steward concerned of the primary reasons for its selection before posting that selection in the plant. If there are no bidders who would be able to do the posted job satisfactorily after the normal training period, the Company may appoint to the opening any probationary employees or any other employee for whom the job represents no reduction in Rate Classification, or may fill the job by hiring directly from the outside.

(66) Demotion from a job in Rate Classification C through J will be made by demoting the least senior employee in the same seniority group and rate classification to the next lower rate classification in the same seniority group. In any demotion, the

-25-

least senior employee in any rate Classification higher than Classification A shall be displaced and its more senior employee demoted from a higher rate classification shall be assigned to the job vacated by the least senior employee. If the demoted employee refuses placement in accordance with the foregoing provisions of this paragraph, that employee shall be demoted to Rate Classification A and shall displace the least senior A rated employee plant wide provided that the demoted man has more seniority than the employee being displaced. An employee being demoted from Rate Classification C will be permitted to displace a less senior employee working on a job in the same rate classification in another seniority group if the more senior employee has been assigned to that job for at least three (3) of the last twelve (12) months. Demotions from Rate Classification B will be made by allowing the B rated employee in the department where the cutback occurs either to displace the least senior A rated employee in the same department or to displace the least senior production employee then permanently assigned to Rate Classification B provided that the demoted man has more seniority than the employee being displaced.

(57) Employees who are assigned to Rate Classification A and who desire to be transferred to another department must file a request to be transferred with the Company, a copy of which will be given to the Union.

When a vacancy in Rate Classification A occurs in any department the Company will make its selection by placing on the job the most senior GMH who has filed a request to be transferred.

-26-

Once an employee has been moved to his preferred department as a result of the GMH transfer provision, he may not request another transfer to another department until he has accumulated six (6) months of work in that department.

A GMH who is laid off from his regular department or bumped out of it during a cutback will be returned to that department upon re-staffing unless a GMH senior to him has a written request in the file.

### HOURS OF WORK

(58) For the purpose of computing overtime and premium pay, the work day shall begin at 12:01 A.M., and the work week shall begin at 12:01 A.M. Monday.

(59) It is the sole right of the Company to determine when overtime shall be worked. The Company will divide overtime as equitably as practicable within a calendar year and within each job in each Department in accordance with the signed and posted departmental overtime policy. If overtime problems arise not covered by the policies, the Company and the Union agree to attempt to resolve the problems on an equitable basis. The Company will keep a record of overtime worked by each employee throughout the year. The record will be available for inspection by any employee in the Department concerned, at his request.

-27-

Secretary-Treasurer of the Local. The Company will correct the error when so notified, but shall have no obligation to make any retroactive adjustments because of an action taken on the basis of that error.

## PROMOTIONS AND TRANSFERS

(55) When an opening is for a period of less than one (1) month, it may be filled by the Company without posting and bidding. If no qualified employee desires such transfer or promotion, the temporary vacancy will be filled by transferring or promoting the least senior qualified employee in the seniority group concerned. The Company and the Union may agree to the extension of any temporary transfer or promotion. When an opening on other than Maintenance jobs, Control Laboratory Technician jobs, or jobs in Rate Classification A is for a period of longer than one (1) month, it will be posted for bidding. The job opening will be posted for a 72 hour period not including the hours between 12:01 A.M., Saturday to 12:01 A.M., Monday. Bidders may apply in writing, in duplicate, with a copy for the Union, and will be considered in the following order:

(a) Promotions to jobs in Rate Classification B will be based primarily on seniority provided the senior bidder is capable of performing the job satisfactorily after a reasonable period of training.

(b) Promotions to jobs in Rate Classification C and above will be based primarily on merit and ability, but where these are equal among two (2) or more employees; the

employee having the greatest seniority shall receive the preference. The order of preference will be as follows:

(1) Those who have been demoted from the posted job because of a cutback in operations within the past twelve (12) months and have not since declined to return to the job that is posted.

(2) Those production employees currently assigned to other rated jobs in the plant. A production employee may not voluntarily bid down to a lower rated job more than one time in any six (6) month period.

The Company will post its selection from among the bidders within three (3) working days after the close of the period allowed for bidding. If the successful bidder is not the bidder with the greatest seniority, the Company will inform the Union Official or Steward concerned of the primary reasons for its selection before posting that selection in the plant. If there are no bidders who would be able to do the posted job satisfactorily after the normal training period, the Company may appoint to the opening any probationary employees or any other employee for whom the job represents no reduction in Rate Classification, or may fill the job by hiring directly from the outside.

(56) Demotion from a job in Rate Classification C through J will be made by demoting the least senior employee in the same seniority group and rate classification to the next lower rate classification in the same seniority group. In any demotion, the

least senior employee in any rate classification higher than Classification A shall be displaced and the more senior employee demoted from a higher rate classification shall be assigned to the job vacated by the least senior employee. If the demoted employee refuses placement in accordance with the foregoing provisions of this paragraph, that employee shall be demoted to Rate Classification A and shall displace the least senior A rated employee plant wide provided that the demoted man has more seniority than the employee being displaced. An employee being demoted from Rate Classification C will be permitted to displace a less senior employee working on a job in the same rate classification in another seniority group if the more senior employee has been assigned to that job for at least three (3) of the last twelve (12) months. Demotions from Rate Classification B will be made by allowing the B rated employee in the department where the cutback occurs either to displace the least senior A rated employee in the same department or to displace the least senior production employee then permanently assigned to Rate Classification B provided that the demoted man has more seniority than the employee being displaced.

(67) Employees who are assigned to Rate Classification A and who desire to be transferred to another department must file a request to be transferred with the Company, a copy of which will be given to the Union.

When a vacancy in Rate Classification A occurs in any department the Company will make its selection by placing on the job the most senior GMH who has filed a request to be transferred.

Once an employee has been moved to his preferred department as a result of the GMH transfer provision, he may not request another transfer to another department until he has accumulated six (6) months of work in that department.

A GMH who is laid off from his regular department or bumped out of it during a cutback will be returned to that department upon re-staffing unless a GMH senior to him has a written request in the files.

## HOURS OF WORK

(58) For the purpose of computing overtime and premium pay, the work day shall begin at 12:01 A.M., and the work week shall begin at 12:01 A.M. Monday.

(59) It is the sole right of the Company to determine when overtime shall be worked. The Company will divide overtime as equitably as practicable within a calendar year and within each job in each Department in accordance with the signed and posted departmental overtime policy. If overtime problems arise not covered by the policies, the Company and the Union agree to attempt to resolve the problems on an equitable basis. The Company will keep a record of overtime worked by each employee throughout the year. The record will be available for inspection by any employee in the Department concerned, at his request.

If overtime is offered to an employee who prefers not to work it, his overtime record will be charged for the equivalent number of hours whether or not he is excused from working it:

(60) When overtime is to be scheduled on Saturday, Sunday or on a holiday, the scheduled overtime hours will be posted (or the employees concerned will be advised) before 3:00 p.m. Thursday the second day prior to the start of the scheduled overtime. It is recognized that circumstances will arise from time to time when overtime cannot be foreseen forty (40) hours in advance. In such cases, the employees concerned will be advised of such overtime as soon as the need for it becomes known.

(61) The provisions of this Section shall not be construed as a guarantee by the Company of hours of work to be provided per day or per week.

(62) It is recognized that because of the nature of the Company's business, changes in production requirements may bring about an increase or decrease in the number of shifts on any operation or may require continuous operations or rotating shift assignments. Except on continuous four-shift operations, rotating shifts will be scheduled so that rotation occurs each week, unless otherwise agreed to by the Company and the Union.

(63) Employees may trade shifts with other employees assigned to the same job and seniority group, provided that no overtime results and that the Foreman concerned have approved

the transfer in advance. Such shift trades will be approved unless the trade would significantly hamper Plant operations and with the understanding that not more than one such trade needs to be approved for any one employee in any one-week period. It is understood that the intent of this paragraph is not to permit extended or permanent shift trades by employees unless approved in advance by the Foreman.

## OVERTIME, PREMIUM & REPORTING PAY

(64) An employee shall be paid one and one-half (1-1/2) times the straight time rate for the job for all hours worked by him in excess of eight (8) hours in any work day or in any period of sixteen (16) consecutive hours, or in excess of forty (40) hours in any work week, whichever computation is the greater.

(65) Work performed during the twenty-four (24) hour period on Saturday shall be paid for at one and one-half (1-1/2) times the straight time rate for the job, except where the work is performed by employees who are scheduled on a continuous four-shift basis.

(66) Work performed during the twenty-four (24) hour period on Sunday shall be paid for at two (2) times the straight time rate for the job, except where the work is performed by employees who are scheduled on a continuous four-shift basis.

(67) An employee shall be paid two and one-half (2-1/2) times the straight time rate for the job for work done by an

(70) The foregoing provisions of Paragraph (64) are not to be pyramided and therefore where two those provisions apply to the same hours of work, which provides the greatest pay for those hours shall exclusion of all other applicable provisions.

## CONTINUOUS FOUR-SHIFT OPERATIONS

(71) When operations are scheduled by the Company on a continuous four-shift basis, the schedule shall be that shown in Exhibit C, unless another schedule is mutually agreed to by the Company and the Union. In any department which has no four-shift operations currently scheduled, the Company will give twenty-one (21) calendar days notice in advance of the initial scheduling of such operations. In any department having no three-shift operations, the Company will give twenty-one (21) calendar days notice in advance of the initial scheduling of such operations. These notices are not to run concurrently in the same department.

(72) Employees working on operations scheduled on a continuous four-shift basis will be paid a premium of fifty (50) cents an hour for all work performed on such operations. This amount shall be included in the computation of other premium pay only to the extent required by law. Employees working on operations scheduled on a continuous four-shift basis will be paid one and one-half (1-1/2) times the straight time rate for the job for all work performed on the sixth scheduled day on the applicable four-shift schedule.

-31-

employee on any holiday set forth in Paragraph (76), or on the day that holiday is celebrated in the Plant.

(68) Except where failure to provide work is due to an Act of God or a condition beyond the reasonable control of the Company, an employee who on prompt arrival when called or scheduled to report for work is not put to work, or is put to work for less than four (4) hours, shall be paid at least the equivalent four (4) hours' pay at his then current straight time hourly rate. An employee who is not notified at least four (4) hours before his scheduled starting time not to report for work is deemed to be instructed to report. No payment shall be made by the Company for time not actually worked if the employee leaves the Plant at his own request after finishing the work assigned to him.

(69) Employees who are asked to report for work at a time earlier than the beginning of the shift for which they are scheduled for that day and who continue working into the scheduled shift, shall be paid time and one-half (1-1/2) (or other applicable premium, if higher) for all such hours worked in advance of the scheduled shift. When an employee is required to change shifts for production reasons or reasons beyond the Company's control with less than 40 hours notice, said employee shall be paid time and one-half (1-1/2) for the first eight hours of such shift schedule change.

The provisions of Paragraph (64) shall not apply to hours of work covered by this Paragraph.

-30-

(73) Employees working on operations scheduled on a continuous four-shift basis will be paid one and one-half (1-1/2) times the straight time rate for the job for all work performed on a day shown on the applicable four-shift schedule as a scheduled day off for employee on the shift to which such employee is then regularly assigned.

(74) Employees working on operations scheduled on a continuous four-shift basis will be paid two (2) times the straight time rate for the job for all work performed on the seventh consecutive day of work within the regularly scheduled work week.

(75) The foregoing provisions of Paragraph (64) through (69) and Paragraph (72), (73) and (74) are not to be pyramided and therefore, where two (2) or more of those provisions apply to the same hours of work, that provision which provides the greatest pay for those hours shall apply to the exclusion of all other applicable provisions.

## HOLIDAYS

(76) There shall be eleven (11) paid holidays which shall be the days on which the following days are legally observed:

New Year's Day
Good Friday (Easter for four-shift employees)
Memorial Day
Independence Day
Labor Day
Veteran's Day
Thanksgiving Day
Day after Thanksgiving
Day before Christmas
Christmas Day
New Year's Eve

-32-

An employee eligible for holiday pay as hereinafter provided shall receive eight (8) hours' pay at his current straight time rate. If an employee is required to work any part of his shift on any of the foregoing paid holidays, he will be paid for that holiday at two and one-half (2-1/2) times the straight time rate for the job (plus applicable shift premium) for all hours worked, as provided in Paragraph (67), and at the straight time rate for the job for the balance of his scheduled shift, if any.

(77) It is the policy of the Company not to operate the Plant on the above named holidays unless there are circumstances requiring installation or repair of equipment or it is necessary to conform with a customer requirement of major importance.

(78) For three-shift operations a holiday which falls on a Sunday will be celebrated on the succeeding scheduled working day and a holiday which falls on a Saturday will be celebrated on the preceding scheduled working day. Four-shift operations will celebrate holidays on the days on which they fall. The Company and the Union can mutually agree to float any of the above holidays provided agreement is reached at least one (1) month in advance of the holiday.

(79) Paid holidays not worked shall be considered eight (8) hours of time worked for the purpose of computing the number of hours worked during the work week.

-33-

(80) To be entitled to pay for a holiday not worked an employee must:

(a) be an employee on the date immediately before the date on which such holiday is celebrated, and

(b) have worked a full shift on his last scheduled work day before, and a full shift on his first scheduled work day after the date on which such holiday is celebrated. This requirement shall be inapplicable to an employee who was absent on both days because of an industrial accident occurring in the Plant, or who was unable to work one or both of these days because of a justifiable reason or because of illness, provided that in the case of illness he furnishes the Company upon request, a written doctor's certificate acceptable to the Company to the effect that he was unable to work on that day because of illness, and further provided the employee had earnings within the week the holiday was celebrated; and

(c) not be on layoff or leave of absence; and

(d) not have failed to report for work on that holiday when he was scheduled in advance to work.

The Company's Holiday Exception Committee, consisting of the Department Manager, will review all holiday pay denials and where justifiable cause prevents an employee from working a full shift before or after the holiday, full holiday pay may be granted if the employee has given proper notification to the Company.

(81) When one of the above holidays is celebrated on a date which falls within an employee's approved vacation period, he shall at his option, be given pay for that holiday or an extra day of paid vacation at a mutually agreed time.

## VACATIONS

(82) Employees who have or will have completed during a given calendar year (commencing on January 1 of each year) the amounts of seniority below shall be entitled to receive vacation benefits in that year in accordance with the following schedule:

(a) Five (5) working days vacation to be taken between June 1 and December 31 if the employee has or will have completed one (1) or more but less than two (2) full years of seniority within the current calendar year.

(b) Seven (7) working days vacation if the employee has or will have completed at least two (2) but less than three (3) years of seniority within the current calendar year.

(c) Ten (10) working days vacation if the employee has or will have completed at least three (3) but less than six (6) years of seniority within the current calendar year.

(d) Eleven (11) working days vacation if the employee has or will have completed at least six (6) but less than seven (7) years of seniority within the current calendar year.

(e) Twelve (12) working days vacation if the employee has or will have completed at least seven (7) but less than eight (8) years of seniority within the current calendar year.

(f) Thirteen (13) working days vacation if the employee has or will have completed at least eight (8) but less than nine (9) years of seniority within the current calendar year.

(g) Fourteen (14) working days vacation if the employee has or will have completed at least nine (9) but less than ten (10) years of seniority within the current calendar year.

(h) Fifteen (15) working days vacation if the employee has or will have completed at least ten (10) but less than eleven (11) years of seniority within the current calendar year.

(i) Sixteen (16) working days vacation if the employee has or will have completed at least eleven (11) but less than twelve (12) years of seniority with the current calendar year.

(j) Seventeen (17) working days vacation if the employee has or will have completed at least twelve (12) but less than thirteen (13) years of seniority with the current calendar year.

(k) Eighteen (18) working days vacation if the employee has or will have completed at least thirteen (13) but less than fourteen (14) years of seniority within the current calendar year.

(l) Nineteen (19) working days vacation if the employee has or will have completed at least fourteen (14) but less than fifteen (15) years of seniority within the current calendar year.

(m) Twenty (20) working days vacation if the employee has or will have completed at least fifteen (15) but less than sixteen (16) years of seniority within the current calendar year.

(n) Twenty-one (21) working days vacation if the employee has or will have completed at least sixteen (16) but less than seventeen (17) years of seniority within the current calendar year.

(o) Twenty-two (22) working days vacation if the employee has or will have completed at least seventeen (17) but less than eighteen (18) years of seniority within the current calendar year.

(p) Twenty-three (23) working days vacation if the employee has or will have completed at least eighteen (18) but less than nineteen (19) years of seniority within the current calendar year.

(q) Twenty-four (24) working days vacation if the employee has or will have completed at least nineteen (19) but less than twenty (20) years of seniority within the current calendar year.

(r) Twenty-five (25) working days vacation if the employee has or will have completed at least twenty (20) but less than twenty-one (21) years of seniority within the current calendar year.

Vacation pay will be computed at a rate of 9.0 hours pay for each eight (8) hours of vacation.

The above hours of pay are subject to a deduction of one-twelfth (1/12) of the total sum for each period of thirty (30) consecutive calendar days not worked during the prior calendar year and are paid at the employee's current permanent straight

time rate. These employees who have or will have completed one year of seniority (82(a)) will be subject to one-twelfth (1/12) pay deduction for each period of thirty (30) consecutive calendar days not worked between June 1 of the prior year and May 31 of the current year (see Paragraph 92 for exceptions).

An employee's current straight time rate will include the four-shift premium if the employee has worked at least six (6) months on four-shift operations during the twelve (12) months prior to his vacation.

(83) A period of temporary shutdown may be designated by the Company as a vacation period. The Company shall give notice of the dates of any such vacation shutdown at least sixty (60) calendar days in advance of the first day of such shutdown, which day shall be no earlier than June 15, nor later than August 15 in any year.

The Company many designate a three (3) week period during which time only one Maintenance Department employee will normally be allowed to take vacation.

(84) The Company reserves the right to grant employees vacation at a mutually agreed upon time other than the time of the vacation shutdown in order to meet production requirements. In such cases, should more employees wish to schedule their vacation for a particular period than production requirements permit, the vacation schedule shall give preference to those employees with the greatest seniority, provided the choice of vacation period was expressed to Management at least sixty (60) calendar days in advance of their desired vacation.

-38-

(85) An employee will be scheduled or called in for overtime work on a weekend or holiday immediately preceding and/or following his scheduled vacation only if he is willing to perform such work or if the work is of such importance that it cannot reasonably be delayed and the employee's presence is required to perform it.

(86) An employee entitled to vacation pay who resigns after having given the Company at least five (5) working days notice of resignation and before receiving his vacation, is entitled to vacation pay in accordance with Paragraph (82) above.

(87) An employee entitled to vacation pay who retires after having given the Company at least five (5) working days' notice of retirement and before receiving his vacation pay in that year is entitled to vacation pay according to Paragraph (82). Such vacation payment will be made to him at the time of retirement.

(88) An employee who is laid off between January 1 and the beginning of the vacation shutdown who has not been recalled before the beginning of that shutdown shall, on the latter date, receive any vacation pay to which he is entitled in accordance with Paragraph (82) above.

(89) An employee who is laid off after the vacation shutdown, but before 'taking the full vacation to which he is entitled in accordance with Paragraph (82)' above, shall receive any remaining vacation pay to which he is entitled at the time he is laid off.

-39-

(89) An employee who is discharged is entitled to vacation pay.

(90) Vacations are not cumulative from year to year.

(91) Employees shall take time off for vacation. In accordance with Paragraph (82). They will receive their vacation pay on the last working day before their vacation. Those employees eligible under Paragraph 82 of this Agreement for more than twenty (20) vacation days may elect not to take any or all of the vacation days in excess of twenty (20). For all such vacation days entitled to but not taken, the employee shall receive vacation pay at a rate of nine (9) hours' pay for each day. Such vacation payment will be made to the employee following the end of each calendar year.

(92) If an employee has been absent for more than thirty (30) consecutive days because of an industrial accident or qualifies for Sickness & Accident, any vacation pay to which he may be entitled under Paragraph (82) shall be computed as if he had worked on the job to which he is permanently assigned for the period of that absence or six (6) months, whichever period is shorter.

## WAGES

(93) Hourly straight time rates and rate classification of employees covered by this Agreement are attached hereto as Exhibit A and are a part of this Agreement.

(94) Employees will receive twenty (20) cents an hour in addition to their straight time rate for all work performed on the evening shift, and for additional hours worked directly before or directly after that shift.

(95) Employees will receive twenty-five (25) cents an hour in addition to their straight time rate for all work performed on the night shift, and for additional hours worked directly before or directly after that shift.

(96) The rate of pay for new or changed jobs within the bargaining unit shall be established by the Company. If requested by the Union, the Company will review with designated Union officials the application to the new or changed job in question of any job evaluation program which the Company has used to assist in making its rate determination. The Union may challenge a rate for new or changed jobs through the grievance procedure, starting at Step 3, as described in Paragraph (222), and arbitration at any time within thirty (30) calendar days after the rate becomes effective. If any change in the rate results, the change will be retroactive to the date the rate for the new or changed job was put into effect by the Company or the date the Union brought the grievance, whichever date is earlier.

(97) The straight time rate of pay for probationary employees will be five (5) cents per hour less than the rates shown in Exhibit A.

(98) An employee who is assigned temporarily by his Foreman to perform a job in a higher rate classification than the job to which he is permanently assigned shall be paid the higher rate for the period of his temporary assignment, provided that the total period of such assignment during one (1) shift is in excess of one (1) hour.

(99) An employee who is assigned temporarily by his Foreman to perform a job in a lower rate classification than the job to which he is permanently assigned shall continue to be paid at the rate of the job to which he is permanently assigned during the period of such temporary assignment. The employee permanently reassigned to a lower rated job shall continue to draw his regular classification pay until he assumes the duties of his new job.

(100) An employee who, while at work, receives an injury that makes it necessary for him to leave the plant for the rest of the shift on which the injury occurred will be paid at his regular rate to the end of that shift. Any employee who requires follow-up medical attention for a work-related injury or illness will be paid for actual time lost from his regular scheduled shift in the treatment process. This applies only to those employees actually at work at the time of treatment. For the purpose of this paragraph "injury" includes illness which is known to result from the work the employee is doing.

## RETIREMENT PLAN

(101) The Retirement Plan of W. R. Grace & Co.-Conn. Chemical Group (Owensboro Plant) shall continue in full force and effect during the term of the Agreement.

-42-

To comply with the Age Discrimination in Employment Act, as revised in 1986, there is no mandatory retirement, and an employee may elect to work beyond age sixty-five (65); however, no pension benefits will commence until the employee actually retires. The early reduction factor for benefits will be four (4) percent per year from age fifty-five (55) to age sixty-two (62). An employee who elects to continue working after age sixty-two (62) will continue to accrue credited service.

The Basic Retirement Benefit of a participant shall consist of a monthly amount equal to $24.00 effective May 1, 1993, equal to $24.50 effective April 1, 1994, and equal to $25.00 effective April 1, 1996, multiplied by years (and monthly fractions thereof measured in one-twelfths (1/12) of credited service) since the most recent hiring date, and excluding all employment during which an employee was eligible to make contributions under the provisions of the plan in effect on March 31, 1971, but failed to do so. Any waiting period (up to 3 years) an employee served before being eligible to participate in the Retirement Plan is counted as credited service. An employee is eligible to participate in the Pension Plan as of the first of the month following his/her date of hire. Participants are fully vested upon the completion of five (5) consecutive years of service, effective April 2, 1990.

The Company shall bear the entire cost of the plan from April 1, 1971. Contributions made by employees prior to April 1, 1971 shall remain in the plan until the employee's service with the Company is terminated by death, retirement, resignation or severance.

-43-

If an employee is at least forty (40) years of age with ten (10) years of credited service and in the event of permanent and total disability occurring on or after December 1, 1978, the pension plan will provide monthly disability income benefits of $24.00 effective May 1, 1993, for each year of credited service payable from the end of the six (6) month of disability for life. Credited disability service as used in this paragraph shall include all credited service up to the date of disability, as defined above, plus those years and fractions thereof measured in one-twelfths (1/12) measured from the date of disability until the first of the month following the disabled employee's sixty-fifth (65) birthday. Effective April 1, 1994, the disability benefit shall be increased from $24.00 to $24.50 per month per year of credited service to the date of retirement, and from $24.50 to $25.00 effective April 1, 1995.

The Retirement Plan will provide, at the participant's age 55, an automatic Pre-Retirement Spouse's Benefit, with a monthly benefit equal to 50% of the retirement benefit the participant would have received, and no penalty for revocation of the option before retirement.

Any employee retiring during the term of this agreement shall receive a $4,000.00 life insurance benefit. Effective July 1, 1993, pursuant to the new Contributory Medical Plan (CMP), this benefit will be increased to $5,000 for the term of the Agreement. This new benefit level will also apply to otherwise eligible employees who are not enrolled in the CMP.

If the lump sum value of retirement amount is less than $3,500.00, it will be cashed out to the employee upon termination of employment, death or retirement.

-44-

## JURY DUTY

(102) Any employee other than a probationary employee, who is called for jury duty and who is absent for that reason on a day he has been scheduled to work, shall be paid the difference, if any, between the amount received by the employee for each such day of jury duty and the amount equal to eight (8) times such employee's straight time rate. To be eligible for such payments, the employee must fulfill the following requirements:

(a) Notify his Foreman on the first working day after receipt of notice to report for jury duty.

(b) Furnish a written statement from the appropriate public official showing the dates and time he served as a juror and all payments received by him for such service.

(c) Report for work as soon as possible on any regular working day when he has been excused in advance from jury duty or when he has been excused within two (2) hours after reporting for jury duty.

It is understood that any earnings of an employee for straight-time hours which he works on a day when he has been excused from jury duty are credited toward any payment that may be due under this paragraph.

Payments due under this paragraph shall be paid no later than the regular pay day for the week in which the jury duty was served, provided the employee has submitted the written statement described in (b) above on or before the Tuesday preceding that pay day; otherwise, no later than the regular pay day next following submission of such statement.

-45-

## GENERAL CONDITIONS

(103) If it is considered necessary by the Company, representatives of management outside the bargaining unit may do work normally included in any job within the bargaining unit under the following conditions:

(a) In instances when employees are not immediately available and prompt action is necessary to prevent or minimize hazardous conditions or to handle serious emergencies requiring immediate action,

(b) In the instruction or training of persons employed by the Company, or

(c) When experimental, development or research work is needed.

It is understood that such work shall not be the cause of displacing employees from their regularly assigned jobs or adversely affecting their employment status with the Company.

(104) Employees will be paid on Thursday (after 3:00 P.M.) for all hours of work performed during the preceding work week. If a regular pay day falls on a Thursday which is observed as a holiday in the Plant, the last scheduled working day (after 3:00 P.M.) shall be the pay day in that week. In case of a person discharged, payment of any earnings due at the time of discharge shall be given or mailed to the employee before the end of the next regularly scheduled working day.

-46-

(105) The Company will make available to the Union printed copies of this Agreement in sufficient quantity to provide a copy to each employee within the bargaining unit.

## EMPLOYMENT CONTRACTS

(106) The Union acknowledges the right of the Company to require from each employee an Employment Contract which safeguards the property, formulae, and trade secrets of the Company, but which does not limit the employee's rights to collective bargaining. Existing Employment Contracts are unaffected by this Agreement, and shall, unless changed by mutual consent, continue in accordance with their terms. If there is at any time any conflict between any provisions of this Agreement and the provision of Employment Contracts, the provision of this Agreement shall govern.

## SAFETY AND HEALTH

(107) The Company will continue to maintain safe and clean working conditions and facilities, as required by applicable State or Federal Laws or Regulations. The Union recognizes the desirability of maintaining such conditions and facilities at all times and agrees to cooperate with the Company in that respect.

There is a $70 allowance towards the purchase of safety shoes per year per employee upon proof of purchase.

-47-

Current employees will be subject to a program of periodic physical examinations and/or medical tests appropriate to monitor exposure to known or suspected health risks occurring in the work environment. Each employee will be given a copy of his/her individual test results and a review of such results by the Company's examining physician. Time spent taking such examinations and reviewing the results thereof shall be compensated at the employee's regular straight time rate plus applicable shift premium. Nothing in this policy shall be construed as obviating responsibility for compliance with Federal, State and local laws and regulations with respect to health and safety and fair employment practices, and the implementation of this policy shall be accomplished in accordance with such laws.

## VOTING

(108) Only employees shall be entitled to take part in any voting conducted by the Union on matters pertaining to this Agreement or the application of its terms.

## POSTING OF NOTICES

(109) The Company will allow the Union to post information regarding Union policies and affairs which do not have a detrimental effect on the operation of the Company or which would not cause the Company to be legally liable for the acts of its employees.

-48-

## ACCESS TO THE PLANT

(110) Representatives of the Union not employed by the Company may visit employees in the Plant for Union business only provided they obtain permission from the Plant Manager or his designated representative prior to such visit.

## MISCELLANEOUS

(111) The Company will administer a plant wide absentee control program in accordance with the signed, dated and posted Absentee Control Policy.

## DURATION

(112) The provisions of this Agreement shall be effective as of 12:01 a.m. on April 5, 1993 and continue in effect until 12:01 a.m. April 1, 1996. Either party may, sixty (60) days prior to April 1, 1996, give notice of its desire to terminate or amend this Agreement. If neither party exercises this privilege, the Agreement will continue in full force and effect for another period of one (1) year from April 1, 1996.

-49-

In witness of the parties hereto have caused this Agreement to be entered into and signed by their agents thereto duly authorized as of April 6, 1993.

For the Company:

G. E. Jensen

For Local Lodge 726:

John Clayton

Bradley Troutman

Paul Embry

Dale Warren

Don Westerfield

-50-

---

## EXHIBIT A

A one-time payment in the amount of $1,000.00 (less appropriate withholdings) per employee will be distributed or mailed to all employees on the seniority list as of 4/5/93. This payment will be available on or before 4/16/93.

## PRODUCTION DEPARTMENTS

| RATE | | | STRAIGHT TIME RATES | | |
| --- | --- | --- | --- | --- | --- |
| CLASSIFICATION | | CURRENT RATE | EFFECTIVE 4/4/94 | EFFECTIVE 4/3/95 | EFFECTIVE 4/8/96 |
| A | GMH<br>Janitor | 12.24 | 12.66 | 13.04 |
| B | Utility B<br>Rewinder Helper<br>Slit/Rewind Helper | 12.45 | 12.87 | 13.26 | 13.52 |
| C | DMH<br>Paper Mill Lift Truck Operator<br>Shipping/Receiving Lift Truck Oper.<br>Dynamic Inventory Clerk<br>Clerk Receiver<br>Round Cell Operator | 12.70 | 13.13 | 13.52 |
| D | Conditioning Line Helper<br>Mixer - Battery Separator<br>Re-Inspect Operator<br>Slit/Rewind Inspector Helper<br>Quality Audit Technician<br>Impregnating Line Helper<br>Stores Attendant | 12.90 | 13.34 | 13.74 |
| E | Rewinder Operator<br>Mixer - Dynamic<br>Bulk Handler<br>Re-Inspect Finishing Operator | 13.09 | 13.54 | 13.95 |
| F | Extruder 1 Helper<br>Stock Prep Operator | 13.32 | 13.77 | 14.18 |

-51-

## PRODUCTION DEPARTMENTS (Cont'd)

| RATE CLASSIFICATION | CURRENT RATE | STRAIGHT TIME RATES EFFECTIVE 4/4/94 | EFFECTIVE 4/3/95 |
|---|---|---|---|
| G. Shipper/Receiver<br>Slit/Rewind Inspector<br>Finishing Line Inspector<br>Extractor 2 Helper<br>Extractor 3 Helper | 13.53 | 13.99 | 14.41 |
| H. Dryer Operator | 13.73 | 14.20 | 14.63 |
| I. Palletizer Operator<br>Slit/Rewind Operator<br>Finishing Line Operators | 13.95 | 14.42 | 14.85 |
| J. Extruder Operator 1<br>Extruder Operator 2<br>Stock Line Operator<br>Extractor 1 Operator<br>Extractor 2 Operator<br>Extractor 3 Operator<br>Conditioning Line Operator<br>Impregnating Line Operator | 14.14 | 14.62 | 15.06 |

## MAINTENANCE DEPARTMENT

| RATE CLASSIFICATION | CURRENT RATE | STRAIGHT TIME RATES EFFECTIVE 4/4/94 | EFFECTIVE 4/3/95 |
|---|---|---|---|
| MT Maintenance Helper-Trainee 12 Months | 13.10 | 13.55 | 13.96 |
| Note: An employee entering the Maintenance Helper-Trainee Program will receive his current rate or MT rate, whichever is higher, for the duration of the training period. | | | |
| MG General Maintenance 9 Months | 14.45 | 14.94 | 15.39 |
| MI General Maintenance 9 Months | 14.78 | 15.28 | 15.74 |

## LABORATORY

| RATE CLASSIFICATION | CURRENT RATE | STRAIGHT TIME RATES EFFECTIVE 4/4/94 | EFFECTIVE 4/3/95 |
|---|---|---|---|
| H Control Laboratory Technician (0-6 Months) | 13.73 | 14.20 | 14.63 |
| I Control Laboratory Technician (6-12 Months) | 13.95 | 14.42 | 14.85 |
| J Control Laboratory Technician (12 Months) | 14.14 | 14.62 | 15.06 |

Employees on the seniority list as of 4/2/90 will receive the rates for the jobs listed above in this Exhibit A for the duration of this Agreement.

## WAGE RATE FOR NEW HIRES

| CLASSIFICATION | STRAIGHT TIME RATES | | |
|---|---|---|---|
| | CURRENT RATE | EFFECTIVE 4/4/94 | EFFECTIVE 4/1/96 |
| **A** GMH <br> Janitor | 9.96 | 10.30 | 10.61 |
| **B** Utility B <br> Rewinder Helper <br> Slit/Rewind Helper <br> Shipper Helper | 10.73 | 11.09 | 11.42 |
| **C** DMH <br> Paper Mill Lift Truck Operator <br> Shipping/Receiving Lift Truck Oper. <br> Daronic Inventory/Clerk <br> Clerk/Receiver <br> Round Cell Operator | 11.56 | 11.95 | 12.31 |
| **D** Conditioning Line Helper <br> Re-Inspect Operator <br> S/R Inspector Helper <br> Quality Audit Technician <br> Impregnating Line Helper <br> Stores Attendant | 12.31 | 12.73 | 13.11 |

New hires, that is those hired on or after 4/5/90 who have never worked for the Company at the Owensboro facility on or before 4/5/90, will be paid according to the new schedule for jobs included within rate classifications A, B, C, and D as indicated above.

-54-

## EXHIBIT B
## GROUP INSURANCE

The following group insurance coverages are available to each eligible employee as of his/her date of hire. All these insurance coverages may cease or be modified in accordance with the terms of the Collective Bargaining Agreement and the Medical Insurance Summary Plan description.

Under the Consolidated Omnibus Budget Reconciliation Act (COBRA), the Company is required to continue health insurance coverage (dental and medical) to employees and their dependents under circumstances which would normally exclude those individuals from coverage. COBRA continuation rights are an alternative to any Company-provided continuation coverage. If an employee elects either the Company-provided medical continuation described in the GMP booklet referenced above, or dental continuation (if such is offered), the employee gives up both dental and medical continuation coverage under COBRA.

**Type of Coverage**

Life Insurance

**Benefits**

Effective 5/1/93 - $16,000
Effective 4/1/94 - $17,000
Effective 4/1/95 - $18,000

Non-Occupational Sickness

During the term of this agreement, the maximum Accident Insurance weekly Sickness and Accident benefit is 60% of the employee's current straight-time rate.

-55-

Payments begin on the first day of absence because of non-industrial accident and on the fourth day of absence because of sickness. Payments continue for a maximum of twenty-six (26) weeks per case.

## Contributory Medical Plan

Effective July 1, 1993, the prior medical plan will be replaced by a new Contributory Medical Plan (CMP) covering employees and their dependents for non-occupational illness and injury. The CMP will provide the same coverage as the Company medical plan in effect for W. R. Grace & Co.-Conn. salaried employees as of April 5, 1993. The CMP is described in booklets entitled "Grace Medical Plan," dated January 1, 1993, and "Grace Highlights of Changes to the Medical Plan and Life Insurance Plan for Retired Employees", which are incorporated by reference into this Agreement.

-56-

In lieu of participation in the CMP, employees will have an opportunity to participate in a federally approved Health Maintenance Organization (HMO) as made available by the Company. An employee may elect (once per year) during open enrollment period to participate in either the CMP or the HMO, provided they are eligible under the terms and conditions of said plans. However, if the cost to participate in the HMO exceeds the Company's cost to provide medical coverage under the CMP, the participating employee will be required to pay the additional cost. If the HMO premium is less than the CMP premium, a participating employee's contribution to the HMO will equal one-half of the contribution required of an employee participating in the CMP, or the difference between the HMO premium and the Company contribution to the CMP whichever is greater.

-57-

Effective July 1, 1993, employees will contribute 20% of the medical plan premium in effect. The employees will continue to contribute 20% for 12 months at the same 1993 rate.

Effective July 1, 1994, the employee contribution for the medical plan will be increased to 25% of the premium in effect for 1994 and will continue to pay at the 25% level of the 1994 rate for 12 months.

Effective July 1, 1995, the employees will contribute 30% of the medical plan premium and continue at the 1995 rate for the remainder of the contract.

The Company will provide to an employee who elects retirement between the age of sixty-two (62) and sixty-five (65) medical insurance until the employee reaches age sixty-five (65) if the employee is retired before July 1, 1993 when the new Grace Medical Plan becomes effective.

Employees between the ages of fifty-five (55) and sixty-two (62) who are retired prior to July 1, 1993 will continue to contribute to the premium at the 10% rate until age sixty-five (65) when they may participate in the Medicare Supplement at 10% of the supplement premium.

Dental

For the duration of the Agreement, for each eligible employee, the Company will provide an Insurance Dental Plan as amended 2/1/87. The benefits of this Plan are described in a booklet for distribution to employees, which is incorporated by reference into this Agreement.

EXHIBIT C

| | MTWTFSS | MTWTFSS | MTWTFSS | MTWTFSS |
|---|---|---|---|---|
| NIGHT | CCDDDDD | DDAAAAA | AABBBBB | BBCCCCC |
| DAY | AAAAABB | BBBBBCC | CCCCCDD | DDDDDAA |
| EVENING | BBCCCCC | CCCDDDD | DDDAAAA | AAABBBB |
| OFF | DDCBBAA | AADCCBB | BBADDCC | CCBAADD |

# EXHIBIT D

The following are established Maintenance Rate Classifications:

MT -Maintenance Helper-Trainee  12 Months
MG -General Maintenance  9 Months
MT -General Maintenance

This number of openings in any rate classification will be determined by the Company. When an opening in the Maintenance Helper/Trainee classification exists, the Company will post the job for bid and will consider those qualified production employees with twelve (12) months seniority on the basis of ability and aptitude. Where these two factors are relatively equal, seniority will govern the selection. All applicants who have applied for the posted job will be considered evaluated for no longer than six (6) months from the time of the job posting. All applicants who were not selected within a six (6) month time period of the initial posting must rebid on any future Maintenance openings.

The Maintenance Helper/Trainee will retain his production seniority for demotion purposes for twelve (12) months. If the Maintenance Helper/Trainee has demonstrated satisfactory qualifications and performance, he will advance to classification MG after one (1) year. A production employee will assume a Maintenance department seniority date for promotional and lay off purposes at the time he assumes the MG rate. This Maintenance department seniority date will include the period in which he was in the MT rate classification.

The Maintenance Helper/Trainee who advance to rate MG and above can exercise his production seniority only for lay off purposes.

New employees can be hired into Maintenance in the following areas: Instrument Repair, Electrical/Electronics, Machinist, Boiler Room Operations, and Lift Truck Repair, Mechanic, and Building Maintenance. The next opening for Mechanic or Building Maintenance after each new hire as a Mechanic or Building Maintenance will be posted for bid. The successful bidder will be selected per the second paragraph of this Exhibit D. New employees hired into Maintenance will start at rate classification MG.

A ten (10) cent an hour premium will be paid to Maintenance employees who are regularly assigned to Instrument Repair, Electrical/Electronic work, Machinist work, Boiler Room Operations, and Lift Truck Repair. Employees assigned to shift coverage will be compensated at the ten (10) cent per hour premium only for those hours actually devoted to the above specialties.

Maintenance overtime will be divided among employees assigned to the following groups: General Maintenance, Instrument Repair, Electrical/ Electronics, Building Maintenance, Boiler Room Operations, Machinist, and Lift Truck Repair.

Shift coverage assignments will normally be made by assigning the employees with the least Maintenance Department seniority to their normal work assignment. If

a rotating shift assignment exists and there are no volunteers, then the opening will be filled by transferring the least senior employee in that work assignment regardless of rate classification. An employee in rate classification MG or MI who wishes to change his shift assignment (days or rotating 3 shifts or 4 shifts) will submit a request in writing to the Maintenance Department. When an opening exists by a change in staffing or attrition, the vacancy will be filled by the employee with the greatest Maintenance Department seniority who has a request on file. If a rotating shift opening remains after the initial vacancy is filled, it will be filled by transferring the most senior (Maintenance Department seniority) day or rotating shift employee with a request on file or assigning the least senior (Maintenance Department seniority) day shift employee if no requests are on file. If a Maintenance Department employee has a request on file for a period of three (3) months and no openings become available due to a change in staffing or attrition, then he may displace the least senior Maintenance Department employee on that shift (days or rotating 3 shifts or 4 shifts). A Maintenance Department employee may exercise this option only once in a twelve month period. The vacancy created will be filled according to the terms of this paragraph.

A maintenance tool allowance of $25 per year per Maintenance employee will be paid.

The Company retains the right for the Stock Room Supervisor to perform all the functions necessary to maintain the Plant Maintenance Stock Room, including the Stores Attendant's

duties. The rate classification D shall be established for the Stores Attendant position (per Company published job description) which shall be filled or vacated per Paragraphs 55 and 66.

## EXHIBIT E

When an opening in the Control Laboratory Technician Classification H exists the Company will post the job for bid and will consider production employees with twelve (12) months seniority on the basis of aptitude, interviews, and job performance. In the event of identical ratings, seniority will govern the choice among candidates. The Laboratory Technician will retain his production seniority for demotion purposes for nine (9) months. If the Laboratory Technician has demonstrated satisfactory qualifications and performance, he will advance to Classification I after six (6) months. A production employee will assume a Control Laboratory seniority date for promotional and lay off purposes at the time he assumes the classification I rate. The Control Laboratory seniority date will include the period in which he was in rate classification H.

The Laboratory Technician who advances to rate classification I and above can exercise his production seniority only for lay off purposes.

Laboratory Technicians will advance from rate classification I to rate classification J after not more than twelve (12) months in rate classification I.

The Company may hire new employees as Laboratory Technician. The Company may assign them to the rate classification deemed appropriate based on their laboratory skills and background.

When an opening occurs on a job which is permanently assigned to the day shift, the Company will offer this job to Laboratory Technicians then assigned to rotating shifts in order of their Control Laboratory seniority.

Shift assignments (days or rotating) will be made on the basis of the Laboratory Department seniority, unless other circumstances are mutually agreed to by the Company and the Union.

If a rotating shift assignment exists and there are no volunteers, then the opening or openings will be filled by transferring the least senior Laboratory Technician to that shift assignment.

A Laboratory Technician who wishes to change his/her shift assignment, for example (three-shift to four-shift or four-shift to three-shift) must submit a request in writing to the Laboratory Manager. When an opening exists by a change in staffing or attrition, the vacancy will be filled by the most senior Laboratory Technician with a request on file, or by assigning the least senior Laboratory Technician if there are no requests on file.

If a Laboratory Technician has a request on file for a period of three (3) months and no openings become available due to a

change in staffing or attrition, then that employee may displace the least senior Laboratory Technician on the shift requested provided the employee with the request on file has greater seniority. A Laboratory Technician may exercise this option only one time in a twelve month period.

## EXHIBIT F

It is the policy of Grace Specialty Chemicals Co. to promote a work environment and a work force which is free of illegal drugs and other mind-altering substances. The unlawful sale, manufacture, distribution, dispensation, possession or use of such substances on company property, or while conducting company business off company property is absolutely prohibited. Because of the severe threat to health, safety and security, all employees are required to report to work free from the effects of these substances and in the appropriate mental and physical condition.

The objectives of this policy are: to insure a safe, healthy work environment for our employees; to provide high quality products and services for our customers; and to protect company property and assets. It is not the company's intention to require random drug testing.

1. Testing Procedures
Tests for alcohol abuse will be done by blood sample. The sample for a blood test will be obtained and analyzed by qualified medical personnel employed by the Owensboro

Daviess County Hospital. If in a given situation the testing of an employee is not feasible due to the severity of the employee's belligerence or unconsciousness, the company may deal with the employee in question without resort to testing, in accordance with its normal performance standards, with consideration to be given within the next 48 hours for rehabilitation.

Tests for drug use will involve the analysis of a urine sample by Compuchem Laboratories, according to its procedures. The drug specimen will be collected by the Minor-EnergiCenter or the Owensboro Daviess County Hospital. Two concurrent samples will be provided, both samples will be sealed in the employee's presence with a tape which both the employee and the clinic's representative will sign, and transmitted to Compuchem in accordance with its chain of custody procedures. One sample will be subjected to an EMIT test, and any positive test result will be confirmed by use of gas chromatography/mass spectroscopy using the same sample in accordance with Compuchem standards and analytical procedures. All positive samples will be retained and stored frozen (at - 10 degrees C) for a minimum of one year or longer upon request.

The second sample specimen jar will not be opened or tested by Compuchem, but will instead be stored, frozen in accordance with the above procedure, except as otherwise provided below.

Test results will be reported back to the clinic and the Company Medical Director (CMD). The CMD will review the confirmed positive test results for consideration of alternative medical explanations, and will consult with the affected employee and the union president or his designee.

If the employee challenges a positive finding, he may request to have his second sample tested by a Roche Laboratories (Roche). Such request must be made at the time of consultation with the CMD. Later requests will be denied as untimely. In the event a second test is requested, Compuchem chain-of-custody procedures will be followed in forwarding the second sample to Roche. Roche must adhere to this same testing procedures as Compuchem described above, including the use of the same detection cut-off levels for the same drugs. Except as otherwise provided above, no positive test results shall be transmitted to management unless such procedures have been adhered to.

At the time the sample is taken, the employee will have the opportunity to indicate what, if any medication (either prescription or over the counter) he/she has taken during the past 30 days. Such information will be transmitted in strict confidence to the laboratory, and as necessary, to the Company Medical Director, and to no others. No tests shall be conducted to determine anything other than the presence of alcohol or controlled substances which may impair an employee's ability to perform his/her job, and no information shall be disclosed by the laboratory other than the presence and quantity of alcohol or controlled substances.

II. **Circumstances Under which Employees may be Tested**

1. Drug or alcohol testing of employees may be required when there is reasonable suspicion of drug use and job performance problems have occurred. Evidence suggesting possible drug use includes but is not limited to:

   a. Abnormally deviant behavior or performance.

   b. Activities carried out with obvious disregard for the health or safety of others.

   c. Possession of drug paraphernalia.

2. Reasonable suspicion must be confirmed by a member of management and reviewed with the department head, the Union President or his designee and the Personnel Department before a drug screening is conducted. If the employee demonstrates that he/she is on a prescription drug and his/her condition corresponds with the side effects of such medication, there will be no drug testing required.

3. Where there is reasonable suspicion, the supervisor will encourage the employee to seek assistance in the Employee Assistance Program (EAP).

4. Periodic drug screening may be conducted for employees involved in specifically agreed upon critical jobs affecting safety. Such testing will not be performed on a random basis.

Affected employees will receive at least seven (7) days advance notice. If the parties are unable to agree upon which jobs should be subject to periodic testing, the matter shall be referred to final and binding arbitration conducted by a mediator under the auspices of the Division of Employment Standards and Mediation, Labor Cabinet of the Commonwealth of Kentucky.

5. An employee refusing a periodic or reasonable suspicion drug screen may be disciplined subject to the following. Prior to discipline, an employee may request a meeting with the department head, another member of management, the Union President or his designee, and the Personnel Department to state the basis for his/her refusal to submit to testing.

6. If an employee tests positive, following the procedures set forth in Part I of this policy, the employee will not be disciplined unless:

   a. the results have been reviewed by the Company Medical Director,

   b. the employee refuses treatment by a qualified rehabilitation program; or

   c. the employee has previously tested positive and participated in a mandatory rehabilitation program as required by this section of the policy. (II6). This section does not apply to employees who without being tested, voluntarily participate in an alcohol or drug treatment program.

Any employee participating in a drug or alcohol rehabilitation program may be suspended with sickness and accident benefits during the period of rehabilitation.

7. The unlawful sale, manufacture, distribution, dispensation, possession or use of illegal drugs or other mind-altering substances on company property, or while conducting company business off company property is absolutely prohibited. Except as otherwise provided above, violations will subject the employee to immediate discipline up to and including discharge.

III. Record Keeping

All test results are confidential and will be maintained by the Company Medical Director. The release of this information is restricted to company personnel who have a substantial business need to know, but if such information is released, the employee will be immediately notified in writing of the release of the information, to whom the results are being released and for what purpose.

IV. Rehabilitation and Training

A. Employee Assistance Plan (EAP)

1. The company recognizes drug and alcohol abuse as a major health problem and a hazard to safety, security and performance. Employees needing help in dealing with such problems are encouraged to use our Employee Assistance Plan (EAP) on their own initiative, and to seek counseling and referral

for rehabilitation. The EAP is free or all employees and their dependents. All counseling is absolutely confidential.

2. Supervisors, managers and/or the Personnel Department shall refer suspect employees to EAP.

3. Conscientious efforts to seek help from the EAP through referral or self-referral will not jeopardize an employee's current job or future opportunities, and will not be recorded in his or her personnel file. Participation in EAP, however, will not prevent normal discipline from occurring for violations of plant rules relating to other than drug or alcohol abuse.

B. Company Group Medical Plan or Health Maintenance Organization (HMO)

Other than an EAP, the cost of rehabilitation is the employee's responsibility. The company group medical plan, Health Maintenance Organization or other insurance plan in which the employee is enrolled shall provide a benefit which covers all or a portion of the expense (provided we maintain our current insurance coverage).

V. Education and Awareness

Training of Supervisors, Managers & Others

Training will be provided to supervisors and managers to assist them in identifying the symptoms of drug abuse that may lead to or be causing a performance problem.

Training will also be provided to management and Union officers and stewards in making referrals to the EAP for troubled employees.

VI. Definitions

A. Company Property

Company Property includes plants, offices, facilities, vehicles, automobiles, parking lots owned or leased by the company. It also includes customers' and suppliers' facilities and any site at which company business is transacted, whether on or away from company-owned or leased property.

B. Qualified Rehabilitation Program

A qualified rehabilitation program is one which has been authorized by a physician or the EAP.

C. Items and Substances Covered

1. All illegal drugs and controlled substances under the Federal Controlled Substance Act of 1970.

2. Drug Paraphernalia.

3. Mind-altering substances that impair performance.

4. Prescription drugs may be permitted provided:

a. these drugs are prescribed by a physician for the person in possession of them and are used as prescribed;

b. these drugs are kept in their originally marked container; or the employee can validate his/her prescription.

-72-

c. the side effects of these drugs do not pose a threat to safety or significantly alter performance.

5. "Over-the-counter" medications may be permitted provided:

a. they are used as directed for the purpose for which they are intended;

b. these drugs are kept in their original marked container; and

c. the side effects of these drugs do not pose a threat to safety or significantly alter performance.

VII. Conflict with Legal Obligations

Nothing in this policy shall be construed as obviating responsibility for compliance with Federal, State and local laws with respect to fair employment practices, and the implementation of this policy shall be accomplished in accordance with such laws.

Effective Date of Policy: July 1, 1990

-73-

CALENDAR FOR 1996

CONFIDENTIAL

## SUBSTITUTION AGREEMENT
### (Battery Separators)

Polypore Group, Inc., to be renamed at the closing Daramic, Inc. ("Daramic") intends to acquire substantially all of the United States assets of the Battery Separators business of W.R. Grace & Co. - Conn. ("Grace") on the date of the closing of the sale of that business (the "Sale Date"). Daramic is aware that the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers and its Local 726 (the "Union") represent the bargaining unit employees ("Bargaining Unit Employees") of Grace's Battery Separators business at the Owensboro, Kentucky Plant (the "Owensboro Plant"), as specified in the Collective Bargaining Agreement between Grace and the Union effective April 6, 1993 ("the CBA") and now in effect.

In order to facilitate the sale of the Battery Separators business and avoid undue interruption of the business of the Owensboro Plant and to promote better understanding regarding the effects of the sale, the undersigned parties understand and agree that the following requirements will be applicable to the sale and transfer of ownership of the Battery Separators business.

1.     Daramic shall recognize the Union as the exclusive bargaining representative of those Bargaining Unit Employees at the Owensboro Plant who become employees of Daramic on the Sale Date.

2.     Grace shall remain the sponsor of the Retirement Plan of W.R. Grace & Co. - Conn., Chemical Group, referred to in Paragraph 101 of the CBA (the "Grace Plan"). The Grace Plan will retain all of its assets and liabilities and will remain liable for the payment of

benefits accrued thereunder with respect to all service up to the Sale Date.  Grace shall remain the sponsor of the welfare plans (including, but not limited to, plans providing life, disability, accident and health benefits) maintained by Grace that cover Bargaining Unit Employees before the Sale Date.  Those welfare plans shall continue to be liable for benefits for covered expenses incurred up to the Sale Date.  Bargaining Unit Employees shall be regarded as terminated from the employment of Grace as of the Sale Date for purposes of the Grace Plan and welfare plans maintained by Grace (except as provided in paragraph 3(c) below).  Neither Daramic nor any of its plans shall have any liability for employee benefit plans or the benefits thereunder retained by Grace as specified above.

3.    It is agreed that on the Sale Date, Daramic will (i) be substituted for Grace for all purposes under the CBA and (ii) succeed to all terms of the CBA except as follows:

a.    A defined benefit pension plan established as of the Sale Date by Daramic shall cover Bargaining Unit Employees who become employees of Daramic as of the Sale Date ("Daramic's Plan").  Daramic's Plan shall credit covered Bargaining Unit Employees for purposes of eligibility to commence participation in and vesting under Daramic's Plan, with all years of service that are credited under the Grace Plan.  Daramic's Plan shall also provide credit for such years of service prior to the Sale Date for purposes of benefit accruals in excess of any amounts accrued under the Grace Plan, eligibility to receive early retirement or other subsidized benefits, and eligibility to receive a disability pension under Daramic's Plan.

b.    Except as provided in paragraph (c) below, for purposes of all other employee benefit programs of Daramic and for purposes of determining seniority and recall rights, Bargaining Unit Employees who become employees of Daramic as of the Sale Date will be credited by Daramic with all service with Grace prior to the Sale Date that was credited by Grace for such purposes.

c.    Daramic shall establish as of the Sale Date one or more insurance programs to provide the welfare benefits and insurance coverages described in Exhibit B of the CBA which will cover all eligible Bargaining Unit Employees (and their eligible dependents) who become employees of Daramic as of the Sale Date; provided, however, as of the Sale Date, with respect to each Bargaining Unit Employee (and each covered dependent of a Bargaining Unit employee) who is ineligible for life and/or medical benefits coverage under Daramic's insurance programs by reason of a pre-existing medical condition of such employee (or dependent) (an "Uncovered Individual"), Grace will maintain each such Uncovered Individual's life and/or medical coverage, as the case may be, uninterrupted under the Grace welfare plans in the same manner as if the employee to whom the coverage relates had continued to be an employee of Grace on and after the Sale Date, and that coverage will be maintained until the Uncovered Individual commences coverage under a life and/or medical plan, as the case may be, maintained by Daramic or until the first to occur of the following:  the employee to whom the coverage relates terminates employment from Daramic (provided, however, Grace shall offer

and be liable for any federal "COBRA" continuation coverage thereafter, as applicable) or Grace terminates medical coverage for all of its active employees in the United States.

BATTERY SEPARATORS DIVISION,
W.R. GRACE & CO.-CONN.

By: _____

Its: _____

Date: _10/31/94_

DARAMIC, INC.

By: _____

Its: ___EVP + Treasurer___

Date: _11/8/94_

THE INTERNATIONAL
BROTHERHOOD OF BOILERMAKERS,
IRON SHIP BUILDERS, BLACKSMITHS,
FORGERS AND HELPERS and its
LOCAL 726

By: _John M. Clayton_

Its: _President L-726_

Date: _10-25-94_

_____  V.P.

_____

_____

_____

- 4 -

## <u>GRACE BATTERY SEPARATORS</u>

### <u>EMPLOYEE BENEFITS AGREEMENT</u>

AGREEMENT dated November [8], 1994 by and among W. R. Grace & Co. ("WRG"), its subsidiary W. R. Grace & Co.-Conn. ("Grace-Conn."), certain of its subsidiaries, Polypore, Inc. ("Acquisition Corp."), certain of its subsidiaries, and The InterTech Group, Inc.

WHEREAS, WRG, Grace-Conn., certain of its subsidiaries, ~~Battery Separators~~ Acquisition Corp. ~~and certain of its subsidiaries~~ and The InterTech Group, Inc. have entered into the Grace Battery Separators Worldwide Sale Agreement dated August 3, 1994 (the "Sale Agreement") providing for, among other things, the acquisition by Acquisition Corp. and certain of its subsidiaries of the Subject Business (as defined in the Sale Agreement);

WHEREAS, certain employees in the Subject Business who are (i) directly employed by Grace-Conn. or (ii) directly employed by Grace G.m.b.H. or (iii) directly employed by the Transferred Company or (iv) directly employed by another direct or indirect subsidiary of Grace-Conn. which is organized outside the United States, shall become employees of a subsidiary of Acquisition Corp. pursuant to the Sale Agreement;

WHEREAS, the parties hereto wish to set forth their agreement as to certain matters regarding the treatment of, and the employee benefits provided to, those employees; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the parties agree as follows:

2.    Provisions Applicable to U.S. Continued Employees

    2.1    Defined Benefit Pension Plans.

        (a)    (i)    As of the Closing, the U.S. Continued Employees who participated in the Retirement Plan of W. R. Grace & Co.-Conn. Chemical Group (Owensboro Plant) (the "Hourly Grace Pension Plan") shall cease to actively participate in that plan.

           (ii)    Effective as of the day of Closing, each U.S. Continued Employee who participated in the Hourly Grace Pension Plan as of the Closing shall be covered by a defined benefit pension plan maintained by the Buyer Group (the "Buyer's Hourly Pension Plan"); provided, however, that the member of the Buyer Group that sponsors the Buyer's Hourly Pension Plan shall be entitled to amend, terminate or otherwise modify the Buyer's Hourly Pension Plan to the extent permitted by applicable law and any applicable collective bargaining or similar agreement with a labor union or similar organization.

           (iii)    Each U.S. Continued Employee covered by the Buyer's Hourly Pension Plan shall be given full credit for service with the Grace Group prior to the day of Closing (to the extent that such service is recognized under the Hourly Grace Pension Plan) solely for purposes of eligibility to commence participation and vesting, but not for purposes of determining benefits or for purposes of eligibility to receive early, disability or other subsidized retirement benefits under the Buyer's Hourly Pension Plan covering the U.S. Continued Employee.

        (b)    As of the Closing, the U.S. Continued Employees who participated in the W. R. Grace & Co. Retirement Plan for Salaried Employees (the "Salaried Grace Pension Plan") shall cease to actively participate in that plan.

        (c)    The Hourly Grace Pension Plan and the Salaried Grace Pension Plan are collectively referred to herein as the "Grace Pension Plans".

(d)    Selling Companies and Buying Companies acknowledge that there shall be no transfer of assets or liabilities from either Grace Pension Plan to any benefit plan of the Buyer Group, and the Buyer Group and its benefit plans shall have no right, title or interest in or to the assets of the Grace Pension Plans.

*Full vesting of closing k's of closing →*

(e)    Grace-Conn. shall cause the Administrative Committee and/or sponsor of the Grace Pension Plans to take any and all necessary action to cause the accrued benefits of all U.S. Continued Employees who are participants in the Grace Pension Plans to become fully vested and nonforfeitable as of the Closing. Each Grace Pension Plan shall thereafter be liable for payment of such accrued benefits in accordance with the terms of the applicable plan and applicable law.

2.2    401(k) Plan.

(a)    As of the Closing: (i) the U.S. Continued Employees who participated in the W. R. Grace & Co. Salaried Employees Savings and Investment Plan (the "Grace Savings Plan") shall cease to actively participate in the Grace Savings Plan and (ii) those U.S. Continued Employees shall be eligible to commence participation in a defined contribution plan maintained by Buyer that is described in Exhibit B with the title of "Retirement Savings Plan (401k)" (the "Buyer's 401(k) Plan").  The Buyer's 401(k) Plan is intended to be qualified under sections 401(a) and 401(k) of the Internal Revenue Code (the "Code").

(b)    Each U.S. Continued Employee shall be given full credit for service with the Grace Group (to the extent such service is recognized under the Grace Savings Plan) solely for purposes of eligibility to commence participation and vesting under the Buyer's 401(k) Plan.

2.3    Long Term Disability Income Plan.

(a)    As of the Closing: (i) the U.S. Continued Employees who participated in the W. R. Grace & Co. Long Term Disability Income Plan (the "Grace LTD

- 4 -

Plan") shall cease to actively participate in the Grace LTD Plan and (ii) those U.S.
Continued Employees who participated in the Grace.LTD Plan shall be eligible to com-
mence participation in a long term disability plan maintained by the Buyer that is de-
scribed in.Exhibit B under the title of "Long Term Disability" ("Buyer's LTD Plan").

(b)    If Buyer's LTD Plan is funded in whole or in part by employee
contributions, that plan shall require (for a period of not less than 12 months) employ-
ee contributions at a rate comparable to the rate in effect under the Grace LTD Plan
on the day before the Closing.  The Buyer's LTD Plan shall recognize all periods of a
U.S. Continued Employee's employment with the Grace Group that are taken into ac-
count under the Grace LTD Plan solely for purposes of eligibility to commence partici-
pation.

(c)    The Grace LTD Plan shall not be liable for payments of disability
benefits with respect to U.S. Continued Employees, except as provided in this para-
graph, and subject to Section 2.12.  The Grace LTD Plan shall be liable for the pay-
ment of long term disability benefits to those eligible employees of the Subject Busi-
ness whose total disability (as defined in the Grace LTD Plan) commenced prior to the
day of Closing (regardless of whether such disability had actually been determined by
the day of Closing to constitute total disability), including (i) all such employees who
participated in the Grace LTD Plan and who are in receipt of, or eligible to receive,
such benefits thereunder as of the Closing, (ii) all such employees who participated in
the Grace LTD Plan whose total disability commenced prior to the day of Closing and
who remain totally disabled for the length of the "qualifying disability period" (as such
term is defined in the Grace LTD Plan) and (iii) all such employees who, as of the
Closing, were absent from active employment by reason of illness or injury but who,
as of the Closing were reasonably and mutually expected by the Grace Group and the
Buyer Group to be able to perform all of the duties of his or her respective position
within six months after the day of Closing but who the Grace Group and Buyer Group

subsequently mutually agree are not so able to return to active employment with the Buyer Group within six months after the day of Closing.

(d)     The Buyer's LTD Plan shall provide for the payment of benefits on account of long term disabilities of U.S. Continued Employees, who participate in that Plan, which commence on or after the day of Closing, subject to Section 2.12.

2.4     Other Grace U.S. Welfare Benefit Plans.

(a)     Subject to Section 2.12, as of the Closing: (i) the U.S. Continued Employees and their dependents who participated in the W. R. Grace & Co. Group Life, AD&D, Medical, Dental and Disability Plan, the W. R. Grace & Co. Business Travel Accident Insurance Plan, and Felonious Assault Insurance Plan, the W. R. Grace & Co. Voluntary Group Accident Insurance Plan and/or any other "employee welfare benefit plan" (as defined by section 3(1) of the Employee Retirement Income Security Act of 1974 ("ERISA")) that is maintained by any member of the Grace Group (collectively the "Grace Welfare Plans") shall cease to actively participate in those Plans except as provided in Sections 2.4(b) and 2.5, and (ii) such eligible U.S. Continued Employees and dependents shall commence participation in group life, accidental death and dismemberment, medical, dental and short-term disability plans maintained by the Buyer that are described in Exhibit B under the title of "Welfare Benefits" (the "Buyer's Welfare Plans").

(b)     The Grace Welfare Plans shall not be liable for payments of benefits with respect to U.S. Continued Employees, except as otherwise provided by this Section 2.4(b) and by Sections 2.4 (e), 2.5 and 2.12. The Grace Welfare Plans shall be liable for the payment of benefits to eligible U.S. Continued Employees and their eligible dependents for claims related to (i) medical services performed, supplies furnished or deaths occurring prior to the day of Closing, and (ii) medical services and supplies furnished for hospitalizations as of the Closing (whether or not such services or supplies are furnished continuously and uninterrupted after the Closing); regardless

- 6 -

of whether any such claim had actually then been filed by the day of Closing, in accordance with the terms of the applicable Grace Welfare Plan.

(c) (i) The provisions of the Buyer's Welfare Plans which provide medical, health and dental care benefits to U.S. Continued Employees (the "Buyer's Medical Plans") shall provide that any expenses incurred during the calendar year of the Closing shall be taken into account for purposes of satisfying the applicable deductible, coinsurance and maximum out-of-pocket provisions of the Buyer's Medical Plans for such calendar year.

(ii) For a period of not less than 12 months after the Closing, the Buyer's Medical Plans shall require employee contributions at a rate that does not exceed the rate in effect for medical, dental and health care under the Grace Welfare Plans as of January 1, 1995 (provided that the rate of required employee contributions under Buyer's Medical Plans may be increased to match any increase in such required contributions under the Grace Welfare Plans providing medical, dental and health care; such increases, if any, under Buyer's Medical Plans shall not be effective before the date that the comparable increases are effective under the Grace Welfare Plans).

(iii) Except as otherwise provided in this Section 2.4 and subject to Section 2.12, for a period of not less than 12 months after the Closing, the benefit and employee cost provisions of each other coverage provided under the Buyer's Welfare Plans shall be comparable to those of the corresponding coverage under the Grace Welfare Plans (taking into account any increases in employee costs under the Grace Welfare Plans, including increases in deductible, coinsurance and maximum out-of-pocket expenses, that take effect during such 12-month period).

(d) Buyer shall, effective as of the day of Closing, offer each U.S. Continued Employee an option to elect to continue medical, health and dental care coverage under the health maintenance organization (a "HMO") option available to the

U.S. Continued Employee the day before the Closing occurs, if any; provided that the HMO permits Buyer to offer such coverage. The employee cost provisions of Section 2.4(c)(ii) shall not apply to such coverage.

(e)    (i)    Subject to Section 2.12, the Buyer's Welfare Plans shall be liable for the payment of benefits to eligible U.S. Continued Employees and their eligible dependents for claims related to medical services and treatments rendered or provided on or after the day of Closing, supplies furnished on or after the day of Closing or deaths occurring on or after the day of Closing, notwithstanding the fact that any such claim may be related to another claim which was paid or is eligible for payment under the terms of any Grace Welfare Plan in accordance with Section 2.4(b)(i) above.

(ii)    The Grace Welfare Plans shall be liable for the payment of benefits for all claims covered by the Grace Welfare Plans to or with respect to (x) eligible employees and former employees of Grace-Conn. and their eligible dependents (including Excluded Employees and their eligible dependents) who do not become employees of the Buyer Group and (y) eligible Inactive Employees and their eligible dependents during the period any such employee remains inactive and is not employed by the Buyer Group; provided that coverage under the Grace Welfare Plans with respect to the individuals specified in this clause (ii) shall be the coverage provided under terms of the Plan and/or policy of Grace-Conn. applicable to other inactive employees; and this clause shall not create additional or new coverage provisions under those Plan.

(f)    Notwithstanding anything in this Section 2.4 to the contrary, nothing in the Sale Agreement or this Employee Benefits Agreement obligates Buyer, any member of the Buyer Group or Buyer's Medical Plans to provide any post-employment benefits coverage to any U.S. Continued Employee or any future former employee or future retiree of the Buyer Group (other than continuation coverage required by Code section 4980B or any other applicable law).

- 8 -

2.5 · Retiree Medical and Life Insurance Coverage.

(a)     With respect to any and all former employees of the Subject Business who are retired from employment with the Subject Business as of the Closing and are then entitled to post-retirement medical expense and life insurance coverage by any Grace Group welfare benefit or other employee benefit plan maintained for retirees of WRG, Grace-Conn. or any other member of the Grace Group organized in the United States, the Grace Group shall continue to provide such coverage for such retired employees and their eligible dependents on and after the day of Closing, and shall continue to charge each such retired employee and eligible dependent the applicable premium, as determined by Grace-Conn.   In addition, the Grace Group shall extend post-retirement medical expense and life insurance coverage to each U.S. Continued Employee (including his or her eligible dependents) beginning as of the date that he or she elects such coverage (which could, in accordance with the employee's election, be the day of Closing or a date thereafter as selected by such employee); but only if the U.S. Continued Employee would otherwise be eligible to elect post-retirement medical expense and life insurance coverage by the Grace Group if he or she were to retire on the day of Closing and he or she pays the applicable premium for such coverage, as determined by Grace-Conn. in accordance with the terms of the applicable plan or plans of the Grace Group.

(b)     Buyer agrees that post-retirement medical expense coverage provided by the Grace Group shall be the secondary payor of medical claims of each U.S. Continued Employee in relation to the Buyer's Medical Plans during the period that the U.S. Continued Employee is employed by the Buyer (with respect to U.S. Continued Employees covered under the Buyer's and the Grace Group's plans).

(c)     The Grace Group expressly reserves the right to amend, alter, modify or terminate the terms of such post-retirement medical expense and life insurance coverage at any time and to reasonably interpret the provisions of that coverage, with respect to U.S. Continued Employees and all of its other former employees.   It is

- 9 -

understood and agreed by the parties hereto that the Grace Group shall not be responsible or otherwise liable for the provision of post-retirement medical expense and life insurance coverage to any U.S. Continued Employees other than as described in Section 2.5(a).

### 2.6    No Assumption Of Grace Group U.S. Employee Benefit Plans.

The parties agree that the Buyer Group does not and shall not assume the sponsorship of, or (subject to Section 2.12) the responsibility for contributions to or any liability in connection with, any employee benefit plan (as defined by section 3(3) of ERISA) directly maintained by WRG, Grace-Conn. or any other member of the Grace Group organized in the United States for U.S. employees, former employees, retirees or their beneficiaries. In addition, with respect to U.S. Continued Employees, the parties agree that Grace-Conn. shall offer and be liable for any continuation health coverage (including any penalties, excise taxes or interest resulting from the failure to provide continuation coverage) required by section 4980B of the Code due to qualifying events which occur before the Closing (or multiple qualifying events where the initial qualifying event occurs before the Closing).

### 2.7    Grace Executive Benefit Plans.

As of the Closing, any and all U.S. Continued Employees who participated in the W. R. Grace & Co. Executive Salary Protection Plan, the W. R. Grace & Co. Supplemental Executive Retirement Plan and/or any other benefit plan maintained by WRG, Grace-Conn. or any other member of the Grace Group organized in the United States exclusively or principally for executive personnel (collectively the "Grace Executive Benefit Plans") shall cease to participate in the Grace Executive Benefit Plans. The Grace Group shall be liable for the payment of any benefits that may be payable under the terms of any Grace Executive Benefit Plan to U.S. Continued Employees. Buyer shall be under no obligation to establish successor plans to replace the benefits provided under any Grace Executive Benefit Plan.

- 10 -

2.8   Grace Group Deferred Compensation Program.

The Grace Group shall remain liable after the Closing for the payment to any U.S. Continued Employee of any compensation which was deferred prior to the Closing and which was not paid on or before the Closing at the election of such employee pursuant to any deferred compensation agreements between any member of the Grace Group and the U.S. Continued Employee, in accordance with such agreements.

2.9   Vacation.

(a)   With respect to U.S. Continued Employees, Buyer shall continue to apply the vacation and leave of absence policies of the Subject Business that are in effect the day before the Closing for at least the remainder of the calendar year in which the Closing occurs; so that each U.S. Continued Employee shall be entitled to use any vacation time or leave of absence, or receive any vacation pay, to which he or she would otherwise be entitled for that calendar year under the vacation and leave policies applicable the day before the Closing. Attached to this Agreement as a Schedule to this Section is a list of those U.S. Continued Employees with carryover vacation from 1993 which they shall be permitted to take after the Closing, if not previously taken during 1994, in addition to any vacation such employees accrue for 1994.

(b)   U.S. Continued Employees shall be given credit by Buyer for their prior service with the Grace Group under Buyer's vacation policies in effect for 1995 and thereafter (except that this Section 2.9(b) shall not apply to those U.S. Continued Employees who are Cambridge Technicians (as defined in Section 12.08(f) of the Sale Agreement)).

2.10   Severance Pay.

(a)   Effective as of the day of Closing, Buyer shall establish a severance pay plan or program for the benefit of all salaried U.S. Continued Employees who were covered by the Grace Severance Program (as hereinafter defined) the day

- 11 -

before the Closing, which plan or program shall remain in effect for a period of not less than 12 months after the Closing (the "Buyer's Severance Program") (except that the Buyer's Severance Program shall only apply to the "Cambridge Technicians" (as defined in Section 12.08(f) of the Sale Agreement) who remain employees of Buyer after the expiration of the 180-day period following the day of Closing). With respect to such salaried U.S. Continued Employees, Buyer's Severance Program shall provide for the following: (i) severance payments that are equal to the payments that would be provided under the terms of the Grace Group severance pay program for salaried employees that was adopted in conjunction with the divestment of the Subject Business and that is set forth as Exhibit A (the "Grace Severance Program"), based upon an aggregation of service with the Grace Group up to the Closing and the Buyer Group on and after the Closing, (ii) payments for unused but accrued vacation as of the date of the employee's termination, (iii) outplacement services as determined by Buyer, and (iv) subject to Section 2.12, continuation of coverage under the Buyer's Medical Plans for the period that installment severance payments are made to the U.S. Continued Employee, under the same terms and conditions of Buyer's Medical Plans applicable to active employees who participate in Buyer's Medical Plans. The monthly cost that a terminated U.S. Continued Employee will incur for coverage under the Buyer's Medical Plans, during the period that the U.S. Continued Employee is receiving installment severance payments, shall not exceed the cost of coverage under Buyer's Medical Plans which is applicable to active employees who participate in such Plans. The Buyer's Severance Program shall provide that severance payments shall be made only in installments and eligible U.S. Continued Employees shall not be permitted to elect lump sum severance payments under the Buyer's Severance Program. In addition, notwithstanding anything in this Section 2.10 or the Sale Agreement to the contrary, severance payments under the Buyer's Severance Program to an eligible U.S. Continued Employee shall cease as of the earlier of the last day of such eligible U.S. Continued Employee's designated severance period in accordance with the terms of the Buyer's Severance Program or the date as of which such U.S. Continued Em-

ployee is employed by another employer (including self-employment as a sole proprietor, partner or otherwise).

The preceding provisions of this Section 2.10(a) shall apply only to each salaried U.S. Continued Employee: (i) who is terminated by Buyer within 12 months after the Closing other than for cause (as determined by the Buyer in its sole discretion in accordance with Buyer's Severance Program), (ii) who voluntarily terminates employment with Buyer in order to avoid a relocation of principal residence or as a result of an unreasonable change in job duties or a decrease in compensation or a change in work location which results in an unreasonable commuting distance from the employee's existing residence (except in connection with any existing relocation plans of the Grace Group), or (iii) who on the day of Closing is absent from work on account of disability or leave of absence (whether or not he or she is receiving workers' compensation payments), who recovers from such disability (if any), is able to perform all of the duties of his or her position and requests reinstatement to active employment status within the 6 month period beginning on the day of Closing but is denied reinstatement by Buyer (provided, however, that an employee who is absent on the day of Closing by reason of a leave covered by the Family and Medical Leave Act of 1993 or other leave of absence that expires within the 6-month period after Closing, who does not request to return to active employment upon the expiration of such leave shall not be entitled to reinstatement or severance benefits).

(b)      After the above-mentioned 12-month period, Buyer may, in its sole discretion, terminate or revise the severance pay policy for U.S. Continued Employees. U.S. Continued Employees shall receive credit for prior service with the Grace Group for purposes of any revised policy.

2.11   Buyer Group Plans

Any employee benefit plan coverages assumed or provided by Buyer to, or with respect to, the U.S. Continued Employees (including, but not limited to, those

- 13 -

employees who are covered by the collective bargaining agreement applicable at the Subject Business's plant in Owensboro, Kentucky) shall be through plans, programs and/or policies established and maintained by Buyer; and no plan, program or policy maintained by the Grace Group shall provide any such coverages assumed or provided by Buyer after the Closing, subject to Section 2.12.

2.12    U.S. Continued Employees With Pre-Existing Conditions
Notwithstanding any other provision of this Agreement or the Sale Agreement:

(a)     Each U.S. Continued Employee or eligible spouse or dependent who is diagnosed prior to day of Closing or receiving a course of medical treatment established and/or commenced prior to the day of Closing, that continues uninterrupted on and after that date, with respect to cancer or Major Organ Dysfunction (as defined herein), shall

(i)     continue to be covered under the medical and dental insurance provisions of the Grace Welfare Plans, as if such U.S. Continued Employee (or, in the case of such a spouse or dependent, as if the Employee through whom coverage under those Plans is provided) had continued to be an employee of Grace-Conn. on and after the day of Closing, except that medical and dental coverage under the Grace Welfare Plans shall cease as of the date of a Termination Event (as defined herein) or, if earlier, the date that such U.S. Continued Employee (or spouse or dependent) satisfies all requirements of the Buyer's medical stop-loss insurance company for coverage under the medical stop-loss insurance policy that provides coverage for Buyer's Medical Plans;

(ii)     continue to be covered under group term life insurance provisions of the Grace Welfare Plans for an amount of death benefit that is effective with respect such U.S. Continued Employee (or spouse or dependent) the day before the day of Closing, except that such coverage under the Grace Welfare Plans shall cease

- 14 -

as of the date of a Termination Event or, if earlier, the date that such U.S. Continued Employee (or spouse or dependent) satisfies all the requirements of the Buyer's group term life insurance company for group term life insurance under the group term policy funding Buyer's employee life insurance plan; and

(iii) commence, as of the day of Closing, to participate in the Buyer's LTD Plan, provided that this clause (iii) shall only apply to U.S. Continued Employees who are covered by the Grace LTD Plan the day before Closing.

(b) Each U.S. Continued Employee or eligible spouse or dependent who is receiving a course of treatment established and/or commenced prior to the date of Closing, that continues uninterrupted on and after that date, with respect to a medical condition (other than cancer and/or Major Organ Dysfunction) that both (1) required hospitalization within 6 months prior to Closing and (2) is regarded by Buyer's medical stop-loss insurance company as a "pre-existing condition" that precludes immediate coverage under the medical stop-loss insurance policy that provides coverage for Buyer's Medical Plan, shall

(i) continue to be covered under the medical and dental insurance provisions of the Grace Welfare Plans, as if such U.S. Continued Employee (or, in the case of such a spouse or dependent, as if the Employee through whom coverage is provided) had continued to be an employee of Grace-Conn. on and after the day of Closing, except that medical and dental coverage shall cease as of the date of a Termination Event or, if earlier, the date that such U.S. Continued Employee is released by his or her treating physician to return to work full-time without major restrictions or (in the case of such a spouse or dependent) to resume all active life functions normally;

(ii) continue to be covered under group term life insurance provisions of the Grace Welfare Plans for an amount of death benefit that is effective with re-

- 15 -

spect such U.S. Continued Employee (or spouse or dependent) the day before the date of Closing, except that such coverage under the Grace Welfare Plans shall cease as of the date of a Termination Event or, if earlier, the date that such U.S. Continued Employee (or spouse or dependent) satisfies all the requirements of the Buyer's group term life insurance company for group term life insurance under the group term policy funding Buyer's employee life insurance plan; and

(iii)    commence, as of the day of Closing, to participate in the Buyer's LTD Plan, provided that this clause (iii) shall only apply to U.S. Continued Employees who are covered by the Grace LTD Plan the day before Closing.

(c)    Buyer shall notify the Vice President of Human Resources of WRG (at One Town Center Road, Boca Raton, Florida 33486; phone (407) 362-2221; fax (407) 362-2246) as soon as practicable after any U.S. Continued Employee (or spouse or dependent) who is referred to in sub-sections (a) or (b) above, ceases to be entitled to coverage under the Grace Welfare Plans in accordance with this Section 2.12.   If Buyer fails to provide such notification, Buyer shall reimburse Grace-Conn. for the cost incurred by Grace-Conn. to provide coverage under the Grace Welfare Plans for services rendered, supplies furnished and deaths occurring after the date the U.S. Continued Employee (or spouse or dependent) ceased to be entitled to such coverage.

(d)    Buyer shall pay to Grace-Conn. an amount equal to the actual cost to Grace-Conn. of the medical claims paid by the Grace Welfare Plans pursuant to this Section 2.12, during the following years, in accordance with the following table:

| Year | Percentage Of Grace-Conn. Cost Buyer Shall Pay To Grace-Conn. |
|------|---------------------------------------------------------------|
| 1995 and prior years | 0% |
| 1996 | 20% |
| 1997 | 40% |
| 1998 | 60% |
| 1999 | 80% |
| 2000 and thereafter | 100% |

(e)    Buyer shall not pay to Grace-Conn. any amount attributable to life insurance death benefits paid by the Grace Welfare Plans pursuant to this Section 2.12, subject to sub-section (c) of this Section 2.12.

(f)    Grace-Conn. shall pay to Buyer an amount equal to the actual cost to Buyer of disability benefits paid under the Buyer's LTD Plan pursuant to this Section 2.12, during the following years, in accordance with the following table:

| Year | Percentage Of Buyer Cost Grace-Conn. Shall Pay To Buyer |
|------|---------------------------------------------------------|
| 1995 and prior years | 100% |
| 1996 | 80% |
| 1997 | 60% |
| 1998 | 40% |
| 1999 | 20% |
| 2000 and thereafter | 0% |

(g)    After the Closing, Grace-Conn. or Buyer (as the case may be) shall periodically provide the other party with a written demand to make the payments required by this Section 2.12. The written demand shall specify the time period covered by the demand, each employee (or spouse or dependent) to whom the demand relates, the

- 17 -

amount of the demand attributable to the employee, a description of the nature of the underlying costs and expenses and the total amount to be reimbursed pursuant to the demand. Buyer or Grace-Conn. (as the case may be) shall provide the other party with all information and documentation reasonably requested in order to verify the amount to be reimbursed under this Section 2.12.

(h)     Grace-Conn. and Buyer (as the case may be) shall be provided by the other party with any information or documentation requested by Grace-Conn. or Buyer that is reasonably necessary to determine a U.S. Continued Employee's (or spouse's or dependent's) eligibility to receive benefits provided by Grace-Conn. or Buyer, or regarding benefits for which either party is responsible for reimbursing the other party, pursuant to this Section 2.12.

(i)     Notwithstanding any other provision of this Agreement or the Sale Agreement to the contrary, any amendments to the coverages under the Grace Welfare Plans (not including the termination of coverage under those plans) shall apply to all U.S. Continued Employees (and spouses and dependents) entitled to coverage under the Grace Welfare Plans pursuant to this Section 2.12 in the same manner as to Grace-Conn. employees located in Cambridge and Lexington.

(j)     For purposes of this section:

"Major Organ Dysfunction" means an imminently life threatening or serious condition disrupting the normal physical operation of any of the major organs of the body, including (without limitation) the heart, lungs, liver, pancreas, intestines, colon, bladder, ovaries, kidney, stomach, brain or uterus.

"Termination Event" means, with respect to an individual entitled to coverage under the Grace Welfare Plans pursuant to this Section 2.12, separation of service of the U.S. Continued Employee (through whom such coverage is provided) from Buyer

- 18 -

U.S. (including in the event of the sale of the assets of the Battery Separators busi-
ness but not the sale of the stock of the entity conducting that business) or, with re-
spect to all such individuals, the termination of employee medical plan coverage for all
U.S. employees of the Grace Group. Notwithstanding any other provision of this Sec-
tion 2.12 to the contrary, the Grace Group shall offer and be liable for any continuation
health coverage (including any penalties, excise taxes or interest resulting from the
failure to provide continuation coverage) required by section 4980B of the Code due to
qualifying events affecting individuals who are covered under the medical and dental
provisions of the Grace Welfare Plans pursuant to this Section 2.12 at the time of a
qualifying event. Buyer shall notify the Grace Group in a timely fashion of the occur-
rence of such qualifying events of which Buyer is, or reasonably should have been,
aware. Buyer shall pay Grace-Conn. an amount equal to the actual cost to Grace-
Conn. of the medical claims paid by the Grace Welfare Plans pursuant to such contin-
uation health coverage in accordance with the table specified under Section 2.12(d).

(k)     Buyer shall establish a plan or policy that covers expenses related to any
medical condition of U.S. Continued Employees (or their spouses or dependents) that
is a "pre-existing condition" which will not be covered immediately under the medical
stop-loss insurance policy providing coverage for the Buyer's Medical Plans (other
than to those U.S. Continued Employees and their spouses and dependents specified
in sub-sections (a) and (b) of this Section 2.12); provided that expenses related to
such medical condition would be covered under that insurance policy but for the
policy's "pre-existing condition" limitation. Grace-Conn. shall reimburse to Buyer an
amount equal to the medical claims actually paid by Buyer for such expenses incurred
during the 12-month period commencing on the day of Closing, but only to the extent
that such medical claims actually paid by Buyer exceed $100,000.

2.13  <u>VGA Coverage</u>     The Grace Group shall direct the insurance company
that issued the insurance policy (the "VGA Policy") that provides benefits under the W.
R. Grace & Co. Voluntary Group Accident Insurance Plan (the "VGA Plan") to issue

- 19 -

Buyer an insurance policy that, as of the day of Closing, provides coverages, benefit levels and rates of employee contributions that are identical to those coverages, benefit levels and rates of employee contributions under the VGA Policy in effect for U.S. Continued Employees who participate in the VGA Plan on the day before the day of Closing; provided that the Buyer, in a timely manner, takes all actions required by the insurance company in order to issue such policy to the Buyer.

3.  **Provisions Applicable To French Employees.**

     3.1  Buyer acknowledges that the conveyance of capital stock of the Transferred Company to Buyer France shall not affect the continuation of the benefits provided to French Employees by the Transferred Company pursuant to employee benefit plans, programs or policies maintained, or contracts entered into, by the Transferred Company.

     3.2  Subject to the provisions of Article 12 of the Sale Agreement, the Buyer Group shall defend, indemnify and hold Grace S.A. and all other members of the Grace Group harmless from and against any claims or liability (including, but not limited to, severance benefits, separation pay or similar entitlements under applicable law or otherwise) arising from the discharge or constructive discharge of any French Employee which occurs on or after the day of Closing.

4.  **Provisions Applicable To German Continued Employees.**

     4.1  Buyer acknowledges that, in accordance with applicable law, Grace Germany's obligations to each German Employee with respect to pensions, life insurance, medical insurance, disability insurance and all other benefits provided by plans, programs or policies maintained by Grace Germany shall be transferred to, and assumed by, Buyer U.S. effective on the day of Closing. As of the Closing, Grace Germany's liability under any such plans, programs and policies, including Grace G.m.b.H. Pension Plan, with respect to each German Employee shall be transferred to, and assumed by, Buyer U.S.

- 20 -

4.2   With respect to the German Employees, at the Closing, Buyer U.S. shall assume Grace Germany's obligations under any contract between Grace Germany and an insurance company which provides life, medical, disability or any other benefit insurance coverage to the German Employees or which provides insurance coverage for Grace Germany's liability to provide pensions to the German Employees. Prior to Closing, Grace Germany and Buyer U.S. shall contact each such insurance company and use their best efforts to arrange that the insurance company enter into a contract with Buyer U.S. which provides the same coverage with respect to the German Employees as the insurance contract between that company and Grace Germany the day before the Closing.

4.3   Grace Germany shall remain liable under each employee benefit plan, program or policy maintained by Grace Germany with respect to individuals who terminated employment with Grace Germany prior to the Closing and with respect to each employee of Grace Germany who does not become an employee of Buyer U.S. (including, but not limited to, any such employee of Grace Germany employed exclusively or primarily in the Subject Business who objects in accordance with applicable law to the transfer of his or her employment contract to Buyer U.S. as of the Closing).

4.4   The Buyer Group shall defend, indemnify and hold Grace Germany and all other members of the Grace Group harmless from and against any claims or liability (including, but not limited to, severance benefits, separation pay or similar entitlement under applicable law or otherwise) arising from the discharge or constructive discharge of any German Employee which occurs after the day of Closing.

5.   Provisions Applicable To Non-U.S. Continued Employees.

5.1   Except to the extent required by applicable law or as otherwise expressly provided in the Sale Agreement or this Agreement, as of the Closing, each Non-U.S. Continued Employee who is provided with coverage as an active employee under any pension, retirement, medical, dental, disability, severance, life insurance, accident

- 21 -

insurance or other retirement or welfare benefit plan, program or policy which is maintained by any member of the Grace Group shall cease to be provided with those coverages.

5.2    The Grace Group shall not be liable for medical, dental, disability, life insurance or accident insurance benefits with respect to Non-U.S. Continued Employees or dependents, except as provided by the next sentence or as required by applicable law.  The Grace Group shall be liable for the payment of such benefits with respect to eligible Non-U.S. Continued Employees or dependents for claims related to services performed, supplies furnished or deaths occurring prior to the day of Closing, regardless of whether any such claim had actually then been filed by the day of Closing, in accordance with the terms of the applicable plan, program or policy.

5.3    The Buyer shall be liable for medical, dental, disability, life insurance or accident insurance benefits with respect to eligible Non-U.S. Continued Employees for claims related to services performed, supplies furnished or deaths occurring on or after the day of Closing, notwithstanding the fact that any such claim may be related to another claim which was paid or is eligible for payment under the terms of any plan, program or policy maintained by the Grace Group in accordance with Section 5.2 above.

5.4    Subject to the provisions of Article 12 of the Sale Agreement, Buyer shall indemnify and hold the Grace Group harmless against any claims for severance pay and other severance or termination benefits made by any Non-U.S. Continued Employee which relate to events occurring on or after the day of Closing.

6.    Miscellaneous.

6.1    Payroll Issues.

At the request of any member of the Grace Group made any time after Closing, any member of the Buyer Group shall, in a timely manner, provide that member of the

- 22 -

Grace Group with the information in Buyer Group's possession which that member of the Grace Group reasonably deems necessary for it to complete any governmental filing (including, but not limited to, any Internal Revenue Service ("IRS") filing, including IRS W-2 Forms), with respect to each individual whose employment with the Grace Group terminated prior to or on the day of Closing.

### 6.2    Conditional Upon The Closing.

The parties' obligations under this Agreement are conditional upon the Closing, the occurrence of which is subject to various conditions set forth in the Sale Agreement.  This Agreement shall become operative if and when the Closing occurs and shall be null and void if the Closing does not occur for any reason.  Nothing contained in this Agreement shall constitute a representation or promise that any party hereto or any related person, will proceed with the Closing, or obligate any party hereto or any related person, to do so.

### 6.3    Right to Amend.

This Agreement may be amended, superseded or canceled, and any of the terms hereof may be waived only by a written instrument specifically referring to this Agreement and specifically stating that it amends, supersedes or cancels this Agreement or waives any of its terms, executed by both parties (or, in the case of a waiver, by the party waiving compliance).  The failure of any party at any time or times to require performance of any provision of this Agreement shall in no manner affect the right at a later time to enforce such provision.  No waiver by either party of any breach of any term contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of such breach, or waiver of any breach of any other term.

6.4   Other Provisions.

(a)   Nothing in this Agreement shall give any employee the right to be retained in the service of any of the parties hereto or to interfere with the parties' rights to discharge or terminate the service of any employee.

(b)   Except as otherwise expressly provided in this Agreement, no provision of this Agreement shall be interpreted or construed in a manner which would prevent the parties hereto, in their sole discretion, from discontinuing, suspending or amending any employee benefit plan, severance pay plan or any other plan or program covering employees, in accordance with applicable law and the terms of the applicable plan documents.

(c)   This Agreement shall not confer any rights to remedies upon any person other than the parties hereto and their respective successors and permitted assigns.

(d)   This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, excluding the conflict of laws provisions thereof that would otherwise require the application of the law of any other jurisdiction.

- 24 -

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

W.R. GRACE & CO.

By: _____
Title: _VP_____

W.R. GRACE & CO.-CONN.

By: _____
Title: _VP_____

GRACE ARGENTINA S.A.

By: _____
Title: _Atty in fact_____

W.R. GRACE AUSTRALIA LTD.

By: _____
Title: _Atty in fact_____

- 25 -

GRACE PRODUTOS QUIMICOS e
PLASTICOS LTDA.

By: _____

Title: _____


GRACE S.A.

By: _____

Title: _____


GRACE G.m.b.H

By: _____

Title: _____


GRACE JAPAN K.K.

By: _____

Title: _____


- 26 -

GRACE BATTERY SEPARATORS S.A.

By: _____

Title: _____


POLYPORE, INC.

By: _____

Title: _____

## EMPLOYEE BENEFITS AGREEMENT
## SCHEDULE TO SECTION 2.9

### 1993 Vacation Carryover

| Name/Location | Amount of Carryover |
| --- | --- |
| **Cambridge** | |
| James Kung | 7 days |
| **Lexington** | |
| Chris Shea | 5 days |
| **Owensboro** | |
| Randy Hanschu | 3 days |