# Exhibit C

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |

**AFFIDAVIT OF NICK BUBNOVICH IN SUPPORT OF THE MOTION
OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS
TO ENTER INTO AN EMPLOYMENT AGREEMENT WITH ITS
CURRENT CHIEF OPERATNG OFFICER UNDER WHICH HE WOULD
ASSUME THE POSITION OF CHIEF EXECUTIVE OFFICER OF THE
DEBTORS ("CEO")**

Nick Bubnovich, being duly sworn, deposes and says:

1.    I am a senior consultant in Watson Wyatt Worldwide's Human Capital ("Human Capital") consulting practice. I offer this affidavit in support of the Motion of the Debtors for an Order Authorizing the Debtors to Enter into an Employment Agreement with the current Chief Operating Officer of the Debtors under which he would become the Chief Executive Officer of the Debtors (the "CEO Agreement").

2.    I have over 25 years of experience in the field of compensation and benefits consulting, but I primarily focus on executive compensation. While I have special expertise with compensation programs for companies that have commenced Chapter 11 cases or are otherwise financially distressed, I also assist both Chapter 11 and non Chapter 11 client companies in the design and evaluation of short and long-term incentive programs, as well as employment contracts and severance contracts and programs.

3.    The salient features of the CEO Agreement proposed compensation are as follows: (i) base salary of $760,000 per annum, (ii) target annual bonus opportunity of 100% of base

salary and (iii) an annual long-term incentive target of $1,690,000 in the Debtors' 2005-2007 Long Term Incentive Program and similar amounts for subsequent LTIPs.

4.    I performed two different analyses to determine if the CEO Candidate's Total Direct Compensation ("TDC") (i.e., the sum of base salary, annual incentive opportunity, and long-term incentive opportunity) under the CEO Agreement is within the range of competitive practice.

5.    My analysis focused on the total compensation opportunity rather than any specific compensation component because the compensation mix can vary from company to company. My view, as well as that of most other compensation consultants, is that TDC (rather than each element comprising TDC) is the most appropriate measure.

6.    The first analysis compared the CEO Candidate's TDC to that of Chief Executive Officers at the Industry Peer Group companies. A list of the fourteen companies from the Industry Peer Group is set forth on Exhibit 1. The Industry Peer Group is appropriate because these companies are in the same specialty industry as Grace and in some cases, direct competitors of Grace. Performance in the specialty chemical industry is sensitive to general economic conditions and, therefore, economic factors which may affect the Industry Peer Group will also affect Grace.

7.    TDC for Chief Executive Officers at the companies in the Industry Peer Group consists of: (i) base salary, (ii) actual annual incentive, (iii) three-year average of the Black-Scholes value of stock options, (iv) the value of any long-term incentive payout, and (v) restricted stock awards valued without regard to any restriction. In this analysis, assuming the implementation of the CEO Agreement, the CEO Candidate's TDC is approximately 20% below median TDC of all Chief Executive Officers in the Industry Peer Group.

2

8.     The second analysis compared the CEO Candidate's TDC to that of Chief Executive Officers at a broad group of chemical and allied product companies, as reported in survey data (the "Survey Group") from three national compensation surveys. Two of the surveys covered companies in the chemical industry (a broader group than the specialty chemical companies comprising the Industry Peer Group), and one survey covered companies in the chemical and allied products industry. While I consider the Industry Peer Group the better benchmark, the Survey Group was used to validate and otherwise double-check the Industry Peer Group analysis.

9.     Chief Executive Officers' TDC for the companies in the Survey Group consists of: (i) base salary, (ii) target annual incentive opportunity and (iii) long-term incentive opportunity. In this analysis, assuming implementation of the CEO Agreement, the CEO Candidate's TDC is approximately 4% above the median TDC of all Chief Executive Officers in the Survey Group and approximately 33% below the 75th percentile of all Chief Executive Officers in the Survey Group.

10.    Based on my experience, as well as that, I believe, of other compensation consultants, most companies target compensation for senior executive positions in a range around the median, sometimes as high as the 75th percentile, depending upon such factors as a particular executive's tenure, experience, and performance, as well as the company's particular circumstances. The CEO Candidate's TDC, assuming implementation of the CEO Agreement, is within that range, below the median in the case of the Industry Peer Group and essentially at the median in the case of the Survey Group. Actual compensation earned, however, is dependent upon company financial performance. I note that two elements of the CEO Candidate's TDC under the CEO Agreement (annual incentive opportunity and long-term incentive opportunity) are contingent upon company performance. Thus, if the Debtors' performance is poor and does

3

not trigger the payment of the annual incentive and long-term incentive opportunities to the CEO Candidate, the CEO Candidate's TDC would be well below the median of Chief Executive Officers in both the Industry Peer Group and the Survey Group. Accordingly, I conclude that the CEO Candidate's TDC under the proposed CEO Agreement is within the range of competitive practice.

11.    The proposed CEO Agreement also provides for a special "Chapter 11 emergence bonus," which would result in the CEO Candidate receiving a total of $1,750,000, provided he continues as CEO for a period extending 18 months after Grace emerges from Chapter 11. Under certain circumstances, this amount would also be paid to the CEO Candidate if he is terminated without cause or if he elects to voluntarily terminate his employment as a result of constructive discharge.

12.    Competitive practice for special retention bonuses for CEOs, similar to the Chapter 11 emergence bonus, generally ranges in size from 100 to 200% of salary on an annualized basis. Assuming that the Debtors remain in Chapter 11 for at least another six months, which seems a conservative assumption, then the amount of the Chapter 11 emergence bonus is approximately 115% of the CEO candidate's salary on an annualized basis. Accordingly, I conclude that the CEO Candidate's Chapter 11 emergence bonus is within the range of competitive practice.

13.    Even if the Chapter 11 emergence bonus is not considered separately but instead the annualized amount is added to the TDC calculation, the CEO Candidate's revised TDC would still be less than the median TDC of the Chief Executive Officers in the Industry Peer Group. (His revised TDC would be approximately 32% greater than the median TDC of the Chief Executive Officers of the Survey Group and 18% less than the 75th percentile TDC of the Chief Executive Officer of the Survey Group.)

4

14.    The proposed CEO Agreement also provides for a severance benefit equal to 2 times an amount equal to 175% of annual base salary, which would result in a severance payment that is somewhat less than 2 times annual base salary plus annual incentive opportunity (which is 100% of annual base salary).    This severance benefit is payable if the CEO Candidate's employment is terminated without cause or if he elects to voluntarily terminate his employment as a result of constructive discharge.

15.    Competitive practice for severance benefits for CEOs range from 1 to 3 times the sum of salary and annual incentive opportunity.    Accordingly, I conclude that the CEO Candidate's severance benefits are within the range of competitive practice.

AFFIANT FURTHER SAYETH NOT

Dated this 20th day of January, 2005.

_____
Nick Bubnovich

SUBSCRIBED AND SWORN TO BEFORE ME

this 20th day of January, 2005.

_____
Notary Public
My Commission Expires:

Official Seal
Natalie K. Rozak
Notary Public State of Illinois
My Commission Expires 10/09/07

5

EXHIBIT 1

INDUSTRY PEER GROUP

Albemarle Corporation

Cabot Corporation

Dow Chemical Company

E.I. DuPont De Nemours

Eastman Chemical Company

Ecolab, Inc.

Engelhard Corporation

Great Lakes Chemical

H.B. Fuller Company

Hercules Incorporated

International Flavors & Fragrances

PPG Industries

Rohm & Haas Company

Sigma-Aldrich