Payments begin on the first day of absence because of non-industrial accident and on the fourth day of absence because of sickness. Payments continue for a maximum of twenty-six (26) weeks per case.

## Contributory Medical Plan

Effective July 1, 1993, the prior medical plan will be replaced by a new Contributory Medical Plan (CMP) covering employees and their dependents and non-occupational illness and injury. The CMP will provide the same coverage as the Company medical plan in effect for W. R. Grace & Co.-Conn. salaried employees as of April 5, 1993. The CMP is described in booklets entitled "Grace Medical Plan," dated January 1, 1993, and "Grace Highlights of Changes to the Medical Plan and Life Insurance Plan for Retired Employees," which are incorporated by reference into this Agreement.

In lieu of participation in the CMP, employees will have an opportunity to participate in a federally approved Health Maintenance Organization (HMO) as made available by the Company. An employee may elect (once per year) during open enrollment period to participate in either the CMP or the HMO, provided they are eligible under the terms and conditions of said plans. However, if the cost to participate in the HMO exceeds the Company's cost to provide medical coverage under the CMP, the participating employee will be required to pay the additional cost. If the HMO premium is less than the CMP premium, a participating employee's contribution to the HMO will equal one-half of the contribution required of an employee participating in the CMP, or the difference between the HMO premium and the Company contribution to the CMP whichever is greater.

Effective July 1, 1993, employees will contribute 20% of the medical plan premium in effect. The employees will continue to contribute 20% for 12 months at the same 1993 rate.

Effective July 1, 1994, the employee contribution for the medical plan will be increased to 25% of the premium in effect for 1994 and will continue to pay at the 25% level of the 1994 rate for 12 months.

Effective July 1, 1995, the employees will contribute 30% of the medical plan premium and continue at the 1995 rate for the remainder of the contract.

The Company will provide to an employee who elects retirement between the age of sixty-two (62) and sixty-five (65) medical insurance until the employee reaches age sixty-five (66) if the employee is retired before July 1, 1993 when the new Grace Medical Plan becomes effective.

-58-

Employees between the ages of fifty-five (55) and sixty-two (62) who are retired prior to July 1, 1993 will continue to contribute to the premium at the 10% rate until age sixty-five (65) when they may participate in the Medicare Supplement at 10% of the supplement premium.

Dental

For the duration of the Agreement, for each eligible employee, the Company will provide an Insurance Dental Plan as amended 2/1/87. The benefits of this plan are described in a booklet for distribution to employees, which is incorporated by reference into this Agreement.

EXHIBIT C

| | MTWTFSS | MTWTFSS | MTWTFSS | MTWTFSS | MTWTFSS |
|---|---|---|---|---|---|
| NIGHT | CCDDDDD | DDAAAAA | BBCCCCC | AABBBBB | BBCCCCC |
| DAY | AAAAABB | BBBBBCC | CCCCCDD | DDDDDAA | DDDDOAA |
| EVENING | BBBCCCC | CCCCDDD | DDDAAAA | AAABBBB | AAABBBB |
| OFF | DDCBAA | AADCCBB | BBAODCC | SBAODCC | CCBAADD |

-59-

## EXHIBIT D

The following are established Maintenance Rate Classifications:

MT -Maintenance Helper-Trainee    12 Months
MG -General Maintenance    9 Months
MI -General Maintenance

The number of openings in any rate classification will be determined by the Company. When an opening in the Maintenance Helper/Trainee classification exists, the Company will post the job for bid and will consider those qualified production employees with twelve (12) months seniority on the basis of ability and aptitude. Where these two factors are relatively equal, seniority will govern the selection. All applicants who have applied for the posted job will be considered evaluated for no longer than six (6) months from the time of the job posting. All applicants who were not selected within a six (6) month time period of the initial posting must rebid on any future Maintenance openings.

The Maintenance Helper/Trainee will retain his production seniority for demotion purposes for twelve (12) months. If the Maintenance Helper/Trainee has demonstrated satisfactory qualifications and performance, he will advance to classification MG after one (1) year. A production employee will assume a Maintenance department seniority date for promotional and lay off purposes at the time he assumes the MG rate. This Maintenance department seniority date will include the period in which he was in the MT rate classification.

The Maintenance Helper/Trainee who advances to rate MG and above can exercise his production seniority only for lay off purposes.

New employee can be hired into Maintenance in the following areas: Instrument Repair; Electrical/Electronics, Machinist, Boiler Room Operations, and Lift Truck Repair, Mechanic, and Building Maintenance. The next opening for Mechanic or Building Maintenance after each new hire as a Mechanic or Building Maintenance will be posted for bid. The successful bidder will be selected per the second paragraph of this Exhibit D. New employees hired into Maintenance will start at rate classification MG.

A ten (10) cent an hour premium will be paid to Maintenance employees who are regularly assigned to Instrument Repair, Electrical/Electronic work, Machinist work, Boiler Room Operations, and Lift Truck Repair. Employees assigned to shift coverage will be compensated at the ten (10) cent per hour premium only for those hours actually devoted to the above specialties.

Maintenance overtime will be divided among employees assigned to the following groups: General Maintenance, Instrument Repair, Electrical/ Electronics, Building Maintenance, Boiler Room Operations, Machinist, and Lift Truck Repair.

Shift coverage assignments will normally be made by assigning the employees with the least Maintenance Department seniority to shifts according to their normal work assignment. If

a rotating shift assignment exists and there are no volunteers, then the opening will be filled by transferring the least senior employee in that work assignment regardless of rate classification. An employee in rate classification MG or MI who wishes to change his shift assignment (days or rotating 3 shifts or 4 shifts) will submit a request in writing to the Maintenance Department. When an opening exists by a change in staffing or attrition, the vacancy will be filled by the employee with the greatest Maintenance Department seniority who has a request on file. If a rotating shift opening remains after the initial vacancy is filled, it will be filled by transferring the most senior (Maintenance Department seniority) day or rotating shift employee with a request on file or assigning the least senior (Maintenance Department seniority) day shift employee if no requests are on file. If a Maintenance Department employee has a request on file for a period of three (3) months and no openings become available due to a change in staffing or attrition, then he may displace the least senior Maintenance Department employee on that shift (days or rotating 3 shifts or 4 shifts). A Maintenance Department employee may exercise this option only once in a twelve month period. The vacancy created will be filled according to the terms of this paragraph.

A maintenance tool allowance of $25 per year per Maintenance employee will be paid.

The Company retains the right for the Stock Room Supervisor to perform all the functions necessary to maintain the Plant Maintenance Stock Room, including the Stores Attendant's

duties. The rate classification D shall be established for the Stores Attendant position (per Company published job description) which shall be filled or vacated per Paragraphs 65 and 66.

## EXHIBIT E

When an opening in the Control Laboratory Technician Classification H exists the Company will post the job for bid and will consider production employees with twelve (12) months seniority on the basis of aptitude, interviews, and job performance. In the event of identical ratings, seniority will govern the choice among candidates. The Laboratory Technician will retain his production seniority for demotion purposes for nine (9) months. If the Laboratory Technician has demonstrated satisfactory qualifications and performance, he will advance to Classification I after six (6) months. A production employee will assume a Control Laboratory seniority date for promotional and lay off purposes at the time he assumes the classification I rate. The Control Laboratory seniority date will include the period in which he was in rate classification H.

The Laboratory Technician who advances to rate classification I and above can exercise his production seniority only for lay off purposes.

Laboratory Technicians will advance from rate classification I to rate classification J after not more than twelve (12) months in rate classification I.

The Company may hire new employees as Laboratory Technicians. The Company may assign them to the rate classification deemed appropriate based on their laboratory skills and background.

When an opening occurs on a job which is permanently assigned to the day shift, the Company will offer this job to Laboratory Technicians then assigned to rotating shifts in order of their Control Laboratory seniority.

Shift assignments (days or rotating) will be made on the basis of the Laboratory Department seniority, unless other circumstances are mutually agreed to by the Company and the Union.

If a rotating shift assignment exists and there are no volunteers, then the opening or openings will be filled by transferring the least senior Laboratory Technician to that shift assignment.

A Laboratory Technician who wishes to change his/her shift assignment, for example (three-shift to four-shift or four-shift to three-shift) must submit a request in writing to the Laboratory Manager. When an opening exists by a change in staffing or attrition, the vacancy will be filled by the most senior Laboratory Technician with a request on file, or by assigning the least senior Laboratory Technician if there are no requests on file.

If a Laboratory Technician has a request on file for a period of three (3) months and no openings become available due to a

change in staffing or attrition, then that employee may displace the least senior Laboratory Technician on the shift requested provided the employee with the request on file has greater seniority. A Laboratory Technician may exercise this option only one time in a twelve month period.

## EXHIBIT F

It is the policy of Grace Specialty Chemicals Co. to promote a work environment and a work force which is free of illegal drugs and other mind-altering substances. The unlawful sale, manufacture, distribution, dispensation, possession or use of such substances on company property, or while conducting company business off company property is absolutely prohibited. Because of the severe threat to health, safety and security, all employees are required to report to work free from the effects of these substances and in the appropriate mental and physical condition.

The objectives of this policy are: to insure a safe, healthy work environment for our employees; to provide high quality products and services for our customers; and to protect company property and assets. It is not the company's intention to require random drug testing.

1. Testing Procedures

Tests for alcohol abuse will be done by blood sample. The sample for a blood test will be obtained and analyzed by qualified medical personnel employed by the Owensboro

Daviess County Hospital. If in a given situation the testing of an employee is not feasible due to the severity of the employee's belligerence or unconsciousness, the company may deal with the employee in question without resort to testing, in accordance with its normal performance standards, with consideration to be given within the next 48 hours for rehabilitation.

Tests for drug use will involve the analysis of a urine sample by Computchem Laboratories, according to its procedures. The drug specimen will be collected by the Minor-EmergiCenter or the Owensboro Daviess County Hospital. Two concurrent samples will be provided, both samples will be sealed in the employee's presence with a tape which both the employee and the clinic's representative will sign, and transmitted to Computchem in accordance with its chain of custody procedures. One sample will be subjected to an EMIT test, and any positive test result will be confirmed by use of gas chromatography/mass spectroscopy using the same sample in accordance with Computchem standards and analytical procedures. All positive samples will be retained and stored frozen (at - 10 degrees C) for a minimum of one year or longer upon request.

The second sample specimen jar will not be opened or tested by Computchem, but will instead be stored, frozen in accordance with the above procedures, except as otherwise provided below.

Test results will be reported back to the clinic and the Company Medical Director (CMD). The CMD will review the confirmed positive test results for consideration of alternative medical explanations, and will consult with the affected employee and the union president or his designee.

If the employee challenges a positive finding, he may request to have his second sample tested by a Roche Laboratories (Roche). Such request must be made at the time of consultation with the CMD. Later requests will be denied as untimely. In the event a second test is requested, Computchem chain-of-custody procedures will be followed in forwarding the second sample to Roche. Roche must adhere to this same testing procedures as Computchem described above, including the use of the same detection cut-off levels for the same drugs. Except as otherwise provided above, no positive test results shall be transmitted to management unless such procedures have been adhered to.

At the time the sample is taken, the employee will have the opportunity to indicate what if any medication (either prescription or over the counter) he/she has taken during the past 30 days. Such information will be transmitted in strict confidence to the laboratory, and as necessary, to the Company Medical Director, and to no others. No tests shall be conducted to determine anything other than the presence of alcohol or controlled substances which may impair an employee's ability to perform his/her job, and no information shall be disclosed by the laboratory other than the presence and quantity of alcohol or controlled substances.

II. Circumstances Under which Employees may be Tested

1. Drug or alcohol testing of employees may be required when there is reasonable suspicion of drug use and job performance problems have occurred. Evidence suggesting possible drug use includes but is not limited to:

   a. Abnormally deviant behavior or performance.
   b. Activities carried out with obvious disregard for the health or safety of others.
   c. Possession of drug paraphernalia.

2. Reasonable suspicion must be confirmed by a member of management and reviewed with the department head, the Union President or his designee and the Personnel Department before a drug screening is conducted. If the employee demonstrates that he/she is on prescription drugs and his/her condition corresponds with the side effects of such medication, there will be no drug testing required.

3. Where there is reasonable suspicion, the supervisor will encourage the employee to seek assistance in the Employee Assistance Program (EAP).

4. Periodic drug screening may be conducted for employees involved in specifically agreed upon critical jobs affecting safety. Such testing will not be performed on a random basis.

Affected employee will receive at least seven (7) days advance notice. If the parties are unable to agree upon which jobs should be subject to periodic testing, the matter shall be referred to final and binding arbitration conducted by a mediator under the auspices of the Division of Employment Standards and Mediation, Labor Cabinet of the Commonwealth of Kentucky.

5. An employee refusing a periodic or reasonable suspicion drug screen may be disciplined subject to the following. Prior to discipline, an employee may request a meeting with the department head, another member of management, the Union President or his designee, and the Personnel Department to state the basis for his/her refusal to submit to testing.

6. If an employee tests positive, following the procedures set forth in Part I of this policy, the employee will not be disciplined unless:

   a. the results have been reviewed by the Company Medical Director,

   b. the employee refuses treatment by a qualified rehabilitation program; or

   c. the employee has previously tested positive and participated in a mandatory rehabilitation program as required by this section of the policy (II6). This section does not apply to employees who without being tested, voluntarily participate in an alcohol or drug treatment program.

Any employee participating in a drug or alcohol rehabilitation program may be suspended with sickness and accident benefits during the period of rehabilitation.

7. The unlawful sale, manufacture, distribution, dispensation, possession or use of illegal drugs or other mind-altering substances on company property, or while conducting company business off company property is absolutely prohibited. Except as otherwise provided above, violations will subject the employee to immediate discipline up to and including discharge.

III. Record Keeping

All test results are confidential and will be maintained by the Company Medical Director. The release of this information is restricted to company personnel who have a substantial business need to know, but if such information is released, the employee will be immediately notified in writing of the release of the information, to whom the results are being released and for what purpose.

IV. Rehabilitation and Training

A. Employee Assistance Plan (EAP)

1. The company recognizes drug and alcohol abuse as a major health problem and a hazard to safety, security and performance. Employees needing help in dealing with such problems are encouraged to use our Employee Assistance Plan (EAP) on their own initiative, and to seek counseling and referral

-70-

for rehabilitation. The EAP is free or all employees and their dependents. All counseling is absolutely confidential.

2. Supervisors, managers and/or the Personnel Department shall refer suspect employees to EAP.

3. Conscientious efforts to seek help from the EAP through referral or self-referral will not jeopardize an employee's current job or future opportunities, and will not be recorded in his or her personnel file. Participation in EAP, however, will not prevent normal discipline from occurring for violation of plant rules relating to other than drug or alcohol abuse.

B. Company Group Medical Plan or Health Maintenance Organization (HMO)

Other than an EAP, the cost of rehabilitation, is the employee's responsibility. The company group medical plan, Health, Maintenance, Organization or other insurance plan in which the employee is enrolled shall provide a benefit which covers all or a portion of the expense (provided we maintain our current insurance coverage).

V. Education and Awareness

Training of Supervisors, Managers & Others

Training will be provided to supervisors and managers to assist them in identifying the symptoms of drug abuse that may lead to or be causing a performance problem.

-71-

Training will also be provided to management and Union officers and stewards in making referrals to the EAP for troubled employees.

VI. Definitions
A. Company Property
Company Property includes plants, offices, facilities, vehicles, automobiles, parking lots owned or leased by the company. It also includes customers' and suppliers' facilities and any site at which company business is transacted, whether on or away from company-owned or leased property.

B. Qualified Rehabilitation Program
A qualified rehabilitation program is one which has been authorized by a physician or the EAP.

C. Items and Substances Covered
1. All illegal drugs and controlled substances under the Federal Controlled Substance Act of 1970.
2. Drug Paraphernalia.
3. Mind-altering substances that impair performance.
4. Prescription drugs may be permitted provided:
   a. these drugs are prescribed by a physician for the person in possession of them and are used as prescribed;
   b. these drugs are kept in their originally marked container; or the employee can validate his/her prescription.

-72-

c. the side effects of these drugs do not pose a threat to safety or significantly alter performance.

5. "Over-the-counter" medication may be permitted provided:
   a. they are used as directed for the purpose for which they are intended;
   b. these drugs are kept in their original marked container; and
   c. the side effects of these drugs do not pose a threat to safety or significantly alter performance.

VII. Conflict with Legal Obligations
Nothing in this policy shall be construed as obviating responsibility for compliance with Federal, State and local laws with respect to fair employment practices, and the implementation of this policy shall be accomplished in accordance with such laws.

Effective Date of Policy: July 1, 1990

-73-

## CALENDAR FOR 1996

| JANUARY | MAY | SEPTEMBER |
| FEBRUARY | JUNE | OCTOBER |
| MARCH | JULY | NOVEMBER |
| APRIL | AUGUST | DECEMBER |

CONFIDENTIAL

## SUBSTITUTION AGREEMENT
### (Battery Separators)

Polypore Group, Inc., to be renamed at the closing Daramic, Inc. ("Daramic") intends to acquire substantially all of the United States assets of the Battery Separators business of W.R. Grace & Co. - Conn. ("Grace") on the date of the closing of the sale of that business (the "Sale Date"). Daramic is aware that the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers and its Local 726 (the "Union") represent the bargaining unit employees ("Bargaining Unit Employees") of Grace's Battery Separators business at the Owensboro, Kentucky Plant (the "Owensboro Plant"), as specified in the Collective Bargaining Agreement between Grace and the Union effective April 6, 1993 ("the CBA") and now in effect.

In order to facilitate the sale of the Battery Separators business and avoid undue interruption of the business of the Owensboro Plant and to promote better understanding regarding the effects of the sale, the undersigned parties understand and agree that the following requirements will be applicable to the sale and transfer of ownership of the Battery Separators business.

1.    Daramic shall recognize the Union as the exclusive bargaining representative of those Bargaining Unit Employees at the Owensboro Plant who become employees of Daramic on the Sale Date.

2.    Grace shall remain the sponsor of the Retirement Plan of W.R. Grace & Co. - Conn., Chemical Group, referred to in Paragraph 101 of the CBA (the "Grace Plan"). The Grace Plan will retain all of its assets and liabilities and will remain liable for the payment of

benefits accrued thereunder with respect to all service up to the Sale Date.  Grace shall remain the sponsor of the welfare plans (including, but not limited to, plans providing life, disability, accident and health benefits) maintained by Grace that cover Bargaining Unit Employees before the Sale Date.  Those welfare plans shall continue to be liable for benefits for covered expenses incurred up to the Sale Date.  Bargaining Unit Employees shall be regarded as terminated from the employment of Grace as of the Sale Date for purposes of the Grace Plan and welfare plans maintained by Grace (except as provided in paragraph 3(c) below).  Neither Daramic nor any of its plans shall have any liability for employee benefit plans or the benefits thereunder retained by Grace as specified above.

3.    It is agreed that on the Sale Date, Daramic will (i) be substituted for Grace for all purposes under the CBA and (ii) <u>succeed</u> to all terms of the CBA except as follows:

a.    A defined benefit pension plan established as of the Sale Date by Daramic shall cover Bargaining Unit Employees who become employees of Daramic as of the Sale Date ("Daramic's Plan").  Daramic's Plan shall credit covered Bargaining Unit Employees for purposes of eligibility to commence participation in and vesting under Daramic's Plan, with all years of service that are credited under the Grace Plan.  Daramic's Plan shall also provide credit for such years of service prior to the Sale Date for purposes of benefit accruals in excess of any amounts accrued under the Grace Plan, eligibility to receive early retirement or other subsidized benefits, and eligibility to receive a disability pension under Daramic's Plan.

- 2 -

b.    Except as provided in paragraph (c) below, for purposes of all other employee benefit programs of Daramic and for purposes of determining seniority and recall rights, Bargaining Unit Employees who become employees of Daramic as of the Sale Date will be credited by Daramic with all service with Grace prior to the Sale Date that was credited by Grace for such purposes.

c.    Daramic shall establish as of the Sale Date one or more insurance programs to provide the welfare benefits and insurance coverages described in Exhibit B of the CBA which will cover all eligible Bargaining Unit Employees (and their eligible dependents) who become employees of Daramic as of the Sale Date; provided, however, as of the Sale Date, with respect to each Bargaining Unit Employee (and each covered dependent of a Bargaining Unit employee) who is ineligible for life and/or medical benefits coverage under Daramic's insurance programs by reason of a pre-existing medical condition of such employee (or dependent) (an "Uncovered Individual"), Grace will maintain each such Uncovered Individual's life and/or medical coverage, as the case may be, uninterrupted under the Grace welfare plans in the same manner as if the employee to whom the coverage relates had continued to be an employee of Grace on and after the Sale Date, and that coverage will be maintained until the Uncovered Individual commences coverage under a life and/or medical plan, as the case may be, maintained by Daramic or until the first to occur of the following:  the employee to whom the coverage relates terminates employment from Daramic (provided, however, Grace shall offer

- 3 -

and be liable for any federal "COBRA" continuation coverage thereafter, as applicable) or Grace terminates medical coverage for all of its active employees in the United States.

BATTERY SEPARATORS DIVISION,
W.R. GRACE & CO.-CONN.

By: ~~Sd Schulz~~

Its: ~~Vice President~~

Date: 10/31/94

DARAMIC, INC.

By: ~~signature~~

Its: EVP + Treasurer

Date: 11/8/94

THE INTERNATIONAL
BROTHERHOOD OF BOILERMAKERS,
IRON SHIP BUILDERS, BLACKSMITHS,
FORGERS AND HELPERS and its
LOCAL 726

By: ~~John M. Clayton~~

Its: ~~President L-726~~

~~signature~~  V.P.

~~signature~~

~~signature~~

~~signature~~

Date: 10-25-94

- 4 -

## GRACE BATTERY SEPARATORS

## EMPLOYEE BENEFITS AGREEMENT

AGREEMENT dated November 8, 1994 by and among W. R. Grace & Co. ("WRG"), its subsidiary W. R. Grace & Co.-Conn. ("Grace-Conn."), certain of its subsidiaries, Polypore, Inc. ("Acquisition Corp."), certain of its subsidiaries, and The InterTech Group, Inc.

WHEREAS, WRG, Grace-Conn., certain of its subsidiaries, ~~Battery Separators~~ Acquisition Corp. ~~and certain of its subsidiaries~~ and The InterTech Group, Inc. have entered into the Grace Battery Separators Worldwide Sale Agreement dated August 3, 1994 (the "Sale Agreement") providing for, among other things, the acquisition by Acquisition Corp. and certain of its subsidiaries of the Subject Business (as defined in the Sale Agreement);

WHEREAS, certain employees in the Subject Business who are (i) directly employed by Grace-Conn. or (ii) directly employed by Grace G.m.b.H. or (iii) directly employed by the Transferred Company or (iv) directly employed by another direct or indirect subsidiary of Grace-Conn. which is organized outside the United States, shall become employees of a subsidiary of Acquisition Corp. pursuant to the Sale Agreement;

WHEREAS, the parties hereto wish to set forth their agreement as to certain matters regarding the treatment of, and the employee benefits provided to, those employees; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the parties agree as follows:

2.    <u>Provisions Applicable to U.S. Continued Employees</u>

    2.1    <u>Defined Benefit Pension Plans.</u>

        (a)    (i)    As of the Closing, the U.S. Continued Employees who participated in the Retirement Plan of W. R. Grace & Co.-Conn. Chemical Group (Owensboro Plant) (the "Hourly Grace Pension Plan") shall cease to actively participate in that plan.

        (ii)    Effective as of the day of Closing, each U.S. Continued Employee who participated in the Hourly Grace Pension Plan as of the Closing shall be covered by a defined benefit pension plan maintained by the Buyer Group (the "Buyer's Hourly Pension Plan"); provided, however, that the member of the Buyer Group that sponsors the Buyer's Hourly Pension Plan shall be entitled to amend, terminate or otherwise modify the Buyer's Hourly Pension Plan to the extent permitted by applicable law and any applicable collective bargaining or similar agreement with a labor union or similar organization.

        (iii)    Each U.S. Continued Employee covered by the Buyer's Hourly Pension Plan shall be given full credit for service with the Grace Group prior to the day of Closing (to the extent that such service is recognized under the Hourly Grace Pension Plan) solely for purposes of eligibility to commence participation and vesting, but not for purposes of determining benefits or for purposes of eligibility to receive early, disability or other subsidized retirement benefits under the Buyer's Hourly Pension Plan covering the U.S. Continued Employee.

        (b)    As of the Closing, the U.S. Continued Employees who participated in the W. R. Grace & Co. Retirement Plan for Salaried Employees (the "Salaried Grace Pension Plan") shall cease to actively participate in that plan.

        (c)    The Hourly Grace Pension Plan and the Salaried Grace Pension Plan are collectively referred to herein as the "Grace Pension Plans".

- 3 -

(d)    Selling Companies and Buying Companies acknowledge that there shall be no transfer of assets or liabilities from either Grace Pension Plan to any bene-fit plan of the Buyer Group, and the Buyer Group and its benefit plans shall have no right, title or interest in or to the assets of the Grace Pension Plans.

(e)    Grace-Conn. shall cause the Administrative Committee and/or sponsor of the Grace Pension Plans to take any and all necessary action to cause the accrued benefits of all U.S. Continued Employees who are participants in the Grace Pension Plans to become fully vested and nonforfeitable as of the Closing.  Each Grace Pension Plan shall thereafter be liable for payment of such accrued benefits in accordance with the terms of the applicable plan and applicable law.

2.2 .  401(k) Plan.

(a)    As of the Closing: (i) the U.S. Continued Employees who partici-pated in the W. R. Grace & Co. Salaried Employees Savings and Investment Plan (the "Grace Savings Plan") shall cease to actively participate in the Grace Savings Plan and (ii) those U.S. Continued Employees shall be eligible to commence participation in a defined contribution plan maintained by Buyer that is described in Exhibit B with the title of "Retirement Savings Plan (401k)" (the "Buyer's 401(k) Plan").  The Buyer's 401(k) Plan is intended to be qualified under sections 401(a) and 401(k) of the Internal Revenue Code (the "Code").

(b)    Each U.S. Continued Employee shall be given full credit for ser-vice with the Grace Group (to the extent such service is recognized under the Grace Savings Plan) solely for purposes of eligibility to commence participation and vesting under the Buyer's 401(k) Plan.

2.3    Long Term Disability Income Plan.

(a)    As of the Closing: (i) the U.S. Continued Employees who partici-pated in the W. R. Grace & Co. Long Term Disability Income Plan (the "Grace LTD

- 4 -

Plan") shall cease to actively participate in the Grace LTD Plan and (ii) those U.S. Continued Employees who participated in the Grace LTD Plan shall be eligible to commence participation in a long term disability plan maintained by the Buyer that is described in Exhibit B under the title of "Long Term Disability" ("Buyer's LTD Plan").

(b)     If Buyer's LTD Plan is funded in whole or in part by employee contributions, that plan shall require (for a period of not less than 12 months) employee contributions at a rate comparable to the rate in effect under the Grace LTD Plan on the day before the Closing. The Buyer's LTD Plan shall recognize all periods of a U.S. Continued Employee's employment with the Grace Group that are taken into account under the Grace LTD Plan solely for purposes of eligibility to commence participation.

(c)     The Grace LTD Plan shall not be liable for payments of disability benefits with respect to U.S. Continued Employees, except as provided in this paragraph, and subject to Section 2.12. The Grace LTD Plan shall be liable for the payment of long term disability benefits to those eligible employees of the Subject Business whose total disability (as defined in the Grace LTD Plan) commenced prior to the day of Closing (regardless of whether such disability had actually been determined by the day of Closing to constitute total disability), including (i) all such employees who participated in the Grace LTD Plan and who are in receipt of, or eligible to receive, such benefits thereunder as of the Closing, (ii) all such employees who participated in the Grace LTD Plan whose total disability commenced prior to the day of Closing and who remain totally disabled for the length of the "qualifying disability period" (as such term is defined in the Grace LTD Plan) and (iii) all such employees who, as of the Closing, were absent from active employment by reason of illness or injury but who, as of the Closing were reasonably and mutually expected by the Grace Group and the Buyer Group to be able to perform all of the duties of his or her respective position within six months after the day of Closing but who the Grace Group and Buyer Group

- 5 -

subsequently mutually agree are not so able to return to active employment with the Buyer Group within six months after the day of Closing.

(d)     The Buyer's LTD Plan shall provide for the payment of benefits on account of long term disabilities of U.S. Continued Employees, who participate in that Plan, which commence on or after the day of Closing, subject to Section 2.12.

2.4    Other Grace U.S. Welfare Benefit Plans.

(a)     Subject to Section 2.12, as of the Closing: (i) the U.S. Continued Employees and their dependents who participated in the W. R. Grace & Co. Group Life, AD&D, Medical, Dental and Disability Plan, the W. R. Grace & Co. Business Travel Accident Insurance Plan, and Felonious Assault Insurance Plan, the W. R. Grace & Co. Voluntary Group Accident Insurance Plan and/or any other "employee welfare benefit plan" (as defined by section 3(1) of the Employee Retirement Income Security Act of 1974 ("ERISA")) that is maintained by any member of the Grace Group (collectively the "Grace Welfare Plans") shall cease to actively participate in those Plans except as provided in Sections 2.4(b) and 2.5, and (ii) such eligible U.S. Continued Employees and dependents shall commence participation in group life, accidental death and dismemberment, medical, dental and short-term disability plans maintained by the Buyer that are described in Exhibit B under the title of "Welfare Benefits" (the "Buyer's Welfare Plans").

(b)     The Grace Welfare Plans shall not be liable for payments of benefits with respect to U.S. Continued Employees, except as otherwise provided by this Section 2.4(b) and by Sections 2.4 (e), 2.5 and 2.12. The Grace Welfare Plans shall be liable for the payment of benefits to eligible U.S. Continued Employees and their eligible dependents for claims related to (i) medical services performed, supplies furnished or deaths occurring prior to the day of Closing, and (ii) medical services and supplies furnished for hospitalizations as of the Closing (whether or not such services or supplies are furnished continuously and uninterrupted after the Closing); regardless

- 6 -

of whether any such claim had actually then been filed by the day of Closing, in accordance with the terms of the applicable Grace Welfare Plan.

(c)    (i)    The provisions of the Buyer's Welfare Plans which provide medical, health and dental care benefits to U.S. Continued Employees (the "Buyer's Medical Plans") shall provide that any expenses incurred during the calendar year of the Closing shall be taken into account for purposes of satisfying the applicable deductible, coinsurance and maximum out-of-pocket provisions of the Buyer's Medical Plans for such calendar year.

(ii) For a period of not less than 12 months after the Closing, the Buyer's Medical Plans shall require employee contributions at a rate that does not exceed the rate in effect for medical, dental and health care under the Grace Welfare Plans as of January 1, 1995 (provided that the rate of required employee contributions under Buyer's Medical Plans may be increased to match any increase in such required contributions under the Grace Welfare Plans providing medical, dental and health care; such increases, if any, under Buyer's Medical Plans shall not be effective before the date that the comparable increases are effective under the Grace Welfare Plans).

(iii) Except as otherwise provided in this Section 2.4 and subject to Section 2.12, for a period of not less than 12 months after the Closing, the benefit and employee cost provisions of each other coverage provided under the Buyer's Welfare Plans shall be comparable to those of the corresponding coverage under the Grace Welfare Plans (taking into account any increases in employee costs under the Grace Welfare Plans, including increases in deductible, coinsurance and maximum out-of-pocket expenses, that take effect during such 12-month period).

(d)    Buyer shall, effective as of the day of Closing, offer each U.S. Continued Employee an option to elect to continue medical, health and dental care coverage under the health maintenance organization (a "HMO") option available to the

- 7 -

U.S. Continued Employee the day before the Closing occurs, if any; provided that the HMO permits Buyer to offer such coverage. The employee cost provisions of Section 2.4(c)(ii) shall not apply to such coverage.

(e)   (i)   Subject to Section 2.12, the Buyer's Welfare Plans shall be liable for the payment of benefits to eligible U.S. Continued Employees and their eligible dependents for claims related to medical services and treatments rendered or provided on or after the day of Closing, supplies furnished on or after the day of Closing or deaths occurring on or after the day of Closing, notwithstanding the fact that any such claim may be related to another claim which was paid or is eligible for payment under the terms of any Grace Welfare Plan in accordance with Section 2.4(b)(i) above.

(ii)   The Grace Welfare Plans shall be liable for the payment of benefits for all claims covered by the Grace Welfare Plans to or with respect to (x) eligible employees and former employees of Grace-Conn. and their eligible dependents (including Excluded Employees and their eligible dependents) who do not become employees of the Buyer Group and (y) eligible Inactive Employees and their eligible dependents during the period any such employee remains inactive and is not employed by the Buyer Group; provided that coverage under the Grace Welfare Plans with respect to the individuals specified in this clause (ii) shall be the coverage provided under terms of the Plan and/or policy of Grace-Conn. applicable to other inactive employees; and this clause shall not create additional or new coverage provisions under those Plan.

(f)   Notwithstanding anything in this Section 2.4 to the contrary, nothing in the Sale Agreement or this Employee Benefits Agreement obligates Buyer, any member of the Buyer Group or Buyer's Medical Plans to provide any post-employment benefits coverage to any U.S. Continued Employee or any future former employee or future retiree of the Buyer Group (other than continuation coverage required by Code section 4980B or any other applicable law).

- 8 -

2.5 · Retiree Medical and Life Insurance Coverage.·

(a)   With respect to any and all former employees of the Subject Business who are retired from employment with the Subject Business as of the Closing and are then entitled to post-retirement medical expense and life insurance coverage by any Grace Group welfare benefit or other employee benefit plan maintained for retirees of WRG, Grace-Conn. or any other member of the Grace Group organized in the United States, the Grace Group shall continue to provide such coverage for such retired employees and their eligible dependents on and after the day of Closing, and shall continue to charge each such retired employee and eligible dependent the applicable premium, as determined by Grace-Conn.   In addition, the Grace Group shall extend post-retirement medical expense and life insurance coverage to each U.S. Continued Employee (including his or her eligible dependents) beginning as of the date that he or she elects such coverage (which could, in accordance with the employee's election, be the day of Closing or a date thereafter as selected by such employee); but only if the U.S. Continued Employee would otherwise be eligible to elect post-retirement medical expense and life insurance coverage by the Grace Group if he or she were to retire on the day of Closing and he or she pays the applicable premium for such coverage, as determined by Grace-Conn. in accordance with the terms of the applicable plan or plans of the Grace Group.

(b)   Buyer agrees that post-retirement medical expense coverage provided by the Grace Group shall be the secondary payor of medical claims of each U.S. Continued Employee in relation to the Buyer's Medical Plans during the period that the U.S. Continued Employee is employed by the Buyer (with respect to U.S. Continued Employees covered under the Buyer's and the Grace Group's plans).

(c)   The Grace Group expressly reserves the right to amend, alter, modify or terminate the terms of such post-retirement medical expense and life insurance coverage at any time and to reasonably interpret the provisions of that coverage, with respect to U.S. Continued Employees and all of its other former employees.   It is

- 9 -

understood and agreed by the parties hereto that the Grace Group shall not be re-
sponsible or otherwise liable for the provision of post-retirement medical expense and
life insurance coverage to any U.S. Continued Employees other than as described in
Section 2.5(a).

2.6    No Assumption Of Grace Group U.S. Employee Benefit Plans.

The parties agree that the Buyer Group does not and shall not assume
the sponsorship of, or (subject to Section 2.12) the responsibility for contributions to or
any liability in connection with, any employee benefit plan (as defined by section 3(3)
of ERISA) directly maintained by WRG, Grace-Conn. or any other member of the
Grace Group organized in the United States for U.S. employees, former employees,
retirees or their beneficiaries. In addition, with respect to U.S. Continued Employees,
the parties agree that Grace-Conn. shall offer and be liable for any continuation health
coverage (including any penalties, excise taxes or interest resulting from the failure to
provide continuation coverage) required by section 4980B of the Code due to qualify-
ing events which occur before the Closing (or multiple qualifying events where the
initial qualifying event occurs before the Closing).

2.7    Grace Executive Benefit Plans.

As of the Closing, any and all U.S. Continued Employees who partici-
pated in the W. R. Grace & Co. Executive Salary Protection Plan, the W. R. Grace &
Co. Supplemental Executive Retirement Plan and/or any other benefit plan maintained
by WRG, Grace-Conn. or any other member of the Grace Group organized in the Unit-
ed States exclusively or principally for executive personnel (collectively the "Grace Ex-
ecutive Benefit Plans") shall cease to participate in the Grace Executive Benefit Plans.
The Grace Group shall be liable for the payment of any benefits that may be payable
under the terms of any Grace Executive Benefit Plan to U.S. Continued Employees.
Buyer shall be under no obligation to establish successor plans to replace the benefits
provided under any Grace Executive Benefit Plan.

- 10 -

2.8    Grace Group Deferred Compensation Program.

The Grace Group shall remain liable after the Closing for the payment to any U.S. Continued Employee of any compensation which was deferred prior to the Closing and which was not paid on or before the Closing at the election of such employee pursuant to any deferred compensation agreements between any member of the Grace Group and the U.S. Continued Employee, in accordance with such agreements.

2.9    Vacation.

(a)    With respect to U.S. Continued Employees, Buyer shall continue to apply the vacation and leave of absence policies of the Subject Business that are in effect the day before the Closing for at least the remainder of the calendar year in which the Closing occurs; so that each U.S. Continued Employee shall be entitled to use any vacation time or leave of absence, or receive any vacation pay, to which he or she would otherwise be entitled for that calendar year under the vacation and leave policies applicable the day before the Closing. Attached to this Agreement as a Schedule to this Section is a list of those U.S. Continued Employees with carryover vacation from 1993 which they shall be permitted to take after the Closing, if not previously taken during 1994, in addition to any vacation such employees accrue for 1994.

(b)    U.S. Continued Employees shall be given credit by Buyer for their prior service with the Grace Group under Buyer's vacation policies in effect for 1995 and thereafter (except that this Section 2.9(b) shall not apply to those U.S. Continued Employees who are Cambridge Technicians (as defined in Section 12.08(f) of the Sale Agreement)).

2.10    Severance Pay.

(a)    Effective as of the day of Closing, Buyer shall establish a severance pay plan or program for the benefit of all salaried U.S. Continued Employees who were covered by the Grace Severance Program (as hereinafter defined) the day

before the Closing, which plan or program shall remain in effect for a period of not less than 12 months after the Closing (the "Buyer's Severance Program") (except that the Buyer's Severance Program shall only apply to the "Cambridge Technicians" (as defined in Section 12.08(f) of the Sale Agreement) who remain employees of Buyer after the expiration of the 180-day period following the day of Closing). With respect to such salaried U.S. Continued Employees, Buyer's Severance Program shall provide for the following: (i) severance payments that are equal to the payments that would be provided under the terms of the Grace Group severance pay program for salaried employees that was adopted in conjunction with the divestment of the Subject Business and that is set forth as Exhibit A (the "Grace Severance Program"), based upon an aggregation of service with the Grace Group up to the Closing and the Buyer Group on and after the Closing, (ii) payments for unused but accrued vacation as of the date of the employee's termination, (iii) outplacement services as determined by Buyer, and (iv) subject to Section 2.12, continuation of coverage under the Buyer's Medical Plans for the period that installment severance payments are made to the U.S. Continued Employee, under the same terms and conditions of Buyer's Medical Plans applicable to active employees who participate in Buyer's Medical Plans. The monthly cost that a terminated U.S. Continued Employee will incur for coverage under the Buyer's Medical Plans, during the period that the U.S. Continued Employee is receiving installment severance payments, shall not exceed the cost of coverage under Buyer's Medical Plans which is applicable to active employees who participate in such Plans. The Buyer's Severance Program shall provide that severance payments shall be made only in installments and eligible U.S. Continued Employees shall not be permitted to elect lump sum severance payments under the Buyer's Severance Program. In addition, notwithstanding anything in this Section 2.10 or the Sale Agreement to the contrary, severance payments under the Buyer's Severance Program to an eligible U.S. Continued Employee shall cease as of the earlier of the last day of such eligible U.S. Continued Employee's designated severance period in accordance with the terms of the Buyer's Severance Program or the date as of which such U.S. Continued Em-

- 12 -

ployee is employed by another employer (including self-employment as a sole proprietor, partner or otherwise).

The preceding provisions of this Section 2.10(a) shall apply only to each salaried U.S. Continued Employee: (i) who is terminated by Buyer within 12 months after the Closing other than for cause (as determined by the Buyer in its sole discretion in accordance with Buyer's Severance Program), (ii) who voluntarily terminates employment with Buyer in order to avoid a relocation of principal residence or as a result of an unreasonable change in job duties or a decrease in compensation or a change in work location which results in an unreasonable commuting distance from the employee's existing residence (except in connection with any existing relocation plans of the Grace Group), or (iii) who on the day of Closing is absent from work on account of disability or leave of absence (whether or not he or she is receiving workers' compensation payments), who recovers from such disability (if any), is able to perform all of the duties of his or her position and requests reinstatement to active employment status within the 6 month period beginning on the day of Closing but is denied reinstatement by Buyer (provided, however, that an employee who is absent on the day of Closing by reason of a leave covered by the Family and Medical Leave Act of 1993 or other leave of absence that expires within the 6-month period after Closing, who does not request to return to active employment upon the expiration of such leave shall not be entitled to reinstatement or severance benefits).

(b)     After the above-mentioned 12-month period, Buyer may, in its sole discretion, terminate or revise the severance pay policy for U.S. Continued Employees. U.S. Continued Employees shall receive credit for prior service with the Grace Group for purposes of any revised policy.

2.11   Buyer Group Plans

Any employee benefit plan coverages assumed or provided by Buyer to, or with respect to, the U.S. Continued Employees (including, but not limited to, those

employees who are covered by the collective bargaining agreement applicable at the Subject Business's plant in Owensboro, Kentucky) shall be through plans, programs and/or policies established and maintained by Buyer; and no plan, program or policy maintained by the Grace Group shall provide any such coverages assumed or provided by Buyer after the Closing, subject to Section 2.12.

2.12    U.S. Continued Employees With Pre-Existing Conditions

Notwithstanding any other provision of this Agreement or the Sale Agreement:

(a)    Each U.S. Continued Employee or eligible spouse or dependent who is diagnosed prior to day of Closing or receiving a course of medical treatment established and/or commenced prior to the day of Closing, that continues uninterrupted on and after that date, with respect to cancer or Major Organ Dysfunction (as defined herein), shall

(i)    continue to be covered under the medical and dental insurance provisions of the Grace Welfare Plans, as if such U.S. Continued Employee (or, in the case of such a spouse or dependent, as if the Employee through whom coverage under those Plans is provided) had continued to be an employee of Grace-Conn. on and after the day of Closing, except that medical and dental coverage under the Grace Welfare Plans shall cease as of the date of a Termination Event (as defined herein) or, if earlier, the date that such U.S. Continued Employee (or spouse or dependent) satisfies all requirements of the Buyer's medical stop-loss insurance company for coverage under the medical stop-loss insurance policy that provides coverage for Buyer's Medical Plans;

(ii)    continue to be covered under group term life insurance provisions of the Grace Welfare Plans for an amount of death benefit that is effective with respect such U.S. Continued Employee (or spouse or dependent) the day before the day of Closing, except that such coverage under the Grace Welfare Plans shall cease

- 14 -

as of the date of a Termination Event or, if earlier, the date that such U.S. Continued Employee (or spouse or dependent) satisfies all the requirements of the Buyer's group term life insurance company for group term life insurance under the group term policy funding Buyer's employee life insurance plan; and

(iii)   commence, as of the day of Closing, to participate in the Buyer's LTD Plan, provided that this clause (iii) shall only apply to U.S. Continued Employees who are covered by the Grace LTD Plan the day before Closing.

(b)   Each U.S. Continued Employee or eligible spouse or dependent who is receiving a course of treatment established and/or commenced prior to the date of Closing, that continues uninterrupted on and after that date, with respect to a medical condition (other than cancer and/or Major Organ Dysfunction) that both (1) required hospitalization within 6 months prior to Closing and (2) is regarded by Buyer's medical stop-loss insurance company as a "pre-existing condition" that precludes immediate coverage under the medical stop-loss insurance policy that provides coverage for Buyer's Medical Plan, shall

(i)   continue to be covered under the medical and dental insurance provisions of the Grace Welfare Plans, as if such U.S. Continued Employee (or, in the case of such a spouse or dependent, as if the Employee through whom coverage is provided) had continued to be an employee of Grace-Conn. on and after the day of Closing, except that medical and dental coverage shall cease as of the date of a Termination Event or, if earlier, the date that such U.S. Continued Employee is released by his or her treating physician to return to work full-time without major restrictions or (in the case of such a spouse or dependent) to resume all active life functions normally;

(ii)   continue to be covered under group term life insurance provisions of the Grace Welfare Plans for an amount of death benefit that is effective with re-

- 15 -

spect such U.S. Continued Employee (or spouse or dependent) the day before the date of Closing, except that such coverage under the Grace Welfare Plans shall cease as of the date of a Termination Event or, if earlier, the date that such U.S. Continued Employee (or spouse or dependent) satisfies all the requirements of the Buyer's group term life insurance company for group term life insurance under the group term policy funding Buyer's employee life insurance plan; and

(iii)   commence, as of the day of Closing, to participate in the Buyer's LTD Plan, provided that this clause (iii) shall only apply to U.S. Continued Employees who are covered by the Grace LTD Plan the day before Closing.

(c)   Buyer shall notify the Vice President of Human Resources of WRG (at One Town Center Road, Boca Raton, Florida 33486; phone (407) 362-2221; fax (407) 362-2246) as soon as practicable after any U.S. Continued Employee (or spouse or dependent) who is referred to in sub-sections (a) or (b) above, ceases to be entitled to coverage under the Grace Welfare Plans in accordance with this Section 2.12.  If Buyer fails to provide such notification, Buyer shall reimburse Grace-Conn. for the cost incurred by Grace-Conn. to provide coverage under the Grace Welfare Plans for services rendered, supplies furnished and deaths occurring after the date the U.S. Continued Employee (or spouse or dependent) ceased to be entitled to such coverage.

(d)   Buyer shall pay to Grace-Conn. an amount equal to the actual cost to Grace-Conn. of the medical claims paid by the Grace Welfare Plans pursuant to this Section 2.12, during the following years, in accordance with the following table:

- 16 -

| Year | Percentage Of Grace-Conn. Cost Buyer Shall Pay To Grace-Conn. |
|---|---|
| 1995 and prior years | 0% |
| 1996 | 20% |
| 1997 | 40% |
| 1998 | 60% |
| 1999 | 80% |
| 2000 and thereafter | 100% |

(e)    Buyer shall not pay to Grace-Conn. any amount attributable to life insurance death benefits paid by the Grace Welfare Plans pursuant to this Section 2.12, subject to sub-section (c) of this Section 2.12.

(f)    Grace-Conn. shall pay to Buyer an amount equal to the actual cost to Buyer of disability benefits paid under the Buyer's LTD Plan pursuant to this Section 2.12, during the following years, in accordance with the following table:

| Year | Percentage Of Buyer Cost Grace-Conn. Shall Pay To Buyer |
|---|---|
| 1995 and prior years | 100% |
| 1996 | 80% |
| 1997 | 60% |
| 1998 | 40% |
| 1999 | 20% |
| 2000 and thereafter | 0% |

(g)    After the Closing, Grace-Conn. or Buyer (as the case may be) shall periodically provide the other party with a written demand to make the payments required by this Section 2.12. The written demand shall specify the time period covered by the demand, each employee (or spouse or dependent) to whom the demand relates, the

- 17 -

amount of the demand attributable to the employee, a description of the nature of the underlying costs and expenses and the total amount to be reimbursed pursuant to the demand. Buyer or Grace-Conn. (as the case may be) shall provide the other party with all information and documentation reasonably requested in order to verify the amount to be reimbursed under this Section 2.12.

(h)    Grace-Conn. and Buyer (as the case may be) shall be provided by the other party with any information or documentation requested by Grace-Conn. or Buyer that is reasonably necessary to determine a U.S. Continued Employee's (or spouse's or dependent's) eligibility to receive benefits provided by Grace-Conn. or Buyer, or regarding benefits for which either party is responsible for reimbursing the other party, pursuant to this Section 2.12.

(i)    Notwithstanding any other provision of this Agreement or the Sale Agreement to the contrary, any amendments to the coverages under the Grace Welfare Plans (not including the termination of coverage under those plans) shall apply to all U.S. Continued Employees (and spouses and dependents) entitled to coverage under the Grace Welfare Plans pursuant to this Section 2.12 in the same manner as to Grace-Conn. employees located in Cambridge and Lexington.

(j)    For purposes of this section:

"Major Organ Dysfunction" means an imminently life threatening or serious condition disrupting the normal physical operation of any of the major organs of the body, including (without limitation) the heart, lungs, liver, pancreas, intestines, colon, bladder, ovaries, kidney, stomach, brain or uterus.

"Termination Event" means, with respect to an individual entitled to coverage under the Grace Welfare Plans pursuant to this Section 2.12, separation of service of the U.S. Continued Employee (through whom such coverage is provided) from Buyer

- 18 -

U.S. (including in the event of the sale of the assets of the Battery Separators business but not the sale of the stock of the entity conducting that business) or, with respect to all such individuals, the termination of employee medical plan coverage for all U.S. employees of the Grace Group. Notwithstanding any other provision of this Section 2.12 to the contrary, the Grace Group shall offer and be liable for any continuation health coverage (including any penalties, excise taxes or interest resulting from the failure to provide continuation coverage) required by section 4980B of the Code due to qualifying events affecting individuals who are covered under the medical and dental provisions of the Grace Welfare Plans pursuant to this Section 2.12 at the time of a qualifying event. Buyer shall notify the Grace Group in a timely fashion of the occurrence of such qualifying events of which Buyer is, or reasonably should have been, aware. Buyer shall pay Grace-Conn. an amount equal to the actual cost to Grace-Conn. of the medical claims paid by the Grace Welfare Plans pursuant to such continuation health coverage in accordance with the table specified under Section 2.12(d).

(k)    Buyer shall establish a plan or policy that covers expenses related to any medical condition of U.S. Continued Employees (or their spouses or dependents) that is a "pre-existing condition" which will not be covered immediately under the medical stop-loss insurance policy providing coverage for the Buyer's Medical Plans (other than to those U.S. Continued Employees and their spouses and dependents specified in sub-sections (a) and (b) of this Section 2.12); provided that expenses related to such medical condition would be covered under that insurance policy but for the policy's "pre-existing condition" limitation. Grace-Conn. shall reimburse to Buyer an amount equal to the medical claims actually paid by Buyer for such expenses incurred during the 12-month period commencing on the day of Closing, but only to the extent that such medical claims actually paid by Buyer exceed $100,000.

2.13   <u>VGA Coverage</u>    The Grace Group shall direct the insurance company that issued the insurance policy (the "VGA Policy") that provides benefits under the W. R. Grace & Co. Voluntary Group Accident Insurance Plan (the "VGA Plan") to issue

- 19 -

Buyer an insurance policy that, as of the day of Closing, provides coverages, benefit levels and rates of employee contributions that are identical to those coverages, bene- fit levels and rates of employee contributions under the VGA Policy in effect for U.S. Continued Employees who participate in the VGA Plan on the day before the day of Closing; provided that the Buyer, in a timely manner, takes all actions required by the insurance company in order to issue such policy to the Buyer.

3.    **Provisions Applicable To French Employees.**

3.1    Buyer acknowledges that the conveyance of capital stock of the Trans- ferred Company to Buyer France shall not affect the continuation of the benefits pro- vided to French Employees by the Transferred Company pursuant to employee benefit plans, programs or policies  maintained, or contracts entered into, by the Transferred Company.

3.2 .  Subject to the provisions of Article 12 of the Sale Agreement, the Buyer Group shall defend, indemnify and hold Grace S.A. and all other members of the Grace Group harmless from and against any claims or liability (including, but not limit- ed to, severance benefits, separation pay or similar entitlements under applicable law or otherwise) arising from the discharge or constructive discharge of any French Em- ployee which occurs on or after the day of Closing.

4.    **Provisions Applicable To German Continued Employees.**

4.1    Buyer acknowledges that, in accordance with applicable law, Grace Germany's obligations to each German Employee with respect to pensions, life insur- ance, medical insurance, disability insurance and all other benefits provided by plans, programs or policies maintained by Grace Germany shall be transferred to, and as- sumed by, Buyer U.S. effective on the day of Closing.  As of the Closing, Grace Germany's liability under any such plans, programs and policies, including Grace G.m.b.H. Pension Plan, with respect to each German Employee shall be transferred to, and assumed by, Buyer U.S.

- 20 -

4.2   With respect to the German Employees, at the Closing, Buyer U.S. shall assume Grace Germany's obligations under any contract between Grace Germany and an insurance company which provides life, medical, disability or any other benefit insurance coverage to the German Employees or which provides insurance coverage for Grace Germany's liability to provide pensions to the German Employees. Prior to Closing, Grace Germany and Buyer U.S. shall contact each such insurance company and use their best efforts to arrange that the insurance company enter into a contract with Buyer U.S. which provides the same coverage with respect to the German Employees as the insurance contract between that company and Grace Germany the day before the Closing.

4.3   Grace Germany shall remain liable under each employee benefit plan, program or policy maintained by Grace Germany with respect to individuals who terminated employment with Grace Germany prior to the Closing and with respect to each employee of Grace Germany who does not become an employee of Buyer U.S. (including, but not limited to, any such employee of Grace Germany employed exclusively or primarily in the Subject Business who objects in accordance with applicable law to the transfer of his or her employment contract to Buyer U.S. as of the Closing).

4.4   The Buyer Group shall defend, indemnify and hold Grace Germany and all other members of the Grace Group harmless from and against any claims or liability (including, but not limited to, severance benefits, separation pay or similar entitlement under applicable law or otherwise) arising from the discharge or constructive discharge of any German Employee which occurs after the day of Closing.

5.   Provisions Applicable To Non-U.S. Continued Employees.

5.1   Except to the extent required by applicable law or as otherwise expressly provided in the Sale Agreement or this Agreement, as of the Closing, each Non-U.S. Continued Employee who is provided with coverage as an active employee under any pension, retirement, medical, dental, disability, severance, life insurance, accident

- 21 -

insurance or other retirement or welfare benefit plan, program or policy which is maintained by any member of the Grace Group shall cease to be provided with those coverages.

5.2    The Grace Group shall not be liable for medical, dental, disability, life insurance or accident insurance benefits with respect to Non-U.S. Continued Employees or dependents, except as provided by the next sentence or as required by applicable law. The Grace Group shall be liable for the payment of such benefits with respect to eligible Non-U.S. Continued Employees or dependents for claims related to services performed, supplies furnished or deaths occurring prior to the day of Closing, regardless of whether any such claim had actually then been filed by the day of Closing, in accordance with the terms of the applicable plan, program or policy.

5.3    The Buyer shall be liable for medical, dental, disability, life insurance or accident insurance benefits with respect to eligible Non-U.S. Continued Employees for claims related to services performed, supplies furnished or deaths occurring on or after the day of Closing, notwithstanding the fact that any such claim may be related to another claim which was paid or is eligible for payment under the terms of any plan, program or policy maintained by the Grace Group in accordance with Section 5.2 above.

5.4    Subject to the provisions of Article 12 of the Sale Agreement, Buyer shall indemnify and hold the Grace Group harmless against any claims for severance pay and other severance or termination benefits made by any Non-U.S. Continued Employee which relate to events occurring on or after the day of Closing.

6.    Miscellaneous.

6.1    Payroll Issues.

At the request of any member of the Grace Group made any time after Closing, any member of the Buyer Group shall, in a timely manner, provide that member of the

- 22 -

Grace Group with the information in Buyer Group's possession which that member of the Grace Group reasonably deems necessary for it to complete any governmental filing (including, but not limited to, any Internal Revenue Service ("IRS") filing, including IRS W-2 Forms), with respect to each individual whose employment with the Grace Group terminated prior to or on the day of Closing.

6.2    Conditional Upon The Closing.

The parties' obligations under this Agreement are conditional upon the Closing, the occurrence of which is subject to various conditions set forth in the Sale Agreement. This Agreement shall become operative if and when the Closing occurs and shall be null and void if the Closing does not occur for any reason. Nothing contained in this Agreement shall constitute a representation or promise that any party hereto or any related person, will proceed with the Closing, or obligate any party hereto or any related person, to do so.

6.3    Right to Amend.

This Agreement may be amended, superseded or canceled, and any of the terms hereof may be waived only by a written instrument specifically referring to this Agreement and specifically stating that it amends, supersedes or cancels this Agreement or waives any of its terms, executed by both parties (or, in the case of a waiver, by the party waiving compliance). The failure of any party at any time or times to require performance of any provision of this Agreement shall in no manner affect the right at a later time to enforce such provision. No waiver by either party of any breach of any term contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of such breach, or waiver of any breach of any other term.

6.4    Other Provisions.

(a)    Nothing in this Agreement shall give any employee the right to be retained in the service of any of the parties hereto or to interfere with the parties' rights to discharge or terminate the service of any employee.

(b)    Except as otherwise expressly provided in this Agreement, no provision of this Agreement shall be interpreted or construed in a manner which would prevent the parties hereto, in their sole discretion, from discontinuing, suspending or amending any employee benefit plan, severance pay plan or any other plan or program covering employees, in accordance with applicable law and the terms of the applicable plan documents.

(c)    This Agreement shall not confer any rights to remedies upon any person other than the parties hereto and their respective successors and permitted assigns.

(d)    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, excluding the conflict of laws provisions thereof that would otherwise require the application of the law of any other jurisdiction.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

W.R. GRACE & CO.

By: _Bob Schult_

Title: _VP_

W.R. GRACE & CO.-CONN.

By: _Bob Schult_

Title: _VP_

GRACE ARGENTINA S.A.

By: _Bob Schult_

Title: _Atty in fact_

W.R. GRACE AUSTRALIA LTD.

By: _Bob Schult_

Title: _Atty in fact_

- 25 -

GRACE PRODUTOS QUIMICOS e
PLASTICOS LTDA.

By: _____

Title: _Atty in fact_____

GRACE S.A.

By: _____

Title: _Atty in fact_____

GRACE G.m.b.H

By: _____

Title: _Atty in fact_____

GRACE JAPAN K.K.

By: _____

Title: _Atty in fact_____

- 26 -

GRACE BATTERY SEPARATORS S.A.

By: _____

Title: _____


POLYPORE, INC.

By: _____

Title: _____

## EMPLOYEE BENEFITS AGREEMENT
## SCHEDULE TO SECTION 2.9

### 1993 Vacation Carryover

| Name/Location | Amount of Carryover |
|---|---|
| **Cambridge** | |
| James Kung | 7 days |
| **Lexington** | |
| Chris Shea | 5 days |
| **Owensboro** | |
| Randy Hanschu | 3 days |