## Conclusion

Taxpayer believes that the proposed adjustments that are the subject of this Protest are erroneous, either factually, legally, or both. Taxpayer further believes that it can support the positions taken in its return as filed with respect to such adjustments and that Taxpayer is entitled to adjustments in its favor as set forth herein. For these reasons, Taxpayer hereby protests the adjustments set forth in the NOPAs and seeks review thereof by Appeals.

\* \* \*

The undersigned assisted in the preparation of the protest but does not know personally that the statements of facts contained in the protest are true and complete.

A power of attorney (Form 2848) authorizing the undersigned to represent the Taxpayer in this matter was previously submitted and is attached hereto as Exhibit C.

Respectfully submitted,

*Elyse Filon*

Elyse Filon
Vice President – Finance
W. R. Grace & Co. Affiliated Group
As Agent For Fresenius Medical Care
Holdings, Inc.

7

# Exhibit G

## 2002 Protest

# GRACE

Elyse Napoli Filon
Vice President
Tax, Risk Management & Strategic Fina

W. R. Grace & Co.
5400 Broken Sound Boulevard NW
Suite 300
Boca Raton, FL 33487

(561) 362-1302
Fax: (561) 362-1323
e-mail: elyse.napolifilon@grace.com

September 3, 2002

**BY HAND DELIVERY**
Mr. Fritz Vilma
Case Manager
Internal Revenue Service
Mail Stop 4714
7850 SW 6th Court
Plantation, Florida 33324

*Received
James F. Fuerle
IRS - LMSB 1714
9/3/2002*

**PROTEST**
In Re: Fresenius Medical Care Holdings, Inc. - EIN 13-3461988
Taxable Years: 1993 through 1996

Dear Mr. Vilma:

This letter constitutes a Protest to the various Forms 5701 – Notice of

Proposed Adjustments ("NOPAs"), identified in a Revenue Agent's Report ("RAR")

dated August 2, 2002 and a corrected RAR dated August 30, 2002 issued to Fresenius

Medical Care Holdings, Inc. Affiliated Group ("Taxpayer") with respect to taxable years

ending December 31, 1993 through December 31, 1996. Fresenius Medical Care

Holdings, Inc. (f/k/a as W.R. Grace & Co.[1], and after that Fresenius National Medical

Care Holdings, Inc.), a New York corporation ("Fresenius" E.I.N. 13-3461988) is the

---

[1]     During the periods referred to in this Protest and the NOPAs a number of different
corporations were named W.R. Grace & Co. They subsequently changed their names. These
corporations during these periods were also the common parent corporations of consolidated
groups referred to by the same name. This explanation is provided to assist the Appeal Office in
understanding the various corporate changes and other issues, some of which arise from the
bankruptcy filing in April 2001 by Grace-Conn.

# GRACE

Elyse Napoli Filon
Vice President
Tax, Risk Management & Strategic Finar

W. R. Grace & Co.
5400 Broken Sound Boulevard NW
Suite 300
Boca Raton, FL 33487

(561) 362-1302
Fax: (561) 362-1323
e-mail: elyse.napolifilon@grace.com

September 3, 2002

**BY HAND DELIVERY**
Mr. Fritz Vilma
Case Manager
Internal Revenue Service
Mail Stop 4714
7850 SW 6th Court
Plantation, Florida 33324

**PROTEST**
In Re: Fresenius Medical Care Holdings, Inc. - EIN 13-3461988
Taxable Years: 1993 through 1996

Dear Mr. Vilma:

This letter constitutes a Protest to the various Forms 5701 – Notice of

Proposed Adjustments ("NOPAs"), identified in a Revenue Agent's Report ("RAR")

dated August 2, 2002 and a corrected RAR dated August 30, 2002 issued to Fresenius

Medical Care Holdings, Inc. Affiliated Group ("Taxpayer") with respect to taxable years

ending December 31, 1993 through December 31, 1996. Fresenius Medical Care

Holdings, Inc. (f/k/a as W.R. Grace & Co.[1], and after that Fresenius National Medical

Care Holdings, Inc.), a New York corporation ("Fresenius" E.I.N. 13-3461988) is the

---

[1]    During the periods referred to in this Protest and the NOPAs a number of different
corporations were named W.R. Grace & Co. They subsequently changed their names. These
corporations during these periods were also the common parent corporations of consolidated
groups referred to by the same name. This explanation is provided to assist the Appeal Office in
understanding the various corporate changes and other issues, some of which arise from the
bankruptcy filing in April 2001 by Grace-Conn.

common parent of Taxpayer for the taxable years ended December 31, 1993 through December 31, 1996. This letter also constitutes a Protest to the various Forms 5701 – Notice of Proposed Adjustments designated as NOPA XXX-G identified in a Revenue Agent's Report ("RAR") dated August 2, 2002 and a corrected RAR dated August 30, 2002 issued to Sealed Air Corporation Affiliated Group (f/k/a W.R. Grace & Co. Affiliated Group) with respect to the taxable period September 29, 1996 through December 31, 1996 to the extent those correlative adjustments impact Taxpayer's tax liability. Sealed Air Corporation (f/k/a W.R. Grace & Co. and before that f/k/a Grace Holding, Inc.), a Delaware corporation ("Sealed Air" E.I.N. 65-0654331), is the common parent of the Sealed Air Corporation Affiliated Group (referred to herein as the Grace-Delaware consolidated group) for the taxable period September 29, 1996 through December 31, 1996.

On September 28, 1996, Sealed Air and certain directly and indirectly wholly-owned subsidiaries, including W.R. Grace & Co.—Conn., a Connecticut corporation ("Grace-Conn." E.I.N. 13-5114230) were spun out of the Taxpayer's consolidated group. Immediately following the spin-off, Grace Holding, Inc. changed its name to W.R. Grace & Co. ("Grace Delaware; n/k/a Sealed Air) and became the parent of a new consolidated group known as the W.R. Grace & Co. and Subsidiaries (E.I.N. 65-0654331) consolidated group which included Grace-Conn.

On March 31, 1998, Grace-Conn., which had become a subsidiary of Grace Specialty Chemicals, Inc., a Delaware Corporation (E.I.N. 65-0773649) (n/k/a W.R. Grace & Co.), and its new parent were spun out of the Grace-Delaware consolidated group. Immediately following the spin-off, Grace-Conn. became a member

of the W.R. Grace & Co. and Subsidiaries (E.I.N. 65-0773649) consolidated group. The Grace-Delaware consolidated group continued in existence and Grace-Delaware subsequently changed its name in 1998 to Sealed Air Corporation. Sealed Air today remains the common parent for the consolidated return filed for the period September 29, 1996 to December 31, 1996.

The Service made certain identical adjustments to both the Taxpayer for 1996 and to the Grace-Delaware consolidated group for the short period commencing September 29, 1996 and ending December 31, 1996. These Grace-Delaware consolidated group items are correlative to the proposed adjustments to Taxpayer and affect, in part, the amount of a net operating loss carryback to the 1994 year of Taxpayer. These NOPAs are designated in the RAR by the issue number followed by the letter "G" and are similarly subject to this Protest.

Taxpayer hereby protests the identified adjustments and requests that all of the matters addressed herein be referred for review by the Appeals Office. Taxpayer also respectfully requests a conference with said Appeals Office. Taxpayer reserves the right to supplement this Protest both before and during such conference.

A power of attorney authorizing the undersigned to represent the Taxpayer has previously been furnished to you.

Exhibit 1 attached hereto identifies NOPAs which were included or referenced in the RAR to which the Taxpayer does not object and which should be treated by Appeals as tentatively agreed items that are not otherwise addressed in this Protest. Grace-Conn is severally liable for any assessment of taxes made with respect to both Taxpayer and the Sealed Air consolidated group. Both W.R. Grace & Co. and Grace-Conn are currently debtors in a bankruptcy action pending in Delaware (Docket No. 01-01140-PJW) and has been informed by its bankruptcy counsel that it will need court approval before it can agree to the NOPAs which are not being protested.

### Proposed Adjustments Protested

| NOPA | Year | | | | Affirmative Adjustment |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | |
| 112 | | | | $ 1,114,755 | (*) |
| 112-G | | | | $ 385,245 | (*) |
| 114 (R&E Credit) | $ 2,525,033 | $ 2,875,927 | $ 1,613,883 | | |
| 129 | $30,781,976 | $26,954,034 | $32,836,273 | $19,291,369 | (*) |
| 129-G | | | | $ 6,666,870 | (*) |
| 136 | | | $ 2,083,449 | | (*) |
| 142 (1) | | | | | $3,253,277 |
| 144 (2) | | | | | $8,347,850 |
| 148 | | | | $ 2,665,750 | (*) |
| 148-G | | | | $ 921,252 | (*) |
| 150 | | | | $ 1,352,568 | (*) |
| 150-G | | | | $ 467,432 | (*) |
| 152 | ($ 7,371,173) | $ 203,209 | ($ 2,658,629) | ($ 351,437) | (*) |
| 155 | ($10,497,910) | $ 324,486 | $20,114,463 | $ 1,418,914 | (*) |
| 155-G | | | | $ 490,360 | (*) |
| 156 | $17,814,555 | $21,956,834 | | $ 1,481,261 | (*) |
| 157 | | $ 2,630,402 | | | (*) |
| 158 (G.B. Credit) | $11,214,676 | | | | (*) |
| 159 (NOL Deduction | $22,376,476 | | | | (*) |
| 160 (Mini Tax Credit) | | | | ($13,507,251) | (*) |
| 161 | ($ 2,161,697) | ($ 210,626) | $11,147,398 | $12,527,990 | (*) |
| 162 (FT Credit | | | | | (*) |
| 164 (3) | | ($1,373,647) | | | |

(*)   To be furnished to Appeals Officer.

(1)   The NOPA disallowed a claim for an affirmative adjustment of the stated amount. Taxpayer reserves the right to ask for an increase to its claim.

(2)   The NOPA disallowed a claim for an affirmative adjustment of the stated amount. Taxpayer reserves the right to ask for an increase to its claim.

(3)   The NOPA disallowed part of a claim for an affirmative adjustment. Taxpayer protests the disallowed amount.

### NOPA 112

In NOPA 112, the Service proposed to disallow a deduction of $1,114,755 for Taxpayer for the year taxable ended December 31, 1996. The adjustment is labeled, "Schedule M-1, line 5, adjustment relating to the 1996 Restructuring Reserve, Account # 2868-19."

According to NOPA 112, this adjustment relates to the transfer of a credit balance of $1,500,000 from its 1995 Restructuring Reserve. In NOPA 112 and NOPA 112-G, the Service determined that Taxpayer should increase its income for 1996 as a result of the transfer of this credit balance. The Service also disallowed an "uninvestigated charge" of $19,970 on the grounds of lack of substantiation.

These adjustments relate to restructuring, divestment, environmental and special charges reserves. Taxpayer is reviewing these and other reserves and was not able to complete its analysis prior to the issuance of the RAR. Taxpayer anticipates that it will provide additional evidence supporting these Schedule M-1 items to Appeals.

### NOPA 112 – G

In NOPA 112-G, the Service proposed to disallow deductions of $385,245 claimed by the Grace-Delaware consolidated group for the taxable year ended December 31, 1996. This adjustment appears to be the balance of the $1,500,000 adjustment that is discussed above with respect to NOPA 112.

This adjustment relates to restructuring, divestment, environmental and special charges reserves. Taxpayer is reviewing these and other reserves and was not

able to complete its analysis prior to the issuance of the RAR. Taxpayer anticipates that it will provide additional evidence supporting these Schedule M-1 items to Appeals.

## NOPA 114

Attached hereto and incorporated herein as Exhibit 2 is a memorandum dated August 24, 2002 setting forth Taxpayer's position disagreeing with the proposed adjustment and setting forth its position that the research and experimentation credits were understated and should be increased as is set forth in Exhibit 2.

## NOPAs 129 and 129-G

| NOPA | Year Ended | Amount |
|------|-----------|--------|
| 129 | 12/31/93 | 30,781,976 |
|     | 12/31/94 | 26,954,034 |
|     | 12/31/95 | 32,836,273 |
|     | 12/31/96 | 19,291,369 |
| 129-G | 12/31/96 | 6,666,870 |

These NOPAs all relate to the disallowance of interest deductions related to corporate owned life insurance ("COLI"). These issues were addressed in detail in a protest filed on August 14, 2001, and a supplemental protest filed on August 27, 2002 (the "COLI Protests") with Mr. Fritz Vilma, the Service's case manager. These COLI Protests have already been forwarded to the Appeals Office for consideration. Taxpayer hereby repeats its objections to these adjustments and the arguments set forth in the COLI Protests are incorporated herein by reference.

## NOPA 136

In NOPA 136, the Service proposed to disallow deductions of $2,083,449 for the taxable year ended December 31, 1995. Taxpayer claimed a deduction for an

Environmental and Adjusted Divestiture Reserve of $2,107,585, which the Service proposes to disallow to the extent in excess of $24,136.

Taxpayer maintained accounts for purposes of tracking its environmental and divestiture liability. During 1995, the balance in the relevant account with respect to environmental reserves increased by $2,398,411, whereas the balance with respect to divestiture liabilities decreased by $290,826. The difference of $2,107,585 is the amount of the deduction claimed by Taxpayer.

The Service's position appears to be that the Taxpayer did not, in fact, incur a deductible liability. NOPA 136 expressly acknowledges that this is a factual issue.

This adjustment relates to restructuring, divestment, environmental and special charges reserves that were deducted in 1995. Taxpayer believes that this is an accounting issue relating to the computation of environmental and divestiture reserves. Taxpayer objects to the disallowance and will provide additional evidence supporting these deductions to Appeals. Taxpayer is further reviewing these reserves and anticipates that it will submit additional evidence to Appeals supporting a claim for an affirmative adjustment.

## NOPA 142

In NOPA 142, the Service proposed to disallow additional deductions claimed with respect to the Cryovac division and the Construction Products division for the taxable year ended December 31, 1995. The adjustment is labeled, "Reconciling Schedule M - Restructuring Reserve, Claim for Refund." The adjustment set forth in

NOPA 142 is $0, as the Service proposes to disallow the additional deductions claimed during the audit.

According to NOPA 142, this adjustment relates to the Taxpayer's claimed restructuring reserves for 1995. With respect to the 1995 restructuring reserves, Taxpayer has previously presented information to the Service concerning the claimed deductions.

The Taxpayer determined that, on a consolidated basis, it had over-deducted $13,909,663, whereas the Service determined that the Taxpayer had over-deducted $17,162,940. The proposed adjustment reflects that differential. (NOPA 142 refers to NOPAs 110 and 137 as to the aggregate components of the amount at issue NOPA 142. After the issuance of NOPA 142, NOPA 137 was revised. Taxpayer believes that the amount of the disallowed claim was not affected by this revision.)

In this regard, the $13,909,663 adjustment proposed by the Taxpayer related to four entities. The Service proposed to accept the adjustments for two entities that resulted in an increase in taxable income (which totaled $17,162,940) but disallowed the adjustments for the other two entities, which resulted in a decrease in taxable income of $3,253,277. This adjustment relates to expenditures by the Cryovac and Construction Products divisions of Grace-Conn.

Turning first to the Cryovac division, the Taxpayer's claimed adjustment of $3,253,277 included $2,228,277, which was derived from a comparison of the 1994 and 1995 ending balances of the reserve accounts maintained by Taxpayer for Grace-Conn's Cryovac division. The Service determined, however, that there were no

expenditures in connection with this aspect of the restructuring in 1995. Instead, according to the Service, the Taxpayer made a charge to a liability account but did not make payment in 1995; payment was made in 1996. According to the Service, the Taxpayer was allowed a deduction for this amount in 1996.

With respect to the Construction Products division, the Service made a similar adjustment of $1,025,000. The Taxpayer claimed restructuring expenditures of $5,131,000 in 1995, but the Service determined that actual expenditures by the Taxpayer in 1995 for restructuring with respect to the construction products division should be limited to $4,374,000. The proposed disallowance is equal to the difference between these two amounts.

Taxpayer objects to the disallowance of the claimed deductions, which the Service acknowledged in NOPA 142 are factual in nature. Taxpayer will provide additional evidence supporting this NOPA to Appeals.

## NOPA 144

In NOPA 144, the Service proposed to disallow an additional deduction of $8,347,850 claimed by Taxpayer for the year taxable ended December 31, 1995. This adjustment is labeled, "Reconciling Schedule M – Environmental Reserve, Claim for Refund."

According to NOPA 144, this adjustment relates to environmental expenditures that were recorded by the Remediation Unit, also known as the Ag Chem division. Taxpayer claimed environmental expenditures of $21,222,150 on its return for

1995, but the Remediation Unit's records indicated that such expenditures totaled $29,570,000, with the difference being the amount of the claimed refund ($8,347,850).

Taxpayer maintained accounts for this division in the general ledger and miscellaneous schedules of the Remediation Unit, which information has previously been provided to the Service. The various environmental costs incurred by the different divisions within Taxpayer were consolidated through intercompany liability accounts. Taxpayer traditionally determined the amount of its expenditures by comparing the opening and closing balances in the various accounts that it maintained.

In this situation, Taxpayer determined the difference between the accumulated expenditures reflected on internal company reports for 11 units, divisions or subsidiaries for the fourth calendar quarter of 1994 and 1995. Taxpayer has provided the Service with a detailed explanation of how these reserves were calculated. The foregoing notwithstanding, the Service contends that no records were provided that would enable the tracking of intercompany accounts or to show that these expenditures were not deducted twice.

This is a factual issue. Taxpayer claimed during the audit that it was entitled to these additional deductions. The Service has essentially proposed to disallow these deductions on grounds of lack of substantiation, but in reality the Service is asking Taxpayer to not only substantiate these deductions but also prove a negative, i.e., that no other entity, affiliate or subsidiary claimed these deductions. Taxpayer believes that it has already fully substantiated these deductions through its accounting processes and has met its burden of proving its entitlement to the deductions. The Service cannot challenge this substantiation except with contrary evidence. If necessary, Taxpayer will provide

additional evidence supporting these deductions to Appeals to the extent necessary to
rebut specific factual assertions raised by the examining agents, although Taxpayer does
not believe that the Service can fairly request it prove a negative in order to be entitled to
these deductions.

## NOPA 148

In NOPA 148, the Service proposed to disallow restructuring expenses of
$2,665,750 for the taxable year ended December 31, 1996. The Service claimed that this
amount was part of expenses totaling $3,587,002, that allegedly were deducted twice.
The deduction was also disallowed for lack of substantiation. (The balance of the
$3,587,002 is addressed in NOPA 148-G, below.)

Taxpayer believes that there was no "double deduction" of this
restructuring expense. Taxpayer is entitled to the deduction as reported on these
respective returns for 1996. Taxpayer is further reviewing its restructuring expenses and
reserves and anticipates that it will provide additional evidence supporting this deduction
to Appeals.

## NOPA 148-G

In NOPA 148-G, the Service proposed to disallow restructuring expenses of $921,252. The Service claimed that this amount was part of expenses totaling $3,587,002, that allegedly was deducted twice on the return for the taxable period ended December 31, 1996. The deduction was also disallowed for lack of substantiation. This proposed adjustment is erroneous for the same reasons set forth in the response to NOPA 148.

## NOPA 150

In NOPA 150, the Service proposed an adjustment to increase Taxpayer's taxable income by $1,352,568 for the taxable year ended December 31, 1996. Taxpayer had claimed a deduction of $1,179,192 for compensation; the Service disallowed this claimed deduction and proposed an additional increase in income of $173,376. Apparently the Service contends that Taxpayer claimed a favorable adjustment on Schedule M-1 of $1,586,707, relating to deductions for "reserve fluctuations" that took into account the timing of compensation deductions, on the grounds that Taxpayer used an incorrect amount in the reversal of the current year's payments that were deducted in a prior year. The Service disallowed this adjustment and also determined an increase. (The Service makes a corresponding adjustment of $467,432 in NOPA 150-G, apparently on the grounds that a total adjustment of $1,820,000 is appropriate, a portion of which is allocable to the Grace-Delaware consolidated group.)

Taxpayer believes that it properly deducted payments for compensation. Taxpayer anticipates that it will provide additional evidence supporting this deduction to Appeals.

## NOPA 150-G

In NOPA 150-G, the Service proposed to increase the Grace-Delaware consolidated group's taxable income by $467,432 for the taxable period ended December 31, 1996. This adjustment is related to NOPA 150.

Taxpayer believes that compensation was appropriately deducted on Grace-Delaware's 1996 returns. Taxpayer anticipates that it will provide additional evidence supporting this deduction to Appeals.

## NOPA 152

The Service proposes additional adjustments to foreign taxes paid as follows:

| Years | Amount | Account or Return Line |
|-------|--------|------------------------|
| 1993 | ($7,371,173) | Foreign Taxes Paid – (TP Favor) |
| 1994 | 203,209 | "     "     " |
| 1995 | ($2,658,629) | "     "     " |
| 1996 | ($   351,437) | "     "     " |

This issue is both factual and computational. Taxpayer reserves the right to submit evidence to Appeals to contest this adjustment. To the extent that adjustments are made to foreign source income or that adjustments are made to taxable income, both the amount of the credit and the utilization of the credit may change. Taxpayer reserves the right to contest the amount and utilization of the credits.

## NOPA 155 and NOPA 155-G

In NOPA 155, the Service proposed the following adjustments to Taxpayer's adjusted current earnings (ACE) for purposes of applying the alternative minimum tax (AMT) during the Years in Issue:

| Year | ACE Adjustment |
|------|----------------|
| 1993 | (10,497,910) |
| 1994 | 324,486 |
| 1995 | 20,114,463 |
| 1996 | 1,418,914 |

These adjustments were based on the Service's allegations concerning the "buildup in life insurance contracts" that were determined by the Service.

The assertion in NOPA 155 and NOPA 155-G that the Taxpayer is expected to agree with these adjustments is erroneous. Taxpayer will provide additional evidence supporting Taxpayer's computation of its ACE adjustments to Appeals.

### NOPA 156

In NOPA 156, the Service proposed to decrease the credit for prior year minimum tax in the following amounts:

| Year | Decreased Credit |
|------|------------------|
| 1993 | 17,814,555 |
| 1994 | 21,956,834 |
| 1995 | 1,481,261 |

According to NOPA 156, Taxpayer claimed credits for prior year minimum taxes of $26,436,593, $21,956,834 and $1,481,261 for 1993, 1994 and 1996, respectively. NOPA 156 alleges that as a result of the IRS examination of the tax returns for years through 1992, the corrected amount of credits for prior year minimum taxes available to Taxpayer for 1993 was limited to $7,269,609, reducing the allowable credit by $19,166, 984. (The disallowance was reduced to $17,814,555 as a result of adjustments made in NOPA 103.)

Taxpayer disputes this computation. Taxpayer had additional minimum tax credit carryovers from 1991 and 1992 that were not taken into account. The minimum tax credit carryover from 1991 and 1992 is also expected to change as a consequence of any adjustments to those returns which result from IRS consideration of claims for refund for 1991 and 1992 relating to COLI which were disallowed and which have been referred to Appeals for consideration.

The utilization of credits is computational and requires correlative adjustments to other tax years at issue. Taxpayer reserves the right to contest these computations and to submit additional evidence to Appeals.

**NOPA 157**

In NOPA 157, the Service proposed to recharacterize as ordinary income $2,630,402 of capital gains reported by the Taxpayer for the year ending December 31, 1994. This determination relates to the application of Section 1231.

Under Section 1231(a), if the section 1231 gains for any taxable year exceed the section 1231 losses for such taxable year, such gains and looses are treated as long-term capital gains or long-term capital losses, as the case may be. Under Section 1231(c), the net section 1231 gain for any taxable year is treated as ordinary income to the extent such gain does not exceed the non-recaptured net section 1231 losses. The non-recaptured net section 1231 losses means the aggregate amount of the net section 1231 losses for the 5 most recent preceding taxable years over the portion of such losses taken into account in determining non-recaptured net section 1231 losses in prior years.

According to NOPA 157, Taxpayer reported net section 1231 losses of

$2,630,402 for 1993, and reported net section 1231 gains of $12,343,153 for 1994.

NOPA 157 contends that Taxpayer failed to treat as ordinary income the amount of its

net section 1231 gains recognized in 1994 that were equal to its non-recaptured net

section 1231 losses from 1993.

Taxpayer is evaluating the Service's position and will submit additional

information as to this adjustment to Appeals.

**NOPA 158**

In NOPA 158, the Service proposed a decrease of general business credit

carryforward of $11,214,676. According to NOPA 158, Taxpayer claimed a

carryforward of general business credits in such amount, which was utilized in its entirety

as a credit against its 1993 tax liability. According to NOPA 158, as a result of

examinations for prior periods, Taxpayer has no unused general business credit carryover

to 1993. Accordingly, the Service disallowed the claimed general business credit

carryover in its entirety.

Taxpayer disputes this determination. Taxpayer had unused general

business credits at least to the extent of the amounts claimed that carried forward to 1993.

Taxpayer will provide a schedule of unused business credits to Appeals.

**NOPA 159**

In 1996, Grace-Conn and Taxpayer engaged in a spin-off transaction in

which Grace-Conn was separated from the group for which Fresenius is now the common

parent. On the return for the period September 29, 1996 through December 31, 1996, the

Grace-Delaware consolidated group reported a net operating loss of $73,714,433. This net operating loss was carried back to 1994.

In NOPA 159, the Service determined that the appropriate amount of the loss that could be carried back was $50,030,638 based upon adjustments reflected in other NOPAs to the return filed by Grace-Delaware for the period September 29, 1996 through December 31, 1996.

This adjustment is computational as it depends in part on other adjustments included in the final computations of tax liability and will involve adjustments from the loss year to 1994 and possibly other years.

## NOPA 160

On its 1997 return, the Grace-Delaware consolidated group reported a net operating loss of $145,789,694. This net operating loss was carried back to Taxpayer's 1988 return and was deducted in full. The carryback to 1988 affected the amounts and applications of prior year minimum tax and other credits that had previously been utilized. Taxpayer determined that, after giving effect to these changes, the prior year minimum tax credit that was available and utilized in the year ended December 28, 1996, was $13,507,251. Accordingly, NOPA 158 tentatively allowed a minimum tax credit for 1996 in such amount. This adjustment is computational and may require correlative adjustments to the extent that any adjustments made in a subsequent audit of 1997 impact the loss that is available to carryback to reduce Taxpayer's 1988 income tax liability.

## NOPA 161

NOPA 161 addressed the foreign tax credits allowable for the below years. NOPA 161 decreased (increased) the foreign tax credits allowable to Taxpayer as follows:

| Year | Foreign Tax Credits |
|------|---------------------|
| 1993 | (2,161,697) |
| 1994 | (210,626) |
| 1995 | 11,147,398 |
| 1996 | 12,527,990 |

In addition, NOPA 161 states that the amounts of foreign tax credits allowed for 1995 and 1996 do not include any carrybacks of excess credits from subsequent separate return years of members included in Taxpayer's returns for the years at issue. However, in subsequent discussions with IRS, the Service has stated that carrybacks of excess credits from subsequent separate return years may be included subject to a review of the computations. The Service is further reviewing this computation and has indicated that it will provide a revised computation of Foreign Tax Credits.

This issue is almost totally computational and may require correlative adjustments depending on the outcome of other issues, subsequent audits and the availability of credits for carryback to Taxpayer's return for the years 1993 through and including 1996.

**NOPA 162**

NOPA 162 states in its entirety:

Per this examination, there are no alternative minimum taxes (AMT) for the 1993-1996 years. Data regarding the available foreign tax credits for AMT purposes will be provided at a later time.

The determination of an AMT liability is expected to be only computational. Taxpayer reserves the right to protest any proposed adjustment to the extent it disagrees with any AMT computations prepared by the Service.

## NOPA 164

In a prior audit of Taxpayer's 1990-1992 returns, Taxpayer disclosed an issue that related to demolition of a plant in Libby Montana. Based on this disclosure, the IRS disallowed demolition expenses of $337,633 in 1990 and $1,373,647 in 1991.

The disallowed Libby plant demolition expenses increase the tax basis of the land on which the demolished structure was located (IRC Section 280B(a)(2)). Taxpayer sold the Libby property in an asset sale during 1994. The capitalized demolition costs should have been deducted in 1994, when the Libby property was sold.

Subsequent review of the tax returns and supporting workpapers revealed that the Taxpayer's disclosure with respect to this issue was erroneous. Taxpayer did not deduct the demolition costs of $1,373,647 in computing its taxable income for 1991. In addition, Taxpayer failed to deduct any of the capitalized demolition costs upon disposition of the Libby property.

On August 9, 2002, Taxpayer filed a claim asserting that the following amounts were not deducted in computing its taxable income for 1994:  (1) $337,633 and $1,373,647 disallowed by the IRS for 1990 and 1991, respectively and (2) $1,373,647 capitalized by the taxpayer in 1991. NOPA 164 allowed a deduction for the demolition costs ($337,633 in 1990 and $1,373,647 in 1991) capitalized by the IRS pursuant to the Rev. Proc. 94-69 disclosure, but the claim for the additional deduction of $1,373,647 was

denied. This denial was based upon the Taxpayer's inability (due to insufficient time) to substantiate its failure to include this amount as a deduction in its 1994 tax return.

Taxpayer will provide Appeals with substantiation that it did not deduct the demolition costs of $1,373,647 in 1994 and that Taxpayer is entitled to an additional deduction of this amount.

## 2. Adjustment to Inventory Relating to 9/28/96

On September 28, 1996, Sealed Air and certain directly and indirectly wholly-owned subsidiaries, including W.R. Grace & Co.-Conn were spun out of Taxpayer's consolidated group. Cost of Goods Sold (CGS) were allocated between the two short period returns of Grace-Conn. Taxpayer is reviewing the inventory allocations relating to this transaction and reserves the right to submit additional information to Appeals.

### Request for Affirmative Adjustments

## 1. Interest Reported in Both 1995 and 1996

In the corrected RAR, the examining agent at p. 4D, ¶ 16 refers to a claim submitted by Taxpayer on August 29, 2002. The Service did not have sufficient time to consider this claim prior to the issuance of the corrected RAR. The corrected RAR acknowledges that the "parties orally agreed to address this issue at a later date." The discussion below summarizes the claim and related documents provided to the agent.

Taxpayer's taxable income was overstated in the 1996 short period tax returns, as filed, by $28,649,577. This overstatement consists of the following components: (1) $17,265,623 of interest received from the IRS that was also reported in

Taxpayer's 1995 taxable income and (2) $11,384,000 of taxable income arising from an incorrect analysis of the book/tax difference relating to "accrued interest - prior year taxes."

a) <u>IRS Interest income included in both 1995 and 1996</u>

During 1996, Taxpayer received $17,265,623 of interest income from the IRS. This interest income was reported in the 1995 income tax return as a component of the book/tax difference calculated for "accrued interest – prior year taxes." Although this taxable income was properly reported in 1995, it was also included as taxable income in 1996.

<u>Book Treatment of IRS Interest</u>

For book purposes, $9,788,000 of the interest was recorded in 1995 and the remaining amount, $7,477,663, was recorded as income in 1996. The income recorded on the books for 1995 was accrued as an account receivable. This receivable balance was reversed in 1996 when the receipt of cash was recorded.

<u>Tax return reporting of interest income in 1995</u>

The interest was reported in the 1995 tax return as follows: (1) $9,788,000 was included in income for both book and tax purposes and (2) $7,477,663 was included in taxable income as a book/tax difference.

<u>Tax return for 1996 short tax periods</u>

The interest income reported for book purposes in 1995 was recorded as an account receivable. In computing 1996 taxable income in the short period tax returns,

reversal of this account receivable was erroneously determined to create an unfavorable book/tax difference of $9,788,000. This book/tax difference of $9,788,000 was included as taxable income in the 1996 tax returns as a book/tax difference for "IRS refund receivable".

The IRS interest income included in book income for 1996 should have been excluded from taxable income as a book/tax difference. However, due to confusion surrounding the way in which this income was recorded for book purposes, it was not properly excluded from taxable income in 1996.

b) Book/tax difference in 1996 for Accrued Interest – Prior Year Taxes

An unfavorable book/tax difference of $11,061,153 was included in the computation of taxable income for 1996 relating to "accrued interest – prior year taxes. The computation of this book/tax difference erroneously included the effect of a transfer of $11,384,000 from the "accrued interest – prior year taxes" account to a federal income taxes payable account. Since the end of year balance in "accrued interest - prior year taxes" changed primarily due to a transfer and not as a result of cash flows or book income/expense, the methodology employed to compute this book/tax difference had the effect of overstating Taxpayer's 1996 taxable income by $11,384,000.

### Conclusion

Taxpayer believes that the proposed adjustments are erroneous, either factually, legally, or both. Taxpayer further believes that it can support the positions taken in its returns as filed and that Taxpayer is entitled to adjustments in its favor as set forth herein and in further requests for affirmative adjustments that will be submitted to

the Appeals Office. For these reasons, Taxpayer hereby protests the adjustments set forth in the NOPAs and seeks review thereof by Appeals.

\* \* \*

The undersigned assisted in the preparation of the protest but does not know personally that the statements of facts contained in the protest are true and complete.

A power of attorney (Form 2848) authorizing the undersigned to represent Taxpayer in this matter was previously submitted and is attached hereto as Exhibit 3.

Respectfully submitted,

*Elyse Napoli Filon*

Elyse Napoli Filon
Vice President – Tax
W. R. Grace & Co. Affiliated Group
As Agent For Fresenius Medical Care
Holdings, Inc.

# Exhibit H

Fresenius Agreement

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., et al., | Case Nos. 01-1139 through 01-1200 |
| Debtors. | |
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, et al., | |
| Plaintiffs, | |
| -against- | Adv. No. 02-2210 [LEAD DOCKET] |
| SEALED AIR CORPORATION and CRYOVAC, INC., | |
| Defendants. | |
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS and OFFICIAL COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS OF W.R. GRACE & CO., suing in behalf of the Chapter 11 Bankruptcy Estate of W.R. GRACE & CO., et al., | |
| Plaintiffs, | |
| -against- | Adv. No. 02-2211 |
| FRESENIUS MEDICAL CARE HOLDINGS, INC. and NATIONAL MEDICAL CARE, INC. | Affects Docket 02-2211 only |
| Defendants. | |

**FIRST AMENDED SETTLEMENT AGREEMENT**
**AND RELEASE OF CLAIMS**

First Amended Settlement Agreement
and Release of Claims

This Settlement Agreement and Release of Claims (the "Agreement") is made as of the 6th day of February, 2003, by and among Fresenius Medical Care Holdings, Inc. (taxpayer identification number 13-3461988) ("FMCH"), National Medical Care, Inc. (taxpayer identification number 04-2835488) ("NMC"), the Official Committee of Asbestos Personal Injury Claimants (the "PI Committee"), and the Official Committee of Asbestos Property Damage Claimants (the "PD Committee," and collectively with the PI Committee, the "Asbestos Committees"), both of the Asbestos Committees in their respective capacities as plaintiffs on behalf of the estates of the Debtors in the Asbestos Claimants' Adversary Proceeding.

## ARTICLE I

## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings (such meanings to be equally applicable to both the singular and the plural forms of the terms defined) assigned to such terms in Appendix A attached hereto or in the Preamble above. Appendix A is incorporated herein by reference, and is fully part of this Agreement.

## ARTICLE II

## TERMS OF SETTLEMENT OF CLAIMS

2.01   Moving Parties to Seek Approval of Settlement. Within forty-five (45) days of the Settlement Execution Date, the Moving Parties shall move the Court to enter an order binding on all of the Estate Parties (including the Settling Parties) approving this Agreement and obligating each of the Estate Parties to the terms and conditions of this Agreement as if each of the Estate Parties had executed this Agreement.

2.02   Preconditions to Settlement Payment Obligation. As a condition precedent to the obligation of the NMC Defendants to make the Settlement Payment, each and every of the

First Amended Settlement Agreement
and Release of Claims

following preconditions shall have occurred, unless the NMC Defendants, in their sole discretion, have provided written notice to the other Settling Parties and the Court that they waive one or more of the preconditions:

(A)    Releases by the Estate Parties. The Plan of Reorganization shall provide that: (i) upon the making of the Settlement Payment, the Asbestos Committees and the Estate Parties will fully, finally, and forever release, relinquish and discharge each and every of the NMC Defendants from any and all Grace-Related Claims that the Asbestos Committees or the Estate Parties have asserted or could have asserted in this or any other forum against any of the NMC Defendants; and (ii) prior to the making of the Settlement Payment, the Asbestos Committees and the Estate Parties will deliver to the NMC Defendants the Release that is attached as Appendix B hereto, which by its terms shall become effective upon the making of the Settlement Payment.

(B)    Releases by Plan Claimants. The Plan of Reorganization shall provide that any Person that votes in favor of the Plan or that receives property under the Plan shall thereby be deemed, upon the making of the Settlement Payment, to have fully and finally released each and every of the NMC Defendants from all Grace-Related Claims that such Person has asserted or could have asserted in this or any other forum against any of the NMC Defendants.

(C)    Releases by Trust Claimants. The Plan of Reorganization shall provide for the establishment of a trust or trusts under state law and pursuant to Section 524(g) of the Bankruptcy Code (the "Asbestos Trust"), and the Plan of Reorganization further shall provide that any Person that receives property from the Asbestos Trust shall thereby be deemed, upon and after the making of the Settlement Payment, to have fully and finally released each and every

-2-

of the NMC Defendants from all Grace-Related Claims that the Person has asserted or could have asserted in this or any other forum against any of the NMC Defendants.

(D)    Bar Order.  The Court shall have issued, pursuant to Section 105(a) of the Bankruptcy Code, a Final Order, effective upon the making of the Settlement Payment, permanently and forever enjoining, restraining and barring any Person from commencing or continuing any suit, action or other proceeding, or from taking any other action, for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, or with respect to, any Grace-Related Claim against any of the NMC Defendants.

(E)    Channelling Injunction.  In addition to the injunction described in (D) above, the Final Order confirming the Plan of Reorganization shall provide that, effective upon the making of the Settlement Payment, the NMC Defendants shall receive the full benefits and protections of an injunction entered pursuant to section 524(g) of the Bankruptcy Code, which injunction shall permanently bar any Person from commencing or continuing any suit, action, or other proceeding, or from taking any other action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, or with respect to, any Asbestos-Related Claim that the Person asserted or could have asserted, against any of the NMC Defendants.

(F)    Indemnification.  The Plan of Reorganization shall provide that the Estate Parties, jointly and severally, upon the making of the Settlement Payment, shall indemnify, defend and hold harmless the NMC Defendants for any loss, cost or expense (including attorneys' fees and other costs of defense) arising out of any and all Grace-Related Claims, commenced or continued in this or any other forum against any of the NMC Defendants.  Such indemnification specifically shall not apply to the costs and expenses (including lawyers' fees and accountants' fees) incurred by the NMC Defendants in (i) defending the Asbestos Claimant's

-3-

First Amended Settlement Agreement
and Release of Claims

Adversary Proceeding or any other proceedings or controversies arising out of or based upon Asbestos-Related Claims prior to the Settlement Execution Date, or (ii) defending any proceedings or controversies arising out of or based upon Grace-Related Claims, other than Asbestos-Related claims, prior to the Settlement Effective Date.

       (G)   Dismissals. Upon the filing of timely motions to dismiss by the NMC Defendants, and the best efforts of the other Settling Parties in support of such motions, each court with jurisdiction over the following actions shall have dismissed by Final Order, effective upon the making of the Settlement Payment, each of the following actions with prejudice as against the NMC Defendants:

       (i)   *Mesquita v. W.R. Grace & Co., et al.*, amended as *Abner v. W.R. Grace & Co. et al.*, No. 315465, Superior Court of California, County of San Francisco, (since transferred to the Court as Adversary Proceeding No. 01-08883);

       (ii)   *Woodward v. Sealed Air Corporation (US) et al.*, No. 01-10547 PBS, U.S. District Court, District of Massachusetts, (since transferred to the Court as Case No. 01-CV-412);

       (iii)   *Lewis v. W.R. Grace & Co. et al.*, U.S. Bankruptcy Court, District of Delaware, Bkr. Case No. D. Del. 01-001139/Adv. Case No. 01-08810; and

       (iv)   The Asbestos Claimants Adversary Proceeding.

       (H)   Successors. The Final Order confirming the Plan of Reorganization shall include a determination by the Court that, as of the Plan Effective Date, the Estate Parties have the ability to pay and satisfy in the ordinary course of business their respective obligations and liabilities, including without limitation, all Indemnified Taxes and all obligations under this Agreement.

-4-

(I)     Court Approval.  The Court by Final Order shall approve this Agreement, and each of the Estate Parties shall become obligated to, and entitled to the benefits of, the terms and conditions of this Agreement.

(J)     Implementation.  Prior to the Settlement Approval Date, none of the Estate Parties shall take any action that would be a breach of such Person's duties under Article III of this Agreement if such action had been taken after the Settlement Approval Date.

2.03   Payment Obligations of the NMC Defendants.  Within five (5) business days of the Settlement Effective Date the NMC Defendants shall wire transfer, subject to the provisions of Section 3.08, one hundred fifteen million dollars ($115,000,000) cash as designated by the Court in the Final Order approving the Plan of Reorganization.

2.04   Release of Sealed Air Defendants.  Upon the Settlement Effective Date, the NMC Defendants will execute a release, acceptable in form and substance to the NMC Defendants, that fully, finally, and forever releases, relinquishes and discharges Sealed Air and Cryovac from any and all Tax claims or Asbestos-Related Claims (including but not limited to claims for lawyers' fees and the costs of litigation related thereto) that the NMC Defendants have asserted or could have asserted in this or any other forum against Sealed Air or Cryovac.

2.05   Publicity.  Before making any public statements or announcements prior to the Settlement Approval Date, each of the Settling Parties shall obtain approval from the other Settling Parties of the text of any such public statement or announcement (including in any filing not under seal in the Court) to be made by such party or its parents, which approval shall not be unreasonably withheld.  If the Settling Parties are not able to agree on or approve the text of such a public statement or announcement and the legal counsel for any party proposing to make a

-5-

public statement or announcement is of the opinion that such public statement or announcement is required by law or the rules of any stock exchange on which such party's securities, or the securities of a parent corporation of such party, are traded, then such party or the parent may make or issue the legally required statement or announcement.

  2.06 <u>The NMC Defendants Solely Responsible for Settlement Payment.</u> Notwithstanding any other provision of this Agreement, or any prior Agreements, the NMC Defendants will not seek indemnification from the Estate Parties, Sealed Air, or Cryovac for the Settlement Payment.

  2.07 <u>Purpose of Payment and Consistency of Treatment.</u> The Settling Parties agree, and the Plan of Reorganization shall provide that the Estate Parties acknowledge and agree, that FMCH and NMC have entered into this Agreement for the purpose of settling and terminating any and all controversies relating to the assertion of Asbestos-Related Claims, as well as other Grace-Related Claims against the NMC Defendants. The Settlement Payment is intended and shall be treated by the Settling Parties as a payment by the NMC Defendants of an ordinary and necessary expense incurred by the NMC Defendants and as income of the Estate Parties in the same amount. Any indemnification payments made by Grace-Conn. to the NMC Defendants, to the extent the indemnified obligation would have been an ordinary and necessary expense if incurred directly by Grace-Conn., shall be treated by the Settling Parties as a payment by Grace-Conn. of an ordinary and necessary expense incurred by Grace-Conn. and, to the extent the indemnified obligation was itself deducted as an ordinary and necessary expense of the NMC Defendants, as income of the NMC Defendants. None of the Settling Parties shall take a position inconsistent with the foregoing in any Tax Return or with any tax authority.

-6-

2.08    No Limitation on Estate Parties' Ability to Propose Plan.  Notwithstanding any

other provision of this Agreement, it shall not be a breach of this Agreement, act of bad faith,

tortious interference with a contractual relationship, or any other malfeasance for the Estate

Parties to propose or support a plan of reorganization that does not provide for the establishment

of an Asbestos Trust or the issuance of an injunction pursuant to Section 524(g) of the

Bankruptcy Code, provided however, the Estate Parties shall use their best efforts to cause all of

the preconditions set forth in Section 2.02, other than those set forth in paragraphs (C) and (E) of

Section 2.02, to occur.  For the avoidance of doubt, if the Plan of Reorganization, as well as the

Final Order of confirmation respecting the Plan of Reorganization, do not satisfy the

preconditions set forth in paragraphs (C) and (E) of Section 2.02, the NMC Defendants may in

their sole discretion waive or decline to waive, as set forth in Section 2.02, the failure of those

preconditions as conditions precedent to the Settlement Payment.

2.09    Best Efforts By Asbestos Committees Respecting Plan.  The Asbestos

Committees shall use their respective best efforts to cause the occurrence of all the preconditions

to the obligation of the NMC Defendants to make the Settlement Payment set forth in Section

2.02, except to the extent the NMC Defendants may in their sole discretion waive, as set forth in

Section 2.02, the failure of those preconditions as conditions precedent to the Settlement

Payment.

## ARTICLE III

## SPECIFIED DUTIES REGARDING TAXES.

3.01    Termination of TSIA.  From the Settlement Execution Date through the

Settlement Effective Date, as among the Settling Parties, the terms of this Agreement shall

supercede the terms of the TSIA, except that Section 4.04 of the TSIA shall remain in force and

is incorporated by reference herein. Upon the Settlement Effective Date, the TSIA shall be

terminated and no party to such TSIA shall have any obligation to any other party to such TSIA

in respect thereof, whether such obligation shall have accrued before or after the Settlement

Approval Date, except that Section 4.04 of the TSIA shall remain in force and is incorporated by

reference herein.

    3.02    Estate Parties' Duty to Pay Indemnified Taxes. From and after the Settlement

Approval Date, the Estate Parties promptly shall pay any Indemnified Taxes as such Taxes

become due and payable to tax authorities pursuant to a Final Determination, provided that the

Estate Parties have obtained authorization from the Court to pay currently any such Indemnified

Taxes. To the extent Indemnified Taxes become due and payable, the Estate Parties shall use

their best efforts to obtain authorization from the Court to pay currently such Indemnified Taxes.

The other Settling Parties shall cooperate in the Estate Parties' efforts to obtain such

authorization from the Court to pay currently such Indemnified Taxes, provided however, that

the foregoing does not modify the obligations of members of the FMCH Group as set forth in

Section 3.04(A). The Settling Parties agree that any such payments by the Estate Parties of

Indemnified Taxes are, for purposes of this Agreement and the administration of the Debtors'

estates, the payment of the Taxes of the Estate Parties.

    3.03    Grace-Conn. Control of Indemnified Tax Matters.

        (A)    Grace-Conn. Authority over Indemnified Taxes. Upon the Settlement

Approval Date, subject to the limitations in Sections 3.03(B) and (C), Grace-Conn. solely shall

be authorized to act for the Grace New York Group in its sole discretion with respect to

Indemnified Taxes. Notwithstanding the authority granted in the previous sentence, Grace-

Conn. and the other Estate Parties shall use their respective best efforts to defer any Final

-8-

First Amended Settlement Agreement
and Release of Claims

Determination of any Indemnified Taxes until such time as the Estate Parties have obtained authorization from the Court to pay currently such Indemnified Taxes, and the other Settling Parties shall cooperate in the effort to defer any Final Determination of any Indemnified Taxes prior to authorization from the Court to pay such Indemnified Taxes, provided however, that the foregoing does not modify the obligations of members of the FMCH Group as set forth in Section 3.04(A). FMCH will provide to Grace-Conn. and its agents from time to time Powers of Attorney with respect to Indemnified Taxes so that Grace-Conn. can act as the agent of the Grace New York Group with respect to Indemnified Taxes. The NMC Defendants agree that, pursuant to the cooperation obligations set forth in Section 3.04(A), they will respect such authority of Grace-Conn. and do nothing to derogate from such authority with respect to Indemnified Taxes, and, so long as none of the Estate Parties are in breach of this Agreement, the NMC Defendants will not initiate communications with any tax authority concerning Indemnified Taxes without obtaining the written consent of Grace-Conn. or the permission of the Court. As requested by Grace-Conn., amendments to Consolidated Tax Returns for or attributable to all Tax Periods of the Grace New York Group ending on or before December 31, 1996 shall be prepared by Grace-Conn. and filed by FMCH on behalf of Grace-Conn.

(B)     Limitations on Agreement To Final Determinations. Neither Grace-Conn. nor any other Estate Party shall voluntarily agree to the payment, assessment, resolution or other Final Determination of any Indemnified Tax prior to the Settlement Effective Date, except to the extent the Estate Parties have obtained authorization from the Court to pay promptly in full any such Indemnified Taxes, or to the extent FMCH hereafter has consented in its sole discretion in writing to the Estate Parties' agreement to such payment, assessment, resolution or other Final Determination.

First Amended Settlement Agreement
and Release of Claims

(C)    Tax Refunds.  Grace-Conn. shall control any Tax Refund of the Grace New York Group with respect to any Tax Period ending on or before December 31, 1996, credited or payable to any member of the Grace New York Group, except that:

(i) any such Tax Refund credited or paid to any member of the Grace New York Group prior to the time the Estate Parties have received authority from the Court to make payments under Section 3.02 above of Indemnified Taxes as they become due and payable shall be repaid to the tax authority as a payment of Indemnified Taxes (whether or not then due and payable) if, in the reasonable determination of FMCH, Indemnified Taxes are expected to become due and payable to such tax authority, provided however, if there is a dispute as to whether additional Indemnified Taxes are expected to become due and payable to such tax authority Grace-Conn. shall first have the opportunity to seek a determination from the Court that additional Indemnified Taxes are not expected to become due and payable to such tax authority and Grace-Conn. therefore should be permitted by the Court to receive and retain such refund; and

(ii) any Tax Refund attributable to the NMC Business with respect to any Tax Period ending on or before December 31, 1996, (I) shall first be applied to satisfaction of NMC Indemnified Taxes and (II) thereafter shall be applied to the satisfaction of Indemnified Taxes or if there are no such NMC Indemnified Taxes or Indemnified Taxes then due and payable, or in the reasonable determination of Grace-Conn. expected to become due and payable within eighteen (18) months, promptly shall be paid to FMCH.  None of the Estate Parties shall seek the refund of any previously paid Taxes of the Grace New York Group with respect to any Tax Period ending on or before December 31, 1996, if in the reasonable determination of either FMCH or Grace-Conn. Indemnified Taxes are expected to become due and payable to such tax authority for Tax Periods ending on or before December 31, 1996.

-10-

First Amended Settlement Agreement
and Release of Claims

3.04    Cooperation.

(A)    Cooperation by FMCH. From and after the Settlement Approval Date,
FMCH from time to time shall provide such cooperation as Grace-Conn. shall reasonably
request, including (i) the implementation of its rights and responsibilities under this Agreement
with respect to Indemnified Taxes, and (ii) provide such Powers of Attorney as provided in
Section 3.03(A), and FMCH will not seek indemnification for the costs and expenses (including
lawyers' fees and accountants' fees) of such cooperation, provided that FMCH will not be
required to incur any unreasonable cost or expense in respect of such cooperation. Whenever
FMCH or other member of the FMCH Group receives notice or demand from any tax authority
with respect to any Tax Item which could increase or decrease the liability for, or give rise to a
Tax Refund with respect to, any Indemnified Tax, FMCH shall in good faith promptly give
notice to Grace-Conn. of such Indemnified Tax related issue, in accordance with Section 5.07.

(B)    Cooperation by Estate Parties. Upon the request of FMCH, each of the
Estate Parties from time to time shall provide such cooperation as FMCH shall reasonably
request, including (i) the implementation of its rights and responsibilities under this Agreement
with respect to NMC Indemnified Taxes and (ii) provide such Powers of Attorney relating to
NMC Indemnified Taxes as FMCH shall request with respect to Tax Periods ending on or before
December 31, 1996, and the Estate Parties will not seek indemnification for the costs and
expenses (including lawyers' fees and accountants' fees) of such cooperation, provided that the
Estate Parties will not be required to incur any unreasonable cost or expense in respect of such
cooperation. Whenever any of the Estate Parties receives notice or demand from any tax
authority with respect to any Tax Item which could increase or decrease the liability for, or give
rise to a Tax Refund with respect to, any NMC Indemnified Tax, Grace-Conn. shall in good faith

-11-

promptly give notice to FMCH of such NMC Indemnified Tax related issue, in accordance with Section 5.07. Grace-Conn. shall provide prompt notice from time to time to FMCH of (i) revenue agents' reports, adjustments to Tax Items that may increase Indemnified Taxes, demands for payment of Indemnified Taxes, notices of proposed assessments and Final Determinations respecting Indemnified Taxes and similar correspondence, notices and demands from tax authorities and (ii) confirmation that Indemnified Taxes have been paid by the Estate Parties.

    3.05    <u>FMCH Group Protection for Indemnified Taxes</u>.  The Estate Parties jointly and severally shall indemnify, defend and hold harmless FMCH and each member of the FMCH Group from and against any loss in respect of (i) Indemnified Taxes or (ii) any action by any Person, including any tax authority, seeking payment by or reimbursement from FMCH or any of the other NMC Defendants for any Indemnified Taxes, provided however, that there shall be no duty to indemnify for costs and expenses (including lawyers' fees and accountants' fees) except in the event of a breach of this Agreement and pursuant to the terms of Section 3.09 below.

    3.06    <u>Estate Parties' Protection for NMC Indemnified Taxes</u>.  FMCH and the other members of the FMCH Group jointly and severally shall indemnify, defend and hold harmless each of the Estate Parties from and against any loss in respect of (i) NMC Indemnified Taxes or (ii) any action by any Person, including any tax authority, seeking payment by or reimbursement from any of the Estate Parties for any NMC Indemnified Taxes, provided however, that there shall be no duty to indemnify for costs and expenses (including lawyers' fees and accountants' fees) except in the event of a breach of this Agreement and pursuant to the terms of Section 3.09 below.

    3.07    <u>Payment of Indemnified Taxes by FMCH</u>. Notwithstanding the obligations of the Estate Parties in Section 3.02, in the event that any tax authority shall demand of FMCH or any

-12-

other members of the FMCH Group payment of any Indemnified Taxes, and FMCH or such other members of the FMCH Group pays such Indemnified Taxes, each of the Estate Parties promptly and unconditionally shall be obligated jointly and severally to and shall repay such amount of the Indemnified Taxes to FMCH or the other members of the FMCH Group, as applicable, with interest from the date of payment at the Hot Interest Rate. To the extent such Indemnified Taxes and interest are not set off against the payment required by Section 2.03 or any other payment required of FMCH or any member of the FMCH Group under this Agreement or otherwise pursuant to Section 3.08 below, FMCH or the other members of the FMCH Group, as applicable, shall have an allowed claim to the extent of such payment, including interest thereon at the Hot Interest Rate, against the estates of the Debtors. On and after the Settlement Effective Date, in addition to any other rights and remedies under this Agreement, each such claim for Indemnified Taxes and interest shall be an Allowed Administrative Claim against the Estate Parties.

    3.08    Right of Setoff. Notwithstanding anything herein to the contrary, FMCH and each member of the FMCH Group shall have a right of setoff or recoupment, including a right of setoff under Section 553 of the Bankruptcy Code, against the payment required by Section 2.03 or any other payment required of FMCH or any member of the FMCH Group under this Agreement or otherwise, for the amount of any obligation of any of the Estate Parties under this Agreement, including without limitation indemnification obligations for Indemnified Taxes, that any of the Estate Parties has failed to pay to FMCH or the members of the FMCH Group.

    3.09    Remedies for Breach. In the event of any breach of this Agreement, including any obligation for indemnification, (i) by the Estate Parties or any member of the New Grace Group, then the Estate Parties shall be jointly and severally liable for and shall indemnify, defend

-13-

and hold harmless the NMC Defendants from and against any Taxes, loss, cost or expense (including without limitation reasonable lawyers' fees and reasonable accountants' fees) attributable to such breach, and the NMC Defendants shall have, among other remedies, an allowed Administrative Claim against each of the Estate Parties for any Taxes, loss, cost or expense (including without limitation reasonable lawyers' fees and reasonable accountants' fees) attributable to such breach; or (ii) by the NMC Defendants or any member of the FMCH Group, then the NMC Defendants shall be jointly and severally liable for and shall indemnify, defend and hold harmless the Estate Parties from and against any Taxes, loss, cost or expense (including without limitation reasonable lawyers' fees and reasonable accountants' fees) attributable to such breach.

   3.10    Preservation of Rights.  In the event that a member of the New Grace Group, or their respective successors or assigns, shall fail to perform any obligation to indemnify, defend and hold harmless FMCH or any member of the FMCH Group, as provided in this Agreement, or prior to its termination, the TSIA, nothing herein shall preclude or estop such member of the FMCH Group from asserting any causes of action on the grounds that one or more of the members of the New Grace Group or of the Sealed Air/Grace Group is primarily liable for such obligation under general principles of law determined without reference to this Agreement or the TSIA.

## ARTICLE IV

## COVENANTS NOT TO SUE AND TOLLING.

   4.01    Claims Against the NMC Defendants.  The Asbestos Committees and the Estate Parties shall not commence or prosecute, or cooperate in the commencement or prosecution of, any suit, demand, claim, or cause of action, whether asserted directly or derivatively, against any

-14-

of the NMC Defendants for any Grace-Related Claims, including the Asbestos Claimants'
Adversary Proceeding, except (i) as permitted in Section 4.03 below or (ii) to enforce this
Agreement.

    4.02   <u>Sealed Air Indemnity Litigation</u>. In connection with the Sealed Air Settlement
Agreement, the Asbestos Committees shall use their best efforts to obtain from Sealed Air and
Cryovac, an agreement acceptable in form and substance to the NMC Defendants, which
provides for the stay, and if necessary the reinstatement, of the Sealed Air Indemnity Litigation
pending the Settlement Effective Date. If Sealed Air and Cryovac do not agree to a stay of the
Sealed Air Indemnity Litigation, then notwithstanding any other provision of this Agreement,
prior to the Settlement Effective Date the NMC Defendants shall remain free to pursue all rights
and remedies they may have against Sealed Air and Cryovac, in any court of competent
jurisdiction.

    4.03   <u>Reinstatement of Litigation Upon Failure of Conditions Precedent</u>. The Asbestos
Committees or the Estate Parties may reinstate the Asbestos Claimants Adversary Proceeding on
the active docket if the Court determines by Final Order (the "Litigation Reinstatement Date")
that despite the best efforts of the Estate Parties and the Asbestos Committees one or more
conditions in Section 2.02 above will not be able to be satisfied, and the failure of such
precondition has not been waived by the NMC Defendants. For purposes of statutes of
limitation, statutes of repose, and any procedural bars to the prosecutions of claims, all claims,
counterclaims, cross-claims, and claims for contribution or indemnity the Settling Parties have
asserted or could have asserted in the Court or any other forum will be deemed to have been
tolled during the time period between the Settlement Execution Date and the Litigation
Reinstatement Date.

-15-

## ARTICLE V

## MISCELLANEOUS PROVISIONS.

5.01    Expenses.  Unless otherwise expressly provided in this Agreement, each Person

shall bear any and all expenses (including legal and accounting) that arise from its respective

obligations under this Agreement.

5.02    Amendment; Agency.  This Agreement may not be amended except by an

agreement in writing, signed by the Settling Parties with the approval of the Court.  The Settling

Parties agree that FMCH shall be entitled to receive notices and to act on behalf of each member

of the FMCH Group and each of the NMC Defendants and that Grace-Conn. shall be entitled to

receive notices and to act on behalf of New Grace, the other Estate Parties and the New Grace

Group, and each member of the New Grace Group, in respect of all matters under this

Agreement.

5.03    Settlement Inadmissible for Other Purposes.  The Settling Parties agree that the

terms of this Agreement reflect a good faith settlement of the Grace-Related Claims and of the other

terms and conditions contained herein, reached voluntarily after consultation with experienced legal

counsel.  Neither this Agreement nor the settlements contained herein, nor any act performed,

document executed, or statement made pursuant to or in support of or in furtherance of this

Agreement or the settlements contained herein: (i) is or may be deemed to be or may be used as an

admission of, or evidence of, the validity or amount of any Grace-Related Claim or any other claim,

or of any wrongdoing or liability; or (ii) is or may be deemed to be or may be used as an admission

of, or evidence of, any fault or omission of any Settling Party in any proceeding in any court,

administrative agency, or other tribunal.  Any Settling Party or other Person released by the terms or

-16-

First Amended Settlement Agreement
and Release of Claims

implementation of this Agreement may file this Agreement in any other action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, accord and satisfaction, bar order, channelling injunction, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim. The Settling Parties may file this Agreement in any proceeding brought to enforce any of its terms.

5.04    Signed Counterparts. This Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument. Counsel for the Settling Parties shall exchange among themselves signed counterparts of this Agreement.

5.05    Confidentiality of Information. All agreements made between and among the Settling Parties and orders entered during the course of the Asbestos Claimants Adversary Proceeding relating to the confidentiality of information shall survive this Agreement.

5.06    Agreement Drafted Equally. This Agreement shall not be construed more strictly against one party than another merely because it, or any part of it, may have been prepared by counsel for one of the parties. The Settling Parties acknowledge and agree that the Agreement is the result of arm's-length negotiations between the parties and all parties have contributed substantially and materially to the preparation of this Agreement.

5.07    Notices. All notices and other communications hereunder shall be in writing and shall be delivered by hand including overnight business courier or mailed by registered or certified mail (return receipt requested) to the parties at the following addresses (or at such other addresses for a party as shall be specified by like notice) and shall be deemed given on the date on which such notice is received:

-17-

First Amended Settlement Agreement
and Release of Claims

To Grace-Conn. or any member of the New Grace Group:

> W.R. Grace & Co.
> 7500 Grace Drive
> Columbia, Maryland 21044
> Attention:      Secretary
> Phone: (410) 531-4212
> Fax:     (410) 531-4783

With a copy to:

> David M. Bernick
> Kirkland & Ellis
> 200 East Randolph Drive
> Chicago, Illinois 60601
> Phone: (312) 861-2000
> Fax (312) 861-2200
> Email: david_bernick@chicago.kirkland.com

To the Official Committee of Asbestos Personal Injury Claimants :

> Peter Van N. Lockwood
> Caplin & Drysdale, Chartered
> 1 Thomas Circle N.W.
> Washington, D.C. 20005
> Phone: (202) 862-5000
> Fax (202) 429-3301
> Email: pvnl@capdale.com

To the Official Committee of Asbestos Property Damage Claimants:

> Scott L. Baena
> Bilzin Sumberg Baena Price & Axelrod LLP
> 200 South Biscayne Blvd., Suite 2500
> Miami, Florida 33131
> Phone: (305) 374-7580
> Fax: (305) 374-7593
> Email: sbaena@bilzin.com

-18-

To FMCH or any member of the FMCH Group:

> c/o Fresenius Medical Care North America
> Corporate Headquarters
> General Counsel
> Corporate Law Department
> 95 Hayden Avenue
> Lexington, MA 02420-9192
> Phone: (781) 402-9000
> Fax: (781) 402-9713

With a copy to:

> David S. Rosenbloom
> McDermott, Will & Emery
> 227 W. Monroe, Suite 4400
> Chicago, Illinois 60606
> Phone: (312) 372-2000
> Fax: (312) 984-7700
> Email: drosenbloom@mwe.com

5.08    Resolution of Disputes.  Any claim or dispute arising out of or relating in any way to this Agreement must be brought before the Court, which shall retain jurisdiction of this matter and the Settling Parties for the purposes of enforcing and implementing the terms and conditions of this Agreement and resolving disputes as to the rights and obligations of the Settling Parties hereunder, provided however that section 524(g)(2) shall govern jurisdiction over any proceeding that involves any injunction entered in accordance with section 524(g) of the Bankruptcy Code. The Settling Parties submit to the jurisdiction of the Court for these purposes.

5.09    Titles and Headings.  Titles and headings to sections herein are inserted for the convenience of reference only and are not intended to be a part or to affect the meaning or interpretation of this Agreement.

5.10    Legal Enforceability.  Without prejudice to any rights or remedies otherwise available to any party hereto, each party hereto acknowledges that damages would be an

-19-

inadequate remedy for any breach of the provisions of this Agreement and agrees that the obligations of the Settling Parties hereunder shall be specifically enforceable.

5.11    Governing Law. This Agreement shall be governed by the laws of the State of Delaware (without giving effect to its provisions on conflict of laws), and without affecting any determination as to the law applicable to the Asbestos Claimants' Adversary Proceeding.

5.12    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the Settling Parties, including without limitation the other Estate Parties; provided that (i) neither this Agreement nor any substantial right or obligation hereunder may be assigned by FMCH, on the one hand, and New Grace or Grace-Conn., on the other, without the consent of the other Settling Parties, which consent shall not be unreasonably withheld, and (ii) none of the Estate Parties shall transfer or agree to transfer a substantial part of their respective assets (in one or a series of transactions, whether or not related) to any Person or Persons, without a prior determination of the Court by Final Order that at the time of each such transaction New Grace and Grace-Conn., or any such successors who agree to be jointly and severally liable for the obligations of New Grace and Grace-Conn., will have the ability to pay and satisfy in the ordinary course of business their respective obligations and liabilities, including without limitation, all Indemnified Taxes and all obligations under this Agreement; provided, however, that this clause (ii) shall not apply at any time when the following two conditions in subclauses (x) and (y) are both satisfied: (x) (I) as a result of the expiration of the applicable statutes of limitation, assessment against and collection of Indemnified Taxes from each of the NMC Defendants (including assessment and collection pursuant to Section 6901 of the Code) is barred by such statutes of limitations and (II) all Indemnified Taxes have been paid in accordance with Section 3.02 of this Settlement Agreement

-20-

and the NMC Defendants have received from the Estate Parties (or adequate provision satisfactory to the NMC Defendants has been made for the payment of) all indemnification and other payments claimed by the NMC Defendants against the Estate Parties in respect of Indemnified Taxes and related matters in accordance with Sections 3.03, 3.05, and 3.07 of this Settlement Agreement; and (y) the injunctions required by Sections 2.02(D) and (E) of this Settlement Agreement shall be in effect and there shall not be pending any lawsuit, action or other judicial or administrative proceeding (I) alleging a Grace-Related Claim and seeking to impose liability on one or more of the NMC Defendants notwithstanding the existence and continuing operative effect of such injunctions or (II) challenging in any manner the continuance or operative effect of such injunctions in respect of the NMC Defendants.

First Amended Settlement Agreement
and Release of Claims

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written, on their own behalf and as authorized agents for each member of their respective affiliated groups.

THE OFFICIAL COMMITTEE OF
ASBESTOS PERSONAL INJURY
CLAIMANTS

By: _____
Name

_____
Title

_3/19/03_____
Date

THE OFFICIAL COMMITTEE OF
ASBESTOS PROPERTY DAMAGE
CLAIMANTS

By: _____
Name

_____
Title

_____
Date

-22-

First Amended Settlement Agreement
and Release of Claims

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written, on their own behalf and as authorized agents for each member of their respective affiliated groups.

THE OFFICIAL COMMITTEE OF
ASBESTOS PERSONAL INJURY
CLAIMANTS

By: _____
    Name

_____
Title

_____
Date

THE OFFICIAL COMMITTEE OF
ASBESTOS PROPERTY DAMAGE
CLAIMANTS

By: _____
    Name

    _Counsel_____
Title

    4-11-03_____
Date

-22-

First Amended Settlement Agreement
and Release of Claims

FRESENIUS MEDICAL CARE HOLDINGS, INC.

By: _____
    Name

_____
Senior Vice President
Title

_____
4/14/03
Date

NATIONAL MEDICAL CARE, INC.

By: _____
    Name

_____
Senior Vice President
Title

_____
4/14/03
Date

First Amended Settlement Agreement
and Release of Claims

W.R. GRACE & CO.

By: _Robert M. Tarola_

Name Robert M. Tarola
Senior Vice President and
Chief Financial Officer

Title

April 14, 2003

Date

W.R. GRACE & CO.—CONN.

By: _Robert M. Tarola_

Name Robert M. Tarola
Senior Vice President and
Chief Financial Officer

Title

April 14, 2003

Date

First Amended Settlement Agreement
and Release of Claims

-24-

(as to each other Debtor)

By: _____

Name  Robert M. Tarola
Vice President or
Authorized Representative
Title

April 14, 2003
Date

CH199 4061081-1.052842.0033

First Amended Settlement Agreement
and Release of Claims

**APPENDIX A**
**TO SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS**

**DEFINITIONS**

As used in the Settlement Agreement and Release of Claims, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and the plural forms of the terms defined):

1.01    "Administrative Claim" shall mean a claim (as defined in Section 101(5) of the Bankruptcy Code) against the Debtors' chapter 11 bankruptcy estates for costs and expenses of administration under Sections 503(a) or 507(a)(1) of the Bankruptcy Code.

1.02    "Asbestos Claimants Adversary Proceeding" shall mean the adversary proceeding captioned, *Official Committee of Asbestos Personal Injury Claimants and Official Committee of Asbestos Property Damage Claimants of W.R. Grace & Co., suing in behalf of the Chapter 11 Bankruptcy Estates of W.R. Grace & Co., et al., Plaintiffs v. Fresenius Medical Care Holdings, Inc. and National Medical Care, Inc.*, Adversary Proceeding No. 02-2211, which the Court consolidated with Adversary Proceeding No. 02-2210, by Order dated March 28, 2002.

1.03    "Asbestos-Related Claim" shall mean any claim, (including but not limited to personal injury, wrongful death, property damage or medical monitoring) whether sounding in tort, contract, warranty, statute, or any other theory of law or equity, based on or arising by reason of direct or indirect damages allegedly caused by consumption, use, storage, manufacturing, assembly, distribution, installation, exposure to, or the presence of asbestos or asbestos containing products or by-products, or products which contain asbestos in any form, consumed, used, stored, manufactured, assembled, distributed, disposed of, or installed by or on behalf of any Grace-Conn. Business.

A-1

1.04    "Asbestos Trust" shall have the meaning ascribed to such term in Section 2.02(C).

1.05    "Bankruptcy Code" shall mean title 11 of the United States Code, as amended.

1.06    "Code" shall mean the Internal Revenue Code of 1986, as amended, and shall include corresponding provisions of any subsequently enacted federal income tax laws.

1.07    "Common Parent" shall mean the common parent, as defined in Treasury Regulation Section 1.1502-77, of those corporations that joined, or hereafter join, in filing a Consolidated Tax Return under Section 1501 of the Code, and the Treasury Regulations thereunder, or a Consolidated Tax Return under comparable provisions of Tax law of other jurisdictions (domestic or foreign).

1.08    "Consolidated Tax Return" shall mean (i) a federal consolidated income Tax Return, within the meaning of Section 1501 of the Code and the Treasury Regulations under Section 1502 of the Code, and (ii) any combined, joint, consolidated or other Tax Return respecting Taxes under the laws of any jurisdiction (domestic or foreign).

1.09    "Court" shall mean the court in which the Asbestos Claimants' Adversary Proceeding is pending, or if no longer pending, the United States Bankruptcy Court for the District of Delaware.

1.10    "Cryovac" shall mean Cryovac, Inc. (f/k/a Grace Communications, Inc.) (taxpayer identification number 13-2830262).

1.11    "Debtor" shall mean each of W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc.,

A-2

Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I,
Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management
Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities
Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace
Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace
Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel
Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings,
Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated,
Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace
Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-
Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc.,
Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC
Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises,
Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings
Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc.
(f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability
Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin &
Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a
Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

    1.12    "Estate Parties" shall mean each of the Debtors, the estate of each Debtor, the
post-confirmation estate of each Debtor, each of the reorganized Debtors, and any trustee that
may be appointed in any of the Debtors' cases under the Bankruptcy Code.

A-3

1.13    "Final Determination" shall mean any assessment or resolution of liability for any

Tax for a Tax Period, (i) by Form 870 or 870-AD or by Form 5701 (or any successor forms

thereto), on the date of acceptance or agreement by or on behalf of the taxpayer, or by

comparable forms respecting Taxes under the laws of other jurisdictions (domestic or foreign);

(ii) by a decision, judgment, decree, or other order by a court of competent jurisdiction, which

has become final and unappealable; (iii) by a closing agreement or accepted offer in compromise

under Section 7121 or 7122 of the Code, or comparable agreements respecting Taxes under the

laws of other jurisdictions (domestic or foreign); (iv) by any allowance of a refund or credit in

respect of an overpayment of Tax, but only after the expiration of all periods during which such

refund may be recovered (including by way of offset) by the Tax imposing jurisdiction (domestic

or foreign); or (v) by any other final disposition, including by reason of Section 6213(b)(3) of the

Code on account of an excessive tentative carryback allowance under Section 6411 of the Code

or comparable provisions of other jurisdictions (domestic or foreign), the expiration of the

applicable statute of limitations, or by mutual agreement of the parties.

1.14    "Final Order" shall mean an order or judgment of the Court , or other court of

competent jurisdiction with respect to the subject matter, which has not been reversed, stayed,

modified or amended, and as to which the time to appeal or seek certiorari has expired and no

appeal or petition for certiorari has been timely taken, or as to which any appeal that has been

taken or any petition for certiorari that has been or may be filed has been resolved by the highest

court to which the order or judgment was appealed or from which certiorari was sought.

1.15    "FMCH Group" shall mean that group of corporations, immediately after

December 31, 1996, that were members of the affiliated group of corporations of which FMCH

(taxpayer identification number 13-3461988) was and on the date hereof continues to be the Common Parent.

1.16    "Form 1139" shall mean a Corporate Application for Tentative Refund on Internal Revenue Service Form 1139, or any successors to such form, or comparable forms for Taxes of any other jurisdiction (domestic or foreign).

1.17    "Grace-Conn." shall mean W.R. Grace & Co.—Conn. (taxpayer identification number 13-5114230).

1.18    "Grace-Conn. Business" shall mean all of the businesses and operations of Grace-Conn. and its parents or subsidiaries at any time, other than the NMC Business.

1.19    "Grace New York" shall mean W.R. Grace & Co., a New York corporation, now known as FMCH, (taxpayer identification number 13-3461988).

1.20    "Grace New York Group" shall mean that group of corporations, including Grace-Conn., Cryovac, and Sealed Air, that were members through September 29, 1996 or December 31, 1996, as applicable, of the affiliated group of corporations within the meaning of Section 1504 of the Code, and the Treasury Regulations thereunder, of which Grace New York was the Common Parent, including, with respect to Taxes of other jurisdictions (domestic or foreign), that group of corporations which included Grace New York or one or more of the members of the Grace New York Group with respect to a Consolidated Tax Return.

1.21    "Grace-Related Claim" shall mean, collectively, all claims (including unknown claims), demands, rights, liabilities and causes of action of every nature and description whatsoever, known or unknown, direct or indirect, whether concealed or hidden, from the beginning of time up to and including the Settlement Effective Date, asserted or that might have been asserted (including without limitation claims for fraudulent conveyance, successor liability, piercing of

First Amended Settlement Agreement
and Release of Claims

corporate veil, negligence, gross negligence, professional negligence, breach of duty of care,

breach of duty of loyalty, breach of duty of candor, fraud, breach of fiduciary duty,

mismanagement, corporate waste, breach of contract, negligent misrepresentation, contribution,

indemnification, any other common law or equitable claims, and violations of any state or federal

statutes, rules or regulations), which are either Asbestos-Related Claims or that are based upon or

arise out of the NMC Transaction, or the conduct or operations of any Grace-Conn. Business,

including without limitation, any liability or obligation of a Grace-Conn. Business under

environmental law, but not including any claims based on or arising out of the conduct or

operations of the NMC Business or any act or omission of the NMC Defendants in connection

with the operation of the NMC Business.

    1.22    "Hot Interest Rate" shall mean the rate of interest charged from time to time on

Taxes under Section 6621(c)(1) of the Code.

    1.23    "Indemnified Taxes" shall mean all Taxes for or attributable to Tax Periods

ending on or before December 31, 1996, other than NMC Indemnified Taxes.

    1.24    "Litigation Reinstatement Date" shall have the meaning ascribed to such term in

Section 4.03.

    1.25    "Moving Parties" shall mean each of FMCH, NMC, the PI Committee, and the

PD Committee.

    1.26    "New Grace" shall mean W.R. Grace & Co., f/k/a Grace Specialty Chemicals,

Inc. (taxpayer identification number 65-0773649).

    1.27    "New Grace Group" shall mean that group of corporations, including Grace-

Conn., that were, or hereafter become, members of that affiliated group of corporations under

Section 1504 of the Code, and the Treasury Regulations thereunder, that joined, or hereafter join,

in filing a Consolidated Tax Return of which New Grace, or any successor to New Grace, including any reorganized Debtor successor to New Grace, was or is the Common Parent.

1.28    "NMC Business" shall mean all of the worldwide healthcare business and operations conducted by NMC and the NMC Subsidiaries at any time, whether prior to or after September 29, 1996.

1.29    "NMC Defendants" shall mean FMCH, NMC, and each of their respective present and former subsidiaries, parents, affiliates, officers, directors, employees, partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and assigns, including but not limited to Fresenius Medical Care AG and Fresenius AG, but not including the Estate Parties, Sealed Air and Cryovac.

1.30    "NMC Group" shall mean NMC and the NMC Subsidiaries, whether members of the Grace New York Group or members of the FMCH Group.

1.31    "NMC Indemnified Taxes" shall mean all Taxes of or attributable to any Tax Period arising from Tax Items relating to the NMC Business conducted by a member of the FMCH Group (net of benefits from Tax Items relating to the NMC Business from one or more Tax Periods not previously paid to, or applied for the benefit of, any member of the FMCH Group) which have not previously been paid to (i) one of the Estate Parties, (ii) Grace New York prior to the NMC Transaction or (iii) the applicable tax authority, by any member of the FMCH Group.

1.32    "NMC Subsidiaries" shall mean all direct and indirect subsidiaries of NMC through which Grace New York or FMCH conducts or conducted the NMC Business.

1.33    "NMC Transaction" shall mean the series of transactions that became effective on September 27 - 30, 1996, whereby, *inter alia,* (i) NMC distributed approximately \$2.3 billion in

A-7

cash and assumed debt to Grace-Conn; (ii) Grace-Conn. distributed 100% of the common shares

of NMC stock to Grace-New York; (iii) Grace New York contributed 100% of the common

shares of Grace-Conn. stock to Sealed Air; (iv) Grace New York distributed 100% of the

common shares of Sealed Air stock to its shareholders; and (v) Grace New York merged with a

subsidiary of Fresenius Medical Care AG, all of which are more fully described in that certain

Distribution Agreement dated as of February 4, 1996, among Grace New York, Grace-Conn. and

Fresenius AG, and that certain Contribution Agreement dated as of February 4, 1996, among

Fresenius AG, Sterilpharma GmbH, and Grace-Conn.

    1.34    "Person" shall mean a natural person, individual, corporation, partnership, limited

partnership, limited liability partnership, limited liability company, association, joint venture,

joint stock company, estate, legal representative, trust, unincorporated association, government

or any political subdivision or agency thereof, and any business or legal entity and their spouses,

heirs, executors, administrators, predecessors, successors, representatives, or assigns.

    1.35    "Plan Effective Date" shall mean the date specified as such in the Plan of

Reorganization.

    1.36    "Plan of Reorganization" shall mean the plan of reorganization of the Debtors

under the Bankruptcy Code approved by a Final Order of confirmation of the Court.

    1.37    "Power of Attorney" shall mean any agency under a power of attorney or other

authorization which authorizes a Person to act on behalf of another Person with respect to Taxes,

including Form 2848.

    1.38    "Sealed Air" shall mean Sealed Air Corporation, f/k/a Grace Holding, Inc.

(taxpayer identification number 65-0654331).

First Amended Settlement Agreement
and Release of Claims

1.39    "Sealed Air/Grace Group" shall mean the group of corporations, including but not limited to Cryovac, Inc., that were from on or about September 29, 1996, or hereafter become, members of the affiliated group of corporations under Section 1504 of the Code, and the Treasury Regulations thereunder, that joined, or hereafter join, in filing a Consolidated Tax Return of which Sealed Air Corporation, or any successor to Sealed Air, was or is the Common Parent.

1.40    "Sealed Air Indemnity Litigation" shall mean the litigation captioned *Sealed Air Corporation vs. Fresenius Medical Care AG, Fresenius Medical Care Holdings, Inc.; National Medical Care, Inc.; and Fresenius USA, Inc.*, (No. 600300/02 N.Y. Sup. Ct.).

1.41    "Sealed Air Settlement Agreement" shall mean the definitive agreement implementing the settlement of the adversary proceeding captioned, *Official Committee of Asbestos Personal Injury Claimants and Official Committee of Asbestos Property Damage Claimants of W.R. Grace & Co., suing in behalf of the Chapter 11 Bankruptcy Estates of W.R. Grace & Co., et al., Plaintiffs v. Sealed Air Corporation. and Cryovac, Inc.*, Adversary Proceeding No. 02-2210, which settlement is reflected in the Acknowledgement of principal terms filed with the Court on November 27, 2002.

1.42    "Settlement Approval Date" shall mean the date the Court enters the orders described in Section 2.01.

1.43    "Settlement Effective Date" shall mean the later of: (i) the Plan Effective Date, or (ii) the satisfaction of all preconditions to payment described in Section 2.02, to the extent each such precondition has not been waived by the NMC Defendants.

1.44    "Settlement Execution Date" shall mean February 6, 2003.

A-9

1.45    "Settling Parties" shall mean (i) each of FMCH, NMC, the PI Committee, and the

PD Committee, and (ii) either upon the satisfaction of the precondition in Section 2.02(I) or upon

the execution of this Agreement by New Grace and Grace-Conn, New Grace and Grace-Conn.,

and (iii) the respective members of the affiliated groups of each of the other Settling Parties.

1.46    "Settlement Payment" shall mean the payment by the NMC Defendants provided

for in Section 2.03, as reduced by the items of setoff or recoupment, if any, referred to in Section

3.08.

1.47    "Taxes" shall mean all forms of taxation, whenever created or imposed, and

whether of the United States or elsewhere, and whether imposed by a local, municipal,

governmental, state, foreign, federation or other body, and without limiting the generality of the

foregoing, shall include income (including alternative minimum), sales, use, *ad valorem*, gross

receipts, license, value added, franchise, transfer, recording, withholding, payroll, employment,

excise, occupation, unemployment insurance, social security, business license, business

organization, stamp, environmental, premium and property taxes, together with any related

interest, penalties and additions to any such tax, or additional amounts imposed by any taxing

authority (domestic or foreign) upon the FMCH Group, the New Grace Group, the Grace New

York Group, the Sealed Air Group or any of their respective members or divisions or branches.

1.48    "Tax Item" shall mean any item of income, gain, loss, deduction, credit,

provisions for reserves, recapture of credit, net operating loss, net capital loss, tax credit, sales,

revenues, property or asset values, capital or any other item which increases or decreases Taxes

paid or payable, including an adjustment under Code Section 481 (or comparable provisions of

the Tax law of any other jurisdiction (domestic or foreign)) resulting from a change in

accounting method, the allowance or disallowance in whole or in part of, or assessment with

A-10

respect to, a tentative allowance of refund claimed on Form 1139, the allowance or disallowance in whole or in part of a net operating loss, net capital loss or tax credit claimed on a Tax Return, an amended Tax Return or claim for refund, or an adjustment attributable to a quick refund of overpayment of estimated tax.

1.49    "Tax Period" shall mean any period for, or with respect to, which a Tax Return is or has been filed, is required to be filed or may be filed.

1.50    "Tax Refund" shall mean an overpayment of, refund of, or credit against, Taxes, including a tentative allowance of refund claimed on Form 1139.

1.51    "Tax Return" shall mean any return, filing, questionnaire, information return or other document required or permitted to be filed, including requests for extensions of time, filings made with estimated tax payments, claims for refund, Forms 1139 and amended returns, that has been, or hereafter may, be filed for any Tax Period with any tax authority (whether domestic or foreign) in connection with any Tax (whether or not a payment is required to be made, or an overpayment, refund, or credit may be allowed, with respect to such filing).

1.52    "TSIA" shall mean that certain Tax Sharing and Indemnification Agreement made as of September 27, 1996, by and among Grace New York, Grace-Conn., and Fresenius AG, an Aktiengesellshaft organized under the laws of the Federal Republic of Germany and an indirect parent of FMCH.

A-11

# Exhibit I

Order Approving Fresenius Agreement

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                          :    Chapter 11
                                :    Case Nos. 01-1139 through 01-1200
W.R. GRACE & CO., et al.,       :
                                :
          Debtors.              :
------------------------
OFFICIAL COMMITTEE OF           :    Adv. No. 02-2210
ASBESTOS PERSONAL INJURY        :    [LEAD DOCKET]
CLAIMANTS and OFFICIAL          :
COMMITTEE OF ASBESTOS           :
PROPERTY DAMAGE                 :
CLAIMANTS OF W.R. GRACE &       :
CO., suing in behalf of         :
the Chapter 11 Bankruptcy       :
Estate of W.R. GRACE &          :
CO., et al.,                    :
                                :
          Plaintiffs,           :
v.                              :
                                :
SEALED AIR CORPORATION          :
and CRYOVAC, INC.,              :
                                :
          Defendants.           :
------------------------
OFFICIAL COMMITTEE OF           :    Adv. No. 02-2211
ASBESTOS PERSONAL INJURY        :
CLAIMANTS and OFFICIAL          :
COMMITTEE OF ASBESTOS           :
PROPERTY DAMAGE                 :
CLAIMANTS OF W.R. GRACE &       :
CO., suing in behalf of         :
the Chapter 11 Bankruptcy       :
Estate of W.R. GRACE &          :
CO., et al.,                    :
                                :
          Plaintiffs,           :
v.                              :
                                :
FRESENIUS MEDICAL CARE          :
HOLDINGS, INC. and              :
NATIONAL MEDICAL CARE,          :
INC.,                           :
                                :
          Defendants.           :

**ORDER AUTHORIZING, APPROVING AND IMPLEMENTING SETTLEMENT
AGREEMENT BY AND AMONG PLAINTIFFS THE OFFICIAL COMMITTEE OF
ASBESTOS PROPERTY DAMAGE CLAIMANTS AND THE OFFICIAL COMMITTEE
OF ASBESTOS PERSONAL INJURY CLAIMANTS, THE DEBTORS,
AND DEFENDANTS FRESENIUS MEDICAL CARE HOLDINGS, INC. AND
NATIONAL MEDICAL CARE, INC.**

On April 15, 2003, the Official Committee of Asbestos
Property Damage Claimants (the "PD Committee") and the Official
Committee of Asbestos Personal Injury Claimants (the "PI
Committee"; collectively, the PI Committee and the PD Committee
are referred to as the "Plaintiffs") of the above-captioned
debtors and debtors in possession (collectively, the "Debtors"),
and the Debtors, filed their motion (the "Motion") pursuant to §§
105(a), 362, and 363 of Title 11, United States Code (the
"Bankruptcy Code") and Rule 9019(a) of the Federal Rules of
Bankruptcy Procedure (the "Bankruptcy Rules") seeking an order
authorizing, approving and implementing the First Amended
Settlement Agreement and Release of Claims (the "Settlement
Agreement") by and among the Plaintiffs, the Debtors, Fresenius
Medical Care Holdings, Inc. ("FMCH") and National Medical Care,
Inc. ("NMC," and collectively with FMCH and certain non-defendant
affiliates of FMCH and NMC further identified in the Settlement
Agreement, the "NMC Defendants"), a copy of which Settlement
Agreement is attached to the Motion as Exhibit A; due, proper,

2

and sufficient notice of the Motion having been given pursuant to
Bankruptcy Rules 2002 and 9019(a) and the Local Rules of this
Court; and the Court having considered the Motion, the files and
records in these cases, the arguments and statements of counsel
offered at a hearing (the "Hearing") on the Motion, the evidence
proffered or adduced at the Hearing, and objections to the
Motion, if any; the Court hereby finds and concludes as follows:[1]

### Jurisdiction and Venue

A.    This Court has jurisdiction to hear and determine
the Motion and to grant the relief requested therein pursuant to
28 U.S.C. §§ 157 and 1334. The Motion gives rise to a core
proceeding pursuant to 28 U.S.C. § 157(b).

B.    Venue of these cases and the Motion is proper in
this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

C.    The predicates for the relief granted by this Order
are Bankruptcy Code §§ 105(a), 362, and 363 and Bankruptcy Rule
9019(a).

---

[1]    The following shall constitute the Court's findings of
fact and conclusions of law as required by Bankruptcy Rule
7052(a). To the extent that findings of fact contain conclusions
of law, such findings shall constitute conclusions of law. To the
extent that conclusions of law contain findings of fact, such
conclusions shall constitute findings of fact.

3

### General Background

D.     On April 2, 2001 (the "Petition Date"), each of the Debtors commenced a voluntary case under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

E.     The Debtors' cases are being jointly administered pursuant to Bankruptcy Rule 1015.

F.     Since the Petition Date, the Debtors continue in possession of their properties and continue to operate their businesses pursuant to Bankruptcy Code §§ 1107(a) and 1108.

G.     No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

H.     On April 12, 2001, the United States Trustee appointed the PD Committee, the PI Committee, and the Official Committee of Unsecured Creditors (the "Creditors' Committee").

### The Adversary Proceedings

**The Debtors' Complaint for Injunction and Motion for TRO.**

I.     On the Petition Date, the Debtors filed their Verified Complaint for Declaratory and Injunctive Relief (the "Complaint for Injunction"), captioned <u>W.R. Grace & Co., et al. v. Margaret</u>

4

<u>Chakarian, et al.</u>, Adversary Proceeding No. 01-771. Contemporaneously with the Complaint for Injunction, the Debtors also filed their Motion for a Temporary Restraining Order and Preliminary Injunction Staying All Asbestos-Related and Fraudulent Transfer Claims Against Affiliated Entities (the "Motion for TRO").

J.   In the Complaint for Injunction and the Motion for TRO, the Debtors sought, among other things, to enjoin prosecution of pending and future fraudulent transfer claims
against certain non-debtors, including, without limitation, the NMC Defendants, Sealed Air Corporation ("Sealed Air"), and Cryovac, Inc. ("Cryovac," and collectively with Sealed Air, the "Sealed Air Companies").

K.   On the Petition Date, the Bankruptcy Court entered its Order Granting Temporary Restraining Order (the "TRO"), which effectively stayed all entities from filing any asbestos-related actions against certain non-debtors, including the NMC Defendants and the Sealed Air Companies.

L.   On April 12, 2001, the Bankruptcy Court entered its Order Extending the Temporary Restraining Order, which extended the TRO through and including April 24, 2001.

M.   At a status conference held by the Court on April 18, 2001, the Bankruptcy Court issued a preliminary injunction further

5

staying all entities from filing any asbestos-related actions against the NMC Defendants or the Sealed Air Companies through and including a hearing on the Complaint for Injunction.

N.   On May 3, 2001, the Bankruptcy Court conducted a hearing on the request for a preliminary injunction and entered an Order Granting Preliminary Injunction (the "Preliminary Injunction Order"), which stayed, inter alia, pending actions alleging certain fraudulent transfer claims against the NMC Defendants and the Sealed Air Companies. The Preliminary Injunction Order, however, did not stay future actions against the NMC Defendants and the Sealed Air Companies.

O.   On January 22, 2002, the Bankruptcy Court entered an order modifying the Preliminary Injunction Order. The January 22 order broadened the scope of the preliminary injunction and stayed both pending and future actions against the NMC Defendants and the Sealed Air Companies, other than by the Plaintiffs, as described below.

**Assignment of Causes of Action to the Plaintiffs.**

P.   On June 14, 2001, the PD Committee and the PI Committee filed their Joint Motion for Authority to Prosecute Fraudulent Transfer Claims (the "Motion to Prosecute") seeking authority to prosecute certain fraudulent transfer claims against, among others,

6

the NMC Defendants and the Sealed Air Companies (the "Fraudulent Transfer Actions").

Q.    At an omnibus hearing held before the Bankruptcy Court on January 29, 2002, the Bankruptcy Court informed the parties that this Court granted the Motion to Prosecute and authorized the PD Committee and the PI Committee to investigate and prosecute the Fraudulent Transfer Actions.

R.    On March 12, 2002, this Court entered an order withdrawing the reference with respect to the Fraudulent Transfer Actions and granting the Motion to Prosecute.

On March 12, 2002, this Court entered an order withdrawing the reference with respect to the Fraudulent Transfer Actions and granting the Motion to Prosecute.

**The Adversary Proceedings.**

S.    After an order granting the Motion to Prosecute had been entered, the parties participated in a case management conference to establish discovery and pleading deadlines.  After considerable negotiation and discussion, the parties submitted a draft case management order to this Court for approval. On March 12, 2002, this Court entered the first Case Management Order in the above-captioned adversary proceedings.

7

T.    On March 18, 2002, the Plaintiffs filed a complaint against the NMC Defendants alleging, <u>inter alia</u>, that the NMC Defendants were liable as successors for the asbestos liability of the Debtors and that the NMC Defendants were recipients of fraudulent transfers in respect of the W.R. Grace entities (the "Fresenius Adversary Proceeding").

U.    On March 18, 2002, the Plaintiffs also filed a complaint against the Sealed Air Companies alleging, <u>inter alia</u>, that the Sealed Air Companies were likewise liable as successors for the asbestos liability of the Debtors and that the Sealed Air Companies likewise were recipients of fraudulent transfers in respect of the W.R. Grace entities (the "Sealed Air Adversary Proceeding").

V.    On April 1, 2002, the NMC Defendants filed their answer in the Fresenius Adversary Proceeding.

W.    Thereafter, at a case management conference held by this Court, the Court granted the Plaintiffs' request to stay the Fresenius Adversary Proceeding pending the outcome of the Sealed Air Adversary Proceeding.

<u>The IRS Tax Audit</u>

X.    The Debtors were members through September 29, 1996, of

8

the Grace New York Group[2] and included in the Grace New York
Group's consolidated tax returns together with certain of the NMC
Defendants for years ending on or before December 31, 1996. The
Sealed Air Companies were also members of the Grace New York Group
for certain tax years ending on or before December 31, 1996.

Y.     Each member of the Grace New York Group is severally and
thus primarily liable for the income taxes (as well as other taxes)
for the tax years during which such corporation was included as a
member of the Grace New York Group.

Z.     The Debtors and certain NMC Defendants entered into that
certain Tax Sharing and Indemnification Agreement dated September
27, 1996 (the "TSIA"), pursuant to which the Debtors obligated
themselves to indemnify such NMC Defendants for certain tax
deficiencies asserted by the tax authorities relating to the tax
years ending on or before, or including, September 29, 1996 (e.g.,
the federal consolidated tax return of the Grace New York Group for
the tax year ending December 31, 1996).

AA. In October, 1997, the Internal Revenue Service (the
"IRS") commenced an examination of the consolidated tax returns of

---

[2] All capitalized terms used hut not defined in this Order
shall have the meanings set forth in the Settlement Agreement. To
the extent that the terms of the Settlement Agreement conflict
with any provision of this Order, the terms of the Settlement
Agreement shall control.

the Grace New York Group with respect to the 1993 through 1996 tax periods (the "Tax Audit").

BB.  Under the TSIA, the Debtors have been acting as the agent of the Grace New York Group in dealing with the IRS during the Tax Audit.

CC.  In connection with the Tax Audit, the IRS has proposed certain adjustments to the Debtors.

DD.  The IRS has filed priority tax claims against the Debtors and their bankruptcy estates. Certain state taxing authorities have filed similar priority tax claims in the above-captioned cases. The amounts of these priority tax claims have not yet been adjudicated.

EE.  On September 24, 2002, the Debtors filed with this Court a Motion for the Entry of an Order Authorizing the Debtors to Enter Into a Settlement Agreement with the Internal Revenue Service in Connection with Interest Deductions Claimed with Respect to Corporate Owned Life Insurance (the "COLI Motion") to settle the largest adjustment proposed by the IRS.

FF.  Because the Sealed Air Companies were members of the Debtors' corporate family at the time the Debtors entered into the TSIA, the NMC Defendants have asserted that the Sealed Air Companies are liable to the NMC Defendants for indemnification and contribution with respect to various claims, including any tax

10

deficiencies arising out of the Tax Audit. Certain litigation among the Sealed Air Companies and the NMC Defendants is referred to in the Settlement Agreement as the "Sealed Air Indemnity Litigation."

## The Settlement Agreement

GG.    On November 27, 2002, at the direction of the Court, the Plaintiffs and the NMC Defendants participated in a lengthy settlement conference, during which the parties were able to successfully negotiate a settlement that addressed three separate areas: (i) settlement of the Fresenius Adversary Proceeding and protection for the NMC Defendants from current and future Grace-Related Claims; (ii) responsibility for the priority taxes arising out of the Tax Audit and for other taxes; and (iii) release of claims against the Sealed Air Companies by the NMC Defendants. This third component, the release of the Sealed Air Companies by the NMC Defendants, was a material part of the Plaintiffs' separate settlement agreement with the Sealed Air Companies, which settlement is expected to provide approximately $900 million of benefits to the Debtors' estates.

HH.    The outlines of the settlement reached at the settlement conference were memorialized in a term sheet executed on November

11

27, 2002. Pursuant to the Term Sheet, the NMC Defendants agreed to pay $15 million as directed by the Court, upon the confirmation of a Plan of Reorganization in respect of the Debtors. In addition, the NMC Defendants agreed to pay the net federal and state income tax liabilities of the Grace New York Group for years ending on or before December 31, 1996, subject to certain control and cooperation agreements. Pursuant to the Term Sheet, the NMC Defendants were to take control over the Tax Audit and all refunds for tax years ending on or before December 31, 1996.  By Order dated November 27, 2002, the Court acknowledged the agreement in principle.

II.  Shortly after the November 27th settlement conference, representatives of the Plaintiffs, the Debtors, and the NMC Defendants jointly began negotiating and drafting the Settlement Agreement. During the course of this joint drafting of the definitive settlement documents, it became apparent that the design and documentation of the tax control and cooperation features of the settlement would be exceedingly cumbersome and difficult, and had the potential to create conflicts between tax positions taken by the Debtors in the future and positions taken by FMCH in years in which they were responsible for the tax payments under the settlement reflected in the Term Sheet. In addition, it became

12

clear that greater tax efficiencies could be achieved by restructuring portions of the settlement reflected in the Term Sheet. As a result, the Plaintiffs, the Debtors, and the NMC Defendants agreed to modify the terms of the settlement to provide economically similar benefits for the Debtors' estates without intricate tax provisions. The Settlement Agreement addresses the same three subject areas as the original Term Sheet, to wit: (i) settlement of the Fresenius Adversary Proceeding and protection for the NMC Defendants from current and future Grace-Related Claims; (ii) responsibility for the priority taxes arising out of the Tax Audit and for other taxes; and (iii) release of the claims against the Sealed Air Companies by the NMC Defendants.

JJ. Under the Settlement Agreement, the NMC Defendants have agreed to make a one-time lump sum payment of $115 million in exchange for full protection from current and future Grace-Related Claims, including Asbestos-Related Claims, claims arising out of the Tax Audit, and other taxes. In addition, the Settlement Agreement provides that the Debtors will retain control of, and responsibility to pay (or indemnify the NMC Defendants) for, Indemnified Taxes. Finally, the Settlement Agreement provides that the NMC Defendants will release the Sealed Air Companies for all Grace-Related Claims. As a consequence, the Debtors' estates may

13

realize an economic benefit equal to the amount of the settlement proceeds (i.e., $115 million), reduced only by the amount of Indemnified Taxes that the Debtors might otherwise have been able to avoid paying as priority tax claims or as indemnification claims to the NMC Defendants. In addition, the Debtors' estates are thus able to settle the Sealed Air Adversary Proceeding without having to indemnify the Sealed Air Companies for the contribution and indemnity claims the NMC Defendants would otherwise pursue against those entities in the Sealed Air Indemnity Litigation.

KK.   As more fully set forth in the Settlement Agreement, in resolution of all Grace-Related Claims, the Plaintiffs, the Debtors, and the NMC Defendants have agreed as follows:

(a)   Within five (5) days of the Settlement Effective Date, the NMC Defendants shall wire transfer $115 million, subject to certain rights of setoff and recoupment set forth in Section 3.8 of the Settlement Agreement, as directed by the Court in the Final Order approving the Plan of Reorganization.

(b)   As conditions precedent to the foregoing payment:

•   The Plan of Reorganization shall provide that: (i) upon the making of the Settlement Payment, the Asbestos Committees and the Estate Parties will fully, finally, and forever release, relinquish and discharge each and every of the NMC Defendants from any and all Grace-Related Claims that the Asbestos Committees or the Estate Parties have asserted or could have asserted in this or any other forum against any of the NMC Defendants; and (ii) prior to the making of the Settlement Payment, the Asbestos Committees and the Estate Parties will deliver to the NMC Defendants the

14

Release that is attached as Appendix B to the Settlement Agreement, which by its terms shall become effective upon the making of the Settlement Payment.

● The Plan of Reorganization shall provide that, in consideration of the Settlement Payment, any Person voting in favor of the Plan or receiving property under the Plan shall thereby be deemed to have fully released each and every of the NMC Defendants from all Grace-Related Claims that such Person has asserted or could have asserted in this or any other forum against any of the NMC Defendants.

● The Plan of Reorganization shall establish a trust or trusts under state law and pursuant to Section 524(g) of the Bankruptcy Code (the "Asbestos Trust"), and shall further provide that, in consideration of the Settlement Payment, any Person that receives property from the Asbestos Trust(s) shall thereby be deemed to have fully released each and every of the NMC Defendants from all Grace-Related Claims that the Person has asserted or could have asserted in this or any other forum against any of the NMC Defendants.

● The Court shall have issued, pursuant to Section 105(a) of the Bankruptcy Code, a Final Order, enforceable upon the making of the Settlement Payment, permanently and forever enjoining, restraining and barring any Person from commencing or continuing any suit, action or other proceeding, or from taking any other action, for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, or with respect to, any Grace-Related Claim against any of the NMC Defendants.

● The Plan of Reorganization shall provide that the NMC Defendants shall receive the full benefits and protections of an injunction entered pursuant to section 524(g) of the Bankruptcy Code, enforceable upon the making of the Settlement Payment, which injunction shall permanently bar any Person from commencing or continuing any suit, action, or other proceeding, or from taking any other action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, or with respect to, any Asbestos-Related Claim that the Person

15

asserted or could have asserted, against any of the NMC Defendants.

● The Plan of Reorganization shall provide that the Estate Parties, jointly and severally, upon the making of the Settlement Payment, shall indemnify, defend and hold harmless the NMC Defendants for any loss, cost or expense (including attorneys' fees and other costs of defense) arising out of any and all Grace-Related Claims, commenced or continued in this or any other forum against any of the NMC Defendants. Such indemnification specifically shall not apply to the costs and expenses (including attorneys' fees and accountants' fees) incurred by the NMC Defendants in defending the Asbestos Claimant's Adversary Proceeding or any other suit prior to the Settlement Execution Date.

● The actions identified in Section 2.02(G) of the Settlement Agreement shall have been dismissed with prejudice.

● The Plan of Reorganization shall contain a determination by the Court that the Estate Parties have the ability to satisfy all Indemnified Taxes, liabilities under the Settlement Agreement and ordinary course of business obligations as of the Plan Effective Date.

(c) The NMC Defendants will not seek indemnification from the Estate Parties, Sealed Air, or Cryovac for the Settlement Payment.

(d) Upon the Settlement Effective Date, the NMC Defendants will execute a release, acceptable in form and substance to the NMC Defendants, that fully releases the Sealed Air Companies from any and all Tax claims or Asbestos-Related Claims (including but not limited to claims for attorneys' fees and the costs of litigation related thereto) that the NMC Defendants have asserted or could have asserted in this or any other forum against the Sealed Air Companies.

(e) Notwithstanding any other provision of the Settlement Agreement, it shall not be a breach of the Settlement Agreement, act of bad faith, tortious interference with a contractual relationship or any other malfeasance, for the Estate Parties to

16

propose or support a plan of reorganization that does not provide
for the establishment of an Asbestos Trust or the issuance of an
injunction pursuant to Section 524(g) of the Bankruptcy Code;
provided however, the Estate Parties shall use their best efforts
to cause all of the preconditions set forth in Section 2.02 of the
Settlement Agreement, other than those set forth in subsections
2.02 (C) and (E) to occur. For the avoidance of doubt, if the Plan
of Reorganization, as well as the Final Order of confirmation
respecting the Plan of Reorganization, do not satisfy the
preconditions set forth in such paragraphs, the NMC Defendants may
in their sole discretion waive or decline to waive, as set forth in
Section 2.02, the failure of those preconditions as conditions
precedent to the Settlement Payment.

(f)    The Plaintiffs shall use their respective best efforts
to cause the occurrence of all the preconditions to the obligation
of the NMC Defendants to make the Settlement Payment set forth in
Section 2.02 of the Settlement Agreement, except to the extent the
NMC Defendants may in their sole discretion waive, as set forth in
Section 2.02, the failure of those preconditions as conditions
precedent to the Settlement Payment.

(g)    From and after the Settlement Approval Date, the Estate
Parties promptly shall pay any Indemnified Taxes as such Taxes
become due and payable to tax authorities pursuant to a Final
Determination, provided that the Estate Parties have obtained
authorization from the Court to pay currently any such Indemnified
Taxes. To the extent necessary, the Estate Parties will use best
efforts to obtain such authorization and shall defer any Final
Determination of any Indemnified Taxes until such time as the
Estate Parties have obtained such authorization. Any Tax Refund of
the Grace New York Group with respect to tax years ending on or
before December 31, 1996, if credited or paid to any member of the
Grace New York Group shall, under certain circumstances as more
fully described in Section 3.03(C) of the Settlement Agreement, be
repaid to the tax authority as a payment of Indemnified Taxes. On
February 14, 2003, Fresenius received a wire transfer from the IRS
in the amount of $7,203,630, which the Plaintiffs and the Debtors
agree is the tentative refund with respect to the 1993 tax period
generated in response to the Form 1139 filed by the Debtors in
December 2002 (the "1993 Tentative Refund"). The Settlement
Agreement requires Fresenius to repay the 1993 Tentative Refund to
the IRS as a payment toward the Indemnified Taxes. Pending approval
of such repayment by this Court, Fresenius has placed the 1993
Tentative Refund in a segregated interest bearing account (the

17

"Segregated Account"). The Plaintiffs and the Debtors have agreed
that upon approval by the Court, which is requested in the Motion,
Fresenius should repay the funds held in the Segregated Account to
the IRS as a payment of Indemnified Taxes pursuant to the terms of
the Settlement Agreement.

(h) From the Settlement Execution Date, the terms of the
Settlement Agreement generally supersede the terms of the TSIA.

(i) Upon approval of the Settlement Agreement by Final Order,
the Estate Parties shall become obligated to, and entitled to the
benefits of, the terms and conditions of the Settlement Agreement.

### Notice of the Motion

LL. As evidenced by the Certificate of Service of Theodore
Tacconelli, actual written notice of the Motion and the Settlement
Agreement, and a reasonable opportunity to object or be heard with
respect thereto, has been afforded to all parties in interest,
including: (a) the Office of the United States Trustee; (b) counsel
to the Debtors' postpetition Lender; (c) counsel to the Creditors'
Committee; (d) all parties to the Fresenius Adversary Proceeding;
(e) all parties to the Sealed Air Adversary Proceeding; and (f)
those parties requesting notice pursuant to Bankruptcy Rule 2002.

MM. This Court finds and concludes that such notice satisfies
the requirements of the Bankruptcy Code, the Bankruptcy Rules, due
process, and other applicable law, and no further notice of the
Motion or the Settlement Agreement is required under the
circumstances.

18

## Approval of the Settlement Agreement

NN.    The Settlement Agreement is in the best interests of these bankruptcy estates and the creditors thereof.

OO.    The result obtained on behalf of these bankruptcy estates in the Settlement Agreement falls within the reasonable range of litigation possibilities in the Fresenius Adversary Proceeding.

PP.    At best, the likely outcome of the Fresenius Adversary Proceeding is uncertain. The Plaintiffs candidly admit to this Court and the parties that litigation risks abound, including, without limitation, that proof of the Debtors' alleged insolvency and proof of the alleged lack of reasonably equivalent value are especially challenging in respect of the fraudulent transfer claims against the NMC Defendants.

QQ.    The Fresenius Adversary Proceeding indisputably involves complex legal and factual issues.

RR.    Prosecuting the Fresenius Adversary Proceeding would create substantial expenses for these bankruptcy estates and the other parties to the Fresenius Adversary Proceeding. Although the litigants might achieve some economies through litigation of the Sealed Air Adversary Proceeding, the transactions involving the NMC Defendants and the Sealed Air Companies were sufficiently different

19

in time and nature that any savings would be marginal, if any.

SS.    Pursuing the Fresenius Adversary Proceeding would also likely entail the commitment of substantial human resources by key personnel of the Debtors. The commitment of such resources and the duration of the litigation would assuredly result in further delays in developing and confirming a plan of reorganization in the above-captioned cases.

TT.    Approval of the Settlement Agreement furthers the paramount interest of creditors in the above-captioned cases.

UU.    Approval of the Settlement Agreement could potentially increase the funds available to fund a plan of reorganization, both through the funds provided by the NMC Defendants and by facilitating settlement with the Sealed Air Companies.

VV.    Approval of the Settlement Agreement will permit the Plaintiffs and the Debtors to focus their attention on other important matters in the above-captioned cases, including developing and confirming a plan of reorganization.

WW.    Approval of the Settlement Agreement will avoid continued expense in the Fresenius Adversary Proceeding and the Sealed Air Adversary Proceeding, thereby resulting in a net economic benefit to these bankruptcy estates.

XX.    Based on the foregoing, the releases, protections, and

20

other benefits provided to the NMC Defendants are necessary to the reorganization in the above-captioned cases.

YY.   In exchange for the releases, protections, and other benefits provided to the NMC Defendants by the Settlement Agreement, the NMC Defendants are providing a substantial contribution and reasonably equivalent value to these bankruptcy estates and the creditors thereof.

ZZ.   The releases, protections, and other benefits provided to the NMC Defendants by the Settlement Agreement are fair to the Plaintiffs, these bankruptcy estates, and the creditors thereof.

AAA. The NMC Defendants are unwilling to settle the Fresenius Adversary Proceeding and provide the substantial contributions to these bankruptcy estates contemplated by the Settlement Agreement without the releases, protections, and other benefits provided to the NMC Defendants by the Settlement Agreement.

BBB. The Plaintiffs, the Debtors, and the NMC Defendants negotiated and entered into the Settlement Agreement in good faith and at arm's length.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:

1.   The Motion is hereby GRANTED in its entirety, and the Settlement Agreement is hereby AUTHORIZED and APPROVED in all

21

respects.

2.     The Plaintiffs, the Debtors, and the NMC Defendants are
hereby authorized, empowered, and directed to take all necessary
acts to carry out and implement the Settlement Agreement in
accordance with its terms without further order of the Court,
including, without limitation, (i) FMCH is authorized to repay the
1993 Tentative Refund and the other funds in the Segregated Account
to the IRS as a payment of Indemnified Taxes, (ii) the NMC
Defendants, the Debtors, and the Estates Parties each are
authorized to repay any additional Tax Refunds to the appropriate
tax authority, pursuant to and subject to the terms of Section
3.03(C) of the Settlement Agreement; and (iii) pursuant to Section
3.03(B) of the Settlement Agreement, to the extent Grace-Conn. or
any other Estate Party voluntarily agrees to the payment,
assessment, resolution or other final determination of any
Indemnified Taxes, the Debtors and the Estate Parties are
authorized to pay promptly and in full any such Indemnified Taxes.

3.     Pursuant to Section 2.09 of the Settlement Agreement, the
Plaintiffs are hereby authorized, empowered, and directed to use
their best efforts to bring about the Settlement Effective Date and
to cause the occurrence of all the preconditions to the obligation
of the NMC Defendants to make the Settlement Payment that are set

22

forth in Section 2.02 of the Settlement Agreement, including, without limitation, seeking the injunctions and releases under Bankruptcy Code §§ 105(a) and 524(g) for the NMC Defendants. Pursuant to Section 2.08 of the Settlement Agreement, the Debtors are hereby authorized, empowered, and directed to use their best efforts to bring about the Settlement Effective Date, and to cause the occurrence of all the preconditions to the obligation of the NMC Defendants to make the Settlement Payment that are set forth in Section 2.02 of the Settlement Agreement, other than those set forth in paragraphs (C) and (E) of Section 2.02, including, without limitation, seeking the benefit of injunctions and releases under Bankruptcy Code § 105(a). In addition, if the Debtors and Estate Parties, in their discretion, choose to seek the protections of an injunction under Bankruptcy Code § 524(g), the Debtors and Estate Parties are authorized, empowered, and directed to seek the benefit of injunctions and releases under Bankruptcy Code § 524(g) for the NMC Defendants to the extent such injunctions are allowable under the law and to the extent they seek such injunctions and releases for the Debtors and the Estate Parties.

4. The terms of the Settlement Agreement shall survive entry of this Order and shall supersede all other agreements relating to these matters, including, without limitation, the TSIA, except as

23

specifically provided otherwise in the Settlement Agreement.

5. The terms of the Settlement Agreement shall not be modified by provisions in any plan of reorganization in the above-captioned cases, or otherwise, without consent of the NMC Defendants.

6. The terms of the Settlement Agreement and this Order shall be binding in all respects on the Debtors, their bankruptcy estates, all holders of claims and interests in the above-captioned cases, all parties in interest, and each of their respective successors and assigns, and upon entry of an order confirming a plan of reorganization in the above-captioned cases, any additional parties subject to the injunctions and releases provided through such a plan.

7. To the extent necessary, the Plaintiffs and the NMC Defendants are hereby granted relief from the automatic stay pursuant to Bankruptcy Code § 362(d) to carry out the provisions of this Order and the Settlement Agreement.

8. This Court hereby retains jurisdiction, even after the closing of these chapter 11 cases, to (i) interpret and enforce the terms and provisions of this Order and the Settlement Agreement and to adjudicate, if necessary, any and all disputes relating to the transactions contemplated by the Settlement Agreement; (ii) enter

24

orders in aid or furtherance of the transactions contemplated in the Settlement Agreement; and (iii) re-open the Debtors' chapter 11 cases to enforce the provisions of this Order.

9.    This Order shall become effective immediately upon entry and there shall not be any automatic stay of this Order pursuant to Bankruptcy Rule 7062 and 6004(g). The provisions of this Order are non-severable and mutually dependant.


Dated: _June 25_, 2003
       Wilmington, Delaware  VIA
       NEWARK, NEW JERSEY

                    UNITED STATES DISTRICT JUDGE

25