**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.*, | ) | Case No. 01-1139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | **Hearing Date: March 21, 2005 at Noon** |
| | ) | **Related Docket No. 7753** |
| | ) | |

**RESPONSE AND OBJECTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO THE MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO (A) AN EMPLOYMENT AGREEMENT WITH ITS CURRENT CHIEF OPERATING OFFICER UNDER WHICH HE WOULD ASSUME THE POSITION OF CHIEF EXECUTIVE OFFICER OF THE DEBTORS ("CEO") AND (B) A POST-RETIREMENT AGREEMENT WITH THE CURRENT CEO WHEREBY HE WOULD PROVIDE CONSULTING SERVICES RELATED TO DEBTORS' CHAPTER 11 CASES [DI 7753]**

The Official Committee of Asbestos Personal Injury Claimants (the "PI Committee"), by and through its undersigned counsel, respectfully submits this response and objection ("Objection") to the Motion of Debtors for an Order Authorizing the Debtors To Enter Into (A) An Employment Agreement With Its Current Chief Operating Officer Under Which He Would Assume The Position of Chief Executive Officer Of the Debtors ("CEO") And (B) A Post-Retirement Agreement With The Current CEO Whereby He Would Provide Consulting Services To Debtors' Chapter 11 Cases (the "Motion"). In support of this Objection, the PI Committee states as follows:

**INTRODUCTION**

1. On April 2, 2001 (the "Petition Date"), W.R. Grace & Co. ("Grace") and its affiliated debtors and debtors in possession (collectively, the "Debtors") commenced the instant proceedings by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code with the Clerk of this Court. The Debtors continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On the Petition Date, the Court entered an order authorizing the joint administration of these cases for procedural purposes.

2.      No trustee or examiner has been appointed in these cases. On April 12, 2001, the United States Trustee for the District of Delaware (the "US Trustee") appointed the PI Committee, the Official Committee of Asbestos Property Damage Claimants, and the Official Committee of Unsecured Creditors. On June 18, 2001, the U.S Trustee appointed the Official Committee of Equity Security Holders.

## BACKGROUND

3.      The Motion seeks entry of an Order authorizing and approving the Debtors' entry into the CEO Agreement[1] and the Norris Consulting Agreement[2]. Since November 2003, Mr. Festa has been serving as the Debtors' Chief Operating Officer ("COO"). *Motion*, ¶ 7. Through the CEO Agreement, the Debtors seek to promote Alfred E. Festa ("Festa") to the position of CEO effective June 1, 2005. *Motion*, ¶ 11.

4.      Festa first joined the Debtors as the COO in November 2003, two and a half (2 ½) years after the Petition Date. Prior to that time, Festa served as a vice-president and general manager of a business unit of Allied Signal, where he also served as vice president of finance and business development. Notably, Festa has no prior experience as CEO of an independent corporation. When he joined the Debtors, Festa's compensation agreement included an annual base salary of $550,000, a targeted award under the Debtors' Annual Incentive Compensation Program equal to 100% of his base salary, and a targeted award

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

[2] The PI Committee does not object to the relief requested in the Motion as to the Norris Consulting Agreement.

{D0039708:4 }                                                   2

under the Debtors' LTIPs in the amount of 125% of his base salary ($687,000). Festa did not participate in the Debtors' 2004 KERP.

5. Festa's proposed CEO Agreement has an initial term of four (4) years and commences on June 1, 2005. *Motion*, ¶ 11. Among other benefits, the CEO Agreement proposes to compensate Festa with an initial base salary of $760,000 and provides for Festa's participation in the Debtors' Annual Incentive Compensation Program at a targeted award equal to 100% of his base salary. Id. The CEO Agreement proposes additional compensation to Festa through his participation in the Debtors' annual LTIPs, with a targeted value under the 2005-2007 LTIP of $1,690,000. Id. If the financial targets are met, the above elements of Festa's compensation total $3,210,000. The CEO Agreement also provides Festa with a severance payment equal to 350% of his base salary at the time of termination. *Motion*, ¶ 13.

6. In addition, the proposed compensation package for Festa includes a Chapter 11 emergence bonus of $1,750,000. *Motion*, ¶ 12. *CEO Agreement*, page 6. Despite being referred to in the Motion and in the actual CEO Agreement as an "Emergence Bonus," Festa will receive $750,000 thirty-six (36) months after the filing of an initial plan of reorganization (presumably from November 15, 2004 when the Debtors' pending plan of reorganization was filed) and the remaining $1,000,000 forty-eight (48) months after the filing of an initial plan of reorganization with the Court. *CEO Agreement*, page 6. As a result, Festa will receive this $1,750,000 Emergence Bonus regardless of whether there is a confirmable plan of reorganization filed and the Debtors actually emerge from bankruptcy. Thus, the term "Emergence Bonus" is deceiving.

**OBJECTION**

7.      The PI Committee does not object to the Debtors entering into an agreement to appropriately compensate Festa for his services as CEO.  The PI Committee recognizes that this Court's analysis should focus on whether the Debtors' Board of Directors exercised "sound business judgment" in approving the CEO Agreement.  See *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999).  In reviewing the pending Motion, this Court has considerable discretion in approving or disapproving the use of estate property outside of the ordinary course of business.  See *Montgomery Ward*, 242 B.R. at 152-153.  However, as set forth below, the Debtors have failed to act with sound business judgment in this instance.

8.      In the Motion, the Debtors' assert that the CEO Agreement is "reasonable in light of the circumstances surrounding the Debtors' Chapter 11 Cases." *Motion*, ¶ 22.  The Debtors rely upon the affidavit of Mr. Nick Bubnovich in support of the position that "the compensation provisions of the CEO Agreement are reasonable for the position." *Motion*, ¶ 22. *Bubnovich Aff.*, ¶ 4.  However, a thorough review of the Bubnovich Affidavit demonstrates that the Debtors in fact failed to exercise sound business judgment and that the CEO Agreement is not reasonable as to Festa.  In addition, the structure under which the CEO Agreement is established, particularly with regard to the Emergence Bonus, will not operate as an incentive for the CEO to lead the Debtors toward a confirmable plan of reorganization.  If the goal is to reward competence, rather than obstructionism, then the CEO Agreement must be revised toward this end.  The CEO Agreement, as currently constructed, is not in the best interests of the creditors.

9. According to his affidavit, Bubnovich performed two different analyses to determine if Festa's Total Direct Compensation ("TDC") (defined to include the sum of base salary, annual incentive opportunity, and long-term incentive opportunity) is within the "range of competitive practice." *Bubnovich Aff.*, ¶ 4. The first analysis compared Festa's TDC – which excludes the $1,750,000 Emergence Bonus – to that of the TDC of CEO's at fourteen (14) Industry Peer Group companies. The TDC of the CEO's at the Industry Peer Group companies is defined to include: (a) base salary; (b) actual annual incentive; (c) a three-year average of the Black-Scholes value of stock options; (d) the value of any long-term incentive payout; and (e) restricted stock awards valued without regard to any restriction.

10. When excluding the Emergence Bonus, Festa's compensation under the CEO Agreement is approximately 20% below the median compensation of CEO's at the Industry Peer Group companies. *Bubnovich Aff.*, ¶ 7. However, the Industry Peer Group companies are not an appropriate group from which to determine the reasonableness of the proposed CEO Agreement. In particular, the Industry Peer Group includes three entities with total revenues substantially higher than the Debtors: Dow Chemical Co., EI DuPont de Nemours, and PPG Industries. As shown on Chart I attached hereto, 2004 revenues for Dow, DuPont and PPG were 17, 11, and 4 times the amount of the Debtors, respectively. Thus, the Debtors analysis is inherently flawed, as it is inappropriate to support the CEO Agreement by utilizing corporations with revenues substantially higher than the Debtors. Bubnovich's use of Dow, DuPont and PPG (the "Big Three") improperly skews the median TDC to a misleadingly high figure.

11. According to Bubnovich's second analysis, based upon three chemical industry CEO compensation surveys ("Survey Group"), Festa's compensation under the CEO

Agreement, excluding the Emergence Bonus, is 4% above the median compensation of CEO's. These figures, however, fail to account for the fact that Festa has only served as COO of the Debtors for less than a year and a half, has not served at that level at any other independent corporation, and lacks any experience as CEO of an independent corporation. Moreover, as addressed below, once the Emergence Bonus is added, Festa will be compensated well above the median of the CEO's in the Survey Group.

12. A particularly troublesome component of the CEO Agreement is the $1,750,000 unconditional bonus, not linked to any incentive, which the Debtors cloak as an emergence bonus. This component of the compensation package is not an emergence bonus in the true sense of the phrase because although it is payable on the event of emergence, it is also payable if no emergence actually occurs. Specifically, the CEO Agreement is structured to pay Festa $750,000 in November 2007 and the remaining $1,000,000 in November 2008. As a result, the Emergence Bonus is not conditioned upon actual emergence from bankruptcy.

13. Ordinarily, an emergence bonus functions as an incentive for the debtors' management to negotiate a consensual plan of reorganization as expeditiously as possible. These Chapter 11 cases are nearly four years old. For the first three and a half (3 ½) years of these Chapter 11 cases, there was minimal effort made by the Debtors to reorganize and emerge. When the Debtors finally filed a proposed Plan of Reorganization, as ordered to do so by the Court, they proposed a completely unconfirmable plan[3]. As the goal of an emergence bonus is to reward leadership and competence in conformity with the Debtors' fiduciary obligations to the creditors, the Emergence Bonus must be tied to the actual

---

[3] See Objection of the Official Committee of Asbestos Personal Injury Claimants to the Debtors' Proposed Disclosure Statement [D.I. 7315].

{D0039708:4}                                     6

emergence of the Debtors. This Emergence Bonus provides no incentive for the Debtors' CEO to move these cases forward.

14.   In addition, Festa's ability to receive the Emergence Bonus has no relation to either his performance as CEO or the success of Debtors' business operations. Unlike the Annual Incentive Compensation Program and the LTIP[4], the Emergence Bonus completely fails to act as an incentive to maximize the value of the Debtors' estates for the benefit of the creditors. Without any relationship to the success of the Debtors' operations, the Emergence Bonus is effectively part of Festa's base salary.[5]

15.   At paragraph 10 if his affidavit, Bubnovich states that "most companies target compensation for senior executives positions in a range around the median, sometimes as high as the 75th percentile, depending upon such factors as a particular executive's tenure, experience, and performance, as well as the particular circumstances." However, other than a

---

[4] The CEO Agreement states that Festa will be eligible for a targeted award under the "Company's [defined as W.R. Grace & Co.] Long-Term Incentive Plan (the "LTIP") for the 2005 – 2007 performance period in the amount of $1,690,000." *CEO Agreement*, page 3. The CEO Agreement continues to provide that "[t]he terms of your award under that LTIP, and your rewards under all other LTIPs, shall be the same as the terms governing the awards of the other participants under the applicable LTIP." *Id.* It is unclear to the PI Committee whether these LTIPs are subsequent to, or concurrent with, the $1,690,000 LTIP.

[5] Bubnovich's affidavit appears to recognize the failure of the Emergence Bonus to operate in the usual sense of the phrase. Specifically, Bubnovich refers to the Emergence Bonus as being similar to "special retention bonuses for CEO's," more along the lines of a KERP. Indeed, in discussions with the Debtors' advisors regarding the pending Motion, this Emergence Bonus was referred to as a "KERP" – to entice Festa to stay at the Debtors and accept the CEO position. Although the Debtors had a KERP in place, Bubnovich was not made a participant upon joining the Debtors in November 2003. Since the Debtors' KERP expired in 2004 without being renewed, no actual KERP currently exists. This $1,750,000 payment could reasonably be considered a one-man KERP, a very unusual arrangement as KERP's ordinarily include a sizeable senior management group. Moreover, since Festa was initially employed by the Debtors two and a half years after the Petition Date, by definition, the concept of a Key Employee Retention Program ("KERP") would not apply as whatever concern or risk that may exist by being employed by an entity filing for bankruptcy existed when Festa accepted employment.

paragraph summarizing a nine month period of financials during Festa's one and a half years with the Debtors, neither the affidavit, nor the Motion, provide this Court with the facts necessary to apply these factors to Festa. There is no basis for the Court to conclude that these financials were, or were not, related to Festa's employment.

16. If the $1,750,000 Emergence Bonus (which is essentially an addition to Festa's base salary since it is unconditional) is added to Festa's cash compensation on an annualized basis over three (3) years ($583,000 per year), Festa's annual total cash compensation[6] ("TCC") would be $2,103,000 and his TDC would be $3,793,000 (see Chart II). With this revised TCC, Festa's TCC would be 6th out of fifteen (15) companies in Bubnovich's Industry Peer Group (including the Big Three). Festa's $2,103,000 TCC would be 61% above Bubnovich's median TCC of $1,305,000 of the Industry Peer Group, just under DuPont's CEO TCC of $2,418,000 and PPG's CEO TCC of $2,350,000. This data shows why the Emergence Bonus should only be included in the CEO Agreement on an incentive basis, to be earned through reaching financial targets that would in turn enhance the value of the Company.

17. Finally, the excess and unreasonableness of the Emergence Bonus, as now constituted, is even more apparent with a review of the Survey Group utilized by Bubnovich in performing his second analysis. Bubnovich states in his affidavit that Festa's compensation package, excluding the Emergence Bonus, "is approximately 4% above the median TDC of all Chief Executive Officers in the Survey Group." *Bubnovich Aff.*, ¶ 9. However, when including the Emergence Bonus, Festa's TDC is 32% greater than the median TDC. *Bubnovich Aff.*, ¶ 13.

---

[6] TCC is defined as annual base salary plus annual incentive and excludes LTIP. This definition computes to Bubnovich's median TCC of $1,305,000 of the Industry Peer Group.

{D0039708:4}                                    8

18.     Bubnovich's inference that is it reasonable to target compensation as high as the 75th percentile must be viewed with skepticism.  As noted by Bubnovich, such compensation must be viewed by factors such as the particular executives' tenure, experience and performance.  In this instance, the Debtors have not put forth the evidence necessary to substantiate the reasonableness of compensating Festa at these high levels.  Festa has no prior experience as CEO of an independent corporation and has less than one and a half years experience with the Debtors, where he has served as COO.  Furthermore, he has no prior experience as COO of an independent company.  Without this support, it is unreasonable for the Debtors to place Festa on a par with other CEO's with actual experience in such a position.

## **CONCLUSION**

19.     The CEO Agreement is not in the best interests of the creditors and is not sound business judgment.  The Festa compensation package, including the Emergence Bonus, is excessive where the candidate lacks experience as a CEO, lacks experience with these Debtors and has not established that he has been a factor in improved operating or finances of the Debtors.  Moreover, the Emergence Bonus is not tied to any real success and provides no incentive for Festa to move towards a confirmable plan.

WHEREFORE, for the foregoing reasons, the PI Committee respectfully requests that the Court deny the Motion of Debtors for an Order Authorizing the Debtors To Enter Into (A) An Employment Agreement With Its Current Chief Operating Officer Under Which He Would Assume The Position of Chief Executive Officer Of the Debtors ("CEO") And (B) A Post-Retirement Agreement With The Current CEO Whereby He Would Provide Consulting Services To Debtors' Chapter 11 Cases.

Date:   March 4, 2005

                       CAMPBELL & LEVINE, LLC

                       */S/ Mark Hurford*
Marla Rosoff Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 King Street, Suite 300
Wilmington, DE  19801
(302) 426-1900

                       -and-

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
399 Park Avenue, 27th Floor
New York, NY  10022-4614
(212) 319-7125

                       -and-

CAPLIN & DRYSDALE, CHARTERED
Peter Van N. Lockwood
Julie W. Davis
One Thomas Circle, N.W.
Washington, D.C.  20005
(202) 862-5000

Counsel to the Official Committee of
   Asbestos Personal Injury Claimants