UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                    .    Chapter 11

W.R. GRACE & CO., <u>et al</u>.,              .    Case No. 01-01139(JKF)
                                          .    Jointly Administered
          Debtors.
                                          .    March 21, 2005 (12:11 p.m.)
                                          .    Wilmington

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.



1      THE COURT:  This is the matter of W.R. Grace,

2  Bankruptcy No. 01-1139.  The parties I have appearing by

3  phone are John Friedland (phonetical), Daniel Glossman

4  (phonetical), Kenneth Thomas, Peter Lockwood but -- I thought

5  -- he's here, okay.  Bruce Levin, Nick Budnovitch

6  (phonetical), Warren Smith, Peter Pearson, David Bletchman

7  (phonetical), Barbara Semioski (phonetical), Darrel Scott,

8  Sarah Edwards, Carl Pernicone (phonetical), Andrew Craig,

9  David Bernick, and Tiffany Cobb.  I'll take entries of those

10  of you in court, please.

11      MS. BAER:  Good morning, Your Honor.  Janet Baer on

12  behalf of the debtors.

13      MR. PASQUALE:  Ken Pasquale for the Creditors

14  Committee, Your Honor.

15      MR. BECKER:  Good morning, Your Honor.  Gary Becker

16  from Kramer . . .  for the Equity Committee.

17      MR. BAENA:  May it please the Court.  Good morning,

18  Your Honor.  Scott Baena and Jay Sackalow (phonetical) on

19  behalf of the Property Damage Committee.

20      MR. HURFORD:  Good afternoon, Your Honor.  Mark

21  Hurford of Campbell & Levine on behalf of the Asbestos

22  Personal Injury Committee.  As you noted, Peter Lockwood from

23  Caplin & Drysdale (phonetical) is here as well.

24      MR. FRANKEL:  Good morning, Your Honor.  Roger

25  Frankel, Swither, Berlin for David Austern who is the Futures

1   Rep.

2   MR. HERST:  Good afternoon, Your Honor.  David

3   Herst from Skadden & Arps on behalf of Sealed Air

4   Corporation.

5   MR. COHEN:  Jacob Cohen, Cozen, O'Connor for

6   Federal Insurance Company.

7   THE COURT:  Ms. Baer.

8   MS. BAER:  Your Honor, taking up the agenda this

9   morning.  Items number 1, 2, and 3 are being continued to the

10  April 25th hearing.  That takes us to item number 4 which is

11  a fee application from Zonolite Attic Insulation claimants.

12  I really don't know anything about this matter.

13  THE COURT:  I'm not aware that there were any

14  objections filed to this; were there?

15  MS. BAER:  I don't see any objections on the

16  agenda, but I also don't see a certificate of no objection.

17  THE COURT:  Well, that was the problem I had too.

18  Is anybody present representing -- I'm sorry.  Is somebody

19  present representing the ZAI claimants?

20  MR. SCOTT:  Darrel Scott, Your Honor.

21  THE COURT:  I'm sorry, what was your name, please.

22  MR. SCOTT:  Darrel Scott.

23  THE COURT:  Oh, Mr. Scott, yes.  I am not aware on

24  the fee application that there were any objections; were

25  there?

4

1      MR. SCOTT:  There were no objections, Your Honor.

2      MR. SULLIVAN:  Your Honor, if I may interrupt.

3  Bill Sullivan, also local counsel for the ZAI claimants.

4  Sorry for interrupting, Your Honor, but Mr. Scott may not be

5  familiar with this particular matter.  This involves the fee

6  application of my former firm who was local counsel to the

7  ZAI claimants.  I did not file this fee application, but

8  because my former firm's involvement has been terminated,

9  they filed it as a final.  I can certainly get the

10  responsible attorney there to file a CNO to move this along.

11      THE COURT:  Well, if he would like to get his fees

12  approved, it would be a good idea to do that.

13      MR. SULLIVAN:  I'll recommend that, Your Honor.

14      THE COURT:  Thank you.

15      MR. SULLIVAN:  Okay.

16      THE COURT:  Okay, so with respect to item 4, I'll

17  wait for a CNO and then enter an order when it's filed.

18      MS. BAER:  Thank you, Your Honor.  That moves us to

19  item agenda -- agenda item number 5 which is the debtors'

20  motion for authorization to modify and expand the scope of

21  the application of Woodcock, Washburn LLP.  We did file a

22  certificate of no objection on that matter, Your Honor.

23      THE COURT:  Okay.  I have not had an opportunity to

24  enter any of the orders, and I have seen the CNO and that

25  order will be entered, but it has not been yet.

1    MS. BAER: Your Honor, I just wanted to clarify one
2    thing on that. When we filed it we had indicated there were
3    approximately $35,000 in past services. We just recently saw
4    the bill. It's actually $40,000 in fees and a couple
5    thousand dollars in expenses, and all of those, of course,
6    are wrapped into -- now they're complete retention.

7    THE COURT: Do you want to do a different order?
8    MS. BAER: No, Your Honor, the order does not say
9    the numbers.

10    THE COURT: Okay, that order will be entered.
11    Thank you.

12    MS. BAER: Your Honor, that brings us to agenda
13    item number 6, which is the debtors' motion for authority to
14    enter into a new employment agreement with its soon to be new
15    chief executive officer and also for a consulting agreement
16    with its current chief executive officer, Paul Norris. Your
17    Honor, this is the opportunity for the company to promote
18    Fred Festa (phonetical) from chief operating officer and
19    president to chief executive officer of the company. He will
20    become chief executive officer effective June 1st, 2005,
21    replacing Mr. Norris who is retiring as of that date. Mr.
22    Norris will stay on as chairman of the Board of W.R. Grace
23    and enter into a consulting agreement with W.R. Grace for the
24    purpose of assisting Grace and seeing itself through the
25    Chapter 11 process and hopefully to confirmation. Your

Honor, this --

THE COURT:   Pardon me.   Before we go any further, is this ready for hearing today?   Everything came in like Friday.   That's well outside the time frames in my case management order.   The debtors' reply instead of being limited to five pages is something like fourteen with about twenty-five pages more of attachments.   I think the order that I have entered says when things are filed, it's to be continued.

MS. BAER:   Your Honor, we did file a reply and asked for leave to have the reply heard by the Court.   All of the other objections did come in on a timely basis.   The reply was filed timely but, yes, it was longer.   We are asking for permission of this Court to give us the permission to file the longer brief.   We are ready to argue the matter. No requests have been made for discovery.   No requests have been made for any additional evidence.   No evidence has been submitted other than the affidavits we have submitted.

THE COURT:   Yes, but part of the case management order isn't for you.   It's for me so I can get ready for things, and when things come in at that level I can't do it, and I certainly don't understand and I have read the reply despite the fact that I did it last night after I got here because that was the first chance I had to see it despite the fact that it's longer than my order requires.   Frankly, it

1    doesn't say anything that couldn't have been said in five

2    pages.  I don't know that it was necessary at all.  Now, have

3    some courtesy, folks.

4              MS. BAER:  Your Honor, I apologize to that extent.

5    We had hoped in our -- We thought that in our reply we had

6    given the additional information that would be necessary.  If

7    Your Honor needs more time, of course, we are happy to have

8    this continued to the next omnibus hearing.  I apologize.  I

9    didn't mean to say that you should be rushing it.  I just

10   wanted to indicate that nobody on this side of the table had

11   had an issue with it.

12             THE COURT:  Well, I'm going to go forward with this

13   because I did read it last night, and I don't want to re-read

14   it.  However, in the future, automatically continue it.  I'm

15   not going to do this in the future.  It's just too difficult.

16   There are too many cases.

17             MS. BAER:  Thank you, Your Honor.

18             THE COURT:  We're fortunate this time because it

19   was a very light agenda for everything.  So, go ahead.

20             MS. BAER:  Thank you, Your Honor, and we'll do so.

21   Your Honor, the promotion Mr. Festa to chief executive

22   officer was anticipated when Mr. Festa was hired in November

23   of '03.  He has had excellent performance as chief operating

24   officer and president with the main Grace businesses

25   reporting directly to him.  During this time period in the

first nine months of 2004, there's been a 13.7 increase in
the sales over 2003.   The pretext in cooperation to the
company has increased almost fifty percent, and the net
income of the company through 9 of '04 is $85.1 million.   The
Grace Board in their sound business judgment believes he's
made a significant contribution to the debtors, possesses the
values, the vision, and the leadership to succeed Paul Norris
as chief executive officer of the company.   The Board of
Directors has met.   The Board of Directors has approved this
compensation package and the promotion.   Your Honor, the
compensation package was approved by the Board on January
19th, 2005.   It has a four-year term commencing on June 1,
'05 with an initial base salary of $760,000 per year.   In
addition to that, Mr. Festa is permitted to participate in
the debtors' existing annual compensation bonus program with
a target award of 100 percent of base salary.   This is an
existing program.   He becomes eligible to participate.   In
addition to that, he is eligible to participate in the
debtors' long-term incentive program, which has a targeted
value for the period 2005 to 2007 of $1,690,000 and there
would be similar opportunities in the future if the debtor in
fact has similar long-term incentive programs going forward
in the future.   The annual bonus program, the long-term
incentive program are both payable only to the extent
specific financial targets are met by the debtors.   These are

1    not new programs for Mr. Festa.   They are existing programs.

2    The other elements of his compensation package are an

3    emergence or retention bonus of $1,750,000 and severance

4    benefits equal to two times 175 percent of his base salary if

5    terminated without cause.   The Grace Board is determined that

6    these are competitive compensation arrangements that are

7    consistent with arrangements provided to other CEOs in

8    similar positions with corporations similar to the debtors.

9    The Grace Board relied on their consultant Nick Budnovitch in

10    putting together this compensation package and approving this

11    compensation package.   Mr. Budnovitch has submitted two

12    affidavits in support of the motion.   The first affidavit

13    dealing with the initial motion and the second affidavit to

14    further do an analysis of the emergence bonus portion of the

15    compensation to explain another way of looking at it if you

16    want to call it a retention bonus.

17        THE COURT:  Well, they're calling it an emergence

18    bonus, and it isn't an emergence bonus.

19        MS. BAER:  Your Honor, it's really a hybrid and

20    that's of course the core for the three objections that have

21    been filed.   The title on the document that the Board has

22    approved does say, "Emergence Bonus".   However, when  you

23    look at the bonus, Your Honor, it is truly a hybrid.   The

24    Board was seeking to establish a balance between wanting to

25    retain their executives to see us through the Chapter 11 and

1  making sure that in fact there was incentive for emergence

2  from Chapter 11.  The way that the bonus is established, Your

3  Honor, it does have both of those elements.  If Grace emerges

4  from Chapter 11, 750,000 would be paid within six months of

5  emergence and the other million in eighteen months.  However,

6  Your Honor, it does in fact have a payable portion to it

7  which is thirty-six months after the initial plan filing, the

8  750,000 would be paid, and the other million to be paid

9  forty-eight months after the initial plan was filed.

10       THE COURT:  Right, which makes it not an emergence

11  bonus because he gets paid whether the case -- the

12  corporation gets out of bankruptcy or not.  Now, I'm sure all

13  of us hope that by the time any of these payments are due,

14  Grace isn't in bankruptcy any more, but regardless of that

15  fact, it's not depending on emergence.

16       MS. BAER:  It's not depending on emergence, Your

17  Honor --

18       THE COURT:  It only accelerates the payment.

19       MS. BAER:  Exactly.

20       THE COURT:  Period.

21       MS. BAER:  And there in itself there's an incentive

22  certainly to work toward an emergence more quickly, but, Your

23  Honor, what we've tried to do with the -- what the Board's

24  tried to do with its compensation consultant to strike a

25  balance.  There was just so much that the debtors can

1   control, viz-a-viz, emergence from Chapter 11.  As much as we

2   want to make it happen, as much as we are moving forward, we

3   have fiduciary obligations to various constituencies and we

4   have various constituencies with various positions.  We felt

5   -- The Board felt, Your Honor, that it was vital to have Mr.

6   Festa both incentivized to emerge from Chapter 11 but also

7   incentivized to stay to see us through however long that may

8   take.  The benefit, of course, Your Honor, is stability,

9   focused leadership, and consistency in difficult times.

10         THE COURT:  Well, why would the CEO of the company

11   not have those incentives?  And surely the CEO of the company

12   doesn't want the company to be in bankruptcy.  So, why does

13   it take a financial incentive?  That ought to be his

14   fiduciary obligation to the shareholders and the creditors of

15   the company whether he's paid a dime for that purpose.

16         MS. BAER:  Your Honor, it is typical with all of

17   these kinds of positions that a bonus is appropriate for

18   seeing this situation through.   Whether you call it an

19   emergence bonus or you call it a retention bonus -- and

20   nobody is really challenging the fact that he's not

21   necessarily entitled to some sort of a bonus here.  I think

22   frankly the biggest problem here is what you call it, and by

23   calling it an emergence bonus in the original contract with

24   Mr. Festa, perhaps it was a little misleading -- or not

25   misleading, but not particularly clear.  But when you look at

1   the terms of it, absolutely, it is not just an emergence

2   bonus.  It's an emergence and retention bonus incentivizing

3   him to stay with us through the long haul, just like he has

4   every incentive to do that, Your Honor, because of his

5   fiduciary duties.  Of course, he has an incentive to get us

6   out of Chapter 11.  It does not help the financial operation

7   of the company to remain in Chapter 11.  Your Honor, if you

8   looked at the Budnovitch affidavits, which are the only

9   evidence that's presented in addition to the affidavit we

10  provided of our independent Grace director, the debtors' duty

11  is in its business judgment to determine that the

12  compensation is reasonable.  The duty then -- or the burden

13  then shifts, Your Honor, to the other side to prove that it's

14  not reasonable.  No evidence has been presented by anybody

15  else other than the debtors here with respect to the

16  reasonableness of this compensation, and with respect to the

17  debtors, Grace's Board's judgment that it is in their sound

18  business practice to do this.  If you look at the numbers,

19  Your Honor, in the entirety here, as outlined in the original

20  Budnovitch affidavit, if you look at this bonus as an

21  emergence bonus, you look at it in over the two years. If you

22  look at it as a retention bonus, then you would look at it,

23  Your Honor, instead looking at kind of a four-year allocation

24  system.  Now interestingly, the PI Committee looked at it

25  three years out, and we're not quite sure what that means,

1   but doing the analysis either way, Your Honor, it still comes

2   out that this is well within the range of appropriate

3   compensation for people in the position of a chief executive

4   officer.   Looking at it as an emergence bonus, therefore the

5   total amount payable in eighteen months, the industry peer

6   group companies, which are companies in the same industry,

7   the same -- some of Grace's absolute competitors, the total

8   direct compensation is 20 percent below the median.   If you

9   look at the survey group companies, which are broad groups of

10  chemical companies, allied product companies, the

11  compensation is 4 percent above the median and 33 percent

12  below the seventy-fifth percentile of compensation of all of

13  the survey group companies.   According to Mr. Budnovitch's

14  affidavit, the target generally is somewhere between median

15  and as high as seventy-five percent.   This compensation

16  package is well within the range, Your Honor.   And in

17  addition, the retention bonus, if that's the way you look at

18  it, Your Honor, one hundred to two hundred percent of the

19  salary is what Mr. Budnovitch found in the industry as being

20  paid.   This is actually 115 percent of salary, so, in the low

21  range of what these kind of bonuses are paid.   If you add the

22  total compensation and the bonus, payable in two years, it's

23  still less than the median of the peer group.   It's thirty-

24  two percent greater than the median of the survey group, but

25  eighteen percent less than the seventy-fifth percentile.   If

1    you look at it --

2         THE COURT:  Who picks these numbers?  You know,

3    this is a case that's in bankruptcy.  What do we really care

4    what the medians and averages and other compensation salaries

5    are and bonuses in this instance?  I mean, if the man is

6    going to be in the Board's view the right person for the job,

7    then they ought to work out a salary term with him, but

8    comparing it to all of these other cases in this instance,

9    frankly, I think is a red herring.  I don't see that it has

10   any relevance to this man's performance with Grace.  That's

11   what counts; isn't it?

12        MS. BAER:  It is what counts, Your Honor, and the

13   Board in their sound business judgment determined that this

14   is reasonable compensation in the range.  But of course the

15   Board does have an obligation to do due diligence.  It did do

16   that due diligence.  It hired a compensation expert and what

17   they do, Your Honor, is they go out in the marketplace.  They

18   do the best they can.  Obviously, one of the problems with a

19   company in Chapter 11 is there's very few people you can

20   compare it to because we can't give stock.  Giving stock in a

21   company in Chapter 11 doesn't make sense.

22        THE COURT:  I can refer you to at least 15 other

23   cases in very similar circumstances which you can use as a

24   comparison.

25        MS. BAER:  But the other problem, Your Honor, is

1   they have to look at the industry and the revenues of the
2   company, and that's where, yes, you can look at many other
3   Chapter 11 cases.   There are frankly very few Chapter 11
4   cases where you have a company as profitable and as
5   successful as W.R. Grace has managed to be while in Chapter
6   11.

7           THE COURT:   I can give you four or five more of
8   those that you can look at.   I hear this in every single one
9   of these -- not every one, that's an exaggeration, in many of
10  these cases.   Look, it seems to me that you identified the
11  issue correctly which is that people -- the objecting parties
12  are concerned that this is looked at as an emergence bonus,
13  and frankly, I can't see how it's an emergence bonus.   The
14  fact that the payment is accelerated simply because the
15  debtor emerges early, in my view, doesn't make it an
16  emergence bonus.   It appears to be much more akin to a
17  retention bonus if anything.   And if it's appropriate, it's
18  appropriate.   Why don't we fight about what the numbers are
19  and whether the whole compensation package is appropriate
20  rather than the characterization of what this particular
21  component of it is.   Now, having said that, viewing the whole
22  salary collectively together, what Mr. Festa would receive
23  over the next four years, let's say, what is the debtors'
24  business judgment about why this is an appropriate salary for
25  Mr. Festa to be paid under the circumstances?

1    MS. BAER:  Your Honor, the Grace Board has
2   determined in their solid business judgment that Mr. Festa is
3   the right person for the job.  He is entitled to the job.
4   He's been doing an excellent job.   That the compensation
5   package that they have negotiated is the appropriate
6   compensation package for a chief executive officer running a
7   company of this kind, of this size, with this kind of revenue
8   and frankly, in Chapter 11, so with the additional challenges
9   that go with Chapter 11.   The Grace Board has hired an
10  expert.   The expert has looked at the industry.   The expert
11  has provided his information and based on what the expert has
12  provided to the Grace Board, the Grace parties determined
13  that in their sound business judgment, this compensation
14  package is an appropriate compensation package for their new
15  chief executive officer, and they're asking for the Court's
16  approval, the entire package to be approved.

17          THE COURT:  All right, how does it differ from what
18  Mr. Norris received?

19          MS. BAER:  Your Honor, I cannot say that.   I do not
20  have that information here.

21          THE COURT:  Well, I'd like to know.

22          MS. BAER:  We can certainly provide that
23  information.

24          THE COURT:  All right.  Mr. Hurford.

25          MR. HURFORD:  Thank you, Your Honor.  Before I get

into my argument, Mark Hurford of Campbell & Levine on behalf
of the Asbestos Personal Injury Committee.   I believe I have
the numbers on Mr. Norris, if I can answer that question.
His annual base salary was a million dollars.   His targeted
annual incentive bonus was one and a quarter, and his long-
term incentive plan was $1,452,000.   So, according to these
calculations and, to be honest with Your Honor, these were
provided by our financial advisor to me, totals $3.7 million.
Mr. Festa's compensation, as you know, is $760,000 in salary,
a hundred percent as a targeted bonus, and $1.69 million as
an L-tip.   That adds up to $3.21 million or roughly 87
percent of Mr. Norris' compensation.

        THE COURT:  Okay, now why is that unreasonable
given the fact that this is a new person coming in behind Mr.
Norris with hopefully a case that may be a little bit closer
to an emergence, but I'm not totally sure that that's the
case, but it may be closer; why is that an unreasonable
compensation for Mr. Festa?

        MR. HURFORD:  Well, those numbers do not include
the emergence bonus, Your Honor.

        THE COURT:  Okay, then with the emergence bonus
what does that add, and did was Mr. Norris not entitled to
one?

        MS. BAER:  Your Honor, fortunately I have the
officers with me today who tell me this:  Mr. Norris over the

1  period of 2001 to 2004 received retention bonuses equalling

2  $4,345,000.  Here Mr. Festa's retention bonus over this

3  period would be $1,750,000.  So it's significantly less.

4      THE COURT:  Okay.  Was Mr. Norris entitled to an

5  emergence -- I'll call it an emergence bonus?

6      MS. BAER:  It was a retention bonus, and that's the

7  $4,435,000.

8      THE COURT:  But not an emergence bonus.

9      MS. BAER:  No.

10     THE COURT:  All right.

11     MR. HURFORD:  Your Honor, we do cover a fair amount

12 of ground in our objection, but our main issue, Your Honor,

13 frankly is with this emergence bonus.  If you look at the

14 debtors' original motion, they justify the emergence bonus as

15 an emergence bonus, and in fact if you look at Mr. Festa's

16 proposed CEO agreement, they define it as an emergence bonus,

17 and our problem with that bonus is that, as Your Honor noted,

18 he will receive that bonus whether or not the debtors

19 actually emerge from Chapter 11.  And our position is that

20 the emergence bonus should function as a true emergence

21 bonus.  Usual case of the other phrase, it will function as

22 an incentive for the debtors' management to negotiate with

23 creditors and to emerge from bankruptcy as soon as possible.

24 We have a problem --

25     THE COURT:  The problem with that theory, Mr.

1  Hurford is, I don't know why any CEO of a company would need

2  a financial incentive to get its company out of bankruptcy.

3  That flies in the face of what the CEO's whole role in the

4  company is.  Of course this looks more like a retention

5  bonus, so let's treat it as a retention bonus, and then tell

6  me why it's improper or excessive.

7  MR. HURFORD:  Okay, let me talk about it as a

8  retention bonus then.  The difference between Mr. Norris and

9  Mr. Festa was that Mr. Norris was running this corporation

10 when it went into bankruptcy.  Mr. Festa, on the other hand,

11 joined the debtors, it was -- I think it was two and a half

12 years after the debtors filed for bankruptcy.  It's a very

13 different scenario.  The usual retention is you have some

14 people running a corporation that you don't want to lose,

15 that you want to keep around because they're going to lose

16 stock options and whatever else, and you give them incentive

17 to stay and to continue to run the corporation.

18 THE COURT:  And how old is Mr. Norris?

19 MR. HURFORD:  I don't know the answer to that

20 question, Your Honor.

21 MS. BAER:  Fifty-eight, Your Honor.

22 MR. HURFORD:  In this circumstance, Mr. Festa

23 joined the debtors well into their bankruptcy and when he

24 joined the debtors he wasn't even made a part of their KERP.

25 The debtors had a KERP.  He was not given or he was not made

1  a participant in the KERP when he joined.  So, whatever usual

2  factors are there for, Hey, I was running this corporation.

3  I was senior management beforehand.  I'm concerned about my

4  future.  He knew when he came here and as the debtors have

5  pointed out in the original motion to sign an agreement with

6  Mr. Festa to be CEO, he knew all of this, you know.  He was

7  in fact going to be groomed to be CEO, but he didn't get a

8  KERP and I don't understand if he joined the company mid-

9  bankruptcy why he needs one now.

10          THE COURT:  Maybe they want to keep him.

11          MR. HURFORD:  Maybe they do want to keep him, but

12  if you look at the emergence bonus where the retention was,

13  whatever we're going to call it, and look at it as against

14  all of his salary, it becomes a rich plan, Your Honor.  The

15  debtors --

16          THE COURT:  Well, that -- I mean, compared to Mr.

17  Norris' from what I just heard, Mr. Norris -- recognizing the

18  difference in the facts that you just articulated, let's see,

19  he has three times the retention bonus.

20          MR. HURFORD:  Mr. Norris also had a whole lot more

21  experience being a CEO than Mr. Festa.  Mr. Festa's never

22  served as CEO of --

23          THE COURT:  But he's apparently, according to the

24  debtors' numbers that have been produced in the affidavit,

25  done a pretty good job for this first effort out of the box.

1   Isn't that a good reason to try to keep him here rather than

2   letting him go to the next highest bidder?

3        MR. HURFORD:  Well, Your Honor, I don't see

4   anywhere on the -- the debtors certainly cite certain

5   statistics in their motion.  I personally don't see anything

6   that ties Mr. Festa's performance to those figures.

7        THE COURT:  Okay.

8        MR. HURFORD:  The affidavits don't do that.  That's

9   a recitation as to how the debtors have done since he's been

10  there, but he was COO and Mr. Norris was CEO.  Very different

11  function.  Mr. Norris was still there.  I have a problem

12  equating that --

13       THE COURT:  Doesn't the COO have a lot to do with

14  how the company actually operates and what it does in terms

15  of specialty of sales and revenue?

16       MR. HURFORD:  Certainly he would, but this was a

17  nine-month picture of the debtors' performance.  And there

18  was a similar increase across the industry.

19       THE COURT:  There was a freeze?

20       MR. HURFORD:  Similar increase across the industry.

21       THE COURT:  Oh, decrease.  I thought --

22       MR. HURFORD:  Increase.

23       THE COURT:  Oh, increase.  I thought you said there

24  was a similar freeze.

25       MR. HURFORD:  No, no.

1       THE COURT:  I didn't understand, I'm sorry.

2       MR. HURFORD:  And, Your Honor, we dispute the idea

3  that it's appropriate to look at this retention bonus over

4  four years, and here's why:  The trigger for the four-year

5  period was last November.  The trigger was the filing of a

6  plan of reorganization.  As Your Honor knows in mid-November

7  of last year, the debtors filed their plan of reorganization.

8  Mr. Festa's not going to become CEO until -- what is it late

9  May or June of this year.  So in essence, what Mr. Budnovitch

10  is asking you to do is to prorate over four years his salary

11  when he's not going to be CEO for the first seven-month

12  period of that time.

13       THE COURT:  All right.

14       MR. HURFORD:  That's why we suggested a three-year

15  period.  In fact, if you look at the way it added to the two

16  payments, because they're not identical payments, it works

17  out to 36.3 months.  So, in response to Ms. Baer's question,

18  that's why we use that time period of three years.  If you

19  look at that three-year period, Mr. Festa's TCC, his total

20  cash compensation is $2.1 million.  That amount is 61 percent

21  above the median TCC of the industry peer group that Mr.

22  Budnovitch put together.  And once again, that's including

23  the three companies that we had some difficulty with.  Those

24  being DuPont, Dow, and PPG.  The $2.1 million TCC that's

25  proposed for Mr. Festa, which once again is assuming the

1   $1.75 million bonus is annualized over three years, would put

2   him just under DuPont's CEO and just under PPG's CEO, and

3   these are two companies with revenues eleven and seventeen

4   times the revenue of W.R. Grace.  Now, the debtors say in

5   their reply, Hey, we need to show some companies to the high

6   side and we need to show some companies to the low side.  We

7   don't have any problem with that, but picking those three

8   companies, specifically those two companies, skews the

9   average, and that is born out if you look at the comparison

10  of the industry peer group from the survey group.  Mr.

11  Festa's numbers are much higher when you look at the survey

12  group which apparently is a much more broad survey of the

13  appropriate salaries.  And once again -- or I would like to

14  point out that the debtors certainly didn't include any

15  companies with revenues one-eleventh or one-seventeenth the

16  size of W.R. Grace's.

17          THE COURT:  So what's the alternative?

18          MR. HURFORD:  Frankly, Your Honor, I think the

19  alternative is to do something -- is to put the emergence

20  bonus into something with some teeth.  Actually set it for

21  emergence, that he has to be employed by the company.  All

22  emergence bonuses you need to be employed by the company in

23  order to receive it.   So, to argue this, hey it's a

24  retention, hey, it's an emergence, it's not really true.  All

25  emergence bonuses are that way.

1       THE COURT:  This is not an emergence bonus.  It is

2   not.  Regardless of the label put on it, it's not an

3   emergence bonus.

4       MR. HURFORD:  If they want to change it and make it

5   a true emergence bonus, then they should set some specific

6   dates, and if he doesn't meet them, he doesn't get it.  If

7   it's going to be a --

8       THE COURT:  Putting the dates in, frankly, is not

9   all up to the debtor.  I mean lots of parties can make sure

10  that those dates are bypassed for good or ill reasons.  So,

11  I'm not sure about that.  Staying with the company to get it

12  might be an appropriate thing.

13      MR. HURFORD:  The dates are somewhat liberal, but

14  as Your Honor is aware, this case is four year old.  The

15  debtors didn't even announce that they were seeking a 524(g)

16  injunction until last summer.  It was last summer when they

17  finally appointed a Futures Rep and it was only in November

18  of 2004 when they filed a plan, and they filed a plan based

19  on Your Honor's order that they had to, which followed our

20  objection to their motion to further extend the exclusivity.

21  So, there's not a whole lot of hope that this is going to

22  continue to push, and as Your Honor knows from the objections

23  that we filed to the disclosure statement, they filed a

24  completely un-confirmable plan.  The plan assumes that all

25  the asbestos claimants are unimpaired and proposes that they

1   not even vote.   There's some serious problems with this plan.

2   That's the plan that we're sitting on that serves as a

3   trigger for Mr. Festa to receive this compensation.   It's not

4   right, and to answer to Your Honor's question another way,

5   another way to do it would be to tie this amount of money

6   into an L-type program.   To make him earn it.   If Mr. Festa

7   is that good and is really responsible for the numbers that

8   the debtors have reported, then tie it into a long-term

9   incentive program and if he's really maximizing the value of

10  the estate for the creditors, then he'll earn it, he'll

11  receive his money.   But right now, it's just free money.

12  Thank you, Your Honor.

13            THE COURT:   Would those of you on the phone, please

14  put your mute buttons on.

15            MR. SIEGL:   Good afternoon, Your Honor.   Jay Siegl

16  from Bills & Sunberg (phonetical) on behalf of the Property

17  Damage Committee.   I realize that we're discussing this as a

18  retention bonus now, not an emergence bonus, but I find it a

19  little ironic until we objected and the TI Committee objected

20  and the Futures Claimants Rep objected, the debtors continued

21  to call it an emergence bonus.   Their own papers call it an

22  emergence bonus.

23            THE COURT:   Well, they're still calling it that.

24            MR. SIEGL:   They're still calling that except that

25  in their . . . (break in taping) retention, so it's

1   whatever's convenient for the moment, but I'll focus on the

2   retention aspect, why we believe it doesn't need to be a

3   retention component.  One of the most telling reasons is the

4   fact that the KERP program that existed from 2001 through

5   2004 that Mr. Norris was under and many of the other officers

6   of the debtors were under has expired.  Those officers will

7   not be receiving any compensation under KERP through 2005,

8   2006, 2007 as Mr. Festa will be under their existing program.

9   So if the debtors are incentivized to try to get this company

10  out of bankruptcy, none of their other officers that are

11  sitting there today have that same protection or same

12  incentive to stay there and help shepherd these debtors out

13  of bankruptcy.

14          THE COURT:  Maybe because they weren't able to do

15  it for the past four years.  Maybe Mr. Festa will be able to

16  do it in the next four.

17          MR. SIEGL:  Well, the debtors profess to have a

18  very sound, wide scope of management and officers and now

19  they're saying they're just going to put it in this one

20  person's hands to push this forward.

21          THE COURT:  Oh, I think the KERP program would have

22  cost the debtors significantly more than just this.

23          MR. SIEGL:  Understood, Your Honor.  This is just

24  the one person.  What assurances do we have if the debtors

25  say the only way to retain Mr. Festa is to keep him there

with this retention program that there won't be a flight of

other officers at this point.   And those are the officers

with the corporate knowledge, corporate history who have put

together this plan that's now on the table that we agree is

un-confirmable, but that's what they put on the table.

THE COURT:   Ms. Baer, I think the Committee wants

to make sure that you put a KERP in place.

MR. SIEGL:   No, that's not the case, Your Honor.

We agree with you that the KERP isn't necessary to keep these

officers or directors there.

THE COURT:   Oh, I didn't say that.   I did not make

that statement.

MR. SIEGL:   In addition to that, Your Honor, we do

have a problem with what it's being called because at the

time we objected to the fact that it was not an emergence

bonus despite being called an emergence bonus, we didn't seek

to take discovery at that point because we understood from

their motion, their supporting affidavit from Mr. Budnovitch

that this was an emergence bonus and it was clear to us that

it wasn't, and that was clear they didn't exercise sound

business judgment.

THE COURT:   All right.   With respect to that issue,

if you want to deny it without prejudice to recharacterizing

this as something else, other than an emergence bonus, I'll

do that if you think that you need discovery for it.   It's

1   not going to change the issue however.

2   MR. SIEGL:  We do believe that some discovery is

3   warranted if they're going to recast this as a retention

4   bonus as opposed to --

5   THE COURT:  Well, I don't know if they are.  I am

6   saying it is not an emergence bonus, and I cannot approve it

7   as an emergence bonus.  I can't in any way see that it is

8   characterized as one.  Whether the total compensation package

9   is appropriate, however, is a different issue.

10   MR. SIEGL:  Understood, Your Honor.

11   THE COURT:  So, what type of discover do you want?

12   MR. SIEGL:  We think we need to take Mr.

13   Budnovitch's deposition to go through his numbers and perhaps

14   Mr. Vanderslice (phonetical), who's the independent Board

15   member who has submitted an affidavit in support of their

16   reply brief.

17   THE COURT:  Ms. Baer.

18   MS. BAER:  Your Honor, I don't think I'm in a

19   position to deny somebody discovery if they're asking for it,

20   although I frankly don't understand why they didn't ask for

21   discovery a week ago when they got the reply.  Your Honor, we

22   were never hiding any balls, and we aren't hiding any balls.

23   Just because the title of it says, Emergence Bonus, and we

24   discuss it as an emergence bonus, doesn't change what it is.

25   You look at the way in which it's paid.  It's extremely clear

and that hasn't changed.  All you're changing is whether you call it emergence or you call it retention.  It is a hybrid. It has items of both.  If everybody looks at it and says, Hey it's much more a retention that emergence, sobeit, it is. But the only thing that's changed here is a word.  The bonus is exactly like it was when the Board approved it.

THE COURT:  Maybe, but I do not want to go on record since everybody in every case is monitoring everything I'm doing in all the other cases as having approved something that's an emergence bonus that isn't, because the next case I get will say something like, Gee, Judge, in the W.R. Grace case you approved an emergence bonus but it wasn't an emergence bonus.  Do it in this case.  So I'm not going to do it.

MS. BAER:  I understand that, Your Honor.  It seems to me we could clarify that in the order that you enter approving this compensation package.

THE COURT:  I want to know how this package as a retention bonus -- and it appears to me that a thirty-six month period of time is appropriate based on the fact that this is key to a plan that was provided to the Court at a time when Mr. Festa was not the CEO and so I'm not sure why that's an appropriate starting place, but I don't know that that matters because the dates are somewhat irrelevant.  But nonetheless, I don't understand why that would be chosen when

1  he was not the CEO at the time.  So it seems to -- And he is

2  not going to be in place until at least June.  So it appears

3  that a four year -- if this is not really a four-year

4  program, given that fact.  So I do agree that the three-year

5  standard is the most appropriate if you're going to use that

6  as a starting date.  I don't understand why that's picked as

7  a starting date however.  What was the magic for that?

8  MS. BAER:  Your Honor, I wasn't involved with that.

9  That was a Board decision.

10  THE COURT:  Okay, well, I don't -- I mean I can't

11  quite intuitively figure out why that date would have been

12  used, but nonetheless, if you're going to stick with that

13  date, then it seems to me that three years is an appropriate

14  period, and I think it does need to be characterized as a

15  retention bonus.  I assume that it's going to be modified to

16  say that he at least has to still be employed by the company

17  in order to get the retention bonus since that's what this

18  will be, if you keep it in the same context.  The discovery

19  depositions of the expert and Mr. Vanderslice are approved.

20  Does anybody else want any other discovery?  All right,

21  they're to be done between now and the next hearing date so

22  that we can get this issue back on the agenda for the next

23  hearing.

24  MS. BAER:  That's fine, Your Honor.

25  THE COURT:  Okay.  I think it would be appropriate

1    for the debtor to amend the motion to characterize this as

2    whatever it really is.  Or if you're making modifications to

3    it, then to lay out whatever the modifications are, if you're

4    going to.

5         MS. BAER:  Your Honor, we're happy to do that

6    although that would not fit within your administrative order.

7         THE COURT:  Do you know -- If all you're going to

8    do is recharacterize this, I don't care whether it fits

9    within that time.  If you're actually going to make

10   modifications to it, then it may be more appropriate either

11   to get an order that bypasses those dates or to put this in

12   May.  I don't know, from Mr. Festa's point of view, whether

13   it's a significant issue that has to be addressed in April or

14   in May.  You know, he's obviously entitled to a salary if

15   he's going to be the head of this company, and to the extent

16   that the performance of the debtor is somehow tied to his

17   operations, he's probably entitled to a pretty healthy

18   salary.  But whether it has to be addressed in April or in

19   May, you know, I think that's between the debtor and Mr.

20   Siegl.

21        MS. BAER:  Your Honor, I'll speak with my clients,

22   and we'll speak with the Creditors Committees and figure out

23   the best way to proceed.

24        THE COURT:  All right, that's fine.

25        MS. BAER:  Thank you.

1    THE COURT:  So, whichever one you put it on it's

2  all right, but if you're going to put it on in April, I want

3  everything.   The last pleading filed not later than a week,

4  one calendar week before the hearing.

5    MS. BAER:  Understood, Your Honor.

6    THE COURT:  All right.

7    MS. BAER:  Your Honor, the next matter on the

8  agenda, item number 7 is the debtors' motion to approve the

9  settlement agreement with the Internal Revenue Service

10  related to some audits.   A certificate of no objection was

11  filed on that matter, Your Honor.

12    THE COURT:  Okay.  That order will be entered.

13    MS. BAER:  Item number 8, Your Honor, is the

14  application filed by the Asbestos Property Damage Committee

15  on behalf of themselves as well as the Asbestos Personal

16  Injury Committee and the debtors for payment of holdbacks

17  that have been held back from the adversary proceedings that

18  were pending before Judge Wolin related to the Sealed Air and

19  the Fersenious (phonetical) fraudulent conveyance litigation.

20  Somehow, Your Honor, in terms of procedure before Judge

21  Wolin, he never set any of the applications for quarterly

22  approvals and therefore the twenty percent holdbacks have

23  been held now for a couple of years, and we jointly are

24  asking that those holdbacks be approved for payment.

25    THE COURT:  Okay.  I did take a look at the fee

1   applications.  I'm not aware that any -- I don't know who was

2   served with these applications, first of all, and secondly,

3   I'm not aware that whoever was served filed any objection.

4   I'm not aware of any objections on the record, but I don't

5   know who was served.

6         MS. BAER:  Your Honor, my recollection is we

7   followed the exact same procedure with these applications

8   that we followed with the procedure before this Court.  So

9   the exact same parties were served.  No objections were ever

10  filed.  We filed certificates of no objection just like we

11  did before this Court.  The only difference was they went

12  before Judge Wolin, and he never ruled.

13        THE COURT:  Oh, so they were actually filed in the

14  District Court docket?

15        MS. BAER:  Yes.

16        THE COURT:  Because I wasn't aware of CNOs filed

17  here.

18        MS. BAER:  No, they were filed in the District

19  Court docket which is what Judge Wolin had told us to do.

20  They were not subject to fee auditors' overview.  That was

21  again Judge Wolin's procedure.  He simply had them there and

22  never did anything with them.  And then, Your Honor, as you

23  may recall, Judge Buckwalter transferred to seal their

24  adversary proceedings back to Your Honor, so we believe you

25  now have the jurisdiction and authority to enter them.

1    THE COURT:  All right, well, it seems to me --

2    again, it's a little difficult when you're reviewing the

3    applications and you were not really involved at all in the

4    case, to figure out what's reasonable or not.  I think the

5    fees that were incurred to litigate those two adversaries

6    were very high.  Nonetheless, you were on a pretty short time

7    frame to get it all done, and I'm sure that that caused a

8    little bit of problem for everyone.  So, it doesn't seem to

9    me at this point in time that the holdbacks are

10   inappropriate.  I think they should be paid.  So, if you will

11   file a CNO at the bankruptcy case so that I'm sure that in

12   fact somebody searched the record and made sure that there

13   were no objections, I will sign the order on the CNO.

14       MS. BAER:  Your Honor, the Asbestos Personal

15   Property Damage Committee did in fact file a CNO on this

16   motion.

17       THE COURT:  Oh, when was that?  I haven't seen

18   that.

19       MR. TACCONELLI:  Good afternoon, Your Honor.

20   Theodore Tacconelli, local counsel for the Property Damage

21   Committee.  Your Honor, on March 7th, a CNO was filed in the

22   adversary proceeding as well as the main case.  The docket

23   number in the adversary proceedings is 724.

24       THE COURT:  All right.

25       MR. TACCONELLI:  And the docket number in the main

1   case is 7964.

2           THE COURT:  Seven nine --

3           MR. TACCONELLI:  Six four.

4           THE COURT:  Okay, but they relate both to -- they

5   relate only to the fees in the adversary.

6           MR. TACCONELLI:  Correct, Your Honor.

7           THE COURT:  My clerk's pointing out that we had

8   this problem with the fact that one of the adversaries was

9   closed, and I'm not sure that it should have been but it has

10  been.

11          MR. TACCONELLI:  The Fersenious adversary, Your

12  Honor, was closed due to the fact the settlement agreement

13  was reached, and the attorneys for Fersenious wanted it

14  closed.

15          THE COURT:  But has there been a settlement

16  agreement approved?  There was?

17          MR. TACCONELLI:  Yes, Your Honor.

18          THE COURT:  Okay.  Filed at that adversary?

19          UNIDENTIFIED SPEAKER:  (Microphone not recording.)

20          THE COURT:  Okay, well it seems to me though that

21  the issue about the fees ought to be addressed really at --

22  Well, how have they been allocated between the two

23  adversaries?  They haven't been.

24          MR. BAENA:  The cases were consolidated.

25          THE COURT:  Yes.

1          MR. BAENA:  But a trial of the Fersenious matter

2    was specifically delayed or abated because of threshold

3    issues that were going to be dealt with in the Sealed Air

4    matter.  And then the settlement occurred in respect to both

5    matters.

6          THE COURT:  So both Sealed Air and Fersenious have

7    orders entered that approve the settlement.

8          MR. BAENA:  No, just Fersenious.

9          THE COURT:  Fersenious, okay.  All right, so, I

10   guess to clarify how this should be paid, I should have the

11   order entered in the main case and not at the adversaries

12   because I don't want two orders entered that approve the same

13   fees.  Or were you getting paid some other way before?

14         MR. BAENA:  No, we weren't, but we're indifferent

15   to where the order is entered.  Whatever best suits the

16   Court, I think both counsel are amenable to it.

17         THE COURT:  All right, so that's docket 7964 at the

18   main case.

19         MR. TACCONELLI:  The CNO, Your Honor.

20         THE COURT:  Yes, thank you.  And the CNO at No. 724

21   in the adversary -- I guess I'm going to do an order that

22   indicates that that's moot based on the other order that's

23   going to be entered at the main case, because I don't --

24   apparently the motions are filed in both places?

25         MR. TACCONELLI:  We were instructed to do that,

1    Your Honor.

2            THE COURT:  Okay.  Okay, the orders that were with

3    the fee applications when the CNO was filed were new orders

4    submitted that approved the fees?

5            MR. TACCONELLI:  It was the same order, Your Honor.

6            THE COURT:  As what?  Same order as what?

7            MR. TACCONELLI:  That was with the motion.

8            THE COURT:  So there are three orders, but only one

9    CNO?

10           MR. TACCONELLI:  No, Your Honor, the caption has

11   the adversary proceeding caption on it.

12           THE COURT:  Yes.

13           MR. TACCONELLI:  It's the exact same order.

14           THE COURT:  But I have three firms.

15           MR. TACCONELLI:  I believe there's four firms, Your

16   Honor.

17           THE COURT:  Four firms, three parties.

18           MR. TACCONELLI:  Five firms, I'm sorry, Your Honor.

19           THE COURT:  So, do I have five orders?

20           MR. TACCONELLI:  No, you have one order with five

21   attachments to the order as Exhibits A, B, C, D, E, and F.

22           THE COURT:  Okay.  All right, my clerk and I, when

23   we get back, will attempt to straighten this out.  Please

24   look at this order and make sure that it's actually the

25   correct order when it's entered.  I'm going to enter it at

the main case.  I'm going to put a notation of some sort in

the adversary that indicates that no additional fees are

being awarded in the adversary because the order's being

docketed at the main case, but since I'm not totally familiar

with this process, what I did was review the fee petitions.

I didn't review those -- the process by which the order was

filed.  So, I'm not totally sure I have it right.  I'm not

sure why they're being filed in two places for the same

thing.

            MR. TACCONELLI:  Understood, Your Honor.

            THE COURT:  Okay.  Okay, Ms. Baer.

            MS. BAER:  Your Honor, that takes us to agenda item

number 9 which is the fourteenth quarterly interim

application of counsel to the debtors and statutory

committees for compensation.  I understand that Mr. Smith's

office has submitted an order under certificate of no

objection to the Court.  I was approached by one party prior

to this hearing, who did not know that and thought there was

still an outstanding issue, so I'm not quite sure if anybody

wanted to speak on it, otherwise there is a certificate of no

objection on file.

            THE COURT:  Okay.  Where is that?

            MS. BAER:  Agenda item number 9.  The certificate

of counsel is Docket No. 8018.  I do have copies with me.

            THE COURT:  It's a certification of counsel not a

1  certificate of no objection?

2       MS. BAER:  I'm sorry, Your Honor, yes, it's a

3  certification of counsel.

4       THE COURT:  Okay.  All right.  Does anybody have

5  something you wish to address on item 9, the fee apps?  Mr.

6  Smith?  He's not there.  All right, yes, Ms. Baer, I'll take

7  this one, please.

8       MS. BAER:  And, Your Honor, counsel pointed out

9  that earlier there was an issue about the Zonolite Attic

10 Insulation claimants' fees.  That actually is on this order.

11 So it looks as though that this order did encompass and take

12 care of those fees.

13      THE COURT:  Okay, just a minute.  So item 4, those

14 separate fee applications are already included in the order

15 on item 9?

16      MS. BAER:  That's what I'm being told.  Your Honor,

17 as I look at this order, I do not know if this takes care of

18 agenda item number 4 because agenda item number 4 is a

19 request for final compensation.  This does not appear to be

20 that.  This looks to me like some interim fees that they are

21 entitled to for this one period and this one period only.

22      THE COURT:  Okay.  This is what I would like on

23 item 4:  A certificate of no objection with a proposed order.

24 That proposed order can either say no separate order is

25 needed because these are included in the order that was

1   entered today, or it can say, these fees were not included in

2   the order that was entered today, and therefore, they are

3   allowed in the following amounts as the final fee apps for

4   former counsel.  Okay?

5         MS. BAER:  Thank you, Your Honor.

6         THE COURT:  All right, that takes care of 4, but

7   let me go back to 9.  Okay, you were going to give me an

8   order or did you?

9         MS. BAER:  Yes, Your Honor, I did, and I gave you a

10  duplicate original if you wouldn't mind so that we can get

11  the ball rolling.

12        THE COURT:  All right, that order is entered.

13        MS. BAER:  Your Honor, agenda item number 10 is the

14  debtors' fourth omnibus objection to claims.  There's one

15  claim left, Your Honor, the claim of Spalding and Slye.  It

16  has to do with a construction services dispute.  We are

17  trying to work that through and we're asking that the matter

18  be continued to the April omnibus hearing, and I have an

19  order for that.

20        THE COURT:  All right.  Counsel on the phone,

21  please put your mute buttons on.  I thought if the Court

22  called you so that you didn't have the problem with the mute

23  button; it doesn't work that way?

24        MS. BAER:  That's what we were told, Your Honor.

25        THE COURT:  Okay, that order is entered.

1          MS. BAER:  Thank you.

2          THE COURT:  Counsel on the phone, please put your

3     mute buttons on.

4          MS. BAER:  Agenda item number 11, Your Honor, is

5     the debtors' fifth omnibus objections to claims.  There are

6     currently ten contested claims that are outstanding, Your

7     Honor.  Pursuant to this order we are prepared to argue with

8     respect to the Peter Pearson claim today.  The remainder of

9     the claims are going to be continued.  Some of them we're

10    trying to work through the objections and in other cases,

11    Your Honor, we would anticipate that we'll be filing a reply

12    and then take it up at the next omnibus hearing in April.

13         THE COURT:  All right.

14         MS. BAER:  Your Honor, Peter Pearson's claim is a

15    pro se claim.  I know that Mr. Pearson was on the phone for

16    the previous hearing, the Armstrong hearing, so I don't know

17    if he's on the phone now for this one.

18         THE COURT:  Mr. Peterson?

19         MS. BAER:  Pearson.

20         THE COURT:  I'm sorry, Mr. Pearson?  Is Peter

21    Pearson on the phone.

22         MR. PEARSON (TELEPHONIC):  Yes, this is he.

23         THE COURT:  Okay, thank you.  This is the objection

24    to your claim.  I'll permit Ms. Baer to state what the

25    objection is and then hear your response, Mr. Pearson.

1    MR. PEARSON (TELEPHONIC): Very good, thank you.

2    MS. BAER: Your Honor, this is a pro se proof of

3    claim filed by Mr. Pearson. He is a former employee of W.R.

4    Grace. He is alleging a non-asbestos personal injury claim

5    related to some alleged exposure to chemicals. Mr. Pearson

6    worked with our roofing division doing roofing repair.

7    Originally, Your Honor, when he filed his proof of claim, he

8    filed it -- he claimed he's owed $741,600 in damages which he

9    calculates to be $400 per day for every day he worked for

10   Grace. Your Honor, there was no indication in his original

11   proof of claim how this amount that he calculated tied to his

12   injury, and there was no real indication in the proof of

13   claim exactly the detail of the claim. The first that W.R.

14   Grace ever heard that Mr. Pearson had a claim against it was

15   the proof of claim that they received, Your Honor. No

16   lawsuit was ever filed. No Worker's Compensation claims were

17   ever made with respect to Mr. Pearson. After having filed

18   his objection, we filed a response, Your Honor. We filed the

19   response essentially saying several things about the -- I'm

20   sorry, the response said essentially nothing. It was just,

21   we have no knowledge of any liability. Mr. Pearson then

22   filed a detailed response to our objection where he outlined

23   the details of his claim, kind of like a complaint. Your

24   Honor, we since then filed a reply where we take issue with

25   some of his legal allegations, basically we believe that it's

1   barred by the statute of limitations.  It's barred by the

2   exclusive remedy of Worker's Compensation.  On Friday

3   afternoon, we received from Mr. Pearson a reply to our

4   response.  He cited some case law of which I'm not familiar,

5   claimed certain statutes dealt with his issue.  It seems to

6   me, Your Honor, at this point in time, one of two things has

7   to happen:  Number one, we file a motion for summary judgment

8   and see if the claim can be resolved on the legal issues.

9   We'd look at whatever Mr. Pearson has now provided.  And if

10  it cannot be resolved that way, Your Honor, then we do have a

11  factual issue.  He claims many things would have to tried.

12  He does not attach medical evidence.  That would have to be

13  taken up.  It could either be done in the context of the

14  claim process here or potentially in our mediation process.

15  But before we go through that again because Mr. Pearson is

16  pro se, and as you may recall, our ADR process calls for

17  sharing of expenses, I think it makes sense for us to file a

18  motion for summary judgment here and see if it can be

19  disposed of on the legal issues.

20           THE COURT:  Mr. Pearson.

21           MR. PEARSON (TELEPHONIC):  Yes, Your Honor.

22           THE COURT:  Tell me what the nature of your claim

23  is, please.

24           MR. PEARSON (TELEPHONIC):  Specifically, the fact

25  that I was exposed while I was employed with W.R. Grace to a

number of chemicals that I was not aware of.  I was not aware

of the nature of the chemicals, and it was only subsequently

after I was terminated after the employment was ended, and it

was brought to my attention because I had some problems, like

I couldn't no longer grab a hammer, and I had my sensitivity

to the sun based upon where some chemicals were splashed on

my face, and I found out, I was talking to a doctor, and he

says, well by law, they're supposed to disclose this

information to you.  I had never seen the MSDS forms, and

then I come to find out that there is a federal -- under the

Emergency Planning Committee Right to Know Act, was 1986,

under 42 U.S.C. they're supposed to disclose this information

to employees.  They're supposed to train the employees on how

to handle certain chemicals.  W.R. Grace never did that in my

case.  And that's what the cause of action is.

THE COURT:  Okay.  I think that Ms. Baer is

suggesting that we can try to do this on a summary proceeding

is probably a good one because to the extent that there is

some statutes that are involved, I don't know whether they

will or won't be the means and ends of this issue, but it

certainly would be a good start to see whether or not it can

be disposed of on the legal briefing.  Especially if there is

a Worker's Comp claim that is an exclusive remedy.  I'm not

sure how this -- even if there's a statutory violation to get

around that at this point, I'm not familiar with the statute

1    that Mr. Pearson just cited.  So I don't even know if there's

2    a private right of action under it.

3              MS. BAER:  I have the same issue, Your Honor.

4              THE COURT:  So, all right.  Why don't we set out a

5    process then for doing that.  Ms. Baer, how much time --

6    Well, first of all do you want to do any discovery before you

7    brief the legal issues?

8              MS. BAER:  Your Honor, at this point in time,

9    there's a lot of materials that Mr. Pearson submitted.  I

10   believe for purposes of statute of limitations and Worker's

11   Comp's exclusive remedy we do not need discovery.  So I would

12   suggest, Your Honor, that perhaps you give us 21 days to file

13   a motion for summary judgment and set a briefing schedule and

14   then see what comes of it.

15             THE COURT:  All right.  What about the issue of the

16   disclosure requirements, however?  I don't know anything

17   about them.  I haven't even seen his reply, so I don't even

18   know what it says at this point in time, but will you need

19   discovery on those issues?

20             MS. BAER:  Your Honor, I've read the reply myself.

21   We got it in late Friday afternoon.  I'm really not sure that

22   there's anything in there that would change our being able to

23   go forward on the legal matters, but again, I'm not familiar

24   with the statue at all, so I don't know what it is.

25             THE COURT:  Okay, Mr. Pearson, at this point, just

1    to brief the legal issues, is there any discovery that you

2    would anticipate that you would need.

3            MR. PEARSON (TELEPHONIC): Offhand, Your Honor, I

4    don't think there's any other discovery that I know of, and

5    I'm willing to disclose anything that the debtors would ask

6    of me.

7            THE COURT: Okay. Why don't I expect at least a

8    motion from the debtor. Mr. Pearson, you have the option of

9    filing a motion for summary judgment if you think that your

10   claim can be sustained on that basis. Because you're

11   representing yourself, if you would choose simply to file a

12   response to the debtors, it may be appropriate to do it that

13   way. Ms. Baer, I'm not sure --

14           MS. BAER: I don't know, Your Honor. Mr. Pearson

15   seems pretty sophisticated in terms of the papers he's

16   filing. I don't know why he doesn't have counsel or -- We

17   can just kind of play it as we go.

18           THE COURT: Because I think cross-motions under

19   these circumstances would probably be better than just a

20   motion and a reply, but I think the pro se debtor has a

21   little bit of latitude. Mr. Pearson, do you intend to get

22   counsel?

23           MR. PEARSON (TELEPHONIC): No, Your Honor, the fact

24   that I don't have the financial capabilities of hiring

25   counsel kind of resorts me to the fact that I must go pro se.

1    THE COURT:  Okay.  Then motion or motions for

2  summary judgment will be due -- just a second, April the

3  12th, together with supporting affidavits and briefs.

4  Responses with supporting affidavits and briefs by May the

5  12th, and --

6    MR. PEARSON (TELEPHONIC):  Good.

7    THE COURT:  -- replies limited to five pages, by

8  May the 27th.  I wonder whether I should have you contact my

9  staff in Pittsburgh and get an argument date that's not on

10  the omnibus date.  I'm not sure that this really needs to be

11  on the omnibus, and it may take some time.

12    MS. BAER:  No, Your Honor, I don't believe Mr.

13  Pearson has the capability to coming to either Wilmington --

14    THE COURT:  Right.

15    MS. BAER:  So he will be on the phone.

16    THE COURT:  Ms. Baer, why don't you contact my

17  staff in Pittsburgh, get an argument date.  It can be a

18  telephonic argument.  Mr. Pearson, Ms. Baer will be in touch

19  with you to let you know when the argument will be.

20    MR. PEARSON (TELEPHONIC):  Okay.

21    THE COURT:  It will obviously be after May 27th,

22  but I can't give you that date right now.

23    MR. PEARSON (TELEPHONIC):  Okay, that's fine.

24    THE COURT:  Do you have Mr. Pearson's phone or

25  other address.

1   MS. BAER: Your Honor, we've been contacting Mr.

2   Pearson by e-mail, and that seems to be working.

3   THE COURT: Is that acceptable, Mr. Pearson?

4   MR. PEARSON (TELEPHONIC): Yes, it is, Your Honor.

5   THE COURT: Okay, that phone argument then, a

6   telephonic argument will be set by my staff in Pittsburgh at

7   a date after May 27th. Okay, thank you.

8   MR. PEARSON (TELEPHONIC): Thank you very much,

9   Your Honor.

10   MS. BAER: Your Honor, with respect to the other

11   objections that are part of this fifth omnibus objection, we

12   will submit an order, Your Honor, because the order we have

13   drafted does not take into account Mr. Pearson's claim and

14   how we're handling it.

15   THE COURT: All right.

16   MS. BAER: Your Honor, the next item on your agenda

17   is item number 12 which is the debtors' eighth omnibus

18   objections to claims. Your Honor, with respect to that

19   objection, the debtor has currently pending 74 claims but one

20   party is responsible for 62 of those and as part of this

21   order that objection to those 62 claims are identical just in

22   different debtor cases. That objection is being withdrawn,

23   and the remaining matters on the fifth omnibus objection some

24   are resolved pursuant to this order and most are continued to

25   the April 25th hearing.

1       THE COURT:  Okay.  That order is entered.

2       MS. BAER:  Thank you, Your Honor.  Your Honor, this

3   takes us to agenda item number 13 which is really a status on

4   the debtors' amended disclosure statement and plan.  Your

5   Honor, as you may recall from last time we were here, we

6   discussed Sealed Air, and it's my understanding that Sealed

7   Air and the Committees who are all parties to the Sealed Air

8   settlement agreement will be filing a motion for approval of

9   the Sealed Air settlement agreement.  This is a renewed

10  motion.  It's my understanding that will be filed so that it

11  can be set up for a status on the May omnibus schedule, not

12  the April omnibus schedule.

13      THE COURT:  All right.

14      MS. BAER:  In addition to that, Your Honor, Sealed

15  Air has contacted the debtors and suggested that perhaps the

16  debtors could actually be signatories to an amended

17  settlement agreement, and we have that information.  We will

18  be reviewing that information.  Your Honor, with respect to

19  the other objections that are still outstanding, non-core

20  confirmation objections to the disclosure statement, we have

21  circulated draft language back to the various outstanding

22  objectors, other than the Libby claimants.  The Libby

23  claimants we have some revised language we're circulating

24  internally with our clients, and then we'll go back out to

25  them, but we're moving that ball along so that those few

remaining non-core confirmation objections can be taken care

of and be settled, you know, prior to anything else.  Your

Honor, that then moves us onto agenda item number 14, which

is a status on case management and estimation.  First of all,

Your Honor, with respect to asbestos property damage, we have

spent a great deal of time going back and forth with the

Asbestos Property Damage Committee.  We have come to an

agreement on a case management order for proceeding with

respect to estimation of asbestos property damage claims.  We

are down to one clause that we have a dispute over that we

would ask Your Honor to make a decision on.  I have the draft

order and will point out its provisions in that one clause.

            THE COURT:  All right.

            MS. BAER:  Your Honor, on Friday we circulated the

drafts to all of the committees, so this is not something

they have not seen before.  We have been circulating

different drafts of this order over the last couple of weeks.

It comes down to one disputed issue in paragraph numbered

(3), and I will point that out first and then we can

certainly go back and talk about the whole structure of the

order.  Your Honor, paragraph number (3) is a provision that

the debtors put into the order to, if you will, put teeth

into the order itself in the event that somebody fails to

comply with the discovery schedule and the other schedules

set out in this case management order.  Obviously, under the

Bankruptcy Rules and the Federal Rules of Civil Procedure any party can come to the Court and ask for sanctions for failure to comply.  The additional clause that the debtors have asked for, that the Asbestos Property Damage Committee would not agree to, is the last two and a half lines of this order which starts with the words "which sanctions could include". It provides which sanctions could include but are not limited to a request by the debtors for disallowance in full for all purposes of a claimant's claim.

THE COURT:  What about combining it with or a request by the claimant for allowance in full of the claimant's claim?

MS. BAER:  Your Honor, the debtors would have no problem with that.  We felt it was very important to notify claimants that we would in fact seek to have their claim disallowed if they did not comply.  With all of the moving parties and moving pieces, we were very concerned about that and the Asbestos Property Damage Committee did not want that language put in.

THE COURT:  Well, I think, you know, you have the right to come back to ask for sanctions, but I don't know at this point in time that I have to say what those sanctions would be.  I mean, if there's a violation of a scheduling order, I think you do have to come in and show why sanctions would be appropriate.  Mr. Baena.

1    MR. BAENA:  Yes, Your Honor.  Your Honor, first,

2  let me just say that paragraph (3) is altogether a compromise

3  because I didn't think we needed to say anything of this sort

4  in this order.  I've never seen one before in a CMO to be

5  honest with you.  And the specific concern I have now about

6  this language is, it really just has a chilling effect on the

7  participation of PD claimants which we discussed in ad

8  nauseam at the last hearing in January.  I don't think this

9  is necessary any more than I would ask Your Honor to put in

10  there that if the debtor fails to comply with the discovery

11  requests maybe the case ought to be converted.  It's just

12  silly to ponder all the possibilities here.  So I would ask

13  that we take it out simply because it has a chilling effect.

14    THE COURT:  I thought I was going far afield.

15  Okay, frankly I don't see that it should have a chilling

16  effect.  You know parties who are subject to a discovery

17  order have to comply and if they don't, you know, parties can

18  ask for sanctions.  It happens pretty regularly.  I don't

19  know that it has to be in this order.  I'm not offended by

20  it.  I don't however agree with the last two lines or two and

21  a half lines in this order.  I don't think that's appropriate

22  unless we also add to it that conversely if the debtor

23  doesn't comply, then the claim may be allowed.  Because, I

24  mean, fair is fair, but I think that last portion should come

25  out.  Whether the rest of it comes out --

1    MR. BAENA:  No, Judge, I agree to everything except
2  that last clause.

3    THE COURT:  All right. I think the last clause
4  should come out.

5    MR. BAENA:  Thank you.

6    MS. BAER:  Thank you, Your Honor, we understand,
7  and I have an alternative order that eliminates the last
8  clause.  That's the only difference in the order.

9    THE COURT:  Okay.  Let me clear this one away then,
10  thank you.  What does the order do specifically since I
11  haven't had a chance to look at it?

12    MS. BAER:  Yes, Your Honor, be happy to take you
13  through it.  Your Honor, the ultimate goal of this order is
14  in paragraph (1) as it sets a hearing on the asbestos PD
15  estimation.  Going through the order, Your Honor, paragraph
16  number (2) essentially sets up Kirkland & Ellis' debtors'
17  counsel and the Asbestos Property Damage claimant's counsel
18  as liaison counsel to assist in the coordination of the
19  effort going forward.  But the establishment of liaison
20  counsel does not limit in any way, shape, or form, or for
21  that matter increase in any way, shape, or form the right to
22  any PD claimant or any claimant for that matter or a party
23  who wants to participate to participate in the estimation
24  process.  Paragraph number (3) we've discussed.  Paragraph
25  number (4) sets time frames for filing expert reports.  It

1  has expert reports due on July 1, 2005.  It also provides
2  that they may supplement it before October 31, 2005.
3  Paragraph number (5) sets up July 1st, 2005 for the
4  preliminary designation of non-expert witnesses and provides
5  that that designation may be supplemented or substituted for
6  other parties by September 1, 2005.  Paragraph number (6)
7  sets a time line for written fact discovery.  It may commence
8  at any time, but the cutoff date is October 1st, 2005.
9  Paragraph number (7), Your Honor, sets a cutoff date for the
10  deposition of non-expert witnesses of October 1, 2005.
11  Paragraph number (8) provides for supplemental expert reports
12  to be filed, if necessary, by October 31, 2005.  Paragraph
13  number (9) sets out the deposition of experts.  Again, they
14  may commence at any time.  They must be concluded by December
15  22nd, 2005.  Paragraph number (10) sets out the deadline of
16  January 31, 2006 for the filing of a final fact witness and
17  expert witness list.  Paragraph number (11) sets forth a
18  pretrial motion cutoff, pretrial motions and similar motions
19  are to be filed by January 30th, 2006.  It sets a briefing
20  schedule so there's no question.  Responses due 21 days after
21  the filing, replies due 7 days thereafter.  Paragraph number
22  (12) sets out February 15th as a proposed date for filing a
23  proposed pretrial order.  Paragraph number (13) sets a
24  pretrial conference date at February blank, depending upon
25  the Court's schedule, Your Honor, obviously sometime after or

1    right about the time of the proposed pretrial order filing of

2    February 15th.   Paragraph number (14) sets out an exchange of

3    exhibits and the like to be done on the date of the pretrial

4    conference.   Paragraph number (15) sets trial briefs as being

5    due 7 days before the trial date.   Paragraph (16), Your

6    Honor, which was a paragraph that we worked on very hard with

7    the Property Damage Committee is a -- it sets out how the

8    Property Damage Committee can obtain non-privilege, non-

9    confidential documents and information with respect to pre-

10   petition settlements and sets out a way to do that without

11   the need for formal discovery.   It does not limit formal

12   discovery.   Any parties are welcome to take formal discovery.

13   This is just a way to get the information to the Committee

14   without the need for that.   Paragraph (17) also deals with

15   pre-petition settlement information in the possession of the

16   debtor, but this is confidential information, and this sets

17   out a procedure that upon notice to the debtors, the debtors

18   will then give 21 days' notice to all parties who are parties

19   to the confidential information being requested, giving them

20   notice that we will produce that information to the Asbestos

21   Property Damage Committee unless they come to court and seek

22   an order preventing us from doing so or limiting it in such a

23   way.   That makes it very clear that if we produce it, it can

24   be used for trial purposes.   It can be given to experts and

25   used and be put into expert reports.   So the burden is on the

1    other parties to the confidential settlement agreements to

2    put limitations on the debtor or the other parties, the

3    Asbestos Committees and the like if they want to do so.   Your

4    Honor, paragraph (19) makes it very clear that by setting

5    forth this procedure it does not reduce or enhance the rights

6    of any parties participating in the estimation to seek formal

7    discovery from any other party.   Paragraph (20) basically

8    says, Your Honor, that we can agree to change the deadlines

9    or upon motion change the deadlines if it is necessary and

10   reasonable.   Paragraph (21)'s the retention of jurisdiction,

11   and paragraph (22) gives us the right to handle discovery

12   disputes to the extent they need to be handled with the Court

13   telephonically rather than having to set up for a formal in-

14   person hearing.   Your Honor, we worked very diligently with

15   the Asbestos Property Damage Committee to work on these

16   dates.   I think everybody would have hoped we could have done

17   it more quickly in terms of getting the estimation process

18   completed, but when looking into the discovery and the like,

19   these are the dates we ended up with.   Your Honor, this has

20   nothing to do with and does not set forth nor prohibit the

21   debtor in any way with respect to regular gateway objections

22   to asbestos property damage claims.   The debtors are working

23   through that process.   They sent out all the supplemental

24   notices that were necessary with respect to claims for which

25   there was improper documentation or insufficient

1  documentation, and the debtors have every intention of

2  getting all gateway objections on file as soon as possible

3  and continuing that process while this discovery process is

4  going on.  And with that, Your Honor, we would ask that Your

5  Honor set the times and enter the order.

6          THE COURT:  All right, well, I have a couple of

7  concerns.  First of all, with respect to the exchanging of

8  copies in connection with the pretrial conference date, that

9  may work for you, but if there is some objections that I need

10  to hear about or am going to be told about it doesn't work

11  for me, because I can't take a look at these -- what may be

12  thousands of pages of documents in that time frame.  So, I

13  think that the exhibits ought to be attached to some form of

14  a pretrial statement and filed or -- when I say "filed", at

15  least delivered in paper copy form to me in Pittsburgh.  I

16  don't know that you'd actually need to file all these

17  exhibits.  In fact, you probably don't want to have to file

18  all of them, but at least delivered in binder fashion.  And I

19  would also like from the company by stipulation with respect

20  to the admissibility of any exhibits that are going to be

21  stipulated to or an indication of what the objection is going

22  to be otherwise.  And I want it before the pretrial

23  conference if at the pretrial conference you intend to

24  address objections.  If you don't intend to address

25  objections then we need another paragraph in here that sets a

1   date for doing that and a separate time frame perhaps for the

2   hearing.  With respect to --

3           MS. BAER:  Your Honor, how soon before the pretrial

4   conference would you want all that submitted?

5           THE COURT:  Well, actually, I prefer them and the

6   trial briefs a month before the pretrial because I don't know

7   at this point what the issues are going to be.  Or at least

8   three weeks, if not a month, because somewhere in there I'm

9   undoubtedly going to overlap with the omnibus hearings and

10  that will make it difficult to address these issues, but, you

11  know, you may get to the point where you've narrowed

12  everything down to the point where what seems to me right now

13  to be something I need may not be necessary later.  So, maybe

14  as an alternative suggestion, we could set up a process that

15  says three weeks before the pretrial for both exhibits and

16  briefs, but also may be set up another pretrial date that's

17  not currently in here, maybe a month before that would be

18  due, so that if there is some change, and in fact have

19  narrowed the issues, and I don't need that much time then we

20  could address that somewhere.

21          MS. BAER:  Okay.

22          THE COURT:  Okay, that's both briefs and the

23  documents I would like earlier.  I understand that there are

24  no responses allowed to the briefs, and so that does help a

25  bit, but I also know that every time I tell you no responses

1   I get motions asking me to let you file replies anyway.  So,

2   in this instance, don't ask.  It's not going to be granted.

3   If you want that opportunity build it into the order now and

4   limit them to something reasonable.

5          MS. BAER:  Understood.

6          THE COURT:  With respect to the pretrial conference

7   date, I haven't set dates in February of next year, so at the

8   moment I can't give you those dates.  I will talk to Mr.

9   Joseph, the Chapter 13 Trustee, to see whether he has picked

10  any dates that far in advance.  I think it's unlikely.  So,

11  maybe what we can simply say is it will be held on whatever

12  the omnibus hearing date is in February 2006, if you want

13  this order entered before then -- I mean before I know the

14  dates.  Or you can say it will be on a date to be determined

15  in February if you'd like, but whatever.  Otherwise, I just

16  don't think I'm going to be able to give you that specific

17  date now.

18         MS. BAER:  Understood, Your Honor.

19         THE COURT:  And with respect to a trial date, I'm

20  happy to give you a trial date sometime in 2006, but how do I

21  know how much time you're going to need?

22         MS. BAER:  It's difficult, Your Honor, I understand

23  right now.  We don't know how may expert reports there will

24  be.  We don't know how many issues there will be.

25         THE COURT:  So, why don't you folks get together

1    maybe -- Well, let's see.  I don't think you're really going

2    to know much until about October under this order because a

3    lot of your things are due in September and October by

4    supplements, and I'm just not sure if before then that you're

5    going to have an expectation of how long the trial is going

6    to be or have you contacted experts already?

7         MS. BAER:  We have already been working with

8    experts, Your Honor, on our side.  I'm not sure about the

9    asbestos property damage side.

10        THE COURT:  Mr. Baena?

11        MR. BAENA:  We have . . . (microphone not

12   recording).

13        THE COURT:  Okay, then, do you have any idea, both

14   of you, at this point how many witnesses altogether, how much

15   time I need for trial?

16        MR. BAENA:  At this point . . . (microphone not

17   recording).

18        THE COURT:  Then my suggestion is that we strike

19   that paragraph instead of giving the trial date now and put

20   on another pretrial conference date maybe in November.  The

21   purpose of which will be to try to see if we can set dates

22   for trial.

23        MS. BAER:  Put it on the November omnibus, Your

24   Honor?

25        THE COURT:  Yes.  And specifically put on the

1   agenda that the purpose is to try to set dates for trial and

2   maybe between now and then you'll have a better estimate.

3           MS. BAER:  That makes sense, Your Honor.  We can do

4   that.

5           THE COURT:  Mr. Baena?

6           MR. BAENA:  (Microphone not recording.)

7           THE COURT:  Okay.

8           MS. BAER:  Sure, we have them every month.

9           MR. BAENA:  All discovery is over in December, so

10  --

11          THE COURT:  That's fine.  The December dates are

12  December 19th, but the discovery ends, I think on the --

13          MR. BAENA:  (Microphone not recording.)

14          THE COURT:  All right, then why don't you put it on

15  the December list for a pretrial.

16          MS. BAER:  We will do that, Your Honor.

17          THE COURT:  All right.  Then you'll modify this

18  case management order?

19          MS. BAER:  We'll modify it, Your Honor, and we'll

20  submit it on a certification of counsel after we're in

21  complete agreement on the language.

22          THE COURT:  All right.  Does anyone see anything

23  else that you need to address in terms of the scheduling

24  issues?  No?  All right.

25          MS. BAER:  I don't think so, Your Honor.  Then,

1    Your Honor, the last item on the agenda's report on the

2    status of where we are on personal injury estimation.  Your

3    Honor, we have had numerous conversations with the Asbestos

4    Personal Injury Committee.  We have circulated drafts of both

5    a case management order and a questionnaire/proof of claim

6    form.  Your Honor, we have determined that while I think

7    we've made great progress there are certainly some key and

8    substantial issues outstanding.  In a conference we had on

9    Friday with the Asbestos Personal Injury Committee that was

10   also attended by the Equity Committee, we agreed to proceed

11   as follows, Your Honor:  The debtors would like to file a

12   motion by April 18th which asks for approval of the case

13   management order and the questionnaire.  The Asbestos

14   Personal Injury Committee will have until May 18th to file a

15   response where they will address the various issues that they

16   have with the debtors' proposed CMO and questionnaire.  Our

17   reply will be due on May 31st, and we would like a hearing

18   date at the first availability in June to have the Court hear

19   the outstanding issues with respect to specifically the

20   questionnaire/proof of claim form.

21        THE COURT:  Okay, when you're contacting my

22   chambers about the Pearson matter, ask for a date in June

23   about this matter, and we'll do it in Pittsburgh on a

24   separate date rather than on an omnibus date.

25        MS. BAER:  That's fine, Your Honor, thank you.

1  And, Your Honor, if you'd like I can submit a separate order

2  to the Court setting forth this schedule?

3            THE COURT:  That's fine.

4            MS. BAER:  Your Honor, that concludes the debtors'

5  items on the agenda for today.

6            THE COURT:  Any housekeeping matters?  All right,

7  we're adjourned.  Thank you.

8            MS. BAER:  Thank you, Your Honor.

9            ALL:  Thank you.

10            (Whereupon at 1:38 p.m. the hearing in this matter

11  was concluded for this date.)

12

13

14

15

16

17

18            I, Elaine M. Ryan, approved transcriber for the

19  United States Courts, certify that the foregoing is a correct

20  transcript from the electronic sound recording of the

21  proceedings in the above-entitled matter.

22

23  *Elaine M. Ryan*                          3-24-05
   Elaine M. Ryan

24  2801 Faulkland Road
   Wilmington, DE 19808
   (302) 683-0221

25